# **EXHIBIT M**

**(Canadian Monitor's Response to Chapter 15 Petitions
re EMEA Debtors Other than NNUK)**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 15 |
| NORTEL NETWORKS UK LIMITED, *et al.*,[1] | Case No. 09-11972 (KG) |
| Debtors in a Foreign Proceeding. | (Jointly Administered) |

**RESPONSE OF THE MONITOR OF THE CANADIAN DEBTORS TO THE VERIFIED CHAPTER 15 PETITIONS FOR RECOGNITION OF FOREIGN PROCEEDINGS AND RELATED RELIEF WITH RESPECT TO THE EMEA DEBTORS**

Ernst & Young Inc., the court-appointed monitor (the "**Monitor**") and authorized foreign representative of Nortel Networks Corporation and certain of its direct and indirect subsidiaries, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation (collectively, the "**Canadian Nortel Debtors**"), by and through its undersigned counsel, hereby files this Response (the "**Response**") to the *Verified Chapter 15 Petitions for Recognition of Foreign Proceedings and Related Relief with Respect to the EMEA Debtors* (the "**Petitions**") [Docket No. 44], and respectfully submits as follows:

## BACKGROUND

1.      On January 14, 2009, insolvency proceedings were commenced by the Canadian Nortel Debtors under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, before the Ontario Superior Court of Justice (Commercial List) and by Nortel

---

[1] The Debtors in these chapter 15 cases are: Nortel Networks UK Limited, Nortel GmbH, Nortel Networks (Austria) GmbH, Nortel Networks (Ireland) Limited, Nortel Networks AB, Nortel Networks B.V., Nortel Networks Engineering Service Kft, Nortel Networks France S.A.S., Nortel Networks Hispania, S.A., Nortel Networks International Finance & Holding B.V., Nortel Networks N.V., Nortel Networks OY, Nortel Networks Polska Sp. Z.o.o., Nortel Networks Portugal S.A., Nortel Networks Romania SRL, Nortel Networks S.A., Nortel Networks S.p.A., Nortel Networks Slovensko, s.r.o., and Nortel Networks s.r.o.

Networks Inc. and certain of its direct and indirect US subsidiaries (the "**US Debtors**") under title 11 of the United States Code (as amended, the "**Bankruptcy Code**"). On the same date, the High Court of Justice of England and Wales issued orders appointing the Administrators[2] for Nortel Networks UK Limited ("**NNUK**") and certain of its affiliates (the "**EMEA Debtors**") under the UK's *Insolvency Act 1986* (the "**English Proceedings**").

2.  On June 26, 2009, NNUK sought and received recognition of the English Proceedings pertaining to NNUK as foreign main proceedings under chapter 15 of the Bankruptcy Code. On October 18, 2010, the EMEA Debtors commenced these chapter 15 cases by filing the Petitions in which they seek recognition of the English Proceedings pertaining to the EMEA Debtors as foreign main proceedings within the meaning of section 1502(4) of the Bankruptcy Code to: "(i) promote full cooperation between [the EMEA Debtors, NNUK, the Canadian Debtors and the US Debtors] and the various courts in which their respective insolvency proceedings are pending; (ii) protect the EMEA Debtors' assets and interests in the US; and (iii) ensure that the comprehensive cross-border restructuring of the various Nortel debtors progresses in an orderly and efficient way." Petition at ¶ 14.

## RESPONSE

3.  In the Petition, the Administrators of the EMEA Debtors assert that the English Proceedings are entitled to recognition as foreign main proceedings within the meaning of section 1502(4) of the Bankruptcy Code, because they are pending in the EMEA Debtors' center of main interests ("**COMI**"). Petition at ¶ 16.

---

[2] The Administrators in the English Proceedings for all of the EMEA Debtors, with the exception of Nortel Networks (Ireland) Limited are: Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, and Stephen John Harris. The Administrators in the English Proceedings for Nortel Networks (Ireland) Limited are: Alan Robert Bloom and David Martin Hughes.

4. In support of that position, the EMEA Debtors rely upon the Declaration of Alan Robert Bloom (the "**Bloom Declaration**"), one of the Administrators of the EMEA Debtors in the English Proceedings, attached as Exhibit A to the Transmittal Declaration of Edwin J. Harron (the "**Transmittal Declaration**"). The Bloom Declaration in turn relies on the witness statements of Sharon Lynette Rolston (the "**Rolston Statements**") and Michel Clément (the "**Clément Statements**") attached as Exhibits I and II, respectively, to support the Administrators' position that the COMI for each of the EMEA Debtors is England.

5. At his deposition on December 16, 2010, at which he testified as a representative witness on behalf of the Administrators under Rule 30(b)(6) and in his personal capacity, Mr. Bloom agreed that, unlike the Administrators, Ms. Rolston and Mr. Clément had a historical perspective on how the Nortel group was managed before the administration filing. *See* Bloom Dep. Tr. at 277:19-23, attached hereto as Exhibit A. As Mr. Bloom acknowledged, the Rolston Statements and Clément Statements were presented to the English court in support of the motion to place the EMEA Debtors into administration in England. *See* Bloom Dep. Tr. at 277:24-278:4.

6. Mr. Bloom testified at this deposition that, to the best of his knowledge and information, the Rolston Statements and Clément Statements remain true and correct, and that he has "no reason to believe that anything has changed." *See* Bloom Dep. Tr. at 49:17-50:4, 107:9-107:17, 278:21-279:9.

7. In her Witness Statement dated January 14, 2009, Ms. Rolston, Director and Chief Financial Officer, EMEA, states that the center of main interest of each of the EMEA Debtors was in England because: "(a) senior management for EMEA is largely located in England at the Company's Maidenhead campus; (b) the senior management, which is largely located in

3

Maidenhead, make the vast majority of significant decisions in respect of the operations of the EMEA Companies; (c) the senior management of all key primary functions (i.e. sales, finance, treasury, legal and human resources) required for the operation of the EMEA Region are located in England; (d) significant decisions in relation to sales and dealings with customers are largely made in England; (e) obligations to suppliers are subject to approval processes conducted and managed in England, a process of which the majority of suppliers are thought to be aware; (f) management, supervision and decision-making in relation to taxation of the EMEA Group is made in England; (g) finance and control functions are run from England; (h) human resources for EMEA are supervised and run from England; (i) decisions in relation to settlement of intercompany accounts are made by the EMEA Treasury team in England. Those terms are determined in accordance with global and EMEA Region procurement policies and are authorised by the individual with the relevant authority level (as determined by the nature of the procurement transaction); (j) all EMEA senior legal decisions are made in England; (k) all matters in relation to compliance, ethics and corporate security for the EMEA Region are dealt with and managed out of England; (l) the EMEA leasehold portfolio is managed through a relationship corporate real estate team located in England; and (m) the treasury and banking functions for the EMEA Companies are managed out of England." Rolston Witness Statement at ¶¶ 15, 111(b).

8. Ms. Rolston also stated that "[t]he acquisition by NNL in 1990 of STC plc, a major UK public company, significantly increased the Nortel Group's UK presence including both a large EMEA customer base and a significant technological base. The UK business then became the largest operation in the EMEA Region as well as the centre of operations, making the vast majority of significant decisions for the EMEA Companies and performing head office

functions." Rolston Witness Statement ¶ 30. At his deposition, Mr. Bloom confirmed he believes that to be a true statement. *See* Bloom Dep. Tr. at 281:3-20.

9. Ms. Rolston further stated that "[t]he strength of central management personnel and its business segment coverage means England is the management centre for EMEA." Rolston Witness Statement ¶ 32. At his deposition, Mr. Bloom confirmed he believes that to be a true statement. *See* Bloom Dep. Tr. at 281:21-282:5.

10. In her January 14, 2009 Witness Statement, Ms. Rolston also stated that "[t]he overall global strategy for the Nortel Group is set at a very high level of generality by the board of directors of NNL and that Chief Executive Officer ("**CEO**") and Chief Financial Officer ("**CFO**") in Canada." At his deposition, Mr. Bloom confirmed he believes that to be an accurate statement. *See* Bloom Dep. Tr. at 282:6-16.

11. Ms. Rolston also stated that "[t]he EMEA Senior Management operates with a large degree of autonomy from Canada, setting all policies, procedures, budgets, targets and operational matters for the EMEA Region which are disseminated to the EMEA Companies which are required to operate within those instructions." Rolston Witness Statement ¶ 114. At his deposition, Mr. Bloom confirmed he believes that to be an accurate statement. *See* Bloom Dep. Tr. at 282:17-283:2.

12. The EMEA Debtors bear the burden of proving that the English Proceedings are foreign main proceedings within the meaning of section 1502 of the Bankruptcy Code and that the Petitions meet the requirements of section 1515 of the Bankruptcy Code, including that the EMEA Debtors' center of main interest is in England.

13. On the basis of the facts above, in particular, the testimony of Alan Bloom at his deposition on December 16, 2010, and the Rolston Statements and Clément Statements on which

Mr. Bloom relies and which he testified remain true and accurate, the Monitor supports the recognition of the EMEA Debtors' English Proceedings as foreign main proceedings. However, should the Court determine that an evidentiary hearing on the matter is appropriate, the Monitor reserves its rights to attend and participate.

Dated: December 30, 2010  **BUCHANAN INGERSOLL & ROONEY PC**
      Wilmington, Delaware

/s/   Mona A. Parikh
Mary F. Caloway (No. 3059)
Mona A. Parikh (No. 4901)
1105 North Market Street
Suite 1900
Wilmington, Delaware 19801
Telephone: (302) 552-4200
Facsimile: (302) 552-4295
Email: mary.caloway@bipc.com
       mona.parikh@bipc.com

- and -

Ken Coleman
Andrew Rhys Davies
Lisa Kraidin
**ALLEN & OVERY LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 610-6300
Facsimile: (212) 610-6399
Email: ken.coleman@allenovery.com
       andrew.rhys.davies@allenovery.com
       lisa.kraidin@allenovery.com

*Counsel to Ernst & Young Inc., as Monitor and Foreign Representative of the Canadian Nortel Group*

# **<u>EXHIBIT A</u>**

*IN RE: NORTEL NETWORKS INC., et al.*

*ALAN ROBERT BLOOM*
*December 16, 2010*
*CONFIDENTIAL*



**Ellen Grauer**
**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 95671.TXT*
*Min-U-Script® with Word Index*

IN RE: NORTEL NETWORKS INC., et al.　　　CONFIDENTIAL　　　ALAN ROBERT BLOOM
December 16, 2010

### Page 1

```
 1   IN THE UNITED STATES BANKRUPTCY COURT
 2   FOR THE DISTRICT OF DELAWARE
     -------------------------------- x
 3   In re
 4   NORTEL NETWORKS INC., et al.,
 5                      Debtors.
 6   Chapter 11
 7   Case No. 09-10138 (KG)
 8   (Jointly Administered)
     -------------------------------- x
 9
10   * * * C O N F I D E N T I A L * * *
11
                450 Park Avenue
12              New York, New York
13              December 16, 2010
                8:30 a.m.
14
15
16          DEPOSITION of ALAN ROBERT BLOOM,
17   taken pursuant to Notice, held at the offices
18   of Cleary Gottlieb Steen & Hamilton, LLP.
19   before Fran Insley, a Notary Public of the
20   States of New York and New Jersey.
21
22
23        ELLEN GRAUER COURT REPORTING CO. LLC
             126 East 56th Street, Fifth Floor
24                New York, New York 10022
                      212-750-6434
25                    Ref: 95671
```

### Page 2

```
 1   A P P E A R A N C E S:
 2
 3   CLEARY GOTTLIEB STEEN & HAMILTON, LLP.
 4   Attorneys for Debtors
 5        One Liberty Plaza
          New York, New York  10006-1470
 6
     BY:  LUKE A. BAREFOOT, ESQ.
 7             -and-
          MEGAN FLEMING-DELACRUZ, ESQ.
 8             -and-
          LISA M. SCHWEITZER, ESQ.
 9        Phone:  (212) 225-2829
          Fax:    (212) 225-3999
10        lbarefoot@cgsh.com
11
12
13   YOUNG CONAWAY STARGATT & TAYLOR, LLP.
14   Attorneys for Witness
15        The Brandywine Building
          1000 West Street
16        Wilmington, Delaware 19801
17   BY:  JOHN T. DORSEY, ESQ.
               -and-
18        EDWIN H. HARRON, ESQ.
          Phone:  (302) 571-6712
19        Fax:    (302) 576-3401
          jdorsey@ycst.com
20
```

### Page 3

```
 1   A P P E A R A N C E S (Cont'd):
 2
 3   AKIN GUMP STRAUSS HAUER & FELD, LLP.
 4   Attorneys for Unsecured Creditors Committee
 5        One Bryant Park
          New York, New York 10036
 6
     BY:  ABID QURESHI, ESQ.
 7             -and-
          BRAD KAHN, ESQ.
 8        Phone:  (212) 872-1000
          Fax:    (212) 872-1002
 9        aqureshi@akingump.com
10
11
12   ALLEN & OVERY, LLP
13   Attorneys for Canadian Monitor
14        1221 Avenue of the Americas
          New York, New York 10020
15
     BY:  ANDREW RHYS DAVIES, ESQ.
16             -and-
          LAURA R. HALL, ESQ.
17        Phone:  (212) 610-6300
          Fax:    (212) 610-6399
18        andrew.rhys.davies@allenovery.com
```

### Page 4

```
 1   A P P E A R A N C E S (Cont'd):
 2
 3   MORRIS, NICHOLS ARSHT & TUNNELL, LLP.
 4   Attorneys for US Debtors
 5        1201 North Market Street
          Wilmington, Delaware 19801
 6
     BY:  DONNA L. CULVER, ESQ.
 7        Phone:  (302) 351-9208
          Fax:    (302) 425-4672
 8        dculver@mnat.com
 9
10   ALSO PRESENT:
11   HERBERT SMITH, LLP.
12   Attorneys for Witness
13        Exchange House Primrose Street
          London, EC2A 2HS
14
     BY:  JOHN WHITEOAK, ESQ.
15             -and-
          KEVIN LLOYD, ESQ.
16
17        JEFFREY S. HYLAND, Capstone Advisory Group
18        FRED MYERS, Goodmans
19        LEE CHANG, Jefferies & Company, Inc.
20        DAN MACOM, Videographer
```

Case 09-10138-MFW    Doc 6024-15    Filed 07/22/11    Page 11 of 20

IN RE: NORTEL NETWORKS INC., et al.          CONFIDENTIAL          ALAN ROBERT BLOOM
                                                                    December 16, 2010

Page 13

 1  MS. SCHWEITZER: Lisa Schweitzer
 2  from Cleary, Gottlieb, Steen & Hamilton.
 3  MR. QURESHI: Abid Qureshi and Brad
 4  Kahn from Akin Gump Strauss Hauer & Feld
 5  on behalf of the U.S. creditors.
 6  MR. RHYS DAVIES: Andrew Rhys Davis
 7  and Laura Hall from Allen & Overy for the
 8  Canadian Monitor.
 9  MR. HARRON: Ed Harron from Young
10  Conaway for the administrators.
11  MR. WHITEOAK: John Whiteoak from
12  Herbert Smith for the administrators.
13  MR. LLOYD: Kevin Lloyd, from
14  Herbert Smith.
15  MR. DORSEY: John Dorsey from Young
16  Conaway and I will be defending the
17  deposition today.
18  MR. MEYERS: Fred Meyers of Goodmans
19  for the Canadian Monitor.
20  MR. CHANG: Leo Chang, Jeffries &
21  Company for the U.S. Creditors Committee.
22  MR. HYLAND: Jeff Hyland, Capstone
23  Advisory Group for U.S. Creditors
24  Committee.
25

Page 14

 1  ALAN ROBERT BLOOM,
 2  having duly affirmed before the
 3  Notary Public, was examined and
 4  testified as follows:
 5
 6  EXAMINATION BY
 7  MR. BAREFOOT:
 8  Q. Good morning, Mr. Bloom.
 9  A. Good morning.
10  Q. My name is Luke Barefoot as I
11  indicated this morning when I introduced
12  myself. I'm from Cleary Gottlieb and I
13  represent the U.S. debtors.
14     Could I ask you to state your
15  address for the record, please?
16  A. One More London Place, London SE1UK.
17  Q. Have you ever been deposed before,
18  Mr. Bloom?
19  A. No.
20  Q. I'm going to explain the deposition
21  process and lay down some ground rules. If
22  with each rule you could just indicate your
23  agreement with.
24     The first is, as the court reporter
25  just indicated, you are under oath and you

Page 15

 1  BLOOM - CONFIDENTIAL
 2  understand that you have an obligation to
 3  testify truthfully this morning?
 4  A. Yes.
 5  Q. If you could, please, for purposes
 6  of transcription, answer verbally rather than
 7  saying ah-ha or uh-uh. Use yes or no. That's
 8  difficult to record and also avoid shaking your
 9  head yes or no. Answer verbally with a yes or
10  no.
11  A. Yes.
12  Q. If you could, please, wait until I'm
13  finished with the question to begin your answer
14  and I'll do the same, waiting until you've
15  finished your answer before I begin the next
16  question, otherwise it's also difficult for the
17  court reporter to take down both of our lines
18  of questioning if they are overlapping.
19  A. Yes.
20  Q. If you don't understand a question
21  or anything I say is unclear, please let me
22  know and I'll try to rephrase it in a way that
23  makes more sense.
24     If you do answer a question, I'll
25  assume that you've understood the question.

Page 16

 1  BLOOM - CONFIDENTIAL
 2  A. Yes.
 3  Q. If at any time today you would like
 4  to take a break, that's perfectly fine, just
 5  let me or let your counsel know. We will be
 6  happy to take a recess. The only thing I would
 7  ask is if there is a question pending, you
 8  finish the question before we adjourn.
 9  A. Yes.
10  Q. There will be a variety of
11  objections this morning from your counsel. In
12  fact, I bet most of what I say your counsel
13  will find objectionable in one form or another.
14  Those are just objections mainly to form. They
15  don't preclude you from answering, so if there
16  is an objection to form, please go ahead and
17  let your counsel get that objection lodged on
18  the record, but then proceed to answer the
19  question to the extent you can.
20  A. Understood.
21  Q. If during the course of the
22  deposition you remember something that is
23  related to an earlier answer that you would
24  like to clarify or supplement, please just let
25  me know or let your counsel know and we will

Page 49

1  BLOOM - CONFIDENTIAL
2  A. Yes.
3  Q. So going forward, if I refer to
4  those collectively as the Rolston witness
5  statements, you'll understand I'm referring to
6  them together?
7  A. Yes.
8  Q. As for Mr. Clement, that refers to
9  the witness statements also dated January 14,
10 2009, submitted with respect to Nortel Networks
11 France SAS and Nortel Networks SA?
12 A. Yes.
13 Q. So again, if I can refer
14 collectively to those two as the Clement
15 witness statements?
16 A. Yes.
17 Q. And it remains the case sitting here
18 today that you believe that the information
19 contained in those exhibits, the Clement
20 witness statement and the Rolston witness
21 statement remains true and correct to the best
22 of your knowledge, information and belief?
23 A. I know of no reason to believe that
24 anything has changed.
25 Q. So then they remain correct to the

Page 50

1   BLOOM - CONFIDENTIAL
2   best of your knowledge, information and belief?
3   A.  To the best of my knowledge,
4   information and belief.
5   Q.  If I could then ask you to turn to
6   what's collectively been marked as Exhibit 3,
7   the interrogatory responses and verifications.
8   Do you recognize these documents?
9   A.  Yes.
10  Q.  And these documents were submitted
11  on behalf of the administrators and the EMEA
12  debtors, correct?
13  A.  Yes.
14  Q.  Who from the administrators was
15  involved in gathering the information that is
16  relayed in these interrogatory responses?
17  A.  Three of us, Alan Bloom, Chris Hill
18  and Steven Harris.
19  Q.  Were there any other individuals
20  from Ernst & Young acting under your
21  supervision that assisted with that process?
22  A.  I have no doubt there must have been
23  some people, but I don't have a list of people
24  that would have assisted those three.
25  Q.  Starting with yourself, can you

Page 107

1  BLOOM - CONFIDENTIAL
2  petition, you believed that they were true and
3  correct, to the best of your knowledge and
4  belief?
5  A. When I signed that, I had no reason
6  to believe that they were not correct.
7  Q. I'm not trying to mince words here,
8  but that's actually not what your verification
9  says. It says you believe the allegations are
10  true and correct to the best of your knowledge,
11  information and belief, right?
12  A. I believe them to be correct and
13  true.
14  Q. And by them, you mean the
15  allegations in the Rolston witness statement
16  and the Clement witness statement?
17  A. Yes.
18  MR. BAREFOOT: I would like to have
19  marked as Exhibit 7 a document that has
20  been produced bearing Bates stamp Nortel
21  underscore admin 3207 to 3268.
22  (Whereupon 3207 to 3268 was marked
23  Exhibit 7 for identification as of this
24  date.)
25  Q. Do you recognize this document as

```
                                          Page 277
 1    BLOOM - CONFIDENTIAL
 2    administrator. Do you recall that testimony?
 3  A. Yes.
 4  Q. Is it your position that it was
 5    somehow wrongful for the Canadian CEO to want
 6    to talk to employees worldwide following the
 7    group's bankruptcy and administration filing?
 8  A. No.
 9  Q. The examples that you gave, though,
10    were examples of what you characterize as
11    interference after the administration filing,
12    correct?
13  A. Yes.
14  Q. Now, you attached to your
15    October 18, 2010 declaration the witness
16    statements of Sharon Rolston and Michel
17    Clement, correct?
18  A. Yes.
19  Q. Isn't it right that unlike you,
20    Mr. Clement and Ms. Rolston have a historical
21    perspective in terms of how the Nortel Group
22    was managed before the administration?
23  A. Yes.
24  Q. And those are the witness statements
25    that were submitted to the English court in
```

Page 278

1    BLOOM - CONFIDENTIAL
2    support of the motion to appoint you
3    administrator?
4    A. Yes.
5    Q. And the English court's ruling that
6    England was the COMI for the EMEA debtors
7    enabled it to appoint you administrator of each
8    of those companies, correct?
9    A. Yes.
10   Q. And that single English
11   administration facilitated the ability to
12   conduct a coordinated sale of the Nortel
13   businesses around the world; would you agree
14   with that?
15   A. That was one of the advantages of
16   the COMI, yes.
17   Q. And the ability to conduct a
18   coordinated sale has benefited creditors
19   generally; would you agree with that?
20   A. Yes.
21   Q. Now, you've placed before the U.S.
22   Bankruptcy Court the Rolston and Clement
23   witness statements. Correct?
24   A. Yes.
25   Q. And you believe they are true and

Page 279

1  BLOOM - CONFIDENTIAL
2  correct?
3  A.  I have no reason to believe that
4  they are not true or correct.
5  Q.  Do you believe that they are true
6  and correct to the best of your knowledge and
7  information?
8  A.  To the best of my knowledge and
9  information they are true and correct.
10 Q.  Could I take you back to Exhibit 2
11 to your deposition, which is your witness
12 statement with the attached Rolston and Clement
13 witness statements.
14 A.  It wasn't my witness statement.  Are
15 we talking about that one?
16 Q.  No, it was Exhibit 2.  It was your
17 declaration which attached the two witness
18 statements.
19 A.  Thank you.  Okay.
20 Q.  Could I take you, first of all, to
21 paragraph 15 of Ms. Rolston's first witness
22 statement.
23    MR. LLOYD: One, five?
24    MR. RHYS DAVIES: One, five.
25 A.  I'm struggling with the pages here.

Page 281

1    BLOOM - CONFIDENTIAL
2  A.  Yes.
3  Q.  You'll see that Ms. Rolston says
4  that, "The acquisition by NNL in 1990 of
5  STCPLC, a major UK public company,
6  significantly increased the Nortel group's UK
7  presence, including both a large EMEA customer
8  base and a significant technological base."
9     And then Ms. Rolston says, "The UK
10 business then became the largest operation in
11 the EMEA region as well as the center of
12 operations making the vast majority of
13 significant decisions for the EMEA companies
14 and performing head office functions."
15    Sir, do you see that statement by
16 Ms. Rolston?
17 A.  Yes.
18 Q.  Isn't that a true statement?
19 A.  I believe that to be a true
20 statement.
21 Q.  I want to refer you next to
22 paragraph 32 of Ms. Rolston's statement where
23 she says, "The strength of central management
24 personnel and its business segment coverage
25 means England is the management center for

Page 282

1    BLOOM - CONFIDENTIAL
2    EMEA."
3       Is that a true statement?
4  A. I believe that to be a true
5    statement.
6  Q. I want to refer you next to
7    paragraph 109 of Ms. Rolston's witness
8    statement. Here Ms. Rolston says, "The overall
9    global strategy for the Nortel group is set at
10   a very high level of generality by the Board of
11   Directors of NNL and the chief executive
12   officer, CEO, and chief finance officer, CFO,
13   in Canada."
14      Sir, is that an accurate statement?
15 A. I believe that to be an accurate
16   statement.
17 Q. Next I want to refer you to
18   paragraph 114 where Ms. Rolston says, "The EMEA
19   senior management operates with a large degree
20   of autonomy from Canada setting all policies,
21   procedures, budgets, targets and operational
22   matters for the EMEA region which are
23   disseminated to the EMEA companies which are
24   required to operate within those instructions."
25      Sir, is that an accurate statement?

Page 283

1   BLOOM - CONFIDENTIAL
2  A. Yes.
3  Q. Next I want to refer you, sir, to
4   paragraph 118 of Ms. Rolston's witness
5   statement where Ms. Rolston concludes,
6   "Therefore, all the key functions required for
7   the operation of the EMEA region are located in
8   and carried out from England. In summary, the
9   local operations of the EMEA companies consist
10  largely of implementing the strategic and
11  operational decisions taken in Maidenhead."
12      Sir, is that an accurate statement?
13 A. It is an accurate statement as at
14  January 2009 and reflected in the submission in
15  October 2010.
16 Q. What are you referring to when you
17  refer to the October 2010 submission?
18 A. As we discussed in earlier testimony
19  there, what we have established subsequent to
20  January 2009 is that a considerable amount of
21  the decision-making process in relation to EMEA
22  was driven out of North America.
23 Q. This paragraph 118 doesn't say that,
24  sir, does it?
25 A. Because this is representing a