## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
----------------------------------------------------X
                                                    :
In re                                               :     Chapter 11
                                                    :
Nortel Networks Inc., et al.,¹                      :     Case No. 09-10138 (KG)
                                                    :
                            Debtors.                :     Jointly Administered
                                                    :
                                                    :     Hearing date:
                                                    :     Beginning September 19, 2011 at 9:30 a.m. ET
                                                    :     Objection date:
                                                    :     August 19, 2011 at 4:00 p.m. ET
----------------------------------------------------X
```

## JOINT OBJECTION AND MOTION TO DISMISS CLAIMS OF
## NORTEL NETWORKS S.A. (NNSA) AND ITS FRENCH LIQUIDATOR

| | |
|---|---|
| CLEARY GOTTLIEB STEEN & HAMILTON LLP | AKIN GUMP STRAUSS HAUER & FELD LLP |
| One Liberty Plaza | One Bryant Park |
| New York, New York 10006 | New York, New York 10036 |
| Telephone: (212) 225-2000 | Telephone: (212) 872-1000 |
| Facsimile: (212) 225-3999 | Facsimile: (212) 872-1002 |
| | |
| MORRIS, NICHOLS, ARSHT & TUNNELL LLP | RICHARDS, LAYTON & FINGER, P.A. |
| 1201 North Market Street | One Rodney Square |
| P.O. Box 1347 | 920 North King Street |
| Wilmington, Delaware 19801 | Wilmington, Delaware 19801 |
| Telephone: (302) 658-9200 | Telephone: (302) 651-7700 |
| Facsimile: (302) 658-3989 | Facsimile: (302) 651-7701 |
| | |
| *Counsel for the Debtors and Debtors in Possession* | *Counsel for the Official Committee of Unsecured Creditors* |

---

¹      The U.S. Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.............................................................................................. iv

SUMMARY CHARTS OF NNSA's CAUSES OF ACTION ................................................ xii

PRELIMINARY STATEMENT .......................................................................................1

JURISDICTION AND VENUE .......................................................................................5

RELEVANT PROCEDURAL HISTORY ...........................................................................5

    A.    English Proceedings of the EMEA Debtors .......................................................5

    B.    EMEA Claims Process ...................................................................................8

NNSA'S AMENDED PROOFS OF CLAIM.......................................................................9

    A.    Factual Predicate: Five Alleged Factual Patterns Underlie NNSA's Claim .........9

        1.    Transfer Pricing....................................................................................9

        2.    "Project Swift" and the February 2008 Repayment ...............................11

        3.    Unspecified Pre-Petition Business Sales ................................................12

        4.    Contingent Tax Liability........................................................................13

        5    FSD Proceedings .................................................................................13

    B.    Causes of Action Pled by NNSA:  Roadmap ...................................................14

ARGUMENT..............................................................................................................17

I.     NNSA'S CLAIMS MUST BE TESTED UNDER FEDERAL PLEADING
     STANDARDS......................................................................................................17

    A.    The Court Should Exercise its Discretion to Apply Rule 12(b) to NNSA's
        Proof of Claim ............................................................................................17

    B.    NNSA's Claim Fails to Meet the Relevant Pleading Standards..........................18

II.    NNSA'S CLAIMS FOR MISMANAGEMENT FAIL TO STATE A CLAIM ..............20

    A.    NNSA is Estopped from Asserting that NNI or NNL Served as a De Facto
        Director of NNSA ........................................................................................21

        1.    NNSA's Representations .......................................................................22

        2.    NNSA is Judicially and Collaterally Estopped from Reversing its
            Position ..............................................................................................27

    B.    NNSA's Allegations Fail to Make a Plausible Claim of Mismanagement
        under French Law .........................................................................................30

        1.    French Law on De Facto Directors .......................................................31

        2.    The Claim Does Not Allege Sufficient Well-Pleaded Facts to
            Render a Mismanagement Claim Plausible ............................................32

III.    NNSA'S ATTEMPT TO IMPOSE SECONDARY LIABILITY ON NNI FAIL ........... 40

    A.    NNSA's Claims for Aiding and Abetting Fail on Multiple Grounds ................. 40

        1.    Delaware and Texas Law ..................................................... 41

        2.    NNSA Does Not State a Claim for Aiding and Abetting Liability .......... 42

            a.    NNSA Does Not Adequately Plead What Wrongful Actions NNI Knowingly Took to Assist a Breach of Fiduciary Duty ............................................................. 44

            b.    NNSA Has Not Adequately Pled Any Underlying Breach by NNL Acting As a De Facto Director ............. 48

    B.    NNSA's Conspiracy Claims Must Be Dismissed Because the Claim Lacks Any Well-Pleaded Allegations to Support Those Claims ................................... 49

        1.    Delaware and Texas Law ..................................................... 49

        2.    NNSA Does Not State a Cognizable Claim for Conspiracy .................... 49

    C.    NNSA's Claims For Aiding and Abetting and Conspiracy are Barred by the *In Pari Delicto* Doctrine ................................................................. 52

IV.    NNSA'S CLAIMS IN TORT UNDER FRENCH LAW SHOULD BE SUMMARILY DISMISSED ........................................................................ 54

        1.    French Law on Tort: Article 1382 of the French Civil Code ................. 54

        2.    NNSA Fails to Sufficiently Plead that NNI Caused its Injury ................ 55

        3.    NNSA's Tort Claims Also Fail to the Extent They Are Based on the Allegations that NNL Was a De Facto Director of NNSA ............... 59

        4.    NNSA's Tort Claims Fail to Satisfy Rule 8 to the Extent its "Fault" Allegations Are Based on a Catch-All Provision .................................... 60

        5.    NNSA Does Not Provide Any Well-Pleaded Allegations that NNI Knowingly Assisted NNL or NNSA's De Jure Director's Act of "Fault" in Bad Faith ............................................................... 61

V.    NNSA'S QUASI CONTRACT AND OTHER CLAIMS RELATING TO UNSPECIFIED BUSINESS SALES CAN BE SUMMARILY DISMISSED ............... 61

    A.    Claims Allegedly Arising from Pre-Petition Business Sales Fail a Basic Test of Notice Pleading ..................................................................... 62

    B.    Claims 10-12 Independently Fail to State a Claim ............................................. 63

        1.    Claims 10 and 11 Fail to Adequately Plead Breach of Contract ............ 63

        2.    Claim 12 Fails Adequately to Plead Mistake ......................................... 64

VI.    NNSA'S CLAIMS IN RESPECT OF FSD LIABILITY CAN BE SUMMARILY DISMISSED ........................................................................ 65

    A.    NNSA's FSD Claims Fail to Plead a Basis for Imposing Liability on NNI Regarding the UK Pension Plan ..................................................... 66

B.      NNSA's FSD Claims Must be Disallowed under the Bankruptcy Code ............. 70

VII.    NNSA'S CLAIMS RELATING TO TRANSFER PRICING, THE FEBRUARY
        2008 REPAYMENT, AND PRE-PETITION BUSINESS SALES ARE TIME-
        BARRED ........................................................................................................... 73

CONCLUSION ........................................................................................................................ 80

# TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

10 Del. C. § 8106 .................................................................................................. 74

10 Del. C. § 8121 .................................................................................................. 73

11 U.S.C. § 108(c) ................................................................................................ 77

15 U.S.C. § 1517(a)(1) .......................................................................................... 30

Fed. R. Bankr. P. 7012(b) ..................................................................................... 17

Fed. R. Bankr. P. 9014(c) ................................................................................. 17, 19

Fed. R. Civ. P. 15(c)(1)(B) .................................................................................... 78

**Cases**

900 Capital Servs., Inc. v. Cloud (In re Cloud),
214 F.3d 1350, No. 99-51109 (CDK), 2000 WL 634637 (5th Cir. May 4, 2000) ............ 17

Abramson v. Ritz-Carlton Hotel Co. LLC,
Civil Action No. 09-3264 (JHR), 2010 WL 3943666 (D.N.J. Oct. 6, 2010) .................... 33

Acierno v. Haggerty,
Civil Action No. 04-1376-KAJ, 2005 U.S. Dist. LEXIS 30353
(D. Del. Nov. 23, 2005) .......................................................................................... 6

Adamson v. Bernier (In re Bernier),
282 B.R. 773 (Bankr. D. Del. 2002) ................................................................. 20, 42

Aetna Cas. & Sur. Co. v. Ga. Tubing Corp.,
93 F.3d 56 (2d Cir. 1996) ..................................................................................... 72

Allied Capital Corp. v. GC-Sun Holdings, L.P.,
910 A.2d 1020 (Del. Ch. 2006) .............................................................................. 49

Am. Int'l Group, Inc. v. Greenberg,
976 A.2d 872 (Del. Ch. 2009), aff'd sub nom., Teachers' Ret, Sys. of La. v. Gen. Re
Corp., 11 A.3d 228 (Del. 2010) .............................................................................. 52

Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.),
107 B.R. 856 (E.D. Pa. 1988), aff'd, 908 F.3d 861 (3d Cir. 1990) ................................ 18

Anjelino v. N.Y. Times Co.,
200 F.3d 73 (3d Cir. 2000) ............................................................................ 28

Asarco LLC v. Ams. Mining Corp.,
396 B.R. 278 (S.D. Tex. 2008) ...................................................................... 52

Ashcroft v. Iqbal,
129 S.Ct. 1937 (2009) .................................................................................. passim

Baldwin Cnty. Welcome Ctr. v. Brown,
466 U.S. 147 (1984) ...................................................................................... 79

Bank Brussels Lambert v. Chase Manhattan Bank, N.A.,
No. 93 Civ. 5298 (LMM), 1999 WL 672302 (S.D.N.Y. Aug. 27, 1999) ........ 79

Beech Aircraft Corp v. Jinkins, III,
739 S.W.2d 19 (Tex. 1987) ........................................................................... 68

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007) ...................................................................................... passim

Bianco v. Erkins (In re Gaston & Snow),
243 F.3d 599 (2d Cir. 2001) ......................................................................... 74

Bonner v. Henderson,
No. 05-99-01582-CV (MW) (CIW) (JRR), 2001 WL 301581 (Tex. App. Mar. 29, 2001)    76

Boyd v. Tempay,
Civil Action No. 07-377-JJF, 2008 WL 5156307 (D. Del. Dec. 4, 2008) ........ 51

Brug v. Enstar Grp., Inc.,
755 F. Supp. 1247 (D. Del. 1991) ................................................................. passim

Buck v. Hampton Twp. Sch. Dist.,
452 F.3d 256 (3d Cir. 2006) ......................................................................... 71

Burlington N. R.R. Co. v. Hyundai Merch. Marine Co.,
63 F.3d 1227 (3d Cir. 1995) ......................................................................... 29

Burrell v. AstraZeneca LP,
C.A. Nos. 07C-01-412 (SER), 07C-04-110 (SER), 07C-04-267 (SER), 2010 WL
3706584 (Del. Super. Ct. Sept. 20, 2010) .................................................... 74

Capitaliza-T Sociedad de Responsabilidad Limitada de Capital Variable v. Wachovia
Bank of Del. Nat'l Ass'n.,
Civ. No. 10-520 (JBS/KMW), 2011 WL 284421 (D. Del. Mar. 9, 2011) ........ 41, 48

Celotex Corp. v. Allstate Ins. Co. (In re Celotex Corp.),
289 B.R. 460 (Bankr. M.D. Fla. 2003) ............................................................. 72

Chamison v. Healthtrust, Inc.,
735 A.2d 912 (Del. Ch. 1999) ........................................................................ 68

Chapa v. Chase Home Fin. LLC,
Civil Action No. C-10-359 (JGJ), 2010 WL 5186785 (S.D. Tex. Dec. 15, 2010)............. 62

Charal Inv. Co. v. Rockefeller (In re Rockefeller Ctr. Props. Inc. Sec. Litig.),
311 F.3d 198 (3d Cir. 2002) ......................................................................... 42

Chase Bank USA N.A. v. Hess,
Civil Action No. 08-121-LPS, 2011 WL 45132 (D. Del. Jan. 6, 2011)............................ 50

Clark v. Strober-Haddonfield Grp., Inc.,
Civil No. 07-910 (RBK), 2008 U.S. Dist. LEXIS 58865 (D.N.J. July 29, 2008) ............. 6

Coan v. O & G Indus., Inc. (In re Austin Driveway Servs., Inc.),
179 B.R. 390 (Bankr. D. Conn. 1995) ............................................................. 78

Delgrosso v. Spang & Co.,
903 F.2d 234 (3d Cir. 1990) ......................................................................... 28

DHP Holdings II Corp. v. Peter Skop Indus., Inc.,
435 B.R. 220 (Bankr. D. Del. 2010) ............................................................... 67

Doug Grant, Inc. v. Greate Bay Casino Corp.,
232 F.3d 173 (3d Cir. 2000) ......................................................................... 10

Eames v. Nationwide Mut. Ins. Co.,
No. Civ.A. 04-1324-KAJ, 2006 WL 2506640 (D. Del. Aug. 29, 2006)............................ 74

End of the Road Trust v. Terex Corp. (In re Fruehauf Trailer Corp.),
250 B.R. 168 (D. Del. 2000)........................................................................... 74-75

Fierro v. Gallucci,
No. 06-CV-5189(JFB)(WDW), 2008 WL 2039545 (E.D.N.Y. May 12, 2008)................. 50

Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.),
398 B.R. 736 (S.D.N.Y. 2008) ...................................................................... 17

Fleck v. KDI Sylvan Pools, Inc.,
981 F.2d 107 (3d Cir. 1992) ......................................................................... 27

Floyd v. Hefner, III,
556 F. Supp. 2d 617 (S.D. Tex. 2008) ............................................................ 41

Folger Adam Sec., Inc. v. DeMatteis/Macgregor, JV,
209 F.3d 252 (3d Cir. 2000) ............................................................................  67

Forman v. Salzano (In re Norvergence, Inc.),
405 B.R. 709 (Bankr. D.N.J. 2009)..................................................................  20, 42

Fowler v. UPMC Shadyside,
578 F.3d 203 (3d Cir. 2009) ............................................................................  passim

Frederico v. Home Depot,
507 F.3d 188 (3d Cir. 2007) ............................................................................  42

G-I Holdings, Inc. v. Reliance Ins. Co.,
586 F.3d 247 (3d Cir. 2009) ............................................................................  28

Global Indus. Techs., Inc. v. Ash Trucking Co. (In re Global Indus. Techs., Inc.),
333 B.R. 251 (Bankr. W.D. Pa. 2005) ..............................................................  74

Global Link Liquidating Trust v. Avantel, S.A. (In re Global Link Telecom. Corp.),
327 B.R. 711 (Bankr. D. Del. 2005) ................................................................  78

Greene v. N.Y. Mercantile Exch. (In re NYMEX S'holder Litig.),
C.A. Nos. 3621-VCN, 3835-VCN, 2009 WL 3206051 (Del. Ch. Sept. 30, 2009) ............  42

Hertz Corp. v. Friend,
130 S. Ct. 1181 (2010) ....................................................................................  27

Hill v. Day (In re Today's Destiny, Inc.),
388 B.R. 737 (Bankr. S.D. Tex. 2008)..............................................................  18, 53

In re Adelphia Commc'ns Corp.,
359 B.R. 54 (Bankr. S.D.N.Y. 2006) ...............................................................  18

In re APCO Liquidating Trust,
370 B.R. 625 (Bankr. D. Del. 2007) ................................................................  70, 72

In re Baldwin-United Corp.,
55 B.R. 885 (Bankr. S.D. Ohio 1985)...............................................................  71

In re Bancredit Cayman Ltd.,
No. 06-11026(SMB), 2007 Bankr. LEXIS 3805 (Bankr. S.D.N.Y. Nov. 2, 2007)............  77

In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.,
374 B.R. 122 (Bankr. S.D.N.Y. 2007), aff'd, 389 B.R. 325 (2008)................................  24, 27

In re Best Prods. Co.,
210 B.R. 714 (Bankr. E.D. Va. 1997) ...............................................................  18

In re British Am. Ins. Co.,
425 B.R. 884 (Bankr. S.D. Fla. 2010)................................................................. 27

In re Coudert Bros. LLP,
No. 09 Civ. 9561(AKH), 2010 WL 2382397 (S.D.N.Y. June 14, 2010).......................... 74

In re Diamond Mortg. Corp. of Ill.,
105 B.R. 876 (Bankr. N.D. Ill. 1989)................................................................. 17

In re Edison Bros. Stores, Inc.,
No. 99-529 (JCA), 2002 Bankr. LEXIS 1228 (Bankr. D. Del. May 15, 2002).................. 78

In re Enron Corp.,
298 B.R. 513 (Bankr. S.D.N.Y. 2003), aff'd, 419 F.3d 115 (2d Cir. 2005)...................... 18

In re Fairfield Sentry Ltd.,
No. 10-13164 (BRL), 2011 Bankr. LEXIS 1895 (Bankr. S.D.N.Y. May 23, 2011).......... 77

In re Grand Prix Assocs. Inc.,
No. 09-16545 (DHS), 2009 Bankr. LEXIS 1239 (Bankr. D.N.J. May 18, 2009). ............. 24

In re Ins. Brokerage Antitrust Litig.,
618 F.3d 300 (3d Cir. 2010) ............................................................................. 69

In re MarchFirst, Inc.,
448 B.R. 499 (Bankr. N.D. Ill. 2011)................................................................. 78

In re Maxim Truck Co.,
415 B.R. 346 (Bankr. S.D. Ind. 2009)................................................................ 79

In re Milan Steel Fabricators, Inc.,
113 B.R. 364 (Bankr. N.D. Ohio 1990) .............................................................. 79

In re Nortel Networks Corp.,
426 B.R. 84 (Bankr. D. Del. 2010), aff'd, No. 09-10138-KG, CA 10-230-LPS, 2011 WL
1154225 (D. Del. Mar. 29, 2011)....................................................................... 66

In re Sevko, Inc.,
143 B.R. 167 (Bankr. N.D. Ill. 1992)................................................................. 17

In re Spiegel, Inc.,
337 B.R. 821 (Bankr. S.D.N.Y. 2006) ............................................................... 17

In re Touch Am. Holdings, Inc.,
409 B.R. 712 (Bankr. D. Del. 2009) .................................................................. 70

In re Wedtech, Corp.,
87 B.R. 279 (Bankr. S.D.N.Y. 1988) ................................................................. 72

In re WorldCom, Inc.,
322 B.R. 530 (Bankr. S.D.N.Y. 2005) .............................................................................. 17

Kahn v. Seaboard Corp.,
625 A.2d 269 (Del. Ch. 1993) ........................................................................................... 76

Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. GMC,
337 F.3d 314 (3d Cir. 2003) ............................................................................................. 29

Malleus v. George,
641 F.3d 560 (3d Cir. 2011) ............................................................................................. 19

Malpiede v. Townson,
780 A.2d 1075 (Del. 2001)..................................................................................41, 44, 48

Marvel Entm't Grp., Inc. v. Mafco Holdings, Inc. (In re Marvel Entm't Grp., Inc.),
273 B.R. 58 (D. Del. 2002) ............................................................................................... 76

Mervyn's Holdings, LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC),
426 B.R. 488 (Bankr. D. Del. 2010) ................................................................................. 74

Miller v. Greenwich Cap. Fin. Prods., Inc. (In re Am. Bus. Fin. Servs. Inc.),
361 B.R. 747 (Bankr. D. Del. 2007) ............................................................................ 50, 52

Murray v. Cadle Co.,
257 S.W.3d 291 (Tex. App. 2008)..................................................................................... 68

Nationwide Mut. Ins. Co. v. Kesterson,
575 A.2d 1127 (Del. 1990)................................................................................................ 69

New Hampshire v. Maine,
532 U.S. 742 (2001).......................................................................................................... 27

Norman v. Elkin,
Civil Action No. 06-005-JJF, 2007 WL 2822798 (D. Del. Sept. 26, 2007)...................... 73

Norpak Corp. v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.),
131 F.3d 1185 (6th Cir. 1997) .......................................................................................... 71

O'Connell v. Arthur Andersen LLP (In re Alphastar Ins. Grp. Ltd.),
383 B.R. 231 (Bankr. S.D.N.Y. 2008) .............................................................................. 19

Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit
Partners L.P. (In re Fedders N. Am. Inc.),
405 B.R. 527 (Bankr. D. Del. 2009) ............................................................................ 41, 75

Official Comm. of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.),
353 B.R. 820 (Bankr. D. Del. 2006) ................................................................ 43

Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.),
343 B.R. 444 (Bankr. S.D.N.Y.. 2006) ............................................................ 53

Patton v. Simone,
Civ. A. Nos. 90C-JA-29, Civ. A. 90C-JL-219, 1992 WL 183064 (Del. Super. Ct. June 25, 1992) .......................................................................................................... 40

Peltz v. CTC Direct, Inc. (In re MBC Greenhouse, Co.),
307 B.R. 787 (Bankr. D. Del. 2004) ................................................................ 78

Pryor v. NCAA,
288 F.3d 548 (3d Cir. 2002) ............................................................................ 10

Quilling v. Compass Bank,
No. 3:03-CV-2180-R (JB), 2004 WL 2093117 (N.D. Tex. Sept. 17, 2004) ..... 76

Ramirez v. Rodriguez (In re Ramirez),
413 B.R. 621 (Bankr. S.D. Tex. 2009) ............................................................. 40

Rescuecom Corp. v. Khafaga (In re Khafaga),
431 B.R. 329 (Bankr. E.D.N.Y. 2010) ......................................................... 78-79

Reserves Dev. LLC v. Severn Sav. Bank, FSB,
Civil Action No. 2502-VCP, 2007 WL 4054231 (Del. Ch. Nov. 9, 2007) ...... 68-69

Rolls-Royce Corp. v. Heros, Inc.,
576 F. Supp. 2d 765 (N.D.Tex. 2008) ............................................................. 78

RTI Hamilton v. Tronox LLC (In re Tronox Inc.),
Bankruptcy No. 09-10156 (ALG), Adversary No. 09-01488 (ALG), 2010 WL 2010844 (Bankr. S.D.N.Y. May 14, 2010) ...................................................................... 64

Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,
81 F.3d 355 (3d Cir. 1996) .............................................................................. 28

Santiago v. Warminster Twp.,
629 F.3d 121 (3d Cir. 2010) ............................................................................ 69

Smith v. Nat'l City Mortg.,
No. A-09-CV-881 LY, 2010 WL 3338537 (W.D. Tex. Aug. 23, 2010) ........... 62

SmithKline Beecham Pharm. Co. v. Merck & Co.,
766 A.2d 442 (Del. 2000) ................................................................................ 75

Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.),
335 B.R. 539 (D. Del. 2005).............................................................................    53

Timberlake v. Synthes Spine, Inc.,
Civil Action No. V-08-4(JDR), 2011 WL 711075 (S.D. Tex. Feb. 18, 2011)...................    49

Toner v. Allstate Ins. Co.,
821 F. Supp. 276 (D. Del. 1993)......................................................................    20

Triton Constr. Co. v. E. Shore Elec. Servs., Inc.,
Civil Action No. 3290-VCP, 2009 WL 1387115 (Del. Ch. May 18, 2009), aff'd, 988
A.2d 938 (Del. 2009) ...................................................................................    49

United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,
216 F. Supp. 2d 198 (S.D.N.Y. 2002)..............................................................    19

United States v. Brodie,
403 F.3d 123 (3d Cir. 2005) .........................................................................    41

United States v. Crawley,
Criminal Action No. H-06-204, Civil Action No. H-09-3457 (FHS), 2010 WL 4393970
(S.D. Tex. Oct. 29, 2010) ..............................................................................    79

United States v. Flood,
327 F. App'x 356 (3d Cir. 2009), cert. denied, 130 S. Ct. 223 (2009) .............................    41

Winstar Holdings LLC v. Blackstone Grp. LP (In re Winstar Commc'ns, Inc.),
435 B.R. 33 (Bankr. D. Del. 2010) .................................................................    73-74

**Summary Table of NNSA Claims - By Cause of Action in the Order Addressed in the Objection**

| Claim # | Law Asserted | Cause of Action | Factual Predicate | Bases for Dismissal in Addition to Rule 12(b)(6) |
|---|---|---|---|---|
| 2 | French | Mismanagement | Transfer pricing | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL |
| 6 | French | Mismanagement | February 2008 repayment and Project Swift | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL |
| 13 | French | Mismanagement | Past business sales | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL |
| 16 | French | Mismanagement | Contingent tax liability | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)) |
| 4 | U.S. Law | Aiding and abetting breach of fiduciary duty or tortious conduct | Transfer pricing | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), *In Pari Delicto* , SOL |
| 8 | U.S. Law | Aiding and abetting breach of fiduciary duty or tortious conduct | February 2008 repayment and Project Swift | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), *In Pari Delicto* , SOL |
| 15 | U.S. Law | Aiding and abetting breach of fiduciary duty or tortious conduct | Past business sales | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), *In Pari Delicto* , SOL |
| 18 | U.S. Law | Aiding and abetting | Contingent tax liability | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), *In Pari Delicto* |
| 5 | U.S. Law | Civil Conspiracy | Transfer pricing | Failure to Plead (Rules 8(a) and 9(b)), SOL, *In Pari Delicto* |
| 9 | U.S. Law | Civil Conspiracy | February 2008 repayment and Project Swift | Failure to Plead (Rules 8(a) and 9(b)), SOL, *In Pari Delicto* |
| 3 | French | Claim in tort | Transfer pricing | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL |
| 7 | French | Claim in tort | February 2008 repayment and Project Swift | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL |
| 14 | French | Claim in tort | Past business sales | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL |

**Summary Table of NNSA Claims - By Cause of Action in the Order Addressed in the Objection**

| Claim # | Law Asserted | Cause of Action | Factual Predicate | Bases for Dismissal in Addition to Rule 12(b)(6) |
|---|---|---|---|---|
| 17 | French | Claim in tort | Contingent tax liability | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)) |
| 10 | Not specified | Implied Contract | Past business sales | Failure to Plead (Rule 8(a)), SOL |
| 11 | Not specified | Implied Term | Past business sales | Failure to Plead (Rule 8(a)), SOL |
| 12 | Not specified | Mistake | Past business sales | Failure to Plead (Rules 8(a) and 9(b)), SOL |
| 19 | U.S. and French Law | Contribution | Contingent FSD Liability | Failure to Plead (Rule 8(a)), Barred by Bankruptcy Code § 502(e)(1)(B) |
| 20 | U.S. and French Law | Recoupment, contribution and/or unjust enrichment | Contingent FSD Liability | Failure to Plead (Rule 8(a)), Barred by Bankruptcy Code § 502(e)(1)(B) |
| 21 | U.S. and French Law | Subrogation | Contingent FSD Liability | Failure to Plead (Rule 8(a)), Barred by Bankruptcy Code § 502(e)(1)(B) |
| 22 | U.S. and French Law | Obligation to repay | Contingent FSD Liability | Failure to Plead (Rule 8(a)), Barred by Bankruptcy Code § 502(e)(1)(B) |

**Summary Table of NNSA Claims - By Claim Number**

| Claim # | Law Asserted | Cause of Action | Factual Predicate | Bases for Dismissal in Addition to Rule 12(b)(6) |
|---|---|---|---|---|
| 2 | French | Mismanagement | Transfer pricing | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL |
| 3 | French | Claim in tort | Transfer pricing | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL |
| 4 | U.S. Law | Aiding and abetting breach of fiduciary duty or tortious conduct | Transfer pricing | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), *In Pari Delicto*, SOL |
| 5 | U.S. Law | Civil Conspiracy | Transfer pricing | Failure to Plead (Rules 8(a) and 9(b)), SOL, *In Pari Delicto* |
| 6 | French | Mismanagement | February 2008 repayment and Project Swift | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL |
| 7 | French | Claim in tort | February 2008 repayment and Project Swift | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL |
| 8 | U.S. Law | Aiding and abetting breach of fiduciary duty or tortious conduct | February 2008 repayment and Project Swift | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), *In Pari Delicto*, SOL |
| 9 | U.S. Law | Civil Conspiracy | February 2008 repayment and Project Swift | Failure to Plead (Rules 8(a) and 9(b)), SOL, *In Pari Delicto* |
| 10 | Not specified | Implied Contract | Past business sales | Failure to Plead (Rule 8(a)), SOL |
| 11 | Not specified | Implied Term | Past business sales | Failure to Plead (Rule 8(a)), SOL |
| 12 | Not specified | Mistake | Past business sales | Failure to Plead (Rules 8(a) and 9(b)), SOL |
| 13 | French | Mismanagement | Past business sales | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)), SOL |
| 14 | French | Claim in tort | Past business sales | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), SOL |
| 15 | U.S. Law | Aiding and abetting breach of fiduciary duty or tortious conduct | Past business sales | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), *In Pari Delicto*, SOL |
| 16 | French | Mismanagement | Contingent tax liability | Judicial & Collateral Estoppel, Failure to Plead (Rule 8(a)) |

**Summary Table of NNSA Claims - By Claim Number**

| Claim # | Law Asserted | Cause of Action | Factual Predicate | Bases for Dismissal in Addition to Rule 12(b)(6) |
|---------|--------------|-----------------|-------------------|--------------------------------------------------|
| 17 | French | Claim in tort | Contingent tax liability | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)) |
| 18 | U.S. Law | Aiding and abetting | Contingent tax liability | Judicial & Collateral Estoppel, Failure to Plead (Rules 8(a) and 9(b)), *In Pari Delicto* |
| 19 | U.S. and French Law | Contribution | Contingent FSD Liability | Failure to Plead (Rule 8(a)), Barred by Bankruptcy Code § 502(e)(1)(B) |
| 20 | U.S. and French Law | Recoupment, contribution and/or unjust enrichment | Contingent FSD Liability | Failure to Plead (Rule 8(a)), Barred by Bankruptcy Code § 502(e)(1)(B) |
| 21 | U.S. and French Law | Subrogation | Contingent FSD Liability | Failure to Plead (Rule 8(a)), Barred by Bankruptcy Code § 502(e)(1)(B) |
| 22 | U.S. and French Law | Obligation to repay | Contingent FSD Liability | Failure to Plead (Rule 8(a)), Barred by Bankruptcy Code § 502(e)(1)(B) |

Nortel Networks Inc. ("NNI") and its affiliated debtors, as respective debtors and debtors in possession (collectively, the "Debtors" or the "U.S. Debtors"), together with the Official Committee of Unsecured Creditors (the "Committee" and together with the U.S. Debtors, the "Movants") hereby object (the "Objection") to claim numbers 7784 and 7785 (the "Proof of Claim" or the "Claim"), filed against NNI by the Joint Administrators (as defined below) on behalf of Nortel Networks S.A. ("NNSA") and the court-appointed French liquidator (the "Liquidator") of NNSA and move this Court pursuant to Sections 105 and 502 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 3001, 3002, 3003, 3007, 7012 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order in the form attached as Exhibit A dismissing NNSA's and the Liquidator's Claim (collectively, the "Claim")[2] and expunging them with prejudice.[3]  In support of this Objection and Motion, the Movants respectfully represent as follows:

## PRELIMINARY STATEMENT

NNSA's Claim cannot be sustained as a matter of law.  To the contrary, this Claim is exactly the type of pleading the Supreme Court decisions in Twombly and Iqbal criticized in giving renewed substance to Rule 8.  Under Twombly and Iqbal, Rule 8 requires plausibility based on allegations of fact – not on conclusory speculation or even conceivable scenarios.

Tested by this standard – and most certainly when tested against Rule 9(b)'s requirement for particularity in pleading claims based on fraud, deception, conspiracy or mistake – NNSA's

---

[2]     Because the claims filed by the Joint Administrators and the French Liquidator with respect to NNSA are virtually identical except for the first introductory paragraph, the claims are collectively referred to as the "Claim" or "NNSA's Claim."  References herein to NNSA's allegations against NNI therefore include both the Joint Administrators' and the French Liquidator's identical allegations.

[3]     The Joint Administrators on behalf of NNSA previously filed claim No. 4923 against NNI, which has been superseded and replaced by the Claim.  To the extent not so superseded or replaced, the Movants object and move to dismiss claim No. 4923 as well.  Copies of claim Nos. 7784, 7785, and 4923 are attached to the Declaration of Lauren L. Peacock, submitted concurrently herewith (the "Peacock Decl.") as Exhibits A, B, and C respectively.

Claim quickly falls.  It is premised on one implausible conclusion after the next, but at its core is based on the far-fetched allegation that NNI, a sister corporation to NNSA with no equity interest in NNSA and no contractual or other rights to control NNSA, for almost a decade was somehow able to compel NNSA's directors to abdicate their directorial responsibilities and repeatedly breach their fiduciary duties.

These allegations are not only inadequately pled, they are directly contrary to what NNSA told both the High Court of Justice of England and Wales to obtain orders of administration in England and this Court to secure Chapter 15 recognition.  In both proceedings, NNSA submitted sworn declarations, including from Michel Clément, president and long-time director of NNSA, affirming that the EMEA Debtors, including NNSA, were autonomously managed and controlled from England.  These submissions provided detailed descriptions of the key corporate functions located in England – including tax and treasury – that made decisions for the EMEA Debtors, including NNSA.  These prior sworn statements – which the EMEA Debtors, including NNSA, relied upon in the courts of two countries to obtain relief – foreclose NNSA's current fanciful theory that its directors were passive puppets blindly following the dictates of either NNL (the common ultimate parent of NNI and NNSA) or NNI.  Both the judicial and collateral estoppel doctrines prevent NNSA from engaging in this type of gamesmanship and alone serve to bar most of its claims.

NNSA's mismanagement claims against NNI are based on the legally incorrect assertion that NNI owed fiduciary duties to NNSA because it was a de facto director of NNSA.  Under certain limited circumstances not adequately pled in the Claim, French law will deem a person who is not a de jure director of a company nonetheless to be a de facto director of that company.  French law does not lightly find a person to be a de facto director of a company.  Rather, French

law imposes a strict and demanding standard, and, particularly in the context of a corporate group, requires that the entity alleged to be a de facto director dominated and controlled the company so as to put it in a position of total subordination.

Moreover, <u>Twombly</u> and <u>Iqbal</u> stand for the proposition that a complaint may not rest on conclusory factual assertions that merely render its claims "conceivable;" rather, the Claim must make well-pleaded factual allegations that render its claims plausible. NNSA fails to meet this standard as it alleges no facts from which it could plausibly be inferred that NNI had the ability to or did dominate NNSA's de jure directors in some capacity. For example, with respect to NNSA's largest claim, NNSA alleges that NNI, with NNL, was "heavily involved" in formulating transfer pricing policies designed to transfer cash and value from the Nortel group of companies to NNL. This is insufficient to establish that NNI acted as a director of NNSA or controlled its existing directors. Disregarding NNSA's conclusory allegations of control, as the Court must under <u>Twombly</u>, the only factual allegation NNSA pleads on this central issue is that it "was instructed" to sign the transfer pricing agreement. This conspicuous use of the passive voice speaks volumes; NNSA does not allege, because it cannot, that NNI had the authority to give – or in fact gave – any such instruction. This claim is rendered even more implausible by NNSA's admission that the transfer pricing arrangements were detrimental to NNI, which overpaid at least $2 billion.

With respect to its claims regarding the 2002 Subordinated Loan (described further herein), NNSA merely alleges that Ryan Smith of NNI – who NNSA elsewhere in its Claim alleges was seconded to NNUK – "pushed" NNSA to agree to repay its outstanding indebtedness to NNL. NNSA, however, also alleges that NNSA's controller rebuffed Mr. Smith and did not accede to this request. These allegations, even if proven, demonstrate that NNI did not dominate

or supplant the decision making of NNSA, the opposite of what NNSA needs to show to make out a de facto director claim.

NNSA's U.S. state law claims that NNI breached a fiduciary duty owed to NNSA, as well as its alternative claims that NNI conspired with or aided and abetted NNL or NNSA's directors' alleged breaches of fiduciary duty, as well as its French tort law claims for the same conduct, fail for numerous additional reasons.  NNSA's claims allege that all of NNSA's directors and NNL engaged in breaches of fiduciary duty and other wrongdoing.  Even if NNSA alleged sufficient facts to state a claim (which it does not), under U.S. law, this misconduct would bar its claims against NNI.  Moreover, NNSA fails to plead facts that would pass muster under Rule 8 and <u>Twombly</u> with respect to essential elements of its claims.  The same is *a fortiori* true with respect to those claims, described herein, that are subject to the heightened pleading requirements of Rule 9(b).

Apart from its fiduciary duty claims, NNSA also brings claims under French and U.S. law for its potential future liability should the UK Pensions Regulator require NNSA to provide financial support for the Nortel Networks UK Pension Plan.  None of NNSA's FSD Claims can stand.  In addition to relying on conclusory recitations of the elements of its French and U.S. claims which are woefully deficient under Rule 8, NNSA's attempt to hold NNI liable for an amount that NNSA is ultimately required to pay to the UK Pensions Regulator is an attempt to end-run this Court's determination that it will decide NNI's liability, if any, to the UK Pension Plan.  These claims are also barred by Section 502(e)(1)(B) of the Bankruptcy Code.

Accordingly, and for the reasons set forth more fully below, NNSA's claims should be dismissed with prejudice.

## JURISDICTION AND VENUE

This Court has jurisdiction over the Objection pursuant to 28 U.S.C. §§ 157 and 1334.

This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue over the

Debtors' Chapter 11 cases and this Objection is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

The statutory bases for the relief requested herein are Sections 105 and 502 of the

Bankruptcy Code and Rules 3001, 3002, 3003, 3007, 7012, and 9014 of the Bankruptcy Rules.

## RELEVANT PROCEDURAL HISTORY

On January 14, 2009 (the "Petition Date"),[4] the U.S. Debtors, other than Nortel Networks

(CALA) Inc.,[5] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code and

the cases were consolidated for procedural purposes only.  The Debtors' ultimate corporate

parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks

Limited ("NNL"), and certain of their Canadian affiliates (together, the "Canadian Debtors")

commenced a parallel proceeding on the Petition Date with the Ontario Superior Court of Justice

(the "Canadian Court") seeking relief from their creditors under the Companies' Creditors

Arrangement Act (Canada).

### A.    English Proceedings of the EMEA Debtors[6]

On January 14, 2009, NNSA and eighteen of its affiliates[7] sought orders from the High

Court of Justice of England and Wales (the "English Court") placing NNSA and the other

---

[4]    Unless otherwise defined herein, initially capitalized terms have the meanings ascribed to them in the Claim.

[5]    Nortel Networks (CALA) Inc. ("NN CALA") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

[6]    On this motion to dismiss, the Court may take judicial notice of the public record of proceedings before the English Court and in the related Chapter 15 proceedings pending in this Court under Case No. 09-11972 (the "Chapter 15 Proceedings").  Clark v. Strober-Haddonfield Grp., Inc., Civil No. 07-910 (RBK), 2008 U.S. Dist. LEXIS 58865 at *4 (D.N.J. July 29, 2008) (taking judicial notice of the record in prior proceedings to dismiss claims based on judicial estoppel); Acierno v. Haggerty, Civil Action No. 04-1376-KAJ, 2005 U.S. Dist. LEXIS 30353, at *19 (D. Del. Nov. 23, 2005) (taking judicial notice of pleadings submitted in previous state court litigation, as "public documents or decisions of other courts" to dismiss claims on estoppel grounds).

EMEA Debtors into administration, and appointing individuals from Ernst & Young LLP as administrators (collectively, the "Joint Administrators"). In support of these applications, the EMEA Debtors submitted witness statements from (i) Michel Clément, president and long-time director of NNSA (the "Clément Statement"), and (ii) Sharon Lynette Rolston, a director of each of the EMEA Companies (the "Rolston Statement").[8] These witnesses affirmed under oath that the EMEA Debtors were autonomously managed and controlled from England, and provided detailed descriptions of the key corporate functions located in England – including tax and treasury – that made decisions for the EMEA Debtors. Based on that evidence, the English Court granted the applications for administration by orders entered on January 14, 2009 (the "Initial Orders").[9] The Initial Orders found that the EMEA Debtors' administration proceedings (the "English Proceedings") were "main proceedings," establishing England as the center of main interests ("COMI") for NNSA and the other EMEA Debtors.[10] Although secondary liquidation proceedings were commenced before the Commercial Court of Versailles, France with respect to NNSA on May 28, 2009, in accordance with the European Union's Council

---

[7]       In addition to NNSA, orders of administration were sought with respect to: Nortel GmbH; Nortel Networks (Austria) GmbH; Nortel Networks (Ireland) Limited; Nortel Networks AB; Nortel Networks B.V.; Nortel Networks Engineering Service Kft; Nortel Networks France S.A.S. ("NNSAS"); Nortel Networks Hispania, S.A.; Nortel Networks International Finance & Holding B.V.; Nortel Networks N.V.; Nortel Networks UK Limited ("NNUK") Nortel Networks OY; Nortel Networks Polska Sp. z.o.o.; Nortel Networks Portugal S.A.; Nortel Networks Romania SRL; Nortel Networks S.A. ("NNSA"); Nortel Networks S.p.A.; Nortel Networks Slovensko, s.r.o.; and Nortel Networks, s.r.o. (collectively, with NNSA, the "EMEA Debtors").

[8]       See Decl. of Sharon L. Rolston, dated June 6, 2009 (attaching Witness Statement of Sharon Lynette Rolston, dated Jan. 14, 2009), Peacock Decl. at Ex. E [D.I. 3 in Case No. 09-11972] (the "Rolston Statement.") and Transmittal Decl. of Edwin J. Harron, dated Oct. 20, 2010 (attaching Clément Witness Statements dated Jan. 14, 2009), Peacock Decl. at Ex. D [D.I. 45 at Ex. A at Ex. II in Case No. 09-11972] (the "Clément Statement"); Transmittal Decl. of Edwin J. Harron, dated Oct. 20, 2010 (attaching true and correct copies of Rolston and Clément Witness Statements) [D.I. 45 in Case No. 09-11972]. Unless otherwise noted, all citations to the Clément Statement in this Motion refer to the Clément Statement submitted on behalf of NNSA.

[9]       Transmittal Decl. of Edwin J. Harron, dated Oct. 18, 2010 (attaching at Ex. B the Orders of the English Court with Respect to EMEA Debtors other than NNUK and NN Ireland, each entered Jan. 14, 2009), Peacock Decl. at Ex. F [D.I. 45 at Ex. B in Case No. 09-11972] (the "Initial Orders").

[10]       Declaration of Michael Todd, Q.C. in Support of Joint Objection and Motion to Dismiss Claims of Nortel Networks UK Ltd. ("Todd Decl.") ¶ 141. The Todd Declaration attached to the Movants' Motion to Dismiss NNUK's claims is hereby incorporated by reference [D.I. 5971].

Regulation (EC) No. 1346/20000 of 29 May 2000, 2000 OJ (L 160), the English Proceedings are the main proceedings in respect to NNSA.  See Order Granting Recognition of Foreign Proceedings and Related Relief with Respect to the EMEA Debtors, filed January 31, 2011, Peacock Decl. at Ex. N ¶ G [D.I. 116 in Case No. 09-11972] ("EMEA Recognition Order") ("England is the center of main interests of … the EMEA Debtors and, accordingly, the English Proceedings are "foreign main proceedings") (internal quotation marks omitted).

Upon the EMEA Debtors' petitions, this Court made parallel findings in granting Chapter 15 recognition of the English Proceedings.[11]  In support of their petitions, the EMEA Debtors submitted the Clément and Rolston Statements to this Court along with declarations and deposition testimony from the Joint Administrators affirming that (i) those witness statements were true and correct, and (ii) the EMEA Debtors' "central management and control is handled to a large extent from England, where all major decisions are made."[12]  In reliance on this evidence, this Court entered two orders finding that the EMEA Debtors' COMI was in England, such that their English Proceedings could be granted Chapter 15 recognition.[13]

---

[11]    NNUK filed a petition for recognition of its English Proceedings as foreign main proceedings pursuant to Section 1517 of the Bankruptcy Code on June 8, 2009.  See Verified Pet. for Recognition of Foreign Proceedings Pursuant to Chapter 15 of the U.S. Bankr. Code, Peacock Decl. at Ex.G [D.I. 2 in Case No. 09-11972] ("NNUK Chapter 15 Petition"). The remaining EMEA Debtors, including NNSA, filed parallel petitions for recognition on October 20, 2010. See Verified Chapter 15 Pets. for Recognition of Foreign Proceedings Pursuant and Related Relief with Respect to the EMEA Debtors, dated Oct. 20, 2010, Peacock Decl. at Ex. H [D.I. 44 in Case No. 09-11972] (the "EMEA Chapter 15 Petition").

[12]    See Decl. of Stephen John Harris, dated June 5, 2009, Peacock Decl. at Ex. I [D.I. 4 in Case No. 09-11972] (the "Harris Decl."); Transmittal Decl. of Edwin J. Harron, dated Oct. 18, 2010 (attaching at Ex. A the Decl. of Alan Robert Bloom), Peacock Decl. at Ex. J [D.I. 45 at Ex. A in Case No. 09-11972] (the "Bloom Decl."); Response of the Monitor of the Canadian Debtors to the Verified Chapter 15 Pets. for Recognition of Foreign Proceedings and Related Relief With Respect to the EMEA Debtors (attaching at Ex. A excerpts from Dep. of Alan Robert Bloom, dated Dec. 16, 2010), Peacock Decl. at Ex. K at Ex. A at 49:17-50:4, 107:7-17 and 278:25-279:13 [D.I. 97 in Case No. 09-11972]; and Jan. 31, 2011 Hr'g Tr., Peacock Decl. at Ex. L at 20:11-4 [D.I. 4788] (the "Jan. 31, 2011 Hr'g Tr."). Note that while the excerpts of the Joint Administrators' deposition transcript is marked confidential, counsel for the Joint Administrators have agreed that such excerpts – which have been publicly filed – do not require confidential treatment.

[13]    See Order Granting Recognition And Relief In Aid Of Foreign Main Proceedings, dated June 26, 2009, Peacock Decl. at Ex. M [D.I. 36 in Case No. 09-11972] (the "NNUK Recognition Order"); EMEA Recognition Order, Peacock Decl. at Ex. N.

7

B.    **EMEA Claims Process**

On August 4, 2009, this Court set September 30, 2009 as the general bar date for filing

proofs of claim or interests against the U.S. Debtors other than NN CALA.[14]  Accordingly, on

September 30, 2009, the Joint Administrators on behalf of NNSA filed a proof of claim against

NNI, which was assigned Claim No. 4923 (the "Placeholder Claim").  See Placeholder Claim,

Peacock Decl. at Ex C.[15]  The Placeholder Claim, which totaled a mere five paragraphs, only

asserted claims "in respect of any heretofore unknown, unliquidated or unmatured claim or

claims that the Administrators, NNUK, the Insolvency Practitioner and/or any EMEA Company

may have against Nortel Networks Inc."  Id. ¶ 2.  The only factual context the Placeholder Claim

provided was to allege that these "potential claims against the Debtors and their affiliates aris[e]

out of transfer pricing, intercompany dealings, trading and other arrangements or agreements

between [NNI and NNSA]."  Id.  No such agreements or arrangements were specified, nor was

other supporting documentation attached.  Though the Placeholder Claim asserted potential

claims for mismanagement or breach of duty, those were only as against the directors and

officers of NNI and only "with respect to the operation, management and control of *Nortel*

*Networks Inc.* or its affiliated debtors."  Id. (emphasis added).

Given the lack of any allegations sufficient to provide notice of the basis for the

Placeholder Claim, or any effort by NNSA to amend it, the Debtors objected to the Placeholder

Claim on April 1, 2011, seeking an order that required NNSA and the other EMEA Debtors to

---

[14]      See Order Establishing Deadlines For Filing Proofs Of Claim And Approving Form And Manner Of Notice
Thereof [D.I. 1280], entered August 4, 2009.

[15]      The French Liquidator did not file a separate placeholder claim against NNI.  Substantially similar claims
were also filed on September 30, 2009 by the other EMEA Debtors or other related entities against each of the U.S.
Debtors other than NN CALA.

amend their proofs of claim to provide a more definite statement.[16]   The Canadian Debtors had

obtained a parallel order from the Canadian Court, requiring the EMEA Debtors to file whatever

claims they asserted against the Canadian Debtors by March 18, 2011.[17]   This Court granted the

U.S. Debtors' objection on May 10, 2011, ordering that the EMEA Debtors provide a more

definite statement by June 1, 2011, absent which their claims would be disallowed and expunged

with prejudice.[18]

## NNSA'S AMENDED PROOFS OF CLAIM

### A.    Factual Predicate: Five Alleged Factual Patterns Underlie NNSA's Claim

Pursuant to the Court's EMEA Claims Order, on June 3, 2011, NNSA filed its amended

Claim.  The Claim alleges 22 causes of action based on five separate pre-petition transactions or

types of transactions which allegedly harmed NNSA.  In short, the Claim represents no more

than a series of "you too" additions to the EMEA Debtors' Canadian Claim: repeated conclusory

allegations that NNI should also somehow be responsible for transactions that were allegedly

entered into to benefit NNL.

### 1.    Transfer Pricing

Prior to the Petition Date, like many multinational groups, Nortel operated a transfer

pricing arrangement, with the goal of allocating profits in each of the countries where the Group

---

[16]    See Debtors' Objection to the Proofs of Claim Filed by the EMEA Claimants and Motion for an Order
Requiring a More Definite Statement of Claim and Setting a Deadline for the Filing of Any Proofs of Claim by the
EMEA Claimants [D.I. 5200] (the "EMEA Claims Objection").

[17]    See EMEA Claims Objection ¶ 3.  Pursuant to the order of the Canadian Court, the EMEA Debtors filed
nineteen claims against the Canadian Debtors (collectively, the "Canadian Claims").  See Notice of Submission of
Proofs of Claim, dated May 18, 2011 [D.I. 5433].

[18]    See Order Requiring EMEA Claimants to File a More Definite Statement of Claim and Setting a Deadline
for the Filing of Any Proofs of Claim By the EMEA Claimants [D.I. 5402] (the "EMEA Claims Order").  On
request of the EMEA Debtors, that date was later extended to June 3, 2011.  See Order Approving Extension of
Deadline for EMEA Claimants to File a More Definite Statement of Claim and to File Any Proofs of Claim [D.I.
5588].  While NNSA filed its Claim against NNI, which purported to amend its Placeholder Claim, over 350 other
claims that were the subject of the EMEA Claims Order were not timely amended or otherwise stated with more
particularity by June 3, 2011.  These claims have since been expunged from the U.S. Debtors' claims register in
accordance with the EMEA Claims Order.

did business.[19]  Claim ¶ 36.  From 2001, the Nortel Group adopted a residual profit split method

("RPSM") of transfer pricing.  Id. ¶ 37.  This system divided participants into two main groups –

limited risk entities and residual profit entities.  Id. ¶ 41.  Limited risk entities were entitled only

to profits from their direct sales earnings; residual profit entities received remaining profits or

losses attributable to intangibles such as research and development.  Id. ¶¶ 41-42.  In December

2004, NNSA, NNI, NNL and certain other Group members entered into a Master Research and

Development Agreement ("MRDA"), which "provided the architecture and contractual basis to

enable the RPSM to be applied."  Id. ¶ 46.

NNSA alleges that the MRDA and RPSM were not entered into on an arm's length basis,

were not in its interests, and deprived NNSA of revenue.  See, e.g., id. ¶¶ 18(d), 54, 106.

Specifically, the Claim alleges that "the imposition and subsequent operation of the RPSM was

detrimental to NNSA, as NNI was aware," and that this alleged harm to NNSA was due to flaws

in the RPSM.  Id. ¶¶ 55-69.  NNSA thus alleges that the transfer pricing systems "took funds

from NNSA, for the benefit of NNL" as part of a "general policy to the effect that value and cash

within the Nortel Group should be transferred to NNL."  Id. ¶¶10, 55; see also id. ¶ 39 ("The

decision to implement the RPSM . . . was primarily motivated by a desire to allocate more profit

to the Canadian entities in order to benefit NNL at the expense of NNSA.").  Nortel's transfer

pricing arrangement negatively affected not only NNSA, but also NNI.  In particular, the Claim

explains that the RPSM model was challenged by the IRS, which resulted in NNI's $2 billion

---

[19]      Movants accept the truth of NNSA's well-pleaded allegations for purposes of this Objection and Motion
only.  See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).  On a motion to dismiss, the Court may
consider not only the complaint, but documents whose contents are alleged in the complaint, and documents
attached to a motion to dismiss that are referred to in the plaintiff's complaint and central to its claims.  See Pryor v.
NCAA, 288 F.3d 548, 559-60 (3d Cir. 2002).  While the court must accept as true all factual allegations in the
complaint, it "need not accept as true unsupported conclusions and unwarranted inferences", and must draw on the
allegations in the complaint "in a realistic, rather than a slavish, manner."  Doug Grant, Inc. v. Greate Bay Casino
Corp., 232 F.3d 173, 184 (3d Cir. 2000) (internal quotations and citations omitted).

claim against NNL "to reflect net overpayments made by NNI to NNL for [past] tax years." Id.

¶ 68.  The Claim further asserts that control of the Nortel Group's operations "was highly

centralized, and on a general basis, was maintained primarily by the Canadian Entities." Id. ¶ 13.

Nonetheless, NNSA alleges that "NNI was also involved in jointly controlling certain

aspects of the Nortel Group's operation." Id. ¶ 15.  The Claim avers that NNI, along with NNL,

was "heavily involved" in the "implementation and operation" of the transfer pricing

arrangements and their approval by the U.S., Canadian, and English tax authorities, to the

exclusion of NNSA.  Id. ¶¶ 16, 18; see also id. ¶ 54 (averring that "NNI facilitated this value

transfer [to NNL]").  NNSA avers that it "was simply instructed to sign the MRDA," without

noting what entity or individuals gave the instruction.  Id. ¶ 18(d).  NNSA asserts that "NNI,

NNL and NNSA's de jure directors . . . acted together . . . with the objective of removing value

from NNSA."  Id. ¶ 125.

### 2.    "Project Swift" and the February 2008 Repayment

NNSA contests the propriety of its partial €25 million repayment to NNL of a €200

million 2002 inter-company loan, of which €50 million was still outstanding (the "February 2008

repayment" and "2002 Subordinated Loan").  Claim ¶¶ 70-71.  NNSA alleges that this February

2008 repayment was conceived and carried out in conjunction with the "Project Swift"

transaction.  Id. ¶¶ 23, 25.  As part of Project Swift, NNSA alleges that "NNSA would be

transferred from the ownership of NNL to NNUK," and "that NNL should be repaid what it was

owed under the 2002 Subordinated Loan before that transaction took place."  Id. ¶ 73.  NNSA

asserts that it originally was intended by NNL and NNSA that NNSA would not repay the loan

until NNSA became profitable, and that "[t]he equity position of NNSA at the start of 2008 was

uncertain."  Id. ¶¶ 70(a), 79(b).

Although the 2002 Subordinated Loan was between NNL and NNSA and NNI was not a party to it, NNSA alleges that the February 2008 repayment was "imposed on NNSA by NNI and NNL." Id. ¶ 79. The only factual allegations offered to support this conclusion are that "members of the team that had planned and implemented Project Swift, including Ryan Smith of NNI, discussed a plan for NNSA to repay the 2002 Subordinated Loan," and that "Ryan Smith pushed for NNSA to repay the entire €50 million outstanding." Id. ¶ 75. NNSA alleges, however, that it was able to resist this "push[ ]" and only paid half the outstanding amount. Id. NNSA also alleges elsewhere in the Claim that at some point in time Ryan Smith was "seconded to NNUK from NNI." Id. ¶ 22.

3.    Unspecified Pre-Petition Business Sales

The Claim alleges that prior to the Petition Date, "NNSA entered into various global business sales with other Nortel entities, including NNI, whereby a particular business line was sold by those Nortel entities to a third party purchaser." Claim ¶ 80. The only example of such transactions (collectively, the "Pre-Petition Business Sales") that the Claim points to is a sale agreement dated December 4, 2006 for the "sale of Nortel's UMTS business to Alcatel Lucent S.A. ('Alcatel') for an adjusted purchase price of approximately US $291 million." Id. No other Pre-Petition Business Sale is identified in the claim, whether by date, parties to the transaction, purchase price, or otherwise.

The Claim asserts that the allocation of the proceeds from the Alcatel sale and other unspecified Pre-Petition Business Sales failed to provide NNSA with the percentage to which it was allegedly entitled. Id. ¶ 83. Specifically, NNSA alleges that the proceeds from Pre-Petition Business Sales were allocated "on the erroneous assumptions that were contained in the transfer pricing structure," which did not comply with the implied agreement of the "parties" to allocate the proceeds of such sales "on the basis of an arm's length legal entitlement that each had to the

12

proceeds." Id. ¶¶ 81-82.  NNSA further avers that "it appears that in fact the allocation was not even applied in conformity with these erroneous assumptions." Id. ¶ 82.  NNSA's Claim is silent as to what allocation methodology any such "legal entitlement" would require.  NNSA asserts only that a transfer-pricing method would not comply with the arm's length principle.  Id. ¶ 82. The Claim suggests that the factual detail concerning the Pre-Petition Sale Proceeds "will be further particularized following discovery." Id. ¶ 149.

4.    <u>Contingent Tax Liability</u>

NNSA also asserts that its taxation matters were controlled by NNL and NNI.  Claim ¶¶ 84, 171 ("At all material times, NNI (together with NNL) controlled NNSA's tax affairs"). This is alleged to be "particularly so in relation to transfer pricing matters" (which allegations are discussed above), but NNSA alleges it was "also the case more generally." Id.  NNSA asserts a contingent claim against NNI to the extent NNSA suffers some future loss in the event a taxation authority was "to make a claim against NNSA in relation to a failure to pay the proper level of taxation in any years." Id. ¶¶ 85, 173.

5.    <u>FSD Proceedings</u>

Finally, NNSA alleges that the UK Pensions Regulator has determined that a Financial Support Direction ("<u>FSD</u>") requiring the provision of financial support to the Nortel Networks UK Pension Plan should be issued "in respect of certain EMEA Companies," including NNSA. Claim ¶ 86.  NNSA asserts that this determination has been referred to the Upper Tribunal (Tax and Chancery Chamber), though those references have not yet been heard.  Id. ¶ 87.  NNSA alleges that an FSD was also issued against NNI.  Id. ¶ 88.  Although NNSA alleges the UK Pensions Regulator may issue an FSD under English law if certain conditions, such as reasonableness, are satisfied, the Claim does not state the grounds for the issuance of the FSD as to NNSA or NNI, nor whether there is any connection between the two FSDs issued.

13

The Claim alleges that "[i]n the event that there is a non-compliance with an FSD, the UK [Pensions] Regulator has power . . . to issue a contribution notice ('<u>CN</u>') to [the recipient of the FSD]." <u>Id.</u> ¶ 92.  NNSA avers that the CN can only be issued if the UK Pensions Regulator finds that it is "reasonable" to do so, and that no CN has been issued against NNSA or NNI.  <u>Id.</u> NNSA maintains, however, "in the event NNSA is ultimately required pursuant to an FSD or CN to make a payment or series of payments to the Trustee" or otherwise support the Scheme, it may assert claims against NNI to recover to the extent NNI is responsible for such payments.  <u>Id.</u> ¶¶ 178-183.

### B.    Causes of Action Pled by NNSA: Roadmap

Based on the five broad categories of transactions set forth above, NNSA's Claim asserts 22 causes of action.  The purported legal bases for these claims range from tort to contract, from direct to secondary liability, and from French to U.S. law.  While many of these causes of action are duplicative or mutually exclusive, for purposes of this Objection, they share common required elements, pleading deficiencies or other legal bars that permit the Court to consider – and dismiss – them in groups.[20]

<u>First</u>, NNSA asserts claims based on four of the five categories of factual allegations (all but the FSD) for the French claim of mismanagement.  Specifically, in claims 2, 6, 13 and 16, NNSA alleges that NNI breached duties owed to NNSA as a de facto director.  <u>See</u> Claim ¶¶ 97-110, 127-34, 154-61, 174.  As set forth below, each of these claims fails because NNSA either

---

[20]    While the Movants do not by this Objection currently seek to dismiss NNSA's claim for alleged outstanding intercompany trading debts (claim 1), the Movants reserve all of their rights with respect to such claim, including without limitation, to object to such claim at a later date on any and all grounds.  For the avoidance of doubt, in the event the Court finds that any portion of NNSA's Claim withstands Rule 12(b)(6) scrutiny, this Objection is without prejudice to further substantive or non-substantive objections to the Claim, including without limitation rights to set-off and any other defenses.

fails to adequately plead, or is estopped from pleading, facts that provide a cognizable basis for any such duty.

Second, implicitly recognizing that its attempts to impose a direct duty on NNI fail, NNSA attempts to plead a variety of causes of action that would hold NNI liable for the alleged primary misconduct of others.  In claims 4, 8, 15, and 18, NNSA makes allegations under various U.S. state laws that NNI aided and abetted breaches of fiduciary duty allegedly committed by NNL and/or the de jure directors of NNSA in respect of four of the five categories of transactions.  Id. ¶¶ 118-23, 140-45, 166-70, 176.  The Claim, however, lacks any non-conclusory allegations (i) of what assistance NNI offered, (ii) of an underlying breach of fiduciary duty, or (iii) that the alleged assistance was undertaken with knowledge of such an underlying breach.  In addition, NNSA pleads conspiracy claims under U.S. state law (claims 5 and 8) allegedly arising from transfer pricing and the February 2008 repayment.  Id. ¶¶ 124-26, 146-48.  Similarly, the conspiracy claims fail to include any particularized allegations identifying who was a party to the alleged conspiracy, the individuals involved, what the conspirators agreed, and when that agreement was reached.  Thus, NNSA's secondary liability claims lack the well-pleaded allegations necessary to survive a motion to dismiss.

Third, NNSA asserts claims under French tort law relating to four of the five categories of factual allegations.  Specifically, in claims 3, 7, 14 and 17, NNSA alleges that NNI committed a fault under French law by acting together or conspiring with NNL, and/or aiding, abetting, assisting and/or encouraging the actions of NNL and/or NNSA's de jure directors and that the fault caused NNSA to suffer a loss.  See id. ¶¶ 111-17, 135-39, 162-65, 175.  As set forth below, each of these claims fails because NNSA fails to adequately plead the required elements of a tort

claim under French law.  Most significantly, NNSA fatally fails to plead causation or the requisite knowledge by NNI required to state such a claim.

Fourth, NNSA asserts a variety of contractual and tort claims that allegedly arise from the "various" Pre-Petition Business Sales.  Id. ¶ 80.  Although these claims are pled under both U.S. and French law, each of such claims – numbered 10-15 – shares a common failure to identify the underlying transactions, their dates, parties, or other basic details to satisfy the requirements of notice pleading under Twombly and Iqbal.  While NNSA attempts to identify a single such sale – a December 2006 transaction with Alcatel – the various quasi-contractual claims for relief it asserts fail on independent grounds.

Fifth, NNSA asserts several claims "under French law, or alternatively …[under] US law," in the event that NNSA is required to make some unknown payment pursuant to an FSD or CN (claims 19-22).   Id. ¶¶ 179-83.  As set forth below, none of the FSD Claims can stand because they are inadequately pled, and in certain instances do not even exist under French law. Alternatively, each of these claims fails under the section 502(e)(1)(B) of the Bankruptcy Code and under U.S. state law.

Finally, to the extent that any claims remain, NNSA asserts a number of claims that arose more than three years before they were asserted, and thus are barred by the applicable statute of limitations.[21]

---

[21]     For the Court's convenience, two charts setting for the causes of action pled by NNSA, together with the claim number, the law that NNSA claims is applicable to the claim, and the bases for dismissal discussed herein, are include above at pages xii-xv.  The first chart presents this information in the order that this Objection addresses NNSA's claims; the second chart is sorted by claim number in the order used by NNSA in its Claim.

**ARGUMENT**

**I.**
**NNSA'S CLAIM MUST BE TESTED UNDER FEDERAL PLEADING STANDARDS**

> **A.    The Court Should Exercise its Discretion to Apply Rule 12(b)**
> **to NNSA's Proof of Claim**

Bankruptcy Rule 9014(c) permits a bankruptcy court to exercise its discretion "at any

stage in a particular matter to direct that one or more of the other rules in Part VII shall apply."

Fed. R. Bankr. P. 9014(c).  This includes Bankruptcy Rule 7012(b), which makes Rules 12(b)

through 12(i) of the Federal Rules of Civil Procedure (the "Federal Rules" or "Rules") applicable

in bankruptcy proceedings.  Fed. R. Bankr. P. 7012(b).  Where, as here, a determination under

Bankruptcy Rule 7012(b) permits dismissal on the pleadings, without a waste of judicial

economy and estate resources through discovery and trial, bankruptcy courts routinely apply

Rule 12(b)(6) to claims objections.  See, e.g., Flake v. Alper Holdings USA, Inc. (In re Alper

Holdings USA, Inc.), 398 B.R. 736, 748 (S.D.N.Y. 2008) (affirming bankruptcy court's

dismissal of claims under Rule 12(b)).[22]  Even if the Court were only to grant this Objection in

part, winnowing the claims at issue would materially progress resolution of NNSA's Claim.  In

re Diamond Mortg. Corp. of Ill., 105 B.R. 876, 877 n.1 (Bankr. N.D. Ill. 1989) (deeming a

claims objection a motion under Bankruptcy Rule 7012 to resolve the objections as a matter of

law "[i]n an effort to move this litigation along.").[23]  Indeed, the Court has already recognized

---

[22]    See also 900 Capital Servs., Inc. v. Cloud (In re Cloud), 214 F.3d 1350, No. 99-51109 (CDK), 2000 WL
634637, at *2 (5th Cir. May 4, 2000) (affirming bankruptcy court's dismissal of proof of claim where "bankruptcy
court was well within its discretion to apply Rule 12(b)(6) to this contested matter"); In re Spiegel, Inc., 337 B.R.
821 (Bankr. S.D.N.Y. 2006) (exercising discretion under Bankruptcy Rule 9014 to apply Rule 12(b)(6) to claims
objection); In re WorldCom, Inc., 322 B.R. 530 (Bankr. S.D.N.Y. 2005) (dismissing proof of claim pursuant to Rule
12(b)(6)); In re Sevko, Inc., 143 B.R. 167 (Bankr. N.D. Ill. 1992) (applying Rule 12(b)(6) to objection to creditors'
amended proof of claim pursuant to Bankruptcy Rule 9014).

[23]    See also In re Adelphia Commc'ns Corp., 359 B.R. 54, 56 n.5 (Bankr. S.D.N.Y. 2006) (finding the Rule
12(b)(6) motion "to be a useful procedural mechanism to decide some kinds of contested matter disputes
economically, saving litigation costs for the benefit of creditors and other stakeholders."); In re Best Prods. Co., 210

17

the advantages the Part VII rules afford in addressing intercompany claims, having applied Rule

12(e) to the EMEA Debtors' Placeholder Claims.  <u>See</u> EMEA Claims Order.

Moreover, courts recognize that a proof of claim is generally the functional equivalent of

a complaint in an adversary proceeding or other civil action.  <u>See, e.g.</u>, <u>Hill v. Day (In re Today's</u>

<u>Destiny, Inc.)</u>, 388 B.R. 737, 757 (Bankr. S.D. Tex. 2008) (noting that the "procedural

consequences for filing a proof of claim or civil action are materially similar."); <u>Amatex Corp. v.</u>

<u>Aetna Cas. & Sur. Co. (In re Amatex Corp.)</u>, 107 B.R. 856, 859 (E.D. Pa. 1988) ("[T]he filings

of proofs of claims by claimants are the equivalent of their filing suits against the Debtor."),

<u>aff'd</u>, 908 F.3d 861 (3d Cir. 1990).  This rationale applies with particular force to NNSA's

Claim, which is structured as a complaint, with separate asserted legal causes of action.

Therefore, Movants should be entitled to move to dismiss the NNSA Claim just as one could

move to dismiss a complaint, particularly as this furthers the goal of bringing bankruptcy court

procedure into line with district court procedure.  <u>See</u> <u>In re Enron Corp.</u>, 298 B.R. 513, 521-22

(Bankr. S.D.N.Y. 2003) (noting that "Part VII of the [B]ankruptcy [R]ules is based on the

premise that to the extent possible practice before the bankruptcy court and the district court

should be the same"), <u>aff'd</u>, 419 F.3d 115 (2d Cir. 2005) (internal quotation marks and citation

omitted).

### B.    NNSA's Claim Fails to Meet the Relevant Pleading Standards

To survive scrutiny under Bankruptcy Rule 7012 and Federal Rule 12(b)(6), Rule 8

requires that a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009) (internal

quotation marks and citation omitted); <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).  A

---

B.R. 714, 716 (Bankr. E.D. Va. 1997) (dismissing claim for administrative expenses under Rule 12(b)(6), as it
"offer[ed] an opportunity to resolve the parties' disputes expeditiously.").

claim has facial plausibility where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S.Ct. at 1949; see also Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009) ("[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts.") (citation omitted). Although "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Iqbal, 129 S.Ct. at 1950.

The Third Circuit applies this Rule 8 analysis in three steps: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011). While various causes of action asserted by NNSA are purportedly brought under French (or other unspecified) law, the question of whether its Claim is adequately pled is determined as a matter of U.S. federal procedure. See O'Connell v. Arthur Andersen LLP (In re Alphastar Ins. Grp. Ltd.), 383 B.R. 231, 274 (Bankr. S.D.N.Y. 2008); United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc., 216 F. Supp. 2d 198, 220-21 n.8 (S.D.N.Y. 2002).

While Rule 8(a) alone requires dismissal of the Claim, Bankruptcy Rule 7009(b) also incorporates the provisions of Federal Rule 9(b), providing that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."[24] Rule 9(b) "appl[ies] to all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud." Toner v. Allstate Ins. Co., 821 F. Supp.

---

[24]    Bankruptcy Rule 9014(c) is clear that Bankruptcy Rule 7009(b) ("Rule 9(b)") automatically applies to contested matters such as this Claim Objection. Fed. R. Bankr. P. 9014(c).

276, 283 (D. Del. 1993).  Certain of NNSA's claims allege that NNI either directly or indirectly

participated in a scheme to remove assets from NNSA for the benefit of the Canadian Debtors.

See Claim ¶¶ 114, 120-22, 125-26, 136, 142-43, 147-48, 153, 163, 168-70; see also Forman v.

Salzano (In re Norvergence, Inc.), 405 B.R. 709, 747 (Bankr. D.N.J. 2009) (where complaint

"equates the conduct of Debtor's [directors] and the Leasing Companies as a fraud enabling the

defendants to exploit and loot the debtor for defendants' own purposes, the aiding and abetting

claims allegations must be stated with particularity in accordance with Rule 9(b).") (internal

quotation marks and citation omitted).  NNSA's claims based on its transfer pricing and Pre-

Petition Business Sale allegations are also predicated on assertions that those transactions were

not negotiated at arm's length, Claim ¶¶ 11, 18, 51-69, 81-82, 106, 114, 150, an allegation which

Courts routinely consider as a "badge of fraud" in inferring fraudulent intent.  See Adamson v.

Bernier (In re Bernier), 282 B.R. 773, 781 (Bankr. D. Del. 2002) ("whether the transaction is

conducted at arm's length" is a factor indicative of an intent to defraud).  As a result, a number

of NNSA's claims – claims 3-5, 7-9, 12, 14-15 – invoke Rule 9(b)'s specificity requirements, as

well as Rule 8(a)'s plausibility test.[25]

## II.
## NNSA'S CLAIMS FOR MISMANAGEMENT FAIL TO STATE A CLAIM

NNSA asserts mismanagement claims under French law based upon transfer pricing

(claim 2), the February 2008 repayment associated with Project Swift (claim 6), certain

unidentified Pre-Petition Business Sales (claim 13), and contingent taxation matters (claim 16).

A mismanagement claim under French law is dependent upon (i) finding NNI is a de facto

director of NNSA and (ii) that NNI engaged in specific, affirmative acts of mismanagement that

---

[25]    Rule 9(b) applies to NNSA's French tort law claims (claims 3, 7, and 17) to the extent these claims are predicated upon allegations that NNI either directly or indirectly participated or conspired in a scheme with NNL to remove assets from NNSA for the benefit of the Canadian Debtors.

contributed to NNSA's excess of liabilities over assets.  The mismanagement claims fail as a matter of law.

First, NNSA is estopped from asserting that NNI or NNL acted as a de facto director of NNSA because of the prior inconsistent positions NNSA has taken that were adopted by this Court and the English Court.  Second, should the Court consider the de facto director claims, such claims must nevertheless be dismissed because NNSA does not allege sufficient facts to render its allegations of de facto directorship legally sufficient or plausible.

**A.      NNSA is Estopped from Asserting that NNI or NNL Served as a De Facto Director of NNSA**

In order to obtain relief in the administration proceedings in England, and then to obtain recognition of those proceedings in this Court, the EMEA Debtors, including NNSA, took the position that they were managed, operated and controlled from England.  After those arguments were accepted by this Court and the English Court to NNSA's benefit, NNSA now attempts an about-face, asserting that the EMEA Debtors were managed and controlled from North America by NNL, allegedly with the assistance of NNI.  NNSA's claims for mismanagement depend on allegations that NNI acted as a de facto director of NNSA (claims 2, 6, 13, and 16).  NNSA's claims against NNI for aiding and abetting and tort under French law are similarly based on the allegation that NNL acted as a de facto director of NNSA (claims 3-4, 7-8, 14-15, 17-18).[26]  In short, each of those claims is premised on the allegation that NNI and/or NNL asserted directorial control over NNSA.  But in light of NNSA's prior inconsistent positions – which were

---

[26]      Claims 3, 7, and 14 are based on the allegation that NNI conspired, aided, abetted, and/or assisted NNL in an "act of mismanagement or mismanagement fault" against NNSA, see Claim ¶¶ 114(a), 136(a), 163(a), which would require that NNL be found to be a de facto director of NNSA.  See Bremond Decl. ¶ 26 ("Liability for mismanagement [under French law] . . . requires . . . the person sued is a *de jure* or a *de facto* director of the legal entity.").

accepted by this Court and the English Court in orders that have long since become final –

NNSA is both judicially and collaterally estopped from now making these contrary allegations.

1.    NNSA's Representations

In order to first obtain the Initial Orders from the English Court placing the EMEA

Debtors into administration, the EMEA Debtors submitted sworn witness statements from

Michel Clément, director of NNSA since November 2000 and president, and Sharon Lynette

Rolston, a director of each of the EMEA Debtors.  Clément Statement, Peacock Decl. at Ex. D;

Rolston Statement, Peacock Decl. at Ex. E.[27]  Unlike the Joint Administrators, Clément and

Rolston had historical perspective on the actual operation of the EMEA Debtors before they were

placed into administration.[28]  Their witness statements repeatedly and unequivocally state that

the EMEA Debtors' own directors and officers were controlled by senior management in

England.  The Clément Statement affirmed that: (i) there was a "wide range of operational,

strategic, financial and high level administrative and advisory control over [NNSA] by senior

management of EMEA in England," Peacock Decl. at Ex. D. ¶ 33; (ii) "[b]anking and [t]reasury

functions are run out of England," id. ¶ 39; and (iii) "financial, tax and distribution issues,

strategic and high level decisions are generally made by the Finance, and Tax functions of the

EMEA group which are all located in England" id. ¶ 40; see also Rolston Statement, Peacock

Decl. at Ex. E ¶15(c) ("senior management of all key primary function (i.e. sales, finance,

treasury, legal and human resources) required for operation of the EMEA Region are located in

England"); id. ¶ 15(i) ("decisions in relation to settlement of intercompany accounts are made by

---

[27]    In his statement, Mr. Clément testified to his direct knowledge on behalf of NNSA and also affirmed that he read the Rolston Statement and "agree[d] with its contents insofar as it relate[d] to the business and affairs of [NNSA]."  Clément Statement, Peacock Decl. at Ex. D ¶ 6; see also id. ¶ 33.

[28]    Response of the Monitor of the Canadian Debtors to the Verified Chapter 15 Pets. for Recognition of Foreign Proceedings and Related Relief With Respect to the EMEA Debtors (attaching at Ex. A excerpts from Dep. of Alan Robert Bloom, dated Dec. 16, 2010), Peacock Decl. at Ex. K at Ex. A at 277:19-23; Clément Statement, Peacock Decl. at Ex. D ¶ 17.

the EMEA [t]reasury team in England"); id. ¶¶ 15(g), 15 (m) (both "finance and control

functions" and "treasury and banking functions" for the EMEA Debtors were run from England).

Mr. Clément and Ms. Rolston also detailed how senior management in England was responsible

for decisions concerning the EMEA Debtors, including NNSA.[29]  This included tax and treasury

functions.[30]

     The Clément Statement expressly asserted that: "central management and control [of

NNSA] is to a large extent directed from England, *where all major decisions are made*."

Clément Statement, Peacock Decl. at Ex. D ¶ 43 (emphasis added).[31]  The Rolston Statement

similarly attested to both the EMEA region's autonomy from Nortel's North American entities as

well as to NNUK's control over the EMEA region.  Peacock Decl. at Ex. E ¶ 114 ("The EMEA

senior management operates with a large degree of autonomy from Canada, setting all policies,

budgets, targets and operational matters for the EMEA Region.").[32]

     The English Court accepted this evidence, finding that because the EMEA Debtors were

operated and controlled by individuals located in England – not North America – the center of

---

[29]    Clément Statement, Peacock Decl. at Ex. D ¶¶ 33, 35; Rolston Statement, Peacock Decl. at Ex. E ¶ 32 ("England is the management centre for EMEA"), id. ¶ 117 (referencing "England as the centre of decision making"); id. ¶ 119 ("the EMEA senior management exercise control and authority over the EMEA region").

[30]    Clément Statement, Peacock Decl. at Ex. D ¶¶ 39-40; Rolston Statement, Peacock Decl. at Ex. E ¶ 84 ("EMEA treasury determines how to settle intercompany accounts . . . with the ultimate decision regarding payment led by EMEA treasury"), id.¶ 85 ("Global inter-company facilities and loans are all managed from EMEA treasury in England"), id. ¶ 186 ("The tax group based in England (the "EMEA Tax Group") is responsible for managing and supervising tax"), id. ¶ 205 ("[i]nter-company loans and inter-company trade settlements are both managed from England").

[31]    See also Clément Statement, Peacock Decl. at Ex. D ¶ 35 ("[s]enior management in England exercise control and authority over [NNSA]"); id. ¶ 39(a) ("[s]ubject to French law requirements decisions regarding payment of intercompany liabilities are made by the Treasury function which is based in England"); id. ¶ 33 (referring to the Rolston Statement as "evidenc[ing] the wide range of operational, strategic, financial and high level administrative and advisory control over the Company in England by senior management of EMEA.");

[32]    Rolston Statement, Peacock Decl. at Ex. E ¶ 109 (while "overall global strategy for the Nortel Group is set at a very high level of generality by NNL and the Chief Executive Officer and Chief Finance Officer in Canada . . . Senior Management in Maidenhead [England] control the applicability of the global strategy to EMEA.").

main interests for NNUK and the other EMEA Debtors was in England.[33]  In its Initial Order, the

English Court found that based upon the Rolston and Clément Statements, (i) the administration

order could be entered, and (ii) that proceedings in England would qualify as "main

proceedings."[34]  Applying the EC Regulation on Insolvency Proceedings 2000, the English Court

necessarily accepted the EMEA Debtors contention that England was the center of main interests

for the EMEA Debtors.  Todd Decl. ¶ 141.[35]

    The EMEA Debtors then submitted much of that same evidence to this Court in seeking

Chapter 15 recognition, upon which the Court entered two orders also finding that England was

the center of main interests for the EMEA Debtors.[36]  The Rolston Statement was twice

submitted to this Court – first in order to obtain Chapter 15 recognition for NNUK in June 2009,

---

[33]    See Memorandum of Law in Support of Verified Chapter 15 Petitions for Recognition of Foreign
Proceedings and Related Relief with Respect to the EMEA Debtors, dated October 20, 2010, Peacock Decl. at Ex. O
at 7-8 [D.I. 48 in Case No. 09-11972] (Joint Administrators arguing that the "[Rolston and Clément] witness
statements attached as Exhibit I and II to the Bloom Declaration detail the many additional facts demonstrating that
the English Proceedings are pending in the center of each of the EMEA Debtors' main interests and constitute
'foreign main proceedings' as defined in § 1502(4) of the Bankruptcy Code.  Viewing these same facts to determine
if each of the EMEA Debtors was a proper debtor under the English Insolvency Act, the English Court held that
England is the center of main interest for each of the EMEA Debtors."); see also Initial Orders, Peacock Decl. at Ex.
F at 1.

[34]    See NNUK Chapter 15 Petition, Peacock Decl. at Ex. G ¶ 15(a) ("In the Initial Order, the English Court
found that the English Proceedings are main proceedings as defined in Article 3 of Council Regulation (EC) No.
1346/2000 on Insolvency Proceedings.  By definition, a main proceeding is one that takes place in the jurisdiction
where the debtor has its center of main interests.  Therefore, the English Court concluded that the [center of main
interests] for the Foreign Debtor was, in fact, England."); see also Initial Orders, Peacock Decl. at Ex. F at 1 ("Upon
reading the evidence relating to this application and upon the Court being satisfied on the evidence before it that the
EC Regulation . . . does apply and that these proceedings are main proceedings as defined in Article 3 of the EC
Regulation.").

[35]    The applicable European insolvency regulation is based on the same UNICTRAL Model Law on Cross-
Border Insolvency as Chapter 15 of the Bankruptcy Code.  See In re Bear Stearns High-Grade Structured Credit
Strategies Master Fund, Ltd., 374 B.R. 122, 129 (Bankr. S.D.N.Y. 2007), aff'd, 389 B.R. 325 (2008).  Under both
that regulation and Chapter 15, even though NNUK was incorporated in England, NNUK could not rely on that
place of incorporation where its activities were actually controlled elsewhere. Id. at 130 (rejecting Chapter 15
petition, even in the absence of objection, where Cayman-incorporated debtor was actually managed and controlled
by personnel located in New York); see also In re Grand Prix Assocs. Inc., No. 09-16545 (DHS), 2009 Bankr.
LEXIS 1239, at * 22 (Bankr. D.N.J. May 18, 2009) ("the Chapter 15 Petition process should not become a 'rubber
stamp' exercise") (internal citations and quotations omitted).

[36]    See NNUK Recognition Order, Peacock Decl. at Ex. M at 1 (citing Rolston Statement); EMEA
Recognition Order, Peacock Decl. at Ex. N at 2 (citing Rolston Statement, Clément Statement and related deposition
testimony entered into evidence).

and again to obtain Chapter 15 recognition for the remaining EMEA Debtors, including NNSA,

together with the Clément Statement, in October 2010.[37]  NNSA also submitted sworn

declarations and deposition testimony from the Joint Administrators themselves affirming that

the Clément and Rolston Statements were true and correct as late as January 2011, such that

"England is the center of main interest for each of the EMEA Debtors as each of the EMEA

Debtor's central management and control is handled to a large extent from Maidenhead,

England."[38]  Indeed, the EMEA Debtors expressly argued that "[w]hile NNC is the ultimate

parent of all Nortel Companies worldwide and NNC's headquarters in Toronto serves as the

global headquarters, *the EMEA Debtors' central management and control is directed from the

head office in Maidenhead, England, where all major decisions specific to the EMEA Debtors

are made.*"[39]  In turn, this Court's orders granting Chapter 15 recognition are express that its

findings on the EMEA Debtors' center of main interests are based upon the Clément and Rolston

Witness Statements.[40]

---

[37]     See Rolston Statement, Peacock Decl. at Ex. E & Bloom Decl., Peacock Decl. at Ex. J ¶ 6.

[38]     Bloom Decl., Peacock Decl. at Ex. J ¶ 7; see also Jan. 31, 2011 Hr'g Tr., Peacock Decl. at Ex. L at 20:11-14 (submitting Joint Administrators' deposition transcript into evidence on record of recognition hearing); Response of the Monitor of the Canadian Debtors to the Verified Chapter 15 Pets. for Recognition of Foreign Proceedings and Related Relief With Respect to the EMEA Debtors (attaching at Ex. A excerpts from Dep. of Alan Robert Bloom, dated Dec. 16, 2010), Peacock Decl. at Ex. K at Ex. A at 49:17 - 50:4, 107:9 - 107:17, 278:21 - 279:9 (Rule 30(b)(6) deposition testimony from Joint Administrators affirming that Rolston and Clément Statements remained true and correct).

[39]     Memorandum of Law in Support of Verified Chapter 15 Petitions for Recognition of Foreign Proceedings and Related Relief with Respect to the EMEA Debtors, dated October 20, 2010, Peacock Decl. at Ex. O at 7 [D.I. 48 in Case No. 09-11972] (emphasis added).

[40]     See EMEA Recognition Order, Peacock Decl. at Ex. N at 2 (noting that the "Court having considered and reviewed the Chapter 15 Petitions and all other documents and evidence filed in support thereof, namely the witness statements of Sharon Rolston attached as Exhibit I to the Declaration of Alan Robert Bloom dated October 18, 2010 and witness statements of Michel Clément attached as Exhibit II thereto, and the deposition testimony of Alan Robert Bloom dated December 16, 2010") and ¶ G (finding that "England is the center of main interests of each of the EMEA Debtors and, accordingly, the English Proceedings are 'foreign main proceedings' . . . and entitled to recognition as foreign main proceedings"); see also NNUK Recognition Order, Peacock Decl. at Ex. M at 1 (basing findings "upon this Court's review and consideration of . . . the Declaration of Sharon L. Rolston, dated June 6, 2009, and Exhibit A (Witness Statement of Sharon Lynette Rolston, dated January 14, 2009) thereto, the Declaration of Stephen John Harris, dated June 5, 2009"), and ¶ G (finding that "England . . . is where the center of main interests of the Foreign Debtor is located").

NNSA's allegations that NNL and NNI controlled NNSA and the other EMEA Debtors are directly contrary to these prior positions.  NNSA's Claim now asserts (in conclusory terms) that control of NNSA was somehow exercised by NNL and NNI, who should be deemed de facto directors of NNSA.  Claim ¶ 13 ("Control of the Nortel Group's operations was highly centralized and . . . was maintained primarily by the Canadian Entities."); id. ¶ 15 ("While the Canadian Entities controlled the Nortel group on a general basis, NNI was also involved in jointly controlling certain aspects of the Group's operation together with the Canadian Entities.").  French law on de facto directors requires, at a minimum, that NNSA's de jure directors' decision making independence was so reduced that the de facto director dominated NNSA in some manner.  Declaration of Guilhem Bremond in Support of Joint Objection and Motion to Dismiss Claims of Nortel Networks S.A. (NNSA) and its French Liquidator ("Bremond Decl.") ¶ 32.  Moreover, French courts will only deem a related company to be a de facto director where the control shown is above and beyond that inherent in a corporate group, which – in the case of parent companies – French courts have found where the subsidiary is placed in a role of "total subordination."  Id. ¶ 36.

To the extent the Claim provides any factual allegations to support its assertion that NNI was a de facto director of NNSA, it focuses on tax and treasury functions, which NNSA now alleges were controlled by NNL and NNI.  See, e.g., Claim ¶ 15 ("The control exerted [over NNSA] by NNI related to the Nortel Group's Tax matters, in particular transfer pricing, and to the Nortel Group's Treasury matters.  These tax and treasury functions were responsible for the transactions pursuant to which value was improperly removed from NNSA.").  This is irreconcilably inconsistent with NNSA's prior position that tax, treasury and other management functions for the EMEA Debtors were controlled from England by NNUK.  Compare Claim ¶ 27

26

("The key individuals within Nortel Treasury were from NNI") and id. ¶ 15 ("The control

exerted by NNI related to . . . the Nortel Group's treasury matters") with Clément Statement,

Peacock Decl. at Ex. D ¶ 39 ("Banking and Treasury functions are run out of England, by the

Group Treasury Operations."). Compare Claim ¶ 84 ("NNSA's taxation affairs were controlled

by NNI and NNL"), with Rolston Statement, Peacock Decl. at Ex. E ¶ 186 ("The tax group based

in England (the 'EMEA Tax Group') is responsible for managing and supervising tax throughout

the EMEA region").

Moreover, the judicial finding from both this Court and the English Court that the EMEA

Debtors' center of main interests were in England is tantamount to a determination that England

was their principal place of business. See In re British Am. Ins. Co., 425 B.R. 884, 908 (Bankr.

S.D. Fla. 2010); In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.,

374 B.R. 122, 129 (Bankr. S.D.N.Y. 2007), aff'd, 389 B.R. 325 (S.D.N.Y. 2008). The principal

place of business is the corporation's "nerve center," from which "a corporation's officers and

directors direct, control and coordinate the corporation's activities." Hertz Corp. v. Friend, 130

S. Ct. 1181 (2010). Findings that the "nerve center" of the EMEA Debtors was England cannot

be reconciled with claims predicated upon control of the EMEA Debtors by NNL and NNI.

       2.    NNSA is Judicially and Collaterally Estopped from Reversing its Position

Under the judge-created doctrine of judicial estoppel, "where a party assumed a certain

position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter,

simply because his interests have changed, assume a contrary position." Fleck v. KDI Sylvan

Pools, Inc., 981 F.2d 107, 121 (3d Cir. 1992) (internal quotation marks and citations omitted).

While the doctrine is not subject to "inflexible prerequisites or an exhaustive formula," New

Hampshire v. Maine, 532 U.S. 742, 751 (2001), the Third Circuit has identified factors that

inform the application of judicial estoppel: (i) the positions a party has taken are irreconcilably

inconsistent; (ii) the party had adopted those positions in bad faith; and (iii) estoppel is tailored to the harm.  G-I Holdings, Inc. v. Reliance Ins. Co., 586 F.3d 247, 262 (3d Cir. 2009).  Judicial estoppel is particularly appropriate where – as here – the party benefitted from its original position.  Delgrosso v. Spang & Co., 903 F.2d 234, 242 (3d Cir. 1990).

Each of these factors is present.  As set forth above, claims that NNI and NNL controlled NNSA from North America are irreconcilably inconsistent with NNSA's prior position that it was managed and controlled from England.  Moreover, the EMEA Debtors asserted that if the English Court did not find England to be their center of main interests, they would be required to commence piecemeal liquidation proceedings that would destroy value in the EMEA region.  Rolston Statement, Peacock Decl. at Ex. E ¶¶ 101-102, 211-212; Clément Statement, Peacock Decl. at Ex. D ¶ 26(a).  The EMEA Debtors also acknowledged to the English Court that it was "strategically advantageous" for them to file administration applications in England.  Rolston Statement, Peacock Decl. at Ex. E ¶ 211.  NNSA's changed position after obtaining the benefits in both the English Court and this Court as a result of their prior position "evidences an intent to play fast and loose with the courts." Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 361 (3d Cir. 1996).  This alone permits the Court to find that NNSA's change in position was made in bad faith.  Anjelino v. N.Y. Times Co., 200 F.3d 73, 100 (3d Cir. 2000) (affirming district court's grant of motion to dismiss where finding of bad faith was based on party's prior inconsistent position).  Finally, no sanction short of estoppel can address this harm.  To permit NNSA to take one position for commencement and recognition of its administration proceedings, and then an opposite position in order to manufacture claims against the U.S. Debtors, is precisely the sort of "intentional self-contradiction . . . used as a means of obtaining unfair advantage" that judicial estoppel aims to avoid.  Ryan Operations G.P., 81 F.3d at 362

(internal quotation marks omitted); <u>Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. GMC</u>, 337

F.3d 314, 319 (3d Cir. 2003) (judicial estoppel precludes a party from "gain[ing] an advantage

by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible

theory") (internal quotation marks and citation omitted).

Collateral estoppel also applies to foreclose claims for NNI's mismanagement as a de

facto director (claims 2, 6, 13, 16), as well as claims 3-4, 7-8, 14-15, 17-18 to the extent based on

a breach of duty by NNL.  Collateral estoppel applies where: (i) the issue sought to be precluded

was actually and necessarily determined in a prior proceeding; (ii) the issue was actually

litigated; (iii) the issue was finally determined; and (iv) the determination was essential to the

prior judgment.  <u>Burlington N. R.R. Co. v. Hyundai Merch. Marine Co.</u>, 63 F.3d 1227, 1232 (3d

Cir. 1995).  First, as set forth above, the EMEA Debtors' center of main interests was actually

and necessarily determined before the English Court and this Court.  Second, the issue was also

"actually litigated."  In connection with the Chapter 15 proceedings, both the U.S. Debtors, the

Committee, and the Canadian Debtors engaged in extensive discovery concerning the factual

basis for the EMEA Debtors' assertion that England was the center of main interests for the

EMEA Debtors, including multiple document requests, the production of nearly 9,000 pages of

documents (many of which were the subject of a motion to compel granted by this Court),

multiple rounds of interrogatories, and a deposition pursuant to Rule 30(b)(6) of one of the Joint

Administrators.[41]  With the benefit of that discovery, the Court held a hearing, at which

---

[41]    <u>See generally</u> Notices of Service of Discovery in Case No. 09-11972 [D.I. 58, D.I. 61, D.I. 64, D.I. 70, D.I. 71, D.I. 79, D.I. 83, D.I. 92]; Notices of Deposition in Case No. 09-11972 [D.I. 65, D.I. 66, D.I. 67, D.I. 68, D.I. 84, D.I. 89]; Motion of the U.S. Debtors and the Committee for an entry of an Order Compelling Discovery of the EMEA Debtors and their Administrators [D.I. 69 in Case No. 09-11972]; Order Compelling Discovery of the EMEA Debtors and Their Administrators [D.I. 77 in Case No. 09-11972]; Nov. 29, 2010 Hr'g Tr. at 10:23-11:13 [D.I. 82 in Case No. 09-11972] (permitting, over EMEA Debtors' objection, participation in discovery by Canadian Monitor); Dec. 8, 2010 Hr'g Tr. at 16 [D.I. 88 in Case No. 09-11972] (granting, over EMEA Debtors' objection, U.S. Debtors' request for extended-time deposition); Dec. 22, 2010 Hr'g Tr. at 10:22-11:25 [D.I. 96 in Case No. 09-11972] (ruling on discovery dispute concerning confidentiality of documents produced) .

voluminous evidence was submitted in support of the EMEA Debtors' assertions that their center

of main interests was in England.  The Court noted on the record that recognition "was a

contested matter, hotly contested for a while and that certainly generates a good record upon

which to make the finding and to make – to grant the recognition of the foreign proceeding and

as well as find that it is the center of main interest."  Jan. 31 2011 Hr'g Tr., Peacock Decl. at Ex.

L at 25:11-16.  Third, both the English Court's Initial Orders[42] and this Court's NNUK and

EMEA Recognition Orders[43] have become final and non-appealable.  Finally, a determination

that England was the EMEA Debtors' center of main interests was essential to the orders of both

this Court and the English Court, as neither court could have entered their orders without making

that finding.[44]

### B.    NNSA's Allegations Fail to Make a Plausible Claim of Mismanagement under French Law

To state a claim for mismanagement under French law, NNSA must allege that NNI was

a de facto director of NNSA and that NNI engaged in specific, affirmative acts of

mismanagement which contributed to its excess of liabilities over assets.  Bremond Decl. ¶¶ 25-

27, 30.  Fatal to these claims, NNSA does not and cannot allege any well-pleaded facts as to how

NNI – its sister corporation – exercised control over NNSA sufficient to render its

mismanagement claims plausible.  Each of these claims lacks any well-pleaded facts to make out

a plausible case that NNI exercised the level of control and domination over NNSA's de jure

directors necessary to give rise to a de facto directorship under French law.

---

[42]    Todd Decl. ¶ 142.

[43]    The NNUK Recognition Order was entered on June 26, 2009.  NNUK Recognition Order, Peacock Decl. at Ex. M.  The EMEA Recognition Order was entered on January 31, 2011.  EMEA Recognition Order, Peacock Decl. at Ex. N.

[44]    Todd Decl. ¶ 141; 15 U.S.C. § 1517(a)(1) ("an order recognizing a foreign proceeding shall be entered if (1) such foreign proceeding for which recognition is sought is a foreign main proceeding . . .").

1.    <u>French Law on De Facto Directors</u>

Under French law, a person may be deemed a de facto director where the affirmative acts of the alleged de facto director "reduced the decision-making *independence* of the company's de jure directors" such that the alleged de facto director *dominated* the debtor company in some way.  Bremond Decl. ¶ 32; <u>see also</u> <u>id.</u> ¶¶ 33-34.[45]  French courts impose a "strict and demanding standard" which requires proof that the alleged de facto director company was able to actually dominate the company.  <u>Id.</u> ¶ 33.  Moreover, for de facto director status to be imposed under French law, it is necessary to demonstrate specific examples of domination; "general accusations of 'control' or 'interference' will not, as a matter of law, suffice to justify such a finding."  <u>Id.</u> ¶ 37.  French courts have found that occasional, isolated allegations of control are also insufficient. <u>Id.</u> ¶ 34.

In the case of related companies, French courts have required that the debtor company prove domination which "'surpassed the limits inherent in the structure of a group of companies[.]'"  Bremond Decl. ¶ 34 (quoting the Court of Appeal of Paris which found a parent company was not a de facto director where it failed to "'exercise[] a dominant influence over the decisions of the subsidiary in managing its affairs in a sovereign and independent manner, [such] that it was the sole master of the economic and financial polices of its subsidiary'").  In the case of parent-subsidiary relationships, French courts have found the requisite level of control beyond that inherent in a corporate group is surpassed when the parent placed its subsidiary in a relationship of "total subordination."  Bremond Decl. ¶¶ 35-36; <u>see also</u> <u>id.</u> ¶ 34 (noting Court of Appeal of Paris did not find parent to be de facto director even though parent company

---

[45]    French courts will not find that a person or company is a de facto director for failure to act or by omission. Bremond Decl. ¶ 30.

maintained the legal department of the subsidiary, directly compensated the subsidiary's CEO,

and managed the subsidiary's financing relationship with a third-party financial institution).[46]

Although a corporation can be a de facto director, because a corporation can only act

through its agents, the debtor corporation (here, NNSA) must ultimately point to actions of the

alleged de facto director company's employees (here, NNI's employees) in order to rely on that

conduct as the basis of its de facto directorship claim.  <u>See</u> Bremond Decl. ¶ 31 n. 40.

2.    <u>The Claim Does Not Allege Sufficient Well-Pleaded Facts to Render a<br>Mismanagement Claim Plausible</u>

Following the Supreme Court's decisions in <u>Iqbal</u> and <u>Twombly</u>, a plaintiff's complaint

must state sufficient facts to "state a claim to relief that it plausible on its face."  <u>Bell Atl. Corp.</u>

<u>v. Twombly</u>, 550 U.S. 544, 570 (2007).  A claim has facial plausibility where "the plaintiff

pleads factual content that allows the court to draw a reasonable inference that the defendant is

liable for the misconduct alleged."  <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009).  "This

'plausibility' determination . . . requires the reviewing court to draw on its judicial experience

and common sense."  <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 211 (3d Cir. 2009) (internal

quotation marks and citation omitted).  In analyzing a claim, the court must disregard

unsupported conclusions and unwarranted inferences, as well as any legal conclusions or bare

recitals of the cause of action.  <u>Id.</u>  Only if the remaining, well-pled components of the complaint

---

[46]       The cases in which French courts have found one member of a corporate group of related companies to be a de facto director of another group member illustrate, by comparison, the insufficiency of NNSA's allegations in this case.  <u>See, e.g.</u>, Bremond Decl. ¶ 36 (a French court found "total subordination" where, among other things, the CFO of the parent had power of attorney over the subsidiary's account, the subsidiary's auditors reported directly to the parent, the survival of the subsidiary depended on its shareholder, and the general meetings of the subsidiary took place at the registered office of its parent); <u>id.</u> (a French court found parent to be de facto director of subsidiary where, among other things, parent had power of attorney over the subsidiary's bank account and right to approve credit operation over 15.000 francs (equivalent to $3,300 US dollars); the subsidiary was required to report regularly to its parent of its operations and decisions, some of which required the parent's approval; executives of the parent attended the subsidiary's management meetings; the parent directly participated in strategic choices of the subsidiary; the parent dismissed the subsidiary's CEO and replaced him with one of its own employees; and three of six board members of the subsidiary were high-level executives of the group and the president of the board was an employee of the parent).

have "shown" an entitlement to relief should the claim be permitted to stand.  Id.; Abramson v.

Ritz-Carlton Hotel Co. LLC, Civil Action No. 09-3264 (JHR), 2010 WL 3943666, at *3 (D.N.J.

Oct. 6, 2010).

Under this standard, claims 2, 6, 13, and 16 must fail.  While such mismanagement

claims are predicated on NNI having acted as a de facto director of its sister corporation NNSA

for the benefit of their common parent, NNSA has failed to plead non-conclusory facts that

would render such a claim plausible.

NNI and NNSA are sister corporations, each owned in whole or in majority by NNL.

Claim ¶ 2; Clément Statement, Peacock Decl. at Ex. D ¶ 16.[47]  Indeed, NNSA asserts that

"[c]ontrol of the Nortel Group's operations was highly centralized and, on a general basis, was

maintained primarily by the Canadian Entities."  Claim ¶ 13.  NNSA also alleges that the Nortel

Group was operated to "enable the transfer of cash and value to NNL."  Id. ¶ 10 (emphasis

added); see also id. ¶¶ 12 ("NNL was the primary beneficiary of such value removal[.]"); id.

(only specific benefit NNI allegedly received from transactions at issue were "payments in cash

from NNL in respect of its intercompany loan facility"); 23.[48]  Nonetheless, the Claim asserts

that "NNI was also involved in jointly controlling certain aspects of the Nortel Group's

operations together with the Canadian Entities," and that this control "related to Group tax

matters, in particular transfer pricing, and to the Nortel Group's treasury matters."  Id.; see also

id.¶¶ 19 (alleging that RPSM team, which included NNI personnel, took "[a]ll strategic decisions

---

[47]     At the Petition Date, NNSA's shares were held as follows:  91.168% by NNL; 8.83% by Nortel Networks
International Finance & Holding BV ("NNIF"); 1 share by Jean-Marie Lesur; 1 share by Darryl Edwards; 1 share by
Michel Clément; and 1 share by Jean-Luc Khayat.  Clément Statement, Peacock Decl. at Ex. D ¶ 16.  NNSA's
second largest shareholder – NNIF – is a subsidiary of NNUK.  Proof of Claim No. 7786 of Nortel Networks UK
Ltd., filed June 3, 2011 [Claim No.7786].

[48]     In addition to being wholly conclusory, as explained in the Joint Objection and Motion to Dismiss Claims
of Nortel Networks UK Limited, [D.I. 5970 at 64], this alleged "benefit" to NNI in the form of intercompany loan
repayments, Claim ¶¶ 12, 23, is not traceable to NNSA.

in relation to the operation . . . of the RPSM"); 28, 30.  NNSA asserts that "these tax and treasury functions were responsible for the transactions pursuant to which value was improperly removed from NNSA."  Id. ¶ 15; see also ¶ 7 ("[T]he cash resources were depleted at the direction of the NNL [sic] and NNI.").  Notably, however, NNSA also alleges that with respect to one of the transactions at issue, the efforts to "push[ ]" NNSA were rejected by NNSA's own controller.  Id. ¶ 75.  From this, NNSA remarkably concludes that "NNI was a de facto director of NNSA under French law."  Id. ¶ 31.

While NNSA makes directorship allegations with respect to each of the four categories of transactions below, in each case, the Claim is devoid of well-pleaded facts that NNI committed affirmative acts such to render it plausible that NNI actually dominated NNSA's de jure directors in some capacity, as French law requires:

**Pre-Petition Business Sales (claim 13).**  The Claim fails to include any non-conclusory allegations whatsoever of NNI's dominion or control over NNSA's de jure directors with respect to NNSA's entry into Pre-Petition Business Sales.  In fact, with one exception, the Claim does not even indicate which Pre-Petition Business Sales are at issue.  See generally Claim ¶¶ 80-83; 149-169.  NNSA merely states that the "allocation that was applied to the proceeds of each of these business sales was decided on almost entirely by NNI and NNL," that "NNSA had no involvement in deciding the allocation methodology that was applied," and "the portion of the proceeds that NNSA received was decided on its behalf by NNI and NNL."  Id. ¶ 82.  Disregarding NNSA's conclusory statements and drawing on common sense, the Claim is devoid of any well-pled factual allegations describing what role NNI played in the allocation process or any facts to explain how it would be plausible that NNI – its sister – was able to impose such an unfavorable allocation upon NNSA and supplant its de jure directors.  See Iqbal, 129 S.Ct. at

1949; Fowler, 578 F.3d at 211 ("'[P]lausibility' determination . . . requires the reviewing court to draw on its judicial experience and common sense.") (internal quotation marks and citation omitted). Therefore, NNSA's allegations are not sufficient to render NNI a de facto director of NNSA with respect to the Pre-Petition Business Sales under French law. Bremond Decl. ¶ 57.[49]

**Contingent Tax Claims (claim 16).** For claim 16, NNSA makes similar conclusory allegations that NNI "controlled" NNSA's tax affairs. Claim ¶ 171; id. ¶ 84 ("NNSA's taxation affairs were controlled by NNI and NNL."). The Claim also alleges that the Nortel Group Tax Department was "effectively a joint function between NNI and the Canadian Entities," with a number of NNI employees in the Tax Department "who had responsibility for NNSA and EMEA[.]" Id. ¶ 22. However, even if true, simple responsibility for taxation matters generally would not, without more, provide a basis upon which NNI would qualify as a de facto director of NNSA under French law with respect to tax matters. Bremond Decl. ¶ 60. To state a claim for de facto directorship, the Claim must allege that NNI dominated NNSA's taxation affairs – in a manner beyond any normal relationship in a corporate group – and that NNI imposed its will upon NNSA through affirmative acts. Id.; see also id. ¶¶ 30, 32-34, 36. Because NNSA's Claim lacks such allegations, NNSA has not alleged facts sufficient to state a claim that NNI is a de facto directorship as to NNSA's taxation matters. Thus, claim 16 cannot stand.

Further, NNSA's contingent tax claim also fails as a matter of law because NNSA does not allege that the tax authorities imposed any penalty or fine which contributed to an excess of NNSA's liabilities over assets. Bremond Decl. ¶¶ 61-62. This is also fatal to claim 16.

**Transfer Pricing (claim 2).** While NNSA makes more extensive allegations based on transfer pricing, their length provides no additional well-pleaded facts from which to draw a

---

[49]    Moreover, to the extent claim 13 is based upon allegations that "NNI committed . . . omissions . . . of mismanagement," Claim ¶ 157, NNSA has not stated a claim upon which relief can be granted. Bremond Decl. ¶ 30 ("[A] person cannot be designated as a de facto director for failures or omissions to act[.]").

plausible inference that NNI acted as a de facto director of NNSA. NNSA brings a litany of allegations of NNI's "involvement" in transfer pricing, alleging that:

- NNI was "heavily involved in the implementation and operation" of the transfer pricing arrangements and calculations, Claim ¶¶ 16, 19;

- the decision to move to the RPSM model "was taken by NNI and NNL," id. ¶ 18 (a), and the process by which the RPSM model was created and structured "was handled by NNI and NNL," id. 18(b);

- the terms of the MRDA "were determined by NNI and NNL," id. ¶ 18(c);

- certain individuals from NNI were "heavily involved in the advanced pricing agreement negotiations" with the U.S., Canadian and English (but not French) taxation authorities, id. ¶¶ 16, 18(e); and

- "NNI and NNL were also responsible for instructing" the legal advisors, id. ¶¶ 16, 18(c).

NNSA alleges that it was not involved or consulted in the decision to implement these arrangements, id. ¶ 18(a), 18(c), its board did not approve these arrangements, id. ¶ 18(f), and instead it was "simply instructed to sign the MRDA." Id. ¶ 18(d). Notably, NNSA does *not* state – because it cannot – that NNI was the one who gave that instruction.

These allegations as to NNI's "involvement" in the creation, "implementation," "operation," and approval of the transfer pricing agreements by the taxing authorities (outside of France) are not sufficient to form a de facto directorship under French law. Bremond Decl. ¶¶ 41-42. Ignoring the generic, conclusory allegations of joint control by NNL and NNI (which warrant no consideration under Iqbal), the Claim does not allege facts which, if true, would show how NNI's "involvement" in or "implementation" of transfer pricing elevated to the dominion and control over NNSA – beyond "the limits inherent in the structure of group companies" – necessary to overcome NNSA's de jure director's decision making authority to render NNI a de facto director with respect to transfer pricing. Bremond Decl. ¶¶ 41-42 (quoting Paris Court of

Appeal), 43-44, 46.  Without such allegations, NNSA has not alleged a cognizable claim of de facto directorship as to transfer pricing and claim 2 cannot stand.[50]

In so far as the Claim alleges anything even approaching dominion over NNSA, it tellingly does so in the passive voice, without alleging that NNI was responsible.  Claim ¶ 18 (d) ("NNSA was simply instructed to sign the MRDA); see also id. ¶ 10 ("the EMEA Companies, together with their personnel, were instructed to identify new schemes which would enable the transfer of cash and value to NNL.").  Merely alleging that NNSA "was instructed" to act falls far short of alleging that NNI gave such instruction or that it acted as a de facto director of NNSA.  Simply, there is no well-pleaded allegation that NNI imposed its will on NNSA's de jure directors, much less a well-pleaded allegation as to how NNI, a mere sister corporation, plausibly could have done so.  See Twombly 550 U.S. at 567-70 (dismissing complaint because it failed to include sufficient well-pleaded allegations to give rise to a plausible suggestion of conspiracy); Iqbal, 19 S. Ct. at 1952 (dismissing complaint because Plaintiff had not pled sufficient factual allegations against petitioners to establish underlying discrimination claim).[51]

**February 2008 Repayment associated with Project Swift (claim 6).**  The Claim alleges that "NNI's directors, officers and senior employees were part of the management group

---

[50]    That NNSA's own board did not approve the transfer pricing agreements, even if true, is irrelevant.  Bremond Decl. ¶ 45 (noting fact that NNSA implemented transfer pricing arrangement without previous authorization of its board "even if true, is not relevant to establish whether NNI could be qualified as a de facto director" because "there is nothing in" the French Commercial Code "that would require NNI (which is not a shareholder of NNSA nor a de jure director of NNSA) . . . to obtain approval from the Board of NNSA").

[51]    NNSA does not allege that NNI benefited from the transfer pricing scheme.  See generally Claim ¶¶ 16-22, 36-69.  To the contrary, NNSA avers that the IRS required that NNL decrease the amount of income reported on its Canadian tax returns by $2 billion, and that NNI increase the amount of income reported on its tax returns by the same $2 billion, "to reflect the net overpayment made by NNI  to NNL" for the 2001 to 2005 tax years.  Id. ¶ 68; see also id. ¶ 39 (Implementation of the RPSM "was primarily motivated by a desire to allocate more profit to the Canadian Entities in order to benefit NNL[.]").  Although neither benefit nor traceability are elements of a mismanagement claim under French law, it strains belief that NNI could and did dominate NNSA such that the independence of its de jure directors was displaced with respect to transfer pricing – so that NNI was a de facto director of NNSA – but that it did so in such a way as to cause itself harm.  The plausibility determination cannot be made in a vacuum.  Fowler, 578 F.3d at 211.

that implemented Project Swift," of which NNSA's 2008 €25 million partial loan repayment was a part.  Claim ¶ 25; <u>see also</u> <u>id.</u> ¶ 23 ("NNI through its personnel was, together with the Canadian Entities, involved in the implementation" of Project Swift); ¶ 74 ("NNI participated in the planning and implementation of Project Swift and was similarly involved in the decision to repay the 2002 Subordinated Loan."); ¶ 26 ("Mark Weisz of NNI ('Director of International Tax') was responsible for approving and supervising the implementation of . . . Project Swift and the February 2008 Repayment[.]").  Specifically, NNSA claims that Ryan Smith, allegedly of NNI and "Leader of Global Tax Planning," was "one of the key driving forces behind the implementation of the Project Swift transaction," that "[h]is team came up for the idea for Project Swift, and that Smith was "largely responsible" for its structuring and implementation.  <u>Id.</u> ¶ 26.  While NNSA alleges that Smith "pushed for NNSA to repay the entire 50 million outstanding under the loan," <u>id.</u> ¶ 75, they also allege that NNSA's controller rebuffed this request, "agree[ing] instead that NNSA would repay half of the outstanding amount in February 2008[.]"  <u>Id.</u>

Like the inadequate allegations as to transfer pricing above, NNSA's allegations that NNI was generally "part of the management group that implemented Project Swift," <u>id.</u> ¶ 25, "involved in the decision" to make the February 2008 repayment, <u>id.</u> ¶ 26, was responsible for "approving and supervising the implementation of Project Swift or the [February 2008] Loan Repayment," <u>id.</u>, do not establish a de facto directorship as a matter of French law.  Bremond Decl. ¶¶ 52-54.  Plainly, these allegations of "involvement" and "implementation" fail to rise to the level of dominion and control NNSA must plead for NNI to become a de facto director of NNSA.  <u>Id.</u>

In particular, the allegation that Ryan Smith "pushed for NNSA to repay the entire €50

million outstanding under the 2002 Subordinated Loan," Claim ¶ 75, yet failed due to the

intervention of NNSA's controller, even if true, does not even come close to the level of

domination NNSA must allege in order to maintain a claim that NNI is de facto director under

French law.  Bremond Decl. ¶¶ 52-53, 54 n. 72 (noting French court refused to confer de facto

director status where de jure directors were free to and did reject shareholder's advice).  It

instead shows a lack of domination.  Moreover, NNSA fails even to clarify whether Smith was

"pushing" as an employee of NNI or of NNUK.  See Claim ¶¶ 22, 26, 74, 75 (alleging that Ryan

Smith undertook certain actions on behalf of NNI, while separately conceding that Smith was

"the EMEA Tax Leader on the ground in the EMEA Region [who was] seconded to NNUK from

NNI.").  Further, NNSA's bald, conclusory assertion that the February 2008 repayment "was

imposed on NNSA by NNI and NNL," id. ¶ 79, is no substitute for well-pled, plausible

allegations and therefore cannot salvage the claim.  Iqbal, 129 S. Ct. at 1950 ("[C]onclusions . . .

are not entitled to the assumption of truth.").  Thus, claim 6 must be dismissed.[52]

Taken as a whole, the Claim lacks sufficient well-pleaded factual detail to "nudge" its

allegations as to NNI's domination over NNSA "across the line from conceivable to plausible."[53]

Twombly, 550 U.S. at 570.

---

[52]    NNSA also alleges that the February 2008 repayment was not approved by the NNSA Board.  Claim ¶ 78.
Even if true, this fact is immaterial to whether NNI was a de facto director of NNSA with respect to the February
2008 repayment.  Bremond Decl. ¶ 45.

[53]    Indeed, in the absence of well-pled allegations as to a "sister company's control through share capital or
through membership in legal bodies charged with directing the debtor company," – none of which are alleged by
NNSA – it would be hard to make a plausible showing that the necessary elements of control and domination could
be established.  See Bremond Decl. ¶ 33 (noting only decision of which Bremond is aware of that found a sister
company to be a de facto director was subsequently quashed); see also id. ¶ 34 (quoting Court of Appeal of Paris
refusing to convey de facto director status where "'limits inherent in the structure of a group of companies'" were
not surpassed); Fowler, 578 F.3d at 211 ("'[P]lausibility' determination . . . requires the reviewing court to draw on
its judicial experience and common sense.") (internal quotation marks and citation omitted).

**III.**
**NNSA'S ATTEMPT TO IMPOSE SECONDARY LIABILITY ON NNI FAIL**

In claims 2, 6, 13, and 16, NNSA attempts, and fails, to impose primary liability on NNI for mismanagement. Many of NNSA's other claims purport to impose secondary liability on NNI for conspiring with or assisting the alleged breaches of duties by NNSA's own directors and by NNL, allegedly in the role of de facto director of NNSA. Specifically, NNSA asserts claims against NNI for aiding and abetting breach of fiduciary duty and civil conspiracy under U.S. state law. Claims 4-5, 8-9, 15, 18.[54] Each of these claims must be dismissed because NNSA has failed to show through well-pleaded allegations that it is entitled to relief. In any event, even if sufficiently pled, the claims are barred by the allegations of NNSA's own misconduct.

**A.      NNSA's Claims for Aiding and Abetting Fail on Multiple Grounds**

NNSA's aiding and abetting claims are based on four of the five categories of factual allegations in the Claim: (i) transfer pricing (claim 4), (ii) the February 2008 repayment as part of Project Swift (claim 8), (iii) Pre-Petition Business Sales (claim 15), and (iv) contingent tax liability (claim 18). These claims allege assistance to NNSA's de jure directors and/or to NNL as NNSA's alleged de facto director. Claim ¶¶ 120, 141, 167, 176.

---

[54]      In the headings of claims 4, 8, and 15 and once in the substance of claim 4, NNSA states that its aiding and abetting claims also apply to certain unidentified "tortious conduct." Apart from those references, however, NNSA does not name or describe what sort of "tortious conduct" is at issue. Because this type of pleading is insufficient to state a claim for aiding and abetting tortious conduct, it must be summarily dismissed. Iqbal, 129 S. Ct. at 1949 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'") (quoting Twombly, 550 U.S. at 555). Accordingly, Movants' discussion of aiding and abetting claims focuses solely on aiding and abetting breach of fiduciary duty. In any event, even if NNSA's claims for aiding and abetting tortious conduct were well-pled (which they are not), they would be invalid for the same reasons as the aiding and abetting breach of fiduciary duty claims because their elements are substantially similar. See Patton v. Simone, Nos. 90C-JA-29, Civ. A. 90C-JL-219, 1992 WL 183064, at **10-12 (Del. Super. Ct. June 25, 1992) (requiring that, in addition to a primary act and knowledge of the violation, there must have been "substantial assistance" by the aider and a better in the achievement of the alleged primary violation) Ramirez v. Rodriguez (In re Ramirez), 413 B.R. 621, 629 (Bankr. S.D. Tex. 2009) (same).

1.    <u>Delaware and Texas Law</u>

NNSA's asserted claims for aiding and abetting breach of fiduciary duty specifically refer to the law of Delaware and Texas.  <u>See</u> Claim ¶¶ 118, 140, 166, 176.  Texas and Delaware law require the same essential elements for such a claim of aiding and abetting breach of fiduciary duty: a breach of fiduciary duty by the primary wrongdoer, the defendant's knowing participation in that breach, and resulting damages to the plaintiff.  <u>Compare</u> <u>Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am. Inc.)</u>, 405 B.R. 527, 543-44 (Bankr. D. Del. 2009) <u>with</u> <u>Floyd v. Hefner, III</u>, 556 F. Supp. 2d 617, 654-55 (S.D. Tex. 2008).  Knowing participation in the breach requires that the defendant must have known that the fiduciary's conduct constituted a breach of the fiduciary's duties.  <u>See</u> <u>Fedders</u>, 405 B.R. at 544 ; <u>Floyd</u>, 556 F. Supp. 2d  at 654-55; <u>see also</u> <u>Brug v. Enstar Grp., Inc.</u>, 755 F. Supp. 1247, 1256 (D. Del. 1991) (knowledge is a "'critical element'" in aiding and abetting liability) (citation omitted).

The "kind of scienter required for aiding and abetting claims is *actual knowledge*.  The 'universal rule requires actual knowledge of the tortious conduct by the wrongdoer, not merely that the defendant knew something was wrong in general.'"  <u>Capitaliza-T Sociedad de Responsabilidad Limitada de Capital Variable v. Wachovia Bank of Del. Nat'l Ass'n.</u>, Civ. No. 10-520 (JBS/KMW), 2011 WL 864421, at *4 (D. Del. Mar. 9, 2011) (emphasis added) (quoting <u>El Camino Res., LTD v. Huntington Nat'l Bank</u>, 722 F. Supp. 875, 905-10, 922 (W.D. Mich. 2010) (collecting cases)); <u>see also</u> <u>Malpiede v. Townson</u>, 780 A.2d 1075, 1097-98 (Del. 2001).[55]

---

[55]    Even to the extent that willful blindness were sufficient to establish knowledge, NNSA's Claim fails under either standard as it is devoid of any well-pleaded facts of actual knowledge or willful blindness.  <u>Capitaliza-T</u>, 2011 WL 284421, at *5 (noting, without citation, potential ambiguity in Delaware law on sufficiency of willful blindness for aiding and abetting liability); <u>see also</u> <u>United States v. Flood</u>, 327 F. App'x 356, 359 (3d Cir. 2009) (noting that for criminal aiding and abetting a finding of willful blindness or deliberate ignorance satisfies the requisite intent to facilitate the crime), <u>cert. denied</u>, 130 S. Ct. 223 (2009); <u>United States v. Brodie</u>, 403 F.3d 123, 146-48 (3d Cir. 2005) (providing a detailed discussion of willful blindness in the context of a criminal conspiracy and explaining

With regard to this element, "conclusory allegations such as '[aiding and abetting defendant] had knowledge of the [fiduciary d]efendants' fiduciary duties and knowingly and substantially participated and assisted in the [fiduciary d]efendants' breaches of fiduciary duty, and, therefore, aided and abetted such breaches of fiduciary duties' are insufficient as a matter of law." Greene v. N.Y. Mercantile Exch. (In re NYMEX S'holder Litig.), C.A. Nos. 3621-VCN, 3835-VCN, 2009 WL 3206051, at *12 (Del. Ch. Sept. 30, 2009) (citations omitted) (alterations in original).[56]

## 2.    NNSA Does Not State a Claim for Aiding and Abetting Liability

NNSA alleges a scheme by which NNI assisted in the deliberate removal of assets from NNSA through various non arm's-length transactions for the benefit of NNL. See, e.g., Claim ¶¶ 9, 10. NNSA's aiding and abetting claims therefore sound in fraud and are subject to Rule 9(b)'s heightened pleading standard. See Forman v. Salzano (In re Norvergence, Inc.), 405 B.R. 709, 746-47 (Bankr. D. N.J. 2009) (applying Rule 9(b) to claim of aiding and abetting breach of fiduciary duty because the underlying violation asserted was a "fraud enabling the defendants to exploit and loot the debtor for [defendants'] own purposes"); see also Adamson v. Bernier (In re Bernier), 282 B.R. 773, 781 (Bankr. D. Del. 2002) ("whether the transaction is conducted at arm's length" is a factor indicative of an intent to defraud). NNSA thus must plead with enough detail to put NNI on notice as to the "precise misconduct" with which it is charged. Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007) (under Rule 9(b), claimant must plead "the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation"); see also Charal Inv. Co. v. Rockefeller (In re Rockefeller

---

that to find willful blindness, a jury must conclude that "the defendant himself was objectively aware of the high probability of the fact in question, and not merely that a reasonable man would have been aware of the probability.") (internal quotation marks and citation omitted).

[56]    Moreover, "'[t]here must be a clear nexus between the knowledge of the wrong and the substantial assistance in carrying out the wrong.'" Capitaliza-T, 2011 WL 864421, at *4 (quoting Jenkins v. Williams, No. 02-331-GMS, 2008 WL 1987268, at *14 (D. Del. May 7, 2008)).

Ctr. Props. Inc. Sec. Litig.), 311 F.3d 198, 216 (3d Cir. 2002).  NNSA does not even come close

to satisfying Rule 9(b)'s pleading requirements.

Even under the Rule 8(a) pleading standards, the aiding and abetting claims still fail.  As

the Supreme Court has held, "Rule 8 marks a notable and generous departure from the hyper-

technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a

plaintiff armed with nothing more than conclusions." Iqbal, 129 S. Ct. at 1950.  "To survive a

motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570).  That is,

plaintiff must allege enough facts to "nudge[] [his] claims . . . across the line from conceivable to

plausible." Id. (internal quotation marks and citation omitted).  Rule 8 does not "empower [a

plaintiff] to plead the bare elements of his cause of action, affix the label 'general allegation' and

expect his complaint to survive a motion to dismiss." Id. at 1954.  The court must disregard

pleadings that are no more than conclusions, which are not entitled to an assumption of truth, and

look only to well-pleaded factual allegations.  Id. at 1950.

Disregarding conclusory allegations and looking only to NNSA's well-pleaded factual

allegations, its aiding and abetting claims fail for two reasons.  First, NNSA has failed to

adequately plead any knowing assistance by NNI.  Second, NNSA has similarly failed to

adequately plead any underlying breach of fiduciary duty by either its unidentified de jure

directors or by NNL acting as an alleged de facto director of NNSA.[57]

---

[57]    Notably, nothing in NNSA's Claim suggests that NNSA has commenced an action against the unnamed de jure directors of NNSA who are alleged to have breached their fiduciary duties.  Claim ¶¶ 34-35.  Nor are the Movants aware of any such action by NNSA.  NNSA thus seeks to hold NNI and NNL liable on an aiding and abetting theory without even attempting to seek any recovery from the primary actors responsible for the underlying breach.  See Official Comm. of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Capital Partners LLC (In re Radnor Holdings Corp.), 353 B.R. 820, 844 n.3 (Bankr. D. Del. 2006) ("the Court notes that it is strikingly odd to have a trial on aiding and abetting breach of fiduciary duties where the alleged primary wrongdoers (the board) are not named as defendants.  The Court is not aware of a single reported post-trial or appellate decision awarding or upholding damages for aiding and abetting breach of fiduciary duty where the primary wrongdoers

a.    NNSA Does Not Adequately Plead What Wrongful Actions NNI
Knowingly Took to Assist a Breach of Fiduciary Duty

NNSA's allegations regarding any "knowing assistance" that NNI offered to the NNSA directors are conclusory and must be disregarded for purposes of a motion to dismiss.  Iqbal, 129 S. Ct. 1950.  As explained above, "[k]nowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach" and knowledge is a "critical element" in aiding and abetting liability.  Malpiede, 780 A.2d at 1097; see also Brug, 755 F. Supp. at 1256.

NNSA's Claim suffers from a complete absence of any well-pled factual allegations regarding "knowing" assistance by NNI concerning breaches of duty by NNSA's directors.

**Pre-Petition Business Sales (claim 15).**  With respect to the Pre-Petition Business Sales that underlie claim 15, NNSA only alleges in conclusory fashion that "NNI, through the involvement of its directors, officers and senior employees, as explained in paragraphs 80 to 83 above, advocated or assisted the conduct by NNSA's directors (either de jure or, in the case of NNL, de facto) which led to these breaches."  Claim ¶ 169; see also id. ¶ 82 (alleging that allocation of proceeds of past sales "was decided on almost entirely by NNI and NNL" without reference to any specific actions taken by NNI).  The Claim does not identify any individuals who offered assistance to the NNSA directors (either de facto or de jure), or what the nature of that assistance was.  The Claim fails to provide any further factual detail concerning NNI's alleged involvement in any Pre-Petition Business Sale, much less any allegation of how NNI

---

were not named as defendants.").  To the contrary, the Joint Administrators on behalf of NNSA have, as recently as January 2011, vouched for the credibility and honesty of those directors who it now accuses – without suing – of massive wrongdoing by submitting and relying upon the witness statement of long-time NNSA director and president Michel Clément.  Moreover, considering NNSA's prior position that it was NNUK, not NNI, that controlled NNSA's treasury and tax functions, see Section II(A) above, it is similarly notable that nothing in NNSA's Claim suggests that NNSA has commenced an action against NNUK or its de jure directors for the alleged removal of value from NNSA as to any of the transactions at issue in the Claim.

knowingly participated in or gave assistance to the NNSA directors' alleged breach.[58]   In fact, the Claim is entirely silent on allegations of the process through which any Pre-Petition Business Sale was considered or approved.  This is precisely the type of conclusory allegation that is to be disregarded under Iqbal and Twombly.  See Iqbal, 129 S. Ct. at 1950; Twombly, 550 U.S. at 555.

      **Contingent Tax Claims (claim 18).**  Claim 18 is based on the NNSA directors' alleged breach in respect of various pre-petition tax arrangements.  Claim ¶ 172.  The Claim, however, provides no explanation of what actual conduct of NNI gives rise to a claim for aiding and abetting.  Instead, claim 18 is apparently based on NNI's purported control over taxation affairs "more generally."  Id. ¶ 84.  The Claim provides no further insight on the nature of that involvement or how, if at all, NNI assisted the alleged breaches of fiduciary duty by NNSA's directors or NNL allegedly acting as a de facto director of NNSA.  While NNSA references in general fashion "NNI's involvement and participation (together with NNL, alternatively NNSA's de jure directors) in controlling NNSA's tax affairs," this conclusion is no substitute for well-pleaded factual allegations identifying precisely what knowing participation NNI is charged with as to the NNSA de jure or de facto directors' alleged breach of fiduciary duties.  Id. ¶ 176.

      **Transfer Pricing and the February 2008 Repayment (claims 4 and 8).**  NNSA's claims arising from transfer pricing and the February 2008 repayment associated with Project Swift involve more words but no more substance.  The Claim fails to allege any actions that any individuals undertook on behalf of NNI that could constitute knowing assistance in the alleged breach of fiduciary duties by NNSA's directors (or who those directors even were).  With respect to transfer pricing, the Claim alleges that NNI "through the involvement of its personnel in the design, implementation and operation of the MRDA and RPSM (as described in paragraphs 16 to

---

[58]      Indeed, as set forth below, all of NNSA's claims that allegedly arise from Pre-Petition Business Sales (including claim 15) fail even to identify (aside from Alcatel) the actual transactions at issue.

22 above), advocated or assisted the conduct by NNSA's directors (de jure and, in the case of

NNL, de facto) which led to the breaches of fiduciary duties." Claim ¶ 122. NNSA makes

parallel allegations as to Project Swift and the February 2008 repayment, alleging generally that

"NNI, through the involvement of its personnel in the planning and implementation of Project

Swift and, in particular, the February 2008 repayment (as described in paragraph 70 to 79

above), advocated or assisted the conduct by NNSA's directors (both de jure and, in the case of

NNL, de facto), which led to the breaches of fiduciary duties." Id. ¶ 144. NNSA thus alleges

that "NNI's directors, officers and senior employees were part of the management group that

implemented Project Swift." Id. ¶ 25.

The Claim attempts a patina of well-pleaded allegations by naming individuals, without

adequately pleading what actions those individuals undertook or the connection they had to

decisions made by NNSA's directors. For example, in relation to transfer pricing, the Claim

alleges that "the key individuals involved included, in particular, John Doolittle of both NNI and

the Canadian Entities and Mark Weisz, Mike Orlando, Laurie Krebs and John Payne of NNI, as

well as representatives from the Canadian Entities," id. ¶ 17, and that a number of those

individuals alleged "at various times" to be NNI employees were "within the Tax Department."

Id. ¶ 22. Beyond alleging generally that "all strategic decisions" and transfer pricing calculations

were taken by this team, id. ¶ 19, however, nowhere does the Claim explain what actual activities

each of these individuals undertook with respect to transfer pricing or the February 2008

repayment. Nor does the Claim allege any instances of contact between these individuals and the

NNSA directors (whomever they were), much less knowing participation in their purported

breach.

As to the February 2008 repayment, the Claim also makes perfunctory references to certain individuals' "involvement" "supervision" or "direction" of the relevant transactions, without including well-pleaded allegations regarding who was "supervised" or "directed," how they "directed," or even if the individuals named were acting on behalf of NNI as an NNI employee.  For example, NNSA alleges that "Ryan Smith ('Leader of Global Tax Planning') was one of the key driving forces behind the implementation and structuring of the Project Swift transaction[.]"  Id. ¶ 26.  With the exception of an allegation that Smith "pushed for NNSA to repay" the 2002 Subordinated Loan (which NNSA alleges it was able to successfully resist), id. ¶ 75, the Claim fails to allege what these individuals actually did.  Moreover, as noted above, even with respect to the Claim's conclusory allegations, it fails to clarify whether the actions were taken on behalf of NNI such that NNI should be held responsible.  See, e.g., id. ¶¶ 22, 26, 74, 75 (alleging that Ryan Smith undertook certain actions on behalf of NNI, while separately conceding that Smith was "the EMEA Tax Leader on the ground in the EMEA Region [who was] seconded to NNUK from NNI.").

Notably, the Claim nowhere alleges that any specific NNI individuals undertook to implement or operate the MRDA or the February 2008 repayment in conjunction with either NNL or NNSA's de jure directors with *knowledge* that doing so would constitute a breach of the NNSA directors' duties.  NNSA, in its pleading, explicitly recognizes that such knowledge is a required element by referring to the requisite knowledge of the underlying breach of fiduciary duty only when restating the abstract legal requirements for the claim.  Id. ¶ 118(c).  But, aside from bald assertions not entitled to deference under Iqbal, entirely absent are allegations that NNI actually acted with knowledge that the actions of the NNSA directors (whether de jure or otherwise) were in breach of their fiduciary duties.  Nor has NNSA included any well-pleaded

47

allegations which indicate that NNI acted with willful blindness toward the NNSA directors' alleged breaches. NNSA thus fails *entirely* to allege the requisite element of scienter/knowing participation and its claims must be dismissed. See Malpiede, 780 A.2d at 1097; Brug, 755 F. Supp. at 1256; Capitaliza-T , 2011 WL 864421, at *4 (D. Del. Mar. 9, 2011) (with regard to an aiding and abetting claim, concluding that "[b]ecause Plaintiff fails to adequately allege the required knowledge element, the Court need not reach the other issues.").

b.   NNSA Has Not Adequately Pled Any Underlying Breach
by NNL Acting As a De Facto Director

To the extent NNSA relies on an asserted breach of fiduciary duty by NNL as de facto director as the basis for its aiding and abetting claim against NNI, NNSA's claim fails. NNSA is estopped from asserting that NNL acted as a de facto director of NNSA, for the same reasons NNSA is estopped from making that claim against NNI. See Section II(A) above. And, even if the Court considered such allegations, NNSA has not provided well-pleaded facts that would render it plausible that NNL is a de facto director of NNSA. As set forth above in Section II(B), a legal entity will not be deemed a de facto director under French law unless it so overcame the decision making independence of the debtor company's de jure directors that it dominated the debtor company in some way. Bremond Decl. ¶ 32. Moreover, before conferring de facto director status on a related company, French courts require that the control surpasses that inherent in a corporate group, which – in the case of a parent company like NNL – French courts have found where the parent places the subsidiary in a position of "total subordination." Bremond Decl. ¶¶ 34-36. Beyond mere conclusory allegations not entitled to an assumption of truth, see Claim ¶ 119 n.9 ("NNL maintained a high degree of control over NNSA and its affairs . . . and at all material times assumed and exercised the functions of a director in respect to NNSA's affairs"), NNSA has not plead any facts that would render a finding of NNL's total

48

subordination over NNSA's de jure directors plausible.  Iqbal, 129 S.Ct. at 1949; Bremond Decl.

¶¶ 76-77, 84-85, 95, 102.  Without NNL as a de facto director, the Claim lacks allegations to

support the primary breach and NNSA's secondary aiding and abetting claims cannot stand.

**B.     NNSA's Conspiracy Claims Must Be Dismissed Because the Claim Lacks Any Well-Pleaded Allegations to Support Those Claims**

NNSA also asserts secondary liability claims for conspiracy (claims 5 and 9) under U.S.

state (Texas and Delaware) law, both of which require substantially the same elements.  NNSA

asserts these claims based upon allegations relating to transfer pricing and Project Swift and the

February 2008 repayment.[59]

**1.     Delaware and Texas  Law**

The requirements of U.S. state law are substantially similar to each other.  A claim for

conspiracy essentially requires an agreement between two or more persons, who have taken at

least one unlawful act, which caused actual damage to a plaintiff. Compare Allied Capital Corp.

v. GC-Sun Holdings L.P., 910 A.2d 1020, 1036 (Del. Ch. 2006) with Timberlake v. Synthes

Spine, Inc., Civil Action No. V-08-4(JDR), 2011 WL 711075, at * 11 (S.D. Tex. Feb. 18, 2011).

**2.     NNSA Does Not State a Cognizable Claim for Conspiracy**

Like NNSA's aiding and abetting breach of fiduciary duty allegations, NNSA's

conspiracy allegations are subject to Rule 9(b)'s heightened pleading requirements.  "The Third

Circuit has long required that claims of conspiracy be supported by allegations of specific facts."

Brug , 755 F. Supp. at 1255.  Accordingly, "[o]nly allegations of conspiracy which are

particularized, such as those addressing the period of the conspiracy, the object of the

---

[59]     These conspiracy claims are arguably duplicative of NNSA's aiding and abetting claims.  Allied Capital Corp. v. GC-Sun Holdings, L.P.  910 A.2d 1020, 1038 (Del. Ch. 2006) ("[I]n cases involving the internal affairs of corporations, aiding and abetting claims represent a context-specific application of civil conspiracy law.");  see also Triton Constr. Co. v. E. Shore Elec. Servs., Inc., Civil Action No. 3290-VCP, 2009 WL 1387115, at *17 (Del. Ch. May 18, 2009), aff'd, 988 A.2d 938 (Del. 2009) (after trial, refusing to consider conspiracy claim because any relief granted for the conspiracy claim would be redundant of the relief for aiding and abetting).

conspiracy, and certain actions of the alleged conspirators taken to achieve that purpose, will be deemed sufficient." Id. (quoting Kalmanovitz v. G. Heileman Brewing Co., 595 F. Supp. 1385, 1401 (D. Del. 1984), aff'd, 769 F.2d 152 (3d Cir. 1985)); see also Miller v. Greenwich Cap. Fin. Prods., Inc. (In re Am. Bus. Fin. Servs. Inc.), 361 B.R. 747, 762 (Bankr. D. Del. 2007); Fierro v. Gallucci, No. 06-CV-5189(JFB)(WDW), 2008 WL 2039545, at *16 (E.D.N.Y. May 12, 2008) ("[T]o survive a motion to dismiss, a complaint must contain more than general allegations in support of the conspiracy. Rather, it must allege the specific times, facts, and circumstances of the alleged conspiracy." (internal quotation marks and citations omitted)).[60]

However, even under Rule 8(a), NNSA's sparse conspiracy allegations still fail. The Supreme Court's decision in Twombly is particularly instructive on this point. There, similar to the allegations here, because the alleged violations occurred over a seven-year span and the complaint "mentioned no specific time, place, or person involved in the alleged conspiracies" the Supreme Court "doubt[ed] that the complaint's references to an agreement among the [defendant companies] would have given the notice required by Rule 8." Twombly, 550 U.S. at 565 n.10. The Supreme Court further contrasted the model form for pleading negligence which alleges that "the defendant struck the plaintiff with his car while plaintiff was crossing a particular highway at a specified date and time" with the complaint at issue, which "furnishe[d] no clue as to which of the four [defendant companies] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place." Id.

---

[60]    Rule 9(b) is particularly applicable because NNSA's conspiracy claims are based upon underlying acts allegedly undertaken to loot NNSA, and therefore independently sound in fraud. See, e.g., Claim ¶ 125 (accusing NNI of engaging in a conspiracy to "remov[e] value" and loot NNSA); see also Allied Capital, 910 A.2d at 1040 n.46 (explaining that the "frequent assertion that civil conspiracy claims require particularized allegations of fact may simply stem from the fact that civil conspiracy claims often do involve fraud."); Chase Bank USA N.A. v. Hess, Civil Action No. 08-121-LPS, 2011 WL 45132, at *10 (D. Del. Jan. 6, 2011) (noting that conspiracy claims based on fraud should meet Rule 9(b) pleading standard, but finding that the claims at issue were based on contractual relations and unjust enrichment, among others); cf. Norvergence, 405 B.R. at 746-47 (applying Rule 9(b) to claim of aiding and abetting breach of fiduciary duty because the underlying violation was based on fraud).

NNSA's Claim is similarly devoid of any well-pleaded factual allegations concerning the alleged conspiracies. NNSA essentially asserts that there is a conspiracy solely because it says so. Stripping out those conclusory assertions which merely restate the elements of a conspiracy, the Claim is left with no well-pleaded factual allegations that raise a plausible inference of conspiracy here, much less any particularized allegations. See Iqbal, 129 S.Ct. at 1950; Twombly, 550 U.S. at 555, 565 n.10.

Conspicuously absent from NNSA's pleading are factual allegations of *who* was involved in the alleged conspiracies, *when* any agreements were reached, or *what* was specifically agreed. Claim ¶¶ 124-126, 147-148. Instead of pleading who was involved in the conspiracy, the Claim asserts that "NNI and NNL" or "alternatively NNI and the de jure directors of NNSA" or yet a third possibility of "NNI, NNL and NNSA's de jure directors" "acted together" by (1) implementing and operating the RPSM and MRDA in a manner which operated contrary to NNSA's interests, id. ¶ 125, and (2) implementing Project Swift and the February 2008 repayment which was contrary to NNSA's interests and caused them a loss. Id. ¶¶ 147-148. NNSA does not identify the *individuals* who agreed to conspire on behalf of NNI, NNL and/or NNSA. This failure alone is fatal to NNSA's claims; there is no notice or plausibility, much less particularity, if the participants are not identified. See Brug, 755 F. Supp. at 1255.

In addition, simply "acting together" – which is all NNSA alleges to have occurred – is not a sufficient basis upon which to allege a civil conspiracy. NNSA must assert "the existence of a confederation or combination" that is a "meeting of the minds on a course of action" by the participants, which is not inferred solely from joint action. See Twombly, 550 U.S. at 556-57 ("Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."); Boyd

v. Tempay, Civil Action No. 07-377-JJF, 2008 WL 5156307, at *4 (D. Del. Dec. 4, 2008)

(dismissing conspiracy claims under Rule 8 as inadequately pled where the complaint failed to

allege individual acts were taken as a "conscious commitment to a common scheme" and failed

to provide the details of when or where the acts occurred) (internal quotation marks and citation

omitted).

In sum, NNSA's barebones allegations of conspiracy are similar to those types of

conclusory allegations that have repeatedly been rejected by courts.  See, e.g., Am. Bus. Fin.

Servs., 361 B.R. at 76; see also Twombly, 550 U.S. at 555, 565 n.10.[61]  As one court noted in

dismissing insufficiently detailed allegations of conspiracy, "[a]lthough the corporate and

business relationships among the several defendants are identified, plaintiffs do not state when

and how they allegedly conspired together to commit fraud.  Nor do they allege any meetings,

any communications, or any other means for effecting the alleged conspiracy."  Brug, 755 F.

Supp. at 1255.  Because – like plaintiffs in Twombly and Brug – NNSA has provided the Court

with no well-pleaded factual allegations that raise a plausible inference of conspiracy, much less

any particularized allegations, claims 5 and 9 must be dismissed.

### C.    NNSA's Claims For Aiding and Abetting and Conspiracy are Barred by the *In Pari Delicto* Doctrine

In addition to being inadequately pled, NNSA's aiding and abetting claims, as well as its

conspiracy claims must be dismissed under the *in pari delicto* doctrine.  "Under the in pari

delicto doctrine, a party is barred from recovering damages if his losses are substantially caused

by activities the law forbade him to engage in."  Am. Int'l Group, Inc. v. Greenberg, 976 A.2d

---

[61]    These allegations are particularly deficient in the context of a parent-subsidiary relationship.  See Asarco LLC v. Ams. Mining Corp., 396 B.R. 278, 417-18 (S.D. Tex. 2008) (holding that "the most well-reasoned approach is one that recognizes a cause of action for conspiracy between a parent and subsidiary only when the parent acts outside its role as 100% owner of the subsidiary.")  NNSA has not pled sufficient detail to demonstrate that NNL was acting outside its role as majority owner of NNSA.

872, 883 (Del. Ch. 2009), aff'd sub nom., Teachers' Ret. Sys. of La. v. Gen. Re Corp., 11 A.3d

228 (Del. 2010) (internal quotation marks and citation omitted) (hereinafter "AIG").

To bar a claim on *in pari delicto* grounds, a court must only determine that the parties

bore "substantially equal responsibility" for a wrongful scheme.  The court need not engage in a

detailed accounting of relative fault as that is precisely the type of analysis the doctrine is meant

to avoid.  AIG, 976 A.2d at 883.  Under both Delaware and Texas law, where, as here, the

applicability of the *in pari delicto* defense is obvious from the face of the complaint, a motion to

dismiss should be granted.  See id. at 876-78 (granting a motion to dismiss based upon the *in*

*pari delicto* defense); Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.), 335 B.R.

539, 547 (D. Del. 2005) ("Although in pari delicto is an affirmative defense, a complaint may be

subject to dismissal under Rule 12(b)(6) when an affirmative defense . . . appears on its face")

(alteration in original) (internal quotation marks omitted); Hill v. Day (In re Today's Destiny,

Inc.), 388 B.R. 737, 747 (Bankr. S.D. Tex. 2008) (considering in *pari delicto* defense where

necessary facts were within the complaint); see also Official Comm. of Unsecured Creditors of

Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.), 343 B.R. 444, 478-81 (Bankr. S.D.N.Y..

2006) (applying *in pari delicto* to dismiss a complaint even where plaintiff argued that an

unspecified jurisdiction's law applied as "all of the jurisdictions . . . possibly relevant have

endorsed either the *Wagoner* Rule or the common law principle of *in pari delicto*").

NNSA's secondary liability claims rest on allegations that NNSA's own directors

(whether de facto or de jure) breached their fiduciary duties.  See, e.g., Claim ¶¶ 120, 125, 142,

147, 168.  Such actions and knowledge of top-level management and directors of a corporation

are imputed to the corporation.  See AIG, 976 A.2d at 887 nn.37, 40.[62]  Accordingly, even

---

[62]    Although there can be an adverse interest exception to this imputation, it is not applicable here.  To qualify
for the adverse interest exception, a party needs to allege total abandonment of the corporation's interests by the

assuming they were well plead, which they most certainly are not, NNSA's claims for aiding and abetting breach of fiduciary duty and conspiracy are nevertheless barred by the *in pari delicto* doctrine.

## IV.
### NNSA'S CLAIMS IN TORT UNDER FRENCH LAW SHOULD BE SUMMARILY DISMISSED

NNSA asserts claims in tort under French law with respect to transfer pricing (claim 3), the Pre-Petition Business Sales (claim 14), the February 2008 repayment associated with Project Swift (claim 7), and certain contingent taxation matters (claim 17). In each of its tort claims, NNSA alleges that NNI committed a "fault" under French law by conspiring with or aiding and abetting or otherwise assisting NNL's or NNSA's de jure directors' breach of duty to NNSA. For the reasons set forth below, NNSA's tort claims fail because NNSA has not shown through well-pleaded allegations that it is entitled to relief.

      1.     French Law on Tort: Article 1382 of the French Civil Code

The elements of a claim in tort under Article 1382 of the French Civil Code ("Article 1382") are: (a) fault, (b) damages, and (c) a causal link between the fault and the damages. Bremond Decl. ¶ 64.[63]

---

interested parties. AIG, 976 A.2d at 891 (citing inter alia Mediators, Inc. v. Manney (In re Mediators, Inc.), 105 F.3d 822, 827 (2d Cir. 1997). In rejecting the adverse interest exception, the court in AIG, noted that the complaint included details about how the company could be said to benefit from the alleged schemes even though those benefits were short-lived. Id. at 891 n.53. Here, while NNSA apparently believes that it could have negotiated a better bargain under a transfer pricing arrangement because the RPSM arrangement did not "adequately" reward it (see, e.g., Claim ¶ 62), there are no allegations that the alleged transactions were entirely detrimental to NNSA.

[63]     The French Civil Code does not provide a definition of fault, but French courts find fault when a party has breached an obligation or duty – for example, when the general duties of care, diligence, and/or good faith and fair dealing have been violated. Bremond Decl. ¶¶ 65-66. When considering fault among a corporate group, it is necessary to evaluate the alleged fault against "conduct reasonably to be expected of law abiding corporate entities in the ordinary course of business." Id. ¶ 66. However, unless a party is found to be a de facto or de jure director of a corporation, there is no duty to act in the best interests of the company. Id. Fault will not be presumed or construed merely because a party states that some "wrongdoing" occurred. Id.

NNSA asserts that NNI committed a tort within the meaning of Article 1382 because it allegedly conspired with, or aided and abetted or assisted, NNL or NNSA's de jure directors in committing a fault against NNSA.  French law does not have a separate claim for conspiracy or aiding and abetting.  Id. ¶ 72.  Where, as here, a tort claim is based on the allegation that a secondary actor (here NNI) conspired with or aided and abetted or assisted wrongdoing by the primary actor (here NNL or NNSA's de jure directors), French law requires as one of the elements of the tort claim that the secondary actor acted in bad faith such that he knew the primary actor was engaged in wrongful conduct.  Id. ¶ 73.  For the reasons set forth above in Section III, because NNSA's tort claims sound in conspiracy and aiding and abetting, each of those claims is subject to Rule 9(b)'s pleading standard.  Even under Rule 8's plausibility standard, however, NNSA has not sufficiently alleged a tort under Article 1382.

2.    NNSA Fails to Sufficiently Plead that NNI Caused its Injury

Although NNSA's French tort claims are predicated upon an assertion that NNI acted in concert with either NNL and/or NNSA's de jure directors to harm NNSA's interests, see generally Claim ¶¶ 114-116, 136-139, 163-165, 175, this reliance on the primary wrongdoing of others does not alleviate NNSA of the requirement under French law to show that "specific actions of NNI" while conspiring with and/or aiding and abetting caused NNSA to suffer the alleged injury.  Bremond Decl. ¶ 78; see also id. ¶¶ 68, 80.  Accordingly, NNSA must plead facts from which it could plausibly be concluded that *NNI's* actions were a cause of NNSA's harm. See id. ¶¶ 68, 78.  At minimum under French law, the fault must be the "but for" cause of the damages alleged, id. ¶ 68; some French courts, however, require a claimant prove the "real or effective cause," or that which would "normally or typically" give rise to the injury suffered.  Id. ¶ 68 n. 86.

With respect to all of NNSA's many permutations of its French-law tort claims, NNSA's pleading with respect to causation suffers from fundamental flaws.  NNSA at most alleges that NNI's tax and finance professionals were "involved" in formulating tax strategies and allocation and transfer pricing formulas.  There is no allegation, however, that NNI was a cause, even a "but for" cause, in NNSA adopting those strategies or formulas.  A vague allegation that some unidentified person – but not NNI – instructed NNSA to act hardly suffices to state a plausible claim that NNI did anything that could plausibly have caused NNSA's directors to breach their fiduciary duties.  This is particularly true as NNSA's own pleading highlights the independence of its directors.

**Pre-Petition Business Sales (claim 14).**  As explained above, with the exception of the Alcatel sale, the Pre-Petition Business Sale claims do not identify which Pre-Petition Business Sales are at issue.  Claim ¶¶ 80-83; 161-65.  For this reason alone, the Article 1382 claim with respect to the Pre-Petition Business Sales fails to satisfy even the most basic precepts of notice pleading, including but not limited to, the causation element.

As to the Alcatel sale, NNSA fails to allege any facts that could plausibly show that NNI's actions were a cause leading to NNSA's alleged injuries.  Even accepting as true the allegation that NNI was "involve[ed]" in devising the allocation formula for the Alcatel or other unidentified sales, see Claim ¶ 82, there is no allegation that NNI did anything that caused NNSA or its de jure directors to accept that allocation.  Bremond Decl. ¶ 96.  Accordingly, claim 14 fails as a matter of law.

**Taxation Matters (claim 17).**  To allege causation as to a loss for an Article 1382 claim; there must be an allegation of harm in the first instance.  Bremond Decl. ¶¶ 61, 103.  NNSA neither alleges any actual tax loss nor provides any well-pled facts as to how NNI contributed to

such an unknown loss.  Indeed, stripping NNSA's conclusory causation allegations from its claim, see Claim ¶ 175 ("NNSA asserts a claim under Article 1382 . . . which caused a loss to NNSA by controlling NNSA's tax affairs and thereby harming NNSA's interests"), leaves no allegation as to causation or even harm at all.  Claim 17, thus, fails to state a claim upon which relief may be granted.

**Transfer Pricing (claim 3).**  NNSA's allegations as to NNI's actions with respect to transfer pricing center around NNI's involvement in the implementation and operation of the transfer pricing arrangements.  See id. ¶¶ 16, 18, 19; Section II(B) above.  But, even if proven, these allegations of involvement would be insufficient to establish causation as a matter of French law.  Bremond Decl. ¶ 80.  As noted above, although NNSA alleges that "NNSA was simply instructed to sign the MRDA," Claim ¶ 18(d), NNSA neither attributes that instruction to NNI nor proffers any well-pled facts to support a plausible inference that such an instruction from a sister company could cause NNSA to compromise its own interest.  See Section II(B) above.  Indeed, there is no well-pled allegation that NNI communicated in any way with NNSA with respect to the adoption of the MRDA.  NNSA's generic and conclusory allegation of causation, "even if found to be true and even if it could be attributed to NNI, would not allow a finding for purposes of article 1382 . . . that NNI was even the but for cause of an injury to NNSA."  Bremond Decl. ¶ 80.

Further, the plausibility of NNSA's allegations as to causation must be read in line with NNSA's own sworn statements and admissions to the Court that the exact functions NNSA asserts were "responsible for the transactions" that allegedly improperly removed value from NNSA, Claim ¶ 15, were controlled by NNUK in England.  See Section II(A) above.  Considering the English control of NNSA on top of their already deficient allegations, it is

simply not plausible to find that any action by NNI was able to cause NNSA's directors (de jure or de facto) to engage in the transfer pricing arrangements to their detriment. Iqbal, 129 S.Ct. at 1950; Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009). Thus, NNSA's tort claim under French law for transfer pricing cannot stand for failure to adequately plead the essential element of causation.[64]

**2008 Loan Repayment (claim 7).** NNSA asserts that NNI and various NNI employees "participated in the planning and implementation of Project Swift and was similarly involved in the decision to repay the 2002 Subordinated Loan," Claim ¶ 74, along with other allegations of NNI's "implementation," id. ¶¶ 23, 26, and avers that Ryan Smith, allegedly "of NNI," "pushed for NNSA to repay" the loan. Id. ¶ 75. But NNSA admits that despite that "push," NNSA's controller resisted, and NNSA ultimately only repaid half of the 2002 Subordinated Loan – or €25 million less than Smith had allegedly proposed. NNSA does not, however, provide any well-pleaded facts as to how this "pushing" – which NNSA admittedly refused to accept – caused NNSA to compromise its own interests in favor of those of NNI or NNL. Moreover, NNSA does not clarify whether Smith was "pushing" on behalf of NNI or on behalf of the EMEA Region as "EMEA Tax Leader." See id. ¶¶ 22, 26, 74, 75 (alleging that Ryan Smith undertook certain actions on behalf of NNI, while separately conceding that Smith was "the EMEA Tax Leader on the ground in the EMEA Region [who was] seconded to NNUK from NNI"). The failure to clearly allege on whose behalf Smith was acting is particularly troubling because, as explained above, NNSA has informed the Court that such treasury functions were controlled out of England. See Section II(A) above; Clément Statement, Peacock Decl. at Ex. D

---

[64]     To the extent NNSA's claim is based upon allegations that transfer pricing was illegally imposed upon NNSA without approval of the NNSA's board, see Claim ¶ 114, NNSA does not allege – because it cannot – that failure was caused by NNI. Bremond Decl. ¶ 45 (noting NNI had no obligation to obtain approval from NNSA's Board with respect to transfer pricing).

¶ 39 ("Banking and Treasury functions are run out of England"); Rolston Statement, Peacock

Decl. at Ex. E ¶ 85 ("Global inter-intercompany facilities and loans are all managed from EMEA

treasury in England.").

Such bare and imprecise allegations are not sufficient to show that NNI's actions caused

NNSA to suffer an injury under French law, Bremond Decl. ¶ 90, thus NNSA's Article 1382

claim must be dismissed.

Accordingly, NNSA's failure to adequately plead the element of causation is an

independent basis upon which to dismiss claims 3, 7, 14, and 17 in their entirety.

3.    <u>NNSA's Tort Claims Also Fail to the Extent They Are Based on the<br>Allegations that NNL Was a De Facto Director of NNSA</u>

As noted above, each of NNSA's French tort claims allege that NNI committed "fault"

by either conspiring with NNL or aiding, abetting, assisting, and/or encouraging NNL's direct

wrongdoing.  <u>See</u> Claim ¶¶ 114(a), 136(a), 163(a).  To state a cognizable tort law claim under

French law for a third party's actions, NNSA must first allege that the third party – here NNL –

committed an actionable fault against NNSA under French law.  Bremond Decl. ¶¶ 72-73.  To

the extent NNSA is alleging NNL committed "fault" as a de facto director of NNSA, this claim

fails as a matter of law.

NNSA has not adequately pleaded that NNL was a de facto director of NNSA.  In

addition to be being estopped from making such statements, <u>see</u> Section II(A) above, NNSA

does not provide any allegations – beyond weightless, conclusory statements, <u>see</u> Claim ¶ 119 n.

9 ("NNL maintained a high degree of control over NNSA and its affairs . . . and at all material

times assumed and exercised the functions of a director in respect of NNSA's affairs") – that

NNL is a de facto director of NNSA.  As set forth in Section II(B) above, a legal entity is not

deemed to be a de facto director under French law unless it reduced the decision making

59

independence of the debtor company's de jure directors such as to dominate the debtor company. Bremond Decl. ¶ 32.  Moreover, in the case of related companies, the control must surpass that normally inherent in a group, id. ¶ 44 – which, in the case of parents, French courts find where the parent placed the subsidiary in a position of "total subordination."  Id. ¶ 36.  NNSA has not plead any facts that would support such a finding here.  Bremond Decl. ¶ 76 n. 97 (noting, under French law, domination necessary to render parent de facto director of subsidiary was not present where parent maintained subsidiary's legal department, directly remunerated subsidiary's CEO, and managed subsidiary's financing relationship with third-party ); see also id. ¶¶ 77, 84-85, 95, 102.  Thus, to the extent NNSA's tort claims are based upon allegations that NNI acted in concert with, conspired or otherwise aided, abetted, and/or assisted NNL's mismanagement fault of NNSA as its de facto director, Claim ¶¶ 114(a), 136(a), 163(a), those portions of claims 3, 7, 14, and 17 must be dismissed.

4.   NNSA's Tort Claims Fail to Satisfy Rule 8 to the Extent its "Fault" Allegations Are Based on a Catch-All Provision

In addition to the allegations of mismanagement and tort, NNSA also alleges generically that NNI acted together, conspired with, and/or aided, abetted, assisted, and/or encouraged NNL (or alternatively NNSA's de jure directors) to commit "[s]ome other breach of law (French or otherwise), of NNL's duties or obligations (or alternatively those of NNSA's de jure directors) and/or of a customary rule."  Claim ¶ 114(d) (as to transfer pricing); ¶ 136(c) (as to the February 2008 repayment); ¶ 163(c) (as to Pre-Petition Business Sales).  This formulaic statement of some unspecified legal violation is patently insufficient under Rule 8.  Twombly, 550 U.S. at 545 ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will

not do.").  This portion of NNSA's tort claims 3, 7, and 14, therefore, cannot survive a motion to dismiss.

> 5.    NNSA Does Not Provide Any Well-Pleaded Allegations that NNI Knowingly Assisted NNL or NNSA's De Jure Director's Act of "Fault" in Bad Faith

In order to state a claim in tort under French law for allegedly conspiring with, and/or aiding, abetting, assisting and/or encouraging NNL or NNSA's de jure directors to commit a breach of duties owed to NNSA, NNSA must allege that NNI knowingly – and thus in bad faith – assisted NNL or NNSA's de jure directors in breaching their alleged duties to NNSA. Bremond Decl. ¶¶ 72-73; see also id. ¶¶ 78, 83, 88, 93.  For the same reasons that NNSA does not adequately plead that NNI knowingly aided or abetted NNL or NNSA's de jure directors under U.S. law, see Section III above, the Claim has not sufficiently alleged that NNI knowingly and thus, in bad faith, assisted a breach under French law; therefore NNSA's French tort law claims must be dismissed.  See Bremond Decl. ¶¶ 79, 89, 96-97, 103.

## V.
## NNSA'S QUASI CONTRACT AND OTHER CLAIMS RELATING TO UNSPECIFIED BUSINESS SALES CAN BE SUMMARILY DISMISSED

NNSA asserts six different causes of action based on alleged sale transactions that closed before the Petition Date.  Though these claims – numbered 10 to 15 – are based on a number of different rights of action, sounding in tort, fraud and/or contract, each is grounded on the same deficient and entirely conclusory factual allegations that fail – with a single exception – even to specify the purported transactions at issue.  In addition, even to the extent NNSA makes claims arising from the one transaction identified (the Alcatel sale), NNSA's quasi-contractual claims for breach of an implied contract (claim 10), breach of an implied term (claim 11), and mistake (claim 12), must be independently dismissed for failure to allege sufficiently the elements necessary to state a claim.

## A.    Claims Allegedly Arising from Pre-Petition Business Sales Fail a Basic Test of Notice Pleading

Most fundamentally, apart from one sale, the Claim fails to even *identify* the Pre-Petition

Business Sale transactions on which claims 10 to 15 are allegedly based.  Instead, these claims

are founded on the generalized allegation that "[p]rior to 14 January 2009, NNSA entered into

*various* global business sales with other Nortel entities, including NNI, whereby a particular

business line was sold by those Nortel entities to a third party purchaser." Claim ¶ 80 (emphasis

added).  NNSA provides but a single example of such transactions – a December 2006 sale to

Alcatel Lucent S.A. – which the Claim asserts was only "[t]he most significant of these [pre-

petition] business sales." Id.  Aside from this single example, nowhere else does the Claim put

the U.S. Debtors on notice of the transactions at issue in claims 10-15.  Inexcusably, the Claim

does not include the dates of the signing or closing, the parties involved, the assets sold, or the

sale price of the unspecified Pre-Petition Business Sales.

NNSA attempts to mask these basic deficiencies by creating a defined term: "Pre-Petition

Sale Proceeds." Id. ¶ 149.  This term is defined only as a "fair and appropriate allocation of the

proceeds for the assets [NNSA] has sold" in "any pre-petition business sale." Id.  NNSA then

uses this defined term throughout claims 10-15, again without any identification of the

transactions at issue.  Id. ¶¶ 150-53, 157, 163, 168.  This impossibly vague pleading requires

dismissal under Rule 8(a).  See Chapa v. Chase Home Fin. LLC, Civil Action No. C-10-359

(JGJ), 2010 WL 5186785, at *5 (S.D.Tex. Dec. 15, 2010) (where "Plaintiff has failed to provide

the loan documents and failed to indicate which loan documents – let alone which provisions –

were breached, Plaintiff has failed to satisfy the pleading standards of Rule 8(a)"); Smith v. Nat'l

City Mortg., No. A-09-CV-881 LY, 2010 WL 3338537, at *11 (W.D.Tex. Aug. 23, 2010)

(dismissing breach of contract claim where plaintiffs "[did] not specify what provision or for that

matter what contract was allegedly breached").  Seemingly cognizant of these deficiencies, the

Claim candidly notes that such allegations "will be further particularized following discovery."

Claim ¶ 149.  Discovery, however, is no substitute for well-pleaded allegations that satisfy Rule

8(a).  See Iqbal, 129 S.Ct. at 1953-54 ("[B]ecause respondent's complaint is deficient under Rule

8, he is not entitled to discovery, cabined or otherwise.").

### B.    Claims 10-12 Independently Fail to State a Claim[65]

#### 1.    Claims 10 and 11 Fail to Adequately Plead Breach of Contract

In claims 10 and 11, NNSA makes claims for breach of contract on the basis of either

(i) "an implied contract as between the selling Nortel entities that the Pre-Petition Sale Proceeds

would be distributed as amongst them in accordance with the arm's length principle," and/or (ii)

an implied term contained within "the relevant sale contracts" that "NNSA would receive a fair

and appropriate allocation."  Claim ¶¶ 150, 152.

In either case, NNSA fails to adequately allege the parameters of the contract or

contractual term.  Instead, the Claim only pleads an alleged "implied" agreement to allocate

"fairly" "based on the arm's length principles."  Id. ¶¶ 151-152.  Nowhere, however, does NNSA

allege facts that define the terms of this alleged agreement, or what allocation of proceeds from

any Pre-Petition Business Sales (including Alcatel) would comply with NNI's alleged

contractual obligations.  Instead, the Claim only alleges (i) that the proceeds and allocation

methods were decided "almost entirely by NNI and NNL," (ii) that the allocation method

violates this open-ended (yet undefined) implied agreement, (iii) that the allocation was allegedly

applied in accordance with "erroneous assumptions" that were contained in the transfer pricing

---

[65]    NNSA does not allege that these claims are governed by foreign law.  Accordingly, they are considered under U.S. law.

structure, and (iv) that the allocation "was not even applied in conformity with these erroneous assumptions."  Id. ¶ 82.

Without alleging the form of allocation that any implied agreement required or how the alleged "erroneous" assumptions contained in the transfer pricing structure were misapplied, the Claim fails to put NNI on notice as to how the allocation method constitutes a breach of contract and what method would comport with the alleged contracts or contractual terms.  As a consequence of this seemingly deliberate ambiguity, the Claim also fails to allege what action or omission by NNI constituted a breach of the supposed implied term of implied contract.  Instead, the Claim references only NNI's "participation in the decision making" and "involvement in this regard."  Id. ¶ 151.

This is only compounded by the Claim's general inability to identify which specific pre-petition sales contracts are purportedly at issue.  Accordingly, the "contract" claims should be dismissed.

2.    Claim 12 Fails Adequately to Plead Mistake

In claim 12, NNSA asserts, in the alternative, a claim for mistake.  Because a claim for mistake is subject to the heightened pleading standard of Rule 9(b), NNSA must particularize (1) the mistake; (2) the identity of the individuals that made the mistake; (3) the nature of their misunderstanding; and (4) when and where the mistake occurred.  RTI Hamilton v. Tronox LLC (In re Tronox Inc.), Bankruptcy No. 09-10156 (ALG), Adversary No. 09-01488 (ALG), 2010 WL 2010844, at *3 (Bankr. S.D.N.Y. May 14, 2010).

NNSA's allegations do not even approach this standard.  The Claim alleges only that "NNSA did not receive a fair allocation of the Pre-Petition Sale Proceeds due to a mistake (either of fact or law) as to the full extent of NNSA's entitlement."  Claim ¶ 153.  As a result, the Claim alleges that "NNI received considerably more from the allocation than it was intended," and "is

64

therefore obliged to repay the overpayment to NNSA." Id. This falls far short of the particularity required by Rule 9(b). NNSA glaringly fails to allege the nature of the mistake – averring only "a mistake (either of fact or law)," id., and omits to identify the individuals involved who made the alleged mistake or the time and place where the mistake occurred. Indeed, despite NNSA's amendment, the claim fails even to put NNI on notice of whether the alleged mistake was made only by NNSA or also by NNI and/or NNL. This plainly fails to satisfy Rule 9(b).

## VI.
## NNSA'S CLAIMS IN RESPECT OF FSD LIABILITY CAN BE SUMMARILY DISMISSED

In claims 19-22, NNSA asserts contingent claims that seek to hold NNI liable for any payments or other financial support that NNSA may ultimately be required to provide for the UK Pension Plan. Claim ¶¶ 86- 92, 177-83. NNSA asserts these contingent claims under French or U.S. law as alternative causes of action for: (i) contribution; (ii) recoupment, contribution and/or unjust enrichment; (iii) subrogation; and (iv) an unspecified "obligation to repay" (together, the "FSD Claims"). Id. ¶¶ 177-83.

These FSD Claims must be dismissed. First, because the FSD Claims seek to indirectly hold NNI liable for a Financial Support Direction or Contribution Notice issued in the United Kingdom, they effectively seek an end-run around this Court's determination that it will *directly* determine NNI's share of liability, if any, relating to the UK Pension Plan. Even if the Court were to consider the FSD Claims, NNSA has failed to allege in anything other than conclusory fashion any basis on which NNI should be held liable for any of NNSA's potential FSD liability. Finally, the FSD Claims are quintessential contingent co-debtor claims, subject in any event to disallowance under Section 502(e)(1)(B) the Bankruptcy Code.

A.    **NNSA's FSD Claims Fail to Plead a Basis for Imposing Liability on NNI Regarding the UK Pension Plan**

As this Court is aware, the UK Pension Trustee and the Pension Protection Fund have directly filed their UK Pension Claims against the U.S. Debtors.  Proof of Claim No. 5573, dated Sept. 30, 2009, Peacock Decl. at Ex. P & Proof of Claim No. 6979, dated Jan. 25, 2010, Peacock Decl. at Ex. Q.  Those UK Pension Claims seek to hold the U.S. Debtors liable in respect of the UK Pension Plan on the basis of a Financial Support Direction or Contribution Notice issued by a UK Determination Panel.  This Court has firmly rejected, however, any attempt to hold the U.S. Debtors liable on the basis of a Financial Support Direction or Contribution Notice issued in proceedings in the United Kingdom.  Instead, the Court has made clear that it can and will decide NNI's liability, if any, in respect of the UK Pension Plan in the context of the claims of the UK Pension Trustee and the Pension Protection Fund.  See, e.g., Feb. 26, 2010 Hr'g Tr. at 183:13-14, Peacock Decl. at Ex. R [D.I. 2646] (ruling that the UK Pension Claim "is a claim which the Court, not easily but, certainly, capably, can decide"); In re Nortel Networks Corp., 426 B.R. 84, 92 (Bankr. D. Del. 2010), aff'd, No. 09-10138-KG, CA 10-230-LPS, 2011 WL 1154225 (D. Del. Mar. 29, 2011) (observing that "[the Pension Protection Fund and UK Pension Trustee] can obtain complete monetary relief in this Court at the appropriate time").  Indeed, the Court has enforced the automatic stay against the UK Pension Trustee and the Pension Protection Fund, holding that as to the U.S. Debtors, the U.K. Pension Proceedings – and thus any finding of liability that results from a Financial Support Directive or Contribution Notice – will be "deemed void and of no force or effect."  Order Enforcing the Automatic Stay against Certain Claimants with Respect to the U.K. Pension Proceedings, dated February 26, 2010, Peacock Decl. at Ex. S ¶ 3 [D.I. 2576].

NNSA cannot reconcile its FSD Claims with these rulings.  Each of those FSD Claims asserts that NNI should be held liable as a joint tortfeasor or otherwise on the basis of the same Financial Support Direction or Contribution Notice at issue in the UK Pension Claims.  See Claim ¶¶ 89-90, 179, 181-83.  But the reasoning of this Court's rulings on the UK Pension Claims – which require this Court to itself determine whether it is reasonable to hold NNI liable in respect of any obligations to the UK Pension Plan – apply with equal force to foreclose liability on the FSD Claims based on proceedings in the United Kingdom.  Nothing in NNSA's Claim suggests any basis for its FSD Claims other than a Financial Support Direction or Contribution Notice.

Even if this Court were to consider the FSD Claims, NNSA has failed to plead plausible claims for relief, as its Claim asserts no well-pleaded facts on which NNI should be held liable for any FSD liability, let alone NNSA's FSD liability.  Specifically, each of NNSA's various FSD Claims require a showing that NNI is liable for the potential exposure that *NNSA* may face in respect of the UK Pension Plan.[66]  First, NNSA's contribution claim does not exist as a valid cause of action under French law,[67] and its recoupment and obligation to repay claims do not exist as valid causes of action under either French or U.S. law.[68]  Second, NNSA's contribution

---

[66]    Additionally, under French law, a claimant must establish, among other things, that his interest is "born and not potential."  Bremond Decl. ¶ 107 (quoting CPC Art. 31).  On that basis alone, NNSA's FSD Claims must fail under French law.

[67]    See Bremond Decl. ¶ 110.

[68]    See, e.g., Bremond Decl. ¶¶ 110, 115 (recoupment), 143-44 (obligation to repay); DHP Holdings II Corp. v. Peter Skop Indus., Inc., 435 B.R. 220, 232 (Bankr. D. Del. 2010) (recoupment is "the setting up of a demand arising from the same transaction as plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim") (citation omitted); Folger Adam Sec., Inc. v. DeMatteis/Macgregor, JV, 209 F.3d 252, 261 (3d Cir. 2000) ("the right of recoupment is a defense, not a claim"); Rolls-Royce Corp. v. Heros, Inc., 576 F.Supp.2d 765, 790 (N.D.Tex. 2008) ("Recoupment is a defense . . . it is available to defendant so long as plaintiff's claim survives").

claim would require a showing of NNI's common liability with NNSA under U.S. law.[69]  Third,

NNSA's unjust enrichment and subrogation claims also require that a payment was made by

NNSA, and that payment was made by NNSA in respect of an obligation of NNI.[70]  To the

extent an "obligation to repay" even represents a cause of action, NNSA's Claim also alleges it is

based on a supposed independent obligation on the part of NNI to repay NNSA for any FSD

payment.  Claim ¶ 183.

However, NNSA's Claim is devoid of any factual allegations concerning NNI's supposed

joint liability in respect of any potential UK Pension Plan obligations.  Instead, its Claim is based

on bare legal conclusions that NNI is or should be liable.  Id. ¶¶ 179-80 ("NNSA asserts a claim

. . . to recover a contribution from NNI, including without limitation under French and US statute

and/or by reason of breaches of the duties owed by NNI to NNSA referred to elsewhere in this

Proof of Claim . . . In this respect it is just and equitable for NNSA to recover from NNI"), ¶ 181

(asserting "a Claim for recoupment or contribution against NNI . . . on the basis that NNSA will

have been required . . . to satisfy . . . an obligation owed by  NNI to the Trustee, and NNI will

therefore have been unjustly enriched at the expense of NNSA"); ¶ 182 (asserting a claim "to be

subrogated in whole or in part to any claim which the Trustee would otherwise have had against

NNI pursuant to an FSD or CN or otherwise"); ¶ 183 (asserting that NNI is "otherwise obliged

---

[69]    Chamison v. Healthtrust, Inc., 735 A.2d 912, 918, 925 n.46 (Del. Ch. 1999) (contribution claim arises "where two or more persons are under a common burden or liability" and "a joint debtor . . . is compelled to pay more than his share"); Beech Aircraft Corp v. Jinkins, III, 739 S.W.2d 19, 21 (Tex. 1987) ("The essential prerequisites for a contribution claim are a judgment finding the party seeking contribution to be a joint tortfeasor and the payment by such party of a disproportionate share of the common liability.").

[70]    See Bremond Decl. ¶¶ 117-127; Murray v. Cadle Co., 257 S.W.3d 291, 299 (Tex. App. 2008) ("There are two key elements to equitable subrogation:  (1) the person whose debt was paid was primarily liable on the debt, and (2) the claimant paid the debt involuntarily."); Reserves Dev. LLC v. Severn Sav. Bank, FSB, Civil Action No. 2502-VCP, 2007 WL 4054231, at *17 (Del. Ch. Nov. 9, 2007) ("Subrogation rights arise . . . to prevent the unjust enrichment of a party whose obligation is fully performed by another.").

. . . to repay that obligation").[71]  Once the Court disregards such legal conclusions, as <u>Twombly</u>

requires, there are no remaining well-pled facts with which NNSA has "shown" its entitlement to

relief.  <u>Twombly</u>, 550 U.S. at 557; <u>see also</u> <u>Santiago v. Warminster Twp.</u>, 629 F.3d 121, 128 (3d

Cir. 2010) (a court "disregard[s] legal conclusions" in assessing adequacy of claims); <u>In re Ins.</u>

<u>Brokerage Antitrust Litig.</u>, 618 F.3d 300, 320 n.18 (3d Cir. 2010) ("The touchstone of Rule

8(a)(2) is whether a complaint's statement of facts is adequate to suggest an entitlement to relief

under the legal theory invoked . . . .").

 While NNSA asserts that "[f]ull particulars of [its FSD] claim are subject to the

circumstances leading to NNSA's obligation," Claim ¶ 183, any factual basis on which NNI

should be treated as a joint tortfeasor or primary obligor depends not on the amount of any

Contribution Notice that is ultimately issued, but on the pre-petition relationship between the

parties and operation of the UK Pension Plan.  Despite the passage of nearly three years since the

Joint Administrators' appointment and despite the Court's order for a more definite statement,

the Claim is devoid of any factual allegations on this critical point.  <u>Iqbal</u> and its progeny thus

require dismissal of the FSD Claims.[72]

---

[71] Even to the extent that NNSA's Claim suggests that the FSD Claims are based on its allegations concerning NNI's alleged role in the corporate governance of NNSA, <u>see</u> Claim ¶ 179 (referencing "breaches of the duties owed by NNI to NNSA referred to elsewhere in this Proof of Claim"), those conclusory allegations are similarly deficient for the reasons set out in Section II. above; <u>see also</u> Bremond Decl. ¶ 113 (noting NNI has not alleged facts that, if true, would render NNI a de facto director of NNSA with regard to its FSD Claims).

[72] Moreover, to state a valid claim for subrogation, the underlying obligation must be one for which NNSA was not primarily liable.  <u>See</u> <u>Severn Sav. Bank</u>, 2007 WL 4054231, at *17.  Here, NNSA's Claim is predicated on a potential Financial Support Direction or Contribution Notice under which "*NNSA* is ultimately required . . . to make a payment or series of payments." Claim ¶ 178 (emphasis added).  NNSA has thus pled itself out of a valid cause of action in claim 21.  <u>Nationwide Mut. Ins. Co. v. Kesterson</u>, 575 A.2d 1127, 1130 (Del. 1990) (rejecting subrogation claim by plaintiff whose claim was premised upon a payment "made as a result of the federal action which resulted in a judgment against [the plaintiff] directly," which thus discharged its own primary obligation).

**B.     NNSA's FSD Claims Must be Disallowed under the Bankruptcy Code**

Even if NNSA had adequately pled claims for contribution, subrogation, recoupment, unjust enrichment, or obligation to repay, the Bankruptcy Code would mandate that the FSD Claims be disallowed.  Section 502(e)(1)(B) provides, in relevant part, that a bankruptcy court "shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that . . . such claim . . . is contingent as of the time of allowance or disallowance . . . ."  11 U.S.C. § 502(e)(1)(B).  The Bankruptcy Code mandates disallowance where three elements are satisfied: "(1) the claim must be one for *reimbursement or contribution*; (2) the entity asserting the claim for reimbursement or contribution must be '*liable with the debtor*' on the claim; and (3) the claim must be *contingent* at the time of its allowance or disallowance."  In re APCO Liquidating Trust, 370 B.R. 625, 631 (Bankr. D. Del. 2007) (emphasis added) (quoting In re Provincetown-Boston Airlines, Inc., 72 B.R. 307, 309 (Bankr. M.D. Fla. 1987), and citing additional cases).  The FSD Claims satisfy each of these elements for disallowance.

First, NNSA's own pleadings demonstrate that its FSD Claims are contingent.  A claim is considered "contingent" for the purposes of Section 502(e)(1)(B) if it "has not yet accrued and is dependent upon some future event that may never happen."  In re Touch Am. Holdings, Inc., 409 B.R. 712, 716 (Bankr. D. Del. 2009) (internal punctuation and citation omitted).  Here, NNSA's FSD Claims begin by conceding that "[a]t the present time, it is *not yet known* . . . whether any one or more of the EMEA Targets [including NNSA] will ultimately be required pursuant to an FSD or CN to make a payment."  Claim ¶ 177 (emphasis added).  Its individual causes of action are similarly clear that the FSD Claims arise only "in the event that NNSA is ultimately required pursuant to an FSD or CN to make a payment."  Id. ¶ 178.

70

Second, the FSD Claims are predicated on NNI's alleged "liability with" NNSA in

respect of any Financial Support Direction or Contribution Notice.  "Courts have held that the

phrase 'an entity that is liable with the debtor' is broad enough to encompass any type of liability

shared with the debtor, whatever its basis."  Norpak Corp. v. Eagle-Picher Indus., Inc. (In re

Eagle-Picher Indus., Inc.), 131 F.3d 1185, 1190 (6th Cir. 1997) (internal quotation marks,

citations, and alterations omitted) (citing cases).

Both NNSA's pleadings and public records of the FSD proceedings upon which NNSA's

FSD Claims are based make clear that NNSA and NNI are alleged to be co-liable in respect of

the FSD Claims.  See Determination Notice Issued Pursuant to Section 96 of the Pensions Act

2004 In re Nortel Networks UK Pensions Plan, dated June 25, 2010 (available at

http://www.thepensionsregulator.gov.uk/docs/DN1694856.pdf), Peacock Decl. at Ex. T (listing

NNI and NNSA as subject to the then-pending FSD).[73]  Indeed, the FSD Claims are by their

nature premised upon monies allegedly owed by NNI directly to the Pension Trustee, which the

Pension Trustee allegedly might require NNSA to pay in NNI's stead.  Claim ¶ 180 (averring

that if NNSA is required to make payments to the U.K. Pension Trustee, NNSA should recover

from NNI "having regard to the extent of NNI's responsibility for the damage in question."); see

also In re Baldwin-United Corp., 55 B.R. 885, 891 (Bankr. S.D. Ohio 1985) ("By its very nature

a claim for contribution presupposes a sharing of liability and thus a codebtor relationship.").

The same holds true for NNSA's alternative claims for subrogation, recoupment, unjust

enrichment, or NNI's unspecified "obligation to repay."  Claim ¶¶ 179-83; see also Eagle-Picher,

---

[73]     Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006) (On a motion to dismiss, a court "may consider ... any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.") (internal quotations and citations omitted).

131 F.3d at 1190 ("[S]o long as [claimant] and [debtor] are both potentially responsible . . . , the legal theory underpinning that shared responsibility is irrelevant.").[74]

Finally, the FSD Claims plainly sound in "reimbursement or contribution" as Section 502(e) requires. Whether a contingent claim sounds in "reimbursement or contribution" is construed broadly, "encompass[ing] every possible right to compensation for paying the debt of another." Celotex Corp. v. Allstate Ins. Co. (In re Celotex Corp.), 289 B.R. 460, 466 (Bankr. M.D. Fla. 2003); In re Wedtech, Corp., 87 B.R. 279, 287 (Bankr. S.D.N.Y. 1988) ("[Reimbursement] is a broad word which encompasses whatever claims a codebtor has which entitle him to be made whole for monies he has expended on account of a debt for which he and the debtor are both liable."). NNSA's claim for contribution (claim 19) falls within the literal text of this requirement. Its remaining claims similarly qualify, as they are each asserted on the "basis that NNSA will have been required . . . to satisfy in whole or in part an obligation owed by NNI." Claim ¶¶ 181, 183; see also id. ¶ 182 (asserting a claim "to be subrogated . . . to any claim which the Trustee would otherwise have had against NNI . . . "); In re Celotex, 289 B.R. at 466 (the terms reimbursement and contribution "encompass every possible right to compensation for paying the debt of another"); see also Aetna Cas. & Sur. Co. v. Ga. Tubing Corp., 93 F.3d 56, 57 (2d Cir. 1996) (claim for "prospective" subrogation was properly disallowed under Section 502(e)(1)(B)).

---

[74] Notably, the applicability of Section 502(e)(1)(B) turns neither upon a final determination of liability nor even upon the filing of claims against a debtor, but rather upon the existence of *potential* claims for which the debtor is co-liable. See APCO, 370 B.R. at 635 (co-liability for purposes of Section 502(e)(1)(B) "is not premised on the filing of multiple claims but, rather on the [actual] existence of such claims") (internal quotation marks and citations omitted). For the avoidance of doubt, the U.S. Debtors indeed do not admit co-liability in respect of the UK Pension Plan, and reserve all of their rights and defenses.

The FSD Claims fall squarely within the class of contingent claims disallowed by Section 502(e)(1)(B). While claims 19-22 independently fail to state a claim and thus should be dismissed with prejudice, at minimum, Section 502(e)(1)(B) compels their disallowance.

# VII.
## NNSA'S CLAIMS RELATING TO TRANSFER PRICING, THE FEBRUARY 2008 REPAYMENT, AND PRE-PETITION BUSINNESS SALES ARE TIME-BARRED

In addition to their basic pleading deficiencies, NNSA's claims predicated on transfer pricing agreements, the February 2008 repayment related to Project Swift, and the Pre-Petition Business Sales (claims 2-15, collectively the "Time-Barred Claims") are time-barred under Delaware's three-year statute of limitations.[75]

For choice of law purposes, statutes of limitations are procedural rather than substantive. See Norman v. Elkin, Civil Action No. 06-005-JJF, 2007 WL 2822798, at *3 (D. Del. Sept. 26, 2007); Winstar Holdings LLC v. Blackstone Grp. LP (In re Winstar Commc'ns, Inc.), 435 B.R. 33, 44 (Bankr. D. Del. 2010). Accordingly, "the law of the forum generally determines whether an action is barred by the statute of limitations." Winstar, 435 B.R. at 44.[76] Delaware's borrowing statute, in turn, provides that where an action arises outside of Delaware, "an action cannot be brought . . . to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose." 10 Del. C. § 8121. Because this borrowing statute requires the

---

[75]    Although NNUK and NN Ireland entered into a tolling agreement with NNI that was approved by this Court, NNSA was not a party to that agreement and thus may not benefit from it. See Order Approving Stipulation Among the Debtors and the Joint Administrators on Behalf of Nortel Networks UK Limited and Nortel Networks (Ireland) Limited Regarding Tolling of Certain Claims, entered Dec. 17, 2010 [D.I. 4623].

[76]    The fact that NNSA's claims involve fiduciary duties of non-Delaware corporations should not vary this analysis. See Norman, 2007 WL 2822798, at *3 (internal affairs doctrine does not trump Delaware borrowing statute for fiduciary duty claims because limitations period is procedural not substantive); Winstar, 435 B.R. at 44 (situs of tort or injury not dispositive as to applicable statute of limitations). Even to the extent that the Court were to find the internal affairs doctrine relevant to certain of NNSA's causes of action, the doctrine has no bearing on NNSA's conspiracy (claims 5 and 9) or quasi-contract (claims 10-12) claims.

application of the <u>shorter</u> limitations period, if a claim is time-barred under Delaware law, it is

untimely as a matter of law without consideration of non-Delaware law.  <u>See</u> <u>Burrell v.</u>

<u>AstraZeneca LP</u>, C.A. Nos. 07C-01-412 (SER), 07C-04-110 (SER), 07C-04-267 (SER), 2010

WL 3706584, at *4 (Del. Super. Ct. Sept. 20, 2010); <u>Winstar</u>, 435 B.R. at 44.[77]

Under Delaware law, a three-year statute of limitations applies to NNSA's claims for

breach of fiduciary duty, aiding and abetting breach of fiduciary duty, civil conspiracy, breach of

contract, and unjust enrichment.  <u>See</u> 10 Del. C. § 8106; <u>End of the Road Trust v. Terex Corp.</u>

<u>(In re Fruehauf Trailer Corp.)</u>, 250 B.R. 168, 184 (D. Del. 2000); <u>Eames v. Nationwide Mut. Ins.</u>

<u>Co.</u>, Civ.A. 04-1324 (KAJ), 2006 WL 2506640, at *4 (D. Del. Aug. 29, 2006) (civil conspiracy

claim is governed by statute of limitations for underlying claims).  As this three-year limitations

period applies to NNSA's claims for aiding and abetting under U.S. law, it similarly applies to

NNSA's duplicative tort law claims under French law (claims 3, 7, 14) because, as alleged, those

tort claims are predicated upon assertions that NNI either conspired with and/or aided, abetted, or

assisted NNL (and/or NNSA's de jure directors) in breaching their duties to NNSA.  <u>See</u> Claim

---

[77]     The application of Delaware's borrowing statute should not depend on the bankruptcy forum in which NNSA has filed its Claim.  <u>See</u> <u>Winstar</u>, 435 B.R. at 45 (finding no special circumstances that would require the bankruptcy court to vary application of Delaware borrowing statute).  Indeed, bankruptcy courts both within and outside the Third Circuit routinely apply the literal terms of the borrowing statute of the forum state to bar untimely creditor claims.  <u>Global Indus. Techs., Inc. v. Ash Trucking Co. (In re Global Indus. Techs., Inc.)</u>, 333 B.R. 251, 260 (Bankr. W.D. Pa. 2005) (dismissing creditor's claims as barred by Pennsylvania borrowing statute where Pennsylvania was the forum state for the debtor's bankruptcy and Pennsylvania law required use of its own limitations period if shorter); <u>Bianco v. Erkins (In re Gaston & Snow)</u>, 243 F.3d 599, 606 (2d. Cir. 2001) (affirming that bankruptcy courts should apply the borrowing statute of the forum state to bar untimely claims, as bankruptcy context creates no sufficient federal interest to depart from state law); <u>In re Coudert Bros. LLP</u>, No. 09 Civ. 9561 (AKH), 2010 WL 2382397, at **2-3 (S.D.N.Y. June 14, 2010) (affirming bankruptcy court's dismissal of creditor's claims against debtor as time-barred under New York borrowing statute over creditor's assertion that claims were timely under English law).  Moreover, where the Joint Administrators for NNSA have asserted that the Claims are "intertwined" with allocation of the proceeds of asset sales conducted under the supervision of this Delaware Court (<u>see</u> The Joint Administrators' Response to the Debtors' Motion for an Order Requiring a More Definite Statement of Claim and Setting a Deadline for the Filing of Any Proofs of Claim by the EMEA Claimants [D.I. 5255] ¶ 7), the Claims are divorced from those authorities which would decline to apply Delaware's borrowing statute in favor of another jurisdiction.  <u>Winstar</u>, 435 B.R. at 45-46 (declining to apply New York limitations period where claims concerned "due diligence performed in this case . . . as part of the sale process approved by this Bankruptcy Court, using professionals employed with the approval of this Bankruptcy Court."); <u>see</u> <u>Mervyn's Holdings, LLC v.</u> <u>Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)</u>, 426 B.R. 488, 502 (Bankr. D. Del. 2010) (applying California statute of limitations where pre-petition transaction lacked other ties to Delaware).

¶¶ 114(a), 136(a), 163(a).  <u>Compare</u> Bremond Decl. ¶¶ 72-73, 83 (as alleged, NNSA's claim for tort under French law requires that: (i) NNL committed acts of fault in breach of their duties to NNSA; (ii) NNI knowingly aided NNL in breaching their duties; and (iii) specific actions of NNI while aiding and abetting or conspiring were a cause of NNSA's alleged injury) <u>with</u> <u>Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am. Inc.)</u>, 405 B.R. 527, 543-44 (Bankr. D. Del. 2009) (elements of aiding and abetting claim are: (i) breach of a fiduciary duty, (ii) substantial participation by defendant, (iii) with knowledge of the breach).  In each case, the statute of limitations runs from the time of the alleged wrongful act, even if the plaintiff was unaware of the cause of action at that time. <u>Fruehauf</u>, 250 B.R. at 184; <u>SmithKline Beecham Pharm. Co. v. Merck & Co.</u>, 766 A.2d 442, 450 (Del. 2000).  As the allegations of the Claim itself make clear, the Time-Barred Claims have been brought more than three years since the time of the alleged wrongful acts.

First, NNSA avers it entered into the MRDA in December 2004, Claim ¶¶ 18(d), 46, but that the MRDA was effective from January 1, 2001.  <u>Id.</u> ¶¶ 18(d), 46.  As the Claim admits, the MRDA "provided the architecture and contractual basis to enable the RPSM [transfer pricing method] to be applied."  <u>Id.</u> ¶ 46.  As of December 2004, NNSA was thus contractually obligated to participate in the Nortel Group's transfer pricing system.  <u>See id.</u> ¶ 114(c) (alleging "[a] breach of contractual obligations owed to NNSA, in NNL's case including, but not limited to, its obligations under the MRDA . . .").  Indeed, it is this decision to "participat[e]" in the RPSM on which NNSA bases its transfer pricing claims.  <u>See, e.g.</u>, <u>id.</u> ¶¶ 104, 106, 120 (alleging that "in bringing about and allowing NNSA's participation in the RPSM and MRDA and the steps taken in the implementation of the same, the directors of NNSA (both de jure and, in the case of NNL,

de facto) breached their duties as the implementation and operation of the RPSM and MRDA

were not in NNSA's best interests"), 122, 125.

Even where NNSA attempts to ground its claims in the "implementat[ion]" or

"operat[ion]" of the RPSM under the MRDA, see, e.g., Claim ¶ 125, Delaware law is clear that

its transfer pricing claims arose at the very latest upon entry into the MRDA.  See Marvel Entm't

Grp., Inc. v. Mafco Holdings, Inc. (In re Marvel Entm't Grp., Inc.), 273 B.R. 58, 72-74 (D. Del.

2002) (subsidiary's claims for breach of fiduciary duty against parent based on allegedly

unfavorable tax-sharing agreement accrued upon the subsidiary's entry into the contract, not

dates or accrual of performance of obligations); Kahn v. Seaboard Corp., 625 A.2d 269, 271

(Del. Ch. 1993) (where "wrong . . . alleged is the use of control over [subsidiary] to require it to

enter into a contract that was detrimental to it and beneficial, indirectly, to the defendants . . .

such wrong occurred at the time that enforceable legal rights against [subsidiary] were created.").

However, NNSA did not assert any claims against the U.S. Debtors until its Placeholder Claim

was filed in September 2009 – more than four and a half years after NNSA entered into the

MRDA.[78]  Accordingly, even assuming arguendo that the Placeholder Claim put the U.S.

Debtors on notice of NNSA's claims in relation to transfer pricing, claims 2-5 arise from entry

into the MRDA and must be dismissed as untimely.[79]

---

[78]    The Liquidator did not file a placeholder claim; thus, it did not assert any claims against NNI until June 3, 2011 – more than six years after NNSA entered into the MRDA.

[79]    Assuming arguendo that Delaware's borrowing statute did not apply, NNSA's claim for aiding and abetting breach of fiduciary duty based on NNSA's agreement to transfer pricing systems, claim 4, is nonetheless time-barred.  The only other state whose law NNSA specifically suggests could apply to claim 4 is Texas.  Texas applies either a three or four year statute of limitations to aiding and abetting breach of fiduciary duty claims.  See Quilling v. Compass Bank, No. 3:03-CV-2180-R (JB), 2004 WL 2093117, at *3 n.6 (N.D. Tex. Sept. 17, 2004) (Texas imposes a three year statute of limitations on aiding and abetting fiduciary duty claims); Bonner v. Henderson, No. 05-99-01582-CV (MW) (CIW) (JRR), 2001 WL 301581, at *6 (Tex. App. Mar. 29, 2001) (deciding that "the limitations period for appellant's . . . knowing participation in breach of fiduciary duty should be four years").  As such, even under Texas law, claims based on NNSA's entry into the MRDA in December 2004 – brought at the earliest in September 2009 – are nonetheless time-barred.

Second, NNSA's claims that allegedly arise from the February 2008 repayment associated with Project Swift and any Pre-Petition Business Sales (claims 6-15) – each of which were asserted for the first time when the Claim was filed in June 2011 – are similarly time-barred.  The February 2008 repayment, which occurred after the planning and implementation of Project Swift, occurred "in or around" February 2008, Claim ¶¶ 75-76, such that the three-year limitations period expired in February 2011 – four months before the Claim was filed.  Although the Claim fails even to specify what transactions constitute the Pre-Petition Business Sales, NNSA does reference the sale of Nortel's UMTS business to Alcatel.  Id. ¶ 80.  That transaction closed in December 2006, id., with allocation of the proceeds allegedly "set out in a statement dated July 24, 2007," id. ¶¶ 80-81.  Regardless of whether any alleged causes of action accrued in December 2006 or July 2007, they were time-barred by July 2010 – nearly a year prior to NNSA's filing of the Claim.[80]

NNSA cannot salvage its alleged claims arising from the February 2008 repayment related to Project Swift and any Pre-Petition Business Sales by suggesting that such claims – first asserted in June 2011 – somehow "relate back" to its Placeholder Claim.  An amendment to a

---

[80]    While the limitations period for NNSA's Pre-Petition Business Sale and February 2008 repayment claims expired after the U.S. Debtors' petition date, Section 108 of the Bankruptcy Code does not render those claims timely.  Even if Section 108(a) could apply to a Chapter 15 debtor, this Court's EMEA Recognition Order was not entered until January 2011, and makes no mention of relief under Section 108.  See In re Bancredit Cayman Ltd., No. 06-11026(SMB), 2007 Bankr. LEXIS 3805 at *7 (Bankr. S.D.N.Y. Nov. 2, 2007) (rejecting attempt to apply Section 108(a) to Chapter 15 debtor whose recognition order did not provide for such relief, noting that in any event "the argument that § 108 is already available to trustees is hard to fathom since the Foreign Representatives are not trustees"); In re Fairfield Sentry Ltd., No. 10-13164 (BRL), 2011 Bankr. LEXIS 1895, at *25 (Bankr. S.D.N.Y. May 23, 2011) (granting Chapter 15 debtor relief under Section 108(a) where proposed orders put defendants on notice, providing potential defendants with an opportunity to be heard).  Nor can NNSA rely on the tolling provisions of Section 108(c).  By its terms, Section 108(c) applies to creditors whose claims would be time-barred based on their inability to commence action "in a court other than the bankruptcy court" because of the pendency of the automatic stay.  11 U.S.C. § 108(c).  Nothing precluded NNSA, however, from filing a proof of claim – or even an adversary proceeding – against the U.S. Debtors in this Court before an intercompany bar date was set.  Indeed, while the EMEA Debtors, including NNSA, filed their Placeholder Claim in September 2009, they failed to so much as mention the February 2008 repayment or any Pre-Petition Business Sale.  Section 108 is thus unavailing to NNSA or the other EMEA Debtors, to whom the same arguments apply.  See Joint Objection and Motion to Dismiss Claims of Nortel Networks UK Limited at 74-80 [D.I. 5970].

proof of claim will relate back only if it asserts a claim "that arose out of the conduct,

transaction, or occurrence set out – or attempted to be set out – in the original pleading." Fed. R.

Civ. P. 15(c)(1)(B); Coan v. O & G Indus., Inc. (In re Austin Driveway Servs., Inc.), 179 B.R.

390, 395 (Bankr. D. Conn. 1995) ("[W]hen the amended pleading does not rely upon the facts

and transactions originally pled or plead them more specifically, but rather is based on new facts

and different transactions, the proposed amendment will not relate back to the original pleading."

The essential inquiry "is whether the defendant was given adequate notice that such claims might

be made upon examining the facts alleged in the original pleading."); Rescuecom Corp. v.

Khafaga (In re Khafaga), 431 B.R. 329, 334-35 (Bankr. E.D.N.Y. 2010) (citation omitted).[81]

The Placeholder Claim failed to provide such notice: it included no mention of Project Swift, the

February 2008 repayment, or any Pre-Petition Business Sales whatsoever.  Instead, the

Placeholder Claim asserted only "potential claims . . . arising out of transfer pricing,

intercompany dealings, trading and other arrangements or agreements between them."

Placeholder Claim ¶ 2.  NNI was not a party to Project Swift or the February 2008 repayment.

Accordingly, none of those transactions can fall within the Placeholder Claim's reference to

"dealings" or "other arrangements" between NNI and NNSA.[82]  Nor can NNSA rely on any

---

[81]    See also Peltz v. CTC Direct, Inc. (In re MBC Greenhouse, Co.), 307 B.R. 787, 790 (Bankr. D. Del. 2004) ("focus[ing] on the notice given by the general fact situation stated in the original pleading."); In re Edison Bros. Stores, Inc., No. 99-529 (JCA), 2002 Bankr. LEXIS 1228, at *10 (Bankr. D. Del. May 15, 2002) (amendment to claim will not relate back where it does not give debtor fair notice of the conduct, transaction, or occurrence that underlies the liability).

[82]    See In re MarchFirst, Inc., 448 B.R. 499, 508 (Bankr. N.D. Ill. 2011) (amendments did not relate back where "[t]he original and amended requests arise out of entirely different conduct at entirely different times"); Khafaga, 431 B.R. at 334 (factual discrepancies between original and amended claims – different time frames, different alleged conduct, and different operative facts – preclude a finding that the amended claim relates back); Global Link Liquidating Trust v. Avantel, S.A. (In re Global Link Telecom. Corp.), 327 B.R. 711, 716 (Bankr. D. Del. 2005) ("[A]n amended complaint will relate back if it merely adds a new legal ground for relief, changes the date and location of the transaction alleged, . . . spells out the details of the transaction alleged, . . . [or] merely increas[es] the ad damnum clause . . . .") (alterations in original).

generic references to "intercompany dealings"[83] or any notice allegedly provided outside of the four corners of the proof of claim[84] as a basis to permit relation back.

By entering the EMEA Claims Order, the Court has already recognized that the Placeholder Claim failed to adequately plead any basis for relief against NNI.  EMEA Claims Order ¶ 3 ("If Claimants do not file . . . amended Proofs of Claim by June 1, 2011, the Proofs of Claim . . . shall be disallowed and expunged with prejudice.").  Thus, there is no adequately pled, timely claim to which the newly-advanced claims can now "relate back."  See Baldwin Cnty. Welcome Ctr. v. Brown, 466 U.S. 147, 149 n.3 (1984) (where an initial pleading is insufficient, it cannot be "rehabilitated" by invoking relation-back); United States v. Crawley, Criminal Action No. H-06-204, Civil Action No. H-09-3457 (FHS), 2010 WL 4393970, at *11 (S.D. Tex. Oct. 29, 2010) (amended claim did not relate back where original filing was "completely devoid of facts, much less operative facts").[85]

---

[83]    See In re Milan Steel Fabricators, Inc., 113 B.R. 364, 367 (Bankr. N.D. Ohio 1990) (amended IRS claim for highway taxes could not relate back to an original claim for unemployment taxes based on generalized references to "taxes due under the Internal Revenue Laws of the United States").

[84]    Khafaga, 431 B.R. at 334 (rejecting arguments that defendant had adequate notice of allegations in amended claim allegations by virtue of examination conducted prior to commencement of adversary proceeding); Bank Brussels Lambert v. Chase Manhattan Bank, N.A., No. 93 Civ. 5298 (LMM), 1999 WL 672302, at *2 (S.D.N.Y. Aug. 27, 1999) (holding that the requisite notice must be given by the allegations set forth in the original complaint).

[85]    That the newly-brought claims were filed in response to the Court's order for a more definite statement certainly cannot help NNSA.  In re Maxim Truck Co., 415 B.R. 346 (Bankr. S.D. Ind. 2009) (dismissing claims asserted for the first time in an amended claim filed pursuant to court's order for a more definite statement).

## CONCLUSION

WHEREFORE, the Movants respectfully request that the Court (i) sustain this Objection and grant this Motion; (ii) enter the proposed order attached hereto as Exhibit A disallowing and expunging with prejudice claims 2 through 22 asserted in claim numbers 7784 and 7785 (and to the extent it is not superseded and replaced by claims 7784 and 7785, claim 4923); and (iii) grant such other and further relief as the Court deems just and proper.

Dated:  July 22, 2011
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Deborah M. Buell (admitted *pro hac vice*)
Howard S. Zelbo (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

    - and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors
and Debtors in Possession*

    - and -

AKIN GUMP STRAUSS HAUER & FELD LLP

Fred Hodara (admitted *pro hac vice*)
David Botter (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

     - and -

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Christopher M. Samis*
Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile: (302) 651-7701

*Counsel for the Official Committee
of Unsecured Creditors*