IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*<br><br>Nortel Networks Inc., *et al.*,<br><br>    Debtors. | Chapter 11<br><br>Case No. 09-10138 (KG)<br><br>Jointly Administered |

**DECLARATION OF GUILHEM BREMOND IN SUPPORT OF
JOINT OBJECTION AND MOTION TO DISMISS CLAIMS OF
NORTEL NETWORKS S.A. (NNSA) AND ITS FRENCH LIQUIDATOR**

I, Guilhem Bremond, hereby declare as follows, pursuant to 28 U.S.C. § 1746:

1.  I submit this declaration in support of the Joint Objection and Motion to Dismiss Claims of Nortel Networks S.A. (NNSA) and its French Liquidator (the "Motion").

2.  My educational background and experience qualify me to address the Court on the business laws of France. I am a lawyer *(avocat)* admitted to the Bar in France in 1994. I have practiced for seventeen years as a lawyer. I advise French and international companies and investment funds in corporate recovery and insolvency situations and in related litigations. In 2006, I founded the law firm Bremond & Associés which is recognized today as one of the leading firms in the fields of insolvency and corporate recovery (Ranked Band 1 in Restructuring and Insolvency by Chambers Partners and designated "Man of the year" in the restructuring field by the French magazine *Options Droit des Affaires* in January 2010). Today, I am the Vice President of the ARE (*Association pour le Retournement des Entreprises*, French association of experts involved in corporate recovery). Prior to being admitted to the Bar, I graduated from ESSEC (MBA) in 1990 and received a Master degree in International Commercial Law from Paris I La Sorbonne in 1993. Further details about my background and experience are set forth in my *curriculum vitae*, which is annexed to this declaration as <u>Exhibit A</u>.

3.  I have been engaged by Cleary Gottlieb Steen & Hamilton LLP, in their capacity as legal counsel to Nortel Networks Inc. ("NNI") and the other U.S. debtors in this case (the "U.S. Debtors"), to provide an expert opinion on French law. I have specifically been requested to opine on French law with respect to the claims and allegations in the *Rider to proof of claim of Nortel Networks S.A.* dated June 3 2011 as well as the *Rider to proof of claim of Maître Cosme Rogeau, in his capacity as the court-appointed French Liquidator of Nortel Networks S.A. on behalf of Nortel Networks S.A.* dated June

3 2011 (together the "Claim of NNSA").[1]  I have not reviewed any documents other than the Claim of NNSA.

4.    I am being compensated at a rate of €540 per hour, which is my customary hourly rate. No part of my compensation for performing this work is contingent upon the results of my work or on the outcome of the Motion.  I have not previously acted for the U.S. Debtors in any matter.

5.    I understand that it is not in dispute that prior to the Nortel Group's bankruptcy filings, both NNI and Nortel Networks S.A. ("NNSA") were subsidiaries of a Canadian parent company, Nortel Networks Limited ("NNL"), which itself was a wholly owned subsidiary of the ultimate Canadian parent company Nortel Networks Corporation ("NNC").

6.    For purposes of this report, I have assumed the facts alleged in the Claim of NNSA to be true.  However, I disregard allegations of a wholly conclusory nature.  Conclusory allegations are those allegations which do not allege a fact but simply state a conclusion. For example, I view the repeated allegations of "control" in the Claim of NNSA as of a conclusory nature because to say that NNI "controlled" NNSA, one would first have to consider a pattern of specific factual allegations and ask whether such facts justify the qualification of "control."  A French court would not adopt such a qualification in the absence of proof of specific elements establishing that the qualification were justified.

7.    I have assumed for purposes of this report that French law applies to those claims as to which the Claim of NNSA asserts French law applies.

8.    This report first briefly describes the five areas of wrongdoing alleged by the joint administrators (the "Joint Administrators") and French court-appointed liquidator (the "Liquidator") of NNSA in the Claim of NNSA.  I will refer to both the Joint Administrators and the Liquidator as "NNSA" for convenience in this report.  In a second part, I describe each theory of French law alleged as a basis for liability and analyze whether, in my view, the alleged wrongdoings as described by NNSA, if assumed to be true, would form a valid basis to establish liability under the French law claims asserted.

---

[1]    Apart from the first paragraph of each document, which identifies the claimant, the riders are identical in substance.  Accordingly, citations to the Claim of NNSA should be understood as referring to both documents.

## I – BRIEF OVERVIEW OF AREAS OF ALLEGED WRONGDOINGS

9.    In this section, I briefly describe the following 5 areas of wrongdoings alleged in the Claim of NNSA: Transfer pricing; February 2008 repayment and Project Swift; Business sales; Taxation matters; FSD liability.[2]

### A.   Transfer pricing (Claims 2 and 3)[3]

10.   NNSA claims the following:
-    That NNI was involved in the implementation and the operation of the transfer pricing arrangements between NNSA and other Nortel Group companies.[4]
-    That NNI was also involved in the advanced pricing agreement negotiations with the relevant revenue authorities, namely the Internal Revenue Service, the Canadian Revenue Authority and Her Majesty's Revenue and Customs.[5]
-    The key individuals involved were John Doolittle, allegedly on behalf of both the Nortel Group Canadian Entities and on behalf of NNI, and Mark Weisz, Mike Orlando, Laurie Krebs and John Payne, all allegedly on behalf of NNI.[6] All of the above-mentioned persons are alleged to have acted against the will of NNSA and the latter's interests.[7]  A depletion of value from NNSA is claimed to have resulted from the alleged wrongdoing in relation to transfer pricing.[8]

11.   NNSA claims that NNL and NNI personnel took policy decisions to implement a new transfer pricing model, establishing the RPSM model to replace the former transfer pricing regime.[9]  They further allege that the RPSM has several drawbacks, including that the RPSM allegedly offered NNSA a routine return that was insufficient in that it allegedly "failed to recognize inter-company sales, significant customer intangibles, the service element performed alongside the distribution function or the risks and costs borne outside the routine return."[10]  The RPSM allegedly did not reflect the high restructuring costs of NNSA.[11]  Moreover, NNSA claims that the corporate costs of

---

2    NNSA also brings a claim for intercompany trading debts allegedly owed by NNI to NNSA. Claim of NNSA, Paragraphs 93-96. I note that this claim has not been alleged under French law. I understand, however, that NNSA has reserved its right to allege that these claims arise under French law. Claim of NNSA, Paragraph 194. However, I do not address this claim as I understand it is not being addressed in the Motion, although counsel for the U.S. Debtors has reserved the right to object to the claim on any ground.

3    I refer here only to those claims which are alleged under French law.

4    Claim of NNSA, Paragraph 16.

5    Claim of NNSA, Paragraph 16.

6    Claim of NNSA, Paragraph 17.

7    Claim of NNSA, Paragraphs 18-19, 22, 54, 61, 66.

8    Claim of NNSA, Paragraphs 9-12, 15-16, 33, 54, 125.

9    Claim of NNSA, Paragraphs 18-19, 37-45.

10   Claim of NNSA, Paragraphs 43, 63.

11   Claim of NNSA, Paragraph 65.

NNL and NNI that were put into the residual profit pool, and shared amongst the MRDA entities, were excessive.[12]

12. It is alleged that the MRDA was "imposed" on NNSA[13] and that during a tax audit, French tax authorities pointed out that there was a lack of internal documentation regarding NNSA's agreement on adopting RPSM.[14]  According to NNSA's allegations, "the RPSM system took funds from NNSA, for the benefit of NNL" and "the effect of the RPSM was that cash was 'funnelled' up from NNSA to NNL."[15]

13. The Claim also alleges that NNL and NNI knew that the decision to implement the RPSM was in order to benefit NNL, at the expense of NNSA.[16]

### B.  February 2008 Repayment and Project Swift (Claims 6 and 7)[17]

14. NNSA alleges that in February 2008, NNSA repaid (the "February 2008 Repayment") a portion of a subordinated loan contracted in 2002 between NNSA and NNL, pursuant to which NNL agreed to make a €200 million loan facility available to NNSA (the "2002 Subordinated Loan").[18]  NNSA alleges that the 2002 Subordinated Loan was initially not supposed to be repaid until NNSA was profitable.[19]  This decision allegedly was imposed on NNSA by NNI and NNL at a time when NNSA was not in a position to repay.[20]  The Claim further alleges that NNSA was not profitable for the years ending 31 December 2007 and 31 December 2008, and that NNSA's "equity position . . . at the start of 2008 was uncertain."[21]

15. The proposal to make the February 2008 Repayment allegedly arose as part of the planning and implementation of a corporate restructuring transaction between NNL and the UK Nortel entity ("NNUK") known as "Project Swift."[22]  NNSA acknowledges that Project Swift was a transaction between NNL and NNUK.  NNI is not alleged to be a party to Project Swift or the February 2008 Repayment.[23]

---

[12]  Claim of NNSA, Paragraph 67.

[13]  Claim of NNSA, Paragraph 18.d.

[14]  Claim of NNSA, Paragraph 20.

[15]  Claim of NNSA, Paragraphs 55, 59.

[16]  Claim of NNSA, Paragraph 39.

[17]  I refer here only to those claims which are alleged under French law.

[18]  Claim of NNSA, Paragraph 70.

[19]  Claim of NNSA, Paragraph 70.

[20]  Claim of NNSA, Paragraph 79.

[21]  Claim of NNSA, Paragraph 79.

[22]  Claim of NNSA, Paragraph 73.

[23]  Claim of NNSA, Paragraphs 73-74.

16.   NNSA alleges that NNI's directors, officers and senior employees were part of the group that planned and implemented Project Swift and the February 2008 Repayment.[24]

C.  Business sales (Claims 13 and 14)[25]

17.   NNSA alleges that before January 14, 2009, NNSA was involved in business sales with other Nortel entities.[26]  Allegedly, all the parties had agreed to allocate the proceeds of the sales according to arm's length principles.[27]  NNSA alleges that the decision to allocate the transactions' proceeds was decided "almost entirely" by NNI and NNL.[28]  It is alleged that the allocations of proceeds were contrary to arm's length principles and benefited NNI and NNL, to the detriment of NNSA.[29]

D.  Taxation matters (Claims 16 and 17)[30]

18.   NNSA alleges that the taxation affairs of NNSA were controlled by NNI and NNL.[31]  As a result, it is alleged that these two entities are responsible for and should bear the financial consequences of any tax claim that may in the future be brought by any tax authority against NNSA.[32]

E.  FSD liability (Claims 19-22)[33]

19.   NNSA claims that a Financial Support Direction (FSD) may be issued in respect of alleged UK pension liabilities to certain Nortel group companies including NNSA and NNI.[34]  Moreover, NNSA asserts that the UK Pensions Regulator has the power to issue a contribution notice (CN) to anyone to whom the FSD was issued if it is reasonable to hold the person liable for the particular amount.[35]  The Claim of NNSA seeks to recover against NNI "in the event that NNSA is ultimately required pursuant to an FSD or CN to make a payment or series of payments to the Trustee or otherwise provide financial

---

[24]   Claim of NNSA, Paragraphs 25, 73-75.

[25]   I refer here only to those claims which are alleged under French law.

[26]   Claim of NNSA, Paragraph 80.

[27]   Claim of NNSA, Paragraph 81.

[28]   Claim of NNSA, Paragraph 82.

[29]   Claim of NNSA, Paragraphs 82-83.

[30]   I refer here only to those claims which are alleged under French law.

[31]   Claim of NNSA, Paragraph 84.

[32]   Claim of NNSA, Paragraph 85.

[33]   All the claims related to FSD liability are alleged under French law.

[34]   Claim of NNSA, Paragraphs 86-88.

[35]   Claim of NNSA, Paragraph 92.

support for the Scheme."[36]  However, there is no allegation that any order has been issued with respect to NNSA requiring NNSA to pay any amounts.

## II – STATEMENT OF RELEVANT DOCTRINES OF FRENCH LAW AND ANALYSIS OF NNSA'S ALLEGATIONS

20.   In this section, I first describe each theory of French law alleged as a basis for liability in the Claim of NNSA and secondly, I analyze whether, for each alleged area of wrongdoing discussed above, assuming the supporting factual allegations were found to be true, the alleged wrongdoing would form a valid basis for liability under the corresponding claims asserted by NNSA under French law.

21.   Before addressing the specific claims asserted, the French system of legal authority will be introduced to provide a proper understanding of all provisions of law, decisions of French courts and scholarly opinion cited in this opinion.

22.   French law recognizes a specific hierarchy of legal norms.  For purposes of this opinion, the relevant norms, in order of persuasive value, are found in provisions of the French Commercial Code and Civil Code (these codes contain the "law" that is relevant to the issues in dispute), *jurisprudence* (or case "law") and *doctrine* (scholarly opinion in journals and treatises).

23.   Importantly, the French legal system does not recognize the doctrine of *stare decisis* or binding precedent.  Accordingly, decisions rendered by one court, even when rendered by the highest court in France's judicial (as opposed to administrative)[37] legal order, the *Cour de Cassation*, are not necessarily binding upon lower courts (absent special circumstances in which a particular matter has been decided by the *Cour de Cassation* in a special session and remanded to the Court of Appeals a second time ordering the Court of Appeals to conform its interpretation to that adopted by the special session of the *Cour de Cassation*).  That said, while not binding, decisions of the *Cour de Cassation* and the Courts of Appeal are regularly cited and generally considered to have persuasive value for future cases, as the *Cour de Cassation* attempts generally to maintain consistent and predictable decisional practices (although it is free at any time to reverse prior decisions and divisions of interpretation sometimes exist amongst its various chambers).

---

[36]     Claim of NNSA, Paragraph 178.

[37]     Unlike other legal systems, the French legal system is divided into two "orders." The judicial order has jurisdiction to hear disputes related to matters of private law, such as those raised by the claims asserted here. The *Cour de Cassation* sits atop the French judicial order.  The administrative order has jurisdiction to hear claims involving matters of public law disputes in which actions of the French public administration are at issue. The *Conseil d'Etat* sits atop the administrative order.  This description is of course a simplification of a division which is often in practice difficult to draw.  Above both the *Cour de Cassation* and *Conseil d'Etat*, and independent of both the judicial and administrative legal orders, sits the *Conseil Constitutionnel*, a court responsible for ensuring that all laws, institutional acts and international agreements are constitutional.  For purposes of the issues addressed in this opinion, only decisions rendered by the French judicial order are relevant.

A.  Claims under article L. 651-2 of the French Commercial Code (Claims 2, 6, 13, 16)

24.    The Claim of NNSA alleges that NNI is liable under article L. 651-2 of the French Commercial Code – known as a claim for mismanagement – with respect to transfer pricing (Claim 2), the February 2008 Repayment (Claim 6), business sales (Claim 13) and taxation matters (Claim 16).

A.1  Description of the requirements for liability under article L.651-2 including principles derived from jurisprudence and doctrine

25.    Article L. 651-2 of the French Commercial Code states that:

*"Where the liquidation of a legal entity reveals an excess of liabilities over assets, the court may, in instances where management fault has contributed to the excess of liabilities over assets, decide that the debts of the legal entity will be borne, in whole or in part, by all or some of the de jure or de facto directors, who have contributed to the management fault. If there are several directors, the court may, by way of a reasoned ruling, declare them jointly and severally liable."*

26.    Liability for mismanagement under article L. 651-2 of the French Commercial Code requires the following:

-    the person sued is a *de jure* or a *de facto* director of the legal entity, and
-    this person was engaged in specific acts of mismanagement, and
-    these acts of mismanagement have contributed to the excess of liabilities over assets.

27.    These conditions are conjunctive, i.e. each one must be satisfied to establish liability under article L. 651-2 of the French Commercial Code.

28.    For purposes of this report, I focus on the first element, the determination of *de facto* director status.

29.    There is no statutory definition of a *de facto* director.[38]

30.    The main criteria that have been drawn from the relevant French *jurisprudence* (case law) and the *doctrine* (scholarly opinion) to define a *de facto* director are the following:

-    (i) the performance, directly or indirectly, of *affirmative acts of management* (which means *a fortiori* that a person cannot be designated as a *de facto* director for failures or omissions to act alleged to constitute mismanagement);
-    (ii) the performance of these acts in an *independent manner* (which means, for instance, that a person cannot be considered a *de facto* director where he/she acts on behalf of or under the direction of *de jure* directors).[39]

---

[38]    Under French law, *de jure* directors are the legal representatives of a legal entity, formally and regularly appointed, and whose mission is to manage the entity. *De jure* directors owe their duties to the company itself and do not report to any "superior" in the corporate hierarchy. *Hans Kelsen, Théorie pure du droit, 1934 ; Recueil Dalloz 2006, « L'ordre des sources ou le renouvellement des sources du droit », Valérie Lasserre-Kiessow.* There is no allegation that NNI was a *de jure* director of NNSA.

31.   *De facto* and *de jure* directors may be (i) individuals, (ii) legal entities[40] or (iii) individuals who serve as legal representatives of legal entities (Article L. 651-1 of the French Commercial Code).

32.   For *de facto* director status to be established under French law, the affirmative acts of the alleged *de facto* director must have reduced the decision-making *independence* of the company's *de jure* directors. Thus, the act(s) of management must have been *imposed upon* the debtor company, which must be found to have been *dominated* by the *de facto* director in some way.[41]

33.   French courts generally impose a strict and demanding standard before qualifying a company as a *de facto* director, requiring proof that the company claimed to be *de facto* director was able to dominate the company. Within a group of companies, discussion often arises in relation to the role played by and powers of a mother company or of the ultimate shareholder of the group. In the case of a sister company, in the absence of a showing of the sister company's control through share capital or through membership in legal bodies charged with directing the debtor company, the elements of control and domination would, in principle, be harder to establish. I am aware of only one decision where a sister company was qualified as a *de facto* director but this decision was quashed by the *Cour de Cassation*.[42]

34.   Even in cases in which an individual or entity may be extensively involved in the management of another company, French courts have rejected claims of *de facto* director status because the relevant allegations do not rise to the level needed to find control and domination of the debtor company. Two illustrations of the extent to which control and domination must be established before *de facto* director status may be found are seen in the following decisions:

   -   The *Cour de Cassation* upheld the decision of a Court of Appeal which ruled that a car manufacturer could not be qualified as a *de facto* director of a dealership distributing its products because (i) the manufacturer did not exceed its rights resulting from the dealership contract, and (ii) the acts of interference in the management of the car dealer by the regional manager of the car manufacturer were occasional, isolated and unspecific. In the Court of Appeal decision, which was upheld by the *Cour de Cassation*, it was emphasized that the presence of the manufacturer's representatives at the dealer's offices was authorized by contract. In particular, the *Cour de Cassation* upheld the Court of Appeal's conclusion that the necessary level of control could not be found based upon the fact that the car

---

[39]   *Fasc. 2905 :   REDRESSEMENT ET LIQUIDATION JUDICIAIRES   – Dirigeants sociaux. Sanctions patrimoniales – Responsabilité pour insuffisance d'actif. Obligation aux dettes sociales, Charley Hannoun, 1er novembre 2006 ; Dictionnaire permanent, Dirigeants et Associés, §2 Dirigeant de fait, point 86.*

[40]   A legal entity may also be deemed a *de facto* director when that legal entity has acted "through intermediaries" (via its employees). (Cass. Com. 06/27/2006, n°04-15831); *Bull. Joly Sociétés 12/01/2006, n°12,p1372 François-Xavier Lucas.*

[41]   (Court of Appeal of Paris, 10/07/2008, RG n°07/13617)

[42]   (Court of Appeal of Pau, 08/12/1999, RG n°96/01246); (Cass. Com. 11/26/2002, n°99-20.588)

manufacturer gave common directions to all its car dealerships regarding accounting, or from the fact that the manufacturer granted a loan to the car dealer more than 4 years before it went into bankruptcy.[43]

- Similarly, the Court of Appeal of Paris ruled that a parent holding company could not be qualified as a *de facto* director of its wholly owned subsidiary even where it had been alleged that the parent company (or one of its affiliates) maintained the legal department of the subsidiary, directly remunerated the chief executive officer of its subsidiary, managed the subsidiary's financing relationship with a third-party financial institution, and that a plan of restructuring developed for the company prior to its bankruptcy filing was addressed not to its own CEO, but to the majority shareholder of the parent company.[44]    According to the Court of Appeal, these allegations did not rise to a level sufficient for *de facto* director status to be established, which the Court of Appeal defined as requiring a showing of a "bundle" of converging elements establishing that the parent company "*surpassed the limits inherent in the structure of a group of companies and committed repeated and affirmative acts of mismanagement in the management of its subsidiary, that it exercised a dominant influence over the decisions of the subsidiary in managing its affairs in a sovereign and independent manner, that it was the sole master of the economic and financial policies of its subsidiary . . . .*"

35.    French courts at times qualify a parent as the *de facto* director of its subsidiary.[45]

36.    However, cases in which *de facto* director qualification is made involve findings that the parent company has placed its subsidiary in a relationship of "total subordination." For example:

- The Court of Appeal of Lyon ruled that a parent holding company could be qualified as a *de facto* director of its subsidiary because the subsidiary was under "the total subordination" of its parent.[46]    This total subordination was evidenced in particular by the fact that (i) the CFO of the parent had a power of attorney over the subsidiary's account, (ii) the subsidiary's auditors reported directly to the parent, (iii) the survival of the subsidiary depended on its shareholder, (iv) the subsidiary was granted additional loans by the banks on the basis of its parent's creditworthiness, (v) the general meetings of the subsidiary took place at the registered office of its parent.

- The Court of Appeal of Aix-en-Provence ruled that a parent holding company could be qualified as a *de facto* director of its subsidiary because it exceeded the limits of its legitimate right of information and of control, and managed directly

---

[43]    (Cass. Com, 10/26/1999, n°97-19.026)

[44]    (Court of Appeal of Paris, 10/07/2008, RG n°07/13617)

[45]    (Cass. Com. 6/06/2000, n°96-21.134) (finding, *inter alia*, that the subsidiary had no autonomy other than for acts performed in the ordinary course of business); (Cass. Com. 11/23/1999, n°97-14693, RJDA n°3/00 n°270) (finding, *inter alia*, that the parent company continued to manage in an independent manner a business transferred to its subsidiary)

[46]    (Court of Appeal of Lyon, 07/02/1999, RG n°98/7888)

and independently its subsidiary.[47] The *de facto* director status of the parent was established "by a set of specific and corroborating facts which characterize the performance by the parent of affirmative acts of management in an independent manner": (i) three board members of the subsidiary out of six were high level executives of the group, and the president of the board was an employee of the parent, (ii) the parent had a power of attorney over the subsidiary's bank account, (iii) the parent had the right to approve any credit operation of its subsidiary which was over 15,000 francs (i.e. US$3,300), (iv) the subsidiary was obliged to give a regular account to its parent of its operations and of all the important decisions to be taken, some of which had to be approved by the parent, (v) the parent authorized and financed the transfer of the subsidiary's registered office, (vi) executives of the parent attended the subsidiary's management meetings, (vii) the president of the board of the subsidiary reported to the parent regarding the situation of the company and communicated to it the letters he sent to the CEO, asked the parent to support the instructions he gave to the CEO, asked for directions from the parent regarding measures to be taken in order to turn around the situation, and held meetings at the parent's office, (viii) the parent directly participated in strategic choices of the subsidiary, (ix) the parent participated in the preparation of the plans to finance the new vehicles of the subsidiary in order to renew its fleet, (x) the parent decided to dismiss the CFO of the subsidiary and to replace him by one of its employees, (xi) the CEO of the subsidiary was not allowed to sign checks and to hire employees, (xii) the parent agreed to substitute its subsidiary if the latter was unable to reimburse the shareholder loan granted by one of its minority shareholders. According to the Court of Appeal, *"together, those acts which exceed the limits of the legitimate right of information and of control of the main shareholder, characterize direct management conducted independently by the mother company which behaved like a de facto director of its subsidiary."*

37.    In the cases described in the paragraphs above, the *Cour de Cassation* and Courts of Appeal relied upon specific and concrete examples of control and domination exercised by the *de facto* director. This shows that it is necessary to demonstrate specific examples of domination to establish *de facto* director status; general accusations of "control" or "interference" will not, as a matter of law, suffice to justify such a finding.

A.2    Analysis of alleged wrongdoing and statement of legal findings as to whether a valid claim for mismanagement has been described under French law in the Claim of NNSA

38.    For each mismanagement claim described in the Claim of NNSA, I will analyze whether the facts alleged, if assumed to be true, would establish a legally valid basis to impose liability on NNI as a *de facto* director under article L. 651-2 of the French Commercial Code.

---

[47]    (Court of Appeal of Aix-en-Provence, 04/06/2004, RG n°02/20731)

a.  Mismanagement claim relating to transfer pricing (Claim 2)

39.    NNSA asserts that NNI acted as a *de facto* director of NNSA.[48]  This conclusion  is
       based upon allegations set forth in the Claim of NNSA, including based upon:

       -    the alleged involvement of the Nortel group tax department, which allegedly was a
            joint function between NNI and the Canadian entities,[49] in the implementation and
            operation of the transfer pricing arrangements (RPSM and MRDA), and notably in
            the negotiations with the Canadian and American tax authorities,[50] and on the
            contrary, the allegedly limited role of NNSA in the negotiation and the
            implementation of these arrangements[51] and the correlative absence of arm's
            length negotiations;

       -    the alleged control by NNI and NNL of the application process of these
            arrangements;[52]

       -    the alleged lack of control by the Board of NNSA of these arrangements:  in
            particular, the entry into the MRDA is alleged to have merely been acknowledged
            by the Board of NNSA on 8 June 2005, with an alleged absence of any other
            Board minutes approving NNSA's entry into these arrangements or internal NNSA
            documentation related to RPSM,[53] a situation allegedly objected to by the French
            tax authority during tax audits.[54]

40.    In sum, NNSA asserts that persons in charge of the Nortel group's tax department,
       including employees of NNI, were much more involved in all aspects of the
       implementation and operation of the transfer pricing arrangements at issue than the local
       management of NNSA, who are alleged simply to have provided information to the
       group tax department and implemented decisions allegedly taken by NNL and NNI.

41.    However, aside from various generic and conclusory allegations of "joint control" on
       the part of NNL and NNI,[55] the Claim of NNSA does not make any non-conclusory
       allegation of acts by NNI which, if found to be true, would form a basis for finding that
       NNI exercised sovereign and independent control over the management of NNSA.
       Instead, NNSA's allegations seeking to establish that NNI was a *de facto* director in
       relation to NNSA's implementation of the transfer pricing arrangements allege
       extensive involvement on the part of NNI in the transfer pricing arrangements adopted

---

[48]    Claim of NNSA, Paragraph 31.

[49]    Claim of NNSA, Paragraph 22.

[50]    Claim of NNSA, Paragraph 16.

[51]    Claim of NNSA, Paragraph 18.

[52]    Claim of NNSA, Paragraph 18.e.

[53]    Claim of NNSA, Paragraph 18.f.

[54]    Claim of NNSA, Paragraph 20.

[55]    See, for example, Claim of NNSA, Paragraph 15.

by NNSA.[56] Such allegations do not, however, describe any facts from which a French court would find that NNI exercised sufficient control over NNSA as a product of its alleged involvement so as to qualify it as a *de facto* director of NNSA.

42.    Under French law, such allegations of involvement in aspects of the development and operation of the transfer pricing arrangements would not form a sufficient basis upon which a French court could conclude that NNI was a *de facto* director of NNSA in relation to transfer pricing. Taking the example of the decision of the Paris Court of Appeal described at Paragraph 35 above, a French court correctly applying article L. 651-2 of the French Commercial Code would examine specific actions of the entity alleged to have acted as *de facto* director and evaluate whether such acts manifested a degree of sovereign and independent power over the debtor company such that it could be concluded that the alleged *de facto* director *"surpassed the limits inherent in the structure of a group of companies . . . that it exercised a dominant influence over the decisions of the* [debtor company] *in managing its affairs in a sovereign and independent manner, that it was the sole master of the economic and financial policies of* [the debtor company] . . . ." Such a showing could result only from allegations showing that control and domination were achieved and imposed upon the debtor company. As noted above, excluding conclusory allegations of "control," the Claim of NNSA appears only to allege factual elements which, if proved, would show involvement by NNI in transfer pricing. This would not be sufficient under French law to render NNI a *de facto* director.

43.    Only once, at paragraph 18.d. of the Claim of NNSA, does NNSA refer to something that could, if found to be true, potentially be interpreted as an affirmative act of "control": *"NNSA was simply instructed to sign the MRDA."* Even here, however, the assertion (even were it proved to be true) would not be sufficient to justify qualification of NNI as a *de facto* director. In particular, the allegation is written in the passive voice, meaning that there is no allegation that *NNI* was the one that gave the instruction. Nor is there any allegation as to why NNSA, a sister company, would follow any such alleged "instruction" from NNI had one been given (again, it is not alleged that NNI issued this alleged instruction). Under ordinary principles of French corporate law, a sister company, not holding shares of its affiliate and not being a member of a corporate board, would not have the necessary powers to cause its affiliate to act in any particular way.[57] Thus, in the absence of some allegation as to how the affiliate exercised control or dominion over its affiliate in relation to the alleged instruction (*i.e.* as to how any instruction caused NNSA to act in a particular way), I do not find sufficient elements in the Claim of NNSA to form a basis under French law to qualify NNI as a *de facto* director of NNSA, which is a prerequisite for imposing liability under article L. 651-2 of the French Commercial Code.

44.    NNSA would also need to demonstrate that the alleged instruction was really an act of management of NNSA and was not, for instance, behavior typical of a party in contractual negotiations with other companies of a group. As the Paris Court of Appeal concluded, even in relation to the extensive involvement of a parent in the management

---

[56]    Claim of NNSA, Pages 13-18.

[57]    *Bull. Joly Sociétés, 01/05/2004, n°5, p. 666, 129. « A propos de l'absence d'immixtion dans la gestion d'une filiale par sa société-mère ; Petites affiches, 04/05/2001, n°89, p.66, « Les filiales en difficulté »*

of its wholly-owned subsidiary, for *de facto* director status to be recognized, control must go beyond that which is inherent in any corporate group.[58]   Similarly, it would have to be demonstrated that any involvement by NNI went beyond that normally inherent in a group structure.

45.   Lastly, NNSA also alleges that it implemented the transfer pricing arrangements without any previous authorization given by its Board whereas these arrangements were interested party transactions under articles L. 225-38 et seq. of the French commercial Code.[59]   This fact, even if true, is not relevant to establish whether NNI could be qualified as a *de facto* director under article L. 651-2 of the French Commercial Code. Indeed, article L. 225-38 et seq. of the French Commercial Code imposes specific requirements upon interested persons (as defined in article L. 225-38), which must be satisfied for an agreement arising out of an interested party transaction to be considered valid.   However, even assuming that the transfer pricing arrangements were themselves subject to such approval requirements due to NNL being a shareholder of NNSA and NNI, there is nothing in L. 225-38 et seq. of the French Commercial Code that would require NNI (which is not a shareholder of NNSA nor a *de jure* director of NNSA, and therefore is not an interested party as defined in article L. 225-38 of the French Commercial Code) to obtain approval from the Board of NNSA.   Thus, the allegation in Paragraph 18.f has no relevance for assessing whether NNI was a *de facto* director under article L. 651-2 of the French Commercial Code.

46.   In sum, it is my opinion that NNSA does not make any non-conclusory factual allegations, even accepting them as true, to justify concluding that NNI exercised direct and independent control of NNSA in relation to transfer pricing and to qualify NNI as a *de facto* director of NNSA under French law.

b.  Mismanagement claim relating to February 2008 Repayment and Project Swift (Claim 7)

47.   The allegations in the Claim of NNSA are that (i) NNL granted a subordinated loan facility of €200M to NNSA in 2002 ("2002 Subordinated Loan"), (ii) the loan documentation did not contain any fixed date of repayment, but (iii) expressly provided that the amounts owed by NNSA to NNL under this loan were subordinated to the prior repayment of any existing and future secured and unsecured creditors of NNSA.[60]   NNI is not alleged to have been a party to the 2002 Subordinated Loan.

48.   NNSA asserts that it was intended that NNSA would not repay the loan until it became profitable again.[61]   It is not alleged that this alleged intention was recorded in the relevant loan documentation or in any amendment to the loan documentation concluded by NNL and NNSA.

---

[58]   (Court of Appeal of Paris, 10/07/2008, RG n°07/13617)

[59]   Claim of NNSA, Paragraph 18.f.

[60]   The allegations of mismanagement in relation to the February 2008 repayment are set out at Paragraphs 70-79 of the Claim of NNSA.

[61]   Claim of NNSA, Paragraphs 70, 76.

49. In addition, according to the Claim of NNSA, €150M of the €200M outstanding under the 2002 Subordinated Loan were converted into equity in December 2003, and €25M of the outstanding €50M were repaid in the February 2008 Repayment.[62] It is alleged that NNL asked for the repayment of its debt as it was contemplating the transfer of the NNSA shares it held to NNUK.[63] This transaction is called Project Swift.[64] NNI is not alleged to have been a party to the Project Swift transaction.

50. NNSA asserts that a director and several employees of NNI were involved in the planning and the implementation of Project Swift and consequently in the decision to have NNSA repay the outstanding amounts owed by it to NNL.[65]

51. I note that, as alleged, the decision to transfer the ownership of NNSA from NNL to NNUK is not a management act of NNSA but a decision of NNL, the shareholder of NNSA. The Claim of NNSA has not alleged that NNI acted as a *de facto* director in relation to that transfer of ownership.

52. Regarding the decision of NNSA to repay its debts towards NNL, which is the subject of a *de facto* management allegation, NNSA alleges that employees of NNI were involved in Project Swift[66] and pushed for the repayment of the whole outstanding debt (€50M) whereas a controller of NNSA expressed reluctance to repay the entire €50M outstanding.[67] As alleged, after NNSA's management objected, NNSA agreed to repay only half of the outstanding debt in February 2008, and the other half prior to the transfer of NNSA shares to NNUK.[68] According to the Claim of NNSA, the repayment was "imposed on NNSA by NNI and NNL."[69]

53. This description of the alleged facts, which I assume to be true for purposes of this analysis, shows at most that there would have been discussions and negotiations between NNL and NNI with NNSA's *de jure* directors and that the latter decided to repay only €25M under the 2002 Subordinated Loan agreement to which NNSA and NNL were parties.[70] Although it is alleged in a conclusory fashion that the February 2008 Repayment "was imposed" by NNI, the Claim of NNSA does not contain any allegations of fact showing how this could have been the case. In relation to NNI, it is alleged only that Ryan Smith, an employee of NNI seconded to NNUK, "pushed for NNSA to repay the entire €50 million outstanding under the 2002 Subordinated

---

[62]    Claim of NNSA, Paragraphs 71, 76.

[63]    Claim of NNSA, Paragraph 73.

[64]    Claim of NNSA, Paragraphs 23, 73.

[65]    Claim of NNSA, Paragraph 74.

[66]    Claim of NNSA, Paragraph 74.

[67]    Claim of NNSA, Paragraph 75.

[68]    Claim of NNSA, Paragraph 75.

[69]    Claim of NNSA, Paragraph 79.

[70]    Claim of NNSA, Paragraph 75.

Loan."[71]  However, without more, the allegation that an employee of NNI, even if his actions as a seconded employee of NNUK could be attributed to NNI, allegedly "pushed" for NNSA to act in a particular manner (again, even if true) would not under French law provide a valid basis upon which NNI could be qualified as a *de facto* director for purposes of article L. 651-2 of the French Commercial Code.

54.  As discussed above, French courts require a showing of control that overcomes the independence of the company's own *de jure* directors.  There is no allegation as to how any "pushing" by the employee of a sister company would result in a decision being imposed upon *de jure* directors, who are, to the contrary, described as having resisted the payment that was requested.[72]  Without a more detailed showing of affirmative acts by which NNI's employees placed NNSA in a relationship of "total dependence"[73] or otherwise achieved control of NNSA, it would not be appropriate under French law for NNI to be characterized as a *de facto* director on the allegations found in the Claim of NNSA relating to the February 2008 Repayment.[74]

c.  Mismanagement claim relating to past dispositions of businesses (Claim 13)

55.  NNSA refers to several business sales that allegedly were concluded between NNSA and other Nortel entities, but without giving any details regarding those transactions.[75]  There is only one exception of a transaction alleged to give rise to liability for purposes of Claim 13.  In particular, it is alleged that the sale of Nortel's UMTS business to Alcatel Lucent in December 2006, and the allocation of the proceeds of that sale between the different Nortel entities constituted an act of mismanagement giving rise to liability under article L. 651-2 of the French Commercial Code.[76]

56.  NNSA alleges that this allocation "was decided on almost entirely by NNI and NNL" without any involvement of NNSA.[77]  It is further alleged that "the proportion of proceeds that NNSA received was decided on its behalf by NNI and NNL."[78]  These assertions are not supported by any allegations describing what role NNI, in particular,

---

[71]    Claim of NNSA, Paragraphs 22, 75.

[72]    The Paris Court of Appeal has concluded that the domination necessary to qualify a parent company as *de facto* director was not established where the *de jure* director was free not to follow the advice from its shareholder, and proved its freedom by taking decisions contrary to the shareholder's advice (Court of Appeal of Paris, 06/01/2001, RG n°2000/02108).

[73]    (Court of Appeal of Lyon, 3$^d$ chamber, 07/02/1999, RG n°98/7888 (the "[C]ollection of these elements of fact demonstrate that the company [A] immersed itself in the management of the company [B], of which it had taken control and which found itself since then in relationship of total dependence").

[74]    I note in this context that any absence of NNSA's Board approval of this repayment does not prove that it was a decision taken by NNL and imposed on NNSA, let alone an affirmative act of NNI creating control over NNSA.

[75]    Claim of NNSA, Paragraphs 80-83.

[76]    Claim of NNSA, Paragraphs 154-161 (referring to Paragraphs 80-83 to describe alleged wrongdoing).

[77]    Claim of NNSA, Paragraph 82.

[78]    Claim of NNSA, Paragraph 82.

allegedly would have played in the allocation process, including, essentially, regarding any imposition by NNI of a particular allocation upon NNSA.

57.    As explained above, to establish *de facto* director status under article L. 651-2 of the French Commercial Code, it is necessary to establish elements reflecting that the *de facto* director achieved domination and control at the expense of the independence of the debtor company's *de jure* directors. Accordingly, because the Claim of NNSA does not describe any particular, non-conclusory element which, if proved to be true, would show control by NNI over NNSA in relation to business sale allocations, it would not be appropriate under French law to impose liability upon NNI on the basis of a qualification of NNI as a *de facto* director in connection with the business sales allegations.

### d.  Mismanagement claim relating to taxation matters (Claim 16)

58.    NNSA alleges that NNSA's taxation affairs were "controlled by NNI and NNL"[79] and that therefore NNI and NNL should be responsible for any penalties, interest or loss payable by NNSA, *if* any tax authority ever were to make a claim against NNSA.[80]

59.    In particular, it is alleged that the Nortel Group Tax department, composed allegedly in majority of NNI employees, was involved in NNSA taxation matters.[81]  Nevertheless, there are no allegations regarding any particular act allegedly committed by NNI in respect of NNSA taxation matters upon which the alleged control could be found. Simple allegations of involvement in taxation matters would not, without more, provide a basis upon which it would be valid to qualify NNI as a *de facto* director of NNSA under French law.

60.    In particular, as explained in more detail above, to qualify NNI as a *de facto* director, it would be necessary to provide allegations which (if proved true) would show that NNI, a sister company of NNSA, achieved control of NNSA's taxation affairs (and even then, in a manner going beyond any normal relationship inside a corporate group) and imposed its will upon NNSA through affirmative acts.  In the absence of the identification of particular affirmative acts characterizing direct control of NNSA conducted independently by NNI, the allegations of NNSA, even accepting them as true, do not provide a basis under French law for qualifying NNI as a *de facto* director of NNSA.

61.    Furthermore, the Claim of NNSA does not refer specifically to any claim having been made by tax authorities against NNSA or any penalty or fine having been imposed by a tax authority.  In the absence of proof of any acts committed by NNI in relation to taxation matters that actually caused harm to NNSA it cannot be established that NNI committed acts of mismanagement that contributed to an excess of liabilities over assets of NNSA.

---

[79]    Claim of NNSA, Paragraph 84.

[80]    Claim of NNSA, Paragraphs 171-174.

[81]    Claim of NNSA, Paragraph 22.

62. Accordingly, the allegations in relation to taxation matters, as described in the Claim of NNSA, are not sufficient to form a basis upon which liability could be imposed upon NNI under article L. 651-2 of the French Commercial Code.[82]

B. Claims under Article 1382 of the French Civil Code (Claims 3, 7, 14, 17)

B.1 Description of the requirements for liability under Art. 1382 of Civil Code, including principles derived from *jurisprudence* and *doctrine*.

63. Article 1382 of the French Civil Code is the general provision for tort liability under French law. It states that *"Any act whatever of man, which causes damage to another, obliges the one by whose fault it occurred, to compensate it."*

64. Three elements must be proved to establish tort liability under article 1382 of the French Civil Code:
    - fault;
    - damages;
    - a causal link between the fault and the damages.

65. The French Civil Code does not provide a definition of "fault"; however, article 1383 of the French Civil Code states that *"Everyone is liable for the damage he causes not only by his intentional act, but also by his negligent conduct or by his imprudence."*

66. The French Civil Code does not provide a definition of fault, but French courts find fault when a party has breached an obligation or duty – for example, when the general duties of care, diligence, and good faith have been violated. The general duties of care and diligence are analyzed, *in abstracto*, by reference to the expected conduct of an ordinarily conscientious and respectful citizen of the same category under similar circumstances.[83] When considering fault among a corporate group, it is therefore necessary to evaluate the alleged fault against conduct reasonably to be expected of law abiding corporate entities in the ordinary course of business. However, unless a party is found to be a de facto or de jure director of a corporation, there is no duty to act in the best interests of the company – only to act within the norms of good faith and fair dealing.[84] Fault will not be presumed or construed merely because a party states that some "wrongdoing" occurred.

---

[82] The Claim of NNSA purports to describe an alleged audit by the French tax authorities and an alleged labeling of the change to the RPSM as "an abnormal act of management." Claim of NNSA, Paragraph 20. There is no allegation, however, that the authorities imposed any form of fine or penalty. As a result, there can be no basis for finding liability because there would be no basis for finding that an act of mismanagement increased liabilities over assets.

[83] *Droit Civil Les Obligations, Alain Bénabent, Montchrestien, Paragraph 540 (12th ed.) ; Les Obligations, Terré Simler Lequette, Dalloz, Paragraph 729 (10th ed.); Les Obligations Philippe Malaurie – Laurent Aynès, Defrénois ; JCP Civil Fasc. 120-10 : DROIT À RÉPARATION – Responsabilité fondée sur la faute – Notion de faute : contenu commun à toutes les fautes, Patrice Jourdain, 10 mai 2006*

[84] *De facto* and *de jure* directors owe duties of loyalty to the company; they should act in the best interest of the company (Cass. Com. 02/24/1998, n°96-12.638) It is also worth noting that shareholders, under article 1382 of the French Civil Code, have a duty not to abuse their powers.  (Cass. Com. 01/21/1997 n°94-18.883) ; (Cass. Com. 07/15/1992, n°90-17.216)

67. Damages recoverable under article 1382 of the French Civil Code are limited to those which are direct, personal and certain.[85]

68. French law requires a causal link between any damages claimed and the fault that allegedly caused such damages. While there is no firmly settled standard of causation under French law, it is clear, at a minimum, that a "but for" causal relationship must be established between fault and the damages alleged.[86] It is important to understand that causation must be analyzed by reference to actions of the individual defendant alleged to have caused damages by fault. It is not possible to rely upon a third party's actions to establish the personalized "causal link" required under French law.

69. In addition, a claim founded on tort may not be combined with a claim for breach of contract or a claim for mismanagement.

   - Claim for breach of contract. The French Civil Code contains two different general regimes for liability: contractual liability based on Articles 1146 et seq. and tort liability based on Articles 1382 et seq.[87] The doctrine and the jurisprudence establish a strict principle of non-combination of liabilities: (a) The liability is contractual between contracting parties for any damage resulting from the non-fulfillment of a contractual obligation; (b) When the conditions of contractual liability are met, tort liability cannot be applied.[88]

   - Claim for mismanagement. The *Cour de Cassation* decided to apply a principle of non-combination[89]: if the liquidator brings an action against a *de jure* or *de facto* director on the basis of acts of mismanagement committed before the judgment opening liquidation proceedings, a tort claim may only be considered (in the alternative) if the mismanagement claim is denied.[90] In particular, the *Cour de Cassation* decided that a claim for tort may be admissible as a demand in the alternative, but liability may be imposed only if the conditions for an action for

---

[85] *Leçons de Droit Civil, Tome 1 – Premier volume, Introduction à l'étude du droit, (333) Henri et Léon Mazeaud, Jean Mazeaud et François Chabas, 1986; JCP Civil Fasc. 101 : Droit à réparation – Conditions de la responsabilité délictuelle – Le dommage – Caractère du dommage réparable. Samuel Rétif. 3 août 2005.*

[86] Two standards of causation have been developed by French doctrine in relation to contractual and tort liability: under the theory of equivalence of conditions, each circumstance or act which contributed to the damage is considered a cause for the damage if the damage would not have occurred without such action (i.e. "but for" causation); whereas the theory of the appropriate cause tends to seek the real or effective cause, i.e. that action which would normally or typically be expected to give rise to the injury observed. French courts apply both theories. *Droit Civil Les Obligations, Alain Bénabent, Montchrestien, Paragraphs 557-558 (12th ed.) ; Les Obligations, Terré Simler Lequette, Dalloz, Paragraphs 859-860 (10th ed.); Les Obligations Philippe Malaurie – Laurent Aynès, Defrénois*

[87] French law also contains special regimes for liability such as managers' liability (Articles L. 225-251 et seq. of the French Commercial Code and Article L. 651-2 of the French Commercial Code).

[88] (Cass. Req, 01/21/1890, DP 1891, I, 380) ; (Cass. Civ. 1, 03/09/1970, Bul. Civ. I, n°87)

[89] (Cass. Com. 06/20/1995, n°93-12.810)

[90] *JCP Sociétés Fasc 41-52 Redressement et Liquidation Judiciaires des entreprises.* There are certain limited exceptions to this rule, none of which is relevant to the allegations made here.

mismanagement are not met.[91] Thus, for the avoidance of confusion, it is important to understand that a French court would consider the claims of NNSA under article 1382 of the French Civil Code *only* upon first concluding that NNI may not be held liable under article L. 651-2 of the French Commercial Code.

B.2  Analysis of alleged wrongdoing and statement of legal findings as to whether a valid tort claim has been described under French law standards in the Claim of NNSA

a.  Tort claim relating to transfer pricing (Claim 3)

70.    NNSA alleges that NNI is at fault for aiding and abetting and/or conspiring with NNL to impose the RPSM and the MRDA on NNSA and then allegedly carrying out the RPSM regime without the prior approval of the NNSA Board.[92]

71.    NNSA claims that NNI conspired, aided, abetted and/or assisted NNL in relation to the above-mentioned actions and therefore committed fault which caused NNSA damage in the amount of $433,300,000.[93]

72.    I note that French civil law does not recognize separate causes of action corresponding to the common law torts of "conspiracy," "aiding and abetting," "assisting" and/or "encouraging," as alleged in the Claim of NNSA. Instead, a French court would analyze the alleged misconduct and ask whether (assuming it were proved) such conduct could be said to involve fault on the part of NNI for purposes of Article 1382 of the French Civil Code. While there is no separate tort cause of action for conspiracy or aiding and abetting, French courts have been willing to impose liability under Article 1382 of the French Civil Code where a party has been shown knowingly and thus, in bad faith[94] (and, under one decision of the *Cour de Cassation*, with an intention to cause injury[95]), to have assisted another party in breaching a duty owed to a third party.

73.    Based upon the logic underlying these cases, I believe that were a French court asked to consider the allegations of wrongdoing in the Claim of NNSA based upon NNI's alleged conspiring with and/or aiding and abetting NNL to breach various alleged duties to NNSA, the court would not find NNI at fault unless it were shown, at a minimum, that NNI acted in bad faith, *i.e.* that it knew that its actions were actually supporting the

---

[91]    (Cass. Com. 02/19/2008, n°06-20.444); (Cass. Com., 06/27/2006, n°05-14.271)

[92]    Claim of NNSA, Paragraph 114.

[93]    Claim of NNSA, Paragraph 116.

[94]    (Cass. Com. 03/13/1979, n°77-13.518); (Cass. Civ. 1, 10/17/2000 n°97-22.498); *JCP Notarial Répertoire Fasc 130-10 Droit à Réparation P. Jourdain 03/17/2008*; (Cass. Com. 12/18/2001 n°00-10.978); *G Viney Introduction à la responsabilité LGDJ 1995, n°207*

[95]    (Cass. Com. 11/26/2003 n°00-10.243 and n°00-10.949 (finding, *inter alia*, that the simple fact of concluding an agreement, even knowing that the agreement is being concluded with a person who had been conducting talks with a third party and where the resulting termination of the original talks was alleged to constitute fault (bad faith termination of negotiations) under article 1382 of the French Civil Code, did not create grounds for finding the party liable under article 1382 of the French Civil Code unless the party who concluded the agreement did so with the intention of causing harm to the original negotiating party or if the concluding of the agreement was accompanied by fraudulent maneuvers) *(RTDCiv 01/2004 n°1 pages 80-86 obs. Jacques Mestre and Bertrand Fages)*

breach of some duty owed by NNL to NNSA (as noted above, one decision of the *Cour de Cassation* would also require proof that NNI intended to harm NNSA, but I do not rely upon that single decision as the basis for my analysis). I therefore consider below whether the allegations of wrongdoing contained in the Claim of NNSA, if assumed to be true, would provide a sufficient basis for a French court to find that NNI (i) committed fault by knowingly, and thus in bad faith, assisting NNL to breach a duty owed by NNL to NNSA and (ii) by its own bad faith actions, caused injury to NNSA.[96]

74.  The Claim of NNSA does not allege that NNL was a *de jure* director of NNSA. Thus, NNL could only be found to have committed a wrongdoing in the context of transfer pricing in one of the following cases: (i) if NNL were found to have been a *de facto* director of NNSA and committed mismanagement acts, (ii) if NNL were found to have assumed and breached contractual obligations of some kind toward NNSA, or (iii) NNL were found liable under article 1382 of the French civil code (some form of wrongful conduct deemed to constitute fault).

75.  As explained above, a legal entity cannot be qualified as a *de facto* director unless it is established that it engaged, independently, in sovereign and affirmative acts of management that were imposed upon the debtor company. Just as the Claim of NNSA fails to describe any non-conclusory allegations which, if proven, could justify NNI's qualification as a *de facto* director in relation to transfer pricing, the Claim of NNSA is equally vague describing NNL's role in allegedly "imposing" the transfer pricing arrangements on NNSA. As explained above, the most specific allegation made, found in Paragraph 18.d, asserts only an "instruction" to NNSA to sign the MRDA. This allegation does not say who issued the alleged instruction or why NNSA would allegedly have been compelled to obey it.

76.  As seen in the cases discussed above, the mere fact that NNL was the parent of NNSA does not suffice to show that any "instruction," assuming it emanated from NNL, establishes *de facto* director status. Indeed, French courts require that any control exercised by a parent go beyond that normally associated with a parent-subsidiary relationship,[97] resulting, for example, in "total subordination" of the subsidiary.[98] The standard is strict. As described above in Paragraph 34, in a situation where a parent of a wholly owned subsidiary maintained the legal department of the subsidiary, directly remunerated the CEO of its subsidiary and managed the subsidiary's financing relationship with a third-party financial institution, and where a plan of restructuring developed for the company prior to its bankruptcy filing was addressed not to its own CEO, but to the majority shareholder of the parent company, the Court of Appeal of

---

[96]     If not found to have been a *de facto* director in relation to transfer pricing (which by operation of the rule of non-combination necessarily would be the case if tort liability were to be considered as a possible basis for liability), it means that the judge did not consider that NNI imposed the RPSM and the MRDA upon NNSA (findings that would be necessary to qualify it as a *de facto* director). For this reason, and based upon the allegations in the Claim of NNSA, I consider only whether NNI could be found at fault for having conspired with or aided and abetted NNL's breach of a duty owed by NNL to NNSA.

[97]     (Court of Appeal of Paris, 10/07/2008, RG n°07/13617, rejecting *de facto* director status despite claim that parent controlled legal department of subsidiary, managed its financial relationship with an outside bank, directly compensated its chief executive officer and was the recipient of the company's restructuring plan)

[98]     (Court of Appeal of Lyon, 07/02/1999, RG n°98/7888)

Paris decided that these elements did not suffice to show the level of domination required for *de facto* director status to be found.[99]

77.  I therefore do not believe that the allegations in relation to transfer pricing, even accepting them as true, give sufficient elements characterizing direct management of NNSA conducted independently by NNL to, as such, form a basis under French law for qualifying NNL as a *de facto* director of NNSA. NNI, therefore, cannot, on this sole basis, be found liable under article 1382 of the French Civil Code for conspiring with NNL or aiding, abetting, assisting and/or encouraging NNL to commit alleged mismanagement acts as *de facto* director.

78.  Even if NNL were found to be a *de facto* director or to have breached some other obligation found to be owed by it to NNSA (*i.e.* of a contractual nature or based upon its general duties under article 1382 of the French Civil Code), before any liability could be imposed upon *NNI* under article 1382 of the French Civil Code, it would also be necessary to show (i) for the reasons set forth in paragraph 72 above, that NNI knowingly and thus, in bad faith aided NNL in breaching duties identified as being owed by NNL to NNSA and (ii) as explained in paragraph 68 above, that specific actions of NNI while conspiring and/or aiding and abetting were the cause of the alleged injury suffered by NNSA.[100] However, putting aside allegations of a conclusory nature, the Claim of NNSA does not allege facts upon which either of the foregoing elements could be established.

79.  First, the Claim of NNSA does not allege that NNI acted in bad faith by assisting NNL in breaching any known duties owed by NNL to NNSA. While the Claim of NNSA does allege that NNL acted in breach of alleged contractual duties owed by it to NNSA in relation to transfer pricing,[101] NNSA does not allege that NNI acted in bad faith by knowingly supporting any such alleged breach of a contractual obligation. Thus, there would be no basis for finding that NNI acted with the requisite bad faith to be liable under Article 1382 of the French Civil Code for conspiring and/or aiding or abetting any breach by NNL of a duty to NNSA.

80.  Second, the Claim of NNSA does not describe how, assuming NNL were found to have breached some legal obligation found to be owed by it to NNSA, NNI's own actions, if any, could be found *causally* to have resulted in any injury to NNSA. As explained in Section 2.2.2.1 above, there is no allegation in the Claim of NNSA describing how NNI in any way caused NNSA's adoption of the transfer pricing regime (the alleged source of injury). The most specific allegation made is that found in Paragraph 18.d, which alleges (in the passive voice) that someone "instructed" NNSA to sign the MRDA. Such an allegation, even if found to be true and even if it could be attributed to NNI, would not allow a finding for purposes of article 1382 of the French Civil Code that

---

[99]    (Court of Appeal of Paris, 10/07/2008, RG n°07-13617)

[100]    These requirements follow from the basic elements that must be satisfied before liability may be imposed under article 1382 of the French Civil Code and from the fact that the only basis for liability possible here would be action, constituting fault, by NNI for its aiding of a breach by NNL of duties owed to NNSA. For this to be shown, it would be necessary to show (i) a basis for finding conduct by NNI designed to further or support a known breach by NNL of duties to NNSA, and (ii) a causal connection between some specific action of NNI and injury to NNSA.

[101]    Claim of NNSA, Paragraph 114.c.

NNI was even the but for cause of an injury to NNSA.  Without allegations that could show causation of injury by NNI, there would be no basis for imposing liability on NNI in relation to transfer pricing under article 1382 of the French Civil Code.

b.  Tort claim relating to the February 2008 Repayment (Claim 7)

81.  NNSA alleges that NNI was at fault under article 1382 of the French Civil Code for conspiring or otherwise acting with NNL to plan and implement Project Swift and, in particular, causing NNSA to make the February 2008 Repayment.[102]

82.  NNSA claims that NNI conspired with, aided and abetted and/or assisted the above-mentioned actions and therefore committed a fault or a negligence which caused NNSA damages in the amount of $33,500,000, which is the amount of the February 2008 Repayment.[103]

83.  As explained at paragraph 73 above, unless it is shown that NNI (i) in bad faith assisted NNL in breaching a known duty owed by it to NNSA, and (ii) by so acting itself caused injury to NNSA, there would be no basis for imposing liability upon NNI under article 1382 of the French Civil Code for having aided, abetted and/or conspired with NNL to make the February 2008 Repayment.  The Claim of NNSA does not allege that NNL was a *de jure* director of NNSA.  Thus, NNL could only be found to have committed a wrongdoing in the context of the February 2008 Repayment in one of the following cases: (i) if NNL were found to have been a *de facto* director of NNSA and committed mismanagement acts, (ii) if NNL were found to have assumed and breached contractual obligations of some kind toward NNSA, or (iii) if NNL were found liable under article 1382 of the French Civil Code (some form of wrongful conduct deemed to constitute fault).

84.  As explained above in relation to NNI, the Claim of NNSA does not describe any non-conclusory factual elements upon which NNL could be found to be a *de facto* director of NNSA in the context of the February 2008 Repayment.  The most specific allegation found in the Claim of NNSA asserts that Ryan Smith of NNI, who was seconded to NNUK, "pushed for NNSA" to repay and that, after resistance on the part of NNSA, it was agreed that only half of the repayment would be made in 2008.[104]  As described more fully above, there are no allegations, other than vague and conclusory ones, characterizing direct management control of NNSA by NNL that would be necessary under French law for NNL to be deemed a *de facto* director of NNSA with the resulting duties.

85.  Again, as explained in Paragraphs 34, 36 and 76 above, the mere fact that NNL is the parent of NNSA does not suffice to alter this analysis.  In the absence of allegations showing how exactly NNL supposedly imposed this repayment upon NNSA, and as such establishing that NNL acted as a *de facto* director of NNSA and committed mismanagement faults, I do not believe that the Claim of NNSA provides sufficient

---

[102]   Claim of NNSA, Paragraphs 135-139.

[103]   Claim of NNSA, Paragraphs 135-139.

[104]   Claim of NNSA, Paragraph 75.

elements which, if proved, would establish a basis to hold NNI liable under Article 1382 of the French Civil Code for conspiring with NNL or aiding, abetting, assisting or encouraging NNL to commit mismanagement acts in relation to the February 2008 Repayment.

86.   Nor does the Claim of NNSA describe any contractual obligation owed by NNL, in relation to which aiding or abetting on the part of NNI (if proved) could give rise to liability on the part of NNI under article 1382 of the French Civil Code.

87.   The Claim of NNSA does not allege that the February 2008 Repayment by NNSA was made in breach of any particular contractual obligation on the part of NNL.[105] Instead, the allegation of NNSA appears to be that the repayment was "contrary to the parties' original intention that the 2002 Subordinated Loan Agreement would be repaid only when NNSA was profitable."[106] Under French law, a contractual obligation could not be established on the basis of a vague assertion of such an alleged "joint intention." Instead, it would have to be alleged and proved that the alleged "intention" was part of the contractual relationship between the parties and it would have to be alleged that an agreement exists in which such an obligation was recorded, something which is not alleged in the Claim of NNSA. On this basis, the Claim of NNSA does not appear to assert the existence of any contractual obligation on the part of NNL toward NNSA in connection with the February 2008 Repayment.

88.   However, even if one assumes that NNSA has adequately stated a claim that NNL owed obligations to NNSA under one of the three bases described in paragraph 74 above (*i.e.* as *de facto* director, on a contractual basis or under its general duty under article 1382 of the French Civil Code not to commit fault), and that any such duty was breached, *arguendo*, NNSA would still have to plead facts to show that (i) NNI in bad faith conspired with and/or aided and abetted NNL in breaching a known duty owed by NNL to NNSA and (ii) by so acting, itself caused harm to NNSA.

89.   First, the Claim of NNSA does not make any allegation which, if found to be true, would show how NNI itself could be found to have known of obligations that were being breached by NNL. At most, the Claim of NNSA alleges that Ryan Smith "pushed for NNSA to repay."[107] Yet, this allegation does not assert that NNI knew that the repayment would be in breach of an alleged obligation owed by NNL to NNSA and therefore acted in bad faith by supporting a breach by NNL of any obligation owed by it to NNSA.

90.   Second, the Claim of NNSA does not allege facts from which it could be said that NNI caused injury to NNSA in the context of the February 2008 Repayment. Again, at most, the Claim of NNSA alleges that Ryan Smith "pushed for NNSA to repay."[108] Without further allegations which, if proved, could show that such alleged "pushing" overcame NNSA's independent volition and resulted in repayment and injury to NNSA,

---

[105]   Claim of NNSA, Paragraph 136.

[106]   Claim of NNSA, Paragraph 76.

[107]   Claim of NNSA, Paragraph 75.

[108]   Claim of NNSA, Paragraph 75.

something that would run contrary to the claim of NNSA that the controllers of NNSA actually rejected the alleged pressure,[109] it would not be appropriate to impose liability upon NNI for a breach of article 1382 of the French Civil Code in relation to the February 2008 Repayment.

## c. Tort claim relating to the Business Sales (Claim 14)

91.  NNSA alleges that NNI should be held liable under article 1382 of the French Civil Code for allegedly conspiring with or aiding and abetting NNL to cause NNSA or to allow NNSA to enter into pre-petition sales and/or to receive an allocation of the pre-petition sale proceeds which were not a proper allocation of appropriate value.[110]

92.  They state that NNI conspired with and/or aided, abetted, assisted and/or encouraged the above-mentioned actions and therefore committed a fault or negligence which caused NNSA damage in an amount to be determined at trial.[111]

93.  As explained in paragraphs 72 and 73 above, based upon the allegations of the Claim of NNSA, NNI can only be found liable under article 1382 of the French Civil Code if it is found to have in bad faith assisted NNL in breaching a known obligation owed by it to NNSA.

94.  It is not alleged that the business sales were made in breach of an alleged contractual obligation owed by NNL to NNSA.

95.  Nor is there a basis for finding that NNI conspired with and/or aided and abetted the breach of NNL's duties as a *de facto* director. As explained above in relation to NNI, the Claim of NNSA does not provide factual allegations that would permit a finding of *de facto* director status of NNL in relation to the business sales. Instead, the allegations in this context[112] claim only that the allocation to NNSA of sale proceeds was "decided on its behalf by NNI and NNL."[113] For the reasons described in more detail in relation to NNI, such generalized and conclusory allegations would not provide an adequate basis under French law for qualification of NNL as a *de facto* director, which would require allegations of factual elements showing affirmative action dominating NNSA and causing the proceeds allocation to be accepted by NNSA. In the absence of such a showing, NNI cannot be liable to NNSA for having conspired with NNL or aided, abetted, or assisted NNL to commit mismanagement faults as *de facto* director.

96.  Moreover, the Claim of NNSA does not describe how any action allegedly performed by NNI (i) involved the bad faith support by NNI of the breach of a known obligation owed by NNL toward NNSA or (ii) caused damages to NNSA.

---

[109]    Claim of NNSA, Paragraph 75.

[110]    Claim of NNSA, Paragraphs 162-165.

[111]    Claim of NNSA, Paragraphs 162-165.

[112]    Claim of NNSA, Paragraphs 80-83 (describing alleged misconduct in connection with the business sales).

[113]    Claim of NNSA, Paragraph 82.

97. First, the Claim of NNSA does not describe how or why NNI should have known of any particular obligation of NNL that was being breached and then acted in bad faith in support of any such breach. Without allegations that could show that NNI's own actions constituted bad faith conduct designed to support the breach of a known obligation of NNL to NNSA, there would be no basis for imposing liability on NNI in relation to business sales under article 1382 of the French Civil Code.

98. Second, the Claim of NNSA is totally silent regarding how any action of NNI allegedly furthered any alleged breach or contributed to the allocation scheme allegedly imposed on NNSA. Without allegations that could show that NNI's own actions caused injury to NNSA, there would be no basis for imposing liability on NNI in relation to business sales under article 1382 of the French Civil Code.

d. Tort claim relating to taxation matters (Claim 17)

99. NNSA asserts a claim against NNI under article 1382 of the French Civil Code based upon the allegation that NNSA's taxation affairs allegedly were controlled by NNI and NNL, who therefore should be responsible for any penalties, interest or loss payable by NNSA if any tax authority were to make a claim against NNSA.[114]

100. As explained above, in the absence of a finding that NNL had a duty toward NNSA in relation to NNSA's taxation affairs, there would be no basis for finding NNI liable for conspiring and/or aiding and abetting in relation to such an alleged breach.

101. It is not alleged in the Claim of NNSA that NNL owed a contractual duty to NNSA in relation to NNSA's tax affairs.

102. As explained above, the Claim of NNSA alleges only in a generic fashion that "NNSA's taxation affairs were controlled by NNI and NNL."[115] Such a blanket allegation, unsupported by factual allegations showing such control, could not form the valid basis for a finding that NNL was the *de facto* director of NNSA and committed mismanagement faults. NNI, therefore, cannot on this sole basis be found liable under article 1382 of the French Civil Code for conspiring with NNL or aiding, abetting, assisting and/or encouraging NNL to commit mismanagement acts as *de facto* director.

103. Moreover, even if NNL were found to have breached some duty to NNSA in connection with taxation matters, the Claim of NNSA does not provide allegations as to (i) how NNI could be found to have conspired with NNL in bad faith to support NNL's breach of a known duty owed by NNL to NNSA or (ii) how any action of NNI caused injury to NNSA. In particular, it has not been alleged that NNSA has suffered any loss as a result of any imposition of an adverse tax payment arising from NNL's and NNI's alleged breaches.

---

[114] Claim of NNSA, Paragraph 175.

[115] Claim of NNSA, Paragraph 84.

## C.  Claims in respect of FSD Liability

104. Taking the allegations of the claim of NNSA as true, I understand that (i) the Nortel Networks UK Pension Plan ("the Scheme") has a deficit and (ii) the UK Pensions Regulator determined that an FSD requiring the provision of financial support to the Scheme, within a period of time to be specified in the FSD, should be issued in respect of certain companies of the group including NNI and certain EMEA companies.[116]  The Claim of NNSA does not allege that NNSA has been ordered to make payment of financial support.

105. NNSA indicates that, in the event of non-compliance with an FSD, the UK Pensions Regulator has the power to issue a contribution notice ("CN") to persons to whom the FSD was issued if certain conditions are fulfilled.[117]  There is no allegation that a CN has been issued to NNSA or is contemplated by the UK Pensions Regulator.

106. NNSA asserts that in the event that NNSA were required by the UK Pensions Regulator pursuant to an FSD or a CN to make a series of payments to the Scheme or to provide financial support to the Scheme, they will have the following claims against NNI:
   - a claim of contribution (C.1);
   - a claim relating to unjust enrichment (C.2);
   - a claim of subrogation (C.3); and
   - a claim relating to an obligation to repay (C.4).

107. As a preliminary remark, it should be noted that under French law, a person may not bring an action in respect of a hypothetical future claim that is not yet in existence.  For a claim to be admissible, the claiming party must establish (among other basic requirements) that he has an interest (or standing) in asserting the claim, and that his interest is "born and not potential."[118]  In other words, it is not possible to initiate an action on the merits regarding an injury that is feared but has not yet occurred or a controversy that has already been resolved.

## C.1  Claim of contribution (Claim 19)

108. Based upon alleged breaches of duties said to be owed by NNI to NNSA, NNSA asserts a claim under French law to recover "a contribution" from NNI.[119]

109. They do not refer to any specific provision of French law.

110. The elements described in the Claim of NNSA to justify the claim of "contribution" are not sufficient for me to understand which French law claim NNSA is attempting to assert against NNI, or whether any particular claim exists under French law that would correspond to their claim for "a contribution."

---

[116]     Claim of NNSA, Paragraphs 86, 88, 91.

[117]     Claim of NNSA, Paragraph 92.

[118]     *CPC Art. 31; Leçons de Droit Civil, Tome 1 – Premier volume, Introduction à l'étude du droit, (333) Henri et Léon Mazeaud, Jean Mazeaud et François Chabas, 1986*

[119]     Claim of NNSA Paragraphs 179-180.

111. I also note that NNSA alleges that its claim is based on the alleged breaches of "duties" said to be owed by NNI to NNSA.[120] The alleged duties upon which the claim is based are not identified. Instead, it is stated that such alleged duties are "referred to elsewhere in this Proof of Claim."[121]

112. NNSA refers to duties that NNI allegedly owed to NNSA in Paragraphs 33 (alleged duties of a *de facto* director), and 119 to 123 of the Claim of NNSA (alleged duties of a *de facto* director). As stated above, NNSA does not, in my opinion, make non-conclusory allegations of fact which, if true, would render NNI a *de facto* director.

113. The Claim of NNSA does not allege that NNI was a *de jure* director of NNSA. Even assuming that NNI were qualified as a *de facto* director, which I do not believe would be appropriate based on the allegations in the Claim of NNSA even if accepted as true, the Claim of NNSA does not attempt to describe any affirmative acts or faults that could have been made by NNI in relation to FSD liability.

114. Nor does the Claim of NNSA describe any other specific basis upon which a duty could be found to have been owed by NNI to NNSA in respect of FSD Liability.

C.2  Claim in respect of unjust enrichment (Claim 20)

115. Even though claim 20 is for "recoupment, contribution and/or unjust enrichment," I will analyze the claim of unjust enrichment only, since, based upon the descriptions provided in the Claim of NNSA, I am unable to recognize either of the other two as forms of claim that exist under French law.

116. The theory of unjust enrichment is based on article 1371 of the French Civil Code and is similar to implied contract ("*quasi-contrat*"). Under French law, the action of unjust enrichment is also called an action *de in rem verso*.

117. Unjust enrichment is a transfer of wealth between two parties that has no legal justification.

118. The following cumulative elements are necessary to bring an action *de in rem verso*:

    - the enrichment of a person or a legal entity and the correlative impoverishment of another person or legal entity;
    - the absence of any legal justification for the transfer of wealth;
    - the absence of any other available legal action to obtain redress.

119. French judges consider that there is enrichment where a person or a legal entity experiences an increase in his assets, a decrease in his liabilities or avoids

---

[120]    Claim of NNSA Paragraph 179.

[121]    Claim of NNSA Paragraph 179.

expenditure.[122]  For instance, if the owner of an asset gets his asset back after an improvement work has been undertaken by the former occupant, there is enrichment.[123]

120. There must be a loss caused to another person or legal entity in order to qualify as unjust enrichment.  For instance, the *Cour de Cassation* considered that there was an impoverishment of the wife of a bar director because she worked for several years without any salary.[124]

121. There must be a correlation between the enrichment of the defendant and the impoverishment of the plaintiff.[125]

122. In addition, there must be no cause for the enrichment.  Therefore, unjust enrichment implies that there was no legal, conventional or juridical obligation or agreement between the enriched and the impoverished party.[126]  Thus, there was no unjust enrichment in a case where the parties had concluded an agreement under which all construction work by the tenant would become the property of the owner at the end of the lease without any compensation.[127]  Nor is enrichment considered unjust when it is based on a legal act between third parties other than the enriched and impoverished party.[128]

123. The action for unjust enrichment is also subject to a rule of subsidiarity.  In other words, an action *de in rem verso* may not be brought unless no other legal action is available to the claimant.

124. Finally, an unjust enrichment claim cannot succeed if the person or legal entity seeking compensation for unjust enrichment created the enrichment through actions undertaken only to further his own personal interests and at his own risk or if he deliberately committed a fault.  For instance, if a person undertook work in the building of his wife with the intention of moving in the building with her and thereby acted in furtherance of his own interests in performing the work, he cannot claim unjust enrichment, even if the couple eventually splits up.[129]  Similarly, there is no unjust enrichment when, by setting

---

[122]    *Droit Civil – Les obligations, Dalloz édition 2009 (10th ed.), François Terré, Philippe Simler et Yves Lequette ; Fasc. unique : QUASI-CONTRATS – Théorie générale, Xavier Pin et Laura Devin, 13 mai 2011 ; Fasc. 40 : QUASI-CONTRATS– Enrichissement sans cause – Effets de l'action en restitution de l'enrichissement sans cause, Xavier Pin, 12 mars 2007*

[123]    *Droit Civil – Les obligations, Dalloz édition 2009 (10th ed.), François Terré, Philippe Simler et Yves Lequette , n°1067* (Court of Appeal of Colmar, 04/16/1982, n°jurisdata 1982-042906)

[124]    (Cass. Civ. 1, 05/29/2001, n°98-21.991)

[125]    (Cass. Civ. 3, 03/31/2010, n°09-11.969)

[126]    (Cass. Civ. 1, 05/10/1984, n°83-12.370)

[127]    (Cass. Civ. 3, 05/28/1986, n°85-10.367)

[128]    *Droit Civil – Les obligations, Dalloz édition 2005, François Terré, Philippe Simler et Yves Lequette ; Fasc. unique : QUASI-CONTRATS – Théorie générale, Xavier Pin et Laura Devin, 13 mai 2011; JCP Civil Fasc. 40 : QUASI-CONTRATS– Enrichissement sans cause – Effets de l'action en restitution de l'enrichissement sans cause, Xavier Pin, 12 mars 2007*

[129]    (Cass. Civ. 1, 09/24/2008, n°07-11.928)

a new electric network across his own land to further his own interests, the owner of the land improves access to the network by his neighbor.[130]

125. Thus, to establish a claim of unjust enrichment, NNSA would have to prove that it made a payment to the UK Pension Scheme in respect of a debt owed by NNI towards the Scheme.

126. However, the Claim of NNSA does not allege that NNSA has made any payment in relation to an FSD or CN.  Accordingly, there is no basis for a claim of unjust enrichment under French law at this time.

127. If, at some future time, NNSA were to make a payment to the Scheme in respect of an FSD or a CN, it will be necessary for NNSA to prove that NNI was the sole debtor of the sums paid in order to bring a claim for unjust enrichment in relation to any such claim.  In other words, if NNSA was also a debtor for such sums, it could not assert a claim of unjust enrichment against NNI.

128. In addition, NNSA has not made any allegations that an action *de in rem verso* is the sole action available to obtain the repayment by NNI of any sums that NNSA might ever have to pay in respect of alleged FSD Liability.  Again, it is not possible to bring an unjust enrichment claim where other causes of action are available to a claimant.

C.3  Claims in respect of "subrogation" (Claim 21)

129. Subrogation under French law can exist in one of two forms – conventional subrogation and subrogation by operation of law.  The Claim fails to identify which type of subrogation NNSA is alleging.

130. Conventional subrogation.  There are two types of conventional subrogation under French law.  The first one is known as subrogation *ex parte creditoris*.  This form of subrogation occurs when the creditor, who receives the payment of a third party, transfers to the latter the rights and actions that he held against his debtor.

131. The second one is subrogation *ex parte debitoris*.  That subrogation occurs when the "*debtor borrows a sum in order to pay his debt and to subrogate the lender to the rights of the creditor.*"[131]  There, the creditor is not involved in the subrogation.

132. In no case may subrogation exceed the amount of the payment.

133. Pursuant to Article 1250 of the French Civil Code, for conventional subrogation *ex parte creditoris* to validly exist, three conditions must be met:

- the conventional subrogation must be express and cannot be presumed;[132]

---

[130]    (Cass. Civ. 1, 10/19/1976, n°75-12.419)

[131]    Article 1250, 2° of the French Civil Code

[132]    (Cass. Civ. 1, 10/18/2005, n°04-12.513)

- subrogation and payment must be made simultaneously (it is impossible to create subrogation by future anticipated payment);[133] and
- the payment must be the act of a third party and cannot be made by the debtor himself.[134] Moreover, the payment must be transferred directly to the creditor by the third party.

134. Conventional subrogation *ex parte debitoris* is defined as follows: "A debtor borrows a sum in order to pay his debt and to subrogate the lender to the rights of the creditor. In order to have a valid subrogation, the instrument of loan and the receipt must be drawn up before the notaries. In the instrument of loan, it is necessary to declare that the sum was borrowed in order to make the payment, and in the receipt, it is necessary to declare that the payment has been made from the funds furnished for this purpose by the new creditor. That subrogation has its effect without the concurrence or the wish of the creditor."[135]

135. More specifically, both the obligation to repay the underlying debt and the receipt delivered by the former creditor must be formally and legally documented. Moreover, there must be an express statement of the origin and the destination of the funds at stake.

136. Subrogation by operation of law. Pursuant to Article 1251 of the French Civil Code, subrogation by operation of law is strictly limited to the following cases:
- *1°"For the benefit of the person who, being himself a creditor, pays another creditor who is preferred to him by reason of his prior charges or mortgages;"*
- *2°"For the benefit of the purchaser of an immovable [real property], who employs the price of his purchase for the payment of the creditors to whom that property was mortgaged;"*
- *3°"For the benefit of the person who, being bound with others or for others to the payment of a debt, was interested in discharging it;"*
- *4°"For the benefit of a beneficiary heir who paid from his own funds the debts of a succession."*

137. Turning to analyze the subrogation claim of NNSA, first of all, it is necessary to prove that some form of payment has been made by NNSA.

138. There is no allegation in the Claim of NNSA that the UK Pensions Regulator has ordered NNSA to pay anything. Therefore, NNSA is not alleged to have made any payment that could give rise to a claim of subrogation under French law.

139. If, at some stage, NNSA were to make a payment to the Scheme in respect of an FSD or a CN, in order to assert a claim of subrogation, NNSA will have to demonstrate that NNSA made a payment to the Scheme in respect of a debt owed by NNI to the Scheme. To be considered *conventional subrogation*, NNSA would have to establish that NNI and NNSA concluded a contract under which the subrogation of NNSA towards NNI was expressly accepted by both parties, at the same time that NNSA paid into the

---

[133]    (Cass. Civ. 2, 02/08/2006, n°04-18.379)

[134]    (Cass. Com., 11/04/1968, D.1969, p.505, note D. Alexandre)

[135]    Article 1250-2° of the French Civil Code

Scheme. There is no allegation in the Claim of NNSA regarding the existence of any such agreement. As such, even if a future payment were made in respect of an FSD or a CN, there would be no basis for NNSA to assert a claim against NNI based upon conventional subrogation under French law.

140. To be considered subrogation *by operation of law*, NNSA would have to demonstrate in respect of any payment made by NNSA in relation to an FSD or a CN that NNSA and NNI fall into one of the specifically enumerated cases found in Article 1251 of the French Civil Code.

141. Situations 1°, 2° and 4° are not relevant here.

142. With respect to situation # 3 – subrogation by operation of law *"for the benefit of the person who, being bound with others or for others to the payment of a debt, was interested in discharging it"* – NNSA would have to show that NNSA made a payment to the Scheme, something which has not been alleged and without which a claim of subrogation by operation of law cannot validly be made. Thus, on the basis of its allegations, NNSA does not state the necessary prerequisites to make out a claim under French law for legal subrogation.

C.4  Claims in respect of obligation to repay (Claim 22)

143. NNSA asserts a claim against NNI on the basis of a supposed future obligation to repay. No explanation is provided regarding the nature of this claim. NNSA does not refer to a specific provision of the Code or any other legal doctrine and I know of none that would correspond to the description provided.

144. Obligation to repay could only be the consequence of a successful claim based on other grounds, but it is not a cognizable ground for a claim in and of itself under French law. Therefore, Claim 22 does not correspond to a cognizable claim under French law.

I declare, under the penalty of perjury of the laws of the United States of America, that the foregoing is true and correct.

Executed this 22nd day of July, 2011
In Paris, France

_____
Guilhem Bremond