# EXHIBIT B
### (NNSA Amended Proof of Claim No. 7785)

| UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE | AMENDED PROOF OF CLAIM |
|---|---|

**Name of Debtor:**
Nortel Networks, Inc.

**Case Number:**
09-10138 (KG)

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

**Name of Creditor:**

Nortel Networks SA and/or any Court-appointed administrator or liquidator thereof

☒ Check this box to indicate that this claim amends a previously filed claim.

**Name and address where notices should be sent:**

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
Attention: Edwin J. Harron
(302) 571-6600

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004
Attention: Michael Luskin
(212) 837-6000

Herbert Smith LLP
Exchange House
Primrose Street
London EC2A 2HS
UNITED KINGDOM
Attention: Stephen Gale
44-20-7374-8000

Telephone number: See above

**Court Claim Number:** _____
*(If known)*

**Filed on:** _____

Name and address where payment should be sent (*if different from above*):

Telephone number:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor trustee in this case.

**1.** Amount of Claim as of Date Case Filed: <u>See attached Rider</u>

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2.** Basis for Claim: <u>See attached Rider to Proof of Claim of Foreign Administrators</u>
(See instruction #2 on reverse side.)

**3.** Last four digits of any number by which creditor identified debtor: _____

3a. Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

**4.** Secured Claim (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate    ☐ Motor Vehicle    ☐ Other
Describe:

Value of Property: $_____    Annual Interest Rate ____%

Amount of arrearage and other charges as of time case filed included in secured claim.
If any: $_____    Basis for perfection: _____

Amount of Secured Claim: <u>Unknown</u>    Amount Unsecured: <u>Unknown</u>

**5.** Amount of claim Entitled to Priority under 11 U.S.C. § 507(a). If any portion of your claim falls in one of the following categories check the box and state the amount.

Specify the priority of this claim.
Unknown
☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a) (__).

**Amount entitled to priority:**

Unknown

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6.** Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7.** Documents: Attach reda~~...~~ invoices, itemized statements also attach a summary. Attach may also attach a summary. (

DO NOT SEND ORIGINAL SCANNING.

If the documents are not avail~~...~~

Filed: USBC - District of Delaware
Nortel Networks Inc., Et Al.
09-10138 (KG)    0000007785

[barcode]

~~...~~ory notes, purchase orders, ~~...~~ agreements. You may ~~...~~ a security interest. You ~~...~~

YED AFTER

**Date:** 6/3/11

Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

G. CHRISTOPHER HILL

JOINT ADMINISTRATOR

**FOR COURT USE ONLY**

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

FILED / RECEIVED

JUN -3 2011

EPIQ BANKRUPTCY SOLUTIONS, LLC

10/33502136_1

1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NORTEL NETWORKS, INC., | Case No. 09-10138 (KG) |
| Debtor. | Jointly Administered |

## RIDER TO PROOF OF CLAIM OF NORTEL NETWORKS S.A.

### PRELIMINARY STATEMENT

1.      Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, in their capacity as the court-appointed administrators and authorized foreign representatives (the "Joint Administrators") of Nortel Networks S.A. ("NNSA") and its affiliates located in the region known as EMEA (Europe, Middle East, and Africa) (collectively, the "EMEA Companies")[1] in proceedings (the "English Proceedings") under the Insolvency Act of 1986 (the "English Insolvency Act"), pending before the High Court of Justice of England and Wales (the "English Court"), hereby submit this rider (the "Rider") to the amended proof of claim (the "Claim"), which amends, and provides a more definite

---

1.  NNSA commenced insolvency proceedings under the English Insolvency Act in the English Court on January 14, 2009.  By a judgment of the Commercial Court of Versailles dated 28 May 2009, NNSA entered into secondary insolvency proceedings in France, pursuant to which Maître Cosme Rogeau was appointed as the French liquidator of NNSA (the "Liquidator").  Nortel Networks UK Limited ("NNUK") also commenced insolvency proceedings under the English Insolvency Act in the English Court on January 14, 2009, together with the following direct or indirect subsidiaries of NNUK: Nortel GmbH; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska SP Zoo; Nortel Networks Hispania SA; Nortel Networks (Austria) GmbH; Nortel Networks sro; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko sro; Nortel Networks Oy; Nortel Networks Romania SRL; Nortel Networks AB; and Nortel Networks International Finance & Holding BV.  Nortel Networks (Ireland) Limited and Nortel Networks France SAS, which (like NNSA) are not subsidiaries of NNUK, also commenced insolvency proceedings under the English Insolvency Act in the English Court on January 14, 2009.  With the exception of Nortel Networks (Ireland) Limited, the Joint Administrators are the court-appointed administrators and foreign representatives for all of the EMEA Companies that have commenced insolvency proceedings in the English Court.  Alan Robert Bloom and David Martin Hughes are the court-appointed administrators and foreign representatives of Nortel Networks (Ireland) Limited.

1

statement of, the timely filed proof of claim submitted by the Joint Administrators on behalf of NNSA against Nortel Networks Inc. ("NNI") and its affiliated debtors in these Chapter 11 cases (collectively, the "Debtors") on September 20, 2009 (the "Original Proof of Claim").[2]  This Rider is an integral part of the Claim and is hereby incorporated into the Claim in full and for all purposes.

## FACTUAL BACKGROUND

### A.    The Nortel Group and its Origins

2.    NNI, its parent Nortel Networks Limited ("NNL"), its ultimate corporate parent, Nortel Networks Corporation ("NNC" and, together with NNL, the "Canadian Entities"), and its affiliates and subsidiaries (collectively, "Nortel" or the "Nortel Group") were one of the leading worldwide groups in the telecommunications industry, including networking solutions, computer networks and software.

3.    The Nortel Group was originally founded in Canada in 1895, subsequently expanded into the US in the 1970s and, by 1990, had become one of the leading telecommunications companies in all of North America.  From this pan-North American base, Nortel sought to expand overseas.

4.    In 1991 the Nortel Group acquired 100% of STC plc ("STC"), a major UK public telecommunications company.  This represented the Nortel Group's first major step into the UK market and brought customer relationships with large European carriers such as British Telecom, Cable & Wireless and Telefonica.  From this base Nortel was able to expand into the wider European markets.  In fiscal year 1991, European revenues were $1.35 billion, an increase

---

2.    The Joint Administrators amend the Original Proof of Claim under compulsion of the Order Requiring EMEA Claimants to File a More Definite Statement of Claims and Setting a Deadline for the Filing of Any Proofs of Claim by the EMEA Claimants, entered by the Court on May 10, 2011 (the "Order").

of 514% from the previous year. These revenues accounted for 17% of the Nortel Group's total revenue, a figure which was to grow in subsequent years.

     5.     The European market was therefore a very important source of revenue for the Nortel Group.

**B.     The Insolvency of the Nortel Group**

     6.     Beginning in 2001, the demand for the Nortel Group's products dropped dramatically in the wake of the "Dot-Com" crisis. Competition also increased. In 2001 alone the Nortel Group reported losses of $25.7 billion. Nortel itself described the downturn as "severe" and "dramatic".

     7.     In an attempt to revive its fortunes, the Nortel Group undertook a major restructuring. By 2008, the Nortel Group had reduced its employee numbers by two-thirds and outsourced its manufacturing. This restructuring did not solve the Nortel Group's financial troubles, which continued. Nevertheless it helped provide a stay of execution and had the effect of ensuring that the collapse of the Nortel Group did not occur until early 2009. In the period leading up to the collapse the cash resources of NNSA were depleted at the direction of the NNL and NNI.

     8.     By January 2009, after such assets had been very significantly depleted, formal insolvency proceedings were commenced.

**C.     Removal of value from the EMEA companies**

     9.     At all relevant points the Nortel Group was operated in such a manner that cash and value were improperly removed from NNSA and the other EMEA Companies and transferred to NNL. The claims in this Rider concern such improper value transfers and NNI's involvement in the same.

10.    Value removal from NNSA occurred pursuant to a general policy to the effect that value and cash within the Nortel Group should be transferred to NNL. Indeed, pursuant to this policy the EMEA Companies, together with their personnel, were instructed to identify new schemes which would enable the transfer of cash and value to NNL.

11.    Particular transactions pursuant to which value was improperly removed from the EMEA Companies, and which form the basis of the claims set out in this Rider, include:

a.    The Nortel Group's transfer pricing arrangements which failed to comply with the arm's length standard; and

b.    The loan repayment made by NNSA to NNL in February 2008 in connection with the Project Swift transaction.

12.    Although NNL was the primary beneficiary of such value removal, on occasions NNI also benefited on certain occasions. These occasions include at the time of the Project Swift transaction when NNI received payments in cash from NNL in respect of its inter-company loan facility following the improper removal of value from NNSA and other EMEA Companies.

**D.    Control by and involvement of NNI**

13.    Control of the Nortel Group's operations was highly centralized and, on a general basis, was maintained primarily by the Canadian Entities.

14.    NNSA has therefore submitted separate claims against those entities pursuant to the Canadian EMEA Claims Process.

15.    While the Canadian Entities controlled the Nortel Group on a general basis, NNI was also involved in jointly controlling certain aspects of the Nortel Group's

4

operation together with the Canadian Entities. The control exerted by NNI related to the Nortel Group's tax matters, in particular transfer pricing, and to the Nortel Group's treasury matters. These tax and treasury functions were responsible for the transactions pursuant to which value was improperly removed from NNSA.

    **1.    Transfer pricing**

    16.    NNI was heavily involved in the implementation and operation of the transfer pricing arrangements that deprived NNSA of so much value (as explained below). NNI was also heavily involved in the advanced pricing agreement negotiations (explained further at paragraph 18.e below) with the Internal Revenue Service ("IRS"), Canadian Revenue Authority ("CRA") and Her Majesty's Revenue and Customs ("HMRC" and, together with the IRS and CRA, the "Revenue Authorities") pursuant to which approval of those Revenue Authorities to the transfer pricing arrangements was sought.

    17.    The key individuals involved included, in particular, John Doolittle of both NNI and the Canadian Entities and Mark Weisz, Mike Orlando, Laurie Krebs and John Payne of NNI, as well as representatives from the Canadian Entities.

    18.    NNSA had no substantive involvement. Its role was limited to providing information for the above individuals as and when required and to implementing the decisions which had been taken by NNI and the Canadian Entities. In this regard:

        a.    The policy decision to change from the previous cost sharing arrangements and to implement a new transfer pricing model, the residual profit split methodology ("RPSM"), was taken by NNI and NNL. NNSA was not involved or consulted in relation to this decision. NNSA was only informed of the change to the RPSM after

5

the RPSM had been implemented.  There was no prior consultation
with French tax authorities (the "French Tax Authorities").

b.  The process by which the RPSM electronic model was created and
structured was also one which was handled by NNI and NNL.

c.  The terms of the Master Research and Development Agreement
("MRDA") dated 22 December 2004, which provided the architecture
and contractual basis for the RPSM, were determined by NNI and
NNL.  NNSA was not consulted in relation to, or involved in, the
decision to implement the MRDA or in the decision regarding what
the terms of the MRDA would be.  NNI and NNL were also
responsible for instructing the legal advisers in relation to the MRDA
and transfer pricing generally.  NNSA had no involvement in the
creation of the RPSM model.

d.  Once the terms of the MRDA had been decided by NNI and NNL,
NNSA was simply instructed to sign the MRDA.  There was no arm's
length negotiation of its terms.  The MRDA was purportedly entered
into on 22 December 2004.  The MRDA was imposed retrospectively
on NNSA as from 1 January 2001.

e.  NNI and NNL controlled the all-important advanced pricing
arrangement/agreement ("APA") application process (referred to
above).  Mark Weisz of NNI, Mike Orlando of NNI and John Doolittle
took the lead in the negotiations with the IRS, the CRA and HMRC.
This team ran the negotiations until around 2006 when Peter Look

6

joined the Nortel Group as Vice President of Global Tax. He replaced John Doolittle alongside Mark Weisz and Mike Orlando. Later, John Payne, also of NNI, joined the lead team together with Peter Look. NNI and NNL also took sole responsibility for instructing Nortel's professional advisers in relation to the APA application process.

f.  There are no Board Minutes approving NNSA's entry into the MRDA. The entry by NNSA into the MRDA qualified, as matter of French law, as an interested (or related) party transaction (*convention réglementée*) and was therefore subject to a prior NNSA Board approval process pursuant to article L225-38 *et seq.* of the French *Code de commerce*. However, that prior approval process never happened and the entry into the MRDA was merely acknowledged by the NNSA Board on 8 June 2005, over five months afterwards. No NNSA Board resolution prior to 8 June 2005 explains, refers to or even mentions the contemplated implementation of the RPSM embodied in the MRDA.

g.  Had the NNSA Board been invited to consider and approve the MRDA and/or the move to the RPSM, it would have found that it was not in NNSA's corporate interest to enter into such an agreement. The retrospective application of the MRDA was particularly detrimental to NNSA, as it was clear from 2001 onwards that the RPSM, introduced from 2001 (and varied over time), would give a greatly more prejudicial result for NNSA than the cost sharing arrangement that had

previously been operated (pursuant to which NNSA was reimbursed its research and development ("R&D") expenditure).

19.    The RSPM was also operated by a team of NNI personnel that included Mr Weisz, Mr Orlando, Mr Krebs and Mr Payne.  In particular:

    a.    All strategic decisions in relation to the operation and subsequent amendment of the RPSM and in relation to the Nortel Group's transfer pricing arrangements, including in respect of NNSA, were in practice taken by that team.

    b.    Calculations of the transfer pricing payments due from NNSA were made by that team.

    c.    At all relevant points NNSA was simply informed by that team what transfer pricing adjustments were required.  It had no role in determining the calculations.

20.    During the tax audits in respect of NNSA for the tax years 2001-2003, the French Tax Authorities objected, inter alia, to the lack of internal NNSA documentation reviewing and approving the change to the RPSM, the fact that no contract evidencing the RPSM had been presented to the French Tax Authorities and the fact that there had been no NNSA Board meeting to approve the changes.  The French Tax Authorities labelled the change to the RPSM an abnormal act of management.

21.    NNSA's responses to the French Tax Authorities' audits were also co-ordinated at Nortel Group level and personnel from the Nortel Group, including NNI personnel, were involved in formulating NNSA's strategy in relation to the tax audits and in explaining the justification for the RPSM to the French Tax Authorities.

22.    The Nortel Group Tax Department was effectively a joint function between NNI and the Canadian Entities.  Many of the key individuals within the Tax Department were NNI personnel (the "NNI Tax Team").  This was particularly so in respect of the members of the Tax Department who had responsibility for NNSA and EMEA and in relation to the transfer pricing function, which was heavily dominated by individuals from NNI.  For example, at various times, the International Tax Director of Nortel was Mark Weisz; Mike Orlando was the Global Transfer Pricing Leader (and right hand man of Peter Look, Vice President of Global Tax); John Payne, was responsible for Global Transfer Pricing; Claire Barbieri was responsible for Global Tax Accounting; and even the EMEA Tax Leader on the ground in the EMEA Region, Ryan Smith was an NNI employee, seconded to NNUK from NNI.

**2.    Treasury matters – Project Swift and the February 2008 Repayment**

23.    NNI through its personnel was, together with the Canadian Entities, involved in the implementation of the initiative described above, pursuant to which Nortel companies were instructed to identify opportunities to transfer cash and value to NNL.  These initiatives benefitted NNL and also enabled cash benefits to be received by NNI in the form of repayments of, and payments of interest on, the inter-company loans it had advanced to NNL.  It was in accordance with this initiative that Project Swift and the €25 million loan repayment made by NNSA in February 2008 as part of Project Swift (the "February 2008 Repayment") came about (see further below).

24.    NNSA reserves its right to plead further in respect of NNI's involvement in Project Swift and the February 2008 Repayment upon disclosure of further documents.

25.    NNI's directors, officers and senior employees were part of the management group that implemented Project Swift.  As explained further at paragraphs 73 to 75

9

below, the February 2008 Repayment was conceived and carried out as part of Project Swift, in anticipation of the transfer to NNUK of NNL's shareholding in NNSA as part of that transaction (which ultimately never occurred).

26.    Directors and officers of NNI (including Mr. Paul Karr and Mr. William LaSalle) were fully aware of Project Swift. On the ground, Ryan Smith of NNI ("Leader of Global Tax Planning") was one of the key driving forces behind the implementation and structuring of the Project Swift transaction. His team came up with the idea for Project Swift and was then largely responsible for the structuring and implementation of the transaction. Mark Weisz of NNI ("Director of International Tax") was responsible for approving and supervising the implementation of the initiatives to transfer cash and value to NNL, such as Project Swift and the February 2008 Repayment and was again involved in the implementation of Project Swift.

27.    In a similar way to the Tax department, Nortel Treasury also performed a central role in relation to the strategic management of the Nortel Group. Nortel Treasury was also involved in most of the significant transactions affecting the Nortel Group, and NNSA and EMEA in particular. The key individuals within Nortel Treasury were from NNI. For example, Katherine Stevenson, a director of NNI, was Treasurer and had overall responsibility for global treasury matters within the Nortel Group. John Doolittle was Treasurer from 2008. Mr Doolittle was also an officer of NNI. Paul Karr was Controller of the Nortel Group and a director of NNI.

**3.    General lack of NNSA Board involvement in NNSA's affairs**

28.    As control of the Nortel Group's operations was highly centralized, with decisions relating to NNSA taken at Group level by individuals from NNI and NNL, the local NNSA directors were frustrated that they were not involved in decisions and that their views were not taken into consideration.

29.     The NNSA Board was not a forum for discussion and strategic decision-making in the usual corporate way.  In the case of transfer pricing, for example, despite the fundamental significance of this issue to NNSA's financial position and end of year results, there is no evidence in NNSA board minutes of the transfer pricing arrangements being approved by the NNSA Board during the period for which NNSA has claims.

30.     In practice, the reason why the NNSA Board did not meet is because the decision-making function in respect of strategy and policy for NNSA had been usurped by NNI and the Canadian Entities, who habitually made strategy and policy decisions on behalf of NNSA without consultation with NNSA's *de jure* directors.

### E.     NNI was a de facto director

31.     For the reasons set out above (and as explained further below), NNI was a de facto director of NNSA under French law by virtue of NNI (i) taking an active and continuous role in the management of NNSA while acting independently under its own discretion, (ii) making decisions in relation to treasury and tax issues which could only be properly be made by a director of NNSA, and/or (iii) causing the de jure directors to act in accordance with its directions in relation to such issues, and in particular regarding NNSA's involvement in:

      a.   the Nortel transfer pricing arrangements; and

      b.   Project Swift and the February 2008 Repayment;

32.     As a de facto director of NNSA, NNI owed, inter alia, duties of loyalty and diligence to NNSA in relation to these specific tax- and treasury- related matters (among others).  Notwithstanding this, NNI in any case assumed such duties with regard to these matters.

33.     By reason of the fact that NNI jointly controlled each of the transactions described in the preceding paragraph and that the transactions themselves improperly removed

value from NNSA and were contrary to its interests, NNI breached the duties it owed to NNSA. NNI is therefore liable to NNSA on the bases set out below.

**F.      The NNSA de jure directors**

34.      In addition, the de jure directors of NNSA also owed, inter alia, duties of loyalty and diligence to NNSA (as set out below).

35.      By causing or allowing NNSA to be involved in the prejudicial transfer pricing arrangements and to make the February 2008 Repayment as part of Project Swift, both of which resulted in NNSA suffering losses, and by allowing NNI (and NNL) to control decision-making in relation to those transactions, the de jure directors of NNSA also breached the duties which they owed.

**G.      Transfer Pricing Systems**

**1.      Overview**

36.      Transfer pricing arrangements are implemented in order to ensure that intra-group trading of a multinational group is undertaken on a basis that enables an allocation of profit in each of the countries where group companies do business (and across the entities within the group) in a manner that replicates the profits that would be earned in arm's length transactions.  The guiding principle, recommended by the Organization for Economic Cooperation and Development and followed by most tax authorities, is that transactions between companies within a group should, so far as possible, be priced as if they were arm's length transactions between independent companies. This is straightforward for routine transactions, such as the sale of manufactured goods, but much more difficult for "intangibles," such as R&D, where the value added and contribution to profits made by different companies within an integrated group are difficult to measure.

12

2.    **Cost Sharing and RPSM Arrangements**

37.    The Nortel Group's first set of transfer pricing arrangements consisted of a cost-sharing arrangement ("CSA") or cost contribution agreement ("CCA") between the Nortel Group's main R&D centres, in which NNSA participated prior to 2001. From 2001, the transfer pricing methods were revised and the RPSM was adopted. The RPSM methodology was amended in 2006.

38.    As the French Tax Authorities pointed out during the tax audits of NNSA in respect of the tax years 2001-2003 (see paragraph 69 below), there is no documentation of any decision of the NNSA Board to enter into the RPSM. No contract related to the RSPM was signed until 2004 and there were no NNSA board minutes approving a change from the CSA to the RPSM. NNSA did not pre-approve the intended MRDA and there is no evidence that its local management or directors were ever even consulted on its contemplated introduction / implementation. The lack of correspondence in this regard suggests that no consultative or prior exchanges ever took place with the local French management or directors.

39.    The decision to implement the RPSM was taken by the Canadian Entities and NNI. It was primarily motivated by a desire to allocate more profit to the Canadian Entities in order to benefit NNL at the expense of NNSA. Both NNI and NNL knew that this was the case.

40.    NNSA and the other EMEA Companies which lost out as a result of RPSM were not involved in the decision to change from the previous CSA to the RPSM.

41.    The RPSM distinguished between two types of participants, RPEs and LREs. NNSA was a Residual Profit Entity ("RPE")). NNL, NNI, NNUK and Nortel Networks (Ireland) Limited ("NN Ireland") were the other RPEs. The other categories of company within

the Nortel Group were classified as (1) Limited Risk Entities (each an "LRE", and together the "LREs"), (2) Cost Plus Entities, (3) At Risk Entities and (4) holding companies.

42.     The RPSM divided the participants' available pooled profits into two main elements: (i) routine profits to be allocated to the participants as measured by market returns, *i.e.* based on their own direct earnings from sales to third parties, and, (ii) the "residual" or remaining profits (or losses) which were treated as attributable to the Nortel Group's intangible development activities (*i.e.* R&D). Both the RPEs and LREs were rewarded with a routine return, whereas residual profits (or losses) were divided between the RPEs only.

43.     For the period 2001 to 2005, the LREs' routine return was based on an operating margin profit level indicator, while the RPEs' routine return was calculated using an adjusted return on net assets ("RONA"). From 2006 onwards, both the LREs and the RPEs received a routine return of an adjusted operating margin of 1% of third party sales. The residual profits were then divided between the RPEs based on their proportional contribution to R&D activity. From 2001 to 2005, the residual profit or loss was allocated to each of the RPEs on the basis of their relative proportion of consolidated R&D capital stock in a given year. From 2006 onwards, an RPE's allocation was determined by its relative proportion of Nortel's consolidated R&D expenditure over the preceding five years.

44.     From 2006 onwards those RPEs, such as NNSA, which provided regional central services and other extra-territorial services to other companies in the Nortel Group, *e.g.* on sales and marketing, received a mark-up on their "excess" costs incurred in relation to those services. The mark-up on excess costs was around 15%.

45.     The Nortel Group registered losses or at best broke even during the entire period in which the RPSM was in force.

### 3.    Master Research and Development Agreement

46.    The MRDA was entered into on 22 December 2004, effective from
1 January 2001, between NNL, NNI, NNUK, NNSA, Nortel Networks Australia Pty Ltd ("NN
Australia")[3] and NN Ireland (defined in the MRDA as the "Participants").  The MRDA provided
the architecture and contractual basis to enable the RPSM to be applied.

47.    NNSA was not involved in the decision to implement the MRDA or in
negotiating its terms.  The terms of the MRDA were determined by NNI and NNL based mainly
on the requirements of Canadian and U.S. tax laws, in negotiations with the Canadian and U.S.
taxing agencies, without any involvement of the *de jure* directors of NNSA or any consultation
with the French Tax Authorities.

48.    Under the MRDA, in exchange for the performance of R&D activity, each
Participant was entitled to receive payments in the manner explained above, purportedly as the
measure of the benefit to which it was entitled commensurate with its performance of, and
contribution to, R&D Activity.  (MRDA Art. 3(a).)

49.    The MRDA provided that legal title to all intellectual property of the
Nortel Group then in existence or thereafter to be acquired or developed would be vested in
NNL, including intellectual property created by the NNSA and the other two EMEA RPEs.
However, the MRDA expressly provided that each of the RPEs would retain a beneficial or
economic interest in the intellectual property.  This continued the parties' agreement under the
pre-2001 CSA.  Accordingly, the MRDA confirms that each RPE owns the intellectual property
in the Nortel Group in proportion to the direct or indirect contribution that entity made to the
creation of that intellectual property.

---

3.    Until 2008 when NN Australia ceased to perform R&D as a result of a sale of its R&D facility in August 2005,
and ceased to be an RPE.

50.     NNL agreed to enter into licenses with each of the other Participants, but in fact profits (or losses) from all territories were divided in accordance with the RPSM. NNL was obliged to administer the agreement and the determinations required under the RPSM with respect to its interests and the interests of the Participants, and in particular to compute the amount of any R&D allocations due to, and payments due from, each Participant on a periodic basis (Article 3(d) of the MRDA).

### 4.     The Arm's Length Principle

51.     A fundamental requirement of a valid transfer pricing method is that it should ensure that each of the entities within the relevant group of companies acts in an arm's length manner in its dealings with another.

52.     This principle is expressly referred to in the MRDA. This defined the RPSM at all material times as "the transfer pricing methodology which establishes the fair market value of the compensation to be received by each Participant for its R&D Activity and shall have the meaning defined in Schedule A." Schedule A to the MRDA in turn provided that the RPSM was adopted at the request of certain Revenue Authorities as the most appropriate method for determining the arm's length compensation due to each Participant for its respective R&D Activity. "R&D Allocation" was defined as "Arm's Length R&D Allocation." Schedule A then set out the basis of calculation of residual profit, and of its division between the Participants/RPEs. Schedule A was subsequently amended, including by the Third Addendum to the MRDA to reflect the revised RPSM in fact employed from 2006 onwards.

53.     Accordingly, the MRDA is to be interpreted and applied, so far as possible, to give effect to the arm's length principle.

5.      **The Nortel RPSM failed to properly reward NNSA**

54.      The RPSM as applied under the MRDA did not comply with the arm's length principle. It deprived certain entities (including NNSA) of revenue, and resulted in an intentional and improper transfer of value away from NNSA and the other EMEA Companies and towards NNL.  NNI facilitated this value transfer.

55.      The ways in which the RPSM system took funds from NNSA, for the benefit of NNL, include but are not limited to:

A. The effect of the transfer pricing regime on NNSA

56.      The imposition and subsequent operation of the RPSM was detrimental to NNSA, as NNI was aware.

57.      Following the introduction of the RPSM, the financial position of NNSA drastically worsened.  In 2000, the last financial year before the introduction of the RPSM, NNSA made a profit of €109 million.  NNSA made substantial losses for the financial years 2001 and 2002.  NNSA's financial results continued to be generally poor in subsequent years, up to its entry into administration on 14 January 2009, with NNSA making a loss in four of the six financial years between 2003 and 2008 (see paragraph 72 below).

58.      The immediate impact of the RPSM in 2001 was that NNSA had to repay sums it had received in 2001 under the old cost-sharing arrangements, which were being terminated.  This had a significant prejudicial impact on NNSA's financial situation and it became technically insolvent on a balance sheet basis as at 31 December 2001.

59.      NNSA got a particularly bad deal from the RPSM as it was increasing its R&D investment with little opportunity to exploit routine returns (because it was not a regional centre).  NNSA was run as a cost centre incurring a significant portion of the R&D costs of the

Nortel Group without benefiting from the corresponding profits. In contrast, the effect of the RPSM was that cash was "funnelled" up from NNSA to NNL.

60.    Draft figures produced at Nortel Group level show that the RPSM had the following effect in the years 2001-2003:

> a.  2001: NNSA would have been US$315 million better off under the old cost sharing arrangements than it was under the RSPM;
>
> b.  2002: NNSA would have been US$160 million better off under the old cost sharing arrangements than it was under the RSPM;
>
> c.  2003: NNSA would have been US$123 million better off under the old cost sharing arrangements than it was under the RSPM;

61.    Furthermore, the transfer pricing regimes operated by NNI and NNL were not arm's length and worked to the detriment of the EMEA Companies (including NNSA). The outcomes flowing to the EMEA Companies resulting from the RPSM did not comply with the arm's length principle.

B. Flaws in RPSM

62.    The RPSM arrangement did not adequately reward NNSA. The RPSM arrangement was flawed for reasons including the following[4]:

63.    First, pursuant to the MRDA, from 2006 onwards, the RPEs, including NNSA, had a contractual right to receive a routine return which reflected an arm's length compensation for its distribution function. In practice, NNSA received a distribution return of only 1% of its third party sales. This level of return failed to recognize inter-company sales, significant customer intangibles, the service element performed alongside the distribution function or the risks and costs borne outside the routine return.

---

4.  The precise nature of the flaws in the RPSM arrangements will be a matter of expert evidence in due course.

64.    Second, as set out at paragraph 44 above, NNSA only received a return in respect of "excess" regional central services and costs incurred to support other Nortel entities from 2006 onwards. Although NNSA incurred such costs from 2001 to 2005, during this period the RPSM did not contain a specific provision for these costs to be reimbursed. An independent entity in the position of NNSA should have been remunerated for providing such services.

65.    Third, the RPSM model did not reflect NNSA's high restructuring costs during the period because restructuring costs were ignored in the calculation of the RPEs' profits.

66.    Fourth, NNSA incurred losses associated with bad debts arising from vendor financing that NNL required NNSA to provide to its customers. A credit committee within NNL made the credit decisions for the Nortel Group. An independent party should not accept and would not have accepted these losses. As such, NNSA should have been reimbursed these losses to produce an arm's length result.

67.    Finally, pursuant to the MRDA, for the period 2006 onwards, stewardship costs were to be excluded from the calculation of the RPEs' residual profits. However, in practice these costs were not excluded. Further, the RPSM also allocated NNL and NNI's corporate costs to the residual profit pool. As a result, the amount of loss to be shared among the RPEs, including NNSA, was increased. Given the industry decline and the sudden reduction in volume of business, the corporate costs of NNL and NNI were significantly in excess of what was necessary to oversee and manage the global Nortel Group, and in particular the EMEA region, given that EMEA had its own head office. An independent party in the position of NNSA acting at arm's length should not agree and would not have agreed to effectively bear these costs (or be charged a higher charge for services). In addition, a significant portion of

these costs provided no benefit to NNSA as they duplicated the head office functionality that already existed within the region.

68.      The IRS successfully challenged the 2001 to 2005 RPSM model on the basis that it did not comply with the arm's length requirement.  Pursuant to a settlement approved by the Court, the IRS required that NNL decrease the amount of income reported on its Canadian income tax returns by $2 billion, and that NNI increase the amount of income reported on its US income tax returns by $2 billion.  These adjustments were said to reflect net overpayments made by NNI to NNL for those tax years.  The settlement is an admission that the RPSM model did not comply with the arm's length principle.

69.      In addition, at some point in 2003, the French Tax Authorities launched a tax audit in respect of NNSA for the tax year 2001 and raised objections to the RPSM, and the fact that, under the RPSM, NNSA could no longer recharge R&D costs to the Nortel Group.  In December 2004 proposed an adjustment to NNSA's tax liabilities for 2001.  The French Tax Authorities subsequently launched similar audits in respect of the tax years 2002 and 2003 and proposed similar adjustments for those years.  It is clear that Nortel Group management, including senior employees of NNI, thought that the French Tax Authorities' complaints had some merit because NNSA was getting a bad deal from RPSM and the application of the RPSM to NNSA could not be justified.  The French Tax Authorities eventually contacted the CRA in an attempt to commence a competent authority process in order to resolve matters.  However, the dispute with the French Tax Authorities was not resolved before insolvency proceedings were commenced.

### H.    The 2002 Subordinated Loan and the repayment in 2008

### 1.    The 2002 Subordinated Loan

70.    In December 2001, NNSA was in serious financial difficulties and was technically insolvent on a balance sheet basis. NNSA's financial difficulties continued into the following financial year and beyond. In connection with these ongoing difficulties on or about 9 September 2002, NNL and NNSA entered into a subordinated loan agreement (the "2002 Subordinated Loan Agreement") under which NNL agreed to make a loan facility of €200 million available to NNSA (the "2002 Subordinated Loan"). That loan was made on a long-term basis. In particular:

a.    No repayment date was stipulated in the 2002 Subordinated Loan Agreement and was repayable at NNSA's discretion. It was intended that NNSA would not repay the loan until it became profitable again.

b.    It was expressly provided that the amounts owed by NNSA to NNL under the 2002 Subordinated Loan Agreement were subordinated to the prior repayment of any existing and future secured and unsecured creditors of NNSA.

c.    It was expressly provided that NNSA would not pay interest on the 2002 Subordinated Loan unless it was profitable. The 2002 Subordinated Loan was therefore classed as "quasi equity" for local French accounting purposes.

71.    NNSA drew down from the 2002 Subordinated Loan the sums of €59 million in or around September 2002, €30 million in or around November 2002 and €111 million in or around December 2002. In December 2003 NNL converted €150 million of the

subordinated loan into share capital in NNSA.  Following this, €50 million was left outstanding under the Subordinated Loan Agreement.

2.      **Background to the repayment: NNSA's financial position in February 2008**

72.      NNSA's financial results since the introduction of the RPSM had been historically poor.  For the financial years 2001 to 2007, NNSA's financial statements showed that:

a.  For the year ended 31 December 2001, NNSA had made a loss of approximately €481 million.

b.  For the year ended 31 December 2002, NNSA had made a loss of approximately €285 million.

c.  For the year ended 31 December 2003, NNSA had made a profit of approximately €34 million.

d.  For the year ended 31 December 2004, NNSA had made a loss of approximately €63.3 million.

e.  For the year ended 31 December 2005, NNSA had made a profit of approximately €5.9 million.

f.  For the year ended 31 December 2006, NNSA had made a loss of approximately €3.03 million.

g.  For the year ended 31 December 2007, NNSA had made a loss of approximately €77.4 million.

3.      **Background to the repayment: Project Swift**

73.      The proposal that NNSA make a partial repayment of the 2002 Subordinated Loan in February 2008 (see further below) arose as part of the planning and

implementation by NNI and NNL of a transaction between NNL and NNUK known as Project

Swift. As part of this transaction it was intended that NNSA would be transferred from the

ownership of NNL to NNUK (the "NNSA Transfer") and it was decided that NNL should be

repaid what it was owed under the 2002 Subordinated Loan before that transaction took place.

74.    NNI participated in the planning and implementation of Project Swift and

was similarly involved in the decision to repay the 2002 Subordinated Loan. Ryan Smith, Mark

Weisz, Michael Orlando and Laurie Krebs of NNI and Paul Karr, an NNI director, were

involved.

75.    Beginning in January 2008, therefore, members of the team that had

planned and implemented Project Swift, including Ryan Smith of NNI, discussed a plan for

NNSA to repay the 2002 Subordinated Loan. Ryan Smith pushed for NNSA to repay the entire

€50 million outstanding under the 2002 Subordinated Loan. However, the controller of NNSA

expressed a reluctance to commit to repaying the loan in full because of the uncertain financial

position of NNSA. It was apparently therefore agreed instead that NNSA would repay half of

the outstanding amount in February 2008 and the other half later in 2008, once its financial

position was more certain and prior to the intended NNSA Transfer.

**4.    The repayment of part of the 2002 Subordinated Loan**

76.    In or around February 2008, contrary to the parties' original intention that

the 2002 Subordinated Loan Agreement would be repaid only when NNSA was profitable,

NNSA made a repayment in cash of €25,000,000.00 or US$33,050,000.00[5] of the sum

outstanding under the 2002 Subordinated Loan Agreement (the "February 2008 Repayment").

77.    The February 2008 Repayment was clearly not in NNSA's best interests.

---

5.    Based on the Euro to US$ mid-range spot rate of exchange published in *The Wall Street Journal* as at 4:00 p.m.
     on 14 January 2009.

78.    The February 2008 Repayment was not approved by the NNSA Board.

79.    The February 2008 Repayment was imposed on NNSA by NNI and NNL at a time when NNSA was not in a position to make it because:

      a.    It had made losses in three of the four tax years since the beginning of 2004 and had most recently made a loss of €77.4 million for the year ended 31 December 2007.  Indeed, the lack of profits in NNSA prevented it from being able to pay any dividend to NNL, its parent company.

      b.    The equity position of NNSA at the start of 2008 was uncertain.

      c.    As it turned out, NNSA subsequently made a loss of approximately €103.5 million for the year ended 31 December 2008, the year in which the February 2008 Repayment had been made.

## I.    Business Sales

80.    Prior to 14 January 2009, NNSA entered into various global business sales with other Nortel entities, including NNI, whereby a particular business line was sold by those Nortel entities to a third party purchaser.  The most significant of these business sales was the sale of Nortel's UMTS business to Alactel Lucent S.A. ("Alcatel") for an adjusted purchase price of approximately US$291 million.  This sale agreement for this deal was signed on 4 December 2006 and the sale completed on 31 December 2006.

81.    The parties agreed as required by law and international accounting regulations that the various selling Nortel entities agreed to allocate the proceeds of these sales amongst themselves on the basis of an arm's length legal entitlement that each had to the proceeds.  In this way, the allocation of the proceeds of this sale had to correspond with the arm's

length principles discussed above in relation to transfer pricing. The allocation applied in relation to the Alcatel sale was set out in a statement dated 24 July 2007.

82.    The allocation that was applied to the proceeds of each of these business sales was decided on almost entirely by NNI and NNL. NNSA had no involvement in deciding the allocation methodology that was applied to the proceeds of the business sales. Accordingly, the allocation methodology applied and the proportion of proceeds that NNSA received was decided on its behalf by NNI and NNL. In any event, the allocation that was applied as between the various selling Nortel entities did not accord with the arm's length principles discussed above. Rather, allocation was attempted on the erroneous assumptions that were contained in the transfer pricing structure that prevailed within the Nortel Group at the time. Further, it appears that in fact the allocation was not even applied in conformity with these erroneous assumptions.

83.    As a consequence of the allocation method adopted, NNSA received significantly less and NNI received significantly more than it was entitled to on an arm's length basis.

**J.    Taxation matters**

84.    As explained above, NNSA's taxation affairs were controlled by NNI and NNL. This was particularly so in relation to transfer pricing matters, but also the case more generally.

85.    To the extent that any tax authority were to make a claim against NNSA in relation to a failure to pay the proper level of taxation in any years (whether because of an under recording of revenue or otherwise), then NNI and NNL would be responsible for any penalties, interest and other loss payable by NNSA.

K.    **FSD Liability**

86.    By a Determination Notice dated 25 June 2010, the Determinations Panel ("the DP") of the UK Pensions Regulator ("the UK Regulator") determined that a Financial Support Direction ("FSD") requiring the provision of financial support to the Nortel Networks UK Pension Plan ("the Scheme") should be issued in respect of certain EMEA Companies (the "EMEA Targets"). NNSA is an EMEA Target.

87.    By two References dated 23 July 2010, the EMEA Targets have referred the decision of the DP to the Upper Tribunal (Tax and Chancery Chamber). The References have not yet been heard.

88.    As well as the EMEA Targets, the Determination Notice referred to above determined that an FSD should be issued in respect of NNI. NNI has not referred the decision of the DP to the Upper Tribunal. Following an application by the UK Regulator, the Upper Tribunal issued directions on 3 February 2011 that confirmed that FSDs can be issued by the UK Regulator as against NNI.

89.    The basis for and effect of an FSD are matters which are governed by English law. As a matter of English law, the power of the UK Regulator to issue an FSD is derived from section 43 of the UK Pensions Act 2004 ("the 2004 Act"). Under that section, the UK Regulator may only issue an FSD to a particular person in relation to a particular pension scheme if a number of conditions are satisfied. One of those conditions is that the UK Regulator must be of the opinion that it is reasonable to impose the requirements of the FSD on the person in question.

90.    In deciding whether it is reasonable to impose the requirements of the FSD on a particular person, the UK Regulator is required to give regard to such matters as it considers to be relevant, including, where relevant, the following:

a. the relationship which the person has or has had with the sponsoring employer of the pension scheme in question (including, where the person is a company, whether the person has or has had control of the employer);

b. the value of any benefits received directly or indirectly by the person from the employer;

c. any connection or involvement which the person has or has had with the scheme; and

d. the financial circumstances of the person.

91.    The principal effect of an FSD is to require the persons to whom it is issued to secure that "financial support" for the pension scheme in question is put in place within the period specified in the FSD, and maintained in place thereafter.  By section 45 of the 2004 Act, "financial support" means one or more arrangements falling within section 45(2) of the 2004 Act, the details of which are approved by a notice issued by the UK Regulator.

92.    In the event that there is non-compliance with an FSD, the UK Regulator has power under section 47 of the 2004 Act to issue a contribution notice (a "CN") to any one or more of the persons to whom the FSD was issued stating that the person is under a liability to pay to the trustees or managers of the pension scheme the sum specified in the CN.  The UK Regulator may only issue a CN to a particular person if it is of the opinion that it is reasonable to impose liability on the person to pay the sum specified in the CN.

## THE CLAIMS

### I.    DEBT CLAIMS

**Claim 1**

93.    NNSA has claims against NNI in respect of the outstanding intercompany trading debts as between the two entities:

94.    As at 14 January 2009, the balance of the intercompany trading debts owed by NNI to NNSA stood at US$7,050,776.91.  These debts were carried on the books and records of NNSA and NNI pursuant to an express or implied agreement that they would be repaid.

95.    As such, to the best of NNSA's knowledge, this amount is contractually due and payable to NNSA by NNI, together with pre and post judgment interest.

96.    Alternatively, NNSA is entitled to damages in this amount for breach of contract.

### II.    TRANSFER PRICING CLAIMS

**Claim 2 - Mismanagement claim relating to transfer pricing against NNI as a De Facto Director under French Law**

97.    Article L651-2 of the French *Code de commerce*, provides, in its relevant parts[6]:

> "Where the rescission of a safeguard or of a reorganization plan or the liquidation of a legal entity reveals an excess of liabilities over assets, the court may, in instances where management fault has contributed to the excess of liabilities over assets, decide that the debts of the legal entity will be borne, in whole or in part, by all or some of the de jure or de facto managers, who have contributed to the management fault. If there are several managers, the court may, by way of a reasoned ruling, declare them jointly and severally liable."

---

6.   Non-binding translation from French, available at www.legifrance.gouv.fr.

98.     NNSA is in Court liquidation proceedings in France.

99.     In order to bring a French law claim against NNI for acts of mismanagement pursuant to Article L651-2 of the French *Code de commerce* it must be established that:

>    a.  NNI acted as a de facto director of NNSA;
>
>    b.  NNI has contributed to management fault; and
>
>    c.  the management fault contributed to the excess of NNSA's liabilities over its assets.

100.    Under French law, a company will be a de facto director of a second company, in circumstances where it is not the de jure director of the second company, if it can be shown that it takes an active and continuous role in the management of the second company while acting independently under its own discretion.

101.    Where a company, acting as a de facto director of a second company, has committed acts or omissions of mismanagement in relation to that second company that are contributing to decisions that are not in the second company's best interests, this will constitute management fault.

102.    Under French law, the management fault must have contributed to a shortfall in the assets of NNSA.  As long as this condition is satisfied, the French Court has the discretion to award up to the total value of the deficit between assets and liabilities.

103.    For the general reasons set out at paragraphs 13 to 33 above, NNI was a de facto director of NNSA.

104.    More specifically, for the reasons set out at paragraphs 16 to 22 above, NNI was a de facto director of NNSA in relation to NNSA's participation in the RPSM, by virtue

of the fact that NNI was involved in all decision making in relation to the transfer pricing arrangements.

105.    In its capacity as a de facto director of NNSA, NNI is liable for acts (or omissions) of mismanagement which were detrimental or prejudicial to the interests of NNSA.

106.    More specifically, for the reasons explained in paragraphs 54 to 69 above, NNI committed acts (or omissions) of mismanagement in relation to NNSA's participation in the RPSM by virtue of the fact that the entry into and subsequent operation of the RPSM was clearly not in NNSA's best interests.    As such, NNI committed management fault in failing to ensure that NNSA received an arm's length return under the RPSM.

107.    These acts of mismanagement or management fault caused and/or contributed substantially to the excess of liabilities over assets in NNSA.    Had NNI not committed these acts of mismanagement or management fault, NNSA would have received a far better return from the Nortel Group's transfer pricing policy, and there would have been no excess of liabilities over assets in NNSA, or alternatively such excess would have been substantially lower.

108.    In these circumstances, the Liquidator of NNSA is entitled to bring proceedings in Versailles, France to hold NNI liable for up to the entire shortfall in the assets of NNSA, that is the amount by which the liabilities of NNSA exceed its asset, on the basis that NNI's acts of mismanagement contributed to such shortfall, as indeed they did.

109.    As the insolvency proceedings in relation to NNSA are ongoing, the precise value of that shortfall is not yet known.    The current overall estimated liabilities of NNSA in the context of these French liquidation proceedings amount to €2,721,466,000.00 or

US\$3,597,778,052.00[7] (subject to subsequent adjustments). This includes a claim of

€2,413,793,000.00 filed jointly on behalf of the Trustee of the NNSA Pension Plan and the UK

Pension Protection Fund, albeit that this claim has been wholly contested by the French

Liquidator and is the subject of proceedings pending before the French Court. If the assets

recovered on behalf of NNSA (including its share of the sale proceeds out of the "lockbox") are

insufficient to cover NNSA's liabilities, NNSA can recover up to the difference on the basis of

the claim brought in France under article L651-2 of the French *Code de commerce*.

110.    The Liquidator of NNSA is also entitled to claim interest on the sum

awarded in accordance with French law.

**Claim 3 - Claim in tort relating to transfer pricing under French law**

111.    Article 1382 of the French Civil Code, provides[8]:

> "Any act whatever of man, which causes damage to another,
> obliges the one by whose fault it occurred, to compensate it."

112.    In order to bring a French law claim against NNI pursuant to Article 1382

of the French Civil Code it must be established that:

a.    There is a fault / negligence committed by NNI;

b.    NNSA has suffered a loss; and

c.    There is a causal relationship between both.

113.    The fault / negligence may result from an act or an omission which

breaches the law or a customary rule. Without prejudice to the generality of the preceding

sentence, where a company is found to have acted together or conspired with a second company

or other individual, and/or aided, abetted, assisted and/or encouraged that second company or

---

7.    Based on the Euro to US\$ mid-range spot rate of exchange published in *The Wall Street Journal* as at 4:00 p.m. on 14 January 2009.

8.    Non-binding translation from French, accessible at official website www.legifrance.gouv.fr.

other individual, to commit some wrong that causes loss to a third party, that first company may

be guilty of a fault / negligence for the purposes of Article 1382 of the French Civil Code.

114.    Without prejudice to the generality of the previous paragraph, for the

reasons stated in paragraphs 16 to 22 above, NNI acted together or conspired with NNL (or

alternatively NNSA's de jure directors), and/or aided, abetted, assisted and/or encouraged NNL

(or alternatively NNSA's de jure directors), to make important strategic decisions and

undertaking acts regarding NNSA, including in relation to the imposition of the RPSM model on

NNSA, the operation of the RPSM in relation to NNSA and the imposition of the MRDA upon

NNSA without the prior approval of the NNSA Board, which approval was required under

French law.  NNL's actions (or alternatively those of NNSA's de jure directors) in this regard

constituted one or more of the following wrongs that caused loss to NNSA:

    a.  An act of mismanagement or management fault (in NNL's case

        committed in circumstances where NNL was a de facto director of

        NNI), which contributed to the shortfall in NNSA's assets and which is

        actionable under Article L651-2 of the French *Code de commerce*;

    b.  A fault / negligence causing NNSA loss that is itself actionable under

        Article 1382 of the French Civil Code;

    c.  A breach of contractual obligations owed to NNSA, in NNL's case

        including, but not limited to, its obligations under the MRDA to ensure

        that NNSA received proper arm's length value under the RPSM to

        reward NNSA in respect of the functions that it performed; and/or

      d.  Some other breach of law (French or otherwise), of NNL's duties or

          obligations (or alternatively those of NNSA's de jure directors) and/or

          of a customary rule.

      115.    By so acting together or conspiring with NNL, and/or by so aiding,

abetting, assisting and/or encouraging the actions of NNL, NNI itself committed a fault /

negligence within the meaning of Article 1382 of the French Civil Code.

      116.    For the reasons stated in paragraphs 54 to 69 above, the fault / negligence

committed by NNI caused NNSA to suffer significant loss and/or damage in the amount of at

least US$433,300,000.00.  Had NNI not committed the fault / negligence, the detriment caused

to NNSA by the imposition and/or operation of the RPSM would not have occurred or,

alternatively, would have been lower.

      117.    As a result, NNSA is entitled to at least US$433,300,000.00 from NNI.

**Claim 4 - Aiding and Abetting Breach of Fiduciary Duty or Tortious Conduct Under State
Law**

      118.    To recover for aiding and abetting breach of fiduciary duty or a tortious

act under the law of Delaware, Texas or any other state whose law might arguably apply, a party

must plead and prove:

      a.  the existence of a fiduciary relationship;

      b.  that the fiduciary breached its duty to the plaintiff;

      c.  that the defendant, who is a non-fiduciary, knowingly participated in

          the breach with knowledge that the conduct advocated or assisted

          constituted such a breach; and

      d.  that damages resulted from the concerted action of the fiduciary and

          non-fiduciary.

119.    As regards the breach of fiduciary duty in question, under French law NNSA's directors (de jure and, in the case of NNL[9], de facto) owed fiduciary duties towards NNSA, including but not limited to the following:

    a.  A duty of loyalty towards NNSA;

    b.  A duty not to compete with NNSA and to avoid conflicts of interest;

    c.  A duty to comply with the applicable laws and regulations and with the company's articles of association; and

    d.  A duty to behave diligently in carrying out their functions in the company.

120.    For the reasons described-in paragraphs 54 to 69 above, it is clear that, in bringing about and allowing NNSA's participation in the RPSM and MRDA and the steps taken in the implementation of the same, the directors of NNSA (both de jure and, in the case of NNL, de facto) breached their duties as the implementation and operation of the RPSM and MRDA were not in NNSA's best interests.

121.    Those breaches of duty caused NNSA to suffer significant damage and/or loss in an amount to be established at trial but in any event no less than US$433,300,000.00.

122.    NNI, through the involvement of its personnel in the design, implementation and operation of the MRDA and RPSM (as described in paragraphs 16 to 22 above), advocated or assisted the conduct by NNSA's directors (both de jure and, in the case of NNL, de facto) which led to the breaches of fiduciary duties.

---

9. In this context NNL maintained a high degree of control over NNSA and its affairs (including the transactions referred to in this Trider) and at all material times assumed and exercised the functions of a director in respect of NNSA's affairs. Further or alternatively NNL was a person in accordance with whose instructions the de jure directors of NNSA were accustomed to act. In all the circumstances NNL was at all material times a de facto, further or alternatively shadow director of NNSA. In any event, by reason of the controlling function it assumed in relation to the transactions that are the subject of this Rider, NNL assumed fiduciary duties in respect of those transactions.

123.    As such, NNSA is entitled to recover at least US$433,300,000.00 from NNI.

**Claim 5 - Civil Conspiracy under State Law**

124.    To recover for civil conspiracy under the law of Delaware, Texas or any other state whose law might arguably apply, a party must plead and prove:

> a.  the existence of a confederation or combination of two or more persons, including the defendant;
>
> b.  the existence of an object to be accomplished;
>
> c.  there was a meeting of the minds on the object or course of action;
>
> d.  that a tortious or unlawful act was done in furtherance of the conspiracy; and
>
> e.  actual damages.

125.    In relation to the Nortel transfer pricing arrangements, NNI and NNL, alternatively NNI, NNL and NNSA's de jure directors, or alternatively NNI and the de jure directors of NNSA, acted together by implementing and operating the RPSM and MRDA with the objective of removing value from NNSA and in a manner which, as NNI, NNL and NNSA's de jure directors were aware, operated contrary to NNSA's interests in a way that caused NNSA's directors (who also included NNL, which was itself a de facto director of NNSA) to breach their fiduciary duties, as set out in paragraph 119 above, and/or to commit tortious breaches of the provisions of the French Civil Code and Code de Commerce, as set out in paragraphs 111 to 113 and 97 to 102 above.  The conduct of NNI and NNL, alternatively NNI, NNL and NNSA's de jure directors, alternatively NNI and NNSA's de jure directors, amounted to a civil conspiracy to injure NNSA through the improper operation of the MRDA and RPSM and the breaches of duty by NNSA's directors (both de jure and, in the case of NNL, de facto) inherent in such operation.

35

126.    This caused significant loss and/or damage to NNSA in an amount to be established at trial but in any event no less than US$433,300,000.00.

## III.    CLAIMS BASED ON THE FEBRUARY 2008 REPAYMENT

**Claim 6 - Mismanagement claim relating to the February 2008 Repayment against NNI as a De Facto Director under French Law**

127.    The elements of a claim for mismanagement under Article L651-2 of the French Code de commerce are set out in 97 to 102 above.

128.    For the reasons set out at paragraphs 13 to 33 above, NNI was a de facto director of NNSA.

129.    In its capacity as a de facto director of NNSA, NNI is liable for any acts (or omissions) of mismanagement which were detrimental or prejudicial to the interests of NNSA.

130.    More specifically, for the reasons explained in paragraphs 70 to 79 above, NNI committed acts (or omissions) of mismanagement in relation to the planning and implementation of Project Swift and, in particular, the February 2008 Repayment by NNSA of the 2002 Subordinated Loan by virtue of the fact that the February 2008 Repayment was clearly not in NNSA's best interests.

131.    These acts of mismanagement or management fault caused and/or contributed to the excess of liabilities over assets in NNSA.  Had NNI not committed these acts of mismanagement or management fault, NNSA would not have made the February 2008 Repayment, and the excess of liabilities over assets in NNSA would have been lower.

132.    In these circumstances, the Liquidator of NNSA is entitled to bring proceedings in Versailles, France to hold NNI liable for up to the entire shortfall in the assets of

NNSA, that is the amount by which the liabilities of NNSA exceed its asset, on the basis that

NNI's acts of mismanagement contributed to such shortfall, as indeed they did.

133.    NNSA repeats paragraph 109 above.

134.    The Liquidator of NNSA is also entitled to claim interest on the sum

awarded in accordance with French law.

**Claim 7 - Claim in tort relating to the February 2008 Repayment under French law**

135.    The elements of a tort claim under Article 1382 of the French Civil Code

are set out in paragraphs 111 to 113 above.

136.    Without prejudice to the generality of the previous paragraph, for the

reasons stated in paragraphs 23 to 27 and 70 to 79 above, NNI acted together or conspired with

NNL (or alternatively NNSA's de jure directors), and/or aided, abetted, assisted and/or

encouraged NNL (or alternatively NNSA's de jure directors), to plan and implement Project

Swift and, in particular, to cause NNSA to make the February 2008 Repayment of the 2002

Subordinated Loan to NNL, which repayment was clearly not in NNSA's best interests.  NNL's

actions (or alternatively those of NNSA's de jure directors) in this regard constituted one or more

of the following wrongs that caused loss to NNSA:

> a.  An act of mismanagement or management fault (in NNL's case
>
>     committed in circumstances where NNL was a de facto director of
>
>     NNI), which contributed to the shortfall in NNSA's assets and which is
>
>     actionable under Article L651-2 of the French *Code de commerce*;
>
> b.  A fault / negligence causing NNSA loss that is itself actionable under
>
>     Article 1382 of the French Civil Code;

    c.  Some other breach of law (French or otherwise), of NNL's duties or

        obligations (or alternatively those of NNSA's de jure directors) and/or

        of a customary rule.

137.    By so acting together or conspiring with NNL (or alternatively NNSA's de

jure directors), and/or by so aiding, abetting, assisting and/or encouraging the actions of NNL (or

alternatively NNSA's de jure directors), NNI itself committed a fault / negligence within the

meaning of Article 1382 of the French Civil Code.

138.    For the reasons stated in paragraphs 76 to 79 above, that fault / negligence

caused NNSA to suffer significant loss and/or damage in the amount of at least

US$33,050,000.00.  Had NNI not committed the fault / negligence, NNSA would not have made

the February 2008 Repayment, and its losses for the year ended 31 December 2008 would

therefore have been lower.

139.    As a result, NNSA is entitled to recover at least US$33,050,000.00 from

NNI.

**Claim 8 - Aiding and Abetting Breach of Fiduciary Duty or Tortious Conduct Under State Law**

140.    The elements of the aiding and abetting a breach of fiduciary duty cause of

action under the law of Delaware, Texas or any other state whose law might arguably apply, are

set out in paragraph 118 above.

141.    NNSA's directors (either de jure or, in the case of NNL, de facto) owed

NNSA fiduciary duties as set out in paragraph 119 above above.

142.    For the reasons described in paragraphs 70 to 79 above, it is clear that the

February 2008 Repayment was not in NNSA's interests and that, accordingly, the directors of

NNSA (both de jure and, in the case of NNL, de facto) breached their duties by allowing NNSA to make the February 2008 Repayment.

143.    That breach of duty caused NNSA to suffer damage and/or loss in an amount to be established at trial but in any event no less than US$33,050,000.00.

144.    NNI, through the involvement of its personnel in the planning and implementation of Project Swift and, in particular, the February 2008 Repayment (as described in paragraphs 70 to 79 above), advocated or assisted the conduct by NNSA's directors (both de jure and, in the case of NNL, de facto) which led to the breaches of fiduciary duties.

145.    As such, NNSA is entitled to recover at least US$33,050,000.00 from NNI.

**Claim 9 - Civil Conspiracy under State Law**

146.    The elements of the Civil Conspiracy cause of action under the law of Delaware, Texas or any other state whose law might arguably apply are set out in paragraph 124 above.

147.    NNI and NNL, alternatively NNI, NNL and NNSA's de jure directors, or alternatively NNI and the de jure directors of NNSA, acted together by planning and implementing Project Swift and, in particular, the February 2008 Repayment, which, as NNI, NNL and NNSA's de jure directors were aware, was contrary to NNSA's interests in a way that caused NNSA's directors (de jure and/or de facto) to breach their fiduciary duties, as set out in paragraph 119 above, and/or to commit tortious breaches of the provisions of the French Civil Code and Code de Commerce, as set out in paragraphs 111 to 113 and 97 to 102 above.  The conduct of NNI and NNL, alternatively NNI, NNL and NNSA's de jure directors, alternatively NNI and NNSA's de jure directors, amounted to a civil conspiracy to injure NNSA, including the

improper repayment of the 2002 Subordinated Loan and the breaches of duty by NNSA's directors (both de jure and, in the case of NNL, de facto) inherent in such repayment.

148.    This caused loss and/or damage to NNSA in an amount to be established at trial but in any event no less than US$33,050,000.00.

## IV.    CLAIMS IN RESPECT OF PAST DISPOSITIONS OF BUSINESS

149.    To the extent that NNSA did not receive from any pre-petition business sale, a fair and appropriate allocation of the proceeds for the assets it has sold ("Pre-Petition Sale Proceeds"), based on the arm's length principle, NNSA has various claims: which will be further particularized following discovery. These claims include:

**Claim 10 – Contract Claim – Implied contract**

150.    Given that the requirements of law and international accounting principles dictate that the Pre-Petition Sale Proceeds must be allocated on an arm's length basis as between the selling Nortel entities and pursuant to the agreement as between the selling Nortel entities that such a fair allocation would be applied, there was an implied contract as between the selling Nortel entities that the Pre-Petition Sale Proceeds would be distributed as amongst them in accordance with the arm's length principle.

151.    In the circumstances, the Pre-Petition Sale Proceeds were not distributed on an arm's length basis, to the detriment of NNSA. NNI's participation in the decision making in relation to the allocation of sale proceeds is explained above in paragraphs 80 to 83. NNI's involvement in this regard constituted a breach of the implied contract fairly to allocate the Pre-Petition Sale Proceeds by NNI.

**Claim 11 - Contractual claim – Implied Term**

152.    NNSA asserts a claim under the relevant sale contracts pursuant to the governing law applicable to the sale contracts that NNSA would receive a fair and appropriate

allocation, based on the arm's length principles, of the Pre-Petition Sale Proceeds as explained above in paragraphs 80 to 83.

**Claim 12 – Mistake**

153.    Alternatively, NNSA did not receive a fair allocation of the Pre-Petition Sale Proceeds due to a mistake (either of fact or law) as to the full extent of NNSA's entitlement. As a consequence of this mistake, NNI received considerably more from the allocation than it was intended to receive.  NNI is therefore obliged to repay the overpayment to NNSA.

**Claim 13 – Mismanagement claim against NNI as a De Facto Director under French Law**

154.    The elements of a claim for mismanagement under Article L651-2 of the French *Code de commerce* are set out in paragraphs 97 to 102 above.

155.    For the reasons set out at paragraphs 13 to 33 above, NNI was a de facto director of NNSA.

156.    In its capacity as a de facto director of NNSA, NNI is liable for any acts (or omissions) of mismanagement which were detrimental or prejudicial to the interests of NNSA.

157.    More specifically, for the reasons explained in paragraphs 80 to 83 above, NNI committed acts (or omissions) of mismanagement in relation to NNI's involvement and participation (together with NNL) causing and/or allowing NNSA to enter into pre-petition sales and/or to receive an allocation of the Pre-Petition Sale Proceeds in respect of which NNSA did not receive a proper allocation of the appropriate value.

158.    These acts of mismanagement or management fault caused and/or contributed to the excess of liabilities over assets in NNSA.  Had NNI not committed these acts of mismanagement or management fault, NNSA's excess of liabilities over assets in NNSA would have been lower.

159.    In these circumstances, the Liquidator of NNSA is entitled to bring proceedings in Versailles, France to hold NNI liable for up to the entire shortfall in the assets of NNSA, that is the amount by which the liabilities of NNSA exceed its asset, on the basis that NNI's acts of mismanagement contributed to such shortfall, as indeed they did.

160.    NNSA repeats paragraph 109 above.

161.    The Liquidator of NNSA is also entitled to claim interest on the sum awarded in accordance with French law.

**Claim 14 – Claim in tort under French law**

162.    The elements of a tort claim under Article 1382 of the French Civil Code are set out in paragraphs 111 to 113 above.

163.    Without prejudice to the generality of the previous paragraph, for the reasons stated in paragraphs 80 to 83 above, NNI acted together or conspired with NNL (or alternatively NNSA's de jure directors), and/or aided, abetted, assisted and/or encouraged NNL (or alternatively NNSA's de jure directors), to cause a loss to NNSA by causing and/or allowing NNSA to enter into pre-petition sales and/or to receive an allocation of the Pre-Petition Sale Proceeds in respect of which NNSA did not receive a proper allocation of the appropriate value. NNL's actions (or alternatively those of NNSA's de jure directors) in this regard constituted one or more of the following wrongs that caused loss to NNSA:

  a. An act of mismanagement or management fault (in NNL's case committed in circumstances where NNL was a de facto director of NNI), which contributed to the shortfall in NNSA's assets and which is actionable under Article L651-2 of the French *Code de commerce*;

  b. A fault / negligence causing NNSA loss that is itself actionable under Article 1382 of the French Civil Code;

c.  Some other breach of law (French or otherwise), of NNL's duties or

obligations (or alternatively those of NNSA's de jure directors) and/or

of a customary rule.

164.    By so acting together or conspiring with NNL (or alternatively NNSA's de

jure directors), and/or by so aiding, abetting, assisting and/or encouraging the actions of NNL (or

alternatively NNSA's de jure directors), NNI itself committed a fault / negligence within the

meaning of Article 1382 of the French Civil Code.

165.    For the reasons stated in paragraphs 80 to 83 above, that fault / negligence.

caused NNSA to suffer loss, and is therefore entitled to recover losses in an amount to be

determined at trial.

## Claim 15 – Aiding and Abetting Breach of Fiduciary Duty or a tortious act under State Law

166.    The elements of the aiding and abetting a breach of fiduciary duty cause of

action the law of Delaware, Texas or any other state whose law might arguably apply, are set out

in paragraph 118 above.

167.    NNSA's directors (either de jure or, in the case of NNL, de facto) owed

NNSA fiduciary duties as set out in paragraph 119 above.

168.    For the reasons described in paragraphs 80 to 83 above, it was manifestly

not in NNSA's interests for NNSA to enter into sales in respect of which NNSA did not receive a

proper allocation of the sale proceeds.  The directors of NNSA breached their duties by causing

and/or allowing NNSA to enter into pre-petition sales and/or to receive an allocation of the Pre-

Petition Sale Proceeds in respect of which NNSA did not receive a proper allocation of the

appropriate value.

169.    NNI, through the involvement of its directors, officers and senior employees, as explained in paragraphs 80 to 83 above, advocated or assisted the conduct by NNSA's directors (either de jure or, in the case of NNL, de facto) which led to these breaches.

170.    As such, NNSA is entitled to recover losses in an amount to be determined at trial.

## V.    TAXATION MATTERS

171.    As explained in paragraphs 84 to 85 above, at all material times, NNI (together with NNL) controlled NNSA's tax affairs.

172.    In such circumstances, by causing and/or allowing NNI and NNL such control NNSA's directors (including its de facto and/or shadow directors) will have breached the fiduciary duties (set out in paragraph 119) and/or any other duties that they owe and/or committed tortious breaches of the provisions of the French Civil Code and *Code de Commerce* (as set out in paragraphs 111 to 113 and 97 to 102 above).

173.    To the extent that NNSA suffers loss as a result of a claim by a tax authority and or the imposition of any form of penalty in relation to its tax affairs NNSA claims against NNI in respect of any losses, penalties and interest which it has suffered (or will suffer) on the below bases.

### Claim 16 – Mismanagement claim against NNI as a De Facto Director under French Law

174.    NNSA asserts a claim under Article L651-2 of the French *Code de Commerce* (outlined above at paragraphs 97 to 102) for acts of mismanagement or management fault, committed by NNI in its capacity as a de facto director of NNSA (as to which see paragraphs 13 to 33 above), and contributing to the excess of liabilities over assets in NNSA, by virtue of NNI's involvement and participation (together with NNL) in controlling NNSA's tax affairs (as explained in paragraphs 84 to 85 above).

**Claim 17 – Claim in tort under French law**

175.    NNSA asserts a claim under Article 1382 of the French Civil Code (outlined above at paragraphs 111 to 113) in respect of NNI's fault by acting together or conspiring with NNL (or alternatively NNSA's de jure directors), and/or aiding, abetting, assisting and/or encouraging NNL (or alternatively NNSA's de jure directors), which caused a loss to NNSA by controlling NNSA's tax affairs and thereby harming NNSA's interests (as explained in paragraphs 84 to 85 above).

**Claim 18 – Aiding and abetting under State Law**

176.    NNSA asserts a claim under Delaware law or other applicable state law in respect of NNI aiding and abetting the breaches of duty set out in paragraph 172 above, by virtue of NNI's involvement and participation (together with NNL, alternatively NNSA's de jure directors) in controlling NNSA's tax affairs (as explained in paragraphs 84 to 85 above).

**VI.    CLAIMS IN RESPECT OF FSD LIABILITY**

177.    As described in paragraphs 86 to 92, at the present time, it is not yet known:

> a.    whether any one or more of the EMEA Targets will ultimately be required pursuant to an FSD or CN to make a payment or series of payments to the trustee of the Scheme ("the Trustee") or otherwise provide financial support for the Scheme;
>
> b.    whether NNI will ultimately be required pursuant to an FSD or CN to make a payment or series of payments to the Trustee or otherwise provide financial support for the Scheme; or
>
> c.    if one or more of the EMEA Targets and NNI are ultimately required pursuant to an FSD or CN to make a payment or series of payments to

the Trustee or otherwise provide financial support for the Scheme,

what the relationship between their respective obligations will be.

178.    However, in the event that NNSA is ultimately required pursuant to an

FSD or CN to make a payment or series of payments to the Trustee or otherwise provide

financial support for the Scheme, NNSA has the following claims against NNI which it hereby

asserts, the quantum of which is not capable of determination at the present time:

**Claim 19.    Contribution**

179.    NNSA asserts a claim under French law, or alternatively as a matter of US

law, to recover a contribution from NNI, including without limitation under French and US

statute and/or by reason of breaches of the duties owed by NNI to NNSA referred to elsewhere in

this Proof of Claim.

180.    In this respect it is just and equitable for NNSA to recover from NNI

having regard to the extent of NNI's responsibility for the damage in question.

**Claim 20.    Claims against NNI on the basis of recoupment, contribution and or unjust
enrichment**

181.    NNSA asserts a Claim for recoupment or contribution against NNI arising

under French law, or alternatively under US law, on the basis that NNSA will have been required

by compulsion of law to satisfy in whole or in part an obligation owed by NNI to the Trustee,

and NNI will therefore have been unjustly enriched at the expense of NNSA.

**Claim 21.    Subrogation**

182.    NNSA asserts a Claim under French law, or alternatively under US law, to

be subrogated in whole or in part to any claim which the Trustee would otherwise have had

against NNI pursuant to an FSD or CN or otherwise.

**Claim 22.**      **Obligation to repay**

183.    NNSA asserts a claim against NNI on the basis that it is otherwise obliged under French or alternatively US law to repay that obligation in whole or in part.  Full particulars of such claim are subject to the circumstances leading to NNSA's obligation.

## VI.    FUTURE AND CONTINGENT RIGHTS

184.    In the event that a claim is made by any third party whatsoever or intimated against NNSA after the bar date (whether on the basis of matters currently known or unknown, and whensoever occurring), NNSA will assert and hereby asserts all claims it has (or may have), all rights of contribution and indemnity under whatever applicable law against NNI. NNSA's position is that such claims are not subject to this bar date but for completeness and the avoidance of doubt hereby includes all claims, rights to contribution or indemnity in respect of all claims, liabilities, costs and expenses from any person or persons, whensoever occurring and whether arising before or after the bar date, to the fullest extent possible and without limitation. NNSA reserves the right to further identify, particularize and modify all its entitlements in this respect in due course.

185.    NNSA further claims in respect of any future, prospective or contingent claims against NNI that NNSA or any office-holder or future office-holder may have.  NNSA reserves the right to advance any prospective, contingent or future claims which may arise or become crystallized at any time hereafter.

## VII.    PROPRIETARY CLAIMS

186.    If and to the extent that (a) NNI has obtained or derived any property or profit by reason of the breaches of duty or other improper conduct identified above, (b) any of NNSA's property has come into NNI's hands by reason of the breaches of fiduciary duty by

NNSA's other directors identified above, (c) any profit or gain made by any such directors by reason of such breaches has come into NNI's hands, NNSA hereby asserts a proprietary claim to the same, and reserves the right to seek turnover and restitution of all such property or profits and/or accounting for the same pursuant to a separate proceeding under Section 541 of the Bankruptcy Code.  NNSA reserves its rights in respect of all liens to which it may be entitled in connection with the same.

**RELIEF REQUESTED**

WHEREFORE, NNSA claims the following relief:

187.    All equitable, common law, civil law, statutory and other remedies available under the applicable laws of any jurisdiction including, but not limited to, damages, equitable compensation, an equitable account of profits, restitution and/or any other recovery in respect of the matters the subject of:

a.   Claim 1 relating to intercompany debts in an amount to be determined at trial but in any event no less than US $7,050,776.91.

b.   Claims 3, 4 and 5 relating to transfer pricing losses in an amount to be determined at trial but in any event no less than US $433,300,000.00.

c.   Claims 7, 8 and 9 relating to the February 2008 Repayment to be determined at trial but in any event no less than US $33,050,000.00.

d.   Claims 10, 11, 12, 14 and 15 relating to past dispositions of business in an amount to be determined at trial.

e.   Claims 16, 17 and 18 relating to taxation matters in an amount to be determined at trial.

      f.   Claims 19, 20, 21 and 22 relating to FSD liability in an amount to be

          determined at trial.

    188.   Payment of a sum equal to up to the entire shortfall in the assets of NNSA

based on the acts of mismanagement committed by NNI as a de facto director of NNSA

described in the following claims:

      a.   Claim 2 relating to transfer pricing.

      b.   Claim 6 relating to the February 2008 Repayment.

      c.   Claim 13 relating to past dispositions of business.

      d.   Claim 17 relating to taxation matters.

    189.   Pre- and post- judgment interest on these amounts; and

    190.   An accounting for, and restitution of, the identifiable or traceable sums, or

substitutes of the above amounts, that are held on trust for and on behalf of NNSA.

## RESERVATIONS

**A.    Reservation regarding jurisdiction, applicable law and forum**

    191.   In so far as liability or quantum in respect of any claim identified in this

Rider is disputed, neither the filing of the claim nor anything in its content is to be taken as

acceptance that the Delaware Bankruptcy Court (or any other US Court) is the appropriate forum

for litigating such dispute or that it has jurisdiction (or should exercise any jurisdiction) to

determine the merits of the same.  In the event that such a dispute arises, NNSA reserves the

right to contend in respect of any of its claim that the relevant jurisdiction and appropriate forum

for litigating such dispute is a different or foreign forum (and in particular the French Tribunal de

commerce de Versailles or another French Court) and to seek a stay of the proceedings in the

49

Delaware Bankruptcy Court pending resolution of the substantive dispute in the appropriate forum.

192.    For the avoidance of doubt, all claims and disputes with regard to the allocation of the "Lockboxes" are to be determined in accordance with the dispute resolution mechanisms to be set up pursuant to the IFSA Allocation Process and nothing herein shall be considered a waiver of NNSA's right to have allocation disputes determined by the dispute resolver appointed under the IFSA.

193.    In so far as this Claim refers to any/or includes claims which may be brought by any office-holder of NNSA pursuant to any applicable law:

a.    Such reference and/or inclusion is not to be taken as acceptance that such claim is or has been a claim subject to the bar date.

b.    Such claim is to be read together with any proof of claim (or other process) submitted or commenced by any appropriate office-holder (as to which NNSA accepts that there should be no double-counting).

194.    In so far as this Claim identifies a foreign law as being applicable to the claim, NNSA's primary case is that this is the law that should be applied.  In so far as this Claim is silent as to applicable law, this is not to be taken as acceptance that US law is, or is necessarily, the applicable law, and in any case NNSA reserves the right further to identify appropriate foreign law, and in particular French law, as being the law applicable to its claims.

**B.    Reservation in respect of claims from NNI and alleged set-off**

195.    Nothing in this Claim is to be taken as acceptance that any claim from NNI against NNSA exists, is valid or is eligible for set off against any of NNSA's claims. Further nothing in this Claim is to be taken as acceptance that the appropriate forum or proper jurisdiction for considering any claim by NNI against NNSA is the Delaware Bankruptcy Court

(or any other US Court) (or the proof of claims process in the US), whether in the context of an allegation that such claim has been or should be the subject of a set off against any claim by NNSA or otherwise.

**C.      Reservation in respect of proprietary claims**

196.   NNSA's proprietary claims constitute claims and rights which fall outside the proof of claims process, being claims in respect of property which NNI does not own.

197.   As such, NNSA's proprietary claims are included in this Rider subject to the same general reservations in this proof without prejudice to NNSA's rights to claim this property in other proceedings or processes and to asserts its rights to seize this property without reference to the Delaware Bankruptcy Court proceedings (or those of any other US Court).

198.   For the avoidance of doubt all references herein to NNSA's proprietary claims are to be read as including a personal claim against NNI for the amount of the claims and for interest thereon to the extent that those proprietary claims are not fully satisfied out of the assets to which they attach.

**D.      Reservation in respect of claims against other parties**

199.   For the avoidance of doubt, all claims and allegations made against NNI made in this Rider are made without prejudice to all claims and allegations that NNSA has made or may make in this proof of claims process or otherwise against any other person (including NNC, NNL, and any present or former officer of NNSA, NNL, or any other natural or corporate person whomsoever).

**E.      General Reservation of Rights**

200.   The execution and filing of the Claim are not (i) a waiver or release of any of the rights against any entity or person liable for all or part of the Claim held by the Joint Administrators, the Liquidator or NNSA; (ii) a waiver of the right to withdraw the reference with

respect to the subject matter of the Claim, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the Joint Administrators, the Liquidator or NNSA; (iii) an election of a remedy which waives or otherwise affects any other remedy; or (iv) a waiver or release of any rights against any third party on behalf of the Joint Administrators, the Liquidator or NNSA.

      201.   The Joint Administrators, the Liquidator and NNSA expressly reserve their rights to further amend or supplement the Rider in any respect. The Joint Administrators, the Liquidator and NNSA expressly reserve their rights to alter, add to or otherwise amend the facts relied on in support of the claims identified in this Claim and the nature and/or quantum of the claims, including as a result of documentary and other information obtained from NNI (or others) and to the extent that expert evidence may be required in order to establish quantum.

## MISCELLANEOUS

      202.   <u>Supporting Documents</u>:  The writings upon which this Claim is based are in the possession of NNI, the Canadian Entities, the US and Canadian creditor committees and the Canadian Monitor and include, without limitation, the MRDA and the other agreements referred to herein. Such documents, will be made available to other interested parties, upon request, under an appropriate confidentiality order.

      203.   <u>Notice</u>. All notices to the claimants concerning the Claim should be sent to:

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Attention: Edwin J. Harron
(302) 571-6600

Herbert Smith LLP
Exchange House
Primrose Street
London  EC2A 2HS
UNITED KINGDOM
Attention: Kevin Lloyd/Stephen Gale
+44-20-7374-8000

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004
Attention: Michael Luskin
(212) 837-6000

FTPA
1 Bis, Avenue Foch
75116
Paris
France
Attention: Edouard Fabre and Rajeev Sharma
Fokeer
+33-1-4500-8620

204.    Protective Filing/Amendments.  The Claim is filed to amend the Original

Proof of Claim to provide a more particularized statement of NNSA's claims as required by the

Order, and is filed to protect the Joint Administrators, the Liquidator, NNSA, and the EMEA

Companies from forfeiture of their claims.

**H
A
N
D**

**D
E
L
I
V
E
R
Y**

_Jacqu_

RECEIVED BY:

6/3/11
DATE

3:30 pm
TIME