**Exhibit B**

**Supplemental IP Transaction Side Agreement re Certain Transaction Costs and Related Matters**

Execution Version

# SUPPLEMENTAL IP TRANSACTION SIDE AGREEMENT re CERTAIN TRANSACTION COSTS AND RELATED MATTERS

This agreement dated as of July 27, 2011 (the "**Agreement**") by and among (i) Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"); (ii) Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"); (iii) Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**"); (iv) the entities listed in Exhibit A hereto (the "**EMEA Sellers**"), which, in the case of Nortel Networks UK Limited (in administration) ("**NNUK**"), Nortel Networks France S.A.S. (in administration) and Nortel GmbH (in administration) are acting by Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP (the "**UK Joint Administrators**") and in the case of Nortel Networks (Ireland) Limited (in administration) is acting by David Hughes of Ernst & Young Chartered Accountants and Alan Robert Bloom (the "**Irish Joint Administrators**") (the UK Joint Administrators and the Irish Joint Administrators being collectively, the "**Joint Administrators**"), and in the case of Nortel Networks S.A. (in administration and *liquidation judiciaire*) ("**NNSA**") is acting by the UK Joint Administrators and Maître Cosme Rogeau, 26 avenue Hoche, 78000 VERSAILLES appointed as *mandataire liquidateur* by the French Court (as defined below) (the "**French Liquidator**"), the Joint Administrators act as agents of the EMEA Sellers without any personal liability and the French Liquidator acts as agent of NNSA without any personal liability; (v) the entities listed in Exhibit B hereto; (vi) the French Liquidator; and (vii) the Joint Administrators.

The parties referred to in (i) through (v) are referred to collectively as the "**Nortel Parties**". The parties referred to in (i) through (vii) are referred to collectively as the "**Parties**".

W I T N E S S E T H

WHEREAS, the Parties and Rockstar Bidco, LP (the "**Purchaser**") have entered into that certain Asset Sale Agreement, dated as of June 30, 2011 (as may be amended and/or restated from time to time in accordance with its terms, the "**Sale Agreement**"), whereby the Purchaser (i) will acquire substantially all of the patent portfolio and certain patent-related assets of the Nortel Parties and (ii) may enter into one or more Optioned Licenses with the Nortel Parties in exchange for the Optioned Licenses Fees;

WHEREAS, the Parties, Ranger Inc. ("**Ranger**") and Google Inc. had entered into that certain Asset Sale Agreement, dated as of April 4, 2011 (the "**Stalking Horse Agreement**"), in furtherance of which the Parties, Ranger and Wells Fargo Bank, National Association, as national banking association, as escrow agent (the "**Escrow Agent**") entered into an escrow agreement (the "**Escrow Agreement**") dated as of April 4, 2011;

WHEREAS, after a court-approved auction process, the Parties entered into the Sale Agreement and terminated the Stalking Horse Agreement;

WHEREAS, the Parties entered into that certain IP Transaction Side Agreement on April 4, 2011 (the "**Signing Side Agreement**");

WHEREAS, the Parties entered into that certain Amended and Restated IP Transaction Side Agreement re: Certain Structural Matters on June 29, 2011 (as the same may be amended, modified and/or restated from time to time in accordance with its terms, the "**Auction Side Agreement**");

WHEREAS, the Nortel Parties and certain other parties have entered into, and NNSA has acceded to, that certain agreement to address interim funding and the settlement of certain intercompany matters dated June 9, 2009 (the "**IFSA**"); and

WHEREAS, in accordance with Section 12.b of the IFSA, the Sellers, Ernst & Young Inc. as "**Monitor**" in connection with the CCAA Cases, and the Official Committee of Unsecured Creditors in the Chapter 11 Cases (the "**Committee**") have entered into or will enter into an escrow agreement with the Distribution Agent (the "**Distribution Escrow Agreement**") governing, among other things, the Distribution Agent's collection, holding in escrow in an escrow account at the Distribution Agent (the "**Distribution Escrow Account**") and distribution to the Sellers and any other party deemed to be a Selling Debtor pursuant to the IFSA (in accordance with the Allocation Rules) of the Total Proceeds from the transactions contemplated by the Sale Agreement (the "**Transaction**") and certain other payments to be made by the Purchaser to the Sellers under or in relation to the Sale Agreement.

NOW, THEREFORE, in consideration of the respective covenants made herein, and of the mutual benefits to be derived hereby (the sufficiency of which are acknowledged), the Parties hereto agree as follows:

1.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth below or, if not defined below, the meanings set forth in the Sale Agreement:

    (a) "**Advisor Fees**" means any fees or other amounts paid or payable to (A) the Distribution Agent in accordance with the terms of the Distribution Escrow Agreement, (B) the Escrow Agent (in its capacity as agent for the various escrows contemplated by the Stalking Horse Agreement), and (C) the Accounting Arbitrator appointed in accordance with the Sale Agreement;

    (b) "**Allocation Rules**" means the rules (expressed as percentages or otherwise) to be used to allocate among the Sellers and other parties, as may be applicable, the benefit of the Total Proceeds and the burden of the Total Payments, as such rules shall be agreed upon among the relevant Sellers pursuant to Section 12.d and Section 12.g of the IFSA or shall be otherwise determined in accordance with the binding procedures to be set forth in the Interim Sales Protocol pursuant to Section 12.c of the IFSA;

    (c) "**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List);

    (d) "**Canadian Debtors**" means NNC, NNL and their Canadian affiliates that are subject to proceedings pending before the Canadian Court under the *Companies'*

2

       *Creditors Arrangement Act* (Canada);

(e)   "**Dispute Resolver Retainer**" means any retainer paid or payable to one or more dispute resolvers appointed pursuant to the Interim Sales Protocol to determine Allocation Rules, to the extent related to the Transaction;

(f)   "**Distribution Agent**" means JP Morgan Chase Bank, N.A. or such other Person appointed with the consent of each of NNL, NNI and NNUK, provided that consent to appoint such Person shall not be withheld unreasonably;

(g)   "**Interim Sales Protocol**" has the meaning ascribed to it in the IFSA;

(h)   "**Total Payments**" means the aggregate of all amounts paid or payable by the Sellers in respect of:

    (i)   Advisor Fees;

    (ii)   the Dispute Resolver Retainer;

    (iii)   disbursements necessary to pay Lazard Frères & Co. LLC (and reimburse NNI, as applicable) in connection with fees and expenses reimburseable solely in connection with the Transaction upon such fees and expenses becoming due and payable;[1]

(i)   "**Total Proceeds**" has the meaning ascribed to it in the Auction Side Agreement;

(j)   "**U.S. Court**" means the United States Bankruptcy Court for the District of Delaware; and

(k)   "**U.S. Debtors**" means NNI and its affiliated debtors subject to the jurisdiction of the U.S. Court in proceedings pending under Chapter 11 of the U.S. Bankruptcy Code.

2.   Subject to Paragraphs 3, 4 and 5 of this Agreement and as otherwise provided in the Signing Side Agreement and the Auction Side Agreement, the Parties agree that the Total Proceeds shall be allocated and distributed in accordance with the Allocation Rules, this Agreement and the Distribution Escrow Agreement.

3.   The Parties agree and acknowledge that the Total Proceeds do not include amounts of or in respect of VAT or Transfer Taxes paid or payable by the Purchaser or, if relevant, any of the Purchaser's limited partners to the Sellers, Joint Administrators or French Liquidator pursuant to the terms of the Sale Agreement. The Parties agree that it is not intended that such amounts of VAT or Transfer Taxes will be payable into the

---

[1] For the avoidance of doubt, nothing in this Agreement is meant to supersede, amend or modify the Lazard Fees Side Agreement approved by the U.S. Court in an order dated November 23, 2010 and approved by the Canadian Court in an order dated December 15, 2010.

3

        Distribution Escrow Account but, notwithstanding this Agreement, where such amounts are paid into the Distribution Escrow Account, the Distribution Agent shall be instructed under the procedures in the Distribution Escrow Agreement to promptly pay such amounts to the Sellers, the Joint Administrators or the French Liquidator (as applicable).

4. To the extent that there are funds available in the Distribution Escrow Account that are attributable to the Transaction, the obligation of the Sellers to make any payment that constitutes part of the Total Payments shall be satisfied by causing the Distribution Agent to pay the relevant amount out of the Distribution Escrow Account.

5. To the extent that any payment that constitutes part of the Total Payments cannot be satisfied by payment out of the Distribution Escrow Account or is required to be paid prior to the Closing Date, any such amounts actually paid by any Seller to the Distribution Agent, or any other Person, as applicable, shall be deducted from any subsequent amounts payable or paid into the Distribution Escrow Account and shall be paid directly to such Seller that made the relevant payment.

6. It is acknowledged and agreed that, in determining how to allocate and distribute the Total Proceeds, except for the items constituting Total Payments and the other expenses, damages, liabilities and payouts specifically allocated herein, in the Signing Side Agreement or the Auction Side Agreement, the Parties reserve all rights in respect of expenses, damages, and all other liabilities, incurred in connection with the performance of their obligations under or pursuant to the Sale Agreement and/or the Transaction Documents, and, in particular, whether such expenses, damages and other liabilities should be deducted from the Total Proceeds, or otherwise considered in connection with a distribution to the Sellers.

7. <u>Indemnification of Distribution Agent</u>.  The Sellers agree that the costs of any indemnification of the Distribution Agent pursuant to the Distribution Escrow Agreement shall be borne on a pro rata basis by the Sellers in a proportion equal to the aggregate Total Proceeds allocated to such party and any Seller paying in excess of such pro rata share of the cost of such indemnification shall have rights of contribution vis-à-vis any Seller that has paid less than such pro rata share of such costs either directly to the Distribution Agent or by payment to another Seller pursuant to this sentence; provided that if the costs of any such indemnification arise solely from a breach of the Distribution Escrow Agreement or other fault of a single Seller or Sellers, the Seller(s) so in breach or at fault shall bear the cost of such indemnification and any Seller paying in excess of its share of the cost of such indemnification, after taking into account the breach or fault of the other Seller(s), shall have rights of contribution vis-à-vis any Seller that has paid less than its share of such costs either directly to the Distribution Agent or by payment to another Seller.

8. The Parties agree that the amount necessary to fully reimburse NNL, NNI and NNUK for all Global IP Costs (as defined in the Signing Side Agreement) paid by NNL, NNI and NNUK as of the closing of the Transaction, which amounts equal $2,679,027.74 reimbursable to NNL, $804,676.69 reimbursable to NNI and $893,742.50 reimbursable

to NNUK, shall be deducted from the Total Proceeds payable by the Purchaser at the closing of the Transaction and such amount shall be paid at the closing of the Transaction to NNL, NNI and NNUK, as applicable, to reimburse each for the payment of such Global IP Costs. After the closing of the Transaction, the obligation of any Nortel Debtor (as defined in the Signing Side Agreement) to make a distribution or payment on account of Global IP Costs shall be satisfied by causing the Distribution Escrow Agent to pay the relevant amount out of the Distribution Escrow Account to Global IP (as defined in the Signing Side Agreement). The Parties further agree that should the Transaction fail to be consummated, nothing herein shall prejudice NNL's, NNI's or NNUK's rights to seek reimbursement of the Global IP Costs from the other Nortel Debtors, including any such rights arising under existing agreements.

9. The U.S. Debtors and the Canadian Debtors agree they will seek approval of this Agreement by the U.S. Court and the Canadian Court.

10. The Parties agree that:

   (a) the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Sellers to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations;

   (b) the Joint Administrators are a party to this Agreement: (i) as agents of each of the respective EMEA Sellers of which they are administrators; and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, (2) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (3) enforcing the obligations of the other Parties to this Agreement and (4) subject to paragraph 10(d) hereof, the purposes of the other Parties hereto enforcing the obligations of the Joint Administrators hereunder;

   (c) notwithstanding anything in paragraphs 14 and 15 hereof, any claim, action or proceeding against the Joint Administrators arising from or related to (i) the personal liability of the Joint Administrators, their firm or partners, employees, advisers, representatives or agents, (ii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act, (iii) their appointment as joint administrators of the relevant EMEA Sellers and their remaining as current joint administrators thereof under this Agreement, or (iv) the duties and obligations of the Joint Administrators as administrators of the EMEA Sellers, shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English courts;

5

(d) any breach of this Agreement by the Joint Administrators shall be deemed to be a breach by them in their capacities as administrators of the relevant EMEA Sellers, and, in such a case, each Party hereto shall only have the right to make claims and assert its rights hereunder, against the relevant EMEA Sellers and their respective successors and assigns;

(e) the French Liquidator is entering into this Agreement as agent for NNSA and that none of the French Liquidator, his firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations; and

(f) notwithstanding anything in paragraphs 14 and 15 hereof, any claim, action or proceeding against the French Liquidator arising from or related to (i) the personal liability of the French Liquidator, his firm, partners, employees, advisers, representatives or agents, (ii) his appointment as Mandataire Liquidateur of NNSA, or (iii) the duties and obligations of the French Liquidator as Mandataire Liquidateur of NNSA, shall be governed exclusively by French law and subject to the exclusive jurisdiction of the French courts.

11. No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege. No Party shall be deemed to have waived any provision of this Agreement unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. Except as expressly set out herein, this Agreement, or any provision hereof, may be waived or amended on no less than five (5) days' notice, only by means of a writing signed by all Parties, and approved, in writing, by the Committee and the Monitor.

12. This Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, provided, however, that the Committee shall be a third party beneficiary of this Agreement entitled to take advantage of the benefits of this Agreement to NNI and the other U.S. Debtors.

13. Except as otherwise expressly provided in this Agreement, all covenants and agreements set forth in this Agreement by or on behalf of the Parties will be binding upon and inure to the benefit of the Parties and their respective successors.

14. The Parties agree that this Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New

York or any other jurisdiction provided, however, that subparagraphs 10(a) through (d) hereof shall be governed exclusively by English law and subparagraphs 10(e) and (f) hereof shall be governed exclusively by French law.

15. To the fullest extent permitted by Law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the U.S. Court and the Canadian Court (in a joint hearing conducted under the Cross-Border Insolvency Protocol), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the U.S. Court if such claim, action, or proceeding would solely affect NNI or any of the other U.S. Debtors, the Canadian Court if such claim, action, or proceeding would solely affect NNL or any of the other Canadian Debtors, or the English Court if such claim, action or proceeding would solely affect the EMEA Sellers, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such claim, action or proceeding brought in such a court or any claim that any such claim, action or proceeding brought in such a court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such claim, action or proceeding or any other manner as may be permitted by Law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such claim, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law provided, however, that any claim, action or proceeding set forth in or on the basis of subparagraphs 10(a) through (d) hereof shall be brought exclusively in the English courts and any claim, action or proceeding set forth in or on the basis of subparagraphs 10(e) through (f) hereof shall be brought exclusively in the French courts.

16. EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION OR MATTER CONTEMPLATED HEREBY.  EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH 16.

17. All notices and communications provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified for such Party in the Stalking Horse Agreement, or at such address, to the attention of such other person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party

pursuant to the provisions of this paragraph 17. Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable. A copy of any notice or communication sent pursuant to this paragraph 17 shall also be sent to the Committee: c/o Akin Gump Strauss Hauer & Feld LLP Attention: Fred S. Hodara and Stephen B. Kuhn, Esq. One Bryant Park New York, New York 10036, U.S.A (Facsimile: +1 212 872 1002) and to the Monitor: Ernst & Young Inc., Ernst & Young Tower Attn: Murray A. McDonald, 222 Bay Street, P. O. Box 251, Toronto, Ontario, Canada, M5K 1J7 (Facsimile: +1 416 943 3300).

18. The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument. Facsimile and pdf signatures shall be deemed original signatures.

19. The obligations of NNC and NNL under this Agreement shall be joint and several. The obligations of NNI and the other U.S. Debtors party hereto shall be joint and several. The obligations of the EMEA Sellers under this Agreement shall be joint and several.

20. If any provision, section, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, section or part under other circumstances, and (ii) as for any other jurisdiction, any provision of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement. Upon such determination that any section or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

21. Except for Paragraph 8 hereof, which is intended to supersede Paragraph 10 of the Signing Side Agreement in its entirety, nothing in this Agreement shall supercede the Signing Side Agreement or the Auction Side Agreement, nor act as an amendment or waiver of any of the rights or obligations thereunder.

22. The Parties hereby agree that, except as specifically set forth herein, nothing in this Agreement shall, or be deemed to, determine, ratify, or adopt, or have any impact whatsoever on, the allocation or distribution of proceeds from the Transaction among the Sellers.

**[Signature pages immediately follow]**

Execution Version

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first written above.

**NORTEL NETWORKS CORPORATION**

By: _____
    Name: Anna Ventresca
    Title: General Counsel - Corporate and Corporate Secretary

By: _____
    Name: Clarke E. Glaspell
    Title: Controller

**NORTEL NETWORKS LIMITED**

By: _____
    Name: Anna Ventresca
    Title: General Counsel - Corporate and Corporate Secretary

By: _____
    Name: Clarke E. Glaspell
    Title: Controller

**NORTEL NETWORKS INC.**

By: _____
    Name:
    Title:

**NN APPLICATIONS MANAGEMENT SOLUTIONS INC.**

By: _____
    Name:
    Title:

**NORTEL ALTSYSTEMS, INC.**

By: _____
    Name:
    Title:

**CORETEK, INC.**

By: _____
    Name:
    Title:

**QTERA CORPORATION**

By: _____
    Name:
    Title:

**XROS, INC.**

By: _____
    Name:
    Title:

**SIGNED** for and on behalf of **Nortel Networks UK Limited** (in administration) by Christopher Hill as Joint Administrator (acting as agent and without personal liability) in the presence of:  )  
)  ...................................................
)  Christopher Hill
)
)

Witness signature

...........W. Graham........................  )
Name: WILMA GRAHAM  )
Address:  )
ERNST & YOUNG LLP
1 More London Place
London
SE1 2AF

SIGNED for and on behalf of Nortel )
Networks (Ireland) Limited (in )   ......................................................
administration) by David Hughes as Joint ) David Hughes
Administrator (acting as agent and without )
personal liability) in the presence of: )

Witness signature
..............................................................
Name:    Niamh J Coveney
Address:  c/o Ernst + Young
          Harcourt Street
          Dublin 2

**SIGNED** for and on behalf of **Nortel Networks S.A.** (in administration and *liquidation judiciaire*) by Christopher Hill as Joint Administrator (acting as agent and without personal liability) in the presence of:            )
)
)
)
)            ..................................................
Christopher Hill

Witness signature

..........*W. Graham*..........            )
Name:     WILMA GRAHAM            )
Address:                          )

ERNST & YOUNG LLP
1 More London Place
London
SE1 2AF

SIGNED for and on behalf of **Nortel Networks France S.A.S.** (in administration) ~~by Kerry Trigg acting as~~ ~~authorized representative of~~ Christopher Hill as Joint Administrator (acting as agent and without personal liability) in the presence of:                )
)  ~~Kerry Trigg~~
)  CHRISTOPHER HILL
)

*by* (handwritten)

Witness signature

................ W. Graham ........................  )
Name:       WILMA GRAHAM              )
Address:                                               )

ERNST & YOUNG LLP
1 More London Place
London
SE1 2AF

SIGNED for and on behalf of **Nortel GmbH** (in administration) by Christopher Hill as Joint Administrator (acting as agent and without personal liability) in the presence of:   )
)
)
)
)

.................................................
Christopher Hill

Witness signature

..................W. Graham........................   )
Name: WILMA GRAHAM   )
Address:   )
1 More London Place
London
SE1 2AF

**SIGNED** by Alan Bloom )  ........../s/ Alan Bloom............
)  Alan Bloom
in his own capacity and on behalf of the Joint )
Administrators without personal liability and
solely for the purpose of obtaining the benefit
of the provisions of this Agreement expressed
to be conferred on or given to the Joint
Administrators in the presence of:

Witness signature

..........W. Graham.......................... )
Name:   Wilma Graham )
Address:  Ernst & Young LLP )
1 More London Place
London
SE1 2AF

Signed by **MAÎTRE COSME ROGEAU**, acting in the capacity of *Mandataire Liquidateur* of **NORTEL NETWORKS S.A. (IN ADMINISTRATION AND LIQUIDATION JUDICIARE)**, without personal liability and solely for the purpose of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the French Liquidator:

By _____
Name: Maître Cosme Rogeau
Title: *Mandataire Liquidateur*

In the presence of:
Witness signature _____
Name: Thibault LEBRAY
Address: 26 rue Hoche
78000 Versailles

**SIGNED** for and on behalf of **NORTEL NETWORKS S.A. (IN ADMINISTRATION AND LIQUIDATION JUDICIARE)** by **MAÎTRE COSME ROGEAU** as *Mandataire Liquidateur* (acting as agent and without personal liability) in the presence of:
Witness signature _____
Name: Thibault LEBRAY
Address: 26 rue Hoche
78000 Versailles

) 
) **MAÎTRE COSME ROGEAU**
)
)
)
)
)
)

Execution Version

## EXHIBIT A – EMEA Sellers

Nortel Networks UK Limited (in administration)
Nortel Networks S.A. (in administration and *liquidation judiciaire*)
Nortel Networks (Ireland) Limited (in administration)
Nortel Networks France S.A.S. (in administration)
Nortel GmbH (in administration)

**EXHIBIT B – Other Sellers**

NN Applications Management Solutions Inc.
Nortel Altsystems, Inc. (previously "Alteon Networks, Inc.")
CoreTek, Inc.
Qtera Corporation
Xros, Inc.