## Exhibit D

**Blackline IP Transaction Side Agreement re Certain Structural Matters**

Execution Version

# SECOND AMENDED AND RESTATED IP TRANSACTION SIDE AGREEMENT RE: CERTAIN STRUCTURAL MATTERS

This agreement dated as of ~~June 29,~~ July 27, 2011 (the "**Agreement**") by and among (i) Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"); (ii) Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"); (iii) Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**"); (iv) the entities listed in Exhibit A hereto (the "**EMEA Sellers**"), which, in the case of Nortel Networks UK Limited (in administration) ("**NNUK**"), Nortel Networks France S.A.S. (in administration) and Nortel GmbH (in administration) are acting by Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP (the "**UK Joint Administrators**") and in the case of Nortel Networks (Ireland) Limited (in administration) is acting by David Hughes of Ernst & Young Chartered Accountants and Alan Robert Bloom (the "**Irish Joint Administrators**") (the UK Joint Administrators and the Irish Joint Administrators being collectively, the "**Joint Administrators**"), and in the case of Nortel Networks S.A. (in administration and *liquidation judiciaire*) ("**NNSA**") is acting by the UK Joint Administrators and Maître Cosme Rogeau, 26 avenue Hoche, 78000 VERSAILLES appointed as *mandataire liquidateur* by the French Court (as defined below) (the "**French Liquidator**"), the Joint Administrators act as agents of the EMEA Sellers without any personal liability and the French Liquidator acts as agent of NNSA without any personal liability; (v) the entities listed in Exhibit B hereto; (vi) the French Liquidator;  and (vii) the Joint Administrators.

The parties referred to in (i) through (v) are referred to collectively as the "**Nortel Parties**".  The parties referred to in (i) through (vii) are referred to collectively as the "**Parties**".

## W I T N E S S E T H

WHEREAS the ~~Nortel~~ Parties ~~have~~ entered into a stalking horse agreement for the sale of the Nortel patent portfolio and certain other assets (the "**Assets**") pursuant to an asset sale agreement dated as of April 4, 2011, among the Parties and Ranger Inc. ~~("**Bidder 1**"),~~ as purchaser~~,~~ and Google Inc.~~,~~ as parent guarantor ~~(as the same may be further amended, restated, amended and restated or modified,~~ (the "**Stalking Horse Agreement**")~~).  The sale of the Assets, whether pursuant to the Stalking Horse Agreement or otherwise (such agreement, including the Stalking Horse Agreement, the "**Sale Agreement**") and whether to Bidder 1 or any other person (such person, including Bidder 1, a "**Purchaser**"), shall be referred to herein as the "**Transaction**"~~;

WHEREAS the Parties entered into that certain IP Transaction Side Agreement on April 4, 2011 (the "**IP Transaction Side Agreement**"); and

~~WHERE AS~~WHEREAS the Parties entered into a certain IP Transaction Agreement re Certain Structural Matters on June 15, 2011 as amended and restated by a certain amended and restated IP Transaction Agreement re Certain Structural Matters on June 29, 2011 (the "**Original Structural Matters Agreement**"); and

WHEREAS the ~~sale of the Assets to Bidder 1 is subject to higher or better offers and an auction process approved by the U.S. Court and Canadian Court; and~~Parties have now entered into an Asset Sale Agreement with Rockstar Bidco, LP (the "**Purchaser**") dated as of June 30, 2011 (as the same may be amended from time to time, the "**Sale Agreement**" and the transactions contemplated by the Sale Agreement, the "**Transaction**");

WHEREAS the Parties and the Purchaser intend to enter into or have entered into an amendment to the Sale Agreement, which, among other things, requires the Purchaser to pay (i) for the benefit of the Sellers other than the Canadian Sellers, a fee of Five Million Dollars (US$5,000,000) (such fee for the benefit of the Sellers other than the Canadian Sellers, the "**Amendment Fee**"), and (ii) a payment of Eighteen Million Dollars (US$18,000,000) to the Canadian Sellers in respect of the utilization of tax attributes of the Canadian Sellers as a result of the receipt of the Optioned Licenses Fees; and

WHEREAS the Parties wish to further amend and restate the Original Structural Matters Agreement on the terms contained herein.

NOW, THEREFORE, in consideration of the respective covenants made herein, and of the mutual benefits to be derived hereby (the sufficiency of which are acknowledged), the Parties hereto agree as follows:

1. Capitalized terms used but not otherwise defined herein shall have the meanings set forth below or, if not defined below, the meanings set forth in the ~~Stalking Horse~~Sale Agreement:

    (a) "**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List);

    (b) "**Canadian Debtors**" means NNC, NNL and their Canadian affiliates that are subject to proceedings pending before the Canadian Court under the *Companies' Creditors Arrangement Act* (Canada);

    (c) "**Direct Canadian Payment**" means the amount of ~~US$15,000,000~~Eighteen Million dollars (US$18,000,000) paid to ~~NNL~~the Canadian Sellers pursuant to the ~~Rockstar Bid~~Sale Agreement;

    (d) "**EMEA Debtors**" means each Nortel debtor in respect of which the Joint Administrators were appointed as administrators on 14 January 2009, including but not limited to the EMEA Sellers;

    (e) "**Interim Sales Protocol**" has the meaning ascribed to it in the Interim Funding and Settlement Agreement entered into by certain of the U.S. Debtors, the Canadian Debtors, the EMEA Debtors and the Joint Administrators, among others, on June 9, 2009 (the "**IFSA**");

(f)     "**Total Proceeds**" means the aggregate amounts ~~(A)~~ paid by the Purchaser to the Sellers under or in respect of the Sale Agreement as Purchase Price, Good Faith Deposit, <u>Optioned Licenses Fees and</u> damages~~, and any amount paid by the Purchaser to the Sellers as compensation or remuneration for a license granted in connection with the Transaction (a "License Fee") and (B) paid to the Sellers under any escrow arrangement pursuant to which a portion of the Purchase Price, License Fee or Good Faith Deposit has been placed in escrow, including the Indemnification Escrow Amount~~, but for greater certainty, subject to the provisions of Paragraph 2 below, shall exclude any amounts not constituting a portion of the Purchase Price ~~or License Fee~~. <u>Good Faith Deposit or Optioned Licenses Fees</u> paid or payable by the Purchaser to one or more Sellers to compensate such Seller for costs incurred or to be incurred by such Seller, as contemplated to be paid directly to such Seller in accordance with the terms of the Sale Agreement, other Transaction Documents or related agreements, including, without limitation, the Direct Canadian Payment~~, if any~~ <u>and the Amendment Fee</u>;

(g)     "**U.S. Court**" means the United States Bankruptcy Court for the District of Delaware; and

(h)     "**U.S. Debtors**" means NNI and its affiliated debtors subject to the jurisdiction of the U.S. Court in proceedings pending under Chapter 11 of the U.S. Bankruptcy Code.

2.     The Parties agree that:

(a)     In the event that the preparation or filing of a Tax Return could reasonably be expected to require a Partial Allocation[1] or a Seller is preparing any Partial Allocation with the Purchaser (whether by agreement or submission to the Accounting Arbitrator), the Seller responsible for filing such Tax Return or preparing such Partial Allocation shall provide notice to the other Sellers and shall consider in good faith any comments by the other Sellers with respect to such Tax Return and any Partial Allocation related thereto, provided, and for the avoidance of doubt, that the other Sellers shall not have a consent or veto right with respect to such Tax Returns or Partial Allocations related thereto.  It is understood that neither this Paragraph 2 nor the exercise or failure to exercise of any rights or privileges provided herein shall, or be deemed to, determine, ratify, adopt, or have any impact whatsoever on, the allocation of proceeds from the Transaction among the Sellers.

(b)     In the event that the Purchaser prepares or files a Tax Return that requires an allocation of the proceeds from the Transaction, such Tax Return and any information contained therein shall not, and shall not be deemed to, determine, ratify, adopt or have any impact whatsoever on the allocation of proceeds from the Transaction among the Sellers.

---

[1]     The Parties agree that, for the purposes of this Agreement, "Partial Allocation" refers to an allocation of the Total Proceeds and not merely the Purchase Price.

(c)     If, in connection with the preparation or filing of a Tax Return as described in subparagraphs (a) and (b) of this Paragraph 2, or in connection with the transfer of the proceeds from the Transaction on the Closing Date, the Purchaser obtains any valuation calculation prepared at its request ("**Valuation**"), such Valuation and any information contained therein (other than information that may be derived therefrom that Purchaser publicly discloses, provided that the Purchaser shall not be considered to have publicly disclosed information solely by virtue of Purchaser giving notice of such information to the Sellers), shall not, and shall not be deemed to, determine, ratify, adopt or have any impact whatsoever on the allocation of proceeds from the Transaction among the Sellers. The Parties agree that none of them shall request, suggest or otherwise encourage the Purchaser to make any Valuation or any information derived therefrom publicly available.  Additionally, the Parties agree to oppose and to cooperate in opposing the use of the Tax Return or the Valuation by any entity before any dispute resolver(s) appointed pursuant to the Interim Sales Protocol, any court, or such other judicial or quasijudicial body or similar authority that may determine the allocation or distribution of the Total Proceeds, in a manner inconsistent with this Agreement.

(d)     In the event a Party becomes aware that the Purchaser or a designated purchaser intends to deduct and withhold an amount from the Transaction proceeds as may be contemplated by the Sale Agreement (a "**Withholding**"), such Party shall forthwith consult with each of NNL, NNI and NNUK with respect to such Withholding. No Party shall consent to a Withholding by the Purchaser or a designated purchaser without the prior written consent of NNL, NNI and NNUK.

(e)     If, in connection with the Transaction, the Purchaser provides for separate consideration to be paid for the intellectual property license being granted to the Purchaser or its affiliates by one or more of the Sellers (including for greater certainty, the Optioned Licenses Fees) including any waivers or consents granted by the Sellers in relation to such license (the "**IP License**"), on the one hand, and the other Assets being transferred to the Purchaser by the Sellers on the other, or otherwise ascribes or allocates a portion of the Total Proceeds or a value to such IP License, on the one hand, and to the other Assets being transferred on the other (any such separate consideration or allocation, a "**License/Patent Designation**"), the Parties agree that any such License/Patent Designation or the structure of both the IP License and any waiver or consent in relation to the IP License shall not, and shall not be deemed to, determine, ratify, adopt or have any impact whatsoever on the allocation of proceeds from the Transaction among the Sellers, and it is the express intent of the Parties that the allocation of the Total Proceeds shall be effected as if the Transaction had been structured so that the Total Proceeds were paid in consideration for the sale of the Assets in a manner similar to that provided in the Stalking Horse Agreement.  The Parties agree that, to the extent that any such License/Patent Designations have not been made public through the auction process for the Transaction and the obtaining of the orders of the U.S. Court and the Canadian Court approving the Transaction, none of them shall request, suggest or

4

otherwise encourage the Purchaser to make any License/Patent Designation or any information derived therefrom publicly available. Additionally, the Parties agree to oppose and to cooperate in opposing the use of the License/Patent Designation or the structure of both the IP License and any waiver or consents in relation to the IP License by any entity before any dispute resolver(s) appointed pursuant to the Interim Sales Protocol, any court, or such other judicial or quasi-judicial body or similar authority that may determine the allocation or distribution of the Total Proceeds, in a manner inconsistent with this Agreement.

(f)    The Parties agree that, subject to the IP Transaction Side Agreement, in accordance with Section 12 of the IFSA, any payment due by the Purchaser (and any designated purchaser) to the Nortel Parties under the Sale Agreement, or upon release from escrow, any escrow agreements provided for in the Sale Agreement, the Transaction Documents or any related agreements, that is included in the Total Proceeds shall be collected and held in escrow by the Distribution Agent (as agent for the Sellers).

(g)    ~~In the event that the Parties accept a bid to enter into a~~<ins>Pursuant to the</ins> Sale Agreement ~~with Rockstar Bidco, LP ("**Rockstar**") as Purchaser, which provides for a structure similar to that proposed in Rockstar's bid submitted on June 13, 2011 and proposed in Apple Inc.'s bid at or around 10:22pm on June 28, 2011 (such Sale Agreements, including Optioned License Fees (as defined in the Rockstar bid of June 13, 2011 and the Apple Inc. bid submitted at or around 10:22pm on June 28, 2011) not to exceed US$1,000,000,000, collectively, the "**Rockstar Bid**")~~<ins>which includes provisions concerning the Optioned Licenses Fees</ins>, the Parties agree that (i) NNL shall receive ~~with respect to any such Rockstar Bid~~ at Closing the Direct Canadian Payment, (ii) the Canadian Debtors shall have no right to seek a further allocation of the Total Proceeds based on such tax attributes of the Canadian Debtors as are or may be used in connection with ~~a Rockstar Bid, and that~~<ins>the Sale Agreement,</ins> (iii) subject to receipt of the Direct Canadian Payment, the use of such tax attributes shall not, and shall not be deemed to, determine, ratify, adopt or have any further impact whatsoever on the allocation of proceeds from the Transaction among the Sellers. ~~The Parties further agree that, at each round of bidding at the Auction (as defined in the U.S Bidding Procedures Order and the Canadian Sales Process Order), the amount of the Direct Canadian Payment should be deducted from the consideration offered by Rockstar in any bid prior to the Sellers determining whether such bid constitutes the highest or otherwise best offer in that round of bidding. For the avoidance of doubt, except as provided in the preceding sentence, each of the Sellers reserves its right at the Auction to determine whether a bid by Rockstar constitutes a higher or otherwise better offer for the Assets, and nothing herein shall constitute the acceptance of a Rockstar Bid or the Agreement by any Seller to the terms of a Rockstar Bid.~~<ins>, and (iv) at the Closing, the Amendment Fee shall be paid by the Purchaser for the benefit of, and shall be held in escrow by the Distribution Agent for the benefit of, the U.S. Debtors who are parties hereto and the EMEA Sellers.</ins>

(h)    ~~3. The U.S. Debtors~~Notwithstanding anything to the contrary in the IFSA, the distribution escrow agreement contemplated to be entered into by the Parties prior to the Closing to hold the Total Proceeds, any of the Transaction Documents, any other agreement among any of the Parties related to the Transaction or any other agreements entered into among the Parties, the Parties agree that the Amendment Fee shall be allocated among the U.S. Debtors who are parties hereto and the EMEA Sellers in a relative proportion equal to the aggregate Total Proceeds allocated to such party, and the Canadian Debtors expressly acknowledge and agree ~~they will seek approval of this Agreement by the U.S. Court and the Canadian Court in connection with the approval of the Transaction~~that they shall have no claim to or interest in the Amendment Fee, for purposes of allocation or otherwise.

3.    [Reserved].

4.    The Parties agree that:

(a)    the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Sellers to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations;

(b)    the Joint Administrators are a party to this Agreement: (i) as agents of each of the respective EMEA Sellers of which they are administrators; and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, (2) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (3) enforcing the obligations of the other Parties to this Agreement and (4) subject to paragraph 4(d) hereof, the purposes of the other Parties hereto enforcing the obligations of the Joint Administrators hereunder;

(c)    notwithstanding anything in paragraphs 8 and 9 hereof, any claim, action or proceeding against the Joint Administrators arising from or related to (i) the personal liability of the Joint Administrators, their firm or partners, employees, advisers, representatives or agents, (ii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act, (iii) their appointment as joint administrators of the relevant EMEA Sellers and their remaining as current joint administrators thereof under this Agreement, or (iv) the duties and obligations of the Joint Administrators as administrators of the EMEA Debtors, shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English courts;

(d)    any breach of this Agreement by the Joint Administrators shall be deemed to be a breach by them in their capacities as administrators of the relevant EMEA Sellers,

and, in such a case, each Party hereto shall only have the right to make claims and assert its rights hereunder, against the relevant EMEA Sellers and their respective successors and assigns;

(e)   the French Liquidator is entering into this Agreement as agent for NNSA and that none of the French Liquidator, his firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations; and

(f)   notwithstanding anything in paragraphs 8 and 9 hereof, any claim, action or proceeding against the French Liquidator arising from or related to (i) the personal liability of the French Liquidator, his firm, partners, employees, advisers, representatives or agents, (ii) his appointment as Liquidateur Judiciaire of NNSA, or (iii) the duties and obligations of the French Liquidator as Liquidateur Judiciaire of NNSA, shall be governed exclusively by French law and subject to the exclusive jurisdiction of the French courts.

5.   No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege. No Party shall be deemed to have waived any provision of this Agreement unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. Except as expressly set out herein, this Agreement, or any provision hereof, may be waived or amended on no less than five (5) days' notice, only by means of a writing signed by all Parties, and approved, in writing, by the Official Committee of Unsecured Creditors of the U.S. Debtors (the "**Committee**") and Ernst & Young Inc. in its capacity as the Monitor of the Canadian Debtors (the "**Monitor**").

6.   This Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, provided, however, that the Committee shall be a third party beneficiary of this Agreement entitled to take advantage of the benefits of this Agreement to NNI and the other U.S. Debtors.

7.   Except as otherwise expressly provided in this Agreement, all covenants and agreements set forth in this Agreement by or on behalf of the Parties will be binding upon and inure to the benefit of the Parties and their respective successors.

8.   The Parties agree that this Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction provided, however, that subparagraphs 4(a) through (d) hereof

shall be governed exclusively by English law and subparagraphs 4(e) and (f) hereof shall be governed exclusively by French law.

9.   To the fullest extent permitted by Law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the U.S. Court and the Canadian Court (in a joint hearing conducted under the Cross-Border Insolvency Protocol), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the U.S. Court if such claim, action, or proceeding would solely affect NNI or any of the other U.S. Debtors, the Canadian Court if such claim, action, or proceeding would solely affect NNL or any of the other Canadian Debtors, or the English Court if such claim, action or proceeding would solely affect the EMEA Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such claim, action or proceeding brought in such a court or any claim that any such claim, action or proceeding brought in such a court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such claim, action or proceeding or any other manner as may be permitted by Law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such claim, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law provided, however, that any claim, action or proceeding set forth in or on the basis of subparagraphs 4(a) through (d) hereof shall be brought exclusively in the English courts and any claim, action or proceeding set forth in or on the basis of subparagraphs 4(e) through (f) hereof shall be brought exclusively in the French courts.

10.   EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION OR MATTER CONTEMPLATED HEREBY.  EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH 10.

11.   All notices and communications provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified for such Party in the Stalking Horse Agreement, or at such address, to the attention of such other person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this paragraph 11. Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered

personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable. A copy of any notice or communication sent pursuant to this paragraph 11 shall also be sent to the Committee: c/o Akin Gump Strauss Hauer & Feld LLP Attention:  Fred S. Hodara and Stephen B. Kuhn, Esq. One Bryant Park New York, New York 10036, U.S.A (Facsimile:  +1 212 872 1002) and to the Monitor: Ernst & Young Inc., Ernst & Young Tower Attn: Murray A. McDonald, 222 Bay Street, P. O. Box 251, Toronto, Ontario, Canada, M5K 1J7 (Facsimile:  +1 416 943 3300).

12.    The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument. Facsimile and pdf signatures shall be deemed original signatures.

13.    The obligations of NNC and NNL under this Agreement shall be joint and several. The obligations of NNI and the other U.S. Debtors party hereto shall be joint and several. The obligations of the EMEA Sellers under this Agreement shall be joint and several.

14.    If any provision, section, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, section or part under other circumstances, and (ii) as for any other jurisdiction, any provision of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement.  Upon such determination that any section or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

15.    Notwithstanding anything contained herein, nothing in this Agreement shall supercede the IP Transaction Side Agreement, nor act as an amendment or waiver of any of the rights or obligations thereunder.

**[Signature pages immediately follow]**

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first written above.

**NORTEL NETWORKS CORPORATION**

By: _____

Name: John M. Doolittle

Title: Senior Vice-President, Corporate Services and Chief Financial Officer

By: _____

Name: Clarke E. Glaspell

Title: Controller

**NORTEL NETWORKS LIMITED**

By: _____

Name: John M. Doolittle

Title: Senior Vice-President, Corporate Services and Chief Financial Officer

By: _____

Name: Clarke E. Glaspell

Title: Controller

**NORTEL NETWORKS INC.**

By:_____
   Name:
   Title:

**NN APPLICATIONS MANAGEMENT
SOLUTIONS INC.**

By:_____
   Name:
   Title:

**NORTEL ALTSYSTEMS, INC.**

By:_____
   Name:
   Title:

**CORETEK, INC.**

By:_____
   Name:
   Title:

**QTERA CORPORATION**

By:_____
   Name:
   Title:

**XROS, INC.**

By:_____
   Name:
   Title:

**SIGNED** for and on behalf of **Nortel**
**Networks UK Limited** (in administration)
by Christopher Hill as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)
)

.......................................................
Christopher Hill

Witness signature
.......................................................
Name:        JAN CORDELL
Address:

)
)
)

Ernst & Young LLP
1 More London Place
London
SE1 2AF

**SIGNED** for and on behalf of **Nortel Networks** )
**(Ireland) Limited** (in administration) by David )
Hughes )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

David Hughes

Witness signature

.............................................................. )
Name: )
Address: )

c/o Ernst & Young
Harcourt Street
Dublin 2.

**SIGNED** for and on behalf of **Nortel Networks S.A.** (in administration and *liquidation judiciaire*) by Christopher Hill as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)
)

.............................................................

Christopher Hill

Witness signature

.............................................................

)

Name:        JAN CORDELL

)

Address:

)

ERNST & YOUNG LLP
1 More London Place
London
SE1 2AF

**SIGNED** for and on behalf of **Nortel**  )
**Networks France S.A.S.** (in           )
administration) by Kerry Trigg acting as  )
authorised representative of Christopher  )
Hill as Joint Administrator (acting as agent
and without personal liability) in the
presence of:

Kerry Trigg

Witness signature

Name: LEISA HARKIN                        )
Address:                                   )
                                           )
    E Ernst & Young LLP
    1 More London Place
    London
    SE1 2AF

**SIGNED** for and on behalf of **Nortel**
**GmbH** (in administration) by Christopher
Hill as Joint Administrator (acting as agent
and without personal liability) in the
presence of:

)
)
)
)

..................................................

Christopher Hill

Witness signature

..................................................    )

Name:          JAN CORDELL    )

Address:          Ernst & Young LLP    )
1 More London Place
London
SE1 2AF

**SIGNED** by Alan Bloom )  ................................................................
)  Alan Bloom
in his own capacity and on behalf of the Joint )
Administrators without personal liability and
solely for the purpose of obtaining the benefit
of the provisions of this Agreement expressed
to be conferred on or given to the Joint
Administrators in the presence of:

Witness signature

................................................  )

Name:        JAN CORDELL            )

Address:                                    )

E......... .............. ...
1 More London .....
London
SE1 2AF

Signed by **MAÎTRE COSME ROGEAU**, acting in the capacity of *Mandataire Liquidateur* of **NORTEL NETWORKS S.A. (IN ADMINISTRATION AND LIQUIDATION JUDICIARE)**, without personal liability and solely for the purpose of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the French Liquidator:

By _____

Name: Maître Cosme Rogeau

Title: ~~Mandataire Liquidateur~~

In the presence of:

Witness signature

Name: Thibault LEBRAY

Address: 26 rue Hoche 78000 Versailles

**SIGNED** for and on behalf of **NORTEL NETWORKS S.A. (IN ADMINISTRATION AND LIQUIDATION JUDICIARE)** by **MAÎTRE COSME ROGEAU** as *Mandataire Liquidateur* (acting as agent and without personal liability) in the presence of:

)
)
)
)
)
)
)
)

**MAÎTRE COSME ROGEAU**

Witness signature

Name: Thibault LEBRAY

Address: 26 rue Hoche 78000 Versailles

### EXHIBIT A – EMEA Sellers

Nortel Networks UK Limited (in administration)
Nortel Networks S.A. (in administration and *liquidation judiciaire*)
Nortel Networks (Ireland) Limited (in administration)
Nortel Networks France S.A.S. (in administration)
Nortel GmbH (in administration)

**EXHIBIT B – Other Sellers**

NN Applications Management Solutions Inc.
Nortel Altsystems, Inc. (previously "Alteon Networks, Inc.")
CoreTek, Inc.
Qtera Corporation
Xros, Inc.

DOCSTOR: 2209193\1