**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

----------------------------------------------------------- X
                                                            :
*In re*                                                     :     Chapter 11
                                                            :
Nortel Networks Inc., *et al.,*[1]                          :     Case No. 09-10138 (KG)
                                                            :
                                   Debtors.                 :     Jointly Administered
                                                            :
                                                            :     **Hearing date: August 23, 2011 at 10:00 AM (ET)
                                                            :     (proposed)**
                                                            :     **Objections due: August 18, 2011 at 4:00 PM (ET)
                                                            :     (proposed)**
----------------------------------------------------------- X

### DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105(A) AND 363 AND FED. R. BANKR. P. 9019 FOR ENTRY OF AN ORDER APPROVING ADJUSTMENTS TO CERTAIN INTERCOMPANY AGREEMENTS

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession, (collectively, the "Debtors") hereby move this Court (the "Motion") for the entry of

an order, substantially in the form attached hereto as Exhibit A, approving adjustments to certain

intercompany agreements, including (i) the Agreement on Transfer Pricing Amendments and

Certain Other Matters, in the form attached hereto as Exhibit B (the "ATPA"), by and among the

Debtors (other than Nortel Networks (CALA) Inc., "NN CALA"), Nortel Networks Limited

("NNL") and the other Canadian Debtors (as defined below), the EMEA Debtors (as defined

below) and Nortel Networks AG ("NNAG," and together with the EMEA Debtors, the "EMEA

Group"), and the Joint Administrators (as defined below, and together with the Debtors (other

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

than NN CALA), the Canadian Debtors and the EMEA Group, the "<u>ATPA Parties</u>"); and (ii) the

Q1 2010 Transfer Pricing Settlement Agreement, in the form attached hereto as <u>Exhibit C</u> (the

"<u>Q1 Settlement Agreement</u>"), by and among the Debtors, Nortel Networks Japan ("<u>NN Japan</u>"),

Nortel Networks India International Inc. ("<u>NN III</u>"), the Canadian Debtors, the EMEA Group

other than Nortel Networks S.A. ("<u>NNSA</u>")[2] and the Joint Administrators (collectively the "<u>Q1</u>

<u>Parties</u>"); and (b) granting them such other and further relief as the Court deems just and proper.

In support of this Motion, the Debtors respectfully represent as follows:

## <u>Jurisdiction</u>

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a) and 363 of

title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rule 9019 of the Federal Rules

of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

## <u>Background</u>

3.      On January 14, 2009 (the "<u>Petition Date</u>"), the Debtors, other than NN CALA,[3]

filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, which cases are

consolidated for procedural purposes only.  The Debtors continue to operate as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[2]      NNSA is not a party to the Q1 Settlement Agreement because of certain ongoing issues in the NNSA proceedings.  As such, any references to the EMEA Debtors or the EMEA Group with respect to the Q1 Settlement Agreement exclude NNSA for the time being.  However, the Q1 Settlement Agreement contemplates NNSA acceding to the agreement at a later date at which time NNSA would be bound by the terms of the Q1 Settlement Agreement.

[3]      NN CALA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

4.      The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors (the "Committee") in respect of the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized (the "Bondholder Group").

5.      On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent NNL (and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[4] commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA), seeking relief from their creditors (collectively, the "Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by the Canadian Court.  Also on the Petition Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[5] into administration (the "English Proceedings") under the control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators").  Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency and dissolution proceedings around the world.

6.      Since the Petition Date, Nortel has sold its business units and assets to various purchasers.  For further information regarding these chapter 11 cases, reference may be made to the Monthly Operating Reports filed by the Debtors and http://dm.epiq11.com/nortel.

---

[4]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[5]      The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

## Relief Requested

7.      By this Motion, the Debtors seek an order, pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 9019, (a) approving the terms and conditions of adjustments to certain intercompany agreements, including (i) the ATPA and (ii) the Q1 Settlement Agreement; and (b) granting such related relief as the Court deems just and appropriate.

## Facts Relevant to this Motion

**A.      Nortel's Transfer Pricing Regime**

8.      As the Court is aware, certain Nortel affiliates, including NNL, NNI, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NNIR"), and NNSA (collectively, the "Main Nortel Companies"), were the primary source of Nortel's research and development ("R&D"), the benefits of which were shared across multiple corporate entities.

9.      In connection therewith, certain Nortel entities, including the Main Nortel Companies, entered into a number of agreements regarding R&D and related matters, including (a) certain distribution agreements between one or more Nortel entities (the "Distribution Agreements"); and (b) the Master R&D Agreement, dated as of December 22, 2004, with an effective date of January 1, 2001, among NNL, NNI, NNUK, NNIR, NNSA and other affiliates (as amended from time to time, the "Master R&D Agreement," together with the Distribution Agreements and certain other related agreements, the "Transfer Pricing Agreements").[6]  In the post-petition period, two group supplier protocol agreements, one between the Joint Administrators on behalf of the EMEA Debtors and the Debtors other than NN CALA, and one between the Joint Administrators on behalf of the EMEA Debtors and the Canadian Debtors,

were entered into to facilitate the intercompany trading of goods and services after the Petition

Date (as amended and extended from time to time, the "GSPAs").

10.     Historically, Nortel used "transfer pricing" to allocate operating profits and losses,

and certain costs, among the various Nortel companies.  The Master R&D Agreement utilizes the

"residual profit split" transfer pricing methodology (the "Nortel Transfer Pricing Regime") and

typically required that payments be made (and allocated) among the Main Nortel Companies in

respect of estimated profits and losses, and certain costs, in any given calendar year and that

certain true-up payments be made after the actual results for such year were known (collectively,

the "Transfer Pricing Payments").

### B.     Treatment of Nortel's Transfer Pricing Regime in the Post-petition Period

11.     Following commencement of these proceedings, discussions began with various

interested parties, including the Debtors, the Canadian Debtors, the Monitor, the Joint

Administrators, the Committee and the Bondholder Group concerning the continued use of the

Nortel Transfer Pricing Regime.  These discussions, among others, resulted in entry by the

ATPA Parties (other than NNAG and NNSA) into the Interim Funding and Settlement

Agreement (the "IFSA"), which was approved by this Court on June 29, 2009.[7] [D.I. 874].  The

IFSA, *inter alia*, settled claims in respect of all Transfer Pricing Payments owed or that could be

owed by the Debtors (other than NN CALA) and any claims of NNL for corporate overhead and

research and development costs, whether pursuant to the Transfer Pricing Agreements or

otherwise, which NNL asserted or could assert would have been reimbursed to NNL through

Transfer Pricing Payments for the period from the Petition Date through and including

---

[6]     References to the Transfer Pricing Agreements, the GSPAs, the IFSA and the FCFSA (each as defined below) in this Motion are for illustrative purposes only and are qualified entirely by the actual agreements and, where applicable, the orders of this Court.

[7]     NNAG and NNSA acceded to the IFSA on September 11, 2009.

September 30, 2009.  The EMEA Debtors also settled all amounts payable or anticipated to become payable as Transfer Pricing Payments as between themselves, and the EMEA Debtors, on the one hand, and one or more of the Canadian Debtors and/or Debtors (other than NN CALA), on the other hand, for the period from the Petition Date through December 31, 2009.

12.      After entry into the IFSA, the Debtors and the Canadian Debtors negotiated the terms of the Final Canadian Funding and Settlement Agreement, dated December 23, 2009, by and among the Debtors (other than NN CALA) and the Canadian Debtors (the "FCFSA"), which was approved by this Court on January 21, 2010.  [D.I. 2347] (the "FCFSA Order").  The FCFSA provided, among other things, for the settlement of certain intercompany claims, including in respect of any claims of the Debtors (other than NN CALA) against the Canadian Debtors for overpayments to the Canadian Debtors under the Transfer Pricing Agreements for, or with respect to, the period from January 1, 2001 to December 31, 2005.  In addition, the FCFSA together with the IFSA settled all Transfer Pricing Payment obligations between the Debtors (other than NN CALA)[8] and the Canadian Debtors from the Petition Date through the end of the Canadian insolvency proceedings.  Both the IFSA and the FCFSA preserved all rights with respect to claims and defenses relating to the Transfer Pricing Agreements, and the parties thereto agreed that neither agreement would have any impact on or relevance to the allocation of sale proceeds among the various Nortel entities.

13.      The EMEA Debtors objected to the approval of the FCFSA, claiming, among other things, that the terms of the FCFSA may be prejudicial to the EMEA Debtors and could be construed to regulate claims and interests of the EMEA Debtors [D.I. 2299] (the "EMEA FCFSA Objection").  Although the Debtors strongly disagreed with the assertions made by the EMEA

---

[8]      Transfer pricing obligations, if any, relating to NN CALA, are being settled as described herein.

6

Debtors, the Debtors agreed to include certain language reserving the EMEA Debtors' rights in the FCFSA Order in order to resolve the EMEA FCFSA Objection.  FCFSA Order at ¶ 7-9.

## C.    The ATPA and Q1 Settlement Agreement

14.    The GSPAs allowed the EMEA Debtors and the Debtors (other than NN CALA), and the EMEA Debtors and the Canadian Debtors, to trade with each other in the ordinary course in the post-petition period.

15.    In late March 2010, the Joint Administrators, on behalf of the EMEA Debtors, proposed to amend the GSPAs to take into account the reduction of the level of intercompany trading between the Nortel entities.  This suggestion prompted discussions among the Debtors, the Canadian Debtors, the Monitor and the Joint Administrators on behalf of the EMEA Debtors, in consultation with the Committee and the Bondholder Group, aimed at halting the obligations of the relevant parties to make any further Transfer Pricing Payments.  While these discussions were ongoing, the EMEA Group and the Canadian Debtors held concurrent negotiations to settle certain Transfer Pricing Payments among and between the EMEA Group and the Canadian Debtors for the period from January 1, 2010 through March 31, 2010.

16.    Following lengthy, difficult and good faith negotiations, on or about August 11, 2011, the ATPA Parties agreed to the terms of the ATPA, and the Q1 Parties agreed to the terms of the Q1 Settlement Agreement.  The entry into, and performance under the ATPA and the Q1 Settlement Agreement, is subject to approval of this Motion and entry into all of the agreements contemplated in this Motion.

17.    The main terms of the ATPA are as follows:[9]

- **Amendment to the Transfer Pricing Agreements**.  In respect of the period from and after April 1, 2010, no further Transfer Pricing Payments are required nor shall be made amongst the respective parties to the Transfer Pricing Agreements.  The non-payment by any ATPA Party or Participant (as defined in the Master R&D Agreement) of Transfer Pricing Payments relating to any period from and after April 1, 2010 shall not constitute a repudiation, rejection or breach of the Transfer Pricing Agreements or give rise to a "Defaulting Event" under the Master R&D Agreement.

- **Intellectual Property Reservation of Rights**.  Any rights in or to intellectual property that any one or more of the ATPA Parties have under or as a result of the Transfer Pricing Agreements shall not be affected by (a) the exclusion of Transfer Pricing Payments from the GSPAs, and (b) the non-payment by any ATPA Party of any Transfer Pricing Payments relating to any period from and after April 1, 2010.

- **Standstill**.  No Party shall terminate or seek to terminate the participation of any other ATPA Party to, or Participant (as defined in the Master R&D Agreement) in, the Transfer Pricing Agreements without the written consent of the other parties to the relevant Transfer Pricing Agreements.

- **General Reservation of Rights**.  Except as expressly provided in the ATPA, nothing in the ATPA shall constitute an amendment, modification or waiver of rights of any ATPA Party (i) under any other agreement, including, without limitation, the Transfer Pricing Agreements, applicable law or otherwise, or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise.

- **IFSA and FCFSA Reservation of Rights**.  Except as expressly set forth in the ATPA, nothing in the ATPA shall constitute an amendment, modification or waiver of rights of any party under, as applicable, the IFSA and the FCFSA, and the ATPA shall not supersede the IFSA and the FCFSA in any respect.

- **Affirmative Covenants**.  The ATPA Parties agree that each shall take all commercially reasonable steps to effect the following releases from escrow:

  - **NNI Cash Reimbursement**.  The release of US$53 million from the Enterprise Distribution Account to NNI in respect of certain funds payable to NNI in connection with the sale of the shares of Nortel Government

---

[9]    Capitalized terms used in this section but not defined herein have the meanings ascribed to them in the ATPA, certain of which definitions appear in sections of the ATPA not set forth herein. A form of the ATPA is attached hereto as Exhibit B.  In the event of any inconsistencies between the ATPA and the Motion, the ATPA shall control.

Solutions Incorporated and Diamondware Ltd. to Avaya Inc. (the "NNI Cash Reimbursement"), including by providing directions in the form attached to the ATPA to the Enterprise Distribution Agent to release the funds to NNI; and

- ▪ Carve-Out Financials Reimbursement. The release of US$30,119,972 from the relevant escrow accounts to NNL in respect of certain funds payable to NNL as reimbursement for payments made to obtain carve-out financial statements (the "Carve-Out Financials Reimbursement").[10]

- • Conditions to Effectiveness.

  - ▪ Orders approving entry into the ATPA by this Court, the Canadian Court and the Commercial Court of Versailles, France (the "French Court"), and execution of the ATPA by the Joint Administrators;

  - ▪ The execution and delivery of instructions to the Enterprise Distribution Agent to release US$53 million from the Enterprise Distribution Account to NNI and the release of such funds in respect of the NNI Cash Reimbursement;

  - ▪ The execution and delivery of instructions to the relevant escrow agents to release US$30,119,972 from the relevant escrow accounts to NNL and the release of such funds in respect of the Carve-Out Financials Reimbursement;

  - ▪ The execution and delivery of instructions to the relevant escrow agents to release US$5,384,932.48 from the relevant escrow accounts to NNI and the release of such funds in respect of the Lazard Fee Reimbursement;[11] and

  - ▪ The execution and delivery of instructions to the relevant escrow agent to release US$3,287,333.34 from the relevant escrow account to Lazard in respect of payments owed to Lazard.

---

[10]     The release of the Carve-Out Financials Reimbursement was approved by the Court on November 23, 2010 in its *Order (I) Authorizing the Debtors to Enter into the Lazard Side Agreement and (II) Authorizing Debtors to Direct the Escrow Agents to Release Funds to NNL for Reimbursement of Certain Professional Fees* [D.I. 4404] (the "Lazard/Carve-Out Order"), and the ATPA Parties have agreed to include an affirmative covenant to take all commercially reasonable steps necessary to effect such reimbursement in the ATPA. The Debtors are not seeking further relief with respect to their ability to exercise the authority granted to them in the Lazard/Carve-Out Order through this Motion.

[11]     The release of the Lazard Fee Reimbursement to NNI and the release of certain other amounts owed to Lazard set forth in the following bullet were also approved by this Court in the Lazard/Carve-Out Order. The ATPA Parties have agreed to include such distributions as conditions to effectiveness of the ATPA in order to ensure that they occur. The Debtors are not seeking further relief with respect to their ability to exercise the authority granted to them in the Lazard/Carve-Out Order through this Motion.

18.     The main terms of the Q1 Settlement Agreement are as follows:[12]

- <u>Shortfall Payments</u>.  NNL and NNUK agree that for the Q1 Settlement Period, after netting previous amounts owed under the IFSA, NNL owes NNUK a net amount of $9.4 million.  Of this balance, NNL shall pay to NNUK the amount of $4.7 million within three (3) Business Days of the Effective Date of the Q1 Settlement Agreement, and the remaining $4.7 million shall be paid by NNL to NNUK in accordance with Section 6.c. of the IFSA.

- <u>Settlement</u>.  The Q1 Settlement Agreement shall constitute a full and final settlement of any and all Transfer Pricing Payments owing and that may, or could be, owing between (i) the EMEA Group *inter se*, and (ii) any member of the EMEA Group, on the one hand, and any Canadian Debtor or US Company, on the other hand, as Transfer Pricing Payments under the Transfer Pricing Agreements for the Q1 Settlement Period, and (a) each member comprising the EMEA Group releases each of the Canadian Debtors and each of the US Companies and agrees that each shall not allege, file or otherwise assert any claim against the Canadian Debtors or US Companies in respect of the Settled Amounts or allege, file or otherwise assert a claim against any person which could result in a claim against the Canadian Debtors in respect of the Settled Amounts; and (b) each of the Canadian Debtors and each of the US Companies releases each member of the EMEA Group and agrees not to allege, file or otherwise assert any claim against any one or more of the EMEA Group in respect of the Settled Amounts or allege, file or otherwise assert a claim against any person which could result in a claim against any member of the EMEA Group in respect of the Settled Amounts.

- <u>FCFSA Reservation of Rights</u>.  Nothing in the Q1 Settlement Agreement shall constitute an amendment, modification or waiver of rights of the Debtors, the Canadian Debtors or the Monitor under the FCFSA, and the Q1 Settlement Agreement shall not supersede the FCFSA in any respect.

- <u>IFSA Reservation of Rights</u>.  Except as expressly set forth in the Q1 Settlement Agreement, nothing in the Q1 Settlement Agreement shall constitute an amendment, modification or waiver of rights of the Debtors, the Canadian Debtors, the Monitor, the EMEA Group or the Joint Administrators under the IFSA, and to the extent a conflict exists between the terms of the Q1 Settlement Agreement and the terms of the IFSA, the terms of the IFSA shall govern.

- <u>Transfer Pricing Agreements Reservation of Rights</u>.  Except as expressly set forth in the Q1 Settlement Agreement, nothing in the Q1 Settlement

---

[12]     Capitalized terms used in this section but not defined herein have the meanings ascribed to them in the Q1 Settlement Agreement, certain of which definitions appear in sections of the Q1 Settlement Agreement not set forth herein. A form of the Q1 Settlement Agreement is attached hereto as <u>Exhibit C</u>.  In the event of any inconsistencies between the Q1 Settlement Agreement and the Motion, the Q1 Settlement Agreement shall control.

Agreement shall constitute an amendment, modification or waiver of rights of any Q1 Party (i) under any other agreement, including, without limitation, the Transfer Pricing Agreements, applicable law or otherwise, or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise.

- <u>Conditions to Effectiveness</u>.  Orders approving entry into the agreement by this Court and the Canadian Court and execution of the Q1 Settlement Agreement by the Joint Administrators.

## D.    US/Canada Term Sheet

19.    In addition to the resolutions sought in the ATPA and the Q1 Settlement Agreement, the Debtors and the Canadian Debtors have worked to resolve certain issues between them, which resolutions are embodied in that certain Timeline for and Proposed Resolutions of Pending US/Canada Issues, by and among NNI, NN CALA, NNL, NN III, Nortel Networks (China) Limited and Nortel de Mexico, S. DE R.L. DE C.V. (the "<u>US/Canada Term Sheet</u>"), a form of which is attached hereto as <u>Exhibit D</u>.[13]  Certain of the resolutions set forth in the US/Canada Term Sheet are summarized below.[14]

## <u>AMENDMENT OF THE SUBJECT LRD AGREEMENTS</u>

20.    Prior to the Petition Date, certain Nortel entities entered into limited risk distribution agreements with NNL (the "<u>LRD Agreements</u>").  Among these LRD Agreements are (a) an agreement between NN CALA and NNL, dated January 1, 2001 (the "<u>CALA LRD</u>

---

[13]    The resolutions contained in the US/Canada Term Sheet do not require the Debtors to take any actions that would require approval by this Court, and therefore the Debtors are not seeking relief with respect to the US/Canada Term Sheet.  The description of the US/Canada Term Sheet in this Motion is for illustrative and contextual purposes only, and in the event of any inconsistencies between the US/Canada Term Sheet and this Motion, the US/Canada Term Sheet shall control.

[14]    The US/Canada Term Sheet also contains certain resolutions that are not described at length in this Motion, including resolutions related to certain payments to be made to NNI by Nortel China Limited, NNI's waiver of claims against the Pakistan branch of Nortel Networks (Asia) Limited ("<u>NN Asia</u>") and the assumption of such obligations by NN Asia, certain payments to be made by NNL to Xros, Inc. with respect to royalty payments received from Microvision, the treatment of withholding taxes as deal costs relating to the CVAS sale, the splitting of costs with respect to Atlanta Telephone Company and the allocation of transition services payments from

Agreement"); (b) an agreement among NN III, Nortel Networks India Private Limited, NNL and

Nortel Networks Singapore PTE LTD, dated April 1, 2004 (the "NN III LRD Agreement"); and

(c) an agreement between NN Japan and NNL, dated January 1, 2001 (the "NN Japan LRD

Agreement," together with the CALA LRD Agreement and the NN III LRD Agreement, the

"Subject LRD Agreements").

21.    Following lengthy good faith negotiations, on or about August 11, 2011, the

parties to the Subject LRD Agreements, including NN CALA, agreed to amend those agreements

and settle certain other claims associated with those agreements.  The entry into, and

performance under the amendments to the Subject LRD Agreements, is subject to approval of

this Motion and entry into all of the agreements contemplated in this Motion.  In general terms,

the amendments to the Subject LRD Agreements and related settlements provide for the

following:

- Cancellation of true-up obligations under Subject LRD Agreements.  All true-up obligations under the Subject LRD Agreements are terminated as of January 1, 2010, after which date products and services have been and shall be purchased on a cost plus basis.

RELATED SETTLEMENTS

- CALA LRD Agreement – 2009 TPA Calculations.  Amounts owed under the CALA LRD Agreement for 2009 will be calculated on a quarterly, not annual basis, with the result being that NN CALA will not owe any amounts to NNL for such period under the CALA LRD Agreement.

- NN CALA.  NNL agrees to make a $1 million payment for services provided to NNL by NN CALA through the end of 2010.  Such payment will be made shortly after entry of an order approving this Motion.  Services provided by NN CALA to NNL after January 1, 2011 have been and will be reimbursed on a "fully loaded" basis.  Further, Nortel Networks de Mexico S.A. de C.V. ("NN Mexico") will confirm in writing that no further claims exist by it against NNI or NN CALA relating to any period after January 1, 2009.

---

Ericsson in connection with the sale of GDNT.  The exclusion of a description for any particular resolution in this Motion shall not be construed to minimize the importance of such resolution.

- <u>NN III</u>.  NN III (which is a wholly-owned subsidiary of NNI but not a Debtor) will acknowledge that it owes $4.3 million to NNL, which shall resolve the entirety of any claim that NNL may have against NN III arising or relating to the period after January 1, 2009.

- <u>NN Japan</u>.  NN Japan (which is a wholly-owned subsidiary of NNI but not a Debtor) will terminate the Japan LRD Amendment as of January 1, 2011, after which date products and services have been and will be purchased on a cost plus basis.

<u>OTHER RELATED SETTLEMENTS</u>

22.    On December 22, 2010, NN CALA filed a motion with this Court seeking authority to pay certain taxes and fees NN CALA incurred as a result of its Trinidad & Tobago operations (the "<u>T&T Tax Motion</u>"). [D.I. 4639].  In conjunction with the preparation and filing of the T&T Tax Motion, NNIC, NNL and NN CALA, after extended good-faith negotiation, have agreed to the following actions in respect of reserves for the potential tax liability of the T&T Branch Office:

- <u>Nortel Networks International Corporation ("NNIC") Payment to NN CALA</u>.  NNIC will transfer the approximately $7.6 million of funds it has received from customers of the T&T Branch Office and that it has been holding since receipt to NN CALA.

- <u>Booking of NN CALA Tax Reserve</u>.  NN CALA agrees to shift a $5.2 million reserve related to VAT obligations previously booked in the fourth quarter of 2009 to 2008, resulting in an adjustment of the 2008 TPA calculation in favor of NN CALA.

- <u>Reduction of NNL Claim</u>.  NNL will reduce its otherwise allowable pre-petition claim against NN CALA by $5.2 million as a result of NN CALA's shift of the VAT reserve from 2009 to 2008.  Should NN CALA be determined to have pre-petition liability to the Trinidad & Tobago taxing authorities that exceeds the amounts addressed in the T&T Tax Motion and the $5.2 million 2008 VAT reserve, NNL shall reduce its otherwise allowable claim by the amount of such increased liability.

13

23.     In 2009, N Mexico COE,[15] which provides sales and marketing services to other Nortel entities, faced liquidity constraints that threatened its ability to continue to operate.  In order to avoid interruption in the provision of goods and services by N Mexico COE, NNI, NN CALA and NNL agreed to increase the activity-based charge out rate paid by NNI, NN CALA and NNL to N Mexico COE during the post-filing period (the "Charge Out Rate").  The increase in the Charge Out Rate was determined by calculating the minimum increase required to maintain N Mexico COE's ongoing operations, based on good faith belief and the best available information at the time, including accounts receivable and other factors.

24.     Subsequently, as accounts receivable were collected, it became apparent that N Mexico COE overestimated the funds required to maintain its operations in 2009, resulting in an unnecessary increase in the Charge Out Rate and overpayment by NNI, NN CALA and NNL.  In light of this overpayment, NNI, NN CALA and NNL, after engaging in extensive negotiations in good faith, have agreed to use the first funds distributed by N Mexico COE as a result of its wind-down after satisfaction of any third party liabilities to refund those amounts that were paid to N Mexico COE above and beyond the prior agreed rates for goods and services as a result of the increase in the Charge Out Rate on a pro-rata basis to NNI, NN CALA, NNL and NN Mexico.[16]  If these amounts are recovered in full, N Mexico COE will pay any pre-filing claims to other intercompany creditors.

**E.      Interrelationship of Agreements**

25.     The US/Canada Term Sheet will be executed at the same time as the ATPA and the Q1 Settlement Agreement.  In addition, it is the intent of the parties to the US/Canada Term

---

[15]     N Mexico COE is 99% owned by NNL, with NNIC holding the remaining ownership interests.

[16]     After the Petition Date, NN Mexico also made certain post-filing advances to N Mexico COE.  In accordance with the settlement described above, NN Mexico will be repaid such amounts on a pro-rata basis with NNI, NN CALA and NNL.

Sheet that certain of the actions set forth in the US/Canada Term Sheet, including the amendment of the Subject LRD Agreements, be implemented at the same time as the actions the Debtors seek authority to take in this Motion.  As such, the proposed form of Order attached hereto as Exhibit A conditions the Debtors' authority to enter into the ATPA and the Q1 Settlement Agreement on the execution by all parties of the US/Canada Term Sheet and performance thereunder.

26.      In addition, the entry into the ATPA and Q1 Settlement Agreement will facilitate the consummation of certain other inter-estate settlements, including those for which the Debtors recently sought approval in their motion to approve certain agreements related to o.o.o. Nortel Networks ("Nortel Russia") [D.I. 6047] and for which the Debtors are seeking approval with respect to a settlement with GENBAND Inc.

27.      As noted above, the Debtors have attached agreed forms of the ATPA and the Q1 Settlement Agreement to this Motion, rather than executed agreements.  The Debtors have not executed the agreements for two reasons.  First, the Debtors have been informed by counsel to the Joint Administrators that, prior to execution of ancillary agreements to the ATPA and the Q1 Settlement Agreement by Nortel Russia, the General Director of Nortel Russia will be seeking shareholder approval of its ability to sign such agreements.  Second, the Debtors have yet to receive final confirmation that the NNSA Liquidator has approved the current form of the ATPA.  The Debtors are filing this Motion prior to the execution of such agreements based on representations made to them by counsel to the Joint Administrators that all necessary approvals and executions will be forthcoming on or before August 16, one week before a hearing on this Motion is proposed to be scheduled.

**Basis for Relief**

28.     The relief requested in this Motion is authorized by sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.  Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105.  See In re Combustion Engineering, Inc., 391 F.3d 190, 236 (3d Cir. 2004) (noting that section 105(a) of the Bankruptcy Code "has been construed to give a bankruptcy court 'broad authority' to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings."); In re VII Holdings Co., 362 B.R. 663, 668 (Bankr. D. Del. 2007) (BLS) (noting that "[s]ection 105(a) bestows broad equitable powers on the Court.") (citing In re Combustion Engineering, Inc., 391 F.3d 190, 236 (3d Cir. 2004)).

29.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease property of the estate outside of the ordinary course of business after notice and a hearing.  11 U.S.C. § 363.  Section 363 applies when an agreement involves the disposition of the estate's assets in a way that ventures beyond an ordinary course transaction.  Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996).

30.     The use or transfer of estate property under section 363 of the Bankruptcy Code must be supported by a sound business purpose.  Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Decora Indus., Inc., No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); Travelers Cas. & Sur. Co. v. Future Claimants Representative, No. 07-2785, 2008 WL 821088, at *4 (D.N.J. Mar. 25, 2008).  A court determining whether a sound business purpose justifies the

transaction "should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." In re Montgomery Ward, 242 B.R. at 153-54 (quoting In re Lionel, 722 F.2d at 1071). In addition, a debtor must show that the transaction has been proposed in good faith, that adequate and reasonable notice has been provided, and that it is receiving fair and reasonable value in exchange. See In re Delaware & Hudson Ry. Co., 124 B.R. at 176; In re Decora Indus., Inc., 2002 WL 32332749, at *2.

31.     Bankruptcy Rule 9019 provides, in pertinent part, that, "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019. Citing this authority, the Third Circuit has emphasized that "[c]ompromises are favored in bankruptcy." Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996) (quoting Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)); see also In re World Health Alternatives, Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006) (finding settlements "generally favored in bankruptcy"). Additionally, the Third Circuit has recognized that "'[i]n administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts.'" In re Penn Cent. Transp. Co., 596 F.2d 1102, 1113 (3d Cir. 1979) (quoting Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968)). And courts in this District have recognized that the approval of a proposed compromise and settlement is committed to the sound discretion of the bankruptcy court. See, e.g., In re Coram Healthcare Corp., 315 B.R. 321, 329 (Bankr. D. Del. 2004).

32.     Before approving a settlement under Bankruptcy Rule 9019, a court must determine whether "the compromise is fair, reasonable, and in the interest of the estate." In re

17

Marvel Entm't Group, Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's, Inc., 211

B.R. 798, 801 (D. Del. 1997)).  Basic to the process of evaluating proposed settlements is "the

need to compare the terms of the compromise with the likely rewards of litigation."  TMT Trailer

Ferry, 390 U.S. at 424-25.  The court need not be convinced that the settlement is the best

possible compromise in order to approve it.  In re Coram Healthcare Corp., 315 B.R. at 330.

Rather, the court's obligation is to "canvass the issues and see whether the settlement falls below

the lowest point in a range of reasonableness."  Travelers Cas. & Sur. Co. v. Future Claimants

Representative, No. 07-2785, 2008 WL 821088, at *5 (D.N.J. Mar. 25, 2008) (citing Matter of

Jasmine, Ltd., 258 B.R. 119 (D.N.J. 2000)); see also In re Coram Healthcare Corp., 315 B.R. at

330.

33.    The Third Circuit has set out four criteria for a bankruptcy court to consider when

evaluating a settlement proposal (the "Martin Factors"):  "(1) the probability of success in

litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved,

and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest

of the creditors."  In re Martin, 91 F.3d at 393 (citing In re Neshaminy Office Bldg. Assocs., 62

B.R. 798, 803 (E.D. Pa. 1986)); see also Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.),

283 F.3d 159, 165 (3d Cir. 2002); In re eToys, Inc., 331 B.R. 176, 198 (Bankr. D. Del. 2005).

34.    The Debtors respectfully submit that the ATPA and Q1 Settlement Agreement

meet each of the requirements under section 363 of the Bankruptcy Code and Bankruptcy Rule

9019.  The ATPA and Q1 Settlement Agreement are supported by a sound business purpose

because entry into the ATPA and Q1 Settlement Agreement will provide clarity that the Debtors

have settled all Transfer Pricing Payments that could be owing by the Debtors and any potential

claims to those payments from the Canadian Debtors and the EMEA Group for the period from

October 1, 2009 through the later of the conclusion of the Canadian Proceedings or the consummation of the wind-down of the Canadian Debtors' estates.  The ATPA also provides for the release of US$53 million to NNI from the Enterprise Distribution Account (as defined in the ATPA).  Any attempt to resolve the issues addressed in the ATPA and the Q1 Settlement Agreement through litigation would delay or frustrate the release of the US$53 million to NNI.  As a result, any potential benefit of such an approach is outweighed by the risks of both litigation and delay.

35.    Accordingly, the Debtors submit that approval of the ATPA and Q1 Settlement Agreement, and the terms and conditions of each are fair and reasonable.  Each of these agreements has been proposed in good faith upon reasonable and adequate notice, and is in the best interest of the Debtors' estates, creditors and other stakeholders and should, therefore, be approved by the Court.

## Notice

36.    Notice of the Motion has been given via facsimile, electronic transmission, hand delivery or overnight mail to the (i) U.S. Trustee; (ii) the Monitor; (iii) counsel to the Committee; (iv) counsel to the Bondholder Group; (v) counsel to the Joint Administrators; (vi) the ATPA and Q1 Parties; and (vii) the general service list established in these chapter 11 cases. The Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

37.    No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  August 11, 2011  
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)  
Lisa M. Schweitzer (admitted *pro hac vice*)  
One Liberty Plaza  
New York, New York 10006  
Telephone:  (212) 225-2000  
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*  
Derek C. Abbott (No. 3376)  
Eric D. Schwartz (No. 3134)  
Ann C. Cordo (No. 4817)  
1201 North Market Street  
P.O. Box 1347  
Wilmington, Delaware 19801  
Telephone:  (302) 658-9200  
Facsimile: (302) 658-3989

*Counsel for the Debtors*  
*and Debtors in Possession*