**EXHIBIT B**

## Agreement on Transfer Pricing Amendments and Certain Other Matters

EXECUTION VERSION

**AGREEMENT ON TRANSFER PRICING AMENDMENTS
AND CERTAIN OTHER MATTERS**

This agreement (the "Agreement") is entered into as of [●], 2011 by and among Nortel Networks Limited ("NNL") and the other entities set forth in Schedule 1 attached hereto (the "Canadian Debtors"), Nortel Networks Inc. ("NNI") and the other entities set forth in Schedule 2 attached hereto (the "US Debtors"), the Joint Administrators (as defined below), the entities set forth in Schedule 3 attached hereto (the "EMEA Debtors") and Nortel Networks AG ("NNAG", together with the EMEA Debtors, the "EMEA Group", and the EMEA Group together with the US Debtors, the Canadian Debtors and the non-debtor affiliates of each, the "Nortel Group"). The Canadian Debtors, the US Debtors, the EMEA Debtors and NNAG are sometimes referred to herein individually as a "Party" and collectively as the "Parties". The Joint Administrators, in their personal capacities, shall be party to this Agreement as provided in Section 8 and solely for the purpose of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Administrators and references to the Parties shall be construed accordingly.

WHEREAS, on January 14, 2009 (the "Filing Date"), the Canadian Debtors commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the *Companies' Creditors Arrangement Act* (Canada) (respectively, "CCAA" and the "Canadian Proceedings"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor"); and

WHEREAS, on the Filing Date, the US Debtors filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the *United States Code* (respectively, the "Bankruptcy Code," and the "US Proceedings"); and

WHEREAS, on the Filing Date, the EMEA Debtors commenced administration proceedings (the "UK Proceedings") before the High Court of Justice in London, England, represented by individuals from Ernst & Young LLP (the "UK Administrator"), and, in the case of Nortel Networks (Ireland) Limited only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), serving as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, the "Joint Administrators"); and

WHEREAS, while the UK Proceedings in respect of Nortel Networks S.A. ("NNSA") are continuing, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator were appointed by the Versailles Commercial Court (the "French Court") (Docket No. 2009P00492) for NNSA. Pursuant to applicable French statutory provisions, the NNSA Liquidator is a signatory of this Agreement on behalf and acting as agent of NNSA; and

WHEREAS, an Official Committee of Unsecured Creditors has been appointed in the US Proceedings (the "Creditors' Committee") and a steering committee of members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with NNL (the "Bondholders' Group") has been formed; and

WHEREAS, prior to the Filing Date, quarterly "true up" payments ("Transfer Pricing Payments") were made by certain members of the Nortel Group to other Nortel Group entities pursuant to a transfer pricing methodology embodied in the (i) Master Research and Development Agreement dated as of December 22, 2004, with an effective date of January 1, 2001 (as amended by, and together with the related understandings contained in, the documents listed in Annex A hereto, the "Master R&D Agreement") and, in particular, the "Second Amendment to Schedule A" thereof and (ii) certain distribution agreements, whether written or oral, between one or more Nortel Group entities, including without limitation the agreements listed in Annex B hereto and any other agreements similar to the agreements listed in Annex B hereto (as amended, supplemented or otherwise modified, the "Distribution Agreements" and, together with the "Master R&D Agreement", the "Transfer Pricing Agreements"); and

WHEREAS, since the Filing Date, the US Debtors, the Canadian Debtors and the EMEA Debtors have engaged in the inter-company trading of goods and services pursuant to those certain group supplier protocol agreements between the US Debtors and the EMEA Debtors and between the Canadian Debtors and the EMEA Debtors (the "GSPAs") and pursuant to certain court orders entered in the Canadian Proceedings and the US Proceedings, and have made and continue to make payments in respect of such inter-company trading (the "Inter-Company Trading Payments"); and

WHEREAS, since the Filing Date, issues relating to Transfer Pricing Payments have arisen among various members of the Nortel Group and certain of those issues were resolved in, *inter alia*, the (i) Interim Funding and Settlement Agreement dated as of June 9, 2009 by and among the Canadian Debtors, the US Debtors and the EMEA Group (the "IFSA"), and (ii) the Final Canadian Funding and Settlement Agreement dated as of December 23, 2009 by and among the Canadian Debtors, the Monitor and the US Debtors (the "FCFSA"); and

WHEREAS, pursuant to the terms of the IFSA and the FCFSA, the US Debtors have settled any and all amounts that the US Debtors may or could owe in respect of the NNI Interim Obligations (as such term is defined in the IFSA) and the Covered Obligations (as such term is defined in the FCFSA), which includes, without limitation, any Transfer Pricing Payments payable by the US Debtors to the Canadian Debtors during, or with respect to, the period from the Filing Date through the later of the conclusion of the Canadian Proceedings or the consummation of the wind-down of the Canadian Debtors' estates; and

WHEREAS, as a result of the various post-Filing Date Nortel business unit divestitures the Parties have determined that the Transfer Pricing Payments are no longer appropriate, however the parties agree that the Transfer Pricing Agreements should otherwise continue in full force and effect as contemplated herein; and

WHEREAS, contemporaneous with the signing of this Agreement, certain of the US Debtors, the Canadian Debtors and the EMEA Debtors have amended the GSPAs retroactive to April 1, 2010 to remove the reference to payments under the Master R&D Agreement from the definition of "Goods and Services" (as defined in the GSPAs); and

WHEREAS, certain of the US Debtors, the Canadian Debtors, certain of their affiliates and Avaya Inc. ("Avaya") have entered into that certain Amended and Restated Asset and Share Sale Agreement, dated as of September 14, 2009 (as amended and restated and as may be further amended and/or restated from time to time in accordance with its terms, the "Enterprise ASSA"), and certain of the EMEA Group and certain of their affiliates, the Joint Administrators and Avaya have entered into that certain Amended Asset Sale Agreement, dated as of September 14, 2009 (as amended and restated by that certain Amendment and Restatement Agreement dated as of September 14, 2009 and as may be further amended and/or restated from time to time in accordance with its terms, the "Enterprise EMEA ASA"); and

WHEREAS, prior to the closing of the transactions contemplated by the Enterprise ASSA and the Enterprise EMEA ASA, certain of the Parties and their affiliates, the Estate Fiduciaries (as defined in the Enterprise Escrow Agreement) and the Distribution Agent (as defined in the Enterprise Escrow Agreement, and hereinafter the "Enterprise Distribution Agent") entered into that certain Escrow Agreement, dated as of December 18, 2009 (the "Enterprise Escrow Agreement") whereby the Enterprise Distribution Agent agreed to hold the Escrow Funds (as defined in the Enterprise Escrow Agreement, hereinafter the "Enterprise Escrow Funds") in a Distribution Account (as defined in the Enterprise Escrow Agreement, hereinafter the "Enterprise Distribution Account") and to release the Enterprise Escrow Funds in accordance with the terms of the Enterprise Escrow Agreement; and

WHEREAS, in addition to other agreements contained herein, the Parties have agreed to direct the release of US$30,119,972 from the relevant escrow accounts to NNL as reimbursement for payments made by NNL to obtain carve-out financial statements (the "Carve-Out Financials Reimbursement"), in the manner approved in that certain order of US Court (i) Authorizing the Debtors to Enter Into the Lazard Side Agreement and (ii) Authorizing Debtors To Direct The Escrow Agents To Release Funds To NNL For Reimbursement Of Certain Professional Fees (listed on the docket of the US Debtors' chapter 11 bankruptcy cases at D.I. 4404, and the motion and related exhibits seeking approval of such order at D.I.s 4237 and 4379) (the "Carve-Out Financials Order"); and

WHEREAS, the Parties and certain of their affiliates have agreed to make certain payments pursuant to that certain Lazard Fee Side Agreement, dated as of November 23, 2010, by and among Nortel Networks Corporation ("NNC") and the other parties contained on Schedule A thereto, NNI and the other parties contained on Schedule B thereto, NNUK and the other parties contained on Schedule C thereto, the Joint Administrators, Nortel Networks Israel (Sales and Marketing) Limited (In Administration), the Joint Israeli Administrators (as defined therein), NNSA, the NNSA Office Holders (as defined therein), and certain other affiliates of NNC listed on Schedule D thereto (the "Lazard Fee Side Agreement"),

NOW, THEREFORE, in consideration of the respective covenants made herein, and of the mutual benefits to be derived hereby (the sufficiency of which are acknowledged), the Parties hereto agree:

1.     In respect of the period from and after April 1, 2010, no further Transfer Pricing Payments are required nor shall be made amongst the respective parties to (i) the Master R&D Agreement, or (ii) the Distribution Agreements.  The non-payment by any Party or Participant (as defined in the Master R&D Agreement) of Transfer Pricing Payments relating to any period from and after April 1, 2010 shall not constitute a repudiation, rejection or breach of the Transfer Pricing Agreements or give rise to a "Defaulting Event" under the Master R&D Agreement. The foregoing constitutes a termination and release of the obligation of those Parties obligated, as of the date of this Agreement, to make Transfer Pricing Payments under the Transfer Pricing Agreements in respect of the period from and after April 1, 2010.

2.     Any rights in or to intellectual property (including for the avoidance of doubt any license rights) that any one or more of the Parties have under the Transfer Pricing Agreements as of the date of this Agreement shall not:

      (a)     be affected by the exclusion of Transfer Pricing Payments from the GSPAs; and

      (b)     be affected by the non-payment by any Party of the Transfer Pricing Payments relating to any period from and after April 1, 2010.

3.     Notwithstanding the terms of the Transfer Pricing Agreements, no Party shall terminate or seek to terminate the participation of any other Party to, or Participant (as defined in the Master R&D Agreement) in, the Transfer Pricing Agreements without the written consent of the other parties to the relevant Transfer Pricing Agreements.

4.     Except as expressly provided for in this Agreement, nothing in this Agreement shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the Transfer Pricing Agreements, applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements, the right to object to the failure to make payments under or in connection with the Transfer Pricing Agreements, or any offset arising therefrom or otherwise, or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise. The use of the term "Transfer Pricing Payments" (or any similar term) or reference to "Transfer Pricing Agreements" (or similar agreement) in this Agreement is for convenience only and shall have no evidentiary effect or be used by any of the Parties hereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any Party of the Transfer Pricing Agreements or any transfer pricing methodology provided in the Transfer Pricing Agreements.  Nothing in this Agreement

4

shall (i) bar, prohibit, or in any way hinder or enhance the rights of the Parties to this Agreement to present any arguments, methodologies, or legal or factual theories in support of a proposed allocation of the proceeds of any transaction, including without limitation, the sale of assets, businesses or intellectual property, that would be subject to allocation amongst any of the Parties hereto (each, a "Sale Transaction"), and such presentation shall not, or otherwise be deemed to, constitute in any way a violation of a Party's rights under any existing agreement or (ii) be deemed to, determine, justify, support or have any impact whatsoever on the allocation of the sale proceeds of any Sale Transaction. For the avoidance of doubt, nothing in this Agreement shall affect any claim, right, argument or defense a Party may have in respect of Transfer Pricing Payments and/or the Transfer Pricing Agreements, in each case solely relating to any period prior to the Filing Date, including without limitation the claims previously filed by the EMEA Debtors and/or NNAG in the US Proceedings and/or the Canadian Proceedings; the rights of any Party to oppose such claims; and the claims of NNI previously allowed in the Canadian Proceedings.

5.    Except as expressly set forth herein, nothing in this agreement shall permit or constitute an amendment, modification or waiver of rights of any party under, as applicable, the IFSA and the FCFSA, and this Agreement shall not supersede the IFSA and the FCFSA in any respect.

6.    <u>Releases from Sale Proceeds Escrow Accounts</u>.

(a)    The Parties hereby agree that each shall take all commercially reasonable steps to direct the release of US$53,000,000 plus any interest accrued thereon from the Enterprise Distribution Account to NNI in respect of the difference between the Closing Companies Net Working Capital and the Target Closing Companies Net Working Capital (each as defined in the Enterprise ASSA) (the "NNI Cash Reimbursement"), including without limitation by providing directions in the form attached hereto as Annex C to the Enterprise Distribution Agent to pay the NNI Cash Reimbursement to NNI, and that the release of the NNI Cash Reimbursement is a condition to the effectiveness of this Agreement, as set forth in Section 7(b). The Parties further agree that the NNI Cash Reimbursement is solely for the purpose of reimbursing funds to NNI that it owned as of December 18, 2009, and such NNI Cash Reimbursement shall have no precedential impact on the ultimate allocation of the Enterprise Escrow Funds to any Depositor (as defined in the Enterprise Escrow Agreement); and

(b)    The Parties hereby agree that each shall take all commercially reasonable steps to direct the release of the Carve-Out Financials Reimbursement, including without limitation by providing letters of direction to the relevant escrow agents in the forms attached hereto in Annex D, and that the release of the Carve-Out Financials Reimbursement is a condition to the effectiveness of this Agreement, as set forth in Section 7(c). The Parties further agree that the Carve-Out Financials Reimbursement is solely for the purpose of reimbursing funds to NNL

5

that it paid to obtain carve-out financial statements, and such Carve-Out Financials Reimbursement shall have no precedential impact on the ultimate allocation of Sale Proceeds (as defined in the IFSA) to any Seller (as defined in the IFSA).

7.    This Agreement shall become effective upon:

(a)    the approval of the US Court, the Canadian Court and the French Court.  The US Debtors, the Canadian Debtors and NNSA shall (i) use commercially reasonable efforts to obtain such approval as soon as possible (ii) keep all other Parties (as well as the Creditors' Committee and the Bondholders' Group) reasonably apprised of the progress of such approval and provide such other information regarding the satisfaction of such approval as reasonably requested by other Parties (and the Creditors' Committee and the Bondholders' Group); and (iii) use commercially reasonable efforts to allow any other Party which so requests in writing reasonable participation in connection with any proceedings in any Court relating to such approval;

(b)    the execution and delivery of the letter of direction attached hereto as Annex C to the Enterprise Distribution Agent and the release of the NNI Cash Reimbursement;

(c)    the execution and delivery of the letters of direction attached hereto in Annex D to the relevant escrow agents effecting the payment to NNL of the Carve Out Financials Reimbursement and the release of the Carve Out Financials Reimbursement;

(d)    the execution and delivery of the letters of direction attached hereto in Annex E to the relevant escrow agents to release US$5,384,932.48 to be paid to NNI pursuant to the Lazard Fee Side Agreement (the "<u>Lazard Fee Reimbursement</u>") and the release of the Lazard Fee Reimbursement; and

(e)    the execution and delivery of the letter of direction attached hereto as Annex F to the relevant escrow agent for the escrow account containing the Sale Proceeds (as defined in the IFSA) from the MEN Sale Transaction (as defined in the Lazard Fee Side Agreement) for the release of US$3,287,333.34, to Lazard Ltd. (f/k/a Lazard Frères & Co. LLC) in respect of the obligations contained in <u>Section 2.2</u> and <u>Schedule F</u> of the Lazard Fee Side Agreement (the "<u>Lazard MEN Fee Payment</u>") and the release of the Lazard MEN Fee Payment.

Notwithstanding any of the foregoing, the following provisions of the Agreement shall be effective as of the date hereof:  Sections 5, 7, 8, 9, 10, 11, 12, 13 and 14.

8.    The Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors excluding NNSA, which is represented by the NNSA Liquidator,

to which they are appointed and none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations. The Joint Administrators are a Party to this Agreement: (i) as agents of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the *United Kingdom Insolvency Act 1986* and for the purposes of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Administrators and enforcing the obligations of certain other Parties to this Agreement.

9.      The NNSA Liquidator has negotiated and is entering into this Agreement as agent for NNSA to which he is appointed and that none of the NNSA Liquidator, his firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group (defined in the IFSA) company to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

10.     The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which shall be an original and all of which together shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic means shall be effective as delivery of a manually executed counterparty of this Agreement.

11.     <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial</u>.

(a)     The Parties agree that this Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; *provided*, *however*, that Section 8 shall be governed exclusively by English law.

(b)     To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US Court and the Canadian Court (in a joint hearing conducted under the Cross-Border Insolvency Protocol approved by the US Court by an Order dated January 15, 2009 and by the Canadian Court in an Order dated January 14, 2009 (as amended or as amended and restated from time to time, the "<u>Cross-Border Insolvency Protocol</u>") for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the US Court if such claim, action or proceeding would solely affect the US Debtors, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Debtors, a joint hearing of both the Canadian

Court and the US Court conducted under the Cross-Border Insolvency Protocol if such claim, action or proceeding would affect the Canadian Debtors, the US Debtors and the EMEA Group, and the English courts if such claim, action or proceeding would solely affect the EMEA Group, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a court or any claim that any such action brought in such a court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law; *provided*, *however*, that any claim, action or proceeding set forth in Section 8 shall be brought exclusively in the English courts.

(c)     Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Agreement or any transaction or matter contemplated hereby. Each Party (i) certifies that no representative, agent or attorney of any other Party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other parties hereto have been induced to enter into this agreement by, among other things, the mutual waivers and certifications in this Section 11.

12.     Amendments; Waiver.  This Agreement may be amended and a term hereunder may be waived, on no less than ten (10) Business Days' notice, only by means of a writing signed by all Parties, and approved in writing by the Creditors' Committee and the Bondholders' Group, which amendments or waivers, if material in the judgment of the Parties, must be approved by all of the Courts that initially approved this Agreement.  For the purpose of this Section 12, "Business Day" shall mean a day that is not a Saturday, Sunday or national public holiday in Canada or the United States.

13.     Third-Party Beneficiaries.  Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the Parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third parties to the Parties, nor shall any provision give any third persons any right of subrogation or action against any party to this Agreement, nor shall any provision estop or otherwise limit the rights of the Parties to assert any claims, counterclaims or defenses against any third party; *provided, however,* that the Creditors' Committee (as a statutory fiduciary body appointed in the US Proceedings) and the Bondholders' Group shall each be a third-party beneficiary of this Agreement entitled to enforce and take advantage of the benefits of this Agreement to their fullest extent as if it were a signatory hereto.

14.    <u>Severability</u>.  In the event that any provision of this Agreement shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision.  The Parties shall negotiate in good faith with respect to any provision to this Agreement found to be illegal, invalid or unenforceable, in order to agree, with the consent of the Parties, the Creditors' Committee and the Bondholders' Group, on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision.

[*Remainder of page intentionally left blank.  Signature pages follow.*]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the date first written above.

NORTEL NETWORKS CORPORATION

Per: _____
      Name:
      Title:

Per: _____
      Name:
      Title:

NORTEL NETWORKS LIMITED

Per: _____
      Name:
      Title:

Per: _____
      Name:
      Title:

NORTEL NETWORKS GLOBAL CORPORATION

Per: _____
      Name:
      Title:

Per: _____
      Name:
      Title:

*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

NORTEL NETWORKS INTERNATIONAL
CORPORATION

Per: _____
    Name:
    Title:


Per: _____
    Name:
    Title:


NORTEL NETWORKS TECHNOLOGY
CORPORATION

Per: _____
    Name:
    Title:


Per: _____
    Name:
    Title:

*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

NORTEL NETWORKS INC.

By: _____
    Name:
    Title:


ARCHITEL SYSTEMS (U.S.) CORPORATION

By: _____
    Name:
    Title:


CORETEK, INC.

By: _____
    Name:
    Title:


NORTEL ALTSYSTEMS, INC.

By: _____
    Name:
    Title:


NORTEL ALTSYSTEMS INTERNATIONAL INC.

By: _____
    Name:
    Title:


*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.

By: _____
      Name:
      Title:


NORTEL NETWORKS CABLE SOLUTIONS
INC.

By: _____
      Name:
      Title:


NORTEL NETWORKS CAPITAL
CORPORATION

By: _____
      Name:
      Title:


NORTEL NETWORKS HPOCS INC.

By: _____
      Name:
      Title:


NORTEL NETWORKS INTERNATIONAL INC.

By: _____
      Name:
      Title:


*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By: _____
      Name:
      Title:


NORTHERN TELECOM INTERNATIONAL
INC.

By: _____
      Name:
      Title:


QTERA CORPORATION


By: _____
      Name:
      Title:


SONOMA SYSTEMS


By: _____
      Name:
      Title:


XROS, INC.


By: _____
      Name:
      Title:


*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

**SIGNED** by Alan Bloom in his own capacity   )
and on behalf of the Joint Administrators   )
without personal liability and solely for the   )   ........................................................................
benefit of the provisions of this Agreement   )
expressed to be conferred on or given to the   )
Joint Administrators in the presence of:   )

Witness signature

........................................................................   )
Name:   )
Address:   )


**SIGNED** for and on behalf of **Nortel Networks**   )
**UK Limited** (in administration) by Christopher   )   ........................................................................
Hill as Joint Administrator (acting as agent and   )
without personal liability) in the presence of:   )

Witness signature

........................................................................   )
Name:   )
Address:   )
   )


**SIGNED** for and on behalf of **Nortel Networks**   )
**(Ireland) Limited** (in administration) by David   )   ........................................................................
Hughes as Joint Administrator (acting as agent   )
and without personal liability) in the presence   )
of:

Witness signature

........................................................................   )
Name:   )
Address:   )

*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

**SIGNED** for and on behalf of **Nortel Networks**                )        ...........................................................................

**N.V.** (in administration) by Christopher Hill as                )

Joint Administrator (acting as agent and without                )

personal liability) in the presence of:                                )

Witness signature

...............................................................            )

Name:                                                                            )

Address:                                                                         )

**SIGNED** for and on behalf of **Nortel Networks**                )        ...........................................................................

**SpA** (in administration) by Christopher Hill as                )

Joint Administrator (acting as agent and without                )

personal liability) in the presence of:                                )

Witness signature

...............................................................            )

Name:                                                                            )

Address:                                                                         )

**SIGNED** for and on behalf of **Nortel Networks**                )        ...........................................................................

**B.V.** (in administration) by Christopher Hill as                )

Joint Administrator (acting as agent and without                )

personal liability) in the presence of:                                )

Witness signature

...............................................................            )

Name:                                                                            )

Address:                                                                         )

*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

**SIGNED** for and on behalf of **Nortel Networks**   )   ..................................................................
**Polska Sp. z.o.o.** (in administration) by   )
Christopher Hill as Joint Administrator (acting   )
as agent and without personal liability) in the   )
presence of:   )

Witness signature

..........................................................   )
Name:   )
Address:   )


**SIGNED** for and on behalf of **Nortel Networks**   )   ..................................................................
**Hispania S.A.** (in administration) by   )
Christopher Hill as Joint Administrator (acting   )
as agent and without personal liability) in the   )
presence of:   )

Witness signature

..........................................................   )
Name:   )
Address:   )


**SIGNED** for and on behalf of **Nortel Networks**   )   ..................................................................
**(Austria) GmbH** (in administration) by   )
Christopher Hill as Joint Administrator (acting   )
as agent and without personal liability) in the   )
presence of:   )

Witness signature

..........................................................   )
Name:   )
Address:   )


*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

S-8

**SIGNED** for and on behalf of **Nortel Networks s.r.o.** (in administration) by Christopher Hill as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

.........................................................

Witness signature

.............................................................

Name:
Address:

)
)
)

**SIGNED** for and on behalf of **Nortel Networks Engineering Services kft** (in administration) by Christopher Hill as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)
)

.........................................................

Witness signature

.............................................................

Name:
Address:

)
)
)

**SIGNED** for and on behalf of **Nortel Networks Portugal S.A.** (in administration) by Christopher Hill as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)
)

.........................................................

Witness signature

.............................................................

Name:
Address:

)
)
)

*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

**SIGNED** for and on behalf of **Nortel Networks**    )    ........................................................
**Slovensko s.r.o.** (in administration) by    )
Christopher Hill as Joint Administrator (acting    )
as agent and without personal liability) in the    )
presence of:    )
    )

Witness signature

........................................................
Name:    )
Address:    )
    )

**SIGNED** for and on behalf of **Nortel Networks**    )    ........................................................
**Romania s.r.l.** (in administration) by    )
Christopher Hill as Joint Administrator (acting    )
as agent and without personal liability) in the    )
presence of:    )

Witness signature

........................................................    )
Name:    )
Address:    )

**SIGNED** for and on behalf of **Nortel Networks**    )    ........................................................
**France S.A.S.** (in administration) by Kerry    )
Trigg acting as authorised representative for the    )
Joint Administrators (acting as agent and    )
without personal liability) in the presence of:    )

Witness signature

........................................................    )
Name:    )
Address:    )

*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

S-10

**SIGNED** for and on behalf of **Nortel Networks**                )       .......................................................................
**GmbH** (in administration) by Christopher Hill                     )
as Joint Administrator (acting as agent and                         )
without personal liability) in the presence of:                     )

Witness signature

.............................................................                )
Name:                                                               )
Address:                                                            )


**SIGNED** for and on behalf of **Nortel Networks**                )       .......................................................................
**Oy** (in administration) by Christopher Hill as                   )
Joint Administrator (acting as agent and without                    )
personal liability) in the presence of:                             )

Witness signature

.............................................................                )
Name:                                                               )
Address:                                                            )


**SIGNED** for and on behalf of **Nortel Networks**                )       .......................................................................
**AB** (in administration) by Christopher Hill as                   )
Joint Administrator (acting as agent and without                    )
personal liability) in the presence of:                             )

Witness signature

.............................................................                )
Name:                                                               )
Address:                                                            )


*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

**SIGNED** for and on behalf of **Nortel Networks**    )    .............................................................
**International Finance and Holding B.V.** (in    )
administration) by Christopher Hill as Joint    )
Administrator (acting as agent and without    )
personal liability) in the presence of:    )

Witness signature

..............................................................    )
Name:    )
Address:    )


**SIGNED** for and on behalf of **Nortel Networks**    )
**S.A.** (in administration and secondary    )    .............................................................
proceedings) by Maitre Cosme Rogeau, in his    )
capacity as French Liquidator (Mandataire    )
Liquidateur) acting as agent and without    )
personal liability, in the presence of:    )    .............................................................

Witness signature

..............................................................    )
Name:    )
Address:    )


**SIGNED** by    )    .............................................................
Duly authorised for and on behalf of **Nortel**    )
**Networks AG** in the presence of:    )

Witness signature

..............................................................    )
Name:    )
Address:    )


*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

## CONSENT OF MONITOR

Ernst & Young Inc., as Monitor of the Canadian Debtors under the *Companies' Creditors Arrangement Act* consents to the Agreement.

**Ernst & Young Inc., in its capacity as Monitor in the CCAA proceedings and not in its personal capacity**

Per: _____

     Name:

     Title:

*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

Schedule 1
Canadian Debtors

Nortel Networks Corporation

Nortel Networks Limited

Nortel Networks Global Corporation

Nortel Networks International Corporation

Nortel Networks Technology Corporation

Schedule 2
US Debtors

Nortel Networks Inc.

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

Schedule 3
EMEA Debtors

Nortel Networks UK Limited (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks NV (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks BV (In Administration)

Nortel Networks Polska Sp z.o.o. (In Administration)

Nortel Networks Hispania, SA (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks sro (In Administration)

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Portugal SA (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel GmbH (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks France S.A.S. (In Administration)

Nortel Networks SA (In Administration)

Annex A

Amendments to and Related Understandings Regarding
Master Research and Development Agreement
dated as of December 22, 2004 ("Master R&D Agreement")

1.    Undated Addendum to Master R&D Agreement executed between October 2005 and June 2006.

2.    Agreement with Respect to Certain NN Technology effective as of December 30, 2006 (being the day before the closing date of the Share and Asset Sale Agreement between NNL and Alcatel-Lucent).

3.    Addendum to Master R&D Agreement dated December 14, 2007 with an effective date of January 1, 2006.

4.    Third Addendum to Master R&D Agreement with an effective date of January 1, 2006.

5.    Fourth Addendum to Master R&D Agreement with an effective date of December 31, 2008.

6.    Letter of acknowledgment dated January 14, 2009 from NNL to the Directors of NNUK, NNSA and NNIR and the UK Administrator.

7.    Release in Connection with Master R&D Agreement dated 1 January 2009.

8.    Memorandum of Understanding in Connection with Master R&D Agreement, dated December 31, 2008 with an effective date of 1 January 2006.

Annex B

Distribution Agreements

| Party | Date |
|---|---|
| Nortel Networks Limited ("NNL") and Nortel Networks N.V. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks S.p.A. | undated, effective as of 1 January 2002 (plus undated and unsigned Addendum, effective as of 1 January 2003) |
| NNL and Nortel Networks B.V. | dated 22 December 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Polska Sp. Z. O. O. | Undated, effective as of 1 January 2001 (letter of amendment executed in November 2003, effective as of 1 January 2001 plus Addendum executed in August 2005, effective as of 1 January 2003) |
| NNL and Nortel Networks Hispania, S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks (Austria) GmbH | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks, s.r.o. | dated 15 April 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Engineering Services Kft | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Portugal S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Slovensko, s.r.o. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Romania SRL | executed 22 January 2004, effective 1 January 2003 |
| NNL and Nortel Networks AG | undated, effective 1 January 2001 |

Annexes C (NNI Cash Reimbursement Joint Instructions), D (Carve-Out Financials Reimbursement Joint Instructions), E (Lazard Fee Reimbursement Joint Instructions) and F (Lazard Fee Reimbursement Joint Instructions) are intentionally omitted because of their voluminous nature and are available upon request of the Debtors.