**EXHIBIT D**

**US/Canada Term Sheet**

Execution Copy

**August 2011**

**Timeline for and Proposed Resolutions of Pending US/Canada Issues**

*The issues listed on this term sheet shall be implemented at the same time as those items set out on the Global Inter-estate Term sheet.  In particular, the Q1SA and the Agreement on Transfer Pricing Amendments and Certain Other Matters shall only be implemented contemporaneously with the Transfer Pricing Issues listed as item I on this term sheet, and the Transfer Pricing Issues listed as item I on this term sheet shall be effective upon U.S. and Canada court approval of the Q1SA and the Agreement on Transfer Pricing Amendments and Certain Other Matters. This term sheet is being executed at the same time as the Q1SA and the Agreement on Transfer Pricing Amendments and Certain Other Matters.

I.     **TRANSFER PRICING ISSUES**

    A.     **Nortel Networks Japan**

- TPA true-ups under the LRD agreement between NN Japan and NNL shall be terminated as of January 1, 2010, after which date products and services shall be purchased on a cost plus basis.

- Parties to work reasonably to achieve the following timeline:

  - Documentation of the LRD agreement finalized.

  - US Court approval not required as Nortel Japan is not a debtor.

  - Approval of UCC obtained.

    B.     **Nortel Networks CALA, Inc.**

- TPA true-up obligations under the LRD agreement between NN CALA and NNL shall be terminated as of January 1, 2010, after which date products and services shall be purchased on a cost plus basis.

- For TPA calculation purposes, NN CALA's $5.4 mm Q4 2009 intercompany charge relating to NN Mexico non-COE (company code 3170) that relates to 2008 expenses to the extent such charges are accepted and booked by NN CALA, will be booked in 2008, leading to a decrease in NNL's pre-petition claim against NN CALA.

- NN CALA 2009 TPA calculations will be done on a quarterly, not annual basis, with result being that neither party will owe true up payments for the period July 14, 2009 to December 31, 2009.

- NNL will agree to a $1 mm payment through end of 2010 for services being provided to NNL by NN CALA.  Such payment to be made within ten (10) days of U.S. and Canada court approval of the Q1SA and the Agreement on Transfer

Pricing Amendments and Certain Other Matters.  Services provided after January 1, 2011, will be reimbursed on a fully loaded basis.

o  The Mexico non-COE entity will confirm in writing within five business days of agreement to term sheet that no further claims (whether liquidated or not) exist by it against NNI or NN CALA relating to any period after January 1, 2009.

o  Parties to work reasonably to achieve the following timeline:

- Documentation finalized.

- US Court approval is not required.

**C.    Nortel Networks III**

o  TPA true-ups whether due under (a) the 4-way LRD among NNIII, N India (Pvt), NNL and N Singapore, with no liability to NNIII, or (b) any bi-lateral LRD, or any other agreement of any sort, whether written or unwritten, between NNIII and NNL or between NNIII and any other Nortel entity, shall be terminated as of January 1, 2010, after which date products and services shall be purchased on a cost plus basis.

o  NNIII will acknowledge that $4.3 mm is owed to NNL, the acknowledgement of which claim shall resolve the entirety of any claim that NNL may have against NNIII arising or relating to the period after January 1, 2009.

o  NNL's claims, including existing book debts and the post-January 1, 2009 TPA amounts owing against NNIII will be pari passu with other unsecured claims against NNIII.

o  Parties to work reasonably to achieve the following timeline:

- Documentation finalized.

- US Court approval is not required as NNIII is not a debtor.

- Approval of UCC obtained.

**II.    NORTEL CHINA LIMITED – NCL**

o  NCL acknowledges that as of September 30, 2010, $28.1mm is owed to NNI, payment of which is conditional upon required documentation and regulatory clearances.

o  NCL will provide monthly updates to NNI on NCL's financial situation.

o  NCL confirms to NNI that its Board of Directors believes, based upon information available to them and as of date of the agreement to term sheet, that

2

NCL is solvent and that there are no present plans to initiate an insolvent liquidation of NCL or turn over NCL's assets to a trustee or other official appointed to liquidate the enterprise.

o   NCL paid $6.75 mm and $5.6M to GDNT on October 12, 2010 and October 18 2010 respectively.  NN Asia paid $1.8M to GDNT on October 19, 2010.  In return, GDNT paid $6.6M to NN Asia on October 13, 2010 and another $6.6M on October 21, 2010.  The payments from GDNT to NN Asia are net of $0.94M withholding tax deducted.  NCL also made the promised payment of $11.2 mm (net of withholding tax of $0.6 mm) to NNI on October 22, 2010.

o   The RM Report dated November 26, 2010 took account of receipts by NN Asia from GDNT in October. The Report shows that NN Asia has surplus cash of $6.16m and the recommendation is that this is paid to NN Asia I/Co creditors on a pro-rata basis.  This payment of $6.16M will be made within 10 business days following approval by the US and Canadian Courts of the Q1 Transfer Pricing Settlement Agreement and Transfer Pricing Amending Agreement.

o   NCL has prepared documentation for payment of $2.1 mm to NNI ($0.4 mm for expat payroll and $1.7 mm for miscellaneous).  The $0.4 mm  has already been paid on various dates between October 15 and October 26, 2010.  The documentation for the remaining $1.7 mm was submitted to the Chinese tax authorities in August – based on correspondence with the tax authorities an amendment to the document agreement was prepared.  On submission of this revised agreement the tax authorities have asked for further documentation to support the transactions. The team are working on obtaining as much as possible of the documents requested with a view to submitting the information again to the authorities in Q2'11.  Regular and timely updates on progress will be provided to NNI.

o   NCL has paid to NNI gross royalty payments of $9.5 mm (less applicable withholding tax) on April 15, 2011.

o   NCL will provide NNI with copies of documentation, as it is located or obtained, with respect to the $5.9 mm of expat payroll and vouchers shown for payment in 2011; copies of the documentation submitted will be provided to NNI; NCL will provide NNI with periodic updates on status, as well as timely notice of submission and either clearance or denial.

o   NCL will pay to NNI all amounts described herein as owing by NCL to NNI within 30 days of the receipt of all necessary approvals from the Chinese regulatory authorities.

o   US Court approval is not required.

o   Approval of UCC obtained.

3

III.    **N PAKISTAN (BRANCH OF NN ASIA)**

o   NNI will execute the waivers and consents requested by NN Asia

o   Waivers and consents will be executed within five business days of agreement to term sheet.

o   US Court approval is not required.

IV.    **TRINIDAD AND TOBAGO**

o   On January 11, 2011, NN CALA obtained U.S. Bankruptcy Court authorization to file tax returns with Trinidad and Tobago Tax Authority to pay $3.43 million in respect of $1.95 million of VAT taxes payable by NN CALA and $1.48 million of corporation, VAT and other local taxes incurred by NTTL for period 2007 – 2010.  Such tax returns were filed on May 31, 2011.

o   Upon execution hereof, NNIC will transfer the funds relating to T&T post-January 14, 2009 (approximately $7.1 mm) to NN CALA.[1]

o   NN CALA's $5.2 mm reserve in Q4 2009 for VAT taxes will be booked in 2008 and will result in an adjustment of 2008 TPA calculation in favor of NN CALA and will reduce NNL's otherwise allowable pre-petition claim against NN CALA by $5.2 mm as a result of NN CALA's increasing its reserve by $5.2 mm.

o   In the event that NN CALA has a larger liability than the full amount of any reserve in NN CALA's books of account, to the T&T tax authority arising out of pre-petition (pre- July 14, 2009) activity, NNL's otherwise allowable pre-petition claim against NN CALA shall be reduced by the amount of such increased liability.

o   US Court approval is not required.

o   Approval of UCC obtained.

V.    **NN MEXICO COE**

o   NNL, NN CALA, NNI and Nortel Networks de Mexico, S.A. de C.V. ("NN Mexico") made incremental payments in the post-filing period totaling $6,603,780.43 to Nortel de Mexico, S. de R.L. de C.V. ("Nortel Mexico COE"). These incremental payments, set forth on Appendix 1 to this Term Sheet, were made as a result of declining service demands, which resulted in increased price per unit charges by Nortel Mexico COE.   Nortel Mexico COE agrees to reimburse NNL, NN CALA, NNI and NN Mexico on a pro-rata basis up to the Appendix 1 amounts, provided that any such reimbursement obligation shall be only to the extent of funds available after Nortel Mexico COE has entered into

---

[1] Funds from NNIC should be deposited in one of NN CALA's USD accounts.

4

liquidation and paid all third party claims. Immediately prior to such pro-rata reimbursement, and in consideration and conditioned upon such reimbursement, the pre-filing intercompany claims of NNL, NN CALA and NNI, if any, against Nortel Mexico COE will be subordinated to such reimbursement.  The reimbursement shall be documented in the form of credit memos against the invoices referenced in Appendix 1.

o    Nortel Mexico COE has confirmed in writing that other than intercompany balances owing at November 1, 2010 and the ordinary course payments for goods and services rendered or to be rendered (payment for which shall promptly be settled by the owing party), NNL, NNI and NN CALA have no obligations to Nortel Mexico COE on a going forward basis from November 1, 2010.

o    Parties to work reasonably to achieve the following timeline:

- US Court approval is not required.

## VI.    MICROVISION

o    NNL will pay over to Xros all license payments received in error, request that the licensee make any further payments to an account designated by Xros, and pay over any other payments that may be received in the future in respect of Xros or any Xros license(s).

o    US Court approval is not required.

## VII.    CVAS SIDE LETTER

o    NNI will agree that the approximately $150k of withholding tax relating to trademarks be classified as deal cost and NNL will agree that purchase price relating to trademarks are subject to allocation on the same basis as other intellectual property provided however that such agreement relates only to the CVAS transaction and has no precedential effect for the purposes of allocation of sale proceeds for any other Nortel sale transaction.

o    Parties to work reasonably to achieve the following timeline:

- CVAS Side Letter to be finalized by July 30, 2011

- US court approval not required so long as UCC consents; UCC consent to be obtained by July 30, 2011.

## VIII.    ATLANTA TELEPHONE COMPANY

o    Cost will be split 50/50.

o    NNI will pay to NNL $70,000, being 50% of the funds received to date within five business days of agreement to term sheet

5

    o  US Court approval is not required.

**IX.    GDNT**

    o  NNI hereby confirms that it will provide the necessary IT, Voice, Corwan and Application access services to Ericsson in connection with the GDNT sale transaction. The cost to Ericsson of transition services will initially be $74,025 per month via work orders, subject to reduction based upon either head count reduction in the case of Voice, Corwan and Application services or service termination on 90 days notice by Ericsson.  All amounts received from Ericsson in respect of such transition services shall be split between NNI as to 60% and NNL as to 40%

    o  The parties will work to bring all post-filing intercompany accounts current and make payments going forward.

Acknowledged and signed this _____ day of _____, 2011.

**NORTEL NETWORKS INC.**

Per:   _____
       Name:
       Title:

**NORTEL NETWORKS (CALA) INC.**

Per:   _____
       Name:
       Title:

**NORTEL NETWORKS LIMITED**

Per:   _____
       Name:
       Title:

Per:   _____
       Name:
       Title:

**NORTEL NETWORKS INDIA INTERNATIONAL INC.**

*Signing for Section I.C Only*

Per: _____
     Name:
     Title:

**NORTEL NETWORKS (CHINA) LIMITED**

*Signing for Article II Only*

Per: _____
     Name:
     Title:

**NORTEL DE MEXICO, S. DE R.L. DE C.V.**

*Signing for Article V Only*

Per: _____
     Name:
     Title: