**EXHIBIT A**

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**SEVENTY-SECOND REPORT OF THE MONITOR**
**DATED AUGUST 16, 2011**

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "Applicants" or the "Canadian Debtors") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to December 14, 2011 by this Honourable Court in its Order dated June 30, 2011.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an

- 2 -

official unsecured creditors committee (the "Committee") was established in January, 2009.

3.   An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009 and July 30, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries and each of these groups is participating in the CCAA proceedings.

4.   Nortel Networks (CALA) Inc. ("NN CALA" and together with NNI and certain of its subsidiaries and affiliates that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.   Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in EMEA were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators").

6.   Subsequent to the Filing Date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7.   The CCAA proceedings and the UK Administration proceedings of NNUK and the other EMEA Debtors have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

- 3 -

8.   Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

**PURPOSE**

9.   The purpose of this Seventy-Second Report of the Monitor ("Seventy-Second Report") is to provide information regarding the Applicants' motions seeking approval of the following:

    a)   the Q1 2010 Transfer Pricing Settlement Agreement among NNL, NNI, NNUK, certain other Nortel entities and the Joint Administrators (the "Q1SA");

    b)   the Agreement on Transfer Pricing Amendments and Certain Other Matters among NNL, NNI, NNUK, certain other Nortel entities, the Joint Administrators and the French Liquidator (the "ATPA");

    c)   the Stipulation and Settlement Agreement by and among the Sellers and GENBAND US LLC and Others (the "GENBAND Settlement Agreement");

    d)   the various escrow amendments and agreements relating to the Russia Settlement (as defined below);

    e)   the LPT Agreement (as defined below); and

    f)   the Supplemental IP Transaction Side Agreement re Certain Transaction Costs and Related Matters among NNC, NNL, NNI, NNUK, certain other Nortel entities, the French Liquidator and the Joint Administrators dated July 27, 2011 (the "Supplemental IP Transaction Side Agreement"),

and to provide the Monitor's support in respect thereof.

**TERMS OF REFERENCE**

10.   In preparing this Seventy-Second Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel. The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information

- 4 -

and accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Seventy-Second Report.

11. Unless otherwise stated, all monetary amounts contained herein are expressed in US dollars.

12. Capitalized terms not defined in this Seventy-Second Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009, the Pre-Filing Report or previous reports of the Monitor.

13. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

## Q1SA AND ATPA

### *Background*

14. As discussed in the Monitor's Fifteenth Report, prior to the Filing Date, certain of the Applicants, the U.S. Debtors, the EMEA Debtors, Nortel Networks AG ("NNAG", together with the EMEA Debtors, the "EMEA Group") and certain other non-filed Nortel entities made certain transfer pricing payments ("Transfer Pricing Payments") pursuant to a transfer pricing methodology as provided for under:

   a) the Master R&D Agreement, dated as of December 22, 2004, with an effective date of January 1, 2001, among NNL, NNI, NNUK, Nortel Networks (Ireland) Limited, Nortel Networks S.A. and other affiliates (as amended from time to time, the "Master R&D Agreement"); and

   b) certain distribution agreements generally between NNL and one or more of Nortel's limited risk distribution entities ("LRDs") pursuant to which NNL typically granted a limited, non-exclusive license to Nortel technology to such LRD and provided a reasonable rate of return to the LRDs in return for the LRD's distribution of Nortel

- 5 -

products (the "Distribution Agreements" and together with the Master R&D Agreement, the "Transfer Pricing Agreements").

15. Since the Filing Date, the U.S. Debtors, the Applicants and the EMEA Debtors have engaged in the inter-company trading of goods and services pursuant to their respective GSPAs and pursuant to certain court orders entered in the CCAA proceedings and the Chapter 11 Proceedings, and have made and continue to make payments in respect of such inter-company trading (the "Inter-Company Trading Payments").

16. Since the Filing Date, issues relating to Transfer Pricing Payments have arisen among various Nortel entities such that post-filing Transfer Pricing Payments have not been included in any Inter-Company Trading Payments.    Certain of the issues relating to Transfer Pricing Payments were resolved in the Interim Funding and Settlement Agreement dated as of June 9, 2009 by and among the Canadian Debtors, the U.S. Debtors (other than NN CALA), the EMEA Debtors and the Joint Administrators (the "IFSA") and in the Final Canadian Funding and Settlement Agreement dated as of December 23, 2009 by and among the Canadian Debtors, the Monitor and the U.S. Debtors (other than NN CALA) (the "FCFSA").

17. The IFSA settled certain transfer pricing matters as between the Applicants and the U.S. Debtors (other than NN CALA) for the period from the Filing Date to September 30, 2009, and as between the Applicants and the EMEA Debtors for the period from the Filing Date to December 31, 2009.[1]

18. Subsequently, pursuant to the FCFSA, the U.S. Debtors (other than NN CALA) have settled any amounts that the U.S. Debtors (other than NN CALA) may or could owe in respect of Covered Obligations (as defined in the FCFSA), which includes any Transfer Pricing Payments payable by the U.S. Debtors (other than NN CALA) to the Canadian Debtors during, or with respect to, the period from October 1, 2009 through the later of the

---

[1] The descriptions of the IFSA, FCFSA and APAC Restructuring Agreement provided herein are for summary purposes only. Reference should be made directly to the IFSA and the FCFSA for a complete understanding of the terms of those agreements.

- 6 -

conclusion of the CCAA proceedings or the consummation of the wind-down of the Canadian Debtors' estates.

19. As discussed in the Monitor's Thirtieth Report, the APAC Entities have settled any amounts that were owed, including Transfer Pricing Payments payable by the APAC Entities to the Canadian Debtors, U.S. Debtors and EMEA Group from the Filing Date through and including December 31, 2009 pursuant to the APAC Restructuring Agreement.

*Q1 2010 Transfer Pricing Settlement Agreement*

20. As discussed in the Monitor's Fifteenth Report, under the IFSA, NNL owes NNUK Shortfall Payments (as defined in the IFSA) totalling $20 million.

21. The Applicants have now negotiated the terms of the Q1SA which resolves Transfer Pricing Payment matters between the Applicants and the EMEA Group for the period January 1, 2010 through to March 31, 2010 (the "Q1 Settlement Period"). A copy of the Q1SA is attached as Appendix "A" hereto.

22. A summary of the material terms of the Q1SA follows. Reference should be made directly to the Q1SA for a complete understanding of the terms thereof.

    a) Net Amount Owing to NNL from EMEA Group and Set-off Against Shortfall Payments – NNL and NNUK agree that for the Q1 Settlement Period, NNL is owed $10.6 million in net Transfer Pricing Payments from the EMEA Group. This amount shall be set-off against the Shortfall Payments such that NNL owes NNUK a net amount of $9.4 million in respect of the Shortfall Payments;

    b) Netting of EMEA Group - NNUK is authorized to seek and retain payment for its own account and sole benefit the Transfer Pricing Payments from the EMEA Group that would otherwise be made to NNL during, or with respect to, the Q1 Settlement Period;

    c) Remaining Shortfall Payments - as settlement of the balance of the Shortfall Payments, NNL shall pay to NNUK $4.7 million within three Business Days of the Effective Date of the Q1SA, and the remaining $4.7 million shall be paid by NNL to

- 7 -

NNUK in accordance with Section 6.c. of the IFSA. Upon the making of this second payment, the Shortfall Charge shall be automatically terminated and extinguished;

d) Settlement - the Q1SA shall constitute a full and final settlement of any and all Transfer Pricing Payments owing and that may, or could, be owing between (i) the members of the EMEA Group *inter se*, and (ii) any member of EMEA Group, on the one hand, and any Applicant or U.S. Company (as defined in the Q1SA), on the other hand, as Transfer Pricing Payments under the Transfer Pricing Agreements for the Q1 Settlement Period and releases are provided in respect of same;

e) NNSA – NNUK shall use commercially reasonable efforts to cause NNSA to accede to the terms of the Q1SA.  From the effectiveness of the Q1SA until NNSA accedes to the Q1SA, NNL agrees to assign all of its rights to any Transfer Pricing Payments paid or payable to NNL from or on behalf of NNSA under the relevant Transfer Pricing Agreements with respect to the Q1 Settlement Period to NNUK and agrees to pay-over any amounts received in respect of same to NNUK; and

f) Conditions to Effectiveness - The Q1SA is subject to approval of both this Honourable Court and the U.S. Court.

**Agreement on Transfer Pricing Amendments and Certain Other Matters**

23.   As a result of the business divestitures, the transactions and activities of the Nortel entities that gave rise to Transfer Pricing Payments have diminished to the point that Transfer Pricing Payments are, relatively speaking, no longer relevant in the global Nortel enterprise. Therefore, the Applicants, NNI and the other U.S. Debtors (other than NN CALA), the Joint Administrators and the EMEA Group have also now resolved negotiations regarding the ATPA, which provides for the cessation of all Transfer Pricing Payments under all Transfer Pricing Agreements from and after April 1, 2010. A copy of the ATPA is attached as Appendix "B" hereto.

24.   A summary of the material terms of the ATPA and certain related matters follows. Reference should be made directly to the ATPA for a complete understanding of the terms thereof.

- 8 -

a) <u>Amendment to the Transfer Pricing Agreements</u> - in respect of the period from and after April 1, 2010, no further Transfer Pricing Payments are required nor shall be made amongst the respective parties to the (i) the Master R&D Agreement, or (ii) the Distribution Agreements. As a result, all subsequent intercompany transactions will be on a cost plus basis. Contemporaneous with the signing of the ATPA, the parties have also agreed to amend the GSPAs retroactive to April 1, 2010 to remove the reference to payments under the Master R&D Agreement from the definition of "Goods and Services" (as defined in the GSPAs);

b) <u>Preservation of Intellectual Property Rights</u> - any rights in or to intellectual property that any one or more of the parties to the ATPA have under the Transfer Pricing Agreements shall not be affected by (a) the exclusion of Transfer Pricing Payments from the GSPAs, and (b) the non-payment by any party to the ATPA of any Transfer Pricing Payments relating to any period from and after April 1, 2010;

c) <u>Standstill</u> - no Party shall terminate or seek to terminate the participation of any other party to the ATPA, or Participant (as defined in the Master R&D Agreement), in the Transfer Pricing Agreements without the written consent of the other parties to the relevant Transfer Pricing Agreements;

d) <u>Releases from Sale Transaction Escrow Accounts</u> - the parties to the ATPA agree that each shall take all commercially reasonable steps to effect the following releases from the relevant sale transaction escrow accounts:

    i. <u>NNI Cash Reimbursement</u> - the release of US$53 million plus any interest accrued thereon from the Enterprise distribution escrow account to NNI (the "NNI Cash Reimbursement"), which amount represents the net working capital of certain subsidiaries of NNI that were sold to Avaya Inc. in the Enterprise transaction; and

    ii. <u>Carve-Out Financials Reimbursement</u> - the release of US$30,119,972 from the relevant sale transaction escrow accounts to NNL to reimburse NNL for payments made to obtain carve-out financial statements (the "Carve-Out Financials Reimbursement") related to the sale of certain of the businesses.

- 9 -

e)  Conditions to Effectiveness

      i.  Orders approving the ATPA by this Honourable Court, the U.S. Court and the Commercial Court of Versailles, France and the execution and delivery of instructions to the Enterprise distribution agent to release the NNI Cash Reimbursement;

      ii.  The execution and delivery of instructions to the relevant escrow agents to release the Carve-Out Financials Reimbursement;

      iii.  The execution and delivery of instructions to the relevant escrow agents to release US$5,384,932 from the relevant sale transaction escrow accounts to NNI to reimburse it for amounts paid to Lazard Ltd. (f/k/a Lazard Freres & Co. LLC) ("Lazard") on account of Lazard's monthly fees and expenses; and

      iv.  The execution and delivery of instructions to the relevant escrow agent to release US$3,287,333 from the relevant escrow account to Lazard in respect of the minority sale transaction fee owed to Lazard in connection with the MEN transaction.[2]

***APAC and Other Non-EMEA/Non-US Debtor LRD Amending Agreements***

25.  As a result of the IFSA, FCFSA, Q1SA, ATPA and the APAC Restructuring Agreement, the majority of post-Filing Date transfer pricing matters have been (or will be) settled and the Transfer Pricing Agreements between the Canadian Debtors and other Nortel entities will be amended such that Transfer Pricing Payments are no longer required on a go forward basis. However, there are other Nortel LRD's (such as non-filed entities in the APAC and CALA region and certain U.S. filed and non-filed entities) that have Distribution Agreements remaining in place which require amendment.

26.  Therefore, simultaneously with the execution of the ATPA and the Q1SA, NNL (which has received the consent of the U.S. Debtors for those agreements impacting U.S. Debtor

---

[2] Items iii. and iv. being in accordance with the Lazard Fees Side Agreement previously approved by this Honourable Court in its Order dated December 15, 2010.

- 10 -

subsidiaries) will be entering into a number of amendments with various other Nortel entities to amend the Distribution Agreements in place with those entities to effectively end any Transfer Pricing Payment obligations post December 31, 2009 under those agreements.

27.    In the case of NN CALA (a U.S. Debtor) and Nortel Networks India International Inc. (a U.S. non-filed entity), NNL has agreed with each of these entities that no further Transfer Pricing Payments are required nor shall be made under their respective Distribution Agreements in respect of the period from and after January 1, 2010, and future intercompany transactions will be on a cost plus basis.

28.    These amendments, in conjunction with the ATPA, will effectively end Transfer Pricing Payments amongst the Nortel entities.  In conjunction with the transfer pricing settlements contemplated by the IFSA, the FCFSA, the Q1SA and the ATPA, this provides a degree of clarity for the Applicants as regards their post-Filing Date transfer pricing obligations and also provides approximately $30 million to NNL as reimbursement for its payment of fees associated with the preparation of carve-out financial statements for the sale of certain of Nortel's businesses.  The Q1SA and ATPA are reasonable in light of the sale of the Nortel businesses and will remove another hurdle for the various filed and non-filed Nortel entities to enable them to progress with the winding-up of their operations and their insolvency proceedings, where applicable.

**GENBAND SETTLEMENT AGREEMENT**

29.    As described in the Fifty-Ninth Report of the Monitor dated February 18, 2011, and the Seventieth Report of the Monitor dated June 24, 2011, subsequent to the closing of the CVAS transaction, certain disputes arose between Nortel and GENBAND US LLC (formerly GENBAND Inc.) ("GENBAND") regarding the final purchase price payable to Nortel. Disputes have centered around the interpretation of the term "Deferred Profit Amount" in the Asset Sale Agreement among NNC, NNL, NNI and certain other Nortel entities and GENBAND dated December 22, 2009 (as amended, the "CVAS Sale Agreement"). Under Nortel's interpretation of this term, the final purchase price payable under the CVAS Sale Agreement would be $182,052,761 (for a purchase price adjustment in favour of GENBAND of $99,947,239), whereas under GENBAND's interpretation, the

- 11 -

final purchase price payable would be $142,904,000 (for a purchase price adjustment in favour of GENBAND of approximately $139,096,000).

30.   Also at issue between the parties were certain transfer taxes which GENBAND was obligated to pay and/or reimburse to Nortel under the terms of the Sale Agreement. In the case of the Applicants, NNL and NNTC have paid an aggregate of CDN $1,049,960.30 on account of transfer taxes payable as a direct result of the transfer of assets to GENBAND pursuant to the CVAS Sale Agreement, which amount GENBAND has not yet reimbursed to the Applicants.

31.   These disputes resulted in each of Nortel and GENBAND bringing motions before the U.S. Court and this Honourable Court. In the case of Nortel's motions, Nortel sought, among other things, a declaration that the Deferred Profit Amount dispute was within the exclusive jurisdiction of the U.S. Court and this Honourable Court and requested an order enforcing Nortel's interpretation of the meaning of Deferred Profit Amount. In the case of GENBAND's motions, GENBAND sought Orders that the dispute be referred to an accounting arbitrator. The parties agreed to defer a hearing on the substantive dispute in order to permit the U.S. Court and this Honourable Court to consider the jurisdictional issue at a joint hearing held on December 16, 2010.

32.   On January 21, 2011, both this Honourable Court and the U.S. Court issued reasons which confirmed the Deferred Profit Amount dispute was not subject to arbitration under the provisions of the CVAS Sale Agreement and that this Honourable Court and the U.S. Court retained exclusive jurisdiction to determine the dispute. On February 1, 2011, GENBAND filed a Notice of Appeal with respect to the U.S. Court's Order and on February 11, 2011, GENBAND sought leave to appeal this Honourable Court's decision to the Ontario Court of Appeal.

33.   The filing of the U.S. appeal by GENBAND resulted in an automatic stay of the U.S. Court's Order and a requirement for mandatory mediation. The mediation was held in New York on April 4, 2011 and was attended by counsel to each of the Applicants, the Monitor, the U.S. Debtors, the Committee and GENBAND. Considerable progress was made during the course of the mediation and over the course of the following weeks the parties engaged

- 12 -

in further negotiations resulting in substantial agreement being reached on most points. As a result of the ongoing negotiations, the Applicants and the Monitor agreed to an adjournment of GENBAND's Canadian leave to appeal application in order to permit the parties to engage in further negotiations with respect to the proposed settlement.

34. As reported in the Seventieth Report, in the period subsequent to th e mediation, the Applicants, the U.S. Debtors and the EMEA Debtors worked to have the various other Nortel entities who were sellers under the CVAS Sale Agreement approve the terms of the settlement in principle reached with GENBAND. As a result of the Russian Settlement discussed below, Nortel Networks o.o.o. ("Nortel Russia"), the last Nortel entity whose approval was required, has indicated it will execute the GENBAND Settlement Agreement, a copy of which is attached as Appendix "C" hereto. A summary of the material terms of the GENBAND Settlement Agreement follows. Reference should be made directly to the GENBAND Settlement Agreement for a complete understanding of the terms thereof.

   a) <u>Purchase Price Settlement</u> - the parties agree to a final purchase price amount of $157,743,756, resulting in a payment obligation to GENBAND of $24,905,244. The payment to GENBAND will be funded through the release of approximately $8 million held in escrow in support of purchase price adjustments, with the balance being released from the distribution escrow account holding the CVAS sale proceeds. The payment to GENBAND is subject to certain deductions as outlined below;

   b) <u>Reimbursement of Canadian Transfer Tax Amounts</u> - amounts due and owing to the Applicants from GENBAND in respect of transfer taxes (being US$1,000,390) shall be deducted from the amount payable to GENBAND and remitted to NNL;

   c) <u>Satisfaction of TSA Amounts Owing to Nortel</u> - GENBAND instructs the Nortel parties to direct $9,072,647.61 of the amount payable to GENBAND to certain Nortel entities (as identified by NNI, NNL and NNUK) on GENBAND's behalf in lieu of making such $9,072,647.61 payment to GENBAND in satisfaction of GENBAND's obligations in connection with the settlement of certain matters pertaining to the CVAS transition services agreement;

- 13 -

d) <u>Withdrawal of Motions, etc.</u> - the various outstanding motions, appeals and other proceedings in relation to the CVAS purchase price dispute will be withdrawn;

e) <u>Releases</u> - GENBAND and the various Nortel entities also exchange mutual releases in respect of, among other things, the final purchase price owing under the Sale Agreement; and

f) <u>Court Approval</u> - the GENBAND Settlement Agreement is subject to the approval of both this Honourable Court and the U.S. Court.

35.   It is the Monitor's view that the GENBAND Settlement Agreement provides for a fair and reasonable resolution of the CVAS purchase price dispute and other disputes with GENBAND, provides the Applicants with payment for transfer tax amounts owing by GENBAND to the Applicants and avoids the costs and uncertainty of continuing to litigate the purchase price dispute and potentially litigating other disputes.

**RUSSIA SETTLEMENT**

36.   Nortel Russia is 99% owned by Nortel Networks International Finance & Holding B.V. ("NNIFH") and 1% owned by Nortel Networks B.V. ("NNBV"), which itself is a wholly-owned subsidiary of NNIFH.  Both NNIFH and NNBV are EMEA Debtors while Nortel Russia has not commenced any insolvency proceedings.

37.   Nortel Russia has participated in the Enterprise, MEN, GSM/GSM-R and CVAS sale transactions (the "Sale Transactions").

38.   Nortel Russia, as a "Depositor", is a party to the following distribution escrow agreements which govern the escrow accounts that hold the proceeds of sale of the above referenced Nortel global sale transactions:

a) the Enterprise Distribution Escrow Agreement dated December 18, 2009 (as amended, the "Enterprise Escrow Agreement");

b) the MEN Distribution Escrow Agreement dated March 19, 2009 (as amended, the "MEN Escrow Agreement");

- 14 -

    c) the GSM/GSM-R Distribution Escrow Agreement dated March 31, 2010 (the "GSM/GSM-R Escrow Agreement"); and

    d) the CVAS Distribution Escrow Agreement dated May 27, 2010 (as amended, the "CVAS Escrow Agreement" and, together with the Enterprise, MEN, and GSM/GSM-R Escrow Agreements, the "Escrow Agreements").

39.    As contemplated by the IFSA and the Escrow Agreements, Nortel Russia may be entitled to a portion of the proceeds from each of the Sale Transactions (the "Sale Proceeds").

40.    Each of the Escrow Agreements provides that, subject to certain exceptions not applicable to these circumstances, it may not be amended without consent of all the parties thereto (excluding Nortel Networks de Colombia S.A. ("Nortel Colombia")), including Nortel Russia, and the approval of both this Honourable Court and the U.S. Court. In addition, under the terms of each of the Escrow Agreements, Nortel Russia, along with all other Depositors and Estate Fiduciaries (as defined in the applicable Escrow Agreements), but excluding Nortel Colombia, must execute a joint letter of instruction to the distribution agent prior to the release of any funds from an escrow account.

*Current Status of Nortel Russia*

41.    The Applicants and the Monitor have been advised by counsel to the EMEA Debtors that, primarily as a result of the Sale Transactions, Nortel Russia no longer has active operations and is preparing to appoint a liquidator and commence voluntary, solvent liquidation proceedings.

42.    The Applicants and Monitor have also been advised by counsel to the EMEA Debtors that some potential risk exists to the Applicants and the other parties to the various Escrow Agreements if Nortel Russia is not removed as a party to the Escrow Agreements prior to the commencement of its liquidation proceeding. Potential issues include the requirement to obtain a new third party liquidator's signature for escrow release instructions and the new liquidator's involvement in global sale proceeds allocation discussions which, in the

- 15 -

context of the complex Nortel proceedings, could potentially cause significant delay in the release of the escrowed Sale Proceeds.

***Escrow Amendments and Russia Agreements***

43.  As a result of these concerns, the Applicants and Monitor have concluded it is in the best interests of the Applicants that the rights of Nortel Russia under the Escrow Agreements and its rights, if any, to the Sale Proceeds be terminated at this time.

44.  Nortel Russia has already received proceeds of sale from the Enterprise and GSM/GSM-R transactions as a result of local sale agreements; however, it has not received any proceeds from the CVAS or MEN sale transactions.

45.  The parties have agreed upon a three-step transaction pursuant to which the parties will enter into the proposed settlement agreements (the "Russia Agreements") and NNIFH will purchase all of Nortel Russia's present and future rights, title and interest, if any, to a share of Sale Proceeds (the "Nortel Russia Rights"), such that any rights Nortel Russia has under the Escrow Agreements or to the Sale Proceeds are to be terminated or assigned to NNIFH (collectively, the "Russia Settlement"). Copies of the Russia Agreements and the related amendments to the Escrow Agreements (the "Escrow Amendments") are attached as Appendix "D" hereto.

46.  The proposed three-step transaction related to the Russia Settlement is outlined below. Reference should be made directly to the terms of the Russia Agreements and the Escrow Amendments for a complete understanding of the terms thereof.

Step 1: Assignment of Nortel Russia Rights to NNIFH

> Pursuant to the terms of the Russia Agreements, Nortel Russia will assign to NNIFH all of the Nortel Russia Rights and all of Nortel Russia's rights and obligations under the Escrow Agreements. These assignments will be conditional upon the completion of the other steps two steps. NNIFH will also be added as a "Depositor" to the Enterprise and CVAS Escrow Agreements since NNIFH currently is not a party to those agreements and Nortel Russia will be removed as a Depositor under the Escrow Agreements.

- 16 -

Step 2: <u>Payment by NNIFH into the MEN and CVAS Escrow Accounts</u>

Upon the execution of the Russia Agreements and the Escrow Amendments and subject to the satisfaction of certain other conditions, in consideration for the assignment described in Step 1 above, NNIFH will pay the amount of $6,015,313.14 and the equivalent U.S. Dollar amount of RUR 207,060.49 into the escrow account established under the MEN Distribution Escrow Agreement (the "MEN Escrow Account") and the amount of $1,404,740.00 and the equivalent U.S. Dollar amount of RUR 2,847,195.39  into the escrow account established under the CVAS Escrow Agreement (the "CVAS Escrow Account") which is inclusive of any applicable value-added tax obligations related to the payment (collectively, the "NNIFH Payments").[3]

Step 3: <u>Payments Made to Nortel Russia from the MEN and CVAS Escrow Accounts</u>

Once the NNIFH Payments are received, the parties to the MEN and CVAS Escrow Agreements, other than the distribution agent (and, in the case of the MEN Escrow Agreement, other than Nortel Colombia), will direct, via the delivery of a letter of instruction to JPMorgan Chase Bank, N.A., as distribution agent under the MEN and CVAS Escrow Agreements, the payment of an amount equal to the NNIFH Payments from the CVAS and MEN Escrow Accounts to Nortel Russia (the "Russia Payments"). The Applicants and the Monitor have been advised by counsel to the EMEA Debtors that, in the circumstances, it is beneficial for Nortel Russia to receive payments directly from the Escrow Accounts.

47.   In connection with the Russia Settlement, Nortel Russia shall provide a solvency certificate to, among others, NNL certifying, among other things, that Nortel Russia does not meet any Russian Insolvency Test (as defined in the solvency certificate).

---

[3] In the case of the Russia Settlement as it relates to the Enterprise and GSM/GSM-R transactions, no payment is required to be made to Nortel Russia as a result of the receipt of sale proceeds by Nortel Russia pursuant to local sale agreements entered into in connection with those transactions and, as such, no payment is made by NNIFH into the relevant escrow account. The Russia Settlement as it relates to these transactions is otherwise substantially the same.

- 17 -

48. In the event that Nortel Russia is placed into insolvent liquidation, or is otherwise deemed insolvent, before the above noted steps are completed, the parties to each of the Russia Agreements shall have the right to terminate all obligations under the Russia Agreements, such that the parties shall have no further obligations thereunder and their rights shall revert to the *status quo ante*.

49. Under the terms of the Russia Agreements, NNIFH shall, *inter alia*, (a) bear any and all risk that the ultimate allocation of the Sale Proceeds to NNIFH as assignee to Nortel Russia is less than the amount of the NNIFH Payments; (b) assume any remaining obligations of Nortel Russia under the Escrow Agreements; and (c) cooperate in the defence of any effort to void or set aside actions taken pursuant to the Russia Agreements under preference, fraudulent conveyance, currency control, or other similar provisions in any jurisdiction.

50. The Monitor understands that the quantum of the NNIFH Payments and the Russia Payments are based on the value-added tax estimates ascribed by the purchasers of the CVAS and MEN businesses. The Applicants and the Monitor do not necessarily agree with these amounts as determinants of the appropriate quantum of the CVAS and MEN Sale Proceeds allocable to Nortel Russia. However, the parties have agreed they will not use these amounts as evidence, or otherwise rely upon the Russia Settlement or any part thereof in any way to support its right to a particular allocation of the Sale Proceeds or any other sale proceeds. Therefore, the Monitor believes that entering into the Russia Settlement will not prejudice the allocation process.

51. Nortel Russia has agreed that prior to its liquidation and upon the filing of the Canadian and U.S. motions for court approval of the Russia Settlement, it will consent to the GENBAND Settlement Agreement, which will benefit the Applicants.

52. The economic impact of the Russia Agreements is entirely neutral to the Applicants, except insofar as benefits are realized from Nortel Russia's consent to the other inter-estate settlement agreements and the potential cost savings associated with the removal of Nortel Russia from the allocation process.

53. It is the Monitor's view that the Russia Settlement provides a comprehensive solution to Nortel Russia's claim to Sale Proceeds from the Sale Transactions and will assist in

- 18 -

minimizing the risks of Nortel Russia's impending liquidation and simplifying the future release of funds from the Escrow Accounts.

## NORTEL - LIBERTY MUTUAL LTP SETTLEMENT AGREEMENT

54.    Prior to the commencement of its bankruptcy proceeding, NNI, in carrying on its business in various US states, required insurance policies to cover its liabilities in respect of workers compensation and employers liability risks and commercial automobile risks covering the period from 1979 to 1997.

55.    Liberty Mutual Insurance Company ("Liberty") issued the necessary policies (the "Policies") and together with its affiliate, Helmsman Management Services, LLC, ("Helmsman") provided certain administrative services related to the Policies.

56.    The Policies provided that NNI would incur financial obligations to Liberty and Helmsman in the form of premium and reimbursements due.  Liberty and Helmsman required security for such financial obligations, which was provided by NNC and NNL and NNI in the form of an irrevocable letter of credit issued by Royal Bank of Canada on July 18, 1997 in the amount of $2,898,225 (the "LC"), an escrow amount that had a balance of $750,802 as at July 1, 2011 (the "Escrow"), and a loss deposit that had a balance of $234,887 as at July 1, 2011 (the "Deposit", and together with the LC and the Escrow, the "Security").  The inter-company obligations in respect of the Security were a matter of dispute among NNL, NNC and NNI following the commencement of their respective insolvency proceedings.

57.    Liberty, NNI, NNL, NNC and the Monitor have engaged in negotiations regarding the transfer of NNI's financial obligations and future liability with respect to the Policies from NNI to Liberty, as well as resolution of the intercompany dispute in respect of the Security.  The result of such negotiations is the attached Settlement and Loss Portfolio Transfer Agreement dated as of July 18, 2011 (the "LPT Agreement"), by and among NNI, NNC, NNL, the Monitor and Liberty (on behalf of itself and its subsidiaries and affiliates).  A copy of the LPT Agreement is attached as Appendix "E" hereto.

58.    The LPT Agreement provides for the following:

   a)  Liberty will issue a new policy (the "LPT Policy") to NNI;

- 19 -

b)  Liberty will retain the full amount of the LC and $453,456 of the Escrow, and Helmsman will retain $47,018 of the Deposit, as consideration for the LPT Policy and as payment of premium and reimbursements due under the Policies;

c)  the balance of the Escrow ($297,345) and the Deposit ($187,869) will be paid in equal parts to each of NNI and NNC;

d)  NNI, Liberty, NNC, NNL and the Monitor provide and receive certain releases in respect of the Policies and the Security; and

e)  the execution of the LPT Agreement is conditioned on its approval by the U.S. Court and this Honourable Court.

59.  The Monitor believes the LPT Agreement is in the best interests of NNC and NNL as it is a fair and reasonable settlement of the dispute relating to the Security such that NNC and NNL will recover approximately $242,000 in the short term and avoid the potential cost and uncertainty of future litigation.

## SUPPLEMENTAL IP TRANSACTION SIDE AGREEMENT

60.  As discussed in the Seventy-First Report, NNC, NNL and certain of NNL's subsidiaries entered into an asset sale agreement dated June 30, 2011 with Rockstar Bidco, LP, a single purpose entity formed by a consortium of technology companies, for the sale of substantially all of Nortel's patent portfolio and certain other related assets (the "Residual IP") for $4.5 billion plus certain assumed liabilities.

61.  The Residual IP sale transaction was approved by this Honourable Court and the U.S. Court on July 11, 2011 and closed on July 29, 2011. Net proceeds of approximately $4.5 billion have been paid into escrow pending determination of allocation issues among the estates.

62.  NNC, NNL, NNI, NNUK, certain other Nortel entities, the Joint Administrators and the French Liquidator have previously entered into two side agreements in connection with the Residual IP transaction, being the IP Transaction Side Agreement dated April 4, 2011 and the Amended and Restated IP Transaction Side Agreement re: Certain Structural Matters

- 20 -

dated June 29, 2011 (as discussed in the Sixty-Third and Seventy-First Reports, respectively).

63.   NNC, NNL, NNI, NNUK, certain other Nortel entities, the Joint Administrators and the French Liquidator have now also entered into the Supplemental IP Transaction Side Agreement, a copy of which is attached as Appendix "F" hereto, to address certain other inter-estate matters in relation to the Residual IP transaction, including their agreement to pay (or reimburse various Nortel entities, including NNL, for the payment of) certain transaction costs related to the Residual IP transaction directly from the Residual IP sale proceeds, including the fees of Lazard and Global IP.

64.   It is the Monitor's view that the Supplemental IP Transaction Side Agreement is reasonable in the circumstances and is consistent with agreements entered into by the estates in connection with other sale transactions.

- 21 -

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

65. For the reasons outlined herein, the Monitor recommends that this Honourable Court grant the Applicants' motions seeking approval of the following agreements and authorizing the Applicants to enter into and perform their obligations thereunder:

    a) the Q1SA;

    b) the ATPA;

    c) the GENBAND Settlement Agreement;

    d) the Russia Settlement, including the Russia Agreements and Escrow Amendments;

    e) the LTP Agreement; and

    f) the Supplemental IP Transaction Side Agreement.

All of which is respectfully submitted this 16th day of August, 2011.


**ERNST & YOUNG INC.**
in its capacity as Monitor of the Applicants
and not in its personal capacity

Per:



Murray A. McDonald
President

APPENDIX "A"

[ATTACHED]

**EXECUTION VERSION**

## Q1 2010 TRANSFER PRICING SETTLEMENT AGREEMENT

This agreement (the "Agreement") is entered into as of [●], 2011 by and among Nortel Networks Limited ("NNL") and the other entities set forth in Schedule 1 attached hereto (the "Canadian Debtors"), Nortel Networks, Inc. ("NNI") and the other entities set forth in Schedule 2 attached hereto (the "US Companies", and as to those US Companies that are debtors in the United States Bankruptcy Court for the District of Delaware, the "U.S. Debtors"), the Joint Administrators (as defined below), the entities set forth in Schedule 3 attached hereto (together with Nortel Networks S.A. ("NNSA"), the "EMEA Debtors"[1]) and Nortel Networks AG ("NNAG", together with the EMEA Debtors, the "EMEA Group" and the EMEA Group, together with the Canadian Debtors, the US Companies and the non-debtor affiliates of each, the "Nortel Group"). The Canadian Debtors, the US Companies and the EMEA Group are sometimes referred to herein individually as a "Party" and collectively as the "Parties". The Joint Administrators, in their personal capacities, shall be party to this Agreement as provided in Section 11 and solely for the purpose of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Administrators and references to the Parties shall be construed accordingly.

WHEREAS, on January 14, 2009 (the "Filing Date"), the Canadian Debtors commenced creditor protection proceedings by obtaining an order (as amended and as the same may be further amended, the "Initial Order") from the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the *Companies' Creditors Arrangement Act* (Canada) (respectively, "CCAA" and the "Canadian Proceedings"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor"); and

WHEREAS, on the Filing Date, the US Debtors (other than Nortel Networks (CALA) Inc. ("NN CALA")) filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the *United States Code* (the "Bankruptcy Code") and on July 14, 2009 NN CALA filed a petition under chapter 11 of the Bankruptcy Code in the US Court (together with the proceedings of the other US Debtors, the "US Proceedings"); and

WHEREAS, on the Filing Date, the EMEA Debtors commenced administration proceedings (the "UK Proceedings") before the High Court of Justice in London, England, represented by individuals from Ernst & Young LLP (the "UK Administrator"), and, in the case of Nortel Networks (Ireland) Limited only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), serving as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, the "Joint Administrators"); and

WHEREAS, while the UK Proceedings in respect of NNSA are continuing, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA

---

[1]    NNSA shall not be considered an EMEA Debtor under this Agreement until such time as NNSA accedes to this Agreement.

Liquidator") and an administrator were appointed by the Versailles Commercial Court (the "French Court") (Docket No. 2009P00492) for NNSA; and

WHEREAS, prior to the Filing Date, quarterly "true up" payments ("Transfer Pricing Payments") were made by certain members of the Nortel Group to other Nortel Group entities pursuant to a transfer pricing methodology embodied in the (i) Master Research and Development Agreement dated as of December 22, 2004, with an effective date of January 1, 2001 (as amended by, and together with the related understandings contained in, the documents listed in Annex A hereto, the "Master R&D Agreement") and, in particular, the "Second Amendment to Schedule A" thereof and (ii) certain distribution agreements, whether written or oral, between one or more Nortel Group entities, including without limitation the agreements listed in Annex B hereto and any other agreements similar to the agreements listed in Annex B hereto (as amended, supplemented or otherwise modified, the "Distribution Agreements" and, together with the "Master R&D Agreement", the "Transfer Pricing Agreements"); and

WHEREAS, since the Filing Date, the US Debtors (other than NN CALA), the Canadian Debtors and the EMEA Debtors have engaged in the inter-company trading of goods and services pursuant to those certain group supplier protocol agreements between the US Debtors (other than NN CALA) and the EMEA Debtors and between the Canadian Debtors and the EMEA Debtors (the "GSPAs") and pursuant to certain court orders entered in the Canadian Proceedings and the US Proceedings, and have made and continue to make payments in respect of such inter-company trading (the "Inter-Company Trading Payments"); and

WHEREAS, since the Filing Date, issues relating to Transfer Pricing Payments have arisen among various members of the Nortel Group such that post-filing Transfer Pricing Payments have not been included in any Inter-Company Trading Payments and certain of those issues were resolved in the Interim Funding and Settlement Agreement dated as of June 9, 2009 by and among the Canadian Debtors, the US Debtors (other than NN CALA), and the EMEA Group (the "IFSA") and in the Final Canadian Funding and Settlement Agreement dated as of December 23, 2009 by and among the Canadian Debtors and the US Debtors (other than NN CALA) (the "FCFSA"); and

WHEREAS, contemporaneous with the signing of this Agreement, the US Debtors (other than NN CALA), the Canadian Debtors and the EMEA Group have entered into the Agreement on Transfer Pricing Amendments and Certain Other Matters, dated as of the date hereof, to, among other things, cease the obligation to make Transfer Pricing Payments from and after April 1, 2010; and

WHEREAS, contemporaneous with the signing of this Agreement, certain of the US Debtors, the Canadian Debtors and the EMEA Debtors have amended the GSPAs retroactive to April 1, 2010 to remove the reference to payments under the Master R&D Agreement from the definition of "Goods and Services" (as defined in the GSPAs); and

WHEREAS, each of the Parties hereto has concluded it is appropriate and in the best interest of each to enter into this Agreement pursuant to which, *inter alia*, the EMEA Group

2

shall among themselves and as between one or more EMEA Group members, on the one hand, and one or more Canadian Debtors or US Companies, on the other hand, settle amounts payable as Transfer Pricing Payments as provided for herein for the period from January 1, 2010 through March 31, 2010 (the "Q1 Settlement Period"),

NOW, THEREFORE, in consideration of the respective covenants made herein, and of the mutual benefits to be derived hereby (the sufficiency of which are acknowledged), the Parties hereto agree:

## PART A – SETTLEMENT MATTERS

1.    Nortel Networks UK Limited ("NNUK") is hereby irrevocably authorized to seek and retain payment for its own account and sole benefit from other members of the EMEA Group of Transfer Pricing Payments owed, or as such payments become due, under the relevant Transfer Pricing Agreements during, or with respect to, the Q1 Settlement Period which would otherwise be made to or administered by NNL, in consideration of the full and final settlement in respect of the Q1 Settlement Period set out herein. Each member of the EMEA Group hereby appoints NNUK as its agent (without liability, including as to failure of any EMEA Group member to make any Transfer Pricing Payment) to administer the collection and distribution of the Transfer Pricing Payments received, solely with respect to the Q1 Settlement Period, as detailed in Annex C hereto. Each member of the EMEA Group agrees that the payments required to be made to NNUK set out in Annex C shall be made to NNUK in cleared funds and without set-off, in consideration of the matters set out in this Agreement, within 30 days of the date hereof, except as otherwise agreed between any EMEA Group member and NNUK. NNUK agrees that it will make any payments to any member of the EMEA Group it is required to make as set out in Annex C without set-off, in consideration of the matters set out in this Agreement, within 30 days of the date hereof. To the extent that any member of the EMEA Group breaches any obligation to make its Transfer Pricing Payment with respect to the Q1 Settlement Period, only NNUK and none of the Canadian Debtors or the US Companies shall have any claim against such defaulting EMEA Group member for such payment and no EMEA Group member shall have any claim against the Canadian Debtors or the US Companies for such payment.

2.    NNL and NNUK hereby agree that for the Q1 Settlement Period, the EMEA Group owes NNL a net amount of US$10.6 million (the "Q1 Net Amount") which shall be satisfied in accordance with Section 3 below.

3.    Shortfall Payments.

(a)    The Parties hereby agree that the Q1 Net Amount shall be setoff and deducted from the Shortfall Payments (as defined in the IFSA) contemplated as being payable by NNL to NNUK under the IFSA.

3

(b)    With respect to the balance of the Shortfall Payments after the setoff referred to in Sub-Section 3(a) above, being a net obligation of US$9.4 million, the Parties hereby agree that:

    (i)    NNL shall pay to NNUK the amount of US$4.7 million (the "Tranche 1 Payment") within three (3) Business Days of the Effective Date of this Agreement;

    (ii)    Upon the making of the Tranche 1 Payment, the Shortfall Charge (as defined in the Initial Order) shall be automatically reduced to US$4.7 million;

    (iii)    The remaining US $4.7 million (the "Tranche 2 Payment") being the net amount of the Shortfall Payments owing after reduction of the setoff amount in Sub-Section 3(a) above and the Tranche 1 Payment, shall be paid by NNL to NNUK in accordance with Section 6.c. of the IFSA as if that Section 6.c of the IFSA were in effect at the time the Tranche 2 Payment is made notwithstanding the provisions of Sub-Section 13.b and/or Section 14 of the IFSA; and

    (iv)    Upon the making of the Tranche 2 Payment, the Shortfall Charge shall be automatically terminated and extinguished.

For the purpose of this Agreement, "Business Day" shall mean a day that is not a Saturday, Sunday or national public holiday in Canada, the United States or the United Kingdom.

4.    This Agreement shall constitute a full and final settlement of any and all Transfer Pricing Payments owing and that may, or could be, owing between (i) the EMEA Group *inter se*, and (ii) any member of the EMEA Group, on the one hand, and any Canadian Debtor or US Company, on the other hand, as Transfer Pricing Payments under the Transfer Pricing Agreements for all calculation periods or parts thereof in the Q1 Settlement Period including, without limitation, any subsequent determination by any revenue authority with respect to the Q1 Settlement Period giving rise to any subsequent liability to taxation of any Party hereto (the "Settled Amounts") and provided further that in connection with such full and final settlement, (a) each member comprising the EMEA Group releases each of the Canadian Debtors and each of the US Companies and agree that they shall not allege, file or otherwise assert any claim against the Canadian Debtors or the US Companies in respect of the Settled Amounts or allege, file or otherwise assert a claim against any person which could result in a claim against the Canadian Debtors or the US Companies in respect of the Settled Amounts; and (b) each of the Canadian Debtors and the US Companies releases each member of the EMEA Group and agrees not to allege, file or otherwise assert any claim against any one or more of the EMEA Group in respect of the Settled Amounts or allege, file or otherwise assert a claim against any person which could result in a claim against any member of the EMEA Group in respect of the

Settled Amounts. For greater certainty, the obligation of NNL to make the Tranche 1 Payment and the Tranche 2 Payment as herein provided shall not be released pursuant to this Section 4.

<u>Covenants</u>

5. NNUK shall use commercially reasonable efforts to obtain, either a deed of adherence whereby NNSA agrees to be bound by all provisions of this Agreement applicable to an EMEA Debtor or a letter from NNSA authorizing the UK Administrator to bind NNSA to all provisions of this Agreement (the "<u>NNSA Accession</u>") and NNL and NNI agree to provide such assistance as NNUK may reasonably require to obtain such deed of adherence or letter. The EMEA Debtors hereby agree to provide copies of such deed of adherence or letter, upon receipt, to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Creditors' Committee and the Bondholders' Group.

6. For the period from the Effective Date (defined below) to the date of the NNSA Accession, NNL hereby unconditionally assigns and transfers to NNUK all of its rights to any Transfer Pricing Payments paid or payable to NNL from or on behalf of NNSA under the relevant Transfer Pricing Agreements with respect to the Q1 Settlement Period (the "<u>NNSA Inter-Company Trading Payments</u>") and agrees that to the extent any such NNSA monies in respect of NNSA Inter-Company Trading Payments are paid by NNSA to NNL during the time between the Effective Date and the date of the NNSA Accession, NNL shall transfer such monies forthwith to such account as NNUK may direct.

<u>PART B – PROVISIONS OF GENERAL APPLICATION</u>

7. Nothing in this agreement shall constitute an amendment, modification or waiver of rights of the US Debtors, the Canadian Debtors or the Monitor under the FCFSA, and this Agreement shall not supersede the FCFSA in any respect.

8. Except as expressly set forth herein, (i) nothing in this Agreement shall constitute an amendment, modification or waiver of rights of the US Debtors, the Canadian Debtors, the Monitor, the EMEA Group or the Joint Administrators under the IFSA, and (ii) to the extent a conflict exists between the terms of this Agreement and the terms of the IFSA, the terms of the IFSA shall govern.

9. Subject to the settlement contemplated in this Agreement, nothing in this Agreement shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the Transfer Pricing Agreements, applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements, the right to object to the failure to make payments under or in connection with the Transfer Pricing Agreements, or any offset arising therefrom or otherwise, or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or

5

any offset arising therefrom or otherwise. The use of the term Transfer Pricing Payment (or any similar term) or reference to Transfer Pricing Agreements (or similar agreement) in this Agreement is for convenience only and shall have no evidentiary effect or be used by any of the Parties hereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any Party of the Transfer Pricing Agreements or any transfer pricing methodology provided in the Transfer Pricing Agreements. Nothing in this Agreement shall bar, prohibit, or in any way hinder or enhance the rights of the Parties to this Agreement to present any arguments, methodologies, legal or factual theories in support of a proposed allocation of the proceeds of any transaction, including without limitation, the sale of assets, businesses or intellectual property, that would be subject to allocation amongst any of the Parties hereto, and such presentation shall not, or otherwise be deemed to, constitute in any way a violation of a Party's rights under any existing agreement. For the avoidance of doubt, nothing in this Agreement shall affect any claim a Party may have in respect of Transfer Pricing Payments relating to any period prior to the Filing Date.

10. This agreement shall become effective between the Parties (the "Effective Date") upon the approval by each of the US Court and the Canadian Court and, with respect to the obligations of NNSA only, upon the approval by the French Court, of this Agreement and all of the provisions hereof. The US Debtors, the Canadian Debtors and NNSA (upon its accession to this Agreement) shall (i) use commercially reasonable efforts to obtain such approvals as soon as possible (ii) keep all other Parties reasonably apprised of the progress of such approvals and provide such other information regarding the satisfaction of such approvals as reasonably requested by other Parties; and (iii) use commercially reasonable efforts to allow any other Party which so requests in writing reasonable participation in connection with any proceedings in any Court relating to such approval.

Notwithstanding the foregoing, the following provisions of this Agreement shall be effective as of the date hereof: Sections 10, 11, 12, 13, 14, 16, 17, and 18.

11. The Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors (excluding NNSA, which is represented by the NNSA Liquidator) to which they are appointed and none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations. The Joint Administrators are a Party to this Agreement: (i) as agents of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and for the purposes of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Administrators and enforcing the obligations of certain other Parties to this Agreement.

6

12. The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic means shall be effective as delivery of a manually executed counterparty of this Agreement.

13. <u>Governing Law.</u>

   (a) The Parties agree that this Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; <u>provided</u>, however, that Section 11 shall be governed exclusively by English law.

   (b) To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US Court and the Canadian Court (in a joint hearing conducted under the Cross-Border Insolvency Protocol approved by the US Court by an Order dated January 15, 2009 and by the Canadian Court in an Order dated January 14, 2009 (as amended or as amended and restated from time to time, the "<u>Cross-Border Insolvency Protocol</u>") for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the US Court if such claim, action or proceeding would solely affect the US Companies, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Debtors, a joint hearing of both the Canadian Court and the US Court conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors, the US Companies and the EMEA Group, and the English courts if such claim, action or proceeding would solely affect the EMEA Group, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a court or any claim that any such action brought in such a court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law; provided, however, that any claim, action or proceeding set forth in Section 11 shall be brought exclusively in the English courts.

   (c) Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Agreement or any transaction or matter contemplated hereby. Each Party (i) certifies that no representative, agent or attorney of any other Party has represented, expressly or otherwise, that such

7

other party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other parties hereto have been induced to enter into this agreement by, among other things, the mutual waivers and certifications in this Section 13.

14.    Each Party approves all payments to be made pursuant to this Agreement and all other matters contemplated hereby, to the extent that such Party is a creditor of the Party making such payment.

15.    Except as specifically provided herein, payments required under this Agreement shall be made in accordance with the terms hereof regardless of any actual or purported right of setoff or other defense.

16.    Except as specifically set forth in this Agreement, the obligations of each Party hereunder are several, and not joint and several.

17.    In the event that any provision of this Agreement shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision. The Parties shall negotiate in good faith with respect to any provision to this Agreement found to be illegal, invalid or unenforceable, in order to agree, with the consent of the Parties, the Creditors' Committee and the Bondholders' Group, on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision.

18.    This Agreement may be amended, on no less than ten (10) Business Days' notice, only by means of a writing signed by all Parties, and approved by the Creditors' Committee and the Bondholders' Group, which amendments, if material in the judgment of the Parties, must be approved by all of the Courts that initially approved this Agreement. For the purpose of this Section 18, "Business Day" shall mean a day that is not a Saturday, Sunday or national public holiday in Canada or the United States.

8

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as the date first written above.

NORTEL NETWORKS CORPORATION

By: _____
           Name:
           Title:

NORTEL NETWORKS LIMITED

By: _____
           Name:
           Title:

NORTEL NETWORKS GLOBAL CORPORATION

Per: _____
           Name:
           Title:

Per: _____
           Name:
           Title:

NORTEL NETWORKS INTERNATIONAL CORPORATION

Per: _____
           Name:
           Title:

Per: _____
           Name:
           Title:

*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

NORTEL NETWORKS TECHNOLOGY
CORPORATION

Per: _____
　　　Name:
　　　Title:


Per: _____
　　　Name:
　　　Title:


NORTEL NETWORKS INC.


By: _____
　　　Name:
　　　Title:


ARCHITEL SYSTEMS (U.S.) CORPORATION


By: _____
　　　Name:
　　　Title:


CORETEK, INC.


By: _____
　　　Name:
　　　Title:


NORTEL ALTSYSTEMS, INC.

By: _____
　　　Name:
　　　Title:


*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

S-2

NORTEL ALTSYSTEMS INTERNATIONAL INC.

By:    _____
           Name:
           Title:


NORTEL NETWORKS APPLICATIONS MANAGEMENT SOLUTIONS INC.

By:    _____
           Name:
           Title:


NORTEL NETWORKS (CALA) INC.

By:    _____
           Name:
           Title:


NORTEL NETWORKS CABLE SOLUTIONS INC.

By:    _____
           Name:
           Title:


NORTEL NETWORKS CAPITAL CORPORATION

By:    _____
           Name:
           Title:


*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

NORTEL NETWORKS HPOCS INC.

By:    _____
       Name:
       Title:


NORTEL NETWORKS INDIA
INTERNATIONAL INC.

By:    _____
       Name:
       Title:


NORTEL NETWORKS INTERNATIONAL INC.


By:    _____
       Name:
       Title:


NORTEL NETWORKS KABUSHIKI KAISHA


By:    _____
       Name:
       Title:


NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By:    _____
       Name:
       Title:


*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

S-4

NORTHERN TELECOM INTERNATIONAL
INC.

By:     _____
        Name:
        Title:


QTERA CORPORATION


By:     _____
        Name:
        Title:


SONOMA SYSTEMS


By:     _____
        Name:
        Title:


XROS, INC.


By:     _____
        Name:
        Title:


*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

**SIGNED** by Alan Bloom in his own capacity ) .............................................................
and on behalf of the Joint Administrators )
without personal liability and solely for the )
benefit of the provisions of this Agreement )
expressed to be conferred on or given to the )
Joint Administrators in the presence of: )

Witness signature

.............................................................. )
Name: )
Address: )


**SIGNED** for and on behalf of **Nortel Networks** ) .............................................................
**UK Limited** (in administration) by Christopher )
Hill as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Witness signature

.............................................................. )
Name: )
Address: )


**SIGNED** for and on behalf of **Nortel Networks** ) .............................................................
**(Ireland) Limited** (in administration) by David )
Hughes as Joint Administrator (acting as agent )
and without personal liability) in the presence )
of: )

Witness signature

.............................................................. )
Name: )
Address: )


*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

S-6

**SIGNED** for and on behalf of **Nortel Networks**    )    ..................................................................
**N.V.** (in administration) by Christopher Hill as    )
Joint Administrator (acting as agent and without    )
personal liability) in the presence of:    )

Witness signature

..........................................................    )
Name:    )
Address:    )


**SIGNED** for and on behalf of **Nortel Networks**    )    ..................................................................
**SpA** (in administration) by Christopher Hill as    )
Joint Administrator (acting as agent and without    )
personal liability) in the presence of:    )

Witness signature

..........................................................    )
Name:    )
Address:    )


**SIGNED** for and on behalf of **Nortel Networks**    )    ..................................................................
**B.V.** (in administration) by Christopher Hill as    )
Joint Administrator (acting as agent and without    )
personal liability) in the presence of:    )

Witness signature

..........................................................    )
Name:    )
Address:    )


*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

S-7

SIGNED for and on behalf of **Nortel Networks**        )        ...................................................................
**Polska Sp. z.o.o.** (in administration) by            )
Christopher Hill as Joint Administrator (acting         )
as agent and without personal liability) in the         )
presence of:                                            )

Witness signature

........................................................        )
Name:                                                   )
Address:                                                )


SIGNED for and on behalf of **Nortel Networks**        )        ...................................................................
**Hispania S.A.** (in administration) by                )
Christopher Hill as Joint Administrator (acting         )
as agent and without personal liability) in the         )
presence of:                                            )

Witness signature

........................................................        )
Name:                                                   )
Address:                                                )


SIGNED for and on behalf of **Nortel Networks**        )        ...................................................................
**(Austria) GmbH** (in administration) by               )
Christopher Hill as Joint Administrator (acting         )
as agent and without personal liability) in the         )
presence of:                                            )

Witness signature

........................................................        )
Name:                                                   )
Address:                                                )

*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

S-8

**SIGNED** for and on behalf of **Nortel Networks**
**s.r.o.** (in administration) by Christopher Hill as        )        ...................................................................
Joint Administrator (acting as agent and without            )
personal liability) in the presence of:                     )
                                                            )

Witness signature


...................................................................           )
Name:                                                       )
Address:                                                    )
                                                            )


**SIGNED** for and on behalf of **Nortel Networks**        )        ...................................................................
**Engineering Service kft** (in administration) by          )
Christopher Hill as Joint Administrator (acting             )
as agent and without personal liability) in the             )
presence of:                                                )

Witness signature


...................................................................           )
Name:                                                       )
Address:                                                    )


**SIGNED** for and on behalf of **Nortel Networks**        )        ...................................................................
**Portugal S.A.** (in administration) by                    )
Christopher Hill as Joint Administrator (acting             )
as agent and without personal liability) in the             )
presence of:                                                )

Witness signature


...................................................................           )
Name:                                                       )
Address:                                                    )


*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

S-9

**SIGNED** for and on behalf of **Nortel Networks**
**Slovensko s.r.o.** (in administration) by          )          .......................................................
Christopher Hill as Joint Administrator (acting      )
as agent and without personal liability) in the      )
presence of:                                          )
                                                      )

Witness signature

..................................................................
Name:                                                 )
Address:                                              )
                                                      )


**SIGNED** for and on behalf of **Nortel Networks**
**Romania s.r.l.** (in administration) by             )          .......................................................
Christopher Hill as Joint Administrator (acting      )
as agent and without personal liability) in the      )
presence of:                                          )

Witness signature

..................................................................
Name:                                                 )
Address:                                              )


**SIGNED** for and on behalf of **Nortel Networks**
**France S.A.S.** (in administration) by Kerry        )          .......................................................
Trigg acting as authorised representative for the    )
Joint Administrators (acting as agent and            )
without personal liability) in the presence of:      )

Witness signature

..................................................................
Name:                                                 )
Address:                                              )

*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

**SIGNED** for and on behalf of **Nortel Networks**      )      ......................................................................
**GmbH** (in administration) by Christopher Hill      )
as Joint Administrator (acting as agent and      )
without personal liability) in the presence of:      )

Witness signature

..................................................................      )
Name:      )
Address:      )


**SIGNED** for and on behalf of **Nortel Networks**      )      ......................................................................
**Oy** (in administration) by Christopher Hill as      )
Joint Administrator (acting as agent and without      )
personal liability) in the presence of:      )

Witness signature

..................................................................      )
Name:      )
Address:      )


**SIGNED** for and on behalf of **Nortel Networks**      )      ......................................................................
**AB** (in administration) by Christopher Hill as      )
Joint Administrator (acting as agent and without      )
personal liability) in the presence of:      )

Witness signature

..................................................................      )
Name:      )
Address:      )


*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

S-11

**SIGNED** for and on behalf of **Nortel Networks**      )      ..........................................................
**International Finance and Holding B.V.** (in      )
administration) by Christopher Hill as Joint      )
Administrator (acting as agent and without      )
personal liability) in the presence of:

Witness signature

..........................................................      )
Name:      )
Address:      )


**SIGNED** by      )      ..........................................................
Duly authorised for and on behalf of **Nortel**      )
**Networks AG** in the presence of:      )

Witness signature

..........................................................      )
Name:      )
Address:      )

*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

## CONSENT OF MONITOR

Ernst & Young Inc., as Monitor under the Companies' Creditors Arrangement Act to the Canadian Debtors, consents to the Agreement.

**Ernst & Young Inc., in its capacity as Monitor in the CCAA proceedings and not in its personal capacity**

Per:    _____

        Name:

        Title:

*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

**SCHEDULE 1**

**CANADIAN DEBTORS**

Nortel Networks Corporation

Nortel Networks Limited

Nortel Networks Global Corporation

Nortel Networks International Corporation

Nortel Networks Technology Corporation

**SCHEDULE 2**

**US COMPANIES**

Nortel Networks Inc.

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

Nortel Networks (CALA) Inc.

*Nortel Networks Kabushiki Kaisha

*Nortel Networks India International Inc.


*Not a debtor in the US Proceedings.

## SCHEDULE 3

### EMEA DEBTORS

Nortel Networks UK Limited (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks NV (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks BV (In Administration)

Nortel Networks Polska Sp z.o.o. (In Administration)

Nortel Networks Hispania, SA (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks sro (In Administration)

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Portugal SA (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel GmbH (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks France S.A.S. (In Administration)

Annex A

Amendments to and Related Understandings Regarding
Master Research and Development Agreement
dated as of December 22, 2004 ("Master R&D Agreement")

1. Undated Addendum to Master R&D Agreement executed between October 2005 and June 2006.

2. Agreement with Respect to Certain NN Technology effective as of December 30, 2006 (being the day before the closing date of the Share and Asset Sale Agreement between NNL and Alcatel-Lucent).

3. Addendum to Master R&D Agreement dated December 14, 2007 with an effective date of January 1, 2006.

4. Third Addendum to Master R&D Agreement with an effective date of January 1, 2006.

5. Fourth Addendum to Master R&D Agreement with an effective date of December 31, 2008.

6. Letter of acknowledgment dated January 14, 2009 from NNL to the Directors of NNUK, NNSA and NNIR and the UK Administrator.

7. Release in Connection with Master R&D Agreement dated 1 January 2009.

8. Memorandum of Understanding in Connection with Master R&D Agreement, dated December 31, 2008 with an effective date of 1 January 2006.

Annex B

Distribution Agreements

| Party | Date |
|---|---|
| Nortel Networks Limited ("NNL") and Nortel Networks N.V. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks S.p.A. | undated, effective as of 1 January 2002 (plus undated and unsigned Addendum, effective as of 1 January 2003) |
| NNL and Nortel Networks B.V. | dated 22 December 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Polska Sp. z. o. o. | undated, effective as of 1 January 2001 (letter of amendment executed in November 2003, effective as of 1 January 2001 plus Addendum executed in August 2005, effective as of 1 January 2003) |
| NNL and Nortel Networks Hispania, S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks (Austria) GmbH | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks, s.r.o. | dated 15 April 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Engineering Services Kft | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Portugal S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Slovensko, s.r.o. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Romania SRL | executed 22 January 2004, effective 1 January 2003 |
| NNL and Nortel Networks AG | undated, effective 1 January 2001 |

Annex C

## Intra-EMEA Transfer Pricing Settlement Amounts

| EMEA Group entity payer | (Amount payable US$m) / payee |
|---|---|
| Nortel Networks S.A.[2] | (11.86) Nortel Networks UK Limited |
| Nortel Networks (Ireland) Limited | (1.82) Nortel Networks UK Limited |
| Nortel Networks Hispania, SA | (2.30) Nortel Networks UK Limited |
| Nortel Networks AG | (1.23) Nortel Networks UK Limited |
| Nortel Networks NV | (1.68) Nortel Networks UK Limited |
| Nortel Networks Portugal SA | (0.09) Nortel Networks UK Limited |
| Nortel Networks Polska Sp z.o.o. | (1.08) Nortel Networks UK Limited |
| Nortel Networks Romania Srl | (0.11) Nortel Networks UK Limited |
| Nortel Networks BV | (3.54) Nortel Networks UK Limited |
| Nortel Networks UK Limited | (0.14) Nortel Networks sro |
| | (0.10) Nortel Networks Engineering Services Kft |
| | (0.21) Nortel Networks Slovensko, sro |
| | (0.01) Nortel Networks (Austria) GmbH |
| | (1.11) Nortel Networks SpA |

---

[2] To the extent it becomes a Party hereto

| EMEA Group entity payee | Amount receivable US$m / (payer) |
|---|---|
| Nortel Networks UK Limited | 11.86 (Nortel Networks S.A.) |
| | 1.82 (Nortel Networks (Ireland) Limited) |
| | 2.30 (Nortel Networks Hispania, SA) |
| | 1.23 (Nortel Networks AG) |
| | 1.68 (Nortel Networks NV) |
| | 0.09 (Nortel Networks Portugal SA) |
| | 1.08 (Nortel Networks Polska Sp z.o.o.) |
| | 0.11 (Nortel Networks Romania Srl) |
| | 3.54 (Nortel Networks BV) |
| Nortel Networks sro | 0.14 (Nortel Networks UK Limited) |
| Nortel Networks Engineering Services Kft | 0.10 (Nortel Networks UK Limited) |
| Nortel Networks Slovensko, sro | 0.21 (Nortel Networks UK Limited) |
| Nortel Networks (Austria) GmbH | 0.01 (Nortel Networks UK Limited) |
| Nortel Networks SpA | 1.11 (Nortel Networks UK Limited) |

**EXHIBIT D**

**US/Canada Term Sheet**

Execution Copy

**August 2011**

**Timeline for and Proposed Resolutions of Pending US/Canada Issues**

*The issues listed on this term sheet shall be implemented at the same time as those items set out on the Global Inter-estate Term sheet. In particular, the Q1SA and the Agreement on Transfer Pricing Amendments and Certain Other Matters shall only be implemented contemporaneously with the Transfer Pricing Issues listed as item I on this term sheet, and the Transfer Pricing Issues listed as item I on this term sheet shall be effective upon U.S. and Canada court approval of the Q1SA and the Agreement on Transfer Pricing Amendments and Certain Other Matters. This term sheet is being executed at the same time as the Q1SA and the Agreement on Transfer Pricing Amendments and Certain Other Matters.

## I.    TRANSFER PRICING ISSUES

### A.    Nortel Networks Japan

- o  TPA true-ups under the LRD agreement between NN Japan and NNL shall be terminated as of January 1, 2010, after which date products and services shall be purchased on a cost plus basis.

- o  Parties to work reasonably to achieve the following timeline:

  - Documentation of the LRD agreement finalized.

  - US Court approval not required as Nortel Japan is not a debtor.

  - Approval of UCC obtained.

### B.    Nortel Networks CALA, Inc.

- o  TPA true-up obligations under the LRD agreement between NN CALA and NNL shall be terminated as of January 1, 2010, after which date products and services shall be purchased on a cost plus basis.

- o  For TPA calculation purposes, NN CALA's $5.4 mm Q4 2009 intercompany charge relating to NN Mexico non-COE (company code 3170) that relates to 2008 expenses to the extent such charges are accepted and booked by NN CALA, will be booked in 2008, leading to a decrease in NNL's pre-petition claim against NN CALA.

- o  NN CALA 2009 TPA calculations will be done on a quarterly, not annual basis, with result being that neither party will owe true up payments for the period July 14, 2009 to December 31, 2009.

- o  NNL will agree to a $1 mm payment through end of 2010 for services being provided to NNL by NN CALA. Such payment to be made within ten (10) days of U.S. and Canada court approval of the Q1SA and the Agreement on Transfer

Pricing Amendments and Certain Other Matters. Services provided after January 1, 2011, will be reimbursed on a fully loaded basis.

o The Mexico non-COE entity will confirm in writing within five business days of agreement to term sheet that no further claims (whether liquidated or not) exist by it against NNI or NN CALA relating to any period after January 1, 2009.

o Parties to work reasonably to achieve the following timeline:

- Documentation finalized.

- US Court approval is not required.

**C.    Nortel Networks III**

o TPA true-ups whether due under (a) the 4-way LRD among NNIII, N India (Pvt), NNL and N Singapore, with no liability to NNIII, or (b) any bi-lateral LRD, or any other agreement of any sort, whether written or unwritten, between NNIII and NNL or between NNIII and any other Nortel entity, shall be terminated as of January 1, 2010, after which date products and services shall be purchased on a cost plus basis.

o NNIII will acknowledge that $4.3 mm is owed to NNL, the acknowledgement of which claim shall resolve the entirety of any claim that NNL may have against NNIII arising or relating to the period after January 1, 2009.

o NNL's claims, including existing book debts and the post-January 1, 2009 TPA amounts owing against NNIII will be pari passu with other unsecured claims against NNIII.

o Parties to work reasonably to achieve the following timeline:

- Documentation finalized.

- US Court approval is not required as NNIII is not a debtor.

- Approval of UCC obtained.

**II.    NORTEL CHINA LIMITED – NCL**

o NCL acknowledges that as of September 30, 2010, $28.1mm is owed to NNI, payment of which is conditional upon required documentation and regulatory clearances.

o NCL will provide monthly updates to NNI on NCL's financial situation.

o NCL confirms to NNI that its Board of Directors believes, based upon information available to them and as of date of the agreement to term sheet, that

NCL is solvent and that there are no present plans to initiate an insolvent liquidation of NCL or turn over NCL's assets to a trustee or other official appointed to liquidate the enterprise.

o  NCL paid $6.75 mm and $5.6M to GDNT on October 12, 2010 and October 18 2010 respectively. NN Asia paid $1.8M to GDNT on October 19, 2010. In return, GDNT paid $6.6M to NN Asia on October 13, 2010 and another $6.6M on October 21, 2010. The payments from GDNT to NN Asia are net of $0.94M withholding tax deducted. NCL also made the promised payment of $11.2 mm (net of withholding tax of $0.6 mm) to NNI on October 22, 2010.

o  The RM Report dated November 26, 2010 took account of receipts by NN Asia from GDNT in October. The Report shows that NN Asia has surplus cash of $6.16m and the recommendation is that this is paid to NN Asia I/Co creditors on a pro-rata basis. This payment of $6.16M will be made within 10 business days following approval by the US and Canadian Courts of the Q1 Transfer Pricing Settlement Agreement and Transfer Pricing Amending Agreement.

o  NCL has prepared documentation for payment of $2.1 mm to NNI ($0.4 mm for expat payroll and $1.7 mm for miscellaneous). The $0.4 mm has already been paid on various dates between October 15 and October 26, 2010. The documentation for the remaining $1.7 mm was submitted to the Chinese tax authorities in August – based on correspondence with the tax authorities an amendment to the document agreement was prepared. On submission of this revised agreement the tax authorities have asked for further documentation to support the transactions. The team are working on obtaining as much as possible of the documents requested with a view to submitting the information again to the authorities in Q2'11. Regular and timely updates on progress will be provided to NNI.

o  NCL has paid to NNI gross royalty payments of $9.5 mm (less applicable withholding tax) on April 15, 2011.

o  NCL will provide NNI with copies of documentation, as it is located or obtained, with respect to the $5.9 mm of expat payroll and vouchers shown for payment in 2011; copies of the documentation submitted will be provided to NNI; NCL will provide NNI with periodic updates on status, as well as timely notice of submission and either clearance or denial.

o  NCL will pay to NNI all amounts described herein as owing by NCL to NNI within 30 days of the receipt of all necessary approvals from the Chinese regulatory authorities.

o  US Court approval is not required.

o  Approval of UCC obtained.

3

III.    **N PAKISTAN (BRANCH OF NN ASIA)**

    o  NNI will execute the waivers and consents requested by NN Asia

    o  Waivers and consents will be executed within five business days of agreement to term sheet.

    o  US Court approval is not required.

IV.    **TRINIDAD AND TOBAGO**

    o  On January 11, 2011, NN CALA obtained U.S. Bankruptcy Court authorization to file tax returns with Trinidad and Tobago Tax Authority to pay $3.43 million in respect of $1.95 million of VAT taxes payable by NN CALA and $1.48 million of corporation, VAT and other local taxes incurred by NTTL for period 2007 – 2010. Such tax returns were filed on May 31, 2011.

    o  Upon execution hereof, NNIC will transfer the funds relating to T&T post-January 14, 2009 (approximately $7.1 mm) to NN CALA.[1]

    o  NN CALA's $5.2 mm reserve in Q4 2009 for VAT taxes will be booked in 2008 and will result in an adjustment of 2008 TPA calculation in favor of NN CALA and will reduce NNL's otherwise allowable pre-petition claim against NN CALA by $5.2 mm as a result of NN CALA's increasing its reserve by $5.2 mm.

    o  In the event that NN CALA has a larger liability than the full amount of any reserve in NN CALA's books of account, to the T&T tax authority arising out of pre-petition (pre- July 14, 2009) activity, NNL's otherwise allowable pre-petition claim against NN CALA shall be reduced by the amount of such increased liability.

    o  US Court approval is not required.

    o  Approval of UCC obtained.

V.    **NN MEXICO COE**

    o  NNL, NN CALA, NNI and Nortel Networks de Mexico, S.A. de C.V. ("NN Mexico") made incremental payments in the post-filing period totaling $6,603,780.43 to Nortel de Mexico, S. de R.L. de C.V. ("Nortel Mexico COE"). These incremental payments, set forth on Appendix 1 to this Term Sheet, were made as a result of declining service demands, which resulted in increased price per unit charges by Nortel Mexico COE. Nortel Mexico COE agrees to reimburse NNL, NN CALA, NNI and NN Mexico on a pro-rata basis up to the Appendix 1 amounts, provided that any such reimbursement obligation shall be only to the extent of funds available after Nortel Mexico COE has entered into

---

[1] Funds from NNIC should be deposited in one of NN CALA's USD accounts.

liquidation and paid all third party claims. Immediately prior to such pro-rata reimbursement, and in consideration and conditioned upon such reimbursement, the pre-filing intercompany claims of NNL, NN CALA and NNI, if any, against Nortel Mexico COE will be subordinated to such reimbursement. The reimbursement shall be documented in the form of credit memos against the invoices referenced in Appendix 1.

o  Nortel Mexico COE has confirmed in writing that other than intercompany balances owing at November 1, 2010 and the ordinary course payments for goods and services rendered or to be rendered (payment for which shall promptly be settled by the owing party), NNL, NNI and NN CALA have no obligations to Nortel Mexico COE on a going forward basis from November 1, 2010.

o  Parties to work reasonably to achieve the following timeline:

- US Court approval is not required.

## VI.    MICROVISION

o  NNL will pay over to Xros all license payments received in error, request that the licensee make any further payments to an account designated by Xros, and pay over any other payments that may be received in the future in respect of Xros or any Xros license(s).

o  US Court approval is not required.

## VII.   CVAS SIDE LETTER

o  NNI will agree that the approximately $150k of withholding tax relating to trademarks be classified as deal cost and NNL will agree that purchase price relating to trademarks are subject to allocation on the same basis as other intellectual property provided however that such agreement relates only to the CVAS transaction and has no precedential effect for the purposes of allocation of sale proceeds for any other Nortel sale transaction.

o  Parties to work reasonably to achieve the following timeline:

- CVAS Side Letter to be finalized by July 30, 2011

- US court approval not required so long as UCC consents; UCC consent to be obtained by July 30, 2011.

## VIII.  ATLANTA TELEPHONE COMPANY

o  Cost will be split 50/50.

o  NNI will pay to NNL $70,000, being 50% of the funds received to date within five business days of agreement to term sheet

5

    o   US Court approval is not required.

**IX.   GDNT**

    o   NNI hereby confirms that it will provide the necessary IT, Voice, Corwan and Application access services to Ericsson in connection with the GDNT sale transaction. The cost to Ericsson of transition services will initially be $74,025 per month via work orders, subject to reduction based upon either head count reduction in the case of Voice, Corwan and Application services or service termination on 90 days notice by Ericsson.  All amounts received from Ericsson in respect of such transition services shall be split between NNI as to 60% and NNL as to 40%

    o   The parties will work to bring all post-filing intercompany accounts current and make payments going forward.

Acknowledged and signed this ____ day of _____, 2011.

**NORTEL NETWORKS INC.**

Per:  _____
      Name:
      Title:

**NORTEL NETWORKS (CALA) INC.**

Per:  _____
      Name:
      Title:

**NORTEL NETWORKS LIMITED**

Per:  _____
      Name:
      Title:

Per:  _____
      Name:
      Title:

**NORTEL NETWORKS INDIA
INTERNATIONAL INC.**

*Signing for Section I.C Only*

Per: _____

     Name:

     Title:


**NORTEL NETWORKS (CHINA) LIMITED**

*Signing for Article II Only*

Per: _____

     Name:

     Title:


**NORTEL DE MEXICO, S. DE R.L. DE C.V.**

*Signing for Article V Only*

Per: _____

     Name:

     Title:

8

**APPENDIX "B"**

**[ATTACHED]**

**EXECUTION VERSION**

## AGREEMENT ON TRANSFER PRICING AMENDMENTS
## AND CERTAIN OTHER MATTERS

This agreement (the "<u>Agreement</u>") is entered into as of [●], 2011 by and among Nortel Networks Limited ("<u>NNL</u>") and the other entities set forth in Schedule 1 attached hereto (the "<u>Canadian Debtors</u>"), Nortel Networks Inc. ("<u>NNI</u>") and the other entities set forth in Schedule 2 attached hereto (the "<u>US Debtors</u>"), the Joint Administrators (as defined below), the entities set forth in Schedule 3 attached hereto (the "<u>EMEA Debtors</u>") and Nortel Networks AG ("<u>NNAG</u>", together with the EMEA Debtors, the "<u>EMEA Group</u>", and the EMEA Group together with the US Debtors, the Canadian Debtors and the non-debtor affiliates of each, the "<u>Nortel Group</u>"). The Canadian Debtors, the US Debtors, the EMEA Debtors and NNAG are sometimes referred to herein individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>".  The Joint Administrators, in their personal capacities, shall be party to this Agreement as provided in Section 8 and solely for the purpose of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Administrators and references to the Parties shall be construed accordingly.

WHEREAS, on January 14, 2009 (the "<u>Filing Date</u>"), the Canadian Debtors commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "<u>Canadian Court</u>") under the *Companies' Creditors Arrangement Act* (Canada) (respectively, "<u>CCAA</u>" and the "<u>Canadian Proceedings</u>"), in connection with which Ernst & Young Inc. was appointed monitor (the "<u>Monitor</u>"); and

WHEREAS, on the Filing Date, the US Debtors filed petitions in the United States Bankruptcy Court for the District of Delaware (the "<u>US Court</u>") under chapter 11 of title 11 of the *United States Code* (respectively, the "<u>Bankruptcy Code</u>," and the "<u>US Proceedings</u>"); and

WHEREAS, on the Filing Date, the EMEA Debtors commenced administration proceedings (the "<u>UK Proceedings</u>") before the High Court of Justice in London, England, represented by individuals from Ernst & Young LLP (the "<u>UK Administrator</u>"), and, in the case of Nortel Networks (Ireland) Limited only, Ernst & Young Chartered Accountants (the "<u>NNIR Administrator</u>"), serving as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, the "<u>Joint Administrators</u>"); and

WHEREAS, while the UK Proceedings in respect of Nortel Networks S.A. ("<u>NNSA</u>") are continuing, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "<u>NNSA Liquidator</u>") and an administrator were appointed by the Versailles Commercial Court (the "<u>French Court</u>") (Docket No. 2009P00492) for NNSA. Pursuant to applicable French statutory provisions, the NNSA Liquidator is a signatory of this Agreement on behalf and acting as agent of NNSA; and

□

WHEREAS, an Official Committee of Unsecured Creditors has been appointed in the US Proceedings (the "Creditors' Committee") and a steering committee of members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with NNL (the "Bondholders' Group") has been formed; and

WHEREAS, prior to the Filing Date, quarterly "true up" payments ("Transfer Pricing Payments") were made by certain members of the Nortel Group to other Nortel Group entities pursuant to a transfer pricing methodology embodied in the (i) Master Research and Development Agreement dated as of December 22, 2004, with an effective date of January 1, 2001 (as amended by, and together with the related understandings contained in, the documents listed in Annex A hereto, the "Master R&D Agreement") and, in particular, the "Second Amendment to Schedule A" thereof and (ii) certain distribution agreements, whether written or oral, between one or more Nortel Group entities, including without limitation the agreements listed in Annex B hereto and any other agreements similar to the agreements listed in Annex B hereto (as amended, supplemented or otherwise modified, the "Distribution Agreements" and, together with the "Master R&D Agreement", the "Transfer Pricing Agreements"); and

WHEREAS, since the Filing Date, the US Debtors, the Canadian Debtors and the EMEA Debtors have engaged in the inter-company trading of goods and services pursuant to those certain group supplier protocol agreements between the US Debtors and the EMEA Debtors and between the Canadian Debtors and the EMEA Debtors (the "GSPAs") and pursuant to certain court orders entered in the Canadian Proceedings and the US Proceedings, and have made and continue to make payments in respect of such inter-company trading (the "Inter-Company Trading Payments"); and

WHEREAS, since the Filing Date, issues relating to Transfer Pricing Payments have arisen among various members of the Nortel Group and certain of those issues were resolved in, inter alia, the (i) Interim Funding and Settlement Agreement dated as of June 9, 2009 by and among the Canadian Debtors, the US Debtors and the EMEA Group (the "IFSA"), and (ii) the Final Canadian Funding and Settlement Agreement dated as of December 23, 2009 by and among the Canadian Debtors, the Monitor and the US Debtors (the "FCFSA"); and

WHEREAS, pursuant to the terms of the IFSA and the FCFSA, the US Debtors have settled any and all amounts that the US Debtors may or could owe in respect of the NNI Interim Obligations (as such term is defined in the IFSA) and the Covered Obligations (as such term is defined in the FCFSA), which includes, without limitation, any Transfer Pricing Payments payable by the US Debtors to the Canadian Debtors during, or with respect to, the period from the Filing Date through the later of the conclusion of the Canadian Proceedings or the consummation of the wind-down of the Canadian Debtors' estates; and

WHEREAS, as a result of the various post-Filing Date Nortel business unit divestitures the Parties have determined that the Transfer Pricing Payments are no longer appropriate, however the parties agree that the Transfer Pricing Agreements should otherwise continue in full force and effect as contemplated herein; and

2

WHEREAS, contemporaneous with the signing of this Agreement, certain of the US Debtors, the Canadian Debtors and the EMEA Debtors have amended the GSPAs retroactive to April 1, 2010 to remove the reference to payments under the Master R&D Agreement from the definition of "Goods and Services" (as defined in the GSPAs); and

WHEREAS, certain of the US Debtors, the Canadian Debtors, certain of their affiliates and Avaya Inc. ("Avaya") have entered into that certain Amended and Restated Asset and Share Sale Agreement, dated as of September 14, 2009 (as amended and restated and as may be further amended and/or restated from time to time in accordance with its terms, the "Enterprise ASSA"), and certain of the EMEA Group and certain of their affiliates, the Joint Administrators and Avaya have entered into that certain Amended Asset Sale Agreement, dated as of September 14, 2009 (as amended and restated by that certain Amendment and Restatement Agreement dated as of September 14, 2009 and as may be further amended and/or restated from time to time in accordance with its terms, the "Enterprise EMEA ASA"); and

WHEREAS, prior to the closing of the transactions contemplated by the Enterprise ASSA and the Enterprise EMEA ASA, certain of the Parties and their affiliates, the Estate Fiduciaries (as defined in the Enterprise Escrow Agreement) and the Distribution Agent (as defined in the Enterprise Escrow Agreement, and hereinafter the "Enterprise Distribution Agent") entered into that certain Escrow Agreement, dated as of December 18, 2009 (the "Enterprise Escrow Agreement") whereby the Enterprise Distribution Agent agreed to hold the Escrow Funds (as defined in the Enterprise Escrow Agreement, hereinafter the "Enterprise Escrow Funds") in a Distribution Account (as defined in the Enterprise Escrow Agreement, hereinafter the "Enterprise Distribution Account") and to release the Enterprise Escrow Funds in accordance with the terms of the Enterprise Escrow Agreement; and

WHEREAS, in addition to other agreements contained herein, the Parties have agreed to direct the release of US$30,119,972 from the relevant escrow accounts to NNL as reimbursement for payments made by NNL to obtain certain carve-out financial statements (the "Carve-Out Financials Reimbursement"), in the manner approved in that certain order of US Court (i) Authorizing the Debtors to Enter Into the Lazard Side Agreement and (ii) Authorizing Debtors To Direct The Escrow Agents To Release Funds To NNL For Reimbursement Of Certain Professional Fees (listed on the docket of the US Debtors' chapter 11 bankruptcy cases at D.I. 4404, and the motion and related exhibits seeking approval of such order at D.I.s 4237 and 4379) (the "Carve-Out Financials Order"); and

WHEREAS, the Parties and certain of their affiliates have agreed to make certain payments pursuant to that certain Lazard Fee Side Agreement, dated as of November 23, 2010, by and among Nortel Networks Corporation ("NNC") and the other parties contained on Schedule A thereto, NNI and the other parties contained on Schedule B thereto, NNUK and the other parties contained on Schedule C thereto, the Joint Administrators, Nortel Networks Israel (Sales and Marketing) Limited (In Administration), the Joint Israeli Administrators (as defined therein), NNSA, the NNSA Office Holders (as defined therein), and certain other affiliates of NNC listed on Schedule D thereto (the "Lazard Fee Side Agreement"),

3

NOW, THEREFORE, in consideration of the respective covenants made herein, and of the mutual benefits to be derived hereby (the sufficiency of which are acknowledged), the Parties hereto agree:

1.  In respect of the period from and after April 1, 2010, no further Transfer Pricing Payments are required nor shall be made amongst the respective parties to (i) the Master R&D Agreement, or (ii) the Distribution Agreements. The non-payment by any Party or Participant (as defined in the Master R&D Agreement) of Transfer Pricing Payments relating to any period from and after April 1, 2010 shall not constitute a repudiation, rejection or breach of the Transfer Pricing Agreements or give rise to a "Defaulting Event" under the Master R&D Agreement. The foregoing constitutes a termination and release of the obligation of those Parties obligated, as of the date of this Agreement, to make Transfer Pricing Payments under the Transfer Pricing Agreements in respect of the period from and after April 1, 2010.

2.  Any rights in or to intellectual property (including for the avoidance of doubt any license rights) that any one or more of the Parties have under the Transfer Pricing Agreements as of the date of this Agreement shall not:

    (a)  be affected by the exclusion of Transfer Pricing Payments from the GSPAs; and

    (b)  be affected by the non-payment by any Party of the Transfer Pricing Payments relating to any period from and after April 1, 2010.

3.  Notwithstanding the terms of the Transfer Pricing Agreements, no Party shall terminate or seek to terminate the participation of any other Party to, or Participant (as defined in the Master R&D Agreement) in, the Transfer Pricing Agreements without the written consent of the other parties to the relevant Transfer Pricing Agreements.

4.  Except as expressly provided for in this Agreement, nothing in this Agreement shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the Transfer Pricing Agreements, applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements, the right to object to the failure to make payments under or in connection with the Transfer Pricing Agreements, or any offset arising therefrom or otherwise, or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise. The use of the term "Transfer Pricing Payments" (or any similar term) or reference to "Transfer Pricing Agreements" (or similar agreement) in this Agreement is for convenience only and shall have no evidentiary effect or be used by any of the Parties hereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any Party of the Transfer Pricing Agreements or any transfer pricing methodology provided in the Transfer Pricing Agreements. Nothing in this Agreement

4

shall (i) bar, prohibit, or in any way hinder or enhance the rights of the Parties to this Agreement to present any arguments, methodologies, or legal or factual theories in support of a proposed allocation of the proceeds of any transaction, including without limitation, the sale of assets, businesses or intellectual property, that would be subject to allocation amongst any of the Parties hereto (each, a "Sale Transaction"), and such presentation shall not, or otherwise be deemed to, constitute in any way a violation of a Party's rights under any existing agreement or (ii) be deemed to, determine, justify, support or have any impact whatsoever on the allocation of the sale proceeds of any Sale Transaction.  For the avoidance of doubt, nothing in this Agreement shall affect any claim, right, argument or defense a Party may have in respect of Transfer Pricing Payments and/or the Transfer Pricing Agreements, in each case solely relating to any period prior to the Filing Date, including without limitation the claims previously filed by the EMEA Debtors and/or NNAG in the US Proceedings and/or the Canadian Proceedings; the rights of any Party to oppose such claims; and the claims of NNI previously allowed in the Canadian Proceedings.

5.  Except as expressly set forth herein, nothing in this agreement shall permit or constitute an amendment, modification or waiver of rights of any party under, as applicable, the IFSA and the FCFSA, and this Agreement shall not supersede the IFSA and the FCFSA in any respect.

6.  Releases from Sale Proceeds Escrow Accounts.

   (a)  The Parties hereby agree that each shall take all commercially reasonable steps to direct the release of US$53,000,000 plus any interest accrued thereon from the Enterprise Distribution Account to NNI in respect of the difference between the Closing Companies Net Working Capital and the Target Closing Companies Net Working Capital (each as defined in the Enterprise ASSA) (the "NNI Cash Reimbursement"), including without limitation by providing directions in the form attached hereto as Annex C to the Enterprise Distribution Agent to pay the NNI Cash Reimbursement to NNI, and that the release of the NNI Cash Reimbursement is a condition to the effectiveness of this Agreement, as set forth in Section 7(b).  The Parties further agree that the NNI Cash Reimbursement is solely for the purpose of reimbursing funds to NNI that it owned as of December 18, 2009, and such NNI Cash Reimbursement shall have no precedential impact on the ultimate allocation of the Enterprise Escrow Funds to any Depositor (as defined in the Enterprise Escrow Agreement); and

   (b)  The Parties hereby agree that each shall take all commercially reasonable steps to direct the release of the Carve-Out Financials Reimbursement, including without limitation by providing letters of direction to the relevant escrow agents in the forms attached hereto in Annex D, and that the release of the Carve-Out Financials Reimbursement is a condition to the effectiveness of this Agreement, as set forth in Section 7(c).  The Parties further agree that the Carve-Out Financials Reimbursement is solely for the purpose of reimbursing funds to NNL

5

that it paid to obtain carve-out financial statements, and such Carve-Out Financials Reimbursement shall have no precedential impact on the ultimate allocation of Sale Proceeds (as defined in the IFSA) to any Seller (as defined in the IFSA).

7.   This Agreement shall become effective upon:

    (a)   the approval of the US Court, the Canadian Court and the French Court. The US Debtors, the Canadian Debtors and NNSA shall (i) use commercially reasonable efforts to obtain such approval as soon as possible (ii) keep all other Parties (as well as the Creditors' Committee and the Bondholders' Group) reasonably apprised of the progress of such approval and provide such other information regarding the satisfaction of such approval as reasonably requested by other Parties (and the Creditors' Committee and the Bondholders' Group); and (iii) use commercially reasonable efforts to allow any other Party which so requests in writing reasonable participation in connection with any proceedings in any Court relating to such approval;

    (b)   the execution and delivery of the letter of direction attached hereto as Annex C to the Enterprise Distribution Agent and the release of the NNI Cash Reimbursement;

    (c)   the execution and delivery of the letters of direction attached hereto in Annex D to the relevant escrow agents effecting the payment to NNL of the Carve Out Financials Reimbursement and the release of the Carve Out Financials Reimbursement;

    (d)   the execution and delivery of the letters of direction attached hereto in Annex E to the relevant escrow agents to release US$5,384,932.48 to be paid to NNI pursuant to the Lazard Fee Side Agreement (the "Lazard Fee Reimbursement") and the release of the Lazard Fee Reimbursement; and

    (e)   the execution and delivery of the letter of direction attached hereto as Annex F to the relevant escrow agent for the escrow account containing the Sale Proceeds (as defined in the IFSA) from the MEN Sale Transaction (as defined in the Lazard Fee Side Agreement) for the release of US$3,287,333.34, to Lazard Ltd. (f/k/a Lazard Frères & Co. LLC) in respect of the obligations contained in Section 2.2 and Schedule F of the Lazard Fee Side Agreement (the "Lazard MEN Fee Payment") and the release of the Lazard MEN Fee Payment.

Notwithstanding any of the foregoing, the following provisions of the Agreement shall be effective as of the date hereof:  Sections 5, 7, 8, 9, 10, 11, 12, 13 and 14.

8.   The Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors excluding NNSA, which is represented by the NNSA Liquidator,

to which they are appointed and none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations. The Joint Administrators are a Party to this Agreement: (i) as agents of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the *United Kingdom Insolvency Act 1986* and for the purposes of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Administrators and enforcing the obligations of certain other Parties to this Agreement.

9. The NNSA Liquidator has negotiated and is entering into this Agreement as agent for NNSA to which he is appointed and that none of the NNSA Liquidator, his firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group (defined in the IFSA) company to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

10. The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which shall be an original and all of which together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic means shall be effective as delivery of a manually executed counterparty of this Agreement.

11. Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

    (a) The Parties agree that this Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; *provided, however*, that Section 8 shall be governed exclusively by English law.

    (b) To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US Court and the Canadian Court (in a joint hearing conducted under the Cross-Border Insolvency Protocol approved by the US Court by an Order dated January 15, 2009 and by the Canadian Court in an Order dated January 14, 2009 (as amended or as amended and restated from time to time, the "Cross-Border Insolvency Protocol") for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the US Court if such claim, action or proceeding would solely affect the US Debtors, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Debtors, a joint hearing of both the Canadian

7

Court and the US Court conducted under the Cross-Border Insolvency Protocol if such claim, action or proceeding would affect the Canadian Debtors, the US Debtors and the EMEA Group, and the English courts if such claim, action or proceeding would solely affect the EMEA Group, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a court or any claim that any such action brought in such a court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law; *provided, however*, that any claim, action or proceeding set forth in Section 8 shall be brought exclusively in the English courts.

(c)    Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Agreement or any transaction or matter contemplated hereby. Each Party (i) certifies that no representative, agent or attorney of any other Party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other parties hereto have been induced to enter into this agreement by, among other things, the mutual waivers and certifications in this Section 11.

12.    Amendments; Waiver. This Agreement may be amended and a term hereunder may be waived, on no less than ten (10) Business Days' notice, only by means of a writing signed by all Parties, and approved in writing by the Creditors' Committee and the Bondholders' Group, which amendments or waivers, if material in the judgment of the Parties, must be approved by all of the Courts that initially approved this Agreement. For the purpose of this Section 12, "Business Day" shall mean a day that is not a Saturday, Sunday or national public holiday in Canada or the United States.

13.    Third-Party Beneficiaries. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the Parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third parties to the Parties, nor shall any provision give any third persons any right of subrogation or action against any party to this Agreement, nor shall any provision estop or otherwise limit the rights of the Parties to assert any claims, counterclaims or defenses against any third party; *provided, however,* that the Creditors' Committee (as a statutory fiduciary body appointed in the US Proceedings) and the Bondholders' Group shall each be a third-party beneficiary of this Agreement entitled to enforce and take advantage of the benefits of this Agreement to their fullest extent as if it were a signatory hereto.

14.    <u>Severability</u>.  In the event that any provision of this Agreement shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision.  The Parties shall negotiate in good faith with respect to any provision to this Agreement found to be illegal, invalid or unenforceable, in order to agree, with the consent of the Parties, the Creditors' Committee and the Bondholders' Group, on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision.

*[Remainder of page intentionally left blank.  Signature pages follow.]*

9

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the date first written above.

NORTEL NETWORKS CORPORATION

Per: _____

Name:

Title:

Per: _____

Name:

Title:

NORTEL NETWORKS LIMITED

Per: _____

Name:

Title:

Per: _____

Name:

Title:

NORTEL NETWORKS GLOBAL CORPORATION

Per: _____

Name:

Title:

Per: _____

Name:

Title:

*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

NORTEL NETWORKS INTERNATIONAL
CORPORATION

Per: _____
        Name:
        Title:


Per: _____
        Name:
        Title:


NORTEL NETWORKS TECHNOLOGY
CORPORATION

Per: _____
        Name:
        Title:


Per: _____
        Name:
        Title:

NORTEL NETWORKS INC.

By: _____
       Name:
       Title:


ARCHITEL SYSTEMS (U.S.) CORPORATION

By: _____
       Name:
       Title:


CORETEK, INC.

By: _____
       Name:
       Title:


NORTEL ALTSYSTEMS, INC.

By: _____
       Name:
       Title:


NORTEL ALTSYSTEMS INTERNATIONAL INC.

By: _____
       Name:
       Title:


*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.

By: _____
      Name:
      Title:


NORTEL NETWORKS CABLE SOLUTIONS
INC.

By: _____
      Name:
      Title:


NORTEL NETWORKS CAPITAL
CORPORATION

By: _____
      Name:
      Title:


NORTEL NETWORKS HPOCS INC.


By: _____
      Name:
      Title:


NORTEL NETWORKS INTERNATIONAL INC.


By: _____
      Name:
      Title:


*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By: _____
          Name:
          Title:


NORTHERN TELECOM INTERNATIONAL
INC.

By: _____
          Name:
          Title:


QTERA CORPORATION


By: _____
          Name:
          Title:


SONOMA SYSTEMS


By: _____
          Name:
          Title:


XROS, INC.


By: _____
          Name:
          Title:


*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

SIGNED by Alan Bloom in his own capacity )    ................................................................
and on behalf of the Joint Administrators )
without personal liability and solely for the )
benefit of the provisions of this Agreement )
expressed to be conferred on or given to the )
Joint Administrators in the presence of: )

Witness signature

................................................................ )
Name: )
Address: )


SIGNED for and on behalf of **Nortel Networks** )    ................................................................
**UK Limited** (in administration) by Christopher )
Hill as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Witness signature

................................................................ )
Name: )
Address: )
)


SIGNED for and on behalf of **Nortel Networks** )    ................................................................
**(Ireland) Limited** (in administration) by David )
Hughes as Joint Administrator (acting as agent )
and without personal liability) in the presence )
of: )

Witness signature

................................................................ )
Name: )
Address: )


*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

S-6

SIGNED for and on behalf of **Nortel Networks**    )   .........................................................
**N.V.** (in administration) by Christopher Hill as    )
Joint Administrator (acting as agent and without    )
personal liability) in the presence of:    )

Witness signature

.........................................................    )
Name:    )
Address:    )


SIGNED for and on behalf of **Nortel Networks**    )   .........................................................
**SpA** (in administration) by Christopher Hill as    )
Joint Administrator (acting as agent and without    )
personal liability) in the presence of:    )

Witness signature

.........................................................    )
Name:    )
Address:    )


SIGNED for and on behalf of **Nortel Networks**    )   .........................................................
**B.V.** (in administration) by Christopher Hill as    )
Joint Administrator (acting as agent and without    )
personal liability) in the presence of:    )

Witness signature

.........................................................    )
Name:    )
Address:    )


*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

**SIGNED** for and on behalf of **Nortel Networks**                )      ..................................................................
**Polska Sp. z.o.o.** (in administration) by                           )
Christopher Hill as Joint Administrator (acting                        )
as agent and without personal liability) in the                       )
presence of:                                                           )

Witness signature

..........................................................              )
Name:                                                                  )
Address:                                                               )


**SIGNED** for and on behalf of **Nortel Networks**                )      ..................................................................
**Hispania S.A.** (in administration) by                               )
Christopher Hill as Joint Administrator (acting                        )
as agent and without personal liability) in the                       )
presence of:                                                           )

Witness signature

..........................................................              )
Name:                                                                  )
Address:                                                               )


**SIGNED** for and on behalf of **Nortel Networks**                )      ..................................................................
**(Austria) GmbH** (in administration) by                              )
Christopher Hill as Joint Administrator (acting                        )
as agent and without personal liability) in the                       )
presence of:                                                           )

Witness signature

..........................................................              )
Name:                                                                  )
Address:                                                               )


*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

**SIGNED** for and on behalf of **Nortel Networks**
**s.r.o.** (in administration) by Christopher Hill as          )          ...................................................................
Joint Administrator (acting as agent and without             )
personal liability) in the presence of:                      )
                                                             )

Witness signature

..................................................................
Name:                                                        )
Address:                                                     )
                                                             )


**SIGNED** for and on behalf of **Nortel Networks**            )          ...................................................................
**Engineering Services kft** (in administration)             )
by Christopher Hill as Joint Administrator                   )
(acting as agent and without personal liability)             )
in the presence of:                                          )

Witness signature

..................................................................          )
Name:                                                        )
Address:                                                     )


**SIGNED** for and on behalf of **Nortel Networks**            )          ...................................................................
**Portugal S.A.** (in administration) by                     )
Christopher Hill as Joint Administrator (acting              )
as agent and without personal liability) in the             )
presence of:                                                 )

Witness signature

..................................................................          )
Name:                                                        )
Address:                                                     )


*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

**SIGNED** for and on behalf of **Nortel Networks**  
**Slovensko s.r.o.** (in administration) by ............................................................. )  
Christopher Hill as Joint Administrator (acting )  
as agent and without personal liability) in the )  
presence of: )  
 )  

Witness signature

...........................................................  
Name: )  
Address: )  
 )  


**SIGNED** for and on behalf of **Nortel Networks** )  
**Romania s.r.l.** (in administration) by ............................................................. )  
Christopher Hill as Joint Administrator (acting )  
as agent and without personal liability) in the )  
presence of: )  

Witness signature

...........................................................  )  
Name: )  
Address: )  


**SIGNED** for and on behalf of **Nortel Networks** )  
**France S.A.S.** (in administration) by Kerry ............................................................. )  
Trigg acting as authorised representative for the )  
Joint Administrators (acting as agent and )  
without personal liability) in the presence of: )  

Witness signature

...........................................................  )  
Name: )  
Address: )  

*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

S-10

**SIGNED** for and on behalf of **Nortel Networks**    )    ...................................................................
**GmbH** (in administration) by Christopher Hill    )
as Joint Administrator (acting as agent and    )
without personal liability) in the presence of:    )

Witness signature

...............................................................    )
Name:    )
Address:    )


**SIGNED** for and on behalf of **Nortel Networks**    )    ...................................................................
**Oy** (in administration) by Christopher Hill as    )
Joint Administrator (acting as agent and without    )
personal liability) in the presence of:    )

Witness signature

...............................................................    )
Name:    )
Address:    )


**SIGNED** for and on behalf of **Nortel Networks**    )    ...................................................................
**AB** (in administration) by Christopher Hill as    )
Joint Administrator (acting as agent and without    )
personal liability) in the presence of:    )

Witness signature

...............................................................    )
Name:    )
Address:    )


*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

**SIGNED** for and on behalf of **Nortel Networks**   )   ...........................................................
**International Finance and Holding B.V.** (in   )
administration) by Christopher Hill as Joint   )
Administrator (acting as agent and without   )
personal liability) in the presence of:

Witness signature

...........................................................   )
Name:   )
Address:   )

**SIGNED** for and on behalf of **Nortel Networks**   )
**S.A.** (in administration and secondary   )   ...........................................................
proceedings) by Maitre Cosme Rogeau, in his   )
capacity as French Liquidator (Mandataire   )
Liquidateur) acting as agent and without   )
personal liability, in the presence of:   )   ...........................................................

Witness signature

...........................................................   )
Name:   )
Address:   )

**SIGNED** by   )   ...........................................................
Duly authorised for and on behalf of **Nortel**   )
**Networks AG** in the presence of:   )

Witness signature

...........................................................   )
Name:   )
Address:   )

*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

S-12

## CONSENT OF MONITOR

Ernst & Young Inc., as Monitor of the Canadian Debtors under the *Companies' Creditors Arrangement Act* consents to the Agreement.

**Ernst & Young Inc., in its capacity as Monitor in the CCAA proceedings and not in its personal capacity**

Per:  _____

     Name:

     Title:

*Signature Page to Agreement on Transfer Pricing Amendments and Certain Other Matters*

Schedule 1
Canadian Debtors

Nortel Networks Corporation

Nortel Networks Limited

Nortel Networks Global Corporation

Nortel Networks International Corporation

Nortel Networks Technology Corporation

Schedule 2
US Debtors

Nortel Networks Inc.

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

Schedule 3
EMEA Debtors

Nortel Networks UK Limited (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks NV (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks BV (In Administration)

Nortel Networks Polska Sp z.o.o. (In Administration)

Nortel Networks Hispania, SA (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks sro (In Administration)

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Portugal SA (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel GmbH (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks France S.A.S. (In Administration)

Nortel Networks SA (In Administration)

Annex A

<u>Amendments to and Related Understandings Regarding
Master Research and Development Agreement
dated as of December 22, 2004 ("Master R&D Agreement")</u>

1.  Undated Addendum to Master R&D Agreement executed between October 2005 and June 2006.

2.  Agreement with Respect to Certain NN Technology effective as of December 30, 2006 (being the day before the closing date of the Share and Asset Sale Agreement between NNL and Alcatel-Lucent).

3.  Addendum to Master R&D Agreement dated December 14, 2007 with an effective date of January 1, 2006.

4.  Third Addendum to Master R&D Agreement with an effective date of January 1, 2006.

5.  Fourth Addendum to Master R&D Agreement with an effective date of December 31, 2008.

6.  Letter of acknowledgment dated January 14, 2009 from NNL to the Directors of NNUK, NNSA and NNIR and the UK Administrator.

7.  Release in Connection with Master R&D Agreement dated 1 January 2009.

8.  Memorandum of Understanding in Connection with Master R&D Agreement, dated December 31, 2008 with an effective date of 1 January 2006.

Annex B

Distribution Agreements

| Party | Date |
|---|---|
| Nortel Networks Limited ("NNL") and Nortel Networks N.V. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks S.p.A. | undated, effective as of 1 January 2002 (plus undated and unsigned Addendum, effective as of 1 January 2003) |
| NNL and Nortel Networks B.V. | dated 22 December 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Polska Sp. Z. O. O. | Undated, effective as of 1 January 2001 (letter of amendment executed in November 2003, effective as of 1 January 2001 plus Addendum executed in August 2005, effective as of 1 January 2003) |
| NNL and Nortel Networks Hispania, S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks (Austria) GmbH | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks, s.r.o. | dated 15 April 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Engineering Services Kft | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Portugal S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Slovensko, s.r.o. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Romania SRL | executed 22 January 2004, effective 1 January 2003 |
| NNL and Nortel Networks AG | undated, effective 1 January 2001 |

**APPENDIX "C"**

**[ATTACHED]**

**STIPULATION AND SETTLEMENT AGREEMENT BY AND AMONG THE
SELLERS AND GENBAND US LLC AND OTHERS**

This stipulation and settlement agreement (this "Stipulation") is entered into

among Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel

Networks Inc. ("NNI"), the EMEA Sellers

[1] and the Other Sellers, each as identified in the Sale Agreement (together with NNC,

NNL, NNI and the EMEA Sellers, the "Sellers"), Nortel Networks S.A. (in administration and

liquidation judiciaire) ("NNSA"), the Joint Administrators (as defined below) and GENBAND

US LLC (f/k/a GENBAND Inc.) ("GENBAND" or the "Purchaser," and with each of the Sellers,

NNSA and Joint Administrators, the "Parties").

WHEREAS, on January 14, 2009 (the "Petition Date"), NNI and certain of its affiliates

(collectively, the "U.S. Debtors")[2], filed voluntary petitions for relief under chapter 11 of title 11

of the United States Code in the Bankruptcy Court for the District of Delaware (the "U.S.

Court");

WHEREAS, also on the Petition Date, NNC, NNL (together with their affiliates,

including the EMEA Debtors (as defined below) and the U.S. Debtors, "Nortel"), and certain of

their Canadian affiliates (collectively, the "Canadian Debtors")[3] filed an application with the

---

[1]        Capitalized terms used but not defined herein shall have the meaning ascribed to them in that certain Asset
Sale Agreement by and among NNC, NNL, NNI, the other entities identified therein as Sellers and GENBAND Inc.
dated December 22, 2009, as amended (the "Sale Agreement"), or the Escrow Agreement (as defined below).

[2]        The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification
number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc.
(9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation
(0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks
Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826),
Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable
Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the
Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

[3]        The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

1

Ontario Superior Court of Justice (the "<u>Canadian Court</u>" and together with the U.S. Court, the

"<u>Courts</u>") under the Companies' Creditors Arrangement Act (Canada), seeking relief from their

creditors (collectively, the "<u>Canadian Proceedings</u>");

      WHEREAS, on January 14, 2009, the High Court of England and Wales placed nineteen

of Nortel's European affiliates (collectively, the "<u>EMEA Debtors</u>")[4] into administration under

the control of individuals from Ernst & Young LLP and Ernst & Young Chartered Accountants

(the "<u>Joint Administrators</u>");

      WHEREAS, on January 19, 2009 the Israeli Court appointed Yaron Har-Zvi and Avi D.

Pelossof (the "<u>Joint Israeli Administrators</u>") as joint administrators of the Israeli Companies (as

defined under the Sale Agreement);

      WHEREAS, on May 28, 2009, the Commercial Court of Versailles, France ordered the

commencement of secondary proceedings and the appointment of an administrator and a

liquidator (the "<u>French Liquidator</u>") in respect of Nortel Networks S.A.;

      WHEREAS, on December 23, 2009, the U.S Debtors filed the *Debtors' Motion For*

*Orders (I) (A) Authorizing Debtors' Entry Into The Stalking Horse Agreement, (B) Authorizing*

*And Approving The Bidding Procedures And Bid Protections, (C) Approving Payment Of An*

*Incentive Fee, (D) Approving The Notice Procedures And The Assumption And Assignment*

*Procedures, (E) Authorizing The Filing Of Certain Documents Under Seal And (F) Setting A*

*Date For The Sale Hearing, And (II) Authorizing And Approving (A) The Sale Of Certain Assets*

---

[4]    The EMEA Debtors include the following entities: Nortel Networks UK Limited (in administration) ("NNUK"), Nortel Networks S.A. (in administration and liquidation judiciaire), Nortel Networks (Ireland) Limited (in administration), Nortel GmbH (in administration), Nortel Networks France S.A.S. (in administration), Nortel Networks Oy (in administration), Nortel Networks Romania SRL (in administration), Nortel Networks AB (in administration), Nortel Networks N.V. (in administration), Nortel Networks S.p.A. (in administration), Nortel Networks B.V. (in administration), Nortel Networks Polska Sp. z.o.o. (in administration), Nortel Networks Hispania, S.A. (in administration), Nortel Networks (Austria) GmbH (in administration), Nortel Networks, s.r.o. (in administration), Nortel Networks Engineering Service Kft (in administration), Nortel Networks Portugal S.A. (in administration), Nortel Networks Slovensko, s.r.o. (in administration) and Nortel Networks International Finance & Holding B.V. (in administration).

*Of Debtors' Carrier Voice Over IP And Application Solutions Business Free and Clear Of All*

*Liens, Claims And Encumbrances And (B) The Assumption And Assignment Of Certain*

*Executory Contracts* [D.I. 2193] seeking approval of the sale of substantially all of the assets

relating to Nortel's Carrier Voice over IP and Communications Solutions Business (the "CVAS

Business") to GENBAND pursuant to a stalking-horse purchase agreement (the "Stalking Horse

Agreement"), subject to the receipt of a higher and better offer at auction;

WHEREAS, on or about December 29, 2009, the Canadian Debtors filed a motion with

the Canadian Court seeking approval of the Stalking Horse Agreement and bidding procedures in

relation to the sale of the CVAS Business;

WHEREAS, following the Canadian Court's and U.S. Court's approval of the bidding

procedures by orders dated January 6, 2010, and January 8, 2010 [D.I. 2259], respectively,

Nortel marketed the CVAS Business to other potentially interested parties, based on the terms of

the Stalking Horse Agreement, but ultimately announced that it would not proceed to auction and

would work toward closing the sale of the CVAS Business with GENBAND.

WHEREAS, following a joint hearing between the Canadian Court and the U.S. Court on

March 3, 2010, the Canadian Court approved the sale of the CVAS Business to GENBAND

pursuant to the Sale Agreement by order dated March 3, 2010, and the U.S. Court approved the

sale of the CVAS Business to GENBAND pursuant to the Sale Agreement by order dated March

4, 2010 [D.I. 2632];

WHEREAS, the sale of the CVAS Business by the Sellers to the Purchaser closed on

May 28, 2010 (the "Closing");

WHEREAS, in connection with the sale of the CVAS Business, Wells Fargo Bank,

National Association ("Wells Fargo"), NNI, NNL, NNUK and GENBAND entered into an

3

Escrow Agreement dated as of January 6, 2010 and amended on May 28, 2010 (the "Escrow Agreement"), and established the Escrow Account, with Wells Fargo as escrow agent, to hold the Escrow Amount, which consists of, among other things, the Purchase Price Adjustment Escrow Amount in the principal sum of $8,000,000 that relates to certain potential post-closing purchase price adjustments that could be made pursuant to Section 2.2.3 of the Sale Agreement;

WHEREAS, under Section 4 of the Escrow Agreement, funds may be released from the Escrow Account either pursuant to the delivery of a joint written instruction by NNI, NNL, NNUK and GENBAND to Wells Fargo directing the release of funds, or by a final, non-appealable court order directing the release of funds;

WHEREAS, on September 15, 2010, the Purchaser delivered to the Sellers a Closing Statement that contained its calculation of certain post-closing purchase price adjustments provided for under the Sale Agreement and provided for a net purchase price adjustment in favor of the Purchaser in the amount of $139,096,000;

WHEREAS, on October 13, 2010,[5] the Sellers delivered a Disagreement Notice to the Purchaser that disputed, among other things, the Purchaser's calculation of the Deferred Profit Amount and provided for a net purchase price adjustment in favor of the Purchaser in the amount of $102,271,863;

WHEREAS, on November 17, 2010, the U.S. Debtors filed the *Debtors' Motion for Entry of an Order Enforcing the Order Authorizing the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Application Solutions Business, and Directing the Release of Certain Escrowed Funds* [D.I. 4345] (the "U.S. Motion to Enforce the Sale Agreement") which motion

---

[5]    To account for certain corrections, on November 16, 2010, the Sellers delivered to the Purchaser a revised Disagreement Notice that provided for a net purchase price adjustment in favor of the Purchaser in the amount of $102,491,255; on January 18, 2011, the Sellers delivered to the Purchaser a further revised Disagreement Notice that provided for a net purchase price adjustment in favor of the Purchaser in the amount of $99,947,239.

4

sought a determination (i) that the U.S. Court maintained jurisdiction over the dispute regarding

the definition of Deferred Profit Amount, (ii) of the Final Purchase Price, (iii) that GENBAND

was liable for payment of a settlement payment received from Verizon (the "Verizon Settlement

Amount") and (iv) that GENBAND was liable for payment of the Canadian Transfer Tax

Amount (defined below);

WHEREAS, on November 18, 2010, GENBAND filed the *Motion of GENBAND Inc. for

Entry of an Order Pursuant to Section 362(d) of the Bankruptcy Code Granting Relief from the

Automatic Stay to Compel Arbitration* [D.I. 4347] (the "U.S. Motion to Compel Arbitration");

WHEREAS, on or about November 30, 2010 the Canadian Debtors filed a motion with

the Canadian Court seeking, *inter alia*, a declaration that the Canadian Court and the U.S. Court

have the exclusive authority and jurisdiction to determine the dispute relating to the Deferred

Profit Amount, an order directing GENBAND to execute instructions to Wells Fargo for the

release of amounts held pursuant to the Escrow Agreement consistent with the Sellers'

calculation of the Deferred Profit Amount and relief in respect of the Canadian Transfer Tax

Amount (as defined below) (the "Canadian Motion to Enforce the Sale Agreement", and together

with the U.S. Motion to Enforce the Sale Agreement, the "Motions to Enforce the Sale

Agreement");

WHEREAS, on or about December 9, 2010, GENBAND filed a motion with the

Canadian Court seeking, *inter alia*, an order requiring Nortel to submit the Deferred Profit

Amount dispute to the Accounting Arbitrator (the "Canadian Motion to Compel Arbitration,"

and collectively with the U.S. Motion to Compel Arbitration and the Motions to Enforce the Sale

Agreement, the "Motions");

WHEREAS, at a telephonic conference held on November 29, 2010, the U.S. Court determined that the dispute over whether the disagreement regarding Deferred Profit Amount should be submitted to arbitration should be decided first, and thus that the U.S. Motion to Compel Arbitration would be determined prior to the U.S. Motion to Enforce the Sale Agreement;

WHEREAS, on December 15, 2010, the U.S. Court and the Canadian Court held a joint hearing regarding the U.S. Motion to Compel Arbitration and the Canadian Motion to Compel Arbitration;

WHEREAS, on January 21, 2011, the U.S. Court denied the U.S. Motion to Compel Arbitration (the "U.S. Order") [D.I. 4737];

WHEREAS, on January 21, 2011, the Canadian Court denied the Canadian Motion to Compel Arbitration (the Order entered by the Canadian Court in respect of such decision, the "Canadian Order");

WHEREAS, pursuant to a Notice of Appeal filed on February 1, 2011 [D.I. 4786], GENBAND appealed the U.S. Order (the "U.S. Appeal");

WHEREAS, on March 8, 2011, the U.S. Appeal was docketed in the United States District Court for the District of Delaware;

WHEREAS, on February 11, 2011, GENBAND served a notice of motion seeking leave to appeal the Canadian Order (the "Canadian Appeal" and together with the U.S. Appeal the "Appeals");

WHEREAS, pursuant to Section 6.1 of the Sale Agreement GENBAND is obligated to promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes imposed upon or payable or collectible or incurred, in each case, as a direct result of the transfer of Assets

6

to GENBAND or a Designated Purchaser pursuant to the Sale Agreement, provided, that if any such Transfer Taxes are required to be collected, remitted or paid by a Seller or any Subsidiary, Affiliate, representative or agent thereof, such Transfer Taxes shall be paid by GENBAND to such Seller, Subsidiary, Affiliate, representative or agent, as applicable;

WHEREAS, NNL and Nortel Networks Technology Corporation paid an aggregate of CDN $1,049,960.30 (the "Canadian Transfer Tax Amount"), which for the purposes of this Stipulation has been calculated to be USD $1,000,390, to the Canadian Tax Authority on account of Transfer Taxes payable as a direct result of the transfer of the Assets to GENBAND pursuant to the Sale Agreement and are entitled to reimbursement for the payment of such Transfer Taxes in accordance with the terms of the Sale Agreement;

WHEREAS, Nortel has demanded payment from GENBAND of the Canadian Transfer Tax Amount and GENBAND has yet to pay such amount;

WHEREAS, on April 4, 2011, GENBAND, the U.S. Debtors, the Canadian Debtors, the Official Committee of Unsecured Creditors, and Ernst & Young Inc. in its capacity as Monitor of the Canadian Debtors engaged in mediation pursuant to the Standing Order of the District Court of Delaware dated July 23, 2004;

WHEREAS, on June 20, 2011, GENBAND initiated an Adversary Proceeding by filing a Complaint for Declaratory Relief and Specific Performance (Adv. Proc. No. 11-52332-KG) [Adv. D.I. 1] (the "Complaint") against the U.S. Debtors in this Court;

WHEREAS, on June 28, 2011, GENBAND filed the Plaintiff's Motion to Expedite the Adversary Proceeding [Adv. D.I. 5] (the "Motion to Expedite");

WHEREAS, in connection with the sale of the CVAS Business,  NNC, NNL, NNI, NNUK, Nortel Networks (Ireland) Limited (in administration) ("NN Ireland"), Nortel Networks

7

de Mexico, S.A. de C.V., Nortel de Mexico, S. de R.L. de C.V., Nortel Networks (China)

Limited, Nortel Networks Australia Pty Limited, Nortel Networks (India) Private Limited, and

each of the Joint Administrators in their respective capacities as joint administrator of

respectively NNUK and NN Ireland only (collectively, the "Nortel TSA Parties") and

GENBAND as the Purchaser entered into the Transition Services Agreement (the "TSA"), dated

May 28, 2010;

  WHEREAS, the Nortel TSA Parties and GENBAND have reached an agreement in

principle to resolve certain disputes concerning the TSA (the "TSA Settlement") under which,

*inter alia*, GENBAND agrees to direct $9,072,647.61 of the amount payable to GENBAND

under this Stipulation to certain of the Sellers and their Affiliates (as identified by NNI, NNL and

NNUK) on GENBAND's behalf in satisfaction of GENBAND's liabilities under TSA

Settlement (the "Directed Payment"); and

  WHEREAS, after engaging in arms' length negotiations and based on the terms and

representations set forth below, the Parties have agreed to resolve the Motions and the Appeals

and the disputes underlying them as follows:

  **NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED THAT**:

  1. Court Approvals.  All provisions of this Stipulation are subject to: (i) the entry of

an order by each of the U.S. Court and the Canadian Court approving this Stipulation and

authorizing the U.S. Debtors and Canadian Debtors, respectively, to enter into and perform their

obligations under this Stipulation (the "Approval Orders"); and (ii) such Approval Orders

becoming final and not subject to further appeal.  The Parties agree to use all deliberate and

reasonable efforts to secure such Approval Orders as soon as is practicable.  In the event the

Approval Orders are not entered by the Courts or such Approval Orders do not become final and

not subject to further appeal, this Stipulation shall have no effect and the Parties reserve all of their rights and defenses with respect to the Motions, the Appeals, the purchase price adjustment under the Sale Agreement and the other matters in dispute as outlined herein.

    2.    <u>Calculation of the Purchase Price Adjustment</u>.

    a.    The Deferred Profit Amount shall be $56,049,381, which shall resolve all disputes among the Parties with respect to the Deferred Profit Amount, including without limitation, adjustments to the Deferred Profit Amount related to the following: (i) disputes related to KPN product credits, (ii) post-closing credit memos relating to Qwest, Avaya and miscellaneous other parties, (iii) the negative deferred cost-of-sales balance related to Nortel Networks (Luxembourg) S.A. and (iv) deferred revenue associated with that certain Telus agreement with Root NTID F58BC800.

    b.    After giving effect to the Deferred Profit Amount, the Final Purchase Price under the Sale Agreement shall be **$157,743,756.** To satisfy their respective obligations under section 2.2.3.2(a) of the Sale Agreement and under clause 3.3 of the EMEA ASA (as defined below) with respect to the reconciliation of the Final Purchase Price, and subject to subparagraph 2(c) below, the Sellers shall remit to GENBAND **$24,905,244** (the "<u>Adjustment Amount</u>") pursuant to the terms of this Stipulation, which shall be effected by (i) a release of the full amount of the Purchase Price Adjustment Escrow Funds to GENBAND and (ii) payment by the Sellers to GENBAND of an amount (the "<u>Balance</u>") that is equal to (x) the Adjustment Amount, <u>minus</u> (y) the Purchase Price Adjustment Escrow Funds released to GENBAND in accordance with the preceding clause (i) all in accordance with Section 4 hereof.

    c.    GENBAND hereby issues an irrevocable instruction to the Parties to this Stipulation authorizing and directing them, as and when all of and the total $24,905,244 payable

to GENBAND under this Stipulation is to be paid, to direct $9,072,647.61 of the amount payable

to GENBAND to certain of the Sellers and their Affiliates (as identified by NNI, NNL, and

NNUK) on GENBAND's behalf in lieu of making such $9,072,647.61 payment to GENBAND

pursuant to subparagraph 2(b) above, in satisfaction of GENBAND's liabilities under the TSA

Settlement.

3.    Transfer Tax Obligations.  In furtherance of Section 6.1(a) of the Sale Agreement,

the Canadian Transfer Tax Amount shall be satisfied by the Sellers deducting an amount equal to

the Canadian Transfer Tax Amount from the Balance payable to GENBAND and the Sellers

paying such amount to NNL, all in accordance with Section 4 hereof. GENBAND hereby

consents to the deduction of the Canadian Transfer Tax Amount from the Balance and the

payment of such amount to NNL in satisfaction of GENBAND's obligation to pay the Canadian

Transfer Tax Amount. Upon the Settlement Date (as defined below), GENBAND shall be

released from its obligations pursuant to the Sale Agreement with respect to Transfer Taxes

imposed by or payable to all Tax Authorities of or in Canada up to the amount of the Canadian

Transfer Tax Amount.  For greater certainty: (i) such release or the release in favour of the

Purchaser contained in section 7(b) hereof shall not release GENBAND from any of its

obligations under the Sale Agreement (x) with respect to Transfer Taxes in any jurisdiction other

than Canada or (y) with respect to Transfer Taxes imposed by or payable to any relevant Tax

Authorities of or in Canada in excess of the Canadian Transfer Tax Amount; and (ii) the terms of

the Sale Agreement as regards Transfer Taxes shall continue in full force and effect as provided

for in the Sale Agreement (including, without limitation, all obligations of the Sellers to

reimburse Purchaser for any deduction, credit, or refund related to Transfer Taxes, as set forth in

the Sale Agreement).

4.      Release of Funds From Escrow, Payment of the Balance by Sellers and Payment of Transfer Tax Amounts by GENBAND.

a.      Within five (5) business days of the Approval Orders becoming final and not subject to further appeal, the Purchaser, NNL, NNI and NNUK shall deliver joint instructions authorizing Wells Fargo to immediately release the entire amount of the Purchase Price Adjustment Escrow Funds (being an amount of $8,000,000 plus interest accrued thereon from the Closing Date until the date of such release[6]) to GENBAND.

b.      Concurrently with the release of the Purchase Price Adjustment Escrow Funds to GENBAND, the Sellers shall pay the Balance, less an amount equal to the Canadian Transfer Tax Amount, by delivering written instructions (which the other Parties hereto, other than GENBAND, also will approve and execute) to JPMorgan Chase Bank, N.A. pursuant to that certain CVAS Distribution Escrow Agreement dated May 27, 2010 (the "Distribution Escrow Agreement"), to pay such amount to GENBAND by wire transfer of immediately available funds to an account designated in writing by GENBAND at least three (3) business days prior to such payment.

c.      Concurrently with the release of the Purchase Price Adjustment Escrow Funds to GENBAND, the Sellers, for and on behalf of GENBAND, shall pay the Canadian Transfer Tax Amount to NNL by delivering written instructions (which the other Parties hereto, other than GENBAND, also will approve and execute) to JPMorgan Chase Bank, N.A. pursuant to the Distribution Escrow Agreement, to pay such amount to NNL by wire transfer of immediately available funds to an account designated in writing by NNL at least three (3) business days prior to such payment.

---

[6]      As of 8/8/11, the entire amount of the Purchase Price Adjustment Escrow Funds is $8,006,814,13.

11

5. <u>Withdrawal of the Motions and the Appeal</u>. Forthwith upon the payments contemplated in Section 4 hereof having been made (the date of such payments, the "<u>Settlement Date</u>") (i) the U.S. Debtors shall file a notice of withdrawal of the U.S. Motion to Enforce the Sale Agreement with the U.S. Court, (ii) the Canadian Debtors shall withdraw the Canadian Motion to Enforce the Sale Agreement with the Canadian Court, and (iii) GENBAND shall file notices of withdrawal of the Appeals, the Complaint and the Motion to Expedite.

6. <u>Resolution of the Verizon Dispute</u>. Withdrawal of the Motions pursuant to paragraph 5 above shall resolve the dispute between the Parties concerning the Verizon Settlement Amount and GENBAND shall retain all amounts received from Verizon that were the subject of the Motions.

7. <u>Releases</u>. The Parties agree to the following releases:

  a. <u>Release of Sellers</u>. Effective upon the Settlement Date, the Purchaser hereby releases and forever discharges the Sellers, NNSA, their respective past and present parents, subsidiaries, affiliates, general partners, limited partners, shareholders, administrators, liquidators, directors, officers, employees, managers, agents, attorneys, solicitors and advisors, and each of their predecessors, successors and assigns, as well as the Joint Administrators (collectively, the "<u>Seller Releasees</u>"), from any and all claims, rights, defenses, demands, liabilities, obligations, damages, actions, suits, causes of action, and setoffs, whether known or unknown, suspected or unsuspected, accrued or unaccrued, matured or unmatured, past or present, fixed or contingent, liquidated or unliquidated, whether sounding in contract, tort or otherwise (collectively "<u>Claims</u>"), that the Purchaser now has, had, may have

12

had, or hereafter may have against any of the Seller Releasees concerning or relating to the Final Purchase Price owed under the Sale Agreement, the Deferred Profit Amount, the Canadian Transfer Tax Amount, or the Verizon Settlement Amount (collectively, the "Settled Matters"), and the Purchaser hereby covenants forever not to sue or bring any Claims against the Seller Releasees concerning or relating to the Settled Matters.

b.   Release of Purchaser.  Effective upon the Settlement Date, the Sellers, the Joint Administrators and NNSA hereby release and forever discharge the Purchaser, its past and present parents, subsidiaries, affiliates, general partners, limited partners, shareholders, directors, officers, employees, agents, attorneys and advisors, and each of their predecessors, successors and assigns (collectively, the "Purchaser Releasees"), from any and all Claims that the Sellers now have, had, may have had, or hereafter may have against any of the Purchaser Releasees concerning or relating to the Settled Matters, and the Sellers hereby covenant forever not to sue or bring any Claims against the Purchaser Releasees concerning or relating to the Settled Matters.

c.   The Parties acknowledge and understand that hereafter they may discover or appreciate claims, facts, issues, or concerns in addition to or different from those that they now know or believe to exist with respect to the Settled Matters, which if known or suspected at the time of execution of this Stipulation, might have materially affected the settlement embodied herein. The Parties nevertheless agree that the releases contained herein apply to any such additional or different claims, facts, issues, or concerns.  The Parties

13

acknowledge that they are familiar with the provisions of California Civil Code Section 1542 ("A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.") and specifically waive all rights and release such claims as referenced therein and in any similar statute or law.

d. The Sellers, NNSA and the Purchaser hereby represent that they are the sole and exclusive owners of the respective Claims concerning or relating to the Settled Matters addressed in this Stipulation and that each Party to this Stipulation respectively has the sole right and exclusive authority to execute this Stipulation and has not sold, assigned, transferred, conveyed, or otherwise disposed of any of the Claims concerning or relating to the Settled Matters referred to in this Stipulation.

e. For the avoidance of doubt, the Releases provided in the above Sections 7(a) and 7(b) do not include any release in respect of any disputed EMEA Tax Claims (which term shall have the meaning ascribed to it in the EMEA Asset Sale Agreement (as defined by the Sale Agreement but only as amended by a deed of accession and amendment dated 28 May 2010) (the "EMEA ASA")).

8.   <u>No Admissions</u>.  This Stipulation and any draft thereof shall not constitute an admission of liability or lack thereof by any Party or the U.S. Debtors, the Canadian Debtors, the EMEA Debtors, the Seller Releasees, the Purchaser Releasees or their affiliates, and shall not be admissible as evidence in any court of law or other legal proceeding for any purpose, other than for the purpose of enforcing the Stipulation.  Each Party acknowledges and agrees that nothing in

14