1.  Pursuant to the equipment purchase and sale agreement dated 31 March 2010 entered into between Nortel Russia and Kapsch CarrierCom Russia O.O.O., Nortel Russia received an amount of US$1,949.63 in payment for the sale of certain equipment as part of the sale of the GSM business of Nortel Russia and its affiliates (the "**GSM Payment**").

2.  Following and by no later than five (5) Business Days after the date of the Court Approvals (as defined below), provided that Liquidation has not yet commenced, the Liquidator has not yet been appointed, and no Insolvency Event has occurred, pursuant to Section 15(a) of the Agreement and the terms of the IFSA as applicable to the Parties, the Depositors, the Estate Fiduciaries and the Distribution Agent shall execute an amendment to the Agreement, substantially in the form attached hereto as Schedule 2, that amends the Agreement to remove all references to Nortel Russia as a Depositor, such that Nortel Russia shall, subject to the terms of the assignment pursuant to paragraph 3 below, have no further rights or obligations under the Agreement, including but not limited to those rights accorded to Depositors under Section 5(a) of the Agreement (the "**Amendment**").

3.  Following and by no later than five (5) Business Days after the date of the Court Approvals (as defined below), provided that Liquidation has not yet commenced, the Liquidator has not yet been appointed, and no Insolvency Event has occurred, the General Director of Nortel Russia shall execute and deliver a certificate of solvency, substantially in the form attached hereto as Schedule 3, to NNIFH, NNL, and NNI, with a copy to the other Parties (the "**Solvency Certificate**").

4.  Upon the transmission of certain payments from sale proceed escrow accounts pursuant to side letters executed on or about the date of this Side Letter relating to the sale of the MEN and CVAS businesses of Nortel Russia and its affiliates, provided that Liquidation has not yet commenced, the Liquidator has not yet been appointed, and no Insolvency Event has occurred, in consideration for the GSM Payment and the transmission of sale proceeds pursuant to side letters executed on or about the date of this Side Letter relating to the sale of the MEN and CVAS businesses of Nortel Russia and its affiliates, all of the rights, title and interest, if any, that, notwithstanding the provisions of paragraph 9 below, Nortel Russia or any successor, assign, trustee, liquidator or similar person as of the date of such payment, had or could have had thereafter, to any allocation and/or distribution of the Escrow Funds, whether pursuant to Section 5(a) of the Agreement, the IFSA or otherwise (the "**Russian Proceeds**"), and any and all rights, title, and interest and obligations of Nortel Russia, or any successor, assign, trustee, liquidator or similar person, if any, under the Agreement, the IFSA or otherwise, shall be, and shall be deemed to be, assigned and

transferred to NNIFH, and neither Nortel Russia, nor any successor, assign (other than NNIFH), trustee, liquidator or similar person shall have any right, title or interest to or under the Agreement, the IFSA, or otherwise, to any allocation or distribution of Escrow Funds.

5.   Following the execution of this Side Letter, provided that Liquidation has not yet commenced, the Liquidator has not yet been appointed, and no Insolvency Event has occurred, NNI and NNL shall use commercially reasonable efforts to obtain final orders from, respectively, the U.S. Bankruptcy Court and the Canadian Court approving the Amendment and this Side Letter and granting related relief (the "**Court Approvals**"), which orders together shall satisfy the requirements of Section 15(a) of the Agreement.

6.   Save for paragraphs 11 to 14, nothing in this Side Letter shall take effect until the Court Approvals have been granted.

7.   For the avoidance of doubt, notwithstanding anything in this Side Letter to the contrary, if at any point prior to the effectiveness of the Amendment an Insolvency Event occurs with respect to Nortel Russia, any Party to this Side Letter may provide written notice to each of the other Parties that, as a result of the Insolvency Event, this Side Letter is therefore null and void (the "**Nullification Notice**").  Upon delivery of the Nullification Notice, (i) this Side Letter shall be null and void, (ii) the Parties' rights, claims and obligations as they existed immediately prior to the execution of this Agreement shall be restored, and (iii) nothing in this Side Agreement shall constitute an admission, limitation or waiver with respect to each of the claims or rights of each of the Parties to the Escrow Funds or the rights of each of the Parties under the Agreement or the IFSA.

8.   At such date as the Escrow Funds are released and distributed in accordance with Section 5(a) of the Agreement and the terms of the IFSA (the "**Final Allocation**"), the total amount of the Russian Proceeds, if any, shall be allocated and distributed to NNIFH.

9.   Subject to the immediately following sentence, nothing in this Side Letter or the Amendment related thereto or the actions taken as contemplated thereby shall bar, prohibit, terminate or in any way hinder or enhance the rights of the Parties to this Side Letter to present any arguments, methodologies, legal or factual theories in support of a proposed allocation of the Sale Proceeds (as defined in the IFSA) or the proceeds of any other transaction, including, without limitation, the sale of assets, businesses or intellectual property, that would be subject to allocation amongst any of the Parties, and such presentation shall not, or otherwise be deemed to, constitute in any way a

violation of a Party's rights under any existing agreement.  The Parties agree that no Party shall use as evidence, or otherwise rely upon, this Side Letter or any part hereof in any way to support its right to a particular allocation of the Sale Proceeds or any other sale proceeds.  Subject to the terms of this Side Letter, the Parties oppose and shall reasonably cooperate in opposing the allocation and/or distribution of the Russian Proceeds to any person other than NNIFH by any dispute resolver(s) appointed pursuant to any Allocation Protocol or otherwise, any court, or such other judicial or quasi-judicial body or any similar entity asserting authority over such determination.

10. NNIFH agrees to reasonably cooperate in the defense of any effort to set aside or void actions taken pursuant to this Side Letter as a preference, fraudulent conveyance or under any similar provision of any other bankruptcy, insolvency, creditor rights law or currency control regulation or law in any similar proceeding under the laws of any jurisdiction.

11. This Side Letter shall be governed by and construed exclusively in accordance with the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; provided, however, that paragraphs 13 to 14 shall be governed exclusively by English law.

12. To the fullest extent permitted by applicable Law, each Party irrevocably agrees to submit to the exclusive jurisdiction of both (i) the U.S. Bankruptcy Court and the Canadian Court for any claim, action or proceeding arising under or out of, in respect of, or in connection with this Side Letter, if such claim, action, suit or proceeding is brought prior to the entry of a final decree closing the Bankruptcy Cases involving the relevant Depositors pending before such courts, and (ii) the federal courts in the Southern District of New York and the state courts of the State of New York, County of New York if brought after entry of such final decree closing such bankruptcy cases involving the relevant depositors pending before the U.S. Bankruptcy Court or the Canadian Court; provided, however, that the courts of England and Wales shall have exclusive jurisdiction to hear and determine or otherwise settle any claim, action, suit or proceeding brought under paragraphs 13 to 14.  Each Party to this Side Letter irrevocably waives any right it may have to object to an action being brought in those courts, to claim that the action has been brought in an inconvenient forum, or to claim that those courts do not have jurisdiction.

13. It is acknowledged that the Joint Administrators are entering into this Side Letter as agents for the EMEA Debtors to which they are appointed and that Maitre Cosme Rogeau, the French Liquidator of NNSA, and Maitre Frank Michel, the French Administrator "mandatiare ad hoc" of NNSA

(collectively the "**NNSA Office Holders**") are entering into this Side Letter as agents of NNSA to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents or the NNSA Office Holders, their firm, partners, employees, advisers, representatives or agents (in respect of NNSA only) shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group (as defined in the IFSA) company to observe, perform or comply with any of its obligations under this Side Letter or under or in relation to any associated arrangements or negotiations.

14. The Joint Administrators are a party to this Side Letter: (i) as agents of certain of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act 1986 and enforcing the obligations of certain other parties to this Side Letter.

15. The Parties may execute this Side Letter in counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which will constitute one and the same instrument. Facsimile or PDF signatures shall be deemed original signatures.

16. The provisions of this Side Letter may be waived or amended if, and only if, such amendment or waiver is in writing and is signed by the Depositors, and the Estate Fiduciaries (with a copy thereof to the Bondholder Group) and, if prior to the entry of a final decree closing the Bankruptcy Cases, such amendment or waiver is approved by both the U.S. Bankruptcy Court and the Canadian Court; provided, however, that (i) court approval shall not be required of any applicable court (whether the U.S. Bankruptcy Court or the Canadian Court) if a final decree closing the Bankruptcy Cases pending before such court shall have been entered by such court; and (ii) court approval shall not be required of any court if final decrees terminating the Bankruptcy Cases shall have been entered by the U.S. Bankruptcy Court and the Canadian Court.

17. No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Side Letter by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Side Letter preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege. No Party shall be deemed to have waived any provision of this Side Letter unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver.

18. This Side Letter is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Side Letter.

19. Except as otherwise expressly provided in this Side Letter, all covenants and agreements set forth in this Side Letter by or on behalf of the Parties will be binding upon and inure to the benefit of the Parties and their respective successors.

20. As required by section 12(g) of the IFSA, NNI has consulted with the Committee and the Bondholder Group (each as defined in the Agreement) and obtained its consent prior to entering into this Side Letter, and as evidenced by signature of the Committee hereto, the Committee consents to this Side Letter.

[Signature pages to follow]

**Copy to:**

The Bondholder Group
c/o Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York 10005
Attn: Albert A. Pisa and Roland Hlawaty
Phone: 212.530.5000
Via Facsimile: 212.822.5735

6

IN WITNESS WHEREOF, each of the parties hereto has caused this Side Letter to be executed on the day and year first above written.

NORTEL NETWORKS LIMITED

By:_____
Name:
Title:


By:_____
Name:
Title:

NORTEL NETWORKS CORPORATION

By:_____
Name:
Title:


By:_____
Name:
Title:

NORTEL NETWORKS INC.


By:_____
Name:  John J. Ray III
Title:  Principal Officer


ERNST & YOUNG INC. SOLELY IN ITS CAPACITY AS THE MONITOR OF NORTEL NETWORKS CORPORATION ET AL., AND NOT IN ITS PERSONAL CAPACITY




By:_____
Name:
Title:

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF NORTEL NETWORKS INC., ET. AL.

By:  AKIN GUMP STRAUSS HAUER & FELD LLP, as Counsel to the Committee and authorized signatory and not in its individual capacity


By:_____
Name:
Title:

S-1

Side Letter Concerning the Escrow Agreement [GSM/GSM-R]

**ARCHITEL SYSTEMS (U.S.)
CORPORATION**


By: _____
Name:  John J. Ray III
Title:  Principal Officer


**NORTEL ALTSYSTEMS INC.**


By: _____
Name:  John J. Ray III
Title:  Principal Officer


**NORTEL ALTSYSTEMS
INTERNATIONAL INC.**


By: _____
Name:  John J. Ray III
Title:  Principal Officer


**NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.**


By: _____
Name:  John J. Ray III
Title:  Principal Officer

Side Letter Concerning the Escrow Agreement [GSM/GSM-R]

**NORTEL NETWORKS CABLE SOLUTIONS INC.**


By:_____
Name:  John J. Ray III
Title:  Principal Officer

**NORTEL NETWORKS CAPITAL CORPORATION**


By_____
Name:  John J. Ray III
Title:  Principal Officer


**NORTEL NETWORKS HPOCS INC.**


By_____
Name:  John J. Ray III
Title:  Principal Officer

**NORTEL NETWORKS INTERNATIONAL INC.**


By:_____
Name:  John J. Ray III
Title:  Principal Officer

**NORTEL NETWORKS OPTICAL COMPONENTS INC.**


By_____
Name:  John J. Ray III
Title:  Principal Officer

Side Letter Concerning the Escrow Agreement [GSM/GSM-R]

**NORTHERN TELECOM
INTERNATIONAL INC.**

By:_____
Name:  John J. Ray III
Title: Principal Officer

**SONOMA SYSTEMS**

By_____
Name:  John J. Ray III
Title: Principal Officer

**QTERA CORPORATION**

By:_____
Name:  John J. Ray III
Title: Principal Officer

**XROS, INC.**

By:_____
Name:  John J. Ray III
Title: Principal Officer

**CORETEK, INC.**

By:_____
Name:  John J. Ray III
Title: Principal Officer

By:_____
Name:
Title:

**SIGNED** by and on behalf of **NORTEL NETWORKS GLOBAL CORPORATION** by

By:_____
Name:
Title:


By:_____
Name:
Title:

**SIGNED** by and on behalf of **NORTEL NETWORKS TECHNOLOGY CORPORATION** by

By:_____
Name:
Title:


By:_____
Name:
Title:

**SIGNED** by and on behalf of **NORTEL DE MEXICO S. DE R.L. DE C.V.** by

By:_____
Name:
Title:


By:_____
Name:
Title:

Side Letter Concerning the Escrow Agreement [GSM/GSM-R]

**SIGNED** by and on behalf of **NORTEL NETWORKS (ASIA) LIMITED** by

By:_____
Name:
Title:


By:_____
Name:
Title:

**SIGNED** by and on behalf of **NORTEL NETWORKS (CHINA) LIMITED** by

By:_____
Name:
Title:


By:_____
Name:
Title:

Side Letter Concerning the Escrow Agreement [GSM/GSM-R]

**SIGNED** for and on behalf of **Nortel Networks**       )       .....................................................
**UK Limited** (in administration) by Christopher       )
Hill as Joint Administrator (acting as agent and       )
without personal liability) in the presence of:       )


Witness signature

..........................................................       )
Name:       )
Address:       )




**SIGNED** for and on behalf of **Nortel GmbH** (in       )       .....................................................
administration) by Christopher Hill as Joint       )
Administrator (acting as agent and without       )
personal liability) in the presence of:       )


Witness signature

..........................................................       )
Name:       )
Address:       )

Side Letter Concerning the Escrow Agreement [GSM/GSM-R]

**SIGNED** for and on behalf of **Nortel Networks**           )        ...................................................................
**SpA** (in administration) by Christopher Hill as            )
Joint Administrator (acting as agent and without              )
personal liability) in the presence of:                       )

Witness signature

...................................................................        )
Name:                                                         )
Address:                                                      )

**SIGNED** for and on behalf of **Nortel Networks**           )        ...................................................................
**Hispania S.A.** (in administration) by Christopher          )
Hill as Joint Administrator (acting as agent and              )
without personal liability) in the presence of:               )

Witness signature

...................................................................        )
Name:                                                         )
Address:                                                      )

**SIGNED** for and on behalf of **Nortel Networks**           )        ...................................................................
**B.V.** (in administration) by Christopher Hill as           )
Joint Administrator (acting as agent and without              )
personal liability) in the presence of:                       )

Witness signature

...................................................................        )
Name:                                                         )
Address:                                                      )

Side Letter Concerning the Escrow Agreement [GSM/GSM-R]

**SIGNED** for and on behalf of **Nortel Networks**  )   ...............................................................
**AB** (in administration) by Christopher Hill as  )
Joint Administrator (acting as agent and without  )
personal liability) in the presence of:  )

Witness signature

...............................................................  )
Name:  )
Address:  )

**SIGNED** for and on behalf of **Nortel Networks**  )   ...............................................................
**N.V.** (in administration) by Christopher Hill as  )
Joint Administrator (acting as agent and without  )
personal liability) in the presence of:  )

Witness signature

...............................................................  )
Name:  )
Address:  )

**SIGNED** for and on behalf of **Nortel Networks**  )   ...............................................................
**(Austria) GmbH** (in administration) by  )
Christopher Hill as Joint Administrator (acting as  )
agent and without personal liability) in the  )
presence of:

Witness signature

   )
...............................................................  )
Name:  )
Address:

Side Letter Concerning the Escrow Agreement [GSM/GSM-R]

**SIGNED** for and on behalf of **Nortel Networks**   )   ..................................................................
**Portugal S.A.** (in administration) by Christopher   )
Hill as Joint Administrator (acting as agent and   )
without personal liability) in the presence of:   )


Witness signature

..........................................................   )
Name:   )
Address:   )


**SIGNED** for and on behalf of **Nortel Networks**   )   ..................................................................
**s.r.o.** (in administration) by Christopher Hill as   )
Joint Administrator (acting as agent and without   )
personal liability) in the presence of:   )


Witness signature

..........................................................   )
Name:   )
Address:   )


S-10

Side Letter Concerning the Escrow Agreement [GSM/GSM-R]

**SIGNED** for and on behalf of **Nortel Networks**          )          ....................................................................
**Polska Sp. z.o.o.** (in administration) by          )
Christopher Hill as Joint Administrator (acting as          )
agent and without personal liability) in the          )
presence of:

Witness signature
                                                                                    )
....................................................................          )
Name:          )
Address:

**SIGNED** for and on behalf of **Nortel Networks**          )          ....................................................................
**Engineering Service kft** (in administration) by          )
Christopher Hill as Joint Administrator (acting as          )
agent and without personal liability) in the          )
presence of:

Witness signature
                                                                                    )
....................................................................          )
Name:          )
Address:

S-11

Side Letter Concerning the Escrow Agreement [GSM/GSM-R]

**SIGNED** for and on behalf of **Nortel Networks**    )    ...............................................................
**Slovensko s.r.o.** (in administration) by    )
Christopher Hill as Joint Administrator (acting as    )
agent and without personal liability) in the    )
presence of:

Witness signature

.........................................................    )    )
Name:    )
Address:


**SIGNED** for and on behalf of **Nortel Networks**    )    ...............................................................
**Romania Srl** (in administration) by Christopher    )
Hill as Joint Administrator (acting as agent and    )
without personal liability) in the presence of:    )

Witness signature

.........................................................    )
Name:    )
Address:    )

Side Letter Concerning the Escrow Agreement [GSM/GSM-R]

**SIGNED** for and on behalf of **Nortel Networks**  )    .................................................................
**Oy** (in administration) by Christopher Hill as  )
Joint Administrator (acting as agent and without  )
personal liability) in the presence of:  )

Witness signature

.........................................................................  )
Name:  )
Address:  )

**SIGNED** for and on behalf of **Nortel Networks**  )    .................................................................
**International Finance & Holding B.V.** (in  )
administration) by Christopher Hill as Joint  )
Administrator (acting as agent and without  )
personal liability) in the presence of:

Witness signature
  )
.........................................................................  )
Name:  )
Address:

Side Letter Concerning the Escrow Agreement [GSM/GSM-R]

**SIGNED** for and on behalf of **Nortel Networks**    )    ................................................................
**France S.A.S.** (in administration) by Kerry Trigg    )
acting as authorised representative for the Joint    )
Administrators (acting as agent and without    )
personal liability) in the presence of:

Witness signature

                                                        )
........................................................    )
Name:                                                   )
Address:

**SIGNED** for and on behalf of **Nortel Networks**    )    ................................................................
**(Ireland) Limited** (in administration) by David    )
Hughes as Joint Administrator (acting as agent    )
and without personal liability) in the presence of:    )

Witness signature

........................................................    )
Name:                                                   )
Address:                                                )

S-14

**SIGNED** for and on behalf of **Nortel Networks**  )    ........................................................
**Networks (Northern Ireland) Limited** (in    )
liquidation) by Kerry Trigg as liquidator (acting    )
as agent and without personal liability) in the    )
presence of:

Witness signature

    )
........................................................    )
Name:    )
Address:

**SIGNED** by Vladimir Kasyanik, General    )    ........................................................
Director, duly authorized for and on behalf of    )
**o.o.o. Nortel Networks**, in the presence of:    )
    )

Witness signature

........................................................
Name:    )
Address:    )
    )

Side Letter Concerning the Escrow Agreement [GSM/GSM-R]

**SIGNED** by _____     )          ...................................................................
duly authorized for and on behalf of **Nortel**      )
**Networks AG** in the presence of:           )
                                              )


Witness signature


...........................................................
Name:                                         )
Address:                                      )
                                              )


**SIGNED** by Alan Bloom in his own capacity and     )     ...................................................................
on behalf of the Joint Administrators without        )
personal liability and solely for the benefit of the )
provisions of this Side Letter expressed to be       )
conferred on or given to the Joint Administrators:


Witness signature


...........................................................
Name:                                         )
Address:                                      )


S-16

Side Letter Concerning the Escrow Agreement [GSM/GSM-R]

**SIGNED** for and on behalf of **NORTEL**          )          ...............................................................
**NETWORKS S.A. (In administration and**          )
**secondary proceedings)** by Maitre Cosme          )
Rogeau, in his capacity as French Liquidator          )
(Mandataire Liquidateur) acting as agent and
without personal liability, in the presence of:

Witness signature          )
          )
...........................................................          )
Name:
Address:

S-17

Side Letter Concerning the Escrow Agreement [GSM/GSM-R]

## Schedule 1

### Other Sellers

**Part 1: Other Sellers**

Nortel Networks Technology Corporation

Nortel Networks Global Corporation

Nortel de Mexico, S. de R.L. de C.V.

Nortel Networks (China) Limited

**Part 2: EMEA Sellers**

Nortel Networks (Ireland) Limited (in administration)

Nortel GmbH (in administration)

Nortel Networks SpA (in administration)

Nortel Networks Hispania SA (in administration)

Nortel Networks B.V. (in administration)

Nortel Networks AG

Nortel Networks N.V. (in administration)

Nortel Networks (Austria) GmbH (in administration)

Nortel Networks Polska Sp. z.o.o. (in administration)

Nortel Networks Engineering Services kft (in administration)

Nortel Networks Slovensko s.r.o. (in administration)

Nortel Networks (Northern Ireland) Limited

Nortel Networks France SAS (in administration)

Nortel Networks Romania srl (in administration)

Nortel Networks s.r.o. (in administration)

**Part 3: Affiliates of Main Sellers that are deemed to be "Selling Debtors":**

Architel (US) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc. (previously "Alteon Websystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon Websystems International Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Syastems

Xros, Inc.


**Part 4: Affiliates of the EMEA Sellers that are deemed to be a "Selling Debtor"**

Nortel Networks Oy (in administration)

Nortel Networks AB (in administration)

Nortel Networks Portugal SA (in administration)

**Schedule 2**

**Escrow Amendment**

**Schedule 3**

**Solvency Certificate**

# FIRST AMENDMENT TO GSM/GSM-R DISTRIBUTION ESCROW AGREEMENT

This First Amendment, dated as of [●], 2011 (this "Amendment") to the GSM/GSM-R Distribution Escrow Agreement (the "Distribution Escrow Agreement"), dated as of March 31, 2010, is by and among (i) Nortel Networks Corporation ("NNC"), (ii) Nortel Networks Limited ("NNL"), (iii) Nortel Networks Inc. ("NNI," and together with NNC and NNL, the "Main Sellers"), (iv) the affiliates of the Main Sellers listed on Schedule A of the Distribution Escrow Agreement (the "Other Sellers" and, together with the Main Sellers, the "Sellers"), (v) the entities set out in Schedule B of the Distribution Escrow Agreement (the "EMEA Sellers"), which are, in the case of the EMEA Debtors, acting by Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP (other than Nortel Networks (Ireland) Limited (In Administration), for which David Hughes of Ernst & Young Chartered Accountants and Alan Robert Bloom serve as joint administrators (collectively the "Joint Administrators")) who act as agents for the EMEA Debtors without any personal liability, (vi) Nortel Networks S.A. (In Administration and liquidation judiciare) ("NNSA") acting by the French Office Holders (as defined in the Distribution Escrow Agreement) who act as agents for NNSA without any personal liability whatsoever, (vii) Nortel Networks (Asia) Limited ("NN Asia"), (viii) each affiliate of the Main Sellers listed in Schedule C of the Distribution Escrow Agreement (each such entity, a "North American ALT Selling Debtor"), (ix) each affiliate of the EMEA Sellers listed in Schedule D of the Distribution Escrow Agreement (each such entity, an "EMEA ALT Selling Debtor" and together with the Sellers, the EMEA Sellers, NNSA, NN Asia and the North American ALT Selling Debtors, the "Depositors"), (ix) the Estate Fiduciaries (as defined in the Distribution Escrow Agreement), and (x) JPMorgan Chase Bank, N.A. ("JPMorgan"), a national banking association organized and existing under the laws of the United States of America and acting through its TS/Escrow Services Division and solely in its capacity as escrow and distribution agent under the Distribution Escrow Agreement and any successors appointed pursuant to the terms thereof (JPMorgan in such capacity, the "Distribution Agent"). Capitalized terms used but not defined herein shall have the meanings given to them in the Distribution Escrow Agreement.

## WITNESSETH:

WHEREAS, the Depositors, the Estate Fiduciaries and the Distribution Agent (the "Parties") desire to amend the Distribution Escrow Agreement.

WHEREAS, this Amendment has been approved by both the U.S. Bankruptcy Court and the Canadian Court pursuant to orders dated [●], 2011, as required pursuant to Paragraph 15(a) of the Distribution Escrow Agreement.

WHEREAS, on August [●], 2011 the Parties entered into that certain Side Letter to the Distribution Escrow Agreement (the "GSM Escrow Side Letter") pursuant to which the parties to the GSM Escrow Side Letter agreed to deliver this Amendment.

WHEREAS, the Parties anticipate that o.o.o. Nortel Networks, aka Nortel Networks o.o.o. ("Nortel Russia") will be placed into voluntary liquidation within approximately one month of the date hereof, and the Parties cannot determine with certainty the length of the liquidation process under applicable Russian law.

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereby agree as follows:

1.     <u>Amendment of Schedule B</u>.  Conditional upon, and with effect from, the transmission of certain payments from sale proceed escrow accounts by their respective distribution agents pursuant to side letters executed on or about the date of the GSM Escrow Side Letter relating to the sale of the MEN and CVAS businesses of Nortel Russia and its affiliates, Schedule B of the Distribution Escrow Agreement shall be amended to remove Nortel Russia from the list of EMEA Sellers party to the Distribution Escrow Agreement.  Nortel Russia shall immediately and irrevocably cease to be a Depositor under the Distribution Escrow Agreement for any and all purposes, and the consent of Nortel Russia shall no longer be required for any purposes thereunder.

2.     <u>Authorization</u>.  Each Party hereto represents to the others that (a) such party has all necessary power and authority to enter into this Amendment; (b) the execution and delivery by such Party of this Amendment has been duly authorized by all requisite corporate or other action on the part of such Party; and (c) this Amendment has been duly executed and delivered by such Party.

3.     <u>Distribution Escrow Agreement Remains in Effect</u>.  This Amendment and the Distribution Escrow Agreement set forth the entire agreement among the Parties with respect to the matters set forth herein.  Except as amended hereby, the Distribution Escrow Agreement shall remain in full force and effect, and nothing herein shall affect any other provision of the Distribution Escrow Agreement or the rights and obligations of the parties thereto.  This Amendment shall be governed by and interpreted and enforced in accordance with the terms of the Distribution Escrow Agreement.

4.     <u>Counterparts</u>.  This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same agreement, it being understood that all of the Parties need not sign the same counterpart. All signatures of the parties to this Amendment may be transmitted by facsimile or other electronic means, and such facsimile or other electronic documents will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party.

*[Signature pages follow.]*

**Copy to:**

The Bondholder Group
c/o Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York 10005
Attn: Albert A. Pisa and Roland Hlawaty
Phone: 212.530.5000
Via Facsimile: 212.822.5735

NORTEL NETWORKS LIMITED

NORTEL NETWORKS CORPORATION

By:_____
Name:
Title:

By:_____
Name:
Title:

By:_____
Name:
Title:

By:_____
Name:
Title:

NORTEL NETWORKS INC.

DISTRIBUTION AGENT

By:_____
Name:  John J. Ray III
Title:  Principal Officer

JPMorgan Chase Bank, N.A., as Distribution Agent

By:_____
Name:
Title:

ERNST & YOUNG INC. SOLELY IN ITS CAPACITY AS THE MONITOR OF NORTEL NETWORKS CORPORATION ET AL., AND NOT IN ITS PERSONAL CAPACITY

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF NORTEL NETWORKS INC., ET. AL.

By:  AKIN GUMP STRAUSS HAUER & FELD LLP, as Counsel to the Committee and authorized signatory and not in its individual capacity

By:_____
Name:
Title:

By:_____
Name:
Title:

S-1

**ARCHITEL SYSTEMS (U.S.)
CORPORATION**

By:_____
Name:  John J. Ray III
Title:  Principal Officer

**NORTEL ALTSYSTEMS INC.**

By:_____
Name:  John J. Ray III
Title:  Principal Officer

**NORTEL ALTSYSTEMS
INTERNATIONAL INC.**

By:_____
Name:  John J. Ray III
Title:  Principal Officer

**NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.**

By:_____
Name:  John J. Ray III
Title:  Principal Officer

First Amendment To GSM/GSM-R Distribution Escrow Agreement

**NORTEL NETWORKS CABLE SOLUTIONS INC.**


By:_____
Name:  John J. Ray III
Title:  Principal Officer

**NORTEL NETWORKS CAPITAL CORPORATION**


By_____
Name:  John J. Ray III
Title:  Principal Officer


**NORTEL NETWORKS HPOCS INC.**


By_____
Name:  John J. Ray III
Title:  Principal Officer

**NORTEL NETWORKS INTERNATIONAL INC.**


By:_____
Name:  John J. Ray III
Title:  Principal Officer

**NORTEL NETWORKS OPTICAL COMPONENTS INC.**


By_____
Name:  John J. Ray III
Title:  Principal Officer

S-3

**NORTHERN TELECOM
INTERNATIONAL INC.**

By:_____
Name:  John J. Ray III
Title:  Principal Officer

**SONOMA SYSTEMS**

By_____
Name:  John J. Ray III
Title:  Principal Officer

**QTERA CORPORATION**

By:_____
Name:  John J. Ray III
Title:  Principal Officer

**XROS, INC.**

By:_____
Name:  John J. Ray III
Title:  Principal Officer

**CORETEK, INC.**

By:_____
Name:  John J. Ray III
Title:  Principal Officer

By:_____
Name:
Title:

First Amendment To GSM/GSM-R Distribution Escrow Agreement

**SIGNED** by and on behalf of **NORTEL NETWORKS GLOBAL CORPORATION** by

By:_____
Name:
Title:


By:_____
Name:
Title:

**SIGNED** by and on behalf of **NORTEL NETWORKS TECHNOLOGY CORPORATION** by

By:_____
Name:
Title:


By:_____
Name:
Title:

**SIGNED** by and on behalf of **NORTEL DE MEXICO S. DE R.L. DE C.V.** by

By:_____
Name:
Title:


By:_____
Name:
Title:

First Amendment To GSM/GSM-R Distribution Escrow Agreement

**SIGNED** by and on behalf of **NORTEL NETWORKS (ASIA) LIMITED** by

By:_____
Name:
Title:


By:_____
Name:
Title:

**SIGNED** by and on behalf of **NORTEL NETWORKS (CHINA) LIMITED** by

By:_____
Name:
Title:


By:_____
Name:
Title:

First Amendment To GSM/GSM-R Distribution Escrow Agreement

**SIGNED** for and on behalf of **Nortel Networks**
**UK Limited** (in administration) by Christopher
Hill as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)

..................................................................

Witness signature

.........................................................................
Name:
Address:

)
)
)

**SIGNED** for and on behalf of **Nortel GmbH** (in
administration) by Christopher Hill as Joint
Administrator (acting as agent and without
personal liability) in the presence of:

)
)
)
)

..................................................................

Witness signature

.........................................................................
Name:
Address:

)
)
)

First Amendment To GSM/GSM-R Distribution Escrow Agreement

SIGNED for and on behalf of **Nortel Networks**
**SpA** (in administration) by Christopher Hill as
Joint Administrator (acting as agent and without
personal liability) in the presence of:

)
)
)
)

.....................................................................

Witness signature

.....................................................................
Name:
Address:

)
)
)

SIGNED for and on behalf of **Nortel Networks**
**Hispania S.A.** (in administration) by
Christopher Hill as Joint Administrator (acting
as agent and without personal liability) in the
presence of:

)
)
)
)

.................................................................

Witness signature

.....................................................................
Name:
Address:

)
)
)

SIGNED for and on behalf of **Nortel Networks**
**B.V.** (in administration) by Christopher Hill as
Joint Administrator (acting as agent and without
personal liability) in the presence of:

)
)
)
)

.................................................................

Witness signature

.....................................................................
Name:
Address:

)
)
)

S-8

**SIGNED** for and on behalf of **Nortel Networks**
**AB** (in administration) by Christopher Hill as
Joint Administrator (acting as agent and without
personal liability) in the presence of:

)
)
)
)

........................................................

Witness signature

........................................................
Name:
Address:

)
)
)

**SIGNED** for and on behalf of **Nortel Networks**
**N.V.** (in administration) by Christopher Hill as
Joint Administrator (acting as agent and without
personal liability) in the presence of:

)
)
)
)

........................................................

Witness signature

........................................................
Name:
Address:

)
)
)

**SIGNED** for and on behalf of **Nortel Networks**
**(Austria) GmbH** (in administration) by
Christopher Hill as Joint Administrator (acting
as agent and without personal liability) in the
presence of:

)
)
)
)

........................................................

Witness signature

)
........................................................
Name:
Address:

)
)

First Amendment To GSM/GSM-R Distribution Escrow Agreement

**SIGNED** for and on behalf of **Nortel Networks**　)　.................................................................
**Portugal S.A.** (in administration) by　)
Christopher Hill as Joint Administrator (acting　)
as agent and without personal liability) in the　)
presence of:

Witness signature

　)
.........................................................　)
Name:　)
Address:

**SIGNED** for and on behalf of **Nortel Networks**　)　.................................................................
**s.r.o.** (in administration) by Christopher Hill as　)
Joint Administrator (acting as agent and without　)
personal liability) in the presence of:　)

Witness signature

.........................................................　)
Name:　)
Address:　)

S-10

**SIGNED** for and on behalf of **Nortel Networks**            )      ...............................................................
**Polska Sp. z.o.o.** (in administration) by                       )
Christopher Hill as Joint Administrator (acting             )
as agent and without personal liability) in the              )
presence of:

Witness signature

                                                                              )
.........................................................                        )
Name:                                                                       )
Address:


**SIGNED** for and on behalf of **Nortel Networks**            )      ...............................................................
**Engineering Service kft** (in administration) by            )
Christopher Hill as Joint Administrator (acting             )
as agent and without personal liability) in the              )
presence of:

Witness signature

                                                                              )
.........................................................                        )
Name:                                                                       )
Address:


S-11

First Amendment To GSM/GSM-R Distribution Escrow Agreement

**SIGNED** for and on behalf of **Nortel Networks**
**Slovensko s.r.o.** (in administration) by
Christopher Hill as Joint Administrator (acting
as agent and without personal liability) in the
presence of:

)
)
)
)

...............................................................

Witness signature

)
)
)

......................................................................
Name:
Address:

**SIGNED** for and on behalf of **Nortel Networks**
**Romania Srl** (in administration) by Christopher
Hill as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)

...............................................................

Witness signature

)
)
)

......................................................................
Name:
Address:

First Amendment To GSM/GSM-R Distribution Escrow Agreement

**SIGNED** for and on behalf of **Nortel Networks**    )    ...............................................................
**Oy** (in administration) by Christopher Hill as    )
Joint Administrator (acting as agent and without    )
personal liability) in the presence of:    )


Witness signature

........................................................    )
Name:    )
Address:    )




**SIGNED** for and on behalf of **Nortel Networks**    )    ...............................................................
**International Finance & Holding B.V.** (in    )
administration) by Christopher Hill as Joint    )
Administrator (acting as agent and without    )
personal liability) in the presence of:    )


Witness signature
    )
........................................................    )
Name:    )
Address:

First Amendment To GSM/GSM-R Distribution Escrow Agreement

**SIGNED** for and on behalf of **Nortel Networks France S.A.S.** (in administration) by Kerry Trigg acting as authorised representative for the Joint Administrators (acting as agent and without personal liability) in the presence of:

)
)
)
)

................................................................

Witness signature

)
)
)

........................................................................

Name:

Address:

**SIGNED** for and on behalf of **Nortel Networks (Ireland) Limited** (in administration) by David Hughes as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

................................................................

Witness signature

)
)
)

........................................................................

Name:

Address:

.

S-14

First Amendment To GSM/GSM-R Distribution Escrow Agreement

**SIGNED** for and on behalf of **Nortel Networks**    )    ...............................................................
**Networks (Northern Ireland) Limited** (in    )
liquidation) by Kerry Trigg as liquidator (acting    )
as agent and without personal liability) in the    )
presence of:

Witness signature

)
...........................................................    )
Name:    )
Address:

**SIGNED** by Vladimir Kasyanik, General    )    ...............................................................
Director, duly authorized for and on behalf of    )
**o.o.o. Nortel Networks**, in the presence of:    )
)

**Witness signature**

..........................................................
**Name:**    )
**Address:**    )
)

S-15

First Amendment To GSM/GSM-R Distribution Escrow Agreement

**SIGNED** by _____ )
duly authorized for and on behalf of **Nortel** )
**Networks AG** in the presence of: )
)

.................................................................

Witness signature

.....................................................................
Name: )
Address: )
)

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS S.A. (In administration and** )
**secondary proceedings)** by Maitre Cosme )
Rogeau, in his capacity as French Liquidator )
(Mandataire Liquidateur) acting as agent and
without personal liability, in the presence of:

.................................................................

Witness signature )
)
.....................................................................  )
Name:
Address:

S-16

**APPENDIX "E"**

**[ATTACHED]**

*Execution Copy*

SETTLEMENT AND LOSS PORTFOLIO TRANSFER AGREEMENT

This AGREEMENT (the "Agreement") is entered into as of July 18, 2011 by and between Liberty Mutual Insurance Company on behalf of itself and its subsidiaries and affiliated companies (including but not limited to Helmsman Management Services, LLC ("Helmsman")) (collectively, "Liberty"), and Nortel Networks Corporation ("NNC"), Nortel Networks Inc. ("NNI") and Nortel Networks Limited ("NNL") (NNC, NNL and NNI collectively, "Nortel"), and Ernst & Young Inc., the court-appointed monitor (the "Monitor") and authorized foreign representative of NNC and certain of its direct and indirect subsidiaries in proceedings under Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended, pending before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court").

## RECITALS

WHEREAS, Liberty issued Workers Compensation and Employers' Liability insurance policies for NNI, covering the periods 5/15/1992 through 5/14/1997 (all such policies, the "WC Deductible Policies"), under which NNI is required to: (i) pay premiums for variable expenses ("WC Variable Expense"), and (ii) pay losses within a deductible amount, or reimburse Liberty for losses advanced on NNI's behalf within that deductible amount.

WHEREAS, Liberty issued Commercial Auto insurance policies for NNI, covering the periods 1/1/1979 through 5/14/1997 (all such policies, the "Auto Deductible Policies"), under which NNI is required to pay losses within a deductible amount, or reimburse Liberty for losses advanced on NNI's behalf within that deductible amount.

WHEREAS, Liberty issued certain retrospectively rated Workers Compensation and Employers' Liability insurance policies for NNI, covering the periods 1/1/1979 through 5/14/1997 (collectively, the "WC Retro Policies" and together with the WC Deductible Policies and the Auto Deductible Policies, the "Insurance Program"), under which Liberty adjusts

retrospective premium annually based upon losses with such adjustments resulting in additional premium due from NNI if premium increases or the return of premium by Liberty if premium decreases; and

WHEREAS, Nortel provided, in respect of the deductible portions of the Insurance Program, Liberty with security to ensure payment of its various financial obligations to Liberty in respect of the deductible portions of the Insurance Program, which security included a letter of credit issued by RBC Financial Group (the "Letter or Credit"), which Liberty asserts has been drawn for the full balance of $2,898,225 (the "Letter of Credit Proceeds") pursuant to its rights under the Letter of Credit and Insurance Program and remains unapplied; and an escrow provided by NNI with a balance of $750,802 as of 7/1/2011 ("Escrow"); and

WHEREAS, NNI acted as a self-insured employer for workers compensation in the State of California for the period 5/15/1990 through 5/15/1996; and

WHEREAS, Helmsman and NNI entered into one or more agreements under which Helmsman provides third-party administration of NNI's California self-insured workers compensation claims (the "Helmsman Agreement"). Pursuant to the Helmsman Agreement, Helmsman has and continues to pay claims on behalf of NNI, for which Helmsman bills NNI on a monthly basis. NNI has provided Helmsman with a loss deposit (the "Loss Deposit"). The balance of the Loss Deposit was $234,887 as of 7/1/2011; and

WHEREAS, on January 14, 2009, NNC and certain of its affiliates, including NNL, filed an application for protection under the Companies' Creditors Arrangement Act (Canada) and were granted creditor protection, and on the same date NNI and certain of its affiliates commenced cases under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of

Delaware (the "Bankruptcy Court" and those cases the "Chapter 11 Cases") (such creditor protection cases together, the "Bankruptcy Cases"); and

WHEREAS, Liberty filed the following proofs of claim in the Chapter 11 Cases against NNI and its affiliates based on the Insurance Program, the Helmsman Agreement and other related agreements:  proof of claim number 5664 filed by Helmsman and proofs of claim number 5665 through 5680 filed by Liberty (collectively, the "Proofs of Claim"); and

WHEREAS, Liberty, Nortel and the Monitor seek to: resolve all amounts described herein currently outstanding between and among Liberty, NNI, NNC and NNL; transfer NNI's payment obligations within the deductibles of the Workers Compensation Deductible Policies and Auto Deductible Policies to Liberty; transfer all of NNI's financial obligations with respect to the Insurance Program and the Helmsman Agreement, regardless of the deductibles, including any and all past, present and future claims, to Liberty; complete a final adjustment of the WC Retro Policies; transfer financial responsibility for NNI's liability as a self-insured employer for workers compensation in the State of California for the period 5/15/1990 through 5/15/1996 to Liberty; withdraw, or cause to be withdrawn, with prejudice the Proofs of Claim; release NNL and NNC from any liability in connection with the Letter of Credit and Letter of Credit Proceeds as to Liberty and as to NNI; mutually release NNI, NNC and NNL from any liability related to or arising out of the Insurance Program; and release the Monitor from any liability related to or arising out of the Insurance Program.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained in this Agreement, the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.      The foregoing recitals are incorporated herein as if fully set forth in the text of the

3

Agreement.

2.      This Agreement is subject in all respects to: (i) the entry of a final order by the

Bankruptcy Court approving all terms and conditions contained in this Agreement (the

"US Approval Order"); and (ii) the entry of a final order by the Canadian Court

approving all terms and conditions contained in this Agreement (the "Canadian Approval

Order").  Upon full execution of this Agreement, NNI shall file a motion with the

Bankruptcy Court seeking the US Approval Order and the Monitor shall file a motion

with the Canadian Court seeking the Canadian Approval Order, and this Agreement will

become effective upon entry of the US Approval Order and the Canadian Approval Order

(the "Effective Date").

3.      Nortel agrees to pay Liberty $3,351,681.48 (the "Nortel Payment") by the method

described in Paragraph 4 for the following:

   a.     $386,113.48 due from NNI to Liberty in reimbursement for losses within the

          deductible of the WC Deductible Policies advanced by Liberty;

   b.     $7,560 in premium due from NNI to Liberty for WC Variable Expense under the

          WC Deductible Policies;

   c.     $3,022,486.00 as premium (including premium tax of $59,264) due from NNI to

          Liberty for the loss portfolio transfer policy described in Paragraph 5, which

          amount shall constitute the entire premium owed by Nortel with respect to the

          LPT Policy; and

   d.     $64,478 due from Liberty to NNI as a final adjustment of the WC Retro Policies.

4.      Promptly on or after the Effective Date, Liberty shall collect the Nortel Payment as

follows:

a.  Liberty shall retain the full Letter of Credit Proceeds of $2,898,225; and

b.  Liberty shall return $297,345.52 of the Escrow to Nortel (the "Liberty Payment") through the payment of one-half of the Liberty Payment to each of NNI and NNL, and Liberty shall retain the balance of $453,456.48.

5.  Immediately upon receipt of the Nortel Payment, Liberty shall issue a Loss Portfolio Transfer policy to NNI in the form attached as Exhibit 1, together with the Information Page in the form attached as Exhibit 2, effective as of January 1, 2011:

a.  Liberty shall assume all of NNI's payment obligations for Claims (as defined below) within the deductibles of the WC Deductible Policies and Auto Deductible Policies and NNI shall have no further liability for those deductible amounts or premium, for variable expense or otherwise, under the WC Deductible Policies or the Auto Deductible Policies.

b.  Liberty shall also assume financial responsibility for Claims pertaining to NNI's liability as a qualified self-insurer for workers compensation in the State of California for the period 5/15/1990 through 5/15/1996.  If NNI has rights to recover all or part of any payment made by Liberty under this paragraph (the "Recovery Rights"), those rights are transferred to Liberty.  Upon the reasonable request of Liberty, NNI will cooperate in all reasonable respects with Liberty to transfer or assert the Recovery Rights.

c.  Liberty, either through Helmsman or otherwise, shall adjust and pay Claims pertaining to NNI's liability as a qualified self-insurer for workers compensation in the State of California for the period 5/15/1990 through 5/15/1996 at Liberty's expense.

d. Without limiting subparagraph 5.c above, NNI will remain a self-insured employer, and Liberty will not become NNI's statutory workers compensation carrier. The Loss Portfolio Transfer policy will not act as a novation of NNI's obligations as a self-insured employer to Liberty.

e. For purpose of this paragraph 5., "Claims" shall mean any demand for, or an assertion of a right to, civil compensation or civil damages, including penalties and interest, or an intimation of an intention to seek such compensation or damages in respect of any and all past, present and future actions, causes of action, suits, debts, liens, contracts, rights, agreements, obligations, promises, liabilities, regulatory sanctions or penalties, claims, counterclaims, demands, damages, controversies, losses, costs and expenses (including attorneys' fees and costs actually incurred relating to any investigation, settlement or defense thereof) of any kind, character, description or nature whatsoever, known or unknown, suspected or unsuspected, reported or unreported, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, whether grounded in law or equity or sounding in tort or contract or otherwise.

Liberty and NNI expressly agree that the loss portfolio transfer is intended as a full transfer of NNI's obligations as described in Subparagraph 5.a. and b.

6. Helmsman shall return $187,869.09 of the Loss Deposit (the "Helmsman Payment") to Nortel through the payment of one-half of the Helmsman Payment to each of NNI and NNL, and Helmsman shall retain the balance of $47,017.91 to satisfy all of NNI's outstanding financial obligations to Helmsman in respect of the Helmsman Agreement. Upon the payment of the Helmsman Payment, Helmsman and NNI will be released from

all outstanding financial obligations under the Helmsman Agreement and the Helmsman

Agreement will terminate except to the extent NNI is required by law to utilize a third-

party administrator as a self-insured for workers compensation in California, in which

case Liberty will assume all of NNI's obligations under the Helmsman Agreement.

7.    Except as provided for herein, upon receipt of the Liberty Payment and the Helmsman

Payment, each of NNI, NNL and NNC hereby releases and forever discharges Liberty

and all its affiliates, subsidiaries, officers, directors, partners, employees, agents,

attorneys, shareholders, successors, assigns and other representatives from liability to it

for any and all claims, controversies, actions, causes of action, demands, debts, damages,

costs, attorneys' fees, monies due on account, obligations, judgments and liabilities of

any nature whatsoever at law or in equity, past or present, in contract, in tort or otherwise,

whether or not now or heretofore known, suspected, or claimed against Liberty, relating

to (i) the Insurance Program, the Escrow, the Letter of Credit, or the Letter of Credit

Proceeds, including without limitation any and all return premiums should loss incurred

for any additional year(s) decrease and return payments be earned with respect to the

Insurance Program and/or any agreement pertaining thereto, and (ii) any claims against

Liberty in the Bankruptcy Cases under any of the avoidance provisions of the Bankruptcy

Code or analogous law; provided, if Liberty fails to defend and pay any Claim described

in paragraph 5. herein, the release in this paragraph shall be null and void; and further

provided, that Nortel does not release Liberty for any Claims (as defined in subparagraph

5.e above), including without limitation contribution or indemnity claims, that may be

made now or in the future in respect of Nortel's rights existing outside the Insurance

Program.  For the avoidance of doubt, nothing herein is intended to release any claims arising out of or based on this Agreement.

8. Except as provided for herein, upon the receipt of the Nortel Payment, Liberty hereby releases and forever discharges each of NNI, NNL and NNC and all of their respective affiliates, subsidiaries, officers, directors, partners, employees, agents, attorneys, shareholders, successors, assigns and other representatives from liability for any and all claims, controversies, actions, causes of action, demands, debts, damages, costs, attorneys' fees, monies due on account, obligations, judgments and liabilities of any nature whatsoever at law or in equity, past or present, in contract, in tort or otherwise, whether or not now or heretofore known, suspected, or claimed against them relating to the Insurance Program, the Escrow, the Letter of Credit, or the Letter of Credit Proceeds, including without limitation any and all increases in premiums should loss incurred for any additional year(s) increase and additional premiums otherwise would be able to be assessed with respect to the Insurance Program and/or any agreement pertaining thereto. For the avoidance of doubt, nothing herein is intended to release any claims arising out of or based on this Agreement.

9. On the Effective Date or as promptly as reasonably practicable thereafter, Liberty shall file, or cause to be filed, with the Bankruptcy Court notices of withdrawal with prejudice of the Proofs of Claim, substantially in the form attached hereto as Exhibit 3.

10. Except as provided for herein, upon receipt of the Nortel Payment, Liberty hereby releases and forever discharges the Monitor and all of its respective affiliates, subsidiaries, officers, directors, partners, employees, agents, attorneys, shareholders, successors, assigns and other representatives from liability for any and all claims,

controversies, actions, causes of action, demands, debts, damages, costs, attorneys' fees,
monies due on account, obligations, judgments and liabilities of any nature whatsoever at
law or in equity, past or present, in contract, in tort or otherwise, whether or not now or
heretofore known, suspected, or claimed against them relating to the Insurance Program,
the Escrow, the Letter of Credit, or the Letter of Credit Proceeds.  For the avoidance of
doubt, nothing herein is intended to release any claims arising out of or based on this
Agreement.

11.    Except as provided for herein, upon receipt of the Nortel Payment, the Monitor hereby
releases and forever discharges the Liberty and all of its respective affiliates, subsidiaries,
officers, directors, partners, employees, agents, attorneys, shareholders, successors,
assigns and other representatives from liability for any and all claims, controversies,
actions, causes of action, demands, debts, damages, costs, attorneys' fees, monies due on
account, obligations, judgments and liabilities of any nature whatsoever at law or in
equity, past or present, in contract, in tort or otherwise, whether or not now or heretofore
known, suspected, or claimed against them relating to the Insurance Program, the
Escrow, the Letter of Credit, or the Letter of Credit Proceeds.  For the avoidance of
doubt, nothing herein is intended to release any claims arising out of or based on this
Agreement.

12.    Liberty shall indemnify Nortel and the Monitor for any and all liability arising out of
Liberty's obligation hereunder to manage the Insurance Program and to pay Claims as
described in Paragraph 5. herein, provided that with respect to NNI's obligation as a
qualified self-insurer for workers compensation in the State of California, such indemnity
obligation shall only extend to the related financial responsibilities.

13.    Except as provided for herein, upon receipt of the Liberty Payment, NNI hereby releases

and forever discharges each of NNL, NNC, their affiliated Canadian debtor entities and

all of their respective officers, directors, employees, agents, attorneys, successors, assigns

and other representatives (each in their capacity as such) and the Monitor from liability

for any and all claims, controversies, actions, causes of action, demands, debts, damages,

costs, attorneys' fees, monies due on account, obligations, judgments and liabilities of

any nature whatsoever at law or in equity, past or present, in contract, in tort or otherwise,

whether or not now or heretofore known, suspected, or claimed against them relating to

the Insurance Program, the Escrow, the Letter of Credit, or the Letter of Credit Proceeds,

including, for the avoidance of doubt, claims for contribution and indemnity relating to

the Insurance Program, the Escrow, the Letter of Credit, or the Letter of Credit Proceeds.

For the avoidance of doubt, nothing herein is intended to release any claims arising out of

or based on this Agreement.

14.    Except as provided for herein, upon receipt of the Liberty Payment, each of NNL, NNC

and the Monitor hereby releases and forever discharges NNI and its affiliated U.S. debtor

entities in the Chapter 11 Cases and all of their respective officers, directors, employees,

agents, attorneys, successors, assigns and other representatives (each in their capacity as

such) from liability for any and all claims, controversies, actions, causes of action,

demands, debts, damages, costs, attorneys' fees, monies due on account, obligations,

judgments and liabilities of any nature whatsoever at law or in equity, past or present, in

contract, in tort or otherwise, whether or not now or heretofore known, suspected, or

claimed against them relating to the Insurance Program, the Escrow, the Letter of Credit,

or the Letter of Credit Proceeds, including, for the avoidance of doubt, claims for

contribution and indemnity relating to the Insurance Program, the Escrow, the Letter of Credit, or the Letter of Credit Proceeds.  For the avoidance of doubt, nothing herein is intended to release any claims arising out of or based on this Agreement.

15.    Each party hereto shall have the right at any time to enforce the provisions of this Agreement in strict accordance with the terms hereof, notwithstanding any conduct or custom on the part of such party in refraining from doing so at any time or times.  The failure of any party at any time or times to enforce its rights under such provisions shall not be construed as having created a custom in any way or manner contrary to specific provisions of this Agreement or as having in any way or manner modified or waived the same.

16.    Any notices or consents required or permitted by this Agreement shall be in writing and shall be deemed delivered if delivered in person or if sent by telecopier, certified main, postage prepaid, return receipt requested, or telegraph, as follows, unless such address is changed by written notice hereunder:

If to Liberty or Helmsman:                              Richard Rey
                                                        Liberty Mutual Group
                                                        175 Berkeley Street
                                                        Boston, MA 02117

With a copy to:                                         General Counsel
                                                        Liberty Mutual Group
                                                        175 Berkeley Street
                                                        Boston, MA 02117

If to NNC:                                              Anna Ventresca
                                                        General Counsel
                                                        5945 Airport Road, Suite 360
                                                        Mississauga, Ontario L4V 1R9

11

| | |
|---|---|
| With a copy to: | Ken Coleman<br>Allen & Overy LLP<br>1221 Avenue of the Americas<br>New York, NY 10020 |
| If to NNL: | Anna Ventresca<br>General Counsel<br>5945 Airport Road, Suite 360<br>Mississauga, Ontario L4V 1R9 |
| With a copy to: | Ken Coleman<br>Allen & Overy LLP<br>1221 Avenue of the Americas<br>New York, NY 10020 |
| If to NNI: | Timothy Ross<br>Nortel Networks Inc.<br>4001 E. Chapel Hill Nelson Highway<br>Research Triangle Park, NC 27709 |
| With a copy to: | James L. Bromley & Lisa M. Schweitzer<br>Cleary Gottlieb Steen & Hamilton LLP<br>One Liberty Plaza<br>New York, NY 10006 |
| If to the Monitor: | Tom C. Ayres<br>Ernst & Young Inc.<br>One London Place, Suite 1800<br>255 Queens Avenue, P.O. Box 5332<br>London, ON N6A 5S7<br>Canada |
| With a copy to: | Ken Coleman<br>Allen & Overy LLP<br>1221 Avenue of the Americas<br>New York, NY 10020 |

17.    Each party represents and warrants that:

(a)    it has been advised by counsel in the negotiations, execution and delivery of this

Agreement and the releases herein;

12

(b)     subject to Paragraph 2., it is duly authorized to enter into, execute, deliver and

perform this Agreement and to give the releases set forth herein: and

(c)     it has voluntarily, with full knowledge and without fraud, coercion, duress or

undue influence of any kind, entered into this Agreement.

18.     Liberty represents and warrants that:

(a)     the Schedule of Covered Policies contained in Part One, Section B of the form

LPT Policy is, to the best of Liberty's knowledge, the comprehensive and

exhaustive list; and

(b)     to the extent that any other policy that is not included in the Schedule of Covered

Policies is identified, such additional policy will be treated in the same manner as

the policies included in the Schedule of Covered Policies.

19.     The Agreement contains the entire agreement between the parties as respects its subject

matter.  All discussions and agreements previously entertained between the parties

concerning the subject matter of the Agreement are merged into this Agreement.  In the

case of a conflict between any provision of this Agreement and any schedule to this

Agreement, including the Loss Portfolio Transfer policy, the terms of this Agreement

shall control.  This Agreement may not be modified or amended, nor any of its provisions

waived, except by an instrument in writing, signed by all parties hereunder.

20.     This Agreement and any amendment hereto may be executed in several counterparts and

by each party on a separate counterpart, each of which, when so executed and delivered

shall be an original, but all of which together shall constitute but one and the same

instrument.  In providing this Agreement, it shall not be necessary to produce or account

for more than one such counterpart signed by the party against whom enforcement is

sought. A signed counterpart transmitted by facsimile or pdf shall be treated as an original.

21. This Agreement shall be binding upon all successors and assigns of each of the parties to the Agreement.

22. This Agreement shall be deemed to have been executed and delivered in the Commonwealth of Massachusetts and shall be governed by and construed in accordance with Massachusetts law (without regard to its principles concerning conflicts of law).

23. For any action or proceeding arising out of or related to this agreement, each party hereby irrevocably submits to and accepts the exclusive jurisdiction of (a) the Bankruptcy Court and the Canadian Court, if such action or proceeding is brought prior to the entry of a final decree closing either of the Bankruptcy Cases; provided that parties retain their rights to request the matter to be heard in a joint hearing as provided for under, and in accordance with, the Amended Cross-Border Protocol approved by the Bankruptcy Court and by the Canadian Court on June 29, 2009, as the same may be further amended from time to time; and (b) any state or federal court sitting in Suffolk County, Commonwealth of Massachusetts, if such action or proceeding is brought after entry of a final decree closing the Bankruptcy Cases, and waives any defense of forum non conveniens or other objection to venue in such action or proceeding.

24. It is understood by the parties hereto that this Agreement represents a compromise of disputed claims, and that this Agreement is not to be construed as an admission of liability on any claims, except as expressly stated herein. Neither the fact of this Agreement, nor any provision contained herein, nor any action taken hereunder, shall constitute an admission with respect to any claims or facts alleged by any of the parties

hereto, except as expressly stated herein. In the event that this Agreement is not approved by either the Bankruptcy Court or the Canadian Court, this Agreement shall be of no force or effect and the parties reserve all of their rights and defenses with respect to the Insurance Program, the Escrow, the Letter of Credit, the Letter of Credit Proceeds, and the Proofs of Claim.

(Signature Page Follows)

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and date first written above.

LIBERTY MUTUAL INSURANCE COMPANY

By: _Richard Fley_

Its: Senior Underwriting Manager

NORTEL NETWORKS INC.

By: _____

Its: Principal Officer

NORTEL NETWORKS CORPORATION

By: _____

Its:

By: _____

Its:

NORTEL NETWORKS LIMITED

By: _____

Its:

By: _____

Its:

16

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and date first written above.


LIBERTY MUTUAL INSURANCE COMPANY

By:_____

Its:


NORTEL NETWORKS INC.

By:_____

Its:


NORTEL NETWORKS CORPORATION

By:_____
    John M. Doolittle

Its: Senior Vice President, Corporate Services
    and Chief Financial Officer

By:_____
    Clarke E. Glaspell

Its: Controller


NORTEL NETWORKS LIMITED

By:_____
    John M. Doolittle

Its: Senior Vice-President, Corporate Services
    and Chief Financial Officer

By:_____
    Clarke E. Glaspell

Its: Controller


16

ERNST & YOUNG INC.
In its capacity as Monitor of the Canadian debtor entities

By Allen & Overy LLP
As Counsel and Authorized Agent for ERNST & YOUNG INC.

By: Ken Coleman
Title:  Partner

**Exhibit 1**

**Form of Loss Portfolio Transfer Policy**



## LOSS PORTFOLIO TRANSFER INSURANCE POLICY

Throughout this policy the words "you", "your" and "Insured" refer to the insured shown in Item 1 of the Information Page. The words "we", "us", "our" and "Company" refer to the Company providing the excess insurance. Please read the entire policy carefully.

In return for the payment of the premium shown in Item 6 of the Information Page, and subject to all the terms and conditions of this policy we agree with you as follows:

### GENERAL SECTION

A. THE POLICY

This is a contract of insurance between you and us. It includes the Information Page. The only agreements relating to this insurance are stated in this policy. The terms of this policy may not be changed or waived except by an endorsement issued by us to be part of this policy.

B. POLICY PERIOD

This policy is effective for the period stated in Item 3 of the Information Page.

C. WHO IS INSURED

The Insured is named in Item 1 of the Information Page. If you are a partnership or joint venture, each of your partners or members of the joint venture is insured but only in their capacity as such.

### PART ONE - Coverage

A. Insuring Agreement

We will pay on your behalf those Payment Amounts that exceed your Retention but not for more than our Aggregate Limit of Liability, both as stated in Item 5 of the Information Page.

B. Payment Amounts

Payment Amounts means the following:

1. All amounts the insured becomes obligated to pay within the applicable deductibles of the workers compensation and employers' liability insurance policies issued by Company to you for the periods May 15, 1992 through May 14, 1997, including without limitation the policies listed in the Schedule of Covered Policies (whether for loss or allocated adjustment expenses).

2. All amounts the insured becomes obligated to pay as a qualified self-insurer for Worker's Compensation in California for the period May 15, 1990 through May 15, 1996.

3. All amounts the insured becomes obligated to pay within the applicable deductibles of the commercial auto insurance policies issued by Company to you for the periods January 1, 1979 through May 14, 1997.

Schedule of Covered Policies

| Policy Number | Effective Date | Expiration Date | Deductible |
|---|---|---|---|
| WA1-65D-004057-152 | 05/15/1992 | 05/14/1993 | $1,000,000 |
| WA2-65D-004057-162 | 05/15/1992 | 05/14/1993 | $1,000,000 |
| WA1-65D-004057-153 | 05/15/1993 | 05/14/1994 | $1,000,000 |
| WA2-65D-004057-163 | 05/15/1993 | 05/14/1994 | $1,000,000 |
| WA1-C5D-004057-164 | 05/15/1994 | 05/14/1995 | $1,000,000 |
| WA1-C5D-004057-165 | 05/15/1995 | 05/14/1996 | $1,000,000 |
| WA1-C5D-004057-166 | 05/15/1996 | 05/14/1997 | $750,000 |

| Contract Number | Effective Date | Expiration Date | Retention |
|---|---|---|---|
| WP8-65B-004057-1190 | 05/15/1990 | 05/14/1991 | Unlimited |
| WC8-65A-004057-1390 | 07/01/1990 | 06/30/1991 | Unlimited |
| WP8-65B-004057-1191 | 05/15/1991 | 05/14/1992 | Unlimited |
| WP8-65B-004057-1192 | 05/15/1992 | 05/14/1993 | $500,000 |
| WP8-65B-004057-1193 | 05/15/1993 | 05/14/1994 | $500,000 |
| WP8-65B-004057-1194 | 05/15/1994 | 05/14/1995 | $250,000 |
| WP8-65B-004057-1195 | 05/15/1995 | 05/14/1996 | $250,000 |
| WP8-65B-004057-1196 | 05/15/1996 | 05/14/1997 | $250,000 |

| Policy Number | Effective Date | Expiration Date | Deductible |
|---|---|---|---|
| AS1-651-004057-078; -088 | 5/15/1988 | 5/14/1989 | Unknown |

| | | | |
|---|---|---|---|
| AS1-651-004057-079; -089 | 5/15/1989 | 5/14/1990 | Unknown |
| AS1-651-004057-070; -080 | 5/15/1990 | 5/14/1991 | Unknown |
| AS1-651-004057-071; -081; -101 | 5/15/1991 | 5/14/1992 | Unknown |
| AS2-651-004057-072; -082; -102; -142 | 5/15/1992 | 5/14/1993 | Unknown |
| AS2-651-004057-073; -083; -103; -143; -193 | 5/15/1993 | 5/14/1994 | Unknown |
| AS2-651-004057-074; -084; -104; -144; -194 | 5/15/1994 | 5/14/1995 | Unknown |
| AS2-651-004057-075; -085; -105; -145; -195; -225 | 5/15/1995 | 5/14/1996 | Unknown |
| AS2-651-004057-076 | 5/15/1996 | 5/14/1997 | Unknown |

## PART TWO- Your Retention and Our Limit of Liability

A.  Your Retention

You are responsible for all Payment Amounts up to the Insured's Retention.

Insured's Retention means the following:

The Insured's Retention is the total amount, as shown in Item 5 of the Information Page, you have already paid in Payment Amounts. For the avoidance of doubt, because you already have paid the Payment Amounts, you will not be required to pay any further Payment Amounts toward the Insured's Retention after the effective date of this Policy.

B.  Our Limit of Liability

The Company's Aggregate Limit of Liability, shown in Item 5 of the Information Page, is the most we will pay for all Payment Amounts (as defined in Part One-B.) that exceed the amount stated as Insured's Retention in Item 5 of the Information Page.

C.  How Retention and Limit of Liability Apply

1.  We will NOT pay any Payment Amounts within the Insured's Retention.

2.  The inclusion of more than one insured in Item 1 of the Information Page will not increase either the Insured's Retention or the Company's Aggregate Limit of Liability.

## PART THREE - Premium

A.  Premium Determination and Payment

All Insureds listed in Item 1 of the Information Page are jointly and severally liable for payment of the policy premium. Premium is indicated in Item 6 of the Information Page.

B.  Final Policy Premium

3

The final policy premium is shown on the Information Page in Item 6.

C. Deposit Premium

The deposit premium shown in Item 6 of the Information Page is a premium payable at the inception of this policy and will be retained by us until the end of the policy period.

## PART FOUR - Conditions

A. Duties of Insured and Company

1. Other than as set forth in (i) the Settlement and Loss Portfolio Transfer Agreement by and among Nortel Networks Inc., Nortel Networks Corporation, Nortel Networks Limited, Ernst & Young, Inc. (acting as the court-appointed monitor) and Liberty Mutual on behalf of itself and its subsidiaries and affiliated companies, dated as of July 18, 2011, and (ii) the policies referred to in Part One, Section B of this Loss Portfolio Policy, we have no duty to investigate, handle, settle or defend any claims, suits, or proceedings against you, other than as set forth in the scheduled policies.

2. Special Servicing Instructions executed or in force prior to the effective date of this policy or any other claims handling agreements shall not apply.

B. Appeals

If you do not appeal an award or judgment which exceeds your retention, we have the right to appeal at our own cost and expense and shall be liable for costs, disbursement and interest related to the appeal. If we elect to appeal, our liability on the award or judgment shall not exceed the applicable limit of liability in Item 5 of the Information Page plus the cost and expense of the appeal.

C. Subrogation and Recovery

If the Insured has rights to recover all or part of any payment made under this Coverage Part, those rights are transferred to us. The Insured must do nothing after loss to impair them. At our request, the Insured will bring suit or transfer those rights to us and help us enforce them.

D. Actions Against Company

You will have no right of action against us unless you have complied with all the terms and conditions of this policy.

E. Assignment

An assignment of interest under this policy will not bind us unless an endorsement assigning interest under this policy is issued by us to be part of the policy.

F. Bankruptcy or Insolvency of Insured

4

Your bankruptcy or insolvency will not relieve us of our duties under this policy.

G.  Sole Representative

If more than one Insured is named in Item 1 of this policy, the Insured first named in Item 1 of the Information Page will act on behalf of all Insureds to give or receive notice of cancellation, receive return premium, or request change in this policy.

H.  Captions

The headings or captions used in this policy are for the purpose of reference only and shall not otherwise affect the meaning of this policy.

IN WITNESS WHEREOF, the Company has caused this policy to be signed by its President and secretary in Boston, Massachusetts.

SECRETARY          PRESIDENT

## Exhibit 2

**Form Information Page**

☐ Liberty Mutual Insurance Company
☐ Liberty Mutual Fire Insurance Company
☒ Liberty Insurance Corporation
☐ LM Insurance Corp.
☐ The First Liberty Insurance Corp.

# Liberty Mutual®

## Loss Portfolio Transfer
## Insurance Policy

## Information Page

| Account No. | Sub Acct No. | Liberty Mutual Insurance Group/Boston | | | | | |
|---|---|---|---|---|---|---|---|
| | 0000 | | | | | | |

| Policy No. | | TD/CD | Sales Office | Code | Sales Representative | Code | N/R | 1st Year |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | N | |

Item 1.    Name of Insured    Nortel Networks Inc. and its successor and reorganized entity

Item 2.    Mailing Address

| | Mo. | Day | Year | To | Mo. | Day | Year |
|---|---|---|---|---|---|---|---|
| Item 3.    Policy Period: From | | | | | *Continuous | | |

12:01 AM  Standard time at the address of the insured as stated herein.

Item 4.    N/A

Item 5.    Excess Indemnity Coverage:  We will pay on your behalf all Payment Amounts that exceed the Insured's Retention but not for more than the Insurer's Aggregate Limit of Indemnity:

Insured's Retention:                                                    $

Insurer's Aggregate Limit of Indemnity each policy period:            $ Unlimited

| Item 6.  Premium | Code | Estimated Annual Remuneration | Rate per $100 Remuneration | Estimated Policy Premium |
|---|---|---|---|---|
| | | | | $ |
| Minimum Policy Premium  $ | | | Deposit Premium $ 100% at Policy Inception | |

This policy, including all endorsements therewith, is hereby countersigned by _____

Authorized Representative

| Loc. Code | Issued | Audit  Basis | Periodic Payment | Rating Basis | Home State | Renewal of: |
|---|---|---|---|---|---|---|
| | | 0 | | R | | New |

LPT                    Copyright, Liberty Mutual, 2007.                    Page 1 of 1

## Exhibit 3

**Form Notice of Withdrawal of Proof of Claim**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------X
                                          :
In re                                     :    Chapter 11
                                          :
Nortel Networks Inc., et al.,[1]          :    Case No. 09-10138 (KG)
                                          :
                      Debtors.            :    Jointly Administered
                                          :
-----------------------------------------------------X
```

## NOTICE OF WITHDRAWAL OF PROOF(S) OF CLAIM

*[Claimant]* hereby withdraws its proof(s) of claim with prejudice in the above-captioned cases (Proof of Claim No(s). *[insert]*).

Dated: *[insert city and state]*
      *[insert date]*, 2011

                           *[Insert Claimant Name]*

                           _____

                           *[insert name and address]*
                           Tel. *[insert]*
                           Fax *[insert]*
                           *[insert email address]*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

APPENDIX "F"

[ATTACHED]

Execution Version

## SUPPLEMENTAL IP TRANSACTION SIDE AGREEMENT re CERTAIN TRANSACTION COSTS AND RELATED MATTERS

This agreement dated as of July 27, 2011 (the "**Agreement**") by and among (i) Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"); (ii) Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"); (iii) Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**"); (iv) the entities listed in Exhibit A hereto (the "**EMEA Sellers**"), which, in the case of Nortel Networks UK Limited (in administration) ("**NNUK**"), Nortel Networks France S.A.S. (in administration) and Nortel GmbH (in administration) are acting by Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP (the "**UK Joint Administrators**") and in the case of Nortel Networks (Ireland) Limited (in administration) is acting by David Hughes of Ernst & Young Chartered Accountants and Alan Robert Bloom (the "**Irish Joint Administrators**") (the UK Joint Administrators and the Irish Joint Administrators being collectively, the "**Joint Administrators**"), and in the case of Nortel Networks S.A. (in administration and *liquidation judiciaire*) ("**NNSA**") is acting by the UK Joint Administrators and Maître Cosme Rogeau, 26 avenue Hoche, 78000 VERSAILLES appointed as *mandataire liquidateur* by the French Court (as defined below) (the "**French Liquidator**"), the Joint Administrators act as agents of the EMEA Sellers without any personal liability and the French Liquidator acts as agent of NNSA without any personal liability; (v) the entities listed in Exhibit B hereto; (vi) the French Liquidator;  and (vii) the Joint Administrators.

The parties referred to in (i) through (v) are referred to collectively as the "**Nortel Parties**".  The parties referred to in (i) through (vii) are referred to collectively as the "**Parties**".

### W I T N E S S E T H

WHEREAS, the Parties and Rockstar Bidco, LP (the "**Purchaser**") have entered into that certain Asset Sale Agreement, dated as of June 30, 2011 (as may be amended and/or restated from time to time in accordance with its terms, the "**Sale Agreement**"), whereby the Purchaser (i) will acquire substantially all of the patent portfolio and certain patent-related assets of the Nortel Parties and (ii) may enter into one or more Optioned Licenses with the Nortel Parties in exchange for the Optioned Licenses Fees;

WHEREAS, the Parties, Ranger Inc. ("**Ranger**") and Google Inc. had entered into that certain Asset Sale Agreement, dated as of April 4, 2011 (the "**Stalking Horse Agreement**"), in furtherance of which the Parties, Ranger and Wells Fargo Bank, National Association, as national banking association, as escrow agent (the "**Escrow Agent**") entered into an escrow agreement (the "**Escrow Agreement**") dated as of April 4, 2011;

WHEREAS, after a court-approved auction process, the Parties entered into the Sale Agreement and terminated the Stalking Horse Agreement;

WHEREAS, the Parties entered into that certain IP Transaction Side Agreement on April 4, 2011 (the "**Signing Side Agreement**");

WHEREAS, the Parties entered into that certain Amended and Restated IP Transaction Side Agreement re: Certain Structural Matters on June 29, 2011 (as the same may be amended, modified and/or restated from time to time in accordance with its terms, the "**Auction Side Agreement**");

WHEREAS, the Nortel Parties and certain other parties have entered into, and NNSA has acceded to, that certain agreement to address interim funding and the settlement of certain intercompany matters dated June 9, 2009 (the "**IFSA**"); and

WHEREAS, in accordance with Section 12.b of the IFSA, the Sellers, Ernst & Young Inc. as "**Monitor**" in connection with the CCAA Cases, and the Official Committee of Unsecured Creditors in the Chapter 11 Cases (the "**Committee**") have entered into or will enter into an escrow agreement with the Distribution Agent (the "**Distribution Escrow Agreement**") governing, among other things, the Distribution Agent's collection, holding in escrow in an escrow account at the Distribution Agent (the "**Distribution Escrow Account**") and distribution to the Sellers and any other party deemed to be a Selling Debtor pursuant to the IFSA (in accordance with the Allocation Rules) of the Total Proceeds from the transactions contemplated by the Sale Agreement (the "**Transaction**") and certain other payments to be made by the Purchaser to the Sellers under or in relation to the Sale Agreement.

NOW, THEREFORE, in consideration of the respective covenants made herein, and of the mutual benefits to be derived hereby (the sufficiency of which are acknowledged), the Parties hereto agree as follows:

1.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth below or, if not defined below, the meanings set forth in the Sale Agreement:

    (a)  "**Advisor Fees**" means any fees or other amounts paid or payable to (A) the Distribution Agent in accordance with the terms of the Distribution Escrow Agreement, (B) the Escrow Agent (in its capacity as agent for the various escrows contemplated by the Stalking Horse Agreement), and (C) the Accounting Arbitrator appointed in accordance with the Sale Agreement;

    (b)  "**Allocation Rules**" means the rules (expressed as percentages or otherwise) to be used to allocate among the Sellers and other parties, as may be applicable, the benefit of the Total Proceeds and the burden of the Total Payments, as such rules shall be agreed upon among the relevant Sellers pursuant to Section 12.d and Section 12.g of the IFSA or shall be otherwise determined in accordance with the binding procedures to be set forth in the Interim Sales Protocol pursuant to Section 12.c of the IFSA;

    (c)  "**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List);

    (d)  "**Canadian Debtors**" means NNC, NNL and their Canadian affiliates that are subject to proceedings pending before the Canadian Court under the *Companies'*

2

*Creditors Arrangement Act* (Canada);

(e)  **"Dispute Resolver Retainer"** means any retainer paid or payable to one or more dispute resolvers appointed pursuant to the Interim Sales Protocol to determine Allocation Rules, to the extent related to the Transaction;

(f)  **"Distribution Agent"** means JP Morgan Chase Bank, N.A. or such other Person appointed with the consent of each of NNL, NNI and NNUK, provided that consent to appoint such Person shall not be withheld unreasonably;

(g)  **"Interim Sales Protocol"** has the meaning ascribed to it in the IFSA;

(h)  **"Total Payments"** means the aggregate of all amounts paid or payable by the Sellers in respect of:

  (i)  Advisor Fees;

  (ii)  the Dispute Resolver Retainer;

  (iii)  disbursements necessary to pay Lazard Frères & Co. LLC (and reimburse NNI, as applicable) in connection with fees and expenses reimburseable solely in connection with the Transaction upon such fees and expenses becoming due and payable;[1]

(i)  **"Total Proceeds"** has the meaning ascribed to it in the Auction Side Agreement;

(j)  **"U.S. Court"** means the United States Bankruptcy Court for the District of Delaware; and

(k)  **"U.S. Debtors"** means NNI and its affiliated debtors subject to the jurisdiction of the U.S. Court in proceedings pending under Chapter 11 of the U.S. Bankruptcy Code.

2.  Subject to Paragraphs 3, 4 and 5 of this Agreement and as otherwise provided in the Signing Side Agreement and the Auction Side Agreement, the Parties agree that the Total Proceeds shall be allocated and distributed in accordance with the Allocation Rules, this Agreement and the Distribution Escrow Agreement.

3.  The Parties agree and acknowledge that the Total Proceeds do not include amounts of or in respect of VAT or Transfer Taxes paid or payable by the Purchaser or, if relevant, any of the Purchaser's limited partners to the Sellers, Joint Administrators or French Liquidator pursuant to the terms of the Sale Agreement. The Parties agree that it is not intended that such amounts of VAT or Transfer Taxes will be payable into the

---

[1]  For the avoidance of doubt, nothing in this Agreement is meant to supersede, amend or modify the Lazard Fees Side Agreement approved by the U.S. Court in an order dated November 23, 2010 and approved by the Canadian Court in an order dated December 15, 2010.

3

Distribution Escrow Account but, notwithstanding this Agreement, where such amounts are paid into the Distribution Escrow Account, the Distribution Agent shall be instructed under the procedures in the Distribution Escrow Agreement to promptly pay such amounts to the Sellers, the Joint Administrators or the French Liquidator (as applicable).

4.  To the extent that there are funds available in the Distribution Escrow Account that are attributable to the Transaction, the obligation of the Sellers to make any payment that constitutes part of the Total Payments shall be satisfied by causing the Distribution Agent to pay the relevant amount out of the Distribution Escrow Account.

5.  To the extent that any payment that constitutes part of the Total Payments cannot be satisfied by payment out of the Distribution Escrow Account or is required to be paid prior to the Closing Date, any such amounts actually paid by any Seller to the Distribution Agent, or any other Person, as applicable, shall be deducted from any subsequent amounts payable or paid into the Distribution Escrow Account and shall be paid directly to such Seller that made the relevant payment.

6.  It is acknowledged and agreed that, in determining how to allocate and distribute the Total Proceeds, except for the items constituting Total Payments and the other expenses, damages, liabilities and payouts specifically allocated herein, in the Signing Side Agreement or the Auction Side Agreement, the Parties reserve all rights in respect of expenses, damages, and all other liabilities, incurred in connection with the performance of their obligations under or pursuant to the Sale Agreement and/or the Transaction Documents, and, in particular, whether such expenses, damages and other liabilities should be deducted from the Total Proceeds, or otherwise considered in connection with a distribution to the Sellers.

7.  Indemnification of Distribution Agent.  The Sellers agree that the costs of any indemnification of the Distribution Agent pursuant to the Distribution Escrow Agreement shall be borne on a pro rata basis by the Sellers in a proportion equal to the aggregate Total Proceeds allocated to such party and any Seller paying in excess of such pro rata share of the cost of such indemnification shall have rights of contribution vis-à-vis any Seller that has paid less than such pro rata share of such costs either directly to the Distribution Agent or by payment to another Seller pursuant to this sentence; provided that if the costs of any such indemnification arise solely from a breach of the Distribution Escrow Agreement or other fault of a single Seller or Sellers, the Seller(s) so in breach or at fault shall bear the cost of such indemnification and any Seller paying in excess of its share of the cost of such indemnification, after taking into account the breach or fault of the other Seller(s), shall have rights of contribution vis-à-vis any Seller that has paid less than its share of such costs either directly to the Distribution Agent or by payment to another Seller.

8.  The Parties agree that the amount necessary to fully reimburse NNL, NNI and NNUK for all Global IP Costs (as defined in the Signing Side Agreement) paid by NNL, NNI and NNUK as of the closing of the Transaction, which amounts equal $2,679,027.74 reimbursable to NNL, $804,676.69 reimbursable to NNI and $893,742.50 reimbursable

4

to NNUK, shall be deducted from the Total Proceeds payable by the Purchaser at the closing of the Transaction and such amount shall be paid at the closing of the Transaction to NNL, NNI and NNUK, as applicable, to reimburse each for the payment of such Global IP Costs. After the closing of the Transaction, the obligation of any Nortel Debtor (as defined in the Signing Side Agreement) to make a distribution or payment on account of Global IP Costs shall be satisfied by causing the Distribution Escrow Agent to pay the relevant amount out of the Distribution Escrow Account to Global IP (as defined in the Signing Side Agreement). The Parties further agree that should the Transaction fail to be consummated, nothing herein shall prejudice NNL's, NNI's or NNUK's rights to seek reimbursement of the Global IP Costs from the other Nortel Debtors, including any such rights arising under existing agreements.

9. The U.S. Debtors and the Canadian Debtors agree they will seek approval of this Agreement by the U.S. Court and the Canadian Court.

10. The Parties agree that:

    (a) the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Sellers to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations;

    (b) the Joint Administrators are a party to this Agreement: (i) as agents of each of the respective EMEA Sellers of which they are administrators; and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, (2) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (3) enforcing the obligations of the other Parties to this Agreement and (4) subject to paragraph 10(d) hereof, the purposes of the other Parties hereto enforcing the obligations of the Joint Administrators hereunder;

    (c) notwithstanding anything in paragraphs 14 and 15 hereof, any claim, action or proceeding against the Joint Administrators arising from or related to (i) the personal liability of the Joint Administrators, their firm or partners, employees, advisers, representatives or agents, (ii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act, (iii) their appointment as joint administrators of the relevant EMEA Sellers and their remaining as current joint administrators thereof under this Agreement, or (iv) the duties and obligations of the Joint Administrators as administrators of the EMEA Sellers, shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English courts;

(d)     any breach of this Agreement by the Joint Administrators shall be deemed to be a breach by them in their capacities as administrators of the relevant EMEA Sellers, and, in such a case, each Party hereto shall only have the right to make claims and assert its rights hereunder, against the relevant EMEA Sellers and their respective successors and assigns;

(e)     the French Liquidator is entering into this Agreement as agent for NNSA and that none of the French Liquidator, his firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations; and

(f)     notwithstanding anything in paragraphs 14 and 15 hereof, any claim, action or proceeding against the French Liquidator arising from or related to (i) the personal liability of the French Liquidator, his firm, partners, employees, advisers, representatives or agents, (ii) his appointment as Mandataire Liquidateur of NNSA, or (iii) the duties and obligations of the French Liquidator as Mandataire Liquidateur of NNSA, shall be governed exclusively by French law and subject to the exclusive jurisdiction of the French courts.

11.     No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege. No Party shall be deemed to have waived any provision of this Agreement unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. Except as expressly set out herein, this Agreement, or any provision hereof, may be waived or amended on no less than five (5) days' notice, only by means of a writing signed by all Parties, and approved, in writing, by the Committee and the Monitor.

12.     This Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, provided, however, that the Committee shall be a third party beneficiary of this Agreement entitled to take advantage of the benefits of this Agreement to NNI and the other U.S. Debtors.

13.     Except as otherwise expressly provided in this Agreement, all covenants and agreements set forth in this Agreement by or on behalf of the Parties will be binding upon and inure to the benefit of the Parties and their respective successors.

14.     The Parties agree that this Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New

York or any other jurisdiction provided, however, that subparagraphs 10(a) through (d) hereof shall be governed exclusively by English law and subparagraphs 10(e) and (f) hereof shall be governed exclusively by French law.

15. To the fullest extent permitted by Law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the U.S. Court and the Canadian Court (in a joint hearing conducted under the Cross-Border Insolvency Protocol), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the U.S. Court if such claim, action, or proceeding would solely affect NNI or any of the other U.S. Debtors, the Canadian Court if such claim, action, or proceeding would solely affect NNL or any of the other Canadian Debtors, or the English Court if such claim, action or proceeding would solely affect the EMEA Sellers, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such claim, action or proceeding brought in such a court or any claim that any such claim, action or proceeding brought in such a court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such claim, action or proceeding or any other manner as may be permitted by Law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such claim, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law provided, however, that any claim, action or proceeding set forth in or on the basis of subparagraphs 10(a) through (d) hereof shall be brought exclusively in the English courts and any claim, action or proceeding set forth in or on the basis of subparagraphs 10(e) through (f) hereof shall be brought exclusively in the French courts.

16. EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION OR MATTER CONTEMPLATED HEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH 16.

17. All notices and communications provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified for such Party in the Stalking Horse Agreement, or at such address, to the attention of such other person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party

pursuant to the provisions of this paragraph 17. Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable. A copy of any notice or communication sent pursuant to this paragraph 17 shall also be sent to the Committee: c/o Akin Gump Strauss Hauer & Feld LLP Attention:  Fred S. Hodara and Stephen B. Kuhn, Esq. One Bryant Park New York, New York 10036, U.S.A (Facsimile:  +1 212 872 1002) and to the Monitor: Ernst & Young Inc., Ernst & Young Tower Attn: Murray A. McDonald, 222 Bay Street, P. O. Box 251, Toronto, Ontario, Canada, M5K 1J7 (Facsimile:  +1 416 943 3300).

18.   The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument. Facsimile and pdf signatures shall be deemed original signatures.

19.   The obligations of NNC and NNL under this Agreement shall be joint and several. The obligations of NNI and the other U.S. Debtors party hereto shall be joint and several. The obligations of the EMEA Sellers under this Agreement shall be joint and several.

20.   If any provision, section, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, section or part under other circumstances, and (ii) as for any other jurisdiction, any provision of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement.  Upon such determination that any section or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

21.   Except for Paragraph 8 hereof, which is intended to supersede Paragraph 10 of the Signing Side Agreement in its entirety, nothing in this Agreement shall supercede the Signing Side Agreement or the Auction Side Agreement, nor act as an amendment or waiver of any of the rights or obligations thereunder.

22.   The Parties hereby agree that, except as specifically set forth herein, nothing in this Agreement shall, or be deemed to, determine, ratify, or adopt, or have any impact whatsoever on, the allocation or distribution of proceeds from the Transaction among the Sellers.

**[Signature pages immediately follow]**

Execution Version

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first written above.

NORTEL NETWORKS
CORPORATION

By: _____

Name: Anna Ventresca
Title: General Counsel - Corporate
       and Corporate Secretary

By: _____

Name: Clarke E. Glaspell
Title: Controller


NORTEL NETWORKS LIMITED

By: _____

Name: Anna Ventresca
Title: General Counsel - Corporate
       and Corporate Secretary

By: _____

Name: Clarke E. Glaspell
Title: Controller

**NORTEL NETWORKS INC.**

By:_____
    Name:
    Title:

**NN APPLICATIONS MANAGEMENT
SOLUTIONS INC.**

By:_____
    Name:
    Title:

**NORTEL ALTSYSTEMS, INC.**

By:_____
    Name:
    Title:

**CORETEK, INC.**

By:_____
    Name:
    Title:

**QTERA CORPORATION**

By:_____
    Name:
    Title:

**XROS, INC.**

By:_____
    Name:
    Title:

**SIGNED** for and on behalf of **Nortel**              )
**Networks UK Limited** (in administration)             )    ....................................................
by Christopher Hill as Joint Administrator             )    Christopher Hill
(acting as agent and without personal                  )
liability) in the presence of:

Witness signature

..................................................    )
Name:        WILMA   GRAHAM                             )
Address:                                               )
             ERNST & YOUNG LLP
             1 More London Place
             London
             SE1 2AF

**SIGNED** for and on behalf of Nortel )
Networks (Ireland) Limited (in )
administration) by David Hughes as Joint )
Administrator (acting as agent and without )
personal liability) in the presence of:

David Hughes

Witness signature

Name:                                        )
Address:                                     )
                Niamh J Caverly   )
          c/o Ernst + Young
          Harcourt Street
          Dublin 2

SIGNED for and on behalf of **Nortel**
**Networks S.A.** (in administration and
*liquidation judiciaire*) by Christopher Hill
as Joint Administrator (acting as agent and
without personal liability) in the presence
of:

)
)
)
)

.................................................
Christopher Hill

Witness signature

.................................................
Name:      WILMA  GRAHAM
Address:

)
)
)

E/ ERNST & YOUNG LLP
1 More London Place
London
SE1 2AF

SIGNED for and on behalf of **Nortel**
**Networks France S.A.S.** (in
administration) ~~by Kerry Trigg acting as~~
~~authorized representative of~~ Christopher
Hill as Joint Administrator (acting as agent
and without personal liability) in the
presence of:

)
)
)
)

..............................................................
~~Kerry Trigg~~
CHRISTOPHER HILL

Witness signature

.................... W. Graham ....................
Name:        WILMA  GRAHAM
Address:

)
)
)

ERNST & YOUNG LLP
1 More London Place
London
SE1 2AF

**SIGNED** for and on behalf of **Nortel**      )
**GmbH** (in administration) by Christopher      )
Hill as Joint Administrator (acting as agent      )
and without personal liability) in the      )
presence of:

........................................................
Christopher Hill

Witness signature

........................................................      )
Name:      WILMA GRAHAM      )
Address:                                     )
            1 More London Place
            London
            SE1 2AF

**SIGNED** by Alan Bloom

in his own capacity and on behalf of the Joint
Administrators without personal liability and
solely for the purpose of obtaining the benefit
of the provisions of this Agreement expressed
to be conferred on or given to the Joint
Administrators in the presence of:

)
)
)

.............................................................
Alan Bloom

Witness signature

.............................................................
Name:
Address:

)
)
)

E/ERNST & YOUNG LLP
1 More London Place
London
SE1 2AF

Signed by **MAÎTRE COSME ROGEAU**,
*acting in the capacity of Mandataire*
*Liquidateur* of **NORTEL NETWORKS S.A.**
**(IN ADMINISTRATION AND**
**LIQUIDATION JUDICIARE)**, without
personal liability and solely for the purpose of
obtaining the benefit of the provisions of this
Agreement expressed to be conferred on or
given to the French Liquidator:

By _____
    Name: Maître Cosme Rogeau
    Title: *Mandataire Liquidateur*

In the presence of:
Witness signature _____

Name:     The Sault LEBRAY
Address:  26 rue Hoche
          78000 Versailles

**SIGNED** for and on behalf of **NORTEL**          )
**NETWORKS S.A. (IN**                                )    **MAÎTRE COSME ROGEAU**
**ADMINISTRATION AND**                               )
**LIQUIDATION JUDICIARE)**                           )
by **MAÎTRE COSME ROGEAU** as                        )
*Mandataire Liquidateur* (acting as agent            )
and without personal liability) in the               )
presence of:                                         )
Witness signature _____

Name:     The Sault LEBRAY
Address:  26 rue Hoche
          78000 Versailles

Execution Version

## EXHIBIT A – EMEA Sellers

Nortel Networks UK Limited (in administration)
Nortel Networks S.A. (in administration and *liquidation judiciaire*)
Nortel Networks (Ireland) Limited (in administration)
Nortel Networks France S.A.S. (in administration)
Nortel GmbH (in administration)

**EXHIBIT B – Other Sellers**

NN Applications Management Solutions Inc.
Nortel Altsystems, Inc. (previously "Alteon Networks, Inc.")
CoreTek, Inc.
Qtera Corporation
Xros, Inc.

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**SEVENTY-SECOND REPORT OF**
**THE MONITOR**
**DATED AUGUST 16, 2011**

---

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.