Exhibit B

### Q1 2010 TRANSFER PRICING SETTLEMENT AGREEMENT

This agreement (the "Agreement") is entered into as of [●], 2011 by and among Nortel Networks Limited ("NNL") and the other entities set forth in Schedule 1 attached hereto (the "Canadian Debtors"), Nortel Networks, Inc. ("NNI") and the other entities set forth in Schedule 2 attached hereto (the "US Companies", and as to those US Companies that are debtors in the United States Bankruptcy Court for the District of Delaware, the "U.S. Debtors"), the Joint Administrators (as defined below), the entities set forth in Schedule 3 attached hereto (together with Nortel Networks S.A. ("NNSA"), the "EMEA Debtors"[1]) and Nortel Networks AG ("NNAG", together with the EMEA Debtors, the "EMEA Group" and the EMEA Group, together with the Canadian Debtors, the US Companies and the non-debtor affiliates of each, the "Nortel Group"). The Canadian Debtors, the US Companies and the EMEA Group are sometimes referred to herein individually as a "Party" and collectively as the "Parties". The Joint Administrators, in their personal capacities, shall be party to this Agreement as provided in Section 11 and solely for the purpose of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Administrators and references to the Parties shall be construed accordingly.

WHEREAS, on January 14, 2009 (the "Filing Date"), the Canadian Debtors commenced creditor protection proceedings by obtaining an order (as amended and as the same may be further amended, the "Initial Order") from the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the *Companies' Creditors Arrangement Act* (Canada) (respectively, "CCAA" and the "Canadian Proceedings"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor"); and

WHEREAS, on the Filing Date, the US Debtors (other than Nortel Networks (CALA) Inc. ("NN CALA")) filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the *United States Code* (the "Bankruptcy Code") and on July 14, 2009 NN CALA filed a petition under chapter 11 of the Bankruptcy Code in the US Court (together with the proceedings of the other US Debtors, the "US Proceedings"); and

WHEREAS, on the Filing Date, the EMEA Debtors commenced administration proceedings (the "UK Proceedings") before the High Court of Justice in London, England, represented by individuals from Ernst & Young LLP (the "UK Administrator"), and, in the case of Nortel Networks (Ireland) Limited only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), serving as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, the "Joint Administrators"); and

WHEREAS, while the UK Proceedings in respect of NNSA are continuing, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA

---

[1]     NNSA shall not be considered an EMEA Debtor under this Agreement until such time as NNSA accedes to this Agreement.

Liquidator") and an administrator were appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

WHEREAS, prior to the Filing Date, quarterly "true up" payments ("Transfer Pricing Payments") were made by certain members of the Nortel Group to other Nortel Group entities pursuant to a transfer pricing methodology embodied in the (i) Master Research and Development Agreement dated as of December 22, 2004, with an effective date of January 1, 2001 (as amended by, and together with the related understandings contained in, the documents listed in Annex A hereto, the "Master R&D Agreement") and, in particular, the "Second Amendment to Schedule A" thereof and (ii) certain distribution agreements, whether written or oral, between one or more Nortel Group entities, including without limitation the agreements listed in Annex B hereto and any other agreements similar to the agreements listed in Annex B hereto (as amended, supplemented or otherwise modified, the "Distribution Agreements" and, together with the "Master R&D Agreement", the "Transfer Pricing Agreements"); and

WHEREAS, since the Filing Date, the US Debtors (other than NN CALA), the Canadian Debtors and the EMEA Debtors have engaged in the inter-company trading of goods and services pursuant to those certain group supplier protocol agreements between the US Debtors (other than NN CALA) and the EMEA Debtors and between the Canadian Debtors and the EMEA Debtors (the "GSPAs") and pursuant to certain court orders entered in the Canadian Proceedings and the US Proceedings, and have made and continue to make payments in respect of such inter-company trading (the "Inter-Company Trading Payments"); and

WHEREAS, since the Filing Date, issues relating to Transfer Pricing Payments have arisen among various members of the Nortel Group such that post-filing Transfer Pricing Payments have not been included in any Inter-Company Trading Payments and certain of those issues were resolved in the Interim Funding and Settlement Agreement dated as of June 9, 2009 by and among the Canadian Debtors, the US Debtors (other than NN CALA), and the EMEA Group (the "IFSA") and in the Final Canadian Funding and Settlement Agreement dated as of December 23, 2009 by and among the Canadian Debtors and the US Debtors (other than NN CALA) (the "FCFSA"); and

WHEREAS, contemporaneous with the signing of this Agreement, the US Debtors (other than NN CALA), the Canadian Debtors and the EMEA Group have entered into the Agreement on Transfer Pricing Amendments and Certain Other Matters, dated as of the date hereof, to, among other things, cease the obligation to make Transfer Pricing Payments from and after April 1, 2010; and

WHEREAS, contemporaneous with the signing of this Agreement, certain of the US Debtors, the Canadian Debtors and the EMEA Debtors have amended the GSPAs retroactive to April 1, 2010 to remove the reference to payments under the Master R&D Agreement from the definition of "Goods and Services" (as defined in the GSPAs); and

WHEREAS, each of the Parties hereto has concluded it is appropriate and in the best interest of each to enter into this Agreement pursuant to which, *inter alia*, the EMEA Group

2

shall among themselves and as between one or more EMEA Group members, on the one hand, and one or more Canadian Debtors or US Companies, on the other hand, settle amounts payable as Transfer Pricing Payments as provided for herein for the period from January 1, 2010 through March 31, 2010 (the "Q1 Settlement Period"),

NOW, THEREFORE, in consideration of the respective covenants made herein, and of the mutual benefits to be derived hereby (the sufficiency of which are acknowledged), the Parties hereto agree:

## PART A – SETTLEMENT MATTERS

1.  Nortel Networks UK Limited ("NNUK") is hereby irrevocably authorized to seek and retain payment for its own account and sole benefit from other members of the EMEA Group of Transfer Pricing Payments owed, or as such payments become due, under the relevant Transfer Pricing Agreements during, or with respect to, the Q1 Settlement Period which would otherwise be made to or administered by NNL, in consideration of the full and final settlement in respect of the Q1 Settlement Period set out herein. Each member of the EMEA Group hereby appoints NNUK as its agent (without liability, including as to failure of any EMEA Group member to make any Transfer Pricing Payment) to administer the collection and distribution of the Transfer Pricing Payments received, solely with respect to the Q1 Settlement Period, as detailed in Annex C hereto. Each member of the EMEA Group agrees that the payments required to be made to NNUK set out in Annex C shall be made to NNUK in cleared funds and without set-off, in consideration of the matters set out in this Agreement, within 30 days of the date hereof, except as otherwise agreed between any EMEA Group member and NNUK. NNUK agrees that it will make any payments to any member of the EMEA Group it is required to make as set out in Annex C without set-off, in consideration of the matters set out in this Agreement, within 30 days of the date hereof. To the extent that any member of the EMEA Group breaches any obligation to make its Transfer Pricing Payment with respect to the Q1 Settlement Period, only NNUK and none of the Canadian Debtors or the US Companies shall have any claim against such defaulting EMEA Group member for such payment and no EMEA Group member shall have any claim against the Canadian Debtors or the US Companies for such payment.

2.  NNL and NNUK hereby agree that for the Q1 Settlement Period, the EMEA Group owes NNL a net amount of US$10.6 million (the "Q1 Net Amount") which shall be satisfied in accordance with Section 3 below.

3.  Shortfall Payments.

    (a)  The Parties hereby agree that the Q1 Net Amount shall be setoff and deducted from the Shortfall Payments (as defined in the IFSA) contemplated as being payable by NNL to NNUK under the IFSA.

3

(b)     With respect to the balance of the Shortfall Payments after the setoff referred to in Sub-Section 3(a) above, being a net obligation of US$9.4 million, the Parties hereby agree that:

    (i)     NNL shall pay to NNUK the amount of US$4.7 million (the "Tranche 1 Payment") within three (3) Business Days of the Effective Date of this Agreement;

    (ii)    Upon the making of the Tranche 1 Payment, the Shortfall Charge (as defined in the Initial Order) shall be automatically reduced to US$4.7 million;

    (iii)   The remaining US $4.7 million (the "Tranche 2 Payment") being the net amount of the Shortfall Payments owing after reduction of the setoff amount in Sub-Section 3(a) above and the Tranche 1 Payment, shall be paid by NNL to NNUK in accordance with Section 6.c. of the IFSA as if that Section 6.c of the IFSA were in effect at the time the Tranche 2 Payment is made notwithstanding the provisions of Sub-Section 13.b and/or Section 14 of the IFSA; and

    (iv)    Upon the making of the Tranche 2 Payment, the Shortfall Charge shall be automatically terminated and extinguished.

For the purpose of this Agreement, "Business Day" shall mean a day that is not a Saturday, Sunday or national public holiday in Canada, the United States or the United Kingdom.

4.     This Agreement shall constitute a full and final settlement of any and all Transfer Pricing Payments owing and that may, or could, be owing between (i) the EMEA Group *inter se*, and (ii) any member of the EMEA Group, on the one hand, and any Canadian Debtor or US Company, on the other hand, as Transfer Pricing Payments under the Transfer Pricing Agreements for all calculation periods or parts thereof in the Q1 Settlement Period including, without limitation, any subsequent determination by any revenue authority with respect to the Q1 Settlement Period giving rise to any subsequent liability to taxation of any Party hereto (the "Settled Amounts") and provided further that in connection with such full and final settlement, (a) each member comprising the EMEA Group releases each of the Canadian Debtors and each of the US Companies and agree that they shall not allege, file or otherwise assert any claim against the Canadian Debtors or the US Companies in respect of the Settled Amounts or allege, file or otherwise assert a claim against any person which could result in a claim against the Canadian Debtors or the US Companies in respect of the Settled Amounts; and (b) each of the Canadian Debtors and the US Companies releases each member of the EMEA Group and agrees not to allege, file or otherwise assert any claim against any one or more of the EMEA Group in respect of the Settled Amounts or allege, file or otherwise assert a claim against any person which could result in a claim against any member of the EMEA Group in respect of the

4

Settled Amounts.  For greater certainty, the obligation of NNL to make the Tranche 1 Payment and the Tranche 2 Payment as herein provided shall not be released pursuant to this Section 4.

Covenants

5.    NNUK shall use commercially reasonable efforts to obtain, either a deed of adherence whereby NNSA agrees to be bound by all provisions of this Agreement applicable to an EMEA Debtor or a letter from NNSA authorizing the UK Administrator to bind NNSA to all provisions of this Agreement (the "NNSA Accession") and NNL and NNI agree to provide such assistance as NNUK may reasonably require to obtain such deed of adherence or letter.  The EMEA Debtors hereby agree to provide copies of such deed of adherence or letter, upon receipt, to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Creditors' Committee and the Bondholders' Group.

6.    For the period from the Effective Date (defined below) to the date of the NNSA Accession, NNL hereby unconditionally assigns and transfers to NNUK all of its rights to any Transfer Pricing Payments paid or payable to NNL from or on behalf of NNSA under the relevant Transfer Pricing Agreements with respect to the Q1 Settlement Period (the "NNSA Inter-Company Trading Payments") and agrees that to the extent any such NNSA monies in respect of NNSA Inter-Company Trading Payments are paid by NNSA to NNL during the time between the Effective Date and the date of the NNSA Accession, NNL shall transfer such monies forthwith to such account as NNUK may direct.

PART B – PROVISIONS OF GENERAL APPLICATION

7.    Nothing in this agreement shall constitute an amendment, modification or waiver of rights of the US Debtors, the Canadian Debtors or the Monitor under the FCFSA, and this Agreement shall not supersede the FCFSA in any respect.

8.    Except as expressly set forth herein, (i) nothing in this Agreement shall constitute an amendment, modification or waiver of rights of the US Debtors, the Canadian Debtors, the Monitor, the EMEA Group or the Joint Administrators under the IFSA, and (ii) to the extent a conflict exists between the terms of this Agreement and the terms of the IFSA, the terms of the IFSA shall govern.

9.    Subject to the settlement contemplated in this Agreement, nothing in this Agreement shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the Transfer Pricing Agreements, applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements, the right to object to the failure to make payments under or in connection with the Transfer Pricing Agreements, or any offset arising therefrom or otherwise, or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or

5

any offset arising therefrom or otherwise. The use of the term Transfer Pricing Payment (or any similar term) or reference to Transfer Pricing Agreements (or similar agreement) in this Agreement is for convenience only and shall have no evidentiary effect or be used by any of the Parties hereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any Party of the Transfer Pricing Agreements or any transfer pricing methodology provided in the Transfer Pricing Agreements. Nothing in this Agreement shall bar, prohibit, or in any way hinder or enhance the rights of the Parties to this Agreement to present any arguments, methodologies, legal or factual theories in support of a proposed allocation of the proceeds of any transaction, including without limitation, the sale of assets, businesses or intellectual property, that would be subject to allocation amongst any of the Parties hereto, and such presentation shall not, or otherwise be deemed to, constitute in any way a violation of a Party's rights under any existing agreement. For the avoidance of doubt, nothing in this Agreement shall affect any claim a Party may have in respect of Transfer Pricing Payments relating to any period prior to the Filing Date.

10.     This agreement shall become effective between the Parties (the "Effective Date") upon the approval by each of the US Court and the Canadian Court of this Agreement and all of the provisions hereof.  The US Debtors and the Canadian Debtors shall (i) use commercially reasonable efforts to obtain such approvals as soon as possible (ii) keep all other Parties reasonably apprised of the progress of such approvals and provide such other information regarding the satisfaction of such approvals as reasonably requested by other Parties; and (iii) use commercially reasonable efforts to allow any other Party which so requests in writing reasonable participation in connection with any proceedings in any Court relating to such approval.

Notwithstanding the foregoing, the following provisions of this Agreement shall be effective as of the date hereof: Sections 10, 11, 12, 13, 14, 16, 17, and 18.

11.     The Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors  (excluding NNSA, which is represented by the NNSA Liquidator) to which they are appointed and none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations. The Joint Administrators are a Party to this Agreement: (i) as agents of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and for the purposes of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Administrators and enforcing the obligations of certain other Parties to this Agreement.

12.     The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of

which together will constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic means shall be effective as delivery of a manually executed counterparty of this Agreement.

13.   Governing Law.

(a)   The Parties agree that this Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; provided, however, that Section 11 shall be governed exclusively by English law.

(b)   To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US Court and the Canadian Court (in a joint hearing conducted under the Cross-Border Insolvency Protocol approved by the US Court by an Order dated January 15, 2009 and by the Canadian Court in an Order dated January 14, 2009 (as amended or as amended and restated from time to time, the "Cross-Border Insolvency Protocol") for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the US Court if such claim, action or proceeding would solely affect the US Companies, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Debtors, a joint hearing of both the Canadian Court and the US Court conducted under the Cross-Border Protocol if such claim, action or proceeding  would affect the Canadian Debtors, the US Companies and the EMEA Group, and the English courts if such claim, action or proceeding would solely affect the EMEA Group, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a court or any claim that any such action brought in such a court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law; provided, however, that any claim, action or proceeding set forth in Section 11 shall be brought exclusively in the English courts.

(c)   Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under or in connection with this Agreement or any transaction or matter contemplated hereby. Each Party (i) certifies that no representative, agent or attorney of any other Party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other parties hereto have been

7

induced to enter into this agreement by, among other things, the mutual waivers and certifications in this Section 13.

14.    Each Party approves all payments to be made pursuant to this Agreement and all other matters contemplated hereby, to the extent that such Party is a creditor of the Party making such payment.

15.    Except as specifically provided herein, payments required under this Agreement shall be made in accordance with the terms hereof regardless of any actual or purported right of setoff or other defense.

16.    Except as specifically set forth in this Agreement, the obligations of each Party hereunder are several, and not joint and several.

17.    In the event that any provision of this Agreement shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision. The Parties shall negotiate in good faith with respect to any provision to this Agreement found to be illegal, invalid or unenforceable, in order to agree, with the consent of the Parties, the Creditors' Committee and the Bondholders' Group, on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision.

18.    This Agreement may be amended, on no less than ten (10) Business Days' notice, only by means of a writing signed by all Parties, and approved by the Creditors' Committee and the Bondholders' Group, which amendments, if material in the judgment of the Parties, must be approved by all of the Courts that initially approved this Agreement. For the purpose of this Section 18, "Business Day" shall mean a day that is not a Saturday, Sunday or national public holiday in Canada or the United States.

8

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as the date first written above.

NORTEL NETWORKS CORPORATION

By: _____
        Name:
        Title:

NORTEL NETWORKS LIMITED

By: _____
        Name:
        Title:

NORTEL NETWORKS GLOBAL CORPORATION

Per: _____
        Name:
        Title:

Per: _____
        Name:
        Title:

NORTEL NETWORKS INTERNATIONAL CORPORATION

Per: _____
        Name:
        Title:

Per: _____
        Name:
        Title:

*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

NORTEL NETWORKS TECHNOLOGY
CORPORATION

Per: _____

      Name:
      Title:


Per: _____

      Name:
      Title:


NORTEL NETWORKS INC.


By: _____

      Name:
      Title:


ARCHITEL SYSTEMS (U.S.) CORPORATION


By: _____

      Name:
      Title:


CORETEK, INC.


By: _____

      Name:
      Title:


NORTEL ALTSYSTEMS, INC.

By: _____

      Name:
      Title:


*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

NORTEL ALTSYSTEMS INTERNATIONAL INC.

By:  _____
        Name:
        Title:


NORTEL NETWORKS APPLICATIONS MANAGEMENT SOLUTIONS INC.

By:  _____
        Name:
        Title:


NORTEL NETWORKS (CALA) INC.

By:  _____
        Name:
        Title:


NORTEL NETWORKS CABLE SOLUTIONS INC.

By:  _____
        Name:
        Title:


NORTEL NETWORKS CAPITAL CORPORATION

By:  _____
        Name:
        Title:


*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

NORTEL NETWORKS HPOCS INC.

By: _____

       Name:
       Title:


NORTEL NETWORKS INDIA
INTERNATIONAL INC.

By: _____

       Name:
       Title:


NORTEL NETWORKS INTERNATIONAL INC.

By: _____

       Name:
       Title:


NORTEL NETWORKS KABUSHIKI KAISHA

By: _____

       Name:
       Title:


NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By: _____

       Name:
       Title:


*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

NORTHERN TELECOM INTERNATIONAL
INC.

By: _____
     Name:
     Title:


QTERA CORPORATION

By: _____
     Name:
     Title:


SONOMA SYSTEMS

By: _____
     Name:
     Title:


XROS, INC.

By: _____
     Name:
     Title:

**SIGNED** by Alan Bloom in his own capacity )    ..................................................................
and on behalf of the Joint Administrators )
without personal liability and solely for the )
benefit of the provisions of this Agreement )
expressed to be conferred on or given to the )
Joint Administrators in the presence of: )

Witness signature

..................................................................    )
Name:                                                               )
Address:                                                            )


**SIGNED** for and on behalf of **Nortel Networks** )    ..................................................................
**UK Limited** (in administration) by Christopher )
Hill as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Witness signature

..................................................................    )
Name:                                                               )
Address:                                                            )
                                                                    )


**SIGNED** for and on behalf of **Nortel Networks** )    ..................................................................
**(Ireland) Limited** (in administration) by David )
Hughes as Joint Administrator (acting as agent )
and without personal liability) in the presence )
of: )

Witness signature

..................................................................    )
Name:                                                               )
Address:                                                            )


*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

S-6

**SIGNED** for and on behalf of **Nortel Networks**          )          ........................................................................
**N.V.** (in administration) by Christopher Hill as          )
Joint Administrator (acting as agent and without          )
personal liability) in the presence of:          )

Witness signature

........................................................................          )
Name:          )
Address:          )


**SIGNED** for and on behalf of **Nortel Networks**          )          ........................................................................
**SpA** (in administration) by Christopher Hill as          )
Joint Administrator (acting as agent and without          )
personal liability) in the presence of:          )

Witness signature

........................................................................          )
Name:          )
Address:          )


**SIGNED** for and on behalf of **Nortel Networks**          )          ........................................................................
**B.V.** (in administration) by Christopher Hill as          )
Joint Administrator (acting as agent and without          )
personal liability) in the presence of:          )

Witness signature

........................................................................          )
Name:          )
Address:          )


*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

S-7

**SIGNED** for and on behalf of **Nortel Networks** )
**Polska Sp. z.o.o.** (in administration) by )  .......................................................................
Christopher Hill as Joint Administrator (acting )
as agent and without personal liability) in the )
presence of: )

Witness signature

.............................................................. )
Name: )
Address: )


**SIGNED** for and on behalf of **Nortel Networks** )
**Hispania S.A.** (in administration) by )  .......................................................................
Christopher Hill as Joint Administrator (acting )
as agent and without personal liability) in the )
presence of: )

Witness signature

.............................................................. )
Name: )
Address: )


**SIGNED** for and on behalf of **Nortel Networks** )
**(Austria) GmbH** (in administration) by )  .......................................................................
Christopher Hill as Joint Administrator (acting )
as agent and without personal liability) in the )
presence of: )

Witness signature

.............................................................. )
Name: )
Address: )

*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

**SIGNED** for and on behalf of **Nortel Networks**
**s.r.o.** (in administration) by Christopher Hill as          )          ........................................................
Joint Administrator (acting as agent and without          )
personal liability) in the presence of:          )
          )

Witness signature


........................................................
Name:          )
Address:          )
          )


**SIGNED** for and on behalf of **Nortel Networks**          )          ........................................................
**Engineering Service kft** (in administration) by          )
Christopher Hill as Joint Administrator (acting          )
as agent and without personal liability) in the          )
presence of:          )

Witness signature


........................................................          )
Name:          )
Address:          )


**SIGNED** for and on behalf of **Nortel Networks**          )          ........................................................
**Portugal S.A.** (in administration) by          )
Christopher Hill as Joint Administrator (acting          )
as agent and without personal liability) in the          )
presence of:          )

Witness signature


........................................................          )
Name:          )
Address:          )


*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

S-9

**SIGNED** for and on behalf of **Nortel Networks**
**Slovensko s.r.o.** (in administration) by                    )      ........................................................................
Christopher Hill as Joint Administrator (acting          )
as agent and without personal liability) in the          )
presence of:                                             )
                                                         )
Witness signature

........................................................................
Name:                                                    )
Address:                                                 )
                                                         )


**SIGNED** for and on behalf of **Nortel Networks**    )      ........................................................................
**Romania s.r.l.** (in administration) by                )
Christopher Hill as Joint Administrator (acting          )
as agent and without personal liability) in the          )
presence of:                                             )

Witness signature

                                                         )
........................................................................
Name:                                                    )
Address:                                                 )


**SIGNED** for and on behalf of **Nortel Networks**    )      ........................................................................
**France S.A.S.** (in administration) by Kerry           )
Trigg acting as authorised representative for the        )
Joint Administrators (acting as agent and                )
without personal liability) in the presence of:          )

Witness signature

                                                         )
........................................................................
Name:                                                    )
Address:                                                 )

*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

**SIGNED** for and on behalf of **Nortel Networks**  )  .......................................................................
**GmbH** (in administration) by Christopher Hill  )
as Joint Administrator (acting as agent and  )
without personal liability) in the presence of:  )

Witness signature

.............................................................  )
Name:  )
Address:  )


**SIGNED** for and on behalf of **Nortel Networks**  )  .......................................................................
**Oy** (in administration) by Christopher Hill as  )
Joint Administrator (acting as agent and without  )
personal liability) in the presence of:  )

Witness signature

.............................................................  )
Name:  )
Address:  )


**SIGNED** for and on behalf of **Nortel Networks**  )  .......................................................................
**AB** (in administration) by Christopher Hill as  )
Joint Administrator (acting as agent and without  )
personal liability) in the presence of:  )

Witness signature

.............................................................  )
Name:  )
Address:  )


*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

**SIGNED** for and on behalf of **Nortel Networks**          )          ...................................................................
**International Finance and Holding B.V.** (in          )
administration) by Christopher Hill as Joint          )
Administrator (acting as agent and without          )
personal liability) in the presence of:

Witness signature

....................................................................          )
Name:          )
Address:          )


**SIGNED** by          )          ...................................................................
Duly authorised for and on behalf of **Nortel**          )
**Networks AG** in the presence of:          )

Witness signature

....................................................................          )
Name:          )
Address:          )

*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

S-12

## CONSENT OF MONITOR

Ernst & Young Inc., as Monitor under the Companies' Creditors Arrangement Act to the Canadian Debtors, consents to the Agreement.

**Ernst & Young Inc., in its capacity as Monitor in the CCAA proceedings and not in its personal capacity**

Per:  _____

Name:
Title:

*Signature Page to Q1 2010 Transfer Pricing Settlement Agreement*

S-13

## SCHEDULE 1

## CANADIAN DEBTORS

Nortel Networks Corporation

Nortel Networks Limited

Nortel Networks Global Corporation

Nortel Networks International Corporation

Nortel Networks Technology Corporation

## SCHEDULE 2

### US COMPANIES

Nortel Networks Inc.

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

Nortel Networks (CALA) Inc.

*Nortel Networks Kabushiki Kaisha

*Nortel Networks India International Inc.


*Not a debtor in the US Proceedings.

## SCHEDULE 3

## EMEA DEBTORS

Nortel Networks UK Limited (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks NV (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks BV (In Administration)

Nortel Networks Polska Sp z.o.o. (In Administration)

Nortel Networks Hispania, SA (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks sro (In Administration)

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Portugal SA (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel GmbH (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks France S.A.S. (In Administration)

**Annex A**

**Amendments to and Related Understandings Regarding
Master Research and Development Agreement
dated as of December 22, 2004 ("Master R&D Agreement")**

1.    Undated Addendum to Master R&D Agreement executed between October 2005 and June 2006.

2.    Agreement with Respect to Certain NN Technology effective as of December 30, 2006 (being the day before the closing date of the Share and Asset Sale Agreement between NNL and Alcatel-Lucent).

3.    Addendum to Master R&D Agreement dated December 14, 2007 with an effective date of January 1, 2006.

4.    Third Addendum to Master R&D Agreement with an effective date of January 1, 2006.

5.    Fourth Addendum to Master R&D Agreement with an effective date of December 31, 2008.

6.    Letter of acknowledgment dated January 14, 2009 from NNL to the Directors of NNUK, NNSA and NNIR and the UK Administrator.

7.    Release in Connection with Master R&D Agreement dated 1 January 2009.

8.    Memorandum of Understanding in Connection with Master R&D Agreement, dated December 31, 2008 with an effective date of 1 January 2006.

**Annex B**

**Distribution Agreements**

| Party | Date |
|---|---|
| Nortel Networks Limited ("NNL") and Nortel Networks N.V. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks S.p.A. | undated, effective as of 1 January 2002 (plus undated and unsigned Addendum, effective as of 1 January 2003) |
| NNL and Nortel Networks B.V. | dated 22 December 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Polska Sp. z. o. o. | undated, effective as of 1 January 2001 (letter of amendment executed in November 2003, effective as of 1 January 2001 plus Addendum executed in August 2005, effective as of 1 January 2003) |
| NNL and Nortel Networks Hispania, S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks (Austria) GmbH | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks, s.r.o. | dated 15 April 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Engineering Services Kft | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Portugal S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Slovensko, s.r.o. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Romania SRL | executed 22 January 2004, effective 1 January 2003 |
| NNL and Nortel Networks AG | undated, effective 1 January 2001 |

**Annex C**

**Intra-EMEA Transfer Pricing Settlement Amounts**

| **EMEA Group entity payer** | **(Amount payable US$m) / payee** |
|---|---|
| Nortel Networks S.A.[2] | (11.86) Nortel Networks UK Limited |
| Nortel Networks (Ireland) Limited | (1.82) Nortel Networks UK Limited |
| Nortel Networks Hispania, SA | (2.30) Nortel Networks UK Limited |
| Nortel Networks AG | (1.23) Nortel Networks UK Limited |
| Nortel Networks NV | (1.68) Nortel Networks UK Limited |
| Nortel Networks Portugal SA | (0.09) Nortel Networks UK Limited |
| Nortel Networks Polska Sp z.o.o. | (1.08) Nortel Networks UK Limited |
| Nortel Networks Romania Srl | (0.11) Nortel Networks UK Limited |
| Nortel Networks BV | (3.54) Nortel Networks UK Limited |
| Nortel Networks UK Limited | (0.14) Nortel Networks sro |
|  | (0.10) Nortel Networks Engineering Services Kft |
|  | (0.21) Nortel Networks Slovensko, sro |
|  | (0.01) Nortel Networks (Austria) GmbH |
|  | (1.11) Nortel Networks SpA |

---

[2] To the extent it becomes a Party hereto

| **EMEA Group entity payee** | **Amount receivable US$m / (payer)** |
|---|---|
| Nortel Networks UK Limited | 11.86 (Nortel Networks S.A.) |
| | 1.82 (Nortel Networks (Ireland) Limited) |
| | 2.30 (Nortel Networks Hispania, SA) |
| | 1.23 (Nortel Networks AG) |
| | 1.68 (Nortel Networks NV) |
| | 0.09 (Nortel Networks Portugal SA) |
| | 1.08 (Nortel Networks Polska Sp z.o.o.) |
| | 0.11 (Nortel Networks Romania Srl) |
| | 3.54 (Nortel Networks BV) |
| Nortel Networks sro | 0.14 (Nortel Networks UK Limited) |
| Nortel Networks Engineering Services Kft | 0.10 (Nortel Networks UK Limited) |
| Nortel Networks Slovensko, sro | 0.21 (Nortel Networks UK Limited) |
| Nortel Networks (Austria) GmbH | 0.01 (Nortel Networks UK Limited) |
| Nortel Networks SpA | 1.11 (Nortel Networks UK Limited) |