**EXHIBIT B**

**Stipulation**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Nortel Networks, Inc., *et al.*,[1]<br><br>                Debtors. | Chapter 11<br><br>Case No. 09-10138 (KG)<br><br>(Jointly Administered) |
| Nortel Networks, Inc. and Nortel Networks (CALA) Inc.,<br><br>                Plaintiffs,<br><br>      v.<br><br>Telmar Network Technology, Inc., Precision Communication Services, Inc. and Precision Communication Services, Corporation,<br><br>                Defendants. | Adv. Proc. No. 11-50021 (KG) |

**STIPULATION OF SETTLEMENT**

This stipulation of settlement (this "Settlement Agreement") is made and entered as of the \\ day of August, 2011 by and among (i) Nortel Networks Inc. ("NNI"), (ii) Nortel Networks (CALA) Inc. ("NNCALA"), (iii) Nortel Networks Corporation ("NNC"), (iv) Nortel Networks Limited ("NNL"), (v) Telmar Network Technology, Inc. ("Telmar"), (vi) Precision Communication Services, Inc. ("PCSI") and (vii) Precision Communication Services Corporation ("PCSC"). This Settlement Agreement is made as a compromise by the foregoing

---

[1] In addition to NNI and NNCALA, the above-captioned debtors (the "Debtors") in the Chapter 11 cases before the Bankruptcy Court are: Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., and Nortel Networks Cable Solutions Inc. Additional information regarding the Debtors can be found in their respective Chapter 11 petitions, which are available at http://dm.epiq11.com/nortel.

parties (the "Parties") for the complete and final settlement of their respective claims, differences and causes of action in respect of the matters described herein.

WHEREAS, on January 14, 2009 (the "Petition Date"), the Debtors (with the exception of NNCALA, which filed on July 14, 2009) each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") (Case No. 09-10138 (KG) (Jointly Administered) (the "Cases"); and

WHEREAS, the Debtors continue to operate as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code; and

WHEREAS, no trustee or examiner has been appointed in the Debtors' Cases; and

WHEREAS, also on the Petition Date, the Debtors' ultimate corporate parent, NNC, NNI's direct corporate parent NNL, and certain of their Canadian affiliates (collectively the "Canadian Debtors") filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) ("CCAA") seeking relief from their creditors (the "Canadian Proceeding"); and

WHEREAS, the Canadian Court appointed Ernst & Young Inc. as the monitor (the "Monitor") and authorized foreign representative of the Canadian Debtors pursuant to various orders of the Canadian Court and the CCAA; and

WHEREAS, an official committee of unsecured creditors (the "Committee") was appointed in the Debtors' Cases; and

WHEREAS, Telmar, PCSI and PCSC have filed the following proofs of claim in the Debtors' Cases: (i) on September 29, 2009, Telmar filed a proof of claim ("Claim No. 4905") against NNCALA in the amount of not less than $349,104.28; (ii) on January 25, 2010, Telmar

filed a proof of claim ("Claim No. 6883") against NNCALA in an amount of not less than $4,912,581.68, which purportedly amended Claim No. 4905; (iii) on September 29, 2009, PCSI filed a proof of claim against NNCALA ("Claim No. 4906") in an amount of not less than $172,941.88; (iv) on January 25, 2010, PCSI filed a proof of claim against NNCALA ("Claim No. 6881") in an amount of not less than $4,736,419.28, which purportedly amended Claim No. 4906; (v) on September 29, 2009, PCSC filed a proof of claim against NNCALA ("Claim No. 4907") in an amount of not less than $176,162.40; (vi) on January 25, 2010, PCSC filed a proof of claim against NNCALA ("Claim No. 6882") in an amount of not less than $4,739,639.80, which purportedly amended Claim No. 4907; (vii) on September 29, 2009, PCSC filed a proof of claim against NNI ("Claim No. 4908") in an amount of not less than $176,162.40; and (viii) on September 29, 2009, PCSI filed a proof of claim against NNI ("Claim No. 4909") in an amount of not less than $172,941.80. Claim No. 4905, Claim No. 4906, Claim No. 4907, Claim No. 4908, Claim No. 4909, Claim No. 6881, Claim No. 6882 and Claim No. 6883 are hereafter collectively referred to as the "Defendants' U.S. Claims"; and

WHEREAS, Telmar, PCSI and PCSC have also filed the following claims in the Canadian Proceeding: (i) on September 29, 2009, PCSC filed a claim ("Claim No. 1581") against NNC in the amounts of (a) CAD$131,924.41 and (b) $66,937.60; and (ii) on September 29, 2009 PCSI filed a claim ("Claim No. 1582") against NNC in the amount of $172,941.88. Claim No. 1581 and Claim No. 1582 are hereafter collectively referred to as the "Defendants' Canadian Claims"; and

WHEREAS, on January 3, 2011, NNI and NNCALA (the "Plaintiffs") instituted the above-captioned adversary proceeding (the "Adversary Proceeding") against Telmar, PCSI and PCSC (the "Defendants") by filing a complaint that seeks, inter alia, damages based upon alleged

3

causes of action for breaches of contracts (including repair orders) among Plaintiffs and Defendants, damages under commercial law, unjust enrichment, account stated, turnover under § 542 of the Bankruptcy Code, alleged violations of § 362 of the Bankruptcy Code, alleged preferential transfers under § 547 of the Bankruptcy Code, recovery of avoided transfers under § 550 of the Bankruptcy Code, and objections to, and disallowance of, the Defendants' U.S. Claims (collectively, the "Adversary Proceeding Claims"); and

WHEREAS, the Monitor, NNC and NNL dispute, among other things, the Defendants' Canadian Claims, and further contend that they have certain claims and causes of action against the Defendants with respect to goods and services provided between the parties, including, without limitation, good and services provided under (i) that certain Master Contract Repair Services Agreement dated as of March 3, 2000 (including all exhibits and schedules thereto, as amended, restated, supplemented or otherwise modified from time to time, collectively, the "Master Agreement") and (ii) purchase orders issued from time to time under, in connection with and relating to the Master Agreement (collectively, the "Canadian Debtors' Claims"); and

WHEREAS, on September 16, 2010, the Bankruptcy Court entered an Order Authorizing and Approving Settlement Procedures to Settle Certain Prepetition Claims (the "Prepetition Claims Settlement Procedures Order"), which, inter alia, requires, among other things, the Debtors to obtain Bankruptcy Court approval pursuant to Bankruptcy Rule 9019 before settling certain disputed proofs of claim that were originally filed in an amount equal to or greater than $1,000,000 [Main D.I. 3953]; and

WHEREAS, on October 27, 2010, the Bankruptcy Court entered an Order Authorizing And Approving Settlement Procedures To Settle Certain Avoidance Claims (the "Avoidance Settlement Procedures Order"), which requires the Debtors to obtain Bankruptcy Court approval

pursuant to Bankruptcy Rule 9019 before settling avoidance claims where the asserted claim amount is greater than $1,000,000 [Main D.I. 4211]; and

WHEREAS, since the commencement of the Adversary Proceeding, the Parties have engaged in arm's-length negotiations to resolve disputes with respect to the Adversary Proceeding Claims and the Canadian Debtors' Claims in order to avoid the cost, risks and burden that would be imposed by further litigation, and as a result of such negotiations have agreed to settle, among other things, the Adversary Proceeding Claims, the Canadian Debtors' Claims, the Defendants' U.S. Claims and the Defendants' Canadian Claims on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is stipulated and agreed by and among the Parties as follows:

1.  Settlement Amount. Within ten (10) business days after an order approving this Settlement Agreement and the terms contained herein is entered by the Bankruptcy Court and such order becomes a "Final Order"[2] (the "Settlement Effective Date"), Defendants shall pay to NNI the sum of

(the "Settlement Amount"), in full and final settlement and satisfaction of, among other things, the Adversary Proceeding Claims and the Canadian Debtors' Claims, by: (a) delivering via traceable courier to Nortel Lockbox 2937 (Tel#302-325-6047), Lockbox Operations 3rd Fl, 8430 W Bryn Mawr Ave., Chicago, IL 60631, a check in the Settlement Amount payable to "Nortel

---

[2] For purposes of this Settlement Agreement, the order entered by the Bankruptcy Court shall become a "Final Order" upon the occurrence of: (i) the entry by the Bankruptcy Court of a final order approving this Settlement Agreement, without modification of its terms, pursuant to Bankruptcy Rule 9019; and (ii) the expiration of the time for appeal or to seek permission to appeal from the Bankruptcy Court's final order approving this Settlement Agreement, or if an appeal from a final order is taken, the affirmance of such order in its entirety, without modification, by the court of last resort to which an appeal of such order may be taken.

5

Networks Inc. as Debtor-in-Possession"; or (b) sending a wire transfer in the Settlement Amount to Nortel Networks Inc., Citibank, 111 Wall Street, New York, NY, ABA Number 021000089, Swift Number CITIUS33, Account Number 30463444 (the "Settlement Payment"). The first date on which all of the following shall have occurred shall hereafter be referred to as the "Settlement Date": (i) NNI shall have received the Settlement Payment; (ii) the Settlement Payment clears; and (iii) the Settlement Payment is collected. Within five (5) days of the Settlement Date, NNI shall transfer $         of the Settlement Amount to NNL by wire transfer of immediately available funds without any deduction, set-off or withholding.

2. Release by Defendants. Except as otherwise expressly provided herein, including the Parties' respective obligations hereunder, effective upon the Settlement Date, Defendants hereby release and forever discharge Plaintiffs, NNC and NNL and their past and present parents, subsidiaries, affiliates, general partners, limited partners, shareholders, directors, officers, employees, agents and attorneys (collectively, the "Debtor Releasees"), from any and all claims, rights, defenses, demands, liabilities, obligations, damages, actions, suits, causes of action, and setoffs, in law or equity, whether known or unknown, suspected or unsuspected, accrued or unaccrued, matured or unmatured, past or present, fixed or contingent, liquidated or unliquidated, that the Defendants now have, had, may have had or hereafter may have against any of the Debtor Releasees, including, without limitation, all claims asserted in the Adversary Proceeding, the Defendants' U.S. Claims, the Defendants' Canadian Claims, all claims relating to the Master Agreement and any accessions thereto, any claims under warranty relating to goods and services sold prior to the Settlement Date, and any claims arising under § 502(h) of the Bankruptcy Code. Notwithstanding anything to the contrary contained herein or elsewhere in this Settlement Agreement, this release is not intended to, nor shall it constitute or be deemed to,

include or waive (a) the payment obligations of Plaintiffs in respect of those invoices set forth on Exhibit A to this Settlement Agreement and (b) the claims, rights, interests and actions of the Defendants and their affiliates *solely* as against the Brazilian Affiliates (defined below), including in respect of repair services performed under that certain Brazilian Services Contract dated as of December 1, 2008 (including all exhibits and schedules thereto, as amended, restated, supplemented or otherwise modified from time to time) (collectively, the "Brazilian Claims"). For purposes of this Settlement Agreement, the term "Brazilian Affiliates" shall mean those affiliates of the Debtors and Canadian Debtors located in Brazil, and specifically shall exclude the Debtors, the Canadian Debtors, and other parties released under this Settlement Agreement.

3. Release by Plaintiffs, NNC and NNL. Effective upon the Settlement Date, Plaintiffs, NNC and NNL each hereby release and forever discharge Defendants and their past and present parents, subsidiaries, affiliates, general partners, limited partners, shareholders, directors, officers, employees, agents and attorneys (collectively, the "Defendant Releasees"), from any and all claims, rights, defenses, demands, liabilities, obligations, damages, actions, suits, causes of action, and setoffs, in law or equity, whether known or unknown, suspected or unsuspected, accrued or unaccrued, matured or unmatured, past or present, fixed or contingent, liquidated or unliquidated, that Plaintiffs, NNC and/or NNL have, had, may have had or hereafter may have against any of the Defendant Releasees, including, without limitation, all claims asserted in the Adversary Proceeding, the Adversary Proceeding Claims, the Canadian Debtors' Claims and any claims relating to the Master Agreement and any accessions thereto, and any claims under warranty relating to goods and services sold prior to the Settlement Date.

4. <u>Dismissal of the Adversary Proceeding</u>. Promptly following the Settlement Date, Plaintiffs will file with the Bankruptcy Court a notice of dismissal *with prejudice* of the Adversary Proceeding.

5. <u>Defendants' Claims</u>. Defendants hereby withdraw *with prejudice* the Defendants' U.S. Claims and the Defendants' Canadian Claims, and agree that they will not (a) seek to reinstate in the Debtors' Cases or in the Canadian Proceeding any of the Defendants' U.S. Claims or Defendants' Canadian Claims or (b) file or otherwise assert any claims against Plaintiffs or the Canadian Debtors released under this Settlement Agreement; <u>provided</u>, that nothing in this paragraph 5 is intended to be, or shall otherwise constitute or be deemed to be, a waiver, withdrawal, release or compromise of the Defendants' right (i) to assert, prosecute, enforce and/or collect upon the Brazilian Claims *solely* as against the Brazilian Affiliates or (ii) to seek payment of those claims listed on Exhibit A hereto.

6. <u>Claims Register</u>. The Debtors, the Debtors' claims agent, Epiq Bankruptcy Solutions, LLC and the Clerk of the Bankruptcy Court are authorized to take all necessary and appropriate actions to give effect to this Settlement Agreement.

7. <u>Court Approval Effectiveness</u>. Pursuant to the Prepetition Claims Settlement Procedures Order and the Avoidance Settlement Procedures Order, this Settlement Agreement is subject to approval of the Bankruptcy Court. Upon the Settlement Effective Date, this Settlement Agreement shall be effective and binding, by its terms, upon the Parties, and their respective successors and assigns, including, without limitation, any trustee, receiver or similar representative that may hereafter be appointed in the Cases or the Canadian Proceeding.

8. <u>Applicable Law</u>. This Settlement Agreement shall be interpreted and construed in accordance with (i) the laws of the State of Delaware, without regard to its conflict of laws rules

and jurisprudence, and (ii) to the extent applicable to the Parties, the provisions of the Bankruptcy Code. For greater certainty, the provisions of the Bankruptcy Code are not applicable to the rights and obligations of NNC and NNL hereunder.

9.  **Confidentiality.** Each of the Parties agrees to keep confidential and not to disclose (and shall use its reasonable best efforts to cause its officers, directors, employees, agents, advisors and attorneys to keep confidential and not to disclose) the Settlement Amount or the discussions and negotiations leading up to or relating to the preparation and execution of this Settlement Agreement, except as required by law or contract (including, without limitation, compliance with financial and/or tax matters), by any court, administrative or legislative body, or as required to seek approval of the Settlement Agreement by the Bankruptcy Court. Notwithstanding the foregoing, the Plaintiffs, NNC or NNL, may disclose this Settlement Amount and the discussions and negotiations leading up to or relating to the preparation and execution of this Settlement Agreement to (i) creditor constituents that are subject to pre-existing confidentiality obligations, including, without limitation, the Committee and the Bondholders Group, and (ii) the Monitor.

10. **Entire Agreement.** This Settlement Agreement contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior or contemporaneous written or oral communications, understandings and agreements with respect to the subject matter hereof.

11. **No Admissions.** Each Party acknowledges and agrees that this Settlement Agreement is the result of a compromise and nothing herein constitutes an admission or concession of liability, culpability, statutory violation or damages on or in connection with any claim or legal issue raised in respect of the subject matter hereof.

12.     <u>Modifications</u>.  This Settlement Agreement may be modified only by a written document signed by each of the Parties.  Electronic mail shall not be considered a "writing" sufficient to change, modify, extend or otherwise affect the terms of this Settlement Agreement.  No waiver of this Settlement Agreement or any of the promises, obligations, terms or conditions hereof shall be valid unless it is written and signed by the Party against whom such waiver or other condition is to be enforced.

13.     <u>Costs and Expenses</u>.  Each Party agrees to bear its own costs (including, without limitation, attorneys' fees), expenses and disbursements incurred in connection with the Adversary Proceeding, the Adversary Proceeding Claims, the Canadian Debtors' Claims, the Defendants' U.S. Claims and the Defendants' Canadian Claims, and the discussions and negotiations leading up to or relating to the preparation, execution, approval and consummation of this Settlement Agreement, and to not seek from each other reimbursement of any such costs, expenses or disbursements.

14.     <u>Representations and Warranties</u>.  Each Party represents and warrants that it is authorized to enter into and consummate this Settlement Agreement.  Each individual executing this Settlement Agreement represents and warrants that he/she has full authority and legal capacity to do so.  Each Party represents that it has not transferred or assigned to any third party any rights possessed by that Party against the other Party in respect of the subject matter of this Settlement Agreement.

15.     <u>Construction</u>.  This Settlement Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing the document to be drafted.  Each Party warrants that it has been represented and advised by counsel in

connection with the negotiation, preparation and execution of this Settlement Agreement and all matters covered by it.

16.  Jurisdiction.  The Bankruptcy Court and the Canadian Court shall have joint jurisdiction over the implementation of this Settlement Agreement and the determination of any matters relating to or arising from this Settlement Agreement or the implementation thereof.

17.  Manner of Execution.  This Settlement Agreement may be executed in counterparts, each of which shall constitute an original, and such counterparts shall constitute and be construed together as one and the same Settlement Agreement.  Facsimile and photocopied signatures and signatures transmitted via email shall constitute original signatures for all purposes relating to this Settlement Agreement.

18.  Cooperation.  The Parties agree to cooperate fully and to take all additional actions that may be reasonably necessary or appropriate, at each Party's respective cost and expense, to give full force and effect to the terms and provisions of this Settlement Agreement.

19.  Materiality.  Each individual term and condition of this Settlement Agreement shall be deemed material.  The failure of any Party to strictly enforce the terms hereof shall not constitute a waiver of any rights herein or as a matter of law.

20.  No Third Party Beneficiary.  Except as otherwise provided in paragraphs 2 and 3 above, no parties other than the signatories to this Settlement Agreement shall receive the benefit of this Settlement Agreement.

21.  Further Assurances.  In connection with this Settlement Agreement and the transactions contemplated hereby, each Party shall execute and deliver any additional documents and instruments and shall perform any additional acts that may be reasonably necessary or appropriate to effectuate and perform its obligations and agreements hereunder and the

transactions contemplated hereby. By execution of this Settlement Agreement, the Monitor acknowledges and approves this Settlement Agreement in accordance with the Monitor's authority under the orders entered by the Canadian Court.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have executed this Settlement Agreement as of the date first written above.

Nortel Networks Inc.

By: /s/ John Ray
John Ray
Principal Officer

Nortel Networks (CALA) Inc.

By: /s/ John Ray
John Ray
Principal Officer

Nortel Networks Corporation

By:_____
Anna Ventresca
General Counsel – Corporate
and Corporate Secretary

By:_____
John M. Doolittle
Senior Vice-President, Corporate
Services and Chief Financial Officer

Nortel Networks Limited

By:_____
Anna Ventresca
General Counsel – Corporate
and Corporate Secretary

By:_____
John M. Doolittle
Senior Vice-President, Corporate
Services and Chief Financial Officer

Telmar Network Technology, Inc.

By:_____
John H. McAlpine
Chief Financial Officer

Precision Communication Services, Inc.

By:_____
John H. McAlpine
Chief Financial Officer

Precision Communication Services Corporation

By:_____
John H. McAlpine
Chief Financial Officer

13

IN WITNESS WHEREOF, the Parties have executed this Settlement Agreement as of the date first written above.

| | |
|---|---|
| Nortel Networks Inc. | Telmar Network Technology, Inc. |
| By:_____<br>John Ray<br>Principal Officer | By:_____<br>John H. McAlpine<br>Chief Financial Officer |
| Nortel Networks (CALA) Inc. | Precision Communication Services, Inc. |
| By:_____<br>John Ray<br>Principal Officer | By:_____<br>John H. McAlpine<br>Chief Financial Officer |
| Nortel Networks Corporation | Precision Communication Services Corporation |
| By: /s/ Anna Ventresca<br>Anna Ventresca<br>General Counsel – Corporate<br>and Corporate Secretary<br><br>By: /s/ Clarke E. Glaspell<br>Clarke E. Glaspell<br>Controller | By:_____<br>John H. McAlpine<br>Chief Financial Officer |
| Nortel Networks Limited | |
| By: /s/ Anna Ventresca<br>Anna Ventresca<br>General Counsel – Corporate<br>and Corporate Secretary<br><br>By: /s/ Clarke E. Glaspell<br>Clarke E. Glaspell<br>Controller | |

13

IN WITNESS WHEREOF, the Parties have executed this Settlement Agreement as of the date first written above.

Nortel Networks Inc.

By:_____
John Ray
Principal Officer

Nortel Networks (CALA) Inc.

By:_____
John Ray
Principal Officer

Nortel Networks Corporation

By:_____
Anna Ventresca
General Counsel – Corporate
and Corporate Secretary

By:_____
John M. Doolittle
Senior Vice-President, Corporate
Services and Chief Financial Officer

Nortel Networks Limited

By:_____
Anna Ventresca
General Counsel – Corporate
and Corporate Secretary

By:_____
John M. Doolittle
Senior Vice-President, Corporate
Services and Chief Financial Officer

Telmar Network Technology, Inc.

By: /s/ John H. McAlpine
John H. McAlpine
Chief Financial Officer

Precision Communication Services, Inc.

By: /s/ John H. McAlpine
John H. McAlpine
Chief Financial Officer

Precision Communication Services Corporation

By: /s/ John H. McAlpine
John H. McAlpine
Chief Financial Officer

13

**ACKNOWLEDGED AND
APPROVED BY:**

**ERNST & YOUNG INC.**
in its capacity as monitor of Nortel
Networks Corporation *et al.* and not in
its personal capacity

By: _____
Name: Tom Ayres
Title: Senior Vice President

DCACTIVE-15828685.5

14

# EXHIBIT A

**Invoices in our systems and Scheduled to pay**

| Invoice | Amount in doc. curr. | Curr. | Net due dt |
|---|---:|---|---|
| 207013 | 634.49 | USD | 8/4/11 |
| 207012 | 634.49 | USD | 8/4/11 |
| 207011 | 634.49 | USD | 8/4/11 |
| 207010 | 634.77 | USD | 8/4/11 |
| 207009 | 1,904.31 | USD | 8/4/11 |
| 207007 | 1,268.98 | USD | 8/4/11 |
| 207006 | 1,268.98 | USD | 8/4/11 |
| 207005 | 634.49 | USD | 8/4/11 |
| 207004 | 634.77 | USD | 8/4/11 |
| 2375524 | 185.00 | USD | 7/21/11 |
| 2376225 | 185.00 | USD | 7/22/11 |
| 2376220 | 45.00 | USD | 7/22/11 |
| 2376219 | 5,220.00 | USD | 7/22/11 |
| 2384560 | 3,750.00 | USD | TBD |
| | **17,634.77** | | |