**EXHIBIT 5**

Court File No. 09-CL-7950

# ONTARIO
## SUPERIOR COURT OF JUSTICE
## (COMMERCIAL LIST)

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION ("Nortel")**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36 AS AMENDED ("CCAA")**

## AFFIDAVIT OF ELENA KING
(sworn November 11, 2009)

I, ELENA KING, of the City of Vaughan, in the Province of Ontario, MAKE OATH AND SAY:

1.  I am the Senior Vice President, Human Resources of Nortel Networks Corporation ("NNC") and Nortel Networks Limited ("NNL") and have held this position for approximately two years. I have however, been employed by Nortel in other capacities for the last 29 years. As such, I have personal knowledge of the matters to which I hereinafter depose in this Affidavit. Where I do not possess personal knowledge, I have stated the source of my information and, in all such cases, believe it to be true.

2.  I swear this affidavit in support of Nortel's motion for directions regarding the ownership of certain annuities held with Sun Life Assurance Company of Canada ("Sun Life").

DOCSTOR: 1738101

## OVERVIEW:

3. On January 14, 2009, the Applicants were granted protection under the CCAA pursuant to an initial order of this Court (the "Initial Order"), and Ernst & Young Inc. was appointed as the monitor. The Initial Order was subsequently amended and restated on February 10 and April 7, 2009.

4. Upon the commencement of the CCAA proceedings, the Applicants stopped making payments on account of unsecured claims that predated the Initial Order. In particular, the Applicants ceased payments to former employees which the Applicants believed constituted unsecured claims. Those included payments pursuant to a Supplementary Pension and Retirement Allowance Plan (the "SPRAP").

5. Nortel takes the position that monies held by Sun Life pursuant to the SPRAP are the property of NNL and the obligation to pay participants under the SPRAP are contractual. Koskie Minsky, on behalf of the plan participants, takes the position that those funds are subject to a trust.

6. Nortel, after consultation with Koskie Minsky and the Monitor has brought this motion for directions to determine the legal ownership of certain funds held by Sun Life.

## SUPPLEMENTARY PENSION AND RETIREMENT ALLOWANCE PLAN:

7. The SPRAP was a retirement benefit plan made available to certain invited senior officers. The Management Resources and Compensation Committee ("MRCC") of the board of directors of Northern Telecom Limited, a predecessor corporation to NNL[1], approved the introduction of the SPRAP in 1979 and the plan continued until 1985 when amendments to the *Income Tax Act* altered the treatment of such plans (plans already in existence such as the

---

[1] I am advised by Samantha Graff, Corporate Counsel & Assistant Secretary of Nortel Networks Ltd., that Northern Telecom Limited became Nortel Networks Corporation on April 29, 1999.

DOCSTOR: 1738101

- 3 -

SPRAP were however "grandfathered") . A copy of the SPRAP is attached hereto as Exhibit "A". The features of the SPRAP included:

    (a)    The principal sums awarded to each officer were to be paid to the third party on the anniversary date of the plan (April 1);

    (b)    Each new money payment would attract interest at a guaranteed rate for a 5 to 10 year period renewable for 5 to 10 years at the renewable interest rate in effect at the time of renewal. The length of the period for which the interest is guaranteed was selected by each officer; and

    (c)    Nortel would be the owner and beneficiary of the individual annuity contracts issued for each new money payment into the plan (to avoid constructive receipt).

8.    During this period, the MRCC, at its annual meetings, considered and approved awards for participating senior officers. Copies of the minutes of the MRCC are attached hereto as Exhibit "B". Nortel paid these amounts on account of the SPRAP directly to a third party.[2]

*The Role of Sun Life*

9.    Nortel entered into a Group Annuity Contract with Sun Life on July 3, 1980 (the "Group Annuity Contract"). Attached hereto as Exhibit "C" is a copy of the group annuity contract #19161-G. Pursuant to the terms of the Group Annuity Contract:

    (a)    Nortel would make deposits to Sun Life annually and to be credited to the "Deposit Fund";

    (b)    Sun Life agreed to maintain a Deposit Fund, which formed a liability of Sun Life's general funds;

---

[2] In 1979 the funds were deposited with Manulife Financial, but all annuities were subsequently transferred to Sun Life in 1980 under Group Annuity Contract No. 19161-G.

(c) A separate "account" would be maintained by Sun Life for each individual to whom a portion of a deposit had been allocated by Nortel;

(d) The amounts credited to said "account" would be the principal contributions plus interest; and

(e) At the direction of Nortel, Sun Life will pay to Nortel all or any portion of the balance in any participant's account by charging against such account the amount withdrawn.

*Process upon Retirement*

10. Upon retirement, participants elected to have the amount in their "account" with Sun Life (the "Accumulated Sum") paid to them through one of the following methods:

(a) a life annuity, guaranteed for 10 years with or without joint and survivor options;

(b) a term certain annuity for a specific period;

(c) a lump-sum payment of the Accumulated Sum; or

(d) a transfer of the Accumulated Sum (from Manulife or Sun Life) to Nortel from which 'planned' withdrawals could be effected.

11. The funds were then withdrawn from the Deposit Fund and were paid out in accordance with the retiree's election as outlined above. Where a retiree elected to have his Accumulated Sum paid into an annuity (either for life or term certain), Sun Life used the Accumulated Sum to purchase an annuity under policy number 14190 (the "Annuity Policy").

12. As at the date of the Initial Order, nine (9) former employees, or their surviving spouses, continued to receive payments from Nortel pursuant to the Annuity Policy. Attached as Exhibit "D" are copies of their Annuity Certificates.


13.  Attached as Exhibit "E" is a copy of the Sun Life Statement of Activity for the month of October, 2009. Attached as Exhibit "F" is the most recent valuation of the Annuity Policy dated July 9, 2009, which values the market value of the Annuity Policy at $7,586,593.

### *Annuity Payments Procedure*

14.  Once a participant elected to have the Accumulated Sum transferred into an annuity, Sun Life purchased an annuity for that value and listed Nortel as both the owner and the beneficiary.

15.  Upon commencement of a participant's annuity payments, Sun Life transferred scheduled benefit payments from the annuity to Nortel. Nortel recorded these payments as income on its balance sheet and deposited the funds into its general operating account. Nortel then issued cheques to the participant (or their surviving spouse). Nortel treated payments to participants as deductible expenses while participants reported these payments as income to be taxed in the usual course.

### *Specific Terms of the SPRAP*

16.  Unfortunately, due to the passage of time, some of the original documents relating to these matters have not been located. As a result, the parties have only been able to locate one signed memorandum of agreement between Nortel and a plan participant. It is unknown whether the other participants also entered into similar agreements but attached as Exhibit "G" is a copy of a draft memorandum of agreement in regards to the SPRAP.

17.  Relevant details of the single signed agreement that has been located are outlined below:

Marcelo Gumucio

18.     The memorandum of agreement between Nortel and Marcelo Gumucio, signed on June 1, 1983 is attached as Exhibit "H" and contains the following provisions:

> 3. Northern Telecom has deposited or shall cause to be deposited with Sun Life Assurance Company of Canada on or before June 30, 1983, the sum of $599,391 (Canadian) for the purchase of an annuity contract for payment to or for the benefit of Northern Telecom of an annuity sufficient to pay the special pension and retirement allowance referred to in paragraph 2 above. <u>Nothing in this Agreement shall give the Employee any right in and to the annuity contract nor any right in any specific asset of Northern Telecom (either as a security interest, as a beneficiary of a trust, or otherwise)</u>. [Emphasis added]
>
> ...
>
> 7. It is a condition of this Agreement, without which it would not have been made, that:
>
> (a)   during the period commencing with the execution of this Agreement and terminating with the final payment of all payments required to be made hereunder, the Employee shall:
>
>> (i)   not take part or become engaged in the conduct or management of business carried on in the United States of America or elsewhere which is directly competitive with the business carried on in the United States of America or such other place by Northern Telecom, Northern Telecom Limited, its subsidiaries and affiliates, without the prior written approval of Northern Telecom; and
>>
>> (ii)   not use and shall treat in a confidential manner any proprietary information or trade secrets acquired by him in respect of any business of Northern Telecom, Northern Telecom Limited, its subsidiaries, or relating to any other dealings, transactions or affairs of Northern Telecom or such companies, which may have come to his knowledge in any manner during his employment with Northern Telecom, Northern Telecom Limited, its subsidiaries and affiliates;
>
> (b)   in the event the Employee fails to perform or breaches any undertaking prescribed by this paragraph 7, his right to receive any

amounts then payable or thereafter becoming payable to him shall terminate ipso facto. [Emphasis in original]

**OTHER ANNUITIES:**

Sun Life Policy #14975

19.     I understand that in 1986, amendments were made to the *Income Tax Act*, which impacted the tax treatment of income deferral arrangements. As a result, Nortel established the Employee Benefit Plan for Senior Management Canada ("Employee Benefit Plan") to replace the SPRAP going forward.

20.     Under the Employee Benefit Plan, senior employees received payments similar to the SPRAP and upon an employee's election at retirement, annuities were purchased from Sun Life. However, annuities held by Sun Life under policy #14975 list the Northern Telecom Employee Benefit Plan as the "owner" and the Montreal Trust Company as the "trustee", and the former employees as the listed "annuitants".

21.     Upon retirement, payments flowed to annuitants from Sun Life through a trust company never once coming into Nortel's possession. As such, payments to annuitants under policy #14975 have continued to flow post filing.

Sun Life Policy #S-0179-G

22.     I have been advised by Suzanne Wood, an associate at Ogilvy Renault LLP ("Ogilvy"), counsel to the Applicants, that Ogilvy Renault was contacted by counsel to Mr. Edmund Fitzgerald, a former Nortel employee.

23.     One of the annuity certificates held by Sun Life under policy #S-0179-G lists Mr. Fitzgerald as the "annuitant" and Northern Telecom Inc., as the "owner". Northern Telecom Inc. is a predecessor corporation to Nortel Networks Inc. ("NNI"), Nortel's principle U.S. operating subsidiary.



- 8 -

24.     Mr. Fitzgerald requested that Nortel also seek the Court's direction with respect to policy #S-0179-G. However, as NNI is under the supervision of the Chapter 11 court in the District of Delaware, we have not sought the advice and direction of this Honourable Court on that question.

SWORN BEFORE ME at the City of Toronto, in the Province of Ontario, on this 11th day of November, 2009.

_____
Commissioner for Taking Affidavits

_____
ELENA KING

Gregory Freeman Wayne Bowley, a
Commissioner etc., Province of Ontario,
while a student-at-law.
Expires April 11, 2011.

DOCSTOR: 1738101