UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., et al., | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |
| | **Hearing Date:**<br>**Oct. 13-14, 2011 at 9:30 a.m. (ET)**<br>**Responses Due: September 14, 2011**<br>**Replies Due: October 5, 2011** |
| | **RE: Docket No. 5970** |

**THE JOINT ADMINISTRATORS' MEMORANDUM OF LAW
IN OPPOSITION TO THE DEBTORS' AND COMMITTEE'S JOINT OBJECTION
AND MOTION TO DISMISS THE CLAIMS OF NORTEL NETWORKS UK LIMITED**

# TABLE OF CONTENTS

PAGES

INTRODUCTION .........................................................................................1

PROCEDURAL HISTORY.............................................................................7

FACTUAL BACKGROUND OF THE CLAIMS.................................................10

ARGUMENT ..............................................................................................16

I.     THE PROOF OF CLAIM SATISFIES ALL RELEVANT PLEADING
STANDARDS......................................................................................16

     A.    The Proof of Claim Complies With The Bankruptcy Rules. ................16

     B.    It Would Serve No Purpose, And Only Lead To Further Delay, To Apply
Rules 8(a) and 12(b)(6). ....................................................................19

     C.    The Proof of Claim Complies With Fed. R. Civ. P. 8(a). ...................22

     D.    The Joint Administrators' Claims Are Not Subject To Dismissal Under
Rule 9(b). ...........................................................................................24

          1.    The Joint Administrators' Claims Do Not Sound In Fraud. .....................25

          2.    In Fact, The Proof Of Claim Is Pleaded With Particularity......................26

     E.    Pleading Standards Are Relaxed For Bankruptcy Trustees and Other
Persons Who Were Not Present When The Underlying Events Occurred,
and Where The Salient Facts Are In The Control Of Others..............29

II.    THE JOINT ADMINISTRATORS STATE CLAIMS FOR BREACH OF DUTY. ........30

     A.    The Joint Administrators State Claims For Breach Of Duties Imposed On
De Facto and Shadow Directors Under English Law. ..........................30

          1.    English Law Regarding Shadow And De Facto Directors. ......................30

          2.    The Joint Administrators Allege Facts Showing That NNI Was A
De Facto Or Shadow Director Of NNUK................................................34

          3.    The Joint Administrators Allege Facts Showing That NNI
Employees Were Acting On Behalf Of NNI. ...........................................38

          4.    Section 251(3) of The English Companies Act Does Not Bar A
Shadow Director Claim Against NNL Or NNI.........................................40

i

# TABLE OF CONTENTS
## (Continued)

B.    The Proof of Claim Alleges That NNUK Was Insolvent. ....................................41

C.    The Proof of Claim Alleges Facts Showing That NNI Owed NNUK An Independent Duty Of Care Under English Law.......................................................43

    1.    NNI Enjoyed A "Relationship of Sufficient Proximity" With Respect to NNUK That Gave Rise To An Independent Duty Of Care Under English Law..............................................................................43

    2.    NNI Breached the Independent Duty Of Care It Owed To NNUK...........45

D.    The Joint Administrators Are Not Estopped From Asserting  That NNI Was A De Facto Or Shadow Director Of NNUK....................................................45

    1.    The Doctrine of Judicial Estoppel Does Not Apply. ................................45

        a.    The Joint Administrators Have Not Taken Inconsistent Positions.......................................................................................46

            i.    The Witness Statements Were Prepared for the Purpose of Supporting a Jurisdictional Finding. ..................................47

            ii.    There Is No Inconsistency Between the Joint Administrators' Positions.....................................................49

        b.    NNI Cannot Show That the Joint Administrators Acted In Bad Faith.........................................................................................52

        c.    NNI Will Suffer No Harm From Any Purported Inconsistency....................................................................................55

    2.    The Doctrine Of Collateral Estoppel Does Not Apply .............................56

III.    THE JOINT ADMINISTRATORS STATE CLAIMS FOR SECONDARY LIABILITY AGAINST NNI. ............................................................................................57

A.    The Joint Administrators State Claims For Dishonest Assistance And Aiding And Abetting Breach of Fiduciary Duty.......................................................57

    1.    Rule 9(b) Does Not Apply To The Joint Administrators' Claims For Aiding and Abetting Or Dishonest Assistance....................................58

    2.    The Proof of Claim Sets Forth Facts Showing The Assistance NNI Provided And From Which It Can Be Inferred That Such Assistance Was Knowing. ...........................................................................59

        a.    The US Debtor Misstates The Required Mental State...................59

## TABLE OF CONTENTS
### (Continued)

|  |  | b. | The Proof of Claim Contains Facts Showing The Assistance Provided And That NNI Acted With The Requisite Mental State. | 62 |

| | 3. | The Joint Administrators Have Alleged Facts Supporting The Underlying Breaches of Duty By NNUK's Directors and NNL. | 66 |

| | 4. | The Joint Administrators' Claims Are Supported By Factual Allegations Showing That NNUK Met The Insolvency Requirement At The Relevant Time. | 67 |

B.    The Joint Administrators State Claims For Conspiracy. ........67

    1.    Rule 9(b) Does Not Apply To The Joint Administrators' Conspiracy Claims. .......67

    2.    The Proof of Claim Alleges Facts Supporting The Elements of the Conspiracy Claims. .......68

C.    The Doctrines of Ex Turpi Causa and In Pari Delicto Do Not Apply. .......70

IV.    THE JOINT ADMINISTRATORS STATE CLAIMS TO RECOVER NNUK PROPERTY RECEIVED BY NNI. .......71

A.    The Proof of Claim Alleges That NNI Received NNUK Funds. .......71

B.    The Proof of Claim Alleges Facts Supporting a Finding That It Would Be Unfair, Inequitable and Unconscionable to Allow NNI To Retain The NNUK Funds It Received. .......72

V.    THE JOINT ADMINISTRATORS STATE CLAIMS TO RECOVER FOR IMPROPER ALLOCATION OF PRE-PETITION NORTEL ASSET SALES. .......73

A.    The Proof Of Claim States A Valid Claim For Mistake Under English Law. .......74

B.    The Proof of Claim States A Valid Claim For Transaction At Undervalue Under English Law. .......74

C.    The Proof Of Claim States Valid Claims For Breach Of Implied Contract And Implied Term Under English Law. .......75

VI.    THE DOCTRINES OF EX TURPI CAUSA AND IN PARI DELICTO DO NOT BAR THE JOINT ADMINISTRATORS' CLAIMS. .......76

A.    There is no Basis To Dismiss the Joint Administrators' Claims Under the Doctrine of Ex Turpi Causa. .......76

# TABLE OF CONTENTS
## (Continued)

B.    The Joint Administrators' Claims For Aiding And Abetting And Conspiracy Are Not Barred By The Doctrines Of Ex Turpi Causa Or In Pari Delicto. ...................................................................................79

    1.    The In Pari Delicto Doctrine Does Not Apply Because NNI Was an Insider of NNUK. .........................................................................80

    2.    The "Adverse Interest" and "Controlling Shareholder" Exceptions to the In Pari Delicto Doctrine Bar its Application Here. ..........................82

    3.    The Policy Underlying the In Pari Delicto Doctrine Would be Thwarted by Dismissing the Claims Brought by the Joint Administrators at This Stage in the Proceeding.........................................83

VII.    THE JOINT ADMINISTRATORS' CLAIMS RELATING TO TRANSFER PRICING, INTERCOMPANY LOANS, AND PRE-PETITION ASSET SALES ARE NOT TIME-BARRED. ............................................................85

A.    The Joint Administrators' Claims Are Not Time-Barred Because Section 108(c) Tolled The Statute of Limitations As Of The Petition Date......................85

B.    The Internal Affairs Doctrine Requires the Court to Apply the Six-Year Statute of Limitations Under The UK Limitation Act 1980 To Claims Arising Out Of The Internal Affairs Of NNUK......................................86

C.    The Claims Based On Transfer Pricing, Interest Free Loans And Project Swift Were Timely As Of The Petition Date.........................................88

D.    The Joint Administrators' Claims For Unjust Enrichment And Breach Of Contract Are Not Time-Barred. ............................................................89

E.    The Joint Administrators' Amended Proof Of Claim Relates Back To Their Original Proof Of Claim For Statute Of Limitations Purposes. ...................89

F.    The Statute Of Limitations Is Equitably Tolled While A Corporation's Board Of Directors Is Controlled By Culpable Directors......................................91

CONCLUSION....................................................................................93

# TABLE OF AUTHORITIES

**Page(s)**

**STATUTES AND RULES**

10 Del. C. § 8106 ..................................................................................................86

11 U.S.C. § 101(2) ................................................................................................81

11 U.S.C. § 101(5) ................................................................................................37

11 U.S.C. § 101(31) ..............................................................................................80

11 U.S.C. § 108(c) .......................................................................................... *passim*

Fed. R. Bankr. P. 3001 .................................................................................... *passim*

Fed. R. Bankr. P. 7001 *et seq*............................................................................19

Fed. R. Bankr. P. 7009 ..........................................................................................24

Fed. R. Bankr. P. 9014 .................................................................................... *passim*

Fed. R. Civ. P. 8 ............................................................................................. *passim*

Fed.R.Civ. P. 9 ............................................................................................... *passim*

Fed. R. Civ. P. 12 ........................................................................................... *passim*

*Limitation Act 1980*........................................................................................87, 88

*Companies Act 2006* ...................................................................................... *passim*

**CASES**

*900 Capital Servs., Inc. v. Cloud (In re Cloud)*,
     No. 99-51109, 2000 WL 634637 (5th Cir. May 4, 2000).......................................20

*Adamson v. Bernier (In re Bernier)*,
     282 B.R. 773 (Bankr. D. Del. 2002) ......................................................................26

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*,
     365 B.R. 24 (Bankr. S.D.N.Y. 2007).....................................................................42

*In re Adelphia Commc'ns Corp.*,
     359 B.R. 54, 56 n.5 (Bankr. S.D.N.Y. 2006).........................................................21

*Aetna Cas. and Sur. Co. v. Leahey Const. Co.*,
     219 F.3d 519 (6th Cir.2000) ..................................................................................59

# TABLE OF AUTHORITIES
## (Continued)

*Allied Capital Corp. v. GC–Sun Holdings, L.P.*,
  910 A.2d 1020 (Del. Ch. 2006) .................................................................88

*In re Alper Holdings USA, Inc.*,
  398 B.R. 736 (S.D.N.Y. 2008) .............................................................19, 83

*In re Am. Bus. Fin. Servs., Inc.*,
  361 B.R. 747 (Bankr. D. Del. 2007) .........................................................68

*Am. Buying Ins. Servs., Inc. v. S. Kornreich & Sons, Inc.*,
  944 F. Supp. 240 (S.D.N.Y. 1996) ............................................................26

*Am. Gen. Life Ins. v. Goldstein*,
  741, F. Supp. 2d 604, 613 (D. Del. 2010) .................................................28

*Am. Int'l Group, Inc. v. Greenberg*,
  976 A.2d 872 (Del. Ch. 2009) ......................................................80, 83, 84

*Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.)*,
  107 B.R. 856 (Bankr. E.D. Pa. 1988) .......................................................21

*Anjelino v. New York Times Co.*,
  200 F.3d 73 (3d Cir. 2000) ........................................................................53

*Arista Records, LLC v. Doe 3*,
  604 F.3d 110 (2d Cir. 2010) ...............................................................22, 23

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009) ..................................................................... *passim*

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
  472 U.S. 299 (1985) ...................................................................................83

*Bell Atlantic Corp. v. Twombly*,
  55 U.S. 544 (2007) ........................................................................... *passim*

*Belmont Finance Corp. v. Williams Furniture Ltd.* [1979] ........................77

*In re Best Products Co.*,
  210 B.R. 714 (Bankr. E.D. Va. 1997) .......................................................21

*Brug v. Enstar Grp., Inc.*,
  755 F. Supp. 1247 (D. Del. 1991) .............................................................68

*Matter of Burger*,
  125 B.R. 894 (Bankr. D. Del. 1991) .........................................................86

## TABLE OF AUTHORITIES
### (Continued)

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)............................................................................42

*Burtch v. Dent (In re Circle Y of Yoakum, Tex.)*,
    354 B.R. 349 (Bankr. D. Del. 2006) ..........................................................86, 91

*Capitaliza-T Sociedad De Responsabilidad Limitada De Capital Variable v. Wachovia*
    *Bank of Del. Nat'l Ass'n*,
    No. CIV. 10-520, 2011 WL 864421 (D. Del. Mar. 9, 2011) ...........................59, 60

*In re Cavalier Indus., Inc.*,
    No. 99-31737, 2003 WL 716291 (Bankr. E.D. Pa. Feb. 6, 2003) ..........................16

*Chapa v. Chase Home Financing LLC*,
    No. C-10-359, 2010 WL 5186785 (S.D. Tex. Dec. 15, 2010)...............................73

*In re Chi-Chi's, Inc.*,
    338 B.R. 618 (Bankr. D. Del. 2006) .................................................................56

*Christidis v. First Pa. Mortg. Trust*,
    717 F.2d 96 (3d Cir. 1983)..............................................................................27

*Cleveland v. Policy Mgmt. Sys. Corp.*,
    526 U.S. 795 (1999).......................................................................................51

*Coan v. O & G Indus. Inc. (In re Austin Driveway Servs., Inc.)*,
    179 B.R. 390 (Bankr. D. Conn. 1995) ..............................................................91

*Copeland v. Merrill Lynch & Co.*,
    47 F.3d 1415 (5th Cir.1995) ...........................................................................57

*Craftmatic Sec. Litig. v. Kraftsow*,
    890 F.2d 628 (3d Cir. 1989).............................................................................27

*Cronus Offshore, Inc. v. Kerr McGee Oil & Gas Corp.*,
    369 F. Supp. 2d 848 (E.D. Tex. 2004) *aff'd*, 133 F. App'x 944 (5th Cir. 2005) ....................25

*Cross v. Kirby* [2000] CA Transcript No. 321 .............................................................79

*Davidson v. Twin City Bank (In re Hollis)*,
    83 B.R. 588 (Bankr. E.D. Ark. 1988) ...........................................................17, 30

*In re DBSI, Inc.*,
    445 B.R. 344 (Bankr. D. Del. 2011) .................................................................42

*In re DeAngelis Tangibles, Inc.*,
    238 B.R. 96 (Bankr. M.D. Pa. 1999) ................................................................18

# TABLE OF AUTHORITIES
## (Continued)

*In re Diamond Mortg. Corp. of Ill.*,
  105 B.R. 876 (N.D. Ill. 1989) ............................................................21

*Dobyns v. United States*,
  91 Fed. Cl. 412 (2010) ......................................................................22

*Duke Energy Int'l, L.L.C. v. Napoli*,
  748 F. Supp. 2d 656 (S.D. Tex. 2010) ...............................................59

*In re DVI, Inc.*,
  No. 03-12656, 2008 WL 4239120 (Bankr. D. Del. Sept. 16, 2008)............................83, 84, 85

*Empire Fin. Servs., Inc. v. Bank of N.Y. (Del.)*,
  900 A.2d 92 (Del. 2006) ...................................................................69

*Re Eurofood IFSC Ltd* [2006] BCC 606.....................................................48

*In re Fedders North America, Inc.*,
  405 B.R. 527 (Bankr. D. Del. 2009) ...................................................88

*Fierro v. Gallucci*,
  06-CV-5189, 2008 WL 2039545 (E.D.N.Y. May 12, 2008) ...........................................67, 68

*Firestone v. Firestone*,
  76 F.3d 1205 (D.C, Cir. 1996)............................................................88

*Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.)*,
  11 U.S.C. § 502(c) .............................................................................19

*Fleck v. KDI Sylvan Pools, Inc.*,
  981 F.2d 107 (3d Cir. 1992)...............................................................53

*Floyd v. CIBC Markets, Inc.*,
  426 B.R. 622 (Bankr. S.D. Tex. 2009) .........................................80, 84

*Floyd v. Hefner*,
  556 F. Supp. 2d 617 (S.D. Tex. 2008) ..........................................69, 80

*Forman v. Salzano (In re Norvergence, Inc.)*,
  405 B.R. 709 (Bankr. D.N.J. 2009) ....................................................26

*Fowler v. UPMC Shadyside*,
  578 F.3d 203 (3d Cir. 2009)..........................................................22, 23

*Gillman v. Inner City Broad. Corp.*,
  No. 08 Civ. 8909, 2009 WL 3003244 (S.D.N.Y. Sept. 18, 2009) ..........................................22

*Gray v. Thames Trains Ltd.* [2009] 1 AC 1339 ..........................................79

# TABLE OF AUTHORITIES
## (Continued)

*Greenfield v. Tele-Communications,*
C.A. No. 9814, 1989 WL 48738 (Del. Ch. May 10, 1989) ....................................................61

*Gubitosi v. Zegeye*,
946 F. Supp. 339 (E.D. Pa. 1996) ........................................................................................26

*Guirgis v. Movers Specialty Servs., Inc.*, 346 F. App'x 774 (3d Cir. 2009)................................22

*Gwembe Valley Development Company Limited v Koshy* [2003] EWCA Civ 1048....................87

*Hamilton v. Leavy*,
No. CIV.A. 94-336-GMS, 2001 WL 848603 (D. Del. July 27, 2001) ...................................56

*Hammerly Oaks, Inc. v. Edwards*,
958 S.W.2d 387 (Tex. 1997)................................................................................................81

*Hecht v. Resolution Trust Corp.*
333 Md. 324, 635 A.2d 394 (1994) ......................................................................................92

*Hill v. Day (In re Today's Destiny, Inc.)*,
388 B.R. 737 (Bankr. S.D. Tex. 2008) .................................................................21, 80, 82, 84

*Hirsch v. Tarricone (In re A. Tarricone, Inc.)*,
286 B.R. 256 (Bankr. S.D.N.Y. 2002).................................................................................81

*Holland v. Revenue & Customs Commissioners* [2011] 1 All ER 373....................................31, 33

*In re I.G. Servs., Ltd.*,
No. 04-5041-C, 2004 WL 5866105 (Bankr. W.D. Tex. Dec. 22, 2004) ................................59

*In re Skyport Global Communications, Inc.*,
08-36737, 2011 WL 111427 (Bankr. S.D. Tex. Jan. 13, 2011)..............................................88

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010)................................................................................................22

*Int'l Bankers Life Ins. Co. v. Holloway*,
368 S.W.2d 567 (Tex. 1963)................................................................................................69

*J.J. Harrison (Props.) Ltd. v. Harrison* [2001].........................................................................87

*Kaliner v. Load Rite Trailers (In re Sverica Acquisition Corp., Inc.)*,
179 B.R. 457 (Bankr. E.D. Pa. 1995) ..................................................................................29

*Kalmanovitz v. G. Heileman Brewing Co., Inc.*,
595 F. Supp. 1385 (D. Del. 1984), *aff'd*, 769 F.2d 152 (3d Cir. 1985)...................................68

# TABLE OF AUTHORITIES
## (Continued)

*In re Keck, Mahin & Cate*,
  237 B.R. 430 (Bankr. N.D. Ill. 1999), *aff'd*, 253 B.R. 530 (N.D. Ill. 2000) ...........................16

*Klein v. Stahl GMBH & Co. Maschinefabrik*,
  185 F.3d 98 (3d Cir. 1999)...............................................................................................55

*Kalb, Voorhies & Co. v. Am. Fin. Corp.*,
  8 F.3d 130 (2d Cir. 1993) .................................................................................................83

*Kuwait Oil Tanker v. Al-Bader* (2000) 2 All ER (Comm) 271......................................................68

*Lewandowski v. Nat'l R.R. Passenger Corp.*,
  882 F.2d 815 (3d Cir. 1989)..............................................................................................53

*Lewis v. Davis*,
  199 S.W.2d 146 (Tex. 1947)........................................................................................83, 84

*In re Loewen Group Inc.*,
  No. 98-6740, 2004 WL 1853137 (E.D. Pa. Aug. 18, 2004) ....................................................91

*Lusk v. Foxmeyer Health Corp.*,
  129 F.3d 773 (5th Cir. 1997) ............................................................................................39

*Malleus v. George*,
  641 F.3d 560 (3d Cir. 2011)..............................................................................................23

*Malpiede v. Townson*,
  780 A.2d 1075 (Del. 2001) ..........................................................................................60, 61

*In re Marvel Entm't Group, Inc.*,
  273 B.R. 58 (D. Del. 2002)...........................................................................................91, 92

*McDermott Inc. v. Lewis*,
  531 A.2d 206 (Del. 1987) .................................................................................................87

*Re Mea Corporation Ltd.* [2006] EWHC 1846 (Ch.) ....................................................................33

*Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*,
  426 B.R. 488 (Bankr. D. Del. 2010) ...................................................................................87

*In re Missionary Baptist Found. of Am., Inc.*,
  712 F.2d 206 (5th Cir. 1983) ............................................................................................81

*Montrose Med. Group Participating Savs. Plan v. Bulger*,
  243 F.3d 773 (3d Cir. 2001)...........................................................................46, 54, 55, 56

*Murray v. Silberstein*,
  882 F.2d 61 (3d Cir. 1989)................................................................................................53

x

## TABLE OF AUTHORITIES
### (Continued)

*Nortel Networks, Inc. v. Commc'ns Test Design, Inc.*,
   Adv. No. 10-53065, 2011 WL 1102829 (Bankr. D. Del. Mar. 22, 2011) .........................24, 27

*Ocasio v. Ollson*,
   596 F. Supp. 2d 890 (E.D. Pa. 2009) ..............................................................................52, 55

*Official Comm. Of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs.*,
   *Inc.*), 299 B.R. 732 (Bankr. D. Del. 2003)................................................................................83

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
   848 F.2d 414 (3d Cir. 1988)....................................................................................................53

*In re Orion Refining Corp.*,
   317 B.R. 660 (D. Del. 2004)..............................................................................................90, 91

*Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*,
   No. 09 C 5619, 2010 WL 1979569 (N.D. Ill. May 17, 2010) .................................................29

*In re Pagnotti*,
   269 B.R. 326 (Bankr. M.D. Pa. 2001) ...................................................................................86

*Pardo v. Avanti Corp. Health Sys., Inc. (In re APF Co.)*,
   274 B.R. 634 (Bankr. D. Del. 2001) .......................................................................................29

*Payless Wholesale Distribs, Inc. v. Alberto Culver (P.R.) Inc.*,
   989 F.2d 570 (1st Cir. 1993)....................................................................................................54

*Phillips v. Cnty. of Allegheny*,
   515 F.3d 224 (3d Cir. 2008)....................................................................................................23

*Pinter v. Dahl*,
   486 U.S. 622 (1988)................................................................................................................83

*Profilet v. Cambridge Fin. Corp.*,
   231 B.R. 373 (S.D. Fla. 1999) ...............................................................................................29

*R v. Siracusa* (1990) 90 Cr. App. R. 340 ....................................................................................68

*In re Rafter*,
   No. 05–51335, 2007 WL 1591880 (Bankr. D.N.J. May 30, 2007) .........................................18

*Raytech Corp. v. White*,
   54 F.3d 187 (3d Cir. 1995)......................................................................................................56

*In re Reliance Fin. & Inv. Group, Inc.*,
   No. 05-80625-CIV, 2006 WL 3663243 (S.D. Fla. Nov. 14, 2006) ...................................17, 29

# TABLE OF AUTHORITIES
## (Continued)

*In re Rimsat Ltd.*,
  223 B.R. 345 (Bankr. N.D. Ind. 1998) .......................................................................16, 17, 19

*Rose v. Bartle*,
  871 F.2d 331 (3d Cir.1989).........................................................................................68

*Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*,
  321 B.R. 128 (Bankr. D. Del. 2005) ...........................................................................28

*Matter of Royale Airlines, Inc.*,
  98 F.3d 852 (5th Cir. 1996) ........................................................................................80

*Ryan Operations. G.P. v. Santiam-Midwest Lumber Co.*,
  81 F.3d 355 (3d Cir. 1996)..........................................................................46, 52, 55

*S. Track & Pump, Inc. v. Terex Corp.*,
  722 F. Supp. 2d 509 (D. Del. 2010).............................................................................28

*Scarano v. Central R.R. Co.*,
  203 F.2d 510 (3d Cir. 1953).........................................................................45, 46, 53

*In re SemCrude, L.P.*,
  436 B.R. 317 (Bankr. D. Del. 2010) ............................................................................18

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*,
  742 F.2d 786 (3d Cir. 1984), *cert. denied*, 469 U.S. 1211 (1985).........................................27

*In re Sevko*,
  143 B.R. 167 (Bankr. N.D. Ill. 1992) ...........................................................................20

*Smith v. National City Mortgage*,
  No. A-09-CV-881, 2010 WL 3338537 (W.D. Tex. Aug. 23, 2010)........................................73

*Smith v. Woodforest Nat'l Bank (In re IFS Fin. Corp.)*,
  No. 02-39553, 2007 WL 1308321 (Bankr. S.D. Tex. May 3, 2007)......................................84

*Southco Inv. v. Penn Eng'g & Mfg. Corp.*,
  768 F. Supp. 2d 715 (D. Del. 2011)..............................................................................28

*In re Spiegel, Inc.*,
  337 B.R. 821, 822-24 (Bankr. S.D.N.Y. 2006)................................................................19

*In re Stanford International Bank Ltd* [2010] EWCA Civ 137 ................................................48

*Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*,
  335 B.R. 539 (Bankr. D. Del. 2005) ............................................................................80

# TABLE OF AUTHORITIES
## (Continued)

*State Farm Mut. Auto. Ins. Co. v. Ficchi*,
Civ. No. 10-555, 2011 WL 2313203 (E.D. Pa. June 13, 2011) ..............................................68

*Stephenson v. Capano Dev., Inc.*,
462 A.2d 1069 (Del. 1983) ...................................................................................................25

*Stone & Rolls Ltd v. Moore Stephens* [2009] ..........................................................76, 77, 78, 79

*Swierkiewicz v. Sorema N.A.*,
534 U.S. 506 (2002) ...............................................................................................................22

*Tese-Milner v. Beeler (In re Hampton Hotel Investors, L.P.)*,
289 B.R. 563 (Bankr. S.D.N.Y. 2003) ...................................................................................80

*Three Rivers DC v. Bank of England (No. 3) (2003)* ..............................................................61

*TMP Worldwide, Inc. v. Inacom Corp. (In re Inacom Corp.)*,
Adv. No. 00-1115, 2001 WL 1819987 (D. Del. Aug. 7, 2001) ..............................................26

*Toner v. Allstate Ins. Co.*,
821 F. Supp. 276 (D. Del. 1993) ............................................................................................25

*In re Total Containment, Inc.*,
No. 05-0145, 2005 WL 6522761 (Bankr. E.D. Pa. Oct. 18, 2005) ........................................85

*In re Trans World Airlines, Inc.*,
145 F.3d 124 (3d Cir. 1998) ...................................................................................................90

*Tri-Ex Enters. v. Morgan Guar. Trust*,
586 F. Supp. 930 (S.D.N.Y. 1984) .........................................................................................91

*Ultraframe UK Ltd. v. Fielding* [2005] ....................................................................................32

*United States v. Bestfoods*,
524 U.S. 51 (1998) .................................................................................................................39

*In re Walls & All, Inc.*,
127 B.R. 115 (W.D.Pa. 1991) ................................................................................................90

*In re Windsor Constructors, Inc.*,
No. 03–36589, 2006 WL 4005568 (Bankr. E.D. Pa. Dec. 18, 2006) .....................................18

*In re WorldCom, Inc.*,
322 B.R. 530 (Bankr. S.D.N.Y. 2005) ...................................................................................20

*Young v. Shore*,
588 F. Supp. 2d 544 (D. Del. 2008) .......................................................................................56

## TABLE OF AUTHORITIES
### (Continued)

*Zirn v. Vli Corp.*,
  15 Del. J. Corp. L. 789, 801-02 (Del. Ch. 1989) ....................................................................59

**TREATISES AND PERIODICAL MATERIALS**

37 Am. Jur. 2d *Fraud & Deceit* § 39 (2011) ................................................................................25

*Collier on Bankruptcy* (16th ed. 2011) ................................................................................18, 86

*Moore's Federal Practice* (3d ed. 2011) .............................................................................27, 91

Arthur R. Miller, *From* Conley *to* Twombly *to* Iqbal*:  A Double Play on the Federal
  Rules of Civil Procedure*, 60 Duke L.J. 1, 44 (2010).................................................................30

The court-appointed administrators and authorized foreign representatives (collectively, the "Joint Administrators")[1] for Nortel Networks UK Limited ("NNUK") and certain of its affiliates (collectively, the "EMEA Debtors")[2] located in the region known as EMEA (Europe, Middle East, and Africa) in proceedings under the *Insolvency Act 1986*, pending before the High Court of Justice of England and Wales (the "English Court"), submit this Memorandum of Law in Opposition to the Joint Objection and Motion (the "Joint Objection") [D.I. 5970] of Nortel Networks, Inc. ("NNI") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"),[3] and the Official Committee of Unsecured Creditors (the "Committee" and, together with the Debtors, the "US Debtor"), to dismiss the amended proof of claim of NNUK (the "Proof of Claim").[4]

## INTRODUCTION

There are two initial points to be made.  First, the US Debtor's objection should be examined in light of the surrounding circumstances.  Second, circumspection is required before dismissing claims of this nature and significance at such a preliminary stage.  The claims

---

1. The administrators in the UK proceedings for all of the EMEA Debtors, with the exception of Nortel Networks (Ireland) Limited, are:  Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, and Stephen John Harris.  The administrators in the UK proceedings for Nortel Networks (Ireland) Limited are: Alan Robert Bloom and David Martin Hughes.

2. The EMEA Debtors are:  Nortel Networks UK Limited; Nortel GmbH; Nortel Networks (Austria) GmbH; Nortel Networks (Ireland) Limited; Nortel Networks AB; Nortel Networks B.V.; Nortel Networks Engineering Service Kft; Nortel Networks France S.A.S.; Nortel Networks Hispania, S.A.; Nortel Networks International Finance & Holding B.V; Nortel Networks N.V.; Nortel Networks OY; Nortel Networks Polska Sp. z.o.o.; Nortel Networks Portugal S.A.; Nortel Networks Romania SRL; Nortel Networks S.A.; Nortel Networks S.p.A.; Nortel Networks Slovensko, s.r.o.; Nortel Networks, s.r.o.

3. The Debtors in these Chapter 11 cases are:  Nortel Networks Inc., Nortel Networks Capital Corporation, Alteon WebSystems, Inc., Alteon WebSystems International, Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

4. Capitalized terms used but not otherwise defined are defined  in the Proof of Claim.

asserted by the Joint Administrators are not based on "far-fetched allegations," as the US Debtor

asserts.  They are bona fide claims which have been brought by the Joint Administrators, acting

responsibly and properly as officers of the English Court.  The claims are pursued for the

ultimate benefit of the EMEA creditors.  These creditors stand to suffer if the result of years of

improper removal of value from EMEA is not now corrected.

The US Debtor's objection is entirely misconceived.  The US Debtor had

suggested to the Court that the Joint Administrators' claims would seek to impose duties running

from NNI to NNUK based solely on the fact that the two companies were under common

control.  But the Proof of Claim, a detailed 58 page document, shows that in fact NNI and its

personnel played a direct and substantial role in devising and enforcing key global policies for

the Nortel Group, including the specific policies and transactions by which NNUK was stripped

of cash.  To the extent that NNI's status as a sister company has any relevance at all, it is only to

defeat at least two of the defenses the US debtor has asserted. [5]  While the underlying facts are

complicated, and the relevant events took place over an extended period of time, the Proof of

Claim shows that the Joint Administrators are entitled to pursue numerous claims under foreign

and US law.  The US Debtor's objection raises complex and disputed questions about the

underlying facts, the content of foreign law, and the application of foreign law to the underlying

facts.  These disputed matters cannot be properly addressed on a motion to dismiss.  It would be

unjust to the innocent creditors of the EMEA Debtors to deny the Joint Administrators the

chance to take discovery and prove their claims at trial.

---

5.   As a sister subsidiary NNI cannot rely on Section 251(3) of the English Companies Act 2006, which only
     applies to a parent company.  (Section II.A.4, *infra*.)  And as an affiliate of NNUK, NNI cannot rely on the
     defense of *in pari delicto*.  (Section VI.B.1, *infra*.)

There is also a striking inconsistency in the US Debtor's position on the underlying facts.  The US Debtor does not and can not deny that there was a policy within the Nortel Group to improperly transfer cash and value to the Canadian entities.  It can reasonably be inferred that this was the basis upon which the US Debtor itself submitted a $2 billion dollar claim against NNL regarding transfer pricing irregularities, and accepted such a claim by the IRS.  Although the US Debtor suggests that it was a fellow victim of these policies, the facts show that the US Debtor was centrally involved in creating and implementing the policy to improperly transfer value to the Canadian entities, as is manifestly clear on the face of the Proof of Claim, and as will become even clearer following discovery.  Just as the US Debtor has received the chance to recover on its $2 billion claim for income wrongly diverted to Canada, NNUK seeks the same opportunity to obtain the value that has been wrongly diverted from NNUK, including from NNI which acted together with NNL to enable this diversion.

The US Debtor's objection must be seen for what it is – yet a further attempt by the US Debtor to avoid dealing with the substance of the Joint Administrators' claims and to avoid providing the Joint Administrators with the disclosure which will assist the Joint Administrators to prove their claims at trial.  The US Debtor has accused the Joint Administrators of "playing games."  They are not.  If anyone is playing games it is the US Debtor.

Turning to the detail of the motion, the US debtor raises four principal issues, none of which has any merit.  The US Debtor contends that:

- the Claim does not meet the necessary pleading standard;

- the Joint Administrators are estopped from pursuing claims based on allegations of *de facto* or shadow directorship under English law;

- the Joint Administrators do not state claims under English law; and

- the claims are time barred.

As to the pleading standard, the relevant test for a proof of claim is supplied by Bankruptcy Rule 3001.  The US Debtor does not dispute that the Proof of Claim now complies with this standard, which is all that the US Debtor asked for in its April 2011 motion to require the Joint Administrators to file a "more definite statement" of their claims.  Significantly, the US Debtor did <u>not</u> at that time ask the Court to apply Fed. R. Civ. P. 8(a) or 12(b)(6) to the amended proof of claim that the Joint Administrators agreed to file voluntarily.

Having obtained a more definite statement of the Joint Administrators' claims, the US Debtor now asks the Court to apply a heightened pleading standard under Fed. R. Civ. P. 8(a), and to entertain a motion under Fed. R. Civ. P. 12(b)(6) to dismiss the Proof of Claim for failure to comply with such a standard.  Although the Court has discretion to apply these rules in a contested matter, the Bankruptcy Rules provide that it can only do so after giving the parties notice and "a reasonable opportunity to comply with the procedures prescribed."  Fed. R. Bankr. P. 9014(c).  The US Debtor's objection should therefore be treated as a motion asking the court to direct that Rules 8(a) and 12(b)(6) will apply.  The Joint Administrators are entitled to advance notice if those rules are to be applied.  While it is the Joint Administrators' position that the Proof of Claim already complies with the higher pleading standard, it would not be appropriate to deny NNUK notice and the opportunity to plead against the higher standard.

Indeed it would not serve any purpose to apply Rules 8(a) and 12(b)(6) to the Joint Administrators' claims.  A review of the Proof of Claim shows that the claims are well-founded and will not be subject to dismissal.  The Proof of Claim provides sufficient factual details to allow the US Debtor to prepare its defense and, regardless of what happens here, the

parties will be exchanging extensive discovery regarding the underlying facts.  The same factual matrix will have to be addressed in order to determine (i) the Joint Administrators' claims against Nortel Networks Ltd. ("NNL") in Canada, and (ii) how the proceeds of the Nortel asset sales should be allocated among the various debtors.  Accordingly, the most efficient overall approach would be to coordinate discovery for all purposes and then address any dispositive motions and cross motions after the conclusion of this process.  All parties will be in a better position to winnow and substantiate their claims and defenses after the conclusion of discovery.

The estoppel issue is a particularly striking example of the US Debtor's unwillingness to address the real issues, coupled with a totally unwarranted attack upon the Joint Administrators' integrity.  The US Debtor's argument fails for the simple reason that there is no inconsistency between the position taken in the Proof of Claim, on the one hand, and in demonstrating that England was the EMEA debtors' center of main interest, on the other.  A finding that England is the EMEA Debtors' center of main interest is not inconsistent with the fact that NNL and NNI exercised sufficient control over NNUK's tax and treasury functions to impose on NNUK the major transactions that caused the company significant damage, as detailed in the Proof of Claim.  Nor has the English Court, or this Court, ever made any finding of fact which would preclude a claim based on the exercise of such control in relation to the transactions at issue.  The US Debtor's arguments are further weakened when it is seen that they have mischaracterized the statements made by Alan Bloom and other NNUK witnesses in the prior proceedings.  The record leaves no doubt that the Joint Administrators have acted in good faith, and the US Debtor has not identified any cognizable harm it might suffer other than being required to defend against meritorious claims.

As for the US Debtor's argument that the facts will not establish the Joint Administrators' claims under English law, these arguments are not appropriate to deal with on a motion to dismiss.  The Joint Administrators' claims engage a wide range of foreign law issues which by their very nature require a proper examination at trial based on all of the evidence.  For example, an enquiry as to whether one company is a *de facto* or shadow director of another necessitates and in depth factual investigation of the internal workings of the company in question.  Such an investigation is not possible based simply on a review of the pleadings.  Even putting this fundamental issue to one side, the US Debtor's attempts to argue that the claims are not made out under English law are misguided.  It is beyond the scope of this section to set out all of these but the US Debtors' failure to deal with the latest developments in the law of *de facto* directors, their curious attempt to rely on Section 251(3) of the Companies Act 2006 to preclude liability of NNI as shadow director, and their wholly misplaced reliance on *ex turpi causa* and *in pari delicto* principles are striking examples.

As to the statute of limitations, the assertions made by the US Debtor are once again without any merit.  In particular, the US Debtor ignores Bankruptcy Code Section 108(c) which had the effect of tolling any applicable limitation periods.  This is a complete answer.  The claims have therefore been submitted on a timely basis.  In any event, the claims are governed by the English statute of limitations and are subject to tolling under the adverse domination doctrine.

Standing back from the detail, the claims which are being pursued by the Joint Administrators entail an application of the law to the facts.  What is critical, therefore, in determining whether or not such claims succeed is an analysis of all of the evidence supporting

the underlying facts.  This is a matter for trial.  What is now necessary is that there is a proper

discovery process so that these facts can be further developed.

## **PROCEDURAL HISTORY**

The Debtors filed voluntary petitions for relief under Chapter 11 of the

Bankruptcy Code on January 14, 2009 (the "Petition Date").[6]  Certain parallel proceedings (the

"Canadian Proceedings") commenced by NNL, as well as NNL's corporate parent Nortel

Networks Corporation ("NNC"), were initiated with the Ontario Superior Court of Justice (the

"Canadian Court") on the Petition Date seeking relief under the Companies' Creditors

Arrangement Act (Canada).  Also on the Petition Date, the English Court entered orders placing

the EMEA Debtors into administration and appointing the Joint Administrators (the "English

Proceedings").[7]  This Court subsequently granted recognition for the English Proceedings under

Chapter 15 of the Bankruptcy Code.[8]

### **The Sales and Mediation Processes**

Since the Petition Date the primary focus of all of the Nortel debtors has been on

the sale of the group's worldwide assets.  In addition they have engaged in consensual and

cooperative efforts to resolve the question of how the proceeds of these asset sales should be

allocated among the various debtors.  Although limited exchanges of information were made, on

a cooperative basis, in connection with the mediation process, there has been no comprehensive

intercompany disclosure process, and neither NNL nor NNI responded fully to information

---

6.  With the exception of Nortel Networks (CALA) Inc., which filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009.

7.  *In the matter of Nortel Networks UK Limited and in the Matter of Insolvency Act 1986*, High Court of Justice (Ch) No. 00536 of 2009, 14 January 2009, Blackburne J.  Barefoot Decl. Ex. E.

8.  Order Granting Recognition And Relief In Aid Of Foreign Main Proceedings, dated June 26, 2009, Barefoot Decl. Ex. M; Order Granting Recognition Of Foreign Proceedings And Related Relief With Respect To The EMEA Debtors, dated January 31, 2011, Barefoot Decl. Ex. N.

requests submitted by the Joint Administrators.[9]  Even the disclosure that has been provided was

provided on a without prejudice basis.  Those documents are not able to be used for this or any

other formal court process.  This is despite persistent requests by the Joint Administrators that

this information would be available for the purposes of perfecting the intercompany claims.

### The US Claims Process

The US Debtor incorrectly suggests that the Joint Administrators have been

dilatory in asserting and documenting their claims.  In fact, the Joint Administrators elected to

file, and later agreed to voluntarily supplement and amend, the protective proof of claim in

advance of the setting of any bar date for intercompany claims.  This suggestion is also

disingenuous because, since mid 2010, the Joint Administrators have been actively engaging

with the US Debtors, on a without prejudice basis, in relation to their claims against the US

Debtors.

The order establishing a Bar Date of September 30, 2009 for the filing of general

creditor claims specifically excluded intercompany claims,[10] including the EMEA Debtors'

claims.  Although not required to do so, the Joint Administrators filed the Original Proof of

Claim against NNI.[11]  The Original Proof of Claim included a rider that stated the bases for the

Joint Administrators' claims.

---

9.    As part of the mediation process the parties exchanged requests for documents commencing in early 2010.
      However, the discovery process to date has been without prejudice, informal, ad hoc, and limited to requests for
      documents which at the time were considered to be significant or required for the purposes of settlement
      negotiations.  Due to a compressed timetable in the lead up to the August 2010 and November 2010 mediation,
      the parties considerably narrowed their requests from their original scope.

10.   (*See* Bar Date Order ¶ 6(f) [D.I. 1280] (excluding from the list of creditors required to file a proof of claim by
      the Bar Date "[a]ny Debtor, nondebtor affiliate of the Debtors or Canadian Debtor, or any of their direct or
      indirect subsidiaries holding a claim against any of the Debtors.").)

11.   (Barefoot Decl. Ex. B.)

The US Debtors have only recently moved to set a proposed bar date of November 15, 2011 for intercompany claims.[12]  But previously, in April 2011 they had singled out the Joint Administrators by filing objections to the Original Proof of Claim and moving for an order requiring a more definite statement.[13]  The Joint Administrators responded to the US Debtor's motion for a more definite statement by voluntarily agreeing to file amended and supplemental claims.[14]  Thus, on June 3, 2011, the Joint Administrators filed their amended Proof of Claim, setting forth the factual and legal grounds for their claims at great length.

### The Canadian Claims Processes

On December 20, 2010, the Canadian Debtor moved the Canadian Court to impose a "bar date" of February 11, 2011, by which time the EMEA Debtors would be required to submit intercompany claims against the Canadian Debtors (the "EMEA Claims Bar Date").  On January 20, 2011, the Canadian Court entered an order setting the EMEA Claims Bar Date for March 18, 2011.  The EMEA Debtors filed intercompany claims against the Canadian Debtors on the EMEA Claims Bar Date.  On May 19, 2011 the Canadian Monitor wrote to the EMEA Debtors' Canadian counsel requesting that the EMEA Debtors provide further particulars in relation to the EMEA intercompany claims against the Canadian Debtors.  The EMEA Debtors provided Further Particulars (running to 110 pages) on September 12, 2011.  However, the Canadian Monitor has indicated that it does not intend to take any further steps to progress

---

12.  (*See* Debtors' Motion for an Order Establishing Deadlines for Filing Proofs of Claim for Non-Canadian Intercompany Claims and Remaining Director and Officer Claims and Approving the Form and Manner of Notice Thereof [D.I. 6303].)

13.  (*See generally* Initial Claims Obj.)

14.  (Proposed Order Requiring EMEA Claimants to File a More Definite Statement of Claim and Setting a Deadline for the Filing of Any Proofs of Claim By the EMEA Claimants [D.I. 5402] (setting June 1, 2011 deadline); Order Approving Extension of Deadline for EMEA Claimants to File a More Definite Statement of Claim and to File Any Proofs of Claim [D.I. 5588] (extending deadline to June 3, 2011).)

the EMEA intercompany claims against the Canadian Debtors and that, should it choose to

progress those claims, it will not do so until after the mediation ordered by the US and Canadian

Courts takes place before Chief Justice Winkler.

## FACTUAL BACKGROUND OF THE CLAIMS

By 1990, the combined Canadian and US operations of the Nortel Group made it

one of the leading telecommunications companies in North America.  (Proof of Claim ¶ 3.)

From this pan-North American base, the Group sought to expand overseas.  (*Id*. ¶ 4.)  In 1991,

the Group acquired STC plc, a major UK public telecommunications company.  This entrée into

the European market brought customer relationships with large European carriers and allowed

Nortel to expand into the wider European markets.  In fiscal year 1991, European revenues

accounted for nearly one-fifth of the Group's total revenue, a figure that grew in later years.  (*Id.*

¶¶ 4-5.)

As Nortel expanded internationally, control of the Group's worldwide businesses

remained centralized in North America.  Although the Canadian companies – NNL, and its

ultimate corporate parent NNC (together, the "Canadian Entities") – were the ultimate parent

companies of NNI, NNUK and the other overseas subsidiaries, NNI was the Group's most

important business unit and there was at all relevant times a special relationship between NNL

and NNI.  There was considerable overlap between the management of the North American

companies, and key areas were controlled jointly by the Canadian Entities and NNI. These areas

included Nortel Group Tax and Treasury, which performed key roles in the Group's centralized,

strategic management.  These units initiated and implemented most of the significant

transactions that impacted the Group.  (*Id.* ¶¶ 15, 19, 25.)

Although the Nortel Group enjoyed considerable financial success following its

expansion into Europe, increased industry competition and decreased demand for the Group's

products in the wake of the "dot-com" crisis in 2001 caused a dramatic downturn in revenue. (*Id.* ¶¶ 6-7.) To combat this downturn, the Group was forced to restructure and, by 2008, had reduced its employee numbers by two-thirds and outsourced its manufacturing. (*Id.* ¶ 7.) This restructuring did not resolve the Group's financial troubles. It only helped stave off the ultimate collapse of the Group until early 2009. (*Id.* ¶¶ 7-8.)

From around 2003, NNL and NNI also implemented a general policy to ensure that value and cash within the Group would be removed from NNUK and the other EMEA entities and transferred to NNL. (*Id.* ¶¶ 9-10.) NNI benefited greatly from this removal of value from NNUK, through, for example, the receipt of cash payments from NNL stemming from intercompany loans that NNUK advanced to NNL (the "Interest Free Loan Facilities"). (*Id.* ¶¶ 11-12.) NNI secured this benefit by exerting its control over Group Tax matters, including transfer pricing, and Group Treasury matters – the functions that advanced the transactions through which cash and value was removed from NNUK, as described more fully below.[15] (*Id.* ¶ 15.)

Transfer Pricing. The guiding principle behind transfer pricing arrangements, as recommended by the Organization for Economic Cooperation and Development and followed by most tax authorities, is that transactions between companies within a multinational group should replicate arm's length transactions between independent companies. (*Id.* ¶ 30.) The arrangements within the Nortel Group, however, ensured exactly the opposite – NNUK and the other EMEA entities were deprived of revenue because NNI, along with NNL, intentionally

---

15. NNL and NNI both exercised the functions of a director of NNUK by making key decisions that could only properly be made in a director's capacity. (Proof of Claim ¶¶ 26-27, 91, 105 n.4, 112 n.6.) NNUK's de jure directors, moreover, allowed both NNI and NNL to control decision-making related to intercompany transactions – including transfer pricing arrangements, the Interest Free Loan Facilities, and Project Swift, as described below – which resulted in NNUK suffering losses. (*Id.* ¶¶ 28-29.)

facilitated the improper transfer of value from NNUK and the other EMEA entities to NNL.  (*Id.* ¶¶ 16-19, 47.)

In an effort to allocate more profit to the Canadian Entities at the expense of NNUK, NNI and the Canadian Entities revised the Nortel Group's transfer pricing method in 2001 without informing NNUK and the other EMEA Companies that were adversely affected by this decision.  (*Id.* ¶¶ 31-33.)  The new transfer pricing method adopted by the Group in 2001 – the residual profit split method ("RPSM") – distinguished between two types of Group participants:  (i) residual profit entities ("RPEs"), which included NNUK, NNL, NNI, Nortel Networks (France) SA ("NNSA"), and Nortel Networks (Ireland) Limited ("NN Ireland"); and (ii) limited risk entities ("LREs").  Under the RPSM, LREs were entitled only to routine profits based on their own direct earnings from sales to third parties, while RPEs received their routine profits as well as profits (or losses) attributable to the Group's intangible development activities (e.g., research and development ("R&D")).  (*Id.* ¶¶ 34-35.)

In December 2004, NNL, NNI, NNUK, NNSA, NN Australia and NN Ireland entered a Master Research and Development Agreement ("MRDA"), which provided the architecture and contractual basis for the RPSM to be applied.  (*Id.* ¶ 39.)  Consistent with the implementation of the RPSM, NNUK was not involved in the decision to implement the MRDA.  The terms of the MRDA were also determined by NNI and NNL, without input from NNUK.  (*Id.* ¶ 40.)

The MRDA provided that in exchange for the performance of R&D, each party to the agreement was entitled to receive payment, commensurate with its performance of, and contribution to, R&D activity.  (*Id.* ¶ 41-42.)  Indeed, the agreement that each of the entities within the group would treat each other in accordance with arm's length principles is expressly

set forth in the MRDA.  (*Id.* ¶¶ 44-46.)  But the RSPM as applied failed to comply with the arm's

length principle.  Instead, NNI facilitated the improper transfer of funds from NNUK for the

benefit of NNL (*id.* ¶¶ 47-48) by:

- <u>Nonpayment of transfer pricing adjustments</u>:  payments due to recipient companies under the RPSM were instead routed through NNL, which acted as a clearing house.  Thus, despite book entries for credit due to NNUK, no cash or other liquid assets were transferred to NNUK, and the amounts due were converted into an interest-free loan to NNL which was purportedly repaid in 2007.  (*Id.* ¶ 49.)

- <u>Flaws in the RPSM</u>:  (i) NNUK received a rate of return that failed to recognize intercompany sales, significant customer intangibles, the service element performed alongside the distribution function or the risks and costs borne outside the routine return; (ii) NNUK was not fully reimbursed for providing regional central services and other extra-territorial services (e.g., sales and marketing) to other companies in the Nortel Group; (iii) the RPSM model did not reflect NNUK's high restructuring costs (including reductions in staff greater than those made by other RPEs); (iv) NNUK incurred losses associated with bad debts arising from vendor financing that NNL required NNUK to provide to its customers; and (v) contrary to the MRDA, stewardship costs were not excluded from the calculation of the RPEs' residual profits.  NNL's and NNI's excessive and duplicative corporate costs were also allocated to the residual pool, even though the EMEA region had its own head office.  (*Id.* ¶¶ 50-56.)

<u>Interest Free Loan Facilities</u>.  In May 2003, NNI and NNL commenced the "Cash

to Canada" initiatives:  a search by the North American leadership of the Group to identify new

schemes which would enable the transfer of cash to NNL from NNUK and other EMEA entities.

"Cash to Canada" was a Group Treasury project headed by Katherine Stevenson of NNI, with

NNI personnel actively involved in devising and implementing various initiatives to transfer cash

from NNUK and the EMEA entities to NNL.  By virtue of the resulting cash funneled to NNL

from NNUK and the EMEA entities,  NNL was able to, and did, in fact, make large cash

payments on its outstanding loan balances to NNI.  (*Id.* ¶¶ 22, 57-60.)

13

Beginning in December 2003, NNL required NNUK to make the unsecured Interest Free Loan Facilities available to NNL.  (*Id.* ¶ 60.)  During the same period when NNUK was required to provide the Interest Free Loan Facilities to NNL, NNI also made a series of loans to NNL which, unlike the loans made by NNUK, were made on an interest-bearing basis and were regularly repaid in cash by NNL.  Notably, Ms. Stevenson signed the formal agreements for the Interest Free Loan Facilities in 2003, 2004, and April and December of 2005, and Ryan Smith, "Leader of Global Tax Planning" and another NNI employee, supervised the team managing the use of the facilities to maximize the transfer of value from NNUK to NNL.  (*Id.* ¶ 22.)  Thus, NNI, together with NNL, exerted sufficient control over NNUK to extend, renew and enlarge the Interest Free Loan Facilities that NNUK made to NNL on an unsecured basis, despite the fact that the Interest Free Loan Facilities were wholly contrary and prejudicial to the commercial interests of NNUK and its creditors.  (*Id.* ¶¶ 65-68.)

Project Swift.  As a result of the Interest Free Loan Facilities, NNL's outstanding loan balance to NNUK reached $950 million (£467 million) by late 2007.  (*Id.* ¶ 69.)  At this time, NNI and NNL decided that part of NNUK's loan to NNL should be repaid.  (*Id.* ¶ 70.)  Contrary to NNL's practice to repay NNI's loans in cash, however, NNL and NNI devised a plan to satisfy the loan balance by making a paper transfer from NNL to NNUK of all the shares of NNL's Dutch subsidiary, Nortel Networks International Finance Holdings BV ("NNIF"), through which NNL held the shares of each of the EMEA Companies (the "Swift Subsidiaries") (except NNSA and NN Ireland, which remained in NNL's hands).  Thus, a price of $628.9 million was applied to NNUK's purchase of NNIF, which NNUK paid by discharging the corresponding amount of debt owed by NNL to NNUK under the revolving loan agreement.  This transaction was executed on December 20, 2007.  (*Id.* ¶ 71.)  As a result of this transaction,

NNUK was put in a materially worse position in insolvency than if it had – like NNI – received repayment of the outstanding receivable from NNL in cash.  (*Id.* ¶¶ 24, 74, 75, 78.)

Prepetition Asset Sales.  Prior to January 14, 2009, NNUK entered into several global business transactions with other Nortel entities, including NNI, whereby a particular business line was sold by those Nortel entities to a third party purchaser.  These transactions included the sale, in December 2006, of Nortel's UMTS business to Alcatel Lucent S.A. ("Alcatel") for an adjusted purchase price of approximately $291 million.  (*Id.* ¶ 79.) Notwithstanding the parties' agreement that the various selling Nortel entities would allocate the proceeds of sales among themselves in accordance with arm's length entitlement to the proceeds – and applicable law and international accounting regulations that demand such allocation – this did not happen.  Instead, allocation was attempted (but apparently not even consistently applied) in conformity with the erroneous assumptions set forth in the transfer pricing structure within the Nortel Group at the time.  (*Id.* ¶¶ 80-81.)  Consequently, at the direction of the Group's North American leadership, NNUK again received significantly less and NNI received significantly more than each was entitled to on an arm's length basis.  (*Id.* ¶ 82.)

Taxation Matters.  NNUK's taxation affairs were controlled by NNI and NNL, particularly with respect to transfer pricing matters.  Thus, to the extent that any Revenue Authority makes a claim against NNUK in connection with any failure to pay the appropriate level of taxation (just as the IRS made a claim against NNI in this regard), NNI and NNL would be responsible for any resulting penalties, interest or other loss payable by NNUK.  (*Id.* ¶¶ 84-85.)

The facts regarding the above transactions and the means by which NNUK had been stripped of cash and assets did not come to light until after the Joint Administrators had

been appointed.  As a result of their investigations, the Joint Administrators concluded that the

*de jure* directors of NNUK had committed multiple breaches of their duties to NNUK.  The Joint

Administrators have therefore commenced proceedings in the English Court to recover from

NNUK's directors for these breaches of duty.[16]

It is well settled that the US Debtor has been aware of the above facts for some time as a result of the

claim by the IRS against NNI.

## ARGUMENT

### I. THE PROOF OF CLAIM SATISFIES ALL RELEVANT PLEADING STANDARDS.

A proof of claim is only required to comply with Bankruptcy Rule 3001.  The US

Debtor does not dispute that the Proof of Claim now complies with that rule.  That should be the

end of the matter.  The US Debtor has not articulated any persuasive reason why the Court

should exercise its discretion to apply Rules 8(a) and 12(b)(6).  If the Court were to apply these

rules, Bankruptcy Rule 9014(c) requires that they be given advance notice and an opportunity to

comply with these rules.  This would lead to delay and serve no purpose inasmuch as the current

Proof of Claim shows that the claims are well-founded and that the Joint Administrators can

comply with the pleading standards under the Federal Rules.

#### A.    The Proof of Claim Complies With The Bankruptcy Rules.

It is well settled that "a proof of claim is not subject to the same rules of pleading

that govern the pleadings filed in an adversary proceeding or other civil litigation."  *In re Rimsat*

*Ltd.*, 223 B.R. 345, 348 (Bankr. N.D. Ind. 1998).[17]  The form and content of proofs of claim are

---

16. Claims were issued against four directors in December 2010 and against two directors in August 2011.
    Although the Joint Administrators have not issued claims against the remaining NNUK directors, they have
    reserved the right to do so.

17. *See also In re Cavalier Indus., Inc.*, No. 99-31737, 2003 WL 716291 (Bankr. E.D. Pa. Feb. 6, 2003)
    (summarizing procedure for claim objection, which differs from federal pleading requirements); *In re Keck,*

governed by Rule 3001(a), which states that: "A proof of claim is a written statement setting

forth a creditor's claim. A proof of claim shall conform substantially to the appropriate Official

Form." Fed. R. Bankr. P. 3001(a). The official proof of claim form only requires the factual

basis for a claim to be stated in the most general terms.[18] A bankruptcy claimant is merely asked

to provide "some kind of factual context for the origin of debtor's liability to it." *Rimsat*, 223

B.R. at 348.[19]

      In making its motion for a more definite statement, the US Debtor only requested

that the Joint Administrators file a claim that complied with the requirements of Bankruptcy Rule

3001, as outlined in *Rimsat* and similar cases. (Initial Claims Obj. ¶¶ 20, 25.)[20] On the present

application, the US Debtor does not contest that the Proof of Claim now meets these

requirements. The Proof of Claim therefore "constitutes *prima facie* evidence of the validity and

---

*Mahin & Cate*, 237 B.R. 430, 432 (Bankr. N.D. Ill. 1999), *aff'd*, 253 B.R. 530 (N.D. Ill. 2000) (noting that less formal nature of contested matter, such as claims objection, renders federal civil pleading rules less important than in adversary proceeding).

18. With respect to the degree of factual support that must be provided, Instruction No. 2 to the official Proof of Claim form provides:

Basis for Claim:

State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, persona injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if the trustee or another party in interest files an objection to your claims.

B-10 (Official Form 10) (04/10).

19. *See also In re Reliance Fin. & Inv. Group, Inc.*, No. 05-80625-CIV, 2006 WL 3663243, at *5 (S.D. Fla. Nov. 14, 2006) ("pleading requirements are generally more relaxed in bankruptcy cases"); *Davidson v. Twin City Bank (In re Hollis)*, 83 B.R. 588, 590 (Bankr. E.D. Ark. 1988) ("[B]ankruptcy courts do not generally insist on the stringent standards required in a nonbankruptcy civil action.").

20. Although the US Debtor argued that the Original Proof of Claim would have failed scrutiny if treated as a complaint governed by the pleading standard under *Iqbal* and *Twombly* (Initial Claims Obj. ¶ 24), it moved for an order requiring a more definite statement under Rule 12(e) and did not ask the Court to order that Rule 8(a) or 12(b)(6) would apply to the amended proof of claim. (Initial Claims Obj. ¶ 24-25; Order ¶ 2.)

amount of the claim."  Fed. R. Bankr. P. 3001(f); *see In re SemCrude, L.P.*, 436 B.R. 317, 319-20 (Bankr. D. Del. 2010) (identifying Rule 3001 as sufficiency standard for proof of claim).

Although the US Debtor's application is denominated an "objection and motion," the US Debtor has not in fact complied with the requirements for filing a valid objection to the Proof of Claim.  Once a valid proof of claim has been filed, the objecting party "has the burden of going forward and of introducing evidence sufficient to rebut the presumption of validity." 9 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 3001.09[2] (16th ed. 2011); *see In re SemCrude*, 436 B.R. at 320 (burden is on objector to refute claim sufficiently stated under Rule 3001); *In re Rafter*, No. 05–51335, 2007 WL 1591880, at *2 (Bankr. D.N.J. May 30, 2007) (noting burden-shifting standard and finding claims objection insufficient to rebut the presumption of validity).  The objection must at minimum allege the facts that are necessary to support the objection, "includ[ing] allegations sufficient to overcome the prima facie validity of the filed proof of claim," as well as providing "a description of the theories on which it is based." *Collier* ¶ 3007.01[3]; *see In re Windsor Constructors, Inc.*, No. 03–36589, 2006 WL 4005568, at *8 (Bankr. E.D. Pa. Dec. 18, 2006); *In re DeAngelis Tangibles, Inc.*, 238 B.R. 96, 98-99 (Bankr. M.D. Pa. 1999) (noting that allegations included in objection "must be sufficient to demonstrate a true dispute and must have probative force equal to the contents of the claim").  To be valid, an objection should also "make clear which facts are disputed," and allege any facts necessary to support any affirmative defenses.  *Collier* ¶ 3007.01[3].

Here, the US Debtor has not provided any substantive response to the allegations contained in the Proof of Claim.  The Joint Administrators' claims therefore retain the presumption of validity.

18

**B.**     **It Would Serve No Purpose, And Only Lead To Further Delay, To Apply Rules 8(a) and 12(b)(6).**

Upon the filing of a valid objection to a proof of claim, a claim becomes a "contested matter" governed by Bankruptcy Rule 9014.  *See Rimsat*, 223 B.R. at 346 & n.2. Rule 9014(c) provides that certain of the Federal Rules of Civil Procedure, as incorporated in Bankruptcy Rule 7001 *et seq*., apply automatically in any contested matter, while others do not. Significantly, Rules 8 and 12 are <u>omitted</u> from the rules generally applicable in contested matters.  It is evident from this that the drafters did not intend for claimants and debtors to waste time addressing motions like the present one.

The US Debtor suggests that the bankruptcy courts "routinely" apply Rule 12 to claims objections in pursuit of a generalized "goal of bringing bankruptcy court procedure into line with district court procedure."[21]  These suggestions are contrary to the obvious intent of Rule 9014(c) and are not supported by the cases cited, which indicate that in fact bankruptcy courts rarely apply Rule 12(b)(6) to proofs of claim, and only do so under circumstances unlike those presented here.  In *Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.)*, the district court upheld the dismissal of a proof of claim pursuant to 11 U.S.C. § 502(c), but applied Rule 12(b)(6) only because the parties agreed that dismissing "a proof of claim pursuant to 11 U.S.C. § 502(c) [sic] is equivalent to dismissing a claim under Fed. R. Civ. P. 12(b)(6)."  398 B.R. 736, 740, 748 (S.D.N.Y. 2008).  Similarly, although the court applied Rule 12(b)(6) to a proof of claim in *In re Spiegel, Inc.*, it did so because the claimant had attached the complaints from parallel state court proceedings against the debtor based on the same underlying facts, and

---

21.  (Joint Obj. at 16-17, 18.)

the parties agreed that the court should address the merits. *See* 337 B.R. 821, 822-24 (Bankr. S.D.N.Y. 2006). This case presents no such consent or prior related proceedings.[22]

More significantly, the US Debtor does not cite <u>any</u> case in which a bankruptcy court has applied the Rule 8(a) pleading standard, as articulated in *Iqbal* and *Twombly*, to test the legal sufficiency of a proof of claim. This is not surprising inasmuch as the Rule 8(a) test under these cases is inconsistent with the presumption of prima facie validity to which claims – but not complaints – are entitled under Bankruptcy Rule 3001.

The US Debtor argues that it would be efficient to apply Rules 8 and 12(b) here because dismissal of claims could save estate and judicial resources that would otherwise be expended in discovery and other further proceedings. (Joint Obj. at 16.) The US Debtor further argues that dismissal of even some part of the Joint Administrators' claims would materially progress resolution of the other claims. (Joint Obj. at 17.) These arguments do not hold water.

First, all of the Joint Administrators' legal claims are based on the same set of factual circumstances. Dismissal of some of the claims will therefore not reduce the burden and expense of discovery because the same discovery will be taken in relation to the remaining claims. More importantly, such discovery will take place <u>regardless</u> of whether some or all of the Joint Administrators' claims are dismissed, because discovery addressing these same underlying facts must take place soon in connection with the Canadian intercompany claims process and to address disputes about the allocation of the proceeds of the sales of the Nortel businesses. Accordingly, the most efficient approach would be to address the US Debtor's objections by way of motions for summary judgment after the conclusion of discovery. Indeed

---

22. In the other cases the US Debtor cites the courts do not provide any explanation as to why Rule 12(b)(6) was applied. *See 900 Capital Servs., Inc. v. Cloud (In re Cloud)*, No. 99-51109, 2000 WL 634637, at *2 (5th Cir. May 4, 2000); *In re WorldCom, Inc.*, 322 B.R. 530, 535-36 (Bankr. S.D.N.Y. 2005); *In re Sevko*, 143 B.R. 167, 171 (Bankr. N.D. Ill. 1992).

the discovery process itself may allow the Joint Administrators to winnow and refine their claims, thereby obviating unnecessary and premature motion practice.

Nor do the cases cited by the US Debtors show that the bankruptcy courts have regularly relied on Rule 12(b)(6) in an effort to winnow out claims at a preliminary stage. The court in *In re Diamond Mortgage Corp. of Illinois* applied Rule 7012 to "move this litigation along" only after observing that it was unclear what was pending before the court, and ultimately deciding to treat the papers as a Rule 12(c) motion for judgment on the pleadings. *See* 105 B.R. 876, 877 n.1 (N.D. Ill. 1989). Both of the parties in *In re Adelphia Communications Corp.* had agreed to the application of Rule 12(b)(6). 359 B.R. 54, 56 n.5 (Bankr. S.D.N.Y. 2006). As in *Diamond Mortgage*, the court noted that an evidentiary hearing or discovery might be necessary prior to resolving the dispute – which shows that this was not a true motion to dismiss scenario. *See Adelphia*, 359 B.R. at 56; *Diamond Mortg.*, 105 B.R. at 877 n.1. Finally, although the court in *In re Best Products Co.* applied Rule 12(b)(6) in order to "resolve the parties' dispute expeditiously," that dispute was over a bank's motion to treat as administrative expenses certain damages incurred under a credit agreement with the debtor. 210 B.R. 714, 715-16 (Bankr. E.D. Va. 1997). The instant case presents issues far more complex and thus inappropriate for summary resolution under Rule 12(b)(6).[23]

Finally, entering an order to apply Rules 8 and 12(b)(6) would only lead to additional delays and motion practice because, under Bankruptcy Rule 9014(c), the Joint Administrators would be entitled to file a further amended proof of claim before any Rule

---

23. The fact that a proof of claim has sometimes been considered the "functional equivalent" of a complaint (Joint Obj. at 17), for unrelated purposes, is not particularly pertinent. In the cases the US Debtor relies on the courts held that the filing of a proof of claim can, under appropriate circumstances, trigger indemnification and contribution rights in the same manner as the filing of a complaint in a lawsuit. (*See* Joint Obj. at 17 (citing *Hill v. Day (In re Today's Destiny, Inc.)*, 388 B.R. 737 (Bankr. S.D. Tex. 2008); *Amatex Corp. v. Aetna Casualty & Surety Co. (In re Amatex Corp.)*, 107 B.R. 856, 858-59 (Bankr. E.D. Pa. 1988).)

12(b)(6) motion is addressed.  Rule 9014(c) provides that while the Bankruptcy Court is given discretion "at any stage in a particular matter [to] direct that one of the other rules in Part VII shall apply," the parties must be given advance notice and "a reasonable opportunity to comply with the procedures prescribed."  Fed. R. Bankr. P. 9014(c).

### C.    The Proof of Claim Complies With Fed. R. Civ. P. 8(a).

The US Debtor argues that the Proof of Claim would be subject to dismissal on a Rule 12(b)(6) motion because it does not comply with the current standard for federal pleading under Rule 8(a), as articulated by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 55 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).  However, even if the Court were to apply Rule 8(a), an examination of the Proof of Claim shows that the claims asserted would in fact withstand a motion to dismiss under current Rule 8(a) jurisprudence.

Contrary to the US Debtor's arguments, the decisions in *Twombly* and *Iqbal* have not altered the fundamental principles of pleading under the Federal Rules.  It remains the rule that a pleading is only required to set forth "a short and plain statement of the claims showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and that "notice pleading" is the guiding principle.[24]  A plaintiff is still not required to plead the evidence that supports a claim or

---

24.  *Twombly* did not overrule the Supreme Court's decision in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002) which confirmed the principle of notice pleading.  *See* 550 U.S. at 569-70; *see also Dobyns v. United States*, 91 Fed. Cl. 412, 425 (2010) (observing that principle of notice pleading is confirmed by *Twombly*).

Following *Iqbal*, Third Circuit decisions indicated that the Supreme Court had overruled its decision in *Swierkiewicz* that had upheld notice pleading.  *See Guirgis v. Movers Specialty Servs., Inc.*, 346 F. App'x 774, 776 n.7 (3d Cir. 2009); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (stating that *Twombly* and *Iqbal* repudiated *Swierkiewicz*).  More recently, however, a different Third Circuit panel described the analysis in *Fowler* as dictum and cited with approval a Second Circuit's statement that *Twombly* is consistent with *Swierkiewicz*.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 319 n.17 (3d Cir. 2010); *see also Arista Records*, 604 F.3d at 120 (noting that *Twombly* and *Iqbal* were consistent with *Swierkiewicz* in not requiring heightened fact pleading and citing *Swierkiewicz* indicating it is still good law); *Gillman v. Inner City Broad. Corp.*, No. 08 Civ. 8909, 2009 WL 3003244, at *3 (S.D.N.Y. Sept. 18, 2009) (observing that "in *Twombly*, which heavily informed *Iqbal*, the Supreme Court explicitly affirmed the vitality of *Swierkiewicz*" and therefore "*Iqbal* was not meant to displace *Swierkiewicz*'s teachings").

(except for claims governed by Rule 9(b)) allege the details of the underlying facts with particularity.[25]  Finally, "the standard [for addressing a motion to dismiss] remains:  'courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.' "[26]

However, the decisions in *Iqbal* and *Twombly* have added two refinements to the traditional inquiry on a motion to dismiss.  First, "labels and conclusions" and "formulaic recitations of the elements of a cause of action" are no longer entitled to the assumption of truth.[27]  Second, a court addressing a motion to dismiss should examine the pleaded facts to see if the asserted claim is "plausible on its face."[28]  "This 'plausibility' determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' "[29]

To apply this test, a court should first identify the elements of each claim asserted by the plaintiff.  Having identified the elements, the court next examines the complaint to see if each element is supported by factual allegations that, if proven, will entitle the pleader to relief. Conclusory allegations that merely parrot the elements of the cause of action are to be disregarded in this analysis.[30]  But a plaintiff need only plead "enough fact[s] to raise a

---

25.  *See, e.g., Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119-21 (2d Cir. 2010) (plaintiff not required to plead evidence).

26.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).  (*See also* Joint Obj. at n.18 (conceding application of this standard).)

27.  *Fowler*, 578 F.3d at 210 (quoting *Twombly*, 550 U.S. at 555).

28.  *Twombly*, 550 U.S. at 570.

29.  *Fowler*, 578 F.3d at 211 (3d Cir. 2009) (quoting *Iqbal*, 129 S. Ct at 1949).

30.  *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011); *Fowler*, 578 F.3d at 210.

reasonable expectation that discovery will reveal evidence" in support of the claim.[31]  Rule 8(a) does not require "detailed factual allegations,"[32] and a claim that alleges the minimum necessary facts should not be dismissed even if it appears that "actual proof of those facts is improbable" or "a recovery is very remote and unlikely."[33]

As set forth in Sections II to V below, each element of each cause of action in the Proof of Claim is supported by allegations of fact that, when proven, will entitle the Joint Administrators to relief on their claims.  The Joint Administrators allege that NNI played an intentional and active role in devising and enforcing a series of transactions by which NNUK and other overseas Nortel subsidiaries were stripped of cash.  Although NNL was the primary beneficiary of these transactions, the Proof of Claim includes detailed factual allegations showing how NNI itself also benefitted.  There is nothing unreasonable or implausible about this scenario.

**D.    The Joint Administrators' Claims Are Not Subject To Dismissal Under Rule 9(b).**

The US Debtor argues that many of the Joint Administrators' claims are also subject to dismissal under Rule 9(b), which provides that when pleading fraud a party must state the underlying circumstances with particularity.  Fed. R. Bankr. P. 7009(b).[34]  This argument

---

31.  *Twombly,* 550 U.S. at 556.

32.  *Id.* at 555.

33.  *Twombly*, 550 U.S. at 556 (internal quotations omitted).  This Court considered the *Twombly* and *Iqbal* decisions in the context of a motion to dismiss in an adversary proceeding.  In *Nortel Networks, Inc. v. Commc'ns Test Design, Inc.*, Adv. No. 10-53065, 2011 WL 1102829 (Bankr. D. Del. Mar. 22, 2011) (Gross, J.), plaintiffs NNI and NNL alleged that defendant CTDI had breached the parties' agreements by misusing proprietary Nortel information and components to copy Nortel products or to refurbish and subsequently resell Nortel products.  *Id.*  The Court denied the motions to dismiss filed by CTDI against NNI and NNL, finding that their complaints had stated a claim for relief even in light of *Twombly* and *Iqbal*.  *Id.*

34.  Unlike Rules 8(a) and 12(b)(6), Bankruptcy Rule 9014(c) provides that Rule 9(b), through Bankruptcy Rule 7009, applies automatically in any contested matter.  *See* Fed. R. Bankr. P. 9014(c).

fails for two reasons:  First, the Joint Administrators have not asserted any claims for fraud.[35]

Second, the allegations contained in the Proof of Claim would in fact meet the standard of

particularity under Rule 9(b), if it is applied.

### 1.    The Joint Administrators' Claims Do Not Sound In Fraud.

Although the Joint Administrators do not assert any claim for fraud, the

US Debtor invokes Rule 9(b) as a ground for dismissing no less than 21 of their 34 claims.[36]  The

US Debtor asserts that these claims should be considered fraud claims because NNI is alleged to

"have participated in a scheme to remove assets from NNUK."  (Joint Obj. at 19.)  The

US Debtor cites authorities holding that Rule 9(b) should be applied "where the gravamen of the

claim is fraud even though the theory supporting the claim is not technically termed fraud."  (*Id.*

(quoting *Toner v. Allstate Ins. Co.*, 821 F. Supp. 276, 283 (D. Del. 1993).)

The gravamen of the Joint Administrators' claims is simply not fraud.  The

essential elements of a fraud claim are that the defendant made an intentional misrepresentation

of a material fact, or failed to disclose a material fact he had a duty to disclose, and that the

plaintiff relied on this misstatement or omission to his detriment.[37]  None of the Joint

Administrators' claims is based on an allegation that NNI made any misrepresentation or

omission of material fact to NNUK, or that NNUK relied to its detriment on any such

---

35.  In particular, The Joint Administrators' claims for dishonest assistance are not based on fraud.  English law requires only that the Joint Administrators establish that NNI has not acted as an honest person, placed in the same circumstances, would have done.  (*See* Marshall Decl. ¶ 43.)  None of the Joint Administrators' other claims require proof of fraud.

36.  (*See* Joint Obj. at 19-20 (arguing that claims 2, 4-8, 10-13, 16, 18-21, 26, 28, 31, 32, 34, and 35 should be tested under Rule 9(b)).)

37.  *See* 37 Am. Jur. 2d *Fraud & Deceit* § 39 (2011); *Cronus Offshore, Inc. v. Kerr McGee Oil & Gas Corp.*, 369 F. Supp. 2d 848, 857 (E.D. Tex. 2004) *aff'd*, 133 F. App'x 944 (5th Cir. 2005); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

misrepresentation or omission.  The gravamen of the Joint Administrators' claims is not fraud, but breach of duty.

Although courts have sometimes elected to apply Rule 9(b) to non-fraud claims that are asserted together with fraud claims based on the same facts, the cases the US Debtor cites do not indicate that Rule 9(b) should apply to claims like the ones asserted by the Joint Administrators here.  In *Forman v. Salzano (In re Norvergence, Inc.)*, 405 B.R. 709, 746-47 (Bankr. D.N.J. 2009), the plaintiff asserted claims for aiding and abetting fraud and aiding and abetting breach of fiduciary duty.  Since the fraud claim and the non-fraud claim were based on the same set of underlying facts, the court held that Rule 9(b) should apply to both.  The court observed, however, that "[t]he heightened pleading requirement of Rule 9(b) 'generally does not apply to the state law claims of breach of fiduciary duty . . . [and] aiding and abetting breach of fiduciary duty.' "  *Id.* at 746 (quoting *TMP Worldwide, Inc. v. Inacom Corp. (In re Inacom Corp.)*, Adv. No. 00-1115, 2001 WL 1819987, *2 (D. Del. Aug. 7, 2001)).[38]  This is consistent with many other authorities holding that Rule 9(b) does <u>not</u> apply to claims of the types asserted by the Joint Administrators.[39]

## 2.    In Fact, The Proof Of Claim Is Pleaded With Particularity.

Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Despite this, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  *Id.*  Rule 9(b) is designed to give notice to the defendant of the circumstances surrounding the

---

38.  The other case cited by the US Debtors, *Adamson v. Bernier (In re Bernier)*, 282 B.R. 773, 781 (Bankr. D. Del. 2002), concerned a fraudulent transfer claim.

39.  *See, e.g., Gubitosi v. Zegeye*, 946 F. Supp. 339, 346 n.4 (E.D. Pa. 1996) ("Fed. R. Civ. P. 9(b) does not require that allegations of conspiracy be alleged with particularity; only allegations of fraud have this requirement under the rule"); *Am. Buying Ins. Servs., Inc. v. S. Kornreich & Sons, Inc.*, 944 F. Supp. 240, 246-47 (S.D.N.Y. 1996) (allegations related to "enterprise," "control," and "conspiracy" need not be pleaded with particularity).

alleged fraud and provide the defendant with the information necessary to respond.  *See* 2 Daniel R. Coquillette et al., *Moore's Federal Practice* ¶ 9.03[1][a] (3d ed. 2011).

While the Third Circuit recognizes that Rule 9(b) "requires plaintiffs to plead the circumstances of the alleged fraud with particularity," it has acknowledged that "focusing exclusively on the particularity requirement is 'too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.' "  *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (quoting *Christidis v. First Pa. Mortg. Trust*, 717 F.2d 96, 100 (3d Cir. 1983)).  For example, the Third Circuit has instructed that while allegations of date, place, and time will satisfy the particularity requirements of Rule 9(b), "nothing in the rule requires them."  *See Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984), *cert. denied*, 469 U.S. 1211 (1985).  Indeed, pleading parties "are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud."  *Id.*  The Third Circuit's flexible approach to fraud pleading also takes into account the reality that strictly applying Rule 9(b) prior to discovery "may permit sophisticated defrauders to successfully conceal the details of their fraud."  *Christidis*, 717 F.2d at 99-100; *see also Craftmatic*, 890 F.2d at 645 (noting that rigidly enforcing Rule 9(b) in face of claims involving internal corporate affairs could allow "sophisticated defrauders" to escape liability).  In other words, the Third Circuit's Rule 9(b) test is similar to the current jurisprudence under Rule 8(a) – i.e., that the court find the claim plausible based on the facts alleged.

This Court recently had the opportunity to analyze and apply the Rule 9(b) standard in a Nortel adversary proceeding.  *See Nortel Networks Ltd.*, 2011 WL 1102829, at *6.[40]

---

[40]. Notably, the claim to which this Court applied Rule 9(b) in that case was one for <u>fraud</u>, rather than an aiding and abetting claim, a conspiracy claim, or any of the other claims that the US Debtor now urges this Court to test under the Rule 9(b) pleading standard.  *See id.*

This Court noted that " '[t]he purpose of [FRCP 9(b)'s requirement that fraud be pled with particularity] is to place the defendants on notice of the precise misconduct with which they are charged.' " *Id.* at \*6 (quoting *Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321 B.R. 128, 140 (Bankr. D. Del. 2005)).  Thus, all a plaintiff must do in order to make out a fraud claim " 'is inform the defendant of the particular conduct which is alleged to have been fraudulent.' " *Id.* (quoting *In re OODC*, 321 B.R. at 140).  Moreover, the "particularity" standard of Rule 9(b) " 'does not require an exhaustive cataloging of facts but only sufficient factual specificity to provide assurance that plaintiff has investigated the alleged fraud and reasonably believes that a wrong has occurred.' " *Id.* (quoting *S. Track & Pump, Inc. v. Terex Corp.*, 722 F. Supp. 2d 509, 517 (D. Del. 2010)).

For example, although the defendant in that Nortel case argued that plaintiffs NNI and NNL had failed to adequately plead fraud because they did not provide the name of the specific person who allegedly made fraudulent statements, this Court determined that such factual allegations were unnecessary.  *See id.* at \*7 (citing *Am. Gen. Life Ins. v. Goldstein*, 741, F. Supp. 2d 604, 613 (D. Del. 2010)).  The Court found that naming a particular corporate employee was unnecessary because it would be "illogical to require a plaintiff to know the specific individuals involved in a successful concealment scheme." *Id.* at \*8; *see also Southco Inv. v. Penn Eng'g & Mfg. Corp.*, 768 F. Supp. 2d 715, 720 (D. Del. 2011) ("Although date, place, and time allegations may fulfill the requirement of pleading with particularity, these types of allegations are not required to satisfy Rule 9(b), so long as the circumstances of the alleged fraud are pled sufficiently " 'to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior.' ") (emphasis added, citation omitted).  Here too the Joint Administrators

know that NNI and NNL directed the transfer pricing, inter-company loans, "Cash to Canada," pre-petition sale proceeds allocation, and other schemes set out in the Proof of Claim, and their adverse impact on NNUK, but do not yet know – or even have access to all of the documents that would disclose – all of the "who-said-what-to-whom-when" details.  There can be no doubt that the relevant Nortel Group personnel were in constant communication about the subject matter of the Joint Administrators' claims.

As described more fully below, the Proof of Claim sets forth the facts supporting the Joint Administrators' claims in considerable detail.  Certainly the Joint Administrators have provided sufficient information to demonstrate that the claims are not implausible and to permit the US Debtor to move forward with its defense.  Thus, application of Rule 9(b) to the Joint Administrators' claims would not result in dismissal of any of those claims.

### E. Pleading Standards Are Relaxed For Bankruptcy Trustees and Other Persons Who Were Not Present When The Underlying Events Occurred, and Where The Salient Facts Are In The Control Of Others.

Any applicable pleading standard would also have to be considered in light of the fact that the events that give rise to the claims occurred before the Joint Administrators were appointed, and key evidence about how the underlying transactions were determined and implemented by NNL and NNI is in the exclusive control of those entities.  It is well-settled that pleading standards are relaxed under such circumstances.[41]

---

41. *See Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, No. 09 C 5619, 2010 WL 1979569, at *13-14 (N.D. Ill. May 17, 2010) (failure to state claim can be excused where plaintiff was unable to access information withheld by defendants); *Reliance Fin.*, 2006 WL 3663243, at *5 ("Trustee will inevitably lack knowledge regarding acts of fraud previously committed by or against a third party debtor."); *Pardo v. Avanti Corp. Health Sys., Inc. (In re APF Co.)*, 274 B.R. 634, 638 (Bankr. D. Del. 2001) ("Especially in bankruptcy cases, where the plaintiff is a trustee acting on behalf of the estate or a group of creditors, courts apply Rule 9(b) with greater flexibility recognizing that trustees often lack knowledge or have only secondhand knowledge of prepetition fraudulent acts involving the debtor and third parties."); *Profilet v. Cambridge Fin. Corp.*, 231 B.R. 373, 379 (S.D. Fla. 1999) ("[T]he Trustee argues – and the Court agrees – that courts should relax the specificity requirements where the plaintiff is a trustee in bankruptcy."); *Kaliner v. Load Rite Trailers (In re Sverica Acquisition Corp., Inc.)*, 179 B.R. 457, 463 (Bankr. E.D. Pa. 1995) ("Flexibility in the application of the particularity requirement of Fed.R.Civ.P. 9 has been recognized as being particularly appropriate in the context

## II.    THE JOINT ADMINISTRATORS STATE CLAIMS FOR BREACH OF DUTY.

Contrary to the US Debtor's assertions, the Joint Administrators have adequately alleged claims against NNI for breach of the duties it owed to NNUK's creditors.

### A.    The Joint Administrators State Claims For Breach Of Duties Imposed On *De Facto* and Shadow Directors Under English Law.

#### 1.    English Law Regarding Shadow And *De Facto* Directors.

Under English law, a *de facto* director is a person who assumes a role of control or influence over a company's affairs sufficient to impose on him a fiduciary duty.  (Marshall Decl. ¶¶ 20, 21.5.)[42]  It is not necessary that the person hold himself out as a director in order to be treated as a *de facto* director.  (*Id*. ¶ 20.)  Nor does he have to exercise influence over <u>all</u> corporate activities of the subject company (*id*. ¶ 21.2.), or act on "equal footing" with the other directors of the company; rather, at times a *de facto* director can defer to other directors (*id*. ¶ 21.4).  A *de facto* directorship can exist where, as here, a person or entity participates in directing the subject company with respect to distinct transactions or commits the company to major obligations.  (*Id*. ¶ 21.2.)  Liability for breach of the resulting fiduciary duties will be imposed on those who were in a position to prevent damage to creditors by taking proper steps to protect their interests.  (*Id*. ¶¶ 19, 21.1.)

---

of fraud claims brought by a statutory trustee in bankruptcy."); *In re Hollis*, 83 B.R. 588, 590 (Bankr. E.D. Ark. 1988) ("This liberality is justified because the Trustee is a third party outsider to the fraudulent transaction and, in most cases, must plead fraud on second hand knowledge for the benefit of the estate and all its creditors."); Arthur R. Miller, *From* Conley *to* Twombly *to* Iqbal*:  A Double Play on the Federal Rules of Civil Procedure*, 60 Duke L.J. 1, 44 (2010) ("[T]o demand fact pleading on pain of dismissal when the facts are unknown or unknowable is a negation of the pleader's ability to access the civil justice system.")**.**

42.  Declaration of Philip Marshall QC in Opposition to Joint Objection and Motion to Dismiss Claims of Nortel Networks UK Limited, dated Sept. 13, 2011 ("<u>Marshall Decl.</u>").

The US Debtor misapprehends English law by urging the application of a rigid test[43] for determining whether a person can be deemed a *de facto* director.[44]  In doing so, it overlooks the fact that the term may have a different meaning depending on context. (*Id.*) Indeed, the circumstances in which a *de facto* directorship arises varies widely from cases to case and the question is "very much as one of fact and degree," one that generally requires a detailed factual investigation.  (*Id.* ¶ 19.)  The focus is not solely on whether the relevant individual undertook functions which could only be properly discharged by a director or exerted real influence in the corporate governance of the company.  (*Id.* ¶¶ 21.2, 21.5.)  Because of the difficulties inherent in defining "corporate governance" and identifying what functions are in essence the sole responsibility of a director,[45] the broader test, and the one this Court should apply, is whether looking at all the acts alleged to be performed by NNI, it assumed a role sufficient to impose a fiduciary duty on the company.  (*Id.* ¶ 21.1.)  Here, NNI's excessive influence and control over treasury and tax functions necessitates holding it to the same standard as a *de jure* director.

Similarly, a shadow director is a person in accordance with whose directions or instructions the directors of the company are accustomed to act.  (*See id.* ¶ 26.)  The essential question is whether NNI exercised "real influence" in the corporate affairs of NNUK, but, as with *de facto* directors, this influence does not have to be over the whole field of its corporate

---

43.  In addition to the "defective appointment" test, the standard cited by the US Debtor is that a *de facto* director must (1) undertake functions that could only be discharged by a director, (ii) participate in directing the affairs of the company on an "equal footing" with the other directors, and (iii) exert a "real influence" in the company's corporate governance.  (Joint Obj. at 30.)

44.  The Supreme Court of the United Kingdom recently held in *Holland v. Revenue & Customs Commissioners* that a rigid, singular test should not be applied in making a *de facto* directorship determination.  (Marshall Decl. ¶¶ 18-20.)

45.  (*See* Marshall Decl. ¶ 21.5 (quoting *Holland*, at 463(e) ("[I]t is 'just as difficult to define 'corporate governance' as to identify those activities which are essentially the sole responsibility of a director or board of directors.' ")).)

activities.  (*Id*. ¶¶ 28-29.)[46]  Indeed, there is no requirement of subservience on the part of

NNUK's Board of Directors.  (*Id*. ¶ 29.)  Whether a communication, "by words or conduct, is to

be classified as a direction or instruction must be objectively ascertained by the <u>court in light of</u>

<u>all the evidence</u>."  (*Id*. ¶¶ 28, 34 (quoting Lord Justice Morritt in <u>Deverell</u>) (emphasis in

Marshall).)  This is a question of fact.  As part of its investigation, the Court should look at all of

the communications between the two entities to see whether NNI regularly provided directions

or instructions to NNUK.  (*Id*. ¶ 29.)

       Like a *de facto* director, a shadow director is a fiduciary and owes duties to the

company as would a *de jure* director.  The Joint Administrators' English law expert flatly

disagrees with the US Debtor's assertion (Joint Obj. at 31), that a shadow director owed no

duties unless he does something more such that he becomes a *de facto* director or takes control of

property of the company.  Notably, the case relied on by the US Debtor's English law expert in

support of his conclusion was decided with reference to the definition of shadow director in the

*Companies Act 1985*, and turned on the absence of any provision therein expressly imposing

fiduciary obligations on shadow directors.  (Marshall Decl. ¶¶ 31-32.1.)[47]  However, the

*Companies Act 2006*, superseding and materially different from the *Companies Act 1985*,

specifically provides for the general duties of directors to apply to shadow directors " 'where,

and to the extent that, corresponding common law rules or equitable principles so apply.' "  (*Id*.

¶ 31, 32.2.1 (quoting *Companies Act 2006* § 170(5).)  It therefore follows that at least some of

---

46. This factor does not distinguish a shadow director from a *de facto* director, as the US Debtor suggests, because a person can be a *de facto* director by virtue of controlling only parts of operations of the business, as explained above.  (Marshall Decl. ¶ 21.2.)

47. The decision in *Ultraframe UK Ltd. v. Fielding* [2005] EWHC 1638 (Ch), relied upon by the US Debtor, does not create a binding precedent under English law.  (Marshall Decl. ¶ 32.)  In any event, *Ultraframe* itself proceeds on the basis that shadow directors can owe fiduciary duties to the company of which they are shadow directors.

the general duties set out in sections 171-177 of the *Companies Act 2006* will apply to shadow directors regardless of whether or not they are also *de facto* directors.  Otherwise the provision would be superfluous and without effect.  (*Id*. ¶ 32.3.)[48]  As the Joint Administrators' English law expert explains in his conclusion on this issue, the correct position is that shadow directors owed fiduciary duties.  (*Id.* ¶ 32.)[49]

Finally, recent cases have eroded the distinction between *de facto* and shadow directors; they are no longer alternatives and are not mutually exclusive.  (*See id*. ¶ 20 (quoting *Holland* at 462g to 464c ("the distinction [between *de facto* and shadow directors] was impossible to maintain with the extension of the concept of de facto directorship and the consideration of such matters as the taking of major decisions by the individual, which might be through instructions to the de jure directors, and the evaluation of his real influence in the affairs of the company")).)  Indeed, at least one commentator has observed that the terms have effectively been treated as synonyms.  (*Id.* ¶ 28 n.13.)  Rather than determining into which category a non-de jure director falls, the essential inquiry is now an evaluation of a defendant's actual exertion of influence upon the subject company.  Therefore, a person could very well be treated as both a *de facto* and shadow director under certain circumstances, such as here, where NNUK's *de jure* directors were accustomed to act at NNI's and NNL's directions.  (*Id*. ¶ 27.)[50]

---

48. The US Debtor asserts that a shadow director would incur fiduciary obligations if he takes personal control of property of the company, like an express trustee.  However, there is no reason why fiduciary obligations would not be owed by someone who *indirectly* deals with the assets of another company through that company's board of directors.  The better analogy to a shadow director is that of a person who intermeddles in the operations of a trust (a "trustee de son tort").  Such person's active role in the administration of the trust will be treated as equivalent to a declaration of himself as a trustee and he will be subject to all the fiduciary obligations of a trustee.  (*See* Marshall Decl. ¶ 32.6.)

49. This conclusion is consistent with the decision in Yukong Line of Kore Ltd v Rendsburg Corp Investments of Liberia Inc. [1998] 1 WLR 294.  (See Marshall Decl. ¶ 31.)

50. *See also Re Mea Corporation Ltd.* [2006] EWHC 1846 (Ch.), at para. 89 ("[T]here is no conceptual difficulty in concluding that a person can be both a shadow director and a de facto director simultaneously.  He may, for example, assume the functions of a director as regards one part of the company's activities (say, marketing) and

Further, even setting aside the issue of whether NNI was a *de facto* or shadow director of NNUK, NNI did in any event owe fiduciary duties to NNUK on a standalone basis by virtue of NNI's excessive involvement in NNUK's affairs.  (*Id.* ¶ 36 n.22.)  The US Debtor's English law expert does not deal with this issue in his declaration.

### 2.    The Joint Administrators Allege Facts Showing That NNI Was A *De Facto* Or Shadow Director Of NNUK.

Contrary to the US Debtor's arguments, there would be no basis to dismiss claims 2, 8, 16, 28, or 32 because the Joint Administrators have pled detailed factual allegations in support of each element of their claim that NNI was a *de facto* or shadow director of NNUK. The Joint Administrators allege that NNI made decisions for and imposed instructions on NNUK in relation to specific treasury and tax matters.  NNI's domination and control over tax and treasury matters was pervasive, and the cumulative effect of the major strategic decisions it made in connection with transfer pricing, the Interest Free Loan Facilities, Project Swift, and prepetition asset sales and tax policy in general, render it a *de facto* or shadow director of NNUK.  (*See* Proof of Claim ¶ 15 ("The control exerted by NNI related to Group Tax matters, in particular transfer pricing, and to Group Treasury matters.  These Group Tax and Treasury functions were responsible for the transactions pursuant to which value was improperly removed from NNUK.").)[51]  These details are explicitly set forth in the Proof of Claim with respect to each of the five sets of transactions on which NNUK's claims are based.[52]

---

give directions to the board as regards another (say, manufacturing and finance).  In each case, it is necessary to examine the facts . . . [and] 'identify those . . . with real influence in the corporate affairs of the company.' ").

51.  The facts alleged in support of the Joint Administrators' claims against NNI for *de facto* and/or shadow director liability apply with equal force to their claims against NNL for *de facto* and/or shadow liability, as the Proof of Claim shows that NNI and NNL acted in concert.

52.  The Joint Administrators' breach of duty allegations do not sound in fraud and therefore Rule 9(b)'s heightened pleading standard does not apply to these claims.

Transfer Pricing.  The Proof of Claim contains more than "generalized references" to NNI's involvement in the implementation and operation of the transfer pricing arrangements.  On the contrary, the Proof of Claim provides specific examples of situations in which NNI exerted control and meddled in the corporate affairs of NNUK in a material way.  For instance, the Proof of Claim identifies key NNI employees who were actively involved in the design and operation of the RPSM, the creation and implementation of the MRDA and negotiations with the relevant tax authorities in connection therewith.  (*See* Proof of Claim ¶ 18a (alleging that NNI made the policy change to move from the previous cost sharing arrangements to the RPSM); *id*. ¶ 18b ("The process by which the RPSM electronic model was created and structured . . . was handled by NNI and NNL."); *id*. ¶ 18e (alleging NNI controlled APA application process, a team of NNI employees ran negotiations with relevant tax authorities, and took sole responsibility for instructing Nortel's professional advisers in same process).  The Proof of Claim also demonstrates how the *de jure* directors effectively sat as a puppet board, acting only in accordance with NNI's directions.  (*See id*. ¶ 18d (alleging NNUK was simply instructed to sign MRDA once terms were decided by NNI and NNL); *id*. ¶ 18f (alleging NNUK was entirely excluded from APA application process, even from negotiations with its own revenue authority, HMRC, and its role was limited to providing necessary information).)  The US Debtor's argument that the proof of claim "tellingly" uses the passive voice when referring to NNUK being instructed to sign the MRDA is fallacious.  (Joint Obj. ¶ 34.)  The reference is clearly to NNI and NNL.

Each of the allegations described above raises a plausible inference that NNI exerted a level of control and influence over the tax affairs of NNUK sufficient to impose on NNI fiduciary obligations as a *de facto* or shadow director.  Moreover, the *de facto* director claim

should not be dismissed for failure to allege the involvement of NNI's directors, as opposed to its managers, an analysis based on a misconception regarding the correct test of *de facto* directorship.  (Marshall Decl. ¶ 25.2.)  Regardless, even if director-level involvement were required, the US Debtor cannot say with certainty that the actions taken by NNI were not of the type generally performed by NNUK's directors – e.g., decision making regarding major corporate transactions.  Determining what actions constitute the conduct of an NNUK director depends on the way that NNUK operated and would require an evidentiary hearing.  (*Id*.)

   <u>Interest Free Loan Facilities and Project Swift</u>.  The Proof of Claim also describes the various ways in which NNI controlled NNUK's treasury function, raising a plausible inference that NNI assumed a role sufficient to impose on it a fiduciary duty.  It identifies specific NNI personnel who were actively involved in devising and implementing the scheme to siphon cash from EMEA and move it to NNL.  (*See* Proof of Claim ¶ 57.)  For instance, the Proof of Claim alleges that Katharine Stevenson, an NNI director, had overall responsibility for global treasury matters and implemented the Interest Free Loan Facilities.  (*Id*. ¶¶ 22, 25.)  Moreover, it names various other NNI employees who were part of a management group that implemented the Interest Free Loan Facilities and Project Swift:  Ryan Smith managed the use of the Interest Free Loan Facilities in such a way to maximize the transfer of value from NNUK to NNL and was the key driving force behind the implementation and structuring of Project Swift; Mark Weisz participated in formulating the strategy for NNUK to make cash available to NNL on an interest-free basis and supervised Project Swift's implementation.  (*Id*. ¶¶ 22-24.)  Notably, Ryan Smith and his treasury team prepared the briefs and presentations on the Swift Transaction in order to influence the NNUK Board to bless the transaction.  Consideration of these acts in the aggregate leads to the logical conclusion that NNI was involved in and influenced all decision-

making with respect to the Interest Free Loan Facilities and Project Swift, and should therefore

be held accountable for its failure to act in the best interests of NNUK and its creditors.

Contingent Tax Claims.  In order to facilitate the claims process, the Bankruptcy

Code allows creditors to assert any "right to payment, whether or not such right is reduced to

judgment, liquidated, unliquidated, fixed, *contingent*, matured, unmatured, disputed, undisputed,

legal, equitable, secured, or unsecured."  Bankruptcy Code § 101(5)(A) (definition of a "claim")

(emphasis added).  The Joint Administrators filed the contingent tax claims against NNI in order

to preserve their right to obtain any recovery from NNI in the event that any Revenue Authority

makes a claim against NNUK in relation to a failure to pay the proper level of taxation in any

years.  NNI should plainly be held accountable for any future tax liabilities imposed on NNUK

that are attributable to decisions made by NNI as a shadow or *de facto* director.  The Proof of

Claim contains a detailed account of NNI's pattern of controlling NNUK's tax functions –

generally and specifically in connection with transfer pricing matters – and thus sufficiently puts

NNI on notice of the conduct on which the Joint Administrators base their claim.  As described

in the preceding paragraphs, the Proof of Claim alleges how key individuals at NNI controlled

negotiations with NNUK's own Revenue Authority in order to secure approval of the transfer

pricing schemes, which deprived NNUK of significant assets.  (*See* Proof of Claim ¶ 18(e)-(f).)

Moreover, as the Proof of Claim alleges, interest was imputed on the balance of the Interest Free

Loan Facilities (despite no interest ever being paid), which were designed and implemented by

NNI personnel, thereby increasing NNUK's future tax liabilities.  (*Id*. ¶ 65(c).)

Pre-Petition Asset Sales.  NNI's control over the implementation and operation of

the transfer pricing arrangements also applied to the pre-petition sale processes.  (*Id*. ¶ 193

(alleging that NNI was involved in all decision making in relation to the settlement of the

allocation methodology and allocation amounts).)  As described in the Proof of Claim, the

allocation of sale proceeds in relation to the Alcatel sale, which is alleged as only one example of

a relevant sale, was to correspond with the arm's length principles that were supposed to govern

transfer pricing.  (*Id*. ¶ 80.)  Instead, proceeds were allocated based on the erroneous assumptions

that were contained in the transfer pricing structure that prevailed at the time, a structure that was

designed and implemented by NNI and NNL.  (*Id*. ¶ 18, 81.)  As a consequence of the allocation

method adopted by NNI and NNL, NNUK received significantly less than it was entitled to on

an arm's length basis, while NNI received significantly more.  By controlling the process, NNI

owed a duty as NNUK's director to act in NNUK's best interest and ensure that NNI received

only the proportion of proceeds to which it was entitled.

### 3.    The Joint Administrators Allege Facts Showing That NNI Employees Were Acting On Behalf Of NNI.

The Joint Administrators have sufficiently pleaded that the NNI employees,

officers, and directors named in the Proof of Claim were acting within the scope of their

authority for NNI.[53]  Each named individual is identified with his or her respective role and title

as an NNI employee and the Proof of Claim alleges throughout that NNI acted through its own

directors, officers and senior employees.  (*See, e.g.*, Proof of Claim ¶ 143 ("NNI, through the

involvement of its directors, officers and senior employees, as explained in paragraphs 15 to 27

above, advocated or assisted the conduct by NNUK's directors which led to these breaches.").)

This is a factual allegation that when proven, will entitle the Joint Administrators to relief.  The

Rule 8(a) pleading standard does not require a greater particularity.

---

53. The question of the nature of the NNI employees, officers and directors' authority will be a question for
discovery and trial.  (Marshall Decl. ¶ 21.6.)

The fact that the US Debtor will dispute these allegations is not relevant to the present motion. That Katherine Stevenson may have signed the NNUK Loan Agreements does not prove that she acted at all times as an NNL employee. As the Joint Administrators have alleged, Ms. Stevenson was Group Treasurer and a director of NNI and the Group Treasury Department, like the Group Tax Department, was effectively a joint function between NNI and the Canadian Entities. (*Id.* ¶ 19, 21-22.) It is not implausible that in playing a key role in the implementation of the Interest Free Loan Facilities and Project Swift, she was acting in her capacity as an NNI employee, despite her signing one Loan Agreement that was between NNL and NNUK, in her capacity as an NNL director. The US Debtor's contention that she was acting in her NNL capacity raises a factual dispute that cannot be dealt with on a motion to dismiss. Nor have the Joint Administrators "conceded" that Ryan Smith was at all times acting in his capacity as an EMEA employee simply because they acknowledge that he was at one time seconded to EMEA. (*Id.* ¶ 19.) Ryan Smith was an employee of NNI, and was working on behalf of NNI while seconded to NNUK headquarters. (*Id.* at 19, 22.) Indeed, it is a well-established principle of corporate law that directors and officers holding dual positions in a corporate family "can and do 'change hats' to represent the two corporations separately, despite their common ownership." *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 779 (5th Cir. 1997). There is no general presumption that directors of both a parent and subsidiary are acting at all times on behalf of the parent.[54] In any event, these are issues of fact that must be determined following discovery and an evidentiary hearing on the issue.

---

54. In fact, the opposite is true: Courts generally presume that directors are wearing their "subsidiary hats" when acting for the subsidiary. *See United States v. Bestfoods*, 524 U.S. 51 (1998).

4.      **Section 251(3) of The English Companies Act Does Not Bar A Shadow Director Claim Against NNL Or NNI.**

Section 251(3) of the *Companies Act 2006* exists to prevent a parent company from automatically being treated as a shadow director of any of its subsidiary companies for the sole reason that its subsidiary is accustomed to act in accordance with its instructions or directions. (Marshall Decl. ¶ 32.2.2.)  Despite this statutory provision, however, if the parent company seeks to impose management or executive decisions on the directors of its subsidiary, then it will incur the potential liabilities of a director. (*Id*. ¶ 30.)  The Proof of Claim includes allegations that illustrate a controlling relationship between NNL and NNUK that far exceeds the simple giving of instructions from parent to subsidiary.  Instead, the Proof of Claim highlights situations in which both parent and another subsidiary (NNI) effectively made and imposed decisions on NNUK, without any substantive involvement from NNUK's own board of directors. (*See* Proof of Claim ¶ 18c (terms of the MRDA "were determined by NNI and NNL.  NNUK was not consulted in relation to, or involved in, the decision to implement the MRDA"); *see id*. ¶ 21 ("Numerous NNI individuals . . . participated in the . . . decisions imposed on NNUK relating to the utilization of the Interest Free Loan Facilities . . . .").)  These are specific factual allegations that, when proven, will establish the Joint Administrators' right to recover.[55]

The US Debtor further asserts that Section 251(3) should equally apply to bar claims of shadow directorship against NNI, as a sister subsidiary of NNUK, if the only basis for the allegation is the existence of common control of the parent. (Joint Obj. at 38.)  This assertion is without any legal foundation.  Section 251(3) is a statutory provision that is clearly defined as

---

55. As made clear by the allegations in the Proof of Claim, this is equally true for NNL and NNUK's *de jure* directors, who owed independent fiduciary duties to the creditors of NNUK and who breached those duties by: (i) in the case of NNL, creating, implementing, and causing NNUK to enter into these wrongful transactions, and (ii) in the case of NNUK's *de jure* directors, yielding to NNI's and NNL's control and influence without regard for the interests of NNUK's creditors.

applicable only to a parent company.  It does not apply to a sister company and NNI's attempts to rewrite the *Companies Act 2006* are desperate to say the least.  In any event, common control is <u>not</u> the basis alleged in the Proof of Claim.  On the contrary, as set out above, the allegation is based on the exercise of control by NNI over the tax and treasury affairs of NNUK and the giving of instructions on material matters in connection therewith.  The US Debtor also points to the fact that a motive for such acts on the part of NNI was to benefit NNL.  However, once again, there is no requirement regarding motive in Section 251 and no suggestion of it even being a factor for consideration in the guiding case law.  (Marshall Decl. ¶ 35.3.)  In any event, the Proof of Claim does allege matters providing a strong motivation for NNI to act as a shadow director so as to benefit itself.  (*See* Proof of Claim ¶ 64 ("The effect of [the Interest Free Loan Facilities] was that NNUK lost value while NNI benefited and received cash.").)

Finally, as explained above, the Joint Administrators are not required to demonstrate additional justification for imposing specific duties on NNI since the *Companies Act 2006* specifically provides that the general duties of directors apply to shadow directors. (Marshall Decl. ¶ 32.2.1.)  However, even if the US Debtor's analysis of how such duties arise were to be applied, NNI would still be held subject to the full range of fiduciary obligations of a director by virtue of its *de facto* director status, as sufficiently pled in the Proof of Claim, and its indirect control over NNUK's assets through its control over the transactions under which value was improperly removed from NNUK.  (*See id*. ¶ 35.2.)

> **B.    The Proof of Claim Alleges That NNUK Was Insolvent.**

The US Debtor argues that NNL and NNI would have had no duty to consider the interests of NNUK's creditors, rather than the interests of NNUK's shareholder NNL, unless NNUK was insolvent.  (Joint Obj. at 39-40.)  However, the US Debtor's English law expert

concedes that "[t]he interests of creditors might also intrude where the company is near-insolvent or of doubtful solvency." (Todd Decl. ¶ 71.)

The Proof of Claim expressly alleges that NNUK was of "doubtful solvency (and/or [at] risk of insolvency) . . . from 2000 onwards." (Proof of Claim ¶ 113.) This allegation is sufficient at the pleading stage and is supported by an account of the business reversals and exorbitant losses suffered by the Nortel Group, and NNUK in particular, beginning in 2001. (*Id.* ¶¶ 6-8.) Other paragraphs in the Proof of Claim include detailed allegations of how NNI and NNL extracted cash from NNUK, causing a significant depletion of its resources by the time the Nortel companies ultimately filed insolvency proceedings, and how the Project Swift transaction put NNUK in a "materially worse position" when it was already "in a parlous financial state." (*Id.* ¶ 72, 76.) These allegations more than satisfy any relevant standard for pleading insolvency.

The Court should disregard the US Debtor's attempts to argue that NNUK was not in fact insolvent, or of questionable solvency, at the relevant time.[56] Insolvency is a factual determination not appropriate for resolution on a motion to dismiss. *See, e.g.*, *In re DBSI, Inc.*, 445 B.R. 344, 349 (Bankr. D. Del. 2011); *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns. Corp.)*, 365 B.R. 24, 37 (Bankr. S.D.N.Y. 2007).

The US Debtor also misstates the law when it argues that where a company is solvent and a "subsidiary's directors act for the benefit of their parent-shareholder to the subsidiary's detriment . . . the parent-shareholder can ratify their actions and preclude <u>any</u> action for breach of duty." (Joint Obj. at 40 (emphasis added).) In fact, a parent shareholder does not

---

[56]  The US Debtor points to a statement made by Sharon Rolston that NNUK would likely become insolvent as a result of the insolvency proceedings to rebut the Joint Administrators' assertion that NNUK was insolvent. (Joint Obj. at 41-42.) The Witness Statement should not be considered by this Court because it is not "integral to or explicitly relied upon" in the Claim. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citations and quotations omitted). In any event, Ms. Rolston's "belief" as to the company's financial condition is in no way dispositive of whether NNUK was, in fact, insolvent during the period asserted by the Joint Administrators.

have unrestricted power to ratify any and all director breaches when the company is solvent.  For

example, where the transaction at issue amounts to an unlawful distribution or an unlawful return

of capital, a parent-shareholder's approval will not be sufficient to excuse the breach of duty of

directors who implemented such a transaction.  (Marshall Decl. ¶ 35.5.3.)  The interests of

creditors are engaged under these circumstances.  The allegations in the Proof of Claim satisfy

the requirement for an unlawful return of capital to NNUK's shareholder, NNL.  A potential

defense of ratification therefore cannot be made out from the facts in the Proof of Claim, and is

not an appropriate subject for a motion to dismiss.

     C.     **The Proof of Claim Alleges Facts Showing That NNI Owed NNUK An Independent Duty Of Care Under English Law.**

     1.     **NNI Enjoyed A "Relationship of Sufficient Proximity" With Respect to NNUK That Gave Rise To An Independent Duty Of Care Under English Law.**

In addition to alleging that NNI owed a duty of care to NNUK based on its status

as a *de facto* or shadow director, the Joint Administrators assert that such duties arose

independently as a matter of English law.  The Proof of Claim includes facts sufficient to show

that NNI owed an independent duty of care because of the special relationship existing between

NNI and NNUK.

Under English common law, an independent duty of care arises where a sufficient

relationship of proximity exists between the alleged wrongdoer and a person who has suffered

damage.  (Marshall Decl. ¶ 39.)  An independent duty of care also arises under well-established

agency principles.  For instance, an agent will generally owe a duty of care to his principal

including a duty that may give rise to liability for financial loss.  (*Id.* ¶ 39.2.)  As the Joint

Administrators have alleged, a relationship of sufficient proximity existed between NNI and

NNUK by virtue of NNI's control over specific tax and treasury matters affecting NNUK.  (*See*

Proof of Claim ¶ 15.)  NNI, along with NNL, exercised complete decision-making authority in connection with transfer pricing, the Interest Free Loan Facilities, Project Swift and asset sales (all transactions which harmed NNUK), and in doing so subordinated NNUK's board to a position in which it simply acted in accordance with and relied upon NNI's  instructions.[57]  The relationship between NNI and NNUK can also be analogized to that between agent and principal, particularly where NNI carried out negotiations with the revenue authorities and instructed professional advisors on NNUK's behalf.  (*Id.* ¶ 18.)  In taking on these responsibilities, NNI also carried with it a duty to act in NNUK's best interest and protect the company from any harm that could foreseeably result from its actions.[58]

The US Debtor further argues that even if there were a relationship of sufficient proximity, a duty of care should not be imposed on NNI because it would not be "fair, just or reasonable" to impose such a duty on NNI where the resulting harm arose out of the Cash to Canada scheme to which NNI was also subjected.  The fact that NNI may also have suffered some harm is not a relevant factor in the decision as to whether a duty of care arose.  (Marshall Decl. ¶ 39.1 n.25.)

---

57.  (For transfer pricing, *see* Proof of Claim ¶ 18 (alleging that NNI and NNL made the decision to implement the RPSM, designed, negotiated and implemented the MRDA and negotiated its terms, and instructed NNUK to execute the MRDA once its terms were decided); for Interest Free Loan Facilities, see *id.* ¶ 22 ("[An NNI employee] participated in the initial formulation in 2003 of the strategy for NNUK to make cash available to NNL on an interest-free basis."); for Project Swift, *see id.* 24 ("[Ryan Smith's] team came up with the idea for Project Swift as a way of purportedly reducing NNL's debt to NNUK and was then largely responsible for the structuring and implementation of the transaction."); for pre-petition asset sales, *see id.* ¶ 193 ("NNI was involved in all decision making in relation to the settlement of the allocation methodology and allocation amounts."); for general tax matters, *see id.* ¶ 18 (alleging how key individuals at NNI controlled negotiations with the relevant tax authorities).)

58.  The US Debtor's efforts to brush aside the Joint Administrators' claim that NNI owed an independent duty of care are of no avail.  Whether or not a duty of care has been held to exist or not as between companies in the same group is of little significance.  This is because the US Debtor's expert fails to take into account the steady development in recent years of the types of the circumstances in which a duty of care may be held to arise even where the harm alleged is pure economic loss, including, for example, where there is an agency relationship between the parties as described above.  (*See* Marshall Decl. ¶¶ 39.1, 39.2.)

### 2.    NNI Breached the Independent Duty Of Care It Owed To NNUK.

Though the US Debtor does not address the remaining elements of the cause of action, the Joint Administrators have stated a plausible claim that NNI breached the duty of care it owed to NNUK by failing to act with reasonable skill and care in relation to NNUK's affairs. Specifically, the Joint Administrators have shown that NNI breached a duty of care owed to NNUK by (i) causing NNUK to participate in the transfer pricing arrangements which were not arm's length transactions, (ii) implementing and operating the Interest Free Loan Facilities and Project Swift which deprived NNUK of considerable value, (iii) allowing NNUK to be allocated a proportion of the Pre-Petition Sale Proceeds that was far below what it should have received on an arm's length basis, and (iv) controlling NNUK's affairs without concern for the foreseeable risk of incurring liabilities for underreporting or otherwise. As a result of NNI's breaches of duty, NNUK suffered significant losses and will continue to suffer losses should any future tax liability be imposed.[59]

### D.    The Joint Administrators Are Not Estopped From Asserting That NNI Was A *De Facto* Or Shadow Director Of NNUK.

### 1.    The Doctrine of Judicial Estoppel Does Not Apply.

The doctrine of judicial estoppel is a judge-made doctrine that prevents a party from gaining an unfair advantage against an opponent through the deliberate adoption of inconsistent positions in successive suits. The purpose of the doctrine is to prevent unscrupulous litigants from "playing fast and loose with the courts." *Scarano v. Central R.R. Co.*, 203 F.2d 510, 513 (3d Cir. 1953). The US Debtor argues that the doctrine of judicial estoppel bars the Joint Administrators from asserting that NNI or NNL served as *de facto* or shadow directors of

---

59.  As made clear by the allegations in the Proof of Claim, this is equally true for NNL and NNUK's *de jure* directors, who owed independent duties of care to the creditors of NNUK and who breached those duties.

NNUK because this position is "irreconcilably inconsistent" with the Joint Administrators' prior

position that England is the EMEA Debtors' center of main interests ("COMI").  (Joint Obj.

at 25-26.)  This argument is legally and factually meritless.

To invoke judicial estoppel successfully, the US Debtor must prove:  (i) the Joint

Administrators' present position is inconsistent with a position that they affirmatively asserted in

a prior judicial proceeding with respect to the issue in question; (ii) bad faith – i.e., that the Joint

Administrators intended to play "fast and loose" with the court and engage in intentional

wrongdoing; and (iii) that the remedy sought (dismissing their claim) is " 'tailored to address the

harm identified' and no lesser sanction would adequately remedy the damage done by the

litigant's misconduct."  *Montrose Med. Group Participating Savs. Plan v. Bulger*, 243 F.3d 773,

779-80 (3d Cir. 2001); *Ryan Operations. G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 361

(3d Cir. 1996).  The US Debtor's arguments fail at every turn.

### a.    The Joint Administrators Have Not Taken Inconsistent Positions.

The threshold requirement for application of judicial estoppel is to determine

whether a litigant has taken an inconsistent position in an earlier judicial proceeding.  It is not

enough, moreover, for the inconsistency to be inadvertent.  *Id.* at 364.  Rather, for judicial

estoppel to apply it is necessary that the inconsistent positions were intentional.  *See, e.g.*,

*Scarano*, 203 F.2d at 513 (emphasizing the "intentional self-contradiction" of lawsuits at issue).

The US Debtor attacks representations made in the Witness Statements (as

defined below) and the EMEA Debtors' petitions for Chapter 15 recognition as irreconcilably

inconsistent with their position that NNI and NNL are *de facto* or shadow directors of NNUK.  In

doing so, the US Debtor mischaracterizes the purpose and substance of a COMI determination,

overstates the breadth of the representations made in the Witness Statements, and misrepresents

the Joint Administrators' claims.  Contrary to their assertion, a finding that NNUK was the

center of day-to-day operations in the EMEA region is not inconsistent with their assertion that

the North American entities controlled major strategic decisions relating to the specific

transactions that form the basis for the Joint Administrators' claims.

### i. The Witness Statements Were Prepared for the Purpose of Supporting a Jurisdictional Finding.

The Joint Administrators were appointed on January 14, 2009 by order of the

English Court (the "Initial Order") to act for NNUK and the EMEA Debtors, following an

application made by each EMEA company's board of directors.  In the few days prior to

commencement, the Joint Administrators met with senior management of the EMEA Debtors to

discuss financial viability of and possibility of continuation and to ultimately prepare witness

statements in support of the EMEA Debtors' administration applications.[60]  Sharon Lynette

Rolston and Michel Clement, directors of the EMEA Debtors, submitted witness statements (the

"Rolston Statement" and the "Clement Statement" and together, the "Witness Statements")

before the English Court to support a finding that England was each EMEA Debtor's COMI and

obviate the need to file separate proceedings in multiple jurisdictions.

Under Article 3 of the EC Regulation on Insolvency Proceedings (the

"Regulation"), the jurisdiction of a company's COMI has exclusive jurisdiction to open main

insolvency proceedings.  Counsel Regulation (EC) No. 1346/2000. The Regulations do not

define the term "COMI."  The only guidance given is that:  (i) the location of a company's

registered office is presumed to be its COMI in absence of proof to the contrary and (ii) a

company's COMI should correspond to the place where the company conducts the

administration of its interests on a regular basis, and therefore can be ascertained by third parties.

---

60.  (Deposition of Alan Robert Bloom 159:15-25, Dec. 16, 2010.)

*Id.*; *see also Re Eurofood IFSC Ltd* [2006] BCC 606; *In re Stanford International Bank Ltd* [2010] EWCA Civ 137.

The courts in *Eurofood* and *Stanford* both held that the appropriate test of COMI depends on ascertainability by those who deal with the company, and that only those factors which are in the public domain and which a typical third party would learn through their dealings with the company are relevant. Both cases instruct that matters that could only be established on inquiry should be excluded because creditors should not have to make detailed investigations concerning the internal workings of a company as to where decisions were made and how the business was actually managed. *Id.*[61] With this test in mind, and the limited facts available to them at the time, the Joint Administrators supported the position that England was each of the EMEA Debtor's COMI.[62] This is because in the EMEA context, the majority of daily operational decisions were made in England, where key personnel were based.[63] The Witness Statements were not intended to report to the English Court the strategic and operational interplay between the EMEA Debtors and NNI and the Canadian Debtors. The purpose was to apprise the English Court of the operation of the EMEA region and demonstrate how entities outside of England were operationally managed by NNUK. Ignoring such matters as parent or affiliate control over internal corporate matters that could only be ascertained upon inquiry, and

---

61. Notably, Sir Andrew Morritt VC in *Stanford* rejected the US receiver's argument that facts were "ascertainable" even if they were not within the public domain but could have been obtained from asking questions of the company's relevant personnel with whom dealings were conducted. Instead, the judge determined that after *Eurofoods* it was wholly unrealistic to seek to impose a burden on creditors or potential creditors dealing with a company to make detailed inquiries as to how its business was conducted in this context. *Stanford* at 68.

62. (Bloom Dep. 160: 9-23.)

63. Indeed, any outside party dealing with the EMEA Debtors would understand this to be true. *See* Rolston Statement ¶ 149 ("Customers would understand that England is the centre of operations for the EMEA Companies and is the point for resolution of serious issues in respect of customer relationships, final decision-making, strategy and strategy investments.").

focusing only on objective factors clear from ordinary dealings between the EMEA Debtors and their creditors, all signs pointed and still point to England as the EMEA Debtors' COMI.

Once appointed, the Joint Administrators faced the immediate task of managing the affairs, business and property of the EMEA Debtors.[64] It was not until this time that the Joint Administrators – having finally conducted an intensive factual investigation – were able to fully appreciate the control exercised by NNI and NNL, which form the basis of their claims against NNI and NNL as *de facto* or shadow directors.[65] Still, this newly acquired information had no bearing on the Joint Administrators' position that day-to-day *operational* management was centered in England for COMI purposes since these internal matters would not be ascertainable to a creditor without investigation. Indeed, they were not ascertainable to the Joint Administrators prior to their own investigation. With the understanding that COMI remained in England, the Joint Administrators sought and obtained recognition of the EMEA Debtors' administration proceedings as foreign main proceedings under Chapter 15 of the Bankruptcy Code.

### ii. There Is No Inconsistency Between the Joint Administrators' Positions.

The US Debtor mischaracterizes the position that the Joint Administrators have taken with respect to the EMEA Debtors' COMI and their claims against NNI based on *de facto* or shadow directorship. First, the US Debtor's overview of the representations in the Witness Statements is grossly misleading. It attempts to create an artificial inconsistency by cherry-picking and twisting Ms. Rolston's statements, so as to make it appear that the EMEA Debtors

---

64. *See, e.g.*, Initial Order, Barefoot Decl. Ex. E at 2.

65. (Bloom Dep. 173: 20-25; 174:2-16.)

functioned with complete autonomy from North America.[66]  In truth, an examination of the

Witness Statements as a whole reveals that although day-to-day operational and practical

business decisions were made from the Maidenhead office,[67] certain strategic decisions were

made by North America.  It does not stand for the proposition the EMEA region was controlled

exclusively from England.  (*Cf.* Joint Obj. at 20-24.)[68]  Additionally, a review of all the

statements made with respect to tax and treasury functions, not just those selectively chosen by

the US Debtors, equally shows that where treasury and tax initiatives were <u>global</u>, they were

determined by North America.[69]  The US Debtor's efforts to frame the Joint Administrators as

opportunists is utterly ridiculous.

---

66.  Even more disingenuously, the US Debtor references incomplete citations, which, if quoted accurately, would show that strategic policy and procedure were determined at a global level in North America and senior management in England were responsible only for operational implementation.

Notably, the US Debtor selectively cites the following from paragraph 15(i) of the Rolston Statement: "[D]ecisions in relation to settlement of intercompany accounts are made by the EMEA treasury team in England." (Joint Obj. at 21.)  The paragraph goes on to read:  "Those terms are determined in accordance with global EMEA Region procurement policies and are authorised by the individual with the relevant authority level."  (Rolston Statement ¶ 15(i).)  The US Debtor also conveniently replaces with ellipses Ms. Rolston's reference to England as the centre of <u>operations</u> in its citation to paragraph 30 of the Rolston Statement.  (*See* Joint Obj. at 22; *compare* Joint. Obj. at 22 (quoting Clement Statement ¶ 32 ("Senior management in England exercise control and authority over the Company."), *with* Clement Statement ¶ 32 ("Senior management in England exercise control and authority over the Company <u>through the global decision-making approval and policy procedure.  Day to day operational management of the company is conducted locally in accordance with these policies</u>.") (emphasis indicating portion omitted by US Debtor).)

67.  *See, e.g.*, Rolston Statement ¶ 6c ("[T]he centre of <u>operations</u> and head office functions for the EMEA Region is carried out from and performed in England.") (emphasis added); *id.* ¶ 14 ("The Company is the centre of <u>operations</u> for the EMEA Region of the Group.") (emphasis added); *id.* ¶ 15c ("[T]he senior management of all key primary functions (i.e. sales, finance, treasury, legal and human resources) required for the <u>operation</u> of the EMEA Region are located in England.") (emphasis added); *id.* ¶ 15c ("[S]ignificant decisions in relation to sales and dealings with customers are largely made in England . . . .").

68.  *See, e.g.*, Rolston Statement ¶ 15d ("senior management for EMEA is <u>largely</u> located in England"); *id.* ¶ 15b ("[T]he senior management, which is largely located in Maidenhead, make the <u>vast majority</u> of significant decisions <u>in respect of the operations</u> of the EMEA Companies.") (emphasis added).

69.  For tax functions, *see* Rolston Statement ¶ 188 ("Tax planning initiatives come from Canada, where there is a global impact, or may be generated by the EMEA Tax Group in relation to specific opportunities in the region, although in the latter case this will always be discussed with Canada before any implementation.").  For treasury functions, *see id.* ¶ 15i (describing how EMEA Treasury can only settle intercompany accounts in accordance with global policies).  Ms. Rolston's references to Canada do not rule out NNI's involvement.

Second, the Joint Administrators do not take the position in the Proof of Claim that NNI exerted overall control over all aspects of the affairs of NNUK and the EMEA Debtors. (Joint Obj. at 25.)  On the contrary, the Proof of Claim focuses on instances where NNI exerted control over treasury and tax functions in connection with transactions involving <u>global</u> strategy.[70]  To prove *de facto* or shadow directorship, NNUK need not show that NNI or NNL exerted control over every aspect of the company; rather, director liability can be imposed on NNI for its control over discrete transactions impacting the EMEA Debtors, as the Joint Administrators have asserted.  (Marshall Decl. ¶ 21.2.)  Accordingly, a COMI finding in England is not incompatible with the position that certain key strategic decisions were made at a level beyond senior management in England.

The alleged inconsistencies here are similar to those raised before the Supreme Court in *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999).  The issue in *Cleveland* was whether a person who sought Social Security Disability ("<u>SSDI</u>") benefits could later be judicially estopped from claiming protected status under the American Disabilities Act ("<u>ADA</u>").  In seeking SSDI benefits, the claimant certified that she was "disabled" and "unable to work," but in a later ADA suit submitted she could perform the essential functions of a job with reasonable accommodation.  *See id*. at 798-99.  The Court rejected the judicial estoppel argument, observing that "in <u>context</u>, these two seeming divergent statutory contentions are often consistent with each other" and that "there are too many situations in which an SSDI claim and an ADA claim can comfortably exist side by side."  *Id*. at 797, 802-03 (emphasis added).  Similarly, the Court should view the Witness Statements in the context in which they were

---

70.  (*See generally* Proof of Claim ¶¶ 9-27.)

prepared and determine that a COMI determination in England is perfectly consistent with

NNUK's claims that control for specific transactions was also exerted from North America.[71]

**b.**     **NNI Cannot Show That the Joint Administrators Acted In Bad Faith.**

For the reasons explained above, there is no inconsistency between the position

taken by the Joint Administrators in the Proof of Claim and the position they previously took

before the English Court and this Court.  Furthermore, under governing Third Circuit decisions,

if a party has asserted inconsistent positions concerning the same issue, judicial estoppel still will

not apply unless that party acted in bad faith and the inconsistency is "<u>attributable to intentional

wrongdoing</u>."  *Ryan Operations,* 81 F.3d at 363 (emphasis added).[72]

The assertion of claims by the Joint Administrators – who are officers of the

English Court – against NNI and NNL as *de facto* or shadow directors of NNUK is not part of a

scheme to mislead the court and it is inappropriate for the US Debtor to suggest otherwise.  The

Joint Administrators had no motive to conceal these claims.  Even if the Court were to determine

that there is some element of inconsistency in the Joint Administrators' position (which there is

not), it could only be attributable to an inadequacy of information available to them at the time

---

71. *See Ocasio v. Ollson*, 596 F. Supp. 2d 890 (E.D. Pa. 2009) (judicial estoppel was inappropriate to bar certain claims against employer in subsequent tort action for injuries that were not described in release agreement where language of release agreement, when read as a whole and under the relevant circumstances, was broad enough to encompass such claims).

72. As discussed in *Ryan Operations*:

Asserting inconsistent positions does not trigger the application of judicial estoppel unless "intentional self contradiction is ... used as a means of obtaining unfair advantage." Thus, the doctrine of judicial estoppel does not apply "when the prior position was taken because of a good faith mistake rather than as part of a scheme to mislead the court." An inconsistent argument sufficient to invoke judicial estoppel must be attributable to intentional wrongdoing.

81 F.3d at 355 (internal citations omitted).

the EMEA Debtors entered into administration.  These facts alone set this case apart from many of the Third Circuit cases applying judicial estoppel.[73]

The Joint Objection is completely devoid of facts that could suggest intentional wrongdoing on the Joint Administrators' part and simply relies on the purported benefits that NNUK received from its prior assertions that the EMEA Debtors' COMI was in England.[74] Specifically, the Joint Objection focuses on the strategic advantage that coordinated proceedings in England brought to the EMEA Debtors and the protections of the automatic stay that NNUK enjoyed by securing Chapter 15 recognition.  Whatever benefit derived from the COMI determination impacted the Nortel Group as whole, not just NNUK, by simplifying the administration of these related insolvency proceedings.  Among other things, this facilitated the global asset sales that have greatly benefitted creditors of the Nortel Group worldwide.[75]  This is

---

73. *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419-20 (3d Cir. 1988) (applying judicial estoppel where party waited until after closure of bankruptcy proceeding to bring claim, thus challenging integrity of judicial system); *see also Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 121-22 (3d Cir. 1992) (party who convinced the bankruptcy court to lift stay on defendant's assets on representation that any recovery against the defendant would be limited to the amount of the defendant's insurance coverage estopped from recovering more); *Murray v. Silberstein*, 882 F.2d 61, 65-66 (3d Cir. 1989) (plaintiff who represented to the court that money damages were unavailable in order to obtain a preliminary injunction estopped from asserting that damages were available); *Scarano v. Central R.R. Co.*, 203 F.2d 510, 512-14 (3d Cir. 1953) (party who represented that he was completely disabled to win damages estopped from asserting that he was able-bodied in order to win reinstatement); *Lewandowski v. Nat'l R.R. Passenger Corp.*, 882 F.2d 815, 818 (3d Cir. 1989) (finding *Scarano* "controlling" on virtually identical facts).

74. The US Debtor's reliance upon *Anjelino v. New York Times Co.,* 200 F.3d 73, 100 (3d Cir. 2000), for the principle, in regards to judicial estoppel, that the receipt of a benefit based on a prior position itself "evidences an intent to play fast and loose with the courts" is misplaced.  In *Anjelino*, the Third Circuit held that the district court did not abuse its discretion when it held "counsel to the representation that no further discovery was needed" because, "[o]n the basis of the record before [the Third Circuit], [the Third Circuit] f[ound] no cause for disturbing the [district] court's application of judicial estoppel to preserve the integrity of the courts by preventing litigants from playing fast and loose with the courts." *Id.* (internal quotations omitted).  The Third Circuit said nothing more significant than this, and to argue that these statements lead to the principle cited by the US Debtor is disingenuous.

75. NNUK felt it was important to take a coordinated and fully integrated approach to the EMEA Debtors' administration proceedings in order to facilitate a restructuring and avoid the risks of uncoordinated insolvency proceedings in multiple jurisdictions.  *See* Rolston Statement ¶ 212.  NNUK was not alone in this sentiment.  What the US Debtor conveniently ignores is that NNI fully supported and participated in the EMEA Debtors' applications for administration before the English Court, including the EMEA Debtors' assertions regarding their COMI.  *See Nortel Networks Inc., et. al.,* Case No. 09-10138, Hr'g Tr. 10-14, Jan. 15, 2009.  NNI

hardly the type of "benefit" that can give rise to an inference of bad faith.  *See Payless Wholesale Distribs, Inc. v. Alberto Culver (P.R.) Inc.*, 989 F.2d 570, 571 (1st Cir. 1993) (applying judicial estoppel upon finding that plaintiff intended to "[c]onceal [its] claims [in the bankruptcy proceeding]; get rid of [its] creditors on the cheap; and start over with a bundle of rights").

      The US Debtor also argues that NNUK misled this Court, which relied on the Witness Statements in granting the EMEA Debtors' Chapter 15 recognition.  This is an unwarranted and inappropriate allegation for the US Debtor to make against the Joint Administrators, officers of the English Court.  Perhaps the most salient fact – conveniently omitted by the US Debtor in its motion papers – is that the Court, in granting Chapter 15 recognition to the remaining EMEA Debtors, also relied on the record from the deposition of one of the Joint Administrators, Alan Robert Bloom, in which Mr. Bloom provided an explanation for any supposed inconsistency in position.  (*See* EMEA Recognition Order, Barefoot Decl. Ex. N at 2.)  Mr. Bloom explained at multiple points during his deposition that it was not until the Joint Administrators further examined the EMEA Debtors' books and records that they discovered that a considerable amount of the decision-making process in relation to EMEA was driven out of North America.[76]  Therefore, the Court never relied exclusively on the representations in the Witness Statements. This type of candor could not possibly amount to an "assault [on] the dignity or authority of the court."  *Montrose,* 243 F.3d at 781.

---

represented to this Court at the hearing on the first day motions that the English Court's finding of COMI was a "very good thing" because it allowed them to sell assets without having to deal with multiple jurisdictions in the European Union.  (Hr'g Tr. 12:9-13:2.)  It is therefore clear that the entire Nortel Group, not just NNUK, benefited from the English Court's finding that England was the COMI for the EMEA Debtors as it facilitated the restructuring of the corporate group as a whole.

76. (*See* Bloom Dep. 83:2-25. 84:2-10, 155:6-25, 157:9-15, 157:24, 158:10-25, 159:2-4, 160:14-23, 161:5-23, 173:13-25, 174:1-16, 188:3-12, 192:10-22, 196:3-10, 283:18-22.)

Finally, the Third Circuit has noted that "equity requires that the presiding court give the party to be estopped a meaningful opportunity to provide an explanation for its position." *Ocasio*, 596 F. Supp. 2d at 902. The ultimate finding of bad faith cannot be reached without first resolving disputes as to the underlying facts. *Montrose*, 243 F.3d at 780. Such an explanation is provided herein. If the US Debtor disputes the explanation or the underlying facts, dismissal would not be appropriate at this juncture.

### c.     NNI Will Suffer No Harm From Any Purported Inconsistency.

Observing that judicial estoppel "is often the harshest remedy" that a court can impose for inequitable conduct, the Third Circuit has held that the doctrine should only be applied where "the sanction [of judicial estoppel] is tailored to address the harm identified." *Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98, 108, 110 (3d Cir. 1999) (also stating judicial estoppel is a "draconian" remedy that should be used sparingly) (internal quotation marks and citations omitted); *see also Ryan Operations,* 81 F.3d at 365.

The US Debtor has identified no harm it will suffer as a result of any purported inconsistency in the Joint Administrators' positions. Certainly the US Debtor could not argue that being required to respond to an otherwise valid claim is a cognizable harm for this purpose. The Joint Administrators have certainly never purposefully concealed information or done anything else that could equate to a fraud on the Court, nor have their positions been inconsistent. *Cf. Ryan Operations*, 81 F.3d at 365 (judicial estoppel not to be used offensively as a sword and should only be applied if court is satisfied that party to be estopped had deliberate intention to manipulate or mislead court). More importantly, the Joint Administrators are not seeking any personal gain – they have pursued these claims in their fiduciary capacities in an effort to increase estate assets and allow for more equitable distributions to innocent creditors. It is those creditors who will be harmed by the dismissal, not the Joint Administrators. *See*

*Montrose*, 243 F.3d at 785-86 (judicial estoppel not tailored to address harm where plaintiffs brought claims in their fiduciary capacities on behalf of pension plan participants who would be harmed if the action was dismissed).

### 2.      The Doctrine Of Collateral Estoppel Does Not Apply.

The US Debtor's assertions that collateral estoppel should foreclose the Joint Administrators' claims are even weaker.  The doctrine of collateral estoppel, or issue preclusion, conserves judicial resources by preventing a party from relitigating an  issue previously litigated and decided.  *Young v. Shore*, 588 F. Supp. 2d 544, 547 (D. Del. 2008).  Collateral estoppel applies where (i) the issue sought to be litigated is <u>identical</u> to one decided in a prior action; (ii) the issue is actually litigation in a prior action; (iii) resolution of the issue is essential to a final judgment in the prior action; and (iv) the party against whom collateral estoppel is sought had a full and fair opportunity to litigate the issue in the first action.  *Raytech Corp. v. White*, 54 F.3d 187, 190 (3d Cir. 1995); *Hamilton v. Leavy*, No. CIV.A. 94-336-GMS, 2001 WL 848603, at *9 (D. Del. July 27, 2001).

The US Debtor argues that the English Court's finding of COMI in England precludes the Joint Administrators from asserting that key decisions were dictated from North America and that collateral estoppel should apply because the EMEA Debtors' COMI was finally determined before the English Court and this Court, was actually litigated and essential to the orders of the English Court and this Court.  (Joint Obj. at 28-29.)

But US Debtor's presentation of the law skips over the most decisive element of the doctrine of collateral estoppel: that the issue presented in the current proceeding is <u>the exact issue</u> already decided in an earlier proceeding.  The facts underlying NNI's alleged status as a *de facto* or shadow director has never been addressed in <u>any</u> proceeding, let alone in a prior proceeding because such a determination was not essential to the COMI determination.  *See In re*

56

*Chi-Chi's, Inc.*, 338 B.R. 618 (Bankr. D. Del. 2006) ("collateral estoppel is unavailable when there are disparate policies underlying each inquiry which result in definite differences in application and result") (quoting *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415, 1422 (5th Cir.1995)).  The English Court received no evidence and made no findings about the roles of NNL and NNI in the transactions that give rise to the Joint Administrators' claims.  The English Court never determined any substantive rights at the time the Initial Orders were entered, nor did this Court when it granted Chapter 15 recognition of the English Proceedings.  Rather, those determinations related strictly to forum – not the status or involvement of NNI.  (Marshall Decl. ¶ 69.)  As noted above, in addressing the COMI question, the English Court was entitled to act on the COMI presumption in respect of NNUK, and, insofar as the other EMEA Debtors are concerned, would have considered only objective and ascertainable factors that a third party would learn through their dealings with those companies.  In contrast, determining whether the facts support a finding that NNI was a *de facto* or shadow director requires an inquiry into the strategic considerations and related internal workings of the company to see how the business was managed and whether NNI played a role in the affairs of the company – factors that were not a necessary focus for COMI purposes and therefore were not essential to any prior judgments in this case.

**III.    THE JOINT ADMINISTRATORS STATE CLAIMS FOR SECONDARY LIABILITY AGAINST NNI.**

**A.    The Joint Administrators State Claims For Dishonest Assistance And Aiding And Abetting Breach of Fiduciary Duty.**

In the alternative to the claims asserting primary liability against NNI, the Joint Administrators assert a series of claims based on NNI's participation in and assistance to the breaches of duty by NNL and NNUK's own directors.  These include claims for aiding and

abetting breach of fiduciary duty (under US state law), dishonest assistance (under English law), and conspiracy (under English and US state law).

The US Debtor argues that the Joint Administrators' aiding and abetting and dishonest assistance claims[77] are subject to dismissal on the grounds that (i) the Joint Administrators have not provided the particulars of the assistance that was provided, nor facts from which it could be inferred that any assistance was given knowingly; (ii) the Joint Administrators have not alleged facts showing that NNL or NNUK's directors breached any duty to NNUK, and (iii) the Joint Administrators have not pleaded that NNUK was insolvent or near insolvency at the relevant times. The US Debtor argues that the Aiding and Abetting and Dishonest Assistance Claims sound in fraud and must therefore be tested under the heightened pleading standard of Rule 9(b).

**1.    Rule 9(b) Does Not Apply To The Joint Administrators' Claims For Aiding and Abetting Or Dishonest Assistance.**

As discussed in Section I.D above, the courts will sometimes apply Rule 9(b) to non-fraud claims where they are either coupled with fraud claims or are based on conduct that might meet the elements of a fraud claim. Here the Joint Administrators do not allege any fraud claims, nor would the underlying facts they rely on make out a claim for the tort of fraud. There is therefore no basis to apply a heightened pleading standard under Rule 9(b) to their allegations of aiding and abetting or dishonest assistance.[78]

---

77.  (Proof of Claim, Claims 4, 6, 10, 13, 18, 20, 31, 34, & 35.)

78.  Certainly there is no support for the US Debtor's suggestion that any claim which incorporates a scienter element must be alleged with particularity.

      **2.**      **The Proof of Claim Sets Forth Facts Showing The Assistance NNI Provided And From Which It Can Be Inferred That Such Assistance Was Knowing.**

      **a.**      **The US Debtor Misstates The Required Mental State.**

At the outset it should be noted that the US Debtors misstate the mental state or degree of knowledge required to support claims for aiding and abetting and dishonest assistance.

With respect to aiding and abetting a breach of fiduciary duty under US state law, the knowledge element is met if it can be inferred from the overall facts that the defendant was aware of the nature of the relationship between the breaching party and of the conduct that was in breach. *See Zirn v. Vli Corp.*, 15 Del. J. Corp. L. 789, 801-02 (Del. Ch. 1989) ("although the Complaint fails to specifically allege that [Defendant] 'knowingly participated' in the directors' alleged breach of their fiduciary duty to the . . . shareholders, I find that it can be logically inferred by reasonable inferences drawn from facts alleged in the Complaint"); *Duke Energy Int'l, L.L.C. v. Napoli*, 748 F. Supp. 2d 656, 672 (S.D. Tex. 2010) (denying motion to dismiss where complaint alleged "facts of a suspicious nature that permit an inference of [Defendant's] knowledge"); *In re I.G. Servs., Ltd.*, No. 04-5041-C, 2004 WL 5866105, at *1 (Bankr. W.D. Tex. Dec. 22, 2004) ("One way to prove knowing participation is to infer it through atypical transactions that lack business justification.") (citations omitted).[79]

The US Debtor's reliance on *Capitaliza-T* for its interpretation of "actual knowledge" is misplaced. In *Capitaliza-T*, the court required actual knowledge on the part of a passive aider and abettor. The defendant US bank and others were accused of "permitting deposits" by a Mexican corporation, which was branching out from facilitating foreign currency

---

79. *See also Aetna Cas. and Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 535 (6th Cir.2000) ("For the purposes of establishing aiding and abetting liability . . . [p]roof of a defendant's knowledge or intent will often be inferential.") (internal quoting reference omitted).

exchanges into international transactions involving interest-bearing accounts (a violation of both

its corporate charter and Mexican law). *See Capitaliza-T Sociedad De Responsabilidad*

*Limitada De Capital Variable v. Wachovia Bank of Del. Nat'l Ass'n*, No. CIV. 10-520, 2011 WL

864421, at *1, 5 (D. Del. Mar. 9, 2011) ("To the extent there is any ambiguity in the Delaware

common law concerning the sufficiency of constructive knowledge or willful blindness, there is

no doubt that where the substantial assistance is permitting money to be deposited in a bank,

actual knowledge on the part of the bank is required."). Under these circumstances the court

required allegations of fact showing that the bank was aware of the underlying fraud and of the

misconduct. Here, in contrast, NNI is alleged to have been intimately involved in the

transactions that constituted a breach of duty, and as a member of the Nortel Group was well

aware of all the relevant relationships and resulting duties. NNI was far from a passive

participant. (*See, e.g.*, Proof of Claim ¶¶ 7, 15, 19, 21, 23, 32, 40.)

The decision in *Malpiede* is likewise inapposite because that decision examined

the knowledge requirement in the context of holding an arm's length bidder liable for aiding and

abetting a target board's breaches of duty. *See Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del.

2001) ("Under this standard, a bidder's attempts to reduce the sale price through arm's-length

negotiations cannot give rise to liability for aiding and abetting, whereas a bidder may be liable

to the target's stockholders if the bidder attempts to create or exploit conflicts of interest in the

board."). In the present case, NNI was not a self-interested bidder dealing with NNUK at arm's

length; the Proof of Claim clearly alleges that NNI participated in the decisions of (and even

supplanted) the board of NNUK with respect to the "Cash to Canada" scheme. *Cf. id.* at 1098

("there is no indication in the amended complaint that [Defendant] participated in the board's

decisions, conspired with [the] board, or otherwise caused the board to make the decisions at

issue"). *Malpiede* also does not support the proposition that the court cannot infer actual

knowledge from allegations of suspect transactions. *See id.* at 1098 n.79 ("It may be that some

circumstances will arise in which the terms of the negotiated transaction themselves are so

suspect as to permit, if proven, an inference of knowledge of an intended breach of trust.")

(quoting *Greenfield v. Tele-Communications,* C.A. No. 9814, 1989 WL 48738, at *3 (Del. Ch.

May 10, 1989)).[80]

With respect to the elements of dishonest assistance under English law, the US

Debtor argues that "dishonesty . . . is a culpable state of mind that goes beyond mere negligence,

requiring, at a minimum, willful blindness or recklessness." (Joint Obj. at 49 (citing Todd Decl.

¶ 85, 88, 91).) But this argument relies on a dissenting opinion in the *Three Rivers* case. (*See*

Marshall Decl. ¶ 45 (citing *Three Rivers DC v. Bank of England (No. 3)* (2003) 2 AC 1, at

¶¶ 183-90).) The majority in that case did not adopt this approach. Moreover, that case did not

address dishonesty for accessory liability in the context of a breach of trust or fiduciary duty but

the tort of misfeasance in public office. (*Id.*) The law is that, in the commercial setting, when a

third party assists a fiduciary in taking risks with trust property that ultimately amount to a

breach of trust, English law imposes liability on such third party if he or she engages in

"commercially unacceptable conduct."[81] (*Id.* ¶ 44.)

---

80. By citing *Malpiede*, the US Debtor effectively recognizes that allegations regarding a defendant's knowledge of the legal consequences of a fiduciary's actions will not be necessary to make out every claim. (*See* Joint Obj. 47 n.56 ("Even to the extent that <u>willful blindness or constructive knowledge were sufficient to establish knowledge</u>, NNUK's [Proof of] Claim fails under either standard . . . .") (emphasis added).) Thus, to the extent that the Court is persuaded that the standard of knowledge required for corporate bidders is somehow applicable in this case, the Proof of Claim contains allegations supporting the inference that, at a minimum, NNI was willfully blind to or should have known about the breaches of duty by NNL and the de jure directors of NNUK.

81. In the specific context of an insolvent company, "[t]he deliberate removal of the assets of an insolvent company so as entirely to defeat the just claim of a creditor is . . . not in accordance with the ordinary standards of honest commercial behaviour." (Marshall Decl. at n.27.)

### b.    The Proof of Claim Contains Facts Showing The Assistance Provided And That NNI Acted With The Requisite Mental State.

The circumstances alleged in the Proof of Claim more than satisfy the necessary

elements.  The Proof of Claim provides detailed allegations of the ways that NNI and its

personnel assisted in the breaches of duty by NNUK's directors and NNL.[82]  It is also replete

with factual allegations that, if proven, will satisfy the knowledge element of the causes of

action.[83]  It further alleges that NNUK's *de jure* directors abandoned their responsibilities to the

company and its creditors by deferring to NNI.  (*See, e.g.*, *id.* ¶ 18(d) ("Once the terms of the

MRDA had been decided by NNI and NNL, NNUK was simply instructed to sign . . . .").)  The

Proof of Claim makes the requisite allegations in relation to each of the underlying transactions:

Pre-Petition Asset Sales.  The Proof of Claim alleges that NNUK's directors

breached their duties to NNUK by "causing and/or allowing NNUK to enter into pre-petition

sales and/or to receive an allocation of the Pre-Petition Sale Proceeds in respect of which NNUK

---

82.  (*See, e.g.*, Proof of Claim ¶ 7 ("[i]n the period leading up to the collapse [of the Nortel Group,] the resources of NNUK were depleted at the direction of the NNL and NNI"); *id.* ¶ 15 ("The control exerted by NNI related to Group Tax matters, in particular transfer pricing, and to Group Treasury matters. These Group Tax and Treasury functions were responsible for the transactions pursuant to which value was improperly removed from NNUK."); *id.* ¶ 19 ("The Nortel Group Tax Department was effectively a joint function between NNI and the Canadian Entities.  Many of the key individuals within the Tax Department were NNI personnel.  This was particularly so in respect of the members of the Tax Department who had responsibility for NNUK and EMEA."); *id.* ¶ 21 ("Numerous NNI individuals were aware of and/or participated in the discussions relating to the initial Interest Free Loan Facility and the later decisions imposed on NNUK relating to the utilization of the Interest Free Loan Facilities that followed."); *id.* ¶ 23 ("In respect of Project Swift . . . NNI's directors, officers and senior employees were part of the management group that implemented Project Swift to the detriment of NNUK."); *id.* ¶ 32 ("The decision to implement the RPSM was taken by the Canadian Entities and NNI.  It was primarily motivated by a desire to allocate more profit to the Canadian Entities in order to benefit NNL at the expense of NNUK. Both NNL and NNI knew that this was to be the case."); *id.* ¶ 40 ("The terms of the MRDA were determined by NNI and NNL based mainly on the requirements of Canadian and U.S. tax laws, in negotiations with the Canadian and U.S. taxing agencies.").)

83.  (*See, e.g.*, Proof of Claim ¶ 107 ("NNI acted dishonestly as it appreciated that the implementation and operation of the MRDA and RPSM were contrary to NNUK's interests."); *id.* ¶ 132 ("NNI acted dishonestly as it appreciated that the Interest Free Loan Facilities were contrary to NNUK's interests."); *id.* ¶ 164 ("NNI acted dishonestly as it appreciated that Project Swift was contrary to NNUK's interests."); ¶ 87(b)(v) ("given the doubtful solvency (and/or risk of insolvency) of NNUK from 2000 onwards, [NNI failed] to consider the best interests of the creditors of NNUK as paramount and to take those interests fully into account in exercising their powers and discretion").)

did not receive appropriate value." (Proof of Claim ¶ 205.) Through its role in the allocation of

the Pre-Petition Sale Proceeds, NNI not only breached its own duties to NNUK; it aided and

abetted the directors of NNUK in conduct amounting to a breach of their duties as well. (*See id.*

¶ 193 ("NNI was involved in all decision making in relation to the settlement of the allocation

methodology and allocation amounts.") The Proof of Claim clearly alleges NNI's motivation: it

received a greater portion of the Pre-Petition Asset Sales than it would have under a fair

allocation methodology. (*See id.* ¶ 82 ("[a]s a consequence of the allocation method adopted,

NNUK received significantly less and NNI received significantly more than it was entitled to on

an arm's length basis").

Contingent Tax Claims. Claims 32-35 assert contingent claims for any tax

liability that may arise out of NNI's breach of its duties as a *de facto* or shadow director of

NNUK, its breach of the duty of care under English law, its aiding and abetting the breach of

other directors of NNUK (whether *de jure*, *de facto*, or shadow), and its dishonest assistance

under English law. (Proof of Claim ¶¶ 208-214.) NNI's control over matters related to taxation,

both generally with respect to the Nortel Group and specifically as to NNUK, may result in

NNUK's liability to the Revenue Authorities. (*See id.* ¶ 15 ("The control exerted by NNI related

to Group Tax matters, in particular transfer pricing . . . .").)

The Proof of Claim further alleges how key individuals at NNI controlled

negotiations with the relevant Revenue Authorities in order to secure approval of the transfer

pricing schemes integral to "Cash to Canada":

> NNI and NNL controlled the all-important advanced pricing
> arrangement/agreement ("APA") application process [pursuant to
> which approval of the transfer pricing arrangements by the
> Revenue Authorities was secured]. The triumvirate of Mark Weisz
> of NNI, Mike Orlando of NNI and John Doolittle took the lead in
> the negotiations with the IRS, the [Canadian Revenue Authority]

63

and [Her Majesty's Revenue and Customs ("HRMC")].  This team ran the negotiations until around 2006 when Peter Look joined the Nortel Group as Vice President of Global Tax.  He replaced John Doolittle alongside Mark Weisz and Mike Orlando.  Later John Payne, also of NNI, joined the lead team together with Peter Look.  NNI and NNL also took sole responsibility for instructing Nortel's professional advisers in relation to the APA application process, in particular Horst Frisch and Ernst & Young.

Once more, NNUK and its directors and officers, were excluded from the process, even in relation to negotiations with NNUK's own Revenue Authority, HMRC.  All dealings with HMRC were conducted by NNI and NNL.  NNUK's role was limited to assisting them to provide information to the Revenue Authorities in response to their information requests.

(Proof of Claim ¶ 18(e)-(f).)

Transfer Pricing, Interest Free Loan Facilities, and Project Swift.  The Proof of Claim names several of the specific NNI officials who were involved in the advance pricing arrangements with the Revenue Authorities entered into on behalf of NNUK and the EMEA Companies, the design and operation of the RPSM, and the creation and implementation of the MRDA.  (*See* Proof of Claim ¶ 17 ("The key individuals involved [in the advance pricing arrangements, RPSM, and MRDA] included in particular John Doolittle of both NNI and the Canadian Entities and Mark Weisz, Mike Orlando, Laurie Krebs and John Payne of NNI as well as representatives from the Canadian Entities."); *see also id.* ¶ 18 ("NNUK had no substantive involvement.  Its role was limited to providing information for the above individuals as and when required and implementing the decisions which had been taken by NNI and the Canadian Entities.").)  The Nortel Group Tax Department, which was heavily involved in transfer pricing arrangements, was also dominated by individuals from NNI.  (*See id.* ¶ 19 ("at various times, the International Tax Director of Nortel was Mark Weisz; Mike Orlando was the Global Transfer Pricing Leader (and right hand man of Peter Look, Vice President of Global Tax); John Payne, was responsible for Global Transfer Pricing; Claire Barbieri [of NNI] was responsible for Global

Tax Accounting; and even the EMEA Tax Leader on the ground in the EMEA Region, Ryan

Smith, was seconded to NNUK from NNI.").)

        The Proof of Claim further alleges that, in 2001, NNI (including through the

above-named individuals) worked with NNL to implement the RPSM, and that the shared

purpose of doing so was to divert profit away from NNUK and toward the Canadian Entities.

(*See id.* ¶ 32 ("[the transition to RPSM transfer pricing] was primarily motivated by a desire to

allocate more profit to the Canadian Entities in order to benefit NNL at the expense of NNUK.

Both NNL and NNI knew that this was to be the case.").)

        Meanwhile, NNUK and the EMEA Companies were excluded from any decision

making with respect to the RPSM.  (*See id.* ¶ 33 ("NNUK and the other EMEA Companies

which lost out as a result of RPSM were not involved in the decision to change from the previous

cost sharing arrangement to RPSM.").)  A 2006 revision to the Nortel Group's RPSM, again

designed and executed by NNI and NNL, changed how each RPE's contribution to the Nortel

Group's R&D activity was measured; the new methodology looked not to the RPE's contribution

to R&D capital stock but rather to its share of consolidated R&D costs.  (*See id.* ¶ 36.)  The

redesigned system, implemented without substantive input from NNUK, imposed a cost mark-up

of approximately 15% for entities like NNUK that provided regional central services and extra-

territorial services for other Nortel companies (which services entailed, among other things,

expenses for sales and marketing).  (*See id.* ¶ 37.)  It is notable that the implementation of RPSM

occurred at a time when the Nortel Group's business prospects had already begun to wane.  (*See

id.* ¶ 38 ("The Nortel Group registered losses or at best broke even during the entire period in

which the RPSM was in force.").)

The Interest Free Loan Facilities were also created to further the shared goal of NNI and the Canadian Entities to move "Cash to Canada."  (*See* Proof of Claim ¶ 20 (under the scheme, "Nortel companies were instructed to identify opportunities to transfer cash and value to NNL.  It was in accordance with this initiative that the idea of the unsecured Interest Free Loan Facilities came about."); *id.* ¶ 23-24 (naming employees of NNI who were involved in the creation and implementation of Project Swift, including Ryan Smith).)

### 3.    The Joint Administrators Have Alleged Facts Supporting The Underlying Breaches of Duty By NNUK's Directors and NNL.

The US Debtor argues that the Joint Administrators' claims for aiding and abetting and dishonest assistance would be subject to dismissal because they have not alleged facts that would support a primary claim against NNUK's *de jure* directors or NNL.  The facts alleged are more than sufficient to state a claim for primary liability against these parties.  As discussed in Section II above, NNL was as *de facto* and/or shadow director of NNUK and, as a consequence, owed fiduciary duties to NNUK and its creditors.  The Proof of Claim shows that NNL breached these duties by (i) causing NNUK to participate in the transfer pricing arrangement and failing to ensure that NNUK received an arm's length return under the RPSM (*see* Proof of Claim ¶¶ 18-19, 40, 105.); (ii) causing NNUK to make the Interest Free Loan Facilities available to NNL and designing, implementing and forcing upon NNUK the Project Swift transaction, knowing that neither were in NNUK's best interests (*see id.* ¶¶ 21, 24-25, 57, 66); (iii) controlling the allocation of proceeds from the pre-petition sales and assigning NNUK an allocation that was significantly less than it was entitled to under the arm's length principle, and profiting from this unequal distribution at NNUK's expense (*see id.* ¶ 205); and (iv) exerting improper control over NNUK's tax matters and making decisions on NNUK's behalf that were contrary to its interests (*see id.* ¶¶ 84-85).  Similarly, NNUK's *de jure* directors breached their

fiduciary duties by allowing NNI and NNL to control such transactions, thereby abandoning their responsibilities to NNUK and its creditors.  (See *id*. ¶ 29.)[84]

### 4. The Joint Administrators' Claims Are Supported By Factual Allegations Showing That NNUK Met The Insolvency Requirement At The Relevant Time.

As discussed in Section II.B above, the Proof of Claim alleges facts showing that NNUK was at or near insolvency during the relevant period.

### B. The Joint Administrators State Claims For Conspiracy.

The Joint Administrators allege that NNI's collaboration with NNL and NNUK's directors in the transactions that stripped NNUK of funds renders it liable for the tort of conspiracy under both English and US state law.[85]  The US Debtor argues that these claims are subject to dismissal on the ground that the Joint Administrators have not alleged the details of the conspiracy with particularity.  The US Debtor argues that the conspiracy claims must meet the particularity requirement under Rule 9(b), which would purportedly require the Joint Administrators to list all persons who participated in the conspiracy, state exactly when and where they met or communicated, what they said, and what they did.

### 1. Rule 9(b) Does Not Apply To The Joint Administrators' Conspiracy Claims.

As discussed in Section I.D above, the US Debtor is incorrect to argue that Rule 9(b) applies to any of the Joint Administrators' claims.  Nor do the cases the US Debtor cites suggest the application of Rule 9(b) to the Joint Administrators' conspiracy claims.  In *Fierro v. Gallucci*, 06-CV-5189, 2008 WL 2039545 (E.D.N.Y. May 12, 2008), the court applied Rule 9(b)

---

84.  As explained above, the Joint Administrators have filed breach of duty claims in England against some of NNUK's *de jure* directors.

85.  (Proof of Claim, Claims 5, 7, 11, 12, 19, and 21.)

where the object of the conspiracy was to commit fraud. *See id.* at \*16 ("A claim of conspiracy

may lie where an underlying tort of fraud has been adequately pleaded [under Rule 9(b).]").  In

none of the other cases cited did the courts apply Rule 9(b) to conspiracy claims.  *See Brug v.*

*Enstar Grp., Inc.,* 755 F. Supp. 1247 (D. Del. 1991) (court applied Rule 9(b) to fraud claims, but

not separate claim for conspiracy); *In re Am. Bus. Fin. Services, Inc.*, 361 B.R. 747, 762 (Bankr.

D. Del. 2007) (same); *Kalmanovitz v. G. Heileman Brewing Co., Inc.*, 595 F. Supp. 1385, 1401

(D. Del. 1984) (Rule 9(b) not applied to any claim), *aff'd*, 769 F.2d 152 (3d Cir. 1985).

   In any event, the allegations in the Proof of Claim do in fact provide detailed

information about the period of the conspiracy, the object of the conspiracy and the persons

involved.  *Cf. State Farm Mut. Auto. Ins. Co. v. Ficchi*, Civ. No. 10-555, 2011 WL 2313203

(E.D. Pa. June 13, 2011) (under Rule 8(a) a plaintiff's allegations of conspiracy "must be

sufficient to 'describe the general composition of the conspiracy, some or all of its broad

objectives, and the defendant's general role in that conspiracy") (quoting *Rose v. Bartle*, 871 F.2d

331, 366 (3d Cir.1989).

   **2.**  **The Proof of Claim Alleges Facts Supporting The Elements of the Conspiracy Claims.**

   Under English law, recovery for the tort of conspiracy does not depend on

pleading or proving an express agreement, whether formal or informal (Marshall Decl. ¶ 52-53

(citing *Kuwait Oil Tanker v. Al-Bader* (2000) 2 All ER (Comm) 271, at ¶ 111).)  An agreement

can always be inferred from conduct because conspiracies are by definition not formed in public.

(Marshall Decl. ¶ 52 ("[T]he origins of all conspiracies are concealed and it is usually quite

impossible to establish when or where the initial agreement was made or when or where other

conspirators were recruited.  The very existence of the agreement can only be inferred from overt

acts.  Participation in a conspiracy is infinitely variable: it can be active or passive.") (quoting  *R*

*v. Siracusa* (1990) 90 Cr. App. R. 340, 349).)  Thus, under English law, both the "combination or agreement" and "intent to injure" elements may be inferred from the overt acts themselves.

Like English law, US state law generally provides that the Court may make inferences from circumstantial evidence of the alleged confederates' acts or statements to conclude that they conspired in furtherance of an illegal purpose.  *See Floyd v. Hefner,* 556 F. Supp. 2d 617, 656 (S.D. Tex. 2008) ("[t]he general rule is that conspiracy liability is sufficiently established by proof showing concert of action or other facts and circumstances from which the natural inference arises that the unlawful overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators.") (quoting *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581-82 (Tex. 1963)); *Empire Fin. Servs., Inc. v. Bank of N.Y. (Del.)*, 900 A.2d 92, 97 (Del. 2006) (holding that it is not necessary for plaintiff to directly prove an express agreement among alleged conspirators) (citations omitted).

The Proof of Claim contains ample factual allegations supporting the inference that the overt acts of (i) NNI and NNL, alternatively (ii) NNI and the *de jure* directors of NNUK, alternatively (iii) NNI and NNL and the *de jure* directors of NNUK, amounted to a combination or agreement to achieve an unlawful purpose or to injure NNUK by unlawful means.  The Proof of Claim describes how NNI and NNL leveraged their positions in the corporate group to extract value from NNUK through unfair transfer pricing arrangements, the Interest Free Loan Facilities, and Project Swift.  (Proof of Claim ¶¶ 9-15.)  The Proof of Claim also alleges overt actions taken by NNI and NNL in furtherance of the conspiracy.  (*Id*. ¶¶ 16-25 (describing roles of named agents of NNI who participated in specific transactions designed to divert assets from NNUK to NNI and NNL).)  The "unlawful means" by which the conspirators injured NNUK is stated in the Proof of Claim, which alleges that the confederates, including NNI and the aforementioned

key players, breached contractual obligations with NNUK or caused the directors of NNUK

(whether *de jure* or, in the case of NNI and NNL, *de facto* or shadow) to breach their duties.

(*See id.* ¶¶ 29, 109, 118, 134, 137, 166 & 174 (directors of NNUK breached U.S. state law

fiduciary duties and English law duty of care through the various value-extracting components of

the "Cash to Canada" scheme); *see also id.* ¶ 109 n.5 (NNL's denial of arm's length return for

NNUK constituted a breach of the MRDA).)

   The US Debtor points to *Twombly* and other cases in which courts have found that

parallel actions taken by otherwise independent parties do not, by themselves, give rise to an

inference that the parties have conspired to act in concert.  This principle is completely

inapposite to the circumstances alleged here, where the conspiracy was formed among parties

and persons who were members of a corporate family and were necessarily in constant

communication with respect to the precise transactions that are alleged to have been the object of

the conspiracy.  Under such circumstances there is nothing implausible in assuming that an

agreement was formed.

   **C.**  **The Doctrines of Ex Turpi Causa and In Pari Delicto Do Not Apply.**

   The US Debtor also asserts that the Joint Administrators' claims for aiding and

abetting, dishonest assistance and conspiracy are barred by the doctrines of *ex turpi causa* and *in*

*pari delicto*.  The US Debtor asserts that allowing the Joint Administrator to recover on these

claims would be tantamount to permitting NNUK to benefit from its own illegal conduct, or to

dividing the spoils of crime between two criminals.  For the reasons stated in Section VI, these

doctrines do not apply here.

IV.    **THE JOINT ADMINISTRATORS STATE CLAIMS TO RECOVER NNUK PROPERTY RECEIVED BY NNI.**

The US Debtor alleges that the Joint Administrators' claims for unconscionable receipt and unjust enrichment are subject to dismissal because they do not allege that NNI actually received any funds traceable to NNUK.  The US Debtors also assert that the alleged facts do not support a finding that it would be unconscionable for NNI to retain any funds it received or that there is a sufficient causal relationship between NNI and any transfer of funds from NNUK.

A.    **The Proof of Claim Alleges That NNI Received NNUK Funds.**

The Proof of Claim alleges that "[b]y virtue of cash being channeled to NNL from NNUK and the EMEA Entities [through the Cash to Canada scheme,] NNL was able to, and did in fact, make large cash payments in respect of outstanding loan balances which it owed to NNI." (Proof of Claim ¶ 58 (including descriptions of some of the large cash payments at issue).)  The Joint Administrators' claims for unconscionable receipt arising out of transfer pricing and Project Swift relate back to the cash payments alleged in Paragraph 58.  (*See id.* ¶¶ 145, 177.)  Similarly, the Proof of Claim alleges that the Interest Free Loan Facilities made available by NNUK facilitated the payments made by NNL to NNI.  (*See* Proof of Claim ¶¶ 60, 122.)  The Proof of Claim also asserts NNI's knowing receipt of the Pre-Petition Sale Proceeds, and alleges that NNI received a disproportionately large share of such proceeds, "constituted in part by property that it knew was rightfully property of NNUK."  (Proof of Claim ¶ 197.)  It goes on to provide detail on the manner in which NNI received, to NNUK's detriment, more of the Pre-Petition Sale Proceeds than it was rightfully entitled to receive.  (*See id.* ¶¶ 79, 83.)[86]

---

86.  Contrary to the US Debtor's argument, in the context of unconscionable receipt, tracing of property "means following the application of the funds or their product and could be done notwithstanding the mixing of the funds with other funds."  (*See* Marshall Decl. ¶ 50.1.)

Information that would permit an actual tracing of NNUK's funds to NNI is in the exclusive control of NNL and NNI. The allegations set forth above give rise to an inference that identifiable funds removed from NNUK were subsequently transferred to NNI. The Joint Administrators cannot reasonably be required to further particularize their claims in advance of discovery. It should be noted that among the forms of relief requested by the Joint Administrators is an accounting. (Proof of Claim ¶ 220.)

B.    **The Proof of Claim Alleges Facts Supporting a Finding That It Would Be Unfair, Inequitable and Unconscionable to Allow NNI To Retain The NNUK Funds It Received.**

It is difficult to take seriously the US Debtor's assertion that the facts set forth in the Proof of Claim would not warrant a finding that NNI should return any NNUK cash that was transferred to it. The Proof of Claim alleges that NNI was an active participant in schemes by which NNUK was stripped of cash at a time when, as NNI knew or should have known, NNUK's solvency was in doubt. It would plainly be unjust, inequitable and unconscionable to allow NNI to retain funds received under such circumstances.

The facts regarding NNI's active participation in the transactions by which NNUK was stripped of funds also satisfy the requirement of a "causal relationship" sufficient to support the return of the property. For example, participants in the "Cash to Canada" scheme, led by Katharine Stevenson (a director of NNI), devised and implemented several plans to divert cash from NNUK and other EMEA entities to NNL. (*See* Proof of Claim ¶ 57.) NNI personnel actively participated in these plans (*id.*), and the scheme enabled NNL to make debt payments to NNI that it would have otherwise lacked the liquidity to pay. (*Id.* ¶¶ 58-59.) If proven, the allegation that a director and the personnel of NNI were so involved in the drive to divert funds from NNUK to NNL raises the plausible inference that the agents of NNI viewed "Cash to Canada" as a strategy to secure repayment from NNL. Thus, the Proof of Claim alleges a

72

plausible causal relationship between NNUK's impoverishment and NNI's enrichment.  Notably, the Joint Objection – preoccupied with the form of the transactions (that the funds were funneled through NNL) – does not address the Proof of Claim's allegations of NNI's extensive involvement.  (*See* Joint Obj. ¶¶ 66-69.)[87]

## V.    THE JOINT ADMINISTRATORS STATE CLAIMS TO RECOVER FOR IMPROPER ALLOCATION OF PRE-PETITION NORTEL ASSET SALES.

The US Debtor argues that since the Joint Administrators have not provided all of the details of all of the pre-petition asset sales that were entered into by the Nortel companies, they should not be allowed to pursue a claim for a fair allocation of the Pre-Petition Sales Proceeds.  (Joint Obj. at 70-71.)  But by the standard of Rule 8(a), and certainly Bankruptcy Rule 3001, the Proof of Claim gives adequate notice of the basis for the Joint Administrators' claims.  Certainly the US Debtor is not in danger of the sort of prejudicial surprise that confronted the defendants in *Chapa v. Chase Home Financing LLC* and *Smith v. National City Mortgage*. *See* No. C-10-359, 2010 WL 5186785, at *5 (S.D. Tex. Dec. 15, 2010); No. A-09-CV-881, 2010 WL 3338537, at *11 (W.D. Tex. Aug. 23, 2010).  The proper procedure for the US Debtor to obtain additional information about the Joint Administrators' claims will be through the discovery process.  Indeed, it is highly probable that much of relevant information about the asset sales is within the possession of the North American entities, beyond the reach of the Joint Administrators.

---

87. The Joint Objection states inaccurately that "NNUK concedes that the intercompany loans and Project Swift were undertaken for the benefit of NNL – not NNI."  (Joint Obj. at 68 (citing Proof of Claim ¶ 57).)  The cited paragraph of the Proof of Claim does state that "Cash to Canada" was a set of "initiatives to remove cash from NNUK and move it to NNL" (Proof of Claim ¶ 57), but the very next paragraph clearly states that NNI was also a beneficiary of NNUK's transfer of cash to NNL (*id.* ¶ 58 ("NNL was not the only beneficiary from the 'Cash to Canada' initiatives.  NNI itself also benefitted.")).

### A.    The Proof Of Claim States A Valid Claim For Mistake Under English Law.

As the Joint Administrators' legal expert makes clear, the English law of restitutionary claims brought in connection with a mistake of fact or law is not limited to mistakes as to the nature of an agreement or contract, as it is understood at US law. (Marshall Decl. ¶ 57.) Here, the relevant mistake is provided in the Proof of Claim as "the erroneous assumptions that were contained in the transfer pricing structure that prevailed within the Nortel group at the time." (*Id.* ¶ 58 (quoting Proof of Claim ¶ 81).) Under English law, such an allegation, if proven, would be sufficient to state a restitutionary claim. (*Id.* ¶ 60.) It is presently beyond the Joint Administrators' knowledge whether this mistake was unilateral or common to both NNI and NNUK, nor has the US Debtor shown why the Joint Administrators should reasonably be expected to make that distinction at this stage of the contested matter.

### B.    The Proof of Claim States A Valid Claim For Transaction At Undervalue Under English Law.

The US Debtor argues that the Proof of Claim fails to adequately plead the required elements of a transaction at undervalue under English law. (Joint Obj. at 72-73.) Relying on the same theory with respect to the pre-petition asset sales that appears elsewhere in the Joint Objection, the US Debtor argues that the execution of an agreement for the sale of assets to Alcatel began the running of the two-year "reach back" period under section 238 of the *Insolvency Act 1986*. (*See* Marshall Decl. ¶¶ 61-62 (citing Todd Decl. ¶¶ 126-127).) However, as discussed herein and in the Proof of Claim, the relevant transaction by which NNUK was injured was not any one particular sale of assets, but the "subsequent division of the proceeds derived from [such sales]." (*Id.* ¶ 63 (citing Proof of Claim ¶ 80).) Using the example of the sale to Alcatel, the earliest date on which the injury to NNUK could have occurred was not when the underlying sale closed, but rather on July 24, 2007 – the date of a statement that provides for

the division of the proceeds among the Nortel entities whose assets were sold.  (*Id.*)  The date of

this statement clearly falls within the two-year statutory "reach back" period applied to a claim

for transaction at undervalue.  But in reality, the actual allocation of proceeds did not occur until

even after that date.[88]  Accordingly, the claim for transaction at undervalue, as pleaded, falls

within the substantive two-year period prior to administration required under the *Insolvency Act*

*1986*.  (*Id.*)

The US Debtor states that a "well-pleaded transaction at undervalue claim would

require a showing that NNUK received consideration that was significantly less than the value of

what it sold."  (Joint Obj. 73.)  That is precisely the allegation made in the Proof of Claim:

"NNUK received significantly less and NNI received significantly more than it was entitled to on

an arm's length basis."  (Proof of Claim ¶ 82.)  This factual allegation, when proven, will

establish the Joint Administrators' right to recover.  The Proof of Claim identifies one of the

transactions in question and states that the reason NNUK received significantly less than it was

entitled to was because the sales proceeds were allocated on the assumptions contained in the

transfer pricing structure that prevailed within the Nortel group at the time.  (Proof of Claim

¶ 81.)  There is nothing implausible in this claim, and the US Debtor has received sufficient

notice.

### C.    The Proof Of Claim States Valid Claims For Breach Of Implied Contract And Implied Term Under English Law.

The US Debtor argues that the Proof of Claim does not allege sufficient facts in

support of the claims for breach of implied contract and implied term under English law because

---

88.  The Joint Objection implicitly acknowledges that actual allocation, which serves as the basis for the claims arising out of the pre-petition asset sale to Alcatel, actually occurred <u>after</u> July 24, 2007.  (*See* Joint Obj. 73 (asserting that allegation in Proof of Claim that "agreed allocation applied in relation to the Alcatel sale was set out in a statement dated 24 July 2007" does not set out date on which funds were actually divided among Nortel entities) (quoting Proof of Claim ¶ 80).)

the Proof of Claim "does not adequately allege the parameters of the contract or contractual

term." (Joint Obj. 73.)  Since the declaration of its English law expert does not address this

claim, there is no basis for the US Debtor to argue that the Joint Administrators have failed to

make out the necessary elements under English law.  Nor has the US Debtor given the Joint

Administrators' expert the opportunity to respond with an opinion on the requirements of

English law.  In fact, the US Debtor neglects to cite the law of any jurisdiction in announcing the

requirement that "the parameters of the contract or contractual term" must be shown.  (*Id.*)

Nonetheless, the Proof of Claim sets out the parameters for the implied contract as

follows:  "[T]here was an implied contract as between the selling Nortel entities that the Pre-

Petition Sale Proceeds would be distributed as amongst them in accordance with the arm's length

principle."  (Proof of Claim ¶ 185.)  The implied term refers to the understanding  "that NNUK

would receive a fair and appropriate allocation, based on the arm's length principles, of the Pre-

Petition Sale Proceeds."  (*Id.* ¶ 185.) There is nothing implausible in the claim and the Joint

Administrators have placed the US Debtor on notice as to the nature of the claim, the basis for

the claim, and the remedy pursued.

**VI.    THE DOCTRINES OF *EX TURPI CAUSA* AND *IN PARI DELICTO*
<u>DO NOT BAR THE JOINT ADMINISTRATORS' CLAIMS</u>.**

> **A.    There is no Basis To Dismiss the Joint Administrators'
> Claims Under the Doctrine of *Ex Turpi Causa*.**

Broadly speaking, the English doctrine of *ex turpi causa* provides that as a matter

of public policy a court will not allow a claimant to found an action on its own wrongful acts.

(Marshall Decl. ¶ 64.)  As set forth in *Stone & Rolls Ltd v. Moore Stephens* [2009] 1 AC 1391,

however – a case heavily relied upon by the US Debtor's English law expert – the "Hampshire

Land principle" precludes the knowledge and conduct of a director from being attributed to the

company itself under this doctrine where the company is the victim of the wrongdoing.

(Marshall Decl. ¶ 65.2.3.)  Indeed, "it would be irrational to treat the directors, who were

allegedly parties to the [wrongdoing], notionally as having transmitted this knowledge to the

[victimized] company."  *See Stone & Rolls*, at 1484B-1484F (Lord Walker's analysis citing

*Belmont Finance Corp. v. Williams Furniture Ltd.* [1979] Ch. 250).

Here, the Proof of Claim alleges that NNUK was the victim of NNI's and its own

directors' breaches of fiduciary duties and other wrongdoing.  With respect to all of the

transactions at issue – including, for example, the transfer pricing arrangements, Interest Free

Loan Facilities, and Project Swift – the Proof of Claim alleges that the value and resources of

NNUK were repeatedly and systematically depleted at the direction of NNL and NNI.  (Proof of

Claim ¶¶ 9-12.)  Likewise, by causing or allowing NNUK to be involved in these transactions,

the Proof of Claim alleges that NNUK's *de jure* directors breached the duties which they owed to

the company.  (*Id.* ¶¶ 28-29.)  In such circumstances, there is no need to even proceed to deal

with the question of attribution to NNUK.  Where claims for breach of fiduciary duty are alleged

(or claims of an accessory nature founded upon a breach of fiduciary to the company) the *ex

turpi causa* doctrine simply cannot be engaged.[89]  In this context there is no illegal conduct that

can be attributed to the company itself.  A company does not owe any fiduciary duties to itself.

As a result, the company will not have acted unlawfully and there will not be any unlawful

conduct of the company on which it must rely in making its claim.[90]

Moreover, given that NNUK was the victim of this abdication of duty, the

"Hampshire Land principle" applies as a consequence.  (Marshall Decl. ¶ 65.2.3.)  In any event,

---

89.  (See Marshall Decl. ¶ 65.)

90.  This point obviously applies in respect of the breach of fiduciary duty claim against NNI, but also to all other
claims that are predicated on a breach of fiduciary duty by NNUK's directors, of which NNUK was the victim.
These claims implicate the internal management of NNUK and are not based on wrongdoing by NNUK itself as
against a third party.  In these circumstances the doctrine of *ex turpi causa* is not engaged.

while the "Hampshire Land principle" does not apply where all of those involved in the

management and ownership of the company are aware of the wrongdoing at issue – i.e., the

"one-man company" or "sole actor" cases (*see* Todd Decl. ¶ 134) – the US Debtor's assertion

that NNUK was a "one-man" company is misplaced and premature.  (*See* Joint Obj. at 44-45.)

This is not a case like *Stone & Rolls*, in which the sole owner of the company, an individual in

"sole control over the company's every act,"[91] was using the company as a vehicle for fraud and

the liquidator brought suit against the company's auditors for failing to detect the fraud.  Here,

the company is the victim, not the villain.  (Marshall Decl. ¶ 65.1.)  Moreover, NNUK is not

claiming recovery from an innocent third party that had no duty to protect the interests of

creditors.[92]  In fact, the opposite is true: the Joint Administrators have brought claims against

NNI – a complicit party in the scheme to extract value from NNUK – relating to breaches of

fiduciary duties owed to protect the interests of the company <u>and</u> its creditors.[93]  Thus, the scope

of the duty extends to protect those for whose benefit the claim is brought.

   Contrary to the US Debtor's unsupported assertions, identifying a "one-man

company" for purposes of attribution is no simple task.  (*Id.* ¶ 65.3.)  In *Stone & Rolls*, this task

was straightforward where the relevant wrongdoing director was completely identified with the

company as its sole beneficial owner, and there were no independent or innocent directors or

---

91.  Stone & Rolls, at 1503.

92.  The US Debtor's English law expert likewise draws a clear line between claims brought directly against a director for breach of its fiduciary duty owed to the company and claims brought against a third party relying on the director's wrongdoing.  In the former case, Mr. Todd states that the company may bring an action against the director without being treated as having the knowledge of the wrongful act which the director has, but in the latter, he opines that the company will be barred from bringing the claim against the third party if the director's knowledge can be imputed to the company.  (Todd Decl. ¶ 129.)

93.  Notably, in writing for the majority in *Stone & Rolls*, Lord Phillips stated that while it was arguable that the scope of the duty undertaken by the auditors of a company should extend to protect the creditors' interests in the preservation of the assets of the company, in that case, unlike here, it was abundantly clear that one individual wrongdoer constituted the entire shareholder body and management.  *Stone & Rolls*, at 1462.

shareholders.  (*Id*.)  However, the attribution of knowledge and actions to a company where, as here, relevant directors serve more than one company simultaneously, is not as simple as the US Debtor's English law expert suggests.  (*Id*. ¶ 65.2.)  This determination requires an inquiry as to whether "it would be contrary to justice and common sense to treat the company as complicit" (*id*. ¶ 66.3 (quoting *Stone & Rolls*, at 1502E)), which necessitates a factual investigation that only discovery will allow for.  (*Id*. ¶ 66 (noting that Mr. Todd's declaration takes a simplistic view in concluding that NNUK was a "one-man company" and "ignores the need to investigate the position of the individuals on the NNUK board")).)

Significantly, the doctrine of *ex turpi causa* is "not so much a principle as a policy," and courts considering its application "face[] the dilemma that by denying relief on the ground of illegality to one party, [they] appear[] to confer an unjustified benefit illegally obtained by the other."  (*Id*. ¶ 66.1 (quoting *Gray v. Thames Trains Ltd.* [2009] 1 AC 1339, at 1370G; *Cross v. Kirby* [2000] CA Transcript No. 321, para. 74).) [94]  Here, its application at this stage of the proceedings would confer on NNI "an unjustified benefit illegally obtained" by permitting NNI to escape liability, without any factual inquiry, for conduct that was detrimental to NNUK, the company to which it owed a fiduciary duty.  (*Id*.)

Accordingly, the *ex turpi causa* doctrine does not bar the Joint Administrators' English common law claims (claims 2-5, 8-10, 12, 14, 16-19, 22, 26, 30, 32-33 and 35).

**B.    The Joint Administrators' Claims For Aiding And Abetting And Conspiracy Are Not Barred By The Doctrines Of *Ex Turpi Causa* Or *In Pari Delicto*.**

The US Debtor has also failed to prove that the *in pari delicto* doctrine can be applied here because, as set forth more fully below, the Proof of Claim alleges sufficient facts to

---

94.  A similar public policy exception exists under US law with respect to the *in pari delicto* doctrine, as described below.

support a finding that: (1) NNI was an insider of NNUK; (2) the "adverse interest" rule bars

application of *in pari delicto*; and (3) dismissal of the claims on this basis would be premature at

this stage of the proceedings.

### 1. The *In Pari Delicto* Doctrine Does Not Apply Because NNI Was an Insider of NNUK.

Under both Texas and Delaware law,[95] the *in pari delicto* doctrine provides that a

plaintiff "cannot recover where, as a result of his own actions, the plaintiff bears at least

substantially equal responsibility for the underlying wrongdoing of which he is complaining."

*Floyd v. CIBC Markets, Inc.*, 426 B.R. 622, 642 (Bankr. S.D. Tex. 2009) (citing *Matter of*

*Royale Airlines, Inc.*, 98 F.3d 852, 856 (5th Cir. 1996)) (emphasis original); *see also Am. Int'l*

*Group, Inc. v. Greenberg*, 976 A.2d 872 (Del. Ch. 2009).  However, it is universally accepted

that the *in pari delicto* defense does not apply where, as here, the defendant is an "insider" of the

corporation.  *See, e.g.*, *Floyd v. Hefner*, 556 F. Supp. 2d 617 (S.D. Tex. 2008).[96]  Under the

Bankruptcy Code, for example, a corporation's "insiders" include, in relevant part:  "(i) [a]

director of the debtor; (ii) [an] officer of the debtor; (iii) [a] person in control of the debtor . . .

[or]; (vi) [a] relative of a general partner, director, officer, or person in control of the debtor."  11

U.S.C. § 101(31)(B).  An insider is also an "affiliate, or insider of an affiliate as if such affiliate

were the debtor." 11 U.S.C. § 101(31)(E).  "Affiliate" is also a defined term under the

Bankruptcy Code, and includes a "corporation, 20 percent or more of whose outstanding voting

---

95. Although a choice of law analysis has not yet been performed, the Joint Administrators take the position that to the extent US law governs the *in pari delicto* defense, Texas law would  be applicable.  Nonetheless, the arguments asserted herein apply with equal force under both Texas and Delaware law.

96. *See also Hill v. Day (In re Today's Destiny, Inc.*, 388 B.R. 737, 749 (Bankr. S.D. Tex. 2008) ("No case, logic or equitable proposition supports the conclusion that insiders of a bankrupt corporation can insulate themselves from liability by virtue of the illegal character of their conduct."); *Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*, 335 B.R. 539, 547 (Bankr. D. Del. 2005) ("*In pari delicto* will not operate to bar claims against insiders of the debtor corporation."); *Tese-Milner v. Beeler (In re Hampton Hotel Investors, L.P.)*, 289 B.R. 563, 577 n.23 (Bankr. S.D.N.Y. 2003) ("*In pari delicto* bars claims against third parties, but does not apply to corporate insiders or partners.") (internal citations omitted).

securities are directly or indirectly owned, controlled, or held . . . by the debtor, or by an entity

that [also] directly or indirectly owns, controls or holds 20 percent or more of the outstanding

voting securities of the debtor.  11 U.S.C. § 101(2)(B).  Congress has made it clear that this

"statutory list is not exhaustive, and it is for the courts to define the limits of non-statutory

insider status."  *Hirsch v. Tarricone (In re A. Tarricone, Inc.)*, 286 B.R. 256, 262 (Bankr.

S.D.N.Y. 2002).  The legislative history of the definition of "insider" instructs that "[a]n insider

is one who has a <u>sufficiently close relationship with the debtor that his conduct is made subject</u>

<u>to closer scrutiny</u> than those dealing at arm's length with the debtor."  S. Rep. No. 95-989, at 23

(1978), *reprinted in* 1978 U.S.C.C.A.N., pp. 5787, 5810 (emphasis added); *see also In re*

*Missionary Baptist Found. of Am., Inc.*, 712 F.2d 206, 210 (5th Cir. 1983).[97]

       NNI is undeniably an affiliate of NNUK and therefore an insider.  In accordance

with 11 U.S.C. § 101(2), NNI and NNUK are affiliates by way of common ownership.  As

wholly owned subsidiaries of NNL, NNL directly owns, controls, or holds 100% of the

outstanding voting securities of both entities, thereby making NNI and NNUK statutory

affiliates.[98]  In fact, the US Debtor concedes in the Joint Objection that NNI and NNUK are

sister corporations, each wholly-owned subsidiaries of NNL.  (Joint Obj. at 32.)

---

97. Ultimately, "[t]he analysis is <u>a fact intensive one</u> and must be done on a case-by-case basis."  *In re A. Tarricone, Inc.,* 286 B.R. at 262 (emphasis added); *In re Student Fin. Corp.*, 335 B.R. at 547 ("[T]he inquiry into insider status 'is fact-intensive and can be made only on a case-by-case basis.' ") (internal citation omitted).

98. Moreover, even if NNI and NNUK were not statutory affiliates, NNI clearly had a "sufficiently close relationship" with NNUK to raise an obvious fact question whether they were insiders who conduct warrants "closer scrutiny."  Indeed, the Proof of Claim points to numerous occasions on which directors, officers, and employees of NNI controlled or directed NNUK in connection with transfer pricing arrangements, the Interest Free Loan Facilities and Project Swift.  Because the actions and knowledge of a corporation's "vice-principals" are imputed to the corporation itself, the Court, following a factual investigation, could conclude that NNI, through its agents, exercised control over NNUK in this respect.  *See Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387 (Tex. 1997).  (A vice-principal includes (1) corporate officers; (2) those with authority to employ, direct, and discharge the corporation's employees; (3) those engaged in performance of non-delegable duties; and (4) those to whom the corporation has confided the management of the whole or a department or division of the business.  *See id.*)  Accordingly, dismissal of the Proof of Claim at this stage would be premature.

2.    The "Adverse Interest" and "Controlling Shareholder" Exceptions to
      the *In Pari Delicto* Doctrine Bar its Application Here.

The "adverse interest" rule protects corporations from application of *in pari delicto* where an agent acted "entirely for his own or another's purpose."  *Hill v. Day* (*In re Today's Destiny, Inc.)*, 388 B.R. 737, 749 n.13 (Bankr. S.D. Tex. 2008) (citations omitted).  Here, the Proof of Claim alleges that the relevant actions of NNUK's *de jure* directors were wholly contrary to the interests of NNUK and inured to the benefit of NNI and the Canadian Entities.  (*See*, *e.g.*, Proof of Claim ¶¶ 9-12.)  Indeed, the Proof of Claim specifically alleges that, under NNI's and the Canadian Entities' control, "[a]t all relevant points the Nortel Group was operated in such a manner that cash and value were improperly removed from NNUK and the other EMEA Companies and transferred to NNL."  (*Id.* ¶ 9.)  These allegations support a finding, therefore, that the "adverse interest" rule applies to preclude application of the *in pari delicto* doctrine.

The US Debtor's arguments to the contrary have no merit.  The US Debtor argues that NNUK "admits that it has received benefits" because: (i) it received approximately $58 million from the Alcatel sale; and (ii) there are no allegations that the transfer pricing arrangements were "entirely detrimental to NNUK."  (Joint Obj. at 62-63 n.68)  These assertions mischaracterize the Proof of Claim.  First, if the expected allocation theory is correct, the Joint Administrators allege that NNUK should have received approximately $240 million from the Alcatel sale, not $58 million.  (Proof of Claim ¶ 83.)  An underpayment of this magnitude cannot be said to bestow a benefit.  Second, the Joint Administrators allege that the transfer pricing arrangements deprived NNUK of revenue and "resulted in an intentional and improper transfer of value away from NNUK and the other EMEA entities and towards NNL."  (*Id.* ¶ 47.)  Missing from these allegations, however, is any indication that NNUK benefited from these transactions.

82

Application of *in pari delicto* is also barred by the related principle that this

defense cannot be applied in actions where an element of the claim is that "a controlling

shareholder forced the corporation to act for the benefit of the shareholder through domination

and control." *Kalb, Voorhies & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 133 (2d Cir. 1993); *see In re

Alper Holdings USA, Inc.*, 398 B.R. 736, 760 (S.D.N.Y. 2008).

      **3.**      **The Policy Underlying the *In Pari Delicto* Doctrine**
                  **Would be Thwarted by Dismissing the Claims Brought**
                  **by the Joint Administrators at This Stage in the Proceeding.**

As the Supreme Court has observed, *in pari delicto* was created not to shield

defendants from liability, but rather to protect the public. *Pinter v. Dahl*, 486 U.S. 622, 633

(1988) (quoting *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310-11 (1985)

(internal quotations omitted)).  The doctrine's underlying purpose is to prevent wrongdoers from

using the courts to benefit from their malfeasance, to deter future misconduct.  *See AIG*, 976

A.2d at 882.  Likewise, the Texas Supreme Court has stated:

> The rule is adopted not for the benefit of either party and not to
> punish either of them, but for the benefit of the public . . . . There
> is often involved, in reaching a decision as to granting or
> withholding relief, the question whether the policy against
> assisting a wrongdoer outweighs the policy against permitting the
> unjust enrichment of one party at the expense of the other.  The
> solution of the question depends upon the <u>peculiar facts and
> equities of the case</u>, and the answer usually given is that which is
> thought will better serve public policy.

*Lewis v. Davis*, 199 S.W.2d 146, 151 (Tex. 1947) (emphasis added).

The Court need not make a determination as to the application of *in pari delicto* at

this stage in the proceedings.  *See In re DVI, Inc.*, No. 03-12656, 2008 WL 4239120, at *11

(Bankr. D. Del. Sept. 16, 2008) ("An affirmative defense with disputed facts is not a proper basis

to dismiss a complaint.") (citing *Official Comm. Of Unsecured Creditors v. Credit Suisse First

Boston (In re Exide Techs., Inc.)*, 299 B.R. 732, 752 (Bankr. D. Del. 2003) (concluding that "[i]n

*pari delicto* is an affirmative defense.  A plaintiff is not required to plead in the complaint all requirements for a claim as well as to contemplate and plead in anticipation of all affirmative defenses that may lie against such claim.").

Indeed, both Texas and Delaware require the Court to make a fact-specific determination as to whether the underlying purposes of the doctrine are served by its application. *Lewis*, 199 S.W.2d at 151; *see also Today's Destiny*, 388 B.R. at 749 ("Under *Lewis*, *in pari delicto* is not an automatic bar."); *AIG*, 976 A.2d at 888 (" 'Unless' is an important word in the *in pari delicto* context because the doctrine is subject to the exception when another policy is perceived to trump the policy basis for the doctrine itself.").  As set forth in the case law relied on by the US Debtor, bankruptcy courts have held that the "need to consider the peculiar facts and equities is particularly acute" where, as here, "a defendant is asserting the defense against a Trustee who seeks recovery for the benefit of creditors of a wrongdoer rather than the wrongdoer himself." *Today's Destiny*, 388 B.R. at 749 (internal citations and quotations omitted).

The case law that the US Debtor relies on also holds that the policy analysis that *Lewis* requires "can not be undertaken prior to discovery and an evidentiary hearing." *Id.*  As such, whether equity and public policy demand that the Joint Administrators be afforded relief will require a factual investigation and cannot be determined at the motion to dismiss stage.  *See In re DVI, Inc.*, 2008 WL 4239120, at *11; *Today's Destiny*, 388 B.R. at 749;  *see also Floyd v. CIBC World Markets*, 426 B.R. at 643; *Smith v. Woodforest Nat'l Bank (In re IFS Fin. Corp.)*, No. 02-39553, 2007 WL 1308321, at *4 (Bankr. S.D. Tex. May 3, 2007).

Likewise, the case law cited by the US Debtor makes clear that application of the "adverse interest" and "insider" exceptions invoked by the Joint Administrators is based on a fact-intensive inquiry that can only be made after discovery. *Today's Destiny*, 388 B.R. at 749

84

n.13 (reserving judgment on the "adverse interest rule" because application is "fact intensive");

*In re Student Finance Corp.*, 335 B.R. 539, 547 (D. Del. 2005) ("the inquiry into insider status

'is fact-intensive and can be made only a case-by-case basis" after "full discovery") (citations

omitted).

   Thus, as a matter of law, the Court cannot conclude on the basis of allegations in

the Proof of Claim that the Joint Administrators' claims are barred by the *in pari delicto*

doctrine.  *Id.*; *see also In re DVI, Inc.*, 2008 WL 4239120, at *11 (where plaintiff invoked the

adverse interest exception on a 12(b)(6) motion, the court found it premature to bar plaintiff's

claim on *in pari delicto* grounds without further development of the facts); *In re Total*

*Containment, Inc.*, No. 05-0145, 2005 WL 6522761, at *24 (Bankr. E.D. Pa. Oct. 18, 2005)

(where trustee pled that defendants' conduct adversely affected the debtor and benefited

defendants, *in pari delicto* is not established on the face of the complaint and cannot be

considered in the context of a motion to dismiss).

**VII.**   **THE JOINT ADMINISTRATORS' CLAIMS RELATING TO TRANSFER PRICING, INTERCOMPANY LOANS, AND PRE-PETITION ASSET SALES ARE NOT TIME-BARRED.**

   The US Debtor argues that the Joint Administrators' claims relating to transfer

pricing, intercompany loans, and pre-petition asset sales are time-barred.  (Joint Obj. at 74-80.)

The Court should reject these arguments.

  **A.**   **The Joint Administrators' Claims Are Not Time-Barred Because Section 108(c) Tolled The Statute of Limitations As Of The Petition Date.**

   The US Debtor argues that the Joint Administrators' claims related to Project

Swift, the NNUK Intercompany Loans and any Pre-Petition Asset Sales are time-barred because

they do not relate back, for statute of limitations purposes, to the Original Proof of Claim.  (Joint

Obj. at 78-80.)  But the date the Original Proof of Claim was filed is not the relevant date.

Section 108(c) of the Bankruptcy Code extends the time period within which a civil action subject to the automatic stay under Section 362 may be brought against a debtor.  *See* 2 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 108.04 (16th ed. 2011) (Section 108(c) provides that if a creditor's claim against the debtor is stayed due to the commencement of a case under title 11, "any time deadline for commencing and continuing the action is extended to 30 days after notice of termination of the stay, if the deadline would have occurred on an earlier date") (citing 11 U.S.C. § 108(c)); *In re Pagnotti*, 269 B.R. 326, 335 (Bankr. M.D. Pa. 2001) (because Section 108(c) "extends the statute of limitations for creditors commencing actions on outstanding debts," creditor's claims are "tolled by the [d]ebtor's bankruptcy filing"); *Matter of Burger*, 125 B.R. 894, 901 (Bankr. D. Del. 1991) (filing date of bankruptcy petition "is the measuring date as to whether the statute's time had run out or not").

Accordingly, the statute of limitations on the Joint Administrators claims was tolled on January 14, 2009, when the US Debtor filed for protection under Chapter 11.

**B.    The Internal Affairs Doctrine Requires the Court to Apply the Six-Year Statute of Limitations Under The UK Limitation Act 1980 To Claims Arising Out Of The Internal Affairs Of NNUK.**

The Joint Objection asserts that the Delaware borrowing statute requires the court to apply Delaware's three year statute of limitations for most the claims asserted to be time barred. (*See* Joint Obj. 76 (citing 10 Del. C. § 8106).)  The borrowing statute, however, does not apply to claims that arise out of corporate governance matters of a foreign corporation.  For such claims, the internal affairs doctrine requires that the limitations period specified in the place of incorporation governs, notwithstanding the borrowing statute.  *See Burtch v. Dent (In re Circle Y of Yoakum, Texas)*, 354 B.R. 349, 359 (Bankr. D. Del. 2006) (applying statute of limitations of Texas in action for breach of fiduciary duty against Texas corporation).

This Court has observed that the purpose of Delaware's borrowing statute is to prevent forum shopping and that it should therefore not be applied in cases where there is no threat of forum shopping.  *See Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 488, 503 (Bankr. D. Del. 2010) (Gross, J.)[99]  Here, as in *Meryvn's*, it cannot be argued that forum shopping motivated the filing of the Proof of Claim in this Court, where the US Debtor's bankruptcy case is pending.  Indeed, filing claims against NNI in any other forum would have violated the automatic stay.

NNUK was formed under, and its internal affairs are governed, by English law, pursuant to which the applicable limitations period on claims for breach of fiduciary duty is at least six-years.  *See UK Limitation Act 1980* §§ 21(3) (providing for six year statute of limitations in actions for breach of trust), 21(1)(b) (providing unlimited period in actions to recover trust property).[100]  The policy concerns underlying Delaware's borrowing statute therefore do not apply here, because the suit was brought in a forum that has a shorter limitations period than the one that would otherwise apply.  *See Mervyn's*, 426 B.R. at 503 (where plaintiff's action was subject to a *shorter* statute of limitations in Delaware compared with suitable alternative jurisdiction, finding "absolutely no threat of forum shopping").[101]

---

99.  The US Debtor apparently cites *Mervyn's* in an attempt to distinguish the present case from those in which courts have applied the internal affairs doctrine, noting that this Court applied California law in that case because the "pre-petition transaction lacked other ties to Delaware."  (*See* Joint Obj. 75 n.75 (citing *Mervyn's*, 426 B.R. at 502.))  In fact, this Court held in *Mervyn's* that the internal affairs doctrine required the application of California law (despite Delaware's borrowing statute) because the corporation whose governance was in question was organized in California.  *See Mervyn's*, 426 B.R. at 503.

100. *See J.J. Harrison (Props.) Ltd. v. Harrison*, [2001] EWCA Civ 1467 ¶ 26 ("[D]irectors who dispose of the company's property in breach of their fiduciary duties are treated as having committed a breach of trust"); *Gwembe Valley Development Company Limited v Koshy* [2003] EWCA Civ 1048 ¶ 90 ("[A] case arising from the breach of a pre-existing [fiduciary] duty is, or is treated by analogy as, an action by a beneficiary for breach of trust.").

101. The internal affairs doctrine applies with equal force where, as here, the jurisdiction of the subject entity's formation is that of a foreign nation.  *See McDermott Inc. v. Lewis*, 531 A.2d 206 (Del. 1987) (applying

Since all of NNUK's claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of the duty of care, dishonest assistance and conspiracy implicate the corporate governance of NNUK, and arise out of breaches of fiduciary duty by its directors, these claims are subject to a limitations period of at least 6 years, as prescribed by the UK Limitation Act 1980.[102]

### C.    The Claims Based On Transfer Pricing, Interest Free Loans And Project Swift Were Timely As Of The Petition Date.

The US Debtor argues that the statute of limitations for the Joint Administrators' transfer pricing claims began to run in December 2004, when the MRDA was executed.  (Joint Obj. at 76-77.)  Even assuming this assertion to be correct – which the Joint Administrators do not concede[103] – the Joint Administrators' claims relating to transfer pricing are subject to at least a six-year statute of limitations under English law and therefore were not time barred as of the January 2009 Petition Date.

Likewise, even based on the earliest date of accrual asserted by the US Debtor with respect to the claims based on the Interest Free Loans – December 2003 (Joint Obj. at 78) – these claims were not time-barred on the Petition Date.  The same is true for claims based on

---

Panamanian law in suit by shareholders of Panamanian corporation to enjoin or rescind reorganization that gave subsidiary voting power).

102. *See, e.g.*, *In re Fedders North America, Inc.*, 405 B.R. 527 (Bankr. D. Del. 2009) ("the internal affairs doctrine compels the Court to apply Delaware law to the claim for aiding and abetting breach of fiduciary duty.").  The internal affairs doctrine should apply equally to conspiracy claims here where the ultimate objective and consequence was a breach of fiduciary duties.  *See In re Skyport Global Communications*, Inc., 08-36737, 2011 WL 111427 (Bankr. S.D. Tex. Jan. 13, 2011) ("Under Delaware law, civil aiding and abetting specifically refers to aiding and abetting a breach of a fiduciary duty, and is very similar to a civil conspiracy claim."); *Allied Capital Corp. v. GC–Sun Holdings, L.P.*, 910 A.2d 1020, 1038–39 (Del. Ch. 2006) ("[I]n cases involving the internal affairs of corporations, aiding and abetting claims represent a context-specific application of civil conspiracy law.").

103. The accrual of a claim for statute of limitations purposes is a question of fact that, if disputed, is not appropriate for resolution on a motion to dismiss.  *See Firestone v. Firestone*, 76 F.3d 1205, 1208-09 (D.C, Cir. 1996).

Project Swift, assuming December 20, 2007, the date on which the transaction was implemented, to be the accrual date (which is not admitted).  (Proof of Claim ¶ 71.)

> D.    **The Joint Administrators' Claims For Unjust Enrichment And Breach Of Contract Are Not Time-Barred.**

Even assuming Delaware's three-year statute of limitations applies to the Joint Administrators' claim for unjust enrichment based on Project Swift (which is not the case) (Joint Obj. at 76), this claim is timely.  Indeed, this claim began to accrue no earlier than November 2007, when NNI first started receiving significant cash payments as a consequence of Project Swift, and less than three years prior to the bankruptcy filing.  (*See* Proof of Claim ¶¶ 58, 67.)

The same holds true, moreover, based on the US Debtor's assertion that a three-year statute of limitations period would apply with respect to the purported accrual date of claims related to the pre-petition asset sales – December 2006, with respect to the closing of the Alcatel Sales, or July 2007, the date of the statement setting forth the allocation of proceeds from the Alcatel Sale.  (Joint Obj. at 78.)  Under a three-year limitation period for unjust enrichment or breach of contract, these claims would be timely based on the Petition Date.  (*See* Proof of Claim ¶¶ 185-87.)

> E.    **The Joint Administrators' Amended Proof Of Claim Relates Back To Their Original Proof Of Claim For Statute Of Limitations Purposes.**

The US Debtor argues that the Joint Administrators' claims related to Project Swift, the NNUK Intercompany Loans and any Pre-Petition Asset Sales are time-barred because they do not relate back, for statute of limitations purposes, to the Original Proof of Claim.  (Joint Obj. at 78-80.)  Although the arguments above dispose of the US Debtor's limitations arguments, were the timing of the proofs of claim relevant, the amended Proof of Claim would in fact relate back to the Original Proof of Claim for limitations purposes.

It is well-settled that amendments to timely proofs of claim are liberally allowed. *In re Orion Refining Corp.*, 317 B.R. 660, 664 (D. Del. 2004) (citing *In re Trans World Airlines, Inc.*, 145 F.3d 124, 140 (3d Cir. 1998)).  "Two rationales for allowing amendments to proofs of claim are that (1) bankruptcy courts are courts of equity, and (2) amendment of a claim are likened to an amendment of a pleading."  *Id.* (citation omitted).  Generally, amendments are allowed when the original claim provides "notice of the existence, nature, and amount of the claim."  *Id.* (citing *In re Walls & All, Inc.*, 127 B.R. 115, 118 (W.D.Pa. 1991) ("It is well settled that, absent contrary equitable considerations or prejudice to the opposing party, amendments to proofs of claim should be freely permitted.").  Indeed, amendments are generally used to "cure obvious defects, describe the claim with greater specificity or plead a new theory or recovery on facts of the original proof of claim," as well as to amend claim amounts.  *Id.*

Here, the Joint Administrators' original Proof of Claim gave adequate notice of all of the causes of action asserted in their amended Proof of Claim.  With respect to the basis for the Joint Administrators' claims, the original proof of claim stated:

> The [Joint] Administrators, the Insolvency Practitioner, NNUK and the EMEA Companies have potential claims against the Debtors and their affiliates arising out of transfer pricing, intercompany dealings, trading and other arrangements or agreements between them.
>
> The [Joint] Administrators, NNUK, EMEA Companies and any Insolvency Practitioner hereby assert a Claim in respect of any heretofore unknown, unliquidated, or unmatured claim or claims that the [Joint] Administrators, NNUK, the Insolvency Practitioner and/or any EMEA Company may have against any one or more of such Directors and Officers of Nortel Networks Inc. or its affiliated debtors in these Chapter 11 cases for mismanagement, breach of duty and/or the conduct of those Directors and Officers with respect to the operation, management and control of Nortel Networks Inc. or its affiliated debtors in these Chapter 11 cases.

(Original Proof of Claim at 2.)

The language in the Original Proof of Claim stating that NNUK's claims arise "out of transfer pricing, intercompany dealings, trading and other arrangements" was clearly broad enough to encompass not only claims related to the MRDA and transfer pricing, but also Project Swift, the intercompany loans and pre-petition asset sales.  The Joint Administrators' are merely "describ[ing] the claim with greater specificity," *Orion Refining Corp.*, 317 B.R. at 664, which is freely permitted under these circumstances.  *See, e.g., Burtch v. Dent (In re Circle Y of Yoakum, Texas)*, 354 B.R. at 361-62 (amendment pleading new facts with respect to management agreement relates back to original complaint where it "adds detail to the conduct surrounding the schematic payments made to [defendant]"); *In re Loewen Group Inc.*, No. 98-6740, 2004 WL 1853137 (E.D. Pa. Aug. 18, 2004) (relation back permitted where "new claims regarding defendants' statements . . . are part of the same basic scheme described in the original complaint").[104]

F.    **The Statute Of Limitations Is Equitably Tolled While A Corporation's Board Of Directors Is Controlled By Culpable Directors.**

Finally, under the adverse domination doctrine, the statute of limitations on a corporation's claim against its officers and/or directors is equitably tolled while the corporation's board of directors is controlled by culpable directors.  *See In re Marvel Entm't Group, Inc.*, 273 B.R. at 74.  "The premise underlying the adverse domination doctrine is that a corporation acts

---

[104].The rationale underlying the relation-back doctrine is that "one who has been given adequate notice of litigation concerning a given transaction or occurrence has been provided with all the protection that statutes of limitations are designed to afford."  *Tri-Ex Enters. v. Morgan Guar. Trust*, 586 F. Supp. 930, 932 (S.D.N.Y. 1984) (citing 3 J. Moore, *Moore's Federal Practice* ¶ 15.15[3] at 15-194).  Moreover, *Coan v. O & G Indus. Inc. (In re Austin Driveway Servs., Inc.)*, 179 B.R. 390, 395 (Bankr. D. Conn. 1995), a case cited by the US Debtor, further supports allowing amendment here.  While the specific facts of *Austin Driveway* are distinguishable from the present case because *Austin Driveway* was a preference action, in which relation back "is the exception rather than the rule," the court observed that the decision to permit amendment turns on "the existence or absence of an underlying common scheme or course of conduct which is the basis of the original action and links otherwise distinct transactions."  *Id.* at 397.  A common underlying course of conduct — such as the one set forth in the original Proof of Claim with respect to transfer pricing, intercompany dealings, trading and other arrangements – provides a relation-back nexus.  *Id.* (citing *Siegel*, 714 F.2d at 216; *Chaus*, 801 F. Supp. at 1264).

through its board of directors, and when that board of directors is controlled by culpable directors it will not cause the corporation to bring a lawsuit against themselves." *Id.* (citations omitted). While courts in many jurisdictions subscribe to various versions of the adverse domination tolling doctrine, *id.* (citing *Hecht v. Resolution Trust Corp.* 333 Md. 324, 635 A.2d 394, 402 (1994) (collecting cases), the Delaware courts have neither accepted nor rejected this doctrine. *Id.*

In *Marvel*, the court declined to recognize the adverse domination doctrine because "the court believes that Delaware's tolling mechanisms, in combination with the availability of shareholder derivative actions, already address the concerns that underlie the adverse domination doctrine." *Id.* at 77.  The court noted that while the director defendants dominated the plaintiff's board, the alleged harmful act (entering a tax sharing agreement) was disclosed to plaintiff's shareholders who could have instituted derivative actions on behalf of the corporation. *Id.* at 76.

This case is different.  Here, NNL, which was party to the wrongdoing, was NNUK's sole shareholder.  There was no possibility of a shareholder derivative action or any other action based on the allegations set forth in the Proof of Claim until the Joint Administrators were appointed.  Indeed, NNUK was controlled by culpable directors who would never bring a lawsuit against themselves.  The statute of limitations was therefore tolled until the Joint Administrators were appointed in January 2009.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the Joint Objection.

Dated:   Wilmington, Delaware          **YOUNG CONAWAY STARGATT & TAYLOR, LLP**
September 14, 2011

 /s/ Jaime N. Luton
James L. Patton (No. 2202)
Edwin J. Harron (No. 3396)
Jaime N. Luton (No. 4936)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571–6600
Facsimile: (302) 571–1253

- and -

**HUGHES HUBBARD & REED LLP**
Michael Luskin
Derek J.T. Adler
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837–6000
Facsimile: (212) 422–4726

- and -

**HERBERT SMITH LLP**
Kevin Lloyd
John Whiteoak
Richard Lawton
Exchange House
Primrose Street
London
EC2A 2HS

*Counsel for the Joint Administrators*