IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

In re Nortel Networks Inc.
*Debtor*

Chapter 11
Case No. 09-10138 (KG)
Jointly Administered

---

## DECLARATION OF PHILIP MARSHALL QC IN OPPOSITION TO JOINT OBJECTION AND MOTION TO DISMISS CLAIMS OF NORTEL NETWORKS UK LIMITED

---

I, Philip Marshall QC, hereby declare as follows, pursuant to 28 USC s.1746:

**Instructions**

1. I have been instructed by Herbert Smith LLP, English counsel to the claimants in these proceedings, to provide an opinion on English law in connection with a number of issues arising out of the Amended Proof of Claim filed by the claimant on 3 June 2011 (**"the Claim"**). I have also been asked to review and respond to a declaration of Mr. Michael Todd QC dated 15 July 2011.

2. I can confirm that prior to receiving instructions to prepare this declaration I have had no instructions from or connection with any of the parties to these proceedings. I am being compensated at a rate of £750 per hour (plus VAT) for providing this declaration, which is my customary hourly rate. No part of my compensation for providing this declaration is contingent in any way upon the results of these proceedings. The contents of the declaration represent my true and complete professional opinion on the issues referred to.

**Qualifications & Experience**

3.    Details of my education and professional background are set out in my résumé. This is annexed to this declaration as Exhibit A. I was called to the Bar of England & Wales in 1987. I became one of Her Majesty's Counsel (**"Queen's Counsel"**) in 2003. My practice encompasses a variety of commercial litigation but I specialise in company and securities law, insolvency law and in the conduct of civil fraud and asset recovery proceedings. In the course of my practice I have acted as an advocate in the Queen's Bench Division, Commercial Court and Chancery Division of the High Court of England & Wales, the Court of Appeal (Civil Division), House of Lords and Supreme Court. My appearances in the Chancery Division have included regular appearances in the Companies and Bankruptcy Courts, which form part of that division. I also regularly appear as an advocate in the Courts of First Instance and Court of Appeal in the British Virgin Islands. I am counsel to the Ministry of Finance of the Government of Bermuda.

4.    I have been ranked as a "Star of the Bar" in Chambers & Partners, one of the leading directories on the legal profession in England. I am recommended as a specialist in company, insolvency and civil fraud, among other areas, in both Chambers & Partners and other directories such as the Legal 500.

5.    I hold certain judicial appointments. In 2008 I was appointed as a Recorder. In 2009 I was appointed as a Deputy High Court Judge in both the Chancery Division and Queen's Bench Division of the High Court. This means that I sit as a judge on a part-time basis. For the remainder of the time I continue my private practice.

6.    Before entering into practice as a barrister I taught commercial law (including insolvency law) at Cambridge University (I was a Fellow of Queens' College, Cambridge University).

7.    I am one of the joint editors of *The Practice & Procedure of the Companies Court* and the contributor for the company and insolvency

chapters of *Civil Appeals.* I have also contributed articles and spoken regularly at a variety of conferences on company, insolvency and civil fraud topics.

## Reading

8. Aside from the declaration of Mr. Todd, the English statutes and case law which he has referred to and those cited below, I have considered the following documents:

    8.1    The Claim;

    8.2    Joint Objection and Motion to Dismiss the Claim dated 15 July 2011 (**"the Motion"**); and

    8.3    The declaration of Luke A. Barefoot dated 3 June 2011 in support of the Motion together with the exhibits thereto.

## Background

9. I have proceeded on the basis that the relevant background is as set out in the Claim.

10. In this declaration I adopt the same definitions as used in the Claim.

## The Issues

## (1) Preliminary Matters

11. In considering the issues that arise under my instructions I have avoided any attempt to resolve any factual disputes that may arise between the parties on the basis that these are matters for the court and outside of my remit.

12. I have therefore proceeded on the assumption that the facts alleged in the Claim will be proved in due course.

13.     I also assume that issues over the manner in which allegations must be pleaded and particularised in the Claim are matters to be determined in accordance with the law of the forum not English law.

14.     I note, however, that Mr. Todd has not been content to proceed on a similar footing (despite acknowledging that *"a US court will apply its own procedural rules in determining the sufficiency of the pleaded allegations based on English substantive law"* (see paragraph 34 of his declaration)). He expresses the view that unless properly/adequately particularised the English court would strike out (and thereby dismiss) the Claim and then goes on, at various points in his declaration, to say that the allegations made in the Claim *"do not comply with the requirements of English law"*. It is not entirely clear to me what Mr. Todd is seeking to convey by this but, at various points, it appears to be his contention that the Claim is not adequately particularised for the purposes of an English court and as a matter of English procedural law would be liable to be struck out.

15.     Although, for the reasons already expressed, I believe this to be irrelevant, I disagree with Mr. Todd in this analysis if this is indeed what he is seeking to convey since it fails to have regard to the following principles:

15.1    The proof of claim filed in these proceedings appears to be similar to a proof of debt in English insolvency proceedings. In the context of a proof of debt there is no requirement for a formal pleading although various formal details would have to be stated (such as the name and address of the creditor, total amount of the claim etc.) along with particulars of how and when the debt was incurred[1]. The proof of claim in this case contains much fuller particulars than I would expect to see in a proof of debt in the English context.

---

[1] Insolvency Rules 1986, rr.2.72(3), 4.75(1) and 6.98(1).

15.2   In England the relevant insolvency office-holder (such as an administrator, liquidator or trustee in bankruptcy) then considers the proof of debt and decides whether to accept or reject it[2].

15.3   If a creditor wishes to challenge a rejection of a proof of debt by an insolvency office holder, then the creditor is required to make an application to the court[3]. On such an application the court could give a number of directions which may include directions for the service of a statement of case setting out the basis of the creditor's claim and apply the requirements of the Civil Procedure Rules (which govern most forms of civil litigation in England) as to the manner in which that statement of case was pleaded[4].

15.4   Under the Civil Procedure Rules, rule 3.4, a party can apply to strike out a statement of case on the basis that it discloses no reasonable grounds for bringing or defending the claim; the statement of case is an abuse of the court's process or is otherwise likely to obstruct the just disposal of the proceedings; or there has been a failure to comply with a rule, practice direction or court order.

15.5   If an attempt is made to contend that a statement of case does not contain sufficient detail or particulars so as to disclose reasonable grounds for bringing a claim the court adopts a cautious approach. In the leading authority on this subject, the decision of the House of Lords in Three Rivers DC v Bank of England [2003] 2 AC 1, Lord Hope, at 248, emphasised that *"a balance must be struck between the need for fair notice to be given on the one hand and excessive demands for detail on the other"*. He endorsed the judgment of Lord Justice Saville in British Airways Pension Trustees Ltd v Sir Robert McAlpine & Sons Ltd (1994) 45 Con LR 1, at 4 – 5, where he stated as follows:

---

[2] Insolvency Rules 1986, rr. 2.77, 4.82 and 6.104.
[3] Insolvency Rules 1986, rr.2.78, 4.83 and 6.105.
[4] Insolvency Rules 1986, r.7.51A.

*"The basic purpose of pleadings is to enable the opposing party to know what case is being made in sufficient detail to enable that party properly to prepare to answer it. To my mind it seems that in recent years there has been a tendency to forget this basic purpose and to seek particularisation even when it is not really required. This is not only costly in itself, but is calculated to lead to delay and to interlocutory battles in which the parties and the Court pore over endless pages of pleadings to see whether or not some particular point has or has not been raised or answered, when in truth each party knows perfectly well what case is made by the other and is able properly to prepare to deal with it".*

Lord Justice Saville added *"Pleadings are not a game to be played at the expense of the litigants, nor an end in themselves, but a means to the end, and that end is to give each party a fair hearing".*

15.6    Lord Hope in <u>Three Rivers</u>, at 248, also endorsed the observations of Lord Woolf MR in <u>McPhilemy v Times Newspapers Ltd.</u> [1999] 3 All ER 775, at 792-793, where he stated that *"The need for extensive pleadings including particulars should be reduced by the requirement that witness statements are now exchanged. In the majority of proceedings identification of the documents upon which a party relies, together with copies of that party's witness statements, will make the detail of the nature of the case the other side has to meet obvious. This reduces the need for particulars in order to avoid being taken by surprise. This does not mean that pleadings are now superfluous. Pleadings are still required to mark out the parameters of the case that is being advanced by each party. In particular they are still critical to identify the issues and the extent of the dispute between the parties. What is important is that the pleadings should make clear the general*

*nature of the case of the pleader. This is true both under the old rules and the new rules".*

15.7    Although allegations of fraud and dishonesty give rise to a greater need for particulars to be given to explain the basis of the allegation, this means in practice that (a) it must be clear that an allegation of this type is being made and (b) the facts alleged to support it should not be consistent with innocence (see <u>Three Rivers</u>, *supra*, at 249-250).

15.8    The English courts will only strike out proceedings as an order of last resort. An application to strike out should not be granted unless the court is certain that the claim will fail[5]. If the pleaded case can be supported by further particulars or by an amendment then the court will order such particulars to be provided and/or permit a suitable amendment and then allow the claim to proceed rather than strike it out[6].

16.    Applying the above principles, the Claim would not, in my opinion, be struck out by an English court. In the course of considering each type of allegation in more detail below I provide brief reasons for this conclusion.

## (2) The Claim

### (a) Breach of Fiduciary Duty: Claims 2, 8, 16, 28 and 32

17.    The Claim alleges that NNI was a de facto or shadow director of NNUK, that NNI thereby owed NNUK certain fiduciary duties and that these were breached as a result of the conduct of NNI in connection with transactions

---

[5] <u>Hughes v Colin Richards & Co.</u> [2004] EWCA Civ 266.
[6] In <u>Belmont Finance Corporation Ltd. v Williams Furniture Ltd. and Others</u> [1979] Ch. 250 the Court of Appeal, while upholding the first instance's judge's determination that the pleaded case did not contain the necessary elements of a claim for fraud, nonetheless overturned his decision not to permit amendment to include the necessary particulars notwithstanding the delay and late stage at which the application was made (at 275 F to G). Millett LJ was prepared to adopt a similar approach to amendment in <u>Armitage v Nurse</u> [1998] Ch 241 (at 263D to G) despite finding against the plaintiff on the claim as pleaded before the court. Although these cases were decided prior to the Civil Procedure Rules, the same approach has been adopted under those rules in analogous circumstances, see <u>AST Sportswear Inc v Majid & Another</u> [2002] EWHC 778 (QB) at paragraph 85.

7

involving transfer pricing, intercompany loans, a scheme known as "Project Swift", the allocation of certain sale proceeds and certain taxation arrangements.

(i) De Facto Directors: Law

18.     Mr. Todd refers to various authorities on the subject of what constitutes a de facto director under English law, focussing in particular upon the first instance decision in Gemma Ltd v. Davies [2008] 2 BCLC 281. Somewhat surprisingly, however, he omits mention of the recent decision of the Supreme Court in Holland v Revenue & Customs Commissioners [2011] 1 All ER 373 which represents the most up to date and highest authority on the subject of de facto directors and which also contains helpful guidance on what will constitute a shadow director.

19.     In Holland, after referring to section 250 of the Companies Act 2006 and predecessor legislation (which provides that a director includes any person occupying the position of director by whatever name called) and a large number of earlier authorities in the lower courts, Lord Hope DP asked the rhetorical question, at 448c, of how it was to be pleaded and proved that a particular party was a de facto director. He answered that question in the following way at 452d-f:

> "It is plain from the authorities that the circumstances vary widely from case to case. Jacob J declined to formulate a single decisive test in Secretary of State for Trade and Industry v Tjolle [1998] 1 BCLC 333, as he saw the question very much as one of fact and degree. He was commended by Robert Walker LJ in Re Kaytech International plc, Secretary of State for Trade and Industry v Kaczer [1999] 2 BCLC 351 at 423 for not doing so, and I respectfully agree that there is much force in Jacob J's observation. All one can say, as a generality, is that all the relevant factors must be taken into account". He then went on to consider the basis for the claim in that case (which was one for misfeasance or breach of fiduciary duty or other duty in respect of

a company in liquidation under section 212 of the Insolvency Act 1986). He said *"It is possible to obtain some guidance by looking at the purpose of the section. As Millett J said in Re Hydrodam (Corby) Ltd [1994] 2 BCLC 180 at 182, the liability is imposed on those who were in a position to prevent damage to creditors by taking proper steps to protect their interests. As he put it, those who assume to act as directors and who thereby exercise the powers and discharge the functions of a director, whether validly appointed or not, must accept the responsibilities of the office. So one must look at what the person actually did to see whether he assumed those responsibilities in relation to the subject company."*

20.    Lord Collins SCJ, who delivered a concurring judgment, observed that it was not necessary that there should be any holding out of a person as a director for them to be treated as a de facto director. He then explained at 462g to 464c:

"*91.    Once the concept of de facto director was divorced from the unlawful holding of office, there were two consequences. The first consequence was that the distinction between de facto directors and shadow directors was eroded. A shadow director is "a person in accordance with whose directions or instructions the directors of the company are accustomed to act": Companies Act 1985, section 741(2); Companies Act 2006, section 251(1). In Re Hydrodam [1994] 2 BCLC 180, 183, Millett J said that de facto and shadow directorship "do not overlap. They are alternatives and in most and perhaps all cases are mutually exclusive." But the distinction was impossible to maintain with the extension of the concept of de facto directorship and the consideration of such matters as the taking of major decisions by the individual, which might be through instructions to the de jure directors, and the evaluation of his real influence in the affairs of the company: see Re Kaytech International plc [1999] 2 BCLC 351, 424, per Robert*

*Walker LJ. The second consequence is that the courts were confronted with the very difficult problem of identifying what functions were in essence the sole responsibility of a director or board of directors. A number of tests have been suggested of which the following are the most relevant. First, whether the person was the sole person directing the affairs of the company (or acting with others equally lacking in a valid appointment), or if there were others who were true directors, whether he was acting on an equal footing with the others in directing its affairs: Re Richborough Furniture Ltd. Second, whether there was a holding out by the company of the individual as a director, and whether the individual used the title: Secretary of State for Trade and Industry v Tjolle. Third, taking all the circumstances into account, whether the individual was part of "the corporate governing structure": Secretary of State for Trade and Industry v Tjolle, at pp 343-344, approved in Re Kaytech International plc [1999] 2 BCLC 351, 423, where Robert Walker LJ also approved the way in which Jacob J in Tjolle had declined to formulate a single test. He also said that the concepts of shadow director and de facto director had in common "that an individual who was not a de jure director is alleged to have exercised real influence (otherwise than as a professional adviser) in the corporate governance of a company" (at p 424). See also especially Re Mea Corpn Ltd [2006] EWHC 1846 (Ch), [2007] 1 BCLC 618 (Lewison J); Ultraframe (UK) Ltd v Fielding (No 2) [2005] EWHC 1638 (Ch) (Lewison J); Secretary of State for Trade and Industry v Hollier [2006] EWHC 1804 (Ch), [2007] BCC 11 (Etherton J). In fact it is just as difficult to define "corporate governance" as it is to identify those activities which are essentially the sole responsibility of a director or board of directors, although perhaps the most quoted definition is that of the Cadbury Report: "Corporate governance is the system by which businesses are directed and controlled" (Report of the*

*Committee on the Financial Aspects of Corporate Governance,*
*1992, para.2.5).*

92.     *Other common law jurisdictions have had to deal with similar*
*problems, and they have also imposed liabilities not only on*
*irregularly appointed directors or persons who, without being*
*appointed as directors, have been held out as directors, but also*
*on persons who perform the functions of directors without any*
*appointment, irregular or otherwise, and without any holding out:*
*for Australia see the Corporations Act 2001, section 9, and eg*
*Gebo Investments (Labuan) Ltd v Signatory Investments Pty Ltd*
*[2005] NSWSC 544; Chameleon Mining NL v Murchison Metals*
*Ltd [2010] FCA 1129; for Canada, contrast Wheeliker v Canada*
*(1999) 172 DLR (4th) 708, at [19] (Fed CA) (remedies available*
*against persons "who act as directors or who are held out by the*
*company as directors although they lack the required qualification*
*or authority") with Scavuzzo v The Queen [2006] 2 CTC 2429, at*
*para 32 ("a person must have some semblance of qualification as*
*director and must hold himself ... out as a director"); in the*
*United States de facto director still connotes a person who,*
*without being a director, claims to be one (eg Osler Institute Inc v*
*Forde, 333 F 3d 832 (7th Cir 2003)), but the courts impose*
*fiduciary duties on other persons who, without being directors, are*
*"control persons" (eg Re Parmalat Securities Litigation, 684 F*
*Supp 2d 453, 475-476 (SDNY 2010)).*

93.     *It does not follow that "de facto director" must be given the same*
*meaning in all of the different contexts in which a "director" may*
*be liable. It seems to me that in the present context of the fiduciary*
*duty of a director not to dispose wrongfully of the company's*
*assets, the crucial question is whether the person assumed the*
*duties of a director. Both Sir Nicolas Browne-Wilkinson V-C in Re*
*Lo-Line (at p 490) and Millett J in Re Hydrodam (at p 183)*
*referred to the assumption of office as a mark of a de facto*

*director. In Fayers Legal Services Ltd v Day, (unreported) 11*
*April 2001, a case relating to breach of fiduciary duty, Patten J,*
*rejecting a claim that the defendant was a de facto director of the*
*company and had been in breach of fiduciary duty, said that in*
*order to make him liable for misfeasance as a de facto director the*
*person must be part of the corporate governing structure, and the*
*claimants had to prove that he assumed a role in the company*
*sufficient to impose on him a fiduciary duty to the company and to*
*make him responsible for the misuse of its assets. It seems to me*
*that that is the correct formulation in a case of the present kind.*
*See also Primlake Ltd v Matthews Associates [2006] EWHC 1227*
*(Ch), [2007] 1 BCLC 666, at para 284."*

21.    Applying these judgments it appears to me that the analysis of the law in
Mr. Todd's declaration at paragraphs 39 to 40 is incomplete or inaccurate
in a number of respects:

21.1    Mr. Todd appears to overlook the fact that the term de facto
director may have a different meaning depending on the context.
In Holland the Supreme Court was concerned with potential
liability for misfeasance, breach of fiduciary duty and other breach
of duty under section 212 of the Insolvency Act in the context of a
company in liquidation. That provision, however, is merely
procedural. It does not create any new rights (see Lord Collins
SCJ in Holland at 453d-e and Re Canadian Land Reclaiming and
Colonizing Co., Coventry and Dixon's Case (1880) 14 Ch D 660
and Re City Equitable Fire Insurance Co. Ltd. [1925] Ch 407).
Accordingly, where the court is considering claims of breach of
fiduciary duty or other duty outside of section 212 but within an
insolvency, where creditors' interests required protection, the
approach is likely to be the same as that adopted in Holland. The
essential issue then appears to be whether what the person actually
did means that he can be treated as having assumed a role

"sufficient to impose on him" the relevant duty and make him responsible for the misuse of the company's assets.

21.2   Mr. Todd seeks to focus on whether the relevant individual undertook functions which could only properly be discharged by a director (paragraphs 39 and 40(i) of his declaration). However, this is really an attempt to formulate a single test for all circumstances (something that the Supreme Court held was incorrect) and is a narrower test than that adopted by the Supreme Court in the context of section 212. It is notable that even under this narrower test, a de facto director need not exert control over every aspect of the business or perform every function of a director. A person could be a de facto director where he or it performs discrete functions (see, for example, Re Mea Corporation Ltd. [2007] 1 BCLC 618, at 639f-g).

21.3   The observation that there is no requirement that a person should be held out as a director although it is a factor to be taken into account (see paragraphs 40(ii)-(iii) of Mr. Todd's declaration) accords with the approach of Lord Collins SCJ in the passage quoted above).

21.4   The proposition that a person alleged to have been a de facto director must have directed the affairs of the company "on an equal footing with the other director(s) and not in a subordinate role" (paragraph 40(iv) of Mr. Todd's declaration) also appears to be an attempt to come up with a single test for all circumstances which is inconsistent with the decision of the Supreme Court. It is one of the three tests which Lord Collins SCJ recites in the Holland judgment at 463a-b but which he declined to apply. It is also notable that even as a factor to be taken into account, rather than the test to be applied, it requires qualification. "Equal footing" does not mean that one director does not defer to another. This is evident from observations made in Secretary of State v Ashby (No. 1915 of 1992) (unreported) on the earlier judgment of

Mr. Timothy Lloyd QC in <u>Re Richborough Furniture Ltd.</u> [1996] B.C.C. 155:

> *"I very much doubt that Mr Lloyd Q.C. meant that in all respects a de facto director had to be on an exactly equal footing to all the other directors. For example, I would expect a de facto finance director to defer to the properly appointed marketing director in matters of marketing in the same way as a de jure appointed finance director would. I think that all Mr Lloyd was trying to do was to encapsulate the notion that, in investigating the qualities of the acts performed by the person whose status is in question, one is looking for someone who is essentially operating at the same level as the properly appointed directors, that is to say they are not in reality subordinate to them at all times."*

21.5    The further proposition that the person in question must be shown to have assumed the status and functions of a director and "exercised "real influence" in the corporate governance of the company" (paragraph 40(v) of Mr. Todd's declaration) once again appears to be an attempt to bring into play one of the various tests which the Supreme Court declined to apply. As Lord Collins SCJ held in <u>Holland,</u> at 463e, it is "just as difficult to define "corporate governance" as to identify those activities which are essentially the sole responsibility of a director or board of directors". In the context of section 212 both Lord Hope and Lord Collins therefore adopted the broader test of whether the person assumed a role sufficient to impose on him a fiduciary duty[7].

---

[7] Lord Collins SCJ also approved an earlier authority which added a further requirement that the person be "part of the corporate governing structure" (at 464b). However, this does not feature in the judgment of Lord Hope DP and Lord Saville SCJ (who agreed with both judgments) did not comment on this point. The majority view would therefore appear to be that of Lord Hope DP without this extension of Lord Collins SCJ (the assumption of responsibility being the only aspect on which they were all agreed).

21.6    The suggestion that a person will be accorded the benefit of the doubt before an English court if there is uncertainty over whether his acts are referable to an assumed directorship appears to be correct in principle if it means no more than that the claimant bears the burden of proof of establishing the de facto directorship. However, this is essentially a procedural and evidential matter which I believe is a matter for the forum. I assume English law will be irrelevant to this issue.

22.    However, I agree with Mr. Todd's view, in paragraph 38 of his declaration, that a de facto director will be treated as a director and subject to obligations on directors imposed by statute, the fiduciary obligations imposed on directors on the basis of equitable principles and the common law duty of care applied to directors. I also agree with his opinion, in paragraph 41 of his declaration, that in considering the acts of individuals who are directors of both NNI and NNUK it will be necessary to consider all the capacities in which they may have been acting before attributing the relevant action to NNI (this broadly accords with the decision in Holland where the Supreme Court placed emphasis on the capacity in which a particular individual had acted when considering whether he was a de facto director[8]). The fact that a person may appear to be acting on his own behalf or on behalf of one party does not mean that he cannot in fact be acting on behalf of another. English law recognises that agents may act for an undisclosed principal and may create binding legal relations between that undisclosed principal and a third party[9]. Whether an agent is acting for an undisclosed principal may involve difficult issues of fact regarding subjective intention that would need to be resolved at a trial[10].

---

[8] As a general matter authority can be actual or ostensible. Actual authority can be expressly given or be implied (often from the authority usually accorded a person holding a particular position or function). In relation to the allegations in the Claim that certain individuals acted so as to bind or affect NNI all of these potential types of authority might have to be considered.
[9] Bowstead & Reynolds on Agency (19th Edn.), Article 76 and commentary.
[10] See, for example, National Oilwell (UK) Limited v Davy Offshore Ltd. [1993] 2 Lloyd's Rep. 582, at 596-597 where Colman J. expressed the view that such a question had to be determined by reference to all admissible evidence.

(ii) De facto Directors: Factual Allegations

23.    In paragraphs 13 to 27 of the Claim details are provided of various ways
       in which NNI acted so as to control the operations and business of
       NNUK. This includes an allegation that this control extended to Group
       Tax matters, in particular transfer pricing, and to Group Treasury matters
       as a result of which value was improperly removed from NNUK.

24.    Whether such conduct could amount to an assumption by NNI of the role
       of director of NNUK will depend on such matters as a consideration of
       the NNUK business as a whole and how significant these matters were to
       it, how precisely the evidence regarding these matters comes out at trial
       and the manner in which creditors' interests should have been taken into
       account (which will depend on detailed evidence of how and during what
       period the insolvency of NNUK came about). If the matter were before an
       English court I have no doubt that it would be treated as a highly fact
       sensitive matter which should be tried and which is wholly unsuited for
       summary determination in an application to strike out.

25.    At paragraphs 42 to 46 of his declaration Mr. Todd gives three reasons for
       his conclusion that even if the factual allegations were established they
       could not support a finding that NNI was a de facto director of NNUK. As
       to these:

       25.1    Mr. Todd says he is not aware of any case in which one subsidiary
               has been held to be de facto director of a fellow subsidiary. I do
               not agree with Mr. Todd that this is material. This is a developing
               area of the law. As Lord Collins SCJ explained in Holland, at
               460e-g and 461d, the modern law on de facto directorships only
               came into being in the late 1980s (prior to this the doctrine was
               confined to cases where there was a defective appointment or a
               person had been a director at a previous time but continued to act
               having ceased to hold office). Since that time the doctrine has
               tended to be contentious in the context of the disqualification of
               individuals as directors. New issues are therefore bound to arise

when considering corporate directors (which were not permitted under the early companies legislation). Holland itself was a relatively novel case where the existence of a corporate director of a particular company affected the issue of whether an individual was a de facto director of that company. Corporate entities can be de facto or shadow directors (this is implicit in section 251(3) of the 2006 Companies Act in the latter context) and there is no reason in principle preventing a sister company from being held to be a de facto or shadow director in appropriate circumstances.

25.2    Mr. Todd says that allegations that NNI "was involved in all decision making" in respect of matters such as transfer pricing are "insufficient to establish that NNI was a de facto director of NNUK in that they do not describe the performance of functions that can only be properly undertaken by a director, or describe participation by NNI in the management of NNUK on an equal footing with NNUK's directors". However, this analysis proceeds on a misconception over the correct test as to what will give rise to a de facto directorship (as set out above). It is instead based on a test that was discarded by the Supreme Court. Furthermore, and in any event, I do not agree with Mr. Todd's conclusion even applying such a restrictive test. As Lord Collins SCJ comments in Holland, at 462j-463a, trying to identify what functions are in essence the sole responsibility of a director or board of directors is "very difficult". It is inevitably something that will depend on the particular facts of each case and in particular on how the subject company is in fact run and conducts business. I fail to see how a conclusion could possibly be reached at this early stage that the evidence at trial will not establish that NNI had carried out acts which were the sole responsibility of the Board of NNUK by participating in decision making as alleged in the Claim. For example, the Claim alleges that the relevant transfer pricing arrangements involving NNUK were planned, implemented and operated by NNI (at paragraph 18 and in particular in

sub-paragraphs 18a and 18b) and that NNI dealt with UK tax authorities in respect of the position of NNUK (paragraph 18(f)). The detailed evidence regarding these matters would have to be considered but it could well be concluded that they came within areas that were the sole responsibility of the Board.

25.3    Finally Mr. Todd observes that there is no allegation that instructions were given by NNI that new schemes be identified enabling the transfer of cash and value to NNL and for the execution of the MRDA. I do not agree with this analysis. It seems to me that, for example, paragraphs 18c, 18d, 18e, 22, 24, 57 and 61 of the Claim do provide specific examples of instructions and directions being given by NNI in respect of what are alleged to be schemes for the transfer of value to NNL and for the implementation of the MRDA. Indeed in paragraph 57 the whole idea of "cash to Canada" is said to have come from NNI as well as NNL. In any event, even if this were not so, there are a host of other matters set out in the Claim, at paragraphs 16 onwards regarding active steps being taken by NNI in relation to transfer pricing, intercompany lending, Project Swift, business sales and taxation which are capable of leading to a finding of a de facto directorship if established at trial.

(iii) Shadow Directors: Law

26.    As stated by Mr. Todd at paragraph 47 of his declaration, a "shadow director" is a statutory concept presently governed by section 251 of the Companies Act 2006. Central to that concept is the requirement that the directors of a company are accustomed to act in accordance with the directions or instructions of such a person.

27.    At one time it was suggested that there was no overlap between de facto and shadow directors. They were thought to be mutually exclusive concepts[11]. However, as explained by Lord Collins SCJ in Holland, at

---

[11] See, for example, Re Hydrodam (Corby) Ltd. [1994] 2 BCLC 180, at 183.

462h, this position was impossible to maintain with the modern development of the concept of de facto directorship and in particular the relevance to both categories of director of matters such as the taking of major decisions, which might be through instructions to the de jure directors, and the evaluation of the person's real influence in the affairs of the company[12]. It seems therefore that a person may well be treated as both a de facto and shadow director in many cases, particularly where the board is acting on instructions or directions from that person[13]. I therefore do not agree with Mr. Todd's suggestion that it is unlikely that the same person could be both a de facto and shadow director or that an allegation that a person fitted within both categories was in any way inadequate or embarrassing (see paragraphs 52 and 54 of the declaration of Mr. Todd). This takes no account of the modern developments mentioned above[14].

28.    The principal authority on the statutory concept of a shadow director remains the Court of Appeal decision in Secretary of State for Trade and Industry v Deverell [2001] Ch 340. Although decided under the Company Directors Disqualification Act 1986, the relevant statutory wording in section 22(4) of that Act mirrors that in section 251(1)-(2) of the 2006 Companies Act. In Deverell, at 354B-G, Lord Justice Morritt summarised the position in the following passage[15]:

> "I propose to express my conclusions on these and other issues in
> a number of propositions. (1) The definition of a shadow director

---

[12] See also in this regard Re Kaytech International plc [1999] 2 BCLC 351, 424, per Robert Walker LJ.

[13] See Sealy, [2011] Company Law Newsletter 1. Indeed one commentator has observed that the similarity in defining characteristics of de facto and shadow directors is such that in many cases the terms have been effectively treated as synonymous (see in this regard the observations in Griffin, *Confusion surrounding the characteristics, identification and liability of a shadow director*, Insolvency Intelligence 2011, 44 citing, as examples, Masri v Consolidated Contractors International [2010] EWHC 2458 (Comm); Lexi Holdings v. Luqman [2007] EWHC 2652 (Ch); Secretary of State v Poulter [2009] BCC 608; Secretary of State v. Hall [2006] EWHC 1995 (Ch); and Primlake Ltd. v Matthews Associates [2007] 1 BCLC 666.

[14] Mr. Todd's conclusion is based on the comments of a first instance judge, Lewison J., in Ultraframe (UK) Ltd. v Fielding [2005] EWHC 1638 (Ch), at [1263]. However, that decision preceded and therefore took no account of the Supreme Court decision in Holland. It is also notable that the same first instance judge accepted that there was in fact a considerable overlap between the concepts of de facto and shadow directors in a more recent decision: Re Mea Corporation Ltd. [2006] EWHC 1846 (Ch), at para.89.

[15] Mr. Todd has sought to summarise these propositions in paragraph 48 of his declaration.

*is to be construed in the normal way to give effect to the parliamentary intention ascertainable from the mischief to be dealt with and the words used. In particular, as the purpose of the Act is the protection of the public and as the definition is used in other legislative contexts it should not be strictly construed because it also has quasi-penal consequences in the context of the Company Directors Disqualification Act 1986. I agree with the statement to that effect of Sir Nicolas Browne-Wilkinson in Re Lo-Line Electric Motors Ltd [1988] Ch. 477, 489. (2) The purpose of the legislation is to identify those, other than professional advisers, with real influence in the corporate affairs of the company. But it is not necessary that such influence should be exercised over the whole field of its corporate activities. I agree with the statements to that effect of Finn J in Australian Securities Commission v AS Nominees Ltd (1995) 133 ALR 1, 52/3 and Robert Walker LJ in Re Kaytech International plc [1999] BCC 390, 402. (3) Whether any particular communication from the alleged shadow director, whether by words or conduct, is to be classified as a direction or instruction must be objectively ascertained by the court in the light of all the evidence. In that connection I do not accept that it is necessary to prove the understanding or expectation of either giver or receiver. In many, if not most, cases it will suffice to prove the communication and its consequence. Evidence of such understanding or expectation may be relevant but it cannot be conclusive. Certainly the label attached by either or both parties then or thereafter cannot be more than a factor in considering whether the communication came within the statutory description of direction or instruction. (4) Non-professional advice may come within that statutory description. The proviso excepting advice given in a professional capacity appears to assume that advice generally is or may be included. Moreover the concepts of "direction" and "instruction" do not exclude the concept of "advice" for all three share the common feature of "guidance". (5) It will, no doubt, be sufficient*

20

*to show that in the face of "directions or instructions" from the alleged shadow director the properly appointed directors or some of them cast themselves in a subservient role or surrendered their respective discretions. But I do not consider that it is necessary to do so in all cases. Such a requirement would be to put a gloss on the statutory requirement that the board are "accustomed to act in accordance with" such directions or instructions. It appears to me that Judge Cooke, in looking for the additional ingredient of a subservient role or the surrender of discretion by the board, imposed a qualification beyond that justified by the statutory language".*

29.    Accordingly in determining whether NNI was a shadow director of NNUK it will be necessary to investigate the essential question of whether it exercised real influence in the corporate affairs of NNUK. The court will look at communications between the two to see whether NNI was engaged in providing directions or instructions but non-professional advice may be sufficient for this purpose and there is no requirement of subservience on the part of the Board of NNUK.

30.    Special considerations arise under section 251(3) of the Companies Act 2006 in respect of a parent company becoming a shadow director of a subsidiary. Obviously this does not apply to NNI which is not a parent and (as I set out below) I do not consider there to be an analogy between the position of NNI and the position of a parent. In relation to the special position of a parent I agree with Mr. Todd's observations in this regard in paragraph 51 of his declaration. As Mr. Todd explains, a parent can be a shadow director in certain circumstances notwithstanding this statutory provision. The additional conduct required, above and beyond the directors of the subsidiary being accustomed to act on the instructions or directions of the parent, will be a question to be determined by reference to the particular circumstances of each case. Here the allegations in the claim do rely on further conduct. For example, it is alleged NNI took over the conduct of certain matters to the exclusion of NNUK de jure directors

(such as various steps in connection with transfer pricing arrangements including negotiation with UK tax authorities (see paragraph 18 of the Claim)). I address Mr. Todd's observations in relation to section 251(3) further at paragraph 35.3 below.

31.     In his declaration, at paragraphs 56 to 64, however, Mr. Todd then goes on to emphasise that, even if it is established that NNI was a shadow director of NNUK, it does not follow that it owed the full range of fiduciary duties owed by de jure or de facto directors under English law. He suggests that a shadow director only becomes subject to any fiduciary duties if either he is a de facto director or takes control of property of the company. The sole basis for this conclusion is the decision at first instance in Ultraframe UK Ltd. v Fielding [2005] EWHC 1638 (Ch), at [1279] – [1291]. However, the Ultraframe case was decided with reference to the definition of shadow director contained in section 741(2) of the Companies Act 1985, which is materially different from that now contained in the Companies Act 2006. Moreover, even in respect of the old Act, Ultraframe was in apparent conflict with another first instance decision, namely Yukong Line of Korea Ltd v Rendsburg Corp Investments of Liberia Inc. [1998] 1 WLR 294.

32.     The decision in Ultraframe does not create a binding precedent under English law and another first instance Judge could decline to follow it. In common with certain commentators[16], I consider that it was wrongly decided on this point (in that it wrongly confines the scope of the fiduciary obligations owed by shadow directors) and would not now be applied and that the Rendsburg decision would be preferred, for the following reasons:

32.1    In arriving at his conclusion that shadow directors did not owe the same range of fiduciary obligations as de jure and de facto directors Mr. Justice Lewison in Ultraframe emphasised the absence of any statutory provision in the 1985 Act expressly

---

[16] See Griffin, *supra*.

treating shadow directors as owing fiduciary obligations or treating them as equivalent to any other director.

32.2    In the 2006 Act, however:

32.2.1    section 170(5) specifically provides for the general duties of directors specified in sections 171 to 177 to apply to shadow directors "where, and to the extent that, the corresponding common law rules or equitable principles so apply". There was no equivalent provision in the 1985 Act; and

32.2.2    section 251(3) (the section defining the term "shadow director") makes specific provision excepting a parent company from the obligations of directors under Chapter 2 of the Act, which encompasses sections 171 to 177, even where it would otherwise be treated as a shadow director. No such exception existed under the 1985 Act.

32.3    The above provisions of the 2006 Act appear to proceed on the footing therefore that at least some of the general duties set out in sections 171 to 177 of the Act will apply to shadow directors irrespective of whether or not they are also de facto directors. Otherwise these provisions would be otiose. Sections 171 to 177 of the 2006 Act contain statutory duties that replace the previous common law and equitable obligations of directors but they are to be interpreted and applied in the same way as the corresponding common law and equitable principles (see section 170(3)-(4)).

32.4    Prior to the implementation of the Companies Act 2006 the Law Commission (one of the principal UK bodies dealing with law reform) appear to have considered that the potential liabilities of shadow and de facto directors were the same (see ˙Law Commission & Scottish Law Commission, *Company Directors: Regulating Conflicts of Interests and Formulating a Statement of Duties* (1998), Law Com. No.261, para.17.15).

32.5    In <u>Ultraframe</u> Mr. Justice Lewison approached the issue of whether a shadow director owed fiduciary duties by seeking to apply cases concerned with the distinction between express trustees, who have property vested in them, and constructive trustees who merely have a duty to account[17]. On this basis he concluded that because a shadow director does not directly deal with or claim the right to deal with assets of a company he will not, without more, have fiduciary duties imposed on him. However, with all due respect to the learned Judge, it is not readily apparent why these cases provide any useful analogy or answer to the issue. They do not address the question of whether fiduciary obligations may be owed by someone who does not deal with the assets of another directly but instead does so indirectly, through another.

32.6    It seems to me likely that the better analogy to a shadow director is that of a person who intermeddles in the operations of a trust. Such a person may be treated as a "trustee de son tort" – his active role in the administration of the trust will be treated as equivalent to a declaration of himself as a trustee and he will be subject to all the fiduciary obligations of a trustee (see Underhill & Hayton, *Law of Trusts & Trustees* (18th Edn.), pp.1243-1245).

32.7    Although Mr Justice Lewison regarded it as odd that a shadow director should owe fiduciary obligations where he gave instructions that were inimical to the company's interests it is difficult to understand why it should be odd. It would be even more odd if a person with substantial resources could evade the fiduciary obligations and liability that go with directorship by putting in place a "puppet board", with few resources, who simply acted in accordance with his directions[18]. Such an approach would

---

[17] These were decisions in <u>Paragon Finance v BB Thakrar & Co.</u> [1999] 1 All ER 400 and <u>Dubai Aluminium Co. Ltd. v Salaam</u> [2003] 2 AC 366.
[18] See in this regard the observations in Griffin, *supra*.

24

potentially undermine the purpose of having the concept of shadow directorship.

(iv) Shadow Directors: Factual Allegations

33.    The details given in paragraphs 13 to 27 of the Claim of the various ways in which NNI acted so as to control the operations and business of NNUK are also relied upon to establish shadow directorship. Whether such conduct could amount to the giving of directions or instructions in accordance with which the board was accustomed to act will depend on a detailed review of the way in which the board operated over the relevant period in respect the particular matters upon which the Claim focuses. This is because it is not necessary that a shadow director give directions in relation to all aspects of a company's business. As Lord Justice Morritt explained in Deverell, in the passage quoted above, although it is necessary to determine whether the putative shadow director exercised real influence over the company "...*it is not necessary that such influence should be exercised over the whole field of its corporate activities*".

34.    This is a detailed factual investigation and will require review in the context of all the evidence available at trial. Thus, as Lord Justice Morritt explained in Deverell, whether *"any particular communication from the alleged shadow director, whether by words or conduct, is to be classified as a direction or instruction must be objectively ascertained by the court in the light of all the evidence"* (emphasis added). As in the case of the de facto directorship issue, if this matter were before an English court, it is the sort of fact sensitive investigation that would be treated as wholly unsuited for summary determination in an application to strike out. As one commentator has put it, it is essentially a "jury question"[19].

35.    In paragraphs 65 to 74 of his declaration Mr. Todd gives five reasons for his conclusion that even if the factual allegations in the Claim were established they could not support a finding that NNI was a shadow director of NNUK. As to these:

---

[19] Griffin, *supra*.

35.1   Once again Mr. Todd seeks to rely on the absence of a previous reported case in which one subsidiary has been treated as a shadow director of another. I do not consider this to be material. As in the case of de facto directorship, this is a developing area of the law. Hitherto the vast majority of cases raising issues of shadow directorship have tended to arise in the context of applications to disqualify individuals from continuing to act as directors of companies. It is hardly surprising that there has been little case law on the position of corporate directors generally and subsidiary companies in particular. Moreover, there is authority for the proposition that one company can be a shadow director of another and there appears to be no reason why a fellow subsidiary should not be[20].

35.2   Mr. Todd says that there is no equivalent to an allegation that NNUK's directors acted or were accustomed to act in accordance with instructions from NNI. I do not agree. In paragraph 15 of the Claim it is expressly stated that NNI exerted control over Group Tax matters and specifically the transactions by which value was improperly removed from NNUK (see, for example paragraph 18d of the Claim regarding signature of the MRDA). In paragraph 20 NNI is alleged to have participated in the instructions given to NNUK to identify opportunities to transfer cash and value to NNL. Further detailed examples of instructions or directions being given by NNI personnel then follow (such as paragraph 22 where implementation of Interest Free Loan Facilities is said to have been conducted under the direction of NNI personnel). In paragraph 26 of the Claim it is then expressly stated that NNI made decisions in relation to treasury and tax issues and caused the board of NNUK to act in accordance with its directions and in particular with regard to transfer pricing arrangements, Interest Free Loan Facilities and Project Swift. In such circumstances I

---

[20] See <u>Re Hydrodam (Corby) Ltd.</u> [1994] B.C.C. 161 at 162- 164 (Millet J was prepared to assume that an indirect parent could be a shadow director); and <u>Secretary of State v Hall</u> [2006] EWHC 1995 (Ch).

cannot see how it can be said that if such matters were proved there could be no possible finding of a shadow directorship (bearing in mind that such directorship can arise from directions being given in connection with part rather than the whole of a company's operations). In my view such a finding is entirely possible and will require detailed investigation of all the relevant evidence at a trial.

35.3    Next Mr. Todd draws attention to section 251(3) of the Companies Act 2006 which relates to the special position of parent companies. He says that it is applicable by analogy to prevent a subsidiary company being treated as a shadow director where "the only basis for the allegation that one subsidiary company is a shadow director of the other subsidiary company is the existence of that common control" (see paragraph 68 of Mr. Todd's declaration). Even if one accepts this proposition, I have seen nothing in the Claim to indicate that the allegation of shadow directorship against NNI is based solely on the existence of common control. On the contrary, as set out above, the allegation is based on the exercise of control by NNI over the affairs of NNUK and the giving of directions on the material matters of transfer pricing arrangements, Interest Free Loan Facilities and Project Swift. In paragraph 68 Mr. Todd points to the fact that a motive for such acts on the part of NNI was to benefit NNL. However, there is no requirement regarding motive in section 251 and no suggestion of it even being a factor for consideration in the guidance provided by the Court of Appeal in <u>Deverell</u>. Also I do not accept that it could lead to the conclusion that in the Claim reliance is placed solely upon common control. In any event, the Claim does allege matters providing a strong motivation for NNI to act as a shadow director so as to benefit itself (see, for example, paragraph 64 of the Claim).

35.4   Mr. Todd's fourth point proceeds on the basis of his analysis of the fiduciary duties of shadow directors. I regard that analysis as incorrect for the reasons already set out above. However, even if his analysis of how such duties arose were to be applied, this would be a case in which, on the pleaded allegations, NNI could be held to be subject to the full range of fiduciary obligations of a director. This follows from the fact that it could be held to be a de facto director (for the reasons already given above) and also given the allegation that NNI had control of the transactions under which value is alleged to have been removed from NNUK (paragraph 15 of the Claim). Control of such transactions could lead to the conclusion that NNI had control of assets and funds of NNUK sufficient to give rise to extensive fiduciary obligations even if one applied what I regard as the flawed analysis derived from Ultraframe.

35.5   The final point made by Mr. Todd is an assertion that the Claim "does not properly allege that NNI acted in breach of fiduciary duty by favouring the interests of NNL at a time when NNUK was insolvent, near insolvent or of doubtful solvency" (see his declaration, paragraph 73). He says that "only a conclusory reference" is made in the Claim of "doubtful solvency (and/or risk of insolvency) of NNUK from 2000 onwards". He then states that only the interests of NNL as shareholder were engaged and therefore either no breach of duty occurred at all or any such breach was approved or ratified. There are a number of major difficulties with this analysis:

35.5.1   Firstly, whether or not a "conclusory" pleading is sufficient must be a matter for the procedural law of the forum. It is not a matter that I believe either Mr. Todd or I can comment upon. If for any reason it is relevant, I can confirm that as a matter of English procedural law there is no rule requiring particulars to be given of an allegation of

insolvency. In my own experience the detailed matters relied upon to establish insolvency are normally addressed as a matter of evidence, after any pleadings have been served, often by the service of accounting evidence.

35.5.2 Secondly, I am by no means convinced that the allegation of insolvency can properly be described as "conclusory". Paragraphs 6 to 8 of the Claim do provide an account of the events leading to the insolvency of NNUK and various subsequent paragraphs describe how losses accumulated as a result of the conduct of NNI in such a way that the interests of creditors of NNUK were engaged. An example is paragraph 72 of the Claim which describes how Project Swift meant the NNUK accepted a reduction of $628.9 million in the sums owed to it in return for illiquid shares in Nortel companies when the whole Nortel group was in a parlous financial state[21]. It is then stated that this was to *"the detriment of NNUK and its creditors"*.

35.5.3 Thirdly, if conduct occurs that would otherwise be a breach of fiduciary duty in respect of a solvent subsidiary it is not always sufficient that the parent was intended to benefit or that it authorised or ratified the transaction. Where the transaction amounts to an unlawful distribution or an unlawful return of capital it will not be permitted whether the parent company benefits or not and its approval will not be sufficient to excuse the breach of duty of directors who implemented such a transaction. This is because the interests of creditors are engaged (see in this regard Gower & Davies, *Principles of Modern Company Law* (18th Edn.), pp.586-588 and <u>Cook v Deeks</u> [1916] 1 AC 554). In this regard I note that the allegations in the Claim essentially involve an allegation of the provision of

---

[21] Consideration of the position of a group is often of relevance in this context, see for example <u>Facia Footwear v Hinchliffe</u> [1998] 1 BCLC 218, at 228c.

economic benefits by a subsidiary to its parent and in the circumstances the principles relating to unlawful return of capital and distribution may be engaged.

## (v) Fiduciary Duties

36.     I broadly agree with the analysis of the provisions in sections 170 to 177 of the Companies Act 2006 and of the relationship between those provisions and the existing case law on fiduciary obligations as set out in paragraphs 56 to 59 of Mr. Todd's declaration. Sections 170 to 177 of the 2006 Act are annexed to this declaration as Appendix B[22].

## (b) Breach of Duty of Care: Claims 3, 9, 17, 30 and 33)

37.     As a de facto director of NNUK, NNI would have owed a common law duty of care that is now codified in section 174 of the Companies Act 2006. This requires a director to exercise reasonable skill, care and diligence meaning the *"care, skill and diligence that would be exercised by a reasonably diligent person with (a) the general knowledge, skill and experience that may reasonably be expected of a person carrying out the same functions carried out by the director in relation to the company and (b) the general knowledge, skill and experience that the director has"*.

38.     In my view, for similar reasons to those set out above in relation to fiduciary duties, a shadow director will also be subject to this duty of care. This was also the view of the Law Commission and the Company Law Review committee (another law reform body) and of commentators on the subject[23].

---

[22] I also note that the Claim alleges that the conduct of NNI gave rise to fiduciary obligations irrespective of whether it held the position of a de facto or shadow director (see Claim, paragraphs 87(a), 121 and 153). It is possible for fiduciary obligations to arise, for example, if NNI undertook various tasks on behalf of NNUK. There is no single all-encompassing test as to when someone may be treated as a fiduciary but one test that has often been adopted is that of Lord Justice Millett in Bristol & West Building Society v Mothew [1998] Ch. 1, at 18: *"A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence".*

[23] See *Company Directors: Regulating Conflicts of Interest and Formulating a Statement of Duties, A Joint Consultation Paper, supra,* para. 17.15; Company Law Review, Completing, para. 4.7; and see also, for example, Gower & Davies, *supra,* p.485.

39.     The Claim also alleges that a sufficient degree of proximity existed between NNI and NNUK so as to give rise to a duty of care which was breached[24]. Mr. Todd expresses the view that such a duty cannot arise because he is not aware of any previous case in which such a duty has been held to exist between companies in a group and he considers that the situation is not analogous to other situations in which a duty has been said to arise (see declaration, paragraphs 79-80). I disagree with Mr. Todd on each of these points:

39.1    Whether or not a duty of care has been held to exist as between companies in the same group is of little significance. The circumstances in which a duty of care may be held to arise are not closed and have undergone steady development over the course of the course of the last two decades (as illustrated by some of the cases that Mr. Todd himself cites)[25].

39.2    An agent will generally owe a duty of care to his principal including a duty that may give rise to liability for financial loss (see *Bowstead & Reynolds on Agency* (19th Edn.), Article 40, p.184). The Claim alleges that not only did NNI give directions to the NNUK directors but carried on the implementation of various steps on behalf of NNUK (see, for example, paragraph 18e, where NNI is alleged to have carried out negotiations with tax authorities on behalf of NNUK and to have instructed professional advisers on its behalf). It seems to me that in these circumstances a duty of care may arise. Its precise extent will no doubt depend on how the evidence comes out at trial.

---

[24] See Claim, paragraph 99.

[25] One test is that set out in *Clerk & Lindsell on Torts* (20th Edn.), p.433, para.8–15 – referred to as the "three stage test", derived from Caparo Industries Plc v Dickman [1990] 2 AC 605 – foreseeability of damage; a relationship of proximity; and that it is fair, just and reasonable to impose a duty of care – although the three requirements can be treated as substantially overlapping. The Claim, para.99 includes an allegation of a duty of care owed by NNI to NNUK with particular emphasis on the proximity of their relationship. I note that in pages 43-44 of the motion to dismiss it is suggested that it would not be fair, just and reasonable to impose a duty of care on NNI on the grounds that it is alleged that it was also *"subjected"* to the *"cash to Canada"* scheme. In my view, this is misconceived. The fact that the alleged wrongdoer may also suffered some harm by the wrongdoing is not likely to be a relevant factor in determining whether a duty of care arose to another.

40.    Finally Mr. Todd repeats the point made earlier regarding authorisation and ratification by the parent company, NNL, and the existence of only a conclusory allegation of insolvency. For the reasons already set out above in relation to shadow directorship I do not consider these assertions to have any substance on a proper analysis of the Claim and the applicable law.

## (c) Dishonest Assistance: Claims 4,10, 18 and 35

### (i) Law

41.    The leading modern decision on the matters required to establish accessory liability for assisting in a breach of trust or fiduciary obligation is the decision of the Privy Council in <u>Royal Brunei Airlines Sdn Bhd v Tan</u> [1995] 2 AC 378. Any requirement that the assistance had to be in respect of a dishonest breach of trust or fiduciary duty by the trustee or fiduciary was abandoned. It was sufficient that there was an honest breach of trust or fiduciary duty. The essential requirement was that the assistance had been provided in respect of that breach by someone who was acting dishonestly. As Lord Nicholls explained, at 385B-C: "...*what matters is the state of mind of the third party sought to be made liable, not the state of mind of the trustee. The trustee will be liable in any event for breach of trust, even if he acts innocently...If the liability of a third party is fault based, what matters is the nature of his fault, not that of the trustee. In this regard dishonesty on the part of the third party would seem to be a sufficient basis for his liability, irrespective of the state of mind of the trustee who is in breach of trust*".

42.    Lord Nicholls went on to explain what dishonesty in this context means. At 389E he stated that "*The standard of what constitutes honest conduct is not subjective. Honesty is not an optional scale, with higher or lower values according to the moral standards of each individual*"[26]. He then

---

[26] Although the later House of Lords decision in <u>Twinsectra v Yardley</u> [1995] 2 AC 378 was thought to create a subjective element in the test of dishonesty in this context this has been clarified by the Privy Council in <u>Barlow Clowes International v Eurotrust International</u> [2006] 1 WLR 1476 as applied by the Court of Appeal in <u>Adan Shaaban Abou-Rahman v Al-Haji Abdul Kadir Abacha</u> [2006] EWCA Civ 1492 and <u>Starglade Properties Ltd v Roland Nash</u> [2010]

illustrated what could amount to dishonesty: *"Honest people do not intentionally deceive others to their detriment. Honest people do not knowingly take other's property. Unless there is a very good and compelling reason, an honest person does not participate in a transaction if he knows it involves a misapplication of trust assets to the detriment of the beneficiaries. Nor does an honest person in such a case deliberately close his eyes and ears, or deliberately not ask questions, lest he learn something he would rather not know, and then proceed regardless"*.

43.   At 389-390 Lord Nicholls went on to consider dishonesty in the context of taking risks. Where a third party knows a trustee or fiduciary is acting outside of his powers and nevertheless assists Lord Nicholls treated this as a case of a person taking a risk which he knows he has no right to take and he classified it as dishonest. Where, however, there was genuine doubt about whether the trustee or fiduciary was acting outside of his powers the issue is more difficult. The appropriate approach was expressed by reference to a formulation derived from an earlier first instance decision:

> *"The individual is expected to attain the standard which would be observed by an honest person placed in those circumstances. It is impossible to be more specific. Knox J. captured the flavour of this, in a case with a commercial setting, when he referred to a person who is "guilty of commercially unacceptable conduct in the particular context involved": see* <u>Cowan de Groot Properties Ltd. v. Eagle Trust Plc</u> *[1992] 4 All ER 700, 761. Acting in reckless disregard of others' rights or possible rights can be a tell-tale sign of dishonesty"*[27].

44.   It seems to me therefore that the statements in paragraph 104 of the Claim that the standard of dishonesty is objective and that it means conduct that

---

EWCA Civ 1314. The test is purely objective.

[27] See also <u>Starglade Properties Ltd v Roland Nash</u> *supra*, at para 39: *"The deliberate removal of the assets of an insolvent company so as entirely to defeat the just claim of a creditor is, in my view,* <u>not in accordance with the ordinary standards of honest commercial behaviour</u>, *however much it may occur. Nor could a person in the position of Mr Nash have thought otherwise notwithstanding a lack of understanding as to the legal position."* (emphasis added).

is commercially unacceptable in a commercial setting is entirely orthodox when considered in conjunction with Lord Nicholls' analysis. For these reasons I disagree with paragraph 86 of Mr. Todd's declaration to the extent that he suggests the contrary.

45.    Somewhat surprisingly Mr. Todd has drawn attention to the judgment of Lord Millett in Three Rivers DC v Bank of England (No.3) [2003] 2 AC 1, at paragraphs 183-190 for guidance on the correct approach. However, that judgment did not address the test of dishonesty for accessory liability in a respect of a breach of trust or fiduciary duty at all. The case concerned the tort of misfeasance in public office. Moreover this was a dissenting judgment on the issue of the requirements for a pleading of fraud. The majority (Lords Steyn, Hope and Hutton) did not adopt Lord Millett's analysis.

46.    I am also unclear as to why it would be appropriate to refer to a judgment on pleading requirements in England in any event given that Mr. Todd appears to have accepted that these are procedural matters for the law of the forum (see paragraph 34 of his declaration). In so far as English procedural rules on pleading are relevant I refer back to what I have already outlined in paragraphs 15.4 to 15.5 above (which is based on the judgment of Lord Hope who was in the majority in Three Rivers).

(ii) Factual Matters

47.    In paragraphs 89 to 92 of his declaration Mr. Todd gives three reasons for concluding that the accessory liability claim "does not meet the requirements of English law". I do not agree with Mr. Todd's analysis or conclusion for the following reasons:

47.1    The first point taken by Mr. Todd is that there could be no dishonesty where the steps taken were in the interest of NNL as the parent of NNUK. He once again asserts that there is no more than a conclusory allegation of insolvency or near insolvency or doubtful solvency at the relevant time. As I have already explained above I do not agree that there is only a conclusory allegation. As

to the adequacy of a conclusory allegation that appears to be a matter of procedure for the law of the forum. For the reasons already provided, however, such an allegation would be sufficient if English procedural rules were applied.

47.2    Next it is said that it is not alleged that NNI had knowledge of or was reckless or wilfully blind to the insolvency of NNUK. It is alleged in the Claim, at paragraphs 107, 132 and 164, that NNI knew that the various transactions referred to in connection with the accessory liability claim were contrary to the interests of NNUK. The Claim also contains allegations that NNI failed to take account of the best interests of creditors in circumstances of doubtful solvency (see, for example, Claim, paragraph 87b and v). Whether these claims contain adequate detail is a matter for the procedural law of the forum. However, if English procedural law was in any way relevant, and the Claim was treated as a pleading it would not be liable to be struck out on this ground. At most further particulars might be ordered to be supplied.

47.3    Finally Mr. Todd asserts that section 251(3) of the Companies Act 2006 precludes any breach of fiduciary duty by NNL as a shadow director of NNUK and that therefore NNI could not be liable for dishonestly assisting any such breach. In fact section 251(3) does not preclude a finding of shadow directorship against NNL. It merely provides that certain factors on their own will not lead to such a finding (as Mr. Todd appears to accept in paragraph 51 of his declaration). As in the case of NNI (to which I have referred in paragraphs 30 and 35.3 above) the Claim contains allegations of additional matters in respect of NNL which could give rise to liability irrespective of the special provision made in the statute.

48.    Accordingly, in my view, the claim based on accessory liability is expressed in accordance with English substantive law. I do not believe that English procedural rules regarding pleadings are relevant but if, for

any reason, they were, there would be no question of the claim being struck out by an English court.

(d) <u>Unconscionable Receipt: Claims 14, 22 and 29</u>

49.    The leading authority on claims for unconscionable receipt of trust property is the decision of the Court of Appeal in <u>BCCI (Overseas) Ltd. v. Akindele</u> [2001] Ch 437. The only reasoned judgment was that of Lord Justice Nourse who stated that two of the basic requirements were those identified by Lord Justice Hoffmann in the earlier case of <u>El Ajou v Dollar Land Holdings Plc</u> [1994] 2 All ER 685, at 700: *"...the plaintiff must show, first a disposal of his assets in breach of fiduciary duty; secondly, the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff"*. The third requirement concerned the mental state of the person receiving the funds. The issue was whether such a person needed to know of the breach of trust and whether they had to act dishonestly. The Court of Appeal concluded that dishonesty was not required. As to the knowledge of the recipient the test was expressed as follows, at 455F: *"The recipient's state of knowledge must be such as to make it unconscionable for him to retain the benefit of the receipt"*.

50.    Mr. Todd has stated that the claims of unconscionable receipt in this case must fail because NNUK does not allege that traceable funds belonging to it were transferred to NNI. As to this:

50.1    The allegations of unconscionable receipt in respect of transfer pricing and Project Swift (claim numbers 14 and 22) refer back to paragraph 58 of the Claim where it is alleged that *"By virtue of cash being channelled to NNL from NNUK and the EMEA Entities NNL was able to, and did in fact, make large cash payments in respect of outstanding loan balances which it owed to NNI"*. Various examples of such payments are then given. Thereafter interest free loans from NNUK to NNL are referred to in paragraph 60 of the Claim, which are alleged to have been made in

breach of fiduciary duty in paragraph 122 of the Claim. At present the Claim does not explain, however, the precise manner in which funds "advanced" under the interest free loans were then used to fund payments to NNI. This tracing exercise has not been set out. Such a tracing exercise will need to be undertaken to enable the unconscionable receipt claim to succeed. Tracing in this context means following the application of the funds or their product and could be done notwithstanding the mixing of the funds with other funds[28]. If the matter were before an English court the issue would be one on which NNUK would be required to provide particulars at an appropriate stage. There would be no question of striking out the claim until such an opportunity had been provided. Moreover the court would take account of the availability of documents and witnesses to the claimant in determining the level of particularity required. If a defendant had documentation or there were witnesses likely to attend trial that could reasonably be expected to support the claim the level of detail to be provided in advance of disclosure or trial might well be more limited (see, for example, the speech of Lord Hutton in <u>Three Rivers</u> at 273F-274A and 278G-279G).

50.2    There is a further allegation of "knowing receipt"[29] in respect of payment of the proceeds of "pre-petition business sales". It is alleged in claim number 29 that NNI received a higher allocation of such proceeds "constituted in part by property that it knew was rightfully property of NNUK" (Claim, paragraph 197). Further detail is provided of the manner in which NNUK received much less and NNI received more than it was properly due in relation to sales of NNUK assets in paragraphs 79 to 83 of the Claim. It seems to me that this could properly be categorised as an

---

[28] The detailed rules on tracing are complex and are summarised in leading textbooks such as *Snell's Equity* (32nd Edn.), chapter 30, section 5.

[29] " Knowing receipt" and "unconscionable receipt" refer to the same cause of action. Knowing receipt is the formulation derived from the older authorities. Unconscionable receipt is the modern formulation.

unconscionable receipt claim and that, although further particulars of the proportion of sums of NNUK said wrongfully to have been received by NNI could be required, the facts alleged could potentially sustain such a claim. Once again, if the matter were before an English court, it would be a case of requiring further particulars to be given rather than considering any strike out of the claim and the level of particularity required would take account of the factors mentioned above.

50.3   For these reasons I do not agree that the claims as they stand are fatally flawed (as asserted by Mr. Todd at paragraph 97 of his declaration). With further particularisation on the tracing aspect they are sustainable.

51.   Mr. Todd also once again seeks to categorise this as a case in which a solvent subsidiary (NNUK) has taken steps to assist its parent (NNL) and asserts that this could not give rise to a breach of duty and undermines any allegation of unconscionable conduct by NNI as recipient (see paragraphs 101 to 102 of Mr. Todd's declaration). For the reasons already set out above, on the assumption that the facts alleged in the Claim are proved, this is not a case in which it can be said NNUK was a solvent subsidiary. Creditors' interests were of importance and the claims of breach of fiduciary duty by the NNUK directors (including NNI as a de facto and/or shadow director) are, in my view, sustainable. Whether or not NNI acted unconscionably in such circumstances will be a matter for determination at trial after a full investigation of its knowledge of such matters by reference to all of the evidence.

(e) Conspiracy: Claims 5, 12 and 19

52.   The requirements for a claim for the tort of conspiracy to injure by unlawful means were described by the Court of Appeal in Kuwait Oil Tanker v. Al-Bader [2000] 2 All ER (Comm) 271. The Court described the tort in the following way, at para.108:"*A conspiracy to injure by unlawful means is actionable where the claimant proves that he has*

> *suffered loss or damage as a result of unlawful action taken pursuant to a*
> *combination or agreement between the defendant and another person or*
> *persons to injure him by unlawful means, whether or not it is the*
> *predominant intention of the defendant to do so."*

53.     As the Court also emphasised, at para.111, there is no requirement for
there to be an express agreement, whether formal or informal. It is enough
that two or more persons combine with a common intention. In this regard
the Court considered that the judgment in <u>R v Siracusa</u> (1990) 90 Cr.
App. R. 340, at 349, was of assistance:

> *"...the origins of all conspiracies are concealed and it is usually*
> *quite impossible to establish when or where the initial agreement*
> *was made or when or where other conspirators were recruited.*
> *The very existence of the agreement can only be inferred from*
> *overt acts. Participation in a conspiracy is infinitely variable: it*
> *can be active or passive. If the majority shareholder or director of*
> *a company consents to the company being used for drug*
> *smuggling carried out in the company's name by a fellow director*
> *and minority shareholder, he is guilty of conspiracy. Consent, that*
> *is agreement or adherence to the agreement, can be inferred if it is*
> *proved that he knew what was going on and the intention to*
> *participate in the furtherance of the criminal purpose is also*
> *established by his failure to stop the unlawful activity".*

54.     The Court went on, at para.112, to emphasise that the conspirators might
join the conspiracy at different times and that asking the question of
whether they were "in it together" might be a helpful question to ask
although it should not obviate considering in detail the acts said to have
been done pursuant to the conspiracy. Importantly, at para.120, the Court
also concluded that the intention to injure can be inferred from the
unlawful acts themselves. Indeed they considered that in the case of most
conspiracies it would be clear from the acts relied on that there was an
intention to injure.

55.    Allegations of unlawful means conspiracy are set out in claim numbers 5, 12 and 19 of the Claim. I consider that they properly set out the necessary constituents of such a claim under English law. I note that in paragraph 110 of his declaration Mr Todd contends that the allegations of conspiracy are in too general terms and do not contain sufficient particulars. Once again, it seems to me that this is a matter of pleading for the procedural law of the forum and is not a matter of English law. However, if for any reason the procedural position under English law was relevant I am in no doubt that an English court would conclude that the Claim was a satisfactory pleading of this cause of action:

55.1    Paragraphs 9 to 15 of the Claim explain how a scheme of value removal from NNUK came about and how that scheme was implemented through control exercised by the Canadian entities in the Nortel group and NNI.

55.2    In paragraphs 16 to 25 details are then given of overt acts of each of NNI and the Canadian entities in relation to transfer pricing, intercompany loans and Project Swift which, if proved, would be capable of substantiating the existence of a combination.

55.3    The unlawful means is identified as involving breaches of fiduciary duty in paragraph 29 and in a note to paragraph 109 breach of contract is also identified as unlawful means in respect of transfer pricing.

55.4    As is commonly the case, the intention to injure might readily be inferred at trial from proof of the overt acts and establishment of the unlawful means.

55.5    Loss is set out in paragraphs 110, 138 and 167 of the Claim.

(f) Mistake: Claim 26

56.    Claim number 26 of the Claim is for the return of an overpayment made
by mistake to NNI which was in fact due to NNUK. On my understanding
of the Claim this is a restitutionary claim.

57.    Mr. Todd appears to have interpreted the claim as one that is dependent
on a mistake as to an agreement (see paragraphs 111 to 113 of his
declaration). However, a restitutionary claim is not so confined. Cases
such as Kleinwort Sons & Co. v. Dunlop Rubber Co. (1907) 97 LT 263
are support for the proposition that a payment made by mistake of fact
can be the subject of a claim for repayment on restitutionary principles.
More recently the decision in Kleinwort Benson v. Lincoln City Council
[1999] 2 AC 349 has established that payments made on the basis of a
mistake of law can be recovered on the same basis.

58.    The relevant mistake is identified in paragraph 81 of the Claim as "the
erroneous assumptions that were contained in the transfer pricing
structure that prevailed within the Nortel group at the time".

59.    A restitutionary claim could be the subject of a defence of change of
position. However, this is a matter for the recipient to raise. As far as I
can see no such change of position defence has been advanced thus far.

60.    In the circumstances, a restitutionary claim appears to me to have been
properly raised as a matter of English law and to be capable of succeeding
at a trial.

(g) Transactions at Undervalue: Claim 27

61.    Claim number 27 involves a claim for the recovery of pre-petition sales
proceeds on the basis that they were transactions at undervalue and liable
to be reversed under section 238 of the Insolvency Act 1986.

62.    In his declaration, at paragraphs 122 to 125 Mr. Todd has set out the
various requirements of such a claim. At paragraphs 126 to 127 of his
declaration, he focuses on the two year time period within which the

relevant transaction needs to have occurred. He takes the view that, in relation to the only transactions identified, these took place more than two years prior to the onset of insolvency.

63.     In fact the dates that Mr. Todd has focused upon are the dates of execution and completion of an agreement for sale to Alcatel Lucent S.A. (see paragraph 79 of the Claim). From my reading of the Claim, however, the relevant transaction for section 238 purposes is the subsequent division of the proceeds derived from that sale. That appears to have occurred pursuant to a statement dated 24 July 2007 (see paragraph 80 of the Claim). This is well within two years of the onset of insolvency as stated in January 2009.

(h) Ex Turpi Causa Non Oritur Actio

64.     Mr. Todd refers to the defence of ex turpi causa non oritur actio in paragraphs 128 to 139 of his declaration and suggests that it is a complete answer to the claims made other than that in respect of a transaction at undervalue. The foundation for this is the decision of the House of Lords in Stone & Rolls v Moore Stephens [2009] 1 AC 1391. In very broad terms the defence involves the proposition that, as a matter of public policy, the court will not allow a claimant to found an action on its own illegality.

65.     I note that Mr. Todd provides what he considers to be a summary of the relevant principles to be derived from Stone & Rolls in paragraph 129 of his declaration. In that summary Mr. Todd states that the defence depends on attributing the knowledge of a wrongdoing director to the company and that this cannot occur where the wrong is done *to the company* but can occur where a claim is brought *against a third party* and the company needs to rely on the director's wrongdoing (paragraph 129(ii) and (iv) of the declaration). Even if one proceeded on this analysis (which I consider to be a substantial over-simplification for the reasons set out below), the defence could not, in my view, apply to the claims advanced by NNUK for breach of fiduciary duty and breach of duty of care against NNI based

on de facto or shadow directorship. These claims are not being advanced against a third party but against a director for a wrong done to the company and (insofar as the case is not put on the basis of breach of fiduciary duty by NNI itself) against an assistor or co-conspirator in breaches committed against the company by the company's directors.

66. In any event I consider Mr. Todd's summary to be a dangerous over-simplification for the following reasons:

66.1 Firstly, and importantly, there is no single uniform doctrine which is applicable in all contexts. As Lord Hoffmann explained in Gray v Thames Trains Ltd. [2009] 1 AC 1339, at 1370G:

> *"The maxim ex turpi causa expresses not so much a principle as a policy. Furthermore, that policy is not based upon a single justification but on a group of reasons, which vary in different situations. For example, as Beldam LJ pointed out in Cross v Kirby [2000] CA Transcript No. 321, para.74, in cases in which the court is concerned with the application of the maxim to property or contractual rights between two people who are both parties to an unlawful transaction: "it faces the dilemma that by denying relief on the ground of illegality to one party, it appears to confer an unjustified benefit illegally obtained on the other".*
>
> *In cases of that kind, the courts have evolved varying rules to deal with the dilemma: compare the approach of the House of Lords in Tinsley v Milligan [1994] 1 AC 340 with that of the High Court of Australia in Nelson v Nelson (1995) 184 CLR 538."*

This is an extremely important factor to bear in mind when considering cases such as Stone & Rolls where the claim was by a company against an innocent third party who was not alleged to have been involved in any illegality but was alleged to have acted

only negligently. The position is very different when considering a claim by a company against a principal wrongdoer whose wrongdoing involved a breach of duties whose purpose was to protect the company and its creditors.

66.2    Secondly, the process by which the knowledge and actions of a director can be attributed to a company, particularly where that director has a dual role (such as where he also acts for or is a director of another company) is much more complex than suggested in Mr. Todd's summary:

66.2.1    The process of attributing knowledge depends in part on various doctrines derived from agency theory, one of which involves the proposition that an agent who is obliged to disclose certain facts that have come to his knowledge must be treated as if he had discharged that obligation. However, as explained by Lord Justice Hoffmann (as he then was) in <u>El Ajou v. Dollar Land Holdings</u>, *supra*, at 157, *"...this is a rebuttable inference of fact"* and moreover there is no basis for a proposition that, in the absence of any duty on the part of a principal to investigate, information received by an agent otherwise than as agent can be imputed to his principal simply on the ground that the agent owed a duty to his principal to disclose it. In this regard Lord Justice Hoffmann referred to and followed the decision in <u>Re David Payne & Co. Ltd.</u> [1904] 2 Ch. 608. In agency theory it is also well established that an agent will not be treated as having any actual authority to act for his principal when he is in fact acting for his own benefit or seeking to defraud his principal.

66.2.2    The process of attributing knowledge and conduct may also depend on a separate doctrine concerned with identifying "the directing mind and will" of the company

for a particular transaction. This doctrine distinguishes between someone who is merely an agent or employee of the company and someone who can be identified with the company itself. This will usually be the board of the company but it may be a particular individual who can be treated as an organ of the company for the purposes of a transaction (see El Ajou v. Dollar Land Holdings, *supra*, at 159-160).

66.2.3    The case of Stone & Rolls was not concerned with the agency doctrines referred to in El Ajou. It was a case concerning the issue of whether a particular individual was the "directing mind and will" of a company and, if he was, there was some basis on which his actions should not be attributed to that company. The focus of the case then became what has been termed "the Hampshire Land principle", so-called by reference to the Court of Appeal decision in Re Hampshire Land Co. [1896] 2 Ch. 743; the principle being that knowledge and conduct of a director should not be attributed to the company where the company is the victim of his wrongdoing. Lord Walker (giving one of the majority judgments) accepted that the principle applied to prevent the knowledge and conduct of a director being attributed to a company where the purpose of obligation imposed was to protect the company itself and its creditors (see in particular his analysis of the decision in Belmont Finance Corpn. v. Williams Furniture Ltd. [1979] Ch. 250 in his judgment at 1484B-1485F). However, he held that it did not apply in Stone & Rolls as in that case the company was a "one-man company" and the duty of the auditors which was alleged to be breached was not for the protection of creditors but for the protection of the company as whole (meaning its existing shareholders) and, this being a "one man company", all the

shareholders were complicit in the wrongdoing (see the judgment at 1494F-H and 1502B-C).

66.3    Thirdly, the process of identifying a "one-man company" is by no means easy. On the facts of <u>Stone & Rolls</u> the point was virtually conceded as it was agreed that the relevant wrongdoing director was as completely identified with the company as it was possible for a human agent to be. He was the sole beneficial owner and there were no independent or innocent directors (see the judgment of Lord Brown, at 1503H). Lord Walker, however, observed that in many other cases the position will not be so straight forward and it would then be necessary to ask whether *"it would be contrary to justice and common sense to treat the company as complicit"* (at 1502E).

66.4    Fourthly Mr. Todd's summary wholly omits the need for a close causal nexus between illegal conduct and the claim being advanced. The need for such a close nexus has been repeatedly emphasised in a number of cases since <u>Stone & Rolls</u>[30]. Mr. Todd does, however, later refer to the need to show that the claimant has to plead or rely on his own illegality later in his declaration, at paragraph 132.

67.    Mr. Todd goes on in his declaration to conclude that NNUK was a "one-man company" and that the actions and conduct of NNI and NNL and perhaps NNC and other companies in the Nortel group are to be treated as those of NNUK so that the decision in <u>Stone & Rolls</u> can be applied. Quite apart from the fact that this analysis is in my view simplistic and ignores the need to investigate the position of the individuals on the NNUK board, it also overlooks the context of the claims in this case. This is not a case in which NNUK is claiming recovery from an innocent third party for the ultimate benefit of creditors

---

[30] See, for example, <u>Nayyar v Denton Wilde Sapte</u> [2009] EWHC 3218 (QB), paras. 79-82; <u>Lexi Holdings Plc v. DTZ Debenham Tie Leung Ltd.</u> [2010] EWHC 2290 (Ch); and <u>Lilly Icos LLC v 8PM Chemists Ltd.</u> [2009] EWHC 1905 (Ch), para.281.

when that third party owed no relevant duty to protect creditors' interests (as in <u>Stone & Rolls</u>). This is a claim for breaches of fiduciary duty as well as other causes of action where the wrongdoer was obliged to protect the interests of the company and its creditors. It is accordingly a very similar type of case to that of <u>Belmont Finance</u>[31], a case treated as rightly decided in <u>Stone & Rolls</u>. In my view, the ex turpi causa defence is misconceived for this reason. Once again I emphasise that matters of procedure are for the forum and not for determination as a matter of English law. However, if for any reason it is relevant, I would add that, in my view, not only would an English court refuse to strike out any part of the basis of this alleged defence, but on the contrary there would be realistic prospect that this supposed defence would be struck out as disclosing no reasonable grounds for defending the Claim.


### (3) Other Points raised in Mr. Todd's Declaration

68.   Mr. Todd refers to orders made by the English court placing nineteen of Nortel's European affiliates, including NNUK, into administration. He expresses the view, at paragraph 141, of his declaration, that this is tantamount to a finding that the EMEA Debtors were managed and controlled from England. Presumably this assertion is designed to support his conclusion that NNI was not a de facto or shadow director.

69.   I disagree with Mr. Todd that the decision of the English court that the centre of main interests of the EMEA Debtors was England for the purposes of the administration orders is of any significance to the present proceedings. That decision did not involve the court specifically considering or determining any issues regarding the status or involvement

---

[31] In <u>Belmont</u> its directors, apparently in collusion with shareholders in another company (Maximum), agreed on behalf of Belmont to buy Maximum for £500,000 when it was said to be worth little more than £60,000. In the next stage of the scheme the ex-Maximum shareholders, with the money supplied by Belmont then bought all the shares in Belmont for £498,000. This involved an offence under s.54 of the Companies Act 1948 which contained prohibitions on a company financing the purchase of its own shares. As Lord Walker explained in <u>Stone & Rolls</u>, at 1485, the directors of Belmont breached their fiduciary duty by causing a breach of s.54 and the real victims were creditors of Belmont.

of NNI. Nor does it create any binding determination as between the parties to these proceedings. Under Council Regulation (EC) No.1346/2000, Article 3(1), the place of the registered office of a company is presumed to be the centre of main interests in the absence of proof to the contrary. This remains the case even in cases where *"its economic choices are or can be controlled by a parent company"* and the position is only likely to be different if it is a "letterbox" company which carries on no business in the state in which its registered office is situate (see <u>Re Eurofood IFSC Ltd.</u> [2006] Ch. 508, at 541-542).

## Conclusion

70.  For the reasons already set out above, I consider each of the allegations in the Claim said to be governed by English law and the subject of review by Mr. Todd, to be ones that could potentially succeed at trial on the facts as set out in the Claim. I do not consider that the ex turpi causa defence is sustainable on the basis of the analysis provided by Mr Todd in his declaration.


I declare, under penalty of perjury of the law of the United States of America that the foregoing is true and correct.

Executed this *13* th day of *September*  2011

In London, England

Philip Marshall QC

# Exhibit A
## Résumé of Mr. Philip Marshall Q.C.

# serle court





# Philip Marshall QC

**Year of Call:**
1987

**Year of Silk:**
2003

**Qualifications:**
MA (First Class), Queens' College, Cambridge (Squire Scholar)
LLM, Harvard University (Kennedy Scholar)
Fellow, Queens' College Cambridge, 1989-1993

Lincoln's Inn;  Denning Scholar 1987

**Appointments**

Deputy High Court Judge - Chancery Division & Queen's Bench Division - 2009
Recorder - 2008
Member of the Panel in The London Court of International Arbitration
Member of The Chartered Institute of Arbitrators

**Main Areas Of Work:**
General commercial and chancery litigation, in particular:

- Commercial fraud (particularly international fraud)
- Insolvency
- Commercial litigation (including arbitration)
- Company law
- Banking
- Professional negligence

**Recommendations:**
Classified in Chambers & Partners as one of "the Stars at the Bar"

**Recommended for**:

Banking & Finance, Commercial Chancery, Commercial Dispute Resolution, Company, Fraud: Civil, Insolvency, Professional Negligence *(Chambers & Partners* )

# serle court



Banking and finance, Commercial litigation, Company, Fraud: civil, Insolvency, International arbitration, Professional negligence (*Legal 500*)

Commercial Litigation, Company, Fraud (asset recovery), Insolvency and corporate reconstruction (*Legal Experts)*

Recently The Times 'Lawyer of the week' for work on Lexi Holdings v. Luqman (a major fraud case).

**Quotes:**
From Chambers & Partners and The Legal 500

**For Fraud cases**:

*"...is highly regarded for his 'confident and robust advocacy coupled with first-rate analytical skills'"*
*"...one of the best - it's like sending in the Marines!"*

*"...always displays star quality"*

*"...clearly one of the leading figures in the fraud world"*

*"...a formidable cross-examiner"*

*"...a team player with a ferocious appetite for work"*

**For Insolvency:**

*"...outstanding on his feet"*
*"...one of the best advocates of his generation"*

*"...a tough but user-friendly advocate who certainly fights his clients' corners"*

**For Commercial Litigation:**

*"...has strong analytical skills, but is first and foremost a very strong advocate - someone to turn to for a tough litigation fight."*
*"...tough and combative"*

*"...first class .... we won everything with him"*

**For Company Law:**

*"...a strong analytical lawyer - if you need something difficult done, he is the guy to do it"*

**For Banking:**

*"...impressive knowledge, courtroom gravitas and genuine standing"*

**For Professional Negligence:**

*"...a very strong and confident advocate"*

# serle court



*"...outstanding advocate"*

*"...punchy, creative and user-friendly, and a tough negotiator when necessary"*

**Additional Information:**

- Speaker for C5 International Fraud Conferences
- Speaker and Chair for Lexis Nexis International Fraud Conferences
- Speaker for R3; Insolvency Lawyers' Association; Chancery Bar Association; Television Education Network (legal)
- Legal Commentator for Sky News
- Bencher, Lincoln's Inn

**Cases of Note:**

*JSC BTA Bank v Ablyzov*: International fraud claim for in excess of $1billion. Issues in respect of freezing relief and jurisdiction.

*Lexi Holdings v Lugman*: International fraud claim for £155m. Involved applications for freezing and search orders as well as two committal hearings. Reported decisions on director's fiduciary obligations and interaction between civil orders and restraint orders.

*AWG v Morrison*: Multi-million pound Fraud claim against directors regarding profit forecast following take over of Morrison by AWG. Acted for former Chief Executive of Morrison.

*Zakharov v White*: International fraud claim; established principles for issue of bench warrants in civil proceedings.

*Rabobank v National Westminster Bank*: Fraud, misrepresentation and unlawful interference claims arising out of banking syndicate in respect of losses exceeding £200m.

*MT Realisations v Digital Equipment*: Company action regarding claim for breach of section 151 of the Companies Act 1985. Reported decisions at first instance and in the Court of Appeal.

*Lexi Holdings v Pannone* - £40m professional negligence claim against solicitors arising out of collapse of Lexi Holdings.

*Canada Trust Co v Stolzenberg* International fraud action for recovery of over $250m, issues on jurisdiction under Brussels/ Lugano Conventions, operation of worldwide Mareva orders.

Three reported decisions in the Court of Appeal and one in the House of Lords:

*Berry Trade v Moussavi* International fraud action; including search and freezing order and committal applications. Trial involving issues of private international law and foreign law.

*Re Murjani*: bankruptcy, international asset recovery; trustee in bankruptcy's inquisitorial powers; contempt proceedings.

# serle court



*Haig v Aitken bankruptcy*: extent of estate; human rights issues

*Cala Cristal v Al-Borno* international fraud action; operation of worldwide Mareva orders, conflict of laws, law of agency.

*Bishopsgate Investment Management v Maxwell* International insolvency investigation, privilege against self-incrimination.

*Wahda Bank v Arab Bank* banking action, conflict of laws re performance bonds.

*Al Fayed v Commissioner of Police*: Wrongful arrest case; issues of professional privilege and impact of earlier civil action.

*Re Hare Wines Ltd*: Insolvency, interaction between confiscation orders under the Criminal Justice Act 1988 and insolvency legislation.

*Peach Publishing v Slater*: Professional negligence / breach of warranty action.

*Goose v Wilson Sandford* fraud/professional negligence action, joint venture, constructive trust claims.

**Memberships:**
Chancery Bar Association (former committee member)
Insolvency Lawyers Association
Commercial Bar Association
Chartered Institute of Arbitrators
The London Court of International Arbitration

**Publications:**
Editor, *The Practice and Procedure of the Companies Court* (LLP, October 1997)
Office Holder's Inquisitional Powers, their uses and limits (1997) Insolvency Law & Practice 66
Contributory Negligence - A Viable Defence for Auditors (1990) LMCLQ 416
Auditors' Duties - A Narrow Approach (1990) LMCLQ 478

**Languages:**
French

**VAT Number:**
524153180

Philip Marshall QC appears on the BSB register as Philip Scott Marshall QC.

# Exhibit B
## Companies Act 2006
## Sections 170 to 177

CHAPTER 2

GENERAL DUTIES OF DIRECTORS

*Introductory*

**170    Scope and nature of general duties**

(1)    The general duties specified in sections 171 to 177 are owed by a director of a company to the company.

(2)    A person who ceases to be a director continues to be subject —

    (a)    to the duty in section 175 (duty to avoid conflicts of interest) as regards the exploitation of any property, information or opportunity of which he became aware at a time when he was a director, and

    (b)    to the duty in section 176 (duty not to accept benefits from third parties) as regards things done or omitted by him before he ceased to be a director.

To that extent those duties apply to a former director as to a director, subject to any necessary adaptations.

(3)    The general duties are based on certain common law rules and equitable principles as they apply in relation to directors and have effect in place of those rules and principles as regards the duties owed to a company by a director.

(4)    The general duties shall be interpreted and applied in the same way as common law rules or equitable principles, and regard shall be had to the corresponding common law rules and equitable principles in interpreting and applying the general duties.

*Companies Act 2006 (c. 46)*
*Part 10 — A company's directors*
*Chapter 2 — General duties of directors*

79

(5)  The general duties apply to shadow directors where, and to the extent that, the corresponding common law rules or equitable principles so apply.

*The general duties*

**171  Duty to act within powers**

A director of a company must—

(a)  act in accordance with the company's constitution, and

(b)  only exercise powers for the purposes for which they are conferred.

**172  Duty to promote the success of the company**

(1)  A director of a company must act in the way he considers, in good faith, would be most likely to promote the success of the company for the benefit of its members as a whole, and in doing so have regard (amongst other matters) to—

(a)  the likely consequences of any decision in the long term,

(b)  the interests of the company's employees,

(c)  the need to foster the company's business relationships with suppliers, customers and others,

(d)  the impact of the company's operations on the community and the environment,

(e)  the desirability of the company maintaining a reputation for high standards of business conduct, and

(f)  the need to act fairly as between members of the company.

(2)  Where or to the extent that the purposes of the company consist of or include purposes other than the benefit of its members, subsection (1) has effect as if the reference to promoting the success of the company for the benefit of its members were to achieving those purposes.

(3)  The duty imposed by this section has effect subject to any enactment or rule of law requiring directors, in certain circumstances, to consider or act in the interests of creditors of the company.

**173  Duty to exercise independent judgment**

(1)  A director of a company must exercise independent judgment.

(2)  This duty is not infringed by his acting—

(a)  in accordance with an agreement duly entered into by the company that restricts the future exercise of discretion by its directors, or

(b)  in a way authorised by the company's constitution.

**174  Duty to exercise reasonable care, skill and diligence**

(1)  A director of a company must exercise reasonable care, skill and diligence.

(2)  This means the care, skill and diligence that would be exercised by a reasonably diligent person with—

(a)  the general knowledge, skill and experience that may reasonably be expected of a person carrying out the functions carried out by the director in relation to the company, and

80

*Companies Act 2006 (c. 46)*
*Part 10 — A company's directors*
*Chapter 2 — General duties of directors*

(b)   the general knowledge, skill and experience that the director has.

## 175   Duty to avoid conflicts of interest

(1)   A director of a company must avoid a situation in which he has, or can have, a direct or indirect interest that conflicts, or possibly may conflict, with the interests of the company.

(2)   This applies in particular to the exploitation of any property, information or opportunity (and it is immaterial whether the company could take advantage of the property, information or opportunity).

(3)   This duty does not apply to a conflict of interest arising in relation to a transaction or arrangement with the company.

(4)   This duty is not infringed—
    (a)   if the situation cannot reasonably be regarded as likely to give rise to a conflict of interest; or
    (b)   if the matter has been authorised by the directors.

(5)   Authorisation may be given by the directors—
    (a)   where the company is a private company and nothing in the company's constitution invalidates such authorisation, by the matter being proposed to and authorised by the directors; or
    (b)   where the company is a public company and its constitution includes provision enabling the directors to authorise the matter, by the matter being proposed to and authorised by them in accordance with the constitution.

(6)   The authorisation is effective only if—
    (a)   any requirement as to the quorum at the meeting at which the matter is considered is met without counting the director in question or any other interested director, and
    (b)   the matter was agreed to without their voting or would have been agreed to if their votes had not been counted.

(7)   Any reference in this section to a conflict of interest includes a conflict of interest and duty and a conflict of duties.

## 176   Duty not to accept benefits from third parties

(1)   A director of a company must not accept a benefit from a third party conferred by reason of—
    (a)   his being a director, or
    (b)   his doing (or not doing) anything as director.

(2)   A "third party" means a person other than the company, an associated body corporate or a person acting on behalf of the company or an associated body corporate.

(3)   Benefits received by a director from a person by whom his services (as a director or otherwise) are provided to the company are not regarded as conferred by a third party.

(4)   This duty is not infringed if the acceptance of the benefit cannot reasonably be regarded as likely to give rise to a conflict of interest.

*Companies Act 2006 (c. 46)*
*Part 10 — A company's directors*
*Chapter 2 — General duties of directors*

81

(5) Any reference in this section to a conflict of interest includes a conflict of interest and duty and a conflict of duties.

**177  Duty to declare interest in proposed transaction or arrangement**

(1) If a director of a company is in any way, directly or indirectly, interested in a proposed transaction or arrangement with the company, he must declare the nature and extent of that interest to the other directors.

(2) The declaration may (but need not) be made—
    (a) at a meeting of the directors, or
    (b) by notice to the directors in accordance with—
        (i) section 184 (notice in writing), or
        (ii) section 185 (general notice).

(3) If a declaration of interest under this section proves to be, or becomes, inaccurate or incomplete, a further declaration must be made.

(4) Any declaration required by this section must be made before the company enters into the transaction or arrangement.

(5) This section does not require a declaration of an interest of which the director is not aware or where the director is not aware of the transaction or arrangement in question.
For this purpose a director is treated as being aware of matters of which he ought reasonably to be aware.

(6) A director need not declare an interest—
    (a) if it cannot reasonably be regarded as likely to give rise to a conflict of interest;
    (b) if, or to the extent that, the other directors are already aware of it (and for this purpose the other directors are treated as aware of anything of which they ought reasonably to be aware); or
    (c) if, or to the extent that, it concerns terms of his service contract that have been or are to be considered—
        (i) by a meeting of the directors, or
        (ii) by a committee of the directors appointed for the purpose under the company's constitution.