## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **NORTEL NETWORKS, INC.,** | **Case No. 09-10138 (KG)** |
| **Debtor** | **Jointly Administered** |

### DECLARATION OF JOHN HENNESSY SC IN OPPOSITION TO
### THE JOINT OBJECTION AND MOTION TO DISMISS THE CLAIMS
### OF NORTEL NETWORKS IRELAND

**I, John Hennessy SC**, hereby declare pursuant to 28 U.S.C. § 1786 as follows:

### A. BACKGROUND

1. My educational background and professional experience qualify me to address the Court on the Irish law issues discussed in this declaration. I was called to the Irish Bar in 1998, and called to the Inner Bar (appointed Senior Counsel) in 2008. I have practised full time at the Irish Bar since 1998, principally in the areas of Commercial, Chancery and Insolvency Law and in the area of professional negligence.

2. Prior to 1998 I was in practice as a professional accountant. I qualified as a Chartered Accountant in 1982 and worked in the areas of audit and business consultancy in Arthur Andersen from 1979 to 1997. I was a member of the worldwide Arthur Andersen partnership from 1991 until I resigned to commence practice at the Bar. I was a founding member of the Auditing Practices Board, representing the Irish accountancy profession on the body that sets auditing standards for the UK and Ireland, and I served on a variety of technical accounting and auditing committees in the Institute of Chartered Accountants in Ireland.

3. I am a non-executive director and Chairman of an Irish publicly quoted company, CPL Resources plc, and I am also a member of that company's audit committee. I am also a Fellow of the Chartered Institute of Arbitrators, and an accredited mediator. I am graduate of Trinity College Dublin, where I obtained an honours degree in Mathematical Sciences. I am also a graduate of King's Inns, where I obtained a BL degree.

### B. SCOPE OF THIS DECLARATION

4. I have been retained by Herbert Smith LLP, the solicitors acting on behalf of Alan Robert Bloom and David Martin Hughes in their capacity as the court-appointed administrators and authorised foreign representatives of Nortel Networks (Ireland) Limited (hereafter "*NN Ireland*"). I am being compensated at a rate of €600 per hour (plus VAT) which is my customary hourly rate. No part of my compensation for performing this work is contingent upon the results of my work or on the outcome of the Motion to Dismiss the Claims of NN Ireland.

5. I have been asked to reply to the Declaration of Aidan Redmond SC executed on 21 July 2011 (hereafter "*the Redmond Declaration*") which sets out the expert opinion of Aidan Redmond SC on the principles of Irish law arising in respect of certain of the legal claims that NN Ireland asserts against Nortel Networks, Inc. (hereafter "*NNI*").

6. In so doing, I have based what is set forth in this Declaration upon my opinions, experience and knowledge, the decisions of the Courts set out herein and the facts derived from the Proof of Claim filed by NN Ireland dated 3 June 2011 (hereafter "*the Proof of Claim*"). I should add that I have assumed the factual allegations set out in the Proof of Claim to be true and accurate.

7. I agree with paragraph 5 of the Redmond Declaration that, insofar as there is reference herein to decisions of the Superior Courts in England and Wales, these decisions (where there is no specific constitutional or statutory divergence) are of persuasive authority. Indeed, as noted in **Byrne & McCutcheon on the Irish Legal System**[1], as recently as 1994, the High Court (Costello J) held that the English authorities are of "*persuasive weight and should not lightly be ignored,*"[2] and the authors noted that implicit in the judgment of the High Court is that "*such* [English] *authority should be followed unless it is shown to be wrongly decided*". Accordingly, where there is no authority of an Irish court on a specific matter, decisions on the same issue by the courts of England and Wales will be regarded as persuasive and, unless distinguishable, will normally be followed by an Irish court.

8. For ease of reference, following the introductory section immediately below, I propose to follow the headings set out in the Redmond Declaration. For the sake of clarity, I should add that where possible I have cross-referenced paragraphs in the Redmond Declaration by use of the initials "*RD*" together with the appropriate paragraph number.

## C. INTRODUCTION

### General

9. It is clear from the Proof of Claim that several (although not all) of the elements of the claims are based on assertions as to Irish law. This declaration seeks to address issues of Irish law that arise in the Proof of Claim and that appear, from the Redmond Declaration, to be in dispute. It does not seek to address or comment upon issues of the law of any other jurisdiction. Where I am in agreement with material elements of the Redmond Declaration, I state my agreement. Accordingly, where I do not address any issue of Irish law, I should not be taken to agree with or accept any statement made in the Redmond Declaration pertaining to that issue.

### Directors and Fiduciary Duties generally

10. A significant number of the claims in the Proof of Claim refer, explicitly or implicitly, to allegations that NNI breached fiduciary duties that it owed to NN Ireland, and that those fiduciary duties arose due to the status of NNI as a de facto director and/or a

---

[1] Fifth Edition, 2009, p437
[2] MMcC –v- JMcC [1994] 1 293 at 303

shadow director of NN Ireland.  I deal below with these issues as they have been addressed in the Redmond Declaration.  However, it is helpful first to consider the overriding issues that arise in relation to this important aspect of the Proof of Claim.

11. The principal questions that arise in considering these aspects of the Proof of Claim are:

   (i)     Can a company be a de facto director?
   (ii)    If yes, was NNI a de facto director of NN Ireland?
   (iii)   If yes, does a de facto director owe fiduciary duties to the company?
   (iv)    Was NNI a shadow director of NN Ireland?
   (v)     If yes, does a shadow director owe fiduciary duties to the company?

12. Of these questions, the answer to (iii) does not appear to be in dispute.  In my view, and based on the relevant authorities, it cannot be seriously contended that a de facto director of a company does not owe fiduciary duties to the company, and I note that paragraph 36 of the Redmond Declaration seems to concede this point.  If there remains any dispute on the matter, in my view it is necessary only to look to the statutory definition of a director, as follows:

" '*director' includes any person occupying the position of director by whatever name called*".[3]

In my view this definition captures those who are, in reality, directors, even if not validly appointed – i.e. de facto directors.

13. Questions (ii) and (iv) above depend for their answers on matters of fact.  Indicia and characteristics of de facto and shadow directorship have been discussed in a variety of cases, and of course there is a statutory definition of the term '*shadow director*' in Section 27 of the Companies Act 1990.  It is a matter for a Court or other tribunal to make determinations of fact and then to evaluate whether those facts as found, when taken together, are such as to give rise to a de facto and/or shadow directorship.  However, on the assumption that the facts pleaded in the Proof of Claim are true, in my view an Irish court would be satisfied that those facts were sufficient to establish on the balance of probabilities (the test applied for this purpose by the Irish courts) that NNI was both a de facto director and a shadow director of NN Ireland.

14. It has been suggested that '*de facto director*' and '*shadow director*' are mutually exclusive terms, and therefore that if a person is a shadow director that person cannot also be a de facto director (and vice versa).  In my opinion this view is not correct, and is not in accordance with the developing jurisprudence.  In my view there is, as a matter of first principle, significant overlap between the two concepts.  Both involve persons who are not formally appointed as directors, but who exercise significant roles in the direction of the business of the company.  It may, at the level of theory, be possible to describe a person who has more of the characteristics of a de facto director than those of a shadow director, or vice versa.  However, at a practical level, if a

---

[3] Section 2(1) Companies Act 1963

person who was not a validly appointed director was habitually exercising significant influence on the decisions being made by a Board of Directors, it would be very difficult to conclude that that person was one and not the other.

15. More importantly, in my view, if a Court were faced with the necessity of determining as a matter of law whether the terms '*de facto director*' and '*shadow director*' were mutually exclusive, the Court would pay particular attention to the raison d'être for the two concepts and the mischief that they are designed to address. The Court would be likely to conclude that both concepts have been developed essentially to achieve the same purpose – that a person should not be able to escape the responsibilities associated with being a company director solely because, whether through inadvertence or design, that person has not been validly appointed. Viewed in this way, the Court would be likely to conclude that the enactment of Section 27 of the Companies Act 1990 was for the purpose of recognising in express terms a concept anticipated by Section 2(1) of the Companies Act 1963 and by the common law – i.e. that important consequences of directorship (e.g. unlimited civil liability for the debts of the company in cases of fraudulent or reckless trading[4]) cannot be avoided by a person who, although not a de jure director, exercises the necessary degree of influence on such directors.

16. Furthermore, recent English decisions (which, as stated above, would be regarded as persuasive by an Irish court) have made it clear that a clear distinction between shadow directors and de facto directors can no longer be maintained.[5]

17. I am therefore of the view that, although there has been no judicial determination of the point to date in Ireland, it is likely that a Court would find that there is a significant overlap between the concepts of de facto and shadow director.

18. Furthermore, it is not at all unlikely that a Court would find that the concept of shadow director is a subset of the concept of de facto director – i.e. that every shadow director is a de facto director. Such a finding would, of course, lead inevitably to the conclusion that every shadow director owes the ordinary fiduciary duties of any director to the company in question. It would also lead to the conclusion, in response to question (i) above, that a company can be a de facto director, since it is already the case, as held by the Supreme Court in *Worldport* (and as acknowledged in the Redmond Declaration) that a company can be a shadow director. In this regard, it is noteworthy that there is no Irish authority to support the proposition that a company cannot be a de facto director (indeed, as noted below at paragraphs 30-31, I consider that a company can be a de facto director under Irish law).

19. Further, there is no Irish authority that establishes whether or not a shadow director *per se* can owe fiduciary duties to the company in question. However, the recent jurisprudence in the superior courts in England advancing the proposition that shadow directors can owe fiduciary duties would – if presented to an Irish court – be

---

[4] Section 297A of the Companies Act, 1963 as inserted by Section 138 of the Companies Act 1990
[5] See, for example, *Re Mea Corporation Limited; Secretary of State for Trade and Industry –v- Aviss & Others* and *Revenue and Customs Commissioners –v- Holland* referred to later in this declaration

persuasive authority for this proposition.[6]  As stated above, a shadow director who is also a de facto director must owe such duties, and it would seem illogical and potentially unjust to ascribe fiduciary duties to one shadow director, and not to another.  Again, in my view a Court addressing this issue would have regard to the mischief being addressed by the concept of 'shadow director', and is likely to conclude that it would be entirely inconsistent to exempt from fiduciary duties a person who is, for example, made liable, by statute, without limitation, for the liabilities of the company where that person was '*knowingly a party to the carrying on of any business of the company in a reckless manner*'.[7]

20. In my view, the trend, both in the case law and in statute, is towards equating the terms director, de facto director, and shadow director, at least insofar as fiduciary duties are concerned.  In this regard it is worth observing the development of the statutory position in Ireland regarding the duties of directors.  The Company Law Review Group (hereafter "*CLRG*") is a body created pursuant to statute[8] for the purpose of, inter alia, preparing draft legislation consolidating and, in certain respects, reforming company law in Ireland.  The CLRG has published the "*general scheme of the new Companies Bill*" and expects that the drafting of the legislation will be completed in 2012.  The general scheme lists the fiduciary duties owed by directors to their companies, and makes it clear that the definition of 'director' for this purpose is to include de facto directors and shadow directors.

21. In conclusion, and by way of response to the questions posed above, in my view, under Irish law:

- a company can be a de facto director (see paragraphs 30-31 below);
- a de facto director of a company owes fiduciary duties to the company; and
- a shadow director owes fiduciary duties to the company.

22. Furthermore, in my opinion if the allegations in the Proof of Claim are assumed to be true, they are of the kind that are likely to persuade an Irish court that NNI was a de facto and/or shadow director of NN Ireland.

23. I now proceed to address specific matters raised in the Redmond Declaration in the order in which they appear in that declaration.

## D.  LEGAL ANALYSIS OF THE CLAIMS OF NN IRELAND

### 1)  BREACH OF FIDUCIARY DUTY (Claims 2, 8, 18 and 24)

24. The Redmond Declaration (at RD9 and RD10) summarises this aspect of the Proof of Claim by stating:

   a) First, that the allegation made by NN Ireland in the Proof of Claim is that NNI owed fiduciary duties to NNI Ireland due to the involvement of NNI's

---

[6] See, for example, *Yukong Line Ltd. –v- Rensberg Investment Corporation of Liberia*, referred to later in this declaration, in which a shadow director was held to owe fiduciary duties to the company
[7] Section 297A of the Companies Act 1963, which applied in the course of the winding up of a company
[8] Part VII Company Law Enforcement Act, 2001

directors, officers and senior employees in the decision-making function of
NN Ireland; and

   b) Second, that in the factual background section to the Proof of Claim, it is
"*simply*" alleged that the Nortel Group's operations were highly centralised
and on a general basis maintained primarily by NNC and NNL (hereafter "*the
Canadian Entities*") and that NNI was involved in jointly controlling certain
aspects of the Group's operations with the Canadian Entities (RD10).

25. The Redmond Declaration concludes (at RD11) that, as pleaded in the Proof of Claim,
the claims of NN Ireland that NNI breached a fiduciary duty owed to NN Ireland (as a
de facto or shadow director) are not well made out in accordance with established Irish
law.

26. I do not agree with this view.

27. At the outset, I would note that the factual background underlying the allegations of
breach of fiduciary duty contained in the Proof of Claim are set out in detail over 21
pages and 71 paragraphs in the Proof of Claim. However, the question of whether, as
a matter of pleading, those sections of the Proof of Claim are sufficient is a matter of
US law. Whilst I note that the Redmond Declaration offers views on the extent of the
pleadings[9], I believe such to be outside the scope of this declaration.

   a) **De Facto Directorship**

     *1.    Can a company be a de facto director?*

28. The central tenet of the Redmond Declaration concerning the claim that NNI acted as
a de facto director of NN Ireland is that a company could not assume the role of de
facto director of NN Ireland.

29. It is correct that Section 2(1) of the Companies Act 1963 ("*the 1963 Act*") defines the
term "*director*" as including any "*person*" occupying the position of director by
whatever name called and that, in turn, Section 176 of the 1963 Act provides (as set
out at RD14) that a company shall not have a body corporate as a director. It does not
follow from the prohibition in relation to *de jure* directors that the same applies in
respect of de facto directors. Indeed, as I explain below, it could be a consequence of
a company acting as a director that it will be held to be a de facto director.

30. The Redmond Declaration also quotes from **Lynrowan**, a decision of the High Court
in Ireland, and relies on the reasoning in that decision to assert that an Irish Court
would be unlikely to conclude that a corporate entity could be a de facto director.
However, the decision in **Lynrowan** was not directed to the issue as to whether a
company could be a de facto director; rather it concerned an application to restrict an
individual who had not been validly appointed but was alleged to have acted in the

---

[9] RD11, RD17, RD22, RD45, RD47, RD53, RD73-75, RD94, RD100 and RD 103.

capacity of director. Accordingly, in my view the characteristics of de facto directorship identified by O'Neill J in *Lynrowan* and listed in the Redmond Declaration (which characteristics have themselves been subject to some criticism – see *Courtney*[10]) are not directly applicable to a situation where a company has acted in the manner of a director. In light of the recent English authority of *Re Mea Corporation* (referred to below), it is my view that – in determining whether a person acted as a de facto director or a shadow director or both – an Irish court would consider a number of factors including the extent to which a person exercised influence in the corporate affairs of a company (see also *Revenue and Customs Commissioners –v- Holland [2010] 1 WLR 2793*).

31. It is also accepted that there is no statutory definition of a de facto director and that it is a concept which has developed through case law. For this reason, the concept of de facto director is something which has been considered by the Irish courts but has not lent itself to a hard-and-fast definition. The Redmond Declaration relies in part upon the commentary contained in Dr. Courtney's textbook on the *Law of Private Companies (Second Edition)*, which refers to de facto directors being persons occupying the position of director but not formally appointed as directors. However, insofar as NN Ireland has made the case that NNI acted as a de facto director (in reliance upon the factual background and particulars contained in the Proof of Claim), in my view there is nothing contained in the Courtney commentary which would prevent a corporate entity (such as NNI) from being a de facto director of NN Ireland. Furthermore, it can readily be argued that the prohibition on having a body corporate as a de jure director could give rise to a situation where a company, while acting in all material respects as a director of another company, is prevented from being appointed by the statutory prohibition and is, therefore, a de facto director.

32. In the Proof of Claim (at paragraphs 87 and 88), NN Ireland pleads the case that:

   a) The directors, officers and senior employees of NNI were involved with the direction of the affairs of NN Ireland;
   b) The directors, officers and senior employees of NNI undertook the decision-making function in respect of NN Ireland (as set out in Section D);
   c) NNI was involved in all decision-making in relation to the transfer pricing arrangements and tax and treasury matters.

33. On foot of the foregoing, the Proof of Claim pleads that NNI *"assumed the role"* of a de facto director (and/or shadow director) of NN Ireland (a) in relation to tax and treasury matters and (b) in relation to NN Ireland's participation in the RPSM. I disagree with the assertion in the Redmond Declaration that NN Ireland has failed *"to provide any explanation or elucidation for"* the allegation that NNI was a de facto director (and/or a shadow director) of NN Ireland. In my view, as a matter of pleading, the details set out in the Proof of Claim would be sufficient within the Irish

---

[10] Second Edition, pages 422, 424. In so determining, O'Neill J in Lynrowan followed the test of Mr Timothy Lloyd QC in Re Richborough Furniture Ltd. However, *Courtney* notes that, notwithstanding its approval by O'Neill J (reflected in the quoted passage in the Redmond Declaration) it is *"thought not to be a correct test for the finding that a person was, or was not, a de facto director"*. Furthermore, *Courtney* comments that "it is thought to be erroneous to say that to be a de facto director a person must either have sole charge of the affairs of a company or that he was on equal footing with the de jure directors".

legal system to support the allegation, although, as previously indicated, their sufficiency in pleading terms for the purposes of the claim is a matter of US law and outside the scope of this declaration.

34. From my review of the Proof of Claim, I note that it is pleaded that these relevant functions were director-level decisions. While this is ultimately a question of fact, I am satisfied that an Irish court is likely to conclude that the relevant functions undertaken by NNI as pleaded in the Proof of Claim could properly only have been discharged by a director or directors of NN Ireland, and not merely by management, and accordingly the carrying out of those functions by NNI is an indicator of a de facto directorship on the part of NNI.

### 2.   Is "holding out" a necessary ingredient of de facto directorship?

35. There is a suggestion in the Redmond Declaration that a person must be held out, by the company or by the person, as a director in order to be a de facto director. If and to the extent that this assertion is made, I disagree with it. Undoubtedly, the holding out as a director of a person not validly appointed may be an indicator of a de facto directorship; it cannot, however, be a prerequisite for same. The term must be broad enough to include persons who act as directors, regardless of how forthcoming those persons, or their companies, are as to their formal status. Indeed, *Courtney* implicitly acknowledges this when, after listing the example indicia of de facto directorship reproduced in the Redmond Declaration (RD18), he remarks: "*The foregoing is a non-exhaustive list of some of the circumstances in which it is thought that a recalcitrant (or indeed desirous) person may be found to be (or to have been) a de facto director.*" (Emphasis added.) In addition, the recent decision of the Supreme Court in England in *Revenue and Customs Commissioners –v- Holland [2010] 1 WLR 2793* Lord Collins supports this view as follows:

*But although in In re Hydrodam Millett J used expressions such as "held out as a director" and "claims and purports to be a director", it has been held that although these were relevant factors, they were not necessary factors, and he could not have meant that the label "director" had to have been attached to the person or that he be held out as a director.*

36. Indeed, in light of the foregoing and the pleas contained in the Proof of Claim that NNI assumed the role of shadow and/or de facto director, NN Ireland's allegations accord precisely with the decision of Finlay Geoghegan J in *Re First Class Toy Traders Ltd: Gray v McLoughlin (High Court, 9 July 2004)* where the learned Judge stated that:

*[E]ssentially a de facto director is a person who assumes to occupy the position of a director or assumes to act as a director of the company.*

### 3.   Are de facto and shadow directorship mutually exclusive?

37. The Redmond Declaration (RD22) states that "*Nortel Ireland's allegations that Nortel Networks Inc. acted covertly as a shadow director render its allegation that it also acted as de facto director of Nortel Ireland unsustainable in Irish law*". The Redmond Declaration appears to rely (RD16) upon the English decision of *Re Hydrodam* in

support of the proposition that the terms "*shadow director*" and "*de facto director*" do not overlap and in most and perhaps all cases are mutually exclusive. The position adopted by Millet J. in *Re Hydrodam* (which was, according to the report, a reserved judgment delivered on the day following the oral hearing) has been commented upon in the textbook of Gower and Davies on *Principles of Modern Company Law (Eight Edition, 2008)* as follows, in reviewing the position in England:

*"Although doubts have subsequently been expressed about whether the categories are mutually exclusive, nevertheless there is agreement that they do not overlap extensively. It is important to draw this distinction in a statutory context because some statutory provisions apply only to shadow directors and directors whilst others only apply to directors, in which category, as said, the courts have long included de facto directors. However, it is not clear that the differences between the two categories of directors should be the main focus of attention when deciding the applicability of the common law, now the general statutory, duties of directors. As Robert Walker L.J. pointed out in Kaytech International Plc, Re [1999] 2 BCLC 352, 424 "the two concepts do have at least this much in common, that an individual who was not a de jure director is alleged to have exercised real influence....in the corporate governance of a company". It is submitted that in terms of the application of the common law duties of directors, the element of commonality (the "real influence") between shadow and de facto directors is more important than the elements of difference"[11].*

38.  Furthermore, as noted by *Ahern (Directors Duties: Law and Practice)*, in *Ultraframe (UK) Ltd –v- Fielding [2005] EWHC 1638,* Lewison J did not regard there being any conceptual difficulty standing in the way of concluding that a person was simultaneously a shadow director and a de facto director.

39.  In the 2007 decision of *Re Mea Corporation Limited; Secretary of State for Trade and Industry –v- Aviss & Others [2007] 1 BCLC 618*, the Court was concerned with an application – under the equivalent English legislation (Company Directors Disqualification Act 1986) – to disqualify (amongst others) persons purportedly acting as shadow directors on the company in question. In reaching the decision that a shadow director was to be subject to a disqualification order, Lewison J (in the Chancery Division of the High Court) referred to the *Hydrodam* case and the proposition apparently advanced by Millett J that the two concepts of de facto director and shadow director were mutually exclusive. Having considered the comments of Robert Walker LJ in the *Kaytech* case (quoted above) and the fact Morritt LJ in the case of *Secretary of State for Trade and Industry –v- Deverell [2002] 2 BCLC 133* had explained that the role of a shadow director does not necessarily extend over the whole range of the company's activities, Lewison J stated as follows:

*it seems to me that there is no conceptual difficulty in concluding that a person can be both a shadow director and a de facto director simultaneously. He may, for example, assume the functions of a director as regards one part of the company's activities (say, marketing) and give directions to the board as regards another (say, manufacturing and finance). In each case, it is necessary to examine the facts, bearing in mind that, as Morritt LJ explained ([2000] 2 BCLC 133 at 145, [2001] Ch 340 at 354), the*

---

[11] Pages 484 -485

*purpose of the legislation is to 'identify those, other than professional advisers, with real influence in the corporate affairs of the company'.*[12]

40. Whilst the **Mea Corporation** decision is not binding in the strict sense upon an Irish court, nonetheless I am of the view that this decision (if presented on similar facts to an Irish court) would be accepted as a persuasive authority, especially in the absence of any contrary Irish jurisprudence on the particular point. Therefore, I would be of the view that an Irish court would be persuaded by an argument that the concepts of shadow director and de facto director are not mutually exclusive.

41. Recently, in the 2009 decision in **Re Hocroft Developments Limited [2009] IEHC 580**, the Irish High Court (McKechnie J) made reference to the quotation from Millett J. in the **Hydrodam** case and stated as follows:

*When discussing both types of director, conceptually or theoretically, the firmness of this view may be justified, but in the context of a given case, it may have to soften, as a finding under both heads may potentially be justified. Laffoy J. in Fyffes [2005] IEHC 477 (at p. 85 of the unreported decision of 21st December 2005) also doubted that both were mutually exclusive.*

42. Furthermore, the **Hydrodam** case and the above-mentioned **Mea Corporation** case were referred to in the judgment of Lord Collins in the very recent English Supreme Court decision of **Revenue and Customs Commissioners –v- Holland [2010] 1 WLR 2793.** Lord Collins stated as follows:[13]

*The decisions have treated In re Hydrodam as a starting point. But although in In re Hydrodam Millett J used expressions such as "held out as a director" and "claims and purports to be a director", it has been held that although these were relevant factors, they were not necessary factors, and he could not have meant that the label "director" had to have been attached to the person or that he be held out as a director: see **In re Moorgate Metals Ltd [1995] 1 BCLC 503 (Warner J); In re Richborough Furniture Ltd [1996] 1 BCLC 507 (Timothy Lloyd QC)** and cf **Secretary of State for Trade and Industry v Tjolle [1998] 1 BCLC 333, 343**.*

*Once the concept of de facto director was divorced from the unlawful holding of office, there were two consequences.*

*The first consequence was that the distinction between de facto directors and shadow directors was eroded. A shadow director is "a person in accordance with whose directions or instructions the directors of the company are accustomed to act": see Companies Act 1985, section 741(2); Companies Act 2006, section 251(1). In re **Hydrodam [1994] 2 BCLC 180, 183**, Millett J said that de facto and shadow directorship "do not overlap. They are alternatives, and in most and perhaps all cases are mutually exclusive". But the distinction was impossible to maintain with the extension of the concept of de facto directorship and the consideration of such matters*

---

[12] At page 16
[13] Page 2825 onwards.

*as the taking of major decisions by the individual, which might be through instructions to the de jure directors, and the evaluation of his real influence in the affairs of the company: see **In re Kaytech International plc [1999] 2 BCLC 351, 424, per Robert Walker LJ**. The second consequence is that the courts were confronted with the very difficult problem of identifying what functions were in essence the sole responsibility of a director or board of directors. A number of tests have been suggested of which the following are the most relevant. First, whether the person was the sole person directing the affairs of the company (or acting with others equally lacking in a valid appointment), or if there were others who were true directors, whether he was acting on an equal footing with the others in directing its affairs: **In re Richborough Furniture Ltd [1996] 1 BCLC 507.***

*Second, whether there was a holding out by the company of the individual as a director, and whether the individual used the title: **Secretary of State for Trade and Industry v Tjolle [1998] 1 BCLC 333.***

*Third, taking all the circumstances into account, whether the individual was part of "the corporate governing structure": see **Secretary of State for Trade and Industry v Tjolle, at pp 343—344**, approved in **re Kaytech International plc [1999] 2 BCLC 351, 423**, where Robert Walker LJ also approved the way in which Jacob J in the Tjolle case had declined to formulate a single test. He also said, at p 424 that the concepts of shadow director and de facto director had in common "that an individual who was not a de jure director is alleged to have exercised real influence (otherwise than as a professional adviser) in the corporate governance of a Company". See also especially **In re Mea Corpn Ltd [2007] 1 BCLC 618** (Lewison J); **Ultraframe (UK) Ltd v Fielding (No 2) [2006] FSR 293** (Lewison J); **Secretary of State for Trade and Industry v Hollier [2007] Bus LR 352** (Etherton J).*

*In fact it is just as difficult to define "corporate governance" as it is to identify those activities which are essentially the sole responsibility of a director or board of directors, although perhaps the most quoted definition is that of the Cadbury Report: "Corporate governance is the system by which companies are directed and controlled" (Report of the Committee on the Financial Aspects of Corporate Governance, 1992,*

43. Consequently, I take the view that the concepts of shadow director and de facto director are not mutually exclusive, that the jurisprudence on this point has developed since **Hydrodam**[14] and that this recent jurisprudence would be very persuasive authority for an Irish court presented with this issue.[15]

### 4.   Does the Proof of Claim support the allegation of de facto directorship?

44. Having set out the factual circumstances surrounding the control by and involvement of NNI in transfer pricing and the Irish Loans and the Irish Dividends (at Section D of

---

[14] As relied on in the Redmond Declaration (RD16) citing ***Moorview Developments & Others-v-First Active plc & Others*** [2009] IEHC 214.

[15] Of course, even if it were accepted that the terms were mutually exclusive, there is no bar or prohibition upon a party seeking to assert that another party (NNI) acted as a shadow director and/or a de facto director.

the Proof of Claim), Section E of the Proof of Claim pleads that (for the reasons set out in Section D and explained further in paragraphs 86 – 89 of the Proof of Claim) NNI was a de facto or shadow director of NNI Ireland by virtue of NNI making decisions in relation to tax and treasury issues which could only properly be made by a director of NN Ireland (or by causing the de jure directors to act in accordance with its directions in relation to such issues), in particular regarding the involvement in:

    a)  The Nortel transfer pricing arrangements; and
    b)  The Irish Loans and the Irish Dividends.

45. Further, the Proof of Claim sets out at paragraph 166 that NNI was a de facto or shadow director of NNI Ireland by virtue of its involvement in all the decision making in relation to the pre-petition sales, and at paragraph 189 in relation to NN Ireland's tax affairs. Consequently, in my view, there is ample explanation and/or elucidation in the Proof of Claim for the allegation that NNI was a de facto and/or shadow director of NN Ireland.[16]

46. I accept that *Courtney* (in the textbook on the *Law of Private Companies, Second Edition*) sets out criteria which an Irish court "*may*" take into account in deciding whether a person acted as a de facto director, but these will be matters to be ultimately established and proven by NN Ireland in the context of the claim put forward. They cannot and should not be considered to be an exhaustive list of the factors which an Irish court must take into account it its determination of whether a person acted as a de facto director. Indeed, as acknowledged by *Ahern (Directors Duties, Law and Practice)*, it was accepted in *Secretary of State for Trade and Industry –v- Hollier [2006] EWHC 1804* that whether a person is a de facto director or not is to be judged **objectively** and "*each case will turn on its own facts*".

47. Indeed, insofar as the Courts have considered the question of de facto directorship, the question posed by Feeney J in *Re. Kendar Holdings Limited (in liquidation) [High Court, 16 January 2009]* was whether there was any evidence of the alleged de facto director "*making any major decisions such as would support a claim that the [alleged director] was part of the governing structure of the company...*". By reference to the Proof of Claim, it is clearly set out that (from on or about 2000) NNI assumed the role of NN Ireland in relation to tax and treasury matters and was involved in all decision-making in relation to the transfer pricing arrangements (see paragraphs 87 and 88 of the Proof of Claim).

### 5.    *Conclusion on de facto directorship*

48. The Redmond Declaration reaches the following conclusion (RD22):

*Nortel Ireland's allegations that Nortel Networks Inc. acted covertly as a shadow director render its allegation that it also acted as a de facto director of Nortel Ireland unsustainable in Irish law.*

---

[16] I note for completeness that I do not regard it as necessary for a de facto director to exercise control over every aspect of a company's affairs: see paragraph 54 below in relation to shadow directors.

49. I do not agree with this conclusion for the reasons set out above and, in my respectful view, there is no merit to the conclusion that, by alleging that NNI acted as a shadow director, the allegation that NNI was also a de facto director if NN Ireland is unsustainable in Irish law.

### b) Shadow Directorship

50. The Redmond Declaration appears to accept – as a starting position – that a corporate entity (such as NNI) is capable of being a shadow director of NN Ireland. For the avoidance of doubt, I am of the same view, based in particular on the judgments of the Supreme Court in *Worldport* and the High Court in *Fyffes*.

51. Laffoy J (in the High Court decision in *Fyffes plc –v- DCC plc [2009] 2 IR 417*) considered the degree of involvement in the direction or governance of the company which a person had to exercise to fall within the definition of "*shadow director*" under Section 27 of the 1990 Act. Whilst I do not propose to repeat the summary set out in the Redmond Declaration (AR28), it is worth applying the factors identified by the High Court:

   a) Majority of the Board of Directors of NN Ireland act in accordance with NNI's directions/instructions;
   b) NNI exercises a controlling influence in the boardroom of NN Ireland (or, at the very least, is accustomed to so acting); and
   c) The level of influence of NNI must occur on an ongoing basis.

52. Based on the allegations set out in the Proof of Claim, each of these factors is established by reason of the fact that (since on or about 2000) NNI directed the policy and practice of NN Ireland as regards tax and treasury matters and the participation of NN Ireland in the RPSM (as part of the transfer pricing arrangements), the Irish Loans and Irish Dividends, and the pre-petition dispositions of businesses.

53. The establishment of whether a person is a *shadow director* involves the identification of whether they :

   *Exercised real influence (otherwise than as a professional adviser) in the corporate governance of the company. Sometimes that influence may be concealed and sometimes it may be open.*[17]

54. That requirement will not be established by showing that a person directed one step undertaken by the company;   what is required is a pattern of conduct in which the directors were accustomed to act on the instructions or directions of the alleged shadow director.[18]   However, this latter requirement does not entail the necessity for proof that every aspect of the company's affairs were directed by the alleged shadow director :

---

[17]   Per Sir Donald Rattee Secretary of State v. Becker [2003] 1 BCLC 555, 565.
[18]   Secretary of State v. Becker [2003] 1 BCLC 555.

13

*... the reference in the section to a person in accordance with whose directions or instructions the directors are 'accustomed to act' does not in my opinion require that there be directions or instructions embracing all matters involving the board. Rather, it only requires that, as and when the directors are directed or instructed, they are accustomed to act as the section requires.[19]*

55. The correct approach to the application of the provision was summarised by Morritt LJ in *Secretary of State v. Deverell [2000] 2 BCLC 133[20]*, as follows :

*(1)  The definition of a shadow director is to be construed in the normal way to give effect to the parliamentary intention ascertainable from the mischief to be dealt with and the words used. In particular, as the purpose of the Act is the protection of the public and as the definition is used in other legislative contexts it should not be strictly construed because it also has quasi-penal consequences in the context of the 1986 Act ...*

*(2)  The purpose of the legislation is to identify those, other than professional advisers, with real influence in the corporate affairs of the company. But it is not necessary that such influence should be exercised over the whole field of its corporate activities ....*

*(3)  Whether any particular communication from the alleged shadow director, whether by words or conduct, is to be classified as a direction or instruction must be objectively ascertained by the court in the light of all the evidence. In that connection I do not accept that it is necessary to prove the understanding or expectation of either giver or receiver. In many, if not most, cases it will suffice to prove the communication and its consequence. Evidence of such understanding or expectation may be relevant but it cannot be conclusive. Certainly the label attached by either or both parties then or thereafter cannot be more than a factor in considering whether the communication came within the statutory description of direction or instruction.*

*(4)  Non-professional advice may come within that statutory description. The proviso excepting advice given in a professional capacity appears to assume that advice generally is or may be included. Moreover the concepts of 'direction' and 'instruction' do not exclude the concept of 'advice' for all three share the common feature of 'guidance'.*

*(5)  It will, no doubt, be sufficient to show that in the face of 'directions or instructions' from the alleged shadow director the properly appointed directors or some of them cast themselves in a subservient role or surrendered their respective discretions. But I do not consider that it is necessary to do so in all cases. Such a requirement would be to put a gloss on the statutory requirement that the board are 'accustomed to act in accordance with' such directions or instructions ...*
(Citations omitted.)

---

[19]  Australian Securities Commission v. AS Nominees Limited (1995) 13 ACLC 1822, 1838 (Finn J.).
[20]  Paragraphs 35 & 36

56. It is also important to note that Morritt LJ emphasised[21] that if the board of a company is accustomed to act on the directions or instructions of another person, it is not necessary to demonstrate that their action was mechanical rather than considered.

57. The above decision in **Deverell** was considered fully by Laffoy J. in **Fyffes Plc. v. DCC Plc. & Ors. [2005] IEHC 477** where, after examining, *inter alia,* certain criticisms made by **Courtney of** that decision, the learned Judge stated:

> *First, it seems to me that it is implicit in s. 27 that the directions or instructions emanating from the alleged shadow director must have an imperative quality. It may be that advice, in a given factual context, will have an imperative quality. If that is the case, it would explain the apparent oddity to which counsel for the plaintiff pointed: why the legislature thought it necessary to exclude advice given in a professional capacity, if advice does not come within the expression "directions or instructions". Therefore, for a communication of any type to constitute a direction or instruction, it must have an imperative quality. Secondly, just because there is consideration by the board interposed between the direction, instruction or imperative advice does not mean that the act of the board is not to be taken into account in applying s. 27, if the board acts in accordance with the direction, instruction or imperative advice. ... Thirdly, s. 27 does not require that the board should always act on the directions and instructions if a shadow directorship is to exist. That is indicated by a requirement that the board should be accustomed so to act ".*

58. Consequently, I am satisfied that, if the facts pleaded in the Proof of Claim are proven, they are of a kind likely to persuade an Irish court that NNI acted as a shadow director of NN Ireland.

### 1.    Can shadow directors owe fiduciary duties?

59. That being said, if so held, the Redmond Declaration posits the view that NNI (as a shadow director) would not thereby be subject to the equitable fiduciary duties imposed on de jure directors of a body corporate (such as NN Ireland).

60. In reaching this conclusion, the Redmond Declaration refers to Section 27 of the Companies Act 1990 ("*the 1990 Act*") which sets out the definition of "*shadow director*".  The contention appears to be that – even if determined to be a shadow director – NNI would only be a shadow director for the purposes of Part III of the 1990 Act which concerns "*transactions involving directors*" and with no wider implications in terms of fiduciary and equitable duties being owed to NN Ireland.

61. In relation to this conclusion, I would make the following observations:

   a) As the Redmond Declaration accepts (RD30), this point is not concluded and there have been "*mixed views*" on whether shadow directors are subject to the equitable and common law duties of directors;

   b) It cannot be accepted that the concept of "*shadow director*" only has application to the Part III of the 1990 Act dealing with transactions involving

---

[21] At page 152

directors. As the Redmond Declaration itself sets out, the concept of shadow directors applies over and beyond Part III of the 1990 Act. Indeed, the concept is referred to or incorporated in a variety of other provisions of Irish company law, including provisions that deal with:

(i) *Fraudulent and Reckless trading*: section 297A of the 1963 Act;

(ii) *Restriction and/or disqualification of directors and shadow directors*: Part VII of 1990 Act;

(iii) *Protections in Liquidation and Receivership on the sale of assets to directors and shadow directors*: sections 231 and 316A of the 1963 Act;

(iv) *Transparency of dealings by directors and shadow directors in shares*: section 53 of the 1990 Act (Declarations of interests in shares held by directors or shadow directors);

(v) *Investigations in relation to companies*: section 8 of 1990 Amendment Act (Examiner's right to information regarding bank accounts of shadow directors) and section 10 of 1990 Act (Inspector's right to same);

(vi) *Protections in respect of self dealing generally*: section 194 of the 1963 Act (declaration of interest in contracts and similar arrangements), sections 29 and 31 of the 1990 Act (significant transactions of non-cash assets and loans and like arrangements).

Consequently, in my view, the wording of Section 27 of the 1990 Act does not support an attempt to limit the consequences of being a *"shadow director"* merely to Part III of the 1990 Act. The concept has wider implications.

c) Whilst the Redmond Declaration makes the point (RD34) that there is no Irish authority to suggest that equitable and fiduciary duties are to be imposed upon shadow directors, by parity of reasoning it can be argued that there is no Irish authority to suggest that equitable and fiduciary duties are not to be imposed upon shadow directors.

d) The Redmond Declaration relies on a 1987 textbook (***Pennington***) to support the contention that in England shadow directors are not subject to the non-statutory duties of de jure directors. However, decided cases demonstrate that the law in England has moved on in important respects. In the case of ***Ultraframe (UK) Ltd v Fielding [2005] EWHC 1638***, Lewison J stated:

*The indirect influence exerted by a paradigm shadow director who does not directly deal with or claim the right to deal directly with the company's assets will not usually, in my judgment, be enough to impose fiduciary duties upon him; although he will, of course be subject to those statutory duties and disabilities that the Companies Act creates. The case is stronger where the shadow director has been acting throughout in furtherance of his own, rather than the company's, interests. However, on the facts of a particular case, the activities of a shadow director may go beyond the mere exertion of indirect influence.*

It is clear from this passage that the learned Judge deliberately left open the possibility that, in certain circumstances, a shadow director could owe

fiduciary duties towards the company.  In particular, he expressly allowed for the possibility that such duties might arise where the shadow director acted *"throughout in furtherance of his own, rather than the company's, interests"* and dealt *"directly with the company's assets"*.  In my view the facts pleaded in the Proof of Claim would, if established, be sufficient to satisfy an Irish court that NNI, in the course of undertaking the actions of which NN Ireland complains in the Proof of Claim, acted throughout in furtherance of its own interests rather than the interests of NN Ireland and, with regard to some of the transactions involved, dealt directly with the assets of NN Ireland.

Further, in the case of ***Yukong Line Ltd –v- Rendsburg Investments Corp of Liberia [1998] 1 WLR 294,*** in the context of a conspiracy claim, the Court found as follows:

> *As to an unlawful means conspiracy, Mr. Yamvrias undoubtedly owed a fiduciary duty to Rendsburg.  Although he was not formally a director, he was a "shadow director" and controlled the company' activities.*

e) As stated earlier, the scheme of proposed companies legislation in Ireland does not envisage any limitation on the consequences of shadow directorship insofar as fiduciary duties are concerned.

62. Based on the above, it is my view that in an appropriate case both the English and Irish courts would not hesitate in imposing fiduciary duties on shadow directors, and the matters pleaded by NN Ireland against NNI are of the kind that are likely to constitute such an appropriate case.

## 2)  BREACH OF THE DUTY OF CARE (Claims 3, 9, 19 and 25)

63. The breach of the duty of care argument is set out at paragraphs 92 – 95 of the Proof of Claim.  The claim is made that, in order to bring a claim for breach of duty of care under Irish law, it must be established that:

a) NNI was a de facto or shadow director of NN Ireland or NNI otherwise owed NN Ireland a duty of care;

b) NNI breached the duty of care which it owed to NN Ireland; and

c) NN Ireland was caused a resultant loss.

64. The Proof of Claim – which is grounded upon the detailed factual background set out therein – asserts that NNI was:

a) under a duty to act with due skill and care in relation to NN Ireland (as a de facto or shadow director); and

b) under a duty of care to NN Ireland generally (i.e. whether or not a de facto or shadow director) if there is a relationship of sufficient proximity between NNI and NN Ireland, the harm in question was reasonably foreseeable and it is appropriate in the circumstances to impose a duty of care.

65. The above is, in my view, a correct statement of the position under Irish law.

### a) **Existence of Duty**

66. The Redmond Declaration emphasises the three (3) stage test approach recognised under Irish law for the imposition of a duty of care which, in summary, requires as follows:

- Reasonable foreseeability;
- Proximity; and
- Just and reasonable to impose the duty sought.

67. I accept this as a general statement of Irish law. However, having set out the law in Ireland, the Redmond Declaration appears to suggest that no duty of care arises for the following reasons:

a) NN Ireland "*failed to plead any specific facts which would inform the analysis of whether it would be just and reasonable to impose a duty of care in the instant case*"; and

b) Proximity is bedevilled by the absence of any specific information concerning the distinct role of the Canadian Entitles and the role of NNI in the Nortel Group tax and treasury policy implementation not to mention the role of the directors, officers and employees of NNI and whether they were acting as servants or agents of NNI or otherwise (RD45).

68. In my view, at least as a matter of Irish law, this analysis is not correct. NN Ireland contends that – for the reasons set out in detail in the Proof of Claim as regards tax and treasury matters – NNI owed a duty as a de facto or shadow director to take reasonable care in and about its dealing with the affairs of NN Ireland, particularly in relation to transfer pricing.

69. NN Ireland relies on the facts set out at Section D of the Proof of Claim (summarised above), and the fact of NNI's involvement in pre-petition sales of businesses at paragraphs 165 and 166, in support of its argument that NNI stood in such proximity to NN Ireland as to owe it a duty of care with regard to those parts of NN Ireland's business with which NNI involved itself.

70. NN Ireland contends that NNI acted as such and/or owed such duties in relation to:

a) NN Ireland's participation in the RPSM and MRDA and the steps taken in the implementation of same by reason of the fact that NNI was involved in all decision making in relation to the transfer pricing arrangements (as set out in the Proof of Claim at paragraphs 16 – 19);

b) NN Ireland's participation in Irish Loans and the Irish Dividends;

c) NN Ireland's participation in the sales of pre-petition businesses; and

d) NN Ireland's tax matters generally.

71. Therefore, NN Ireland contends that NNI breached its duty of care to NN Ireland as:

a)  the operation and implementation of the RPSM and MRDA;
b)  operation and implementation of the Irish Loans and Irish Dividends;
c)  the allocation of the pre-petition sales; and
d)  NNI's control over NN Ireland's tax matters; were not in NN Ireland's best interests, and the duty of care was breached by NNI in:

a)  causing NN Ireland to participate under such arrangements; and
b)  failing to ensure that NN Ireland received an arm's length return under the RPSM;
c)  causing NN Ireland to participate in the Irish Loans and Irish Dividends;
d)  failing to ensure NN Ireland received a proper allocation of sales proceeds; and
e)  to the extent that NN Ireland suffers loss as a result of a claim by a tax authority and or the imposition of any form of penalty in relation to its tax affairs, by causing or allowing NNI and NNL control over NN Ireland's tax affairs.

72. The first concept of *"reasonable foreseeability"* derives from the oft-approved passage of Lord Atkin in **Donoghue –v- Stevenson [1932] AC 562**, as follows:

*The rule that you are to love your neighbour becomes in law you must not injure your neighbour; and the lawyer's question, who is my neighbour? receives a restricted reply. You must take reasonable care to avoid acts or omissions which you can reasonably foresee would be liable to injure your neighbour. Who, then, in law is my neighbour? The answer seems to be – persons who are so closely and directly affected by my act that I ought reasonably to have them in contemplation as being so affected when I am directing my mind to the acts or omissions which are called in question.*

73. There is little doubt in my mind that – insofar as the Proof of Claim alleged breaches of duty under Irish law and the facts are assumed to be true underlying these claims – an Irish court would be easily persuaded that the loss and damage to NN Ireland arising from the breach of duty of NNI was reasonably foreseeable.

74. As regards proximity, given the inter-relationship between NN Ireland and NNI and the close connection between their operations as regards the tax and treasury policy (underlying the transfer pricing claims), the inter-company loans and dividends, the past disposition of business and the taxation matters, I do not think that an Irish court would be at all troubled in making a finding that there was a sufficient level of *"proximity"* between NN Ireland and NNI based upon the allegations, if proven, in the Proof of Claim.

75. Finally, I take the view that it would require very powerful reasons to be advanced as to how or in what circumstances it was not just and reasonable to impose liability upon NNI and I do not think that this would be a significant hurdle for NN Ireland to overcome in any such claims under Irish law.

76. By reason of the foregoing, I cannot accept the contention that NN Ireland has failed to plead specific facts that would inform the analysis of whether it would be just and reasonable to impose a duty of care in this case.

### b) Economic Loss

77. In relation to the claim for economic loss, the Redmond Declaration recites the quotation from Keane CJ in the **Glencar case** (RD46). In my view, this judgment does not have the effect of rendering economic loss irrecoverable under Irish law in actions for any particular type of negligence. In fact, the Supreme Court through Keane CJ in that judgment **expressly reserved for another occasion** the question of recoverability for economic loss in actions for negligence other than negligent misstatement and those falling within the identified categories, and whether the decision of the House of Lords in **Junior Books Limited –v- Veitchi Co. Ltd. [1983] 1 AC 520** should be followed in Ireland. To this extent, I do not accept (as put forward in the Redmond Declaration – RD47) that any "*bar*" is in place under Irish law regarding recovery for economic loss in actions for negligence.

78. In this context, it is important to emphasise that in an earlier (1997) case, the High Court was called upon to determine the point as to whether economic loss (consequent upon a negligent act) was recoverable as damages in Ireland: **McShane Wholesale Fruit and Vegetables Ltd. –v- Johnston Haulage Co. Ltd. [1997] 1 ILRM 86**.

79. In McShane, Flood J held as follows:

> *In Ireland since the Supreme Court decision in Ward v. McMaster 1989 I.L.R.M. 400 , the test for actionable negligence is:*
> *(a) A sufficient relationship of proximity between the alleged wrongdoer and the person who has suffered damage.*
> *(b) Such relationship that, in the reasonable contemplation of the former, carelessness on his part may be likely to cause damage to the latter — in which case a prima facie duty of care arises.*
> *(c) Subject always to any compelling exemption based on public policy.*
>
> *Mr. Justice McCarthy at page 409 stated the position as follows:-*
>
> *"I prefer to express the duty as arising from the proximity of the parties, the foreseeability of the damage and the absence of any compelling exemption based on public policy. I do not in any fashion seek to exclude the latter consideration although I confess that such a consideration must be a very powerful one if it is to be used to deny any injured party his right to redress at the expense of the person or body that injured him"*
>
> *The quality of the damage does not arise. It can be damage to property, to the person, financial or economic — see Sweeney -v- Duggan, 1991 I.R. 274 . The question as to whether the damage (of whatever type) is recoverable is dependent on proximity and foreseeability subject to the caveat of compelling exemption on public policy.*

*In short, the proximity of the parties giving rise to the duty of care must be such, as a matter of probability to be causal of the damage. If it is not, the damage is too remote and the action will fail. It will fail not because the damage is of a particular type but because the relationship between the wrongdoer and the person who suffers the damage does not have the essential, of sufficient relationship of proximity or neighbourhood.*

*It therefore follows that __the fact that the damage is economic is not in itself a bar to recovery where the other elements above stated are present__.*

*Whether the damage in this instance is or is not too remote is a question of fact to be determined on evidence.*
*(Emphasis added.)*

80. It is the case that the ***Ward –v- McMaster*** test referred to in the above quotation of Flood J has since been replaced by the slightly different three (3) stage test of the ***Breslin*** case (referred to in the Redmond Declaration – RD44). In essence, the third "*limb*" has replaced public policy considerations with the test of just and reasonableness. However, I take the view that the reasoning of Flood J applies equally as he determined that a claim for economic loss would fail not because it is purely economic but because a person seeking recovery of such loss might not have the required degree of "proximity" (the test for which remained unchanged. If the three (3) stage test for negligence is met, the fact that the damage is purely economic will not prevent recovery by NN Ireland under Irish law.

81. Whilst there has been quite extensive academic commentary upon the issue of recoverability as damages for pure economic loss, this issue has not to any great extent troubled the courts in Ireland in recent years and I am of the view that – even taking into account the hesitancy expressed by the Chief Justice in ***Glencar (2002)*** – these claims are of a kind that could well persuade an Irish court that NNI was liable to NN Ireland for its economic loss.

## 3) DISHONEST ASSISTANCE (Claims 4, 10 and 26) AND UNCONSCIONABALE RECEIPT (Claims 11 and 21)

82. The Redmond Declaration deals *en masse* with the claims concerning dishonest assistance and the claims concerning unconscionable receipt. I propose to deal with each in turn.

### a) Dishonest Assistance (Claims 4, 10 and 26)

83. The Redmond Declaration states that Claim 4 is predicated upon assisting a fiduciary in breach of duty rather than NNI being a fiduciary in breach of duty) and (in summary) states that NNI is said to have advocated or assisted (through the involvement of its personnel in the design, implementation and operation of the MRDA and RPSM) conduct by the directors of NN Ireland which led to breaches of fiduciary duties.

84. This is partly correct.   However, NN Ireland makes the further argument (at paragraphs 104, 136, and 167 of the Proof of Claim) that NNI acted dishonestly as it appreciated that the implementation and operation of the MRDA and RPSM, the Irish Loans and Irish Dividends, and the allocation of the proceeds of the sales of the pre-petition dispositions of businesses were contrary to the interests of NN Ireland and that the directors of NN Ireland were acting in breach of duty by allowing NN Ireland to participate in such arrangements.

85. The liability for dishonest assistance contended for in the Proof of Claim finds its roots in the doctrine of constructive trusts and the fundamental principle that the law will not permit a party in the position of a fiduciary to take advantage of his position to make a personal profit.   Instead, the fiduciary will hold any such profit as constructive trustee for the person equitably entitled to the property.   The seminal statement of this principle is that of Chatterton VC in *Gabbett v Lawder [1883] 11 IR 295* as follows:

> *The fundamental position upon which the doctrine of constructive trusts proceeds is that no person in a fiduciary capacity shall be allowed to retain any advantage gained by him in his character as trustee.  His cestui que trusts are entitled to the benefit of any advantage so gained by him, to any addition or accretion to the trust estate which he may have acquired and to all profit which he may have made by any dealing with it.*

86. The extension of the fiduciary's liability to those who knowingly assist in a dishonest or fraudulent design, or who receive or become chargeable with some part of the trust property, is well established and is referred to in the excerpt from *Barnes v Addy* cited in the Redmond Declaration at RD50.

87. The circumstances in which liability will be imposed under the heading of "*dishonest assistance*" were referred to by Lord Nicholls in the Privy Council in *Royal Brunei Airlines Sdn Bhd –v- Ton Kok Ming [1995] 2 AC 378, 392* as follows:

> *A liability in equity to make good resulting loss attaches to a person who dishonestly procures or assists in a breach of trust or fiduciary obligation.*

88. As noted by *Delany*[22], whilst these issues have not been addressed by the Courts in this jurisdiction, "*it seems likely that they would follow the principles laid down by Lord Nicholls and apply the requirement that dishonesty on the part of the accessory must be shown in order to impose liability*"[23].

89. In addressing the question of honesty, and whether the concept of 'dishonesty' is to be interpreted in a purely objective manner or whether it must be established that a defendant was aware that his conduct was dishonest, Lord Nicholls stated as follows:

> *[I]n the context of the accessory liability principle acting dishonestly, or with a lack of probity, which is synonymous, means simply not acting as an honest person would in all the circumstances.  This is an objective standard.  At first sight this may seem*

---

[22] Equity and the Law of Trusts in Ireland (Fifth Edition, 2011)
[23] Page 246

*surprising. Honestly has a connotation of subjectivity, as distinct from the objectivity of negligence. Honesty, indeed, does have a strong subjective element in that it is a description of a type of conduct assessed in the light of what a person actually knew at the time, as distinct from what a reasonable person would have known or appreciated. Further, honesty and its counterpart dishonesty are mostly concerned with advertent conduct, not inadvertent conduct. Carelessness is not dishonesty. Thus for the most part dishonesty is to be equated with conscious impropriety.*

*However, these subjective characteristics of honesty do not mean that individuals are free to set their own standard of honesty in particular circumstances. The standard of what constitutes honest conduct is not subjective. Honesty is not an optional scale, with higher or lower values according to the moral standards of each individual. If a person knowingly appropriates another's property, he will not escape a finding of dishonesty simply because he sees nothing wrong in such behaviour.*

90. ***Delany (Equity and the Law of Trusts in Ireland, Fifth Edition, 2011)*** notes that the Courts in this jurisdiction have yet to properly address the question of the standard to be applied in cases of "*dishonest assistance*" but does express the view that "*it appears likely that the test which would be adopted is whether by ordinary standards the defendant's conduct would be characterised as dishonest*"[24].

91. The control by and involvement of NNI in NN Ireland and the transfer pricing mechanism which was adopted is described at paragraphs 16 to 19 of the Proof of Claim. These transactions, it is pleaded, improperly removed value from NN Ireland. The claim is made (in respect of Claims 4, 10 and 26) as follows:

    a) NNI acted dishonestly as it appreciated that the implementation and operation of the MRDA and RPSM were contrary to NN Ireland's interests and that the directors of NN Ireland were acting in breach of duty by allowing NN Ireland to participate in such arrangements (Claim 4);

    b) NNI acted dishonestly as it appreciated that the Irish Loans and Irish Dividends were contrary to NN Ireland's interests and that the directors of NN Ireland were acting in breach of duty by allowing NN Ireland to participate in such arrangements (Claim 10);

    c) NNI dishonestly assisted the breaches of duty by virtue of NNI's involvement and participation in controlling NN Ireland's tax affairs (Claim 26).

92. To the extent that the Redmond Declaration deals with certain general legal principles that apply to a claim for dishonest assistance, they are broadly uncontroversial. However, the "*peculiar importance*" of the excerpt from ***Fyffes*** recited at paragraph 52 is not understood in relation to the instant case. Laffoy J was there referring to the fact that the statutory remedy for insider dealing at the relevant time involved a requirement for counterparties to unlawful dealing to be compensated for their losses, and for the wrongdoer to account for its profits to the company in whose securities the unlawful dealing took place. By contrast, a liability to account to the company arising from the exercise by the Court of its equitable jurisdiction would provide no compensation to the counterparties that had suffered losses as a consequence of the

---

[24] Page 257

unlawful dealing. It is not clear that this distinction has any relevance to the facts of the instant case, as the claimant here is the entity that has suffered the loss.

93. The Redmond Declaration (RD53 and RD54) states as follows:

> *Insofar as the claim by way of Knowing Assistance is being advanced one of the requirements would be the identification of the "design" on the part of the directors assisted. It appears plain however that the main thrust of the claim alleged is that the design was that of Nortel Networks Inc., not the directors of Nortel Ireland.*
> *This confusion is important in an Irish law context as Knowing Assistance results in the wrongdoer being held accountable as a constructive trustee even where he has not received the trust property.*

94. There does not appear to me to be any confusion in the claim in respect of dishonest assistance. I understand the Redmond Declaration to construe the Proof of Claim as stating that NNI was the person with the design. However, my reading of the Proof of Claim establishes that there is no "confusion" and that NN Ireland pleads that NNI was the person with the "design" and/or NNI assisted NNL and/or the directors of NN Ireland in that "design".

95. It is correct to say, as is clear from the Proof of Claim, that this aspect of the claim is grounded in part on the assertion that NNI knowingly assisted NN Ireland's other directors in wrongfully removing value from NN Ireland. This claim is, of course, without prejudice to the claim that NNI was a de facto and/or shadow director of NN Ireland.

96. In my view, the claim for dishonest assistance is made out on the Proof of Claim, and I do not understand the Redmond Declaration to disagree.

### b) Unconscionable Receipt (Claims 11 and 21)

97. The Redmond Declaration states that:

a) Claim 11 is predicated on a primary breach of fiduciary duties by the directors of NN Ireland in respect of the Irish Loans and Dividends and that NNI is alleged to have been sufficiently aware of these breaches due to its involvement in the Irish Cash Repatriation Strategy;

b) As regards Claim 21, a similar allegation is made in respect of the Pre-Petition Sales, of which NNI is alleged to have been aware due to its participation in the sales.

98. As regards unconscionable (or *"knowing"* receipt), a recipient of property which has been misappropriated in breach of trust may be liable as a constructive trustee of this property provided he possesses the necessary degree of knowledge of the breach of trust.

99. There are relatively few authorities on the issue of liability in knowing receipt in Ireland but, as noted by *Delany*, the Supreme Court appears to be prepared to accept that constructive notice will suffice to ground liability even in a commercial context: *Re Frederick Inns Ltd [1994] 1 ILRM 387* and *Fyffes.*

100. The question of the degree of knowledge required to establish liability for knowing receipt has also been considered by Laffoy J in *Ulster Factors Ltd –v- Entoglen Ltd* where the decision of Blayney J in *Re Fredericks Inns Ltd* was quoted with approval in which he had applied the English decision of *Belmont Finance Corporation Ltd – v- William Furniture (No. 2)* which is authority for the proposition that dishonesty is not a necessary ingredient of liability for knowing receipt.

101. Laffoy J held as follows:

*What renders the recipient of, or dealer with, funds which are being misapplied in breach of the fiduciary duties of the directors of a company liable as a constructive trustee is knowledge, actual or constructive, of the breach of trust.*

102. Again, taking the pleaded facts as given, in my view the requirements for a finding of unconscionable receipt are satisfied, and I do not understand the Redmond Declaration to disagree with this view.

### 4) CONSPIRACY (Claims 5 and 12)

103. From my review of the Proof of Claim, I note that there are two (2) separate conspiracy claims, as follows:

   a) *Claim 5* alleges that NNI and NNL, or alternatively NNI and the de jure directors of NN Ireland, or alternatively all three of them, conspired to implement and operate the RPSM and MRDA in relation to the transfer pricing arrangements with the predominant unlawful purpose of damaging the economic interests of NN Ireland; and
   b) *Claim 12* alleges the same combinations of parties conspired for the same purpose in respect of the Irish Loans and Dividends.

104. As is conceded in the Redmond Declaration, the tort of conspiracy is recognised in Ireland, and I concur with this assessment.

105. Whilst legal principles concerning the law of conspiracy are set out at paragraphs 60 -68 of the Redmond Declaration, no conclusion is drawn from the application of these legal principles to the facts set out in the Proof of Claim. Consequently, it is not clear to me whether the Redmond Declaration is accepting that, if the allegations in the Proof of Claim are assumed to be true, they are of a kind that could persuade an Irish court that NNI committed a tortious conspiracy.

106. The leading textbook in Ireland on tort law *(The Law of Torts, McMahon & Binchy, Third Edition, 2005)* confirms that there are two (2) forms of conspiracy:

   a) Simple Conspiracy; and
   b) Unlawful Means Conspiracy.

107. Simply put, "*simple conspiracy*" occurs where two or more persons combine with the predominant purpose of damaging the economic interests of another, without

justification. The seminal case concerning this type of simple conspiracy is the 1942 House of Lords decision of *Crofter Hand Woven Harris Tweed Co. Ltd. –v- Veitchi [1942] AC 435* wherein it was made clear that, if there was more than one purpose actuating that combination of two or more persons, liability will depend upon the *"predominant purpose"* of the alleged perpetrators (in this case, NNI, NNL and/or the de jure directors of NN Ireland):

    a) If that predominant purpose is to damage another person (in this case, NN Ireland), and damage results, there is tortious conspiracy (once the facts pleaded in the Proof of Claim are proven to be true);

    b) If the predominant purpose is the lawful protection or promotion of any lawful interest of the combiners (no illegal means being employed), it is not a tortious conspiracy, even though it causes damage to another person.

108. This analysis of the law was set out by Walsh J. in the Supreme Court in Ireland in the case of *McGowan –v- Murphy (10 April 1967)* and endorsed by McCarthy J in *Taylor –v- Smith* (referred to in the Redmond Declaration – RD64) ,.

109. Paragraph 107 of the Proof of Claim concerns transfer pricing and alleges that (a) NNI and NNL, or (b) NNI and the de jure directors of NN Ireland, or (c) NNI, NNL and NN Ireland's directors engaged in a conspiracy together by implementing and operating the RPSM and MRDA in relation to the transfer pricing arrangements with the predominant unlawful purpose of damaging the economic interests of NN Ireland.

110. Paragraph 144 of the Proof of Claim concerns the Irish Loans and the Irish Dividends and alleges (a) NNI and NNL, or (b) NNI and the de jure directors of NN Ireland, or (c) NNI, NNL and NN Ireland's directors acted with the predominant unlawful purpose of damaging the economic interests of NN Ireland.

111. In both claims, it is alleged that loss was thereby caused to NN Ireland.

112. Assuming the facts contained in the Proof of Claim to be true, it is my view that the necessary ingredients for a claim for simple conspiracy are made out, being:

    a) Combination of two or more persons;

    b) Acing in a manner which damaged the economic interests of another; and

    c) The predominant purpose of that combination was to injure the claimant.

113. The Redmond Declaration states that conspiracy *"is a very difficult tort to prove"* and, expresses the view that there is a *"very fine"* line between a defendant's self interest and a *"predominant intent to injure the defendant"*.   The Redmond Declaration offers no view as regards the conspiracy claims in the Proof of Claim, but I would express these views:

    a) Whilst not necessarily accepting the proposition that conspiracy is a *"very difficult tort to prove"*, I am satisfied that a party who can establish the necessary ingredients to such a claim (as identified above) can succeed in such a claim in the Irish courts.  The question of the proof necessary to succeed in such a claim is beyond the scope of this Declaration.  That said, the Irish courts

have shown a willingness to recognise conspiracy claims. Indeed, the case referred to in the Redmond Declaration (*Meskell –v- CIE [1973] 1 IR 121*) resulted in the recognition of an actionable conspiracy, as also occurred in the subsequent case of *Cotter –v- Ahern (High Court, 25 February 1977)*;

b) I accept that not all claims for conspiracy succeed. However, the Connolly case relied upon in the Redmond Declaration concerned the activities of a trade/retail association where (in my respectful view) it is much more difficult to prove an actionable conspiracy than in the matter at issue herein (by reason of the fact that a trade association may seek to defend a conspiracy claim on the grounds that its predominant purpose was to promote and protect the best interests of its members but any such defence would not appear open to NNI on the basis of the matters set out in the Proof of Claim). Furthermore, insofar as the Redmond Declaration relies upon *Tru-Value Ltd. –v- Switzers & Co. (High Court, 10 March 1972)* in support of the proposition that the tort is very difficult to prove, this case (as reported) solely concerned an application for an injunction to prevent department stores in the Plaintiff's locality from coming together to pressurise a perfume supplier not to supply the Plaintiff. Whilst the claim appears to have been based on conspiracy, the reported decision of Kenny J. relates to the injunction application of the Plaintiff (which was unsuccessful) and in respect of which differing legal principles apply;

c) As regards the purported fine line between a defendant's self-interest and their predominant intent to injure a plaintiff, Lord Cave in *Sorrell –v- Smith [1925] AC 700* (which was expressly referred to in the *McGowan –v- Murphy* decision) stated that the distinction lies in whether there was "*just cause or excuse for the action taken*". From my review of the Proof of Claim as regards transfer pricing and the Irish Loans and the Irish Dividends (on the assumption of their being true), it has strongly been argued by NN Ireland that no such just cause or excuse existed or could reasonably have existed.

114. In addition, and as acknowledged in the Redmond Declaration, there is a second type of tortious conspiracy, being that known as "*unlawful means conspiracy*". This occurs where two or more persons combine to engage in an unlawful act: "*if there be a combination to use unlawful means to achieve a particular aim, that is actionable conspiracy*" (per McCarthy J in *Taylor –v- Smith [1991] IR 142*).

115. As has been explained in *Law of Torts (McMahon & Binchy, Third Edition, 2005)*, this tort occurs where two or more persons engage in an unlawful act "*such as a crime, tort or infringement of a constitutional right and damage to the plaintiff occurs*". Both Claim 5 and Claim 12 expressly plead that loss/damage has thereby been occasioned to NN Ireland.

116. Consequently, for NN Ireland to succeed in a claim for unlawful means conspiracy, under Irish law would be required to establish that (a) there was a combination of two or more persons and (b) that unlawful means were employed. Breach of fiduciary duty has been identified as an "*unlawful means*": *Yukong Line Ltd –v- Rendsburg Investments Corp of Liberia [1998] 1 WLR 294.*

117. In this regard, I am satisfied that if the parties were – as alleged in the Proof of Claim – acting tortiously together and in breach of fiduciary duty towards NN Ireland they would, thereby, be determined as having engaged in an unlawful act and be determined to have committed a tortious conspiracy.  As stated by McCarthy J. in the **Taylor –v- Smith** case, "*if [the conspiracy] be executed, then the cause of action derives from the execution whether it be because of the unlawful nature of the act done or the unlawful means used*".

118. The Redmond Declaration expresses no concluded view on whether, assuming the Proof of Claim to be factually accurate, the necessary ingredients are present to ground a claim in Conspiracy.  For the avoidance of doubt, I am of the view that they are.

### 5)  MISTAKE (Claim 20)

119. Claim 20 relates to the Pre-Petition Sale Proceeds and is a plea in the alternative to the other contractual/breach of fiduciary duty/breach of duty of care claim.  Put simply, NN Ireland claims that it did not receive a fair allocation of the Pre-Petition Sale Proceeds due to a mistake (either of fact or law) as to the full extent to which NN Ireland is entitled.  Consequently, NNI received considerably more from the allocation than it was intended to receive (and is therefore obliged to repay the overpayment).

120. As regards the three (3) varietals of mistake advanced in the Redmond Declaration, these categories are helpful when seeking to explain the law of mistake but, whilst adopted by McDermott in **Contract Law (First Edition, 2001)**, he does note that the terms (mutual/common/unilateral) are not used consistently as, for instance, in **Nolan –v- Nolan (1954) 92 ILTR 94** where Dixon J. stated that "*the whole question whether a mistake was mutual or unilateral was largely one of phraseology*"[25].

121. The criticism of the Proof of Claim is made in the Redmond Declaration that NN Ireland has not identified which varietal of mistake is being alleged against NNI.  However, I cannot accept this as a valid criticism of the Proof of Claim.  In practice in the Irish courts, once interlocutory matters such as discovery are dealt with, the party making a claim under the law of mistake may be in a position to plead as to the varietal of mistake being alleged against the other party.  Whilst NN Ireland has set out in the Proof of Claim its understanding that the allocation was mistaken, it appears that it is not in a position to plead as to whether specific acts of NNI were done intentionally or on the basis of a mistake.  For instance, NNI may have been labouring under a mistake that the allocation accorded with the arm's length principle (common mistake) or the parties may have been at cross-purposes (mutual mistake) or, indeed, NN Ireland may have been mistaken as to how the allocation would occur, and NNI may have known of NN Ireland's mistake.

122. Consequently, whilst the principles concerning mistake are traditionally divided into the three (3) categories suggested in the Redmond Declaration, the precise nature of the mistake would be a matter to be determined by the Court, based on the evidence adduced.  Insofar as the criticism is levelled against NN Ireland that it has not

---

[25] Page 94 thereof

precisely identified which category of mistake is being alleged, in my view this does not detract from the merits of the claim under the law of mistake.

123. The point is made that the claim would more properly appear to be a claim for breach of contract rather than an attempt to impugn the contract on the grounds of mistake. It is to be recalled that the claim for mistake is made in the alternative to the contractual claim (and the claim for breach of duty and breach of fiduciary duty). However, as the factual matrix supports a plea of mistake, it is properly claimed in the Proof of Claim.

124. As regards the claim for mistake of law, Section I of the Proof of Claim makes clear that the agreed allocation (required by law and international accounting regulations) ought to have corresponded with the arm's length principle but did not do so. The claim is that the failure so to do arose from a mistake as to the law and/or international accounting regulations and/or a factual mistake as to the proper allocation of the Pre-Petition Sale Proceeds.

125. As to the point made in the Redmond Declaration that "*no plea is raised which would allow this issue to be comprehensively addressed*", I disagree as a matter of Irish legal practice and procedure (to the extent that Irish practice is relevant). The sufficiency of the pleading from a US law perspective is, as stated previously, outside the scope of this declaration.

126. Nonetheless, insofar as there is a fine distinction between a mistake of fact and a mistake of law, the Irish courts are likely to take a pragmatic view as to the irrelevance of the distinction between them, as reflected in the comments of Hamilton J in *Dublin Corporation –v- Provost of Trinity College, Dublin [1985] ILRM 283*:

*The plaintiffs were in my view primarily responsible for the mistake and I am satisfied that so far as this issue is concerned were not in pari delicto. Where money is paid, whether under a mistake of fact or law, justice requires that such money should be recoverable if the law so permits.*

127. I do not accept the contention made in the Redmond Declaration (RD75) that no plea is made as to an alleged mistake of law which would allow the issue to be comprehensively addressed. As set out above, the plea of mistake of law is set out in Section I of the Proof of Claim. Furthermore, given the factual background pleaded in the Proof of Claim (and, in particular, the manner in which NN Ireland acted on the instructions/directions of NNI and the Canadian Entities) there is a live, factual issue to be determined as to whether or not the parties were *in pari delicto*. Thus, it remains open to NN Ireland to succeed under Irish law in advancing a claim for loss arising from a mistake of law.

128. The final point made (as regards the mistake claims) in the Redmond Declaration is the point that NN Ireland does not allege it was a seller in any of these transactions and, additionally, there would seem to be several other third parties to the transaction whose rights and liabilities have not been addressed. Whilst the Redmond Declaration is not entirely clear as to what conclusion (if any) is being drawn from the point that NN Ireland has not alleged it was a seller in any of the transactions

(RD74), there is no Irish authority of which I am aware which requires a party (making a claim for mistake) to allege that it was a seller in a particular transaction. Furthermore, my view is that a case has been made out for a claim under the law of mistake and the issue of the rights and obligations of other third parties does not have a bearing on an analysis of whether NN Ireland is entitled to relief under the law of mistake.

### 6) TRANSACTIONS AT AN UNDERVALUE / FRADULENT DISPOSITION (Claim 22)

129. The claim of NN Ireland is made out at paragraphs 176 – 179 of the Proof of Claim.

130. The Redmond Declaration makes the point that NN Ireland's claim - insofar as Section 139 of the 1990 Act is concerned - is contingent upon opening of Irish insolvency proceedings and the appointment of a liquidator under the Companies Acts, which has not occurred.

131. I do not disagree with this analysis and, in any event, the wording of paragraphs 176 – 179 of the Proof of Claim make abundantly clear that this claim is contingent upon the appointment of a liquidator in Ireland:

*If a liquidator were to be appointed in Ireland in relation to Nortel Ireland, a similar claim could be brought on the basis that these diversions of cash from Nortel Ireland to Nortel Networks Inc. constituted fraudulent dispositions pursuant to section 139 of the Irish Companies Act 1990.*

132. Subject to that proviso, this claim of NN Ireland is in accordance with the statutory relief provide for under the 1990 Act and the Redmond Declaration does not appear to dispute this claim (subject to the appointment of a liquidator which has not occurred).

133. I do not agree that the point is *"moot"* but, rather, that for it to arise it would first be necessary for a winding-up to commence in Ireland.

### 7) CONTRIBUTION; UNJUST ENRICHMENT; SUBROGATION; OBLIGATION TO REPAY (Claims 28 – 31)

134. These claims are made in the Proof of Claim exclusively on the basis of a determination notice issued by the Determinations Panel of the UK Pensions Regulator to the effect that a direction should be issued in respect of certain companies, including NN Ireland, requiring those companies to provide financial support to the Nortel Networks UK Pension Plan. There would appear to be several reasons why it is contingent at this time whether, and in what amount, a liability will ultimately arise for NN Ireland pursuant to these matters.

(i)     The decision of the Determinations Panel affecting NN Ireland has been referred to the Upper Tribunal (Tax and Chancery Chamber), and the references have not yet been heard.

    (ii)    The question of the enforceability against NN Ireland of any Financial Support Direction or Contribution Notice is a matter, at least in part if not entirely, of UK law and outside the scope of this declaration.

    (iii)   No indication has been given as to the possible or likely quantum of any liability that might arise on foot of these matters and how such liability might be apportioned between and/or met by the various recipients of Financial Support Directions and/or Contribution Notices.

    (iv)   In particular, the effect on the allocation of liability of the failure of NNI to refer to the Upper Tribunal the determination made against it by the Determinations Panel and of the subsequent directions made by the Upper Tribunal against NNI are unknown.

    (v)    Furthermore, the likelihood of a liability arising for NN Ireland in circumstances where a determination has been made against NNI in respect of the same underlying circumstances and has not been referred to the Upper Tribunal by NNI cannot readily be assessed at this stage.

    (vi)   The basis on which any liability that might ultimately rest with NN Ireland would be recoverable from NNI must inevitably depend to some extent on unknown future events and is therefore not ascertainable at present.

    (vii)   The scheme of the relevant provisions appears to envisage the exercise of some discretion by the UK Pensions Regulator, by way of consideration as to whether it is reasonable to impose liability, and it is not possible to anticipate how such discretion would be exercised.

135. It is clear therefore that the existence and quantum of the potential liability for NN Ireland arising pursuant to these matters is contingent on future events and is affected by UK law. For example, an Irish court would need to be appraised of the factual background to the possible imposition of a liability on NN Ireland and the basis on which it is claimed that part or all of that liability ought to rest with NNI. Because the relevant facts will inevitably change and develop over time, it is not possible to arrive, at this time, at any accurate assessment of the likelihood of success of such a claim in Irish law. Also, if an Irish court were asked to consider granting relief in respect of a contingency (e.g. declaratory relief giving a right to an indemnity) the Court would be very likely to require to be informed as to the likelihood that the contingency would crystallise, and such information would again obviously be provided as of the date on which the matter came before the Court.

136. It is therefore not possible to express any firm view based on the information currently available as to whether a claim grounded on these circumstances would ultimately succeed under Irish law. However, the relevant legal principles on which any such claim might be advanced under Irish law can be summarised, and these are dealt with below, by way of response to the Redmond Declaration.

137. The Redmond Declaration seeks to set out and summarise the law concerning three (3) inter-related areas and I will turn to each of these:

### a) Unjust Enrichment

138. At the outset, I wish to refer to the Redmond Declaration (RD94) and, in the context of the claim in respect of the FSD liability, the contention that NN Ireland's claim does not allege that there was any *"enrichment of the defendant at the expense of the plaintiff"*. I agree that the Proof of Claim does not allege any past unjust enrichment arising from claim in respect of FSD liability. However, possible future unjust enrichment contingent on the outcome of this issue is clearly alleged in the Proof of Claim.

139. In this regard I refer to paragraph 196 of the Proof of Claim (Claim 29) where it states as follows:

> *In the event that NN Ireland is ultimately required pursuant to an FSD or CN to make a payment or series of payments to the Trustee or otherwise provide financial support for the Scheme, NN Ireland will or may have claims for recoupment or contribution against NNI arising under English law, Irish law, or alternatively under US law, on the basis that NN Ireland will have been required by compulsion of law to satisfy in whole or in part an obligation owed by NNI to the Trustee, and **NNI will therefore have been unjustly enriched at the expense of NN Ireland**. (Added emphasis.)*

140. In my view, the statement of the law set out in the Redmond Declaration is correct and, in my view, applying the *"test"* of the Irish courts regarding unjust enrichment to the Proof of Claim establishes that the claim would be well made out in Irish law. I accept that the Court may well look at the issue of whether the behaviour of the party who retained the money was *"unconscionable"* but in my view the conduct alleged in the Proof of Claim would be likely to be found to have been sufficiently unconscionable to satisfy the Court. Commentary in *Goff & Jones* on *The Law of Restitution* supports this view based on decisions of the English courts where a defendant has received a benefit at the plaintiff's expense and *"which today can be best explained on the ground that it would be unconscionable for the defendant, having received an incontrovertible benefit at the plaintiff's expense, to reject a claim that he should make restitution of his unjust enrichment"*[26]. Whilst cautioning against this being used to rewrite commercial agreements negotiated at arm's length, I nonetheless take the view that there is an argument to be made that the receipt of the benefit may be sufficient of itself to satisfy the requirement of *"unconscionability"*.

141. It is the case that there is no express Irish authority on whether a claim for unjust enrichment based on a future contingency can result in the granting of relief to a claimant. This remains an open question, and therefore remains a possibility in Irish law.

### b) Subrogation and Obligation to Repay (Recoupment)

---

[26] Page 51, para 1-059.

142. The Redmond Declaration offers no view as to NN Ireland's claim for subrogation and obligation to repay, other than asserting (without express authority) that there must be actual damages and not merely a contingent harm alleged.

143. ***Recoupment*** refers to the legal principle, recognised under Irish law, that any person who has (under compulsion of law) made a payment whereby he has discharged the primary liability of another is entitled to be indemnified by that other. ***Subrogation*** is the remedy available to an aggrieved party (such as NN Ireland) to reverse an instance of unjust enrichment. As noted in ***Halsbury's Laws of England***[27], subrogation arises not only in cases of suretyship, but also in cases in which – without a contract of suretyship – there is a primary and a secondary liability of two persons for one and the same debt, the debt being, as between the two, that of one of those persons only, and not equally of both, so that the other, if he should be compelled to pay it, would be entitled to reimbursement for the person by whom, as between the two, it ought to have been paid.

144. Again, whilst the concepts of subrogation and recoupment are grounded on the existence of actual damage, there appears to be no binding judicial determination that these reliefs cannot be available in respect of a contingent loss.

### c) Contribution

145. ***Goff & Jones*** on ***The Law of Restitution (Seventh Edition, 2007)*** introduces the right to contribution as follows:

> *It has long been held that at law and in equity, sureties, joint-contractors, trustees, directors, partners, insurers, mortgagors and co-owners can as a general rule claim contribution from their co-obligors if they satisfy more than their proper share of the common debt. But contribution claims were and are not limited to these familiar situations*[28].

146. The law of contribution requires a common demand and the ground for the claim (as in this instance) is to seek – by way of restitution – to require the co-obligor to contribute that which was paid by the claimant under compulsion of law.

147. The Redmond Declaration states that the claim for a contribution is "*deficient*" since there is no specific assertion that the relationship of principal/surety exists between NN Ireland and NNI. In light of the fact that a claim for contribution is not limited to principal/surety, I do not agree with his assessment that the claim of NN Ireland is thereby deficient.

148. Again, the question whether contribution can arise on a contingent loss does not appear to have be dealt with expressly in reported decisions of the Irish Courts.

### 8) CONTRACTUAL CLAIMS (Claims 16, 17)

---

[27] Fourth Edition, paragraph 770.
[28] Page 385, para 14-001

149. The Proof of Claim contains three (3) distinct contractual claims, as follows:

    a) ***Claim 1:*** Contractual claim for inter-company trading debts in the amount of US$2,902,547.59 due by NNI to NN Ireland which arises from debts carried on the books and records of NN Ireland pursuant to an express or implied agreement that they would be repaid – it appears that this claim is not being disputed in the instant proceedings;

    b) ***Claim 16:*** Contractual claim on the basis that there was an implied contract between the selling Nortel entities that the Pre-Petition Sale Proceeds would be distributed as amongst them in accordance with the arm's length principle. The allegation is that NNI's participation in the decision making in relation to the allocation of sale proceeds constituted a breach by NNI of that implied contract; and

    c) ***Claim 17:*** Contractual claim under the relevant sale contracts pursuant to the governing law applicable to the sale contracts that NN Ireland would receive a fair and appropriate allocation (based on the arm's length principle) of the Pre-Petition Sale Proceeds.

150. The Redmond Declaration enumerates eight (8) points which are stated to be "basic minimum" which Irish courts require on a contract claim. The Redmond Declaration concludes that the Proof of Claim fails to allege any of the "*requisite facts apparent*", and that therefore Claims 16 and 17 do not "*satisfy Irish law*".

151. I do not agree with the conclusion as regards Claims 16 and 17 of the Proof of Claim (RD103).

152. Under Irish law, the general rule is that a contract does not have to be in writing before it can be enforced. For instance, in the case of ***Pernod Ricard & Comrie plc – v- FII (Fyffes) plc (Unreported, High Court, 21 October 1988),*** an oral agreement for a multi-million pound takeover was enforced. Costello J. in the High Court stated as follows:

    *It is true that no written form of irrevocable undertaking had been produced for the defendant's inspection at [the] time [of the agreement] and that it was understood that one would be executed [the following day]. But the contract was not required by law to be in writing and the execution of a written document was not made a condition precedent to the defendant's liability under the agreement; it was merely a means of implementing a concluded bargain.*

153. In summary, Irish law does not (subject to certain exceptions primarily derived from the *Statute of Frauds (Ireland) 1695*) impose basic minimum requirements as to the nature of the contract concluded.

154. The basis for Claims 16 and 17 is set out at Section I of the Proof of Claim whereby it is alleged that NN Ireland entered into various global business sales with other Nortel entities (including NNI) for the sale of particular business lines (hereafter "*the Contract*") and that the implied terms of the Contract were as follows:

    a) The Pre-Petition Sale Proceeds would be distributed on an arm's length basis; and

    b) NN Ireland would receive a fair and appropriate allocation (based on the arm's length principle) of the Pre-Petition Sale Proceeds.

155. In my view, the claims (16 and 17) accord with contract law in Ireland and, if the claims were subject to litigation before an Irish court, the evidential matters enumerated in the Redmond Declaration would be matters of proof to be established at the trial of the action (or, indeed, a defendant could elect to seek further and better particulars of the basis upon which it is alleged that the relevant contract(s) contained the implied terms alleged).

However, the contractual claims cannot simply be dismissed on the basis of not meeting *"basic minimum"* set by the Irish courts. In my view, the matters listed at paragraph 102 of the Redmond Declaration refer to the evidence which a party claiming such a contract may be required to adduce at the trial of the action. However, insofar as contract law in Ireland is concerned, my view is that as a matter of pleading, the details set out in the Proof of Claim would be sufficient within the Irish legal system to allow the allegation to proceed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 14 September, 2011

John Hennessy SC
SC