# MERRILL BRINK
## INTERNATIONAL

**17 DOMINION STREET, LONDON EC2M 2EF**
**PHONE: +44 (0)20 7562 3300**

Wednesday, 14 September 2011

To whom it may concern,

We, Merrill Brink International, hereby certify under penalty of perjury of the laws of the United States that to the best of our knowledge the English document attached to this letter ("Mr Menjucq Declaration – 14 September 2011 (English)") is a true and accurate translation of the original French document ("Mr Menjucq Declaration – 14 September 2011 (French)") provided to us by Herbert Smith LLP.

If there is any further information we can provide you with, please do not hesitate to contact us.

Yours sincerely,

Christiane Leinhaas
Operations Manager

*ON BEHALF OF*
**MERRILL BRINK INTERNATIONAL**
17 DOMINION STREET
LONDON EC2M 2EF
TEL: +44 (0) 20 7562 3300
FAX: +44 (0) 20 7562 3335

Signed: _____

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., et al., | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |

**DECLARATION OF PROFESSOR MICHEL MENJUCQ IN SUPPORT OF JOINT ADMINISTRATORS' OPPOSITION TO THE DEBTORS' AND COMMITTEE'S JOINT OBJECTION AND MOTION TO DISMISS THE CLAIMS OF NORTEL NETWORKS S.A. (NNSA) AND ITS FRENCH LIQUIDATOR**

**Michel MENJUCQ**

*Agrégé des Facultés droit*

*Professeur à l'Université*

*Paris I-Panthéon-Sorbonne*

## DECLARATION

## I.      INTRODUCTION

I, Michel Menjucq, hereby declare as follows in compliance with article 28 USC §1746:

1.      This declaration is prepared in connection with the Notice of Joint Objection and Motion to Dismiss Claims of Nortel Networks S.A. ("NNSA") and its French liquidator, filed by, amongst others, Nortel Networks Inc. ("NNI") in respect of the Proof of Claim filed on 3 June 2011 by NNSA and its French liquidator appointed in the course of the secondary insolvency proceedings opened in France (the "Proof of Claim").

2.      On the basis of my professional and academic experience, I am qualified to give this opinion. I have been a Professor at the *Université de la Sorbonne* (Université Paris I) since 2000, *agrégé* of the Faculties of Law since 1997, doctor of law since 1995, and, since 2009, I have been scientific director of the Review of Insolvency Proceedings, which is the principal French journal specialising in insolvency law.

3.      As a specialist in domestic and international commercial law, I am the author of several works and many articles on French, European and international insolvency proceedings. Several of my articles on European insolvency law have been published in international journals (see CV appended).

ON BEHALF OF

MERRILL BRINK INTERNATIONAL

C.L,

4.  In my capacity as University Professor, *agrégé* of the Faculties of Law, I am frequently consulted by *avocats* to give my opinion on specific points of domestic French, European or international insolvency law.

5.  The *aggregation* in private law and criminal sciences examination, which may only be taken by doctors of law, is extremely selective and requires that candidates have an in-depth knowledge of all private law. The examination process, which takes place every two years, lasts for approximately one full year and comprises four very difficult tests. One test, called the 24-hour lesson, requires a one-hour presentation before a panel consisting of six professors and a magistrate of the *Cour de cassation* on a broad subject, after 24 hours of preparation.

6.  The aggregation examination, following which successful candidates are appointed *professeurs agrégés* and choose their university according to their ranking, is regarded as one of the most challenging in France. The fact that the examination is very selective contributes to the fact that *professeurs agrégés* are considered legal experts in France and are often requested to give legal opinions by *avocats*. In my experience, in practice, it is rare in France for *avocats* to be asked by their colleagues to serve as experts.

7.  I have been instructed to prepare this declaration by (i) *Maître* Cosme Rogeau, and his counsel Foucaud Tchekhoff Pochet & Associés, liquidator of NNSA in the secondary insolvency proceedings opened in France, and, by (ii) the Joint Administrators of NNSA appointed in the main insolvency proceedings opened in the United Kingdom, and their counsel Herbert Smith LLP.

8.  In order to prepare this declaration, I have read:

    8.1  the Proof of Claim;

    8.2  the Declaration of Guilhem Bremond in Support of Joint Objection and Motion to Dismiss Claims of NNSA and its French Liquidator dated 22 July 2011; and

    8.3  the Joint Objection and Motion to Dismiss the Claims of NNSA and its French liquidator dated 22 July 2011.

9.  For the purposes of this declaration, I have assumed the facts stated in the Proof of Claim to be true. Therefore, any opinions expressed hereafter assume that the facts as pleaded are true.

10. In making this declaration, I have been remunerated with fees at the hourly rate of 450 Euros, which is the rate I usually charge for my consultation activity. No success fee was agreed or provided for to draw up this declaration. I have never previously worked on behalf of any of the companies of the Nortel Group.

11. Mr Bremond refers to three types of French law claims: (1) claims in liability for insufficiency of assets based on article L. 651-2 of the Commercial Code; (2) claims in civil liability based on article 1382 of the Civil Code; and (3) claims relating to actions with respect to the UK Pension Regulator. I will examine each of these claims in turn. First, I will provide a short description of the French legal system.



## II.    PRESENTATION OF THE FRENCH LEGAL SYSTEM

12.    Before examining the claims, it is necessary to explain the role of the law, case law and doctrine in the French legal system as the French system differs greatly from that of the USA.

13.    In France, statutes, understood as legislation passed by Parliament, are the main source of the law.

14.    The role of the courts is to apply the law as it is written. Unlike the USA, the French system does not have a system of precedent. Article 5 of the Civil Code prohibits precedents, which means that a French judge cannot, in relation to a case that he/she has to try, formulate a general statement. Just as article 5 of the Civil Code does not allow judges to bind themselves for the future by declaring that they will judge the same questions in accordance with the principles they have previously laid down, it prevents them from simply referring to a former decision (irrespective of whether such decision is a previous decision of that judge or a decision of the *Cour de cassation*, the highest French Court) to justify their decision.[1]

15.    In France, the existence of a previous decision on a particular point of law will not at all require other courts having to rule on the same legal issue, in different proceedings, to deliver the same decision.

16.    As a result, decisions of French trial judges (i.e. first instance courts and courts of appeal, rather than the *Cour de cassation*) have limited influence. They may be taken into account by the courts but do not bind other trial judges to adopt the same conclusions.

17.    This principle also applies to the decisions of the *Cour de cassation* which are not binding on inferior courts as precedent for propositions of law. However, as a result of the seniority of the *Cour de cassation*, which is the highest court of the French judicial system, lower courts generally take into consideration the position adopted by the *Cour de cassation* although there is no legal obligation to do so.

18.    Pursuant to article 4 of the Civil Code, a French judge has a duty to decide the case submitted to him/her, including when the relevant legislation is incomplete, i.e. there is no specific rule related to the point in question or the rule is unclear.

19.    In these two circumstances, a judge will often rely on doctrine in order to find a solution or to interpret the law. In France, legal doctrine is principally produced by academics, amongst whom the most eminent are *professeurs agrégés* of the faculties of law. *Avocats* are less involved in French doctrine and their opinions are less often taken into consideration by French judges. Thus, French judges regularly draw the solutions of their cases from the opinions expressed by doctrine, which gives doctrine an important role in the creation of case law.

---

[1] *Cour de cassation,* second civil chamber, 2 Nov 1994, Bull. civ. 1994, II, no. 216.

MERRILL BRINK INTERNATIONAL

C·L,

### III.    CLAIMS BASED ON ARTICLE L. 651-2 OF THE COMMERCIAL CODE (Claims No. 2, 6, 13 and 16)

20.    The basis of this action is article L. 651-2, paragraph 1, of the Commercial Code; it has been known traditionally under the name of "action for payment of insufficiency of assets" but now, since the law of 26 July 2005, called "action for liability for insufficiency of assets".

21.    This article provides: *"When the court-ordered liquidation of a corporate entity shows an insufficiency of assets, the court, in the event of mismanagement having contributed to this insufficiency of assets, may decide that the amount of this insufficiency of assets shall be borne, wholly or partly, by all legal or de facto directors, or by some of them, having contributed to the mismanagement. In the event of multiple directors, the court may, through a reasoned decision, declare them jointly and severally liable."*

22.    Article L. 651-2 was introduced into the Commercial Code by the law on insolvency proceedings of 26 July 2005. That law did not change the substantive conditions for action for payment of insufficiency of assets, which had been previously defined identically in the former article 180 of the law of 25 January 1985 and, before that, in article 99 of the law of 13 July 1967. The law of 26 July 2005 only changed the number of the article of the Commercial Code, in which the provision already existed (at article L. 623-4) following the new codification of the Commercial Code in 2000.

23.    As a result, since 1967, there has been legal continuity for the criteria of the action for payment of insufficiency of assets and, thus, decisions prior to 2005 are still of interest.

24.    As Mr Bremond[2] and the Proof of Claim[3] indicate, the conditions which must be satisfied for article L. 651-2 to be applicable are as follows:

    24.1    the people sued are the legal or de facto directors;

    24.2    those legal or de facto directors have committed mismanagement;

    24.3    such mismanagement contributed to the insufficiency of assets of the company.

    Each of the conditions set out at 24.1 to 24.3 must be proven.

25.    A claim on the basis of article L. 651-2 of the Commercial Code is time-barred from three years after judgment ordering judicial liquidation.[4]

26.    Since NNI was not a de jure director of NNSA, NNSA must demonstrate, in order for article L. 651-2 of the Commercial Code to apply, that NNI was a de facto director of NNSA. NNSA must then demonstrate that NNI committed one or more mismanagement act(s). Finally, NNSA must establish that the mismanagement act(s) contributed to its insufficiency of assets. I will examine each criterion in turn.

---

[2] Declaration of Mr Bremond, no. 26.
[3] Proof of Claim, no. 99.
[4] Article L.651-2(2) of the Commercial Code.

MERRILL DRINK INTERNATIONAL

C.L,

### III.1    On NNI's de facto director status

27.    Determination of de facto director status falls within the sovereign assessment of trial judges, but the *Cour de cassation* exercises control by ensuring that the reasons relied upon by these judges are sufficient and pertinent. If this is not the case, their decision is quashed for insufficient reasons or lack of legal basis. In that respect, considering the case law of the *Cour de cassation* is relevant.

28.    In order to determine whether NNI may be sued by NNSA on the basis of article L. 651-2 of the Commercial Code, it must be first determined whether NNI can be regarded as de facto director of NNSA. In that respect, as noted by Mr Bremond,[5] French law does not give a definition of the concept of de facto director. It is doctrine[6] which has defined this concept and this definition has been used by French courts.

29.    The status of de facto director has been applied to a highly diverse range of people (banker, franchisor,[7] licensor, relative or friend of a legal director, employee,[8] or public body), with no shareholding relationship with the company, even though, of course, it has also been applied in the context of a group of companies.

30.    Two elements define de facto director status:

   30.1    performance of positive acts of management as would a de jure director; and

   30.2    performance of these acts independently and continuously.

### A.    Performance of acts of management as would a de jure director

*"Total subordination" is not a criterion of de facto directorship*

31.    "Total subordination" is absolutely not a criterion of de facto directorship.

32.    The most important criterion is the performance of predominant influence through the performance of acts of management as would a de jure director.

33.    In that sense, I can only disagree with Mr Bremond's statement that de facto director status for a parent company is demonstrated only in cases of "total subordination".[9]

---

[5] Declaration of Mr Bremond, no. 29.

[6] G. Notté, Les dirigeants de fait des personnes morales de droit privé: Thèse Paris, 1978; La notion de dirigeant de fait au regard du droit des procédures collectives: JCP CI 1980, 8560. - D. Tricot, Les critères de la gestion de fait: Droit et patrimoine Jan 1996, p.24.

[7] For an example of franchisors considered as de facto directors: *Cour de cassation*, Commercial Chamber, 9 November 1993, appeal no 91-18351.

[8] For an example of salaried technical directors considered as de facto directors: Paris Court of Appeal, 3rd chamber A, 30 October 2007, *Revue des procédures collectives* 2008, p.69, no. 84.

[9] Declaration of Mr Bremond, no. 36.

MERRILL BRINK INTERNATIONAL

C·L·

34.    Whilst, on occasions, certain decisions may have noted that element, French courts have never regarded "total subordination" as a condition for making out de facto directorship. Even though Mr Bremond heavily relies on one decision of the Court of Appeal of Lyon of 7 February 1999[10] which found, according to him, that a parent company was a de facto director because of the total subordination of the subsidiary, this decision is from a lower court which does not have any binding authority on other courts which are not obliged to apply this solution.

35.    In this respect, a recent decision of the *Cour de cassation* of 15 February 2011[11] properly demonstrates that the status of de facto director may be adopted with regard to a person (in this case, an individual) who was merely a majority shareholder. In this case, according to the *Cour de cassation*, the individual (who was also the lawyer of the company in question) did *"not only act as majority shareholder, drafter of legal documentation and advisor, as lawyer, but had a major decision-making role in the management of the company"*. This case law can be transposed to relationships between the companies of the same group and demonstrates that what is essential to recognise the status of de facto director is the existence of a predominant influence in the company's decision-making process, although it is not necessary to demonstrate "total subordination".

36.    Under French law, there can be several de facto directors of the same company, which confirms the fact that the criterion of "total subordination" stated by Mr. Bremond is not a relevant criterion for de facto directorship. [12] In the case of several de facto directors, judges must determine their individual liability.    Only those who have committed mismanagement can be held liable. Provided that judges give specific reasons to that effect, de facto directors can be held jointly and severally liable.  Also, de facto and de jure directors can be held jointly liable.

Group of companies

37.    Merely belonging to a group of companies will not establish de facto directorship.

38.    It therefore must be proven that one of the companies of the group became involved in the management of another company (subsidiary or sister company) by exercising positive management acts independently.  A corporate entity may be regarded as a de facto director if it has acted via a private individual it has chosen and which has acted for its account.[13]  It has thus been judged that a parent company exercising predominant influence over its subsidiary and having de facto authority over its managers must be considered a de facto director.[14]

39.    While, within the framework of groups of companies, French courts have often ruled on scenarios in which the de facto director was the parent company, this element is in no way essential, and the direct holding of share capital is certainly not a condition required by French courts to uphold the status of de facto director of a company.

---

[10] Declaration of Mr Bremond, no. 36.

[11] *Cour de cassation*, Commercial Chamber, 15 February 2011, appeal no. 10-11781: *Bulletin Joly*, August 2011, p.583, note B. Saintourens.

[12] See F. Pérochon and R. Bonhomme, Law on undertakings in difficulty, instruments of credit and payment, LGDJ, 8th edition 2009, no. 568.

[13] *Cour de cassation,* Commercial Chamber, 27 June 2006, appeal no. 04-15.831.

[14] Court of Appeal of Aix-en-Provence, 8th ch, 26 May 1981: D. 1983, inf. rap. p.60, obs. Derrida; RJ com 1981, p.344.

MERRILL BRINK INTERNATIONAL

*C.L.*

40.    In a decision dated 16 December 1981, the *Cour de cassation* found[15] that a private individual who was a legal director of company M was also de facto director of company D, a subsidiary of company M, whereas company M was not regarded itself as de facto director of company D.  In this case, the fact that the private individual did not hold directly any share in the subsidiary did not prevent that person from being regarded as de facto director of that company by the *Cour de cassation*.

41.    In the same sense, the *Cour de cassation* ruled that a corporate entity without any shareholding link with a company managing a hotel should be regarded as de facto director of the latter since, under cover of a service provision contract, it was responsible for the administrative and financial organisation, set the pricing policy, negotiated contracts and set the commercial policy of that company.[16]

42.    This also applies of course to the companies of a group, as a company can be considered the de facto director of one of its sister companies, although this scenario is less common in case law than finding the status of de facto director for a parent company.  In this respect I note that NNI provided many services for NNSA, for which it determined tax policy, including with regard to its relations with the French tax authorities.[17]  Thus, I find that the conclusion found in the previous ruling of the *Cour de cassation* of 19 December 1995 with regard to the de facto director of a hotel company could apply to NNI.

43.    I note that it is not at all necessary in French law to provide the reasons that have led to a company allowing itself to be managed in practice by an individual or corporate entity other than its de jure directors.

44.    Thus, the fact that Mr Bremond[18] wonders why and how NNSA has followed NNI's instructions, its sister company, is pointless.

45.    French courts never ask these questions.  They are only interested in evidence demonstrating the existence of a de facto directorship situation.

The method applied by French courts

46.    De facto directorship will be found when it is demonstrated that the de facto director had a predominant influence over the management of the company through the performance of positive acts of management in the same way a de jure director would.  It is not necessary to demonstrate that the de facto director was involved in all decision-making for the company.

47.    In order to determine the existence of such an influence, French courts apply the "bundle of concurring elements" technique.[19]

48.    With regard to the method used by French courts, the analysis of Mr Bremond throughout his statement (which leads him to examine each element separately and to assess whether each element, taken individually, supports the conclusion that there is a de facto director situation) is not correct.

---

[15] Bull. Joly 1982, p.154, § 54-1 ; *Revue Trimestrielle de droit commercial*, 1982, p.467, obs. Ph. Merle.
[16] *Cour de cassation,* Commercial Chamber, 19 Dec 1995, appeal no. 92-20.116: Juris-Data no. 995-003707.
[17] Proof of Claim, nos. 21 – 22.
[18] Declaration of Mr Bremond, no. 43.
[19] See D. Gibrila, Juris-cl commercial, line 1050: *Cour de cassation, Commercial Chamber,* 19 February 2002, RJDA 7/2002, no. 791.



ON BEHALF OF
MERRILL BRINK INTERNATIONAL
C.L.

49.    Contrary to the method followed by Mr Bremond, the elements of management must not be analysed separately, but jointly.  The status of de facto director is deduced from the elements in aggregate.  Consequently, to determine whether NNI may be considered a de facto director, one must not, contrary to what Mr Bremond has done in his statement, analyse the role of NNI by considering each management act in isolation; on the contrary, it is necessary, to comply with the method followed by French courts to make a global analysis taking into consideration all of the positive management acts over which NNI has had an influence.

50.    If it turns out from this global analysis that the elements do concur that NNI has exercised a predominant influence over the acts of management of NNSA, then NNI must be classified as a de facto director of NNSA.

Application of the "bundle of concurring elements" method to NNI and NNSA

51.    In this case, the elements in the aggregate support the conclusion that NNI performed positive acts of management as a de jure director would have done.

*Element No 1: putting into place arrangements relating to intra-group transfer pricing*

52.    With regard to the intra-group transfer pricing, the decision to apply a new model, entitled *"Residual Profit Split Methodology"* (RPSM), which replaced the previous model, called *"cost sharing arrangements"*, which was far more balanced for NNSA,[20] was taken by NNI and NNL without even consulting NNSA whose de jure directors played no role in the decision-making process which led to this very significant change of method.[21]

53.    The RSPM project was indeed prepared by a team of NNI employees from the Nortel group's tax department and its implementation was carried out under the responsibility of, in particular, Mark Weisz, international tax director of the group and an employee of NNI.[22]

54.    Furthermore, an illustration of the absence of any consultation with NNSA can be seen from the absence of consultation with the French tax authority even though the authority could have called into question the basis of the new transfer pricing method by taxing NNSA.[23]

55.    A consultation with NNSA's board of directors did not take place when determining the content of the "Master Research and Development Agreement" (MRDA)[24] which constitutes the general contractual framework in which the RPSM is incorporated.  The RPSM methodology was very detrimental to NNSA.[25]  The lack of minutes of NNSA's board meeting on the approval of NNSA's involvement in the MRDA is an example of the absence of any contribution by the de jure directors of NNSA in the decision-making process.[26]

---

[20] Proof of Claim, nos. 18(g), 57 – 69.
[21] Proof of Claim, nos. 16 – 22; 36 – 45.
[22] Proof of Claim, nos. 19, 21 – 22.
[23] Proof of Claim, nos. 18(a), 69.
[24] Proof of Claim, nos. 18(c), 47.
[25] Proof of Claim, nos. 54 – 69.
[26] Proof of Claim, no. 18(f), 18(g).


MERRILL BRINK INTERNATIONAL

C./L.

56.   The lack of minutes is all the more remarkable since the MRDA could have been classified as a "regulated agreement"[27] according to French law, requiring a deliberation of the NNSA board of directors.

57.   It was only in June 2005, after the MRDA agreement went into effect, that NNSA's board of directors acknowledged this agreement.[28]

58.   In fact, NNSA received the instruction from NNI and NNL to sign the MRDA, the implementation of which was imposed on it retrospectively to 1st January 2001, at a time where NNSA was already experiencing substantial losses.[29]

59.   I note therefore that with regard to the RPSM and the MRDA, NNSA's de jure directors had no part in the decision-making process which led NNSA to conclude those agreements. These decisions were taken by NNI and NNL and imposed upon NNSA without consulting its de jure directors.

60.   I note that the Proof of Claim states that the French Tax Authorities considered that the change to the RPSM was an abnormal act of management.[30]

61.   In my opinion, these facts constitute significant evidence that NNI and NNL had a predominant influence over NNSA which led them to decide on positive management acts in lieu of NNSA's de jure directors. The act of taking decisions instead of the de jure directors is typical of de facto directorship since it corresponds to one of the criteria generally noted by French courts.[31]

*Element No 2: the repayment in February 2008 of the subordinated loan contracted in 2002*

62.   The repayment in February 2008 of the subordinated debt contracted in 2002 by NNSA constitutes further evidence of the de facto management performed by NNI over NNSA.[32]

63.   While the subordinated loan by NNL to NNSA only provided for its repayment should NNSA return to a profitable financial position, NNI and NNL imposed, in 2008, the repayment decision on NNSA. I note, in this regard, the pressure exerted by Ryan Smith (of NNI).[33]

---

[27] Article 225-38 of the Commercial Code:  "Any agreement taking place directly or through a person intervening between the company and its general manager, one of its deputy general managers, one of its directors, one of its shareholders holding a share of the voting rights greater than 10% or, where it is a shareholding company, the controlling company in accordance with article L.233-3 must first receive the authorisation of the board of directors.
*The same applies to agreements in which a person referred to in the previous paragraph has an indirect interest.*
*Agreements entered into between the company and another firm are also subject to prior consent if the company's general manager, one of its assistant general managers or one of its directors is the owner, an indefinitely liable partner, a manager, a director or a member of that firm's supervisory board or, more generally, is in any way involved in its management."*
[28] Proof of Claim, no. 18(f).
[29] Proof of Claim, no. 18(d), 72. I understand the Proof of Claim, at paragraph 18(d), as meaning that NNSA received from NNI and NNL the instruction to sign the MRDA.
[30] Proof of Claim, no. 20.
[31] P.M. Le Corre, Dalloz Action Insolvency Proceedings, 2010-2011, no. 921.21.
[32] Proof of Claim, nos. 23 – 26; 70 – 79.
[33] Proof of Claim, no. 75.


MERRILL BRINK INTERNATIONAL

C.L.

64.     Again, I note NNSA's board of directors had not approved this repayment decision.[34]

65.     Thus, the early repayment is another example of a decision taken by NNI in lieu of NNSA's de jure directors.

*Element No 3: the determination of the tax policy of NNSA*

66.     Another element of the de facto directorship over NNSA arises from NNI and NNL's determination of NNSA's tax policy.[35]

67.     During NNSA's 2001 to 2003 tax audit, staff from NNI's tax department prepared NNSA's responses to the French tax authority and demonstrated the merits of the RPSM directly to this authority.[36]

68.     The taking over of a company's tax management has been mentioned several times by case law as evidence of a de facto management situation.

69.     For example, one notes a decision of the Aix Court of Appeal[37] that regarded as de facto director a foreign company which had strict control over its French subsidiary and, in particular, gave instructions concerning its stock management and compatibility and, consequently, its taxes.

70.     Furthermore, the Versailles Court of Appeal ruled that there was de facto management where the notably interested party was the preferred point of contact for administrative services.[38]

71.     Finally, and more importantly, the drafting of corporate and tax documents was also taken into account by the *Cour de cassation* in finding de facto directorship status.[39]


*Element No 4: control over the asset sales and the allocation of proceeds thereof*

72.     Additional evidence resides in the control by NNI and NNL over business sales to unrelated parties and particularly in the allocation of the price received for the sale of the Nortel group UMTS unit to Alcatel Lucent SA in December 2006.[40]

73.     The allocation of the business sale proceeds amongst the Nortel group's entities was decided entirely by NNI and NNL without consulting NNSA, which received significantly less while NNI received significantly more than what would have been allocated according to the arm's length principle.[41]

74.     This element is consistent with the preceding elements and is an additional element evidencing that NNI and NNL took decisions on behalf of NNSA instead of the latter's de jure directors.

---

[34] Proof of Claim, no. 78.
[35] Proof of Claim, nos. 84 – 85.
[36] Proof of Claim, nos. 21 – 22.
[37] Aix Court of Appeal, 15 December 1978, Aix Journal 4/1978, p.89, cited in Francis Lefèbvre's Handbook, Commercial Companies 2011, no. 91481.
[38] Versailles Court of Appeal, 13th chamber, 21 December 2000, RJDA 2001/4, no. 487.
[39] *Cour de cassation*, Commercial chamber, 10 March 2004, appeal no. 01-10015.
[40] Proof of Claim, nos. 80 – 83.
[41] Proof of Claim, nos. 82 – 83.



MERRILL BRINK INTERNATIONAL

C. L.

75. In conclusion, taking as true the allegations abovementioned, my opinion is that all of the elements examined above evidence that NNI has had a predominant influence on the management of NNSA through the performance of positive acts of management as would have a de jure director.

**B.  Performance of management acts independently and continuously**

76. De facto director status implies that acts of management have been performed by the de facto director of his/her own volition.  Hence, de facto director status would not be found for management acts performed pursuant to an agency agreement granted by the de jure directors[42] or power of attorney.[43]  De facto director status would also not be found in relation to an employee who has acted within the limits of his job description and according to the instructions of his employer.  In the latter case, the acts committed by the employee would be attributable to the employer, who could then be regarded as a de facto director.

77. There is no suggestion in the Proof of Claim that there has been an agency agreement or power of attorney.  On the contrary, it seems that NNI acted of its own volition.

78. The Proof of Claim does not suggest that the employees of NNI to which it refers have acted outside the scope of their role.  In these circumstances, the acts of these employees are attributable to NNI.

79. It is also apparent from the Proof of Claim that NNI took decisions and performed management acts during several years, and this evidences continuity.[44]

**C.  Conclusion on de facto directorship**

80. Assuming the aforementioned allegations are true, my opinion is that a French court would very likely judge that NNI has acted as de facto director of NNSA:

80.1  There is more than a sufficient number of concurring elements of positive acts of management as would have been performed by a de jure director.

80.2  NNI has acted independently and continuously.

**III.2  Regarding the existence of mismanagement acts committed by NNI**

81. The concept of mismanagement has a broad acceptance by French courts: *"Any mismanagement, even slight, any carelessness or negligence may call into question the directors' liability"*[45] whether they are de facto or legal directors.

82. One single act of mismanagement will suffice to trigger the liability of a facto director, provided that this mismanagement act predates the opening of court-ordered liquidation proceedings.

83. As another author notes, *"case law is very extensive, almost all management decisions that have or could have a consequence on management (with an extended meaning)"*[46] can be considered mismanagement.

---

[42] *Cour de cassation*, Commercial chamber, 13 February 2007, no. 05-20126.
[43] P.M. Le Corre, Dalloz Action Insolvency Proceedings, 2010-2011, no. 921.21.
[44] Proof of Claim, nos. 18(c), 18(d); 20 – 21; 76, 80 – 83.
[45] Francis Lefèbvre Handbook, Commercial Companies, 2011, no. 91550.

MERRILL BRINK INTERNATIONAL



*C.L.*

84.     Thus, for example, it was judged that a de facto director had committed mismanagement by poorly assessing the company's actual development capacity in an unfavourable economic context and by having taken measures which were inadequate or insufficient in order to remedy the company's situation.[47]

85.     In the present case, the following acts can be considered mismanagement:

85.1     the act of having substituted an unbalanced transfer pricing method to the detriment of NNSA by requiring NNSA to participate in the agreement;[48]

85.2     the act of having required NNSA to repay the 2002 subordinated loan in 2008 even though NNSA had not returned to a healthy financial position;[49]

85.3     the act of having determined NNSA's tax policy to NNSA's disadvantage;[50]

85.4     the act of having being involved in the allocation of the proceeds received from business sales in a manner that was unbalanced for NNSA.[51]

86.     Assuming the allegations contained in the Proof of Claim are true, my opinion is that a French court would judge that NNI committed several mismanagement acts as de facto director of NNSA.

87.     The acts did not allow NNSA's situation to be remedied but, to the contrary, significantly aggravated NNSA's financial situation.[52]

**III.3     Regarding NNI's contribution to NNSA's insufficiency of assets**

88.     Two conditions are to be met for a French court to order a de facto director to contribute to an insufficiency of assets: (1) there must be an insufficiency of assets on the one hand, and (2) a causal link between the mismanagement and the insufficiency of assets on the other hand.

89.     According to the *Cour de cassation*, the insufficiency of assets is the result of an imbalance between the liabilities prior to the start of the court-ordered liquidation proceedings and the assets existing on the day of the judge's ruling.[53]

90.     As for the causal link between the mismanagement and the insufficiency of assets, French courts apply a "loose concept"[54] referring to *"the theory of equivalence of conditions generated by the ordinary law of civil liability which authorises the attribution of all of the damage to each of those who have contributed to causing it"*.[55]

---

[46] F. Pérochon in F. Pérochon and R. Bonhomme, *Law on undertakings in difficulty, Instruments of credit and payment*, LGDJ, 8th edition 2009, no. 568.
[47] Douai Court of Appeal, 31 October 1991, Juris-Data no. 050898.
[48] Proof of Claim, nos. 36 – 69.
[49] Proof of Claim, nos. 70 – 79.
[50] Proof of Claim, nos. 20 – 22, 84.
[51] Proof of Claim, nos. 80 – 83.
[52] Proof of Claim, nos. 107, 131, 158.
[53] *Cour de cassation*, Commercial Chamber, 27 June 2006, appeal no. 05-11690.
[54] F. Pérochon in F. Pérochon and R. Bonhomme, *Law on undertakings in difficulty, Instruments of credit and payment*, LGDJ, 8th edition 2009, no. 570.
[55] C. Hannoun, Juris-cl, Commercial, fasc. 2905, no. 54.

MERRILL BRINK INTERNATIONAL

C.L.

91.  As asserted by the *Cour de cassation*:[56] *"the director of a corporate entity may be declared liable (...) even if the mismanagement it has committed is only one of the causes of the insufficiency of assets and may be ordered to bear all or part of the corporate debts, even if his/her breach is the cause of only a part thereof".*

92.  In the case of the Nortel group, it is apparent from the Proof of Claim that NNI's mismanagement acts having consisted, on one hand, in deciding that NNSA would participate in transfer price agreements less favourable to it than the previous agreements, (which gave rise to the repayment of sums received under the *"cost sharing arrangement"*[57]) and, on the other hand, the repayment in 2008 of the subordinated debt of 2002 contrary to the contractual provisions[58] are, at least, causes of NNSA's insufficiency of assets.   The allocation of proceeds from the sale of assets, which were not made according to the arm's length principle, also contributed to the insufficiency of assets.[59]

93.  These decisions, constituting mismanagement, have led to NNSA's paying other Nortel group entities very significant sums of money or not receiving sums rightly owed to it which contributed to its insufficiency of assets.

### III.4    Conclusion on article L. 651-2 of the Commercial Code

94.  Assuming the allegations in the Proof of Claim are true, my opinion is:

94.1    the conditions for the application of article L. 651-2 of the Commercial Code are all met with regard to NNI;

94.2    NNI was a de facto director of NNSA;

94.3    NNI committed mismanagement which has contributed to NNSA's insufficiency of assets;

94.4    there is a real probability that a French court would uphold NNSA's liability claims based on article L. 651-2 of the Commercial Code against NNI.

---

[56] *Cour de cassation*, Commercial Chamber, 21 June 2005, appeal no. 04-12087.
[57] Proof of Claim, nos. 54 – 69.
[58] Proof of Claim, nos. 70 – 79.
[59] Proof of Claim, nos. 80 – 83.

ON BEHALF OF

MERRILL BRINK INTERNATIONAL

C.L.

## IV.    CLAIMS BASED ON ARTICLE 1382 OF THE CIVIL CODE (Claims No. 3, 7, 14 and 17)

### IV.1    The claims based on article 1382 of the Civil Code are in the alternative to those based on article L. 651-2 of the Commercial Code

95.    The claims based on article 1382 of the Civil Code are alternative claims to claims numbers 2, 6, 13 and 16 based on article L. 651-2 of the Commercial Code.

96.    Indeed, as Mr Bremond recalls in his statement[60], French courts affirm a principle of non-accumulation of claims based on article L. 651-2 of the Commercial Code and article 1382 of the Civil Code.  Claims numbers 3, 7, 14 and 17 may only be upheld if claims numbers 2, 6, 13 and 16 have first been dismissed.

97.    Conversely, if the claims based on article L. 651-2 of the Commercial Code were accepted by French judges, which is highly probable in my opinion, claims numbers 3, 7, 14 and 17 would be declared inadmissible.  These claims are, therefore, in the alternative to the claims based on article L. 651-2.

### IV.2    General principles of civil liability

98.    The general principle of civil liability is stated at article 1382 of the Civil Code which stipulates: *"any action by a person, which has caused damage to another, obliges that person to provide compensation for the damage caused"*.

99.    The provisions of article 1382 are complemented by article 1383 of the Civil Code which provides that liability is also incurred in case of negligence or imprudent act.  In practice, a claim brought under article 1382 of the Civil Code includes an implicit reference to article 1383.

100.    The application of article 1382 of the Civil Code requires three conditions to be met:

  100.1    the existence of an action;

  100.2    damage; and

  100.3    a causal link between the action and the damage.

101.    The concept of fault is used in the Proof of Claim and Mr Bremond's declaration in order to describe the first element required by article 1382 of the Civil Code.  However, I consider that the first element is better described as an event that causes damage or a damaging event.  This is the term that I prefer using because it better describes the evolution of the French law of civil liability, as I will explain below.

### A.    Damaging event

102.    The first element required by article 1382 is not defined by law and once again it is doctrine that has defined the concept.

103.    Traditionally, doctrine referred to the concept of fault.

---

[60] Declaration of Mr Bremond, no. 69.



104. According to Professor Fages, the "fault" required under the first element of article 1382 can be a result of the violation of a legislative or regulatory rule or code of ethics or professional rules but also *"more generally, fault occurs when, assessing a conduct retrospectively, it can be said that a person has not behaved as he or she should have and this is because his or her attitude went against what could have been expected from a reasonable person in the same circumstances (this evaluation is done conceptually by referring to an objective standard)."*[61]

105. In light of the widening of the definition which is currently given by doctrine (and the manner in which article 1382 of the Civil Code is applied by the French courts) I believe, together with other authors of doctrine[62] – although the point remains controversial – that the concept of fault is less and less important in relation to civil liability. In reality, the main criterion is the existence of a damaging event.

106. Mr Bremond states[63] that in French civil law there are no separate causes of action for the common law torts of conspiracy, aiding and abetting, assisting and/or encouraging. He adds, however, that claims brought before common law jurisdictions under these causes of actions would be analysed by French courts on the basis of article 1382 of the Civil Code.[64] I agree with Mr Bremond on these points.

107. Mr Bremond also adds that French courts have applied article 1382 of the Civil Code when one person has helped, in bad faith, another in breaching an obligation towards a third party.[65]

108. I do not agree with Mr Bremond when he states that French courts would require bad faith (as that concept is understood in French law) to be demonstrated before applying article 1382 of the Civil Code in such a case.

109. As I have just stated, the requirement of the first element of article 1382 is an event which causes damage and the intention of the person sued is in any case not relevant even in the traditional concept of civil liability.

110. The irrelevance of the intention of the person being sued means that *"the civil fault is not necessarily an intentional act: it does not require proof of intention to harm or, more exactly, the desire to cause damage. In general, liability may be incurred due to a simple fact of carelessness or negligence".*[66]

111. Bad faith is therefore not a condition for the application of article 1382 of the Civil Code. Accordingly, contrary to Mr Bremond's statement, I consider that French courts would not require proof that NNI knew that its actions would cause a violation of an obligation towards NNSA to impose civil liability upon NNI.

112. Insofar as anyone would argue that "bad faith" is relevant, I add that "bad faith" (as that concept is understood in French law) is not limited to the knowledge of the breach of a duty. There is also bad faith when the person sued is aware that his/her behaviour would cause damage.

---

[61] B. Fages, *Droit des obligations,* LGDJ 2007, no. 494.
[62] Y Buffelan-Lanore and V. Larribau-Terneyre, Droit civil-Les Obligations, 12th ed, 2010, no. 1537 et seq.
[63] Declaration of Mr Bremond, no. 72.
[64] Declaration of Mr Bremond, no. 72.
[65] Declaration of Mr Bremond, no. 72.
[66] B. Fages, *Droit des obligations,* LGDJ 2007, no. 493.

MERRILL BRINK INTERNATIONAL
C.L

**B.**     **The damage**

113.   Damage must be certain and compensable.

114.   A damage which is certain is a damage that undoubtedly occurred and that cannot be questioned.

115.   Damage is compensable only if the loss suffered by the victim is legitimate.  For example, loss of illegal revenue would not be compensable.

**C.**     **The causal link**

116.   Finally, for compensation to be payable, the damage suffered must be caused by a damaging event: this is the causal link.

117.   There must be an actual relationship between the damage suffered and the damaging event. This relationship is required by French courts.

118.   For the relationship to be established, the damaging event need only be one of the causes of the damage.

**IV.3**     **Application of the general principles of civil liability to NNI**

**A.**     **The damaging event**

119.   The Proof of Claim notes that NNI, *inter alia*, acted together with NNL in the following ways:

119.1   the implementation and application of the transfer price policy which contributed to the insufficiency of NNSA's assets (claim no. 3);[67]

119.2   the February 2008 repayment (claim no. 7);[68]

119.3   the unequal distributions in relation to disposals of assets (claim no.  14);[69] and

119.4   NNSA's tax policy (claim no.  17).[70]

120.   The Proof of Claim describes NNI's participation in each of the above in detail and how such actions have resulted in damage to NNSA.

121.   As a result, I believe on the basis of the allegations in the Proof of Claim, and assuming such allegations are correct, that a French court could find that NNI participated in a damaging event that could trigger its liability on the basis of article 1382 of the Civil Code.

122.   The Proof of Claim further states that NNI knew, by participating in certain of the actions mentioned above, that it was causing damage to NNSA.[71] Assuming such allegations are correct, I believe that a French court would find that NNI acted in bad faith (within the meaning of French law) and did not behave as a sister company, placed under the same set

---

[67] Proof of Claim, nos. 111 – 117.
[68] Proof of Claim, nos. 135 – 139.
[69] Proof of Claim, nos. 162 – 165.
[70] Proof of Claim, nos. 171 – 173, 175.
[71] Proof of Claim, nos. 39, 56.


MERRILL BRINK INTERNATIONAL
C.L.

of circumstances, should have reasonably behaved. NNI would have committed fault within the traditional meaning mentioned at paragraphs 103 - 104.

123.    Even if bad faith were a requisite element of article 1382 of the Civil Code – which I do not believe – I consider that the liability of NNI would be triggered.

**B.      The damage**

124.    The damage corresponds to the loss of assets either because NNSA made payments or because NNSA did not receive sums which were owed to it.[72]

125.    The damage is therefore certain. It is compensable.

**C.      The causal link**

126.    The damage has been directly caused by the damaging events (referred to above) and NNI participated in those damaging events.

**IV.4    Conclusion on article 1382 of the Civil Code**

127.    Assuming the allegations in the Proof of Claim are correct, I believe that a French court could find (if NNI were not a de facto director) that the acts of NNI, in relation to NNSA, are enough to trigger liability under article 1382 of the Civil Code.

**V.      CLAIMS RELATED TO FSD LIABILITY (Claims No. 19 – 22)**

128.    The Proof of Claim states[73] that either a Financial Support Direction ("FSD") or Contribution Notice ("CN") may be issued against European entities within the Nortel group, including NNSA, and that such entities may be required to make a payment for the benefit of the UK Pension Scheme, or otherwise provide financial support.

129.    On the date the Proof of Claim was submitted, it was not certain that NNSA would be required to make a payment, or otherwise provide financial support, in respect of any pension scheme liability.

130.    Whether this claim is properly and appropriately pleaded in the present U.S. proceedings is a matter of U.S. law. However, for completeness and contrary to what Mr. Bremond states,[74] the uncertain nature of the claim does not, under French law, prevent a statement of claim from being filed in insolvency proceedings.

131.    According to French law, creditors not only have a right - but an obligation - to declare their claim, even if such a claim is only a theoretical claim, in insolvency proceedings. As Professor Le Cannu illustrates in relation to the creditor of a partnership: *"He [the creditor] has a potential claim on the partners in this partnership and this claim must be made during the proceedings brought against a partner (Cour de cassation, Commercial Division, 30 June 2004, Revue des sociétés 2004, p. 952, note J-F. Barbiéri.)"[75]*

132.    If NNSA were subsequently required to make a payment, or otherwise provide financial support, in respect of any pension scheme liability, it would have several grounds on which

---

[72] Proof of Claim, nos. 54 – 69, 70 – 79, 80 – 83.
[73] Proof of Claim, nos. 86 – 92.
[74] Declaration of Mr Bremond, no. 107.
[75] P. Le Cannu and M. Jeantin, *Entreprises en difficulté*, Dalloz ed. 7th edition, 2006, no. 471, footnote no. 2.

MERRILL BRINK INTERNATIONAL

C.L.

to recover any monies it has paid, for example: contribution; unjust enrichment; subrogation; or, obligation to repay.

133. The applicability of any of these grounds will depend on the circumstances of the application of the FSD or CN.

134. All those legal grounds exist under French law.

135. Mr Bremond describes the regime of unjust enrichment and subrogation in his declaration.[76]

136. Mr Bremond states that he does not know on what legal basis a claim for contribution or obligation to repay can be formed under French law.[77]

137. Contribution and obligation to repay are interrelated concepts. When several debtors are jointly and severally obliged to pay the same debt, if one of the debtors pays the whole debt he has a claim in contribution for payment of the debt against each of the other debtors. Those other debtors must then contribute for the payment of the debt paid by the *solvens* (the debtor who paid) up to their share, i.e. in principle, by equal shares, unless another allocation has been decided. These principles are at article 1213 of the Civil Code when the debt is contractual. French courts apply the same principles when they find several parties jointly and severally liable.[78]

138. The obligation to repay follows the same legal mechanism but from the perspective of the debtors who have not paid the debt. Since according to article 1213, mentioned above, the joint and several obligation to another creditor is divisible by operation of law, these other debtors have an obligation to repay the debtor who paid the whole debt (in proportion to their share in the same manner as referred to in paragraph 137).

139. I note that since NNSA's claim is contingent, NNSA cannot demonstrate at this stage the conditions of their application on each possible legal basis. These conditions can only be specified at a later date, if the FSD and/or CN are issued and NNSA has suffered damage.

140. In these circumstances, and contrary to what Mr Bremond asserts, I do not consider that it is possible, at this point, to set aside the sections of the Proof of Claim which relate to the FSD and/or the CN. In this respect, I disagree with Mr Bremond on the alleged inapplicability of the grounds because all or part of these grounds would apply if the FSD and/or the CN were issued against NNSA.

I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Executed on 14 September 2011, in Bordeaux, France.

*[signature]*

_____

Michel MENJUCQ

---

[76] Declaration of Mr Bremond, nos. 115 – 128 and 129 – 142.
[77] Declaration of Mr Bremond, nos. 110, 143.
[78] *Cour de cassation*, second civil chamber, 5 October 2006, appeal no. 05-16514.

MERRILL BRINK INTERNATIONAL

C.L.

**Michel Menjucq**

*Agrégé des Facultés de droit*
*Professeur à l'Université de*
*Paris I - Panthéon-Sorbonne*

33 Rue Gabriel Geneste
33110      Le Bouscat

mobile: 06 61 45 13 87

mmenjucq@club-internet.fr

# I. Diplomas

- *Agrégation* in private law and criminal sciences, April 1997

- Lecturer (*maître de conférences*), June 1996

- Doctorate in Law, doctoral thesis: "Corporate mobility within Europe", November 1995

- Bar exam (CAPA), November 1989

# II. University positions

-  01/09/2007 to date: co-director of the "Sorbonne-Business" Research Centre of the Tunc Institut of Université Paris I-Panthéon-Sorbonne

-  01/09/2000 to date: Professor at Université Paris I-Panthéon-Sorbonne

- 01/09/1997 - 01/09/2000: Professor at Université de Pau et des Pays de l'Adour

 - 01/09/1996 - 01/09/1997: Lecturer at Université Montesquieu - Bordeaux IV

# III. Other positions

- Expert registered with Paris Chamber of Commerce and Industry:
        - for corporate international law
        - for European law on insolvency proceedings

- Expert to the International Expertise Mission of the General Directorate in charge of research work at the Ministry for Higher Education and Research, since April 2011

- Expert to the Ministry for Education within the context of the scientific, technique and pedagogic mission of the Department of Social Sciences, January 2003 to January 2008

- Member of the National Committee of the CNRS (National Centre for Scientific Research), Section 36 (sociology, norms and rules), December 2004 to December 2007

- Member of the French Committee for Private International Law, since 2002



## IV. Areas of expertise

**Commercial law**
**International and EU company law**
**National, EU, and international insolvency proceedings**


## V. Publishing

- **Co-editor, Revue des procédures collectives [Review of Insolvency Proceedings]**


### Participation on the editorial board for the following

- **Lamy Droit des Affaires [*Lamy Business Law*]**
- **Journal des Sociétés [*Companies Journal*]**
- **European Company Law (Kluwer)**


### Main publications

- **Droit international et européen des sociétés** [International and European Company Law], Montchrestien, Précis Domat, 3rd ed., 2011 (part III focuses on international bankruptcies and European insolvency proceedings);

- **Traité de droit du commerce international** [Treatise on International Commercial Law], ed. J. Béguin and M. Menjucq (with A. Couret, D. Mainguy, C. Seraglini, M. Ruiz-Fabri), Litec, 2nd ed., 2011 (chapter on international bankruptcies and European insolvency proceedings);

- **Droit des affaires: le commerçant, actes de commerce, fonds de commerce** [Business Law: traders, "actes de commerce" and business assets], Gualino, collection Memento, 7th ed., 2011;

- **L'EIRL** [The Limited Liability Individual Entrepreneur] contribution on the EIRL and insolvency law, Litec, collection 360°, 2010;

- **Dalloz Action "Ingénérie Juridique"** [Legal Engineering]: contribution on the European company, May 2009;

- **"La mobilité des sociétés dans l'espace européen"** [Company mobility in Europe] L.G.D.J, collection Bibliothèque de droit privé, 1997.

### Prizes and scientific awards

- Durieux 2006 Award, granted by the Academy for Moral and Political Sciences for Traité de droit du commerce international [Treatise on International Commercial Law]

- Cercle Montesquieu 2002 Award for best book on commercial law for the first edition of Droit international et européen des sociétés [International and European Company Law] (Cercle Montesquieu comprises the General Counsels of the 200 largest corporates in France)

MERRILL BRINK INTERNATIONAL

C.L.

**Main articles on bankruptcy laws in the last four years:**

- "La simplification manquée de la sauvegarde financière accélérée" [A missed opportunity to simplify the accelerated financial recovery procedure], *Revue des procédures collectives*, no. 4/2011, Repère p. 1,

- "Affaire Cœur Défense: la Cour de cassation recadre la Cour d'appel de Paris sur la notion de difficultés justifiant une sauvegarde" [The *Coeur Défense* case: the *Cour de cassation* corrects the Paris Court of Appeal on the concept of difficulties that justify a business recovery procedure], *Revue des procédures collectives*, no. 2/2011, Repère, p. 1,

- "Adoption de la 'sauvegarde financière accélérée': consécration du 'prepackaged plan' en droit français !" [Adoption of the procedure for 'accelerated financial recovery': instituting the 'prepackaged plan' in French law!], *Revue des procédures collectives*, no. 6/2010, Nov.-Dec. 2010, p. 1,

- "L'extension de procédure pour confusion de patrimoine passée au crible du règlement n° 1346/2000: une question à suspense !" [The extension of proceedings for merged assets examined in light of Regulation 1346/2000: an open question!] *Revue des procédures collectives*, no. 4/2010, July-Aug. 2010, p. 1,

- "Commentaire de l'arrêt de la Cour d'appel de Paris, du 25 février 2010" [Comment on the Paris Court of Appeal ruling of 25 February 2010], *Revue des procédures collectives*, no. 3/2010, May-June 2010, Etude, p. 15,

- "Affaire Eurotunnel: une cassation bienvenue !" [The *Eurotunnel* case: a welcome reversal!], *Revue des procédures collectives*, no. 4/2009, July-Aug. 2009, p. 1,

- "LBO et procédures collectives" [LBOs and bankruptcy proceedings], *Les petites affiches*, 9 April 2009,

- "EC-Regulation on Insolvency Proceedings and Groups of Companies", *European Company and Financial Law Review*, June 2008, p. 135,

- "Regulation No. 1346/2000 on Insolvency Proceedings: Facing the Companies Group Phenomenon", *Business Law International*, May 2008, p. 145.

MERRILL BRINK INTERNATIONAL

*C -L .*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., et al., | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |

## DECLARATION OF PROFESSOR MICHEL MENJUCQ IN SUPPORT OF JOINT ADMINISTRATORS' OPPOSITION TO THE DEBTORS' AND COMMITTEE'S JOINT OBJECTION AND MOTION TO DISMISS THE CLAIMS OF NORTEL NETWORKS S.A. (NNSA) AND ITS FRENCH LIQUIDATOR

**Michel MENJUCQ**

*Agrégé des Facultés de droit*

*Professeur à l'Université*

*Paris I-Panthéon-Sorbonne*

### CONSULTATION

## I.  INTRODUCTION

Je soussigné, Michel MENJUCQ, déclare conformément à l'article 28 U.S.C. § 1746 :

1.  La présente consultation est établie au regard de la *Notice of Joint Objection and Motion to Dismiss Claims of Nortel Networks S.A. and its French Liquidator* régularisée pour le compte, notamment, de la société NORTEL NETWORKS INC. ("NNI") à la suite de la déclaration de créances régularisée le 3 juin 2011 par NORTEL NETWORKS S.A. ("NNSA") et son liquidateur français désigné dans le cadre de la procédure secondaire d'insolvabilité ouverte en France ("*Proof of claim*").

2.  Mon parcours et mon expérience professionnelle me qualifient pour établir la présente consultation. En effet, je suis professeur à l'Université de la Sorbonne (Université Paris I) depuis 2000, agrégé des Facultés de droit en 1997, docteur en droit en 1995, et depuis 2009, je suis directeur scientifique de la Revue des procédures collectives qui est la principale revue française spécialisée en droit des procédures collectives.

3.  Spécialiste de droit des affaires interne et international, je suis l'auteur de plusieurs ouvrages et de nombreux articles sur les procédures collectives françaises, européennes ou internationales. Plusieurs de mes articles sur le droit européen des procédures collectives ont été publiés dans des revues internationales (voir CV en annexe).



2

4. En qualité de Professeur d'Université, agrégé des Facultés de droit, je suis fréquemment consulté par des avocats pour donner mon opinion sur des points précis du droit français interne, du droit européen ou du droit international des procédures collectives.

5. En effet, le concours de l'agrégation de droit privé et de sciences criminelles, auquel ne peuvent participer que les titulaires du grade de docteur en droit, est très sélectif et suppose que les candidats approfondissent l'étude de l'ensemble du droit privé. Ce concours national qui n'a lieu que tous les deux ans dure pratiquement une année entière et comporte quatre épreuves très difficiles. L'une de ces épreuves, appelée la leçon de 24 heures, consiste à présenter pendant une heure, au jury composé de six professeurs et d'un magistrat de la Cour de cassation, un sujet très large tiré au sort après l'avoir préparé pendant 24 heures.

6. Le concours de l'agrégation, à l'issue duquel les candidats reçus sont nommés professeurs agrégés et choisissent leur université en fonction de leur classement, est réputé être l'un des plus difficiles en France. La sélectivité du concours d'agrégation de droit privé contribue à ce que les professeurs agrégés sont considérés en France comme des experts du droit et sont souvent consultés par les avocats. D'expérience, dans la pratique, il est rare, en France, que des avocats soient sollicités par leurs confrères pour intervenir comme experts.

7. J'ai été sollicité pour préparer cette consultation par (i) Maître Cosme ROGEAU, liquidateur de NNSA dans le cadre de la procédure d'insolvabilité secondaire ouverte en France, et ses avocats, Foucaud Tchekhoff Pochet & Associés, et par (ii) les *Joint Administrators* de NNSA désignés dans le cadre de la procédure principale d'insolvabilité ouverte au Royaume-Uni, et leurs avocats, Herbert Smith LLP.

8. Pour préparer la présente consultation, j'ai lu:

   8.1  la *Proof of claim*,

   8.2  la *Declaration of Guilhem BREMOND in Support of Joint Objection and Motion to Dismiss Claims of NNSA and its French liquidator* en date du 22 juillet 2011,

   8.3  la *Joint Objection and Motion to Dismiss the Claims of NNSA and its French Liquidator* en date du 22 juillet 2011.

9. Pour établir cette consultation, j'ai considéré que les faits allégués dans la *Proof of Claim* étaient exacts. En conséquence, toutes les opinions exprimées ci-après tiennent les faits allégués comme exacts.

10. Pour réaliser cette consultation, j'ai été rémunéré par des honoraires au tarif horaire de 450 euros qui est le tarif que je pratique habituellement pour mon activité de consultation. Aucun honoraire de résultat n'a été convenu ni prévu pour l'établissement de cette consultation. Précédemment, je n'ai jamais travaillé pour le compte de l'une des sociétés du groupe NORTEL.

11. A la lecture de la déclaration de M. BREMOND, je comprends qu'il discute trois types de demandes sur le fondement du droit français : (1) demandes en responsabilité pour insuffisance d'actif fondées sur l'article L. 651-2 du Code de commerce, (2) demandes en responsabilité civile délictuelle fondées sur l'article 1382 du Code civil, (3) demandes se rapportant à des actions du *UK Pension Regulator*. Je vais examiner chacune de ces demandes successivement. Avant cela, je vais donner une brève description du système juridique français.



3

## II.  PRESENTATION DU SYSTEME JURIDIQUE FRANÇAIS

12. Avant d'examiner les demandes, il est nécessaire de préciser le rôle de la loi, de la jurisprudence et de la doctrine en droit français car le système français est très différent du système américain.

13. En France, la loi, entendue comme les actes législatifs votés par le Parlement, est la source principale du droit.

14. Le rôle des juridictions est d'appliquer la loi. Contrairement au droit américain, le système français ne connaît pas le système du "*precedent*". L'article 5 du Code civil interdit les arrêts de règlement, ce qui signifie qu'un juge français ne peut, à l'occasion du cas qui lui est soumis, formuler une disposition générale. De même que l'article 5 du Code civil interdit aux juges de se lier pour l'avenir en déclarant qu'ils jugeront les mêmes questions d'après les principes par eux posés, il leur interdit de se borner, pour justifier leurs décisions, à renvoyer à une précédente décision, qu'il s'agisse de leur propre jurisprudence ou de celle de la Cour de cassation (la plus haute juridiction judiciaire)[1].

15. En France, l'existence d'une décision antérieure ayant statué sur un point de droit particulier n'oblige donc absolument pas les juridictions ayant à statuer à nouveau sur la même question de droit dans un autre litige de se prononcer dans le même sens.

16. Il en résulte que les décisions des juges du fond français (à savoir les décisions émanant des tribunaux et cours d'appel par opposition à la Cour de cassation) ont une influence limitée. Elles peuvent être prises en considération mais n'obligent assurément pas les autres juridictions du fond saisies ultérieurement à adopter la même solution.

17. Ce principe est aussi vrai pour les arrêts de la Cour de cassation qui ne s'imposent pas aux juridictions inférieures comme arrêts de règlement. Toutefois, en raison de l'autorité morale de la Cour de cassation, qui est la juridiction supérieure de l'ordre judiciaire français, les juridictions inférieures prennent généralement en considération la position adoptée par la Cour de cassation, alors qu'elles n'y sont pas légalement obligées.

18. En vertu de l'article 4 du Code civil, le juge français a le devoir de trancher le litige qui lui est soumis y compris lorsque la loi est défaillante, c'est-à-dire qu'il n'existe pas de règle légale se rapportant au cas litigieux ou que cette règle légale n'est pas claire.

19. Dans cette double hypothèse, le juge va souvent s'appuyer sur la doctrine pour trouver une solution ou interpréter la loi. En France, la doctrine juridique est principalement produite par les enseignants, dont les plus éminents sont les professeurs agrégées des Facultés de droit. Les avocats sont beaucoup moins présents dans la doctrine française et leur opinion est moins souvent prise en compte par les juges français. Ainsi, les juges français puisent régulièrement dans les opinions doctrinales la solution de leurs décisions, ce qui confère à la doctrine un rôle important dans l'élaboration de la jurisprudence.

---

[1] Cour de cassation, deuxième Chambre civile, 2 novembre 1994, Bull. civ. 1994, II, n° 216.

ON BEHALF OF
MERRILL BRINK INTERNATIONAL
C. L.

4

### III. "CLAIMS" FONDÉS SUR L'ARTICLE L. 651-2 DU CODE DE COMMERCE (CLAIMS n° 2, 6, 13 et 16)

20. Le fondement de cette action, connue classiquement sous le nom d'action en comblement de passif mais désormais appelée en droit français "action en responsabilité pour insuffisance d'actif" depuis une loi du 26 juillet 2005, est l'article L. 651-2 alinéa 1er du Code de commerce.

21. Cet article prévoit : *"Lorsque la liquidation judiciaire d'une personne morale fait apparaître une insuffisance d'actif le tribunal peut, en cas de faute de gestion ayant contribué à cette insuffisance d'actif, décider que le montant de cette insuffisance d'actif sera supporté, en tout ou en partie, par tous les dirigeants de droit ou de fait, ou par certains d'entre eux, ayant contribué à la faute de gestion. En cas de pluralité de dirigeants, le tribunal peut, par décision motivée, les déclarer solidairement responsables."*

22. L'article L. 651-2 a été introduit dans le Code de commerce par la loi sur les procédures collectives du 26 juillet 2005. Cette loi n'a pas modifié les conditions de l'action en comblement de passif qui était auparavant définies à l'identique dans l'ancien article 180 de la loi du 25 janvier 1985, et même plus anciennement encore dans l'article 99 de la loi du 13 juillet 1967. La loi du 26 juillet 2005 n'a fait que modifier le numéro de l'article du Code de commerce dans lequel les dispositions se trouvaient déjà (au numéro d'article L. 623-4) depuis qu'elles y avaient été insérées en 2000 lors de la codification du nouveau Code de commerce.

23. En conséquence, il existe depuis 1967 une continuité législative pour les conditions de l'action en comblement de passif, de sorte que les décisions antérieures à 2005 ont toujours un intérêt.

24. Comme l'indique M. BREMOND[2] et la *Proof of claim*[3], les conditions d'application de l'article L. 651-2 sont les suivantes :

    24.1  les personnes poursuivies sont les dirigeants de droit ou de fait,

    24.2  les personnes poursuivies ont accompli une ou plusieurs fautes de gestion,

    24.3  les fautes de gestion ont contribué à l'insuffisance d'actif de la société.

    Bien évidemment, chaque condition citée aux paragraphes 24.1 à 24.3 doit être prouvée.

25. L'action fondée sur l'article L. 651-2 du Code de commerce se prescrit par trois ans à compter du jugement qui prononce la liquidation judiciaire[4].

26. Puisque NNI n'était pas un dirigeant de droit de NNSA, NNSA doit démontrer, pour que l'article L. 651-2 du Code de commerce puisse s'appliquer, que NNI était un dirigeant de fait. NNSA doit ensuite démontrer que NNI a commis une ou plusieurs faute(s) de gestion. Enfin, NNSA doit démontrer que la ou les faute(s) de gestion a(ont) contribué à son insuffisance d'actif. Je vais examiner ces trois critères successivement.

---

[2] *Declaration of Mr BREMOND*, n° 26.
[3] *Proof of claim*, n° 99.
[4] Article L.651-2 al. 2 du Code de commerce.

ON BEHALF OF
MERRILL BRINK INTERNATIONAL
C. L.

5

### III.1 Sur la qualité de dirigeant de fait de NNI

27. La qualification de dirigeant de fait relève de l'appréciation souveraine des juges du fond, mais la Cour de cassation exerce un contrôle en s'assurant que les motifs allégués par ceux-ci sont suffisants et pertinents. À défaut, leur décision encourt la cassation pour insuffisance de motifs ou défaut de base légale. L'analyse de la jurisprudence de la Cour de cassation est donc pertinente à cet égard.

28. Pour déterminer si NNI peut être poursuivie par NNSA sur le fondement de l'article L. 651-2 du Code de commerce, il faut donc d'abord déterminer si la société NNI peut être qualifiée de dirigeant de fait (*de facto* director) de NNSA. Or ainsi que le relève M. BREMOND[5], la loi française ne définit pas la notion de dirigeant de fait. C'est la doctrine[6] qui a défini cette notion et cette définition a été reprise par les juridictions françaises.

29. La qualification de dirigeant de fait peut concerner des personnes très diverses (banquier, franchiseur[7], concédant, parent ou ami d'un dirigeant de droit, salarié[8] ou même une collectivité publique), sans lien de capital avec la société, même si, bien évidemment, elle a aussi été reconnue dans le cadre de groupes de sociétés. Je constate que la jurisprudence française est très stable en la matière.

30. Deux éléments participent à la définition du dirigeant de fait:

   30.1  l'accomplissement d'actes positifs de direction comme le ferait un dirigeant de droit ;

   30.2  l'exercice de ces actes en toute indépendance de manière continue.

### A.  L'accomplissement d'actes positifs de direction comme le ferait un dirigeant de droit

La "subordination totale" n'est pas un critère de la direction de fait

31. La "subordination totale" ne constitue absolument pas un critère de la définition du dirigeant de fait.

32. L'élément déterminant consiste dans l'exercice d'une influence prédominante au travers de l'accomplissement d'actes positifs de direction comme le ferait un dirigeant de droit.

33. En ce sens, je ne peux être qu'en désaccord avec l'affirmation de M. BREMOND[9] selon laquelle la qualité de dirigeant de fait d'une société mère n'est retenue que dans le cas d'une "subordination totale".

---

[5] *Declaration of Mr BREMOND*, n° 29.
[6] G. Notté, Les dirigeants de fait des personnes morales de droit privé : Thèse Paris, 1978 ; La notion de dirigeant de fait au regard du droit des procédures collectives : JCP CI 1980, 8560. - D. Tricot, Les critères de la gestion de fait : Droit et patrimoine janv, 1996, p. 24.
[7] Pour un exemple de franchiseur qualifié de dirigeant de fait : Cour de cassation, Chambre commerciale, 9 novembre 1993, pourvoi n° 91-18351.
[8] Pour un exemple de directeur technique salarié qualifié de dirigeant de fait : Cour d'appel de Paris, 3ème chambre A, 30 octobre 2007, Revue des procédures collectives 2008, p. 69, n° 84.
[9] *Declaration of Mr BREMOND*, n° 36.

ON BEHALF OF
MERRILL BRINK INTERNATIONAL
C.L.

6

34. Même si, à l'occasion, certaines décisions ont pu relever cet élément, les juridictions françaises n'ont jamais fait de la "subordination totale" une condition pour retenir la qualification de dirigeant de fait. Ainsi, si M. BREMOND fait grand cas d'un arrêt de la Cour d'appel de Lyon du 7 février 1999[10] ayant reconnu, selon lui, la qualité de dirigeant de fait à une société mère en raison de la totale subordination de la filiale, cet arrêt émanant d'une juridiction inférieure n'a aucun caractère obligatoire sur les autres juridictions qui sont nullement obligées de reprendre la solution adoptée.

35. A cet égard, une décision récente de la Cour de cassation du 15 février 2011[11] démontre bien que la qualité de dirigeant de fait peut être retenue à l'égard d'une personne (en l'occurrence physique), associée simplement majoritaire. Dans ce cas, selon la Cour de cassation, la personne physique qui était par ailleurs avocat de la société en cause ne s'était *"pas limitée à ses rôles d'associé majoritaire, de rédacteur d'acte et de conseil, en sa qualité d'avocat, mais a eu un rôle décisionnel de premier plan dans la gestion de la société"*. Cette jurisprudence est transposable aux relations entre sociétés d'un même groupe et démontre que ce qui est fondamental pour l'admission de la qualité de dirigeant de fait est l'existence d'une influence prépondérante dans le processus décisionnel de la société, sans pour autant qu'il soit nécessaire de prouver une "subordination totale".

36. En droit français, il peut y avoir plusieurs dirigeants de fait pour une même société[12] ce qui confirme que l'exigence d'une "subordination totale" relevée par M. BREMOND n'est pas un critère pertinent de la direction de fait. En cas de pluralité de dirigeants de fait, les juges doivent individualiser la faute de chacun. Seuls ceux ayant commis une faute de gestion peuvent être condamnés. Sous réserve d'une décision spécialement motivée à cet effet, les différents dirigeants de fait peuvent être condamnés avec solidarité. De la même manière, des dirigeants de fait et de droit peuvent être condamnés solidairement.

Groupe de sociétés

37. La seule appartenance d'une société à un groupe ne permet pas de caractériser la direction de fait.

38. Il faut donc rapporter la preuve que l'une des sociétés du groupe s'est immiscée dans la gestion d'une autre société (filiale ou société sœur) en exerçant en toute indépendance des actes positifs de direction. Une personne morale peut être qualifiée de dirigeant de fait si elle a agi par l'intermédiaire d'une personne physique qu'elle a choisie et qui a agi sous son emprise[13]. Il a été ainsi jugé que doit être considérée comme dirigeante de fait la société mère qui exerce une influence prédominant sur sa filiale et dispose d'une autorité de fait sur la personne de ses responsables[14].

39. Si dans le cadre des groupes de sociétés, les juridictions françaises ont souvent statué sur l'hypothèse dans laquelle le dirigeant de fait était la société mère, cet élément n'a rien de déterminant et la détention directe du capital n'est certainement pas une condition requise par les juridictions françaises pour retenir la qualification de dirigeant de fait d'une société.

---

[10] *Declaration of Mr BREMOND*, n° 36.

[11] Cour de cassation, Chambre commerciale, 15 février 2011, pourvoi n° 10-11781 ; Bulletin Joly, août 2011, p.583, note B. Saintourens.

[12] Voir F. Pérochon et R. Bonhomme, Droit des entreprises en difficultés, Instruments de crédit et de paiement, LGDJ, 8ème éd. 2009, n° 568.

[13] Cour de cassation, Chambre commerciale, 27 juin 2006, pourvoi n° 04-15.831.

[14] Cour d'appel d'Aix-en-Provence, 8e ch., 26 mai 1981 : D. 1983, inf. rap. p. 60, obs. Derrida ; RJ com 1981, p. 344.

ON BEHALF OF
MERRILL BRINK INTERNATIONAL
C. L.

7

40. Ainsi, la Cour de cassation a jugé, dans un arrêt du 16 décembre 1981[15], que la personne physique qui était dirigeant de droit d'une société M était aussi dirigeant de fait d'une société D, filiale de M, sans pour autant que cette dernière société M, qui était pourtant la société mère de D, ne fût qualifiée elle-même de dirigeant de fait de la société D. Dans cette affaire, le fait que la personne physique ne détenait directement aucune action de la société filiale n'a pas empêché qu'elle fût qualifiée de dirigeant de fait de cette société par la Cour de cassation.

41. Dans le même sens, la Cour de cassation a précisé que doit être considérée comme dirigeant de fait d'une société destinée à exploiter un hôtel, la personne morale, sans aucun lien capitalistique avec la société hôtelière, qui sous couvert d'un contrat de prestations de services s'était réservée la mise en place de l'organisation administrative et financière, la définition de la politique des prix, la négociation des contrats et la politique commerciale de ladite société[16].

42. Ceci vaut bien évidemment aussi pour les sociétés d'un groupe, une société pouvant être qualifiée de dirigeant de fait de l'une de ses sociétés sœurs, même si cette hypothèse est moins fréquente en jurisprudence que l'admission de la qualité de dirigeant de fait d'une société mère. Je constate à cet égard que NNI effectuait de nombreuses prestations de services pour NNSA dont elle déterminait la politique fiscale y compris pour ce qui relevait des relations avec l'administration fiscale française[17]. Ainsi, je considère que la solution dégagée dans l'arrêt précédent de la Cour de cassation du 19 décembre 1995 sur le dirigeant de fait d'une société hôtelière pourrait s'appliquer à NNI.

43. Je relève qu'il n'est pas du tout nécessaire en droit français d'indiquer les raisons qui ont conduit une société à se laisser diriger dans les faits par une personne physique ou morale autre que ses dirigeants de droit.

44. Ainsi, il est sans objet comme le fait M. BREMOND[18] de se demander pourquoi et comment la société NNSA a suivi les instructions de NNI, sa société sœur.

45. Les juridictions françaises ne se posent jamais ces questions. Elles ne s'intéressent qu'aux indices démontrant ou non l'existence d'une direction de fait.

La méthode appliquée par les juridictions françaises

46. Une situation de direction de fait suppose la démonstration que le dirigeant de fait avait une influence prépondérante sur la gestion de la société par l'accomplissement d'actes positifs de direction comme le ferait un dirigeant de droit. Il n'est pas nécessaire de démontrer que le dirigeant de fait a été impliqué dans toutes les décisions de la société.

47. Pour déterminer l'existence d'une telle influence, les juridictions françaises recourent à la technique du faisceau d'indices concordants[19].

48. Au regard de la technique utilisée par les juridictions françaises, l'analyse de M. BREMOND tout au long de sa déclaration, qui le conduit à examiner séparément chaque indice et à déterminer si chacun, pris isolément, permet de conclure à la qualification de dirigeant de fait n'est pas correcte.

---

[15] Bull. Joly 1982, p. 154, § 54-I; Revue Trimestrielle de droit commercial, 1982, p. 467, obs. Ph. Merle.
[16] Cour de cassation, Chambre commerciale, 19 décembre 1995, pourvoi n° 92-20.116 : Juris-Data n° 995-003707.
[17] Proof of claim, n° 21 – 22.
[18] Declaration of Mr BREMOND, n° 43.
[19] Voir D. Gibrila, Juris-cl commercial, fasc. 1050; Cour de cassation, Chambre commerciale, 19 février 2002, RJDA 7/2002, n° 791.

ON BEHALF OF
MERRILL BRINK INTERNATIONAL

8

49. En effet, contrairement à la méthode suivie par M. BREMOND, les indices de la gestion de fait ne doivent pas être analysés séparément mais conjointement. La qualification de dirigeant de fait est déduite de leur cumul. En conséquence, pour déterminer si NNI peut être considérée comme dirigeant de fait, il ne faut pas, comme l'a fait M.BREMOND dans sa déclaration, analyser de manière totalement cloisonnée le rôle de NNI à l'égard de tel ou tel acte de direction de NNSA, chaque acte étant traité distinctement, mais, au contraire, il est nécessaire, pour se conformer à la méthode suivie par les juridictions françaises, de faire une analyse globale prenant en considération la globalité des actes positifs de direction de NNSA pour lesquels NNI a exercé une influence.

50. S'il ressort de cette analyse globale que les indices concordent pour affirmer que NNI a exercé une influence prédominante sur les actes de direction de NNSA, alors NNI devra être qualifiée de dirigeant de fait de NNSA.

<u>Application à NNI et NNSA de la méthode du faisceau d'indices concordants</u>

51. Dans cette affaire, les éléments concordent vers la conclusion que NNI a accompli des actes positifs de direction comme l'aurait fait un dirigeant de droit.

*Indice n° 1 : la mise en place des accords sur les prix de transfert intragroupe*

52. Concernant les prix de transfert intragroupe, la décision d'appliquer un nouveau modèle, intitulé *"Residual Profit Split Methodology"* (RPSM) qui a remplacé le *cost sharing arrangements"*, beaucoup plus équilibré pour NNSA[20], a été prise par NNI et NNL sans même consulter NNSA dont les dirigeants n'ont eu aucun rôle dans le processus décisionnel aboutissant à ce changement de méthode au combien important[21].

53. Le projet de RPSM a, en effet, été élaboré par une équipe d'employés de NNI appartenant au département fiscal du groupe NORTEL et sa mise en œuvre a été réalisée sous la responsabilité notamment de Mark WEISZ, directeur fiscal international du groupe, et employé de NNI[22].

54. En outre, une illustration de l'absence de toute concertation avec NNSA réside dans l'absence de consultation de l'administration fiscale française alors que celle-ci aurait pu remettre en cause les bases de la nouvelle méthode de prix de transfert en taxant NNSA[23].

55. Une consultation du conseil d'administration de NNSA n'a pas davantage eu lieu lors de la détermination du contenu du *"Master Research and Developpment Agreement"* (MRDA)[24] qui constitue le cadre contractuel général dans lequel vient s'insérer le RPSM. La méthodologie du RPSM a été préjudiciable à NNSA[25]. Un indice de l'absence de contribution des dirigeants de droit de NNSA dans le processus de décision est l'inexistence de procès-verbal de la réunion du conseil d'administration de NNSA sur l'approbation de la participation de NNSA au MRDA[26].

---

[20] *Proof of claim*, n° 18g, 57 – 69.
[21] *Proof of claim*, n° 16 – 22, 36 – 45.
[22] *Proof of claim*, n° 19, 21 – 22.
[23] *Proof of claim*, n° 18a, 69.
[24] *Proof of claim*, n° 18c, 47.
[25] *Proof of claim*, n° 54 – 69.
[26] *Proof of claim*, n° 18f, 18g.



56. Cette absence de procès-verbal est d'autant plus remarquable que le MRDA pouvait être qualifiée de "convention réglementée"[27] au sens du droit français, exigeant une délibération du conseil d'administration de NNSA.

57. Ce n'est que postérieurement à l'entrée en application de la convention de MRDA, en juin 2005[28], que le conseil d'administration de NNSA a pris note de cet accord.

58. En fait, NNSA a reçu la directive de la part de NNI et NNL de signer le MRDA dont l'application lui a, en outre, été imposée rétroactivement à la date du 1er janvier 2001 à une époque où NNSA enregistrait déjà des pertes significatives[29].

59. Je constate donc que, tant à l'égard du RPSM qu'à l'égard du MRDA, les dirigeants de droit de NNSA n'ont eu aucune part dans le processus décisionnel qui a cependant conduit à ce que NNSA conclut ces conventions. Ces décisions ont été prises par NNI et NNL qui les ont imposées à NNSA sans consultation de ses dirigeants de droit.

60. Je relève que la *Proof of claim* indique que l'administration fiscale française a considéré que le changement en faveur du RPSM constituait un acte anormal de gestion[30].

61. Mon opinion est que ces faits constituent un indice important que NNI et NNL exerçaient une influence prédominante sur NNSA qui les ont conduites à décider d'actes positifs de direction à la place des dirigeants de droit de NNSA. Or, le fait de prendre des décisions à la place des dirigeants de droit caractérise la direction de fait, car correspond à l'un des critères généralement retenu par les juridictions françaises[31].

*Indice n° 2 : le remboursement en février 2008 de la dette subordonnée contractée en 2002*

62. Le remboursement en février 2008 de la dette subordonnée contractée en 2002 par NNSA constitue un autre indice de la direction de fait exercée par NNI sur NNSA[32].

63. En effet, alors que le prêt subordonné de NNL à NNSA ne prévoyait son remboursement qu'en cas de retour de NNSA à une situation financière bénéficiaire, NNI et NNL ont imposé à NNSA, en 2008, la décision de remboursement. Je relève, à cet égard, la pression exercée par Ryan Smith (de NNI)[33].

64. Cette fois encore, je constate que le conseil d'administration de NNSA n'a pas approuvé cette décision de remboursement[34].

---

[27] Article 225-38 du Code de commerce : *"Toute convention intervenant directement ou par personne interposée entre la société et son directeur général, l'un de ses directeurs généraux délégués, l'un de ses administrateurs, l'un de ses actionnaires disposant d'une fraction des droits de vote supérieure à 10 % ou, s'il s'agit d'une société actionnaire, la société la contrôlant au sens de l'article L. 233-3, doit être soumise à l'autorisation préalable du conseil d'administration.*
*Il en est de même des conventions auxquelles une des personnes visées à l'alinéa précédent est indirectement intéressée.*
*Sont également soumises à autorisation préalable les conventions intervenant entre la société et une entreprise, si le directeur général, l'un des directeurs généraux délégués ou l'un des administrateurs de la société est propriétaire, associé indéfiniment responsable, gérant, administrateur, membre du conseil de surveillance ou de façon générale, dirigeant de cette entreprise".*
[28] *Proof of claim*, n°18f.
[29] *Proof of claim*, n° 18d, 72. Je comprends du paragraph 18d de la Proof of claim que NNSA a bien reçu de NNI et NNL l'instruction de signer le MRDA.
[30] *Proof of claim*, n° 20.
[31] P.M. Le Corre, Dalloz Action Procédures Collectives, 2010-2011, n° 921.21.
[32] *Proof of claim*, n° 23 – 26, 70 – 79.
[33] *Proof of claim*, n° 75.
[34] *Proof of claim*, n° 78.



10

65. Ce remboursement anticipé est donc un nouvel indice de décision prise par NNI et NNL en lieu et place des dirigeants de droit de NNSA.

*Indice n° 3 : la détermination de la politique fiscale de NNSA*

66. Un autre indice encore de la direction de fait exercée sur NNSA résulte de la détermination de sa politique fiscale par NNI et NNL[35].

67. Ainsi, lors de la vérification fiscale de NNSA pour les années 2001 à 2003, c'est le personnel du département fiscal de NNI qui a élaboré les réponses de NNSA à l'administration fiscale française et a justifié directement auprès de cette administration le bien fondé du RPSM[36].

68. Or la prise en charge de la gestion fiscale d'une société a été à plusieurs reprises relevée par les juridictions françaises comme venant conforter une situation de direction de fait.

69. Ainsi, par exemple, on relève une décision de la Cour d'appel d'Aix[37] qui admet la qualité de dirigeant de fait d'une société étrangère qui exerçait un contrôle rigoureux sur sa filiale française, et notamment donnait des directives sur sa gestion des stocks et sur sa comptabilité, et donc par voie de conséquence sur sa fiscalité.

70. En outre, la Cour d'appel de Versailles a retenu la direction de fait car, notamment, la personne en question était l'interlocuteur privilégié des organismes sociaux[38].

71. Enfin et surtout, l'établissement des documents sociaux et fiscaux a été également pris en compte pour retenir la qualification de dirigeant de fait par la Cour de cassation[39].

*Indice n° 4 : le contrôle des cessions d'actifs et la répartition des prix de cession*

72. Un indice supplémentaire de la gestion de fait réside dans le contrôle par NNI et NNL des cessions d'actifs à des tiers, et particulièrement dans la répartition du prix de cession de l'activité UMTS du groupe Nortel à ALCATEL LUCENT SA en décembre 2006[40].

73. L'allocation d'une quote-part du prix aux entités du groupe NORTEL a été décidée entièrement par NNI et NNL sans concertation de NNSA qui a reçu significativement moins, et NNI significativement plus, que ce qui aurait été alloué conformément au *arm's lenght principle*[41].

74. Cet indice est concordant avec les indices précédents et représente un élément supplémentaire attestant que NNI et NNL prenaient des décisions pour le compte de NNSA en lieu et place des dirigeants de droit de celle-ci.

75. En définitive, en tenant pour établies les allégations précitées, mon opinion est que l'ensemble des indices examinés ci-dessus démontrent que NNI a eu une influence prépondérante sur la gestion de NNSA par l'accomplissement d'actes positifs de direction comme le ferait un dirigeant de droit.

---

[35] *Proof of claim*, n° 84 – 85.
[36] *Proof of claim*, n° 21 – 22.
[37] Cour d'appel d'Aix, 15 décembre 1978, Bulletin d'Aix 4/1978, p. 89, cité in Mémento Francis Lefèbvre, Sociétés commerciales 2011, n° 91481.
[38] Cour d'appel de Versailles, 13ème chambre, 21 décembre 2000, RJDA 2001/4, n° 487.
[39] Cour de cassation, Chambre commerciale, 10 mars 2004, pourvoi n° 01-10015.
[40] *Proof of claim*, n° 80 – 83.
[41] *Proof of claim*, n° 82 – 83.

ON BEHALF OF

MERRILL BRINK INTERNATIONAL

C. L.

**B.  L'exercice d'actes de direction en toute indépendance de manière continue**

76. La qualification de dirigeant de fait suppose la démonstration que les actes de direction ont été accomplis par le dirigeant de fait en toute indépendance. Ainsi, la qualité de dirigeant de fait ne serait pas reconnue pour des actes de direction effectués en vertu de mandats donnés par les dirigeants de droit[42] ou d'une délégation de pouvoir[43]. Elle ne serait pas non plus reconnue à l'égard d'un salarié qui a agi dans le cadre de ses fonctions en respectant les instructions de son employeur. Dans ce dernier cas, les actes commis par l'employé seraient imputables à l'employeur qui pourrait être qualifié de dirigeant de fait.

77. La *Proof of Claim* ne fait pas apparaître qu'il y ait eu une délégation ou un mandat. Au contraire, il semble que NNI ait agi en toute indépendance.

78. La *Proof of claim* ne suggère pas non plus que les employés de NNI qu'elle mentionne ont agi hors de leurs fonctions. Dans ces conditions, les actes commis par ces employés sont imputables à NNI.

79. Il ressort aussi de la *Proof of Claim* que NNI a pris des décisions et commis des actes de direction pendant plusieurs années, ce qui caractérise la continuité[44].

**C.  Conclusions sur la direction de fait**

80. En tenant pour exactes les allégations précitées, mon opinion est qu'une juridiction française jugerait très probablement que NNI a agi comme dirigeant de fait de NNSA:

   80.1  Il existe des indices concordants d'accomplissement d'actes positifs de direction comme le ferait un dirigeant de droit en nombre plus que suffisant ;

   80.2  NNI a agi en toute indépendance de manière continue.

**III.2 Sur l'existence de fautes de gestion commises par NNI**

81. Les juridictions françaises retiennent une acception large de la notion de faute de gestion : *"Toute faute de gestion, même légère, toute imprudence ou négligence peut entraîner la mise en cause de la responsabilité des dirigeants sociaux"*[45] de fait ou de droit.

82. Il suffit d'une seule faute, dès lors que cette faute de gestion est antérieure à l'ouverture de la liquidation judiciaire pour engager la responsabilité du dirigeant de fait.

83. Comme le relève un autre auteur, *"la jurisprudence est très extensive, la quasi-totalité des décisions des dirigeants ayant ou pouvant avoir une incidence sur la gestion, largement entendue"*[46] peut être considérée comme une faute de gestion.

---

[42] Cour de cassation, Chambre commerciale, 13 février 2007, pourvoi n° 05-20126.
[43] P.M. Le Corre, Dalloz Action Procédures Collectives, 2010-2011, n° 921.21.
[44] *Proof of claim*, n° 18c, 18d, 20 – 21, 76, 80 – 83.
[45] Mémento Francis Lefèbvre, Sociétés commerciales, 2011, n° 91550.
[46] F. Pérochon, in F. Pérochon et R. Bonhomme, Droit des entreprises en difficultés, Instruments de crédit et de paiement, LGDJ, 8ᵉᵐᵉ éd. 2009, n° 568.

ON BEHALF OF
MERRILL BRINK INTERNATIONAL

84. Ainsi, il a, par exemple, été considéré que le dirigeant de fait avait commis une faute de gestion en appréciant mal les capacités réelles de développement de l'entreprise dans un contexte économique peu favorable et en ayant pris des mesures inadéquates ou insuffisantes pour redresser la situation de la société[47].

85. Dans le cas présent, peuvent être considérés comme fautifs, les actes suivants commis par NNI :

    85.1  Le fait d'avoir substitué une méthode de prix de transfert déséquilibrée au détriment de NNSA en ayant imposé à cette dernière société de participer à l'accord[48] ;

    85.2  Le fait d'avoir imposé à NNSA de procéder, en 2008, au remboursement du prêt subordonné de 2002 alors que NNSA n'était pas revenue à une situation financière saine[49] ;

    85.3  Le fait d'avoir déterminé la politique fiscale de NNSA, de manière désavantageuse pour cette société[50] ;

    85.4  Le fait d'avoir contribué à une allocation déséquilibrée pour NNSA des prix de cession d'actifs[51].

86. En prenant pour exactes les allégations contenues dans la *Proof of claim*, mon opinion est qu'une juridiction française jugerait que NNI a commis plusieurs fautes de gestion en qualité de dirigeant de fait de NNSA.

87. En effet, les mesures n'ont pas permis de redresser la situation financière de NNSA mais au contraire l'ont aggravée de manière importante[52].

### III.3 Sur la contribution de NNI à l'insuffisance d'actif de NNSA

88. Pour qu'une juridiction française ordonne au dirigeant de fait de contribuer à l'insuffisance d'actif, deux conditions doivent être remplies : (1) d'une part l'existence d'une insuffisance d'actif et (2) d'autre part un lien de causalité entre la faute de gestion et l'insuffisance d'actif.

89. Selon la Cour de cassation, l'insuffisance d'actif est déterminée par un déséquilibre entre le passif antérieur à l'ouverture de la procédure de liquidation judiciaire et l'actif existant au jour où le juge statue[53].

90. Concernant le lien de causalité entre la faute de gestion et l'insuffisance d'actif, les juridictions françaises appliquent une *"conception lâche"*[54] faisant référence *"à la théorie de l'équivalence des conditions générée par le droit commun de la responsabilité civile qui autorise l'imputation de l'entier dommage à chacun de ceux qui ont contribué à le causer"*[55].

---

[47] Cour d'appel de Douai, 31 octobre 1991, Juris-Data n° 050898.
[48] *Proof of claim*, n° 36 – 69.
[49] *Proof of claim*, n° 70 – 79.
[50] *Proof of claim*, n° 20 – 22, 84.
[51] *Proof of claim*, n° 80 – 83.
[52] *Proof of claim*, n° 107, 131, 158.
[53] Cour de cassation, Chambre commerciale, 27 juin 2006, pourvoi n° 05-11690.
[54] F. Pérochon, in F. Pérochon et R. Bonhomme, Droit des entreprises en difficultés, Instruments de crédit et de paiement, LGDJ, 8ᵐᵉ éd. 2009, n° 570.
[55] C. Hannoun, Juris-cl. Commercial, fasc. 2905, n° 54.


ON BEHALF OF
MERRILL BRINK INTERNATIONAL
C. L.

91. Comme l'a affirmé la Cour de cassation[56] : "*le dirigeant d'une personne morale peut être déclaré responsable, (...), même si la faute de gestion qu'il a commise n'est que l'une des causes de l'insuffisance d'actif et peut être condamné à supporter en totalité ou en partie les dettes sociales, même si sa faute n'est à l'origine que d'une partie d'entre elles.*"

92. Dans le cas du groupe NORTEL, il ressort de la *Proof of claim* que les fautes de gestion de NNI ayant consisté, d'une part, à décider de la participation de NNSA à des accords de prix de transfert plus désavantageux pour cette entité que l'accord antérieur (ce qui a donné lieu au remboursement de sommes perçues dans le cadre du "*cost sharing arrangements*")[57] et, d'autre part, dans le remboursement en 2008 de la dette subordonnée de 2002, contrairement aux stipulations contractuelles[58], sont, pour le moins, des causes de l'insuffisance d'actif de NNSA. Les répartitions des prix de cessions d'actifs qui n'ont pas été effectuées conformément au *arm's length principle* ont également contribué à l'insuffisance d'actif[59].

93. Ces décisions constitutives de fautes de gestion ont effectivement conduit à la non perception par NNSA ou au versement par NNSA à d'autres entités du groupe NORTEL de sommes d'argent très importantes ce qui a contribué à son insuffisance d'actif.

### III.4 Conclusion sur l'article L. 651-2 du Code de commerce

94. En prenant pour exactes les allégations contenues dans le *Proof of claim*, mon opinion est que :

94.1 Les conditions d'application de l'article L. 651-2 du Code de commerce sont toutes réunies à l'égard de la société NNI ;

94.2 NNI était un dirigeant de fait de NNSA ;

94.3 NNI a commis des fautes de gestion qui ont contribué à l'insuffisance d'actif de NNSA ;

94.4 Il y a une réelle probabilité qu'une juridiction française accueille l'action en responsabilité de NNSA à l'encontre de NNI fondée sur l'article L. 651-2 du Code de commerce.

---

[56] Cour de cassation, Chambre commerciale, 21 juin 2005, pourvoi n° 04-12087.
[57] *Proof of claim*, n° 54 – 69.
[58] *Proof of claim*, n° 70 – 79.
[59] *Proof of claim*, n° 80 – 83.

ON BEHALF OF
MERRILL BRINK INTERNATIONAL
C. L.

14

## IV. "CLAIMS" FONDÉS SUR L'ARTICLE 1382 DU CODE CIVIL (CLAIMS n° 3, 7, 14 et 17)

### IV.1 Les demandes fondées sur l'article 1382 du Code civil sont subsidiaires à celles fondées sur l'article L. 651-2 du Code de commerce

95. Les "claims" fondés sur l'article 1382 du Code civil sont alternatifs aux claims n° 2, 6, 13 et 16 fondés sur l'article L. 651-2 du Code de commerce.

96. En effet, comme le rappelle M. BREMOND dans sa déclaration[60], les juridictions françaises affirment un principe de non cumul des actions fondées sur l'article L. 651-2 du Code de commerce et l'article 1382 du Code civil. Les claims n° 3, 7, 14 et 17 ne peuvent donc être retenus que si les claims n° 2, 6, 13 et 16 ont été préalablement rejetés.

97. A l'inverse, si l'action fondée sur l'article L. 651-2 du Code de commerce était accueillie par les juges français, ce qui représente une probabilité forte selon mon opinion, les claims n° 3, 7, 14 et 17 seraient déclarés irrecevables. Il ne s'agit donc que de *claims* subsidiaires à l'action principale fondée sur l'article L. 651-2.

### IV.2 Principes généraux de la responsabilité civile délictuelle

98. Le droit commun de la responsabilité civile délictuelle figure à l'article 1382 du Code civil selon lequel : *"tout fait quelconque de l'homme, qui cause à autrui un dommage, oblige celui par la faute duquel il est arrivé à le réparer".*

99. L'article 1383 du Code civil complète la règle de l'article 1382 du Code civil en mentionnant que la responsabilité civile délictuelle peut également être engagée en cas de négligence ou d'imprudence. En pratique, une action fondée sur l'article 1382 du Code civil inclut implicitement une référence à l'article 1383.

100. La mise en œuvre de l'article 1382 du Code civil suppose la réunion de trois éléments :

    100.1 l'existence d'un fait,

    100.2 d'un dommage,

    100.3 et d'un lien de causalité entre le fait et le dommage.

101. La notion de faute est utilisée dans la *Proof of Claim* et dans la déclaration de M. BREMOND pour décrire le premier élément requis par l'article 1382 du Code civil. Cependant, je considère que le premier critère est mieux décrit par l'expression fait générateur. Je préfère utiliser cette expression car elle décrit mieux l'évolution du droit français de la responsabilité civile délictuelle comme je l'expliquerai ci-après.

---

[60] *Declaration of Mr BREMOND*, n° 69.

ON BEHALF OF
MERRILL BRINK INTERNATIONAL
C.L.

## A. Le fait générateur

102. Le premier élément de l'article 1382 n'est pas défini par la loi et, ici encore, c'est la doctrine qui a défini cette notion.

103. Traditionnellement, la doctrine se référait à la notion de faute.

104. Selon le professeur Fages, la faute requise pour démontrer le premier élément de l'article 1382 peut résulter de la méconnaissance d'une règle impérative de nature législative ou réglementaire, ou encore déontologique ou professionnelle mais aussi *"plus généralement, il y a faute lorsqu'en appréciant après-coup son comportement, on peut dire qu'une personne ne s'est pas comportée comme elle aurait dû le faire ; et ceci parce que son attitude a été contraire à celle que l'on pouvait attendre d'une personne raisonnable placée dans les mêmes circonstances (l'appréciation se fait in abstracto par référence à un modèle...)"*[61].

105. Compte tenu de la définition de plus en plus large qui est actuellement retenue en doctrine et les applications de l'article 1382 du Code civil par les juridictions françaises, je considère avec une partie de la doctrine[62], mais la question est controversée, que la notion de faute est de moins en moins un élément déterminant de la responsabilité civile délictuelle. En réalité, le critère est l'existence d'un fait générateur d'un dommage.

106. M. BREMOND indique[63] que le droit français de la responsabilité civile ne connaît pas des causes correspondant aux cas de *"conspiracy"*, *"aiding and abetting"*, *"assisting"*, *"encouraging"* de la common law. Il ajoute cependant que les demandes qui seraient soumises aux juridictions de common law sur ces fondements seraient analysées par les juridictions françaises sur le fondement de l'article 1382 du Code civil[64]. Je suis d'accord avec M. BREMOND sur ces points.

107. M. BREMOND ajoute également que les juridictions françaises ont appliqué l'article 1382 du Code civil lorsqu'une personne a aidé, de mauvaise foi, une autre personne à violer une obligation envers une troisième[65].

108. Je ne suis pas d'accord avec M. BREMOND lorsqu'il considère que l'application de l'article 1382 du Code civil dans un tel cas exigerait que soit prouvée la mauvaise foi (tel que le concept est connu en droit français) de la personne poursuivie.

109. Comme je viens de le dire, le premier élément de l'article 1382 est un événement qui cause un dommage et l'intention de la personne poursuivie est en tout état de cause indifférente, même dans la conception traditionnelle de la responsabilité civile.

110. L'indifférence de l'élément moral signifie que *"la faute civile n'est pas nécessairement une faute intentionnelle : elle ne nécessite pas la preuve d'une intention de nuire ou, plus exactement, la volonté de causer un dommage. De façon générale, en effet, la responsabilité peut être engagée en présence d'une simple faute d'imprudence ou de négligence"*[66].

---

[61] B. Fages, Droit des obligations, LGDJ 2007, n° 494.
[62] Y Buffelan-Lanore et V. Larribau-Terneyre, Droit civil – Les Obligations, 12ème ed, 2010, n° 1537 et s.
[63] Declaration of Mr BREMOND, n° 72.
[64] Declaration of Mr BREMOND, n° 72.
[65] Declaration of Mr BREMOND, n° 72.
[66] B. Fages, Droit des obligations, LGDJ 2007, n° 493.



ON BEHALF OF
MERRILL BRINK INTERNATIONAL
C.L.

111. La mauvaise foi n'est donc pas une condition de la mise en jeu de l'article 1382 du Code civil. En conséquence, contrairement à l'affirmation de M. BREMOND, je considère que les juridictions françaises n'exigeraient pas pour retenir la responsabilité civile de NNI que soit rapportée la preuve de la connaissance par NNI que ses actions provoqueraient la violation d'une obligation envers NNSA.

112. Dans la mesure où le concept de mauvaise foi serait pertinent, j'ajoute que la mauvaise foi (tel que le concept est connu en droit français), ne se limite pas à la connaissance de la violation d'une obligation. Elle est également caractérisée par la connaissance par la personne poursuivie que son comportement causerait un dommage.

## B.   Le dommage

113. Le dommage doit être certain et réparable.

114. Le dommage est certain lorsqu'il est avéré, indubitable, qu'il ne peut être mis en doute.

115. Le dommage n'est réparable que s'il est légitime. Par exemple, la perte de revenus illégaux ne serait pas réparable.

## C.   Le lien de causalité

116. Pour qu'il y ait lieu à réparation, il faut que le dommage subi soit causé par le fait générateur de la responsabilité : c'est le lien de causalité.

117. Le lien de causalité peut se définir comme le rapport certain existant entre le dommage subi et le fait générateur de ce dommage. Le caractère certain est exigé par les juridictions françaises.

118. Pour que le caractère certain soit établi, il suffit que le fait générateur soit l'une des causes du dommage.

## IV.3 Application des principes généraux de la responsabilité délictuelle à NNI

## A.   Le fait générateur

119.  La *Proof of claim* indique que NNI a notamment participé, aux côtés de NNL, aux faits suivants:

   119.1 La mise en place et l'application d'une politique de prix de transfert ayant contribué à l'insuffisance d'actif de NNSA (claim n° 3)[67];

   119.2 Le remboursement de février 2008 (claim n° 7)[68] ;

   119.3 Les répartitions inégalitaires des produits des cessions d'actifs (claim n° 14)[69];

   119.4 La détermination de la politique fiscale de NNSA (claim n° 17)[70].

120. La *Proof of claim* décrit en détail la participation de NNI dans chacun des faits précédents et comment ces faits ont causé un dommage à NNSA.

---

[67] *Proof of claim*, n° 111 – 117.
[68] *Proof of claim*, n° 135 – 139.
[69] *Proof of claim*, n° 162 – 165.
[70] *Proof of claim*, n° 171 – 173, 175.



17

121. En conséquence, j'estime, sur le fondement des allégations de la *Proof of claim*, et en les supposant exactes, qu'une juridiction française pourrait juger que NNI a participé à un fait générateur susceptible d'engager sa responsabilité sur le fondement de l'article 1382 du Code civil.

122. La *Proof of claim* indique de plus que NNI savait, en participant à certains des actes mentionnés ci-dessus, qu'elle causait un préjudice à NNSA[71]. En supposant ces allégations exactes, j'estime qu'une juridiction française jugerait que NNI a agi de mauvaise foi (au sens du droit français) et ne s'est pas comportée comme une société sœur, placée dans les mêmes circonstances, aurait dû raisonnablement se comporter. NNI aurait donc commis une faute au sens traditionnel décrit aux paragraphes 103 et 104.

123. Même si on devait considérer que la mauvaise foi était une condition de l'application de l'article 1382 du Code civil, ce que je ne pense pas, j'estime que la responsabilité de NNI serait tout de même engagée.

## B. Le dommage

124. Le dommage correspond à des pertes d'actifs, soit que NNSA a effectué des paiements, soit qu'elle n'a pas reçu des sommes qui lui étaient dues[72].

125. Ce dommage est donc certain. Il est de plus réparable.

## C. Le lien de causalité

126. Le dommage a été directement causé par les faits générateurs ci-dessus auxquels NNI a participé.

## IV.4 Conclusion sur l'article 1382 du Code civil

127. En prenant pour exactes les allégations contenues dans la *Proof of claim*, je pense qu'une juridiction française pourrait juger (si NNI n'était pas un dirigeant de fait) que les actes de NNI à l'égard de NNSA sont suffisants pour engager sa responsabilité sur le fondement de l'article 1382 du Code civil.

## V. "CLAIMS" SE RAPPORTANT AU "FSD LIABILITY" (CLAIMS n° 19 à 22)

128. La *Proof of claim* mentionne[73] que des "*Financial Support Direction*" ("FSD") ou "*Contribution Notice*" ("CN") pourraient être émises contre une ou plusieurs entités européennes du groupe NORTEL, parmi lesquelles figure NNSA, et que, en conséquence, ces entités pourraient être obligées de faire un paiement ou fournir une garantie financière au bénéfice du *UK Pension Scheme*.

129. Au moment où la *Proof of claim* a été régularisée, il n'était pas certain que NNSA serait obligée d'effectuer un paiement ou fournir une garantie financière.

---



[71] *Proof of claim*, n° 39, 56.
[72] *Proof of claim*, n° 54 – 69, 70 – 79, 80 – 83.
[73] *Proof of claim*, n° 86 – 92.



130. La question de savoir si la demande sur le fondement de la "FSD Liability" est correctement argumentée dans le cadre de la présente procédure américaine est une question gouvernée par le droit américain. Quoi qu'il en soit, par souci d'exhaustivité, je dois préciser que le caractère incertain d'une demande n'interdit pas en droit français, et contrairement à ce qu'affirme M. BREMOND[74], qu'une déclaration de créance soit faite dans le cadre d'une procédure d'insolvabilité.

131. En droit français, les créanciers ont non seulement le droit mais encore davantage l'obligation de déclarer leur créance, même seulement éventuelle, à la procédure collective ouverte contre leur débiteur. En ce sens, le professeur Le Cannu illustre cette obligation légale de déclaration du créancier éventuel par l'exemple du créancier d'une société civile : "*il a une créance éventuelle sur les associés de cette société et doit déclarer sa créance à la procédure ouverte contre un associé (Cour de cassation, Chambre commerciale, 30 juin 2004, Revue des sociétés 2004, p. 952, note J.-F. Barbiéri )*"[75].

132. Si la société NNSA était ultérieurement obligée d'effectuer un paiement, ou de fournir une garantie, relativement au "*pension scheme*", elle disposerait, en fonction des hypothèses, de différents fondements pour recouvrer les sommes d'argent qu'elle aurait versées, par exemple : la contribution, l'enrichissement sans cause, la subrogation ou l'obligation de remboursement.

133. La mise en œuvre de l'un ou l'autre de ces fondements dépendrait des circonstances dans lesquelles les FSD ou CN seraient émises.

134. Tous ces fondements existent en droit français.

135. M. BREMOND décrit le régime de l'enrichissement sans cause et de la subrogation dans sa déclaration[76].

136. M. BREMOND indique qu'il ignore sur quel fondement une demande en contribution ou en remboursement pourrait être formée en droit français[77].

137. La contribution et l'obligation de remboursement sont liées. Lorsqu'il existe plusieurs débiteurs tenus solidairement pour la même dette, si l'un des codébiteurs paye la totalité de la dette, il dispose d'un recours en contribution au paiement de la dette contre chacun de ses codébiteurs. Ces derniers doivent ainsi contribuer au paiement de la dette payée par le *solvens* (le codébiteur qui a payé) dans la mesure de leur "part et portion", c'est-à-dire, en principe, par parts égales sauf si une autre répartition a été prévue. Ces principes figurent à l'article 1213 du Code civil lorsque la dette est de nature contractuelle. Les juridictions françaises appliquent les mêmes principes lorsqu'elles condamnent plusieurs parties *in solidum*[78].

138. L'obligation de remboursement décrit le même mécanisme juridique du point de vue des codébiteurs qui n'ont pas payé la dette. Comme, selon l'article 1213 précité, l'obligation contractée solidairement envers un créancier se divise de plein droit, les codébiteurs ont l'obligation de rembourser, en proportion de leurs parts de la dette comme dit au paragraphe 137, le codébiteur qui a payé la totalité de la dette.

---

[74] *Declaration of Mr BREMOND*, n° 107.
[75] P. Le Cannu et M. Jeantin, Entreprises en difficulté, éd. Dalloz, 7ème éd., 2006, n° 471, note de bas de page n° 2.
[76] *Declaration of Mr BREMOND*, n° 115 – 128, 129 – 142.
[77] *Declaration of Mr BREMOND*, n° 110, 143.
[78] Cour de cassation, deuxième Chambre civile, 5 octobre 2006, pourvoi n° 05-16514.

MERRILL BRINK INTERNATIONAL

19

139. Je relève que la créance de NNSA étant éventuelle, NNSA ne peut pas indiquer, à ce jour, pour chaque fondement possible les conditions de leur mise en œuvre. Ce n'est qu'ultérieurement, si les FSD et/ou CN sont émises, que ces conditions pourront, en cas de préjudice pour NNSA, être précisées.

140. Dans ces conditions, contrairement à ce qui est affirmé par M. BREMOND, il ne me paraît pas possible d'écarter à ce jour la *Proof of claim* en ce qu'elle se rapporte aux FSD et/ou CN. A cet égard, je ne suis pas d'accord avec M. BREMOND sur le caractère prétendument inopérant de ces fondements car tout ou partie de ces fondements trouverait une raison de s'appliquer si des FSD et/ou CN étaient émises contre NNSA.

Je déclare, à peine des sanctions prévues pour le parjure, en application des lois des Etats-Unis d'Amérique, que les développements qui précèdent sont vrais et corrects.

Fait à Bordeaux, France, le 14 septembre 2011



Michel MENJUCQ

ON BEHALF OF

MERRILL BRINK INTERNATIONAL

C.L.

**Michel MENJUCQ**

*Agrégé des Facultés de droit*
*Professeur à l'Université de*
*Paris I - Panthéon-Sorbonne*

33 Rue Gabriel Geneste
33110     Le Bouscat

mobile : 06 61 45 13 87

mmenjucq@club-internet.fr

## I. Diplômes et concours

- Concours d'agrégation de droit privé et de sciences criminelles : avril 1997

- Concours de maître de conférences : juin 1996

- Doctorat en droit : thèse intitulée « La mobilité des sociétés dans l'espace européen », novembre 1995

- Certificat d'aptitude à la profession d'avocat (CAPA) : novembre 1989

## II. Fonctions universitaires

- Depuis le 01/09/2007, co-directeur du centre de recherche « Sorbonne-Affaires » de l'Institut Tunc de l'Université Paris I-Panthéon-Sorbonne

- Depuis le 01/09/ 2000 : Professeur à l'Université Paris I-Panthéon-Sorbonne

- 01/09/1997- 01/09/2000: Professeur à l'Université de Pau et des Pays de l'Adour

- 01/09/1996 - 01/09/1997 : Maître de conférences à l'Université Montesquieu- Bordeaux IV

## III. Autres fonctions

- Expert auprès de la Chambre de commerce et d'industrie de Paris :
        - pour le droit international des sociétés
        - pour le droit européen des procédures d'insolvabilité

- Expert dans le cadre de la Mission d'expertise internationale de la Direction générale de la recherche du Ministère de l'enseignement supérieur et de la recherche, depuis avril 2011

- Expert auprès du Ministère de l'Education nationale, dans le cadre de la Mission scientifique, technique et pédagogique du Département des Sciences de la Société de janvier 2003 à janvier 2008

- Membre du Comité national du CNRS (Centre national de la recherche scientifique, section 36 (sociologie, normes et règles) de décembre 2004 à décembre 2007

- Membre du Comité français de droit international privé depuis 2002


ON BEHALF OF
MERRILL BRINK INTERNATIONAL
C.L.

## IV. Domaines d'expertise

**Droit des affaires**
**Droit international et communautaire des sociétés**
**Procédures collectives nationales, communautaires et internationales**

## V. Activités éditoriales

**- Co-directeur scientifique de la Revue des procédures collectives**

**Participation au comité scientifique des revues**

- **Lamy droit des affaires**
- **Journal des sociétés**
- **European Company law (Kluwer)**

**Principaux ouvrages**

- **Droit international et européen des sociétés,** éd. Montchrestien, Précis Domat, 3ème éd., 2011 (dont la partie III est consacrée aux faillites internationales et aux procédures d'insolvabilité européennes)

- **Traité de droit du commerce international,** sous la direction de J. Béguin et M. Menjucq (avec A. Couret, D. Mainguy, C. Seraglini, M. Ruiz-fabri), éd. Litec, 2ème éd., 2011, rédaction du Titre sur les faillites internationales et les procédures d'insolvabilité européennes

- **Droit des affaires, (le commerçant, actes de commerce, fonds de commerce),** éd. Gualino, coll. Memento, 7ème éd., 2011

- **L'EIRL,** contribution sur L'EIRL et le droit des procédures collectives, éd. Litec, coll. 360° 2010

- **Dalloz Action « Ingénérie Juridique »** : contribution sur la société européenne, mai 2009

- **La mobilité des sociétés dans l'espace européen** éd. L.G.D.J, collection bibliothèque de droit privé, 1997

**Prix et distinctions scientifiques**

- Prix Durieux 2006 de l'Académie des Sciences Morales et Politiques pour le "Traité de droit du commerce international"

- Prix du Cercle Montesquieu 2002 (rassemblant les directeurs juridiques des 200 plus grandes entreprises en France) du meilleur ouvrage de droit des affaires pour la première édition de "Droit international et européen des sociétés"


MERRILL BRINK INTERNATIONAL

**Principaux articles en droit des procédures collectives des quatre dernières années**

- *La simplification manquée de la sauvegarde financière accélérée*, Revue des procédures collectives, n° 4/2011, Repère p. 1

- *Affaire Cœur Défense : la Cour de cassation recadre la Cour d'appel de Paris sur la notion de difficultés justifiant une sauvegarde*, Revue des procédures collectives, n° 2/2011, Repère, p. 1

- *Adoption de la « sauvegarde financière accélérée » : consécration du « prepackaged plan » en droit français !*, Revue des procédures collectives, n° 6/2010, novembre-décembre 2010, p. 1

- *L'extension de procédure pour confusion de patrimoine passée au crible du règlement n° 1346/2000 : une question à suspense !*, Revue des procédures collectives, n° 4/2010, juillet-août 2010, p. 1

- *Commentaire de l'arrêt de la Cour d'appel de Paris, du 25 février 2010*, Revue des procédures collectives, n° 3/2010, mai-juin 2010, Etude, p. 15

- *Affaire Eurotunnel : une cassation bienvenue !*, Revue des procédures collectives, n° 4/2009, juillet-août 2009, p. 1

- *LBO et procédures collectives*, Les petites affiches du 9 avril 2009

- *EC-Regulation on Insolvency Proceedings and Groups of companies*, European Company and Financial Law Review, June 2008, p. 135

- *Regulation no 1346/2000 on Insolvency Proceedings facing the companies' group phenomenon*, Business Law International, May 2008, p. 145

ON BE...

MERRILL BRINK INTERNATIONAL

C.L.