UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., et al., | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |
| | **Hearing Date:**<br>**Oct. 13-14, 2011 at 9:30 a.m. (ET)**<br>**Responses Due: September 16, 2011**<br>**Replies Due: October 7, 2011**<br><br>**RE: Docket No. 6022** |

**THE JOINT ADMINISTRATORS' MEMORANDUM OF LAW
IN OPPOSITION TO THE DEBTORS' AND COMMITTEE'S
JOINT OBJECTION AND MOTION TO DISMISS
THE CLAIMS OF NORTEL NETWORKS (IRELAND) LIMITED**

# TABLE OF CONTENTS

PAGES

INTRODUCTION ..................................................................................................1

PROCEDURAL HISTORY....................................................................................6

FACTUAL BACKGROUND OF THE CLAIMS.......................................................9

ARGUMENT.......................................................................................................17

I.      THE PROOF OF CLAIM SATISFIES ALL RELEVANT PLEADING
        STANDARDS..........................................................................................17

        A.      The Proof of Claim Complies With The Bankruptcy Rules. ................17

        B.      It Would Serve No Purpose, And Only Lead To Further Delay, To Apply
                Rules 8(a) and 12(b)(6). ......................................................................19

        C.      The Proof of Claim Complies With Fed. R. Civ. P. 8(a)......................22

        D.      The Joint Administrators' Claims Are Not Subject To Dismissal Under
                Rule 9(b). ...........................................................................................25

                1.      The Joint Administrators' Claims Do Not Sound In Fraud. .....26

                2.      In Fact, The Proof Of Claim Is Pleaded With Particularity.......27

        E.      Pleading Standards Are Relaxed For Bankruptcy Trustees and Other
                Persons Who Were Not Present When The Underlying Events Occurred,
                and Where The Salient Facts Are In The Control Of Others................30

II.     THE JOINT ADMINISTRATORS STATE CLAIMS FOR BREACH OF DUTY. ........31

        A.      The Joint Administrators State Claims For Breach Of Duties Imposed On
                *De Facto* and Shadow Directors Under Irish Law.................................31

                1.      Irish Law Regarding Shadow And *De Facto* Directors............31

                2.      The Joint Administrators Allege Facts Showing That NNI Was A
                        *De Facto* Or Shadow Director Of NN Ireland..........................36

                3.      The Joint Administrators Allege Facts Showing That NNI
                        Employees Were Acting On Behalf Of NNI. ...........................40

        B.      The Joint Administrators Are Not Required to Plead that NN Ireland was
                Insolvent for their Breach of Fiduciary Duty Claims to Survive............42

i

## TABLE OF CONTENTS
### (Continued)

C.    The Proof of Claim Alleges Facts Showing That NNI Owed NN Ireland An Independent Duty Of Care Under Irish Law.....................................................43

    1.    NNI Enjoyed A "Relationship of Sufficient Proximity" With Respect to NN Ireland That Gave Rise To An Independent Duty Of Care Under Irish Law. .........................................................................43

    2.    NNI Breached the Independent Duty Of Care It Owed To NN Ireland. .................................................................................45

D.    The Joint Administrators Are Not Estopped From Asserting  That NNI Was A *De Facto* Or Shadow Director Of NN Ireland...........................................46

    1.    The Doctrine of Judicial Estoppel Does Not Apply. ................................46

        a.    The Joint Administrators Have Not Taken Inconsistent Positions.........................................................................47

            i.    The Witness Statements Were Prepared for the Purpose of Supporting a Jurisdictional Finding. ..................................48

            ii.    There Is No Inconsistency Between the Joint Administrators' Positions......................................................50

        b.    NNI Cannot Show That the Joint Administrators Acted In Bad Faith.......................................................................52

        c.    NNI Will Suffer No Harm From Any Purported Inconsistency...................................................................55

    2.    The Doctrine Of Collateral Estoppel Does Not Apply .............................56

III.    THE JOINT ADMINISTRATORS STATE CLAIMS FOR SECONDARY LIABILITY AGAINST NNI. ...............................................................................58

    A.    The Joint Administrators State Claims For Dishonest Assistance And Aiding And Abetting Breach of Fiduciary Duty.....................................................58

        1.    Rule 9(b) Does Not Apply To The Joint Administrators' Claims For Aiding and Abetting Or Dishonest Assistance.....................................59

        2.    The Proof of Claim Sets Forth Facts Showing The Assistance NNI Provided And From Which It Can Be Inferred That Such Assistance Was Knowing. .........................................................59

            a.    The US Debtor Misstates The Required Mental State...................59

**TABLE OF CONTENTS**
**(Continued)**

        b.    The Proof of Claim Contains Facts Showing The Assistance Provided And That NNI Acted With The Requisite Mental State. ...................................................64

    3.    The Joint Administrators Have Alleged Facts Supporting The Underlying Breaches of Duty By NN Ireland's Directors and NNL. .........69

    4.    The Joint Administrators' Claims Are Supported By Factual Allegations Showing That NN Ireland Met The Insolvency Requirement At The Relevant Time. ...........................................70

  B.    The Joint Administrators State Claims For Conspiracy. .......................70

    1.    Rule 9(b) Does Not Apply To The Joint Administrators' Conspiracy Claims. ....................................................70

    2.    The Proof of Claim Alleges Facts Supporting The Elements of the Conspiracy Claims. ....................................................71

IV.    THE JOINT ADMINISTRATORS STATE CLAIMS TO RECOVER NN IRELAND PROPERTY RECEIVED OR RETAINED BY NNI. .............................74

  A.    The Proof of Claim Alleges That NNI Received NN Ireland Funds. ...................75

    1.    The Irish Cash Repatriation Strategy ...........................................75

    2.    Allocation of the Pre-Petition Sale Proceeds ..............................77

  B.    The Proof of Claim Alleges Facts Supporting a Finding That It Would Be Unfair, Inequitable and Unconscionable to Allow NNI To Retain The NN Ireland Funds It Received. ....................................................78

V.    THE JOINT ADMINISTRATORS STATE CLAIMS TO RECOVER FOR IMPROPER ALLOCATION OF PRE-PETITION NORTEL ASSET SALES...............79

  A.    The Proof of Claim States a Claim for Mistake Under Irish Law. .......................80

  B.    The Proof of Claim States a Claim For Transaction At Undervalue and Fraudulent Disposition Under English and Irish Law. ..........................................82

  C.    The Proof of Claim States Claims for Breach of Implied Contract And Implied Term Under Irish Law. ....................................................85

VI.    THE JOINT ADMINISTRATORS' CLAIMS BASED ON FSD LIABILITY SHOULD NOT BE DISALLOWED. ....................................................86

VII.    THE DOCTRINE *IN PARI DELICTO* DOES NOT BAR THE JOINT ADMINISTRATORS' CLAIMS. ....................................................89

**TABLE OF CONTENTS**
**(Continued)**

A. The Joint Administrators' Claims For Aiding And Abetting And Conspiracy Are Not Barred By The Doctrine Of *In Pari Delicto*. ........................89

 1. The *In Pari Delicto* Doctrine Does Not Apply Because NNI Was an Insider of NN Ireland. ..........................................................................89

 2. The "Adverse Interest" and "Controlling Shareholder" Exceptions to the *In Pari Delicto* Doctrine Bar its Application Here. .........................91

 3. The Policy Underlying the *In Pari Delicto* Doctrine Would be Thwarted by Dismissing the Claims Brought by the Joint Administrators at This Stage in the Proceeding.........................................92

VIII. THE JOINT ADMINISTRATORS' CLAIMS RELATING TO TRANSFER PRICING, IRISH LOANS, AND PRE-PETITION ASSET SALES ARE NOT TIME-BARRED. ...............................................................................................94

 A. The Joint Administrators' Claims Are Not Time-Barred Because Section 108(c) Tolls The Statute of Limitations As Of The Petition Date............95

 B. The Internal Affairs Doctrine Requires The Court To Apply The Six-Year Statute of Limitations Under Irish Law To Claims Arising Out Of The Internal Affairs Of NN Ireland. ..............................................................95

 C. The Claims Based On Transfer Pricing, Irish Loans And Pre-Petition Asset Sales Were Timely As Of The Petition Date. ...............................................97

 D. The Joint Administrators' Claims For Unjust Enrichment And Breach Of Contract Are Not Time-Barred. ..............................................................98

 E. The Joint Administrators' Amended Proof Of Claim Relates Back To Their Original Proof Of Claim For Statutes Of Limitation Purposes....................98

 F. The Statute Of Limitations Is Equitably Tolled While A Corporation's Board Of Directors Is Controlled By Culpable Directors....................................100

# TABLE OF AUTHORITIES

**Page(s)**

**STATUTES AND RULES**

10 Del. C. § 8106 ...................................................................................................................96

11 U.S.C. § 101 ........................................................................................................... *passim*

11 U.S.C. § 108 ........................................................................................................... *passim*

11 U.S.C. § 502 ....................................................................................................................88

Bankruptcy Code Chapter 15 ...............................................................................8, 11, 12, 13

Fed. R. Bank. P. 3001 .................................................................................................. *passim*

Fed. R. Bank. P. 7001 *et seq.* ...............................................................................................19

Fed. R. Bank. P. 7009 ..........................................................................................................25

Fed. R. Bank. P. 7012 ..........................................................................................................21

Fed. R. Bank. P. 9014 .................................................................................................. *passim*

Fed. R. Civ. P. 8 .......................................................................................................... *passim*

Fed. R. Civ. P. 9 .......................................................................................................... *passim*

Fed. R. Civ. P. 12 ........................................................................................................ *passim*

*Irish Statute of Limitations 1957* ..................................................................................97, 98

*Irish Companies Act 1963* ...................................................................................................31

*UK Insolvency Act 1986* ..................................................................................................1, 83

*Irish Companies Act 1990* .......................................................................................34, 35, 84

*UK Pensions Act 2004* .............................................................................................17, 86, 87

**CASES**

*900 Capital Services, Inc. v. Cloud (In re Cloud)*, No. 99-51109, 2000 WL 634637 (5th Cir. May 4, 2000) ...............................................................................................................20

*Adamson v. Bernier (In re Bernier)*, 282 B.R. 773 (Bankr. D. Del. 2002) ...................27

## TABLE OF AUTHORITIES
### (Continued)

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns. Corp.)*, 365 B.R. 24 (Bankr. S.D.N.Y. 2007) ............................................................................ 43

*In re Adelphia Communications Corp.*, 359 B.R. 54, 56 n.5 (Bankr. S.D.N.Y. 2006) ............... 22

*Aetna Cas. and Sur. Co. v. Ga. Tubing Co.*, 1995 U.S. Dist. LEXIS 10120 (S.D.N.Y. July 20, 1995) ................................................................................................................... 89

*Aetna Cas. and Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519 (6th Cir. 2000) ............................ 60

*Allied Capital Corp. v. GC–Sun Holdings, L.P.*, 910 A.2d 1020 (Del. Ch. 2006) ....................... 97

*In re Am. Bus. Fin. Services, Inc.*, 361 B.R. 747 (Bankr. D. Del. 2007) ...................................... 71

*Am. Buying Ins. Servs., Inc. v. S. Kornreich & Sons, Inc.*, 944 F. Supp. 240 (S.D.N.Y. 1996) .................................................................................................................... 27

*Am. Gen. Life Ins. v. Goldstein*, 741 F. Supp. 2d 604, 613 (D. Del. 2010) .................................. 29

*Am. Int'l Group, Inc. v. Greenberg*, 976 A.2d 872 (Del. Ch. 2009) ........................... 89, 92, 93, 94

*Amatex Corp. v. Aetna Casualty & Surety Co. (In re Amatex Corp.)*, 107 B.R. 856 (Bankr. E.D. Pa. 1988) .............................................................................................. 22

*Anjelino v. New York Times Co.*, 200 F.3d 73 (3d Cir. 2000) ...................................................... 54

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) ........................................................ 23

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ................................................................................ passim

*Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299 (1985) ......................................... 92

*Bell Atlantic Corp. v. Twombly*, 55 U.S. 544 (2007) ................................................................ passim

*In re Best Products Co.*, 210 B.R. 714 (Bankr. E.D. Va. 1997) .................................................... 22

*Brug v. Enstar Grp., Inc.*, 755 F. Supp. 1247 (D. Del. 1991) ....................................................... 71

*Matter of Burger*, 125 B.R. 894 (Bankr. D. Del. 1991) ................................................................ 95

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) .................................... 43

*Burtch v. Dent (In re Circle Y of Yoakum, Texas)*, 354 B.R. 349 (Bankr. D. Del. 2006) ...... 96, 100

*Capitaliza-T Sociedad De Responsabilidad Limitada De Capital Variable v. Wachovia Bank of Del. Nat'l Ass'n*, No. CIV. 10-520, 2011 WL 864421 (D. Del. Mar. 9, 2011) .......... 60

*In re Cavalier Indus., Inc.*, No. 99-31737, 2003 WL 716291 (Bankr. E.D. Pa. Feb. 6, 2003) ...................................................................................................................... 17

# TABLE OF AUTHORITIES
## (Continued)

*Chapa v. Chase Home Fin. LLC*, No. C-10-359 (JGJ), 2010 WL 5186785 (S.D. Tex. Dec. 15, 2010) ......................................................................................................................79

*In re Chi-Chi's, Inc.*, 338 B.R. 618 (Bankr. D. Del. 2006)..................................................57

*Christidis v. First Pa. Mortg. Trust*, 717 F.2d 96 (3d Cir. 1983) ......................................28

*Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999).............................52

*Coan v. O & G Indus. Inc. (In re Austin Driveway Servs., Inc.)*, 179 B.R. 390 (Bankr. D. Conn. 1995)......................................................................................................100, 101

*Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415 (5th Cir.1995) .......................................57

*Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628 (3d Cir. 1989).................................27, 28

*Cronus Offshore, Inc. v. Kerr McGee Oil & Gas Corp.*, 369 F. Supp. 2d 848 (E.D. Tex. 2004) *aff'd*, 133 F. App'x 944 (5th Cir. 2005)...............................................................26

*Davidson v. Twin City Bank (In re Hollis)*, 83 B.R. 588 (Bankr. E.D. Ark. 1988) ...............18, 30

*In re DBSI, Inc.*, 445 B.R. 344 (Bankr. D. Del. 2011).......................................................43

*In re DeAngelis Tangibles, Inc.*, 238 B.R. 96 (Bankr. M.D. Pa. 1999) .............................19

*In re Diamond Mortg. Corp. of Ill.*, 105 B.R. 876 (N.D. Ill. 1989)..............................21, 22

*Dobyns v. United States*, 91 Fed. Cl. 412 (2010)...............................................................23

*Duke Energy Int'l, L.L.C. v. Napoli*, 748 F. Supp. 2d 656 (S.D. Tex. 2010) ....................60

*In re DVI, Inc.*, No. 03-12656, 2008 WL 4239120 (Bankr. D. Del. Sept. 16, 2008) ..............93, 94

*Empire Fin. Servs., Inc. v. Bank of N.Y. (Del.)*, 900 A.2d 92 (Del. 2006).......................73

*Re Eurofood IFSC Ltd* [2006] BCC 606..............................................................................49

*Fierro v. Gallucci*, 06-CV-5189, 2008 WL 2039545 (E.D.N.Y. May 12, 2008) ..............71

*Firestone v. Firestone*, 76 F.3d 1205 (D.C. Cir. 1996)......................................................98

*Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.)*, 398 B.R. 736 (S.D.N.Y. 2008)..............................................................................................................20

*Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107 (3d Cir. 1992) .........................................53

*Floyd v. CIBC Markets, Inc.*, 426 B.R. 622 (Bankr. S.D. Tex. 2009)........................89, 94

*Floyd v. Hefner*, 556 F. Supp. 2d 617 (S.D. Tex. 2008)................................................73, 90

**TABLE OF AUTHORITIES**
**(Continued)**

*Forman v. Salzano (In re Norvergence, Inc.)*, 405 B.R. 709 (Bankr. D.N.J. 2009) ...............26, 27

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009)......................................................23, 24

*Fyffes Pic* v. *DCC Pic* [2009] 2 I.R. 417 ......................................................................................63

*Gillman v. Inner City Broad. Corp.*, No. 08 Civ. 8909, 2009 WL 3003244 (S.D.N.Y. Sept. 18, 2009) ..........................................................................................................................23

*Greenfield v. Tele-Communications,* C.A. No. 9814, 1989 WL 48738 (Del. Ch. May 10, 1989) ........................................................................................................................................62

*Gubitosi v. Zegeye*, 946 F. Supp. 339 (E.D. Pa. 1996) ...................................................................27

*Guirgis v. Movers Specialty Servs., Inc.*, 346 F. App'x 774 (3d Cir. 2009)..................................23

*Gwembe Valley Development Company Limited v Koshy* [2003] EWCA Civ 1048....................97

*Hamilton v. Leavy*, No. CIV.A. 94-336-GMS, 2001 WL 848603 (D. Del. July 27, 2001)...........57

*Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387 (Tex. 1997) ...................................................91

*Hecht v. Resolution Trust Corp.* 333 Md. 324, 635 A.2d 394 (1994) .........................................101

*Hill v. Day (In re Today's Destiny, Inc.)*, 388 B.R. 737 (Bankr. S.D. Tex. 2008) ............... *passim*

*Hirsch v. Tarricone (In re A. Tarricone, Inc.)*, 286 B.R. 256 (Bankr. S.D.N.Y. 2002) ...............90

*Re Hocroft Developments Limited* [2009] 1 EHC 580 ...................................................................34

*In re I.G. Servs., Ltd.*, No. 04-5041-C, 2004 WL 5866105 (Bankr. W.D. Tex. Dec. 22, 2004) ........................................................................................................................................60

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010)...............................................23

*Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567 (Tex. 1963) ........................................73

*J.J. Harrison (Props.) Ltd. v. Harrison* [2001] EWCA Civ 1467 ..................................................97

*Kalb, Voorhies & Co. v. Am. Fin. Corp.*, 8 F.3d 130 (2d Cir. 1993)............................................92

*Kaliner v. Load Rite Trailers (In re Sverica Acquisition Corp., Inc.)*, 179 B.R. 457 (Bankr. E.D. Pa. 1995)................................................................................................................30

*Kalmanovitz v. G. Heileman Brewing Co., Inc.*, 595 F. Supp. 1385 (D. Del. 1984), *aff'd*, 769 F.2d 152 (3d Cir. 1985)......................................................................................................71

*In re Keck, Mahin & Cate*, 237 B.R. 430 (Bankr. N.D. Ill. 1999), *aff'd*, 253 B.R. 530 (N.D. Ill. 2000).........................................................................................................................17

# TABLE OF AUTHORITIES
## (Continued)

*Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98 (3d Cir. 1999) ..................................56

*Lewandowski v. Nat'l R.R. Passenger Corp.*, 882 F.2d 815 (3d Cir. 1989)..................................54

*Lewis v. Davis*, 199 S.W.2d 146 (Tex. 1947) .........................................................................93, 94

*In re Loewen Group Inc.*, No. 98-6740, 2004 WL 1853137 (E.D. Pa. Aug. 18, 2004)..............100

*Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773 (5th Cir. 1997).....................................................41

*Malleus v. George*, 641 F.3d 560 (3d Cir. 2011).........................................................................24

*Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001)..................................................................61, 62

*Marvel Entm't Group, Inc. V. Mafco Holdings, Inc. (In re Marvel Entm't Group, Inc.)*,
    273 B.R. 58 (D. Del. 2002).........................................................................................101, 102

*Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R.
    488 (Bankr. D. Del. 2010) .............................................................................................96, 97

*In re Missionary Baptist Found. of Am., Inc.*, 712 F.2d 206 (5th Cir. 1983) ...............................90

*Montrose Med. Group Participating Savs. Plan v. Bulger*
    243 F.3d 773 (3d Cir. 2001).................................................................................47, 55, 56

*Murray v. Silberstein*, 882 F.2d 61 (3d Cir. 1989) ......................................................................53

*Nortel Networks, Inc. v. Commc'ns Test Design, Inc.*, Adv. No. 10-53065, 2011 WL
    1102829 (Bankr. D. Del. Mar. 22, 2011)...................................................................24, 25, 28

*Ocasio v. Ollson*, 596 F. Supp. 2d 890 (E.D. Pa. 2009) .........................................................52, 55

*Official Comm. Of Unsecured Creditors of Fedders N. Am. v. Goldman Sachs Credit
    Partners, LP. (In re Fedders North America, Inc.)*, 405 B.R. 527 (Bankr. D. Del.
    2009) .................................................................................................................................97

*Official Comm. Of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs.,
    Inc.)*, 299 B.R. 732 (Bankr. D. Del. 2003)................................................................................93

*Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414 (3d Cir. 1988).......................53

*In re Orion Refining Corp.*, 317 B.R. 660 (D. Del. 2004).....................................................99, 100

*Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, No. 09 C 5619, 2010 WL
    1979569 (N.D. Ill. May 17, 2010) ..........................................................................................30

*In re Pagnotti*, 269 B.R. 326 (Bankr. M.D. Pa. 2001)................................................................95

# TABLE OF AUTHORITIES
## (Continued)

*Pardo v. Avanti Corp. Health Sys., Inc. (In re APF Co.)*, 274 B.R. 634 (Bankr. D. Del. 2001) ................................................................................................................30

*Payless Wholesale Distribs, Inc. v. Alberto Culver (P.R.) Inc.*, 989 F.2d 570 (1st Cir. 1993) ................................................................................................................54

*Per Sir Donald Rattee Secretary of State v. Becker* [2003] 1 BCLC 555 ....................33

*Phillips v. Cnty. of Allegheny*, 515 F.3d 224 (3d Cir. 2008)..........................................23

*In re Pinnacle Brands, Inc.*, 259 B.R. 46 (Bankr. D. Del. 2001).....................................89

*Pinter v. Dahl*, 486 U.S. 622 (1988) ...............................................................................92

*Profilet v. Cambridge Fin. Corp.*, 231 B.R. 373 (S.D. Fla. 1999)...................................30

*In re Rafter*, No. 05–51335, 2007 WL 1591880 (Bankr. D.N.J. May 30, 2007)...........19

*Raytech Corp. v. White*, 54 F.3d 187 (3d Cir. 1995) .....................................................57

*In re Reliance Fin. & Inv. Group, Inc.*, No. 05-80625-CIV, 2006 WL 3663243 (S.D. Fla. Nov. 14, 2006) ..................................................................................18, 30

*Revenue Customs Commissioners v Holland* [2010] 1 WLR 2793 ................................34

*In re Rimsat Ltd.*, 223 B.R. 345 (Bankr. N.D. Ind. 1998)..................................17, 18, 19

*Rose v. Bartle*, 871 F.2d 331 (3d Cir.1989) ...................................................................71

*Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321 B.R. 128 (Bankr. D. Del. 2005) ........28

*Ryan Operations. G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355 (3d Cir. 1996) .....47, 53, 56

*S. Track & Pump, Inc. v. Terex Corp.*, 722 F. Supp. 2d 509 (D. Del. 2010)................................29

*Scarano v. Central R.R. Co.*, 203 F.2d 510 (3d Cir. 1953)....................................46, 47

*Schermerhorn v. Centurytel, Inc., (In re Skyport Global Commc's)*, Inc. ....................97

*Secretary of State for Trade and Industry v Aviss & Others* [2007]...............................34

*Secretary of State for Trade and Industry v. Hollier* [2006].........................................33

*In re SemCrude, L.P.*, 436 B.R. 317 (Bankr. D. Del. 2010) ....................................18, 19

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786 (3d Cir. 1984), *cert. denied*, 469 U.S. 1211 (1985) .........................................................................28

*In re Sevko*, 143 B.R. 167 (Bankr. N.D. Ill. 1992) .......................................................20

## TABLE OF AUTHORITIES
### (Continued)

*Smith v. Nat'l City Mortg.*, No. A-09-CV-881 (LY), 2010 WL 3338537 (W.D. Tex. Aug. 23, 2010) ..............................................................................................................................79

*Smith v. Woodforest Nat'l Bank (In re IFS Fin. Corp.)*, No. 02-39553, 2007 WL 1308321 (Bankr. S.D. Tex. May 3, 2007) ...............................................................................94

*Southco Inv. v. Penn Eng'g & Mfg. Corp.*, 768 F. Supp. 2d 715 (D. Del. 2011) .........................29

*In re Spiegel, Inc.*, 337 B.R. 821, 822-24 (Bankr. S.D.N.Y. 2006) ..............................................20

*In re Stanford International Bank Ltd* [2010] EWCA Civ 137 .....................................................49

*Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*, 335 B.R. 539 (Bankr. D. Del. 2005) ................................................................................................................90, 94

*State Farm Mut. Auto. Ins. Co. v. Ficchi*, Civ. No. 10-555, 2011 WL 2313203 (E.D. Pa. June 13, 2011) ..............................................................................................................71

*Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069 (Del. 1983) .....................................................26

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ......................................................................23

*Tese-Milner v. Beeler (In re Hampton Hotel Investors, L.P.)*, 289 B.R. 563 (Bankr. S.D.N.Y. 2003) ...........................................................................................................90

*TMP Worldwide, Inc. v. Inacom Corp. (In re Inacom Corp.)*, Adv. No. 00-1115, 2001 WL 1819987, *2 (D. Del. Aug. 7, 2001) ................................................................27

*In re Today's Destiny, Inc.*, 388 B.R. 737, 749 (Bankr. S.D. Tex. 2008).........................90, 93, 94

*Toner v. Allstate Ins. Co.*, 821 F. Supp. 276 (D. Del. 1993)..........................................................26

*In re Total Containment, Inc.*, No. 05-0145, 2005 WL 6522761 (Bankr. E.D. Pa. Oct. 18, 2005) ................................................................................................................................94

*In re Trans World Airlines, Inc.*, 145 F.3d 124 (3d Cir. 1998).....................................................99

*Tri-Ex Enters. v. Morgan Guar. Trust*, 586 F. Supp. 930 (S.D.N.Y. 1984) ...............................100

*In re Tronox Inc.*, No. 09-10156 (ALG), 2010 WL 2010844 (Bankr. S.D.N.Y. May 14, 2010) ................................................................................................................................80

*United States v. Bestfoods*, 524 U.S. 51 (1998) ...........................................................................41

*In re Walls & All, Inc.*, 127 B.R. 115 (W.D. Pa. 1991) ................................................................99

*In re Wedtech Corp.*, 87 B.R. 279 (Bankr. S.D.N.Y. 1988) .........................................................88

# TABLE OF AUTHORITIES
## (Continued)

*In re Windsor Constructors, Inc.*, No. 03–36589, 2006 WL 4005568 (Bankr. E.D. Pa. Dec. 18, 2006).......................................................................................................................19

*In re WorldCom, Inc.*, 322 B.R. 530 (Bankr. S.D.N.Y. 2005)........................................................20

*Young v. Shore*, 588 F. Supp. 2d 544 (D. Del. 2008) ....................................................................57

*Yukong Line Ltd v Rendsburg Investments Corp of Liberia* [1998] ..............................................35

*Zirn v. Vli Corp.*, 15 Del. J. Corp. L. 789, 801-02 (Del. Ch. 1989)...............................................60

**REGULATIONS**

*EC Regulations on Insolvency Proceedings* ...........................................................................48, 49

**TREATISES AND PERIODICAL MATERIALS**

37 Am. Jur. 2d *Fraud & Deceit* § 39 (2011) ...............................................................................26

Daniel R. Coquillette et al., *Moore's Federal Practice* (3d ed. 2011) ..........................................27

Lawrence P. King et al., *Collier on Bankruptcy* (16th ed. 2011) ...........................................19, 95

Arthur R. Miller, *From* Conley *to* Twombly *to* Iqbal*: A Double Play on the Federal Rules of Civil Procedure*, 60 Duke L.J. 1, 44 (2010)................................................................30

The court-appointed administrators and authorized foreign representatives (collectively, the "Joint Administrators")[1] for Nortel Networks (Ireland) Limited ("NN Ireland") and certain of its affiliates (collectively, the "EMEA Debtors")[2] located in the region known as EMEA (Europe, Middle East, and Africa) in proceedings under the *Insolvency Act 1986*, pending before the High Court of Justice of England and Wales (the "English Court"), submit this Memorandum of Law in Opposition to the Joint Objection and Motion (the "Joint Objection") [D.I. 6022] of Nortel Networks, Inc. ("NNI") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"),[3] and the Official Committee of Unsecured Creditors (the "Committee" and, together with the Debtors, the "US Debtor"), to dismiss the amended proof of claim of NN Ireland (the "Proof of Claim").[4]

## INTRODUCTION

There are two initial points to be made.  First, the US Debtor's objection should be examined in light of the surrounding circumstances.  Second, circumspection is required before dismissing claims of this nature and significance at such a preliminary stage.  The claims

---

1. The administrators in the UK proceedings for all of the EMEA Debtors, with the exception of Nortel Networks (Ireland) Limited, are:  Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, and Stephen John Harris.  The administrators in the UK proceedings for Nortel Networks (Ireland) Limited are:  Alan Robert Bloom and David Martin Hughes.

2. The EMEA Debtors are:  Nortel Networks UK Limited; Nortel GmbH; Nortel Networks (Austria) GmbH; Nortel Networks (Ireland) Limited; Nortel Networks AB; Nortel Networks B.V.; Nortel Networks Engineering Service Kft; Nortel Networks France S.A.S.; Nortel Networks Hispania, S.A.; Nortel Networks International Finance & Holding B.V; Nortel Networks N.V.; Nortel Networks OY; Nortel Networks Polska Sp. z.o.o.; Nortel Networks Portugal S.A.; Nortel Networks Romania SRL; Nortel Networks S.A.; Nortel Networks S.p.A.; Nortel Networks Slovensko, s.r.o.; Nortel Networks, s.r.o.

3. The Debtors in these Chapter 11 cases are:  Nortel Networks Inc., Nortel Networks Capital Corporation, Alteon WebSystems, Inc., Alteon WebSystems International, Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

4. Capitalized terms used but not otherwise defined are defined  in the Proof of Claim.

asserted by the Joint Administrators are not based on "far-fetched allegations," as the US Debtor

asserts.  They are bona fide claims which have been brought by the Joint Administrators, acting

responsibly and properly as officers of the English Court.  The claims are pursued for the

ultimate benefit of NN Ireland's creditors.  These creditors stand to suffer if the result of years of

improper removal of value from NN Ireland is not now corrected.

The US Debtor's objection is entirely misconceived.  The US Debtor had

suggested to the Court that the Joint Administrators' claims would seek to impose duties running

from NNI to the EMEA Debtors based solely on the fact that the companies were under common

control.  But the Proof of Claim, a detailed 49 page document, shows that in fact NNI and its

personnel played a direct and substantial role in devising and enforcing key global policies for

the Nortel Group, including the specific policies and transactions by which NN Ireland was

stripped of cash.  While the underlying facts are complicated, and the relevant events took place

over an extended period of time, the Proof of Claim shows that the Joint Administrators are

entitled to pursue numerous claims under foreign and US law.  The US Debtor's objection raises

complex and disputed questions about the underlying facts, the content of foreign law, and the

application of foreign law to the underlying facts.  These disputed matters cannot be properly

addressed on a motion to dismiss.  It would be unjust to the innocent creditors of NN Ireland to

deny the Joint Administrators the chance to take discovery and prove their claims at trial.

There is also a striking inconsistency in the US Debtor's position on the

underlying facts.  The US Debtor does not and can not deny that there was a policy within the

Nortel Group to improperly transfer cash and value to the Canadian entities.  It can reasonably be

inferred that this was the basis upon which the US Debtor itself submitted a $2 billion dollar

claim against NNL regarding transfer pricing irregularities, and accepted such a claim by the

IRS.  Although the US Debtor suggests that it was a fellow victim of these policies, the facts show that the US Debtor was centrally involved in creating and implementing the policy to improperly transfer value to the Canadian entities, as is manifestly clear on the face of the Proof of Claim, and as will become even clearer following discovery.  Just as the US Debtor has received the chance to recover on its $2 billion claim for income wrongly diverted to Canada, NN Ireland seeks the same opportunity to obtain the value that has been wrongly diverted from NN Ireland, including from NNI which acted together with NNL to enable this diversion.

The US Debtor's objection must be seen for what it is – yet a further attempt by the US Debtor to avoid dealing with the substance of the Joint Administrators' claims and to avoid providing the Joint Administrators with the disclosure which will assist the Joint Administrators to prove their claims at trial.  The US Debtor has accused the Joint Administrators of "playing games."  They are not.  If anyone is playing games it is the US Debtor.

Turning to the detail of the motion, the US Debtor raises four principal issues, none of which has any merit.  The US Debtor contends that:

- the Proof of Claim does not meet the necessary pleading standard;

- the Joint Administrators are estopped from pursuing claims based on allegations of *de facto* or shadow directorship under Irish law;

- the Joint Administrators do not state claims under Irish law; and

- the claims are time barred.

As to the pleading standard, the relevant test for a proof of claim is supplied by Bankruptcy Rule 3001.  The US Debtor does not dispute that the Proof of Claim now complies with this standard, which is all that the US Debtor asked for in its April 2011 motion to require

the Joint Administrators to file a "more definite statement" of their claims.  Significantly, the US

Debtor did <u>not</u> at that time ask the Court to apply Fed. R. Civ. P. 8(a) or 12(b)(6) to the amended

proof of claim that the Joint Administrators agreed to file voluntarily.

Having obtained a more definite statement of the Joint Administrators' claims, the

US Debtor now asks the Court to apply a heightened pleading standard under Fed. R. Civ. P.

8(a), and to entertain a motion under Fed. R. Civ. P. 12(b)(6) to dismiss the Proof of Claim for

failure to comply with such a standard.  Although the Court has discretion to apply these rules in

a contested matter, the Bankruptcy Rules provide that it can only do so after giving the parties

notice and "a reasonable opportunity to comply with the procedures prescribed."  Fed. R. Bankr.

P. 9014(c).  The US Debtor's objection should therefore be treated as a motion asking the court

to direct that Rules 8(a) and 12(b)(6) will apply.  The Joint Administrators are entitled to

advance notice if those rules are to be applied.  While it is the Joint Administrators' position that

the Proof of Claim already complies with the higher pleading standard, it would not be

appropriate to deny NN Ireland notice and the opportunity to plead against the higher standard.

Indeed it would not serve any purpose to apply Rules 8(a) and 12(b)(6) to the

Joint Administrators' claims.  A review of the Proof of Claim shows that the claims are well-

founded and will not be subject to dismissal.  The Proof of Claim provides sufficient factual

details to allow the US Debtor to prepare its defense and, regardless of what happens here, the

parties will be exchanging extensive discovery regarding the underlying facts.  The same factual

matrix will have to be addressed in order to determine (i) the Joint Administrators' claims

against NNL in Canada, and (ii) how the proceeds of the Nortel asset sales should be allocated

among the various debtors.  Accordingly, the most efficient overall approach would be to

coordinate discovery for all purposes and then address any dispositive motions and cross motions

after the conclusion of this process.  All parties will be in a better position to winnow and

substantiate their claims and defenses after the conclusion of discovery.

   The estoppel issue is a particularly striking example of the US Debtor's

unwillingness to address the real issues, coupled with a totally unwarranted attack upon the Joint

Administrators' integrity.  The US Debtor's argument fails for the simple reason that there is no

inconsistency between the position taken in the Proof of Claim, on the one hand, and in

demonstrating that England was the EMEA debtors' center of main interest, on the other.  A

finding that England is the EMEA Debtors' center of main interest is not inconsistent with the

fact that NNL and NNI exercised sufficient control over NN Ireland's tax and treasury functions

to impose on NN Ireland the major transactions that caused the company significant damage, as

detailed in the Proof of Claim.  Nor has the English Court, or this Court, ever made any finding

of fact which would preclude a claim based on the exercise of such control in relation to the

transactions at issue.  The US Debtor's arguments are further weakened when it is seen that they

have mischaracterized the statements made by Alan Bloom and other EMEA witnesses in the

prior proceedings.  The record leaves no doubt that the Joint Administrators have acted in good

faith, and the US Debtor has not identified any cognizable harm it might suffer other than being

required to defend against meritorious claims.

   As for the US Debtor's argument that the facts will not establish the Joint

Administrators' claims under Irish law, these arguments are not appropriate to deal with on a

motion to dismiss.  The Joint Administrators' claims engage a wide range of foreign law issues

which by their very nature require a proper examination at trial based on all of the evidence.  For

example, an inquiry as to whether one company is a *de facto* or shadow director of another

necessitates an in-depth factual investigation of the internal workings of the company in

question.  Such an investigation is not possible based simply on a review of the pleadings.  Even

putting this fundamental issue to one side, the US Debtor's attempts to argue that the claims are

not made out under Irish law are misguided.  It is beyond the scope of this section to set out all of

these but the US Debtor's failure to deal with the latest developments in the law of *de facto*

directors, their curious attempt to limit the scope of fiduciary duties owed by NNI as a shadow

director, and their wholly misplaced reliance on *in pari delicto* principles are striking examples.

As to the statute of limitations, the assertions made by the US Debtor are once

again without any merit.  In particular, the US Debtor ignores Bankruptcy Code Section 108(c)

which had the effect of tolling any applicable limitation periods as of the filing date.  This is a

complete answer.  The claims have therefore been submitted on a timely basis.  In any event, the

claims are governed by the Irish Statute of limitations and are subject to equitable tolling under

the adverse domination doctrine.

## PROCEDURAL HISTORY

The Debtors filed voluntary petitions for relief under Chapter 11 of the

Bankruptcy Code on January 14, 2009 (the "Petition Date").[5]  Certain parallel proceedings (the

"Canadian Proceedings") commenced by NNL, as well as NNL's corporate parent Nortel

Networks Corporation ("NNC"), were initiated with the Ontario Superior Court of Justice (the

"Canadian Court") on the Petition Date seeking relief under the Companies' Creditors

Arrangement Act (Canada).  Also on the Petition Date, the English Court entered orders placing

the EMEA Debtors into administration and appointing the Joint Administrators (the "English

---

5.    With the exception of Nortel Networks (CALA) Inc., which filed a voluntary petition for relief under
      Chapter 11 of the Bankruptcy Code on July 14, 2009.

Proceedings")[6]  This Court subsequently granted recognition for the English Proceedings under Chapter 15 of the Bankruptcy Code.[7]

**The Sales and Mediation Processes**

Since the Petition Date the primary focus of all of the Nortel debtors has been on the sale of the group's worldwide assets.  In addition they have engaged in consensual and cooperative efforts to resolve the question of how the proceeds of these asset sales should be allocated among the various debtors.  Although limited exchanges of information were made, on a cooperative basis, in connection with the mediation process, there has been no comprehensive intercompany disclosure process, and neither NNL nor NNI responded fully to information requests submitted by the Joint Administrators.[8]  Even the disclosure that has been provided was provided on a without prejudice basis.  Those documents are not able to be used for this or any other formal court process.  This is despite persistent requests by the Joint Administrators that this information would be available for the purposes of perfecting the intercompany claims.

**The US Claims Process**

The US Debtor incorrectly suggests that the Joint Administrators have been dilatory in asserting and documenting their claims.  In fact, the Joint Administrators elected to file, and later agreed to voluntarily supplement and amend, the protective proof of claim in advance of the setting of any bar date for intercompany claims.  This suggestion is also

---

6.  (*In the matter of Nortel Networks UK Limited and in the Matter of Insolvency Act 1986*, High Court of Justice (Ch) No. 00536 of 2009, 14 January 2009, Blackburne J. (the "Initial Orders"), Joksimovic Decl. Ex. G.)

7.  (Order Granting Recognition And Relief In Aid Of Foreign Main Proceedings, dated June 26, 2009, Joksimovic Decl. Ex. O; Order Granting Recognition Of Foreign Proceedings And Related Relief With Respect To The EMEA Debtors, dated January 31, 2011 (the "EMEA Recognition Order"), Joksimovic Decl. Ex. P.)

8.  As part of the mediation process the parties exchanged requests for documents commencing in early 2010. However, the discovery process to date has been without prejudice, informal, ad hoc, and limited to requests for documents which at the time were considered to be significant or required for the purposes of settlement negotiations.  Due to a compressed timetable in the lead up to the August 2010 and November 2010 mediation, the parties considerably narrowed their requests from their original scope.

disingenuous because, since mid 2010, the Joint Administrators have been actively engaging with the US Debtor, on a without prejudice basis, in relation to their claims against the US Debtor.

The order establishing a Bar Date of September 30, 2009 for the filing of general creditor claims specifically excluded intercompany claims,[9] including the EMEA Debtors' claims.  Although not required to do so, the Joint Administrators filed the Original Proof of Claim against NNI.[10]  The Original Proof of Claim included a rider that stated the bases for the Joint Administrators' claims.

The US Debtor has only recently moved to set a proposed bar date of November 15, 2011 for intercompany claims.[11]  But previously, in April 2011, they had singled out the Joint Administrators by filing objections to the Original Proof of Claim and moving for an order requiring a more definite statement.[12]  The Joint Administrators responded to the US Debtor's motion for a more definite statement by voluntarily agreeing to file amended and supplemental claims.[13]  Thus, on June 3, 2011, the Joint Administrators filed their amended Proof of Claim, setting forth the factual and legal grounds for their claims at great length.

---

9.   (*See* Bar Date Order ¶ 6(f) [D.I. 1280] (excluding from the list of creditors required to file a proof of claim by the Bar Date "[a]ny Debtor, nondebtor affiliate of the Debtors or Canadian Debtor, or any of their direct or indirect subsidiaries holding a claim against any of the Debtors.").)

10.  (Joksimovic Decl. Ex. B.)

11.  (*See* Debtors' Motion for an Order Establishing Deadlines for Filing Proofs of Claim for Non-Canadian Intercompany Claims and Remaining Director and Officer Claims and Approving the Form and Manner of Notice Thereof [D.I. 6303].)

12.  (*See generally* Initial Claims Obj.)

13.  (Proposed Order Requiring EMEA Claimants to File a More Definite Statement of Claim and Setting a Deadline for the Filing of Any Proofs of Claim By the EMEA Claimants [D.I. 5402] (setting June 1, 2011 deadline); Order Approving Extension of Deadline for EMEA Claimants to File a More Definite Statement of Claim and to File Any Proofs of Claim [D.I. 5588] (extending deadline to June 3, 2011).)

## The Canadian Claims Processes

On December 20, 2010, the Canadian Debtor moved the Canadian Court to impose a "bar date" of February 11, 2011, by which time the EMEA Debtors would be required to submit intercompany claims against the Canadian Debtors (the "EMEA Claims Bar Date"). On January 20, 2011, the Canadian Court entered an order setting the EMEA Claims Bar Date for March 18, 2011. The EMEA Debtors filed intercompany claims against the Canadian Debtors on the EMEA Claims Bar Date. On May 19, 2011 the Canadian Monitor wrote to the EMEA Debtors' Canadian counsel requesting that the EMEA Debtors provide further particulars in relation to the EMEA intercompany claims against the Canadian Debtors. The EMEA Debtors provided Further Particulars (running to 110 pages) on September 12, 2011. However, the Canadian Monitor has indicated that it does not intend to take any further steps to progress the EMEA intercompany claims against the Canadian Debtors and that, should it choose to progress those claims, it will not do so until after the mediation ordered by the US and Canadian Courts takes place before Chief Justice Winkler.

## FACTUAL BACKGROUND OF THE CLAIMS

By 1990, the combined Canadian and US operations of the Nortel Group made it one of the leading telecommunications companies in North America. (Proof of Claim ¶ 3.) From this pan-North American base, the Group sought to expand overseas. (*Id.*) In 1991, the Group acquired STC plc, a major UK public telecommunications company. This entrée into the European market brought customer relationships with large European carriers and allowed Nortel to expand into the wider European markets. In fiscal year 1991, European revenues accounted for nearly one-fifth of the Group's total revenue, a figure that grew in later years. (*Id.* ¶¶ 4-5.)

As Nortel expanded internationally, control of the Group's worldwide businesses remained centralized in North America.  Although the Canadian companies – NNL, and its ultimate corporate parent NNC (together, the "<u>Canadian Entities</u>") – were the ultimate parent companies of NNI, NN Ireland and the other overseas subsidiaries, NNI was the Group's most important business unit and there was at all relevant times a special relationship between NNL and NNI.  There was considerable overlap between the management of the North American companies and key areas were controlled jointly by the Canadian Entities and NNI. These areas included Nortel Group Tax and Treasury, which performed key roles in the Group's centralized, strategic management and initiated and implemented most of the significant transactions that impacted the Group.  (*Id.* ¶¶ 15, 19, 26.)

Although the Nortel Group enjoyed considerable financial success following its expansion into Europe, increased industry competition and decreased demand for the Group's products in the wake of the "dot-com" crisis in 2001 caused a dramatic downturn in revenue. (*Id.* ¶¶ 6-7.)  To combat this downturn, the Group was forced to restructure and, by 2008, had reduced its employee numbers by two-thirds and outsourced its manufacturing.  (*Id.* ¶ 7.)  This restructuring did not resolve the Group's financial troubles.  It only helped stave off the ultimate collapse of the Group until early 2009.  (*Id.* ¶¶ 7-8.)

NNI and NNL also implemented a general policy to ensure that value and cash within the Group would be removed from NN Ireland and the other EMEA entities and transferred to NNL.  (*Id.* ¶¶ 9-10.)  NNI benefited greatly from this removal of value from NN Ireland, including, for example, through the receipt of cash payments from NNL stemming from intercompany loans which were advanced by NN Ireland to NNL.  (*Id.* ¶¶ 11-12.)  NNI secured this benefit by exerting its control over Group Tax matters, including transfer pricing, and Group

Treasury matters – the functions that advanced the transactions through which cash and value was removed from NN Ireland.  (*Id.* ¶ 15.)

Thus, in the period leading up to the collapse of the Nortel Group, NNI and the Canadian Entities worked hand-in-hand to systematically deplete the resources of NN Ireland by orchestrating a scheme through which cash and value was repeatedly and improperly removed and transferred from NN Ireland and the other EMEA entities to NNL and NNI, as described more fully below.[14]

Transfer Pricing.  The guiding principle behind transfer pricing arrangements, as recommended by the Organization for Economic Cooperation and Development and followed by most tax authorities, is that transactions between companies within a multinational group should replicate arm's length transactions between independent companies.  (*Id.* ¶ 31.)  The arrangements within the Nortel Group, however, ensured exactly the opposite – NN Ireland and the other EMEA entities were deprived of revenue because NNI, along with NNL, intentionally facilitated the improper transfer of value from NN Ireland and the other EMEA entities to NNL. (*Id.* ¶¶ 16-19, 33.)

In an effort to allocate more profit to the Canadian Entities at the expense of NN Ireland, NNI and/or the Canadian Entities revised the Nortel Group's transfer pricing method in 2001 without involving NN Ireland and the other EMEA Companies that were adversely affected by this decision.  (*Id.* ¶¶ 32-34.)  The new transfer pricing method adopted by the Group in 2001 – the residual profit split method ("RPSM") – distinguished between two types of Group

_____

14. NNL and NNI both exercised the functions of a director of NN Ireland by making key decisions that could only properly be made in a director's capacity or by causing the *de jure* directors to act in accordance with its instructions and directions.  (*Id.* ¶ 26-27, 89, 111 n.5.)  NN Ireland's *de jure* directors, moreover, allowed both NNI and NNL to control decision-making related to intercompany transactions – including transfer pricing arrangements and intercompany loans, as described below – which resulted in NN Ireland suffering losses and damages.  (*Id.* ¶¶ 29-30.)

participants: (i) residual profit entities ("RPEs"), which included NN Ireland, NNL, NNI, Nortel

Networks SA ("NNSA") and Nortel Networks UK Limited ("NNUK"), and (ii) limited risk

entities ("LREs").  Under the RPSM, LREs were entitled only to routine profits based on their

own direct earnings from sales to third parties, while RPEs received their routine profits as well

as profits (or losses) attributable to the Group's intangible development activities (e.g., research

and development ("R&D")).  (*Id.* ¶¶ 35-36.)

        In December 2004, NNL, NNI, NN Ireland, NNSA, NN Australia and NNUK

entered into a Master Research and Development Agreement ("MRDA"), which provided the

architecture and contractual basis for the RPSM to be applied.  (*Id.* ¶ 40.)  Consistent with the

implementation of the RPSM, NN Ireland was not involved in the decision to implement the

MRDA.  The terms of the MRDA had also been determined by NNI and NNL, without input

from NN Ireland.  (*Id.* ¶ 41.)

        The MRDA provided that in exchange for the performance of R&D, each party to

the agreement was entitled to receive payment commensurate with its performance of, and

contribution to, R&D activity.  (*Id.* ¶ 42-43.)  Indeed, the agreement that each of the entities

within the group would treat each other in accordance with arm's length principles is expressly

set forth in the MRDA.  (*Id.* ¶¶ 45-47.)  But the RSPM as applied under the MRDA failed to

comply with the arm's length principle.  Instead, NNI facilitated the improper transfer of funds

from NN Ireland for the benefit of NNL.  (*Id.* ¶ 48.)  Specifically, the RPSM arrangement was

flawed because:

    (i)      NN Ireland's rate of return failed to recognize intercompany sales, significant
                customer intangibles, the service element performed alongside the distribution
                function or the risks and costs borne outside the routine return;

(ii) NN Ireland was not fully reimbursed for providing regional central services and other extra-territorial services (e.g., sales and marketing) to other companies in the Nortel Group;

(iii) The RPSM model did not reflect NN Ireland's high restructuring costs;

(iv) NN Ireland incurred losses associated with bad debts arising from vendor financing that NNL required NN Ireland to provide to its customers; and

(v) Contrary to the MRDA, stewardship costs were not excluded from the calculation of the RPEs' residual profits. NNL's and NNI's excessive and duplicative corporate costs were also allocated to the residual pool, even though the EMEA region had its own head office.

(*Id.* ¶ 49.)

  <u>Intercompany Loans And Dividends</u>. NNL's and NNI's operating strategy was to structure NN Ireland's affairs such that NN Ireland's cash and profit would be channeled to NNL (the "<u>Irish Cash Repatriation Strategy</u>"). (*Id.* ¶ 51.) Accordingly, under the direction of Katherine Stevenson, Group Treasurer and Director of NNI, the Irish Cash Repatriation Strategy was implemented, through which non-commercial interest free and unsecured intercompany loans were advanced by NN Ireland to NNL (the "<u>Irish Loans</u>") and various dividends were declared by NN Ireland in NNL's favor (the "<u>Irish Dividends</u>"). (*Id.* ¶¶ 11, 20-22.) Ryan Smith, "Leader of Global Tax Planning" and NNI employee, took a lead role in identifying and exploiting opportunities to funnel cash from NN Ireland to NNL, including the establishment of the Irish Loans and Irish Dividends. (*Id.* ¶ 23.)

  From 2000 onward, NNL and NNI set in motion the Irish Cash Repatriation Strategy, through which NNL became the direct shareholder in NN Ireland and obtained multiple eight- and nine-figure interest-free loans and dividend payments from NN Ireland. (*Id.* ¶¶ 52-56.)

In June 2006, NNL obtained from NNI an interest-free loan facility of €80 million, which was drawn down in full and repaid without interest on or about July 19, 2006. Subsequently, in April 2008, NN Ireland provided NNL with a 364-day revolving non-commercial interest-free €100 million facility (the "April 2008 Loan") (*id.* ¶ 56), which apparently was fully drawn down on April 21, 2008. By resolutions dated April 22, 2008, the *de jure* directors declared dividends totaling approximately €21.6 million in NNL's favor (the "April 2008 Dividends"), and purported to approve and ratify the April 2008 Loan owing to Ireland. (*Id.* ¶ 55.) The following day, the balance of the April 2008 Loan was purportedly reduced to €73.3 million as a result of the offsetting of the April 2008 Dividends. (*Id.* ¶ 55.)

In fact, in June 2008, Irish Dividends totaling approximately €20 million were paid in cash by NN Ireland to NNL — an amount, as discovered in September 2008, that NN Ireland had insufficient distributable profits to have declared in NNL's favor. As such, the June 2008 dividends were unlawful. (*Id.* ¶ 57.) Remarkably, NNL and NNI determined that rather than repaying these unlawful dividends in cash, they would be treated as a loan to NNL. NNL and NNI accomplished this feat by treating the dividend as being "repaid" to NN Ireland and then advanced again to NNL by adding the same sum of approximately €20 million to the balance of a previous loan from April 2008. Then, to avoid repaying the April 2008 loan balance of almost €100,000,000 in cash, the balance was purportedly reduced and settled over the months of October through December 2008 by declaring transfer pricing adjustments in NN Ireland's favor. NNL jumped through all of these hoops to purposefully avoid paying cash to NN Ireland. (*Id.* ¶ 58-59.)

At the same time, NNI continued to benefit from these transactions. NNI made a number of loans to NNL which, unlike the non-commercial interest-free loans made by NN

Ireland, were made on a commercial interest-bearing basis and were regularly repaid in cash by

NNL.  Thus, NNI, together with NNL, exerted sufficient control over NN Ireland to extend and

enlarge NN Ireland's dividend payments and loans to NNL on an interest-free, unsecured basis

despite the fact that contrary to NN Ireland's commercial interests, these transactions extracted

significant value from NN Ireland during a period when NN Ireland was of doubtful solvency.

The pattern, therefore, of  the Group's North American leadership causing NN Ireland to lose

value while NNI benefited and received cash continued unabated.  (*Id.* ¶¶ 60-65.)

Pre-Petition Asset Sales.  Prior to January 14, 2009, NN Ireland entered into

various global business transactions with other Nortel entities, including NNI, whereby a

particular business line was sold by those Nortel entities to a third party purchaser.  (*Id.* ¶ 66.)

Notwithstanding the parties' agreement that the various selling Nortel entities would allocate the

proceeds of sales among themselves in accordance with arm's length entitlement – and

applicable law and international accounting regulations that demand such allocation – this did

not happen.  (*Id.* ¶ 67.)  Instead, allocation was attempted (but apparently not even consistently

applied) in conformity with the erroneous assumptions set forth in the transfer pricing structure

within the Nortel Group at the time.  (*Id.* ¶ 68.)  Consequently, at the direction of the Group's

North American leadership, NN Ireland again received significantly less and NNI received

significantly more than each was entitled to on an arm's length basis.  (*Id.* ¶ 69.)

Taxation Matters.  NN Ireland's taxation affairs were controlled by NNI and

NNL, particularly with respect to transfer pricing matters.  Thus, to the extent that any Revenue

Authority makes a claim against NN Ireland in connection with any failure to pay the appropriate

level of taxation, NNI and NNL would be responsible for any resulting penalties, interest or

other loss payable by NN Ireland.  (*Id.* ¶¶ 71-72.)

FSD Proceedings.  On June 25, 2010, the Determinations Panel ("DP") of the UK Pensions Regulator ("UK Regulator") determined that a Financial Support Direction ("FSD") requiring the provision of financial support to the NNUK pension plan should be issued with respect to certain EMEA entities (the "EMEA Targets"), including NN Ireland, and NNI.  (*Id.* ¶¶ 73-75.)  The EMEA Targets have referred the DP's decision to the Upper Tribunal (Tax and Chancery Chamber) and are waiting to be heard; NNI has not referred the DP's decision to the Upper Tribunal.  (*Id.* ¶¶ 73-75.)

Pursuant to an application by the UK Regulator, the Upper Tribunal issued directions on February 3, 2011, confirming that FSDs can be issued by the UK Regulator as against NNI.  (*Id.* ¶ 75.)  In deciding whether it is reasonable to impose the requirements of an FSD on a particular person, the UK Regulator is required to consider, where relevant: (i) the relationship the person has or had with the sponsoring employer of the pension scheme in question (including, where the person is a company, whether the person has or had control of the employer); (ii) the value of any benefits received directly or indirectly by the person from the employer; (iii) any connection or involvement the person has or had with the scheme; and (iv) the financial circumstances of the person.  (*Id.* ¶ 77.)

The principal effect of an FSD is to require the persons to whom it is issued to secure and maintain financial support for the pension scheme at issue.  (*Id.* ¶ 78.)  In the event of non-compliance with an FSD, the UK Regulator has power to issue a contribution notice ("CN") requiring the person to whom the FSD was issued to pay the trustees or managers of the pension scheme, where is it reasonable to impose such liability.  (*Id.* ¶ 79.)

To the extent that NN Ireland is ultimately required to make a payment pursuant to an FSD or CN, NN Ireland would be entitled to recover from NNI based on the extent of

NNI's responsibility for NN Ireland's financial condition as set forth above. (*Id.* ¶¶ 194-95.)

Under Section 40(8) of the *UK Pensions Act 2004*, a CN can be imposed on a joint and several

basis.

## ARGUMENT

## I.   THE PROOF OF CLAIM SATISFIES ALL RELEVANT PLEADING STANDARDS.

A proof of claim is only required to comply with Bankruptcy Rule 3001. The US

Debtor does not dispute that the Proof of Claim now complies with that rule. That should be the

end of the matter. The US Debtor has not articulated any persuasive reason why the Court

should exercise its discretion to apply Rules 8(a) and 12(b)(6). If the Court were to apply these

rules, Bankruptcy Rule 9014(c) requires that they be given advance notice and an opportunity to

comply with these rules. This would lead to delay and serve no purpose inasmuch as the current

Proof of Claim shows that the claims are well-founded and that the Joint Administrators can

comply with the pleading standards under the Federal Rules.

### A.   The Proof of Claim Complies With The Bankruptcy Rules.

It is well settled that "a proof of claim is not subject to the same rules of pleading

that govern the pleadings filed in an adversary proceeding or other civil litigation." *In re Rimsat*

*Ltd.*, 223 B.R. 345, 348 (Bankr. N.D. Ind. 1998).[15] The form and content of proofs of claim are

governed by Rule 3001(a), which states that: "A proof of claim is a written statement setting

forth a creditor's claim. A proof of claim shall conform substantially to the appropriate Official

Form." Fed. R. Bankr. P. 3001(a). The official proof of claim form only requires the factual

---

15.   *See also In re Cavalier Indus., Inc.*, No. 99-31737, 2003 WL 716291 (Bankr. E.D. Pa. Feb. 6, 2003) (summarizing procedure for claim objection, which differs from federal pleading requirements); *In re Keck, Mahin & Cate*, 237 B.R. 430, 432 (Bankr. N.D. Ill. 1999), *aff'd*, 253 B.R. 530 (N.D. Ill. 2000) (noting that less formal nature of contested matter, such as claims objection, renders federal civil pleading rules less important than in adversary proceeding).

basis for a claim to be stated in the most general terms.[16]  A bankruptcy claimant is merely asked to provide "some kind of factual context for the origin of debtor's liability to it."  *Rimsat*, 223 B.R. at 348.[17]

In making its motion for a more definite statement, the US Debtor only requested that the Joint Administrators file a claim that complied with the requirements of Bankruptcy Rule 3001, as outlined in *Rimsat* and similar cases.  (Initial Claims Obj. ¶¶ 20, 25.)[18]  On the present application, the US Debtor does not contest that the Proof of Claim now meets these requirements.  The Proof of Claim therefore "constitutes *prima facie* evidence of the validity and amount of the claim."  Fed. R. Bankr. P. 3001(f); *see In re SemCrude, L.P.*, 436 B.R. 317, 319-20 (Bankr. D. Del. 2010) (identifying Rule 3001 as sufficiency standard for proof of claim).

Although the US Debtor's application is denominated an "objection and motion," the US Debtor has not in fact complied with the requirements for filing a valid objection to the Proof of Claim.  Once a valid proof of claim has been filed, the objecting party "has the burden

---

16. With respect to the degree of factual support that must be provided, Instruction No. 2 to the official Proof of Claim form provides:

Basis for Claim:

State the type of debt or how it was incurred.  Examples include goods sold, money loaned, services performed, persona injury/wrongful death, car loan, mortgage note, and credit card.  If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.  You may be required to provide additional disclosure if the trustee or another party in interest files an objection to your claims.

B-10 (Official Form 10) (04/10).

17. *See also In re Reliance Fin. & Inv. Group, Inc.*, No. 05-80625-CIV, 2006 WL 3663243, at *5 (S.D. Fla. Nov. 14, 2006) ("pleading requirements are generally more relaxed in bankruptcy cases"); *Davidson v. Twin City Bank (In re Hollis)*, 83 B.R. 588, 590 (Bankr. E.D. Ark. 1988) ("[B]ankruptcy courts do not generally insist on the stringent standards required in a nonbankruptcy civil action.").

18. Although the US Debtor argued that the Original Proof of Claim would have failed scrutiny if treated as a complaint governed by the pleading standard under *Iqbal* and *Twombly* (Initial Claims Obj. ¶ 24), it moved for an order requiring a more definite statement under Rule 12(e) and did not ask the Court to order that Rule 8(a) or 12(b)(6) would apply to the amended proof of claim.  (Initial Claims Obj. ¶ 24-25; Order ¶ 2.)

of going forward and of introducing evidence sufficient to rebut the presumption of validity."
9 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 3001.09[2] (16th ed. 2011); *see In re SemCrude*, 436 B.R. at 320 (burden is on objector to refute claim sufficiently stated under Rule 3001); *In re Rafter*, No. 05–51335, 2007 WL 1591880, at *2 (Bankr. D.N.J. May 30, 2007) (noting burden-shifting standard and finding claims objection insufficient to rebut the presumption of validity).  The objection must at minimum allege the facts that are necessary to support the objection, "includ[ing] allegations sufficient to overcome the prima facie validity of the filed proof of claim," as well as providing "a description of the theories on which it is based." *Collier* ¶ 3007.01[3]; *see In re Windsor Constructors, Inc.*, No. 03–36589, 2006 WL 4005568, at *8 (Bankr. E.D. Pa. Dec. 18, 2006); *In re DeAngelis Tangibles, Inc.*, 238 B.R. 96, 98-99 (Bankr. M.D. Pa. 1999) (noting that allegations included in objection "must be sufficient to demonstrate a true dispute and must have probative force equal to the contents of the claim").  To be valid, an objection should also "make clear which facts are disputed," and allege any facts necessary to support any affirmative defenses.  *Collier* ¶ 3007.01[3].

Here, the US Debtor has not provided any substantive response to the allegations contained in the Proof of Claim.  The Joint Administrators' claims therefore retain the presumption of validity.

**B.    It Would Serve No Purpose, And Only Lead To Further Delay, To Apply Rules 8(a) and 12(b)(6).**

Upon the filing of a valid objection to a proof of claim, a claim becomes a "contested matter" governed by Bankruptcy Rule 9014.  *See Rimsat*, 223 B.R. at 346 & n.2. Rule 9014(c) provides that certain of the Federal Rules of Civil Procedure, as incorporated in Bankruptcy Rule 7001 *et seq*., apply automatically in any contested matter, while others do not. Significantly, Rules 8 and 12 are <u>omitted</u> from the rules generally applicable in contested

matters.  It is evident from this that the drafters did not intend for claimants and debtors to waste time addressing motions like the present one.

The US Debtor suggests that the bankruptcy courts "routinely" apply Rule 12 to claims objections in pursuit of a generalized "goal of bringing bankruptcy court procedure into line with district court procedure."[19]  These suggestions are contrary to the obvious intent of Rule 9014(c) and are not supported by the cases cited, which indicate that in fact bankruptcy courts rarely apply Rule 12(b)(6) to proofs of claim, and only do so under circumstances unlike those presented here.  In *Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.)*, the district court upheld the dismissal of a proof of claim pursuant to 11 U.S.C. § 502(c), but applied Rule 12(b)(6) only because the parties agreed that dismissing "a proof of claim pursuant to 11 U.S.C. § 502(c) [sic] is equivalent to dismissing a claim under Fed. R. Civ. P. 12(b)(6)."  398 B.R. 736, 740, 748 (S.D.N.Y. 2008).  Similarly, although the court applied Rule 12(b)(6) to a proof of claim in *In re Spiegel, Inc.*, it did so because the claimant had attached the complaints from parallel state court proceedings against the debtor based on the same underlying facts, and the parties agreed that the court should address the merits.  *See* 337 B.R. 821, 822-24 (Bankr. S.D.N.Y. 2006).  This case presents no such consent or prior related proceedings.[20]

More significantly, the US Debtor does not cite any case in which a bankruptcy court has applied the Rule 8(a) pleading standard, as articulated in *Iqbal* and *Twombly*, to test the legal sufficiency of a proof of claim.  This is not surprising inasmuch as the Rule 8(a) test under

---

19.  (Joint Obj. at 17-18.)

20.  In the other cases the US Debtor cites the courts do not provide any explanation as to why Rule 12(b)(6) was applied.  *See 900 Capital Services, Inc. v. Cloud (In re Cloud)*, No. 99-51109, 2000 WL 634637, at *2 (5th Cir. May 4, 2000); *In re WorldCom, Inc.*, 322 B.R. 530, 535-36 (Bankr. S.D.N.Y. 2005); *In re Sevko*, 143 B.R. 167, 171 (Bankr. N.D. Ill. 1992).

these cases is inconsistent with the presumption of prima facie validity to which claims – but not complaints – are entitled under Bankruptcy Rule 3001.

The US Debtor argues that it would be efficient to apply Rules 8 and 12(b) here because dismissal of claims could save estate and judicial resources that would otherwise be expended in discovery and other further proceedings.  (Joint Obj. at 17.)  The US Debtor further argues that dismissal of even some part of the Joint Administrators' claims would materially progress resolution of the other claims.  (Joint Obj. at 17.)  These arguments do not hold water.

First, all of the Joint Administrators' legal claims are based on the same set of factual circumstances.  Dismissal of some of the claims will therefore not reduce the burden and expense of discovery because the same discovery will be taken in relation to the remaining claims.  More importantly, such discovery will take place regardless of whether some or all of the Joint Administrators' claims are dismissed, because discovery addressing these same underlying facts must take place soon in connection with the Canadian intercompany claims process and to address disputes about the allocation of the proceeds of the sales of the Nortel businesses.  Accordingly, the most efficient approach would be to address the US Debtor's objections by way of motions for summary judgment after the conclusion of discovery.  Indeed the discovery process itself may allow the Joint Administrators to refine their claims, thereby obviating unnecessary and premature motion practice.

Nor do the cases cited by the US Debtor show that the bankruptcy courts have regularly relied on Rule 12(b)(6) in an effort to winnow out claims at a preliminary stage.  The court in *In re Diamond Mortgage Corp. of Illinois* applied Rule 7012 to "move this litigation along" only after observing that it was unclear what was pending before the court, and ultimately deciding to treat the papers as a Rule 12(c) motion for judgment on the pleadings.  *See* 105 B.R.

876, 877 n.1 (N.D. Ill. 1989).  Both of the parties in *In re Adelphia Communications Corp.* had

agreed to the application of Rule 12(b)(6).  359 B.R. 54, 56 n.5 (Bankr. S.D.N.Y. 2006).  As in

*Diamond Mortgage*, the court noted that an evidentiary hearing or discovery might be necessary

prior to resolving the dispute – which shows that this was not a true motion to dismiss scenario.

*See Adelphia*, 359 B.R. at 56; *Diamond Mortg.*, 105 B.R. at 877 n.1.  Finally, although the court

in *In re Best Products Co.* applied Rule 12(b)(6) in order to "resolve the parties' dispute

expeditiously," that dispute was over a bank's motion to treat as administrative expenses certain

damages incurred under a credit agreement with the debtor.  210 B.R. 714, 715-16 (Bankr. E.D.

Va. 1997).  The instant case presents issues far more complex and thus inappropriate for

summary resolution under Rule 12(b)(6).[21]

Finally, entering an order to apply Rules 8 and 12(b)(6) would only lead to

additional delays and motion practice because, under Bankruptcy Rule 9014(c), the Joint

Administrators would be entitled to file a further amended proof of claim before any Rule

12(b)(6) motion is addressed.  Rule 9014(c) provides that while the Bankruptcy Court is given

discretion "at any stage in a particular matter [to] direct that one of the other rules in Part VII

shall apply," the parties must be given advance notice and "a reasonable opportunity to comply

with the procedures prescribed."  Fed. R. Bankr. P. 9014(c).

## C.    The Proof of Claim Complies With Fed. R. Civ. P. 8(a).

The US Debtor argues that the Proof of Claim would be subject to dismissal on a

Rule 12(b)(6) motion because it does not comply with the current standard for federal pleading

---

21.  The fact that a proof of claim has sometimes been considered the "functional equivalent" of a complaint (Joint
Obj. at 18), for unrelated purposes, is not particularly pertinent.  In the cases the US Debtor relies on the courts
held that the filing of a proof of claim can, under appropriate circumstances, trigger indemnification and
contribution rights in the same manner as the filing of a complaint in a lawsuit.  (*See* Joint Obj. at 18 (citing *Hill
v. Day (In re Today's Destiny, Inc.)*, 388 B.R. 737 (Bankr. S.D. Tex. 2008); *Amatex Corp. v. Aetna Casualty &
Surety Co. (In re Amatex Corp.)*, 107 B.R. 856, 858-59 (Bankr. E.D. Pa. 1988).)

under Rule 8(a), as articulated by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 55 U.S.

544 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).  However, even if the Court were to

apply Rule 8(a), an examination of the Proof of Claim shows that the claims asserted would in

fact withstand a motion to dismiss under current Rule 8(a) jurisprudence.

   Contrary to the US Debtor's arguments, the decisions in *Twombly* and *Iqbal* have

not altered the fundamental principles of pleading under the Federal Rules.  It remains the rule

that a pleading is only required to set forth "a short and plain statement of the claims showing

that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and that "notice pleading" is the

guiding principle.[22]  A plaintiff is still not required to plead the evidence that supports a claim or

(except for claims governed by Rule 9(b)) allege the details of the underlying facts with

particularity.[23]  Finally, "the standard [for addressing a motion to dismiss] remains:  'courts

accept all factual allegations as true, construe the complaint in the light most favorable to the

plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff

may be entitled to relief.' "[24]

---

22. *Twombly* did not overrule the Supreme Court's decision in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002) which confirmed the principle of notice pleading.  *See* 550 U.S. at 569-70; *see also Dobyns v. United States*, 91 Fed. Cl. 412, 425 (2010) (observing that principle of notice pleading is confirmed by *Twombly*).

 Following *Iqbal*, Third Circuit decisions indicated that the Supreme Court had overruled its decision in *Swierkiewicz* that had upheld notice pleading.  *See Guirgis v. Movers Specialty Servs., Inc.*, 346 F. App'x 774, 776 n.7 (3d Cir. 2009); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (stating that *Twombly* and *Iqbal* repudiated *Swierkiewicz*).  More recently, however, a different Third Circuit panel described the analysis in *Fowler* as dictum and cited with approval a Second Circuit's statement that *Twombly* is consistent with *Swierkiewicz*.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 319 n.17 (3d Cir. 2010); *see also Arista Records*, 604 F.3d at 120 (noting that *Twombly* and *Iqbal* were consistent with *Swierkiewicz* in not requiring heightened fact pleading and citing *Swierkiewicz* indicating it is still good law); *Gillman v. Inner City Broad. Corp.*, No. 08 Civ. 8909, 2009 WL 3003244, at *3 (S.D.N.Y. Sept. 18, 2009) (observing that "in *Twombly*, which heavily informed *Iqbal*, the Supreme Court explicitly affirmed the vitality of *Swierkiewicz*" and therefore "*Iqbal* was not meant to displace *Swierkiewicz*'s teachings").

23. *See, e.g., Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119-21 (2d Cir. 2010) (plaintiff not required to plead evidence).

24. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).  (*See also* Joint Obj. at n.25 (conceding application of this standard).)

However, the decisions in *Iqbal* and *Twombly* have added two refinements to the traditional inquiry on a motion to dismiss.  First, "labels and conclusions" and "formulaic recitations of the elements of a cause of action" are no longer entitled to the assumption of truth.[25]  Second, a court addressing a motion to dismiss should examine the pleaded facts to see if the asserted claim is "plausible on its face."[26]  "This 'plausibility' determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' "[27]

To apply this test, a court should first identify the elements of each claim asserted by the plaintiff.  Having identified the elements, the court next examines the complaint to see if each element is supported by factual allegations that, if proven, will entitle the pleader to relief.  Conclusory allegations that merely parrot the elements of the cause of action are to be disregarded in this analysis.[28]  But a plaintiff need only plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" in support of the claim.[29]  Rule 8(a) does not require "detailed factual allegations,"[30] and a claim that alleges the minimum necessary facts should not be dismissed even if it appears that "actual proof of those facts is improbable" or "a recovery is very remote and unlikely."[31]

---

25. *Fowler*, 578 F.3d at 210 (quoting *Twombly*, 550 U.S. at 555).

26. *Twombly*, 550 U.S. at 570.

27. *Fowler*, 578 F.3d at 211 (3d Cir. 2009) (quoting *Iqbal*, 129 S. Ct at 1949).

28. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011); *Fowler*, 578 F.3d at 210.

29. *Twombly*, 550 U.S. at 556.

30. *Id.* at 555.

31. *Twombly*, 550 U.S. at 556 (internal quotations omitted).  This Court considered the *Twombly* and *Iqbal* decisions in the context of a motion to dismiss in an adversary proceeding.  In *Nortel Networks, Inc. v. Commc'ns Test Design, Inc.*, Adv. No. 10-53065, 2011 WL 1102829 (Bankr. D. Del. Mar. 22, 2011) (Gross, J.), plaintiffs NNI and NNL alleged that defendant CTDI had breached the parties' agreements by misusing

24

As set forth in Sections II to V below, each element of each cause of action in the Proof of Claim is supported by allegations of fact that, when proven, will entitle the Joint Administrators to relief on their claims. The Joint Administrators allege that NNI played an intentional and active role in devising and enforcing a series of transactions by which NN Ireland and other overseas Nortel subsidiaries were stripped of cash. Although NNL was the primary beneficiary of these transactions, the Proof of Claim includes detailed factual allegations showing how NNI itself also benefitted. There is nothing unreasonable or implausible about this scenario.

### D. The Joint Administrators' Claims Are Not Subject To Dismissal Under Rule 9(b).

The US Debtor argues that many of the Joint Administrators' claims are also subject to dismissal under Rule 9(b), which provides that when pleading fraud a party must state the underlying circumstances with particularity. Fed. R. Bankr. P. 7009(b).[32] This argument fails for two reasons: First, the Joint Administrators have not asserted any claims for fraud.[33] Second, the allegations contained in the Proof of Claim would in fact meet the standard of particularity under Rule 9(b), if it is applied.

---

proprietary Nortel information and components to copy Nortel products or to refurbish and subsequently resell Nortel products. *Id.* The Court denied the motions to dismiss filed by CTDI against NNI and NNL, finding that their complaints had stated a claim for relief even in light of *Twombly* and *Iqbal*. *Id.*

32. Unlike Rules 8(a) and 12(b)(6), Bankruptcy Rule 9014(c) provides that Rule 9(b), through Bankruptcy Rule 7009, applies automatically in any contested matter. *See* Fed. R. Bankr. P. 9014(c).

33. In particular, the Joint Administrators' claims for dishonest assistance are not based on fraud. Irish law requires only that the Joint Administrators establish that NNI has not acted as an honest person, placed in the same circumstances, would have done. (*See* Hennessy Decl. ¶ 89.) None of the Joint Administrators' other claims require proof of fraud.

### 1.      The Joint Administrators' Claims Do Not Sound In Fraud.

Although the Joint Administrators do not assert any claim for fraud, the

US Debtor invokes Rule 9(b) as a ground for dismissing no less than 16 of their 31 claims.[34]  The

US Debtor asserts that these claims should be considered fraud claims because NNI is alleged to

"have participated in a scheme to remove assets from NN Ireland."  (Joint Obj. at 20.)  The

US Debtor cites authorities holding that Rule 9(b) should be applied "where the gravamen of the

claim is fraud even though the theory supporting the claim is not technically termed fraud."  (*Id.*

(quoting *Toner v. Allstate Ins. Co.*, 821 F. Supp. 276, 283 (D. Del. 1993).)

The gravamen of the Joint Administrators' claims is simply not fraud.  The

essential elements of a fraud claim are that the defendant made an intentional misrepresentation

of a material fact, or failed to disclose a material fact he had a duty to disclose, and that the

plaintiff relied on this misstatement or omission to his detriment.[35]  None of the Joint

Administrators' claims is based on an allegation that NNI made any misrepresentation or

omission of material fact to NN Ireland, or that NN Ireland relied to its detriment on any such

misrepresentation or omission.  The gravamen of the Joint Administrators' claims is not fraud,

but breach of duty.

Although courts have sometimes elected to apply Rule 9(b) to non-fraud claims

that are asserted together with fraud claims based on the same facts, the cases the US Debtor

cites do not indicate that Rule 9(b) should apply to claims like the ones asserted by the Joint

Administrators here.  In *Forman v. Salzano (In re Norvergence, Inc.)*, 405 B.R. 709, 746-47

---

34.  (*See* Joint Obj. at 20 (arguing that claims 2, 4-8, 10, 12-14, 18, 20, 23,-24, and 26-27 should be tested under Rule 9(b)).)

35.  *See* 37 Am. Jur. 2d *Fraud & Deceit* § 39 (2011); *Cronus Offshore, Inc. v. Kerr McGee Oil & Gas Corp.*, 369 F. Supp. 2d 848, 857 (E.D. Tex. 2004) *aff'd*, 133 F. App'x 944 (5th Cir. 2005); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

(Bankr. D.N.J. 2009), the plaintiff asserted claims for aiding and abetting fraud and aiding and abetting breach of fiduciary duty.  Since the fraud claim and the non-fraud claim were based on the same set of underlying facts, the court held that Rule 9(b) should apply to both.  The court observed, however, that "[t]he heightened pleading requirement of Rule 9(b) 'generally does not apply to the state law claims of breach of fiduciary duty . . . [and] aiding and abetting breach of fiduciary duty.' "  *Id.* at 746 (quoting *TMP Worldwide, Inc. v. Inacom Corp. (In re Inacom Corp.)*, Adv. No. 00-1115, 2001 WL 1819987, *2 (D. Del. Aug. 7, 2001)).[36]  This is consistent with many other authorities holding that Rule 9(b) does <u>not</u> apply to claims of the types asserted by the Joint Administrators.[37]

### 2.    In Fact, The Proof Of Claim Is Pleaded With Particularity.

Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Despite this, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  *Id.*  Rule 9(b) is designed to give notice to the defendant of the circumstances surrounding the alleged fraud and provide the defendant with the information necessary to respond.  *See* 2 Daniel R. Coquillette et al., *Moore's Federal Practice* ¶ 9.03[1][a] (3d ed. 2011).

While the Third Circuit recognizes that Rule 9(b) "requires plaintiffs to plead the circumstances of the alleged fraud with particularity," it has acknowledged that "focusing exclusively on the particularity requirement is 'too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.' "  *Craftmatic Sec. Litig. v.*

---

36.  The other case cited by the US Debtor, *Adamson v. Bernier (In re Bernier)*, 282 B.R. 773, 781 (Bankr. D. Del. 2002), concerned a fraudulent transfer claim.

37.  *See, e.g., Gubitosi v. Zegeye*, 946 F. Supp. 339, 346 n.4 (E.D. Pa. 1996) ("Fed. R. Civ. P. 9(b) does not require that allegations of conspiracy be alleged with particularity; only allegations of fraud have this requirement under the rule"); *Am. Buying Ins. Servs., Inc. v. S. Kornreich & Sons, Inc.*, 944 F. Supp. 240, 246-47 (S.D.N.Y. 1996) (allegations related to "enterprise," "control," and "conspiracy" need not be pleaded with particularity).

*Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (quoting *Christidis v. First Pa. Mortg. Trust*, 717

F.2d 96, 100 (3d Cir. 1983)).  For example, the Third Circuit has instructed that while allegations

of date, place, and time will satisfy the particularity requirements of Rule 9(b), "nothing in the

rule requires them."  *See Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786,

791 (3d Cir. 1984), *cert. denied*, 469 U.S. 1211 (1985).  Indeed, pleading parties "are free to use

alternative means of injecting precision and some measure of substantiation into their allegations

of fraud."  *Id.*  The Third Circuit's flexible approach to fraud pleading also takes into account the

reality that strictly applying Rule 9(b) prior to discovery "may permit sophisticated defrauders to

successfully conceal the details of their fraud."  *Christidis*, 717 F.2d at 99-100; *see also*

*Craftmatic*, 890 F.2d at 645 (noting that rigidly enforcing Rule 9(b) in face of claims involving

internal corporate affairs could allow "sophisticated defrauders" to escape liability).  In other

words, the Third Circuit's Rule 9(b) test is similar to the current jurisprudence under Rule 8(a) –

i.e., that the court find the claim plausible based on the facts alleged.

      This Court recently had the opportunity to analyze and apply the Rule 9(b)

standard in a Nortel adversary proceeding.  *See Nortel Networks Ltd.*, 2011 WL 1102829, at *6.[38]

This Court noted that " '[t]he purpose of [FRCP 9(b)'s requirement that fraud be pled with

particularity] is to place the defendants on notice of the precise misconduct with which they are

charged.' "  *Id.* at *6 (quoting *Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321 B.R.

128, 140 (Bankr. D. Del. 2005)).  Thus, all a plaintiff must do in order to make out a fraud claim

" 'is inform the defendant of the particular conduct which is alleged to have been fraudulent.' "

*Id.* (quoting *In re OODC*, 321 B.R. at 140).  Moreover, the "particularity" standard of Rule 9(b)

---

38.  Notably, the claim to which this Court applied Rule 9(b) in that case was one for <u>fraud</u>, rather than an aiding
    and abetting claim, a conspiracy claim, or any of the other claims that the US Debtor now urges this Court to
    test under the Rule 9(b) pleading standard.  *See id.*

" 'does not require an exhaustive cataloging of facts but only sufficient factual specificity to provide assurance that plaintiff has investigated the alleged fraud and reasonably believes that a wrong has occurred.' "  *Id.* (quoting *S. Track & Pump, Inc. v. Terex Corp.*, 722 F. Supp. 2d 509, 517 (D. Del. 2010)).

   For example, although the defendant in that Nortel case argued that plaintiffs NNI and NNL had failed to adequately plead fraud because they did not provide the name of the specific person who allegedly made fraudulent statements, this Court determined that such factual allegations were unnecessary.  *See id.* at *7 (citing *Am. Gen. Life Ins. v. Goldstein*, 741 F. Supp. 2d 604, 613 (D. Del. 2010)).  The Court found that naming a particular corporate employee was unnecessary because it would be "illogical to require a plaintiff to know the specific individuals involved in a successful concealment scheme."  *Id.* at *8; *see also Southco Inv. v. Penn Eng'g & Mfg. Corp.*, 768 F. Supp. 2d 715, 720 (D. Del. 2011) ("Although date, place, and time allegations may fulfill the requirement of pleading with particularity, these types of allegations are not required to satisfy Rule 9(b), so long as the circumstances of the alleged fraud are pled sufficiently " 'to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior.' ") (emphasis added, citation omitted).  Here too the Joint Administrators know that NNI and NNL directed the transfer pricing, intercompany loans, pre-petition sale proceeds allocation, and other schemes set out in the Proof of Claim, and their adverse impact on NN Ireland, but do not yet know – or even have access to all of the documents that would disclose – all of the "who-said-what-to-whom-when" details.  There can be no doubt that the relevant Nortel Group personnel were in constant communication about the subject matter of the Joint Administrators' claims.

As described more fully below, the Proof of Claim sets forth the facts supporting the Joint Administrators' claims in considerable detail.  Certainly the Joint Administrators have provided sufficient information to demonstrate that the claims are not implausible and to permit the US Debtor to move forward with its defense.  Thus, application of Rule 9(b) to the Joint Administrators' claims would not result in dismissal of any of those claims.

E.    **Pleading Standards Are Relaxed For Bankruptcy Trustees and Other Persons Who Were Not Present When The Underlying Events Occurred, and Where The Salient Facts Are In The Control Of Others.**

Any applicable pleading standard would also have to be considered in light of the fact that the events that give rise to the claims occurred before the Joint Administrators were appointed, and key evidence about how the underlying transactions were determined and implemented by NNL and NNI is in the exclusive control of those entities.  It is well-settled that pleading standards are relaxed under such circumstances.[39]

---

39.  *See Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, No. 09 C 5619, 2010 WL 1979569, at *13-14 (N.D. Ill. May 17, 2010) (failure to state claim can be excused where plaintiff was unable to access information withheld by defendants); *Reliance Fin.*, 2006 WL 3663243, at *5 ("Trustee will inevitably lack knowledge regarding acts of fraud previously committed by or against a third party debtor."); *Pardo v. Avanti Corp. Health Sys., Inc. (In re APF Co.)*, 274 B.R. 634, 638 (Bankr. D. Del. 2001) ("Especially in bankruptcy cases, where the plaintiff is a trustee acting on behalf of the estate or a group of creditors, courts apply Rule 9(b) with greater flexibility recognizing that trustees often lack knowledge or have only secondhand knowledge of pre-petition fraudulent acts involving the debtor and third parties."); *Profilet v. Cambridge Fin. Corp.*, 231 B.R. 373, 379 (S.D. Fla. 1999) ("[T]he Trustee argues – and the Court agrees – that courts should relax the specificity requirements where the plaintiff is a trustee in bankruptcy."); *Kaliner v. Load Rite Trailers (In re Sverica Acquisition Corp., Inc.)*, 179 B.R. 457, 463 (Bankr. E.D. Pa. 1995) ("Flexibility in the application of the particularity requirement of Fed.R.Civ.P. 9 has been recognized as being particularly appropriate in the context of fraud claims brought by a statutory trustee in bankruptcy."); *In re Hollis*, 83 B.R. 588, 590 (Bankr. E.D. Ark. 1988) ("This liberality is justified because the Trustee is a third party outsider to the fraudulent transaction and, in most cases, must plead fraud on second hand knowledge for the benefit of the estate and all its creditors."); Arthur R. Miller, *From* Conley *to* Twombly *to* Iqbal*:  A Double Play on the Federal Rules of Civil Procedure*, 60 Duke L.J. 1, 44 (2010) ("[T]o demand fact pleading on pain of dismissal when the facts are unknown or unknowable is a negation of the pleader's ability to access the civil justice system.")**.**

II.    **THE JOINT ADMINISTRATORS STATE CLAIMS FOR BREACH OF DUTY.**

Contrary to the US Debtor's assertions, the Joint Administrators have alleged detailed facts supporting their claims against NNI for breach of the duties it owed to NN Ireland and to take into account the interests of its creditors.

A.    **The Joint Administrators State Claims For Breach Of Duties Imposed On *De Facto* and Shadow Directors Under Irish Law.**

1.    **Irish Law Regarding Shadow And *De Facto* Directors.**

Under Irish law, a "director" includes any person occupying the position of director by whatever name called.  (Hennessy Decl. ¶ 12 (citing Section 2(1) of the *Companies Act 1963*).)[40]  This definition captures those who are, in substance, directors, even if not validly appointed – *i.e. de facto* directors.  (*Id*.)

As a preliminary matter, the US Debtor's position that a corporate entity cannot qualify as a *de facto* director should be rejected.  Though the US Debtor notes that there is no Irish authority that has held that a corporate entity can be deemed a *de facto* director (Joint Obj. at 30), it is unable to cite to any Irish authority holding that a corporate entity <u>cannot</u> be a deemed a *de facto* director.[41]  That is because there is none.  Instead, the US Debtor's Irish law expert relies on a provision of the Companies Act 1963, which provides that a company cannot have a corporate body as a director.  (*Id*. (citing Redmond Decl. ¶ 15).)  But it does not follow from the prohibition in relation to *de jure* directors that the same applies in respect of *de facto*

---

40.  Declaration of John Hennessy SC in Opposition to the Joint Objection and Motion to Dismiss the Claims of Nortel Networks Ireland, dated Sept. 14, 2011 [D.I. 6375] ("<u>Hennessy Decl.</u>").

41.  Instead, the US Debtor's Irish law expert cites a decision of the High Court of Ireland, relying on the reasoning in that decision to assert that an Irish Court would be unlikely to conclude that a corporate entity could be a *de facto* director. (Redmond Decl. ¶ 15.)  However, the decision in that case was not directed to the issue as to whether a company could be a *de facto* director; rather, it concerned an application to restrict an individual who had not been validly appointed but was alleged to have acted in the capacity of director.  (Hennessy Decl. ¶ 30.)  Accordingly, the characteristics of *de facto* directorship identified in that case and listed in the Redmond Declaration are not directly applicable to a situation where a company has acted in the manner of a director. (*Id*.)

directors. (Hennessy Decl. ¶ 29.) Indeed, being that there is no jurisprudence on the matter, it can be readily argued that the prohibition on having a corporate body as a *de jure* director could give rise to a situation where a company, acting in all material respects as a director of another company, is prevented from being "validly appointed" by the statutory prohibition, thereby rendering it a *de facto* director. (*Id*. ¶ 31.)[42] There is simply no Irish statute, case or other authority that would prohibit NNI from being considered a *de facto* director of NN Ireland.

The concept of *de facto* director has not lent itself to a hard-and-fast definition as it is constantly developing through case law. (*Id*. ¶ 31.) In light of recent English authority, however, an Irish court, in determining whether *de facto* director status should be imposed, would consider a number of factors including the extent to which a person exercised influence in the corporate affairs of a company.[43] (*Id*. ¶ 30.) Though the US Debtor cites <u>some</u> of the factors that a court may consider in determining *de facto* director status, its Irish law expert expressly recognizes that the list is by no means exhaustive. (Redmond Decl. ¶ 19; *see also* Hennessy Decl. ¶ 46.) One of the many factors a court will consider is whether the alleged *de facto* director carried out functions that would properly be discharged by a director. (*Id.* ¶ 34.)[44] It might also consider evidence of the alleged *de facto* director making major decisions that would effectively make him part of the governing structure of the company. (*Id.* 47.) Once determined,

---

42. The US Debtor's Irish law expert also relies upon on a textbook on the Law of Private Companies (Second Edition), which refers to *de facto* directors being persons occupying the position of director but not formally appointed as directors. (Redmond Decl. ¶ 18.) However, Joint Administrators' Irish law expert is of the view that insofar as a case is shown that a company acted as a *de facto* director, there is nothing contained in the commentary cited by Mr. Redmond which would prevent a corporate entity from being a *de facto* director. (Hennessy Decl. ¶ 31.)

43. (Hennessy Decl. ¶7 ("Decisions of the Superior Courts in England and Wales … (where there is no specific Constitutional or statutory divergence) are persuasive authority in Ireland.").)

44. However, it is not at all necessary that the person hold himself out nor that the company hold him out as a director in order to be treated as a *de facto* director. (*Id.* ¶ 35 ("Undoubtedly, the holding out as a director of a person not validly appointed may be an indicator of *de facto* directorship; it cannot, however, be a prerequisite for same.").)

a *de facto* director is subject to fiduciary duties coextensive with those imposed on *de jure* directors.  (*Id*. ¶ 12.)

Similarly, a shadow director is a person[45] in accordance with whose directions or instructions the directors of the company are accustomed to act.  (*See id*. ¶ 54.)  The establishment of shadow director status involves the identification of whether the person or entity "exercised real influence . . . in the corporate governance of the company."  (*Id*. ¶ 53 (citing *Per Sir Donald Rattee Secretary of State v. Becker* [2003] 1 BCLC 555).)  Sometimes that influence may be concealed and sometimes it may be open.  (*Id*.)  However, it is not necessary to show that every aspect of the company's affairs was directed by the person (*id*. ¶ 54) or that the board's action, in following the shadow director's instruction, was mechanical rather than considered.  (*Id*. ¶ 56.)  Some of the factors an Irish court would consider are (i) whether the majority of NN Ireland's *de jure* directors acted in accordance with NNI's directions/instructions; (ii) whether NNI exercised a controlling influence in NN Ireland's boardroom; and (ii) whether the level of influence occurred on an ongoing basis.  (*Id*. ¶ 51.) Finally, it should be noted that the question of whether NNI served as either a *de facto* director or a shadow director of NN Ireland presents issues of fact to be determined based on the circumstances of a particular case.  (*Id.* ¶ 12; *see also id*. ¶ 46 (citing *Secretary of State for Trade and Industry v. Hollier* [2006] EWHC 1804) (Irish courts apply an objective standard and "each case will turn on its own facts.").)  This question should not be decided on a motion to dismiss.

The US Debtor asserts that *de facto* and shadow directorship are mutually exclusive terms (Joint Obj. at 31), and that the Joint Administrators' allegations that NNI acted as a shadow director render its allegation that it also acted as a *de facto* director unsustainable

---

45.  Person refers to both individual and corporate entity.  Whether a corporation can be deemed a shadow director is not disputed.  (Redmond Decl. ¶ 23.)

under Irish law (Redmond Decl. ¶ 22).  This is not an accurate statement of the developing area of *de facto* and shadow directorship jurisprudence in Ireland and ignores the functional overlap between the two categories:  both presume the directorship of persons "who are not formally appointed as directors, but who exercise significant roles in the direction of the business of the company."  (Hennessy Decl. ¶ 13.)  Indeed, an Irish court confronted with the question of mutual exclusivity would likely consult the raison d'être underlying both concepts: "that a person should not be able to escape the responsibilities associated with being a company director solely because, whether through inadvertence or design, that person has not been validly appointed." (*Id.* ¶ 15.)  Although no Irish court has heretofore directly confronted this question in the emerging area of *de facto* and shadow directorship, recent English decisions (which would be regarded as persuasive in an Irish Court) decided after *Hydrodam*, the case heavily relied on by the US Debtor and its Irish law expert,[46] illustrate that a clear distinction no longer be maintained (Hennessy Decl. ¶ 17.)[47]  Notably, a 2009 Irish High Court decision in reaction to the *Hydrodam* decision stated: "When discussing both types of director, conceptually or theoretically, the firmness of this view may be justified, but in the context of a given case, it may have to soften, as a finding under both heads may potentially justified."  (*Id.* ¶ 41 (citing *Re Hocroft Developments Limited* [2009] IEHC 580).)[48]  Therefore, the main focus when deciding whether

---

46.  *See* Redmond Decl. 16 (*citing* Re Hydrodam (Corby) Limited [1994] 2 BCLC 180.)

47.  (*See* Hennessy Decl. ¶ 39 (citing *Re Mea Corporation Limited; Secretary of State for Trade and Industry v Aviss & Others* [2007] 1 BCLC 618 ("[I]t seems to me that there is no conceptual difficulty in concluding that a person can be both a shadow director and a de facto director simultaneously."); *id.* 42 (citing *Revenue Customs Commissioners v Holland* [2010] 1 WLR 2793 ("[T]he distinction [between shadow and de facto directors] was impossible to maintain with the extension of the concept of de facto directorship and the consideration of such matters as the taking of major decisions by the individual, which might be through instructions to the de jure directors, and the evaluation of his real influence in the affairs of the company.").)

48.  (*See also* Hennessy Decl. ¶ 14) ("[A]t a practical level, if a person who was not validly appointed as a director was habitually exercising significant influence on the decisions made by a Board of Directors, it would be very difficult to conclude that that person was one and not the other."); *id.* ¶ 18 (a court could find that shadow directorship is actually a subset of *de facto* directorship.)

NNI is either type of director should be whether it has exercised real influence in the corporate governance of the company.  (*Id*. ¶ 37.)

The US Debtor also incorrectly asserts that a shadow director does not owe broad fiduciary duties to the company.  (Joint Obj. at 31.)  The US Debtor's Irish law expert relies on Section 27 of the Companies Act 1990 (the "1990 Act"), which sets out a definition of "shadow director" for purposes of Part III of the 1990 Act,[49] and concludes that shadow director only becomes subject to fiduciary duties if it engages in certain interested transactions with other debtors.  (Hennessy Decl. ¶ 60.)  However, the wording of Section 27 of the 1990 Act does not support an attempt to limit the consequences of being a shadow director merely to Part III of the Companies Act 1990.  (*Id*. ¶ 61(b).)  The concept has much wider implications and is referred to or incorporated in a variety of other provisions of Irish company law, including provisions that deal with, for example, fraudulent and reckless trading and investigations in relation to companies.  (*Id*.)  Notably, while the US Debtor's Irish law expert points out that there is no Irish authority to suggest that equitable and fiduciary duties are to be imposed upon shadow directors, by parity of reasoning it can be argued that there is no Irish authority to suggest that such duties are not to be imposed upon shadow directors.  (*Id*. ¶ 61(c).)  Indeed, the US Debtor's Irish law expert even admits that there have been "mixed views" on whether shadow directors are subject to the equitable and common law duties of directors.  (*Id*. ¶ 61.)

Finally, the US Debtor's position ignores the fact that the current trend in Ireland, both in developing case law and in statute,[50] is towards equating the terms director, *de facto*

---

49. Part III of the 1990 Act pertains to transactions involving directors.  (Hennessy Decl. ¶ 60.)

50. It is worth observing the development of statutory position in Ireland regarding the duties of creditors.  The Company Law Review Group ("CLRG"), a body created pursuant to statute for the purpose of preparing draft legislation and, in certain respects, reforming company law in Ireland, recently published the "general scheme of the new Companies Bill."  The general scheme lists the fiduciary duties owed by directors to their companies, and make it clear that the definition of "director" for this purpose is to include *de facto* directors and

director and shadow director, at least insofar as fiduciary duties are concerned.  (Hennessy Decl.

¶ 20.)[51]  Therefore, this Court should not hesitate to impose fiduciary duties on NNI as a shadow

director of NN Ireland.

> **2.      The Joint Administrators Allege Facts Showing That NNI Was A
> *De Facto* Or Shadow Director Of NN Ireland.**

Contrary to the US Debtor's arguments, there would be no basis to dismiss claims

2, 8, 16, or 24 because the Joint Administrators have pled detailed factual allegations in support

of each element of their claim that NNI was a *de facto* and/or shadow director of NN Ireland.

The Proof of Claim shows NNI exercised a "real influence" in NN Ireland's corporate

governance by virtue of having made major decisions for NN Ireland and committing it to

significant obligations in relation to specific treasury and tax matters.  It also alleges that NNI's

domination and control over tax and treasury matters was pervasive, and the cumulative effect of

the major strategic decisions it made in connection with transfer pricing, the Irish Loans and Irish

Dividends, certain pre-petition sales of the Nortal Group's businesses and tax policy in general,

render it a *de facto* and/or shadow director of NN Ireland.  (*See* Proof of Claim ¶ 18 ("NN

Ireland had no substantive involvement [in transfer pricing].  Its role was limited to providing

information [to NNI employees] as and when required and implementing the decisions which

had been taken by NNI and the Canadian Entities."); *id*. 15 ("The control exerted by NNI related

to Group Tax matters, in particular transfer pricing, and to Group Treasury matters.  These

Group Tax and Treasury functions were responsible for the transactions pursuant to which value

---

shadow directors and does not envisage any limitation on the consequences of shadow directorship insofar as fiduciary duties are concerned.  (Hennessy Decl. ¶¶ 20, 61(e).)

51.  Furthermore, according to the Joint Administrators' Irish law expert, the recent jurisprudence in the superior courts in England advancing the proposition that shadow directors can owe fiduciary duties would, if presented to an Irish court, be persuasive authority for this proposition.  (Hennessy Decl. ¶ 19 (citing *Yukong Line Ltd. -v- Rensberg Investment Corporation of Liberia* ).)

was improperly removed from NN Ireland.").).[52]  These details are explicitly set forth in the

Proof of Claim with respect to each of the five sets of transactions on which NN Ireland's claims

are based.[53]

        Transfer Pricing.  The Proof of Claim contains more than "generalized

references" to NNI's involvement in the implementation and operation of the transfer pricing

arrangements.  On the contrary, the Proof of Claim provides specific examples of situations in

which NNI exerted influence and control in NN Ireland's corporate affairs and performed

functions that would normally be performed by a director.  For instance, the Proof of Claim

identifies key NNI employees who were actively involved in the design and operation of the

RPSM, the creation and implementation of the MRDA and negotiations with the relevant tax

authorities in connection therewith.  (*See* Proof of Claim ¶ 18a (alleging that NNI made the

policy change to move from the previous cost sharing arrangements to the RPSM); *id*. ¶ 18b

("The process by which the RPSM electronic model was created and structured . . . was handled

by NNI and NNL."); *id*. ¶ 18e (alleging NNI controlled APA application process, a team of NNI

employees ran negotiations with relevant tax authorities, and took sole responsibility for

instructing Nortel's professional advisers in same process).  The Proof of Claim also

demonstrates how NN Ireland's *de jure* directors effectively sat as a puppet board and were

accustomed to act in accordance with NNI's directions.  (*See id*. ¶ 18d (alleging NN Ireland was

simply instructed to sign MRDA once terms were decided by NNI and NNL); *id*. ¶ 18f (alleging

NN Ireland was entirely excluded from APA application process, and its role was limited to

---

52.  The facts alleged in support of the Joint Administrators' claims against NNI for *de facto* and/or shadow director liability apply with equal force to their claims against NNL for *de facto* and/or shadow liability, as the Proof of Claim shows that NNI and NNL acted in concert.

53.  The Joint Administrators' breach of duty allegations do not sound in fraud and therefore Rule 9(b)'s heightened pleading standard does not apply to these claims.

providing necessary information).)  The US Debtor's argument that the proof of claim "tellingly" uses the passive voice when referring to NN Ireland being instructed to sign the MRDA is fallacious.  (Joint Obj. at 35.)  One need only look at the preceding and following paragraphs to understand that this reference is clearly to NNI and NNL.

Each of the allegations described above support a claim that NNI performed functions that would otherwise be performed by a director and played a significant role in the governing structure of the company.  The US Debtor cannot say with certainty that the actions taken by NNI were not of the type generally performed by NN Ireland's directors – e.g., decision making regarding major corporate transactions.  The US Debtor argues that activities such as the undertaking of negotiation with taxation authorities do not amount to "director only" activities but offer no support for that assertion.  (Joint Obj. at 35.)  Determining what actions the conduct of an NN Ireland director depends on the way that NN Ireland operated and would require an evidentiary hearing.

Irish Loans and Irish Dividends.  The Proof of Claim also describes the various ways in which NNI controlled NN Ireland's treasury function, which can only be characterized as exercising a "real influence" in NN Ireland's corporate governance.  It identifies specific NNI personnel who were actively involved in devising and implementing the scheme to siphon cash from NN Ireland and move it to NNL.  (*See* Proof of Claim ¶¶ 22-26.)  For instance, the Proof of Claim alleges that Katharine Stevenson, an NNI director, was the ultimate director of the Irish Cash Repatriation Strategy, and was involved in promoting initiatives to move cash to NNL generally across EMEA, but also was more specifically aware of and involved in the transactions related to NN Ireland such as the Irish Loans and Irish Dividends.  (*Id*. ¶ 22.)  Moreover, it names various other NNI employees who were part of a management group that implemented the

Irish Cash Repatriation Strategy which deprived NN Ireland of so much value.  Ryan Smith took a lead role in establishing the Irish Loans and Irish Dividends, and appears to have focused on supervising a team which identified cash that could be transferred to NNL and then considered the most tax efficient way of transferring that cash to NNL.  (*Id.* ¶ 23.)  Similarly, Mark Weisz ("Director of International Tax" and an employee of NNI) was responsible for approving and supervising the implementation of the various initiatives that Mr. Smith and his team identified. (*Id*. ¶¶ 23-24.)  The Proof of Claim also illustrates how NN Ireland's Board was accustomed to act upon NNI's instructions over an extended period of time by resolving to pay dividends.  (*Id*. ¶¶ 55-58.)  Consideration of these acts in the aggregate leads to the logical conclusion that NNI was involved in and influenced all decision-making with respect to the Irish Cash Repatriation Strategy, and should therefore be held accountable for its failure to act in the best interests of NN Ireland and its creditors.

Contingent Tax Claims.  The Joint Administrators filed the contingent tax claims[54] against NNI in order to preserve their right to obtain any recovery from NNI in the event that any Revenue Authority makes a claim against NN Ireland in relation to a failure to pay the proper level of taxation in any years.  NNI should plainly be held accountable for any tax liabilities imposed on NN Ireland in the future that are attributable to decisions made by NNI as a shadow and/or *de facto* director.  The Proof of Claim contains a detailed account of NNI's pattern of controlling NN Ireland's tax functions – generally and specifically in connection with transfer pricing matters – and thus sufficiently puts NNI on notice of the conduct on which the Joint Administrators base their claim.  As described in the preceding paragraphs, the Proof of

---

54.  In order to facilitate the claims process, the Bankruptcy Code allows creditors to assert any "[r]ight to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, *contingent*, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  Bankruptcy Code § 101(5)(A) (definition of a "claim") (emphasis added).

Claim alleges how key individuals at NNI controlled negotiations with the relevant tax authorities on behalf of the EMEA entities in order to secure approval of the transfer pricing schemes, which deprived NN Ireland of significant assets.  (*See* Proof of Claim ¶ 18(e)-(f).)

Pre-Petition Asset Sales.  NNI's control over the implementation and operation of the transfer pricing arrangements also applied to the pre-petition sale processes.  (*Id*. ¶ 162 (alleging that NNI was involved in all decision making in relation to the settlement of the allocation methodology and allocation amounts).)  As described in the Proof of Claim, the allocation of sale proceeds in relation to the pre-petition asset sales was to correspond with the arm's length principles that were supposed to govern transfer pricing.  (*Id*. ¶ 67.)  Instead, proceeds were allocated based on the erroneous assumptions that were contained in the transfer pricing structure that prevailed at the time, a structure that was designed and implemented by NNI and NNL.  (*Id*. ¶¶ 18, 68.)  As a consequence of the allocation method adopted by NNI and NNL, NN Ireland received significantly less than it was entitled to on an arm's length basis, while NNI received significantly more.  (*Id*. ¶ 69.)  By controlling the process, NNI owed a duty as NN Ireland's director to act in NN Ireland's best interest and ensure that NNI received only the proportion of proceeds to which it was entitled.

> **3.    The Joint Administrators Allege Facts Showing That NNI Employees Were Acting On Behalf Of NNI.**

The Joint Administrators have sufficiently pleaded that the NNI employees, officers, and directors named in the Proof of Claim were acting within the scope of their authority for NNI.  Each named individual is identified with his or her respective role and title as an NNI employee and the Proof of Claim alleges throughout that NNI acted through its own directors, officers and senior employees.  (*See, e.g.*, *id.* ¶ 115 ("NNI, through the involvement of its personnel . . . (as described in paragraphs 16 to 19 above), advocated or assisted the conduct

by NN Ireland's directors . . . which led to these breaches of fiduciary duties.") (emphasis added).)  This is a factual allegation that when proven, will entitle the Joint Administrators to relief.  The Rule 8(a) pleading standard does not require a greater particularity.

The fact that the US Debtor will dispute these allegations is not relevant to the present motion.  Contrary to the US Debtor's assertions, the Proof of Claim is replete with allegations that Katherine Stevenson and Ryan Smith were acting in a manner that established NNI as a director of NN Ireland.  As the Joint Administrators have alleged, Ms. Stevenson was Group Treasurer and a director of NNI and the Group Treasury Department, like the Group Tax Department, was effectively a joint function between NNI and the Canadian Entities.  (*Id.* ¶ 19, 21-22.)  It is not implausible that in playing a key role in the implementation of the Irish Loans and Irish Dividends, transactions that benefitted NNI, they were acting in their capacity as NNI employees.  Nor have the Joint Administrators "conceded" that Ryan Smith was at all times acting in his capacity as an EMEA employee simply because they acknowledge that he was at one time seconded to EMEA.  (*Id.* ¶ 19.)  Ryan Smith was an employee of NNI, and was working on behalf of NNI while seconded to NNUK headquarters.  (*Id.* at 19, 23.)  In any event, the US Debtor's contentions that these NNI employees were acting in other capacities raises a factual dispute that must be determined following discovery and an evidentiary hearing on the issue.

Finally, the Joint Administrators are not required to demonstrate additional justification for imposing specific fiduciary or other duties on NNI as shadow director of NN Ireland for the reasons described in Section II.A.1 above.

**B.    The Joint Administrators Are Not Required to Plead that NN Ireland was Insolvent for their Breach of Fiduciary Duty Claims to Survive.**

The US Debtor argues that the Joint Administrators are required to show that NN Ireland was insolvent in order for duties to be owed to NN Ireland's creditors simply because the Proof of Claim concedes that such a showing is required. (Joint Obj. at 39 ("NNI Ireland's claim leaves no dispute that it is only the alleged insolvency or doubtful insolvency of NN Ireland that required its directors to consider the interests of creditors.").)  Curiously, however, the US Debtor does not take the affirmative stance that, under Irish law, duties are only owed to creditors under these circumstances.  The Court should therefore disregard the US Debtor's argument because it is not supported by any legal authority.  In any event, this argument has no bearing on the Joint Administrators' claims for breach of fiduciary duties owed to NN Ireland. (*See, e.g.*, Proof of Claim ¶ 87 ("NNI owed these fiduciary duties to NN Ireland under Irish law.").)

Should a showing that NN Ireland was insolvent at the relevant times be necessary, the Joint Administrators have, in fact, satisfied their burden.  The Proof of Claim expressly alleges that NN Ireland was of "doubtful solvency (and/or [at] risk of insolvency) . . . from 2000 onwards."  (Proof of Claim ¶ 112.)  This allegation is sufficient at the pleading stage and is supported by an account of the business reversals and exorbitant losses suffered by the Nortel Group, and NN Ireland in particular, beginning in 2001.  (*Id.* ¶¶ 6-8.)  Other paragraphs in the Proof of Claim include detailed allegations of how NNI and NNL extracted cash value from NN Ireland, causing a significant depletion of its resources by the time the Nortel companies ultimately filed insolvency proceedings, and how the Irish Dividends were paid "when there were insufficient distributable reserves" and that the best interests of NN Ireland and its creditors

would have been best served if the Irish Dividends were not declared.  (*Id.* ¶¶ 63-65.)  These allegations more than satisfy any relevant standard for pleading insolvency.

Even though a showing that NN Ireland was insolvent is not necessary in order for these claims to proceed, the Court should disregard the US Debtor's attempts to argue that NN Ireland was not in fact insolvent, or of questionable solvency, at the relevant times.[55] Insolvency is a factual determination not appropriate for resolution on a motion to dismiss.  *See, e.g.*, *In re DBSI, Inc.*, 445 B.R. 344, 349 (Bankr. D. Del. 2011); *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns. Corp.)*, 365 B.R. 24, 37 (Bankr. S.D.N.Y. 2007).

### C.    The Proof of Claim Alleges Facts Showing That NNI Owed NN Ireland An Independent Duty Of Care Under Irish Law.

#### 1.    NNI Enjoyed A "Relationship of Sufficient Proximity" With Respect to NN Ireland That Gave Rise To An Independent Duty Of Care Under Irish Law.

In addition to alleging that NNI owed a duty of care to NN Ireland based on its status as a *de facto* and/or shadow director as described in Section II.A. above, the Joint Administrators assert that such duties arose independently as a matter of Irish law.  The Proof of Claim includes facts sufficient to show that NNI owed an independent duty of care because of the special relationship existing between NNI and NN Ireland.

Under Irish law, an independent duty of care arises where a sufficient relationship of proximity exists between the alleged wrongdoer and a person who has suffered damage, the harm in question was reasonably foreseeable and it is appropriate in the circumstances to impose

---

55. The US Debtor points to a statement made by Sharon Rolston that NN Ireland would likely become insolvent as a result of the insolvency proceedings in an effort to prove that NN Ireland was not insolvent or approaching insolvency at the times alleged in the Proof of Claim. (Joint Obj. at 40-41.)  The Witness Statement should not be considered by this Court because it is not "integral to or explicitly relied upon" in the Claim. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citations and quotations omitted).  In any event, Ms. Rolston's "belief" as to the company's financial condition is in no way dispositive of whether NN Ireland was, in fact, insolvent at any point prior to commencement of its administration proceedings.

a duty of care.  (Hennessy Decl. ¶ 64.)  Under this standard, a person will owe a duty to anyone

who is "so closely and directly affected by [his] act that [he] ought reasonably to have them in

contemplation as being so affected when [he is] directing [his] mind to the acts or omissions

which are called in question."  (Hennessy Decl. ¶ 72.) (*citing Donoghue -v- Stevenson* [1932] AC

562).)  As the Proof of Claim makes clear, NN Ireland was so closely and directly affected by

NNI's influence and control over its tax and treasury functions, that it would defy reason to

conclude that NNI did not owe duty of care with respect to those aspects of NN Ireland's

business with which it actively involved itself.  (*See* Proof of Claim ¶ 15.)  Similarly, it cannot be

seriously argued that loss or damage to NN Ireland was not reasonably foreseeable when NNI

employees played an active role in devising the various initiatives for extracting value from NN

Ireland.  (*Id*. ¶ 19, 51.)  Was it reasonably foreseeable that NNI's operation of the MRDA in a

manner contrary to the arm's length principle would cause harm to NN Ireland?  (*Id*. ¶ 48.)

Should NN Ireland have reasonably foreseen that its idea to have NNL repay the Irish Loans

through the declaration of unjustified transfer pricing payments would deprive NN Ireland of

significant value?  (*Id*. ¶ 25.)  Judging by an objective standard, the answer must certainly be yes.

The US Debtor's efforts to brush aside the Joint Administrators' claim on the

basis that Irish courts are "reluctant" to impose a duty of care when the claim involves pure

economic loss must fail.  (Joint Obj. at 42.)  The case cited by the US Debtor's Irish law expert

in support of that proposition did not render economic loss irrecoverable under Irish law in

actions for any particular type of negligence.  (Hennessy Decl. ¶ 77.)  Instead, the Irish Supreme

Court in that case expressly reserved for another occasion the question of recoverability for

economic loss in actions for negligence other than misstatement and those falling within the

identified categories.  (*Id*.)  Indeed, the Irish High Court had previously held that "the fact that the

damage is economic is not in itself a bar to recovery where the other elements above stated are

present."  (Hennessy Decl. ¶¶ 78-79 (citing *McShane Wholesale Fruit and Vegetables Ltd. -v-*

*Johnson Haulage Co. Ltd*. [1997] ILRM 86.)  Therefore, the breach of duty claims should not be

dismissed simply because the Joint Administrators seek recovery for pure economic loss.

Finally, the US Debtor argues that even if there was a relationship of sufficient

proximity, a duty of care should not be imposed on NNI because it would not be "fair, just or

reasonable" to impose such a duty on NNI where the resulting harm arose out of a transfer

pricing scheme that also caused NNI to overpay NNL. (Joint Obj. at 42.) This argument fails for

multiple reasons.  First, NNI must have a "powerful reason" to justify why an otherwise

appropriate duty should not be imposed.  (Hennessy Decl. ¶ 75.)  NNI's defense that it was also

harmed by NNL is irrelevant, especially in light of the fact that NNI has already been

recompensed for its losses from NNL in the form of a $2 billion settlement payment.  (Proof of

Claim ¶ 50.)  Second, the Joint Administrators' breach of fiduciary duty claims do not only arise

out of the transfer pricing arrangements, but also the Irish Loan and Dividends and pre-petition

sales of some of the Nortel Group's businesses.  Surely NNI cannot argue that it was "harmed"

by these transactions, too, where the Joint Administrators have specifically alleged that they

were unjustly enriched by them.

### 2.    NNI Breached the Independent Duty Of Care It Owed To NN Ireland.

Though the US Debtor does not address the remaining elements of the cause of

action, the Joint Administrators have stated a plausible claim that NNI breached the duty of care

it owed to NN Ireland by failing to act with reasonable skill and care in relation to NN Ireland's

affairs.  Specifically, the Joint Administrators have shown that NNI breached a duty of care

owed to NN Ireland by (i) causing NN Ireland to participate in the transfer pricing arrangements

which were not arm's length transactions and failing to ensure that NN Ireland received an arm's

length return under the RPSM, (ii) designing and implementing the Irish Cash Repatriation Strategy and causing NN Ireland to make non-commercial, interest-free loans and declare improper, unlawful dividends, which deprived NN Ireland of considerable value, (iii) allocating to NN Ireland a proportion of the Pre-Petition Sale Proceeds that was far below what it should have received on an arm's length basis, and (iv) controlling NN Ireland's tax policy without concern for the foreseeable risk of incurring liabilities for underreporting or otherwise.  As a result of NNI's breaches of duty, NN Ireland suffered significant losses and will continue to suffer losses should any future tax liability be imposed.[56]

> **D.    The Joint Administrators Are Not Estopped From Asserting That NNI Was A *De Facto* Or Shadow Director Of NN Ireland.**

> **1.    The Doctrine of Judicial Estoppel Does Not Apply.**

The doctrine of judicial estoppel is a judge-made doctrine that prevents a party from gaining an unfair advantage against an opponent through the deliberate adoption of inconsistent positions in successive suits.  The purpose of the doctrine is to prevent unscrupulous litigants from "playing fast and loose with the courts."  *Scarano v. Central R.R. Co.*, 203 F.2d 510, 513 (3d Cir. 1953).  The US Debtor argues that the doctrine of judicial estoppel bars the Joint Administrators from asserting that NNI or NNL served as *de facto* or shadow directors of NN Ireland because this position is "irreconcilably inconsistent" with the Joint Administrators' prior position that England is the EMEA Debtors' center of main interests ("COMI").  (Joint Obj. at 25-26.)  This argument is legally and factually meritless.

To invoke judicial estoppel successfully, the US Debtor must prove:  (i) the Joint Administrators' present position is inconsistent with a position that they affirmatively asserted in

---

56.  As made clear by the allegations in the Proof of Claim, this is equally true for NNL and NN Ireland's *de jure* directors, who owed independent duties of care to the creditors of NN Ireland and who breached those duties. (Proof of Claim ¶ 111.)

a prior judicial proceeding with respect to the issue in question; (ii) bad faith – i.e., that the Joint Administrators intended to play "fast and loose" with the court and engage in intentional wrongdoing; and (iii) that the remedy sought (dismissing their claim) is " 'tailored to address the harm identified' and no lesser sanction would adequately remedy the damage done by the litigant's misconduct." *Montrose Med. Group Participating Savs. Plan v. Bulger*, 243 F.3d 773, 779-80 (3d Cir. 2001); *Ryan Operations. G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 361 (3d Cir. 1996). The US Debtor's arguments fail at every turn.

### a.      The Joint Administrators Have Not Taken Inconsistent Positions.

The threshold requirement for application of judicial estoppel is to determine whether a litigant has taken an inconsistent position in an earlier judicial proceeding. It is not enough, moreover, for the inconsistency to be inadvertent. *Id.* at 364. Rather, for judicial estoppel to apply it is necessary that the inconsistent positions were <u>intentional</u>. *See, e.g.*, *Scarano*, 203 F.2d at 513 (emphasizing the "intentional self-contradiction" of lawsuits at issue).

The US Debtor attacks representations made in the Witness Statements (as defined below) and the EMEA Debtors' petitions for Chapter 15 recognition as irreconcilably inconsistent with their position that NNI and NNL are *de facto* or shadow directors of NN Ireland. In doing so, the US Debtor mischaracterizes the purpose and substance of a COMI determination, overstates the breadth of the representations made in the Witness Statements, and misrepresents the Joint Administrators' claims. Contrary to their assertion, a finding that England was the center of day-to-day operations in the EMEA region is not inconsistent with their assertion that the North American entities controlled major strategic decisions relating to the specific transactions that form the basis for the Joint Administrators' claims.

### i.    The Witness Statements Were Prepared for the Purpose of Supporting a Jurisdictional Finding.

The Joint Administrators were appointed on January 14, 2009 by order of the English Court (the "Initial Order") to act for NN Ireland and the EMEA Debtors, following an application made by each EMEA company's board of directors.  In the few days prior to commencement, the Joint Administrators met with senior management of the EMEA Debtors to discuss financial viability of and possibility of continuation and to ultimately prepare witness statements in support of the EMEA Debtors' administration applications.[57]  Sharon Lynette Rolston and Michel Clement, directors of the EMEA Debtors, submitted witness statements (the "Rolston Statement" and the "Clement Statement" and together, the "Witness Statements") before the English Court to support a finding that England was each EMEA Debtor's COMI and obviate the need to file separate proceedings in multiple jurisdictions.

Under Article 3 of the EC Regulation on Insolvency Proceedings (the "Regulation"), the jurisdiction of a company's COMI has exclusive jurisdiction to open main insolvency proceedings.  Counsel Regulation (EC) No. 1346/2000. The Regulations do not define the term "COMI."  The only guidance given is that:  (i) the location of a company's registered office is presumed to be its COMI in absence of proof to the contrary and (ii) a company's COMI should correspond to the place where the company conducts the administration of its interests on a regular basis, and therefore can be ascertained by third parties. *Id.*; *see also Re Eurofood IFSC Ltd* [2006] BCC 606; *In re Stanford International Bank Ltd* [2010] EWCA Civ 137.

The courts in *Eurofood* and *Stanford* both held that the appropriate test of COMI depends on ascertainability by those who deal with the company, and that only those factors

---

57.  (Deposition of Alan Robert Bloom, December 16, 2010 ("Bloom Dep.") 159:15-25.)

which are in the public domain and which a typical third party would learn through their dealings

with the company are relevant.  Both cases instruct that matters that could only be established on

<u>inquiry</u> should be excluded because creditors should not have to make detailed investigations

concerning the internal workings of a company as to where decisions were made and how the

business was actually managed.  *Id.*[58]  With this test in mind, and the limited facts available to

them at the time, the Joint Administrators supported the position that England was each of the

EMEA Debtor's COMI.[59]  This is because in the EMEA context, the majority of daily

operational decisions were made in England, where key personnel were based.[60]  The Witness

Statements were not intended to report to the English Court the strategic and operational

interplay between the EMEA Debtors and NNI and the Canadian Debtors.  The purpose was to

apprise the English Court of the operation of the EMEA region and demonstrate how entities

outside of England were operationally managed from England.  Ignoring such matters as parent

or affiliate control over internal corporate matters that could only be ascertained upon inquiry,

and focusing only on objective factors clear from ordinary dealings between the EMEA Debtors

and their creditors, all signs pointed and still point to England as the EMEA Debtors' COMI.

 Once appointed, the Joint Administrators faced the immediate task of  managing

the affairs, business and property of the EMEA Debtors.[61]  It was not until this time that the Joint

---

58. Notably, Sir Andrew Morritt VC in *Stanford* rejected the US receiver's argument that facts were "ascertainable" even if they were not within the public domain but could have been obtained from asking questions of the company's relevant personnel with whom dealings were conducted.  Instead, the judge determined that after *Eurofoods* it was wholly unrealistic to seek to impose a burden on creditors or potential creditors dealing with a company to make detailed inquiries as to how its business was conducted in this context.  *Stanford* at 68.

59. (Bloom Dep. 160: 9-23.)

60. Indeed, any outside party dealing with the EMEA Debtors would understand this to be true.  *See* Rolston Statement ¶ 149 ("Customers would understand that England is the centre of operations for the EMEA Companies and is the point for resolution of serious issues in respect of customer relationships, final decision-making, strategy and strategy investments.").

61. (*See, e.g.*, Initial Order, Joksimovic Decl. Ex. H at 2.)

Administrators – having finally conducted an intensive factual investigation – were able to fully appreciate the control exercised by NNI and NNL, which form the basis of their claims against NNI and NNL as *de facto* or shadow directors.[62]  Still, this newly acquired information had no bearing on the Joint Administrators' position that day-to-day *operational* management was centered in England for COMI purposes since these internal matters would not be ascertainable to a creditor without investigation.  Indeed, they were not ascertainable to the Joint Administrators prior to their own investigation.  With the understanding that COMI remained in England, the Joint Administrators sought and obtained recognition of the EMEA Debtors' administration proceedings as foreign main proceedings under Chapter 15 of the Bankruptcy Code.

> ### ii.   There Is No Inconsistency Between the Joint Administrators' Positions.

The US Debtor mischaracterizes the position that the Joint Administrators have taken with respect to the EMEA Debtors' COMI and their claims against NNI based on *de facto* or shadow directorship.  First, the US Debtor's overview of the representations in the Witness Statements is grossly misleading.  It attempts to create an artificial inconsistency by cherry-picking and twisting Ms. Rolston's statements, so as to make it appear that the EMEA Debtors functioned with complete autonomy from North America.[63]  In truth, an examination of the Witness Statements as a whole reveals that although day-to-day operational and practical business decisions were made from the Maidenhead office,[64] certain strategic decisions were

---

62.  (Bloom Dep. 173: 20-25; 174:2-16.)

63.  Even more disingenuously, the US Debtor references incomplete citations, which, if quoted accurately, would show that strategic policy and procedure were determined at a global level in North America and senior management in England were responsible only for operational implementation.

64.  *See*, *e.g.*, Rolston Statement ¶ 6c ("[T]he centre of <u>operations</u> and head office functions for the EMEA Region is carried out from and performed in England.") (emphasis added); *id.* ¶ 14 ("The Company is the centre of

made by North America.  It does not stand for the proposition that the EMEA region was controlled exclusively from England.  (*Cf.* Joint Obj. at 20-24.)[65]  Additionally, a review of all the statements made with respect to tax and treasury functions, not just those selectively chosen by the US Debtor, equally shows that where treasury and tax initiatives were <u>global</u>, they were determined by North America.[66]  The US Debtor's efforts to frame the Joint Administrators as opportunists is utterly ridiculous.

Second, the Joint Administrators do not take the position in the Proof of Claim that NNI exerted overall control over all aspects of the affairs of NN Ireland and the EMEA Debtors.  (Joint Obj. at 25.)  On the contrary, the Proof of Claim focuses on instances where NNI exerted control over treasury and tax functions in connection with transactions involving <u>global</u> strategy.[67]  To prove *de facto* or shadow directorship, NN Ireland need not show that NNI or NNL exerted control over every aspect of the company; rather, director liability can be imposed on NNI for its control over discrete transactions impacting the EMEA Debtors, as the Joint Administrators have asserted.  (Hennessy Decl. ¶ 53-54.)  Accordingly, a COMI finding in England is not incompatible with the position that certain key strategic decisions were made at a level beyond senior management in England.

---

<u>operations</u> for the EMEA Region of the Group.") (emphasis added);  *id.* ¶ 15c ("[T]he senior management of all key primary functions (i.e. sales, finance, treasury, legal and human resources) required for the <u>operation</u> of the EMEA Region are located in England.") (emphasis added); *id.* ¶ 15c ("[S]ignificant decisions in relation to sales and dealings with customers are largely made in England . . . .").

65.  *See, e.g.*, Rolston Statement ¶ 15d ("senior management for EMEA is <u>largely</u> located in England"); *id.* ¶ 15b ("[T]he senior management, which is largely located in Maidenhead, make the <u>vast majority</u> of significant decisions <u>in respect of the operations</u> of the EMEA Companies.") (emphasis added).

66.  For tax functions, *see* Rolston Statement ¶ 188 ("Tax planning initiatives come from Canada, where there is a global impact, or may be generated by the EMEA Tax Group in relation to specific opportunities in the region, although in the latter case this will always be discussed with Canada before any implementation.").  For treasury functions, *see id.* ¶ 15i (describing how EMEA Treasury can only settle intercompany accounts in accordance with global policies).  Ms. Rolston's references to Canada do not rule out NNI's involvement.

67.  (*See generally* Proof of Claim ¶¶ 9-28.)

The alleged inconsistencies here are similar to those raised before the Supreme Court in *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999). The issue in *Cleveland* was whether a person who sought Social Security Disability ("SSDI") benefits could later be judicially estopped from claiming protected status under the American Disabilities Act ("ADA"). In seeking SSDI benefits, the claimant certified that she was "disabled" and "unable to work," but in a later ADA suit submitted she could perform the essential functions of a job with reasonable accommodation. *See id*. at 798-99. The Court rejected the judicial estoppel argument, observing that "in context, these two seeming divergent statutory contentions are often consistent with each other" and that "there are too many situations in which an SSDI claim and an ADA claim can comfortably exist side by side." *Id*. at 797, 802-03 (emphasis added). Similarly, the Court should view the Witness Statements in the context in which they were prepared and determine that a COMI determination in England is perfectly consistent with the Joint Administrators' claims that control for specific transactions was also exerted from North America.[68]

   **b.  NNI Cannot Show That the Joint Administrators Acted In Bad Faith.**

   For the reasons explained above, there is no inconsistency between the position taken by the Joint Administrators in the Proof of Claim and the position they previously took before the English Court and this Court. Furthermore, under governing Third Circuit decisions, if a party has asserted inconsistent positions concerning the same issue, judicial estoppel still will

---

68. *See Ocasio v. Ollson*, 596 F. Supp. 2d 890 (E.D. Pa. 2009) (judicial estoppel was inappropriate to bar certain claims against employer in subsequent tort action for injuries that were not described in release agreement where language of release agreement, when read as a whole and under the relevant circumstances, was broad enough to encompass such claims).

not apply unless that party acted in bad faith and the inconsistency is "<u>attributable to intentional wrongdoing</u>." *Ryan Operations,* 81 F.3d at 363 (emphasis added).[69]

   The assertion of claims by the Joint Administrators – who are officers of the English Court – against NNI and NNL as *de facto* or shadow directors of NN Ireland is not part of a scheme to mislead the court and it is inappropriate for the US Debtor to suggest otherwise. The Joint Administrators had no motive to conceal these claims.  Even if the Court were to determine that there is some element of inconsistency in the Joint Administrators' position (which there is not), it could only be attributable to an inadequacy of information available to them at the time the EMEA Debtors entered into administration.  These facts alone set this case apart from many of the Third Circuit cases applying judicial estoppel.[70]

   The Joint Objection is completely devoid of facts that could suggest intentional wrongdoing on the Joint Administrators' part and simply relies on the purported benefits that

---

69. As discussed in *Ryan Operations*:

 Asserting inconsistent positions does not trigger the application of judicial estoppel unless "intentional self contradiction is ... used as a means of obtaining unfair advantage." Thus, the doctrine of judicial estoppel does not apply "when the prior position was taken because of a good faith mistake rather than as part of a scheme to mislead the court." An inconsistent argument sufficient to invoke judicial estoppel must be attributable to intentional wrongdoing.

 81 F.3d at 355 (internal citations omitted).

70. *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419-20 (3d Cir. 1988) (applying judicial estoppel where party waited until after closure of bankruptcy proceeding to bring claim, thus challenging integrity of judicial system); *see also Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 121-22 (3d Cir. 1992) (party who convinced the bankruptcy court to lift stay on defendant's assets on representation that any recovery against the defendant would be limited to the amount of the defendant's insurance coverage estopped from recovering more); *Murray v. Silberstein*, 882 F.2d 61, 65-66 (3d Cir. 1989) (plaintiff who represented to the court that money damages were unavailable in order to obtain a preliminary injunction estopped from asserting that damages were available); *Scarano v. Central R.R. Co.*, 203 F.2d 510, 512-14 (3d Cir. 1953) (party who represented that he was completely disabled to win damages estopped from asserting that he was able-bodied in order to win reinstatement); *Lewandowski v. Nat'l R.R. Passenger Corp.*, 882 F.2d 815, 818 (3d Cir. 1989) (finding *Scarano* "controlling" on virtually identical facts).

NN Ireland received from its prior assertions that the EMEA Debtors' COMI was in England.[71]

Specifically, the Joint Objection focuses on the strategic advantage that coordinated proceedings

in England brought to the EMEA Debtors and the protections of the automatic stay that NN

Ireland enjoyed by securing Chapter 15 recognition.  (Joint Obj. at 27.)  Whatever benefit

derived from the COMI determination impacted the Nortel Group as whole, not just NN Ireland,

by simplifying the administration of these related insolvency proceedings.  Among other things,

this facilitated the global asset sales that have greatly benefitted creditors of the Nortel Group

worldwide.[72]  This is hardly the type of "benefit" that can give rise to an inference of bad faith.

*See Payless Wholesale Distribs, Inc. v. Alberto Culver (P.R.) Inc.*, 989 F.2d 570, 571 (1st Cir.

1993) (applying judicial estoppel upon finding that plaintiff intended to "[c]onceal [its] claims

[in the bankruptcy proceeding]; get rid of [its] creditors on the cheap; and start over with a

bundle of rights").

       The US Debtor also argues that the Joint Administrators misled this Court, which

relied on the Witness Statements in granting the EMEA Debtors' Chapter 15 recognition.  This is

---

71.  The US Debtor's reliance upon *Anjelino v. New York Times Co.,* 200 F.3d 73 (3d Cir. 2000), for the principle, in regards to judicial estoppel, that the receipt of a benefit based on a prior position itself "evidence[s] an intent to play fast and loose with the courts" (Joint Obj. at 27.) is misplaced.  In *Anjelino*, the Third Circuit held that the district court did not abuse its discretion when it held "counsel to the representation that no further discovery was needed" because, "[o]n the basis of the record before [the Third Circuit], [the Third Circuit] f[ound] no cause for disturbing the [district] court's application of judicial estoppel to preserve the integrity of the courts by preventing litigants from playing fast and loose with the courts."  200 F.3d at 100. (internal quotations omitted).  The Third Circuit said nothing more significant than this, and to argue that these statements lead to the principle cited by the US Debtor is disingenuous.

72.  NN Ireland felt it was important to take a coordinated and fully integrated approach to the EMEA Debtors' administration proceedings in order to facilitate a restructuring and avoid the risks of uncoordinated insolvency proceedings in multiple jurisdictions.  *See* Rolston Statement ¶ 212.  NN Ireland was not alone in this sentiment. What the US Debtor conveniently ignores is that NNI fully supported and participated in the EMEA Debtors' applications for administration before the English Court, including the EMEA Debtors' assertions regarding their COMI.  *See Nortel Networks Inc., et. al.,* Case No. 09-10138, Hr'g Tr. 10-14, Jan. 15, 2009.  NNI represented to this Court at the hearing on the first day motions that the English Court's finding of COMI was a "very good thing" because it allowed them to sell assets without having to deal with multiple jurisdictions in the European Union.  (Hr'g Tr. 12:9-13:2.)  It is therefore clear that the entire Nortel Group, not just NN Ireland, benefited from the English Court's finding that England was the COMI for the EMEA Debtors as it facilitated the restructuring of the corporate group as a whole.

an unwarranted and inappropriate allegation for the US Debtor to make against the Joint

Administrators, officers of the English Court.  Perhaps the most salient fact – conveniently

omitted by the US Debtor in its motion papers – is that the Court, in granting Chapter 15

recognition to the remaining EMEA Debtors, also relied on the record from the deposition of one

of the Joint Administrators, Alan Robert Bloom, in which Mr. Bloom provided an explanation

for any supposed inconsistency in position.  (*See* EMEA Recognition Order, Joksimovic Decl.

Ex. P at 2.)  Mr. Bloom explained at multiple points during his deposition that it was not until the

Joint Administrators further examined the EMEA Debtors' books and records that they

discovered that a considerable amount of the decision-making process in relation to EMEA was

driven out of North America.[73]  Therefore, the Court never relied exclusively on the

representations in the Witness Statements. This type of candor could not possibly amount to an

"assault [on] the dignity or authority of the court."  *Montrose,* 243 F.3d at 781.

Finally, the Third Circuit has noted that "equity requires that the presiding court

give the party to be estopped a meaningful opportunity to provide an explanation for its

position." *Ocasio*, 596 F. Supp. 2d at 902.  The ultimate finding of bad faith cannot be reached

without first resolving disputes as to the underlying facts.  *Montrose*, 243 F.3d at 780.  Such an

explanation is provided herein.  If the US Debtor disputes the explanation or the underlying

facts, dismissal would not be appropriate at this juncture.

### c.    NNI Will Suffer No Harm From Any Purported Inconsistency.

Observing that judicial estoppel "is often the harshest remedy" that a court can

impose for inequitable conduct, the Third Circuit has held that the doctrine should only be

---

73.  (*See* Bloom Dep. 83:2-25. 84:2-10, 155:6-25, 157:9-15, 157:24, 158:10-25, 159:2-4, 160:14-23, 161:5-23, 173:13-25, 174:1-16, 188:3-12, 192:10-22, 196:3-10, 283:18-22.)

applied where "the sanction [of judicial estoppel] is tailored to address the harm identified." *Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98, 108, 110 (3d Cir. 1999) (also stating judicial estoppel is a "draconian" remedy that should be used sparingly) (internal quotation marks and citations omitted); *see also Ryan Operations,* 81 F.3d at 365.

The US Debtor has identified no harm it will suffer as a result of any purported inconsistency in the Joint Administrators' positions.  Certainly the US Debtor could not argue that being required to respond to an otherwise valid claim is a cognizable harm for this purpose. The Joint Administrators have certainly never purposefully concealed information or done anything else that could equate to a fraud on the Court, nor have their positions been inconsistent.  *Cf. Ryan Operations*, 81 F.3d at 365 (judicial estoppel not to be used offensively as a sword and should only be applied if court is satisfied that party to be estopped had deliberate intention to manipulate or mislead court).  More importantly, the Joint Administrators are not seeking any personal gain – they have pursued these claims in their fiduciary capacities in an effort to increase estate assets and allow for more equitable distributions to innocent creditors.  It is those creditors who will be harmed by the dismissal, not the Joint Administrators.  *See Montrose*, 243 F.3d at 785-86 (judicial estoppel not tailored to address harm where plaintiffs brought claims in their fiduciary capacities on behalf of pension plan participants who would be harmed if the action was dismissed).

## 2.    The Doctrine Of Collateral Estoppel Does Not Apply

The US Debtor's assertions that collateral estoppel should foreclose the Joint Administrators' claims are even weaker.  The doctrine of collateral estoppel, or issue preclusion, conserves judicial resources by preventing a party from relitigating an  issue previously litigated and decided.  *Young v. Shore*, 588 F. Supp. 2d 544, 547 (D. Del. 2008).  Collateral estoppel applies where (i) the issue sought to be litigated is <u>identical</u> to one decided in a prior action;

(ii) the issue is actually litigation in a prior action; (iii) resolution of the issue is essential to a final judgment in the prior action; and (iv) the party against whom collateral estoppel is sought had a full and fair opportunity to litigate the issue in the first action. *Raytech Corp. v. White*, 54 F.3d 187, 190 (3d Cir. 1995); *Hamilton v. Leavy*, No. CIV.A. 94-336-GMS, 2001 WL 848603, at *9 (D. Del. July 27, 2001).

The US Debtor argues that the English Court's finding of COMI in England precludes the Joint Administrators from asserting that key decisions were dictated from North America and that collateral estoppel should apply because the EMEA Debtors' COMI was finally determined before the English Court and this Court, was actually litigated and essential to the orders of the English Court and this Court. (Joint Obj. at 28-29.)

But the US Debtor's presentation of the law skips over the most decisive element of the doctrine of collateral estoppel: that the issue presented in the current proceeding is <u>the exact issue</u> already decided in an earlier proceeding. The facts underlying NNI's alleged status as a *de facto* or shadow director has never been addressed in <u>any</u> proceeding, let alone in a prior proceeding because such a determination was not essential to the COMI determination. *See In re Chi-Chi's, Inc.*, 338 B.R. 618 (Bankr. D. Del. 2006) ("collateral estoppel is unavailable when there are disparate policies underlying each inquiry which result in definite differences in application and result") (quoting *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415, 1422 (5th Cir.1995)). The English Court received no evidence and made no findings about the roles of NNL and NNI in the transactions that give rise to the Joint Administrators' claims. The English Court never determined any substantive rights at the time the Initial Orders were entered, nor did this Court when it granted Chapter 15 recognition of the English Proceedings. Rather, those determinations related strictly to forum – not the status or involvement of NNI. (Marshall Decl.

¶ 69.)  As noted above, in addressing the COMI question, the English Court was entitled to act on the COMI presumption in respect of NNUK, and, insofar as the other EMEA Debtors are concerned, would have considered only objective and ascertainable factors that a third party would learn through their dealings with those companies.  In contrast, determining whether the facts support a finding that NNI was a *de facto* or shadow director requires an inquiry into the strategic considerations and related internal workings of the company to see how the business was managed and whether NNI played a role in the affairs of the company – factors that were not a necessary focus for COMI purposes and therefore were not essential to any prior judgments in this case.  Consequently, the US Debtor's collateral estoppel should be rejected.

## III.    THE JOINT ADMINISTRATORS STATE CLAIMS FOR SECONDARY LIABILITY AGAINST NNI.

### A.    The Joint Administrators State Claims For Dishonest Assistance And Aiding And Abetting Breach of Fiduciary Duty.

In the alternative to the claims asserting primary liability against NNI, the Joint Administrators assert a series of claims based on NNI's participation in and assistance to the breaches of duty by NNL and NN Ireland's *de jure* directors.  These include claims for aiding and abetting breach of fiduciary duty (under US state law), dishonest assistance (under Irish law), and conspiracy (Irish and US state law).

The US Debtor argues that the Joint Administrators' aiding and abetting and dishonest assistance claims[74] are subject to dismissal on the grounds that (i) the Joint Administrators have not provided the particulars of the assistance that was provided, nor facts from which it could be inferred that any assistance was given knowingly; (ii) the Joint Administrators have not alleged facts showing that NNL or NN Ireland's directors breached any

---

74.  (Proof of Claim, Claims 4, 6, 10, 13, 23, 26, and 27.)

duty to NN Ireland, and (iii) the Joint Administrators have not pleaded that NN Ireland was insolvent or near insolvency at the relevant times.  The US Debtor argues that the Aiding and Abetting and Dishonest Assistance Claims sound in fraud and must therefore be tested under the heightened pleading standard of Rule 9(b).

      **1.**      **Rule 9(b) Does Not Apply To The Joint Administrators' Claims For Aiding and Abetting Or Dishonest Assistance.**

As discussed in Section I.D above, the courts will sometimes apply Rule 9(b) to non-fraud claims where they are either coupled with fraud claims or are based on conduct that might meet the elements of a fraud claim.  Here the Joint Administrators do not allege any fraud claims, nor would the underlying facts they rely on make out a claim for the tort of fraud.  There is therefore no basis to apply a heightened pleading standard under Rule 9(b) to their allegations of aiding and abetting or dishonest assistance.[75]

      **2.**      **The Proof of Claim Sets Forth Facts Showing The Assistance NNI Provided And From Which It Can Be Inferred That Such Assistance Was Knowing.**

      **a.**      **The US Debtor Misstates The Required Mental State.**

At the outset it should be noted that the US Debtor misstates the mental state or degree of knowledge required to support claims for aiding and abetting and dishonest assistance.

With respect to aiding and abetting a breach of fiduciary duty under US state law, the knowledge element is met if it can be inferred from the overall facts that the defendant was aware of the nature of the relationship between the breaching party and of the conduct that was in breach.  *See Zirn v. Vli Corp.*, 15 Del. J. Corp. L. 789, 801-02 (Del. Ch. 1989) ("although the Complaint fails to specifically allege that [Defendant] 'knowingly participated' in the directors'

---

75. Certainly there is no support for the US Debtor's suggestion that any claim which incorporates a scienter element must be alleged with particularity.

alleged breach of their fiduciary duty to the . . . shareholders, I find that it can be logically

inferred by reasonable inferences drawn from facts alleged in the Complaint"); *Duke Energy*

*Int'l, L.L.C. v. Napoli*, 748 F. Supp. 2d 656, 672 (S.D. Tex. 2010) (denying motion to dismiss

where complaint alleged "facts of a suspicious nature that permit an inference of [Defendant's]

knowledge"); *In re I.G. Servs., Ltd.*, No. 04-5041-C, 2004 WL 5866105, at *1 (Bankr. W.D. Tex.

Dec. 22, 2004) ("One way to prove knowing participation is to infer it through atypical

transactions that lack business justification.") (citations omitted).[76]

      The US Debtor's reliance on *Capitaliza-T* for its interpretation of "actual

knowledge" is misplaced.  In *Capitaliza-T*, the court required actual knowledge on the part of a

passive aider and abettor.  The defendant US bank and others were accused of "permitting

deposits" by a Mexican corporation, which was branching out from facilitating foreign currency

exchanges into international transactions involving interest-bearing accounts (a violation of both

its corporate charter and Mexican law).  *See Capitaliza-T Sociedad De Responsabilidad*

*Limitada De Capital Variable v. Wachovia Bank of Del. Nat'l Ass'n*, No. CIV. 10-520, 2011 WL

864421, at *1, 5 (D. Del. Mar. 9, 2011) ("To the extent there is any ambiguity in the Delaware

common law concerning the sufficiency of constructive knowledge or willful blindness, there is

no doubt that where the substantial assistance is permitting money to be deposited in a bank,

actual knowledge on the part of the bank is required.").  Under these circumstances the court

required allegations of fact showing that the bank was aware of the underlying fraud and of the

misconduct.  Here, in contrast, NNI is alleged to have been intimately involved in the

transactions that constituted a breach of duty, and as a member of the Nortel Group was well

---

76.  *See also Aetna Cas. and Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 535 (6th Cir.2000) ("For the purposes of
    establishing aiding and abetting liability . . . [p]roof of a defendant's knowledge or intent will often be
    inferential.") (internal quoting reference omitted).

aware of all the relevant relationships and resulting duties.  NNI was far from a passive

participant.  (*See, e.g.*, Proof of Claim ¶¶ 7, 15, 19, 21, 23, 33, 40.)

        The decision in *Malpiede* is likewise inapposite because that decision examined

the knowledge requirement in the context of holding an arm's length bidder liable for aiding and

abetting a target board's breaches of duty.  *See Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del.

2001) ("Under this standard, a bidder's attempts to reduce the sale price through arm's-length

negotiations cannot give rise to liability for aiding and abetting, whereas a bidder may be liable

to the target's stockholders if the bidder attempts to create or exploit conflicts of interest in the

board.").  In the present case, NNI was not a self-interested bidder dealing with NN Ireland at

arm's length; the Proof of Claim clearly alleges that NNI participated in the decisions of (and

even supplanted) the board of NN Ireland with respect to the scheme by which value was

diverted to the Canadian Entities from NN Ireland and the EMEA Companies.  *Cf. id.* at 1098

("there is no indication in the amended complaint that [Defendant] participated in the board's

decisions, conspired with [the] board, or otherwise caused the board to make the decisions at

issue").  *Malpiede* also does not support the proposition that the court cannot infer actual

knowledge from allegations of suspect transactions.  *See id.* at 1098 n.79 ("It may be that some

circumstances will arise in which the terms of the negotiated transaction themselves are so

suspect as to permit, if proven, an inference of knowledge of an intended breach of trust.")

(quoting *Greenfield v. Tele-Communications,* C.A. No. 9814, 1989 WL 48738, at *3 (Del. Ch.

May 10, 1989)).[77]

_____

77. By citing *Malpiede*, the US Debtor effectively recognizes that allegations regarding a defendant's knowledge of
the legal consequences of a fiduciary's actions will not be necessary to make out every claim.  (*See* Joint Obj.
45 n.50 ("Even to the extent that <u>willful blindness or constructive knowledge were sufficient to establish
knowledge</u>, NN Ireland's [Proof of] Claim fails under either standard . . . .") (emphasis added).)  Thus, to the
extent that the Court is persuaded that the standard of knowledge required for corporate bidders is somehow
applicable in this case, the Proof of Claim contains allegations supporting the inference that, at a minimum, NNI

NN Ireland's claims for dishonest assistance (claims 4, 10, and 26) are rooted in the Irish doctrine of constructive trusts and the fundamental policy that a fiduciary will not be permitted to take advantage of his position for personal profit.  (*See* Hennessy Decl. ¶ 85.)  Upon this foundation, it is settled in Ireland that such liability is extended to those who knowingly assist in a fiduciary's wrongful conduct, as well as one who receives or becomes chargeable with some part of the trust property.  (*See id.* ¶ 86; *see* Redmond Decl. ¶ 50.)[78]  In the seminal case on the modern law of dishonest assistance, Lord Nicholls in the Privy Council wrote that equitable liability "attaches to a person who dishonestly procures or assists in a breach of trust or fiduciary obligation."  (*See* Hennessy Decl. ¶ 87.)  The Joint Administrators' expert acknowledges that Irish courts are likely to follow Lord Nicholls' requirement of "dishonesty."  (*Id.* ¶ 88.)  Lord Nicholls wrestled with the choice between the objective and subjective standards and concluded that although dishonesty may be equated with "conscious impropriety," a person's lower moral values or situational excuses will not save him if he knowingly engaged in conduct that is objectively dishonest.  (*See id.* ¶ 89)  In other words, the inquiry is objective with respect to the standard of dishonesty, but that objective standard will be informed by the subjective knowledge of the defendant (i.e., the conduct is assessed in light of what the defendant actually knew at the relevant time, as distinct from what a reasonable person in the defendant's position would have known or appreciated).  (*Id.*)  However, a person who sees nothing wrong in his own misconduct will not be spared from liability for dishonest assistance.  (*See id.*)  Thus, NN Ireland need only allege and prove that NNI's advertent assistance of NN Ireland's *de jure*, *de facto*, and/or

---

was willfully blind to or should have known about the breaches of duty by NNL and the *de jure* directors of NN Ireland.

78.  (Declaration of Aidan Redmond SC in Support of the Joint Objection and Motion to Dismiss the Claims of Nortel Networks Ireland (Nortel Ireland), dated July 21, 2011 [D.I. 6023] ("Redmond Decl.").)

shadow directors' breaches of fiduciary duty amounted to behavior that was objectively dishonest.

The Movants invoke the *Fyffes* case[79] in an apparent attempt to convince the Court that Irish jurisprudence applies an onerous standard for dishonesty in this context. (Joint Obj. at 44 ("the court held that plaintiffs had failed to establish dishonesty for knowing assistance in circumstances where there had been allegations of insider trading by a director") (citing Redmond ¶ 52.)) However, it is not clear why *Fyffes* has any relevance here; in that case, the court was struggling to reconcile the statutory remedy for insider trading, which requires an accounting to counterparties irrespective of actual loss, with the equitable remedy for dishonest assistance, which offers compensation only if a counterparty has suffered actual loss. (*See* Hennessy Decl. ¶ 92.)[80] Since NN Ireland is itself a party that has suffered compensable losses as a result of NNI's dishonest assistance and there is no allegation of insider trading, the operative holding in *Fyffes* has dubious, if any, relevance here. (*See id.*)

In addition to the allegations cited below supporting claims that NNI is secondarily liable for its assistance in breaches of fiduciary duties owed to NN Ireland, the Claim alleges facts supporting the inference that NNI behaved, with respect to several types of transactions, "dishonestly" within the meaning of Irish law. (Hennessy Decl. ¶ 87; *see* Proof of Claim ¶ 104 ("NNI acted dishonestly as it appreciated that the implementation and operation of the MRDA and RPSM were contrary to NN Ireland's interests and that the directors of NN Ireland were acting in breach of duty by allowing NN Ireland to participate in such

---

79.  *Fyffes Pic* v. *DCC Pic* [2009] 2 I.R. 417

80.  (*See* Redmond Decl. ¶ 52 ("Plaintiffs [in *Fyffes*] failed to establish either a factual or hypothetical dishonesty to ground the imposition of liability *to account*" and "it would require more than a modicum of judicial ingenuity to ensure that the equitable remedy sat comfortably with the statutory remedies.") (emphasis added.))

arrangements."); Proof of Claim ¶ 136 (same, with respect to Irish Loans and Irish Dividends); Proof of Claim ¶ 191 (NNI dishonestly assisted breaches of duty by virtue of its involvement in and control over NN Ireland's tax affairs).)

      **b.**      **The Proof of Claim Contains Facts Showing The Assistance Provided And That NNI Acted With The Requisite Mental State.**

The circumstances alleged in the Proof of Claim more than satisfy the necessary elements. The Proof of Claim provides detailed allegations of the ways that NNI and its personnel assisted in the breaches of duty by NNL and NN Ireland's *de jure* directors.[81] It is also replete with factual allegations that, if proven, will satisfy the knowledge element of the causes of action.[82] It further alleges that NN Ireland's *de jure* directors abandoned their responsibilities to the company and its creditors by deferring to NNI. (*See, e.g.*, *id.* ¶ 18(d) ("Once the terms of

---

81. (*See, e.g.*, Proof of Claim ¶ 7 ("In the period leading up to the collapse [of the Nortel Group,] the resources of NN Ireland were depleted at the direction of the NNL and NNI."); *id.* ¶ 15 ("The control exerted by NNI related to Nortel Group Tax matters, in particular transfer pricing, and to Nortel Group Treasury matters. These group tax and treasury functions were responsible for the transactions pursuant to which value was improperly removed from NN Ireland."); *id.* ¶ 19 ("The Nortel Group Tax Department was effectively a joint function between NNI and the Canadian Entities. Many of the key individuals within the Tax Department were NNI personnel. This was particularly so in respect of the members of the Tax Department who had responsibility for NN Ireland and the EMEA Companies."); *id.* ¶ 21 ("The Irish Loans and the Irish Dividends were established and declared for the benefit of the NNI and the Canadian Entities to the detriment of NN Ireland. Both the Canadian Entities and NNI were involved in the implementation of these arrangements for this very purpose. Numerous NNI individuals were aware of and/or participated in the initial discussions relating to these arrangements and the later decisions made as to the use and repayment of the Irish Loans, including the related treatment of the Irish Dividends."); *id.* ¶ 33 ("The decision to implement the RPSM was taken by the Canadian Entities and NNI. It was primarily motivated by a desire to allocate more profit to the Canadian Entities in order to benefit NNL at the expense of NN Ireland and the EMEA Companies. Both NNL and NNI knew or should have known that this was the case."); *id.* ¶ 41 ("The terms of the MRDA were determined by NNI and NNL based mainly on the requirements of Canadian and U.S. tax laws, in negotiations with the Canadian and U.S. taxing agencies.").)

82. (*See, e.g.*, Proof of Claim ¶ 104 ("NNI acted dishonestly as it appreciated that the implementation and operation of the MRDA and RPSM were contrary to NN Ireland's interests and that the directors of NN Ireland were acting in breach of duty by allowing NN Ireland to participate in such arrangements."); *id.* ¶ 136 ("NNI acted dishonestly as it appreciated that the Irish Loans and Irish Dividends were contrary to NN Ireland's interests and that the directors of NN Ireland were acting in breach of duty by allowing NN Ireland to participate in such arrangements."); *id.* ¶ 86 ("[G]iven the doubtful solvency (and/or risk of insolvency) of NN Ireland from 2000 onwards, in carrying out their fiduciary duties to NN Ireland, the directors were obliged at all times to consider the best interests of the creditors of NN Ireland as paramount and to take those interests fully into account in exercising their powers and discretions").)

the MRDA had been decided by NNI and NNL, NN Ireland was simply instructed to sign the MRDA. There was no arm's length negotiation of its terms.").)  The Proof of Claim makes the requisite allegations in relation to each of the underlying transactions:

Pre-Petition Asset Sales.  The Proof of Claim alleges that NN Ireland's directors breached their duties to NN Ireland by "causing and/or allowing NN Ireland to enter into sales in respect of which NN Ireland did not receive a proper allocation of the Pre-Petition Sale Proceeds."  (Proof of Claim ¶ 182.)  Through its role in the allocation of the Pre-Petition Sale Proceeds, NNI not only breached its own fiduciary and other duties to NN Ireland; it aided and abetted the directors of NN Ireland in conduct amounting to a breach of their duties as well.  (*See id.* ¶ 182 ("[I]t was manifestly not in NN Ireland's interests for NN Ireland to enter into sales in respect of which NN Ireland did not receive a proper allocation of the sale proceeds. The directors of NN Ireland breached their duties by causing and/or allowing NN Ireland to enter into sales in respect of which NN Ireland did not receive a proper allocation of the Pre-Petition Sale Proceeds."); *id.* ¶ 184 ("NNI, through the involvement of its directors, officers and senior employees…advocated or assisted the conduct by NN Ireland's directors which led to these breaches.").)  The Proof of Claim clearly alleges NNI's motivation:  it received a greater portion of the Pre-Petition Asset Sales than it would have under a fair allocation methodology.  (*See id.* ¶ 69 ("As a consequence of the allocation method adopted, NN Ireland received significantly less, and NNI received significantly more, than it was entitled to on an arm's length basis.").)

Contingent Tax Claims.  Claims 24-27 assert contingent claims for any tax liability that may arise out of NNI's breach of its duties as a *de facto* or shadow director of NN Ireland, its breach of the duty of care under Irish law, its aiding and abetting the breach of other directors of NN Ireland (whether *de jure*, *de facto*, or shadow), and its dishonest assistance

under Irish law.  (*See* Proof of Claim ¶¶ 186-192.)  NNI's control over matters related to taxation, both generally with respect to the Nortel Group and specifically as to NN Ireland, may result in NN Ireland's liability to the Revenue Authorities.  (*See id.* ¶ 15 ("The control exerted by NNI related to Nortel Group tax matters, in particular transfer pricing, and to Nortel Group treasury matters.  These group tax and treasury functions in turn were responsible for the transactions pursuant to which value was improperly removed from NN Ireland.").)

The Proof of Claim further alleges how key individuals at NNI controlled negotiations with the relevant Revenue Authorities in order to secure approval of the transfer pricing schemes vital to the effort of NNL and NNI to divert cash and/or value from NN Ireland and the EMEA Companies:

> NNI and NNL controlled the all-important advanced pricing arrangement/agreement ("APA") application process [pursuant to which approval of the transfer pricing arrangements by the Revenue Authorities was secured].  The triumvirate of Mark Weisz of NNI, Mike Orlando of NNI and John Doolittle took the lead in the negotiations with the IRS, the [Canadian Revenue Authority] and [Her Majesty's Revenue and Customs ("HRMC")].  This team ran the negotiations until around 2006 when Peter Look joined the Nortel Group as Vice President of Global Tax.  He replaced John Doolittle alongside Mark Weisz and Mike Orlando.  Later John Payne, also of NNI, joined the lead team together with Peter Look.  NNI and NNL also took sole responsibility for instructing Nortel's professional advisers in relation to the APA application process.

> Once more, NN Ireland and its directors and officers, were excluded from the process.

(Proof of Claim ¶ 18(e)-(f).)

Transfer Pricing and the Irish Cash Repatriation Strategy.  The Proof of Claim names several of the specific NNI officials who were involved in the advance pricing arrangements with the Revenue Authorities entered into on behalf of NN Ireland and the EMEA Companies, the design and operation of the RPSM, and the creation and implementation of the

MRDA.  (*See* Proof of Claim ¶ 17 ("The key individuals involved [in the advance pricing arrangements, RPSM, and MRDA] included in particular John Doolittle of both NNI and the Canadian Entities and Mark Weisz, Mike Orlando, Laurie Krebs and John Payne of NNI as well as representatives from the Canadian Entities."); *see also id.* ¶ 18 ("NN Ireland had no substantive involvement in transfer pricing.  Its role was limited to providing information for the above individuals as and when required and implementing the decisions which had been taken by NNI and the Canadian Entities.").)  The Nortel Group Tax Department, which was heavily involved in transfer pricing arrangements, was also dominated by individuals from NNI.  (*See id.* ¶ 19 ("[A]t various times, the International Tax Director of Nortel was Mark Weisz; Mike Orlando was the Global Transfer Pricing Leader (and right hand man of Peter Look, Vice President of Global Tax); John Payne, was responsible for Global Transfer Pricing; Claire Barbieri [of NNI] was responsible for Global Tax Accounting; and even the EMEA Tax Leader on the ground in the EMEA Region, Ryan Smith, was seconded to NN Ireland from NNI.").)

The Proof of Claim further alleges that, in 2001, NNI (including through the above-named individuals) worked with NNL to implement the RPSM, and that the shared purpose of doing so was to divert profit away from NN Ireland and toward the Canadian Entities. (*See id.* ¶ 33 ("The decision to implement the RPSM was taken by the Canadian Entities and NNI.  It was primarily motivated by a desire to allocate more profit to the Canadian Entities in order to benefit NNL at the expense of NN Ireland and the EMEA Companies.  Both NNL and NNI knew or should have known that this was the case.").)

Meanwhile, NN Ireland and the EMEA Companies were excluded from any decision making with respect to the RPSM.  (*See id.* ¶ 34 ("NN Ireland and the other EMEA Companies which lost out as a result of RPSM were not involved in the decision to change from

the previous CSA to RPSM.").)  A 2006 revision to the Nortel Group's RPSM, again designed

and executed by NNI and NNL, changed how each RPE's contribution to the Nortel Group's

R&D activity was measured; the new methodology looked not to the RPE's contribution to R&D

capital stock but rather to its share of consolidated R&D costs.  (*See id.* ¶ 37.)  The redesigned

system, implemented without substantive input from NN Ireland, imposed a cost mark-up of

approximately 15% for entities like NN Ireland that provided regional central services and extra-

territorial services for other Nortel companies (which services entailed, among other things,

expenses for sales and marketing).  (*See id.* ¶ 38.)  It is notable that the implementation of RPSM

occurred at a time when the Nortel Group's business prospects had already begun to wane.  (*See

id.* ¶ 39 ("The Nortel Group registered losses or at best broke even during the entire period in

which the RPSM was in force.").)

    The Irish Loans and the Irish Dividends, were also created to further the shared

goal of NNI and the Canadian Entities to move cash from NN Ireland and the EMEA Companies

to the Canadian Entities.  (*See* Proof of Claim ¶ 20 ("NNI, through its personnel, was, together

with the Canadian Entities, fully involved and aware of the implementation of the initiative

described above, pursuant to which Nortel companies were instructed to identify opportunities to

transfer cash and value to NNL. It was in accordance with this initiative that the idea for the Irish

Loans and the Irish Dividends ('the Irish Cash Repatriation Strategy') came about."); *id.* ¶ 51

("The Irish Loans and Irish Dividends, the subject of this claim, were in practice made and

declared at the behest of NNL with the participation and assistance of NNI.  NNL and NNI's

strategy, operating at all material times from at least the year 2000, was to structure NN Ireland's

affairs with the intention of channelling cash and profit to NNL."); *id.* ¶ 23 ("The

implementation of the Irish Cash Repatriation Strategy was conducted under the ultimate

direction of Katharine Stevenson (Group Treasurer and a director of NNI).”); *id.* ¶ 24 (“Ryan

Smith (‘Leader of Global Tax Planning’ and an employee of NNI) took a lead role in identifying

and exploiting relevant opportunities, including the establishment of the Irish Loans and the Irish

Dividends.”); *id.* ¶ 24 (“Mark Weisz (‘Director of International Tax’ and an employee of NNI)

was responsible for approving and supervising the implementation of the various initiatives that

Mr Smith and his team identified.”).)

### 3. The Joint Administrators Have Alleged Facts Supporting The Underlying Breaches of Duty By NN Ireland’s Directors and NNL.

The US Debtor argues that the Joint Administrators’ claims for aiding and

abetting and dishonest assistance would be subject to dismissal because they have not alleged

facts that would support a primary claim against NN Ireland’s *de jure* directors or NNL.  The

facts alleged are more than sufficient to state a claim for primary liability against these parties.

As discussed in Section II above, NNL was as *de facto* and/or shadow director of NN Ireland

and, as a consequence, owed fiduciary duties to NN Ireland and its creditors.  The Proof of Claim

shows that NNL breached these duties by (i) causing NN Ireland to participate in the transfer

pricing arrangement and failing to ensure that NN Ireland received an arm’s length return under

the RPSM (*see* Proof of Claim ¶¶ 18-19, 40, 107.); (ii) designing and implementing the Irish

Cash Repatriation Strategy and causing NN Ireland to make the Irish Loans and to declare and

distribute the Irish Dividends, all for the benefit of the Canadian Entities and NNI, while

knowing that none of these transactions were in NN Ireland’s best interests (*see id*. ¶¶ 20-26, 52-

65); (iii) controlling the allocation of proceeds from the pre-petition sales and assigning NN

Ireland an allocation that was significantly less than it was entitled to under the arm’s length

principle, and profiting from this unequal distribution at NN Ireland’s expense (*see id*. ¶¶ 181-

85); and (iv) exerting improper control over NN Ireland’s tax matters and making decisions on

NN Ireland's behalf that were contrary to its interests (*see id*. ¶¶ 71-72; 192).  Similarly, NN Ireland's *de jure* directors breached their fiduciary duties by allowing NNI and NNL to control such transactions, thereby abandoning their responsibilities to NN Ireland and its creditors.  (See *id*. ¶¶ 29-30.)

### 4. The Joint Administrators' Claims Are Supported By Factual Allegations Showing That NN Ireland Met The Insolvency Requirement At The Relevant Time.

As discussed in Section II.B above, the Proof of Claim alleges facts showing that NN Ireland was at or near insolvency during the relevant period.

### B. The Joint Administrators State Claims For Conspiracy.

The Joint Administrators allege that NNI's collaboration with NNL and NN Ireland's directors in the transactions that stripped NN Ireland of value renders it liable for the tort of conspiracy under both Irish and US state law.[83]  The US Debtor argues that these claims are subject to dismissal on the ground that the Joint Administrators have not alleged the details of the conspiracy with particularity.  The US Debtor argues that the conspiracy claims must meet the particularity requirement under Rule 9(b), which would purportedly require the Joint Administrators to list all persons who participated in the conspiracy, state exactly when and where they met or communicated, what they said, and what they did.

### 1. Rule 9(b) Does Not Apply To The Joint Administrators' Conspiracy Claims.

As discussed in Section I.D above, the US Debtor is incorrect to argue that Rule 9(b) applies to any of the Joint Administrators' claims.  Nor do the cases the US Debtor cites suggest the application of Rule 9(b) to the Joint Administrators' conspiracy claims.  In *Fierro v. Gallucci*, 06-CV-5189, 2008 WL 2039545 (E.D.N.Y. May 12, 2008), the court applied Rule 9(b)

---

83.  (Proof of Claim, Claims 5, 7, 12, 14, and 19.)

where the object of the conspiracy was to commit fraud.  *See id.* at *16 ("A claim of conspiracy

may lie where an underlying tort of fraud has been adequately pleaded [under Rule 9(b).]").  In

none of the other cases cited did the courts apply Rule 9(b) to conspiracy claims.  *See Brug v.*

*Enstar Grp., Inc.,* 755 F. Supp. 1247 (D. Del. 1991) (court applied Rule 9(b) to fraud claims, but

not separate claim for conspiracy); *In re Am. Bus. Fin. Services, Inc.*, 361 B.R. 747, 762 (Bankr.

D. Del. 2007) (same); *Kalmanovitz v. G. Heileman Brewing Co., Inc.*, 595 F. Supp. 1385, 1401

(D. Del. 1984) (Rule 9(b) not applied to any claim), *aff'd*, 769 F.2d 152 (3d Cir. 1985).

      In any event, the allegations in the Proof of Claim do in fact provide detailed

information about the period of the conspiracy, the object of the conspiracy and the persons

involved.  *Cf. State Farm Mut. Auto. Ins. Co. v. Ficchi*, Civ. No. 10-555, 2011 WL 2313203

(E.D. Pa. June 13, 2011) (under Rule 8(a) a plaintiff's allegations of conspiracy "must be

sufficient to 'describe the general composition of the conspiracy, some or all of its broad

objectives, and the defendant's general role in that conspiracy") (quoting *Rose v. Bartle*, 871 F.2d

331, 366 (3d Cir.1989)).

      **2.**    **The Proof of Claim Alleges Facts Supporting The Elements of the Conspiracy Claims.**

      Under Irish law, conspiracy is recognized as an independent cause of action

sounding in tort, and there are two species of conspiracy: simple and unlawful means.

(Hennessy Decl. ¶¶ 104, 106.)  A simple means conspiracy occurs when two or more persons

combine with the predominant purpose of damaging the economic interests of another.  (*Id.*

¶ 107.)  On the other hand, an unlawful means conspiracy occurs when the parties to be held

liable acted pursuant to a "combination to use unlawful means to achieve a particular aim."

(Hennessy Decl. ¶ 114.)  Such unlawful means may include "a crime, tort, or infringement of a

constitutional right" which causes damage to the plaintiff.  (*Id.* ¶ 115.)  Since the Joint

Administrators have alleged that NNI conspired with the *de jure*, *de facto* and/or shadow directors of NN Ireland for the predominant purpose of injuring the economic interests of NN Ireland through tortious breaches of trust, both the simple and unlawful means species of conspiracy may apply. (Proof of Claim ¶¶ 107, 144; *see* Joint Obj. at 52.) The allegations in the Proof of Claim, if true, would state claims for conspiracy under Irish law. (Hennessy Decl. ¶ 118.)

The Joint Administrators do not accept the proposition of the Movants' Irish law expert that conspiracy is "a very difficult tort to prove"; where a party is able to establish the elements above, Irish courts do not shy from holding conspirators liable. (Hennessy Decl. ¶ 113; *see* Redmond Decl. ¶ 67.) Nor is it clear why such an opinion, even if true, would be relevant on a motion to dismiss under Rule 12(b)(6), insofar as it does not challenge the allegations in the Claim.[84] If anything, such an observation would highlight the difficulty overcome by the Joint Administrators in making factual allegations bearing on conspiracy without the benefit of discovery. The Movants' expert also expresses the opinion that there is a "fine line" between benign self-interest and a "predominant intent to injure." (Redmond Decl. ¶ 67.) Like the general statement on the supposed difficulty of proving a conspiracy claim, the Joint Administrators do not understand why the "fineness" of this line is relevant where it is clearly alleged that neither the motives nor the means of NNI were justified. (*See* Proof of Claim ¶¶ 107, 144.) Without accepting the Movants' expert's statement as true, the Joint Administrators point out that it is undisputed that there is a line, and the distinction lies in whether there was "just cause or excuse for the action taken." (*See* Hennessy Decl. ¶ 113(c).)

---

84. The US Debtor's expert has not taken a position on whether the allegations in the Proof of Claim, if proven, would support a cause of action for conspiracy under Irish law. (*See* Hennessy Decl. ¶ 105 ("[I]t is not clear to me whether the Redmond Declaration is accepting that, if the allegations in the Proof of Claim are assumed to be true, they are of a kind that could persuade an Irish court that NNI committed a tortious conspiracy.").)

The Movants will have the opportunity at trial to offer proof that NNI acted with "just cause or excuse."

Under US state law, the Court may make inferences from circumstantial evidence of the alleged confederates' acts or statements to conclude that they conspired in furtherance of an illegal purpose. *See Floyd v. Hefner,* 556 F. Supp. 2d 617, 656 (S.D. Tex. 2008) ("[t]he general rule is that conspiracy liability is sufficiently established by proof showing concert of action or other facts and circumstances from which the natural inference arises that the unlawful overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators.") (quoting *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581-82 (Tex. 1963)); *Empire Fin. Servs., Inc. v. Bank of N.Y. (Del.)*, 900 A.2d 92, 97 (Del. 2006) (holding that it is not necessary for plaintiff to directly prove an express agreement among alleged conspirators) (citations omitted).

The Proof of Claim contains ample factual allegations supporting the inference that the overt acts of (i) NNI and NNL, alternatively (ii) NNI and the *de jure* directors of NN Ireland, alternatively (iii) NNI and NNL and the *de jure* directors of NN Ireland, amounted to a combination or agreement to achieve an unlawful purpose or to injure NN Ireland by unlawful means. The Proof of Claim describes how NNI and NNL leveraged their positions in the corporate group to extract value from NN Ireland through unfair transfer pricing arrangements and the Irish Cash Repatriation Strategy. (*See* Proof of Claim ¶¶ 9-26.) The Proof of Claim also alleges overt actions taken by NNI and NNL in furtherance of the conspiracy. (*See id*. ¶¶ 13-26 (describing roles of named agents of NNI who participated in specific transactions designed to divert assets from NN Ireland to NNI and NNL).) The "unlawful means" by which the conspirators injured NN Ireland is stated in the Proof of Claim, which alleges that the

confederates, including NNI and the aforementioned key players, breached contractual

obligations with NN Ireland or caused the directors of NN Ireland (whether *de jure* or, in the

case of NNI and NNL, *de facto* or shadow) to breach their duties.  (*See id.* ¶¶ 29-30, 107, 144,

and 153 (directors of NN Ireland breached U.S. state law fiduciary duties and Irish law duty of

care through the various value-extracting components of the scheme to divert value from NN

Ireland to the Canadian Entities); *see also id.* ¶¶ 33, 45-50, 90, 107, 118 (NNL's denial of arm's

length return for NN Ireland constituted a breach of the MRDA and its fiduciary and standalone

duties).)

        The US Debtor points to *Twombly* and other cases in which courts have found that

parallel actions taken by otherwise independent parties do not, by themselves, give rise to an

inference that the parties have conspired to act in concert.  This principle is completely

inapposite to the circumstances alleged here, where the conspiracy was formed among parties

and persons who were members of a corporate family and were necessarily in constant

communication with respect to the precise transactions that are alleged to have been the object of

the conspiracy.  Under such circumstances there is nothing implausible in assuming that an

agreement was formed.

## IV.    THE JOINT ADMINISTRATORS STATE CLAIMS TO RECOVER NN IRELAND PROPERTY RECEIVED OR RETAINED BY NNI.

        The US Debtor alleges that the Joint Administrators' claims for unconscionable

receipt and unjust enrichment are subject to dismissal because they do not allege that NNI

actually received any funds traceable to NN Ireland.  The US Debtor also asserts that the alleged

facts do not support a finding that it would be unconscionable for NNI to retain any funds it

received or that there is a sufficient causal relationship between NNI and any transfer of funds

from NN Ireland.

Under Irish law, a recipient of property that was misappropriated by a fiduciary in breach of trust will be held liable as a constructive trustee of such property if he possesses the necessary level of knowledge of the breach of trust, or, in the present case, breach of fiduciary duty.  (Hennessy Decl. ¶ 98.)  Although there are relatively few Irish precedents on point, those decisions and a leading Irish treatise are in agreement that either actual or constructive knowledge of the breach will suffice.  (*Id.* ¶¶ 99-101.)  The type of awareness contemplated by Irish case law need not involve dishonesty on the part of the person to be held liable; even honest knowledge of the relevant breach of trust supports a cause of action for unconscionable receipt.  (*Id.* ¶ 100 ("dishonesty is not a necessary ingredient of liability for knowing receipt.").)

A defendant may also be liable for an unjust enrichment under US law if he unconsciously retains such property, regardless of the manner in which it was obtained.

As set forth below, NNI has made well-pleaded factual allegations supporting the inference that NNI knew or should have known that it received value from NN Ireland as a result of the Irish Cash Repatriation Strategy and the inequitable allocation of the Pre-Petition Sale Proceeds.

A.      **The Proof of Claim Alleges That NNI Received NN Ireland Funds.**

1.      **The Irish Cash Repatriation Strategy**

The Proof of Claim states that the Irish Loans and Irish Dividends were designed as a method to deplete the assets of NN Ireland for the benefit of NNL and NNI.  (*See* Proof of Claim ¶¶ 51-65.)  NNI was aware of, participated in, assisted with, and benefitted from the implementation of this scheme.  (*See, e.g. id.* ¶ 20-25 ("The Irish Loans and the Irish Dividends were established and declared for the benefit of the NNI and the Canadian Entities to the detriment of NN Ireland . . . . Numerous NNI individuals were aware of and/or participated in the initial discussions relating to these arrangements and the later decisions made as to the use

and repayment of the Irish Loans, including the related treatment of the Irish Dividends.").)  The various manipulations of the Irish Loans and Irish Dividends effected by NNI and NNL were detrimental to NN Ireland and its creditors.  (*See id.* ¶¶ 60-5.)

In June 2006, the first Irish Loan was made by NN Ireland to NNL in the amount of €80,000,000.00; it served no proper commercial purpose and was repaid without interest the very next month.  (*See id.* ¶ 53.)  In December of the following year, Nortel Networks International Finance and Holding BV sold its shares in NN Ireland to NNL so that the latter could take out interest free loans from NN Ireland without incurring Irish withholding taxes.  (*See id.* ¶ 54.)  After that restructuring, in April of 2008, the *de jure* directors of NN Ireland declared and distributed the April 2008 Dividend to NNL in the total amount of €21,608,750.00.  (*See id.* ¶ 55.)  On the very same day, April 22, 2008, the NN Ireland's directors voted to "ratify" a €100,000,000 interest-free credit facility extending funds to NNL, even though the entire amount had already been drawn down by NNL; like the first Irish Loan, the April 2008 Loan served no proper commercial purpose.  (*See id.* ¶ 56.)  This outstanding balance under that facility was deemed "paid down" to the extent of the April 2008 Irish Dividend, leaving a non-interest-bearing balance of €78,391,250.00.  (*See id.*)

On June 10, 2008, the *de jure* directors of NN Ireland declared the June 2008 Dividend in the total amount of €20,008,750, but a subsequent adjustment to NN Ireland's financial statements revealed that this amount was excessive in relation to distributable profits.  (*See id.* ¶ 57.)  In order to prevent the return of any cash to NN Ireland, NNI and NNL decided to simply treat this as an additional borrowing under the April 2008 Loan, increasing the outstanding non-interest-bearing balance to €98,400,000.  (*See id.* ¶ 58.)  From that point forward, NNI and NNL imposed transfer pricing adjustments on NN Ireland in favor of NNL

that "paid down" the April 2008 Loan; using this method, the entire amount outstanding was paid down by the end of that year (again, without interest).  (*See id. ¶* 59.)

During the period in which the above transactions occurred, NNL borrowed from NNI under the NNI Loans, which, unlike the Irish Loans, were interest-bearing.  (*See* Proof of Claim ¶ 60.)  NNI received payments of interest and principal from NNL, but NN Ireland earned no interest on its loans.  (*See id.*)  Whereas NNI received cash payments of principal plus interest from NNL, the Irish loans were simply offset, as to principal only, by the declaration of dividends in favor of NNL.  (*See id*.)  The effect of the disparity in treatment between the NNI Loans and the Irish Loans was to transfer value from NN Ireland to NNI through NNL.  (*See id.* ¶ 139 ("NNL was only able to make certain cash repayments of the NNI Loans due to the fact that it did not have to repay [to NN Ireland] the April 2008 Loan and/or the June 2008 dividends in cash.  As such, NNI received value which truly belonged to NN Ireland.").)

### 2.    Allocation of the Pre-Petition Sale Proceeds

The Proof of Claim alleges that the division of proceeds of the various sales of business lines was required to be distributed in accordance with the arm's length principle under an agreement dated July 24, 2007 (*See* Proof of Claim ¶ 67.)  However, because the actual distribution of the Pre-Petition Sale Proceeds comported with the erroneous transfer pricing system then in effect, NNI received a disproportionately large share, while NN Ireland received significantly less.  (*See id.* ¶ 68-69.)  Moreover, even if the US Debtor were to argue that allocation should have been based *solely* on the revenue lines generated (which the Joint Administrators do not concede), the portion of the Pre-Petition Sale Proceeds received by NN Ireland was grossly deficient.  (*See id.* ¶ 70.)

The US Debtor takes issue with the Joint Administrators' present inability to trace the Pre-Petition Sale Proceeds to NNI from the sale of assets rightfully belonging to NN Ireland,

the Joint Administrators respectfully submit that more information is needed before they can attempt that analysis.  However, information and documents that would permit an actual tracing of NN Ireland's funds to NNI is in the exclusive control of NNL and NNI.  The allegations set forth above give rise to the plausible inference that identifiable funds removed from NN Ireland were subsequently transferred to NNI.  The Joint Administrators cannot reasonably be required to further particularize their claims in advance of discovery.  It should be noted that among the forms of relief requested by the Joint Administrators is an accounting or restitution of identifiable or traceable sums (or substitutes thereof) which are in the hands of NNI.  (Proof of Claim ¶ 204.)

**B.      The Proof of Claim Alleges Facts Supporting a Finding That It Would Be Unfair, Inequitable and Unconscionable to Allow NNI To Retain The NN Ireland Funds It Received.**

It is difficult to take seriously the US Debtor's assertion that the facts set forth in the Proof of Claim would not warrant a finding that NNI should return any NN Ireland value that was transferred to it.  The Proof of Claim alleges that NNI was an active participant in schemes by which NN Ireland was stripped of value at a time when, as NNI knew or should have known, NN Ireland's solvency was in doubt.  It would plainly be unjust, inequitable and unconscionable to allow NNI to retain funds received under such circumstances.

The facts regarding NNI's active participation in the transactions by which NN Ireland was stripped of funds also satisfy the requirement of a "causal relationship" sufficient to support the return of the property.  As described above, participants in the Irish Cash Repatriation Strategy, led by Katharine Stevenson (a director of NNI), devised and implemented several plans to divert value from NN Ireland and other EMEA Companies to NNL, including the Irish Cash Repatriation Strategy.  (Proof of Claim ¶¶ 22-24.)  NNI personnel actively participated in this scheme, which enabled NNL to make debt payments to NNI that it would

have otherwise lacked the liquidity to pay.  If proven, the allegation that a director and the personnel of NNI were so involved in the drive to divert value from NN Ireland to NNL raises the plausible inference that the agents of NNI viewed the Irish Cash Repatriation Strategy as a way to secure repayment of the NNI Loans from NNL.  Thus, the Proof of Claim alleges a plausible causal relationship between NN Ireland's impoverishment and NNI's enrichment. Notably, the Joint Objection – preoccupied with the form of the transactions (that the funds were funneled through NNL) – does not address the Proof of Claim's allegations of NNI's extensive involvement.  (*See* Joint Obj. at 59-61.)

## V.    THE JOINT ADMINISTRATORS STATE CLAIMS TO RECOVER FOR IMPROPER ALLOCATION OF PRE-PETITION NORTEL ASSET SALES.

The US Debtor argues that since the Joint Administrators have not provided all of the details of all of the pre-petition asset sales that were entered into by the Nortel companies, they should not be allowed to pursue a claim for a fair allocation of the Pre-Petition Sales Proceeds.  (Joint Obj. at 61-65.)  But by the standard of Rule 8(a), and certainly under Bankruptcy Rule 3001, the Proof of Claim gives adequate notice of the basis for the Joint Administrators' claims.  Certainly the US Debtor is not in danger of the sort of prejudicial surprise that confronted the defendants in *Chapa v. Chase Home Fin. LLC*, No. C-10-359 (JGJ), 2010 WL 5186785, at *5 (S.D. Tex. Dec. 15, 2010) and *Smith v. Nat'l City Mortg.*, No. A-09-CV-881 (LY), 2010 WL 3338537, at *11 (W.D. Tex. Aug. 23, 2010).  The proper procedure for the US Debtor to obtain additional information about the Joint Administrators' claims will be through the discovery process.  Indeed, it is highly probable that much of the relevant information about the asset sales is within the exclusive possession of the North American entities, beyond the reach of the Joint Administrators.

Furthermore, it is unfair to expect the Joint Administrators to provide, at this stage, the details of sales transactions in which Nortel companies other than NN Ireland exercised substantially all decision making power and the records of which remain beyond the reach of the Joint Administrators.  The Proof of Claim alleges that arm's length sales transactions among affiliated companies are the internationally prescribed rule.  (Proof of Claim ¶¶ 45-47.) The failure to abide by this rule in allocating the Pre-Petition Sales Proceeds underlies claims 16, 17, 20, and 22.

The Joint Objection disputes the sufficiency of the Proof of Claim's allegations as to these claims.  (Joint Obj. at 62-67.)  As explained below, the US Debtor's arguments fail.

**A.    The Proof of Claim States a Claim for Mistake Under Irish Law.**

The Joint Objection asserts that allegations of mistake under Irish law are subject to the heightened pleading requirements of Rule 9(b).  (Joint Obj. at 64-65.)  However, the lone case cited by the US Debtor in support of this assertion was decided under US state law, not Irish law.  (*See id.* 64 (citing *In re Tronox Inc.*, No. 09-10156 (ALG), 2010 WL 2010844, at *3-4 (Bankr. S.D.N.Y. May 14, 2010) (dismissing causes of action for unilateral and mutual mistake under Mississippi law).)  Thus, the US Debtor has not carried its burden of demonstrating that Rule 9(b) applies to causes of action for mistake under Irish law.  Nor has the US Debtor provided any reason why it is necessary for the Joint Administrators to plead, at the proof of claim stage, whether the relevant mistake was unilateral, mutual, or common.  (*See* Joint Obj. at 64.)

Irish courts view the distinction among the varieties of mistake as neither consistent nor consequential.  (*See* Hennessy Decl. ¶ 120 (citing a leading modern treatise on mistake, which quotes a classic Irish decision for the proposition that "the whole question whether a mistake was mutual or unilateral [is] largely one of phraseology"); *id.* ¶ 122 ("Insofar

as the criticism is levelled against NN Ireland that it has not precisely identified which category of mistake is being alleged, in my view this does not detract from the merits of the claim under the law of mistake.").)  Where, as here, a party seeking relief for mistake is not in a position to firmly state which of the three species is being pursued, discovery is often necessary before such a distinction may be made.  (*Id*. ¶¶ 121-122.)  Indeed, "NNI may have been labouring under a mistake that the allocation accorded with the arm's length principle (common mistake) or the parties may have been at cross-purposes (mutual mistake) or, indeed, NN Ireland may have mistaken as to how the allocation would occur and NNI may have known of NN Ireland's mistake."  (*Id* ¶ 122.)

The Joint Objection concludes, without support, that the Proof of Claim should have specified that either a mistake of fact or a mistake of law occurred.  (Joint Obj. at 64.) [85] However, this argument conjures a false choice between the two; indeed, the allegations in the Proof of Claim support inferences that a mistake of *both* law and fact underlies Claim 20.  (*See* Hennessy Decl. ¶ 124 ("The claim is that the failure [to comply with the arm's length principle] arose from a mistake as to the law and/or international accounting regulations and/or a factual mistake as to the proper allocation of the Pre-Petition Sale Proceeds.").)  The US Debtor also asserts that an action for mistake may not be maintained because claim 20 resembles an action for breach of contract; however, the fact that alternative legal theories are supported by the same factual allegations is no more a bar to raising a cause of action in Ireland than it is in this

---

85. Specifically with respect to mistake of law, the US Debtor's expert once again exceeds his role of explaining Irish substantive  law to the Court by opining on the sufficiency of the Joint Administrators' allegations of mistake under U.S. pleading standards.  (*See* Redmond Decl. ¶ 75 ("mistake of law is also pleaded without any particularity as to the alleged mistake.  Where the parties are in pari delicto Irish law grants no relief. No plea is raised which would allow this issue to be comprehensively addressed.").)  In any event, the allegations in the Proof of Claim would, if proven, support an action for mistake of law.  (*See, e.g.*, Hennessy Decl. ¶ 127 ("there is a live, factual issue to be determined as to whether or not the parties were *in pari delicto*.").)

country.  (*See id.* ¶ 123 ("the claim for mistake is made in the alternative to the contractual

claim. . . . [h]owever, as the factual matrix supports a plea of mistake, it is properly claimed"))

Finally, the US Debtor's Irish law expert concludes, without support, that no

claim for mistake can be stated because NN Ireland was not the seller in the underlying sales

transactions and because the right and obligations of third parties are involved but not addressed

in the Proof of Claim.  (Redmond Decl. ¶ 74.)  However, this argument not only overlooks the

fact that the *allocation of the proceeds*[86] (rather than the conduct of any underlying sale) is at

issue; it also invents criteria for mistake that are not present in Irish law.  (*See* Hennessy Decl.

¶ 128 ("the issue of the rights and obligations of other third parties does not have a bearing on an

analysis of whether NN Ireland is entitled to relief under the law of mistake.").)

Here, the relevant mistake is identified in the Proof of Claim as "the erroneous

assumptions that were contained in the transfer pricing structure that prevailed within the Nortel

group at the time."  (Proof of Claim ¶ 68.)  Under Irish law, such an allegation, if proven, would

be sufficient to state a claim for mistake.  (*See* Hennessy Decl. ¶ 126.)  The Joint Administrators

respectfully submit that the Proof of Claim's factual allegations regarding the Pre-Petition Asset

Sales reflect the extent of knowledge they can reasonably be expected to possess.

**B.      The Proof of Claim States a Claim For Transaction At Undervalue and Fraudulent Disposition Under English and Irish Law.**

The US Debtor argues that the Proof of Claim fails to adequately plead the

required elements of a transaction at undervalue under English law.  (Joint Obj. at 65-66.)

Relying on the same theory with respect to the pre-petition asset sales that abounds elsewhere in

the Joint Objection, the US Debtor argues that the execution of an agreement for any of the

---

86.  (*See* Proof of Claim ¶ 174 ("NN Ireland did not receive a fair allocation of the Pre-Petition Sale Proceeds . . . .").)

underlying sales of assets began the running of the two-year "reach back" period under section 238 of the *UK Insolvency Act 1986*.  (*See* Marshall Decl. ¶¶ 62-63 (discussing "reach back" period in the context of the amended proof of claim filed by NNUK) (citing Todd Decl. ¶¶ 126-127).)[87]  However, as discussed herein and in the Proof of Claim, the relevant transaction by which NN Ireland was injured was not any one sale of assets, but the "subsequent division of the proceeds derived from [such sales.]"  (Marshall Decl. ¶ 63.)  The earliest date on which the injury occurred was not when the underlying sale closed, but on July 24, 2007, the date of a statement providing for the division of certain Pre-Petition Sales Proceeds among the Nortel entities whose assets were sold.  (*Id.*)  And in reality, the actual allocation of proceeds did not occur until after that date.[88]  Accordingly, the US Debtor cannot establish that the claim for transaction at undervalue, as pleaded, concerns transactions that occurred outside the substantive two-year "reach-back" period prior to administration, as required under the *UK Insolvency Act 1986*.  (*Id.*)

As mentioned above, the relevant transaction by which NN Ireland was injured was not any sale of assets, but the subsequent division of the proceeds derived from each of those sales.  (*See* Proof of Claim ¶ 68 ("allocation [of the Pre-Petition Sales Proceeds] was attempted on the erroneous assumptions that were contained in the transfer pricing structure that prevailed within the Nortel Group at the time [and] it appears that in fact the allocation was not even applied in conformity with these erroneous assumptions.").)  The US Debtor states that a "well-pleaded transaction at undervalue claim would require a showing that NN Ireland received

---

87.  (Declaration of Michael Todd Q.C. in Support of Joint Objection and Motion to Dismiss Claims of Nortel Networks UK Limited, dated July 15, 2011 [D.I. 5971] ("Todd Decl.").)

88.  The Joint Objection implicitly acknowledges that actual allocation, upon which the claims arising out of the division of certain Pre-Petition Sale Proceeds are premised, actually occurred *after* July 24, 2007.  (*See* Joint Obj. at 73 ("this pleading does not allege that any actual allocation occurred in July 2007").)

consideration that was significantly less than the value of what it sold."[89]  That is precisely the

allegation made in the Proof of Claim:  "NN Ireland received significantly less and NNI received

significantly more than it was entitled to on an arm's length basis."[90]  The US Debtor's argument

that the pleading is deficient for failing to plead "when the assets were transferred or when

consideration for those assets was received" simply ignores the allegations.[91]  The Proof of

Claim identifies the transaction in question and states that the reason NN Ireland received

significantly less than it was entitled to was because the sales proceeds were allocated on the

assumptions contained in the transfer pricing structure that prevailed within the Nortel group at

the time.[92]  There can be no doubt about the case that the US Debtor must defend against, or that

the Joint Administrators have placed NNI on notice of the nature of the claim against it.

        The Joint Administrators have also stated, in the alternative, a claim for fraudulent

disposition under Irish law.  The US Debtor mistakes the contingent nature of this claim for an

inability of the Joint Administrators to plead sufficient facts.  (*See* Joint Obj. at 66. ("The

Claim's conditional 'if' makes clear that NN Ireland could not plead the predicate facts.").)  The

US Debtor's Irish law expert points out that Section 139 of the Irish Companies Act requires as a

precondition to relief that an Irish liquidator be appointed.  (Joint Obj. at 66 (citing Redmond

Decl. ¶¶ 80-81).)  The Joint Administrators do not disagree with that assessment.  (*See* Hennessy

Decl. ¶ 131 ("the Proof of Claim make abundantly clear that this claim is contingent upon the

appointment of a liquidator in Ireland").)  However, the fact that an Irish liquidator has not yet

been appointed does not somehow deprive the Joint Administrators of the right to assert a

---

89.  (Joint Obj. at 66.)

90.  (Proof of Claim ¶ 69.)

91.  (Joint Obj. at 66.)

92.  (Proof of Claim ¶ 68.)

contingent claim under the Bankruptcy Code.  Assuming the allegations in the Proof of Claim

are true, in the event that an Irish liquidator is appointed, NN Ireland, acting through the Irish

Liquidator, would have a valid cause of action for fraudulent disposition under Irish law.[93]

#### C.   The Proof of Claim States Claims for Breach of Implied Contract And Implied Term Under Irish Law.

The US Debtor argues that the Proof of Claim does not state a claim for breach of

implied contract and implied term under Irish law because the Proof of Claim does not

adequately "allege the parameters of the contract or contractual term."  (Joint Obj. at 67.)

However, it is unclear upon what basis, whether in US pleading standards or Irish substantive

law, the US Debtor announces such a standard.  In fact, the US Debtor neglects to cite the law of

any jurisdiction in announcing the requirement that "the parameters of the contract or contractual

term" must be shown.  (*Id.*)  The US Debtor's Irish law expert cobbles together a list of eight

"requirements" for contract formation gathered from seven different Irish cases.  (*See* Redmond

Decl.¶ 102.)  However, under Irish law, there are no such mandatory elements; apart from the

*Statute of Frauds (Ireland) 1695*, there are no "basic requirements" for finding a contract.  (*See*

Hennessy Decl. ¶ 150-53.)  It is more probable that this list involves the elements that were

found to be necessary in specific contract disputes in a variety of contexts.  For instance, it is

difficult to believe that evidence as to choice of law (Redmond Decl. ¶ 102(ii)) and jurisdiction

(*id.* ¶ 102(iv)) would be required in each and every contract.  Moreover, there is no support in the

Joint Objection for the proposition that these eight supposed requirements translate into a US

pleading standard of "parameters," as offered by the US Debtor.  (*See* Hennessy Decl. ¶ 155 ("In

my view, the matters listed at paragraph 102 of the Redmond Declaration refer to the evidence

---

93. (*See* Hennessy Decl. ¶ 132 ("this claim of NN Ireland is in accordance with the statutory relief provide[d] for under the 1990 Act and the Redmond Declaration does not appear to dispute this claim (subject to the appointment of a liquidator which has not occurred)").)

which a party claiming such a contract may be required to adduce at the trial of the action.")

(emphasis added).)

    In any event, the Proof of Claim indeed sets out the parameters for the implied

contract as follows: "there was an implied contract as between the selling Nortel entities that the

Pre-Petition Sale Proceeds would be distributed as amongst them in accordance with the arm's

length principle."  (Proof of Claim ¶ 161.)  The implied term refers to the understanding,

expressly embraced in the MRDA and implied in other Nortel group arrangements, that NN

Ireland would receive such a fair and appropriate allocation in accordance with the international

principle of arm's length transactions.  (*See id.* ¶¶ 45-47, 163.)  Under Irish contract law, these

allegations, if proven, would support a cause of action.  (*See* Hennessy Decl. ¶ 155.)  Thus, even

without guidance as to the origin or meaning of the US Debtor's preferred pleading standard, the

Joint Administrators submit that they have nonetheless satisfied that standard with respect to

claims 16 and 17.

**VI. THE JOINT ADMINISTRATORS' CLAIMS BASED ON FSD LIABILITY SHOULD NOT BE DISALLOWED.**

    Under Section 43 of the *UK Pensions Act 2004*, the UK Regulator has the power

to issue an <u>FSD</u> to a person based on several factors.[94]  (*See* Proof of Claim ¶ 76.)  In order to

issue an FSD, the UK Regulator must be satisfied that imposing an FSD on the person in

---

94. Matters to be considered in determining whether an FSD is reasonable include:

 a.  the relationship which the person has or has had with the sponsoring employer of the pension scheme in question (<u>including, where the person is a company, whether the person has or has had control of the employer</u>);

 b.  the value of any benefits received directly or indirectly by the person from the employer;

 c.  any connection or involvement which the person has or has had with the scheme; and

 d.  the financial circumstances of the person.

 (Proof of Claim ¶ 77 (emphasis added).)

question is reasonable.  (*Id.*)  The purpose of an FSD is to require financial support for a pension

plan from the person to which the FSD is issued.  (*Id.* ¶ 78.)  If an FSD is issued, but not

complied with, the UK Regulator has statutory authority to issue a CN, which sets forth the

liability of the person in question for the sums owed to the pension plan.  (*Id.* ¶ 79.)  On June 25,

2010, the UK Regulator determined that an FSD should be issued to the EMEA Targets,

including NN Ireland, on account of the underfunding of the NNUK pension plan.  (*Id.* ¶ 73.)[95]

As of the date on which the Proof of Claim was filed, no FSD had yet been issued to NN Ireland.

(*Id.* ¶¶ 193-198.)

       It is unknown at this time whether any of the EMEA Targets will be required to

provide financial support to the NNUK pension plan, what the nature or amount of such support

will be, how the total obligation to the NNUK pension plan will be divided between the entities

who receive FSDs, or the rationale that may be articulated for such division.  (*Id.* ¶ 193.)

NN Ireland's liability to the NNUK pension plan (which is denied) is therefore contingent upon

both the issuance of an FSD or CN and the amount that NN Ireland is required to pay, which are

unknown at this time.  Should an FSD of CN be issued against NN Ireland, the Joint

Administrators will contend that NNI and NNL should be liable for some or all of the required

contribution, based on the role they played in causing NNUK's pension plan to be underfunded.

Because the Joint Administrators do not know, and cannot know, what the amount or basis

NN Ireland's potential liability will be, they bring four claims against NNI that reserve the right

to recover on behalf of NN Ireland any payments or other financial support that NN Ireland may

be required to pay to the NNUK pension plan pursuant to an FSD or CN (the "<u>FSD Claims</u>").

(*See id.* ¶¶ 193-198.)

---

95.  The EMEA Targets have referred the decision of the UK Regulator to the Upper Tribunal (Tax and Chancery
    Chamber), which is pending.  (*Id.* ¶ 74.)

The Joint Administrators were compelled to file claims by the June 3, 2011 bar date, whether or not those claims are "reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured" 11 U.S.C. § 101(5)(A), or risk having those claims extinguished.  Accordingly, the Joint Administrators have asserted the FSD Claims in order to preserve their rights, as provided under the Bankruptcy Code.

The US Debtor's arguments show why it would be incompatible with the Bankruptcy Code to apply Rule 12(b)(6) here.  The Bankruptcy Code expressly preserves the right of a creditor to assert pre-petition claims that remain contingent, unliquidated and unmatured on the filing date.  The subsequent setting of a bar date requires the creditor to give notice of such claims.  Once the claim is stated in a proof of claim, the creditor can then amend the claim to provide details after the claim matures.  There is no need to determine or disallow an unmatured claim until plan confirmation or the making of a distribution to creditors.[96]  To expunge its contingent or unmatured claims prematurely will therefore deprive NN Ireland of a right reserved in the Bankruptcy Code.[97]

---

96. The Bankruptcy Code provides that "[a] claim for reimbursement or contribution of [an entity that is liable with the debtor] that becomes fixed after the commencement of the case shall be determined, and shall be allowed under subsection . . . (b) . . . of this section . . . the same as if such claim had become fixed before the date of the filing of the petition."  11 U.S.C. § 502(e)(2).

97. Any dismissal (or disallowance) of the FSD Claims should be without prejudice to the Joint Administrators' right to reassert or seek reconsideration of the FSD Claims in the event they mature.  *See In re Wedtech Corp.*, 87 B.R. 279, 282 (Bankr. S.D.N.Y. 1988) ("[D]isallowance because of the contingency of a codebtor's claim is effectively without prejudice.  For the Code itself provides in section 502(e)(2) that a contingent claim for reimbursement which is fixed after the commencement of the case is to be allowed or disallowed in the same manner as if fixed prior to bankruptcy and provides further in section 502(j) that a claim that has been disallowed may be reconsidered for cause."); *Aetna Cas. and Sur. Co. v. Ga. Tubing Co.*, 1995 U.S. Dist. LEXIS 10120, at *14 (S.D.N.Y. July 20, 1995) (recognizing that reconsideration under § 502(j) of a claim disallowed pursuant to § 502(e)(1)(B) is the appropriate remedy if the contingency is removed at a later date); *In re Pinnacle Brands, Inc.*, 259 B.R. 46, 56 (Bankr. D. Del. 2001) (recognizing a creditor's right to seek reconsideration pursuant to § 502(j) of a claim disallowed pursuant to § 502(e)(1)(B) once the liability is no longer contingent).

## VII.   THE DOCTRINE *IN PARI DELICTO* DOES NOT BAR
##        THE JOINT ADMINISTRATORS' CLAIMS.

### A.    The Joint Administrators' Claims For Aiding And Abetting And Conspiracy
###       Are Not Barred By The Doctrine Of *In Pari Delicto.*

The doctrine of *in pari delicto* does not apply here because the Proof of Claim allege sufficient facts to support a finding that: (1) NNI was an insider of NN Ireland; (2) the "adverse interest" and "controlling shareholder" rules bar application of the doctrine; and (3) dismissal of the claims based on this defense would be premature at this stage.

### 1.    The *In Pari Delicto* Doctrine Does Not
###       Apply Because NNI Was an Insider of NN Ireland.

Under both Texas and Delaware law,[98] the *in pari delicto* doctrine provides that a plaintiff "cannot recover where, as a result of his own actions, the plaintiff bears at least substantially equal responsibility for the underlying wrongdoing of which he is complaining." *Floyd v. CIBC Markets, Inc.*, 426 B.R. 622, 642 (Bankr. S.D. Tex. 2009); *see Am. Int'l Group, Inc. v. Greenberg*, 976 A.2d 872 (Del. Ch. 2009).  However, it is universally accepted that the *in pari delicto* defense does not apply where, as here, the defendant is an "insider" of the corporation.  *See, e.g.*, *Floyd v. Hefner*, 556 F. Supp. 2d 617 (S.D. Tex. 2008).[99]  Under the Bankruptcy Code, for example, a corporation's "insiders" include, in relevant part:  "(i) [a] director of the debtor; (ii) [an] officer of the debtor; (iii) [a] person in control of the debtor . . . [or]; (vi) [a] relative of a general partner, director, officer, or person in control of the debtor."  11

---

98.  Although no determination of applicable law has been made, the Joint Administrators take the position that to the extent US law governs the *in pari delicto* defense, Texas law would be applicable.  Nonetheless, the arguments asserted herein apply with equal force under both Texas and Delaware law.

99.  *See also Hill v. Day (In re Today's Destiny, Inc.*, 388 B.R. 737, 749 (Bankr. S.D. Tex. 2008) ("No case, logic or equitable proposition supports the conclusion that insiders of a bankrupt corporation can insulate themselves from liability by virtue of the illegal character of their conduct."); *Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*, 335 B.R. 539, 547 (Bankr. D. Del. 2005) ("*In pari delicto* will not operate to bar claims against insiders of the debtor corporation."); *Tese-Milner v. Beeler (In re Hampton Hotel Investors, L.P.)*, 289 B.R. 563, 577 n.23 (Bankr. S.D.N.Y. 2003) ("*In pari delicto* bars claims against third parties, but does not apply to corporate insiders or partners.") (internal citations omitted).

U.S.C. § 101(31)(B).  An insider is also an "affiliate, or insider of an affiliate as if such affiliate

were the debtor." 11 U.S.C. § 101(31)(E).  "Affiliate" is also a defined term under the

Bankruptcy Code, and includes a "corporation, 20 percent or more of whose outstanding voting

securities are directly or indirectly owned, controlled, or held . . . by the debtor, or by an entity

that [also] directly or indirectly owns, controls or holds 20 percent or more of the outstanding

voting securities of the debtor.  11 U.S.C. § 101(2)(B).  Congress has made it clear that this

"statutory list is not exhaustive, and it is for the courts to define the limits of non-statutory

insider status."  *Hirsch v. Tarricone (In re A. Tarricone, Inc.)*, 286 B.R. 256, 262 (Bankr.

S.D.N.Y. 2002).  The legislative history of the definition of "insider" instructs that "[a]n insider

is one who has a <u>sufficiently close relationship with the debtor that his conduct is made subject

to closer scrutiny</u> than those dealing at arm's length with the debtor."  S. Rep. No. 95-989, at 23

(1978), *reprinted in* 1978 U.S.C.C.A.N., pp. 5787, 5810 (emphasis added); *see also In re

Missionary Baptist Found. of Am., Inc.*, 712 F.2d 206, 210 (5th Cir. 1983).[100]

        NNI is undeniably an affiliate of NN Ireland and therefore an insider.  In

accordance with 11 U.S.C. § 101(2), NNI and NN Ireland are affiliates by way of common

ownership.  As wholly owned subsidiaries of NNL, NNL directly owns, controls, or holds 100%

of the outstanding voting securities of both entities, thereby making NNI and NN Ireland

statutory affiliates.[101]  In fact, the US Debtor concedes in the Joint Objection that NNI and

NN Ireland are sister corporations, each wholly-owned subsidiaries of NNL.  (Joint Obj. at 83.)

---

100. Ultimately, "[t]he analysis is <u>a fact intensive one</u> and must be done on a case-by-case basis."  *In re
    A. Tarricone, Inc.,* 286 B.R. at 262 (emphasis added); *In re Student Fin. Corp.*, 335 B.R. at 547 ("[T]he inquiry
    into insider status 'is fact-intensive and can be made only on a case-by-case basis.' ") (internal citation omitted).

101. Moreover, even if NNI and NN Ireland were not statutory affiliates, NNI clearly had a "sufficiently close
    relationship" with NN Ireland to raise an obvious fact question whether they were insiders who conduct
    warrants "closer scrutiny."  Indeed, the Proof of Claim points to numerous occasions on which directors,
    officers, and employees of NNI controlled or directed NN Ireland in connection with transfer pricing
    arrangements, the Interest Free Loan Facilities and Project Swift.  Because the actions and knowledge of a

2.      The "Adverse Interest" and "Controlling Shareholder"
        Exceptions to the *In Pari Delicto* Doctrine Bar its Application Here.

The "adverse interest" rule protects corporations from application of *in pari delicto* where an agent acted "entirely for his own or another's purpose."  *Hill v. Day* (*In re Today's Destiny, Inc.*), 388 B.R. 737, 749 n.13 (Bankr. S.D. Tex. 2008) (citations omitted).  Here, the Proof of Claim alleges that the relevant actions of NN Ireland's *de jure* directors acted contrary to the interests of NN Ireland in taking actions that only benefitted NNI and the Canadian Entities.  (*E.g.*, Proof of Claim ¶¶ 9-12.)  Indeed, the Proof of Claim specifically allege that, under NNI's and the Canadian Entities' control, "[a]t all relevant points the Nortel Group was operated in such a manner that cash and value were improperly removed from NN Ireland and the other EMEA Companies and transferred to NNL." (*Id.* ¶ 9.)  These allegations support a finding, therefore, that the "adverse interest" rule applies to preclude application of the *in pari delicto* doctrine.

The US Debtor's arguments to the contrary are without merit.  The US Debtor argues that NN Ireland mistakenly believes it could have negotiated a better bargain because "the RPSM agreement did not adequately reward it."  (Joint Obj. at 57 n.60.)  These assertions mischaracterize the Proof of Claim.  The Joint Administrators allege that the transfer pricing arrangements deprived NN Ireland of revenue and "resulted in an intentional and improper transfer of value away from NN Ireland and the other EMEA entities and towards NNL." (*Id.*

---

corporation's "vice-principals" are imputed to the corporation itself, the Court, following a factual investigation, could conclude that NNI, through its agents, exercised control over NN Ireland in this respect.  *See Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387 (Tex. 1997).  A vice-principal includes (1) corporate officers; (2) those with authority to employ, direct, and discharge the corporation's employees; (3) those engaged in performance of non-delegable duties; and (4) those to whom the corporation has confided the management of the whole or a department or division of the business.  *See id.*  Accordingly, dismissal of the Proof of Claim at this stage would be premature.

¶ 48.)  Missing from these allegations, however, is any indication that NN Ireland benefited from these transactions.

Application of *in pari delicto* is also barred by the related principle that this defense cannot be applied in actions where an element of the claim is that "a controlling shareholder forced the corporation to act for the benefit of the shareholder through domination and control."  *Kalb, Voorhies & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 133 (2d Cir. 1993); *see In re Alper Holdings USA, Inc.*, 398 B.R. 736, 760 (S.D.N.Y. 2008).

> **3.      The Policy Underlying the *In Pari Delicto* Doctrine
> Would be Thwarted by Dismissing the Claims Brought
> by the Joint Administrators at This Stage in the Proceeding.**

As the Supreme Court has observed, *in pari delicto* was created not to shield defendants from liability, but rather to protect the public.  *Pinter v. Dahl*, 486 U.S. 622, 633 (1988) (quoting *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310-11 (1985) (internal quotations omitted)).  The doctrine's underlying purpose is to prevent wrongdoers from using the courts to benefit from their malfeasance, to deter future misconduct.  *See AIG*, 976 A.2d at 882.  Likewise, the Texas Supreme Court has stated:

> The rule is adopted not for the benefit of either party and not to punish either of them, but for the benefit of the public . . . . There is often involved, in reaching a decision as to granting or withholding relief, the question whether the policy against assisting a wrongdoer outweighs the policy against permitting the unjust enrichment of one party at the expense of the other.  The solution of the question depends upon the <u>peculiar facts and equities of the case</u>, and the answer usually given is that which is thought will better serve public policy.

*Lewis v. Davis*, 199 S.W.2d 146, 151 (Tex. 1947) (emphasis added).

The Court need not make a determination as to the application of *in pari delicto* at this stage in the proceedings.  *See In re DVI, Inc.*, No. 03-12656, 2008 WL 4239120, at *11 (Bankr. D. Del. Sept. 16, 2008) ("An affirmative defense with disputed facts is not a proper basis

to dismiss a complaint.") (citing *Official Comm. Of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.*), 299 B.R. 732, 752 (Bankr. D. Del. 2003) (concluding that "[i]n *pari delicto* is an affirmative defense.  A plaintiff is not required to plead in the complaint all requirements for a claim as well as to contemplate and plead in anticipation of all affirmative defenses that may lie against such claim.").

Indeed, both Texas and Delaware require the Court to make a fact-specific determination as to whether the underlying purposes of the doctrine are served by its application. *Lewis*, 199 S.W.2d at 151; *see also Today's Destiny*, 388 B.R. at 749 ("Under *Lewis*, *in pari delicto* is not an automatic bar."); *AIG*, 976 A.2d at 888 (" 'Unless' is an important word in the *in pari delicto* context because the doctrine is subject to the exception when another policy is perceived to trump the policy basis for the doctrine itself.").  As set forth in the case law relied on by the US Debtor, bankruptcy courts have held that the "need to consider the peculiar facts and equities is particularly acute" where, as here, "a defendant is asserting the defense against a Trustee who seeks recovery for the benefit of creditors of a wrongdoer rather than the wrongdoer himself." *Today's Destiny*, 388 B.R. at 749 (internal citations and quotations omitted).

The case law that the US Debtor relies on also holds that the policy analysis that *Lewis* requires "can not be undertaken prior to discovery and an evidentiary hearing." *Id.*  As such, whether equity and public policy demand that the Joint Administrators be afforded relief will require a factual investigation and cannot be determined at the motion to dismiss stage.  *See In re DVI, Inc.*, 2008 WL 4239120, at *11; *Today's Destiny*, 388 B.R. at 749;  *see also Floyd v. CIBC World Markets*, 426 B.R. at 643; *Smith v. Woodforest Nat'l Bank (In re IFS Fin. Corp.)*, No. 02-39553, 2007 WL 1308321, at *4 (Bankr. S.D. Tex. May 3, 2007).

Likewise, the case law cited by the US Debtor makes clear that application of the "adverse interest" and "insider" exceptions invoked by the Joint Administrators is based on a fact-intensive inquiry that can only be made after discovery. *Today's Destiny*, 388 B.R. at 749 n.13 (reserving judgment on the "adverse interest rule" because application is "fact intensive"); *In re Student Finance Corp.*, 335 B.R. 539, 547 (D. Del. 2005) ("the inquiry into insider status 'is fact-intensive and can be made only a case-by-case basis" after "full discovery") (citations omitted).

Thus, as a matter of law, the Court cannot conclude on the basis of allegations in the Proof of Claim that NN Ireland's claims are barred by the *in pari delicto* doctrine. *Id.*; *see also In re DVI, Inc.*, 2008 WL 4239120, at *11 (where plaintiff invoked the adverse interest exception on a 12(b)(6) motion, the court found it premature to bar plaintiff's claim on *in pari delicto* grounds without further development of the facts); *In re Total Containment, Inc.*, No. 05-0145, 2005 WL 6522761, at *24 (Bankr. E.D. Pa. Oct. 18, 2005) (where trustee pled that defendants' conduct adversely affected the debtor and benefited defendants, *in pari delicto* is not established on the face of the complaint and cannot be considered in the context of a motion to dismiss).

## VIII.   THE JOINT ADMINISTRATORS' CLAIMS RELATING TO TRANSFER PRICING, IRISH LOANS, AND PRE-PETITION ASSET SALES ARE NOT TIME-BARRED.

The US Debtor argues that the Joint Administrators' claims relating to transfer pricing, intercompany loans, and pre-petition asset sales are time-barred. (Joint Obj. at 74-80.) The Court should reject these arguments.

**A.     The Joint Administrators' Claims Are Not Time-Barred Because Section 108(c) Tolls The Statute of Limitations As Of The Petition Date.**

The US Debtor's statute of limitations arguments rely on the date the Original Proof of Claim was filed.  But the date the Original Proof of Claim was filed is not the relevant date.  Section 108(c) of the Bankruptcy Code extends the time period within which a civil action subject to the automatic stay of Section 362 may be brought against the debtor, provided that the claims had not expired prior to the petition date.  11 U.S.C. § 108(c); *see* 2 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 108.04 (16th ed. 2011) (Section 108(c) provides that if a creditor's claim against the debtor is stayed due to the commencement of a case under title 11, "any time deadline for commencing and continuing the action is extended to 30 days after notice of termination of the stay, if the deadline would have occurred on an earlier date") (citing 11 U.S.C. § 108(c)); *In re Pagnotti*, 269 B.R. 326, 335 (Bankr. M.D. Pa. 2001) (because Section 108(c) "extends the statute of limitations for creditors commencing actions on outstanding debts," creditor's claims are "tolled by the [d]ebtor's bankruptcy filing"); *Matter of Burger*, 125 B.R. 894, 901 (Bankr. D. Del. 1991) (filing date of bankruptcy petition "is the measuring date as to whether the statute's time had run out or not").

Accordingly, the statutes of limitations on the Joint Administrators' claims were tolled on January 14, 2009, when the US Debtor filed for protection under Chapter 11.

**B.     The Internal Affairs Doctrine Requires The Court To Apply The Six-Year Statute of Limitations Under Irish Law To Claims Arising Out Of The Internal Affairs Of NN Ireland.**

The Joint Objection asserts that the Delaware borrowing statute requires the court to apply Delaware's three year statute of limitations for most of the claims asserted to be time barred.  (*See* Joint Obj. at 76 (citing 10 Del. C. § 8106).)  The borrowing statute, however, does not apply to claims that arise out of corporate governance matters of a foreign corporation.  For

such claims, the internal affairs doctrine requires that the limitations period specified in the place

of incorporation governs, notwithstanding the borrowing statute.  *See Burtch v. Dent (In re*

*Circle Y of Yoakum, Texas)*, 354 B.R. 349, 359 (Bankr. D. Del. 2006) (applying statute of

limitations of Texas in action for breach of fiduciary duty against Texas corporation).

This Court has observed that the purpose of Delaware's borrowing statute is to

prevent forum shopping and that it should therefore not be applied in cases where there is no

threat of forum shopping.  *See Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's*

*Holdings, LLC)*, 426 B.R. 488, 503 (Bankr. D. Del. 2010) (Gross, J.)[102]  Here, as in *Meryvn's*, it

cannot be argued that forum shopping motivated the filing of the Proof of Claim in this Court,

where the US Debtor's bankruptcy case is pending.  Indeed, filing claims against NNI in any

other forum would have violated the automatic stay.

NN Ireland was formed under, and its internal affairs are governed by, Irish law,

pursuant to which the applicable limitations period on claims for breach of fiduciary duty is at

least <u>six years</u>.  *Irish Statute of Limitations 1957 ¶* 43 (an action for breach of trust is governed

by a six years limitations period); *¶* 44(2) (no limitation period will apply to an action against a

trustee where the claim is to recover trust property or the proceeds thereof retained by or

previously received by the trustee).[103]  The policy concerns underlying Delaware's borrowing

statute therefore do not apply here because the suit was brought in a forum that has a shorter

---

102. The US Debtor apparently cites *Mervyn's* in an attempt to distinguish the present case from those in which
courts have applied the internal affairs doctrine, noting that this Court applied California law in that case
because the "pre-petition transaction lacked other ties to Delaware."  (*See* Joint Obj. at 75-76 n.71 (citing
*Mervyn's*, 426 B.R. at 502).)  In fact, this Court held in *Mervyn's* that the internal affairs doctrine required the
application of California law (despite Delaware's borrowing statute) because the corporation whose governance
was in question was organized in California.  *See Mervyn's*, 426 B.R. at 503.

103. *See J.J. Harrison (Props.) Ltd. v. Harrison*, (2001) EWCA Civ 1467 ¶ 26 (directors who dispose of the
company's property in breach of their fiduciary duties are treated as having committed a breach of trust");
*Gwembe Valley Development Company Limited v Koshy* [2003] EWCA Civ 1048 ¶ 90 ("[A] case arising from
the breach of a pre-existing [fiduciary] duty is, or is treated by analogy as, an action by a beneficiary for breach
of trust.").

limitations period than the one that would otherwise apply. *See Mervyn's*, 426 B.R. at 503

(where plaintiff's action was subject to a *shorter* statute of limitations in Delaware compared

with suitable alternative jurisdiction, finding "absolutely no threat of forum shopping").

Since all of NN Ireland's claims for breach of fiduciary duty, aiding and abetting

breach of fiduciary duty, breach of the duty of care, dishonest assistance, and conspiracy

implicate the corporate governance of NN Ireland, and arise out of breaches of fiduciary duty by

its directors, these claims are subject to a limitations period of at least six years, as prescribed by

the applicable Irish statute of limitations.[104]  *Irish Statute of Limitations 1957 ¶ 43.*

### C.    The Claims Based On Transfer Pricing, Irish Loans And Pre-Petition Asset Sales Were Timely As Of The Petition Date.

The US Debtor argues that the statute of limitations for the Joint Administrators'

transfer pricing claims began to run in December 2004, when the MRDA was executed.  (Joint

Obj. at 76-77.)  Even assuming this assertion to be correct – which the Joint Administrators do

not concede[105] – the Joint Administrators' claims relating to transfer pricing are subject to at

least a six-year statute of limitations under Irish law and therefore were not time barred as of the

January 2009 Petition Date.  *Irish Statute of Limitations 1957 ¶ 43.*

Likewise, even based on the earliest date of accrual asserted by the US Debtor as

to the claims based on the Pre-Petition Asset Sales and Irish Loans – July 2007, with respect to

---

104. *See, e.g., Official Comm. Of Unsecured Creditors of Fedders N. Am. v. Goldman Sachs Credit Partners, LP., (In re Fedders North America, Inc.)*, 405 B.R. 527, 543 (Bankr. D. Del. 2009) ("the internal affairs doctrine compels the Court to apply Delaware law to the claim for aiding and abetting breach of fiduciary duty").  The internal affairs doctrine should apply equally to conspiracy claims here where the ultimate objective and consequence was a breach of fiduciary duties.  *See Schermerhorn v. Centurytel, Inc., (In re Skyport Global Commc's)*, Inc., 08-36737, 2011 WL 111427 (Bankr. S.D. Tex. Jan. 13, 2011) ("Under Delaware law, civil 'aiding and abetting' specifically refers to aiding and abetting a breach of a fiduciary duty, and is very similar to a civil conspiracy claim."); *Allied Capital Corp. v. GC–Sun Holdings, L.P.*, 910 A.2d 1020, 1038 (Del.Ch.2006) ("[I]n cases involving the internal affairs of corporations, aiding and abetting claims represent a context-specific application of civil conspiracy law.").

105. The accrual of a claim for statute of limitations purposes is a question of fact that, if disputed, is not appropriate for resolution on a motion to dismiss.  *See Firestone v. Firestone*, 76 F.3d 1205, 1208-09 (D.C. Cir. 1996).

the Pre-Petition Asset Sales, and July 2006, with respect to the Irish Loans (Joint Obj. at 78-79)

– these claims were not time-barred as of the Petition Date.  *Irish Statute of Limitations 1957*

¶ 43.

> **D.** **The Joint Administrators' Claims For Unjust Enrichment And Breach Of Contract Are Not Time-Barred.**

Even assuming Delaware's three-year statute of limitations applies to the Joint

Administrators' claim for unjust enrichment (which is not the case) (Joint Obj. at 76), this claim

is timely.  Indeed, this claim began to accrue no earlier than April 2008, in connection with the

loan NN Ireland made to NNL at that time, and less than three years prior to the bankruptcy

filing.  (*See* Proof of Claim ¶¶ 60, 158.)

The same holds true, moreover, based on the US Debtor's assertion that a three-

year statute of limitations period would apply with respect to the purported accrual date of claims

related to the Irish Loans, in June 2006.  (Joint Obj. at 78-79.)  Under a three-year limitation

period for breach of contract, these claims would be timely based as of the Petition Date, and

therefore preserved under 11 U.S.C. § 108(c).

> **E.** **The Joint Administrators' Amended Proof Of Claim Relates Back To Their Original Proof Of Claim For Statutes Of Limitation Purposes.**

The US Debtor argues that the Joint Administrators' claims related to Pre-Petition

Asset Sales are time-barred because they do not relate back, for statute of limitations purposes, to

the original proof of claim.  (Joint Obj. at 79-80.)  Although the arguments above dispose of the

US Debtor's limitations arguments, were the timing of the proofs of claim relevant, the Amended

Proof of Claim would in fact relate back to the Original Proof of Claim for limitations purposes.

It is well-settled that amendments to timely proofs of claim are liberally allowed.

*In re Orion Refining Corp.*, 317 B.R. 660, 664 (D. Del. 2004) (citing *In re Trans World Airlines,*

*Inc.*, 145 F.3d 124, 140 (3d Cir. 1998)).  "Two rationales for allowing amendments to proofs of

claim are that (1) bankruptcy courts are courts of equity, and (2) amendment of a claim are

likened to an amendment of a pleading." *Id.* (citation omitted).  Generally, amendments are

allowed when the original claim provides "notice of the existence, nature, and amount of the

claim." *Id.* (citing *In re Walls & All, Inc.*, 127 B.R. 115, 118 (W.D. Pa. 1991) ("It is well settled

that, absent contrary equitable considerations or prejudice to the opposing party, amendments to

proofs of claim should be freely permitted.").  Indeed, amendments are generally used to "cure

obvious defects, describe the claim with greater specificity or plead a new theory or recovery on

facts of the original proof of claim," as well as to amend claim amounts.  *Id.*

 Here, the Joint Administrators' original Proof of Claim gave adequate notice of

all of the causes of action asserted in their amended Proof of Claim.  With respect to the basis for

the Joint Administrators' claims, the original proof of claim stated:

> The [Joint] Administrators, the Insolvency Practitioner, NNUK
> and the EMEA Companies have potential claims against the
> Debtors and their affiliates arising out of transfer pricing,
> intercompany dealings, trading and other arrangements or
> agreements between them.
>
> The [Joint] Administrators, NNUK, EMEA Companies and any
> Insolvency Practitioner hereby assert a Claim in respect of any
> heretofore unknown, unliquidated, or unmatured claim or claims
> that the [Joint] Administrators, NNUK, the Insolvency Practitioner
> and/or any EMEA Company may have against any one or more of
> such Directors and Officers of Nortel Networks Inc. or its affiliated
> debtors in these Chapter 11 cases for mismanagement, breach of
> duty and/or the conduct of those Directors and Officers with
> respect to the operation, management and control of Nortel
> Networks Inc. or its affiliated debtors in these Chapter 11 cases.

(Original Proof of Claim at 2.)

 The language in the original Proof of Claim indicating that NN Ireland's claims

arise "out of transfer pricing, intercompany dealings, trading and other arrangements" was

clearly broad enough to encompass not only claims related to the MRDA and transfer pricing,

but also claims related to the Irish Loans, Irish Dividends and Pre-Petition Asset Sales.  The Joint

Administrators are merely "describ[ing] the claim with greater specificity,"  *Orion Refining*

*Corp.*, 317 B.R. at 664, which is freely permitted under these circumstances.  *See*, *e.g.*, *Burtch v.*

*Dent (In re Circle Y of Yoakum, Texas)*, 354 B.R. at 361-62 (amendment pleading new facts with

respect to management agreement relates back to original complaint where it "adds detail to the

conduct surrounding the schematic payments made to [defendant]"); *In re Loewen Group Inc.*,

No. 98-6740, 2004 WL 1853137 (E.D. Pa. Aug. 18, 2004) (relation back permitted where "new

claims regarding defendants' statements . . . are part of the same basic scheme described in the

original complaint").[106]

F.    **The Statute Of Limitations Is Equitably Tolled While A Corporation's Board Of Directors Is Controlled By Culpable Directors.**

Finally, under the adverse domination doctrine, the statute of limitations on a

corporation's claim against its officers and/or directors is equitably tolled while the corporation's

board of directors is controlled by culpable directors.   *Marvel Entm't Group, Inc. V. Mafco*

*Holdings, Inc. (In re Marvel Entm't Group, Inc.)*, 273 B.R. 58, 74 (D. Del. 2002).  "The premise

underlying the adverse domination doctrine is that a corporation acts through its board of

directors, and when that board of directors is controlled by culpable directors it will not cause the

corporation to bring a lawsuit against themselves."  *Id.* (citations omitted).  While courts in many

---

106. The rationale underlying the relation-back doctrine is that "one who has been given notice of litigation concerning a given transaction or occurrence has been provided with all the protection that statutes of limitations are designed to afford."  *Tri-Ex Enters. v. Morgan Guar. Trust*, 586 F. Supp. 930, 932 (S.D.N.Y. 1984) (citing 3 J. Moore, *Moore's Federal Practice* ¶ 15.15[3] at 15-194).  Moreover, *Coan v. O & G Indus. Inc. (In re Austin Driveway Servs., Inc.)*, 179 B.R. 390, 395 (Bankr. D. Conn. 1995), a case cited by the US Debtor, further supports allowing amendment here.  While the specific facts of *Austin Driveway* are distinguishable from the present case because *Austin Driveway* was a preference action, in which relation back "is the exception rather than the rule," the court observed that the decision to permit amendment turns on "the existence or absence of an underlying common scheme or course of conduct which is the basis of the original action and links otherwise distinct transactions."  *Id.* at 397.  A common underlying course of conduct – such as the one set forth in the original Proof of Claim with respect to transfer pricing, intercompany dealings, trading and other arrangements – provides a relation-back nexus.  *Id.* at 398.

jurisdictions subscribe to various versions of the adverse domination tolling doctrine (*id.* (citing *Hecht v. Resolution Trust Corp.* 333 Md. 324, 635 A.2d 394, 402 (1994) (collecting cases)), Delaware courts have neither accepted nor rejected this doctrine.  *Id.*

In *Marvel*, the court declined to recognize the adverse domination doctrine because "the court believes that Delaware's tolling mechanisms, in combination with the availability of shareholder derivative actions, already address the concerns that underlie the adverse domination doctrine."  *See id.* at 77.  The court noted that while the director defendants dominated the plaintiff's board, the alleged harmful act (entering a tax sharing agreement) was disclosed to plaintiff's shareholders who could have instituted derivative actions on behalf of the corporation.  *See id.* at 76.

This case is different.  Here, NNL, which was party to the wrongdoing, was NN Ireland's sole shareholder.  There was no possibility of a shareholder derivative action or any other action based on the breaches of fiduciary duty and other unlawful conduct set forth in the Proof of Claim until the Joint Administrators were appointed.  Indeed, NN Ireland was controlled by culpable directors who would never bring a lawsuit against themselves.  *Id.* at 74.  The statute of limitations was therefore tolled until the Joint Administrators were appointed in January 2009.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the Joint Objection.

Dated:  Wilmington, Delaware          **YOUNG CONAWAY STARGATT & TAYLOR, LLP**
September 16, 2011

                                                                    /s/ Jaime N. Luton
                                                                    James L. Patton (No. 2202)
                                                                    Edwin J. Harron (No. 3396)
                                                                    Jaime N. Luton (No. 4936)
                                                                    The Brandywine Building
                                                                    1000 West Street, 17th Floor
                                                                    Wilmington, Delaware 19801
                                                                    Telephone: (302) 571–6600
                                                                    Facsimile: (302) 571–1253

                                                                    - and -

                                                                    **HUGHES HUBBARD & REED LLP**
                                                                    Michael Luskin
                                                                    Derek J.T. Adler
                                                                    One Battery Park Plaza
                                                                    New York, New York 10004
                                                                    Telephone: (212) 837–6000
                                                                    Facsimile: (212) 422–4726

                                                                    - and -

                                                                    **HERBERT SMITH LLP**
                                                                    Kevin Lloyd
                                                                    John Whiteoak
                                                                    Richard Lawton
                                                                    Exchange House
                                                                    Primrose Street
                                                                    London
                                                                    EC2A 2HS

                                                                    *Counsel for the Joint Administrators*