UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., et al., | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |
| | **Hearing Date:**<br>**Oct. 13-14, 2011 at 9:30 a.m. (ET)**<br>**Responses Due: September 16, 2011**<br>**Replies Due: October 7, 2011**<br><br>**RE: Docket No. 6026** |

**THE JOINT ADMINISTRATORS' AND FRENCH LIQUIDATOR'S
MEMORANDUM OF LAW IN OPPOSITION TO THE DEBTORS' AND
COMMITTEE'S JOINT OBJECTION AND MOTION TO DISMISS
<u>THE CLAIMS OF NORTEL NETWORKS S.A.</u>**

# TABLE OF CONTENTS

PAGES

INTRODUCTION ........................................................................................................2

PROCEDURAL HISTORY.........................................................................................7

FACTUAL BACKGROUND OF THE CLAIMS.....................................................10

ARGUMENT .............................................................................................................18

I.      THE PROOF OF CLAIM SATISFIES ALL RELEVANT PLEADING
        STANDARDS....................................................................................................18

        A.      The Proof of Claim Complies With The Bankruptcy Rules. ................19

        B.      It Would Serve No Purpose, And Only Lead To Further Delay, To Apply
                Rules 8(a) And 12(b)(6)..........................................................................21

        C.      The Proof Of Claim Complies With Fed. R. Civ. P. 8(a). ....................24

        D.      NNSA's Claims Are Not Subject To Dismissal Under Rule 9(b). ........26

                1.      NNSA's Claims Do Not Sound In Fraud....................................27

                2.      In Fact, The Proof of Claim Is Pleaded With Particularity........28

        E.      Pleading Standards Are Relaxed For Bankruptcy Trustees And Other
                Persons Who Were Not Present When The Underlying Events Occurred,
                And Where The Salient Facts Are In The Control Of Others................31

II.     THE PROOF OF CLAIM STATES CLAIMS FOR MISMANAGEMENT. ...................32

        A.      The Proof of Claims States a Claim of Mismanagement Under French
                Law. .......................................................................................................32

                1.      French Law Regarding *De Facto* Directors................................32

                2.      The Proof of Claim Shows that NNI Performed Positive Acts of
                        Management as Would a De Jure Director of NNSA.................34

                3.      The Proof of Claim Shows that NNI Committed Acts of
                        Mismanagement that Contributed to NNSA's Insufficiency of
                        Assets. ........................................................................................40

        B.      Neither The French Liquidator Nor The Joint Administrators Are
                Estopped From Asserting That NNI Was A *De Facto* Director Of NNSA..........41

# TABLE OF CONTENTS
## (Continued)

1.     The US Debtor Does Not Assert Any Basis for Estopping the French Liquidator ...................................................................................41

2.     The Doctrine of Judicial Estoppel Does Not Apply. ................................42

    a.     The Joint Administrators Have Not Taken Inconsistent Positions. ......................................................................................43

        i.     The Witness Statements Were Prepared for the Purpose of Supporting a Jurisdictional Finding. ..................................43

        ii.     There Is No Inconsistency Between the Joint Administrators' Positions....................................................46

    b.     NNI Cannot Show That the Joint Administrators Acted In Bad Faith. ........................................................................................48

    c.     NNI Will Suffer No Harm From Any Purported Inconsistency....................................................................................51

3.     The Doctrine Of Collateral Estoppel Does Not Apply ............................52

III.     THE PROOF OF CLAIM STATES CLAIMS FOR SECONDARY LIABILITY AGAINST NNI UNDER APPLICABLE STATE LAW. ..................................................54

  A.     The Joint Administrators and the French Liquidator State Claims For Breach of Fiduciary Duty Under US State Law. ......................................54

    1.     Rule 9(b) Does Not Apply To The Joint Administrators' Claims For Aiding and Abetting Breach of Fiduciary Duty. ................................55

    2.     The Proof of Claim Sets Forth Facts Showing The Assistance NNI Provided And From Which It Can Be Inferred That Such Assistance Was Knowing. .........................................................................55

        a.     The US Debtor Misstates The Required Mental State....................55

        b.     The Proof of Claim Contains Facts Showing The Assistance Provided And That NNI Acted With The Requisite Mental State. ...................................................................58

        c.     NNL Was A *De Facto* Director Of NNSA. ..................................62

  B.     The Proof of Claim States Claims for Conspiracy................................62

    1.     Rule 9(b) Does Not Apply To NNSA's Conspiracy Claims. ...................63

**TABLE OF CONTENTS**
**(Continued)**

2.  The Proof of Claim Alleges Facts Supporting the Elements of the Conspiracy Claims. ...................................................................................64

IV.  THE PROOF OF CLAIMS STATES CLAIMS FOR TORT LIABILITY UNDER ARTICLE 1382 OF THE FRENCH CIVIL CODE. ........................................................65

A.  The French Law of Civil Liability. .......................................................66

B.  The Proof of Claim Contains Facts Supporting All Elements Of A Claim Under Article 1382 of the French Civil Code. ........................................................67

V.  THE JOINT ADMINISTRATORS STATE CLAIMS TO RECOVER FOR IMPROPER ALLOCATION OF PRE-PETITION NORTEL ASSET SALES. ...............69

VI.  NNSA'S CLAIMS BASED ON FSD LIABILITY SHOULD NOT BE DISALLOWED. ...........................................................................................70

VII.  THE DOCTRINE OF *IN PARI DELICTO* DOES NOT BAR ANY OF NNSA'S CLAIMS. ...........................................................................................72

A.  The Claims For Aiding And Abetting And Conspiracy Are Not Barred By The Doctrine Of *In Pari Delicto*. ...........................................................72

1.  The *In Pari Delicto* Doctrine Does Not Apply Because NNI Was an Insider of NNSA. ...........................................................73

2.  The "Adverse Interest" and "Controlling Shareholder" Exceptions to the *In Pari Delicto* Doctrine Bar its Application Here. ........................74

3.  The Policy Underlying the *In Pari Delicto* Doctrine Would be Thwarted by Dismissing the Claims at This Stage in the Proceeding. ...........................................................75

VIII.  NNSA'S CLAIMS RELATING TO TRANSFER PRICING, THE FEBRUARY 2008 REPAYMENT, AND PRE-PETITION ASSET SALES ARE NOT TIME-BARRED. ...........................................................................................78

A.  NNSA's Claims Are Not Time-Barred Because Section 108(c) Tolls The Statute of Limitations As Of The Petition Date. ........................................78

B.  The Internal Affairs Doctrine Requires The Court To Apply Limitations Periods under French Law To the Claims Arising Out Of The Internal Affairs Of NNSA. ...........................................................79

C.  The Claims Based On Transfer Pricing, The February 2008 Repayment, And Pre-Petition Business Sales Are Timely. ........................................81

**TABLE OF CONTENTS**
**(Continued)**

D.      The Joint Administrators' Amended Proof Of Claim Relates Back To
Their Original Proof Of Claim For Statutes Of Limitation Purposes. ................... 82

E.      The Statute Of Limitations Is Equitably Tolled While A Corporation's
Board Of Directors Is Controlled By Culpable Directors. .................................... 84

CONCLUSION ................................................................................................................ 86

# TABLE OF AUTHORITIES

**Page(s)**

**STATUTES AND RULES**

10 Del. C. § 8106 .................................................................................................................79

11 U.S.C. § 101 ...............................................................................................................37, 74

11 U.S.C. § 108 ...........................................................................................................7, 78, 79

11 U.S.C. § 501 ....................................................................................................................71

11 U.S.C. § 502 ...........................................................................................................21, 72, 73

Bankruptcy Code Chapter 11 ...........................................................................................1, 7

Bankruptcy Code Chapter 15 ...........................................................................8, 11, 12, 13

Fed. R. Bank. P. 3001 ................................................................................................ *passim*

Fed. R. Bank. P. 7001 *et seq*. ...........................................................................................21

Fed. R. Bank. P. 7009 ..........................................................................................................27

Fed. R. Bank. P. 7012 ..........................................................................................................23

Fed. R. Bank. P. 9014 ................................................................................................ *passim*

Fed. R. Civ. P. 8 ........................................................................................................ *passim*

Fed. R. Civ. P. 9 ........................................................................................................ *passim*

Fed. R. Civ. P. 12 ...................................................................................................... *passim*

French Civil Code, Article 1382 ............................................................................... *passim*

French Civil Code, Article 1383 .......................................................................................7, 66

French Commercial Code, Article L. 651-2 ...........................................................32, 54, 55, 80

*UK Pensions Act 2004* ...................................................................................................18, 70, 71

**CASES**

*900 Capital Services, Inc. v. Cloud (In re Cloud)*,
    No. 99-51109, 2000 WL 634637 (5th Cir. May 4, 2000).......................................................22

## <u>TABLE OF AUTHORITIES</u>
### (Continued)

*Adamson v. Bernier (In re Bernier)*,
 282 B.R. 773 (Bankr. D. Del. 2002) ....................................................................28

*Aetna Cas. & Sur. Co. v. Ga. Tubing Co.*,
 1995 U.S. Dist. LEXIS 10120 (S.D.N.Y. July 20, 1995) .......................................72

*Aetna Cas. & Sur. Co. v. Leahey Const. Co.*,
 219 F.3d 519 (6th Cir.2000) .................................................................................56

*Allied Capital Corp. v. GC–Sun Holdings, L.P.*,
 910 A.2d 1020 (Del.Ch.2006)...............................................................................80

*In re Am. Bus. Fin. Services, Inc.*,
 361 B.R. 747 (Bankr. D. Del. 2007) ....................................................................63

*Am. Buying Ins. Servs., Inc. v. S. Kornreich & Sons, Inc.*,
 944 F. Supp. 240 (S.D.N.Y. 1996).........................................................................28

*Am. Gen. Life Ins. v. Goldstein*,
 741 F. Supp. 2d 604, 613 (D. Del. 2010)..............................................................30

*Am. Int'l Group, Inc. v. Greenberg*,
 976 A.2d 872 (Del. Ch. 2009)...............................................................73, 75, 76

*Amatex Corp. v. Aetna Casualty & Surety Co. (In re Amatex Corp.)*,
 107 B.R. 856 (Bankr. E.D. Pa. 1988) ..................................................................23

*Anjelino v. New York Times Co.*,
 200 F.3d 73 (3d Cir. 2000)...................................................................................49

*Arista Records, LLC v. Doe 3*,
 604 F.3d 110 (2d Cir. 2010)...........................................................................24, 25

*Ashcroft v. Iqbal*,
 129 S. Ct. 1937 (2009)............................................................................. *passim*

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
 472 U.S. 299 (1985)...............................................................................................75

*Bell Atlantic Corp. v. Twombly*,
 55 U.S. 544 (2007)................................................................................... *passim*

*Brug v. Enstar Grp., Inc.*,
 755 F. Supp. 1247 (D. Del. 1991).........................................................................63

*Matter of Burger*,
 125 B.R. 894 (Bankr. D. Del. 1991) ....................................................................78

**TABLE OF AUTHORITIES**
**(Continued)**

*Burtch v. Dent (In re Circle Y of Yoakum, Tex.),*
      354 B.R. 349 (Bankr. D. Del. 2006) ................................................................79, 83

*Capitaliza-T Sociedad De Responsabilidad Limitada De Capital Variable v. Wachovia*
      *Bank of Del. Nat'l Ass'n,* No. CIV. 10-520, 2011 WL 864421 (D. Del. Mar. 9, 2011) ..........56

*In re Cavalier Indus., Inc.,*
      No. 99-31737, 2003 WL 716291 (Bankr. E.D. Pa. Feb. 6, 2003) ...........................................19

*Chapa v. Chase Home Financing LLC,*
      No. C-10-359, 2010 WL 5186785 (S.D. Tex. Dec. 15, 2010)..................................................69

*In re Chaus Sec. Litig.,* 801 F. Supp. 1257 (S.D.N.Y. 1992)...........................................................83

*In re Chi-Chi's, Inc.,* 338 B.R. 618 (Bankr. D. Del. 2006).............................................................53

*Christidis v. First Pa. Mortg. Trust,* 717 F.2d 96 (3d Cir. 1983) ...................................................29

*Cleveland v. Policy Management Systems Corp.,*
      526 U.S. 795 (1999)........................................................................................................47, 48

*Coan v. O & G Indus. Inc. (In re Austin Driveway Servs., Inc.),*
      179 B.R. 390 (Bankr. D. Conn. 1995) .....................................................................................83

*Copeland v. Merrill Lynch & Co.,* 47 F.3d 1415
      (5th Cir.1995)...........................................................................................................................53

*Craftmatic Sec. Litig. v. Kraftsow,*
      890 F.2d 628 (3d Cir. 1989).....................................................................................................29

*Cronus Offshore, Inc. v. Kerr McGee Oil & Gas Corp.,*
      369 F. Supp. 2d 848 (E.D. Tex. 2004) *aff'd,* 133 F. App'x 944 (5th Cir. 2005) .....................27

*Davidson v. Twin City Bank (In re Hollis),*
      83 B.R. 588 (Bankr. E.D. Ark. 1988) ................................................................................19, 32

*In re DeAngelis Tangibles, Inc.,*
      238 B.R. 96 (Bankr. M.D. Pa. 1999) .......................................................................................20

*Dobyns v. United States,*
      91 Fed. Cl. 412 (2010) .............................................................................................................24

*Duke Energy Int'l, L.L.C. v. Napoli,*
      748 F. Supp. 2d 656 (S.D. Tex. 2010) .....................................................................................56

*In re DVI, Inc.,*
      No. 03-12656, 2008 WL 4239120 (Bankr. D. Del. Sept. 16, 2008)...................................76, 77

# TABLE OF AUTHORITIES
## (Continued)

*Empire Fin. Servs., Inc. v. Bank of N.Y. (Del.)*,
  900 A.2d 92 (Del. 2006) ........................................................................64

*Re Eurofood IFSC Ltd* [2006] BCC 606.......................................................44

*In re Fedders North America, Inc.*,
  405 B.R. 527 (Bankr. D. Del. 2009) .....................................................80

*Fierro v. Gallucci*,
  06-CV-5189, 2008 WL 2039545 (E.D.N.Y. May 12, 2008).................63

*Firestone v. Firestone*,
  76 F.3d 1205 (D.C. Cir. 1996)...............................................................81

*Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.)*,
  398 B.R. 736, 740, 748 (S.D.N.Y. 2008).........................................21, 75

*Fleck v. KDI Sylvan Pools, Inc.*,
  981 F.2d 107 (3d Cir. 1992)....................................................................49

*Floyd v. CIBC Markets, Inc.*,
  426 B.R. 622 (Bankr. S.D. Tex. 2009) ............................................73, 77

*Floyd v. Hefner*,
  556 F. Supp. 2d 617 (S.D. Tex. 2008) .............................................64, 73

*Forman v. Salzano (In re Norvergence, Inc.)*,
  405 B.R. 709 (Bankr. D.N.J. 2009) .......................................................28

*Fowler v. UPMC Shadyside*,
  578 F.3d 203 (3d Cir. 2009)......................................................24, 25, 26

*Gillman v. Inner City Broad. Corp.*,
  No. 08 Civ. 8909, 2009 WL 3003244 (S.D.N.Y. Sept. 18, 2009).........24

*Greenfield v. Tele-Communications*,
  C.A. No. 9814, 1989 WL 48738 (Del. Ch. May 10, 1989) ...................57

*Gubitosi v. Zegeye*,
  946 F. Supp. 339 (E.D. Pa. 1996) ..........................................................28

*Guirgis v. Movers Specialty Servs., Inc.*,
  346 F. App'x 774 (3d Cir. 2009) ............................................................24

*Hamilton v. Leavy*,
  No. CIV.A. 94-336-GMS, 2001 WL 848603 (D. Del. July 27, 2001) ...................53

# TABLE OF AUTHORITIES
## (Continued)

*Hammerly Oaks, Inc. v. Edwards*,
958 S.W.2d 387 (Tex. 1997)..................................................74

*Hecht v. Resolution Trust Corp.*,
333 Md. 324, 635 A.2d 394 (1994) ..................................................84

*Hill v. Day (In re Today's Destiny, Inc.)*,
388 B.R. 737 (Bankr. S.D. Tex. 2008) ..................................23, 73, 75

*Hirsch v. Tarricone (In re A. Tarricone, Inc.)*,
286 B.R. 256 (Bankr. S.D.N.Y. 2002)..................................................74

*In re I.G. Servs., Ltd.*,
No. 04-5041-C, 2004 WL 5866105 (Bankr. W.D. Tex. Dec. 22, 2004) ..................56

*In re Adelphia Commc's Corp.*,
359 B.R. 54 (Bankr. S.D.N.Y. 2006) ..................................................23

*In re Best Products Co.*,
210 B.R. 714, 715-16 (Bankr. E.D. Va. 1997) ..................................................23

*In re Diamond Mortg. Corp. of Ill.*,
105 B.R. 876 (N.D. Ill. 1989)..................................................23

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010)..................................................24

*Int'l Bankers Life Ins. Co. v. Holloway*,
368 S.W.2d 567 (Tex. 1963)..................................................64

*Kalb, Voorhies & Co. v. Am. Fin. Corp.*,
8 F.3d 130 (2d Cir. 1993) ..................................................75

*Kaliner v. Load Rite Trailers (In re Sverica Acquisition Corp., Inc.)*,
179 B.R. 457 (Bankr. E.D. Pa. 1995) ..................................................31

*Kalmanovitz v. G. Heileman Brewing Co., Inc.*,
595 F. Supp. 1385 (D. Del. 1984), *aff'd*, 769 F.2d 152 (3d Cir. 1985)..................63

*In re Keck, Mahin & Cate*,
237 B.R. 430 (Bankr. N.D. Ill. 1999), *aff'd*, 253 B.R. 530 (N.D. Ill. 2000)..................19

*Klein v. Stahl GMBH & Co. Maschinefabrik*,
185 F.3d 98 (3d Cir. 1999)..................................................51

*Lewandowski v. Nat'l R.R. Passenger Corp.*,
882 F.2d 815 (3d Cir. 1989)..................................................49

# TABLE OF AUTHORITIES
## (Continued)

*Lewis v. Davis*,
199 S.W.2d 146 (Tex. 1947) ................................................................................................76

*In re Loewen Group Inc.*,
No. 98-6740, 2004 WL 1853137 (E.D. Pa. Aug. 18, 2004) ....................................................83

*Malleus v. George*,
641 F.3d 560 (3d Cir. 2011) ..................................................................................................26

*Malpiede v. Townson*,
780 A.2d 1075 (Del. 2001) ....................................................................................................57

*Marvel Entm't Group, Inc. V. Mafco Holdings, Inc. (In re Marvel Entm't Group, Inc.)*,
273 B.R. 58 (D. Del. 2002) ....................................................................................................84

*Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*,
426 B.R. 488 (Bankr. D. Del. 2010) .............................................................................79, 81

*In re Missionary Baptist Found. of Am., Inc.*, 712 F.2d 206 (5th Cir. 1983) ................................74

*Montrose Med. Group Participating Savs. Plan v. Bulger*
243 F.3d 773 (3d Cir. 2001) ...................................................................................42, 51, 52

*Murray v. Silberstein*,
882 F.2d 61 (3d Cir. 1989) ....................................................................................................49

*Nortel Networks, Inc. v. Commc's Test Design, Inc.*,
Adv. No. 10-53065, 2011 WL 1102829 (Bankr. D. Del. Mar. 22, 2011) ........................26, 29

*Ocasio v. Ollson*,
596 F. Supp. 2d 890 (E.D. Pa. 2009) ...........................................................................48, 51

*Official Comm. Of Unsecured Creditors v. Credit Suisse First Boston*
*(In re Exide Techs., Inc.)*, 299 B.R. 732 (Bankr. D. Del. 2003) ...........................................76

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
848 F.2d 414 (3d Cir. 1988) ..................................................................................................49

*In re Orion Refining Corp.*,
317 B.R. 660 (D. Del. 2004) ............................................................................................82, 83

*Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*,
No. 09 C 5619, 2010 WL 1979569 (N.D. Ill. May 17, 2010) ................................................31

*In re Pagnotti*,
269 B.R. 326 (Bankr. M.D. Pa. 2001) ...................................................................................78

# TABLE OF AUTHORITIES
## (Continued)

*Pardo v. Avanti Corp. Health Sys., Inc. (In re APF Co.)*,
274 B.R. 634 (Bankr. D. Del. 2001) ................................................................31

*Payless Wholesale Distribs, Inc. v. Alberto Culver (P.R.) Inc.*,
989 F.2d 570 (1st Cir. 1993) ..........................................................................50

*Phillips v. Cnty. of Allegheny*,
515 F.3d 224 (3d Cir. 2008) ...........................................................................25

*In re Pinnacle Brands, Inc.*,
259 B.R. 46 (Bankr. D. Del. 2001) .................................................................72

*Pinter v. Dahl*, 486 U.S. 622 (1988) ........................................................................75

*Profilet v. Cambridge Fin. Corp.*, 231 B.R. 373 (S.D. Fla. 1999)...............................31

*In re Rafter*, No. 05–51335, 2007 WL 1591880 (Bankr. D.N.J. May 30, 2007)...........20

*Raytech Corp. v. White*, 54 F.3d 187 (3d Cir. 1995) ................................................52

*In re Reliance Fin. & Inv. Group, Inc.*, No. 05-80625-CIV, 2006 WL 3663243 (S.D. Fla.
Nov. 14, 2006) ..........................................................................................19, 31

*In re Rimsat Ltd.*, 223 B.R. 345 (Bankr. N.D. Ind. 1998)................................18, 19, 21

*Rose v. Bartle*,
871 F.2d 331 (3d Cir.1989)............................................................................63

*Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*,
321 B.R. 128 (Bankr. D. Del. 2005) ...............................................................30

*Ryan Operations. G.P. v. Santiam-Midwest Lumber Co.*,
81 F.3d 355 (3d Cir. 1996).....................................................................43, 48, 51

*S. Track & Pump, Inc. v. Terex Corp.*,
722 F. Supp. 2d 509 (D. Del. 2010)................................................................30

*Scarano v. Central R.R. Co.*,
203 F.2d 510 (3d Cir. 1953)...................................................................42, 43, 49

*In re SemCrude, L.P.*,
436 B.R. 317 (Bankr. D. Del. 2010) ...............................................................20

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*,
742 F.2d 786 (3d Cir. 1984), *cert. denied*, 469 U.S. 1211 (1985)..........................29

*In re Sevko*,
143 B.R. 167 (Bankr. N.D. Ill. 1992) ..............................................................22

## TABLE OF AUTHORITIES
### (Continued)

*Siegel v. Converters Transp., Inc.*,
   714 F.2d 213, 216 (2d Cir. 1983)..........................................................................83

*In re Skyport Global Commc's, Inc.*,
   No. 08-36737, 2011 WL 111427 (Bankr. S.D. Tex. Jan. 13, 2011)........................80

*Smith v. National City Mortg.*,
   No. A-09-CV-881, 2010 WL 3338537 (W.D. Tex. Aug. 23, 2010).......................69

*Smith v. Woodforest Nat'l Bank (In re IFS Fin. Corp.)*,
   No. 02-39553, 2007 WL 1308321 (Bankr. S.D. Tex. May 3, 2007)......................77

*Southco Inv. v. Penn Eng'g & Mfg. Corp.*,
   768 F. Supp. 2d 715 (D. Del. 2011).......................................................................30

*In re Spiegel, Inc.*,
   337 B.R. 821, 822-24 (Bankr. S.D.N.Y. 2006).....................................................22

*In re Stanford International Bank Ltd* [2010] EWCA Civ 137 .............................44, 45

*Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*,
   335 B.R. 539 (Bankr. D. Del. 2005) .........................................................73, 74, 77

*State Farm Mut. Auto. Ins. Co. v. Ficchi*,
   Civ. No. 10-555, 2011 WL 2313203 (E.D. Pa. June 13, 2011).............................63

*Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069 (Del. 1983).....................................27

*Swierkiewicz v. Sorema N.A.*,
   534 U.S. 506 (2002)..............................................................................................24

*Tese-Milner v. Beeler (In re Hampton Hotel Investors, L.P.)*,
   289 B.R. 563 (Bankr. S.D.N.Y. 2003)..................................................................74

*TMP Worldwide, Inc. v. Inacom Corp. (In re Inacom Corp.)*,
   Adv. No. 00-1115, 2001 WL 1819987 (D. Del. Aug. 7, 2001)..............................28

*Toner v. Allstate Ins. Co.*,
   821 F. Supp. 276 (D. Del. 1993)...........................................................................27

*In re Total Containment, Inc.*, No. 05-0145, 2005 WL 6522761 (Bankr. E.D. Pa. Oct. 18,
   2005) ....................................................................................................................77

*In re Trans World Airlines, Inc.*,
   145 F.3d 124 (3d Cir. 1998)..................................................................................82

*Tri-Ex Enters. v. Morgan Guar. Trust*,
   586 F. Supp. 930 (S.D.N.Y. 1984)........................................................................83

## TABLE OF AUTHORITIES
### (Continued)

*In re Walls & All, Inc.*,
127 B.R. 115 (W.D.Pa. 1991) ...................................................................................82

*In re Wedtech Corp.*,
87 B.R. 279 (Bankr. S.D.N.Y. 1988) .......................................................................72

*In re Windsor Constructors, Inc.*,
No. 03–36589, 2006 WL 4005568 (Bankr. E.D. Pa. Dec. 18, 2006) .....................20

*In re WorldCom, Inc.*,
322 B.R. 530 (Bankr. S.D.N.Y. 2005) .....................................................................22

*Young v. Shore*,
588 F. Supp. 2d 544 (D. Del. 2008) .........................................................................52

*Zirn v. Vli Corp.*,
15 Del. J. Corp. L. 789 (Del. Ch. 1989) ...................................................................55

### OTHER AUTHORITIES

S. Rep. No. 95-989 (1978). .......................................................................................74

37 Am. Jur. 2d *Fraud & Deceit* § 39 (2011) .............................................................27

Daniel R. Coquillette et al., *Moore's Federal Practice* (3d ed. 2011) .......................29

Lawrence P. King et al., *Collier on Bankruptcy* (16th ed. 2011) ..........................20, 78

Arthur R. Miller, *From* Conley *to* Twombly *to* Iqbal: *A Double Play on the Federal Rules of Civil Procedure*, 60 Duke L.J. 1, 44 (2010)................................................32

B. Fages, *Droit des Obligations*, LGDJ 2007, no. 494 ...............................................66

P. Le Cannu & M. Jeantin, *Entreprises en Difficulté*,
Dalloz ed. 7th ed., 2006, no. 471, fn.2. ..................................................................71

The court-appointed administrators and authorized foreign representatives (collectively, the "Joint Administrators")[1] for Nortel Networks S.A. ("NNSA") and certain of its affiliates (collectively, the "EMEA Debtors")[2] located in the region known as EMEA (Europe, Middle East, and Africa) in proceedings under the *Insolvency Act 1986*, pending before the High Court of Justice of England and Wales (the "English Court"), as well as Maître Cosme Rogeau, in his capacity as the court-appointed French liquidator for NNSA (the "French Liquidator"), submit this Memorandum of Law in Opposition to the Joint Objection and Motion (the "Joint Objection") [D.I. 6026] of Nortel Networks, Inc. ("NNI") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"),[3] and the Official Committee of Unsecured Creditors (the "Committee" and, together with the Debtors, the "US Debtor"), to dismiss the amended proof of claim filed by the Joint Administrators on behalf of NNSA and the proof of claim filed by the French Liquidator on behalf of NNSA (collectively, the "Proof of Claim").[4]

---

1. The administrators in the UK proceedings for all of the EMEA Debtors, with the exception of Nortel Networks (Ireland) Limited, are:  Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, and Stephen John Harris.  The administrators in the UK proceedings for Nortel Networks (Ireland) Limited are: Alan Robert Bloom and David Martin Hughes.

2. The EMEA Debtors are:  Nortel Networks UK Limited; Nortel GmbH; Nortel Networks (Austria) GmbH; Nortel Networks (Ireland) Limited; Nortel Networks AB; Nortel Networks B.V.; Nortel Networks Engineering Service Kft; Nortel Networks France S.A.S.; Nortel Networks Hispania, S.A.; Nortel Networks International Finance & Holding B.V; Nortel Networks N.V.; Nortel Networks OY; Nortel Networks Polska Sp. z.o.o.; Nortel Networks Portugal S.A.; Nortel Networks Romania SRL; Nortel Networks S.A.; Nortel Networks S.p.A.; Nortel Networks Slovensko, s.r.o.; Nortel Networks, s.r.o.

3. The Debtors in these Chapter 11 cases are:  Nortel Networks Inc., Nortel Networks Capital Corporation, Alteon WebSystems, Inc., Alteon WebSystems International, Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

4. The amended proof of claim filed by the Joint Administrators and the proof of claim filed by the French Liquidator are substantially identical and will therefore be referred to as one document herein.  Capitalized terms used but not otherwise defined are defined in the Proof of Claim.

## <u>INTRODUCTION</u>

There are two initial points to be made.  First, the US Debtor's objection should be examined in light of the surrounding circumstances.  Second, circumspection is required before dismissing claims of this nature and significance at such a preliminary stage.  The claims asserted by the Joint Administrators and the French Liquidator are not based on "far-fetched allegations," as the US Debtor asserts.  They are bona fide claims which have been brought by the Joint Administrators and the French Liquidator acting responsibly in the execution of their duties.  The claims are pursued for the ultimate benefit of NNSA's creditors.  These creditors stand to suffer if the result of years of improper removal of value from NNSA is not now corrected.

The US Debtor's objection is entirely misconceived.  The US Debtor had suggested to the Court that the EMEA Debtors' claims would seek to impose duties running from NNI to the EMEA Debtors based solely on the fact that the companies were under common control.  Indeed, this is one of the major grounds on which the US Debtor says the NNSA claim is flawed.  But the Proof of Claim, a detailed 53-page document, shows that, in fact, NNI and its personnel played a direct and substantial role in devising and enforcing key global policies for the Nortel Group, including the specific policies and transactions by which NNSA was stripped of cash.[5]  While the underlying facts are complicated, and the relevant events took place over an extended period of time, the Proof of Claim shows that the Joint Administrators and the French Liquidator are entitled to pursue numerous claims under foreign and US law.  The US Debtor's objection raises complex and disputed questions about the facts, the content of foreign law, and

---

5.    To the extent that NNI's status as a sister company has any relevance at all, it is only to defeat defenses the US Debtor has asserted.  As an affiliate of NNSA, NNI cannot rely on the defense of *in pari delicto*. (Section VII.A.2, *infra*.)

the application of foreign law to the underlying facts.  These disputed matters cannot be properly addressed on a motion to dismiss.  It would be unjust to the innocent creditors of NNSA to deny the Joint Administrators and the French Liquidator the chance to take discovery and prove their claims at trial.

There is also a striking inconsistency in the US Debtor's position on the underlying facts.  The US Debtor does not and cannot deny that there was a policy within the Nortel Group to improperly transfer cash and value to the Canadian entities.  It can reasonably be inferred that this was the basis upon which the US Debtor itself submitted a $2 billion dollar claim against its parent, Nortel Networks Ltd. ("NNL"), regarding transfer pricing irregularities, and accepted such a claim by the IRS.  Although the US Debtor suggests that it was a fellow victim of these policies, the facts show that the US Debtor was centrally involved in creating and implementing the policy to improperly transfer value to the Canadian entities, as is manifestly clear on the face of the Proof of Claim, and as will become even clearer following discovery.  Just as the US Debtor has received the chance to recover on its $2 billion claim for income wrongly diverted to Canada, the Joint Administrators and the French Liquidator seek the same opportunity to obtain the value that has been wrongly diverted from NNSA as a result of actions taken by NNI.

The Joint Objection must be seen for what it is – yet a further attempt by the US Debtor to avoid dealing with the substance of the EMEA Debtors' claims and to avoid providing the disclosure which will assist the Joint Administrators in proving their claims at trial.  The US Debtor has accused the Joint Administrators of "playing games."  They are not.  If anyone is playing games it is the US Debtor.

Turning to the details of the motion, the US Debtor raises four principal issues, none of which has any merit.  The US Debtor contends that:

- the Proof of Claim does not meet the necessary pleading standard;

- the Joint Administrators and the French Liquidator are estopped from pursuing claims of mismanagement under French law;

- the Joint Administrators do not state claims under French law; and

- the claims are time barred.

As to the pleading standard, the relevant test for a proof of claim is supplied by Bankruptcy Rule 3001.  The US Debtor does not dispute that the Proof of Claim now complies with this standard, which is all that the US Debtor asked for in its April 2011 motion to require the Joint Administrators and the French Liquidator to file a "more definite statement" of NNSA's claims.  Significantly, the US Debtor did <u>not</u> at that time ask the Court to apply Fed. R. Civ. P. 8(a) or 12(b)(6) to the amended proofs of claim that the Joint Administrators and the French Liquidator agreed to file voluntarily.

Having obtained a more definite statement of NNSA's claims, the US Debtor now asks the Court to apply a heightened pleading standard under Fed. R. Civ. P. 8(a), and to entertain a motion under Fed. R. Civ. P. 12(b)(6) to dismiss the Proof of Claim for failure to comply with such a standard.  Although the Court has discretion to apply these rules in a contested matter, the Bankruptcy Rules provide that it can only do so after giving the parties notice and "a reasonable opportunity to comply with the procedures prescribed."  Fed. R. Bankr. P. 9014(c).  The US Debtor's objection should therefore be treated as a motion asking the court to direct that Rules 8(a) and 12(b)(6) will apply.  The Joint Administrators and the French Liquidator are entitled to advance notice if those rules are to be applied.  While it is their position

that the Proof of Claim already complies with the higher pleading standard, it would not be

appropriate to deny the Joint Administrators and the French Liquidator notice and the

opportunity to plead against the higher standard.

Indeed it would not serve any purpose to apply Rules 8(a) and 12(b)(6) to the

Proof of Claim.  A review of the Proof of Claim shows that the claims are well-founded and will

not be subject to dismissal.  The Proof of Claim provides sufficient factual details to allow the

US Debtor to prepare its defense and, regardless of what happens here, the parties will be

exchanging extensive discovery regarding the underlying facts.  The same factual matrix will

have to be addressed in order to determine (i) the Joint Administrators' claims against NNL in

Canada, and (ii) how the proceeds of the Nortel Group asset sales should be allocated among the

various debtors.  Accordingly, the most efficient overall approach would be to coordinate

discovery for all purposes and then address any dispositive motions and cross motions after the

conclusion of this process.  All parties will be in a better position to winnow and substantiate

their claims and defenses after the conclusion of discovery.

The estoppel issue is a particularly striking example of the US Debtor's

unwillingness to address the real issues.  First of all, the US Debtor cannot seek to challenge the

French Liquidator's proof of claim on estoppel grounds because the French Liquidator was not

involved in the prior proceedings on which the estoppel argument is based.  In addition, the

US Debtor's estoppel argument against the Joint Administrators fails for the simple reason that

there is no inconsistency between the position taken in the Proof of Claim, on the one hand, and

those taken by the Joint Administrators in demonstrating that England was the EMEA Debtors'

center of main interest, on the other.  A finding that England is the EMEA Debtors' center of

main interest is not inconsistent with the fact that NNL and NNI exercised sufficient control over

NNSA's tax and treasury functions to impose on NNSA the major transactions that caused the

company significant damage, as detailed in the Proof of Claim.  Nor has the English Court, or

this Court, ever made any finding of fact which would preclude a claim based on the exercise of

such control in relation to the transactions at issue.  The US Debtor's arguments are further

weakened when it is seen that they have mischaracterized the statements made by Alan Bloom

and other witnesses in the prior proceedings.  The record leaves no doubt that the Joint

Administrators have acted in good faith, and the US Debtor has not identified any cognizable

harm it might suffer other than being required to defend against meritorious claims.

As for the US Debtor's argument that the facts will not establish the Joint

Administrators' claims under French law, these arguments are not appropriate to deal with on a

motion to dismiss.  The Joint Administrators' claims engage a wide range of foreign law issues

which by their very nature require a proper examination at trial based on all of the evidence.  For

example, an inquiry as to whether one company is a *de facto* director of another necessitates an

in-depth factual investigation of the internal workings of the company in question.  Such an

investigation is not possible based simply on a review of the pleadings.  Even putting this

fundamental issue to one side, the US Debtor's attempts to argue that the claims are not made out

under French law do not succeed.  Indeed, Professor Menjucq (an *agrégé* and Professor – the

highest expert in French law)[6] has declared that, under French law, if the facts as pleaded in the

Proof of Claim are made out at trial, a French Court would find that NNI is a *de facto* director

and that NNI is liable for acts of mismanagement.  That should be the end of the matter for a

dispositive motion.  Professor Menjucq adds that the US Debtor's French expert, an *avocat*,

---

6.    (Declaration of Professor Michel Menjucq in Support of Joint Administrators' Opposition to the Debtors' and
      Committee's Joint Objection and Motion to Dismiss the Claims of Nortel Networks S.A. (NNSA) and its
      French Liquidator, dated Sept. 14, 2011 [D.I. 6376] ("Menjucq Decl.").)

overstates the requirements not only for mismanagement but also for claims under Articles 1382 and 1383 of the French Civil Code.  However, Professor Menjucq admits that even if NNI were not a *de facto* director, a French court could find that NNI participated in a damaging event that could trigger its tort liability under Articles 1382 and 1383.  (*See* Menjucq Decl. ¶ 121.)  Again, this should be the end of the matter.  In addition, the US Debtor's reliance on *in pari delicto* principles is utterly without foundation.

As to the statute of limitations, the assertions made by the US Debtor are once again without any merit.  Among other defects in its arguments, the US Debtor ignores Bankruptcy Code Section 108(c), which had the effect of tolling the applicable limitations periods for claims that were timely as of the bankruptcy filing date.  This is a complete answer, as none of the limitations periods governing the Joint Administrators' claims had expired prior to January 14, 2009, the date NNI filed its Chapter 11 petition.  The claims have therefore been submitted on a timely basis.

## PROCEDURAL HISTORY

The Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on January 14, 2009 (the "Petition Date").[7]  Certain parallel proceedings (the "Canadian Proceedings") commenced by NNL, as well as NNL's corporate parent Nortel Networks Corporation ("NNC"), were initiated with the Ontario Superior Court of Justice (the "Canadian Court") on the Petition Date seeking relief under the Companies' Creditors Arrangement Act (Canada).  Also on the Petition Date, the English Court entered orders placing the NNSA and the other EMEA Debtors into administration and appointing the Joint

---

7.  With the exception of Nortel Networks (CALA) Inc., which filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009.

Administrators (the "<u>English Proceedings</u>").[8]  This Court subsequently granted recognition for

the English Proceedings under Chapter 15 of the Bankruptcy Code.[9]  The French Liquidator was

appointed by a judgment of the Commercial Court of Versailles, dated May 28, 2009, pursuant to

which NNSA entered secondary insolvency proceedings in France (the "<u>French Proceedings</u>").

### The Sales and Mediation Processes

Since the Petition Date the primary focus of all of the Nortel debtors has been on

the sale of the group's worldwide assets.  In addition they have engaged in consensual and

cooperative efforts to resolve the question of how the proceeds of these asset sales should be

allocated among the various debtors.  Although limited exchanges of information were made, on

a cooperative basis, in connection with the mediation process, there has been no comprehensive

intercompany disclosure process, and neither NNL nor NNI responded fully to information

requests submitted by the Joint Administrators.[10]  Even the disclosure that has been provided was

provided on a without prejudice basis.  Those documents are not able to be used for this or any

other formal court process.  This is despite persistent requests by the Joint Administrators that

this information would be available for the purposes of perfecting the intercompany claims.

### The US Claims Process

The US Debtor incorrectly suggests that the Joint Administrators have been

dilatory in asserting and documenting their claims.  In fact, the Joint Administrators elected to

---

8.   (*In the matter of Nortel Networks UK Limited and in the Matter of Insolvency Act 1986*, High Court of Justice
     (Ch) No. 00536 of 2009, 14 January 2009, Blackburne J. (the "<u>Initial Orders</u>"), Peacock Decl. Ex. F.)

9.   (Order Granting Recognition And Relief In Aid Of Foreign Main Proceedings, dated June 26, 2009, Peacock
     Decl. Ex. M; Order Granting Recognition Of Foreign Proceedings And Related Relief With Respect To The
     EMEA Debtors, dated Jan. 31, 2011 (the "<u>EMEA Recognition Order</u>"), Peacock Decl. Ex. N.)

10.  As part of the mediation process the parties exchanged requests for documents commencing in early 2010.
     However, the discovery process to date has been without prejudice, informal, ad hoc, and limited to requests for
     documents which at the time were considered to be significant or required for the purposes of settlement
     negotiations.  Due to a compressed timetable in the lead up to the August 2010 and November 2010 mediation,
     the parties considerably narrowed their requests from their original scope.

file, and later agreed to voluntarily supplement and amend, the protective proof of claim in

advance of the setting of any bar date for intercompany claims.  This suggestion is also

disingenuous because, since mid-2010, the Joint Administrators have been actively engaging

with the US Debtor, on a without prejudice basis, in relation to their claims against the

US Debtor.

The order establishing a Bar Date of September 30, 2009 for the filing of general

creditor claims specifically excluded intercompany claims,[11] including the EMEA Debtors'

claims.  Although not required to do so, the Joint Administrators filed the Original Proof of

Claim against NNI.[12]  The Original Proof of Claim included a rider that stated the bases for the

Joint Administrators' claims.

The US Debtor has only recently moved to set a proposed bar date of November

15, 2011 for intercompany claims.[13]  But previously, in April 2011, they had singled out the Joint

Administrators by filing objections to the Original Proof of Claim and moving for an order

requiring a more definite statement.[14]  The Joint Administrators responded to the US Debtor's

motion for a more definite statement by voluntarily agreeing to file amended and supplemental

claims.[15]  Thus, on June 3, 2011, the Joint Administrators filed their amended Proof of Claim,

setting forth the factual and legal grounds for NNSA's claims at great length.

---

11. (*See* Bar Date Order ¶ 6(f) [D.I. 1280] (excluding from the list of creditors required to file a proof of claim by the Bar Date "[a]ny Debtor, nondebtor affiliate of the Debtors or Canadian Debtor, or any of their direct or indirect subsidiaries holding a claim against any of the Debtors.").)

12. (Peacock Decl. Ex. C.)

13. (*See* Debtors' Motion for an Order Establishing Deadlines for Filing Proofs of Claim for Non-Canadian Intercompany Claims and Remaining Director and Officer Claims and Approving the Form and Manner of Notice Thereof [D.I. 6303].)

14. (*See generally* Initial Claims Obj.)

15. (Proposed Order Requiring EMEA Claimants to File a More Definite Statement of Claim and Setting a Deadline for the Filing of Any Proofs of Claim By the EMEA Claimants [D.I. 5402] ("May 10, 2011 Order")

The French Liquidator did not file a claim in September 2009, and was therefore not subject to the May 10, 2011 Order directing that more definite statements be filed in respect of claims previously filed on behalf of the EMEA Debtors.  Nevertheless, the French Liquidator filed a proof of claim on behalf of NNSA on June 3, 2011, in a form substantially identical to the one filed by the Joint Administrators on NNSA's behalf.

### The Canadian Claims Processes

On December 20, 2010, the Canadian Debtor moved the Canadian Court to impose a "bar date" of February 11, 2011, by which time the EMEA Debtors would be required to submit intercompany claims against the Canadian Debtors (the "EMEA Claims Bar Date").  On January 20, 2011, the Canadian Court entered an order setting the EMEA Claims Bar Date for March 18, 2011.  The EMEA Debtors filed intercompany claims against the Canadian Debtors on the EMEA Claims Bar Date.  On May 19, 2011 the Canadian Monitor wrote to the EMEA Debtors' Canadian counsel requesting that the EMEA Debtors provide further particulars in relation to the EMEA intercompany claims against the Canadian Debtors.  The EMEA Debtors provided Further Particulars (running to 110 pages) on September 12, 2011.  However, the Canadian Monitor has indicated that it does not intend to take any further steps to progress the EMEA intercompany claims against the Canadian Debtors and that, should it choose to progress those claims, it will not do so until after the mediation ordered by the US and Canadian Courts takes place before Chief Justice Winkler.

### FACTUAL BACKGROUND OF THE CLAIMS

By 1990, the combined Canadian and US operations of the Nortel Group made it one of the leading telecommunications companies in North America.  (Proof of Claim ¶ 3.)

---

(setting June 1, 2011 deadline); Order Approving Extension of Deadline for EMEA Claimants to File a More Definite Statement of Claim and to File Any Proofs of Claim [D.I. 5588] (extending deadline to June 3, 2011).)

From this pan-North American base, the Group sought to expand overseas. (*Id*.) In 1991, the

Group acquired STC plc, a major UK public telecommunications company. This entrée into the

European market brought customer relationships with large European carriers and allowed

Nortel to expand into the wider European markets. In fiscal year 1991, European revenues

accounted for nearly one-fifth of the Group's total revenue, a figure that grew in later years. (*Id.*

¶¶ 4-5.)

        As Nortel expanded internationally, control of the Group's worldwide businesses

remained centralized in North America. Although the Canadian companies – NNL, and its

ultimate corporate parent NNC (together, the "<u>Canadian Entities</u>") – were the ultimate parent

companies of NNI, NNSA, and the other overseas subsidiaries, there was at all relevant times a

special relationship between NNL and NNI. There was considerable overlap between the

management of the North American companies and key areas were controlled jointly by the

Canadian Entities and NNI. These areas included Nortel Group Tax and Treasury, which

performed a key role in the Group's centralized, strategic management and initiated and

implemented most of the significant transactions that impacted the Group. (*Id.* ¶¶ 15, 22, 27.)

        Although the Nortel Group enjoyed considerable financial success following its

expansion into Europe, increased industry competition and decreased demand for the Group's

products in the wake of the "dot-com" crisis in 2001 caused a dramatic downturn in revenue.

(*Id.* ¶¶ 6-7.) To combat this downturn, the Group was forced to restructure and, by 2008, had

reduced its employee numbers by two-thirds and outsourced its manufacturing. (*Id.* ¶ 7.) This

restructuring did not resolve the Group's financial troubles. It only helped stave off the ultimate

collapse of the Group until early 2009. (*Id.* ¶¶ 7-8.)

From around 2003, NNI and NNL implemented a general policy to ensure that value and cash within the Group would be improperly removed from NNSA and the other EMEA entities and transferred to NNL. (Proof of Claim ¶¶ 9-10.) NNI benefited from this removal of value from NNSA, including, for example, through the receipt of cash payments from NNL stemming from intercompany loans which were advanced by NNSA to NNL. (*Id.* ¶¶ 11-12.) NNI secured this benefit by exerting its control over Group Tax matters, including transfer pricing, and Group Treasury matters – the functions that advanced the transactions through which cash and value was removed from NNSA. (*Id.* ¶¶ 15, 21-22.)

As control of the Nortel Group's operations remained highly centralized, NNSA directors became frustrated that they were not involved in decisions related to NNSA made by NNI and NNL personnel. (*Id.* ¶ 28.) Indeed, NNSA's Board did not meet because its decision-making function related to NNSA's strategy and policy was usurped by NNI and the Canadian Entities, which made important decisions on NNSA's behalf without consulting NNSA's directors. (*Id.* ¶ 30.)

Thus, in the period leading up to the collapse of the Nortel Group, NNI and the Canadian Entities worked hand-in-hand to systematically deplete the resources of NNSA by orchestrating a scheme through which cash and value was repeatedly and improperly removed and transferred from NNSA and the other EMEA entities to NNL and NNI, as described more fully below.[16]

---

16. NNL and NNI both exercised the functions of a director of NNSA by making key decisions that could only properly be made in a director's capacity. (Proof of Claim ¶¶ 31-32, 104, 119 n.9.) NNSA's *de jure* directors, moreover, allowed both NNI and NNL to control decision-making related to intercompany transactions – including transfer pricing arrangements and the February 2008 Repayment that was part of Project Swift, as described below – which resulted in NNSA suffering losses. (*Id.* ¶ 35.)

Transfer Pricing.  The guiding principle behind transfer pricing arrangements, as recommended by the Organization for Economic Cooperation and Development and followed by most tax authorities, is that transactions between companies within a multinational group should replicate arm's length transactions between independent companies.  (Proof of Claim ¶ 36.)  The arrangements within the Nortel Group, however, ensured exactly the opposite – NNSA and the other EMEA entities were deprived of revenue because NNI, along with NNL, intentionally facilitated the improper transfer of value from NNSA and the other EMEA entities to NNL.  (*Id.* ¶¶ 16-19, 39.)

In an effort to allocate more profit to the Canadian Entities at the expense of NNSA, NNI and the Canadian Entities revised the Nortel Group's transfer pricing method in 2001 without informing NNSA and the other EMEA Companies that were adversely affected by this decision.  (*Id.* ¶¶ 39-40.)  The new transfer pricing method adopted by the Group in 2001[17] – the residual profit split method ("RPSM") – distinguished between two types of Group participants: (i) residual profit entities ("RPEs"), which included NNSA, NNL, NNI, Nortel Networks (Ireland) SA ("NN Ireland") and Nortel Networks UK Limited ("NNUK"), and (ii) limited risk entities ("LREs").  Under the RPSM, LREs were entitled only to routine profits based on their own direct earnings from sales to third parties, while RPEs received their routine profits as well as profits (or losses) attributable to the Group's intangible development activities (e.g., research and development ("R&D")).  (*Id.* ¶¶ 37, 41-42.)

In December 2004, NNL, NNI, NNUK, NNSA, NN Australia and NN Ireland entered a Master Research and Development Agreement ("MRDA"), which provided the

---

17.  Despite the fundamental significance of this issue to NNSA's financial position, there is no evidence in NNSA's board minutes of the transfer pricing arrangement being approved by the NNSA Board during the relevant period.  (*Id.* ¶ 29.)

architecture and contractual basis for the RPSM to be applied.  (Proof of Claim ¶ 46.)  Consistent

with the implementation of the RPSM, NNSA was not involved in the decision to implement the

MRDA.  The terms of the MRDA were also determined by NNI and NNL, without input from

NNSA.  (*Id.* ¶ 47.)  Had the NNSA Board been invited to consider the MRDA and RPSM, it

would have discovered that such an agreement was contrary to NNSA's corporate interests.  (*Id.*

¶ 18.)

        The MRDA provided that in exchange for the performance of R&D, each party to

the agreement was entitled to receive payment commensurate with its performance of, and

contribution to, R&D activity.  (*Id.* ¶¶ 48-49.)  Indeed, the agreement that each of the entities

within the group would treat each other in accordance with arm's length principles is expressly

set forth in the MRDA.  (*Id.* ¶¶ 51-53.)  But the RSPM as applied under the MRDA failed to

comply with the arm's length principle.  Instead, NNI facilitated the improper transfer of funds

from NNSA for the benefit of NNL, thereby drastically worsening NNSA's financial position.

(*Id.* ¶¶ 54-57.)

        NNSA went from profitable to bordering on insolvency as a result of the RPSM.

(*Id.* ¶ 58.)  NNSA was forced to repay sums it had received in 2001 under the prior cost-sharing

arrangements.  This had a significant prejudicial impact on NNSA's financial situation and

NNSA became technically insolvent on a balance sheet basis as of December 31, 2001.  (*Id.*)

Contrary to arm's length principles, NNSA was effectively run as a cost center incurring

significant and increasing R&D costs for the Nortel Group without corresponding profits, which

were funneled to NNL.  (*Id.* ¶¶ 59-61.)

        Moreover, the RPSM arrangement was flawed because:

(i)      NNSA's rate of return failed to recognize intercompany sales, significant customer intangibles, the service element performed alongside the distribution function or the risks and costs borne outside the routine return;

(ii)     NNSA was not fully reimbursed for providing regional central services and other extra-territorial services (e.g., sales and marketing) to other companies in the Nortel Group;

(iii)    The RPSM model did not reflect NNSA's high restructuring costs;

(iv)     NNSA incurred losses associated with bad debts arising from vendor financing that NNL required NNSA to provide to its customers; and

(v)      Contrary to the MRDA, stewardship costs were not excluded from the calculation of the RPEs' residual profits.  NNL's and NNI's excessive and duplicative corporate costs were also allocated to the residual pool, even though the EMEA region had its own head office.  (Proof of Claim ¶¶ 62-67.)

Subordinated Loan And Repayment.  In December 2001, following the implementation of the RPSM, NNSA was in serious financial trouble.  This trouble extended into 2002 and beyond.  In order to bolster NNSA's cash position, in September 2002, NNL and NNSA entered into a subordinated loan agreement under which NNL agreed to make a loan facility of €200 million available to NNSA.  No repayment date was stipulated in the loan agreement, which provided that (i) the amounts owed by NNSA were subordinated to the prior repayment of any existing and future secured and unsecured creditors of NNSA, and (ii) NNSA would not pay interest unless it was profitable.  (*Id.* ¶ 70.)

In December 2003, NNL converted €150 million of the subordinated loan into share capital in NNSA, leaving €50 million outstanding under the loan agreement.  (*Id.* ¶ 71.)

NNSA continued to struggle financially through 2008, turning a profit in only two years, 2003 and 2005, while mounting huge losses every other year in the period from 2001 through 2007. (*Id.* ¶ 72.)  Nonetheless, beginning in January 2008, the team of NNI personnel that had planned and implemented Project Swift – a transaction by which NNSA would be transferred from the ownership of NNL to NNUK – discussed a plan for NNSA to repay the entire €50 million outstanding on the loan balance.  In the face of reluctance from NNSA's controller due to NNSA's uncertain financial position, it was agreed, instead, that NNSA would repay half of the outstanding amount in February 2008 and the other half later in 2008.  NNSA therefore made a €25 million cash repayment in February 2008, contrary to the parties' intention that the 2002 loan would be repaid only when NNSA was profitable.  (Proof of Claim ¶ 76.)

This repayment was not approved by NNSA's Board – instead, it was imposed on NNSA by NNI and NNL without regard to NNSA's worsening financial condition.  (*Id.* ¶¶ 78-79.)  The pattern, therefore, of the Nortel Group's North American leadership causing NNSA to lose value while NNI benefited and received cash continued unabated.  (*Id.* ¶ 23.)

Prepetition Asset Sales.  Prior to January 14, 2009, NNSA entered into various global business transactions with other Nortel entities, including NNI, whereby particular business lines were sold by those Nortel entities to third party purchasers.  (*Id.* ¶ 80.) Notwithstanding the parties' agreement that the various selling Nortel entities would allocate the proceeds of sales among themselves in accordance with arm's length entitlement – and applicable law and international accounting regulations that demand such allocation — this did not happen.  (*Id.* ¶¶ 81-82.)  Instead, allocation was attempted (but apparently not even consistently applied) in conformity with the erroneous assumptions set forth in the transfer pricing structure within the Nortel Group at the time.  (*Id.* ¶ 82.)  Consequently, at the direction

of the Group's North American leadership, NNSA received significantly less and NNI received significantly more than each was entitled to on an arm's length basis.  (*Id.* ¶ 83.)

Taxation Matters.  NNSA's taxation affairs were controlled by NNI and NNL, particularly with respect to transfer pricing matters.  Thus, to the extent that any Revenue Authority makes a claim against NNSA in connection with any failure to pay the appropriate level of taxation, NNI and NNL would be responsible for any resulting penalties, interest or other loss payable by NNSA.  (Proof of Claim ¶¶ 84-85.)

FSD Proceedings.  On June 25, 2010, the Determinations Panel ("DP") of the UK Pensions Regulator ("UK Regulator") determined that a Financial Support Direction ("FSD") requiring the provision of financial support to the Nortel Networks UK Pension Plan should be issued with respect to certain EMEA entities, including NNSA (the "EMEA Targets"), and NNI. (*Id.* ¶¶ 86-88.)  The EMEA Targets have referred the DP's decision to the Upper Tribunal (Tax and Chancery Chamber) and are waiting to be heard.  NNI has not referred the DP's decision to the Upper Tribunal.  (*Id.*)

Pursuant to an application by the UK Regulator, the Upper Tribunal issued directions on February 3, 2011, confirming that FSDs can be issued by the UK Regulator as against NNI.  (*Id.* ¶ 88.)  In deciding whether it is reasonable to impose the requirements of an FSD on a particular person, the UK Regulator is required to consider, where relevant:  (i) the relationship the person has or had with the sponsoring employer of the pension scheme in question (including, where the person is a company, whether the person has or had control of the employer); (ii) the value of any benefits received directly or indirectly by the person from the employer; (iii) any connection or involvement the person has or had with the scheme; and (iv) the financial circumstances of the person.  (*Id.* ¶ 90.)

17

The principal effect of an FSD is to require the persons to whom it is issued to secure and maintain financial support for the pension scheme at issue. (*Id.* ¶ 91.) In the event of non-compliance with an FSD, the UK Regulator has power to issue a contribution notice ("<u>CN</u>") requiring the person to whom the FSD was issued to pay the trustees or managers of the pension scheme, where is it reasonable to impose such liability. (Proof of Claim ¶ 92.)

To the extent NNSA is ultimately required to make a payment pursuant to an FSD or CN, NNSA would be entitled to recover from NNI based on the extent of NNI's responsibility for NNSA's financial condition as set forth above. (*Id.* ¶¶ 178-180.) Pursuant to Section 40 of the *Pensions Act 2004*, under certain circumstances, a CN could be imposed on a joint and several basis.

## ARGUMENT

## I.    THE PROOF OF CLAIM SATISFIES ALL RELEVANT PLEADING STANDARDS.

A proof of claim is only required to comply with Bankruptcy Rule 3001. The US Debtor does not dispute that the Proof of Claim complies with that rule. That should be the end of the matter. The US Debtor has not articulated any persuasive reason why the Court should exercise its discretion to apply Rules 8(a) and 12(b)(6). If the Court were to apply these rules, Bankruptcy Rule 9014(c) requires that the Joint Administrators and the French Liquidator be given advance notice and an opportunity to comply with these rules. This would lead to delay and serve no purpose inasmuch as the current Proof of Claim shows that the claims are well-founded and that the Joint Administrators and the French Liquidator can comply with the pleading standards under the Federal Rules.

###### A.      The Proof of Claim Complies With The Bankruptcy Rules.

It is well settled that "a proof of claim is not subject to the same rules of pleading that govern the pleadings filed in an adversary proceeding or other civil litigation." *In re Rimsat Ltd.*, 223 B.R. 345, 348 (Bankr. N.D. Ind. 1998).[18]  The form and content of proofs of claim are governed by Rule 3001(a), which states that:  "A proof of claim is a written statement setting forth a creditor's claim.  A proof of claim shall conform substantially to the appropriate Official Form."  Fed. R. Bankr. P. 3001(a).  The official proof of claim form only requires the factual basis for a claim to be stated in the most general terms.[19]  A bankruptcy claimant is merely asked to provide "some kind of factual context for the origin of debtor's liability to it."  *Rimsat*, 223 B.R. at 348.[20]

In making its motion for a more definite statement (which did not apply to the French Liquidator), the US Debtor only requested that the Joint Administrators file a claim that complied with the requirements of Bankruptcy Rule 3001, as outlined in *Rimsat* and similar

---

18.  *See also In re Cavalier Indus., Inc.*, No. 99-31737, 2003 WL 716291 (Bankr. E.D. Pa. Feb. 6, 2003) (summarizing procedure for claim objection, which differs from federal pleading requirements); *In re Keck, Mahin & Cate*, 237 B.R. 430, 432 (Bankr. N.D. Ill. 1999), *aff'd*, 253 B.R. 530 (N.D. Ill. 2000) (noting the less formal nature of a contested matter, such as claims objection, renders federal civil pleading rules less important than in adversary proceeding).

19.  With respect to the degree of factual support that must be provided, Instruction No. 2 to the official Proof of Claim form provides:

Basis for Claim:

State the type of debt or how it was incurred.  Examples include goods sold, money loaned, services performed, persona injury/wrongful death, car loan, mortgage note, and credit card.  If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.  You may be required to provide additional disclosure if the trustee or another party in interest files an objection to your claims.

B-10 (Official Form 10) (04/10).

20.  *See also In re Reliance Fin. & Inv. Group, Inc.*, No. 05-80625-CIV, 2006 WL 3663243, at *5 (S.D. Fla. Nov. 14, 2006) ("pleading requirements are generally more relaxed in bankruptcy cases"); *Davidson v. Twin City Bank (In re Hollis)*, 83 B.R. 588, 590 (Bankr. E.D. Ark. 1988) ("[B]ankruptcy courts do not generally insist on the stringent standards required in a nonbankruptcy civil action.").

cases.  (Initial Claims Obj. ¶¶ 20, 25.)[21]  On the present application, the US Debtor does not

contest that the Proof of Claim now meets these requirements.  The Proof of Claim therefore

"constitutes *prima facie* evidence of the validity and amount of the claim."  Fed. R. Bankr.

P. 3001(f); *see In re SemCrude, L.P.*, 436 B.R. 317, 319-20 (Bankr. D. Del. 2010) (identifying

Rule 3001 as sufficiency standard for proof of claim).

        Although the US Debtor's application is denominated an "objection and motion,"

the US Debtor has not in fact complied with the requirements for filing a valid objection to the

Proof of Claim.  Once a valid proof of claim has been filed, the objecting party "has the burden

of going forward and of introducing evidence sufficient to rebut the presumption of validity."

9 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 3001.09[2] (16th ed. 2011); *see In re*

*SemCrude*, 436 B.R. at 320 (burden is on objector to refute claim sufficiently stated under Rule

3001); *In re Rafter*, No. 05–51335, 2007 WL 1591880, at *2 (Bankr. D.N.J. May 30, 2007)

(noting burden-shifting standard and finding claims objection insufficient to rebut the

presumption of validity).  The objection must, at minimum, allege the facts that are necessary to

support the objection, "includ[ing] allegations sufficient to overcome the prima facie validity of

the filed proof of claim," as well as providing "a description of the theories on which it is based."

*Collier* ¶ 3007.01[3]; *see In re Windsor Constructors, Inc.*, No. 03–36589, 2006 WL 4005568,

at *8 (Bankr. E.D. Pa. Dec. 18, 2006); *In re DeAngelis Tangibles, Inc.*, 238 B.R. 96, 98-99

(Bankr. M.D. Pa. 1999) (noting that allegations included in objection "must be sufficient to

demonstrate a true dispute and must have probative force equal to the contents of the claim").

---

21. Although the US Debtor argued that the Original Proof of Claim would have failed scrutiny if treated as a
complaint governed by the pleading standard under *Iqbal* and *Twombly* (Initial Claims Obj. ¶ 24), it moved for
an order requiring a more definite statement under Rule 12(e) and did not ask the Court to order that Rule 8(a)
or 12(b)(6) would apply to the amended proof of claim.  (Initial Claims Obj. ¶ 24-25; Order ¶ 2.)

To be valid, an objection should also "make clear which facts are disputed," and allege any facts necessary to support any affirmative defenses. *Collier* ¶ 3007.01[3].

Here, the US Debtor has not provided any substantive response to the allegations contained in the Proof of Claim. The claims asserted on behalf of NNSA therefore retain the presumption of validity.

**B.     It Would Serve No Purpose, And Only Lead To Further Delay, To Apply Rules 8(a) and 12(b)(6).**

Upon the filing of a valid objection to a proof of claim, a claim becomes a "contested matter" governed by Bankruptcy Rule 9014. *See Rimsat*, 223 B.R. at 346 & n.2. Rule 9014(c) provides that certain of the Federal Rules of Civil Procedure, as incorporated in Bankruptcy Rule 7001 *et seq.*, apply automatically in any contested matter, while others do not. Significantly, Rules 8 and 12 are <u>omitted</u> from the rules generally applicable in contested matters. It is evident from this that the drafters did not intend for claimants and debtors to waste time addressing motions like the present one.

The US Debtor suggests that the bankruptcy courts "routinely" apply Rule 12 to claims objections in pursuit of a generalized "goal of bringing bankruptcy court procedure into line with district court procedure."[22] These suggestions are contrary to the obvious intent of Rule 9014(c) and are not supported by the cases cited, which indicate that, in fact, bankruptcy courts rarely apply Rule 12(b)(6) to proofs of claim, and only do so under circumstances unlike those presented here. In *Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.)*, the district court upheld the dismissal of a proof of claim pursuant to 11 U.S.C. § 502(c), but applied Rule 12(b)(6) only because the parties agreed that dismissing "a proof of claim pursuant to 11 U.S.C. § 502(c) [sic] is equivalent to dismissing a claim under Fed. R. Civ. P. 12(b)(6)." 398

---

22.  (Joint Obj. at 16-17, 18.)

B.R. 736, 740, 748 (S.D.N.Y. 2008).  Similarly, although the court applied Rule 12(b)(6) to a

proof of claim in *In re Spiegel, Inc.*, it did so because the claimant had attached the complaints

from parallel state court proceedings against the debtor based on the same underlying facts, and

the parties agreed that the court should address the merits.  *See* 337 B.R. 821, 822-24 (Bankr.

S.D.N.Y. 2006).  This case presents no such consent or prior related proceedings.[23]

      More significantly, the US Debtor does not cite <u>any</u> case in which a bankruptcy

court has applied the Rule 8(a) pleading standard, as articulated in *Iqbal* and *Twombly*, to test the

legal sufficiency of a proof of claim.  This is not surprising inasmuch as the Rule 8(a) test under

these cases is inconsistent with the presumption of prima facie validity to which claims – but not

complaints – are entitled under Bankruptcy Rule 3001.

      The US Debtor argues that it would be efficient to apply Rules 8 and 12(b) here

because dismissal of claims could save estate and judicial resources that would otherwise be

expended in discovery and other further proceedings.  (Joint Obj. at 17.)  The US Debtor further

argues that dismissal of even some part of the Joint Administrators' claims would materially

progress resolution of the other claims.  (Joint Obj. at 17.)  These arguments do not hold water.

      First, all of NNSA's legal claims are based on the same set of factual

circumstances.  Dismissal of some of the claims will therefore not reduce the burden and expense

of discovery because the same discovery will be taken in relation to the remaining claims.  More

importantly, such discovery will take place <u>regardless</u> of whether some or all of the Joint

Administrators' claims are dismissed, because discovery addressing these same underlying facts

must take place soon in connection with the Canadian intercompany claims process, and to

---

23.  In the other cases the US Debtor cites the courts do not provide any explanation as to why Rule 12(b)(6) was
applied.  *See 900 Capital Servs., Inc. v. Cloud (In re Cloud)*, No. 99-51109, 2000 WL 634637, at *2 (5th Cir.
May 4, 2000); *In re WorldCom, Inc.*, 322 B.R. 530, 535-36 (Bankr. S.D.N.Y. 2005); *In re Sevko*, 143 B.R. 167,
171 (Bankr. N.D. Ill. 1992).

address disputes about the allocation of the proceeds of the sales of the Nortel businesses.

Accordingly, the most efficient approach would be to address the US Debtor's objections by way

of motions for summary judgment after the conclusion of discovery.  Indeed the discovery

process itself may allow the Joint Administrators to winnow and refine their claims, thereby

obviating unnecessary and premature motion practice.

        Nor do the cases cited by the US Debtor show that the bankruptcy courts have

regularly relied on Rule 12(b)(6) in an effort to winnow out claims at a preliminary stage.  The

court in *In re Diamond Mortgage Corp. of Illinois* applied Rule 7012 to "move this litigation

along" only after observing that it was unclear what was pending before the court, and ultimately

deciding to treat the papers as a Rule 12(c) motion for judgment on the pleadings.  *See* 105 B.R.

876, 877 n.1 (N.D. Ill. 1989).  Both of the parties in *In re Adelphia Communications Corp.* had

agreed to the application of Rule 12(b)(6).  359 B.R. 54, 56 n.5 (Bankr. S.D.N.Y. 2006).  As in

*Diamond Mortgage*, the court noted that an evidentiary hearing or discovery might be necessary

prior to resolving the dispute – which shows that this was not a true motion to dismiss scenario.

*See Adelphia*, 359 B.R. at 56; *Diamond Mortg.*, 105 B.R. at 877 n.1.  Finally, although the court

in *In re Best Products Co.* applied Rule 12(b)(6) in order to "resolve the parties' dispute

expeditiously," that dispute was over a bank's motion to treat as administrative expenses certain

damages incurred under a credit agreement with the debtor.  210 B.R. 714, 715-16 (Bankr. E.D.

Va. 1997).  The instant case presents issues far more complex and thus inappropriate for

summary resolution under Rule 12(b)(6).[24]

---

24. The fact that a proof of claim has sometimes been considered the "functional equivalent" of a complaint (Joint Obj. at 18), for unrelated purposes, is not particularly pertinent.  In the cases the US Debtor relies on the courts held that the filing of a proof of claim can, under appropriate circumstances, trigger indemnification and contribution rights in the same manner as the filing of a complaint in a lawsuit.  (*See* Joint Obj. at 18 (citing *Hill v. Day (In re Today's Destiny, Inc.)*, 388 B.R. 737 (Bankr. S.D. Tex. 2008); *Amatex Corp. v. Aetna Casualty & Surety Co. (In re Amatex Corp.)*, 107 B.R. 856, 858-59 (Bankr. E.D. Pa. 1988).)

Finally, entering an order to apply Rules 8 and 12(b)(6) would only lead to additional delays and motion practice because, under Bankruptcy Rule 9014(c), the Joint Administrators would be entitled to file a further amended proof of claim before any Rule 12(b)(6) motion is addressed.  Rule 9014(c) provides that while the Bankruptcy Court is given discretion "at any stage in a particular matter [to] direct that one of the other rules in Part VII shall apply," the parties must be given advance notice and "a reasonable opportunity to comply with the procedures prescribed."  Fed. R. Bankr. P. 9014(c).

### C.    The Proof of Claim Complies With Fed. R. Civ. P. 8(a).

The US Debtor argues that the Proof of Claim would be subject to dismissal on a Rule 12(b)(6) motion because it does not comply with the current standard for federal pleading under Rule 8(a), as articulated by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 55 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).  However, even if the Court were to apply Rule 8(a), an examination of the Proof of Claim shows that the claims asserted would in fact withstand a motion to dismiss under current Rule 8(a) jurisprudence.

Contrary to the US Debtor's arguments, the decisions in *Twombly* and *Iqbal* have not altered the fundamental principles of pleading under the Federal Rules.  It remains the rule that a pleading is only required to set forth "a short and plain statement of the claims showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and that "notice pleading" is the guiding principle.[25]  A plaintiff is still not required to plead the evidence that supports a claim or

---

[25]  *Twombly* did not overrule the Supreme Court's decision in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002) which confirmed the principle of notice pleading.  *See* 550 U.S. at 569-70; *see also Dobyns v. United States*, 91 Fed. Cl. 412, 425 (2010) (observing that principle of notice pleading is confirmed by *Twombly*).

Following *Iqbal*, Third Circuit decisions indicated that the Supreme Court had overruled its decision in *Swierkiewicz* that had upheld notice pleading.  *See Guirgis v. Movers Specialty Servs., Inc.*, 346 F. App'x 774, 776 n.7 (3d Cir. 2009); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (stating that *Twombly* and *Iqbal* repudiated *Swierkiewicz*).  More recently, however, a different Third Circuit panel described the analysis in *Fowler* as dictum and cited with approval a Second Circuit's statement that *Twombly* is consistent

(except for claims governed by Rule 9(b)) allege the details of the underlying facts with particularity.[26]  Finally, "the standard [for addressing a motion to dismiss] remains:  'courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.' "[27]

However, the decisions in *Iqbal* and *Twombly* have added two refinements to the traditional inquiry on a motion to dismiss.  First, "labels and conclusions" and "formulaic recitations of the elements of a cause of action" are no longer entitled to the assumption of truth.[28]  Second, a court addressing a motion to dismiss should examine the pleaded facts to see if the asserted claim is "plausible on its face."[29]  "This 'plausibility' determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"[30]

To apply this test, a court should first identify the elements of each claim asserted by the plaintiff.  Having identified the elements, the court next examines the complaint to see if each element is supported by factual allegations that, if proven, will entitle the pleader to relief.

---

with *Swierkiewicz*.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 319 n.17 (3d Cir. 2010); *see also Arista Records*, 604 F.3d at 120 (noting that *Twombly* and *Iqbal* were consistent with *Swierkiewicz* in not requiring heightened fact pleading and citing *Swierkiewicz* indicating it is still good law); *Gillman v. Inner City Broad. Corp.*, No. 08 Civ. 8909, 2009 WL 3003244, at *3 (S.D.N.Y. Sept. 18, 2009) (observing that "in *Twombly*, which heavily informed *Iqbal*, the Supreme Court explicitly affirmed the vitality of *Swierkiewicz*" and therefore "*Iqbal* was not meant to displace *Swierkiewicz*'s teachings").

26.  *See, e.g.*, *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119-21 (2d Cir. 2010) (plaintiff not required to plead evidence).

27.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).  (*See also* Joint Obj. at 10 n.19 (conceding application of this standard).)

28.  *Fowler*, 578 F.3d at 210 (quoting *Twombly*, 550 U.S. at 555).

29.  *Twombly*, 550 U.S. at 570.

30.  *Fowler*, 578 F.3d at 211 (3d Cir. 2009) (quoting *Iqbal*, 129 S. Ct at 1949).

Conclusory allegations that merely parrot the elements of the cause of action are to be disregarded in this analysis.[31]  But a plaintiff need only plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" in support of the claim.[32]  Rule 8(a) does not require "detailed factual allegations,"[33] and a claim that alleges the minimum necessary facts should not be dismissed even if it appears that "actual proof of those facts is improbable" or "a recovery is very remote and unlikely."[34]

As set forth below, each element of each cause of action in the Proof of Claim is supported by allegations of fact that, when proven, will entitle the Joint Administrators  and the French Liquidator to relief on their claims.  The Joint Administrators and the French Liquidator allege that NNI played an intentional and active role in devising and enforcing a series of transactions by which NNSA and other overseas Nortel subsidiaries were stripped of cash.  Although NNL was the primary beneficiary of these transactions, the Proof of Claim includes detailed factual allegations showing how NNI itself also benefitted.  There is nothing unreasonable or implausible about this scenario.

###       D.       NNSA's Claims Are Not Subject To Dismissal Under Rule 9(b).

The US Debtor argues that many of NNSA's claims are also subject to dismissal under Rule 9(b), which provides that when pleading fraud a party must state the underlying

---

31.  *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011); *Fowler*, 578 F.3d at 210.

32.  *Twombly*, 550 U.S. at 556.

33.  *Id.* at 555.

34.  *Twombly*, 550 U.S. at 556 (internal quotations omitted).  This Court considered the *Twombly* and *Iqbal* decisions in the context of a motion to dismiss in an adversary proceeding.  In *Nortel Networks, Inc. v. Commc's Test Design, Inc.*, Adv. No. 10-53065, 2011 WL 1102829 (Bankr. D. Del. Mar. 22, 2011) (Gross, J.), plaintiffs NNI and NNL alleged that defendant CTDI had breached the parties' agreements by misusing proprietary Nortel information and components to copy Nortel products or to refurbish and subsequently resell Nortel products.  *Id.*  The Court denied the motions to dismiss filed by CTDI against NNI and NNL, finding that their complaints had stated a claim for relief even in light of *Twombly* and *Iqbal*.  *Id.*

circumstances with particularity.  Fed. R. Bankr. P. 7009(b).[35]  This argument fails for two

reasons:  First, the Joint Administrators have not asserted any claims for fraud.[36]  Second, the

allegations contained in the Proof of Claim would in fact meet the standard of particularity under

Rule 9(b), if it is applied.

### 1.    NNSA's Claims Do Not Sound In Fraud.

Although the Joint Administrators and the French Liquidator do not assert any

claim for fraud, the US Debtor invokes Rule 9(b) as a ground for dismissing no less than 9 of

their 22 claims.[37]  The US Debtor asserts that these claims should be considered fraud claims

because NNI is alleged to have "participated in a scheme to remove assets from NNSA."  (Joint

Obj. at 20.)  The US Debtor cites authorities holding that Rule 9(b) should be applied "where the

gravamen of the claim is fraud even though the theory supporting the claim is not technically

termed fraud."  (*Id.* (quoting *Toner v. Allstate Ins. Co.*, 821 F. Supp. 276, 283 (D. Del. 1993).)

The gravamen of NNSA's claims is simply not fraud.  The essential elements of a

fraud claim are that the defendant made an intentional misrepresentation of a material fact, or

failed to disclose a material fact he had a duty to disclose, and that the plaintiff relied on this

misstatement or omission to his detriment.[38]  None of NNSA's claims is based on an allegation

that NNI made any misrepresentation or omission of material fact to NNSA, or that NNSA relied

---

35.  Unlike Rules 8(a) and 12(b)(6), Bankruptcy Rule 9014(c) provides that Rule 9(b), through Bankruptcy Rule 7009, applies automatically in any contested matter.  *See* Fed. R. Bankr. P. 9014(c).

36.  In particular, none of the Joint Administrators' claims for mismanagement or tortious acts are based on fraud. French law does not require liability in either mismanagement (*see* Menjucq Decl. ¶ 24) or tort (*see* Menjucq Decl. ¶ 110, 112) to rest on either intentionality or bad faith.  Under French law, bad faith is not limited to actions causing damage or an intention to harm.  (Menjucq Decl. ¶ 122.)

37.  (*See* Joint Obj. at 20 (arguing that claims 3-5, 7-9, 12, 14-15 should be tested under Rule 9(b)).)

38.  *See* 37 Am. Jur. 2d *Fraud & Deceit* § 39 (2011); *Cronus Offshore, Inc. v. Kerr McGee Oil & Gas Corp.*, 369 F. Supp. 2d 848, 857 (E.D. Tex. 2004) *aff'd*, 133 F. App'x 944 (5th Cir. 2005); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

to its detriment on any such misrepresentation or omission.  The gravamen of the Joint

Administrators' claims is not fraud, but breach of duty.

      Although courts have sometimes elected to apply Rule 9(b) to non-fraud claims

that are asserted together with fraud claims based on the same facts, the cases the US Debtor

cites do not indicate that Rule 9(b) should apply to claims like the ones asserted by the Joint

Administrators here.  In *Forman v. Salzano (In re Norvergence, Inc.)*, 405 B.R. 709, 746-47

(Bankr. D.N.J. 2009), the plaintiff asserted claims for aiding and abetting fraud and aiding and

abetting breach of fiduciary duty.  Since the fraud claim and the non-fraud claim were based on

the same set of underlying facts, the court held that Rule 9(b) should apply to both.  The court

observed, however, that "[t]he heightened pleading requirement of Rule 9(b) 'generally does not

apply to the state law claims of breach of fiduciary duty . . . [and] aiding and abetting breach of

fiduciary duty.'"  *Id.* at 746 (quoting *TMP Worldwide, Inc. v. Inacom Corp. (In re Inacom

Corp.)*, Adv. No. 00-1115, 2001 WL 1819987, *2 (D. Del. Aug. 7, 2001)).[39]  This is consistent

with many other authorities holding that Rule 9(b) does <u>not</u> apply to claims of the types asserted

here.[40]

### 2.      In Fact, The Proof of Claim Is Pleaded With Particularity.

      Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Despite this,

"[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

*Id.*  Rule 9(b) is designed to give notice to the defendant of the circumstances surrounding the

---

39.  The other case cited by the US Debtor, *Adamson v. Bernier (In re Bernier)*, 282 B.R. 773, 781 (Bankr. D. Del. 2002), concerned a fraudulent transfer claim.

40.  *See, e.g., Gubitosi v. Zegeye*, 946 F. Supp. 339, 346 n.4 (E.D. Pa. 1996) ("Fed. R. Civ. P. 9(b) does not require that allegations of conspiracy be alleged with particularity; only allegations of fraud have this requirement under the rule"); *Am. Buying Ins. Servs., Inc. v. S. Kornreich & Sons, Inc.*, 944 F. Supp. 240, 246-47 (S.D.N.Y. 1996) (allegations related to "enterprise," "control," and "conspiracy" need not be pleaded with particularity).

alleged fraud and provide the defendant with the information necessary to respond.  *See* 2 Daniel

R. Coquillette et al., *Moore's Federal Practice* ¶ 9.03[1][a] (3d ed. 2011).

       While the Third Circuit recognizes that Rule 9(b) "requires plaintiffs to plead the

circumstances of the alleged fraud with particularity," it has acknowledged that "focusing

exclusively on the particularity requirement is 'too narrow an approach and fails to take account

of the general simplicity and flexibility contemplated by the rules.'"  *Craftmatic Sec. Litig. v.*

*Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (quoting *Christidis v. First Pa. Mortg. Trust*, 717

F.2d 96, 100 (3d Cir. 1983)).  For example, the Third Circuit has instructed that while allegations

of date, place, and time will satisfy the particularity requirements of Rule 9(b), "nothing in the

rule requires them."  *See Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786,

791 (3d Cir. 1984), *cert. denied*, 469 U.S. 1211 (1985).  Indeed, pleading parties "are free to use

alternative means of injecting precision and some measure of substantiation into their allegations

of fraud."  *Id.*  The Third Circuit's flexible approach to fraud pleading also takes into account the

reality that strictly applying Rule 9(b) prior to discovery "may permit sophisticated defrauders to

successfully conceal the details of their fraud."  *Christidis*, 717 F.2d at 99-100; *see also*

*Craftmatic*, 890 F.2d at 645 (noting that rigidly enforcing Rule 9(b) in face of claims involving

internal corporate affairs could allow "sophisticated defrauders" to escape liability).  In other

words, the Third Circuit's Rule 9(b) test is similar to the current jurisprudence under Rule 8(a) –

i.e., that the court find the claim plausible based on the facts alleged.

       This Court recently had the opportunity to analyze and apply the Rule 9(b)

standard in a Nortel adversary proceeding.  *See Nortel Networks Ltd.*, 2011 WL 1102829, at *6.[41]

---

41.  Notably, the claim to which this Court applied Rule 9(b) in that case was one for <u>fraud</u>, rather than an aiding
    and abetting claim, a conspiracy claim, or any of the other claims that the US Debtor now urges this Court to
    test under the Rule 9(b) pleading standard.  *See id.*

This Court noted that " '[t]he purpose of [FRCP 9(b)'s requirement that fraud be pled with particularity] is to place the defendants on notice of the precise misconduct with which they are charged.' " *Id.* at *6 (quoting *Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321 B.R. 128, 140 (Bankr. D. Del. 2005)).  Thus, all a plaintiff must do in order to make out a fraud claim " 'is inform the defendant of the particular conduct which is alleged to have been fraudulent.' " *Id.* (quoting *In re OODC*, 321 B.R. at 140).  Moreover, the "particularity" standard of Rule 9(b) " 'does not require an exhaustive cataloging of facts but only sufficient factual specificity to provide assurance that plaintiff has investigated the alleged fraud and reasonably believes that a wrong has occurred.'"  *Id.* (quoting *S. Track & Pump, Inc. v. Terex Corp.*, 722 F. Supp. 2d 509, 517 (D. Del. 2010)).

       For example, although the defendant in that Nortel case argued that plaintiffs NNI and NNL had failed to adequately plead fraud because they did not provide the name of the specific person who allegedly made fraudulent statements, this Court determined that such factual allegations were unnecessary.  *See id.* at *7 (citing *Am. Gen. Life Ins. v. Goldstein*, 741 F. Supp. 2d 604, 613 (D. Del. 2010)).  The Court found that naming a particular corporate employee was unnecessary because it would be "illogical to require a plaintiff to know the specific individuals involved in a successful concealment scheme."  *Id.* at *8; *see also Southco Inv. v. Penn Eng'g & Mfg. Corp.*, 768 F. Supp. 2d 715, 720 (D. Del. 2011) ("Although date, place, and time allegations may fulfill the requirement of pleading with particularity, these types of allegations are not required to satisfy Rule 9(b), so long as the circumstances of the alleged fraud are pled sufficiently "'to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior.'") (emphasis added, citation omitted).  Here too the Joint Administrators

and the French Liquidator know that NNI and NNL directed the transfer pricing, inter-company loans, pre-petition sale proceeds allocation, and other schemes set out in the Proof of Claim, and their adverse impact on NNSA, but do not yet know – or even have access to all of the documents that would disclose – all of the "who-said-what-to-whom-when" details.  There can be no doubt that the relevant Nortel Group personnel were in constant communication about the subject matter of NNSA's claims.

As described more fully below, the Proof of Claim sets forth the facts supporting NNSA's claims in considerable detail.  Certainly the Joint Administrators and the French Liquidator have provided sufficient information to demonstrate that the claims are not implausible and to permit the US Debtor to move forward with its defense.  Thus, application of Rule 9(b) to NNSA's claims would not result in dismissal of any of those claims.

> **E.    Pleading Standards Are Relaxed For Bankruptcy Trustees and Other Persons Who Were Not Present When The Underlying Events Occurred, and Where The Salient Facts Are In The Control Of Others.**

Any applicable pleading standard would also have to be considered in light of the fact that the events that give rise to the claims occurred before the Joint Administrators and the French Liquidator were appointed, and key evidence about how the underlying transactions were determined and implemented by NNL and NNI is in the exclusive control of those entities.  It is well-settled that pleading standards are relaxed under such circumstances.[42]

---

42.  *See Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, No. 09 C 5619, 2010 WL 1979569, at *13-14 (N.D. Ill. May 17, 2010) (failure to state claim can be excused where plaintiff was unable to access information withheld by defendants); *Reliance Fin.*, 2006 WL 3663243, at *5 ("Trustee will inevitably lack knowledge regarding acts of fraud previously committed by or against a third party debtor."); *Pardo v. Avanti Corp. Health Sys., Inc. (In re APF Co.)*, 274 B.R. 634, 638 (Bankr. D. Del. 2001) ("Especially in bankruptcy cases, where the plaintiff is a trustee acting on behalf of the estate or a group of creditors, courts apply Rule 9(b) with greater flexibility recognizing that trustees often lack knowledge or have only secondhand knowledge of prepetition fraudulent acts involving the debtor and third parties."); *Profilet v. Cambridge Fin. Corp.*, 231 B.R. 373, 379 (S.D. Fla. 1999) ("[T]he Trustee argues – and the Court agrees – that courts should relax the specificity requirements where the plaintiff is a trustee in bankruptcy."); *Kaliner v. Load Rite Trailers (In re Sverica Acquisition Corp., Inc.)*, 179 B.R. 457, 463 (Bankr. E.D. Pa. 1995) ("Flexibility in the application of the particularity requirement of Fed.R.Civ.P. 9 has been recognized as being particularly appropriate in the context

## II.      THE PROOF OF CLAIM STATES CLAIMS FOR MISMANAGEMENT.

### A.      The Proof of Claims States a Claim of Mismanagement under French Law.

Contrary to the US Debtor's arguments, the Joint Administrators and the French Liquidator have sufficiently pled claims against NNI for mismanagement under French law.[43] Under article L. 651-2 of the French Commercial Code, a claim for mismanagement arises when the *de jure* or *de facto* directors of a company committed acts of mismanagement which contributed to the company's insufficiency of assets.  (Menjucq Decl. ¶ 24.)  Should the pleading standard under Fed. R. Civ. P. 8(a) be applied to the Proof of Claim, the Proof of Claim alleges ample facts to prove mismanagement claims against NNSA.  Professor Menjucq opines that the facts alleged in the Proof of Claim, if proven, will lead to success on the merits as a matter of French law.  (Menjucq Decl. ¶ 94.)  Furthermore, neither the French Liquidator nor the Joint Administrators' is estopped, either judicially or collaterally, from asserting these meritorious claims on behalf of NNSA.

### 1.      French Law Regarding *De Facto* Directors.

Under French legal doctrine, a *de facto* director is a person or entity who, without being a legal director, takes an active role in the management of the company (*i.e.* performs acts of management as would a *de jure* director) while acting independently and continuously. (Menjucq Decl. ¶ 30.)  Contrary to what the US Debtor argues, total subordination is not a

---

of fraud claims brought by a statutory trustee in bankruptcy."); *In re Hollis*, 83 B.R. 588, 590 (Bankr. E.D. Ark. 1988) ("This liberality is justified because the Trustee is a third party outsider to the fraudulent transaction and, in most cases, must plead fraud on second hand knowledge for the benefit of the estate and all its creditors."); Arthur R. Miller, *From* Conley *to* Twombly *to* Iqbal*:  A Double Play on the Federal Rules of Civil Procedure*, 60 Duke L.J. 1, 44 (2010) ("[T]o demand fact pleading on pain of dismissal when the facts are unknown or unknowable is a negation of the pleader's ability to access the civil justice system.")**.**

43.  The Joint Administrators have asserted mismanagement claims against NNI in respect of transfer pricing (Claim 2), the February 2008 Repayment made in connection with Project Swift (Claim 6), the allocation of pre-petition sales proceeds (Claim 13) and taxation matters (Claim 16).

criterion of *de facto* directorship in the case of related companies.  (Menjucq Decl. ¶ 31.)[44]  Nor

is the direct holding of a share capital in the subject company.  (*Id.* ¶ 39; *cf.* Joint Obj. n.53.)[45]

What is essential in order to impose *de facto* director liability is the existence of a "predominant

influence in the company's decision making process," and this standard applies equally to both

individuals and entities within a corporate group.  (Menjucq Decl. ¶ 35.)[46]  It is not necessary to

demonstrate that the *de facto* director was involved in all decision-making for the company.  (*Id.*

¶ 46.)

        In determining the necessary level of influence, French courts apply the "bundle

of concurring elements" technique.  (*Id.* ¶ 47.)  The analysis followed by Mr. Guilhem Bremond,

the US Debtor's French law expert, whereby he examines each fact alleged by the Joint

Administrators individually, and in isolation, to conclude that NNI was not a *de facto* director, is

not the correct approach.  (*Id.* ¶ 48.)  Instead, French courts conduct a <u>global</u> analysis and

consider all of the elements in the <u>aggregate</u> when determining whether a party has the status of a

*de facto* director.  (*Id.* ¶ 49.)  In addition Mr. Bremond has exceeded the scope of his instructions

---

44. The US Debtor's French law expert relies heavily on a case decided by the Court of Appeal of Lyon to support his assertion that "total subordination" is a criterion for imposing *de facto* director status on a parent company. (*See* Declaration of Guilhem Bremond in Support of Joint Objection and Motion to Dismiss Claims of Nortel Networks S.A. (NNSA) and its French Liquidator ¶ 36, dated July 22, 2011 [D.I. 6027] ("<u>Bremond Decl.</u>") (citing Court of Appeal of Lyon, 07/02/1999, RG n°98/7888).)  However, this decision carries little, if any weight, as it was decided by a lower appeals court, and therefore has no binding authority on other courts in France. (Menjucq Decl. ¶ 34.)  As described in further detail in the Menjucq Declaration, the French legal system is not a system of precedent, and consequently, the existence of a previous decision on a particular point of law will not require other courts having to rule on the same legal issue to deliver the same decision.  (*Id.* ¶°15.)  Moreover, the fact that French law allows for the existence of several *de facto* directors of the same company further discounts the US Debtor's position.  (*Id.* ¶ 36.)

45. Indeed, the *Cour de cassation*, the highest French court, found a non-shareholder corporate entity managing a company to be a *de facto* director thereof where, under cover of a service provision contract, it was responsible for the administrative and financial organization, set the pricing policy, negotiated contracts, and set the commercial policy of the subject company.  (Menjucq Decl. ¶ 41.)

46. A corporate entity can be regarded as a *de facto* director by acting through its agents.  (Menjucq Decl. ¶ 38.) The status of *de facto* director has also been applied to a diverse range of people with no shareholding relationship with the company, such as franchisor, licensor, and public body.  (*Id.* ¶ 29.)

by improperly opining on the sufficiency of the Joint Administrators' pleadings and drawing self-serving distinctions between "conclusory" and "non-conclusory" allegations.[47]  These opinions address matters of US law and procedure that should be determined exclusively by the Court.

Finally, the alleged *de facto* director must perform positive acts of management both independently and continuously.  To establish independence, it must be shown that the *de facto* director performed the acts of mismanagement of his own volition.  (Menjucq Decl. ¶ 76.) Accordingly, it will not be found to exist where management acts are performed pursuant to an agency agreement granted by the *de jure* directors, or power of attorney, nor would it be imposed on an employee who has acted within the scope of his duties and according to the instructions of his employer.  (*Id*.)[48]  Mr. Bremond also opines on French procedure as if that is somehow of assistance.  However, procedure in a civil system is entirely different from a common law system and references to French procedure are irrelevant.

**2.    The Proof of Claim Shows that NNI Performed Positive Acts of Management as Would a *De Jure* Director of NNSA.**

The US Debtor has not demonstrated that there would be a basis to dismiss claims 2, 6, 13 and 16.  Only the contrary, the Joint Administrators have pleaded detailed factual allegations in support of each element of their claims that NNI, as a *de facto* director of NNSA,

---

47. (*See, e.g.*, Bremond Decl. ¶ 46 ("In sum, it is my opinion that NNSA does not make any <u>non-conclusory factual allegations</u> . . . to qualify NNI as a de facto director of NNSA . . . .").) (emphasis added); *id.* ¶ 41 ("[A]side from various <u>generic</u> and <u>conclusory allegations</u> of "joint control" on the part of NNI and NNL, the Claim . . . does not make any <u>non-conclusory allegation</u> of acts . . . .") (emphasis added).)

48. There is no suggestion in the Proof of Claim that any of these conditions exist:  NNSA never expressly or implicitly granted NNI the authority to act on its behalf, and the Joint Administrators do not submit that the employees of NNI acted outside the scope of their employment.   The allegations in the Proof of Claim further support a finding that NNI took decisions and performed management acts over the course of several years, which evidences continuity.  (Menjucq Decl. ¶ 79.)  Therefore, as described in further detail below, the Joint Administrators have shown that the positive acts of management taken by NNI were independent and continuous.

committed acts of mismanagement.[49]  NNI's predominant influence over NNSA's tax and treasury functions was pervasive and continuous, and the cumulative effect of the major strategic decisions it made in connection with transfer pricing, the February 2008 Repayment associated with Project Swift, certain pre-petition asset sales and its tax policy in general, render it a *de facto* director of NNSA.  (*See* Proof of Claim ¶ 15 ("The control exerted by NNI related to the Nortel Group's tax matters, in particular transfer pricing, and to the Nortel Group's Treasury matters.  These [] functions were responsible for the transactions pursuant to which value was improperly removed from NNSA.").)  NNSA's *de jure* directors, in comparison, had no decision-making authority when it came to its own strategy and policy because those functions were usurped by NNI and NNL.  (*Id*. ¶ 30; *id.* ¶ 28 ("[T]he local NNSA directors were frustrated that they were not involved in decisions and that their views were not taken into consideration.").)  NNI cannot pretend that the Joint Administrators' allegations only support an inference that NNI was a benign and passive co-subsidiary of NNSA.  Rather, the Proof of Claim is replete with specific and concrete examples of the control exercised by NNI and its taking of positive acts of management as would one of NNSA's *de jure* directors.  This is true with respect to each of the five transactions on which NNSA's claims are based and therefore, *a fortiori*, for NNI's involvement when viewed as a whole.[50]

---

49. NNSA's mismanagement allegations do not sound in fraud and therefore Rule 9(b)'s heightened pleading standard does not apply to these claims, as described more fully in Section I.D above.  The mismanagement claims are not based on allegations that NNI made any misrepresentation or omission of material fact to NNSA, or that NNSA relied to its detriment on any such misrepresentation or omission – the essential elements of fraud.  Indeed, for a mismanagement claim to succeed "[a]ny act of mismanagement, even slight, any carelessness or negligence may call into question [a] directors' liability."  (Menjucq Decl. ¶ 81.)

50. The facts alleged in support of the Joint Administrators' claims against NNI for *de facto* director liability and mismanagement apply with equal force to their claims against NNL for *de facto* liability, as the Proof of Claim shows that NNI and NNL acted in concert.

Transfer Pricing.  The Proof of Claim contains more than "generalized references" to NNI's involvement in the implementation and operation of the transfer pricing arrangements.  An examination of the facts alleged in the Proof of Claim shows that NNI personnel dominated the implementation and operation of the transfer pricing arrangements, whereas NNSA's management had little to no involvement in the process.

Specifically, the Proof of Claim identifies key NNI employees (*see* Proof of Claim ¶¶ 17, 22) who directed the design and operation of the RPSM, the creation and implementation of the MRDA and negotiations with the relevant tax authorities in connection therewith.  (*See*, *e.g.*, Proof of Claim ¶ 18a (alleging that NNI and NNL jointly made the policy change to move from the previous cost sharing arrangements to the RPSM); *id*. ¶ 18b ("The process by which the RPSM electronic model was created and structured . . . was handled by NNI and NNL."); *id*. ¶ 18d (alleging that NNI and NNL decided the terms of the MRDA without consulting any of the other parties to the agreement, including NNSA); ¶ 18e (alleging NNI and NNL controlled the APA application process, a team of NNI employees ran negotiations with relevant tax authorities, and took sole responsibility for instructing Nortel's professional advisers in that same process).

The Proof of Claim also demonstrates how NNSA's *de jure* directors effectively sat as a puppet board with no involvement in the decision-making processes in connection with transfer pricing.  (*See id*. ¶ 18d (alleging NNSA was simply instructed to sign MRDA once terms were decided by NNI and NNL);[51] *id*. ¶ 18e (alleging NNSA had no substantive involvement in the APA application process).  In fact, NNSA's board of directors (the "NNSA Board") never

---

51. The US Debtor's argument that the Proof of Claim "tellingly" uses the passive voice when referring to NNSA being instructed to sign the MRDA is desperate.  (Joint Obj. at 37.)  One need only read the preceding and subsequent sentences to understand that the reference is to NNI and NNL.  (Proof of Claim ¶ 18(d); *see also* Menjucq Decl. ¶ 29.)

even deliberated or voted on whether NNSA should accept the newly devised RPSM method or

the terms of the MRDA, even though a prior board approval process for these "interested"

transactions was required before entry under French law.  (*Id*. ¶ 18f.)[52]  Remarkably, it was not

until five months after the MRDA was already in force that the NNSA Board "acknowledged"

NNSA's entry into the agreement.  (*Id*.)  NNI's role in transfer pricing did not end there.  It also

controlled the operation of the RPSM and determined calculations due from NNSA and the

transfer pricing adjustments required.  (*Id*. ¶ 19b.)  NNSA played no role in this important

process.  (*Id*. ¶ 19c.)

        These acts of management rise well above "the limits inherent in the structure of

group companies."  (Joint Obj. at 36.)  An entity within a corporate family does not have the

inherent authority to impose decisions of such magnitude on a sister-subsidiary.  NNI cannot

avoid liability for its wrongful acts by hiding behind its status as a "sister corporation" when its

predominant influence over NNSA's management caused NNSA to suffer such significant

losses.  (Proof of Claim ¶ 58.)

        <u>Contingent Tax Claims</u>.  The Joint Administrators filed the contingent tax

claims[53] against NNI in order to preserve their right to recover from NNI in the event that any tax

authority makes a claim against NNSA in relation to a failure to pay the proper level of taxation

in any years.  NNI should plainly be held accountable for any future tax liabilities imposed on

---

52.  By failing to comply with the obligatory approval process for interested (or related) party transactions, NNSA's *de jure* directors committed acts of mismanagement.  Had the NNSA Board considered the MRDA, it would have found that it was not in NNSA's interest to enter into such an agreement since it was clear, following the enactment and implementation of the RPSM method, that operation of the MRDA would produce a much more prejudicial result for NNSA that the previous cost sharing arrangement. (Proof of Claim ¶ 18g.)

53.  In order to facilitate the claims process, the Bankruptcy Code allows creditors to assert any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, *contingent*, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  Bankruptcy Code § 101(5)(A) (definition of a "claim") (emphasis supplied).

NNSA that are attributable to decisions made by NNI as *de facto* director.  The Proof of Claim

contains a detailed account of NNI's pattern of controlling NNSA's tax functions – particularly

in connection with transfer pricing matters – and thus sufficiently puts NNI on notice of the

conduct on which the Joint Administrators base their cause of action.  As described in the

preceding paragraphs, the Proof of Claim alleges how key individuals at NNI controlled

negotiations with the tax authorities in order to secure approval of the transfer pricing schemes,

which deprived NNSA of significant assets.  (*See* Proof of Claim ¶ 18(e)-(f).)  The Proof of

Claim further alleges that when the French Tax Authorities conducted a tax audit for the years

2001-2003 and objected to the process by which the RPSM was approved,[54] it was a team

including NNI personnel, and not NNSA employees, who prepared the responses to the French

Tax Authorities' audits and directly demonstrated to them the merits of the RPSM.  (*Id.* ¶¶ 20-21

("NNI personnel[] were involved in . . . explaining the justification for the RPSM to the French

Tax Authorities.").)[55]  Significantly and not surprisingly, the French Tax Authorities labeled the

change to the RPSM "an abnormal act of management."  (*Id.* ¶ 20.)  It is abundantly clear, as the

Proof of Claim alleges, that NNI had more than "simple responsibility" (Joint. Obj. ¶ 35) for

NNSA's taxation matters, and that its level of control went above and beyond the limits inherent

in the relations between members of a corporate group.[56]

---

54.  Specifically, the French Tax Authorities objected to the absence of internal documentation evidencing the
     NNSA Board's review and approval of the MRDA and NNSA's failure to obtain approval from the French Tax
     Authorities, as required.  (Proof of Claim ¶ 20.)

55.  The French Tax Authorities also raised objections to the fact that under the RPSM, NNSA could no longer
     charge research & development costs to the Nortel Group, as it could under the previous cost sharing
     arrangement.  The French Tax Authorities subsequently contacted Canadian tax authorities in an effort to
     commence a competent authority process to resolve its issues with the RPSM, but this matter was not resolved
     prior to the Nortel Group's filing of insolvency proceedings.  (*Id.* ¶ 69.)

56.  The taking over of a company's tax management has been mentioned several times in French case law as
     sufficient to impose *de facto* directorship status.  (*See* Menjucq Decl. ¶ 71 (a French highest court took into
     account the drafting of corporate and tax documents on behalf of the subject company in finding *de facto*
     director status; *id.* ¶ 69 (the highest court in France regarded as *de facto* director a foreign company that gave

February 2008 Repayment in Connection with Project Swift.  The Proof of Claim also describes the various ways in which NNI controlled NNSA's treasury function, demonstrating that it took positive acts of management that would normally be taken by NNSA's *de jure* directors.  It identifies specific NNI personnel who were actively involved in devising and implementing the resulting scheme to improperly remove cash from NNSA, such as Mark Weisz of NNI, who was "Director of International Tax," and responsible for approving and supervising two of these initiatives:  the February 2008 Repayment and Project Swift.  (*See* Proof of Claim ¶ 26.)  As described in the Proof of Claim, NNI and NNL pushed NNSA in February 2008 to repay the subordinated loan made by NNL to NNSA in 2002 (the "February 2008 Repayment"), even though it was stipulated that no repayment would be owed until NNSA was profitable again, which it was not.  (*Id.* ¶¶ 70, 79.)  In particular, the Proof of Claim alleges that Ryan Smith, the orchestrator of the Project Swift transaction, pressured NNSA to repay the entire €50 million outstanding as part of the planning and realization of Project Swift.  (*Id.* ¶ 75.)  The fact that NNSA was ultimately required to repay only half of its obligations is of no consequence and simply demonstrates that NNSA, faced with a Hobson's choice, chose the lesser of evils.

Committing NNSA to such a significant obligation was certainly an act of management that would have and should have been taken by a director, yet the February 2008 Repayment was never approved by the NNSA Board.  (*Id.* ¶ 78.)  Even further, committing NNSA to a €25 million repayment obligation at time when it was in dire financial straits, was undoubtedly an act of mismanagement.  A consideration of all of these acts in the aggregate, the method applied by French courts, leads to the logical conclusion that NNI took positive acts of

_____

instructions to its French subsidiary concerning its taxes); *id.* ¶ 70 (a French court ruled that there was *de facto* director management where the interested party was the preferred point of contact for administrative services).)

management on behalf of NNSA and should therefore be held accountable for its actions that contributed to NNSA's insufficiency of assets.

        <u>Pre-Petition Asset Sales</u>.  Additional allegations demonstrating NNI's predominant influence over NNSA's management are seen in the control it exercised over the certain pre-petition sale processes and particularly in the allocation of the price received for the sale of the Nortel Group's UMTS unit to Alcatel Lucent SA in December 2006.  (*Id*. ¶¶ 80-82) (alleging that the allocation of the business sale proceeds amongst the Nortel selling entities was decided entirely by NNI and NNL without consulting NNSA)  As described in the Proof of Claim, the allocation of sale proceeds in relation to the Alcatel sale was intended to correspond with the arm's length principles that were supposed to govern transfer pricing.  (*Id*. ¶ 81.) Instead, proceeds were allocated based on the erroneous assumptions that were contained in the transfer pricing structure that prevailed at the time, a structure that was designed and implemented by NNI and NNL.  (*Id*. ¶ 82.)  As a consequence of the allocation method adopted by NNI and NNL, NNSA received significantly less than it was entitled to on an arm's length basis, while NNI received significantly more. (*Id*. ¶ 83.)   By controlling the process, NNI owed a duty as NNSA's director to act in its best interest and ensure that it received the proportion of proceeds to which it was entitled.

        **3.**       **The Proof of Claim Shows that NNI Committed Acts of Mismanagement that Contributed to NNSA's Insufficiency of Assets.**

        Under French law, the standard for judging whether a director's conduct constitutes an act of mismanagement is not difficult to meet.  (Menjucq Decl. ¶ 81 ("Any mismanagement, even slight, any carelessness or negligence may call into question the director's liability . . . .").)  In fact, one single act of mismanagement will suffice to trigger the liability, provided that the mismanagement act predates the opening of court-ordered liquidation

proceedings.  (*Id.* ¶ 82.)[57]  As the Proof of Claim spells out, NNI, in its role as *de facto* director

of NNSA, committed acts of mismanagement by (i) imposing upon NNSA a transfer pricing

method that deprived NNSA of revenue (Proof of Claim ¶ 58); (ii) imposing an unfavorable tax

policy on NNSA, which caused the French Tax Authorities to question the legitimacy of the

RPSM (*id.* ¶ 69); (iii) causing NNSA to make the February 2008 Repayment despite its

precarious financial position (*id.* ¶¶ 70, 73); and (iv) commandeering the sales allocation process

and distributing proceeds in a manner contrary to the arm's length principle (*id.* ¶ 82).  Each of

NNI's acts of mismanagement contributed to NNSA's insufficiency of assets[58] because they

either resulted in an improper transfer of value away from NNSA and towards NNL and NNI or

had the effect of neglecting to reward NNSA sums rightly owed to it.[59]

      B.      **Neither The French Liquidator Nor The Joint Administrators Are Estopped From Asserting That NNI Was A *De Facto* Director Of NNSA.**

           1.      **The US Debtor Does Not Assert Any Basis for Estopping The French Liquidator.**

By definition, the doctrines of judicial estoppel and collateral estoppel only apply

to a party who has taken a position or otherwise participated in previous judicial proceedings.

---

57.  For example, a mismanagement act will be found where a director "poorly assessing the company's actual development capacity in an unfavourable economic environment context and by having taken measures which were inadequate or insufficient in order to remedy the company's situation." (Menjucq Decl. ¶ 84.)

58.  French courts apply a "loose concept" when determining whether the acts of mismanagement contributed to the company's insufficiency of assets and will hold accountable the company's directors even if they were only one of the causes of the insufficiency.  (Menjucq Decl. ¶ 90.)

59.  For example, the Proof of Claim illustrates that following the February 2008 Repayment, NNSA suffered a loss of approximately €103.5 million.  (Proof of Claim ¶ 79.)   It also shows that with respect to pre-petition asset sales, NNSA received significantly less than it was entitled to on an arm's length basis, and given NNSA's parlous financial state at the time, it is plausible that NNSA's acts of mismanagement in this regard contributed to its excess of liabilities over assets.  (*Id.* ¶ 82.)  The Proof of Claim further alleges that as a result of the RPSM, NNSA had to repay the sums it received in 2001 under the old cost-sharing arrangements, which caused NNSA to become technically insolvent on a balance sheet as of December 31, 2001. (*Id.* ¶ 58.)  Similarly, NNSA's acts of mismanagement taken with respect to NNSA's tax policy in connection with transfer pricing contributed to NNSA's insufficiency of assets for the same reasons above.  Should a tax liability be assessed in the future, NNSA's excess of liabilities over assets will be even greater.

Since the French Liquidator was not a party to either the administration proceedings in England or the Chapter 15 proceedings here, the US Debtor cannot argue that the French Liquidator is estopped as a result of anything that took place in those proceedings.

### 2.    The Doctrine of Judicial Estoppel Does Not Apply.

The doctrine of judicial estoppel is a judge-made doctrine that prevents a party from gaining an unfair advantage against an opponent through the deliberate adoption of inconsistent positions in successive suits.  The purpose of the doctrine is to prevent unscrupulous litigants from "playing fast and loose with the courts."  *Scarano v. Central R.R. Co.*, 203 F.2d 510, 513 (3d Cir. 1953).  The US Debtor argues that the doctrine of judicial estoppel bars the Joint Administrators from asserting that NNI or NNL served as *de facto* directors of NNSA because this position is "irreconcilably inconsistent" with the Joint Administrators' prior position that England is the EMEA Debtors' center of main interests ("COMI").  (Joint Obj. at 27.)  This argument is legally and factually meritless.[60]

To invoke judicial estoppel successfully, the US Debtor must prove:  (i) the Joint Administrators' present position is inconsistent with a position that they affirmatively asserted in a prior judicial proceeding with respect to the issue in question; (ii) bad faith – i.e., that the Joint Administrators intended to play "fast and loose" with the court and engage in intentional wrongdoing; and (iii) that the remedy sought (dismissing their claim) is " 'tailored to address the harm identified' and no lesser sanction would adequately remedy the damage done by the litigant's misconduct."  *Montrose Med. Group Participating Savs. Plan v. Bulger*, 243 F.3d 773,

---

60. The US Debtor's effort to apply judicial estoppel to bar the French Liquidator's claims against NNI fails from the outset as the French Liquidator never took any position before the English Court or this Court with respect to NNSA's center of main interests.

42

779-80 (3d Cir. 2001); *Ryan Operations. G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 361 (3d Cir. 1996).  The US Debtor's arguments fail at every turn.

<strong>a.    The Joint Administrators Have Not Taken Inconsistent Positions.</strong>

The threshold requirement for application of judicial estoppel is to determine whether a litigant has taken an inconsistent position in an earlier judicial proceeding.  It is not enough, moreover, for the inconsistency to be inadvertent.  *Id.* at 364.  Rather, for judicial estoppel to apply it is necessary that the inconsistent positions were <u>intentional</u>.  *See, e.g.*, *Scarano*, 203 F.2d at 513 (emphasizing the "intentional self-contradiction" of lawsuits at issue).

The US Debtor attacks representations made in the Witness Statements (as defined below) and the EMEA Debtors' petitions for Chapter 15 recognition as irreconcilably inconsistent with their position that NNI and NNL are *de facto* directors of NNSA.  In doing so, the US Debtor mischaracterizes the purpose and substance of a COMI determination, overstates the breadth of the representations made in the Witness Statements, and misrepresents the Joint Administrators' claims.  Contrary to their assertion, a finding that England was the center of day-to-day operations in the EMEA region is not inconsistent with their assertion that the North American entities controlled major strategic decisions relating to the specific transactions that form the basis for the Joint Administrators' claims.

<strong>i.    The Witness Statements Were Prepared for the Purpose of Supporting a Jurisdictional Finding.</strong>

The Joint Administrators were appointed on January 14, 2009 by order of the English Court (the "<u>Initial Order</u>") to act for NNSA and the EMEA Debtors, following an application made by each EMEA company's board of directors.  In the few days prior to commencement, the Joint Administrators met with senior management of the EMEA Debtors to discuss financial viability of and possibility of continuation and to ultimately prepare witness

statements in support of the EMEA Debtors' administration applications.[61]  Sharon Lynette

Rolston and Michel Clement, directors of the EMEA Debtors, submitted witness statements (the

"Rolston Statement" and the "Clement Statement" and together, the "Witness Statements")

before the English Court to support a finding that England was each EMEA Debtor's COMI and

obviate the need to file separate proceedings in multiple jurisdictions.

        Under Article 3 of the EC Regulation on Insolvency Proceedings (the

"Regulation"), the jurisdiction of a company's COMI has exclusive jurisdiction to open main

insolvency proceedings.  Council Regulation (EC) No. 1346/2000. The Regulations do not

define the term "COMI."  The only guidance given is that:  (i) the location of a company's

registered office is presumed to be its COMI in absence of proof to the contrary and (ii) a

company's COMI should correspond to the place where the company conducts the

administration of its interests on a regular basis, and therefore can be ascertained by third parties.

*Id*.; *see also Re Eurofood IFSC Ltd* [2006] Ch 508; *In re Stanford International Bank Ltd* [2010]

EWCA Civ 137.

        The courts in *Eurofood* and *Stanford* both held that the appropriate test of COMI

depends on ascertainability by those who deal with the company, and that only those factors

which are in the public domain and which a typical third party would learn through their dealings

with the company are relevant.  Both cases instruct that matters that could only be established on

inquiry should be excluded because creditors should not have to make detailed investigations

concerning the internal workings of a company as to where decisions were made and how the

business was actually managed.  *Id*.[62]  With this test in mind, and the limited facts available to

61.  (Deposition of Alan Robert Bloom, December 16, 2010 ("Bloom Dep.") 159:15-22.)

62.  Notably, Sir Andrew Morritt VC in *Stanford* rejected the US receiver's argument that facts were "ascertainable" even if they were not within the public domain but could have been obtained from asking questions of the

44

them at the time, the Joint Administrators supported the position that England was each of the

EMEA Debtor's COMI.[63]  This is because in the EMEA context, the majority of daily

operational decisions were made in England, where key personnel were based.[64]  The Witness

Statements were not intended to report to the English Court the strategic and operational

interplay between the EMEA Debtors and NNI and the Canadian Debtors.  The purpose was to

apprise the English Court of the operation of the EMEA region and demonstrate how entities

outside of England were operationally managed from England.  Ignoring such matters as parent

or affiliate control over internal corporate matters that could only be ascertained upon inquiry,

and focusing only on objective factors clear from ordinary dealings between the EMEA Debtors

and their creditors, all signs pointed and still point to England as the EMEA Debtors' COMI.

Once appointed, the Joint Administrators faced the immediate task of  managing

the affairs, business and property of the EMEA Debtors.[65]  It was not until this time that the Joint

Administrators – having finally conducted an intensive factual investigation – were able to fully

appreciate the control exercised by NNI and NNL, which form the basis of their claims against

NNI and NNL as *de facto* directors.[66]  Still, this newly acquired information had no bearing on

the Joint Administrators' position that day-to-day *operational* management was centered in

England for COMI purposes since these internal matters would not be ascertainable to a creditor

---

company's relevant personnel with whom dealings were conducted.  Instead, the judge determined that after
*Eurofoods* it was wholly unrealistic to seek to impose a burden on creditors or potential creditors dealing with a
company to make detailed inquiries as to how its business was conducted in this context.  *Stanford* at 68.

63.  (Bloom Dep. 160: 9-23.)

64.  Indeed, any outside party dealing with the EMEA Debtors would understand this to be true.  *See* Rolston
Statement ¶ 149 ("Customers would understand that England is the centre of operations for the EMEA
Companies and is the point for resolution of serious issues in respect of customer relationships, final decision-
making, strategy and strategy investments.").

65.  (*See, e.g.*, Initial Orders, Peacock Decl. Ex. F at 3.)

66.  (Bloom Dep. 173: 20-25; 174:2-16.)

without investigation.  Indeed, they were not ascertainable to the Joint Administrators prior to their own investigation.  With the understanding that COMI remained in England, the Joint Administrators sought and obtained recognition of the EMEA Debtors' administration proceedings as foreign main proceedings under Chapter 15 of the Bankruptcy Code.

> ii.    **There Is No Inconsistency Between the Joint Administrators' Positions.**

The US Debtor mischaracterizes the position that the Joint Administrators have taken with respect to the EMEA Debtors' COMI and their claims against NNI based on *de facto* directorship.  First, the US Debtor's overview of the representations in the Witness Statements is grossly misleading.  It attempts to create an artificial inconsistency by cherry-picking and twisting Ms. Rolston's statements, so as to make it appear that the EMEA Debtors functioned with complete autonomy from North America.[67]  In truth, an examination of the Witness Statements as a whole reveals that although day-to-day operational and practical business decisions were made from the Maidenhead office,[68] certain strategic decisions were made by

---

67. Even more disingenuously, the US Debtor references incomplete citations, which, if quoted accurately, would show that strategic policy and procedure were determined at a global level in North America and senior management in England were responsible only for operational implementation.

  Notably, the US Debtor selectively cites the following from paragraph 15(i) of the Rolston Statement: "[D]ecisions in relation to settlement of intercompany accounts are made by the EMEA treasury team in England." (Joint Obj. at 22-23.)  The paragraph goes on to read:  "Those terms are determined in accordance with global EMEA Region procurement policies and are authorised by the individual with the relevant authority level."  (Rolston Statement ¶ 15(i).)  The US Debtor also conveniently replaces with ellipses Ms. Rolston's reference to England as the centre of <u>operations</u> in its citation to paragraph 30 of the Rolston Statement.  (*See* Joint Obj. at 22; *compare* Joint. Obj. at 22 (quoting Clement Statement ¶ 32 ("Senior management in England exercise control and authority over the Company."), *with* Clement Statement ¶ 32 ("Senior management in England exercise control and authority over the Company <u>through the global decision-making approval and policy procedure.  Day to day operational management of the company is conducted locally in accordance with these policies.</u>") (emphasis indicating portion omitted by US Debtor).)

68. *See*, *e.g.*, Rolston Statement ¶ 6c ("[T]he centre of <u>operations</u> and head office functions for the EMEA Region is carried out from and performed in England.") (emphasis added); *id.* ¶ 14 ("The Company is the centre of <u>operations</u> for the EMEA Region of the Group.") (emphasis added);  *id.* ¶ 15c ("[T]he senior management of all key primary functions (i.e. sales, finance, treasury, legal and human resources) required for the <u>operation</u> of the EMEA Region are located in England.") (emphasis added); *id.* ¶ 15c ("[S]ignificant decisions in relation to sales and dealings with customers are largely made in England . . . .").

North America.  It does not stand for the proposition that the EMEA region was controlled exclusively from England.  (*Cf.* Joint Obj. at 21-27.)[69]  Additionally, a review of all the statements made with respect to tax and treasury functions, not just those selectively chosen by the US Debtor, equally shows that where treasury and tax initiatives were <u>global</u>, they were determined by North America.[70]  The US Debtor's efforts to frame the Joint Administrators as opportunists is utterly ridiculous.

        Second, the Joint Administrators do not take the position in the Proof of Claim that NNI exerted overall control over all aspects of the affairs of NNSA and the EMEA Debtors.  On the contrary, the Proof of Claim focuses on instances where NNI exerted control over treasury and tax functions in connection with transactions involving <u>global</u> strategy.[71]  To prove *de facto* directorship, NNSA need not show that NNI or NNL exerted decision-making power over every aspect of the company; rather, director liability can be imposed on NNI for its "positive acts of management" of discrete transactions impacting the EMEA Debtors, as the Joint Administrators have asserted.  (Menjucq Decl. ¶ 46.)  Accordingly, a COMI finding in England is not incompatible with the position that certain key strategic decisions were made at a level beyond senior management in England.

        The alleged inconsistencies here are similar to those raised before the Supreme Court in *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999).  The issue in

---

69.  *See, e.g.*, Rolston Statement ¶ 15d ("senior management for EMEA is <u>largely</u> located in England"); *id.* ¶ 15b ("[T]he senior management, which is largely located in Maidenhead, make the <u>vast majority</u> of significant decisions <u>in respect of the operations</u> of the EMEA Companies.") (emphasis added).

70.  For tax functions, *see* Rolston Statement ¶ 188 ("Tax planning initiatives come from Canada, where there is a global impact, or may be generated by the EMEA Tax Group in relation to specific opportunities in the region, although in the latter case this will always be discussed with Canada before any implementation.").  For treasury functions, *see id.* ¶ 15i (describing how EMEA Treasury can only settle intercompany accounts in accordance with global policies).  Ms. Rolston's references to Canada do not rule out NNI's involvement.

71.  (*See generally* Proof of Claim ¶¶ 9-27.)

*Cleveland* was whether a person who sought Social Security Disability ("SSDI") benefits could later be judicially estopped from claiming protected status under the American Disabilities Act ("ADA").  In seeking SSDI benefits, the claimant certified that she was "disabled" and "unable to work," but in a later ADA suit submitted she could perform the essential functions of a job with reasonable accommodation.  *See id*. at 798-99.  The Court rejected the judicial estoppel argument, observing that "in context, these two seeming divergent statutory contentions are often consistent with each other" and that "there are too many situations in which an SSDI claim and an ADA claim can comfortably exist side by side."  *Id*. at 797, 802-03 (emphasis added). Similarly, the Court should view the Witness Statements in the context in which they were prepared and determine that a COMI determination in England is perfectly consistent with the Joint Administrators' claims that control for specific transactions was also exerted from North America.[72]

> **b.**   **NNI Cannot Show That the Joint Administrators Acted In Bad Faith.**

For the reasons explained above, there is no inconsistency between the position taken by the Joint Administrators in the Proof of Claim and the position they previously took before the English Court and this Court.  Furthermore, under governing Third Circuit decisions, if a party has asserted inconsistent positions concerning the same issue, judicial estoppel still will not apply unless that party acted in bad faith and the inconsistency is "attributable to intentional wrongdoing."  *Ryan Operations,* 81 F.3d at 363 (emphasis added).[73]

---

72.  *See Ocasio v. Ollson*, 596 F. Supp. 2d 890 (E.D. Pa. 2009) (judicial estoppel was inappropriate to bar certain claims against employer in subsequent tort action for injuries that were not described in release agreement where language of release agreement, when read as a whole and under the relevant circumstances, was broad enough to encompass such claims).

73.  As discussed in *Ryan Operations*:

The assertion of claims by the Joint Administrators – who are officers of the English Court – against NNI and NNL as *de facto* directors of NNSA is not part of a scheme to mislead the court and it is inappropriate for the US Debtor to suggest otherwise.  The Joint Administrators had no motive to conceal these claims.  Even if the Court were to determine that there is some element of inconsistency in the Joint Administrators' position (which there is not), it could only be attributable to an inadequacy of information available to them at the time the EMEA Debtors entered into administration.  These facts alone set this case apart from many of the Third Circuit cases applying judicial estoppel.[74]

The Joint Objection points to no set of facts that could suggest intentional wrongdoing on the Joint Administrators' part and simply relies on the purported benefits that NNSA received from its prior assertions that the EMEA Debtors' COMI was in England.[75]

---

Asserting inconsistent positions does not trigger the application of judicial estoppel unless "intentional self contradiction is ... used as a means of obtaining unfair advantage." Thus, the doctrine of judicial estoppel does not apply "when the prior position was taken because of a good faith mistake rather than as part of a scheme to mislead the court." An inconsistent argument sufficient to invoke judicial estoppel must be attributable to intentional wrongdoing.

81 F.3d at 355 (internal citations omitted).

74.  *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419-20 (3d Cir. 1988) (applying judicial estoppel where party waited until after closure of bankruptcy proceeding to bring claim, thus challenging integrity of judicial system); *see also Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 121-22 (3d Cir. 1992) (party who convinced the bankruptcy court to lift stay on defendant's assets on representation that any recovery against the defendant would be limited to the amount of the defendant's insurance coverage estopped from recovering more); *Murray v. Silberstein*, 882 F.2d 61, 65-66 (3d Cir. 1989) (plaintiff who represented to the court that money damages were unavailable in order to obtain a preliminary injunction estopped from asserting that damages were available); *Scarano v. Central R.R. Co.*, 203 F.2d 510, 512-14 (3d Cir. 1953) (party who represented that he was completely disabled to win damages estopped from asserting that he was able-bodied in order to win reinstatement); *Lewandowski v. Nat'l R.R. Passenger Corp.*, 882 F.2d 815, 818 (3d Cir. 1989) (finding *Scarano* "controlling" on virtually identical facts).

75.  The US Debtor's reliance upon *Anjelino v. New York Times Co.*, 200 F.3d 73 (3d Cir. 2000), for the principle, in regards to judicial estoppel, that the receipt of a benefit based on a prior position itself "evidences an intent to play fast and loose with the courts" (Joint Obj. at 28) is misplaced.  In *Anjelino*, the Third Circuit held that the district court did not abuse its discretion when it held "counsel to the representation that no further discovery was needed" because, "[o]n the basis of the record before [the Third Circuit], [the Third Circuit] f[ound] no cause for disturbing the [district] court's application of judicial estoppel to preserve the integrity of the courts by preventing litigants from playing fast and loose with the courts."  200 F.3d at 100. (internal quotations

Specifically, the Joint Objection focuses on the strategic advantage that coordinated proceedings in England brought to the EMEA Debtors and the protections of the automatic stay that NNSA enjoyed by securing Chapter 15 recognition.  Whatever benefit derived from the COMI determination impacted the Nortel Group as whole, not just NNSA, by simplifying the administration of these related insolvency proceedings.  Among other things, this facilitated the global asset sales that have greatly benefitted creditors of the Nortel Group worldwide.[76]  This is hardly the type of "benefit" that can give rise to an inference of bad faith.  *See Payless Wholesale Distribs, Inc. v. Alberto Culver (P.R.) Inc.*, 989 F.2d 570, 571 (1st Cir. 1993) (applying judicial estoppel upon finding that plaintiff intended to "[c]onceal [its] claims [in the bankruptcy proceeding]; get rid of [its] creditors on the cheap; and start over with a bundle of rights").

 The US Debtor also argues that the Joint Administrators misled this Court, which relied on the Witness Statements in granting the EMEA Debtors' Chapter 15 recognition.  This is an unwarranted and inappropriate allegation for the US Debtor to make against the Joint Administrators, officers of the English Court.  Perhaps the most salient fact – conveniently omitted by the US Debtor in its motion papers – is that the Court, in granting Chapter 15 recognition to the remaining EMEA Debtors, also relied on the record from the deposition of one of the Joint Administrators, Alan Robert Bloom, in which Mr. Bloom provided an explanation

---

omitted).  The Third Circuit said nothing more significant than this, and to argue that these statements lead to the principle cited by the US Debtor is disingenuous.

76. NNSA felt it was important to take a coordinated and fully integrated approach to the EMEA Debtors' administration proceedings in order to facilitate a restructuring and avoid the risks of uncoordinated insolvency proceedings in multiple jurisdictions.  *See* Rolston Statement ¶ 212.  NNSA was not alone in this sentiment.  What the US Debtor conveniently ignores is that NNI fully supported and participated in the EMEA Debtors' applications for administration before the English Court, including the EMEA Debtors' assertions regarding their COMI.  *See Nortel Networks Inc., et. al.,* Case No. 09-10138, Hr'g Tr. 10-14, Jan. 15, 2009.  NNI represented to this Court at the hearing on the first day motions that the English Court's finding of COMI was a "very good thing" because it allowed them to sell assets without having to deal with multiple jurisdictions in the European Union.  (Hr'g Tr. 12:9-13:2.)  It is therefore clear that the entire Nortel Group, not just NNSA, benefited from the English Court's finding that England was the COMI for the EMEA Debtors as it facilitated the restructuring of the corporate group as a whole.

for any supposed inconsistency in position.  (*See* EMEA Recognition Order, Peacock Decl. Ex. N at 2.)  Mr. Bloom explained at multiple points during his deposition that it was not until the Joint Administrators further examined the EMEA Debtors' books and records that they discovered that a considerable amount of the decision-making process in relation to EMEA was driven out of North America.[77]  Therefore, the Court never relied exclusively on the representations in the Witness Statements. This type of candor could not possibly amount to an "assault [on] the dignity or authority of the court."  *Montrose,* 243 F.3d at 781.

Finally, the Third Circuit has noted that "equity requires that the presiding court give the party to be estopped a meaningful opportunity to provide an explanation for its position." *Ocasio*, 596 F. Supp. 2d at 902.  The ultimate finding of bad faith cannot be reached without first resolving disputes as to the underlying facts.  *Montrose*, 243 F.3d at 780.  Such an explanation is provided herein.  If the US Debtor disputes the explanation or the underlying facts, dismissal would not be appropriate at this juncture.

### c.    NNI Will Suffer No Harm From Any Purported Inconsistency.

Observing that judicial estoppel "is often the harshest remedy" that a court can impose for inequitable conduct, the Third Circuit has held that the doctrine should only be applied where "the sanction [of judicial estoppel] is tailored to address the harm identified." *Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98, 108, 110 (3d Cir. 1999) (also stating judicial estoppel is a "draconian" remedy that should be used sparingly) (internal quotation marks and citations omitted); *see also Ryan Operations,* 81 F.3d at 365.

---

77.  (*See* Bloom Dep. 83:2-25. 84:2-10, 155:6-25, 157:9-15, 157:24, 158:10-25, 159:2-4, 160:14-23, 161:5-23, 173:13-25, 174:1-16, 188:3-12, 192:10-22, 196:3-10, 283:18-22.)

The US Debtor has identified no harm it will suffer as a result of any purported inconsistency in the Joint Administrators' positions.  Certainly the US Debtor could not argue that being required to respond to an otherwise valid claim is a cognizable harm for this purpose. The Joint Administrators have certainly never purposefully concealed information or done anything else that could equate to a fraud on the Court, nor have their positions been inconsistent.  *Cf. Ryan Operations*, 81 F.3d at 365 (judicial estoppel not to be used offensively as a sword and should only be applied if court is satisfied that party to be estopped had deliberate intention to manipulate or mislead court).  More importantly, the Joint Administrators are not seeking any personal gain – they have pursued these claims in their fiduciary capacities in an effort to increase estate assets and allow for more equitable distributions to innocent creditors.  It is those creditors who will be harmed by the dismissal, not the Joint Administrators.  *See Montrose*, 243 F.3d at 785-86 (judicial estoppel not tailored to address harm where plaintiffs brought claims in their fiduciary capacities on behalf of pension plan participants who would be harmed if the action was dismissed).

### 3.    The Doctrine Of Collateral Estoppel Does Not Apply.

The US Debtor's assertions that collateral estoppel should foreclose the Joint Administrators' claims are even weaker.  The doctrine of collateral estoppel, or issue preclusion, conserves judicial resources by preventing a party from relitigating an  issue previously litigated and decided.  *See Young v. Shore*, 588 F. Supp. 2d 544, 547 (D. Del. 2008).  Collateral estoppel applies where (i) the issue sought to be litigated is <u>identical</u> to one decided in a prior action; (ii) the issue is actually litigation in a prior action; (iii) resolution of the issue is essential to a final judgment in the prior action; and (iv) the party against whom collateral estoppel is sought had a full and fair opportunity to litigate the issue in the first action.  *Raytech Corp. v. White*, 54

F.3d 187, 190 (3d Cir. 1995); *Hamilton v. Leavy*, No. CIV.A. 94-336-GMS, 2001 WL 848603, at *9 (D. Del. July 27, 2001).

The US Debtor argues that the English Court's finding of COMI in England precludes the Joint Administrators from asserting that key decisions were dictated from North America and that collateral estoppel should apply because the EMEA Debtors' COMI was finally determined before the English Court and this Court, was actually litigated and essential to the orders of the English Court and this Court.  (Joint Obj. at 29-30.)

But the US Debtor's presentation of the law skips over the most decisive element of the doctrine of collateral estoppel: that the issue presented in the current proceeding is <u>the exact issue</u> already decided in an earlier proceeding.  The facts underlying NNI's alleged status as a *de facto* director has never been addressed in <u>any</u> proceeding, let alone in a prior proceeding because such a determination was not essential to the COMI determination.  *See In re Chi-Chi's, Inc.*, 338 B.R. 618 (Bankr. D. Del. 2006) ("collateral estoppel is unavailable when there are disparate policies underlying each inquiry which result in definite differences in application and result") (quoting *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415, 1422 (5th Cir.1995)).  The English Court received no evidence and made no findings about the roles of NNL and NNI in the transactions that give rise to the Joint Administrators' claims.  The English Court never determined any substantive rights at the time the Initial Orders were entered, nor did this Court when it granted Chapter 15 recognition of the English Proceedings.  Rather, those determinations related strictly to forum – not the status or involvement of NNI.[78]  As noted above, in addressing the COMI question, the English Court was entitled to act on the COMI presumption in respect of NNUK, and, insofar as the other EMEA Debtors are concerned, would have considered only

---

78.  (*See* Declaration of Philip Marshall QC in Opposition to Joint Objection and Motion to Dismiss Claims of Nortel Networks UK Limited, dated Sept. 13, 2011 [D.I. 6374] ("<u>Marshall Decl.</u>") ¶ 69.)

objective and ascertainable factors that a third party would learn through their dealings with those companies.  In contrast, determining whether the facts support a finding that NNI was a *de facto* director requires an inquiry into the strategic considerations and related internal workings of the company to see how the business was managed and whether NNI played a role in the affairs of the company – factors that were not a necessary focus for COMI purposes and therefore were not essential to any prior judgments in this case.  Consequently, the US Debtor's collateral estoppel should be rejected.

## III.    THE PROOF OF CLAIM STATES CLAIMS FOR SECONDARY LIABILITY AGAINST NNI UNDER APPLICABLE STATE LAW.

### A.    The Joint Administrators and the French Liquidator State Claims For Breach Of Fiduciary Duty Under US State Law.

In the alternative to the claims asserting primary liability against NNI, the Joint Administrators and the French Liquidator assert a series of claims based on NNI's participation in and assistance to the acts of mismanagement by NNL and NNSA's *de jure* directors.[79]  These include claims for aiding and abetting breach of fiduciary duty and conspiracy (under US state law).  The US Debtor argues that these claims are subject to dismissal on the grounds that (i) the Joint Administrators have not provided the particulars of the assistance or facts from which it could be inferred that NNI knowingly gave any assistance; (ii) the Joint Administrators have not alleged facts showing that NNL or NNSA's *de jure* directors mismanaged NNSA.[80]  The US

---

79.  For the sake of clarity in addressing US state law on aiding and abetting and conspiracy, the use of the familiar terminology "breach of duty" and "breach of fiduciary duty" used at times herein and in the Proof of Claim refers to analogous French law concepts of mismanagement. (*See* Section II, *supra*.) The cause of action for mismanagement under article L. 651-2 of the French Code of Commerce underlies the Joint Administrators' and the French Liquidator's claims for both aiding and abetting and conspiracy.

80  The US Debtor does not argue that the Proof of Claim is deficient due to a failure to plead  NNSA's insolvency or a shortfall of assets.  In any event, the Proof of Claim alleges that NNSA suffered from a shortfall of assets at all relevant times and that the actions of NNI contributed to that shortfall. (*See, e.g.* ¶¶ 106-107 (NNI's acts of mismanagement, in which NNL and the *de jure* directors of NNSA participated and/or to which they consented, in causing NNSA to receive less than an arm's length return under the RPSM and the MRDA "caused and/or

Debtor further asserts that the aiding and abetting claims sound in fraud and must therefore be tested under the heightened pleading standard of Rule 9(b). However, for the following reasons, the US Debtor's arguments do not succeed.

**1.      Rule 9(b) Does Not Apply To The Joint Administrators' Claims For Aiding and Abetting Breach of Fiduciary Duty.**

As discussed above, courts will sometimes apply Rule 9(b) to non-fraud claims where they are either coupled with fraud claims or are based on conduct that might meet the elements of a fraud claim. Here, the Joint Administrators do not allege any fraud claims, nor would the underlying facts they rely on make out a claim for the tort of fraud. There is therefore no basis to apply a heightened pleading standard under Rule 9(b) to their allegations of aiding and abetting breach of fiduciary duty.[81]

**2.      The Proof of Claim Sets Forth Facts Showing The Assistance NNI Provided And From Which It Can Be Inferred That Such Assistance Was Knowing.**

**a.      The US Debtor Misstates The Required Mental State.**

At the outset it should be noted that the US Debtor misstates the mental state or degree of knowledge required to support claims for aiding and abetting breach of fiduciary duty. (*See* Joint Obj. 42-43.)

With respect to aiding and abetting a breach of fiduciary duty, the knowledge element is met if it can be inferred from the overall facts that the defendant was aware of the nature of the relationship between the breaching party and the plaintiff (in this case, the mismanaging party) and of the conduct that was in violation. *See Zirn v. Vli Corp.*, 15 Del. J.

---

contributed substantially to the excess of liabilities over assets in NNSA.")); (*id*. ¶ 58 (alleging that the immediate impact of the RPSM was that NNSA had to repay sums it had received under the old cost-sharing arrangements, which left NNSA technically insolvent on a balance sheet basis as of December 2001).)

81.  Certainly there is no support for the US Debtor's suggestion that any claim which incorporates a scienter element must be alleged with particularity.

Corp. L. 789, 801-02 (Del. Ch. 1989) ("although the Complaint fails to specifically allege that [Defendant] 'knowingly participated' in the directors' alleged breach of their fiduciary duty to the . . . shareholders, I find that it can be logically inferred by reasonable inferences drawn from facts alleged in the Complaint"); *Duke Energy Int'l, L.L.C. v. Napoli*, 748 F. Supp. 2d 656, 672 (S.D. Tex. 2010) (denying motion to dismiss where complaint alleged "facts of a suspicious nature that permit an inference of [Defendant's] knowledge"); *In re I.G. Servs., Ltd.*, No. 04-5041-C, 2004 WL 5866105, at *1 (Bankr. W.D. Tex. Dec. 22, 2004) ("One way to prove knowing participation is to infer it through atypical transactions that lack business justification.") (citations omitted).[82]

The US Debtor's reliance on *Capitaliza-T* for its interpretation of "actual knowledge" is misplaced.  In *Capitaliza-T*, the court required actual knowledge on the part of a passive aider and abettor.  The defendant US bank and others were accused of "permitting deposits" by a Mexican corporation, which was branching out from facilitating foreign currency exchanges into international transactions involving interest-bearing accounts (a violation of both its corporate charter and Mexican law).  *See Capitaliza-T Sociedad De Responsabilidad Limitada De Capital Variable v. Wachovia Bank of Del. Nat'l Ass'n*, No. CIV. 10-520, 2011 WL 864421, at *1, 5 (D. Del. Mar. 9, 2011) ("To the extent there is any ambiguity in the Delaware common law concerning the sufficiency of constructive knowledge or willful blindness, there is no doubt that where the substantial assistance is permitting money to be deposited in a bank, actual knowledge on the part of the bank is required.").  Under these circumstances the court required allegations of fact showing that the bank was aware of the underlying fraud and of the

---

82.  *See also Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 535 (6th Cir.2000) ("For the purposes of establishing aiding and abetting liability . . . [p]roof of a defendant's knowledge or intent will often be inferential.") (internal quoting reference omitted).

misconduct.  Here, in contrast, NNI is alleged to have been intimately involved in the

transactions that constituted acts of mismanagement, and as a member of the Nortel Group was

well aware of all the relevant relationships and resulting duties.  NNI was far from a passive

participant.  (*See, e.g.*, Proof of Claim ¶¶ 7, 12, 15, 16, 22, 23, 39, 47.)

       *Malpiede* is likewise inapposite because that decision examined the knowledge

requirement in the context of holding an arm's length bidder liable for aiding and abetting a

target board's breaches of duty.  *See Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001)

("Under this standard, a bidder's attempts to reduce the sale price through arm's-length

negotiations cannot give rise to liability for aiding and abetting, whereas a bidder may be liable

to the target's stockholders if the bidder attempts to create or exploit conflicts of interest in the

board.").  In the present case, NNI was not a self-interested bidder dealing with NNSA at arm's

length; the Proof of Claim clearly alleges that NNI participated in the decisions of (and even

supplanted) the board of NNSA with respect to the various initiatives to divert funds to Canada.

*Cf. id.* at 1098 ("there is no indication in the amended complaint that [Defendant] participated in

the board's decisions, conspired with [the] board, or otherwise caused the board to make the

decisions at issue").  *Malpiede* also does not support the proposition that the court cannot infer

actual knowledge from allegations of suspect transactions.  *See id.* at 1098 n.79 ("It may be that

some circumstances will arise in which the terms of the negotiated transaction themselves are so

suspect as to permit, if proven, an inference of knowledge of an intended breach of trust.")

(quoting *Greenfield v. Tele-Communications,* C.A. No. 9814, 1989 WL 48738, at *3 (Del. Ch.

May 10, 1989)).[83]

---

83.  By citing *Malpiede*, the US Debtor effectively recognizes that allegations regarding a defendant's knowledge of
the legal consequences of a fiduciary's actions will not be necessary to make out every claim.  (*See* Joint Obj.
at 41 n.55 ("Even to the extent that <u>willful blindness or constructive knowledge were sufficient to establish
knowledge</u>, NNSA's [Proof of] Claim fails under either standard . . . .") (emphasis added).)  Thus, even if the

**b.      The Proof of Claim Contains Facts Showing The Assistance Provided And That NNI Acted With The Requisite Mental State.**

The circumstances alleged in the Proof of Claim more than satisfy the necessary elements.  The Proof of Claim provides details of the ways that NNI and its personnel assisted in the acts of mismanagement committed by NNSA's *de jure* directors and NNL and makes allegations that, if proven, will satisfy the knowledge element of the causes of action.[84]  It further alleges that NNSA's *de jure* directors abandoned their responsibilities to the company and its creditors by deferring to NNI.  (*See, e.g.*, *id.* ¶ 18(d) ("Once the terms of the MRDA had been decided by NNI and NNL, NNSA was simply instructed to sign . . . .").)  The Proof of Claim makes the requisite allegations in relation to each of the underlying transactions:

Pre-Petition Asset Sales.  In support of Claim 15, the Proof of Claim alleges that NNL and NNSA's directors mismanaged NNSA by "causing and/or allowing NNSA to enter into pre-petition sales and/or to receive an allocation of the Pre-Petition Sale Proceeds in respect of which NNSA did not receive a proper allocation of the appropriate value."  (Proof of Claim ¶ 168.)  Through its role in the allocation of the Pre-Petition Sale Proceeds, NNI not only

---

Court is persuaded that the standard of knowledge required for corporate bidders is somehow applicable in this case, the Proof of Claim contains allegations supporting the inference that, at a minimum, NNI was willfully blind to or should have known about the mismanagement committed by NNL and the *de jure* directors of NNSA.

84.  (*See, e.g.*, Proof of Claim ¶ 7 ("[i]n the period leading up to the collapse [of the Nortel Group,] the cash resources of NNSA were depleted at the direction of the NNL and NNI")); *id.* ¶ 15 ("The control exerted by NNI related to the Nortel Group's Tax matters, in particular transfer pricing, and to the Nortel Group's Treasury matters.  These tax and treasury functions were responsible for the transactions pursuant to which value was improperly removed from NNSA.")); *id.* ¶ 22 ("The Nortel Group Tax Department was effectively a joint function between NNI and the Canadian Entities.  Many of the key individuals within the Tax Department were NNI personnel (the "NNI Tax Team").  This was particularly so in respect of the members of the Tax Department who had responsibility for NNSA and EMEA.")); *id.* ¶ 25 ("NNI's directors, officers and senior employees were part of the management group that implemented Project Swift.")); *id.* ¶ 39 ("The decision to implement the RPSM was taken by the Canadian Entities and NNI.  It was primarily motivated by a desire to allocate more profit to the Canadian Entities in order to benefit NNL at the expense of NNSA.  Both NNL and NNI knew that this was to be the case.")); *id.* ¶ 47 ("The terms of the MRDA were determined by NNI and NNL based mainly on the requirements of Canadian and U.S. tax laws, in negotiations with the Canadian and U.S. taxing agencies.").)

58

engaged in acts of mismanagement; it aided and abetted NNL and the directors of NNSA in their

wrongful conduct as well.  (*See, e.g. id.* ¶ 82 ("the allocation methodology applied and the

proportion of proceeds that NNSA received was decided on its behalf by NNI and NNL").)  The

Proof of Claim clearly alleges NNI's motivation:  it received a greater portion of the Pre-Petition

Asset Sales than it would have under a fair allocation methodology.  (*See id.* ¶ 83 ("As a

consequence of the allocation method adopted, NNSA received significantly less and NNI

received significantly more than it was entitled to on an arm's length basis.").)

> Contingent Tax Claims.  Claims 16-18 assert contingent claims for any tax

liability that may arise out of NNI's acts of mismanagement, its tortious conduct under French

law, or its aiding and abetting NNL's and NNSA's *de jure* directors' mismanagement.  (Proof of

Claim ¶¶ 174-76.)  NNI's control over matters related to taxation, both generally with respect to

the Nortel Group and specifically as to NNSA, may result in NNSA's liability to the Revenue

Authorities.  (*See id.* ¶ 15 ("The control exerted by NNI related to Group Tax matters, in

particular transfer pricing . . . .").)  The Proof of Claim further alleges how key individuals at

NNI controlled negotiations with the relevant Revenue Authorities in order to secure approval of

the transfer pricing schemes integral to moving cash to Canada:

> NNI and NNL controlled the all-important advanced pricing
> arrangement/agreement ("APA") application process (referred to
> above). Mark Weisz of NNI, Mike Orlando of NNI and John
> Doolittle took the lead in the negotiations with the IRS, the CRA
> and HMRC.  This team ran the negotiations until around 2006
> when Peter Look joined the Nortel Group as Vice President of
> Global Tax. He replaced John Doolittle alongside Mark Weisz and
> Mike Orlando. Later, John Payne, also of NNI, joined the lead
> team together with Peter Look.  NNI and NNL also took sole
> responsibility for instructing Nortel's professional advisers in
> relation to the APA application process.

(*See* Proof of Claim ¶ 18(e).)  NNSA's role was limited to assisting the above personnel by

providing information requested by the Revenue Authorities.  (*See id.* ¶ 18.)

Transfer Pricing, Project Swift, and the February 2008 Repayment.  The Proof of

Claim names several of the specific NNI officials who were involved in the advance pricing

arrangements with the Revenue Authorities entered into on behalf of NNSA and the EMEA

Companies, the design and operation of the RPSM, and the creation and implementation of the

MRDA.  (*See* Proof of Claim ¶ 17 ("The key individuals involved [in the advance pricing

arrangements, RPSM, and MRDA] included, in particular, John Doolittle of both NNI and the

Canadian Entities and Mark Weisz, Mike Orlando, Laurie Krebs and John Payne of NNI, as well

as representatives from the Canadian Entities."); (*see also id.* ¶ 18 ("NNSA had no substantive

involvement.  Its role was limited to providing information for the above individuals as and when

required and implementing the decisions which had been taken by NNI and the Canadian

Entities.").)  The Nortel Group Tax Department, which was heavily involved in transfer pricing

arrangements, was also dominated by individuals from NNI.  (*See id.* ¶ 22 ("at various times, the

International Tax Director of Nortel was Mark Weisz; Mike Orlando was the Global Transfer

Pricing Leader (and right hand man of Peter Look, Vice President of Global Tax); John Payne,

was responsible for Global Transfer Pricing; Claire Barbieri [of NNI] was responsible for Global

Tax Accounting; and even the EMEA Tax Leader on the ground in the EMEA Region, Ryan

Smith, was seconded to NNSA from NNI.").)

The Proof of Claim further alleges that, in 2001, NNI (including through the

above-named individuals) worked with NNL to implement the RPSM, and that the shared

purpose of doing so was to divert profit away from NNSA and toward the Canadian Entities.

(*See id.* ¶ 39 ("[the transition to RPSM transfer pricing] was primarily motivated by a desire to

allocate more profit to the Canadian Entities in order to benefit NNL at the expense of NNSA.

Both NNL and NNI knew that this was to be the case.").)  Meanwhile, NNSA and the EMEA

60

Companies were excluded from any decision making with respect to the RPSM.  (*See id.* ¶ 40

("NNSA and the other EMEA Companies which lost out as a result of RPSM were not involved

in the decision to change from the previous [cost sharing arrangement] to the RPSM.").)  A 2006

revision to the Nortel Group's RPSM, again designed and executed by NNI and NNL, changed

how each RPE's contribution to the Nortel Group's R&D activity was measured; the new

methodology looked not to the RPE's contribution to R&D capital stock but rather to its share of

consolidated R&D costs.  (*See id.* ¶ 43.)  The redesigned system, implemented without

substantive input from NNSA, imposed a cost mark-up of approximately 15% for entities like

NNSA that provided regional central services and extra-territorial services for other Nortel

companies (which services entailed, among other things, expenses for sales and marketing).  (*See

id.* ¶ 44.)  It is notable that the implementation of the RPSM occurred at a time when the Nortel

Group's business prospects had already begun to wane.  (*See id.* ¶ 45 ("The Nortel Group

registered losses or at best broke even during the entire period in which the RPSM was in

force.").)

   As for the February 2008 Repayment, the Proof of Claim contains ample details

supporting the Joint Administrators' claims.  NNSA made this payment because Ryan Smith of

NNI pressured NNSA to make an early payment of about $33,050,000 million on the 2002

Subordinated Loan.  (*See* Proof of Claim ¶¶ 76, 187(c).)  This occurred despite the fact that NNL

and NNSA had intended, as expressly memorialized in the 2002 Subordinated Loan documents,

that NNSA would not be required to repay the balance outstanding until it became profitable,

which it was not.  (*See id.* ¶ 70; *id.* ¶ 72 (providing details of NNSA's poor performance and

financial condition for the years ended 2001 to 2007); *id*. ¶¶ 74 (naming employees of NNI who

were involved in the decision to repay the 2002 subordinated loan, including Ryan Smith).)

### c.     NNL Was A *De Facto* Director Of NNSA.

To the extent that these claims depend on NNL's status as a *de facto* director (*see* Proof of Claim ¶ 114(a)), as explained above, the facts alleged in support of the Joint Administrators' claims against NNI for acts of mismanagement as a *de facto* director of NNSA apply with equal force to their claims against NNL alleging its mismanagement as a *de facto* director of NSSA because the Proof of Claim shows that NNI and NNL acted in concert. (*See* Section II, *supra.*) NNL was a *de facto* director of NNSA and, as a consequence, it is susceptible to claims for mismanagement under French law. (*See id.*) The Proof of Claim shows that NNL, which was aided, abetted, assisted, and/or encouraged by NNI, engaged in acts of mismanagement by devising, imposing, and implementing transactions and arrangements that contributed to NNSA's shortfall of assets. (Proof of Claim ¶ 114(a); *see id.* ¶ 111-17, 135-39, 162-65, 171-73, and 175.) Similarly, NNSA's *de jure* directors committed, in concert with NNI, acts of mismanagement by allowing NNI and NNL to control or by actively assisting them in such transactions, thereby abandoning their responsibilities to the company and its creditors. (*See id.* ¶¶ 29-30.)

### B.     The Proof of Claim States Claims for Conspiracy.

The Joint Administrators allege that NNI's collaboration with NNL and NNSA's directors in the transactions that stripped NNSA of funds renders it liable for conspiracy under US state law.[85] The US Debtor argues that these claims are subject to dismissal on the ground that the Joint Administrators have not alleged the details of the conspiracy with particularity. The Joint Objection asserts that the conspiracy claims must meet the particularity requirement under Rule 9(b), which would purportedly require the Joint Administrators to list all persons who

---

[85].  (Proof of Claim, Claims 5 and 9.)

participated in the conspiracy, state exactly when and where they met or communicated, what they said, and what they did.

### 1.    Rule 9(b) Does Not Apply To NNSA's Conspiracy Claims.

As discussed in Section I.D above, the US Debtor is incorrect to argue that Rule 9(b) applies to any of the Joint Administrators' claims.  Nor do the cases the US Debtor cites suggest the application of Rule 9(b) to the Joint Administrators' conspiracy claims.  In *Fierro v. Gallucci*, 06-CV-5189, 2008 WL 2039545 (E.D.N.Y. May 12, 2008), the court applied Rule 9(b) where the object of the conspiracy was to commit fraud.  *See id*. at *16 ("A claim of conspiracy may lie where an underlying tort of fraud has been adequately pleaded [under Rule 9(b).]").  In none of the other cases cited did the courts apply Rule 9(b) to conspiracy claims.  *See Brug v. Enstar Grp., Inc.,* 755 F. Supp. 1247 (D. Del. 1991) (court applied Rule 9(b) to fraud claims, but not separate claim for conspiracy); *In re Am. Bus. Fin. Services, Inc.*, 361 B.R. 747, 762 (Bankr. D. Del. 2007) (same); *Kalmanovitz v. G. Heileman Brewing Co., Inc.*, 595 F. Supp. 1385, 1401 (D. Del. 1984) (Rule 9(b) not applied to any claim), *aff'd*, 769 F.2d 152 (3d Cir. 1985).

In any event, the allegations in the Proof of Claim do in fact provide detailed information about the period of the conspiracy, the object of the conspiracy and the persons involved.  *Cf. State Farm Mut. Auto. Ins. Co. v. Ficchi*, Civ. No. 10-555, 2011 WL 2313203 (E.D. Pa. June 13, 2011) (under Rule 8(a) a plaintiff's allegations of conspiracy "must be sufficient to 'describe the general composition of the conspiracy, some or all of its broad objectives, and the defendant's general role in that conspiracy") (quoting *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir.1989).

### 2.     The Proof of Claim Alleges Facts Supporting The Elements of the Conspiracy Claims.

US state law generally provides that the Court may make inferences from circumstantial evidence of the alleged confederates' acts or statements to conclude that they conspired in furtherance of an illegal purpose.  *See Floyd v. Hefner,* 556 F. Supp. 2d 617, 656 (S.D. Tex. 2008) ("[t]he general rule is that conspiracy liability is sufficiently established by proof showing concert of action or other facts and circumstances from which the natural inference arises that the unlawful overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators.") (quoting *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581-82 (Tex. 1963)); *Empire Fin. Servs., Inc. v. Bank of N.Y. (Del.)*, 900 A.2d 92, 97 (Del. 2006) (holding that it is not necessary for plaintiff to directly prove an express agreement among alleged conspirators) (citations omitted).

The Proof of Claim contains ample factual allegations supporting the inference that the overt acts of (i) NNI and NNL, alternatively (ii) NNI and the *de jure* directors of NNSA, alternatively (iii) NNI and NNL and the *de jure* directors of NNSA, amounted to a combination or agreement to achieve an unlawful purpose or to injure NNSA by unlawful means.  The Proof of Claim describes how NNI and NNL leveraged their shared power to extract value from NNSA through unfair transfer pricing arrangements, the February 2008 Repayment, and Project Swift.  (Proof of Claim ¶¶ 9-15.)  The Proof of Claim also alleges overt actions taken by NNI and NNL in furtherance of the conspiracy.  (*Id.* ¶¶ 16-27 (describing roles of named agents of NNI who participated in specific transactions designed to divert assets from NNSA to NNI and NNL).  The confederates, including NNI and the aforementioned key players, breached contractual obligations with NNSA or caused NNL or the *de jure* directors of NNSA to engage in mismanagement within the meaning of French law.  (*See, e.g. id.* ¶¶ 35, 116, 120-123, 125-26,

131-32, 136-138, and 144 (NNL and directors of NNSA committed acts of mismanagement under French law, with NNI's assistance or active participation, through the various value-extracting transactions); *see also id.* ¶ 114(c) (denial of arm's length return for NNSA constituted a breach of the MRDA).)

The US Debtor points to *Twombly* and other cases in which courts have found that parallel actions taken by otherwise independent parties do not, by themselves, give rise to an inference that the parties have conspired to act in concert.  This principle is completely inapposite to the circumstances alleged here, where the conspiracy was formed among parties and persons who were members of a corporate family and were necessarily in constant communication with respect to the precise transactions that are alleged to have been the object of the conspiracy.  Under such circumstances there is nothing implausible in assuming that an agreement was formed.

## IV.    THE PROOF OF CLAIMS STATES CLAIMS FOR TORT LIABILITY UNDER ARTICLE 1382 OF THE FRENCH CIVIL CODE.

The Joint Administrators and the French Liquidator assert claims for tort under Article 1382 of the French Civil Code with respect to transfer pricing (Claim 3), the allocation of the Pre-Petition Sales Proceeds (Claim 14), the February 2008 Repayment associated with Project Swift (Claim 7), and certain contingent taxation matters (Claim 17).  These claims are based on allegations that NNI acted together or conspired with NNL, or in the alternative with NNSA's *de jure* directors, to take actions which caused harm to NNSA.  The US Debtor argues that these claims are subject to dismissal because the facts set forth in the Proof of Claim do not make out the required elements of a claim under Article 1382.  In fact the Proof of Claim includes detailed factual allegations supporting each required element.

A.    **The French Law of Civil Liability.**

Article 1382 of the French Civil Code creates a general tort cause of action that allows a party who has been harmed by the conduct of another to recover for that harm.  The language of Article 1382 is quite broad, providing that "any action by a person, which has caused damage to another, obliges that person to provide compensation for the damage caused." (Menjucq Decl. ¶ 98.)  Article 1382 is complemented by Article 1383 of the French Civil Code, which provides that a person can also be held liable for negligence or imprudent acts.  (*Id.* ¶ 99 ("In practice, a claim brought under article 1382 of the Civil Code includes an implicit reference to article 1383.").)

There are three elements to a claim under Article 1382:  (i) a damaging action on the part of the defendant; (ii) damages suffered by the plaintiff; and (iii) a causal link between the damaging action and the damages suffered by the plaintiff.  (Menjucq Decl. ¶ 100-18.) Although the element of a damaging action had traditionally incorporated a concept of "fault," the concept has become less and less important as French legal doctrine has evolved.  (*Id.* 103-05.)  Neither bad faith nor an intention to harm is required in order to satisfy this element.  (*Id.* ¶ 104 ("fault occurs when . . . it can be said that a person has not behaved as he or she should have and that is because his or her attitude went against what could have been expected from a reasonable person in the same circumstances (this evaluation is done conceptually by referring to an objective standard)") (quoting B. Fages, *Droit des Obligations*, LGDJ 2007, no. 494.); *id.* ¶ 110 ("the civil fault is not necessarily an intentional act: it does not require proof of intention to harm or, more exactly, the desire to cause damage"); *id.* ¶ 111 ("Bad faith is therefore not a condition for the application of article 1382 of the Civil Code.").)

Although French Law does not recognize separate causes of action for the common law torts of conspiracy or aiding and abetting, analogous claims can be brought under Article 1382.  (*Id.* ¶ 110.)[86]

**B.    The Proof of Claim Contains Facts Supporting All Elements Of A Claim Under Article 1382 of the French Civil Code.**

The US Debtor argues that the Proof of Claim does not support a claim under Article 1382 because the factual allegations do not show (i) a causal connection between actions by NNI and harm suffered by NNSA; (ii) that NNI was at fault; (iii) that NNL can be considered a *de facto* director of NNL; or (iv) that the *de jure* directors of NNSA were at fault.  In fact, as NNSA's French law expert opines, the allegations in the Proof of Claim satisfy all elements for a claim under Article 1382.  (Menjucq Decl. ¶ 119-27.)

Contrary to the US Debtor's argument, the Proof of Claim alleges facts showing a strong causal connection between actions of NNI and the harm suffered by NNSA.  <u>First</u>, NNI, along with NNL and/or the *de jure* directors of NNSA, took an active role in devising and implementing the transfer pricing policy to which NNSA was subject and which led to NNSA's insufficiency of assets.  (Proof of Claim ¶¶ 111-117.)[87]  <u>Second</u>, NNSA's repayment of the February 2008 loan (in contravention of the conditions for repayment) was effectuated by

---

86.  The US Debtor also argues that Claims 3, 7, 14, and 17 should be subject to the heightened pleading requirements of Rule 9(b).  As explained above in Sections I and III, these claims do not sound in fraud and are not subject to Rule 9(b).

87.  (*See* Proof of Claim ¶ 114 ("NNI acted together or conspired with NNL (or alternatively NNSA's *de jure* directors), and/or aided, abetted, assisted and/or encouraged NNL (or alternatively NNSA's *de jure* directors), to make important strategic decisions and undertaking acts regarding NNSA, including in relation to the imposition of the RPSM model on NNSA, the operation of the RPSM in relation to NNSA and the imposition of the MRDA upon NNSA without the prior approval of the NNSA Board, which approval was required under French law).)

pressure from NNI.  (*See id.* ¶¶ 135-139.)[88]  Third, the Proof of Claim alleges that NNI

benefitted from an inequitable allocation of the Pre-Petition Sales Proceeds.  (*See id.* ¶¶ 162-

165.)[89]  Finally, NNI caused injury to NNSA through its role in Nortel's Tax Department and its

assistance in negotiating and creating tax and transfer pricing arrangements among the Nortel

companies and with the Revenue Authorities that were detrimental to NNSA.  (*See id.* ¶¶ 171-

173, 75.)[90]  These allegations, when proven, will support the element of causation necessary to

recover under Article 1382.  (*See* Menjucq Decl. ¶ 121.)[91]

       Nor can the US Debtor seriously suggest that NNI's conduct was unknowing.

The allegations in the Proof of Claim detail a series of transactions that were actively devised by

NNI and NNL, who jointly made the relevant decisions, for the precise purpose of extracting

value from NNSA during a period when they knew it was suffering substantial annual losses.

(Proof of Claim ¶¶ 10, 16, 22, 25-27, 31, 39, 56, 75 & 79.)  NNI's knowledge is implicit in the

central role it played, and the fact show that it breached the appropriate standard of conduct.

(Menjucq Decl. ¶ 122 (the Proof of Claim alleges that NNI "did not behave as a sister company,

placed under the same set of circumstances, should have reasonably behaved.").)

---

88. (*See id.* ¶ 136 ("NNI is secondarily liable for its role in "plan[ning] and implement[ing] Project Swift and, in particular, to cause NNSA to make the February 2008 Repayment of the 2002 Subordinated Loan to NNL, which repayment was clearly not in NNSA's best interests.").)

89. (*See id.* ¶ 163 (NNI is secondarily liable for its role in "caus[ing] a loss to NNSA by causing and/or allowing NNSA to enter into pre-petition sales and/or to receive an allocation of the Pre-Petition Sale Proceeds in respect of which NNSA did not receive a proper allocation of the appropriate value.").)

90. (*See id.* ¶ 173 (seeking relief "[t]o the extent that NNSA suffers loss as a result of a claim by a tax authority and or the imposition of any form of penalty in relation to its tax affairs NNSA claims against NNI in respect of any losses, penalties and interest which it has suffered (or will suffer).").)

91. The US Debtor tries to suggest that "but for" causation is required, but acknowledges that some French courts would recognize claims under Article 1382 where the defendant's actions were a "real and effective cause" of the plaintiff's injury, or one that would "normally or typically" give rise to the injury.  (Joint Obj. at 55 (citing Bremond Decl. ¶ 68 n. 86).)  In fact, "for the relationship to be established, the damaging event need only be one of the causes of the damage."  (Menjucq Decl. ¶ 118.)

To the extent that a secondary liability type of claim under Article 1382 may depend on showing that NNL would be considered a *de facto* director of NNSA under French law, and breached the resulting obligations, the facts showing that NNI was a *de facto* director apply with equal force to NNL because the two companies were acting in concert with respect to the relevant conduct.  Further, the Proof of Claim alleges facts showing that NNL, which was aided, abetted, assisted, and/or encouraged by NNI, engaged in mismanagement or management fault by devising, imposing, and implementing transactions and arrangements that contributed to NNSA's shortfall of assets.  (Proof of Claim ¶ 114(a); *see id.* ¶ 111-17, 135-39, 162-65, 171-73, and 175.)  Similarly, NNSA's *de jure* directors committed, in concert with NNI, acts of mismanagement or management fault by allowing NNI and NNL to control or by actively assisting them in such transactions, thereby abandoning their responsibilities to the company and its creditors.  (*See id.* ¶ 29.)  These allegations more than demonstrate the required third party conduct to support an aiding and abetting or conspiracy type claim under Article 1382.[92]

## V.    THE JOINT ADMINISTRATORS STATE CLAIMS TO RECOVER FOR IMPROPER ALLOCATION OF PRE-PETITION NORTEL ASSET SALES.

The US Debtor argues that since the Joint Administrators have not provided all of the details of all of the pre-petition asset sales that were entered into by the Nortel companies, they should not be allowed to pursue a claim for a fair allocation of the Pre-Petition Sales Proceeds.  (Joint Obj. at 61-65.)  But by the standard of Rule 8(a), and certainly under Bankruptcy Rule 3001, the Proof of Claim gives adequate notice of the basis for the Joint Administrators' claims.  Certainly the US Debtor is not in danger of the sort of prejudicial surprise that confronted the defendants in *Chapa v. Chase Home Financing LLC* and *Smith v.*

---

92.  The Joint Administrators have filed claims for breach of duty (analogous to mismanagement or management fault actions under French law) against some of NNSA's *de jure* directors in England.

*National City Mortgage. See* No. C-10-359, 2010 WL 5186785, at *5 (S.D. Tex. Dec. 15, 2010);

No. A-09-CV-881, 2010 WL 3338537, at *11 (W.D. Tex. Aug. 23, 2010).  The proper procedure

for the US Debtor to obtain additional information about the Joint Administrators' claims will be

through the discovery process.  Indeed, it is highly probable that much of relevant information

about the asset sales is within the possession of the North American entities, beyond the reach of

the Joint Administrators.

## VI.    NNSA'S CLAIMS BASED ON FSD LIABILITY SHOULD NOT BE DISALLOWED.

Under Section 43 of the *UK Pensions Act 2004*, the UK Pensions Regulator (the

"UK Regulator") has the power to issue a Financial Support Directive ( "FSD").  (*See* Proof of

Claim ¶ 89.)  The purpose of an FSD is to require financial support for a pension plan from the

person to whom the FSD is issued.  (*Id.* ¶ 91.)  If an FSD is issued, but not complied with, the

UK Regulator has statutory authority to issue a contribution notice ("CN"), which sets forth the

liability of the person in question for the sums owed to the pension plan.  (*Id.* ¶ 92.)  On June 25,

2010, the UK Regulator determined that an FSD should be issued to certain EMEA companies

(the "EMEA Targets"), including NNSA, on account of the underfunding of the NNUK pension

plan.  (*Id.* ¶ 86.)[93]  As of the date on which the Proof of Claim was filed, no FSD had yet been

issued to NNSA.  (*Id.* ¶ 177.a.)

It is unknown at this time whether any of the EMEA Targets will be required to

provide financial support to the NNUK pension plan, what the nature or amount of such support

will be, how the total obligation to the NNUK pension plan will be divided between the entities

who receive FSDs or CNs, or the rationale that may be articulated for such division.  NNSA's

---

93.  The EMEA Targets have referred the decision of the UK Regulator to the Upper Tribunal (Tax and Chancery Chamber), which is pending.  (*Id.* ¶ 87.)

liability to the UK Pension Plan is therefore contingent upon both the issuance of an FSD or CN and the amount that NNSA is required to pay, which are unknown at this time.

Should an FSD of CN be issued against NNSA, the Joint Administrators and the French Liquidation will contend that NNI and NNL should be liable for some or all of the required contribution, based on the role they played in causing NNUK's pension plan to be underfunded.  Because the Joint Administrators and the French Liquidation do not know, and cannot know, what the amount or basis NNSA's potential liability will be, they have asserted four claims against NNI in order to preserve their right to recover on behalf of NNSA any payments or other financial support that NNSA may be required to pay to the UK Pension Plan pursuant to an FSD or CN (the "<u>FSD Claims</u>").  (*See id.* ¶¶ 179-183.)[94]

The Joint Administrators were compelled to file amended claims by the June 3, 2011 bar date, whether or not those claims were "reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured", 11 U.S.C. § 101(5)(A), or risk having those claims extinguished.  Accordingly, the Joint Administrators asserted the FSD Claims in order to preserve their rights, as allowed under the Bankruptcy Code.

The US Debtor's arguments show why it would be incompatible with the Bankruptcy Code to apply Rule 12(b)(6) here.  The Bankruptcy Code expressly preserves the right of a creditor to assert pre-petition claims that remain contingent, unliquidated and unmatured on the filing date.  The subsequent setting of a bar date requires the creditor to give notice of such claims.  Once the claim is stated in a proof of claim, the creditor can then amend

---

94. The bases for the FSD Claims are viable grounds for recovery under French law.  (Menjucq Decl. ¶¶ 128-140.) The uncertain nature of these claims is not a valid basis for dismissal as a matter of French law; indeed, creditors have an obligation to give notice of a bankruptcy claim, even if the claim is simply theoretical.  (*See id.* ¶ 131 (citing P. Le Cannu & M. Jeantin, *Entreprises en difficulté*, Dalloz ed. 7th ed., 2006, no. 471, fn.2).)

the claim to provide details after the claim matures.  There is no need to determine or disallow an

unmatured claim until plan confirmation or the making of a distribution to creditors.[95]  To

expunge its contingent or unmatured claims prematurely will therefore deprive NNSA of a right

reserved in the Bankruptcy Code.[96]

## VII.    THE DOCTRINE OF *IN PARI DELICTO* DOES NOT BAR ANY OF NNSA'S CLAIMS.

### A.    The Claims For Aiding And Abetting And Conspiracy Are Not Barred By The Doctrine Of *In Pari Delicto*.

The doctrine of *in pari delicto* does not apply here because the Proof of Claim

alleges sufficient facts to support a finding that:  (1) NNI was an insider of NNSA and (2) the

"adverse interest" and "controlling shareholder" rules bar application of the doctrine.  In any

event, dismissal of the claims based on this defense would be premature at this stage.

---

95.  The Bankruptcy Code provides that "[a] claim for reimbursement or contribution of [an entity that is liable with the debtor] that becomes fixed after the commencement of the case shall be determined, and shall be allowed under subsection . . . (b) . . . of this section . . . the same as if such claim had become fixed before the date of the filing of the petition."  11 U.S.C. § 502(e)(2).

96.  Any dismissal (or disallowance) of the FSD Claims should be without prejudice to the Joint Administrators' right to reassert or seek reconsideration of the FSD Claims in the event they mature.  *See In re Wedtech Corp.*, 87 B.R. 279, 282 (Bankr. S.D.N.Y. 1988) ("[D]isallowance because of the contingency of a codebtor's claim is effectively without prejudice.  For the Code itself provides in section 502(e)(2) that contingent claim for reimbursement which is fixed after the commencement of the case is to be allowed or disallowed in the same manner as if fixed prior to bankruptcy and provides further in section 502(j) that a claim that has been disallowed may be reconsidered for cause."); *Aetna Cas. & Sur. Co. v. Ga. Tubing Co.*, 1995 U.S. Dist. LEXIS 10120, at *14 (S.D.N.Y. July 20, 1995) (recognizing that reconsideration under § 502(j) of a claim disallowed pursuant to § 502(e)(1)(B) is the appropriate remedy if the contingency is removed at a later date); *In re Pinnacle Brands, Inc.*, 259 B.R. 46, 56 (Bankr. D. Del. 2001) (recognizing a creditor's right to seek reconsideration pursuant to § 502(j) of a claim disallowed pursuant to § 502(e)(1)(B) once the liability is no longer contingent).

1.    The *In Pari Delicto* Doctrine Does Not Apply
       Because NNI Was an Insider of NNSA.

Under both Texas and Delaware law,[97] the *in pari delicto* doctrine provides that a

plaintiff "cannot recover where, as a result of his own actions, the plaintiff bears at least

substantially equal responsibility for the underlying wrongdoing of which he is complaining."

*Floyd v. CIBC Markets, Inc.*, 426 B.R. 622, 642 (Bankr. S.D. Tex. 2009); *see Am. Int'l Group,*

*Inc. v. Greenberg*, 976 A.2d 872 (Del. Ch. 2009).  However, it is universally accepted that the *in*

*pari delicto* defense does not apply where, as here, the defendant is an "insider" of the

corporation.  *See, e.g.*, *Floyd v. Hefner*, 556 F. Supp. 2d 617 (S.D. Tex. 2008).[98]  Under the

Bankruptcy Code, for example, a corporation's "insiders" include, in relevant part:  "(i) [a]

director of the debtor; (ii) [an] officer of the debtor; (iii) [a] person in control of the debtor . . .

[or]; (vi) [a] relative of a general partner, director, officer, or person in control of the debtor."

11 U.S.C. § 101(31)(B).  An insider is also an "affiliate, or insider of an affiliate as if such

affiliate were the debtor."  11 U.S.C. § 101(31)(E).  "Affiliate" is also a defined term under the

Bankruptcy Code, and includes a "corporation, 20 percent or more of whose outstanding voting

securities are directly or indirectly owned, controlled, or held . . . by the debtor, or by an entity

that [also] directly or indirectly owns, controls or holds 20 percent or more of the outstanding

voting securities of the debtor.  11 U.S.C. § 101(2)(B).  Congress has made it clear that this

"statutory list is not exhaustive, and it is for the courts to define the limits of non-statutory

---

97.  Although no determination of applicable law has been made, the Joint Administrators take the position that to
      the extent US law governs the *in pari delicto* defense, Texas law would be applicable.  Nonetheless, the
      arguments asserted herein apply with equal force under both Texas and Delaware law.

98.  *See also Hill v. Day (In re Today's Destiny, Inc.*, 388 B.R. 737, 749 (Bankr. S.D. Tex. 2008) ("No case, logic or
      equitable proposition supports the conclusion that insiders of a bankrupt corporation can insulate themselves
      from liability by virtue of the illegal character of their conduct."); *Stanziale v. Pepper Hamilton LLP (In re*
      *Student Fin. Corp.)*, 335 B.R. 539, 547 (Bankr. D. Del. 2005) ("*In pari delicto* will not operate to bar claims
      against insiders of the debtor corporation."); *Tese-Milner v. Beeler (In re Hampton Hotel Investors, L.P.)*, 289
      B.R. 563, 577 n.23 (Bankr. S.D.N.Y. 2003) ("*In pari delicto* bars claims against third parties, but does not apply
      to corporate insiders or partners.") (internal citations omitted).

insider status." *Hirsch v. Tarricone (In re A. Tarricone, Inc.)*, 286 B.R. 256, 262 (Bankr.

S.D.N.Y. 2002).  The legislative history of the definition of "insider" instructs that "[a]n insider

is one who has a <u>sufficiently close relationship with the debtor that his conduct is made subject</u>

<u>to closer scrutiny</u> than those dealing at arm's length with the debtor."  S. Rep. No. 95-989, at 23

(1978), *reprinted in* 1978 U.S.C.C.A.N., pp. 5787, 5810 (emphasis added); *see also In re*

*Missionary Baptist Found. of Am., Inc.*, 712 F.2d 206, 210 (5th Cir. 1983).[99]

        NNI is undeniably an affiliate of NNSA and therefore an insider.  In accordance

with 11 U.S.C. § 101(2), NNI and NNSA are affiliates by way of common ownership.  As

wholly owned subsidiaries of NNL, NNL directly owns, controls, or holds 100% of the

outstanding voting securities of both entities, thereby making NNI and NNSA statutory

affiliates.[100]  In fact, the US Debtor concedes in the Joint Objection that NNI and NNSA are

sister corporations, each wholly-owned or majority-owned subsidiaries of NNL.  (Joint Obj.

at 33.)

        **2.      The "Adverse Interest" and "Controlling Shareholder" Exceptions to**
                **the *In Pari Delicto* Doctrine Bar its Application Here.**

        The "adverse interest" rule protects corporations from application of *in pari*

*delicto* where an agent acted "entirely for his own or another's purpose."  *Hill v. Day* (*In re*

---

99.  Ultimately, "[t]he analysis is <u>a fact intensive one</u> and must be done on a case-by-case basis."  *In re*
      *A. Tarricone, Inc.,* 286 B.R. at 262 (emphasis added); *In re Student Fin. Corp.*, 335 B.R. at 547 ("[T]he inquiry
      into insider status 'is fact-intensive and can be made only on a case-by-case basis.' ") (internal citation omitted).

100. Moreover, even if NNI and NNSA were not statutory affiliates, NNI clearly had a "sufficiently close
      relationship" with NNSA to raise an obvious fact question whether they were insiders who conduct warrants
      "closer scrutiny."  Indeed, the Proof of Claim points to numerous occasions on which directors, officers, and
      employees of NNI controlled or directed NNSA in connection with transfer pricing arrangements, the February
      2008 Repayment, and Project Swift.  Because the actions and knowledge of a corporation's "vice-principals"
      are imputed to the corporation itself, the Court, following a factual investigation, could conclude that NNI,
      through its agents, exercised control over NNSA in this respect.  *See Hammerly Oaks, Inc. v. Edwards*, 958
      S.W.2d 387 (Tex. 1997).  (A vice-principal includes (1) corporate officers; (2) those with authority to employ,
      direct, and discharge the corporation's employees; (3) those engaged in performance of non-delegable duties;
      and (4) those to whom the corporation has confided the management of the whole or a department or division of
      the business.  *See id.*)  Accordingly, dismissal of the Proof of Claim at this stage would be premature.

*Today's Destiny, Inc.)*, 388 B.R. 737, 749 n.13 (Bankr. S.D. Tex. 2008) (citations omitted).

Here, the Proof of Claim alleges that NNSA's *de jure* directors acted contrary to the interests of

NNSA in taking actions that only benefitted NNI and the Canadian Entities.  (*E.g.*, Proof of

Claim ¶¶ 125, 147.)  Indeed, the Proof of Claim specifically alleges that, under NNI's and the

Canadian Entities' control, "[a]t all relevant points the Nortel Group was operated in such a

manner that cash and value were improperly removed from NNSA and the other EMEA

Companies and transferred to NNL."  (*Id.* ¶ 9.)  These allegations support a finding, therefore,

that the "adverse interest" rule applies to preclude application of the *in pari delicto* doctrine.

Application of *in pari delicto* is also barred by the related principle that this

defense cannot be applied in actions where an element of the claim is that "a controlling

shareholder forced the corporation to act for the benefit of the shareholder through domination

and control."  *Kalb, Voorhies & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 133 (2d Cir. 1993); *see In re

Alper Holdings USA, Inc.*, 398 B.R. 736, 760 (S.D.N.Y. 2008).

> **3.**      **The Policy Underlying the *In Pari Delicto* Doctrine**
> **Would be Thwarted by Dismissing the Claims at**
> **This Stage in the Proceeding.**

As the Supreme Court has observed, *in pari delicto* was created not to shield

defendants from liability, but rather to protect the public.  *Pinter v. Dahl*, 486 U.S. 622, 633

(1988) (quoting *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310-11 (1985)

(internal quotations omitted)).  The doctrine's underlying purpose is to prevent wrongdoers from

using the courts to benefit from their malfeasance, to deter future misconduct.  *See AIG*, 976

A.2d at 882.  Likewise, the Texas Supreme Court has stated:

> The rule is adopted not for the benefit of either party and not to
> punish either of them, but for the benefit of the public . . . . There
> is often involved, in reaching a decision as to granting or
> withholding relief, the question whether the policy against
> assisting a wrongdoer outweighs the policy against permitting the

> unjust enrichment of one party at the expense of the other.  The
> solution of the question depends upon the <u>peculiar facts and
> equities of the case</u>, and the answer usually given is that which is
> thought will better serve public policy.

*Lewis v. Davis*, 199 S.W.2d 146, 151 (Tex. 1947) (emphasis added).

  The Court should not make a determination as to the application of *in pari delicto* at this stage in the proceedings.  *See In re DVI, Inc.*, No. 03-12656, 2008 WL 4239120, at *11 (Bankr. D. Del. Sept. 16, 2008) ("An affirmative defense with disputed facts is not a proper basis to dismiss a complaint.") (citing *Official Comm. Of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs.*, *Inc.*), 299 B.R. 732, 752 (Bankr. D. Del. 2003) (concluding that "[*i*]*n pari delicto* is an affirmative defense.  A plaintiff is not required to plead in the complaint all requirements for a claim as well as to contemplate and plead in anticipation of all affirmative defenses that may lie against such claim.").

  Indeed, both Texas and Delaware require the Court to make a fact-specific determination as to whether the underlying purposes of the doctrine are served by its application. *Lewis*, 199 S.W.2d at 151; *see also Today's Destiny*, 388 B.R. at 749 ("Under *Lewis*, *in pari delicto* is not an automatic bar."); *AIG*, 976 A.2d at 888 (" 'Unless' is an important word in the *in pari delicto* context because the doctrine is subject to the exception when another policy is perceived to trump the policy basis for the doctrine itself.").  As set forth in the case law relied on by the US Debtor, bankruptcy courts have held that the "need to consider the peculiar facts and equities is particularly acute" where, as here, "a defendant is asserting the defense against a Trustee who seeks recovery for the benefit of creditors of a wrongdoer rather than the wrongdoer himself." *Today's Destiny*, 388 B.R. at 749 (internal citations and quotations omitted).

  The case law that the US Debtor relies on also holds that the policy analysis that *Lewis* requires "can not be undertaken prior to discovery and an evidentiary hearing." *Id.*  As

such, whether equity and public policy demand that the Joint Administrators be afforded relief will require a factual investigation and cannot be determined at the motion to dismiss stage.  *See In re DVI, Inc.*, 2008 WL 4239120, at *11; *Today's Destiny*, 388 B.R. at 749;  *see also Floyd v. CIBC World Markets*, 426 B.R. at 643; *Smith v. Woodforest Nat'l Bank (In re IFS Fin. Corp.)*, No. 02-39553, 2007 WL 1308321, at *4 (Bankr. S.D. Tex. May 3, 2007).

Likewise, the case law cited by the US Debtor makes clear that application of the "adverse interest" and "insider" exceptions invoked by the Joint Administrators is based on a fact-intensive inquiry that can only be made after discovery. *Today's Destiny*, 388 B.R. at 749 n.13 (reserving judgment on the "adverse interest rule" because application is "fact intensive"); *In re Student Finance Corp.*, 335 B.R. 539, 547 (D. Del. 2005) ("the inquiry into insider status 'is fact-intensive and can be made only a case-by-case basis" after "full discovery") (citations omitted).

Thus the Court cannot conclude as a matter of law, on the basis of allegations in the Proof of Claim that NNSA's claims are barred by the *in pari delicto* doctrine.  *Id.*; *see also In re DVI, Inc.*, 2008 WL 4239120, at *11 (where plaintiff invoked the adverse interest exception on a 12(b)(6) motion, the court found it premature to bar plaintiff's claim on *in pari delicto* grounds without further development of the facts); *In re Total Containment, Inc.*, No. 05-0145, 2005 WL 6522761, at *24 (Bankr. E.D. Pa. Oct. 18, 2005) (where trustee pled that defendants' conduct adversely affected the debtor and benefited defendants, *in pari delicto* is not established on the face of the complaint and cannot be considered in the context of a motion to dismiss).

## VIII.  NNSA'S CLAIMS RELATING TO TRANSFER PRICING, THE FEBRUARY 2008 REPAYMENT, AND PRE-PETITION ASSET SALES ARE NOT TIME-BARRED.

The US Debtor argues that NNSA's claims relating to transfer pricing, intercompany loans, and pre-petition asset sales are time-barred.  (Joint Obj. at 73-79.)  The Court should reject these arguments.

### A.  NNSA's Claims Are Not Time-Barred Because Section 108(c) Tolls The Statute of Limitations As Of The Petition Date.

The US Debtor's argument that the statute of limitations has expired on the Joint Administrators' claims is based on the date the Original Proof of Claim was filed.  But the date the Original Proof of Claim was filed is not the relevant date.  Section 108(c) of the Bankruptcy Code extends the time period within which a civil action subject to the automatic stay of Section 362 may be brought against the debtor, provided that the creditor's claims have not already expired prior to the bankruptcy filing.  *See* 2 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 108.04 (16th ed. 2011) (Section 108(c) provides that if a creditor's claim against the debtor is stayed due to the commencement of a case under Title 11, "any time deadline for commencing and continuing the action is extended to 30 days after notice of termination of the stay, if the deadline would have occurred on an earlier date") (citing 11 U.S.C. § 108(c)); *In re Pagnotti*, 269 B.R. 326, 335 (Bankr. M.D. Pa. 2001) (because Section 108(c) "extends the statute of limitations for creditors commencing actions on outstanding debts," creditor's claims are "tolled by the [d]ebtor's bankruptcy filing"); *Matter of Burger*, 125 B.R. 894, 901 (Bankr. D. Del. 1991) (filing date of bankruptcy petition "is the measuring date as to whether the statute's time had run out or not").

Accordingly, the statutes of limitations on the Joint Administrators' claims were tolled on January 14, 2009, when the US Debtor filed for Chapter 11 protection.

**B.      The Internal Affairs Doctrine Requires The Court To Apply Limitations Periods Under French Law To the Claims Arising Out Of The Internal Affairs Of NNSA.**

The Joint Objection asserts that the Delaware borrowing statute requires the Court to apply Delaware's three year statute of limitations for most of the claims asserted to be time barred.  (*See* Joint Obj. at 73-74 (citing 10 Del. C. § 8106).)  The borrowing statute, however, does not apply to claims that arise out of corporate governance matters of a foreign corporation. For such claims, the internal affairs doctrine requires that the limitations period specified by the law of the place of incorporation governs, notwithstanding the borrowing statute.  *See Burtch v. Dent (In re Circle Y of Yoakum, Tex.)*, 354 B.R. 349, 359 (Bankr. D. Del. 2006) (applying statute of limitations of Texas in action for breach of fiduciary duty against Texas corporation).

This Court has observed that the purpose of Delaware's borrowing statute is to prevent forum shopping and that it should therefore not be applied in cases where there is no threat of forum shopping.  *See Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 488, 503 (Bankr. D. Del. 2010) (Gross, J.)[101]  Here, as in *Mervyn's*, it cannot be argued that forum shopping motivated the filing of the Proof of Claim in this Court, where the US Debtor's bankruptcy case is pending.  Indeed, filing claims against NNI in any other forum would have violated the automatic stay.

NNSA was formed under, and its internal affairs are governed, by French law.  As set forth in the Proof of Claim, the Joint Administrators' claims related to transfer pricing, the

---

101. The US Debtor apparently cites *Mervyn's* in an attempt to distinguish the present case from those in which courts have applied the internal affairs doctrine, noting that this Court applied California law in that case because the "pre-petition transaction lacked other ties to Delaware."  (*See* Joint Obj. at 74 n.77 (citing *Mervyn's*, 426 B.R. at 502).)  In fact, this Court held in *Mervyn's* that the internal affairs doctrine required the application of California law (despite Delaware's borrowing statute) because the corporation whose governance was in question was organized in California.  *See Mervyn's*, 426 B.R. at 503.

February 2008 Repayment, and pre-petition asset sales[102] are all predicated upon acts of

mismanagement committed by NNSA's directors (either *de jure* or *de facto*) arising under

Article L. 651-2 of the French Commercial Code and/or Article 1382 of the French Civil Code

and can be considered the analogues of breach of fiduciary duty claims.  As each of these claims

involve the internal affairs of the company and address issues of corporate governance, the Court

must apply the applicable French limitations periods to the Joint Administrators' claims rather

than Delaware law.[103]  Under French law, a claim for mismanagement under Article L. 651-2 of

the French Commercial Code may be brought until <u>three years after judgment ordering</u>

<u>liquidation</u>. (Menjucq Decl. ¶ 25.) Thus, these claims would not be barred until May 2012, three

years from the date on which an order was entered appointing the French Liquidator.[104]  For

claims brought under Article 1382 of the French Civil Code, the applicable limitations period is

five years from the date on which the claimant knew or should have known of the facts that form

the basis of the claim.  Code Civil [C. civ.] art. 2224 (Fr.).

         The policy concerns underlying Delaware's borrowing statute therefore do not

apply here, because the suit was brought in a forum that has a shorter limitations period than the

---

102. The Joint Administrators' have also brought claims in quasi-contract arising out of the pre-petition asset sales. The timeliness of those claims are discussed below.

103. The Court should also apply French limitations periods to the Joint Administrators' claims for aiding and abetting acts of mismanagement under L. 651-2 of the French Commercial Code and Article 1382 of the French Civil Code.  *See, e.g.*, *In re Fedders North America, Inc.*, 405 B.R. 527 (Bankr. D. Del. 2009) ("the internal affairs doctrine compels the Court to apply Delaware law to the claim for aiding and abetting breach of fiduciary duty").  The internal affairs doctrine should apply equally to conspiracy claims here where the ultimate objective and consequence was a breach of fiduciary duties.  *See In re  Global Commc's, Inc.*, No. 08-36737, 2011 WL 111427 (Bankr. S.D. Tex. Jan. 13, 2011) ("Under Delaware law, civil "aiding and abetting" specifically refers to aiding and abetting a breach of a fiduciary duty, and is very similar to a civil conspiracy claim.");  *Allied Capital Corp. v. GC–Sun Holdings, L.P.*, 910 A.2d 1020, 1038–39 (Del.Ch.2006) ("[I]n cases involving the internal affairs of corporations, aiding and abetting claims represent a context-specific application of civil conspiracy law.").

104. (Proof of Claim ¶ 1 n.1. (By judgment of the Commercial Court of Versailles dated May 28, 2009, NNSA entered into secondary insolvency proceedings in France (the "Liquidation Order")).)

one that would otherwise apply.  *See Mervyn's*, 426 B.R. at 503 (where plaintiff's action was

subject to a *shorter* statute of limitations in Delaware compared with suitable alternative

jurisdiction, finding "absolutely no threat of forum shopping").

      C.      **The Claims Based On Transfer Pricing, The February 2008 Repayment, And Pre-Petition Business Sales Are Timely.**

      The US Debtor argues that the statute of limitations for the Joint Administrators'

transfer pricing claims began to run in December 2004, when the MRDA was executed.  (Joint

Obj. at 75-76.)  Even assuming this assertion to be correct – which the Joint Administrators do

not concede[102] – all of the Joint Administrators' claims relating to transfer pricing are subject to

at least the limitations period of three years after entry of the Liquidation Order or five years for

claims under Article 1382 of the French Civil Code.  Therefore, the earliest the Joint

Administrators' claims could be time barred would be December 2009, well after the US Debtor

filed for bankruptcy.

      Likewise, even based on the earliest date of accrual asserted by the US Debtor

with respect to the claims based on the February 2008 Repayment related to Project Swift –

February 2008 (Joint Obj. at 77) – these claims judged under either the five year limitations

period or 3 year insolvency period were not time barred as of the January 2009 Petition Date.

      The same holds true, moreover, based on the US Debtor's assertion that a three-

year statute of limitations period would apply with respect to the purported accrual date of claims

related to the pre-petition asset sales – December 2006, with respect to the closing of the Alcatel

Sales, or July 2007, the date of the statement setting forth the allocation of proceeds from the

---

102. The accrual of a claim for statute of limitations purposes is a question of fact that, if disputed, is not appropriate for resolution on a motion to dismiss.  *See Firestone v. Firestone*, 76 F.3d 1205, 1208-09 (D.C. Cir. 1996).

Alcatel Sale.  (Joint Obj. at 77.)  Under a three-year limitation period, these claims would not be time barred on the US Debtor's petition date, and therefore have been timely brought.

> ### D.    The Joint Administrators' Amended Proof Of Claim Relates Back To Their Original Proof Of Claim For Statutes Of Limitation Purposes.

The US Debtor argues that the Joint Administrators' claims related to Project Swift and Pre-Petition Asset Sales are time-barred because they do not relate back, for statute of limitations purposes, to the Original Proof of Claim.  (Joint Obj. at 77-79.)  Although the arguments above dispose of the US Debtor's limitations arguments, were the timing of the proofs of claim relevant, the Amended Proof of Claim would in fact relate back to the Original Proof of Claim for limitations purposes.

It is well-settled that amendments to timely proofs of claim are liberally allowed. *In re Orion Refining Corp.*, 317 B.R. 660, 664 (D. Del. 2004) (citing *In re Trans World Airlines, Inc.*, 145 F.3d 124, 140 (3d Cir. 1998)).  "Two rationales for allowing amendments to proofs of claim are that (1) bankruptcy courts are courts of equity, and (2) amendment of a claim are likened to an amendment of a pleading."  *Id.* (citation omitted).  Generally, amendments are allowed when the original claim provides "notice of the existence, nature, and amount of the claim."  *Id.* (citing *In re Walls & All, Inc.*, 127 B.R. 115, 118 (W.D.Pa. 1991) ("It is well settled that, absent contrary equitable considerations or prejudice to the opposing party, amendments to proofs of claim should be freely permitted.").  Indeed, amendments are generally used to "cure obvious defects, describe the claim with greater specificity or plead a new theory or recovery on facts of the original proof of claim," as well as to amend claim amounts.  *Id.*

Here, the Joint Administrators' original Proof of Claim gave adequate notice of all of the causes of action asserted in their amended Proof of Claim.  With respect to the basis for the Joint Administrators' claims, the original proof of claim stated:

> The [Joint] Administrators, the Insolvency Practitioner, NNUK
> and the EMEA Companies have potential claims against the
> Debtors and their affiliates arising out of transfer pricing,
> intercompany dealings, trading and other arrangements or
> agreements between them.
>
> The [Joint] Administrators, NNUK, EMEA Companies and any
> Insolvency Practitioner hereby assert a Claim in respect of any
> heretofore unknown, unliquidated, or unmatured claim or claims
> that the [Joint] Administrators, NNUK, the Insolvency Practitioner
> and/or any EMEA Company may have against any one or more of
> such Directors and Officers of Nortel Networks Inc. or its affiliated
> debtors in these Chapter 11 cases for mismanagement, breach of
> duty and/or the conduct of those Directors and Officers with
> respect to the operation, management and control of Nortel
> Networks Inc. or its affiliated debtors in these Chapter 11 cases.

(Original Proof of Claim at 2.)

The language in the Original Proof of Claim that NNSA's claims arise "out of transfer pricing, intercompany dealings, trading and other arrangements" was clearly broad enough to encompass not only claims related to the MRDA and transfer pricing, but also claims related to the February 2008 loan repayment and pre-petition asset sales. The Joint Administrators are merely "describe[ing] the claim[s] with greater specificity," *Orion Refining Corp.*, 317 B.R. at 664, which is freely permitted under these circumstances. *See*, *e.g.*, *Burtch*, 354 B.R. at 361-62 (amendment pleading new facts with respect to management agreement relates back to original complaint where it "adds detail to the conduct surrounding the schematic payments made to [defendant]"); *In re Loewen Group Inc.*, No. 98-6740, 2004 WL 1853137 (E.D. Pa. Aug. 18, 2004) (relation back permitted where "new claims regarding defendants' statements . . . are part of the same basic scheme described in the original complaint").[103]

---

103. The rationale underlying the relation-back doctrine is that "one who has been given adequate notice of litigation concerning a given transaction or occurrence has been provided with all the protection that statutes of limitations are designed to afford." *Tri-Ex Enters. v. Morgan Guar. Trust*, 586 F. Supp. 930, 932 (S.D.N.Y. 1984) (citing 3 J. Moore, *Moore's Federal Practice* ¶ 15.15[3] at 15-194). Moreover, *Coan v. O & G Indus. Inc. (In re Austin Driveway Servs., Inc.)*, 179 B.R. 390, 395 (Bankr. D. Conn. 1995), a case cited by the US Debtor, further supports allowing amendment here. While the specific facts of *Austin Driveway* are

E.    **The Statute Of Limitations Is Equitably Tolled While A Corporation's Board Of Directors Is Controlled By Culpable Directors.**

Finally, under the adverse domination doctrine, the statute of limitations on a corporation's claim against its officers and/or directors is equitably tolled while the corporation's board of directors is controlled by culpable directors.  *See In re Marvel Entm't Group, Inc.*, 273 B.R. at 74.  "The premise underlying the adverse domination doctrine is that a corporation acts through its board of directors, and when that board of directors is controlled by culpable directors it will not cause the corporation to bring a lawsuit against themselves."  *Id.* (citations omitted). While courts in many jurisdictions subscribe to various versions of the adverse domination tolling doctrine, *id.* (citing *Hecht v. Resolution Trust Corp.* 333 Md. 324, 635 A.2d 394, 402 (1994) (collecting cases), the Delaware courts have neither accepted nor rejected this doctrine. *Id.*

In *Marvel*, the court declined to recognize the adverse domination doctrine because "the court believes that Delaware's tolling mechanisms, in combination with the availability of shareholder derivative actions, already address the concerns that underlie the adverse domination doctrine."  *Id.* at 77.  The court noted that while the director defendants dominated the plaintiff's board, the alleged harmful act (entering a tax sharing agreement) was disclosed to plaintiff's shareholders who could have instituted derivative actions on behalf of the corporation.  *Id.* at 76.

---

distinguishable from the present case because *Austin Driveway* was a preference action, in which relation back "is the exception rather than the rule," the court observed that the decision to permit amendment turns on "the existence or absence of an underlying common scheme or course of conduct which is the basis of the original action and links otherwise distinct transactions."  *Id.* at 397.  A common underlying course of conduct – such as the one set forth in the original Proof of Claim with respect to transfer pricing, intercompany dealings, trading and other arrangements – provides a relation-back nexus.  *Id.* (citing *Siegel v. Converters Transp., Inc.*, 714 F.2d 213, 216 (2d Cir. 1983);  *In re Chaus Sec. Litig.*, 801 F. Supp. 1257, 1264 (S.D.N.Y. 1992)).

This case is different.  Here, NNL, which was party to the wrongdoing, held substantially all of NNSA's stock.  Although NNIF and certain NNSA directors combines to hold a slight minority of the shares, NNL controlled NNSA in the many ways set forth above and was therefore effectively the sole shareholder.  There was no possibility of a shareholder derivative action or any other action based on the allegations set forth in the Proof of Claim until the Joint Administrators were appointed.  Moreover, NNSA was controlled by culpable directors who would never bring a lawsuit against themselves.  The statute of limitations was therefore tolled until the Joint Administrators were appointed in January 2009.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the Joint Objection.


Dated:    Wilmington, Delaware          **YOUNG CONAWAY STARGATT & TAYLOR, LLP**
          September 16, 2011


<u>/s/ Jaime N. Luton</u>
James L. Patton (No. 2202)
Edwin J. Harron (No. 3396)
Jaime N. Luton (No. 4936)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571–6600
Facsimile: (302) 571–1253

- and -

**HUGHES HUBBARD & REED LLP**
Michael Luskin
Derek J.T. Adler
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837–6000
Facsimile: (212) 422–4726

- and -

**HERBERT SMITH LLP**
Kevin Lloyd
John Whiteoak
Richard Lawton
Exchange House
Primrose Street
London
EC2A 2HS

*Counsel for the Joint Administrators
and the French Liquidator*