## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------X

| | |
|---|---|
| *In re* | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |
| | **Hearing date:**<br>**October 14, 2011 at 9:00 a.m. ET** |
| | **RE: DI 5970, 5971, 5972, 6373, 6374** |

--------------------------------------------------------- X


## JOINT REPLY IN FURTHER SUPPORT OF OBJECTION AND MOTION TO DISMISS CLAIMS OF NORTEL NETWORKS UK LIMITED

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Counsel for the Debtors and Debtors in Possession*

*Counsel for the Official Committee of Unsecured Creditors*

---

[1]     The U.S. Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iv

SUMMARY CHART OF ARGUMENTS BY CAUSE OF ACTION IN SUPPORT OF MOTION TO DISMISS CLAIMS OF NNUK ............................................ xi

PRELIMINARY STATEMENT ......................................................................... 1

ARGUMENT ...................................................................................................... 5

I. NNUK'S CLAIM SHOULD BE TESTED AGAINST – AND DISMISSED UNDER – THE STANDARDS OF RULE 12(b)(6) ................................................. 5

    A.    NNUK Cannot Avoid Application of Rule 12(b)(6) ........................... 5

    B.    NNUK's Attempt to Dilute the Requirements of Rule 8(a) Cannot Be Squared With Binding Precedent ............................................ 9

    C.    Rule 9(b)'s Heightened Standard Applies to NNUK's Claims That Sound In Fraud ........................................................................ 10

II. NNI OWED NO DUTIES TO NNUK OR ITS CREDITORS ............................ 13

    A.    NNUK Cannot Avoid the Estoppel Effects of Its Prior Representations to This Court ............................................................... 14

        1.    NNUK's Prior Representations Are Directly Contrary to Its Current Allegations .................................................... 14

        2.    The Location of Those Who Manage and Control the Debtor is Crucial to COMI ..................................................... 16

        3.    NNUK Has No Good Faith Excuse For Its Inconsistent Positions .......... 18

        4.    The Elements of Judicial Estoppel Have Been Met ................................ 20

        5.    NNUK Misstates the Test for Collateral Estoppel ................................... 21

    B.    NNUK's Failure to Adequately Plead Insolvency is Fatal to Its Directorship Claims ....................................................................... 22

    C.    NNUK Fails to Plead a Plausible Claim That NNI was a Director Under English Law ........................................................................ 24

        1.    English Law Regarding De Facto Directors ........................................... 25

        2.    English Law Regarding Shadow Directors ............................................. 28

        3.    Properly Construed, NNUK States No English Law Claim for Shadow or De Facto Directorship ............................................ 32

    D.    NNUK Cannot Extend English Law to Create a Duty of Care as a Remedy for Pure Economic Loss .................................................. 39

    E.    NNUK Cannot Avoid the Application of *Ex Turpi Causa* ................................. 40

III. NNUK'S ATTEMPTS TO IMPOSE SECONDARY LIABILITY ON NNI FAIL.............. 42

    A.    NNUK's Claims for Aiding and Abetting and Dishonest Assistance
Cannot Withstand Scrutiny ................................................................................. 42

        1.    NNUK's Attempts to Manufacture a Dispute Over the Standard for
"Dishonesty" Do Not Save Its Dishonest Assistance Claims .................. 42

        2.    NNUK's Similar Attempt to Loosen the Requirements for the
"Knowing Assistance" Element of an Aiding and Abetting Claim
Does Not Save Its Claim ........................................................................ 44

        3.    NNUK Fails to Adequately Allege Assistance Given by NNI or
Knowledge of Any Underlying Breach of Fiduciary Duty...................... 45

            a.    There is No Well-Plead Allegation of an Underlying
Breach of Duty ................................................................. 46

            b.    NNUK Fails to Allege That NNI Knew NNUK was
Insolvent .......................................................................... 46

            c.    The Claim Lacks Well-Pleaded Facts to Identify Any
Knowing Assistance by NNI .............................................. 47

    B.    NNUK Fails to Show Any Well-Pleaded Allegations to Support Its
Conspiracy Claims (Claims 5, 7, 11, 12, 19, 21) ................................................. 51

    C.    NNUK's Claims For Aiding and Abetting, Dishonest Assistance and
Conspiracy are Barred by the *Ex Turpi Causa* and *In Pari Delicto*
Doctrines ........................................................................................................... 53

IV. NNUK FAILS TO ADEQUATELY ALLEGE NNI'S UNJUST RECEIPT OF ANY
NNUK PROPERTY............................................................................................................ 54

    A.    NNUK Concedes That It Has Failed to Establish Tracing, an Element of
Its Unconscionable Receipt and Knowing Receipt Claim .................................... 54

    B.    NNUK Does Not Allege That NNI Unjustly Received Any of Its Property ....... 55

V. NNUK'S QUASI-CONTRACT AND OTHER CLAIMS RELATING TO
UNSPECIFIED ASSET SALES SHOULD BE DISMISSED............................................. 56

    A.    NNUK Cannot Remedy Its Basic Failures of Notice Pleading ........................... 56

    B.    Claims 24-27 Independently Fail to State a Claim ............................................. 57

        1.    Claim 26 Fails Adequately To Plead Mistake ........................................ 57

        2.    NNUK Does Not Plead Required Elements of a Transaction at
Undervalue Claim ................................................................................. 57

        3.    Implied Term/Implied Contract ............................................................. 58

VI. NNUK'S CLAIMS RELATING TO TRANSFER PRICING, INTERCOMPANY
LOANS, AND PRE-PETITION ASSET SALES ARE TIME-BARRED ........................... 59

**Page**

    A.     NNUK Provides No Basis to Avert Dismissal of Its U.S. State Law Claims...... 59

    B.     Delaware's Borrowing Statute Should Apply to the Remaining Claims ............ 61

    C.     Section 108(c) ................................................................................................... 62

CONCLUSION ........................................................................................................... 63

# TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

11 U.S.C. § 108(c) .............................................................................................. 62-63

Bankr. R. 7009 .................................................................................................... 57

Fed. R. Bankr. P. 9017 ....................................................................................... 25

**Cases**

900 Capital Servs., Inc. v. Cloud (In re Cloud),
214 F.3d 1350, No. 99-51109, 2000 WL 634637 (5th Cir. May 4, 2000).......................... 7

Adams v. Dorsie's Steak House, Inc. (In re Dorsie's Steak House, Inc.),
130 B.R. 363 (D. Mass. 1991) ............................................................................. 7

Aetna Cas. and Sur. Co. v. Leahey Const. Co.,
219 F.3d 519 (6th Cir. 2000) ............................................................................. 44

Airport Blvd. Apts., Ltd. v. NE 40 Partners, Ltd. (In re NE 40 Partners Ltd.),
440 B.R. 124 (Bankr. S.D. Tex. 2010) ................................................................. 12

Angell v. Ber Care, Inc. (In re Caremerica, Inc.),
409 B.R. 737 (Bankr. E.D.N.C. 2009)................................................................. 12, 58

Animal Sci. Prods., Inc. v. China Nat'l Metals and Minerals Imp. And Exp. Corp.,
702 F. Supp. 2d 320 (D. N.J. 2010), rev'd on other grounds sub nom., Animal Sci Prods.
v. China Minmetals Corp., 2011 U.S. App. LEXIS 17046 (3d. Cir. Aug. 17, 2011)......... 25

Anjelino v. N.Y. Times Co.,
200 F.3d 73 (3d Cir. 2000).................................................................................. 19

Asarco LLC v. Ams. Mining Corp.,
382 B.R. 49 (S.D. Tex. 2007) ............................................................................. 62

Ashcroft v. Iqbal,
129 S.Ct. 1937 (2009)....................................................................... 10, 13, 52-53, 55

Bautista v. L.A. Cnty,
216 F.3d 837 (9th Cir. 2000) ............................................................................. 56-57

Bell Atlantic Corp. v. Twombly,
550 U.S. 544 (2007).......................................................................................... 51, 52

Belmont Fin. Corp. Ltd. v Williams Furniture Ltd.,
[1979] Ch 250 ...................................................................................................... 41

Bissessur v. Indiana Univ. Bd. of Tr.,
581 F.3d 599 (7th Cir. 2009) ............................................................................... 59

Blackwell v. Wells Fargo (In re I.G. Servs., Ltd.),
No. 04-5041-C, 2004 WL 5866105 (Bankr. W.D. Tex. Dec. 22, 2004) ........................ 45

Brug v. Enstar Grp., Inc.,
755 F. Supp. 1247 (D. Del. 1991)...................................................................... 45, 46

Burger v. Level End Dairy Investors,
125 B.R. 894 (Bankr. D. Del. 1991) ..................................................................... 61

Burrell v. AstraZeneca LP,
C. A. No. 07C-01-412(SER), 2010 WL 3706584 (Del. Super. Ct. Sept. 20, 2010)........... 62

Burtch v. Huston (In re U.S. Digital, Inc.),
443 B.R. 22 (Bankr. D. Del. 2011) ...................................................................... 23

Capitaliza-T Sociedad de Responsibilidad Limitada de Capital Variable v. Wachovia
Bank of Del. Nat'l Ass'n,
Civil No. 10-520, 2011 WL 864421 (D. Del. Mar. 9, 2011) ............................................ 45

Clark v. McDonald's Corp.,
213 F.R.D. 198 (D.N.J. 2003).............................................................................. 6

Commw. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.,
836 F.2d 173 (3d Cir. 1988).............................................................................. 58

Decker v. Kraftsow (In re Craftmatic Sec. Litig.),
890 F.2d 628 (3d Cir. 1989)............................................................................... 13

Duke Energy Int'l L.L.C. v. Napoli,
748 F. Supp. 2d 656 (S.D. Tex. 2010) ................................................................. 45

Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.),
398 B.R. 736 (S.D.N.Y. 2008).......................................................................... 7, 8

FoodComm Int'l v. Barry,
463 F. Supp. 2d 818 (N.D. Ill. 2006) .................................................................. 62

Forman v. Salzano (In re Norvergence, Inc.),405 B.R. 709 (Bankr. D.N.J. 2009) ........... 10-11

Fowler v. UPMC Shadyside,
578 F.3d 203 (3d Cir. 2009)............................................................................... 9

**Page(s)**

G-I Holdings, Inc. v. Reliance Ins. Co.,
586 F.3d 247 (3d Cir. 2009)..................................................................... 16

Gilstrap v. Radianz Ltd.,
443 F. Supp. 2d 474 (S.D.N.Y. 2006), aff'd 233 F. App'x 83 (2d. Cir. 2007).................. 28-29

Glinka v. Dartmouth Banking Co. (In re Kelton Motors Inc.),
121 B.R. 166 (Bankr. D. Vt. 1990)............................................................ 12

Hansford v. Bank of Am.,
No. 07-4716, 2008 U.S. Dist. LEXIS 65502 (E.D. Pa. Aug. 26, 2008) ........................... 20

Holland v. Revenue & Customs Comm'rs,
[2010] 1 All ER 373........................................................................ 26

Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.,
585 F.Supp.2d 623 (D. Del. 2008)........................................................... 21

In re Adelphia Commc'ns Corp.,
359 B.R. 54 (Bankr. S.D.N.Y. 2006).......................................................... 7

In re Basis Yield Alpha Fund (Master),
381 B.R. 37 (Bankr. S.D.N.Y. 2008).......................................................... 17

In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.,
374 B.R. 122 (Bankr. S.D.N.Y. 2007), aff'd, 389 B.R. 325 (S.D.N.Y. 2008) ................... 17

In re Best Prods. Co.,
210 B.R. 714 (Bankr. E.D. Va. 1997).......................................................... 5

In re Diamond Mortg. Corp. of Ill.,
105 B.R. 876 (Bankr. N.D. Ill. 1989) ......................................................... 5

In re DJK Residential LLC,
416 B.R. 100 (Bankr. S.D.N.Y. 2009).......................................................... 7, 8

In re Dow Corning Corp.,
No. 95-20512, 2000 Bankr. LEXIS 1579 (Bankr. E.D. Mich. Nov. 3, 2000) ..................... 8

In re G–I Holdings, Inc.,
443 B.R. 645 (Bankr. D.N.J. 2010) ........................................................... 7

In re HealthSouth Corp. S'Holders Litig.,
845 A.2d 1096 (Del. Ch. 2003).............................................................. 53

**Page(s)**

In re Ins. Brokerage Antitrust Litig.,
618 F.3d 300 (3d Cir. 2010)................................................................................... 9

In re Kane,
628 F.3d 631 (3d Cir. 2010)................................................................................... 18

In re Sevko, Inc.,
143 B.R. 167 (Bankr. N.D. Ill. 1992) ................................................................... 7

In re Spiegel, Inc.,
337 B.R. 821 (Bankr. S.D.N.Y. 2006)................................................................... 7

In re WorldCom, Inc.,
322 B.R. 530 (Bankr. S.D.N.Y. 2005)................................................................... 7

Klein v. Stahl GMBH & Co.,
185 F.3d 98 (3d Cir. 1999)..................................................................................... 19

Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.,
337 F.3d 314 (3d Cir. 2003)................................................................................... 18

Licci v. Am. Express Bank Ltd.,
704 F. Supp. 2d 403 (S.D.N.Y. 2010)................................................................... 24-25

Malleus v. George,
641 F.3d 560 (3d Cir. 2011)................................................................................... 9

Malpiede v. Townson,
780 A. 2d 1075 (Del. 2001) ................................................................................... 45

McCoy v. Grinnell (In re Radcliffe's Warehouse Sales, Inc.),
31 B.R. 827 (Bankr. W.D. Wash. 1983) ............................................................... 63

Med Mut. Of Ohio Inc. v. Braintree Labs.,
Civ. No. 10-604-SLR, 2011 U.S. Dist. LEXIS 74996 (D. Del. July 12, 2011)................. 62

Montrose Med. Grp. Participating Savs. Plan v. Bulger,
243 F.3d 773 (3d Cir. 2001).........................................................................16-17, 20

Mooney v. Vitolo,
435 F.2d 838 (2d. Cir. 1970)................................................................................. 12

Morgan v. Cash,
C.A. No. 5053-VCS, 2010 WL 2803746 (Del. Ch. July 16, 2010) ................................... 45

**Page(s)**

New Hampshire v. Maine,
532 U.S. 742 (2001) ............................................................................................. 18

Nisselson v. Lernout,
469 F.3d 143 (1st Cir. 2006) ............................................................................... 53

Norman v. Elkin,
Civil Action No. 06-005-JJF, 2007 WL 2822798 (D. Del. Sept. 26, 2007) ...................... 61

O'Connell v. Arthur Andersen LLP (In re Alphastar Ins. Grp. Ltd.),
383 B.R. 231 (Bankr. S.D.N.Y. 2008) ................................................................. 43

Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions Corp.),
330 B.R. 67 (Bankr. D. Del. 2005) ...................................................................... 21

Oneida Motor Freight, Inc. v. United Jersey Bank,
848 F.2d 414 (3d Cir. 1988) ................................................................................ 19-20

Parklane Hosiery Co. v. Shore,
439 U.S. 322 (1979) ............................................................................................. 22

Rafter Seven Ranches L.P. v. WNL Invs. LLC (In re Rafter Seven Ranches L.P.),
414 B.R. 722 (B.A.P. 10th Cir. 2009) .................................................................. 7

Raytech Corp. v. White,
54 F.3d 187 (3d Cir. 1995) ................................................................................... 21

Re Kaytech Int'l plc,
[1999] 2 BCLC 351 ............................................................................................. 27-28

Re Mea Corp,
[2006] EWHC 1846 (Ch), [2007] 1 BCLC 618 .................................................. 29

Re Richborough Furniture Ltd,
[1996] 1 BCLC 507 ............................................................................................. 34

Related Westpac LLC v. Jer Snowmass LLC,
C.A. No. 5001-VCS, 2010 WL 2929708 (Del. Ch. July 23, 2010) .................................. 46

Robertson v. Olsen (In re Running),
Case No. 91 C 20302 (PGR), 1992 U.S. Dist. LEXIS 4686 (N.D. Ill. Mar. 2, 1992) ........ 7

Royal Brunei Airlines Sdn Bhd v. Tan,
[1995] 2 AC 378 ................................................................................................. 43

**Page(s)**

Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,
81 F.3d 355 (3d Cir. 1996)........................................................................... 19

Santiago v. Warminster Twp.,
629 F.3d 121 (3d Cir. 2010).......................................................................... passim

Secretary of State for Trade and Industry v. Deverell,
[2001] Ch 340 ............................................................................................ 28

Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.),
335 B.R. 539 (D. Del. 2005)........................................................................ 54

Stone and Rolls Ltd. v. Moore Stephens,
[2009] 1 AC 1391 ....................................................................................... 40, 42

Swierkiewicz v. Sorema N.A.,
534 U.S. 506 (2002) .................................................................................... 9

Toner v. Allstate Ins. Co.,
821 F. Supp. 276 (D. Del. 1993)................................................................... 10, 11

Twohy v. First Nat'l Bank of Chi.,
758 F.2d 1185 (7th Cir. 1985) ..................................................................... 25

UD Tech. Corp. v. Phenomenex, Inc.,
No. 05-942 (GMS), 2007 WL 28295 (D. Del. Jan. 4, 2007) ............................ 32, 40

Ultraframe UK Ltd. v. Fielding,
[2005] EWHC 1638 (Ch)............................................................................. 29

United States ex rel. Pilecki-Simko v. Chubb Inst.,
No. 10-3097, 2011 WL 3890975 (3d Cir. Sept. 6, 2011) .................................. 11

United States v. Bestfoods,
524 U.S. 51 (1998) ...................................................................................... 37

Wenglicki v. Tribeca Lending Corp.,
Civ. Act. No. 07-4522, 2009 WL 2195221 (E.D. Pa. July 22, 2009)................. 11

Yukong Line of Korea Ltd v. Rendsburg Corp. Invs. of Liberia Inc.,
[1998] 1 WLR 294 ...................................................................................... 30

**Other Authorities**

Financial Services and Markets Act § 417(1) (2000) ........................................ 31

**Page(s)**

Shorter Oxford English Dictionary,
(William R. Trumble et al. eds., 6th ed. 2007) ....................................................................    44

The American Heritage Dictionary of the English Language,
(3d ed. 1994) ....................................................................................................................    44

Webster's Ninth New Collegiate Dictionary,
(9th ed. 1983) ....................................................................................................................    44

## SUMMARY CHART OF ARGUMENTS BY CAUSE OF ACTION
## IN SUPPORT OF MOTION TO DISMISS CLAIMS OF NNUK

The below chart provides the Court with a summary of certain of the bases for dismissal applicable to each category of NNUK's claims.  This presentation is intended for the convenience of the Court and is qualified in its entirety by the arguments set forth in the Motion and Reply, all of which arguments are expressly preserved.

*I.   ENGLISH LAW CLAIMS*

| | |
|---|---|
| Breach of Fiduciary Duty (claims 2, 8, 16, 28, 32) | • Judicial & Collateral Estoppel (sworn representations made to this Court in recognition proceedings that NNUK was managed and controlled autonomously from England)<br>• Failure to Adequately Plead Existence of Fiduciary Duty (no well-plead allegations of directions given by NNI to the NNUK board, of NNI's participation in NNUK corporate governance, or that NNI undertook directorial functions of NNUK; no allegations sufficient to extend fiduciary duties to shadow director)<br>• Ratification (No well-plead allegations of insolvency, absent which ratification eliminates any breach)<br>• *Ex Turpi Causa*<br>• Largely time-barred under DE law (borrowing statute) |
| Breach of Duty of Care (claims 3, 9, 17, 30, 33) | • No Fiduciary Duty Owed (as set forth above)<br>• Non-Compliance with English Law (no duty of care for pure economic loss as between affiliates, and no other basis pled for imposing duty)<br>• *Ex Turpi Causa*<br>• Largely time-barred under DE law (borrowing statute) |
| Dishonest Assistance (claims 4, 10, 18, 35) | • No underlying breach of duty (failure to plead insolvency)<br>• Failure to Meet English Law Requirements (no well-pled allegations of assistance, or facts from which inference of any NNI dishonesty can be inferred)<br>• Failure to Meet U.S. Pleading Standards (Rules 8(a) and 9(b) failure to plead NNI's knowledge of breach)<br>• *Ex Turpi Causa*<br>• Largely time-barred under DE law (borrowing statute) |
| Conspiracy (claims 5, 12, 19) | • Failure to Meet U.S. Pleading Standards (Rules 8(a) and 9(b))<br>• *Ex Turpi Causa*<br>• Largely time-barred under DE law (borrowing statute) |
| Unconscionable / Knowing Receipt (claims 14, 22, 29) | • Failure to Meet English Law Requirements (tracing of NNUK property to NNI) |

| | |
|---|---|
| | • Failure to Meet U.S. Pleading Standards (Rule 8(a) identification of NNUK property received by NNI)<br>• *Ex Turpi Causa* |
| Implied Contract<br>   (claims 24, 25) | • Failure to Meet U.S. Pleading Standards (Rule 8(a) identification of contract, contractual obligations) |
| Mistake<br>   (claim 26) | • Failure to Meet U.S. Pleading Standards (Rule 9(b) failure to identify contract, mistake with specificity) |
| Transaction at Undervalue<br>   (claim 27) | • Failure to Meet English Law Requirements (identification of transactions, pleading a transaction within the "relevant time")<br>• Failure to Meet U.S. Pleading Standards (Rule 8(a) identification of transactions, pleading facts to infer an "undervalue") |

II.      *U.S. STATE LAW CLAIMS*

| | |
|---|---|
| Aiding and Abetting Breach of Fiduciary Duty<br>   (claims 6, 13, 20, 31, 34) | • Statute of Limitations (all transfer pricing claims, all Pre-Petition Asset Sales and all NNUK Intercompany Loans prior to January 2005)<br>• No Underlying Breach of Fiduciary Duty (judicial estoppel as to NNL, failure to plead insolvency)<br>• Failure to Meet U.S. Pleading Standards (Rules 8(a) and 9(b) failure to allege assistance given by NNI, failure to allege facts to infer knowledge of breach)<br>• *In Pari Delicto* |
| Conspiracy<br>   (claims 7, 11, 21) | • Statute of Limitations (all transfer pricing claims, all Pre-Petition Asset Sales and all NNUK Intercompany Loans prior to January 2006)<br>• Failure to Meet U.S. Pleading Standards (Rules 8(a) and 9(b))<br>• *In Pari Delicto* |
| Unjust Enrichment<br>   (claims 15, 23) | • Failure to Meet U.S. Pleading Standards (Rule 8(a), failure to allege receipt of NNUK Property, or NNI as the intended beneficiary) |

The Movants respectfully submit this reply (the "Reply") in further support of the

Movants' Joint Objection and Motion to Dismiss Claims of Nortel Networks UK Limited [D.I.

5970] (the "Motion" or "Opening Brief"), and in response to the Joint Administrators'

Memorandum of Law in Opposition to the Debtors' and Committee's Joint Objection and

Motion to Dismiss the Claims of Nortel Networks UK Limited [D.I. 6373] (the "Response" or

"Opposition").[2]  In reply to the Opposition, and in further support of the Motion, the Movants

respectfully represent as follows:

## PRELIMINARY STATEMENT

NNUK's opposition to the Motion starkly reveals the lack of substance to its Claim.

NNUK's Response consists primarily of (i) an effort to avoid application of well-settled pleading

standards articulated by the Supreme Court and Third Circuit, (ii) misstatements or proposed

expansion of existing English law and (iii) a hollow plea that "circumspection is required" before

dismissing claims.

Taking these in order, NNUK's pleading utterly fails to meet the requirements of Rule 8

as articulated by the Supreme Court in Twombly and Iqbal, much less the requirements of Rule

9(b) which applies to many of its claims.  It is no surprise therefore that NNUK strenuously

insists that those pleading requirements should not be applied to its Claim.  NNUK's argument

that it did not have proper notice that Rules 8(a) and 12(b)(6) would apply – and thus should be

entitled to a third attempt to re-plead – is contrary to the clear record in this case, which amply

demonstrates that NNUK fully understood that its amended Claim would have to pass muster

under these well-settled pleading requirements.

---

[2]        The accompanying Declaration of Philip Marshall QC in Opposition to Joint Objection and Motion to
Dismiss Claims of Nortel Networks UK Limited [D.I. 6374] will be referred to herein as the "Marshall Declaration."
Additional capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

NNUK not only seeks to wish away well-settled U.S. law pleading requirements that are applicable to its Claim, it also urges this Court to expand or to ignore existing English law.  The following points of English law, however, are not in dispute:

- No English court has ever held a sister corporation liable as a de facto or shadow director of its English affiliate.

- The leading and most recent English case analyzing a shadow director's duties flatly rejected NNUK's assertion that a shadow director automatically owes to an English company a full set of common law fiduciary duties.

- No English court has ever found a generalized duty of care arising in circumstances remotely analogous to those alleged in the Claim.

NNUK's generalized plea that because the Claim is large and purportedly brought on behalf of NNUK's creditors, "circumspection" is required before dismissing its Claim completely misses the point.  Where, as here, a pleading fails to state a claim, there is no basis for the Court to refuse to dismiss it merely because the claimant has asserted a large damages claim.  Nor is there any exception in U.S. pleading rules or the governing substantive law because the claimant claims it is acting "responsibly."  Indeed, "examin[ing] [the Motion] in light of the surrounding circumstances," as NNUK states the Court must do (Opp. at 1), makes it even clearer that the Claim should be promptly dismissed.  As the Court is aware, there is approximately $7.4 billion in assets waiting to be distributed to Nortel creditors worldwide; the impediment to the ultimate distribution to creditors and the successful conclusion of these proceedings are the issues relating to allocation of post-bankruptcy proceeds from the sale of Nortel businesses and assets.  The Joint Administrators have made clear their desire to inject these baseless claims into the allocation process, for no purpose, we submit, other than to attempt

without justification to boost the allocation to the EMEA entities.  The Claim plainly fails as a matter of law and must be dismissed.

First, NNUK is estopped from asserting claims based on duties allegedly owed by NNI and NNL. NNUK cannot explain away its about-face: a direct comparison of its prior positions with its current litigation posture reveals they are irreconcilably inconsistent.  Nor can NNUK claim that only after the Joint Administrators were appointed did they uncover facts that called its prior positions into question.  The Joint Administrators themselves continued to verify under oath the truth of those positions – and advocate them to this Court – as recently as this year.

 Second, the majority of NNUK's claims can be dismissed for failure to adequately plead insolvency.  NNUK generally agrees that absent insolvency, its parent (NNL) would be deemed to have ratified the transactions at issue, which forecloses any resulting breach claims.  As NNUK has not – and could not – allege well-pleaded facts to support a claim of insolvency, it falls back on its talismanic incantation that NNUK was insolvent or of "doubtful" solvency for a continuous period of nearly ten years, which is precisely the type of conclusory allegation that must be disregarded after Iqbal.  NNUK's general background allegations regarding the Nortel Group's losses are equally insufficient as they are irrelevant to the test for insolvency under English law.  Nor can NNUK avoid this result through a ratification exception for unlawful capital distributions, which is inapplicable on its face to the challenged transactions.

Third, the Court must also reject NNUK's suggestion that English law is unsettled or unclear regarding de facto and shadow directors, which forms the basis for NNUK's allegations that NNI breached a fiduciary duty owed to NNUK.  Over the course of several decades, if not longer, English courts have developed well-settled standards, which NNUK's allegations simply fail to meet.  A shadow director claim requires NNI to have issued instructions to NNUK's board

and NNUK's board to have been accustomed to acting in accordance with those instructions.  A de facto director claim requires NNI to have occupied a place in the corporate governance structure or undertaken director-level functions on an equal footing with other directors.  The threadbare allegations of the complaint do not show an entitlement to relief under either of these theories.

Fourth, NNUK's attempt to expand the English duty of care also should be rejected. NNUK agrees English courts impose a duty of care in cases of pure economic loss only in limited circumstances (e.g., professional liability) and that no English court has ever imposed a duty of care in circumstances such as the ones pled here.

Fifth, just as NNUK's direct theories of liabilities fail, its attempt to repackage those allegations as secondary liability claims fail for similar reasons.  Given NNUK's failure to adequately plead insolvency, these claims fail because there is no adequately pled underlying breach.  But even if NNUK had sufficiently pled insolvency, nowhere has it even alleged NNI's knowledge of that alleged insolvency, which precludes any knowledge on NNI's part that NNUK's directors were in breach – as required for its dishonest assistance under English law and aiding and abetting claims.  NNUK's U.S. law secondary liability claims are largely time-barred.   Moreover, NNUK's dishonest assistance claim requires proof that NNI acted with dishonesty, thus invoking Rule 9(b).  But NNUK fails to plead with specificity the particular acts allegedly undertaken by NNI to assist in any fiduciary breach, or sufficient facts to infer that NNI did so dishonestly.

Sixth, NNUK's duplicative U.S. and English law claims predicated on alleged receipt of NNUK property fail.  NNUK concedes both that English law receipt claims require tracing of the property allegedly received back to NNUK and that its Claim does not set forth or even allege

that required element.  NNUK also concedes that any transfers were made for NNL's direct

benefit, not for NNI, as an unjust enrichment claim requires.

Accordingly, and for the reasons set forth more fully below and in the Motion, the

"surrounding circumstances" thus demand that the Claims be dismissed promptly so that the

parties can move forward with the important business of determining how to allocate the sale

proceeds and make worldwide distributions to creditors.

## ARGUMENT

### I.
### NNUK'S CLAIM SHOULD BE TESTED AGAINST – AND DISMISSED UNDER – THE STANDARDS OF RULE 12(b)(6)

**A.      NNUK Cannot Avoid Application of Rule 12(b)(6)**

Implicitly recognizing its pleading deficiencies, NNUK devotes a substantial portion of

its Response to arguing that Rule 12(b)(6) should not be applied to its Claim.  NNUK, however,

cannot and does not contest that this Court has discretion to apply Rule 12(b)(6) to dismiss the

Claim.   As elaborated in the Motion and herein, given the facts, circumstances, and procedural

history of this case, it is precisely the type of case to which the Court should exercise its

discretion to apply Rule 12(b)(6).  In light of the paramount interest of all parties in enabling

distributions to creditors, expeditious resolution of NNUK's Claim through a motion to dismiss

is particularly appropriate.[3]

Incredibly, NNUK argues that it did not have proper notice that Rules 8(a) and 12(b)(6)

would apply to its Claim and that, therefore, before applying those Rules, the Court must first

enter an order under Rule 9014(c) and then permit NNUK a <u>third</u> attempt to replead.  Opp. at 21-

22.  This feigned ignorance of the application of Rules 8(a) and 12(b)(6) to its Claim is belied by

---

[3]      In re Best Prods. Co., 210 B.R. 714, 716 (Bankr. E.D. Va. 1997) (applying Rule 12(b)(6) to creditor claim to "resolve the parties' dispute expeditiously"); In re Diamond Mortg. Corp. of Ill., 105 B.R. 876, 877 n.1 (Bankr. N.D. Ill. 1989) (deeming a claims objection a motion under Bankruptcy Rule 7012 "in an effort to move this litigation along").

the record.  While NNUK asserts that the EMEA Claims Objection "only requested that the Joint

Administrators file a claim that complied with the requirements of Bankruptcy Rule 3001" (Opp.

at 17), in fact, each of the EMEA Claims Objection, the EMEA Debtors' response to that

objection, and the statements made at the hearing at which the objection was granted made plain

that Rule 12(b) would apply to NNUK's amended claims.

First, the EMEA Claims Objection expressly asserted that "under Bankruptcy Rule 7012

and Federal Rule 12(b)(6)," NNUK's Claim would be required to "contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face."  EMEA Claims

Objection ¶ 24.  The U.S. Debtors cited to both <u>Twombly</u> and <u>Iqbal</u> for this standard.  <u>Id.</u>

Second, NNUK and the other EMEA Debtors not only failed to refute application of the <u>Iqbal</u>

and <u>Twombly</u> Rule 8(a) standards, they consented to the U.S. Debtors' requested relief.[4]

Third, a pleading made in response to an order requiring a more definite statement under

Rule 12(e) must, at a minimum, comply with the notice pleading standard embodied in Rule 8(a).

<u>See, e.g.</u>, <u>Clark v. McDonald's Corp.</u>, 213 F.R.D. 198, 233 (D.N.J. 2003) ("Rule 12(e)'s *raison*

*d'etre* is to require greater specificity than what is ordinarily required under Rule 8(a)(2)").  And,

if more were needed, the record of the hearing on the EMEA Claims Objection made clear that

the U.S. Debtors would be moving to dismiss the Claims under Rule 12(b)(6).  <u>See</u> May 10,

2011 Hr'g Tr. at 25:17-19 ("We do anticipate moving to dismiss these claims as quickly as

possible").  The Court noted that the U.S. Debtors would "have dispositive motions that may

address those [amended NNUK] claims in any event," and posed questions concerning the

---

[4]      <u>See</u> The Joint Administrators' Response to the Debtors' Motion for an Order Requiring a More Definite
Statement of Claim and Setting a Deadline for the Filing of Any Proofs of Claim By the EMEA Claimants ¶ 11 [D.I.
5255] ("the EMEA Debtors will acquiesce to the U.S. Debtors' request and will file amended proofs of claim"); <u>see
also</u> May 10, 2011 Hr'g Tr. at 32:19-22 ("[MR. HARRON]: . . . what we're talking about [is] the motion to file
an amended claim.  As Your Honor can read from our reply and I think the parties all understood, we agreed to the
relief sought in that motion.").

schedule "if I decide not to dismiss the claims." Id. at 27:6-20.[5]  Under such circumstances,

courts have rejected formalistic attempts to invoke Rule 9014(c).[6]

NNUK's assertion that "bankruptcy courts rarely apply Rule 12(b)(6) to proofs of claim"

(Opp. at 19) is undermined by its efforts to distinguish the dozen authorities cited by Movants

where courts have done precisely that.  Indeed, NNUK cites to no authority (nor are the Movants

aware of any) where a court refused to apply Rule 12(b)(6) to a claims objection.  NNUK also

incorrectly asserts that the "US Debtor does not cite any case in which a bankruptcy court has

applied the Rule 8(a) pleading standard, as articulated in *Iqbal* and *Twombly*, to test the legal

sufficiency of a proof of claim."  Opp. at 20 (emphasis in original).  The Motion cites to Flake v.

Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.), 398 B.R. 736, 748 (S.D.N.Y. 2008),

which applied the "plausibility standard," as articulated in Twombly, to dismiss a proof of claim.

Nor is Alper an outlier.[7]  Whereas NNUK seeks to disregard cases where parties consented to

apply Rule 12(b)(6),[8] or where courts do not analyze its application,[9] these authorities only

---

[5]      Moreover, EMEA concedes that "Rule 9(b), through Bankruptcy Rule 7009, applies automatically in any contested matter" (Opp. at 24 n.34), such that NNUK's procedural arguments are inapplicable to those claims that invoke Rule 9(b).

[6]      See Adams v. Dorsie's Steak House, Inc. (In re Dorsie's Steak House, Inc.), 130 B.R. 363, 365 (D. Mass. 1991) (rejecting arguments concerning the absence of a formal order under Rule 9014(c) to parties prior to applying Fed. R. Civ. P. 16, where party had "actual notice" and suffered no prejudice); see also Rafter Seven Ranches L.P. v. WNL Investments LLC (In re Rafter Seven Ranches L.P.), 414 B.R. 722, 738–39 (B.A.P. 10th Cir. 2009) ("Debtor provides no authority for the proposition that the bankruptcy court's failure to comply with the particulars of Rule 9014 is a basis for overturning the order and we conclude it is not").

[7]      See also In re G–I Holdings, Inc., 443 B.R. 645, 665 (Bankr. D.N.J. 2010) (equating a motion to disallow a claim with a motion to dismiss, as governed by Twombly and Iqbal); In re DJK Residential LLC, 416 B.R. 100, 106-07 (Bankr. S.D.N.Y. 2009) (dismissing claim where it "fails under the Rule 8 standard," which required "enough facts to state a claim to relief that is plausible on its face" (citing Twombly)).

[8]      In re Adelphia Commc'ns Corp., 359 B.R. 54, 56 n.5 (Bankr. S.D.N.Y. 2006).  Although the Opposition categorizes In re Spiegel, Inc., as a case involving "consent," the Court in fact overruled claimant's "procedural objections" to application of Rule 12(b)(6), as it enabled the Court to best address the parties' interests in resolving the merits of the claim.  337 B.R. 821, 822-24 (Bankr. S.D.N.Y. 2006).

[9]      900 Capital Servs., Inc. v. Cloud (In re Cloud), 214 F.3d 1350, No. 99-51109, 2000 WL 634637 (5th Cir. May 4, 2000); In re WorldCom, Inc., 322 B.R. 530, 535-36 (Bankr. S.D.N.Y. 2005); In re Sevko, Inc., 143 B.R. 167, 171 (Bankr. N.D. Ill. 1992); Robertson v. Olsen (In re Running), Case No. 91 C 20302 (PGR), 1992 U.S. Dist. LEXIS 4686, at * 2 (N.D. Ill. Mar. 2, 1992).

demonstrate the uncontroversial consensus that Rule 12(b) should apply to contested matters if it will expedite resolution of the claim.

Further, NNUK has it backwards when it suggests that Rule 12(b)(6) should be applied only to simplistic claims. Opp. at 21. To the contrary, applying Rule 12(b)(6) is particularly appropriate where – as here – disposition on the pleadings can avoid protracted and expensive proceedings on claims that fail as a matter of law. See, e.g., Alper Holdings, 398 B.R. at 750 (disposing of proofs of claim alleging environmental contamination and remediation, including complex alter ego and successor liability claims, on a Rule 12(b)(6) motion). Indeed, as NNUK's Claim is structured as a complaint, with independent counts, attempted factual allegations, and a demand for relief, application of Rule 12(b)(6) is particularly appropriate. See In re DJK Residential LLC, 416 B.R. 100, 107 (Bankr. S.D.N.Y. 2009) (applying Twombly to expunge a proof of claim that took the form of a complaint). Moreover, NNUK cannot seriously suggest that its Claim is subject to presumptive validity under Rule 3001. Its Claim is not based on a simple amount payable, but instead on a series of purported multi-billion dollar tort claims based on unprecedented applications of foreign law. See, e.g., In re Dow Corning Corp., No. 95-20512, 2000 Bankr. LEXIS 1579, at *6 n.3 (Bankr. E.D. Mich. Nov. 3, 2000) ("a proof of claim seeking recovery for a disputed, unliquidated tort claim should, as a general rule, not be afforded prima facie validity.").

Finally, contrary to NNUK's suggestion, the same extensive discovery will not be taken "regardless of whether some or all" of the Claim is dismissed. Opp. at 20 (emphasis omitted). NNUK asserts that such discovery will necessarily occur because discovery addressing the same underlying facts will take place in connection with intercompany claims asserted against the Canadian Debtors and in connection with the allocation proceeding. Id. Whether NNUK

engages in extensive discovery as part of the Canadian claims process is irrelevant to the Court's determination with respect to the dismissal of claims against NNI. Even dismissal of only some claims would eliminate entire factual topics, narrowing the scope and burden of discovery for all parties.

**B.    NNUK's Attempt to Dilute the Requirements of Rule 8(a) Cannot Be Squared With Binding Precedent**

Not only should the Court apply Rules 8(a) and 12(b) to the Claim, it should reject NNUK's attempts to dilute the proper tests under those rules. In a misguided attempt to wish away the pleading requirements of Twombly and Iqbal, NNUK asserts that the Rule 12(b)(6) standard "remains" that courts accept "all factual allegations as true," construe the complaint in the light most favorable to the plaintiff, and determine "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Opp. at 23. Remarkably, this language was rejected as *inconsistent* with the teachings of Iqbal in the very case cited by NNUK.[10] Instead, the Third Circuit's current standard for judging a motion under Rule 12(b)(6) has indeed changed after Twombly and Iqbal, such that courts are now required to "(1) identify[] the elements of the claim, (2) review[] the complaint to strike conclusory allegations, and then (3) look[] at the well-pleaded components of the complaint and evaluat[e] whether all of the elements identified in part one of the inquiry are sufficiently alleged." Mot. at 18.[11]

---

[10]    See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). Fowler explained that the language quoted by NNUK was predicated on the mistaken understanding that Twombly was confined to the antitrust context. In Fowler, the Third Circuit abandoned that formulation in light of the holding in Iqbal. Fowler, 578 F.3d at 210.

[11]    Indeed, elsewhere NNUK concedes that this is now the proper test. See Opp. at 23. Clearly uncomfortable with this standard, NNUK nonetheless seizes on the fact that the Supreme Court in Twombly did not "overrule" Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002), such that bare "notice pleading" survives. See Opp. at 22 n.24. The Third Circuit, however, has made clear that Swierkiewicz cannot excuse parties from complying with the Iqbal pleading standard. See, e.g., Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011) (applying Iqbal test for evaluating motions to dismiss without mentioning Swierkiewicz); Santiago v. Warminster Twp., 629 F.3d 121,130 (3d Cir. 2010) (same). Even the Third Circuit opinion cited by NNUK for the proposition that Swierkiewicz survives Iqbal and Twombly made that observation in dicta and, in any event, did not rely on Swierkiewicz in formulating the standard by which it judged the defendants' motion to dismiss, but instead applied the Twombly standard. See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 319-20 (3d Cir. 2010).

9

NNUK acknowledges that courts may no longer accept as true "labels and conclusions" and "formulaic recitations of the elements of a cause of action." Opp. at 23. Notwithstanding its repeated protestations that its allegations are "detailed" or "factual," at base NNUK asks this Court to do just that. See Ashcroft v. Iqbal, 129 S.Ct. 1937, 1950 (2009) (courts "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks and citation omitted)). That there are some factual allegations in the Claim does not alter the "fundamentally conclusory character" of the allegations with respect to key elements of its purported causes of action against NNI. See Santiago v. Warminster Twp., 629 F.3d 121, 131 (3d Cir. 2010) ("While the allegations regarding [defendants' subordinates'] conduct are factual and more than merely the recitation of the elements of a cause of action, the allegation of supervisory liability is, in essence, that '[defendants] told [their subordinates] to do what they did' and is thus a 'formulaic recitation of the elements of a [supervisory liability] claim.'" (citation omitted)).

## C.    Rule 9(b)'s Heightened Standard Applies To NNUK's Claims That Sound In Fraud

While acknowledging Rule 9(b) is applicable to this contested matter for claims that sound in fraud, NNUK both misstates the standard for Rule 9(b) and wrongly contends that the Claim falls outside of its terms. As set forth in the Motion, Rule 9(b) "appl[ies] to all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud." Toner v. Allstate Ins. Co., 821 F. Supp. 276, 283 (D. Del. 1993). Indeed, the case cited by NNUK for the proposition that Rule 9(b) "generally does not apply to the state law claims of breach of fiduciary duty . . . [and] aiding and abetting breach of fiduciary duty" (Opp. at 26) ultimately held that Rule 9(b) did apply to such claims in that case. See Forman v. Salzano (In re Norvergence, Inc.), 405 B.R. 709, 747 (Bankr. D.N.J. 2009) (applying Rule 9(b) to aiding and abetting claims where the complaint "equate[d] the conduct of Debtor's

[directors] and the Leasing Companies as a fraud enabling the defendants to exploit and loot the debtor for [defendants'] own purposes").

Moreover, NNUK is simply wrong when it suggests that courts apply Rule 9(b) to non-fraud claims only when they are "asserted together with fraud claims based on the same facts." Opp. at 26. For example, the plaintiffs in <u>Toner</u> did not bring a fraud claim, yet Rule 9(b) applied to its claims for breach of the covenant of good faith and fair dealing. 821 F. Supp. at 278, 283-84. Nor should the Court consider NNUK's wholly irrelevant comparison of the elements of its own claims against those of common law fraud (<u>see</u> Opp. at 25-26); the relevant inquiry is not whether the claims share elements with a fraud claim, but whether the "gist" of the facts alleged in the claim "sound[s] in fraud." <u>See</u> <u>Toner</u>, 821 F. Supp. at 283-84. As set forth below, certain of NNUK's claims do exactly that.

NNUK also makes the unsupported suggestion that "the Third Circuit's Rule 9(b) test is similar to the current jurisprudence under Rule 8(a)." Opp. at 27. Established law is firmly to the contrary. <u>See</u> <u>United States ex rel. Pilecki-Simko v. Chubb Inst.</u>, No. 10-3097, 2011 WL 3890975, at *3 (3d Cir. Sept. 6, 2011) (distinguishing between the plausibility pleading standard of Rule 8(a) and the particularity required by Rule 9(b)); <u>Wenglicki v. Tribeca Lending Corp.</u>, Civ. Act. No. 07-4522, 2009 WL 2195221, at *2 (E.D. Pa. July 22, 2009) ("These allegations are not even sufficient under <u>Twombly/Phillips</u> and F.R.C.P. 8(a)(2). Therefore, the allegations fall far short of F.R.C.P. 9(b)'s requirement[s].").

The Joint Administrators, moreover, are not entitled to any "relaxed" or "flexible" application of this pleading standard on the theory that they are trustees. In the nearly three years since the Joint Administrators' appointment, NNUK has continued to operate, and many key

managers and employees have remained in place.[12]  And the Joint Administrators have spent

untold hours and substantial sums pursuing formal investigations into NNUK's affairs.[13]  Unlike

a newly-appointed outsider, the Joint Administrators are (and have been for a considerable

period of time) well situated to be informed about the affairs of NNUK, precluding application of

cases that relax the pleading standard of Rule 9(b) for trustees.  See Opp. at 27-29.  This relaxed

standard is simply inapplicable to the Joint Administrators, whose inability to plead a claim with

sufficient particularity has nothing to do with a purported lack of access to information.  See

Mooney v. Vitolo, 435 F.2d 838, 839 (2d. Cir. 1970) (dismissing claims brought by trustee who

had "extensive access to the records and files of the bankrupt corporation"); Glinka v. Dartmouth

Banking Co. (In re Kelton Motors Inc.), 121 B.R. 166, 187 (Bankr. D. Vt. 1990) (Trustees in

bankruptcy must plead with particularity facts giving rise to their fraud actions when they have

access to information.) (internal quotation marks and citation omitted).[14]  Relaxing the pleading

standard for the Joint Administrators also makes particularly little sense in the present case

where both sides are fiduciaries acting for the benefit of creditors.

For the same reason, the Court should reject NNUK's request that the Court adopt a

"flexible" approach to Rule 9(b) based on the Joint Administrators' suggestions that "key

evidence" remains in the exclusive control of NNL and NNI, or that application of the pleading

---

[12]        See generally, Administrators' Progress Reports for Nortel Networks UK Limited ("NNUK Progress Reports"), available at http://www.nortel.com/corporate/adminprogreports.html.

[13]        See NNUK Progress Report, Aug. 10, 2011, at App'x 3 (Joint Administrators have spent £425,104 on "Investigations" as of June 3, 2011).  Overall, the Joint Administrators have spent more than £61 million in administering the NNUK estate as of June 2011. Id.

[14]        Indeed, the very existence of a "relaxed" pleading standard is in doubt after Twombly and Iqbal rejected the "no set of facts" language of Conley v. Gibson on which many of the "relaxed pleading" cases cited by NNUK relied.  See Angell v. Ber Care, Inc. (In re Caremerica, Inc.), 409 B.R. 737, 754 (Bankr. E.D.N.C. 2009) ("[T]he trustee is certainly more likely to have access to [factual information supporting his allegations] than the antitrust plaintiffs in Twombly or the Pakistani detainee in Iqbal.  If these claimants were held to a heightened pleading standard, so too can a trustee in bankruptcy."); Airport Blvd. Apts., Ltd. v. NE 40 Partners, Ltd. (In re NE 40 Partners Ltd.), 440 B.R. 124, 127-28 (Bankr. S.D. Tex. 2010) (holding that "relaxed" pleading standards for trustees should be discarded after Twombly).

rules would "permit sophisticated defrauders to successfully conceal the details of their fraud."

Opp. at 27-29 (internal quotation marks and citation omitted). NNUK – unlike NNI – was a

party to every transaction it pleads, and nowhere does NNUK allege (nor could it) that NNI or

NNL concealed the existence or facts of these transactions from NNUK. See Decker v.

Kraftsow (In re Craftmatic Sec. Litig.), 890 F.2d 628, 645 (3d Cir. 1989) (explaining that in

order for courts to employ a flexible application of Rule 9(b) "pleaders must allege that the

necessary information lies within defendants' control, and their allegations must be accompanied

by a statement of the facts upon which the allegations are based.").

Finally, NNUK's suggestion that the remedy for its pleading deficiencies is to permit

discovery,[15] fails as a matter of law. According to NNUK, the Court should forego examining

the sufficiency of its claims under Rule 12(b)(6) in favor of a protracted discovery process

which, according to NNUK, "may allow the Joint Administrators to winnow and refine their

claims" themselves. Opp. at 21 (emphasis added). NNUK has the law backwards. The Supreme

Court has made clear that, where, as here, the pleading "is deficient under Rule 8, [the claimant]

is not entitled to discovery, cabined or otherwise." Iqbal, 129 S.Ct. at 1953-54.[16]    This is of

particular import here where there will be a waste of resources and significant costs to both the

Court and NNI's creditors if NNUK is permitted to proceed on claims that do not meet the

requisite pleading requirements.

## II.
## NNI OWED NO DUTIES TO NNUK OR ITS CREDITORS

NNUK's Response confirms that its claims predicated on duties owed by NNI must fail.

Not only does NNUK remain judicially estopped from alleging that NNI or NNL directed or

---

[15]        See, e.g., Opp. at 2, 3, 5, 7, 20-21, 38 n.53, 72, and 73.

[16]        This remains the law irrespective of any claimed "information asymmetry between plaintiffs and
defendants." Santiago, 629 F.3d at 134 n.10.

controlled NNUK,[17] but under current, established English law, their allegations are insufficient to impose a duty on NNI – fiduciary or otherwise.

**A.    NNUK Cannot Avoid the Estoppel Effect of Its Prior Representations to This Court**

1.    NNUK's Prior Representations Are Directly Contrary to Its Current Allegations

NNUK's prior positions and sworn statements that all major decisions for NNUK were made and controlled from England simply cannot be reconciled with its Claim, which is predicated on alleged control from North America.  NNUK's attempts to harmonize its two positions (Opp. at 49-52) are refuted by a side-by-side comparison of NNUK's prior representations with the positions staked out in the Claim and Opposition:

| NNUK's Prior Representations | NNUK's Current Allegations |
|---|---|
| "Excess cash in a subsidiary can be loaned to facilitate funding of other subsidiaries within the region or globally.  Global inter-company facilities and loans are all managed from EMEA Treasury in England."  Barefoot Decl. Ex. C ¶ 85 (Rolston Statement). <br><br>"[D]ecisions in relation to settlement of intercompany accounts are made by the EMEA Treasury team in England."  Barefoot Decl. Ex. C ¶ 15(I (Rolston Statement). | "[D]ecisions [were] imposed on NNUK relating to the utilization of the Interest Free Loan Facilities."  Claim ¶ 21. |
| "In relation to corporate matters such as, financial, tax, and distribution issues, strategic and high level decisions are generally made by the Finance and Tax functions of the EMEA group which are all located in England."  Barefoot Decl. Ex D ¶ 36 (Clement Statements). | "NNI's domination and control over tax and treasury matters was pervasive, and the cumulative effect of the major strategic decisions it made in connection with transfer pricing, the Interest Free Loan Facilities, Project Swift and prepetition asset sales and tax policy in general, render it a de facto or shadow director of NNUK."  Opp. at 34. |
| "[M]anagement, supervision, and decision-making in relation to taxation of the EMEA Group is made in England."  Barefoot Decl. Ex. C ¶ 15(f) | "NNUK's taxation affairs were controlled by NNI and NNL."  Opp. at 15. |

---

[17]    Judicial estoppel provides the basis to dismiss claims 2-3, 8-9, 16-17, 28, 30, 32-33.  Additionally, to the extent NNUK's aiding and abetting and dishonest assistance claims are based on the actions of NNL as an alleged de facto or shadow director, those claims (4, 6, 10, 13, 18, 20, 31, 34-35) are barred by judicial estoppel as well.

| | |
|---|---|
| (Rolston Statement). | |
| "The tax group based in England (the 'EMEA Tax Group') is responsible for managing and supervising tax throughout the EMEA Region." Barefoot Decl. Ex. C ¶ 186 (Rolston Statement). | "The control exerted by NNI related to Group Tax matters, in particular transfer pricing, and to Group Treasury matters."  Claim ¶ 15. |
| "T[]he Banking and Treasury functions are run out of England, by the Group Treasury Operations . . . Simon Freemantle operates in England for EMEA's Treasury Functions."  Barefoot Decl. Ex. D ¶ 35 (Clement Statements).<br><br>"[T]he treasury and banking functions for the EMEA Companies are managed out of England." Barefoot Decl. Ex. C ¶ 15(m) (Rolston Statement). | "NNI controlled NNUK's treasury function." Opp. at 36. |
| "While NNC is the ultimate parent of all Nortel Companies worldwide and NNC's headquarters in Toronto serves as the global headquarters, the EMEA Debtors' central management and control is directed from the head office in Maidenhead, England, where all major decisions specific to the EMEA Debtors are made."  Barefoot Decl. Ex. O at 7 (Mem. of Law in Supp. of Verified Chapter 15 Petitions for Recognition of Foreign Proceedings and Related Relief With respect to the EMEA Debtors, dated October 20, 2010 [D.I. 48 in Case No. 09-11972]). | "NNUK had no substantive involvement.  Its role was limited to providing information for the above individuals [from NNI and NNL] as and when required and implementing the decisions which had been taken by NNI and the Canadian Entities."  Claim ¶ 18. |
| "The strength of central management personnel and its business segment coverage means England is the management centre for EMEA."  Barefoot Decl. Ex. C ¶ 32 (Rolston Statement). | "[K]ey areas were controlled jointly by the Canadian Entities and NNI.  These areas included Nortel Group Tax and Treasury, which performed key roles in the Group's centralized, strategic management."  Opp. at 10. |

As this comparison makes plain, the record forecloses NNUK's attempt to minimize its

prior submissions as relating only to operational matters.  Opp. at 49.  NNUK's representations

went far beyond that, affirming that management, tax and treasury functions were controlled

from England, where "key governance" took place.  See, e.g., Barefoot Decl. Ex. G ¶ 15(f) ("key

governance and decision making for the EMEA Region takes place in England"); id. ¶ 17 ("the

15

Foreign Debtor's management, strategic planning, decision making and key functions are located

in England"); Barefoot Decl. Ex. I ¶ 4(e) ("NNUK's central management and control is to a large

extent handled from England, where <u>all major decisions</u> are made") (emphasis added).[18]  The

details the Witness Statements provided on customer relations and sales demonstrate only that

England was the locus of <u>both</u> operational and decision-making functions.[19]

      Nor can NNUK harmonize its litigation stances by pointing out that a de facto or shadow

directorship can be imposed with respect to specific transactions.  Opp. at 51.  First, to obtain

recognition, NNUK confirmed that it was managed and controlled from England – writ large and

without qualification.  <u>See, e.g.</u>, Barefoot Decl. Ex. G ¶ 17 ("[NNUK's] management, strategic

planning, decision making and key functions are located in England").  More importantly,

NNUK's prior submissions specifically stated that the very functions it now alleges were

centered in North America – tax and treasury – were controlled from England.  While NNUK

struggles mightily to blur this inconsistency, its positions remain irreconcilable in any light.

      2.    <u>The Location of Those Who Manage and Control the Debtor is Crucial to COMI</u>

      Having submitted extensive evidence concerning the location of those who managed and

controlled the EMEA Debtors, NNUK now does an about face and suggests that such facts were

irrelevant to a determination of COMI.  Opp. at 47-48.[20]  This ignores the relevant test for

---

[18]      Indeed, as NNUK acknowledges, to the extent the Witness Statements suggest any influence from outside of England, they point to Canada – *not* the U.S.  <u>See</u> Opp. at 50 n.69.

[19]      NNUK points out that the Clement Statement references "[d]ay-to-day operational management" (Opp. at 50 n.66), but this only draws a distinction between operational management that was performed in each local EMEA jurisdiction, and the strategic control and authority exercised by senior management in England and, therefore, supports Movants' argument.  <u>See</u> Barefoot Decl. Ex. D ¶¶ 32, 36.

[20]      Even if NNUK were correct – which it is not – that the Court did not rely on its representation that those who managed and controlled NNUK were located in England, that is no bar to application of judicial estoppel.  The location of those who managed and controlled NNUK is a purely factual inquiry, to which judicial estoppel applies regardless of the Court's reliance on the Witness Statements.  <u>See</u> G-I Holdings, Inc. v. Reliance Ins. Co., 586 F.3d 247, 262 (3d Cir. 2009) (reaffirming that when faced with claims of judicial estoppel, courts "will apply it to neutralize threats to judicial integrity however they may arise" even "where no court has accepted an initial position"); <u>Montrose Med. Grp. Participating Savs. Plan v. Bulger</u>, 243 F.3d 773, 783 n.7 (3d Cir. 2001) (expressly

determining COMI to obtain Chapter 15 recognition.[21]  This Court could not have entered the

NNUK Recognition Order if – as NNUK's Claim now asserts– the officers and directors located

in England "act[ed] only in accordance with NNI's directions" from North America.  Opp. at 35.

Crucial factors in determining whether to grant recognition are the locations of those who

actually manage the debtor and the location of the debtor's head-office functions.  See, e.g., In re

Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122, 129

(Bankr. S.D.N.Y. 2007), aff'd, 389 B.R. 325 (S.D.N.Y. 2008).

Where a foreign debtor is actually controlled outside of its jurisdiction of incorporation,

courts have not hesitated to deny recognition.  See Bear Stearns, 374 B.R. at 129 (rejecting

Chapter 15 recognition for Cayman-incorporated funds even in the absence of an objection

where the investment manager and principal management were located in the United States)

aff'd 389 B.R. 325 (S.D.N.Y. 2008); In re Basis Yield Alpha Fund (Master), 381 B.R. 37, 47

(Bankr. S.D.N.Y. 2008) (denying motion for summary judgment seeking recognition without

evidence on location of those who managed and controlled the debtor).[22]  Moreover, NNUK's

argument that responsibility for strategic oversight and control over the debtors was irrelevant to

a determination of COMI is belied by NNUK's submission of detailed evidence to this Court on

---

preserving the applicability of an adoption or reliance requirement to cases of estoppel based on pure issues of fact, where "there may be good reasons to apply a different rule").

[21]    NNUK's Response fails even to address the relevant standard under which it obtained recognition from this Court under Chapter 15, focusing instead exclusively on the EC Regulation governing its administration proceedings.  Opp. at 47-48.  Even if NNUK's interpretation of that regulation is correct, its representations to this Court alone provide sufficient basis for judicial estoppel.

[22]    Nor, as NNUK suggests, could the Court have relied solely on the presumption created by its jurisdiction of incorporation.  Opp. at 57.  Even with the benefit of such presumption under Section 1516, and in the absence of an objection, the Court could only have granted NNUK recognition if it made an independent determination that NNUK's COMI was in England.  See Bear Stearns, 374 B.R. at 128.  It is the representations in the Witness Statements and other submissions of NNUK that enabled this Court to do so.

NNUK's control over the entire EMEA region and its autonomy and independence from North America.[23]

3.    NNUK Has No Good Faith Excuse For Its Inconsistent Positions

NNUK attempts to explain away the inconsistent positions it has taken with the Court by "an inadequacy of information available to [it] at the time the EMEA Debtors entered into administration."  Opp. at 52-53.[24]  Thus, NNUK now claims that only after the Joint Administrators' appointment were the Joint Administrators "able to fully appreciate the control exercised by NNI and NNL."  Id. at 49.  The record belies any such assertion.

The witnesses from whom the EMEA Debtors submitted statements had long-standing personal knowledge with respect to the decision-making for the EMEA region.  If, as NNUK now suggests, the Joint Administrators' investigation revealed that certain facts in the Witness Statements were incorrect or that the witnesses had provided false testimony, the EMEA Debtors could not have, consistent with their obligations to this Court, continued to verify those Witness Statements under penalty of perjury, or offer them into evidence before this Court as recently as

---

[23]    In fact, NNUK previously conceded the relevance of these factual details when it sought Chapter 15 recognition, admitting that factors in determining COMI included "[t]he location of the debtor's headquarters; [and] the location of those who actually manage the debtor (which, conceivably, could be the headquarters of a holding company)."  Mem. of Law in Support of Verified Petition for Recognition of Foreign Proceedings Pursuant to Chapter 15 of the United States Bankruptcy Code [D.I. 8 in Case No. 09-11972] at 7.

[24]    Notably, while NNUK asserts that a finding of bad faith is a prerequisite to a finding of judicial estoppel (Opp. at 52), the Supreme Court has emphasized that judicial estoppel is a flexible inquiry that can be employed by the court at its discretion.  See New Hampshire v. Maine, 532 U.S. 742, 751 (2001) ("because [judicial estoppel] is intended to prevent improper use of judicial machinery, judicial estoppel is an equitable doctrine invoked by a court at its discretion") (internal quotation marks and citations omitted).  Properly considered, bad faith is thus only an "additional consideration that may inform the [judicial estoppel] doctrine's application in specific factual contexts." In re Kane, 628 F.3d 631, 639 (3d Cir. 2010); Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp., 337 F.3d 314, 319-20 (3d Cir. 2003) (characterizing bad faith as only one of the "criteria for determining when seemingly inconsistent litigation stances justify application of the doctrine").  The argument that a bad faith finding must be made in every case would be inconsistent with the Supreme Court's instruction that judicial estoppel cannot be "[subject] to inflexible prerequisites or an exhaustive formula."  Maine, 532 U.S. at 751.

January 2011.[25]  Yet that is precisely what the EMEA Debtors did.[26]  Nor, as NNUK suggests,

can the deposition transcript of Mr. Alan Robert Bloom (the "Bloom Deposition") somehow

excuse or explain NNUK's inconsistencies.  Opp. at 54.  The Bloom Deposition was taken in

December 2010, such that it was not even available – much less provided to the Court – when

NNUK obtained Chapter 15 recognition in June 2009.  Instead, the Witness Statements and

related declarations from the Joint Administrators were the only record evidence submitted by

NNUK to enable the Court to make its COMI determination.  Given these circumstances, the

record amply supports the conclusion that NNUK has played "fast and loose" with the Court.

Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 361 (3d Cir. 1996); see

also Anjelino v. N.Y. Times Co., 200 F.3d 73, 100 (3d Cir. 1999) (affirming finding of bad faith

where appellant made tactical decision to represent that no discovery was needed and later

reversed its position, seeking document production).

      Nor is any further factual development required to determine whether NNUK played

"fast and loose with the Court."  As NNUK concedes, its Response has provided it with an

opportunity to attempt an explanation of its contrary and inconsistent positions.  Opp. at 55.  It

has failed to provide any good faith explanation.  To the extent required, the Court can determine

whether NNUK should be estopped from its review of the undisputed procedural history.[27]  No

further evidentiary development is needed or warranted.

---

[25]      To the contrary, if NNUK had truly discovered facts that called into question portions of the Witness
Statements, NNUK's counsel would have been under an obligation to correct the record before the Court.  See Del.
Code of Prof. Conduct R. 3.3(a)(1).

[26]      See Barefoot Decl. Ex H at 9 (sworn verification dated October 18, 2010 affirming that the Witness
Statements "are true and correct to the best of my knowledge, information, and belief."); Jan. 31, 2011 Hr'g Tr. at
20:7-10) ("attached as exhibits to the Bloom declaration . . . is the witness statement of Sharon Ralston [sic] and the
witness statement of Michael Clemont [sic], and we would ask to admit that entire package into evidence.").

[27]      Klein v. Stahl GMBH & Co., 185 F.3d 98, 111 n.13 (3d Cir. 1999) (precedent does not "require[ ] a district
court to discern [bad faith] intent by way of an evidentiary hearing"); Ryan Operations, 81 F.3d at 364-65 (assessing
appellant's bad faith by conducting a review of the procedural history, rather than vacating the district court's
finding of bad faith and remanding for an evidentiary hearing); Oneida Motor Freight, Inc. v. United Jersey Bank,

4.      The Elements of Judicial Estoppel Have Been Met

NNUK argues that judicial estoppel should not apply because the "US Debtor has

identified no harm it will suffer as a result of any purported inconsistency in the Joint

Administrators' positions."  Opp. at 55.  However, the application of judicial estoppel does not

turn on whether litigants have been prejudiced.  NNUK's own authorities recognize "judicial

estoppel may not be used to punish litigants for how they treat other litigants or third parties; its

only legitimate purpose is to remedy an affront to the court's integrity."  Montrose Med. Grp.

Participating Savs. Plan v. Bulger, 243 F.3d 773, 785-86 (3d Cir. 2011).  Judicial estoppel thus

focuses solely on a party's conduct vis-à-vis the Court, not vis-à-vis its adversary.  See Hansford

v. Bank of Am., No. 07-4716, 2008 U.S. Dist. LEXIS 65502, at *27 (E.D. Pa. Aug. 26, 2008)

("Any reliance or prejudice suffered by the other party as a result of the inconsistent positions is

immaterial to the application of judicial estoppel.").  In any event, Movants would plainly be

prejudiced if NNUK were permitted, whenever it suited them, to play fast and loose with this

Court by disavowing positions and sworn statements it used to obtain earlier relief.[28]

Similarly irrelevant is the fact that NNUK is pursuing its claims for the benefit of

creditors.  Unlike the private defendants in Montrose, the Movants are also fiduciaries,

attempting to safeguard estate resources for distribution to creditors.  Moreover, the

representations that form the basis for estoppel here were undertaken on behalf of NNUK for the

benefit of its creditors.  In any event, as with all estoppel cases, Montrose was decided on its

---

848 F.2d 414 (3d Cir. 1988) (affirming dismissal of claims under Rule 12(b)(6) on judicial estoppel grounds where there was ample evidence in the record from which an inference of deliberate manipulation could be drawn).

[28]      Even if conduct of the U.S. Debtors were relevant, the record demonstrates that the U.S. Debtors relied on the Witness Statements and NNUK's affirmance of their truth in not pursuing an objection to the EMEA Debtors' request for Chapter 15 recognition.  See Jan. 31, 2011 Hr'g Tr. at 22:16-23 ("[F]or the U.S. Debtors, Mr. Harron is correct that in reliance on the materials that the EMEA Administrators are moving into evidence at today's hearing [which included the Witness Statements] . . . the U.S. debtors don't object to this Court's recognition of the English proceedings as foreign main proceedings").

particular facts and circumstances; lest there be any doubt, courts have continued to apply estoppel to estate fiduciaries where, as here, the circumstances warrant.  <u>See, e.g.</u>, <u>Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions Corp.)</u>, 330 B.R. 67, 72 (Bankr. D. Del. 2005) (applying estoppel to prevent creditors' committee from pursuing breach of fiduciary duty claims to recover transfers for the benefit of creditors, where committee had previously touted benefits of underlying contracts).[29]

     5.    <u>NNUK Misstates the Test for Collateral Estoppel</u>

NNUK also cannot avoid application of collateral estoppel to its fiduciary duty based claims.  While NNUK does not dispute that the other elements of collateral estoppel are satisfied, it argues that the doctrine is inapplicable only because the issues decided in its recognition proceedings are not "identical" to the allegations made in this Claim.  Opp. at 56-57.

NNUK's argument misstates the governing law.  Courts do not require that the issue presented in the current proceeding be "the exact issue already decided in an earlier proceeding", as NNUK contends.  <u>See</u> Opp. at 56.  Instead, collateral estoppel applies where, as here, the issue was implicitly determined by the first court, or where there is substantial overlap between the evidence advanced in the two proceedings, and a close relationship between the claims involved in the two proceedings.[30]  As set forth above, the location of those who actually managed NNUK and the situs of its head office functions were necessarily central factors in this Court's determination that NNUK's COMI was in England.  To permit NNUK to relitigate these

---

[29]    Similarly misplaced is NNUK's suggestion that the U.S. Debtors' support of NNUK's administration proceedings somehow undermines the Movants' invocation of judicial estoppel.  <u>See</u> Opp. at 53.  Movants do not dispute the benefits that the entire Nortel Group obtained from the coordinated process that the administration and Chapter 15 Proceedings enabled.  The thrust of the Movants' judicial estoppel argument is in fact aimed at preserving those benefits by precluding NNUK from taking contrary positions to mount its Claim.

[30]    <u>Raytech Corp. v. White</u>, 54 F.3d 187, 193 (3d Cir. 1995) (finding identity of issues for collateral estoppel where issues between two cases were "in substance the same"); <u>Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.</u>, 585 F.Supp.2d 623, 630 (D. Del. 2008) (applying collateral estoppel to claims under two different patents where party relied on the same facts and same analysis).

questions based on immaterial or procedural differences between its claims and the recognition

proceedings would defeat the very purpose of collateral estoppel – to "protect[] litigants" and

"promot[e] judicial economy."  Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979).

**B.    NNUK's Failure to Adequately Plead Insolvency is Fatal to Its Directorship Claims**

Even if estoppel were not determinative, NNUK's pleading failures justify dismissal of

its directorship claims (as well as its secondary liability claims based upon alleged breaches of

duty).  NNUK agrees that as a matter of English law, in a solvent company, if the parent

company acts with regard to its interests, and ratifies the subsidiary's actions, "there can be no

challenge to the validity of what the directors have done," thereby foreclosing any claims for

breach of fiduciary duty.  See Todd Decl. ¶¶ 71-72; Marshall Decl. ¶ 35.5.3.  NNUK does not

challenge – and its Claim admits – that NNL, the parent of both NNUK and NNI, approved all of

the actions that NNUK alleges its directors (whether de jure, de facto, or shadow) undertook.

Accordingly, the well-settled English law doctrine of ratification bars NNUK's Claim.

NNUK offers only two responses:  (a) there is an exception to this ratification doctrine

for "unlawful distribution or an unlawful return of capital," and (b) that it has in fact adequately

pled NNUK's insolvency.  Opp. at 41-43.  Both of NNUK's arguments fail.

First, while NNI agrees with NNUK that the ratification doctrine would be inapplicable

to breach claims arising from the distribution of capital, that exception is irrelevant to the

transactions alleged in the Claim.  Reply Declaration of Michael Todd Q.C. in Further Support of

Joint Objection and Motion to Dismiss Claims of Nortel Networks UK Limited (the "Todd Reply

Decl.) ¶¶ 59-60.  The transactions at issue consist of intercompany loans, asset sales, transfer

pricing arrangements, and corporate reorganizations – not distributions to NNL in its capacity as

an equity holder.[31]  Indeed, even if NNUK could have somehow attempted to recharacterize any of these transactions as a dividend (which is not the case), it has not pled any such claim against either NNI or NNL in respect of any of the five sets of transactions with which its Claim takes issue.  The "exception" to the ratification rule that NNUK points to is thus inapplicable on its face to the transactions that underlie the claims.

Second, the allegations of insolvency on which NNUK relies are the paradigmatic "mere conclusions" that must be disregarded under Iqbal.  NNUK's allegation that NNUK was of "doubtful solvency (and/or at risk of insolvency) . . . from 2000 onwards" (Opp. at 42 (citing Claim ¶ 113)) is woefully insufficient under the applicable pleading standards set forth by the Supreme Court and the Third Circuit, as well as the cases set forth in the Motion addressing insolvency allegations in particular, which NNUK entirely fails even to address in its Response.  That precedent makes plain that Iqbal requires more than bare allegations of insolvency to withstand a motion to dismiss.[32]

English law defines insolvency by reference to an inability to pay debts as they come due (the "cash flow" test), or where the value of the company's assets is less than its liabilities (including contingent and prospective liabilities) (the "balance sheet" test).  Todd Reply Decl. ¶ 54.  The English Court of Appeal has clarified that balance sheet insolvency is a stringent test, which is satisfied only where the company has reached the "point of no return," such that a prudent businessman would be obligated to "put up the shutters."  Id. ¶ 56 (citing BNY Corp. Tr.

---

[31]      NNUK's English law expert acknowledges as much, as he does not opine that the distribution-of-capital exception is applicable, but instead only that "the principles relating to unlawful return of capital and distribution may be engaged."  Marshall Decl. ¶ 35.5.3.

[32]      See Mot. at 40-41 (citing, inter alia, Seidel v. Byron, No. 05-C-6698 (JBM), 2008 U.S. Dist LEXIS 76306, at *8 (N.D. Ill. Sept. 26, 2008) (granting motion to dismiss claim for breach of fiduciary duty owed to creditors based on bare allegation of insolvency, where "[n]othing in the complaint indicates when [the debtor's] liabilities far exceeded its assets, or when it could no longer pay its debts . . . thereby failing to provide notice to defendants."); see also Burtch v. Huston (In re U.S. Digital, Inc.), 443 B.R. 22, 39 (Bankr. D. Del. 2011) (dismissing constructive fraud claim where "the Trustee has failed to provide any support to the factual allegations that USDigital was insolvent or was rendered insolvent at the time it purchased USDTV's assets out of bankruptcy.").

Servs. Ltd. v Eurosail UK [2007] 3BL EWCA 227).  NNUK is unable to point to any well-pleaded facts that would satisfy either test.  Rather, NNUK only points to its generalized background allegations on the performance of the Nortel Group (Opp. at 42), which not only fail to address the relevant English law standards, but fail to address NNUK separately.  Nowhere does the Claim plead that NNUK was unable to pay its debts as they fell due, nor does the Claim include any factual allegations regarding the value of NNUK's assets as compared to its liabilities at any point in time, much less going back continuously to the year 2000.  Claim ¶¶ 6-8, 72, 76.[33]  This is particularly deficient where NNUK makes a blanket and conclusory allegation of "insolvency" over a period of nearly ten years, during which NNUK not only continued to trade, but was extending significant cash facilities to NNL.

## C.   NNUK Fails to Plead a Plausible Claim that NNI was a Director Under English Law

NNUK's Claim is devoid of well-pleaded allegations that could plausibly state a claim that NNI was a de facto or shadow director of NNUK under English law.  NNUK does not challenge that there is no English case holding that a company could be a de facto or shadow director of its sister company, despite more than 100 years of English-law jurisprudence on the subject.  NNUK also acknowledges that the most recent English case to consider the issue, and the case that most extensively analyzed the issue, held that a shadow director only has fiduciary duties in limited circumstances not alleged here.

NNUK's speculative and wishful thinking of what English courts may one day in the future hold should be given no weight by this Court.  This Court's role under Rule 44.1 is to determine English law as currently applied by the English courts.  See Licci v. Am. Express Bank Ltd., 704 F. Supp. 2d 403, 410 (S.D.N.Y. 2010) (rejecting "expert's prediction of the

---

[33]   Equally unavailing is NNUK's insistence that solvency is a factual question inappropriate for determination on a motion to dismiss.  Opp. at 42.  NNI does not seek a factual finding that NNUK was solvent, but rather a determination that NNUK's conclusory pleadings of insolvency are insufficient as a matter of law.

Israeli courts' willingness to more broadly interpret the law," given the current absence of any

factually apposite caselaw so extending the law).[34]  Application of the pleading rules applicable

to this case and substantive English law clearly dictate that NNUK's de facto and shadow

directorship claims against NNI must be dismissed.

       1.     <u>English Law Regarding De Facto Directors</u>

      NNUK asserts that NNI could be a de facto director of NNUK if "it assumed a role

sufficient to impose a fiduciary duty on the company."  Opp. at 31.  Of course, this general

statement fails to account for the settled factors that English courts look to to determine whether

a person assumed such a role so as to qualify as a de facto director.  In its Claim, NNUK

admitted that "[u]nder English law, a company will be a de facto director of a second company if

it can be shown that the company performed functions in relation to the second company which

could only be properly performed by a director."  Claim ¶ 88(a).  Following the showing in the

Motion that NNUK's pleading fails to meet this acknowledged standard, NNUK in its Response

now claims the exact opposite – that the test is <u>not</u> "whether the relevant individual undertook

functions which could only be properly discharged by a director."  Opp. at 31.  NNUK's

newfound view of English law is plainly wrong.

      As set forth in the Motion, English courts look to whether the person (a) occupied a place

in the corporate governance structure of the company or (b) undertook functions in relation to the

company that could only be undertaken by a director of that company, such that it could be said

---

[34]     It is well-settled that a determination of foreign law is a question of law, not fact, which the Court is empowered to make on a motion to dismiss.  <u>See</u> Fed. R. Bankr. P. 9017 (incorporating Rule 44.1 of the Federal Rules of Civil Procedure). <u>Twohy v. First Nat'l Bank of Chi.</u>, 758 F.2d 1185, 1186-87, 1191, 1195 (7th Cir. 1985) (affirming district court's dismissal of claims on the pleadings pursuant to Rule 12(c) despite parties' disagreement over foreign law applicable to plaintiff's claims, where court determined that plaintiff failed to state a claim under foreign law); <u>Animal Sci. Prods., Inc. v. China Nat'l Metals and Minerals Imp. And Exp. Corp.</u>, 702 F. Supp. 2d 320, 426 (D. N.J. 2010) (dismissing claims on a 12(b)(6) motion, where "'differences of opinion among experts on the content, applicability, or interpretation of foreign law do not create a genuine issue as to any material fact' for the purposes of the court's review and final ruling.") (citation omitted), <u>rev'd on other grounds sub nom.</u>, <u>Animal Sci Prods. v. China Minmetals Corp.</u>, 2011 U.S. App. LEXIS 17046 (3d. Cir. Aug. 17, 2011).

the person exercised a "real influence" over the company on "equal footing" with the company's

de jure directors.[35]  Mot. at 30 (citing Todd Decl. ¶¶ 39-40).  These well-settled factors are set

forth in numerous English law cases spanning at least the past twenty years as well as leading

English-law treatises.  Todd Reply Decl. ¶¶ 8-11.

Notably, NNUK does not set forth any other test used by English courts to determine

whether a person is a de facto director.  Instead, NNUK claims that in a 2011 case, Holland v.

Revenue & Customs Commissioners, 1 All ER 430, the English High Court swept away twenty

years of English law on de facto directorships and instead pronounced that there are no longer

any standards by which an English court is to determine whether a person is a de facto director of

a company.  NNUK is wrong for numerous reasons.

First, the judges who authored judgments in Holland, both in the majority and the dissent,

cited with approval the numerous cases that preceded it setting forth the basic standards for

determining de facto directorship as set forth in the Motion and relied upon in the initial

declaration of NNI's English-law expert.[36]  Thus, contrary to NNUK's implicit position, the

Holland case did not overrule or cast doubt on any of this settled law, but confirmed its

continued vitality.  Second, leading English-law treatises after Holland continue to cite with

approval the cases relied upon by NNI's English-law expert and the factors for determining de

facto directorship as set forth in his initial report.  Todd Reply Decl. ¶¶ 10.2-10.3.  Third, NNUK

ignores the fact that the Holland court found that the defendant, Mr. Holland, was not a de facto

---

[35]    In this context, "equal footing" does not require absolute parity between the directors.  There may be circumstances in which one director defers to another.  Todd Reply Decl. ¶ 22 n.9.

[36]    Lord Collins's opinion, upon which NNUK's expert heavily relies, makes clear that "in order to make him liable for misfeasance as a de facto director, the person must be part of the corporate governing structure."  Holland ¶ 93.  Similarly, both Lords Hope and Collins quote from the passage in Hydrodam cited in the Todd Declaration, which makes clear that "it is necessary to plead and prove that he undertook functions in relation to the company which could properly be discharged only by a director."  Holland  ¶¶ 29, 86 (quoting Re Hydrodam (Corby) Ltd, [1994] 2 BCLC 180, 183).  Lest there be any doubt, the dissenting opinion read the judgments announced as accepting precisely this test.  Holland ¶ 128.

director despite the fact that he and his wife were the sole indirect shareholders of the companies in question, the sole directors of the corporate parent and that Mr. Holland made all decisions for and was the "guiding mind" with respect to the companies in question.  Not only does the result in Holland demonstrate that NNUK's allegations are insufficient to tar NNI as a de facto director of NNUK, but Holland discusses numerous additional cases in which the English courts have not found a de facto director in situations where the defendant had far more influence over the subject company's affairs than those alleged here.  See Holland ¶ 30 (no de facto directorship despite the person "having undertaken negotiations with creditors and performed some of the functions of a finance director."), ¶ 31 (no de facto directorship despite the "courtesy title of deputy managing director" because the person did not "form part of the real corporate governance of the company.  There was no function that she performed that could only be properly discharged by a director."), ¶¶ 33-34 (no de facto directorship as it was not shown that an individual had assumed the status and functions of a director of the subject company; a de facto directorship required "positive action by an individual which showed that he was acting as if he was a director.").

Not surprisingly, the English cases that have found a de facto director occur in factual circumstances vastly different than the factual allegations pled here.  For example, Re Kaytech International plc was a case involving a company that went into liquidation after only twelve months of trading and in which the company was found to have fraudulently represented that it had paid up share capital of £2.5 million.  The company had only two de jure directors, one of whom was not involved in the company at all.  A third person was found to be a de facto director as he was the "moving spirit" in giving instructions to set up the company, he alone pretended to raise the necessary capital for it, he described himself as a director on "at least one occasion

when precise and correct information was called for" and he "allowed himself to be held out as a joint founder and chief executive of the company" at a very important meeting with suppliers. Re Kaytech International plc [1999] 2 BCLC 351 at 423.[37]

2.    English Law Regarding Shadow Directors

NNUK does not (and cannot) contest the basic English law requirements for a shadow directorship: that the person give instructions or directions to the board, that the board act in accordance with those instructions, and that the board be accustomed to doing so.  Todd Decl. ¶ 49; Marshall Decl. ¶ 26; Claim ¶ 88(b).  Indeed, a shadow directorship is a creature of statute, and this test is set forth in the Companies Act itself.  Todd Decl. ¶ 47; Marshall Decl. ¶ 26.  Nor does NNUK disagree that no English court has ever found a sister company to be a shadow director of its affiliate.  Todd Decl. ¶ 65.  This alone should end the Court's inquiry.[38]  See Gilstrap v. Radianz Ltd., 443 F. Supp. 2d 474, 491 (S.D.N.Y. 2006), aff'd 233 F. App'x 83 (2d. Cir. 2007) ("Though the federal courts are called upon not infrequently to apply the laws of other nations, they should be more hesitant to engage in such a task when doing so would necessarily involve expanding, extending, or departing from well-settled and long established principles of

---

[37]    The lower court further observed that "[i]f [the company] had been a company in which there was an identifiable group of directors (whether validly or invalidly appointed) who met on a regular basis to make decisions, then it might well be, if Mr. Potier were not a member of such group, that would be a persuasive indicator that he was not acting as a director.  But that is not this case.  This was a company which had either one or two de jure directors, depending on what Mr. Solly's status was. But even if Mr. Solly was a de jure director, his role in directing [the company's] affairs was zero. For practical purposes, all the various aspects of its business were conducted by Mr. Kaczer and Mr Potier [a de facto director]."  [1999] 2 BCLC 351 at 405 (emphasis added).  Moreover, the court found Mr. Potier to have been a "dishonest and unscrupulous man" whom the court called a "liar," "cheat," and "forger" who "knowingly allowed [the company] to lie to the public generally about its status as a public limited company with a paid up capital of £2.5m and to lie to the people it dealt with, including its creditors, by presenting balance sheets to them which he knew falsely pretended that it had such a paid up capital."  Id. at 397-98.

[38]    NNUK's assertion that English law requires the Court to make its determination "in light of all of the evidence," or conduct an "investigation" (Opp. at 32) is both unsupported and contrary to the U.S. procedural rules that govern this Motion.  While NNUK cites to Secretary of State for Trade and Industry v. Deverell [2001] Ch 340 for this point, the Marshall Declaration itself makes clear that Deverell speaks only to the inquiry that a court must make at trial.  Marshall Decl. ¶ 34 ("This is a detailed factual investigation and will require review in the context of all the evidence available at trial.").  Such inquiries are simply inapplicable to this Rule 12(b)(6) Motion, where the well-pleaded allegations in the Claim – or absence thereof – are determinative.

foreign law.").[39]  Moreover, English cases in which a shadow directorship have been found

demonstrate the high level of instruction and involvement necessary to find someone a shadow

director.  See, e.g., Re Mea Corp [2006] EWHC 1846 (Ch), [2007] 1 BCLC 618 (individuals

were shadow directors where they attended board meetings, gave instructions to the boards that

the boards felt they could not ignore, and where directors even resigned because of those

instructions and their being "kept in the dark.").[40]

Even if NNUK's allegations stated a shadow directorship claim – which they do not –

imposing fiduciary duties on NNI as an alleged shadow director would require this Court to

reject established English authority.  As set forth in the Todd Declaration, Ultraframe UK Ltd. v.

Fielding [2005] EWHC 1638 (Ch) squarely addressed this issue, and after extensive analysis,

concluded that a shadow director does not ordinarily owe fiduciary duties to the company.  Todd

Decl. ¶ 60; Todd Reply Decl. ¶¶ 39-42.  Rather, a shadow director can only become vested with

such duties if he does something more, for example becomes a de facto director, or takes control

of property of the company.  Todd Decl. ¶ 60; Todd Reply Decl. ¶ 42.8.  The claimant in

Ultraframe even sought to appeal the decision on this point, but permission to appeal on this

---

[39]     NNUK's shadow director claims are not viable without even considering Section 251(3) of the Companies Act.  NNUK argues that it is inapplicable, but fails to refute the rationale for its application where claims against a sister company are founded on common control.  NNUK instead protests that its allegations here are not founded solely on common control, an assertion that cannot be squared with the allegations themselves, which are all premised on NNI's involvement in "jointly controlling certain aspects of the Group's operations together with the Canadian Entities."  See, e.g., Claim ¶ 15; see also Todd Reply Decl. ¶¶ 27-29.

[40]     In Mea the court explained that "the key allegation, to my mind, was that Mr. Aviss and Mr. Berry dictated company policy and gave instructions to the directors of the three companies, on which they were accustomed to act. I have already mentioned a number of examples of this.  Within that general allegation, the most significant feature is the decision to have a central treasury, the decision that Projects and CJB should pay their recoveries into that central treasury and the decision to pay moneys out of that central treasury to other companies, outside the Mea group, in which Mr. Aviss had a substantial interest.  All the directors (including Mr. Walker, who has Mr. Berry said, was a loyal servant and did as he was told) protested that control over payment of creditors had been taken out of their hands.  Their protests were overridden by Mr. Aviss and Mr. Berry."  Re Mea Corp [2006] EWHC 1846 (Ch), [2007] 1 BCLC 618, at ¶ 104.

ground was denied by the Court of Appeal, which reflects a judgment that the issue did not even

merit consideration.  Todd Reply Decl.  ¶¶ 42.4-42.7.[41]

NNUK relies solely on a prior decision in Yukong Line of Korea Ltd v. Rendsburg Corp.

Invs. of Liberia Inc. [1998] 1 WLR 294, on the basis of which it asserts that Ultraframe "would

not now be applied." Opp. at 32; Marshall Decl. ¶ 32.  This is absurd: Yukong preceded

Ultraframe by seven years.   See Todd Reply Decl. ¶¶ 33-34.  Moreover, Yukong was decided by

a court of the same level as Ultraframe, and includes only an unexplained finding that a shadow

director owed a fiduciary duty.  In fact, the Yukong decision contains no legal reasoning to

support its claim that a shadow director owes fiduciary duties, or what these duties might be.  Id.

¶ 35.  The language in Yukong on which NNUK relies also appears to reflect a confusion of

language between shadow and de facto directors.[42]  Id.  By contrast, Ultraframe contained a

reasoned discussion of the issue, relevant statutes, and precedent, in light of which the

Ultraframe court specifically rejected the holding in Yukong.  Id. ¶¶ 42.1-42.2.  Notably, no

English authority since Ultraframe has held that a shadow director owes fiduciary duties.  Id. ¶

40.  It stands to reason that such a significant and new point of English law on directors' duties

cannot spring only from an unreasoned section of a lower court decision handed down 13 years

ago, and found nowhere else before or since.

NNUK further attempts to muddy the waters by noting that Ultraframe analyzed the

Companies Act 1985 (as opposed to the Companies Act 2006), but this is of no moment.  Prior to

the Companies Act 2006, directors' fiduciary and other duties were laid down by common law

and equity, not by statute.  Todd Reply Decl. ¶ 45.  De jure and de facto directors owed fiduciary

---

[41]      Notably, Lewison LJ, who rendered the decision in Ultraframe has been elevated to the Court of Appeal
with effect from October 4, 2011.  Todd Reply Decl. ¶ 33 n.14.

[42]      This confusion was explicitly noted in Ultraframe, where the court explained that the language used was
more appropriate to a finding of de facto rather than shadow directorship.  Todd Reply Decl. ¶ 37.1.

duties, but as explained in <u>Ultraframe</u>, fiduciary duties did not generally apply to shadow directors; they applied only if the shadow director did something exceptional, such as taking possession or control of a company's property.  <u>Id.</u> ¶¶ 45, 47.  The Companies Act 2006 codified the common law and equitable duties of a director into a statutory scheme, and the statutory duties in sections 171-177 were applied to de jure and de facto directors.  <u>Id.</u> ¶ 45.4.  Although NNUK seeks to rely on the fact that the Companies Act 2006 contains language that did not exist in the Companies Act 1985 with respect to the application of duties to shadow directors, section 170(5) specifically states that such duties only apply "where, and to the extent that, the corresponding common law rules or equitable principles so apply."  Marshall Decl. ¶ 32.2.1; <u>see also</u> Todd Reply Decl. ¶ 46.  Thus, the new language in the Companies Act 2006 was meant only to apply to the extent prescribed by the existing body of common law and equity, as set out in <u>Ultraframe</u>.  Todd Reply Decl. ¶ 46.  The Explanatory Notes to the Companies Act 2006 very clearly explain this distinction.  <u>Id.</u> ¶ 48.  If Parliament had intended to impose all directors' duties on shadow directors, it could have simply provided that a shadow director owes the same duties to a company as a director.  However, it has not done so and this is telling given that Parliament has chosen to do so in other statutes.  <u>See, e.g.</u>, Financial Services and Markets Act § 417(1) (2000).[43]

Finally, NNUK suggests that a fiduciary duty should nonetheless be imposed, even where NNI is not alleged to have taken control over NNUK's property, because it is alleged to have "indirectly deal[t]" with NNUK's assets.  Opp. at 33 n.48; Marshall Decl. ¶¶ 32.5, 32.6.  Not only is such a vague allegation wholly conclusory and absent from NNUK's Claim, but NNUK is unable to point to any English court, nor is NNI aware of any, that has ever held that indirectly

---

[43]    Defining a director, in relation to a body corporate as "(a) a person occupying in relation to it the position of a director (by whatever name called); and (b) a person in accordance with whose directions or instructions (not being advice given in a professional capacity) the directors of that body are accustomed to act."

dealing with corporate assets would be sufficient to impose fiduciary duties as an alleged shadow director.  See Todd Reply Decl. ¶ 47.[44]

       3.       Properly Construed, NNUK States No English Law Claim for
                 Shadow or De Facto Directorship

As demonstrated in the Motion, NNUK's allegations relating to each of the five sets of transactions in the Claim fail to state directorship claims under English law.  Nothing in NNUK's Response changes this.  The allegations it points to in an effort to salvage its claims are either absent from the Claim itself (and would be insufficient even had they been included), or fail to include any well-pleaded facts on key elements of its shadow and de facto director claims.[45]

Transfer Pricing.  NNUK concedes that there are simply no allegations in its Claim that NNI instructed NNUK's directors with respect to the MRDA, or that NNUK's directors were accustomed to act in accordance with those instructions.  NNUK attempts to correct this glaring omission in its Response, by asserting that its passive voice reference to NNUK "being instructed to sign the MRDA" should somehow be understood to refer "clearly to NNI and NNL."  Opp. at 35 (citing Claim ¶ 18(d)).  Not only is NNUK precluded from amending its

---

[44]      NNUK cannot change this result by now suggesting that NNI owed fiduciary duties to NNUK irrespective of whether it was a shadow or de facto director.  Opp. at 34.  For this proposition, NNUK relies only on its English law expert's assertion that "[i]t is possible for fiduciary obligations to arise, for example, if NNI undertook various tasks on behalf of NNUK."  Marshall Decl. ¶ 36 n.22.  While fiduciary obligations can arise under English law in various circumstances, as in agency relationships (see Todd Reply Decl. ¶¶ 67), NNUK has not pled the existence of any such relationships – only a shadow or de facto director directorship.  This forecloses any belated attempt to create alternative methods of imposing a fiduciary duty on NNI.  See, e.g., UD Tech. Corp. v. Phenomenex, Inc., No. 05-942 (GMS), 2007 WL 28251, at *7 (D. Del. Jan. 4, 2007) (rejecting assertion that plaintiff could pursue claims based on an agency theory, where it "did not plead agency and cannot defeat a motion to dismiss by now advancing the theory").

[45]      NNUK's allegations fail under Rule 8(a) alone.  Fairly read, however, NNUK's directorship allegations also invoke Rule 9(b)'s particularity requirements.  NNUK fails to respond to the necessary relationship between its claims for breach of duty of care – which is governed by a basic negligence standard – and its independent claims for breach of fiduciary duty, which are based on an alleged scheme of self-dealing by NNI and NNL to strip assets from NNUK.  See Opp. at 44 ("the resulting harm arose out of the Cash to Canada Scheme"), at 72 ("NNI was an active participant in schemes by which NNUK was stripped of cash").  Pleading such claims separately implicitly concedes that while the duty of care claims are governed by Rule 8(a), the conduct underlying the fiduciary duty claims sounds in fraud.  Nor does NNUK address the import of its repeated pleading that the transactions at issue were not undertaken at arms' length – something courts routinely consider as a badge of fraudulent intent.  See Mot. at 19-20.

Claim through its Response, but even if it had properly attributed this allegation to NNI, it is

entirely conclusory as it merely restates one of the elements of its claim.  See Santiago v.

Warminster Twp., 629 F.3d 121, 131-32 (3d Cir. 2010).  As such it fails to pass muster under the

Supreme Court and Third Circuit pleading standards even under Rule 8.  Moreover, NNUK fails

to allege, even in conclusory fashion, a required element for a shadow director claim: that

through a course of conduct, NNUK was accustomed to act in accordance with NNI's

instructions.  Tellingly, the Claim makes such allegations only with respect to NNL – not NNI.

See Claim ¶¶ 105 n.4, 112 n.6 ("NNL was a person in accordance with whose instructions the de

jure directors of NNUK were accustomed to act.").  This failure alone is enough to dismiss all of

NNUK's shadow director claims.

NNUK likewise utterly fails to allege sufficient factual allegations to sustain its claim

that NNI was a de facto director of NNUK.  As explained above, for its Claim to survive a

motion to dismiss, the Claim must include sufficient factual matter which, if accepted as true,

would state a plausible claim that NNI occupied a place in NNUK's corporate governance

structure or undertook functions in relation to the company that could only be undertaken by an

NNUK director, such that it could be said the person exercised a "real influence" over NNUK on

"equal footing" with its de jure directors.  No such factual allegations exist.

The Claim is bereft of any well-pled factual allegations that could plausibly support a

reasonable inference that NNI exercised real influence over NNUK or that it was part of

NNUK's corporate governance.  There is no allegation that NNI ever held itself out as a director

of NNUK or attended any board meetings.[46]  There also is no allegation that NNI participated in

---

[46]     "Holding out" is not a prerequisite for finding a de facto directorship, but it is a factor that English courts consider.  Todd Decl. ¶ 40.  Moreover, though NNUK's Response suggests, in conclusory fashion, that "NNI participated in the decisions of (and even supplanted) the board of NNUK" (Opp. at 60), its Claim in fact contains no such allegation.

NNUK's board deliberations or decision-making process with respect to approval of the RPSM or MRDA, which is the act upon which NNUK bases its breach claims.  While the Claim alleges that NNI was generally "involved in jointly controlling certain aspects of the Group's operation together with the Canadian Entities" (¶ 15) and that "NNUK had no substantive involvement" in these areas (¶ 18), this is precisely the type of "naked assertion[ ] devoid of further factual enhancement" and "threadbare recital[ ] of the elements of a cause of action, supported by mere conclusory statements" that Supreme Court and Third Circuit precedent mandate must be disregarded for purposes of a motion to dismiss.  Santiago, 629 F.3d at 131 (quoting Ashcroft v. Iqbal, 129 S.Ct 1937, 1949 (2009)).

NNUK contends, however, that its "Claim identifies key NNI employees who were actively involved in the design and operation of the RPSM, the creation and implementation of the MRDA and negotiations with the relevant tax authorities in connection therewith."  Opp. at 35.  None of these activities, even if undertaken by NNI, would state a claim that NNI, acting as an alleged director, controlled NNUK's decision to approve the MRDA.  Although NNUK contends this raises a factual dispute, NNUK's Claim is devoid of any well-pleaded facts to suggest that these alleged activities – creating and implementing a global transfer pricing system for a multi-national corporate group or negotiating with tax authorities – are director-level functions or something that could only be undertaken by a director.[47]  Re Richborough Furniture Ltd, [1996] 1 BCLC 507 at 525 is instructive.  There, an individual was entrusted with negotiations with creditors including the Inland Revenue and the Customs and Excise.  However,

---

[47]      Additionally, NNUK does not, as its Response suggests, "identif[y] key NNI employees who were actively involved in . . . the creation and implementation of the MRDA."  Opp. at 35.  Instead, the Claim only identifies individuals who undertook negotiations on the APA.  Such negotiations cannot substitute for well-pled allegations concerning NNI's role in the act that NNUK claims was a breach of duty: NNUK's agreement to the terms of the MRDA.  See Claim ¶ 92 ("NNI breached its fiduciary duties in causing NNUK to participate in [the MRDA]").  NNUK's remaining allegations either assert only that certain individuals were "involved" (Claim ¶ 17) or that they held positions in the tax group (Claim ¶ 19), without identification of what actions they undertook.

the court, inter alia, found that he was not a de facto director because those were tasks that could be performed by a professional or an employee.

At bottom, NNUK is left with nothing more than its wholly conclusory allegation that NNUK "was simply instructed to sign the MRDA." Claim ¶ 18d.  There is, however, no allegation – conclusory or otherwise – in the Claim that this alleged instruction came from anyone at NNI or that NNUK's de jure board members followed an alleged instruction from NNI, its sister company.  NNUK's attempt to amend its Claim through its Response, by claiming what it meant to allege is that NNUK "was instructed" by NNI and NNL, is both impermissible (as well as conclusory) and only serves to highlight the deficiencies in NNUK's Claim that require its dismissal.  In short, because there are no well-pled allegations that could support a plausible inference that NNI exercised real influence over NNUK's de jure directors, its directorship claims with respect to transfer pricing must be dismissed.

NNUK Intercompany Loans and Project Swift.  Neither NNUK's Claim nor its Response contests that the NNUK board of directors approved NNUK's entry into Project Swift and the NNUK Intercompany Loans.  See Opp. at 36-37.  Nor does NNUK assert – even in conclusory terms – that NNUK's board was somehow supplanted with respect to these two transactions.  Id.  NNUK further fails to allege any directions given by NNI to the NNUK board in connection with its approval of these transactions, much less that the board was accustomed to act in accordance with NNI's instructions.[48]  Instead, NNUK pleads that Ryan Smith – who it alleges was seconded to NNUK – prepared briefing notes and presentations for the NNUK board, suggesting that the NNUK board did precisely what was required of it in considering the transactions.[49]

---

[48]    NNUK concedes that these are required elements necessary to sustain a shadow director claim.  See, e.g., Claim ¶ 88(b).  Their absence alone is fatal to its shadow director causes of action in claims 8 and 16.

[49]    While NNUK's Response now argues that these "briefs and presentations" were prepared "in order to influence the NNUK Board to bless the transaction" (Opp. at 36), no such allegation is included in its Claim.  See

Otherwise, NNUK remains entirely silent as to the process through which Project Swift or the NNUK Intercompany Loans were considered and approved by NNUK's board of directors. Absent factual allegations concerning the process by which NNUK entered into the NNUK Intercompany Loans and Project Swift – and NNI's alleged role (if any) therein – NNUK cannot make out the basic elements of either a shadow or a de facto director claim.

The bulk of the allegations that NNUK's Response <u>does</u> identify relate instead to the management, operation, or implementation of Project Swift and the NNUK Intercompany Loans.[50] But NNUK does not allege, nor could it, that such functions were director-only level functions which could not be performed by managers, as a de facto director claim would require. Rather, NNUK's own Claim makes clear that it bases its directorship claims on the NNUK board's decision to authorize NNUK's entry into Project Swift and the NNUK Intercompany Loans in the first instance – not the mere management or implementation of the transactions after NNUK agreed to their terms. <u>See</u> Claim ¶ 122 ("NNI breached its fiduciary duties in causing NNUK to enter [into] and act in accordance with the Interest Free Loan Facilities"); ¶ 154 ("NNI breached its fiduciary duties in allowing NNUK to enter into Project Swift"). Indeed, it is from the point of entry into the transactions that NNUK's fiduciary breach claims would accrue. <u>See</u> Mot. at 77.[51]

---

Claim ¶ 24 (alleging that Ryan Smith "and his team were also responsible for preparing the briefing notes to the various Nortel boards").

[50]     <u>See, e.g.</u>, Claim ¶ 22 (alleging that Ryan Smith "supervised the team on the ground whose role included managing the use of the  Interest Free Loan Facilities in such a way as to maximize the transfer of value from NNUK to NNL."), ¶ 23 ("In respect of Project Swift, again, NNI's directors, officers and senior employees were part of the management group that implemented Project Swift"); ¶ 24 ("Directors and officers of NNI (including Mr. Paul Kerr and Mr. William LaSalle) were fully aware of Project Swift and actively involved in its implementation."). Nor can NNUK fall back on its allegations simply noting that NNI employees held treasury-related positions, without any factual allegations of what those employees actually did with respect to the challenged transactions. <u>See</u> Claim ¶ 25.

[51]     Equally unhelpful to NNUK is its allegation that Mark Weisz "approved the Project Swift proposal" (Claim ¶ 24) or "was responsible for approving and supervising the implementation of . . . the Interest Free Loan Facilities" (Claim ¶ 22).  Both of these allegations reference Weisz's role as Director of International Tax for the Nortel Group

NNUK cannot change this result in reliance on remaining allegations concerning Katharine Stevenson (the "Group Treasurer") or Ryan Smith, or their role in "devising" or "structuring" Project Swift and the NNUK Intercompany Loans, as its own Claim precludes attribution of their actions to NNI.  While NNUK points to its allegation that both Stevenson and Smith held positions at NNI (Opp. at 38-39), such an allegation alone is insufficient.  What is lacking from NNUK's Claim is any allegation that the actions at issue were undertaken by Stevenson or Smith in their capacity as NNI agents.[52]  NNUK's own authorities underscore the necessity of such an allegation, where officers holding dual positions in a corporate family "can and do 'change hats' to represent the two corporations separately."  United States v. Bestfoods, 524 U.S. 51, 69 (1998) (quoting Lusk v. Foxmeyer Health Corp., 129 F.3d 773, 779 (5th Cir. 1997)); Opp. at 39.  The Claim even suggests that Stevenson and Smith were not acting on behalf of NNI.  See Claim ¶ 19 ("the EMEA Tax Leader on the ground in the EMEA Region, Ryan Smith, was seconded to NNUK"); Opp. at 39 (acknowledging that Stevenson signed certain of the NNUK Intercompany Loans "in her capacity as an NNL director").  Though NNUK argues that this merely raises a fact dispute (Opp. at 39), it is the absence of required allegations in its own Claim that these employees were acting on behalf of NNI that preclude attribution of their actions to NNI so as to avoid dismissal.

Contingent Tax Claims.  While NNUK focuses on its right to assert contingent claims (Opp. at 37), its claims fail not because the amount of its tax liabilities are unliquidated, but rather because it fails to plead the requisite direction or participation in corporate affairs

---

and are devoid of either any allegation that Weisz was acting in his capacity as an NNI offer, or any reference to the approval or authorization of the transaction by NNUK – the only act that is relevant for claims 8 and 16.

[52]    Although NNUK asserts in its Response that "Ryan Smith was an employee of NNI, and was working on behalf of NNI while seconded to NNUK headquarters" (Opp. at 39 (emphasis added)), this argument does not appear as an allegation in its Claim, and thus must be disregarded in considering the Motion.

necessary to impose a directorship on NNI.  Because these facts relate to the pre-petition governance of NNUK, NNUK cannot excuse its pleading failures by reference to the contingent nature of its claims.

NNUK's Response points to no instructions that NNI gave to NNUK nor any allegations that NNUK was accustomed to act in accordance with NNI's instructions, precluding a shadow director claim.  Equally absent from the Response are citations to any well-pleaded facts concerning the role that NNI played in all of NNUK's tax decisions, as a well-pleaded de facto director claim of this breadth would require.  Opp at 37.  Nor could NNUK plead such facts, as demonstrated by the Witness Statements, which indicate that the tax functions for NNUK were autonomous and centralized in England.  Instead, NNUK points to the same allegations it relies on for its transfer pricing claim, which allegations cannot cure these basic pleading failures.[53] Claim 32 seeks to impose a directorship on NNUK not with respect to transfer pricing alone, but in respect of "NNUK's taxation affairs" writ large.  See, e.g., Claim ¶ 85 (asserting that "NNI and NNL would be responsible for any penalties, interest and other loss payable by NNUK" concerning any "failure to pay the proper level of taxation in any years (whether because of an under recording of revenue or otherwise)").  Aside from incorporating its allegations concerning specific transactions – which are themselves deficient – NNUK makes no non-conclusory allegations of NNI's supposed role.  See Claim ¶ 84 (repeating bald allegation that "NNUK's taxation affairs were controlled by NNI and NNL."); see also Claim ¶ 15.

Pre-Petition Asset Sales.  Most importantly, NNUK's Response does nothing to justify its failure to even identify the transactions on which it purports to base its claim, pointing only to the Alcatel Sale as "one example of a relevant sale."  Opp. at 38.  Even as to the Alcatel Sale,

---

[53]     Similarly, NNUK cannot rely on its allegation concerning the tax consequences of the NNUK Intercompany Loans (Opp. at 37 (citing Claim ¶ 65(c)), because as discussed above, its Claim fails to allege necessary well-pleaded facts concerning NNI's role in NNUK's entry into such loans.

NNUK's Response simply confirms the absence of well-pleaded allegations necessary to sustain

a directorship claim.  NNUK points only to conclusory allegations that fail to make out the

required elements of a shadow or de facto director claim.  Opp. at 37-38 (citing Claim ¶ 193

("NNI was involved in all decision making in relation to the settlement of the allocation

methodology and allocation amounts." )).  NNUK identifies no instructions or directions given to

NNUK, or any facts concerning what "involvement" NNI is alleged to have played in NNUK's

agreement to any asset sales or the allocation of their proceeds.  Indeed, NNUK fails to offer any

facts whatsoever concerning the process by which the unidentified Pre-Petition Asset Sales were

considered or approved.[54]

### D.    NNUK Cannot Extend English Law to Create a Duty of Care as a Remedy for Pure Economic Loss

Apart from its shadow and de facto director claims, NNUK also argues that NNI owed it

an "independent" duty of care.  Opp. at 43.[55]  However, NNUK does not, and cannot, refute that

where, as here, a claimant alleges solely economic loss, English law has imposed a duty of care

only in specific contexts, where the parties are in sufficient "proximity" – such as professional

services, employment, or landlord-tenant relationships.  Todd Decl. ¶¶ 79-80; Marshall Decl. ¶

39.  Needless to say, no such relationship is pled here.  Nor has any English case ever imposed a

duty of care as between companies in a group.  See Todd Decl. ¶ 79-80; Marshall Decl. ¶ 39.

---

[54]      NNUK cannot cure these defects by reference to its transfer pricing allegations.  Specifically, NNUK points to its allegation that sale proceeds were allocated "on the erroneous assumptions that were contained in the transfer pricing structure."  Opp. at 38 (citing Claim ¶ 81).  Nowhere, however, does NNUK plead – as its Response suggests – that this "allocation method [was] adopted by NNI and NNL."  Opp. at 38.  Instead, its Claim is devoid of any allegations whatsoever on how the method for allocating sale proceeds was adopted or selected, much less any facts on NNI's alleged role.  In the absence of such well-pleaded allegations, claim 28 cannot stand.

[55]      For the contingent tax allegations in claim 33, NNUK pled a duty of care only based on a shadow or de facto directorship –  not any independent duty of care.  See Claim ¶ 212.  Claim 33 thus fails solely on the basis of NNUK's de facto and shadow director allegations, without consideration of any independent duty of care alleged with respect to claims 3, 9, 17 and 30.

Recognizing that its duty of care claims fail under this existing English law, NNUK makes two arguments.  First, it asks this Court to announce an expansion of existing English law. Marshall Decl. ¶ 39.1.  Second, it seeks through its Response to add an "agency" claim that is nowhere pled in its Claim.   See Opp. at 43-44; Marshall Decl. ¶ 39.2.

 First, there is no basis for this Court to disregard existing English law, as NNUK suggests.  According to NNUK, its duty of care claim is sustainable based on the "steady development [of English law] over the course of . . . the last two decades."  Marshall Decl. ¶ 39.1. What NNUK fails to mention is that there is not a single case in the past 20 years during which this law has developed where an English court has imposed a duty of care in a case of pure economic loss, outside of recognized categories not alleged here.  See Todd Reply Decl. ¶ 65. English law simply does not support NNUK's duty of care claims, and NNUK's speculation as to a future extension of English law should be disregarded by this Court.

Second, NNUK's assertion that "an independent duty of care also arises under well-established agency principles" (Opp. at 43) fails because the Claim does not allege that NNI acted as NNUK's agent.  To the contrary, the Claim plainly alleges an independent duty of care based only on the supposed "proximity" between NNI and NNUK.  Claim ¶¶ 97, 125, 157, 199. NNUK is precluded from amending the Claim through its Response to now allege instead that NNI acted as NNUK's agent.  Phenomenex, 2007 WL 28295, at *7.[56]

**E.    NNUK Cannot Avoid the Application of *Ex Turpi Causa***

NNUK agrees that the House of Lords' decision in Stone and Rolls Ltd. v. Moore Stephens [2009] 1 AC 1391 governs the application of the *ex turpi causa* doctrine to its claims.

---

[56]    In any event, the only "agency" relationship NNUK even suggests was through negotiations NNI allegedly undertook with revenue authorities.  Opp. at 44 (citing Claim ¶ 18).  Not only are most of its claims wholly unrelated to such negotiations (NNUK Intercompany Loans, Project Swift, Pre-Petition Asset Sales), but even its transfer pricing claims relate to NNUK's agreement to the terms of the MRDA – not whether any tax authorities would accept that structure.  See Claim ¶ 101 ("NNI breached its duty of care in causing NNUK to participate" in the MRDA).

NNUK also concedes that the "'Hampshire Land Principle' [which would ordinarily preclude attribution of a director's misconduct to the company] does <u>not</u> apply where all of those involved in the management and ownership of the company are aware of the wrongdoing at issue." Opp. at 78 (emphasis added). English courts refer to this as the "one-man company" principle. <u>Id.</u>; <u>see also</u> Todd Reply Decl. ¶¶ 101.3.

As set forth in the Motion, NNUK's Claim alleges – and is indeed premised on the assertion – that all of NNUK's directors abdicated their responsibilities to NNUK and participated in intentional breaches of duty. <u>See, e.g.,</u> Claim ¶¶ 26, 28-29, 105, 130, 169-170. In its Response, NNUK does not contradict this, and can point to no allegation that identifies a single director or officer that was not involved in the breaches it alleges. Opp. at 78-79.[57] Because the Claim's allegations are the sole basis for determining this Motion, application of the one-man company principle is thus straightforward. NNUK's argument to the contrary – that this Court "need investigate the position of the individuals on the NNUK board" (Opp. at 79) – both misconstrues English law and ignores the basic principles of Rule 12(b)(6). First, the passage from <u>Stone and Rolls</u> from which NNUK selectively quotes actually suggests that an inquiry would be appropriate where "there are 'innocent minority shareholders'" and the case is not otherwise suitable for strike-out. <u>Stone and Rolls</u> makes clear that no such inquiry is required where – as here – it is clear that the wrongdoers were the company's directing will and mind. Todd Reply Decl. ¶ 103.5 (quoting <u>Stone and Rolls</u> at 192). Second, each of NNUK's claims is predicated on an assertion that <u>all</u> of NNUK's de jure directors, as well as alleged shadow and de facto directors, were complicit in the "scheme to siphon cash from EMEA and move it to NNL." Opp. at 36. To now suggest that the Court must conduct an investigation into

---

[57]     While NNUK's English law expert points to <u>Belmont Fin. Corp. Ltd v Williams Furniture Ltd</u> [1979] Ch. 250 as "a very similar type of case" (Marshall Decl. ¶ 67), <u>Belmont</u> found the "one man company" rule inapplicable, and the breach of duty allegations there were made against only a minority of the directors.

the position of the individuals on the NNUK board to reveal the potential presence of contrary

facts turns the underlying premise of Rule 12(b)(6) on its head.  Accepting NNUK's allegations

as true, as the Court must, makes plain the application of *ex turpi causa*.[58]

This Court should not accept NNUK's invitation to engage in an open-ended inquiry into

the policy of *ex turpi causa*, to grapple with the supposed "dilemma that by denying relief on the

ground of illegality to one party, they appear to confer an unjustified benefit."  Opp. at 79.  The

English courts have already settled such competing policy concerns through the test set out in

Stone and Rolls.  Indeed, Stone and Rolls itself refutes NNUK's suggestion that *ex turpi causa*

should not apply because it is in administration and acts for the benefit of creditors.  Todd Decl.

¶ 134(iv) (quoting Stone and Rolls' exhortation that "there is no good reason to apply a different

rule to a company in liquidation.  Apart from special statutory claims . . . it cannot assert any

cause of action which it could not have asserted before the commencement of its liquidation.").

NNUK cannot escape the fact that, as Lord Walker put it, *ex turpi causa* is "unforgiving and

uncompromising."  Stone and Rolls [2009] 1 AC 1391 at 188; Todd Reply Decl. ¶¶ 101, 103.2.

### III.
### NNUK'S ATTEMPTS TO IMPOSE SECONDARY LIABILITY ON NNI FAIL

**A.    NNUK's Claims for Aiding and Abetting and Dishonest Assistance Cannot Withstand Scrutiny**

1.    NNUK's Attempts to Manufacture a Dispute Over the Standard for "Dishonesty" Do Not Save Its Dishonest Assistance Claims

---

[58]    The Court need not seriously consider NNUK's unsupported assertion that the Court need not reach the question of attribution because the *ex turpi causa* doctrine is per se inapplicable in cases of breach of fiduciary duty. Opp. at 77.  As an initial matter, the Marshall Declaration takes no such position, nor does NNUK reference any English authorities so holding.  See Opp. at 77 (citing Marshall Decl. ¶ 65).  Moreover, NNUK's argument proceeds on the assertion that the directors must be viewed as third parties, whose alleged breaches of duty were not undertaken by or attributable to the company.  As NNUK concedes, however, this is a question of whether there is "illegal conduct that can be attributed to the company itself."  Id. at 77.  That question is governed by the attribution analysis that compels application of the one-man-company rule, rather than any separate exception unique to fiduciary duty claims.  See Todd Reply Decl. ¶¶ 101.3-101.7.

The parties agree that <u>Royal Brunei Airlines Sdn Bhd v. Tan</u> [1995] 2 AC 378 sets forth

the elements of a dishonest assistance claim under English law.  Marshall Decl. ¶ 41; Todd Decl.

¶ 84; Todd Reply Decl. ¶ 72.  The parties further agree that "[t]he essential requirement [is] that

the assistance had been provided in respect of [a] breach by someone who was acting

dishonestly" and that the "standard of dishonesty is objective."  Marshall Decl. ¶¶ 41, 44; Todd

Decl. ¶ 85; Todd Reply Decl. ¶ 73.  In the <u>Royal Brunei</u> case, Lord Nicholls explained the

standard as follows: "Honest people do not intentionally deceive others to their detriment.

Honest people do not knowingly take others' property . . . Nor does an honest person in such a

case deliberately close his eyes and ears or deliberately not ask questions, lest he learn something

he would rather not know, and then proceed regardless."  <u>See</u> Marshall Decl. ¶ 42.  While

NNUK now suggests that dishonesty could be shown through mere "conduct that is

commercially unacceptable in a commercial setting," that standard is drawn from a case

construing the elements of knowing receipt – not dishonest assistance.  Todd Reply Decl. ¶ 74.4.

The <u>Royal Brunei</u> case, which the parties agree provides the relevant standard, instead makes

clear that a showing of commercially unacceptable conduct can only provide a "tell tale sign" of

dishonesty; it cannot supplant the requirement to show dishonesty itself.  <u>Id.</u> ¶ 75.

As this standard makes clear, NNUK's dishonest assistance claims are subject to Rule

9(b).  <u>See</u> <u>O'Connell v. Arthur Andersen LLP (In re Alphastar Ins. Group Ltd.)</u>, 383 B.R. 231,

274 (Bankr. S.D.N.Y. 2008) (dismissing a claim under Bermuda law for dishonest assistance

because the complaint "fail[ed] to allege with particularity that the [Defendant] did anything that

would be considered 'dishonest.'").  Not surprisingly, NNUK's Response is completely silent

regarding this case – the only U.S. case the Movants have located addressing a dishonest

assistance claim – or its application of Rule 9(b).  Nor is the holding in <u>Alphastar</u> surprising:

43

Rule 9(b)'s application follows from the dictionary definition of dishonesty, which NNUK must prove.[59]  Indeed, English courts similarly require, as a matter of substance, that dishonesty be "distinctly alleged and distinctly proved."  Todd Decl. ¶¶ 87-88.  As discussed below, NNUK's Claim simply fails to allege with particularity what NNI purportedly did that would be considered dishonest.

    2.    <u>NNUK's Similar Attempt to Loosen the Requirements for the "Knowing Assistance" Element of an Aiding and Abetting Claim Does Not Save Its Claim</u>

As an initial matter, as set forth below, much of NNUK's aiding and abetting claims are plainly time-barred, including the entirety of claim number 6, which is predicated on its transfer pricing allegations.  Dismissal of that claim alone would substantially winnow NNUK's Claim, further undermining NNUK's suggestion that critical scrutiny of its Claim prior to discovery would serve no purpose.

As part and parcel of its efforts to lower the bar to salvage its secondary liability claims, NNUK claims that "the US Debtors misstate the [required] mental state," arguing that actual knowledge of the primary breach is not required with respect to its state law aiding and abetting claims.  Opp. at 59.  It is NNUK that is mistaken.  One of the cases NNUK itself cites explicitly "stress[es] that the requirement is *actual* knowledge (which, again, may be proven by circumstantial evidence), and therefore evidence establishing negligence, i.e., that a bank 'should have known,' will not suffice."  <u>Aetna Cas. and Sur. Co. v. Leahey Const. Co.</u>, 219 F.3d 519, 536 (6th Cir. 2000) (emphasis in original).  NNUK further challenges "[t]he U.S. Debtor's reliance on <u>Capitaliza-T</u> for its interpretation of 'actual knowledge'" and tries to limit <u>Capitaliza-</u>

---

[59]    <u>See</u> Shorter Oxford English Dictionary (William R. Trumble et al. eds., 6th ed. 2007) (dishonest conduct is defined as "not straightforward or honourable; (now chiefly) fraudulent, of the nature of or involving theft, lying, or cheating."); <u>see also</u> Webster's Ninth New Collegiate Dictionary (9th ed. 1983) (defining "honest" as "free from fraud or deception", while dishonest "implies a willful perversion of truth in order to deceive, cheat, or defraud."); The American Heritage Dictionary of the English Language (3d ed. 1994) (defining honest as "not deceptive or fraudulent; genuine" and dishonest as "disposed to lie, cheat, defraud, or deceive").

T to its facts. Opp. at 59-60. NNUK, however, ignores Capitaliza-T's express holding that "the universal rule requires actual knowledge" to sustain an aiding and abetting claim.[60] NNUK tries to subvert the actual knowledge requirement by manufacturing a non-existent dispute over how one proves knowledge, not whether such knowledge is required in the first place. See Opp. at 59. NNI does not dispute NNUK's assertion that "[p]roof of a defendant's knowledge or intent will often be inferential." Id. at 59 n. 79 (citing Aetna, 219 F.3d at 535).[61] However, that such knowledge can be inferred does not excuse NNUK from pleading facts that plausibly give rise to an inference of knowledge. Nor does NNUK dispute that, in addition to knowledge, its aiding and abetting claims require that it plead actions amounting to substantial participation or substantial assistance in the primary wrongdoer's breach. Brug v. Enstar Grp., Inc., 755 F. Supp. 1247, 1256 (D. Del. 1991).

3.  NNUK Fails to Adequately Allege Assistance Given by NNI or Knowledge of Any Underlying Breach of Fiduciary Duty

As discussed above, because NNUK's allegations are based on dishonesty or fraud, they should be tested under Rule 9(b). But, even under the Rule 8(a) standard, NNUK fails to plead

---

[60]  Capitaliza-T Sociedad de Responsibilidad Limitada de Capital Variable v. Wachovia Bank of Del. Nat'l Ass'n, Civil No. 10-520, 2011 WL 864421, at *4 (D. Del. Mar. 9, 2011) (emphasis added). Nor can NNUK effectively suggest that actual knowledge was required in Capitaliza-T because the defendant was a "passive aider and abetter." Opp. at 59. This flies in the face of the basic test for aiding and abetting, which requires the defendant to have "substantially participated in or provided substantial assistance for the wrongful act." Capitaliza-T, 2011 WL 864421, at *4 (emphasis added). NNUK's attempt to distinguish Malpiede v. Townson, 780 A. 2d 1075 (Del. 2001) is equally unavailing. See Opp'n Br. at 60. The legal standard for aiding and abetting tort liability does not vary depending upon the parties involved in the lawsuit.

[61]  The remaining cases cited by NNUK are simply fact specific applications of the knowledge requirement that offer no guidance here. See Opp. at 59. In particular, while NNUK cites authorities inferring knowledge from "atypical transactions that lack business justification," NNUK itself recognizes that the challenged transactions are both necessary and common in multinational business enterprises. See, e.g., Claim ¶ 30 ("Transfer pricing arrangements are implemented in order to . . . enable an allocation of profit in each of the countries where group companies do business"); see also Blackwell v. Wells Fargo (In re I.G. Servs., Ltd.), No. 04-5041-C, 2004 WL 5866105, *1 (Bankr. W.D. Tex. Dec. 22, 2004) (referencing the law in passing in determining whether an expert's testimony was admissible); Duke Energy Int'l L.L.C. v. Napoli, 748 F. Supp.2d 656, 663 (S.D. Tex. 2010) (inferring actual knowledge from specific pleaded facts); Morgan v. Cash, C.A. No. 5053-VCS, 2010 WL 2803746, at *6 (Del. Ch. July 16, 2010) (finding Zirn v. VLI Corp., Civ. A. No. 9488, 1989 WL 79963 (Del. Ch. July 17, 1989) inapplicable in the absence of factual allegations "suggesting how and why the acquirer actually used its knowledge of the target board's conflicts to collude with the target board").

45

allegations sufficient to show NNI knowingly assisted any breach of fiduciary duty.  NNUK has

failed to show, through well-pled allegations, what assistance NNI allegedly provided to

NNUK's directors, or what facts permit an inference that NNI knew those directors were in

breach of their fiduciary duties.

> a.    There is No Well-Pled Allegation of An Underlying Breach of Duty

As discussed above, NNUK has failed to plead in any non-conclusory fashion that it was

insolvent during the nearly ten-year span of the alleged wrongdoing.  This failure eliminates any

underlying breach of fiduciary duty, because absent any well-pled facts of insolvency, these

transactions were of necessity ratified by the parent and thus, do not constitute breaches of

fiduciary duty.  Because there can be no aiding and abetting liability if there is no underlying

breach, this fact alone dictates dismissal.[62]  See Brug, 755 F. Supp. at 1256; Related Westpac

LLC v. Jer Snowmass LLC, C.A. No. 5001-VCS, 2010 WL 2929708, at *8 (Del. Ch. July 23,

2010).

> b.    NNUK Fails to Allege That NNI Knew NNUK was Insolvent

In the Motion, the U.S. Debtors argued that "[n]owhere in the Claim does NNUK assert

that NNI was aware that NNUK was actually insolvent at any time, much less that it was so

aware at the time of each transaction."  Mot. at 56.  NNUK does not dispute this pleading failure;

its Response simply asserts that "the Proof of Claim alleges facts showing that NNUK was at or

near insolvency during the relevant period."  Opp. at 67.  However, even if NNUK had

adequately pled insolvency (which it did not), NNUK's Response does not point to any

allegations that show NNI knew that NNUK was insolvent.  Absent such knowledge, NNI could

have no ability to apprehend that any of the actions allegedly taken by NNUK could constitute

---

[62]       In addition, NNUK does not dispute that if it is judicially estopped from claiming NNL was a de facto or
shadow director, there can be no aiding and abetting claim based on an alleged breach by NNL.

breaches of fiduciary duties to creditors.  See Mot. at 55-57.  Though NNUK argues in its

Response that "as a member of the Nortel Group, [NNI] was well aware of all the relevant

relationships and resulting duties," (Opp. at 60) this allegation is not only wholly conclusory, but

is not pled anywhere in its Claim.  Even assuming arguendo that NNUK was insolvent, the lack

of allegations as to NNI's knowledge of that purported insolvency preclude knowledge of any

breach, and thus requires dismissal of these claims.

        c.     The Claim Lacks Well-Pleaded Facts to Identify Any Knowing Assistance
by NNI

For each of the five sets of transactions in the Claim, NNUK fails to show through well-

pled allegations what NNI did to assist the NNUK directors, or to infer that NNI knew the

NNUK directors were in breach of their fiduciary duties.

Pre-Petition Asset Sales.  NNUK fails to cite any well-pled facts addressing NNI's

alleged assistance or participation in NNUK's approval of the Pre-Petition Asset Sales.  Most

importantly, with the exception of a single "example," NNUK does not even identify the

transactions on which it bases claim 31.  Instead, NNUK summarily argues that "[t]hrough its

role in the allocation of the Pre-Petition Sales Proceeds, NNI not only breached its own duties to

NNUK; it aided and abetted the directors of NNUK in conduct amounting to a breach of their

duties as well."  Opp. at 63.  NNUK cites a single paragraph of the Claim in support of that

argument, paragraph 193.  Notably, in its entirety paragraph 193 states "[f]or the reasons stated

in paragraphs 15 to 27 above, NNI was a de facto or shadow director of NNUK and owed

NNUK fiduciary duties in respect of the allocation of Pre Petition Sale Proceeds by virtue of the

fact that NNI was involved in all decision making in relation to the settlement of the allocation

methodology and allocation amounts, as explained above."[63]   Claim ¶ 193.  An examination of

Paragraphs 15-27 of the Claim reveals no allegations about NNI's involvement in any Pre

Petition Asset Sales, much less any facts to show that NNI was involved in "all decision making"

or how NNI assisted any of NNUK's directors in breaching their duties.  NNUK remains unable

to point to any allegations identifying any NNI "involve[ment]" in the Pre-Petition Asset Sales,

any of the individuals involved, or even the process by which the Pre-Petition Asset Sales were

approved.  See Claim ¶¶ 79-83.  The absence of such facts is not only fatal to the required

element of assistance, but precludes any plausible inference that such assistance was undertaken

with knowledge of the directors' breach.  Just as the Third Circuit requires more for a

supervisory liability claim related to excessive force than merely "describing the force used and

appending the phrase 'and the chief told them to do it,'" aiding and abetting liability requires

more than a bare allegation of NNI's "involvement" in a transaction.  See Santiago v.

Warminster Twp., 629 F.3d 121, 133 (3d Cir. 2010).

    Project Swift, NNUK Intercompany Loans, and Transfer Pricing.  NNUK cannot escape

the absence of any allegations in its Claim regarding what actions any individuals undertook on

behalf of NNI to advocate or substantially assist in the alleged breaches of fiduciary duties by

NNUK's directors (whether de jure or de facto).

    NNUK does not even seriously contest that it has failed to adequately plead the requisite

participation or mental state with respect to Project Swift and the NNUK Intercompany Loans –

transactions to which NNI was not even a party.  NNUK fails to respond to the Motion's detailed

demonstration that there are no non-conclusory allegations sufficient to infer NNI knew these

---

[63]     Moreover, allegations in paragraph 193 that NNI "caused" to enter into the Pre-Petition Asset Sales relate
to its primary directorship claims.  If nothing else, this underscores that NNUK's secondary liability claims are
merely a conclusory repackaging of their primary liability claims and accordingly must fail.  See Santiago, 629 F.3d
121 (rejecting an attempt to repackage primary liability claims of excessive force against police officers as
secondary liability claims against their supervisors where the allegations regarding the supervisors' liability were
merely conclusory assertions they told the officers to do what they did).

transactions were a breach of the NNUK directors' fiduciary duties, much less to sufficiently identify what NNI actually did to participate or assist in that breach. See Mot. at 53-55.[64] Instead, NNUK limits its Response to assertions that these transactions were part of an alleged "Cash to Canada" scheme. Opp. at 66. Such allegations fail to satisfy Rule 8(a), much less Rule 9(b).

NNUK's allegations with regard to transfer pricing are equally unavailing. NNUK's references to specific NNI individuals' participation in global tax and treasury functions are simply insufficient to raise an inference that NNI knew the transfer pricing system was a breach of the NNUK directors' duties. As the Motion demonstrates, although the Claim alleges that "[t]he key individuals involved included in particular John Doolittle of both NNI and the Canadian Entities and Mark Weisz, Mike Orlando, Laurie Krebs and John Payne of NNI as well as representatives from the Canadian Entities" (Claim ¶ 17), the Claim never mentions any actions undertaken by Ms. Krebs and the Claim concedes that Mr. Doolittle held positions with NNL as well. See Mot. at 53. Further, the Claim never pleads that any individual's alleged actions were undertaken in the scope of their role as an NNI officer, barring attribution to NNI. As the Motion further explained, for the remaining individuals, NNUK alleges only that they undertook negotiations or instructed outside advisors. Id. Because NNUK's claims do not arise out of any negotiations with the taxation authorities, such negotiations do not show any knowing assistance as to the claimed breach – NNUK's entry into the MRDA.

---

[64]   While NNUK continues to point to allegations concerning Katharine Stevenson's alleged role in implementing the NNUK Intercompany Loans, as the Motion demonstrated, Ms. Stevenson was also an employee of NNL and signed certain of those loans on behalf of NNL. See Mot. at 36, Barefoot Decl. Ex. P.  NNUK similarly seeks to rely on allegations concerning Ryan Smith, despite its allegation that he was seconded to NNUK.  Nowhere does NNUK allege that Ms. Stevenson or Mr. Smith undertook any actions on behalf of, or within the scope of their duties for, NNI.  These allegations thus fail to raise a fact dispute.  The Third Circuit's decision in Santiago is instructive.  There, the Third Circuit rejected as implausible an inference that excessive force was planned, in light of an obvious alternative explanation.  Santiago, 629 F.3d at 133.  NNUK's suggestion that Ms. Stevenson was acting as an NNI employee, despite her signing the loan agreement in her capacity as an NNL director, is equally implausible.

Moreover, NNUK again attempts to argue allegations that it has not pled.  For example, nowhere does the Claim allege that "specific NNI individuals were involved in the advanced pricing arrangements with the Revenue Authorities entered into on behalf of NNUK and the EMEA Companies."  Opp. at 64 (emphasis added).  Rather, NNUK alleges only that there was an "advanced pricing arrangement/agreement ("APA") application process" and that certain individuals "took the lead in negotiations."  Claim ¶ 18(e).  These allegations simply do not allege that NNI took actions on behalf of NNUK.  In any event, NNUK's allegations of any breach arise out of the transfer pricing system itself, not whether that system was blessed by any particular revenue authority.[65]  NNUK also argues in its Response that the "Claim clearly alleges that NNI participated in the decisions of (and even supplanted) the board of NNUK."  Opp. at 60. However, the Claim never alleges that NNI participated in NNUK's board decisions.  In fact, the only reference to a "board" in the entire Claim alleges simply that presentations were made to various Nortel boards.  Claim ¶ 24.[66]

Contingent Tax Claims.  Though claims 34-35 attempt to impose liability on NNI for "any form of penalty in relation to its tax affairs" (Claim ¶ 210), the only allegations NNUK points to in support of NNI's purported dishonest and knowing assistance are the same (time-barred) allegations that underlie its transfer pricing claims.  Opp. at 63-64.  NNUK otherwise resorts to its conclusory allegation that NNI had "control over matters related to taxation."  Id. at 63.  This fails to even identify what the underlying breach of fiduciary duty was, much less what

---

[65]    NNUK also focuses on NNI's "involvement" in group tax and treasury functions.  But as NNUK concedes, transfer pricing is a normal function of an international business (Claim ¶ 30), such that "involvement" cannot give rise to an inference of NNI's knowledge of any underlying breach.

[66]    While NNUK similarly points to its allegations identifying NNI employees employed in the Nortel Group Tax Department (Opp. at 64), it is notably silent on what actions (e.g., any participation or assistance) each of those employees undertook.  See Mot. at 52-53.

alleged assistance NNI provided to NNUK.  These threadbare allegations similarly foreclose any inference that NNI had knowledge of any breach.

**B.    NNUK Fails to Show Any Well-Pleaded Allegations to Support Its Conspiracy Claims (Claims 5, 7, 11, 12, 19, 21)**

NNUK's superficial attempts to justify its conspiracy claims fail.  Even when tested under Rule 8(a), NNUK's claims fall far short of the required factual allegations.[67]  NNUK asks this Court to ignore the Supreme Court's recent guidance on how properly to plead a conspiracy. See Mot. at 59 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 565 n.10 (2007)).  In Twombly, because the alleged violations occurred over a seven-year span and the complaint "mentioned no specific time, place, or person involved in the alleged conspiracies" the Supreme Court "doubt[ed] that the complaint's reference to an agreement among the defendant would have given the notice required by Rule 8."  Twombly, 550 U.S. at 565 n.10; Mot. at 59.  The Supreme Court further noted that the complaint there "furnishe[d] no clue as to which of the [defendant companies] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place."  Id.  NNUK's conspiracy claims lack precisely these required facts.

Instead of addressing these omissions, NNUK asserts, without citation, that Twombly is "inapposite to the circumstances alleged here, where the conspiracy was formed among parties and persons who were members of a corporate family and were necessarily in constant communication with respect to the precise transactions that are alleged to have been the object of the conspiracy."  See Opp. at 70.  NNUK has it backwards.  Twombly is particularly apposite

---

[67]    Although NNUK attempts to distinguish the cases cited in the Motion concerning application of Rule 9(b) (see Opp. at 67-68), NNUK cannot avoid the fact that "[t]he Third Circuit has long required that claims of conspiracy be supported by allegations of specific facts" and that "[o]nly allegations of conspiracy which are particularized, such as those addressing the period of the conspiracy, the object of the conspiracy, and certain actions of the alleged conspirators taken to achieve that purpose, will be deemed sufficient."  See Mot. at 58 (collecting authorities).  In any event, for the reasons set forth above, NNUK's underlying breach of fiduciary duty allegations sound in fraud, such that even under its cabined view of the law, its conspiracy claims invoke Rule 9(b).

precisely because NNI, NNL and NNUK are members of a corporate family such that an illegal

agreement cannot plausibly be inferred from the fact that the parties were in contact about

everyday business activities like global tax and treasury functions.

NNI does not contend that the Court may not infer an agreement from pleaded facts.  But,

as Twombly makes clear, NNUK must still plead sufficient facts so that the inference of an

agreement to commit an unlawful act or a lawful act by unlawful means is plausible.  NNUK

asserts three potential alternative sets of conspirators, without specifying who was involved,

when they agreed, or with whom they agreed.  See Opp. at 69.  NNUK tries to gloss over these

failures by citing to its Claim as "describing roles of named agents of NNI who participated in

specific transactions designed to divert assets from NNUK to NNI and NNL."  Opp. at 69 (citing

to Claim ¶¶ 16-25).  This misstates the content of those allegations.  NNUK alleges only that

certain employees "took the lead in negotiations with the IRS, the CRA and HRMC" (¶18e), that

many of the "key individuals" in the "Group Tax Department" were NNI personnel (¶19), or that

"[d]irectors and officers of NNI (including Mr Paul Karr and Mr William LaSalle) were fully

aware of Project Swift and were actively involved in its implementation" (¶24).  Such allegations

simply do not put NNI on notice of which NNI employees conspired with whom or when.

Just as there was "no reason to infer that the companies had agreed among themselves to

do what was only natural anyway" in Twombly, there is no reason to infer any agreement by

NNI and its affiliates to do an illegal act when all that is alleged is NNI's awareness of

transactions between other members of the corporate group or involvement in the global tax and

treasury functions of a global corporation.  See Twombly, 550 U.S. at 566; see also Ashcroft v.

Iqbal, 129 S.Ct. 1937, 1950 (2009) (explaining that under Twombly, while "parallel conduct was

consistent with an unlawful agreement, the Court nevertheless concluded that it did not plausibly

suggest an illicit accord because it was not only compatible with, but indeed was more likely

explained by, lawful, unchoreographed free-market behavior.").

## C.    NNUK's Claims For Aiding and Abetting, Dishonest Assistance and Conspiracy are Barred by the *Ex Turpi Causa* and *In Pari Delicto* Doctrines

Despite its lengthy attempt to argue otherwise, NNUK cannot escape the ultimate

conclusion that as pled, their secondary liability claims for aiding and abetting, dishonest

assistance, and conspiracy are barred by the *ex turpi causa* and *in pari delicto* doctrines.  Indeed,

NNUK totally ignores the <u>Alphastar</u> case, which, on a motion to dismiss, held that a dishonest

assistance claim was barred by the *ex turpi causa* doctrine.[68]  <u>See</u> Motion at 45 (citing <u>O'Connell</u>

<u>v. Anderson LLP (In re Alphastar Ins. Grp. Ltd.)</u>, 383 B.R. 231, 274-75 (Bankr. S.D.N.Y.

2008)).  As it does elsewhere, NNUK again urges that the Court need not make a determination

at this time.  <u>See</u> Opp. at 83.  But nothing in NNUK's Response changes the law that a court may

consider these defenses on a motion to dismiss if they appear on the face of the complaint.[69]  <u>See</u>

Mot. at 62 (collecting cases).[70]

NNUK's argument that NNI is an insider to whom the *in pari delicto* defense does not

apply is similarly unavailing.  It is true that "the application of the *in pari delicto* doctrine has

been rejected in situations when corporate fiduciaries seek to avoid responsibility for their own

conduct vis-à-vis their corporations."  <u>See e.g.</u>, <u>In re HealthSouth Corp. S'Holders Litig.</u>, 845

A.2d 1096, 1107 (Del. Ch. 2003).  But, NNI has not argued that *in pari delicto* applies to

NNUK's claims against it for breach of fiduciary duty or breach of a duty of care.  The defense

---

[68]    The *ex turpi causa* defense is discussed above in Section II.E.

[69]    In what is plainly an attempt to escape the Delaware Chancery court's recent application of *in pari delicto* on a motion to dismiss, NNUK's Response suddenly asserts that Texas law would apply to any *in pari delicto* defense.  <u>See</u> Opp. at 80 n. 95.  However, NNUK has chosen to plead its claims under either Delaware or Texas law. It cannot now select Texas law only with respect to a determinative defense.  In any event, Texas and Delaware law both mandate dismissal of its claims on *in pari delicto* grounds.

[70]    <u>See also</u> <u>Nisselson v. Lernout</u>, 469 F.3d 143, 154 (1st Cir. 2006) (collecting cases affirming dismissal of claims on *in pari delicto* grounds, and affirming lower court's dismissal on that basis).

<u>does</u> apply with full force to NNUK's secondary liability claims, which are predicated on alternative allegations that NNI did not owe NNUK a fiduciary duty and instead somehow assisted in the primary misconduct of NNUK's own directors.[71]  For purposes of these secondary claims, there is no basis to extend the insider limitation on the defense to a defendant who had no fiduciary duty to the plaintiff.

Finally, NNUK's argument that the adverse interest exception applies here fails on its substance.  NNUK admits that the adverse interest rule applies only where an agent acted "entirely for his own or another's purpose."  Opp. at 82.  The Claim does not allege either that NNUK's directors were acting entirely for another's purpose, or that the challenged transactions conferred no benefit on NNUK.  Addressing the millions of dollars that NNUK admits it received (Claim ¶ 83), NNUK responds only that it should have received more.  Opp. at 82 ("[a]n underpayment of this magnitude cannot be said to bestow a benefit").  Similarly, NNUK's argument that there is no indication that NNUK benefitted from transfer pricing ignores its allegation that NNUK was due "large amounts of money" under the RPSM and that there were "book entries of the credit due into NNUK's accounts."  Claim ¶ 49.

## IV.
### NNUK FAILS TO ADEQUATELY ALLEGE NNI'S UNJUST RECEIPT OF ANY NNUK PROPERTY

**A.      NNUK Concedes That It Has Failed to Establish Tracing, an Element of Its Unconscionable Receipt and Knowing Receipt Claims**

NNUK's Response establishes that its claims for unconscionable receipt and knowing receipt under U.K. law (claims 14, 22, 29) must be dismissed for failure to plead basic requirements of those causes of action.  NNUK concedes that tracing the receipt of its funds is

---

[71]      NNUK also cites to <u>Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)</u>, 335 B.R. 539, 547 (D. Del. 2005), but that case too discusses insider status in the context of a direct breach of fiduciary duty claim.

one of the three required elements of an unconscionable receipt claim.[72]  Marshall Decl. ¶ 49.

NNUK also concedes that "this tracing exercise has not been set out," and that as a matter of

English law it is needed for an "unconscionable receipt claim to succeed."  Id. ¶ 50.1.  The

Marshall Declaration admits that "[w]ith further particularisation on the tracing aspect [these

claims] are sustainable," indicating that as pled, they are not.  Id. ¶ 50.3; see also Todd Reply

Decl. ¶¶ 79-80.  Recognizing these deficiencies, NNUK reverts to its incorrect argument that it

"cannot reasonably be required to further particularize [its] claims in advance of discovery."

Opp. at 72.  But NNUK has already had years to investigate its claims, as well as an opportunity

to amend, and the Supreme Court has instructed that discovery does not replace adequate

pleading.  See Iqbal, 129 S.Ct. at 1953-54.

## B.    NNUK Does Not Allege That NNI Unjustly Received Any of Its Property

NNUK's unjust enrichment claims under state law (claims 15 and 23) fail for similar

reasons.  NNUK has not, through well-pleaded allegations, raised any plausible inference that

NNI was unjustly enriched to NNUK's detriment.  First, NNUK argues – wrongly – that it has

pled NNI's actual receipt of NNUK funds.  But the Claim alleges only that transfers to NNL

facilitated or enabled separate payments by NNL to NNI.[73]  Nor does NNUK address the

uncontested fact that the only repayments that it does allege NNL made to NNI bear no

correlation to the dates and amounts of NNL's draw-downs under its loan facilities with NNUK.

See Mot. at 67.  NNUK similarly fails to explain how NNI could have received its property in

respect of Project Swift, which was "a paper transfer from NNL to NNUK."  Claim ¶ 71.

---

[72]    Although NNUK references an unconscionable receipt claim related to transfer pricing in its Response, no such cause of action is pled in the Claim.  Compare Opp. at 71 with Claim ¶¶ 144-48 (NNUK Intercompany Loans), 176-80 (Project Swift), 196-97 (Pre-Petition Asset Sales).

[73]    Though NNUK also points to allegations suggesting the transfer of its property to NNI through the Pre-Petition Asset Sales (Opp. at 71), such allegations are wholly irrelevant, as NNUK asserts no claim for unjust enrichment based upon those Pre-Petition Asset Sales.

Second, NNUK does not address the case law cited in the Motion that a "showing that the defendant was unjustly enriched by the plaintiff who acted <u>for</u> the defendant's benefit is essential" and that "[i]t is not enough that the defendant received a benefit from the activities of the plaintiff; if the services were performed at the behest of someone other than the defendants, the plaintiff must look to that person for recovery." <u>See</u> Mot. at 68 (quoting <u>Metcap Sec. LLC v. Pearl Senior Care, Inc.</u>, No. Civ. A 2129-VCN, 2007 WL 1498989, at *6 (Del. Ch. May 16, 2007) (emphasis in original). Instead, NNUK first attempts some misdirection, suggesting that the Motion misstated its Claim. The Claim itself demonstrates otherwise; NNUK clearly alleges transactions <u>for the benefit of NNL</u>, not NNI. For example, NNUK alleges that the NNUK Intercompany Loans "were put in place for the benefit of NNL to the detriment of NNUK" and that Project Swift was designed to reduce the loan balance NNL owed NNUK. <u>See</u> Claim ¶¶ 21, 71, 72; <u>see also</u> Mot. at 68-69 n.72. NNUK's conclusory allegations that "NNI itself also benefitted" from the "Cash to Canada" scheme (Opp. at 73 n.87) do not change what is alleged. At best, NNUK has alleged an incidental benefit, which as <u>Metcap</u> demonstrates is insufficient. Instead, as noted above, the plaintiff must have acted for the defendant's benefit. Thus, there is no plausible causal relationship sufficient to state a claim for unjust enrichment.

**V.**
**<u>NNUK'S QUASI-CONTRACT AND OTHER CLAIMS RELATING TO
UNSPECIFIED ASSET SALES SHOULD BE DISMISSED</u>**

**A.    NNUK Cannot Remedy Its Basic Failures of Notice Pleading**

NNUK argues that its allegations as to claims 24-31 – which do not identify the transactions at issue – satisfy the requirements of Rule 8(a). <u>See</u> Opp. at 73. That assertion is both unsupported and unsupportable. <u>See, e.g.</u>, <u>Bautista v. L.A. Cnty.</u>, 216 F.3d 837, 840 (9th Cir. 2000) (explaining, even prior to <u>Iqbal</u>, that "[t]o comply with Rule 8, each plaintiff must plead a short and plain statement of the elements of his or her claim, identifying the transaction

56

or occurrence giving rise to the claim).  Alternatively, NNUK contends that its pleading omissions will be rectified through discovery.  Opp. at 73.  This, again, ignores clear precedent that discovery is not a substitute for adequate pleading.[74]

## B.    Claims 24-27 Independently Fail to State a Claim

### 1.    Claim 26 Fails Adequately To Plead Mistake

NNUK fails to address – much less contest – the application of Rule 9(b) to its claim for mistake.  See Bankr. R. 7009 ("In alleging fraud or mistake, a party must state with particularity the circumstances") (emphasis added).  NNUK stands silent on how its Claim could possibly satisfy the Rule 9(b) standards, where it fails to plead (i) the individuals who made the mistake,[75] (ii) the nature of their misunderstanding, or (iii) when and where that mistake occurred.  See Claim ¶ 188 (alleging only "a mistake (either of fact or law) as to the full extent of NNUK's entitlement").  Rule 9(b) alone thus requires dismissal.[76]

### 2.    NNUK Does Not Plead Required Elements of a Transaction at Undervalue Claim

Through its Opposition, NNUK belatedly attempts to correct the most glaring pleading failure in claim 27 – the absence of allegations on any cognizable "transaction" completed within the two year reach-back period imposed by English Law.  While NNUK concedes that the December 2006 signing and closing of the Alcatel Sale fall outside of that period, it now suggests that its claim nonetheless survives because it is based on a division of those sale proceeds which "in reality" did not occur until after July 2007.  Opp. at 75.  NNUK does not

---

[74]    Nor can NNUK credibly suggest that the "relevant information about the asset sales is within the possession of the North American entities."  Opp. at 73.  NNUK's Claim alleges that NNUK was a party to each of the Pre-Petition Asset Sales (Claim ¶ 79), which the Joint Administrators have nonetheless failed to identify, after nearly three years of investigation.

[75]    Indeed, NNUK's Claim fails to identify a single officer, employee or agent of NNUK.

[76]    NNUK's Opposition focuses solely on whether English law recognizes a claim for mistake outside of an agreement or contract.  That question is rendered academic not only by NNUK's pleading failure, but by NNUK's Claim, which plainly bases Claim 26 on an alleged "agreement that the various selling Nortel entities would allocate the proceeds of sales among themselves in accordance with arm's length entitlement."  Opp. at 15; see also Todd Decl. ¶¶ 111-19.

even attempt to argue that it pled this new theory.  The "reality" is that NNUK's claims must be determined solely by the allegations in its Claim, and cannot be amended through its Opposition. Commw. of Pa. ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir. 1988).  NNUK's Claim nowhere alleges the date on which the sale proceeds were allocated.  It alleges only the date of a statement reflecting that allocation, which statement is not a "transaction," and could have pre-dated or post-dated the actual allocation.  Todd Reply Decl. ¶¶ 94, 97-98.

NNUK acknowledges that a required element of its claim is that NNUK receive "significantly less" consideration (see Marshall Decl. ¶ 62), yet it points only to its formulaic restatement of this element.  Opp. at 75 ("That is precisely the allegation made in the Proof of Claim: 'NNUK received significantly less and NNI received significantly more than it was entitled to on an arm's-length basis.' (Proof of Claim ¶ 82.)").  Such bare recitations of the legal elements of a cause of action are not entitled to a presumption of truth and must be disregarded. Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010).  NNUK fails to set forth facts that would render such a conclusion plausible – allegations concerning the amount of proceeds received by NNI, and the value of the NNUK assets conveyed.[77]

3.    Implied Term/Implied Contract

The Motion argues that NNUK's purported contract claims (claims 24 & 25) should be dismissed because NNUK failed to adequately allege the parameters of the contract or contractual term.  Mot. at 73.  The Motion further argues that because of those ambiguities, the Claim fails to allege what action or omission by NNI constitutes a breach of the supposed implied term of implied contract.  See id.  NNUK, however, rejects that "the law of any

---

[77]    See Angell v. Ber Care, Inc. (In re Caremerica, Inc.), 409 B.R. 737, 756 (Bankr. E.D.N.C. 2009) (dismissing constructive fraud claim that merely "mirror[ed] the elements of § 548(a)(1)(B)" without factual assertions such as "an identification of the consideration received by each transferor, information as to why the value of such consideration was less than the amount transferred, and facts supporting the debtors' insolvency at the time of the transfer").

jurisdiction . . . require[s] that 'the parameters of the contract or contractual term' must be shown" to survive a motion to dismiss.  Opp. at 76 (citation omitted).  NNUK is wrong as Rule 8(a) establishes that "[a] plaintiff may not escape dismissal on a contract claim, for example, by stating that he had a contract with the defendant, gave the defendant consideration, and the defendant breached the contract. What was the contract? The promises made? The consideration? The nature of the breach?"  <u>Bissessur v. Indiana Univ. Bd. of Tr.</u>, 581 F.3d 599, 603 (7th Cir. 2009).

NNUK does not identify allegations in the Claim that satisfy those requirements.  As to both its implied contract and implied term claims, NNUK fails to meaningfully allege what NNI's contractual obligations were, or identify what performance would have averted their alleged breach.  While NNUK points to allegations that NNI was obligated to allocate proceeds "fairly," or "in accordance with the arms-length principle," it deliberately fails to allege what form of allocation or percentage of proceeds would comply with that alleged obligation.  Claim ¶¶ 185-86.  NNI is thus left without notice of what its obligations were under the alleged agreement(s), and what conduct constituted the claimed breach.

## VI.
## <u>NNUK'S CLAIMS RELATING TO TRANSFER PRICING, INTERCOMPANY LOANS, AND PRE-PETITION ASSET SALES ARE TIME-BARRED</u>

**A.    NNUK Provides No Basis to Avert Dismissal of Its U.S. State Law Claims**

The Movants' Opening Brief established that NNUK's state common law claims are governed by at most a four-year statute of limitations.  Mot. at 57 n.74.  As a consequence, the entirety of NNUK's aiding and abetting and conspiracy claims grounded in its transfer pricing allegations are time-barred, as are significant portions of its state law claims relating to the NNUK Intercompany Loans and unspecified Pre-Petition Asset Sales.  This alone significantly

winnows NNUK's claims, both as to the dollar amount sought, and to define the scope of further proceedings (if any).

As to these state law claims, NNUK predicates its Response on the premise that <u>all</u> of its claims are governed by a six-year statute of limitations established by English law.  <u>See</u> Opp. at 88-89.  NNUK appears to base this argument on the internal affairs doctrine, but even if applicable, that would require application of the substantive law of the jurisdiction of incorporation in toto – thus eliminating the state law claims alleged.  NNUK provides no basis, nor is there any, to apply an English statute of limitations to U.S. state law claims brought in a U.S. court.

Addressing when the claims arose, NNUK "do[es] not concede" that its transfer-pricing claims arose upon entry into the MRDA (Opp. at 88), but it fails to address any of the governing authorities in the Motion that dictate that result.  <u>See</u> Mot. at 77.  NNUK's argument that the date of accrual of those claims is a question of fact (Opp. at 88 n. 103) also fails given that the dates of entry into the MRDA and the NNUK Intercompany Loans are established by NNUK's Claim. <u>See</u> Claim ¶¶ 39, 62.

Specifically, NNUK pleads that the MRDA was entered into in December 2004.  Claim ¶ 39.  Under either Delaware or Texas law,[78] resulting state law claims for aiding and abetting (claim 6) are governed by at most a four-year statute of limitations, and were thus time-barred in December 2008 – before the Petition Date.  State law claims for conspiracy (claim 7) are governed by an even shorter three-year limitations period, and were time-barred no later than December 2007.  These claims must be dismissed in their entirety.

Similarly, the relevant NNUK Intercompany Loans were entered into in December 2003,

---

[78]    NNUK does not dispute that Delaware law imposes a three year statute of limitations for both aiding and abetting and civil conspiracy claims, while Texas applies a two-year statute of limitations to conspiracy claims and either a three or four year time bar to aiding and abetting claims.  Mot. at 76-78.

October 2004, and April 2005.  Claim ¶ 62.  Under either Delaware or Texas law, resulting

conspiracy claims would carry a maximum of a three year statute of limitations, such that

NNUK's state conspiracy claims based on such transactions (claim 11) became time-barred no

later than December 2008.  Claim 13 – for aiding and abetting as to the NNUK Intercompany

Loans – is similarly time-barred in part, as any claims based on the December 2003 and October

2004 loans, which became time barred no later than December 2008.

Finally, while NNUK fails to identify the Pre-Petition Asset Sales on which it bases the

aiding and abetting allegations in claim 31, that cause of action is governed by at most a four-

year statute of limitations.  Assuming that the January 2009 Petition Date operated to toll such

claims (which as set forth below, it did not), allegations based on any Pre-Petition Asset Sales

that pre-date January 2005 also are time-barred.

All such claims can be dismissed before even reaching application of Delaware's

borrowing statute or Section 108(c).[79]

**B.**      **Delaware's Borrowing Statute Should Apply to the Remaining Claims**

Recognizing the dispositive effect of Delaware's borrowing statute, NNUK urges that

this Court depart from its literal terms, either by resort to the internal affairs doctrine, or because

the forum shopping concerns that underlie the borrowing statute are supposedly absent.  Each of

these arguments should be dismissed.  First, under well-established precedent, statutes of

limitations are procedural – not substantive – such that the internal affairs doctrine is

inapplicable on its face.  Norman v. Elkin, Civil Action No. 06-005-JJF, 2007 WL 2822798, at

*3 (D. Del. Sept. 26, 2007).  Moreover, even if the internal affairs doctrine could vary the

application of Delaware's borrowing statute, it has no application to NNUK's claims for

---

[79]      Burger v. Level End Dairy Investors, 125 B.R. 894, 901 (Bankr. D. Del. 1991) ("[I]f the period has already expired before the bankruptcy petition was filed, then [Section 108(c)] does not operate to preserve the cause of action.").

conspiracy,[80] quasi-contract, unjust enrichment, or unconscionable / knowing receipt.  Nor can

NNUK maintain its position that the borrowing statute should not be applied here because there

is no threat of forum shopping.  By its plain terms, if a cause of action is time-barred under

Delaware's statute of limitations, no consideration of non-Delaware law, or the purposes behind

the borrowing statute, should be required.  See Burrell v. AstraZeneca LP, C. A. No. 07C-01-

412(SER), 2010 WL 3706584, at *4 (Del. Super. Ct. Sept. 20, 2010).  Similarly, neither the

bankruptcy context of the case, nor the effect of the automatic stay, present sufficient reason to

depart from the well-established application of the forum state's borrowing statute.[81]  As such,

Delaware's three year statute of limitations governs all of NNUK's English law claims.  This

renders the English-law transfer-pricing causes of action that accrued in December 2004 (claims

2, 3, 4 and 5) untimely in their entirety.  It also eliminates additional allegations relating to

NNUK Intercompany Loans that were extended prior to January 2005 from the English law

causes of action asserted in claims 8, 9, and 10.[82]  Finally, even assuming that the tolling

provisions of Section 108(c) apply, application of the borrowing statute alone bars those portions

of claims 28 and 30 arising from any Pre-Petition Asset Sales completed prior to January 2005.

## C.      Section 108(c)

The tolling provisions of Section 108(c) are inapplicable on their face to NNUK's

claims.  By its plain text, Section 108(c)'s tolling provisions are triggered only if "applicable

---

[80]      NNUK ignores that courts uniformly reject application of the internal affairs doctrine to conspiracy claims.
See Asarco LLC v. Ams. Mining Corp., 382 B.R. 49, 74 n.14 (S.D. Tex. 2007) (holding internal affairs doctrine
inapplicable to conspiracy claims where "unlike the issue of breach of fiduciary duty, a claim for conspiracy
presupposes two different persons and/or entities and by definition would not be limited solely to the internal affairs
of one corporation"); FoodComm Int'l v. Barry, 463 F. Supp. 2d 818, 830 (N.D. Ill. 2006); see also Opp. at 88.

[81]      See Mot. at 75 n.75; see also Med Mut. of Ohio Inc. v. Braintree Labs., Civ. No. 10-604-SLR, 2011 U.S.
Dist. LEXIS 74996, at *18 (D. Del. July 12, 2011) (rejecting argument that plaintiff should be excused from the
borrowing statute where pre-existing litigation meant "it was bound to litigate here").

[82]      Because both Delaware and Texas apply a three-year statute of limitations to claims for conspiracy, the
borrowing statute renders claim 12 untimely to the extent based on NNUK Intercompany Loans extended prior to
January 2006.

nonbankruptcy law . . . fixes a period for commencing or continuing a civil action in a court *other than a bankruptcy court* on a claim against the debtor." 11 U.S.C. § 108(c). See McCoy v. Grinnell (In re Radcliffe's Warehouse Sales, Inc.), 31 B.R. 827, 831 (Bankr. W.D. Wash. 1983) (applying Section 108 "where the creditor is hampered from proceeding outside the bankruptcy court, due to the provisions of the [automatic stay].").  NNUK was free to bring claims against NNI in the bankruptcy court.  Indeed, NNUK did assert claims relating to transfer pricing in its Placeholder Claim in September 2009.  No provision of applicable non-bankruptcy law prevented NNUK from doing so with respect to its claims based on the NNUK Intercompany Loans and Pre-Petition Asset Sales, which it asserted for the first time in June 2011.[83]  Section 108(c) thus cannot salvage NNUK's claims relating to the Alcatel Sale (claims 28, 29, and 30), or the NNUK Intercompany Loans dated December 2006 or September 2007 which expired during the term of the Debtors' cases.[84]

## CONCLUSION

WHEREFORE, the Movants respectfully request that the Court (i) grant the Movant's Motion; (ii) overrule the objections set forth in the Opposition; (iii) enter the proposed order attached to the Motion disallowing and expunging with prejudice claims 2 through 35 asserted in claim number 7786 (and to the extent it is not superseded and replaced by claim 7786, claim 5122); and (iv) grant such other and further relief as the Court deems just and proper.

---

[83]     Indeed, while NNUK asserts that its Claim merely describes its Placeholder Claim with greater specificity, NNUK fails to refute NNI's authorities demonstrating that such the Placeholder Claim's generic reference to "intercompany dealings, trading and other arrangements or agreements between [NNI and NNUK]" was insufficient to place NNI on notice or to encompass its current claims.  See Opp. at 90-91; Mot. at 79-80.  In particular, NNUK ignores that its Placeholder Claim was limited to agreements between NNI and NNUK, which on its face is inapplicable to the NNUK Intercompany Loans, to which NNI admittedly was not a party.

[84]     Just as the Court should reject NNUK's attempts to expand foreign law into unchartered waters, the application of equitable tolling must fail, as NNUK concedes that equitable tolling has never been recognized under Delaware law.  See Opp. at 91-92 (citing In re Marvel Entm't Grp, Inc., 273 B.R. 58, 74 (D. Del. 2002)).

Dated:  October 5, 2011                CLEARY GOTTLIEB STEEN & HAMILTON LLP
         Wilmington, Delaware

Deborah M. Buell (admitted *pro hac vice*)
Howard S. Zelbo (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*

- and -

AKIN GUMP STRAUSS HAUER & FELD LLP

Fred Hodara (admitted *pro hac vice*)
David Botter (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

- and -

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Christopher M. Samis*
Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile: (302) 651-7701

*Counsel for the Official Committee*
*of Unsecured Creditors*