IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

*In re*

Nortel Networks Inc., *et al.*,

Debtors.

Chapter 11

Case No. 09-10138 (KG)

Jointly Administered

**REPLY DECLARATION OF MICHAEL TODD Q.C. IN
FURTHER SUPPORT OF JOINT OBJECTION AND MOTION
TO DISMISS CLAIMS OF NORTEL NETWORKS UK LIMITED**

I, Michael Todd Q.C., hereby declare as follows, pursuant to 28 U.S.C. § 1746:

1. I submit this reply declaration in further support of the Joint Objection and Motion to Dismiss Claims of Nortel Networks UK Limited ("NNUK" and the "Motion" respectively) and in response to the Declaration of Philip Marshall QC in Opposition to Joint Objection and Motion to Dismiss Claims of Nortel Networks UK Limited, dated 13 September 2011 (the "Marshall Decl."). Except as otherwise indicated, all capitalized terms used herein shall have the same meaning as in my opening declaration dated 15 July 2011 (the "First Todd Decl.").[1]

**A.    Introduction**

2. The purpose of this declaration in reply is to highlight and respond to the principal issues under English substantive law that arise out of Mr. Marshall's declaration. I have not sought to identify and respond to every point in issue between Mr. Marshall and me on our respective declarations. Nor do I propose to respond to those parts of Mr. Marshall's declaration which contain argument. To the extent I do not respond to anything said in Mr. Marshall's declaration, this should not be construed as acceptance of Mr. Marshall's position.

3. The following sections address each of NNUK's claims. The penultimate section concerns the defense of *ex turpi causa*, which operates to bar almost all of NNUK's claims. Within each section, I identify the areas where Mr. Marshall and I agree. Where we disagree, I respond to Mr. Marshall's critique of my position. I also point out, where relevant, those instances where Mr. Marshall appears to misunderstand, or does not accurately summarise, my position on a particular issue.

---

[1]     I note that my first declaration contained a typographical error in that it stated that I have been Vice-Chairman of the Bar Council since January 2001. First Todd Decl. ¶ 1. The correct date is January 2011.

4.      By way of a general introductory comment, I note that Mr. Marshall refers in several places to the developing state of English law.  I accept (and I anticipate that this is common ground between Mr. Marshall and me) that English law develops incrementally because of the doctrine of precedent.  I do not accept, however, that English law has developed precisely as described in Mr. Marshall's declaration and I explain below where I disagree with Mr. Marshall's opinion on this point.

**B.      Breach of Fiduciary Duties – De Facto or Shadow Director**

5.      The distinction between the 'de facto' and 'shadow' director tests is explained in my first declaration.  Mr. Marshall appears to agree with me that these concepts are distinct, but seeks to extrapolate from the fact that, as I accept and said in my first declaration, the two are not mutually exclusive, to suggest a greater overlap than the case law warrants in my view.  The fiduciary duties which accompany them (if at all, in the case of shadow directors) are also different.  The case to which Mr. Marshall principally refers (*Holland*) supports and did not change the test I outlined.  The factors I outlined which a court will take into account were also cited in that case without disapproval.

**B.1     De Facto Director – The Proper Test**

6.      On the issue of de facto directors, Mr. Marshall:

        6.1      asserts that the law governing what constitutes a de facto director is governed by *Holland v Revenue & Customs Commissioners* [2011] 1 All ER 430 (Marshall Decl. ¶ 18);

        6.2      questions my reliance in my first declaration on *Gemma Ltd v Davies* [2008] 2 BCLC 281 and other pre-*Holland* authority, such as *Re Richborough Furniture Ltd* [1996] 1 BCLC 507 and *Re Kaytech International plc* [1999] 2 BCLC 351 (Marshall Decl. ¶¶ 18 (re *Gemma*), 21.4 (re *Richborough*) and 21.5 (re *Kaytech*)); and

        6.3      identifies as the test of de facto directorship laid down in *Holland* "whether the person assumed a role sufficient to impose on him a fiduciary duty" (Marshall Decl. ¶ 21.5).

7.      Although Mr. Marshall discusses and quotes from *Holland* at length (Marshall Decl. ¶¶ 18-20), I do not consider that on proper analysis there is much disagreement between us in substance on the test for a de facto director.

8.      Mr. Marshall appears to suggest that *Holland* represents an entirely new test for a de facto director and that the tests laid down in pre-*Holland* authority are no longer applicable.  (Marshall Decl. ¶¶ 18, 21-21.5)  I do not accept that is the case.

9.      As to *Holland*:

        9.1      Contrary to what Mr. Marshall appears to suggest in paragraphs 18 and 21 of his declaration, I did not overlook *Holland* for the purposes of my first declaration.  I

was familiar with it (more usually referred to as *Re Paycheck Services 3 Ltd*) and considered it.

9.2     The issue in *Holland* was a narrow one – namely, where an individual is a director of a company (A) which is a corporate director (and sole director) of another company (B), the question arises whether that individual is a de facto director of B:

"The question is whether fiduciary duties can be imposed, in relation to a company [(B)] whose sole director is a corporate director [(A)], on [an individual] director of that corporate director [(A)] when all of his relevant acts were done as a director of the corporate director [(A)] and can be attributed in law solely to the activities of the corporate director [(A)]".[2]

That factual scenario is different from the allegations set out in the Amended Proof of Claim.

9.3     The decision in *Holland* (by a 3:2 majority) was that: (i) Mr. Holland had done no more than discharge his duties as the director of the corporate director of the subject companies; (ii) it did not follow from the fact that he was taking all the relevant decisions that he was part of the corporate governance of the subject companies or that he assumed fiduciary duties in respect of them or that he was a de facto director of them; and (iii) he was therefore not liable under section 212 of the Insolvency Act 1986.[3]

9.4     The ratio in *Holland* is that: on the question whether an individual director of a corporate director (A) of another company (B) should be considered as a director of company (B), the guiding principle is that so long as he performed relevant acts entirely within the ambit of the discharge of his duties and responsibilities as director of the corporate director (A), it is to that capacity that his acts have to be attributed; and that attribution of his acts to company (A) may preclude a finding that the individual is a de facto director of B.[4]  Again, that ratio is not directly applicable to the Amended Proof of Claim.

9.5     I agree that the judgments in *Holland* contain the dicta set out in paragraphs 19 and 20 of Mr. Marshall's declaration.

9.6     I also agree that the judgments in *Holland* review earlier authority on the test for a de facto director.

9.7     Where I disagree with Mr. Marshall is as to the extent to which the pre-*Holland* authority remains relevant to the test of a de facto director.  Mr. Marshall suggests

---

[2]     Per Lord Collins at [53].

[3]     *See* Palmer's Company Law, Vol 2, ¶ 8.214, p 8020.

[4]     *See id.*

that the tests laid down in *Richborough* and *Kaytech* are no longer relevant. (Marshall Decl. ¶¶ 21.4-21.5)

9.8    I consider that the pre-*Holland* authorities and tests referred to in my first declaration remain relevant, are consistent with *Holland* and indeed are applied by the judgments in *Holland*.

10.    As to *Gemma v Davies*:

10.1    I referred to *Gemma v Davies* for a number of reasons:

(i)    it contains a useful, succinct summary of the relevant principles and authorities;

(ii)    the analysis is a broadly based one which identifies general principles – in contrast to the analysis in *Holland*, where the examination of the principles and authorities is very much tied to the particular facts of the case (paragraphs [9.2] and [9.4] above).

10.2    My approach follows that of the principal company law commentators, which consider *Gemma v Davies* as providing a useful overview of the relevant principles, before they turn to consider *Holland*: for example, Gore-Browne on Companies, 45th ed, para 15[2] describes the relevant principles and authorities for the test of a de facto director, stating that in *Gemma* "the following were helpfully summarised as the tests to determine this question"; and Palmer's Company Law, Vol 2, para 8.214, p 8019 states that *Gemma* "contains a useful overview of the authorities".

10.3    No commentator suggests that *Gemma*, or the principles and authorities summarised in it, are inconsistent with, overruled or in any way superseded by *Holland*. *Holland* does not itself question the summary of the relevant principles and authorities in *Gemma*.

11.    For the above reasons, I consider that my analysis of the principles and authorities for the test of a de facto director set out in paragraphs 39-40 of my first declaration is correct and is consistent with *Holland*.

### B.1.a    Response to Particular Points as to English Law on De Facto Directors

12.    In paragraph 20 of his declaration, Mr. Marshall quotes at length from the judgment of Lord Collins in *Holland*, including his conclusion at [91] that de facto and shadow directorships are not mutually exclusive. I agree with that conclusion. (*See* ¶ [5] above and First Todd Decl. ¶ 52) However, each of the doctrines has a different legal nature, as explained further in Section B.3.

13.     As Mr. Marshall notes,[5] the test for a de facto directorship is variously stated as whether the person: "assumed office as a director" (per Lord Hope at [29]), "assumed the duties of a director" such that he is "part of the corporate governing structure" (per Lord Collins at [93]), "assumed a role in the company sufficient to impose on him a fiduciary duty to the company and to make him responsible for the misuse of its assets" (per Lord Collins at [93] relying on *Fayers Legal Services Ltd v Day*) or "assumed a role sufficient to impose on him a fiduciary duty" (per Marshall Decl. ¶ 21.5).  I accept that the final sentence of paragraph 21.1 of Marshall's declaration appropriately summarises the "assumption of office" test, but still it does not identify the type of act which would satisfy the assumption of office test.

14.     Neither Lord Hope nor Lord Collins in *Holland* identifies the criteria by which it is determined that a person has assumed office or duties or a role sufficient to impose a fiduciary duty on him and render him a de facto director.  Nor does Mr. Marshall's declaration.

15.     In my opinion, earlier authorities which were cited with approval (or without disapproval) in *Holland* continue to provide the indicia of when a de facto directorship is assumed – for example, the "equal footing" test in *Hollier* and *Richborough* and the "real influence" test in *Kaytech*.  (First Todd Decl. ¶ 40(iv), 40(v))  Also, courts look to whether a parent has undertaken functions in relation to the company which could properly be discharged only by a director.  (First Todd Decl. ¶ 40(i))  Consistent with this, the commentaries do not state that the earlier authorities are no longer good law.  The commentaries also suggest that for a parent to be a director, there needs to be an assumption of the day-to-day running of the business.[6]

16.     Mr. Marshall refers to the term "de facto director" as "hav[ing] a different meaning depending on the context".[7]  It is difficult to understand precisely what is meant by that assertion.  Whichever of the "assumption of office" formulations (paragraph [13] above) is correct, the <u>test</u> should be the same as should the meaning of "de facto director" in each context – i.e. whether the person assumed the office, duties or role of a director sufficient to impose on him fiduciary duties.

---

[5]     *See* Marshall Decl. ¶ 19 (which quotes the judgment of Lord Hope in Holland at [39]), ¶ 20 (which quotes the judgment of Lord Collins in *Holland* at [93]), ¶ 21.1.

[6]     *See* Goode, Principles of Corporate Insolvency Law, 4th ed, ¶ 14-05, pp 643-646:  *"[A] parent company is not taken to be a director, or to be responsible on other grounds for the management of its subsidiary, merely because as parent it controls the composition of the subsidiary's board of directors or because members of the parent board are also directors of the subsidiary or because the parent imposes on the subsidiary budgetary rules or operational guidelines within which the subsidiary  is required to conduct its business or stipulates that certain decisions taken by the directors of the subsidiary exercising their own independent discretion and judgment require the parent's approval.  More direct assumption of the day-to-day running of the business is required before the parent can be treated as a director of the subsidiary, and assertions that a company is a de facto director of its subsidiary are infrequently made and rarely successful."*

[7]     Marshall Decl. ¶ 20 (quoting Lord Collins at [93]), ¶ 21.

17.     In other words, the actions of the person are assessed to determine whether the test is satisfied – i.e. whether there was a sufficient assumption of an office or role so as to give rise to fiduciary duty.  That test does not change, but the effect of it will change depending on the factual circumstances.  In my opinion, this is what Lord Collins meant when he referred to the possibility of a different meaning for a de facto director depending on the context.

18.     Mr. Marshall takes issue with the summary of the relevant principles and authorities for the test of a de facto director in paragraphs 39-40 of my first declaration.  (Marshall Decl. ¶¶ 21-21.2, 21.4-21.5 )  I deal with these briefly below.

19.     Paragraph 21.2 of Mr. Marshall's declaration criticises paragraphs 39 and 40(i) of my first declaration as an incorrect attempt to formulate a single test for all circumstances for a de facto directorship.  That is not correct and mischaracterizes paragraphs 39, 40(i), and 40(iv)-(vi) of my first declaration.[8]  Those paragraphs set out indicia of a de facto directorship, where that office or role or sufficient level of responsibility has been assumed, derived from the pre-*Holland* authorities.  The judgments in *Holland* (in particular that of Lord Collins) cite the earlier authorities, without disapproving or overruling them.

20.     In paragraph 39 of my first declaration I referred to the requirement of the test for a de facto director that the Claimant must show that the person (a) occupied a place in the corporate governance structure of the company; or (b) that he undertook functions in relation to the company that could only be undertaken by a director of it.  Mr. Marshall challenges this.  (Marshall Decl. ¶¶ 21.1, 21.2)  I consider that the test set out in paragraph 39 of my first declaration is correctly stated and not undermined in any way by *Holland*:

        20.1     Requirement (a) is the very test approved by Lord Collins in *Holland* at [93], where he refers to *Fayers Legal Services Ltd v Day*.

        20.2     Requirement (b) is taken from Lord Millett in *Re Hydrodam* at 183.  That passage was quoted in *Holland* by Lord Hope at [29] and Lord Collins at [86] (and see also [93]).  Lord Clarke (dissenting) at [128] is to the same effect.

21.     In summary, Lord Hope at [29] interprets this as a test "whether the individual assumed office as a director", as does Lord Collins at [93].  I do not consider that there is any difference between the formulations "undertaking functions" as a director in *Hydrodam* and my first declaration, "assumption of office" in *Holland* or "assumption of a role" in *Fayers*.

22.     In paragraph 40(iv) of my first declaration, I referred to the "equal footing" requirement of the test for a de facto director, which was set out in *Richborough*, explained by Etherton J in *Secretary of State for Trade and Industry v Hollier* [2007] Bus LR 352 at

---

[8]     Mr. Marshall agrees with paragraphs 40(ii)-(iii) of my first declaration, which state that it is not a requirement that a de facto director be held out as a director.  Marshall Decl. ¶ 21.3.

[68]-[69] and identified with approval in *Gemma*.  In paragraph 21.4 of his declaration, Mr. Marshall challenges this also as an attempt to impose a single test for a de facto director for all circumstance: that criticism is rejected for the reasons set out in ¶ [19] above.[9]  I also referred to the elements of the de facto director test laid down in *Kaytech* – namely, whether the person assumed the status and functions of a director and whether he exercised "real influence" in the corporate governance of the company.  (First Todd Decl. ¶ 40(v))

23.     Mr. Marshall claims (Marshall Decl. ¶¶ 21.4 and 21.5) that Lord Collins declined to apply either the "equal footing" test laid down in *Richborough*, or the "real influence" test applied in *Kaytech*, but Mr. Marshall cites no reference to Lord Collins' judgment where he so declined.  I do not read his judgment in that way: Lord Collins described both *Richborough* and *Kaytech* as "notable development[s]" (at [89]) and among the "most relevant" tests (at [91]) and appears to have approved them.  In my opinion, the "equal footing" and "real influence" requirements for a de facto director referred to in paragraphs 40(iv) and (v) of my first declaration apply and are unaffected by the decision in *Holland*.[10]

**B.1.b    Response to Particular Points on NNUK's Factual Allegations on De Facto Director**

24.     Paragraphs 23-25.3 of Mr. Marshall's declaration state that: NNUK's allegations are that NNI so controlled the business of NNUK that NNI assumed the role of director of NNUK; that is a "highly fact sensitive matter"; and an English court would treat it as a matter which should be tried and which is wholly unsuited for determination on an application to strike out.  For the reasons set out in my first declaration, I do not agree: I consider that an English court would regard NNUK's allegations as insufficiently pleaded to proceed to trial.

25.     Paragraph 25.2 of Marshall's declaration criticises my opinion in paragraph 45 of my first declaration as to the inadequacy of NNUK's pleaded case, on the grounds that my opinion is based on the wrong test for a de facto directorship, which is now that laid down in *Holland*.  That criticism is addressed above.  In summary: I do not accept that *Holland* imposes a new test for a de facto director; the test has not changed; *Holland* did not criticise or overrule cases such as *Richborough*, *Hollier* and *Kaytech* or the concepts of "equal footing" or "real influence" which they considered; and those considerations remain relevant in determining whether the "assumption of office" test is satisfied so as to give rise to a de facto directorship.

---

[9]     However, in this context, I accept the qualification in paragraph 21.4 of Mr. Marshall's declaration that the "equal footing" test does not require absolute parity of responsibilities between directors and that there may be circumstances in which one director defers to another.  I accept the statement of principle in *Ashby* quoted in paragraph 21.4 of Mr. Marshall's declaration: the same quotation from *Ashby* explaining *Richborough* is set out in *Hollier*, to which I referred in my first declaration.  First Todd Decl. ¶ 40(iv) fn 10.

[10]    Paragraphs 21.3 (no requirement that a person be held out as a director to be a de facto director), 21.6 (the benefit of any doubt as to whether a person's acts are referable to an assumed directorship) and 22 (the imposition of fiduciary duties on a de facto director and agency considerations) of Mr. Marshall's declaration all concern areas where my first declaration and Mr. Marshall's declaration are in agreement or substantially in agreement and I do not consider them further in this declaration in reply.

**B.2**     **Shadow Director – The Proper Test**

26.    Paragraph 29 of the Marshall Declaration describes the "essential question" for the test of whether NNI was a shadow director as "whether it exercised real influence in the corporate affairs of NNUK".  I agree.  That statement accords with paragraphs 48 and 49 of my first declaration and with the dictum of Robert Walker LJ in *Kaytech* [1999] 2 BCLC 351 at 424.  To demonstrate that this essential question has been satisfied, NNUK must demonstrate – as Section 251(1) of the Companies Act 2006 requires – that NNUK's directors acted in accordance with the directions or instructions of NNI, and were accustomed to do so. (First Todd Decl. ¶¶ 47, 49)

27.    Paragraph 30 of Mr. Marshall's declaration deals with section 251(3) of the Companies Act 2006 and the question whether a subsidiary may be a shadow director of a fellow subsidiary of a common parent (i.e. a sister company).  There is some agreement between us on the effect of section 251(3) of the Companies Act 2006 – i.e. the need for there to be "something more" in the conduct of a parent company to take it outside the protection against shadow directorship afforded by that section.  (First Todd Decl. ¶ 51)

28.    However, Mr. Marshall disagrees with paragraph 68 of my first declaration that a sister company may be protected against liability as a shadow director in the same way as a parent may be, but he mis-states what I said in paragraph 68 of my first declaration. (Marshall Decl. ¶¶ 30, 35.3)

28.1    Mr. Marshall suggests that I stated that the protection afforded by section 251(3) to a parent company which gives instructions to a subsidiary applies "by analogy" to prevent a subsidiary from being held to be a shadow director of a fellow subsidiary.  I did not so state.

28.2    What I stated in paragraph 68 was that the *rationale* for giving the protection to the parent company applies equally as between sister subsidiaries where the only basis for suggesting that one sister subsidiary may be a shadow director of the other is the existence of that common control.

28.3    In other words, if two companies have a common parent and that parent directs or instructs one subsidiary to give directions or instructions to the other subsidiary, the parent company is protected against shadow directorship of either subsidiary by section 251(3); and the subsidiary which gives the directions to the other should equally not be a shadow director of the other.

28.5    If the parent company is not liable as a shadow director in those circumstances, the subsidiary which is involved in the giving of the directions or instructions only as a result of its control by the parent ought not itself to be liable.

28.6    Mr. Marshall states further that even if the principles of Section 251(3) apply by analogy where a sister corporation is alleged to be a shadow director based on the existence of common control, the allegations in the Amended Proof of Claim are not predicated solely on common control.

29.     In fact, in the Amended Proof of Claim NNUK's case is predicated on the basis that NNL involved NNI in various intercompany transactions between NNL and NNUK and then imposed those transactions on NNUK.[11]  Mr. Marshall (in paragraph 35.3 of his declaration) points to paragraph 64 of the Amended Proof of Claim, which alleges that "NNL was able to make cash repayments in relation to the NNI Loans because it did not make cash repayments in relation to the Interest Free Loan Facilities" with NNUK, the effect of which was that "NNI benefited as a result."  This allegation of an indirect benefit, however, has nothing to do with NNUK's shadow director allegations and does not change the fact that those allegations are based solely on the existence of common control by NNL.

**B.3     Distinction between De Facto and Shadow Director**

30.     Mr. Marshall also refers to *Holland* and the statement that once being held out as a de jure director is not a necessary characteristic of a de facto director, "the concept of de facto director was divorced from the unlawful holding of office" and "the distinction between de facto directors and shadow directors was eroded" (at [91]).  (Marshall Decl. ¶¶ 20, 27)

31.     I make three comments in this respect.  First, the reference to shadow directorship in *Holland* is obiter dicta since the case only concerned the concept of de facto director.[12]  Second, and in any event, Mr. Marshall agrees with me on the law.  Lord Collins' statement that the distinction between shadow and de facto directors has been eroded refers to the development, set out in my first declaration (¶ 40(ii) & fn 8), that "holding out" is not a necessary condition for the finding of a de facto director (although it is still a relevant factor).[13]  The distinction between de facto and shadow directors as a matter of English law is as set out in my first report.  In summary, although it is possible that the facts could give rise to a finding of both de facto and shadow director (more likely in succession), it is important to remember that each of the doctrines has a different legal nature and the duties applicable to them differ.  (First Todd Decl. ¶¶ 52-55)

32.     Third, for the purposes of this Motion, the extent of any overlap between de facto and shadow directors is not an issue and is irrelevant – each status must be analysed separately and the allegations in the Amended Proof of Claim can be tested against the legal standards relevant to each status.  The attempt to equate de facto directors with shadow directors seeks to circumvent the rule that shadow directors, unlike de facto directors, do not ipso facto owe fiduciary duties, to which I now turn.

---

[11]     I quoted the relevant paragraphs of the Proof of Claim in paragraph 69 of my first declaration.  For instance, in paragraphs 9-10 of the Proof of Claim, NNUK alleges, "At all relevant points the Nortel Group was operated in such a manner that cash and value were improperly removed from NNUK and the other EMEA companies and transferred to NNL…pursuant to a general policy...that value and cash within the Group should be transferred to NNL."

[12]     *Holland* at [22]:  "[I]t has not been asserted in this case that Mr. Holland was a shadow director."

[13]     *Holland* at [90].

**B.4     Duties of a Shadow Director**

33.    Mr. Marshall contends in paragraphs 31 and 32 of his declaration that *Yukong Line Ltd v Rendsburg Investments Corpn* (No 2) [1998] 1 WLR 294 (Toulson J), is authority for the proposition that a shadow director owes fiduciary duties and in that regard is to be preferred to the more recent judgment of Lewison J[14] in *Ultraframe UK Ltd v Fielding* [2005] EWHC 1638 [Ch], despite a number of reasons why *Ultraframe* plainly represents the law as it is.

34.    I do not accept Mr. Marshall's contentions to be correct.  In my view of the case, Toulson J in *Yukong* did not in fact find that the Defendant (i) was a shadow director of the claimant (but was referring to the position of a de facto director which he held) and (ii) thereby owed it fiduciary duties.  Further, if I am wrong in that view and Toulson J did so find, I consider that his decision was wrong as a matter of English law because it was contrary to other authority and would not now be followed by an English court.  The subsequently decided *Ultraframe* case puts the issue beyond doubt, for the reasons given below.

       What was the finding in *Yukong*?

35.    The suggestion in *Yukong* that one of the defendants (Mr. Yamvrias) was a shadow director of another defendant (Rendsburg) is devoid of any reasoning, and appears to be based on a confusion of language on the part of the learned Judge between the statutory test for shadow directorship with the test for de facto directorship.  This is clear from the relevant passage in the judgment:

> "*As to an unlawful means conspiracy, Mr Yamvrias undoubtedly owed a fiduciary duty to Rendsburg.  Although he was not formally a director, he was a "shadow director" and controlled the company's activities.  To remove the funds in Rendsburg's bank account when it had a probable liability to Yukong far in excess of its assets involved a clear breach of that fiduciary duty:* West Mercia Safetywear Ltd v Dodd *[1988] B.C.L.C. 250.  No argument was advanced that the position is different in Liberian law from English law, and indeed an agreed expert's report stated that in Liberian law* <u>a person who assumes to act in the position of a director of a corporation has a fiduciary duty towards it</u>.*"*[15]

36.    The underlined wording, on which Toulson J relied in finding that Mr. Yamvrias owed a fiduciary duty as a <u>shadow</u> director of the Claimant, actually states the test for a <u>de facto</u> director (i.e. the definition now contained in section 250 of the Companies Act 2006, formerly section 741(1) of the Companies Act 1985).  It is accepted that a de facto director owes fiduciary duties to the company of which he is a director.

---

14       Lewison LJ was appointed to the Court of Appeal with effect from 04.10.11.

15       *Yukong* at 311B (emphasis added).

37.    It seems that Toulson J intended to find, and did in fact find, that Mr. Yamvrias was a <u>de facto</u> director of the Claimant and thereby owed it fiduciary duties, but *mistakenly* referred to a <u>shadow</u> director:

    37.1    As Lewison J held in *Ultraframe*, the language used by Toulson J is more appropriate to a finding of de facto rather than shadow directorship. Toulson J held that Mr. Yamvrias "controlled the company's activities".[16]

    37.2    Toulson J did not anywhere find or suggest that the de jure directors of the Claimant were accustomed to act in accordance with Mr. Yamvrias' directions or instructions (which is the test for a <u>shadow</u> director under section 251(1) of the Companies Act 2006, formerly section 741(2) of the Companies Act 1985).

    37.3    Other dicta of Toulson J in the *Yukong* judgment are either ambiguous as to the type of directorship which he had in mind or suggest that he was intending to make a finding of a <u>de facto</u> rather than a <u>shadow</u> directorship:

        (i)    Toulson J found that Mr. Yamvrias would have had no defence to a claim for breach of fiduciary duty, but did not state the type of directorship which he was there considering;[17]

        (ii)    Toulson J referred to the fact that "Mr. Yamvrias had effective control over Rendsburg", which is more apt to describe a <u>de facto</u> director;[18]

        (iii)    Toulson J referred to "a company, and its only effective officer ..."; the reference to "officer" is more apposite to a de facto director.[19]

38.    There are other judgments in the *Yukong v Rendsburg* litigation, at least one of which is to the same effect. In a judgment on 1 October 1997, Toulson J held that Mr. Yamvrias was Rendsburg's "director and controlling mind".[20] That reference is more appropriate to a <u>de facto</u> director.

<u>Was Yukong correctly decided?</u>

39.    If, contrary to the above, Toulson J in *Yukong* did in fact find that the Defendant (i) was a shadow director of the Claimant and (ii) thereby owed it fiduciary duties, I consider that his conclusion in (ii) was incorrect as a matter of English law.

40.    There is no other English authority which holds that a shadow director owes fiduciary duties without more.

---

[16]    *Ultraframe* at [1283]-[1284].

[17]    *Yukong* at 314G.

[18]    *Yukong* at 314H.

[19]    *Yukong* at 315A.

[20]    *Yukong Line Ltd v Rendsburg Investments Corpn* [2000] EWCA Civ 358, [2001] 2 Lloyd's Rep 113 (CA) at [13] per Potter LJ.

41.    Lewison J held in *Ultraframe* that a shadow director does not ordinarily owe such duties. (First Todd Decl. ¶ 60 & fn 21)

42.    If *Yukong* and *Ultraframe* are in conflict on this point (as Mr. Marshall suggests at paragraphs 31 and 32 of his declaration, but which I would not accept for the reasons given above), the decision in *Ultraframe* is to be preferred for the following reasons:

42.1    Significantly, *Yukong* was cited to Lewison J in *Ultraframe*, but Lewison J refused to follow it.[21]

42.2    Lewison J's reasoning is persuasive.

(i)    A shadow director may give directions or instructions to a company's de jure or de facto directors to act in a way which is inimical to the company's interests.  It is difficult to see why in those circumstances the shadow director can or should be the subject of the full range of fiduciary duties, including the duty of loyalty.

(ii)    The width of the definition of a shadow director makes it more difficult to impose on such a director the full range of fiduciary duties imposed on a de jure or a de facto director.

(iii)    "[A]t least one distinguished academic commentator"[22] (Pennington Company Law 7th ed, p 712) considers that a shadow director is not subject to fiduciary duties.

Mr. Marshall does not address that reasoning of Lewison J.

42.3    Other commentators are of the same view – namely, that as a matter of English law, shadow directors are not generally subject to the same fiduciary duties as de jure directors, and cite *Ultraframe* as authority for that proposition.[23]

42.4    Significantly, the Claimant in *Ultraframe* sought *specifically* to appeal Lewison J's judgment on this point.  Paragraph 115 of the Grounds for Appeal dated 1 December 2005 stated:

*"(1) The Judge erred in law in holding that shadow directors do not, without more, owe the same fiduciary duties as de facto directors: ¶1258-1291.  The Judge's holding that one who directs the company's business himself owes fiduciary duties but one who directs the company's business through others does*

---

[21]    *Ultraframe* at [1283]-[1284].

[22]    *Ultraframe* at [1284].

[23]    *See, e.g.,* Gore-Browne on Companies, 45th ed, Vol 1, para 15[2A], p 15-4, fn 12 (the leading work on English company law); Mortimore QC "Company Directors – Duties, Liabilities, and Remedies", 2008, paras 9.29-9.36, esp at 9.35; Tolley's Company Law, Vol 1, para [D3002.1], pp D30-4–D30-5; Sinclair, Vogel and Snowden QC "Company Directors: Law and Liability", para 4.9, p 4/10.

*not, is without any merit, was not required by the authorities, and ignores the inherent fairness and flexibility of equity.*"

42.5    The Court of Appeal (Waller and Jacob LJ) refused permission to appeal on that Ground (indeed, on all Grounds of Appeal against the main judgment).[24]  Thus, the issue was specifically considered by two Court of Appeal Judges, who concluded not only that the judgment should not be disturbed, but that it did not even reach the threshold for consideration by the full Court of Appeal.

42.6    Accordingly, Lewison J's finding on this point is final and binding.

42.7    Mr. Marshall does not mention the fact or effect of the unsuccessful application for permission to appeal.

42.8    Mr. Marshall questions the reliance of Lewison J in *Ultraframe* on trust principles, and suggests that it is appropriate to subject a shadow director to the full range of fiduciary duties by analogy with a "trustee de son tort".  (Marshall Decl. ¶¶ 32.5, 32.6)  Again, I do not accept that proposition as correct in law, nor as relevant in these circumstances, as Lewison J explained.  A "trustee de son tort" assumes liability because he possesses and directly controls trust property. Lewin on Trusts, 18th ed, ¶¶ 42-74, p1773, states that a person may become "a trustee *de son tort* and he may be called to account by the beneficiaries for the money he has received under the colour of the trust.  A trustee *de son tort* closely resembles an express trustee." (emphasis added).

It is only where the shadow director takes possession of, directly controls or deals with the company's property that he will become subject to fiduciary duties, in which case his position is then akin to that of a "trustee de son tort" but not before.[25]

## B.4.a    Sections 170(5) and 251(3) of the Companies Act 2006: the Statutory Framework

43.    In paragraphs 32-32.3 (in particular, paragraph 32.2) of his declaration, Mr. Marshall argues that the effect of sections 170(5) and 251(3) of the Companies Act 2006 is that even if *Ultraframe* were correctly decided, since the Companies Act 2006, shadow directors have been subject to the general duties in sections 171-177.  In my opinion, that is not correct: the assertion misinterprets the statutory framework in the Companies Act 2006.

---

[24]    [2006] EWCA Civ 1133 at [3(a)].

[25]    *Ultraframe* at [1281]-[1282], [1285]-[1291].

44.     Section 170 of the Companies Act 2006 provides as follows:

"170 Scope and nature of general duties

(1) The general duties specified in sections 171 to 177 are owed by a director of a company to the company.

(2) A person who ceases to be a director continues to be subject—

(a) to the duty in section 175 (duty to avoid conflicts of interest) as regards the exploitation of any property, information or opportunity of which he became aware at a time when he was a director, and

(b) to the duty in section 176 (duty not to accept benefits from third parties) as regards things done or omitted by him before he ceased to be a director.

To that extent those duties apply to a former director as to a director, subject to any necessary adaptations.

(3) The general duties are based on certain common law rules and equitable principles as they apply in relation to directors and have effect in place of those rules and principles as regards the duties owed to a company by a director.

(4)The general duties shall be interpreted and applied in the same way as common law rules or equitable principles, and regard shall be had to the corresponding common law rules and equitable principles in interpreting and applying the general duties.

(5) The general duties apply to shadow directors where, and to the extent that, the corresponding common law rules or equitable principles so apply."

45.     The statutory framework is as follows:

45.1    Prior to the Companies Act 2006, directors' fiduciary and other duties were owed at common law and in equity.  They were not laid down by statute.

45.2    Fiduciary duties applied to de jure and de facto directors.

45.3    Fiduciary duties did not generally apply to shadow directors, but might exceptionally do so where, for example, the shadow director personally took possession or control of a company's property.[26]

45.4    By the Companies Act 2006:

(i)     the common law and equitable duties of a "director" where codified into a statutory form or scheme in sections 171-178;

(ii)    "director" was defined in section 250;

---

[26]     *Ultraframe* at [1279-1291] at [1279, 1285 and 1288-1291].

(iii)    by that definition the statutory duties in sections 171-177 were applied to de jure and de facto directors;

(iv)    the previous common law and equitable duties ceased to apply to a "director" (ie a de jure or a de facto director) (section 170(3));

(v)    however, the statutory duties are to be interpreted and applied in the same way as, and having regard to, the corresponding common law rules and equitable principles (section 170(4));

(vi)    the general statutory duties in sections 171-177, which are expressed to apply to de jure and de facto directors, apply to shadow directors, but only where the corresponding (i.e. pre-existing) common law and equitable principles applied to shadow directors (section 170(5)).

46.    Section 170(5) therefore is a restriction on a shadow director being the subject of fiduciary duties. He will only be subject to the general statutory duties in sections 171-177 if he would have been subject to the corresponding duties which formerly applied to de jure and de facto directors at common law or in equity. It is expressly not an extension of the existing common law rules and equitable principles as they apply to shadow directors, although Mr. Marshall wrongly concludes that it is. (Marshall Decl. ¶¶ 32.1-32.3.)

47.    Prior to the Companies Act 2006, a shadow director was subject to fiduciary duties only where he did something more than giving directions or instructions to the de jure or de facto directors, such as taking personal control of property of the company.[27] The effect of section 170(5) is to continue that limitation or restriction on the imposition of fiduciary duties on a shadow director, notwithstanding the imposition of the general statutory duties on other types of directors (i.e. de jure and de facto directors) by sections 171-177. Mr. Marshall cites no authorities (and I am aware of none) showing that shadow directors have been fixed with fiduciary duties beyond the narrow category of taking control of property identified in *Ultraframe*, or that shadow directors have been fixed with fiduciary duties where they have taken control of transactions. (Marshall Decl. ¶ 35.4)

48.    The Explanatory Notes to the Companies Act 2006 confirm this.[28] Paragraph 310 of the Explanatory Notes provides that:

"*310. The statutory duties apply to shadow directors where, and to the extent that, the common law rules or equitable principles which they replace so apply (section 170(5)). This means that where a common law rule or equitable principle applies to a shadow director, the statutory duty replacing that common law rule or equitable principle will apply to the shadow director (in place of that rule or principle). Where the rule or*

---

[27]    *Ultraframe* at [1279]-[1291]; *see also* First Todd Decl. ¶ 60.

[28]    http://www.legislation.gov.uk/ukpga/2006/46/notes/division/5/30.

*principle does not apply to a shadow director, the statutory duty replacing that rule or principle will not apply either."*[29]

49.     Mr. Marshall relies on section 251(3) and asserts, wrongly, that the exception it contains which protects a parent company from being deemed a shadow director of its subsidiary is new – "[no] such exception existed under the 1985 Act". (Marshall Decl. ¶ 32.2.2)  It did.  Section 251(3) is in almost identical terms to section 741(3) of the Companies Act 1985.  Indeed, the concept or label of a "shadow director" was first introduced in section 63 of the Companies Act 1980 and the exception has existed in the companies legislation since section 63(5) of the Companies Act 1980.  No material change was made by the Companies Act 2006.  In any event, the exception does not logically offer any support for the argument that under the Companies Act 2006, fiduciary duties were extended so as generally to apply to shadow directors.

50.     Paragraph 468 of the Explanatory Notes to section 251 of the Companies Act 2006 simply states:  *"This section restates the definition of 'shadow director' in section 741(2) of the 1985 Act."*  The Explanatory Notes make it clear that section 251 is not derived from any law reform review and is not intended to reform or modify the existing law.  This can be contrasted with, for example, paragraphs 300-304 of the Explanatory Notes, which make it clear where the new Act (i) accepts and implements proposals for reform (paragraphs 301, 303 and 304) and/or (ii) departs from the current law (paragraph 302).

51.     Mr. Marshall also relies on a Law Commission paper and suggests that the Law Commission "appear to have considered that the potential liabilities of shadow and de facto directors were the same".  (Marshall Decl. ¶ 32.4)  I cannot accept that statement as relevant or as supporting the argument that a shadow director is as a matter of English law subject to the same fiduciary duties as a de jure or de facto director:

  (i)     The paper referred to was merely an earlier Consultation Paper, not the final Report, contrary to the reference given by Mr. Marshall.

  (ii)    The Final Report of The Company Law Review Steering Group "Modern Company Law For a Competitive Economy" dated June 2001, which led to the Companies Bill and ultimately the Companies Act 2006, did not adopt that position.  On the contrary, it recognised that "[t]he extension of the substantive law to shadow directors will indeed need to be considered provision by provision ...".[30]

  (iii)   In any event, and dispositively for the purposes of the point advanced by Mr. Marshall, the Companies Act 2006 did <u>not</u> include any recognition of fiduciary duties being generally applicable to shadow directors.

---

[29]     Explanatory Notes may be used as an aid to construction of an Act to identify and explain the contextual scene in which the Act is set.  *See Tarlochan Singh Flora v Wakom (Heathrow) Ltd* [2006] EWCA Civ 1103 at [15]-[17] per Brooke LJ; Bennion on Statutory Interpretation, 5th ed, section 219, pp 641-643 at 642.

[30]     Vol 1, paragraph 6.7, p 135.

**B.5     Effect of Ratification by Parent of a Solvent Company**

**B.5.a   Insolvency**

52.     Paragraph 35.5.2 of Mr. Marshall's declaration seeks to respond to paragraph 73 of my first declaration and the issue of whether NNUK has pleaded a case which is capable of resulting in a finding that NNUK was insolvent at the time of, or as a result of, the various transactions which it now seeks to challenge.  It does so in very tentative terms ("I am by no means convinced that …").

53.     In paragraph 35.5.2 of his declaration, Mr. Marshall draws together NNUK's case on its own insolvency, but in doing so, confirms that the Amended Proof of Claim does not allege facts which are sufficient to establish a case of insolvency.  My conclusion that NNUK does not allege facts which could establish insolvency at the relevant time is confirmed by the limited matters set out and relied upon by Mr. Marshall.

    53.1     First, Mr. Marshall refers to paragraphs 6-8 of the Amended Proof of Claim, which are said to "provide an account of the events leading to the insolvency". (Marshall Decl. ¶ 35.5.2)  Those paragraphs do not establish insolvency at any time prior to the administration of NNUK, nor the level of any insolvency.  They merely refer to: a fall in demand; increased competition; Group losses in 2001;[31] and a reduction in the number of employees.  None of those matters is probative of insolvency on either of the two tests which apply under English law.

    53.2     Second, Mr. Marshall refers to the "subsequent paragraphs" (i.e. following paragraphs 6-8 of the Amended Proof of Claim) which are said to "describe how losses accumulated".  (Marshall Decl. ¶ 35.5.2)  The paragraphs relied upon by Mr. Marshall are not identified.  The paragraphs following paragraphs 6-8 do not set out the amount of the losses alleged to have been sustained by NNUK at the time of the impugned transactions or in the period leading to its administration.

    53.3     Third, in any event the allegation that losses were made by NNUK is not probative of an allegation of insolvency: a company may be loss-making, but at the same time be hugely solvent on a cash-flow or balance sheet test.  Put another way, the fact that a company has made losses does not mean that its asset-cover (i.e. the excess of its assets over its liabilities) has been reduced to the extent of being extinguished.

    53.4     Fourth, Mr. Marshall gives as an "example"[32] of losses (presumably of NNUK) a reduction of $628.9 million in the sums owed to NNUK in return for illiquid assets, the value of which allegedly depended on the continued trading of the Nortel Group at a time when it was "in a parlous financial state".  (Marshall Decl. ¶ 35.5.2)  No other paragraphs are identified.  The amount of the alleged loss of

---

[31]     No explanation is given as to why 2001 is singled out for mention when the impugned transactions occurred several years later and administration orders were not made until 2009.  The fact that a loss was made does not establish insolvency on either of the two tests which apply under English law.

[32]     Set out in ¶ 72 of the Amended Proof of Claim.

value to NNUK is not stated.  The alleged "parlous financial state" of the Nortel Group is not explained.  Even if there were a loss in value to NNUK as a result of Project Swift, paragraph 72 of the Amended Proof of Claim does not prove cash-flow or balance sheet insolvency.

54.    There are two tests for insolvency under English law – neither of which Mr. Marshall addresses – namely:

54.1    "cash-flow insolvency" or "commercial insolvency", which is defined in section 123(1)(e) of the Insolvency Act 1986 as where "the company is unable to pay its debts as they fall due", and

54.2    "balance sheet insolvency", which is defined in section 123(2) of the Insolvency Act 1986 as where "the value of the company's assets is less than the amount of its liabilities, taking into account its contingent and prospective liabilities".

55.    The test for "cash-flow insolvency" or "commercial insolvency" in section 123(1)(e) of the Insolvency Act 1986 requires an analysis of the company's debts at the time of the impugned transaction and the company's ability to discharge those debts when properly required to do so.  The Amended Proof of Claim does not contain that information and does not enable the "cash-flow insolvency" test to be applied at the time of any of the impugned transactions, much less going back to 2001, with the result that NNUK has not alleged and is not capable of satisfying the first test of insolvency for any time prior to its administration in January 2009.

56.    In *BNY Corporate Trustee Services Ltd v Eurosail* [2011] EWCA Civ 227 the Court of Appeal considered "balance sheet insolvency" test.  It held that it only applies where the company is at the "point of no return" because of an incurable deficiency in its assets rather than a "mechanical" assets-based assessment (at [48]-[49], [58]).

57.    To determine whether that test is satisfied at any point in time (here being the date of the transactions now impugned by NNUK) requires a determination of NNUK's assets, its liabilities (including its contingent and prospective liabilities) and whether it has reached "the point of no return".  That information simply is not set out in the Amended Proof of Claim.  It is impossible on NNUK's pleaded allegations to apply the "balance sheet insolvency" test.  NNUK could not establish on its pleaded case that NNUK was insolvent at the time of the impugned transactions applying the balance sheet test.

58.    In summary, I consider that: (i) the Amended Proof of Claim does not allege sufficient facts which (if proven at trial) could establish the insolvency of NNUK at the time of any of the impugned transactions, either applying the "cash-flow insolvency" test under section 123(1)(e) of the Insolvency Act 1986 or the "balance sheet insolvency" test under section 123(2) of the Insolvency Act 1986; and (ii) paragraph 35.5.2 of Mr. Marshall's declaration confirms that conclusion.

**B.5.b  Ratification**

59.     Paragraph 35.5.3 of Mr. Marshall's declaration raises an argument about bars to ratification.  It states that ratification may not be possible where the transaction amounts to an unlawful distribution or an unlawful return of capital.  Mr. Marshall relies on this to suggest, tentatively, that "the allegations in the Claim <u>essentially</u> involve an allegation of the provision of economic benefits by a subsidiary to its parent and <u>in the circumstances</u> the principles relating to unlawful return of capital and distribution <u>may</u> be engaged" (emphasis added).

60.     As to that:

   60.1     I agree that an unlawful distribution or return of capital cannot be ratified as an act of the company: an unlawful act is ultra vires the company and therefore cannot be made binding on it by ratification.

   60.2     The hesitant suggestion by Mr. Marshall in paragraph 35.5.3 of his declaration that the claims made by NNUK are "essentially" claims in respect of unlawful distributions and "may" engage the principles relating to them, is not pleaded in NNUK's Amended Proof of Claim.  No case is advanced by NNUK against NNI that there was an unlawful distribution or return of capital to NNI or its parent, NNL.

   60.3     No facts are alleged by NNUK in the Amended Proof of Claim sufficient to justify a finding that there was an unlawful distribution by NNUK.

   60.4     Further, there is no properly pleaded allegation by NNUK that the benefit of the alleged unlawful distribution was paid to its parent, NNL, received by its parent or paid at its parent's instigation.

   60.5     It would be a gross over-simplification for NNUK to seek to argue that any transaction by a subsidiary which benefits its parent, or which indirectly benefits its fellow subsidiary, must be a distribution or return of capital.  Conferring a commercial benefit on another group company does not in itself involve a distribution.

   60.6     Even assuming that there was a distribution by NNUK (which is not alleged), there is no properly pleaded case that a <u>lawful</u> distribution could <u>not</u> have been made (the burden of proof being on NNUK).

   60.7     In particular, the paucity of NNUK's pleaded case as to its own insolvency as at the date of the transactions it seeks to impugn[33] means that insolvency is not a ground on which NNUK can establish that a lawful distribution was impossible or that ratification is barred.

---

[33]     *See* ¶¶ 6, 7, 87(v) and 113 of its Amended Proof of Claim; First Todd Decl. ¶ 73; ¶ [51-51.4] above.

C.    **Breach of Duty of Care**

61.    Paragraphs 37-40 of Mr. Marshall's declaration deal with the allegation that NNI owed NNUK a duty of care.

62.    Paragraph 38 asserts that a shadow director owes the duty of care set out in section 174 of the Companies Act 2006 (referred to in paragraph 37 of Mr. Marshall's declaration) for de jure and de facto directors, for the same reasons as fiduciary duties are said by Mr. Marshall to apply to shadow directors; and that those reasons include the views of the Law Commission and the Company Law Review Committee.  I do not agree, for the reasons given above in respect of fiduciary duties.

63.    Paragraph 39 asserts that NNUK's Amended Proof of Claim alleges "a sufficient degree of proximity" to give rise to a duty of care owed by NNI to NNUK.  I do not agree.

64.    "Proximity" in itself is not enough to establish a duty of care.  As appears from paragraph 39.1 fn 25 of Mr. Marshall's declaration, "a relationship of proximity" is just one of the factors to be pleaded and proved to establish a duty of care.

65.    Mr. Marshall does not challenge that there are defined instances in which English law has imposed a duty of care for pure economic loss.  Nor does Mr. Marshall suggest that any of those circumstances are analogous to NNUK's allegations here.  Mr. Marshall instead relies on the "steady development" of the law (Marshall Decl. ¶ 39.1), but there is no indication in the twenty years this law has been developing that it is moving in the direction Mr. Marshall suggests.

66.    On the authorities, no sufficient relationship of proximity between NNUK and NNI is pleaded.  Paragraph 39 of Mr. Marshall's declaration suggests that a sufficient relationship of proximity is pleaded in paragraph 99 of the Amended Proof of Claim.  It is not: paragraph 99 contains a bare assertion of proximity without identifying the nature or aspects of the relationship said to give rise to the requisite degree of proximity.[34]  The only matters to which paragraph 99 refers are: (i) "the circumstances described above", which are not particularised; and (ii) paragraphs 15-27 the Amended Proof of Claim.  The latter describe the transactions which NNUK impugns and asserts in general terms NNI's control thereof, but no relationship of proximity is adequately set out therein.

67.    Paragraph 39 of Mr. Marshall's declaration alleges that a duty of care was owed by NNI as the agent of NNUK, again tentatively.  The allegation is confused:

67.1    I agree that an agent will generally owe a duty of care to his principal.

67.2    Paragraph 39.2 of the Marshall Declaration does not clearly state how the alleged agency relationship is said to have arisen, but it appears to be said that it arose by virtue of NNI having negotiated on behalf of NNUK, for example.

---

[34]    Contrast First Todd Declaration ¶ 80.

67.3    No relationship of agency is pleaded by NNUK in its Amended Proof of Claim.

67.4    If an agency could be alleged (which it is not), it appears that the relationship would arise out of NNI's alleged de facto or shadow directorship of NNUK.

67.5    If that is the case, the allegation of an agency relationship and a duty of care owed by NNI to NNUK arising therefrom adds nothing to the de facto and shadow director claims.

68.    The suggestion of agency in paragraph 39.2 of Mr. Marshall's declaration appears to be that NNI was the agent of NNUK as both a de facto and a shadow director of it.  This is reinforced by the reliance in paragraph 39.2 of Mr. Marshall's declaration on paragraph 99 of the Amended Proof of Claim, which refers to both types of directorship.  This is confused:

68.1    It is difficult to understand how NNI could be a de facto or shadow director of NNI and at the same time be an agent of it.

68.2    It particular, it is difficult to understand how a shadow director, who is "a person in accordance with whose directions or instructions the directors of the company are accustomed to act" (section 251 of the Companies Act 2006), can properly be characterised as an agent.  By that definition, a shadow director is a person who directs or instructs the board of a company to do an act; but the shadow director does not itself do the act on behalf of the company.

69.    Not only is it inappropriate that paragraph 39.2 of Mr. Marshall declaration is based on a theory of liability which is not pleaded at all in the Amended Proof of Claim, but paragraph 39.2 is itself inadequate.  It is both tentative ("it seems to me that in these circumstances a duty of care <u>may</u> arise" (emphasis added)) and speculative ("Its precise extent will no doubt depend on how the evidence comes out at trial").  That "wait and see" approach is inappropriate.  To advance a case of agency, NNUK should have pleaded facts which are alleged to establish a sufficient relationship of proximity so as to give rise to a duty of care.  No agency relationship is alleged and no supporting facts are pleaded.  There is merely an unparticularised argument, made for the first time, as far as I can see, in Mr. Marshall's declaration.

**D.    <u>Dishonest Assistance</u>**

70.    In paragraph 41-48, Mr. Marshall address the dishonest assistance claims, which are discussed at paragraphs 82-92 of my first declaration.

71.    There is a measure of agreement between Mr. Marshall and me as to the legal principles applicable to a case of dishonest assistance.

72.    I agree with paragraphs 41-42 of Mr. Marshall's declaration.  In particular, I agree that the test for dishonest assistance laid down in *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378 is whether the person assisting the breach of trust or fiduciary duty was acting

dishonestly and that there is no requirement of dishonesty on the part of the trustee or fiduciary.

73.     I also agree that the test is objective.  This has been confirmed since *Royal Brunei Airlines Sdn Bhd v Tan* in *Barlow Clowes International Ltd (in liquidation) v Eurotrust International Ltd* [2006] 1 WLR 1476.

74.     However, I do not agree with paragraph 43 of Mr. Marshall's declaration that the test for dishonest assistance can be expressed as a test of whether the person assisting the breach of trust has been guilty of "commercially unacceptable conduct".  The following are the principal points:

74.1    The reference to "commercially unacceptable conduct" in *Royal Brunei Airlines Sdn Bhd v Tan* was not expressed by Lord Nicholls to be an alternative test to the test of dishonesty, nor a lesser test.  The test remains one of dishonesty.

74.2    Thus, the leading commentaries all focus on the test of dishonesty.  They do not even mention "commercially unacceptable conduct" as a possible test for dishonest assistance.[35]

74.3    Nor has any subsequent dishonest assistance case accepted "commercially unacceptable conduct" as a substitute test for dishonesty.

74.4    Lord Nicholls makes a single reference to "commercially unacceptable conduct" in *Royal Brunei Airlines Sdn Bhd v Tan* by reference to *Cowan de Groot Properties Ltd v  Eagle Trust Plc* [1992] 4 All ER 700,761 (a knowing receipt case).  Lord Nicholls did not refer to the case as providing an alternative or substitute test for dishonesty: he merely indicated that the case "captured the flavour" of the test.

74.5    A better appreciation of the approach of Lord Nicholls can be seen in a fuller quote from his judgment than is set out in paragraph 43 of Mr. Marshall's declaration (at 390D-391A):

"The difficulty here is that the differences are of degree rather than of kind.  So far as the trustee himself is concerned the legal analysis is straightforward.  Honesty or lack of honesty is not the test for his liability.  He is obliged to comply with the terms of the trust.  His liability is strict.  If he departs from the trust terms he is liable unless excused by a provision in the trust instrument or relieved by the court.  The analysis of the position of the accessory, such as the solicitor who carries through the transaction for him, does not lead to such a simple, clear-cut answer in every case.  He is required to act honestly; but what is required of an honest person in these circumstances?  An honest person knows there is doubt.  What does honesty require him to do?

---

[35]     *See, e.g.,* Lewin on Trusts, 18th ed, ¶¶ 40-09, 40-22–40-36 esp at 40-22, pp 1627, 1635-1645 esp at 1635-1636; Virgo "The Principles of the Law of Restitution", 2nd ed, pp 533-537; Oakley "Constructive Trusts", 3rd ed, pp 186-222.

The only answer to these questions lies in keeping in mind that honesty is an objective standard. The individual is expected to attain the standard which would be observed by an honest person placed in those circumstances. It is impossible to be more specific. Knox J. captured the flavour of this, in a case with a commercial setting, when he referred to a person who is 'guilty of commercially unacceptable conduct in the particular context involved;' see *Cowan de Groot Properties Ltd. v. Eagle Trust Plc.* [1992] 4 All E.R. 700, 761. Acting in reckless disregard of others' rights or possible rights can be a tell-tale sign of dishonesty. An honest person would have regard to the circumstances known to him, including the nature and importance of the proposed transaction, the nature and importance of his role, the ordinary course of business, the degree of doubt, the practicability of the trustee or the third party proceeding otherwise and the seriousness of the adverse consequences to the beneficiaries. The circumstances will dictate which one or more of the possible courses should be taken by an honest person. He might, for instance, flatly decline to become involved. He might ask further questions. He might seek advice, or insist on further advice being obtained. He might advise the trustee of the risks but then proceed with his role in the transaction. He might do many things. Ultimately, in most cases, an honest person should have little difficulty in knowing whether a proposed transaction, or his participation in it, would offend the normally accepted standards of honest conduct."

74.6    It appears that NNUK uses the phrase "commercially unacceptable conduct" in preference to the generally accepted test of dishonesty to suggest a lesser test for dishonest assistance. Thus, in paragraph 104 of the Amended Proof of Claim NNUK states that the objective test of dishonesty "in a commercial setting simply means conduct which is commercially unacceptable" (emphasis added).

75.    It follows that I agree with Mr. Marshall at paragraph 44 of his declaration that paragraph 104 of the Amended Proof of Claim states the orthodox view that the test for dishonest assistance is an objective standard of dishonesty. However, I disagree with the suggestion that the reference to "commercially unacceptable conduct" represents an orthodox view of the test. Mr. Marshall attempts to substitute "commercially unacceptable conduct" – which can merely be a "tell-tale sign" of dishonesty – for the requirement to prove dishonesty itself. On a proper reading of Lord Nicholls' judgment, the test remains one of dishonesty. The reference to "commercially unacceptable conduct" has not subsequently been favoured or approved in any of the leading commentaries or other authorities as an alternative or substitute test.

76.    Paragraph 45 of Mr. Marshall's declaration deals with the reference in paragraph 87 of my first declaration to *Three Rivers DC v Bank of England (No 3)* [2003] 2 AC 1. As to that:

76.1    Paragraph 45 states, in effect, that *Three Rivers* was not a case of dishonest assistance. That is correct. It involved a claim of misfeasance in public office. The case is relevant because the elements of the claim included consideration of

concepts of bad faith, fraud and dishonesty, and the court considered the requirements of pleading such a concept in the judgment beginning at [2003] AC 237.[36]

76.2    Paragraph 45 also criticises the reference in my first declaration to Lord Millett's judgment in *Three Rivers* on the grounds that his was a dissenting judgment and the majority did not adopt his analysis.  That is not correct.  The requirements for pleading dishonesty were considered in the judgments of Lords Hope and Hutton referred to above and were consistent with Lord Millett's approach.  The other judgments may not have been as detailed as Lord Millet's judgment on this point, but they were consistent with it.  All three relied on *Davy v Garrett* (1878) 7 Ch D 473, 489.

76.3    Paragraph 46 questions why my first declaration considered the decision in *Three Rivers*, when procedural matters should be for the law of the forum.  The reason is that I was asked to consider whether the claims made by NNUK against NNI which are governed by English law are properly pleaded as a matter of English law.  That involves consideration as to whether the claims allege facts which are sufficient to establish a case of dishonest assistance.

## E.    **Unconscionable / Knowing Receipt**

77.    Paragraphs 49-51 of Mr. Marshall's declaration address the unconscionable receipt claims, which are discussed at paragraphs 93-102 of my first declaration.

78.    Mr. Marshall and I agree to a considerable extent as to the principles and authorities applicable to unconscionable receipt claims under English law.  (First Todd Decl. ¶¶ 94-96; Marshall Decl. ¶ 49)

79.    The principal issue in respect of these claims is whether the Amended Proof of Claim sets out a sufficiently pleaded case for tracing.  The defects in that pleading are summarised in paragraphs 97-101 of my first declaration.  They appear to be substantially accepted by NNUK.

80.    While paragraph 50.1 of Mr. Marshall's declaration points to paragraph 58 of the Amended Proof of Claim, which addresses the NNUK Intercompany Loans, Mr. Marshall acknowledges that the required "tracing exercise has not been set out" and "will need to be undertaken to enable the unconscionable receipt claim to succeed."  Similarly, with regard to the Pre-Petition Asset Sales, although Mr. Marshall points to paragraph 197 of the Amended  Proof of Claim, he acknowledges that only with "further particularisation on the tracing aspect" would they be sustainable.  (Marshall Decl. ¶¶ 50.2-50.3)

---

[36]    *See* Lord Hope at [51]-[53] and [55]; Lord Hutton at [121]-[122]; and Lord Millett at [183]-[190].

**F.**    **Unlawful Means Conspiracy**

81.    Paragraphs 52-55.5 of Mr. Marshall's declaration address the claims for conspiracy, which are discussed at paragraphs 103-110 of my first declaration.

82.    Mr. Marshall and I agree that the principles governing an unlawful means conspiracy are as set out in *Kuwait Oil Tanker v Al Bader* [2000] 2 All ER (Comm) 271.  (First Todd Decl. ¶ 107 fn 37; Marshall Decl. ¶ 52)

83.    We are also agreed as to the elements of the tort.  I agree that *Kuwait Oil Tanker v Al Bader* contains the dicta set out in paragraphs 53-54 of Mr. Marshall's declaration.

84.    Whether those elements are sufficiently pled is, as Mr. Marshall points out, a matter of U.S. procedure.  (Marshall Decl. ¶ 13)

**G.**    **Mistake**

85.    Paragraphs 56-60 of Mr. Marshall's declaration address claim 26 for mistake, which is discussed at paragraphs 111-119 of my first declaration.

86.    Mr. Marshall does not disagree with the principles of law set out in those paragraphs, which apply to a claim of mistake with respect to an agreement between the parties.

87.    Rather, Mr. Marshall interprets the Amended Proof of Claim as asserting a restitutionary claim outside of the terms of an agreement.  (Marshall Decl. ¶¶ 56-58, 60)

88.    I do not disagree with Mr. Marshall's recitation of the law applicable to restitutionary claims for mistake.

89.    I do disagree, however, with Mr. Marshall that the Amended Proof of Claim clearly raised such a restitutionary claim.  For this, Mr. Marshall focuses only on the second sentence in paragraph 81 of the Amended Proof of Claim.  However, Mr. Marshall does not account for the allegations in paragraph 80 of the Amended Proof of Claim that there was an agreement between the parties on allocation of the proceeds of sale "on the basis of an arm's length legal entitlement", or in the first sentence of paragraph 81 that the allocation applied "did not accord with the arm's length principle discussed above."

90.    Paragraph 188 of the Amended Proof of Claim is in general terms and does not shed any light on the basis for NNUK's claim of mistake.

91.    Given the lack of clarity in NNUK's pleading, I cannot comment further on that possible claim.

**H.**    **Transactions at Undervalue**

92.    Paragraphs 61-63 of Mr. Marshall's declaration address claim 27 for transactions at an undervalue, which are discussed at paragraphs 120-127 of my first declaration.

93.     Mr. Marshall says very little in response.  The only points made are in paragraph 63 of Mr. Marshall's declaration, where Mr. Marshall explains his understanding of the relevant transaction for the purposes of section 238 of the Insolvency Act 1986 "[f]rom [his] reading of the Claim".  Paragraph 63 makes two short points: (i) whereas he says that my first declaration focused on the date of the sale to Alcatel (in December 2006, outside the "relevant time" (i.e. two-year period) under sections 238 and 240 of the Insolvency Act 1986), he considers that the relevant transaction is "the <u>subsequent</u> division of the proceeds derived from that sale" (emphasis added); and (ii) the division "appears" to have occurred "pursuant to" the statement dated 24 July 2007.  It appears therefore that Mr. Marshall submits that the allocation occurred after 24 July 2007.

94.     I cannot accept those assertions, which are not consistent with NNUK's Amended Proof of Claim:

94.1    The Amended Proof of Claim does not make any assertion as to the date of allocation.

94.2    Paragraph 63 of Mr. Marshall's declaration asserts that the allocation was <u>subsequent</u> to the sale, but NNUK's pleaded case is equally consistent with an allocation at the date of the sale.

94.3    The 24 July 2007 statement is referred to in the final sentence of paragraph 80 of the Amended Proof of Claim, but that is merely a reference to the date of a record of the allocation.  It does not assert that the allocation was made on that date, before it or after it.

95.     A "transaction" for the purposes of section 238 of the Insolvency Act 1986 is non-exhaustively defined in section 436 of the Insolvency Act 1986 as including "a gift, agreement or arrangement, and references to entering into a transaction shall be construed accordingly".

96.     In my opinion, the date of the transaction for the purposes of section 238 of the Insolvency Act 1986 will generally be the date on which the subject company contracts to dispose of its interest in an asset, which may be earlier than the date on which the disposition is performed or completed.

97.     In the case of the Alcatel sale proceeds, the relevant date will be the date on which the allocation was agreed on behalf of NNUK and became binding on it.  That is not necessarily the date on which it was recorded in the statement (24 July 2007).

98.     There is simply no pleaded allegation as to when the allocation was agreed on behalf of NNUK and no basis for Mr. Marshall's assertions in paragraph 63 of his declaration as to the "subsequent" allocation or division of the Alcatel sale proceeds.

I.       **Ex Turpi Causa**

99.      Paragraphs 64-67 of Mr. Marshall's declaration address the ex turpi causa doctrine
         discussed at paragraphs 128-139 of my first declaration and the decision of the House of
         Lords in *Stone & Rolls Ltd. v. Moore Stephens* [2009] 3 WLR 455.

100.     Mr. Marshall argues that the ex turpi causa doctrine does not apply to bar NNUK's
         claims against NNI.  However, the arguments raised in paragraphs 64-67 of his
         declaration were expressly dealt with by the majority in *Stone & Rolls* and rejected.

101.     The following principles, relevant to the arguments advanced by Mr. Marshall in
         paragraphs 64-67, can be derived from the majority opinions of Lords Phillips, Walker
         and Brown in *Stone & Rolls* (the majority opinions are put in different ways, but Lord
         Walker's opinion is the most easily accessible):

         101.1    NNUK cannot maintain a claim against NNI which is based on its (NNUK's) own
                  wrongdoing, nor can NNUK benefit from its own wrongdoing, owing to the ex
                  turpi causa doctrine.[37]

         101.2    Whether a director's wrongdoing is that of his company depends upon whether
                  the conduct (or knowledge) in question of the director can be attributed to the
                  company.

         101.3    Where the wrongdoing is attributable to the company, a claim by the company
                  may be barred under the ex turpi causa doctrine even where the company's claim
                  is against its director in respect of that director's wrongful conduct as such
                  director.

                  (i)     The ordinary rule of imputation is that where a director acts fraudulently
                          or in breach of duty, his knowledge will not be imputed to the company
                          (referred to as the "adverse interest" exception to the ordinary rule of
                          imputation, or the *Hampshire Land* principle, following *In re Hampshire
                          Land Co* [1896] 2 Ch 743).[38]

                  (ii)    However, where the company is a "one-man company" and the case is a
                          "sole actor" case (i.e. the person or persons with ownership or control of
                          the company are entirely complicit in the alleged fraud or breach of duty,
                          so that there is no single individual connected with the company who can
                          be regarded as an innocent party deceived and prejudiced by the fraud or
                          breach of duty), the "adverse interest" exception/the *Hampshire Land*
                          principle has no application; and the knowledge of the director who has
                          committed the fraud or breach of duty is attributed to the company.[39]

---

[37]     *See* Lord Walker in *Stone & Rolls* at [128]; First Todd Decl. ¶ 131.

[38]     *See* Lord Walker in *Stone & Rolls* at [137].

[39]     At [167].

101.4   The ex turpi causa doctrine is therefore not confined only to bar claims by the company against a third party where the company would have to rely on its own wrongdoing – it also bars claims by the company against the wrongdoer whose acts are attributable to the company (i.e. in a "sole actor" or "one-man company" case).

101.5   There is no exception to the doctrine, where the wrongful act is attributable to the company, to enable the company to bring claims against the wrongdoer or a third party on the grounds that the company is insolvent or in liquidation.[40]

101.6   The generality of this principle is reflected in the fact that a person who is guilty of wrongdoing directly and not through a one-man company, or the trustee in bankruptcy of such person, could not resist the ex turpi causa defence and would have had no cause of action where he had to rely on his own wrongdoing regardless of whether he was insolvent and the claim was being advanced on behalf of his creditors.[41]   Similarly, he would have no claim against a fellow individual wrongdoer (his "partner in crime") owing to the ex turpi causa doctrine.[42]

101.7   Further, the doctrine applies to bar a claim by a company which would have to rely upon its director's wrongdoing which is attributable to the company, even where the company may be regarded as a victim of the wrongdoing.[43]   Lord Walker thus directly addressed and rejected the argument advanced in paragraphs 66.1 and 67 of Mr. Marshall's declaration.

101.8   The ex turpi causa defence is thus inflexible and axiomatic, or as Lord Walker put it, "unforgiving and uncompromising".[44]

101.9   The foregoing are the principles which apply in "sole actor" cases.[45]   The present case is pleaded as being a sole actor case: in respect of the transactions impugned by NNUK, NNI is alleged to have caused them.   Mr. Marshall does not dispute that this is a "sole actor" case or suggest otherwise.   (Marshall Decl. ¶¶ 64-67)   NNI is alleged to have been central to the transactions in question.

101.10  As reflected in the passage cited by Mr. Marshall in paragraph 66.1, these principles from *Stone & Rolls* reflect and incorporate competing policy concerns inherent in the ex turpi causa doctrine.   A court faced with an ex turpi causa defence must apply the tests set forth in *Stone & Rolls*, not independently consider policy concerns that underlie the defence.

---

[40]   At [184] and [188].

[41]   At [184] and [186].  *See also* Lord Brown at [197]-[201] and [203].

[42]   At [187] and [188].

[43]   At [189].

[44]   At [188].

[45]   At [157] and [166]-[167].

101.11 Accordingly, the acts of NNI as an alleged de facto or shadow director of NNUK are attributable to NNUK, which cannot therefore maintain a claim against NNI in respect thereof.

102.    In respect of the above analysis, paragraph 65 of Mr. Marshall's declaration mis-states the positions taken in my first declaration.  Mr. Marshall states that the knowledge of a wrongdoing director may not be attributed to the company where the wrong is done <u>to the company</u>, but may be attributed where the wrong is done to <u>a third party</u>, and refers to paragraphs 129(ii) and (iv) of my first declaration.  In so asserting, Mr. Marshall wrongly elides different scenarios set out in my first declaration:

102.1   Paragraph 129(ii) of my first declaration states the position in cases other than sole actor or one-man company cases – i.e. where the ordinary rule of attribution is excluded by the "adverse interest" exception/the *Hampshire Land* principle.

102.2   Paragraph 129(iv) of my first declaration states the position in respect of claims against third parties.

102.3   Paragraph 129(v) of my first declaration states the position in sole actor or one-man company cases – i.e. where the exception to the ordinary rule of attribution (the "adverse interest" exception/the *Hampshire Land* principle) is itself excluded.

103.    To the extent that Mr. Marshall advances arguments which are contrary to the analysis of the principles in *Stone & Rolls* set out above (Marshall Decl. ¶¶ 66-67), I consider that they are wrong in law.  The following particular points should be noted:

103.1   Paragraph 66.1 of Mr. Marshall's declaration asserts that "there is no single uniform doctrine [of ex turpi causa] which is applicable in all contexts", relying on *Gray v Thames Trains* [2009] 1 AC 1339.  This is incorrect in two respects.  First, *Gray* did not so hold: as appears from the dictum of Lord Hoffmann quoted by Mr. Marshall in paragraph 66.1, the <u>doctrine</u> itself is uniform, but the <u>justifications</u> or reasons for it are a group, the applicability of which varies.  To say that the reasons vary is not to say that the doctrine is not uniform.  Second, as appears from the judgment of Lord Walker in *Stone & Rolls* at [188], the doctrine is not flexible, but is "unforgiving and uncompromising".  (*See* ¶ [99.8] above)  The argument in paragraph 66.1 of Mr. Marshall's declaration is inconsistent with that and should be rejected.

103.2   Paragraph 66.1 of Mr. Marshall's declaration concludes by asserting that a "very different" rule applies to a claim against a principal wrongdoer involving a breach of duties intended to protect the company "and its creditors", in contrast to a claim against an "innocent third party" who is negligent.  Three points can be made.  First, Mr. Marshall cites no authority or reasoning for that bare assertion.  Second, it is inconsistent with the principles laid down in *Stone & Rolls* set out above: there is no difference in the application of the ex turpi causa doctrine in those two scenarios.  Third, the reference to protecting creditors is misconceived: as set out above, *Stone & Rolls* makes it clear that the insolvency of the claimant, its

liquidation or the fact that its claim is brought on behalf of or for the benefit of its creditors is irrelevant and does not impact on or bar the applicability of the ex turpi causa doctrine.

103.3   Paragraph 66.2 of Mr. Marshall's declaration argues that: the rules regarding attribution of knowledge to a company are more complex than stated in my first declaration, relying on *El Ajou v Dollar Land* [1994] 2 All ER 685; attribution may depend on agency principles; and *Stone & Rolls* was not concerned with those agency principles, but rather with the *Hampshire Land* exception to the ordinary rule of attribution, and with the "sole actor" exception to that exception.[46]  There is no basis for determining attribution in the present case by reference to agency principles.  The reasoning in *Stone & Rolls* as to the applicability of the "sole actor" exception to the *Hampshire Land* exception is relevant to NNUK's claims against NNI.  Mr. Marshall does not answer that reasoning or establish why it does not apply to NNUK's claims.

103.4   Paragraph 66.3 of Mr. Marshall's declaration states that the process of identifying a "one-man company" (or sole actor company) "is by no means easy".  However, Mr. Marshall does not challenge the conclusion in my first declaration that NNUK's Amended Proof of Claim asserts a sole actor claim against NNI or assert that the sole actor approach is inappropriate.  In this regard, the Amended Proof of Claim alleges involvement of all of the directors of NNUK which (if accepted as true) would in my opinion give rise to a sole actor company.

103.5   Paragraph 66.3 also takes out of context a passage from Lord Walker's judgment in *Stone & Rolls* to suggest that there need be an inquiry into "whether it would be contrary to justice and common sense to treat the company as complicit."  The full passage, however, suggests that such an inquiry might be appropriate where "there are innocent minority shareholders who have no say in the management of the company, or even where innocent majority shareholders have been 'hijacked' by a fraudulent but dominant managing director," which cases would not be suitable for strikeout (i.e. but not in a "sole actor" case).[47]  No such circumstances are alleged in the Amended Proof of Claim, which alleges that NNUK's sole shareholder, NNL, controlled the transaction at issue.[48]

103.6   Paragraph 66.4 of Mr. Marshall's declaration asserts that my first declaration omits adequately to refer to the factual nexus required between the illegality relied on and the claim being advanced.  It has always been accepted that the ex turpi causa doctrine requires that the claim being advanced by the claimant depends on its own illegality (including illegality attributable to it).  This is perfectly clear from paragraph 132 of my first declaration.

---

[46]   *See* Lord Brown at [198]-[201].

[47]   *Stone & Rolls* at [192].

[48]   Amended Proof of Claim ¶¶ 13, 15.

103.7   Paragraph 67 of Mr. Marshall's declaration repeats the points made previously on behalf of NNUK as to the distinction between claims against "innocent" third parties and claims against fiduciaries for breach of duties intended to protect the interests of the company and its creditors.  These points are addressed above.

## J.   Conclusory Allegations

104.    Finally, in my first declaration, I noted that a number of the allegations made in NNUK's Amended Proof of Claim are inadequately particularised, are unsupported assertions or are conclusory.  By a "conclusory" allegation, I mean an allegation which merely asserts the principal or ultimate finding which a party asks the court to make, without setting out the supporting facts upon which the court is asked to make the finding.  An example of this is the allegation of a shadow director – i.e. a person in accordance with whose directions or instructions the directors of a company are accustomed to act (section 251(1) of the Companies Act 2006).  In my opinion, it is not enough for a party to ask the court to find that a person was a shadow director of a company or that the directors of the company were accustomed to act in accordance with that person's directions or instructions, without more.  On the contrary, the party must allege facts upon the basis of which it can be asserted and the court can find that the directors of the company were accustomed to act on the person's directions or instructions.

105.    This is particularly so in relation to NNUK's allegations of its insolvency, which merely refers to "the doubtful solvency (and/or risk of insolvency) of NNUK from 2000 onwards" without further elaboration.[49]

106.    Mr. Marshall takes issue in his declaration with my criticism of NNUK's Amended Proof of Claim.  He questions why the adequacy of NNUK's pleaded case is addressed in my first declaration.  (Marshall Decl. ¶ 14)  The simple reason is that I have been instructed to give evidence on the question of whether NNUK's allegations make out a claim under English law.  That inevitably requires an assessment as to whether, accepting the non-conclusory allegations as true, the essential elements of those claims have been properly stated as a matter of English law.

---

[49]    *See, e.g.,* Todd First Decl. ¶¶ 73, 81, 90.  The grounds for the alleged insolvency of NNUK from 2000 onwards are not sufficiently alleged there or elsewhere.  For example, paragraph 6 of the Amended Proof of Claim merely refers to commercial pressures and losses in 2001, and paragraph 7 refers to a re-structuring and its effects by 2008, including a delay in the Group's demise until 2009.

107.    However, we agree that the question whether NNUK's Amended Proof of Claim satisfies pleading requirements is a matter for the U.S. court.[50]

I declare, under the penalty of perjury of the laws of the United States of America, that the foregoing is true and correct.

Executed this 5th day of October, 2011, in London, England

Michael Todd Q.C.

---

[50]    Marshall Decl. ¶ 14.  Mr. Marshall sets out a number of reasons why he suggests that NNUK's Amended Proof of Claim would be acceptable as a matter of English law.  Marshall Decl. ¶ 15-15.8.  I do not agree with Mr. Marshall's analysis.  The analogy to a proof of debt in English insolvency proceedings is inapposite, but in any event, when the proof is rejected and there is a substantial dispute as to the claim, the court will require detailed statements of case upon which it can determine the claim.