IN THE UNITED STATES BANKRUPTCY
COURT FOR THE DISTRICT OF
DELAWARE

 

×

*In re*

Nortel Networks Inc., *et al.*,[1]

              Debtors.

Chapter 11

Case No. 09-10138 (KG)

Jointly Administered

×

## REPLY DECLARATION OF AIDAN REDMOND SC IN SUPPORT OF THE JOINT OBJECTION AND MOTION TO DISMISS THE CLAIMS OF NORTEL NETWORKS IRELAND (NN IRELAND)

I, Aidan Redmond SC, hereby declare as follows, pursuant to 28 U.S.C. § 1746:

1.     I submit this Reply Declaration in further support of the Joint Objection and Motion to Dismiss the claim of Nortel Networks Ireland ("NN Ireland") and in reply to the Declaration of John Hennessy SC ("Hennessy Declaration"). Mr. Hennessy comments on the opinions set forth in my declaration of July 21, 2011 ("Declaration"); where useful to sharpen the points of difference between us, I address certain of those comments herein. To the extent I do not

---

[1]    I am informed that the debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), and Nortel Networks (CALA) Inc. (4226), (collectively the "U.S. Debtors"). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

comment expressly on any aspect of the Hennessy Declaration, I rely on the substance of my Declaration, and silence in respect of other aspects of the Hennessy Declaration should not be taken acquiescence therewith.[2] Except as otherwise indicated, all statements set forth in this Reply Declaration are based on my opinions, expertise and knowledge, the Irish authorities cited herein, the Proof of Claim ("POC") dated June 3, 2011 filed by NN Ireland and my review of the Hennessy Declaration.

## Role of U.K. Decisions Under Irish Law

2.    As I noted in my Declaration (¶ 5), where there is no specific constitutional or statutory divergence, Irish courts deem decisions of superior English Courts to be of persuasive authority.

3.    The Hennessy Declaration goes beyond that opinion. It opines that "where there is no authority of an Irish court on a specific matter, decisions on the issue by the courts of England and Wales will be regarded as persuasive and, unless distinguishable, will normally be followed by an Irish court." (Hennessy Decl. ¶ 7).

4.    I believe that statement to be overbroad. It would be a very rare thing indeed to uncover a U.K. precedent, indistinguishable as to fact, argument or precedent from an Irish case. This is why U.K. precedent is regarded as persuasive rather than dispositive. The common and statutory law of the Republic of Ireland share many common features with the law of the U.K. but

---

[2]    My comments regarding the sufficiency of the allegations in the Proof of Claim are offered in the context of the elements required under Irish law. I understand that the U.S. Debtors have made U.S. based pleading arguments and I do not purport to offer an opinion with respect to the adequacy of the allegations under U.S. procedural rules, which go beyond the scope of this Reply Declaration and my initial Declaration.

are nonetheless a fully distinct and independent body of law. The High Courts of Ireland, for example, are not bound to follow as precedent the decisions of other High Court decisions, although they will normally do so unless insufficient authority was cited, incorrect submissions advanced or if it is clear that the Judge disregarded or misunderstood an important element or argument, as confirmed and ruled in *The Environmental Protection Agency v. Neiphin Trading Limited, Dean Waste Company Limited, Jenzsoph Limited, Anthony Dean, Keith Cairns, Thady Nealon and Samuel Stears and by Order Ireland and the Attorney General* (2011) IEHC 67.

5.     A decision of the U.K. Court, however persuasive, is not a court of equal jurisdiction and therefore the contention in *Byrne and McCutcheon on the Irish Legal System* is, in my opinion, unfounded.   As Mr. Justice Costello said in *M. McC v. J. McC*, [1994] 1 I.R. 293 at 303:

> ...I think I have liberty to give effect to this opinion even though it is contrary to the decisions of the English courts on this subject.  These decisions are of persuasive weight and should not likely be ignored. But the Irish courts are not bound by them and I think I am not required to follow decisions which I think misconstrued the effect of an earlier decision of the House of Lords which I would be prepared to follow...

6.     The decisions of the Irish Supreme Court are of binding authority on the High Courts.  The Irish Supreme Court makes its own determinations as to if and when U.K. law should be adopted as the law of Ireland. A good illustration of this disposition is to be found in the decision of the Irish Supreme Court in *Re Tralee Beef and Lamb Ltd; Kavanagh-v-Delaney [2008] 3 IR 347.* The Irish Supreme Court was not prepared at first instance to accept that executive and non-executive directors, which are clearly subsets of de jure directors,

3

automatically owed the same common law fiduciary duties. It should further

be noted that *Re Barings plc* was being urged upon the Irish Supreme Court as

an authority upon which the court could rely when dealing with executive and

non-executive directors when it was the case that *Re Barings plc* dealt

exclusively with executive directors. Hardiman J refused when urged to adopt

and apply a U.K. decision:

> "...In my view, apart from any general amplification of the words of
>
> Shanley J., there is a yet unmet need to make authoritative findings
> after full debate, as to the respective duties of an executive and a non-
> executive director and, perhaps, a non-executive appointed...for a
> particular and specific purpose. But this has yet to occur.
>
> I would not be prepared simply to apply Re Barings plc (No. 5) [1999]
> 1 B.C.L.C. 433 criteria, without such argument, to all these classes of
> director, or to assume that their common law duties are identical...."

**De Facto And Shadow Directors**

7.      This is a particularly relevant point because the Hennessy Declaration cites no

case decided under Irish law that holds, or even addresses, whether a sister

company such as NNI is liable as a de facto or shadow director of its affiliate.

Instead, the Hennessy Declaration relies on certain U.K. precedent as

supporting the opinion that Irish law will develop to support that result. (¶¶

17, 19).  The Hennessy Declaration also relies on U.K. law for the opinion that

Irish courts would not apply the statutory restriction prohibiting a company

from being a de jure directors set forth in Section 176 of the Companies Act

1963 to de facto directors. (Hennessy Decl. ¶¶ 30-31).

8.      As set more fully forth below, as an initial matter I do not read the U.K. cases

relied on by the Hennessy Declaration for the predictive opinion that under

U.K. law shadow directors are a subset of de facto directors having the full range of common law fiduciary duties as authorities for such a proposition.

9.    In addition, even if U.K. law were as described, I believe that Irish courts would be very hesitant to change and to expand Irish law by combining these two distinct concepts of director.  Nor do I believe U.K. law persuasive on the question of a corporate entity as a de facto director, particularly given that in my understanding U.K. law has no analogue to Section 176 of the 1963 Companies Act, which states that "[a] company shall not, after expiration of 3 months of the operative date, have as a director of the company a body corporate."

10.   As set forth in my Declaration, de facto director status is largely a development of Irish common law, while shadow directors are a creation of Irish statute. There is a very voluminous body of case law which deals with the status of de facto directors and the consequences of same, together with the fiduciary duties arising from that status.

11.   As a result, if it is established that Nortel Networks Inc is a de facto director of Nortel Ireland, there are certain consequences.  If it is established that Nortel Networks Inc is a shadow director, there are different consequences.  In its proof of claim, Nortel Ireland has endeavoured to elide the status of de facto and shadow directors as it has engaged in no penetrating analysis of what type of director it believed Nortel Networks Inc to be.

12.   It is noteworthy that the Proof of Claim does not set out a set of circumstances and allege that those circumstances are indicative of the status of Nortel Networks Inc as a de facto director.  Equally, there is no setting out of a set of

circumstances in respect of which it is alleged those circumstances are indicative of the status of Nortel Networks Inc as a shadow director.

13.   As the Hennessy Declaration confirms, however, NN Ireland relies on the projected development of Irish law beyond the existing body of law. In my experience, when urged to expand Irish law beyond current boundaries, Irish courts will carefully examine the alleged mischief to determine whether a change in the law is necessary to provide a remedy. See again *Re Tralee Beef and Lamb Ltd.* Where Irish law already provides a remedy for the misdeeds of de facto directors and the misdeeds of shadow directors and where there is no effort to set out the remedial deficit from which the law of Ireland allegedly suffers, Irish courts will, in my opinion, decline to expand or change the law just so a particular litigant can successfully assert a claim however pleaded.

14.   The Hennessy Declaration opines at Paragraph 13 that based on the facts pleaded in the POC, an Irish court would be satisfied that those facts were sufficient to establish that NNI was both a de facto and a shadow director of NN Ireland. This is based on the view:

   i.   that based on recent U.K. authority a company can be a de facto director (even though a company cannot be a de jure director) (¶¶ 30-31);

   ii.  that based on recent English decisions an Irish court would no longer maintain the distinctions between de facto and shadow directors (¶¶ 16-17); and

iii. that based on U.K. decisions an Irish court would

find that a shadow director owes common law

fiduciary duties to the company on an equal footing

as a de facto director.  (¶¶ 18-20).

15. With respect to whether a corporation can be a de facto director, the Hennessy

Declaration relies on two U.K. cases, *Re Mea Corporation*; *Secretary of State*

*for Trade and Industry v. Aviss* [2007] 1 BCLC 618 and *Revenue Customs*

*Commissioners v. Holland* [2010] 1 WLR 2793.

16. The U.K. decisions in *Mea Corporation* and *Holland* do not address the

question of whether a corporate entity can be considered a de facto director in

light of Section 176 of the Companies Act of 1963. As discussed in *Holland* at

Paragraph 24, the U.K. does not have a complete statutory prohibition of

companies serving as de jure directors, unlike Ireland.  Moreover, neither *Mea*

*Corporation* nor *Holland* case addresses the issue of a corporate entity as a de

facto director - - both cases analyzed the status of individual defendants and

whether they could be deemed a de facto or (in the *Mea Corporation* case) a

shadow director.

17. The  Hennessy Declaration also relies on *Mea Corporation* and *Holland*, as

well as other U.K. decisions, to support the prediction that an Irish court

would conclude - - contrary to *In re Lynrowan Enterprises* [2002] IEHC 90

(31 July, 2022, unreported, High Court, O'Neill, J.) - - that "holding out" of

oneself as a director is not required under Irish law to constitute a de facto

director <u>and</u> that the longstanding distinction between the de facto and shadow

status would be collapsed, rendering shadow director status simply a subset of de facto director status.

18.   That conclusion runs counter to, among other cases, the 2009 Irish decision in *Moorview Development and Others v. First Active PLC and Others* [2009] IEHC 214. In *Moorview*, the High Court expressly approved and applied the language of a U.K. case (*In re Hydrodam Limited* [1994] 2 BCLC 180, 184 [1994] BCC 1961) which as I quoted at Paragraph 16 of my Declaration emphasized the distinctions between de facto and shadow directors:

> In my judgment an allegation that a defendant acted as de facto director or shadow director, without distinguishing between the two, is embarrassing. It suggests…that the liquidator takes the view that de facto or shadow directors are very similar, that their roles overlap, and that it may not be possible in a given case to determine whether a particular person was a de facto or shadow director. I do not accept that at all. The terms do not overlap. They are not alternatives and in most and perhaps all cases are mutually exclusive. A de facto director is a person who assumes to act as a director. He is held out as a director by the company, and claims and purports to be a director, although never actually or validly appointed as such. To establish that a person was a de facto director of a company it is necessary to plead and prove that he undertook functions in relation to the company which could properly be discharged only by a director. It is not sufficient to show that he was concerned in the management of the company's affairs or undertook tasks in relation to its business which can properly be performed by a manager below board level. A de factor director, I repeat, is one who claims to act and purports to act as a director, although not validly appointed as such. A shadow director, by contrast, does not claim or purport to act as director. On the contrary, he claims not to be a director. He lurks in the shadows, sheltering behind others who, he claims, are the only directors of the company to the exclusion of himself. He is not held out as a director of the company.

19.   The High Court's endorsement in *Moorview* of this well-established distinction between de facto and shadow director "status" under Irish law is, in my view, a clear statement of the status of Irish law on this point. The 2009

High Court decision in *Moorview* was issued well after the 2007 U.K. *Mea Corporation* decision and other precedent cited in Paragraph 42 of the Hennessy Declaration as the basis for concluding that Irish law would move away from existing concepts of de facto and shadow directors. The High Court's decision in *Re Hocroft Developments Limited* [2009] IEHC 580, is not to the contrary.   Indeed, Justice McKechnie in *Hocroft* whilst at pains to point out the importance of clear articulation of the case being made in the pleadings, noted that the distinction between de facto and shadow directors:

> "may be a matter of significant importance for a defendant, who is entitled to know precisely what case he has to meet so as to answer it. Therefore a Liquidator should always particularize his claim and on many occasions may be compelled to do so."

20.    In respect of *Holland Respondent v. The Commissioners for Her Majesty's Revenue and Customs Appellants* [2010] U.K.SC 51, a number of observations need to be made.  It is urged by the Hennessy Declaration that this decision should be adopted as a persuasive authority in the developing jurisprudence which is alleged to elide the status of shadow director with that of de facto director. It should be noted that it was never asserted in those proceedings that Mr. Holland was a shadow director. This must militate against the decision being any form of authority for the proposition laid. Of even greater import is the fact that the case revolved around Section 212 of the U.K. Insolvency Act 1986 which statutorily did not apply to shadow directors.  Hence this decision is of relevance to the potential liability of de facto directors only. Bearing in mind that subject to very minor exception U.K. companies are not statutorily barred from being directors it is hard to see how this case can be authority for

the proposition that companies can be de facto directors in Ireland as this issue

was already determined on a statutory basis in England.

21.    Also relevant to *Holland*, it appears that at least by way of argument and

principle, there was a significant divergence of opinion between Lord Hope,

Lord Saville, and Lord Collins, who together formed the majority decision that

the individual Defendant could <u>not</u> be held liable as a de facto director.

Furthermore a very different set of facts required very different considerations

to those alleged concerning NNI and NN Ireland.

22.    Indeed, Lord Hope in *Holland* expressly approved of the rationale of Millett J.

in the *Hydrodam* decision, expressly approving the following extract from

Millett J.'s judgment:

> ... the liquidator submitted that where a body corporate is a director of
> a company, whether it be a de jure, de facto or shadow director, its
> own directors must ipso facto be shadow directors of the company. In
> my judgment that simply does not follow. Attendance at board
> meetings and voting, with others, may in certain limited circumstances
> expose a director to personal liability to the company of which he is a
> director or its creditors. But it does not, without more, constitute him a
> director of any company of which his company is a director.

23.    Lord Hope, at Paragraph 38 of his judgment, in dealing with the statutory

matrix, makes the following interesting observation:

> The remedy that is provided by Section 212IA 1986 may be sought
> only against persons to whom that section applies, as described in
> Section 212(1). The description that applies to this case is that set out
> in paragraph (a) of the Subsection: "is or has been an officer of the
> company". The word "officer" includes a director, but it is accepted
> that the section does not apply to shadow directors because the statute
> does not provide for this. It follows that HMRC must plead and prove
> against Mr. Holland that he was a de facto director of the composite
> companies.

This is a clear acknowledgement of the different position of a shadow from that of a de facto director.

24.    In summary, therefore, it is not accepted that the extract from the judgment of Lord Collins is part of the ratio decidendi of the decision in the *Holland* case and that therefore, rather than urging the acceptance of the stare decisis offered by the *Holland* decision, what is in fact being offered is an obiter dictum of one of the judges who decided the *Holland* case. It is in that context that one should view the suggestion that an English authority should be followed as persuasive. This begs the question as to what exactly is persuasive about the *Holland* decision.

25.    Mr. Hennessy describes the *Holland* decision as part of "developing jurisprudence". By this, it is plainly acknowledged that Irish law has not gone so far. It is clear that the *Hydrodam* decision has been accepted and implemented in this jurisdiction in the *Moorview* decision, but it is equally clear that the *Holland* decision has yet to be analyzed or applied in this jurisdiction, and even if it were to be analyzed and applied in this jurisdiction, the extract from the judgment of Lord Collins is not, it is submitted, part of the ratio decidendi, nor central to the issues required to be determined in the *Holland* case.

**Duties Of Shadow Director**

26.    The Hennessy Declaration relies on two U.K. cases *(Ultraframe (UK) Ltd. v. Fielding* [2005] EWHC 1638 and *Yukong Line Ltd. v. Rendsburg Investments Corp. of Liberia* [1998] 1 WLR 294) for the opinion that an Irish court would hold that a shadow directors owe the company the full range of common law

This is a clear acknowledgement of the different position of a shadow from that of a de facto director.

24.    In summary, therefore, it is not accepted that the extract from the judgment of Lord Collins is part of the ratio decidendi of the decision in the *Holland* case and that therefore, rather than urging the acceptance of the stare decisis offered by the *Holland* decision, what is in fact being offered is an obiter dictum of one of the judges who decided the *Holland* case. It is in that context that one should view the suggestion that an English authority should be followed as persuasive. This begs the question as to what exactly is persuasive about the *Holland* decision.

25.    Mr. Hennessy describes the *Holland* decision as part of "developing jurisprudence". By this, it is plainly acknowledged that Irish law has not gone so far. It is clear that the *Hydrodam* decision has been accepted and implemented in this jurisdiction in the *Moorview* decision, but it is equally clear that the *Holland* decision has yet to be analyzed or applied in this jurisdiction, and even if it were to be analyzed and applied in this jurisdiction, the extract from the judgment of Lord Collins is not, it is submitted, part of the ratio decidendi, nor central to the issues required to be determined in the *Holland* case.

**Duties Of Shadow Director**

26.    The Hennessy Declaration relies on two U.K. cases *(Ultraframe (UK) Ltd. v. Fielding* [2005] EWHC 1638 and *Yukong Line Ltd. v. Rendsburg Investments Corp. of Liberia* [1998] 1 WLR 294) for the opinion that an Irish court would hold that a shadow directors owe the company the full range of common law

fiduciary duties. ( ¶61(d)).   The Hennessy Declaration does not address how shadow directors, as statutory creations under Section 27 of the 1990 Companies Act, can be vested with obligations beyond Part III of the 1990 Act and the other express statutory provisions (irrelevant to the allegations here) alluded to in my first Declaration.   The Hennessy Declaration does not explain how the selective approach by the Irish Legislature to the imposition of obligations on shadow directors, as by the Companies Acts 1963-2009 appears, lends itself to prove the argument that the status of shadow director is of general application.

27.      Nor does the Hennessy Declaration address the more recent High Court decision in *Moorview* which analyzed the scope of potential liabilities of shadow directors only pursuant to the statutory provisions of the Companies Act of 1990.

28.    I am of the opinion that reliance on the *Ultraframe* and *Yukong* decisions contemporaneously is unsustainable when one sees what  Lewison, J. said in *Ultraframe* of the *Yukong* decision:

> "Toulson J did not explain the reasons that led him to the conclusion that a shadow director "undoubtedly" owes fiduciary duties to the company... the findings of fact that Toulson J made more naturally lead to the conclusion that Mr. Yamvrais was a de facto rather than a shadow director. It seems to me, therefore that I must be cautious before accepting that a shadow director "undoubtedly" owes fiduciary duties to the company of which he is a shadow director. The instructions that a shadow director gives (and which the de jure directors act upon) may be quite inimical to the company's interests. It would be odd if, in those circumstances, a person who has no direct relationship with the company and who consistently gives instructions inimical to its interests were nevertheless held to have undertaken a duty of loyalty to the company; and to have agreed to subordinate his own interest to those of the company. Moreover the wider the interpretation of the statutory definition, the less easy it is to impose

upon one who falls within the definition the full range of fiduciary duties imposed upon a de jure or de facto director. I am not persuaded that the mere fact that a person falls within the statutory definition of "shadow director" is enough to impose upon him the same fiduciary duties to the relevant company as are owed by a de jure or de facto director…"

29.   As the language cited from *Ultraframe* shows, U.K. law is not itself established in determining that shadow directors should be made liable for a full range of common law fiduciary duties.  Neither that language nor that of the citation relied upon in the Hennessy Declaration supports, in my view, the contention  that  a U.K. court did let alone that an Irish court should expand the liabilities of a shadow director beyond their statutory definition to the full range of common law duties of a de jure director or de facto director.

30.   Indeed in *Ultraframe* the trial judge went further and stated:

"In truth, it seems to me that the use of labels such as "shadow director", which is a statutory definition, may serve only to obscure the real question. The real question is not what is the proper label to attach? It is: in what circumstances will equity impose fiduciary obligations on a person with regard to property belonging to another?"

31.   It was in this context that Lewison, J. went on to say:

The indirect influence exerted by a paradigm shadow director who does not directly deal with the company's assets will not usually, in my judgment, be enough to impose fiduciary duties upon him; although he will, of course be subject to those statutory duties and disabilities that the Companies Acts creates…."

32.   In this context what was actually decided is of paramount importance in illustrating that *Ultraframe* is in no way authority for the proposition that

13

shadow directors owe the same fiduciary duties as de jure and de facto

directors:

> " It is, in my judgment, indisputable that as sole signatory on that
> account he was not entitled to draw on the account for his personal
> benefit. By voluntarily becoming the sole signatory on that account, he
> took it upon himself to assume control of an asset belonging to another.
> That voluntary assumption must, in my judgment, carry with it a duty
> to use the asset for the benefit of the person to whom it belongs. That
> duty is properly called a fiduciary duty. However, it is important to
> recognize that this fact alone does not mean that wider fiduciary duties
> are imposed upon him..."

33.    What is urged upon this Court by the Hennessy Declaration is the engrafting

of common law fiduciary duties upon a specific statutory provision by reliance

upon U.K. decisions which it is submitted are not authority for the proposition

urged.

34.    It is suggested that this is the way in which the Irish company law statutes are

evolving.  Reference is made to the Company Law Revision Group and the in-

preparation consolidating Companies Bill which draft defines de jure, de facto

and shadow directors and enumerates the fiduciary duties each are to owe.  In

short sum, what is urged upon this Court is to implement a matter in a pre Bill

draft which has yet to go before the Irish Parliament to be debated and/or

amended and thereafter enacted into law, if such it be.  To bypass the Irish

legislature in order to apply the law as it might be in the future would,

predicated upon caselaw which is not authority for the proposition laid, be

extremely unlikely to commend itself to the Irish Courts.

35.    Furthermore no compelling reason is proffered in either the points of claim or

the Hennessy Declaration to ignore the literal meaning of s.27 of the

Companies Act 1990 in the course of interpreting same which flies in the face

of the statutory imperative contained with the provisions of the Interpretation

Act 2005 and in particular section 5 thereof which countenances departure

from literal meaning only when same is manifestly absurd or fails to reflect

the plain intention of the legislature.

36.   The Companies Acts provide very specific parameters within which to define

a shadow director and consequences of same.  There is no judicial precedent

in this jurisdiction to extend the liabilities of a shadow director beyond its

statutory remit.

37.   Finally, the Hennessy Declaration at Paragraph 52 also concludes that the

Proof of Claim properly alleges the predicate for shadow director status by

alleging that NNI directed the "policy and practice of NN Ireland" as

concerned various areas such as transfer pricing. I do not agree with that

conclusion as the Proof of Claim nowhere sets forth allegations of when and

where NNI actually directed the decisions of the NN Ireland directors as to

those matters and indeed nowhere alleges which directors were allegedly the

subject of the required imperative directions.  Insofar as it is suggested that it

is appropriate to elide without any detail or justification the directing of

"policy and practice of NN Ireland" with an allegation of imperative

intervention with the decision making processes of the Board of NN Ireland I

cannot agree either that to do so is appropriate or that simple direction of

policy and practice within a group of companies is the mischief targeted by the

requisite provisions of the 1990 Act.

## The Duty of Care

38. The Hennessy Declaration offers two bases upon which NNI could be found to owe a duty of care to NN Ireland under Irish law: (1) allegations that NNI was a de facto or shadow director of NN Ireland (¶ 68) or, (2) regardless of de facto or shadow directorship, NNI's alleged involvement with NN Ireland (¶¶ 69-76).

39. The first basis is addressed in my initial Declaration and as set forth above.

40. In relation to the second, the Hennessy Declaration opines that the allegations of the Proof of Claim would be viewed by an Irish court as sufficient to establish proximity, the reasonable forseeability of injury, and would also make it just and reasonable to impose a duty of care upon NNI (¶¶ 69-76). The Hennessy Declaration further asserts that "it would require very powerful reasons to be advanced as to how or in what circumstances it was not just and reasonable to impose liability upon NNI" (¶ 75).

41. In *Glencar Exploration v. Mayo County Council* [2002] 1 I.R. 84, however, the Irish Supreme Court, Keane, C.J., made clear that the "just and reasonable" inquiry should act as a restraint upon the imposition of newfound duties of care, and expressly disapproved of the contrary view that a defendant should have to prove that it was not just and reasonable to impose a duty on the facts of a given case. Chief Justice Keane cautioned against any "massive extension of a prima facie duty restrained only by indefinable circumstances," citing with approval the decision of Brennan, J., in *Sutherland Shire Council v. Heyman* (1985) 157 C.L.R. 424, who further stated that "the law should develop novel categories of negligence incrementally and by analogy with

established categories." The Hennessy Declaration cites to no decided case to support the prediction that NN Ireland's allegations would persuade an Irish court that imposition of a duty of care on NNI in these alleged circumstances would be "just and reasonable," as stated in *Glencar.*

42.    As to the distinct required element of damages, the Hennessy Declaration also is of the view that pure economic loss can sustain a claim for breach of duty as a matter of Irish law, citing the High Court opinion in *McShane Wholesale Fruit and Vegetables Ltd. v. Johnston Haulage Co. Ltd.* [1997] 1 ILRM 86, for the view that "the quality of the damage" is not relevant to the availability of recovery.  (Hennessy Decl. ¶ 79)

43.    Reliance on this reasoning is misplaced in light of the later decision of the Irish Supreme Court in *Glencar*, which reaffirmed the rule that damages for economic loss are "normally not recoverable" in tort except in certain narrow circumstances (negligent misstatement and negligent leasing of an un-inhabitable property).  The Hennessy Declaration points to no case that has permitted recovery for pure economic loss on foot of the claims alleged here.

**Dishonest Assistance and Unconscionable Receipt**

44.    In relation to the claims of dishonest assistance, the Hennessy Declaration (¶ 94) misunderstands my view that, to the extent the Proof of Claim alleges that NNI was the one responsible for the allegedly improper design or its implementation, no claim for dishonest assistance is made out. (Redmond Decl. ¶ 53)

45.     In short sum, and as stated in my Declaration, if NNI was responsible for the
design, it is not guilty of dishonest assistance with respect to the design.
(¶ 53).  Thus, the Hennessy Declaration is incorrect when he suggests that I
agree that a claim for dishonest assistance is made out as a matter of Irish law
in the Proof of Claim.  (Hennessy Decl. ¶ 96)

46.     In addition, I disagree with the conclusion in the Hennessy Declaration that an
action contrary to the best interests of another per se satisfies the requirement
for dishonest assistance.  That conclusion is supported neither by the U.K. case
*Royal Brunei Airlines Sdn Bhd v. Ton Kok Ming*, [1995] 2 A.C. 378 cited in
the Hennessy Declaration or by the Irish authorities referred in paragraph 51
and 55 of my initial Declaration.

47.     With respect to NN Ireland's claims for unconscionable receipt, the  Hennessy
Declaration does not address the required element that a plaintiff be able to
trace its property to the custody of the defendant.  (Redmond Decl. ¶ 56)
Again, the Hennessy Declaration  misapprehends my view when it suggests
that I agree that a claim for unconscionable receipt is made out in the Proof of
Claim.  (Hennessy Decl. ¶ 104)

## Conspiracy

48.     The Hennessy Declaration states the  view that the Proof of Claim makes out a
claim for unlawful means conspiracy on the basis of "the parties . . . acting
tortiously together in breach of fiduciary duty towards NN Ireland."  (¶ 117)
NN Ireland's unlawful means conspiracy claims thus stand or fall on the basis
of its claims of NNI's de facto and shadow directorship, by which NN Ireland
alleges the requisite fiduciary duties arose.  Because, for the reasons stated

herein and in my Declaration (¶¶ 8-39), I believe that those claims are not made out as a matter of Irish law, I also am of the view that NN Ireland has not made out a claim for unlawful means conspiracy.

49.    The claim for simple conspiracy as alleged in Proof of Claim also expressly relies on the asserted breach of fiduciary duty as the predicate unlawful purpose.  See Proof of Claim paragraphs 107, 144.  Thus I also have the same view as expressed above with respect to the claim for simple conspiracy.

**Mistake**

50.    The Hennessy Declaration opines that it is not necessary for Nortel Ireland to allege, as part of its claim that it failed as a result of a mistake to receive its fair allocation of Pre-Petition Sale Proceeds, that it was a seller of some or all of the assets sold, nor for Nortel Ireland to identify the type of mistake it alleges took place. (Hennessy Decl. ¶¶ 121, 128)

51.    I disagree that an Irish court would accept the claim in the absence of such fundamental pleaded elements.  In particular, I take issue with the contention that in practice in the Irish Courts once interlocutory matters such as discovery are dealt with, the party making a claim under the law of mistake may be in a position to plead as to the varietal of mistake being alleged against the other party.

52.    The core test in an interlocutory application for discovery is an analysis of whether the documents in question are relevant to the case as pleaded.

53.    In *Framus Limited v. CRH plc* [2004] 2 I.R. 20 in agreeing with the

Defendant's submission that the Plaintiffs were seeking documents not

relevant to the matters as pleaded by the Plaintiffs, the Chief Justice held:

> However, what the Plaintiffs in effect seek in this context is access to
> all documents concerning all transactions … because they believe that
> among them they will find evidence of the anti-competitive practices
> of which they suspect the defendants.    Apart from its speculative
> element, this particular application is more akin to an investigative
> process rather than a discovery process and perhaps more appropriate
> to, as the High Court judge pointed out, the exercise of a public
> investigatory power by a competent authority.

54.    To suggest, therefore, that a blanket allegation of mistake can be made and

that the determination of which varietal mistake is operative should await the

outcome of discovery, would be an abuse of interlocutory procedures and an

attempt to circumvent well established pleading requirements.

## Contractual Claims

55.    In my Declaration, I address contractual claims under Irish law.

56.    The Hennessy Declaration contention that the contract alleged by Nortel

Ireland is implied and oral misses my point.  The points cited in my

Declaration apply, if relevant to the alleged contract, whether the contract

sought to be enforced is in writing or oral.  It is not that every contract requires

each of these elements, but that, depending upon the type of contract claimed,

as set forth in the cases cited in Paragraph 102 of my Declaration, those issues

are not merely evidence but the elemental terms of an agreement sought to be

judicially enforced.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, executed on the ___5th___ day of October 2011.

Aidan Redmond S.C.