IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| *In re* <br><br> Nortel Networks Inc., *et al.*, <br><br> Debtors. | | Chapter 11 <br><br> Case No. 09-10138 (KG) <br><br> Jointly Administered |

**SECOND DECLARATION OF GUILHEM BREMOND IN SUPPORT OF
JOINT OBJECTION AND MOTION TO DISMISS CLAIMS OF
NORTEL NETWORKS S.A. (NNSA) AND ITS FRENCH LIQUIDATOR**

I, Guilhem Bremond, hereby declare as follows, pursuant to 28 U.S.C. § 1746:

1.  I submit this declaration in further support of the Joint Objection and Motion to Dismiss Claims of Nortel Networks S.A. ("NNSA")[1] and its French Liquidator and as a supplement to my earlier declaration in this matter, dated July 22, 2011 ("First Bremond Declaration"). The terms of my engagement and the basic assumptions that I shall apply herein remain those which I set out in my first declaration.[2]

2.  For purposes of this supplemental declaration, I have been asked to review the Declaration of Professor Michel Menjucq in support of the Joint Administrators' Opposition to the Debtors' and Committee's Joint Objection and Motion to Dismiss, dated September 14, 2011 ("Menjucq Declaration"), and to provide an expert opinion on the analysis of French law performed by Professor Menjucq therein. For the avoidance of doubt, this second declaration is complementary to my July 22, 2011 declaration. Below, I follow the same structure as that contained in Professor Menjucq's declaration. Accordingly, I examine, in turn, the three categories of claims addressed by Professor Menjucq: (i) claims based on article L. 651-2 of the Commercial Code; (ii) claims based on article 1382 of the Civil Code; and (iii) claims relating to actions with respect to the UK Pension regulator. Before addressing these claims, however, I offer a few comments on the introduction and presentation of the French legal system contained in Professor Menjucq's declaration.

---

[1]     All terms used herein and not otherwise defined shall carry the meaning ascribed to them in my declaration dated July 22, 2011.

[2]     First Bremond Decl. ¶¶ 3-7.

I – Introduction and Presentation of the French Legal System[3]

3.      Professor Menjucq asserts that it is rare in France for *avocats* to be asked by their colleagues to "serve as experts."[4]  It is important to understand that insolvency matters are considered by lawyers in France to involve specialized legal expertise.  As a practicing lawyer who specializes in the insolvency field and litigates issues of insolvency on a daily basis, I have been consulted on many of the most important recent insolvency matters in France, and I am regularly asked to provide advice on questions of insolvency law to *avocats* at other law firms (including some of the largest and most respected French law firms).  I am consulted because of my recognized expertise in this field.[5]

4.      In describing the French legal system, Professor Menjucq asserts that decisions of French courts of appeal have "limited influence."   It is true, as both Professor Menjucq and I explain, that no decision in the French legal system (including those issued by the *Cour de Cassation*) represents binding precedent (in the sense known in the common law).  However, in practice, parties very much rely upon decisions of the courts of appeal (such as those cited in my first declaration and those cited by Professor Menjucq himself) in addition to those of the *Cour de Cassation*, to understand and to demonstrate how the law should be applied.  For example, parties litigating the question of whether an individual or company should be qualified as a *de facto* director under French law would, at the risk of committing malpractice for having failed to do so, rely strongly upon citations to earlier decisions in order to show the bases upon which earlier courts (including the courts of appeal) have made such a qualification.  The *doctrine*[6] also analyzes decisions by the courts of appeal for the same instructive purpose, *i.e.* highlighting the types of positive and independent acts of management that courts have found sufficient or insufficient to warrant imposition of *de facto* director status.

II- Claims based on Article L. 651-2 of the Commercial Code (Claims 2, 6, 13 and 16)

II.1    On the qualification of NNI as a *de facto* director

  A-  Standards and Methodology Applied by French Courts[7]

  A.1.      Standards

5.      Professor Menjucq confirms that NNI was not a *de jure* director of NNSA and that, as a consequence, NNSA must demonstrate that NNI was a *de facto* director of NNSA in

---

[3]      I respond in this section to Paragraphs 6 and 12-19 of Professor Menjucq's declaration.

[4]      Menjucq Decl. ¶ 6.

[5]      I refer to my *curriculum vitae*, First Bremond Decl. Ex. A, for further detail regarding the honors that have been bestowed upon me by the French legal community in recognition of my expertise in the insolvency field.

[6]      As noted in my first declaration, *doctrine* is scholarly opinion in journals and treatises, which is generally considered to have some persuasive value in the interpretation of French law.  First Bremond Decl. ¶ 22.

[7]      I respond in this section to Paragraphs 27-50 of Professor Menjucq's declaration.

order for liability to be imposed on NNI under Article L. 651-2 of the Commercial Code.[8]

6.     Professor Menjucq also confirms my opinion that the two criteria drawn from the relevant French *jurisprudence* and *doctrine*, both of which must be shown in order for a court to find a party to be a *de facto* director, are:

-     performance of positive acts of management; and
-     performance of those acts independently and continuously.[9]

7.     In addition, I note that while Professor Menjucq maintains that a sister company like NNI could be qualified as a *de facto* director, he has not cited a single case in which such a qualification has ever been made.[10]

8.     As I explained in my first declaration, in order for a French court to find that a party engaged in "positive acts of management" of a nature and degree such that he may be qualified as a *de facto* director, the affirmative acts of the alleged *de facto* director must have reduced the decision-making independence of the company's *de jure* directors, *i.e.*, the acts of management must have been imposed upon the debtor company such that the debtor company was dominated by the alleged *de facto* director.[11]   Although French courts employ a variety of terms to describe the level of activity necessary to rise to the level of *de facto* directorship, such as "total subordination,"[12] "strict control,"[13] "dependence and submission,"[14] or any number of other descriptions, each reflects the concept of *domination*.

9.     According to Professor Menjucq, "The most important criterion is the performance of *predominant influence* through the performance of acts of management as would a de jure director."[15]   As the cases Professor Menjucq himself cites make clear, this is merely a different articulation of the same dominance test.[16]   Thus, to the extent Professor Menjucq suggests that "predominant influence" involves something less than the domination standard discussed above (and it is not entirely clear that he does suggest that), he is mistaken.

10.    That domination is the touchstone of the *de facto* directorship analysis,[17] is confirmed by each of the decisions I cited in my first declaration.[18]   Professor Menjucq criticizes

---

[8]        Menjucq Decl. ¶ 26; First Bremond Decl. ¶¶ 26, 28.

[9]        Menjucq Decl. ¶ 30; First Bremond Decl. ¶ 30.

[10]        Menjucq Decl. ¶ 39, 42; see also First Bremond Decl. ¶ 33 (noting that I am aware of only one decision in which such a qualification was made, and this decision was quashed by the *Cour de Cassation*).

[11]        First Bremond Decl. ¶ 32.

[12]        Court of Appeal of Lyon, 07/02/1999, RG n° 98/7888.

[13]        Court of Appeal of Aix en Provence, 8° ch, 15 December 1978; see ¶ 11 below.

[14]        Cass. Com. 02/15/2011, n°10-11781; see ¶ 11 below.

[15]        Menjucq Decl. ¶ 32 (emphasis added).

[16]        See ¶ 11 below.

[17]        I note that Professor Menjucq appears to be in agreement with me that merely belonging to a group of companies will not establish a *de facto* directorship, Menjucq Decl. ¶ 37, and that an individual officer of one

me for supposedly "heavily rel[ying]" on one decision of the Court of Appeal of Lyon, in which the Court qualified a parent as the *de facto* director of its subsidiary on the grounds that the parent had reduced its subsidiary to a position of "total subordination."[19] However, Professor Menjucq does so while apparently ignoring and without even attempting to address the numerous other decisions from the courts of appeal and the *Cour de Cassation* that I cited and upon which I relied, *all of which* corroborate the principle that *de facto* director status will not be imposed under French law absent concrete elements establishing domination.[20]

11.   Moreover, review of the cases cited by Professor Menjucq himself confirms that this is the correct standard.  By way of illustration, I describe below the relevant elements in a number of the cases relied upon by Professor Menjucq, all of which show that domination through positive acts of management on the part of the defendant are necessary for the defendant to be qualified as a *de facto* director:

   a)   *Cour de Cassation* (February 15, 2011):[21] The person qualified as *de facto* director was an individual who was the majority shareholder of the company and a lawyer who "set the purchase price of the business and of the inventory as well as the payment methods, [] established the head office of the company at his domicile, [] defined the economic and financial operations of the company as well as its future prospects and [] was regularly consulted by the de jure director who was in a relationship of dependence and submission to his opinions."[22]

   b)   *Cour de Cassation* (February 19, 2002):[23]  The Court found a close involvement of a shareholder and salaried employee in the management of the company, which appeared to be operated as if it were the employee's own business.  In particular, the employee took the initiative of hiring employees, took accounting and banking decisions, had a power of attorney over the company's bank account and had close relationships with the customers and the suppliers of the company.

   c)   *Cour de Cassation* (December 19, 1995):[24]  A company managing a network of hotels was regarded as *de facto* director of the company operating one hotel where the managing company was responsible for hiring and dismissals of the employees of the company operating the hotel, set up the administrative and financial organization, set the pricing policy, negotiated contracts and set the commercial policy.[25]

---

company may be deemed a *de facto* director of another company without the company that such officer formally represents also being found to be a *de facto* director, Menjucq Decl.  ¶ 40.

[18]   <u>See</u> First Bremond Decl. ¶¶ 32-37.

[19]   Menjucq Decl. ¶ 34.  <u>See</u> First Bremond Decl., footnote 46.

[20]   First Bremond Decl., footnotes 41, 44, 45, 47.

[21]   Menjucq Decl. ¶ 35.

[22]   Menjucq Decl. ¶ 35; (Cass. Com. 02/15/2011, n°10-11781).

[23]   Menjucq Decl., footnote 19.

[24]   Menjucq Decl. ¶¶ 41-42.

[25]   Menjucq Decl. ¶ 42.

d) Court of Appeal of Versailles (December 21, 2000):[26] The Court of Appeal qualified as *de facto* directors two shareholders of a company, who were also employees of this company, due to their strong involvement in the management, noting that they had higher salaries than the *de jure* director, were the main interlocutors of the clients, signed various contracts or commercial papers, and were granted a general power of attorney by the *de jure* directors.

e) Court of Appeal of Aix en Provence (May 26, 1981):[27] Finding that the shareholder had authority over the managers of the subsidiary, that the shareholder was favored in its commercial relationship with its subsidiary and that it essentially imposed the subsidiary's pricing terms (without any ability of the subsidiary to control its own pricing), and therefore had a "predominant influence" over the activity and the future of its subsidiary.

f) Court of Appeal of Aix en Provence (December 15, 1978):[28] The Court of Appeal found that the shareholder "had a strict control" over its subsidiary and interfered in the management of the company which lost its independence.  In particular, the shareholder managed the bank accounts of its subsidiary, managed the inventory, gave direct instructions to the employees of its subsidiary, gave instructions regarding accounting and had direct authority over the sales manager.

12.  The *doctrine* relied upon by Professor Menjucq also confirms that French courts require a very strong showing of mastery and domination before *de facto* directorship will be imposed.  For instance, Professor Menjucq refers to an article written by Professor Tricot, a member of the Faculties of Law who also served as Chairman of the Commercial, Economic and Financial Chamber of the *Cour de Cassation* between 2002 and 2007,[29] which is the section of the *Cour de Cassation* that renders most of the relevant decisions in this field.  His opinion is therefore of great interest.  In his article, Professor Tricot emphasized that before the *de facto* director qualification may be applied, the alleged *de facto* director must be found to have behaved as the *master of the business*[30] and to have taken decisions on behalf of the company.

13.  In sum, in order for an entity in a corporate group to be found to be a *de facto* director of another entity in that group, the former must dominate the latter, which is shown by pointing to affirmative decisions or acts of management imposed on -- and that reduced the decision-making independence of -- the company's *de jure* directors by the alleged *de facto* director.

---

[26]    Menjucq Decl. ¶ 70.

[27]    Menjucq Decl. ¶ 38.

[28]    Menjucq Decl. ¶ 69.

[29]    Menjucq Decl., footnote 6.

[30]    *Les critères de la gestion de fait* : Droit et Patrimoine Jan 1996, p. 24.

A.2.    Methodology

14.    Professor Menjucq observes, and I agree, that French courts apply the "bundle of concurring elements" technique of analysis in examining whether *de facto* director status is justified.[31]  Contrary to Professor Menjucq's accusation, however, I did not examine each alleged element contained in the Claim of NNSA in isolation, asking whether it alone could be held sufficient to justify qualification of NNI as a *de facto* director of NNSA.  As stated in my first report, a positive management act must have been an act that was imposed upon the debtor company.[32]  I found no such positive acts which could have warranted consideration of whether a "bundle" of such acts existed, so my analysis ended there.

B.    Application to the Claims of NNSA[33]

15.    Professor Menjucq states that the elements alleged in the Claim of NNSA, "in the aggregate support the conclusion that NNI performed positive acts of management as a *de jure* director would have done."[34]

16.    As I explain below, I disagree with Professor Menjucq that the allegations, even if accepted as true, show any "positive acts of management," much less a sufficient "bundle" of such acts to qualify NNI as a *de facto* director of NNSA.

B.1 Transfer Pricing[35]

17.    Based upon NNSA's allegations in relation to transfer pricing, Professor Menjucq concludes that "NNI and NNL had a predominant influence over NNSA which led them to decide on positive management acts in lieu of NNSA's de jure directors."[36]  I disagree with Professor Menjucq's conclusion because, as I explained in my first declaration, the Claim of NNSA does not contain any non-conclusory allegations upon which a French court could find that NNI dominated NNSA by imposing the new transfer pricing regime upon it.[37]

18.    Moreover, the allegations recited by Professor Menjucq that certain NNI employees were *involved* in NNSA's tax affairs,[38] even if not conclusory, would not suffice to show domination; any such "involvement" would not, under the prevailing standards of French law (as illustrated in the cases discussed above), establish *NNI's* ability to master or control NNSA.

---

[31]    Menjucq Decl. ¶ 47.

[32]    First Bremond Decl. ¶ 32.

[33]    I respond in this section to Paragraphs 51-80 of Professor Menjucq's declaration.

[34]    Menjucq Decl. ¶ 51.

[35]    I respond in this section to Paragraphs 52-61 of Professor Menjucq's declaration.

[36]    Menjucq Decl. ¶ 61.

[37]    First Bremond Decl. ¶ 46.

[38]    Menjucq Decl. ¶ 53

19.   The sole allegation addressed by Professor Menjucq (which I addressed in my first report[39]) that could be interpreted as an example of an affirmative act of management, is the allegation that "NNSA was simply instructed to sign the MRDA."[40]   Professor Menjucq claims to have an "understanding" that this means "NNSA received the instruction from NNI **and** NNL to sign the MRDA."[41]   I note that is not what the Claim says.   However, even if it was, such an allegation would not suffice to show the requisite level of domination for at least two reasons:   First, a mere instruction by NNI and NNL would not be a management act imposed on NNSA without any further allegation that NNSA obeyed the instruction because its decision-making independence had been reduced by NNI (and there is no such allegation).   Second, merely alleging that both NNI and NNL gave an instruction would not suffice under French law to show dominance on the part of NNI.

20.   I therefore disagree with Professor Menjucq's conclusion that the Claim shows that NNI's actions with respect to the transfer pricing arrangements show any positive acts of management by which NNI reduced the decision-making independence of NNSA's *de jure* directors.[42]

B.2 <u>February 2008 Repayment</u>[43]

21.   On the basis of a conclusory allegation that NNI and NNL "imposed" the repayment decision upon NNSA, Professor Menjucq opines that this "is another example of a decision taken by NNI in lieu of NNSA's de jure directors."[44]   I disagree that such conclusory allegations would suffice to show a positive act of management.

22.   Moreover, the one non-conclusory allegation addressed by Professor Menjucq in this regard completely undermines his conclusion.[45]   That an employee of NNI (on secondment to NNUK) is alleged to have "pushed" NNSA to make the Repayment, even if his "pushing" could be attributable to NNI, does not show that he decided in lieu of the *de jure* directors of the company to make the repayment.   In the present case, the Claim of NNSA never refers to any decision regarding the February 2008 Repayment made by NNI.   On the contrary, the Claim of NNSA alleges that a controller of NNSA expressed reluctance to repay the entire amount outstanding and that NNSA eventually repaid only half of the outstanding amount.[46]   This demonstrates clearly that NNI did not decide this full repayment or dominate NNSA.

---

[39]      First Bremond Decl. ¶ 43.

[40]      Claim of NNSA ¶ 18d.

[41]      Menjucq Decl. ¶ 58, fn.29.

[42]      Professor Menjucq also makes various observations regarding the alleged lack of proper approval of the MRDA by the *de jure* directors of NNSA.   Menjucq Decl. ¶¶ 55-60.   I explained at Paragraph 45 of my first report why such allegations are irrelevant to NNI and any allegation against it.

[43]      I respond in this section to Paragraphs 62-65 of Professor Menjucq's declaration.

[44]      Menjucq Decl. ¶ 65.

[45]      Menjucq Decl. ¶ 63.

[46]      Claim of NNSA ¶ 75.

23.    Therefore, I again disagree with Professor Menjucq's conclusion that a French court would consider any of NNI's alleged actions with respect to the February 2008 Repayment to show positive acts by which NNI reduced the decision-making independence of NNSA's *de jure* directors.

B.3 <u>Taxation Matters</u>[47]

24.    Professor Menjucq opines that "[a]nother element of the de facto directorship over NNSA arises from NNI and NNL's determination of NNSA's tax policy."[48]  I note that the paragraphs of the Claim cited by Professor Menjucq for the proposition that NNI "determin[ed]" NNSA's tax policy contain only a conclusory allegation that "NNSA's taxation affairs were controlled by NNI and NNL."[49]   I therefore disagree with Professor Menjucq because, as I explained in my first declaration, the Claim of NNSA does not refer to any non-conclusory alleged act of decision-making committed by NNI in relation to NNSA's taxation affairs.[50]  Moreover, simple allegations of "involvement" of NNI employees in taxation matters would not, under the governing standards of French law, justify a finding of domination by NNI of NNSA in respect of taxation matters.[51]

25.    Moreover, Professor Menjucq attempts to support his conclusion with a reference to certain cases, asserting that "[t]he taking over of a company's tax management has been mentioned several times by case law as evidence of a *de facto* management situation."[52]  To support this assertion, he refers to a decision of the Court of Appeal of Aix-en-Provence dated December 15, 1978,[53] and asserts that the Court noted that the foreign parent company "gave instructions concerning its stock management and compatibility and, consequently, its taxes."[54]   The description provided by Professor Menjucq is inaccurate.  In the case upon which Professor Menjucq relies, the Court of Appeal, before finding a *de facto* director relationship, found a series of elements of domination and control that go much further than any taxation matters (indeed, the decision did not even mention taxation matters).  In particular, the Court of Appeal found a relationship involving what it characterized as "strict control," noting that the parent company directly managed the bank account and inventory of its subsidiary, and gave instructions to the employees, especially for accountancy matters, and had authority over the

---

[47]    I respond in this section to Paragraphs 66-71 of Professor Menjucq's Declaration.

[48]    Menjucq Decl. ¶ 66.

[49]    Claim of NNSA ¶ 84.

[50]    First Bremond Decl. ¶¶ 58-62.

[51]    I note that while Professor Menjucq describes the Claim of NNSA as having alleged that NNI staff "demonstrated the merits of the RPSM directly" to the French tax authority, Menjucq Decl. ¶ 67, the Claim of NNSA never alleges any contact between NNI and the French tax authorities or the drafting by NNI of any tax documents.  <u>See</u> Claim of NNSA ¶ 18e.  Thus, the cases cited by Professor Menjucq (Menjucq Decl. ¶¶ 66-71), are not similar to the allegations actually made by NNSA against NNI.

[52]    Menjucq Decl. ¶ 68.

[53]    Court of Appeal of Aix en Provence, 8° ch, 15 December 1978.

[54]     Menjucq Decl. ¶ 69.  The English language translation of Professor Menjucq's declaration translates the French "comptabilité" as "compatibility."  I have quoted the translation faithfully, but note that the correct translation is "accounting" rather than "compatibility."

company's sales manager.  Such elements of "strict control" go far beyond NNSA's allegation here.

26. Professor Menjucq cites two additional decisions in his discussion of taxation matters, one of the Court of Appeal of Versailles[55] and another of the *Cour de Cassation*.[56] Professor Menjucq argues that in these cases the court imposed *de facto* director status on the basis that the alleged *de facto* director was a "preferred point of contact" for various administrative services or drafting of corporate and tax documents.  What Professor Menjucq does not mention is that in both decisions, the element he refers to was again only one among numerous elements relied upon by the Courts in finding a bundle of converging elements establishing the degree of domination and control necessary for qualification of *de facto* directorship.  For example, the *Cour de Cassation* in its decision of March 10, 2004,[57] also found that the relevant manager placed orders with suppliers, had a power of attorney over all of the company's bank accounts, managed the collection of payments, and signed checks for the company.  The Court of Appeal of Versailles in its decision of December 21, 2000, also found that the *de facto* manager hired employees, and signed the company's rental agreement as well as several quotes provided by the company.

27. Finally, it is important to emphasize that the *doctrine* cited by Professor Menjucq expressly states that mere suggestions or recommendations are not positive management acts sufficient to impose *de facto* directorship.[58]

28. Therefore, the allegations contained in the Claim regarding NNI's involvement in the tax matters of NNSA again do not justify a court finding that NNI engaged in positive acts of management by which it reduced the decision-making independence of NNSA's *de jure* directors.

29. In any event, as I explained in my first declaration, because the Claim of NNSA does not refer to any claim having been made by tax authorities against NNSA or any penalty or fine having been imposed upon NNSA, there is no basis under which a French court could find that NNI contributed to any alleged excess of liabilities over assets at NNSA.[59]  Accordingly, there would be no possible basis for holding NNI liable in relation to taxation matters under article L. 651-2 of the Commercial Code even if it were, *arguendo*, deemed a *de facto* director of NNSA.  I note that Professor Menjucq has not responded to this conclusion.

---

[55]    Menjucq Decl. ¶ 70.

[56]    Menjucq Decl. ¶ 71.

[57]    Menjucq Decl. ¶ 70.

[58]    Menjucq Decl., footnote 6 (citing, Gérard Notté, *La notion de dirigeant de fait au regard du droit des procédures collectives*, JCP CI 1980, 8560, §7).

[59]    First Bremond Decl. ¶¶ 61-62.

B.4 <u>Control Over Business Sales</u>[60]

30.    Professor Menjucq asserts that additional evidence of the *de facto* directorship status of NNI towards NNSA resides in the alleged control by NNI and NNL over business sales. Again, I disagree with Professor Menjucq because, as I explained in my first declaration,[61] the Claim of NNSA does not refer to any non-conclusory alleged act of decision-making committed by NNI in relation to business sales, nor do its allegations that "NNI and NNL" controlled the business sales suffice under French law to show dominance on the part of NNI.[62]

B.5 <u>Conclusion</u>

31.    Professor Menjucq concludes that all the above-mentioned elements establish that NNI had a predominant influence over the management of NNSA through positive acts of management.

32.    As I have explained above in relation to the specific allegations by NNSA in each area of alleged wrongdoing, it is my opinion that not one of the allegations against NNI in the Claim of NNSA, nor all of them together, provides a valid basis under French law to establish that NNI was the master of the business of NNSA or that it dominated NNSA.[63]

## III- Claims based on Article 1382 of the Civil Code (Claims 3, 7, 14 and 17)

III-1    <u>Legal Standards</u>[64]

33.    Professor Menjucq confirms that the claims under article 1382 of the Civil Code are in the alternative to the claims based on article L. 651-2 of the Commercial Code.[65] Thus, a court would only consider possible liability under article 1382 of the Civil Code if it had first denied liability under article L. 651-2 of the Commercial Code.

---

[60]    I respond in this section to Paragraphs 72-75 of Professor Menjucq's declaration.

[61]    First Bremond Decl. ¶ 57.

[62]    Claim of NNSA ¶ 82.

[63]    Professor Menjucq goes on in his declaration to discuss the alleged existence of mismanagement acts (Paragraphs 81-87) and alleged causation of harm by NNI by its alleged acts of mismanagement (Paragraphs 88-93).  Because I found that the Claim of NNSA does not establish a basis upon which NNI could be qualified as a *de facto* director of NNSA, a finding which precludes any possible liability for NNI under article L. 651-2 of the Commercial Code, I did not address the second or third elements of the claim of mismanagement.  For the sake of completeness, however, I note that Professor Menjucq's description of the relevant standards of causation under article L. 651-2 of the Commercial Code is highly misleading.  In particular, while purporting to rely upon an article of Professor Hannoun for the proposition that French courts apply a "loose concept" of causation under article L. 651-2 of the French Commercial Code (Menjucq Decl. ¶90), Professor Menjucq fails to mention that Professor Hannoun goes on in his article to explain that the "loose concept" "is treated as a necessary condition but insufficient."  Professor Hannoun adds, correctly in my view, that "once several causes are chosen by the judges applying the ["loose concept"] filter, the *Cour de Cassation* will then sort those causes out . . . . In doing so, it struggles against a kind of assumption of collective responsibility of the board."

[64]    I respond in this section to Paragraphs 95-118 of Professor Menjucq's declaration.

[65]    Menjucq Decl. ¶¶ 95-97.

34.    Below, I address three significant differences of opinion between myself and Professor Menjucq in relation to the standard of liability that a French court would apply under article 1382 of the Civil Code.  The first relates to the question of whether "fault" must be demonstrated as an element of liability.  The second relates to the role of "bad faith" in the context of the types of claims asserted in the Claim of NNSA, which allege that NNI "aided and abetted" and/or conspired with NNL to commit wrongs against NNSA.  The third relates to the required nexus between the individual acts and the alleged harm.

A-  The Element of Fault

35.    As I explained in my first report,[66] under standard and well established principles of French law, three elements would need to be established before any liability could be imposed:

-    fault;
-    damages; and
-    a causal link between the fault and the damages.

36.    Professor Menjucq agrees with the second and third elements of the basic test required for liability under article 1382.  However, he asserts that the first element should not be defined as requiring a showing of "fault," but instead merely proof of the existence of a "damaging event," resulting in a strict liability standard.[67]  Professor Menjucq himself admits that his strict liability concept remains a "controversial" idea, even in the French scholarly literature, but appears to prefer such an approach because he believes that "the concept of fault is less and less important in relation to civil liability."[68]

37.    Notably, Professor Menjucq does not go so far as to affirm that his preferred strict liability approach has been endorsed or accepted by the French *Cour de Cassation* or by the majority of French courts.  Indeed, he acknowledges that the "traditional" approach under French law is to require a showing of fault.[69]

38.    I maintain that the correct understanding of article 1382 of the Civil Code (under both traditional and current decisional practice) requires proof of fault.  Recent case law from the *Cour de Cassation* confirms that fault is one of the elements required to establish tort liability under article 1382.[70]  Similarly, authors of *doctrine* almost unanimously confirm that fault is the first required element to establish tort liability on the basis of article 1382.[71]  Indeed, the requirement of "fault" is found within the text of article 1382 of the Civil Code itself, which, according to the official French government-approved

---

[66]    First Bremond Decl. ¶ 64.

[67]    Menjucq Decl. ¶ 101.

[68]    Menjucq Decl. ¶ 105.

[69]    Menjucq Decl. ¶¶ 103-104.

[70]    (Cass. Civ. 1, 26/05/2011, n°10-13.780); (Cass. Civ. 1, 26/10/2004, n°01-16.523).

[71]    Droit Civil Les Obligations, François Terré, Philippe Simler, Yves Lequette, Dalloz, paragraph 715 (10th ed.): "*When the act of man is contemplated on its own, it only renders its author liable, in principle, if the latter has committed a fault (…). This quite natural solution results, in our law, from article 1382 of the Civil Code*"; Droit Civil Les Obligations 2. Le fait juridique, Jacques Flour, Jean-Luc Aubert, Eric Savaux, Sirey, paragraph 97 (12th ed.): « *Tort liability for personal behavior is the one which sanctions the damaging fault committed by a person. The principle lies in article 1382 of the Civil Code*". See also Droit des Obligations, Philippe Malinvaud, Dominique Fenouillet, Litec, paragraph 573 (11th ed.).

translation, provides as follows: "Any act whatever of man, which causes damage to another, obliges the one by whose fault it occurred, to compensate it."[72]  Indeed, the Civil Code in the original French, quoted in Professor Menjucq's declaration, contains the word "*faute*."[73]  I therefore find the English translation in Professor Menjucq's report, in which the word "fault" is omitted from article 1382, and upon which Professor Menjucq's bases his strict liability theory, to be highly misleading.[74]

39.    It is essential to understand that the strict liability standard described by Professor Menjucq in relation to classic cases under article 1382 of the Civil Code is not widely accepted by courts.  While Professor Menjucq's theory has been proposed in the scholarly literature and applied in certain areas of the law, such limited areas are far removed from the ones at issue here.  In particular, Professor Menjucq's theory has been applied in the context of vicarious liability for damages caused by the acts of persons for whom an individual or a company is responsible or by things which are under a person's custody.  However, such liability, at issue in cases involving, for example, damages caused by one's employees, arises under a separate and distinct form of tort liability under French law, not alleged here, which is codified under article 1384 of the Civil Code.[75]  The other areas of law where this broad definition of fault is applied involve special regimes of tort liability, such as traffic accidents.[76]  The underlying reason for such a large definition is the desire to ensure protection of special categories of victims and to allow their indemnification.[77]

40.    These situations are completely different from the allegations that NNI aided, abetted or conspired with NNL to cause various harms to NNSA, each of which is alleged and would be analyzed under article 1382 of the Civil Code with its classic notions of fault.[78]

---

[72]    Official English translation of article 1382 of the Civil Code, accessible at the public website, *legifrance.gouv.fr.*

[73]    Menjucq Decl. (in French) ¶ 98.

[74]    Menjucq Decl. (English translation) ¶ 98 (translating article 1382 in terms reflecting Professor Menjucq's preferred strict liability approach:  "any action by a person, which has caused damage to another, obliges that person to provide compensation for the damage caused").

[75]    Article 1384 of the Civil Code

[76]    JCP Civil Fasc. 120-10 : Droit à Réparation – responsabilité fondée sur la faute – notion de faute : contenu commun à toutes les fautes, Patrice Jourdain, 10 mai 2006, n°3, cited in First Bremond Decl. ¶ 83.

[77]    Indeed, the authors cited by Professor Menjucq in his discussion of strict liability (Menjucq Decl. ¶ 72), Professors Buffelan-Lanore and Larribau-Terneyre, affirm that while strict liability regimes have been developed in some specific areas of law, they are not based on article 1382.

[78]    I note that NNSA also claims under article 1382 of the Civil Code, in the alternative, that NNI aided and abetted or conspired with NNSA's *de jure* directors.  See Claim of NNSA ¶¶ 114,137, 164, 175.  The Claim of NNSA does not provide a single allegation describing how NNI provided such alleged wrongful assistance to NNSA's *de jure* directors.  Therefore NNSA's conclusory assertions would not provide a valid basis for finding liability under article 1382 of the Civil Code.  I also consider that any claim that NNI aided and abetted or conspired with NNSA's *de jure* directors would be subject to the same bad faith and knowledge requirements discussed immediately below at Paragraphs 41-47 of this declaration.  Just as the Claim of NNSA does not allege that NNI knew its actions would cause the breach of duties owed by NNL vis-a-vis NNSA, it equally fails to allege knowledge that its actions would cause NNSA's *de jure* directors to breach their duties to the company.  Accordingly, such allegations would not provide a valid basis for imposing liability upon NNI under article 1382 of the Civil Code.

B-  <u>The Elements of Knowledge and Bad Faith in Secondary Liability Cases</u>

41.    Professor Menjucq confirms that in French civil law, there are no separate causes of action for the torts of conspiracy, adding and abetting, assisting and/or encouraging, and that they would be analyzed by French courts on the basis of article 1382 of the Civil Code.[79]

42.    In my first declaration, I cited the *jurisprudence* of the *Cour de Cassation*, which makes clear that mere knowledge of some future injury to a third party would not be sufficient to establish fault in cases where one party is alleged to have assisted another in breaching a duty owed to a third party.  Instead, in such cases, the *Cour de Cassation* required knowledge of the breach of an obligation to a third party in order to find fault (indeed, in one case, the *Cour de Cassation* required not only knowledge, but also a showing of an intention to cause injury or fraudulent conduct).[80]  Based upon my detailed review of the allegations made by NNSA, I observed that NNSA had not alleged elements from which a French court could find the requisite fault for imposing liability under article 1382 of the Civil Code.  In particular, the Claim of NNSA does not allege knowledge by NNI that its actions would cause the breach of a duty owed by NNL to NNSA.[81]

43.    Notably, Professor Menjucq has completely ignored the cases that I cited when I explained why French courts require proof of knowledge of the breach of a legal duty in the rare cases in which any liability is imposed for aiding and abetting type claims.  Rather than even attempt to distinguish the decisions of the *Cour de Cassation* that I cited, Professor Menjucq simply declares, without citation to any authority, that "French courts would not require proof that NNI knew that its actions would cause a violation of an obligation towards NNSA."[82]  According to Professor Menjucq, who (without explanation) apparently views the decisions of the *Cour de Cassation* on this issue as irrelevant, irrespective of what the *Cour de Cassation* has held in the past, bad faith would not be required here, first, because "fault" is not required for liability under article 1382 of the Civil Code, and, second, because even if fault were required, it could be established through negligence.[83]  Moreover, according to Professor Menjucq, bad faith is understood under French law as including not just actions known to be in violation of a legal duty, but also those from which the actor knows that harm will result.[84]  All three assertions are incorrect.

44.    As explained above, I reject Professor Menjucq's assertion that a showing of fault would not be required under French law for the allegations made against NNSA here.

45.    It is therefore clear that fault is a necessary element of NNSA's tort claims here.  As just noted, Professor Menjucq has not responded to the assertion in my first declaration,

---

[79]    Menjucq Decl. ¶ 106.

[80]    First Bremond Decl. ¶ 72.

[81]    First Bremond Decl. ¶ 79.

[82]    Menjucq Decl.  ¶ 111.

[83]    Menjucq Decl. ¶¶ 108-112.

[84]    Menjucq Decl. ¶¶ 108-112.

based on the *jurisprudence* of the *Cour de Cassation*, that in order to be held liable for helping another breach a third party's contractual rights, knowledge of the breach of the third party's rights is required.  In view of such decisions, Professor Menjucq's sweeping view that at most negligence must be shown is inaccurate.  Although NNSA's claims under article 1382 of the Civil Code do not clearly identify in each instance the nature of the rights alleged to have been breached by NNL as the basis for the aiding and abetting allegation against NNI,[85] to the extent that the allegation is that NNI helped NNL breach alleged contractual rights of NNSA[86] – (i) alleged rights said to flow from the MRDA (*i.e.* the transfer pricing claims), (ii) alleged contractual obligations under the 2002 Subordinated Loan Agreement (*i.e.* the February 2008 repayment claims)[87] and/or alleged agreements in relation to the allocation of proceeds from asset sales (*i.e.* the Business Sales claims)[88] – the reasoning of these contractual cases would apply and liability would not be possible without knowledge.[89]  Even if such claims were not alleged as contractual obligations, but instead as the aiding and abetting of non-contractual wrongdoing by NNL, I believe that the logic underlying the existing decisions of the *Cour de Cassation* in the aiding and abetting context, where nothing less than knowledge has always been necessary before secondary liability has been recognized, would require at least knowledge on the part of NNI.  Indeed, in the one case in which the *Cour de Cassation* considered aiding and abetting in a non-contractual context, which arose in the context of allegations that a party aided another in breaching its good faith bargaining obligations to a third party (a breach that sounds under article 1382 of the Civil Code), the *Cour de Cassation* required not just knowledge of the existence of the pre-contractual negotiations, but an intent to cause injury to the third party.[90]  In any event, the fact that the *Cour de Cassation* required proof of knowledge of a breach of legal duties or intent to cause injury as evidence of "bad faith" in such cases shows that Professor Menjucq is wrong when he opines, without qualification, that "bad faith" may be established through knowledge of "damage" alone.[91]

46.    Professor Menjucq notes by way of reply that intent is not strictly necessary to establish liability under article 1382 because French law also recognizes negligence as a basis of liability for purposes of article 1382.[92]  While it is true as a general matter that fault for

---

[85]    See, e.g., Claim of NNSA ¶ 136 (referring to "one or more of the following wrongs that caused loss to NNSA": an act of mismanagement or management fault; a fault/negligence under article 1382 of the Civil Code; "[s]ome other breach of law (French or otherwise), of NNL's duties or obligations . . . and/or of a customary rule").

[86]    The fact that these claims appear to make reference to and rely upon the alleged violation of what could be understood as alleged obligations of a contractual nature does not mean that NNSA has described valid contracts under French law.

[87]    Claim of NNSA ¶ 70a (referring to alleged intentions under the 2002 Subordinated Loan regarding the terms of repayment).

[88]    Claim of NNSA ¶ 81 (referring to alleged agreements).

[89]    As noted below, it is unclear whether the taxation matters claim also is alleged to arise from the breach of alleged contractual obligations (*e.g.* arising out of the MRDA).  To the extent that such claims do relate to alleged contractual duties, they also fail for lack of allegation that NNI had knowledge of any such duty.  In any event, because such claims are entirely contingent in nature, they fail under basic principles of ripeness and for lack of allegation of any causation of actual injury to NNSA.

[90]    First Bremond Decl. ¶ 72, footnote 95 (citing Cass. Com. 11/26/2003 n°00-10.243 and n°00-10.949).

[91]    Menjucq Decl. ¶¶ 108-112.

[92]    Menjucq Decl. ¶¶ 110, 112.

purposes of article 1382 may also be established by conduct that is negligent in nature, *i.e.* conduct inconsistent with the manner in which society would expect a reasonable person to act under the same circumstances, Professor Menjucq has cited no authority for his apparent view that a French court would allow an extension of existing *jurisprudence* (requiring knowledge or intent to cause injury) to allow liability to be established on the basis of mere negligence in a case involving allegations of wrongful assistance (particularly in a case involving the relationship between two fellow subsidiaries in a corporate group).[93]  For the avoidance of doubt, I am unaware of *any* case in which a French court has recognized negligence as a basis of liability in the context of allegations of "aiding and abetting" or conspiracy.  This is unsurprising because such theories are essentially alien to French civil law, which focuses under article 1382 on the direct link between the alleged tortfeasor and his alleged victim. Thus, as I explained above, in the only cases in which secondary liability has been recognized (which cases involved contractual obligations or pre-contractual duties – there are no other areas where secondary liability has been recognized to my knowledge in this type of context), the *Cour de Cassation* has required knowledge of a breach of a legal obligation or an intent to cause injury.

47.  In the context of considering what could validly be qualified under French law as wrongful conduct for purposes of analyzing the duties of a third party such as NNI, it is important to emphasize that the mere fact that an action might cause injury or economic loss does not necessarily make it "wrongful."  For instance, we all suffer economic loss when paying taxes but the resulting loss of wealth is in no sense wrongful.  Similarly, companies forming part of a corporate group often see their relative wealth decrease over time, without necessarily being the victim of a breach of a legal right.

C-  The Element of Causation

48.  Professor Menjucq confirms that in order to establish liability under article 1382 of the Civil Code, damages and a causal link between damages and what he describes as the "damaging event" must be established.[94]

49.  In my first declaration, I explained that under French law, the requisite causal link between fault and damages must be assessed on an individualized basis, *i.e.* against the acts of a specific individual actor, and that it is therefore impossible to establish causation based upon the actions of a third party or to impose collective responsibility under article 1382 of the Civil Code.[95]  Professor Menjucq has not responded to my description of this requirement, which is fundamental under French law in all but certain very rare cases – which are irrelevant here – in which it is impossible to individualize the causation of damages.[96]

---

[93]     Professor Menjucq identifies no case in which a French court has imposed liability under article 1382 of the Civil Code based upon allegations that a sister company caused injury to its affiliate in the same corporate group.

[94]     Menjucq Decl. ¶ 116.

[95]     First Bremond Decl. ¶ 68.

[96]     The classic scenario involves the hunting expedition in which multiple hunters fire simultaneously to cause injury but the victim is unable to trace the origins of the bullet.  Under such circumstances, French courts may relax the requirements of individualized causation because to do otherwise would leave the victim without any possibility of redress (Cass 2è civ., 05/18/1955; Cass 2è civ. 06/05/1957).

50.   While he purports to acknowledge the requirement of causation in principle, without saying so, Professor Menjucq approaches the issue of causation in a way that impermissibly eliminates any inquiry into its individualized character.  In particular, Professor Menjucq asks only whether the alleged "damaging event" caused damages, not whether the faulty action of an individual actor can be causally linked to damages alleged.[97]  Professor Menjucq's approach is not recognized under French law.

51.   Employing his technique, Professor Menjucq is therefore able to opine that because NNSA has alleged NNI's "participation" in "damaging events," NNI may be found liable for any damages resulting from such "events."  As explained above, Professor Menjucq's approach does not respect basic elements of French civil law under article 1382 and would not therefore be accepted before a French court, which would refuse to impose liability absent a clear causal link between specific alleged actions of NNI and the injury claimed to have been suffered.  As explained below, NNSA has not even attempted to allege any causal role individual to NNI.  Accordingly, I do not believe that Professor Menjucq's approach to causation is valid.

III.2   Application[98]

52.   Below, I first respond to Professor Menjucq's analysis of the alleged wrongdoing set forth in the Claim of NNSA.  Second, I consider Professor Menjucq's failure to address the requirement of individualized causation under French law.

    A-  Professor Menjucq's Conclusions Regarding The Alleged Wrongdoing

53.   Professor Menjucq performs a very general analysis of the tort claims formulated against NNI.  He first describes the four areas of alleged wrongdoing at issue (transfer pricing, the February 2008 repayment, distribution of proceeds from asset sales and taxation matters), then notes the allegation that NNI "participated" in each such area of alleged wrongdoing to conclude that NNI therefore "participated in a damaging event."[99]  While maintaining that fault or bad faith are not required under article 1382, Professor Menjucq argues that fault could be found in what he describes as an allegation that NNI knew that it was participating in actions causing damage to NNSA, something he asserts a reasonable sister company would not have done, and therefore that liability would be appropriate even under the fault standard he rejects.[100]

54.   I disagree with Professor Menjucq's analysis for a number of reasons.

55.   First, Professor Menjucq applies in the first instance a strict liability analysis which, for the reasons I have described above, is irrelevant under French law in this context.

56.   Second, when he does consider fault, Professor Menjucq does not perform any detailed analysis of the element of fault.  That is, Professor Menjucq fails to consider whether

---

[97]     Menjucq Decl. ¶¶ 116-18, 126.

[98]     I respond in this section to Paragraphs 119-127 of Professor Menjucq's declaration.

[99]     Menjucq Decl. ¶¶ 119-121, 126.

[100]    Menjucq Decl. ¶¶ 121-23.

NNSA has made non-conclusory allegations that could justify a finding that NNI itself did anything that a French court would qualify as faulty.

57.    In the only instance in which Professor Menjucq considers any allegation of wrongdoing, describing what he understands to be an allegation that NNI knew that it was causing damage to NNSA, Professor Menjucq refers to Paragraphs 39 and 56 of the Claim of NNSA.[101]   The allegations referred to are both made exclusively in relation to transfer pricing.  Thus, Professor Menjucq does not offer any analysis under French law in relation to the other areas of alleged wrongdoing.

58.    Professor Menjucq's reference to an alleged knowledge of "damages" in relation to transfer pricing does not establish a valid basis upon which a French court would find fault under article 1382 of the Civil Code.  As I explained above, under French law, a mere allegation of knowledge that one's actions might cause "damages," "loss" or "detriment" would not be sufficient to establish fault under article 1382 of the Civil Code.  Instead, in relation to a contractual obligation, existing case law makes clear that NNSA would have to allege that NNI knew that its actions would cause the breach of NNSA's legal rights.  I explained in my first declaration in reference to each area of alleged wrongdoing why such allegations are absent here.  In relation to general, non-contractual legal duties, as explained above, it would be necessary to establish a basis to find that NNI was at fault, *i.e.* that it knew that the alleged wrongdoing involved a breach of NNSA's rights.

59.    Once again, NNSA has not made any allegation that NNI knew that any alleged change in NNSA's position resulted from a breach of rights owed to NNSA.  Rather than analyzing the relevant allegations, Professor Menjucq simply concludes that a French court would find NNI at fault because, in his opinion, a reasonable sister company would not have participated in the acts in which NNI is alleged to have participated.  However, Professor Menjucq never explains why this would be the case; in any event, he applies the wrong standard, failing to address how the allegations show that NNI knew that NNL was breaching NNSA's rights, as is required under the governing standard.

B-  Professor Menjucq's Failure To Properly Address Causation

60.    As explained above, French law requires proof of individualized causation.  Professor Menjucq fails to perform the requisite analysis under article 1382 of the Civil Code.  Instead, as noted above, he simply refers to the allegation that NNI "participated" in the various areas of alleged wrongdoing, which he defines as "damaging events," and concludes that because such "damaging events" are alleged to have caused injury, NNI could be held liable.

61.    Professor Menjucq's approach is fundamentally invalid because the Claim of NNSA never explains how NNI, as opposed to NNL, could be found to have caused injury to

---

[101]        Menjucq Decl. ¶ 122, footnote 71.  While Professor Menjucq refers to knowledge of "damage[s]," Menjucq Decl. ¶ 122, a term usually associated with legal liability, the Claim of NNSA, in both paragraphs cited by Professor Menjucq, alleges only NNI's awareness that the transfer pricing changes were "at the expense of" or "detrimental to" NNSA, Claim of NNSA ¶¶ 39, 56.

NNSA. In my first declaration, I considered the question of causation in relation to each area of alleged wrongdoing, concluding that NNSA alleged no basis for finding that NNI, even if found to have been at fault, caused harm to NNSA because there would be no basis for finding that NNI ever imposed any management decision on NNSA that could have given rise to injury or otherwise caused injury to NNSA. Instead, in each case, the Claim of NNSA attempts to group NNI together with NNL under conclusory allegations evoking the alleged collective responsibility of NNI and NNL. Professor Menjucq has not responded to any of my analysis in relation to the problem of individualized causation.

62. In his discussion of causation under article 1382, Professor Menjucq's only observation regarding NNI is that it allegedly "participated" in alleged wrongdoing of others.[102] However, allegations of "participation" by NNI in NNL's alleged wrongdoing do not offer an example of individualized proof because the allegations fail to specify what role NNI's alleged participation played in causing any injury to NNSA.

63. Finally, it is noteworthy that Professor Menjucq accepts the possibility of liability for NNI in relation to the taxation matters, despite the fact that such claims are entirely contingent in nature (no assessment or penalty having been imposed). As I explained in my first declaration, it would not be possible to find NNI liable under article 1382 without a finding that it caused injury – something which is logically impossible in the context of a contingent claim.

IV - <u>Claims Related to FSD Liability (Claims 19-22)</u>[103]

IV.1- <u>The Possibility Of Presenting A Contingent Claim</u>

64. As Professor Menjucq notes, "Whether this claim [for FSD liability] is properly and appropriately pleaded in the present U.S. proceedings is a matter of U.S. law."[104] I agree with Professor Menjucq that French law is not applicable in this claim, which is instead governed by United States procedural law.

65. Professor Menjucq, however, goes on to address the question of whether, under French law, a contingent claim may be admitted in an insolvency proceeding, stating that "the uncertain nature of the claim does not, under French law, prevent a statement of claim from being filed in insolvency proceedings."[105] For the sake of completeness only, I believe that Professor Menjucq's statement should be clarified.

66. French law distinguishes between the "filing" of a claim (a letter to be sent to the "*mandataire judiciaire*" (creditors' representative)) from its "*admission*" (a judicial process involving admission of the claim by a judge). While it is possible to file a contingent claim before the creditors' representative, the claim will not necessarily be admitted by the presiding judge.

---

[102]     Menjucq Decl. ¶ 126.

[103]     I respond in this section to Paragraphs 128-40 of Professor Menjucq's declaration.

[104]     Menjucq Decl. ¶ 130.

[105]     Menjucq Decl. ¶ 130.

67.    Under the relevant French procedure, once a claim is filed before the creditors' representative, the representative establishes a list of all claims filed against the estate and, for each claim, suggests to the judge of the insolvency proceedings either to admit or to reject the claim (or to transfer the claim to the court of competent jurisdiction, as the case may be).[106]

68.    The judge will then examine whether the interest of the claiming party in asserting the claim is "born and not potential."[107]  At this stage, the judge controls the existence, the nature and the amount of the claim, which will not be admitted if it is merely contingent in nature.  Only in the case of a debt due at a future time, where the amount of the debt is known or determinable, may the judge admit a contingent claim.[108]

69.    Thus, as I explained in my first declaration, under French law, a person cannot bring an action in respect of a hypothetical future claim that is not yet in existence.  Other than in the exceptional case of a certain or determinable debt referred to above, while a contingent claim may be filed, it may not be judicially registered.

70.    I note that there is no allegation in the Claim of NNSA that an FSD or a contribution notice has been issued against NNSA at this time.  Accordingly, there is no basis at this time upon which the existence of a debt owed by NNI to NNSA could be established.  Thus, a French judge would not be able to admit the FSD claims alleged by NNSA.

IV.2    Principles of Joint and Several Liability[109]

71.    NNSA asserts a claim under French law to recover "a contribution" from NNI, but it does not refer to any specific provision of French Law.[110]   I stated in my first declaration that NNSA does not refer to any specific provision of French law in its claim.

72.    Professor Menjucq states that "contribution and obligation to repay are interrelated concepts."[111]  He adds:

    -    "When several debtors are jointly and severally obliged to pay the same debt, if one of the debtors pays the whole debt, he has a claim in contribution against each of the debtors";[112]
    -    "[A]ccording to article 1213 of the Civil Code . . . , the joint and several obligation to another creditor is divisible by operation of law, [so] these other debtors have an obligation to repay the debtor who paid the whole debt."[113]

---

[106]    French Commercial Code, article L.624-2.

[107]    First Bremond Decl. ¶ 107; CPC art. 31 ; *Leçons de Droit Civil, Tome 1 – Premier volume, Introduction à l'étude du droit, (333)*, Henri et Léon Mazeaud, Jean Mazeaud et François Chabas, 1986.

[108]    Cass. Com., 06.11.03, n°00-12.547

[109]    I respond in this section to Paragraphs 132-40 of Professor Menjucq's Declaration.

[110]    Claim of NNSA ¶¶ 179-180; First Bremond Decl. ¶¶ 108-09.

[111]    Menjucq Decl. ¶ 137.

[112]    Menjucq Decl. ¶ 137.

73. Article 1213 of the Civil Code deals with contractual obligation between joint debtors and a third party creditor. NNSA's claim does not refer to any binding contract between, on the one hand, NNI and NNSA, and, on the other hand, a third party creditor. As such, article 1213 of the Civil Code is irrelevant here.

74. The Claim of NNSA does not allege that NNSA has been ordered to make a payment of financial support.

75. In discussing subrogation and obligation to repay, Professor Menjucq refers to obligations deriving from a primary liability shared jointly between two parties. Subrogation or obligation to repay would then apply to determine how to allocate the primary obligation as between the jointly liable parties.

76. In the present case, Professor Menjucq fails to define or explain for which primary joint obligation (deriving from a contract or a joint guarantee) the secondary obligation (subrogation or obligation to repay) would derive.

77. The Claim of NNSA contains no valid basis under French law for imposing any payment obligation upon NNI at this time in relation to a contingent FSD liability.


I declare, under the penalty of perjury of the laws of the United States of America, that the foregoing is true and correct.

Executed this 5th day of October, 2011
In Paris, France

Guilhem Bremond

---

[113]    Menjucq Decl. ¶ 138.