## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------X
:
*In re*                                               :    Chapter 11
:
Nortel Networks Inc., *et al.*,[1]                     :    Case No. 09-10138 (KG)
:
                Debtors.    :    Jointly Administered
:
:    **Hearing date:**
:    **October 14, 2011 at 9:00 a.m. ET**
:
:    RE:  DI 6022, 6023, 6024, 6375, 6379, 6555
:
----------------------------------------------------------- X


## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
## OF JOINT OBJECTION AND MOTION TO DISMISS
## CLAIMS OF NORTEL NETWORKS (IRELAND) LIMITED

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

AKIN GUMP STRAUSS HAUER & FELD
LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

MORRIS, NICHOLS, ARSHT & TUNNELL
LLP
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Counsel for the Debtors and Debtors in
Possession*

*Counsel for the Official Committee of
Unsecured Creditors*

---

[1]      The U.S. Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................... iv

SUMMARY CHART OF ARGUMENTS BY CAUSE OF ACTION IN SUPPORT
OF MOTION TO DISMISS CLAIMS OF NN IRELAND.................................... x

PRELIMINARY STATEMENT ............................................................................ 1

ARGUMENT ........................................................................................................ 2

I.  NN IRELAND'S CLAIMS SHOULD BE TESTED AGAINST – AND
    DISMISSED – UNDER THE STANDARDS OF RULE 12(b)(6) .......................... 2

    A.  NN Ireland Cannot Avoid Application of Rule 12(b)(6)................................. 2

    B.  NN Ireland's Attempts to Dilute the Requirements of Rule 8(a) Cannot Be
        Squared with Binding Precedent.................................................... 6

    C.  Rule 9(b)'s Heightened Standard Applies to NN Ireland's Claims That
        Sound in Fraud ............................................................................ 8

II. NNI OWED NO DUTIES TO NN IRELAND OR ITS CREDITORS .................... 11

    A.  NN Ireland Cannot Avoid the Estoppel Effect of Its Prior Representations
        to This Court ............................................................................... 11

        1.  NN Ireland's Prior Representations are Directly Contrary to Its
            Current Allegations ............................................................ 11

        2.  The Location of Those Who Manage and Control the Debtor Is
            Crucial to COMI .............................................................. 14

        3.  NN Ireland Has No Good Faith Excuse for Its Inconsistent
            Positions ...................................................................... 16

        4.  The Elements of Judicial Estoppel Have Been Met.......................... 18

        5.  NN Ireland Misstates the Test for Collateral Estoppel ..................... 19

    B.  NN Ireland's Effort to Plead Insolvency Fails to Satisfy U.S. Pleading
        Standards...................................................................................... 20

    C.  NN Ireland Fails to Plead a Plausible Claim that NNI was a Director
        Under Irish Law ............................................................................ 22

        1.  The Court Must Reject NN Ireland's Attempts to Obfuscate and
            Extend Settled Irish Law on De Facto and Shadow Directors.......... 22

        2.  NN Ireland States No Irish Law Claim for Shadow or De Facto
            Directorship.................................................................. 28

    D.  NN Ireland Cannot Extend Irish Law to Create a Duty of Care .................... 34

**Page**

III.   NN IRELAND'S ATTEMPTS TO IMPOSE SECONDARY LIABILITY ON
       NNI FAIL..................................................................................................... 38

       A.   NN Ireland's Claims for Aiding and Abetting and Dishonest Assistance
            Fail as a Matter of Law .................................................................... 38

            1.   The Claims for "Dishonest Assistance" Under Irish Law Must Be
                 Tested Under Rule 9(b) (claims 4, 10, 26)........................................ 38

            2.   The U.S. Law Claims for Aiding and Abetting Breach of Fiduciary
                 Duty Fail Under Either Rule 9(b) and Rule 8(a) (claims 6, 13, 23,
                 27) ................................................................................................ 39

            3.   NN Ireland's Pleaded Allegations Fall Short.................................... 40

       B. NN Ireland Fails to Show Any Well-Pleaded Allegations to Support Its
          Conspiracy Claims (claims 5, 7, 12, 14)......................................... 43

       C. NN Ireland's Claims for Aiding and Abetting and Conspiracy are Barred By
          the *In Pari Delicto* Doctrine .......................................................... 45

IV.   NN IRELAND FAILS TO ADEQUATELY ALLEGE NNI'S UNJUST
      RECEIPT OF ANY NN IRELAND PROPERTY.................................... 47

       A.   NN Ireland's Proof of Claim Does Not Plead the Required Element of
            Tracing .......................................................................................... 47

       B.   NN Ireland Does Not Allege that NNI Unjustly Received Any of Its
            Property.......................................................................................... 48

V.    NN IRELAND'S QUASI-CONTRACT AND OTHER CLAIMS RELATING TO
      UNSPECIFIED ASSET SALES CAN BE SUMMARILY DISMISSED ............... 49

       A.   NN Ireland Cannot Remedy Its Basic Failures of Notice Pleading.............. 49

       B.   Claims 16, 17, 20 and 22 Independently Fail to State a Claim..................... 50

            1.   Claim 20 Fails Adequately to Plead Mistake.................................... 50

            2.   NN Ireland Does Not Plead Required Elements of a
                 Transaction at Undervalue Claim Under English Law, and
                 Does Not Have Standing to Bring a Fraudulent Disposition
                 Claim Under Irish Law .................................................................. 51

            3.   Implied Term/Implied Contract ..................................................... 53

VI.   NN IRELAND'S CLAIMS IN RESPECT OF FSD LIABILITY SHOULD BE
      SUMMARILY DISMISSED ..................................................................... 54

VII.  NN IRELAND'S CLAIMS RELATING TO TRANSFER PRICING, IRISH
      LOANS, AND PRE-PETITION ASSET SALES ARE TIME-BARRED ................ 55

       A.   NN Ireland Provides No Basis to Avert Dismissal of Its U.S. State Law
            Transfer Pricing Claims (claims 6 and 7) ....................................... 55

**Page**

B.      Delaware's Borrowing Statute Should Apply to Additional Claims
        (claims 2-5, 11-12, 16-17, 20-21) ................................................................    56

C.      Section 108(c) .............................................................................................    58

CONCLUSION...........................................................................................................    59

# TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

11 U.S.C. § 108(c) ............................................................................................... 58

11 U.S.C. § 502(e)(1)(B) ..................................................................................... 55

Bankr. R. 7009 ..................................................................................................... 50

Fed. R. Bankr. P. 9017 ......................................................................................... 22

**Cases**

900 Capital Servs., Inc. v. Cloud (In re Cloud),
214 F.3d 1350, No. 99-51109, 2000 WL 634637 (5th Cir. May 4, 2000) (table) ............. 5

Adams v. Dorsie's Steak House, Inc. (In re Dorsie's Steak House, Inc.),
130 B.R. 363 (D. Mass. 1991) ............................................................................. 4

Aetna Cas. & Sur. Co. v. Leahey Constr. Co.,
219 F.3d 519 (6th Cir. 2000) ............................................................................. 39

Airport Blvd. Apts., Ltd. v. NE 40 Partners, Ltd. (In re NE 40 Partners Ltd.),
440 B.R. 124 (Bankr. S.D. Tex. 2010) ................................................................ 10

Angell v. Ber Care, Inc. (In re Caremerica, Inc.),
409 B.R. 737 (Bankr. E.D.N.C. 2009) ........................................................... 10, 52

Animal Sci. Prods. v. China Nat'l Metals and Minerals Imp. & Exp. Corp.,
702 F. Supp. 2d 320 (D.N.J. 2010), rev'd on other grounds sub nom., Animal Sci Prods.
v. China Minmetals Corp., No. 10-2288 (CCH), 2011 U.S. App. LEXIS 17046 (3d. Cir.
Aug. 17, 2011) .................................................................................................... 22

Asarco LLC v. Ams. Mining Corp.,
382 B.R. 49 (S.D. Tex. 2007) ............................................................................. 57

Ashcroft v. Iqbal,
129 S.Ct. 1937 (2009) ................................................................................... passim

Bautista v. L.A. Cnty.,
216 F.3d 837 (9th Cir. 2000) ............................................................................. 49

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007) .................................................................... 11, 28, 43-44, 45

Bissessur v. Indiana Univ. Bd. of Trs.,
581 F.3d 599 (7th Cir. 2009) ............................................................................. 53

iv

**Page(s)**

Brug v. Enstar Grp., Inc.,
755 F. Supp. 1247 (D. Del. 1991) ................................................................... 40, 41

Burger v. Level End Dairy Investors,
125 B.R. 894 (Bankr. D. Del. 1991) ................................................................ 56

Burrell v. AstraZeneca LP,
C. A. No. 07C-01-412(SER), 2010 WL 3706584 (Del. Super. Ct. Sept. 20, 2010) ........... 57

Burtch v. Huston (In re USDigital, Inc.),
443 B.R. 22 (Bankr. D. Del. 2011) ................................................................. 21

Capitaliza-T Sociedad de Responsibilidad Limitada de Capital Variable v. Wachovia
Bank of Del. Nat'l Ass'n,
Civil No. 10-520 (JBS/KMW), 2011 WL 864421 (D. Del. Mar. 9, 2011) ........................ 40

Clark v. McDonald's Corp.,
213 F.R.D. 198 (D.N.J. 2003) ........................................................................ 4

Commw. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.,
836 F.2d 173 (3d Cir. 1988) ......................................................................... 51-52

Decker v. Kraftsow (In re Craftmatic Sec. Litig.),
890 F.2d 628 (3d Cir. 1989) ......................................................................... 10

Duke Energy Int'l L.L.C. v. Napoli,
748 F. Supp. 2d 656 (S.D. Tex. 2010) .............................................................. 40

Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.),
398 B.R. 736 (S.D.N.Y. 2008) ....................................................................... 5

FoodComm Int'l v. Barry,
463 F. Supp. 2d 818 (N.D. Ill. 2006) .............................................................. 57

Forman v. Salzano (In re Norvergence, Inc.),
405 B.R. 709 (Bankr. D.N.J. 2009) ................................................................ 8

Fowler v. UPMC Shadyside,
578 F.3d 203 (3d Cir. 2009) ......................................................................... 7

Frederico v. Home Depot,
507 F.3d 188 ......................................................................................... 38

G-I Holdings, Inc. v. Reliance Ins. Co.,
586 F.3d 247 (3d. Cir. 2009) ........................................................................ 14

**Page(s)**

Gilstrap v. Radianz Ltd.,
443 F. Supp. 2d 474 (S.D.N.Y. 2006), aff'd, 233 F. App'x. 83 (2d. Cir. 2007)................. 23-24

Glencar Exploration v. Mayo Cnty. Council,
[2002] 1 I.R. 84 .......................................................................................................... 35

Glinka v. Dartmouth Banking Co. (In re Kelton Motors Inc.),
121 B.R. 166 (Bankr. D. Vt. 1990)................................................................................. 9-10

Hansford v. Bank of Am.,
Civil Action No. 07-4716, 2008 U.S. Dist. LEXIS 65502 (E.D. Pa. Aug. 26, 2008) ........ 18

Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.,
585 F. Supp. 2d 623 (D. Del. 2008)................................................................................. 19

In re Adelphia Commc'ns Corp.,
359 B.R. 54 (Bankr. S.D.N.Y. 2006)................................................................................. 5

In re Basis Yield Alpha Fund (Master),
381 B.R. 37 (Bankr. S.D.N.Y. 2008)................................................................................. 15

In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.,
374 B.R. 122 (Bankr. S.D.N.Y. 2007), aff'd, 389 B.R. 325 (2008) ................................... 15

In re Best Prods, Co.,
210 B.R. 714 (Bankr. E.D. Va. 1997)................................................................................. 3

In re Diamond Mortg. Corp. of Ill.,
105 B.R. 876 (Bankr. N.D. Ill. 1989) ................................................................................. 3

In re DJK Residential LLC,
416 B.R. 100 (Bankr. S.D.N.Y. 2009)................................................................................. 5

In re Dow Corning Corp.,
No. 95-20512, 2000 Bankr. LEXIS 1579 (Bankr. E.D. Mich. Nov. 3, 2000) .................... 6

In re G-I Holdings, Inc.,
443 B.R. 645 (Bankr. D.N.J. 2010) ................................................................................... 5

In re HealthSouth Corp. S'Holders Litig.,
845 A.2d 1096 (Del. Ch. 2003)........................................................................................ 46

In re Ins. Brokerage Antitrust Litig.,
618 F.3d 300 (3d Cir. 2010)............................................................................................. 7

**Page(s)**

In re Kane,
628 F.3d 631 (3d Cir. 2010)................................................................................. 16

In re Sevko, Inc.,
143 B.R. 167 (Bankr. N.D. Ill. 1992) ................................................................. 5

In re Spiegel, Inc.,
337 B.R. 821 (Bankr. S.D.N.Y. 2006).................................................................. 5

In re Tronox Inc.,
No. 09-10156, 2010 WL 2010844 (Bankr. S.D.N.Y. May 14, 2010) ................................ 50

In re WorldCom, Inc.,
322 B.R. 530 (Bankr. S.D.N.Y. 2005)................................................................. 5

Klein v. Stahl GMBH & Co.,
185 F.3d 98 (3d Cir. 1999)................................................................................. 17

Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.,
337 F.3d 314 (3d Cir. 2003)............................................................................... 16

Licci v. Am. Express Bank,
704 F. Supp. 2d 403 (S.D.N.Y. 2010)............................................................... 22-23

Malleus v. George,
641 F.3d 560 (3d Cir. 2011)............................................................................... 7

Malpiede v. Townson,
780 A. 2d 1075 (Del. 2001) ............................................................................ 40-41

McCoy v. Grinnell (In re Radcliffe's Warehouse Sales, Inc.),
31 B.R. 827 (Bankr. W.D. Wash. 1983) ............................................................ 58

McShane Wholesale Fruit & Vegetables Ltd. v. Johnston Haulage Co. Ltd.,
[1997] 1 ILRM 86................................................................................................ 35

Med Mut. of Ohio Inc. v. Braintree Labs.,
Civ. No. 10-604-SLR, 2011 U.S. Dist. LEXIS 74996 (D. Del. July 12, 2011)................. 57

Montrose Med. Grp. Participating Sav. Plan v. Bulger,
243 F.3d 773 (3d Cir. 2001)........................................................................... 14, 18

Mooney v. Vitolo,
435 F.2d 838 (2d Cir. 1970)............................................................................... 9

**Page(s)**

Moorview Devs. & Others v. First Active PLC & Others,
[2009] IEHC 214..................................................................................................    25

Morgan v. Cash,
C.A. No. 5053-VCS, 2010 WL 2803746 (Del. Ch. July 16, 2010) ....................................    40

New Hampshire v. Maine,
532 U.S. 742 (2001)..........................................................................................    16

Nisselson v. Lernout,
469 F.3d 143 (1st Cir. 2006) ..............................................................................    46

Norman v. Elkin,
Civil Action No. 06-005-JJF, 2007 WL 2822798 (D. Del. Sept. 26, 2007) .......................    57

O'Connell v. Arthur Andersen LLP (In re Alphastar Ins. Grp. Ltd.),
383 B.R. 231 (Bankr. S.D.N.Y. 2008).................................................................38, 39, 50

Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.),
330 B.R. 67 (Bankr. D. Del. 2005) .......................................................................    19

Oneida Motor Freight, Inc. v. United Jersey Bank,
848 F.2d 414 (3d Cir. 1988)...............................................................................    17

Parklane Hosiery Co. v. Shore,
439 U.S. 322 (1979)..........................................................................................    20

Rafter Seven Ranches L.P. v. WNL Invs. LLC (In re Rafter Seven Ranches L.P.),
414 B.R. 722 (B.A.P. 10th Cir. 2009)...................................................................    4

Raytech Corp. v. White,
54 F.3d 187 (3d Cir. 1995).................................................................................    19

Re Hydrodam Ltd.,
[1994] 2 BCLC 180 .........................................................................................    25-26

Re Hocroft Development Limited,
[2009] IEHC 580.............................................................................................    26

Re Mea Corp.,
[2007] 1 BCLC 618 .........................................................................................    25

Revenue Customs Comm'rs v. Holland,
[2010] 1 WLR 2793 ........................................................................................    25

**Page(s)**

Robertson v. Olsen (In re Running),
Case No. 91 C 20302 (PGR), 1992 U.S. Dist. LEXIS 4686 (N.D. Ill. Mar. 2, 1992)........ 5

Roth v. Am. Family Mut. Ins. Co.,
567 F.3d 884 (7th Cir. 2009) ............................................................................. 38

Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,
81 F.3d 355 (3d Cir. 1996).................................................................................. 17

Santiago v. Warminster Twp.,
629 F.3d 121 (3d Cir. 2010)............................................................................. passim

Swierkiewicz v. Sorema N.A.,
534 U.S. 506 (2002).......................................................................................... 7

Toner v. Allstate Ins. Co.,
821 F. Supp. 276 (D. Del. 1993)........................................................................ 8-9

Twohy v. First Nat'l Bank of Chi.,
758 F.2d 1185 (7th Cir. 1985) .......................................................................... 22

Ultraframe (UK) Ltd. v. Fielding,
[2005] EWHC 1638 ........................................................................................... 27

United States ex rel. Pilecki-Simko v. Chubb Inst.,
No. 10-3097, 2011 WL 3890975 (3d Cir. Sept. 6, 2011) ................................... 9

Wenglicki v. Tribeca Lending Corp.,
Civil Action No. 07-4522, 2009 WL 2195221 (E.D. Pa. July 22, 2009)........................... 9

**Other Authorities**

Shorter Oxford English Dictionary,
(William R. Trumble et al. eds., 6th ed. 2007) ................................................. 39

The American Heritage Dictionary of the English Language,
(3d ed. 1994) ................................................................................................... 39

Webster's Ninth New Collegiate Dictionary,
(9th ed. 1983) .................................................................................................. 39

**SUMMARY CHART OF ARGUMENTS BY CAUSE OF ACTION
IN SUPPORT OF MOTION TO DISMISS CLAIMS OF NN IRELAND**

The below chart aims to provide the Court with a summary of certain of the bases for dismissal applicable to each category of NN Ireland's claims.  This presentation is intended for the convenience of the Court and is qualified in its entirety by the arguments set forth in the Motion and Reply, all of which arguments are expressly preserved.

*I.*     *IRISH LAW CLAIMS*

| | |
|---|---|
| Breach of Fiduciary Duty (claims 2, 8, 18, 24) | • Judicial & Collateral Estoppel (sworn representations made to this Court in recognition proceedings that NN Ireland was managed and controlled autonomously from England)<br>• Failure to Adequately Plead Existence of Fiduciary Duty (no well-pled allegations of directions given by NNI to the NN Ireland board, or of NNI's participation in NN Ireland corporate governance; no allegations sufficient to extend fiduciary duties to shadow director)<br>• Largely time-barred under DE law (borrowing statute) |
| Breach of Duty of Care (claims 3, 9, 19, 25) | • No Fiduciary Duty Owed (as set forth above)<br>• Non-Compliance with Irish Law (no duty of care for pure economic loss as between affiliates, and no other basis pled for imposing duty)<br>• Largely time-barred under DE law (borrowing statute) |
| Dishonest Assistance (claims 4, 10, 26) | • No underlying breach of duty (failure to plead insolvency)<br>• Failure to Meet Irish Law Requirements (no well-pled allegations of assistance, or facts from which inference of any NNI dishonesty can be inferred)<br>• Failure to Meet U.S. Pleading Standards (Rule 9(b), failure to plead NNI's knowledge of breach)<br>• Largely time-barred under DE law (borrowing statute) |
| Conspiracy (claims 5, 12) | • Failure to Meet U.S. Pleading Standards (Rule 8(a) – <u>Twombly</u> requirement of pleading "which of the defendant companies (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place"; Rule 9(b) to the extent sounding in fraud)<br>• Largely time-barred under DE law (borrowing statute) |

x

| Unconscionable / Knowing Receipt (claims 11, 21) | • Judicial & Collateral Estoppel<br>• Failure to Meet Irish Law Requirements (tracing of NN Ireland property to NNI)<br>• Failure to Meet U.S. Pleading Standards (identification of NN Ireland property received by NNI) |
|---|---|
| Mistake (claim 20) | • Failure to Meet U.S. Pleading Standards (Rule 9(b) failure to identify contract, mistake with specificity) |

## II.    U.S. STATE LAW CLAIMS

| Aiding and Abetting Breach of Fiduciary Duty (claims 6, 13, 23, 27) | • Statute of Limitations (all transfer pricing claims, all Pre-Petition Asset Sales prior to January 2005)<br>• No Underlying Breach of Fiduciary Duty (judicial estoppel as to NNL, failure to plead insolvency)<br>• Failure to Meet U.S. Pleading Standards (failure to allege assistance given by NNI, failure to allege facts to infer knowledge of breach)<br>• *In Pari Delicto* |
|---|---|
| Conspiracy (claims 7, 14) | • Statute of Limitations (all transfer pricing claims, all Pre-Petition Asset Sales prior to January 2006)<br>• Failure to Meet U.S. Pleading Standards (Rule 8(a), <u>Twombly</u>; Rule 9(b))<br>• *In Pari Delicto* |
| Unjust Enrichment (claim 15) | • Failure to Plead U.S. Elements of Claim (receipt of NN Ireland Property, or NNI as the intended beneficiary) |

*III.    ENGLISH, IRISH OR U.S. LAW CLAIMS*

| Implied Contract (claims 16,17) | • Failure to Meet U.S. Pleading Standards (identification of contract, contractual obligations)<br>• Failure to meet Irish Law Requirements |
|---|---|
| Transaction at Undervalue (claim 22) | • Failure to meet U.S. pleading standards (Rule 8(a))<br>• Failure to meet U.K. Law Requirements (time barred)<br>• Failure to Meet Irish Law Requirements (must be asserted by Irish liquidator) |
| Contingent FSD Liability Claims (claims 28-31) | • Automatic Stay Order (prevents reliance on U.K. Pension Proceedings)<br>• Failure to meet U.S. Pleading Standards (Rule 8(a))<br>• Subject to dismissal under Bankruptcy Code Section 502(e)(1)(B) |

The Movants respectfully submit this reply (the "Reply") in further support of the Movants' Joint Objection and Motion to Dismiss Claims of Nortel Networks Ireland [D.I. 6022] (the "Motion" or "Opening Brief"), and in response to the Joint Administrators' Memorandum of Law in Opposition to the Debtors' and Committee's Joint Objection and Motion to Dismiss the Claims of Nortel Networks (Ireland) Limited [D.I. 6379] (the "Response" or "Opposition").[2]  In reply to the Opposition, and in further support of the Motion, the Movants respectfully represent as follows:

**PRELIMINARY STATEMENT**

NN Ireland's opposition to the Motion confirms rather than refutes the lack of substance underlying its Proof of Claim.  There is no dispute that its primary claims for breach of fiduciary duty against NNI do not rest on actual Irish law but rather on a predictive argument as to Irish law of the future.  This acknowledged lack of Irish precedent for those multi-billion dollar assertions demonstrates resoundingly the merit of the Motion.

There is no dispute that *no* Irish court has ever held a corporation liable as a de facto director.

There is no dispute that *no* Irish court has ever held a sister corporation liable as a shadow director of its Irish affiliate.

There is no dispute that *no* Irish court has ever held that a shadow director – a creation of Irish statute – owes to an Irish company a full set of common law fiduciary duties, well beyond the liabilities for acting as a shadow director set forth in Irish statute.

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

And there is no dispute that *no* Irish court has ever held a defendant liable for breach of a general duty of care based on a claim of economic loss in circumstances remotely like the allegations at issue here.

The Motion should be granted. NN Ireland's claims fail as a matter of the substantive law asserted and established U.S. pleading requirements. Tellingly, NN Ireland opens its opposition briefing with an argument for entitlement to a *third* try to properly plead its claims, claiming that it is entitled to "advance notice" before its Proof of Claim can be tested under Rule 12. The suggestion that NN Ireland has *not* had such notice, of course, flies in the face of the record before this Court during the hearing on the Debtors' previous motion – under Rule 12(e) – to require NN Ireland and the other EMEA Debtors to file a more definite statement of their claims. See May 10, 2011 Hr'g Tr. at 25:17-19 ("[Mr. Bromley:] We do anticipate moving to dismiss these claims as quickly as possible"); at 27:9-10 ("[The Court:] You'll have dispositive motions that may address those claims in any event.").

Based on Irish law, on U.S. law, on NN Ireland's prior judicial statements under oath and on the inadequate allegations of the Proof of Claim, the Motion should be granted, and NN Ireland's claims should be dismissed and disallowed.

## ARGUMENT

### I.
### NN IRELAND'S CLAIMS SHOULD BE TESTED AGAINST – AND DISMISSED – UNDER THE STANDARDS OF RULE 12(b)(6)

**A.    NN Ireland Cannot Avoid Application of Rule 12(b)(6)**

Implicitly recognizing its pleading deficiencies, NN Ireland devotes a substantial portion of its Response to arguing that Rule 12(b)(6) should not be applied to its Claim. NN Ireland, however, cannot and does not contest that this Court retains discretion to apply Rule 12(b)(6) to

dismiss the Claim.  As elaborated in the Motion and herein, given the facts, circumstances, and procedural history of this case, it is precisely the type of case to which the Court should exercise its discretion to apply Rule 12(b)(6).  In light of the paramount interest of all parties in enabling distributions to creditors, expeditious evaluation of NN Ireland's Claim on legal grounds through a motion to dismiss is particularly appropriate.[3]  Incredibly, NN Ireland argues that it did not have proper notice that Rules 8(a) and 12(b)(6) would apply to its Claim and that, therefore, before applying those Rules, the Court must first enter an order under Rule 9014(c) and then permit NN Ireland a *third* attempt to replead.  Opp. at 22.  While NN Ireland asserts that the EMEA Claims Objection "only requested that the Joint Administrators file a claim that complied with the requirements of Bankruptcy Rule 3001" (Opp. at 18), this feigned ignorance of the application of Rules 8(a) and 12(b)(6) to its Claim is belied by the record.  The EMEA Claims Objection, the EMEA Debtors' response to that objection, and the statements made at the hearing at which the objection was granted all made plain that Rule 12(b) would apply to NN Ireland's amended claims.

First, the EMEA Claims Objection expressly asserted that "under Bankruptcy Rule 7012 and Federal Rule 12(b)(6)," NN Ireland's Claim would be required to "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  EMEA Claims Objection ¶ 24.  The U.S. Debtors cited to both Twombly and Iqbal for this standard.  Id. Second, NN Ireland and the other EMEA Debtors not only failed to refute application of the Iqbal and Twombly Rule 8(a) standards, they consented to the U.S. Debtors' requested relief.[4]

---

[3]       In re Best Prods, Co., 210 B.R. 714, 716 (Bankr. E.D. Va. 1997) (applying Rule 12(b)(6) to creditor claim to "resolve the parties' dispute expeditiously"); In re Diamond Mortg. Corp. of Ill., 105 B.R. 876, 877 n.1 (Bankr. N.D. Ill. 1989) (deeming a claims objection a motion under Bankruptcy Rule 7012 "in an effort to move this litigation along").

[4]       See The Joint Administrators' Response to the Debtors' Motion for an Order Requiring a More Definite Statement of Claim and Setting a Deadline for the Filing of Any Proofs of Claim By the EMEA Claimants ¶ 11 [D.I.

Third, a pleading made in response to an order requiring a more definite statement under Rule 12(e) must, at a minimum, comply with the notice pleading standard embodied in Rule 8(a). See, e.g., Clark v. McDonald's Corp., 213 F.R.D. 198, 233 (D.N.J. 2003) ("Rule 12(e)'s *raison d'etre* is to require greater specificity than what is ordinarily required under Rule 8(a)(2)."). And, if more were needed, the record of the hearing on the EMEA Claims Objection made clear that the U.S. Debtors would be moving to dismiss the claims under Rule 12(b)(6). See May 10, 2011 Hr'g Tr. at 25:17-19 ("We do anticipate moving to dismiss these claims as quickly as possible."). The Court noted that the U.S. Debtors would "have dispositive motions that may address those [amended NN Ireland] claims in any event," and posed questions concerning the schedule "if I decide not to dismiss the claims." Id. at 27:6-20.[5] Under such circumstances, courts have rejected formalistic attempts to invoke Rule 9014(c).[6]

NN Ireland's assertion that "bankruptcy courts rarely apply Rule 12(b)(6) to proofs of claim" (Opp. at 20) is undermined by its efforts to distinguish the dozen authorities cited by Movants where courts have done precisely that. Indeed, NN Ireland cites to *no* authority (nor are the Movants aware of any) where a court refused to apply Rule 12(b)(6) to a claims objection. NN Ireland incorrectly asserts that "the US Debtor does not cite *any* case in which a bankruptcy court has applied the Rule 8(a) pleading standard, as articulated in Iqbal and Twombly, to test the

---

5255] ("the EMEA Debtors will acquiesce to the U.S. Debtors' request and will file amended proofs of claim"); see also May 10, 2011 Hr'g Tr. at 32:19-22 ("[MR. HARRON:] . . . what we were talking about [is] the motion to file an amended claim. As Your Honor can read from our reply and I think the parties all understood, we agreed to the relief sought in that motion.").

[5]      Moreover, EMEA concedes that "Rule 9(b), through Bankruptcy Rule 7009, applies automatically in any contested matter" (Opp. at 25 n. 32), such that NN Ireland's procedural arguments are inapplicable to those claims that invoke Rule 9(b).

[6]      See Adams v. Dorsie's Steak House, Inc. (In re Dorsie's Steak House, Inc.), 130 B.R. 363, 365 (D. Mass. 1991) (rejecting arguments concerning the absence of a formal order under Rule 9014(c) to parties prior to applying Fed. R. Civ. P. 16, where party had "actual notice" and suffered no prejudice); see also Rafter Seven Ranches L.P. v. WNL Investments LLC (In re Rafter Seven Ranches L.P.), 414 B.R. 722, 738-39 (B.A.P. 10th Cir. 2009) ("Debtor provides no authority for the proposition that the bankruptcy court's failure to comply with the particulars of Rule 9014 is a basis for overturning the order and we conclude it is not.").

legal sufficiency of a proof of claim." Opp. at 20 (emphasis in original). The Motion cites to

Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.), 398 B.R. 736, 748

(S.D.N.Y. 2008), which applied the "plausibility standard," as articulated in Twombly, to

dismiss a proof of claim. Nor is Alper an outlier.[7] Whereas NN Ireland seeks to disregard cases

where parties consented to apply Rule 12(b)(6),[8] or where courts did not analyze its application,[9]

these authorities only demonstrate the uncontroversial consensus that Rule 12(b) should apply to

contested matters if it will expedite resolution of the claim.

Further, NN Ireland has it backwards when it suggests that Rule 12(b)(6) should only be

applied to simplistic claims. Opp. at 22. To the contrary, applying Rule 12(b)(6) is particularly

appropriate where – as here – disposition on the pleadings can avoid protracted and expensive

proceedings on claims that fail as a matter of law. See, e.g., Alper Holdings, 398 B.R. at 750

(disposing of proofs of claim alleging environmental contamination and remediation, including

complex alter ego and successor liability claims, on a Rule 12(b)(6) motion). Indeed, as NN

Ireland's Claim is structured as a complaint, with independent counts, attempted factual

allegations, and a demand for relief, application of Rule 12(b)(6) is particularly appropriate. See

In re DJK Residential LLC, 416 B.R. 100, 107 (Bankr. S.D.N.Y. 2009) (applying Twombly to

expunge a proof of claim that took the form of a complaint). NN Ireland's Claim is not based on

---

[7]     See also In re G-I Holdings, Inc., 443 B.R. 645, 665 (Bankr. D.N.J. 2010) (equating a motion to disallow a claim with a motion to dismiss, as governed by Twombly and Iqbal); In re DJK Residential LLC, 416 B.R. 100, 106-07 (Bankr. S.D.N.Y. 2009) (dismissing claim where it "fails under the Rule 8 standard," which required "enough facts to state a claim to relief that is plausible on its face" (citing Twombly)).

[8]     In re Adelphia Commc'ns Corp., 359 B.R. 54, 56 n.5 (Bankr. S.D.N.Y. 2006). Although the Opposition categorizes In re Spiegel, Inc. as a case involving "consent," the court in that case in fact overruled claimant's "procedural objections" to application of Rule 12(b)(6), as it enabled the court to best address the parties' interests in resolving the merits of the claim. 337 B.R. 821, 822-24 (Bankr. S.D.N.Y. 2006).

[9]     900 Capital Servs., Inc. v. Cloud (In re Cloud), 214 F.3d 1350, No. 99-51109, 2000 WL 634637, at *2 (5th Cir. May 4, 2000); In re WorldCom, Inc., 322 B.R. 530, 535-36 (Bankr. S.D.N.Y. 2005); In re Sevko, Inc., 143 B.R. 167, 171 (Bankr. N.D. Ill. 1992); Robertson v. Olsen (In re Running), Case No. 91 C 20302 (PGR), 1992 U.S. Dist. LEXIS 4686, at *2 (N.D. Ill. Mar. 2, 1992).

a simple amount payable, but instead on a series of multi-billion dollar tort claims based on unprecedented applications of foreign law.  See, e.g., In re Dow Corning Corp., No. 95-20512, 2000 Bankr. LEXIS 1579, at *6 n.3 (Bankr. E.D. Mich. Nov. 3, 2000) ("A proof of claim seeking recovery for a disputed, unliquidated tort claim should, as a general rule, not be afforded prima facie validity.").

Finally, contrary to NN Ireland's suggestion, the same extensive discovery will not be taken "regardless of whether some or all" of the Claim is dismissed.  Opp. at 21 (emphasis omitted).  NN Ireland asserts that such discovery will necessarily occur because discovery addressing these same underlying facts will take place in connection with the intercompany claims asserted against the Canadian Debtors and in connection with a potential allocation proceeding.  Id.  Whether NN Ireland engages in extensive discovery as part of the Canadian claims process is irrelevant to the Court's determination with respect to dismissal of the claims against NNI.  Even dismissal of only some claims or sets of allegations would narrow the scope and burden of discovery for all parties.

**B.**     **NN Ireland's Attempts to Dilute the Requirements of Rule 8(a) Cannot Be Squared with Binding Precedent**

Not only should the Court apply Rules 8(a) and 12(b) to the Claims, it should reject NN Ireland's attempts to dilute the proper tests under those rules.  In a misguided attempt to wish away the pleading requirements of Twombly and Iqbal, NN Ireland asserts that the Rule 12(b)(6) standard remains that "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Opp. at 23.  Remarkably, this language was

rejected as *inconsistent* with the teachings of Iqbal in the very case cited by NN Ireland.[10]

Instead, the Third Circuit's current standard for judging a motion under Rule 12(b)(6) has indeed

changed after Twombly and Iqbal, such that courts are now required to "(1) identify[] the

elements of the claim, (2) review[] the complaint to strike conclusory allegations, and then (3)

look[] at the well-pleaded components of the complaint and evaluat[e] whether all of the

elements identified in part one of the inquiry are sufficiently alleged."  Mot. at 19.[11]

NN Ireland acknowledges that courts may no longer accept as true "labels and

conclusions" and "formulaic recitations of the elements of a cause of action."  Opp. at 24.

Notwithstanding its repeated protestations that its allegations are "detailed" or "factual,"

however, NN Ireland essentially asks this Court to do just that.  See Ashcroft v. Iqbal, 129 S.Ct.

1937, 1950 (2009) (courts "are not bound to accept as true a legal conclusion couched as a

factual allegation" (citation and internal quotation marks omitted)).  That there are *some* factual

allegations in the Claim does not alter the "fundamentally conclusory character" of the

allegations with respect to NNI.  See Santiago v. Warminster Twp., 629 F.3d 121, 131 (3d Cir.

2010) ("While the allegations regarding [defendants' subordinates'] conduct are factual and

more than merely the recitation of the elements of a cause of action, the allegation of supervisory

---

[10]      See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).  Fowler explained that the language
quoted by NN Ireland was predicated on the mistaken understanding that Twombly was confined to the antitrust
context.  In Fowler, the Third Circuit abandoned that formulation in light of the holding in Iqbal.  Fowler, 578 F.3d
at 210.

[11]      Indeed, elsewhere NN Ireland concedes that this is now the proper test.  See Opp. at 24.  Clearly
uncomfortable with this standard, NN Ireland nonetheless seizes on the fact that the Supreme Court in Twombly did
not "overrule" Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002), such that bare "notice pleading" survives.  See
Opp. at 23 n.22.  The Third Circuit, however, has made clear that Swierkiewicz cannot excuse parties from
complying with the Iqbal pleading standard.  See, e.g., Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011)
(applying Iqbal test for evaluating motions to dismiss without mentioning Swierkiewicz); Santiago v. Warminster
Twp., 629 F.3d 121, 130 (3d Cir. 2010) (same).  Even the Third Circuit opinion cited by NN Ireland for the
proposition that Swierkiewicz survives Iqbal and Twombly made that observation in dicta and, in any event, did not
rely on Swierkiewicz in formulating the standard by which it judged the defendants' motion to dismiss, but instead
applied the Twombly standard.  See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 319-20 (3d Cir. 2010)
(applying Twombly).

liability is, in essence, that '[defendants] told [their subordinates] to do what they did' and is thus a 'formulaic recitation of the elements of a [supervisory liability] claim.'" (citation omitted)).

## C.     Rule 9(b)'s Heightened Standard Applies to NN Ireland's Claims that Sound in Fraud

While acknowledging Rule 9(b) is automatically applicable to this contested matter for claims that sound in fraud, NN Ireland both misstates the standard for Rule 9(b) and wrongly contends that the Claim falls outside of its terms.  As set forth in the Motion, Rule 9(b) "appl[ies] to all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud."  Toner v. Allstate Ins. Co., 821 F. Supp. 276, 283 (D. Del. 1993) (citation omitted).  Indeed, the case cited by NN Ireland for the proposition that Rule 9(b) "generally does not apply to the state law claims of breach of fiduciary duty . . . [and] aiding and abetting breach of fiduciary duty" (Opp. at 27) ultimately held that Rule 9(b) *did* apply to such claims in that case.  See Forman v. Salzano (In re Norvergence, Inc.), 405 B.R. 709, 746-47 (Bankr. D.N.J. 2009) (applying Rule 9(b) to aiding and abetting claims where the complaint "equat[ed] the conduct of Debtor's [directors] and the Leasing Companies as a fraud enabling the defendants to exploit and loot the debtor for [defendants'] own purposes").

Moreover, NN Ireland is simply wrong when it suggests that courts apply Rule 9(b) to non-fraud claims only when they are "asserted together with fraud claims based on the same facts."  Opp. at 26.  For example, the plaintiffs in Toner did not bring a fraud claim, yet Rule 9(b) applied to their claims for breach of the covenant of good faith and fair dealing.  821 F. Supp. at 278, 283-84.  Nor should the Court consider NN Ireland's wholly irrelevant comparison of the elements of its own claims against those of common law fraud (see Opp. at 26); the relevant inquiry is not whether the claims share elements with a fraud claim, but whether the "gist" of the facts alleged in the claim "sound[s] in fraud."  See Toner, 821 F. Supp. at 283-84

(citation and internal quotations marks omitted).  As set forth below, certain of NN Ireland's claims do exactly that.

NN Ireland also makes the unsupported argument that "the Third Circuit's Rule 9(b) test is similar to the current jurisprudence under Rule 8(a)."  Opp. at 28.  Established law is firmly to the contrary.  See United States ex rel. Pilecki-Simko v. Chubb Inst., No. 10-3097, 2011 WL 3890975, at *3 (3d Cir. Sept. 6, 2011) (distinguishing between plausibility pleading standard of Rule 8(a) and the particularity required by Rule 9(b)); Wenglicki v. Tribeca Lending Corp., Civ. Act. No. 07-4522, 2009 WL 2195221, at *2 (E.D. Pa. July 22, 2009) ("These allegations are not even sufficient under Twombly/Phillips and F.R.C.P. 8(a)(2).  Therefore, the allegations fall far short of F.R.C.P. 9(b)'s requirement[s].").

The Joint Administrators, moreover, are not entitled to any "relaxed" or "flexible" application of this pleading standard.  See Opp. at 30.  In the nearly three years since the Joint Administrators' appointment, NN Ireland has continued to operate, and many key managers and employees have remained in place for extended periods.[12]  Unlike a newly-appointed outsider, the Joint Administrators are (and have been for a considerable period of time) well situated to be informed about the affairs of the company.  This relaxed standard is simply inapplicable to the Joint Administrators, whose inability to plead a claim with sufficient particularity has nothing to do with a purported lack of access to information.  See Mooney v. Vitolo, 435 F.2d 838, 839 (2d Cir. 1970) (dismissing claims brought by trustee who had access to records); Glinka v. Dartmouth Banking Co. (In re Kelton Motors Inc.), 121 B.R. 166, 187 (Bankr. D. Vt. 1990) (trustees in bankruptcy must plead with particularity facts giving rise to their fraud actions when

---

[12]    See generally Administrators' Progress Reports for Nortel Networks Ireland Limited ("NN Ireland Progress Reports"), available at http://www.nortel.com/corporate/adminprogreports.html.

they have access to information).[13]  Relaxing the pleading standard for the Joint Administrators

also makes particularly little sense in the present case where *both* sides are fiduciaries acting for

the benefit of creditors.

For the same reason, the Court should reject NN Ireland's request that the Court adopt a

"flexible" approach to Rule 9(b) based on the Joint Administrators' suggestions that "key

evidence" remains in the exclusive control of NNL and NNI, or that application of the pleading

rules would "permit sophisticated defrauders to successfully conceal the details of their fraud."

Opp. at 28, 30 (citation and internal quotation marks omitted).  NN Ireland – unlike NNI – was a

party to every transaction it pleads, and nowhere does NN Ireland allege (nor could it) that NNI

or NNL concealed the existence or facts of these transactions from NN Ireland.  See Decker v.

Kraftsow (In re Craftmatic Sec. Litig.), 890 F.2d 628, 645 (3d Cir. 1989) (explaining that in

order for courts to employ a flexible application of Rule 9(b) "pleaders must allege that the

necessary information lies within defendants' control, and their allegations must be accompanied

by a statement of the facts upon which the allegations are based").

Finally, NN Ireland's suggestion that the remedy for its pleading deficiencies is to permit

discovery,[14] fails as a matter of law.  According to NN Ireland, the Court should forego

examining the sufficiency of its claims under Rule 12(b)(6) in favor of a protracted discovery

process which, according to NN Ireland, "*may* allow the Joint Administrators" to winnow and

"refine their claims" themselves.  Opp. at 21 (emphasis added).  NN Ireland has the law

---

[13]    Indeed, the very existence of a "relaxed" pleading standard is in doubt after Twombly and Iqbal rejected the "no set of facts" language of Conley v. Gibson on which many of the "relaxed pleading" cases cited by NN Ireland relied.  See Angell v. Ber Care, Inc. (In re Caremerica, Inc.), 409 B.R. 737, 754 (Bankr. E.D.N.C. 2009) ("[T]he trustee is certainly more likely to have access to [factual information supporting his allegations] than the antitrust plaintiffs in Twombly or the Pakistani detainee in Iqbal.  If these claimants were held to a heightened pleading standard, so too can a trustee in bankruptcy."); Airport Blvd. Apts., Ltd. v. NE 40 Partners, Ltd. (In re NE 40 Partners Ltd.), 440 B.R. 124, 127-28 (Bankr. S.D. Tex. 2010) (holding that "relaxed" pleading standards for trustees should be discarded after Twombly).

[14]    See, e.g., Opp. at 2, 3, 5, 21, 78, and 79.

backwards.  The Supreme Court has made clear that, where, as here, the pleading "is deficient under Rule 8, [the claimant] is not entitled to discovery, cabined or otherwise." <u>Iqbal</u>, 129 S.Ct. at 1953-54.[15]  Indeed, in <u>Twombly</u>, the Supreme Court reiterated that "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court."  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 558 (2007) (citation and internal quotation marks omitted).   That point is now and is particularly important here where there will be a waste of resources and significant costs to both the court and creditors if NN Ireland is permitted to proceed on claims that do not even meet the requisite pleading requirements.

## II.
## NNI OWED NO DUTIES TO NN IRELAND OR ITS CREDITORS

NN Ireland's Response confirms that its claims predicated on duties owed by NNI must fail.  Not only does NN Ireland remain judicially estopped from alleging that NNI directed or controlled NN Ireland,[16] but under current, established Irish law, their allegations are insufficient to impose a duty on NNI – fiduciary or otherwise.

### A.    NN Ireland Cannot Avoid the Estoppel Effect of Its Prior Representations to this Court

1.    <u>NN Ireland's Prior Representations are Directly Contrary to Its Current Allegations</u>

NN Ireland's prior positions and sworn statements that all major decisions for NN Ireland were made and controlled from England simply cannot be reconciled with its Claim, which is

---

[15]    <u>See also</u> <u>Santiago v. Warminster Twp.</u>, 629 F.3d 121, 134 n.10 (3d Cir. 2010) (recognizing that because plaintiff's amended complaint was filed after the close of discovery, there was "no reason to believe that [her] conclusory allegations were simply the result of the relevant evidence being in the hands of the defendants," but continuing that "[u]nder <u>Iqbal</u>, however, *the result would be the same even had no discovery been completed. . . .* The Supreme Court has struck the balance, . . . and we abide by it." (emphasis added)).

[16]    Judicial estoppel provides a basis to dismiss claims 2-4, 6, 8-11, 13, 18, 19, 21 and 23-27.  Additionally, to the extent NN Ireland's aiding and abetting and dishonest assistance claims are based on the actions of NNL as an alleged de facto or shadow director, these claims (4, 6, 10, 13, 23, 26-27) are barred by judicial estoppel as well.

predicated on alleged control from North America.  NN Ireland's attempts to harmonize its two

positions (Opp. at 50-52) are refuted by a side-by-side comparison of NN Ireland's prior

representations with the positions staked out in the Claim and Opposition:

| NN Ireland's Prior Representations | NN Ireland's Current Allegations |
| --- | --- |
| "Excess cash in a subsidiary can be loaned to facilitate funding of other subsidiaries within the region or globally.  Global inter-company facilities and loans are all managed from EMEA Treasury in England."  Joksimovic Decl. Ex. C ¶ 85.<br><br>"[D]ecisions in relation to settlement of intercompany accounts are made by the EMEA Treasury team in England."  Joksimovic Decl. Ex. C ¶ 15(i). | "NNL and NNI determined that … the unlawful June 2008 dividends would be treated as a loan to NNL."  Claim ¶ 58. |
| "In relation to corporate matters such as, financial, tax, and distribution issues, strategic and high level decisions are generally made by the Finance and Tax functions of the EMEA group which are all located in England."  Joksimovic Decl. Ex E ¶ 36. | "… NNI's domination and control over tax and treasury matters was pervasive, and the cumulative effect of the major strategic decisions it made in connection with transfer pricing, the Irish Loans and Irish Dividends, certain pre-petition sales of the Nortal [sic] Group's businesses and tax policy in general, render it a *de facto* and/or shadow director of NN Ireland."  Opp. at 36. |
| "[M]anagement, supervision and decision-making in relation to taxation of the EMEA Group is made in England."  Joksimovic Decl. Ex. C ¶ 15(f). | "NN Ireland's taxation affairs were controlled by NNI and NNL."  Claim ¶ 71. |
| "The tax group based in England (the 'EMEA Tax Group') is responsible for managing and supervising tax throughout the EMEA Region."  Joksimovic Decl. Ex. C ¶ 186. | "The control exerted by NNI related to Nortel Group tax matters, in particular transfer pricing, and to Nortel Group treasury matters."  Claim ¶ 15. |

| | |
|---|---|
| "[T]he Banking and Treasury functions are run out of England, by the Group Treasury Operations. Simon Freemantle operates in England for EMEA's treasury functions."  Joksimovic Decl. Ex. E ¶ 35.<br><br>"[T]he treasury and banking functions for the EMEA Companies are managed out of England." Joksimovic Decl. Ex. C ¶ 15(m). | "NNI controlled NN Ireland's treasury function."  Opp. at 38. |
| "While NNC is the ultimate parent of all Nortel Companies worldwide and NNC's headquarters in Toronto serves as the global headquarters, the EMEA Debtors' central management and control is directed from the head office in Maidenhead, England, where all major decisions specific to the EMEA Debtors are made."  Barefoot Decl. Ex. O at 7.[17] | "NN Ireland had no substantive involvement in transfer pricing.  Its role was limited to providing information for the above individuals [from NNI and NNL] as and when required and implementing the decisions which had been taken by NNI and the Canadian Entities." Claim ¶ 18. |
| "The strength of central management personnel and its business segment coverage means England is the management centre for EMEA." Joksimovic Decl. Ex. C ¶ 32. | "NNI was also involved in jointly controlling certain aspects of the Nortel Group's operation together with the Canadian Entities.  The control exerted by NNI related to Nortel Group tax matters, in particular transfer pricing, and to Nortel Group treasury matters."  Claim ¶ 15. |

As this comparison makes plain, the record forecloses NN Ireland's attempt to minimize its prior submissions as relating only to operational matters.  Opp. at 50.  NN Ireland's representations went far beyond that, affirming that management, tax and treasury functions were controlled from England, where "key governance" took place.  See, e.g., Joksimovic Decl. Ex. K ¶ 15(g) ("key governance and decision making for the EMEA Region takes place in England"); see also Joksimovic Decl. Ex. J ¶ 16(a) ("the English proceedings are pending in the EMEA Debtors' center of main interests").[18]  The details the Witness Statements provided on customer

---

[17]        The "Barefoot Decl." refers to the Declaration of Luke A. Barefoot dated July 15, 2011, submitted with the Joint Objection and Motion to Dismiss Claims of Nortel Networks UK Limited.

[18]        Indeed, as NN Ireland acknowledges, to the extent the Witness Statements suggest any influence from outside of England, they point to Canada – not the U.S.  See Opp. at 51 n.66.

relations and sales also demonstrate that England was the locus of *both* operational and decision-making functions.

Nor can NN Ireland harmonize its litigation stances by pointing out that a de facto or shadow directorship can be imposed with respect to specific transactions.  Opp. at 51.  First, to obtain recognition, NN Ireland confirmed that it was managed and controlled from England – writ large and without qualification.  See, e.g., Joksimovic Decl. Ex. F ¶ 7 ("England is the center of main interest for each of the EMEA Debtors as each of the EMEA Debtor's central management and control is handled to a large extent from Maidenhead, England."); Joksimovic Decl. D ¶ 28 ("[T]he Company is effectively managed from EMEA's head office which is located in Maidenhead, England.").  More importantly, NN Ireland's prior submissions specifically stated that the very functions it now alleges were centered in North America – tax and treasury – were controlled from England.  While NN Ireland struggles mightily to blur this inconsistency, its positions remain irreconcilable in any light.

2.    The Location of Those Who Manage and Control the Debtor Is Crucial to COMI

Having submitted extensive evidence concerning the location of those who managed and controlled the EMEA Debtors, NN Ireland now does an about face and suggests that such facts were irrelevant to a determination of COMI.  Opp. at 48-49.[19]  This ignores the relevant test for determining COMI to obtain Chapter 15 recognition.[20]  This Court could not have entered the

---

[19]    Even if NN Ireland were correct – which it is not – its representation that those who managed and controlled NN Ireland were located in England is a purely factual inquiry, to which the Court may apply judicial estoppel regardless of its reliance on the Witness Statements.  See G-I Holdings, Inc. v. Reliance Ins. Co., 586 F.3d 247, 262 (3d. Cir. 2009) (reaffirming that judicial estoppel "will apply … to neutralize threats to judicial integrity however they may arise" even "where no court has accepted an initial position"); Montrose Med. Grp. Participating Sav. Plan v. Bulger, 243 F.3d 773, 783 n.7 (3d Cir. 2001) (declining to declare that adoption or reliance is necessary for estoppel based on pure issues of fact, where there "may be good reasons to apply a different rule").

[20]    NN Ireland's Response fails even to address the relevant standard under which it obtained recognition from this Court under Chapter 15, focusing instead exclusively on the EC Regulation governing its administration proceedings.  Opp. at 48-49.  Even if NN Ireland's interpretation of that regulation is correct, its representations to this Court alone provide sufficient basis for judicial estoppel.

EMEA Recognition Order if – as NN Ireland's Claim now asserts– the officers and directors located in England "were accustomed to act in accordance with NNI's directions" from North America.  Opp. at 37.  Crucial factors in determining whether to grant recognition are the locations of those who actually manage the debtor and the location of the debtor's head-office functions.  See, e.g., In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122, 129 (Bankr. S.D.N.Y. 2007), aff'd, 389 B.R. 325 (2008).  Where a foreign debtor is actually controlled outside of its jurisdiction of incorporation, courts have not hesitated to deny recognition.  See id. at 129 (rejecting Chapter 15 recognition for Cayman-incorporated funds even in the absence of an objection where the investment manager and principal management were located in the United States); In re Basis Yield Alpha Fund (Master), 381 B.R. 37, 47 (Bankr. S.D.N.Y. 2008) (denying motion for summary judgment seeking recognition without evidence on location of those who managed and controlled the debtor).[21]  Moreover, NN Ireland's argument that responsibility for strategic oversight and control over the debtors was irrelevant to a determination of COMI is belied by NN Ireland's submission of detailed evidence to this Court on NNUK's control over the entire EMEA region and its autonomy and independence from North America.[22]

---

[21]    Nor, as NN Ireland suggests, could the Court have relied solely on the presumption created by its jurisdiction of incorporation.  Opp. at 58.  Even with the benefit of such presumption under Section 1516, and in the absence of an objection, the Court could only have granted NN Ireland recognition if it made an independent determination that NN Ireland's COMI was in England.  See Bear Stearns, 374 B.R. at 128.  It is the representations in the Witness Statements and other submissions of NN Ireland that created the basis for this Court to do so.

[22]    In fact, NN Ireland previously conceded the relevance of these factual details when it sought Chapter 15 recognition, explaining that relevant factors in determining COMI included "the location of the debtor's headquarters; [and] the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company)."  Mem. of Law in Support of Verified Petition for Recognition of Foreign Proceedings Pursuant to Chapter 15 of the United States Bankruptcy Code [D.I. 8 in Case No. 09-11972] at 7.

3.    NN Ireland Has No Good Faith Excuse for Its Inconsistent Positions

NN Ireland attempts to explain away the inconsistent positions it has taken by "an inadequacy of information available to [it] at the time the EMEA Debtors entered into administration." Opp. at 53.[23] Thus, NN Ireland now claims that only after the Joint Administrators' appointment were the Joint Administrators "able to fully appreciate the control exercised by NNI and NNL." Id. at 50. The record belies any such assertion.

The witnesses from whom the EMEA Debtors submitted statements had long-standing personal knowledge with respect to the decision-making for the EMEA region. If, as NN Ireland now suggests, the Joint Administrators' investigation later revealed that certain facts in the Witness Statements were incorrect or that the witnesses had provided false testimony, the EMEA Debtors could not have, consistent with their obligations to this Court, verified those Witness Statements under penalty of perjury, or offered them into evidence before this Court as recently as January 2011. Yet that is precisely what the EMEA Debtors did.[24]

Nor, as NN Ireland suggests, can the deposition transcript of Mr. Alan Robert Bloom (the "Bloom Deposition") somehow excuse or explain NN Ireland's inconsistencies. Opp. at 54-55. Such a review bolsters, rather than defeats, a finding that the Joint Administrators intended to

---

[23]    Notably, while NN Ireland asserts that a finding of bad faith is a prerequisite to a finding of judicial estoppel (Opp. at 52-53), the Supreme Court has emphasized that judicial estoppel is a flexible inquiry that can be employed by the court at its discretion. See New Hampshire v. Maine, 532 U.S. 742, 750 (2001) ("Because [judicial estoppel] is intended to prevent improper use of judicial machinery, judicial estoppel is an equitable doctrine invoked by a court at its discretion." (citations and internal quotation marks omitted)). Properly considered, bad faith is thus only an "[a]dditional consideration [that] may inform the [judicial estoppel] doctrine's application in specific factual contexts." In re Kane, 628 F.3d 631, 639 (3d Cir. 2010); Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp., 337 F.3d 314, 319-20 (3d Cir. 2003) (characterizing bad faith as only one of the "criteria for determining when seemingly inconsistent litigation stances justify application of the doctrine"). The argument that a bad faith finding must be made in every case would be inconsistent with the Supreme Court's instruction that judicial estoppel cannot be "[subject to] inflexible prerequisites or an exhaustive formula." Maine, 532 U.S. at 751.

[24]    See Joksimovic Decl. Ex J at p. 9 (sworn verification dated October 18, 2010 affirming that the Witness Statements "are true and correct to the best of my knowledge, information, and belief."); Jan. 31, 2011 Hr'g Tr. at 20:7-10) ("Attached as exhibits to the Bloom declaration . . . is the witness statement of Sharon Ralston [sic] and the witness statement of Michael Clemont [sic], and we would ask to admit that entire package into evidence.").

play "fast and loose" with the Court.  See Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 361 (3d Cir. 1996).  At his deposition – in a representative capacity pursuant to Rule 30(b)(6) – Mr. Bloom repeatedly affirmed without qualification that the positions taken in the Rolston and Clement Witness Statements remained true and correct. [25]  Bloom Dep. Tr. at 49:17-50:4, 107:7-17, 278:21-279:9.  Mr. Bloom specifically affirmed the very portions of the Witness Statements that are at odds with NN Ireland's new litigation posture.[26]

Nor is any further factual development required to determine whether NN Ireland played "fast and loose with the Court."  As NN Ireland concedes, its Opposition Brief has provided it with an opportunity to attempt an explanation of its contrary and inconsistent positions.  Opp. at 55.  It has failed to provide any good faith explanation.  To the extent required, the Court can determine whether NN Ireland should be estopped from its review of the undisputed procedural history.[27]  No further evidentiary development is needed or warranted.

---

[25]    The Court was informed that the "record developed in the course of discovery and in particular Mr. Bloom's deposition where he acknowledged the accuracy of the witness statements by Ms. Ralston [sic] and Mr. Clemont [sic] are – are more than sufficient to overcome the presumption in favor of COMI in the jurisdiction of registration and that, instead, COMI was in – is in England for these Debtors."  Tr. Jan. 31, 2011 Hr'g at 23:19-25.

[26]    See, e.g., Bloom Dep. Tr. at 282:8-16 ("Here Ms. Rolston says, 'The overall global strategy for the Nortel group is set at a very high level of generality by the Board of Directors of NNL and the chief executive officer, CEO, and chief finance officer, CFO, in Canada.' Sir, is that an accurate statement?  A: I believe that to be an accurate statement."); id. at 282:18-283:2 ("Ms. Rolston says, 'The EMEA senior management operates with a large degree of autonomy from Canada setting all policies, procedures, budgets, targets and operational matters for the EMEA region which are disseminated to the EMEA companies which are required to operate within those instructions.'  Sir, is that an accurate statement?  A: Yes."); id. at 281:9-20 ("And then Ms. Rolston says, 'The UK business then became the largest operation in the EMEA region as well as the center of operations making the vast majority of significant decisions for the EMEA companies and performing head office functions.'  Sir, do you see that statement by Ms. Rolston?  A: Yes.  Q: Isn't that a true statement?  A: I believe that to be a true statement.").

[27]    Klein v. Stahl GMBH & Co., 185 F.3d 98, 111 n.13 (3d Cir. 1999) (precedent does not "require[] a district court to discern [bad faith] intent by way of an evidentiary hearing"); Ryan Operations, 81 F.3d at 364-65 (assessing appellant's bad faith by conducting a review of the procedural history, rather than vacating the district court's finding of bad faith and remanding for an evidentiary hearing); Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414 (3d Cir. 1988) (affirming dismissal of claims under Rule 12(b)(6) on judicial estoppel grounds where "there was ample evidence in the record from which an inference of deliberate manipulation could be drawn").

4.    The Elements of Judicial Estoppel Have Been Met

NN Ireland argues that judicial estoppel should not apply because the "US Debtor has identified no harm it will suffer as a result of any purported inconsistency in the Joint Administrators' positions." Opp. at 56. However, the application of judicial estoppel does not turn on whether litigants have been prejudiced. As NN Ireland's own authorities recognize, "judicial estoppel may not be used to punish litigants for how they treat other litigants or third parties; its *only* legitimate purpose is to remedy an affront to the court's integrity." Montrose, 243 F.3d at 785-86. Judicial estoppel thus focuses solely on a party's conduct vis-à-vis the Court, not vis-à-vis its adversary. See Hansford v. Bank of Am., No. 07-4716, 2008 U.S. Dist. LEXIS 65502, at *27 (E.D. Pa. Aug. 26, 2008) ("Any reliance or prejudice suffered by the other party as a result of the inconsistent positions is immaterial to the application of judicial estoppel."). In any event, Movants would plainly be prejudiced if NN Ireland were permitted, whenever it suited NN Ireland, to disavow positions and sworn statements it used to obtain earlier relief.[28]

Similarly irrelevant is the fact that NN Ireland is pursuing its Claim for the benefit of creditors. Unlike the private defendants in Montrose, the Movants are also fiduciaries, attempting to safeguard estate resources for distribution to creditors. Moreover, the representations that form the basis for estoppel here were undertaken on behalf of NN Ireland for the benefit of its creditors. In any event, as with all estoppel cases, Montrose was decided on its particular facts and circumstances; lest there be any doubt, courts have continued to apply

---

[28]    Even if conduct of the U.S. Debtors were relevant, the record demonstrates that the U.S. Debtors relied on the Witness Statements and NN Ireland's affirmance of their truth in not pursuing an objection to the EMEA Debtors' request for Chapter 15 recognition. See Jan. 31, 2011 Hr'g Tr. at 22:16-23 ("[Mr. Barefoot:] [F]or the U.S. debtors. Mr. Harron is correct that in reliance on the materials that the EMEA administrators are moving into evidence at today's hearing [which included the Witness Statements] . . . the U.S. debtors don't object to this Court's recognition of the English proceedings as foreign main proceedings . . . .").

18

estoppel to estate fiduciaries where, as here, the circumstances warrant.  See, e.g., Official

Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.), 330 B.R. 67, 72

(Bankr. D. Del. 2005) (applying estoppel to prevent creditors' committee from pursuing breach

of fiduciary duty claims to recover transfers for the benefit of creditors, where committee had

previously touted benefits of underlying contracts).[29]

5.    NN Ireland Misstates the Test for Collateral Estoppel

NN Ireland also cannot avoid application of collateral estoppel to its fiduciary duty-based

claims.  While NN Ireland does not dispute that the other elements of collateral estoppel are

satisfied, it argues that the doctrine is inapplicable only because the issues decided in its

recognition proceedings are not "identical" to the allegations made in this Claim.  Opp. at 56-58.

NN Ireland's argument misstates the governing law.  Courts do not require that the issue

presented in the current proceeding be "the exact issue already decided in an earlier proceeding,"

as NN Ireland contends.  See Opp. at 57 (emphasis omitted).  Instead, collateral estoppel applies

where, as here, the issue was implicitly determined by the first court, or where there is

substantial overlap between the evidence advanced in the two proceedings and a close

relationship between the claims involved in the two proceedings.[30]  As set forth above, the

location of those who actually managed NN Ireland and the situs of its head office functions

were necessarily central factors in this Court's determination that the EMEA Debtors' COMI

was in England.  To permit NN Ireland to relitigate these questions based on immaterial or

---

[29]    Similarly misplaced is NN Ireland's suggestion that the U.S. Debtors' support of NN Ireland's
administration proceedings somehow undermines the Movants' invocation of judicial estoppel.  See Opp. at 54 n.
72.  Movants do not dispute the benefits that the entire Nortel Group obtained from the coordinated process that the
administration and Chapter 15 Proceedings enabled.  The thrust of the Movants' judicial estoppel argument is in fact
aimed at preserving those benefits by precluding NN Ireland from taking contrary positions to mount its Claim.

[30]    See Raytech Corp. v. White, 54 F.3d 187, 193 (3d Cir. 1995) (finding identity of issues for collateral
estoppel where issues between two cases were "in substance the same" (citation and internal quotation marks
omitted)); Honeywell Int'l Inc. v. Universal Avionics Sys. Corp., 585 F. Supp. 2d 623, 630 (D. Del. 2008) (applying
collateral estoppel to claims under two different patents where party relied on the same facts and same analysis).

procedural differences between its Claim and the recognition proceedings would defeat the very purpose of collateral estoppel – to "protect[] litigants" and "promot[e] judicial economy." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979).

**B.      NN Ireland's Effort to Plead Insolvency Fails to Satisfy U.S. Pleading Standards**

Even if estoppel were not determinative, NN Ireland's failure to adequately plead insolvency justifies dismissal of its directorship claims (as well as its secondary liability claims based upon alleged breaches of duty by NNL or NN Ireland's de jure directors).  NN Ireland grounded its breach of fiduciary duty claims upon this very premise.  Claim ¶ 86 ("*[G]iven the doubtful solvency (and/or risk of insolvency)* of NN Ireland . . . the directors were obliged at all times to consider the best interests of the creditors of NN Ireland as paramount.").  Even as NN Ireland now invites the Court to ignore its insolvency allegation (at page 42 of its Response), it makes the point elsewhere in its Response that a showing of insolvency "at the relevant time" *is* necessary in order to make out its Claim.  Id. at 70 ("The Joint Administrators' Claims Are Supported By Factual Allegations Showing that NN Ireland Met the Insolvency Requirement At The Relevant Time.").

The allegations upon which NN Ireland relies in an effort to show insolvency at the time of the events at issue are paradigmatic "mere conclusions" that must be disregarded under Iqbal. NN Ireland's citation to the Claim's allegation that NN Ireland was of "doubtful solvency (and/or [at] risk of insolvency) . . . from 2000 onwards," Opp. at 42 (citing Claim ¶ 112), is woefully insufficient under the applicable pleading standards set forth by the Supreme Court and the Third Circuit, as well as the cases set forth in the Motion addressing insolvency allegations in

particular, which NN Ireland fails even to address in its Response.[31]  That caselaw makes plain

that Iqbal requires more than bare allegations of insolvency to withstand a motion to dismiss.[32]

The Proof of Claim is particularly defective given that NN Ireland makes a blanket assertion of

"insolvency" covering a period of nine years, during which the Claim simultaneously alleges that

NN Ireland extended tens of millions of dollars in interest-bearing loans to affiliates, and yet in

2007 it allegedly "had considerable liquid cash resources . . . of US $100 million."  Claim

¶ 54(a).

Recognizing the inadequacy of its bare averments of insolvency, NN Ireland selectively

and misleadingly quotes other portions of its pleadings.  NN Ireland implies that the allegation

that the Irish Dividends were paid "when there were insufficient distributable reserves" suffices

to show that the company was thereby rendered insolvent, Opp. at 42, but in fact the Claim states

that the alleged "insufficiency" related to a transfer pricing adjustment that rendered NN

Ireland's profits insufficient *in 2008* legally to have justified the dividends.  Claim ¶ 57.  This is

not a well-pleaded allegation of insolvency from 2000-2009, or even in 2008.  NN Ireland also

points to allegations that "NNI and NNL extracted cash value from NN Ireland," and that "the

best interests of NN Ireland and its creditors would have been best served if the Irish Dividends

were not declared," Opp. at 42-43, but those allegations simply sidestep the allegation of

insolvency.  Nowhere does the Claim plead any inability by NN Ireland to pay its debts as they

---

[31]      Equally unavailing is NN Ireland's insistence that solvency is a factual question inappropriate for
determination on a motion to dismiss.  Opp. at 43.  NNI does not seek a factual finding that NN Ireland was solvent,
but rather a determination that NN Ireland's conclusory pleadings of insolvency are insufficient as a matter of law.

[32]      See Mot. at 40 (citing, *inter alia*, Seidel v. Byron, No. 05-C-6698 (JBM), 2008 U.S. Dist LEXIS 76306, at
*8 (N.D. Ill. Sept. 26, 2008) (granting motion to dismiss claim for breach of fiduciary duty owed to creditors based
on bare allegation of solvency, where "[n]othing in the complaint indicates when [the debtor's] liabilities far
exceeded its assets, or when it could no longer pay its debts . . . thereby failing to provide notice to defendants"); see
also Burtch v. Huston (In re USDigital, Inc.), 443 B.R. 22, 39 (Bankr. D. Del. 2011) (dismissing constructive fraud
claim where "the Trustee has failed to provide any support to the factual allegations that USDigital was insolvent or
was rendered insolvent at the time it purchased USDTV's assets out of bankruptcy").

fell due, or include any facts on the value of NN Ireland's assets as compared to its liabilities, see Claim ¶¶ 6-8, 63-65, which information is within NN Ireland's knowledge and control.

**C.    NN Ireland Fails to Plead a Plausible Claim that NNI was a Director Under Irish Law**

NN Ireland argues that it has made out a claim for breach of fiduciary duty under Irish law. NN Ireland is wrong, both with respect to its positions on Irish law and with respect to the sufficiency of its allegations in the Proof of Claim. [33]

1.    <u>The Court Must Reject NN Ireland's Attempts to Obfuscate and Extend Settled Irish Law on De Facto and Shadow Directors</u>

NN Ireland takes the position that the issue of whether NNI was a de facto or shadow director of NN Ireland is a fact-intensive inquiry that should not be decided on a motion to dismiss. Opp. at 32-33. This is incorrect. It is well-settled that a determination of foreign law is a question of law, not fact, which the Court is empowered to make on a motion to dismiss. <u>See</u> Fed. R. Bankr. P. 9017 (incorporating Rule 44.1 of the Federal Rules of Civil Procedure). [34]

NN Ireland also seeks to create the false impression that Irish law has not addressed various relevant legal issues and therefore reliance should be placed on English precedents. NN Ireland's position on Irish law is manifestly incorrect, and its reliance on English law is mere wishful thinking of what Irish courts may one day in the future hold, but it is not the current state of Irish law. This Court's role under Rule 44.1 is to determine Irish law as currently applied by the Irish courts. <u>See</u> <u>Licci v. Am. Express Bank</u>, 704 F. Supp. 2d 403, 410 (S.D.N.Y. 2010)

---

[33]    This argument pertains to claims 2, 8, 18 and 24.

[34]    <u>See also</u> <u>Twohy v. First Nat'l Bank of Chi.</u>, 758 F.2d 1185, 1186-87, 1191, 1195 (7th Cir. 1985) (affirming district court's dismissal of claims on the pleadings pursuant to Rule 12(c) despite parties' disagreement over foreign law applicable to plaintiff's claims, where court determined that plaintiff failed to state a claim under foreign law); <u>Animal Sci. Prods. v. China Nat'l Metals and Minerals Imp. & Exp. Corp.</u>, 702 F. Supp. 2d 320, 426 (D.N.J. 2010) (dismissing claims on a Rule 12(b)(6) motion, since "differences of opinion among experts on the content, applicability, or interpretation of foreign law do not create a genuine issue as to any material fact for the purposes of the court's review and final ruling" (citation and internal quotation marks omitted)), <u>rev'd on other grounds sub nom.</u>, <u>Animal Sci Prods. v. China Minmetals Corp.</u>, No. 10-2288(CCH), 2011 U.S. App. LEXIS 17046 (3d. Cir. Aug. 17, 2011).

(rejecting "expert's prediction of the Israeli courts' willingness to more broadly interpret the law," given the current absence of any factually apposite caselaw so extending the law (emphasis omitted)).

NN Ireland's focus on English law is misplaced for another reason. It is not correct, as NN Ireland's Irish law expert maintains, that "where there is no authority of an Irish court on a specific matter, decisions on the same issue by the courts of England and Wales will be regarded as persuasive and, unless indistinguishable, will normally be followed by an Irish court." Declaration of John Hennessy SC in Opposition to the Joint Objection and Motion to Dismiss the Claims of Nortel Networks Ireland dated September 14, 2011 ("Hennessy Decl.") ¶ 7. While English precedent is regarded as persuasive by Irish courts, a decision of a court in England is not binding on an Irish court. See Reply Declaration of Aidan Redmond SC in Support of the Joint Objection and Motion to Dismiss the Claims of Nortel Networks Ireland (NN Ireland) dated October 5, 2011 ("Reply Redmond Decl.") ¶¶ 4-5 (citing M. McC v. J. McC, [1994] 1 I.R. 293 at 303, in which the judge explains that English court "decisions are of persuasive weight and should not likely be ignored. But the Irish courts are not bound by them . . . .").

NN Ireland tellingly does not contradict that in the area of shadow and de facto directors, *no* Irish court (or English court for that matter) has *ever* upheld a claim for shadow or de facto directorship against a sister corporation. Reply Redmond Decl. ¶ 7. Nor has a corporate entity ever been held liable as a de facto director, nor has a shadow director ever been charged with broad-scale fiduciary duties as alleged here. This alone should end the Court's inquiry and result in dismissal of NN Ireland's claims. See Gilstrap v. Radianz Ltd., 443 F. Supp. 2d 474, 491 (S.D.N.Y. 2006), aff'd, 233 F. App'x 83 (2d. Cir. 2007) ("Though the federal courts are called upon not infrequently to apply the laws of other nations, they should be more hesitant to engage

in such a task when doing so would necessarily involve expanding, extending, or departing from well-settled and long established principles of foreign law.").

NN Ireland's misstatements of Irish law fall into three categories:  whether corporations may be deemed de facto directors, whether shadow directors are a subset of de facto directors and whether shadow directors owe the full range of fiduciary duties.  Each of these issues is discussed below in turn.

*First*, NN Ireland can point to no Irish decision holding a corporation to be a de facto director.  As explained in Movants' opening brief, the 1963 Companies Act contains a definition of a de jure director, and expressly excludes a corporate entity from serving as one.  Mot. at 30.  In particular, section 176 of the Act states that "[a] company shall not, after expiration of 3 months of the operative date, have as a director of the company a body corporate."  Reply Redmond Decl. ¶ 9.  While the concept of a de facto director is not addressed in the statute but has instead been developed through caselaw, no case has ever held a corporation – which cannot be a de jure director – to be deemed a de facto director.  Mot. at 30 (citing Declaration of Aidan Redmond SC in Support of the Joint Objection and Motion to Dismiss the Claims of Nortel Networks Ireland (NN Ireland) dated July 21, 2011 ("Initial Redmond Decl.") ¶¶ 12, 15)).

NN Ireland admits there is no Irish authority deeming a corporate entity to be a de facto director, and does not point to any Irish authority calling into question the applicability to de facto directors of the Irish statutory restriction prohibiting a corporate entity from serving as a director.  Opp. at 31.  Rather, it criticizes the Movants for failing to find an Irish case that proves the negative proposition "that a corporate entity *cannot* be a [sic] deemed a *de facto* director."  Id.  The conclusion that NN Ireland and its Irish law expert seem to draw from this acknowledged lack of jurisprudence is that there "could" be a situation in which an Irish court

24

would hold that a company is a de facto director.  Id. at 32; Hennessy Decl. ¶ 29.  But as explained above, what is relevant to this Motion is not what Irish law could one day be, but what it is today.

NN Ireland's Irish law expert relies on English law to argue that NNI, even though it is a corporate entity, may be deemed to be a de facto director of NN Ireland.  However, the statutory scheme in England is entirely different from that of Ireland on this point.  English law contains no analogue to Section 176 of the 1963 Companies Act.  Reply Redmond Decl. ¶ 9.  In other words, in England, corporate entities may (with limited exceptions) serve as de jure directors. Id. ¶ 16.  This difference makes any analogy to or reliance upon English law particularly inappropriate with respect to the issue of whether corporate entities may serve as de facto directors.  Id. ¶ 20.[35]

*Second*, contrary to NN Ireland's position, there is no "functional overlap" between the concepts of de facto and shadow directors.  Opp. at 34.  This is clear under Irish law as it currently stands, and there is no basis on which to conclude that Irish law would change on this point.  Reply Redmond Decl. ¶¶ 8-10.

NN Ireland is wrong that "no Irish court has heretofore directly confronted this question." Opp. at 34.  In the 2009 decision of Moorview Development & Others v. First Active PLC & Others [2009] IEHC 214, the Irish High Court applied the principles set forth in the 1994 English case Re Hydrodam Limited [1994] 2 BCLC 180, 184, [1994] BCC 1961, in which the court said:

> The terms do not overlap.  They are not alternatives and in most
> and perhaps all cases are mutually exclusive.  A de facto director is
> a person who assumes to act as a director.  He is held out as a
> director by the company, and claims and purports to be a director,
> although never actually or validly appointed as such … [A]

---

[35]    Moreover, the English cases which NN Ireland cites are inapposite.  Both Re Mea Corp., [2007] 1 BCLC 618, and Revenue Customs Comm'rs v. Holland [2010] 1 WLR 2793, addressed the issue of whether individual defendants could be deemed a de facto or shadow director.  Reply Redmond Decl. ¶ 16.

> shadow director, by contrast, does not claim or purport to act as a
> director.  On the contrary, he claims not to be a director.  He lurks
> in the shadows. . . .  He is not held out as a director of the
> company.

Reply Redmond Decl. ¶ 18.

In an attempt to circumvent <u>Moorview</u> and its acceptance of <u>Hydrodam</u>, NN Ireland argues that "recent English decisions (which would be regarded as persuasive in an Irish Court) decided after <u>Hydrodam</u> . . . illustrate that a clear distinction no longer be maintained."  Opp. at 34.  But English law's evolution after <u>Hydrodam</u> has no bearing on the current state of Irish law. <u>Moorview</u> was decided *after* one of the two English precedents upon which NN Ireland's expert relies, <u>Re Mea Corp.</u>, and *no* Irish court has applied the second cited English case, <u>Revenue Customs Commissioners v. Holland</u>.  Reply Redmond Decl. ¶ 25.  Therefore, it is undisputed that under the current state of Irish law, the concepts of de facto and shadow directors are distinct.[36]

*Third*, NN Ireland's argument that shadow directors owe the full range of fiduciary duties – which is the reason behind its attempt to erode the distinction between the shadow and de facto director concepts – is wrong.  Under settled Irish law, shadow directors do *not* owe the full range of fiduciary duties.  Mot. at 31, 38.  Thus, even if NNI were deemed to be a shadow director of NN Ireland, NN Ireland's claim for breach of fiduciary duty would still fail.

This issue is governed by Irish statute.  Under Irish law, shadow directors are statutory creations (under Section 27 of the 1990 Companies Act) and therefore only have those duties set forth by statute.  <u>Id.</u>; Reply Redmond Decl. ¶ 26.  This is consistent with recent Irish case law,

---

[36]     Nor is the High Court decision in <u>Re Hocroft Development Limited</u> [2009] IEHC 580, to the contrary. Reply Redmond Decl. ¶ 19.  Indeed, the court there took pains to note the distinction between de facto and shadow directors and the need to plead them with particularity as a matter of Irish law.

which has analyzed the scope of potential liabilities of shadow directors only pursuant to the

provisions of the Act.  Id. ¶ 27.

Here again, NN Ireland makes the wrong conclusion about the absence of any Irish

authority holding that shadow directors owe the full range of fiduciary duties – an absence which

NN Ireland acknowledges.  NN Ireland instead points out that "there is no Irish authority to

suggest that such duties are not to be imposed upon shadow directors" and again attempts to rely

on English case law to make a prediction about what Irish courts might hold in the future.  Opp.

at 35-36 & n.51 (citing Hennessy Decl. ¶ 19, which relies on the English case of Yukong Line

Ltd. of Korea v. Rendsburg Invs. Corp. of Liberia [1998] 1 WLR 294).

English law is not the governing law, for the same reasons as explained above, but in any

event, even under English law, shadow directors do not owe the full range of fiduciary duties.

The English case of Ultraframe (UK) Ltd. v. Fielding [2005] EWHC 1638, held so, and leave to

appeal on this issue was not granted.  Reply Declaration of Michael Todd Q.C. in Further

Support of Joint Objection and Motion to Dismiss Claims of Nortel Networks UK Limited dated

October 5, 2011 ("Reply Todd Decl.") ¶¶ 42.4, 42.5;[37] see also Reply Redmond Decl. ¶¶ 29-33.

The Yukong case, upon which NN Ireland's expert relies, was decided by a court of the same

level as Ultraframe, preceded Ultraframe, and contained only a brief and unexplained statement

that shadow directors owe duties.  Reply Todd Decl. ¶¶ 34-35.  In fact, Ultraframe criticized

Yukong on this point, explaining that the "findings of fact that Toulson J [the judge in Yukong]

made more naturally lead to the conclusion that Mr. Yamvrais [one of the defendants] was a de

facto rather than a shadow director . . . I am not persuaded that the mere fact that a person falls

within the statutory definition of 'shadow director' is enough to impose upon him the same

---

[37]    Movants incorporate by reference the Declaration of Michael Todd Q.C. in Support of Joint Objection and
Motion to Dismiss Claims of Nortel Networks UK Limited dated July 15, 2011, and the Reply Todd Decl.

fiduciary duties to the relevant company as are owed by a de jure or de facto director." Reply

Redmond Decl. ¶ 28 (quoting Ultraframe).

NN Ireland also refers to its Irish law expert's reliance on certain *draft* legislation in

Ireland, which proposes that the statute define de jure, de facto and shadow directors and

enumerate the fiduciary duties each owe. Opp. at 35 & n.50. This argument only serves to prove

the Movants' point that what NN Ireland is describing is not the state of current Irish law on de

facto and shadow directors but a prediction of how it might change in the future. In the case of

the scope of duties of shadow directors, which are limited under Irish law, it is going further and

seeking to bypass the Irish legislature. This argument should be rejected. Reply Redmond Decl.

¶¶ 34-36.

    2.   <u>NN Ireland States No Irish Law Claim for Shadow or De Facto Directorship</u>

As set forth in the opening brief, NN Ireland's Claim fails to allege sufficient well-

pleaded facts to render a directorship claim plausible, and therefore, its breach of fiduciary duty

claims (Claims 2, 8, 18 and 24) fail. Mot. at 32-37.

NN Ireland takes no issue with the Movants' description of U.S. Supreme Court

precedent – that on a motion to dismiss, courts must determine whether a claim alleges sufficient

facts to "state a claim to relief that is plausible on its face," <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S.

544, 570 (2007), and must disregard unsupported or legal conclusions, unwarranted inferences or

bare recitals of the cause of action, <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009). <u>See</u> Mot. at

32.[38]

---

[38]    While NN Ireland does dispute that its breach of duty allegations sound in fraud and therefore invoke Rule 9(b)'s heightened pleading standard, Opp. at 37 n.53, as the Movants explained in their opening brief, NN Ireland's claims fail regardless of whether Rule 9(b)'s heightened pleading standard applies, as they are insufficient under Rule 8(a) alone. Mot. at 32-33.

NN Ireland likewise does not disagree that under Irish law, in order to find a de facto directorship, consideration must be given to whether the alleged de facto director carried out functions that would properly be discharged by a director and made major decisions that effectively made him part of the governing structure of the company.  <u>Compare</u> Mot. at 30, <u>with</u> Opp. at 32.  NN Ireland also does not disagree that under Irish law, a shadow director is a person who directs or instructs the directors of a company, who follow those directions.  <u>Compare</u> Mot. at 31, <u>with</u> Opp. at 33.

NN Ireland nevertheless takes the position that its Claim is sufficient to withstand this motion to dismiss.  <u>See, e.g.</u>, Opp. at 36 (arguing that the Claim "shows NNI exercised a 'real influence' in NNI Ireland's corporate governance by virtue of having made major decisions for NN Ireland").  An analysis of the allegations in the Claim belies this argument.  The Claim fails to allege well-pleaded facts of any actions undertaken by NNI to comprehensively direct NN Ireland's affairs as an acting board member (as required to state a de facto director claim), much less the imperative directions given by NNI to NN Ireland's directors (as required to state a shadow director claim).  The Proof of Claim nowhere sets forth allegations of when and where NNI supposedly directed the decisions of the NN Ireland directors as to the various intercompany transactions at issue, nor does it identify who these NN Ireland directors even are.

<u>Transfer Pricing</u>.  NN Ireland fails to identify any required factual allegations that NNI occupied a place in NN Ireland's corporate governance structure so as to sustain its de facto director claims.  NN Ireland points to no allegations of any board meetings that NNI attended, or of any role that NNI undertook in NN Ireland's approval of the MRDA.  Indeed, NN Ireland concedes that there are simply no allegations in its Claim that NNI instructed NN Ireland's

directors with respect to the MRDA, or that NN Ireland's directors were accustomed to act in accordance with those instructions.

In its Response, NN Ireland attempts to correct this glaring omission, now asserting that its passive voice reference to NN Ireland having been "simply instructed to sign the MRDA" (Claim ¶ 18(d)) should somehow be understood to refer "clearly to NNI and NNL." Opp. at 38. Not only is NN Ireland precluded from amending its Claim through its Response, but even if it had properly attributed this allegation to NNI, it failed to allege any facts supporting the other required element for a shadow director claim:  that through a course of conduct, NN Ireland was accustomed to act in accordance with NNI's instructions.

NN Ireland points to paragraph 18(a), (b), (d), (e) and (f) of the Claim, stating that it "provides specific examples of situations in which NNI . . . performed functions that would normally be performed by a director" and that it "demonstrates how NN Ireland's *de jure* directors . . . were accustomed to act in accordance with NNI's directions." Opp. at 37.  These paragraphs do not contain allegations of director-level involvement or participation in board-level corporate governance but rather describe managerial actions, and they do not identify actions taken by NNI individuals to play a role in NN Ireland's corporate governance.  Nor do they concern directions or instructions that NNI gave to NN Ireland's de jure directors.

Paragraph 18(f) does not even mention NNI.  And what the other cited paragraphs allege is that NNI took the decision "to implement the RPSM" (Claim ¶ 18(a)), "created and structured" the "RPSM electronic model" (Claim ¶ 18(b)), decided "the terms of the MRDA" (Claim ¶ 18(d)), "took the lead in the negotiations" with the tax authorities and "took sole responsibility for instructing Nortel's professional advisers in relation to the APA application process" (Claim

¶ 18(e)).[39]  At best, these allegations relate to NNI's alleged involvement in the design, management and implementation of Nortel's transfer pricing system, which is not a substitute for alleging that NNI employees undertook functions with respect to transfer pricing that could only be performed by a director such as voting to approve a transfer pricing methodology.  Indeed, there is no allegation that NNI ever attended any NN Ireland board meetings, participated in NN Ireland board deliberations or controlled NN Ireland's decision to approve the RPSM or MRDA.  There is also no allegation that the NN Ireland board did *not* approve the MRDA before NN Ireland signed it.  Nor is there any well-pled allegation that NN Ireland was accustomed to act in accordance with NNI's instructions with respect to transfer pricing.  As a de facto and shadow director claim ultimately requires these kind of allegations, the Claim is plainly deficient.

Irish Loans and Dividends.  Neither NN Ireland's Claim or its Response contests that the NN Ireland board of directors approved the Irish loans and dividends at issue, nor alleges that NN Ireland's board was somehow supplanted with respect to these transactions.  Indeed, the Claim contains specific allegations at paragraphs 55-57 about the resolutions pursuant to which and the board meetings at which these transactions were approved – which make no mention of NNI whatsoever.  NN Ireland argues that paragraphs 22-26 of the Proof of Claim identify "specific NNI personnel who were actively involved in devising and implementing the scheme to siphon cash from NN Ireland and move it to NNL."  Opp. at 38.  But there are no allegations as to NNI controlling or influencing the NN Ireland board to approve the arrangements.

NN Ireland also argues that paragraphs 55-58 of the Proof of Claim illustrate "how NN Ireland's Board was accustomed to act upon NNI's instructions over an extended period of time by resolving to pay dividends."  Opp. at 39.  This is not the case.  Paragraph 58 is the only

---

[39]    The focus on negotiations with tax authorities is especially misplaced since NN Ireland's fiduciary duty claims arise not from any such negotiations, but instead from NN Ireland's agreement to participate in the RPSM and MRDA.  Claim ¶¶ 88-90.

paragraph that even mentions NNI, and even here, it lumps NNI with NNL saying that both

"determined that . . . the unlawful June 2008 dividends would be treated as a loan to NNL, or

would be treated as being 'repaid' and then advanced again to NNL." The NNI individual that

purportedly made the "determination" is not identified, and even if that had been done, this does

not equate to alleging that NN Ireland's de jure directors did not willingly approve this

transaction but instead were instructed or directed by NNI to do so.

Contingent Tax Claims. While NN Ireland focuses on its right to assert contingent

claims (Opp. at 39), its claim fails not because the amount of tax liabilities are unliquidated, but

rather because it fails to plead the requisite direction or participation in corporate affairs

necessary to impose a directorship on NNI. Because these allegations relate to the pre-petition

governance of NN Ireland, NN Ireland cannot excuse its pleading failures by reference to the

contingent nature of its claims.

NN Ireland's Response contains no factual allegations of instructions that NNI gave to

NN Ireland, nor factual allegations showing that NN Ireland was accustomed to act in

accordance with NNI's instructions, precluding a shadow director claim. Nor does the Response

point to any well-pleaded facts concerning the role that NNI played in NN Ireland's tax

decisions, as a well-pleaded de facto director claim would require. Instead, NN Ireland points to

the same allegations it relies on for its transfer pricing claim (Opp. at 39-40), which allegations

cannot cure these basic pleading failures. Claim 24 seeks to impose a directorship on NNI not

with respect to transfer pricing alone, but in respect of "NN Ireland's tax affairs" writ large.

Claim ¶ 72 (asserting that "NNI and NNL would be responsible for any penalties, interest and

other loss payable by NN Ireland" concerning any "failure to pay the proper level of taxation in

any years (whether because of an under recording of revenue or otherwise)"). Aside from an

incorporation of its allegations concerning transfer pricing – which are themselves deficient – NN Ireland makes no non-conclusory allegations of NNI's supposed role in tax matters.  See, e.g., Claim ¶ 71 (stating bald allegation that "NN Ireland's taxation affairs were controlled by NNI and NNL").  Indeed, the allegations here are not even sufficient to put NNI on notice of the conduct on which NN Ireland bases this cause of action.  See Mot. at 34.

Pre-Petition Asset Sales.  NN Ireland does not dispute, and does not justify, its failure to identify the assets sold, buyers, sellers or consideration; the decisions by NNI acting as a director of NN Ireland with respect to such sales; or the process by which the sales were considered and approved.  See Mot. at 33-34.  Rather, it points to various paragraphs of the Proof of Claim (¶¶ 18, 67-69, 162), which it argues support the proposition that "[b]y controlling the process, NNI owed a duty as NN Ireland's director to act in NN Ireland's best interest."  Opp. at 40.  Paragraph 18 is irrelevant as it concerns transfer pricing.  And the other paragraphs contain only conclusory allegations that fail to make out the required elements of a shadow or de facto director claim.  Claim ¶ 69 ("As a consequence of the allocation method adopted, NN Ireland received significantly less, and NNI received significantly more, than it was entitled to on an arm's length basis."); ¶ 162 ("NNI's involvement in this regard constituted a breach of the implied contract fairly to allocate the Pre-Petition Sale Proceeds by NNI.").  NN Ireland barely even mentions NNI in these allegations, much less does it identify instructions or directions given to NN Ireland by NNI, or any facts concerning how NNI played a role in corporate governance with respect these sales.

Attribution of actions to NNI.  Finally, NN Ireland does not dispute that in order to make out a directorship claim against NNI, "NN Ireland must allege that [the named] individuals were acting within the scope of their employment and authority at NNI."  Mot. at 32.  Nor does it

assert that its Claim contains an allegation that the actions at issue were undertaken by the named individuals *in their capacity as NNI* agents.  Instead, NN Ireland argues that its pleadings are sufficient because "[e]ach named individual is identified with his or her respective role and title as an NNI employee."  Opp. at 40.  This is not correct.

One of the individuals upon which NN Ireland focuses is Katharine Stevenson, who is alleged to have been "involved in promoting initiatives to move cash to NNL" (*not* NNI).  Claim ¶ 22.  Ms. Stevenson is identified as *both* "Group Treasurer and a director of NNI."  Id.  No timeframe is provided for when she served as an NNI director, not to mention an explanation of why she would be "promoting initiatives to move cash to NNL," id., in her capacity as NNI director rather than Group Treasurer, which is the more plausible conclusion.

With respect to Ryan Smith, the other individual upon which NN Ireland focuses, NN Ireland does not allege in its Claim but rather argues in its brief that he "was working on behalf of NNI while seconded to NNUK headquarters."  Opp. at 41 (citing Claim ¶¶ 19, 23).  Argument in a brief is no substitute for an allegation in the Claim itself.  Indeed, the Claim contains the opposite allegation – that Smith was "the EMEA Tax Leader on the ground in the EMEA Region (responsible for NN Ireland)."  Claim ¶ 19; see also Claim ¶ 23 (identifying Smith as "Leader of Global Tax Planning" and alleging that "[h]is particular role appears to have focussed on supervising a team which identified cash that could be transferred to NNL and then considered the most tax efficient way of transferring that cash to NNL.").

## D.     NN Ireland Cannot Extend Irish Law to Create a Duty of Care

NN Ireland alleges two bases upon which to impose a duty of care (claims 9, 19, 25) on NNI under Irish law:  (i) a fiduciary duty as an alleged shadow or de facto director, or (ii) independently as a general duty of care based on an argument of "proximity," the alleged foreseeability of harm, and that it would be just and reasonable to do so.  Opp. at 43-46.  As

established above, NN Ireland's directorship allegations fail.  So do its allegations of a general duty of care.

First, there is no dispute that no Irish court ever has imposed a general duty of care where, as here, the harm alleged is solely economic and between affiliates.  Indeed, NN Ireland concedes that the Irish Supreme Court in Glencar Exploration v. Mayo County Council [2002] 1 I.R. 84 has made clear that it has not yet decided whether economic loss is recoverable for negligence outside a handful of narrowly defined factual circumstances not relevant here (for negligent misstatements and the negligent leasing of an inhabitable property).  See Opp. at 44; Hennessy Decl. ¶ 77; Reply Redmond Decl. ¶¶ 41-42.  NN Ireland nonetheless suggests that this Court should go where the Irish Supreme Court has expressly not gone, relying on a lower court decision decided before the Supreme Court's decision in Glencar.  In McShane Wholesale Fruit and Vegetables Ltd. v. Johnston Haulage Co. Ltd. [1997] 1 ILRM 86, decided by the High Court (an appellate court), the judge, in a real property negligence case, stated his belief that the nature of damages was irrelevant to whether a duty of care was violated.  Opp. at 44-45; Hennessy Decl. ¶¶ 78-79.  NN Ireland's reliance on the reasoning of McShane, however, is plainly misplaced in light of the subsequent opinion of Chief Justice Keane of Ireland's highest court in Glencar, in which he made clear that the Irish rule remains that damages for pure economic loss are "normally not recoverable" in tort.  Reply Redmond Decl. ¶ 43.

In asserting that this Court should be willing to expand Irish law on the duty of care to cover this claim, NN Ireland turns logic on its head.  NN Ireland argues that, in order to avoid the imposition of a duty of care in a novel case, NNI must advance "very powerful reasons" why not to impose a duty.  Hennessy Decl. ¶ 75; Opp. at 45.  But NN Ireland again runs afoul of Glencar, in which Chief Justice Keane rejected precisely this "why not?" approach to expanding the duty

of care, cautioning against the "massive extension of a prima facie duty restrained only by indefinable circumstances." Reply Redmond Decl. ¶ 41.

Second, even assuming that an Irish court would consider expanding the duty of care where economic loss is the damage alleged, NN Ireland has not adequately plead the existence of a relationship of proximity between NNI and NN Ireland. Crucially, NN Ireland premises the claimed duty of care upon its allegations of NNI's "influence and control over [NN Ireland's] tax and treasury functions." See Opp. at 44. For much the same reasons that those allegations were insufficient to show that NNI was a de facto or shadow director of NN Ireland, they are insufficient to show that NNI owed NN Ireland any independent duty of care.

Wholly absent from the Proof of Claim are plausible, non-conclusory pleadings that establish the basis for the alleged duty – pleadings that show that NNI owed NN Ireland a duty of care because NNI personnel "controlled" NN Ireland in respect of the transactions, as NN Ireland argues. Opp. at 44.[40]  In effect, NN Ireland asks the Court to infer that because NNI personnel purportedly occupied various global tax and treasury roles, the NNI personnel acting for NNI must have controlled NN Ireland as to those transactions.

Third Circuit precedent makes clear that this inference is not plausible, and that NN Ireland's duty of care claim therefore fails under Iqbal. In Santiago v. Warminster Township, 629 F.3d 121 (3d Cir. 2010), the Third Circuit rejected under Iqbal an analogous effort by a plaintiff to plead a claim based on allegations of control. There, the plaintiff alleged that certain named individuals occupied senior positions in Warminster Township's police force (one

---

[40]     NN Ireland attempts to lend the allegations in the Proof of Claim a non-conclusory veneer by pleading:  (1) the positions held within the Nortel Group by various named personnel, and (2) the harms to NN Ireland that allegedly occurred in connection with various transactions or potential transactions (transfer pricing arrangements, the Irish Loans and Dividends, Pre-Petition Asset Sales, contingent tax matters).  For the reasons stated in the Motion (at 33-38), these allegations fail to rise to a plausible level.  For example, NN Ireland alleges that Ryan Smith was working for NNUK, not NNI, at the time of the relevant events. Id. at 36-37.  Also, NN Ireland has failed to identify even a single Pre-Petition Asset Sale in which it was harmed. Id. at 33.

individual as police chief and two others as lieutenants), and that these officers variously "approved the plan" for, "were in charge of," or "planned and help[ed] execute" a "surround and call out" operation at the plaintiff's home.  Id. at 132.  The plaintiff alleged mistreatment by police officers on the scene during the execution of the operation.  Id. at 132-33.  Applying the pleading standard of Iqbal, the Third Circuit dismissed the plaintiff's claims against senior police officers, because her allegations amounted to nothing more than "naked assertion[s]" of responsibility and lacked the factual allegations to plausibly infer that the senior officers had been in control.  Id. at 131-32.

Likewise here, NN Ireland's claims for a breach of the duty of care rely on allegations that certain personnel held positions in various Nortel global entities, including NNI, and were "aware of," "involved in," or "participated in" the planning for or implementation of certain transactions.  Claim ¶¶ 19-26.  Absent, however, are any non-conclusory allegations of when or how, if at all, NNI directed those individuals.[41]  Nor are there any non-conclusory allegations of how those individuals exercised "influence" or "control" over NN Ireland or its board of directors for NNI – the purported relationship upon which NN Ireland bases its duty of care allegations.  Opp. at 44.

As discussed in the Motion (at 33-37), there are no factual allegations whatsoever of interactions between the alleged NNI personnel and NN Ireland's board of directors, much less allegations of the frequency of any such interactions or as to whether or how NN Ireland responded to any interactions with NNI personnel, if indeed any occurred at all.  See Santiago, 629 F.3d at 131 & n.9 (dismissing claim where allegations of responsibility amounted to little more than a bare assertion that "[defendants] said to do it").  And absent any non-conclusory

---

[41]    Katharine Stevenson, for example, is alleged to have been Group Treasurer, as well as a director of NNI. Claim ¶ 22.  There is no factual allegation creating a plausible inference that Stevenson was acting for NNI as opposed to the Group in connection with the Irish Loans and Dividends.

allegations of influence or control over NN Ireland, NN Ireland's allegations are insufficient to

create a plausible inference of such control.  See id. at132-34.  This failing alone warrants

dismissal of NN Ireland's duty of care claims.

## III.
## NN IRELAND'S ATTEMPTS TO IMPOSE SECONDARY LIABILITY ON NNI FAIL

**A.      NN Ireland's Claims for Aiding and Abetting and Dishonest Assistance Fail as a Matter of Law**

      1.      The Claims for "Dishonest Assistance" Under Irish Law Must Be Tested Under Rule 9(b) (claims 4, 10, 26)

 NN Ireland's Irish legal expert acknowledges that "dishonesty" is an element of this

claim under Irish law.  See Hennessy Decl. ¶¶ 86, 89.  Accordingly, the claim for dishonest or

knowing assistance is subject to Rule 9(b).  See O'Connell v. Arthur Andersen LLP (In re

Alphastar Ins. Grp. Ltd.), 383 B.R. 231, 274 (Bankr. S.D.N.Y. 2008) (dismissing claim for

dishonest assistance under Bermuda law where complaint "fail[ed] to allege with particularity

that the [defendants] did anything that would be considered 'dishonest'"); Roth v. Am. Family

Mut. Ins. Co., 567 F.3d 884, 887 (7th Cir. 2009) (holding that "dishonest" has the "primary

connotation of theft or fraud").  NN Ireland thus must plead these claims with enough detail to

put NNI on notice as to the "precise misconduct" with which it is charged.  See Frederico v.

Home Depot, 507 F.3d 188, 200 (3d Cir. 2007) (under Rule 9(b), claimant must plead "the date,

time and place of the alleged fraud or otherwise inject precision or some measure of

substantiation into a fraud allegation").

 NN Ireland argues generally in its Response that Rule 9(b) should not apply to any of its

claims, but makes no effort to analyze why Rule 9(b) should not apply in particular to the

dishonest assistance claim.  <u>See</u> Opp. at 26-27, 59.  But where dishonest assistance is the claim,

Rule 9(b) applies.  <u>See</u> <u>Alphastar</u>, 383 B.R. at 274.[42]

> 2.      <u>The U.S. Law Claims for Aiding and Abetting Breach of Fiduciary
>         Duty Fail Under Either Rule 9(b) Or Rule 8(a) (claims 6, 13, 23, 27)</u>

As an initial matter, as set forth below, much of NN Ireland's state law aiding and

abetting claims are plainly time-barred, including the entirety of claim number 6, which is

predicated on its transfer pricing allegations.  Dismissal of that claim alone would substantially

winnow NN Ireland's Claim.

As part and parcel of its efforts to salvage its secondary liability claims, however, NN

Ireland claims that "the US Debtor misstates the [required] mental state," arguing that actual

knowledge of the primary breach is not required with respect to its state law aiding and abetting

claims.  Opp. at 59.  It is NN Ireland that is mistaken.  One of the cases NN Ireland itself cites

explicitly "stress[es] that the requirement is *actual* knowledge (which, again, may be proven by

circumstantial evidence), and therefore evidence establishing negligence, i.e., that a bank 'should

have known,' will not suffice."  <u>Aetna Cas. and Sur. Co. v. Leahey Const. Co.</u>, 219 F.3d 519,

536 (6th Cir. 2000) (citation omitted) (emphasis in original).  NN Ireland further challenges

"[t]he U.S. Debtor's reliance on <u>Capitaliza-T</u> for its interpretation of 'actual knowledge'" and

tries to limit <u>Capitaliza-T</u> to its facts.  Opp. at 60.  NN Ireland, however, ignores <u>Capitaliza-T</u>'s

express holding that "the *universal rule* requires actual knowledge" to sustain an aiding and

---

[42]     The dictionary definition of "dishonesty" confirms this.  <u>See</u> Shorter Oxford English Dictionary (William R. Trumble et al. eds., 6th ed. 2007) (defining dishonest conduct as "not straightforward or honourable; (now chiefly) fraudulent, of the nature of or involving theft, lying, or cheating"); <u>see also</u> Webster's Ninth New Collegiate Dictionary (9th ed. 1983) (defining "honest" as "free from fraud or deception," while dishonest "implies a willful perversion of truth in order to deceive, cheat, or defraud"); The American Heritage Dictionary of the English Language (3d ed. 1994) (defining honest as "not deceptive or fraudulent; genuine" and dishonest as "disposed to lie, cheat, defraud, or deceive").

abetting claim.[43]  NN Ireland tries to subvert the actual knowledge requirement by manufacturing

a non-existent dispute over *how* one proves knowledge, not whether such knowledge is required

in the first place.  See Opp. at 60.  NNI does not dispute NN Ireland's assertion that "[p]roof of a

defendant's knowledge or intent will often be inferential."  Id. at 60 n.76 (citing Aetna, 219 F.3d

at 535).[44]  However, that such knowledge can be inferred does not excuse NN Ireland from

pleading facts that plausibly give rise to the inference of knowledge.  Nor does NN Ireland

dispute that, in addition to knowledge, its aiding and abetting claims require that it plead actions

amounting to substantial participation or substantial assistance in the primary wrongdoer's

breach.  See Brug v. Enstar Grp. Inc., 755 F. Supp. 1247, 1256 (D. Del. 1991).

       3.      NN Ireland's Pleaded Allegations Fall Short

NN Ireland's allegations regarding "knowing assistance" that NNI offered to the NN

Ireland directors (for either the U.S. or Irish law claims) are conclusory and must be disregarded

for purposes of the motion to dismiss.  See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009).  As

explained above, "[k]nowing participation in a board's fiduciary breach requires that the third

party act with the knowledge that the conduct advocated or assisted constitutes such a breach"

---

[43]      Capitaliza-T Sociedad de Responsabilidad Limitada de Capital Variable v. Wachovia Bank of Del. Nat'l Ass'n, Civil No. 10-520 (JBS/KMW), 2011 WL 864421, at *5 (D. Del. Mar. 9, 2011) (citation omitted) (emphasis added).  Nor can NN Ireland effectively suggest that actual knowledge was required in Capitaliza-T because the defendant was a "passive aider and abetter."  Opp. at 60.  This flies in the face of the basic test for aiding and abetting, which requires the defendant to have "substantially *participated* in or provided substantial *assistance* for the wrongful act."  Capitaliza-T, 2011 WL 864421, at *4.  NN Ireland's attempt to distinguish Malpiede v. Townson, 780 A. 2d 1075 (Del. 2001), is equally unavailing.  See Opp. at 61.  The legal standard for aiding and abetting tort liability does not vary depending upon the parties involved in the lawsuit.

[44]      The remaining cases cited by NN Ireland are simply fact specific applications of the knowledge requirement that offer no guidance here.  See Opp. at 59-60; Duke Energy Int'l L.L.C. v. Napoli, 748 F. Supp. 2d 656, 663 (S.D. Tex. 2010) (inferring actual knowledge from specific pleaded facts); Morgan v. Cash, C.A. No. 5053-VCS, 2010 WL 2803746, at *6 (Del. Ch. July 16, 2010) (finding Zirn v. VLI Corp., Civ. A. No. 9488, 1989 WL 79963 (Del. Ch. July 17, 1989), inapplicable in the absence of factual allegations "suggesting how and why the acquirer actually used its knowledge of the target board's conflicts to collude with the target board").  In particular, while NN Ireland cites authorities inferring knowledge from "atypical transactions that lack business justification," id. at 60, NN Ireland itself recognizes that the challenged transactions are both necessary and common in multinational business enterprises. See, e.g., Claim ¶ 31 ("Transfer pricing arrangements are implemented in order to . . . enable[] an allocation of profit in each of the countries where group companies do business").

and knowledge is a "critical element" in aiding and abetting liability.  Malpiede, 780 A.2d at

1097; see also Brug, 755 F. Supp. at 1256; Initial Redmond Decl. ¶ 52 (Irish law requires

knowledge of a dishonest design).  Equally important, NN Ireland must assert well-pleaded,

plausible factual allegations of NNI's supposed "assistance" as well as allege the primary breach

of fiduciary duty.[45]  NN Ireland fails at each step.

Pre-Petition Asset Sales.  In the Motion, Movants argued that all the allegations with

respect to Pre-Petition Asset Sales are wholly lacking in factual information regarding NNI's

alleged involvement in the (unidentified) asset sales.  There are no factual allegations identifying

the breach of duty or NNI's supposed assistance – there are no allegations identifying the sales,

the assets, the buyers, the consideration paid, the consideration that NN Ireland claims it should

have received or of NN Ireland's ownership interest in these unidentified assets.  Nor are there

non-conclusory allegations regarding NNI.  In Response, NN Ireland can only point to the same

conclusory allegations that Movants challenge.  See, e.g., Claim ¶ 184 ("NNI, through the

involvement of its directors, officers and senior employees . . . advocated or assisted the conduct

by NN Ireland's directors which led to these breaches.").  NN Ireland's allegations do not come

close to satisfying Rule 8(a).

Contingent Tax Liability.  As pointed out in the Motion, Claims 26-27 assert contingent

claims against NNI in a secondary capacity for any potential tax liability arising from NN

Ireland's unnamed directors' alleged breach of duties.  In the Proof of Claim, NN Ireland

premises this claim on the same allegations that underlie its claims based on transfer pricing.

---

[45]     NN Ireland does not refute Movants' argument that if judicial estoppel applies to bar its claims for breach
of fiduciary duty against NNI (which NN Ireland does dispute), then NN Ireland is also estopped from asserting a
breach of duty by NNL as the predicate for the claims for aiding and abetting and dishonest assistance.  See Mot. at
46-47; Opp. at 64-65.  Further, as discussed in the Motion (at 47 n.54) and above in Section II.B, NN Ireland's
failure to allege in a non-conclusory fashion that it was insolvent also defeats any allegation of a duty to creditors
that could form the basis for a primary breach of fiduciary duty.

See Claim ¶¶ 191-192.  In its Response, NN Ireland points to other allegations, not referred to in those claims, see Opp. at 66, citing Claim ¶ 18 (e)-(f).  But none of NN Ireland's allegations plausibly make out a claim that NNI controlled the NN Ireland directors on tax matters.  The allegations merely recite what steps were taken by the Nortel global tax team, which included NNI employees.  There is, however, no allegation as to how NNI assisted in controlling or instructing the NN Ireland board in connection with transfer pricing.  See Santiago, 629 F.3d at 131 (holding that recitation of what individuals did was insufficient under Iqbal to plead plausible claim for supervisory liability based on formulaic recitation of control).

Transfer Pricing and the Irish Loans and Dividends.  NN Ireland's defense of its transfer pricing allegations also seeks to equate its allegations of NNI's involvement in transfer pricing with knowing assistance of a breach of fiduciary duty.  See Opp. at 66 ("The Proof of Claim names several of the specific NNI officials who were involved in the advance pricing arrangements with the Revenue Authorities entered into on behalf of NN Ireland . . . .").  NNI's involvement in transfer pricing cannot plausibly be equated with wrongful or dishonest assistance of a breach of duty.  Indeed, while NN Ireland alleges that its directors were excluded from transfer pricing decisions, *there is no allegation that they were excluded by NNI*, or that NNI assisted in the alleged exclusion.  See, e.g., Claim ¶ 34 ("NN Ireland and the other EMEA Companies which lost out as a result of RPSM were not involved in the decision to change from the previous CSA to RPSM.").

The Irish Loans and Dividends allegations are even farther afield.  There is no allegation that NNI received loans or dividend transfers from NN Ireland.  Indeed, NN Ireland simply repeats conclusory assertions of NNI's involvement.  See, e.g., Opp. at 68 ("The Irish Loans and Irish Dividends, the subject of this claim, were in practice made and declared at the behest of

NNL with the participation and assistance of NNI.  NNL and NNI's strategy, operating at all material times from at least the year 2000, was to structure NN Ireland's affairs with the intention of channeling cash and profit to NNL." (citing Claim ¶ 51)).  Illustrative of the implausibility of these allegations, NN Ireland's allegations actually point the finger at NNUK – a co-claimant of these multi-billion dollar claims – as having a role in diverting cash from NN Ireland to NNL, by alleging the wrongful (but unspecified) involvement of Ryan Smith, a NNI employee *who was seconded to NNUK at the relevant time*.  Claim ¶ 19.  NN Ireland's allegations thus fail the test of Rule 9(b) and also the plausibility test of Twombly and Iqbal.

### B.    NN Ireland Fails to Show Any Well-Pleaded Allegations to Support Its Conspiracy Claims (claims 5, 7, 12, 14)

NN Ireland's superficial attempts to justify its conspiracy claims fail.  Even when tested under Rule 8(a), NN Ireland's claims fall far short of the required factual allegations.[46]  NN Ireland asks this Court to ignore the Supreme Court's recent guidance on how properly to plead a conspiracy.  See Mot. at 53-54 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 565 n.10 (2007)).  In Twombly, because the alleged violations occurred over a seven-year span and the complaint "mentioned no specific time, place, or person involved in the alleged conspiracies" the Supreme Court "doubt[ed] that the complaint's references to an agreement among the [defendants] would have given the notice required by Rule 8."  Twombly, 550 U.S. at 565 n.10; see also Mot. at 54.  The Supreme Court further noted that the complaint there "furnishe[d] no clue as to which of the [defendant companies] (much less which of their employees) supposedly

---

[46]     Although NN Ireland attempts to distinguish the cases cited in the Motion concerning application of Rule 9(b) (see Opp. at 70-71), NN Ireland cannot avoid the fact that "[t]he Third Circuit has long required that claims of conspiracy be supported by allegations of specific facts" and that "[o]nly allegations of conspiracy which are particularized, such as those addressing the period of the conspiracy, the object of the conspiracy, and certain actions of the alleged conspirators taken to achieve that purpose, will be deemed sufficient."  See Mot. at 53 (collecting authorities).  In any event, for the reasons set forth in Section I.C, NN Ireland's underlying allegations sound in fraud, such that even under its cabined view of the law, its conspiracy claims invoke Rule 9(b).

agreed, or when and where the illicit agreement took place." <u>Twombly</u>, 550 U.S. at 565 n.10. NN Ireland's conspiracy claims lack precisely these required facts.

Instead of addressing these omissions, NN Ireland asserts, without citation, that <u>Twombly</u> is "inapposite to the circumstances alleged here, where the conspiracy was formed among parties and persons who were members of a corporate family and were necessarily in constant communication with respect to the precise transactions that are alleged to have been the object of the conspiracy." Opp. at 74. NN Ireland has it backwards. <u>Twombly</u> is particularly apposite *precisely because* NNI, NNL and NN Ireland are members of a corporate family such that an illegal agreement cannot plausibly be inferred from the fact that the parties were in contact about everyday business activities like global tax and treasury functions.

NNI does not contend that the Court may not infer an agreement from pleaded facts. But, as <u>Twombly</u> makes clear, NN Ireland must still plead sufficient facts so that the inference of an agreement to commit an unlawful act or a lawful act by unlawful means is plausible. NN Ireland asserts three potential alternative sets of conspirators, without specifying who was involved, when they agreed, or with whom they agreed. <u>See</u> Opp. at 73. NN Ireland tries to gloss over these failures by citing to its Claim as "describing roles of named agents of NNI who participated in specific transactions designed to divert assets from NN Ireland to NNI and NNL." Opp. at 73 (citing to Claim ¶¶ 13-26). This misstates the content of those allegations. NN Ireland alleges only that certain employees "took the lead in the negotiations with the IRS, the CRA and HRMC" (Claim ¶ 18e), that many of the "key individuals" in the "Group Tax Department" were NNI personnel (<u>id.</u> ¶ 19), or that individuals such as Katharine Stevenson were "aware of and involved in the transactions relating to NN Ireland which formed part of the Irish Cash

Repatriation Strategy" (id. ¶ 22). Such allegations do not put NNI on notice of who allegedly conspired with whom or when.

Just as there was "no reason to infer that the companies had agreed among themselves to do what was only natural anyway" in Twombly, there is no reason to infer any agreement by NNI and its affiliates to do an illegal act when all that is alleged is NNI's awareness of transactions between other members of the corporate group or involvement in the global tax and treasury functions of a global corporation. See 550 U.S. at 566; see also Iqbal, 129 S.Ct. at 1950 (explaining that under Twombly, while "parallel conduct was consistent with an unlawful agreement, the Court nevertheless concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior").

NN Ireland's allegations of conspiracy also fail because, whether viewed as allegations of simple ("unlawful purpose") or unlawful means conspiracy, the purported unlawful purpose or unlawful acts involve the same alleged breaches of fiduciary duty that form the basis of NN Ireland's de facto and shadow directorship claims. Reply Redmond Decl. ¶¶ 48-49. As discussed above, those claims are untenable because NN Ireland is estopped by its prior representations, because NN Ireland has not adequately pled that it was insolvent at the relevant time, and because NNI Ireland has not pled a plausible claim under Irish law that NNI was its director.

**C.    NN Ireland's Claims for Aiding and Abetting and Conspiracy are Barred By the *In Pari Delicto* Doctrine**

Despite its lengthy attempt to argue otherwise, NN Ireland cannot escape the ultimate conclusion that, as pled, its secondary liability claims for aiding and abetting and conspiracy are barred by the *in pari delicto* doctrine. As it does elsewhere, NN Ireland urges that the Court

need not make a determination at this time.  See Opp. at 92-93.  But nothing in NN Ireland's

Response changes the law that a court may consider this defense on a motion to dismiss if it

appears on the face of the complaint.[47]  See Mot. at 56 (collecting cases).[48]

NN Ireland's argument that NNI is an insider to whom the *in pari delicto* defense does

not apply is similarly unavailing.  It is true that "the application of the *in pari delicto* doctrine has

been rejected in situations when corporate fiduciaries seek to avoid responsibility for their own

conduct vis-à-vis their corporations."  See, e.g., In re HealthSouth Corp. S'Holders Litig., 845

A.2d 1096, 1107 (Del. Ch. 2003).  But, NNI has not argued that *in pari delicto* applies to NN

Ireland's primary claims against it for breach of fiduciary duty or breach of a duty of care.

NN Ireland's alternate argument that the adverse interest exception applies here also fails

on its substance.  NN Ireland admits that the adverse interest rule applies only where an agent

acted "entirely for his own or another's purpose."  Opp. at 91 (citation omitted).  The Claim does

not allege either that NN Ireland's directors were acting entirely for another's purpose, or that the

challenged transactions conferred no benefit on NN Ireland.  To the contrary, the Claim makes

clear that NN Ireland received a benefit in the Pre-Petition Asset Sales, and complains only that

it should have received more.  Claim ¶ 69.  Likewise, NN Ireland's suggestion that the transfer

pricing arrangements conferred no benefit upon it (Opp. at ¶¶ 91-92) is belied by its own

allegation that "the RPSM arrangement did not *adequately* reward NN Ireland."  Claim ¶ 49

(emphasis added).

---

[47]     In what is plainly an attempt to escape the Delaware Chancery court's recent application of *in pari delicto* on a motion to dismiss, NN Ireland's Response suddenly asserts that Texas law would apply to any *in pari delicto* defense.  See Opp. at 89 n.98.  However, NN Ireland has chosen to plead its claims under either Delaware or Texas law.  It cannot now select Texas law only with respect to a determinative defense.  In any event, Texas and Delaware law both mandate dismissal of its claims on *in pari delicto* grounds.

[48]     See also Nisselson v. Lernout, 469 F.3d 143, 154 (1st Cir. 2006) (collecting cases affirming dismissal of claims on *in pari delicto* grounds, and affirming lower court's dismissal on that basis).

**IV.**
**NN IRELAND FAILS TO ADEQUATELY ALLEGE NNI'S**
**UNJUST RECEIPT OF ANY NN IRELAND PROPERTY**

**A.      NN Ireland's Proof of Claim Does Not Plead the Required Element of Tracing**

NN Ireland's Response establishes that its claim 21 for unconscionable or knowing

receipt must be dismissed for failure to plead basic requirements of the cause of action.

Although NN Ireland's expert legal declaration omits discussion of whether NN Ireland must

trace the receipt of its funds to NNI as a required element of an unconscionable receipt claim,

Hennessy Decl. ¶¶ 97-102, its brief concedes that tracing is a required element, Opp. at 77-78.

As addressed in the Motion, NN Ireland does not allege that NNL transferred any of the Irish

Loan proceeds that it received to NNI, or that NNI received any cash or other assets from NN

Ireland in respect of the Pre-Petition Asset Sales.  Mot. at 58.

NN Ireland now admits its "present inability to trace [NN Ireland's] Pre-Petition Sale

Proceeds to NNI," and so reverts to its argument that it "cannot reasonably be required to further

particularize [its] claims in advance of discovery."  Opp. at 77-78.  But NN Ireland has already

had years to investigate its claims, as well as an opportunity to amend its pleadings, and the

Supreme Court has made clear that discovery is not a remedy for inadequate pleading.  Iqbal,

129 S. Ct. at 1953-54.   Further, it should be clear that NN Ireland's allegations regarding the

Pre-Petition Asset Sales are wholly insufficient to support a plausible unconscionable receipt

claim – under the analysis set forth in Iqbal, a court conducts a plausibility analysis only *after*

disregarding any conclusory allegations, see e.g., Santiago v. Warminster Twp., 629 F.3d 121,

130 (3d Cir. 2010), and NN Ireland's pleadings do not even identify *any* of the Pre-Petition Asset

Sales upon which its claims are purportedly based, much less make any non-conclusory

allegations that might make it plausible that NNI received NN Ireland's property as a result of such sales, see Mot. at 58-59.[49]

**B**.      **NN Ireland Does Not Allege that NNI Unjustly Received Any of Its Property**

NN Ireland's unjust enrichment claim under state law (claim 15) fails for similar reasons. NN Ireland has not, through well-pleaded allegations, raised any plausible inference that NNI was unjustly enriched to NN Ireland's detriment.  First, NN Ireland argues – wrongly – that it has pled NNI's actual receipt of NN Ireland funds.  See Opp. at 77, citing Claim ¶ 60.  But the Claim alleges only that transfers to NNL facilitated separate payments by NNL to NNI.  Claim ¶ 60.[50]  The Claim fails to identify any specific loan transaction and repayment between NNL and NNI, the dates or amounts of such repayments, or any other facts that could render plausible NN Ireland's assertion that but for the Irish Loans, NNL could not have repaid NNI.  Mot. at 60.

Second, NN Ireland does not address the case law cited in the Motion that a "showing that the defendant was unjustly enriched by the plaintiff who acted *for* the defendant's benefit is essential" and that "[i]t is not enough that the defendant received a benefit from the activities of the plaintiff; if the services were performed at the behest of someone other than the defendants, the plaintiff must look to that person for recovery."  See Mot. at 60-61 (quoting Metcap Sec. LLC v. Pearl Senior Care, Inc., No. Civ. A 2129-VCN, 2007 WL 1498989, at *6 (Del. Ch. May 16, 2007) (emphasis in original).  The Proof of Claim admits that "[t]he Irish Loans and Irish Dividends . . . were in practice made and declared at the behest *of NNL*" and "with the intention

---

[49]      Even if NN Ireland had adequately pled the tracing element – which it has not – NN Ireland's knowing receipt claims would fail because NN Ireland makes no non-conclusory allegation that NNI knew or should have known that the transactions or funds in question resulted from a breach of fiduciary duties, whether by the de jure directors of NN Ireland or by NNL acting as a de facto or shadow director of NN Ireland.  Mot. at 59.  Further, as discussed in Section II.B, NN Ireland's underlying breach of fiduciary duty claims fail independently as a result of its failure to adequately plead insolvency.

[50]      Though NN Ireland also points to allegations suggesting the transfer of its property to NNI through the Pre-Petition Asset Sales (Opp. at 77), such allegations are wholly irrelevant, as NN Ireland asserts no claim for unjust enrichment based upon those Pre-Petition Asset Sales.

of channelling cash and profit *to NNL*."  Claim ¶ 51 (emphasis added).  NN Ireland pins its hope

on the allegation that NNI "participat[ed] and assist[ed]," id., and asserts in conclusory fashion

that the scheme was designed for NNI's benefit as well, Opp. at 75, but every factual allegation

regarding the Irish Loans and Dividends again relates to payments and transfers between NN

Ireland and *NNL*.  See Claim ¶¶ 53-59.  At best, NN Ireland has alleged an incidental benefit to

NNI, which Metcap Sec. demonstrates is insufficient.  Thus, there is no plausible quasi-

contractual relationship sufficient to state a claim for unjust enrichment.

## V.
## NN IRELAND'S QUASI-CONTRACT AND OTHER CLAIMS RELATING TO UNSPECIFIED ASSET SALES CAN BE SUMMARILY DISMISSED

**A.    NN Ireland Cannot Remedy Its Basic Failures of Notice Pleading**

NN Ireland argues that its allegations as to claims 16 (implied contract), 17 (implied

term), 20 (mistake), and 22 (transaction at undervalue) – which are all based on the alleged Pre-

Petition Asset Sales but do not identify the transactions at issue – satisfy the requirements of

Rule 8(a).  See Opp. at 79.  That assertion is both unsupported and unsupportable.  See, e.g.,

Bautista v. L.A. Cnty., 216 F.3d 837, 840 (9th Cir. 2000) (explaining, even prior to Iqbal, that

"[t]o comply with Rule 8, each plaintiff must plead a short and plain statement of the elements of

his or her claim, identifying the transaction or occurrence giving rise to the claim").

Alternatively, NN Ireland contends that its pleading omissions will be rectified through

discovery.  Opp. at 79.  This, again, ignores clear precedent that discovery is no substitute for

adequate pleading.[51]

---

[51]    Nor can NN Ireland credibly suggest that the "relevant information about the asset sales is within the
exclusive possession of the North American entities."  Opp. at 79.  NN Ireland's Claim alleges that NN Ireland was
a party to each of the Pre-Petition Asset Sales (Claim ¶ 66), which the Joint Administrators have nonetheless failed
to identify, after nearly three years of investigation.

**B.      Claims 16, 17, 20 and 22 Independently Fail to State a Claim**

1.      <u>Claim 20 Fails Adequately to Plead Mistake</u>

NN Ireland cannot rebut the application of Rule 9(b) to its claim for mistake.  <u>See</u> Bankr.

R. 7009 ("In alleging fraud or <u>mistake</u>, a party must state with particularity the circumstances

constituting fraud or <u>mistake</u>.") (emphasis added).  While NN Ireland asserts that Rule 9(b) does

not apply to a mistake plead under foreign law, Opp. at 80, they provide no support for that

untenable proposition.  Indeed, as <u>Alphastar</u> makes clear, Rule 9(b) is a pleading standard that

applies to the designated types of claims regardless of the source of the legal right.  <u>See</u>

<u>O'Connell v. Arthur Andersen LLP (In re Alphastar Ins. Grp. Ltd.</u>), 383 B.R. 231, 269 (Bankr.

S.D.N.Y. 2008) ("while [foreign] law governs the existence and elements of the Trustee's breach

of fiduciary duty claim, American law determines the sufficiency of the allegations.").

NN Ireland must plead with particularity (1) the mistake; (2) the identity of the

individuals who made the mistake; (3) the nature of their misunderstanding; and (4) when and

where the mistake occurred.  <u>In re Tronox Inc.</u>, No. 09-10156, 2010 WL 2010844, at *3 (Bankr.

S.D.N.Y. May 14, 2010).  NN Ireland fails to meet that standard.  The Claim alleges that "NN

Ireland did not receive a fair allocation of the Pre-Petition Sale Proceeds due to a mistake (either

of fact or law) as to the full extent to which NN Ireland is entitled," as a result "NNI received

considerably more from the allocation than it was intended to receive," and NNI should be

required "to repay the overpayment to NN Ireland."  Claim ¶ 174.  NN Ireland does not identify

its mistake, simply mentioning a "mistake (either of fact or law)."  <u>Id.</u>  That lack of particularity

fails the Rule 9(b) standard on its face.

Moreover, without specific information about the results of the mistake, the seller of the

assets sold, and the type of mistake, the claim by NN Ireland also fails as a matter of Irish law.

An Irish court will not accept a claim "in the absence of such fundamental pleaded elements."

Reply Redmond Decl. ¶¶ 50–51.  Irish law, like U.S. law, applies well-established pleading

requirements which include the varietal of mistake being alleged against the other party.  Id. ¶

51.  Thus, the claim plainly fails to satisfy either Rule 9(b) or the basic elements of the cause of

action for mistake under Irish law.

Finally, and contrary to the position of NN Ireland, Irish law does not treat discovery as

an "investigative process" where parties can attempt to find evidence to confirm suspicions.

Reply Redmond Decl. ¶ 53 (citing Framus Ltd. v. CRH plc [2004] 2 I.R. 20).  Irish courts do not

simply allow discovery to help parties focus their legal claims.  Opp. at 81.  Discovery can only

proceed when the documents sought are relevant to the matters pled.  Reply Redmond Decl. ¶

52.  NN Ireland cannot allege a broad claim for mistake and await the outcome of discovery.  Id.

¶ 54.

    2.    NN Ireland Does Not Plead Required Elements of a Transaction at
         Undervalue Claim Under English Law, and Does Not Have Standing
         To Bring a Fraudulent Disposition Claim Under Irish Law

Through its Response, NN Ireland belatedly attempts to correct the most glaring pleading

failure in claim 22 for transaction under value – the absence of allegations on any cognizable

"transaction" completed within the two year reach-back period imposed by English law, or any

relevant transaction that was *ever* completed.[52]  NN Ireland suggests that its claim nonetheless

survives because it is based on a division of sale proceeds (from the unidentified transactions)

which "in reality" did not occur until after July 2007.  Opp. at 83.  NN Ireland does not even

attempt to argue that it pled this new theory in its Proof of Claim.  The "reality" is that NN

Ireland's claims must be determined solely by the allegations in its Claim, and cannot be

amended through its Opposition.  Commw. of Pa. ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d

---

[52]    NN Ireland has asserted this claim under English or Irish law.

173, 181 (3d Cir. 1988).  NN Ireland's Claim nowhere alleges the date on which the sale

proceeds were allocated.  It alleges only the date of a statement reflecting that allocation, which

statement is not a "transaction" and could have pre-dated or post-dated the actual allocation.

Reply Todd Decl. ¶ 94.

In addition, the Joint Administrators acknowledge that a required element of its claim is

that NN Ireland receive "significantly less" consideration that it is entitled to (see Declaration of

Philip Marshall QC in Opposition to Joint Objection and Motion to Dismiss Claim of Nortel

Networks UK Limited, dated September 13, 2011, ¶ 62), yet it points only to its formulaic

restatement of this element.  See Opp. at 84 ("That is precisely the allegation made in the Proof

of Claim: 'NN Ireland received significantly less and NNI received significantly more than it

was entitled to on an arm's length basis.' (Proof of Claim ¶ 69.).").  Such bare recitations of the

legal elements of a cause of action are not entitled to a presumption of truth and must be

disregarded.  Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010).  NN Ireland fails

to set forth facts that would render such a conclusion plausible – allegations concerning the

amount of proceeds received by NNI and the value of the NN Ireland assets conveyed.[53]

NN Ireland also argues that in the alternative they have stated a claim for fraudulent

disposition under Irish law.  This argument also fails.  The experts from NNI and NN Ireland

both agree that Section 139 of the Companies Act 1990 governs this fraudulent disposition

claim.  Initial Redmond Decl. ¶ 77; Hennessey Decl. ¶ 131.  Under that law, only "a liquidator,

---

[53]      See Angell v. Ber Care, Inc. (In re Caremerica, Inc.), 409 B.R. 737, 756 (Bankr. E.D.N.C. 2009)
(dismissing constructive fraud claim that merely "mirror[ed] the elements of § 548(a)(1)(B)" without factual
assertions such as "an identification of the consideration received by each transferor, information as to why the
value of such consideration was less than the amount transferred, and facts supporting the debtors' insolvency at the
time of the transfer").

creditor or contributory of a company which is being wound up" can apply for the claim.  Id.

Since NN Ireland is not such an actor, it cannot bring a fraudulent disposition claim.[54]

3.    Implied Term/Implied Contract

The Motion argued that NN Ireland's purported contract claims (claims 16 & 17) should

be dismissed because NN Ireland failed utterly to allege the parameters of any contract or

contractual term.  Mot. at 67.  The Motion further argued that because of those ambiguities, the

Claim fails to allege what action or omission by NNI constitutes a breach of the supposed

implied term of an implied contract.  See id.

NN Ireland, however, astonishingly rejects that "the law of any jurisdiction . . . require[s]

that the parameters of the contract or contractual term must be shown" to survive a motion to

dismiss.  Opp. at 85 (internal citation and quotations omitted).  In fact, Irish law does require

identification of the basic terms of a contract which is the basis for a claim of breach.  Reply

Redmond Decl. ¶ 56.  Further, U.S. pleading requirements undermine NN Ireland's assertion.

Rule 8(a) establishes that "[a] plaintiff may not escape dismissal on a contract claim, for

example, by stating that he had a contract with the defendant, gave the defendant consideration,

and the defendant breached the contract.  What was the contract?  The promises made?  The

consideration?  The nature of the breach?"  Bissessur v. Indiana Univ. Bd. of Tr., 581 F.3d 599,

603 (7th Cir. 2009).

NN Ireland does not identify allegations that satisfy those requirements.  As to both its

implied contract and implied term claims, NN Ireland fails to allege what NNI's contractual

obligations were, or identify what performance would have averted their alleged breach.  While

NN Ireland points to allegations that NNI was obligated to allocate proceeds "fairly" or "based

---

[54]    Further, as evident by the use of the conditional word "if" in the Claim, the fraudulent disposition argument
is contingent upon a liquidator being appointed in Ireland in relation to this case.  Claim ¶ 179.  Only then can a NN
Ireland liquidator bring its fraudulent disposition claim.

on the arms length principle," it deliberately fails to allege what form of allocation or percentage of proceeds would comply with that alleged obligation. Claim ¶¶ 161-163. NNI is thus left without notice of what its obligations were under the alleged agreement(s) and what conduct constituted the claimed breach.

**VI.**
**NN IRELAND'S CLAIMS IN RESPECT OF FSD**
**LIABILITY SHOULD BE SUMMARILY DISMISSED**

NN Ireland's contingent FSD claims (28, 29, 30, 31) should be dismissed. NN Ireland does not, and cannot, refute that this Court has held that it can and will *directly* determine NNI's share of liability, if any, relating to the U.K. Pension Plan by considering the Proofs of Claim submitted by the U.K. Pension Trustee and the Pension Protection Fund. See Mot. at 68. Nor does NN Ireland refute that the Court held that as to the U.S. Debtors, the U.K. Pension Proceedings – and thus any finding of liability that results from a Financial Support Direction or Contribution Notice – will be "deemed void and of no force or effect," which thus forecloses liability on the FSD claims based on the proceedings in the U.K. Mot. at 69. NN Ireland not only seeks an end-run around these rulings by asserting FSD claims against NNI, but asserts those claims solely based on factual allegations arising from the U.K. Pension Proceedings.

NN Ireland asserts that the contingent nature of the FSD claims make them incompatible with the pleading requirements of Rule 12(b)(6). See Opp. at 88. While the contingent nature of the FSD claims does mean that certain aspects of those claims, such as dollar value, may not be able to calculated at this time, NN Ireland does not even make basic assertions about any actions of NNI that could lead to liability pursuant to the FSD claims. Despite NN Ireland's conclusory assertion that the alleged FSD liability is "based on the role [NNI and NNL] played in causing NNUK's pension plan to be underfunded," Opp. at 87, NN Ireland fails to point to any pre-petition actions of NNI that contributed to that underfunding, or any relationship at all between

NNI and the U.K. Pension Plan.  Iqbal and its progeny require dismissal of the FSD claims under

Rule 12(b)(6).

Finally, NN Ireland has failed to refute the U.S. Debtors' contention that even if the FSD

claims are not dismissed as inadequately pled, Section 502(e)(1)(B) of the Bankruptcy Code

requires that they be disallowed.  See 11 U.S.C. § 502(e)(1)(B) (stating that a bankruptcy court

"*shall disallow* any claim for reimbursement or contribution of an entity that is liable with the

debtor on or has secured the claim of a creditor, to the extent that . . . such claim . . . is contingent

as of the time of allowance or disallowance" (emphasis added)).  Instead of asserting that their

claims do not fall within the requirements of Section 502(e)(1)(B), NN Ireland merely requests

in a footnote that if the FSD claims are disallowed, it be permitted to reassert or seek

reconsideration of the claims in the event they become non-contingent in the future.  Opp. at 88

n.97.  But here the FSD claims also fail to state a claim and should be dismissed with prejudice

on those independent grounds.

## VII.
## NN IRELAND'S CLAIMS RELATING TO TRANSFER PRICING, IRISH LOANS, AND PRE-PETITION ASSET SALES ARE TIME-BARRED

**A.    NN Ireland Provides No Basis to Avert Dismissal of Its U.S. State Law Transfer Pricing Claims (Claims 6 and 7)**

The Movants' opening brief established that NN Ireland's state common law claims are

governed by at most a four-year statute of limitations.  Mot. at 78 n.74.  As a consequence, NN

Ireland's U.S. law aiding and abetting and conspiracy claims grounded in its transfer pricing

allegations are time-barred.

As to these state law claims, NN Ireland predicates its Response on the premise that *all* of

its claims – whether governed by U.S. or Irish law – are governed by a six-year statute of

limitations established by Irish law.  See Opp. at 97.  NN Ireland appears to base this argument

on the internal affairs doctrine, but even if applicable, that would require application of the substantive law of the jurisdiction of incorporation in toto – thereby precluding the state law claims alleged.  NN Ireland provides *no* basis, nor is there any, to somehow engraft an Irish statute of limitations onto U.S. law claims that NN Ireland has brought in a U.S. court.

Addressing when the claims arose, NN Ireland "do[es] not concede" that its transfer-pricing claims arose upon entry into the MRDA (Opp. at 97), but it fails to discuss or refute any of the governing authorities in the Motion that dictate that result.  See Mot. at 77.  NN Ireland's argument that the date of accrual of those claims is a question of fact (Opp. at 97 n.105) also fails given that its date of entry into the MRDA is established by the Proof of Claim as December 2004 (Claim ¶ 40).  Thus, under either Delaware or Texas law,[55] the related state law claims for aiding and abetting breach of fiduciary duty (claim 6) and civil conspiracy (claim 7) were time-barred at the latest in December 2008 – before the January 2009 Petition Date.  These claims can be dismissed before even reaching application of Delaware's borrowing statute or Section 108(c).[56]

## B.    Delaware's Borrowing Statute Should Apply to Additional Claims (Claims 2-5, 11-12, 16-17, 20-21)

Recognizing the dispositive effect of Delaware's borrowing statute, NN Ireland urges that this Court depart from its literal terms, either by resort to the internal affairs doctrine, or because the forum shopping concerns that underlie the borrowing statute are supposedly absent.  Each of these arguments should be disregarded.  First, under well-established precedent, statutes of limitations are procedural – not substantive – such that the internal affairs doctrine is

---

[55]    NN Ireland does not dispute that Delaware law imposes a three-year statute of limitations for both aiding and abetting and civil conspiracy claims, while Texas applies a two-year statute of limitations to conspiracy claims and either a three- or four-year time bar to aiding and abetting claims.  Mot. at 76-78.

[56]    Burger v. Level End Dairy Investors, 125 B.R. 894, 901 (Bankr. D. Del. 1991) ("[I]f the period has already expired before the bankruptcy petition was filed, then [Section 108(c)] does not operate to preserve the cause of action.").

inapplicable on its face. <u>Norman v. Elkin</u>, Civil Action No. 06-005-JJF, 2007 WL 2822798, at

*3 (D. Del. Sept. 26, 2007).  Moreover, even if the internal affairs doctrine could vary the

application of Delaware's borrowing statute, it would be limited to certain claims – it would have

*no* application to NN Ireland's Irish law claims for conspiracy (claims 5, 12),[57] breaches of

contract and mistake (claims 16, 17, 20), or unconscionable/knowing receipt (claims 11, 21).

NN Ireland's argument that the borrowing statute should not be applied here because

there is no threat of forum shopping does not hold up.  Opp. at 96.  By its plain terms, if a cause

of action is time-barred under Delaware's statute of limitations, no consideration of non-

Delaware law or the purposes behind the borrowing statute should be required.  <u>See</u> <u>Burrell v.</u>

<u>AstraZeneca LP</u>, C. A. Nos. 07C-01-412(SER), 07C-04-110 (SER), 07C-04-267 (SER), 2010

WL 3706584, at *4 (Del. Super. Ct. Sept. 20, 2010).  Similarly, neither the bankruptcy context of

the case nor the effect of the automatic stay present sufficient reason to depart from the well-

established application of the forum state's borrowing statute.[58]  Thus, Delaware's three-year

statute of limitations governs all of NN Ireland's Irish law claims.  This renders the Irish-law

transfer-pricing claims that accrued in December 2004 (claims 2 through 5) untimely in their

entirety.  It also bars Pre-Petition Asset Sale-related claims (claims 16 through 22)[59] for any sales

that may have occurred more than three years prior to the January 2009 Petition Date, though

NN Ireland has failed to plead the dates of such sales.

---

[57]     NN Ireland ignores that courts uniformly reject application of the internal affairs doctrine to conspiracy claims.  <u>See</u> <u>Asarco LLC v. Ams. Mining Corp.</u>, 382 B.R. 49, 74 n.14 (S.D. Tex. 2007) (holding internal affairs doctrine inapplicable to conspiracy claims where "unlike the issue of . . . breach of fiduciary duty, a claim for conspiracy presupposes two different persons and/or entities and therefore, by definition, would not be limited solely to the internal affairs of one corporation"); <u>FoodComm Int'l v. Barry</u>, 463 F. Supp. 2d 818, 830 (N.D. Ill. 2006); <u>see also</u> Opp. at 88.

[58]     <u>See</u> Mot. at 75 n.71; <u>see also</u> <u>Med Mut. Of Ohio Inc. v. Braintree Labs.</u>, Civ. No. 10-604-SLR, 2011 U.S. Dist. LEXIS 74996, at *17 (D. Del. July 12, 2011) (rejecting argument that plaintiff should be excused from the borrowing statute where pre-existing litigation meant "it was bound to litigate here").

[59]     As noted elsewhere, NN Ireland has failed to identify the transactions in question and so its claims fail to pass muster under Rule 8(a).

C.    **Section 108(c)**

The tolling provisions of Section 108(c) are inapplicable on their face to NN Ireland's

claims.  By its plain text, Section 108(c)'s tolling provisions are triggered only if "applicable

nonbankruptcy law . . . fixes a period for commencing or continuing a civil action in a court

*other than a bankruptcy court* on a claim against the debtor."  11 U.S.C. § 108(c).  See McCoy v.

Grinnell (In re Radcliffe's Warehouse Sales, Inc.), 31 B.R. 827, 831 (Bankr. W.D. Wash. 1983)

(applying Section 108 "where the creditor is hampered from proceeding outside the bankruptcy

court, due to the provisions of the [automatic stay]").  NN Ireland was free to bring claims, or

commence an adversary proceeding, against NNI in the bankruptcy court.  Indeed, NN Ireland

did assert claims relating to transfer pricing in its Placeholder Claim in September 2009.  No

provision of applicable non-bankruptcy law prevented NN Ireland from doing so with respect to

its claims based on the Pre-Petition Asset Sales (claims 16-22) – which were asserted for the first

time in June 2011[60] – or claims relating to the Irish Loans and Dividends (claims 8-15).  Even

assuming that the statute of limitations for claims based on the Pre-Petition Asset Sales began to

run as late as July 24, 2007 – the date on which NN Ireland claims that "the allocation of the

proceeds of this [unspecified] sale" was "set out" (Claim ¶ 67) – those claims expired in July

2010, nearly a year before they were first brought.[61]  Likewise, even if claims relating to the Irish

Loans and Dividends were first asserted in September 2009 via NN Ireland's Placeholder Claim,

those claims are based in part upon an alleged June 2006 loan facility that was repaid in July

---

[60]     While NN Ireland asserts that its Claim merely describes its Placeholder Claim with greater specificity, Opp. at 100, NN Ireland fails to refute NNI's authorities demonstrating that the Placeholder Claim's generic reference to "intercompany dealings, trading and other arrangements or agreements between [NNI and NN Ireland]" was insufficient to place NNI on notice or to encompass its current claims relating to Pre-Petition Asset Sales, see Opp. 98-100; Mot. at 79-80.

[61]     Just as the Court should reject NN Ireland's attempts to expand foreign law into unchartered waters, the application of equitable tolling must fail, as NN Ireland concedes that equitable tolling has never been recognized under Delaware law.  See Opp. at 100-101 (citing In re Marvel Entm't Grp, Inc., 273 B.R. 58, 74 (D. Del. 2002)).

2006, Claim ¶¶ 53, 64(f), 65(a), 125(a), meaning that the limitations period for claims relating to

that loan expired at the latest in July 2009.

## **CONCLUSION**

WHEREFORE, the Movants respectfully request that the Court (i) sustain the Objection

and grant the Motion; (ii) enter the proposed order attached to the Motion as Exhibit A

disallowing and expunging with prejudice claims 2 through 31 asserted in claim number 7774

(and to the extent it is not superseded and replaced by claim 7774, claim number 5089); and (iii)

grant such other and further relief as the Court deems just and proper.

Dated:  October 7, 2011  
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Deborah M. Buell (admitted *pro hac vice*)  
Howard S. Zelbo (admitted *pro hac vice*)  
James L. Bromley (admitted *pro hac vice*)  
Lisa M. Schweitzer (admitted *pro hac vice*)  
One Liberty Plaza  
New York, New York 10006  
Telephone:  (212) 225-2000  
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

     */s/ Ann C. Cordo*  
Derek C. Abbott (No. 3376)  
Eric D. Schwartz (No. 3134)  
Ann C. Cordo (No. 4817)  
1201 North Market Street  
P.O. Box 1347  
Wilmington, Delaware 19801  
Telephone:  (302) 658-9200  
Facsimile: (302) 658-3989

*Counsel for the Debtors and Debtors in Possession*

- and -

AKIN GUMP STRAUSS HAUER & FELD LLP

Fred Hodara (admitted *pro hac vice*)
David Botter (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

- and -

RICHARDS, LAYTON & FINGER, P.A.

_____*/s/ Christopher M. Samis*_____
Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile: (302) 651-7701

*Counsel for the Official Committee*
*of Unsecured Creditors*