# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------X
          :

*In re*           :     Chapter 11
          :

Nortel Networks Inc., *et al.*,[1]     :     Case No. 09-10138 (KG)
          :

          Debtors.     :     Jointly Administered
          :
          :
          :     **Hearing date:**
          :     **October 14, 2011 at 9 a.m. ET**
          :
          **Re: DI 6026, 6027, 6028, 6380, 6376, 6556**

------------------------------------------------------------ X

## JOINT REPLY IN FURTHER SUPPORT OF OBJECTION AND MOTION TO DISMISS CLAIMS OF NORTEL NETWORKS S.A. (NNSA) AND ITS FRENCH LIQUIDATOR

| | |
|---|---|
| CLEARY GOTTLIEB STEEN & HAMILTON LLP<br>One Liberty Plaza<br>New York, New York 10006<br>Telephone: (212) 225-2000<br>Facsimile: (212) 225-3999 | AKIN GUMP STRAUSS HAUER & FELD LLP<br>One Bryant Park<br>New York, New York 10036<br>Telephone: (212) 872-1000<br>Facsimile: (212) 872-1002 |
| MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br>1201 North Market Street<br>P.O. Box 1347<br>Wilmington, Delaware 19801<br>Telephone: (302) 658-9200<br>Facsimile: (302) 658-3989 | RICHARDS, LAYTON & FINGER, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, Delaware 19801<br>Telephone: (302) 651-7700<br>Facsimile: (302) 651-7701 |
| *Counsel for the Debtors and Debtors in Possession* | *Counsel for the Official Committee of Unsecured Creditors* |

---

[1]      The U.S. Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... iii

SUMMARY CHART OF ARGUMENTS BY CAUSE OF ACTION IN SUPPORT OF MOTION TO DISMISS CLAIMS OF NNSA ............................................................ ix

PRELIMINARY STATEMENT ......................................................................... 1

ARGUMENT ................................................................................................... 4

I. NNSA'S CLAIM SHOULD BE TESTED AGAINST – AND DISMISSED UNDER – THE STANDARDS OF RULE 12(b)(6) ........................................... 4

    A.     NNSA Cannot Avoid Application of Rule 12(b)(6) ............................. 4

    B.     NNSA's Attempt to Dilute the Requirements of Rule 8(a) Cannot Be Squared with Binding Precedent ........................................................ 8

    C.     Rule 9(b)'s *Heightened* Standard Applies to NNSA's Claims that Sound in Fraud ............................................................................... 9

II. NNSA DOES NOT PLAUSIBLY ALLEGE NNI BECAME ITS *DE FACTO* DIRECTOR ........................................................................................... 13

    A.     NNSA Cannot Avoid the Estoppel Effect of Its Prior Representations to this Court ................................................................................... 13

         1.     NNSA's Prior Representations Are Directly Contrary to Its Current Allegations ................................................................... 13

         2.     The Location of Those Who Manage and Control the Debtor Is Crucial to COMI ............................................................... 17

         3.     NNSA Has No Good Faith Excuse for Its Inconsistent Positions ........... 18

         4.     The Elements of Judicial Estoppel Have Been Met................................. 20

         5.     NNSA Misstates the Test for Collateral Estoppel ................................... 21

         6.     The French Liquidator Is Bound by Previous NNSA Statements ........... 22

    B.     NNSA's Allegations of *De Facto* Director Status Fall Short .............................. 24

III. NNSA'S ATTEMPTS TO IMPOSE SECONDARY LIABILITY ON NNI FAIL ............. 32

    A.     NNSA's Claims for Aiding and Abetting Cannot Withstand Scrutiny ............... 32

         1.     NNSA's Attempt to Loosen the Requirements for the "Knowing Assistance" Element of an Aiding and Abetting Claim Does Not Save Its Claim ............................................................................... 32

         2.     NNSA Fails to Adequately Allege Assistance Given by NNI or Knowledge of Any Underlying Breach of Fiduciary Duty...................... 33

**Page**

    B.     NNSA Fails to Show Any Well-Pled Allegations to Support Its Conspiracy Claims ................................................................. 37

    C.     NNSA's Claims for Aiding and Abetting and Conspiracy Are Barred by the *In Pari Delicto* Doctrine .......................................... 39

IV. NNSA'S ARTICLE 1382 CLAIMS REQUIRE DISMISSAL ............................ 41

    A.     NNSA's Article 1382 Claim Is Premised on a Strict Liability Theory that Is Not Accepted by French Courts in this Context ............................. 41

    B.     NNSA's Claims Fail to Satisfy the Fault Requirement ....................... 43

    C.     NNSA's Attempt to Rewrite the Causation Requirement under Article 1382 Fails ................................................................. 44

    D.     NNSA's Article 1382 Claims Cannot Stand to the Extent They Rely Upon NNL as *De Facto* Director ...................................................... 46

V. NNSA'S QUASI-CONTRACT AND OTHER CLAIMS RELATING TO UNSPECIFIED BUSINESS SALES SHOULD BE DISMISSED ....................... 47

    A.     NNSA Cannot Remedy Its Basic Failures of Notice Pleading ............ 47

    B.     Claims 10-12 Independently Fail to State a Claim ........................... 47

         1.     Claim 12 Fails Adequately to Plead Mistake ........................... 47

         2.     Implied Term / Implied Contract ........................................ 48

VI. NNSA'S CLAIMS IN RESPECT OF FSD LIABILITY SHOULD BE SUMMARILY DISMISSED ................................................................. 48

VII. NNSA'S CLAIMS RELATING TO TRANSFER PRICING, THE FEBRUARY 2008 REPAYMENT, AND PRE-PETITION BUSINESS SALES ARE TIME BARRED ....................................................................................... 50

    A.     NNSA Provides No Basis to Avert Dismissal of Its U.S. State Law Claims ...... 50

    B.     Delaware's Borrowing Statute Should Apply to the Remaining Claims ............ 51

    C.     Section 108(c) ............................................................... 52

CONCLUSION ....................................................................................... 53

# TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

11 U.S.C. § 108(c) ........................................................................................... 53

11 U.S.C. § 502(e)(1)(B) ................................................................................. 49-50

Bankr. R. 7009 ................................................................................................. 47

Del. Code. Of Prof. Conduct R. 3.3(a)(1) ......................................................... 19

**Cases**

900 Capital Servs., Inc. v. Cloud (In re Cloud),
214 F.3d 1350, No. 99-51109, 2000 WL 634637 (5th Cir. May 4, 2000) ......................... 6

Adams v. Dorsie's Steak House, Inc. (In re Dorsie's Steak House, Inc.),
130 B.R. 363 (D. Mass. 1991) ........................................................................ 6

Aetna Cas. and Sur. Co. v. Leahey Const. Co.,
219 F.3d 519 (6th Cir. 2000) ......................................................................... 32, 33

Airport Blvd. Apts., Ltd. v. NE 40 Partners, Ltd. (In re NE 40 Partners Ltd.),
440 B.R. 124 (Bankr. S.D. Tex. 2010) ............................................................ 11

Angell v. Ber Care, Inc. (In re Caremerica, Inc.),
409 B.R. 737 (Bankr. E.D.N.C. 2009) ............................................................ 11

Anjelino v. N.Y. Times Co.,
200 F.3d 73 (3d Cir. 2000) ............................................................................. 20

Asarco LLC v. Ams. Mining Corp.,
382 B.R. 49 (S.D. Tex. 2007) ........................................................................ 52

Ashcroft v. Iqbal,
129 S.Ct. 1937 (2009) .................................................................................. 9, 12, 39, 48

Bautista v. L.A. Cnty.,
216 F.3d 837 (9th Cir. 2000) ......................................................................... 47

Bell Atlantic Corp. v. Twombly,
550 U.S. 544 (2007) ...................................................................................... 31, 38, 39

Blackwell v. Wells Fargo (In re I.G. Servs., Ltd.),
No. 04-5041-C, 2004 WL 5866105 (Bankr. W.D. Tex. Dec. 22, 2004) ........................... 33

**Page(s)**

Brug v. Enstar Grp., Inc.,
755 F. Supp. 1247 (D. Del. 1991).................................................................... 33

Burger v. Level End Dairy Investors,
125 B.R. 894 (Bankr. D. Del. 1991).................................................................. 51

Burrell v. AstraZeneca LP,
C. A. No. 07C-01-412(SER), 2010 WL 3706584 (Del. Super. Ct. Sept. 20, 2010)........... 52

Capitaliza-T Sociedad de Responsibilidad Limitada de Capital Variable v. Wachovia
Bank of Del. Nat'l Ass'n,
Civil No. 10-520, 2011 WL 864421 (D. Del. Mar. 9, 2011) ............................................. 32

Chi., Rock Island & Pac. Ry. Co. v. Schendel,
270 U.S. 611 (1926).......................................................................................... 23

Clark v. McDonald's Corp.,
213 F.R.D. 198 (D.N.J. 2003)............................................................................. 5

Commw. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.,
836 F.2d 173 (3d Cir. 1988)............................................................................... 28

Decker v. Kraftsow (In re Craftmatic Sec. Litig.),
890 F.2d 628 (3d Cir. 1989)............................................................................... 12

Duke Energy Int'l L.L.C. v. Napoli,
748 F. Supp. 2d 656 (S.D. Tex. 2010) ............................................................... 33

EEOC v. U.S. Steel Corp.,
921 F.2d 489 (3d Cir. 1990)............................................................................... 23

Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.),
398 B.R. 736 (S.D.N.Y. 2008)............................................................................ 6, 7

FoodComm Int'l v. Barry,
463 F. Supp. 2d 818 (N.D. Ill. 2006) ................................................................. 52

Forman v. Salzano (In re Norvergence, Inc.),
405 B.R. 709 (Bankr. D.N.J. 2009) .................................................................... 9

Fowler v. UPMC Shadyside,
578 F.3d 203 (3d Cir. 2009)............................................................................... 8

G-I Holdings, Inc. v. Reliance Ins. Co.,
586 F.3d 247 (3d. Cir. 2009).............................................................................. 17

**Page(s)**

Gilstrap v. Radianz Ltd.,
443 F. Supp. 2d 474 (S.D.N.Y. 2006), aff'd, 233 F. App'x 83 (2d. Cir. 2007)................. 24

Glinka v. Dartmouth Banking Co. (In re Kelton Motors Inc.),
121 B.R. 166 (Bankr. D. Vt. 1990)..................................................................... 11

Hansford v. Bank of Am.,
No. 07-4716, 2008 U.S. Dist. LEXIS 65502 (E.D. Pa. Aug. 26, 2008) ............................ 20-21

Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.,
585 F.Supp.2d 623 (D. Del. 2008)...................................................................... 22

In re Adelphia Commc'ns Corp.,
359 B.R. 54 (Bankr. S.D.N.Y. 2006) ................................................................... 6

In re Basis Yield Alpha Fund (Master),
381 B.R. 37 (Bankr. S.D.N.Y. 2008)................................................................... 17

In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.,
374 B.R. 122 (Bankr. S.D.N.Y. 2007), aff'd, 389 B.R. 325 (S.D.N.Y. 2008) ................... 17

In re Best Prods. Co.,
210 B.R. 714 (Bankr. E.D. Va. 1997).................................................................. 4

In re Diamond Mortg. Corp. of Ill.,
105 B.R. 876 (Bankr. N.D. Ill. 1989) .................................................................. 4

In re DJK Residential LLC,
416 B.R. 100 (Bankr. S.D.N.Y. 2009)................................................................. 6, 7

In re Dow Corning Corp.,
No. 95-20512, 2000 Bankr. LEXIS 1579 (Bankr. E.D. Mich. Nov. 3, 2000) ................... 7

In re G–I Holdings, Inc.,
443 B.R. 645 (Bankr. D.N.J. 2010) ..................................................................... 6

In re HealthSouth Corp. S'holders Litig.,
845 A.2d 1096 (Del. Ch. 2003)........................................................................... 40

In re Ins. Brokerage Antitrust Litig.,
618 F.3d 300 (3d Cir. 2010).............................................................................. 8

In re Kane,
628 F.3d 631 (3d Cir. 2010).............................................................................. 18

**Page(s)**

In re Sevko, Inc.,
143 B.R. 167 (Bankr. N.D. Ill. 1992) .................................................................... 6

In re Spiegel, Inc.
337 B.R. 821 (Bankr. S.D.N.Y. 2006) .................................................................... 6

In re WorldCom, Inc.,
322 B.R. 530 (Bankr. S.D.N.Y. 2005) .................................................................... 6

Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.,
458 F.3d 244 (3d Cir. 2006) .................................................................................... 23

Klein v. Stahl GMBH & Co.,
185 F.3d 98 (3d Cir. 1999) ...................................................................................... 20

Knight v. Carmike Cinemas,
Civil Action No. 11-280, 2011 WL 3665379 ........................................................ 28

Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.,
337 F.3d 314 (3d Cir. 2003) .................................................................................... 18

Liebersohn v. Ali (In re Fineberg),
202 B.R. 206 (Bankr. E.D. Pa. 1996) ..................................................................... 23

Malleus v. George,
641 F.3d 560 (3d Cir. 2011) .................................................................................... 8

Malpiede v. Townson,
780 A. 2d 1075 (Del. 2001) .................................................................................... 32-33

McCoy v. Grinnell (In re Radcliffe's Warehouse Sales, Inc.),
31 B.R. 827 (Bankr. W.D. Wash. 1983) ................................................................. 53

Med Mut. Of Ohio Inc. v. Braintree Labs.,
Civ. No. 10-604-SLR, 2011 U.S. Dist. LEXIS 74996 (D. Del. July 12, 2011)................ 52

Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.,
568 F. Supp. 2d 1152 (C.D. Cal. 2008) .................................................................. 24

Montrose Med. Grp. Participating Savs. Plan v. Bulger,
243 F.3d 773 (3d Cir. 2001) .................................................................................... 17, 20

Mooney v. Vitolo,
435 F.2d 838 (2d. Cir. 1970) .................................................................................. 11

**Page(s)**

Morgan v. Cash,
Civ. A. No. 5053-VCS, 2010 WL 2803746 (Del. Ch. July 16, 2010) ............................... 33

New Hampshire v. Maine,
532 U.S. 742 (2001) ................................................................................................... 18

Nisselson v. Lernout,
469 F.3d 143 (1st Cir. 2006) ....................................................................................... 40

Norman v. Elkin,
Civil Action No. 06-005-JJF, 2007 WL 2822798 (D. Del. Sept. 26, 2007) ...................... 52

Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions Corp.),
330 B.R. 67 (Bankr. D. Del. 2005) .............................................................................. 21

Oneida Motor Freight, Inc. v. United Jersey Bank,
848 F.2d 414 (3d Cir. 1988) ........................................................................................ 20

Parklane Hosiery Co. v. Shore,
439 U.S. 322 (1979) ................................................................................................... 22

Rafter Seven Ranches L.P. v. WNL Investments LLC (In re Rafter Seven Ranches L.P.),
414 B.R. 722 (B.A.P. 10th Cir. 2009) ........................................................................... 6

Raytech Corp. v. White,
54 F.3d 187 (3d Cir. 1995) .......................................................................................... 22

Robertson v. Olsen (In re Running),
Case No. 91 C 20302 (PGR), 1992 U.S. Dist. LEXIS 4686 (N.D. Ill. Mar. 2, 1992) ........ 6

Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,
81 F.3d 355 (3d Cir. 1996) ...................................................................................... 19-20

Santiago v. Warminster Twp.,
629 F.3d 121 (3d Cir. 2010) ................................................................................... passim

Sportscare of Am., P.C. v. Multiplan, Inc.,
2011 WL 589955 (D.N.J. Feb. 10, 2011) ...................................................................... 48

Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.),
335 B.R. 539 (D. Del. 2005) ....................................................................................... 40

Swierkiewicz v. Sorema N. A.,
534 U.S. 506 (2002) ..................................................................................................... 8

**Page(s)**

Taylor v. Sturgell,
553 U.S. 880 (2008) .......................................................................................................... 23

Toner v. Allstate Ins. Co.,
821 F. Supp. 276 (D. Del. 1993) ........................................................................................ 9, 10

United States ex rel. Pilecki-Simko v. Chubb Inst.,
No. 10-3097, 2011 WL 3890975 (3d Cir. Sept. 6, 2011) ................................................... 10

Wenglicki v. Tribeca Lending Corp.,
Civ. Act. No. 07-4522, 2009 WL 2195221 (E.D. Pa. July 22, 2009) ................................ 10

**SUMMARY CHART OF ARGUMENTS BY CAUSE OF ACTION
IN SUPPORT OF MOTION TO DISMISS CLAIMS OF NNSA**

The below chart provides the Court with a summary of certain of the bases for dismissal applicable to each category of NNSA's claims. This presentation is intended for the convenience of the Court and is qualified in its entirety by the arguments set forth in the Motion and Reply, all of which arguments are expressly preserved.

*I.      FRENCH LAW CLAIMS*

| | |
|---|---|
| Mismanagement (claims 2, 6, 13, 16) | • Judicial & Collateral Estoppel (sworn representations made to this Court in recognition proceedings that NNSA was managed and controlled autonomously from England)<br>• Failure to Adequately Plead *De Facto* Status as to NNI (no well-pled allegations that would render it plausible that NNI's affirmative acts dominated NNSA's *de jure* directors)<br>• Failure to Adequately Plead NNI Contributed to NNSA's Excess of Liabilities over Assets (claim 16)<br>• Largely time-barred under DE law (borrowing statute) |
| Article 1382 (claims 3, 7, 14, 17) | • Failure to Meet French Law Requirements (failure to allege bad faith, failure to allege a causal link between any actions by NNI and alleged damages)<br>• Failure to Meet U.S. Pleading Standards (Rules 8(a) and 9(b), failure to plead NNI's knowledge of breach)<br>• Failure to Adequately Plead *De Facto* Director Status as to NNL (judicial estoppel as to NNL, no well-pled allegations that NNL's affirmative acts dominated NNSA's *de jure* directors)<br>• Largely time-barred under DE law (borrowing statute) |
| Contribution (claim 19) | • Automatic Stay Order (prevents reliance on U.K. Pension Proceedings)<br>• Failure to Meet U.S. Pleading Standards (Rule 8(a))<br>• Failure to Meet French Law Standards (does not allege a valid cause of action)<br>• Subject to Dismissal Under Bankruptcy Code § 502(e)(1)(B) |
| Recoupment, Contribution and/or Unjust Enrichment (claim 20) | • Automatic Stay Order (prevents reliance on U.K. Pension Proceedings)<br>• Failure to Meet U.S. Pleading Standards (Rule 8(a))<br>• Failure to Meet French Law Standards (recoupment and contribution are not valid causes of action and no |

| | |
|---|---|
| | well-pled allegations of unjust enrichment)<br>• Subject to Dismissal Under Bankruptcy Code § 502(e)(1)(B) |
| Subrogation<br>(claim 21) | • Automatic Stay Order (prevents reliance on U.K. Pension Proceedings)<br>• Failure to Meet U.S. Pleading Standards (Rule 8(a))<br>• Failure to Meet French Law Standards (no well-pled allegations of subrogation)<br>• Subject to Dismissal Under Bankruptcy Code § 502(e)(1)(B) |
| Obligation to Repay<br>(claim 22) | • Automatic Stay Order (prevents reliance on U.K. Pension Proceedings)<br>• Failure to Meet U.S. Pleading Standards (Rule 8(a))<br>• Failure to Meet French Law Standards (does not allege a valid cause of action)<br>• Subject to Dismissal Under Bankruptcy Code § 502(e)(1)(B) |

## II.    U.S. STATE LAW CLAIMS

| | |
|---|---|
| Aiding and Abetting Breach of Fiduciary Duty or Tortious Conduct/Aiding and Abetting<br>(claims 4, 8, 15, 18) | • Statute of Limitations (all transfer pricing claims and all Pre-Petition Business Sales prior to January 2005)<br>• No Underlying Breach of Fiduciary Duty (judicial estoppel as to NNL)<br>• Failure to Meet U.S. Pleading Standards (failure to allege assistance given by NNI, failure to allege facts to infer knowledge of breach)<br>• *In Pari Delicto* |
| Conspiracy<br>(claims 5, 9) | • Statute of Limitations (all transfer pricing claims and all Pre-Petition Business Sales prior to January 2006)<br>• Failure to Meet U.S. Pleading Standards (Rules 8(a) and 9(b))<br>• *In Pari Delicto* |
| Contribution<br>(claim 19) | • Automatic Stay Order (prevents reliance on U.K. Pension Proceedings)<br>• Failure to Meet U.S. Pleading Standards (Rule 8(a))<br>• Subject to Dismissal Under Bankruptcy Code § 502(e)(1)(B) |

| Recoupment, Contribution and/or Unjust Enrichment (claim 20) | • Automatic Stay Order (prevents reliance on U.K. Pension Proceedings)<br>• Failure to Meet U.S. Pleading Standards (Rule 8(a))<br>• Subject to Dismissal Under Bankruptcy Code § 502(e)(1)(B) |
|---|---|
| Subrogation (claim 21) | • Automatic Stay Order (prevents reliance on U.K. Pension Proceedings)<br>• Failure to Meet U.S. Pleading Standards (Rule 8(a))<br>• Subject to Dismissal Under Bankruptcy Code § 502(e)(1)(B) |
| Obligation to Repay (claim 22) | • Automatic Stay Order (prevents reliance on U.K. Pension Proceedings)<br>• Failure to Meet U.S. Pleading Standards (Rule 8(a))<br>• Subject to Dismissal Under Bankruptcy Code § 502(e)(1)(B) |

### III.    UNSPECIFIED CLAIMS

| Implied Contract (claim 10) | • Failure to Meet U.S. Pleading Standards (Rule 8(a) – identification of contract, contractual obligations) |
|---|---|
| Implied Term (claim 11) | • Failure to Meet U.S. Pleading Standards (Rule 8(a) – identification of contract, contractual obligations) |
| Mistake (claim 12) | • Failure to Meet U.S. Pleading Standards (Rules 8(a) and 9(b) – failure to identify contract, mistake with specificity) |

The Movants respectfully submit this reply (the "Reply") in further support of the

Movants' Joint Objection and Motion to Dismiss Claims of Nortel Networks S.A. ("NNSA") and

the court-appointed French liquidator (the "Liquidator") of NNSA [D.I. 6026] (the "Motion" or

"Opening Brief"), and in response to the Joint Administrators' and French Liquidator's

Memorandum of Law in Opposition to the Debtors' and Committee's Joint Objection and

Motion to Dismiss the Claims of Nortel Networks S.A. and its French Liquidator [D.I. 6380] (the

"Response" or "Opposition").[2]  In reply to the Opposition, and in further support of the Motion,

the Movants respectfully represent as follows:

## PRELIMINARY STATEMENT

NNSA's opposition to the Motion starkly reveals the lack of substance to its Claim.

NNSA's Response consists primarily of (i) an effort to avoid application of well-settled pleading

standards articulated by the Supreme Court and Third Circuit, (ii) misstatements or proposed

expansion of existing French law and (iii) a hollow plea that "circumspection is required" before

dismissing claims.

NNSA's pleading utterly fails to meet the requirements of Rule 8 as articulated by the

Supreme Court in Twombly and Iqbal, much less the requirements of Rule 9(b) which apply to

many of its claims.  It is no surprise therefore that NNSA strenuously insists that those pleading

requirements should not be applied to its Claim.  NNSA's argument that it did not have proper

notice that Rules 8(a) and 12(b)(6) would apply – and thus should be entitled to a *third* attempt to

re-plead – is baseless given the clear record in this case, which amply demonstrates that NNSA

---

[2]      The accompanying Second Declaration of Guilhem Bremond in Support of Joint Objection and Motion to
Dismiss Claims of Nortel Networks S.A. (NNSA) and its French Liquidator will be referred to herein as the
"Bremond Reply Declaration."  Additional capitalized terms not otherwise defined herein shall have the meanings
ascribed to them in the Motion.

fully understood that its amended Claim would have to pass muster under these well-settled pleading requirements.

Indeed, NNSA cannot escape the implausibility of its own allegations – at the same time that it conclusorily alleges NNI's "predominant influence," NNSA's other allegations prove the opposite.  For example, and contrary to its allegations of dominance, NNSA alleges that the "mere reluctance" of its controller was sufficient to change the terms of a loan repayment demand, allegedly by NNI, for NNL's benefit.  Claim ¶ 75.  NNSA's allegations collapse under the weight of their own inconsistency.

NNSA's allegations are both implausible and legally unfounded under French and U.S. law.

<u>First</u>, NNSA is estopped from asserting claims based on duties allegedly owed by NNI and NNL.  NNSA cannot explain away its about-face:  a direct comparison of its prior positions with its current litigation posture reveals that they are irreconcilably inconsistent.  Nor can NNSA claim that only after the Joint Administrators were appointed did it uncover facts that called its prior positions into question.  The Joint Administrators themselves continued to verify, under oath, the truth of those positions – and advocate them to this Court – as recently as this year.  NNSA's assertion of identical claims through its alternative representative, the French Liquidator (who is represented by the same attorneys as the Joint Administrators), does nothing to avoid the preclusive force of the Joint Administrators' prior statements.

 <u>Second</u>, the Court must reject NNSA's suggestion to expand French law regarding *de facto* directorship.  It is uncontested that NNSA must allege that NNI was a *de facto* director as a predicate for its mismanagement claims.  To find that a party has risen to the level of *de facto* director, French courts have consistently required one touchstone:  domination.  Thus, under

established law, NNI must have so reduced the decision-making authority of NNSA's *de jure* directors as to have *dominated* NNSA in order to qualify as a *de facto* director. But the Claim's threadbare and conclusory allegations lack any well-pled allegations to render it plausible that NNI achieved the necessary domination of its sister affiliate, NNSA.

Third, the Court should reject NNSA's desperate attempt to expand well-settled French law for two of the necessary elements of its Article 1382 claims. NNSA ignores the plain and unambiguous language of the statute and French authority to advocate replacing fault with a rule of *strict liability*. The Court should reject NNSA's invitation to go where no French court has ever gone in circumstances such as these – a "controversial" place that even NNSA's own French-law expert concedes is not the current law in France. NNSA similarly seeks to eliminate the established concept of but-for causation under Article 1382 and instead find liability for "participation" in a "damaging event" that is alleged to have caused injury. This also is not the law in France. When subject to the correct fault and causation requirements, NNSA's Article 1382 claims do not withstand scrutiny.

Fourth, just as NNSA's direct theories of liabilities fail, its attempt to repackage those allegations as secondary liability claims fail for similar reasons. Nowhere has NNSA alleged that NNI knowingly assisted in NNSA's directors' breach – as required for its Article 1382 and aiding and abetting claims. Also, NNSA's U.S. law secondary liability claims are largely time-barred and barred by the *in pari delicto* doctrine.

Fifth, NNSA does not refute that this Court stated it will determine NNI's share (if any) of liability to the U.K. Pension Plan pursuant to claims submitted by the U.K. Pension Trustee and the Pension Protection Fund; that, as to the U.S. Debtors, the U.K. Pension Proceedings will be deemed void and of no force or effect; and that even if the FSD claims are not dismissed as

inadequately pled (which they are), Section 502(e)(1)(B) of the Bankruptcy Code requires that

they be disallowed.

## ARGUMENT

### I.
### NNSA'S CLAIM SHOULD BE TESTED AGAINST – AND DISMISSED UNDER – THE STANDARDS OF RULE 12(b)(6)

**A.    NNSA Cannot Avoid Application of Rule 12(b)(6)**

Implicitly recognizing its pleading deficiencies, NNSA devotes a substantial portion of its

Response to arguing that Rule 12(b)(6) should not be applied to its Claim.  NNSA, however,

cannot and does not contest that this Court has discretion to apply Rule 12(b)(6) to dismiss the

Claim.  As elaborated in the Motion and herein, given the facts, circumstances, and procedural

history of this case, it is precisely the type of case to which the Court should exercise its

discretion to apply Rule 12(b)(6).  In light of the paramount interest of all parties in enabling

distributions to creditors, expeditious resolution of NNSA's Claim through a motion to dismiss is

particularly appropriate.[3]

Incredibly, NNSA argues that it did not have proper notice that Rules 8(a) and 12(b)(6)

would apply to its Claim and that, therefore, before applying those Rules, the Court must first

enter an order under Rule 9014(c) and then permit NNSA a *third* attempt to replead.  Opp. at 24.

This feigned ignorance of the application of Rules 8(a) and 12(b)(6) to its Claim is belied by the

record.  While NNSA asserts that the EMEA Claims Objection "only requested that the Joint

Administrators file a claim that complied with the requirements of Bankruptcy Rule 3001" (Opp.

at 19), in fact, each of the EMEA Claims Objection, the EMEA Debtors' response to that

---

[3]      In re Best Prods. Co., 210 B.R. 714, 716 (Bankr. E.D. Va. 1997) (applying Rule 12(b)(6) to creditor claim to "resolve the parties' dispute expeditiously"); In re Diamond Mortg. Corp. of Ill., 105 B.R. 876, 877 n.1 (Bankr. N.D. Ill. 1989) (deeming a claims objection a motion under Bankruptcy Rule 7012 "in an effort to move this litigation along").

objection, and the statements made at the hearing at which the objection was granted made plain

that Rule 12(b) would apply to NNSA's amended claims.

<u>First</u>, the EMEA Claims Objection expressly asserted that "under Bankruptcy Rule 7012

and Federal Rule 12(b)(6)," NNSA's Claim would be required to "contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face."  EMEA Claims

Objection ¶ 24 (internal quotation marks omitted).  The U.S. Debtors cited to both <u>Twombly</u> and

<u>Iqbal</u> for this standard.  <u>Id.</u>  <u>Second</u>, NNSA and the other EMEA Debtors not only failed to refute

application of the <u>Iqbal</u> and <u>Twombly</u> Rule 8(a) standards, they consented to the U.S. Debtors'

requested relief.[4]

<u>Third</u>, a pleading made in response to an order requiring a more definite statement under

Rule 12(e) must, at a minimum, comply with the notice pleading standard embodied in Rule 8(a).

<u>See, e.g.</u>, <u>Clark v. McDonald's Corp.</u>, 213 F.R.D. 198, 233 (D.N.J. 2003) ("Rule 12(e)'s *raison*

*d'être* is to require greater specificity than what is ordinarily required under Rule 8(a)(2).").  And,

if more were needed, the record of the hearing on the EMEA Claims Objection made clear that

the U.S. Debtors would be moving to dismiss the Claims under Rule 12(b)(6).  <u>See</u> May 10,

2011 Hr'g Tr. at 25:17-19 ("We do anticipate moving to dismiss these claims as quickly as

possible.").  The Court noted that the U.S. Debtors would "have dispositive motions that may

address those [amended] claims in any event," and posed questions concerning the schedule "if I

---

[4]      <u>See</u> The Joint Administrators' Response to the Debtors' Motion for an Order Requiring a More Definite
Statement of Claim and Setting a Deadline for the Filing of Any Proofs of Claim By the EMEA Claimants ¶ 11 [D.I.
5255] ("[T]he EMEA Debtors will acquiesce to the U.S. Debtors' request and will file amended proofs of claim.");
<u>see also</u> May 10, 2011 Hr'g Tr. at 32:19-22 ("[MR. HARRON:] . . . what we were talking about [is] the motion to
file an amended claim.  As Your Honor can read from our reply and I think the parties all understood, we agreed to
the relief sought in that motion.").

decide not to dismiss the claims." Id. at 27:6-20.[5]  Under such circumstances, courts have rejected formalistic attempts to invoke Rule 9014(c).[6]

NNSA's assertion that "bankruptcy courts rarely apply Rule 12(b)(6) to proofs of claim" (Opp. at 21) is undermined by its efforts to distinguish the dozen authorities cited by Movants where courts have done precisely that.  Indeed, NNSA cites to *no* authority (nor are the Movants aware of any) where a court refused to apply Rule 12(b)(6) to a claims objection.  NNSA also incorrectly asserts that the "US Debtor does not cite *any* case in which a bankruptcy court has applied the Rule 8(a) pleading standard, as articulated in Iqbal and Twombly, to test the legal sufficiency of a proof of claim."  Opp. at 22 (emphasis in original).  The Motion cites to Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.), 398 B.R. 736, 748 (S.D.N.Y. 2008), which applied the "plausibility standard," as articulated in Twombly, to dismiss a proof of claim. Nor is Alper an outlier.[7]  Whereas NNSA seeks to disregard cases where parties consented to apply Rule 12(b)(6),[8] or where courts do not analyze its application,[9] these authorities only

---

[5]     Moreover, EMEA concedes that "Rule 9(b), through Bankruptcy Rule 7009, applies automatically in any contested matter" (Opp. at 27 n.35), such that NNSA's procedural arguments are inapplicable to those claims that invoke Rule 9(b).

[6]     See Adams v. Dorsie's Steak House, Inc. (In re Dorsie's Steak House, Inc.), 130 B.R. 363, 365 (D. Mass. 1991) (rejecting arguments concerning the absence of a formal order under Rule 9014(c) to parties prior to applying Fed. R. Civ. P. 16, where party had "actual notice" and suffered no prejudice); see also Rafter Seven Ranches L.P. v. WNL Investments LLC (In re Rafter Seven Ranches L.P.), 414 B.R. 722, 738–39 (B.A.P. 10th Cir. 2009) ("Debtor provides no authority for the proposition that the bankruptcy court's failure to comply with the particulars of Rule 9014 is a basis for overturning the order and we conclude it is not").

[7]     See also In re G–I Holdings, Inc., 443 B.R. 645, 665 (Bankr. D.N.J. 2010) (equating a motion to disallow a claim with a motion to dismiss, as articulated by Twombly and Iqbal); In re DJK Residential LLC, 416 B.R. 100, 106-07 (Bankr. S.D.N.Y. 2009) (dismissing claim where it "fails under the Rule 8 standard," which required "enough facts to state a claim to relief that is plausible on its face" (citing Twombly)).

[8]     In re Adelphia Commc'ns Corp., 359 B.R. 54, 56 n.5 (Bankr. S.D.N.Y. 2006).  Although the Opposition categorizes In re Spiegel, Inc., as a case involving "consent" (Opp. at 22), the Court in fact overruled claimant's "procedural objections" to application of Rule 12(b)(6), as it enabled the Court to best address the parties' interests in resolving the merits of the claim.  337 B.R. 821, 822-24 (Bankr. S.D.N.Y. 2006).

[9]     900 Capital Servs., Inc. v. Cloud (In re Cloud), 214 F.3d 1350, No. 99-51109, 2000 WL 634637 (5th Cir. May 4, 2000); In re WorldCom, Inc., 322 B.R. 530, 535-36 (Bankr. S.D.N.Y. 2005); In re Sevko, Inc., 143 B.R. 167, 171 (Bankr. N.D. Ill. 1992); Robertson v. Olsen (In re Running), Case No. 91 C 20302 (PGR), 1992 U.S. Dist. LEXIS 4686, at * 2 (N.D. Ill. Mar. 2, 1992).

demonstrate the uncontroversial consensus that Rule 12(b) should apply to contested matters if it will expedite resolution of the claim.

Further, NNSA has it backwards when it suggests that Rule 12(b)(6) should be applied only to simplistic claims.  Opp. at 23.  To the contrary, applying Rule 12(b)(6) is particularly appropriate where – as here – disposition on the pleadings can avoid protracted and expensive proceedings on claims that fail as a matter of law.  See, e.g., Alper Holdings, 398 B.R. at 750 (disposing of proofs of claim alleging environmental contamination and remediation, including complex alter ego and successor liability claims, on a Rule 12(b)(6) motion).  Indeed, because NNSA's Claim is structured as a complaint, with independent counts, attempted factual allegations, and a demand for relief, application of Rule 12(b)(6) is particularly appropriate.  See In re DJK Residential LLC, 416 B.R. 100, 107 (Bankr. S.D.N.Y. 2009) (applying Twombly to expunge a proof of claim that took the form of a complaint).  Its Claim is not based on a simple amount payable, but instead on a series of purported multi-billion dollar tort claims based on unprecedented applications of foreign law.  See, e.g., In re Dow Corning Corp., No. 95-20512, 2000 Bankr. LEXIS 1579, at *6 n.3 (Bankr. E.D. Mich. Nov. 3, 2000) ("[A] proof of claim seeking recovery for a disputed, unliquidated tort claim should, as a general rule, not be afforded prima facie validity.").

Finally, contrary to NNSA's suggestion, the same extensive discovery will not be taken "regardless of whether some or all" of the Claim is dismissed.  Opp. at 22-23 (emphasis omitted).  NNSA asserts that such discovery will necessarily occur because discovery addressing the same underlying facts will take place in connection with intercompany claims asserted against the Canadian Debtors and in connection with the allocation proceeding.  Id.  Whether NNSA engages in extensive discovery as part of the Canadian claims process is irrelevant to the Court's

determination with respect to the Claims against NNI.  Even dismissal of only some claims

would eliminate entire factual topics, narrowing the scope and burden of discovery for all parties.

**B.      NNSA's Attempt to Dilute the Requirements of Rule 8(a) Cannot Be Squared with Binding Precedent**

Not only should the Court apply Rules 8(a) and 12(b) to the Claim, it should reject

NNSA's attempts to dilute the proper tests under those rules.  In a misguided attempt to wish

away the pleading requirements of Twombly and Iqbal, NNSA asserts that the Rule 12(b)(6)

standard "remains" that courts accept "all factual allegations as true," construe the complaint in

the light most favorable to the plaintiff, and determine "whether, under any reasonable reading of

the complaint, the plaintiff may be entitled to relief."  Opp. at 25.  Remarkably, this language

was rejected as *inconsistent* with the teachings of Iqbal in the very case cited by NNSA.[10]

Instead, the Third Circuit's current standard for judging a motion under Rule 12(b)(6) has indeed

changed after Twombly and Iqbal, such that courts are now required to "(1) identify[] the

elements of the claim, (2) review[] the complaint to strike conclusory allegations, and then (3)

look[] at the well-pleaded components of the complaint and evaluat[e] whether all of the

elements identified in part one of the inquiry are sufficiently alleged."  Mot. at 19.[11]

NNSA acknowledges that courts may no longer accept as true "labels and conclusions"

and "formulaic recitations of the elements of a cause of action."  Opp. at 25.  Notwithstanding its

---

[10]      See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).  Fowler explained that the language quoted by NNSA was predicated on the mistaken understanding that Twombly was confined to the antitrust context. In Fowler, the Third Circuit abandoned that formulation in light of the holding in Iqbal.  Fowler, 578 F.3d at 210.

[11]      Indeed, elsewhere NNSA concedes that this is now the proper test.  See Opp. at 25.  Clearly uncomfortable with this standard, NNSA nonetheless seizes on the fact that the Supreme Court in Twombly did not "overrule" Swierkiewicz v. Sorema N. A., 534 U.S. 506 (2002), such that bare "notice pleading" survives.  See Opp. at 24 n.25. The Third Circuit, however, has made clear that Swierkiewicz cannot excuse parties from complying with the Iqbal pleading standard.  See, e.g., Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011) (applying Iqbal test for evaluating motions to dismiss without mentioning Swierkiewicz); Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (same).  Even the Third Circuit opinion cited by NNSA for the proposition that Swierkiewicz survives Iqbal and Twombly made that observation in dicta and, in any event, did not rely on Swierkiewicz in formulating the standard by which it judged the defendants' motion to dismiss, but instead applied the Twombly standard.  See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 319-20 (3d Cir. 2010).

repeated protestations that its allegations are "detailed" or "factual" (Opp. at 2, 5, 9, 26, 34, 38, 63, 65), at base NNSA asks this Court to do just that.  See Ashcroft v. Iqbal, 129 S.Ct. 1937, 1950 (2009) (courts "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks and citation omitted)).  That there are *some* factual allegations in the Claim does not alter the "fundamentally conclusory character" of the allegations with respect to key elements of its purported causes of action against NNI.  See Santiago v. Warminster Twp., 629 F.3d 121, 131 (3d Cir. 2010) ("While the allegations regarding [defendants' subordinates'] conduct are factual and more than merely the recitation of the elements of a cause of action, the allegation of supervisory liability is, in essence, that '[defendants] told [their subordinates] to do what they did' and is thus a 'formulaic recitation of the elements of a [supervisory liability] claim.'" (citation omitted)).

## C.    Rule 9(b)'s *Heightened* Standard Applies to NNSA's Claims that Sound in Fraud

While acknowledging Rule 9(b) is applicable to this contested matter for claims that sound in fraud, NNSA both misstates the standard for Rule 9(b) and wrongly contends that the Claim falls outside of its terms.  As set forth in the Motion, Rule 9(b) "appl[ies] to all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud."  Toner v. Allstate Ins. Co., 821 F. Supp. 276, 283 (D. Del. 1993).  Indeed, the case cited by NNSA for the proposition that Rule 9(b) "generally does not apply to the state law claims of breach of fiduciary duty . . . [and] aiding and abetting breach of fiduciary duty" (Opp. at 28) ultimately held that Rule 9(b) *did* apply to such claims in that case.  See Forman v. Salzano (In re Norvergence, Inc.), 405 B.R. 709, 746-47 (Bankr. D.N.J. 2009) (applying Rule 9(b) to aiding and abetting claims where the complaint "equate[d] the conduct of Debtor's [directors] and the Leasing Companies as a fraud enabling the defendants to exploit and loot the debtor for [defendants'] own purposes").

9

Moreover, NNSA is simply wrong when it suggests that courts apply Rule 9(b) to non-fraud claims only when they are "asserted together with fraud claims based on the same facts." Opp. at 28.  For example, the plaintiffs in <u>Toner</u> did not bring a fraud claim, yet Rule 9(b) applied to its claims for breach of the covenant of good faith and fair dealing.  821 F. Supp. at 278, 283-84.  Nor should the Court consider NNSA's wholly irrelevant comparison of the elements of its own claims against those of common law fraud (<u>see</u> Opp. at 27-28); the relevant inquiry is not whether the claims share elements with a fraud claim, but whether the "gist" of the facts alleged in the claim "sound[s] in fraud."  <u>See</u> <u>Toner</u>, 821 F. Supp. at 283-84.  As set forth below, certain of NNSA's claims do exactly that.

NNSA also makes the unsupported suggestion that "the Third Circuit's Rule 9(b) test is similar to the current jurisprudence under Rule 8(a)."  Opp. at 29.  Established law is firmly to the contrary.  <u>See</u> <u>United States ex rel. Pilecki-Simko v. Chubb Inst.</u>, No. 10-3097, 2011 WL 3890975, at *3 (3d Cir. Sept. 6, 2011) (distinguishing between the plausibility pleading standard of Rule 8(a) and the particularity required by Rule 9(b)); <u>Wenglicki v. Tribeca Lending Corp.</u>, Civ. Act. No. 07-4522, 2009 WL 2195221, at *2 (E.D. Pa. July 22, 2009) ("These allegations are not even sufficient under <u>Twombly/Phillips</u> and F.R.C.P. 8(a)(2).  Therefore, the allegations fall far short of F.R.C.P. 9(b)'s requirement[s].").

The Joint Administrators and French Liquidator (represented by the same attorneys), moreover, are not entitled to any "relaxed" or "flexible" application of this pleading standard on the theory that they are trustees.  For more than two years after the Joint Administrators' appointment, NNSA continued to operate, and many key managers and employees remained in place.[12]  And the Joint Administrators have spent untold hours and substantial sums pursuing

---

[12]     <u>See generally</u>, Administrators' Progress Reports for EMEA Debtors ("Progress Reports"), <u>available at</u> http://www.nortel.com/corporate/adminprogreports.html.  It appears that as of August 2011, the Joint Administrators

formal investigations into the EMEA Debtors' affairs.[13]  Unlike a newly-appointed outsider, the

Joint Administrators are (and have been for a considerable period of time) well situated to be

informed about the affairs of NNSA, precluding application of cases that relax the pleading

standard of Rule 9(b) for trustees.  See Opp. at 31.  This relaxed standard is simply inapplicable

to the Joint Administrators, whose inability to plead a claim with sufficient particularity has

nothing to do with a purported lack of access to information.  See Mooney v. Vitolo, 435 F.2d

838, 839 (2d. Cir. 1970) (dismissing claims brought by trustee who had "extensive access to the

records and files of the bankrupt corporation"); Glinka v. Dartmouth Banking Co. (In re Kelton

Motors Inc.), 121 B.R. 166, 187 (Bankr. D. Vt. 1990) ("Trustees in bankruptcy must plead with

particularity facts giving rise to their fraud actions when they have access to information.")

(internal quotation marks and citation omitted).[14]  Relaxing the pleading standard for the Joint

Administrators and French Liquidator also makes particularly little sense in the present case

where *both* sides are fiduciaries acting for the benefit of creditors.

---

had finally disposed of all of NNSA's businesses.  See NNSA Progress Report, Aug. 12, 2011, at 4-5; NNSA Progress Report, Feb. 11, 2011, at 4 (noting that as of February 2011, the Joint Administrators continued to operate those businesses of NNSA that had not yet been disposed of).

[13]    See NNUK Progress Report, Aug. 10, 2011, at App'x 3 (Joint Administrators have spent £425,104 on "Investigations" as of June 3, 2011).  Though the Progress Reports for NNSA do not mention "investigations," the Joint Administrators admitted that they had been billing work to NNUK that related to all EMEA debtors.  See NNUK Progress Report, Feb. 11, 2011, at 10 (indicating that, after review, more than £2.5 million billed by the Joint Administrators to NNUK for work done between February and October 2010 would be "re-apportioned" to the other EMEA debtors).  Overall, the Joint Administrators have spent more than €2.5 million (excluding "core M&A transaction time") administering the NNSA estate, and more than €25.5 million in "core M&A transaction time" for all EMEA entities, as of June 3, 2011.  NNSA Progress Report, Aug. 12, 2011, at App'x 3.

[14]    Indeed, the very existence of a "relaxed" pleading standard is in doubt after Twombly and Iqbal rejected the "no set of facts" language of Conley v. Gibson on which many of the "relaxed pleading" cases cited by NNSA relied.  See Angell v. Ber Care, Inc. (In re Caremerica, Inc.), 409 B.R. 737, 754 (Bankr. E.D.N.C. 2009) ("[T]he trustee is certainly more likely to have access to [factual information supporting his allegations] than the antitrust plaintiffs in Twombly or the Pakistani detainee in Iqbal.  If these claimants were held to a heightened pleading standard, so too can a trustee in bankruptcy."); Airport Blvd. Apts., Ltd. v. NE 40 Partners, Ltd. (In re NE 40 Partners Ltd.), 440 B.R. 124, 127-28 (Bankr. S.D. Tex. 2010) (holding that "relaxed" pleading standards for trustees should be discarded after Twombly).

For the same reason, the Court should reject NNSA's request that the Court adopt a "flexible" approach to Rule 9(b) based on NNSA's suggestions that "key evidence" remains in the exclusive control of NNL and NNI, or that application of the pleading rules would "permit sophisticated defrauders to successfully conceal the details of their fraud."  Opp. at 29-31 (internal quotation marks and citation omitted).  NNSA – unlike NNI – was a party to every transaction it pleads, and nowhere does NNSA allege (nor could it) that NNI or NNL concealed the existence or facts of these transactions from NNSA.  See Decker v. Kraftsow (In re Craftmatic Sec. Litig.), 890 F.2d 628, 645 (3d Cir. 1989) (explaining that in order for courts to employ a flexible application of Rule 9(b) "pleaders must allege that the necessary information lies within defendants' control, and their allegations must be accompanied by a statement of the facts upon which the allegations are based.").

Finally, NNSA's suggestion that the remedy for its pleading deficiencies is to permit discovery[15] fails as a matter of law.  According to NNSA, the Court should forego examining the sufficiency of its claims under Rule 12(b)(6) in favor of a protracted discovery process which, according to NNSA, "*may* allow the Joint Administrators to winnow and refine their claims" themselves.  Opp. at 23 (emphasis added).  NNSA has the law backwards.  The Supreme Court has made clear that, where, as here, the pleading "is deficient under Rule 8, [the claimant] is not entitled to discovery, cabined or otherwise." Iqbal, 129 S.Ct. at 1953-54.[16]  This is of particular import here where there will be a waste of resources and significant costs to both the Court and NNI's creditors if NNSA is permitted to proceed on claims that do not meet the requisite pleading requirements.

---

[15]    See, e.g., Opp. at 2-3, 5, 6, 20, 22-23, 70.

[16]    This remains the law irrespective of any claimed "information asymmetry between plaintiffs and defendants." Santiago, 629 F.3d at 134 n.10.

**II.**

**NNSA DOES NOT PLAUSIBLY ALLEGE NNI BECAME ITS *DE FACTO* DIRECTOR**

As set forth in the Motion, NNSA's claims for mismanagement must be dismissed. NNSA is estopped from alleging that NNI dominated NNSA's *de jure* directors to such an extent that NNI became a *de facto* director of NNSA. In addition, NNSA misstates French law and has failed to allege any well-pled facts from which it could plausibly be inferred that NNI was a *de facto* director of NNSA under established French law.

**A.    NNSA Cannot Avoid the Estoppel Effect of Its Prior Representations to this Court**

1.    NNSA's Prior Representations Are Directly Contrary to Its Current Allegations

NNSA's prior positions and sworn statements that all major decisions for NNSA were made and controlled from England simply cannot be reconciled with its Claim, which is predicated on alleged control from North America.[17] NNSA's attempts to harmonize its two positions (Opp. at 46-47) are refuted by a side-by-side comparison of NNSA's prior representations with the positions staked out in the Claim[18] and Opposition:

---

[17]    The Joint Administrators sought Chapter 15 recognition as "authorized foreign representatives . . . for . . . the 'EMEA Debtors' [including NNSA]." Verified Chapter 15 Petitions for Recognition of Foreign Proceedings and Related Relief with Respect to the EMEA Debtors, Peacock Decl. Ex. H at 1.

[18]    The judicial estoppel argument provides a basis to dismiss claims 2, 6, 13, 16 in their entirety. Additionally, to the extent NNSA's aiding and abetting and Article 1382 claims are based on the actions of NNL as an alleged *de facto* director, claims 3, 4, 7, 8, 14, 15, 17, 18 are also barred by judicial estoppel.

| NNSA's Prior Representations | NNSA's Current Allegations |
|---|---|
| "While NNC is the ultimate parent of all Nortel Companies worldwide and NNC's headquarters in Toronto serves as the global headquarters, the EMEA Debtors' central management and control is directed from the head office in Maidenhead, England, where all major decisions specific to the EMEA Debtors are made."  Memorandum of Law in Support of Verified Chapter 15 Petitions for Recognition of Foreign Proceedings and Related Relief with Respect to the EMEA Debtors, dated October 20, 2010, Peacock Decl. Ex. O at 7. | "NNSA had no substantive involvement.  Its role was limited to providing information for the above individuals [from NNI and NNL] as and when required and to implementing the decisions which had been taken by NNI and the Canadian Entities."  Claim ¶ 18. |
| There was a "wide range of operational, strategic, financial and high level administrative and advisory control over [NNSA] by senior management of EMEA in England."  Witness Statement of Michel Clement, dated Jan. 14, 2009 ("Clement Statement"), Peacock Decl. Ex. D ¶ 33.<br><br>"[T]he Company's central management and control is to a large extent directed from England, where all major decisions are made."  Clement Statement, Peacock Decl. Ex. D ¶ 43.<br><br>"Senior management in England exercise control and authority over the Company through the global decision making approval and policy procedure."  Clement Statement, Peacock Decl. Ex. D ¶ 35.<br><br>"The strength of central management personnel and its business segment coverage means England is the management centre for EMEA."  Witness Statement of Sharon Lynette Rolston, dated Jan. 14, 2009 ("Rolston Statement"), Peacock Decl. Ex. E ¶ 32. | "[K]ey areas were controlled jointly by the Canadian Entities and NNI.  These areas included Nortel Group Tax and Treasury, which performed a key role in the Group's centralized, strategic management and initiated and implemented most of the significant transactions that impacted the Group."  Opp. at 11. |

| | |
|---|---|
| "In relation to corporate matters such as, financial, tax and distribution issues, strategic and high level decisions are generally made by the Finance, and Tax functions of the EMEA group which are all located in England."  Clement Statement, Peacock Decl. Ex. D ¶ 40. | "NNI's predominant influence over NNSA's tax and treasury functions was pervasive and continuous, and the cumulative effect of the major strategic decisions it made in connection with transfer pricing, the February 2008 Repayment associated with Project Swift, certain pre-petition asset sales and its tax policy in general, render it a *de facto* director of NNSA."  Opp. at 35. |
| "[M]anagement, supervision, and decision-making in relation to taxation of the EMEA Group is made in England."  Rolston Statement, Peacock Decl. Ex. E at ¶ 15(f). | "NNSA's taxation affairs were controlled by NNI and NNL, particularly with respect to transfer pricing matters."  Opp. at 17. |
| "The tax group based in England (the 'EMEA Tax Group') is responsible for managing and supervising tax throughout the EMEA Region."  Rolston Statement, Peacock Decl. Ex. E at ¶ 186. | "The control exerted by NNI related to the Nortel Group's tax matters, in particular transfer pricing, and to the Nortel Group's treasury matters."  Claim ¶ 15. |
| "Banking and Treasury functions are run out of England, by the Group Treasury Operations."  Clement Statement, Peacock Decl. Ex. D ¶ 39. | "NNI . . . exert[ed] its control over . . . Group Treasury matters . . . ."  Opp. at 12.<br><br>"NNI's predominant influence over NNSA's . . . treasury functions was pervasive and continuous . . . ."  Opp. at 35. |
| "[D]ecisions in relation to settlement of intercompany accounts are made by the EMEA Treasury team in England."  Rolston Statement, Peacock Decl. Ex. E ¶ 15(i). | "The February 2008 Repayment [of the 2002 intercompany loan extended to NNSA by NNL] was imposed on NNSA by NNI and NNL . . . ."  Claim ¶ 79. |

As this comparison makes plain, the record forecloses NNSA's attempt to minimize its

prior submissions as relating only to operational matters.  See Opp. at 46.  NNSA's

representations went far beyond that, affirming that management, tax and treasury functions were

controlled from England, where "strategic" and "high level" decisions with respect to NNSA

were made.  See, e.g., Clement Statement, Peacock Decl. Ex. D ¶ 33 ("[There was a] "wide

range of *operational*, *strategic*, *financial* and *high level* administrative and advisory control over

[NNSA] by senior management of EMEA in England." (emphasis added)); id. ¶ 40 ("In relation to corporate matters such as, financial, tax and distribution issues, *strategic and high level decisions* are generally made by the Finance, and Tax functions of the EMEA group which are all located in England.") (emphasis added)).[19]  The details the Witness Statements provided on customer relations and sales demonstrate only that England was the locus of *both* operational and decision-making functions.[20]

Nor can NNSA harmonize its litigation stances by pointing out that a *de facto* directorship can be imposed with respect to specific transactions.  Opp. at 47.[21]  First, to obtain recognition, NNSA confirmed that it was managed and controlled from England – writ large and without qualification.  See, e.g., Clement Statement, Peacock Decl. Ex. D ¶ 43 ("[T]he Company's central management and control is to a large extent directed from England, where *all* major decisions are made." (emphasis added)).  More importantly, NNSA's prior submissions specifically stated that the very functions it now alleges were centered in North America – tax and treasury – were controlled from England.  While NNSA struggles mightily to blur this inconsistency, its positions remain irreconcilable in any light.

---

[19]    Indeed, as NNSA acknowledges, to the extent the Witness Statements suggest any influence from outside of England, they point to Canada – *not* the U.S.  See Opp. at 47 n.70.

[20]    NNSA points out that the Clement Statement references "[d]ay to day operational management" (Opp. at 46 n.67), but this only draws a distinction between operational management that was performed in each local EMEA jurisdiction, and the strategic control and authority exercised by senior management in England and, therefore, supports Movants' argument.  See Clement Statement, Peacock Decl. Ex. D ¶¶ 35, 40.

[21]    This directly contradicts NNSA's argument that French courts *reject* this piece-meal approach and instead would consider all of the of NNI's actions "in the aggregate" to determine whether it became a *de facto* director.  See Opp. at 33 ("French courts conduct a *global* analysis and consider all of the elements in the *aggregate* when determining whether a party has the status of a *de facto* director." (emphasis in original)); Menjucq Decl. ¶ 49 ("[T]he elements of management must not be analysed separately, but jointly.  The status of *de facto* director is deduced from the elements in aggregate.").

2.      The Location of Those Who Manage and Control the Debtor Is Crucial to COMI

Having submitted extensive evidence concerning the location of those who managed and controlled the EMEA Debtors, NNSA now does an about face and suggests that such facts were irrelevant to a determination of COMI.  Opp. at 44-45.[22]  This ignores the relevant test for determining COMI to obtain Chapter 15 recognition.[23]  This Court could not have entered the EMEA Debtors' Recognition Order if – as NNSA's Claim now asserts – decision-making authority for NNSA was completely "usurped" by the North American entities.  Opp. at 35.  Crucial factors in determining whether to grant recognition are the locations of those who actually manage the debtor and the location of the debtor's head-office functions.  See, e.g., In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122, 129 (Bankr. S.D.N.Y. 2007), aff'd, 389 B.R. 325 (S.D.N.Y. 2008).

Where a foreign debtor is actually controlled outside of its jurisdiction of incorporation, courts have not hesitated to deny recognition.  See Bear Stearns, 374 B.R. at 129 (rejecting Chapter 15 recognition for Cayman-incorporated funds even in the absence of an objection where the investment manager and principal management were located in the United States); In re Basis Yield Alpha Fund (Master), 381 B.R. 37, 47 (Bankr. S.D.N.Y. 2008) (denying motion for summary judgment seeking recognition without evidence on location of those who managed

---

[22]      Even if NNSA was correct – which it is not – that the Court did not rely on its representation that those who managed and controlled NNSA were located in England, that is no bar to application of judicial estoppel.  The location of those who managed and controlled NNSA is a purely factual inquiry, to which judicial estoppel applies regardless of the Court's reliance on the Witness Statements.  See G-I Holdings, Inc. v. Reliance Ins. Co., 586 F.3d 247, 262 (3d Cir. 2009) (reaffirming that when faced with claims of judicial estoppel, courts "will apply it to neutralize threats to judicial integrity however they may arise" even "where no court has accepted an initial position"); Montrose Med. Grp. Participating Sav. Plan v. Bulger, 243 F.3d 773, 783 n.7 (3d Cir. 2001) (expressly preserving the applicability of an adoption or reliance requirement to cases of estoppel based on pure issues of fact, where "there may be good reasons to apply a different rule").

[23]      NNSA's Response fails even to address the relevant standard under which it obtained recognition from this Court under Chapter 15, focusing instead exclusively on the EC Regulation governing its administration proceedings.  Opp. at 44-45.  Even if NNSA's interpretation of that regulation is correct, its representations to this Court alone provide sufficient basis for judicial estoppel.

17

and controlled the debtor). Moreover, NNSA's argument that responsibility for strategic

oversight and control over the debtors was irrelevant to a determination of COMI is belied by

NNSA's submission of detailed evidence to this Court on England's control over the entire

EMEA region and its autonomy and independence from North America.[24]

       3.     <u>NNSA Has No Good Faith Excuse for Its Inconsistent Positions</u>

NNSA attempts to explain away the inconsistent positions it has taken with the Court by

"an inadequacy of information available to [it] at the time the EMEA Debtors entered into

administration." Opp. at 48-49.[25] Thus, NNSA now claims that only after the Joint

Administrators' appointment were the Joint Administrators "able to fully appreciate the control

exercised by NNI and NNL." <u>Id.</u> at 45. The record belies any such assertion.

The witnesses from whom the EMEA Debtors submitted statements had long-standing

personal knowledge with respect to the decision-making for the EMEA region. If, as NNSA

now suggests, the Joint Administrators' investigation revealed that certain facts in the Witness

Statements were incorrect or that the witnesses had provided false testimony, the EMEA Debtors

could not have, consistent with their obligations to this Court, continued to verify those Witness

---

[24]     In fact, NNSA previously conceded the relevance of these factual details when it sought Chapter 15 recognition, admitting that relevant factors in determining COMI included "the location of the debtor's headquarters; [and] the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company)." Memorandum of Law in Support of Verified Chapter 15 Petitions for Recognition of Foreign Proceedings and Related Relief with Respect to the EMEA Debtors, dated October 20, 2010, Peacock Decl. Ex. O at 7.

[25]     Notably, while NNSA asserts that a finding of bad faith is a prerequisite to a finding of judicial estoppel (Opp. at 48), the Supreme Court has emphasized that judicial estoppel is a flexible inquiry that can be employed by the court at its discretion. <u>See New Hampshire v. Maine</u>, 532 U.S. 742, 750 (2001) ("Because [judicial estoppel] is intended to prevent improper use of judicial machinery, judicial estoppel is an equitable doctrine invoked by a court at its discretion[.]") (internal quotation marks and citations omitted). Properly considered, bad faith is thus only an "additional consideration that may inform the [judicial estoppel] doctrine's application in specific factual contexts." <u>In re Kane</u>, 628 F.3d 631, 639 (3d Cir. 2010); <u>Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.</u>, 337 F.3d 314, 319-20 (3d Cir. 2003) (characterizing bad faith as only one of the "criteria for determining when seemingly inconsistent litigation stances justify application of the doctrine"). The argument that a bad faith finding must be made in every case would be inconsistent with the Supreme Court's instruction that judicial estoppel cannot be "[subject] to inflexible prerequisites or an exhaustive formula." <u>Maine</u>, 532 U.S. at 751.

Statements under penalty of perjury, or offer them into evidence before this Court as recently as January 2011.[26]  Yet that is precisely what the EMEA Debtors did.[27]

Nor, as NNSA suggests, can the deposition transcript of Mr. Alan Robert Bloom somehow save NNSA from a finding of bad faith, as NNSA suggests (Opp. at 50-51).  A review of the transcript bolsters, rather than defeats, a finding that the Joint Administrators intended to play "fast and loose" with the Court.  At his deposition – as a representative of the Joint Administrators and the EMEA Debtors, including NNSA, pursuant to Rule 30(b)(6) (Bloom Dep. Tr. 22:6-14) – Mr. Bloom repeatedly affirmed without qualification that the positions taken in the Rolston and Clement Witness Statements remained true and correct.[28]  Id. at 49:17-50:4, 107:7-17, 278:21-279:9.  Mr. Bloom specifically affirmed the very portions of the Witness Statements that are at odds with NNSA's new litigation posture.[29]  Given these circumstances, the record amply supports the conclusion that NNSA has played "fast and loose" with the Court, which is what is required to apply judicial estoppel.  Ryan Operations G.P. v. Santiam-Midwest

---

[26]    To the contrary, if NNSA had truly discovered facts that called into question portions of the Witness Statements, NNSA's counsel would have been under an obligation to correct the record before the Court.  See Del. Code of Prof. Conduct R. 3.3(a)(1).

[27]    See Verified Chapter 15 Petitions for Recognition of Foreign Proceedings and Related Relief with Respect to the EMEA Debtors, Peacock Decl. Ex H at 9 (sworn verification dated October 18, 2010 affirming that the Witness Statements "are true and correct to the best of my knowledge, information, and belief."); Jan. 31, 2011 Hr'g Tr. at 20:7-10) ("[A]ttached as exhibits to the Bloom declaration . . . is the witness statement of Sharon Ralston [sic] and the witness statement of Michael Clemont [sic], and we would ask to admit that entire package into evidence.").

[28]    The Court was informed that the "record developed in the course of discovery and in particular Mr. Bloom's deposition where he acknowledged the accuracy of the witness statements by Ms. Ralston [sic] and Mr. Clemont [sic] are – are more than sufficient to overcome the presumption in favor of COMI and the jurisdiction of registration and that, instead, COMI was in – is in England for these debtors."  Tr. Jan. 31, 2011 Hr'g at 23:19-25.

[29]    See, e.g., Bloom Dep. Tr. at 282:8-16 ("Here Ms. Rolston says, 'The overall global strategy for the Nortel group is set at a very high level of generality by the Board of Directors of NNL and the chief executive officer, CEO, and chief finance officer, CFO, in Canada.' Sir, is that an accurate statement. A: I believe that to be an accurate statement."); id. at 282:18-283:2 ("Ms. Rolston says, 'The EMEA senior management operates with a large degree of autonomy from Canada setting all policies, procedures, budgets, targets and operational matters for the EMEA region which are disseminated to the EMEA companies which are required to operate within those instructions.' Sir, is that an accurate statement? A: Yes."); id. at 281:9-20 ("And then Ms. Rolston says, 'The UK business then became  the largest operation in the EMEA region as well as the center of operations making the vast majority of significant decisions for the EMEA companies and performing head office functions.' Sir, do you see that statement by Ms. Rolston? A: Yes. Q: Isn't that a true statement? A: I believe that to be a true statement.").

Lumber Co., 81 F.3d 355, 361 (3d Cir. 1996); see also Anjelino v. N.Y. Times Co., 200 F.3d 73,

100 (3d Cir. 2000) (affirming finding of bad faith where appellant made tactical decision to

represent that no discovery was needed and later reversed its position, seeking document

production).

     Nor is any further factual development required to determine whether NNSA played "fast

and loose with the Court."  As NNSA concedes, its Response has provided it with an opportunity

to attempt an explanation of its contrary and inconsistent positions.  Opp. at 51.  It has failed to

provide any good faith explanation.  To the extent required, the Court can determine whether

NNSA should be estopped from its review of the undisputed procedural history.[30]  No further

evidentiary development is needed or warranted.

    4.    The Elements of Judicial Estoppel Have Been Met

     NNSA argues that judicial estoppel should not apply because the "US Debtor has

identified no harm it will suffer as a result of any purported inconsistency in the Joint

Administrators' positions."  Opp. at 51-52.  However, the application of judicial estoppel does

not turn on whether litigants have been prejudiced.  NNSA's own authorities recognize "judicial

estoppel may not be used to punish litigants for how they treat other litigants or third parties; its

only legitimate purpose is to remedy an affront to the court's integrity."  Montrose Med. Grp.

Participating Sav. Plan v. Bulger, 243 F.3d 773, 785-86 (3d Cir. 2011).  Judicial estoppel thus

focuses solely on a party's conduct vis-à-vis the Court, not vis-à-vis its adversary.  See Hansford

v. Bank of Am., No. 07-4716, 2008 U.S. Dist. LEXIS 65502, at *27 (E.D. Pa. Aug. 26, 2008)

---

[30]    Klein v. Stahl GMBH & Co., 185 F.3d 98, 111 n.13 (3d Cir. 1999) (precedent does not "require[] a district court to discern [bad faith] intent by way of an evidentiary hearing"); Ryan Operations, 81 F.3d at 364-65 (assessing appellant's bad faith by conducting a review of the procedural history, rather than vacating the district court's finding of bad faith and remanding for an evidentiary hearing); Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414 (3d Cir. 1988) (affirming dismissal of claims under Rule 12(b)(6) on judicial estoppel grounds where there was ample evidence in the record from which an inference of deliberate manipulation could be drawn).

("Any reliance or prejudice suffered by the other party as a result of the inconsistent positions is immaterial to the application of judicial estoppel.").  In any event, Movants would plainly be prejudiced if NNSA were permitted, whenever it suited them, to play fast and loose with this Court by disavowing positions and sworn statements it used to obtain earlier relief.[31]

Similarly irrelevant is the fact that NNSA is pursuing its claims for the benefit of creditors.  Unlike the private defendants in Montrose, the Movants are also fiduciaries, attempting to safeguard estate resources for distribution to creditors.  Moreover, the representations that form the basis for estoppel here were undertaken on behalf of NNSA for the benefit of its creditors.  In any event, as with all estoppel cases, Montrose was decided on its particular facts and circumstances; lest there be any doubt, courts have continued to apply estoppel to estate fiduciaries where, as here, the circumstances warrant.  See, e.g., Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions Corp.), 330 B.R. 67, 72 (Bankr. D. Del. 2005) (applying estoppel to prevent creditors' committee from pursuing breach of fiduciary duty claims to recover transfers for the benefit of creditors, where committee had previously touted benefits of underlying contracts).[32]

5.    NNSA Misstates the Test for Collateral Estoppel

NNSA also cannot avoid application of collateral estoppel to its fiduciary duty based claims.  While NNSA does not dispute that the other elements of collateral estoppel are satisfied,

---

[31]    Even if conduct of the U.S. Debtors were relevant, the record demonstrates that the U.S. Debtors relied on the Witness Statements and the affirmance by the EMEA Debtors (including NNSA) of their truth in not pursuing an objection to the EMEA Debtors' request for Chapter 15 recognition.  See Jan. 31, 2011 Hr'g Tr. at 22:16-23 ("[F]or the U.S. Debtors[,] Mr. Harron is correct that in reliance on the materials that the EMEA administrators are moving into evidence at today's hearing [which included the Witness Statements] . . . the U.S. debtors don't object to this Court's recognition of the English proceedings as foreign main proceedings . . . .").

[32]    Similarly misplaced is NNSA's suggestion that the U.S. Debtors' support of NNSA's administration proceedings somehow undermines the Movants' invocation of judicial estoppel.  See Opp. at 50.  Movants do not dispute the benefits that the entire Nortel Group obtained from the coordinated process that the administration and Chapter 15 Proceedings enabled.  The thrust of the Movants' judicial estoppel argument is in fact aimed at preserving those benefits by precluding NNSA from taking contrary positions to mount its Claim.

it argues that the doctrine is inapplicable only because the issues decided in its recognition proceedings are not "identical" to the allegations made in this Claim.  Opp. at 53-54.

NNSA's argument misstates the governing law.  Courts do not require that the issue presented in the current proceeding be "the exact issue already decided in an earlier proceeding," as NNSA contends.  See id. at 53.  Instead, collateral estoppel applies where, as here, the issue was implicitly determined by the first court, or where there is substantial overlap between the evidence advanced in the two proceedings, and a close relationship between the claims involved in the two proceedings.[33]  As set forth above, the location of those who actually managed NNSA and the situs of its head office functions were necessarily central factors in this Court's determination that NNSA's COMI was in England.  To permit NNSA to relitigate these questions based on immaterial or procedural differences between its claims and the recognition proceedings would defeat the very purpose of collateral estoppel – to "protect[] litigants" and "promot[e] judicial economy."  Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979).

6.      The French Liquidator Is Bound by Previous NNSA Statements

The French Liquidator is also bound by these inconsistent positions taken in the prior proceedings.  Without citing any authority, NNSA contends that because "the doctrines of judicial estoppel and collateral estoppel only apply to a party who has taken a position or otherwise participated in previous judicial proceedings," and because the French Liquidator was not a party to either the administration proceedings in England or the Chapter 15 proceedings here, the French Liquidator is not estopped by anything the Joint Administrators did in those proceedings.  See Opp. at 41-42.  This argument fails.

---

[33]      Raytech Corp. v. White, 54 F.3d 187, 193 (3d Cir. 1995) (finding identity of issues for collateral estoppel where issues between two cases were "in substance the same"); Honeywell Int'l Inc. v. Universal Avionics Sys. Corp., 585 F.Supp.2d 623, 630 (D. Del. 2008) (applying collateral estoppel to claims under two different patents where party relied on the same facts and same analysis).

NNSA does not dispute that it is bound by the statements and actions of the Joint

Administrators.  See id. at 42-54.  Because the French Liquidator brings these claims as NNSA's

representative, it is also bound by previous statements made by the Joint Administrators on

NNSA's behalf.[34]  "[A] party bound by a [prior] judgment may not avoid its preclusive force by

relitigating through a proxy."  Taylor v. Sturgell, 553 U.S. 880, 895 (2008); see also id.

("Preclusion is . . . .in order when a person who did not participate in a litigation later brings suit

as the designated representative of a person who was a party to the prior.").

Moreover, where privity exists – as it does between a party and its representative, see

EEOC v. U.S. Steel Corp., 921 F.2d 489, 493 (3d Cir. 1990) – the doctrines of judicial and

collateral estoppel apply as if the parties were the same.[35]  See, e.g., Chi., Rock Island & Pac.

Ry. Co. v. Schendel, 270 U.S. 611, 622 (1926) (holding that prior judgment against beneficiary

of the estate was binding against administrator of the estate); see also Jean Alexander Cosmetics,

Inc. v. L'Oreal USA, Inc., 458 F.3d 244, 253 (3d Cir. 2006) (explaining collateral estoppel "has

the dual purpose of protecting litigants from the burden of relitigating an identical issue with the

same party or his privy and of promoting judicial economy by preventing needless litigation."

(emphasis added) (internal quotation marks and citation omitted)); Liebersohn v. Ali (In re

Fineberg), 202 B.R. 206, 227-28 (Bankr. E.D. Pa. 1996) (noting that "doctrine of judicial

estoppel" may apply against trustee of debtor where debtor was party to prior action because

---

[34]    As noted above, the Joint Administrators sought and obtained Chapter 15 recognition on behalf of the EMEA Debtors, including NNSA. Verified Chapter 15 Petitions for Recognition of Foreign Proceedings and Related Relief with Respect to the EMEA Debtors, Peacock Decl. Ex. H at 1.

[35]    Even if more were needed – and it is not – the Joint Administrators and the French Liquidator are represented by the same law firms in these proceedings.  Compare Claim ¶ 203 (providing that notices concerning the Claim should be sent to addresses of four law firms) with Claim of the French Liquidator of Nortel Networks S.A. ¶ 203 (same).

relationship of privity requires "that the [t]rustee is thus bound by the [d]ebtor's actions").[36]

NNSA is therefore wrong that the French Liquidator can escape estoppel resulting from NNSA's

prior inconsistent positions.

**B.      NNSA's Allegations of *De Facto* Director Status Fall Short**

Even if NNSA was not estopped from alleging that it was controlled by NNI, NNSA has

not pled facts to support a plausible inference that NNI dominated NNSA such that NNI became

its *de facto* director.  This is fatal to NNSA's mismanagement claims.

Notably, NNSA fails to cite a single French case that has ever found a company to be a

*de facto* director of its sister company.  See Menjucq Decl. ¶ 39, 42; Bremond Reply Decl. ¶ 7.

This Court should apply French law as it currently stands – and, as French law stands today,

Movants are not aware of (and NNSA has not cited) any French case that has ever upheld a *de

facto* directorship on facts analogous to those alleged here.  See, e.g., Bremond Reply Decl. ¶¶ 7,

11, 25, 32; see also Gilstrap v. Radianz Ltd., 443 F. Supp. 2d 474, 491 (S.D.N.Y. 2006), aff'd,

233 F. App'x 83 (2d Cir. 2007) ("Though the federal courts are called upon not infrequently to

apply the laws of other nations, they should be more hesitant to engage in such a task when

doing so would necessarily involve expanding, extending, or departing from well-settled and

long established principles of foreign law.").

NNSA agrees that to succeed on a mismanagement claim under French law a claimant

must prove that the person sued is a *de jure* or *de facto* director, the latter of which is shown by

the performance of positive acts of management independently and continuously.  Menjucq Decl.

¶ 24, 30; Bremond Reply Decl. ¶¶ 5-6.  NNSA asserts that the "most important criterion" in the

*de facto* director inquiry is "the performance of *predominant influence* through the performance

---

[36]      See also Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc., 568 F. Supp. 2d 1152, 1168-69 (C.D.
Cal. 2008) (noting plaintiff in current proceeding will be deemed "same party" as another party involved in prior
proceeding for judicial estoppel purposes where the two parties are in "privity").

of acts of management as would a *de jure* director." Menjucq Decl. ¶ 32 (emphasis added); <u>see</u> <u>also</u> <u>id.</u> ¶¶ 35, 46. NNSA then points to its wholly conclusory allegations of the involvement of individuals in global positions who also held a role with NNI in tax, transfer pricing, and treasury functions, and to NNI's alleged role in the February 2008 repayment and the Pre-Petition Business Sales, as purportedly sufficient to establish NNI's "predominant influence" over NNSA – and, thus, *de facto* directorship of NNSA. Opp. at 35-40. This argument fails for several reasons.

As explained in the Motion, in order for a French court to find that a party engaged in positive acts of management such that he became a *de facto* director, his acts must have reduced the decision-making independence of the debtor company's *de jure* directors such that the alleged *de facto* director *dominated* the debtor company. Bremond Decl. ¶ 32; Bremond Reply Decl. ¶ 8.[37] Although French courts use a variety of terms to describe the management acts that ultimately rise to the level of *de facto* directorship – for example, "total subordination," "strict control," and "dependence and submission" – each requires that the *de facto* director *dominate* the debtor. Bremond Reply Decl. ¶ 8 (citing French cases); <u>see also</u> <u>id.</u> ¶¶ 10, 32. Indeed, the *doctrine* and cases cited by NNSA's own French-law expert wholly support this standard. <u>See</u> Bremond Reply Decl. ¶¶ 11-12 (examining cases and *doctrine* cited by Professor Menjucq); <u>see,</u> <u>e.g.</u>, <u>id.</u> ¶ 11(f) (French court qualified as *de facto* director a shareholder who had "strict control"

---

[37]        Recognizing that French law does not support its claims, NNSA tries to run from established law. Namely, NNSA attempts to undermine Movants' reliance on decisions of the French courts of appeal and, to some extent, the whole of French authority on the grounds that former decisions have "limited influence" and, more generally, "the existence of a previous decision on a particular point of law will not require other courts to rule on the same legal issue to deliver the same decision." <u>See</u> Opp. at 33 n.44. While it is true that the French legal system is not a system of precedent, prior cases – including courts of appeal decisions – are persuasive authority that parties and authors of *doctrine* look to in predicting outcomes under French law. Bremond Reply Decl. ¶ 4. Indeed, NNSA and their expert concede the persuasive value of French case law by relying upon cases (including courts of appeal decisions) throughout their papers. <u>See, e.g.</u>, Menjucq Decl. ¶¶ 35, 38-42 (citing cases to explain *de facto* director standard); <u>id.</u> ¶¶ 29, 38, 69, 70, 84 (citing courts of appeal cases); <u>see also</u> <u>id.</u> ¶ 27 ("considering the case law of the *Cour de cassation* is relevant").

over its subsidiary, managed its bank account, inventory, gave instructions on accounting, and had direct authority over its sales manager such that the subsidiary lost any independence rose to *de facto* director);[38] Bremond Decl. ¶ 34 (French court did not find parent to be *de facto* director even where parent maintained subsidiary's legal department, directly compensated its CEO, and managed its financing relationship with third-party, noting acts did not render parent "the sole master" of its subsidiary).  Thus, to the extent NNSA suggests that "predominant influence" requires something less than domination, NNSA is mistaken.  See Bremond Reply Decl. ¶ 9.

Applying the correct French law *de facto* directorship standard to the Claim – in a manner consistent with the legal authority cited by *both* Movants' and NNSA's experts – it is clear that NNSA has failed to allege a claim that NNI was a *de facto* director of NNSA.  NNSA simply does not (and cannot) point to any non-conclusory allegations in its Claim that could plausibly give rise to a claim that NNI dominated the *de jure* directors of NNSA, its sister corporation, in a manner that could lead to the imposition of *de facto* director liability on NNI.  Mot. at 32-39; Bremond Decl. ¶¶ 46, 54, 57, 62; Bremond Reply Decl. ¶ 32.[39]  In fact, by comparison, the cases relied upon by NNSA only serve to further illustrate the deficiency of NNSA's allegations.  See, e.g., Bremond Reply Decl. ¶ 11(a) (*Cour de Cassation* case, cited by

---

[38]     See also, e.g., Bremond Reply Decl. ¶ 11(b) (*Cour de Cassation* deemed shareholder *de facto* director of subsidiary where shareholder had a "close involvement" in the management of the company, in particular by hiring employees, making accounting and banking decisions, having power of attorney over company's bank account and maintaining close relationships with company's customers and suppliers); id. ¶ 11(d) (French court found two shareholders, who were also employees, to be *de facto* directors due to the shareholders' strong involvement in the company's management, higher salaries than *de jure* directors, power of attorney, status as the main interlocutor of clients, and power to sign various contracts and commercial paper on company's behalf); id. ¶ 11(e) (French court found shareholder became *de facto* director of subsidiary where shareholder imposed prices on subsidiary, subsidiary favored shareholder in commercial relationships, and shareholder had authority over subsidiary's managers).

[39]     Despite NNSA's complaint (Opp. at 33-34), Maître Bremond's analysis of the Claim – specifically his refusal to analyze NNSA's conclusory allegations – is wholly proper.  Maître Bremond disregarded such conclusory allegations because a French court would not apply a *de facto* director qualification absent facts illustrating positive acts of domination.  See Bremond Decl. ¶ 6.  In any event, U.S. procedural law requires that conclusory allegations be given no weight at the motion to dismiss stage.  See Santiago v. Warminster Twp., 629 F.3d 121, 131 (3d Cir. 2010); see also Mot. at 19; Opp. at 25-26.

Professor Menjucq at ¶ 35, found majority shareholder and lawyer who "set the purchase price of the business and of the inventory as well as the payment methods, . . . established the head office of the company at his domicile, . . . defined the economic and financial operations of the company as well as its future prospects and . . . was regularly consulted by the *de jure* director who was in a relationship of dependence and submission to his opinions" to be *de facto* director).[40]

**February 2008 Repayment.**  The crux of NNSA's domination argument with respect to the February 2008 repayment remains that Ryan Smith, "the orchestrator of the Project Swift transaction, pressured NNSA to repay the entire" remaining balance of the subordinated loan. NNSA, however, admits it successfully resisted this "pressure" because it ultimately only paid half of its obligation.  See Opp. at 39 (citing Claim ¶ 75).  As stated in the Motion, these allegations show that NNSA could and did "just say no" – revealing a *lack* of domination.  Mot. at 39; Bremond Reply Decl. ¶ 22 ("NNSA alleges that a controller of NNSA expressed reluctance to repay the entire amount outstanding and that NNSA eventually repaid only half of the outstanding amount.  This demonstrates clearly that NNI did not decide this full repayment or dominate NNSA.").  NNSA's assertion that it is of no consequence that NNSA was ultimately not required to pay half of its obligation because it was faced with a "Hobson's choice" (Opp. at 39) is not pled in its Claim and wholly ignores that NNSA did successfully resist the "pressure" to repay what was asked.  Moreover, NNSA provides no explanation of how, Ryan Smith, whom it also alleges was seconded to NNUK, can plausibly be inferred to have acted on behalf of NNI. Compare Claim ¶ 22 with Opp. at 39, 61.

---

[40]    See also Bremond Reply Decl. ¶ 11(c) (*Cour de Cassation*, cited by Professor Menjucq at ¶¶ 41-42, found company that was responsible for hiring and firing of employees, set up the administrative and financial organization, set pricing and commercial policy, and which negotiated contracts, to be *de facto* director).

The sum total of NNSA's remaining argument regarding the February 2008 repayment is that the Claim "identifies specific NNI personnel who were actively involved in devising and implementing" the February 2008 repayment and related transactions.  Opp. at 39 (citing Claim ¶ 26).[41]  This completely misses the point.  Even if these allegations were not conclusory (and they are), NNSA fails to explain how NNI dominated or controlled NNSA's *de jure* directors with respect to any aspect of the February 2008 repayment.  See Opp. at 39-40; Bremond Reply Decl. ¶¶ 21-23.

**Transfer Pricing.**  Unlike the allegations of fact as to the February 2008 repayment (although directly contradictory to its claim), NNSA does not point to one well-pled allegation of fact in the Claim showing how NNI's general "involvement" in or "implementation" or "operation" of transfer pricing reduced the decision-making independence of its directors in any way (Opp. at 36-37), much less provide allegations sufficient to show that NNI plausibly dominated NNSA and its *de jure* directors.

In its Response, NNSA attempts to correct this glaring pleading deficiency by asserting that its passive voice allegation that "NNSA was instructed to sign the MRDA" actually referred to an instruction by "NNI and NNL."  See Opp. at 36 n.51 (citing Claim ¶ 18(d); Menjucq Decl. ¶ 58 n.29 ("I understand the Proof of Claim, at paragraph 18(d), as meaning that NNSA received from NNI and NNL the instruction to sign the MRDA.").  This new allegation cannot save NNSA's claim.  First, NNSA cannot amend its Claim through its brief.[42]  Second, this new allegation is wholly conclusory – it does not identify who from NNI issued the alleged

---

[41]    Three of these "specific NNI personnel" referenced in Claim ¶ 26 are also alleged to have held global positions.  Claim ¶ 26 (referring to "Mark Weisz of NNI ('Director of International Tax')" and "Ryan Smith of NNI ('Leader of Global Tax Planning')"); ¶ 27 ("Paul Karr was Controller of the Nortel Group").

[42]    See Commw. of Pa. ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir. 1988); Knight v. Carmike Cinemas, Civil Action No. 11-280, 2011 WL 3665379, at *2 n.3 (D. Del. Aug. 22, 2011).

"instruction" or to whom at NNSA it was given – and therefore must be disregarded.  See

Santiago v. Warminster Twp., 629 F.3d 121, 131-32 (3d Cir. 2010) (allegations "that

'[defendants] told [their subordinates] to do what they did' and is thus a 'formulaic recitation of

the elements of a [supervisory liability] claim.'" (citation omitted)).

Third, even if this new allegation were credited, NNSA still would not have sufficiently

pled that NNI was a *de facto* director of NNSA.  A mere instruction by NNI and NNL does not

become a management act without a further allegation that NNSA actually obeyed NNI's

instruction such that *NNI* reduced the board's decision-making independence.  See Bremond

Reply Decl. ¶ 19.  The Claim lacks any factual allegations that could plausibly show that

NNSA's *de jure* directors were so dominated by NNI – NNSA's sister corporation – such that

they followed NNI's alleged instruction, as opposed to, for example, following an instruction

from NNL.  Stated differently, attributing the alleged "instruction" to both "NNI and NNL" is

invalid under French law because the Claim does not allege that *NNI* reduced the decision-

making independence of NNSA's *de jure* directors.  See id. ¶ 19 ("[M]erely alleging that both

NNI and NNL gave an instruction would not suffice under French law to show dominance on the

part of NNI."); Bremond Decl. ¶ 54.[43]

NNSA's argument that NNI "*dominated* the implementation and operation of the transfer

pricing arrangements" and "*controlled* the operation of the RPSM" (Opp. 36-37) similarly fail.

Language of neither "domination" nor "control" resides in the Claim paragraphs that state these

---

[43]       Additionally, all of the allegations in the Claim of acts taken by "NNI and NNL" (with the possible, though
irrelevant, exception of their alleged discussions with the U.S., Canadian, and English tax authorities) are wholly
conclusory and are not entitled to an assumption of truth.  See Claim ¶¶ 18(a), 18(b), 18(c), 18(d), 28, 39, 47, 61, 79,
82, 84, 125, 147, 172.  Cf. Claim ¶ 18(e) (providing spare details as to which NNI employees – who also are alleged
to have had global positions – and Nortel Group employees were allegedly involved, and how they were allegedly
involved, in the APA process).

allegations.  See Claim ¶¶ 16, 19(b).[44]  Moreover, these allegations are wholly conclusory

additions of domination meant to restate the necessary element of *de facto* directorship and thus

are not entitled to deference under Rule 8.  Santiago, 629 F.3d at 131-32.

**Contingent Tax Claims.**  Despite its bald assertion that the "Claim contains a detailed

account of NNI's pattern of controlling NNSA's tax functions," NNSA also does not direct the

Court to any non-conclusory allegation that NNI, its sister, actually dominated NNSA's *de jure*

directors with respect to its tax matters.  See Opp. at 38 (citing Claim ¶ 18(e), for the conclusory

allegation that "NNI and NNL controlled the all-important advanced pricing arrangement" and

the irrelevant allegation that certain NNI employees with global positions negotiated with

revenue authorities; citing Claim ¶ 18(f) and ¶ 20, which do not mention NNI at all).  The

remainder of NNSA's citations is to mere allegations that NNI was "involved" in NNSA's tax

matters.  Opp. at 38 (citing Claim ¶ 21).  As stated in the Motion, these allegations do not justify

a finding of domination sufficient to render NNI a *de facto* director of NNSA.  Bremond Reply

Decl. ¶ 24.[45]

Moreover, while NNSA invokes its right under the Bankruptcy Code to assert contingent

claims (Opp. at 37 n.53), its claims fail not because the amount of its tax liabilities are

---

[44]    Compare Opp. at 36 ("*NNI personnel dominated the implementation and operation* of the transfer pricing arrangements" without a Claim citation (emphasis added)) with Claim ¶ 16 ("*NNI was heavily involved in the implementation and operation* of the transfer pricing arrangements" (emphasis added)); Opp. at 37 ("[NNI] also *controlled the operation of the RPSM*," citing ¶ 19(b) (emphasis added)) with Claim ¶ 19(b) ("Calculations of the transfer pricing payments due from NNSA were made by that team [of NNI personnel]").

[45]    NNSA attempts to remedy their obvious pleading deficiency in this regard by asserting that "[t]he taking over of a company's tax management has been mentioned several times in French case law as sufficient to impose *de facto* directorship status."  See Opp. at 38 n.56 (citing Menjucq Decl. ¶ 71).  This is wholly unavailing – none of the cases cited by NNSA's French-law expert relied *solely* on allegations of control over tax management to establish the *de facto* directorship, but instead found a series of elements of domination and control beyond, although in some cases including, taxation matters.  Bremond Reply Decl. ¶¶ 25-26 (explaining cases cited by Professor Menjucq found a bundle of converging elements establishing requisite level of a degree of domination and control); see also id. ¶ 25 (noting one French Court of Appeal case cited by Professor Menjucq did not even mention taxation matters, but instead relied on "strict control" evidenced by direct management of the subsidiary's bank account and inventory, and the giving of instructions to employees of the subsidiary).  Allegations of domination and control are notably absent from the Claim.

unliquidated, but because NNSA has not alleged that any penalty or fine has contributed to an excess of NNSA's liabilities over assets. Mot. at 35. This is an independent basis to dismiss claim 16. See Bremond Reply Decl. ¶ 29; Bremond Decl. ¶¶ 61-62.

**Pre-Petition Business Sales.** Rather than direct the Court to any affirmative act of management by NNI that reduced NNSA's decision-making independence (or even to any specific Pre-Petition Business Sale other than Alcatel (see Opp. at 40)), NNSA refers to Claim paragraphs 80 to 83 which, as Movants noted in the Motion, "fail[] to include any non-conclusory allegations whatsoever[.]" Mot. at 34-35; Bremond Reply Decl. ¶ 30. To illustrate, Claim paragraph 82, which is the only cited paragraph where NNI's alleged "control" over NNSA is even mentioned, states as follows:

> The allocation that was applied to the proceeds of each of these business sales was decided on almost entirely by NNI and NNL. NNSA had no involvement . . . . Accordingly, the allocation methodology applied and the proportion of proceeds that NNSA received was decided on its behalf by NNI and NNL.

Claim ¶ 82. This is exactly the sort of bare, conclusory recital in a pleading that is not entitled to an assumption of the truth. See Santiago, 629 F.3d at 131-32. Further, for the reasons stated above, NNSA's reliance on actions taken by "NNI and NNL" together without differentiating between the two is insufficient under French law. See Bremond Reply Decl. ¶ 30; Bremond Decl. ¶ 54.

In sum, despite NNSA's attempt to lower the *de facto* director standard (and to re-write their Claim to meet that standard), it remains the case that, taken as a whole, nothing in the Claim nudges NNSA's allegations that NNI dominated NNSA "across the line from conceivable to plausible." Bell Atlantic Corp v. Twombly, 550 U.S. 544, 570 (2007).[46]

---

[46] NNSA is incorrect that Movants did not examine all of NNSA's allegations in the aggregate. Bremond Reply Decl. ¶¶ 14-16.

**III.**

**NNSA'S ATTEMPTS TO IMPOSE SECONDARY LIABILITY ON NNI FAIL**

**A.    NNSA's Claims for Aiding and Abetting Cannot Withstand Scrutiny**

1.    NNSA's Attempt to Loosen the Requirements for the "Knowing Assistance" Element of an Aiding and Abetting Claim Does Not Save Its Claim

As an initial matter, as set forth below, much of NNSA's state law aiding and abetting claims are time-barred, including the entirety of claim number 4, which is predicated on its transfer pricing allegations.  Dismissal of those claims alone would substantially winnow NNSA's Claim, further undermining NNSA's suggestion that critical scrutiny of its Claim prior to discovery would serve no purpose.

As part and parcel of its efforts to lower the bar to salvage its secondary liability claims, NNSA claims that "the US Debtor misstates the [required] mental state," arguing that actual knowledge of the primary breach is not required with respect to its state law aiding and abetting claims.  Opp. at 55-57.  It is NNSA that is mistaken.  One of the cases NNSA itself cites explicitly "stress[es] that the requirement is *actual* knowledge (which, again, may be proven by circumstantial evidence), and therefore evidence establishing negligence, i.e., that a bank 'should have known,' will not suffice."  Aetna Cas. and Sur. Co. v. Leahey Const. Co., 219 F.3d 519, 536 (6th Cir. 2000) (emphasis in original).  NNSA further challenges "[t]he U.S. Debtor's reliance on Capitaliza-T for its interpretation of 'actual knowledge'" and tries to limit Capitaliza-T to its facts.  Opp. at 56-57.  NNSA, however, ignores Capitaliza-T's express holding that "the *universal rule* requires actual knowledge" to sustain an aiding and abetting claim.[47]  NNSA tries

---

[47]    Capitaliza-T Sociedad de Responsibilidad Limitada de Capital Variable v. Wachovia Bank of Del. Nat'l Ass'n, Civil No. 10-520, 2011 WL 864421, at *4 (D. Del. Mar. 9, 2011) (emphasis added).  Nor can NNSA effectively suggest that actual knowledge was required in Capitaliza-T because the defendant was a "passive aider and abetter."  Opp. at 56.  This flies in the face of the basic test for aiding and abetting, which requires the defendant to have "substantially *participated* in or provided substantial *assistance* for the wrongful act."  Capitaliza-T, 2011 WL 864421, at *4 (emphasis added).  NNSA's attempt to distinguish Malpiede v. Townson, 780 A.2d 1075 (Del.

32

to subvert the actual knowledge requirement by manufacturing a non-existent dispute over *how* one proves knowledge, not whether such knowledge is required in the first place.  See Opp. at 55-56.  NNI does not dispute NNSA's assertion that "[p]roof of a defendant's knowledge or intent will often be inferential."  Id. at 56 n.82 (citing Aetna, 219 F.3d at 535).[48]  However, that such knowledge can be inferred does not excuse NNSA from pleading facts that plausibly give rise to an inference of knowledge.  Nor does NNSA dispute that, in addition to knowledge, its aiding and abetting claims require that it plead actions amounting to substantial participation or substantial assistance in the primary wrongdoer's breach.  Brug v. Enstar Grp., Inc., 755 F. Supp. 1247, 1256 (D. Del. 1991).

      2.      NNSA Fails to Adequately Allege Assistance Given by NNI or Knowledge of Any Underlying Breach of Fiduciary Duty

As discussed above, because NNSA's allegations are based on fraud, they should be tested under Rule 9(b).  But, even under the Rule 8(a) standard, NNSA fails to plead allegations sufficient to show NNI knowingly assisted any breach of fiduciary duty.   Specifically, for each of the four sets of transactions in the Claim, NNSA failed to show, through well-pled allegations, what NNI did to assist NNSA's directors, or what facts permit an inference that NNI knew those directors were in breach of their fiduciary duties.

---

2001) is equally unavailing.  See Opp. at 57.  The legal standard for aiding and abetting tort liability does not vary depending upon the parties involved in the lawsuit.

[48]      The remaining cases cited by NNSA are simply fact specific applications of the knowledge requirement that offer no guidance here.  See Opp. at 55-56.  In particular, while NNSA cites authorities inferring knowledge from "atypical transactions that lack business justification" (Opp. at 56), NNSA itself recognizes that the challenged transactions are both necessary and common in multinational business enterprises.  See, e.g., Claim ¶ 36 ("Transfer pricing arrangements are implemented in order to . . . enable an allocation of profit in each of the countries where group companies do business"); see also Blackwell v. Wells Fargo (In re I.G. Servs., Ltd.), No. 04-5041-C, 2004 WL 5866105, *1 (Bankr. W.D. Tex. Dec. 22, 2004) (referencing the law in passing in determining whether an expert's testimony was admissible); Duke Energy Int'l L.L.C. v. Napoli, 748 F. Supp. 2d 656, 663 (S.D. Tex. 2010) (inferring actual knowledge from specific pleaded facts); Morgan v. Cash, Civ. A. No. 5053-VCS, 2010 WL 2803746, at *6 (Del. Ch. July 16, 2010) (finding Zirn v. VLI Corp., Civil Action No. 9488, 1989 WL 79963 (Del. Ch. July 17, 1989) inapplicable in the absence of factual allegations "suggesting how and why the acquiror actually used its knowledge of the target board's conflicts to collude with the target board").

**Pre-Petition Business Sales.**  NNSA fails to cite any well-pled facts addressing NNI's alleged assistance or participation in NNSA's approval of the Pre-Petition Business Sales.  Most importantly, with the exception of a single "example," NNSA does not even identify the transactions on which it bases claim 15.

Instead, NNSA summarily argues that "[t]hrough its role in the allocation of the Pre-Petition Sale Proceeds, NNI not only engaged in acts of mismanagement; it aided and abetting NNL and the directors of NNSA in their wrongful conduct as well."  Opp. at 58-59.  NNSA cites a single paragraph of the Claim in support of that argument (Claim ¶ 82).  Notably, the only allegations against either NNI or NNL in paragraph 82 are that "[t]he allocation that was applied to the proceeds of each of these business sales was decided on almost entirely by NNI and NNL . . . Accordingly, the allocation methodology applied and the proportion of proceeds that NNSA received was decided on its behalf by NNI and NNL." Claim ¶ 82.[49]  The Claim reveals no facts to show that the allocation of the business sales was "decided on almost entirely by NNI and NNL" or how NNI assisted any of NNSA's directors in breaching their duties.  NNSA remains unable to point to any allegations identifying any NNI involvement in "deciding" the allocation of the Pre-Petition Business Sales, any of the individuals involved, or even the process by which the allocation of Pre-Petition Business Sales was approved.  See id. ¶¶ 80-83.

The absence of such facts is fatal to the required element of assistance.  Just as the Third Circuit requires more for a supervisory liability claim related to excessive force than merely "describing the force used and appending the phrase 'and the chief told them to do it,'" aiding

---

[49]       Moreover, these allegations underscore that NNSA's secondary liability claims are merely a conclusory repackaging of their primary liability claims and accordingly must fail.  See Santiago, 629 F.3d 121 (rejecting an attempt to repackage primary liability claims of excessive force against police officers as secondary liability claims against their supervisors where the allegations regarding the supervisors' liability were merely conclusory assertions they told the officers to do what they did).

and abetting liability requires more than a bare allegation of NNI's "deciding" the allocation in conjunction with NNL.  See Santiago, 629 F.3d at 133.

**February 2008 Repayment and Transfer Pricing.**  NNSA cannot escape the absence of any allegations in its Claim regarding what actions any individuals undertook on behalf of NNI to advocate or substantially assist in the alleged breaches of fiduciary duties by NNSA's directors (whether *de jure* or *de facto*) with respect to the February 2008 repayment or transfer pricing.

NNSA does not even seriously contest that it has failed to adequately plead the requisite participation or mental state with respect to the February 2008 repayment – a transaction to which NNI was not even a party.  NNSA fails to respond to the Motion's detailed demonstration that there are no non-conclusory allegations sufficient to infer NNI knew this transaction was a breach of the NNSA's directors' fiduciary duties, much less to sufficiently identify what NNI actually did to participate or assist in that breach.  See Mot. at 45-48.[50]  Such allegations fail to satisfy Rule 8(a), much less Rule 9(b).

NNSA's allegations with regard to transfer pricing are equally unavailing.  NNSA's references to specific NNI individuals' participation in global tax and treasury functions are simply insufficient to raise an inference that NNI knew the transfer pricing system was a breach of the NNSA directors' duties.  As the Motion demonstrates, although the Claim alleges that "[t]he key individuals involved included, in particular, John Doolittle of both NNI and the Canadian Entities and Mark Weisz, Mike Orlando, Laurie Krebs and John Payne of NNI, as well

---

[50]    While NNSA continues to point to allegations concerning Ryan Smith's alleged role in "pushing" for repayment, as the Motion demonstrated, Mr. Smith was seconded to NNUK.  See Claim ¶ 22.  NNSA has not explicitly alleged that Mr. Smith was acting solely as an NNI employee despite this secondment to NNUK, though even if they had, such an inference would be implausible and should be rejected.  See Santiago, 629 F.3d at 133 (rejecting as implausible an inference that excessive force was planned, in light of an obvious alternative explanation).

as representatives from the Canadian Entities," and that a number of those individuals were "at various times" NNI employees "within the Tax Department," the Claim never mentions any actions undertaken by each of these individuals with respect to transfer pricing or the February 2008 repayment except alleging generally that "all strategic decisions" and transfer pricing calculations were taken by this team.   See Mot. at 46 (quoting Claim ¶¶ 17, 22); see also Claim ¶ 74 (alleging that many of the same individuals were "involved in the decision to repay the 2002 Subordinated Loan").   Such allegations do not show any knowing assistance as to the claimed breach – NNSA's entry into the MRDA or the decision to make the February 2008 repayment.

Moreover, NNSA again attempts to argue allegations that it has not pled.  For example, nowhere does the Claim allege that "specific NNI officials . . . were involved in the advance pricing arrangements with the Revenue Authorities entered into *on behalf of NNSA and the EMEA Companies.*"  Opp. at 60 (emphasis added).  Rather, the Claim alleges only that there was an "advanced pricing arrangement/agreement ('APA') application process" and that certain individuals (not all of which are alleged to be NNI employees) "took the lead in the negotiations" with the non-French Revenue Authorities (Claim ¶ 18(e)), and that "personnel from the Nortel Group, including NNI personnel, were involved in formulating NNSA's strategy . . . and in explaining the justification for the RPSM to the French Tax Authorities."  Id. ¶ 21.  These allegations simply do not state that specific NNI officials took actions *on behalf* of NNSA.  In any event, NNSA's allegations of any breach arise out of NNSA's entry into the transfer pricing system, and not whether that system was blessed by any particular revenue authority.[51]

---

[51]      NNSA also focuses on NNI's "involve[ment]" in group tax and treasury functions.  See, e.g., Claim ¶¶ 15-16, 21, 23, 74, 104, 122, 144, 174, 176.  But as NNSA concedes, transfer pricing is a normal function of an international business (Claim ¶ 36), such that "involvement" cannot give rise to an inference of NNI's knowledge of any underlying breach.

**Contingent Tax Claims.**  Though claim 18 attempts to impose liability on NNI for "any form of penalty in relation to its tax affairs" (Claim ¶ 173), the only allegations NNSA points to in support of NNI's purported knowing assistance are the same (time-barred) allegations that underlie its transfer pricing claims.  Opp. at 59.  NNSA otherwise resorts to its conclusory allegations that NNI had "control over matters related to taxation," and that "key individuals at NNI controlled negotiations with the relevant Revenue Authorities."  Id. (citing Claim ¶¶ 15, 18(e)).  But the Claim it is notably silent on what actions (e.g., any participation or assistance) each of those employees undertook.  See Mot. at 45-46.  The Claim thus fails to identify what the underlying breach of fiduciary duty was, much less what alleged assistance NNI provided to NNSA.  These threadbare allegations similarly foreclose any inference that NNI had knowledge of any breach.[52]

**B.      NNSA Fails to Show Any Well-Pled Allegations to Support Its Conspiracy Claims**

NNSA's superficial attempts to justify its state law conspiracy claims (claims 5 and 9) fail.  Even when tested under Rule 8(a), NNSA's claims fall far short of the required factual allegations.[53]  NNSA asks this Court to ignore the Supreme Court's recent guidance on how

---

[52]      In arguing that Movants had constructive knowledge, NNSA also generally contends – without citing its Claim – that the "Claim clearly alleges that NNI participated in the decisions of (and even supplanted) the board of NNSA with respect to the various initiatives to divert funds to Canada."  Opp. at 57.  Reviewing the Claim in its entirety, the only allegation with respect to NNI's relationship with NNSA's board is the wholly conclusory – and contradictory – allegation, not that NNI participated in or supplanted NNSA's board decisions, but that "the reason why the NNSA Board did not meet is because the decision-making function . . . had been usurped by NNI and the Canadian Entities[.]"  Claim ¶ 30.  Neither of these assertions are supported by any well-pled facts in the Claim: the Claim contains no allegation that NNI attended any of NNSA's board meetings, no allegation that NNI had any contact with NNSA's de jure directors, no allegation that NNI instructed NNSA's board members on any of its board decisions, no allegations that NNI instructed NNSA's board members not to meet, and no allegations that NNSA's de jure director did (or would) follow either set of instructions.  In any event, the proper standard – which NNSA fails to meet – is actual knowledge.

[53]      Although NNSA attempts distinguish the cases cited in the Motion concerning application of Rule 9(b) (see Opp. at 63), NNSA cannot avoid the fact that "[t]he Third Circuit has long required that claims of conspiracy be supported by allegations of specific facts" and that "[o]nly allegations of conspiracy which are particularized, such as those addressing the period of the conspiracy, the object of the conspiracy, and certain actions of the alleged conspirators taken to achieve that purpose, will be deemed sufficient."  See Mot. at 49-50 (collecting authorities).  In

properly to plead a conspiracy.  See Mot. at 50 (citing Twombly, 550 U.S. at 565 n.10).  In Twombly, because the alleged violations occurred over a seven-year span and the complaint "mentioned no specific time, place, or person involved in the alleged conspiracies" the Supreme Court "doubt[ed] that the complaint's reference to an agreement among the defendants would have given the notice required by Rule 8."  Twombly, 550 U.S. at 565 n.10; Mot. at 50.  The Supreme Court further noted that the complaint there "furnishe[d] no clue as to which of the [defendant companies] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place."  Id.  NNSA's conspiracy claims lack precisely these required facts.

Instead of addressing these omissions, NNSA asserts, without citation, that Twombly is "inapposite to the circumstances alleged here, where the conspiracy was formed among parties and persons who were members of a corporate family and were necessarily in constant communication with respect to the precise transactions that are alleged to have been the object of the conspiracy."  See Opp. at 65.  NNSA has it backwards.  Twombly is particularly apposite precisely because NNI, NNL and NNSA are members of a corporate family such that an illegal agreement cannot plausibly be inferred from the fact that the parties were in contact about everyday business activities like global tax and treasury functions.

NNI does not contend that the Court may not infer an agreement from pleaded facts.  But, as Twombly makes clear, NNSA must still plead sufficient facts so that the inference of an agreement to commit an unlawful act or a lawful act by unlawful means is plausible.  NNSA asserts three potential alternative sets of conspirators, without specifying who was involved, when they agreed, or with whom they agreed.  See Opp. at 64.  NNSA tries to gloss over these

---

any event, for the reasons set forth above, NNSA's underlying breach of fiduciary duty allegations sound in fraud, such that even under its cabined view of the law, its conspiracy claims invoke Rule 9(b).

failures by citing to its Claim as "describing roles of named agents of NNI who participated in specific transactions designed to divert assets from NNSA to NNI and NNL."  Opp. at 64 (citing Claim ¶¶ 16-27).  This misstates the content of those allegations.  NNSA simply alleges that certain employees "took the lead in negotiations with the IRS, the CRA and HMRC" (Claim ¶ 18(e)), that many of the "key individuals" in the "Group Tax Department" were NNI personnel (Claim ¶ 22), or that "[d]irectors and officers of NNI (including Mr. Paul Karr and Mr. William LaSalle) were fully aware of Project Swift" (Claim ¶ 26).  Such allegations simply do not put NNI on notice of which NNI employees conspired with, whom, or when.

Just as there was "no reason to infer that the companies had agreed among themselves to do what was only natural anyway" in Twombly, there is no reason to infer any agreement by NNI and its affiliates to do an illegal act when all that is alleged is NNI's awareness of transactions between other members of the corporate group or involvement in the global tax and treasury functions of a global corporation.  See Twombly, 550 U.S. at 566; see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009) (explaining that under Twombly, while "parallel conduct was consistent with an unlawful agreement, the Court nevertheless concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior").

## C.    NNSA's Claims for Aiding and Abetting and Conspiracy Are Barred by the *In Pari Delicto* Doctrine

Despite its lengthy attempt to argue otherwise, NNSA cannot escape the ultimate conclusion that as pled, their secondary liability claims for aiding and abetting and conspiracy are barred by the *in pari delicto* doctrine.  As it does elsewhere, NNSA again urges that the Court need not make a determination at this time.  See Opp. at 76.  But nothing in NNSA's Response

changes the law that a court may consider these defenses on a motion to dismiss if they appear on the face of the complaint.[54]  See Mot. at 53 (collecting cases).[55]

NNSA's argument that NNI is an insider to whom the *in pari delicto* defense does not apply is similarly unavailing.  It is true that "the application of the *in pari delicto* doctrine has been rejected in situations when corporate fiduciaries seek to avoid responsibility for their own conduct vis-à-vis their corporations."  See e.g., In re HealthSouth Corp. S'holders Litig., 845 A.2d 1096, 1107 (Del. Ch. 2003).  But, NNI has not argued that *in pari delicto* applies to NNSA's claims against it for mismanagement.  The defense *does* apply with full force to NNSA's secondary liability claims, which are predicated on alternative allegations that NNI did not owe NNSA a fiduciary duty and instead somehow assisted in the primary misconduct of NNSA's own directors.[56]  For purposes of these secondary claims, there is no basis to extend the insider limitation on the defense to a defendant who had no fiduciary duty to the plaintiff.

Finally, NNSA's argument that the adverse interest exception applies here fails on its substance.  NNSA admits that the adverse interest rule applies only where an agent acted "entirely for his own or another's purpose."  Opp. at 74.  The Claim does not allege either that NNSA's directors were acting entirely for another's purpose, or that the challenged transactions conferred no benefit on NNSA.

---

[54]     In what is plainly an attempt to escape the Delaware Chancery court's recent application of *in pari delicto* on a motion to dismiss, NNSA's Response suddenly asserts that Texas law would apply to any *in pari delicto defense*.  See Opp. at 73 n.97.  However, NNSA has chosen to plead its claims under either Delaware or Texas law.  It cannot now select Texas law only with respect to a determinative defense.  In any event, Texas and Delaware law both mandate dismissal of its claims on *in pari delicto* grounds.

[55]     See also Nisselson v. Lernout, 469 F.3d 143, 154 (1st Cir. 2006) (collecting cases affirming dismissal of claims on *in pari delicto* grounds, and affirming lower court's dismissal on that basis).

[56]     NNSA also cites to Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.), 335 B.R. 539, 547 (D. Del. 2005), but that case too discusses insider status in the context of a direct breach of fiduciary duty claim.

**IV.**
**NNSA'S ARTICLE 1382 CLAIMS REQUIRE DISMISSAL**

Again recognizing that its claims as pled cannot withstand scrutiny under established law, NNSA advocates a change in settled French law with respect to the requirements of fault and causation, which are essential elements of a claim under Article 1382.  For the following reasons, NNSA's Article 1382 claims cannot withstand scrutiny and must be dismissed.

**A.    NNSA's Article 1382 Claim Is Premised on a Strict Liability Theory that Is Not Accepted by French Courts in this Context**

Ignoring the plain language of Article 1382, NNSA seeks to eliminate the fault element of this claim under French law.  Opp. at 66-67.  Specifically, NNSA swaps the traditional element of "fault" for an "event that causes damage or a damaging event" because NNSA asserts that, although "controversial," it "better describes the evolution of the French law of civil liability."  Menjucq Decl.  ¶¶ 101, 105, 109; see also Opp. at 66 ("Although the element of a damaging action had traditionally incorporated a concept of 'fault,' the concept has become less and less important as French legal doctrine has evolved.").  Replacing the fault requirement with strict liability is, as NNSA's own French-law expert concedes, not the current law in France under Article 1382 and is flatly inconsistent with the plain and unambiguous terms of Article 1382.  Bremond Reply Decl. ¶¶ 35-40.[57]

French courts, authors of *doctrine*, and the Civil Code confirm that fault is the first required element for any claim under Article 1382:  "Any act whatever of man, which causes damage to another, obliges the one by whose *fault* it occurred, to compensate it."  Id. ¶ 38 (quoting official translation of Article 1382) (emphasis added).  Moreover, the limited scenarios where fault may no longer be as "important" (Opp. at 66) plainly have no applicability here.  The

---

[57]    Although NNSA's expert does not use the term "strict liability" his replacement of "fault" with "an event that causes damage or a damaging event" (Menjucq Decl. ¶ 101) is exactly that.

special context that French courts have imposed a form of strict liability – for example, for claims involving vicarious liability of employers for acts of employees under a separate article of the Civil Code or applying strict liability under a special regime of French tort liability that deals with traffic accidents – has no persuasive force to these allegations.  See Bremond Reply Decl. ¶¶ 39-40.  Once again, the Court should reject NNSA's invitation to expand French law and instead should apply French law as it has traditionally been applied and currently stands.

Turning to what "fault" is required here, Movants made clear in the Motion that where the "fault" alleged involves allegations of conspiracy, aiding or abetting, or encouraging the breach of an obligation held by another to a third-party,[58] a French court would require that the defendant acted in "bad faith," i.e., that the actor knew that its actions would cause a breach of duty owed to the third-party.  Bremond Decl. ¶¶ 72-73 (citing French cases); Bremond Reply Decl. ¶¶ 42-47.  Without even addressing the cases Movants cited in support of this proposition, and without citation to any authority, NNSA's French-law expert simply declares that "French courts would not require proof that NNI knew that its actions would cause a violation of an obligation towards NNSA" (Menjucq Decl. ¶ 111), and even if bad faith were required it "is not limited to the knowledge of the breach of a duty."  Id. ¶ 112.  NNSA is mistaken and without support on both counts.

As explained in the Motion, in the case of conspiracy or the "aiding and abetting"-type fault alleged in the Claim, a French court would require that NNI had knowledge that its actions would cause the breach of a duty owed by another to NNSA in order to impose liability under Article 1382.  Bremond Decl. ¶¶ 72-73; Bremond Reply Decl. ¶¶ 42-47 (explaining French courts have required knowledge of breach of a contract or obligation in finding fault for assisting

---

[58]    Claim ¶ 115 (asserting that Article 1382 claim is based on allegation that by "acting together or conspiring with NNL, and/or by . . . aiding, abetting, assisting and/or encouraging the actions of NNL," NNI purportedly itself committed a fault within the meaning of Article 1382); see also id. ¶¶ 114, 136-37, 163-64, 175.

a breach of a third-party's right or obligation), 58.  Moreover, Movants are not aware of any

French court that has ever found fault in the case of a conspiracy or an "aiding and abetting"-

type case for anything less than *actual* knowledge.  See Bremond Reply Decl. ¶ 46 (asserting that

he is unaware of any case finding Article 1382 liability for aiding and abetting or conspiracy

based on negligence, which "is unsurprising because such theories [of aiding and abetting or

conspiracy] are essentially alien to French civil law, which focuses . . . on the direct link between

the alleged tortfeasor and his alleged victim").  Nor has NNSA or its French-law expert cited any

such case.

## B.    NNSA's Claims Fail to Satisfy the Fault Requirement

Because NNSA has conceded that their Article 1382 claims are predicated upon

allegations that NNI either directly or indirectly participated or conspired in a scheme to remove

assets from NNSA (Opp. at 68),[59] these claims should be tested under Rule 9(b).  But, even

examining the Claim for the fault required under French law under Rule 8(a), NNSA has not

even pointed (through well-pled allegations) to any facts that permit an inference that NNI

actually knew that NNSA's directors (either *de jure* or *de facto*) were in breach of their fiduciary

or other legal duties with respect to the transactions at issue.  See above Part III.A; Mot. at 61;

Bremond Decl. ¶¶ 79, 89, 96-97, 103; Bremond Reply Decl. ¶¶ 58-59.

Asserting that NNI's knowledge was "implicit" based upon the "central role it played"

(Opp. at 68), and citing eleven (largely conclusory) Claim paragraphs does nothing to remedy

NNSA's failure to plead NNI's actual knowledge of either NNL or NNSA's *de jure* directors'

breach.  See Bremond Decl. ¶ 73; Bremond Reply Decl. ¶¶ 58-59.  The eleven paragraphs NNSA

relies upon here either: (1) omit mention of NNI entirely (see Claim ¶ 10), (2) contain mere

---

[59]    Specifically, NNSA asserts that "NNI and NNL . . . jointly made the relevant decisions, for the precise purpose of extracting value from NNSA during a period when they knew it was suffering substantial annual losses." Opp. at 68.

conclusions or bare recitals of the elements of the claim (see id. ¶¶ 31, 39 (alleging that "[b]oth NNI and NNL knew" that the decision to implement the RPSM "was primarily motivated by a desire to allocate more profit to the Canadian Entities in order to benefit NNL at the expense of NNSA"), 56 (alleging in a conclusory fashion that NNI was "aware" that "[t]he imposition and subsequent operation of the RPSM was detrimental to NNSA")), (3) allege only that NNI employees were aware of the transactions complained of (as opposed to any supposed breach of duty owed to NNSA) (see id. ¶¶ 25-27), or (4) fail to address NNI's knowledge at all (see id. ¶¶ 16, 22, 75, 79).

NNSA's Article 1382 claims therefore must fall for absence of well-pled allegations of the required element of fault.

### C.    NNSA's Attempt to Rewrite the Causation Requirement under Article 1382 Fails

NNSA agrees that a claim under Article 1382 requires a claimant to prove "a causal link between the action and the damage" (Menjucq Decl. ¶ 100.3), such that the damaging event must be "one of the causes of the damage" (id. ¶ 118).  NNSA, however, turns a blind eye to the requirement under French law (which Movants made clear in the Motion) that the party alleged to have committed the "action" must have been *one* of those causes by his own acts.  Bremond Decl. ¶ 68; Bremond Reply Decl. ¶¶ 49-51.

NNSA contends that mere "participat[ion]" in the "damaging events" that are alleged to have caused injury meets the causation element under Article 1382.  Menjucq Decl. ¶ 126.  This is wrong under French law.  Bremond Decl. ¶ 68; Bremond Reply Decl. ¶¶ 50-51 ("Professor Menjucq's [causation] approach does not respect basic elements of French civil law under article 1382 and would not therefore be accepted before a French court"), 60-62.  Because the Claim lacks any well-pled allegations that *NNI's* participation in the "damaging events" was even a but-

for cause of NNSA's damage – as opposed to an act by either NNL or NNSA's *de jure* directors, who NNSA alleges was primarily responsible for its harm (Claim ¶¶ 136-37, 163-64, 175) – NNSA has not sufficiently pled the necessary element of causation.  See Bremond Reply Decl. ¶¶ 51, 60-63.[60]

NNSA's pleading deficiency as to the causation element is further revealed in its arguments as to each supposed "damaging event."  See Opp. at 67-68.  As to tax and transfer pricing, NNSA contends that NNI (along with NNL and NNSA's *de jure* directors) took an active role in "devising and implementing the transfer pricing policy" (Opp. at 67), and that "NNI caused injury to NNSA through its role in Nortel's Tax Department and its assistance in negotiating and creating tax and transfer pricing arrangements among the Nortel companies and with the Revenue Authorities" (id. at 68) – but NNSA fatally fails to point to any well-pled allegation that NNI was a cause of NNSA *adopting* the tax or transfer or pricing policies that allegedly caused it harm.

Moreover, as to its contingent tax claims, NNSA does not explain how exactly it is possible that NNI "caused" its injury when its potential claims have yet to vest.  Bremond Reply Decl. ¶ 63.  With respect to the February 2008 repayment, NNSA argues – based upon its wholly conclusory allegations in Claim paragraphs 135 to 139, – that the repayment was "effectuated by pressure from NNI."  Opp. at 67-68.  Notably absent is any explanation of how it is plausible that NNI pressured its sister NNSA when it was Ryan Smith – "the EMEA Tax Leader on the ground in the EMEA Region . . . . seconded to NNUK from NNI" (Claim ¶ 22) – who allegedly "pushed for NNSA to repay" part of the 2002 Subordinated Loan and NNSA, as it alleged, successfully resisted this so-called "push."  Id. ¶ 75.  The Claim is thus devoid of any explanation as to how

---

[60]        Neither does NNSA's reliance on its bare, conclusory recitations of the causation element (Opp. at 67-68) provide any relief.  See Santiago v. Warminster Twp., 629 F.3d 121, 131 (3d Cir. 2010).

*NNI* "effectuated" this repayment when NNSA ultimately resisted the "pressure" and only repaid half of the 2002 Subordinated Loan (refusing to pay an additional €25 million). Compare Opp. at 68 with Claim ¶ 75. Finally, NNSA's assertion that NNI "benefitted from an inequitable allocation of the Pre-Petition Sales Proceeds" (Opp. at 68) is wholly irrelevant to causation.

As NNSA's conclusory allegations are not sufficient to show that NNI caused NNSA to suffer any harm under French law, their claims under Article 1382 (claims 3, 7, 14, and 17) should be summarily dismissed.[61]

## D. NNSA's Article 1382 Claims Cannot Stand to the Extent They Rely Upon NNL as *De Facto* Director

Additionally, to the extent that NNSA's Article 1382 claims are predicated upon allegations that NNI committed a "fault" by aiding, abetting, or assisting NNL's mismanagement as a *de facto* director (see Claim ¶¶ 114(a), 136(a), 163(a)), those claims cannot prevail because – as set forth above with respect to NNI – NNSA has not adequately pled that NNL was a *de facto* director of NNSA. As explained above, merely alleging in a conclusory fashion that NNL acted "in concert with respect to the relevant conduct" at issue (Opp. at 69) is insufficient to render a company a *de facto* director under French law. See above at Part II.B; Bremond Decl. ¶¶ 34, 42, 59; Bremond Reply Decl. ¶¶ 19, 24, 30. Further, NNSA's argument that NNL "engaged in mismanagement or management fault by devising, imposing, and implementing transactions and arrangements that contributed to NNSA's shortfall of assets" (Opp. at 69) is irrelevant where NNSA does not (and cannot) point to any well-pled allegations showing that NNL reduced the decision making independence of NNSA's *de jure* directors such that NNL dominated NNSA. See Bremond Decl. ¶ 32. Thus, the Court should dismiss the portion of

---

[61]    This conclusion is supported by NNSA's French-law expert's total failure to explain how NNSA's causation allegations are sufficient under French law. See Menjucq Decl. ¶ 126 (asserting, without more, that "[t]he damage has been directly caused by the damaging events (referred to above) and NNI participated in those damaging events").

NNSA's Article 1382 claims that are based upon NNI's alleged assistance of NNL's

mismanagement of NNSA.[62]

## V.
## NNSA'S QUASI-CONTRACT AND OTHER CLAIMS RELATING TO UNSPECIFIED BUSINESS SALES SHOULD BE DISMISSED

### A.    NNSA Cannot Remedy Its Basic Failures of Notice Pleading

NNSA argues that its allegations as to claims 10-15 – which, apart from one, do not

identify the transactions at issue – satisfy the requirements of Rule 8(a).  See Opp. at 69-70.

That assertion is both unsupported and unsupportable.  See, e.g., Bautista v. L.A. Cnty., 216 F.3d

837, 840 (9th Cir. 2000) (explaining, even prior to Iqbal, that "[t]o comply with Rule 8, each

plaintiff must plead a short and plain statement of the elements of his or her claim, identifying

the transaction or occurrence giving rise to the claim").  Alternatively, NNSA contends that its

pleading omissions will be rectified through discovery.  Opp. at 70.  This, again, ignores clear

precedent that discovery is not a substitute for adequate pleading.[63]

### B.    Claims 10-12 Independently Fail to State a Claim

1.    Claim 12 Fails Adequately to Plead Mistake

NNSA fails to address – much less contest – the application of Rule 9(b) to its claim

for mistake.  See Bankr. R. 7009 ("In alleging fraud or *mistake*, a party must state with

particularity the circumstances.") (emphasis added).  NNSA stands silent on how its Claim could

possibly satisfy the Rule 9(b) standard, where it fails to plead (i) the individuals who made the

---

[62]    Finally, NNSA does not dispute that its hopelessly inadequate allegations that NNI acted in concert with NNSA's *de jure* or *de facto* directors to commit some unspecified "breach of law" or "customary rule" have no chance of satisfying Rule 8.  Mot. at 60-61.  As such, the relevant portions of NNSA's Article 1382 claims 3, 7, and 14 that rely upon this catch-all provision should be dismissed.

[63]    Nor can NNSA credibly suggest that the "relevant information about the asset sales is within the possession of the North American entities."  Opp. at 70.  NNSA's Claim alleges that NNSA was a party to each of the Pre-Petition Business Sales (Claim ¶ 80), which the Joint Administrators have nonetheless failed to identify, after nearly three years of investigation.

mistake,[64] (ii) the nature of their misunderstanding, or (iii) when and where that mistake

occurred.  See Claim ¶ 153 (alleging only "a mistake (either of fact or law) as to the full extent of

NNSA's entitlement").  Rule 9(b) alone requires dismissal.

      2.      Implied Term / Implied Contract

      The Motion argues that NNSA's purported contract claims (claims 10 and 11) should be

dismissed because NNSA failed to adequately allege the parameters of the contract or

contractual term.  Mot. at 63-64.  The Motion further argues that because of those ambiguities,

the Claim fails to allege what action or omission by NNI constitutes a breach of the supposed

implied term or implied contract.  Id.  NNSA has neither disputed that this is the proper standard,

nor has it attempted to explain how its Claim adequately alleges the parameters of – or how NNI

allegedly breached – the purported implied contract or implied term.  See Opp. at 69-70.  Instead,

NNSA simply asserts that it should be allowed discovery to rectify its pleading failures; again,

NNSA's suggestion has been rejected by the Supreme Court.  See Iqbal, 129 S.Ct. at 1953-54

(2009).  Further, by refusing to respond to Movants' arguments, NNSA has essentially conceded

that claims 10 and 11 should be dismissed for failure to meet Rule 8.  See Sportscare of Am.,

P.C. v. Multiplan, Inc., Civil Action No. 2:10-4414 (WJM), 2011 WL 589955, at *1 (D.N.J. Feb.

10, 2011) ("[F]ailure to respond in an opposition brief to an argument put forward in an opening

brief constitutes waiver or abandonment in regard to the uncontested issue.").

**VI.**
**NNSA'S CLAIMS IN RESPECT OF FSD LIABILITY SHOULD BE**
**SUMMARILY DISMISSED**

      NNSA's contingent FSD claims (claims 19, 20, 21, and 22) should be dismissed.  NNSA

does not, and cannot, refute that this Court has held that it can and will *directly* determine NNI's

---

[64]      Indeed, NNSA's Claim fails to identify a single officer, employee or agent of NNSA by name.

share of liability, if any, relating to the U.K. Pension Plan by considering the Proofs of Claim submitted by the U.K. Pension Trustee and the Pension Protection Fund.  See Mot. at 65-66.  Nor does NNSA refute that the Court held that as to the U.S. Debtors, the U.K. Pension Proceedings – and thus any finding of liability that results from a Financial Support Direction or Contribution Notice – will be "deemed void and of no force or effect," which thus forecloses liability on the FSD claims based on the proceedings in the United Kingdom.  Mot. at 66-67.  NNSA not only seeks an end-run around these rulings by asserting FSD claims against NNI, but asserts those claims solely based on factual allegations arising from the U.K. Pension Proceedings.

NNSA asserts that the contingent nature of the FSD claims make them incompatible with the pleading requirements of Rule 12(b)(6).  See Opp. at 71.  While the contingent nature of the FSD claims does mean that certain aspects of those claims, such as dollar value, may not be able to be calculated at this time, NNSA does not even make basic assertions about any actions of NNI that could lead to liability pursuant to the FSD claims.  Despite NNSA's conclusory assertion that the alleged FSD liability is "based on the role [NNI and NNL] played in causing NNUK's pension plan to be underfunded" (id. at 71), NNSA fails to point to any pre-petition actions of NNI that contributed to that underfunding, or any relationship at all between NNI and the U.K. Pension Plan.  Iqbal and its progeny require dismissal of the FSD claims under Rule 12(b)(6).[65]

Finally, NNSA has failed to refute the U.S. Debtors' contention that even if the FSD claims are not dismissed as inadequately pled, Section 502(e)(1)(B) of the Bankruptcy Code requires that they be disallowed.  See 11 U.S.C. § 502(e)(1)(B) (stating that a bankruptcy court "shall disallow any claim for reimbursement or contribution of an entity that is liable with the

---

[65]     Similarly, NNSA's statement that "the FSD Claims are viable grounds for recovery under French law" (Opp. at 71 n.94), is also incorrect.  See Bremond Reply Decl. ¶¶ 65-70.

debtor on or has secured the claim of a creditor, to the extent that . . . such claim . . . is contingent as of the time of allowance or disallowance" (emphasis added)).  Instead of asserting that their claims do not fall within the requirements of Section 502(e)(1)(B), NNSA merely requests in a footnote that, if the FSD claims are disallowed, they be permitted to reassert or seek reconsideration of the claims in the event they become non-contingent in the future.  Opp. at 72 n.96.  Here, however, the FSD claims also fail to state a claim and therefore should be dismissed with prejudice on those independent grounds.

**VII.**
**NNSA'S CLAIMS RELATING TO TRANSFER PRICING, THE FEBRUARY 2008 REPAYMENT, AND PRE-PETITION BUSINESS SALES ARE TIME BARRED**

**A.      NNSA Provides No Basis to Avert Dismissal of Its U.S. State Law Claims**

The Movants' Opening Brief established that NNSA's state common law claims are governed by at most a four-year statute of limitations.  As a consequence, the entirety of NNSA's aiding and abetting and conspiracy claims grounded in its transfer pricing allegations are time-barred, as are its aiding and abetting claims based on Pre-Petition Business Sales that were completed prior to January 2005.  This alone significantly winnows NNSA's claims, both as to the dollar amount sought, and to define the scope of further proceedings (if any).

As to these state law claims, NNSA predicates its Response on the premise that all of its claims are governed by one of two limitations periods provided by French law – three years from the date of judgment ordering liquidation applicable to claims brought under article L 651-2 of the Commercial Code, and five years from the date the claimant knew or should have known the facts that form the basis of the claim applicable to claims brought under article 1382 of the Civil Code.  Opp. at 79-81.  NNSA appears to base this argument on the internal affairs doctrine, but even if applicable, that would require application of the substantive law of the jurisdiction of

incorporation in toto – thus eliminating the state law claims alleged.  NNSA provides no basis, nor is there any, to somehow engraft a French statute of limitations onto claims that NNSA has brought under U.S. state law.

Addressing when the claims arose, NNSA "do[es] not concede" that its transfer-pricing claims arose upon entry into the MRDA (Opp. at 81), but it fails to address any of the governing authorities in the Motion that dictate that result.  See Mot. at 76.  NNSA's argument that the date of accrual of those claims is a question of fact (Opp. at 81 n.102) also fails given that the date of entry into the MRDA is established by NNSA's own Claim.  See Claim ¶ 46.

Specifically, NNSA pleads that the MRDA was entered into in December 2004. Claim ¶ 46.  Under either Delaware or Texas law,[66] resulting state law claims for aiding and abetting (claim 4) are governed by at most a four year statute of limitations, and were thus time barred in December 2008 – before the petition date.  State law claims for conspiracy (claim 5) are governed by an even shorter three year limitations period, and were time barred no later than December 2007.  Such claims can be dismissed before even reaching application of Delaware's borrowing statute or Section 108(c).[67]

## B.    Delaware's Borrowing Statute Should Apply to the Remaining Claims

Recognizing the dispositive effect of Delaware's borrowing statute, NNSA urges that this Court depart from its literal terms, either by resort to the internal affairs doctrine, or because the forum shopping concerns that underlie the borrowing statute are supposedly absent.  Each of these arguments should be dismissed.  First, under well-established precedent, statutes of

---

[66]    NNSA does not dispute that Delaware law imposes a three year statute of limitations for both aiding and abetting and civil conspiracy claims, while Texas applies a two year statute of limitations to conspiracy claims and either a three or four year time bar to aiding and abetting claims.  Mot. at 76-78.

[67]    Burger v. Level End Dairy Investors, 125 B.R. 894, 901 (Bankr. D. Del. 1991) ("[I]f the period has already expired before the bankruptcy petition was filed, then [Section 108(c)] does not operate to preserve the cause of action.").  Similarly, NNSA's aiding and abetting claims based on Pre-Petition Business Sales that were completed prior to January 2005 are time-barred without reaching Delaware's borrowing statute or Section 108(c).

limitations are procedural – not substantive – such that the internal affairs doctrine is

inapplicable on its face.  Norman v. Elkin, Civil Action No. 06-005-JJF, 2007 WL 2822798, at

*3 (D. Del. Sept. 26, 2007).  Moreover, even if the internal affairs doctrine could vary the

application of Delaware's borrowing statute, it has no application to NNSA's conspiracy

claims,[68] much less to its quasi-contract claims.  Nor can NNSA maintain its position that the

borrowing statute should not be applied here because there is no threat of forum shopping.  By its

plain terms, if a cause of action is time-barred under Delaware's statute of limitations, no

consideration of non-Delaware law, or the purposes behind the borrowing statute, should be

required.  See Burrell v. AstraZeneca LP, C.A. No. 07C-01-412(SER), 2010 WL 3706584, at *4

(Del. Super. Ct. Sept. 20, 2010).  Similarly, neither the bankruptcy context of the case, nor the

effect of the automatic stay, present sufficient reason to depart from the well-established

application of the forum state's borrowing statute.[69]  As such, Delaware's three-year statute of

limitations governs all of NNSA's French law claims.  This renders time-barred the French law

transfer pricing causes of action that accrued in December 2004 (claims 2 and 3) as well as all

state and French law claims based on Pre-Petition Business Sales that were completed prior to

January 2006 (claims 13, 14, 15), again irrespective of Section 108(c).

## C.    Section 108(c)

The tolling provisions of Section 108(c) are inapplicable on their face to NNSA's

claims.  By its plain text, Section 108(c)'s tolling provisions are triggered only if "applicable

---

[68]    NNSA ignores that courts uniformly reject application of the internal affairs doctrine to conspiracy claims.
See Asarco LLC v. Ams. Mining Corp., 382 B.R. 49, 74 n.14 (S.D. Tex. 2007) (holding internal affairs doctrine
inapplicable to conspiracy claims where "unlike the issue of breach of fiduciary duty, a claim for conspiracy
presupposes two different persons and/or entities and by definition, would not be limited solely to the internal affairs
of one corporation"); FoodComm Int'l v. Barry, 463 F. Supp. 2d 818, 830 (N.D. Ill. 2006).

[69]    See Mot. at p. 74 n.77; see also Med Mut. of Ohio Inc. v. Braintree Labs., Civ. No. 10-604-SLR, 2011 U.S.
Dist. LEXIS 74996, at *18 (D. Del. July 12, 2011) (rejecting argument that plaintiff should be excused from the
borrowing statute where pre-existing litigation meant "it was bound to litigate here").

nonbankruptcy law . . . fixes a period for commencing or continuing a civil action in a court

*other than a bankruptcy court* on a claim against the debtor." 11 U.S.C. § 108(c) (emphasis

added). See McCoy v. Grinnell (In re Radcliffe's Warehouse Sales, Inc.), 31 B.R. 827, 831

(Bankr. W.D. Wash. 1983) (applying Section 108 "where the creditor is hampered from

proceeding outside the bankruptcy court, due to the provisions of the [automatic stay].").  NNSA

was free to bring claims against NNI in the bankruptcy court.  Indeed, NNSA did assert claims

relating to transfer pricing in its Placeholder Claim in September 2009.  No provision of

applicable non-bankruptcy law prevented NNSA from doing so with respect to its claims based

on the February 2008 repayment and Pre-Petition Business Sales, which it asserted for the first

time in June 2011.[70]  Section 108(c) thus cannot salvage NNSA's claims relating to the

December 2006 Alcatel Sale (claims 10, 11, 12, 13, 14, and 15), or the repayment dated February

2008 (claims 6, 7, 8, and 9), all of which expired during the term of the Debtors' cases.[71]

## CONCLUSION

WHEREFORE, the Movants respectfully request that the Court (i) grant the Movant's

Motion; (ii) overrule the objections set forth in the Opposition Brief; (iii) enter the proposed

order attached to the Motion as Exhibit A disallowing and expunging with prejudice claims 2

through 22 asserted in claim number 7784 and 7785 (and to the extent it is not superseded and

---

[70]     Indeed, while NNSA asserts that its Claim merely describes its Placeholder Claim with greater specificity (Opp. at 82-83), NNSA fails to refute NNI's authorities demonstrating that the Placeholder Claim's generic reference to "intercompany dealings, trading and other arrangements or agreements between [NNI and NNSA]" was insufficient to place NNI on notice or to encompass its current claims.  See Mot. at 77-79.  In particular, NNSA ignores that its Placeholder Claim was limited to agreements between *NNI* and "the Administrators, NNUK, the Insolvency Practitioner and/or any EMEA Company," including NNSA (see Claim No. 4923, Peacock Decl. Ex. C ¶ 2), which on its face is inapplicable to the February 2008 repayment, to which NNI admittedly was not a party.

[71]     See Mot. at 77.  Just as the Court should reject NNSA's attempts to expand foreign law into unchartered waters, the application of equitable tolling must fail, as NNSA concedes that equitable tolling has never been recognized under Delaware law.  See Opp. at 84 (citing In re Marvel Entm't Grp., Inc., 273 B.R. 58, 74 (D. Del. 2002)).

replaced by claims 7784 and 7785, claim 4923); and (iv) grant such other and further relief as the

Court deems just and proper.

Dated:  October 7, 2011
        Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Deborah M. Buell (admitted *pro hac vice*)
Howard S. Zelbo (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

    - and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


       */s/ Ann C. Cordo*
—————————————————————
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*

    - and -

AKIN GUMP STRAUSS HAUER & FELD LLP

Fred Hodara (admitted *pro hac vice*)
David Botter (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

    - and -

54

RICHARDS, LAYTON & FINGER, P.A.

_____/s/ Christopher M. Samis_____
Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile: (302) 651-7701

*Counsel for the Official Committee
of Unsecured Creditors*