## <u>EXHIBIT A</u>

00044

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

SEVENTY-FIFTH REPORT OF THE MONITOR

DATED SEPTEMBER 19, 2011

00045

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................... 1

II.     OVERVIEW ......................................................................................... 3

III.    PURPOSE OF THIS REPORT................................................................. 10

IV.     TERMS OF REFERENCE ...................................................................... 10

V.      BACKGROUND ................................................................................... 11

    A.    The Claims Procedure Order .......................................................... 11

    B.    Employee Representatives and Representative Counsel ..................... 12

    C.    The Employee Settlement Agreement .............................................. 15

    D.    Approval of HWT Allocation Methodology...................................... 17

    E.    Hardship Fund and Termination Fund.............................................. 19

VI.     PROCESS FOR NEGOTIATING AND DEVELOPING THE COMPENSATION

CLAIMS PROCESS ....................................................................................... 20

VII.    COMPENSATION CLAIMS AND CLAIMANTS ......................................... 24

    A.    Employee Benefits ........................................................................ 25

        (1)    Registered Pension Plans ........................................................ 26

        (2)    Non-Registered Pension Plans.................................................. 27

        (3)    Non-Pension Benefits ............................................................. 27

        (4)    Patent Awards Program .......................................................... 31

        (5)    Vacation Policy...................................................................... 32

    B.    Claimants .................................................................................... 34

- 2 -

00046

(1) Deferred Vested Employees, Canadian Service Employees and Precision Employees ................................................................ 34

(2) Pre-Filing Terminated Employees, Post-Filing Terminated Employees and Pensioner Eligible Terminated Employees ........................................ 35

(3) Post-Filing Transferred Employees ........................................... 35

(4) Pensioners ................................................................ 36

(5) LTD Beneficiaries ........................................................... 36

(6) Active Employees ........................................................... 37

VIII. COMPENSATION CLAIMS METHODOLOGY ........................................ 38

A. Benefit Claims ................................................................ 38

B. Termination and Severance Pay Claims ........................................... 41

C. Patent Award Claims ........................................................... 43

IX. COMPENSATION CLAIMS PROCEDURE ................................................ 44

A. Information Statement Process .................................................. 44

B. Proof of Claim Process ........................................................ 50

C. Notice to Creditors ........................................................... 52

D. Resolution of Claims .......................................................... 56

E. Role of Employee Representatives and Representative Counsel .......................... 59

F. Other Claims Matters .......................................................... 63

X. MONITOR'S RECOMMENDATIONS .................................................... 64

00047

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

SEVENTY-FIFTH REPORT OF THE MONITOR
DATED SEPTEMBER 19, 2011

## I.  INTRODUCTION

1.     On January 14, 2009 (the "**Filing Date**"), Nortel Networks Corporation ("**NNC**" and

       collectively with all of its subsidiaries, "**Nortel**" or the "**Company**"), Nortel Networks

       Limited ("**NNL**"), Nortel Networks Technology Corporation, Nortel Networks

       International Corporation and Nortel Networks Global Corporation (collectively, the

       "**Applicants**") filed for and obtained protection under the *Companies' Creditors*

       *Arrangement Act* ("**CCAA**"). Pursuant to the Order of this Honourable Court dated

       January 14, 2009, as amended and restated (the "**Initial Order**"), Ernst & Young Inc.

       ("**EYI**") was appointed as the Monitor of the Applicants (the "**Monitor**") in the CCAA

- 2 -

00048

proceedings. The stay of proceedings was extended to December 14, 2011, by this Honourable Court in its Order dated June 30, 2011.

2. Also on the Filing Date, Nortel Networks Inc. ("**NNI**") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code (the "**Code**") in the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**") (the "**Chapter 11 Proceedings**"). Nortel Networks (CALA) Inc. filed a voluntary petition under the Code on July 14, 2009. (Nortel Networks (CALA) Inc., NNI and those of its subsidiaries that filed the Chapter 11 Proceedings on the Filing Date, are referred to collectively as the "**U.S. Debtors**").

3. As required by U.S. law, an official committee of unsecured creditors of the U.S. Debtors (the "**Committee**") was established in January, 2009. Also, an ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "**Bondholder Group**"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009 and July 30, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries and each of these groups is participating in the CCAA proceedings.

4. Nortel Networks UK Limited ("**NNUK**") and certain of its subsidiaries located in EMEA (together the "**EMEA Debtors**") were granted Administration orders by the English High Court on January 14, 2009. These Administration orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the

00049

various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed. On June 8, 2009, the Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an Order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

5.    Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

6.    Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

## II. OVERVIEW

7.    Approximately 16,000 of the Applicants' employees, former employees, pensioners and their survivors, including LTD Beneficiaries (collectively, the "**Employees**") may have employment-related claims, given the various compensation and benefit programs provided by the Applicants. Most of these claims relate to the loss of benefits that, but for the relief sought in this motion, would require individualized actuarial determinations and calculations. As well, claims by former Employees in connection with the loss of their employment would require individualized determinations of the applicable notice of

00050

termination and/or severance period and the calculation of any damages incurred during such period.

8.    It is a substantial task to value these claims, magnified because Nortel offered compensation and benefit programs over the course of many decades, during which time the programs underwent changes.  In addition, there were differences in compensation and benefit programs provided to unionized and non-unionized employees and certain Employees had individual employment contracts.  Further, given Nortel's international operations, a number of Employees transferred among jurisdictions and many moved between different benefit categories of employment over time.

9.    The Applicants, the Monitor, the Employee Representatives, Representative Counsel and the CAW recognized the magnitude of the task of valuing these claims and the fact that, generally, individuals are not in a position to value their own claims.  In most cases, it would be impossible for an individual to obtain the necessary actuarial and other advice. Even if it were possible, individual calculations and assessments might yield inconsistent results.

10.   The Applicants, the Monitor, the Employee Representatives, Representative Counsel and the CAW realized that it would be in the interests of all the Employees and the estate if they could develop and agree upon an acceptable methodology for the calculation of employment-related claims and a streamlined procedure to deal with them.   The Applicants' proposed Compensation Claims Process was reached after extensive discussions and negotiations among the Applicants, the Monitor, the Former Employees' Representatives, the Former Employees' Representative Counsel, the LTD Beneficiaries'

00051

Representative, the LTD Beneficiaries' Representative Counsel, CAW Counsel, the Continuing Employees' Representatives, the Continuing Employees' Representative Counsel and their respective actuarial and financial advisors (collectively, the "**Compensation Claims Participants**"). These consultations and negotiations led to the development of certain principles that, taken as a whole and applied consistently to each individual, were acceptable to the Employee Representatives and the CAW, representing different categories of Employees. These categories (described more fully below) reflect the commonality within similarly situated groups of Employees, even though their individual situations might differ.

11.     Each of the Employee Representatives and Representative Counsel consents to the proposed Compensation Claims Process and the related Orders. The fact that the employee groups with potentially differing interests worked together successfully so that this motion could be brought on consent is a considerable achievement and supports the fairness and reasonableness of the proposed Compensation Claims Process.

12.     If approved, the proposed Compensation Claims Methodology will be final and binding on all Employees and stakeholders. The vast majority of employment-related claims will be valued based on:

(a)     identified and agreed-upon benefits and agreed categories of claims, including post-retirement benefits;

(b)     agreed-upon actuarial assumptions and calculations, including with respect to income benefits, other benefits for LTD Beneficiaries, post-retirement benefits and non-registered pension plan benefits and, with respect to adjustments relating

00052

to administrative costs and income tax, as applicable, that increase or "gross up" claim amounts as described in further detail below and in the Mercer 2011 Valuations attached as Appendices "B" and "C"; and

(c)    agreed-upon formulae relating to Termination and Severance Pay Claims, including the following key components:

(i)    recognition of outstanding payments due under pre-filing employment contracts and termination agreements;

(ii)    for unionized Employees who were terminated post-filing, a notice of termination/severance period and/or a lay-off lump sum payment, as set out in the applicable collective bargaining agreement;

(iii)    for non-unionized Employees who were terminated post-filing, a notice of termination/severance period of 3.3 weeks per year of service, with a minimum of 8 weeks and a maximum of 78 weeks;

(iv)    employee benefits, pension accruals and entitlements to post-retirement benefits and non-registered pension plans to which the Employee became entitled or "grew in" during the applicable notice period; and

(v)    with respect to mitigation:

(A)    no deduction will be taken in respect of employees who were not offered an opportunity to transfer to a buyer; and

- 7 -

00053

    (B)    a deduction will be taken in respect of former employees who were transferred to a buyer.[1]

The application of the proposed termination and severance pay methodology relevant to each category of employee is summarized in Appendix "D".

13.    Under the proposed Compensation Claims Procedure:

    (a)    The vast majority of employment-related claims will proceed by way of individual Information Statements. The Information Statements will reflect the amount of these claims calculated in accordance with the Compensation Claims Methodology as well as the underlying data used in such calculation. Individual Employees will have an opportunity to correct data they believe is inaccurate. The amount set out in the Information Statement will be accepted as the individual's Compensation Claim in the CCAA proceedings for all purposes and will be changed only if the individual's proposed information corrections are accepted by the Monitor and if they affect the Compensation Claim amount. There will be no opportunity in the Compensation Claims Procedure to challenge calculations for Compensation Claims made in accordance with the Compensation Claims Methodology if approved by this Honourable Court.

---

[1] Those employees who declined offers of employment from a buyer will be treated as if they had transferred and deduction will be taken for mitigation. However, their Termination and Severance Pay Claims will not fall below the amounts prescribed by applicable employment standards legislation.

- 8 -                                    00054

(b)      There is a parallel proof of claim process which:

    (i)      allows any individual who believes he/she is entitled to a claim in addition to the claims set out in the Information Statement to submit such a claim for determination; and

    (ii)     calls for Grievance Claims, director compensation claims and director or officer indemnification claims that were excluded from the Applicants' prior claims process.

14.     The total value of Compensation Claims, which rank as ordinary, unsecured claims, is estimated to be approximately $1.06 billion[2], comprised of the following components:

(a)      Benefit Claims consisting of:

    (i)      claims under the Non-Registered Pension Plans of approximately $268 million[3]; and

    (ii)     claims for Non-Pension Benefits of approximately $631 million[4];

(b)      Base Severance Claims of approximately $164 million; and

---

[2] This amount will be reduced by distributions received from the corpus of the HWT and any other valid set-offs relating to amounts owing by the Compensation Creditor to an Applicant but reflects a reduction by payments received under the Termination Fund. This amount does not include claims of Active Employees, Active Canadian Service Employees and Active Precision Employees as at the date they cease active employment. In total, these claims are estimated to be less than the amount to be deducted for HWT distributions.

[3] This amount includes Termination and Severance Pay Claims relating to the Non-Registered Pension Plans and Registered Pension Plan accruals.

[4] This amount includes Termination and Severance Pay Claims relating to the Non-Pension Benefits.

- 9 -

00055

   (c)     Patent Award Claims of approximately \$285,000[5].

15.    The Monitor recognizes that the proposed Compensation Claims Process is complex and the Information Statements will be lengthy. The process and forms reflect the sheer number of potential Compensation Claims, the need to take into account numerous individual data points, and the variations in Nortel's compensation and benefit programs over time. The Applicants and the Monitor developed a process and forms in consultation with the other Compensation Claims Participants, including the Employee Representatives' governing committees, who devoted significant time and expertise to the task, and who have indicated their commitment to assisting their constituents in understanding and, where necessary, responding to, the Information Statements.

16.    The Monitor is of the view that the proposed Compensation Claims Process establishes a fair, reasonable, efficient and orderly process for the calculation and determination of the numerous employment-related claims against the Applicants. Overall, the Compensation Claims Process fairly balances the interests of the Applicants' stakeholders and represents an important step towards the development of a plan of compromise or arrangement for the Applicants' restructuring. It has been arrived at in a fair and reasonable way, after extensive negotiations among the Compensation Claims Participants.

---

[5] The Patent Award Claim Methodology is set out in Appendix "E".

00056

## III. PURPOSE OF THIS REPORT

17.    The purpose of this Seventy-Fifth Report of the Monitor is to provide this Honourable Court with:

    (a)    information relating to the Compensation Claims Process; and

    (b)    the Monitor's support for the Compensation Claims Methodology Order and the Compensation Claims Procedure Order in the form submitted by the Applicants.

## IV. TERMS OF REFERENCE

18.    In preparing this Seventy-Fifth Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel. The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Seventy-Fifth Report.

19.    Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.

20.    Capitalized terms used in this Seventy-Fifth Report are defined in the Glossary attached as Appendix "A". Some terms are also defined in the body of this report for ease of reference. In the Termination and Severance Claim Methodology Appendix, certain capitalized terms are defined by detailed calculations. These terms are defined in the appendix itself and are cross-referenced in the Glossary.

00057

## V. BACKGROUND

### A.    The Claims Procedure Order

21.    On July 31, 2009, this Honourable Court granted the Claims Procedure Order.

22.    The following claims, among others, were excluded from the Claims Procedure Order:

> (a)    claims of any current or former employee of any of the Applicants for amounts owing to him or her on account of wages, salaries, any other form of compensation (whether sales-based, incentive-based, deferred, retention-based, share-based or otherwise), severance or termination pay, employee benefits (including, but not limited to, medical and similar benefits, disability benefits, relocation or mobility benefits and benefits under employee assistance programs), pension and retirement benefits, vacation pay and employee expenses, claims of any current or former employee of any of the Applicants arising from the administration, management or oversight of any of the pension plans or employee benefit plans administered or sponsored by the Applicants or their subsidiaries and the claims of any Director for compensation for acting as a Director including without limitation fees, deferred share-based compensation, benefits and director expenses;

> (b)    claims for grievances under any collective agreements to which any of the Applicants are a party; and

> (c)    claims of any Director and Officer of the Applicants for indemnification and/or contribution arising from such Director's or Officer's service to any Applicant.

00058

23. Compensation and employment-related claims of any person or entity other than an Employee (i.e., claims of the Ontario Pension Benefits Guarantee Fund, pension plan administrators or pension regulators) were not excluded. Therefore, deficiency claims relating to the Registered Pension Plans are subject to the Claims Procedure Order.

24. The U.S. Debtors also implemented a call for claims procedure with a filing deadline of September 30, 2009. The U.S. Debtors adopted a different approach, requiring all employees (current and former) of the U.S. Debtors to fill out and submit proofs of claims. The adjudication of those claims is ongoing.

25. Although employee compensation and employment-related claims were excluded from the Claims Procedure Order, some employees filed employment-related claims with the Applicants in error. These claims filed in response to the Claims Procedure Order will be disallowed under the Claims Procedure Order. The claims filed in error under the Claims Procedure Order will be subject to the Compensation Claims Process. The employee will either receive an Information Statement Package or a Proof of Claim Document Package.

B. **Employee Representatives and Representative Counsel**

26. Almost all individuals with Compensation Claims are represented in these proceedings by:

- 13 -

00059

    (a)    Court-appointed representative counsel, being the Former Employees' Representative Counsel, LTD Beneficiaries' Representative Counsel[6], Continuing Employees' Representative Counsel[7] or CAW Counsel (collectively, the "**Representative Counsel**"); and

    (b)    Court-appointed representatives, being the Former Employees' Representatives, the LTD Beneficiaries' Representative or the Continuing Employees' Representatives[8] (together with the CAW, the "**Employee Representatives**").

27.    The only individuals not represented by the above appointments are:

    (a)    5 Employees who opted out of such representation; and

    (b)    any (i) former chief executive officer or chairman of the board of directors, (ii) non-employee member of the board of directors, and (iii) former employees or officers who are subject to investigation and charges by the Ontario Securities Commission or the United States Securities and Exchange Commission.

28.    The Court Orders appointing the Employee Representatives authorize them to represent their constituents in these proceedings. Further, the Court Orders appointing the Former

---

[6] The Former Employees' Representatives and their counsel and the LTD Beneficiaries' Representative and her counsel represent Former Employees and LTD Beneficiaries respectively who were subject to a collective bargaining agreement with a union other than CAW (which unions include the Canadian Office Employee Union and the Canadian Union of Communication Workers), including, in the case of the Former Employees, unionized Post-Filing Transferred Employees.

[7] The Continuing Employees' Representatives and their counsel represent the Active Employees and the non-unionized Post-Filing Transferred Employees. The order appointing them may require clarification in this regard, as discussed in paragraph 150 below.

[8] See footnote 7.

- 14 -

00060

Employees' Representatives and the LTD Beneficiaries' Representative expressly state that they may represent their constituents for the purpose of settling or compromising their claims in insolvency proceedings or in any other proceeding which has been or may be brought before this Honourable Court.  In addition, the mandate of Representative Counsel includes acting as counsel in respect of employment-related issues affecting their constituents in the CCAA proceedings.  CAW derives its authority from its retainer in relation to former CAW members (including Pensioners and their survivors who have retained the CAW) and as the exclusive bargaining agent for Employees, including LTD Beneficiaries, who are CAW members.

29.     The Monitor has been advised by the CAW that the retainer executed by certain former CAW members authorizes:

(a)     CAW Counsel to discuss the issues, facts and potential resolutions of their cases relating to the CCAA proceedings with representatives of the CAW; and

(b)     such representatives to provide instructions necessary to conduct these former members' cases relating to the CCAA proceedings.

CAW is the sole and exclusive bargaining agent for Employees, including LTD Beneficiaries, who are CAW members in relation to all employment-related matters.

30.     The Representative Counsel and Employee Representatives have established structures and mechanisms to communicate with their constituents and provide a forum for constituents to submit inquiries and raise matters for discussion.  These include websites, email communications and bulletins, information sessions and webinars and the

00061

establishment of legal steering committees. The Former Employees' Representatives and the LTD Beneficiaries' Representative are actively involved with two organizations established prior to the appointment of the Employee Representatives: the NRPC and the CNELTD (previously the NNLTDS), respectively. Through these structures and mechanisms, Representative Counsel and Employee Representatives are able to assess the main concerns of a large number of their constituents and use this assessment to settle claims of their constituents in accordance with their Court-approved mandate.

31.    The appointments of the Employee Representatives and Representative Counsel established a framework for the Applicants and the Monitor to engage in discussions and consultations with them throughout the CCAA proceedings, including with respect to a settlement regarding certain employment-related issues and the Compensation Claims Process.

32.    Representative Counsel and the Employee Representatives have been involved from the initial stages of development of the Compensation Claims Process. Extensive discussions and negotiations involving the Compensation Claims Participants have culminated in the proposed Compensation Claims Methodology and the consent of Employee Representatives and Representative Counsel to the Compensation Claims Process, including the Compensation Claims Methodology.

C.     **The Employee Settlement Agreement**

33.    The Settlement Agreement was approved by this Honourable Court by Order dated March 31, 2010. Leave to appeal the Order was denied by the Ontario Court of Appeal on June 3, 2010 and the Settlement Agreement has become effective in accordance with

00062

its terms. Additional information on the Settlement Agreement and the process leading up to it can be found in the Thirty-Ninth Report, the supplements to the Thirty-Ninth Report and the Forty-Second Report of the Monitor.

34.     In summary, the Settlement Agreement:

   (a)     addresses the payment of benefits incurred during 2010 to, among others, Pensioners and LTD Beneficiaries;

   (b)     confirms that claims in respect of benefits and relating to the HWT rank as ordinary unsecured claims on a *pari passu* basis with the claims of the ordinary unsecured creditors of the Applicants; and

   (c)     releases directors, officers, the Trustee and others from certain direct and indirect claims (other than against a director of Nortel for a matter referred to in subsection 5.1(2) of the CCAA or with respect to fraud).

35.     Pursuant to the Settlement Agreement and Court orders, eligible terminated employees (including eligible LTD Beneficiaries) received payments from the Termination Fund established under the Settlement Agreement. These payments will be deducted from their Compensation Claims (as described in further detail below).

36.     The Settlement Agreement also provided that the parties would work towards a Court-approved distribution of the corpus of the HWT to its beneficiaries entitled thereto and the resolution of any issues necessarily incidental thereto.

- 17 -

**D.**    **Approval of HWT Allocation Methodology**

37.    Nortel established the HWT on January 1, 1980 as a tax-efficient vehicle through which Nortel would continue to provide employee benefits.  Certain of Nortel's non-pension employee benefits, including life insurance, long term disability, medical, dental and survivor income benefits were funded by Nortel on a pay-as-you-go basis but as an administrative matter were paid using the HWT as a payment mechanism.  Certain other benefit plans were funded in part by the HWT, using trust assets.

38.    In August 2010, the Monitor served and filed its motion for approval of a proposed allocation methodology with respect to the funds held in the HWT and ancillary relief to implement the proposed methodology and distribute the funds held in the HWT to the beneficiaries entitled thereto.    The Fifty-First Report of the Monitor, dated August 27, 2010:

    (a)    provides details regarding the HWT and the benefits provided thereunder;

    (b)    attaches the Mercer HWT Report; and

    (c)    proposes an allocation methodology for distribution of the HWT corpus.

39.    Pursuant to the HWT Allocation Order dated November 9, 2010, this Honourable Court approved the HWT Allocation Methodology, under which distributions are being made *pro rata* on account of the following benefits:

- 18 -

00064

(a)   Pensioner Life;[9]

(b)   LTD Basic Life;

(c)   LTD Income;

(d)   LTD Optional Life Benefit;

(e)   SIBs; and

(f)   STBs in pay.

40.   On November 29, 2010, counsel for a small group of dissenting LTD Beneficiaries filed leave to appeal the HWT Allocation Order to the Ontario Court of Appeal.   The application was dismissed.   An application for leave to appeal to the Supreme Court of Canada was dismissed on June 9, 2011.   Two interim distributions were made from the HWT, with the approval of this Court, while the leave applications were in process.

41.   As a result of the Supreme Court of Canada's refusal to grant leave to appeal, there is now certainty that the corpus of the HWT is to be distributed in accordance with the HWT Allocation Methodology.   However, some degree of uncertainty still remains regarding the final amount that will be available to distribute from the HWT, because it will be based on the outcome of matters referred to in the Monitor's prior reports. Accordingly, the Monitor sought approval for further interim distributions from the

---

[9] The value of Pensioner Life benefits for Pensioners is reduced by the amount paid from the HWT in 2010 for Pensioner Life premiums.

00065

HWT.  By Court Orders dated June 21, 2011 and August 23, 2011, respectively, this Honourable Court approved such further interim distributions.

42.   The Monitor has worked and will continue to work diligently with the Applicants, the Trustee, the LTD Beneficiaries' Representative and her advisors, the Former Employees' Representatives and their advisors, the CAW and others to finalize outstanding HWT matters, including accounting and financial reporting thereon, so that the final distribution from the HWT may be made to all HWT Participating Beneficiaries.

43.   The claims of the HWT Participating Beneficiaries in the Compensation Claims Process will be reduced by the distributions they receive from the HWT.

E.   **Hardship Fund and Termination Fund**

44.   This Court, by Order dated July 30, 2009, approved an employee hardship process making available up to $750,000 for hardship payments that will reduce the amount of any eventual distributions to the Employees who receive them.  By Orders dated February 25, 2011 and April 8, 2011, respectively, the total available for hardship payments was reduced by an amount to be used to supplement the Termination Fund (to be treated as Termination Fund payments when made) and by a further amount to make payments to SIB beneficiaries and STB Beneficiaries entitled to STBs in pay (to be used and treated as hardship fund payments).  The total hardship payments to date, including those authorized by the April 8, 2011 Order but excluding the amounts used to supplement the Termination Fund, are approximately $299,000.

00066

45.   The total Termination Fund payments to date are approximately $4.33 million. Termination Fund payments will reduce the amount of the proven claims of the Employees to whom they are made.

## VI.   PROCESS FOR NEGOTIATING AND DEVELOPING THE COMPENSATION CLAIMS PROCESS

46.   The Applicants and the Monitor worked closely with the Employee Representatives in identifying potential Compensation Claims, many of which had been previously identified through the Settlement Agreement and HWT Allocation Methodology approval processes.

47.   Throughout these CCAA proceedings, the Applicants proceeded with the assistance of the Monitor and their respective counsel.  In summary, among other things, they:

    (a)   reviewed the records of the Applicants to identify those Employees with employment contracts, including employment termination contracts;

    (b)   reviewed the Applicants' employment policies, including its CARP and the relevant collective bargaining agreements;

    (c)   identified potential Compensation Claims and consulted Mercer with respect to those Compensation Claims requiring actuarial assistance, including data exchanges, testing for reasonableness and confirmation of data consistency and, where necessary, made adjustments required to comply with benefit documents; and

    (d)   considered, for all claims, with the assistance of counsel:

- 21 -                              00067

    (i)     the Applicant's policies and practices;

    (ii)    the nature and quantum of claims; and

    (iii)   the legal basis and any uncertainty or litigation risk associated with such claims.

48.    The Employee Representatives for their part asserted claims, which the Applicants with the assistance of the Monitor and counsel considered.

49.    After extensive discussion and negotiations among the Compensation Claims Participants, the basic principles of the Compensation Claims Methodology were identified and agreed-upon, including the actuarial assumptions. Mercer prepared valuations, when appropriate, using work done for the HWT Allocation Methodology approval motion. Segal, in its capacity as actuarial advisor to the Former Employees' Representatives, the LTD Beneficiaries' Representative and the Continuing Employees' Representatives, reviewed Mercer's assumptions and performed due diligence with respect to the valuations. The Applicants, with the assistance of the Monitor and counsel, began a detailed process of considering and applying the basic principles to numerous fact situations. RSM Richter Inc., in its capacity as financial advisor to the Former Employees' Representatives and the LTD Beneficiaries' Representative, reviewed the work product from time to time.

50.    The Applicants, with the assistance of the Monitor and counsel, considered the practical elements of implementing any Compensation Claims process, including:

    (a)    number of claimants;

- 22 -                                                    00068

(b)    actuarial factors;

(c)    number and types of potential claims of any individual Employee given the number of benefits over time; and

(d)    costs.

51.    It was concluded that simply calling for claims would not be realistic, fair or cost-effective. Consideration was then given to various alternative processes in which, after the Compensation Claims Methodology was approved, completed forms would be sent to Employees who have been identified as having a Compensation Claim.  Various potential elements of the procedure were considered, including:

(a)    requiring positive confirmation of data;

(b)    whether a proof of claim process should be carried on in tandem; and

(c)    the design and nature of any materials.

52.    The Compensation Claims Participants were closely involved in the development of the Compensation Claims Process.  Draft materials were circulated among and commented on by the Representative Counsel.  Further, there were two in person meetings and a number of telephone meetings in which certain of the Employee Representatives and their committee members (along with their counsel and advisors) participated directly with Applicants' counsel, the Monitor and its counsel, and, at one in person meeting, with Mercer.

00069

53.    The Compensation Claims Participants agreed on the basic principle that individualized packages would be developed for each Employee who is identified as having a Compensation Claim that would include claims results and the individualized data on which the claims were based.  A due diligence process was then followed for the design and content of the Information Statement Packages and for the Proof of Claim Document Packages, which were reviewed by the Employee Representatives, including French translations.

54.    "Mock-ups" of the materials were performed confidentially for individual Employees identified by the Employee Representatives and who had agreed their claims information could be shared with the members of their respective committees.  The mock-up exercises provided an opportunity to review the cover letters and Information Statements for different Employees with different claims, which led to further drafts and refinement.

55.    The next stage was the performance of "test runs" during which claims packages were run through the calculation process that will be used if the Compensation Claims Process is approved.  Again, the test runs were performed for individual Employees identified by the Employee Representatives with multiple and different claims chosen with a view to testing the spectrum of potential claims.  The Employee Representatives, their respective committees and advisors worked with the Employees and gathered comments and concerns, which were shared with the Applicants and the Monitor.  The process and forms were then further refined and tested.

56.    The Applicants and the Monitor engaged in various discussions with the U.S. Debtors, the Committee and the Bondholder Group with respect to the Compensation Claims

00070

Process.  The Applicants and the Monitor have been providing an estimate of the aggregate value of the employment-related claims against the Applicants to the U.S. Debtors as well as to the Committee and Bondholder Group, which estimates were materially consistent with the current estimate of the value for the Compensation Claims of approximately $1.06 billion.  The Monitor and the Applicants have also provided the U.S. Debtors as well as the Committee and the Bondholder Group with an opportunity to ask questions, including of Mercer, which led to a number of conference calls, a meeting and exchange of information.

57.    The Monitor believes the process resulting in the proposed Compensation Claims Methodology Order and Compensation Claims Procedure Order was diligent, prudent and fair and reasonable, while also taking into account and balancing appropriately the interests of all stakeholders, including various Employee groups.

## VII.    COMPENSATION CLAIMS AND CLAIMANTS

58.    The first step in the Compensation Claims Process is Court approval of the proposed Compensation Claims Methodology for calculating:

(a)    Benefit Claims;

(b)    Termination and Severance Pay Claims; and

(c)    the Patent Award Claims.

59.    With Court approval of the Compensation Claims Methodology, the Applicants and the Monitor, with actuarial assistance, can proceed to the next step in the Compensation

00071

Claims Process, namely, the completion of the Information Statements reflecting the amount of the Compensation Claims calculated in accordance with the Compensation Claims Methodology and setting out the personal information upon which the individual's Compensation Claims have been calculated. The nature of potential claims differs depending on, among other things, whether the Employee was unionized or non-unionized, was terminated pre-filing or post-filing or transferred to a buyer, is a pensioner or his/her survivor, or is an employee on long term disability. The Compensation Claims Participants have therefore developed and agreed upon the form of Information Statement, that addresses all the potential claims for each of these various Employee circumstances.

60.     There will also be a proof of claim process for other employment-related claims that compensation claimants believe they have against an Applicant, a Director or an Officer that is not included on the Information Statement, including claims for director compensation or monetary grievances. However, by far the majority of the Compensation Claims will proceed by way of Information Statement.

61.     The Compensation Claims Methodology is set out in Section VIII and the Compensation Claims Procedure in Section IX. Both were developed after identification and consideration of the employee benefits and the categories of Employees who were entitled to the benefits.

A.     **Employee Benefits**

62.     Nortel provided benefits to Employees over the course of many decades. The Applicants and Monitor reviewed those benefit plans and booklets that are available. Certain benefit

00072

booklets and Sun Life policies were attached to the Fifty-First Report, which (together with its Appendices) is available on the Monitor's website.

63.    Starting in 2000, certain communications to employees contained language specifying that Nortel reserved the right to make changes to its CARP (including retiree benefit programs) in the future.

64.    Effective January 1, 2008, changes were made to the CARP, of which Nortel gave eighteen months prior notice. Attached as Appendix "F" are employee communications concerning CARP changes, including certain frequently asked questions and information concerning those employees who were "grandfathered" or unaffected with respect to certain existing retiree benefits at December 31, 2007.

65.    No further changes were made to the retiree benefits. As at December 31, 2010, Nortel had in place the following benefit plans or programs:

**(1)    Registered Pension Plans**

66.    The Applicants provided pension benefits through the Registered Pension Plans. Claims of the administrators and the regulators of the Registered Pension Plans, among others, were included in the call for claims pursuant to the Claims Procedure Order. The Applicants, as administrator of the Registered Pension Plans at that time, filed an omnibus claim in September 2009 in respect of each of the Registered Pension Plans, which has not yet been adjudicated or allowed. On October 1, 2010, Morneau became the administrator of the Registered Pension Plans and it is anticipated that Morneau will submit an amended claim under the Claims Procedure Order. Although deficiency

00073

claims related to the Registered Pension Plans are not included in the Compensation Claims Process, individual claims for loss of pension accrual during the notice period are addressed as components of the Termination and Severance Pay Claims as well as claims of LTD Beneficiaries for pension accruals.

**(2)      Non-Registered Pension Plans**

67.     In addition, the Applicants provided pension benefits under the Non-Registered Pension Plans, which are summarized in the Mercer 2011 Non-Registered Pension/Pension Accruals Valuation.   Copies of the Non-Registered Pension Plans are attached as Appendices "G" to "K".

68.     The Applicants ceased making payments under the Non-Registered Pension Plans on the Filing Date.  Claims relating to the Non-Registered Pension Plans are included in the Compensation Claims Process.  The Applicants propose these claims be calculated based on the methodology and assumptions set out in the Mercer 2011 Non-Registered Pension/Pension Accruals Valuation.

**(3)      Non-Pension Benefits**

69.     The Applicants also provided the Non-Pension Benefits.  Pursuant to the Settlement Agreement, the Applicants ceased paying the Non-Pension Benefits as at December 31, 2010.  Claims relating to the Non-Pension Benefits are included in the Compensation Claims Process.  The Applicants propose that these claims be calculated based on the methodology and assumptions set out in the Mercer 2011 Non-Pension Benefits

00074

Valuation.  These benefits are summarized below and described in greater detail in the Fifty-First Report of the Monitor and the supplements thereto.

**(a)**    *Pensioner Benefits*

70.    Nortel provided the following benefits to Pensioners:

(a)    Pensioner Life;

(b)    ADB;

(c)    Pensioner M&D; and

(d)    STB M&D Accrual.

71.    Pensioner Life premiums were historically paid from HWT assets.  Pensioner M&D was historically funded by Nortel on a pay-as-you-go basis but, as an administrative matter, was paid using the HWT as the payment mechanism.  These practices continued during the CCAA proceedings and, as provided under the Settlement Agreement, until December 31, 2010.

**(b)**    *LTD Benefits*

72.    LTD benefits are provided when short-term disability benefits end and continue until the earlier of:

(a)    the date the employee returns to active status; or

(b)    age 65, when the employee qualifies for pensioner benefits.

00075

73.    Nortel provided the following LTD benefits:

    (a)    waiver of premium for the following benefits while an individual is on LTD benefits:

        (i)    LTD Basic Life;

        (ii)    LTD Optional Life Benefit;

        (iii)    LTD AD&D Benefit; and

        (iv)    LTD Dependent Life Benefit;

    (b)    LTD M&D;

    (c)    LTD-STB Accrual; and

    (d)    LTD Income.

74.    LTD Income was historically paid from HWT assets.    Other LTD benefits were historically funded by Nortel on a pay-as-you-go basis but, as an administrative matter, were paid using the HWT as the payment mechanism.    These practices continued during the CCAA proceedings, prior to the Settlement Agreement.    Under the Settlement Agreement, all LTD benefits were paid by Nortel on a pay-as-you-go basis until December 31, 2010.

75.    The Settlement Agreement provided for termination of employment of LTD Beneficiaries on December 31, 2010 and that:

"such termination shall not affect in any manner any rights the LTD Beneficiaries or anyone claiming through them may have, either under a collective agreement, at common law or pursuant to any statute in relation to ordinary unsecured claims against Nortel arising out of their employment or termination thereof, including but not limited to claims for future lost long term disability or income continuation benefits, pension benefits or pension benefit accruals, and medical, dental and life insurance benefits, nor should affect in any manner their ability to participate in any program of benefits for which they are eligible that is established as a successor to the plans in which they participated prior to December 31, 2010".

(c)     *Survivor Income Benefits*

76.     SIBs have not been provided since before the commencement of the CCAA proceedings but continue to be paid to a group of surviving spouses. SIBs were historically paid by the HWT from HWT assets, which continued during the CCAA proceedings prior to the Settlement Agreement. Under the Settlement Agreement, SIBs were paid by Nortel on a pay-as-you-go basis until December 31, 2010.

(d)     *Survivor Transition Benefits*

77.     STBs were funded on a pay-as-you-go basis by Nortel but, as an administrative matter, were paid using the HWT as the payment mechanism. This practice continued during the CCAA proceedings and, as provided under the Settlement Agreement, until December 31, 2010.

00077

78.    STBs were closed during 2003.  Those people who were entitled to STBs at that time (namely, survivors then in pay, survivors of individuals who retired prior to April 1, 2003 and who remained LTD Beneficiaries with no interruptions of more than 60 days) were grandfathered.

(e)    *Optional Life Benefit*

79.    Nortel provided basic, core group life insurance (group life – part I), for all active employees.  In addition, Nortel offered Optional Life (also known as group life – part II) to active employees at their own cost, insured by Sun Life under a policy naming Nortel as the policyholder.  Optional Life participants changed from year to year as they decided to opt in or out of coverage or their employment was terminated.  Optional Life is term life insurance, with benefits terminating no later than January 1st following an Optional Life participant's 65th birthday.  Each Optional Life participant selected an amount of coverage by applying the benefit formula.

(4)    **Patent Awards Program**

80.    Nortel provided the Patent Filing Award to Employees for patent applications filed or the Patent Issuance Award for patents issued on inventions that an Employee made during his or her term of active employment with Nortel.  Any such inventions and patents were assigned to Nortel in accordance with the conditions of employment.  Nortel has advised the Monitor that:

(a)    it began the patent awards program in September 1996;

00078

(b)    the program was amended in September 1999, October 2001 and July 2005 (although the 2005 amendments did not change the amount of the awards from the 2001 program);

(c)    awards were provided based on the program in place at the time the event occurred giving rise to an award (i.e. if a patent application was filed in 2000, the employee-inventor would have received the Patent Filing Award based on the program in place in 2000 and, if that same patent was issued in 2006, the employee-inventor would have received the Patent Issuance Award based on the program in place in 2006); and

(d)    Nortel ceased making payments under the patent awards program effective December 31, 2009.

81.    Based on the information available to the Monitor, the total value of the claims under the patent awards program is approximately $285,000.    Attached as Appendix "L" is a summary of Nortel's patent awards program.

**(5)    Vacation Policy**

82.    Pursuant to the Nortel Vacation Policy:

(a)    a Non-Unionized Employee:

(i)    accrues vacation entitlement every month based on years of continuous service as follows:

- 33 -

00079

(A)     less than 10 years of service – 15 days per annum or 112.5 hours per annum, based on an hourly accrual rate of 9.375 hours per month;

(B)     after 10 years and less than 19 years of service – 20 days per annum or 150 hours per annum, based on an hourly accrual rate of 12.5 hours per month; and

(C)     after 19 years of service – 25 days per annum or 187.5 hours per annum, based on an hourly accrual rate of 15.625 hours per month;

(ii)     prior to 2001, an employee who accrued vacation at a higher rate than listed above (or who was eligible for a higher accrual rate by December 31, 2000) was grandfathered and continued to earn vacation at the higher rate; and

(iii)     upon cessation of employment, any accrued and unused vacation is paid out;

(b)     certain Non-Unionized Employees have employment contracts setting out vacation accrual entitlement that may differ from the entitlement described in (a) above, in which case, vacation entitlement accrues in accordance with the employment contract, and upon cessation of employment any accrued and unused vacation is paid out; and

- 34 -                                    00080

(c)     a Unionized Employee accrues vacation entitlement in accordance with the applicable collective bargaining agreement and upon cessation of employment, accrued and unused vacation is paid out.

## B.    <u>Claimants</u>

83.    The Employees have been grouped in categories based on their potential Compensation Claims. In each category, the potential claims are the same, and are calculated using the same methodology, for which the same information is required. There are a number of categories for which the claims are specific to that category, although there is also overlap between categories. For example, LTD Beneficiaries have potential claims specific to them as well as certain of the potential claims of the Former Employees and Pensioners. Whether an individual has a particular Compensation Claim will depend on the individual circumstances. The following are the potential Compensation Claims by category of claimant.

## (1)    **Deferred Vested Employees, Canadian Service Employees and Precision Employees**

84.    For those Deferred Vested Employees who do not have Termination and Severance Pay Claims[10], the potential Compensation Claims are:

(i)     claims under Non-Registered Pension Plans; and

(ii)    Patent Award Claims.

---

[10] Deferred Vested Employees who have a Termination and Severance Pay Claim are included in the Pre-Filing Terminated Employees category and their claims will be calculated in accordance with the Pre-Filing Terminated Employee Termination and Severance Claim Methodology.

00081

85.    The potential Compensation Claims of Canadian Service Employees are claims under Non-Registered Pension Plans.

86.    The potential Compensation Claims of Precision Employees are claims under the RAP.

**(2)    Pre-Filing Terminated Employees, Post-Filing Terminated Employees and Pensioner Eligible Terminated Employees**

87.    The potential Compensation Claims of Pre-Filing Terminated Employees, Post-Filing Terminated Employees and Pensioner Eligible Terminated Employees are:

    (a)    Termination and Severance Pay Claims calculated in accordance with the Pre-Filing Terminated Employee Termination and Severance Claim Methodology, Post-Filing Terminated Employee Termination and Severance Claim Methodology or the Pensioner Eligible Terminated Employee Termination and Severance Claim Methodology, as applicable (set out in Sections A, B and D of Appendix "D"); and

    (b)    Patent Award Claims.

**(3)    Post-Filing Transferred Employees**

88.    The buyers of the Applicants' business units offered employment to certain of the Employees in those business units on substantially the same terms as the Applicants, but did not offer post-retirement benefits, non-registered pension plans or defined benefit pension plans.    The potential Compensation Claims of Post-Filing Transferred Employees are:

00082

(a)    Termination and Severance Pay Claims calculated in accordance with the Post-Filing Transferred Employee Termination and Severance Claim Methodology (set out in Section C of Appendix "D"); and

(b)    Patent Award Claims.

**(4)    Pensioners[11]**

89.    The potential Compensation Claims of Pensioners are:

(a)    claims under Non-Registered Pension Plans;

(b)    SIB claims;

(c)    STB claims, including claims for accrual of STBs;

(d)    claims for Pensioner M&D including STB M&D Accrual;

(e)    claims for Pensioner Life, including ADB and death benefits; and

(f)    Patent Award Claims.

**(5)    LTD Beneficiaries**

90.    The potential Compensation Claims of LTD Beneficiaries are:

(a)    claims for LTD Basic Life, LTD Optional Life Benefit, LTD AD&D Benefit and LTD Dependent Life Benefit;

---

[11] For the purposes of describing their potential claims, Pensioners do not include Post-Filing Transferred Employees who were retirement eligible on the date of transfer or became retirement eligible during the proposed applicable notice period.

(b)    claims for LTD M&D;

(c)    claims for LTD Income;

(d)    claims for accrual of STBs;

(e)    claims for continuation of defined benefit or defined contribution accruals under the Registered Pension Plans;

(f)    claims under the Non-Registered Pension Plans;

(g)    claims for Pensioner M&D;

(h)    claims for Pensioner Life, including ADB;

(i)    Patent Award Claims; and

(j)    Termination and Severance Pay Claims calculated in accordance with the LTD Beneficiary Termination and Severance Claim Methodology (set out in Section E of Appendix "D").

**(6)    Active Employees**

91.    Active Employees have continued their employment with a buyer of the Applicants' businesses, have or will retire if they become eligible to do so, have or will be terminated as the Applicants sell and wind down their remaining business operations or have or may voluntarily leave the employ of an Applicant.

92.    The types of potential Compensation Claims of Active Employees against the Applicants that will form the basis of their Compensation Claim amount and personal Information

00084

Statement will depend on the status of the Active Employee when he or she ceases employment with an Applicant and are as follows:

(a)     if the Active Employee continued his/her employment with a buyer, claims as a Post-Filing Transferred Employee;

(b)     if the Active Employee is terminated, claims as a Post-Filing Terminated Employee or Pensioner Eligible Terminated Employee;

(c)     if the Active Employee meets the applicable benefit eligibility requirements on the date on which the Active Employee ceases to be an Active Employee and that Active Employee retires from one of the Applicants, claims as a Pensioner; and

(d)     if the Active Employee voluntarily leaves the employ of an Applicant, no claim other than a Patent Award Claim.

## VIII.   COMPENSATION CLAIMS METHODOLOGY

93.    With the potential Compensation Claims identified, the Compensation Claims Participants agreed on a methodology for calculating the Benefit Claims, the Termination and Severance Pay Claims and the Patent Award Claims, for which the Applicants are seeking approval in this motion.   The Compensation Claims all rank as ordinary, unsecured claims against the Applicants.

## A.   **Benefit Claims**

94.    Faced with the uncertainty of future events and the conflict inherent in each beneficiary seeking to maximize his or her recovery by obtaining the highest possible valuation, the

00085

Monitor believes the use of agreed-upon actuarial assumptions is a reasonable, fair and practical approach to the required valuation. The Mercer 2011 Valuations were prepared following extensive consultation with Segal, the actuary for the Employee Representatives, and the other Compensation Claims Participants.

95.    Mercer prepared the Mercer 2011 Valuations, copies of which are attached as Appendices "B" and "C" hereto. The Mercer 2011 Valuations were prepared for the purpose of determining the value of Benefit Claims, Non-Registered Pension Plan Claims and the portions of the Termination and Severance Pay Claims relating to Registered Pension Plan accruals, Non-Registered Pension Plans and Non-Pension Benefits for purposes of the Compensation Claims Process. The reports outline in detail the methodology and assumptions used to arrive at the valuation results and are based on the most recent data available as at December 31, 2010, as reflected in the Applicants' books and records, which data may be updated from time to time.

96.    The data and assumptions on which the Mercer 2011 Valuations are based are set out in the valuations.

97.    The actuarial assumptions used in the Mercer 2011 Non-Pension Benefits Valuation are substantially the same as the assumptions used in the Mercer HWT Report, on which the HWT Allocation Methodology was based. Mercer has prepared a detailed list of the differences between the Mercer HWT Report and the Mercer 2011 Non-Pension Benefits Valuation, which is attached as Appendix "M".

98.    Other than the matters on which Mercer received instructions based on the agreement among the Compensation Claims Participants, and the discount rates and costs of living

00086

adjustment rate, which were updated in accordance with actuarial standards, there are no differences of a substantive nature or which have a substantial impact on the value of the Compensation Claims. There are differences in presentation designed to make certain of the information more easily understood.

99.    The Applicants and the Monitor took into account Nortel's historic cost of providing the Non-Pension Benefits, including the administrative and tax expenses, and availability and cost of replacing coverage for these benefits. The Compensation Claims Participants reached agreement that Mercer should be instructed to make the following adjustments:

(a)    an increase of 10% on the present value of medical and dental benefits[12] (the **"Administrative Costs Gross Up"**); and

(b)    a net effective 10% gross up for income taxes on the present value of the following claims[13] (the **"Income Tax Gross Up"**) to reflect the potential negative consequences of receiving the following benefits as a lump sum:

(i)    Pensioner Life, including ADB and all LTD Life insurances (i.e., Basic Life, Optional Life, AD&D, Dependent Life);

(ii)    claims under Non-Registered Pension Plans;

(iii)    claims for Registered Pension Plan accruals;

---

[12]  For example, assuming a present value of $100, the Administrative Cost Gross Up will result in a claim value of $110.

[13]  For example, assuming a present value of $100, the Income Tax Gross Up will result in a claim value of $111.11. The net effective gross-up puts the claimant in the same net position assuming a 10% tax rate.

- 41 -

00087

(iv)    SIBs; and

(v)    STBs.

100.    The Mercer 2011 Valuations will be used to prepare the individual Information Statements (including the calculation of the Benefit Claims and components of the Termination and Severance Pay Claims set out therein) for submission in the Compensation Claims Process and will form the basis for distributions to compensation claimants from the Applicants' estates.

101.    In preparing the Information Statements, Mercer will apply the same actuarial assumptions and data dates used to value the benefits to each Identified Claimant. For Active Employees, Active Canadian Service Employees and Active Precision Employees, Mercer will apply the same actuarial assumptions but based on a determination date of the date employment ceased with respect to discount rates, inflation and mortality as determined by the Canadian Institute of Actuaries' standard at that time. Mercer will also apply unique employee information to determine the individual amounts for the Benefit Claims and the portions of the Termination and Severance Pay Claims relating to Registered Pension Plan accruals, the Non-Registered Pension Plans and Non-Pension Benefits, as indicated in the Mercer 2011 Valuations.

B.    **Termination and Severance Pay Claims**

102.    Although Nortel had termination and severance guidelines, it did not have a general termination and severance policy that applied to all employees and could be considered part of their employment contract.    Therefore, the methodology for calculating

00088

Termination and Severance Pay Claims was the subject of extensive discussions and negotiations among the Applicants, the Monitor and the other Compensation Claims Participants.

103.    With respect to the notice of termination/severance period specifically, a number of factors, including age, years of service, position and compensation, were considered, as well as how mitigation could be taken into account in a practical way.  After due diligence (including modelling of different factors with different weightings) and negotiations among the Compensation Claim Participants, agreement was reached that an approach using only years of service and without mitigation for those Terminated Employees who did not have employment contracts dealing with termination and severance and who did not transfer to buyers but with mitigation for those Terminated Employees who transferred or declined transfer to buyers would achieve a reasonable, fair and practical result that can be applied objectively and uniformly among the affected Employees.

104.    A rate of 5.14% was applied for employee benefits during the notice period to base weekly or base monthly salary, as applicable.  This approximates the Applicants' 2010 cost of providing medical and dental benefits, life insurance benefits, travel and other insurance benefits and the employer match portion of RRSP contributions.

105.    Attached as Appendix "D-1" is a description of the proposed methodology for calculating Termination and Severance Pay Claims for each category of Employee.  Attached as Appendix "D-2" is the Aggregate Severance Grid reflecting the aggregate liability for Base Severance Claims under the proposed methodology and attached as Appendix "D-

00089

3" are charts reflecting the Severance Grid Formulae for calculating the Base Severance Claims for each category of Terminated Employees. The methodology varies depending on the timing of termination and the category of compensation claimant in which the Terminated Employee belongs. For example, Terminated Employees who were terminated or provided with notice of termination before the Filing Date received a termination package forming the basis of their Termination and Severance Pay Claim. The Termination and Severance Pay Claims of Employees terminated after the Filing Date will be calculated using a proposed methodology that differs depending, for example, on whether the Employee was unionized, was transferred (or was offered transfer) to a buyer or was on long term disability benefits.

106. Where the applicable minimum notice period (and severance period for Ontario employees) under the ESA Minimum Notice/Severance Period is greater than the proposed methodology notice period for Non-Unionized Employees terminated post-filing, the individual Information Statement will reflect the applicable statutory period and the applicable severance calculations will be made and shown accordingly.

107. In preparing the Information Statements, the Applicants and the Monitor will apply the applicable Termination and Severance Claim Methodology described in Appendix "D-1" and reflected on the Severance Grid.

## C.   Patent Award Claims

108. The methodology for the calculation of Patent Award Claims is set out in Appendix "E".

- 44 -

00090

## IX. COMPENSATION CLAIMS PROCEDURE

### A.    <u>Information Statement Process</u>

109.    If the Compensation Claims Orders are granted, the vast majority of claims will proceed by way of the Information Statement process.  In summary, under the Information Statement process:

(a)    The Information Statement Package will be sent to Identified Claimants, who do not include Active Employees, Active Canadian Service Employees or Active Precision Employees;

(b)    Active Employees, Active Canadian Service Employees and Active Precision Employees will be sent an Information Statement Package in a prescribed period of time after their employment has ceased;

(c)    Claimants will have an opportunity to correct their Personal Information and to file a proof of claim for Other Compensation Claims, being claims other than Benefit Claims, Termination and Severance Pay Claims and Patent Award Claims.  The methodology for the calculation of the Compensation Claims, if approved, cannot be challenged;

(d)    The Monitor may accept or disallow the changes to information and a proof of claim;

(e)    There is a resolution process for disputed information and claims.

00091

110.  A copy of the English version in substantially the form of the Information Statement Package which will be individualized and mailed to each Identified Claimant according to his or her indicated language preference as per the Applicant's records is attached as Appendix "N". A French version of the Information Statement Package will be attached as an appendix to a supplementary report of the Monitor to be served and filed in advance of the within motion. The Information Statement Package is comprised of:

(a)    a cover letter summarizing the Compensation Claims Process, which will include the aggregate amount of the Employee's Compensation Claims against the Applicants calculated in accordance with the Compensation Claims Methodology using data as of December 31, 2010 from the Applicants' books and records;

(b)    the Information Statement consisting of:

(i)    Form A – Your Compensation Claim Amount; and

(ii)    Form B – Your Personal Information Change Form;

(c)    Guide to Using Form B;

(d)    Form C Proof of Claim; and

(e)    Guide to Completing Form C.

111.  The Applicants and the Monitor, with actuarial assistance, will complete an Information Statement for each of the Identified Claimants, Active Employees, Active Canadian Service Employees and Active Precision Employees using the Compensation Claims

00092

Methodology and data as at December 31, 2010 from the Applicants' books and records (as updated from time to time).

112.    Each Information Statement will include:

(a)    Form A (Your Compensation Claim Amount) setting out the Employee's:

(i)    Termination and Severance Pay Claim amount, if applicable, as calculated based on the applicable Termination and Severance Claim Methodology;

(ii)    Benefit Claim amount, if applicable, under one or more of the Non-Registered Plans as calculated pursuant to the methodology and assumptions in the Mercer 2011 Valuations; and

(iii)    Patent Award Claim amount, if applicable, as calculated based on the Patent Award Claim Methodology; and

(b)    Form B (Your Personal Information Change Form) setting out the Personal Information relating to the particular Employee as at December 31, 2010 (completed based on the books and records of the Applicants, as updated from time to time) that is used in the determination of the Compensation Claim amounts, which section includes a column for the Employee to indicate any corrections to the data (together with supporting documentation to be attached) and the Confirming Changes Section, to be signed and completed by the Employee only if that Employee has requested changes or corrections to the personal information.

00093

113.    The Information Statements indicate the "Employer of Record" based on the books and records of the Applicants. An issue has been raised as to whether the Applicant named as Employer of Record is necessarily the only or the appropriate entity to be responsible for the Employee's claim given, among other things, that Employees were transferred among the Applicants. The Compensation Claims Participants have agreed to defer this issue while the Applicants develop a Plan, which may render the issue moot, depending on the nature of the Plan.

114.    The cover letter and Information Statement include sections that are applicable to specific categories of Employees. Only the section relevant to a specific Employee will be sent to that Employee. English and French versions of examples of the form of personalized cover letter and Information Statement that will be sent to Pre-Filing Terminated Employees, Post-Filing Terminated Employees, Post-Filing Transferred Employees, Pensioners and LTD Beneficiaries will be attached as appendices to a supplementary report of the Monitor to be served and filed in advance of the within motion.

115.    Also included in the Information Statement Package is a Guide to Using Form B. This Guide is intended to assist the Employee in understanding the various data points that are completed for the Employee in Form B, which, in turn, will assist the Employee in determining whether any of the Personal Information requires correction. In addition, the Guide describes documents that the Employee can look to in order to verify the particular data point and that can be used as supporting documentation to be attached to the Confirming Changes Section should the Employee determine that a correction is required.

00094

116.   An Employee who has any changes or corrections to Form B must mark those changes or corrections in the corrections column, attach supporting documentation, complete and sign the Confirming Changes Section and return Form B as so completed and signed (a "**Request for Correction**") to the Monitor so that it is received by the Monitor on or before 4:00 p.m. (Eastern Time) on December 23, 2011 (the "**Request for Correction Bar Date**").

117.   The Information Statement Package will also be sent to Active Employees, Active Canadian Service Employees and Active Precision Employees, however, the process and bar date with respect to these active employees differs.  Any claims an Active Employee, Active Canadian Service Employee or Active Precision Employee may have as at December 31, 2010 are subject to adjustment once that employee ceases active employment.  In addition, an Active Employee, Active Canadian Service Employee or Active Precision Employee may have claims that arise between January 1, 2011 and the date on which that employee ceases active employment.  Accordingly, it is only once an Active Employee, Active Canadian Service Employee or Active Precision Employee ceases active employment that such employee will receive an Information Statement setting out his or her applicable Compensation Claims (a "**Rolling Information Statement**"), which Information Statement is subject to a rolling bar date, namely on or before 4:00 p.m. (Eastern Time) on the date that is forty-five calendar days after the day on which an Information Statement was sent to that Active Employee, Active Canadian Service Employee or Active Precision Employee (the "**Request for Correction Rolling Bar Date**", together with the Request for Correction Bar Date, the "**Correction Bar Date**").

00095

118.    The Monitor, in consultation with the Applicants, will review and consider any Requests
        for Correction and may accept the corrections requested or reject them (in whole or in
        part).  The Monitor will provide copies of the Requests for Correction received to the
        applicable Representative Counsel.

119.    If the Request for Correction is accepted and the correction(s):

        (a)    change the Compensation Claim amount set out in the Employee's Form A, the
               Monitor will send a Revised Information Statement with explanatory cover letter
               to the Employee reflecting the correction(s) to the Personal Information and the
               revised Compensation Claim amount; or

        (b)    do not change the Compensation Claim amount set out in the Employee's Form
               A, the Monitor will send a Notice of Acceptance (Personal Information) to the
               Employee indicating acceptance of the change in the Personal Information and
               that the change does not result in a revised Compensation Claim amount.

120.    Where a Request for Correction has not been received by the Monitor on or before the
        applicable Correction Bar Date, or a Request for Correction has been accepted in writing
        by the Monitor, then the Compensation Claim amount and Personal Information set out in
        the Information Statement, Revised Information Statement, or Notice of Acceptance
        (Personal Information), as applicable, shall be final and binding for all purposes,
        including for the purposes of voting and distribution under the Plan, and the Employee
        shall be barred from disputing the Compensation Claim amount or Personal Information
        set out therein and from making any Claim inconsistent with such Personal Information.

00096

121.    If the Request for Correction is rejected, the Monitor will send the Employee a Notice of Disallowance (Personal Information) together with a blank Dispute Notice (Personal Information) and the Employee will have an opportunity to dispute that disallowance, each in the manner and as described in Section D below.

122.    Notwithstanding the foregoing, if the Monitor independently discovers or is made aware of any errors in the Personal Information that affect the amount of the Compensation Claim of such Employee, the Monitor has the discretion to make those corrections.  If any such errors are discovered and corrections are made by the Monitor, the Monitor will send a Monitor Corrected Information Statement together with a blank Dispute Notice (Personal Information) to the individual, who will have 28 calendar days after the Monitor Corrected Information Statement is sent to dispute the revised data in the Monitor Corrected Information Statement, which will be subject to the dispute resolution process for Compensation Claims.

**B.**    **Proof of Claim Process**

123.    As discussed, the Compensation Claims Process is structured so that the vast majority of claims are based on Information Statements and any accepted Requests for Correction, rather than individual proofs of claim.  However, as referenced above, certain claims were excluded from the Claims Procedure Order.  As a result, an individual Form C Proof of Claim must be filed:

00097

(a)    by the individual if:

    (i)     an Employee believes he/she has any other claim against any one or more of the Applicants, the Directors or Officers for amounts owing to him/her in his/her capacity as an employee or arising from the administration, management or oversight of any pension plans or employee benefit plans administered or sponsored by the Applicants or their subsidiaries that is not included in Form A (Your Compensation Claim Amount) of the Information Statement;

    (ii)     a Director believes he/she has a claim for compensation for acting as a director, including, without limitation in respect of fees, deferred share-based compensation, benefits and director expenses; and

    (iii)     a Director or Officer believes he/she has a claim against one or more of the Applicants for indemnification and/or contribution arising from such Director's or Officer's service to any Applicant; and

(b)    by the applicable union if an Employee believes he or she has a Grievance Claim.

The claims set out in (a) and (b) above are referred to collectively as the **"Other Compensation Claims"**.[14]   A copy of substantially the form of the Proof of Claim Document Package is attached as Appendix "O".

---

[14] Some of these claims were subsequently released pursuant to the Settlement Agreement and the Order approving it.

00098

124. Any Proof of Claim (other than with respect to an Active Employee, Active Canadian Service Employee or Active Precision Employee) must be filed so that it is received by the Monitor prior to 4:00 pm (Eastern time) on December 23, 2011 (the "**Proof of Claim Bar Date**").

125. Any Active Employee, union in respect of a Grievance Claim of an Active Employee, Active Canadian Service Employee or Active Precision Employee must file a Form C Proof of Claim so that it is received by the Monitor prior to 4:00 pm (Eastern time) on the date that is forty-five calendar days after the day on which the Information Statement Package was sent to that Employee (the "**Proof of Claim Rolling Bar Date**" with the Proof of Claim Bar Date, as applicable, the "**Applicable Proof of Claim Bar Date**").

126. Any Compensation Creditor (or union with respect to a Grievance Claim) who does not file a Form C Proof of Claim (together with supporting documentation) which is received by the Monitor on or before the Applicable Proof of Claims Bar Date (a) shall be forever barred from making or enforcing any Other Compensation Claim against the Applicants, or any of them, or against the Directors or Officers, or any of them; (b) shall not be entitled to vote at the Creditors' Meeting with respect to any Other Compensation Claim in respect of the Plan or to receive any distribution thereunder, and (c) in respect of any Other Compensation Claim, shall not be entitled to any further notice, and shall not be entitled to participate as a creditor, in these proceedings.

## C.    Notice to Creditors

127. Within 10 business days following the making of the Compensation Claims Procedure Order, the Monitor will post on its website at www.ey.com/ca/Nortel an electronic copy

00099

of the Motion Record relating to the within Motion and will also, as a separate link, post an electronic copy of the following documents:

(a)    the Compensation Claims Procedure Order;

(b)    Guide to Using Form B (in both English and French);

(c)    a Proof of Claim Document Package (in both English and French);

(d)    the Mercer 2011 Valuations (Appendices "B" and "C");

(e)    the Termination and Severance Claim Methodology (Appendix "D"); and

(f)    the Patent Award Claim Methodology (Appendix "E").

128.   The Monitor will send a copy of the following by ordinary mail at the Employee's address as last shown in the Applicants' records within 21 business days of the making of the Compensation Claims Procedure Order:

(a)    the applicable Information Statement Package to each Identified Claimant;

(b)    a Proof of Claim Package to those employees referred to in paragraph 25 who are not sent an Information Statement Package;

(c)    to the Active Employees, a letter substantially in the form as attached as Appendix "P";

(d)    to the Post-Filing Transferred Employees who are not receiving an Information Statement Package, a letter substantially in the form as attached as Appendix "Q" and a Proof of Claim Document Package; and

00100

(e)     to Employees with out of country addresses who are not receiving an Information Statement Package, a letter substantially in the form attached as Appendix "R" and a Proof of Claim Document Package.

129.    The letters will be translated into French and sent in French or English, as applicable, according to the indicated language preference of the Employee as per the Applicant's records.  French versions of the letters will be attached as appendices to a supplementary report of the Monitor to be served and filed in advance of the within motion.

130.    The Monitor will send a copy of the Information Statement Package to each Active Employee, Active Canadian Service Employee and Active Precision Employee:

(a)     within twenty-one (21) Business Days of December 31, 2011 for those (A) Active Employees and Active Canadian Service Employees the Applicants have informed the Monitor ceased to be an Active Employee or Active Canadian Service Employee, as applicable, on or before December 31, 2011 and (B) Active Precision Employees the Former Employees' Representative Counsel have informed the Monitor and the Applicants ceased to be an Active Precision Employee on or before December 31, 2011; or

(b)     within twenty-one (21) Business Days after (A) the Applicants inform the Monitor that the Active Employee or Active Canadian Service Employee ceased to be an Active Employee or Active Canadian Service Employee, as applicable, on or after January 1, 2012 and (B) the Former Employees' Representative Counsel inform the Monitor and the Applicants that the Active Precision Employee ceased to be an Active Precision Employee on or after January 1, 2012.

00101

131.   If an Information Statement Package, Proof of Claim Document Package or letter referred to in paragraph 128 is returned by the post office as having an incorrect address, the Monitor and the Applicants will make reasonable efforts to ascertain a correct address for the applicable individual and resend the applicable documents to such individual.

132.   Within 21 business days of the making of the Compensation Claims Procedure Order, the Monitor will cause to be published a notice for publication in the form attached as Appendix "S" hereto in English in the Globe and Mail (National Edition), The Ottawa Citizen, the Calgary Herald, the Toronto Star, the Belleville Intelligencer, the Kingston Whig Standard, the London Free Press, Vancouver Sun, Halifax Chronicle Herald and the Montreal Gazette and in French in La Presse and Le Droit.

133.   In addition, provided that such request is received by the Monitor prior to the applicable claims bar date, the Monitor will send the applicable Claims Package to any person claiming to be a Compensation Creditor as soon as reasonably possible after receipt of such a request from a potential compensation creditor.

134.   In the Monitor's view:

   (a)      each of the Request for Correction Bar Date, Proof of Claim Bar Date, Request for Correction Rolling Bar Date and the Proof of Claim Rolling Bar Date is reasonable in that they provide at least 45 calendar days from the date of mailing of the Information Statement Packages during which compensation claimants may review the Personal Information, evaluate their employment-related claims against the Applicants and/or Directors/Officers and submit any Requests for Correction or Proofs of Claim; and

00102

(b)      the identification of Compensation Creditors, the mailing of Claims Packages, the posting of the documents on the Monitor's website and the newspaper advertisements described above will provide sufficient and timely notification to allow Compensation Creditors to submit any Requests for Correction and Proofs of Claim by the applicable claims bar date.

**D.    Resolution of Claims**

135.    Any Claim, as determined in accordance with the Compensation Claims Orders, shall be final for all purposes including any Plan filed with this Honourable Court and any distributions made to creditors of the Applicants pursuant to such Plan.

136.    The Monitor, in consultation with the Applicants and, if a Claim is asserted against a Director or Officer, such Director or Officer, will review all Requests for Correction and each Form C Proof of Claim filed on or before the applicable claims bar date and at any time may:

(a)      request additional information from a Compensation Creditor; and

(b)      accept or disallow (in whole or in part):

   (i)      the corrections requested in any Request for Correction by delivering to the applicable Compensation Creditor a Revised Information Statement or Notice of Acceptance (Personal Information), as applicable, if the Request for Correction is accepted or, if the Request for Correction is rejected, in whole or in part, a Notice of Disallowance (Personal Information), together with a blank Dispute Notice (Personal Information); and

00103

(ii)   the amount and/or status of the Other Compensation Claim set out in any Form C Proof of Claim. If a Form C Proof of Claim is rejected, in whole or in part, the Monitor will deliver to the applicable Compensation Creditor a Notice of Disallowance (Proof of Claim), together with a blank Dispute Notice (Proof of Claim).

The forms of Notice of Acceptance (Personal Information), Notice of Disallowance (Personal Information), Notice of Disallowance (Proof of Claim), Dispute Notice (Personal Information) and Dispute Notice (Proof of Claim) are attached hereto as Appendices "T" to "X".

137.   Any Compensation Creditor who intends to dispute a Notice of Disallowance must file a Dispute Notice with the Monitor no later than 4:00 pm (Eastern time) on the date that is 28 calendar days after the Monitor sends the Notice of Disallowance or Monitor Corrected Information Statement.

138.   Where a Compensation Creditor who receives a Notice of Disallowance or Monitor Corrected Information Statement fails to file a Dispute Notice with the Monitor within the time limited therefor, the amount and status of such Compensation Creditor's Claim, together with the Personal Information, shall be deemed to be as set out in the Notice of Disallowance or Monitor Corrected Information Statement and shall establish such Compensation Creditor's proven claim.

139.   The Monitor believes the period of time to file a Dispute Notice is reasonable as most creditors will have performed an evaluation of their Claim prior to submitting a Request

00104

for Correction or Proof of Claim and therefore should be in a position to respond within the time period established.

140.   Upon receipt of a Dispute Notice, the Monitor, in consultation with the Applicants and a Director or Officer if the Claim is asserted against such Director or Officer, may attempt to consensually resolve the amount of the Claim with the Compensation Creditor.  If the Claim is not settled within a time period or in a manner satisfactory to the Monitor, the Monitor may refer the dispute to a Claims Officer for determination or, in the alternative, bring the dispute before this Honourable Court for determination.

141.   If the Monitor refers the dispute to a Claims Officer for determination, the Claims Officer will determine the manner, if any, in which evidence may be brought before the Claims Officer by the parties as well as any other procedural or substantive manners.

142.   The Claims Officer shall notify the Compensation Creditor, Monitor, the Applicants and, if a Claim is asserted against a Director of Officer, such Director or Officer, as soon as practicable and in any event no later than 30 calendar days from the closing of submissions or such other date as the Claims Officer and the Monitor may agree, as to the Claims Officer's determination of the amount and status of the Compensation Creditor's Claim.

143.   The Applicants propose that each Compensation Creditor, the Monitor and a Director or Officer, if a Claim is asserted against such Director or Officer, have the ability to appeal a determination of the Claims Officer by way of motion to this Honourable Court filed within ten business days of delivery of such determination.

00105

144.    The amount and status of all Claims as finally determined in accordance with the forms and procedures set out in the Compensation Claims Orders and as described above shall be final for all purposes, including any Plan, and including without limitation for any distribution made to Compensation Creditors and no other Claim may be made by a Compensation Creditor.

**E.    Role of Employee Representatives and Representative Counsel**

145.    The Employee Representatives and Representative Counsel will assist and facilitate their constituents in reviewing the Information Statements, filing any proofs of claim for any Other Compensation Claims and respond to inquiries their constituents may have regarding the Information Statements and Compensation Claims Process.

146.    Representative Counsel will hold a series of informational webinars following service of the Compensation Claims Process materials in order to provide an overview of the Compensation Claims Process, including the proposed methodology and Information Statement process, to their respective constituents and an opportunity for their constituents to ask any questions they may have regarding the Compensation Claims Process. The proposed schedule for the informational webinars is as follows:

(a)    Pensioners, Terminated Employees, Unionized Post-Filing Transferred Employees and CAW members - The Former Employees' Representatives, Former Employees' Representative Counsel and their financial and actuarial advisors, with the participation of CAW Counsel, will hold informational webinars on September 22, 2011 and September 30, 2011;

00106

(b)   LTD Beneficiaries and CAW members - The LTD Beneficiaries' Representative, LTD Beneficiaries' Representative Counsel and their financial and actuarial advisors, with the participation of CAW Counsel, will hold a special informational webinar on September 30, 2011, which is supplementary to the webinars for Pensioners, Terminated Employees, Unionized Post-Filing Transferred Employees and CAW members on September 22 and 30, 2011; and

(c)   Active Employees and Non-Unionized Post-Filing Transferred Employees - The Continuing Employees' Representatives and Continuing Employees' Representative Counsel will hold an informational webinar on September 26, 2011.

147.   It is anticipated that following approval of the Compensation Claims Process and delivery of the Information Statements, Representative Counsel will also hold a series of webinars and "roadshows" in a variety of locations to facilitate an understanding of the Information Statements and proof of claim process and respond to inquiries.   The anticipated schedule for these informational webinars and roadshows is as follows:

(a)   Pensioners, Terminated Employees and Unionized Post-Filing Transferred Employees - The Former Employees' Representatives, Former Employees' Representative Counsel and their financial and actuarial advisors will hold an informational webinar on November 10, 2011 and the following roadshows:

(i)   Calgary - November 14, 2011;

(ii)   Toronto - November 15, 2011 and November 24, 2011;

- 61 -

00107

 (iii)  London - November 16, 2011;

 (iv)  Bellville - November 17, 2011;

 (v)  Kingston - November 17, 2011;

 (vi)  Ottawa - November 21, 2011; and

 (vii)  Montreal - November 22, 2011;

(b) <u>LTD Beneficiaries</u> - The LTD Beneficiaries' Representative, LTD Beneficiaries' Representative Counsel and their financial and actuarial advisors will hold an informational webinar on November 10, 2011 and roadshows in the same locations and dates as set out in (a) above;

(c) <u>CAW members</u> – The informational webinars referenced in (a) and (b) above will be open to CAW members and CAW Counsel will participate in those webinars. CAW Counsel will also participate in the roadshows referenced in (a) and (b) above in the locations in which the CAW has collective bargaining rights, being Toronto, London, Belleville and Kingston; and

(d) <u>Active Employees and Non-Unionized Post-Filing Transferred Employees</u> – The Continuing Employees' Representatives and Continuing Employees' Representative Counsel will hold an informational webinar on November 11, 2011 and a roadshow in Ottawa on November 17, 2011.

00108

148.    A schedule of the webinars and roadshows referenced in paragraphs 146 and 147 above will be provided to Employees with the Information Statement Package and the letters referenced in paragraph 128 above.

149.    Representative Counsel may act for an Employee who disputes the data in his Information Statement or where the Employee, in the judgment of the Representative Counsel, has a *bona fide* claim that has not been dealt with through the Compensation Claims Methodology, at the cost of the Applicants. However, the costs associated with adjudicating any claim that is not reasonably resolved, including preparation for adjudication, shall be dealt with by the Claims Officer or the Court, as applicable.

150.    Since their Court appointment, the Continuing Employees' Representatives and their counsel have included on their websites and in communications, information concerning potential offers of employment to Active Employees from buyers of Nortel assets and addressed concerns of Post-Filing Transferred Employees with respect to the insolvency proceedings and their claims. Their governance structure includes the Post-Filing Transferred Employees that are not Unionized Employees. The Former Employees' Representatives and their counsel have not included Post-Filing Transferred Employees that are not Unionized Employees in their governance structure and have not formally communicated with them nor represented their interests in the insolvency proceedings. While the Monitor, the Applicants and the Employee Representatives all recognized that the Continuing Employees' Representatives and their counsel represented Non-Unionized Post-Filing Transferred Employees, it has been brought to the attention of the Monitor that the Order appointing the Continuing Employees' Representatives and their counsel

00109

may not be completely clear with respect to their representation of Post-Filing Transferred Employees. The Monitor is of the view that to eliminate any potential concerns, the Continuing Employees' Representatives appointment order should be amended to explicitly reflect that the Post-Filing Transferred Employees that are not Unionized Employees are included therein.[15]   The Monitor believes all of the Representatives have carried out their mandates appropriately, that the Post-Filing Transferred Employees are being appropriately represented and that there is no prejudice to any party in clarifying that Order.

F.    **Other Claims Matters**

151.   Compensation Claims or distributions in respect thereof have been or will be reduced, on a dollar for dollar basis, by any payments in respect of the following that a Compensation Creditor receives during the CCAA proceedings before a final distribution from the Applicants' estates:

(a)    hardship payments received as a partial distribution in advance of a general distribution to creditors (which will reduce the amount of any eventual distribution to which such Compensation Creditor may be entitled under a Plan);

(b)    payments received from the Termination Fund created under and payable in accordance with the Settlement Agreement or Court Order as a credit against proven claims of such Compensation Creditor (which is currently reflected as a

---

[15] CAW Counsel will continue to act for Post-Filing Transferred Employees that are CAW members and Former Employees' Representative Counsel will continue to act for Post-Filing Transferred Employees that are subject to a collective bargaining agreement with Unions other than CAW.

00110

reduction to the Termination and Severance Pay Claim in an Employee's Form A);

(c)    distributions received from the corpus of the HWT (which will reduce the amount of the proven claim of such Compensation Creditor); and

(d)    any other valid set-offs relating to amounts owing by the Compensation Creditor to one or more of the Applicants.[16]

## X. MONITOR'S RECOMMENDATIONS

152.    In the Monitor's view, the proposed Compensation Claims Process:

(a)    represents a fair, reasonable, efficient and practical method for the calculation and submission of employment-related claims that approximately 16,000 Employees may have against the Applicants, the majority of which relate to claims for loss of benefits that require actuarial determination and calculation;

(b)    will assist in ensuring that claims which have facts or issues in common will be determined consistently in a streamlined, efficient process; and

(c)    brings greater certainty to the calculation of Compensation Claims, fairly taking into account litigation risk, thereby reducing the risk that assets would be depleted in order to fund potentially significant litigation costs.

---

[16] In this regard, the Information Statements contain a data point setting out any amount showing on Nortel's books and records as owed to the Applicants by the employee due to an overpayment of an item through payroll or a tax equalization calculation, which will reduce the amount of the proven claim of such employee.

00111

153.    The Monitor believes that, overall, the Compensation Claims Process represents a fair balancing of the interests of the Applicants' stakeholders and an important step in the implementation of the Applicants' restructuring. It was arrived at after extensive negotiations among the Compensation Claims Participants. The Monitor recommends that this Honourable Court approve the Compensation Claims Process and grant the Compensation Claims Orders substantially in the form submitted by the Applicants.

All of which is respectively submitted this 19th day of September, 2011.

**ERNST & YOUNG INC.**

**In its capacity as Monitor of the Applicants**

Per:

Murray A. McDonald
President

\5991257.20