## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X
            :

*In re*           :    Chapter 11

           :

Nortel Networks Inc., *et al.,*[1]    :    Case No. 09-10138 (KG)

           :

             Debtors.    :    Jointly Administered

           :

           :    **Hearing date:  November 15, 2011 10:00 AM (ET)**

           :    **Objections due:  November 8, 2011 4:00 PM (ET)**

-------------------------------------------------------X

## DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO (A) IMPLEMENT THE NORTEL NETWORKS INC. 2012 INCENTIVE PLAN; AND (B) ENTER INTO CERTAIN SPECIAL INCENTIVE PAYMENT AGREEMENTS

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105, 363(b) and 503 of title 11 of the United States Code (the "Bankruptcy Code"), authorizing the Debtors to (i) implement the Nortel Networks Inc. 2012 Incentive Plan (attached hereto as Exhibit B); and (ii) enter into individual special incentive payment agreements with certain key personnel of the Debtors.  In support of this Motion, the Debtors respectfully represent as follows:

### Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

2.      The statutory basis for the relief requested herein is sections 105 and 363(b) of the Bankruptcy Code.

## Background

3.      On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc.,[2] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, which cases are consolidated for procedural purposes only.  The Debtors continue to operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors (the "Committee") in respect of the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized (the "Bondholder Group").

5.      On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[3] commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by the Canadian Court.  Also on the Petition Date, the High Court of England and Wales placed

---

[2]      Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

[3]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[4] into administration

(the "English Proceedings") under the control of individuals from Ernst & Young LLP

(collectively, the "Joint Administrators").  Other Nortel affiliates have commenced and in the

future may commence additional creditor protection, insolvency and dissolution proceedings

around the world.

6.    Since the Petition Date, Nortel has sold its business units and other assets to

various purchasers.  For further information regarding these chapter 11 cases, reference may be

made to the Monthly Operating Reports filed by the Debtors and http://dm.epiq11.com/nortel.

## Relief Requested

7.    By this Motion, the Debtors seek entry of an order authorizing the Debtors to (i)

implement the Nortel Networks Inc. 2012  Incentive Plan (attached hereto as Exhibit B); and (ii)

enter into individual special incentive payment agreements with certain key personnel of the

Debtors.

## Facts Relevant to the Motion

### A.    Background

8.    On February 11, 2010, the Debtors filed the Debtors' Motion for an Order (A)

Approving the Nortel Special Incentive Plan; (B) Authorizing Certain Payments under the Key

Employee Retention Plan and Key Executive Incentive Plan; and (C) Approving Certain

Employment Agreements  [D.I. 2400] (the "NSIP Motion").  On March 4, 2010, the Court

granted the NSIP Motion and entered the Order (A) Approving the Nortel Special Incentive Plan;

(B) Authorizing Certain Payments under the Key Employee Retention Plan and Key Executive

---

[4]    The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

Incentive Plan; and (C) Approving Certain Employment Agreements [D.I. 2400] (the "NSIP Order"), which, among other things, authorized the implementation of the Nortel Special Incentive Plan (the "NSIP").

9.      The NSIP was designed to provide cash incentive payments to certain employees of the Debtors to encourage the achievement of certain performance targets and other business goals important to the Debtors, including the continued maximization of value, the successful conclusion of these chapter 11 cases, compliance with the Debtors' obligations under transition services agreements with the purchasers of their businesses and the wind-down of various Nortel entities.  (Other Nortel affiliates also participated in the NSIP for their own employees.)  The NSIP has served to incentivize employees to support the Debtors during their restructuring, including the sale of certain intellectual property for $4.5 billion approved by this Court on July 11, 2011, and the Debtors expect that it will continue to do so through the end of 2011. However, while much has been accomplished, there remain a number of significant goals that the Debtors must meet to conclude these chapter 11 cases successfully and complete the wind-down of the Debtors' operations, and the time frame for completion of these goals has extended beyond the period originally contemplated by the NSIP.

10.     The NSIP, as approved by the Court in the NSIP Order, provides for payments to be earned in respect of two plan periods (each a "Plan Period").  The first Plan Period commenced on January 1, 2010 and ended on December 31, 2010.  The second Plan Period commenced on January 1, 2011 and will end on December 31, 2011.  The NSIP itself will terminate by its terms on June 30, 2012.

11.     As described in the NSIP Motion, the total cost of the NSIP (and the special incentive payments under employment agreements approved simultaneously in the NSIP

4

Motion) to the Debtors was originally estimated at $6,671,531.[5]  In addition, the NSIP, as

approved by the NSIP Order, authorized the Debtors to request authority to make additional

payments and/or increase payments under the NSIP in an aggregate amount not to exceed $7

million, with the consent of NNI's Principal Officer and prior consultation with the Committee

and the Bondholder Group.  The Debtors note that, primarily as a result of forfeitures under the

NSIP by participants in the NSIP who voluntarily terminated their employment, only $1,184,197

of the $6,671,531 originally estimated in the NSIP Motion as the Debtors' total cost for the NSIP

has been paid out or is currently anticipated to be paid out by the Debtors under the NSIP, and

the Debtors have not made any payments out of the additional authorized $7 million.

**B.    Nortel Networks Inc. 2012 Incentive Plan**

12.    The Debtors expect that the services of certain current participants in the NSIP

who are employees of the Debtors will be needed in 2012 in order to continue to meet the

Debtors' remaining restructuring goals and see those goals to completion.  As a result, the

Debtors have developed and are asking the Court to authorize the Debtors to grant cash incentive

awards under the Nortel Networks Inc. 2012 Incentive Plan (the "2012 Plan") to certain

employees of the Debtors in respect of the 2012 calendar year.   The Debtors note that, unlike the

NSIP, the Debtors are proposing the 2012 Plan as only including the Debtors (and not their

affiliates), and participants in the 2012 Plan will be limited to employees of the Debtors.  The

Debtors understand that the Canadian Debtors may adopt a separate incentive plan as well for

their employees.[6]  In designing and implementing the 2012 Plan, the Debtors have consulted

with the Committee and the Bondholder Group.

---

[5]    This amount was derived as follows:  $55,596,095 (total cost attributable to Debtors) - $48,924,564 (88% of cost funded by purchasers of Nortel businesses through transition services agreements) = $6,671,531.

[6]    In a further effort to separate the estates, the Debtors also are establishing their own Annual Incentive Plan, rather than have their employees participate in the Annual Incentive Plan established by NNL as was previously the

13.     After substantial diligence, the Debtors identified the areas and skill sets that would be required in order to support their remaining activities, which include their completion and exit from remaining transition services agreements with purchasers of their businesses and subsequent wind-down of Nortel Business Services (the business unit which has overseen the transition services), as well as data retention and information technology support and the completion of these chapter 11 proceedings.  The Debtors then carefully identified the employees necessary to assist with these efforts (the "2012 Plan Participants") as well as specific goals for each of them ("Performance Goals") and a schedule for their completion.  As a result of the nature of the tasks in question, at the time an employee accomplishes his or her Performance Goals, such employee will have his or her employment terminated by the Debtors.  In order to incentivize the 2012 Plan Participants to remain with the Debtors and strive to complete their assigned Performance Goals in a timely fashion, the Debtors have identified an incentive award amount for each proposed 2012 Plan Participant (the "2012 Awards") to be granted under the 2012 Plan.  There will be approximately 97 2012 Plan Participants and the aggregate amount of the 2012 Awards paid will not exceed approximately $3,485,570.[7]  None of the 2012 Plan Participants is an "insider" of the Debtors.[8]

14.     Under the proposed 2012 Plan, each 2012 Plan Participant will receive a letter (each, a "Participation Letter") that sets forth the 2012 Award that he or she may be eligible to receive under the 2012 Plan, as well as his or her Performance Goals and the expected

---

case.  The Debtors are not seeking Court approval for their Annual Incentive Plan as it has and will continue to be run in the ordinary course as described in the Debtors' Motion for an Order Seeking Approval of Key Employee Retention Plan and Key Executive Incentive Plan, and Certain Other Related Relief [D.I. 389]).  The Annual Incentive Plan to be established by the Debtors will duplicate the plan with only such changes as are necessary or appropriate in order to reflect the limitation of participation to the Debtors' employees and the wind-down of the Debtors' businesses.

[7]     NNI will initially pay this cost; however, NNI reserves all of its rights to seek reallocation among the Debtors.

[8]     Separately, however, the Debtors are seeking authority to enter into the SIP Agreements (as defined below) with three insiders.  The details of the SIP Agreements are discussed below.

achievement date for such Performance Goals (and corresponding expected date of termination of employment).  However, the Participation Letter will clearly state that such expected date is provided for guidance only, is not binding upon the Debtors, and that the actual achievement date (and corresponding date of termination of employment) will be determined by the NNI Principal Officer in his sole discretion.  All Performance Goals are anticipated to be achieved by no later than December 31, 2012, although the Debtors realize changes in the time line may occur.

15.    Each 2012 Plan Participant's 2012 Award will be conditioned upon his or her accomplishment of his or her Performance Goals.  Each 2012 Plan Participant's Award will vest in full on the date the NNI Principal Officer designates as the achievement date of his or her Performance Goals and corresponding date of termination of employment, as determined in the sole discretion of the NNI Principal Officer (such date, the "Vesting Date").  Each 2012 Plan Participant's 2012 Award will be paid to such 2012 Plan Participant in a lump sum cash payment as soon as practicable, but no later than 30 days, following the applicable Vesting Date.  Upon termination of employment of a 2012 Plan Participant for any reason other than involuntary termination by the Debtors without cause prior to the Vesting Date, the right to any outstanding unvested 2012 Award will be forfeited on the date of such employment termination.  Upon the involuntary termination of employment of a 2012 Plan Participant by the Debtors without cause prior to the Vesting Date, any outstanding unvested 2012 Award will vest and be paid in a lump sum cash payment as soon as practicable, but no later than 30 days, following the date of termination of employment.  For purposes of the 2012 Plan, "cause" shall mean inappropriate actions or inactions, misconduct, breach of an agreement with the NNI or the 2012 Plan

Participant's unsatisfactory performance or "cause" as legally defined, if at all, in the relevant jurisdiction, as determined by the NNI Principal Officer in his sole discretion.

## C.    Special Incentive Payment Agreements

16.    Many of Debtors' senior employees have left, and those who remain are responsible for overseeing the fulfillment of the remaining transition services agreements and wind up of the responsible business unit, preserving the integrity of the Debtors' financial and other records as the Debtors are wound down and ensuring a successful completion of these chapter 11 proceedings.  In order to meet these demands, such key personnel will be taking on substantially increased roles and broader responsibilities.  As a result, the Debtors are asking the Court to authorize the Debtors to enter into special incentive payment agreements with certain key personnel of the Debtors (the "SIP Agreements")[9] -- Timothy Ross, Allen Stout and Luis Guerra Sanz (the "Key Personnel").[10]  The Debtors believe that the SIP Agreements are necessary to adequately incentivize the Key Personnel to meet the demands of the roles and responsibilities that they are undertaking in order to achieve the Debtors' business objectives.  The aggregate amount of payments authorized for the Key Personnel under the SIP Agreements is approximately $973,000.  The SIP Agreements are separate from the 2012 Plan, and none of the Key Personnel are participating in the 2012 Plan.

17.    The Committee and the Bondholder Group were consulted regarding the SIP Agreements and offered an opportunity to review and evaluate them.  A description of the roles of the three Key Personnel is provided below.

---

[9]    The summaries and descriptions of the terms and conditions of the SIP Agreements set forth in the Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such.  The summaries and descriptions are qualified in their entirety by the SIP Agreements.  In the event there is a conflict between the Motion and the SIP Agreements, the SIP Agreements shall control in all respects.

[10]    The SIP Agreements have been provided to the counsel to the Committee and the Bondholder Group and will be provided to the U.S. Trustee.

18.    ***Timothy Ross.***  As Chief Financial Officer of NNI, Mr. Ross will be accountable for the financial, administrative, and risk management operations of NNI and its branches and subsidiaries, including the other Debtors.  He will oversee all financial planning, preparation and interpretation of financial reports, and the establishment and monitoring of controls designed to preserve assets of the Debtors and to report accurate financial information.  Mr. Ross will also directly manage the finance and administrative functions, including treasury, finance and accounting, tax, information technology, human resources, and physical infrastructure.  He will also advise internal and external parties on financial affairs of the Debtors.  Mr. Ross also currently is the sole director of each of the Debtors.

19.    ***Allen Stout.***  As Controller, it is Mr. Stout's responsibility to ensure that the books and records of NNI and the other Debtors, and their branches and subsidiaries, are maintained in compliance with generally accepted accounting principles (GAAP) in support of U.S. and local tax reporting and filing requirements.  He will provide financial support for the wind-down and liquidation of NNI and the other Debtors and their branches and subsidiaries with a primary focus on the orderly disposition of the Debtors' balance sheet in compliance with GAAP and identifying and mitigating financial risk.

20.    ***Luis Guerra Sanz.***  As Entity Liquidation and Wind-Down Leader, Mr. Guerra Sanz will be responsible for the effective operational liquidation and wind-down of NNI and the other Debtors, and their branches and subsidiaries, including the other Debtors, leading a cross functional team of legal, finance, and tax professionals.  Mr. Guerra Sanz also has director and officer responsibilities for non-Debtor entities and branches in various international jurisdictions.

21.    Under each SIP Agreement, each Key Personnel will receive his special incentive payment upon the achievement of such reasonable performance objectives established by the

NNI Principal Officer (in consultation with the Committee and the Bondholder Group), and communicated to such Key Personnel prior to January 1, 2012. Under the SIP Agreements, the special incentive payment will vest in full on the date the NNI Principal Officer designates as the achievement date of such performance objectives and corresponding date of termination of employment, as determined in the sole discretion of the NNI Principal Officer (such date, the "Vesting Date"). The special incentive payment will be paid to the Key Personnel in a lump sum cash payment as soon as practicable, but no later than 30 days, following the Vesting Date.

22.     Upon a Key Personnel's termination of employment for any reason other than involuntary termination by the Debtors without cause prior to the Vesting Date, he will forfeit right to any payment under his SIP Agreement on the date of such employment termination. Upon a Key Personnel's involuntary termination of employment by the Debtors without cause prior to the completion of his performance objectives, he will be paid his special incentive payment in a lump sum cash payment as soon as practicable, but no later than 30 days, following the date of termination of employment. For the purposes of the SIP Agreements, "cause" shall mean inappropriate actions or inactions, misconduct, breach of an agreement with the NNI or the Key Personnel's unsatisfactory performance or "cause" as legally defined, if at all, in the relevant jurisdiction, as determined by the NNI Principal Officer in his sole discretion.

23.     The Debtors believe that the payments under the SIP Agreements contemplated for the Key Personnel is fair and reasonable in light of industry practice, market rates both in and out of chapter 11 proceedings and the scope of work to be performed.

**Basis for Relief**

24.     The Debtors seek authority pursuant to sections 105, 363(b) and 503 of the Bankruptcy Code to (i) implement the 2012 Plan; and (ii) enter into the SIP Agreements with

certain Key Personnel of the Debtors.  The Debtors submit that the relief requested is reasonable and necessary under the circumstances and justified.

**A.      The 2012 Plan and the SIP Agreements Satisfy the Standards of Section 363(b) of the Bankruptcy Code**

25.      Section 363(b)(1) of the Bankruptcy Code permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1).  Use of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a "sound business purpose" for it.  See In re Lionel Corp., 722 F. 2d 1063, 1071 (2d Cir. 1983) ("[t]he rule we adopt requires that a judge determining a 363(b) application expressly find from the evidence presented before him a good business reason to grant the application."); In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. Del. 1991).

26.      Once a debtor articulates a valid business justification for a particular form of relief, the Court reviews the debtor's request under the "business judgment rule."  The business judgment rule "is a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985).   The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing.  See In re Martin, 91 F.3d 389, 395 (3d Cir. 1996) (citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991)); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999).

27.      The 2012 Plan and the SIP Agreements are appropriate to properly compensate and motivate the few remaining employees critical to winding down the Debtors' operations in

11

2012 and successfully concluding these chapter 11 cases.  The Debtors strongly believe that without the 2012 Plan and the SIP Agreements, the morale of these essential employees will be impaired and they likely will leave their jobs to pursue more stable employment elsewhere, at a time when their continued service is most critical.  The Debtors believe that the 2012 Plan and the SIP Agreements will create a meaningful level of stability, morale and motivation in the workplace and will allow the Debtors to retain those employees they need to wind down the Debtors' operations effectively.

28.    For all of the reasons that were applicable at the time of the filing of the NSIP Motion in respect of incentive awards for 2010 and 2011, attrition among these necessary employees would result in a significant burden on the Debtors in finding and training temporary employees, and any such temporary employees would lack the experience and knowledge to perform their duties efficiently and effectively.  These concerns are even more pronounced given that fewer employees remain with the Debtors at this time.

**B.    The 2012 Plan and the SIP Agreements Comply With Section 503(c) of the Bankruptcy Code**

29.    The 2012 Plan and the SIP Agreements comply with section 503(c) of the Bankruptcy Code.  Section 503(c) restricts transfers or payments by debtors for retention or severance and payments that are considered outside of the ordinary course and not justified by the facts and circumstances.

30.    Sections 503(c)(1) and (c)(2) of the Bankruptcy Code are inapplicable to these circumstances.  Section 503(c)(1) of the Bankruptcy Code limits payments to "insiders" to the extent such payments are made "for the purpose of inducing such person to remain with the debtor's business."  11 U.S.C. § 503(c)(1).  Section 503(c)(2) of the Bankruptcy Code places restrictions on "severance payment[s]" to "insider[s]."  11 U.S.C. § 503(c)(2).  Neither section

12

503(c)(1) nor 503(c)(2) of the Bankruptcy Code applies here because the 2012 Plan and the SIP

Agreements do not include retention payments or severance payments to insiders of the Debtors.

31.    First, the 2012 Plan does not provide for retention payments or severance

payments to insiders of the Debtors because no 2012 Plan Participant is an "insider" of the

Debtors.  Even with respect to the SIP Agreements for the three Key Personnel, however,

sections 503(c)(1) and (c)(2) of the Bankruptcy Code are inapplicable to these circumstances

because the payments under the SIP Agreements do not include retention or severance payments.

Payments under both the 2012 Plan and the SIP Agreements are incentive payments that are tied

to the achievement of performance goals, and therefore the 2012 Plan and the SIP Agreements

are not in the nature of retention or severance agreements.

32.    Moreover, to the extent sections 503(c)(1) and (c)(2) were even applicable, the

2012 Plan and the SIP Agreements would satisfy the requirements of section 503(c)(3) of the

Bankruptcy Code.  Section 503(c)(3) of the Bankruptcy Code prohibits "transfers or obligations

that are outside the ordinary course of business and not justified by the facts and circumstances

of the case."  11 U.S.C. § 503(c)(3).  The Debtors submit that the 2012 Plan and the SIP

Agreements are justified by the "facts and circumstances" of this case and thus satisfy the

applicable standards of section 503(c)(3) of the Bankruptcy Code.

33.    The standard for approval under the "facts and circumstances" test of section

503(c)(3) is similar to the business judgment standard for approval under section 363(b)(1) of the

Bankruptcy Code. See, e.g., In re Global Home Products, LLC, 369 B.R. 778, 783-84 (Bankr. D.

Del. 2007) ("Compensation issues are normally governed by the business judgment standards,

i.e., proof that there is a broad business purpose for an action."); In re Nobex Corp., No. 05-

20050 (MFW), 2006 WL 4063024, at *3 (Bankr. D. Del. Jan. 19, 2006) (section 503(c)(3)

standard is that of the business judgment of the debtor); see also In re Dana Corp., 358 B.R. 567,

576-77 (Bankr. S.D.N.Y. 2006) ("Dana II") (acknowledging the sound business judgment test as

the standard of review for key employee incentive programs); In re Silicon Graphics, Inc., Case

No. 06-10977 (BRL) (Bankr. S.D.N.Y. July 27, 2006) (approving employee incentive plan under

business judgment standard pursuant to section 363 of the Bankruptcy Code); In re Movie

Gallery, Inc., Case No. 07-33849 (DOT) (Bankr. E.D. Va. Feb. 29, 2008) (approving the debtor's

key employee incentive plan under sections 363(b) and 503(c)(3)).

     34.     Courts have examined certain factors to determine if incentive-based

compensation programs are appropriate under section 503(c)(3). Among some of the factors on

which courts have focused are:

     (a)     whether the plan is calculated to achieve the desired performance;

     (b)     whether the cost of the plan is reasonable within the context of the debtor's assets, liabilities, and earnings potential;

     (c)     whether the scope of the plan is fair and reasonable;

     (d)     whether the plan is consistent with industry standards;

     (e)     whether the debtor engaged in due diligence related to the need for the plan, the employees that needed to be incentivized, and what types of plans are generally applicable in a particular industry; and

     (f)     whether the debtor received independent counsel in performing due diligence and in creating and authorizing the incentive compensation.

See, e.g., In re Global Home Prods., LLC, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (citing Dana

II, 358 B.R. at 576-77).  Courts will balance the foregoing factors, and a debtor need not satisfy

every factor to demonstrate that its proposed compensation structure should be approved.  See,

e.g., Global Home Prods., 369 B.R. at 786 (holding that the debtors' performance-based

compensation structure was a proper exercise of the debtors' business judgment even though, for

instance, the debtors did not use a benefits consultant to structure the program).

14

35.     The Debtors submit that the overall aggregate cost of the 2012 Plan and the SIP Agreements is reasonable because they will provide significant value to the Debtors' estates at a relatively small cost.  As stated above, the Debtors did not utilize a substantial portion of the amount authorized to be paid under the NSIP by the Debtors for purposes of incentive awards for 2010 and 2011 and seek to use such amounts for purposes of incentive awards for 2012.   In light of the relatively small number of employees being asked to support the ongoing financial and technological needs of the Debtors and to accomplish the wind-down of the Debtors and their successful completion of their chapter 11 cases, the Debtors submit that the amounts that they seek authority to pay under the 2012 Plan and the SIP Agreements are reasonable and responsibly targeted.  The 2012 Plan and the SIP Agreements were designed by NNI's Principal Officer, in consultation with the Committee and the Bondholder Group, after extensive diligence regarding what tasks remained to accomplish and the employees best suited to accomplish them. The Debtors, therefore, respectfully submit that the 2012 Plan and the SIP Agreements satisfy all or nearly all of the factors considered by courts in approving such incentive schemes.

36.     The 2012 Plan and the SIP Agreements also are consistent with employee incentive plans approved in other chapter 11 cases.  See, e.g., In re Sharper Image Corp., No. 08-10322 (KG) (Bankr. D. Del. June 26, 2008) (approving incentive plan to employees and senior management for performance related to a wind-down process); In re American Home Mortgage Holdings, Inc., No. 07-11047 (CJS) (Bankr. D. Del. Nov. 28, 2007) (approving incentive plan to senior management for, among other things, performance related to wind-down process); In re New Century TRS Holdings, Inc., No. 07-10416 (KJC) (Bankr. D. Del. May 25, 2007) (approving sale-related incentive plan to senior management and retention and incentive pay to certain nonmanagement employees); In re Global Home Products, LLC, No. 06-10340 (JG)

15

(Bankr. D. Del. May 30, 2006) (order authorizing payment of a one-time incentive bonus to certain management employees upon the closing of the going-concern sale); In re Nobex Corp., No. 05-20050 (MFW) (Bankr. D. Del. Jan. 19, 2006) (approving sale-based incentive compensation where plan participants' sale efforts would extend beyond their ordinary duties).

37.    For the foregoing reasons, the Debtors believe that approval of the 2012 Plan and the SIP Agreements is appropriate and in the best interests of the Debtors, their bankruptcy estates and all parties in interest, and that the incentives proposed in the 2012 Plan and the SIP Agreements are reasonable and necessary to motivate their critical employees to maximize the value of the Debtors' estates.  Throughout these chapter 11 cases, the Debtors have been focused on ensuring the best outcome for the greatest number of people, including not only their creditors, but also their employees, customers and other stakeholders, in order to maximize the value of the Debtors' estates to be distributed to their creditors.  The remaining work for the Debtors requires knowledgeable and experienced employees and is important to the Debtors' ability to bring these cases to a successful conclusion.  The grant of 2012 Awards under the 2012 Plan and awards under the SIP Agreements will provide the incentive necessary for the employees essential to completing the remaining tasks.  Authorization of the 2012 Plan and the SIP Agreements requested in this Motion is therefore in the best interests of the Debtors, their estates and their creditors.

## Notice

38.    Notice of the Motion has been given via hand delivery or first class mail to the (i) U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; and (iv) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

39.     The Debtors have engaged in discussions regarding the relief requested in this Motion with the Committee and the Bondholder Group.  The Committee and the Bondholder Group do not oppose the relief requested.

**<u>No Prior Request</u>**

40.     No prior request for the relief sought herein has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  October 25, 2011
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley *(admitted pro hac vice)*
Lisa M. Schweitzer *(admitted pro hac vice)*
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors
and Debtors in Possession*