# EXHIBIT A

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**SEVENTY-EIGHTH REPORT OF THE MONITOR**
**DATED DECEMBER 7, 2011**

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC"
    and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel
    Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"),
    Nortel Networks International Corporation and Nortel Networks Global
    Corporation (collectively the "Applicants") filed for and obtained protection under
    the *Companies' Creditors Arrangement Act* ("CCAA").  Pursuant to the Order of
    this Honourable Court dated January 14, 2009, as amended and restated (the "Initial
    Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the
    "Monitor") in the CCAA proceedings.  The stay of proceedings was extended to
    December 14, 2011 by this Honourable Court in its Order dated June 30, 2011.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates
    concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy
    Code (the "Code") in the United States Bankruptcy Court for the District of
    Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings").

As required by U.S. law, an official committee of unsecured creditors (the "Committee") was established in January, 2009.

3.  An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009 and July 30, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries and each of these groups is participating in the CCAA proceedings.

4.  Nortel Networks (CALA) Inc. ("NN CALA" and together with NNI and certain of its subsidiaries and affiliates that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.  Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in EMEA were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators").

6.  Subsequent to the filing date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

2

7.    The CCAA proceedings and the UK Administration proceedings of NNUK and the other EMEA Debtors have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.    Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

**PURPOSE**

9.    The purpose of this seventy-eighth report of the Monitor (the "Seventy-Eighth Report") is to report to this Honourable Court on the following matters:

   a)   consolidated cash position and liquidity as at November 26, 2011;

   b)   actual receipts and disbursements from June 5, 2011 until November 26, 2011;

   c)   cash flow forecast for the period from November 27, 2011 to June 30, 2012;

   d)   consolidated Canadian entities' net inter-company position by region;

   e)   status of the Applicants' claims process and cross-border claims matters;

   f)   status of the Compensation Claims Process;

   g)   status of same/overlapping Compensation Claims;

   h)   status of the Health and Welfare Trust ("HWT");

   i)   status of the Termination Fund;

   j)   status of the Employee Hardship Application Process and Fund;

   k)   status of realization of remaining assets;

   l)   status of allocation matters and mediation;

m) status of environmental matters;

n) status of inter-estate settlements;

o) Applicants' proposed 2012 employee retention plan ("Nortel 2012 Retention Plan");

p) other matters;

q) status of foreign proceedings; and

r) the Applicants' request for an order that:

    i. the stay of proceedings be extended up to and including June 29, 2012;

    ii. the Employee Hardship Application Process be extended until June 29, 2012;

    iii. the Eligibility Requirements and the Procedure with respect to Employee Hardship Payments Applications be amended consistent with (ii) above;

    iv. the Nortel 2012 Retention Plan be approved as it relates to employees of the Applicants; and

    v. the Confidential Appendices (defined below) be sealed pending further Order of the Court.

**TERMS OF REFERENCE**

10. In preparing this Seventy-Eighth Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel. The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of this information and accordingly, the Monitor expresses no

opinion or other form of assurance on the information contained in this Seventy-Eighth Report.

11.  Unless otherwise stated, all monetary amounts contained herein are expressed in US dollars.

12.  Capitalized terms not defined in this Seventy-Eighth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009, the Pre-Filing Report or previous reports of the Monitor.

13.  The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

## CONSOLIDATED CASH POSITION AND LIQUIDITY AS AT NOVEMBER 26, 2011

14.   As at November 26, 2011, Nortel's consolidated cash balance was approximately $10.5 billion including $3.1 billion of total treasury cash.  Nortel's consolidated cash balance is held globally in various Nortel entities and joint ventures.  The following is an overview of Nortel's consolidated cash position as at November 26, 2011:

| Region | Gross Cash | Restricted | Unavaliable (JV's and Other Items) | Available Cash |
|---|---|---|---|---|
| NNL | 539 | (2) | (238) | 299 |
| Other Canada | 33 | (22) | - | 11 |
| NNI | 991 | (3) | - | 988 |
| Other US (excluding NN CALA) | 58 | - | - | 58 |
| North America | 1,621 | (27) | (238) | 1,356 |
| NN UK Limited | 369 | (1) | - | 368 |
| Other EMEA Filed Entities | 463 | (2) | - | 461 |
| EMEA non-filed entities | 15 | - | - | 15 |
| UK/Europe | 847 | (3) | - | 844 |
| Greater China | 99 | - | - | 99 |
| Other ASIA PAC (excl JVs) | 237 | (6) | - | 231 |
| Other JVs | 162 | - | (162) | - |
| ASIA | 498 | (6) | (162) | 330 |
| NN CALA | 87 | - | - | 87 |
| Other CALA filed entities | - | - | - | - |
| CALA non-filed entities | 49 | - | - | 49 |
| Cala | 136 | - | - | 136 |
| Total Treasury Cash | 3,102 | (36) | (400) | 2,666 |
| Divestiture Proceeds | 7,364 | (7,364) | - | - |
| Other Funds held in Escrow | 35 | (35) | - | - |
| Total Cash | 10,501 | (7,435) | (400) | 2,666 |

15.  As at November 26, 2011, the Applicants had cash available for operations and post-filing inter-company settlements of approximately $310 million.

16.  None of the Applicants' Restricted Cash and Unavailable Cash is readily available to them. Restricted Cash relates primarily to: (i) $12 million held in the D&O Trust as detailed in the Pre-Filing Report; (ii) $10 million held in escrow related to the settlement of the Global Class Action; (iii) $1 million in support of the EDC performance bonds issued in exotic foreign currencies; (iv) $0.5 million of cash collateral posted with EDC in support of post filing performance bonding; (v) $0.3 million held in escrow as cash collateral to support the Jabil supply agreement; and (vi) $0.1 million of cash collateral posted by the Applicants in support of non-EDC performance bonds and letter of credit facilities. Unavailable Cash relates primarily to: (i) $8.5 million of net proceeds from the sale of the Strandherd Lands; (ii) $229 million from the sale of NNL's interest in the LGN joint venture held in a single purpose bank account; and (iii) $1 million from the sale of NNL's interest in the Relay business held in a single purpose bank account.

17.  The U.S. entities had cash available for operations and post-filing inter-company settlements of approximately $1.0 billion. NNI's Restricted Cash relates primarily to: (i) $1 million held in escrow for the benefit of utility providers in accordance with the First Day Order; and (ii) $2 million held in escrow as cash collateral to support the Jabil supply agreement.

18.  The Joint Administrators on behalf of NNUK and the other EMEA Debtors had available cash for operations and post–filing inter-company settlements of approximately $829 million. The EMEA non-filed entities had available cash of approximately $15 million which is expected to be used primarily to fund their in-country operations and inter-company settlements.

19.  Nortel entities in the APAC region have approximately $330 million of available cash for operations and inter-company settlements. As a result of the regulatory

7

regime in the People's Republic of China, the funds in Greater China of approximately $99 million are generally only available to fund operations within Greater China and inter-company settlements.

20.    As at November 26, 2011, NN CALA and the CALA non-filed entities had available cash of $87 million and $49 million, respectively. This cash is expected to be used to fund their domestic operations and inter-company settlements.

21.    On March 10, 2010, Nortel Networks Telecomunicacoes Do Brazil Ltda. ("NN Brazil") filed for bankruptcy protection, on April 15, 2010 Nortel Networks de Colombia S.A. was placed into liquidation, on July 30, 2010 Nortel Networks de Venezuela C.A. ceased operations as its financial obligations exceeded its available funds and on November 9, 2011 Nortel Networks O.O.O. ("NN Russia") was placed into liquidation. As such, funds held by these entities have not been reflected in the foregoing analysis.

22.    Divestiture proceeds of approximately $7.4 billion are being held in escrow by various escrow agents (the "Divestiture Proceeds"). The funds held in escrow include:

a)    approximately $7.3 billion held in escrow by JPMorgan Chase Bank, N.A. ("JP Morgan") until an agreement is reached or determination made regarding allocation of these proceeds among the various Nortel legal entities, including the Applicants. The current divestiture proceeds held in escrow include: (i) $4.5 billion from the sale Nortel's patent portfolio and related assets (the "Residual IP"); (ii) $1.0 billion from the sale of CDMA/LTE Access assets; (iii) $18 million from the sale of the Layer 4-7 business; (iv) $10 million from the sale of the Next Generation Packet Core business; (v) $857 million from the sale of Enterprise assets; (vi) $625 million from the sale of the MEN assets; (vii) $103 million from the sale of GSM/GSM-R assets; (viii) $138

million from the sale of CVAS assets; and (ix) $43 million from the sale of MSS assets;

b) $50 million held by CitiBank relating to the sale of CDMA/LTE Access assets. These divestiture proceeds are being held in support of the related Transition Services Agreement (the "TSA");

c) $22 million held by CitiBank relating to the sale of MEN assets. These divestiture proceeds include $8 million being held in support of the related TSA and $14 million being held subject to certain succession tax and other adjustments;

d) $12 million held by CitiBank relating to the sale of GSM assets. These divestiture proceeds are being held in support of the related TSA;

e) $1 million held by Wells Fargo relating to the sale of CVAS assets. These divestiture proceeds are being held subject to resolution of certain tax liabilities in EMEA;

f) $8 million held by JP Morgan consisting of $3 million in support of the CVAS TSA and $5 million in support of potential severance liabilities for a specified employee group in EMEA relating to the sale of CVAS assets;

g) $4 million held by JP Morgan relating to the sale of MSS assets. These divestiture proceeds are being held in support of the related TSA; and

h) $1 million held by Wells Fargo relating to the sale of MSS assets. These divestiture proceeds are being held subject to resolution of certain tax liabilities in North America and EMEA.

23. Other unavailable funds include $35 million transferred from the CDMA/LTE Access asset divestiture proceeds escrow to a separate trust account pursuant to the Cascade Trust Indenture as more fully described in the Forty-First Report.

9

## ACTUAL RECEIPTS AND DISBURSEMENTS FROM JUNE 5, 2011 TO NOVEMBER 26, 2011

24. The Applicants' actual consolidated net cash flow for the period June 5, 2011 to November 26, 2011 was $62.2 million. A summary of the actual receipts and disbursements as compared to the forecast filed with the Seventieth Report (the "Seventieth Report Forecast") is attached at Appendix "A".

25. Actual net cash flow exceeded forecast by $108.4 million. Significant items contributing to this favourable variance were as follows:

   a) a favourable permanent variance of $4.0 million with respect to the collection of accounts receivable primarily related to higher than forecast contract manufacturing receipts;

   b) a favourable variance of $32.1 million with respect to Other Receipts primarily as a result of the following:

      i. $18.3 million receipt from the purchaser of the Residual IP, primarily relating to the utilization of certain tax attributes of the Applicants in connection with the Residual IP transaction;

      ii. $4.8 million receipt in relation to the Communications Test Design, Inc. ("CTDI") settlement as described later in this Seventy-Eighth Report;

      iii. $3.0 million release from cash collateral held in support of EDC performance bonds issued in exotic foreign currencies;

      iv. $2.7 million receipt from the Residual IP sale proceeds for the reimbursement of fees paid by NNL to Global IP in connection with the Residual IP transaction;

10

v.   $1.4 million release from cash collateral posted in support of non-EDC performance bonds and letter of credit facilities;

vi.  $1.0 million reimbursement from Genband in respect of transfer taxes paid by NNL and NNTC as a direct result of the transfer of assets to Genband pursuant to the CVAS sale agreement; and

vii. $1.0 million primarily on account of the release of funds from various escrow and cost flow-through accounts;

c)  a favourable permanent variance of $12.8 million with respect to TSA recoveries from buyers primarily as a result of higher than forecast CDMA TSA billings due to an extension in the end-date of the CDMA TSA;

d)  a favourable net variance of approximately $50.6 million with respect to inter-company receipts and disbursements primarily as a result of the following:

i.   $19.8 million favourable permanent variance as a result of dividends received from GDNT ($8.0 million), NN New Zealand ($7.0 million) and Peru ($4.8 million) that were declared subsequent to the issuance of the Seventieth Report Forecast;

ii.  $19.4 million favourable timing variance as inter-company settlements with affiliates in Australia, China and Korea were settled earlier than originally forecast;

iii. $7.2 million favourable variance as net remittances to NNI were lower than forecast on account of two factors.  First, a $4.5 million timing variance on account of certain trade payable settlements with NNI having been retimed to Q1 2012.  Second, a $2.7 million permanent variance primarily related to TSA true-ups received that had not previously been forecast;

11

iv. $2.9 million favourable timing variance on account of two factors. First, $3.9 million in receipts from certain APAC entities were settled earlier than originally forecast. Second, the above noted favourable variance was partially offset by a $1.0 million disbursement to NN CALA pursuant to the Inter-Estate Term Sheet; and

v. $1.3 million favourable timing variance as trade payables settlements with NNUK and EMEA region entities have been retimed to Q1 2012;

e) a favourable variance of $1.1 million with respect to payroll primarily as a result of the following:

i. a favourable timing variance of $0.8 million relating to the timing of NSIP payments; and

ii. a favourable permanent variance of $0.3 million relating to favourable foreign exchange translations on Canadian dollar payroll payments as a result of the depreciation of the Canadian dollar;

f) a favourable variance of $5.5 million with respect to benefits primarily as a result of the following:

i. a favourable timing variance of $4.7 million as a result of lower than forecast funding for the HWT; and

ii. a favourable timing variance of $0.8 million as a result of lower than forecast payments in respect of fringe benefits; and

g) a favourable timing variance of $2.4 million with respect to restructuring costs as professional fees were lower than originally forecast.

26. Available Cash was also lower than forecast by approximately $4.8 million relating to an unfavourable foreign exchange translation on Canadian dollar denominated

12

cash balances as a result of a depreciation of the Canadian dollar relative to the U.S. dollar.

27.    Unavailable Cash was lower than forecast by approximately $0.2 million relating to an unfavourable foreign exchange translation on Strandherd land proceeds held in Canadian dollars.

28.    Restricted Cash was lower than forecast by approximately $14.5 million primarily as a result of the following:

   a) $9.7 million drawn down by the issuing bank or the beneficiary from cash collateral posted by NNL in support of non-EDC performance bonds;

   b) $3.0 million release from cash collateral held in support of EDC performance bonds issued in exotic foreign currencies;

   c) $1.4 million release from cash collateral posted in support of non-EDC performance bonds and letter of credit facilities; and

   d) $0.4 million decrease in the amount held in the D&O Trust due to the depreciation of the Canadian dollar relative to the U.S. dollar.

## CASH FLOW FORECAST FOR THE PERIOD NOVEMBER 27, 2011 TO JUNE 30, 2012

29.    The Applicants, with the assistance of the Monitor, have prepared an updated 31-week cash flow forecast for the period November 27, 2011 to June 30, 2012 (the "November 27th Forecast" and the "Forecast Period", respectively). A copy of the November 27th Forecast is attached as Appendix "B".

30.    As at November 27, 2011, the Applicants had Available Cash balances of approximately $310.1 million, excluding Restricted Cash and Unavailable Cash of approximately $261.9 million.

13

31. Based on the November 27th Forecast, it is anticipated the Applicants will have total receipts of $10.6 million and total disbursements of $114.7 million resulting in a net cash outflow of $104.1 million during the Forecast Period.

32. Significant assumptions used in preparing the November 27th Forecast include the following:

   a) monthly billings for transition services provided by the Applicants to buyers of the various Nortel assets and businesses pursuant to the respective TSAs are invoiced on an average 45 day billing cycle and subject to 30 day payment terms. The majority of the TSAs have been completed and going forward only minimal services are forecast to be provided by the Applicants under the remaining TSAs;

   b) divestiture proceeds from the Layer 4-7, CDMA/LTE Access, Enterprise, Next Generation Packet Core, MEN, MSS, GSM/GSM-R, CVAS and Residual IP transactions are to be held in escrow and are not reflected in the November 27th Forecast;

   c) no material collections are anticipated in the forecast in respect of accounts receivable not acquired by the purchasers as part of the divestiture of the business units;

   d) receipt of a dividend from GDNT of $9.8 million (as declared by the board of directors of GDNT in November 2011 with payment subject to Chinese regulatory and tax approvals);

   e) all pre-filing amounts owed to suppliers are stayed and post-filing amounts are paid on significantly reduced credit terms as a result of the CCAA proceedings;

14

f) inter-company trade accounts receivable and payable for post-filing transactions continue to settle on a cash basis between the Applicants, U.S. Debtors, EMEA Debtors and other Nortel entities. Inter-company net pre-filing loans and trade accounts payable between the Applicants and all other Nortel filed and non-filed entities are stayed. Intercompany net pre-filing loans and trade accounts receivable owing to the Applicants by all other Nortel filed entities are stayed;

g) payroll includes remaining payments on the NSIP and 2011 AIP, as well as applicable amounts anticipated to be paid during the period in respect of the proposed Nortel 2012 Retention Plan and 2012 AIP;

h) pursuant to the terms of the Amended and Restated Employee Settlement Agreement ("Settlement Agreement"), there are no further current funding contributions to the Applicants' defined benefit pension plans.  Funding related to current employees' retirement savings plans are reflected in benefits disbursements. Funding for non-registered pension or other retirement plans is stayed;

i) Benefit payments include various true up payments, including run-off funding to the HWT for benefits incurred up to December 31, 2010 for pensioners and individuals on long term disability;

j) all interest payments relating to the Company's pre-filing indebtedness are stayed; and

k) professional fees have been forecast based on current and anticipated run rates.

33. Based on the analysis prepared by the Monitor, the Applicants have sufficient cash resources to fund the CCAA proceedings through June 29, 2012.

15

**CONSOLIDATED CANADIAN ENTITIES' NET INTER-COMPANY POSITION BY REGION**

34.  Summarized below are the preliminary net inter-company book balances (including trade and loan balances) as at September 30, 2011. For purposes of the summary, all Canadian entities (the Applicants and their Canadian non-filed subsidiaries) have been consolidated. These inter-company balances have been prepared by the Company under US GAAP and are subject to further adjustments. The Company, under US GAAP, has fully reserved against the net inter-company balances owing from filed entities. For presentation purposes the full amount of inter-company balances, before any reserve, has been reflected.

35.  For purposes of calculating the net inter-company balances between trading pairs, balances between the same legal entities have been set-off provided such balances both arose prior to January 14, 2009 ("Pre-filing Balances") or both arose after January 14, 2009 ("Post-filing Balances). No Pre-filing Balances have been set-off against Post-filing Balances.

36.  Pre-filing Balances have been converted using January 14, 2009 foreign exchange rates. Post-filing Balances are converted using September 30, 2011 foreign exchange rates.

37. The net pre-filing inter-company payable position of $2.065 billion with the U.S. region includes a $62.7 million Revolver Claim by the U.S. Debtors which remains outstanding and is secured by a court-ordered charge in the CCAA proceedings. The balance of the pre-filing inter-company payable position is unsecured.

| | Region | Pre-filing (Jan. 14, 2009 FX rates) | Post-filing (Sept 30, 2011 FX rates) |
|---|---|---|---|
| Net Receivable Position | | (in millions) | |
| Filed Entities | CALA | 3 | - |
| | EMEA | 102 | - |
| | US * | 53 | 1 |
| Filed Total | | 158 | 1 |
| | | | |
| Non Filed | | | |
| | APAC | 57 | 9 |
| | CALA | 42 | 2 |
| | EMEA | 5 | - |
| | US | 14 | 4 |
| Non Filed Total | | 118 | 15 |
| | | | |
| Net Receivable Total | | 276 | 16 |
| | | | |
| Net Payable Position | | | |
| Filed Entities | | | |
| | CALA | (24) | - |
| | EMEA | (203) | (2) |
| | US | (2,065) | (4) |
| Filed Total | | (2,292) | (6) |
| | | | |
| Non Filed | APAC | (202) | (10) |
| | CALA | - | - |
| | EMEA | - | - |
| Non Filed Total | | (202) | (10) |
| | | | |
| Net Payable Total | | (2,494) | (16) |
| | | | |
| Grand Total | | (2,218) | - |

* Includes NN CALA Inc., a US entity that filed for Chapter 11 protection on July 14, 2009. Amounts owing from NN CALA Inc. for the period January 14, 2009 to July 14, 2009 are considered pre-filing balances and are stayed.

## STATUS OF THE APPLICANTS' CLAIMS PROCESS AND CROSS BORDER CLAIMS MATTERS

38. On July 30, 2009, this Honourable Court issued an Order (as amended and restated, the "Claims Procedure Order") setting out the procedure for the filing of certain claims against the Applicants.

39. Pursuant to the provisions of the Claims Procedure Order, a claims bar date of September 30, 2009 was established (the "Claims Bar Date") whereby all claims were to be filed with the Monitor with the exception of the Excluded Claims, as defined in the Claims Procedure Order, including:

   a) Inter-company Claims;
   b) Compensation Claims of the current and former employees and directors of the Applicants;
   c) claims secured by any of the Charges in the Initial Order;
   d) claims for grievances under any collective agreements to which any of the Applicants are a party; and
   e) claims of any director or officer of the Applicants for indemnification and/or contribution, arising from such director's or officer's service to any Applicant.

40. By order dated August 4, 2009, the U.S. Court also established September 30, 2009 as its bar date for filing of various claims in the Chapter 11 Proceedings.

41. On September 16, 2010, this Honourable Court issued an Order approving the methodology applicable for the review and determination of claims filed against the Applicants (the "Claims Resolution Order"). In a joint hearing on the same date, a Cross-Border Claims Protocol was approved which specifically addressed the level of cooperation and consultation between the Applicants and U.S. Debtors with respect to Overlapping Claims and Same-Creditor Claims (the "Cross-Border Claims Protocol").

42. In its Seventieth Report, the Monitor provided an update as to the status of claims filed against the Applicants as of May 31, 2011.

43. The table below (the "Claims Report") provides an update as to the status of claims filed against the Applicants as of November 26, 2011, with the exception of claims filed by various EMEA entities pursuant to the EMEA Claim Procedure Order dated January 14, 2011, and claims pursuant to the Compensation Claims Process dated October 6, 2011. All claim amounts are in Canadian dollars using January 14, 2009 exchange rates.

Nortel Networks - CCAA Applicants Overall Claims Status  (Excluding EMEA Claims and Compensation Claims)
November 26, 2011
All amounts in CAD $ millions

| | | | | | | Current claim value - most recent stage | | | | | | | | (1) (2) |
| Debtor | Claim Category | Filed Proof of Claim | | Under Review | | Accepted or Reviewed and unadjusted | | Value per Notice of Disallowance | | Value per Notice of Dispute | | Valued by Claims Officer | | Valued by Court |
| | | # | $ | # | $ | # | $ | # | $ | # | $ | # | $ | # | $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Nortel Networks Corporation** | | | | | | | | | | | | | | | |
| | Trade | 73 | 1,666.0 | 36 | 158.2 | 32 | 0.1 | 2 | - | 3 | 20.8 | - | - | - | - |
| | Bonds | 2 | 4,808.7 | 2 | 4,808.7 | - | - | - | - | - | - | - | - | - | - |
| | Term & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | Pension & Benefits | 7 | 2,514.0 | 7 | 2,514.0 | - | - | - | - | - | - | - | - | - | - |
| | Other | 161 | 756.3 | 69 | 752.3 | 89 | 1.2 | - | - | 3 | 1.2 | - | - | - | - |
| | Total | 243 | 9,745.0 | 114 | 8,233.2 | 121 | 1.3 | 2 | - | 6 | 22.0 | - | - | - | - |
| **Nortel Networks Global Corporation** | | | | | | | | | | | | | | | |
| | Trade | 10 | 1,493.2 | 3 | 10.0 | 6 | - | - | - | 1 | 0.8 | - | - | - | - |
| | Bonds | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | Term. & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | Pension & Benefits | 6 | 2,510.3 | 6 | 2,510.3 | - | - | - | - | - | - | - | - | - | - |
| | Other | 35 | 213.6 | 35 | 213.6 | - | - | - | - | - | - | - | - | - | - |
| | Total | 51 | 4,217.1 | 44 | 2,733.9 | 6 | - | - | - | 1 | 0.8 | - | - | - | - |
| **Nortel Networks International Corporation** | | | | | | | | | | | | | | | |
| | Trade | 7 | 1,492.4 | 3 | - | 4 | - | - | - | - | - | - | - | - | - |
| | Bonds | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | Term. & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | Pension & Benefits | 6 | 2,510.3 | 6 | 2,510.3 | - | - | - | - | - | - | - | - | - | - |
| | Other | 35 | 213.6 | 35 | 213.6 | - | - | - | - | - | - | - | - | - | - |
| | Total | 48 | 4,216.3 | 44 | 2,723.9 | 4 | - | - | - | - | - | - | - | - | - |
| **Nortel Networks Limited** | | | | | | | | | | | | | | | |
| | Trade | 311 | 1,605.1 | 62 | 660.8 | 231 | 39.6 | 2 | - | 16 | 38.1 | - | - | - | - |
| | Bonds | 4 | 5,243 | 4 | 5,243 | - | - | - | - | - | - | - | - | - | - |
| | Inter-company (NNI chain) | 1 | 2,517 | - | - | 1 | 2,517 | - | - | - | - | - | - | - | - |
| | Term. & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | Pension & Benefits | 7 | 2,511 | 7 | 2,511 | - | - | - | - | - | - | - | - | - | - |
| | Other | 190 | 1,583 | 147 | 1,553 | 43 | 19.9 | - | - | - | - | - | - | - | - |
| | Total | 513 | 13,458.6 | 220 | 9,967.1 | 275 | 2,576.3 | 2 | - | 16 | 38.1 | - | - | - | - |
| **Nortel Networks Technology Corporation** | | | | | | | | | | | | | | | |
| | Trade | 141 | 1,544.3 | 16 | 11.0 | 120 | 19.6 | - | - | 5 | 21.5 | - | - | - | - |
| | Bonds | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | Term. & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | Pension & Benefits | 6 | 2,510 | 6 | 2,510 | - | - | - | - | - | - | - | - | - | - |
| | Other | 36 | 214 | 36 | 214 | - | - | - | - | - | - | - | - | - | - |
| | Total | 183 | 4,268.3 | 58 | 2,735.0 | 120 | 19.6 | - | - | 5 | 21.5 | - | - | - | - |
| **Grand Total** | | 1,038 | 35,905.3 | 480 | 26,393.1 | 526 | 2,597.2 | 4 | - | 28 | 82.4 | - | - | - | - |

Notes:
Note 1:  The estimated value of individual claims by category is aggregated and shown in one claim stage only.
Note 2:  All amounts (other than Accepted) are subject to potential material change (i.e. negotiation, appeal, etc.) as the process for the determination of claims proceeds.
Note 3:  Excludes claims filed by various EMEA entities pursuant to the EMEA Claim Procedure Order dated January 14, 2011 and the claims under the Compensation Claim Procedure which have a bar date of January 8, 2012

19

44. Pursuant to the provisions of the Canadian Funding and Settlement Agreement, the Claims Report includes a claim by NNI against NNL for $2.0627 billion. This claim consists of two portions:

    a) $2.0 billion representing a pre-filing unsecured claim against NNL ranking *pari passu* with all other unsecured pre-filing claims; and

    b) $62.7 million representing a pre-filing secured claim pursuant to the provisions of the Initial Order relating to the Revolving Loan Agreement.

45. To date, 1,038 claims with a cumulative value of CAD $35.9 billion have been filed against the Applicants. This includes potential duplicative claims filed against multiple Applicants and claims filed subsequent to the Claims Bar Date. The Monitor, in conjunction with the Applicants, has reviewed 558 claims with a claim value of $9.5 billion. Of the claims reviewed, the Monitor has provisionally accepted 526 claims with a claim value of $2.6 billion.

46. Pursuant to the provisions of the Claims Resolution Order, the Monitor has provided the U.S. Debtors with supporting detail for the Claims Report as of November 26, 2011. A copy of the Claims Report has been posted on the Monitor's website.

47. The claims resolution process has progressed since the issuance of the Claims Resolution Order. The Monitor continues to review, revise and disallow claims, as applicable, and will report to this Honourable Court further on this process in subsequent reports.

## STATUS OF THE COMPENSATION CLAIMS PROCESS

48. On October 6, 2011, this Honourable Court approved the Compensation Claims Methodology Order and the Compensation Claims Procedure Order (as amended, collectively, the "Compensation Claims Orders").

49.   The Compensation Claims Orders allow for a fair, reasonable, efficient and practical method for the calculation and submission of employment-related claims that approximately 16,000 employees may have against the Applicants, the majority of which relate to claims for loss of benefits that require actuarial determination and calculation.

50.   The Compensation Claims Methodology Order approved the methodology, actuarial methods and assumptions used to value Benefit Claims and approved the methodology for the valuation of Termination and Severance Pay Claims and Patent Award Claims.

51.   The Compensation Claims Procedure Order set a bar date of January 6, 2012 for:

   a)   those that receive an Information Statement Package to return any Requests for Corrections; and

   b)   the filing of a Form C Proof of Claim in respect of any other compensation related claims.

52.   In accordance with the Compensation Claims Orders, the Monitor published an English version of the Notice of the Compensation Claims Process in the following newspapers on November 3, 2011: The Globe and Mail (National Edition), USA Today, Calgary Herald, Ottawa Citizen, The Intelligencer (in Belleville), The Kingston Whig Standard, London Free Press, Vancouver Sun, The Chronicle Herald (in Halifax) and The Gazette (in Montreal). In addition, a French version was published in La Presse (in Montreal) and Le Droit (in Ottawa), on the same date.

53.  Between November 2 and November 7, 2011, the Monitor mailed:

   a)  an Information Statement Package to approximately 13,700 Identified
       Claimants. These Information Statements set out the aggregate value of their
       Compensation Claim, broken down by claim type;

   b)  the prescribed letter to approximately 400 Active Employees/Active Canadian
       Service employees/Active Precision employees indicating an Information
       Statement would be prepared for them at a future date and they will have 50
       days from the date the Information Statement Package is mailed to return any
       Requests for Corrections or Form C Proofs of Claim;

   c)  the prescribed letter with a Proof of Claim Document Package to
       approximately 1,400 Post-Filing Transferred Employees indicating an
       Information Statement would not be prepared for them as according to Nortel
       records they do not have a Compensation Claim and they have until January 6,
       2012 to file a Form C Proof of Claim, if applicable;

   d)  the prescribed letter with a Proof of Claim Document Package to
       approximately 8 Employees with international addresses indicating an
       Information Statement would not be prepared for them as according to Nortel
       records they do not have a Compensation Claim and they have until January 6,
       2012 to file a Form C Proof of Claim, if applicable; and

   e)  a Proof of Claim Document Package to approximately 52 Employees who had
       filed a compensation claim in error in response to the call for claims pursuant
       to the Claims Procedure Order and who were not otherwise receiving an
       Information Statement Package.

54.  To date, the Monitor has received approximately 250 Information Statement
     Packages by returned mail as having incorrect addresses and is working together

with Representative Counsel to ascertain the appropriate address to which the Information Statement Package should be resent.

55.  All Information Statement Packages and letters contained contact information for Representative Counsel and the Monitor to enable Employees to call should they have questions regarding their packages or if they did not receive their packages. To date the Monitor has received and responded to over 1,500 phone calls.

56.  In addition, to address questions and concerns regarding the Compensation Claims Process, the Former Employees' Representatives, LTD Beneficiaries' Representatives, Former Employees' Representative Counsel, LTD Beneficiaries' Representative Counsel and their financial and actuarial advisors held an informational webinar on November 10, 2011 and hosted information sessions, which were attended by the Monitor and its counsel, at the following locations:

- Calgary - November 14, 2011 (2 sessions);
- Toronto - November 15, 2011;
- London - November 16, 2011;
- Bellville - November 17, 2011;
- Kingston - November 17, 2011;
- Ottawa - November 21, 2011 (3 sessions);
- Montreal - November 22, 2011 (2 sessions);
- Toronto – November 24, 2011 (2 sessions); and
- Ottawa – November 28, 2011.

57.  All the above sessions were open to Employees represented by CAW. CAW Counsel participated in the webinar and in the information sessions held in Toronto, London, Belleville and Kingston, where the CAW had collective bargaining rights.

23

58.    The Continuing Employees' Representatives and Continuing Employees' Representative Counsel held an informational webinar on November 11, 2011 and an information session in Ottawa on November 17, 2011.

59.    The information sessions were well attended with approximately 3,000 Employees attending the various Former Employee/LTD Beneficiary sessions and over 300 Employees attending the Continuing Employee webinar/session.

## STATUS OF SAME/OVERLAPPING COMPENSATION CLAIMS

60.    By Court Order dated November 8, 2011, this Honourable Court approved an amendment to the Compensation Claims Procedure Order to address Compensation Claims of Identified Claimants that are: (i) in excess of $5 million and subject to the Claims Resolution Order; or (ii) potentially Same-Creditor Claims or Overlapping Claims and subject to the Cross-Border Claims Protocol which is described in more detail in the Seventy-Seventh Report.

61.    For reasons set out in the Seventy-Seventh Report, the Monitor was not able to mail Information Statements to 194 Identified Claimants who have claims in excess of $5 million (4 Identified Claimants with Specific Claims) or who may potentially hold Same-Creditor or Overlapping Claims (190 Identified Claimants).    In accordance with the November 8, 2011 Compensation Claims Procedure Order amendment, on November 15, 2011 the Monitor mailed an explanatory letter to these Identified Claimants stating that once consultation with the U.S. Debtors had been completed, Information Statements would be mailed and they would have 50 days from the date of mailing to review and return any Requests for Correction or Form C Proofs of Claims.

62.    On November 16, 2011, the Monitor and the U.S. Debtors were able to determine that 130 of the 190 Identified Claimants held Same-Creditor Claims.    On November 17, 2011 the Monitor mailed Information Statement Packages to those Identified Claimants that do not hold Same-Creditor Claims.

24

63.   On November 28, 2011, the Monitor and U.S. Debtors were able to determine that 20 of the 130 Same-Creditor Claims were not Overlapping Claims and the Monitor has mailed the Information Statement Packages to the holders of those claims. In addition, it was confirmed that five of the Same-Creditor Claims are Overlapping Claims. The Monitor and the U.S. Debtors are working towards a coordinated approach with respect to such Overlapping Claims.

64.   The Monitor and the U.S. Debtors continue to consult with respect to the remaining 105 Same-Creditor Claims to determine which of those claims are Overlapping Claims.

65.   Of the four Identified Claimants with Specific Claims, the Monitor and U.S. Debtors have determined that two of these Specific Claims are also Overlapping Claims. The Monitor will report further regarding these claims as, in accordance with the Claims Resolution Order, Specific Claims will need to be approved by this Honourable Court.

**STATUS OF THE HEALTH AND WELFARE TRUST**

66.   By a series of Court Orders dated December 15, 2010, May 3, 2011 and June 21, 2011, this Honourable Court approved interim distributions from the HWT to Income Beneficiaries (as defined in such Orders). Cumulative interim distributions in the amount of approximately CAD $24.0 million were made to 761 Income Beneficiaries (including 344 LTD Beneficiaries, 80 SIB Beneficiaries and 337 STB Beneficiaries) during the period from January to July 2011.

67.   By Court Order dated August 23, 2011, this Honourable Court approved a fourth interim distribution from the HWT to LTD Beneficiaries on account of their LTD Life and LTD Optional Life Benefit (the "Fourth Interim Distribution", as defined in that order). The Fourth Interim Distribution, in the amount of approximately CAD $1.9 million, was made to 351 beneficiaries on or about September 30, 2011.

25

68.   By Court Order dated November 8, 2011, this Honourable Court approved a fifth interim distribution from the HWT to individuals on account of Pensioner Life (the "Fifth Interim Distribution", as defined in that order). The Fifth Interim Distribution, in the amount of approximately CAD $21.2 million, was made to 8,296 individuals (including 327 LTD Beneficiaries and 7,804 Pensioners and others) on or about November 30, 2011. As of the date hereof 488 payments have not been made as, among other reasons, they have not been cleared by Service Canada. The Monitor is working to resolve outstanding issues and the release of payments will be made as soon as practicable.

69.   As a result of the decision of the Supreme Court of Canada, there is now certainty that the distribution of the corpus of the HWT is to be made in accordance with the Approved HWT Allocation Methodology. The Monitor believes the ultimate total distribution from the HWT is likely to meet or exceed 33.8% of the value of the Participating Benefits[1], the percentage indicated in the illustrative scenario reflecting the Approved HWT Allocation Methodology filed with the Supplement to the Fifty-First Report. However, there remains a degree of uncertainty regarding the final amount that will be available to distribute from the HWT, as a result of matters referred to in previous reports of the Monitor. Accordingly, the Monitor is not yet in a position to recommend a final distribution be made from the HWT. The Monitor will continue to work diligently with the Applicants, the Trustee, the LTD Beneficiaries' Representative and her advisors, the Former Employees' Representatives and their advisors, the CAW and others to finalize outstanding matters, including accounting and financial reporting thereon, to allow a final distribution from the HWT to be made to all Participating Beneficiaries.

---

[1] With the value of Pensioner Life relating to Pensioners being reduced as a result of actual 2010 Pensioner Life premiums.

**STATUS OF THE TERMINATION FUND**

70. In accordance with the settlement agreement approved by this Honourable Court on March 31, 2010, the Applicants established a CAD $4.3 million fund for the benefit of former employees of the Applicants (the "Termination Fund"). Under the settlement agreement:

    i. a former employee is eligible to apply for payment from the Termination Fund to a maximum of CAD $3,000, if: (a) employment was terminated on or prior to June 30, 2010; (b) amounts are owing to the former employee for termination or severance pay; (c) the former employee has not been offered employment with a purchaser of Nortel's assets; and (d) the former employee did not receive certain other payments;

    ii. any payments under the Termination Fund to former employees will be credited against allowed claims of such individuals and such claims will be correspondingly reduced; and

    iii. to the extent that funds remain unused in respect of terminations prior to or on June 30, 2010, the Termination Fund may be used to make payments on account of terminations after June 30, 2010 to former employees who meet the eligibility requirements.

71. By Court Order dated February 25, 2011, this Honourable Court extended the eligibility time period to those former employees terminated during the period from July 1, 2010 to and including December 31, 2010 and who otherwise meet the eligibility requirements ("Additional Former Eligible Employees"). The February 25, 2011 Order also amended the Employee Hardship Application Process to permit the use of a portion of the funds allocated to the Employee Hardship Application Process, in combination with the remaining funds in the Termination Fund, to make payments to the Additional Eligible Former Employees.

72. As of November 26, 2011, 1,116 former employees terminated on or prior to June 30, 2010 have received payments totalling CAD $3,348,000. The remaining former employees terminated on or prior to June 30, 2010 have a potential combined entitlement of CAD $123,000.

73. As of November 26, 2011, 332 of the Additional Eligible Former Employees have received payments totalling CAD $996,000. The remaining Additional Eligible Former Employees have a potential combined entitlement of CAD $93,000.

74. The Applicants continue to receive applications and make payments to eligible former employees pursuant to the above orders.

## STATUS OF THE EMPLOYEE HARDSHIP APPLICATION PROCESS AND FUND

75. On July 30, 2009, a Court Order was issued by this Honourable Court approving an employee hardship application process (the "Employee Hardship Order") as more fully described in the Sixteenth Report and the Affidavit of John Doolittle dated July 24, 2009.

76. On February 25, 2011, this Honourable Court approved the Applicants' request to:

   a) amend the employee hardship application criteria such that sufficient hardship funds (the "Required Funds") be made available for payment of CAD $3,000 to the Additional Eligible Former Employees, when combined with the unused funds in the Termination Fund; and

   b) reduce the amount available for hardship applications by the Required Funds.

77. By Court Order dated April 8, 2011, this Honourable Court approved making sufficient funds available from the Employee Hardship process to pay each of the SIB Beneficiaries and the STB Beneficiaries entitled to STBs in Pay the maximum 10% distribution in accordance with the methodology used for the January Interim

Distribution to a maximum of one month's benefits.  The amount available for hardship applications was to be reduced by the amount required to effect this Order.

78.  On June 30, 2011 this Honourable Court approved the Applicants' request to extend the Application Period until December 14, 2011.

79.  As a result of the Court Orders dated February 25, 2011 and April 8, 2011, the amount available for employee hardship applications (in CAD $000s) as of November 26, 2011 is as follows:

| | | |
|---|---:|---:|
| Hardship Fund, Opening | | 750 |
| Hardship Payments per Monitor's 70th Report | (128) | |
| Additional Hardship Payments to November 26, 2011 | (2) | |
| | | (130) |
| Additional Eligible Former Employees-paid | (267) | |
| Additional Eligible Former Employees - reserved | (93) | |
| | | (360) |
| April SIB/STB Hardship | | (180) |
| Hardship Fund, Remaining | | 80 |

80.  The Monitor is continuing to administer the hardship payment application process and report thereon to the appropriate representative counsel.  There currently remains available approximately CAD $80,000 to satisfy future hardship application requests.  Applications continue to be received from former employees of the Applicants asserting financial hardship resulting from illness, healthcare costs or ineligibility for pension or employment insurance benefits.

81.  The Monitor is working closely with counsel to the CAW, LTD Beneficiaries' and Former Employees' Representative Counsel to facilitate access to programs that can offer relief to former employees, particularly with respect to healthcare costs. The Monitor has had an active facilitation role with one such program since last reporting on this matter.  The Monitor believes access to the hardship application

procedure remains necessary as applications continue to be received as a result of the cessation of benefits to LTD Beneficiaries and Former Employees. Accordingly, the Monitor supports the Applicant's request for an extension of the deadline for submitting hardship applications to June 29, 2012.

82.   A copy of the proposed amended Eligibility Requirements and the Procedure With Respect To Hardship Payment Applications is attached as Appendix "C" to this Seventy-Eighth Report.

**STATUS OF REALIZATION OF REMAINING ASSETS**

83.   While Nortel has now completed the sale of its operating units, the Applicants continue to assess the sale of their remaining assets in consultation with their legal and financial advisors.

*Residual IP Sale*

84.   The sale of the Residual IP to Rockstar Bidco, LP closed on July 29, 2011, with the purchaser depositing $4.45 billion into an escrow account established by the Nortel selling parties with JP Morgan.  In addition, the purchaser's good faith deposit of $54 million, which was previously held in escrow by Citibank, was transferred to the same escrow account.

85.   Immediately following the closing, $2.1 million was drawn from the purchase price escrow to reimburse NNI for amounts paid to Lazard in connection with the Residual IP transaction.  A further $4.4 million was drawn to reimburse the Applicants, NNI and NNUK for fees paid to Global IP in connection with the Global IP transaction.  Payments totalling $29 million were made to Ranger Inc. in connection with break-fee and expense reimbursement obligations of the Nortel selling parties under the stalking-horse agreement for the Residual IP.

86.   As at November 26, 2011, approximately $4.47 billion in net proceeds was held in the Residual IP sale proceeds escrow account.

87. In addition, the purchaser paid $18 million to the Applicants in respect of the utilization of certain tax attributes of the Applicants in connection with the Residual IP transaction and paid the Applicants and NNI, $273,209 and $44,713, respectively, in connection with its obligation to bear certain severance costs of the Nortel sellers.

*Residual IT Assets Sale Process*

88. On March 25, 2011 this Honourable Court granted an order with respect to the process for the sale of the Applicants' remaining information technology infrastructure assets (the "Residual IT Assets"), including the Applicants' portfolio of IP addresses. The Applicants, with the assistance of the Monitor, have been making progress and the Monitor expects to report back to the Court in the near future.

## STATUS OF ALLOCATION MATTERS AND MEDIATION

89. As previously reported in the Seventieth Report, on June 17, 2011, Orders were issued by this Honourable Court and the U.S. Court pursuant to which various parties interested in the allocation of the Nortel global divestiture sale proceeds were ordered to mediate the issues raised in the allocation protocol motions heard before this Honourable Court and the U.S. Court on June 7, 2011, pending the release of the Courts' decisions on same.

90. By their respective Orders dated June 29, 2011, this Honourable Court and the U.S. Court appointed The Honourable Warren K. Winkler, Chief Justice of Ontario, to serve as mediator.

91. On August 3, 2011, the U.S. Court entered an order requesting the appointed mediator to consider the postponement of the mediation until after the U.S. Court's decision on the U.S. Debtors' objections and motions to dismiss the claims of the EMEA Debtors against them.

92.   The U.S. Court hearing with respect to the EMEA Debtors' claims took place October 14, 2012.  The U.S. Court's decision is pending.

93.   The Applicants and Monitor are prepared to participate in mediation once scheduling has been finalized.

**STATUS OF ENVIRONMENTAL MATTERS**

94.   As previously reported in the Seventieth Report, the Applicants brought a motion seeking, *inter alia*, the approval of the repudiation of contracts relating to environmental monitoring and remediation at the Impacted Sites (as defined in the Sixty-Sixth Report) and a declaration that various Orders of the Ontario Ministry of the Environment (the "MOE") and related proceedings before the Ontario Environmental Review Tribunal were subject to the stay of proceedings granted by this Honourable Court.  Further details with respect to this motion are contained in the motion materials and the Sixty-Sixth and Seventy-Fourth Reports.

95.   The motion was heard on September 19 and 20, 2011 and this Honourable Court has reserved its decision on the motion.

96.   In the interim, the Applicants and the MOE have agreed that the status quo with respect to ongoing monitoring and remediation efforts would be maintained at the Impacted Sites until such time as this Honourable Court renders its decision.  In addition, various discussions have been taking place among the Applicants, the Monitor and various interested parties with respect to the valuation of potential claims as well as details of further investigative and remedial work that may be necessary at the Impacted Sites to advance discussions among the interested parties.

**STATUS OF INTER-ESTATE SETTLEMENTS**

97.   The subparagraphs that follow provide an update in respect of certain inter-estate settlements: