a) the Q1 2010 Transfer Pricing Settlement Agreement among NNL, NNI, NNUK, certain other Nortel entities and the Joint Administrators (the "Q1SA") was approved by this Honourable Court on August 23, 2011 and executed by the parties on September 8, 2011. In accordance with the terms of the Q1SA, NNL has remitted $4.7 million to NNUK;

b) the Agreement on Transfer Pricing Amendments and Certain Other Matters among NNL, NNI, NNUK, certain other Nortel entities, the Joint Administrators and the French Liquidator (the "ATPA") was approved by this Honourable Court on August 23, 2011 and executed by the parties on September 8, 2011. In accordance with the terms of the ATPA:

  i. no further Transfer Pricing Payments are required nor shall be made amongst the respective parties to (i) the Master R&D Agreement, or (ii) the Distribution Agreements in respect of the period from and after April 1, 2010. As a result, all subsequent intercompany transactions will be on a cost plus basis. Contemporaneous with the signing of the ATPA, the GSPAs have also been amended retroactive to April 1, 2010 to remove the reference to payments under the Master R&D Agreement from the definition of "Goods and Services" (as defined in the GSPAs);

  ii. approximately $53 million was released from the Enterprise distribution escrow account to NNI, which amount represents the net working capital of certain subsidiaries of NNI that were sold to Avaya Inc. in the Enterprise transaction;

  iii. approximately $5.4 million was released from the relevant sale transaction escrow accounts to NNI to reimburse it for amounts paid to Lazard Ltd. ("Lazard") on account of Lazard's monthly fees and expenses;

33

      iv.  approximately $3.3 million was released from the relevant escrow account to Lazard in respect of the minority sale transaction fee owed to Lazard in connection with the MEN transaction; and

      v.  approximately $30 million was released from the relevant sale transaction escrow accounts to NNL to reimburse NNL for payments made to obtain carve-out financial statements related to the sale of certain of the businesses; and

c)  various escrow amendments and agreements relating to the Russia Settlement were approved by this Honourable Court on August 23, 2011. In September 2011, in accordance with the terms of the Russia Settlement Agreement, NNIFH deposited specified amounts in certain of the sale proceed escrow accounts and amounts equal to such deposits were subsequently released from escrow to Nortel Russia as part of Nortel Russia's assignment to NNIFH of all of its rights and obligations under the relevant escrow agreements and to the sale proceeds.

## APPLICANTS' PROPOSED 2012 EMPLOYEE RETENTION PLAN

### *2010-2011 Nortel Special Incentive Plan - Overview of Cost and Applicants Achievements*

98.  The Nortel Special Incentive Plan ("NSIP"), described in more detail in the Thirty-Seventh Report, covered the period January 1, 2010 to December 31, 2011.

99.  The purpose of the NSIP was to incentivize key employees to remain with Nortel during the restructuring period. The NSIP, as approved by this Honourable Court and the U.S. Court on March 8, 2010, allowed for compensation to be earned in respect of two plan periods (each, a "NSIP Plan Period"). The first NSIP Plan Period commenced on January 1, 2010 and ended on December 31, 2010. The

second NSIP Plan Period commenced on January 1, 2011 and will end on December 31, 2011.

100. Since 2009, Nortel has been focused on divesting its significant business units, intellectual property and miscellaneous other assets, delivery of services pursuant to various TSAs related to the sale of the business units and other restructuring activities. During the NSIP Plan Period, the Applicants made significant achievements in this regard including, among other things, the:

   a) sale of the CDMA/LTE, Enterprise, MEN, GSM/GSM-R, CVAS and MSS business units;

   b) sale of the Residual IP;

   c) execution and delivery of services to the purchasers of the various business units and substantial completion and wind down of the TSAs related to the business units;

   d) sale of NNL's interest in LGN;

   e) sale of substantially all the assets of GDNT;

   f) sale of the Applicants' Carling facility;

   g) entry into the Final Canadian Funding and Settlement Agreement, including resolution of advanced pricing agreement matters with the relevant taxing authorities;

   h) transfer of the administration of the Applicants' defined benefit pension plans to Morneau Shepell Ltd.;

   i) several interim distributions to beneficiaries of the HWT;

   j) establishment of the employee compensation claim process;

35

    k) collection of the majority of recoverable third party customer receivables;

    l) continued wind down and repatriation of cash from various of the Applicants' worldwide affiliates; and

    m) significant progress toward the segregation of the Applicants' operations, financial reporting and IT infrastructure from the other estates to facilitate an orderly wind down of the Applicants' estates.

101. As outlined in the Thirty-Seventh Report, the aggregate cost of the NSIP for the Applicants over the two year NSIP Plan Period was estimated to be approximately CAD \$29.6 million, of which the Applicants anticipated recovering 80% (approximately CAD \$23.7 million) through TSA billings to the purchasers of the business units, resulting in a net cost to the Applicants of approximately CAD \$5.9 million.

102. Based on actual NSIP payments made to date and payments anticipated to be made which total approximately CAD \$28.8 million (including amounts related to the reserve pool discussed below) and TSA billings invoiced or anticipated to be invoiced of approximately CAD \$23.0 million (approximately 80% cost recovery), the current estimate of the net cost to the Applicants of the NSIP is CAD \$5.8 million.

103. The NSIP also provided the Applicants with a reserve pool of up to CAD \$3 million to allow the Applicants, with the consent of the Monitor, the ability to increase individual payments, extend termination dates or make payments to additional employees, if necessary. The Applicants have made or anticipate making only CAD \$0.6 million of such payments.

104. While much progress has been made by the Applicants, there remains a number of significant milestones the Applicants must achieve to conclude the CCAA proceedings and complete the wind-down of the Applicants' operations.

Furthermore, the time frame for the completion of these goals has extended beyond the period contemplated by the NSIP. Accordingly, the Applicants, in consultation with the Monitor, have designed a retention plan to retain and incentivize employees of the Applicants and certain of their affiliates in respect of the 2012 calendar year.

### Overview of the Nortel 2012 Retention Plan

105. Retaining their remaining employees is critical to the Applicants' ability to:

   a) complete their restructuring efforts, monetize remaining residual assets (including the Applicants' Residual IT Assets) and repatriate cash from affiliates in APAC and CALA;

   b) comply with ongoing public reporting and tax reporting requirements;

   c) perform remaining obligations pursuant to TSAs entered into with Ciena and Rockstar;

   d) complete estate segregation activities with respect to IT infrastructure and applications;

   e) assist in the creditor claims processes, including determination and resolution of inter-company, trade and compensation related claims;

   f) assist in the sale proceeds allocation process; and

   g) complete and implement a plan of arrangement, including distributions to creditors, in a manner that maximizes the value of the Applicants' estates for the benefit of all stakeholders.

106. The Nortel 2012 Retention Plan is designed to provide cash incentive awards (the "Retention Payments") to employees of the Applicants and certain of their affiliates in the APAC and CALA regions in which the Applicants have an economic interest.

37

107. Unlike the NSIP, the Nortel 2012 Retention Plan does not include the U.S. Debtors. The U.S. Debtors employees are subject to a separate incentive plan in respect of the 2012 calendar year, as approved by the U.S. Court on November 14, 2011.

108. The Nortel 2012 Retention Plan also does not include the EMEA Debtors or other EMEA entities.

109. Globally, the Nortel 2012 Retention Plan covers approximately 148 employees, including 110 employees of the Applicants. Retention Payments will be funded by the Nortel entity that employs a particular employee. Five employees of NNI will be incentivized on a basis that substantially mirrors the Nortel 2012 Retention Plan. As these five employees perform services required by NNL, NNL will fund the costs associated with these incentives. These payments are not material to NNL and are summarized in Confidential Appendix "D" (as discussed in greater detail below).

110. The aggregate cost of the Nortel 2012 Retention Plan relating to the Applicants' participants is forecast to be approximately CAD $3.9 million. As there are only minimal activities to be performed under the remaining TSAs, no substantial recoveries are anticipated from the purchasers of the business units with respect to such costs.

111. The Nortel 2012 Retention Plan is scalable and should milestones be achieved earlier than anticipated, the cost for the Applicants' participants is forecast to be reduced to approximately CAD $3.5 million. Further details of the Nortel 2012 Retention Plan as it relates to employees of the Applicants who are participants and further details in respect of the costs related to the five NNI employees are provided in Confidential Appendix "D" attached hereto.

112. Confidential Appendix "D" contains personal information and individual compensation details of the Applicants' employees. This information is sensitive and confidential. As such, the Applicants and the Monitor are requesting that

confidential Appendix "D" attached hereto be sealed pending further Order of this Honourable Court.

### Significant Terms of the Nortel 2012 Retention Plan

113. A summary of the significant terms of the Nortel 2012 Retention Plan is provided in the following sub-paragraphs. Reference should be made directly to the Nortel 2012 Retention Plan, a copy of which is attached as Appendix "E" to this Seventy-Eighth Report, for a complete understanding of the terms governing same. Capitalized terms used in the following sub-paragraphs and not otherwise defined shall have the meaning given to them in the Nortel 2012 Retention Plan.

#### Participating Employees

a) The Plan Participants are employees of a Participating Employer who will be actively employed by that Participating Employer for any portion of 2012, subject to the discretion of management;

b) Each employee selected for participation in the Nortel 2012 Retention Plan will receive a letter (the "Participation Letter") setting forth the Annual Award Amount (as defined below) he or she may be eligible to receive pursuant to the Nortel 2012 Retention Plan with respect to the Plan Period (as defined below) and requiring such employee be bound by the terms and conditions of the Nortel 2012 Retention Plan;

c) Upon execution and timely return of the Participation Letter, such employee will become a Plan Participant;

#### Award Amounts

d) Each Plan Participant's Participation Letter will designate an individual Annual Award Amount (the "Annual Award Amount") that will be

determined by the Company in accordance with criteria approved by the Board of Directors of NNL (the "Board");

e) Each Plan Participant will be eligible to receive a Retention Payment up to a maximum of his or her Annual Award Amount (such Retention Payment, the "Award Payment Amount"). Subject to certain exceptions, a Plan Participant's Award Payment Amount will be a proportion of his or her Annual Award Amount that is determined by his or her Termination Date (as detailed in Section V(b) of the plan). For instance, a Plan Participant whose Termination Date is in March 2012 will be entitled to an Award Payment Amount equal to 3/12 of such Plan Participant's Annual Award Amount and a Plan Participant whose Termination Date is in September or October 2012 will be entitled to an Award Payment Amount equal to 90% of his or her Annual Award Amount;

f) The Termination Date of a Plan Participant may be changed on ninety days written notice and his or her Award Payment Amount adjusted in accordance with Section V(b) of the plan, provided that if a Plan Participant Participation Letter provided for an original Termination Date between and including May 1, 2012 and December 31, 2012, the Plan Participant's Award Payment Amount will be the greater of the entitlement under Section V(b) of the plan and Section V(d) of the plan. If a Plan Participant's Termination Date is extended on ninety days notice and such Plan Participant elects to terminate his or her employment with the Participating Employer prior to the extended Termination Date, then the right to any unpaid Award Payment Amount of such Plan Participant will be forfeited;

*Payment Process*

g) For Plan Participants located outside of Asia, the Award Payment Amount shall be paid as soon as practicable following such Plan Participant's

Termination Date, but, in any event, no later than forty-five days following such Termination Date. For Plan Participants located in Asia, the Award Payment Amount shall be paid in instalments as described in Section V(f)(ii) of the plan;

h) Notwithstanding anything in the plan to the contrary, if the Board, in its sole discretion, concludes that a Plan Participant has committed intentional misconduct the Plan Participant will forfeit his/her entire Award Payment Amount and promptly reimburse his or her Participating Employer the amount of any Retention Payment received to date;

*Termination of Employment*

i) Notwithstanding anything in the plan to the contrary, upon the involuntary termination of employment of a Plan Participant for Cause or the voluntary termination of employment by a Plan Participant for any reason, in each case during the Plan Period, the right to any unpaid portion of the Award Payment Amount of such Plan Participant will be forfeited on the date of such employment termination and such Plan Participant will have no further rights under the plan; and

*Effectiveness of the Plan*

j)  The 2012 Retention Plan shall be effective as of January 1, 2012, subject to the approval of this Honourable Court.

**Benchmarking and Overall Reasonableness of the Nortel 2012 Retention Plan**

114. In developing the NSIP, the Company consulted with Mercer (US) Inc. ("Mercer"), its compensation consultant. A report prepared by Mercer outlining the NSIP and providing comparisons to certain market data was attached to the Confidential Supplement to the Thirty-Seventh Report. A copy is re-attached as Confidential Appendix "F" hereto (together with Confidential Appendix "D", the "Confidential Appendices").

115. Confidential Appendix "F" contains compensation details related to the Applicants' employees. This information is sensitive and confidential. As such, the Applicants and the Monitor are requesting that confidential Appendix "F" hereto be sealed pending further Order of this Honourable Court.

116. The Annual Award Amounts under the Nortel 2012 Retention Plan are consistent with awards under the NSIP for the 2011 calendar year.

117. The Nortel 2012 Retention Plan is essentially a scalable version of the bench marked NSIP and provides the Applicants with a flexible tool to retain their employees that can be adjusted as the relevant timeframes for completing their restructuring objectives become clearer.

118. The Nortel 2012 Retention Plan has been reviewed with the ad hoc committee of creditors having claims against only the Applicants, the Bondholder Group and the Committee.

119. The Applicants require the expertise, knowledge, experience and continued commitment of their remaining employees to complete the various restructuring

42

goals discussed above. As such, the Applicants need to appropriately incentivize those employees, by way of competitive compensation, to remain in the employment of the Applicants pending the completion of those goals. The Monitor is of the view the Nortel 2012 Retention Plan is appropriate having regard to this need and recommends that this Honourable Court approve the Nortel 2012 Retention Plan.

## OTHER MATTERS

### *Genband Settlement*

120. The Stipulation and Settlement Agreement by and among the Sellers and Genband US LLC and Others (the "Genband Settlement Agreement") was approved by this Honourable Court on August 23, 2011. In accordance with the terms of the Genband Settlement Agreement, approximately $24 million was released from the CVAS escrow account in favour of Genband as follows:

   a) approximately $14 million was remitted directly to Genband;

   b) approximately $1 million was remitted to NNL in settlement of transfer taxes due and owing to the Applicants from Genband; and

   c) approximately $9 million was remitted to certain Nortel entities in satisfaction of Genband's obligations in connection with the settlement of certain matters pertaining to the CVAS TSA.

### *CTDI Litigation*

121. On June 10, 2011, a settlement was reached between CTDI, NNL and NNI whereby CTDI agreed to pay $19 million to Nortel to settle claims brought by NNL and NNI against CTDI for the misappropriation of trade secrets, trademark infringement, dilution of a famous mark, false designation of origin, breach of contract, breach of

covenant of good faith and fair dealing, fraud and unjust enrichment. All required settlement documentation has been executed and U.S. Court approval has been obtained with respect to the settlement.

122. On November 7, 2011, NNL received approximately $4.8 million as its share of the settlement amount.

### *SNMP Research Matters*

123. On September 21, 2011, SNMP Research International, Inc. and SNMP Research, Inc. (collectively, "SNMP Research") brought a motion seeking an order lifting the stay of proceedings such that it could file a complaint with the U.S. Court against, *inter alia*, the Applicants relating to the alleged unlawful use, possession and transfer of SNMP Research products after the Filing Date.

124. Following the service of the motion, the Applicants, the U.S. Debtors and SNMP Research engaged in good faith negotiations and agreed to mediate the matters at issue between SNMP Research and Nortel. In connection with such agreement, the Applicants and the Monitor consented to an Order of this Court dated October 26, 2011, lifting the stay for the sole purpose of permitting SNMP Research to move for relief in the U.S. Court to file its complaint under seal, to simultaneously file the complaint with the U.S. Court, and to complete service of the complaint on the Applicants. Such relief was granted in order to permit SNMP Research to seek to preserve its existing claims (if any) from becoming statute barred and on a without prejudice basis as to any and all matters that are or may be at issue between Nortel and SNMP Research, including, without limitation, the merits of SNMP Research's lift stay motion and the appropriate forum(s) for the hearing and determination of SNMP Research's claims.

125. The Applicants, the U.S. Debtors and SNMP Research are presently in the process of discussing the particulars of the mediation.

*Estate Separation Activities*

126. As discussed in previous reports, many of Nortel's corporate functions span
multiple legal entities. As the divestiture of the various operating lines of business
has been completed and with the expectation that the majority of transition services
provided to the various buyers will be completed during 2011, the interdependency
of the Nortel entities continues to diminish. The various Nortel estates are
developing plans for the separation of IT functions during the first quarter of 2012
in order to allow each estate to operate going forward on a "standalone" basis.

127. The Monitor believes it is in the best interest of the Applicants to position
themselves to operate on an independent basis.

*French Employee Claims*

128. Approximately 128 former employees of NNSA have commenced actions against,
*inter alia*, NNC, NNL and the Monitor before the Versailles employment tribunal
in France. Although the specific relief claimed varies on a case by case basis, the
central claim is that NNC and NNL are liable for various employment related
claims on the grounds that they were "co-employers" with NNSA. The aggregate
amount claimed is approximately €18 million. A full hearing was originally
scheduled before the Versailles employment tribunal on October 31, 2011;
however, this hearing has now been adjourned to June 6, 2012.

*NNL Series 5 Preferred Shares Conversion*

129. Pursuant to the provisions attaching to NNL's outstanding Cumulative Redeemable
Class A Preferred Shares Series 5 (the "Series 5 Preferred Shares"), holders thereof
had the right to elect to convert such shares into Cumulative Redeemable Class A
Preferred Shares Series 6 (the "Series 6 Preferred Shares") on December 1, 2011.
The principal distinction between the Series 5 Preferred Shares and the Series 6
Preferred Shares (of which none are outstanding), aside from their conversion

45

rights, is that the Series 5 Preferred Shares provide a floating adjustable dividend rate whereas the Series 6 Preferred Shares provide for fixed dividends.

130. On November 1, 2011, NNL issued a press release to provide notice to the holders of the Series 5 Preferred Shares that NNL would not be following the notification procedures set out in the provisions of those shares in connection with the right to convert, nor would a fixed dividend rate with respect to the Series 6 Preferred Shares be set.

131. The rationale supporting this decision included, amongst other things:

    a)  these CCAA proceedings;

    b)  NNL had suspended dividends on its preferred shares in November 2008 and does not expect to resume the declaration or payment of dividends in the future; and

    c)  NNL does not expect that holders of its preferred shares (of any series) will receive any value from the CCAA proceedings and expects that these proceedings will result in the cancellation of such shares.

*Ernst & Young Merger with RSM Richter*

132. On December 2, 2012, Ernst & Young LLP completed a merger with the Toronto and Calgary offices of RSM Richter LLP. As certain employees of RSM Richter LLP act as financial advisors to the former employee representatives, appropriate measures and actions have been implemented within Ernst & Young to maintain confidentiality and independence. These actions include segregating and securing electronic and hardcopy data and records, physically securing premises and implementing protocols with respect to information exchange. The various stakeholders and their professional advisors have been advised of the merger and

46

the specifics of the confidentiality measures put in place and that the former RSM Richter LLP individuals involved will continue in their respective roles.

## STATUS OF FOREIGN PROCEEDINGS

*Chapter 11*

133. The following is a summary of the court orders that have been issued and the financial information that has been filed in the U.S. Chapter 11 proceedings since the last update provided in the Seventieth Report:

    a)  on June 21, 2011, the U.S. Debtors obtained an order approving procedures for appointing an official committee of retired employees;

    b)  on June 22, 2011, the U.S. Court entered an order appointing an official committee of long-term disability participants;

    c)  on June 29, 2011, the U.S. Court amended and supplemented its order entered June 17, 2011 directing mediation of the U.S. Debtors' motion for entry of an order establishing an allocation protocol pursuant to the Interim Funding and Settlement Agreement (filed as corrected on July 12, 2011). On August 3, 2011, the U.S. Court entered an order requesting the appointed mediator to consider the postponement of the mediation until after the U.S. Court's decision on the U.S. Debtors' objections and motions to dismiss the claims of the EMEA Debtors;

    d)  on July 11, 2011, the U.S. Court entered orders:

        i.  appointing a mediator with respect to the U.S. Debtors' motion for (i) approval of the stipulation by and between NNI and U.S. Bank National Association, (ii) direction to U.S. Bank National Association to turn over property to NNI, and (iii) related relief to the Nortel Networks U.S. Deferred Compensation Plan; and

47

ii.  authorizing and approving the sale of the Residual IP;

e)  on August 2, 2011, the U.S. Trustee appointed an Official Committee of Retired Employees;

f)  on September 23, 2011, the U.S. Debtors obtained an order establishing deadlines for filing proofs of claim for non-Canadian intercompany claims and remaining director and officer claims and approving the form and manner of notice thereof;

g)  on October 7, 2011, the U.S. Debtors filed a periodic report regarding the value, operations and profitability of entities in which the U.S. Debtor estates hold a substantial or controlling interest;

h)  on November 14, 2011, the U.S. Debtors obtained orders:

    i.  authorizing the disposal of certain product shipping and storage documentation; and

    ii.  authorizing the U.S. Debtors to implement the Nortel Networks Inc. 2012 incentive plan and enter into certain special incentive payment agreements;

i)  the U.S. Debtors filed Debtor-in-Possession Monthly Operating Reports for the months of May, June, July, August and September on June 30, 2011, August 16, 2011, September 1, 2011, September 30, 2011 and November 22, 2011, respectively; and

j)  in addition, the U.S. Debtors obtained orders granting omnibus objections to claims, approving certain settlement and side agreements, resolving certain discovery issues, authorizing and amending the retention and payment of professionals, approving certain intercompany agreements and adjustments thereto, resolving certain claims and motions, and enlarging certain time periods related to avoidance actions.

*Chapter 15*

134. The following is a summary of the filings in the Chapter 15 proceedings of the Applicants since the last update provided in the Seventieth Report:

    a) on July 1, 2011, the Monitor filed notice of the Stay and Hardship Extensions Order and Endorsement of this Honourable Court;

    b) on August 18, 2011, the Monitor obtained an order giving effect in the U.S. to this Honourable Court's Approval and Vesting Order relating to the sale of the Residual IP; and

    c) on December 2, 2011, the Monitor filed motions, which are scheduled for hearing before the U.S. Court on December 30, 2011, for the recognition and enforcement of:

        i. the consent order of this Honourable Court granting certain limited relief from the stay to SNMP Research; and

        ii. the Compensation Claims Orders; and

    d) the Monitor has continued to file with the U.S. Court and serve on required parties notices of each of its Reports to this Honourable Court.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

135. The Stay Period presently expires on December 14, 2011. The Applicants are seeking a 197 day extension of the Stay Period up to and including June 29, 2012. As stated above, based on the cash flow analysis, including the assumptions contained therein, the Applicants have sufficient cash resources to fund operations through the requested stay extension.

136. The Monitor has assisted and continues to assist the Applicants in their efforts to efficiently complete the realization and maximization of value from their assets,

conduct the claims process and prepare a plan of arrangement. The Monitor believes the Applicants are working diligently and in good faith and continue to progress towards the development of a plan of arrangement.

137. For the reasons outlined in this Seventy-Eighth Report, the Monitor supports the Applicants' request for the following:

a) an extension of the stay up to and including June 29, 2012;

b) an extension of the Employee Hardship Application Process to June 29, 2012;

c) that the Eligibility Requirements and the Procedure with Respect to Hardship Payments Applications be amended consistent with (b), above;

d) approval of the Nortel 2012 Retention Plan as it relates to employees of the Applicants; and

e) sealing of the Confidential Appendices pending further Order of this Court.

All of which is respectfully submitted this 7th day of December, 2011.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**
**and not in its personal capacity**

Per:

Murray A. McDonald
President

# APPENDIX "A"

[Attached]

APPENDIX A

**Nortel Networks - June 5 to November 26, 2011**
**CCAA Applicants**
Forecast Cash Flow - Variances
USD (Millions)

| | Forecast | Actuals | Variances |
|---|---|---|---|
| Start of period | 05-Jun-11 | 05-Jun-11 | 05-Jun-11 |
| End of period | 26-Nov-11 | 26-Nov-11 | 26-Nov-11 |

## 1 . Receipts & Disbursements

| | Forecast | Actuals | Variances |
|---|---|---|---|
| **Receipts** | | | |
| Collection of Accounts Receivable | 0.1 | 4.1 | 4.0 |
| Other Receipts | 30.0 | 62.1 | 32.1 |
| TSA Recoveries from Buyer | 12.8 | 25.6 | 12.8 |
| Payroll & AP reimbursement from Buyers | - | 0.2 | 0.2 |
| Intercompany Receipts | 9.8 | 52.3 | 42.5 |
| **Total Receipts** | 52.7 | 144.3 | 91.6 |
| **Disbursements** | | | |
| Payroll (Gross) | 16.6 | 15.4 | 1.1 |
| Benefits | 9.5 | 4.0 | 5.5 |
| Pension | - | - | - |
| Inventory Purchases | - | 0.1 | (0.1) |
| Non-Inventory Purchases | 16.3 | 16.2 | 0.1 |
| Payroll & AP payments on behalf of Buyers | - | 0.2 | (0.2) |
| Intercompany Disbursements | 14.2 | 6.2 | 8.1 |
| Restructuring Costs | 42.3 | 39.9 | 2.4 |
| **Total Disbursements** | 98.9 | 82.1 | 16.8 |
| **Net Cash Flow** | (46.2) | 62.2 | 108.4 |
| FX Impact | - | (4.8) | (4.8) |
| **Opening Available Cash Balance** | 252.6 | 252.6 | - |
| **Closing Available Cash Balance** | 206.4 | 310.1 | 103.6 |
| Unavailable Cash | 238.6 | 238.4 | (0.2) |
| **Total Cash** | 445.0 | 548.5 | 103.4 |
| Restricted Cash | 38.0 | 23.5 | (14.5) |
| **Total Cash + Restricted Cash** | 483.0 | 572.0 | 89.0 |

# APPENDIX "B"

[Attached]

**Nortel Networks - November 27, 2011**
**CCAA Applicants**
**Forecast Cash Flow**
USD (Millions)

| | Dec.2011 | | | | | Jan.2012 | | | | | | Feb.2012 | | | | | Mar.2012 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start period | 27-Nov-11 | 01-Dec-11 | 04-Dec-11 | 11-Dec-11 | 18-Dec-11 | 25-Dec-11 | 01-Jan-12 | 08-Jan-12 | 15-Jan-12 | 22-Jan-12 | 29-Jan-12 | 01-Feb-12 | 05-Feb-12 | 12-Feb-12 | 19-Feb-12 | 26-Feb-12 | 01-Mar-12 | 04-Mar-12 | 11-Mar-12 |
| End period | 30-Nov-11 | 03-Dec-11 | 10-Dec-11 | 17-Dec-11 | 24-Dec-11 | 31-Dec-11 | 07-Jan-12 | 14-Jan-12 | 21-Jan-12 | 28-Jan-12 | 31-Jan-12 | 04-Feb-12 | 11-Feb-12 | 18-Feb-12 | 25-Feb-12 | 29-Feb-12 | 03-Mar-12 | 10-Mar-12 | 17-Mar-12 |
| **Receipts** | | | | | | | | | | | | | | | | | | | |
| Collection of Accounts Receivable | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.1 | - |
| Reimbursement from Buyers | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Intercompany Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.1 | - |
| **Disbursements** | | | | | | | | | | | | | | | | | | | |
| Payroll (Gross) | 0.5 | 0.5 | 0.5 | 1.1 | | 0.5 | | | 11.8 | | | 0.5 | | | 2.4 | | | 0.4 | |
| Benefits | | | | 0.1 | | | | | 0.8 | | | | | | 4.9 | | | | |
| Pension | | | | | | | | | | | | | 5.5 | | | | | | |
| Inventory Purchases | | | | | | | | | | | | | 0.4 | | | | | | |
| Non-Inventory Purchases | 0.4 | 0.4 | 0.4 | | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | | 0.4 | | 0.4 |
| Intercompany Disbursements | | | 0.2 | | | | 0.3 | | | | | | | | | | | | |
| Restructuring Costs | 1.7 | 1.7 | 1.7 | 1.7 | | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | | 2.1 | 2.1 | 2.1 | |
| **Total Disbursements** | 2.6 | 2.6 | 2.1 | 2.6 | 2.3 | 2.9 | 0.4 | 3.0 | 2.5 | 15.4 | 2.1 | 0.4 | 2.9 | 8.0 | 9.7 | 2.5 | - | 2.9 | 2.5 |
| **Net Cash Flow** | (2.6) | (2.6) | (2.1) | (2.3) | (1.8) | (2.9) | (0.4) | (3.0) | (2.5) | (15.4) | (2.1) | (0.4) | (2.9) | (8.0) | (9.7) | (2.5) | - | (2.8) | (2.5) |
| FX Impact | | | | | | | | | | | | | | | | | | | |
| Opening Available Cash Balance | 310.1 | 310.1 | 305.4 | 303.1 | 301.3 | 298.5 | 298.0 | 298.0 | 285.0 | 292.5 | 277.1 | 275.0 | 274.6 | 271.7 | 283.7 | 263.9 | 253.9 | 251.4 | 248.6 |
| Closing Available Cash Balance | 310.1 | 307.5 | 305.4 | 303.1 | 298.5 | 298.0 | 298.0 | 285.0 | 292.5 | 277.1 | 275.0 | 274.6 | 271.7 | 283.7 | 263.9 | 253.9 | 251.4 | 248.6 | 246.1 |
| **Total Cash** | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 513.0 | 515.5 | 513.4 | 513.0 | 510.1 | 502.1 | 482.3 | 499.8 | 493.8 | 487.0 | 484.5 | 238.4 |
| US & Shareheld Proceeds | | | | | | | | | | | | | | | | | | | |
| Restricted Cash | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 |
| **Total Cash + Restricted Cash** | 572.0 | 569.4 | 567.3 | 565.0 | 563.2 | 562.4 | 562.0 | 559.0 | 556.5 | 554.4 | 538.9 | 536.5 | 533.6 | 525.6 | 515.8 | 513.3 | 510.5 | 510.5 | 508.0 |

APPENDIX B

**Nortel Networks – November 27, 2011**
**CCAA Applicants**
**Forecast Cash Flow**
USD (Millions)

| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mar 2012 | | Apr 2012 | | | | | May 2012 | | | | Jun 2012 | | | | | |
| Start of period | 18-Mar-12 | 25-Mar-12 | 01-Apr-12 | 08-Apr-12 | 15-Apr-12 | 22-Apr-12 | 29-Apr-12 | 06-May-12 | 13-May-12 | 20-May-12 | 27-May-12 | 01-Jun-12 | 03-Jun-12 | 10-Jun-12 | 17-Jun-12 | 24-Jun-12 | 27-Nov-11 |
| End of period | 24-Mar-12 | 31-Mar-12 | 07-Apr-12 | 14-Apr-12 | 21-Apr-12 | 28-Apr-12 | 05-May-12 | 12-May-12 | 19-May-12 | 26-May-12 | 31-May-12 | 02-Jun-12 | 09-Jun-12 | 16-Jun-12 | 23-Jun-12 | 30-Jun-12 | 30-Jun-12 |
| **Receipts** | | | | | | | | | | | | | | | | | |
| Collection of Accounts Receivable | 0.5 | - | - | 0.6 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.4 |
| Reimbursement from Buyers | - | - | - | - | - | - | - | 9.8 | - | - | - | - | - | - | - | - | 0.1 |
| Intercompany Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 10.1 |
| **Total Receipts** | - | - | - | - | - | - | - | 9.8 | - | - | - | - | - | - | - | - | 10.6 |
| **Disbursements** | | | | | | | | | | | | | | | | | |
| Payroll (Gross) | - | - | 0.3 | 0.1 | - | - | 0.2 | 0.2 | - | - | 0.2 | 0.2 | - | - | 0.2 | 0.4 | 20.5 |
| Benefits | - | - | 0.1 | - | - | - | - | - | - | - | - | 0.1 | - | - | 0.1 | - | 6.0 |
| Pension | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Inventory Purchases | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 5.5 |
| Non-Inventory Purchases | 0.4 | - | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 11.7 |
| Intercompany Disbursements | 7.7 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 8.2 |
| Restructuring Costs | 2.1 | 2.5 | 2.5 | 2.5 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.5 | 2.5 | 2.5 | 2.5 | 62.9 |
| **Total Disbursements** | 10.6 | 2.5 | 3.3 | 2.8 | 3.4 | 2.8 | 2.6 | 2.3 | 2.6 | 2.3 | 2.3 | 2.3 | 2.8 | 3.2 | 2.9 | 3.2 | 114.7 |
| **Net Cash Flow** | (10.6) | (2.5) | (3.3) | (2.8) | (3.4) | (2.8) | (2.6) | (2.3) | (2.6) | 7.5 | (2.3) | (0.2) | (2.8) | (3.2) | (2.9) | (3.2) | (104.1) |
| FX Impact | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Opening Available Cash Balance | 246.1 | 235.5 | 233.0 | 229.7 | 226.9 | 223.5 | 220.6 | 218.1 | 215.8 | 213.2 | 220.7 | 218.4 | 218.1 | 215.3 | 212.2 | 209.2 | 310.1 |
| Closing Available Cash Balance | 235.5 | 233.0 | 229.7 | 226.9 | 223.5 | 220.6 | 218.1 | 215.8 | 213.2 | 220.7 | 218.4 | 218.1 | 215.3 | 212.2 | 209.2 | 206.0 | 206.0 |
| LC & Branched Proceeds | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 |
| **Total Cash** | 473.9 | 471.4 | 468.1 | 465.3 | 461.9 | 459.0 | 456.5 | 454.2 | 451.6 | 459.1 | 456.8 | 456.5 | 453.7 | 450.6 | 447.6 | 444.4 | 444.4 |
| Restricted Cash | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 |
| **Total Cash + Restricted Cash** | 497.4 | 494.9 | 491.6 | 488.8 | 485.4 | 482.5 | 480.0 | 477.7 | 475.1 | 482.6 | 480.3 | 480.0 | 477.2 | 474.1 | 471.1 | 467.9 | 467.9 |

# APPENDIX "C"

[Attached]

**APPENDIX C**

**Eligibility Requirements and Procedure with Respect to Hardship Payment Applications**

1. **Eligibility** – A former employee would be eligible for hardship payments if he or she is resident in Canada and has no available source of income, being all monies receivable by the former employee including, without limitation, employment income such as wages, salary or bonuses, consulting income, or pension or disability payments or income replacement payments ("Income"), or Income of a spouse, as of the date of the application and has no reasonable expectation of being in receipt of Income during the Application Period (referred to below) and:

   a. The former employee is unable to work due to illness or is incurring costs in excess of 25% of his or her EI payments as a result of treatment for illness or healthcare costs, or as a result of the illness of a family member who is dependent on the former employee for support; or

   b. During the Application Period the former employee is not receiving a Nortel pension or employment insurance (EI) as a result of ineligibility for EI or exhaustion of EI benefits, and demonstrates some other significant hardship in dealing with financial obligations.

2. **Application Process** – Notice of the application process will be posted on the Monitor's website and the website of the Nortel Retiree Protection Committee (NRPC) in a form approved by the Court. An applicant would be required to complete an application form (to be approved by the Court) to be submitted to a person designated by the Monitor. The person so designated would be expected to deal with completed applications within 14 to 21 days and to make an initial determination to approve or reject the application. The first payment will proceed within seven business days subject to the payment parameters set out below. If not approved, the application is to be reviewed by an informal committee and the applicant will be given the right to be heard by the committee. The committee will be composed of one company appointee, one appointee of the Monitor and one appointee chosen by the NRPC, who will be compensated for his time on an hourly basis. A further appeal may be brought to the Court or an officer of the Court designated by the presiding judge, costs to be determined by the Court on the application.

3. **Payment Parameters** – Any successful applicant may be approved for a maximum payment of up to 8 weeks salary based on a maximum weekly salary of up to $1,200 per week payable in monthly instalments. The hardship committee will also have discretion to approve additional amounts in cases of medical and other emergencies in an amount up to $2,500.

4. **Application Period** – From the date of court approval to June 29, 2012.

5. **Miscellaneous**

   a. Hardship Payments are advances against distributions on claims, and will be deducted from any payments on claims that may be allowed in the ultimate claims process in these proceedings.

   b. The Monitor shall report to the Court on or before November 30, 2009 with respect to the processing and administration of hardship payment applications.

   c. The aggregate maximum amount available for hardship payments on applications approved during the Application Period is $750,000 less the total Required Funds (as defined by paragraph 4 of the February 25, 2011 Court order plus as defined by paragraph 3 of the April 8, 2011 Court Order).

CONFIDENTIAL

# APPENDIX "D"

# APPENDIX "E"

[Attached]

Appendix E

## NORTEL 2012 RETENTION PLAN

### I.    PLAN OBJECTIVE

The Nortel 2012 Retention Plan (the "<u>Plan</u>") is designed to provide cash incentive payments (the "<u>Retention Payments</u>") to certain employees of Nortel Networks Limited ("<u>NNL</u>") and certain of its direct and indirect subsidiaries and affiliates participating in the Plan (each a "<u>Participating Employer</u>" and collectively, the "<u>Company</u>") to encourage the achievement of certain business goals important to the Company and its stakeholders, including a conclusion of NNL's and certain of its affiliates' proceedings under the *Companies' Creditors Arrangement Act* (Canada) (the "<u>Proceedings</u>") and the wind down of various Company entities during the Plan Period (as defined below).

### II.   PARTICIPATING EMPLOYEES

(a) Only those employees who will be actively employed by a Participating Employer for any portion of 2012 will be eligible to participate in the Plan, subject to the discretion of management.

(b) Each employee of a Participating Employer selected for participation in the Plan shall receive a letter (each, a "<u>Participation Letter</u>") that sets forth the Annual Award Amount (as defined below) that he or she may be eligible to receive under the Plan with respect to the Plan Period. The Participation Letter will require such employee to agree to be bound by the terms and conditions of the Plan, including any amendments thereto, in order to obtain the benefits of the Plan. Upon execution and timely return of the Participation Letter in accordance with its terms, such selected employee shall become a participant in the Plan (a "<u>Plan Participant</u>") and will be eligible to receive a Retention Payment.

### III.  AWARD AMOUNTS

(a) Each Plan Participant's Participation Letter will designate an individual Annual Award Amount ("<u>Annual Award Amount</u>") that will have been determined by the Company in accordance with criteria approved by the Board of Directors of NNL (the "<u>Board</u>").

(b) Each Plan Participant will be eligible to receive a Retention Payment in respect of the Plan Period in an amount determined in accordance with Section V (such Retention Payment, the "<u>Award Payment Amount</u>"). Retention Payments under this Plan are available to Plan Participants solely and exclusively in the form of Award Payment Amounts, to be paid in accordance with the terms of this Plan.

(c) Except as required by applicable law or the terms of Company benefit plans or programs, Retention Payments will not be taken into account for purposes of Company benefits in which a Plan Participant may participate and will not be included in "eligible earnings" for purposes of capital accumulation and retirement plans offered in various jurisdictions by the Company. Where required, deductions

- 2 -

will be made from the Retention Payments paid in accordance with the specific capital accumulation and retirement plan in which the Plan Participant participates.

## IV.    PLAN PERIOD

The Plan shall commence on January 1, 2012 and end on December 31, 2012 (the "Plan Period").

## V.    PAYMENT PROCESS

(a) The intended termination date of the employment of a particular Plan Participant shall be set out in the Participation Letter provided to that Plan Participant (as may be adjusted in accordance with the terms of this Plan, the "Termination Date").

(b) Subject to Section VII, the Plan Participant's Termination Date shall determine each Plan Participant's Award Payment Amount, as follows:

(i)    If the Plan Participant's Termination Date is in January 2012, the Plan Participant's Award Payment Amount will be one-twelfth ($^1/_{12}$) of his/her Annual Award Amount.

(ii)    If the Plan Participant's Termination Date is in February 2012, the Plan Participant's Award Payment Amount will be two-twelfths ($^2/_{12}$) of his/her Annual Award Amount.

(iii)    If the Plan Participant's Termination Date is in March 2012, the Plan Participant's Award Payment Amount will be three-twelfths ($^3/_{12}$) of his/her Annual Award Amount.

(iv)    If the Plan Participant's Termination Date is in April 2012, the Plan Participant's Award Payment Amount will be four twelfths ($^4/_{12}$) of his/her Annual Award Amount.

(v)    If the Plan Participant's Termination Date is in May or June 2012, the Plan Participant's Award Payment Amount will be sixty percent (60%) of his/her Annual Award Amount.

(vi)    If the Plan Participant's Termination Date is in July or August 2012, the Plan Participant's Award Payment Amount will be seventy-five percent (75%) of his/her Annual Award Amount.

(vii)    If the Plan Participant's Termination Date is in September or October 2012, the Plan Participant's Award Payment Amount will be ninety percent (90%) of his/her Annual Award Amount.

(viii) If the Plan Participant's Termination Date is in November or December 2012, the Plan Participant's Award Payment Amount will be one hundred percent (100%) of his/her Annual Award Amount.

- 3 -

(c) A Plan Participant's Termination Date may be changed upon at least ninety (90) days prior written notice of such change to that Plan Participant. Upon the provision to the Plan Participant of at least ninety (90) days written notice of the change of Termination Date, the Plan Participant's Award Payment Amount will be adjusted in accordance with section V(b), subject to section V(d), and the Termination Date of such Plan Participant shall be adjusted for all purposes of this Plan. For greater certainty, if a Plan Participant's Termination Date is adjusted in accordance with this section V(c) and such Plan Participant elects to terminate his or her employment with the Participating Employer prior to the adjusted Termination Date, then section VII(a) hereof shall apply to such termination of employment.

(d) If the Plan Participant's Participation Letter provided for an original Termination Date between and including May 1, 2012 and December 31, 2012 and the Termination Date is changed in accordance with section V(c), the Plan Participant's adjusted Award Payment Amount will be the greater of: i) the entitlement described under section V(b) using the adjusted Termination Date, or ii) the entitlement described below:

    (i) 50% of the Plan Participant's Annual Award Amount, if the original Termination Date was in May or June 2012;

    (ii) 55% of the Plan Participant's Annual Award Amount, if the original Termination Date was in July or August 2012;

    (iii) 60% of the Plan Participant's Annual Award Amount, if the original Termination Date was in September or October 2012; or

    (iv) 66 2/3% of the Plan Participant's Annual Award Amount, if the original Termination Date was in November or December 2012.

(e) Less than (90) days prior to a Plan Participant's Termination Date, a request may be made to a Plan Participant to extend his/her Termination Date. In such a case, the Plan Participant has the option to either accept or reject this request within the time period set out in the extension request received. If the Plan Participant accepts the requested extension by written notice to the applicable Participating Employer within the time period set out in the extension request, his/her Termination Date will be adjusted accordingly and the revised Award Payment Amount determined in accordance with section V(b). If the Plan Participant rejects a requested extension made pursuant to this section V(e), there is no change to his/her Termination Date or Award Payment Amount.

(f) Subject to Sections VII(a) through (c):

    (i) for Plan Participants employed outside of Asia ("Non-Asia Plan Participants"), the Award Payment Amount shall be conclusively determined upon the Non-Asia Plan Participant's termination of employment with the Participating Employer and payment of a Non-Asia Plan Participant's entire Award Payment Amount shall be made as soon as practicable following such Non-Asia Plan Participant's

- 4 -

Termination Date, but, in any event, no later than forty-five (45) days following such Termination Date.

(ii) for Plan Participants employed in Asia (an "Asia Plan Participant"), the Award Payment Amount shall be conclusively determined upon the Asia Plan Participant's termination of employment with the Participating Employer, it being understood that:

    i. the Award Payment Amount will be paid in installments (the "Installment Payments") on: (a) the first regularly scheduled pay date following the end of each calendar quarter that ends prior to the Asia Plan Participant's Termination Date; and (b) a date that is as soon as practicable following an Asia Plan Participant's Termination Date, but, in any event, no later than forty-five (45) days following such Termination Date; and

    ii. the amount of a particular Installment Payment shall be calculated as follows:

        A. the Asia Plan Participant's expected Award Payment Amount based upon the Asia Plan Participant's expected Termination Date as at the time of the particular Installment Payment, less the Installment Payments previously made to such Asia Plan Participant;

        divided by:

        B. the number of Installment Payments remaining based upon the Asia Plan Participant's expected Termination Date as at the time of the particular Installment Payment.

(g) Notwithstanding anything in the Plan to the contrary, if the Board, in its sole discretion, concludes that a Plan Participant has committed intentional misconduct, as defined in the Policy Regarding Recoupment of Incentive Compensation relating to the forfeiture and/or recoupment of incentive compensation, the Plan Participant will forfeit his/her entire Award Payment Amount and promptly reimburse his or her Participating Employer the amount of any Retention Payment received to date.

## VI.  PLAN ADMINISTRATION

The Board shall have full discretionary authority to administer the Plan, including discretionary authority to interpret and construe any and all provisions of the Plan.

## VII.  TERMINATION OF EMPLOYMENT

(a) Notwithstanding anything in the Plan to the contrary, upon the involuntary termination of employment of a Plan Participant for Cause (as defined below) or the voluntary termination of employment by a Plan Participant for any reason, in each case during the Plan Period, the right to any unpaid portion of the Award Payment

- 5 -

Amount of such Plan Participant will be forfeited on the date of such employment termination and such Plan Participant will have no further rights under the Plan.

(b) Upon:

(i) the termination of employment of a Plan Participant during the Plan Period due to such Plan Participant's death; or

(ii) the involuntary termination of employment of a Plan Participant other than for Cause;

the Retention Payment shall be deemed to be the Award Payment Amount (as may have been adjusted in accordance with the provisions of Section V hereof prior to the termination of such Plan Participant's employment) and will be accelerated and any remaining balance thereof will be paid as soon as practicable, but, in any event, no later than forty-five (45) days following such Termination Date.

(c) For the purposes of the Plan, "Cause" shall mean inappropriate actions or inactions, misconduct, breach of an agreement with the Company or unsatisfactory performance by a Plan Participant or cause (as "cause" is legally defined, if at all, in the relevant jurisdiction) as determined by the Board in its sole discretion.

(d) Notwithstanding any other term or provision of this Plan, in the event a Plan Participant is on a voluntary or involuntary leave of absence for any portion of 2012, his/her Award Payment Amount will be adjusted. The revised Award Payment Amount will be calculated by multiplying the Award Payment Amount otherwise applicable by a fraction: i) the numerator of which is the number of calendar months during the Plan Period in which the Plan Participant was actively engaged in employment activities for the Participating Employer for at least one day during the month, and ii) the denominator of which is the number of calendar months (or part months) from the commencement of the Plan Period until such Plan Participant's Termination Date.

## VIII.  EFFECTIVE DATE; TERMINATION DATE OF THE PLAN

Subject to receiving the approval of the Ontario Superior Court of Justice (Commercial List), the Plan shall be effective as of January 1, 2012 and shall expire on the date on which all Retention Payments under the Plan have been made.

## IX.  NO PROMISE OF CONTINUED EMPLOYMENT

The Plan and any Plan Participant's selection as a participant in the Plan does not, and is in no manner intended to, constitute a promise of employment for any period of time or change a Plan Participant's employment status, if applicable, as an at will employee subject to employment termination at any time for any reason.

- 6 -

X.   **TAXES**

All payments made pursuant to the Plan shall be subject to applicable taxes and standard withholding and deductions as determined by the relevant Participating Employer. Neither the Company nor its officers or agents makes or has made any representation about the tax consequences of any payments made or offered to any Plan Participant under the Plan.

XI.   **CONFIDENTIALITY**

Subject to applicable law, a Plan Participant's participation in the Plan, the Participation Letter, the Award Payment Amount, the Retention Payment and any other documents contemplated to be delivered hereunder are confidential and a Plan Participant may not disclose, publicize or discuss his or her participation in the Plan, the Participation Letter, the Award Payment Amount, the Retention Payment or any other documents contemplated to be delivered hereunder with any current or former employee of the Company or any other person except a Plan Participant's spouse, accountant, financial advisor or attorney, who must be informed by the Plan Participant not to further disclose such confidential information. Notwithstanding the foregoing, the Company may disclose Participants' participation in the Plan, Participation Letter, Award Payment Amounts, Retention Payments and any other documents contemplated to be delivered hereunder as required under applicable law or as it deems necessary in the implementation and administration of the Plan and in the conduct of the Company's business.

XII.   **SEVERABILITY**

If any provision of the Plan is determined to be invalid or unenforceable, in whole or in part, this determination shall not affect any other provision of the Plan and the provision in question shall be modified so as to be rendered enforceable in a manner consistent with the intent of the parties insofar as possible.  Any waiver of a breach of any of the terms of the Plan shall not operate or be construed as a waiver of any other breach of such terms or conditions or of any other terms and conditions, nor shall any failure to enforce any provision hereof operate or be construed as a waiver of such provision or of any other provision.

XIII.   **CHOICE OF LAW AND VENUE**

The Plan shall be governed by the laws of Ontario and the laws of Canada applicable therein.  With respect to any Plan Participant who is an employee of a Participating Employer that is subject to the Proceedings, as a condition of such Plan Participant being entitled to participate in the Plan such Plan Participant (a) irrevocably and unconditionally consents to the exclusive jurisdiction of the Ontario Superior Court of Justice (Commercial List) with respect to any disputes arising from or connected to the Plan or any Retention Payment hereunder, (b) irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of or related to the Plan or any Retention Payment in such court and (c) irrevocably and

- 7 -

unconditionally waives and agrees not to plead or claim that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum.

## XIV.  ENTIRE AGREEMENT AND AMENDMENT

This Plan document (together with the Participation Letters and any other document contemplated to be delivered hereunder) constitutes the complete, final and exclusive embodiment of the terms and conditions of the Plan.  Any amendments or modifications of the Plan must be authorized by the Board or a person specifically authorized by the Board to take action with respect to the Plan; subject, in each case, to any approvals which may be required in light of the Proceedings.  Any agreement between any Plan Participant and any Participating Employer with regard to the Plan and its subject matter is hereby superseded.

## XV.  NO ASSIGNMENT

The rights of a Plan Participant or any other person to any payment or other benefits under the Plan may not be assigned, transferred, pledged or encumbered except by will or the laws of descent and distribution.

## XVI.  FUNDING

The Plan is an unfunded plan and any and all amounts payable to a Plan Participant under the Plan shall be paid from the general assets of his or her Participating Employer.  The obligation under the Plan with respect to any specific Plan Participant shall be the several obligation of his or her Participating Employer and will not be a joint obligation of any other Company entity.

CONFIDENTIAL

# APPENDIX "F"