**Exhibit B**

Execution Version

# GLOBAL SETTLEMENT AND RELEASE AGREEMENT

Flextronics Corporation ("FC"), Flextronics Telecom Systems Ltd ("FTS") and the affiliates of FC and FTS that are signatories hereto, on behalf of themselves and their respective Affiliates (as defined below) (collectively, "Flextronics"), and (i) Nortel Networks Limited ("NNL") and its Canadian affiliates[1] (collectively, the "Canadian Debtors") that have filed an application under the Companies' Creditors Arrangement Act (the "CCAA"), (ii) Nortel Networks Inc. ("NNI") and its US debtor affiliates[2] (collectively, the "US Debtors"), (iii) the companies listed on Schedule A hereto (collectively the "EMEA Entities"; and (i), (ii) and (iii) collectively, "Nortel"), and (iv) the joint administrators acting on behalf of the EMEA Entities also listed on Schedule A hereto (the "Joint Administrators") (Flextronics, Nortel and the Joint Administrators are collectively referred to herein as the "Parties") hereby enter into this agreement dated as of December 15, 2011 (the "Agreement"), on the terms and conditions set forth below;

**WHEREAS**, NNL and Flextronics are, or in the past were, parties to (i) a Master Contract Manufacturing Services Agreement, dated as of September 30, 2003, between NNL and Flextronics Corporation (f/k/a Solectron Corporation), including[3] any ancillary agreements referenced thereunder or transaction documents entered into therewith, including certain Virtual Systems House Agreements ("VSHAs"), schedules, exhibits, annexes and purchase orders, and as amended by an amending agreement, dated June 18, 2004, (the "SLR MCMSA"), and (ii) an Amended and Restated Master Contract Manufacturing Services Agreement, dated as of June 29, 2004, between NNL and Flextronics Telecom Systems Ltd., including any ancillary agreements referenced thereunder or transaction documents entered into therewith (which, for the avoidance of doubt, include the Logistics Services Agreement and the Repair Services Agreement, in each case together with all related schedules, exhibits, annexes and orders thereunder and as defined in the Flextronics MCMSA), including certain VSHAs, schedules, exhibits, annexes and purchase orders, as amended from time to time by the following agreements: (i) the first amending agreement, dated November 1, 2004; (ii) the second amending agreement, dated May 8, 2006; (iii) a memorandum of understanding, dated October 13, 2006; and (iv) the third amending agreement, dated March 31, 2008, (the "Flextronics MCMSA," and together with the SLR MCMSA, as amended, the "MCMSAs");

**WHEREAS**, on January 13, 2009, NNL and Flextronics entered into an agreement (the "Amending Agreement") under which, among other things, NNL agreed to purchase from Flextronics US$120,000,000 of inventory, as further described therein;

---

[1]     The Canadian Debtors are:  Nortel Networks Corporation, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[2]     The U.S. Debtors are:  Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.

[3]     All references to "including" and "include" herein shall mean "including (or include) without limitation".

- 2 -

WHEREAS, on or about January 14, 2009 (the "Petition Date")[4], (i) the Canadian Debtors filed an application under and were granted certain initial creditor protection pursuant to the CCAA in Canada to facilitate a comprehensive business and financial restructuring (the "CCAA Proceedings") pursuant to the terms of an initial order of the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court"), as the same has been and may be amended and restated from time to time, (ii) the US Debtors[5] commenced bankruptcy cases (the "US Bankruptcy Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "US Bankruptcy Court" and together with the Canadian Court, the "Courts"), and (iii) the High Court of Justice in England placed nineteen of Nortel's European affiliates[6], including the EMEA Entities, into administration under the control of individuals from Ernst & Young LLC (the "EMEA Proceedings", and together with the CCAA Proceedings and the US Bankruptcy Cases, the "Proceedings");

WHEREAS, Flextronics' business relationship with Nortel is primarily governed by the MCMSAs;

WHEREAS, subsequent to the commencement of the Proceedings, certain disputes emerged between Flextronics and Nortel regarding the proper interpretation of the Amending Agreement and certain other matters, and the resolution of such disputes was memorialized in a Settlement Agreement (the "Settlement Agreement") and related Side Letter (the "Side Letter"), each dated as of May 22, 2009, which, among other things, required NNL to purchase an additional $25 million of inventory from Flextronics (NNL's obligation to purchase an aggregate $145 million of inventory from Flextronics under the Amending Agreement and the Settlement Agreement, the "$145 Million Inventory Buy-Back Obligation");

WHEREAS, the Parties entered into a Settlement and Release Agreement dated November 20, 2009 (the "Settlement and Release Agreement"), which, among other things (i) resolved substantially all claims among the Parties related to the period prior to the Petition Date, (ii) documented Flextronics' agreement to enter into direct contractual arrangements with the purchasers of Nortel's business units and (iii) provided that the SLR MCMSA shall terminate effective as of December 12, 2009 pursuant to and subject to the contractual terms and conditions that apply to a termination made in accordance with its terms;

---

[4]     The Petition Date shall also refer, only in the case of Nortel Networks (CALA) Inc., to July 14, 2009.

[5]     The US Debtors include Nortel Networks (CALA) Inc., which subsequently filed a voluntary chapter 11 petition in the US Bankruptcy Court on July 14, 2009, and the US Bankruptcy Cases include the Chapter 11 case of Nortel Networks (CALA) Inc.

[6]     Such entities are: Nortel Networks UK Limited ("NNUK"), Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

- 3 -

WHEREAS, in connection with the Settlement and Release Agreement, the US Debtors, the Canadian Debtors and the EMEA Entities entered into a Side Agreement dated November 20, 2009 (the "November 2009 Side Agreement"), for the purpose, among other things, of facilitating payments due to Flextronics under the Settlement and Release Agreement, subject to the potential reallocation of the total liabilities due to Flextronics thereunder among the US Debtors, Canadian Debtors and EMEA Entities;

WHEREAS, the Amending Agreement, the Settlement Agreement, the Side Letter and the Settlement and Release Agreement have been approved by the Canadian Court in the CCAA Proceedings, and the Settlement Agreement, the Side Letter and the Settlement and Release Agreement have been approved by the US Bankruptcy Court in the US Bankruptcy Cases;

WHEREAS, the SLR MCMSA has terminated, and Nortel has not delivered a termination notice or sought to repudiate or moved to assume or reject the Flextronics MCMSA to date;

WHEREAS, Nortel has closed the sales of substantially all of its businesses and product lines to various purchasers (the "Purchasers", such divestitures the "Divestitures"), and Flextronics has entered into direct contractual relationships with certain of such Purchasers for the supply of goods and services to such Purchasers, and there are no longer any back-to-back or similar agreements or arrangements between Nortel, Flextronics and such Purchasers pursuant to which Nortel orders goods or services from Flextronics for the account of such Purchasers;

WHEREAS, in connection with certain of the Divestitures, including pursuant to section 3 of the Settlement Agreement and section 4(a)(iv) of the Settlement and Release Agreement, Nortel purchased certain inventory from Flextronics relating to Nortel's divested businesses (Nortel's obligation to Flextronics in connection with the Divestitures, including any obligations to purchase inventory relating to Nortel's divested businesses, the "Nortel Divestiture Obligations");

WHEREAS, Flextronics and certain of the Nortel entities have certain outstanding amounts claimed as owing between them and their various Affiliates, where "Affiliates" means any entity that controls, is controlled by or is under common control with any of the Flextronics or Nortel Parties, respectively, where "control" means ownership of more than 10% of the voting equity of an entity or the ability to otherwise direct the management of an entity;

WHEREAS, while each of the Parties do not admit the validity of the respective claims asserted against them, the Parties wish to (i) except as expressly set forth herein, resolve all outstanding claims among Nortel on the one hand and Flextronics on the other hand, including any claims held by Nortel on account of the $145 Million Inventory Buy-Back Obligation and any claims held by Flextronics on account of the Nortel Divestiture Obligations, and (ii) terminate the Flextronics MCMSA, any agreements being performed in accordance with the Flextronics MCMSA (including pursuant to section 5 of the Settlement and Release Agreement), any agreements being performed in accordance with the SLR MCMSA (including pursuant to section 5 of the Settlement and Release Agreement) and the Related Agreements (as defined below);

- 4 -

**WHEREAS**, the Parties have been and are currently represented by counsel at all times during the course of the settlement negotiations culminating in this Agreement and the Parties have shared equally in the drafting of this Agreement.

**NOW THEREFORE**, in consideration of the foregoing and in consideration of the terms, conditions, mutual agreements and covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, and in order to avoid the expense, delay and uncertainty associated with litigation relating to the claims and the other matters addressed herein, it is hereby:

**AGREED**, by and between the Parties hereto, as follows:

1. **Payment Obligations**. In full and final settlement of the Released Claims (as defined in Section 5(a) hereof), subject to the terms and conditions set forth below, on the Effective Date, NNI shall pay to Flextronics US$1,282,460.17 (such payment, the "Payment Obligation", and the date that such payment is made to Flextronics, the "Settlement Date"). To facilitate the payment of the Payment Obligation, NNL and NNUK shall pay to NNI the amounts listed in Schedule B hereto at the time and in the manner prescribed in Schedule B hereto. Promptly following receipt of the Payment Obligation, Flextronics shall acknowledge in writing receipt of the Payment Obligation. Such acknowledgement may take the form of an e-mail from Flextronics' counsel to Nortel's counsel.

2. **Termination of the MCMSAs**. The Parties acknowledge and agree that the Flextronics MCMSA, any agreements being performed in accordance with the Flextronics MCMSA (including pursuant to section 5 of the Settlement and Release Agreement), any agreements being performed in accordance with the SLR MCMSA (including pursuant to section 5 of the Settlement and Release Agreement), and, except as provided in section 3(b) below, any other agreements between Nortel on the one hand and Flextronics on the other hand (the "Related Agreements"), in each case including any ancillary agreements referenced thereunder, transaction documents entered into therewith and all VSHAs, schedules, exhibits, annexes, purchase orders, work orders, amendments, memoranda of understanding or supplements thereunder or thereto (whether or not entered into before, on, or after the Petition Date), shall terminate with no further liability or obligation by or among the Parties on the Effective Date. For the avoidance of doubt, it is the intent of the Parties that, except as provided in section 3(b) below and except for the obligations created by this Agreement, all contractual relationships between Nortel on the one hand and Flextronics on the other hand shall terminate on the Effective Date. Flextronics expressly waives any right under section 5 of the Settlement and Release Agreement to require Nortel to give 210 days' notice of the repudiation, rejection, cancelation or termination of the Flextronics MCMSA.

3. **Prior Settlements**.

a.        The Parties acknowledge that, except as expressly set forth in section 3(b) below, there are no further obligations owed by any parties under the Amending Agreement, the Settlement Agreement, the Side Letter and the Settlement and Release Agreement. Without limiting the generality of the foregoing, (i) Flextronics acknowledges that Flextronics has received all payments required to be made by Nortel under section 1 of the Amending

- 5 -

Agreement, section 1 of the Settlement Agreement, section 6 of the Side Letter and section 1 of the Settlement and Release Agreement, (ii) Flextronics acknowledges that Nortel has no further obligation to purchase inventory from Flextronics under sections 1, 4 or 6 of the Amending Agreement or sections 1, 3 or 5 of the Settlement Agreement (as modified by section 4 of the Settlement and Release Agreement), (iii) Nortel waives any right to delivery of or title to any inventory that Flextronics has not delivered (as of the date hereof) pursuant to sections 1, 4 or 6 of the Amending Agreement or sections 1, 3 or 5 of the Settlement Agreement (as modified by section 4 of the Settlement and Release Agreement) and (iv) the Parties acknowledge that all equipment required to be delivered by Flextronics under sections 3(a)(ii) and 4(a)(v) of the Settlement and Release Agreement has been delivered and that Flextronics has received all payments that it is entitled to related to the transfer of such equipment.

b.          Notwithstanding the foregoing, the Parties agree that their covenants under sections 7(c) and 7(d) of the Settlement Agreement and sections 4(b) and 8 of the Settlement and Release Agreement (which include Flextronics' right to assert a claim against NNL with respect to the Pension Claims) are preserved.  For greater certainty, any releases contained in the Amending Agreement, the Settlement Agreement, the Side Letter and the Settlement and Release Agreement continue in full force and effect.

c.          For the avoidance of doubt, nothing herein shall amend, supersede or constitute a waiver of any obligations of the US Debtors, the Canadian Debtors or the EMEA Entities under the November 2009 Side Agreement.

4.    **Nortel Release**.

a.          Upon the Settlement Date, Nortel (including the US Debtors, the Canadian Debtors, the EMEA Entities and their respective estates) (the foregoing collectively referred to as the "Nortel Releasors") does hereby release, waive, and discharge any and all rights, rights of set-off, causes of action, liabilities, damages, remedies and claims of any kind or nature whatsoever which the Nortel Releasors have, may have or could have against Flextronics or its former, present or future officers, directors, employees or agents (the foregoing collectively referred to as the "Flextronics Released Parties"), which arise from or relate to transactions, events or circumstances occurring, deemed to occur or existing on or prior to the date hereof, in law or in equity, whether known or unknown, foreseen or unforeseen, matured or unmatured, contingent or not contingent, whether or not hidden or concealed, whether based on tort, fraud, contract or otherwise, and/or any other obligations, claims, interests, or debts of any kind, which the Nortel Releasors, from the beginning of time, heretofore possessed or may possess against the Flextronics Released Parties, which include all claims for delivery of or title to inventory not delivered to Nortel as of the date hereof in connection with the $145 Million Inventory Buy-Back Obligation, all claims arising under or relating to the MCMSAs (including any ancillary agreements referenced

thereunder or transaction documents entered into therewith and all VSHAs, schedules, exhibits, annexes, purchase orders, work orders, amendments, memoranda of understanding or supplements thereunder or thereto), including all claims for guaranty, warranty and indemnity arising thereunder, all claims arising under purchase orders issued pursuant to the MCMSAs, all claims of set-off and all claims for cure under the MCMSAs, all claims relating to the termination of the MCMSAs, all claims arising under or relating to the Related Agreements (including any ancillary agreements referenced thereunder or transaction documents entered into therewith and all VSHAs, schedules, exhibits, annexes, purchase orders, work orders, amendments, memoranda of understanding or supplements thereunder or thereto) and all claims relating to the termination of the Related Agreements (collectively, the "Nortel Released Claims").

b.          Notwithstanding the foregoing, the Nortel Released Claims shall not include (i) any rights, causes of action, liabilities, remedies and claims or defenses of any kind or nature the Nortel Releasors have, may have or could have against Flextronics arising pursuant to a Pension and Retirement Benefits Agreement (the "PRBA") in connection with the transfer of facilities and employees from Nortel to Flextronics in 2004, including any rights, causes of action, liabilities, remedies and claims of any kind or nature or defenses arising from obligations under the PRBA for certain post-retirement benefits (PRBs), transition retirement allowances (TRAs) and retirement allowance payments (RAPs) (the "Pension Claims"), (ii) any other defences to any proofs of claim filed by Flextronics with respect to the Pension Claims, provided that the Nortel Releasors shall not assert a right of setoff in relation to the Pension Claims unless the claim sought to be set off against the Pension Claims arises pursuant to or in connection with the PRBA, and (iii) any obligations, rights, causes of action, liabilities, remedies or claims of any kind or nature arising under or preserved by this Agreement, including the covenants preserved under Section 3(b) hereof. For the avoidance of doubt, subject to the proviso in Section 4(b)(ii) hereof, nothing in this Agreement releases or constitutes a waiver of Nortel's defences to any proofs of claim filed by Flextronics with respect to the Pension Claims.

c.          For the avoidance of doubt, the releases contained in this section 4 are additive to any releases contained in the Amending Agreement, the Settlement Agreement, the Side Letter and the Settlement and Release Agreement, and shall not be interpreted to limit such releases.

5.    **Flextronics Release**.

a.          Upon the Settlement Date, Flextronics (the foregoing referred to as the "Flextronics Releasors") does hereby release, waive, and discharge any and all rights, rights of set-off, causes of action, liabilities, damages, remedies and claims of any kind or nature whatsoever which the Flextronics Releasors have, may have or could have against the Canadian Debtors, the US Debtors, the EMEA Entities, their respective Affiliates, the respective former, present or

future administrators, trustees, officers, directors, employees or agents of any of the foregoing entities, the Joint Administrators or Ernst & Young Inc. as "Monitor" in connection with the CCAA Proceedings (the "Monitor") (the foregoing collectively referred to as the "Nortel Released Parties"), which arise from or relate to transactions, events or circumstances occurring, deemed to occur or existing on or prior to the date hereof, in law or in equity, whether known or unknown, foreseen or unforeseen, matured or unmatured, contingent or not contingent, whether or not hidden or concealed, whether based on tort, fraud, contract or otherwise, and/or any other obligations, claims, interests, or debts of any kind, which the Flextronics Releasors, from the beginning of time, heretofore possessed or may possess against the Nortel Released Parties, which include all claims in connection with the Nortel Divestiture Obligations and all claims arising under or relating to the MCMSAs (including any ancillary agreements referenced thereunder or transaction documents entered into therewith and all VSHAs, schedules, exhibits, annexes, purchase orders, work orders, amendments, memoranda of understanding or supplements thereunder or thereto), including all claims for guaranty, warranty and indemnity arising thereunder, all claims arising under purchase orders issued pursuant to the MCMSAs, all claims of set-off and claims for cure under the MCMSAs, all claims relating to the termination of the MCMSAs, all claims arising under or relating to the Related Agreements (including any ancillary agreements referenced thereunder or transaction documents entered into therewith and all VSHAs, schedules, exhibits, annexes, purchase orders, work orders, amendments, memoranda of understanding or supplements thereunder or thereto) and all claims relating to the termination of the Related Agreements (all of the foregoing collectively, the "Flextronics Released Claims" and together with the Nortel Released Claims, the "Released Claims").

b.  Notwithstanding the foregoing, the Flextronics Released Claims shall not include (i) any rights, causes of action, liabilities, remedies and claims or defenses of any kind or nature the Flextronics Releasors have, may have or could have against NNL arising in connection with the Pension Claims or (ii) any obligations, rights, causes of action, liabilities, remedies or claims of any kind or nature arising under or preserved by this Agreement, including the covenants preserved under Section 3(b) hereof.

c.  For the avoidance of doubt, the releases contained in this section 5 are additive to any releases contained in the Amending Agreement, the Settlement Agreement, the Side Letter and the Settlement and Release Agreement, and shall not be interpreted to limit such releases.

6.  **No Claims or Defenses Asserted**.  For the avoidance of doubt, except as expressly permitted under this Agreement, Flextronics and Nortel hereby acknowledge and agree that they (i) shall not assert any further claim, demand payment or seek further court relief or resolution, in either the Courts or any other court, with respect to all or any of the Released Claims and (ii) promptly following the Effective Date, shall reduce the related accounts receivable and accounts payable to zero balances in their respective books and records and accounting systems.  Flextronics further hereby acknowledges and agrees that any and all proofs

of claim filed or otherwise asserted by Flextronics in the Proceedings are deemed withdrawn in the applicable proceedings with prejudice, provided, however, that, the proofs of claim filed against NNL in the CCAA Proceedings in relation to the Pension Claims shall not be deemed withdrawn and shall be resolved in accordance with the Claims Resolution Order of the Canadian Court dated September 16, 2010 and any other applicable Order of the Canadian Court.

7. **Approval by the US Bankruptcy Court**. This Agreement is subject in all respects to the entry of a Final (as defined below) order by the US Bankruptcy Court approving all terms and conditions contained in this Agreement. Within five (5) business days after NNI's receipt of an executed copy of this Agreement, NNI shall file a motion with the US Bankruptcy Court, which motion shall be in form and substance reasonably acceptable to Flextronics, seeking the approval of this Agreement pursuant to §§ 101 and 363 of the Bankruptcy Code (the "US Approval Order") and any other applicable law, rules, orders or procedures, and shall use reasonable best efforts to pursue the same until the US Approval Order is entered and becomes Final. If the US Bankruptcy Court does not approve all terms and conditions contained in this Agreement on or before January 31, 2012, then this Agreement shall be null and void.

8. **Approval by the Canadian Court**. This Agreement is subject in all respects to the entry of a Final (as defined below) order by the Canadian Court approving all terms and conditions contained in this Agreement. Within five (5) business days after NNL's receipt of an executed copy of this Agreement, NNL shall file a motion with the Canadian Court, which motion shall be in form and substance reasonably acceptable to Flextronics, seeking the approval of this Agreement pursuant to applicable law in the CCAA Proceedings (the "Canadian Approval Order") and any other applicable law, rules, orders or procedures, and shall use reasonable best efforts to pursue the same until the Canadian Approval Order is entered and becomes Final. If the Canadian Court does not approve all terms and conditions contained in this Agreement on or before January 31, 2012, then this Agreement shall be null and void.

9. **Effective Date**. This Agreement shall become effective on the first day after both the US Approval Order and the Canadian Approval Order (each an "Approval Order") become Final (the "Effective Date"). For purposes of this Agreement, "Final" with respect to each Approval Order means the date on which the respective Approval Order is approved and entered by the respective court (in a form satisfactory to each of Nortel and Flextronics as determined in their respective reasonable discretion) and is no longer subject to appeal, writ of certiorari, reargument or rehearing, or, in the event that a timely appeal has been noticed, or a timely writ of certiorari, reargument or rehearing has been sought with regard to the respective Approval Order, then such Approval Order shall become Final upon being affirmed by the highest court to which the Approval Order was appealed (without material modifications to such Approval Order, as determined by each of Nortel and Flextronics in their respective reasonable discretion) and the time to take any further appeal, to petition for writ of certiorari or to move for reargument or rehearing has expired. Notwithstanding the foregoing, the Parties shall have the right to waive the requirement that the Approval Orders become Final.

10. **Execution of Documents**. The Parties agree to execute any and all documents, and to perform any acts, upon request by the other, reasonably necessary or proper to effectuate or further evidence the terms and provisions of this Agreement.

- 9 -

11.  **Consultation and Review**.  Each of the Parties hereby represents to the other that (i) it has had full and adequate opportunity to request and review any and all documents relevant to this Agreement; (ii) it has negotiated this Agreement at arm's length; (iii) it has read this Agreement in its entirety and understands its terms and contents; (iv) it has had full and adequate opportunity to consult with and, in fact, has consulted with legal counsel on all matters related to this Agreement; (v) it has provided any comments regarding this Agreement to its legal counsel; (vi) it has executed this Agreement freely, voluntarily and without coercion; and (vii) it has not relied on any inducements, promises, statements, representations or warranties made by any person or entity not expressly set forth in this Agreement.

12.  **Binding Effect**.  This Agreement constitutes a legal, valid and binding obligation enforceable against each of the Parties and any successors or assigns of the Parties in accordance with the terms hereof, subject to the approval of the US Bankruptcy Court and the Canadian Court.  Each of the Parties represents and warrants that the execution, delivery and performance of this Agreement has been approved, if necessary, by all requisite corporate actions on its part and is within the scope of its authority and powers, and shall not cause any default in or breach or violation of any applicable law, rule, regulation, contract or other instrument to which it is a party or by which any of its assets are bound or affected.

13.  **Objection to this Agreement**.  In the event that an objection is filed to any motion for US Bankruptcy Court approval or Canadian Court approval of this Agreement, the Parties shall in good faith support the approval of this Agreement before the US Bankruptcy Court and/or the Canadian Court, and defend any appeals of an Approval Order to the fullest extent reasonably practical.

14.  **Third-Party Rights**.  Unless otherwise expressly provided, nothing in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the Parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to the Parties, nor shall any provision give any third persons any right of subrogation or action against any party to this Agreement.

15.  **No Admission of Liability**.  It is understood by the Parties that this Agreement represents a compromise of disputed claims, and that this Agreement is not to be construed as an admission of liability on any claims.  Neither the fact of this Agreement, nor any provision contained herein, nor any action taken hereunder, shall constitute an admission with respect to any claims or facts alleged by any of the Parties hereto.

16.  **Interpretation**.  If any provision or term of this Agreement is deemed unenforceable for any reason, then the Parties agree that the rest of the Agreement should be given full force and effect to the greatest extent permissible under applicable law, and that the court interpreting such provision is entitled to amend or substitute a provision to give effect to the original intent and meaning of the unenforceable provision to the greatest extent possible.

17.  **No Transfer of Claims**.  By executing this Agreement, each Party represents and warrants to the other that it has not sold, assigned, transferred or otherwise conveyed any of its respective Released Claims to any other person or corporation or other entity that is not a Party

- 10 -

to this Agreement.  Any sale, assignment, transfer or other conveyance of claims after the date hereof in violation of this section 17 shall be null and void and of no force and effect.

18.    **Modification**.  This Agreement may not be changed, modified or altered in any manner except in a written instrument signed by each of the Parties, which instrument is approved by the Monitor and the Official Committee of Unsecured Creditors appointed in the US Bankruptcy Cases or approved by the Courts.

19.    **Headings**.  The headings contained herein are set forth only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Agreement nor the intent of any provision thereof.

20.    **Consent to Jurisdiction**.   To the fullest extent and for the maximum time period permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US Bankruptcy Court and the Canadian Court (if applicable, in a joint hearing conducted under the cross-border protocol adopted by such courts, as it may be in effect from time to time (the "Cross-Border Protocol")), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the US Bankruptcy Court if such claim, action or proceeding would solely affect the US Debtors, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Debtors, a joint hearing of both the Canadian Court and the US Court conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors and the English courts if such claim, action or proceeding would solely affect the EMEA Entities, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a court or any claim that any such action brought in such a court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

21.    **Injunctive Relief**.  Each of the Parties agrees that this Agreement may be pled as a defense to any such claim or action in any court of competent jurisdiction.  In connection with the foregoing, the Parties agree that monetary damages would not be sufficient to remedy any breach by a party of this Agreement and that the non-breaching party would be entitled to equitable relief, including, without limitation, temporary injunctive relief preventing (or allowing, as the case may be) the unilateral termination of performance and specific performance in respect of any breach of the Agreement.

22.    **Governing Law**.  This Agreement shall be governed by the laws of the Province of Ontario and the federal laws of Canada applicable therein; provided, however, that any questions, claims, disputes, remedies or actions arising from or related to sections 27 – 29 and any questions, claims, disputes, remedies or actions arising from or related to (i) the capacity of the Joint Administrators to act as agents of the EMEA Entities, (ii) the personal liability of the Joint Administrators, their firm, partners, employees, advisors, representatives or agents, (iii) their qualification to act as insolvency practitioners in accordance with Part XIII of the UK

- 11 -

Insolvency Act, (iv) their appointment as joint administrators of the EMEA Entities and their status as such, or (v) the statutory duties of the Joint Administrators or the legal obligations in relation to the exercise of their powers, duties or functions as administrators of the EMEA Entities under the UK Insolvency Act or any other applicable legislation or statutory instrument, shall be governed by English law and subject to the non-exclusive jurisdiction of the English courts.

   23. **Counterparts**.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same complete agreement among the Parties.  A facsimile or a PDF signature shall be treated in all manners and respects as a binding and original signature.

   24. **Notices**.  All notices and other communications under this Agreement shall be in writing and shall be deemed to have been given when provided by e-mail in addition to one of the following: (a) when delivered personally by hand, (b) when sent by facsimile (with written confirmation of receipt) or (c) one (1) business day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following e-mails, addresses and facsimile numbers:

     If to Nortel:

     Nortel Networks Limited
     5945 Airport Road, Suite 360
     Mississauga, Ontario, Canada L4V 1R9
     Attention: Anna Ventresca
     Fax:  (905) 863-2057
     E-Mail:  annav@nortel.com

     -and-

     Nortel Networks Inc.
     4001 E. Chapel Hill – Nelson Hwy.
     Research Triangle Park, North Carolina 27709
     United States
     Attention: Timothy Ross
     Fax: (919) 905-3741
     E-Mail: timothyr@nortel.com

     with copies (which shall not constitute notice) to:

     Cleary Gottlieb Steen & Hamilton LLP
     One Liberty Plaza
     New York, New York 10006
     Attn: James L. Bromley, Esq.
      Lisa M. Schweitzer, Esq.
     Fax:  (212) 225-3999
     E-Mail: jbromley@cgsh.com
      lschweitzer@cgsh.com

- 12 -

-and-

Norton Rose OR LLP
Royal Bank Plaza
South Tower
200 Bay Street, Suite 3800
P.O. Box 84
Toronto, Ontario, Canada M5J 2Z4
Attn: Derrick C. Tay, Esq.
Fax:  (416) 216-3930
E-Mail: derrick.tay@nortonrose.com

If to the Monitor:

Ernst & Young Inc.
Ernst & Young Tower
222 Bay Street, P. O. Box 251
Toronto, Ontario, Canada N M5K 1J7
Attn: Murray A. McDonald
Fax:  (416) 943-3300
E-Mail: Murray.A.McDonald@ca.ey.com

with copies (which shall not constitute notice) to:

Goodmans LLP
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario, Canada M5H 2S7
Attn: Joseph Pasquariello
Fax: (416) 979-1234
E-mail: jpasquariello@goodmans.ca

If to the Joint Administrators:

Ernst & Young LLP
One More Place
London SE1 2AF
United Kingdom
Attn: Alan Bloom
Fax: +44 (0) 20 7951 1345
abloom@uk.ey.com

with copies (which shall not constitute notice) to:

Herbert Smith LLP
Exchange House
Primrose Street

- 13 -

London EC2A 2HS
United Kingdom
Attn:   Alan Montgomery, Esq.
         Ben Ward, Esq.
Fax: +44 (0) 20 7098 4878
alan.montgomery@herbertsmith.com
ben.ward@herbertsmith.com

If to Flextronics:

Flextronics Corporation
48 Gables Court
Beaconsfield, Quebec, Canada H9W 5H4
Attn: Simon Robins
Fax:  (514) 426-4262
E-Mail: simon.robins@ca.flextronics.com

-and-

Flextronics International
847 Gibraltar Drive
Milpitas, California 95035
Attn.: Steve Jackman, Esq.
E-Mail: steve.jackman@flextronics.com

with copies (which shall not constitute notice) to

Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, New York 10178-0061
Attn:  Steven J. Reisman, Esq.
Fax:  (212) 697-1559
E-Mail: sreisman@curtis.com

-and-

ThorntonGroutFinnigan LLP
Suite 3200, Canadian Pacific Tower
100 Wellington St. West, Toronto-Dominion Centre
Toronto, Ontario, Canada M5K 1K7
Attention: Leanne M. Williams, Esq.
Fax: 416-304-1313
E-Mail: lwilliams@tgf.ca

     25.   **Authorized Signatory**.  Each person who executes this Agreement on behalf of
(i) a Canadian Debtor, or (ii) a US Debtor, warrants and represents that he or she has been duly
authorized and empowered to execute and deliver this Agreement on behalf of each Nortel entity

- 14 -

for which it signs.  Each of the EMEA Entities (acting by the Joint Administrators) warrants and represents that, with respect to itself, this Agreement has been duly executed and delivered by a representative of the Joint Administrators as agent for and on behalf of such EMEA Entity, and constitutes legal, valid and binding obligations of such EMEA Entity enforceable against such EMEA Entity in accordance with its terms.  The person who executes this Agreement on behalf of Flextronics warrants and represents that he or she has been duly authorized and empowered to execute and deliver this Agreement on behalf of Flextronics and each of its Affiliates.  Each of Flextronics' Affiliates shall be entitled to enforce and take advantage of the benefits of this Agreement to its fullest extent as if they were signatories hereto.

26.    Without limiting anything in this Agreement or any other agreement between the Parties, each of the Parties agrees that it shall not do indirectly, through an affiliate, agent or otherwise, anything that it has agreed not to do under this Agreement.

27.    The Parties agree that the Joint Administrators  have negotiated and are entering into this Agreement as agents for the EMEA Entities and notwithstanding that they have also entered into the Agreement in their personal capacities, none of the Joint Administrators or their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of the EMEA Entities to observe, perform or comply with any of their obligations under this Agreement or under or in relation to any associated arrangements or negotiations whether such liability would arise under paragraph 99(4) of schedule B1 to the Insolvency Act of 1986, as amended ("Insolvency Act") or otherwise.

28.    The Joint Administrators are parties to this Agreement (i) as agents of each of the respective EMEA Entities of which they are administrators; and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, or otherwise, (2) obtaining the benefit of any provisions of this Agreement in their favor and (3) enforcing obligations of the other Parties to this Agreement.

29.    For the purposes of the acknowledgements or agreements to, or exclusions of, liability in favor of the Joint Administrators in this Agreement, references to the Joint Administrators where the context so permits shall mean and include any additional or successor administrator of the EMEA Entities and their respective firms or future firms, employees, agents, members, partners and personal representatives.

30.    The Parties agree that any breach of this Agreement by the Joint Administrators shall be deemed to be a breach by them in their capacities as adminsitrators of the relevant EMEA Entities and, in such a case, each party hereto shall have the right to make claims and assert its rights hereunder, against the relevant EMEA Entities and their respective successors and assigns.

31.    **Accession by Nortel Networks, S.A.** Nortel Networks S.A. (in administration and liquidation judiciaire) ("NNSA") may, within 60 days of the Effective Date of this Agreement, by notice in writing to the Parties hereto, accede to this Agreement (such accession conditioned, if applicable, on French court approval).  In the event it so accedes, NNSA shall be deemed an EMEA Entity for all purposes under this Agreement with all the rights and

- 15 -

obligations thereof. The Parties agree that the provisions of this Section 31 are for the benefit of NNSA and may be enforced by NNSA.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, each Party, by its respective duly-authorized representative identified below, acknowledges and agrees to the terms and conditions of this Agreement.

**NORTEL NETWORKS CORPORATION**

By: _____

Name: ANNA VENTRESCA

Title: GENERAL COUNSEL + CORPORATE
                                    SECRETARY

By: _____

Name: CLARKE GLASPELL

Title: CONTROLLER

**NORTEL NETWORKS INC.**

By: _____

Name: _____

Title: _____

**NORTEL NETWORKS CAPITAL CORPORATION**

By: _____

Name: _____

Title: _____

**NORTEL NETWORKS LIMITED**

By: _____

Name: ANNA VENTRESCA

Title: GENERAL COUNSEL + CORPORATE
                                    SECRETARY

By: _____

Name: CLARKE GLASPELL

Title: CONTROLLER

**NORTEL ALTSYSTEMS INC.**

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, each Party, by its respective duly-authorized representative identified below, acknowledges and agrees to the terms and conditions of this Agreement.

**NORTEL NETWORKS CORPORATION**

By: _____

Name: _____

Title: _____


By: _____

Name: _____

Title: _____


**NORTEL NETWORKS LIMITED**

By: _____

Name: _____

Title: _____


By: _____

Name: _____

Title: _____


**NORTEL NETWORKS INC.**

By: _____

Name: _____John J. Rayss_____

Title: _____Principal Officer_____


**NORTEL NETWORKS CAPITAL CORPORATION**

By: _____

Name: _____John J. Rayss_____

Title: _____Principal Officer_____


**NORTEL ALTSYSTEMS INC.**

By: _____

Name: _____John J. Rayss_____

Title: _____Principal Officer_____

**SONOMA SYSTEMS**

By: _____

Name: _____

Title: _____

**NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.**

By: _____

Name: _____

Title: _____

**QTERA CORPORATION**

By: _____

Name: _____

Title: _____

**NORTEL NETWORKS OPTICAL
COMPONENTS INC.**

By: _____

Name: _____

Title: _____

**CORETEK, INC.**

By: _____

Name: _____

Title: _____

**NORTEL NETWORKS HPOCS INC.**

By: _____

Name: _____

Title: _____

**ARCHITEL SYSTEMS (U.S.)
CORPORATION**

By: _____

Name: _____

Title: _____

**NORTEL NETWORKS CABLE
SOLUTIONS INC.**

By: _____

Name: _____

Title: _____

**NORTEL NETWORKS
INTERNATIONAL INC.**

By: _____

Name: _____

Title: _____

**NORTEL NEWORKS (CALA) INC.**

By: _____

Name: _____

Title: _____

**NORTHERN TELECOM
INTERNATIONAL INC.**

By: _____

Name: _____

Title: _____

**NORTEL ALTSYSTEMS INTERNATIONAL INC.**

By: _____

Name: John J. Ray

Title: Principal Officer

**XROS, INC.**

By: _____

Name: John J Ray

Title: Principal Officer

**NORTEL NETWORKS TECHNOLOGY CORPORATION**

By: _____

Name: _____

Title: _____


By: _____

Name: _____

Title: _____

**NORTEL NETWORKS GLOBAL CORPORATION**

By: _____

Name: _____

Title: _____


By: _____

Name: _____

Title: _____

**NORTEL NETWORKS INTERNATIONAL CORPORATION**

By: _____

Name: _____

Title: _____


By: _____

Name: _____

Title: _____

**NORTEL ALTSYSTEMS**
**INTERNATIONAL INC.**

By: _____

Name: _____

Title: _____

**XROS, INC.**

By: _____

Name: _____

Title: _____

**NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

By: _____

Name: CLARKE GLASPELL

Title: President and Controller

By: _____

Name: ANNA VENTRESCA

Title: Secretary

**NORTEL NETWORKS GLOBAL**
**CORPORATION**

By: _____

Name: CLARKE GLASPELL

Title: Controller

By: _____

Name: ANNA VENTRESCA

Title: Secretary

**NORTEL NETWORKS**
**INTERNATIONAL CORPORATION**

By: _____

Name: Clarke E. Glaspell

Title: Treasurer

By: _____

Name: Anna Ventresca

Title: Secretary

Signed by ALAN BLOOM in his own
capacity and on behalf of the Joint
Administrators without personal liability and
solely for the purpose of obtaining the
benefit of the provisions of this Agreement
expressed to be conferred on or given to the
Joint Administrators

By _____

Name: _____ A R Bloom _____

Title: _____ Joint Administrator _____

in the presence of:

Witness signature: JAN COLDELL

Name:

Address: 1 MORE LONDON PLACE
LONDON SE1 2AF

**SIGNED** for and on behalf of **NORTEL NETWORKS UK LIMITED (IN ADMINISTRATION)** by **CHRISTOPHER J.W. HILL** as Joint Administrator (acting as agent and without any personal liability whatsoever) in the presence of:

)
)
)
)

**CHRISTOPHER J.W. HILL**

Witness: _____

Name: _____
Title: _____

**SIGNED** for and on behalf of NORTEL )    ~~DAVID HUGHES~~
NETWORKS (IRELAND) LIMITED (IN )    *Niall Coveney*
**ADMINISTRATION)** *Niall Coveney under*    POWER OF ATTORNEY
by ~~DAVID HUGHES~~ as Joint Administrator )    FOR David Hughes
(acting as agent and without personal liability
whatsoever) in the presence of:


Witness: *Peter Friel*

Name: *PETER    FRIEL*
Title: *Accountant*
       *c/o Ernst + Young*
       *Harcourt Centre*
       *Harcourt Street*
       *Dublin 2*

**SIGNED** for and on behalf of **NORTEL NETWORKS BV (IN ADMINISTRATION)** by **CHRISTOPHER J.W. HILL** as Joint Administrator (acting as agent and without personal liability whatsoever) in the presence of:

)
)
)
)

**CHRISTOPHER J.W. HILL**

Witness: UN Cordell

Name: JAN CORDELL

Title: SECRETARY

**SIGNED** for and on behalf of NORTEL )     **CHRISTOPHER J.W. HILL**
**NETWORKS HISPANIA, S.A.** by )
**CHRISTOPHER J.W. HILL** as Joint )
Administrator (acting as agent and without )
personal liability whatsoever) in the presence
of:

Witness: _____

Name: _____
Title: _____

**FLEXTRONICS TELECOM SYSTEMS LTD**

By: _____

Name: Manny Marimuthu
Title: Director


**FLEXTRONICS AMERICA, LLC**

By: _____

Name: Michael Clarke
Title: President, Infrastructure


**FLEXTRONICS CORPORATION**

By: _____

Name: Michael Clarke
Title: President, Infrastructure


**FLEXTRONICS EMS CANADA INC.**

By: _____

Name:  Brent Serbin
Title:  Vice President


**FLEXTRONICS INTERNATIONAL EUROPE B.V.**

By: _____

Name: Bart van Loon
Title:  Managing Director

**FLEXTRONICS   TELECOM   SYSTEMS LTD**

By: _____

Name: Manny Marimuthu
Title: Director


**FLEXTRONICS AMERICA, LLC**

By: _____

Name: Michael Clarke
Title: President, Infrastructure


**FLEXTRONICS CORPORATION**

By: _____

Name: Michael Clarke
Title: President, Infrastructure


**FLEXTRONICS EMS CANADA INC.**

By: _____

Name:  Brent Serbin
Title:  Vice President


**FLEXTRONICS INTERNATIONAL EUROPE B.V.**

By: _____

Name: Bart van Loon
Title:  Managing Director

**FLEXTRONICS   TELECOM   SYSTEMS LTD**

By: _____

Name: Manny Marimuthu
Title: Director


**FLEXTRONICS CORPORATION**

By: _____

Name: Michael Clarke
Title: President, Infrastructure


**FLEXTRONICS AMERICA, LLC**

By: _____

Name: Michael Clarke
Title: President, Infrastructure


**FLEXTRONICS EMS CANADA INC.**

By: _____

Name:  Brent Serbin
Title:  Vice President


**FLEXTRONICS INTERNATIONAL EUROPE B.V.**

By: _____

Name: Bart van Loon
Title:  Managing Director

**FLEXTRONICS TELECOM SYSTEMS LTD**

By: _____

Name: Manny Marimuthu
Title: Director


**FLEXTRONICS AMERICA, LLC**

By: _____

Name: Michael Clarke
Title: President, Infrastructure


**FLEXTRONICS CORPORATION**

By: _____

Name: Michael Clarke
Title: President, Infrastructure


**FLEXTRONICS EMS CANADA INC.**

By: _____

Name:  Brent Serbin
Title:  Vice President


**FLEXTRONICS INTERNATIONAL EUROPE B.V.**

By: _____

Name: Bart van Loon
Title:  Managing Director

**FLEXTRONICS INTERNATIONAL
LATIN AMERICA (L) LTD**

By: _____

Name: Manny Marimuthu
Title:  Director


**FLEXTRONICS SALES &
MARKETING NORTH ASIA (L) LTD.**

By: _____

Name: Manny Marimuthu
Title:  Director


**FLEXTRONICS INTERNATIONAL USA,
INC.**

By: _____

Name: Michael Clarke
Title: President, Infrastructure


**FLEXTRONICS FUNDING LLC**

By: _____

Name: Paul Read
Title: President


**FLEXTRONICS LOGISTICS USA, INC.**

By: _____

Name: Paul Read
Title: CFO


**FLEXTRONICS ELECTRONICS
TECHNOLOGY (SUZHOU) CO. LTD.**

By: _____

Name: Manny Marimuthu
Title: Legal Representative

**FLEXTRONICS INTERNATIONAL LATIN AMERICA (L) LTD**

By: _____

Name: Manny Marimuthu
Title: Director


**FLEXTRONICS SALES & MARKETING NORTH ASIA (L) LTD.**

By: _____

Name: Manny Marimuthu
Title: Director


**FLEXTRONICS INTERNATIONAL USA, INC.**

By: _____

Name: Michael Clarke
Title: President, Infrastructure


**FLEXTRONICS FUNDING LLC**

By: _____

Name: Paul Read
Title: President


**FLEXTRONICS LOGISTICS USA, INC.**

By: _____

Name: Paul Read
Title: CFO


**FLEXTRONICS ELECTRONICS TECHNOLOGY (SUZHOU) CO. LTD.**

By: _____

Name: Manny Marimuthu
Title: Legal Representative

**FLEXTRONICS TECHNOLOGY
(PENANG) SDN. BHD.**

By: _____

Name: Manny Marimuthu
Title:  Director

**FLEXTRONICS CANADA DESIGN
SERVICES INC.**

By: _____

Name: Brent Serbin
Title:  Vice President

**FLEXTRONICS (CANADA) INC.**

By: _____

Name: Brent Serbin
Title:  Vice President

**FLEXTRONICS ENCLOSURE
SYSTEMS (CHANGZHOU) LTD.**

By: _____

Name: Manny Marimuthu
Title: Director

**FLEXTRONICS INTERNATIONAL
POLAND SP. Z.O.O.**

By: _____

Name: _____

Title: _____

Dated: ___, 2011

**FLEXTRONICS TECHNOLOGY (PENANG) SDN. BHD.**

By: _____

Name: Manny Marimuthu
Title:  Director

**FLEXTRONICS CANADA DESIGN SERVICES INC.**

By: _____

Name: Brent Serbin
Title:  Vice President

**FLEXTRONICS (CANADA) INC.**

By: _____

Name: Brent Serbin
Title:  Vice President

**FLEXTRONICS ENCLOSURE SYSTEMS (CHANGZHOU) LTD.**

By: _____

Name: Manny Marimuthu
Title: Director

**FLEXTRONICS INTERNATIONAL POLAND SP. Z.O.O.**

By: _____

Name:_____

Title:_____

Dated: ___, 2011

**FLEXTRONICS TECHNOLOGY (PENANG) SDN. BHD.**

By: _____

Name: Manny Marimuthu
Title: Director


**FLEXTRONICS CANADA DESIGN SERVICES INC.**

By: _____

Name: Brent Serbin
Title: Vice President


**FLEXTRONICS (CANADA) INC.**

By: _____

Name: Brent Serbin
Title: Vice President


**FLEXTRONICS ENCLOSURE SYSTEMS (CHANGZHOU) LTD.**

By: _____

Name: Manny Marimuthu
Title: Director


**FLEXTRONICS INTERNATIONAL POLAND SP. Z.O.O.**

By: _____

Name: Peter Mavropoulos        Andrzej Potajko

Title: Financial Director       General Manager


Dated: __, 2011

**Schedule A - The EMEA Entities**

1.      The EMEA Entities

Nortel Networks B.V (in administration)
Nortel Networks (Ireland) Limited (in administration)
Nortel Networks UK Limited (in administration)
Nortel Networks Hispania, S.A. (in administration)

2.      The Joint Administrators of Nortel Networks B.V. (in administration), Nortel Networks UK Limited (in administration) and Nortel Networks Hispania, S.A. (in administration)

Alan Robert Bloom
Stephen John Harris
Alan Michael Hudson
Christopher John Wilkinson Hill
c/o Ernst & Young LLP
1 Moore Place
London SE1 2AF

3.      The Joint Administrators of Nortel Networks (Ireland) Limited (in administration)

David Hughes
c/o Ernst & Young Chartered Accountants
Harcourt Centre, Harcourt Street
Dublin 2, Ireland

Alan Robert Bloom
c/o Ernst & Young LLP
1 Moore Place
London SE1 2AF

**Schedule B – Funding of Payment Obligation**

On or prior to the Effective Date, (i) NNI shall establish a segregated account (the "<u>Segregated Account</u>") solely for the purpose of holding the Payment Obligation until such amount is distributed in accordance with this Agreement, (ii) NNL shall transfer and remit to NNI US$77,955.40 for deposit into the Segregated Account (iii) NNUK shall transfer and remit to NNI US$631,673.93 for deposit into the Segregated Account, and (iv) NNI shall deposit a further US$572,830.84 into the Segregated Account (where (ii), (iii) and (iv) collectively constitute the "<u>Segregated Funds</u>").   NNI shall hold the Segregated Funds for the benefit of Nortel and shall use the Segregated Funds solely for the purpose of satisfying the Payment Obligation in accordance with this Agreement. In the event the Effective Date does not occur or the Agreement otherwise becomes null and void such that the Payment Obligation is not required to be made, NNI shall return the respective portions of the Segregated Funds funded by NNI, NNL and NNUK to such Parties without any deduction, withholding or set-off howsoever arising.