## EXHIBIT A

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

**SEVENTY-NINTH REPORT OF THE MONITOR**
**DATED DECEMBER 19, 2011**

**INTRODUCTION**

1.    On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC"
and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel
Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"),
Nortel Networks International Corporation and Nortel Networks Global
Corporation (collectively the "Applicants") filed for and obtained protection under
the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of
this Honourable Court dated January 14, 2009, as amended and restated (the "Initial
Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the
"Monitor") in the CCAA proceedings. The stay of proceedings was extended to
April13, 2012 by this Honourable Court in its Order dated December 14, 2011.

2.    Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates
concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy
Code (the "Code") in the United States Bankruptcy Court for the District of
Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings").

As required by U.S. law, an official committee of unsecured creditors (the "Committee") was established in January, 2009.

3.    An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009 and July 30, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries and each of these groups is participating in the CCAA proceedings.

4.    Nortel Networks (CALA) Inc. ("NN CALA" and together with NNI and certain of its subsidiaries and affiliates that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.    Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in EMEA were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators").

6.    Subsequent to the filing date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7.   The CCAA proceedings and the UK Administration proceedings of NNUK and the
     other EMEA Debtors have been recognized by the U.S. Court as foreign main
     proceedings under Chapter 15 of the Code.

8.   Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for
     creditor protection or bankruptcy proceedings in the local jurisdiction in which they
     are located.

**PURPOSE**

9.   The purpose of this seventy-ninth report of the Monitor (the "Seventy-Ninth
     Report") is to provide to this Honourable Court with an update on the status of
     issues relating to Nortel's relationship with Flextronics and request approval of the
     Global Settlement and Release Agreement as discussed further in this Seventy-
     Ninth Report.

**TERMS OF REFERENCE**

10.  In preparing this Seventy-Ninth Report, the Monitor has relied upon unaudited
     financial information, the Company's books and records, financial information
     prepared by the Company and discussions with management of Nortel.   The
     Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or
     completeness of this information and accordingly, the Monitor expresses no
     opinion or other form of assurance on the information contained in this Seventy-
     Ninth Report.

11.  Unless otherwise stated, all monetary amounts contained herein are expressed in
     US dollars.

12.  Capitalized terms not defined in this Seventy-Ninth Report are as defined in the
     Affidavit of John Doolittle sworn on January 14, 2009, the Pre-Filing Report or
     previous reports of the Monitor.

3

13. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

## FLEXTRONICS GLOBAL SETTLEMENT AND RELEASE AGREEMENT

14. As reported on previous occasions, Flextronics Corporation and Flextronics Telecom Systems Ltd (with their affiliates, collectively, "Flextronics") was a significant contract manufacturer for Nortel that, at one point, provided approximately 70% of Nortel's hardware products on a global basis and a significant portion of logistics and repair services required in connection with those products.

15. This Honourable Court has previously approved various agreements between Nortel and Flextronics that ensured the continued supply of goods and services to Nortel by Flextronics during the pendency of Nortel's global creditor protection proceedings, Flextronics's cooperation with the various Nortel business divestitures and settled certain other matters between Nortel and Flextronics.

16. As a result of the completion of Nortel's business divestitures and transitional services agreements, Nortel's commercial relationship with Flextronics has effectively ended. Accordingly, Nortel and Flextronics have negotiated, and the Applicants are seeking this Honourable Court's approval of, a Global Settlement and Release Agreement among various Flextronics entities, the Applicants, the U.S. Debtors, various EMEA Debtors and the Joint Administrators dated December 15, 2011 (the "Global Settlement Agreement"), a copy of which is attached as Appendix "A" hereto.

17. A summary of the principal terms of the Global Settlement Agreement is provided in the following sub-paragraphs. Reference should be made directly to the Global Settlement Agreement for a complete understanding of its terms:

a) In full and final settlement of the releases given under the Global Settlement Agreement, NNI shall pay to Flextronics $1,282,460.17, which amount represents, in part, a netting of the remaining commercial liabilities existing between Nortel and Flextronics as well as a settlement payment in respect of various outstanding issues between Nortel and Flextronics. NNL and NNUK have agreed to pre-fund $77,955.40 and $631,673.93, respectively, to NNI in respect of such payment.

b) All contract manufacturing, related and other agreements between Nortel and Flextronics are terminated with no further liability or obligation;

c) The parties acknowledge no further obligations exist under the various post-filing settlement agreements and certain other agreements, save for previously given releases and covenants in furtherance of such releases and agreements regarding the Pension Claims (as defined in the Global Settlement Agreement and discussed below);

d) Nortel and Flextronics exchange mutual releases of any and all claims existing up to the date of the Global Settlement Agreement, save in respect of the Pension Claims, any obligations expressly preserved under the Global Settlement Agreement and any obligations under the Global Settlement Agreement itself; and

e) The Global Settlement Agreement is subject to approval by both this Honourable Court and the U.S. Court by no later than December 31, 2011. The Monitor understands the U.S. Debtors intend to seek approval of the Global Settlement Agreement from the U.S. Court at a hearing scheduled for December 30, 2011.

18. Upon the Global Settlement Agreement becoming effective in accordance with its terms, the Monitor understanding that all matters between Nortel and Flextronics will be resolved, except for the Pension Claims.

19.  The Pension Claims relate to a Pension and Retirement Benefits Agreement entered into between NNL and Flextronics in connection with the transfer of facilities, operations and employees from Nortel to Flextronics in 2004. In accordance with a previous settlement agreement approved by this Honourable Court, Flextronics was permitted to file amended proofs of claim against NNL solely with regard to the Pension Claims, which it has done. The Pension Claims are subject to and will be resolved in accordance with the Claims Resolution Order and any other applicable Orders of this Honourable Court. The Applicants and the Monitor are in the process of reviewing the Pension Claims.

20.  In connection with entering into the Global Settlement Agreement, the Applicants and the U.S. Debtors have entered into a letter agreement pursuant to which they have agreed to set-off certain outstanding post-filing inter-estate obligations owing as between them, including obligations in relation to the funding of payments made to Flextronics to purchase inventory under certain of the agreements previously approved by this Honourable Court. This agreement will result in the Applicants making a net payment of approximately $5 million to the U.S. Debtors. This payment was included in the November 27, 2011 cash flow forecast filed in connection with the Seventy-Eighth Report.

21.  There remain certain inter-estate matters to be resolved regarding the Nortel – Flextronics relationship, including as provided for pursuant to that certain Side Agreement dated November 20, 2009, among the Applicants, the U.S. Debtors and certain of the EMEA Debtors.

**MONITOR'S RECOMENDATION**

22.  The Monitor has been involved in the discussions leading to the Global Settlement Agreement and is of the view it represents a reasonable settlement of the remaining commercial issues between Nortel and Flextronics, limits the Applicants' remaining exposure to Flextronics to the Pension Claims (which will be resolved in the

6

context of the CCAA proceedings claims processes) and is an important further milestone in the winding down of the Applicants' affairs. Accordingly, the Monitor supports the Applicants' request seeking approval of the Global Settlement Agreement.

All of which is respectfully submitted this 19th day of December, 2011.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**
**and not in its personal capacity**

Per:

Murray A. McDonald
President

7

APPENDIX "A"

[ATTACHED]

Execution Version

## GLOBAL SETTLEMENT AND RELEASE AGREEMENT

Flextronics Corporation ("FC"), Flextronics Telecom Systems Ltd ("FTS") and the affiliates of FC and FTS that are signatories hereto, on behalf of themselves and their respective Affiliates (as defined below) (collectively, "Flextronics"), and (i) Nortel Networks Limited ("NNL") and its Canadian affiliates[1] (collectively, the "Canadian Debtors") that have filed an application under the Companies' Creditors Arrangement Act (the "CCAA"), (ii) Nortel Networks Inc. ("NNI") and its US debtor affiliates[2] (collectively, the "US Debtors"), (iii) the companies listed on Schedule A hereto (collectively the "EMEA Entities"; and (i), (ii) and (iii) collectively, "Nortel"), and (iv) the joint administrators acting on behalf of the EMEA Entities also listed on Schedule A hereto (the "Joint Administrators") (Flextronics, Nortel and the Joint Administrators are collectively referred to herein as the "Parties") hereby enter into this agreement dated as of December 15, 2011 (the "Agreement"), on the terms and conditions set forth below;

**WHEREAS**, NNL and Flextronics are, or in the past were, parties to (i) a Master Contract Manufacturing Services Agreement, dated as of September 30, 2003, between NNL and Flextronics Corporation (f/k/a Solectron Corporation), including[3] any ancillary agreements referenced thereunder or transaction documents entered into therewith, including certain Virtual Systems House Agreements ("VSHAs"), schedules, exhibits, annexes and purchase orders, and as amended by an amending agreement, dated June 18, 2004, (the "SLR MCMSA"), and (ii) an Amended and Restated Master Contract Manufacturing Services Agreement, dated as of June 29, 2004, between NNL and Flextronics Telecom Systems Ltd., including any ancillary agreements referenced thereunder or transaction documents entered into therewith (which, for the avoidance of doubt, include the Logistics Services Agreement and the Repair Services Agreement, in each case together with all related schedules, exhibits, annexes and orders thereunder and as defined in the Flextronics MCMSA), including certain VSHAs, schedules, exhibits, annexes and purchase orders, as amended from time to time by the following agreements: (i) the first amending agreement, dated November 1, 2004; (ii) the second amending agreement, dated May 8, 2006; (iii) a memorandum of understanding, dated October 13, 2006; and (iv) the third amending agreement, dated March 31, 2008, (the "Flextronics MCMSA," and together with the SLR MCMSA, as amended, the "MCMSAs");

**WHEREAS**, on January 13, 2009, NNL and Flextronics entered into an agreement (the "Amending Agreement") under which, among other things, NNL agreed to purchase from Flextronics US$120,000,000 of inventory, as further described therein;

---

[1]  The Canadian Debtors are:  Nortel Networks Corporation, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[2]  The U.S. Debtors are:  Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc.,No rtel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.

[3]  All references to "including" and "include" herein shall mean "including (or include) without limitation".

- 2 -

**WHEREAS**, on or about January 14, 2009 (the "Petition Date")[4], (i) the Canadian Debtors filed an application under and were granted certain initial creditor protection pursuant to the  CCAA in Canada to facilitate a comprehensive business and financial restructuring (the "CCAA Proceedings") pursuant to the terms of an initial order of the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court"), as the same has been and may be amended and restated from time to time, (ii) the US Debtors[5] commenced bankruptcy cases (the "US Bankruptcy Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "US Bankruptcy Court" and together with the Canadian Court, the "Courts"), and (iii) the High Court of Justice in England placed nineteen of Nortel's European affiliates[6], including the EMEA Entities, into administration under the control of individuals from Ernst & Young LLC (the "EMEA Proceedings", and together with the CCAA Proceedings and the US Bankruptcy Cases, the "Proceedings");

**WHEREAS**, Flextronics' business relationship with Nortel is primarily governed by the MCMSAs;

**WHEREAS**, subsequent to the commencement of the Proceedings, certain disputes emerged between Flextronics and Nortel regarding the proper interpretation of the Amending Agreement and certain other matters, and the resolution of such disputes was memorialized in a Settlement Agreement (the "Settlement Agreement") and related Side Letter (the "Side Letter"), each dated as of May 22, 2009, which, among other things, required NNL to purchase an additional $25 million of inventory from Flextronics (NNL's obligation to purchase an aggregate $145 million of inventory from Flextronics under the Amending Agreement and the Settlement Agreement, the "$145 Million Inventory Buy-Back Obligation");

**WHEREAS**, the Parties entered into a Settlement and Release Agreement dated November 20, 2009 (the "Settlement and Release Agreement"), which, among other things (i) resolved substantially all claims among the Parties related to the period prior to the Petition Date, (ii) documented Flextronics' agreement to enter into direct contractual arrangements with the purchasers of Nortel's business units and (iii) provided that the SLR MCMSA shall terminate effective as of December 12, 2009 pursuant to and subject to the contractual terms and conditions that apply to a termination made in accordance with its terms;

---

[4]    The Petition Date shall also refer, only in the case of Nortel Networks (CALA) Inc., to July 14, 2009.

[5]    The US Debtors include Nortel Networks (CALA) Inc., which subsequently filed a voluntary chapter 11 petition in the US Bankruptcy Court on July 14, 2009, and the US Bankruptcy Cases include the Chapter 11 case of Nortel Networks (CALA) Inc.

[6]    Such entities are: Nortel Networks UK Limited ("NNUK"), Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

- 3 -

**WHEREAS**, in connection with the Settlement and Release Agreement, the US Debtors, the Canadian Debtors and the EMEA Entities entered into a Side Agreement dated November 20, 2009 (the "November 2009 Side Agreement"), for the purpose, among other things, of facilitating payments due to Flextronics under the Settlement and Release Agreement, subject to the potential reallocation of the total liabilities due to Flextronics thereunder among the US Debtors, Canadian Debtors and EMEA Entities;

**WHEREAS**, the Amending Agreement, the Settlement Agreement, the Side Letter and the Settlement and Release Agreement have been approved by the Canadian Court in the CCAA Proceedings, and the Settlement Agreement, the Side Letter and the Settlement and Release Agreement have been approved by the US Bankruptcy Court in the US Bankruptcy Cases;

**WHEREAS**, the SLR MCMSA has terminated, and Nortel has not delivered a termination notice or sought to repudiate or moved to assume or reject the Flextronics MCMSA to date;

**WHEREAS**, Nortel has closed the sales of substantially all of its businesses and product lines to various purchasers (the "Purchasers", such divestitures the "Divestitures"), and Flextronics has entered into direct contractual relationships with certain of such Purchasers for the supply of goods and services to such Purchasers, and there are no longer any back-to-back or similar agreements or arrangements between Nortel, Flextronics and such Purchasers pursuant to which Nortel orders goods or services from Flextronics for the account of such Purchasers;

**WHEREAS**, in connection with certain of the Divestitures, including pursuant to section 3 of the Settlement Agreement and section 4(a)(iv) of the Settlement and Release Agreement, Nortel purchased certain inventory from Flextronics relating to Nortel's divested businesses (Nortel's obligation to Flextronics in connection with the Divestitures, including any obligations to purchase inventory relating to Nortel's divested businesses, the "Nortel Divestiture Obligations");

**WHEREAS**, Flextronics and certain of the Nortel entities have certain outstanding amounts claimed as owing between them and their various Affiliates, where "Affiliates" means any entity that controls, is controlled by or is under common control with any of the Flextronics or Nortel Parties, respectively, where "control" means ownership of more than 10% of the voting equity of an entity or the ability to otherwise direct the management of an entity;

**WHEREAS**, while each of the Parties do not admit the validity of the respective claims asserted against them, the Parties wish to (i) except as expressly set forth herein, resolve all outstanding claims among Nortel on the one hand and Flextronics on the other hand, including any claims held by Nortel on account of the $145 Million Inventory Buy-Back Obligation and any claims held by Flextronics on account of the Nortel Divestiture Obligations, and (ii) terminate the Flextronics MCMSA, any agreements being performed in accordance with the Flextronics MCMSA (including pursuant to section 5 of the Settlement and Release Agreement), any agreements being performed in accordance with the SLR MCMSA (including pursuant to section 5 of the Settlement and Release Agreement) and the Related Agreements (as defined below);

- 4 -

**WHEREAS**, the Parties have been and are currently represented by counsel at all times during the course of the settlement negotiations culminating in this Agreement and the Parties have shared equally in the drafting of this Agreement.

**NOW THEREFORE**, in consideration of the foregoing and in consideration of the terms, conditions, mutual agreements and covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, and in order to avoid the expense, delay and uncertainty associated with litigation relating to the claims and the other matters addressed herein, it is hereby:

**AGREED**, by and between the Parties hereto, as follows:

1. **Payment Obligations**. In full and final settlement of the Released Claims (as defined in Section 5(a) hereof), subject to the terms and conditions set forth below, on the Effective Date, NNI shall pay to Flextronics US$1,282,460.17 (such payment, the "Payment Obligation", and the date that such payment is made to Flextronics, the "Settlement Date"). To facilitate the payment of the Payment Obligation, NNL and NNUK shall pay to NNI the amounts listed in Schedule B hereto at the time and in the manner prescribed in Schedule B hereto. Promptly following receipt of the Payment Obligation, Flextronics shall acknowledge in writing receipt of the Payment Obligation. Such acknowledgement may take the form of an e-mail from Flextronics' counsel to Nortel's counsel.

2. **Termination of the MCMSAs**. The Parties acknowledge and agree that the Flextronics MCMSA, any agreements being performed in accordance with the Flextronics MCMSA (including pursuant to section 5 of the Settlement and Release Agreement), any agreements being performed in accordance with the SLR MCMSA (including pursuant to section 5 of the Settlement and Release Agreement), and, except as provided in section 3(b) below, any other agreements between Nortel on the one hand and Flextronics on the other hand (the "Related Agreements"), in each case including any ancillary agreements referenced thereunder, transaction documents entered into therewith and all VSHAs, schedules, exhibits, annexes, purchase orders, work orders, amendments, memoranda of understanding or supplements thereunder or thereto (whether or not entered into before, on, or after the Petition Date), shall terminate with no further liability or obligation by or among the Parties on the Effective Date. For the avoidance of doubt, it is the intent of the Parties that, except as provided in section 3(b) below and except for the obligations created by this Agreement, all contractual relationships between Nortel on the one hand and Flextronics on the other hand shall terminate on the Effective Date. Flextronics expressly waives any right under section 5 of the Settlement and Release Agreement to require Nortel to give 210 days' notice of the repudiation, rejection, cancelation or termination of the Flextronics MCMSA.

3. **Prior Settlements**.

    a.     The Parties acknowledge that, except as expressly set forth in section 3(b) below, there are no further obligations owed by any parties under the Amending Agreement, the Settlement Agreement, the Side Letter and the Settlement and Release Agreement. Without limiting the generality of the foregoing, (i) Flextronics acknowledges that Flextronics has received all payments required to be made by Nortel under section 1 of the Amending

- 5 -

Agreement, section 1 of the Settlement Agreement, section 6 of the Side Letter and section 1 of the Settlement and Release Agreement, (ii) Flextronics acknowledges that Nortel has no further obligation to purchase inventory from Flextronics under sections 1, 4 or 6 of the Amending Agreement or sections 1, 3 or 5 of the Settlement Agreement (as modified by section 4 of the Settlement and Release Agreement), (iii) Nortel waives any right to delivery of or title to any inventory that Flextronics has not delivered (as of the date hereof) pursuant to sections 1, 4 or 6 of the Amending Agreement or sections 1, 3 or 5 of the Settlement Agreement (as modified by section 4 of the Settlement and Release Agreement) and (iv) the Parties acknowledge that all equipment required to be delivered by Flextronics under sections 3(a)(ii) and 4(a)(v) of the Settlement and Release Agreement has been delivered and that Flextronics has received all payments that it is entitled to related to the transfer of such equipment.

b.          Notwithstanding the foregoing, the Parties agree that their covenants under sections 7(c) and 7(d) of the Settlement Agreement and sections 4(b) and 8 of the Settlement and Release Agreement (which include Flextronics' right to assert a claim against NNL with respect to the Pension Claims) are preserved. For greater certainty, any releases contained in the Amending Agreement, the Settlement Agreement, the Side Letter and the Settlement and Release Agreement continue in full force and effect.

c.          For the avoidance of doubt, nothing herein shall amend, supersede or constitute a waiver of any obligations of the US Debtors, the Canadian Debtors or the EMEA Entities under the November 2009 Side Agreement.

4.    **Nortel Release**.

a.          Upon the Settlement Date, Nortel (including the US Debtors, the Canadian Debtors, the EMEA Entities and their respective estates) (the foregoing collectively referred to as the "Nortel Releasors") does hereby release, waive, and discharge any and all rights, rights of set-off, causes of action, liabilities, damages, remedies and claims of any kind or nature whatsoever which the Nortel Releasors have, may have or could have against Flextronics or its former, present or future officers, directors, employees or agents (the foregoing collectively referred to as the "Flextronics Released Parties"), which arise from or relate to transactions, events or circumstances occurring, deemed to occur or existing on or prior to the date hereof, in law or in equity, whether known or unknown, foreseen or unforeseen, matured or unmatured, contingent or not contingent, whether or not hidden or concealed, whether based on tort, fraud, contract or otherwise, and/or any other obligations, claims, interests, or debts of any kind, which the Nortel Releasors, from the beginning of time, heretofore possessed or may possess against the Flextronics Released Parties, which include all claims for delivery of or title to inventory not delivered to Nortel as of the date hereof in connection with the $145 Million Inventory Buy-Back Obligation, all claims arising under or relating to the MCMSAs (including any ancillary agreements referenced

- 6 -

thereunder or transaction documents entered into therewith and all VSHAs, schedules, exhibits, annexes, purchase orders, work orders, amendments, memoranda of understanding or supplements thereunder or thereto), including all claims for guaranty, warranty and indemnity arising thereunder, all claims arising under purchase orders issued pursuant to the MCMSAs, all claims of set-off and all claims for cure under the MCMSAs, all claims relating to the termination of the MCMSAs, all claims arising under or relating to the Related Agreements (including any ancillary agreements referenced thereunder or transaction documents entered into therewith and all VSHAs, schedules, exhibits, annexes, purchase orders, work orders, amendments, memoranda of understanding or supplements thereunder or thereto) and all claims relating to the termination of the Related Agreements (collectively, the "Nortel Released Claims").

b.         Notwithstanding the foregoing, the Nortel Released Claims shall not include (i) any rights, causes of action, liabilities, remedies and claims or defenses of any kind or nature the Nortel Releasors have, may have or could have against Flextronics arising pursuant to a Pension and Retirement Benefits Agreement (the "PRBA") in connection with the transfer of facilities and employees from Nortel to Flextronics in 2004, including any rights, causes of action, liabilities, remedies and claims of any kind or nature or defenses arising from obligations under the PRBA for certain post-retirement benefits (PRBs), transition retirement allowances (TRAs) and retirement allowance payments (RAPs) (the "Pension Claims"), (ii) any other defences to any proofs of claim filed by Flextronics with respect to the Pension Claims, provided that the Nortel Releasors shall not assert a right of setoff in relation to the Pension Claims unless the claim sought to be set off against the Pension Claims arises pursuant to or in connection with the PRBA, and (iii) any obligations, rights, causes of action, liabilities, remedies or claims of any kind or nature arising under or preserved by this Agreement, including the covenants preserved under Section 3(b) hereof. For the avoidance of doubt, subject to the proviso in Section 4(b)(ii) hereof, nothing in this Agreement releases or constitutes a waiver of Nortel's defences to any proofs of claim filed by Flextronics with respect to the Pension Claims.

c.         For the avoidance of doubt, the releases contained in this section 4 are additive to any releases contained in the Amending Agreement, the Settlement Agreement, the Side Letter and the Settlement and Release Agreement, and shall not be interpreted to limit such releases.

5.   **Flextronics Release**.

a.         Upon the Settlement Date, Flextronics (the foregoing referred to as the "Flextronics Releasors") does hereby release, waive, and discharge any and all rights, rights of set-off, causes of action, liabilities, damages, remedies and claims of any kind or nature whatsoever which the Flextronics Releasors have, may have or could have against the Canadian Debtors, the US Debtors, the EMEA Entities, their respective Affiliates, the respective former, present or

- 7 -

future administrators, trustees, officers, directors, employees or agents of any of the foregoing entities, the Joint Administrators or Ernst & Young Inc. as "Monitor" in connection with the CCAA Proceedings (the "Monitor") (the foregoing collectively referred to as the "Nortel Released Parties"), which arise from or relate to transactions, events or circumstances occurring, deemed to occur or existing on or prior to the date hereof, in law or in equity, whether known or unknown, foreseen or unforeseen, matured or unmatured, contingent or not contingent, whether or not hidden or concealed, whether based on tort, fraud, contract or otherwise, and/or any other obligations, claims, interests, or debts of any kind, which the Flextronics Releasors, from the beginning of time, heretofore possessed or may possess against the Nortel Released Parties, which include all claims in connection with the Nortel Divestiture Obligations and all claims arising under or relating to the MCMSAs (including any ancillary agreements referenced thereunder or transaction documents entered into therewith and all VSHAs, schedules, exhibits, annexes, purchase orders, work orders, amendments, memoranda of understanding or supplements thereunder or thereto), including all claims for guaranty, warranty and indemnity arising thereunder, all claims arising under purchase orders issued pursuant to the MCMSAs, all claims of set-off and claims for cure under the MCMSAs, all claims relating to the termination of the MCMSAs, all claims arising under or relating to the Related Agreements (including any ancillary agreements referenced thereunder or transaction documents entered into therewith and all VSHAs, schedules, exhibits, annexes, purchase orders, work orders, amendments, memoranda of understanding or supplements thereunder or thereto) and all claims relating to the termination of the Related Agreements (all of the foregoing collectively, the "Flextronics Released Claims" and together with the Nortel Released Claims, the "Released Claims").

b.          Notwithstanding the foregoing, the Flextronics Released Claims shall not include (i) any rights, causes of action, liabilities, remedies and claims or defenses of any kind or nature the Flextronics Releasors have, may have or could have against NNL arising in connection with the Pension Claims or (ii) any obligations, rights, causes of action, liabilities, remedies or claims of any kind or nature arising under or preserved by this Agreement, including the covenants preserved under Section 3(b) hereof.

c.          For the avoidance of doubt, the releases contained in this section 5 are additive to any releases contained in the Amending Agreement, the Settlement Agreement, the Side Letter and the Settlement and Release Agreement, and shall not be interpreted to limit such releases.

6.    **No Claims or Defenses Asserted**. For the avoidance of doubt, except as expressly permitted under this Agreement, Flextronics and Nortel hereby acknowledge and agree that they (i) shall not assert any further claim, demand payment or seek further court relief or resolution, in either the Courts or any other court, with respect to all or any of the Released Claims and (ii) promptly following the Effective Date, shall reduce the related accounts receivable and accounts payable to zero balances in their respective books and records and accounting systems. Flextronics further hereby acknowledges and agrees that any and all proofs

- 8 -

of claim filed or otherwise asserted by Flextronics in the Proceedings are deemed withdrawn in the applicable proceedings with prejudice, provided, however, that, the proofs of claim filed against NNL in the CCAA Proceedings in relation to the Pension Claims shall not be deemed withdrawn and shall be resolved in accordance with the Claims Resolution Order of the Canadian Court dated September 16, 2010 and any other applicable Order of the Canadian Court.

7.    **Approval by the US Bankruptcy Court**.  This Agreement is subject in all respects to the entry of a Final (as defined below) order by the US Bankruptcy Court approving all terms and conditions contained in this Agreement.  Within five (5) business days after NNI's receipt of an executed copy of this Agreement, NNI shall file a motion with the US Bankruptcy Court, which motion shall be in form and substance reasonably acceptable to Flextronics, seeking the approval of this Agreement pursuant to §§ 101 and 363 of the Bankruptcy Code (the "US Approval Order") and any other applicable law, rules, orders or procedures, and shall use reasonable best efforts to pursue the same until the US Approval Order is entered and becomes Final.  If the US Bankruptcy Court does not approve all terms and conditions contained in this Agreement on or before January 31, 2012, then this Agreement shall be null and void.

8.    **Approval by the Canadian Court**.  This Agreement is subject in all respects to the entry of a Final (as defined below) order by the Canadian Court approving all terms and conditions contained in this Agreement.  Within five (5) business days after NNL's receipt of an executed copy of this Agreement, NNL shall file a motion with the Canadian Court, which motion shall be in form and substance reasonably acceptable to Flextronics, seeking the approval of this Agreement pursuant to applicable law in the CCAA Proceedings (the "Canadian Approval Order") and any other applicable law, rules, orders or procedures, and shall use reasonable best efforts to pursue the same until the Canadian Approval Order is entered and becomes Final.  If the Canadian Court does not approve all terms and conditions contained in this Agreement on or before January 31, 2012,then  this Agreement shall be null and void.

9.    **Effective Date**.  This Agreement shall become effective on the first day after both the US Approval Order and the Canadian Approval Order (each an "Approval Order") become Final (the "Effective Date").  For purposes of this Agreement, "Final" with respect to each Approval Order means the date on which the respective Approval Order is approved and entered by the respective court (in a form satisfactory to each of Nortel and Flextronics as determined in their respective reasonable discretion) and is no longer subject to appeal, writ of certiorari, reargument or rehearing, or, in the event that a timely appeal has been noticed, or a timely writ of certiorari, reargument or rehearing has been sought with regard to the respective Approval Order, then such Approval Order shall become Final upon being affirmed by the highest court to which the Approval Order was appealed (without material modifications to such Approval Order, as determined by each of Nortel and Flextronics in their respective reasonable discretion) and the time to take any further appeal, to petition for writ of certiorari or to move for reargument or rehearing has expired.  Notwithstanding the foregoing, the Parties shall have the right to waive the requirement that the Approval Orders become Final.

10.    **Execution of Documents**.  The Parties agree to execute any and all documents, and to perform any acts, upon request by the other, reasonably necessary or proper to effectuate or further evidence the terms and provisions of this Agreement.

- 9 -

11.  **Consultation and Review**.  Each of the Parties hereby represents to the other that (i) it has had full and adequate opportunity to request and review any and all documents relevant to this Agreement; (ii) it has negotiated this Agreement at arm's length; (iii) it has read this Agreement in its entirety and understands its terms and contents; (iv) it has had full and adequate opportunity to consult with and, in fact, has consulted with legal counsel on all matters related to this Agreement; (v) it has provided any comments regarding this Agreement to its legal counsel; (vi) it has executed this Agreement freely, voluntarily and without coercion; and (vii) it has not relied on any inducements, promises, statements, representations or warranties made by any person or entity not expressly set forth in this Agreement.

12.  **Binding Effect**.  This Agreement constitutes a legal, valid and binding obligation enforceable against each of the Parties and any successors or assigns of the Parties in accordance with the terms hereof, subject to the approval of the US Bankruptcy Court and the Canadian Court. Each of the Parties represents and warrants that the execution, delivery and performance of this Agreement has been approved, if necessary, by all requisite corporate actions on its part and is within the scope of its authority and powers, and shall not cause any default in or breach or violation of any applicable law, rule, regulation, contract or other instrument to which it is a party or by which any of its assets are bound or affected.

13.  **Objection to this Agreement**.  In the event that an objection is filed to any motion for US Bankruptcy Court approval or Canadian Court approval of this Agreement, the Parties shall in good faith support the approval of this Agreement before the US Bankruptcy Court and/or the Canadian Court, and defend any appeals of an Approval Order to the fullest extent reasonably practical.

14.  **Third-Party Rights**.  Unless otherwise expressly provided, nothing in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the Parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to the Parties, nor shall any provision give any third persons any right of subrogation or action against any party to this Agreement.

15.  **No Admission of Liability**.  It is understood by the Parties that this Agreement represents a compromise of disputed claims, and that this Agreement is not to be construed as an admission of liability on any claims. Neither the fact of this Agreement, nor any provision contained herein, nor any action taken hereunder, shall constitute an admission with respect to any claims or facts alleged by any of the Parties hereto.

16.  **Interpretation**.  If any provision or term of this Agreement is deemed unenforceable for any reason, then the Parties agree that the rest of the Agreement should be given full force and effect to the greatest extent permissible under applicable law, and that the court interpreting such provision is entitled to amend or substitute a provision to give effect to the original intent and meaning of the unenforceable provision to the greatest extent possible.

17.  **No Transfer of Claims**.  By executing this Agreement, each Party represents and warrants to the other that it has not sold, assigned, transferred or otherwise conveyed any of its respective Released Claims to any other person or corporation or other entity that is not a Party

- 10 -

to this Agreement. Any sale, assignment, transfer or other conveyance of claims after the date hereof in violation of this section 17 shall be null and void and of no force and effect.

18. **Modification**. This Agreement may not be changed, modified or altered in any manner except in a written instrument signed by each of the Parties, which instrument is approved by the Monitor and the Official Committee of Unsecured Creditors appointed in the US Bankruptcy Cases or approved by the Courts.

19. **Headings**. The headings contained herein are set forth only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Agreement nor the intent of any provision thereof.

20. **Consent to Jurisdiction**. To the fullest extent and for the maximum time period permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US Bankruptcy Court and the Canadian Court (if applicable, in a joint hearing conducted under the cross-border protocol adopted by such courts, as it may be in effect from time to time (the "Cross-Border Protocol")), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the US Bankruptcy Court if such claim, action or proceeding would solely affect the US Debtors, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Debtors, a joint hearing of both the Canadian Court and the US Court conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors and the English courts if such claim, action or proceeding would solely affect the EMEA Entities, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a court or any claim that any such action brought in such a court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

21. **Injunctive Relief**. Each of the Parties agrees that this Agreement may be pled as a defense to any such claim or action in any court of competent jurisdiction. In connection with the foregoing, the Parties agree that monetary damages would not be sufficient to remedy any breach by a party of this Agreement and that the non-breaching party would be entitled to equitable relief, including, without limitation, temporary injunctive relief preventing (or allowing, as the case may be) the unilateral termination of performance and specific performance in respect of any breach of the Agreement.

22. **Governing Law**. This Agreement shall be governed by the laws of the Province of Ontario and the federal laws of Canada applicable therein; provided, however, that any questions, claims, disputes, remedies or actions arising from or related to sections 27 – 29 and any questions, claims, disputes, remedies or actions arising from or related to (i) the capacity of the Joint Administrators to act as agents of the EMEA Entities, (ii) the personal liability of the Joint Administrators, their firm, partners, employees, advisors, representatives or agents, (iii) their qualification to act as insolvency practitioners in accordance with Part XIII of the UK

- 11 -

Insolvency Act, (iv) their appointment as joint administrators of the EMEA Entities and their status as such, or (v) the statutory duties of the Joint Administrators or the legal obligations in relation to the exercise of their powers, duties or functions as administrators of the EMEA Entities under the UK Insolvency Act or any other applicable legislation or statutory instrument, shall be governed by English law and subject to the non-exclusive jurisdiction of the English courts.

23. **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same complete agreement among the Parties. A facsimile or a PDF signature shall be treated in all manners and respects as a binding and original signature.

24. **Notices**. All notices and other communications under this Agreement shall be in writing and shall be deemed to have been given when provided by e-mail in addition to one of the following: (a) when delivered personally by hand, (b) when sent by facsimile (with written confirmation of receipt) or (c) one (1) business day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following e-mails, addresses and facsimile numbers:

> If to Nortel:
>
> Nortel Networks Limited
> 5945 Airport Road, Suite 360
> Mississauga, Ontario, Canada L4V 1R9
> Attention: Anna Ventresca
> Fax:  (905) 863-2057
> E-Mail:  annav@nortel.com
>
> -and-
>
> Nortel Networks Inc.
> 4001 E. Chapel Hill – Nelson Hwy.
> Research Triangle Park, North Carolina 27709
> United States
> Attention: Timothy Ross
> Fax: (919) 905-3741
> E-Mail: timothyr@nortel.com
>
> with copies (which shall not constitute notice) to:
>
> Cleary Gottlieb Steen & Hamilton LLP
> One Liberty Plaza
> New York, New York 10006
> Attn: James L. Bromley, Esq.
>        Lisa M. Schweitzer, Esq.
> Fax:  (212) 225-3999
> E-Mail: jbromley@cgsh.com
>  lschweitzer@cgsh.com