# **<u>EXHIBIT A</u>**

B10 (Official Form 10) (12/08)

| United States Bankruptcy Court - District of Delaware | PROOF OF CLAIM |
|---|---|
| Name of Debtor:<br>**NORTEL NETWORKS (CALA), INC.** | Case Number:<br>**09-12515 (KG)** |

*NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>**TELEFONICA INTERNACIONAL, S.A.U.** | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:<br>Telefonica Internacional, S.A.U.<br>c/o Connie Graver, Paralegal<br>Stearns Weaver Miller, et al<br>150 West Flagler Street, Suite 2200<br>Miami, FL 33130<br>Telephone number: (305) 789-3200 | Court Claim Number: _____<br>*(If known)*<br><br>Filed on: _____ |
| Name and address where payment should be sent (if different from above):<br><br><br><br>Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

**1. Amount of Claim as of Date Case Filed:** $ __1,675,000 Euros__

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:** Commissions due pursuant to attached contract
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** __37684.0003__

3a. Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff:   ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe:

Value of Property:$ _____   Annual Interest Rate _____

Amount of arrearage and other charges as of time case filed included in secured claim,
if any: $ _____ Basis for perfection: _____

Amount of Secured Claim: $ _____   Amount Unsecured: $ _____

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any purchase orders, invoices, itemized statement agreements. You may also attach a summary perfection of a security interest. You may als
DO NOT SEND ORIGINAL DOCUMENTS SCANNING.
If the documents are not available, please ex,

Filed: USBC - District of Delaware
Nortel Networks Inc., Et Al.
09-10138 (KG)    0000005980

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**Amount entitled to priority:**
$ _____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**FOR COURT USE ONLY**

FILED / RECEIVED

OCT 1 4 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date:<br><br>October 13, 2009 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>Drew M. Dillworth, Attorney for Claimant | |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**Telefónica Internacional, S.A.**
Sociedad del Grupo Telefónica

Ronda de la Comunicación, s/n. Distrito C.
Edificio Oeste 3, planta 2 - 28050 Madrid - España



```
DNI/CIF:                                    NORTEL NETWORKS (CALA) INC.
NORTEL NETWORKS (CALA) INC.                 Concord Terrace 1500
1500 Concord Terrace                        33323 Sunrise
33323 Sunrise                               EE.UU.
EE.UU.
Nº Pedido/Orden:                            Atn.:
Centro Coste Cliente:
```

| Factura nº / Invoice no. | | | Fecha / Date: | |
|---|---|---|---|---|
| 2800000142 | Emitida en: Madrid | | | 12/29/2008 |

### Detalle de la factura / Invoice Detail

| Concepto / Concept | Cantidad / Quantity | P.Unitario / Price Unit | Importe / Amount |
|---|---|---|---|
| Comisión por intermediación por la designación de Nortel como prestador de servicios de Centralita Móvil para las Operadoras Móviles de Latam (Excepto Brasil) 825.000 Euros pagaderos antes del 31de enero 2009 1.675.000 Euros pagaderos antes del 30 de junio 2009 | 1 | 2,500,000.00 | 2,500,000.00 |

```
Importe total a facturar                                                      2,500,000.00
IVA Rep.Serv.Prestados a No residentes UE Exento 0% (2,500,000.00 )                   0.00
Importe de la factura en EUR                                                  2,500,000.00 €
```

El pago de la factura se acredita con el correspondiente documento bancario
The payment of the invoice is credited whith the corresponding banking document

```
Datos internos de control.
Datos Cliente.
Modalidad de Pago: Transferencia
Cuenta para Transferencia: 0182 3994 01 0010283492 BANCO BILBAO VIZCAYA ARGENTARIA, S.A.
              * IMPORTANTE: CITAR EL NÚMERO DE FACTURA AL ORDENAR EL PAGO.
Cod. Swift: BBVAESMM .
I.B.A.N (International Bank Account Number): ES3901823994010010283492
Telf:      Mail:
Datos emisora.
Telf:      Mail:
```

Fecha Vto: 29.12.2008

1 /    1

Original para el Cliente / Copy for the Client

## <u>CONTRATO DE MEDIACIÓN</u>

En Madrid a 29 de Septiembre de 2.008.

### REUNIDOS

**DE UNA PARTE**; Don Fernando Valdivielso Delgado, con DNI/NIF español núm. 13131264-N, en su calidad de Apoderado de la mercantil **NORTEL NETWORKS (CALA) Inc.**, entidad de nacionalidad estadounidense domiciliada en 1500 Concord Terrace, Sunrise, Florida 33323 Estados Unidos de América, actuando en nombre y representación de la misma, según acredita mediante poder especial otorgado a su favor ante Mrs. Ivonne Williamns, Notario de Público del Estado de Florida, el 24 de Septiembre de 2.008 ( en adelante **"Empresa"**);

**Y DE OTRA PARTE**; Don Manuel Alvarez-Tronge, con pasaporte argentino número 13.417.628-N, en su calidad de Apoderado, de la mercantil **TELEFONICA INTERNACIONAL, S.A.U.** Entidad domiciliada a estos efectos en Ronda de las Comunicaciones s/n, Distrito C, Edificio Oeste 3, 3ª planta, 28.050 Madrid, con NIF número A-78035441, y actuando en nombre y representación de la misma, según acredita la Escritura de poder otorgada ante el Notario de Madrid, D Antonio Crespo Monerri, de fecha 3 de mayo de 2006y bajo el nº 1221 de orden de su protocolo. (en adelante **"Mediador"**).

La Empresa y el Mediador serán en adelante conjuntamente denominados como las "Partes" e individualmente como la "Parte".

### EXPONEN

I.- Que la Empresa, es una persona jurídica que está interesada en contratar y utilizar los servicios del Mediador para que éste consiga y concluya para la Empresa (o cualquiera de sus Filiales actuales y/o futuras) la Oportunidad de Negocio con las Operadoras en Latinoamérica, en los términos y condiciones que se describen más adelante.

II.- Que el Mediador, entidad con amplia experiencia en el sector de las Telecomunicaciones y en la Región de Latinoamérica, está interesado en hacer de intermediario entre la Empresa y las Operadoras, por un periodo de tiempo determinado

con el fin de conseguir la Oportunidad de Negocio bien para la Empresa o bien para cualquiera de sus Filiales, en Latinoamérica.

**III.-** Que el Mediador en fecha 31 de Agosto de 2.008 ha presentado a la Empresa la Oportunidad de Negocio descrita en la Cláusula PRELIMINAR, para cuya conclusión el Mediador prestará los servicios aquí contratados.

**IV.-** Que el Mediador una vez presentada a la Empresa la Oportunidad de Negocio, señalada en el expositivo anterior, ha venido trabajando en la conclusión de la misma desde el pasado 1 de Septiembre del año 2.008, con independencia de la fecha de formalización del presente Contrato.

**V.-** Que reconociéndose mutuamente capacidad legal suficiente, la Empresa y el Mediador convienen otorgar y suscribir el presente CONTRATO DE MEDIACIÓN MERCANTIL (en adelante, el "**Contrato**"), el cual se regirá con arreglo y sujeción a las siguientes:

## CLÁUSULAS

**PRELIMINAR.-** Definiciones: A lo largo del presente Contrato y a los efectos de la interpretación de lo establecido en el mismo, los siguientes términos, utilizados en singular o en plural (indistintamente), tendrán el significado que se les atribuye a continuación:

(i) "Contrato", significa el presente acuerdo de mediación mercantil y su Anexo I, que formalizan la Empresa y el Mediador en la fecha que figura en su encabezamiento.

(ii) "Carta de Designación" ó "Cartas de Designación", significa el documento que el Mediador entregará a la Empresa firmado por el CEO de cada una de las Operadoras que constan en el Anexo I, en los términos que figuran en el presente Contrato, y, específicamente, en la Cláusula PRIMERA del mismo.

(iii) "Contrato Marco de Prestación de Servicios", significa el acuerdo de suministro de Servicios de Centralita Móvil que será suscrito entre la Empresa (ó cualquiera de sus Filiales) y las Operadoras.

(iv) "Empresa", significa "NORTEL NETWORKS (CALA), Inc.", entidad estadounidense domiciliada en Sunrise, Florida.



(v) "Filiales", significa "NORTEL NETWORKS CORPORATION", entidad jurídica Canadiense matriz de la Empresa, y sus subsidiarias operativas en Latinoamérica.

(vi) "Mediador", significa "TELEFÓNICA INTERNACIONAL, S.A.U", entidad Española perteneciente al grupo Telefónica y domiciliada en Madrid, España.

(vii) "Operadoras", significa todas y cada una de las filiales de telefonía móvil de la entidad Española "TELEFÓNICA, S.A." que operan y prestan sus servicios de telefonía móvil en la Región de Latinoamérica que se detallan en **Anexo I** al presente Contrato.

(viii) "Oportunidad de Negocio", significa la designación de la Empresa (o de cualquiera de sus Filiales) por las Operadoras como proveedor en exclusiva de soluciones y tecnologías en el mercado de los Servicios de Centralita Móvil, mediante la firma de las Cartas de Designación por los CEO de cada una de las Operadoras, en los términos establecidos en la Cláusula PRIMERA.

(ix) "Servicios de Centralita Móvil", significa las soluciones y tecnología en el mercado de los servicios de centralita móvil que permiten a los usuarios de una empresa o PYME -cliente de las Operadoras- gestionar sus comunicaciones móviles desde su PC de trabajo o desde sus terminales móviles avanzados gracias a un software instalable en los mismos, denominado comunicador ("Comunicador"), así como permitir a través del Comunicador el acceso al servicio Centralita Móvil y otros servicios avanzados de red (presencia, mensajería, etc.).

**PRIMERA.-** En virtud de este Contrato la Empresa encarga al Mediador, quien acepta, que le sirva y actúe como intermediario entre la Empresa (o sus Filiales) y las Operadoras, realizando las gestiones necesarias a fin de conseguir la designación por las Operadoras a favor de la Empresa (o cualquiera de sus Filiales) como suministrador en exclusiva de los Servicios de Centralita Móvil para las Operadoras, mediante la entrega a la Empresa -dentro del plazo establecido en la Cláusula TERCERA del Contrato- de las Cartas de Designación firmadas por los CEO de las Operadoras, en las siguientes condiciones y aquellas otras que fueran, en su caso, determinadas conjuntamente por las Operadoras con la Empresa:



(i) La designación de la Empresa (ó sus Filiales) como suministradora del Servicio de Centralita Móvil será en calidad de exclusividad a favor de la Empresa para todas las Operadoras por el plazo establecido en el Contrato Marco de Prestación de Servicios;

(ii) El Contrato Marco de Prestación de Servicios tendrá un plazo de 48 meses;

(iii) La Empresa se hará cargo de todo el despliegue de la infraestructura para la prestación del Servicio de Centralita Móvil y para ello, deberá instalar tres Nodos cabecera ("Nodos") Perú, México y Argentina;

(iv) La instalación de los Nodos se llevará a cabo en la forma y plazo que se establezca el Contrato Marco de Prestación de Servicios, y previamente al inicio de dicho despliegue las Operadoras de Perú, México y Argentina, deberán haber suscrito el Contrato Marco de Prestación de Servicios mediante su adhesión al mismo dentro de los noventa (90) días siguientes al de la fecha de este Contrato;

(v) En las adhesiones al Contrato Marco de Prestación de Servicios que firmen por la Operadoras de Perú, Méjico y Argentina, se establecerá que la prestación del Servicio de Centralita Móvil será por cuenta y cargo de la Empresa e incluirá el soporte, mantenimiento y actualización de la infraestructura durante todo el periodo del Contrato Marco de Prestación de Servicios. La Empresa ostentará en todo momento la plena propiedad sobre la infraestructura desplegada para la prestación de los Servicios de Centralita Móvil, y podrá desintarlada a partir del momento de la terminación del Contrato Marco de Prestación de Servicios en el plazo y modo que estime conveniente. 

(vi) El Contrato Marco de Prestación de Servicios no implicará la intención de crear una asociación ("*joint venture*"), sociedad, ó agencia. Asimismo la partes contratantes serán independientes y ninguna actuará como agente de la otra, salvo acuerdo expreso en contrario.



(vii) Las tarifas de los servicios Centralita Móvil serán fijadas por la Operadora según las practicas comerciales del país correspondiente, pero en todo caso se fijará durante el Plazo Contractual un monto mínimo de Tres Dólares de los Estados Unidos de América (US $3) por usuario por los servicios Centralita Móvil. Cada Operadora podrá comercializar los servicios Centralita Móvil sin costo a sus usuarios nuevos que se inscriban al servicio durante cada mes siempre y cuando el número máximo para tal mes de usuarios nuevos inscritos con servicio sin costo, no exceda el veinte por ciento (20%) de todos sus usuarios nuevos inscritos en el referido mes, y que el periodo máximo de servicio sin costo a dicho usuario nuevo no exceda seis (6) meses contados a partir de fecha que comienza los servicios Centralita Móvil para tal usuario nuevo.

(viii) El Contrato Marco de Prestación de Servicios definirá *"Cargo Mensual"* como el importe facturado por las Operadoras a sus clientes correspondiente a los Servicios Centralita Móvil.

(ix) La participación de la Empresa en los Cargos Mensuales de los Servicios Centralita Móvil de la Operadora será la siguiente:

*(1)* El cincuenta por ciento (50%);



*(2)* El cuarenta por ciento (40%), desde el momento en que el total de la participación de la Empresa en los Cargos Mensuales de los Servicios Centralita Móvil exceda de Veintidós Millones Quinientos Mil Dólares Estadounidenses (22.500.000 USD) de forma acumulada respecto de todas las Operadoras donde se preste el servicio, y

*(3)* Treinta por ciento (30%), a partir de la fecha que el total de la participación de la Empresa sobre los Cargos Mensuales de los Servicios Centralita Móvil exceda Cuarenta y Cinco Millones de Dólares Estadounidenses



(45.000.000 USD) de forma acumulada respecto de todas las Operadoras donde se preste el servicio.

Al final de cada mes, Nortel emitirá un factura a la Operadora correspondiente por un monto equivalente al (1) número de usuarios habilitados por la Operadora para usar los Servicios Centralita Móvil, multiplicado por (2) el monto mínimo para los Cargos Mensuales de los Servicios Centralita Móvil, multiplicado por (3) la participación de la Empresa.

(x) Al final de cada trimestre, la Empresa emitirá una factura a la Operadora correspondiente, por la diferencia entre la tarifa vigente pagada por el usuario final y el monto mínimo de los Cargos Mensuales, multiplicado por la cantidad de usuarios en dicho trimestre.

(xi) El Contrato Marco de Prestación de Servicios finalizará en caso que el monto total de pagos cobrados por la Empresa por las Licencias de Software y por su participación en los Cargos Mensuales de Servicios Centralita Móvil sea igual o superior a SETENTA Y CINCO MILLONES DE DÓLARES ESTADOUNIDENSES (USD 75.000.000).



(xii) Asimismo el Contrato Marco de Prestación de Servicios finalizará si transcurrido veinticuatro (24) meses después de la fecha de firma del Contrato, la suma de los Cargos Mensuales no alcanza Un Mllón y Medio de Dólares Estadounidenses (USD 1.500.0000).

**SEGUNDA.-** Como contraprestación por la conclusión de la Oportunidad de Negocio la Empresa abonará al Mediador una comisión por importe total de TRES MILLONES (3.000.000.-€) EUROS, de los cuales (2.500.000.-Euros) corresponden a la Oportunidad de Negocio de todas las Operadoras excepto Brasil, y (500.000.-Euros) corresponden a la Operadora de Brasil.

El Mediador podrá emitir las facturas correspondientes a la referida contraprestación en cualquier momento posterior a la fecha en la que Empresa hubiera recibido las Cartas de



Designación firmadas por parte de los CEO de las Operadoras, en los términos descritos en la Cláusula PRIMERA del presente Contrato.

El Mediador identificará en la factura emitida la c/c en la que la Empresa deberá ingresar el importe de la comisión.

Una vez emitida la factura, la contraprestación se abonará al Mediador en las siguientes fechas:

a) UN MILLÓN (1.000.000) EUROS no más tarde del 31 de Enero de 2009.

b) DOS MILLONES (2.000.000) EUROS, no más tarde del 30 de Junio de 2009.

**TERCERA.-** El plazo que dispone el Mediador para llevar a cabo la entrega a la Empresa de las Cartas de Designación firmadas por los CEO de las Operadoras será de un máximo de (i) treinta (30) días para las Operadoras de Méjico, Perú y Argentina, y (ii) sesenta (60) días para las restantes Operadoras. Ambos plazos se computarán a partir de la fecha de firma del presente Contrato.

**CUARTA.-** La Empresa y el Mediador se obligan mutua y recíprocamente durante y con posterioridad a la vigencia de este Contrato a tratar el mismo y toda la información manejada en relación al mismo, así como las informaciones que se faciliten mutuamente (sea por escrito, oralmente o por mera presencia) (en adelante la "Información Confidencial"), de forma estrictamente confidencial, utilizándola única y exclusivamente para los fines que se expresan en este Contrato y adoptando las medias de seguridad necesarias para que su contenido no se divulgue a terceros. 

La Parte que reciba Información Confidencial, la tratará como confidencial; no la usará excepto tal y como esté permitido bajo este Contrato y no la revelará a terceros sin consentimiento escrito previo de la Parte que la suministró. Asimismo, la Parte que reciba Información Confidencial protegerá dicha información del uso no autorizado o la revelación a tercero como mínimo, con el mismo grado de cuidado y diligencia que protege su propia información confidencial y nunca en un grado menor que debería tener en tal situación un ordenado comerciante.

Las restricciones de esta cláusula no se aplicarán a la información que:



- fuera desarrollada sin uso alguno de Información Confidencial recibido de la otra Parte;

- fuera comunicada a dicha Parte por un tercero que tuviera derecho a revelarla sin quiebra alguna de este Contrato o cualquier otro acuerdo.

- fuera de conocimiento público al tiempo en que fue revelada por una Parte a la otra Parte o se convierte en pública sin que intervenga culpa alguna de la Parte que la recibió;

- era ya conocida por la Parte que la recibe al tiempo de recibirla; o

- es solicitada a una de las Partes por autoridad administrativa o judicial.

Las Partes igualmente reconocen que son propietarias de la Información Confidencial de las que son informantes, a excepción de aquella que se materialice en y para la ejecución del presente Contrato, que pertenecerá en todo caso a la parte informante. Asimismo las Partes reconocen que de la entrega de la información Confidencial, y a excepción de lo antedicho, no se desprende derecho alguno, cesión o licencia, fuera de lo establecido en este Contrato.

Finalizado el Contrato por la causa que fuera, la parte receptora deberá devolver a la otra, o destruir, según criterio de la parte informante, la Información Confidencial de que disponga. En todo caso, la parte receptora deberá acreditar por escrito el cumplimiento de esta obligación.

El incumplimiento por cualquiera de las Partes de esta Cláusula de Confidencialidad, facultará a la otra Parte para resolver el Contrato y además exigir los daños y perjuicios que se le hubiesen ocasionado.

La obligación de confidencialidad permanecerá vigente durante toda la vigencia del presente Contrato y por un plazo de cinco años desde la terminación del mismo.

**QUINTA.-** Serán de cuenta del Mediador los gastos de desplazamiento, hospedaje y manutención que fueren necesarios para la realización de los servicios de mediación establecidos en este Contrato y la designación de la Empresa (o sus Filiales) como proveedor de los Servicios Centralita para las Operadoras.



**SEXTA.-** Miscelánea: En virtud de este Contrato no se crea relación laboral o de trabajo, de sociedad, *joint venture*, o agencia entre la Empresa y el Mediador. Ninguna de las Partes estará autorizada a representar a la otra en el cumplimiento de sus obligaciones legales o contractuales, ni podrá asumir responsabilidades o compromisos en su nombre.

Este Contrato y sus Anexos constituyen el único acuerdo válido y exigible entre las Partes; cualquier modificación al presente Contrato deberá formalizarse por escrito mediante la firma de los representantes autorizados de las Partes. La expiración o terminación del Contrato por cualquier razón, no liberará a las Partes de sus responsabilidades y obligaciones establecidas en este Contrato que las Partes hayan expresamente acordado que continuarán en vigor a la expiración o terminación del Contrato, o que no hayan aún sido ejecutadas, o que por su naturaleza debe entenderse que serán aplicables a la expiración o terminación del presente Contrato.

La demora u omisión en el ejercicio de los derechos o facultades aquí previstos no significará ni será interpretado como una renuncia a su ejercicio. La renuncia por cualquiera de las Partes a exigir a la otra el cumplimiento de cualquier obligación asumida en virtud de lo dispuesto en el presente Contrato no significará ni será interpretada como una renuncia a exigir el cumplimiento ulterior de cualesquiera otras obligaciones contractuales.

El presente Contrato obligará a las Partes y a sus respectivos sucesores y cesionarios por operación legal. Ninguna de las Partes podrá ceder los derechos u obligaciones asumidas en virtud del mismo sin la previa autorización escrita otorgada por la otra Parte. No se considerará cesión las operaciones de reorganización societaria que afecten a cualquiera de las Partes, tales como fusiones, escisiones, consolidaciones, venta de acciones, o intercambio o venta de activos o similares, siempre que como resultado de la operación la Parte afectada sea la entidad superviviente

Las notificaciones que se realicen en virtud de este Contrato se harán por escrito, y se entenderán que han sido debidamente realizadas si se entregan personalmente o se envían por mensajero, fax o por correo certificado con acuse de recibo, y se dirigen a la dirección establecida por las Partes al efecto en el encabezamiento.

Si cualquier disposición del presente Contrato resultara ilegal, ineficaz o nula, ambas Partes quedarán relevadas de cumplir con lo previsto en la disposición afectada. No obstante, las Partes negociarán de buena fe otra disposición que sustituya a aquella que resultase ilegal, ineficaz o nula, preservando el espíritu y objetivo de la disposición afectada.



El presente Contrato será otorgado en dos originales, uno para cada Parte.

**SÉPTIMA.-** La Empresa y el Mediador acuerdan que todas las controversias que puedan surgir de la interpretación, y cumplimiento de este Contrato sean resueltas, mediante arbitraje de derecho, por la Corte Civil y Mercantil de Arbitraje de Madrid, (CIMA), a la que se encomienda la administración del mismo y la designación de los árbitros conforme a a sus Reglamentos y Estatutos.

La Empresa y el Mediador hacen constar su compromiso de cumplir el laudo arbitral que se dicte, y renuncian a cualquier otro fuero jurisdiccional distinto al aquí establecido.

Asimismo las Partes acuerdan que el presente Contrato se regirá por la legislación española.

Y en prueba de conformidad con cuanto antecede en lugar y fecha establecidos en el encabezamiento firman las Partes el presente Contrato por duplicado ejemplar y a un solo efecto.

EMPRESA

Fdo.: Fernando Valdivielso Delgado

MEDIADOR

Fdo.: Manuel Álvarez-Tronge



## ANEXO I

### Listado Operadoras y Territorio

| OPERADORA | PAÍS |
|---|---|
| Vivo, S.A. | BRASIL |
| Telefónica Móviles Argentina, S.A. | ARGENTINA |
| Telefónica Móviles Chile, S.A. | CHILE |
| Telefónica Móviles del Uruguay, S.A. | URUGUAY |
| Pegaso PCS, S.A de C.V. | MÉXICO |
| Telefónica Móviles el Salvador, S.A. | EL SALVADOR |
| Telefónica Moviles Guatemala, S.A. | GUATEMALA |
| Telefónica Móviles Nicarágua, S.A. | NICARAGUA |
| Telefónica Móviles Panamá, S.A. | PANAMÁ |
| Telcel, S.A. | VENEZUELA |
| Telefónica Móviles Colômbia, S.A. | COLOMBIA |
| Otecel, S.A. | ECUADOR |
| Telefónica Móviles Peru, S.A. | PERU |



# STEARNS WEAVER MILLER
# WEISSLER ALHADEFF & SITTERSON, P.A.

Connie Graver
Museum Tower
150 West Flagler Street, Suite 2200
Miami, FL 33130
Direct: (305) 789-3430
Fax: (305) 789-3395
cgraver@stearnsweaver.com

October 13, 2009

Nortel Networks (CALA), Inc. Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, Third Floor
New York, NY 10017

Re:   *In re Nortel Networks (CALA), Inc.*
      **Case No. 09-12515 (KG)**
      **United States Bankruptcy Court, District of Delaware**

Dear Sir/Madam:

Please find enclosed an original and one copy of a proof of claim for Telefonica International, S.A.U. to be filed against the above-referenced bankruptcy estate. Please acknowledge your receipt and filing of the claim by returning a stamped copy of the claim to me in the enclosed return envelope.

Thank you for your assistance.

Very truly yours,

*Connie Graver*

Connie Graver
Paralegal

Enclosures
cc:    Drew M. Dillworth, Esq. (w/enc.)

G:\W-BANK\37684\0003\Drafts\Letter-Epiq.wpd

From: Origin ID: MPBA  (305) 789-3200
Connie Graver
Stearns Weaver Miller PA
150 West Flagler Street
150 West Flagler Street
Miami, FL 33130


FedEx Express

Ship Date: 13OCT09
ActWgt: 1.0 LB
CAD: 2282631/INET9090
Account#: S *********

Delivery Address Bar Code



SHIP TO: (305) 789-3430    BILL SENDER

**Nortel Networks (CALA), Inc. Claims**
**Epiq Bankruptcy Solutions, LLC**
**757 3RD AVE FRNT 3**

**NEW YORK, NY 10017**

Ref #
Invoice #
PO #
Dept #

RECEIVED
OCT 14 2009



TRK# 7970 1520 7370
0201

WED - 14OCT    A1
**STANDARD OVERNIGHT**


**XA OGSA**

10017
NY-US
EWR

---

**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic valueof the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.