## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTEL NETWORKS, INC., *et al.*, | ) | Case No. 09-10138(KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| ———————————————— | ) | |

## OPINION ON JOINT OBJECTIONS TO AND MOTIONS TO DISMISS CLAIMS OF NORTEL NETWORKS UK LIMITED, NORTEL NETWORKS (IRELAND) LIMITED AND NORTEL NETWORKS S.A.[1]

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19801

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE   19801

*Counsel for the Debtors
and Debtors in Possession*

*Counsel for the Official Committee
of Unsecured Creditors*

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004

HERBERT SMITH LLP
Exchange House
Primrose Street
London
EC2A 2HS

*Counsel for Claimants*

---

[1] "The court is not required to state findings or conclusions when ruling on a motion under Rule 12 . . . ." Fed. R. Bankr. P. 7052(a)(3). Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## INTRODUCTION

The size and complexity of this bankruptcy case cannot be overstated. Through Debtors' efforts, stewarded by their highly skilled and tireless lawyers, with the invaluable assistance and cooperation of the Official Committee of Unsecured Creditors and Ad Hoc Bondholders Committee and their able lawyers, Debtors now have nearly $9 Billion for distribution to creditors. The Court has been both taxed and invigorated by the challenge, never more than to decide the matters which lead to this decision. This opinion arises from a dispute over the allocation of the $9 Billion among related entities. The Court is addressing objections to and motions to dismiss (the "Motions") [D.I. Nos. 5970, 5971, and 5972] filed by Nortel Networks Inc. ("NNI"), its affiliated debtors,[2] (collectively, the "U.S. Debtors") and the Official Committee of Unsecured Creditors (the "Committee," and, together with the U.S. Debtors, the "Movants"). The Movants seek dismissal of the proofs of claim filed by the Joint Administrators of Nortel Networks UK Limited ("NNUK"); Nortel Networks S.A. ("NNSA"); Nortel Networks (Ireland) Limited ("NNIR"), (collectively, NNSA, NNIR, and NNUK are referred to as the "Claimants" and the Proofs of Claim are collectively, referred to as the "Claims").[3] In this complex and important contest, it is not surprising that the disputing parties have used every cause of action and defense imaginable. Adding to the challenge to the Court's decision is the presence and applicability of foreign law. The excellence and persuasiveness of

---

[2] The debtors in these Chapter 11 cases, which are jointly administered, are: Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.

[3] Claimants' lawyers take a back seat to no one in their legal acumen and dedication.

the lawyers on both sides is a two-edged sword, making it both easier and more difficult to decide the Motions.   The Claimants, located in a Nortel operating region known as Europe, the Middle East and Africa ("EMEA"), each filed proofs of claim containing similar allegations. The thrust of the Claimants' claims is that NNI improperly diverted or assisted in diverting cash and value from them for the benefit of Nortel Networks Limited ("NNL"), the Canadian parent company.   The Movants argue that the Claimants cannot sustain their claims as a matter of law for several reasons, explained more fully below.

Upon consideration of the Motions, the oppositions, and the replies, and having held oral argument, the Court has determined that the Motions must be granted in part and denied in part.

## JURISDICTION

The Court has jurisdiction over these contested matters pursuant to 28 U.S.C.  §§ 157 and 1334(b).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).  Venue is proper pursuant to 28 U.S.C. § 1409.

## FACTS[4]

### A.  Corporate Structure

NNI is part of a highly stratified, but now defunct, corporate empire.  NNI, incorporated under the laws of the state of Delaware, is a direct subsidiary of NNL and is the principal U.S. operating subsidiary of the entire corporate family.  NNL is the principal Canadian operating subsidiary of Nortel Networks Corporation ("NNC," together with NNL and their affiliates,

---

[4] The transactions and business dealings at issue are enormously complex and involve vast sums of money.  It is surprising, therefore, that the parties spend very few pages in their briefs detailing the facts.  Instead, facts, allegations and legal arguments seem woven together.  It is entirely understandable and the Court is making an observation rather than a critisism.

including the U.S. Debtors, "Nortel"). NNC is the ultimate parent company of NNL and NNI, and is incorporated under the laws of Canada.

NNUK owned all but three of the nineteen Nortel European affiliates,[5] including the Claimants (the Claimants, together with the remaining European affiliates, are the "EMEA Debtors") via ownership of Nortel International Finance and Holding, B.V. ("NNIF"), pursuant to a restructuring of the EMEA entities in December 2007.

### B. Events Leading up to Bankruptcy

Originally founded in Canada in 1895 as an equipment provider for Canada's telephone system, Nortel expanded into the United States, Europe, Asia, Africa, and Latin America during a period from the mid-1980s through 2000. During this period, in addition to providing traditional land-line phone technology and equipment, Nortel began moving into the wireless and digital arenas. Eventually, Nortel supplied end-to-end networking products and solutions for a vast range of businesses and government agencies globally.

In 2000, Nortel reported approximately $30 billion of annual revenue, employed nearly 93,000 people, and had a market capitalization of over $250 billion. Nortel's business was essentially two-fold: the supply of physical hardware with embedded or bundled software and the deployment and support of that hardware.

---

[5] In addition to NNUK, orders of administration were obtained in England with respect to: Nortel GmbH; Nortel Networks (Austria) GmbH; NNIR; Nortel Networks AB; Nortel Networks B.V.; Nortel Networks Engineering Service Kft; Nortel Networks France S.A.S. ("NNSAS"), which is the ultimate subsidiary of NNSA; Nortel Networks Hispania, S.A.; Nortel Networks International Finance & Holding B.V.; Nortel Networks N.V.; Nortel Networks OY; Nortel Networks Polska Sp. z.o.o.; Nortel Networks Portugal S.A.; Nortel Networks Romania SRL; NNSA; Nortel Networks S.p.A.; Nortel Networks Slovensko, s.r.o.; and Nortel Networks, s.r.o. (collectively, with NNUK, the "EMEA Debtors").

However, with the burst of the "dot-com bubble" in early 2001, and the accompanying downturn in the telecommunications industry, the competition for market share rapidly became nearly insurmountable.    Another challenge that Nortel faced was the constantly shifting technology landscape, as well as the difficult task of adjusting course to the changing industry.

In 2004, Nortel announced certain accounting irregularities and its intention to restate prior period financial results, at which point Standard & Poor's Corp. and Moody's Investors Service, Inc., lowered Nortel's credit rating to below investment grade.    Nortel ultimately issued four successive restatements of its consolidated financial statements for the fiscal years 2000 through 2005.    In 2008, S&P and Moody's downgraded Nortel again.    These downgrades further propelled Nortel toward a liquidity crisis because, coupled with Nortel's accounting irregularities, they effectively blocked Nortel's access to capital markets.    Nortel relied on high yield/convertible debt for several years during this period.

These restatements also subjected Nortel to substantial shareholder litigation in Canada and the U.S.    Nortel settled the litigation in 2006 for $575 million and a percentage of NNC's shares.

The highly leveraged debt position, due in large part to a number of acquisitions Nortel undertook in the 1990s, and the other challenges facing Nortel, caused Nortel to begin a series of restructuring measures in 2005, none of which were successful.    Partly as a result of the significant cost of those restructuring efforts, Nortel began to experience negative cash flow in the years immediately preceding the filing of these chapter 11 cases.  Competition for innovation in the telecommunications industry, high operating expenses, the deterioration of the global economy and a general decrease in demand for some of Nortel's products, in addition to

4

previously described difficulties, caused Nortel to confront a full-blown liquidity crisis and the insolvency proceedings in Canada and here.

## C.  Commencement of Global Insolvency Proceedings

On January 14, 2009 (the "Petition Date"), the U.S. Debtors (except for Nortel Networks (CALA) Inc. ("NN CALA"), which filed on July 14, 2009) filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Also on the Petition Date, NNC, NNL and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[6] filed applications with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings").  The Honorable Geoffrey P. Morawetz, Justice of the Superior Court of Justice, Ontario, Canada, presides over the Canadian Proceedings.

On January 15, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as foreign proceedings under section 18.6 of the CCAA.  Also on that date, this Court entered an order approving the cross-border court-to-court protocol. (D.I. No. 54).  On February 27, 2009, this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.  (Case No. 09-10164, D.I. No. 40).

NNUK was the center of operations and headquarters for the EMEA region of Nortel. Accordingly, on January 14, 2009, pursuant to the English Insolvency Statute and the European Insolvency Regulation, the High Court of Justice, Chancery Division (the "English Court") placed the EMEA Debtors into administration and appointed individuals from Ernst & Young LLP, as administrators (the "Joint Administrators").

_____

[6]  The other Canadian Debtors were: Nortel Networks Global Corp., Nortel Networks International Corp., and Nortel Networks Technology Corp.

On May 28, 2009, at the request of the Joint Administrators, NNSA entered into secondary insolvency proceedings in the Commercial Court of Versailles (the "French Court"). Also on that date, the French Court issued a judgment appointing a liquidator (the "NNSA Liquidator").

The EMEA Debtors performed their respective head office functions in England. Accordingly, England was identified as the center of main interests (the "COMI") of each of the EMEA Debtors for purposes of NNUK's petition in this Court for recognition of the English insolvency proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. The need for coordination in the proceedings prompted the Court to enter an order on June 26, 2009, recognizing the English Proceedings.

On July 12, 2010, the U.S. Debtors filed the Joint Chapter 11 Plan of Nortel Networks Inc. and its Affiliated Debtors. Docket No. 3580.  Several months later, the U.S. Debtors filed their Proposed Disclosure Statement for the Joint Chapter 11 Plan of Nortel Networks Inc. and its Affiliated Debtors.  D.I. No. 3874**.**

### D.  The Interim Funding Settlement Agreement

On June 9, 2009, the U.S. Debtors, the Canadian Debtors, and the EMEA Debtors (excluding NNSA and Nortel Networks AG)[7] entered into the Interim Funding Settlement Agreement (the "IFSA").  The Court and the Canadian Court approved the IFSA on June 29, 2009.  (D.I. No. 993).  The parties intended the IFSA to resolve, on an interim basis, certain allocation and post-petition cross-affiliate claims issues, pending the final allocation of the proceeds of the planned sales of their businesses.

---

[7]  On September 11, 2009, NNSA and Nortel Networks AG acceded to the IFSA as EMEA Debtors, each agreeing to comply with its obligations "as if it had been a party from the date of the execution thereof."

### E.  Asset Sales

Early in 2009, Nortel began a comprehensive global asset liquidation process.  On March 26, 2009 the Court[8] entered an order approving the sale of certain portions of Nortel's Application Delivery portfolio to Radware Ltd. (D.I. 539).  On July 28, 2009, the Court entered an order approving the sale of CDMA and LTE-related assets to Telefonaktiebolaget LM Ericsson ("Ericsson") (D.I. 1205).  On September 16, 2009, the Court entered an order approving the sale of the Enterprise Solutions business to Avaya Inc. (D.I. 1514).  On October 28, 2009, the Court entered an order approving the sale of assets associated with Nortel's Next Generation Packet Core network components to Hitachi, Ltd. (D.I. 1760).  On December 2, 2009, the Court entered an order approving the sale of assets associated with Nortel's GSM/GSM-R business to Ericsson and Kapsch Carriercom AG (D.I. 2065).  On December 3, 2009, the Court entered an order approving the sale of Nortel's Metro Ethernet Networks business to Ciena Corporation (D.I. 2070).  On March 4, 2010, the Court entered an order approving the sale of certain assets of Nortel's Carrier Voice Over IP and Application Solutions business to GENBAND Inc. (D.I. 2632).  On September 30, 2010, the Court entered an order approving the sale of certain assets of Nortel's Multi-Service Switch business to Ericsson (D.I. 4050).  On July 11, 2011, the Court entered an order approving the sale of Nortel's Residual Patent Assets, representing some 6,000 patents for telecommunications, internet, wireless, and other technology, to Rockstar Bidco, LP. (D.I. 5935).  The sales proceeds totaled nearly  $9 Billion.   The sales were enormously successful and not a single creditor, including the Committee, ever challenged a sale.

---

[8]  The Canadian Court, in joint hearings with the Court, also entered orders approving this and the other described sales.

### F.  Mediation Process

The Court entered an order appointing a mediator on October 27, 2010 to assist in resolving disputes concerning the allocation of sale proceeds among the U.S. Debtors, the Canadian Debtors, the EMEA Debtors, the Committee, and the Bondholder Group, (collectively, the "Mediation Parties").  The Mediation Parties attended mediation sessions in Fall 2010 and Spring 2011 in an effort to allocate the proceeds of the various asset sales among the Nortel entities and their creditors.  On April 25, 2011, the Movants requested that the Court enter an order approving an allocation protocol, establishing procedures and an expedited schedule for the cross-border resolution for the allocation of the proceeds from the asset sales.

### G.  The Claims

On August 4, 2009, this Court set September 30, 2009 as the general bar date for filing proofs of claim or interests against the U.S. Debtors other than NN CALA. (D.I. 1280).  On September 30, 2009, the Joint Administrators filed proofs of claim against NNI on behalf of NNSA and the NNSA Liquidator, NNIR, and NNUK (claims 4923, 5089, and 5122, respectively; and collectively, the "Original Claims").  The U.S. Debtors objected to the Original Claims (the "Objection") and sought an order requiring the Claimants to amend the Original Claims.  This Court granted the Objection on May 10, 2011, ordering that the Claimants provide a more definite statement, absent which their claims would be disallowed and expunged with prejudice (the "EMEA Claims Order"). (D.I. 5402).

On June 3, 2011, the Claimants each filed amended claims (claims 7774 (the "NNIR Claim"); 7784 and 7785 (the "NNSA Claim"); and 7786 (the "NNUK Claim")) (collectively, the "Amended Claims").  The Amended Claims each assert multiple causes of action under U.S.,

French, Irish, and English law.  Despite the complexity of the claims, they are all predicated on similar facts.

The broad picture the Claimants paint is that NNI jointly controlled Nortel's operations along with NNC and NNL, allowing the siphoning of funds from the Claimants to NNL through a complex series of transactions.  Amended Claims ¶¶ 13, 15.

## H.  Alleged Wrongdoing By NNI

### 1.  Transfer Pricing

#### a.  Facts

Transfer pricing is a method commonly used by multi-national companies to allocate profits and losses among parents and subsidiaries.  NNUK Claim ¶ 30, NNIR Claim ¶ 31, NNSA Claim ¶ 36.  The guiding principle of transfer pricing, set out by the Organization for Economic Cooperation and Development, is that inter-company transactions should be priced at an arm's length standard.  *Id.*  Implementation of this standard becomes increasingly complex, however, when applied to intangibles such as research and development.  *Id.*

In 2001, Nortel adopted a species of transfer pricing, termed a "residual profit split method" ("RPSM"), which divided participants into two main groups - limited risk entities and residual profit entities.  NNUK Claim ¶ 34, NNIR Claim ¶ 35, NNSA Claim ¶ 41.  Limited risk entities received profits from their direct sales earnings, while residual profit entities received remaining profits or losses attributable to intangibles.  NNUK Claim ¶ 35, NNIR Claim ¶ 36, NNSA Claim ¶ 42.  NNC, NNL, and NNI allegedly unilaterally implemented the RPSM.  Amended Claims ¶ 18.

NNUK, NNL, NNI, NNSA, and NNIR were residual profit entities.  NNUK Claim ¶ 34, NNIR Claim ¶ 35, NNSA Claim ¶ 41.  The other classifications within Nortel were cost plus

entities, at risk entities, and holding companies.  *Id.*  The RPSM divided the participants'

available pooled profits into two main elements: (i) routine profits based on their own direct

earnings from sales to third parties and (ii) the "residual" or remaining profits or losses, treated

as attributable to Nortel's intangible development activities.  NNUK Claim ¶ 35, NNIR Claim ¶

36, NNSA Claim ¶ 42. Both the residual profit entities and the limited risk entities received a

regular return, whereas residual profits or losses were divided among the residual profit entities

only.  *Id.*

    In 2004, NNUK, NNIR, NNSA, NNI, NNL, and certain other Nortel entities entered into

a Master Research and Development Agreement ("MRDA"), which provided the structure for

implementing the RPSM.  NNUK Claim ¶ 39, NNIR Claim ¶ 40, NNSA Claim ¶ 46.  Under the

MRDA, each participant received payment as contemplated by the RPSM in exchange for the

performance of and contribution to research and development activity.  NNUK ¶ 41, NNIR ¶ 42,

NNSA ¶ 48.

### b.  Claimants' Allegations

    The Claimants allege that the RPSM and the MRDA were not arm's length agreements.

NNUK Claim ¶ 47, NNIR Claim ¶ 48, NNSA Claim ¶ 54.  Likewise, the Claimants allege they

played no part in formulating the terms of the MRDA and that they were merely instructed to

sign the MRDA.  Amended Claims ¶ 18.

    The bulk of the Claimants' allegations with respect to transfer pricing are identical.

Namely, the Claimants allege that:

> (i) they received a rate of return that failed to recognize intercompany sales,
> significant customer intangibles, the service element performed alongside the
> distribution function or the risks and costs borne outside the routine return;

10

(ii) they were not fully reimbursed for providing regional central services and other extra-territorial services such as sales and marketing to other companies within Nortel;

(iii) the RPSM model did not reflect the Claimants' high restructuring costs;

(iv) the Claimants incurred losses associated with bad debts arising from vendor financing that NNL required the Claimants to provide to its customers; and

(v) contrary to the MRDA, stewardship costs were not excluded from the calculation of residual profits, so that NNL's and NNI's corporate costs were also allocated to the residual profit entities' pool, even though the EMEA region had its own head office.

NNUK Claim ¶¶ 50-56, NNIR Claim ¶ 49, NNSA Claim ¶¶ 62-67.

NNUK and NNSA make several additional allegations. Specifically, NNUK alleges that NNI facilitated the improper transfer of funds from NNUK for the benefit of NNL by routing payments due to recipient companies under the RPSM through NNL, so that despite book entries for credit due to NNUK, no cash or other liquid assets were transferred to NNUK. The amounts due were converted into an "interest-free loan" to NNL, which NNL "purportedly" repaid in 2007. NNUK Claim ¶¶ 47- 49.

NNSA alleges that it was forced to repay sums it had received in 2001 under the cost-sharing arrangements that preceded the RPSM, making NNSA insolvent on a balance sheet basis as of December 31, 2001. NNSA Claim ¶ 58. NNSA further alleges that it was run as a cost center, incurring substantial and increasing research and development costs for Nortel, the profits of which were funneled to NNL. Id. ¶¶ 59-61.

## 2.  The English Loans and the Irish Loans/Dividends

The Claimants refer to certain non-commercial, interest free, unsecured inter-company loans which were advanced by NNIR and NNUK (the "Irish Loans" and the "English Loans,"

11

respectively) to NNL.  Additionally, they assert that NNIR was compelled to declare certain dividends in favor of NNL (the "Irish Dividends").

In May 2003, NNI and NNL allegedly commenced a strategy to transfer cash to NNL from NNUK, NNIR, and other EMEA entities.  NNUK Claim ¶¶ 22, 57-60.  This effort was allegedly headed by Katherine Stevenson of NNI, along with the assistance of NNI personnel. *Id.*  Likewise, beginning in 2000, NNI and NNL allegedly structured NNIR's affairs so that cash and profit were funneled from NNIR to NNL.  NNIR Claim ¶ 51.  The Claimants allege that from 2000 onward, NNL and NNI set in motion the "Irish Cash Repatriation Strategy," through which NNL became the direct shareholder in NNIR and obtained multiple eight- and nine-figure interest-free loans and dividend payments from NN Ireland.  NNIR Claim ¶¶ 52-56.

Beginning in December 2003, NNL allegedly required NNUK to make the English Loans.  NNUK Claim ¶ 60.  Ms. Stevenson signed the formal agreements for the English Loans in 2003, 2004, and April and December of 2005, and Ryan Smith, another NNI employee, supervised the team managing the use of the loans to allegedly transfer value from NNUK to NNL.  NNUK Claim ¶ 22.  Likewise, beginning in 2006, NNL allegedly began to facilitate the Irish Loans.  NNIR Claim ¶ 53.

Thus, the Claimants allege that NNI, together with NNL, exerted sufficient control over NNUK and NNIR to extend, renew, and enlarge the English and Irish Loans.  NNUK Claim ¶¶ 65-68, NNIR Claim ¶¶ 60-65.

### 3. NNSA's Subordinated Loan

In September 2002, NNL and NNSA entered into a subordinated loan agreement (the "NNSA Subordinated Loan"), under which NNL agreed to make a loan facility of €200 million available to NNSA.  No repayment date was stipulated in the loan agreement, which provided

that (i) the amounts owed by NNSA were subordinated to the prior repayment of any existing and future secured and unsecured creditors of NNSA, and (ii) NNSA would not pay interest unless it was profitable.  NNSA Claim ¶ 70.

In December 2003, NNL converted €150 million of the subordinated loan into share capital in NNSA, leaving €50 million outstanding under the loan agreement.  *Id.* ¶ 71.  NNSA continued to struggle financially through 2008, turning a profit in only two years, 2003 and 2005, while mounting substantial losses in the other years.  *Id.* ¶ 72.

### 4.  Project Swift and the NNSA February 2008 Repayment

The Claimants refer to the Project Swift transaction ("Project Swift"), a December 2007 corporate restructuring within Nortel, in which certain allegedly illiquid and undervalued company shares were transferred to NNUK.

As a result of the English Loans, NNL's outstanding loan balance to NNUK reached $950 million (£467 million) by late 2007.  NNUK Claim ¶ 69.  NNL and NNI allegedly devised a plan to satisfy the loan balance by making a paper transfer from NNL to NNUK of all the shares of NNL's Dutch subsidiary, Nortel Networks International Finance Holdings BV ("NNIF"), through which NNL held the shares of each of the EMEA Companies (except NNSA and NNIR).  *Id.* ¶ 71.  Thus, a price of $628.9 million was applied to NNUK's purchase of NNIF, which NNUK paid by discharging the corresponding amount of debt owed by NNL to NNUK under the revolving loan agreement.  *Id.* ¶ 72.  As a result of this transaction, NNUK was allegedly put in a materially worse position in insolvency than if it had received repayment in cash of the outstanding receivable.  *Id.* ¶¶ 24, 74, 75, 78.

Beginning in January 2008, a team of NNI personnel allegedly discussed a plan for NNSA to repay the entire €50 million outstanding on the NNSA Subordinated Loan.  NNSA's

controller was hesitant to make the repayment because NNSA's financial position was uncertain. It was agreed, instead, that NNSA would repay half of the outstanding amount in February 2008 and the other half later in 2008 (the "February 2008 Repayment").  NNSA Claim ¶ 75.  NNSA therefore made a €25 million cash repayment in February 2008.  NNSA Claim ¶ 76.  This repayment was not approved by NNSA's Board.  *Id.* ¶¶ 78-79.

### 5. Sale Proceeds from Pre-Petition Business Activity

Prior to the Petition Date, NNUK entered into several global business transactions with other Nortel entities, including NNI, whereby a particular business line was sold by those Nortel entities to a third party purchaser.  NNUK Claim ¶ 79, NNIR Claim ¶ 66, NNSA Claim ¶ 80. These transactions included the sale in December 2006, of Nortel's UMTS business to Alcatel Lucent S.A. ("Alcatel") for an adjusted purchase price of approximately $291 million.  NNUK Claim ¶ 79.  Allocation of the sale proceeds was attempted in conformity with the transfer pricing structure.  *Id.* ¶¶ 80-81.  However, the Claimants allege that at the direction of Nortel's North American leadership, the Claimants received significantly less and NNI received significantly more than each would have received on an arm's length basis.  NNUK Claim ¶ 82, NNIR Claim ¶ 69, NNSA Claim ¶ 83.

### 6. Tax Matters

The Claimants allege that their tax affairs were controlled by NNI and NNL, particularly with respect to transfer pricing.  Thus, to the extent that any revenue authority makes a claim against the Claimants in connection with any failure to pay the appropriate level of tax, the Claimants allege that NNI and NNL would be responsible for any resulting penalties, interest or other loss payable by NNUK, NNIR, or NNSA ("Contingent Tax Liability").  NNUK Claim ¶¶ 84-85, NNIR Claim ¶¶ 71-72, NNSA Claim ¶¶ 84-85.

14

### 7. FSD Proceedings

On June 25, 2010, the Determinations Panel ("DP") of the UK Pensions Regulator ("UK Regulator") determined that a Financial Support Direction ("FSD") requiring the provision of financial support to the NNUK pension plan should be issued with respect to certain EMEA entities, including NNIR and NNSA, and NNI.   NNUK Claim ¶¶ 73-75.   Pursuant to an application by the UK Regulator, the Upper Tribunal (Tax and Chancery Chamber) issued directions on February 3, 2011, confirming that the UK Regulator can issue FSDs against NNI. *Id.* ¶ 75.   In deciding whether it is reasonable to impose the requirements of an FSD on a particular person, the UK Regulator is required to consider, where relevant: (i) the relationship the person has or had with the sponsoring employer of the pension scheme in question (including, where the person is a company, whether the person has or had control of the employer); (ii) the value of any benefits received directly or indirectly by the person from the employer; (iii) any connection or involvement the person has or had with the scheme; and (iv) the financial circumstances of the person. *Id.* ¶ 77.

The principal effect of an FSD is to require the persons to whom it is issued to secure and maintain financial support for the pension scheme at issue. *Id.* ¶ 78.   In the event of non-compliance with an FSD, the UK Regulator has power to issue a contribution notice ("CN") requiring the person to whom the FSD was issued to pay the trustees or managers of the pension scheme, where is it reasonable to impose such liability. *Id.* ¶ 79.

The Claimants assert that to the extent that NNIR or NNSA are ultimately required to make a payment pursuant to an FSD or CN, NNIR or NNSA would be entitled to recover from NNI based on the extent of NNI's responsibility for NNIR's or NNSA's financial condition

15

("Contingent FSD Liability").    NNIR Claim ¶¶ 194-95, NNSA Claim ¶¶ 178-180.    Under

Section 40(8) of the UK Pensions Act 2004, a CN can be imposed on a joint and several basis.

## CLAIMS

The following charts are useful for understanding the causes of action of each of the

Claimants.

**The Amended Claims and Applicable Law[9]**

| NNUK Claim | | | |
|---|---|---|---|
| Claim number | Supporting law | Nature of claim | Factual predicate |
| 2 | English Law | Breach of fiduciary duty | Transfer pricing |
| 3 | English Law | Breach of duty of care | Transfer pricing |
| 4 | English Law | Dishonest Assistance | Transfer pricing |
| 5 | English Law | Unlawful Means Conspiracy | Transfer pricing |
| 6 | U.S. Law | Aiding and abetting breach of fiduciary duty | Transfer pricing |
| 7 | U.S. Law | Civil Conspiracy | Transfer pricing |
| 8 | English Law | Breach of fiduciary duty | English loans |
| 9 | English Law | Breach of duty of care | English loans |
| 10 | English Law | Dishonest Assistance | English loans |
| 11 | U.S. Law | Civil Conspiracy | English loans |
| 12 | English Law | Unlawful Means Conspiracy | English loans |
| 13 | U.S. Law | Aiding and abetting breach of fiduciary duty | English loans |
| 14 | English Law | Unconscionable Receipt | English loans |
| 15 | U.S. Law | Unjust enrichment | English loans |
| 16 | English Law | Breach of fiduciary duty | Project Swift |
| 17 | English Law | Breach of duty of care | Project Swift |
| 18 | English Law | Dishonest Assistance | Project Swift |

---

[9]  The Motions omit reference to the first claim in each of the Amended Claims, dealing with intercompany trading debts.  The Movants have reserved their rights with respect to these claims.

| NNUK Claim (cont'd) | | | |
|---|---|---|---|
| Claim number | Supporting law | Nature of claim | Factual predicate |
| 19 | English Law | Unlawful Means Conspiracy | Project Swift |
| 20 | U.S. Law | Aiding and abetting breach of fiduciary duty | Project Swift |
| 21 | U.S. Law | Civil Conspiracy | Project Swift |
| 22 | English Law | Unconscionable Receipt | Project Swift |
| 23 | U.S. Law | Unjust enrichment | Project Swift |
| 24 | Not specified | Implied Contract | Past business sales |
| 25 | Not specified | Implied Term | Past business sales |
| 26 | English Law | Mistake | Past business sales |
| 27 | English Law | Transaction at Undervalue | Past business sales |
| 28 | English Law | Breach of fiduciary duty | Past business sales |
| 29 | English Law | Knowing Receipt | Past business sales |
| 30 | English Law | Breach of duty of care | Past business sales |
| 31 | U.S. Law | Aiding and abetting breach of fiduciary duty | Past business sales |
| 32 | English Law | Breach of fiduciary duty | Contingent tax liability |
| 33 | English Law | Breach of duty of care | Contingent tax liability |
| 34 | U.S. Law | Aiding and abetting breach of fiduciary duty | Contingent tax liability |
| 35 | English Law | Dishonest Assistance | Contingent tax liability |

| NNIR Claim | | | |
|---|---|---|---|
| Claim number | Supporting law | Nature of claim | Factual predicate |
| 2 | Irish Law | Breach of fiduciary duty | Transfer pricing |
| 3 | Irish Law | Breach of duty of care | Transfer pricing |
| 4 | Irish Law | Dishonest assistance | Transfer pricing |
| 5 | Irish Law | Conspiracy | Transfer pricing |
| 6 | U.S. Law | Aiding and abetting breach of fiduciary duty | Transfer pricing |
| 7 | U.S. Law | Civil conspiracy | Transfer pricing |
| 8 | Irish Law | Breach of fiduciary duty | Intercompany loans and dividends |

17

| NNIR Claim (cont'd) | | | |
|---|---|---|---|
| Claim number | Supporting law | Nature of claim | Factual predicate |
| 9 | Irish Law | Breach of duty of care | Intercompany loans and dividends |
| 10 | Irish Law | Dishonest assistance | Intercompany loans and dividends |
| 11 | Irish Law | Unconscionable receipt | Intercompany loans and dividends |
| 12 | Irish Law | Conspiracy | Intercompany loans and dividends |
| 13 | U.S. Law | Aiding and abetting breach of fiduciary duty | Intercompany loans and dividends |
| 14 | U.S. Law | Civil conspiracy | Intercompany loans and dividends |
| 15 | U.S. Law | Unjust enrichment | Intercompany loans and dividends |
| 16 | Not specified | Implied contract | Past business sales |
| 17 | Not specified | Implied term | Past business sales |
| 18 | Irish Law | Breach of fiduciary duty | Past business sales |
| 19 | Irish Law | Breach of duty of care | Past business sales |
| 20 | Irish Law | Mistake | Past business sales |
| 21 | Irish Law | Unconscionable receipt | Past business sales |
| 22 | Not specified (English or Irish Law) | Transaction at undervalue / Fraudulent disposition | Past business sales |
| 23 | U.S. Law | Aiding and abetting breach of fiduciary duty | Past business sales |
| 24 | Irish Law | Breach of fiduciary duty | Contingent tax liability |
| 25 | Irish Law | Breach of duty of care | Contingent tax liability |
| 26 | Irish Law | Dishonest assistance | Contingent tax liability |
| 27 | U.S. Law | Aiding and abetting breach of fiduciary duty | Contingent tax liability |
| 28 | English, Irish, or U.S. Law | Contribution | Contingent FSD liability |
| 29 | English, Irish, or U.S. Law | Unjust enrichment and/or subrogation | Contingent FSD liability |
| 30 | English, Irish, or U.S. Law | Subrogation | Contingent FSD liability |
| 31 | English, Irish, or U.S. Law | Obligation to repay | Contingent FSD liability |

18

| NNSA Claim | | | |
|---|---|---|---|
| **Claim number** | **Supporting law** | **Nature of claim** | **Factual predicate** |
| 2 | French | Mismanagement | Transfer pricing |
| 3 | French | Claim in tort | Transfer pricing |
| 4 | U.S. Law | Aiding and abetting breach of fiduciary duty or tortious conduct | Transfer pricing |
| 5 | U.S. Law | Civil Conspiracy | Transfer pricing |
| 6 | French | Mismanagement | February 2008 repayment and Project Swift |
| 7 | French | Claim in tort | February 2008 repayment and Project Swift |
| 8 | U.S. Law | Aiding and abetting breach of fiduciary duty or tortious conduct | February 2008 repayment and Project Swift |
| 9 | U.S. Law | Civil Conspiracy | February 2008 repayment and Project Swift |
| 10 | Not specified | Implied Contract | Past business sales |
| 11 | Not specified | Implied Term | Past business sales |
| 12 | Not specified | Mistake | Past business sales |
| 13 | French | Mismanagement | Past business sales |
| 14 | French | Claim in tort | Past business sales |
| 15 | U.S. Law | Aiding and abetting breach of fiduciary duty or tortious conduct | Past business sales |
| 16 | French | Mismanagement | Contingent tax liability |
| 17 | French | Claim in tort | Contingent tax liability |
| 18 | U.S. Law | Aiding and abetting | Contingent tax liability |
| 19 | U.S. and French | Contribution | Contingent FSD Liability |
| 20 | U.S. and French | Recoupment, contribution, and/or unjust enrichment | Contingent FSD Liability |
| 21 | U.S. and French | Subrogation | Contingent FSD Liability |
| 22 | U.S. and French | Obligation to repay | Contingent FSD Liability |

## PARTIES' ARGUMENTS AND DISCUSSION

### A. Application of the Motion to Dismiss Standard to the Proofs of Claim

The Movants argue that the Amended Claims should be tested under the federal civil pleading requirements. They advance judicial economy and preservation of estate resources as reasons for applying the federal standards to "winnow" the Amended Claims and promote efficiency in the claims process. Specifically, the Movants request that the Court exercise its discretionary power under Bankruptcy Rule 9014(c)[10] to apply Bankruptcy Rule 7012 to the claims. Bankruptcy Rule 7012 makes Federal Rule of Civil Procedure 12(b)(6) applicable to adversary proceedings and provides for dismissal of a complaint that fails to state a claim upon which relief can be granted. In support of this argument, the Movants cite numerous cases and rely heavily on *Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.)*, 398 B.R. 736 (S.D.N.Y. 2008). There, the district court upheld the bankruptcy court's disallowance of a series of proofs of claim filed against the debtor relating to the alleged contamination and remediation of an industrial site. Nine years after the alleged contamination occurred, the debtor became the direct corporate parent of the company that owned the industrial site. On the basis of the remote connection between the contamination that allegedly caused the harm forming the basis for the proofs of claim and the debtor's ascendance as parent company, the bankruptcy court dismissed the claims.

---

[10] Rule 9014(c) provides in relevant part: "The court may at any stage in a particular matter direct that one or more of the other rules in Part VII shall apply. The court shall give the parties notice of any order issued under this paragraph to afford them a reasonable opportunity to comply with the procedures prescribed by the order." Here, Movants arguments to the contrary, the Movants request and the Court did not give notice that it would apply the Rule 12(b) standards. The Movants citation to the record establishes that no one discussed a Rule 12(b)(6) motion.

The Claimants object to this argument on the basis of the district court's observation that "[t]he parties agree that dismissing a proof of claim pursuant to 11 U.S.C. § 502(c) is equivalent to dismissing a claim under Fed.R.Civ.P. 12(b)(6)." *In re Alper Holdings USA, Inc.*, 398 B.R. 736, 748 (S.D.N.Y. 2008). The Claimants' point is that *Alpers* is distinguishable because the parties there, unlike here, were in agreement on the proper standard for considering the proofs of claim at issue.[11]

The Movants finally contend that under the relevant pleading standards for a motion to dismiss, the Amended Claims fail. The Claimants argue that even if the Court applied the motion to dismiss standard to the Amended Claims, they would withstand scrutiny. As explained below, the Court will apply the more rigorous Rule 12(b) measure.

While the Code and Rules do not explicitly analogize proofs of claim to complaints in civil actions, most courts have gone so far as to apply the federal pleading standards to proofs of claim. See *e.g.*, *In re G-1 Holdings, Inc., 443 B.R. 645, 655 (Bankr. D.N.J. 2010); In re DJK Residential, LLC*, 416 B.R. 100, 106–07 (Bankr. S.D.N.Y.2009); *In re Adelphia Comm'cns Corp.* 359 B.R. 54, 56 n.5 (Bankr. S.D.N.Y. 2006). Other courts, including the U.S. Court of Appeals for the Third Circuit, have not imposed the federal pleading standards on those seeking to file proofs of claim, "requiring simply that a proof of claim 'allege facts sufficient to support the claim' without mentioning notice or any other standard by which sufficiency might be determined." *In re marchFirst, Inc.*, 431 B.R. 436, 443 (Bankr. N.D.Ill. 2010), citing *In re Allegheny, Intern., Inc.*, 954 F.2d 167 (3d Cir. 1992).

---

[11] Likewise, the Claimants highlight another case that the Movants cite, *In re Spiegel, Inc.*, 337 B.R. 821 (Bankr. S.D.N.Y. 2006), for the proposition that the bankruptcy court applied Fed.R.Civ.P. 12(b)(6) only because the claims at issue stemmed from complaints, attached to the proofs of claim, filed in parallel state court proceedings, and the fact that both parties wanted the court to address the merits of the claims.

As noted above, the Movants have urged the Court to dismiss the Amended Claims as insufficient applying federal pleading standards.  While, it is clear that in the Third Circuit, the *Allegheny* standard is the rule, the present circumstances are highly unusual, even unique.  As noted earlier, Claimants filed when Movants requested and the Court ordered the Amended Claims with more definite statements.   The Amended Claims are in every sense in the familiar format of a complaint, including separate counts and prayers for relief.

The Court will therefore treat the Amended Claims as a Complaint.  Accordingly, the Court will apply the pleading standards under F.R. Civ. P. 12(b)(6) which requires "sufficient factual material, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009); and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The Third Circuit has prescribed a three step analysis: (1) identify the elements of the claim, (2) ignore conclusory allegations, and (3) evaluate the allegations for step (1) sufficiency.  *Mallens v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

### B.  Application of Rule 9(b)'s Particularity Requirement to the Claims

The Movants mount a second procedural attack, application of Fed.R.Civ.P. 9(b)'s particularity requirement, on a number of the claims within the Amended Claims.  Fed.R.Civ.P. 9(b) requires parties to state with particularity the circumstances constituting fraud or mistake.  Rule 9(b) is made applicable to adversary proceedings by Bankruptcy Rule 7009 and is also directly applicable to contested matters via Bankruptcy Rule 9014(c).

While the Claimants do not specifically plead fraud, the Movants contend that "the requirements of [Rule 9(b)] apply to all cases where the gravamen of the complaint is fraud even though the theory supporting the claim is not technically termed fraud." *Toner v. Allstate Ins. Co.*, 821 F.Supp. 276, 283 (D. Del. 1993).  Moreover, they argue that where a claim is based on

an underlying fraud that enables a party to "exploit and loot the debtor for [the defendants'] own purposes," that claim must be stated with particularity in accordance with Rule 9(b).  *Forman v. Salzano (In re Norvergence, Inc.*), 405 B.R. 709, 747 (Bankr. D. N.J. 2009).

The Movants contend that by asserting that the Transfer Pricing and Pre-Petition Asset Sale were not negotiated at arm's length, the Claimants are invoking a "badge of fraud" - a type of allegation that Movants argue courts routinely consider in inferring fraudulent intent. *Adamson v. Bernier (In re Bernier)*, 282 B.R. 773, 781 (Bankr. D. Del. 2002) ("whether the transaction is conducted at arm's length" is a factor indicative of an intent to defraud).

Consequently, the Movants assert that most of NNUK's claims (claims 2, 4-7, 8, 10-13, 16, 18-21, 26, 28, 31-32, and 34-35); most of NNIR's claims (claims 2, 4-8, 10, 12-14, 18, 20, 23-24, and 26-27); and a number of NNSA's claims (claims 3-5, 7-9, 12, 14-15) invoke Rule 9(b)'s specificity requirements, as well as Rule 8(a)'s plausibility test.

The Claimants respond by asserting that the Amended Claims do not sound in fraud and therefore Rule 9(b)'s particularity requirement does not apply.  Alternatively, the Claimants posit that the Amended Claims are pleaded with particularity sufficient to satisfy Rule 9(b) and, additionally, that the pleading standard under Rule 9(b) would have to be relaxed for the Claimants as outside third parties to the transaction at issue, similar, the Claimants argue, to trustees in bankruptcy.

The Court is satisfied that the Amended Claims do not sound in fraud but, rather, breach of fiduciary duty.  Claimants disavow any claim of fraud.  The Court is also of the view that it is appropriate to treat the fraud claims with "flexibility," especially when the claimant, as here, serves as a trustee and was absent when the alleged fraud occurred.  *See*, *e.g.*, *Pardo v. Avanti Corp. Health Sys., Inc.* (*In re APF Co.*), 274 B.R. 634, 638 (Bankr. D. Del 2001).

23

Especially in bankruptcy cases, where the plaintiff is a trustee acting on behalf of the estate or a group of creditors, courts apply Rule 9(b) with greater flexibility since the trustee lacks knowledge or has only second hand knowledge of prepetition fraudulent acts involving he debtor and third parties.   Accordingly, the Court declines Movants' invitation to apply the heightened standards of Rule 9(b).   Were Rule 9(b) applicable, the Court would find that Claimants satisfied the Rule 9(b) pleading standards.

## DISPOSITION OF AMENDED CLAIMS

### A.  Application of Foreign Law

The majority of the claims that the Claimants assert arise under foreign law, i.e., English, Irish and French law.  Therefore, to prevail on the Objections, the Movants must offer proof of English, Irish, and French law sufficient to negate the prima facie validity of the claims. [12] Federal Rule of Civil Procedure 44.1, made applicable here by Bankruptcy Rule 9017, governs determinations of foreign law and provides in relevant part:  "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.   The court's

---

[12] A properly filed claim is prima facie valid and deemed allowed unless a party in interest objects, at which point the court must determine the amount of the claim to be allowed.  See 11 U.S.C. § 502(a), (b); Fed. R. Bankr.P. 3001(f).  Case law, however, provides a "gloss" on that foundation.  *In re marchFirst, Inc.*, 431 B.R. 436, 443 (Bankr. N.D.Ill. 2010).  The seminal case in the Third Circuit on the burden shifting analysis involved in considering objections to proofs of claim is *In re Allegheny Int'l, Inc.* 954 F.2d 167, 173 (3d Cir. 1992).  The burden of proof related to claims and claims' objections "shifts between the proponent of, and objector to, a claim."  *In re Smurfit-Stone Container Corp.*, 444 B.R. 111, 117 (Bankr. D.Del. 2011), citing *Allegheny*, 954 F.2d at 173.   Once a party in interest objects to a claim, the objector must "produce sufficient evidence [to] discredit[] at least one of the allegations essential to the claim's legal sufficiency."  *Id*., citing *Allegheny*, 954 F.2d at 173-4.  Should the objector succeed in producing such evidence, "the burden to demonstrate an entitlement to payment on its claim shifts back to the claimant."  *Id*., citing *Allegheny*, 954 F.2d at 174.  The burden of persuasion is always on the claimant.  *Allegheny*, 954 F.2d at 173-4.

determination must be treated as a ruling on a question of law." Fed. R. Civ. P. 44.1; Fed. R. Bankr. P. 9017; but see *Bodum USA, Inc. v. Law Cafetiere, Inc.*, 621 F.3d 624, 628-29 (7th Cir. 2010) (noting that courts may engage in their own research under Rule 44.1 and encouraging courts to do so where foreign law is widely available in English).

This Court's role under Rule 44.1 is to determine foreign law as currently applied by English, Irish, and French courts. *See Gilstrap v. Radianz Ltd.*, 443 F. Supp. 2d 474, 491 (S.D.N.Y. 2006), aff'd, 233 F. App'x 83 (2d Cir. 2007) ("Though the federal courts are called upon not infrequently to apply the laws of other nations, they should be more hesitant to engage in such a task when doing so would necessarily involve expanding, extending, or departing from well-settled and long established principles of foreign law."); See also *Licci v. Am. Express Bank Ltd.*, 704 F. Supp. 2d 403, 410 (S.D.N.Y. 2010) (expert's mere "prediction of the Israeli courts' willingness to more broadly interpret the law," did not establish existence of actual conflict in law of negligence between Israel and New York). As discussed within, to sustain the breach of fiduciary duty claims would require the Court to extend foreign law.

### B. Foreign and U.S. State Substantive Law Claims – Primary Liability

### 1. Breach of Fiduciary Duty - English Law (NNUK Claims 2, 8, 16, 28, and 32)

The Movants argue that NNUK has failed to plead a plausible claim that NNI was a director under English law, precluding any recovery under a theory of breach of fiduciary duty. NNUK argues that it has pleaded facts sufficient to establish that NNI was a *de facto* or shadow director of NNUK and that it has stated a claim for a corresponding breach of fiduciary duty.

The parties dispute the proper test under English law for establishing *de facto* directorship. The Movants argue that the Claimants must show that the prospective *de facto* director (a) occupied a place in the corporate governance structure of the company; or (b) that he

or she undertook functions in relation to the company that could only be undertaken by its director.  Todd Decl. ¶ 39.  The Claimants argue that this test both narrows and misstates the law.  Marshall Decl. ¶¶ 21.1, 21.2.  The Claimants' expert, Phillip Marshall, cites to *Holland v Revenue & Customs Commissioners* [2011] 1 All ER 373, as the most recent and highest authority on the subject of *de facto* directors and from which he extrapolates the "essential issue" – whether what the person actually did means that he can be treated as having assumed a role "sufficient to impose on him" the relevant duty and make him responsible for the misuse of the company's assets.  Marshall Decl. ¶¶ 18, 21.1.  Because of the difficulties inherent in defining "corporate governance" and identifying what functions are in essence the sole responsibility of a director, the Claimants argue that this Court should apply a broader test: whether looking at all the acts alleged to be performed by NNI, it assumed a role sufficient to impose a fiduciary duty on NNI.  Marshall Decl. ¶ 21.1.

The Movants argue that under English law, although a corporation can be a *de facto* or shadow director, because a corporation can only act through its agents, NNUK must ultimately show that individuals were acting within the scope of their employment and authority at NNI in order to impute that conduct to NNI and rely on it as the basis of a claim of shadow or *de facto* director.  Todd Decl. ¶¶ 41, 50.  Moreover, Movants' English law expert, Michael Todd, did not encounter any English authority that has found that one subsidiary company is a *de facto* director of another subsidiary.  *Id.* ¶ 43.  Todd likewise did not locate any English authority that has held a sister corporation to be a shadow director of its affiliate. *Id.* ¶ 65.

Both English law experts agree that the central inquiry for determining shadow directorship is "whether [NNI] exercised real influence in the corporate affairs of NNUK."  Marshall Decl. ¶ 29, Todd Reply Decl. ¶ 26.  Under section 251(3) of the Companies Act 2006,

parent companies receive a degree of protection against shadow directorship claims by its subsidiaries where the sole reason for imposing liability is that its subsidiary is accustomed to act in accordance with its instructions or directions.  Todd Decl. ¶ 47, Marshall Decl. ¶ 32.2.2.  Both experts agree that there need be "something more" in the conduct of a parent company to take it outside that statutory provision's protection.  Todd Reply Decl. ¶ 26, Marshall Decl. ¶ 30.  The experts disagree, however, on whether this same protection may be afforded to a sister company that imposes directions on another subsidiary.  Todd Reply Decl. ¶ 28, Marshall Decl. ¶ 30.  Todd asserts that the rationale for protecting a parent company against shadow directorship liability should apply with equal force here, where NNUK's sole basis for attempting to impose liability on NNI, according to the Movants, is that NNI was acting on instructions from NNL.  Todd Reply Decl. ¶ 28.  In other words, because NNL itself would be shielded by section 251(3) because it instructed a subsidiary who then instructed another subsidiary, NNI should also be shielded from liability.  *Id.*  Marshall, by contrast, argues that NNI exerted sufficient control over the operations and business of NNUK so as to establish the "something more" needed for a finding of shadow directorship.

The English law experts also disagree on whether fiduciary duties are imposed on shadow directors.  Todd asserts that a case Marshall relies on to establish this proposition, *Yukong Line of Korea Ltd v. Rendsburg Corp Investments of Liberia Inc.* [1998] 1 WLR 294, is either "wrong as a matter of English law" or that the judge in that case mistakenly used the term "shadow director" and was actually referring to *de facto* directorship.   Todd Reply Decl. ¶¶ 33 – 40.  Marshall similarly asserts that the case Todd relies on, *Ultraframe UK Ltd v. Fielding* [2005] EWHC 1638, to establish that shadow directors do not have fiduciary duties imposed on

them, "was wrongly decided" and "does not create binding precedent under English law." Marshall Decl. ¶ 32.

The Movants further argue that NNUK's failure to adequately plead insolvency (Todd Reply Decl. ¶ 58)[13] subjects this claim to the defense of ratification.  Under this defense, the directors of a solvent subsidiary company of a parent can act with regard to the interests of the parent and seek to further the interests of the parent company, to the detriment of the subsidiary company, so long as such acts are approved or ratified by the parent.  Todd Decl. ¶ 90.

In response, NNUK raises an argument about bars to ratification. It states that ratification may not be possible where the transaction amounts to an unlawful distribution or an unlawful return of capital.  Marshall Decl. ¶ 35.  Accordingly, NNUK asserts that "the allegations in the Claim essentially involve an allegation of the provision of economic benefits by a subsidiary to its parent and in the circumstances the principles relating to unlawful return of capital and distribution may be engaged."  *Id.*

### 2.  Breach of Fiduciary Duty - Irish Law (NNIR Claims 2, 8, 16, and 24)

The Movants argue that NNIR has failed to plead a plausible claim that NNI was a director under Irish law, precluding any recovery under a theory of breach of fiduciary duty. NNIR argues that it has plead facts sufficient to establish that NNI was a *de facto* or shadow director of NNIR and that it has stated a claim for a corresponding breach of fiduciary duty.

As a preliminary matter, the Movants' Irish law expert, Aidan Redmond, disagrees with

---

[13]    The Movants set forth two tests for determining insolvency and conclude that NNUK's insolvency argument fails under either formulation.  In sum, the Movants argue that "(i) the Amended Proof of Claim does not allege sufficient facts which (if proven at trial) could establish the insolvency of NNUK at the time of any of the impugned transactions, either applying the "cash-flow insolvency" test under section 123(1)(e) of the Insolvency Act 1986 or the "balance sheet insolvency" test under section 123(2) of the Insolvency Act 1986."  Todd Reply Decl. ¶ 58.

the Claimants' Irish law expert, John Hennessy, on the weight that English precedent should be given in evaluating these breach of fiduciary duty claims. Redmond Reply Decl. ¶¶ 3-4. Redmond cites to *In Re Lynrowan Enterprises Limited* [2002] IEHC 90 (31 July 2002, Unreported, High Court, O'Neill J.), which lists several circumstances under which *de facto* directorship can be established: (1) where there is clear evidence that that person has been either the sole person directing the affairs of the company; or (2) is directing the affairs of the company with others equally lacking in valid appointment; or (3) where there were other validly appointed directors, that he was acting on an equal or more influential footing with the true directors in directing the affairs of the company. Redmond Decl. ¶ 13. Hennessy argues that the characteristics of *de facto* directorship listed in the Redmond Declaration are not directly applicable to a situation where a company has acted in the manner of a director. Hennessy Decl. ¶ 30.

Rather, Hennessy argues that in light of the recent English authority of *Re Mea Corporation Limited; Secretary of State for Trade and Industry v Aviss & Others* [2007] 1 BCLC618 and *Revenue and Customs Commissioners v. Holland* [2010] J 1 WLR 2793, an Irish court determining whether a person acted as a *de facto* director or a shadow director (or both) would consider a number of factors including the extent to which a person exercised influence in the corporate affairs of a company. Hennessy Decl. ¶ 30. Hennessy observes that "where there is no authority of an Irish court on a specific matter, decisions on the issue by the courts of England and Wales will be regarded as persuasive and, unless distinguishable, will normally be followed by an Irish court." Hennessy Decl. ¶ 7. Redmond argues that this reliance on English law goes too far. Redmond Reply Decl. ¶ 4. Redmond asserts that English law is regarded as

persuasive rather than dispositive. *Id.* ("It would be a very rare thing indeed to uncover a U.K. precedent, indistinguishable as to fact, argument or precedent from an Irish case.").

Under the same recent English authority, Hennessy argues that a company can be a *de facto* director under Irish law (Hennessy Decl. ¶¶ 30-31), that an Irish court would no longer maintain the distinctions between *de facto* and shadow directors (Hennessy Decl. ¶¶ 16-17), and that a shadow director would owe the same fiduciary duties to a company that a *de facto* director owed (Hennessy Decl. ¶¶ 18-20). The Movants take issue with each of these assertions.

First, Redmond argues, no Irish decision has ever held a corporation to be a *de facto* director. Redmond Decl. ¶¶ 12, 15. Instead, he argues that the 1963 Companies Act defines *de jure* directors, and expressly excludes corporate entities from the definition. *Id.* In particular, section 176 of the Act states that "[a] company shall not, after expiration of 3 months of the operative date, have as a director of the company a body corporate." Redmond Reply Decl. ¶ 9. English law contains no analog to Section 176 of the 1963 Companies Act. Redmond Reply Decl. ¶ 9. The Movants argue that because English law does allow companies to serve as *de jure* directors, any reliance on English law in considering these claims is inappropriate. *Id.* ¶ 20. Second, the Movants assert, contrary to NNIR's position, that there is no "functional overlap" between the concepts of *de facto* and shadow directors. Redmond Reply Decl. ¶¶ 8-10. Redmond points to the 2009 decision of *Moorview Development & Others v. First Active PLC & Others* [2009] IEHC 214, in which the Irish High Court applied the principles set forth in the 1994 English case *Re Hydrodam Limited* [1994] 2 BCLC 180, 184, [1994] BCC 1961, in which the court said: "The terms do not overlap. They are not alternatives and in most and perhaps all cases are mutually exclusive." Redmond Reply Decl. ¶ 18. *Moorview* was decided after one of the two English precedents upon which NNIR's expert relies, *Re Mea Corp.*, and no Irish court

has applied the second cited English case, *Revenue Customs Commissioners v. Holland*. Redmond Reply Decl. ¶ 25.  Therefore, the Movants argue that it is undisputed that under the current state of Irish law, the concepts of *de facto* and shadow directors are distinct.

Third, the Movants argue that under settled Irish law, shadow directors do not owe the full range of fiduciary duties.  Redmond Decl. ¶ 23.  Under Irish law, the Movants argue, shadow directors are creatures of statute (under Section 27 of the 1990 Companies Act) and therefore only have those duties set forth by statute.  *Id.*; Redmond Reply Decl. ¶ 26.  Thus, according to the Movants, even if NNI were deemed to be a shadow director of NNIR, NNIR's claim for breach of fiduciary duty would still fail.

### 3.  Mismanagement – French Law (NNSA Claims 2, 6, 13, and 16)

The Movants assert that NNSA has not pleaded facts to support a plausible inference that NNI dominated NNSA such that NNI became its *de facto* director, fatally undermining NNSA's mismanagement claims.  NNSA argues that it has stated a claim for mismanagement under article L. 651-2 of the French Commercial Code by asserting that NNI, as the *de jure* or *de facto* directors of NNSA, committed acts of mismanagement which contributed to the company's insufficiency of assets.  Menjucq Decl. ¶ 24.

The Movants argue that NNSA has not cited a single French case finding a company to be a *de facto* director of its sister company.  Menjucq Decl. ¶ 39, 42; Bremond Reply Decl. ¶ 7. The parties agree that to succeed on a mismanagement claim under French law a claimant must prove that the person sued is a *de jure* or *de facto* director, the latter of which is shown by the performance of positive acts of management independently and continuously.  Menjucq Decl. ¶ 24, 30; Bremond Reply Decl. ¶¶ 5-6.  NNSA asserts that the "most important criterion" in the *de facto* director inquiry is "the performance of predominant influence through the performance of

31

acts of management as would a *de jure* director." Menjucq Decl. ¶ 32.   NNSA then points to the involvement of individuals in global positions who also held a role with NNI in tax, transfer pricing, and treasury functions, and to NNI's alleged role in the February 2008 repayment and the Pre-Petition Business Sales, as purportedly sufficient to establish NNI's "predominant influence" over NNSA – and, thus, *de facto* directorship of NNSA.

The Movants argue that in order for a French court to find that a party engaged in positive acts of management such that he became a *de facto* director, his acts must have reduced the decision-making independence of the debtor company's *de jure* directors such that the alleged *de facto* director dominated the debtor company.  Bremond Decl. ¶ 32; Bremond Reply Decl. ¶ 8.  Although French courts use a variety of terms to describe the management acts that ultimately rise to the level of *de facto* directorship – for example, "total subordination," "strict control," and "dependence and submission" – the Movants assert that each requires that the *de facto* director dominate the debtor.  Bremond Reply Decl. ¶ 8 (citing French cases).

In determining the necessary level of influence to establish *de facto* directorship, NNSA argues that French courts apply the "bundle of concurring elements" technique.  Menjucq Decl. ¶ 47.   NNSA argues that Bremond incorrectly examines each fact alleged by the Joint Administrators individually, and in isolation, to conclude that NNI was not a *de facto* director. *Id.* ¶ 48.  Instead, Menjucq argues, French courts conduct a global analysis and consider all of the elements in the aggregate when determining whether a party has the status of a *de facto* director.  *Id.*  ¶ 49.  Employing this analysis, NNSA asserts that it has made out a claim for mismanagement under French law.

### 4.  Duty of Care - English Law (NNUK Claims 3, 9, 17, 30, and 33)

NNUK argues that NNI owed it an "independent" duty of care.  However, the Movants

argue that where a claimant alleges solely economic loss, English law has imposed a duty of care

only in specific contexts, where the parties are in sufficient "proximity" – such as professional

services, employment, or landlord-tenant relationships. Todd Decl. ¶¶ 79-80; Marshall Decl. ¶

39.  Moreover, the Movants assert that they have found no English case imposing a duty of care

as between companies in a group.  See Todd Decl. ¶ 79-80; Marshall Decl. ¶ 39.  To do so, the

Movants argue, would be tantamount to asking this Court to announce an expansion of existing

English law.  Marshall Decl. ¶ 39.1.  NNUK asserts that it has established a relationship of

sufficient proximity to establish a duty of care.

### 5.  Duty of Care - Irish Law (NNIR Claims 3, 9, 19, and 25)

NNIR, like NNUK, asserts that NNI owed it a general duty of care based on a

relationship of "proximity."  The Movants argue that no Irish court ever has imposed a general

duty of care where the harm alleged is solely economic and between affiliates.  The Movants

argue that Irish Supreme Court has made clear that it has not yet decided whether economic loss

is recoverable for negligence outside a handful of narrowly defined factual circumstances (for

negligent misstatements and the negligent leasing of an inhabitable property).  *Glencar*

*Exploration v. Mayo County Council* [2002] 1 I.R. 84.  Hennessy Decl. ¶ 77; Redmond Reply

Decl. ¶¶ 41-42.

NNIR argues that *McShane Wholesale Fruit and Vegetables Ltd. v. Johnston Haulage*

*Co. Ltd.* [1997] 1 ILRM 86, stands for the proposition that "the fact that the damage is economic

is not in itself a bar to recovery," where other elements are met.  Hennessy Decl. ¶¶ 78-79.  The

Movants argue that reliance on *McShane* is misplaced in light of the subsequent opinion of Chief

Justice Keane of Ireland's highest court in *Glencar*, in which the Movants argue that Justice Keane made clear that the Irish rule remains that damages for pure economic loss are "normally not recoverable" in tort.  Redmond Reply Decl. ¶ 43.

### 6.  Directorship Claims under English, Irish, and French Law

The Claimants assert that NNI (1) had a fiduciary duty to the EMEA Debtors under various formulations of English, Irish, and French law and (2) breached that duty.  In order to prevail on the Objections with respect to these claims, the Movants must offer proof of English, Irish, and French law regarding the various breach of fiduciary duty claims sufficient to negate the prima facie validity of the Claims.  As noted above, the parties' experts vigorously dispute the state of all three foreign sovereign's law on *de facto* directors.  The Court has carefully considered the parties' arguments, the expert opinions, and the foreign cases, statutes, and treatises submitted to the Court.  However, it is the absence of direct precedent establishing a sister company as a *de facto* or shadow director that the Court finds most significant.  To so find would usurp the function of the legislative authorities of the foreign sovereign nations.  The Court is not prepared to extend foreign law.  Accordingly, as to NNUK Claims 2, 8, 16, 28, and 32; NNIR Claims 2, 8, 16, and 24; and NNSA Claims 2, 6, 13, and 16, the Court finds that the Movants have met their burden and the Objections with respect to those claims are sustained.

### 7.  English Law on Sister Company as *De Facto* and Shadow Directors

The Movants argue that no English case has regarded a sister company, such as NNI, as a *de facto* or shadow director of another sister company.  In response, NNUK points to the *Holland* case as the most recent iteration of *de facto* directorship law, arguing that it permits the Court to infer that a sister company may be liable as a *de facto* director.  Indeed, NNUK argues that "there is no reason in *principle* preventing a sister company from being held to be a *de facto*

or shadow director in appropriate circumstances."   Marshall Decl. ¶ 25.1 (emphasis added).

Indeed, NNUK does not challenge the Movants' assertion that there is no English case holding

that a company could be a *de facto* or shadow director of its sister company.   Instead, NNUK

suggests that the Court extend the definition of *de facto* and shadow directorship under English

law to include sister companies.

The Court declines to find that NNI is a *de facto* or shadow director when the only

authority for doing so is a theoretical extension of current English law on the subject.   Therefore,

in the absence of any English precedent establishing that a sister company can be considered a

*de facto* or shadow director of another sister company, the Court will not hold NNI liable as a *de

facto* or shadow director of NNUK.

### 8.   Irish Law on Sister Company as *De Facto* or Shadow Director

The Movants argue that no Irish case has regarded a sister company, such as NNI, as a *de

facto* or shadow director of another company.   Moreover, they point out that NNIR does not

contradict that in the area of shadow and *de facto* directors, no Irish court (or English court) has

ever upheld a claim for shadow or *de facto* directorship against a sister corporation.   NNIR

responds by pointing out that neither do the Movants cite any Irish authority holding that a

corporate entity cannot be deemed a *de facto* director.

Here, too, in the absence of any Irish precedent establishing that a sister company can be

considered a *de facto* or shadow director of another sister company, the Court will not hold NNI

liable as a *de facto* or shadow director of NNIR.

### 9.   French Law on Sister Company as *De Facto* Director

The Movants argue that NNSA fails to cite a single French case that has ever found a

company to be a *de facto* director of its sister company, an essential element of a

mismanagement claim under French law.  In response, NNSA asserts that it has made out a case for "predominant influence" sufficient to establish that NNI was a *de facto* or *de jure* director of NNSA.

In the absence of any French law establishing that a sister company can be considered a *de facto* or shadow director of another sister company, the Court will not hold NNI liable as a *de facto* or shadow director of NNSA.

### 10.  Ruling

The foregoing discussion of the parties' arguments and the Court's review of the applicable foreign laws lead the Court to one clear and concise concluse, *viz*. there is no existing legal basis upon which the Court can impose liability for breaches of fiduciary duty upon NNI, a corporation, as a shadow or *de facto* director.  Accordingly, the Claimants' causes of action in the nature of breaches of fiduciary will be dismissed.

### ESTOPPEL DEFENSES

### A.  Foreign and U.S. State Substantive Law Claims – Affirmative Defenses

Movants challenge the good faith of NNUK in taking inconsistent positions – one when seeking the initial orders from the English Court and the recognition order from this Court, and the reverse on its claims.  When seeking relief in England and then here, NNUK asserted that all management and operations ran from England.  Both courts premised their rulings on evidence NNUK submitted that all control and decision making were U.K. based.  Now NNUK argues on its claims that NNL and NNI exercised complete control.   These inconsistencies are

troublesome.  The explanation given by NNUK is that the Joint Administrators did not know the amount of control being exerted by NNL and NNI.[14]

The Court recognizes the inconsistencies and understands Movants' displeasure. However, from the Court's vantage, the inconsistencies do not rise to the level that would cause the Court to eliminate claims which might otherwise be viable.  The Court is, in any event, dismissing the breach of fiduciary duty claims and, accordingly, the Court is not addressing the estoppel arguments at length.

## B.  Judicial Estoppel

The EMEA Debtors submitted sworn witness statements from Sharon Lynette Rolston, a director of each of the EMEA Debtors, and Michel Clement, president of NNSAS and a director of NNSA, establishing NNUK as the COMI of the EMEA Debtors.  Barefoot Decl. Exs C and D. The Movants argue that a large portion of the Amended Claims hinge on the assertion that NNI and/or NNL asserted directorial control over the EMEA Debtors.  Because that assertion is allegedly contrary to the Rolston and Clement declarations,[15] the argument continues, many of the Amended Claims should be precluded by the doctrines of judicial and collateral estoppel.

The judge-made doctrine of judicial estoppel contains three elements:

> First, the party to be estopped must have taken two positions that are irreconcilably inconsistent. Second, judicial estoppel is unwarranted unless the party changed his or her position "in bad faith-i.e., with intent to play fast and loose with the court."  Finally, a district court may not employ judicial estoppel unless it is "tailored to address the harm identified" and no lesser sanction would adequately remedy the damage done by the litigant's misconduct.

---

[14] See Deposition Transcript, Alan Robert Bloom, pages 83-84, 154-196.  Mr. Bloom is one of the Joint Administrators.

[15] The declarations which the parties submitted provide evidence of foreign law which the Court may consider pursuant to F.R.E. 44.1.

*Montrose Medical Group Participating Savings Plan v. Bulger*, 243 F.3d 773, 780 (3d Cir. 2001).

Specifically, the Movants argue that the NNUK and NNIR claims for breach of fiduciary duty depend on allegations that NNI acted as a director of NNUK and NNIR (NNUK claims 2, 8, 16, 28, 32; NNIR claims 2, 8, 18 and 24). Likewise, the Movants argue that the NNUK and NNIR claims against NNI for aiding and abetting or dishonest assistance are based in part on the allegation that NNL acted as a *de facto* or shadow director of NNUK (NNUK claims 4, 6, 10, 13, 18, 20, 31, 34-35; NNIR claims 4, 6, 10, 13, 23 and 26-27). Similarly, the Movants allege that NNSA's claims for mismanagement depend on allegations that NNI acted as a *de facto* director of NNSA (NNSA claims 2, 6, 13, and 16) and that NNSA's claims against NNI for aiding and abetting and tort under French law are based on the allegation that NNL acted as a *de facto* director of NNSA (NNSA claims 3-4, 7-8, 14-15, 17-18).

The Claimants respond by arguing that a finding that NNUK was the center of day-to-day operations in the EMEA region does not contradict their assertion that NNI and/or NNL controlled major strategic decisions relating to the specific transactions that form the basis for the Amended Claims. The Claimants further argue that the Rolston and Clement declarations were prepared for the purpose of a jurisdictional finding, a distinction they mark as critical given that the Joint Administrators made the COMI determination in the absence of any detailed inquiry into the real workings of NNUK. Rather, relying on English law, the Joint Administrators argue that they considered only facts in the public domain and which a typical third party would learn through their dealings with the company. The Claimants insist that the Rolston and Clement declarations were not intended to report to either this Court or the English Court the strategic and operational interplay between the EMEA Debtors, NNI, and the Canadian

Debtors.  Moreover, the Claimants assert that even if the Court were to find that their positions were inconsistent, in the absence of any "intentional wrongdoing," they would not be judicially estopped from asserting their claims.  *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 363 (3d Cir. 1996).

The Claimants also highlight the fact that the Court, in granting Chapter 15 recognition to the remaining EMEA Debtors, also relied on the record from the deposition of one of the Joint Administrators, Alan Robert Bloom.  EMEA Recognition Order, Barefoot Decl. Ex. N at 2.  Mr. Bloom averred that it was not until the Joint Administrators further examined the EMEA Debtors' books and records that they discovered that a considerable amount of the decision-making process in relation to EMEA came from North America.  The Claimants argue that this disclosure precludes any argument of bad faith.  The Movants argue in response that the Bloom Deposition was taken in December 2010, such that it was not even available to the Court when NNUK obtained Chapter 15 recognition in June 2009.  Instead, they assert that the Witness Statements and related declarations from the Joint Administrators were the only record evidence submitted by NNUK to enable the Court to make its COMI determination.

Finally, the Claimants argue that NNI will not suffer any harm as a result of the alleged inconsistencies in position.  In response, the Movants argue that the application of judicial estoppel does not turn on whether litigants have been prejudiced.  Judicial estoppel, the Movants argue "may not be used to punish litigants for how they treat other litigants or third parties; its only legitimate purpose is to remedy an affront to the court's integrity." *Montrose Med. Grp.*, 243 F.3d at 785-86.

The Court is satisfied with NNUK's explanation and, accordingly, agrees with Claimants that judicial estoppel does not apply.

### C.  Collateral Estoppel

Collateral estoppel applies where "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Raytech Corp. v. White*, 54 F.3d 187, 190 (3d Cir. 1995).  With respect to the application of collateral estoppel to the Claimants' fiduciary duty based claims, the Movants argue that the EMEA Debtors' COMI was actually and necessarily determined before both this Court and the English Court, that the issue was actually litigated, and that the orders associated with EMEA Recognition have become final and non-appealable.

The Claimants respond by asserting that the doctrine of collateral estoppel is inapplicable to their fiduciary duty based claims because the question of NNI's *de facto* or shadow directorship was not the exact issue decided in its recognition proceedings.  The Movants, in turn, argue that the Claimants have mischaracterized the test for collateral estoppel and that the first element, identity of issues, can be satisfied where two cases are "in substance the same." *Id*. at 193.

The Third Circuit found the identity of issues element to be satisfied where a district court had not previously expressly considered fraud in its successor liability analysis but where the indicia of improper purpose raised before the Third Circuit were the same for the purposes of considering whether the transfer was a fraudulent attempt to avoid asbestos liability, even though the transferor's asbestos-related assets were not part of transaction.  *Id*.  The Court is satisfied that Claimants are not collaterally estopped from asserting their breach of fiduciary duty claims.

40

### D. *Ex Turpi Causa*

The English doctrine of *ex turpi causa* applies to bar causes of action that require a claimant to plead or rely on his own illegality.  Todd Decl. ¶¶ 131-32.  Grounded in public policy, the principle is also known by the common law maxim *ex turpi causa non oritur actio*: "from a dishonorable cause an action does not arise."  *Id.* ¶ 131.  While illegality will not be attributed to a corporation based on the misconduct of its employee or agent, where the directing mind and will of the company commits the fraud or wrong, those acts are treated as the act of the company.  *Id.* ¶ 132.  In such cases, where all those in the management and ownership of the company are, or must be taken to be, aware of the fraud or breach of duty at issue, their wrongful acts will be attributed to the company.  *Id.* ¶ 134.  This applies even where the "sole actor" consists of multiple shareholders or directors acting in concert.  *Id.*  The only exception to the "sole actor" rule – under which the wrongful conduct is attributed to the company – is where there is an "innocent" shareholder or director unaware of the breach.  *Id.* ¶ 134(iii).  NNUK's common law claims are predicated on allegations that NNUK's *de jure* directors breached their fiduciary duties to the company, with the assistance, involvement and/or knowledge of NNI and/or NNL – its sole shareholder.  NNUK Claim ¶¶ 29, 105, 130, 162, 214.

As set forth in *Stone & Rolls Ltd v. Moore Stephens* [2009] 1 AC 1391, however, the "Hampshire Land principle" precludes the knowledge and conduct of a director from being attributed to the company itself under this doctrine where the company is the victim of the wrongdoing.  Marshall Decl. ¶ 65.2.3.  Indeed, "it would be irrational to treat the directors, who were allegedly parties to the [wrongdoing], notionally as having transmitted this knowledge to the [victimized] company." See *Stone & Rolls*, at 1484B-1484F.  NNUK argues that where claims for breach of fiduciary duty are alleged (or claims of an accessory nature founded upon a

41

breach of fiduciary to the company) the *ex turpi causa* doctrine cannot be engaged.  Marshall Decl. ¶ 65.  NNUK posits that the Hampshire Land principle applies here because NNIK was a victim of NNI's alleged abdication of duty.

The Movants assert that NNUK fails to allege that there were any independent directors or shareholders of NNUK who were ignorant of the breaches of fiduciary duty NNUK now alleges.  The Movants argue that the Claimants specifically allege that NNUK's directors participated with NNL in the alleged wrongdoing.  See, e.g., NNUK Claim ¶¶ 13, 15, 61, 105.  The Movants thus argue that the alleged breaches of fiduciary duty are imputed to NNUK because *NNUK's de facto* and shadow director claims allege that NNL was either an equal participant with NNUK's *de jure* directors or gave directions to such directors.  Therefore, the Movants continue, *ex turpi causa* precludes all of NNUK's English common law claims (NNUK Claims 2-5, 8-10, 12, 14, 16-19, 22, 26, 28-30, 32-33, 35); Todd Decl. ¶¶ 128, 139.

The Court's dismissal of the breach of fiduciary claims make it unnecessary to decide the doctrine's applicability to such claims.  To the extent the Movants ask the Court to apply the doctrine to Claimants' other claims, the Court finds the Amended Claims are sufficient to overcome dismissal.

### E.  *In Pari Delicto*

It is well settled that "under the *in pari delicto* doctrine, a party is barred from recovering damages if his losses are substantially caused by activities the law forbade him to engage in." *Am. Int'l Group, Inc. v. Greenberg*, 976 A.2d 872, 883 (Del. Ch. 2009) (internal quotation marks and citation omitted) (hereinafter "*AIG*"); see also *Floyd v. CIBC Markets, Inc.*, 426 B.R. 622, 642 (Bankr. S.D. Tex. 2009).  To bar a claim on *in pari delicto* grounds, a court must only determine that the parties bore "substantially equal responsibility" for a wrongful scheme.  The

court need not engage in a detailed accounting of relative fault as that is precisely the type of analysis the doctrine is meant to avoid. *AIG*, 976 A.2d at 883.

The Movants argue that the Claimants' secondary liability claims rest on allegations that the Claimants' own directors (whether *de facto*, shadow, or *de jure*) breached their fiduciary duties. Accordingly, the Movants assert that such actions and knowledge of top-level management and directors of a corporation are imputed to the corporation. See *AIG*, 976 A.2d at 887 n.37, n.40.

The Claimants argue that the doctrine of *in pari delicto* does not apply here because the Claims allege sufficient facts to support a finding that: (1) NNI was an insider of NNUK, NNIR, and NNSA; (2) the "adverse interest" and "controlling shareholder" rules bar application of the doctrine; and (3) dismissal of the claims based on this defense would be premature at this stage.

The "adverse interest" rule protects corporations from application of *in pari delicto* where an agent acted "entirely for his own or another's purpose." *Hill v. Day* (*In re Today's Destiny, Inc.*), 388 B.R. 737, 749 n.13 (Bankr. S.D. Tex. 2008) (citations omitted). Here, the Claims allege that the Claimants' *de jure* directors acted contrary to the interests of the Claimants in taking actions that only benefitted NNI and the Canadian Entities. Indeed, the Proof of Claim specifically alleges that, under NNI's and the Canadian Entities' control, "[a]t all relevant points the Nortel Group was operated in such a manner that cash and value were improperly removed from NNSA and the other EMEA Companies and transferred to NNL." Application of *in pari delicto* is also barred by the related principle that this defense cannot be applied in actions where an element of the claim is that "a controlling shareholder forced the corporation to act for the benefit of the shareholder through domination and control." *Kalb,*

*Voorhies & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 133 (2d Cir. 1993); see *In re Alper Holdings USA,*

*Inc.*, 398 B.R. 736, 760 (S.D.N.Y. 2008).

The Movants argue that the adverse interest exception is not applicable here.  To qualify

for the adverse interest exception, a party needs to allege total abandonment of the corporation's

interests by the interested parties.  *AIG*, 976 A.2d at 891.  In rejecting the adverse interest

exception, the court in *AIG* noted that the complaint included details about how the company

could be said to benefit from the alleged schemes even though those benefits were short-lived.

*AIG*, 976 A.2d at 891 n.53.  Here, the Movants assert that the Claimants admit that they have

received benefits. For example, the Movants argue that NNUK admits receiving at least

$57,905,533 from the Alcatel sale.  Similarly, the Movants argue that while NNUK, NNIR, and

NNSA apparently believe that they could have negotiated a better bargain under a transfer

pricing arrangement because the RPSM arrangement did not "adequately" reward them, there are

no allegations that the alleged transactions were entirely detrimental to the Claimants.

Again, as with *ex turpi causa*, a claim for breach of fiduciary duty is not legally

cognizable under the circumstances of this case, and, therefore, the Court will not reach this

issue.

### F.  Statute of Limitations

The Movants assert that many of the Claims asserted here are barred by applicable

statutes of limitations.  The Claimants respond by arguing, among other things, that the Movants

have ignored Bankruptcy Code Section 108(c), which had the effect of tolling the applicable

limitations periods for claims that were timely as of the bankruptcy filing date.  As none of the

claims had expired prior to the Petition Date, the Claimants argue that they submitted the claims

on a timely basis.  The Court agrees.

44

## SECONDARY CLAIMS

The Movants' arguments are persuasive in showing the weakness and unlikelihood of ultimate success of Claimants on their Secondary Claims.  That is not, however, the test at this stage of the proceedings.  Instead, the Court must look at the allegations of the Claims for plausibility, basic sufficiency of facts and applicable law.

NNI makes essentially four arguments against the secondary claims.  The first is that the Joint Administrators have not particularized the nature of the assistance or that NNI assisted "knowingly."  The second is that the Joint Administrators have not alleged facts showing that either NNL or Claimants' directors have breached any duty to Claimants.  The third is that there are no allegations that Claimants were insolvent or near insolvency at the relevant times, and the fourth is that the aiding and abetting and related claims sound in fraud and are therefore subject to the more rigorous standard of Rule 9(b).[16]

At the proof of claim stage of these proceedings the Court is unable, unwilling and precluded from determining the validity of the Secondary Claims.  These claims raise factual issues, sufficiently stated in the Claims, entailing the following:

(1)     Claimants' insolvency at the relevant times;

(2)     Whether Claimants' directors acted in bad fath;

(3)     Movants' mental state, i.e., what they knew and when;

(4)     Whether NNL and Claimants' directors breached duties to Claimants.

(5)     If Movants have any understandings with NNL relating to Claimants and diversion of assets through pricing arrangements, interest fee loans and Project Swift.

---

[16]  The Court has rejected the Movants' characterization of the Secondary Claims as sounding in fraud.

45

**Aiding and Abetting (NNUK Claims 6, 13, 20, 31, and 34;**
**NNIR Claims 6, 13, 23, and 27; NNSA Claims 4, 8, 15, and 18)**

NNUK asserts claims for aiding and abetting breach of fiduciary duty under U.S. state law in claims 6, 13, 20, 31, and 34.  Likewise, NNIR asserts claims for aiding and abetting breach of fiduciary duty under U.S. state law in claims 6, 13, 23, and 27.  NNSA asserts similar claims in claims 4, 8, 15, and 18.  The Claimants all make specific reference to the laws of Delaware and Texas.

Texas and Delaware law require the same essential elements for such a claim: a breach of fiduciary duty by the primary wrongdoer, the defendant's knowing participation in that breach, and resulting damages to the plaintiff.  Compare *In re Fedders N. Am., Inc.*, 405 B.R. 527, 543-44 (Bankr. D. Del. 2009) with *Floyd v. Hefner, III*, 556 F. Supp. 2d 617, 654-55 (S.D. Tex. 2008).  Thus, the defendant must have known that the fiduciary's conduct constituted a breach of the fiduciary's duties.  See *In re Fedders*, 405 B.R. at 544; *Floyd*, 556 F. Supp. 2d at 654-55.

The Movants argue that the scienter required for aiding and abetting claims is actual knowledge.  *Capitaliza-T Sociedad de Responsabilidad Limitada de Capital Variable v. Wachovia Bank of Del. Nat'l Ass'n.*, Civ. No. 10-520 (JBS/KMW), 2011 WL 864421, at *4 (D. Del. Mar. 9, 2011) (citing *El Camino Res., LTD v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 905-10, 922 (W.D. Mich. 2010) (collecting cases)); See also *Malpiede v. Townson*, 780 A.2d 1075, 1097-98 (Del. 2001).  NNUK argues that the knowledge element is met if it can be inferred from the overall facts that the defendant was aware of the nature of the relationship between the breaching party and of the conduct that was in breach.  See *Zirn v. Vli Corp.*, 15 Del. J. Corp. L. 789, 801-02 (Del. Ch. 1989); *Duke Energy Int'l, L.L.C. v. Napoli*, 748 F. Supp. 2d 656, 672 (S.D. Tex. 2010).

The Claimants further argue that the Movants' reliance on *Capitaliza-T* for its interpretation of "actual knowledge" is misplaced. In *Capitaliza-T*, the court required actual knowledge on the part of a passive aider and abettor. The defendant U.S. bank and others were accused of "permitting deposits" by a Mexican corporation, which was branching out from facilitating foreign currency exchanges into international transactions involving interest-bearing accounts (a violation of both its corporate charter and Mexican law). See *Capitaliza-T*, WL 864421, at *1, 5 (D. Del. Mar. 9, 2011) ("To the extent there is any ambiguity in the Delaware common law concerning the sufficiency of constructive knowledge or willful blindness, there is no doubt that where the substantial assistance is permitting money to be deposited in a bank, actual knowledge on the part of the bank is required."). The Claimants argue that the District Court's requirement of actual knowledge in that case hinged on the specific facts of the case (*i.e.* the bank was aware of the underlying fraud and of the misconduct). The Claimants posit that here, by contrast, NNI is alleged to have been intimately involved in the transactions that constituted a breach of duty, and as a member of the Nortel Group was aware of all the relevant relationships and resulting duties.

The Claimants argue that the decision in *Malpiede* is likewise inapposite because that decision examined the knowledge requirement in the context of holding an arm's length bidder liable for aiding and abetting a target board's breaches of duty. See *Malpiede*, 780 A.2d at1097. By way of contrast, the Claimants argue that NNI participated in the decisions of the respective boards in relation to the "Cash to Canada" scheme. Further, the Claimants argue that *Malpiede* does not support the proposition that the court cannot infer actual knowledge from allegations of suspect transactions. See *Id.* at 1098 n.79. The Amended Claims are both plausible and sufficiently pleaded.

47

**<u>Dishonest Assistance (NNUK Claims 4, 10, 18, 35; NNIR Claims 4, 10, and 26)</u>**

NNUK asserts claims for dishonest assistance under English law in claims 4, 10, 18, and 35.  NNUK asserts that the standard under English law for establishing a claim for dishonest assistance is that, in the commercial setting, when a third party assists a fiduciary in taking risks with trust property that ultimately amount to a breach of trust, English law imposes liability on such a third party if he or she engages in "commercially unacceptable conduct."  Marshall Decl. ¶ 44.  The parties agree, however, that *Royal Brunei Airlines Sdn Bhd v. Tan* [1995] 2 AC 378 sets forth the elements of a dishonest assistance claim under English law. Marshall Decl. ¶ 41; Todd Decl. ¶ 84; Todd Reply Decl. ¶ 72.  To prevail on a claim for dishonest assistance under English law under the *Royal Brunei* standard, NNUK must show: (a) an underlying breach of fiduciary duty owed to NNUK by the party NNI is alleged to have wrongfully assisted; (b) that NNI assisted in any such breach; (c) dishonesty on the part of NNI; and (d) damages to NNUK. Todd Decl. ¶ 84.  NNUK asserts that its claims satisfy the necessary elements.

The parties further agree that "[t]he essential requirement [is] that the assistance had been provided in respect of [a] breach by someone who was acting dishonestly" and that the "standard of dishonesty is objective."  Marshall Decl. ¶¶ 41, 44; Todd Decl. ¶ 85; Todd Reply Decl. ¶ 73.

The Movants assert that the Claimants have failed to establish insolvency at the time the transactions at issue occurred.  Therefore, the argument goes, those acts cannot form the basis for a claim of breach of fiduciary duty since the directors of a solvent subsidiary company of a parent can act with regard to the interests of the parent and seek to further the interests of the parent company, to the detriment of the subsidiary company, so long as such acts are approved or ratified by the parent, as is alleged to be the case here.  Todd Decl. ¶ 90.  The approval or ratification adopts the act on behalf of the company.  *Id.*  Under this formulation, the Movants

posit, there can therefore be no breach of duty and no dishonest assistance. *Id.* The Claimants argue that they have sufficiently pleaded insolvency and that the ratification defense fails. Marshall Decl. ¶ 47.

NNIR asserts claims for dishonest assistance under Irish law in claims 4, 10 and 26. Dishonest assistance – referred to as knowing assistance under Irish law – requires a showing that a defendant knowingly assisted another party in a dishonest and fraudulent design that caused the plaintiff injury. See Redmond Decl. ¶ 52.

The Movants highlight the case of *Fyffes plc v. DCC plc* [2009] 2 I.R. 417, in which the Irish court held that plaintiffs had failed to establish dishonesty for knowing assistance in circumstances where there had been allegations of insider trading by a director. *Id.* NNIR posits that because NNIR is itself a party that has suffered compensable losses as a result of NNI's alleged dishonest assistance and there is no allegation of insider trading, the operative holding in *Fyffes* has little relevance here. Hennessy Decl. ¶ 92.

The concept of knowing assistance in Ireland finds its roots in the doctrine of constructive trusts and the fundamental policy that a fiduciary will not be permitted to take advantage of his position for personal profit. See Hennessy Decl. ¶ 85. Such liability is extended to those who knowingly assist in a fiduciary's wrongful conduct, as well as one who receives or becomes chargeable with some part of the trust property. See *Id.* ¶ 86; see Redmond Decl. ¶ 50.

While NNIR's expert acknowledges that Irish courts have not considered a case directly on point, he deems it likely that they would follow the *Royal Brunei* case from England in evaluating the standard to be applied. Hennessy Decl. ¶ 88. There, Lord Nicholls wrote that equitable liability "attaches to a person who dishonestly procures or assists in a breach of trust or

fiduciary obligation." See Hennessy Decl. ¶ 87. NNIR argues that the standard to be applied in cases of dishonest assistance is objective with respect to the standard of dishonesty, but that that objective standard will be informed by the subjective knowledge of the defendant (*i.e.*, the conduct is assessed in light of what the defendant actually knew at the relevant time, as distinct from what a reasonable person in the defendant's position would have known or appreciated).

*Id.* Therefore, the argument continues, NNIR need only allege and prove that NNI's advertent assistance of NNIR's *de jure*, *de facto*, and/or shadow directors' breaches of fiduciary duty amounted to behavior that was objectively dishonest. The Court finds that Claimants have met the pleading requirements.

### Civil Conspiracy under English, Irish, and U.S. Law (NNUK Claims 5, 7, 11, 12, 19, and 21; NNIR Claims 5, 7, 12, and 14; NNSA Claims 5 and 9)

The Claimants allege that NNI is liable for the tort of conspiracy under both English, Irish, and U.S. state law.

The Movants argue that under English law, to establish an unlawful means conspiracy, NNUK must show: (a) a combination or agreement between NNI and another, (b) to do an unlawful act, (c) with the intention of harming NNUK and (d) the causing of harm as a result. Todd Decl. ¶ 107.65. The Movants posit that unlawful means conspiracy is a scienter-based (i.e., an action knowingly or willfully taken) cause of action, as it includes an element of intent. *Id.* ¶ 108. They argue that NNUK must also show an agreement between the conspirators on the scope of action to be undertaken. *Id.* ¶ 107.

NNUK, by way of contrast, argues that under English law, recovery for the tort of conspiracy does not depend on pleading or proving an express agreement, whether formal or informal. Marshall Decl. ¶ 52-53 (citing *Kuwait Oil Tanker v. Al-Bader* (2000) 2 All ER

(Comm) 271, at ¶ 111).  NNUK further asserts that an agreement can always be inferred from conduct because conspiracies are by definition not formed in public.  Marshall Decl. ¶ 52 ("[T]he origins of all conspiracies are concealed and it is usually quite impossible to establish when or where the initial agreement was made or when or where other conspirators were recruited.  The very existence of the agreement can only be inferred from overt acts. Participation in a conspiracy is infinitely variable: it can be active or passive.") (quoting *R v. Siracusa* (1990) 90 Cr. App. R. 340, 349).  Thus, according to NNUK, under English law, both the "combination or agreement" and "intent to injure" elements may be inferred from the overt acts themselves.

The parties agree that under Irish law, two types of conspiracy in tort exist: (1) conspiracy by unlawful means; and (2) simple conspiracy.  Redmond Decl. ¶ 61; Hennessy Decl. ¶¶ 104, 106..  NNIR asserts that an unlawful means conspiracy occurs when the parties to be held liable acted pursuant to a "combination to use unlawful means to achieve a particular aim." Hennessy Decl. ¶ 114.  On the other hand, NNIR asserts that a simple means conspiracy occurs when two or more persons combine with the predominant purpose of damaging the economic interests of another.  *Id.* ¶ 107.

The Movants argue that to establish an unlawful means conspiracy under Irish law, NNIR must show an agreement between NNI and another to collusively employ unlawful means that injured NNIR.  Redmond Decl. ¶ 62.  NNIR asserts that such unlawful means may include "a crime, tort, or infringement of a constitutional right" which causes damage to the plaintiff. Hennessy Decl. ¶ 115.

The Movants also argue that to establish a simple conspiracy under Irish law, NNIR must show an agreement between NNI and another to act in concert and action in concert to inflict

harm to NNIR.  Redmond Decl. ¶ 65.  NNIR asserts that the allegations that NNI conspired with the *de jure*, *de facto* and/or shadow directors of NNIR for the predominant purpose of injuring the economic interests of NNIR through tortious breaches of trust, if true, are sufficient to establish both the simple and unlawful means species of conspiracy.  Hennessy Decl. ¶ 118.

Under U.S. law, a claim for conspiracy essentially requires an agreement between two or more persons, who have taken at least one unlawful act, which caused actual damage to a plaintiff.  Compare *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006) with *Timberlake v. Synthes Spine, Inc.*, No. V-08-4 (JDR), 2011 WL 711075, at * 11 (S.D. Tex. Feb. 18, 2011).  The Court may make inferences from circumstantial evidence of the alleged confederates' acts or statements to conclude that they conspired in furtherance of an illegal purpose. See *Floyd v. Hefner*, 556 F. Supp. 2d 617, 656 (S.D. Tex. 2008) ("[t]he general rule is that conspiracy liability is sufficiently established by proof showing concert of action or other facts and circumstances from which the natural inference arises that the unlawful overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators.") (quoting *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581-82 (Tex. 1963)).

The Movants assert that the U.S. conspiracy claims sound in fraud and have not been pleaded with the requisite particularity.  Therefore, the Movants argue that those conspiracy claims should be dismissed under Rule 9(b).  NNUK and NNIR posit that the U.S. conspiracy claims do not sound in fraud and that dismissal under Rule 9(b) is inappropriate.  Moreover, NNUK and NNIR assert that their proofs of claim allege facts sufficient to allow the Court to infer conspiracy under U.S. law.  The Court agrees with Claimants.

### Claims in Tort under Article 1382 of the
### French Civil Code (NNSA Claims 3, 7, 14, and 17)

Article 1382 of the French Civil Code creates a general tort cause of action that allows a party who has been harmed by the conduct of another to recover for that harm. The language of Article 1382 provides that "any action by a person, which has caused damage to another, obliges that person to provide compensation for the damage caused." Menjucq Decl. ¶ 98; Bremond Decl. ¶ 64. Article 1383 of the French Civil Code provides that a person can also be held liable for negligence or imprudent acts. Menjucq Decl. ¶ 99 ("In practice, a claim brought under article 1382 of the Civil Code includes an implicit reference to article 1383.").

NNSA asserts that while fault was traditionally an element of the damaging action element, it is less important in modern French legal doctrine. Menjucq Decl. ¶ 103- 05. Rather, NNSA argues that neither bad faith nor an intention to harm is required in order to satisfy this element. *Id.* ¶ 104 ("fault occurs when . . . it can be said that a person has not behaved as he or she should have and that is because his or her attitude went against what could have been expected from a reasonable person in the same circumstances (this evaluation is done conceptually by referring to an objective standard)") (quoting B. Fages, Droit des Obligations, LGDJ 2007, no. 494.); *Id.* ¶ 110 ("the civil fault is not necessarily an intentional act: it does not require proof of intention to harm or, more exactly, the desire to cause damage"); *Id.* ¶ 111 ("Bad faith is therefore not a condition for the application of article 1382 of the Civil Code.").

The Movants emphasize that French law does not have a separate claim for conspiracy or aiding and abetting. Bremond Decl. ¶ 72. Rather, the Movants posit that where a tort claim is based on the allegation that a secondary actor conspired with the primary actor, French law requires as one of the elements of the tort claim that the secondary actor acted in bad faith such

that he knew the primary actor was engaged in wrongful conduct. *Id.* ¶ 73. The Court finds that the Claimants have met their burden and therefore survive the Motions.

### Implied Contract and Implied Term Claims (NNUK Claims 24 and 25; NNIR Claims 16 and 17; NNSA Claims 10 and 11)

The Claimants all mount similar arguments in these implied contract and implied term claims. The Claimants base their claims on alleged sale transactions that closed before the Petition Date, namely (i) "an implied contract as between the selling Nortel entities that the Pre-Petition Sale Proceeds would be distributed as amongst them in accordance with the arm's length principle," and/or (ii) an implied term contained within "the relevant sale contracts" that "NNUK would receive a fair and appropriate allocation." NNUK Claim ¶¶ 185, 187; NNIR Claim ¶¶ 161, 163; and NNSA Claim ¶¶ 150, 152.

The Movants argue that in either case, the Claimants do not adequately allege the parameters of the contract or contractual term. Instead, the Movants posit that these claims only plead an alleged agreement to allocate "fairly" "based on the arm's length principles." NNUK Claim ¶¶ 186-187; NNIR Claim; NNSA Claim ¶¶ 151-152. Further, the Movants assert that the Claimants have failed to allege facts that define the terms of this agreement, or what allocation of proceeds from any Pre-Petition Asset Sales would comply with NNI's alleged contractual obligations.

The Claimants respond by asserting that the Movants have failed to cite any relevant authority establishing these deficiencies. To the contrary, the Claimants assert that they have made out claims for breach of implied contract and implied term under relevant principles of English and Irish law. The Court finds for Claimants.

### Mistake (NNUK Claim 26; NNIR Claim 20; NNSA Claim 12)

The Movants assert that a claim for mistake is subject to the heightened pleading standard of Rule 9(b), and that therefore the Claimants must particularize (1) the mistake; (2) the identity of the individuals that made the mistake; (3) the nature of their misunderstanding; and (4) when and where the mistake occurred. *RTI Hamilton v. Tronox LLC(In re Tronox Inc.)*, Bankruptcy No. 09-10156 (ALG), Adversary No. 09-01488 (ALG), 2010WL 2010844, at *3 (Bankr. S.D.N.Y. May 14, 2010).The Movants further argue that the Claimants' allegations do not approach this standard.  Moreover, the Movants argue that the Claimants must indicate whether the relevant mistake was unilateral, mutual, or common.

NNUK responds by asserting that the English law of restitutionary claims brought in connection with a mistake of fact or law is not limited to mistakes as to the nature of an agreement or contract, as it is understood at US law.  Marshall Decl. ¶ 57.  Here, the relevant mistake is provided in the NNUK Proof of Claim as "the erroneous assumptions that were contained in the transfer pricing structure that prevailed within the Nortel group at the time." *Id.* ¶ 58.  Under English law the argument goes, such an allegation, if proven, would be sufficient to state a restitutionary claim. *Id.* ¶ 60.  These are clearly not fraud claims.

NNIR responds by asserting that Irish courts view the distinction among the varieties of mistake as neither consistent nor consequential.  See Hennessy Decl. ¶ 120 (citing a leading modern treatise on mistake, which quotes a classic Irish decision for the proposition that "the whole question whether a mistake was mutual or unilateral [is] largely one of phraseology"); *Id.* ¶ 122 ("Insofar as the criticism is levelled against NN Ireland that it has not precisely identified which category of mistake is being alleged, in my view this does not detract from the merits of the claim under the law of mistake.").  Where a party seeking relief for mistake is not in a

position to firmly state which of the three species is being pursued, NNIR asserts that discovery is often necessary before such a distinction may be made. *Id.* ¶¶ 121-122. Indeed, "NNI may have been laboring under a mistake that the allocation accorded with the arm's length principle (common mistake) or the parties may have been at cross-purposes (mutual mistake) or, indeed, NN Ireland may have mistaken as to how the allocation would occur and NNI may have known of NN Ireland's mistake." Id ¶ 122. NNSA's response does not address its mistake claim.

The Court will not dismiss these claims on the basis of the Motions.

### Contingent FSD Liability Claims
### (NNIR Claims 28, 29, 30, and 31; NNSA Claims 19, 20, 21, and 22)

In NNIR Claims 28-31 and NNSA Claims 19-22, the Movants argue that NNIR and NNSA assert allegedly contingent claims that seek to hold NNI liable for any payments or other financial support that NNIR and NNSA may ultimately be required to provide for the UK Pension Plan. NNIR and NNSA assert these allegedly contingent claims under English, Irish, French, or U.S. law (respectively) as alternative causes of action for: (i) contribution; (ii) enrichment and/or subrogation; (iii) subrogation; and (iv) an unspecified "obligation to repay"(together, the "FSD Claims").

The Movants assert that the FSD Claims must be dismissed. First, the Movants posit that because the FSD Claims seek to indirectly hold NNI liable for a Financial Support Direction or Contribution Notice issued in the United Kingdom, they effectively seek an end run around this Court's determination that it will directly determine NNI's share of liability, if any, relating to the UK Pension Plan. Even if the Court were to consider the FSD Claims, the Movants contend that NNIR and NNSA have failed to allege in anything other than conclusory fashion any basis on which NNI should be held liable for any of NNIR and NNSA's potential FSD liability.

Finally, the Movants assert that the FSD Claims are quintessential contingent co-debtor claims, subject in any event to disallowance under Section 502(e)(1)(B) the Bankruptcy Code.

NNIR and NNSA assert that it is unknown at this time whether any of the EMEA Targets will be required to provide financial support to the NNUK pension plan, what the nature or amount of such support will be, how the total obligation to the NNUK pension plan will be divided between the entities who receive FSDs or CNs, or the rationale that may be articulated for such division. NNIR and NNSA's liability to the UK Pension Plan is therefore contingent upon both the issuance of an FSD or CN, and the amount that NNIR and NNSA are required to pay. Accordingly, NNIR and NNSA assert that they properly filed the FSD Claims in order to preserve their rights, as allowed under the Bankruptcy Code.

The Court agrees with Movants that the claim of NNSA for Movant's liability for the U.K. Pension Plan fail. The claim is based upon claims filed in UK pension proceedings. The Court previously ruled that as to Movants, such claims are void and of no force or effect thereby precluding liability. Additionally, the FSD claims are subject to disallowance pursuant to the Bankruptcy Code Section 502(e)(1)(B).

### Transaction at Undervalue under English and Irish Law
### (NNUK Claim 27; NNIR Claim 22)

In claim 27, NNUK asserts a claim under English law for transaction at undervalue, under Section 238 of the Insolvency Act 1986. NNIR asserts the same claim in claim 22 and further alleges that "[i]f a liquidator were to be appointed in Ireland in relation to NN Ireland, a similar claim could be brought on the basis that these diversions of cash from NN Ireland to NNI constituted fraudulent dispositions pursuant to section 139 of the Irish Companies Act 1990." NNIR Claim ¶ 179.

The elements of a claim for transaction at undervalue under this statute are: (i) the plaintiff entered into a transaction for no consideration or "significantly less" consideration than the value of what it provided, (ii) during the "relevant time," and (iii) when plaintiff was unable to pay its debts, or it became unable to pay its debts as a result of the transaction. Todd Decl. ¶¶ 121-125. For "connected persons" – which includes [associates] of the company – the "relevant time" is within two years of commencement of administration proceedings. Todd Decl. ¶¶ 124-125.

The Movants allege that NNUK and NNIR's claims are either insufficiently pleaded under the federal civil standards, or time barred.

The Movants also assert that it is unclear whether NNIR is actually advancing a claim for fraudulent disposition under the Irish Companies Act 1990. See Claim ¶ 179 (stating only that "[i]f a liquidator were to be appointed in Ireland in relation to NN Ireland, a similar claim could be brought." To the extent that NNIR does advance such a claim, as a matter of the statute, the Movants assert that only a liquidator may assert the claim in an Irish proceeding – not by an entity in U.K. administration insolvency proceedings. See Redmond Decl. ¶¶ 80-81.

The Amended Claims are sufficient to defeat the Motions.

### Unconscionable Receipt under English and Irish Law and Knowing Receipt under English Law (NNUK Claims 14, 22, and 29; NNIR Claims 11 and 21)

In claims 14, 22, and 29, NNUK asserts English law claims for unconscionable receipt and knowing receipt. Under English law, the Movants assert that to establish a claim for knowing receipt NNUK must show that (1) assets of NNUK were dispersed in breach of a fiduciary duty owed to NNUK and (2) NNI received specific assets in which NNUK had a beneficial interest. Todd Decl. ¶¶ 94-95.Moreover, the argument continues, to establish a claim

for unconscionable receipt, NNUK must show the two factors necessary to establish knowing receipt, but also establish that NNI was "at fault" by receiving the property. According to the Movants, establishing fault in turn requires a showing that it would be unconscionable for NNI to retain the property at issue. Todd Decl. ¶ 96. To satisfy the beneficial interest element of both claims, the Movants argue that NNUK must trace property received by NNI to NNUK, meaning the original property must be located and identified, either as a separate fund or as a separately identifiable portion of a mixed fund. *Id.* ¶ 95. The Movants conclude that NNUK's claims for both unconscionable receipt and for knowing receipt both fail because it does not plausibly allege the beneficial interest element.

NNUK responds by asserting that its claim establishes that NNI received funds traceable to NNUK. Further, contrary to the Movants' argument, NNUK argues that in the context of unconscionable receipt, tracing of property "means following the application of the funds or their product and could be done notwithstanding the mixing of the funds with other funds." See Marshall Decl. ¶ 50.1.

In claims 11 and 21, NNIR asserts Irish law claims for unconscionable receipt. The Movants assert that under Irish law, unconscionable receipt – known as knowing receipt – requires a showing that the defendant received property, which the defendant knew had been taken from the plaintiff through a breach of a fiduciary duty by another party. Redmond Decl. ¶ 56. Further, the argument continues, to satisfy the requirement that NNI received property of NNIR as a result of a breach of fiduciary duty, NNIR must trace its property to the custody of NNI. Redmond Decl. ¶ 57. The Movants argue that NNIR's claims fail because they do not sufficiently or plausibly allege this element or any other elements.

NNIR responds by asserting that under Irish law, a recipient of property that was misappropriated by a fiduciary in breach of trust will be held liable as a constructive trustee of such property if he possesses the necessary level of knowledge of the breach of trust, or, in the present case, breach of fiduciary duty.  Hennessy Decl. ¶ 98.  While acknowledging that there are relatively few Irish precedents on point, NNIR asserts that those decisions and a leading Irish treatise are in agreement that either actual or constructive knowledge of the breach will suffice. *Id.* ¶¶ 99-101. According to NNIR, the type of awareness contemplated by Irish case law need not involve dishonesty on the part of the person to be held liable; even honest knowledge of the relevant breach of trust supports a cause of action for unconscionable receipt.  *Id.* ¶ 100 ("dishonesty is not a necessary ingredient of liability for knowing receipt.").  The Motions are denied as to these claims.

### Unjust Enrichment under U.S. Law (NNUK Claims 15 and 23; NNIR Claim 15)

Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Pa. Emp. Benefit Trust Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 485(D. Del. 2010); *State Farm Bank, F.S.B. v. Manheim Auto. Fin. Servs., Inc.*, Civ. No. 10-cv-00519-L (SAL), 2010 WL 3156008, at *4-*5 (N.D. Tex. Aug. 6, 2010).  The Movants assert that to prevail on an unjust enrichment claim, a claimant must demonstrate: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law. *Metcap Sec. LLC v. Pearl Senior Care, Inc.*, No. Civ.A 2129-VCN, 2007 WL 1498989, at *5 (Del. Ch. May 16, 2007).

NNUK responds by asserting that information that would permit an actual tracing of NNUK's funds to NNI is in the exclusive control of NNL and NNI.  Moreover, NNUK posits

that the allegations set forth above give rise to an inference that identifiable funds removed from NNUK were subsequently transferred to NNI.

NNIR responds by asserting that a defendant may also be liable for an unjust enrichment under U.S. law if he unconsciously retains such property, regardless of the manner in which it was obtained.  The Court will not dismiss these claims.

## CONCLUSION

The Court is granting Movants' request for dismissal of Claimants' breach of fiduciary duty claims.  Except as noted, the Court is declining to dismiss the Secondary Claims.  The accompanying Order identifies the disposition of the individual claims.

The parties' dispute will now move to mediation with the Chief Justice of Ontario, The Honorable Warren K. Winkler, serving as the mediator.  The Court is hopeful that for the sake of the parties and the estates of both the U.S. Debtors and the Canadian debtors, settlement can be attained.

Dated:  March 20, 2012

KEVIN GROSS, U.S.B.J.

61