## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- X
                           :

*In re*                      :     Chapter 11
                           :

Nortel Networks Inc., *et al.*,[1]    :     Case No. 09-10138 (KG)
                           :

             Debtors.    :     Jointly Administered
                           :

                           :     **Hearing date: April 18, 2012 10:00 AM (ET)**
                           :     **Objections due: April 11, 2012 4:00 PM (ET)**
-------------------------------------------------------- X

## MOTION FOR ENTRY OF AN ORDER (I) APPOINTING A NEUTRAL MEDIATOR CONCERNING THE MODIFICATION OR TERMINATION OF THE NORTEL RETIREE WELFARE PLANS AND THE NORTEL LONG-TERM DISABILITY PLANS; (II) AUTHORIZING THE DEBTORS TO PAY THE COSTS OF ENGAGEMENT; AND (III) GRANTING RELATED RELIEF

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 9019-2, 9019-3 and 9019-5 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (i) appointing a neutral mediator concerning the modification or termination of the Nortel Retiree Welfare Plans and the Nortel LTD Plans (each as defined below); (ii) authorizing the Debtors to pay the costs of

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

engagement; and (iii) granting them such other and further relief as the Court deems just and proper.  In support of this Motion, the Debtors respectfully represent as follows:

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code, as supplemented by Rules 9019-2, 9019-3 and 9019-5 of the Local Rules.

## Background

3.      On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc.,[2] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, which cases are consolidated for procedural purposes only.  The Debtors continue to operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.       The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors (the "UCC") in respect of the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized (the "Bondholder Group").

5.      On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their

---

[2]      Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

Canadian affiliates (collectively, the "Canadian Debtors")[3] commenced a proceeding with the

Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors

Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the

"Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by

the Canadian Court.  Also on the Petition Date, the High Court of England and Wales placed

nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[4] into administration

(the "English Proceedings") under the control of individuals from Ernst & Young LLP

(collectively, the "Joint Administrators").  Other Nortel affiliates have commenced and in the

future may commence additional creditor protection, insolvency and dissolution proceedings

around the world.

      6.      Since the Petition Date, Nortel has sold its business units and other assets to

various purchasers.  For further information regarding these chapter 11 cases, reference may be

made to the Monthly Operating Reports filed by the Debtors and http://dm.epiq11.com/nortel.

### Relief Requested

      7.      The Retiree Committee and LTD Committee were appointed in August 2011 in

order to engage in negotiations with the Debtors regarding the modification or termination of

employee benefits currently provided to their constituents.  Despite the passage of over seven

months, and the Debtors having provided voluminous information to the advisors to the

Committees, the Committees have not engaged in any serious negotiation regarding the

---

[3]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[4]      The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

modification or termination of the benefits, and to date have not responded to the proposals made

by the Debtors to each of the Committees on January 17, 2012.  While the Debtors remain

willing to explore the possibility of negotiating consensual termination of the benefit plans

before seeking more substantive relief from the Court, such negotiations must proceed promptly

and in earnest, rather than the plodding pace seen to date.  Accordingly, by this Motion, the

Debtors seek an order pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Local

Bankruptcy Rules 9019-2(c), (e) and (f), Rule 9019-3 and 9019-5, (i) appointing a neutral

mediator concerning the modification or termination of the Nortel Retiree Welfare Plans (as

defined below) and the Nortel LTD Plans (as defined below); (ii) authorizing the Debtors to pay

the costs of engagement; and (iii) granting them such other and further relief as the Court deems

just and proper.

### Facts Relevant To This Motion

8.      The Debtors historically have provided a number of benefits to their active

employees and retired employees (the "Retirees") through benefit plans and other programs,

including, for the Retirees, the Nortel Networks Inc. Retiree Medical Plan, the Nortel Networks

Inc. Retiree Life Insurance and Long-Term Care Plan for Retirees and other formal or informal

benefit plans or arrangements made on a group or individual basis (together, the "Retiree

Welfare Plans") and for long-term disabled employees (the "LTD Participants"), the Nortel

Networks Inc. Long-Term Disability Plan, the Nortel Networks Inc. Medical Plan, the Nortel

Networks Inc. Dental, Vision, and Hearing Care Plan, the Nortel Networks Inc. Life Insurance

Plan, the Nortel Networks Inc. AD&D Insurance Plan, the Nortel Networks Inc. Health Care

Reimbursement Account Plan, the Nortel Networks Inc. Dependent Day Care Reimbursement

Account Plan, the Nortel Networks Inc. Long-Term Investment Plan and any other formal or

4

informal benefit plans or arrangements made on a group or individual basis (together, the "LTD Plans," and, together with the Retiree Welfare Plans, the "Plans").  During the course of these chapter 11 cases, the Debtors have continued to provide benefits under the Retiree Welfare Plans and the LTD Plans, including as authorized by this Court's January 15, 2009 *Order Authorizing, But Not Directing, Debtors to Pay Certain Prepetition (I) Wages, Salaries and Other Compensation, (II) Reimbursable Expenses, and (III) Medical, Retirement and Similar Benefits* [D.I. 59].

9.    The current cost to the Debtors of providing benefits under the Retiree Welfare Plans and LTD Plans is nearly $2 million per month.  In light of the substantial cost of continuing to maintain the Plans, at a time when the Debtors have divested their various businesses and are winding down their remaining operations, the Debtors sought the appointment of a Retiree Committee to engage in discussions regarding the modification or termination of the Retiree Welfare Plans by filing the *Debtors' Motion for Entry of an Order Pursuant to Section 1114 of the Bankruptcy Code Appointing an Official Committee of Retired Employees* [D.I. 5568].

10.    Although, as current employees, the LTD Participants are not conferred with the protections afforded to retirees under Bankruptcy Code section 1114, the Debtors did not oppose the *Motion for Entry of an Order Pursuant to Section 1102(a)(2) of the Bankruptcy Code Appointing an Official Committee of Long-Term Disability Plan Participants* [D.I. 5595] other than to seek to clarify the scope of the LTD Committee's appointment, so that the Debtors could engage in parallel discussions with these employees regarding the modification or termination of their benefits.

11.     Thereafter, the Court issued orders directing the United States Trustee to appoint a retiree committee for the sole purpose of serving as the authorized representative of the Retirees in connection with their rights under section 1114 of the Bankruptcy Code and for no other purpose (the "Retiree Committee") [D.I. 5783] and to appoint a committee of long-term disability participants for the sole purpose of serving as the authorized representative of the LTD Participants in connection with negotiations regarding the modification or termination of the LTD Plans, and for no other purpose (the "LTD Committee," and, together with the Retiree Committee, the "Committees") [D.I. 5790].  On August 2, 2011, as directed by the Court, the United States Trustee appointed the members of the Retiree Committee [D.I. 6074] and the members of the LTD Committee [D.I. 6073].

12.     Since the appointment of the Committees, the Debtors have acted diligently and in good faith to provide the Committees with requested information, to attempt to negotiate settlement terms with the Committees and to bring any disputes regarding the modification or termination of the Plans to a consensual resolution.

13.     On September 12, 2011, the LTD Committee sent the Debtors broad requests for documents and information (the "LTD Requests"), and on September 29, 2011, the Retiree Committee sent the Debtors similarly broad requests for documents and information (the "Retiree Requests," and, together with the LTD Requests, the "Committee Requests").[5] Although the Debtors believe that many of the Committee Requests are overbroad and neither necessary nor useful to negotiate a modification or termination of the Plans, the Debtors nevertheless began providing the requested documents and information to the LTD Committee

---

[5]     Since receiving the Committee Requests, the Debtors have received numerous additional requests from the Committees, including requests from the Retiree Committee dated November 9, 2011 and December 6, 2011 and request from the LTD Committee dated November 9, 2011 and December 7, 2011.

on September 16, 2011, and to the Retiree Committee on September 29, 2011. The Debtors have regularly sent additional documents and information to the Committees as they became available. To date, the Debtors have provided the LTD Committee with approximately 331 documents totaling more than 3,700 pages and at least 26 spreadsheets, and have provided the Retiree Committee with approximately 123 documents totaling more than 3,160 pages and at least 12 spreadsheets. Many of the spreadsheets were created solely in response to the Committee Requests. Responding to the Requests has taken thousands of hours of work on the part of the Debtors and their professionals, at a considerable cost to the Debtors' estates. Since the Committees' appointment, the Debtors have incurred well over $15 million in costs related to the Plans and the Committee process. Moreover, the Debtors' professionals have spent numerous hours on regularly scheduled conference calls with the Committees' professionals explaining and clarifying the data that the Debtors have produced to the Committees.[6] Despite the Debtors' voluminous responses to the Committee Requests over the past six months and the fact that all material Committee Requests that can be answered without undue burden have been fulfilled, the Debtors and the Committees have made little progress toward reaching an agreement – or even engaging in substantive negotiations – regarding the modification or termination of the Plans.

14.    For example, although the entire purpose for the formation of the Committees was to facilitate the negotiation of settlements with the Debtors regarding the modification or termination of the Plans, there have only been two substantive meetings between the Debtors and the Committees, the first in October 2011, and more recently on February 27, 2012. Both

---

[6]    Calls between the Debtors' professionals and the Committees' professionals occurred on November 15, 2011, December 12, 2011, January 19, 2012, and March 12, 2012.

meetings were at the request and insistence of the Debtors and both requests received the now familiar response that the Committees needed more time before they could engage substantively.

15.     At the October 2011 meeting, the Debtors provided the Committees with substantial financial information regarding the current benefit plans.  Representatives of a potential alternative insurer also attended the meeting and were prepared to make a presentation on the insurance program they could offer, but the Committees declined to meet with the insurer despite being informed that further delays would increase the cost of the replacement insurance because the insurance company would be unable to honor rates indefinitely.

16.     Prior to and since the October 6, 2011 meeting, the Debtors have provided the Committees with voluminous information in response to the Committee Requests, and have attempted to engage in substantive discussions regarding the Plans.  To that end, on January 19, 2012, the Debtors provided term sheets containing a settlement proposal to each of the Committees and on January 24, 2012, followed up with a request to meet with the Committees on January 31, 2012 regarding the Debtors' proposed term sheets.  The meeting with the Committees, attended by members of both Committees, their legal and financial advisors, the Debtors' professionals and advisors of the UCC and Bondholder Group ultimately occurred on February 27, 2012.

17.     At the February 27, 2012 meeting, counsel to each of the Committees stated that they were still unprepared to engage in substantive negotiations regarding the Debtors' proposals.  Once again, the Committees were informed by the insurance carrier that the rates, which increased since the failed October meeting, would again be at risk for increase without action by the Committees.  After the meeting, the advisors to the Committees said they needed certain additional discrete information and a little more time to respond to the proposals.  To

date, the Debtors have not received a response to their proposals, which have been outstanding

for two months.  The Committees' relentless questions, requests for clarifications, resistance to

meeting and lack of response appear designed to simply delay the process and defer the date at

which the Plans will terminate.  Rather than focus on monetary relief and the replacement

coverage needed by their constituents, the Committees seem to be trying to ensure that the Plans

terminate at confirmation and not a minute earlier.  Unfortunately, these tactics cost the Debtors'

millions and deprive their constituents of value, which could be used to pay for replacement

coverage, while insurance rates continue to increase.  Predictably, the Committees will attempt to

rationalize the delay by responding that all of their questions were in earnest, the matter is

complicated, the data is difficult and changing as the employee populations change and the

Committees may wish to talk to other carriers, but such excuses do not justify the significant

passage of time without any substantive discussion and merely reinforce the impression that the

Committees would be content to delay matters until confirmation.

18.    Each of the Plans provides the Debtors with the unequivocal contractual right to

unilaterally amend or terminate the Plan at any time.  However, the Debtors do not seek to move

to unilaterally terminate the Plans at this time.[7]  Rather, the Debtors continue to hope to reach a

consensual agreement regarding the termination of the Plans that will minimize the hardships to

the Retirees and LTD Participants when the benefits provided by the Plans inevitably come to an

end.  That said, the Debtors believe that given the course of their discussions with the

Committees to date, they will not be able to reach such agreements without the assistance of a

neutral third-party mediator.

---

[7]    The Debtors reserve all rights to seek such termination by later motion.

**Basis for Relief**

19.     The Debtors believe that the appointment of a neutral third-party mediator in this case is a means for furthering the hope of achieving a consensual resolution to the modification or termination of the Plans.  It is well within the Court's power to appoint a mediator in these circumstances.

20.     Local Bankruptcy Rule 9019-3 provides, "[n]otwithstanding any provision of the law to the contrary, the Court may refer a dispute pending before it to mediation . . . ."  Local Bankruptcy Rule 9019-5 provides, "[t]he Court may assign to mediation any dispute arising . . . in a bankruptcy case."  Moreover, section 105(a) of the Bankruptcy Code vests this Court with broad equitable powers and particularly authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  See also In re Combustion Eng'g, Inc., 391 F.3d 190, 236 (3d Cir. 2004) (noting that section 105(a) of the Bankruptcy Code "has been construed to give a bankruptcy court 'broad authority' to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings."); In re VII Holdings Co., 362 B.R. 663, 668 (Bankr. D. Del. 2007) (BLS) (noting that "[s]ection 105(a) bestows broad equitable powers on the Court.") (citing Combustion Engineering, 391 F.3d at 236.  In this case, the appointment of a mediator would further the negotiations which the Debtors are seeking to undertake with the Committees.

21.     Section 363(b) of the Bankruptcy Code further permits a debtor to use, sell or lease property of the estate outside of the ordinary course of business after notice and a hearing. 11 U.S.C.  § 363.  Section 363 applies when a debtor seeks to use estate assets in a way that ventures beyond an ordinary course transaction.  Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996).

22.     The use or transfer of estate property under section 363 of the Bankruptcy Code must be supported by a sound business purpose. Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Decora Indus., Inc., No. 00-4459 JJF, 2002 WL 32332749, at *2 (D. Del. May 20, 2002); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); Travelers Cas. & Sur. Co. v. Future Claimants Representative, Civil Action No. 07-2785 (FLW), 2008 WL 821088, at *4 (D.N.J. Mar. 25, 2008).  A court determining whether a sound business purpose justifies the transaction "should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." In re Montgomery Ward, 242 B.R. at 153 (quoting In re Lionel, 722 F.2d at 1071).  In addition, a debtor must show that the transaction has been proposed in good faith, that adequate and reasonable notice has been provided, and that it is receiving fair and reasonable value in exchange.  See In re Del. & Hudson Ry. Co., 124 B.R. at 176; In re Decora Indus., Inc., 2002 WL 32332749, at *2.

23.     The Debtors believe that retention of a neutral third-party mediator's services will be instrumental in resolving issues related to the modification or termination of the Plans and in moving the settlement negotiations forward.  The Debtors already have committed significant resources to this process since the Committees were appointed and are mindful of the continued costs of providing benefits to retirees and long-term disabled individuals at a time where they are nearing completion of the wind-down of their estates.  In 2012, the Debtors' remaining workforce will be reduced to a few essential employees and it is anticipated that the cost of providing Retiree and LTD benefits will constitute almost 2.5 times the cost of the annual payroll

and benefits for the Debtors' active employees. As of April, the Debtors will employ only 47 active employees, which headcount is expected to drop to only 15 employees in July 2012, and to only 4 employees by the end of the year.  Indeed, at the last meeting of the Committees, there were more professionals and Committee members in attendance than the Debtors have active employees.  While it is the Debtors' view that the Plans allow the Debtors to terminate benefits without incurring additional liability, the Debtors have proposed a generous and reasonable settlement that would provide some compensation to the affected employees and are willing to negotiate to see whether a consensual solution can be reached.  However, such negotiations require the Committees to actively engage in substantive discussions.  It is the Debtors' view that the involvement of a neutral third-party will expedite and improve the process.

24.     While the Debtors could move to terminate the Retiree Welfare Plans pursuant to section 1114(g), and could terminate the LTD Plans without Court authorization, the Debtors would prefer to modify the Plans with the Committees' consent.  However, if agreements are not reached soon, the Debtors will be forced to seek termination of the Plans without such consent. While the Debtors anticipate that the Committees will oppose such relief, the Debtors must continue the wind-down of their remaining operations and cannot continue to fund the Plans indefinitely to the detriment of other creditors of the Debtors' estates and the completion of their wind-down efforts.  This is particularly the case now that the mediation to allocate the sale proceeds amongst the various Nortel estates will be commencing in earnest, and the pathway to the confirmation of the Debtors' Joint Chapter 11 Plan is in sight.

25.     Therefore, the Debtors respectfully request that this Court appoint a neutral third-party mediator of this Court's choosing and authorize the Debtors to pay any reasonable fees and costs required by the mediator.  Payment of such fees constitutes a sound business purpose when

one considers the considerable expense that the Debtors have incurred by paying for the voluminous document production, the related time of the Debtors' professionals, as well as the Committees' professionals since the appointment of the Committees.  Moreover, the fees for such professionals will only increase if the Debtors were to move forward and terminate the Plans on a contested basis.  Further, if the Committees' constituents wish to obtain replacement coverage, they need to act now to preserve the best rates.

26.     Accordingly, the Debtors submit that the relief requested herein is in the best interest of the Debtors, their estates, their creditors and all other parties in interest.

### Notice

27.     Notice of the Motion has been given via overnight mail to (i) the U.S. Trustee; (ii) counsel to the Retiree Committee; (iii) counsel to the LTD Committee; (iv) counsel to the Bondholder Group; (v) counsel to the UCC; and (vi) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

### No Prior Request

28.     No prior request for the relief sought herein has been made to this or any other court.

13

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed mediation order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  March 28, 2012
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


_____*/s/ Ann C. Cordo*_____
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*