**EXHIBIT A**

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**EIGHTY-THIRD REPORT OF THE MONITOR**
**DATED MARCH 29, 2012**

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to April 13, 2012, by this Court in its Order dated December 14, 2011.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January 14, 2009. As required by U.S. law, an official unsecured creditors committee (the "Committee") was established in January, 2009.

- 2 -

3.    An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group").  In addition, pursuant to Orders of this Court dated May 27, 2009, July 22, 2009 and July 30, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries and each of these groups is participating in the CCAA proceedings.

4.    Nortel Networks (CALA) Inc. filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.    Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in EMEA were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors").  The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed.

6.    Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7.    The CCAA proceedings and the UK Administration proceedings of NNUK and the other EMEA Debtors have each been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.    Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

- 3 -

## PURPOSE

9.  The purpose of this Eighty-Third Report of the Monitor (the "Eighty-Third Report") is to provide this Court with information regarding the Applicants' motions seeking:

    a)  approval of an asset sale agreement (the "Bell Aliant Sale Agreement") dated January 30, 2012, between  NNL and NNTC (collectively, the "Seller"), as seller, and Bell Aliant Regional Communications, Limited Partnership ("Bell Aliant" or the "Purchaser"), as purchaser, in respect of the sale of the Seller's rights in a certain number of internet protocol addresses ("IP Addresses"); and

    b)  a sealing order in respect of the confidential appendices to this Eighty-Third Report,

    and to provide the Monitor's support in respect thereof.

## TERMS OF REFERENCE

10.  In preparing this Eighty-Third Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel.  The Monitor has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Eighty-Third Report.

11.  Capitalized terms not defined in this Eighty-Third Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report or previous reports of the Monitor. Reference may also be made to the Eight-First Report of the Monitor for details regarding previous IP Address sales.

- 4 -

## GENERAL BACKGROUND

12. On March 25, 2011 this Court granted an order with respect to the process for the sale of the Applicants' remaining information technology infrastructure (the "Residual IT Assets"), which includes the Applicants' portfolio of IP Addresses (the "Canadian Sale Process Order").

13. Prior to divesting portions of the IP Addresses in transactions previously approved by this Court, the Applicants were the holders of approximately 17 million IP Addresses, including a contiguous Class A block of approximately 16.7 million IP Addresses. All of the Applicants' IP Addresses were allocated before July 1990 and, as such, are classified as "Legacy" addresses that pre-date the formation of the five Regional Internet Registries ("RIR").

## THE SALES PROCESS

14. In March 2011, the Applicants commenced efforts to market the Residual IT Assets. The Monitor and the Applicants approached or were contacted by 107 prospective buyers or buyer groups. As a result of those efforts, 78 parties indicated an initial interest in the opportunity and were sent a "teaser" package providing certain details regarding the Residual IT Assets and the IP Addresses as well as a form of non-disclosure agreement. Sixteen parties executed non-disclosure agreements and were given access to a confidential electronic data room containing due diligence materials for the Residual IT Assets.

15. A sale process letter providing a timeline for the submission of bids and including a form of asset sale agreement was provided to 13 of the interested parties. Eight parties submitted proposals to acquire a portion of the IP Addresses at the time. Other interested parties have submitted proposals to acquire a portion of the IP Addresses from time to time since the initial proposals were received.

16. The Applicants and the Monitor have proceeded to negotiate with multiple bidders in parallel. As a result of certain of these negotiations, asset sale agreements were entered into

- 5 -

between the Seller and each of salesforce.com, Inc. and CSC Holdings, LLC. Those transactions were approved by this Court on February 17, 2012, and closed on February 27, 2012 and February 29, 2012, respectively. Separate negotiations with Bell Aliant culminated in the Bell Aliant Sale Agreement. The Applicants have also entered into sale agreements with other purchasers to transfer portions of their IP Address portfolio. Such transactions will be brought for Court approval upon the satisfaction or waiver of certain conditions as agreed between the Applicants and the applicable purchaser. In addition, the Applicants, with the assistance of the Monitor, continue to market the IP Addresses that are not subject to a pending sale agreement and to receive and consider expressions of interest or bids for such IP Addresses.

17. In considering bids, the Applicants, in consultation with the Monitor, have had regard to, among other factors:

   a) the price per IP Address offered;

   b) the number of IP Addresses to be purchased;

   c) the total transaction value; and

   d) the terms of the proposed transaction.

18. The Applicants' stakeholders and other interested parties, including representatives of the Superintendent of Financial Services in its capacity as the administrator of the Pension Benefit Guarantee Fund, the former employee groups, the Bondholder Group, the U.S. Debtors and the Committee, have been kept apprised as to the progress of the sale process and provided with analyses of the bids submitted and drafts of the Bell Aliant Sale Agreement and other sale agreements. A non-redacted execution version of the Bell Aliant Sale Agreement has been provided to representatives of the foregoing groups on a confidential basis as well.

- 6 -

## BELL ALIANT TRANSACTION

19.  Bell Aliant is an entity related to Bell Aliant Inc. (TSX: BA).  Bell Aliant Inc. is one of North America's largest regional communications providers. It serves customers in six Canadian provinces with innovative information, communication and technology services including voice, data, Internet, video and value-added business solutions.

20.  Following the announcement of the sale process for the Residual IT Assets, the Applicants and the Monitor were contacted by the American Registry for Internet Numbers ("ARIN"), the RIR for, among other countries, Canada and the United States, whom the Monitor understands provides services related to the technical coordination and management of internet number resources. The Applicants and the Monitor have had various discussions with ARIN regarding transactions involving the IP Addresses.

21.  It was a closing condition in favour of the Purchaser that it receive confirmation from ARIN with respect to the registration of the subject IP Addresses in its name (the "ARIN Confirmation") upon the closing of the transaction. Following the execution of the Bell Aliant Sale Agreement, the Monitor understands that the Purchaser engaged in independent discussions with ARIN regarding the ARIN Confirmation. ARIN and the Purchaser have confirmed to the Applicants that the ARIN Confirmation has been received in respect of the Bell Aliant Sale Agreement.

22.  A copy of the Bell Aliant Sale Agreement is attached as confidential appendix "A" hereto and a summary of the financial terms of the proposed transaction and previous IP Address transactions approved by this Court is attached as confidential appendix "B". For the reasons discussed below at paragraphs 24 to 26, the Applicants and the Monitor are requesting that confidential appendices "A" and "B" be sealed by this Court.

23.  The terms governing the proposed transaction are substantially similar to previous IP Address transactions approved by this Court. The following paragraphs provide a summary overview of the material terms of the Bell Aliant Sale Agreement.

- 7 -

*Purchased Assets and Assumed Liabilities*

a) The Seller shall transfer the Seller's rights in a certain number of IP Addresses (the "Legacy Number Blocks") to the Purchaser on an "as is" and "where is" basis. No other assets are being conveyed. The Purchaser is assuming all liabilities with respect to the use or exploitation of the Legacy Numbers Blocks arising and relating to periods after the closing date.

*Purchase Price and Good Faith Deposit*

b) The purchase price payable by the Purchaser is payable to the Seller in cash upon the closing.

c) The Purchaser has provided a good faith deposit, held in trust by the Applicants' counsel, to be applied to the purchase price payable at closing.

*Representations and Warranties/Covenants of the Parties*

d) The Bell Aliant Sale Agreement contains standard representations and warranties on the part of the Seller and the Purchaser with respect to organization and corporate power and authorization and binding effect. The Bell Aliant Sale Agreement also contains limited representations on the part of the Seller with respect to the status of the Legacy Number Blocks and litigation.

e) The Bell Aliant Sale Agreement contains covenants on the part of the Seller and the Purchaser with respect to, among other things, seeking approval of the transaction by this Court, the ARIN Confirmation, pre-closing cooperation, public announcements, confidentiality and taxes.

f) No representations or warranties, covenants or agreements in the Bell Aliant Sale Agreement or other transaction documents survive beyond the closing date, except for certain specified representations in favour of the Seller, covenants relating to taxes, and those covenants that by their terms are to be satisfied after the closing date.

- 8 -

***Closing Conditions***

g) The Seller's and Purchaser's obligation to effect the closing is subject to: (i) there being in effect no law, or any binding material order, injunction, decree or judgment of any court or other government entity prohibiting the consummation of the transaction; and (ii) this Court having issued and entered the proposed Approval and Vesting Order and such order not having been stayed or modified, revised or amended in a manner adverse to the parties.

h) The obligation of the Purchaser to effect the closing is subject to satisfaction of the following conditions:

   i.   each of the Seller's representations and warranties being true and correct, except for any failure to be true and correct that has not had, and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect;

   ii.  the Seller shall have complied in all materials respects with all material covenants, obligations and agreements contained in the Bell Aliant Sale Agreement required to be performed by the Seller on or before closing;

   iii. the Purchaser shall have been furnished with a certificate of a senior officer of the Seller certifying that the above two conditions have been satisfied;

   iv.  the Seller shall have delivered required closing deliveries; and

   v.   the ARIN Confirmation shall have been received.

i) The obligation of the Seller to effect the closing is subject to satisfaction of the following conditions:

   i.   each of the Purchaser's representations and warranties being true and correct, except for any failure to be true and correct that has not had, and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect;

- 9 -

    ii.  the Purchaser shall have performed in all materials respects all material covenants, obligations and agreements contained in the Bell Aliant Sale Agreement required to be performed by the Purchaser on or before closing;

    iii.  the Seller shall have been furnished with a certificate of a senior officer of the Purchaser certifying that the above two conditions have been satisfied; and

    iv.  the Purchaser shall have delivered required closing deliveries.

*Termination Rights*

j)  The Bell Aliant Sale Agreement may be terminated prior to closing:

    i.  by mutual written consent of the parties;

    ii.  by any party if the closing does not take place on or prior to April 30, 2012;

    iii.  by the Purchaser or the Seller in the event of an uncured material breach by the other party which breach would result in a failure of certain specified conditions to closing; and

    iv.  by the Seller upon the Purchaser's uncured breach of its obligation to close the transaction at the closing.

*Closing*

k)  Closing shall occur five business days after the date upon which all closing conditions (other than conditions to be satisfied at the closing, but subject to the waiver or fulfillment of those conditions) have been satisfied or, if permissible, waived. Subject to this Court granting the proposed Approval and Vesting Order, the Monitor expects that the closing of the transaction will occur by the end of April.

- 10 -

## SEALING OF THE BELL ALIANT SALE AGREEMENT

24. The Applicants, with the Monitor's support, seek a sealing order in respect of confidential appendices "A" and "B" hereto, which include the Bell Aliant Sale Agreement.

25. Disclosure of the financial and other terms of the transaction could be detrimental to the commercial interests of the Applicants as they seek to consummate other potential transactions in respect of the IP Addresses. Further, the Applicants continue to market their remaining IP Addresses and disclosure of the financial and other terms of the proposed transaction could have a negative effect on the Applicants' ability to achieve maximum value for such addresses.

26. Accordingly, the Monitor is of the view that the public disclosure of the Bell Aliant Sale Agreement would be prejudicial to the Applicants' commercial interests.

## PROCEEDS FROM THE SALE OF IP ADDRESSES

27. The U.S. Debtors have asserted an interest in the IP Addresses and any proceeds of sale derived therefrom. The Applicants and the Monitor reject such claims.

28. In an effort to facilitate transactions involving the IP Addresses, the Applicants and the U.S. Debtors have agreed, among other things, to deposit the proceeds of sale from the IP Addresses received by the Applicants (the "Sale Proceeds") into a single purpose bank account in the name of NNL. The Applicants and the U.S. Debtors have further agreed that any dispute relating to the NNI Interests (as defined in the proposed Approval and Vesting Order) including NNI's right, if any, to an allocation of the Sale Proceeds shall be the subject of a joint hearing of this Court and the U.S. Court conducted pursuant to the Cross-Border Insolvency Protocol and prior to any distribution of the Sale Proceeds, and if appropriate after such joint hearing, distributions of the Sale Proceeds shall be made only after Orders of both this Court and the U.S. Court approving such distributions. The form of the proposed Approval and Vesting Order reflects the foregoing agreements.

- 11 -

## MONITOR'S RECOMMENDATIONS

29. The Monitor is of the view that the Applicants' efforts to market the IP Addresses were comprehensive and conducted in accordance with the Canadian Sales Process Order. As a result, the Monitor is of the view that the Bell Aliant transaction provides appropriate value for the IP Addresses being transferred. Accordingly, the Monitor recommends that this Court grant the proposed Approval and Vesting Order.

30. For the reasons described at paragraphs 24 to 26, above, the Monitor further recommends that confidential appendices "A" and "B" to this Eighty-Third Report be sealed.

All of which is respectfully submitted this 29th day of March, 2012.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**
**and not in its personal capacity**

Per:

*Sharon Hamilton*

Sharon Hamilton
Senior Vice President

APPENDIX "A"

[CONFIDENTIAL]

APPENDIX "B"

[CONFIDENTIAL]

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**EIGHTY-THIRD REPORT OF THE MONITOR DATED MARCH 29, 2012**

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini (LSUC#: 22293T)
Joseph Pasquariello (LSUC# 38390C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.