**EXHIBIT A**

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

EIGHTY-FOURTH REPORT OF THE MONITOR
DATED APRIL 5, 2012

## INTRODUCTION

1.   On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and
     collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited
     ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks
     International Corporation and Nortel Networks Global Corporation (collectively the
     "Applicants") filed for and obtained protection under the *Companies' Creditors*
     *Arrangement Act* ("CCAA"). Pursuant to the Order of this Court dated January 14, 2009,
     as amended and restated (the "Initial Order"), Ernst & Young Inc. was appointed as the
     Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of
     proceedings was extended to April 13, 2012 by this Court in its Order dated December 14,
     2011.

2.   Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates
     concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the
     "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S.
     Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an
     official committee of unsecured creditors (the "Committee") was established in January,
     2009.

1

3.    An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Court dated May 27, 2009, July 22, 2009 and July 30, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries and each of these groups is participating in the CCAA proceedings.

4.    Nortel Networks (CALA) Inc. ("NN CALA" and together with NNI and certain of its subsidiaries and affiliates that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.    Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in EMEA were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators").

6.    Subsequent to the filing date, Nortel Networks S.A. ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7.    The CCAA proceedings and the UK Administration proceedings of NNUK and the other EMEA Debtors have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.    Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

2

**PURPOSE**

9.   The purpose of this Eighty-Fourth Report of the Monitor (the "Eighty-Fourth Report") is to report to this Court on the following matters:

   a)  consolidated cash position and liquidity as at March 24, 2012;

   b)  actual receipts and disbursements from November 27, 2011 to March 24, 2012;

   c)  cash flow forecast for the period from March 25, 2012 to July 31, 2012;

   d)  consolidated Canadian entities' net inter-company position by region;

   e)  status of the Applicants' claims process and cross-border claims matters;

   f)  status of the Compensation Claims Process;

   g)  status of same/overlapping Compensation Claims;

   h)  status of the Health and Welfare Trust ("HWT");

   i)  status of the Termination Fund;

   j)  status of the Employee Hardship Application Process and Fund;

   k)  status of realization of remaining assets;

   l)  status of allocation matters and mediation;

   m) status of environmental matters;

   n)  other matters;

   o)  status of foreign proceedings; and

   p)  the Applicants' request for an order that:

       i.  the stay of proceedings be extended up to and including July 31, 2012;

3

  ii. the Employee Hardship Application Process be extended until July 31, 2012; and

  iii. the Eligibility Requirements and the Procedure with respect to Employee Hardship Payments Applications be amended consistent with (ii) above.

## TERMS OF REFERENCE

10. In preparing this Eighty-Fourth Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel. The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of this information and accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Eighty-Fourth Report.

11. Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

12. Capitalized terms not defined in this Eighty-Fourth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009, the Pre-Filing Report or previous reports of the Monitor.

13. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

**CONSOLIDATED CASH POSITION AND LIQUIDITY AS AT MARCH 24, 2012**

14.  As at March 24, 2012, Nortel's consolidated cash balance was approximately $10.3 billion including $2.9 billion of total treasury cash.  Nortel's treasury cash is held globally in various Nortel entities and joint ventures.  The following is an overview of Nortel's consolidated cash position as at March 24, 2012:

| Region | Gross Cash | Restricted | Unavailable (JV's and Other Items) | Available Cash |
|---|---|---|---|---|
| NNL | 498 | (2) | (238) | 258 |
| Other Canada | 33 | (22) | - | 11 |
| | | | | |
| NNI | 958 | (1) | - | 957 |
| Other US (excluding NN CALA) | 58 | - | - | 58 |
| **North America** | 1,547 | (25) | (238) | 1,284 |
| | | | | |
| NN UK Limited | 356 | - | - | 356 |
| Other EMEA Filed Entities | 426 | - | - | 426 |
| JV - Netas | - | - | - | - |
| EMEA non-filed entities | 16 | - | - | 16 |
| **UK/Europe** | 798 | - | - | 798 |
| | | | | |
| Greater China | 87 | - | - | 87 |
| Other ASIA PAC (excl JVs) | 201 | (6) | - | 195 |
| Other JVs | 166 | (3) | (163) | - |
| **ASIA** | 454 | (9) | (163) | 282 |
| | | | | |
| NN CALA | 84 | - | - | 84 |
| Other CALA filed entities | - | - | - | - |
| CALA non-filed entities | 47 | - | - | 47 |
| **Cala** | 131 | - | - | 131 |
| | | | | |
| **Total Treasury Cash** | 2,930 | (34) | (401) | 2,496 |
| | | | | |
| **Divestiture Proceeds** | 7,346 | (7,346) | - | - |
| | | | | |
| **Other Funds held in Escrow** | 35 | (35) | - | - |
| | | | | |
| **Total Cash** | 10,311 | (7,415) | (401) | 2,495 |

15.  As at March 24, 2012, the Applicants had cash available for operations and post-filing inter-company settlements of approximately $269 million.

5

16. None of the Applicants' Restricted Cash and Unavailable Cash[1] is readily available to them. Restricted Cash relates primarily to: (i) $12 million held in the D&O Trust as detailed in the Pre-Filing Report; (ii) $10 million held in escrow related to the settlement of the Global Class Action; (iii) $1 million in support of the EDC performance bonds issued in exotic foreign currencies; and (iv) $0.5 million of cash collateral posted with EDC in support of post filing performance bonding. Unavailable Cash relates primarily to: (i) $8.6 million of net proceeds from the sale of the Strandherd Lands; (ii) $229 million from the sale of NNL's interest in the LGN joint venture held in a single purpose bank account; and (iii) $1 million from the sale of NNL's interest in the Relay business held in a single purpose bank account.

17. The U.S. entities had cash available for operations and post-filing inter-company settlements of approximately $1.0 billion. NNI's Restricted Cash relates primarily to $1 million held in escrow for the benefit of utility providers in accordance with the First Day Order.

18. The Joint Administrators on behalf of NNUK and the other EMEA Debtors had available cash for operations and post–filing inter-company settlements of approximately $782 million. The EMEA non-filed entities had available cash of approximately $16 million which is expected to be used primarily to fund their in-country operations and inter-company settlements.

19. Nortel entities in the APAC region had approximately $282 million of available cash for operations and inter-company settlements. As a result of the regulatory regime in the People's Republic of China, the funds in Greater China of approximately $87 million are generally only available to fund operations within Greater China and inter-company settlements.

---

[1] Unavailable Cash for the Applicants disclosed above excludes proceeds received in respect of the sale of certain of the Applicants' rights in internet protocol addresses. These proceeds are being held in a single purpose bank account. Information with respect to the aggregate purchase price payable in connection with these transactions has been sealed pursuant to Orders of this Court dated Feb 17, 2012.

20. NN CALA and the CALA non-filed entities had available cash of $84 million and $47 million, respectively. This cash is expected to be used to fund their domestic operations and inter-company settlements.

21. On March 10, 2010, Nortel Networks Telecomunicacoes Do Brazil Ltda. filed for bankruptcy protection, on April 15, 2010 Nortel Networks de Colombia S.A. was placed into liquidation, on July 30, 2010 Nortel Networks de Venezuela C.A. ceased operations as its financial obligations exceeded its available funds and on November 9, 2011 Nortel Networks O.O.O. was placed into liquidation. As such, funds held by these entities have not been reflected in the foregoing analysis.

22. Divestiture proceeds of approximately $7.3 billion are being held in escrow by various escrow agents (the "Divestiture Proceeds"). As at March 24, 2012, the funds held in escrow included:

   a) approximately $7.3 billion held in escrow by JPMorgan Chase Bank, N.A. ("JP Morgan") until an agreement is reached or determination made regarding allocation of these proceeds among the various Nortel legal entities, including the Applicants. The current divestiture proceeds held in escrow include: (i) $4.45 billion from the sale Nortel's patent portfolio and related assets (the "Residual IP"); (ii) $1.0 billion from the sale of CDMA/LTE Access assets; (iii) $18 million from the sale of the Layer 4-7 business; (iv) $10 million from the sale of the Next Generation Packet Core business; (v) $857 million from the sale of Enterprise assets; (vi) $625 million from the sale of the MEN assets; (vii) $103 million from the sale of GSM/GSM-R assets; (viii) $145 million from the sale of CVAS assets; and (ix) $42 million from the sale of MSS assets;

   b) $50 million held by CitiBank relating to the sale of CDMA/LTE Access assets. These divestiture proceeds are being held in support of the related Transition Services Agreement (the "TSA")[2];

---

[2] This amount was released to the JP Morgan escrow for CDMA / LTE Access Assets on March 29, 2012.

c) $22 million held by CitiBank relating to the sale of MEN assets. These divestiture proceeds include $8 million being held in support of the related TSA and $14 million being held subject to certain succession tax and other adjustments;

d) $12 million held by CitiBank relating to the sale of GSM assets. These divestiture proceeds are being held in support of the related TSA[3];

e) $1 million held by Wells Fargo relating to the sale of CVAS assets. These divestiture proceeds are being held subject to resolution of certain tax liabilities in EMEA;

f) $4 million held by JP Morgan relating to the sale of MSS assets. These divestiture proceeds are being held in support of the related TSA; and

g) $1 million held by Wells Fargo relating to the sale of MSS assets. These divestiture proceeds are being held subject to resolution of certain tax liabilities in North America and EMEA.

23.   Other unavailable funds include $35 million transferred from the CDMA/LTE Access asset divestiture proceeds escrow to a separate trust account pursuant to the Cascade Trust Indenture as more fully described in the Forty-First Report.

## ACTUAL RECEIPTS AND DISBURSEMENTS FROM NOVEMBER 27, 2011 TO MARCH 24, 2012

24.   The Applicants' actual consolidated net cash outflow for the period November 27, 2011 to March 24, 2012 was $43.0 million. A summary of the actual receipts and disbursements as compared to the forecast filed with the Seventy-Eighth Report (the "Seventy-Eighth Report Forecast") is attached at Appendix "A".

25.   Actual net cash flow exceeded forecast by $31.6 million. Significant items contributing to this favourable variance were as follows:

a) a favourable permanent variance of $1.1 million with respect to Other Receipts primarily as a result of the following:

---

[3] This amount was released to the JP Morgan escrow for GSM Assets on March 29, 2012.

    i. $0.5 million receipt in relation to a final settlement of accounts with a trade supplier;

    ii. $0.4 million on account of a property tax refund received from the city of Ottawa; and

    iii. $0.2 million primarily on account of the release of funds from various restricted cash accounts;

b) a favourable net variance of approximately $7.5 million with respect to inter-company receipts and disbursements primarily as a result of the following:

    i. $2.9 million favourable permanent variance as a result of a dividend received from PT Nortel Networks Indonesia;

    ii. $2.1 million favourable timing variance on account of a receipt from Nortel Networks Australia Pty Limited in relation to the Asia Restructuring Agreement;

    iii. $1.5 million favourable timing variance as certain trade payable settlements with NNUK have been retimed to Q3 2012; and

    iv. $1.0 million favourable permanent variance on account of certain trade payable settlements with NNI having been lower than forecast;

c) an unfavourable variance of $2.1 million with respect to payroll primarily as a result of the following:

    i. an unfavourable variance of $1.0 million largely driven by the timing of 2011 AIP payments; and

    ii. an unfavourable permanent variance of $1.0 million relating to several factors including higher than forecast payments in respect of vacation pay;

d) a favourable timing variance of $4.8 million with respect to benefits primarily relating to lower than forecast funding for the HWT;

e) a favourable timing variance of $5.5 million with respect to inventory purchases as payments related to certain supplier commitments have been retimed to Q3 2012; and

f) a favourable timing variance of $13.7 million with respect to restructuring costs as professional fees were lower than originally forecast.

26. Available Cash was higher than forecast by approximately $2.0 million relating to a favourable foreign exchange translation on Canadian dollar denominated cash balances as a result of an appreciation of the Canadian dollar relative to the U.S. dollar.

27. Unavailable Cash was higher than forecast by approximately $0.1 million relating to a favourable foreign exchange translation on Strandherd land proceeds held in Canadian dollars.

28. Restricted Cash was lower than forecast by approximately $0.2 million primarily on account of releases from cash collateral held in support of the Jabil supply agreement.

## CASH FLOW FORECAST FOR THE PERIOD MARCH 25, 2012 TO JULY 31, 2012

29. The Applicants, with the assistance of the Monitor, have prepared an updated 18-week cash flow forecast for the period March 25, 2012 to July 31, 2012 (the "March 25[th] Forecast" and the "Forecast Period", respectively). A copy of the March 25th Forecast is attached as Appendix "B".

30. As at March 25, 2012, the Applicants had Available Cash balances of approximately $269.1 million, excluding Restricted Cash and Unavailable Cash of approximately $261.8 million.

31. Based on the March 25th Forecast, it is anticipated the Applicants will have total receipts of $11.2 million and total disbursements of $51.5 million resulting in a net cash outflow of $40.3 million during the Forecast Period

32. Significant assumptions used in preparing the March 25th Forecast include the following:

a) the TSAs have been completed and going forward only minimal transitional services are forecast to be provided by the Applicants under certain remaining work orders. No material receipts are expected on account of any remaining transition services to be provided by the Applicants to the buyers of the various Nortel assets and businesses;

b) divestiture proceeds from  the Layer 4-7, CDMA/LTE Access, Enterprise, Next Generation Packet Core, MEN, MSS, GSM/GSM-R, CVAS and Residual IP transactions are to be held in escrow and are not reflected in the March 25th Forecast;

c) no material collections are anticipated during the Forecast Period in respect of accounts receivable not acquired by the purchasers as part of the divestiture of the business units;

d) receipt of a $9.9 million dividend from GDNT during the Forecast Period (with payment subject to Chinese regulatory and tax approvals);

e) receipt of a of $1.3 million dividend from Nortel Networks Communications Ltd. during the Forecast Period;

f) all pre-filing amounts owed to suppliers are stayed and post-filing amounts are paid on significantly reduced credit terms as a result of the CCAA proceedings;

g) inter-company trade accounts receivable and payable for post-filing transactions continue to settle on a cash basis between the Applicants, U.S. Debtors, EMEA Debtors and other Nortel entities.  Inter-company net pre-filing loans and trade accounts payable between the Applicants and all other Nortel filed and non-filed entities are stayed. Intercompany net pre-filing loans and trade accounts receivable owing to the Applicants by all other Nortel filed entities are stayed;

h) payroll disbursements include amounts anticipated to be paid during the Forecast Period in respect of the Nortel 2012 Retention Plan;

i) pursuant to the terms of the Amended and Restated Employee Settlement Agreement approved by this Court on March 31, 2010 (the "Employee Settlement Agreement"),

there are no further current funding contributions to the Applicants' defined benefit pension plans. Funding related to current employees' retirement savings plans are reflected in benefits disbursements. Funding for non-registered pension or other retirement plans is stayed;

j) all interest payments relating to the Company's pre-filing indebtedness are stayed; and

k) professional fees have been forecast based on current and anticipated run rates.

33. Based on the analysis prepared by the Monitor, the Applicants have sufficient cash resources to fund the CCAA proceedings through July 31, 2012.

## CONSOLIDATED CANADIAN ENTITIES' NET INTER-COMPANY POSITION BY REGION

34. Summarized below are the preliminary net inter-company book balances (including trade and loan balances) as at December 31, 2011. For purposes of the summary, all Canadian entities (the Applicants and their Canadian non-filed subsidiaries) have been consolidated. These inter-company balances have been prepared by the Company in accordance with US GAAP and are subject to further adjustments. The Company has fully reserved against the net inter-company balances owing from filed entities. For presentation purposes, the full amount of the inter-company balance, before the reserve, has been reflected.

35. For purposes of calculating the net inter-company balances between trading pairs, balances owing between the same legal entities have been set-off provided such balances both arose prior to January 14, 2009 ("Pre-filing Balances") or both arose after January 14, 2009 ("Post-filing Balances"). No Pre-filing Balances have been set-off against Post-filing Balances.

36. Unless otherwise noted Pre-filing Balances have been converted using January 14, 2009 foreign exchange rates. Post-filing Balances are converted using December 31, 2011 foreign exchange rates.

37. The net pre-filing inter-company payable position of $2.065 billion with the U.S. region includes a $62.7 million Revolver Claim by the U.S. Debtors which remains outstanding and is secured by a court-ordered charge in the CCAA proceedings. The balance of the pre-filing inter-company payable position is unsecured.

38. On or about January 5, 2012 NNL paid approximately $5 million to NNI in connection with the settlement of various outstanding post-filing amounts between NNL and NNI. Both entities continue to settle subsequent post filing transactions on a monthly basis.

**Consolidated Canadian Net Inter-company positions by Region (including trade and loans)**
Balances per US GAAP reconciled to Dec 31, 2011
In millions of USD $

| | Region | Pre-filing (Jan. 14, 2009 FX rates) | Post-filing (Dec 31, 2011 FX rates) |
|---|---|---|---|
| | | (In millions) | |
| **Net Receivable Position** | | | |
| Filed Entities | CALA | 3 | - |
| | EMEA | 102 | - |
| | US * | 56 ** | - |
| Filed Total | | 161 | - |
| | | | |
| Non Filed | | | |
| | APAC | 57 | 8 |
| | CALA | 42 | 2 |
| | EMEA | 5 | - |
| | US | 14 | 4 |
| Non Filed Total | | 118 | 14 |
| | | | |
| Net Receivable Total | | 279 | 14 |
| | | | |
| **Net Payable Position** | | | |
| Filed Entities | CALA | (24) | - |
| | EMEA | (203) | (2) |
| | US | (2,065) | (6) |
| Filed Total | | (2,292) | (8) |
| | | | |
| Non Filed | APAC | (210) | (10) |
| | CALA | - | - |
| | EMEA | - | - |
| Non Filed Total | | (210) | (10) |
| | | | |
| Net Payable Total | | (2,502) | (18) |
| | | | |
| Grand Total | | (2,223) | (4) |

* Includes NN CALA Inc., a US entity that filed for Chapter 11 protection on July 14, 2009.

** $55.6M of the pre-filing balance relates to amounts owing from NN CALA Inc. for the pre-filing period ending July 14, 2009 (converted at Dec 31, 2011 rates). Per NN CALA Inc's US GAAP records, these are considered pre-filing balances and are stayed.

13

**STATUS OF THE APPLICANTS' CLAIMS PROCESS AND CROSS BORDER CLAIMS MATTERS**

39. On July 30, 2009, this Court issued an Order (as amended and restated, the "Claims Procedure Order") setting out the procedures for the filing of certain claims against the Applicants.

40. Pursuant to the provisions of the Claims Procedure Order, a claims bar date of September 30, 2009 was established (the "Claims Bar Date") whereby all claims were to be filed with the Monitor with the exception of certain specified excluded claims.

41. By order dated August 4, 2009, the U.S. Court also established September 30, 2009 as its bar date for filing of claims in the Chapter 11 Proceedings.

42. On September 16, 2010, this Court issued an Order approving the methodology applicable for the review and determination of claims filed against the Applicants pursuant to the Claims Procedure Order (the "Claims Resolution Order"). In a joint hearing on the same date, a Cross-Border Claims Protocol was approved which specifically addressed, *inter alia*, the level of cooperation and consultation between the Applicants and U.S. Debtors with respect to Overlapping and Same-Creditor claims (the "Cross-Border Claims Protocol").

43. The table attached as Appendix "C" (the "Claims Report") provides an update as to the status of claims filed against the Applicants pursuant to the Claims Procedure Order as of March 16, 2012 with the exception of claims filed by various EMEA entities pursuant to the EMEA Claim Procedure Order dated January 14, 2011 and claims filed pursuant to the Compensation Claims Procedure Order dated October 6, 2011. All claim amounts are in Canadian dollars using January 14, 2009 exchange rates.

44. Pursuant to the provisions of the Canadian Funding and Settlement Agreement, the Claims Report includes a claim by NNI against NNL for $2.0627 billion. This claim consists of two portions:

   a) $2.0 billion representing a pre-filing unsecured claim against NNL ranking pari passu with all other unsecured pre-filing claims; and

14

b) $62.7 million representing a pre-filing secured claim pursuant to the provisions of the Initial Order relating to the Revolving Loan Agreement.

45. To date, 1053 claims with a cumulative value of CAD $36 billion have been filed against the Applicants pursuant to the Claims Procedure Order. This includes potential duplicative claims filed against multiple Applicants and claims filed subsequent to the Claims Bar Date. The Monitor, in conjunction with the Applicants, has initially reviewed all 1053 claims filed to date.

46. As at March 16, 2012, the Monitor has provisionally accepted 659 claims with a current claim value of $2.6 billion (original filed claim amount of $11.3 billion). In addition, 64 claims with a current claim value of $73 million (original filed claim amount of $82 million) have been either partially or fully disallowed and a Notice of Dispute has been filed by the creditor.

47. The remaining 330 claims, representing a claim value of $24.6 billion, primarily relate to bond claims, certain pension claims, original EMEA related entity claims and claims filed subsequent to the Claims Bar Date. These claims require further review, analysis and negotiation prior to finalization.

48. Pursuant to the provisions of the Claims Resolution Order, the Monitor has provided the U.S. Debtors with supporting detail for the Claims Report as of March 16, 2012. A copy of the Claims Report has also been posted on the Monitor's website.

49. As more fully described in the Eightieth Report, 20 claims totalling CAD $1,323,783 were originally filed against a US Debtor prior to the Claims Bar Date that should have been filed against an Applicant. By Order dated February 17, 2012 the Court deemed these misfiled claims as validly filed Pre-filing Claims in accordance with the Claims Procedure Order. Accordingly, these claims have been included in the Claims Report.

50. The claims resolution process has progressed since the issuance of the Claims Resolution Order. The Monitor in conjunction with the Applicants continues to review, revise and disallow claims, as applicable and the Monitor will report to this Court further on this process in subsequent reports.

**STATUS OF THE COMPENSATION CLAIMS PROCESS**

51.　In November 2011, the Monitor prepared approximately 13,900 Information Statement Packages and mailed approximately 13,800 Information Statement Packages to Identified Claimants. Approximately 100 Information Statement Packages were not mailed at that time as they were identified as being potential U.S. Same-Creditors (the status of which is discussed later in this Eighty-Fourth Report).

52.　The total value of the Compensation Claims for all Information Statement Packages prepared in November 2011 is approximately CAD $1,047.9 million[4], comprised of the following components:

　　　a)　Claims under the Non-Registered Pension Plans and claims for Non-Pension Benefits of approximately CAD $884.5 million[5];

　　　b)　Base Severance Claims of approximately CAD $163.2 million; and

　　　c)　Patent Award Claims of approximately CAD $0.2 million.

53.　On January 20, 2012, the Monitor prepared and mailed:

　　　a)　approximately 220 Information Statement Packages to employees who ceased to be Active Employees, Active Canadian Service Employees or Active Precision Employees as at December 31, 2011; and

　　　b)　the prescribed letter with the Proof of Claim Document Package to 100 Post-Filing Transferred Employees and Canadian Service Employees who ceased to be Active Employees or Active Canadian Service Employees as at December 31, 2011 and who were not otherwise receiving Information Statement Packages. The letter indicated an Information Statement would not be prepared for them as according to Nortel

---

[4] This amount will be reduced by the distributions received from the corpus of the HWT and any other valid set-offs relating to amounts owing by the Compensation Creditor to an Applicant but reflects a reduction by payments received under the Termination Fund.

[5] This amount includes Termination and Severance Pay Claims relating to the Non-Registered Pension Plans, Registered Pension Plan Accruals and Non-Pension Benefits.

records they did not have a Compensation Claim and advising them they had 50 days from the date of the letter to file a Form C Proof of Claim, if applicable.

54. The total value of Compensation Claims relating to the Information Statement Packages mailed in January 2012 is approximately CAD $26.2 million[6], comprised of the following components:

    a) Claims under the Non-Registered Pension Plans and claims for Non-Pension Benefits of approximately CAD $7.7 million[7];

    b) Base Severance Claims of approximately CAD $18.4 million; and

    c) Patent Award Claims of approximately CAD $0.1 million.

55. As at the date of this Report, there are approximately 150 Active Employees, Active Canadian Service Employees and Active Precision Employees.    Pursuant to the Compensation Claims Orders, the Monitor will mail an Information Statement Package or prescribed letter to any individual whose status changes, within 21 business days of being advised of the status change.

56. The Compensation Claims Procedure Order  established a bar date of January 6, 2012 for Identified Claimants and a Rolling Bar Date for those who cease employment after December 31, 2010 and who receive an Information Statement Package to:

    a)   return any Requests for Corrections; and/or

    b)   file a Form C Proof of Claim in respect of any other compensation related claims.

57. To date, the Monitor has received approximately 1,510 Request for Corrections and approximately 770 Proofs of Claim from approximately 2,060 claimants.  The Monitor is

---

[6] This amount will be reduced by the distributions received from the corpus of the HWT and any other valid set-offs relating to amounts owing by the Compensation Creditor to an Applicant but reflects a reduction by payments received under the Termination Fund.
[7] This amount includes Termination and Severance Pay Claims relating to the Non-Registered Pension Plans, Registered Pension Plan Accruals and Non-Pension Benefits.

working towards providing copies of all these requests and claims to Representative Counsel and counsel to the CAW, as appropriate.

58.  Since the January 6, 2012 bar date, the Monitor has been reviewing the Requests for Corrections and Proofs of Claims received. The process consists of reviewing supporting documentation, identifying the requested corrections or claim and communicating with the claimants for additional clarification or documentation. This detailed process is necessary to ensure the Requests for Corrections and the Proofs of Claims are accurately and fully understood before any determinations are made regarding the claims. Once the review has been finalized, Mercer will be requested to revalue the claim based on the accepted changes. The Monitor anticipates the claimants will begin to receive correspondence with respect to the determination of these claims within the next 6 to 8 weeks. The Monitor has kept Representative Counsel informed of its progress through this process.

59.  To date, the Monitor has received approximately 70 Requests for Correction and Form C Proofs of Claim after the January 6, 2012 bar date or Rolling Bar Date, as applicable. Upon completing a review of these claims, the Monitor will seek further direction from this Court.

60.  Since the initial mailing in November 2011, 365 Information Statement Packages/prescribed letters have been returned to the Monitor as a result of undeliverable mail ("Returned Mail"). Through the address change protocol developed by the Monitor, as well as assistance from Representative Counsel, counsel for the CAW and the NRPC, the Monitor has obtained and confirmed corrected mailing addresses for 154 pieces of the Returned Mail. The Returned Mail has now been re-sent to the correct addresses, together with a letter stating the January 6, 2012 bar date has been extended and revised to a Rolling Bar Date.

61.  Of the remaining 211 pieces of Returned Mail, the Monitor has obtained alternate addresses for 89 former employees and has mailed a letter to these alternate addresses requesting the recipients contact the Monitor to confirm their address. Once the address has been confirmed, the Monitor will re-send the documents; together with a letter advising the January 6, 2012 bar date was extended and revised to a Rolling Bar Date. The Monitor

18

continues to work with the Company, Representative Counsel, counsel for the CAW and the NRPC to obtain alternate mailing addresses for the remaining 122 undelivered pieces of Returned Mail.

## STATUS OF SAME/OVERLAPPING COMPENSATION CLAIMS

62. By Court Order dated November 8, 2011, this Court approved an amendment to the Compensation Claims Procedure Order to address Compensation Claims of Identified Claimants that are: (i) in excess of $5 million and subject to the Claims Resolution Order; or (ii) potentially Same-Creditor Claims or Overlapping Claims and subject to the Cross-Border Claims Protocol which is described in more detail in the Seventy-Seventh Report.

63. Since the last update provided in the Seventy-Eighth Report, the Monitor and the U.S. Debtor have been consulting on a regular basis to resolve 105 Same-Creditor Claims to determine which of those claims are Overlapping Claims.   As a result of these consultations, the Monitor and U.S. Debtors have determined that out of the 105 Same-Creditor Claims:

   a) 84 were not Overlapping Claims and the Monitor has mailed Information Statement Packages to the holders of those claims;

   b) 18 of the Same-Creditor Claims are Overlapping Claims; and

   c) three claims are still under review.

64. The Monitor and U.S. Debtors have agreed the first step in resolving the 18 Overlapping Claims identified is to request the claimant to rescind/amend the claim filed in the Chapter 11 Proceedings thereby allowing the Monitor to release their Information Statement Package. The Monitor has requested the assistance of Representative Counsel and counsel to the CAW as appropriate to initiate these discussions with the claimant.

65. To date, the Monitor has also received five Form C Proofs of Claim from claimants identified as potentially Same-Creditor Claims or Overlapping Claims. The Monitor has advised the U.S. Debtors of these claims and they are currently under review.

66.  As of the date of this Eighty-Fourth Report, five information statements contain total claims in excess of $5.0 million. In addition, depending upon the final determination of the Requests for Correction and Form C Proofs of Claim received, there may be additional creditors with claims exceeding $5.0 million. Pursuant to the Compensation Claims Procedure Order, these claims require Court approval and where applicable the Monitor will seek such approval at a later date.

## STATUS OF THE HEALTH AND WELFARE TRUST

67.  By a series of Court Orders dated December 15, 2010, May 3, 2011, June 21, 2011 and March 2, 2012, this Court approved interim distributions from the HWT to Income Beneficiaries (as defined in such Orders). Cumulative interim distributions in the amount of approximately CAD $34.4 million were made to 761 Income Beneficiaries (including 344 LTD Beneficiaries, 80 SIB Beneficiaries and 337 STB Beneficiaries) during the period from January 2011 to March 2012.

68.  By Court Order dated August 23, 2011, this Court approved a fourth interim distribution from the HWT to LTD Beneficiaries on account of their LTD Life and LTD Optional Life Benefit (the "Fourth Interim Distribution", as defined in that order). The Fourth Interim Distribution, in the amount of approximately CAD $1.9 million, was made to 351 beneficiaries on or about September 30, 2011.

69.  By Court Order dated November 8, 2011, this Court approved a fifth interim distribution from the HWT to individuals on account of Pensioner Life (the "Fifth Interim Distribution", as defined in that Order). The Fifth Interim Distribution, in the amount of approximately CAD $21.2 million, was made to 8,783 individuals (including 330 LTD Beneficiaries, 8,154 Pensioners and others) during the period from November 2011 to March 2012.

70.  The illustrative scenario reflecting the Approved HWT Allocation Methodology contained in the Supplemental Fifty-First Report shows 33.8% of the value of the Participating

20

Benefits[8] being paid to Income Beneficiaries and LTD Beneficiaries on account of their LTD Life and LTD Optional Life benefit from the corpus of the HWT. However, the Monitor now believes the total ultimate distribution from the HWT will exceed 33.8% of the value of the Participating Benefits. As a result, through the series of interim distributions already approved by this Court and paid, the Income Beneficiaries and LTD Beneficiaries have received 35% of the value of his or her Income Benefits, LTD Life and LTD Optional Life Benefits as the case may be. There remains a degree of uncertainty regarding the final amount that will be available to distribute from the HWT, as a result of matters referred to in previous reports of the Monitor. Accordingly, there is a provision for recoupment of any distributions in the event of an overpayment to an Income Beneficiary by an Order of this Court dated March 2, 2012. Such recoupment would be firstly, from each beneficiary's future distributions from the HWT on account of Pensioner Life, if any, and secondly, if such amount is insufficient to cover such difference, then from the amount of each beneficiary's future distributions from the estate of Nortel to the extent of any remaining difference. The Monitor will continue to work diligently with the Applicants, the Trustee, the LTD Beneficiaries' Representative and her advisors, the Former Employees' Representatives and their advisors, the CAW and others to finalize outstanding matters, including accounting and financial reporting thereon, to allow a final distribution from the HWT to be made to all Participating Beneficiaries.

**STATUS OF THE TERMINATION FUND**

71.  In accordance with the Employee Settlement Agreement the Applicants established a CAD $4.3 million fund for the benefit of former employees of the Applicants (the "Termination Fund"). Under the settlement agreement:

    a)  a former employee is eligible to apply for payment from the Termination Fund to a maximum of CAD $3,000, if: (i) employment was terminated on or prior to June 30, 2010; (ii) amounts are owing to the former employee for termination or severance pay; (iii) the former employee has not been offered employment with a purchaser of Nortel's assets; and (iv) the former employee did not receive certain other payments;

---

[8] With the value of Pensioner Life relating to Pensioners being reduced as a result of actual 2010 Pensioner Life premiums.

b) any payments under the Termination Fund to former employees will be credited against allowed claims of such individuals and such claims will be correspondingly reduced; and

c) to the extent that funds remain unused in respect of terminations prior to or on June 30, 2010, the Termination Fund may be used to make payments on account of terminations after June 30, 2010 to former employees who meet the eligibility requirements.

72. By Court Order dated February 25, 2011, this Court extended the eligibility time period to those former employees terminated during the period from July 1, 2010 to and including December 31, 2010 and who otherwise meet the eligibility requirements ("Additional Former Eligible Employees"). The February 25, 2011 Order also amended the Employee Hardship Application Process to permit the use of a portion of the funds allocated to the Employee Hardship Application Process, in combination with the remaining funds in the Termination Fund, to make payments to the Additional Eligible Former Employees.

73. As of March 9, 2012, 1,122 former employees terminated on or prior to June 30, 2010 have received payments totalling approximately CAD $3.4 million. The remaining former employees terminated on or prior to June 30, 2010 have a potential combined entitlement of CAD $105,000.

74. As of March 9, 2012, 332 of the Additional Eligible Former Employees have received payments totalling CAD $996,000. The remaining Additional Eligible Former Employees have a potential combined entitlement of CAD $93,000. The Applicants continue to receive applications and make payments to eligible former employees pursuant to the above orders.

**STATUS OF THE EMPLOYEE HARDSHIP APPLICATION PROCESS AND FUND**

75. On July 30, 2009, a Court Order was issued by this Court approving an employee hardship application process (the "Employee Hardship Order") as more fully described in the Sixteenth Report and the Affidavit of John Doolittle dated July 24, 2009.

76. On February 25, 2011, this Court approved the Applicants' request to:

   a) amend the employee hardship application criteria such that sufficient hardship funds (the "Required Funds") be made available for payment of CAD $3,000 to the Additional Eligible Former Employees, when combined with the unused funds in the Termination Fund; and

   b) reduce the amount available for hardship applications by the Required Funds.

77. By Court Order dated April 8, 2011, this Court approved making sufficient funds available from the Employee Hardship process to pay each of the SIB Beneficiaries and the STB Beneficiaries entitled to STBs in Pay the maximum 10% distribution in accordance with the methodology used for the January Interim Distribution to a maximum of one month's benefits. The amount available for hardship applications was to be reduced by the amount required to effect this Order.

78. On December 7, 2011, this Court approved the Applicants' request to extend the Application Period until June 29, 2012.

79. As a result of the Court Orders dated February 25, 2011 and April 8, 2011, the amount available for employee hardship applications as of March 9, 2012 is as follows:

| (in CAD 000's) | | |
|---|---|---|
| Hardship Fund, Opening | | 750 |
| Hardship Payments per Monitor's 78th Report | (130) | |
| Additional Hardship Payments to March 9, 2012 | (9) | |
| | | (139) |
| Additional Eligible Former Employees-paid | (267) | |
| Additional Eligible Former Employees - reserved | (93) | |
| | | (360) |
| April SIB/STB Hardship | | (180) |
| Hardship Fund, Remaining | | 71 |

23

80. The Monitor is continuing to administer the hardship payment application process and report thereon to the appropriate representative counsel. There currently remains available approximately CAD $71,000 to satisfy future hardship application requests. Applications continue to be received from former employees of the Applicants asserting financial hardship resulting from illness, healthcare costs or ineligibility for pension or employment insurance benefits.

81. The Monitor is working closely with counsel to the CAW, LTD Beneficiaries' and Former Employees' Representative Counsel to facilitate access to programs that can offer relief to former employees, particularly with respect to healthcare costs. The Monitor has had an active facilitation role with one such program since last reporting on this matter. The Monitor believes access to the hardship application procedure remains necessary as applications continue to be received as a result of the cessation of benefits to LTD Beneficiaries and Former Employees. Accordingly, the Monitor supports the Applicants' request for an extension of the deadline for submitting hardship applications to July 31, 2012.

82. A copy of the proposed amended Eligibility Requirements and the Procedure With Respect To Hardship Payment Applications is attached as Appendix "D" to this Eighty-Fourth Report.

**STATUS OF REALIZATION OF REMAINING ASSETS**

83. While Nortel has now completed the sale of its operating units, the Applicants continue to assess the sale of their remaining assets in consultation with their legal and financial advisors.

*Residual IT Assets Sale Process*

84. On March 25, 2011, this Court granted an order with respect to the process for the sale of the Applicants' remaining information technology infrastructure assets (the "Residual IT Assets"), including the Applicants' portfolio of IP addresses.

24

85. On February 17, 2012, this Court granted orders approving the sale of certain of the Applicants' rights in a certain number of internet protocol addresses to CSC Holdings, LLC ("Cablevision") and salesforce.com, Inc. ("Salesforce"). The Cablevision and Salesforce transactions closed on February 29, 2012 and February 27, 2012, respectively.

86. On April 4, 2012, this Court granted an order approving the sale of certain of the Applicants' rights in a certain number of internet protocol addresses to Bell Aliant Regional Communications, Limited Partnership. This transaction is anticipated to close in early to mid April, 2012.

87. The Applicants have also entered into sale agreements with other purchasers to transfer additional portions of their IP address portfolio. Such transactions will be brought for Court approval upon the satisfaction or waiver of certain conditions as agreed between the Applicants and the applicable purchaser. The Applicants, with the assistance of the Monitor, continue to market their IP addresses that are not subject to a pending sale agreement and to receive and consider expressions of interest or bids for such IP addresses.

## STATUS OF ALLOCATION MATTERS AND MEDIATION

88. As previously reported in the Seventieth Report, Orders were issued by this Court and the U.S. Court dated June 17, 2011 pursuant to which various parties interested in the allocation of the Nortel global divestiture sale proceeds were ordered to mediate the issues raised in the allocation protocol motions heard on June 7, 2011 before this Court and the U.S. Court pending the release of the Courts' decisions on same.

89. By their respective Orders dated June 29, 2011, this Court and the U.S. Court appointed The Honourable Warren K. Winkler, Chief Justice of Ontario, to serve as mediator (the "Mediator").

90. On August 3, 2011, the U.S. Court entered an order requesting the appointed mediator to consider the postponement of the mediation until after the U.S. Court's decision on the U.S. Debtors' objections and motions to dismiss the claims of the EMEA Debtors against them.

91.  The U.S. Court hearing with respect to the EMEA Debtors' claims took place October 14, 2011. On March 20, 2012, the U.S. Court entered an order and issued a memorandum opinion granting in part and denying in part the U.S. Debtors' and Official Committee of Unsecured Creditors' joint objections and motions to dismiss the claims of NNUK, Nortel Networks (Ireland) Limited and NNSA. The issuance of this decision by the U.S. Court now allows for the mediation to commence.

92.  On March 26, 2012 the parties to the mediation, including the Applicants and Monitor, received a letter from the Mediator indicating that parties are to file new or revised briefs by April 16, 2012 and a meeting of the parties to the mediation is scheduled for April 24, 2012 in Toronto, Canada.

## STATUS OF ENVIRONMENTAL MATTERS

93.  As previously reported in the Seventieth Report, the Applicants brought a motion seeking, *inter alia*, the approval of the repudiation of contracts relating to environmental monitoring and remediation at the Impacted Sites (as defined in the Sixty-Sixth Report) and a declaration that various Orders of the Ontario Ministry of the Environment (the "MOE Orders") and related proceedings before the Ontario Environmental Review Tribunal were subject to the stay of proceedings granted by this Court. Further details with respect to that motion are contained in the related motion materials and the Sixty-Sixth and Seventy-Fourth Reports.

94.  By Endorsement dated March 9, 2012 (the "Environmental Matters Decision"), a copy of which is attached as Appendix "E" hereto, this Court held that:

   a)  the MOE Orders are subject to the stay of proceedings;

   b)  all proceedings before the Ontario Environmental Review Tribunal in relation to the MOE Orders are stayed;

   c)  the Applicants are authorized to cease performing any remediation at or in relation to the Impacted Sites;

26

    d)  the Applicants are released from all contractual obligations to carry out remediation requirements at or in relation to the Impacted Sites; and

    e)  any claims in relation to such current or future remediation requirements by the MOE against any of the Applicants or their current or former directors or officers in relation to the Impacted Sites are subject to resolution and determination in accordance with the terms of the Claims Procedure Order and the Claims Resolution Order.

95.  On March 21, 2012, the Applicants sent a letter to those parties whom they understand to have an interest in the Impacted Sites advising them of:

    a)  this Court's Endorsement dated March 9, 2012;

    b)  the Applicants' intent to cease any remediation and monitoring activities on the Impacted Sites effective April 23, 2012; and

    c)  inviting any of the parties receiving the letter to contact legal counsel for the Applicants to make arrangements for any necessary transition steps that may be necessary to undertake remediation activities on their own behalf.

A copy of this letter is attached as Appendix "F".

96.  As of the date of this Eighty-Fourth Report, certain of the parties have been in contact with legal counsel for the Applicants to facilitate a transition of responsibilities relating to remediation and monitoring work on the Impacted Sites.

97.  On March 23, 2012, Her Majesty the Queen in right of Ontario as represented by the Ministry of the Environment served a notice of motion for leave to appeal the Environmental Matters Decision to the Ontario Court of Appeal.

**OTHER MATTERS**

*SNMP Research Matters*

98.  On or about September 21, 2011, SNMP Research International, Inc. and SNMP Research, Inc. (collectively, "SNMP Research") gave notice of a motion seeking an order lifting the

stay of proceedings, to permit SNMP Research to file a complaint with the U.S. Court against, *inter alia*, the Applicants relating to the alleged unlawful use, distribution, licence and sale of SNMP Research products after the Filing Date.

99.  Following the service of the motion, the Applicants, the U.S. Debtors and SNMP Research engaged in good faith negotiations and agreed to mediate the matters at issue between SNMP Research and Nortel. In connection with such agreement, the Applicants and the Monitor consented to an Order of this Court dated October 26, 2011, lifting the stay for the sole purpose of permitting SNMP Research to move for relief in the U.S. Court to file its complaint under seal, to simultaneously file the complaint with the U.S. Court, and to complete service of the complaint on the Applicants. Such relief was granted in order to permit SNMP Research to seek to preserve its existing claims (if any) from becoming statute barred and on a without prejudice basis as to any and all matters that are or may be at issue between Nortel and SNMP Research, including, without limitation, the merits of SNMP Research's lift stay motion and the appropriate forum(s) for the hearing and determination of SNMP Research's claims.

100. The Applicants, the U.S. Debtors and SNMP Research are presently in the process of engaging a mediator and discussing other particulars of the mediation.

*Estate Separation Activities*

101. As discussed in previous Reports, many of Nortel's corporate functions span multiple legal entities. As the divestiture of the various operating lines of business and the majority of transition services provided to the various buyers has been completed, the interdependency of the Nortel entities has diminished.

102. As discussed in the Seventy-Eighth Report, various Nortel estates are developing and implementing plans for the separation of IT functions during the first half of 2012 in order to allow each estate to operate going forward on a "standalone" basis.

103. The Applicants have made considerable progress in this regard and have successfully completed the separation of several shared applications including migrating to a standalone

accounting and reporting system. Certain IT applications and databases remain shared across various estates and efforts are underway to complete the separation of IT functions.

*French Employee Claims*

104. Approximately 128 former employees of NNSA have commenced actions against, *inter alia*, NNC, NNL and the Monitor before the Versailles employment tribunal in France. Although the specific relief claimed varies on a case by case basis, the central claim is that NNC and NNL are liable for various employment related claims on the grounds that they were "co-employers" with NNSA. The aggregate amount claimed is approximately €18 million. A full hearing was originally scheduled before the Versailles employment tribunal on October 31, 2011; however, this hearing has now been adjourned to June 6, 2012.

## STATUS OF FOREIGN PROCEEDINGS

*Chapter 11*

105. The following is a summary of the court orders that have been issued and the financial information that has been filed in the Chapter 11 Proceedings since the last update provided in the Seventy-Eighth Report:

   a) on January 6, 2012, the U.S. Debtors obtained an order authorizing NNI to deliver certain consents and authorizations and enter into certain agreements to facilitate the wind-down of Nortel Networks Kabushiki Kaisha;

   b) on March 20, 2012, the U.S. Court entered an order and issued a memorandum opinion granting in part and denying in part the U.S. Debtors' and Official Committee of Unsecured Creditors' joint objections and motions to dismiss the claims of NNUK, Nortel Networks (Ireland) Limited and NNSA;

   c) the U.S. Debtors filed Debtor-in-Possession Monthly Operating Reports for the months of October, November and December 2011 on December 1, 2011, December 30, 2011 and March 25, 2012, respectively; and

d) in addition, the U.S. Debtors obtained orders granting omnibus objections to claims, approving certain settlement and side agreements, resolving issues related to the provision and handling of certain information in connection with the Official Committee of Long Term Disability Plan Participants and Official Committee of Retired Employees, authorizing and amending the retention and payment of professionals, resolving certain discovery issues, modifying certain procedural rules related to the filing of claim objections, and resolving certain claims and motions.

*Chapter 15*

106. The following is a summary of the filings in the Chapter 15 proceedings of the Applicants since the last update provided in the Monitor's Seventy-Eighth Report:

a) on December 16, 2011, the Monitor filed notice of the order of this Court dated December 15, 2011, which, among other things, extended the Stay Period to and including April 13, 2012;

b) on December 28, 2011, the Monitor obtained orders giving effect in the U.S. to the orders of this Court: (i) granting certain limited relief from the stay to SNMP Research; and (ii) authorizing and approving related methodologies for the valuation of compensation claims;

c) on December 30, 2011, the Monitor filed notice of the Order and Endorsement of this Court dated December 23, 2011, relating to the approval of a Global Settlement and Release Agreement between the Applicants, the U.S. Debtors, certain EMEA entities, the Joint Administrators and Flextronics; and

d) the Monitor has continued to file with the U.S. Court and serve on required parties notices of each of its Reports to this Court.

**MONITOR'S ANALYSIS AND RECOMMENDATIONS**

107. The Stay Period presently expires on April 13, 2012. The Applicants are seeking a 109 day extension of the Stay Period up to and including July 31, 2012. As stated above, based

on the cash flow analysis, including the assumptions contained therein, the Applicants have sufficient cash resources to fund operations through the requested stay extension.

108. The Monitor has assisted and continues to assist the Applicants in their efforts to efficiently complete the realization and maximization of value from their assets, conduct the claims process and prepare a plan of arrangement. An extension of the Stay Period is required to permit these efforts to continue and to otherwise continue with an orderly wind-down of the Applicants' affairs. The Monitor believes the Applicants are working diligently and in good faith and continue to progress towards the development of a plan of arrangement.

109. For the reasons outlined in this Eighty-Fourth Report, the Monitor supports the Applicants' request for the following:

   a)  an extension of the stay up to and including July 31, 2012;

   b)  an extension of the Employee Hardship Application Process to July 31, 2012; and

   c)  that the Eligibility Requirements and the Procedure with Respect to Hardship Payments Applications be amended consistent with (b), above.

All of which is respectfully submitted this 5th day of April, 2012.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**
**and not in its personal capacity**

Per:

Murray A. McDonald
President

31

APPENDIX "A"

[ATTACHED]

APPENDIX A

**Nortel Networks - November 27, 2011 to March 24, 2012**
**CCAA Applicants**
**Forecast Cash Flow - Variances**
USD (Millions)

| | Forecast | Actuals | Variances |
|---|---|---|---|
| Start of period | 27-Nov-11 | 27-Nov-11 | 27-Nov-11 |
| End of period | 24-Mar-12 | 24-Mar-12 | 24-Mar-12 |

**1. Receipts & Disbursements**

| | Forecast | Actuals | Variances |
|---|---|---|---|
| **Receipts** | | | |
| Collection of Accounts Receivable | - | 0.7 | 0.7 |
| Other Receipts | 0.4 | 1.5 | 1.1 |
| TSA Recoveries from Buyer | 0.1 | 0.3 | 0.2 |
| Payroll & AP reimbursement from Buyers | - | 0.1 | 0.1 |
| Intercompany Receipts | 0.3 | 5.3 | 5.0 |
| **Total Receipts** | 0.8 | 7.9 | 7.1 |
| | | | |
| **Disbursements** | | | |
| Payroll (Gross) | 18.2 | 20.3 | (2.1) |
| Benefits | 5.8 | 1.0 | 4.8 |
| Pension | - | - | - |
| Inventory Purchases | 5.5 | - | 5.5 |
| Non-Inventory Purchases | 6.6 | 6.4 | 0.2 |
| Payroll & AP payments on behalf of Buyers | - | 0.1 | (0.1) |
| Intercompany Disbursements | 8.1 | 5.6 | 2.5 |
| Restructuring Costs | 31.2 | 17.5 | 13.7 |
| **Total Disbursements** | 75.4 | 50.9 | 24.5 |
| | | | |
| **Net Cash Flow** | (74.6) | (43.0) | 31.6 |
| FX Impact | - | 2.0 | 2.0 |
| | | | |
| **Opening Available Cash Balance** | 310.1 | 310.1 | - |
| | | | |
| **Closing Available Cash Balance** | 235.5 | 269.1 | 33.6 |
| | | | |
| Unavailable Cash | 238.4 | 238.5 | 0.1 |
| **Total Cash** | 473.9 | 507.6 | 33.7 |
| | | | |
| Restricted Cash | 23.5 | 23.3 | (0.2) |
| **Total Cash + Restricted Cash** | 497.4 | 530.9 | 33.5 |

APPENDIX "B"

[ATTACHED]

APPENDIX B

## Nortel Networks – March 25, 2012
## CCAA Applicants
## Forecast Cash Flow
USD (Millions)

| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start of period | 25-Mar-12 | 01-Apr-12 | 08-Apr-12 | 15-Apr-12 | 22-Apr-12 | 29-Apr-12 | 06-May-12 | 13-May-12 | 20-May-12 | 27-May-12 | 03-Jun-12 | 10-Jun-12 |
| End of period | 31-Mar-12 | 07-Apr-12 | 14-Apr-12 | 21-Apr-12 | 28-Apr-12 | 05-May-12 | 12-May-12 | 19-May-12 | 26-May-12 | 02-Jun-12 | 09-Jun-12 | 16-Jun-12 |
| | | Apr 2012 | | | | | May 2012 | | | | | |
| **Receipts** | | | | | | | | | | | | |
| Collection of Accounts Receivable | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimbursement from Buyers | - | - | - | - | - | - | - | - | - | - | - | - |
| Intercompany Receipts | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | - | - | - | - | - | - | - | - | - | - | - | - |
| **Disbursements** | | | | | | | | | | | | |
| Payroll (Gross) | 0.3 | - | - | - | 0.6 | - | - | 0.2 | - | - | - | - |
| Benefits | 0.1 | - | - | - | - | - | - | - | - | - | - | - |
| Pension | - | - | - | - | - | - | - | - | - | - | - | - |
| Inventory Purchases | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Inventory Purchases | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | - | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 |
| Intercompany Disbursements | - | - | - | - | - | - | - | - | - | - | - | - |
| Restructuring Costs | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | - | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 2.1 |
| **Total Disbursements** | 2.5 | 2.9 | 2.5 | 3.1 | 2.5 | - | 2.3 | 2.1 | 2.3 | 2.1 | 2.1 | 2.7 |
| **Net Cash Flow** | (2.5) | (2.9) | (2.5) | (3.1) | (2.5) | - | (2.3) | (2.1) | (2.3) | (2.1) | (2.1) | (2.7) |
| FX Impact | - | - | - | - | - | - | - | - | - | - | - | - |
| Opening Available Cash Balance | 269.1 | 266.6 | 263.7 | 261.2 | 258.1 | 255.6 | 255.6 | 253.3 | 251.2 | 248.9 | 246.8 | 244.7 |
| Closing Available Cash Balance | 266.6 | 263.7 | 261.2 | 258.1 | 255.6 | 255.6 | 253.3 | 251.2 | 248.9 | 246.8 | 244.7 | 242.0 |
| LG & Structured Proceeds | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 |
| **Total Cash** | 505.1 | 502.2 | 499.7 | 496.6 | 494.1 | 494.1 | 491.8 | 489.7 | 487.4 | 485.3 | 483.2 | 480.5 |
| Restricted Cash | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 |
| **Total Cash + Restricted Cash** | 528.4 | 525.5 | 523.0 | 519.9 | 517.4 | 517.4 | 515.1 | 513.0 | 510.7 | 508.6 | 506.5 | 503.8 |

## Nortel Networks - March 25, 2012
## CCAA Applicants
### Forecast Cash Flow
### USD (Millions)

| | Forecast Jun 2012 | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast Jul 2012 | Forecast |
|---|---|---|---|---|---|---|---|---|---|
| Start of period: | 10-Jun-12 | 17-Jun-12 | 24-Jun-12 | 01-Jul-12 | 08-Jul-12 | 15-Jul-12 | 22-Jul-12 | 29-Jul-12 | 25-Mar-12 |
| End of period: | 16-Jun-12 | 23-Jun-12 | 30-Jun-12 | 07-Jul-12 | 14-Jul-12 | 21-Jul-12 | 28-Jul-12 | 31-Jul-12 | 31-Jul-12 |
| **Receipts** | | | | | | | | | |
| Collection of Accounts Receivable | - | - | - | - | - | - | - | - | - |
| Other Receipts | - | - | - | - | - | - | - | - | - |
| Reimbursement from Buyers | - | - | - | - | - | - | - | - | - |
| Intercompany Receipts | - | - | 11.2 | - | - | - | - | - | 11.2 |
| **Total Receipts** | - | - | 11.2 | - | - | - | - | - | 11.2 |
| **Disbursements** | | | | | | | | | |
| Payroll (Gross) | 0.2 | | 0.3 | | 0.2 | | 0.2 | | 2.4 |
| Benefits | 0.1 | | | | | | | 0.3 | 0.5 |
| Pension | - | - | - | - | - | - | - | - | - |
| Inventory Purchases | 0.4 | 0.4 | 0.4 | 0.3 | 0.3 | 0.3 | 5.5 | 5.5 | 6.5 |
| Non-Inventory Purchases | - | 0.1 | - | - | - | - | - | - | 6.8 |
| Intercompany Disbursements | - | - | - | - | - | - | - | - | 0.1 |
| Restructuring Costs | 2.1 | 2.1 | 2.1 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 56.2 |
| **Total Disbursements** | 2.8 | 2.8 | 2.9 | 2.5 | 2.7 | 2.5 | 8.5 | 8.5 | 57.5 |
| **Net Cash Flow** | (2.3) | (2.6) | 8.4 | (2.5) | (2.7) | (2.5) | (8.5) | - | (40.3) |
| FX Impact | - | - | - | - | - | - | - | - | - |
| Opening Available Cash Balance | 242.0 | 239.2 | 236.6 | 245.0 | 242.5 | 239.8 | 237.3 | 228.8 | 269.1 |
| Closing Available Cash Balance | 239.2 | 236.6 | 245.0 | 242.5 | 239.8 | 237.3 | 228.8 | 228.8 | 228.8 |
| LG & Standstill Proceeds | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 |
| **Total Cash** | 477.7 | 475.1 | 483.5 | 481.0 | 478.3 | 475.8 | 467.3 | 457.3 | 467.3 |
| Restricted Cash | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 |
| **Total Cash + Restricted Cash** | 501.0 | 498.4 | 506.8 | 504.3 | 501.6 | 499.1 | 490.6 | 480.6 | 490.6 |

APPENDIX "C"

[ATTACHED]

## Appendix C
## Nortel Networks - CCAA Applicants Overall Claims Status
March 16, 2012
All amounts in CAD $ millions

| Debtor / Claim Category | Current claim value - most recent stage [1][2][3] | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Filed Proof of Claim | | Under Review | | Accepted or Reviewed and unadjusted | | Value per Notice of Disallowance | | Value per Notice of Dispute | |
| | # | $ | # | $ | # | $ | # | $ | # | $ |
| **Nortel Networks Corporation** | | | | | | | | | | |
| Trade | 73 | 1,666.0 | 28 | 77.4 | 42 | 0.1 | - | - | 3 | 20.8 |
| Bonds | 2 | 4,808.7 | 2 | 4,808.7 | - | - | - | - | - | - |
| Term. & Severance | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 7 | 2,514.0 | 7 | 2,514.0 | - | - | - | - | - | - |
| Other | 162 | 769.6 | 45 | 306.2 | 114 | 1.8 | - | - | 3 | 1.2 |
| Total | 244 | 9,758.3 | 82 | 7,706.3 | 156 | 1.9 | - | - | 6 | 22.0 |
| **Nortel Networks Global Corporation** | | | | | | | | | | |
| Trade | 10 | 1,493.2 | 3 | 10.0 | 6 | - | - | - | 1 | 0.8 |
| Bonds | - | - | - | - | - | - | - | - | - | - |
| Term. & Severance | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 6 | 2,510.3 | 6 | 2,510.3 | - | - | - | - | - | - |
| Other | 35 | 213.6 | 30 | 0.1 | 5 | - | - | - | - | - |
| Total | 51 | 4,217.1 | 39 | 2,520.4 | 11 | - | - | - | 1 | 0.8 |
| **Nortel Networks International Corporation** | | | | | | | | | | |
| Trade | 7 | 1,492.4 | 3 | - | 4 | - | - | - | - | - |
| Bonds | - | - | - | - | - | - | - | - | - | - |
| Term. & Severance | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 6 | 2,510.3 | 6 | 2,510.3 | - | - | - | - | - | - |
| Other | 35 | 213.6 | 30 | 0.1 | 5 | - | - | - | - | - |
| Total | 48 | 4,216.3 | 39 | 2,510.4 | 9 | - | - | - | - | - |
| **Nortel Networks Limited** | | | | | | | | | | |
| Trade | 320 | 1,579.8 | 55 | 556.7 | 251 | 62.5 | - | - | 14 | 28.1 |
| Bonds | 4 | 5,243 | 4 | 5,243 | - | - | - | - | - | - |
| Inter-company (NNI claim) | 1 | 2,517 | - | - | 1 | 2,517 | - | - | - | - |
| Term. & Severance | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 7 | 2,511 | 7 | 2,511 | - | - | - | - | - | - |
| Other | 194 | 1,718 | 66 | 1,076 | 100 | 22.1 | - | - | 38 | 0.7 |
| Total | 526 | 13,568.7 | 122 | 9,386.9 | 352 | 2,601.6 | - | - | 52 | 28.8 |
| **Nortel Networks Technology Corporation** | | | | | | | | | | |
| Trade | 142 | 1,544.3 | 12 | 10.8 | 125 | 21.0 | - | - | 5 | 21.5 |
| Bonds | - | - | - | - | - | - | - | - | - | - |
| Term. & Severance | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 6 | 2,510 | 6 | 2,510 | - | - | - | - | - | - |
| Other | 36 | 214 | 30 | 0 | 6 | - | - | - | - | - |
| Total | 184 | 4,268.3 | 48 | 2,521.2 | 131 | 21.0 | - | - | 5 | 21.5 |
| **Grand Total** | 1,053 | 36,028.7 | 330 | 24,645.1 | 659 | 2,624.4 | - | - | 64 | 73.0 |

Notes:
Note 1:  The estimated value of individual claims by category is aggregated and shown in one claim stage only.
Note 2:  All amounts (other than Accepted) are subject to potential material change (i.e., negotiation, appeal, etc.) as the process for the determination of claims proceeds.
Note 3:  Excludes claims filed by various EMEA entities pursuant to the EMEA Claim Procedure Order dated January 14, 2011 and claims filed pursuant to
         the Compensation Claims Procedure Order dated October 6, 2011.

APPENDIX "D"

[ATTACHED]

**APPENDIX D**

**Eligibility Requirements and Procedure with Respect to Hardship Payment Applications**

1. **Eligibility** – A former employee would be eligible for hardship payments if he or she is resident in Canada and has no available source of income, being all monies receivable by the former employee including, without limitation, employment income such as wages, salary or bonuses, consulting income, or pension or disability payments or income replacement payments ("Income"), or Income of a spouse, as of the date of the application and has no reasonable expectation of being in receipt of Income during the Application Period (referred to below) and:
   a. The former employee is unable to work due to illness or is incurring costs in excess of 25% of his or her EI payments as a result of treatment for illness or healthcare costs, or as a result of the illness of a family member who is dependent on the former employee for support; or
   b. During the Application Period the former employee is not receiving a Nortel pension or employment insurance (EI) as a result of ineligibility for EI or exhaustion of EI benefits, and demonstrates some other significant hardship in dealing with financial obligations.

2. **Application Process** – Notice of the application process will be posted on the Monitor's website and the website of the Nortel Retiree Protection Committee (NRPC) in a form approved by the Court. An applicant would be required to complete an application form (to be approved by the Court) to be submitted to a person designated by the Monitor. The person so designated would be expected to deal with completed applications within 14 to 21 days and to make an initial determination to approve or reject the application. The first payment will proceed within seven business days subject to the payment parameters set out below. If not approved, the application is to be reviewed by an informal committee and the applicant will be given the right to be heard by the committee. The committee will be composed of one company appointee, one appointee of the Monitor and one appointee chosen by the NRPC, who will be compensated for his time on an hourly basis. A further appeal may be brought to the Court or an officer of the Court designated by the presiding judge, costs to be determined by the Court on the application.

3. **Payment Parameters** – Any successful applicant may be approved for a maximum payment of up to 8 weeks salary based on a maximum weekly salary of up to $1,200 per week payable in monthly instalments. The hardship committee will also have discretion to approve additional amounts in cases of medical and other emergencies in an amount up to $2,500.

4. **Application Period** – From the date of court approval to July 31, 2012.

5. **Miscellaneous**
   a. Hardship Payments are advances against distributions on claims, and will be deducted from any payments on claims that may be allowed in the ultimate claims process in these proceedings.
   b. The Monitor shall report to the Court on or before November 30, 2009 with respect to the processing and administration of hardship payment applications.
   c. The aggregate maximum amount available for hardship payments on applications approved during the Application Period is $750,000 less the total Required Funds (as defined by paragraph 4 of the February 25, 2011 Court order plus as defined by paragraph 3 of the April 8, 2011 Court Order).

APPENDIX "E"

[ATTACHED]

CITATION: Nortel Networks Corporation (Re), 2012 ONSC 1213
COURT FILE NO.: 09-CL-7950
DATE: 20120309

## SUPERIOR COURT OF JUSTICE – ONTARIO
## (COMMERCIAL LIST)

**RE:**    IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

**BEFORE:**    MORAWETZ J.

**COUNSEL:**    Alan Mersky and Nicholas Daube, for the Applicants, Nortel Networks Corporation et al

Joseph Pasquariello and Christopher Armstrong, for the Monitor, Ernst & Young Inc.

Ian Brady and Matthew Page, for Sydney Street Properties Corp.

Lyndon Barnes, for Directors of Nortel Networks Corporation

Leonard Marsello, William MacLarkey and Joshua Hunter, for Her Majesty The Queen in Right of Ontario, as Represented by the Ministry of the Environment

R. Benjamin Mills, for the Corporation of the City of Belleville and the Algonquin and Lakeshore Catholic District School Board

Andrew Gray, for Nortel Networks Inc.

Craig Mills and Tamara Farber, for 2058756 Ontario Limited

Lee Cassey and Jonathan Bell, for Nortel Informal Noteholder Group

Jane Dietrich and Alex MacFarlane, for the Official Committee of Unsecured Creditors

Thomas McCrae and Arthur O. Jacques, for Nortel Canadian Continuing Employees

Brett Harrison, for Rogers Corporation

- Page 2 -

## ENDORSEMENT

[1]    A number of motions, detailed below, were brought in connection with environmental issues affecting Nortel Networks Corporation et al (collectively, "Nortel").

[2]    The primary motion was brought by Nortel (the "Nortel Motion").   Nortel seeks authorization and direction that it cease performing any remediation at or in relation to the Impacted Sites (defined below) and a declaration that any claims in relation to such current or future remediation requirements by the Ministry of the Environment ("MOE") or any other person (as defined in the Initial Order) against Nortel or their current or former directors or officers in relation to the Impacted Sites be subject to resolution and determination in accordance with the terms of the Amended and Restated Claims Procedure Order dated July 30, 2009 (the "CP Order") and the Claims Resolution Order dated September 16, 2010 (the "CR Order").

[3]    Nortel also seeks an order repudiating or disclaiming any contractual obligations to carry out remediation requirements at the Impacted Sites; an order declaring that the relief sought by the MOE Orders (defined below; referred to as the "2009 Order" in Nortel's Notice of Motion) is financial and monetary in nature and that the MOE Orders are stayed by the Stay of Proceedings (the "Stay") set out in paragraphs 14 and 15 of the Initial Order dated January 14, 2009, as amended and restated (the "Initial Order"); a declaration that the proceedings before the Ontario Environmental Review Tribunal in relation to the MOE Orders be stayed and finally, advice and direction with respect to the Retained Lands at the London site (defined below).

[4]    Sydney Street Properties Corporation ("SSPC") brought a motion requesting that Nortel and its environmental consultants disclose and produce to SSPC all non-privileged documentation relating to the historical remediation and monitoring of the environmental condition of the property located at 250 Sydney Street, Belleville, Ontario and surrounding properties.  The SSPC motion also requested an order extending the claims bar date to allow SSPC to file an amended claim related to the pollution at 250 Sydney Street, Belleville, to the later of 90 days from the date of determination of the Nortel Motion or 15 days from the date of approval by the MOE of the work plan required pursuant to the Directors' Order of September 7, 2011.  The SSPC motion also requested a declaration that the revised proof of claim dated August 22, 2011 of SSPC is permitted to be filed with the Monitor and is not barred under the CP Order.

.[5]    The SSPC motion was adjourned to a scheduling appointment within 30 days of the disposition of the Nortel Motion.

[6]    The Corporation of the City of Belleville and the Algonquin and Lakeshore Catholic District School Board brought a motion similar to that of SSPC, relating to property in Belleville, Ontario.  This motion was also adjourned to a scheduling appointment within 30 days of the disposition of the Nortel Motion.

[7]    Nortel also served a Notice of Constitutional Question indicating that Nortel intended to question the constitutional applicability of the *Environmental Protection Act*, R.S.O. 1990, c. E. 19 (the "EPA"), in particular sections 18, 157, 157.1 (1), 196 (1), 196 (2), 197 (1) and 197 (2).

- Page 3 -

## OVERVIEW

[8]     The Nortel Motion arises from the untidy intersection of the CCAA and, in particular, the Stay provided for in the Initial Order and the powers of the MOE to make orders with respect to the remediation of real property in Ontario.

[9]     Nortel and its predecessors once conducted manufacturing operations in Ontario which were largely terminated and the sites disposed of in the late 1990s.  Nortel advises that in conjunction with the disposition of these sites, it identified environmental impacts arising from past operations at five Impacted Sites.

[10]    At the time of its CCAA filing on January 14, 2009, Nortel had disposed of the Impacted Sites with the exception of a partial interest in one Impacted Site in London, Ontario.  At the time of filing, Nortel was not subject to any MOE remediation orders.  Nortel takes the position that it was conducting limited remediation of some of the Impacted Sites on a contractual or voluntary basis.

[11]    Nortel takes the position that subsequent to the CCAA filing, but prior to the filing of the Nortel Motion, the MOE purported to make an order at one Impacted Site in London, Ontario and since the service of the Nortel Motion, the MOE has purported to:

> (a) revoke, reissue and serve a new order for the Impacted London Site; and

> (b) prepare orders concerning three other Impacted Sites (collectively, with the order for London, the "MOE Orders").

[12]    Nortel raises the concern that the MOE Orders require extensive further remediation steps and it estimates that fully responding to the MOE Orders would require minimum expenditures of $18 million.

[13]    Nortel takes the position that the MOE Orders are in substance and effect requirements for it to pay money.

[14]    Nortel submits that the MOE already may access certain statutory remedies in insolvency and that the MOE Orders fall outside those remedies, effectively creating an unlegislated priority and exceeding the ambit of a regulatory action.

[15]    Consequently, Nortel requests a declaration that the MOE Orders are stayed by the Stay and of no force and effect.

[16]    Not surprisingly, the overview provided by the MOE is significantly different.

[17]    The MOE points out that Nortel, as a former and current owner of environmentally contaminated property, is subject to regulatory obligations under the EPA which are in the nature of performance obligations.  Further, on the facts of this case, the MOE submits that these performance obligations have not advanced to the point of being "claims" that can be stayed pursuant to s. 11 of the CCAA or compromised under a plan of arrangement.

- Page 4 -

## THE FACTS

[18]    As early as the 1940s, Nortel and its predecessors operated manufacturing facilities in Ontario which involved the use of various hazardous substances, particularly, chlorinated solvents (also known as volatile organic compounds, "VOCs"). In the late 1990s, Nortel disposed of the majority of its land holdings in Ontario and, in conjunction with such dispositions, identified environmental impacts in soil and groundwater at manufacturing sites in Brampton (the "Brampton Site"), Brockville (the "Brockville Site"), Kingston (the "Kingston Site"), Belleville (the "Belleville Site") and London (the "London Site") (collectively, the "Impacted Sites").

[19]    As of the date of CCAA filing, Nortel retained a partial interest in one of the Impacted Sites (London). The other sites were sold off in the prior two decades.

[20]    Notwithstanding the sales, Nortel had undertaken investigation, remediation, monitoring and risk assessment activities at the Impacted Sites. The MOE was generally apprised of such activities, with variations on a site-by-site basis.    Nortel advises that it has invested approximately $30.2 million on these remediation efforts since the late 1990s.

[21]    In the facta filed by Nortel and the MOE, considerable detail is provided with respect to the status of remediation at the Impacted Sites as well as the status of various orders issued by the MOE.

[22]    Summary information was also set out in the 66th and 74th Reports of the Monitor.

## BRAMPTON

[23]    Nortel ceased manufacturing operations at the Brampton Site in 1999 and the property was sold in 2005. On June 30, 2011, Nortel entered into a Transition Agreement (the "Brampton Transition Agreement") with Rogers Communication Inc. ("Rogers"). Under the Brampton Transition Agreement, Nortel and Rogers agreed to a gradual cessation of Nortel's environmental risk assessment obligations at the Brampton property in order to effect an orderly transition of environmental responsibilities in relation to the property. Nortel has obtained court approval of the Brampton Transition Agreement. There are no MOE Orders relating to the Brampton Site. The execution of Nortel's obligations under the Brampton Transition Agreement has concluded all issues relating to the Brampton Site.

## BROCKVILLE

[24]    In 1999, Nortel sold the Brockville Site and its associated manufacturing operations. The subsequent owner (SCI) ceased manufacturing operations in approximately 2004. The Site was then sold in 2006 and is now used as a warehouse facility.

[25]    At the time of Nortel's acquisition of the Brockville Site, environmental impacts to groundwater had been identified, including trichloroethylene ("TCE"). Remediation activities to extract and treat impacted groundwater were initiated during Nortel's ownership. At the time of its sale of the site, Nortel arranged access to conduct environmental work. To date, Nortel

- Page 5 -

continues to conduct remediation activities on a contractual basis by pumping and treating impacted groundwater.

[26]    Nortel has provided annual updates to the MOE and the owner of the Brockville Site. Prior to this motion, there were no MOE Orders sought or enforced with respect to the Brockville Site.

[27]    After service of this motion, the MOE posted a draft order on the Environmental Bill of Rights ("EBR") registry for public comment.   The draft order requires Nortel and other responsible parties to submit and implement a workplan for additional groundwater investigations at and related to the Brockville Site in order to confirm the extent of contamination.   The draft order will also require the implementation and completion of the remaining remediation and/or monitoring work and the decommissioning of the monitoring and recovery wells.

[28]    Nortel estimates these environmental efforts will cost a minimum of $4.5 million over an estimated period of 18 years. The current property owner has filed a claim $16.5 million in the CCAA claims process for related amounts.

[29]    The MOE submits that it is premature to fix the costs of the work required by the draft order. The draft order requires the submission of a workplan for review and approval, which will include investigations to determine the nature and extent of contamination. The MOE further takes the position that until these investigations are undertaken and the workplan is approved, the costs associated with the workplan are unknown.

[30]    At the current time, Nortel is engaged in minimal maintenance operations at the Brockville Site.

**KINGSTON**

[31]    Nortel sold the Kingston Site and its associated manufacturing operations in 1995. Manufacturing operations were subsequently discontinued around 2003.

[32]    Impacts to soil and groundwater were identified with respect to aboveground and underground storage tanks (containing VOCs) formerly located at the Kingston Site.  In the course of Nortel's remediation efforts to address the contamination, numerous monitoring wells were installed at the Kingston Site.

[33]    Nortel has provided updates regarding the status of remediation activities to the owner of the Kingston Site and the MOE has been aware of this work.  Prior to the Nortel Motion, there were no MOE Orders sought or enforced with respect to the Kingston Site.

[34]    In contrast to Nortel's statement, the MOE alleges that it appears that between 1996 and April 2011, Nortel did not make any contact with the MOE concerning the Kingston Site, nor did it provide the MOE with any reports.

[35]    Nortel, with the assistance of its environmental consultant, Golder Associates Ltd. ("Golder"), has assessed the risk to human health and the environment at the Kingston Site as

- Page 6 -

low. Contrary to Nortel's assertions, however, the MOE alleges that adverse effects related to soil vapour and groundwater impacts may arise, and migration may continue if an appropriate remediation and monitoring program is not implemented.

[36]    After service of the Nortel Motion, the MOE posted a draft Director's Order on the EBR Registry for public comment. This draft order requires Nortel and other responsible parties to propose additional groundwater investigations, identify the remaining remediation and/or monitoring work required to remediate the site to appropriate cleanup standards, propose a timetable for the completion of the investigations, remediation and monitoring, and propose a decommissioning plan for the existing monitoring and recovery wells.

[37]    Nortel estimates these efforts will cost a minimum of $1 million. The current property owner has filed a claim of $5.2 million in the CCAA claims process.

[38]    The MOE alleges that it is premature to quantify the cost of required work under the draft order because the MOE does not know whether and to what extent the environmental conditions at the Kingston Site have been addressed since 1996. Consequently, the MOE contends that it is speculative to attach a cost estimate to the work required by the draft order.

**BELLEVILLE**

[39]    Nortel ceased active manufacturing activities at the Belleville Site in late 1999 and 2000, when the Belleville Site was sold. In conjunction with the sale, Nortel entered into a lease with SSPL in order to conduct research and design activities as well as environmental work at the Belleville Site. Nortel's research and design activities continued at the site until 2009, when the operations were sold and the operating facilities sublet for a short period.

[40]    Nortel conducted an environmental investigation at the time of the Belleville Site's sale and discovered impacts to soil and groundwater, including TCE impacts. To date, Nortel has performed remediation work on the Belleville Site on a contractual basis.

[41]    Nortel and Golder have assessed the risk to human health and the environment at the Belleville Site as low. The MOE disputes these assertions.

[42]    Prior to this motion, there were no MOE Orders sought or enforced with respect to the Belleville Site. After service of the Nortel Motion, the MOE posted a draft order on the EBR Registry for public comment.

[43]    Nortel estimates these remediation efforts will cost a minimum of $2.5 million. The current property owner has filed a claim of $10 million in the CCAA proceedings for related amounts.

[44]    The MOE disputes these figures and submits that it is premature to fix the costs of the work required by the draft order and that until the nature and extent of the required work is identified by Nortel and approved by the MOE, the costs associated with such work are unknown.

## LONDON

[45]    Nortel terminated manufacturing operations at the London Site in 1994. Nortel has identified environmental impacts to soil and groundwater, including the presence of TCE.

[46]    In 1997 and 1998, Nortel sold portions of the London Site (the "Transferred Lands") while maintaining ownership of the remainder (the "Retained Lands").

[47]    To date, Nortel has performed remediation activities on various portions of the London Site, doing so on a voluntary basis or subject to contractual obligations with purchasers, with notice provided to and approvals obtained from the MOE as necessary. In October 2009, the MOE issued an order (the "First London Order") which, according to Nortel, requires investigation and reporting as to the contamination at, and ongoing treatment activities conducted on the boundary between the Retained Lands and the Transferred Lands.

[48]    In November 2009, Nortel requested particulars and filed an appeal of the First London Order before the Environmental Review Tribunal ("ERT"). The appeal has been adjourned pending Nortel's motion in these proceedings.

[49]    After service of this motion, the MOE posted a draft Director's Order on the EBR Registry. The order requires Nortel to provide the MOE with adequate information to make a proper evaluation of the environmental situation.

[50]    Nortel estimates that the remediation efforts set out in the Second London Order will cost a minimum of $12 million. The MOE disputes these figures, contending that any estimate of remediation cost at this point is premature because the order first requires an assessment of the nature and extent of contamination, the results of which will determine the extent of any remedial work.

[51]    Currently, Nortel has arrived at a mutual accommodation with the MOE pending the release of these reasons. This accommodation provides that Nortel will continue in its small scale maintenance efforts at London.    The ERT hearing rights have been preserved and adjourned.

## ISSUES AND LAW

[52]    Nortel sets out the issue raised on this motion as follows: "Are the MOE Orders subject to the Stay?".

[53]    From the standpoint of the MOE, Nortel's motion raises the following issues:

    (a) whether the MOE Orders referenced constitute compromisable claims under the CCAA;

    (b) whether the MOE Orders referenced are stayed by operation of paragraphs 14 and 15 of the Initial Order or should be otherwise stayed; and

- Page 8 -

(c) whether, given principles of constitutional law, the MOE Orders ought to be characterized as compromisable "claims" and stayed.

[54]    The relevant portion of the Initial Order reads as follows:

[14]    THIS COURT ORDERS that until and including February 13, 2009 or such later date as this court may order (the "Stay Period"), no proceeding or enforcement process in any court or tribunal (each, a "Proceeding") shall be commenced, or continued against or in respect of any of the Applicants or the Monitor, or affecting the Business or the Property, except with the written consent of the affected Applicant and the Monitor, or with leave of this court, and any and all Proceedings currently under way against or in respect of the affected Applicant or affecting the Business or the Property are hereby stayed and suspended pending further order of this court.

[15]    THIS COURT ORDERS that during the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "Persons" and each being a "Person") against or in respect of the Applicants' or the Monitor, or affecting the business or the property, are hereby stayed and suspended except with the written consent of the affected Applicants and the Monitor, or leave of this court, provided that nothing in this order shall (i) empower the Applicants to carry on any business which the Applicants are not lawfully entitled to carry on, (ii) exempt the Applicants from compliance with statutory or regulatory provisions relating to health, safety, or the environment, (iii) prevent the filing of any registration to preserve or protect a security interest, or (iv) prevent the registration of a claim for lien.

**POSITION OF NORTEL**

[55]    Counsel to Nortel submits that the basis for the Stay was founded in s. 11 of the CCAA, which, as noted by the Court of Appeal in *Stelco Inc. (Re)*, [2005] O.J. No. 1171 at para. 36, is the engine that drives the broad and flexible statutory scheme of the CCAA. As noted by the Court of Appeal in these CCAA proceedings, exceptions to the Stay should be narrowly interpreted. See *Nortel Networks Corporation (Re)* 2009 ONCA 833 at para. 17.

[56]    Counsel to Nortel also referenced *Century Services Inc. v. Canada (Attorney General)* 2010 SCC 60 at para. 22 for the proposition that stays provided for by the CCAA and other insolvency regimes enable the centralization and maximization of a debtor's assets for the benefit of all creditors.

[57]    Counsel to Nortel submits that the MOE Orders conflict with the aforementioned goals of the CCAA, as the MOE Orders would entail an expenditure of funds to remedy past actions on lands Nortel, for the most part, no longer owns. Counsel contends that the necessary effects of the MOE Orders are to:

(a) require directly and indirectly the expenditure of a minimum of $18 million; and

(b) consequently, prioritize environmental liabilities over all other unsecured claims against Nortel, such as those asserted by pension, employee, trade and financial creditors.

[58]  The thrust of the argument put forth by Nortel is that the true nature and substance of the MOE Orders is financial, not regulatory and thus the MOE Orders give rise to an operational conflict with the CCAA.

[59]  Counsel to Nortel states that s. 11.8(8) of the CCAA provides for the preferred treatment of environmental liabilities in certain circumstances:

> 11.8(8)  Any claim by Her Majesty in right of Canada or a province against a debtor company in respect of which proceedings have been commenced under this Act for costs of remedying any environmental condition or environmental damage affecting real property of the company is secured by a charge on the real property and on any other real property of the company that is contiguous thereto and that is related to the activity that caused the environmental condition or environmental damage, and the charge
>
> > (a)  is enforceable in accordance with the law of the jurisdiction in which the real property is located, in the same way as a mortgage, hypothec or other security on real property; and
> >
> > (b)  ranks above any other claim, right or charge against the property, notwithstanding any other provision of this Act or anything in any other federal or provincial law.

[60]  Section 11.8(9) is also relevant. It reads:

> A claim against a debtor company for costs of remedying any environmental condition or environmental damage affecting real property of the company shall be a claim under this Act, whether the condition arose or the damage occurred before or after the date on which proceedings under this Act were commenced.

[61]  Counsel to Nortel contends that the effect of the above-referenced sections provides a specific remedy: "a super priority" over real property that is contaminated.

[62]  Counsel also referenced *Harbert Distressed Investment Fund, LP v. General Chemical Canada Ltd.* 2007 ONCA 600, leave to appeal to the Supreme Court dismissed 2008 CarswellOnt 879, where the court noted, at paragraph 46, in reviewing similar provisions in the *Bankruptcy and Insolvency Act* ("BIA"):

> To give effect to provincial environmental legislation in the face of these amendments to the BIA would impermissibly affect the scheme of priorities in the federal legislation.

- Page 10 -

[63]    Nortel acknowledges that the MOE retains the ability to act unilaterally against a debtor, where the MOE's orders are in substance regulatory. This exception is explicitly recognized in the Initial Order.

[64]    Counsel to Nortel emphasized that it is important to note that Nortel no longer conducts operations at any of the Impacted Sites and the contamination on such sites has been present for decades.

[65]    Further, counsel submits that there are no compliance obligations under Ontario's environmental legislation with respect to historic contamination and there is no mandatory duty or positive directive under any Ontario statute or regulation to undertake cleanup of impacted soil, remediate groundwater, or prevent offsite migration of contaminants.

[66]    Counsel further submits that against this background, the court in its supervisory authority under the CCAA is required to determine the actual character of orders made by a regulator.    In this respect, counsel to Nortel referenced the following passage from *AbitibiBowater Inc. (Arrangement relative à)*, 2010 QCCS 1261, at paras. 144, 148, and 157, leave to appeal to QCCA refused, 2010 QCCA 965, leave to appeal to SCC granted (2010), 413 NR 397 ["*AbitibiBowater*"] (the appeal of which was heard by the Supreme Court of Canada on November 16, 2011):

> Applying these considerations to the situation at hand, the Court is of the view that it has the authority to decide if the EPA Orders qualify as claims under the CCAA and can be described as provable or contingent claims under the BIA.

> ...

> Accordingly, environmental obligations arising from a regulatory order that remain, in a particular fact pattern, truly financial and monetary in nature can be qualified as claims under the CCAA. Likewise, if one is convinced that there exists, in such a fact pattern, a claim that "might" be filed, it is open to be compromised on the plain reading of s. 12 of the CCAA.

> ...

> Parliament has therefore confirmed that the CCAA may be employed to place an appropriate check on regulatory actions, particularly when they are purely "monetary orders". This is exactly the kind of jurisdiction the court is exercising here. Of course, this exercise requires the court looking at substance over form.

[67]    Counsel to Nortel further submits that there are competing interests in insolvency proceedings and that courts have adopted the "single proceeding model" so as to ensure a fair and orderly assessment of claims. The Supreme Court in *Century Services, supra*, at para. 22 stated:

> Grouping all possible actions against the debtor into a single proceeding controlled in a single forum facilitates negotiation with creditors because it places them all on an equal footing, rather than exposing them to the risk that a more

aggressive creditor will realize its claims against the debtor's limited assets while the other creditors attempt a compromise. With a view to achieving that purpose, both the CCAA and the BIA allow a court to order all actions against a debtor to be stayed while a compromise is sought.

[68]   In this case, counsel to Nortel submits that the MOE Orders are promulgated with only one societal interest in mind:   protection of the environment from and remediation of contaminants.   That interest, counsel submits, however valid, is generally superseded by the "single proceeding model" of insolvencies.

[69]   This issue was identified and addressed in *AbitibiBowater, supra,* at paras. 160 and 170-172, where the court stated:

> The true regulatory character or otherwise financial and monetary nature of a given order is influenced by who issues the order, who stands to benefit from it, what remains its genuine objective and what means of enforcement truly exist in reality.
>
> ...
>
> While the dividing line between regulatory claims and their financial consequences may be blurred at times, there can be no confusing the two when the regulatory authority is seeking to make orders concerning solely past actions and activities in relation to properties that the debtor has disposed or been dispossessed of.
>
> The broad CCAA and BIA provisions referred to above contain no comfort for a regulatory authority seeking to limit the Claims Procedure Order from impacting their plainly financially material actions with artificial distinctions about "regulatory" orders and "financial" ones.   To an insolvent company in CCAA restructuring, an order to pay tens of millions of dollars directly is no different from an order to spend an equivalent amount on specific actions that will benefit others.
>
> Where, as here, the EPA Orders are moreover founded exclusively upon alleged actions in the past and relate in no way to activities taken after the commencement of proceedings, the supervising CCAA court applying such broad definitions has the jurisdiction to intervene.

[70]   Nortel submits that the MOE Orders are, in reality, orders to pay money.   They may be framed in the terminology of ordering investigations, or the drafting and implementation of workplans, but the inevitable consequence of those workplans and investigations is to cause Nortel to spend substantial funds at the behest of the MOE, on lands it largely no longer operates upon or owns.

[71]   Counsel further contends that if Nortel fails to comply, it may be found guilty of an offence with various financial consequences.   In addition, in the event the MOE Orders are not stayed, the EPA permits the Director to order Nortel to pay the costs for work performed should

- Page 12 -

Nortel fail to perform that work itself. The provisions of the EPA thus contemplate, from Nortel's standpoint, a monetary judgment as an ultimate means of enforcing an order.

[72]    Counsel to Nortel submits that, in the circumstances, there is no meaningful distinction between the MOE presenting Nortel with a bill for remediation conducted by the MOE, and the MOE directing Nortel to conduct the remediation in the first instance.

[73]    It was also put forth by Nortel that none of the above circumstances engage the MOE's core regulatory function of prevention and deterrence. According to Nortel, it is those functions which are untouched by the Stay and preserved by the Initial Order, where it stipulates that it does not: "... exempt the Applicants from compliance with or regulatory provisions relating to health, safety or the environment". To the extent that the MOE is concerned with events of non-compliance, Nortel contends that they are decades past, non-recurring, and have no connection to Nortel's current operations.

[74]    Accordingly, counsel argues that, as was found in *AbitibiBowater*, the MOE's Orders are "plainly material financial actions" that are caught by the Stay.

[75]    As indicated above, Nortel has served a Notice of Constitutional Question. The Attorney General of Canada declined to respond. The Attorney General of Ontario is present on behalf of the MOE.

[76]    Counsel to Nortel submits that, if the MOE's orders are primarily monetary in nature, an operational conflict with the CCAA will exist and it is uncontroversial that, at that juncture, otherwise valid provincial legislation will be superseded. See *Canadian Western Bank v. Alberta* 2007 SCC 22; *Nortel Networks Corporation (Re)* 2009 ONCA 833 at paras. 36-38; *Harbert Distressed Investment Fund, LP v. General Chemical Canada Ltd*, 2007 ONCA 600, leave to appeal to the Supreme Court dismissed 2008 CarswellOnt 879; *AbitibiBowater, supra*, at para. 270.

[77]    Counsel to Nortel concludes that the MOE Orders require the payment of large sums in direct contravention of the CCAA priority structure for claims, at the expense of recovery for all other creditors. As such, counsel argues that the MOE Orders must yield to the CCAA for the operational conflict they produce.

[78]    The position of Nortel was supported by the Official Committee of Unsecured Creditors, the Nortel Informal Noteholder Group, the Nortel employee groups, and the directors of Nortel.

[79]    The Monitor also recommended that the relief requested by Nortel be granted.

## POSITION OF THE MOE

[80]    The MOE argues that Nortel's position is incorrect regarding the statutory priority scheme in the CCAA. It submits that s. 11.8(8) of the CCAA addresses the priority standing of the MOE only when it is acting in its capacity as a creditor to recover costs. The MOE submits that Nortel's argument mischaracterizes performance obligations as financial or monetary obligations owed to the Crown. It argues that giving effect to Nortel's submission would unfairly shift any expense associated with environmental remediation to the taxpayers of Ontario

and away from the company's creditors who chose to do business with the company in the first place.

[81]    The MOE takes issue with Nortel's argument that any MOE order relating to its responsibility for historic contamination must be monetary in nature. The MOE takes the position that, apart from the Quebec Superior Court decision in *AbitibiBowater*, this submission has no foundation in law. Further, as the MOE points out in Part II of its factum, Nortel acknowledges having conducted environmental work on properties it no longer owns. The MOE questions the position put forth by Nortel since, if the obligations were monetary in nature, on Nortel's theory of the case, Nortel need not have done the work after the date of the Initial Order.

[82]    The MOE also takes the position that Nortel's analysis ignores the fact that obligations for historic contamination only become "claims provable" when the Minister exercises his discretion in such a way as to transform the performance obligations into monetary ones, thereby creating a debtor/creditor relationship. The MOE argues that it is not legitimate for Nortel to purport to exercise discretion on behalf of the Minister so as to create a debt owed to the Crown. The MOE acknowledges that in discharging its obligations as a regulator, it may, on occasion, take steps that constitute it as a "creditor". In this case, however, they take the position that ministerial discretion has not been so exercised.

[83]    The MOE disputes Nortel's submission that because the MOE Orders require it to spend money, they are "orders for the payment of money". The MOE argues that any financial obligations Nortel might incur to third parties as a function of retaining their services for the purpose of complying with the MOE Orders are entirely different than monetary obligations incurred directly to the Crown itself.

[84]    In its factum, the MOE states that its involvement with any particular site ranges along a regulatory continuum. On one end of that continuum, the MOE, acting as regulator, may impose performance obligations on a responsible party. On the other end of the continuum, the MOE, acting as creditor, may seek the recovery of money from the responsible party, thereby creating a financial obligation which is properly subject to a CCAA stay and a compromisable claim.

[85]    The MOE sets out the continuum as follows, moving from regulatory actions to more creditor-like actions:

    (i)     receive and consider applications for Certificates of Approval in respect of regulated facilities, where applicable;

    (ii)    conduct announced or unannounced inspections of a site, but take no action/issue no orders to the regulated entity. This is sometimes done in conjunction with a plan of voluntary compliance agreed to by the regulated entity, but such a plan is not always necessary if the MOE is of the view that the *status quo* of the site is not an environmental concern;

    (iii)   issue a provincial officer's order/Director's order, for example under sections 18 and 157.1 respectively of the EPA, requiring the regulated entity to undertake a range of possible actions that could include retention of a consultant, assessment of the nature and extent of contamination, development of a workplan to address

the contamination, and implementation of that workplan, which might include monitoring of groundwater, surface water and/or soil conditions, and remediation in one or more forms. These orders deal with existing environmental concerns or with conditions that may lead to an environmental concern;

(iv)  if it appears the regulated entity will not do the work, or if the regulated entity otherwise fails to do the work, the MOE will look to other parties such as former owners or those formerly in management or control of the property, and may issue orders to these other parties to assess and address the environmental concerns;i

(v)  if no other parties can be located to answer the environmental liability, the MOE may issue a notice of intent to do the work itself; however, this is a discretionary decision of the Director exercised only upon a consideration of many factors;

(vi)  the MOE, in fact, does the work itself because there is no one else to do it and the environmental or human health concern is significant;

(vii)  the MOE issues an order to recover costs pursuant to s. 150 of EPA;

(viii)  the MOE takes steps to enforce its recovery order.

[86]  The MOE contends that MOE Orders are not compromisable "claims" and should not be stayed for three principal reasons:

(a)  The CCAA is an insolvency statute and is properly concerned only with obligations that create financial obligations owed to the MOE in its capacity as a creditor. On the facts, Nortel's environmental performance obligations are not monetary claims because any contingent financial liability remains inchoate, is too remote and speculative in nature and is not recoverable by legal process. Transforming regulatory performance obligations into an enforceable right to payment requires, among other things, the exercise of ministerial discretion that might never occur;

(b)  By its terms, the Initial Order specifically preserves Nortel's obligation to comply with regulatory provisions relating to the environment and, accordingly, any actions taken by the MOE (short of seeking to enforce the recovery of money as a creditor) are not stayed. Given this result, there is no conflict between the Initial Order and the MOE Orders and accordingly, the constitutional doctrine of paramountcy need not be considered;

(c)  In any event, any interpretation of the CCAA that would permit the characterization of environmental regulatory performance obligations as compromisable claims would usurp the province's regulatory powers and exceed the federal power over "Bankruptcy and Insolvency".

[87]  Counsel to the MOE submits that Nortel's position would mean that any order issued by the MOE that requires Nortel to spend money to deal with historical pollution would constitute a compromisable claim. However, counsel submits that it is not the spending of money by Nortel or the fact that Nortel is no longer operating on the properties that makes an EPA order a claim.

The MOE submits that Nortel's argument mischaracterizes what are in their nature performance obligations and ignores the fundamental trigger that transforms public regulatory obligations into claims, namely, the exercise of ministerial discretion.

[88]    At the heart of its argument, counsel to the MOE submits that the EPA contemplates a number of remedial and preventative measures, (stages (i) to (iv) on the regulatory continuum referenced above) that are injunctive in nature rather than monetary. Counsel submits that these remedial measures do not create a debtor/creditor relationship. They are consistent with the "polluter pays" principle which seeks to hold the polluting party responsible for remedying environmental contamination.

[89]    In contrast, the MOE contends that the super priority created by sections 11.8(8) and (9) of the CCAA, which specifically referenced the "costs of remedying any environmental condition or environmental damages", were clearly intended to give the MOE a priority only when acting as creditor at stages (v) through (viii) of the regulatory continuum. Specifically, counsel contends that "costs" for the purposes of the super priority are only created where the regulator seeks to recover the costs of work the MOE has done from the responsible party or where the regulator has committed to spending public funds to undertake such environmental remediation, even though the costs have not yet been incurred.

[90]    Counsel further argues that the CCAA applies only to liabilities or obligations in the nature of debts owed to the MOE in its capacity as creditor. Counsel submits that "claim" as defined in s. 12(1) of the CCAA applicable to this proceeding, currently s. 2(1), means any indebtedness, liability or obligation of any kind that, if unsecured, would be a debt provable (now called a "claim") in bankruptcy within the meaning of the BIA.

[91]    Counsel for the MOE contends that s. 2 of the BIA defines "claim provable in bankruptcy" as including any claim or liability provable in proceedings under this Act by a creditor. Accordingly, counsel argues, an interpretation of "claim" that purports to include all performance obligations, including those that do not give rise to a right to payment to the MOE, would rewrite this express definition. In contrast to the position put forth by Nortel, the MOE argues that there is a very meaningful distinction between the MOE acting as a creditor to seek reimbursement for costs of work conducted by the MOE and the MOE acting as regulator issuing an order directing Nortel to carry out performance obligations.

[92]    Counsel also contends that the MOE does not have a "contingent claim" within the meaning of s. 121 of the BIA on the basis that, first, claims that are remote and speculative in nature are not contingent claims; and second, a provable claim must also be recoverable by legal process. Counsel contends that both of these factors militate against a finding that the MOE Orders amount to a monetary claim. A contingent environmental liability, counsel submits, is not created by the mere fact that a property is polluted, by the fact that a regulator has statutory remedies that might or might not develop into monetary claims, or because performance obligations may require responsible parties to spend money to discharge environmental obligations.

[93]    Counsel further submits that the MOE cannot enforce any right to receive payment until it exercises its broad regulatory discretion to do the requested work thereby transforming

regulatory "obligations" owed to the public into compromisable claims owed to the regulator as a creditor. Further, counsel to the MOE contends that while orders at stages (i) through (iv) of the regulatory continuum may well require payment by a company to a third party, such a payment does not create the necessary debtor/creditor nexus between the company and the MOE. On the facts of this case, counsel contends that crystallization of any contingent liability on the part of Nortel is speculative at best.

[94]   Counsel to the MOE also takes issue with Nortel's reliance on *AbitibiBowater* for the proposition that any MOE order relating to its responsibility for historic contamination must be monetary in nature. Counsel contends that the CCAA court in *AbitibiBowater* found that Newfoundland had expropriated the sites at issue in retaliation for an unrelated claim by AbitibiBowater under NAFTA and, as owner, Newfoundland stood to benefit directly from any remedial work. Moreover, Newfoundland had requested proposals for remedial work and done emergency work to repair a dam. Compared factually with *AbitibiBowater*, counsel argues, the situation in this case compels a very different result. Counsel argues that none of the facts as found by the Quebec Superior Court exist in the present cases:

(a) No steps have been taken by the MOE to undertake any environmental work in Nortel's place or to act as a creditor;

(b) The MOE has not expropriated the subject properties from Nortel and does not stand to benefit financially as it does not own any of the Impacted Sites;

(c) The MOE has issued regulatory orders to require Nortel to continue to perform ongoing work to protect the environment. The Orders are not disguised debt obligations;

(d) The extent of and potential costs associated with environmental remediation on the properties cannot be reasonably identified and quantified at the present time;

(e) The 2009 EPA Order respecting the London properties not owned by Nortel requires the current owners of these sites to grant access to Nortel for the purpose of discharging its obligations under the Orders;

(f) The MOE's "target" was the enforcement of statutory duties and obligations, it was not Nortel. The MOE, in its role as regulator, has followed the "polluter pays" philosophy of environmental legislation and sought compliance from the polluter – Nortel. But, the MOE has also issued orders against other responsible persons to deal with the outstanding environmental obligations on the Nortel sites; and

(g) The MOE has and continues to act in good faith toward Nortel. There is no basis whatsoever in the evidence to, for example, conclude that the MOE has withheld making orders or taking action as any sort of legal tactic.

[95]   Counsel to the MOE also cites several other cases to support their argument that, in the present circumstances, the MOE is acting solely in a regulatory capacity, rather than as a creditor. Counsel submits that these cases demonstrate that not all environmental regulatory

obligations fall within the scope of "claim" and the intended scope of ss. 11.8(8) and (9) of the CCAA.

- In *Shirley (Re)*, [1995] O.J. No. 3060 (Gen. Div.) *[Shirley (Re)]*, the fact that the company had dispossessed of the contaminated property, as in the present case, did not bear on the court's determination that the MOE was a creditor. In that case, the MOE had already issued orders, entered onto lands, commenced cleanup actions, and made it clear that it intended to look to the debtor for reimbursement.

- In *Harbert Distressed Investment Fund, L.P. v. General Chemical Canada Ltd.*, [2006] O.J. No. 3087 (S.C.J.), aff'd 2007 ONCA 600, leave to appeal to the Supreme Court dismissed 2008 CarswellOnt 879 *["Harbert"]*, the court viewed the MOE as a creditor, rather than as a regulator, because the MOE had already made the decision to cause the bankrupt's Soda Ash Settling Basin to be remediated in the event that no one else would undertake such work.

- In *Lamford Forest Products Ltd. (Re)*, [1991] B.C.J. No. 3681 *[Lamford Forest Products (Re)]*, the B.C. Supreme Court concluded that a Pollution Abatement Order was *not* a provable claim in bankruptcy because the Act did not expressly stipulate that the regulator could go onto the land of the polluter, perform the removal or remedial action, and then seek to recover those costs from the responsible party, thereby becoming the holder of a claim for the amount it cost to clean up the damage.

- In *Canadian Imperial Bank of Commerce v. Isobord Enterprises Inc.* [2002] M.J. No. 172 (Q.B) *[CIBC v. Isobord]*, Manitoba Conservation, as permitted by statute, contracted a third party to develop a rodent control program when the company failed to do so pursuant to an order of Manitoba Conservation. The regulator claimed a priority charge for the cost of the program, but lost its priority fight on the narrow ground that it had not complied with the statutory preconditions to acquire a claim under the provincial legislation.

- In *Strathcona (County) v. PriceWaterhouseCoopers Inc.*, [2005] A.J. No. 915 (Q.B.) *[Strathcona]* the court ordered that the cost of uncompleted drainage work required by Strathcona County as a condition of issuing development permits be paid from the assets of the bankrupt estate in advance of debts to secured creditors. The court concluded that the County never assumed the role of creditor. A court order contemplated the County doing the required work at the developer's expense. The compliance plan also contemplated that the County would retain an engineer to do the drainage design, would get the work done, and that the developers would pay funds into court. The plan failed because the developer did not pay the funds into court and without that security, the County did not do the work.

[96]    The MOE submits that not all environmental regulatory obligations fall within the definition of "claim" and the intended scope of ss. 11.8(8) and (9) of the CCAA, and that the court must first consider whether the environmental regulatory obligation is a certain and provable contingent claim within the meaning of the legislation. Counsel to the MOE suggests the following question is informative: "Is a debt presently due to the MOE or has the MOE

exercised its discretion to spend public funds to undertake such environmental remediation even though it may not as yet have incurred such costs?" In other words, has the regulator exercised its statutory jurisdiction to crystallize its claim as a creditor?

[97]    Counsel to the MOE referred to the regulatory continuum discussed above, submitting that the parties are only at stage (iv), and that whether stage (v) is reached depends on certain factors, mainly:

(a) whether Nortel fails to do the work the MOE ordered;

(b) whether other potentially responsible parties will address the environmental liabilities; and

(c) whether the MOE issues a Notice of Intent to do the work itself.

Counsel to the MOE argues that the existence of fact (c) in this case is too speculative to constitute a "claim", because it assumes facts and the exercise of ministerial discretion which may never occur.

[98]    Counsel to the MOE also submits that paragraph 15 of the Initial Order, which provides that "nothing in this Order shall (ii) exempt the Applicants from compliance with statutory or regulatory provisions relating to health, safety or the environment," requires Nortel to continue to comply with statutory or regulatory provisions relating to the environment. Further, counsel argues that s. 11 of the CCAA does not immunize companies under its protection from compliance with regulatory regimes. Because s. 11.1(2) specifically contemplates that a regulator may continue to operate outside of the CCAA regime, counsel submits that to deem any regulatory performance order as a "payment ordered" would narrow this exception into "virtual nonexistence".

[99]    Counsel to the MOE also argues that the Initial Order should not be interpreted in a manner that prohibits the issuing of EPA orders to Nortel during the CCAA process and that the federal power over insolvency does not give Parliament the general power to release insolvent debtors from their obligations to comply with provincial legislation.

[100]   The position of the MOE was supported by the City of Belleville and by 2058756 Ontario Limited ("2058").

**ANALYSIS**

[101]   It is a simplistic statement but one that is necessary to emphasize: insolvency statutes such as the CCAA and the BIA do not mesh very well with environmental legislation. The environmental legislation and its regulatory framework functions more effectively when insolvency is not present. Unfortunately, that is not the situation that faces parties affected by the Nortel restructuring.

[102]   Despite the able arguments of counsel to the MOE, and others opposed to the requested relief, I have concluded that the position put forth by Nortel must prevail.

- Page 19 -

[103]  Counsel to the MOE referenced, on a number of occasions, the regulatory continuum, submitting that the MOE is only at stage (iv) and has not crossed over to stage (v).  I have reached the conclusion that it is not possible to draw such a bright-line distinction.

[104]  I do not take issue with the submission of counsel to the MOE that the Minister has the discretion under the legislation and, if the Minister is solely acting in its regulatory capacity, it can do so unimpeded by the Stay.  This is the effect of s. 11.1(2) of the CCAA.

[105]  However, it seems to me that, when the entity that is the subject of the MOE's attention is insolvent and not carrying on operations at the property in question, it is necessary to consider the substance of the MOE's actions.  If the result of the issuance of the MOE Orders is that Nortel is required to react in a certain way, it follows, in the present circumstances, that Nortel will be required to incur a financial obligation to comply.  It is not a question of altering its operational activities in order to comply with the EPA on a going forward basis.  There is no going forward business.  Nortel is in a position where it has no real option but to pay money to comply with an environmental issue.  In my view, if the MOE moves from draft orders to issued orders, the result is clear.  The MOE would be, in reality, enforcing a payment obligation, which step is prohibited by the Stay.

[106]  In this respect, I am in agreement with the submissions made by counsel to Nortel. Regardless of whether the MOE's activities result in a direct claim as against Nortel, or a claim against third parties who in turn will make a claim against Nortel, the result, for practical purposes, is the same.  It seems to me that the critical point to be determined is not the distinction between performance obligations and monetary obligations, but rather it is whether the actions of the MOE are such that Nortel is required to react or respond to a step taken by the MOE and in doing so, incur a financial obligation.  In my view, the effect of the MOE Orders, if issued, is to require Nortel to prepare an action plan, which results in Nortel having to incur a financial obligation.

[107]  I do not agree with the MOE's contention that financial obligations incurred by Nortel for the purpose of complying with the MOE Orders are different from obligations incurred directly to the Crown.  For the purpose of Nortel's CCAA proceedings, what matters is that Nortel is obligated to undertake remedial work which will result in Nortel expending money.  Any money expended by Nortel in respect of MOE obligations is money that is directed away from creditors participating in the insolvency proceedings.  The same insolvency considerations ought to apply regardless of who receives the money.  In my view, this view is consistent with the "single proceeding model" discussed by the Supreme Court in *Century Services*.

[108]  I also do not believe the MOE is aided in this regard by the decision in *CIBC v. Isobord*. On the MOE's continuum, described above, this case would fit stage (vi).  It supports the proposition that where a regulator contracts a third party to perform work that a debtor company has failed to perform, the regulator is acting as a creditor.  However, it does *not* support the proposition that actions earlier in the MOE's continuum can *never* be characterized as the actions of a creditor.  That is, it does not support the proposition endorsed by the MOE: that ordering a debtor company to perform work that requires the expenditure of resources (stage (iii)) does not render the MOE a creditor unless and until the MOE expends its own resources to ensure that the work gets done (stage (vi)).

- Page 20 -

[109]  This interpretation is, in my view, the result directed by the governing insolvency statutes.

[110]  In *Century Services*, at paras. 23-24, the Supreme Court emphasized the convergence of the BIA and the CCAA in terms of priorities:

> Because the CCAA is silent about what happens if reorganization fails, the BIA scheme of liquidation and distribution necessarily supplies the backdrop for what will happen if a CCAA reorganization is ultimately unsuccessful...

> With parallel CCAA and BIA restructuring schemes now an accepted feature of the insolvency law landscape, the contemporary thrust of legislative reform has been towards harmonizing aspects of insolvency law common to the two statutory schemes to the extent possible...

[111]  Subsection 12(1) of the CCAA (as it existed in January, 2009, and which applies in the present case) defines "claim" as "any indebtedness, liability or obligation of any kind that, if unsecured, would be a debt provable in bankruptcy within the meaning of the Bankruptcy and Insolvency Act". The meaning of "indebtedness, liability or obligation" is to be determined by reference to whether a claim is a debt provable in bankruptcy.

[112]  The reference to "debt provable" in s. 12(1) of the CCAA, which references the BIA, has to be considered in the context of s. 2 of the BIA, which refers to "claim provable" and directs that "claim provable in bankruptcy", "provable claim" and "claim provable" include any claim or liability provable by a creditor in proceedings under the BIA.

[113]  Subsection 121(1) of the BIA addresses what are claims provable. It provides:

> All debts and liabilities, present or future, to which the bankrupt is subject on the day on which the bankrupt becomes bankrupt or to which the bankrupt may become subject before the bankrupt's discharge by reason of any obligation incurred before the day on which the bankrupt becomes bankrupt shall be deemed to be claims provable in proceedings under this Act.

[114]  Section 14.06(8) of the BIA, entitled "Claim for clean-up costs," contains an exception to s. 121(1):

> Despite subsection 121(1), a claim against a debtor in a bankruptcy or proposal for the costs of remedying any environmental condition or environmental damage affecting real property or an immovable of the debtor shall be a provable claim, whether the condition arose or the damage occurred before or after the date of the filing of the proposal or the date of the bankruptcy.

[115]  The impact of these statutory provisions requires a full consideration of the position of the MOE. In my view, it is necessary to take into account the defining event for a claim. In this case, the defining event is the point at which the condition arose or the damage occurred.

[116]  It is also important to note that s. 14.06(8), unlike other subsections of s. 14.06, is not restricted in its application to a trustee.  On the contrary, the focus of s. 14.06(8) is related to s. 121(1) – provable claims.  As such, it seems to me that Parliament clearly directed its mind to the issue of creating an exception to s. 121(1) of the BIA and in doing so addressed the issue as to how environmental conditions and damage were to be addressed by an insolvent debtor.  The BIA and CCAA have to take into account the reality that a debtor may not have continuing operations.  If there are continuing operations, there has to be ongoing compliance with environmental legislation.  But if there are no ongoing operations, the environmental regulator has to rely on its security, failing which it has unsecured status.                    ·

[117]  Further, while it is apparent that s. 11.8(8) of the CCAA does not apply in the current circumstances as Nortel no longer owns any real property at the Impacted Sites, with the exception of the Retained Lands at the London site, s.11.8(9) does apply and is conspicuous in its similarities to s. 14.06(8) of the BIA.  Subsection 11.8(9) of the CCAA, entitled "Claim for clean-up costs", directs that:

> A claim against a debtor company for costs of remedying any environmental condition or environmental damage affecting real property of the company shall be a claim under this Act, whether the condition arose or the damage occurred before or after the date on which proceedings under this Act were commenced.

[118]  A priority scheme has also been enacted and is contained in s. 11.8(8).  In this case, the priority scheme is of limited effect as Nortel does not own the property in question, save for the Retained Lands at the London site.  The result, in my view, is straightforward.  The MOE can look to whatever security may be available, failing which it has unsecured status.

[119]  I do not accept the MOE's argument that the triggering event for a claim is when the Minister exercises his discretion.  In my view, that is not what is directed by s. 14.06(8).  Further, given the effect of s. 14.06(8), I do not believe that *Shirley (Re)* and *Lamford Forest Products*, relied upon by the MOE, are of any assistance, since both were decided before the addition of that subsection to the BIA.

[120]  This is consistent with the decision in *Harbert*.  In that case, the bankrupt intended to make a distribution to secured creditors.  The MOE objected on the basis that the costs of remediation exceeded the value of the real property over which the MOE had statutorily granted security.  The court ruled that, save for the real property, the MOE was an unsecured creditor.  At para. 55, the court stated that although the MOE was acting as a creditor, it could "be nothing more than an unsecured creditor... for cleanup costs to the extent General Chemical's real property and existing financial assurance are insufficient to meet those needs."  In that case, as here, the court order appointing an interim receiver did not exempt the debtor from complying with environmental regulatory provisions or MOE orders pursuant to the EPA.  However, the court noted that "[t]he provisions of the order do not create a secured claim for the MOE's orders, nor do they suggest the MOE has priority over the interests of secured creditors."  Thus, in my view, and contrary to the MOE's contention, the case does not stand for the proposition that companies subject to CCAA proceedings must prioritize compliance with MOE orders over the claims of secured creditors.  Rather, it supports the position of Nortel.

[121]  The event that gives rise to a CCAA claim against Nortel has already occurred, as the events giving rise to the "environmental condition or environmental damage" have taken place. The only step that has yet to take place is the quantification of the claim, but the absence of that quantification does not impact on the analysis of the position of the MOE. The MOE has the option of not filing a claim. If it chooses this route, there will eventually be a distribution to creditors without participation by the MOE. If the MOE attempts to crystallize its claim at some future time, it may have to accept the consequences of its failure to act in a more timely basis. Section 14.06(8) of the BIA makes it clear that any claim of the MOE is a provable claim in a CCAA proceeding.

[122]  The preceding statutory analysis echoes the observations of the court in *AbitibiBowater*, at paragraphs 118 to 120. In my view, given the Supreme Court's guidance with respect to the convergence of the two insolvency statutes, the proper interpretation of the above provisions is they direct that once steps are taken by the MOE to require Nortel to take actions in respect of a factual matrix that arose prior to the filing date, if those actions require a monetary expenditure they must, for the purposes of the CCAA, be considered to be part of a claims process and must also, by necessity, be stayed.

[123]  In my view, the distinction drawn by the MOE is blurred. In an insolvency context, the distinction should not be based on whether the order is characterized as a "regulatory" order or a "financial" order. Rather, it should be based on the real effect of the actions taken by the regulator. The MOE's position regarding where on its continuum it ceases to act as a regulator and commences acting as a creditor is not the determining factor in the analysis of this issue.

[124]  It seems to me that it is not open to the MOE to take the position that the fact situation is too speculative or too remote, such that they cannot formulate a claim. This argument is addressed by s. 14.06(8) of the BIA.

[125]  In my view, it is necessary to comment on the *Strathcona* case, relied upon by the MOE. I note that in this case the court applied what it referred to as the "Panamericana principle." Abiding by this principle, the court characterized a debtor's obligation to complete drainage work as an obligation owed to the public, not to the regulator per se. The regulator is just the vehicle that protects the public's interest, and where the Panamericana principle applies, the debtor must pay to fulfill the obligation to the public in priority to all secured creditors. The court interpreted s. 14.06(8) narrowly, stating, at para. 42, that it is intended "only to overcome what would otherwise be the effect of s. 121(1)." The court reasoned that but for s. 14.06(8), s. 121(1) would direct that an environmental claim arising after the date of bankruptcy but before discharge might not be a provable claim. The court's view was that s. 14.06(8) is designed only to deal with that timing issue.

[126]  In my view, the Panamericana principle, as articulated above, does not reflect the clear intention of Parliament as evidenced in the BIA. Section 11.8(8) of the BIA delineates, and thus limits, the scope of the MOE's security in this context. It states that the "costs of remedying any environmental condition or environmental damage affecting real property of the company is secured by a charge on the real property and on any other real property of the company that is contiguous thereto." If the MOE's claim was characterized as an obligation Nortel owed to the public, and the Panamericana principle were applied, the MOE Orders would be granted priority

over all secured creditors, placing the MOE in a better position than that which is directed by s, 11.8(8).

[127]  The MOE clearly does have options. It can maintain its position that it is not a creditor. However, if this position is maintained, the MOE must recognize that it will not be in a position to effect any remedy against Nortel arising out of any draft order that has been posted on the EBR Registry or any subsequent order.   These draft orders "require" Nortel and other responsible parties to submit and implement workplans for certain investigations. The moment that Nortel is "required" to undertake such activity it is "required" to expend monies in response to actions being taken by the MOE.  In my view, any such financial activity that Nortel is required to undertake is stayed by the provisions of the Initial Order.

[128]  The assets of Nortel have been sold and substantial proceeds are being held pending a determination of the allocation of assets as between various Nortel entities and the quantification of claims as against various Nortel entities.  At this point, a distribution to unsecured creditors seems likely.

[129]  It is open to the MOE to maintain its position that it does not have a claim as a creditor. If so, the consequences of taking such a position are obvious.  Distributions will eventually be made to creditors of Nortel and, if the MOE chooses not to participate as a creditor, it will not receive a distribution.  On the other hand, if the MOE decides to file a claim, it could very well be that its claim will be valued and a distribution provided to the MOE. Section 14.06(8) of the BIA makes it clear that any claim of the MOE arising from environmental conditions on properties which are or have been owned by Nortel are claims in Nortel's CCAA proceedings.

## THE POSITION OF 2058756 ONTARIO LTD.

[130]  I will also deal with the submissions of 2058, which is the current owner of the Kingston Site.  2058 argues that Nortel should be precluded from disclaiming an Asset Purchase Agreement ("APA") and Environmental Access Agreement ("Access Agreement"), both of which were agreements between Nortel and Cable Design Technologies, from which 2058 purchased the Kingston Site.  2058 argues that the APA and the Access Agreement are "covenants running with the land" and that it would be inequitable to disclaim Nortel from its obligations under those agreements.

[131]  In my view, Nortel has provided a complete answer to the arguments of 2058 in its Reply Factum.  The APA and Access Agreement are not covenants that run with the land.  A covenant that runs with the land can only bind persons with an interest in the land: *Royal Bank of Canada v. MacPherson* (2009), 311 DLR (4th) 361 (Ont Div Ct), para 44.  Nortel does not have an interest in the land in question.  Further, as obligations that require the expenditure of money or the doing of an act, the APA and Access Agreement are positive covenants. A positive covenant does not run with the land, even if the parties' intention is to the contrary: *Parkinson et al. v. Reid*, [1966] SCR 162 at 167; *Amberwood Investments Ltd. v. Durham Condominium Corp. No. 123* (2002), 50 OR (3d) 670 (SCJ), paras 15-17, aff'd 58 OR (3d) 481 (CA).

[132]  I also disagree with 2058's submission that it would be inequitable to disclaim Nortel's obligations under the APA and Access Agreement.  In considering whether 2058 would be

prejudiced by such an order, it is necessary to consider the interests of all stakeholders in this highly complex cross-border insolvency. 2058 accepted Nortel's credit risk when it acquired the Kingston Site, and is in the same position as all other creditors of Nortel who accepted Nortel's credit risk on an unsecured basis. 2058 may have a claim for damages, but it would be inequitable to prioritize that claim above all of the other unsecured creditors.

## CONCLUSION

[133]  I agree with the court's analysis in *AbitibiBowater*, and, in my view, it applies to the present case. As the court in that case recognized, the relevant case law directs that CCAA courts ought to take a substance over form approach. In my view, the MOE Orders, if issued, are, in substance, financial obligations for Nortel.

[134]  Further, through s. 11.8(8), the CCAA recognizes that claims for the costs of remedying environmental conditions and environmental damage can arise in an insolvency context. When this occurs, the CCAA stipulates the extent of the security accorded to the claimants: "a charge on the *real property* and on any other real property of the company that is contiguous thereto and *that is related to the activity that caused the environmental condition or environmental damage*" [emphasis added].  Where the security stipulated in s. 11.8(8) is absent, the claimant is unsecured.

[135]  In *Nortel Networks Corp. (Re)* (2009) 55 C.B.R. (5th) 229, I recognized that the CCAA can be applied in a liquidating insolvency. In such circumstances, the CCAA directs that where the debtor does not own land on which an environmental condition or damage is present, any claim by the MOE in respect of that condition or damage is unsecured.

[136]  Given my conclusion that the MOE Orders are, in these circumstances, financial obligations, an operational conflict between the EPA and the CCAA exists. I accept counsel to Nortel's submission that, given that conflict, otherwise valid provincial legislation is superseded. See *Canadian Western Bank v. Alberta* 2007 SCC 22; *Nortel Networks Corporation (Re)* 2009 ONCA 833 at paras. 36-38; *Harbert Distressed Investment Fund, LP v. General Chemical Canada Ltd.* 2007 ONCA 600, leave to appeal to the Supreme Court dismissed 2008 CarswellOnt 879; *AbitibiBowater, supra*, at para. 270.

## DISPOSITION

[137]  In the result, the Nortel Motion is granted. I have concluded that the MOE's posting of a draft Director's Order on the EBR Registry for public comment is the first step on the road to the enforcement of a financial and monetary claim. Because the MOE Orders are draft orders, they are not yet in breach of the Stay. However, if issued they would require Nortel to respond, causing Nortel to incur a liability which would be stayed by the Stay. It is not open for the MOE to take any steps to confirm the draft MOE Orders. It is open, however, for the MOE to take a step to withdraw the draft Director's Order.

[138]  However, it is recognized that the MOE may have secured status under s. 11.8(8) with respect to the Retained Lands at the London site.

- Page 25 -

[139]  A declaration is also to be issued that all proceedings before the Ontario Environmental Review Tribunal in relation to the MOE Orders are stayed.

[140]  Authorization is also provided to the Nortel Applicants to cease performing any remediation at or in relation to the Impacted Sites and a declaration shall issue that any claims in relation to such current or future remediation requirements by the MOE against any of the Nortel Applicants or their current or former directors or officers in relation to the Impacted Sites, whether statutory, contractual, or otherwise, are subject to resolution and determination in accordance with the terms of the Amended and Restated Claims Procedure Order dated July 30, 2009 and the Claims Resolution Order dated September 16, 2010.

[141]  The Nortel Applicants are also released from all contractual obligations to carry out remediation requirements at the Impacted Sites.

[142]  I am indebted to counsel for their informative facta and oral argument on this motion.

[143]  An order shall issue to give effect to the foregoing.

MORAWETZ J.

**Date:**   March 9, 2012

APPENDIX "F"

[ATTACHED]

March 21, 2012

**Sent By E-mail**

To the Persons Listed on
Schedule "A" attached

NORTON ROSE

Barristers & Solicitors / Patent & Trade-mark Agents

Norton Rose Canada LLP
Royal Bank Plaza, South Tower, Suite 3800
200 Bay Street, P.O. Box 84
Toronto, Ontario M5J 2Z4 CANADA

F: +1 416.216.3930
nortonrose.com

On January 1, 2012, Macleod Dixon joined
Norton Rose OR to create Norton Rose Canada.
Direct line
416.216.4805

Email
Alan.Merskey@nortonrose.com

Your reference

Our reference
01007946-0077

Dear Sirs and Mesdames:

### Nortel Networks – Environmental Remediation Activities – Order of Mr. Justice Morawetz of the Ontario Superior Court of Justice, Commercial List dated March 12, 2012 ("March 12 Order")

As you are aware, following a motion brought by Nortel Networks Limited and various related parties ("Nortel") in its *Companies' Creditors Arrangement Act* proceedings before the Ontario Superior Court of Justice ("**CCAA Proceedings**"), Mr. Justice Morawetz issued reasons on March 9, 2012 providing that, among other things, Nortel was authorized to cease performing remediation activities at or in relation to the Impact Sites[1].

Please be advised that, pursuant to the advice and direction of the Court, Nortel intends to cease, in an orderly fashion, any such ongoing remediation or monitoring activities on April 23, 2012.  The purpose of this correspondence is to:

1    provide you with notice of the foregoing; and

2    invite you, if interested, to contact me to make arrangements for any necessary transition steps you may wish to engage in, in order to undertake such remediation activities on your own behalf.

Yours very truly,

Alan B. Merskey

ABM/cd

Enclosure

Copies to:    Tom Ayres, Ernst & Young Inc.
Christopher Armstrong (Goodmans)
Alexandria Pike (Davies Ward Phillips & Vineberg LLP)

---

[1] As defined in the court proceedings, located in London, Brampton, Brockville, Kingston and Belleville, Ontario.

DOCSTOR: 2382735\1

Norton Rose Canada LLP is a limited liability partnership established in Canada  Norton Rose OR LLP together with Norton Rose LLP, Norton Rose Australia, Norton Rose South Africa (incorporated as Deneys Reitz Inc) and their respective affiliates constitute Norton Rose Group, an international legal practice with offices worldwide, details of which, with certain regulatory information, are at nortonrose.com

ENVIRONMENTAL CONTACTS

| COMPANY | CONTACTS |
|---|---|
| **Kingston – 700 Gardiners Road** | |
| Belden CDT (Canada) Inc.<br>100 King Street West<br>Suite 1600<br>Toronto, ON  M5X 1G5 | Douglas F. Harrison<br>Stikeman Elliott LLP<br>5300 Commerce Court West, 199 Bay Street<br>Toronto, ON  M5L 1B9<br>416-869-5693<br><br>Jeffrey K. Spiegelman and Vern W. DaRe<br>Fogler, Rubinoff LLP<br>95 Wellington Street West, Suite 1200<br>Toronto-Dominion Centre<br>Toronto, ON  M5J 2Z9<br>416.864.9700 |
| 2058756 Ontario Limited<br>220 Duncan Mill Road<br>Suite 619<br>North York, ON  M3B 3J5 | Ms Tamara Farber and Mr. Craig Mills<br>Miller Thomson LLP<br>Scotia Plaza, Suite 5800<br>40 King Street West<br>PO Box 1011<br>Toronto, ON M5H 3S1<br>416-595-8520<br><br>Counsel for MOE for Kingston, Brockville and Belleville:<br>Paul McCulloch<br>Counsel<br>Ministry of the Environment Legal Services Branch<br>2430 Don Reid Dr<br>Ottawa ON K1H 1E1<br>613-521-3450, ext 234<br><br>Leonard Marsello and William MacLarkey<br>Department of Justice<br>Ontario Regional Office<br>The Exchange Tower, Box 36<br>130 King Street W., Suite 3400<br>Toronto, Ontario  M5X 1K6<br>416.973.3172 |

- 2 -

| COMPANY | CONTACTS |
|---|---|
| **Brockville – 100 Strowger Boulevard** | |
| Apex Logistics Inc.<br>100 Strowger Boulevard<br>Suite 100<br>Brockville, ON  K6V 5W8 | Charles J Birchall and  Jeffrey K. Spiegelman<br>Fogler, Rubinoff LLP<br>46 Elgin Street<br>Suite 410<br>Ottawa, ON K1P 5K6<br>613-842-7440 |
| S.C.I. Brockville Corp.<br>100 Strowger Boulevard<br>Brockville, ON  K6V 5W8 | Larry Cobb and Ashley Taylor<br>Stikeman Elliott LLP<br>5300 Commerce Court West<br>199 Bay Street<br>Toronto, ON M5L 1B9<br>416-869-5618<br><br>Counsel for MOE for Kingston, Brockville and Belleville:<br>Paul McCulloch<br>Counsel<br>Ministry of the Environment Legal Services Branch<br>2430 Don Reid Dr<br>Ottawa ON K1H 1E1<br>613-521-3450, ext 234<br><br>Leonard Marsello and William MacLarkey<br>Department of Justice<br>Ontario Regional Office<br>The Exchange Tower, Box 36<br>130 King Street W., Suite 3400<br>Toronto, Ontario  M5X 1K6<br>416.973.3172 |
| **Belleville – 250 Sidney Street** | |
| Sidney Street Properties Corp.<br>P.O. Box 1598<br>257 Pinnacle Street<br>Belleville, ON  K8N 3B2<br>Palmer Road Properties Corp.<br>P.O. Box 1598<br>257 Pinnacle Street<br>Belleville, ON  K8N 5J2 | Ian W. Brady<br>302 - 205 Dundas St. E.<br>Belleville, ON K8N 5K6<br>613-967-2516 |

- 3 -

| COMPANY | CONTACTS |
|---|---|
| The Corporation of the City of Belleville<br>169 Front Street<br>Belleville, ON  K8N 2Y8 | David Demille and R. Benjamin Mills<br>Templeman, Menninga, Kort, Sullivan & Fairbrother<br>205 Dundas Street East<br>P.O. Box 234<br>Suite 200<br>Belleville, ON K8N 5A2<br>613-966-2620<br><br>Counsel for MOE for Kingston, Brockville and Belleville:<br>Paul McCulloch<br>Counsel<br>Ministry of the Environment Legal Services Branch<br>2430 Don Reid Dr<br>Ottawa ON K1H 1E1<br>613-521-3450, ext 234<br><br>Leonard Marsello and William MacLarkey<br>Department of Justice<br>Ontario Regional Office<br>The Exchange Tower, Box 36<br>130 King Street W., Suite 3400<br>Toronto, Ontario  M5X 1K6<br>416.973.3172 |
| Algonquin and Lakeshore Catholic District School Board | Andrew J. F. Kent and Wael Rostom<br>McMILLAN LLP<br>Brookfield Place<br>181 Bay Street, Suite 4400<br>Toronto, Ontario M5J 2T3<br>416.865.7160 |
| **London** | |
| Nagata Auto Parts Canada Co., Ltd.<br>1477 Sise Road, County of Middlesex<br>London, ON  N6N 1E1 | Laird French<br>Carlyle Peterson Lawyers<br>700 Richmond Street, Suite 216<br>London Ontario N6A 5C7<br>519-432-0632 |
| The Corporation of the City of London<br>c/o City Hall, 300 Dufferin Ave.<br>P.O. Box 5035<br>London, ON  N6A 4L9 | Janice Page<br>City of London<br>300 Dufferin Avenue<br>London, ON  N6B 1Z2<br>519-661-4707 |

- 4 -

| COMPANY | CONTACTS |
|---|---|
| Ministry of the Environment | Danielle Meuleman<br>Office of Legal Services<br>Ministry of Environment<br>135 St Clair Ave W<br>Toronto  ON M4V 1P5<br>416-314-7605<br><br>Leonard Marsello and William MacLarkey<br>Department of Justice<br>Ontario Regional Office<br>The Exchange Tower, Box 36<br>130 King Street W., Suite 3400<br>Toronto, Ontario  M5X 1K6<br>416.973.3172 |
| Freightliner Properties Ltd.<br>6701 Financial Drive, Suite 100<br>Mississauga, ON  L5N 7J7 | Aaron E. Atcheson<br>Miller Thomson LLP<br>One London Place, 255 Queens Avenue<br>Suite 2010<br>London, ON N6A 5R8<br>519-931-3526 |
| Team Truck (tenant on Freightliner site) | Sue Carlysle<br>Carlyle Peterson Lawyers LLP<br>216 - 700 Richmond St.<br>London, ON N6A 5C7<br>519-432-0632 ext. 222 |

\6062735.1

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**EIGHTY-FOURTH REPORT OF THE MONITOR DATED APRIL 5, 2012**

---

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON M5H 2S7

Jay A. Carfagnini  (LSUC#: 22293T)
Joseph Pasquariello (LSUC# 38390C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.