**EXHIBIT A**
**CHARTIS MOTION AND RELATED FILINGS**

Index

Motion Record, filed October 7, 2011 by the Canadian Applicants . . . . . . . . . . . . . . . . . . A-1

Supplemental Motion Record, filed May 16, 2012 by the Canadian Applicants. . . . . . . . . A-2

Factum, filed May 16, 2012 by the Canadian Applicants . . . . . . . . . . . . . . . . . . . . . . . . . . A-3

Factum, filed May 23, 2012 by Chartis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4

Factum, filed May 14, 2012 by the Board of Directors of NNC and NNL . . . . . . . . . . . . A-5

Factum, filed May 25, 2012 by the U.S. Debtors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-6

**EXHIBIT A-1**
**MOTION RECORD**

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**MOTION RECORD OF NORTEL**
**D&O POLICY MOTION**
**(returnable December 22, 2011)**

October 7, 2011

**NORTON ROSE OR LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto Ontario M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: derrick.tay@nortonrose.com

**Jennifer Stam LSUC#: 46735J**
Tel: (416) 216-2327
Email: jennifer.stam@nortonrose.com

Fax: (416) 216-3930

Lawyers for the Applicants

# INDEX

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

## TABLE OF CONTENTS

| TAB | DOCUMENT | PAGE |
|---|---|---|
| 1. | Notice of Motion returnable December 22, 2011 | 1 |
| 2. | Affidavit of Anna Ventresca, sworn October 7, 2011 | 28 |
| A | Executive and Organization Liability Insurance Policy, Policy No. 01-335-76-98 | 32 |
| B | Claim 09-CV-4691, in the United States District Court for the Southern District of New York | 103 |
| C | Proof of Claim of Nortel Networks UK Limited in Court File No. 09-CL-7950 | 123 |
| D | Trust Indenture for the Directors and Officers of Nortel Networks Corporation, dated January 13, 2009 | 210 |

# TAB 1

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**NOTICE OF MOTION**
**(returnable December 22, 2011)**

Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") will make a motion to Justice Morawetz of the Commercial List Court, on December 22, 2011, at 10:00 a.m. or as soon after that time as the motion can be heard, at 330 University Avenue, Toronto, Ontario.

PROPOSED METHOD OF HEARING: The motion is to be heard:

[ ] in writing under subrule 37.12.1(1) because it is on consent or unopposed or made without notice;
[ ] in writing as an opposed motion under subrule 37.12.1(4);
[X] orally.

THE MOTION IS FOR:

(a) Advice and directions regarding the obligations of Chartis, Inc. ("Chartis"), as provider of the executive and organization liability insurance policy (the "D&O Policy") to the Applicants and their subsidiaries;

(b) A declaration that retention provisions specified in the D&O Policy are not applicable in the circumstances of the within proceedings; and

(c) Such further and other relief as counsel may advise and this Honourable Court deems just.

2

THE GROUNDS FOR THE MOTION ARE:

**Background**

(d) References to "Nortel" herein shall be to the global enterprise as a whole;

(e) All dollar amounts refer to Canadian currency unless otherwise specified;

(f) On January 14, 2009, this Honourable Court made an order (the "Initial Order") granting a stay of proceedings against the Applicants (the "Stay") pursuant to the *Companies' Creditors Arrangement Act*, (Canada) R.S.C. 1985, c. C-36, as amended (the "CCAA") and appointing Ernst & Young Inc. as monitor (the "Monitor") in the CCAA proceedings;

(g) Also on January 14, 2009, certain of NNC's U.S. subsidiaries, including Nortel Networks Inc., made voluntary filings under Chapter 11 of the United States Bankruptcy Code (the "Code"). On the same date, this Honourable Court granted an order pursuant to section 18.6(4) of the CCAA recognizing the Chapter 11 cases in the U.S. as "foreign proceedings" in Canada and giving effect to the automatic stay under the Code in Canada;

(h) On February 27, 2009, the U.S. Court granted petitions recognizing the CCAA proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code;

(i) In the time since the CCAA proceedings were commenced, a number of claims have been filed against certain directors and officers of NNC specifically and Nortel generally;

**The Insurance Structure**

(j) NNC entered into the D&O Policy with AIG Commercial Insurance Company of Canada ("AIG"), now carrying on business as Chartis, which holds the policy number 01-335-76-98;

(k) The period covered by the D&O Policy is December 1, 2008 to December 1, 2009;

(l) The D&O Policy provides coverage for various claims made against NNC, its subsidiaries, or their executives or employees;

(m) Such coverage extends to reasonable and necessary fees, costs and expenses that result from defending a claim made against an executive or employee;

(n)     The D&O Policy provides for a total retention amount of US$10 million (the "Retention Amount") for the claims against NNC, its subsidiaries, and their executives and employees to which it applies, with certain exceptions;

(o)     Under the D&O Policy, the Retention Amount will not apply in certain circumstances, including in the event that NNC, or its relevant subsidiary, has not indemnified nor is permitted or required to indemnify an executive or employee due to law;

(p)     Subsequent to the commencement of these CCAA proceedings, Nortel established a trust fund for the benefit of directors and officers of NNC and its subsidiaries (the "D&O Trust"), in the amount of approximately $12 million;

(q)     The D&O Trust does not constitute insurance.  It was established to provide payment for liability claims, including defence costs, against Nortel's directors and officers only to the extent that such claims are not paid or satisfied by insurance policies maintained by NNC with respect to director and officer liabilities and NNC is unable to indemnify the individual director or officer;

(r)     The purpose of the D&O Trust is not to indemnify the directors and officers of Nortel in the place of Nortel's operating directors' and officers' insurance policies;

(s)     As a result of the Stay and the within insolvency proceedings, NNC cannot directly indemnify Nortel's officers and directors;

(t)     Claims have arisen against Nortel's directors and officers or former directors and officers (the "D&O Claims");

(u)     The conditions required for the application of the Retention Amount provisions of the D&O Policy have not been met;

(v)     In the absence of such conditions being met, Chartis is required to provide payments related to the D&O Policy now;

(w)     Chartis has refused to provide coverage for the D&O Claims prior to the exhaustion of the Retention Amount; and

(x)     Such further and other grounds as counsel may advise and this Honourable Court deems just.

THE FOLLOWING DOCUMENTARY EVIDENCE will be used at the hearing of the motion:

(a)     The within pleadings and proceedings;

(b)     The Affidavit of Anna Ventresca, sworn October 7th, 2011.

October 7, 2011                              Norton Rose OR LLP
                                             Royal Bank Plaza, South Tower, Suite 3800
                                             200 Bay Street, P.O. Box 84
                                             Toronto, Ontario  M5J 2Z4  CANADA

                                             **Derrick Tay  LSUC#: 21152A**
                                             Tel: +1 416.216.4832
                                             Email: derrick.tay@nortonrose.com

                                             **Jennifer Stam LSUC#: 46735J**
                                             Tel: +1 416.216.2327
                                             Email: jennifer.stam@nortonrose.com

                                             Fax: +1 416.216.3930

                                             Lawyers for the Applicants

TO:       The Service List

**IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at TORONTO

**NOTICE OF MOTION**
**(RETURNABLE December 22, 2011)**

**NORTON ROSE OR LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street, P.O. Box 84
Toronto, Ontario M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: +1 416.216.4832
Email: derrick.tay@nortonrose.com

**Jennifer Stam LSUC#: 46735J**
Tel: +1 416.216.2327
Email: jennifer.stam@nortonrose.com

Fax: +1 416.216.3930

Lawyers for the Applicants

DOCSTOR: 2245652\4

[SERVICE LIST REMOVED FOR THE PURPOSE OF THIS EXHIBIT]

# TAB 2

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED**

**AFFIDAVIT OF ANNA VENTRESCA**
**(sworn October 7, 2011)**

1. I, ANNA VENTRESCA, of the city of Hamilton, in the Province of Ontario, MAKE OATH AND SAY AS FOLLOWS:

2. I am the General Counsel - Corporate and Corporate Secretary of Nortel Networks Corporation ("NNC") and Nortel Networks Limited ("NNL") and have held this position since August 2009. From July, 2007, to July, 2009, I was the Assistant General Counsel – Corporate and Assistant Secretary. As such, I have personal knowledge of the matters to which I hereinafter depose in this Affidavit. Where I do not possess personal knowledge, I have stated the source of my information and, in all such cases, believe it to be true.

3. I swear this affidavit in support of the motion by NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") for an Order for:

(a) advice and directions as to the obligations of Chartis, Inc. ("Chartis"), as provider of a D&O Policy, as defined below; and

(b) a declaration that retention amounts specified in the D&O Policy are not applicable in the circumstances of the within proceedings.

4. In brief, Chartis contracted to provide insurance coverage for claims made against the directors and officers or former directors and officers of the Applicants and other subsidiaries of NNC (the "D&Os"). In the normal course, Chartis's obligations are more limited in circumstances where the Applicants, or other relevant NNC subsidiaries, are obligated to provide indemnification to the D&Os.

5.      The Applicants' obligations to indemnify the D&Os have been circumscribed by the stay.  Chartis
has refused to provide initial coverage or protection to the D&Os for assorted claims on the basis that any
loss arising from such claims would be an "indemnifiable loss".

6.      As the effect of Chartis's position would be to require the Applicants to indemnify the D&Os for
pre-filing actions, at the expense of other creditors, the Applicants seek this Court's advice and direction
as to the effect of the stay upon the Applicants' obligations to indemnify.

**Background**

7.      References to "Nortel" herein shall be to the global enterprise as a whole.

8.      All dollar amounts refer to Canadian currency unless otherwise specified.

9.      On January 14, 2009, this Honourable Court made an order (the "Initial Order") granting a stay of
proceedings against the Applicants (the "Stay") pursuant to the *Companies' Creditors Arrangement Act*,
R.S.C. 1985, c. C-36, as amended (the "CCAA") and appointing Ernst & Young Inc. as monitor (the
"Monitor") in the CCAA proceedings.

10.     Also on January 14, 2009, certain of NNC's U.S. subsidiaries, including Nortel Networks Inc.,
made voluntary filings under Chapter 11 of the United States Bankruptcy Code (the "Code").  On the same
date, this Honourable Court granted an order pursuant to section 18.6(4) of the CCAA recognizing the
Chapter 11 cases in the U.S. as "foreign proceedings" in Canada and giving effect to the automatic stay
under the Code, in Canada.

11.     On February 27, 2009, the U.S. Court granted petitions recognizing the CCAA proceedings as
"foreign main proceedings" pursuant to Chapter 15 of the Code.

12.     In the time since the CCAA proceedings were commenced, a number of claims have been filed
against certain directors and officers of NNC specifically and Nortel generally.

13.     Further details regarding the background to these proceedings and the various other proceedings
are set out in affidavits previously filed in these proceedings and are therefore not repeated herein.

**The Insurance Structure**

14.     NNC entered into an executive and organization liability insurance policy with AIG Commercial
Insurance Company of Canada ("AIG"), now carrying on business as Chartis, which holds the policy
number 01-335-76-98 (the "D&O Policy").  The D&O Policy is attached hereto as Exhibit "A".

15.     The period covered by the D&O Policy is December 1, 2008, to December 1, 2009.

16.    The D&O Policy provides coverage for certain claims made against NNC or its executives or employees; it extends to reasonable and necessary fees, costs and expenses that result from defending a claim made against an executive or employee.  However, the Policy specifies a retention amount of US$10 million (the "Retention Amount") for the claims against NNC and its executives and employees to which it applies, with certain exceptions.  Under the D&O Policy, the Retention Amount will not apply in certain circumstances, including in the event that NNC has not indemnified nor is permitted or required to indemnify an executive or employee due to law.

**The Lucescu Action**

17.    In or about May 2009, intended class proceedings were commenced against Michael Zafirovski and Pavi Binning, in the United States District Court for the Southern District of New York, by David Lucescu (the "Lucescu Claim").  The Lucescu Claim asserts allegations against Messrs. Zafirovski and Binning for actions taken in 2008, in their respective capacities as Chief Executive Officer and Chief Financial Officer of NNC.  A copy of the Lucescu Claim is attached as Exhibit "B".

18.    The Lucescu Claim is stayed by the Stay.  However, counsel for the D&Os have incurred fees in addressing the Lucescu Claim.  These fees have not been indemnified by the Applicants, as a result of the stay imposed upon their indemnification obligations.  Chartis has refused to pay these fees prior to the exhaustion of the Retention Amount.

**The EMEA D&O Claims**

19.    In addition to the Lucescu Claim, other assertions of liability have been made against the D&Os. In particular, broad assertions of liability have been made by the Applicants' European subsidiaries (the "EMEA Claims") pursuant to the claims process of this Honourable Court.  A copy of one of the EMEA Claims by Nortel Networks UK Limited is attached as Exhibit "C".

20.    Similar claims have been filed by approximately 19 other EMEA entities.  Based upon Chartis's current position, the Applicants anticipate that Chartis will also refuse to respond to the EMEA Claims before the exhaustion of the Retention Amount.

**The D&O Trust**

21.    Under the laws of various jurisdictions, directors of companies may become personally liable for certain liability claims.    Immediately prior to the commencement of the CCAA proceeding, NNC determined that supplemental protection for its directors and officers was required in addition to that provided by the D&O Policy.  Nortel accordingly established a trust fund for the benefit of the directors and officers of NNC and its subsidiaries (the "D&O Trust"), in the amount of $11,941,440.  A copy of the trust indenture dated January 13, 2009, is attached hereto as Exhibit "D".

22. As set out in the trust indenture, the D&O Trust was established to provide payment for the cost of liability claims, including defence costs, against individuals serving as D&Os of NNC and its subsidiaries, from the date of the creation of the trust forward, only in circumstances where:

(a) NNC is unable to indemnify the individual director or officer; and

(i) insurance policies with respect to director and officer liabilities maintained by NNC do not cover such costs; or

(ii) the amount paid from insurance policies with respect to director and officer liabilities maintained by NNC does not satisfy the amount of such costs so incurred.

23. The D&O Trust was established on the eve of the CCAA filing because of the concern that the D&O Policy would be exhausted or expire and the company would not be able to fulfill its obligation to indemnify the directors and officers. The indenture creating the D&O Trust provides that the D&O Trust is not intended to be used to pay claims that would be covered by the D&O Policy unless the D&O Policy is not otherwise available. I am concerned that use of the funds in the D&O Trust other than for the express purposes for which it was established will improperly deplete the D&O Trust to the detriment of its D&O beneficiaries.

24. Notwithstanding the express purpose of the D&O Trust, Chartis has taken the position that the D&O Trust provides an additional basis to excuse it from providing coverage before the retention amount has been exhausted.

**SWORN BEFORE ME** at the City of Toronto, in the Province of Ontario, this 7th day of October, 2011.

A Commissioner, etc.
Andrew Lloyd McCoomb, a Commissioner, etc., Province of Ontario, while a Student-at-Law. Expires April 23, 2013.

**ANNA VENTRESCA**

# TAB A

This is Exhibit ......A...... referred to in the affidavit of ANNA VENTRESCA sworn before me, this 7TH day of OCTOBER 20 11

A COMMISSIONER FOR TAKING AFFIDAVITS

33

Canadian Head Office
145 WELLINGTON STREET WEST
TORONTO, ON M5J 1H8

## AIG Commercial Insurance Company of Canada
(herein called the Insurer)

## EXECUTIVE AND ORGANIZATION LIABILITY INSURANCE POLICY

Replacement Of Policy#: *00-112-90-34* Policy No.: *01-335-76-98*

**NOTICE: COVERAGES A, B AND C ARE CLAIMS MADE. THE COVERAGE OF THIS POLICY IS GENERALLY LIMITED TO LIABILITY FOR CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS AND CRISIS FIRST OCCURRING DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. PLEASE READ THIS POLICY CAREFULLY AND REVIEW ITS COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

**NOTICE: AMOUNTS INCURRED FOR LEGAL DEFENCE SHALL REDUCE THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS, AND SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.**

**NOTICE: THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND. THE INSURER MUST ADVANCE DEFENCE COSTS, EXCESS OF THE APPLICABLE RETENTION, PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM.**

**NOTICE: TERMS APPEARING IN BOLD FACE TYPE HAVE SPECIAL MEANING. SEE CLAUSE 2 OF THE POLICY.**

### DECLARATIONS

| ITEMS | | | | |
|---|---|---|---|---|
| 1 | **NAMED ENTITY:** NORTEL NETWORKS CORPORATION (herein "**Named Entity**") | | | |
| 1(a) | MAILING ADDRESS: 195 THE WEST MALL TORONTO, ON M9C 5K1 | | | |
| 1(b) | JURISDICTION OF INCORPORATION/FORMATION: *Ontario* | | | |
| 2 | **POLICY PERIOD:** From: *December 1, 2008* To: *December 1, 2009* 12:01 A.M. standard time at the address stated in Item 1(a) | | | |
| 3 | **POLICY AGGREGATE LIMIT OF LIABILITY** (herein "**Limit of Liability**") For all **Loss**, in the aggregate, under this policy including **Defence Costs**: *$15,000,000 US* | | | |
| 4 | **RETENTION:** Not applicable to **Non-Indemnifiable Loss** and certain **Defence Costs** - (See Clause 6 for details.) | | | |
| 4(a) | **Securities Claims:** *$10,000,000 US* | | 4(b) | **Employment Practices Claims:** *N/A* |
| 4(c) | **Oppressive Conduct Claims:** *$10,000,000 US* | | 4(d) | **Canadian Pollution Claims:** *$10,000,000 US* |
| 4(e) | All other **Claims**: *$10,000,000 US* | | | |

MARSH CANADA LIMITED
TORONTO

*1253907*

FEB - 2 2009

RECEIVED
UNIT F

MARSH CANADA LIMITED - TORONTO

Policy/Endorsement Reviewed

Document requires corrections. Yes [ ] No [✓]

Client notified. Date FEB 6, 2001

Gregory Galino
(Reviewer - Print Full Name) Date

AE: Date
(Approver - Print Full Name)

Corrections have been made Date

(Reviewer - Print Full Name) Date

AE Date
(Approver - Print Full Name)

| ITEMS (continued) | | | | |
|---|---|---|---|---|
| 5 | **CONTINUITY DATE** (herein "**Continuity Date**") | | | |
| 5(a) | Coverages A and B, other than **Outside Entity Executive** coverage: *November 1, 2005* | 5(b) | **Outside Entity Executive** coverage, including Coverage C: | The date on which the **Insured Person** first served as an **Outside Entity Executive** of such **Outside Entity**. |
| 5(c) | Coverage D: *November 1, 2005* | | | |
| 6 | **PREMIUM:** *$995,000 US* | | | |
| 7 | **CRISISFUND**® limit: | | | |
| 7(a) | **Crisis Loss:** *$50,000 US* | 7(b) | Additional **CRISISFUND** for **Delisting Crisis Loss:** *$25,000 US* | |
| 8 | **NAME AND ADDRESS OF INSURER:** *AIG Commercial Insurance Company of Canada*<br>*145 WELLINGTON STREET WEST*<br>*TORONTO, ON M5J 1H8* | | | |
| | **PRODUCER:**<br>*MARSH CANADA LIMITED*<br>*161 BAY ST*<br>*TORONTO, ON M5J 2S4* | | | |

All limits of insurance, premiums and other sums of money as expressed in this policy are in Canadian currency unless otherwise stated in writing

By signing below, the Chief Executive Officer and the Secretary of the Insurer agree on behalf of the Insurer to all the terms of this Policy.

**Chief Executive Officer**
**AIG Commercial Insurance Company of Canada**

**Secretary**
**AIG Commercial Insurance Company of Canada**

*TORONTO*
SIGNED AT

*January 29, 2009*
DATE

*1253907*

36



AIG
Commercial Insurance

Canada Head Office
145 WELLINGTON STREET WEST
TORONTO, ON M5J 1H8

**AIG Commercial Insurance Company of Canada**
(herein called the Insurer)

# EXECUTIVE AND ORGANIZATION LIABILITY INSURANCE POLICY

In consideration of the payment of the premium, and in reliance upon the **Application** and the statements therein, which form a part of this policy, the **Insurer** agrees as follows:

## 1. INSURING AGREEMENTS

With respect to Coverage A, B and C, solely with respect to **Claims** first made against an **Insured** during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, and subject to the other terms, conditions and limitations of this policy, this policy affords the following coverage:

### COVERAGE A: EXECUTIVE LIABILITY INSURANCE

This policy shall pay the **Loss** of any **Insured Person** arising from a **Claim** (including, but not limited to, an **Employment Practices Claim**, an **Oppressive Conduct Claim**, a **Canadian Pollution Claim** and a **Statutory Claim**) made against such **Insured Person** for any **Wrongful Act** of such **Insured Person**, except when and to the extent that an **Organization** has indemnified such **Insured Person**. Coverage A shall not apply to **Loss** arising from a **Claim** made against an **Outside Entity Executive**.

### COVERAGE B: ORGANIZATION INSURANCE

(i) *Organization Liability*: This policy shall pay the **Loss** of any **Organization** arising from:

(a) a **Securities Claim**;
(b) an **Oppressive Conduct Claim**; or
(c) a **Canadian Pollution Claim**,

made against such **Organization** for any **Wrongful Act** of such **Organization**.

(ii) *Indemnification of an Insured Person*: This policy shall pay the **Loss** of an **Organization** arising from a **Claim** made against an **Insured Person** (including an **Outside Entity Executive**) for any **Wrongful Act** of such **Insured Person**, but only to the extent that such **Organization** has indemnified such **Insured Person**.

### COVERAGE C: OUTSIDE ENTITY EXECUTIVE LIABILITY INSURANCE

This policy shall pay the **Loss** of any **Outside Entity Executive** arising from a **Claim** made against such **Outside Entity Executive** for any **Wrongful Act** of such **Outside Entity Executive** but only excess of any indemnification provided by an **Outside Entity** and any insurance coverage afforded to an **Outside Entity** or its **Executives** applicable to such **Claim**, except when and to the extent that an **Organization** has indemnified such **Outside Entity Executive**.

### COVERAGE D: CRISISFUND® INSURANCE

This policy shall pay the **Crisis Loss** (including **Delisting Crisis Loss**) of an **Organization** solely with respect to a **Crisis** (including a **Delisting Crisis**) occurring during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, up to the amount of the respective **CrisisFund**, from first dollar; provided that payment of any **Crisis Loss** under this policy shall not waive any of the **Insurer's** rights under this policy or at law. This Coverage D shall apply regardless of whether a **Claim** is ever made against an **Insured** arising from such **Crisis** and, in the case where a **Claim** is made, regardless of whether the amount is incurred prior to or subsequent to the making of the **Claim**.

## 2. DEFINITIONS

(a) "**Application**" means each and every signed application, any attachments to such applications, other materials submitted therewith or incorporated therein and any other documents submitted in connection with the underwriting of this policy or the underwriting of any other directors and officers (or equivalent) liability policy issued by the **Insurer**, or any of its affiliates, of which this policy is a renewal, replacement or which it succeeds in time, and any public documents filed by an **Organization** with any federal, provincial, municipal or foreign regulatory agency (including but not limited to any provincial securities commission (PSC)).

(b) "**Canadian Pollution Claim**" means a **Claim**, other than a **Securities Claim**, which alleges a violation of the Canadian Environmental Protection Act, R.S.C. 1985, c. 16 (4th supp.), or the Environmental Protection Act, R.S.O. 1990, c. E-19, the regulations promulgated thereunder and amendments thereto, or similar provisions of any Canadian provincial law.

(c) "**Claim**" means:

(1) a written demand for monetary, non-monetary or injunctive relief;
(2) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by: (i) service of a Writ of Summons, Statement of Claim or similar originating legal document; (ii) return of a summons, information, indictment or similar document (in the case of a criminal proceeding); or (iii) receipt or filing of a notice of charges; or
(3) a civil, criminal, administrative or regulatory investigation of an **Insured Person**:
  (i) once such **Insured Person** is identified in writing by such investigating authority as a person against whom a proceeding described in Definition (c)(2) may be commenced; or
  (ii) in the case of an investigation by any PSC or similar foreign securities authority, after the service of a subpoena upon such **Insured Person**.

The term "**Claim**" shall include any **Securities Claim**, **Employment Practices Claim**, **Oppressive Conduct Claim**, **Canadian Pollution Claim** and **Statutory Claim**.

(d) "**Cleanup Costs**" means expenses (including but not limited to legal and professional fees) incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants**.

(e) "**Crisis**" has the meaning as defined in Appendix B attached to this policy.

(f) "**CrisisFund**" means:

(1) in the case of all **Crisis Loss**, other than **Delisting Crisis Loss**, the dollar amount set forth in Item 7(a) of the Declarations; and

(2) in the case of **Delisting Crisis Loss** the dollar amount set forth in Item 7(a) of the Declarations plus the additional dollar amount set forth in Item 7(b) of the Declarations, combined.

(g) "**Crisis Loss**" has the meaning as defined in Appendix B attached to this policy. "**Delisting Crisis Loss**" means a **Crisis Loss** resulting solely from a **Delisting Crisis** (as defined in Appendix B).

(h) "**Defence Costs**" means reasonable and necessary fees, costs and expenses consented to by the **Insurer** (including premiums for any appeal bond, attachment bond or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defence and/or appeal of a **Claim** against an **Insured**, but excluding any compensation of any **Insured Person** or any **Employee** of an **Organization**.

(i) "**Employee**" means any past, present or future employee, other than an **Executive** of an **Organization**, whether such employee is in a supervisory, co-worker or subordinate

position or otherwise, including any full-time, part-time, seasonal and temporary employee.

(j) "**Employment Practices Claim**" means a **Claim** alleging any **Employment Practices Violation**.

(k) "**Employment Practices Violation**" means any actual or alleged:

(1) wrongful or unfair dismissal, discharge or termination, either actual or constructive, of employment;
(2) harassment (including but not limited to sexual harassment);
(3) discrimination;
(4) retaliation;
(5) employment-related misrepresentation;
(6) employment-related libel, slander, humiliation, defamation or invasion of privacy;
(7) wrongful failure to employ or promote;
(8) wrongful deprivation of career opportunity, wrongful demotion or negligent **Employee** evaluation;
(9) wrongful discipline;
(10) failure to grant tenure; or
(11) with respect to any of the foregoing items (1) through (10) of this definition: negligent hiring, retention, training or supervision, infliction of emotional distress, failure to provide or enforce adequate or consistent corporate policies and procedures, or violation of an individual's human rights,

but only if such act, error or omission relates to an **Executive** of, an **Employee** of or an applicant for employment with an **Organization** or an **Outside Entity**, whether committed directly, indirectly, intentionally or unintentionally. In addition, with respect to any natural person customer or client, "**Employment Practices Violation**" shall mean only actual or alleged discrimination, sexual harassment or violation of an individual's human rights relating to such discrimination or sexual harassment, whether committed directly, indirectly, intentionally or unintentionally.

(l) "**Executive**" means any:

(1) past, present and future duly elected or appointed director, officer, trustee or governor of a corporation, management committee member of a joint venture and member of the management board of a limited liability company (or equivalent position), including a de facto director, officer, trustee, governor, management committee member or member of the management board of such entities;
(2) past, present and future person in a duly elected or appointed position in an entity organized and operated in a **Foreign Jurisdiction** that is equivalent to an executive position listed in Definition (l)(1); or
(3) past, present and future General Counsel and Risk Manager (or equivalent position) of the **Named Entity**.

(m) "**Foreign Jurisdiction**" means any jurisdiction, other than Canada.

(n) "**Foreign Policy**" means the **Insurer's** or any other member company of American International Group, Inc.'s (AIG) standard executive managerial liability policy (including all mandatory endorsements, if any) approved by AIG to be sold within a **Foreign Jurisdiction** that provides coverage substantially similar to the coverage afforded under this policy. If more than one such policy exists, then "**Foreign Policy**" means the standard policy most recently registered in the local language of the **Foreign Jurisdiction**, or if no such policy has been registered, then the policy most recently registered in that **Foreign Jurisdiction**. The term "**Foreign Policy**" shall not include any partnership managerial, pension trust or professional liability coverage.

(o) "**Indemnifiable Loss**" means **Loss** for which an **Organization** has indemnified or is permitted or required to indemnify an **Insured Person** pursuant to law or contract or

memorandum, articles, bylaws, charter, operating agreements or similar documents of an **Organization**.

(p) "**Insured**" means any:

(1) **Insured Person**; or
(2) **Organization**, but only with respect to a **Securities Claim**, an **Oppressive Conduct Claim** or a **Canadian Pollution Claim**.

(q) "**Insured Person**" means any:

(1) **Executive** of an **Organization**;
(2) **Employee** of an **Organization**; or
(3) **Outside Entity Executive**.

(r) "**Loss**" means damages (including aggravated damages), settlements, judgments (including pre/post-judgment interest on a covered judgment), **Defence Costs** and **Crisis Loss**; however, "**Loss**" (other than **Defence Costs**) shall not include: (1) civil or criminal fines or penalties; (2) taxes; (3) punitive or exemplary damages; (4) multiplied portion of multiplied damages; (5) any amounts for which an **Insured** is not financially liable or which are without legal recourse to an **Insured**; and (6) matters which may be deemed uninsurable under the provincial or state law pursuant to which this policy shall be construed.

Notwithstanding the foregoing paragraph, **Loss** shall specifically include (subject to this policy's other terms, conditions and limitations, including but not limited to exclusions relating to profit or advantage, deliberate fraud or deliberate criminal acts): (1) civil penalties assessed against any **Insured Person** pursuant to the Corruption of Foreign Public Officials Act, R.S.C. 1998, c. C-33, or, Section 2(g)(2)(C) of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(g)(2)(C); and (2) solely with respect to **Securities Claims**, punitive, exemplary and multiplied damages. Enforceability of this paragraph shall be governed by such applicable law that most favors coverage for such penalties and punitive, exemplary and multiplied damages.

In the event of a **Claim** alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity is inadequate, **Loss** with respect to such **Claim** shall not include any amount of any judgment or settlement representing the amount by which such price or consideration is effectively increased; provided, however, that this paragraph shall not apply to **Defence Costs** or to any **Non-Indemnifiable Loss** in connection therewith.

(s) "**Management Control**" means: (1) owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of: the Board of Directors of a corporation; the management committee members of a joint venture; or the members of the management board of a limited liability company; or (2) having the right, pursuant to written contract or the articles, by-laws, charter, operating agreement or similar documents of an **Organization**, to elect, appoint or designate a majority of: the Board of Directors of a corporation; the management committee of a joint venture; or the management board of a limited liability company.

(t) "**No Liability**" means a final judgment of no liability obtained: (1) prior to trial, in favor of each and every **Insured** named in the **Claim**, by reason of a motion to dismiss, motion for summary judgment or dismissal order, after the exhaustion of all appeals; or (2) after trial and after the exhaustion of all appeals, in favor of each and every **Insured** named in the **Claim**.

In no event shall the term "**No Liability**" apply to a **Claim** made against an **Insured** for which a settlement has occurred.

(u) "**Non-Indemnifiable Loss**" means **Loss** for which an **Organization** has neither indemnified

nor is permitted or required to indemnify an **Insured Person** pursuant to law or contract or memorandum, articles, bylaws, charter, operating agreement or similar documents of an **Organization**.

(v) "**Oppressive Conduct Claim**" means a **Claim** brought by or on behalf of a shareholder of an **Organization** against the **Organization**, or, any **Executive** of the **Organization** with respect to such shareholder's interest in securities of such **Organization**, whether directly or by class action, which alleges a violation of the oppression or unfairly prejudicial provisions of the Canada Business Corporations Act, R.S.C. 1985, c. C-44 or similar provisions of any Canadian provincial law.

(w) "**Organization**" means:

(1) the **Named Entity**;
(2) each **Subsidiary**; and
(3) in the event of a bankruptcy proceeding shall be instituted by or against the foregoing entities in the United States the resulting debtor-in-possession (or equivalent status outside the United States), if any.

(x) "**Outside Entity**" means any:

(1) not-for-profit entity; and
(2) other entity listed as an "**Outside Entity**" in an endorsement attached to this policy.

(y) "**Outside Entity Executive**" means any:

(1) **Executive** of an **Organization** who is or was acting at the specific written request or direction of an **Organization** as an **Executive** of an **Outside Entity**; or
(2) any other person listed as an **Outside Entity Executive** in an endorsement attached to this policy.

(z) "**Policy Period**" means the period of time from the inception date shown in Item 2 of the Declarations to the earlier of the expiration date shown in such Item 2 or the effective date of cancellation of this policy.

(aa) "**Pollutants**" means, but is not limited to, any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapour, soot, fumes, acids, alkalis, chemicals and **Waste** exhibiting any hazardous substances characteristics as defined by, or identified on a list of hazardous substances issued by the Canadian Environmental Protection Act, R.S.C. 1985, c. 16 (4th supp.), the regulations promulgated thereunder and amendments thereto. "**Waste**" includes materials to be recycled, reconditioned or reclaimed.

(bb) "**Securities Claim**" means a **Claim**, other than an administrative or regulatory proceeding against, or investigation of an **Organization**, made against any **Insured**:

(1) alleging a violation of any federal, provincial or foreign regulation, rule or statute regulating securities (including but not limited to the purchase or sale or offer or solicitation of an offer to purchase or sell securities) which is:
   (a) brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of an **Organization**; or
   (b) brought by a security holder of an **Organization** with respect to such security holder's interest in securities of such **Organization**; or
(2) brought derivatively on the behalf of an **Organization** by a security holder of such **Organization**.

Notwithstanding the foregoing, the term "**Securities Claim**" shall include an administrative or regulatory proceeding against an **Organization**, but only if and only during the time that such proceeding is also commenced and continuously maintained against an **Insured Person**.

(cc) "**Statutory Claim**" means a **Claim** made against any **Executive**, which alleges a violation of any Canadian federal or provincial legislation arising out of, based upon or attributable to:

(1) the failure to deduct, withhold or remit tax from a payment of salary or wages of an **Employee** of an **Organization;**
(2) the failure to deduct, withhold or remit unemployment insurance contributions from a payment of salary or wages of an **Employee** of an **Organization**;
(3) the failure to deduct, withhold or remit pension plan contributions from a payment of salary or wages of an **Employee** of an **Organization**;
(4) the failure to pay wages of an **Employee** of an **Organization** properly due and owing.

(dd) "**Subsidiary**" means: (1) any for-profit entity that is not formed as a partnership of which the **Named Entity** has **Management Control** ("**Controlled Entity**") on or before the inception of the **Policy Period** either directly or indirectly through one or more other **Controlled Entities**; and (2) a not-for-profit organization as defined in Section 149.1(b) of the Income Tax Act, R.S.C., 1985 (5th Supp.) sponsored exclusively by the **Named Entity**.

(ee) "**Wrongful Act**" means:

(1) any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act or any actual or alleged **Employment Practices Violation**:
(i) with respect to any **Executive** of an **Organization**, by such **Executive** in his or her capacity as such or any matter claimed against such **Executive** solely by reason of his or her status as such;
(ii) with respect to any **Employee** of an **Organization**, by such **Employee** in his or her capacity as such, but solely in regard to any: (a) **Securities Claim**; or (b) other **Claim** so long as such other **Claim** is also made and continuously maintained against an **Executive** of an **Organization**; or
(iii) with respect to any **Outside Entity Executive**, by such **Outside Entity Executive** in his or her capacity as such or any matter claimed against such **Outside Entity Executive** solely by reason of his or her status as such; or
(2) with respect to an **Organization**, any actual or alleged breach of duty, neglect, error, misstatement, mis-leading statement, omission or act by such **Organization**, but solely in regard to: (a) any **Securities Claim** or **Oppressive Conduct Claim**; or (b) a **Canadian Pollution Claim** so long as such **Canadian Pollution Claim** is also made and continuously maintained against an **Executive** of an **Organization**.

## 3. WORLDWIDE EXTENSION

Where legally permissible, this policy shall apply to any **Claim** made against any **Insured** anywhere in the world.

In regard to **Claims** brought and maintained solely in a **Foreign Jurisdiction** against an **Organization** formed and operating in such **Foreign Jurisdiction** or an **Insured Person** thereof for **Wrongful Acts** committed in such **Foreign Jurisdiction**, the **Insurer** shall apply to such **Claim(s)** those terms and conditions (and related provisions) of the **Foreign Policy** registered with the appropriate regulatory body in such **Foreign Jurisdiction** that are more favourable to such **Insured** than the terms and conditions of this policy. However, this paragraph shall apply only to Clauses 1-4, 9-13, 15, 16, 18, 20 and 21 of this policy and the comparable provisions of the **Foreign Policy**. In addition, this paragraph shall not apply to the non-renewal or claims made and reported provisions of any policy.

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of Canada. If judgment is rendered, settlement is denominated or other elements of **Loss** are stated or incurred in a currency other than Canadian dollars, payment of covered **Loss** due under this policy (subject to the terms, conditions and limitations of this policy) will be made either in such other currency (at the option of the **Insurer** and if agreeable to the **Named Entity**) or, in Canadian dollars, at the rate of exchange published in The National Post on the date the **Insurer's** obligation to pay such **Loss** is established (or if not published on such date the next publication date of The National Post).

## 4. EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured**:

(a) arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which the **Insured** was not legally entitled;

(b) arising out of, based upon or attributable to payments to an **Insured** of any remuneration without the previous approval of the shareholders or members of an **Organization**, which payment without such previous approval shall be held to have been illegal;

(c) arising out of, based upon or attributable to the committing in fact of any deliberate criminal or deliberate fraudulent act by the **Insured**;

(d) alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related **Wrongful Acts** alleged or contained in any **Claim** which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(e) alleging, arising out of, based upon or attributable to, as of the **Continuity Date**, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an **Insured** had notice, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

(f) with respect to any **Outside Entity Executive**, for any **Wrongful Act** occurring prior to the **Continuity Date** if any **Insured**, as of such **Continuity Date**, knew or could have reasonably foreseen that such **Wrongful Act** could lead to a **Claim** under this policy;

(g) alleging, arising out of, based upon or attributable to any actual or alleged act or omission of an **Insured Person** serving in his or her capacity as an **Executive** or an **Employee** of any entity that is not an **Organization** or an **Outside Entity**, or by reason of his or her status as an **Executive** or an **Employee** of such other entity;

(h) for bodily injury, sickness, disease, or death of any person (other than emotional distress, mental anguish or nervous shock), or for damage to or destruction of any tangible property; including the loss of use thereof;

(i) which is brought by or on behalf of an **Organization** or any **Insured Person**, other than an **Employee** of an **Organization**; or which is brought by any security holder or member of an **Organization**, whether directly or derivatively, unless such security holder's or member's **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any **Executive** of an **Organization** or any **Organization**; provided, however, this exclusion shall not apply to:

    (1) any **Claim** brought by an **Insured Person** in the form of a cross-claim or third-party claim for contribution or indemnity which is part of, and results directly from, a **Claim** that is covered by this policy;
    (2) any **Employment Practices Claim** brought by an **Insured Person**, other than an **Insured Person** who is or was a member of the Board of Directors (or equivalent governing body) of an **Organization**;
    (3) in any bankruptcy proceeding by or against an **Organization**, any **Claim** brought by the examiner, trustee, receiver, receiver manager, liquidator or rehabilitator (or any assignee thereof) of such **Organization**, if any;
    (4) any **Claim** brought by any past **Executive** of an **Organization** who has not served as a duly elected or appointed director, officer, trustee, governor, management committee member, member of the management board, General Counsel or Risk Manager (or equivalent position) of or consultant for an **Organization** for at least four (4) years prior to such **Claim** being first made against any person; or
    (5) any **Claim** brought by an **Executive** of an **Organization** formed and operating in a **Foreign Jurisdiction** against such **Organization** or any **Executive** thereof, provided that such **Claim** is brought and maintained outside Canada, the United States, or any other common law country (including any territories thereof);

(j) for any **Wrongful Act** arising out of the **Insured Person** serving as an **Executive** of an **Outside Entity** if such **Claim** is brought by the **Outside Entity** or by any **Executive** thereof; or which is brought by any security holder of the **Outside Entity**, whether directly or derivatively, unless such security holder's **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of the **Outside Entity**, any **Executive** of the **Outside Entity** or an **Organization** or any **Executive** of an **Organization**;

(k) alleging, arising out of, based upon or attributable to, directly or indirectly: (i) the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants**; or (ii) any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, (including but not limited to a **Claim** alleging damage to an **Organization** or its securities holders); provided, however, that this exclusion shall not apply to: (1) **Loss** constituting **Non-Indemnifiable Loss**; (2) **Loss** arising from a **Canadian Pollution Claim**; and (3) **Loss** arising from a **Securities Claim** brought in Canada and alleging a violation of a Canadian federal or provincial rule or statute regulating securities; but in either case of (1), (2) or (3) of this exclusion (k) **Loss** shall not include **Cleanup Costs**;

(l) for emotional distress of any person, or for injury from libel, slander, defamation or disparagement, or for injury from a violation of a person's right of privacy; provided, however, this exclusion shall not apply to an **Employment Practices Claim**;

(m) alleging or arising out of any of the responsibilities, obligations or duties imposed upon fiduciaries by the Canada Pension Benefits Standards Act, 1985 R.S.C., or the Ontario Pension Benefits Act, R.S.O. 1990 or by the Employee Retirement Income Security Act of 1974 (ERISA) and amendments, the Canada Labour Code, R.S.C. 1985 c. L-2, the Labour Adjustments Benefits Act, S.C. 1996, or any federal or provincial workers' compensation legislation or any similar statutory or regulatory law, including any similar foreign law;

(n) with respect to an **Employment Practices Claim**, for damages by reason of the **Organization's** failure to afford reasonable notice to an **Employee** that has been terminated or discharged; and

(o) with respect to a **Canadian Pollution Claim**, arising out of, based upon or attributable to the committing in fact of any willful violation of any statute, rule, regulation, agreement or judicial or regulatory order.

For the purpose of determining the applicability of the foregoing Exclusions 4(a) through 4(c) and Exclusions 4(f) and 4(o): (1) the facts pertaining to and knowledge possessed by any **Insured** shall not be imputed to any other **Insured Person**; and (2) only facts pertaining to and knowledge possessed by any past, present or future chairman of the board, president, chief executive officer, chief operating officer, chief financial officer or General Counsel (or equivalent position) of an **Organization** shall be imputed to an **Organization**.

This Clause 4, Exclusions, shall not be applicable to **Crisis Loss**.

**5. LIMIT OF LIABILITY (FOR ALL LOSS – INCLUDING DEFENCE COSTS)**

The **Limit of Liability** stated in Item 3 of the Declarations is the aggregate limit of the **Insurer's** liability for all **Loss**, under Coverages A, B, C and D combined, arising out of all **Claims** first made against each and every **Insured**, and all **Crisis Loss** occurring, during the **Policy Period** and the **Discovery Period** (if applicable). The **Limit of Liability** for the **Discovery Period** and the **CrisisFund** shall be part of, and not in addition to, the **Limit of Liability** for the **Policy Period**. Further, a **Claim** which is made subsequent to the **Policy Period** or **Discovery Period** (if applicable) which pursuant to Clause 7(b) or 7(c) is considered made during the **Policy Period** or **Discovery Period** shall also be subject to the one aggregate **Limit of Liability** stated in Item 3 of the Declarations. The limit of the **Insurer's** liability for **Crisis Loss** and **Delisting Crisis Loss** arising from all **Crises** occurring during the **Policy Period**, in the aggregate, shall be the amounts set forth as the **CrisisFund**. The **CrisisFund** shall be the aggregate limit of the **Insurer's** liability for all **Crises** under this

policy regardless of the number of **Crises** occurring during the **Policy Period**.

*__Defence Costs__ are not payable by the __Insurer__ in addition to the __Limit of Liability__. __Defence Costs__ are part of __Loss__ and as such are subject to the __Limit of Liability__ for __Loss__.*

**6. RETENTION CLAUSE**

For each **Claim**, the **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the applicable Retention amounts stated in Items 4(a), 4(b), 4(c), 4(d) and 4(e) of the Declarations, such Retention amounts to be borne by an **Organization** and/or the **Insured Person** and remain uninsured, with regard to all **Loss** other than **Non-Indemnifiable Loss**. The Retention amount specified in:

(i) Item 4(a) applies to **Defence Costs** that arise out of a **Securities Claim**;
(ii) Item 4(b) applies to **Loss** that arises out of an **Employment Practices Claim**;
(iii) Item 4(c) applies to **Loss** that arises out of an **Oppressive Conduct Claim**;
(iv) Item 4(d) applies to **Loss** that arises out of a **Canadian Pollution Claim**; and
(v) Item 4(e) applies to **Loss** that arises out of any **Claim** other than a **Claim** listed in Clause 6(i) through 6(iv) above.

A single Retention amount shall apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or related **Wrongful Acts**.

In the event a **Claim** triggers more than one of the Retention amounts stated in Items 4(a) through 4(e) of the Declarations, then, as to that **Claim**, the highest of such Retention amounts shall be deemed the Retention amount applicable to **Loss** (to which a Retention is applicable pursuant to the terms of this policy) arising from such **Claim**.

Further, with respect to all **Claims**, other than **Employment Practices Claims**, no Retention shall apply to **Loss** arising from such **Claims** and the **Insurer** shall reimburse **Defence Costs** otherwise covered hereunder and paid by the **Insured**, in the event of: (1) a determination of **No Liability** of each and every **Insured** against whom the same **Claim** or related **Claims** have been made; or (2) a Notice of Discontinuance in respect of each and every **Insured** against whom the same **Claim** or related **Claims** have been made without prejudice and without the payment of any consideration by or on behalf of any **Insured**. However, in the case of (2) above, such reimbursement shall occur 90 days after the date of such Notice of Discontinuance as long as such **Claim** is not brought (or any other **Claim** which is subject to the same single retention by virtue of Clause 6 is not pending or brought) again within that time, and further subject to an undertaking by an **Organization** in a form acceptable to the **Insurer** that such reimbursement shall be paid back by such **Organization** to the **Insurer** in the event the **Claim** (or any other **Claim** which is subject to the same single retention by virtue of Clause 6) is brought after such 90-day period.

No Retention amount is applicable to **Crisis Loss** or **Non-Indemnifiable Loss**.

**7. NOTICE/CLAIM REPORTING PROVISIONS**

Notice hereunder shall be given in writing to the Insurer named in Item 8 of the Declarations at the address indicated in Item 8 of the Declarations. If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

(a) An **Organization** or an **Insured** shall, as a condition precedent to the obligations of the **Insurer** under this policy, give written notice to the **Insurer** of a **Claim** made against an **Insured** or a **Crisis** as soon as practicable: (i) after the **Named Entity's** Risk Manager or General Counsel (or equivalent position) first becomes aware of the **Claim**; or (ii) the **Crisis** commences, but in all events no later than either:

(1) the end of the **Policy Period** or the **Discovery Period** (if applicable); or
(2) within 30 days after the end of the **Policy Period** or the **Discovery Period** (if applicable), as long as such **Claim** was first made against an **Insured** within the final 30 days of the **Policy Period** or the **Discovery Period** (if applicable).

(b) If written notice of a **Claim** has been given to the **Insurer** pursuant to Clause 7(a) above, then a **Claim** which is subsequently made against an **Insured** and reported to the **Insurer** alleging, arising out of, based upon or attributable to the facts alleged in the **Claim** for which such notice has been given, or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** alleged in the **Claim** of which such notice has been given, shall be considered related to the first **Claim** and made at the time such notice was given.

(c) If during the **Policy Period** or during the **Discovery Period** (if applicable) an **Organization** or an **Insured** shall become aware of any circumstances which may reasonably be expected to give rise to a **Claim** being made against an **Insured** and shall give written notice to the **Insurer** of the circumstances, the **Wrongful Act** allegations anticipated and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, then a **Claim** which is subsequently made against such **Insured** and reported to the **Insurer** alleging, arising out of, based upon or attributable to such circumstances or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

**8. DEFENCE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENCE COSTS)**

Under Coverages A, B and C of this policy, except as hereinafter stated, the **Insurer** shall advance, excess of any applicable retention amount, covered **Defence Costs** no later than ninety (90) days after the receipt by the **Insurer** of such defence bills. Such advance payments by the **Insurer** shall be repaid to the **Insurer** by each and every **Insured** or **Organization**, severally according to their respective interests, in the event and to the extent that any such **Insured** or **Organization** shall not be entitled under this policy to payment of such **Loss**.

*The **Insurer** does not, however, under this policy, assume any duty to defend. The **Insureds** shall defend and contest any **Claim** made against them. The **Insureds** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defence Costs** without the prior written consent of the **Insurer**. Only those settlements, stipulated judgments and **Defence Costs** which have been consented to by the **Insurer** shall be recoverable as **Loss** under the terms of this policy. The **Insurer's** consent shall not be unreasonably withheld, provided that the **Insurer** shall be entitled to effectively associate in the defence, the prosecution and the negotiation of any settlement of any **Claim** that involves or appears reasonably likely to involve the **Insurer**.*

The **Insurer** shall have the right to effectively associate with each and every **Organization** and **Insured Person** in the defence and prosecution of any **Claim** that involves, or appears reasonably likely to involve, the **Insurer**, including, but not limited to, negotiating a settlement. Each and every **Organization** and **Insured Person** shall give the **Insurer** full cooperation and such information as it may reasonably require.

Notwithstanding any of the foregoing, if all **Insured** defendants are able to dispose of all **Claims** which are subject to one retention amount (inclusive of **Defence Costs**) for an amount not exceeding any applicable retention amount, then the **Insurer's** consent shall not be required for such disposition.

No **Organization** is covered in any respect under Coverage A or Coverage C. An **Organization** is covered, subject to the policy's terms, conditions and limitations only with respect to: (1) its indemnification of its **Insured Persons** under Coverage B(ii) as respects a **Claim** against such **Insured Persons**; and (2) under Coverage B(i) for a **Securities Claim**, an **Oppressive Conduct Claim**, or a **Canadian Pollution Claim**. Accordingly, the **Insurer** has no obligation under this policy for covered **Defence Costs** incurred by, judgments against or settlements by an **Organization** arising out of a **Claim** made against an **Organization** other than a covered **Securities Claim**, a covered **Oppressive Conduct Claim**, or a covered **Canadian Pollution Claim** or any obligation to pay **Loss** arising out of any legal liability that an **Organization** has to a claimant, except as respects a covered **Securities Claim**, covered

**Oppressive Conduct Claim** or a covered **Canadian Pollution Claim** against such **Organization**.

With respect to: (i) **Defence Costs** jointly incurred by; (ii) any joint settlement entered into by; and/or (iii) any judgment of joint and several liability against any **Organization** and any **Insured** in connection with any **Claim**, other than a **Securities Claim**, an **Oppressive Conduct Claim**, or a **Canadian Pollution Claim**, any such **Organization** and any such **Insured** and the **Insurer** agree to use their best efforts to determine a fair and proper allocation of the amounts as between any such **Organization**, any such **Insured** and the **Insurer**, taking into account the relative legal and financial exposures, and the relative benefits obtained by any such **Insured** and any such **Organization**.

In the event that a determination as to the amount of **Defence Costs** to be advanced under the policy cannot be agreed to, then the **Insurer** shall advance **Defence Costs** excess of any applicable retention amount which the **Insurer** states to be fair and proper until a different amount shall be agreed upon or determined pursuant to the provisions of this policy and applicable law.

This Clause 8 shall not be applicable to **Crisis Loss**. Nevertheless the **Insurer** does not, under this policy, assume any duty to defend.

**9. PRE-AUTHORIZED SECURITIES DEFENCE ATTORNEYS FOR U.S. SECURITIES CLAIMS**

Affixed as Appendix A hereto and made a part of this policy is a list of Panel Counsel law firms (**"Panel Counsel Firms"**). The list provides the **Insureds** with a choice of law firms from which a selection of legal counsel shall be made to conduct the defence of any **Securities Claim** made against such **Insureds**.

The **Insureds** shall select a **Panel Counsel Firm** to defend the **Securities Claim** made against the **Insureds** in the jurisdiction in which the **Securities Claim** is brought. In the event the **Claim** is brought in a jurisdiction not included on the list, the **Insureds** shall select a **Panel Counsel Firm** in the listed jurisdiction which is the nearest geographic jurisdiction to where the **Securities Claim** is brought. In such instance the **Insureds** also may, with the express prior written consent of the **Insurer**, which consent shall not be unreasonably withheld, select a non-**Panel Counsel Firm** in the jurisdiction in which the **Securities Claim** is brought to function as "local counsel" on the **Claim** to assist the **Panel Counsel Firm** which will function as "lead counsel" in conducting the defence of the **Securities Claim**.

With the express prior written consent of the **Insurer**, an **Insured** may select a **Panel Counsel Firm** different from that selected by another **Insured** defendant if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable. The list of **Panel Counsel Firms** may be amended from time to time by the **Insurer**. However, no firm shall be removed from the specific list attached to this policy during the **Policy Period**, without the consent of the **Named Entity**.

This clause shall only apply to a **Securities Claims** brought in the United States, its territories or possessions, or alleging a violation of the securities laws or any common or statutory law, including breaches of fiduciary duty, of the United States, any state, locality, territory or possession thereof.

**10. DISCOVERY CLAUSE**

Except as indicated below, if the **Named Entity** shall cancel or the **Named Entity** or the **Insurer** shall refuse to renew this policy, the **Named Entity** shall have the right to a period of either one, two or three years following the effective date of such cancellation or nonrenewal (the **"Discovery Period"**) upon payment of the respective **"Additional Premium Amount"** described below in which to give to the **Insurer** written notice pursuant to Clause 7(a) and 7(c) of the policy of: (i) **Claims** first made against an **Insured**; and (ii) circumstances of which an **Organization** or an **Insured** shall become aware, in either case during said **Discovery Period** and solely with respect to a **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this policy.

The **Additional Premium Amount** for: (1) one year shall be no more than 75% of the **Full Annual Premium**; (2) two years shall be no more than 150% of the **Full Annual Premium**; and (3) three years shall be no more than 225% of the **Full Annual Premium**. As used herein, "**Full Annual Premium**" means the premium level in effect immediately prior to the end of the **Policy Period**.

Notwithstanding the first paragraph of Clause 5, if the **Named Entity** shall cancel or the **Insurer** or the **Named Entity** shall refuse to renew this policy, then the **Named Entity** shall also have the right, to request an offer from the **Insurer** of a **Discovery Period** (with respect to **Wrongful Acts** occurring prior to the end of the **Policy Period**) with an aggregate limit of liability applicable to **Claims** made against the **Insured** during such **Discovery Period** which is in addition to, and not part of, the applicable **Limit of Liability** set forth in Item 3 of the Declarations. The **Insurer** shall quote such a **Discovery Period** pursuant to such terms, conditions, exclusions and additional premium as it deems appropriate in its sole and absolute discretion.

In the event of a **Transaction** as defined in Clause 12(a), the **Named Entity** shall have the right to request an offer from the **Insurer** of a **Discovery Period** (with respect to **Wrongful Acts** occurring prior to the effective time of the **Transaction**). The **Insurer** shall offer such **Discovery Period** pursuant to such terms, conditions, exclusions and additional premium as the **Insurer** may reasonably decide. In the event of a **Transaction**, the right to a **Discovery Period** shall not otherwise exist except as indicated in this paragraph.

The **Discovery Period** is not cancelable and the additional premium charged shall be fully earned at inception. This Clause 10 shall not apply to any cancellation resulting from non-payment of premium. The rights contained in this Clause 10 shall terminate unless written notice of election of a **Discovery Period** together with any additional premium due is received by the **Insurer** no later than thirty (30) days subsequent to the effective date of the cancellation, nonrenewal or **Transaction**.

**11. CANCELLATION CLAUSE**

This policy may be canceled by the **Named Entity** at any time only by mailing written prior notice to the **Insurer** or by surrender of this policy to the **Insurer** or its authorized agent. This policy may only be canceled by or on behalf of the **Insurer** in the event of non-payment of premium by the **Named Entity**. In the event of non-payment of premium by the **Named Entity**, the **Insurer** may cancel this policy by delivering to the **Named Entity** or by mailing to the **Named Entity**, by registered, certified, or other first class mail, at the **Named Entity's** address as shown in Item 1(a) of the Declarations, written notice stating when, not less than 15 days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The **Policy Period** terminates at the date and hour specified in such notice, or at the date and time of surrender. The **Insurer** shall have the right to the premium amount for the portion of the **Policy Period** during which the policy was in effect.

If this policy shall be canceled by the **Named Entity**, the **Insurer** shall retain the customary short rate proportion of the premium herein. If the period of limitation relating to the giving of notice as set forth in this Clause 11 is also set forth in any law controlling the construction thereof, then such period shall be deemed to be amended so as to be equal to the minimum period of limitation set forth in the controlling law.

**12. ORGANIZATIONAL CHANGES**

(a) If during the **Policy Period**:

(1) the **Named Entity** shall consolidate with, merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

(2) any person or entity or group of persons or entities acting in concert shall acquire **Management Control** of the **Named Entity**;

(any of such events being a "**Transaction**"), then this policy shall continue in full force and effect as to **Wrongful Acts** occurring prior to the effective time of the **Transaction**, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the **Transaction**. This policy may not be canceled after the effective time of the **Transaction** and the entire premium for this policy shall be deemed earned as of such time. The **Named Entity** shall also have the right to an offer by the **Insurer** of a **Discovery Period** described in the fourth paragraph of Clause 10 of this policy.

(b) *Subsidiary Additions*: "**Subsidiary**" also means any for-profit entity that is not formed as a partnership of which the **Named Entity** first had **Management Control** during the **Policy Period**, whether directly or indirectly through one or more other **Subsidiaries**, and:

(1) whose assets total less than 25% of the total consolidated assets of each and every **Organization** as of the inception date of this policy; or
(2) whose assets total 25% or more than the total consolidated assets of each and every **Organization** as of the inception date of this policy, but such entity shall be a "**Subsidiary**" only: (i) for a period of sixty (60) days from the date the **Named Entity** first had **Management Control** of such entity; or (ii) until the end of the **Policy Period**, which ever ends or occurs first (hereinafter "**Auto-Subsidiary Period**");

provided that the **Named Entity** or any other **Insured** shall report such **Subsidiary** to the **Insurer**, in writing, prior to the end of the **Policy Period**.

The **Insurer** shall extend coverage for any **Subsidiary** described in 12(b)(2) above, and any **Insured Person** thereof, beyond its respective **Auto-Subsidiary Period** if during such **Auto-Subsidiary Period**, the **Named Entity** shall have provided the **Insurer** with full particulars of the new **Subsidiary** and agreed to any additional premium and amendment of the provisions of this policy required by the **Insurer** relating to such **Subsidiary**. Further, coverage as shall be afforded to any **Subsidiary** and any **Insured Person** thereof is conditioned upon the **Named Entity** paying when due any additional premium required by the **Insurer** relating to such **Subsidiary**.

(c) *Insured Persons and Outside Entity Executives*: Coverage will automatically apply to all new **Insured Persons** of and **Outside Entity Executives** of an **Organization** following the inception date of this policy.

(d) *Other Organizational Changes*: In all events, coverage as is afforded under this policy with respect to a **Claim** made against any **Organization** and/or any **Insured Person** thereof shall only apply for **Wrongful Acts** committed or allegedly committed after the effective time such **Organization** became an **Organization** and such **Insured Person** became an **Insured Person**, and prior to the effective time that such **Organization** ceases to be an **Organization** or such **Insured Person** ceases to be an **Insured Person**. An **Organization** ceases to be an **Organization** when the **Named Entity** no longer maintains **Management Control** of an **Organization** either directly or indirectly through one or more of its **Subsidiaries**.

**13. SUBROGATION**

In the event of any payment under this policy, the **Insurer** shall be subrogated to the extent of such payment to all of each and every **Organization's** and **Insured's** rights of recovery thereof, and each such **Organization** and **Insured** shall execute all papers required and shall do everything that may be necessary to secure such rights including the execution of any and all documents necessary to enable the **Insurer** effectively to bring suit in the name of each such **Organization** and each such **Insured**. In no event, however, shall the **Insurer** exercise its rights of subrogation against an **Insured Person** under this policy unless such **Insured Person** has been convicted of a deliberate criminal act, or been determined to have in fact committed a deliberate fraudulent act, or been determined to have in fact obtained any profit or advantage to which such **Insured Person** was not legally entitled.

**14. OTHER INSURANCE AND INDEMNIFICATION**

Such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance, unless such other insurance is written only as specific excess insurance over the **Limit of Liability** provided by this policy. This policy shall specifically be excess of any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this policy may be obligated to pay **Loss**.

In the event of a **Claim** made against an **Outside Entity Executive**, coverage as is afforded by this policy, whether under Coverage B(ii) or Coverage C, shall be specifically excess of: (1) any indemnification provided by an **Outside Entity**; and (2) any insurance coverage afforded to an **Outside Entity** or its **Executives** applicable to such **Claim**. Further, in the event such other **Outside Entity** insurance is provided by the **Insurer** or any other member company of American International Group, Inc. (AIG) (or would be provided but for the application of the retention amount, exhaustion of the limit of liability or failure to submit a notice of a claim as required) then the **Insurer's** maximum aggregate **Limit of Liability** for all **Loss** under this policy, as respects any such **Claim**, shall be reduced by the amount of the limit of liability (as set forth on the Declarations) of the other AIG insurance provided to such **Outside Entity**.

**15. NOTICE AND AUTHORITY**

It is agreed that the **Named Entity** shall act on behalf of its **Subsidiaries** and each and every **Insured** with respect to the giving of notice of **Claim**, the giving and receiving of notice of cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy and the exercising or declining of any right to a **Discovery Period**.

**16. ASSIGNMENT**

This policy and any and all rights hereunder are not assignable without the written consent of the **Insurer**.

**17. ALTERNATIVE DISPUTE RESOLUTION PROCESS**

It is hereby understood and agreed that all disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of **Loss**, shall be submitted to the alternate dispute resolution ("**ADR**") process set forth in this clause.

Either the **Insurer** or the **Insureds** may elect the type of **ADR** process discussed below; provided, however, that the **Insureds** shall have the right to reject the **Insurer's** choice of the type of **ADR** process at any time prior to its commencement, in which case the **Insureds'** choice of **ADR** process shall control.

The **Insurer** and the **Insureds** agree that there shall be two choices of **ADR** process: (1) non-binding mediation administered by the American Arbitration Association, in which the **Insurer** and the **Insureds** shall try in good faith to settle the dispute by mediation under or in accordance with its then-prevailing Commercial Mediation Rules; or (2) arbitration conducted under and in accordance with the Ontario Arbitration Act, 1991 S.O. 1991, c. 17. In either mediation or arbitration, the mediator(s) or arbitrators shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute. The mediator(s) or arbitrators shall also give due consideration to the general principles of the law of the province where the **Named Entity** is incorporated or formed in the construction or interpretation of the provisions of this policy. In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the arbitrators' award shall not include attorneys fees or other costs. In the event of mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until the mediation shall have been terminated and at least 120 days shall have elapsed from the date of the termination of the mediation. In all events, each party shall share equally the expenses of the **ADR** process.

Either choice of **ADR** process may be commenced in the province indicated in Item 1 of the Declarations as the mailing address for the **Named Entity**. The **Named Entity** shall act on behalf of all **Insureds** in deciding to proceed with **ADR** process under this clause.

**18. ACTION AGAINST INSURER**

Except as provided in Clause 17 of the policy, no action shall lie against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, or until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against such **Insured** after actual trial or by written agreement of the **Insured**, the claimant and the **Insurer**.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the **Insurer** as a party to any action against any **Insured** or **Organization** to determine the **Insured's** liability, nor shall the **Insurer** be impleaded by any **Insured Person**, their spouse, any **Organization** or any legal representative of the foregoing.

**19. BANKRUPTCY**

Bankruptcy or insolvency of any **Organization** or any **Insured Person** shall not relieve the **Insurer** of any of its obligations hereunder.

It is further understood and agreed that the coverage provided under this policy is intended to protect and benefit the **Insured Persons**. Further, if a liquidation or reorganization proceeding is commenced by the **Named Entity** and/or any other **Organization** (whether voluntarily or involuntarily) under the Company Creditors' Arrangement Act, R.S.C. 1985 c. C-36 (as amended), or any similar provincial or foreign law (collectively "**Bankruptcy Law**") then, in regard to a covered **Claim** under this policy, the **Insureds** hereby:

(a) waive and release any automatic stay or injunction to the extent it may apply in such proceeding to the proceeds of this policy under such **Bankruptcy Law**; and
(b) agree not to oppose or object to any efforts by the **Insurer** or any **Insured** to obtain relief from any stay or injunction applicable to the proceeds of this policy as a result of the commencement of such liquidation or reorganization proceeding.

**20. SPOUSAL AND LEGAL REPRESENTATIVE EXTENSION**

If a **Claim** against an **Insured Person** includes a **Claim** against: (i) the lawful spouse of such **Insured Person**; or (ii) a property interest of such spouse, and such **Claim** arises from any actual or alleged **Wrongful Act** of such **Insured Person**, this policy shall cover **Loss** arising from the **Claim** made against that spouse or the property of that spouse to the extent that such **Loss** does not arise from a **Claim** for any actual or alleged act, error or omission of such spouse. This policy shall cover **Loss** arising from a **Claim** made against the estates, heirs, or legal representatives of any deceased **Insured Person**, and the legal representatives of any **Insured Person**, in the event of incompetency, insolvency or bankruptcy, who was an **Insured Person** at the time the **Wrongful Acts** upon which such **Claim** is based were committed.

**21. RENEWAL APPLICATION PROCEDURE**

If this policy is a renewal of, a replacement of, or succeeds in time any policy (providing similar coverage) issued by the **Insurer**, or any of its affiliates, then in granting coverage under this policy it is agreed that the **Insurer** has relied upon the **Application** as being accurate and complete in underwriting this policy. This Clause 21 together with the **Application** constitute the complete **Application** that is the basis of this policy and form a part hereof, and is material to the risk assumed by the **Insurer**. No written renewal application form need be completed by the **Named Entity** in order to receive a renewal quote from the **Insurer**, although the **Insurer** reserves the right to require specific information upon renewal.

**22. ORDER OF PAYMENTS**

In the event of **Loss** arising from a covered **Claim** for which payment is due under the provisions of this policy, then the **Insurer** shall in all events:

(a) first, pay **Loss** for which coverage is provided under Coverage A and Coverage C of this policy; then

(b) only after payment of **Loss** has been made pursuant to Clause 22(a) above, with respect to whatever remaining amount of the **Limit of Liability** is available after such payment, at the written request of the chief executive officer of the **Named Entity**, either pay or withhold payment of such other **Loss** for which coverage is provided under Coverage B(ii) of this policy; and then

(c) only after payment of **Loss** has been made pursuant to Clause 22(a) and Clause 22(b) above, with respect to whatever remaining amount of the **Limit of Liability** is available after such payment, at the written request of the chief executive officer of the **Named Entity**, either pay or withhold payment of such other **Loss** for which coverage is provided under Coverages B(i) and D of this policy.

In the event the **Insurer** withholds payment pursuant to Clause 22(b) and/or Clause 22(c) above, then the **Insurer** shall at such time and in such manner as shall be set forth in written instructions of the chief executive officer of the **Named Entity** remit such payment to an **Organization** or directly to or on behalf of an **Insured Person**.

The bankruptcy or insolvency of any **Organization** or any **Insured Person** shall not relieve the **Insurer** of any of its obligations to prioritize payment of covered **Loss** under this policy pursuant to this Clause 22.

**23. HEADINGS**

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

All limits of insurance, premiums and other sums of money as expressed in this policy are in Canadian currency unless otherwise stated in writing

By signing below, the Chief Executive Officer and the Secretary of the Insurer agree on behalf of the Insurer to all the terms of this Policy.

**Chief Executive Officer**
**AIG Commercial Insurance**
**Company of Canada**

**Secretary**
**AIG Commercial Insurance**
**Company of Canada**

This Policy shall not be valid unless signed at the time of issuance by an authorized representative of the Insurer, either below or on the Declarations page of the policy.

## APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

In consideration of the premium charged, it is understood and agreed as follows: The information in our Panel Counsel lists/appendices is now accessible through our online Panel Counsel Directory at http://www.briefbase.com/default.aspx at the "Panel Counsel" tab. To access the applicable online Panel Counsel Directory, please go to the website, click on the "Panel Counsel" tab and then click on the "Directors & Officers (Securities Claims)" link.

References in this policy to list of Panel Counsel law firms or related appendices are deemed amended to refer to the applicable Panel Counsel Directories at the website referenced above.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

# APPENDIX B

## I. DEFINITIONS

(a) "**Crisis**" means:

(1) a **Delisting Crisis**; and

(2) one of the following events which, in the good faith opinion of the Chief Financial Officer of an **Organization** did cause or is reasonably likely to cause a "**Material Effect on an Organization's Common Stock Price** ":

(i) *Negative earning or sales announcement*

The public announcement of an **Organization's** past or future earnings or sales, which is substantially less favorable than any of the following: (i) an **Organization's** prior year's earnings or sales for the same period; (ii) an **Organization's** prior public statements or projections regarding earnings or sales for such period; or (iii) an outside securities analyst's published estimate of an **Organization's** earnings or sales.

(ii) *Loss of a patent, trademark or copyright or major customer or contract*

The public announcement of an unforeseen loss of: (i) an **Organization's** intellectual property rights for a patent, trademark or copyright, other than by expiration; (ii) a major customer or client of an **Organization**; or (iii) a major contract with an **Organization**.

(iii) *Product recall or delay*

The public announcement of the recall of a major product of an **Organization** or the unforeseen delay in the production of a major product of an **Organization**.

(iv) *Mass tort*

The public announcement or accusation that an **Organization** has caused the bodily injury, sickness, disease, death or emotional distress of a group of persons, or damage to or destruction of any tangible group of properties, including the loss of use thereof.

(v) *Employee layoffs or loss of key executive officer(s)*

The public announcement of layoffs of **Employees** of an **Organization**. The death or resignation of one or more key **Executives** of the **Named Entity**.

(vi) *Elimination or suspension of dividend*

The public announcement of the elimination or suspension of a regularly scheduled dividend previously being paid by an **Organization**.

(vii) *Write-off of assets*

The public announcement that an **Organization** intends to write off a material amount of its assets.

(viii) *Debt restructuring or default*

The public announcement that an **Organization** has defaulted or intends to default on its debt or intends to engage in a debt restructuring.

***END***

(ix) *Bankruptcy*

The public announcement that an **Organization** intends to file for bankruptcy protection or that a third party is seeking to file for involuntary bankruptcy on behalf of an **Organization**; or that bankruptcy proceedings are imminent, whether voluntary or involuntary.

(x) *Governmental or regulatory litigation*

The public announcement of the commencement or threat of commencement of litigation or governmental or regulatory proceedings against an **Organization**.

(xi) *Unsolicited takeover bid*

An unsolicited written offer or bid by any person or entity other than an **Insured** or any affiliate of any **Insured**, whether publicly announced or privately made to an **Executive** of an **Organization**, to effect a **Transaction** (as defined in Clause 12(a) of the policy) of the **Named Entity**.

A **Crisis** shall first commence when an **Organization** or any of its **Executives** shall first become aware of such **Crisis**. A **Crisis** shall conclude once a **Crisis Firm** advises an **Organization** that such **Crisis** no longer exists or when the **CrisisFund®** has been exhausted.

(b) **"Crisis Firm"** means any public relations firm, crisis management firm or law firm as listed in section III of this Appendix B. Any **"Crisis Firm"** may be hired by an **Organization** to perform **Crisis Services** without further approval by the **Insurer**.

(c) **"Crisis Loss"** means the following amounts incurred during the pendency of a **Crisis** for which an **Organization** is legally liable:

(1) the reasonable and necessary fees and expenses incurred by a **Crisis Firm** in the performance of **Crisis Services** for an **Organization**;
(2) the reasonable and necessary fees and expenses incurred in the printing, advertising or mailing of materials; and
(3) travel costs incurred by **Executives**, employees or agents of an **Organization** or of the **Crisis Firm**, arising from or in connection with the **Crisis**.

(d) **"Crisis Services"** means those services performed by a **Crisis Firm** in advising an **Insured** or any **Employee** of an **Organization** on minimizing potential harm to an **Organization** from the **Crisis** (including but not limited to maintaining and restoring investor confidence in an **Organization**), and solely with respect to **Delisting Crisis Loss**, any legal services performed by a **Crisis Firm** in responding to a **Delisting Crisis**.

(e) **"Delisting Crisis"** means written notice to an **Organization** that such **Organization's** securities will be or have been delisted from an **Exchange**.

(f) **"Exchange"** means the Toronto Stock Exchange, the Canadian Venture Exchange, NASDAQ, the American Stock Exchange, the New York Stock Exchange and the Singapore Exchange.

(g) **"Material Effect on an Organization's Common Stock Price"** means, within a period of 24 hours, that the price per share of an **Organization's** common stock shall decrease by the greater of $2.00, or 15% net of the percentage change in the Standard & Poor's Composite Index.

***END***

56

## II. EXCLUSIONS

The term **Crisis** shall not include any event relating to:

(i) any **Claim** which has been reported, or any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(ii) the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants**; or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; provided, however, the foregoing shall not apply if the policy contains any provision or endorsement modifying or deleting, in part or in whole, exclusion (k) of the policy; or

(iii) the hazardous properties of nuclear materials; provided, however, the foregoing shall not apply to any **Crisis** arising from the ownership of, operation of, construction of, management of, planning of, maintenance of or investment in any nuclear facility.

## III. PRE-APPROVED CRISIS FIRMS

(a) For all **Crises** (including a **Delisting Crisis**), **Crisis Firm(s)** means any public relations firm listed in (1) – (8) below:

(1) ABERNATHY MACGREGOR SCANLON
501 Madison Avenue
New York, NY 10022
(212) 371-5999
Contact: James T. MacGregor

(2) BURSON-MARSTELLER
230 Park Avenue South
New York, NY 10003-1566
(212) 614-5236
Contact: Michael Claes

(3) PATTON BOGGS, LLP
2550 M Street, N.W.
Washington, D.C., 20037
(202) 457-6000
Contact: Thomas H. Boggs

(4) KEKST AND COMPANY
437 Madison Avenue
New York, NY 10022
(212) 593-2655
Contact: Andrew Baer

(5) ROBINSON LERER & MONTGOMERY
75 Rockefeller Plaza, 6th floor
New York, NY 10019
(212) 484-7721
Contact: Michael Gross

(6) SARD VERBINNEN & CO.
630 Third Avenue
New York, NY 10017
(212) 687-8080
Contact: Paul Verbinnen or George Sard

(7) SITRICK & COMPANY
2029 Century Park East
Suite 1750
Los Angeles, CA 90067
(310) 788-2850
Contact: Michael Sitrick

(8) KROLL ASSOCIATES
900 3rd Avenue
New York, NY 10022
(212) 833-3238
Contact: Alan Brill

(b) Solely for **Delisting Crises**, **"Crisis Firm(s)"** shall also include any **Panel Counsel Firm** (as defined in Clause 9) approved to handle **Securities Claims**.

***END***

**ENDORSEMENT# 1**

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98* issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

**NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT**

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

A. alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, the **Hazardous Properties** of **Nuclear Material**, including but not limited to:

(1) **Nuclear Material** located at any **Nuclear Facility** owned by, or operated by or on behalf of, the **Organization**, or discharged or dispersed therefrom; or

(2) **Nuclear Material** contained in spent fuel or waste which was or is at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of the **Organization**; or

(3) the furnishing by an Insured or the **Organization** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **Nuclear Facility**; or

(4) **Claims** for damage or other injury to the **Organization** or its shareholders which allege, arise from, are based upon, are attributed to or in any way involve, directly or indirectly, the **Hazardous Properties** of **Nuclear Material**.

B. (1) which is insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability underwriters, or Nuclear Insurance Association of Canada, or would be insured under any such policy but for its termination or exhaustion of its limit of liability; or,

(2) with respect to which: (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the **Insured** is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

As used in this endorsement:

"**Hazardous Properties**" include radioactive, toxic or explosive properties.

"**Nuclear facility**" means:

(a) any nuclear reactor;

(b) any equipment or device designed or used for

(1) separating the isotopes of uranium or plutonium,

*END 001*

**ENDORSEMENT# 1** (continued)

(2) processing or utilizing spent fuel, or

(3) handling, processing or packaging wastes;

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; and

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

**"Nuclear Material"** means source material, special nuclear material or byproduct material.

**"Nuclear Reactor"** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

**"Source Material," "Special Nuclear Material,"** and **"Byproduct Material"** have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

**"Spent Fuel"** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor.

**"Waste"** means any waste material (1) containing by product material and (2) resulting from the operation by any person or organization of any **Nuclear Facility** included within the definition of nuclear facility under paragraph (a) or (b) thereof.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

***END 001***

**ENDORSEMENT# 2**

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98* issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

**COMMISSIONS EXCLUSION**

In consideration of the premium charged, it is hereby understood and agreed that the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon, or attributable to:

(i) Payments, commissions, gratuities, benefits or any other favors to or for the benefit of any full or part-time domestic or foreign government or armed services officials, agents, representatives, employees or any members of their family or any entity with which they are affiliated; or

(ii) Payments, commissions, gratuities, benefits or any other favors to or for the benefit of any full or part-time officials, directors, agents, partners, representatives, principal shareholders, or owners or employees, or "**Affiliates**" (as that term is defined in The Securities Exchange Act of 1934, or any federal, provincial or foreign regulation, rule or statute regulating securities including any officers, directors, agents, owners, partners, representatives, principal shareholders or employees of such **Affiliates**) of any customers of the company or any members of their family or any entity with which they are affiliated; or

(iii) Political contributions, whether domestic or foreign.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

***END 002***

**ENDORSEMENT# 3**

This endorsement, effective 12:01 am December 1, 2008 forms a part of policy number 01-335-76-98 issued to NORTEL NETWORKS CORPORATION

by AIG Commercial Insurance Company of Canada

**CAPTIVE INSURANCE COMPANY EXCLUSION**

In consideration of the premium charged, it is hereby understood and agreed that the **Insurer** shall not be liable to make any payments for **Loss** in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon, attributable to the ownership, management, maintenance, operation and/or control by the **Organization** of any captive insurance company or entity including but not limited to any **Claim** alleging the insolvency or bankruptcy of an **Organization** as a result of such ownership, operation, management and control.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

***END 003***

61

**ENDORSEMENT# 4**

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98* issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

**"NO LIABILITY" PROVISION DELETED AND SECURITIES CLAIM RETENTION APPLIES TO ALL LOSS**

In consideration of the premium charged, it is hereby understood and agreed that the policy is hereby amended as follows:

(1) The Definition of and all provisions referring to "**No Liability**" are hereby deleted in their entirety.

(2) Clause 6 RETENTION CLAUSE is deleted in its entirety and replaced by the following:

**6. RETENTION CLAUSE**

For each **Claim**, the **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the applicable Retention amounts stated in Items 4(a) through 4(e) of the Declarations, such Retention amounts to be borne by an **Organization** and/or the **Insured Person** and remain uninsured, with regard to all **Loss** other than **Non-Indemnifiable Loss**. The Retention amount specified in:

(i) Item 4(a) applies to **Loss** that arises out of a **Securities Claim**;
(ii) Item 4(b) applies to **Loss** that arises out of an **Employment Practices Claim**; and
(iii) Item 4(c) applies to **Loss** that arises out of **Oppressive Conduct Claim;**
(iv) Item 4(d) applies to **Loss** that arises out of a **Canadian Pollution Claim;** and
(v) Item 4(e) applies to **Loss** that arises out of any **Claim** other than a **Claim** listed in Clause 6(i) through 6(iv) above.

A single Retention amount shall apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or related **Wrongful Acts**.

In the event a **Claim** triggers more than one of the Retention amounts stated in Items 4(a) through 4(e) of the Declarations, then, as to that **Claim**, the highest of such Retention amounts shall be deemed the Retention amount applicable to **Loss** (to which a Retention is applicable pursuant to the terms of this policy) arising from such **Claim**.

No Retention amount is applicable to **Crisis Loss** or **Non-Indemnifiable Loss**.

(3) Item 4 of the Declarations is hereby deleted in its entirety and replaced by the following:

62

**ENDORSEMENT#** *4* (continued)

| | | | | |
|---|---|---|---|---|
| 4 | **RETENTION:** | Not applicable to **Non-Indemnifiable Loss** | | |
| 4(a) | **Securities Claims:** *$10,000,000* | | 4(b) | **Employment Practices Claims:** *N/A* |
| 4(c) | **Oppressive Conduct Claims:** *$10,000,000* | | 4(d) | **Canadian Pollution Claims:** *$10,000,000* |
| 4(e) | All other **Claims:** *$10,000,000* | | | |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

***END 004***

**ENDORSEMENT# 5**

This endorsement, effective *12:01 am December 1, 2008* forms a part of policy number *01-335-76-98* issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

**DISCOVERY CLAUSE AMENDED**

In consideration of the premium charged, it is hereby understood and agreed that the policy (and any endorsement amending Clause 10. DISCOVERY CLAUSE) is hereby amended to the extent necessary for the policy to provide the following:

Clause 10. DISCOVERY CLAUSE is hereby deleted in its entirety and replaced with the following:

**10. DISCOVERY CLAUSE**

Except as indicated below, if the **Named Entity** shall cancel or the **Named Entity** or the **Insurer** shall refuse to renew this policy, the **Named Entity** shall have the right to a period of either one, two or three years following the effective date of such cancellation or nonrenewal (the "**Discovery Period**") upon payment of the respective "**Additional Premium Amount**" described below, in which to give to the **Insurer** written notice pursuant to Clause 7(a) and 7(c) of the policy of: (i) **Claims** first made against an **Insured**; and (ii) circumstances of which an **Organization** or an **Insured** shall become aware, in either case during said **Discovery Period** and solely with respect to a **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this policy.

The **Additional Premium Amount** for: (1) one year shall be no more than *150*% of the **Full Annual Premium**; and (2) two and three years shall be an additional premium amount as shall be determined by the **Insurer** in its sole and absolute discretion. As used herein, "**Full Annual Premium**" means the premium level in effect immediately prior to the end of the **Policy Period**.

In the event of a **Transaction** as defined in Clause 12(a), the **Named Entity** shall have the right to request an offer from the **Insurer** of a **Discovery Period** (with respect to **Wrongful Acts** occurring prior to the effective time of the **Transaction**). The **Insurer** shall offer such **Discovery Period** pursuant to such terms, conditions, exclusions and additional premium as the **Insurer** may reasonably decide. In the event of a **Transaction**, the right to a **Discovery Period** shall not otherwise exist except as indicated in this paragraph.

The **Discovery Period** is not cancelable and the additional premium charged shall be fully earned at inception. This Clause 10 shall not apply to any cancellation resulting from non-payment of premium. The rights contained in this Clause 10 shall terminate unless written notice of election of a **Discovery Period** together with any additional premium due is received by the **Insurer** no later than thirty (30) days subsequent to the effective date of the cancellation, nonrenewal or **Transaction**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

***END 005***

**ENDORSEMENT# 6**

This endorsement, effective 12:01 am December 1, 2008 forms a part of policy number 01-335-76-98
issued to NORTEL NETWORKS CORPORATION

by AIG Commercial Insurance Company of Canada

**EMPLOYMENT PRACTICES CLAIMS EXCLUSION**

In consideration of the premium charged, it is hereby understood and agreed that the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Employment Practices Claim(s)** made against any **Insured**.

**ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.**

AUTHORIZED REPRESENTATIVE

***END 006***

**ENDORSEMENT# 7**

This endorsement, effective *12:01 am December 1, 2008* forms a part of policy number *01-335-76-98* issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

**PROFESSIONAL ERRORS & OMISSIONS EXCLUSION**

**(SECURITIES CLAIM CARVE-OUT)**

In consideration of the premium charged, it is hereby understood and agreed that the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon or attributable to the **Organization's** or any **Insured's** performance of or failure to perform professional services for others for a fee, or any act(s), error(s) or omission(s) relating thereto.

Notwithstanding the foregoing, it is further understood and agreed that this endorsement shall not apply to any **Securities Claim**, provided that such **Securities Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, the **Organization** or any **Insured**.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© American International Group, Inc. All rights reserved.

**ENDORSEMENT# 8**

This endorsement, effective 12:01 am December 1, 2008 forms a part of policy number 01-335-76-98
issued to NORTEL NETWORKS CORPORATION

by AIG Commercial Insurance Company of Canada

**B(i) DELETED ALLOCATION ENDORSEMENT AMENDED**

**(PREDETERMINED ALLOCATION FOR DEFENCE COSTS OTHER THAN SECURITIES CLAIM)**

In consideration for the premium charged, it is hereby understood and agreed that notwithstanding any other provision of this policy (including any endorsement attached hereto whether such endorsement precedes or follows this endorsement in time or sequence), insurance as is provided by COVERAGE B(i): ***Organization** Liability* is hereby deleted in its entirety.

All provisions of this policy as they relate to insurance as would be provided to **Loss** under Coverage B(i) are hereby deleted in their entirety and the policy is hereby amended as follows:

**I.**

**Clause 1. INSURING AGREEMENTS** is hereby amended as follows:

**COVERAGE B: ORGANIZATION INSURANCE** is hereby deleted in its entirety and replaced with the following:

**COVERAGE B: ORGANIZATION INSURANCE**

*Indemnification of an **Insured Person***: This policy shall pay the **Loss** of an **Organization** arising from a **Claim** made against an **Insured Person** (including an **Outside Entity Executive**) for any **Wrongful Act** of such **Insured Person**, but only to the extent that such **Organization** has indemnified such **Insured Person**.

**II.**

**Clause 2. DEFINITIONS** is hereby amended as follows:

1. The Definition of **Insured** is deleted in its entirety and replaced with the following:

   " **Insured**" means any:

   (1) **Insured Person**; or
   (2) **Organization**, but only with respect to Coverage B and subject to its limitations.

2. The Definition of **Securities Claim** is deleted in its entirety and replaced with the following:

   " **Securities Claim**" means a **Claim** made against any **Insured Person**:

***END 8***

**ENDORSEMENT#** *8* **(Continued)**

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98* issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

(1) alleging a violation of any federal, state, provincial, local or foreign regulation, rule or statute regulating securities (including, but not limited to, the purchase or sale or offer or solicitation of an offer to purchase or sell securities) which is:

(a) brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of an **Organization**; or

(b) brought by a security holder of an **Organization** with respect to such security holder's interest in securities of such **Organization**; or

(2) brought derivatively on the behalf of an **Organization** by a security hold of such **Organization**, relating to a **Securities Claim** as defined in subparagraph (1) above.

3. The Definition of **Wrongful Act** is modified by deleting paragraph (2) thereof in its entirety.

**III.**

**Clause 6. RETENTION CLAUSE** is hereby amended by adding the following paragraph to the end thereof:

With respect to any **Claim**, the applicable **Retention Amount** shall only apply to the percentage of **Loss** which shall be payable by the **Insurer** and shall in no way be applicable to the percentage of **Loss** payable by the **Organization**.

**IV.**

**Clause 8. DEFENCE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENCE COSTS)** is deleted in its entirety and replaced with the following:

**8. DEFENCE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENCE COSTS)**

(a) Under Coverage A, B and C of this policy, except as hereinafter stated, the **Insurer** shall advance, excess of any applicable retention amount, covered **Defence Costs** no later than ninety (90) days after the receipt by the **Insurer** of such defence bills. Such advance payments by the **Insurer** shall be repaid to the **Insurer** by each and every **Insured Person** or **Organization**, severally according to their respective interests, in the event and to the extent that any such **Insured Person** or **Organization** shall not be entitled under this policy to payment of such **Loss**.

***END 8***

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98*
issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

(b) The **Insurer** does not, under this policy assume any duty to defend. The **Insureds Person** and, with respect to Coverage B, the **Organization**, shall defend and contest any **Claim** made against them. The **Insureds** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defence Costs** without the prior written consent of the **Insurer**. Only those settlements, stipulated judgments and **Defence Costs** which have been consented to by the **Insurer** shall be recoverable as **Loss** under the terms of this policy. The **Insurer's** consent shall not be unreasonably withheld, provided that the **Insurer** shall be entitled to effectively associate in the defence, the prosecution and the negotiation of any settlement of any **Claim** that involves or appears reasonably likely to involve the **Insurer**.

(c) The **Insurer** shall have the right to associate fully and effectively with each and every **Insured Person** and, with respect to Coverage B, the **Organization**, in the defence and prosecution of any **Claim** or any counterclaim, cross-claim or third party claim of any **Claim** that involves, or appears reasonably likely to involve, the **Insurer**, including, but not limited to, negotiating a settlement. Each and every such **Insured** shall give the **Insurer** full cooperation and such information as it may reasonably require relating to the defence of any **Claim** and the prosecution of any counterclaim, cross-claim or third party claim, including without limitation the assertion of indemnification or contribution rights. Each and every obligation of such **Insureds** hereunder is a condition precedent to the coverage afforded by this policy, including the obligation to advance **Defence Costs**.

Notwithstanding any of the foregoing, if all such **Insureds** are able to dispose of all **Claims** which are subject to one retention amount (inclusive of **Defence Costs**) for an amount not exceeding any applicable retention amount, then the **Insurer's** consent shall not be required for such disposition.

(d) No **Organization** is covered in any respect under Coverage A or Coverage C. An **Organization** is covered, subject to the policy's terms, conditions and limitations only with respect to its indemnification of **Insured Persons** under Coverage B as respects a **Claim** against such **Insured Persons.** Accordingly, the **Insurer** has no obligation under this policy for covered **Defence Costs** incurred by, judgments against or settlements by an **Organization** arising out of a **Claim** made against an **Organization**, or any obligation to pay **Loss** arising out of any legal liability that an **Organization** has to a claimant.

(e) In connection with any **Securities Claim**, with respect to **Loss** incurred as: (i) **Defence Costs** jointly incurred by, (ii) any joint settlement entered into by, or (iii) any judgment of joint and several liability, against an **Organization** and an **Insured Person**, the following shall govern:

**ENDORSEMENT#** *8* **(Continued)**

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98* issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

(i) for any **Loss** incurred while a **Securities Claim** is made and maintained solely against an **Insured Person**, this policy shall provide coverage for 100% of **Loss** incurred by the **Insured Person** up to the Limit of Liability of the policy, subject to the policy's terms, conditions and exclusions;

(ii) for any **Loss** incurred while a **Securities Claim** is made and maintained solely against the **Organization** and not an **Insured Person**, this policy shall not provide any coverage for such **Loss**;

(iii) for any such **Loss**, other than **Non-indemnifiable Loss**, incurred while a **Securities Claim** is jointly made and maintained against both the **Organization** and one or more **Insured Person(s)**, this policy shall pay 80% of such **Loss** up to the Limit of Liability of the policy, subject to the policy's terms, conditions and exclusions, and the **Organization** shall pay the remaining 20% of each and every such **Loss**;

(iv) for any **Loss** incurred while a **Securities Claim** as defined in subparagraph (2) of the Definition of **Securities Claim** is jointly made and maintained against both the **Organization** and one or more **Insured Person(s)**, this policy shall provide coverage for 100% of such **Loss** up to the Limit of Liability of the policy and subject to the terms, conditions and exclusions; and

(v) this policy shall provide coverage for 100% of any **Non-indemnifiable Loss** incurred by any **Insured Person** up to the Limit of Liability of the policy, subject to the policy's terms, conditions and exclusions.

(f) In connection with any **Claim**, other than a **Claim** that is or includes a **Securities Claim**, with respect to: (i) any joint settlement entered into by, or (ii) any judgment of joint and several liability against any **Organization** and any **Insured Person**, there shall be a fair and equitable allocation as between any such **Organization** and any such **Insured Person**, taking into account the relative legal and financial exposures and the relative benefits obtained by any such **Insured Person** and any such **Organization**, without any presumption that the coverage afforded to the **Insured Person** shall in any way reduce the allocation to the **Organization** which shall not be insured for such allocation.

If a covered **Claim** other than a **Securities Claim(s)** results in **Loss** which is both covered under the terms and conditions of this policy and uncovered by the terms and conditions of this policy (other than as a result of an exception to the Definition of **Loss**, the Definition of **Defence Costs** or the terms, conditions and limitations of this Clause 8), because such **Claim**

***END 8***

**This endorsement, effective** *12:01 am* *December 1, 2008* **forms a part of policy number** *01-335-76-98*
**issued to** *NORTEL NETWORKS CORPORATION*

**by** *AIG Commercial Insurance Company of Canada*

includes both covered and uncovered matters or covered and uncovered parties, then the **Insurer**, the **Insureds** and the **Organization** agree to allocate **Defence Costs** incurred in connection with such **Claim**, as follows:

Eighty percent (80%) shall be deemed to be **Loss** incurred by the **Insureds**; however, the **Insurer** shall only be liable to pay such **Loss** of the **Insureds** subject to the policy's applicable retention amount, limits of liability, and expressed exceptions to the definition of **Loss** and the other provisions of this Clause 8 and the definition of **Defence Costs**; and the remainder shall be deemed to be the obligation of the **Organization** and the **Insureds** and not insured under this policy. (" **Preset Allocation of Defence Costs**" )

Provided that in all events the **Preset Allocation of Defence Costs** described above shall not apply to or create any presumption with respect to the allocation of any damages, judgments or settlement in regard to any **Claim**.

It is further understood and agreed that the **Insurer** may make any settlement of any **Claim** it deems expedient with respect to any **Insured** subject to such **Insured's** written consent.

It is further understood and agreed that coverage as provided by this endorsement shall not apply to any uncovered **Loss** resulting from the application of Clause 4. **EXCLUSIONS** (a), (b), or (c).

This policy shall provide coverage for 100% of any **Non-indemnifiable Loss** incurred by any **Insured Person** up to the Limit of Liability of the policy, subject to the policy's terms, conditions and exclusions.

(g) The **Organization** hereby agrees to indemnify the **Insured Persons** to the fullest extent that an **Organization** is permitted or required to provide such indemnification pursuant to law, common or statutory, or contract or by the charter, by-laws, operating agreement or similar documents of an **Organization**, which are hereby deemed to incorporate, for the purposes of this policy, the broadest provisions of the law which determines or defines such rights of indemnity. The **Organization** hereby agrees to indemnify the **Insured Persons** to the fullest extent permitted by law, including the making in good faith of any required application for court approval.

**V.**

It is further understood and agreed that **Clause 19. BANKRUPTCY and Clause 22. ORDER OF PAYMENTS** are hereby deleted in their entirety and replaced with the following:

**19. BANKRUPTCY**

**ENDORSEMENT#** *8* **(Continued)**

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98* issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

Bankruptcy or insolvency of any **Organization** or any **Insured Person** shall not relieve the **Insurer** of any of its obligations hereunder.

The coverage provided under this policy is intended as a matter of priority to protect and benefit the **Insured Persons** such that, in the event of bankruptcy of the **Organization**, the **Insurer** shall first pay **Loss** under Coverages A and C prior to paying **Loss** under Coverage B.

**VI.**

**It is further understood and agreed THAT IN NO EVENT SHALL THIS ENDORSEMENT HAVE THE EFFECT OF EXPANDING COVERAGE AS IS PROVIDED BY COVERAGE A; COVERAGE B(ii); OR COVERAGE C OF THIS POLICY.**

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© American International Group, Inc. All rights reserved.

72

**ENDORSEMENT# 9**

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98*
issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

**SPECIFIC INVESTIGATION/CLAIM/LITIGATION/EVENT OR ACT EXCLUSION**

In consideration of the premium charged, it is hereby understood and agreed that, without limiting the effectiveness of exclusions (d) or (e) of the policy, the **Insurer** shall not be liable to make any payment for **Loss** in connection with: (i) any of the **Claim(s)**, notices, events, investigations or actions referred to in any of items (1) through (27) below; (hereinafter "**Events**"); (ii) the prosecution, adjudication, settlement, disposition, resolution or defense of: (a) any **Event(s)**; or (b) any **Claim(s)** arising from any **Event(s)**; or (iii) any **Wrongful Act**, underlying facts, circumstances, acts or omissions in any way relating to any **Event(s)**.

EVENTS

(1) Securities Class Action - class period November 1, 2000 to February 15, 2001
Docket #01-CV-0945
Docket #01-CV-1855

(2) Securities Class Action - Class period January 7, 2004 to March 15, 2004
Docket #04-CV-2115

(3) Rohac et al v. Nortel Networks Corp.

(4) Skarstedt et al v. Nortel Networks Corp.

(5) Domenikos, Hurd & Epstein (Epicon) et al v. Nortel Networks Corp.

(6) Gallardi et al v. Nortel Networks Corp. et al

(7) Ionica v. Nortel Networks Inc.

(8) FECHT Max, Boston International Partners, L.P., Guidance Components Corp., Stephen R. Raab, Leon Sharpiro and Erwin Sternberg v. Northern Telecom Ltd., Jean C. Monty, Martin G. Mand, Edward E. Lucente, Roy Merrills, Alan G. Lutz, Desmond F. Hudson and Frank A. Dunn Court: United States District Court, Southern District of New York

(9) Cohen, Franny v. David House, Bay Networks, Northern telecom, et al Court: Delaware Court of Chancery, New Castle County

(10) WAKE v. Bay Networks, Inc.,
Court: Delaware Court of Chancery

(11) SCIBELLI, Gary on behalf of himself and all others similarly situated v. Northern Telecom Limited, John A. Roth and C. Wes M. Scott
Court: U.S. District Court for Southern District of New York

***END 9***

**ENDORSEMENT# 9** (Continued)

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98* issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

(12) Craddock v. Saraide.Com LTD., Marret et al

(13) Entrust Securities Litigation v. Entrust Technologies Inc. and Nortel Networks Corporation Court: District Court, Eastern District of Texas ÝNo. 2-00-CV-119-TJW¨

(14) S. Bernheim v. Nortel Networks et al.
Court: Superior Court of the State of California for the County of Los Angeles
ÝCase No. BC299778¨

(15) A.P.E.I.Q. (Association de Protection des Epargnants et Investisseurs du Quebec) and Dussault, Andre Ý2001 Quebec Class Action¨ v. Nortel Networks Corporation
Court: Superior Court, Quebec, District Of Montreal Docket # 500-06-00126-017

(16) Jeffery, Janie and Mensing, Ronald Ý2001 BC Class Action¨ v. Nortel Networks Corporation, John A. Roth, Frank , A. Dunn, F. William Conner and Chahram Bolouri
Court: Supreme Court Of British Columbia {S015159}

(17) Law, Rick Hong Chu; Ahrens, Thomas Ý2001 Ontario Class Action¨ v. Nortel Networks Corp, John Andrew Roth, Frank Dunn, F. William Conner, Charam Bolouri, William R. Hawe, and Deloitte and Touche LLP
Court: Ontario Superior Court of Justice Ý02-CL-4605¨

(18) Deep, Albert Ross M.D. v. M.D. Management, Nortel Networks Corporation, and John Roth
Court: Ontario Superior Court of Justice Ý03-CV-258779¨

(19) Nortel Networks Corp. Securities Litigation; Lead Plaintiff: OP Trust Ý2001 US Consolidated Class Action¨ v. Nortel Networks Corporation, John Andrew Roth, William F. Connor Chahram Bolouri and Frank DunnCourt: U.S. District Court, Southern District Of New York Ý01CIV.1855¨

(20) Weisburgh, Philip, et al ÝJDS Uniphase¨ v. Nortel Networks Corporation, John Andrew Roth, Frank Dunn and Clarence Chandran
Court: U.S. District Court, Southern District Of New York Ý01CV2041¨

***END 9***

71

**ENDORSEMENT#** 9 **(Co ...nued)**

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98* issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

(21) In re Nortel Networks Corporation Securities Litigation (Lead Plaintiffs: Ontario Teachers' Pension Plan Board and Department of the Treasury of the State of New Jersey; formerly known as John Campagnuola Jr. Individually and on behalf of others similarly situated)Ý2004 Securities Litigation¨ v. Nortel Networks Corporation, Frank A. Dunn, Douglas C. Beatty and Michael J. Gollogly
Court: USDC, S.D.N.Y. ÝMaster File No. 05 MD 1659 (LAP)¨

(22) Walsh, Michael F. v. Nortel Networks Corporation, Frank A. Dunn, Douglas C. Beatty, Michael J. Gollogly and Does 1 - 10 inclusive
Court: USDC, Central District of California - Transfered To S.D.N.Y. ÝMaster File No. 05 MD 1659 (LAP)¨

(23) International Union of Operating Engineers--Construction Industry Trust (Locals 302 and 612), Indiana Electrical Workers Pension Trust Fund IBEW and Dong Wen, Derivatively and on behalf of Nortel Networks Corporation ÝDerivative Action¨ v. James J. Blanchard, Robert E. Brown, John E. Cleghorn, L. Yves Fortier, Robert Ingram, Guylaine Saucier, Sherwood H. Smith, Jr., Lynton R. Wilson, Frank C. Carlucci, Frank A. Dunn, Douglas C. Beatty, Michael J. Gollogly, Nicholas J. DeRoma, John A. Roth, Clarence J. Chandran, Brian W. McFadden, Jean C. Monty, Chahram Bolouri, Malcolm K. Collins, Richard J. Currie, Pascal Debon, James Kinney, Ken Taylor, Craig A. Johnson, Susan L. Spradley, Gary R. Donahee, Frank Plastina and Doug Hamilton
Court: U.S. Dist. Ct. - S.D. N.Y ÝCivil Action No. 04-5954¨

(24) Domenikos, Steven; George Domenikos, Robin Hurd and Sasha Epstein ÝEPICON¨ v. Nortel Networks Corporation, John Andrew Roth, Clarence Chandran, and Frank Dunn
Court: USDC, SD of New York Ý05 CV 2080¨

(25) Rohac, Cyril; Samman Leung Sum and Angela Xin Wei Sum Ý2004 ONTARIO CLASS ACTON¨ v. Nortel Networks Corporation, Nortel Networks Limited, Douglas Beatty, Dr. Manifred Bischoff, James J. Blanchard, Robert E. Brown, John E. Cleghorn, Frank A. Dunn, L. Yves Fortier, Michael Gollogly, Robert A. Ingram, John P. Manley, William A. Owens, Guylaine Saucier, Sherwood H. Smith Jr. and Lynton R. Wilson
Court: Ontario Superior Court of Justice

(26) Skarstedt, Clifford W., individually and all others similarly situated Ý2004 Quebec Class Action¨ v. Nortel Networks Corporation
Court: Province de Quebec, District of Montreal ÝNo. 500-06¨

**END 9**

**ENDORSEMENT# 9** (Continued)

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98* issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

(27) Gallardi, Peter v. Nortel Networks Corporation, Frank A. Dunn, Douglas Beatty, Michael Gollogly, John Edward Cleghorn, Robert Ellis Brown, Robert Alexander Ingram, Guylaine Saucier, Sherwood Hubbard Smith, Jr., and Deloitte and Touche LLP
Court: Ontario Superior Court of Justice, Commercial List
Ý05-CV-285606 CP"

It is further understood and agreed that the **Insurer** shall not be liable for any **Loss** in connection with:

(A) any restatement, retraction, amendment or revision of in part or in whole:

(i) any document or statement filed or submitted or required to be filed or submitted with the Securities and Exchange Commission or any other similar federal, state or local agency (including but not limited to any 10K's, 10Q's or annual reports); or

(ii) any written or oral statement made regarding the assets, revenues, sales or financial condition of the **Organization,**

resulting from, arising out, based upon or attributable to any **Event** or the resolution of said **Events**; and

(B) any **Claim** alleging, arising out of, based upon, attributable to or in any way related directly or indirectly, in part or in whole, to an **Interrelated Wrongful Act** (as that term is defined below), regardless of whether or not such **Claim** involved the same or different **Insureds**, the same or different legal causes of action or the same or different claimants or is brought in the same or different venue or resolved in the same or different forum.

For the purposes of this endorsement an " **Interrelated Wrongful Act** " means: (i) any fact, circumstance, act or omission alleged in any **Event(s)** and/or (ii) any **Wrongful Act** which is the same as, similar or related to or a repetition of any **Wrongful Act** alleged in any **Event(s)**.

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© American International Group, Inc. All rights reserved.

ENDORSEMENT# 10

This endorsement, effective 12:01 am December 1, 2008 forms a part of policy number 01-335-76-98 issued to NORTEL NETWORKS CORPORATION

by AIG Commercial Insurance Company of Canada

**SPECIFIC INVESTIGATION/CLAIM/LITIGATION/EVENT OR ACT EXCLUSION WITH REMEDIAL ACTION CARVEBACK**

In consideration of the premium charged, it is hereby understood and agreed that, without limiting the effectiveness of Clause 4. **EXCLUSIONS** (d) or (e) of the policy, the **Insurer** shall not be liable to make any payment for **Loss** in connection with: (i) any of the **Claim(s)**, notices, events, investigations or actions referred to in item (1) below; (hereinafter " **Events**"); (ii) the prosecution, adjudication, settlement, disposition, resolution or defense of: (a) any **Event(s)**; or (b) any **Claim(s)** arising from any **Event(s)**; or (iii) any **Wrongful Act**, underlying facts, circumstances, acts or omissions in any way relating to any **Event(s)**.

EVENTS

(1) October 23, 2003 8K

It is further understood and agreed that the **Insurer** shall not be liable for any **Loss** in connection with:

(A) the **Restatement**; and

(B) any **Claim** alleging, arising out of, based upon, attributable to or in any way related directly or indirectly, in part or in whole, to an **Interrelated Wrongful Act** (as that term is defined below), regardless of whether or not such **Claim** involved the same or different **Insureds**, the same or different legal causes of action or the same or different claimants or is brought in the same or different venue or resolved in the same or different forum.

For the purposes of this endorsement an " **Interrelated Wrongful Act**" means: (i) any fact, circumstance, act or omission alleged in any **Event(s)** and/or (ii) any **Wrongful Act** which is the same as, similar or related to or a repetition of any **Wrongful Act** alleged in any **Event(s)**.

For the purposes of this endorsement, " **Restatement**" means any restatement, retraction, amendment or revision of in part or in whole:

(i) any document or statement filed or submitted or required to be filed or submitted with the Securities and Exchange Commission or any other similar federal, state or local agency (including but not limited to any 10K's, 10Q's or annual reports); or

(ii) any written or oral statement made regarding the assets, revenues, sales or financial condition of the **Organization**;

resulting from, arising out, based upon or attributable to any **Event** or the resolution of said **Events**.

**ENDORSEMENT#** *10* (Continued)

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98* issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

Without affecting the foregoing exclusion regarding any **Restatement** or **Interrelated Wrongful Act**, it is understood and agreed that the above exclusion shall not apply to any **Claim** first made against an **Insured** during the **Policy Period** or **Discovery Period** (if applicable) alleging, arising out of, based upon or attributable solely to **Remedial Action**.

For purposes of this endorsement, " **Remedial Action**" means any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by an **Insured(s)** relating to conduct by an **Insured(s)** on or after April 28, 2004 to remedy or correct conditions, practices or procedures which may have caused, contributed to, or allowed the commission of any **Wrongful Act**, by persons other than such **Insured(s)** and occurring or alleged to have occurred prior to April 28, 2004 , which gave rise to the **Event(s)** identified above.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© American International Group, Inc. All rights reserved.

**ENDORSEMENT#** 11

This endorsement, effective 12:01 am December 1, 2008 forms a part of policy number 01-335-76-98
issued to NORTEL NETWORKS CORPORATION

by AIG Commercial Insurance Company of Canada

**OPPRESSIVE CONDUCT REFERENCE DELETED**

In consideration for the premium charged, it is hereby understood and agreed that notwithstanding any other provision of this policy, all references to **Oppressive Conduct Claims** contained in any provision of this policy (including any endorsement attached hereto whether such endorsement precedes or follows this endorsement in time or sequence),,are hereby deleted in their entirety.

The policy is further amended as follows:

**I.**

The Declarations page is hereby amended by deleting Item 4(c) in its entirety.

**II.**

**Clause 1. INSURING AGREEMENTS** is hereby amended by deleting **COVERAGE A: EXECUTIVE LIABILITY INSURANCE** and subsection (i) of **COVERAGE B: ORGANIZATION INSURANCE** in their entirety and replacing them with the following:

**COVERAGE A: EXECUTIVE LIABILITY INSURANCE**

This policy shall pay the **Loss** of any **Insured Person** arising from a **Claim** (including, but not limited to, an **Employment Practices Claim**, a **Canadian Pollution Claim** and a **Statutory Claim**) made against such **Insured Person** for any **Wrongful Act** of such **Insured Person**, except when and to the extent that an **Organizatio** n has indemnified such **Insured Person.** Coverage A shall not apply to **Loss** arising from a **Claim** made against an **Outside Entity Executive**.

**COVERAGE B: ORGANIZATION INSURANCE**

(i) ***Organization*** *Liability:* This policy shall pay the **Loss** of any **Organization** arising from:
 (a) a **Securities Claim**; or
 (b) a **Canadian Pollution Claim**;
 made against such **Organization** for any **Wrongful Act** of such **Organization.**

**III.**

**Clause 2. DEFINITIONS** is hereby amended as follows:

1. The Definition of **Claim** is amended by deleting the last paragraph thereof in its entirety

**ENDORSEMENT#** *11* **(Continued)**

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98* issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

and replacing it with the following:

The term " **Claim**" shall include any **Securities Claim**, **Employment Practices Claim**, **Canadian Pollution Claim** and **Statutory Claim**.

2. The Definition of **Insured** is deleted in its entirety and replaced with the following:

   " **Insured**" means any:
   (1) **Insured Person**; or
   (2) **Organization**, but only with respect to a **Securities Claim** or a **Canadian Pollution Claim**.

3. The Definition of **Oppressive Conduct Claim** is hereby deleted in its entirety.

4. The Definition of **Wrongful Act** is amended by deleting subparagraph (2) thereof in its entirety and replacing it with the following:

   (2) with respect to an **Organization**, any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by such **Organization**, but solely in regard to: (a) any **Securities Claim**; or (b) a **Canadian Pollution Claim** so long as such **Canadian Pollution Claim** is also made and continuously maintained against an **Executive** of an **Organization**.

**IV.**

**Clause 6. RETENTION CLAUSE** is hereby amended by deleting subparagraph (iii) of the first paragraph in its entirety.

**V.**

**Clause 8. DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)** is amended by deleting the fifth and sixth paragraphs thereof and replacing them with the following:

No **Organization** is covered in any respect under Coverage A or Coverage C. An **Organization** is covered, subject to the policy's terms, conditions and limitations only with respect to: (1) its indemnification of its **Insured Persons** under Coverage B(ii) as respects a **Claim** against such **Insured Persons**; and (2) under Coverage B(i) for a **Securities Claim** or a **Canadian Pollution Claim**. Accordingly, the **Insurer** has no obligation under this policy for covered **Defense Costs** incurred by, judgments against

**ENDORSEMENT#** 11 **(Continued)**

This endorsement, effective 12:01 am December 1, 2008 forms a part of policy number 01-335-76-98 issued to NORTEL NETWORKS CORPORATION

by AIG Commercial Insurance Company of Canada

or settlements by an **Organization** arising out of a **Claim** made against an **Organization** other than a covered **Securities Claim** or a covered **Canadian Pollution Claim**, or any obligation to pay **Loss** arising out of any legal liability that an **Organization** has to a claimant, except as respects a covered **Securities Claim** or a covered **Canadian Pollution Claim** against such **Organization**.

With respect to: (i) **Defense Costs** jointly incurred by; (ii) any joint settlement entered into by; and/or (iii) any judgment of joint and several liability against any **Organization** and any **Insured** in connection with any **Claim** other than a **Securities Claim**, or a **Canadian Pollution Claim**, any such **Organization** and any such **Insured** and the **Insurer** agree to use their best efforts to determine a fair and proper allocation of the amounts as between any such **Organization**, any such **Insured** and the **Insurer**, taking into account the relative legal and financial exposures, and the relative benefits obtained by any such **Insured** and any such **Organization**.

**VI.**

**It is further understood and agreed THAT WITH RESPECT TO ALL CLAIMS, IN NO EVENT SHALL THIS ENDORSEMENT HAVE THE EFFECT OF EXPANDING COVERAGE AS IS PROVIDED BY COVERAGE A; COVERAGE B; OR COVERAGE C OF THIS POLICY.**

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© American International Group, Inc. All rights reserved.

**ENDORSEMENT# 12**

This endorsement, effective 12:01 am December 1, 2008 forms a part of policy number 01-335-76-98
issued to NORTEL NETWORKS CORPORATION

by AIG Commercial Insurance Company of Canada

**NON-INDEMNIFIABLE LOSS - VOIDING OF COVERAGE**

In consideration of the premium charged, it is hereby understood and agreed that solely with respect to any **Non-Indemnifiable Loss** of any **Insured Person**, under no circumstances shall the coverage provided by this Policy be deemed void, whether by rescission or otherwise, but such coverage will be subject to all other terms, conditions and exclusions of the Policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

***END 012***

82

**ENDORSEMENT#** *13*

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98*
issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

**OUTSIDE ENTITY ENDORSEMENT**

**(Excluding Hi-Tech, Fi-Institutions, Bio-Tech, Telecommunications, & U.S.)**

In consideration of the premium charged, it is hereby understood and agreed that each of the following entities shall be deemed an " **Outside Entity**".

OUTSIDE ENTITY

1) any not-for-profit organization, other than any health care organization;

2) any for-profit entity other than a **Hi-Tech Entity**, **Telecommunication Entity**, **Financial Institution**, **Bio-Tech Entity**, or a **Subsidiary**.

The term "**High-Tech Entity**" shall mean any organization involved in computer products including but not limited to hardware, software, semi-conductors, microprocessors, integrated circuits and other peripherals whose securities are traded publicly. "**High-Tech Entity**" shall also include any retail or service organization, which incorporates the Internet and/or Internet applications into its primary business platform.

The term " **Financial Institution**" means any entity that is a bank (including but not limited to commercial banks and savings and loan institutions) or any entity which is a diversified financial institution (including but not limited to insurance companies, brokerage firms and investment companies).

The term " **Bio-Tech Entity**" means any entity involved in the use of microorganisms or biological substances to perform industrial processes.

The term " **Telecommunications Entity**" means any entity involved in the transmission of voice and/or data through any medium by wire, radio, or other electrical electromagnetic, or optical means whose securities are traded publicly. Telecommunications includes all aspects of transmitting information.

It is further understood and agreed that the coverage afforded by this endorsement shall not apply to any **Outside Entity** that has any securities traded in the United States.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© American International Group, Inc. All rights reserved.

**ENDORSEMENT#** *14*

This endorsement, effective *12:01 am December 1, 2008* forms a part of policy number *01-335-76-98*
issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

**OUTSIDE ENTITY EXECUTIVE ENDORSEMENT (Triple Excess)**

In consideration of the premium charged, it is hereby understood and agreed that each of the following entities shall be deemed an " **Outside Entity**":

OUTSIDE ENTITY

1) any not-for-profit health care organization;

2) any for-profit **Hi-Tech Entity**, **Telecommunication Entity**, **Financial Institution** or **Bio-Tech** Entity: and

3) any not-for-profit organization or for-profit entity that has securities traded in the United States,

other than a **Subsidiary**.

This policy provides coverage for any **Claim** made against an **Executive** of the **Organization** solely for any **Wrongful Act** committed by such **Executive** in his or her capacity as an **Outside Entity Executive** of an **Outside Entity** listed above that occurred either prior to November 1, 2003, or on or after December 1, 2007.

Solely with regard to the **Outside Entity Executive** coverage provided by this endorsement, the policy is further amended as follows:

(1) Clause 1, Coverage B(ii) is deleted in its entirety and replaced with the following:

> *(ii)* *Indemnification of an **Insured Person***: This policy shall pay the **Loss** of an **Organization** arising from a **Claim** made against an **Insured Person** (other than an **Outside Entity Executive**) for any **Wrongful Act** of such **Insured Person** which occurred either prior to November 1, 2003, or on or after December 1, 2007, but only to the extent that such **Organization** has indemnified such **Insured Person**.

(2) The second paragraph of Clause 14. **OTHER INSURANCE AND INDEMNIFICATION** is deleted in its entirety and replaced with the following:

**ENDORSEMENT#** *14* **(C :inued)**

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98*
issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

In the event of a **Claim** made against an **Outside Entity Executive**, coverage as is afforded by this policy shall be specifically excess of: (1) any indemnification provided by an **Outside Entity**; (2) any insurance coverage afforded to an **Outside Entity** or its **Executives** applicable to such **Claim**; and (3) any indemnification provided by an **Organization**. Further, in the event such other **Outside Entity** insurance is provided by the **Insurer** or any other company of American International Group, Inc. (" **AIG**") (or would be provided but for the application of the retention amount, exhaustion of the limit of liability or failure to submit a notice of a claim as required) then the **Insurer's** maximum aggregate **Limit of Liability** for all **Loss** under this policy, as respects any such **Claim**, shall be reduced by the amount of the limit of liability (as set forth on the Declarations) of the other **AIG** insurance provided to such **Outside Entity**. It is further understood and agreed that for the purposes of the applicability of this policy to **Loss** of an **Outside Entity Executive** of an **Outside Entity**, the **Organization** will be conclusively deemed to have indemnified the **Insureds** to the maximum extent that the **Organization** is permitted or required pursuant to law or contract or the charter, bylaws, operating agreement or similar documents of an **Organization** (which are hereby deemed to adopt the broadest provisions of the law which determined or defines such rights of indemnity). The **Organization** hereby agrees to indemnify the **Insureds** to the fullest extent permitted by law including the making in good faith of any required application for court approval.

(3) Solely with regard to the **Outside Entity Executive** coverage provided by this endorsement, the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Outside Entity Executive** alleging any **Wrongful Act** which occurred on or after November 1, 2003, and prior to December 1, 2007. This endorsement only provides coverage for **Wrongful Acts** by an **Outside Entity Executive** occurring either prior to November 1, 2003, or on or after December 1, 2007, and otherwise covered by this policy. **Loss** arising out of the same or related **Wrongful Act** shall be deemed to arise from the first such same or related **Wrongful Act**.

(4) Solely with regard to the **Outside Entity Executive** coverage provided by this endorsement, the following definitions shall apply:

**ENDORSEMENT#** *14* **(C( 'nued)**

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98*
issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

The term **"High-Tech Entity"** shall mean any organization involved in computer products including but not limited to hardware, software, semi-conductors, microprocessors, integrated circuits and other peripherals whose securities are traded publicly. **"High-Tech Entity"** shall also include any retail or service organization, which incorporates the Internet and/or Internet applications into its primary business platform.

The term " **Financial Institution**" means any entity that is a bank (including but not limited to commercial banks and savings and loan institutions) or any entity which is a diversified financial institution (including but not limited to insurance companies, brokerage firms and investment companies).

The term " **Bio-Tech Entity**" means any entity involved in the use of microorganisms or biological substances to perform industrial processes.

The term " **Telecommunications Entity**" means any entity involved in the transmission of voice and/or data through any medium by wire, radio, or other electrical electromagnetic, or optical means whose securities are traded publicly. Telecommunications includes all aspects of transmitting information.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© American International Group, Inc. All rights reserved.

**END 14**

**ENDORSEMENT#** 15

This endorsement, effective 12:01 am December 1, 2008 forms a part of policy number 01-335-76-98 issued to NORTEL NETWORKS CORPORATION

by AIG Commercial Insurance Company of Canada

**SEVERABILITY OF THE APPLICATION ENDORSEMENT (FULL INDIVIDUAL SEVERABILITY; NON-RESCINDABLE A SIDE COVER)**

In consideration of the premium charged, it is hereby understood and agreed that the following Clause is added to the policy at the end thereof:

**SEVERABILITY**

In granting coverage under this policy, it is agreed that the **Insurer** has relied upon the statements, warranties and representations contained in the **Application** as being accurate and complete. All such statements, warranties and representations are the basis for this policy and are to be considered as incorporated into this policy.

The **Insureds** agree that in the event that the particulars and statements contained in the **Application** are not accurate and complete and materially affects either the acceptance of the risk or the hazard assumed by the Insurer under the policy, then this Policy shall be void *ab initio* solely with respect to any of the following **Insureds**:

(1) solely with respect to **Loss** other than **Non-Indemnifiable Loss**, any **Insured Person** who knew as of the inception date of the **Policy Period** the facts that were not accurately and completely disclosed in the **Application**,

(2) an **Organization**, under Clause 1. Insuring Agreements, COVERAGE B(ii), to the extent it indemnifies any **Insured Person** referenced in (1), above, and

(3) an **Organization**, under Clause 1. Insuring Agreement, COVERAGE B(i), if any **Insured Person** knew as of the inception date of the **Policy Period**, the facts that were not accurately and completely disclosed in the **Application**,

whether or not such **Insured Person** knew that such facts were not accurately and completely disclosed in the **Application**.

Solely with respect to any **Non-Indemnifiable Loss** of any **Insured Person**, under no circumstances shall the coverage provided by this Policy be deemed void, whether by rescission or otherwise, but such coverage will be subject to all other terms, conditions and exclusions of the Policy.

It is understood and agreed that this endorsement supersedes any inconsistent language contained in the **Application**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

***END 015***

81

**ENDORSEMENT# 16**

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98*
issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

**EXCLUSION (d) & (e) AMENDATORY ENDORSEMENT**

In consideration of the premium charged, it is hereby understood and agreed that Clause 4. **EXCLUSIONS**, paragraphs (d) and (e) are deleted in their entirety and replaced with the following:

(d) alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related **Wrongful Acts** alleged or contained in any **Claim** which has been reported, or in any circumstances of which notice has been given, under any directors and officers liability policy of which this policy is a renewal or replacement or which it may succeed in time;

(e) alleging, arising out of, based upon or attributable to, as of the **Continuity Date**, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an **Insured** had notice, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation; provided, however, that this exclusion shall apply only to **D&O Litigation, Proceedings and Investigations**;

For purposes of this endorsement, " **D&O Litigation, Proceedings and Investigations** " means any litigation or administrative or regulatory proceeding or investigation that on or before the **Continuity Date**, involves, includes, arises out of, is based upon or is attributable to an allegation(s) of a **Wrongful Act** by an **Insured**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© American International Group, Inc. All rights reserved.

**END 16**



88

**ENDORSEMENT#** *17*

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98*
issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

**RELIANCE UPON OTHER CARRIER'S APPLICATION**

In granting coverage under this policy, it is agreed that the **Insurer** has relied upon the statements and representations contained in the below referenced application (including materials submitted thereto and, if such application is a renewal application, all such previous policy applications, and their attachments and materials, for which this policy is a renewal or succeeds in time) as being accurate and complete. It is further understood and agreed that the **Organization** and the **Insureds** warrant and represent to the **Insurer** that the statements and representations made in such application were accurate on the date such representations and statement were so given and that in connection therewith the **Insureds** hereby reaffirm each and every statement made in their application to XL Specialty Insurance Company as accurate as of August 12, 2005 as if it was made to the **Insurer** on such date. All such statements and representations shall be deemed to be material to the risk assumed by the **Insurer**, are the basis of this policy and are to be considered as incorporated into this policy.

| TYPE OF POLICY APPLICATION | CARRIER | DATE SIGNED |
|---|---|---|
| | XL Specialty Insurance Company | August 12, 2005 |

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© American International Group, Inc. All rights reserved.

**ENDORSEMENT# 18**

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98*
issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

**CURRENCY ENDORSEMENT**

In consideration of the premium charged, it is hereby understood and agreed that all dollar amounts referenced on the Declarations page and any amendments thereto shall be subject to United States currency.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

**END 018**

**ENDORSEMENT#** 19

This endorsement, effective 12:01 am December 1, 2008 forms a part of policy number 01-335-76-98 issued to NORTEL NETWORKS CORPORATION

by AIG Commercial Insurance Company of Canada

**EXTRADITION COVERAGE**

In consideration of the premium charged, it is understood and agreed that, where permitted by law:

1. "**Claim**" also means any:

   (a) official request for **Extradition** of any **Insured Person**; or

   (b) the execution of a warrant for the arrest of an **Insured Person** where such execution is an element of **Extradition**.

2. "**Defense Costs**" also means reasonable and necessary fees, costs and expenses incurred through legal counsel and consented to by the **Insurer** resulting from an **Insured Person** lawfully:

   (a) opposing, challenging, resisting or defending against any request for or any effort to obtain the **Extradition** of that **Insured Person**; or

   (b) appealing any order or other grant of **Extradition** of that **Insured Person**.

3. "**Extradition**" means any formal process by which an **Insured Person** located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation.

4. Clause 9 does not apply to **Defense Costs** solely relating to **Extradition** even if the underlying **Wrongful Acts** relate to a **Securities Claim**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

**END 019**

91

**ENDORSEMENT#** *20*

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98* issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

**INSURED V. INSURED EXCLUSION AMENDED (WHISTLEBLOWER)**

In consideration of the premium charged, it is hereby understood and agreed that Clause 4. EXCLUSIONS is amended by adding the following subsection (6) to the end of Exclusion (i):

(6) any **Securities Claim**, provided that such **Securities Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any **Organization** or any **Executive** of an **Organization**; provided, however, solely with respect to this subsection (6):

(a) an **Executive's** engaging in any protected activity specified in 18 U.S.C. 1514A(a) ("whistleblower" protection pursuant to the Sarbanes-Oxley Act of 2002) or any protected activity specified in any other "whistleblower" protection pursuant to any similar Canadian federal, provincial, local or municipal securities laws, or any similar foreign securities laws; shall not be deemed to trigger this exclusion.

Notwithstanding the forgoing exception, this exclusion (i) shall apply where the actions of any **Executive** includes the filing of any proceeding or voluntarily testifying, voluntarily participating in or voluntarily assisting (other than de minimis assistance) in the filing or prosecution of any proceeding against an **Insured** relating to any violation of any rule or regulation of the Ontario Securities Commission or any similar provision of any federal, provincial, local, municipal or foreign rule or law, including but not limited to any rule or regulation of the U.S. Securities and Exchange Commission, relating to fraud against shareholders, other than such actions in connection with a proceeding that is brought by the Ontario Securities Commission, any similar federal, provincial, local, municipal or foreign regulatory body that regulates securities, or any federal, provincial, local, municipal or foreign law enforcement authority.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

**END 020**

**ENDORSEMENT#** *21*

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98*
issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

**ADDITION TO THE TERM EXECUTIVE**

In consideration of the premium charged, it is hereby understood and agreed that the term " **Executive**" is amended to include the following position(s), but solely for **Wrongful Acts** committed in his or her respective capacity described below and subject to the specified **Continuity Date**:

| CAPACITY | CONTINUITY DATE |
|---|---|
| Disclosure Committee Member | December 1, 2006 |
| Investor Relations Personnel | December 1, 2006 |

Furthermore, provided that for the purpose of the applicability of the coverage provided by this endorsement, the **Organization** will be conclusively deemed to have indemnified the individuals afforded coverage by this endorsement to the extent that the **Organization** is permitted or required to indemnify such persons pursuant to law (common or statutory) or contract or the charter, bylaws, operating agreement or similar documents of an **Organization** (which are hereby deemed to adopt the broadest provision of the law which determines, or defines such rights of indemnity). The **Organization** hereby agrees to indemnify such persons to the fullest extent permitted by law, including the making in good faith of any required application for court approval and the passing of any required corporate resolution or the execution of any contract.

It is further understood and agreed that only as respects any additional coverage granted by virtue of this endorsement, the Insurer shall not be liable for any Loss in connection with any Claim made against an Insured alleging any Wrongful Act occurring prior to each individual's respective Continuity Date if an Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a Claim under this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSION REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© American International Group, Inc. All rights reserved.

**ENDORSEMENT# 22**

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98*
issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

**PUNITIVE/EXEMPLARY DAMAGES ENDORSEMENT**

In consideration of the premium charged, it is hereby understood and agreed that the Definition of **Loss** is hereby amended by adding the following at the end thereof:

> Notwithstanding the foregoing, with respect to all **Claims** (other than **Securities Claims** and **Employment Practices Claims**) subject to the policy's other terms, conditions and exclusions, including but not limited to exclusions relating to personal profit or advantage, illegal remuneration, deliberate fraud, deliberate criminal acts and willful violation of statute, rule or law, **Loss** shall include punitive, exemplary and multiple damages (if insurable by law) imposed upon any **Insured**.

It is further understood and agreed that solely in regard to the coverage provided by this endorsement the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured** arising out of, based upon or attributable to the committing in fact of a dishonest act or any willful violation of any statute, rule or law. For the purpose of determining the applicability of the foregoing exclusion the facts pertaining to and knowledge possessed by any **Insured Person** shall not be imputed to any other **Insured Person**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

**END 022**

**ENDORSEMENT#** *23*

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98* issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

**BODILY INJURY/PROPERTY DAMAGE EXCLUSION**

In consideration of the premium charged, it is hereby understood and agreed that Clause 4. EXCLUSIONS, is hereby amended by deleting Exclusion (h) in its entirety and replacing it with the following:

(h) for bodily injury, sickness, disease, or death of any person (other than emotional distress, mental anguish or nervous shock), or for damage to or destruction of any tangible property, including the loss of use thereof; provided, however, this exclusion shall not apply to any **Securities Claim**, provided that such **Securities Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, the **Organization** or any **Insured**.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© American International Group, Inc. All rights reserved.

95

**ENDORSEMENT#** *24*

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98*
issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

**SECTION 11 OR 12 ENDORSEMENT**

In consideration of the premium charged, it is hereby understood and agreed that Clause 2. **DEFINITIONS**, paragraph (r) "**Loss**," is amended by deleting subparagraph (6) thereof in its entirety and replacing it with the following:

(6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed. Notwithstanding the foregoing subparagraph (6), the **Insurer** shall not assert that, in a **Securities Claim** alleging violations of Section 11 or 12 of the U.S. Securities Act of 1933, as amended, the portion of any amounts incurred by **Insureds** which are attributable to such violations constitutes uninsurable loss and shall treat that portion of all such settlements, judgments and **Defence Costs** as constituting **Loss** under the Policy.

It is further understood and agreed that Clause 4. **EXCLUSIONS** is amended by adding the following at the end thereof:

Notwithstanding anything stated in Clause 4. **EXCLUSIONS** above, Exclusions (a) and (b) shall not apply, in a **Securities Claim** alleging violations of Section 11 or 12 of the U.S. Securities Act of 1933, as amended, to the portion of any **Loss** attributable to such violations.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

***END 024***

**ENDORSEMENT#** *25*

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98* issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

**DOMESTIC PARTNER COVERAGE**

In consideration of the premium charged, it is hereby understood and agreed that such coverage as is afforded by this policy pursuant to Clause 20. **SPOUSAL AND LEGAL REPRESENTATIVE EXTENSION** to the lawful spouse of an **Insured Person** under this policy shall also extend to any "**Domestic Partner**" of such **Insured Person**, whether or not such person would be deemed a "spouse" under the applicable law.

"**Domestic Partner**" means any individual person legally recognized as a domestic or civil union partner under: (1) the provisions of any applicable federal, state, or local law; or (2) the provisions of any formal program established by the **Named Entity** or any **Subsidiary**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

©American International Group, Inc. All rights reserved

**ENDORSEMENT#** *26*

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98* issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

**CLAIM DEFINITION AMENDED - WELLS NOTICE**

In consideration of the premium charged, it is hereby understood and agreed that in Clause 2. **DEFINITIONS**, paragraph (c), "**Claim**," subparagraph (3) is deleted in its entirety and replaced with the following:

(3) a civil, criminal, administrative or regulatory investigation of an **Insured Person**:

(i) once such **Insured Person** is identified in writing by such investigating authority as a person against whom a proceeding described in Definition (c)(2) may be commenced; or

(ii) in the case of an investigation by any PSC or similar foreign securities authority, after the service of a subpoena or written Wells notice upon such **Insured Person**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

©American International Group, Inc. All rights reserved

***END 026***

**ENDORSEMENT# 27**

This endorsement, effective 12:01 am December 1, 2008 forms a part of policy number 01-335-76-98 issued to NORTEL NETWORKS CORPORATION

by AIG Commercial Insurance Company of Canada

**CANADIAN CORPORATE TAX EXTENSION**

In consideration of the premium charged, it is hereby understood and agreed that, solely with respect to coverage for **Non-Indemnifiable Loss** under this policy from **Claims** made against any **Executive** of an **Organization** incorporated or formed in Canada, the following shall apply:

1. *Definitions*

"**Claim**" shall also include any written demand, action, proceeding, or investigation for **Statutory Tax Liability** first made or commenced by any Canadian governmental tax authority against an **Executive** pursuant to the **Tax Sections** after an event identified in the **Tax Sections** has occurred.

"**Loss**," which, without this endorsement would not include taxes, is amended to include **Statutory Tax Liability**.

"**Statutory Tax Liability**" means taxes: (i) actually assessed against an **Executive** and (ii) for which such **Executive** is liable to pay, pursuant to the **Tax Sections**. "**Statutory Tax Liability**" also includes any statutory penalties and interest assessed in connection with the assessment of such taxes against the **Executive** pursuant to the **Tax Sections**.

"**Tax Sections**" means Section 227.1 of the Canadian Income Tax Act; Section 323 of the Canadian Excise Tax Act; or any Canadian provincial or local tax statute law imposing comparable tax liability upon an **Executive**.

2. ***Organization** Indemnification of **Insurer***

The **Organization** hereby agrees to indemnify and hold the **Insurer** harmless from any payment made to or on the behalf of an **Executive** pursuant to the coverage granted by this endorsement.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

***END 027***

**ENDORSEMENT#** 28

This endorsement, effective 12:01 am December 1, 2008 forms a part of policy number 01-335-76-98 issued to NORTEL NETWORKS CORPORATION

by AIG Commercial Insurance Company of Canada

**CANCELLATION CLAUSE AMENDMENT**

In consideration of the premium charged, it is hereby understood and agreed that the Cancellation Clause of this policy is amended by adding the following paragraph to the end thereof:

> Notwithstanding the foregoing, if after the date that the coverage contemplated in this policy is bound, the financial strength rating of AIG Commercial Insurance Company of Canada ("AIGCIC") is downgraded below: (1) A- by A.M. Best Co.; or (2) BBB by Standard & Poor's Ratings Services (hereinafter "Credit Rating Downgrade"), this policy may be cancelled by the first Named Insured as shown on the Declarations page of this policy (the "Named Insured") by mailing written prior notice to AIGCIC or by surrender of this policy to AIGCIC or its authorized agent. If this policy is cancelled by the Named Insured within 30 days after such Credit Rating Downgrade, AIGCIC shall, subject to any minimum earned premium clause, or any minimum retained premium as stipulated on the binder of insurance and/or in the policy (if any), return to the Named Insured the unearned pro rata proportion of the premium as of the effective date of cancellation.

All other terms and conditions of the policy remain the same.

AUTHORIZED REPRESENTATIVE

© American International Group, Inc. All rights reserved.

**ENDORSEMENT#** *29*

This endorsement, effective *12:01 am* *December 1, 2008* forms a part of policy number *01-335-76-98*
issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

**SPECIFIED FILINGS 12 MONTHS BACK**

In consideration of the premium charged, it is hereby understood and agreed as follows:

The definition of " **Application**" is deleted in its entirety and replaced with the following:

" **Application**" means as of the inception of the **Policy Period**:

(1) each and every signed application, any attachments to such applications, any separate written warranty or representation, or other materials submitted therewith or incorporated therein and any other documents submitted in connection with the underwriting of this policy or the underwriting of any other directors and officers (or equivalent) liability policy issued by the **Insurer** or any of its affiliates of which this policy is a renewal, replacement or which it succeeds in time, and any public documents filed by an Organization with any federal, provincial, municipal or foreign regulatory agency (including but not limited to the Securities and Exchange Commission (SEC) or any provincial securities commission (PSC)); and

(2) each and every public filing by or on behalf of an **Organization** made with the SEC or the PSC including, but not limited to, the **Organization's** Annual Report(s), 10Ks, 10Qs, 8Ks and proxy statements, any financial information in such filings, and any certifications relating to the accuracy of the foregoing, provided that such public filing was filed during the period of time:

(i) beginning at the start of the 12 month period immediately preceding the first submission to the **Insurer** in connection with the underwriting of this policy; and

(ii) ending at the inception of the **Policy Period**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© American International Group, Inc. All rights reserved.

101

**ENDORSEMENT# 30**

This endorsement, effective 12:01 am December 1, 2008 forms a part of policy number 01-335-76-98 issued to NORTEL NETWORKS CORPORATION

by AIG Commercial Insurance Company of Canada

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| 76194 | 02/00 | CANADA DO DEC |
| 76195 | 02/00 | CANADA DO GUTS |
| | 06/08 | SECURITIES CLAIM PANEL COUNSEL LIST |
| 75013 | 02/00 | CRISISFUND |
| 83550 | 11/03 | NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT |
| C0152 | 11/03 | COMMISSIONS EXCLUSION |
| 83516 | 11/03 | CAPTIVE INSURANCE COMPANY EXCLUSION |
| C0171 | 05/05 | 'NO LIABILITY' PROVISION DELETED AND SECURITIES CLAIM RETENTION APPLIES TO ALL LOSS |
| C0119 | 05/06 | DISCOVERY AMENDED - BILATERAL, PRE-SET 1 YR, TBD 2 & 3 |
| 83533 | 11/03 | EMPLOYMENT PRACTICES CLAIMS EXCLUSION |
| 83569 | 11/03 | PROFESSIONAL ERRORS & OMISSIONS EXCLUSION |
| | | B(i) DELETED ALLOCATION ENDORSEMENT AMENDED |
| | | SPECIFIC INVESTIGATION/CLAIM/LITIGATION/EVENT OR ACT EXCLUSION |
| | | SPECIFIC INVESTIGATION/CLAIM/LITIGATION/EVENT OR ACT EXCLUSION WITH REMEDIAL ACTION CARVEBACK |
| | | OPPRESSIVE CONDUCT REFERENCE DELETED |
| C0132 | 05/06 | NON-INDEMNIFIABLE LOSS-VOIDING OF COVERAGE |
| | | OUTSIDE ENTITY ENDORSEMENT |
| | | OUTSIDE ENTITY EXECUTIVE ENDORSEMENT (Triple Excess) |
| 89636 | 07/05 | SEVERABILITY OF THE APPLICATION ENDORSEMENT(FULL INDIVIDUAL SEVERABILITY; NON-RESCINDABLE A SIDE COVER) |
| | | EXCLUSION (d) & (e) AMENDATORY ENDORSEMENT |
| | | RELIANCE UPON OTHER CARRIER'S APPLICATION |

**END 030**

**ENDORSEMENT#** *30*

This endorsement, effective *12:01 am December 1, 2008* forms a part of policy number *01-335-76-98* issued to *NORTEL NETWORKS CORPORATION*

by *AIG Commercial Insurance Company of Canada*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| C0112 | 05/06 | CURRENCY ENDORSEMENT-US |
| 91490 | 08/06 | EXTRADITION COVERAGE |
| C0167 | 03/06 | INSURED V. INSURED EXCLUSION AMENDED (WHISTLEBLOWER) |
| | | ADDITION TO THE TERM EXECUTIVE |
| 89495 | 05/05 | PUNITIVE/EXEMPLARY DAMAGES ENDORSEMENT |
| | | BODILY INJURY/PROPERTY DAMAGE EXCLUSION |
| C0161 | 07/07 | SECTION 11 OR 12 ENDORSEMENT |
| 91712 | 06/07 | DOMESTIC PARTNER COVERAGE |
| 98913 CAN | 01/08 | CLAIM DEFINITION AMENDED - WELLS NOTICE |
| C0169 | 06/08 | CANADIAN CORPORATE TAX EXTENSION |
| | | CANCELLATION CLAUSE AMENDMENT |
| 94188 | | SPECIFIED FILINGS 12 MONTHS BACK |
| 78859 | 10/01 | FORMS INDEX ENDORSEMENT |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

**END 030**

# TAB B

*This is Exhibit* ......B...... *referred to in the*
*affidavit of* ......ANNA VENTRESCA......
*sworn before me, this* ......7th......
*day of* ......OCTOBER...... *20* ..11..

..........................................................
A COMMISSIONER FOR TAKING AFFIDAVITS

104

JUDGE SCHEINDLIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

09 CV 4691

| | | |
|---|---|---|
| DAVID LUCESCU, Individually and On Behalf of All Others Similarly Situated, Plaintiff, vs. MIKE ZAFIROVSKI and PAVI BINNING, Defendants. | : | Civil Action No. CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS |

RECEIVED
09 MAY 18 PM 9:34
U.S. DISTRICT COURT
S.D.N.Y.

RECEIVED
MAY 18 2009
U.S.D.C. S.D. N.Y.
CASHIERS

MAY 22 2009

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Nortel Networks Corporation ("Nortel" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal class action on behalf of purchasers of the securities of Nortel between May 2, 2008 and September 17, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

4. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

5. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

6. Plaintiff David Lucescu, as set forth in the accompanying certification, incorporated by reference herein, purchased the securities of Nortel during the Class Period and has been damaged thereby.

7. Nortel supplies end-to-end networking products and solutions that help organizations enhance and simplify communications. Nortel is not named in this action as a Defendant because it and its core operating subsidiaries filed for bankruptcy protection in January 2009.

8. (a) Defendant Mike Zafirovski ("Zafirovski") served as Nortel's Chief Executive Officer and President during the Class Period.

(b) Defendant Pavi Binning ("Binning") served as Nortel's Chief Financial Officer during the Class Period.

(c) Defendants Zafirovski and Binning are collectively referred to herein as the "Individual Defendants."

9. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

10. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein is the collective action of the narrowly defined group of Defendants identified above. Each of the above officers of Nortel, by

virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11. As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE") and the Toronto Stock Exchange ("TSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of

their Board membership and/or executive and managerial positions with Nortel, each of the Individual Defendants had access to the adverse undisclosed information about Nortel's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Nortel and its business issued or adopted by the Company materially false and misleading.

13. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

14. Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Nortel common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Nortel's business, operations, management and the intrinsic value of Nortel common stock; and (ii) caused Plaintiff and other members of the Class to purchase Nortel common stock at artificially inflated prices.

**CLASS ACTION ALLEGATIONS**

15. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of Nortel during the Class Period, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of

their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

16. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Nortel common shares were actively traded on the NYSE and TSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Nortel or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

17. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

18. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

19. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Nortel; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

20. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

21. Nortel supplies end-to-end networking products and solutions that help organizations enhance and simplify communications. These organizations range from small businesses to multinational corporations involved in all aspects of commercial and industrial activity, to federal, state and local government agencies and the military.

22. The Class Period commences on May 2, 2008. On that date, Nortel issued a press release announcing its financial results for the first quarter of 2008. According to the press release, the Company's first quarter results "demonstrated continued progress against the Company's turnaround strategy. Strong operational progress in margins combined with steady revenue growth kept Nortel on track to meet full year goals." Defendant Zafirovski commented on the announcement, stating, in pertinent part, as follows:

> Nortel had a strong first quarter, driven by the completion of a contract in our LG-Nortel joint venture and continued improvements in gross and operating margins. Nortel's operating margin, a critical measure of our plan's traction, expanded for the seventh consecutive quarter year over year, recording a 512 bps improvement to 4.7 percent. . . We expect to achieve our full year guidance and we continue to make solid progress against the strategy to turn around the company. Our relentless focus on execution and our determination to deliver value to customers is strengthening the foundation upon which to build our performance over the balance of 2008 and beyond.

The press release provided the Company's "Outlook," stating, in pertinent part, as follows:

Nortel reiterates its financial outlook for the full year 2008, and continues to expect:

- Revenue to grow in the low single digits compared to 2007
- Gross Margin to be about the business model target of 43 percent of revenue
- Operating Margin as a percentage of revenue to increase by about 300 basis points compared to 2007

23. On May 21, 2008, Nortel issued a press release reconfirming its full year Outlook and stating, in pertinent part, as follows:

- Revenue to grow in the low single digits compared to 2007
- Gross Margin to be about the business model target of 43 percent of revenue
- Operating Margin as a percentage of revenue to increase by about 300 basis points compared to 2007

24. That same day, Nortel issued a press release announcing that its principal direct operating subsidiary, Nortel Networks Limited, had commenced a proposed $500 million offering of 10.75% senior unsecured notes due 2016 in the United States to qualified institutional buyers.

25. On May 28, 2008, Nortel issued a press release announcing that it had completed a $675 million senior notes offering and used the proceeds to redeem $675 million in outstanding principal of 4.25% convertible senior notes due September 1, 2008.

26. On June 11, 2008, Nortel issued a press release announcing that it would be holding a day-long conference in Toronto with the investment community to "provide an update on the company's transformation." The press release "reconfirmed" the Company's Outlook and stated, in pertinent part, as follows:

> Executives will review the achievements of the past two years to build the operational and execution capabilities required to compete and win in a rapidly changing market. Of note, they will discuss how this fundamental phase of the transformation was accomplished while delivering consistent margin improvements that go against industry trends. The Nortel team will also explain how this

112

> strengthened foundation, along with the company's growing market relevance, will be leveraged to capture profitable new revenue opportunities in growth segments of the market.

27. During the Class Period, Defendants held conference calls and meetings with analysts and investors to discuss the Company's earnings and operations. During these calls and presentations, Defendants made numerous materially false and misleading statements concerning Nortel's business.

28. The statements referenced above in ¶¶22, 23, 26 and 27 were each materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts, among others:

(a) that demand for the Company's products was declining as carriers cut back their capital expenditures and other customers deferred purchase decisions;

(b) that the Company's financial results were materially overstated as the Company was failing to properly write-down its goodwill;

(c) that the Company's restructuring was not meeting with success as the Company was struggling to cut costs and improve profitability; and

(d) as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its business, operations, earnings and prospects.

29. On August 1, 2008, Nortel issued a press release announcing its financial results for the second quarter of 2008. Defendant Zafirovski commented on the results, stating, in pertinent part, as follows:

> Nortel's financial performance in the first half of 2008 has been consistent and disciplined. We have achieved our objectives and are on track to meet our targets for the year. . . In the second quarter, the company focused on the work at hand and improved productivity, stepped-up cost reduction activities and enhanced margin performance. We delivered gross margin of 43.1%, the seventh consecutive quarter of year-over-year improvement, and management operating margin of 4.3%, the eighth consecutive quarter of year-over-year improvement.

113

> **We continue to see strong customer momentum in key growth areas of our business.** In recent months, we've signed a comprehensive global managed services telepresence agreement with Deloitte, have secured approximately 20 wins for our innovative 40G offering, and earlier this week signed on as the official network infrastructure partner for the London 2012 Olympic and Paralympic Games. . . In the second half, faced with a challenging business environment, we will continue our focus on execution and on delivering accelerated growth in key segments in order to achieve our financial objectives for the year.
>
> [Emphasis added.]

The press release provided the Company's Outlook, stating, in pertinent part, as follows:

> Nortel faces a challenging business environment with increasing risk due to general macro-economic weakness, continuing competitive pressures and potential of further reduced capex spending by key North American CDMA customers.
>
> Accelerated growth in Nortel's Enterprise and Metro Ethernet businesses in the second half and the expected completion of wireless contracts in the fourth quarter, representing approximately $350 million of previously deferred revenue, are key to the company achieving its financial objectives for this year.
>
> Nortel reiterates its financial outlook for the full year 2008, and continues to expect:
>
> - Revenue to grow in the low single digits compared to 2007
> - Gross Margin to be about the business model target of 43 percent of revenue
> - Management Operating Margin as a percentage of revenue to increase by about 300 basis points compared to 2007

30. Following this press release, the price of Nortel stock declined from $7.64 per share to $6.52 per share. Defendants, however, continued to conceal the scope and severity of the problems at Nortel and its operations.

31. Then, on September 17, 2008, Nortel issued a press release announcing its "preliminary view on certain third quarter results." According to the press release, "the Company is experiencing significant pressure as Carrier customers cut back their capital expenditures further than previously expected and certain Enterprise and Metro Ethernet customers defer new IT and

optical investments." With respect to Nortel's third quarter results and the Company's Outlook, the press release stated, in pertinent part, as follows:

> As a result, the Company currently expects revenues in the third quarter of 2008 of about $2.3 billion. Third quarter gross margin is currently expected to be approximately 39 percent of revenue primarily as a result of a product delivery delay into the fourth quarter and customer mix within the Carrier business. Third quarter operating expense (SG&A and R&D) is currently expected to be $60 million less than the second quarter 2008 level.
>
> In the context of the foregoing, the Company has revised its full year 2008 outlook (a) and now currently expects:
>
> - Revenue to decline between two and four percent compared to 2007
> - Gross Margin of approximately 42 percent of revenue
> - Management Operating Margin as a percentage of revenue to improve 125 to 175 basis points compared to 2007

The Company also announced that it was engaging in a "comprehensive review" of Nortel's business and that "planning" was "underway for further restructuring and other cost reduction initiatives. . ."

32. In response to the Company's announcement, the price of Nortel stock declined from $5.30 per share to $2.68, on heavy trading volume.

33. On November 10, 2008, Nortel issued a press release announcing its financial results for the third quarter of 2008, the period ending September 30, 2008. Among other things, the Company reported that it would be taking a charge of $3.21 billion to write-down goodwill and deferred tax asset, "driven by changes in assumptions and lower growth projections in the current environment."

34. On January 14, 2009, Nortel issued a press release announcing that it and certain of its operating subsidiaries would seek protection under the Companies' Creditors Arrangement Act

("CCAA") in Canada and that certain of the Company's U.S. subsidiaries had filed voluntary petitions in the United States under Chapter 11 of the U.S. Bankruptcy Code.

35. The market for Nortel securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Nortel common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Nortel common stock relying upon the integrity of the market price of Nortel common stock and market information relating to Nortel, and have been damaged thereby.

36. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Nortel common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

37. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Nortel's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Nortel and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing

the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

**Additional Scienter Allegations**

38. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Nortel, their control over, and/or receipt and/or modification of Nortel's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Nortel, participated in the fraudulent scheme alleged herein.

**Applicability of Presumption of Reliance: Fraud on the Market Doctrine**

39. At all relevant times, the market for Nortel common stock was an efficient market for the following reasons, among others:

(a) Nortel stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Nortel filed periodic public reports with the SEC and the NYSE;

(c) Nortel regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the

117

national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Nortel was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

40. As a result of the foregoing, the market for Nortel common stock promptly digested current information regarding Nortel from all publicly available sources and reflected such information in Nortel's stock price. Under these circumstances, all purchasers of Nortel common stock during the Class Period suffered similar injury through their purchase of Nortel common stock at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

41. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Nortel who knew that those statements were false when made.

**FIRST CLAIM**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

42. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

43. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

44. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

45. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Nortel common stock. Plaintiff and the Class would not have purchased Nortel common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

46. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Nortel common stock during the Class Period.

119

## SECOND CLAIM

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

47. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48. The Individual Defendants acted as controlling persons of Nortel within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of Nortel, and their ownership of Nortel stock, the Individual Defendants had the power and authority to cause Nortel to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: May 18, 2009

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

HOLZER HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
200 Ashford Center North, Suite 300
Atlanta, Georgia 30338
Telephone: 770/392-0090
770/392-0029 (fax)

DYER & BERENS LLP
ROBERT J. DYER III
JEFFREY A. BERENS
682 Grant Street
Denver, Colorado 80203
Telephone: 303/861-1764
303/395-0393 (fax)

**CERTIFICATION OF NAMED PLAINTIFF**
**PURSUANT TO FEDERAL SECURITIES LAWS**

The undersigned declares, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4. Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost |
|---|---|---|---|
| NT | Sept 12, 2008 | #3,000 | $17,403 CAD |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds |
|---|---|---|---|
| NT | Dec 24, 2008 | 3,000 | $925.23 CAD |

5. During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15 day of MAY, 2009 in TORONTO, ONTARIO CANADA
City State

(Signature) X [signature]

# TAB C

*This is Exhibit* C *referred to in the affidavit of* ANNA VENTRESCA *sworn before me, this* 7th *day of* OCTOBER *20* 11

A COMMISSIONER FOR TAKING AFFIDAVITS

124

**CANADIAN CCAA Proof of Claim** **re Nortel Networks Corporation and others**

❶ Name of Debtor (the "Debtor") Debtor: DIRECTORS AND OFFICERS OF NORTEL NETWORKS CORPORATION AND NORTEL NETWORKS LIMITED

❷ **Original Creditor Identification (the "Creditor")**

| Legal Name of Creditor | | | Name of Contact |
|---|---|---|---|
| Nortel Networks UK Limited | | | |
| Address: C/O The Joint Administrators, Ernst & Young LLP, 1 More London Place | | | Phone #<br>Fax # |
| City: London | Prov / State | Postal/Zip code: SE1 2AF | e-mail |

❸ **Assignee, if claim has been assigned**

| Full Legal Name of Assignee | | | Name of Contact |
|---|---|---|---|
| Address | | | Phone #<br>Fax # |
| City | Prov / State | Postal/Zip code | e-mail |

❹ **Amount of Claim**

The Debtor / Officer(s) / Director(s) was/were and still is/are indebted to the Creditor as follows:

*Claims will be recorded as "Unsecured" unless the "Secured" box is checked* *(Check only if applicable)*

If you are making a claim against an Officer or Director check the box below, and list the Officer(s) and Director(s) against whom you assert your claim

| Currency | Original Currency Amount | Secured | S. 136 Priority | Restructuring | | |
|---|---|---|---|---|---|---|
| | | ☐ | ☐ | ☐ | ☐ | See attached Particulars of Claim |
| | | ☐ | ☐ | ☐ | ☐ | |
| | | ☐ | ☐ | ☐ | ☐ | |
| | | ☐ | ☐ | ☐ | ☐ | |
| | | ☐ | ☐ | ☐ | ☐ | |
| | | ☐ | ☐ | ☐ | ☐ | |

❺ **Documentation**

Provide all particulars of the Claim and supporting documentation, including amount, description of transaction(s) or agreement(s) giving rise to the Claim, name of any guarantor which has guaranteed the Claim, and amount of invoices, particulars of all credits, discounts, etc. claimed, description of the security, if any, granted by the affected Debtor to the Creditor and estimated value of such security, particulars of any restructuring claim.

❻ **Certification**

I hereby certify that:

- I am the Creditor, or authorized Representative of the Creditor.
- I have knowledge of all the circumstances connected with this Claim.
- The Creditor asserts this claim against the Debtor; and the Officer(s) and Director(s) as indicated above.
- Complete documentation in support of this claim is attached.

| Signature | Name: C.J.W HILL |
|---|---|
| [signature] | Title: JOINT ADMINISTRATOR |
| Dated at 18/3/11 | Signed at LONDON |

This space reserved for use by the Monitor

❼ **Filing of Claim**

**This Proof of Claim must be received by the Monitor by no later than 4:00 p.m. (prevailing Eastern Time) on SEPTEMBER 30, 2009, by prepaid ordinary mail, courier, personal delivery or electronic or digital transmission at the following address:**

Ernst & Young Inc.
222 Bay St., P.O. Box 251
Toronto-Dominion Centre
Toronto, ON M5K 1J7
CANADA
Attention: Nortel Claims

Fax: 416-943-2808
Tel: 1-866-942-7177 or 416-943-4439
e-mail: nortel.monitor@ca.ey.com

An electronically fillable version of this form is available at www.ey.com/ca/nortel

**Proof of Claim by Nortel Networks (UK) Limited**
**against the Officers and Directors of**
**Nortel Networks Limited and Nortel Networks Corporation:**

**Particulars of the Claim and supporting documentation**
**under section 5 of the Proof of Claim**

**A: THIS DOCUMENT**

1. This document provides particulars of the Claims by Nortel Networks (UK) Limited ("NNUK") against those officers and directors of Nortel Networks Limited ("NNL") and Nortel Networks Corporation ("NNC") which, at any given time, were also de jure directors of NNUK, as required by section 5 of the Proof of Claim to which this document is attached.

2. This document, together with the Proof of Claim form to which it is attached, is referred to herein as "the Proof of Claim".

3. The Claims and the quantum of the same set out in this Proof of Claim represent the best current assessments on the part of the NNUK and its office-holders. NNUK reserves the right to add to and/or modify the Claims, the nature of the claims, the facts relied on in support of those claims, and their quantum in due course, including as a result of documentary and other information obtained from NNL, NNC (or elsewhere) and/or in the light of expert evidence produced in connection with the claims.

4. NNUK refers to the contents of the Proofs of Claim filed by NNUK (i) against NNL ("the NNL Proof"), and (ii) against NNC ("the NNC Proof"), together, "NNL/C Proofs") and adopts and repeats the contents of the NNL/C Proofs in this Proof of Claim.

5. In the NNL/C Proofs, NNUK advances a number of claims against NNL and/or NNC on the basis of breach of fiduciary duty by NNL and/or NNC in its capacity as de facto, alternatively shadow, director of NNUK, together with related claims deriving from NNL's and/or NNC's involvement in NNUK's decisions to enter the relevant transactions. Certain of these claims relate to the conduct of officers and directors of NNL and/or NNC who were also, at the relevant time, de jure directors of NNUK.

6. NNUK does not accept that any claims against its de jure directors for breach of fiduciary duty (or otherwise) are claims subject to the bar date. However, they are being included in this Proof of Claim in order to protect NNUK's position in the event that such claims are deemed to be subject to the bar date on the basis that certain conduct, acts or omissions by the de jure directors of NNUK were or might be related or interlinked with (or may be said to amount to) those directors' conduct, acts or omissions as officers and/or directors of NNL and/or NNC.

7. The Claims are still being investigated. Pending further investigation, NNUK cannot specify the names of the relevant officers and directors of NNL and/or NNC.

8. NNUK advances the Claims for relief, on the basis that the relevant officers and/or directors of NNL and/or NNC owed fiduciary duties to NNUK as de jure directors of NNUK and breached such duties. NNUK is entitled to equitable compensation, damages or any other relief that is deemed fit. The quantum of the Claims is not capable of determination at the present time.

9. This Proof of Claim and the Claims set out within it are submitted strictly subject to the various reservations of rights set out in the NNL/C Proofs, including but not limited to reservations in respect of applicable law, jurisdiction and forum.

*128*

129

**CANADIAN CCAA Proof of Claim** **re Nortel Networks Corporation and others**

**1 Name of Debtor (the "Debtor")**
Debtor: Nortel Networks Limited

**2 Original Creditor Identification (the "Creditor")**

| Legal Name of Creditor<br>Nortel Networks UK Limited | | | Name of Contact |
|---|---|---|---|
| Address<br>C/O The Joint Administrators<br>Ernst & Young LLP<br>1 More London Place | | | Phone #<br>Fax # |
| City<br>London | Prov / State | Postal/Zip code<br>SE1 2AF | e-mail |

**3 Assignee, if claim has been assigned**

| Full Legal Name of Assignee | | | Name of Contact |
|---|---|---|---|
| Address | | | Phone #<br>Fax # |
| City | Prov / State | Postal/Zip code | e-mail |

**4 Amount of Claim**

The Debtor / Officer(s) / Director(s) was/were and still is/are indebted to the Creditor as follows:

*Claims will be recorded as "Unsecured" unless the "Secured" box is checked* — *(Check only if applicable)*

If you are making a claim against an Officer or Director check the box below, and list the Officer(s) and Director(s) against whom you assert your claim

| Currency | Original Currency Amount | Secured | S. 136 Priority | Restructuring | | |
|---|---|---|---|---|---|---|
| | | ☐ | ☐ | ☐ | ☐ | See attached Particulars of Claim |
| | | ☐ | ☐ | ☐ | ☐ | |
| | | ☐ | ☐ | ☐ | ☐ | |
| | | ☐ | ☐ | ☐ | ☐ | |
| | | ☐ | ☐ | ☐ | ☐ | |
| | | ☐ | ☐ | ☐ | ☐ | |

**5 Documentation**

Provide all particulars of the Claim and supporting documentation, including amount, description of transaction(s) or agreement(s) giving rise to the Claim, name of any guarantor which has guaranteed the Claim, and amount of invoices, particulars of all credits, discounts, etc. claimed, description of the security, if any, granted by the affected Debtor to the Creditor and estimated value of such security, particulars of any restructuring claim.

**6 Certification**

I hereby certify that:

- I am the Creditor, or authorized Representative of the Creditor.
- I have knowledge of all the circumstances connected with this Claim.
- The Creditor asserts this claim against the Debtor; and the Officer(s) and Director(s) as indicated above.
- Complete documentation in support of this claim is attached.

| Signature [signature] | Name C.J.W. Hill |
|---|---|
| | Title Joint Administrator |
| Dated at 18/3/11 | Signed at London |

This space reserved for use by the Monitor

**7 Filing of Claim**

**This Proof of Claim must be received by the Monitor by no later than 4:00 p.m. (prevailing Eastern Time) on <u>SEPTEMBER 30, 2009</u>, by prepaid ordinary mail, courier, personal delivery or electronic or digital transmission at the following address:**

Ernst & Young Inc.
222 Bay St., P.O. Box 251
Toronto-Dominion Centre
Toronto, ON M5K 1J7
CANADA
Attention: Nortel Claims

Fax: 416-943-2808
Tel: 1-866-942-7177 or 416-943-4439
e-mail: nortel.monitor@ca.ey.com

An electronically fillable version of this form is available at www.ey.com/ca/nortel

**Proof of Claim by Nortel Networks (UK) Limited**
**against Nortel Networks Limited:**

**Particulars of the Claim**
**under section 5 of the Proof of Claim**

A. Introductory Section .......... 2
B. Summary of Claims .......... 4
C. Debt Claims .......... 7
D. Claims by NNUK in respect of Intercompany Loans .......... 8
E. Claims by NNUK in respect of Project Swift .......... 23
F. Claims in respect of Transfer Pricing .......... 33
G. Proprietary Claims .......... 55
H. NNUK'S Pension Scheme Funding Claims .......... 61
I. Customer Recognition .......... 64
J. Claims in respect of Past Dispositions of Business .......... 66
K. Future and Contingent Rights .......... 69
L. Reservation of Rights .......... 72

## A. INTRODUCTORY SECTION

### A.1. This document

1. This document provides particulars of the Claim by Nortel Networks (UK) Limited ("NNUK") against Nortel Networks Limited ("NNL") as required by section 5 of the Proof of Claim to which this document is attached.

2. This document, together with the Proof of Claim form to which it is attached, is referred to herein as "the Proof of Claim".

3. NNUK is incorporated in England and Wales and is a subsidiary company of NNL.

4. The documentation supporting the Claims set out herein is extensive and will be provided as part of the agreed upon or court ordered process. In addition, NNUK notes that a significant proportion of the evidence relevant to NNUK's claims is held by NNL and has not yet been made available to NNUK (or to the limited extent that it has been made available, is subject to confidentiality and without prejudice restrictions preventing NNUK's providing such evidence together with this Proof of Claim).

5. The Claims and the quantum of the same set out in this Proof of Claim represent the best current assessments on the part of NNUK and its office-holders. NNUK reserves the right to add to and/or modify the Claims, the nature of the claims, the facts relied on in support of those claims, and their quantum, including as a result of documentary and other information obtained from NNL (or elsewhere) and/or in the light of expert evidence produced in connection with the claims.

### A.2. Reservations of rights

6. This Proof of Claim and the Claims set out within it are submitted strictly subject to the various reservations of rights set out in section L of this document, including but not limited to reservations in respect of applicable law, jurisdiction and forum.

### A.3. Proprietary claims

7. Certain of the Claims referred to in this document are proprietary claims.

8. NNUK's case is that in so far as its claims are proprietary claims, they attach to the assets that are the subject of them and/or their identifiable or traceable substitute

(and all profits made thereon) in NNL's hands. Such assets are in these circumstances the property of NNUK. NNUK is entitled to those assets in full (failing which it is entitled to equitable compensation for their value in full, together with interest in equity on a compounded basis). The assets which are the subject of these proprietary claims fall outside the insolvent estate of NNL, are NNUK's, and are not available for distribution to any of NNL's creditors.

9. In so far as NNUK's proprietary claims are not able to be satisfied out of the assets that are properly the subject of those claims, NNUK will have a claim against NNL for the deficiency.

10. In this context, as explained at paragraph 213 below, NNUK is entitled to assert an equitable lien over NNL's assets (both inside and outside the Lockbox[1]); if NNUK elects to do so in respect of the diversion of resources from NNUK as a result of the wrongful conduct of NNUK's directors (including NNL), and in which NNL participated (as set out at paragraph 213).

11. NNUK refers further to section G below in respect of its proprietary claims.

**A.4. Security**

12. Save as pleaded at paragraphs 7 to 11 above, and the parts of this Proof of Claim to which those paragraphs refer (including section G below), NNUK's claims are not secured.

[1] Subsequent to the collapse of the Nortel Group, certain of the assets of Nortel entities have been realised and their proceeds held pursuant to escrow agreements ("the Lockboxes"), to be distributed pursuant to the mechanisms to be established under the Interim Funding Settlement Agreement dated 9 June 2009 (the "IFSA")

## B. SUMMARY OF CLAIMS

13. The table below provides a summary of the claims dealt with in this Proof of Claim, together with a cross-reference to those parts of the document dealing the relevant claim. This provides a breakdown of the Amount of Claim identified at section 4 of the Proof of Claim form to which this document is attached.

14. The interest amounts included in this summary table have been calculated to 14 January 2009 ("the Filing Date") and will also accrue thereafter.

15. In summary, the claims dealt with in this document are grouped into various main areas:

    15.1. A claim in respect of the outstanding intercompany trading debts as between the two entities.

    15.2. Claims in respect of interest-free inter-company loans made by NNUK to NNL at NNL's behest, which were uncommercial, improper and unlawful, thereby giving rise to a liability on NNL's part on a number of bases. This is dealt with at section D below.

    15.3. Claims in respect of the Project Swift transaction, under which NNL devised a scheme purportedly to reduce its liabilities under the above loans, and which was itself uncommercial and improper, giving rise to further liabilities on the part of NNL. This is dealt with at section E below.

    15.4. Claims relating to the transfer pricing arrangements between NNL and NNUK. These are dealt with at section F.

    15.5. Proprietary claims. These arise both by reason of the matters dealt with at sections D to F and otherwise. These are dealt with at Section G below. That section also refers more generally to NNUK's claims in relation to the allocation of the proceeds in the Lockboxes.

    15.6. Claims relating to the funding of the NNUK Pension Plan

| Claim | Curr-ency | Original currency amount | Principal Claim component | Interest component | Cross-reference to proof document |
|---|---|---|---|---|---|
| Claim for trading debt | CAN$ | 733,976.69 | 708,812.13 | 25,164.56 | C |
| Claim for trading debt | US$ | 588,321.29 | 588,242.00 | 79.29 | C |
| Claim for trading debt | € | 107,579.49 | 104,111.75 | 3,467.74 | C |
| Claim for trading debt | £ | 30,875,969.39 | 30,460,040.87 | 415,928.52 | C |
| NNUK/NNL loan: claim for amounts contractually owing | £ | 489,253,803.87 | 489,253,803.87 | - | D.4 |
| NNUK/NNL loan: setting aside/restitution on a proprietary basis | £ | 609,760,299.79 | 489,253,804.01 | 120,506,495.78 | D.4 |
| NNUK/NNL loan: equitable account of profits | £ | To be assessed by the relevant Court | | | D.4 |
| NNUK/NNL loan: equitable compensation | £ | 609,760,299.79 | 489,253,804.01 | 120,506,495.78 | D.4D.4 |
| NNUK/NNL loan: unconscionable receipt | £ | 609,760,299.79 | 489,253,804.01 | 120,506,495.78 | D.4 |
| NNUK/NNL loan: transaction at an undervalue | £ | 609,760,299.79 | 489,253,804.01 | 120,506,495.78 | D.4 |
| NNUK/NNL loan: value of eroded non-trading losses | £ | As yet to be ascertained | | | D.4 |
| Swift: setting aside /restitution on a proprietary basis | £ | 349,793,039.00 | 327,579,852.24 | 22,213,186.76 | E.4 |
| Swift: equitable account of profits made | £ | As to be assessed by the relevant Court | | | E.4 |
| Swift: equitable compensation being difference in value between | £ | 349,793,039.00 | 327,579,852.24 | 22,213,186.76 | E.4 |

| | | | | | |
|---|---|---|---|---|---|
| purchase price and value of Swift Subsidiaries at time of Swift | | | | | |
| Swift: unconscionable receipt | £ | 349,793,039.00 | 327,579,852.24 | 22,213,186.76 | E.4 |
| Swift: transaction at an undervalue | £ | 349,793,039.00 | 327,579,852.24 | 22,213,186.76 | E.4 |
| Swift: claim re NNIF restructuring | US$ | 125,662,334.28 | 120,574,803 | 5,087,531.28 | E.4 |
| Transfer pricing claim | US$ | 1,351,000,000.00 | 1,083,000,000.00 | 268,000,000.00 | F.3 |
| **See paragraphs 7 to 10 above regarding secured/proprietary claims** | | | | | |

## C. DEBT CLAIMS

16. NNUK has the following debt claims against NNL:

16.1. A claim in respect of the outstanding intercompany trading debts as between the two entities.

16.2. As at 14 January 2009, the balance of the intercompany trading debts owed by NNL to NNUK stood at CAN$708,812.13; US$588,242.00; €104,111.75; and £30,460,040.87. As such, this amount is contractually due and payable to NNUK by NNL together with interest in the amounts of CAN$25,164.56; US$79.29; €3,467.74; and £415,928.52 respectively to the best of NNUK's knowledge. Alternatively, NNUK is entitled to damages in this amount for breach of contract.

## D. CLAIMS BY NNUK IN RESPECT OF INTERCOMPANY LOANS

### D.1. The Claim

17. **NNUK claims against NNL in respect of any and all loss or damage which it has suffered (and/or to assert any proprietary rights which it has) as a result of or in connection with the interest free loan facilities advanced by NNUK to NNL from December 2003 onwards.**

18. Without in any way derogating from the generality of the claims set out in paragraph 17 above, NNUK sets out below in sections D.2 to D.3 particulars of those claims and the quantum of those claims as best as it is currently able on the basis of the information that it currently has. NNUK reserves its right to alter, add to or otherwise amend the below facts relied on in support of the claims, the nature and/or quantum of the claims, including as a result of documentary and other information obtained from NNL (or others) and to the extent that expert evidence may be required in order to establish quantum.

19. NNUK makes all claims in respect of these intercompany advances made to NNL without prejudice to NNUK's claims with regard to transfer pricing at section E of this Proof of Claim.

### D.2. The NNUK intercompany loans

#### D.2.1. Background and intention to benefit NNL

20. NNL operated the Nortel Group at all relevant points so as to ensure that cash and or value in the group were transferred away from subsidiary companies, including NNUK, to NNL.

21. In line with this general practice, in or around May 2003, NNL commenced the search for "Cash to Canada" initiatives to identify new schemes which would enable the transfer of cash and/or value to NNL from NNUK (and other EMEA entities).

22. One such scheme was to use interest free loan facilities as a means of transferring cash from NNUK to NNL. Under this scheme, NNL compelled NNUK to make a series of interest free loan facilities available to NNL (each a "Loan Facility" and collectively "Loan Facilities").

23. The Loan Facilities benefitted NNL (to NNUK's detriment) by:

    23.1. enabling NNL to make cash drawings from NNUK as necessary, thereby improving NNL's liquidity position;

    23.2. enabling NNL to purportedly discharge its inter-company debt obligations to NNUK (particularly in respect of transfer pricing adjustments which it owed to NNUK) without having to make any cash payments to NNUK;

    23.3. enabling NNL to avoid paying interest to NNUK which would have otherwise been due to NNUK under the MRDA in respect of unpaid transfer pricing adjustments; and

    23.4. providing NNL with a way of avoiding having to withhold sums in respect of tax which it would otherwise have had to withhold if the Loan Facility had been interest bearing.

24. The key consideration at all relevant points was how to benefit NNL. There was no desire to protect or further NNUK's best interests.

**D.2.2. The various Loan Facility agreements and drawdowns**

25. A Loan Facility was established on 10 December 2003 when NNUK was compelled by NNL to make available to NNL an unsecured, interest free loan facility of £200,000,000 ("the December 2003 Agreement") until 31 October 2004. The term of the loans was subsequently effectively extended by the grant of replacement Loan Facilities.

26. Between December 2003 and December 2008, NNL used the Loan Facilities to discharge its inter-company debt obligations to NNUK, particularly in respect of transfer pricing adjustments NNL owed to NNUK. Through NNL's continual draw-downs and its inability readily to repay the Loan Facilities, the maximum facility amount increased under later loan agreements[2], reaching a peak of £600,000,000.00 available for draw-down in September 2007. Each time the maximum facility amount was increased, the consideration was not to the best interests of NNUK or its creditors.

---

[2] Which were otherwise on substantially the same terms as the December 2003 Agreement.

27. The drawn-down loan balance owed by NNL was at £466,782,402 in October 2007. From March 2007 onwards, the loan balance apparently tended to reduce due to purported offsetting of transfer pricing adjustments purportedly owed by NNUK to NNL and set-offs under Project Swift. Project Swift concerned the transfer of various subsidiary companies of NNL to NNUK. For the avoidance of doubt, the claims arising out of Project Swift are set out in section E below. It is not accepted that this, or any other purported set-off by reason of Project Swift and/or the transfer pricing adjustments referred to at section F below were validly made. With regard to all such purported set-offs, NNUK refers further to its claims in relation to Project Swift and transfer pricing. The purported transactions under the Loan Facilities are set out in the table below:

| | | | **Loan Balance (£)** |
|---|---|---|---|
| **Agreement dated 10 December 2003, maximum facility amount £200,000,000.00** | | | |
| **Date** | **Amount (£)** | **Description** | |
| 17 December 2003 | 112,985,142.04 | Draw-down | 112,985,142.04 |
| 20 April 2004 | 23,716,754.95 | Draw-down | 136,701,896.99 |
| 17 September 2004 | 27,298,103.01 | Draw-down | 164,000,000.00 |
| **Agreement dated 31 October 2004, maximum facility amount £250,000,000.00** | | | |
| **Date** | **Amount (£)** | **Description** | |
| 17 December 2004 | 30,000,000.00 | Draw-down | 194,000,000.00 |
| 18 March 2005 | 36,000,000.00 | Draw-down | 230,000,000.00 |
| **Agreement dated 01 April 2005, maximum facility amount £350,000,000.00** | | | |
| **Date** | **Amount (£)** | **Description** | |
| 20 June 2005 | 38,000,000.00 | Draw-down | 268,000,000.00 |
| 24 October 2005 | 81,500,000.00 | Draw-down | 349,500,000.00 |
| **Agreement dated 29 December 2005, maximum facility amount £500,000,000.00** | | | |
| **Date** | **Amount (£)** | **Description** | |
| 16 February 2006 | 26,700,000.00 | Draw-down | 376,200,000.00 |
| 25 September 2006 | 10,000,000.00 | Draw-down | 386,200,000.00 |

| | | | |
|---|---|---|---|
| 15 December 2006 | 41,500,000.00 | Draw-down | 427,700,000.00 |
| **Agreement dated 27 December 2006, maximum facility amount £500,000,000.00** | | | |
| **Date** | **Amount (£)** | **Description** | |
| 23 February 2007 | 27,400,000.00 | Draw-down | 455,100,000.00 |
| 20 March 2007 | (6,068,812.15) | Purported to be money owed by NNUK to NNL | 449,031,187.85 |
| **Agreement dated 13 September 2007, maximum facility amount £600,000,000.00** | | | |
| **Date** | **Amount (£)** | **Description** | |
| 23 October 2007 | 17,751,215.01 | Draw-down | 466,782,402.86 |
| 04 December 2007 | (1,146,616.98) | Purported offset for transfer pricing adjustments | 465,635,785.88 |
| 31 December 2007 | (316,031,255.28) | Purported offset for Project Swift | 149,604,530.60 |
| 31 December 2007 | (1,019,661.22) | Purported offset for Project Swift | 148,584,869.38 |
| 27 March 2008 | (12,669,776.98) | Purported offset for transfer pricing adjustments | 135,915,102.40 |
| 31 March 2008 | (10,528,925.74) | Purported offset for Project Swift | 125,386,166.66 |
| 24 June 2008 | 8,956,636.70 | Draw-down | 134,342,803.36 |
| **Agreement dated 10 September 2008, maximum facility amount £250,000,000.00** | | | |
| **Date** | **Amount (£)** | **Description** | |
| 10 September 2008 | (3,976,581.52) | Purported offset for transfer pricing adjustments | 130,366,221.84 |
| 25 November 2008 | 7,445,952.30 | Draw-down | 137,812,174.14 |
| 16 December 2008 | (24,779,973.80) | Purported offset for transfer pricing adjustments | 113,032,200.34 |

**D.2.3. Loan Facility contrary to NNUK's best interests**

28. Each of the loan agreements identified in the table at paragraph 27 above and the advances thereunder (together "the Interest-Free Loans") amounted to unsecured interest-free obligations, which had no legitimate commercial purpose for NNUK.

29. They were entered into so as to transfer cash and/or value from NNUK to NNL, and, as stated in paragraphs 23 to 24 above, were contrary to the best interests of and prejudicial to NNUK and its creditors. In particular:

29.1. At the time that the idea of the Loan Facilities were initially conceived in May 2003, and on the grant of the replacement Facilities and the draw-downs thereunder, NNL was not in a position, and knew that it was not in a position, to make repayment of the Interest-Free Loans on an adequately timely or commercial basis and it was not intended that NNL do so.

29.2. The maximum facility amount under the Loan Facilities was increased repeatedly between December 2003 and October 2007, with the loan balance improperly allowed to accrue to £466,782,402.86 on or around 23 October 2007, in circumstances where NNL was not in a position to make repayment on any or any adequately timely or commercial basis (and was not intended to do so) and there was a serious and unacceptable likelihood or risk that the loans would never be repaid in full.

29.3. In order for an inter-company loan to be at arm's length, it was necessary to charge interest on the Interest-Free Loans and to obtain valid security in respect of them. NNUK was not paid interest on the amounts it provided and nor was it granted any security under these arrangements in spite of the fact that this:

29.3.1. was uncommercial and of no, or no acceptable, benefit to NNUK;

29.3.2. was contrary to Nortel Group's general practice in respect of inter-company loans;

29.3.3. effectively operated to impede NNUK's ability to enjoy benefits to which it was otherwise entitled under the MRDA (i.e. its entitlement to be paid interest by NNL on overdue transfer pricing adjustments which it owed to NNUK).

29.4. Notwithstanding that NNUK was not paid interest by NNL, interest was imputed on the balance of the Loan Facility for UK tax purposes by Her

Majesty's Revenue and Customs ("HMRC"), thereby eroding NNUK's corporate income tax on trading losses

30.   Notwithstanding the above, the Loan Facilities were extended, renewed and enlarged on an unsecured (as well as interest-free) basis without any, or any adequate, regard to the interests of NNUK (or its creditors), even though NNL's interests were plainly favoured over NNUK's (and its creditors) and in spite of the fact that NNUK was entitled to terminate those agreements and demand repayment of the outstanding loan amounts in full from NNL at any time on five days' notice (see Article 2, Section 2.4(b)).

31.   When the balance of the Loan Facilities was purportedly reduced in December 2007, as a result of Project Swift (which is denied, as set out below), this was done to the detriment of NNUK (and its creditors) through the transfer of various group companies (being entirely illiquid assets which, for all practical purposes, NNUK would never be able to realise on a going concern basis) to NNUK, rather than by way of repayment in cash.

32.   Even following Project Swift, a loan balance of £113,032,200.34 was left outstanding on the Interest-Free Loans as at 14 January 2009.

**D.3.    Particulars of claims in respect of Interest-Free Loans**

**D.3.1.    Claims in respect of the breach of fiduciary duties by NNL as de facto director of NNUK**

33.   The claims set out in this section D.3.1 are governed by English law.

34.   The directors of NNUK owed fiduciary duties to NNUK, including (inter alia) duties:

   34.1.    to act bona fide in the best interests of the company;

   34.2.    to act for proper purposes (and not collateral or improper ones);

   34.3.    to avoid conflicts of interest and not to favour the interests of themselves or any other person over the interests of the company;

   34.4.    not to profit from their fiduciary position at the expense of the company.

35.    Further, given the doubtful solvency (and/or risk of insolvency) of NNUK from 2000 onwards, in carrying out their fiduciary duties to NNUK, the directors were obliged at all times (and, from 1 October 2007, statutorily obliged pursuant to section 172(3) of the Companies Act 2006), to consider the best interests of the creditors of NNUK as paramount and to take those interests fully into account in exercising their powers and discretions.

36.    As NNL and the *de jure* directors of NNUK knew and understood (or ought to have known and understood) the Interest-Free Loan arrangements were not in the best interests of NNUK for the reasons set out in paragraph 29 above. By approving (and/or causing or procuring the making of) the Interest-Free Loan arrangements, the directors of NNUK acted in breach of the duties set out at paragraph 34.

37.    The directors of NNUK acted in further breach of their obligations by reason of their failure to determine that NNUK should rescind, or alternatively exercise the right pursuant to Article 2, Section 2.4(b) of each agreement, to terminate the Interest-Free Loan arrangements.

*Breach of fiduciary duties by NNL*

38.    NNL was itself a *de facto* director of NNUK. In this context:

   38.1.    From around 2000, the *de jure* board of directors of NNUK met infrequently. The role of the *de jure* board of directors was limited to the fulfilment of statutory functions, such as the approval of accounts and the signing of documents for corporate acquisitions or divestures.

   38.2.    At all material times the Nortel Group operated predominantly along business and functional lines, with control of the Nortel Group's operations highly centralised in NNL.

   38.3.    At all material times from about the year 2000, the principal commercial decision-making function in respect of the Nortel EMEA subsidiary companies (the "EMEA subsidiaries"), including, but not limited to, NN Lux, NNUK, NN Ireland, NNSA and NNIF, was exercised by NNL.

   38.4.    All major decisions about, concerning and/or by NNUK were in practice taken by NNL (including in conjunction with NNI). For example:

38.4.1. inter-company lending decisions of NNUK, including whether to lend to other group entities and on what terms, were taken by NNL;

38.4.2. all decisions regarding the implementation, operation and subsequent amendment of the transfer pricing arrangements to which NNUK was subject were taken exclusively by NNL, with little or no consultation with the NNUK board of directors, as explained further in paragraph 177 below.

38.4.3. whilst pension scheme funding decisions were notionally the responsibility of the NNUK Pension Funding Policy Committee (the "UK PFPC") all such decisions were in fact taken by NNL which controlled the funding of the NNUK Pension Plan.

38.4.4. all decisions to upscale capacity at Nortel's subsidiaries and all subsequent decisions to reduce such capacity, thereby necessitating restructuring costs to be incurred, were taken by NNL (as explained further at paragraphs 152 to 154 below).

38.4.5. All decisions in relation to the provision of vendor financing to Nortel's customers were taken by NNL, as explained further at paragraphs 155 to 156 below.

38.5.   Such decisions were habitually made by NNL (including in conjunction with NNI) despite the fact that they resulted in prejudicial consequences for NNUK.

38.6.   Further, at all material times, the NNUK board of directors included senior North American representatives. For example, Bill LaSalle was a director of NNUK until May 2008 whilst also holding the position of General Counsel of the Nortel Group and being an employee of NNL. When NNL made a determination on behalf of NNUK which formally required a resolution of the *de jure* board of NNUK or the signature of a *de jure* director of NNUK, this would be obtained through representatives of NNL contacting the necessary board member(s) and setting out the course of action required by NNL.

39. In directing the affairs of NNUK and/or in undertaking the decision-making function in respect of NNUK, NNL assumed the role of a *de facto* director of NNUK at all material times from, or about, at least the year 2000.

40. In its role as a *de facto* director of NNUK, NNL owed the company and creditors of NNUK all applicable statutory, common law and fiduciary duties. Such obligations included, but were not limited to the duties pleaded at paragraph 34 above.

41. Further or alternatively, if, which is denied, NNL was not generally a *de facto* director of NNUK at all times, NNL assumed the role of *de facto* director in respect of each and every decision of NNUK in the determination of which it was involved. Such determinations included, but were not limited to, NNUK's decision to enter into, and advance loan funding pursuant to, the Loan Facilities and/or NNUK's failure to exercise the right, pursuant to Article 2, Section 2.4(b) of each of these agreements, to terminate the Interest-Free Loan arrangements. Each of those decisions were decisions taken and implemented by NNL, as to which paragraphs 38.3 and 38.4 above are repeated. In its role of *de facto* director in respect of these decisions, NNL owed the company and creditors of NNUK the like duties as are pleaded at paragraphs 34 above.

42. Further and alternatively, NNL was a person in accordance with whose directions or instructions the *de jure* directors of NNUK were accustomed to act and, accordingly, NNL was, as a general matter, a shadow director of NNUK at all material times from around the year 2000. Given the extent to which NNL directed the affairs of NNUK and/or undertook the decision-making function in respect of NNUK and/or exercised control over the assets of NNUK (as pleaded above), NNL assumed fiduciary duties to NNUK and creditors in respect of NNL's role (including its role in the approval, procuring or arranging the agreements and advances referred to above) such that it owed the like duties as are pleaded at paragraph 34 above.

43. In approving and/or arranging and/or procuring each of the Interest-Free Loans in the circumstances described at paragraph 38.4.1 above, NNL acted in breach of its duties to NNUK. In particular NNL breached its fiduciary duties to NNUK (entitling NNUK to the relief identified at paragraph 59 below) in that it:

146

43.1. acted contrary to the best interests of NNUK and its creditors;

43.2. acted for a collateral purpose;

43.3. favoured its own interests over those of NNUK;

43.4. profited from its fiduciary position at the expense of NNUK.

**D.3.2. Unconscionable receipt claim against NNL**

44. Further or alternatively, the directors of NNUK owed the duties to NNUK set out in paragraph 34 above. In breach of their duties, such directors approved (and/or caused or procured the making of) the Interest-Free Loans referred to above.

45. At all material times (and by reason of its intimate involvement in NNUK's commercial affairs and its role in procuring the advances for NNL's benefit) NNL was aware of these breaches of fiduciary duty, and knowingly or unconscionably assisted in and received the benefits of such breaches.

46. Accordingly, such sums (and their identifiable or traceable substitutes) are held on trust for and on behalf of NNUK, and NNL is obliged to account for such sums to NNUK.

**D.3.3. Claim in respect of transactions at an undervalue pursuant to section 238 of the Insolvency Act 1986 ("the IA 1986")**

47. Further, or alternatively, the administrators of NNUK are entitled to relief in relation to the Interest-Free Loan arrangements as being transactions at an undervalue under section 238 of the IA 1986.

48. The Loan Facilities in 2007 and 2008 identified at paragraph 27 above ("the September 2007 Revolving Loan Agreement and/or the September 2008 Revolving Loan Agreement") and the advances made under them were transactions at undervalue for the purpose of section 238(4) of the IA 1986, on the basis that they were:

48.1. transactions which were entered into with a connected party within two years of the date of NNUK entering insolvency (being 14 January 2009);

48.2.    transactions for which NNUK received no consideration and/or where the value of the consideration provided by NNL was significantly less than the value of the consideration provided by NNUK;

48.3.    in circumstances where the statutory presumption under section 240(2) that the transaction occurred at a time when NNUK was unable to pay its debts and/or caused NNUK to be unable to pay its debts is applicable;

48.4.    thereby entitling the office-holders of NNUK, if they so elect, to an order pursuant to section 238 of the IA 1986, an order that NNUK should be restored to the position that it would have been if NNUK had not entered into the September 2007 Revolving Loan Agreement and/or the September 2008 Revolving Loan Agreement.

49.    For the avoidance of doubt the claims dealt with in this section D.3.3 are governed by English law, and the appropriate jurisdiction and forum for the resolution of any dispute in relation to them is the Courts of England and Wales.

**D.3.4.    Claim for money due and payable**

50.    Alternatively to the claims and relief referred to above, NNUK is entitled to claim the full amount still outstanding under the September 2008 Revolving Loan Agreement:

50.1.    Pursuant to Article 3, Section 3.3 of the September 2008 Revolving Loan Agreement, NNL was obliged to repay the principal outstanding not later than the last day of the Term.

50.2.    Pursuant to Article 2, Section 2.4(c)(ii) of the September 2008 Revolving Loan Agreement, the Term of the Agreement ended on 14 January 2009.

51.    As at 14 January 2009, the balance of the loan from NNUK to NNL stood at £113,032,200.34. As such, this amount is contractually due and payable to NNUK by NNL. Alternatively, NNUK is entitled to damages in this amount for breach of contract.

52.    Further, on the basis of the claims pleaded below, the £42,572,949.28 purportedly set off for money owed to NNL under transfer pricing was not in fact owed and was not able to be set off. As such, in addition to the amounts in paragraph 51 above,

£42,572,949.28 is contractually due and payable to NNUK by NNL. Alternatively, NNUK is entitled to damages in this amount for breach of contract.

53. Further, on the basis of the claims pleaded below at section E.3, the £327,579,842.10 purportedly set off under Project Swift to NNL was not able to be set off. As such, in addition to the amounts in paragraph 51 and 52 above, £327, 579,842.10 is contractually due and payable to NNUK by NNL. Alternatively, NNUK is entitled to damages in this amount for breach of contract.

54. Further, the £6,068,812.15 purportedly set off on 20 March 2007 was not able to be set off. As such, in addition to the amounts in paragraph 51, 52 and 53 above, £6,068,812.15 is contractually due and payable to NNUK by NNL. Alternatively, NNUK is entitled to damages in this amount for breach of contract.

**D.3.5. Further claims in relation to inter-company loans**

55. Further, or alternatively, NNUK has the following claims in relation to the above Interest-Free Loans, entitling it to the relief set out in section D.4 below.

**D.3.5.1. Unjust Enrichment**

56. In addition or in the alternative, through its involvement in the Interest-Free Loans as detailed above, NNL has been unjustly enriched at NNUK's expense.

**D.3.5.2. Oppression**

57. In addition or in the alternative, NNL's conduct was, and effected a result that was, oppressive and unfairly disregarded the interests of NNUK and its creditors through its involvement in the Interest-Free Loans contrary to section 241 of the *Canada Business Corporations Act*.

**D.3.5.3. Conspiracy**

58. In addition or in the alternative, in connection with the scheme of entering into the Interest-Free Loans, NNL entered into an agreement with others (including but not limited to NNI), (i) with the predominant purpose of injuring NNUK, and/or (ii) where NNL's conduct was unlawful and directed towards NNUK where it was known that NNUK would be harmed by such conduct.

**D.4. Summary of remedies to which NNUK is Entitled**

59. As a result of the above, NNUK is, in summary, entitled to at least the following relief:[3]

59.1. If NNUK elects for this remedy, the setting aside of the Loan Facilities and the restitution to NNUK of all sums advanced by it to NNL, including restitution (together with any traceable or identifiable product or substitute of the same) on a proprietary basis.

59.2. Further, or alternatively, an equitable account of profits that NNL has made pursuant to the Interest-Free Loans.

59.3. Further, or alternatively, equitable compensation or damages measured at the total of all sums advanced by NNUK to NNL (without deduction for any alleged repayment), together with the amount of interest that should have been charged in relation to the same if NNUK's directors had discharged their duties, calculated at a commercial rate, and (as equitable compensation) compounded at quarterly rests.

59.4. Further, or alternatively, damages in respect of the value eroded from the corporate income tax non-trading losses in NNUK as a result of the notional tax charges resulting from the imputed interest on the Interest-Free Loans (see paragraph 29.4 above).

59.5. Further, or alternatively, NNL is liable for the unconscionable receipt of any and all benefits received by NNL under the Loan Facilities and accordingly, such sums (and their identifiable or traceable substitutes) are held on trust for and on behalf of NNUK, and NNL is obliged to account for such sums to NNUK.

59.6. Further, or alternatively, under section 238 of the IA 1986 the administrators of NNUK are entitled, if they elect to do so, pursuant to

[3] For the avoidance of doubt, all references in this paragraph to the claims set out earlier in this section D are to be taken as incorporating and repeating, for the purposes of the claim to relief, any identification of law, forum and jurisdiction in respect of those claims.

section 238 of the IA 1986, to an order that NNUK should be restored to the position that it would have been if NNUK had not entered into the September 2007 Revolving Loan Agreement and/or the September 2008 Revolving Loan Agreement.

59.7.  Alternatively to the claims set out above, £489,253,803.87, as the amount contractually due and payable to NNUK by NNL.

59.8.  Further, or alternatively, damages.

59.9.  In any event, interest (equitable or otherwise) in relation to any of the entitlements referred to in this paragraph, calculated (in the case of all equitable claims) by reference to the rate and quarterly compounding referred to at paragraph 59.3 above.

60.  NNUK's best current estimates of the amounts of these claims are set out in the table below.  For the avoidance of doubt NNUK specifically reserves the right to amend any basis and calculation of any interest component identified.

| Claim | Curr-ency | Original currency amount | Principal Claim component | Interest component |
|---|---|---|---|---|
| NNUK/NNL loan: claim for amounts contractually owing | £ | 489,253,803.87 | 489,253,803.87 | - |
| NNUK/NNL loan: setting aside/restitution on a proprietary basis | £ | 609,760,299.79 | 489,253,804.01 | 120,506,495.78 |
| NNUK/NNL loan: equitable account of profits | £ | To be assessed by the relevant Court | | |
| NNUK/NNL loan: equitable compensation | £ | 609,760,299.79 | 489,253,804.01 | 120,506,495.78 |
| NNUK/NNL loan: unconscionable receipt | £ | 609,760,299.79 | 489,253,804.01 | 120,506,495.78 |
| NNUK/NNL loan: transaction at an undervalue | £ | 609,760,299.79 | 489,253,804.01 | 120,506,495.78 |

| NNUK/NNL loan: value of eroded non-trading losses | £ | As yet to be ascertained | | |
|---|---|---|---|---|

## E. CLAIMS BY NNUK IN RESPECT OF PROJECT SWIFT

### E.1. The Claim

61. **NNUK claims against NNL in respect of any and all loss or damage which it has suffered (and or to assert any proprietary rights which it has) as a result of or in connection with the transaction to which NNUK and NNL were party ("Project Swift") pursuant to which NNL's indebtedness under the Interest-Free Loans referred to in the previous section of this Proof of Claim was purportedly reduced (which is denied).**

62. Without in any way derogating from the generality of the claims set out in paragraph 61 above, NNUK sets out below in sections E.3 to E.4 particulars of those claims and the quantum of those claims as best as it is currently able on the basis of the information that it currently has. NNUK reserves its right to alter, add to or otherwise amend the below facts relied on in support of the claims, the nature and or quantum of the claims, including as a result of documentary and other information obtained from NNL (or others) and to the extent that expert evidence may be required in order to establish quantum.

### E.2. The Project Swift transaction

#### E.2.1. Background

63. As explained in paragraph 29.2 above, by October 2007, NNL owed £466,782,402.86 to NNUK under the Interest-Free Loans.

64. Due to the size of the outstanding debt under the Loan Facilities, the notional tax charges resulting from the imputed interest on the loan were significant (approximately US$20 million per year) and were eroding the corporate income tax non-trading losses in NNUK. By mid-2007, this erosion was such that NNUK would soon have had to pay tax on its non-operating income.

65. In 2007 NNL was responsible for promoting and implementing a scheme whereby NNL could purportedly reduce the amount that it owed under the Interest-Free Loans without making any payment to NNUK in cash ("Project Swift").

66. Pursuant to the Project Swift scheme, NNL determined that NNUK would agree to buy a 100% shareholding in NNIF and various Nortel subsidiaries held by NNIF (the "Swift subsidiaries") from NNL, the purchase price of which would be offset against the outstanding amount NNL owed to NNUK. It was envisaged that Project Swift would include the transfer from NNL to NNUK of the Swift subsidiaries and the transfer from NNL to NNUK of NNL's 91% shareholding in NNSA, the remaining 9% shareholding in NNSA being held by NNIF.

67. Prior to, and in connection with, the Project Swift transaction NNL also decided to effect a restructuring of NNIF (the "NNIF Restructuring"). The NNIF Restructuring included a capital reduction in NNIF of €295,005,419.57 with the benefit of this redemption going to NNL as sole shareholder. The net effect of the NNIF Restructuring included the release of approximately US $121 million of cash to NNL. This cash amount was formed of a combination of dividends which were paid by NNIF subsidiaries to NNIF in anticipation of the NNIF Restructuring and money already in the accounts of NNIF. The result of this was to remove a significant sum of cash from NNIF prior to its transfer to NNUK.

68. The benefits of Project Swift for NNL were as follows:

68.1. the repatriation of cash to Canada of US$121 million;

68.2. it allowed NNL to be able to purport to discharge a substantial proportion of the debt it owed to NNUK under the Interest-Free Loans whilst not having to make a cash payment to NNUK.

69. For the reasons explained below at paragraphs 75 to 85 it was not in the best interests of NNUK or its creditors that NNL should purport to make a settlement of the Interest-Free Loans by virtue of the Project Swift transaction rather than by effecting repayment in cash. Moreover, to the detriment of the interests of NNUK, the value attributed to the assets transferred was much greater than the actual value of those assets.

**E.2.2. The transaction structure**

70. The eventual implementation of Project Swift occurred via a Sale and Purchase Deed dated 20 December 2007 (the "Deed"), whereunder NNUK agreed to purchase

the entire issued share capital of NNIF from NNL at an initial purchase price of US $628,902,198, with further payment to be made if the aggregate Net Cash of the NNIF Group was greater than US$168,000.000.

71.    As mentioned above, it had initially been intended that Project Swift would involve the transfer from NNL to NNUK of NNL's 91% shareholding in NNSA (the remaining 9% shareholding in NNSA being held by NNIF). However, it was subsequently decided to exclude this shareholding in NNSA from Project Swift.

72.    Pursuant to Project Swift and the Deed, on or about 31 December 2007, the Initial Purchase Price of £316,031,255.28, and a further £1,019,661.22 as a result of a exchange rate clarification, was purportedly offset against the outstanding loan balance that NNL owed to NNUK under Interest-Free Loans, reducing the loan balance from £465,635,785.88 to £148,584,869.38. Further, on or about 31 March 2008, the sum of £10,528,935.74 was further offset against the then outstanding loan balance of £135,915,092.40, the sum of £10,528,935.74 being payable as a valuation adjustment by NNUK to NNL pursuant to Article 2, Section 2.3 of the Deed (the "Adjustment").

73.    In the event, given the financial position of NNUK (and the Nortel Group more generally) at the time of Project Swift, the value of the Swift subsidiaries to NNUK was substantially lower than the amount of NNL's debt to NNUK which was deemed to be discharged as a result of the arrangement.

74.    Further, those assets were entirely illiquid and as such had no, or little, value on a going concern basis. They were obviously inferior by comparison with the cash equivalent given up.

### E.2.3.   Project Swift not in NNUK's best interests

75.    The purported benefits of the Project Swift transaction to NNUK were that:

75.1.    NNUK's financial exposure to NNL pursuant to the NNUK/NNL inter-company loan arrangements was reduced from £465,635,785.88 to £148,584,869.38; and

75.2.    NNUK would reduce its potential exposure to tax charges in respect of the imputed interest on the Loan Facility, estimated at around US$12.3 million per year.

76.    Whilst the purported reduction in the balance pursuant to the Interest-Free Loans might appear to have ostensibly been in NNUK's interests, in reality they were not.

77.    In light of NNUK's (and the wider Nortel Group's) financial position at the time, the value of the Swift Subsidiaries to NNUK was substantially lower than the amount of NNL's debt to NNUK which was deemed to be discharged as a result of the Project Swift.

78.    The assets acquired by NNUK in place of the cash repayment of its loans to which it was otherwise entitled comprised illiquid assets, whose real ascertainable (or realisable, or sufficiently certain) value was substantially less than the cash value given up, and which it was not in NNUK's interests to have instead of cash repayment.

79.    Prior to the implementation of Project Swift, and at a time when there was a significant threat of the Nortel Group entering insolvency, both NNUK and NNL had been advised that, following Project Swift, NNUK would likely be in a materially worse position in any such insolvency than it would be were Project Swift not to occur.

80.    Given its financial circumstances, NNUK ought properly to have received repayment of the outstanding receivable in cash from NNL.

81.    By receiving shares in the Swift subsidiaries, rather than cash, in settlement of the amount owed by NNL under the Interest-Free Loans, NNUK was put in a materially worse position in any Group-wide and/or NNUK insolvency situation than it would have been otherwise.

82.    In particular, in light of the exclusion of NNSA from Project Swift, US$121 million in cash was extracted from NNIF and which could have been paid to NNUK.

83.    As regards the purported reduction in NNUK's potential tax exposure going forward, NNUK should never have been exposed to such a tax charge in the first place. The only reason that it was exposed to this was because interest was being

imputed on a loan facility which was not itself interest bearing. The potential reduction of NNUK's tax exposure cannot therefore truly be regarded as a benefit to NNUK. It was, in effect, nothing more than mitigation of a potential tax liability to which NNUK should never have been exposed, and to which it was only exposed by virtue of the breaches of duty by NNL referred to in section D.3 above.

84.     Properly considered Project Swift was therefore a transaction designed to benefit NNL, and it did so at NNUK's expense and to its detriment.

85.     Not only was Project Swift not in the best interests of NNUK, but it was not in the interests of NNUK's creditors even though it was implemented at a time when NNUK's directors had a duty to act in the best interests of their creditors as a result of NNUK's and the Nortel Group's financial position.

**E.3.     Particulars of Claims in respect of Project Swift**

**E.3.1.   Claims arising from the breaches of fiduciary duty by NNL as de facto director of NNUK**

86.     The claims dealt with in this section E.3.1 are governed by English law.

87.     Project Swift, as executed by the Deed, was not in NNUK's best interests or in the interests of its creditors (see paragraphs 69 and 85 above).

*Breach of fiduciary duties by NNL as a de facto director of NNUK*

88.     The directors of NNUK owed fiduciary duties to NNUK, including (inter alia) the duties pleaded at 34 above. The directors were further obliged to take into account creditors' interests as pleaded at paragraph 35 above.

89.     As explained at paragraphs 38 and 39 above, NNL was itself a *de facto* director of NNUK from at least the year 2000 onwards. Further and in any event, in directing the affairs of NNUK and/or in undertaking the decision-making function in respect of NNUK, NNL assumed the role of a *de facto* director of NNUK at all material times in relation to Project Swift (in which it was the decision-maker) and/or each and every decision made in relation thereto.

90.    In its role as a *de facto* director of NNUK, NNL owed the company and creditors of NNUK all applicable statutory, common law and fiduciary duties. Such obligations included, but were not limited to the duties pleaded at paragraph 34 above.

91.    Further and alternatively, NNL was a person in accordance with whose directions or instructions the *de jure* directors of NNUK were accustomed to act and, accordingly, NNL was, as a general matter, a shadow director of NNUK at all material times from around the year 2000. Given the extent to which NNL directed the affairs of NNUK and/or undertook the decision-making function in respect of NNUK and/or exercised control over the assets of NNUK, NNL assumed fiduciary duties to NNUK and creditors in respect of NNL's role (including its role in the approval, procuring or arranging Project Swift in particular) such that in respect of the Project Swift transaction (at least) it owed the like duties as are pleaded at paragraph 34 above.

92.    In approving and/or arranging and/or procuring Project Swift in the circumstances described at sections E.2.1 to E.2.3 above, the directors of NNUK, and NNL in particular, acted in breach of their duties to NNUK, entitling NNUK to the relief set out at paragraph 104 below.

**E.3.2.    Unconscionable receipt by reason of the breach of fiduciary duties by NNUK's directors**

93.    Further or alternatively, the directors of NNUK owed the duties to NNUK set out in paragraph 34 above.  In breach of their duties, such directors approved (and/or caused or procured the making of) the Project Swift transactions referred to above.

94.    At all material times (and by reason of its intimate involvement in NNUK's commercial affairs and its role in procuring, organising and implement the Project Swift transactions) NNL was aware of these breaches of fiduciary duty, and knowingly or unconscionably received the benefits of them.

95.    Accordingly, those benefits (and their identifiable or traceable substitutes) are held on trust for and on behalf of NNUK, and NNL is obliged to account for such sums to NNUK.

**E.3.3.    Claim in respect of transactions at an undervalue pursuant to section 238 of the IA 1986**

96.    Further, or alternatively, the administrators of NNUK are entitled to relief in respect of the Project Swift transaction as a transaction at an undervalue under section 238 of the IA 1986.

97.    Project Swift, as executed by the Deed, was a transaction at an undervalue for the purpose of section 238(4) of the IA 1986, on the basis that it was:

97.1.    a transaction which was entered into with a connected party (i.e. NNL) within two years of the date of NNUK entering insolvency (being 14 January 2009);

97.2.    a transaction for which NNUK received no consideration and/or where the value of the consideration provided by NNL was significantly less than the value of the consideration provided by NNUK; and

97.3.    the statutory presumption under section 240(2) that the transaction occurred at a time when NNUK was unable to pay its debts and/or caused NNUK to be unable to pay its debts is applicable.

98.    As a result, the office-holders of NNUK are entitled, if they so elect, to an order pursuant to section 238 of the IA 1986 that NNUK should be restored to the position that it would have been if NNUK had not entered into the Project Swift transaction.

99.    For the avoidance of doubt the claims dealt with in this section E.3.3 are governed by English law.

**E.3.4.    Further claims in relation to Project Swift**

100.    Further, or alternatively, NNUK has the following claims in relation to Project Swift, entitling it to the relief set out in section E.4 below.

**E.3.4.1.    Unjust Enrichment**

101.    In addition or in the alternative, through its involvement in Project Swift as detailed above, NNL has been unjustly enriched at NNUK's expense.

### E.3.4.2. Oppression

102. In addition or in the alternative, NNL's conduct was, and effected a result that was, oppressive and unfairly disregarded the interests of NNUK and its creditors through its involvement in the Project Swift Transaction contrary to section 241 of the *Canada Business Corporations Act*.

### E.3.4.3. Conspiracy

103. In addition or in the alternative, in connection with the scheme of entering into the Project Swift Transaction, NNL entered into an agreement with others (including but not limited to NNI), (i) with the predominant purpose of injuring NNUK, and/or (ii) where NNL's conduct was unlawful and directed towards NNUK where it was known that NNUK would be harmed by such conduct.

## E.4. Summary of remedies to which NNUK is Entitled

104. As a result of the above, NNUK is, in summary, entitled to at least the following relief:[4]

104.1. The setting aside, if NNUK elects to do so, of the Deed.

104.2. Further or alternatively, equitable compensation or damages, measured as the difference in the value between the purchase price pursuant to the Deed, and the true value of the shareholding in NNIF, such shareholding value being effectively nominal.

104.3. Further, or alternatively, NNL is liable for the unconscionable receipt of any and all benefits received by NNL in relation to Project Swift, such sums (and their identifiable or traceable substitutes) are held on trust for and on behalf of NNUK, and NNL is obliged to account for such sums to NNUK.

104.4. Further, or alternatively, under section 238 of the IA 1986 the administrators of NNUK are entitled at their election to an order that

[4] For the avoidance of doubt, all references in this paragraph to the claims set out earlier in this section E are to be taken as incorporating and repeating, for the purposes of the claim to relief, any identification of law, forum and jurisdiction in respect of those claims

NNUK should be restored to the position that it would have been if NNUK had not entered into the Project Swift transaction.

104.5. Further, or alternatively, damages.

104.6. In any event, interest (equitable or otherwise) in relation to any of the entitlements referred to in this paragraph, calculated (in the case of all equitable claims) at a commercial rate of Libor +1 compounded at quarterly rests.

104.7. Further, or alternatively, an equitable account of profits that NNL has made pursuant to Project Swift.

104.8. Further, or alternatively a claim in damages (or to otherwise recover) US$121 million in respect of the cost extracted through the NNIF Reorganisation.

105. NNUK's best current estimates of the amounts of these claims are set out in the table below. For the avoidance of doubt NNUK specifically reserves the right to amend any basis and calculation of any interest component identified.

| Claim | Curr-ency | Original currency amount | Principal Claim component | Interest component |
|---|---|---|---|---|
| Swift: setting aside /restitution on a proprietary basis | £ | 349,793,039.00 | 327,579,852.24 | 22,213,186.76 |
| Swift: equitable account of profits made | £ | As to be assessed by the relevant Court | | |
| Swift: equitable compensation being difference in value between purchase price and value of Swift Subsidiaries at time of Swift | £ | 349,793,039.00 | 327,579,852.24 | 22,213,186.76 |
| Swift: unconscionable receipt | £ | 349,793,039.00 | 327,579,852.24 | 22,213,186.76 |
| Swift: transaction at an undervalue | £ | 349,793,039.00 | 327,579,852.24 | 22,213,186.76 |
| Swift: claim re | US$ | 125,662,334.28 | 120,574,803 | 5,087,531.28 |

| NNIF restructuring | | | | |
|---|---|---|---|---|

## F. CLAIMS IN RESPECT OF TRANSFER PRICING

### F.1. The Claim

106. **NNUK claims against NNL in respect of any and all loss or damage which it has suffered (and/or to assert any proprietary rights which it has) as a result of or in connection with the transfer pricing arrangements to which it was subject from 1 January 2001 to the Filing Date.**

107. Without in any way derogating from the generality of the claims set out in paragraph 106 above, NNUK sets out below in sections F.3 to F.4 particulars of those claims and the quantum of those claims as best as it is currently able on the basis of the information that it currently has. NNUK reserves its right to alter, add to or otherwise amend the below facts relied on in support of the claims, the nature and or quantum of the claims, including as a result of documentary and other information obtained from NNL (or others) and to the extent that expert evidence may be required in order to establish quantum.

### F.2. Transfer Pricing

#### F.2.1. Overview

108. Transfer pricing is a mechanism which is intended to ensure that intra-group trading of a multinational group is performed on a basis which (i) enables an allocation of profit across the countries in which it trades (and across the entities within the group) in a manner which replicates an arm's length situation and (ii) avoids double taxation.

109. It is a fundamental part of transfer pricing that individual group members structure their commercial affairs on the basis that they act at arm's length in their dealings with each other ("the arm's length principle").

110. The OECD has developed and published Guidelines ("the OECD Guidelines") detailing the approach which multinational groups should take to determine their allocation of profits, in accordance with the arm's length principle. The arm's length principle is also reflected in Article 9 of the OECD Model Tax Convention, which states that:

> "[where] conditions are made or imposed between two [associated] enterprises in their commercial or financial relations which differ from those which would be made between independent enterprises, then any profits which would, but for those conditions, have accrued to one of the enterprises, but, by reason of those conditions, have not so accrued, may be included in the profits of that enterprise and taxed accordingly."

111. The OECD Guidelines outline a number of different transfer pricing methods and outline a transactional profit method which is consistent with the arm's length principle, namely the "profit split method".

**F.2.2. Transfer Pricing within the Nortel Group**

112. Prior to 2001, the Nortel Group had used a Cost Sharing Arrangement or Cost Contribution Arrangement ("CSA" or "CCA") to deal with research and development ("R&D") and resulting intangibles. From 2001, the transfer pricing methods were revised, and thereafter a residual profit split method ("RPSM") was used.

113. These claims relate to the RPSM imposed on NNUK and operated by the Nortel Group from 2001 to 14 January 2009.

114. The move to an RPSM was primarily motivated by a desire to allocate more profit to NNL. NNL was seen as a "tax haven" because it had extensive tax losses, and because Canada had a system of R&D tax credits which could shelter a greater level of profits. Under the previous cost sharing method, NNL did not derive a great deal of profit. However, using an RSPM which used R&D expenditure as the key means of allocating residual profit going forward would see much more profit allocated to NNL.

115. Under the RPSM, the Residual profit entities ("RPEs", see paragraph 116 below) remained beneficial or economic owners of the intangible assets and IP that they had created and/or contributed to. This is dealt with in more detail in paragraphs 142 to 143 below.

116. The RPSM approach used by Nortel made a distinction between two types of RPSM participants.

116.1. RPEs (also sometimes referred to as "integrated entities") are those entities which had been actively engaged in R&D, but also engaged in

     manufacturing and distribution activities. These included NNL, NNI, NNUK, NNSA, NN Ireland and Nortel Networks Australia Pty Ltd ("NN Australia")[5].

116.2. Limited risk distribution entities ("LREs") are those entities which had not been engaged in R&D activities, but rather performed routine distribution functions, such as sales and support services, and distributing and installing Nortel products.

117. In brief, under the RPSM arrangements from 2001 onwards:

117.1. Both RPEs and LREs, regardless whether or not they undertook R&D activities, were first rewarded with a routine return.

117.2. These returns then formed the basis for determining the level of residual profits (or losses) attributable to the Nortel Group's intangible development activities (i.e. R&D).

117.3. The residual profits (or losses) were then divided between the RPEs only based on their proportional contribution to R&D activity.

118. Whilst Nortel adopted an RPSM throughout the period 2001 to 14 January 2009, the RPSM methodology was amended from 2006 onwards (inclusive). For this reason NNUK's claims in respect of transfer pricing are dealt with below in respect of two distinct time periods: 2001 to 2005 and 2006 to 14 January 2009.

119. There were a number of flaws in the RPSM in fact employed by the Nortel Group, with the consequence that it resulted in outcomes which did not comply with the arm's length principle, did not properly or fairly reward certain entities (including NNUK) and resulted in an improper transfer of value to NNL.

120. In this regard, the US Inland Revenue Service ("IRS") challenged the 2001 to 2005 model. Such challenge resulted in a US$2 billion adjustment being made in favour of NNI. The IRS required that NNL decrease the amount of income reported on its Canadian income tax returns by US$2 billion, and that NNI increase the amount of income reported on its US income tax returns by US$2 billion, being US$400

[5] Until 2008 when NN Australia ceased to perform R&D as a result of a sale of its R&D facility in August 2005, and ceased to be an RPE

million for each of the years 2001 – 2005. These adjustments were said to reflect net overpayment made by NNI to NNL for those tax years. An adjustment of this magnitude plainly calls into question the arm's length nature of that model. It also reflects the fact that the RPSM methodology employed was designed to benefit NNL at the expense of others in the group.

**F.2.3. The operation of RPSM from 2001 to 2005**

Routine Returns for LREs, 2001-2005

121. Routine Returns for LREs in the period 2001-2005 were calculated using the transactional net margin method and an operating margin profit level indicator. In practice, the margins used for the LREs' Routine Returns were as follows:

121.1. In 2001, the ranges fluctuated from entity to entity, ranging from 1% to 4.8% of sales to third parties (although the majority earned less than a 2% operating margin)

121.2. In 2002, the margin was 0% on third party sales.

121.3. In 2003-2005, the margin was 1% of third party sales.

122. The LREs did, however, bear certain risks and costs outside of the routine return.

Routine Returns for RPEs, 2001-2005

123. Routine returns for RPEs for the period 2001-2005 were calculated using an adjusted return on net assets ("RONA"). The RONA return was intended to reflect the RPEs' manufacturing and related support functions, and was calculated by applying a return to short-term assets and a second return to long-term assets.

124. The RPEs bore certain risks and costs outside of this return.

Residual Profits, 2001-2005

125. The residual profits to be allocated to RPEs in the Period 2001-2005 were determined as follows:

125.1. Consolidated economic profit for the Group was calculated.[6] Economic profit for each RPE was calculated by adding back to each entity's operating profit all R&D expenses incurred in a particular year, and then subtracting from this figure the amortised portion of the entity's R&D capital stock for that year. As LREs did not incur R&D costs, their economic profit was the same as their accounting profit.

125.2. The residual profits (or losses) for the Group were then calculated by subtracting from the consolidated economic profit the consolidated routine returns allocated to the RPEs and LREs.

125.3. This consolidated residual profit or loss was then allocated to each of the RPEs on the basis of their relative proportion of consolidated R&D capital stock in a given year.

126. Each RPE's RPSM profit/loss (i.e. to which it was "entitled" under the scheme) was then calculated as the sum of its share of any residual profit or loss for a given year and its routine return.

127. The difference between each entity's RPSM profit/loss and its economic profit (i.e. which it had actually earned) formed the basis for an adjustment to accounting profit (if necessary) for the entity in a particular year (the "transfer pricing adjustment").

**F.2.4. Operation of RPSM from 2006 to 2009**

Routine Returns, 2006-14 January 2009

128. From 2006 onwards the RONA routine return which RPEs had previously received was replaced and RPEs were provided first with a routine return for their distribution activities ("Distribution Return"), of an adjusted operating margin return of 1% of third party sales. The LREs and RPEs therefore were both subject

[6] There is a distinction to be made between accounting profit and economic profit. Accounting profit is based on accounting standards and the principles of conservatism embodied in those standards. The calculation of economic profit attempts to capture the true economic life of assets and the corresponding depreciation or amortization value to be used in this computation in a particular period. Given that Nortel's transfer pricing methodology was founded on the assumption that R&D is the primary driver of intangible profit, economic profit was used to reflect that the benefits accruing from an investment in R&D are not wholly realized in the year in which the investment is made, but over the course of a number of years in the future.

to the same routine return from 2006 onwards. They both continued to bear certain costs outside of their routine return as previously explained in paragraphs 122 and 124 above.

129. RPEs also incurred selling, general and administrative expenses part of which, the "excess costs", were considered to benefit other Nortel Group entities outside their own respective territories ("excess central services expenses"). Costs incurred beyond that normal level would be deemed to have been incurred to support the operations of other Group entities. From 2006 onwards the RPEs received a profit mark-up of 15% on their excess central services expenses.

Residual Profit, 2006-2009

130. Residual profits were calculated by subtracting from the Group's consolidated adjusted operating profit[7] the consolidated routine returns attributed to each of the LREs and RPEs. From 2006 onwards, residual profits were then allocated to each of the RPEs based on their relative proportion of Nortel's consolidated R&D expenditure over the preceding five years.

131. From 2006 onwards, accounting profit was used rather than economic profit.

**F.2.5. Master Research and Development Agreement ("MRDA")**

132. The MRDA is an agreement between the RPEs that provides the architecture, and contractual basis, to enable the RPSM (from time to time) to be applied.

133. The MRDA was entered into on 22 December 2004, effective from 1 January 2001, between NNL, NNI, NNUK, NNSA, NN Australia and NN Ireland (i.e. the RPEs referred to above, defined in the MRDA as "the Participants"). It covered both of the periods of time referred to above, and was amended from time to time by Addenda.

134. The MRDA provided that:

134.1. For and as a consequence of the performance of R&D Activity, each Participant should be entitled to receive a payment in an amount equal to

[7] Consolidated operating profit was adjusted to remove the operating profit or loss of certain joint venture companies, and also to deduct amortization of intangibles, gain or loss on the sale of business, restructuring and stewardship costs (see Schedule A of the MRDA, as amended by the Third Addendum to the MRDA).

the R&D Allocation determined under the RPSM, as the measure of the benefit to which it was entitled commensurate with its performance of, and contribution to, R&D Activity (Article 3(a)).

134.2. The R&D Allocation would be computed pursuant to Schedule A (Article 3(c)). Article 3(c) also recorded that the Participants understood that the RPSM was the subject of review, discussion and negotiations with the Revenue Authorities, and that the Participants agreed *"to amend this Agreement and adjust the RPSM to the extent necessary to reflect any negotiated determination with the Revenue Authorities as to the final R&D Allocation"*.

134.3. Article 3(d) provided, in the original MRDA, that NNL would administer the agreement and the determinations required under the RPSM with respect to its interests and the interests of the Participants, and in particular to compute the amount of any R&D Allocations due to, and payments due from, each Participant on a periodic basis. This Article was amended by the Third Addendum so as to provide that NNL agreed to administer the agreement "or cause this Agreement to be administered by a Licensed Participant or a third party".

134.4. Any amount owing by a Participant should be due and payable in US dollars or equivalent (Article 3(f)). Any amount owing would be due and payable immediately upon written notice of its R&D Allocation from NNL, and any amount paid after 90 days after notice of its R&D Allocation would accrue interest until the date payment was made (Article 3(g)).

134.5. Legal title to all NN Technology then in existence or thereafter to be acquired or developed would be vested in NNL. (As explained further below, beneficial title rested with the contributors to that technology in proportion to their contribution). NNL agreed to enter into licenses with each of the other Participants, but in fact profits from all territories were divided in accordance with the RPSM.

The RPSM and "R&D Allocation"

135. The "RPSM" was defined in the MRDA at all material times as *"the transfer pricing methodology which establishes the fair market value of the compensation to be received by each Participant for its R&D Activity and shall have the meaning defined in Schedule A"*.

136. Schedule A to the MRDA provided at all material times, amongst other things, that the RSPM was adopted at the request of certain Revenue Authorities as the most appropriate method for determining the arm's length compensation due to each Participant for its respective R&D Activity. "R&D Allocation" was defined as "Arm's Length R&D Allocation"

137. Schedule A then set out the basis of calculation of residual profit, and of its division between the Participants/RPEs. Schedule A was subsequently amended, including by the Third Addendum to the MRDA to reflect the revised RPSM in fact employed from 2006 onwards.

**F.2.6. The effect of, and rights under, the MRDA**

138. Some key general principles underlie, and are made express in, the MRDA, and the MRDA must be construed so as to give proper effect to them.

The Arm's Length Principle

139. As set out above, it is a key requirement of any transfer pricing method that it should ensure that each of the entities within the group acts at arm's length in their dealings with each other.

140. This principle is enshrined in the MRDA, which is intended to adhere to the arm's length principle. In this regard:

140.1. The RPSM adopted by Nortel is expressly stated in the MRDA to be a methodology which establishes fair market value compensation for each RPE's R&D activity, and the most appropriate method for determining arm's length compensation to each RPE.

140.2. The MRDA recognises in its terms that the RPSM may be adjusted so as to achieve an arm's length result: see Article 3(c).

141. The MRDA is accordingly to be interpreted, so far as possible, to give effect to the arm's length principle.

Beneficial Ownership of IP

142. Consistently with the arm's length principle, the MRDA confirms that the RPEs have beneficial interests in the IP created with their funding contributions (and hence the proceeds of sale of that IP). In this regard:

142.1. Although NNL was the only legal owner of the IP created from the R&D activities of the RPEs, the MRDA expressly records that the other RPEs possess a beneficial or economic ownership of it. As noted above, this approach continued the same beneficial ownership characteristics of the CSA which had been in operation prior to 2001.

142.2. The Recitals to the MRDA further provide that each RPE "should benefit from its contribution to research and development activity commensurate with the value of its contribution".

142.3. Schedule A to the MRDA provided, at all material times, that the R&D Allocation *"reflects the fact that the Participants bear the full entrepreneurial risk of the Nortel business, such as the risks attendant with the substantial and continuous development and ownership of the NN Technology. Mathematically, the RPSM accords the Participants all the upside risk in the Nortel business as well as the downside risk".*

142.4. The Recitals to the Second Addendum to the MRDA dated 14 December 2007 confirm this again, recording that *"each Participant holds and enjoys equitable and beneficial ownership of NN Technology"* and *"this Addendum continues each Participant's rights and obligations in the NN Technology".*

143. Accordingly, and pursuant to the express terms of the MRDA, the RPEs own the IP in the Nortel Group in proportion to their individual contribution to its creation,

assessed (on a proper construction) by reference to both direct and indirect contributions as pleaded at section F.2 of this document.[8]

**F.2.7. Particulars of Claims arising out of the operation of Transfer Pricing**

144. To the extent that the claims set out in this section F.2 are based on breaches of fiduciary duty, the law applicable to those claims (and the existence of the relevant duties) is English law.

145. To the extent that the claims set out in this section F.2 arise under the UK insolvency legislation, NNUK will contend that the proper law is English.

**F.2.8. Non arm's length aspects of the RPSM**

146. NNUK sets out (subject to the reservation in 107 above) the manner in which it considers the RPSM did not comply with the arm's length principle.

Distribution Return

147. Pursuant to the MRDA, from 2006 onwards, the RPEs had a contractual right to receive a distribution return which reflected an arm's length compensation for its distribution function. As to this:

147.1. It was an express term of the MRDA that the routine return for each RPE from 2006 onwards would represent an arm's length compensation for each RPE's distribution function and other activities which supported revenue outside of the RPE's country of residence, which would be determined based on current industry standards and third party studies (see paragraph 3(iii) of Schedule A, as amended by the Third Addendum).

147.2. Alternatively, a term to the above effect is to be implied into the MRDA as a necessary, obvious and reasonable to give business efficacy to the contract which was intended (and required) to be consistent with the arm's length principle.

[8] As set out in paragraph 214 below, if and to the extent that the MRDA did not have the result that NNUK had a beneficial interest in the IP proportionate to its contributions to it, then NNUK has claims against NNL based on breach of fiduciary duty, account of profit and unconscionable receipt which would in any event give it proprietary claims against the IP and their proceeds in the hands of NNL.

148. RPEs (including NNUK) received, from 2006 onwards, a distribution return as part of their routine return, of an adjusted 1% operating margin return on third party sales, based on US GAAP.

149. In breach of the MRDA, these returns were significantly less than NNUK would be entitled to as a distribution return on an arm's length, fair market value, basis. In this regard:

149.1. A distribution return of only 1% of third party sales fails to recognise inter-company sales, significant customer intangibles, the service element performed alongside the distribution function or the risks and costs borne outside the return. The service element of these functions in particular should have been recognised in the routine return as some of the activities carried out were for the benefit of other group entities. Accordingly, the routine return should be calculated on total operating revenue (as opposed to just third party revenue) and at a higher level than 1%. Indeed, given that the 1% margin was so low, and given that RPEs (including NNUK) would bear costs outside that margin, they were often pushed into a loss position, inconsistent with an arm's length approach.

149.2. Prior to 2001, Nortel provided many of its distributors with a guaranteed 3% operating margin, a rate of return more consistent with an arm's length return.

149.3. No independent distributor performing equivalent functions to NNUK would have entered into agreements on terms that it would receive the returns that NNUK in fact received.

Return for Costs of Central Services

150. As set out in paragraph 129 above, a return of 15% was provided in the RPSM from 2006 onwards to RPEs in respect of regional central services and costs incurred by RPEs to support other Group entities outside their respective territories. However, under the RPSM for the period 2001 to 2005, although such costs were incurred by RPEs, there was no specific provision for any return to RPEs for such costs.

151.    Given the nature of the central services undertaken and given that they provided benefit to other Group entities, an independent entity in the position of NNUK would expect to be remunerated by NNL for such services on an arm's length basis in the period 2001-2005.

Restructuring Costs

152.    From 2001 onwards, the Nortel Group faced continual downsizing and restructuring costs. Prior to 2001, NNL had made decisions in relation to demand planning which had required RPEs and LREs to increase their capacity. When the downturn arose in 2000-2001, those entities were then faced with considerable restructuring costs. Restructuring costs were regularly borne by the RPEs and LREs over the course of 2001 to the Filing Date.

153.    The restructuring costs incurred by NNUK were borne entirely by NNUK. The amount of the restructuring charges incurred was so great that substantial net losses resulted.

154.    Given that these costs resulted from decisions taken by, and instructions given by, NNL, an independent party acting at arm's length would not agree to bear these costs. A proportion of such costs incurred by NNUK should have been reimbursed by NNL. A reasonable reimbursement by NNL, recognising the entities' respective risk profiles and allowing for some sharing of costs, would have been 50% for each year from 2001. However, no reimbursement was made by NNL to NNUK.

Vendor Financing Losses

155.    Vendor financing losses are losses associated with bad debts arising from vendor financing that was provided by Nortel to its customers. A credit committee within NNL made the credit decisions for the Nortel Group. However, these losses were allocated to the RPEs through the RPSM.

156.    An independent party acting at arm's length would not accept these losses, given that it did not make the credit decision itself. Such costs should have been allocated only to NNL. As such, NNL should have reimbursed NNUK in respect of these losses in order to give an arm's length result

North American headquarter and stewardship costs

157.   Pursuant to the MRDA, for the period 2006 onwards, stewardship costs were to be excluded from the calculation of the residual profit pool.

158.   However, such costs were not so excluded.  Further details in this regard will be provided in due course and when available.

159.   Further, the RPSM allocated NNL's (and NNI's) corporate costs to the residual profit pool, thereby increasing the amount of loss to be shared.  Given the industry decline and the sudden reduction in volume of business, the corporate costs of NNL (and NNI) would have been significantly in excess of what was necessary to oversee and manage the global Group, and in particular the EMEA region, given that EMEA had its own head office

160.   An independent party in the position of NNUK acting at arm's length would not agree to effectively bear these costs (or be charged a higher charge for services) simply because its supplier had incurred excess costs.  In addition, a significant portion of these costs provided no benefit to NNUK as they duplicated the head office functionality that already existed within the region.

161.   The excess costs incurred by NNL over the period from 2001 to the Filing Date which have been included in the residual profit pool can be estimated at 50% of NNL's general and administrative costs (i.e. excluding sales and marketing and technical and operational costs), along with the 15% return on excess central services costs received by NNL for the period 2006-2008.

**F.3.    Particulars of Claims arising**

**F.3.1.   Claim for Breach of the MRDA and breach of duty**

162.   In breach of the MRDA:

162.1.   NNUK did not receive an appropriate level of routine returns in the period 2001 onwards (as set out above);

162.2.   The allocation of residual profits to NNUK was not consistent with the arm's length principle, in that, among other things, excess headquarter and stewardship costs were included in the residual profit pool, and

restructuring and vendor financing costs were not reimbursed to NNUK (as set out above).

163.   Further, NNL was responsible for administering the MDRA, made determinations with respect to NNUK's interests under the RPSM, and calculated entitlements by way of routine returns and residual profit allocations from 2001 onwards.

164.   NNL was obliged to make such determinations and calculate such entitlements so as to ensure that such entitlements were consistent with the arm's length principle.

165.   In the circumstances, NNL owed a like duty of care to NNUK.

166.   In breach of its contractual obligation, or alternatively in breach of its duty of care:

166.1.   NNL failed to calculate NNUK's routine returns in a manner consistent with the arm's length principle.

166.2.   NNL failed to reimburse any part of the restructuring costs or vendor financing losses that it had caused NNUK to incur.

166.3.   NNL allocated stewardship costs and 50% of NNL's general and administrative costs to the residual profit pool such that those costs were effectively (and wrongfully) borne by all the RPEs, including NNUK.

167.   Further or alternatively, in breach of Article 3 of the MRDA, the sums that were recognised as owing from NNL to NNUK pursuant to the MRDA were not paid in cash but rather were added to the amount outstanding under the intercompany loan between NNL and NNUK.

Relief sought

168.   By reason of NNL's breach of the MRDA and/or of its duty of care in failing to properly reward NNUK for its routine functions, NNUK has suffered loss and damage in the amount of approximately US$327.4 million.

169.   Further, by reason of NNL's breach of the MRDA and/or of its duty of care in failing to reimburse NNUK for restructuring costs and vendor financing losses, NNL is liable to:

169.1.   reimburse to NNUK in respect of its restructuring costs for the years 2001 to 2008 in the amount of approximately US$525.3 million;

169.2. reimburse NNUK in respect of vendor financing losses for the years 2001-2008 in the amount of approximately US$112.8 million.

170. Further, by reason of NNL's breach of the MRDA and/or of its duty of care in allocating stewardship costs and 50% of NNL's general and administrative costs to the residual profit pool, NNUK has suffered loss and damage as follows:

170.1. Had such costs been borne by NNL, the amounts due to NNUK over the period 2001-2008 would have been increased in an amount of approximately US$113 million, by way of decrease in residual losses to be borne by NNUK.

170.2. By reason of NNL's failure to make such payments and/or the imposition of additional losses on NNUK, NNUK has suffered loss and damage in the amount of approximately US$113 million.

171. Further, NNUK is entitled to and claims interest pursuant to Article 3(g) of the MRDA on:

171.1. All amounts that were recognised as owing by way of R&D Allocation from NNL to NNUK but which were not paid in cash;

171.2. The amounts by which such R&D Allocations should have been increased by reason of the matters set out above.

**F.3.2.   Claim for mistake**

172. Further or alternatively, between 2006 and the Filing Date, NNUK mistakenly believed that a routine return of 1% represented fair market value, arm's length compensation for its distribution activities, and that its returns and share of residual profits had been determined on an arm's length basis. That mistaken belief was either common to NNUK and NNL or was held by NNUK and not corrected by NNL.

173. Further, between 2001 and 2005, NNUK mistakenly believed that it was not entitled, on an arm's length basis, to a return in respect of excess central services costs or reimbursement of restructuring and/or vendor financing losses. That mistaken belief was either common to NNUK and NNL or was held by NNUK and not corrected by NNL.

174. As a result of such mistaken belief NNUK was deprived of entitlements it should properly have had or received and/or made payments to or gave credits to NNL in respect of amounts it believed to be due to NNL but which were not or ought not to have been due, and/or NNL was unjustly enriched at the expense of NNUK.

Relief sought

175. Accordingly, the sum of US$1,083,000,000.00 is recoverable from NNL in restitution and/or unjust enrichment.

**F.3.3. Claim for breach of fiduciary duty by NNL as de facto director**

176. Further, as previously stated in paragraphs 38 to 40 of section D above, NNL was a *de facto* director of NNUK.

177. In any event, NNL acted as such in relation to NNUK's participation in the RPSM by virtue of the fact that all decision making in relation to the entry into, operation of and subsequent amendment of the RPSM was in practice taken by NNL. NNUK refers to the following:

177.1. The key individuals responsible for strategic decision making in relation to the Group's transfer pricing arrangements were senior employees/officers of NNL.

177.2. The decision to implement the RPSM was taken by NNL, with the involvement of NNI. NNUK was not involved in the decision whether to change from the previous costs sharing arrangements to RPSM.

177.3. Similarly, NNUK had no involvement in the creation of the RPSM model. The RPSM model was created by NNL (with the assistance of NNI) in conjunction with Arthur Anderson as professional advisers.

177.4. NNUK was only informed of the change to the RPSM after the RPSM had been implemented.

177.5. NNUK was not involved in the decision to implement the MRDA or in the decision regarding what the terms of the MRDA would be. The terms of the MRDA were determined by NNL and NNI, with the assistance of the lawyers Sutherland, Asbill & Brennan LLP.

177.6.   There was no arm's length negotiation of the terms of the MRDA. NNUK first received a copy of the draft MRDA in or around December 2004 by which point its terms had already been decided. NNUK was simply instructed to sign the MRDA.

177.7.   NNUK also had little involvement in the APA application processes (referred to above), beyond assisting NNL to answer information requests issued by the tax authorities. The APA application process was handled by NNL, with the assistance of NNI. Again, decision making in relation to the APA process was taken by NNL. Whilst HMRC was involved in the APA process for the period 2001 to 2005, dealings with HMRC were conducted by NNL.

177.8.   Whilst various professional advisers were retained by NNL and/or NNI to assist with the APA process, no independent professional advisers were retained to advise NNUK in respect of the APA process.

178.   Accordingly, NNL owed fiduciary duties to NNUK, including (but not limited to) the duties of the nature described in paragraph 34 above.

179.   Further, given the doubtful solvency and/or risk of insolvency of NNUK from 2000 onwards, in carrying out its fiduciary duties to NNUK, NNL was obliged at all times to consider the interests of the creditors of NNUK as paramount and to take those interests fully into account in exercising their powers and discretions.

180.   Further or alternatively, NNL was a person in accordance with whose directions or instructions the directors of NNUK were accustomed to act and, accordingly, NNL was, as a general matter, a shadow director of NNUK at all material times from around the year 2000. Given the extent to which (as set out above) NNL directed the affairs of NNUK and/or undertook the decision-making function in respect of NNUK and/or exercised control over the assets of NNUK (in particular with regard to its participation in the transfer pricing scheme operated by NNL), NNL assumed fiduciary duties to NNUK and creditors such that it owed the above duties generally and/or with regard to the operation of the transfer pricing scheme in particular.

181.   In breach of its fiduciary duties, NNL failed to ensure that NNUK received an arm's length share of residual profits and losses, in particular for the reasons set out above.

182. In so doing, NNL acted contrary to the interests of NNUK and its creditors, and favoured its own interests over those of NNUK.

<u>Relief sought</u>

183. As a result of the above breaches of fiduciary duty, NNUK has suffered loss and/or damage as set out above, in the amount of approximately US$1,083 million.

184. NNL is accordingly liable to NNUK for damages and/or liable to compensate NNUK in equity for that amount.

185. Further, NNL has obtained profits by virtue of its breaches of duty, in an amount to be assessed. All fiduciary gains (and/or their identifiable or traceable substitutes) were received and are held on constructive trust for and on behalf of NNUK, and NNL is obliged to account for all profits to NNUK.

**F.3.4. Claim for Unconscionable Receipt**

186. Further or alternatively, each of the directors of NNUK owed the duties to NNUK set out in paragraphs 34 above.

187. In the same manner as NNL (as set out in paragraph 181 above) such directors breached their duties to NNUK.

188. As a result of the above breaches of duty NNL received approximately US$1,083 million. At all material times (and by reason of its intimate involvement in NNUK's commercial affairs, NNL was aware of this breach of fiduciary duty, assisted in it, and received such sums with such knowledge, such that the amount of approximately US$1,083 million (and/or the identifiable or traceable substitutes of such receipts) were received and are held on constructive trust for and on behalf of NNUK, and NNL is obliged to account for such sums to NNUK.

**F.3.5. Claim for Unauthorised return of capital**

189. Further or alternative, the payments referred to in paragraphs 183 and 188 above represented or amounted to an unauthorised return of capital to NNL, the sole beneficial shareholder of NNUK. Such return of capital was ultra vires and incapable of ratification.

Relief sought

190.    In the circumstances, NNL held all such payments on constructive trust for NNUK and is liable to repay such sums (or their traceable proceedings and identifiable substitutes) to NNUK or is liable to pay damages or equitable compensation to NNUK and/or in any event make restitution (including on a proprietary basis) in the amount of US$1,083 million.

**F.3.6.   Further claims in relation to transfer pricing**

191.    Further, or alternatively, NNUK has claims in relation to transfer pricing as set out in this section.

192.    In connection with the claims set out below, NNL owed duties to NNUK as de facto director of NNUK.  In this regard, all decision making in relation to the entry into, operation of and subsequent amendment of the RPSM was in practice taken by NNL.  NNUK refers to the following:

192.1.   The key individuals responsible for strategic decision making in relation to the Group's transfer pricing arrangements were senior employees/officers of NNL.

192.2.   The decision to implement the RPSM was taken by NNL, with the involvement of NNI.  NNUK was not involved in the decision whether to change from the previous costs sharing arrangements to RPSM.

192.3.   Similarly, NNUK had no involvement in the creation of the RPSM model. The RPSM model was created by NNL (with the assistance of NNI) in conjunction with Arthur Andersen as professional advisers.

192.4.   NNUK was only informed of the change to the RPSM after the RPSM had been implemented.

192.5.   NNUK was not involved in the decision to implement the MRDA or in the decision regarding what the terms of the MRDA would be.  The terms of the MRDA were determined by NNL and NNI, with the assistance of the lawyers Sutherland, Asbill & Brennan LLP.

192.6. There was no arm's length negotiation of the terms of the MRDA. NNUK first received a copy of the draft MRDA in or around December 2004 by which point its terms had already been decided. NNUK was simply instructed to sign the MRDA.

192.7. In so doing, NNL acted contrary to the interests of NNUK and its creditors, and favoured its own interests over those of NNUK. NNL's conduct in relation to transfer pricing constituted actionable breaches of NNL's duties as a director of NNUK.

**F.3.6.1 Unjust Enrichment**

193. In addition or in the alternative to the other claims set out in this Proof of Claim, through its involvement in the transfer pricing arrangements as detailed above, NNL has been unjustly enriched at NNUK's expense.

**F.3.6.2 Oppression**

194. In addition or in the alternative, NNL's conduct was, and effected a result that was, unfairly disregarded the interests of NNUK and its creditors through its involvement in the transfer pricing arrangements contrary to section 241 of the *Canada Business Corporations Act.*

Relief sought

195. In relation to the claims at F.3.6.1 and F.3.6.2 above, NNUK is entitled to at least the following relief:

195.1. In the event that NNUK (acting by its office-holders) elects for such a remedy, the setting aside of the relevant transactions as appropriate and in any event an order restoring NNUK to the position it would have been in but for the oppressive conduct of NNL.

195.2. Damages, or equitable compensation, in at least the amounts set out at paragraphs 183 and 188 of this proof.

195.3. Restitution (including on a proprietary basis) of all amounts by which NNL has been unjustly enriched, in at least the amounts set out at paragraphs 183 and 188.

195.4. Interest on all amounts due, including compound interest.

**F.3.7 Claim in respect of Transaction at an undervalue/preference**

196. Further, or alternatively, NNUK has the following claims under the UK insolvency legislation.

197. NNUK entered administration in England and Wales on 14 January 2009;

Relief sought

198. In such circumstances, the administrator of NNUK is entitled, pursuant to section 238 of the IA 1986, to an order that the position of NNUK should be restored to the position that it would have been if NNUK had not entered into a transaction at undervalue:

198.1. Between 14 January 2007 and 14 January 2009, NNUK made payments to NNL by way of transfer pricing adjustments or "true up" payments, and/or gave credit to NNL for such amounts. Such payments were inflated by reason of NNUK not being provided with an arm's length distribution return.

198.2. To that extent, such payments represented transactions at undervalue for the purpose of section 238(4) of the IA 1986, being transactions for which NNUK received no consideration and/or being transactions where the value of the consideration provided by NNL was, in money or in money's worth, significantly less than the value, in money or money's worth, of the consideration provided by NNUK.

198.3. These transactions at undervalue were entered into at a relevant time for the purpose of section 238(2) of the IA 1986, having been, pursuant to section 240(1)(a) of the IA 1986, entered into with a connected person in the period of two years ending with the onset of insolvency and with the presumption contained in section 240(2) of the IA applying.

**F.4. SUMMARY OF TRANSFER PRICING CLAIMS[9]**

199. Accordingly, NNUK claims from NNL approximately:

[9] Leaving aside the proprietary claims in section G below.

199.1.   US$ 327.4 million in respect of routine returns (see paragraphs 147 to 151) above);

199.2.   US$ 525.3 million in respect of restructuring costs (see paragraphs 152 to 154) above);

199.3.   US$ 112.8 million in respect of vendor financing costs (see paragraphs 155 to 156) above);

199.4.   US$ 113 million in respect of NNL and NNI's excess Head Office costs (see paragraphs 157 to 161) above);

199.5.   The interest (as yet to be assessed) due in respect of amounts recognised as owing to NNUK but added by NNL to the amount owing to NNUK under the intercompany loan rather than being paid in cash;

199.6.   Interest on the above amounts as set out above.

## G. PROPRIETARY CLAIMS

### G.1. The Lockbox

200. Subsequent to the collapse of the Nortel Group, certain of the assets of Nortel entities have been realised and their proceeds currently held pursuant to escrow agreement, to be distributed pursuant to the mechanisms to be established under the Interim Funding Settlement Agreement. NNUK advances proprietary claims which extend to (but are not limited to) assets within the Lockbox. Further:

200.1. All claims in respect of the allocation of the Lockbox are to be dealt with pursuant to the provisions of, and procedures established under, the IFSA.

200.2. NNUK's claim is that all such claims are to be dealt with outside the Proof of Claims process and are not subject to the bar date.

200.3. If, contrary, to this position, any of the claims are so subject, NNUK hereby makes claims to the assets of the Lockbox (on both a proprietary and personal basis, and without limitation), and reserves the right to add to, amend, or provide further particulars of them in the future.

200.4. NNUK also advances the proprietary claims referred to below in relation to assets that are in NNL's hands and which fall outside the Lockbox. NNUK's position in relation to those claims is that they are proprietary and hence not claims to NNL's estate for the purposes of any proof process but claims to assets of NNUK. NNUK further contends that the appropriate time for resolving any dispute in relation to such claims is after, and in the light of, the resolution of the allocation claims to the Lockbox pursuant to the IFSA processes.

### G.2. IP Proprietary claim

201. NNUK's proprietary claims referred to above include the following claims in relation to IP created with funding contributions from NNUK.

202. As set out in paragraphs 142 to 143 above, the express terms of the MRDA create beneficial interests in favour of NNUK, NNSA and NN Ireland in the IP created with the funding contributions to R&D, and the proceeds of sale of that IP.

203. Alternatively, a term to that effect is to be implied into the MRDA, as a necessary, obvious and reasonable term in order to give the MRDA business efficacy to adhere to the arm's length principle which underlies the MRDA, comply with the purpose of the MRDA and avoid prejudicial results for the RPEs.

204. Further or alternatively, the parties to the MRDA shared a common intention that they should each have a beneficial interest in the IP created with their respective funding contributions. In this regard:

204.1. That common intention is reflected in the express terms of the MRDA.

204.2. Moreover, the circumstances in which the MRDA was entered into make it clear that the intention behind the arrangements was that NNUK would obtain an interest in the IP commensurate to its contribution. This is also consistent with the economic rationale of a transfer pricing agreement intending to adhere to the arm's length principle.

204.3. NNUK refers to paragraphs 115 and 142 to 143 above in particular.

205. In reliance on this common intention, NNUK acted to its detriment, by contributing to the creation of IP. It did so in the belief that in so acting it was acquiring a beneficial interest in such IP.

206. Accordingly, a trust in favour of NNUK arises over the IP as a matter of law from the making of the relevant contribution. NNUK's interest in the IP is proportionate to its contributions, both direct and indirect (see paragraph 209 below).

207. Further or alternatively, in the circumstances NNUK's contributions to the creation of IP, legal title to which was held in the name of NNL, gave rise to a resulting trust in NNUK's favour, proportionate to such contributions.

208. Further or alternatively, in the circumstances described above, NNL acquiesced in NNUK's reasonable belief that its contributions entitled it to a proportionate beneficial interest in the IP resulting from such contributions. In the circumstances, it would be inequitable for NNL to deny that NNUK had such an interest, and it is estopped from doing so, such that the Court should give effect to such interest.

Valuation of Contributions to IP

209.   NNUK's beneficial interest in the IP is proportionate to its direct and indirect
       contributions to the creation of such IP. In this regard:

   209.1.   The parties' common intention was, as set out above, that each of them
            would have a beneficial interest in the IP created proportionate to their
            respective contributions. This is the result that is to be arrived at on a
            proper construction of the MRDA.

   209.2.   Moreover, to the extent that the MRDA or RPSM would not have regard to
            indirect contributions (as set out below), that was also inconsistent with the
            parties' common intention and with the arm's length principle.

   209.3.   If, and to the extent that, the MRDA or RPSM would have any different
            effect, that was inconsistent with the parties' common intention and with
            the arm's length principle. The MRDA was drafted by, and imposed upon
            the other parties by, NNL. It would not be equitable in the circumstances
            to have regard to its terms if and to the extent that they provide for a
            different result than was the common intention of the parties.

   209.4.   The MRDA expressly recognises that the RPSM was subject to adjustment
            to achieve an arm's length result.

210.   NNUK's direct contribution to the creation of IP is to be increased to take account of
       indirect contributions, including (in particular) inequitable, unjust, unfair or
       unconscionable conduct which had the effect of transferring or enabling the transfer
       of benefit into other entities (and in particular NNL) rather than NNUK, including
       benefit transferred pursuant to the following:

   210.1.   The Interest-Free Loans referred to at section D above.

   210.2.   The Project Swift transaction referred to at section E above.

   210.3.   The amounts which should have been paid to NNUK (or the amounts paid
            to NNL by NNUK which should have been retained by NNUK) in order
            for NNUK to receive a fair market value, arm's length compensation for
            its distribution activities and its central services.

210.4.   The amounts which NNUK should have received by way of reimbursement of restructuring costs and vendor financing losses, as set out in paragraphs 152 to 156 and 199 above.

210.5.   The amounts by which NNUK's allocation of residual profits should have been increased (or its allocation of residual losses should have been reduced) had headquarter and stewardship costs not been wrongfully allocated to the residual profits pool.

210.6.   The amounts to which NNUK was entitled to under the MRDA (and which should have been paid in cash so as to be available for contribution to R&D) but which were instead added to the amount owing from NNL to NNUK under the Interest-Free Loans.

211.   Accordingly, NNUK is entitled to and claims a proprietary interest in all the proceeds of the IP (including profits earned therefrom and the proceeds of sale of the IP) in the hands of NNL.

212.   Further or alternatively, NNUK has a claim against NNL in respect of its proportionate share of such of the proceeds of the IP as have passed through NNL's hands.

213.   Further by reason of the receipt and retention by NNL of NNUK's property pursuant to breaches of NNL's fiduciary duties as described in the paragraphs above, NNUK is entitled as a matter of law to an equitable lien in its favour of NNUK as against NNL, which extends to all the proceeds of NNL's breach of fiduciary duty (and specifically all such assets in NNL's hands, including assets with which NNUK's property was mixed, or their substitutes). NNUK is entitled to enforce such a lien so as to secure its personal claim against NNL until restoration of NNUK's assets has been achieved. For the avoidance of doubt, any right of election as between this remedy and the enforcement of NNUK's proprietary claim is reserved.

214.   Further or alternatively, if the MRDA or RPSM were to be construed or considered in any way to preclude NNUK's proprietary claim to a beneficial interest in the IP resulting from its direct and/or indirect contributions to IP, then NNUK will contend that (i) the directors of NNUK (including NNL) were in breach of their fiduciary

duties as set out above in causing or allowing NNUK to enter into the MRDA or RPSM without ensuring that its terms ensured that NNUK would obtain or maintain a proportionate beneficial interest in the IP, and (ii) NNL is obliged to account for the profits and benefits it has thereby received, and/or holds the IP (and its proceeds) received by it as a result of the directors' breach of duty on trust for NNUK. Accordingly, in those circumstances, NNUK has the same or the like proprietary claims to the IP and its proceeds (including proceeds of sale) as set out above. Further, NNUK has alternative personal claims against NNL for the loss caused to NNUK by such breach of duty.

**G.3. Other proprietary claims**

215. NNUK has other proprietary claims to assets in the hands of NNL, as identified above.

***All proprietary claims – assets inside and outside the Lockbox***

216. For the avoidance of doubt:

216.1. To the extent that the proceeds of the IP, and/or any other assets or proceeds to which NNUK maintains its proprietary claims, are represented by sums in the "Lockbox", then NNUK asserts its proprietary claims to the appropriate proportion of, or amount in, the Lockbox

216.2. To the extent that any of NNUK's proprietary claims to assets or proceeds (including its claim to IP and its proceeds) represented by sums in the Lockbox are not satisfied from the Lockbox, then NNUK maintains it will have a proprietary and/or personal claim to the shortfall from NNL.

216.3. NNUK asserts its proprietary claims to assets outside the Lockbox, as well as within it.

216.4. To the extent that any of NNUK's proprietary claims (including its claim to IP and its proceeds) are not satisfied from any other assets to which NNUK asserts a proprietary claim, then NNUK will have a proprietary and/or personal claim to the shortfall from NNL

**G.4. Other claims to the Lockbox more generally**

217. NNUK asserts claims to the assets in the Lockbox both on the basis of the proprietary claims referred to above and more generally, including on the basis of the proper construction of the Interim Funding Settlement Agreement. As stated above, NNUK's position is that such claims to the allocation of the Lockbox are to be dealt with outside the Proof of Claims process and are not subject to the bar date.

## H. NNUK'S PENSION SCHEME FUNDING CLAIMS

### H.1. Claim

218. **NNUK claims against NNL in respect of any and all loss or damage which it has suffered as a result of or in connection with the failure of NNUK to properly fund the Scheme (as defined below).**

219. Without in any way derogating from the generality of the claims set out in paragraph 218 above, NNUK sets out below in sections H.2 to H.8 particulars of those claims and the quantum of those claims as best as it is currently able on the basis of the information that it currently has. NNUK reserves its right to alter, add to or otherwise amend the below facts relied on in support of the claims, the nature and/or quantum of the claims, including as a result of documentary and other information obtained from NNL (or others) and to the extent that expert evidence may be required in order to establish quantum.

### H.2. Introduction

220. NNUK is the principal employer of a defined benefit pension scheme known as the Nortel Networks UK Pension Plan ("the Scheme"). The Scheme was originally established on 28 September 1949 and was inherited by the Nortel Group following its acquisition of STC plc during the period between 1987 and 1991.

221. NNUK has been the principal employer of the Scheme since around June 2000. The trustee of the Scheme is Nortel Networks UK Pension Trust Limited ("the Trustee").

### H.3. Control over funding decisions and influence over investment strategy

222. At all material times:

222.1. NNL exercised full control over NNUK's decisions as to what contributions, if any, to make to the Scheme; and

222.2. NNL exercised, or caused NNUK to exercise, influence over the investment strategy adopted by the Trustee.

223. In the circumstances, NNL either appreciated or ought to have appreciated that the interests of NNUK and its creditors and employees would be best served by the

rapid elimination in any funding deficit of the Scheme through contributions and by the investment of the assets of the Scheme in a relatively conservative manner.

224. NNL:

224.1. caused NNUK to make fewer contributions to the Scheme than it should have made;

224.2. did not ensure that a more conservative investment strategy was adopted.

**H.4. Section 75 Debt**

225. On 14 January 2009, NNUK went into administration in England. This event triggered a statutory debt owed by NNUK to the Trustee pursuant to section 75 of the UK Pensions Act 1995 in the approximate amount of GBP £2,100,000,000.00 ("the Section 75 Debt").

226. The Section 75 Debt is significantly larger than it would have been if NNL had ensured:

226.1. NNUK made larger and/or earlier contributions to the Scheme; and/or

226.2. a more conservative investment strategy was adopted, investing a higher proportion of the assets of the Scheme in bonds rather than equities.

**H.5. Breaches of duties owed by NNL as *de facto* or shadow director of NNUK**

227. For the reasons described at paragraphs 38 to 40 above, as a matter of English law, NNL was a *de facto* or shadow director of NNUK during the relevant period and, as such, owed fiduciary and other duties to NNUK.

228. Further or alternatively, in light of the facts and matters set out at paragraphs 41 to 42 above, NNL assumed the role of a *de facto* or shadow director of NNUK specifically in respect of:

228.1. decisions as to the timing and amount of any contributions to the Scheme; and

228.2. decisions as to whether and if so how to seek to influence the investment strategy adopted by the Trustee.

229. As a *de facto* or shadow director of NNUK, NNL owed all applicable statutory, common law and fiduciary duties deriving from that role.

230. In this regard, NNL's duties included:

230.1. an obligation to have regard to the interests of the employees of NNUK when exercising its powers and discretions; and

230.2. given the doubtful solvency (and/or risk of insolvency) of NNUK from 2000 onwards, an obligation to consider the best interests of the creditors of NNUK as paramount and to take those interests fully into account in exercising their powers and discretions.

231. By causing NNUK to make contributions to the Scheme at a lower level than required and/or causing a relatively aggressive investment strategy to be adopted NNL acted contrary to the best interests of NNUK and otherwise in breach of the duties set out at paragraph 34 above.

**H.6. Oppression**

232. Further, or in the alternative, NNL's conduct effected a result that unfairly disregarded the interests of NNUK and its creditors through its involvement in causing NNUK to make contributions to the Scheme at a lower level than required and/or causing the Trustee to adopt and subsequently maintain a relatively aggressive investment strategy. Such conduct was in breach of section 241 of the *Canada Business Corporations Act.*

**H.7. Losses suffered by NNUK**

233. As a result of NNL's breaches of duty and/or oppression NNUK has suffered loss and damage.

**H.8. Remedies**

234. As a result of the above, NNUK would be entitled to the following relief:

234.1. Equitable compensation or damages.

234.2. Further or in the alternative, an equitable account of any profits that NNL has made as a result of the breaches of duty described above.

234.3. Interest calculated at the commercial rate on a compound basis.

## I. CUSTOMER RECOGNITION

235. At all material times, NNL:

235.1. determined which Nortel entity would contract with customers, without making reference to whom would perform the obligations under the contract and whom was the entity that had procured the contract.

235.2. determined which Nortel entity would record and receive the revenue earned from customers.

236. In deciding the matters in paragraph A above, NNL was primarily motivated by a desire to minimise tax that was payable on customer revenues from NNL's perspective and ultimately to maximise cash flows to Canada.

237. As a consequence, certain Nortel entities were deprived of revenue under customer contracts which were rightfully those entities' to enjoy ("Deprived Entities"). This was not in the Deprived Entities' interest or the interests of its creditors.

238. As previously stated above, NNL was a de facto and/or shadow director of NNUK.

239. In any event, by reason of the matters listed above, NNL acted as a de facto director in relation to NNUK's decisions on the revenue it received in relation to customer contracts;

240. As a consequence NNL owed fiduciary duties to NNL as set out in section D.3.1 above.

241. From 2000 onwards, given the doubtful solvency (and/or risk of insolvency) of NNUK, the directors of NNUK were obliged to consider the best interests of the creditors of NNUK as paramount and to take those interests fully into account in exercising their powers and discretions..

242. To the extent that NNUK was a Deprived Entity:

242.1. NNL breached those fiduciary duties in not ensuring that NNUK received the revenue it was rightfully entitled to;

242.2. In addition or in the alternative, NNL has been unjustly enriched at NNUK's expense.

242.3. In addition or in the alternative, NNL's conduct effected a result that unfairly disregarded the interests of NNUK and its creditors contrary to section 241 of the *Canada Business Corporations Act*.

242.4. In addition or in the alternative, in connection with customer recognition, NNL entered into an agreement with others (including but not limited to NNI), (i) with the predominant purpose of injuring NNUK, and/or (ii) where NNL's conduct was unlawful and directed towards NNUK and it was known that NNUK would be harmed by such conduct.

**I.1. Losses suffered by NNUK**

243. As a result of the above NNUK has or will have suffered loss and damage.

**I.2. Remedies**

244. As a result of the above, NNUK would be entitled to the following relief:

244.1. Equitable compensation or damages.

244.2. Further or in the alternative, an equitable account of any profits that NNL has made as a result of the breaches of duty described above.

244.3. Restitution (including on a proprietary basis) of all amounts by which NNL has been unjustly enriched.

244.4. Interest calculated at the commercial rate described above on a compound basis.

## J. CLAIMS IN RESPECT OF PAST DISPOSITIONS OF BUSINESS

245. At various times prior to 14 January 2009 NNUK disposed of assets as part of various co-ordinated business sales with NNL and other Nortel entities

246. Following those business sales, NNL allocated and/or directed the allocation amongst the Nortel entities, including NNUK, the portion of the proceeds of sale referable to each entity.

247. Each entity was entitled to a portion of the proceeds that was actually referable to the assets that entity was selling.

248. To the extent that NNUK did not receive from any business sale, a fair and appropriate allocation of the proceeds for the assets it has sold it has the following claims:

248.1. A claim under the relevant sale contracts for a fair and appropriate allocation of the proceeds for the assets it has sold.

248.2. as previously stated above, NNL was a de facto or shadow director of NNUK;

248.3. in any event, NNL acted as a de facto director in relation to NNUK's decisions on the allocation of proceeds from business sales;

248.4. as a consequence of the above NNL owed fiduciary duties to NNUK as set out above; NNL also owed a duty of skill and care;

248.5. from 2000 onwards, given the doubtful solvency (and/or risk of insolvency) of NNUK, the directors of NNUK were obliged to consider the best interests of the creditors of NNUK as paramount and to take those interests fully into account in exercising their powers and discretions;

248.6. NNL breached those fiduciary duties and its duty of skill and care in not ensuring that NNUK received its rightful allocation from the business sales;

248.7. NNUK claims equitable compensation and/or damages as a consequence.

248.8. Further or alternatively, each of the directors of NNUK owed fiduciary duties as set out above, including a duty of skill and care.

248.9. In the same manner as NNL set out above such directors breached their duty to NNUK.

248.10. As a result of the above breaches of duty NNL received greater proceeds from the business sales than it was entitled. At all material times (and by reason of its intimate involvement in NNUK's commercial affairs), NNL was aware of this breach of fiduciary duty and received such sums with such knowledge (and/or identifiable or traceable substitutes of such receipts) and are held on constructive trust for and on behalf of NNUK, and NNL is obliged to account for such sums to NNUK.

248.11. Further, or in the alternative, NNUK claims equitable compensation or damages on the basis that NNL's conduct effected a result that unfairly disregarded the interests of NNUK and its creditors contrary to section 241 of the *Canada Business Corporations Act.*

248.12. Further, or in the alternative, NNUK mistakenly believed that the allocation it received from the various co-ordinated business sales was a fair allocation representing the assets that it had sold in that at business and/or that it was not entitled to any more than it received. That mistaken belief was either common to NNL and NNUK or was held by NNUK and not corrected by NNL.

248.13. As a result of such mistaken belief NNUK was deprived of entitlements it should properly have received and/or made payments or gave credits to NNL which were not or ought not have been due, and/or NNL was unjustly enriched at the expense of NNUK.

248.14. Further or in the alternative, in connection with the allocation of proceeds of business sale, NNL entered into an agreement with others (including but not limited to NNI), (i) with the predominant purpose of injuring NNUK, and/or (ii) where NNL's conduct was unlawful and directed towards NNUK where it was known that NNUK would be harmed by such conduct

248.15. On the basis of the above, NNUK also claims interest on all amounts due, including compound interest.

249.    On the basis of the above, NNUK is entitled to the following relief:

    249.1.    In the event that NNUK (acting by its office-holders) elects for such a remedy, the setting aside of the relevant transactions as appropriate and in any event an order restoring NNUK to the position it would have been in but for the oppressive conduct of NNL.

    249.2.    Damages, or equitable compensation.

    249.3.    Restitution (including on a proprietary basis) of all amounts by which NNL has been unjustly enriched.

    249.4.    Interest on all amounts due, including compound interest.

## K. FUTURE AND CONTINGENT RIGHTS

250. Further:

250.1. In the event that a claim is made or intimated against NNUK after the bar date (whether on the basis of matters currently known or unknown, and whensoever occurring), NNUK will assert and hereby asserts all rights of contribution and indemnity against NNL. NNUK's position is that such claims are not subject to this bar date but for completeness and the avoidance of doubt hereby includes all rights to contribution or indemnity in respect of all claims, liabilities, costs and expenses from any person or persons, whensoever occurring and whether arising before or after the bar date, to the fullest extent possible and without limitation. NNUK reserves the right to further identify, particularise and modify all its entitlements in this respect in due course.

250.2. NNUK further claims in respect of any future, prospective or contingent claims against NNL that NNUK or any office-holder or future office-holder may have. NNUK reserves the right to advance any prospective, contingent or future claims which may arise or become crystallised at any time hereafter.

251. Without in any way derogating from the above, NNUK makes the following contingent claims:

***Claims in respect of taxation and revenue***

*Tax*

252. All relevant decisions in relation to taxation for NNUK was taken and/or directed by NNL.

253. As previously stated above, NNL was a *de facto* director of NNUK.

254. In any event, NNL acted *as a de facto* director in relation to NNUK's decisions in relation to NNUK's taxation affairs (alternatively a shadow director owing fiduciary obligations in that regard);

255. As a consequence NNL owed fiduciary duties to NNUK as set out in section D.3 and a duty of skill and care.

256. To the extent that any tax authority makes a claim against NNUK in relation to a failure to pay the proper level of taxation in any years (whether because of an under recording of revenue or otherwise), then:

256.1. NNUK claims all penalties, interest and other loss payable by NNUK as a loss naturally flowing from the claims (or some of them) referred to in this Proof of Claim.

256.2. Further or alternatively:

256.2.1. NNL breached its fiduciary duties and its duty of skill and care in not ensuring that NNUK paid the appropriate level of taxation and/or declared the appropriate level of income for tax purposes; and/or

256.2.2. NNL's conduct effected a result that unfairly disregarded the interests of NNUK and its creditors contrary to section 241 of the *Canada Business Corporations Act*.

256.3. Those breaches of duty and/or that oppressive conduct resulted in loss and damage amounting at least to the amount of any such penalties, interest and other loss payable by NNUK.

257. On the basis of the above, NNUK is entitled to the following relief:

257.1. equitable compensation or damages as a consequence; and

257.2. interest on all amounts due, including compound interest.

*`Revenue*

258. To the extent that any entity makes a claim against NNUK on the basis of the over or under recording of its revenue (whether because of section I or otherwise) then:

258.1. NNUK claims all penalties, interest and other loss payable by NNUK as a loss naturally flowing from the claims (or some of them) referred to in this Proof of Claim.

258.2. Further or alternatively:

258.2.1. NNL owed fiduciary duties to NNUK as a *de facto* director in relation to NNUK's decisions in relation to its revenue recording (alternatively as a shadow director owing fiduciary obligations in that regard). NNL also owed a duty of skill and care;

258.2.2. NNL breached its fiduciary duties and its duty of skill and care in not ensuring that NNUK was paid and recorded the revenue to which it was entitled; and/or

258.2.3. NNL's conduct effected a result that unfairly disregarded the interests of NNUK and its creditors contrary to section 241 of the *Canada Business Corporations Act.*

258.2.4. Those breaches of duty and/or that oppressive conduct resulted in loss and damage amounting at least to the amount of any such penalties, interest and other loss payable by NNUK.

259. On the basis of the above, NNUK is entitled to the following relief:

259.1. equitable compensation and/or damages as a consequence;

259.2. interest on all amounts due, including compound interest.

## L.    RESERVATION OF RIGHTS

### L.1.    Reservation regarding jurisdiction, applicable law and forum

260.    In so far as liability or quantum in respect of any claim identified in this Proof of Claim is disputed, neither the filing of this Proof of Claim nor anything in its content is to be taken as acceptance that the Canadian Court is the appropriate forum for litigating such dispute or that it has jurisdiction (or should exercise any jurisdiction) to determine the merits of the same. In the event that such a dispute arises, NNUK reserves the right to contend in respect of any of its claim that the appropriate forum for litigating such dispute is a different or foreign forum (and in particular the Courts of England and Wales). Without prejudice to the generality of the foregoing:

260.1.    NNUK reserves its right to contend that the Courts of England and Wales are the relevant jurisdiction and most appropriate forum for determining any dispute in respect of the claims in this Proof of Claim in respect of which the applicable law is English law (although NNUK refers to paragraph 260.2 below).

260.2.    For the avoidance of doubt, all claims and disputes with regard to the allocation of the "Lockbox" are to be determined in accordance with the dispute resolution mechanisms to be set up pursuant to the Interim Funding Settlement Agreement dated 9 June 2009 (the "IFSA Allocation Process").

260.3.    NNUK refers to paragraphs 7 to 11 above and 264 to 269 below in respect of its proprietary claims. NNUK also notes that the amounts recoverable pursuant to this Proof of Claim are dependent upon the outcome of the IFSA Allocation Process.

260.4.    If and to the extent that the Proof of Claims process is relevant at all to any of the claims referred to in the above paragraphs which fall to be dealt with pursuant to the IFSA Allocation Process or the Courts of England and Wales, NNUK will contend (and/or reserves the right to contend) that at the very least such process should be stayed in respect of such claims pending resolution of the substantive dispute in the appropriate forum.

261.    In so far as this Proof of Claim refers to any/or includes claims which may be brought by any office-holder of NNUK pursuant to any applicable law:

261.1.    Such reference and/or inclusion is not to be taken as acceptance that such claim is or has been a claim subject to the bar date.

261.2.    Such claim is to be read together with any Proof of Claim (or other process) submitted or commenced by any appropriate office-holder (as to which NNUK accepts that there should be no double-counting).

262.    In so far as this Proof of Claim identifies a foreign law as being applicable to the claim, NNUK's primary case is that this is the law that should be applied. However:

262.1.    In so far as the Proof of Claim is silent as to applicable law, this is not to be taken as acceptance that Canadian law is, or is necessarily, the applicable law, and NNUK reserves the right further to identify appropriate foreign law as being the law applicable to its claims.

262.2.    NNUK reserves the right to alter the law (or jurisdiction or forum) identified as being appropriate for its claims.

262.3.    For the avoidance of doubt, in so far as (by way of primary case) a proper law, forum or jurisdiction is identified other than that of Canada, NNUK reserves the right to abandon that primary case with the result that (absent the identification of some other law, forum or jurisdiction) Canadian law, jurisdiction and forum is to be treated as being applicable, and to that end all such claims in this Proof of Claim are to be treated as including a claim in the alternative based on Canadian law (and where the Courts of Canada are the appropriate forum or jurisdiction).

**L.2.    Reservation in respect of claims from NNL and alleged set-off**

263.    Nothing in this Proof of Claim is to be taken as acceptance that any claim from NNL against NNUK exists, is valid or is eligible for set off against any of NNUK's claims. Further nothing in this Proof of Claim is to be taken as acceptance that the appropriate forum or proper jurisdiction for considering any claim by NNL against NNUK is the Courts of Canada (or the proof of claims process in Canada), whether

in the context of an allegation that such claim has been or should be the subject of a set off against any claim by NNUK or otherwise.

**L.3.    Reservation in respect of proprietary claims**

264.    Any reference to NNUK's proprietary claims in this document are to be read subject (and without prejudice) to the primary contention set out in paragraph 260 above.

265.    Any reference herein to NNUK's proprietary claims is not to be read as an acceptance that those claims are required to be filed by the bar date (indeed the inclusion of any claim in this Proof of Claim is not to be taken as acceptance that such claim is or has been a claim that was, or was necessarily, required, to have been filed ahead of the bar date of 18 March 2010), or that (in the event of dispute) the appropriate forum for the resolution of any of those claims (which are not unsecured creditor claims) is the Proof of Claim process in Canada.

266.    NNUK's proprietary claims constitute claims and rights which fall outside the EMEA Claims Process, being claims in respect of property which NNL does not own.

267.    As such, NNUK's proprietary claims are included in this Proof of Claim without prejudice to NNUK's rights to claim this property in other proceedings or processes and to asserts its rights to seize this property without reference to the EMEA Claims Process.

268.    For the avoidance of doubt all references herein to NNUK's proprietary claims are to be read as including a personal claim over against NNL (both for the amount of the claims and for interest thereon) to the extent that those proprietary claims are not fully satisfied out of the assets to which they attach.

269.    NNUK repeats its contention at paragraph 260.2 above that the resolution of its proprietary claims should be dealt with in the IFSA Allocation Process (at least in the first instance, and/or in so far as those proprietary claims relate to assets in the Lockbox) and that to the extent that any dispute resolution process (including any part of the Proof of Claim process) should properly be dealing with any part of those proprietary claims (and in particular proprietary claims to assets falling outside the

Lockbox), such process should be deferred until after the IFSA Allocation Process has taken place.

**L.4. Reservation in respect of claims against other parties**

270. For the avoidance of doubt, all claims and allegations made against NNL made in this Proof of Claim are made without prejudice to all claims and allegations that NNUK has made or may make in this Proof of Claims process or otherwise against any other person (including NNC, NNI, and any present or former officer of NNUK, NNI, or any other natural or corporate person whomsoever).

205

206

**CANADIAN CCAA Proof of Claim** **re Nortel Networks Corporation and others**

**1 Name of Debtor (the "Debtor")**
Debtor: Nortel Networks Corporation

**2 Original Creditor Identification (the "Creditor")**

| Legal Name of Creditor | | | Name of Contact |
|---|---|---|---|
| Nortel Networks UK Limited | | | |
| Address<br>C/O The Joint Administrators<br>Ernst & Young LLP<br>1 More London Place | | | Phone #<br><br>Fax # |
| City<br>London | Prov / State | Postal/Zip code<br>SE1 2AF | e-mail |

**3 Assignee, if claim has been assigned**

| Full Legal Name of Assignee | | | Name of Contact |
|---|---|---|---|
| Address | | | Phone #<br><br>Fax # |
| City | Prov / State | Postal/Zip code | e-mail |

**4 Amount of Claim**

The Debtor / Officer(s) / Director(s) was/were and still is/are indebted to the Creditor as follows:

| *Claims will be recorded as "Unsecured" unless the "Secured" box is checked* | | | *(Check only if applicable)* | | If you are making a claim against an Officer or Director check the box below, and list the Officer(s) and Director(s) against whom you assert your claim | |
|---|---|---|---|---|---|---|
| Currency | Original Currency Amount | Secured | S. 136 Priority | Restructuring | | |
| | | ☐ | ☐ | ☐ | ☐ | See attached Particulars of Claim |
| | | ☐ | ☐ | ☐ | ☐ | |
| | | ☐ | ☐ | ☐ | ☐ | |
| | | ☐ | ☐ | ☐ | ☐ | |
| | | ☐ | ☐ | ☐ | ☐ | |
| | | ☐ | ☐ | ☐ | ☐ | |

**5 Documentation**

Provide all particulars of the Claim and supporting documentation, including amount, description of transaction(s) or agreement(s) giving rise to the Claim, name of any guarantor which has guaranteed the Claim, and amount of invoices, particulars of all credits, discounts, etc. claimed, description of the security, if any, granted by the affected Debtor to the Creditor and estimated value of such security, particulars of any restructuring claim.

**6 Certification**

I hereby certify that:

- I am the Creditor, or authorized Representative of the Creditor.
- I have knowledge of all the circumstances connected with this Claim.
- The Creditor asserts this claim against the Debtor; and the Officer(s) and Director(s) as indicated above.
- Complete documentation in support of this claim is attached.

| Signature | Name C.J.W. HILL<br>Title JOINT ADMINISTRATOR |
|---|---|
| Dated at 18/3/11 | Signed at LONDON |

This space reserved for use by the Monitor

**7 Filing of Claim**

**This Proof of Claim must be received by the Monitor by no later than 4:00 p.m. (prevailing Eastern Time) on <u>SEPTEMBER 30, 2009</u>, by prepaid ordinary mail, courier, personal delivery or electronic or digital transmission at the following address:**

Ernst & Young Inc.
222 Bay St., P.O. Box 251
Toronto-Dominion Centre
Toronto, ON M5K 1J7
CANADA
Attention: Nortel Claims

Fax: 416-943-2808
Tel: 1-866-942-7177 or 416-943-4439
e-mail: nortel.monitor@ca.ey.com

An electronically fillable version of this form is available at www.ey.com/ca/nortel

**Proof of Claim by Nortel Networks (UK) Limited against Nortel Networks Corporation:**

**Particulars of the Claim under section 5 of the Proof of Claim**

1. This document provides particulars of the Claim by Nortel Networks (UK) Limited ("NNUK") against Nortel Networks Corporation ("NNC") as required by section 5 of the Proof of Claim to which this document is attached.

2. This document, together with the Proof of Claim form to which it is attached, is referred to herein as "the Proof of Claim".

3. The Claims and the quantum of the same set out in this Proof of Claim represent the best current assessments on the part of NNUK and its office-holders. NNUK reserves the right to add to and/or modify the Claims, the nature of the claims, the facts relied on in support of those claims, and their quantum, including as a result of documentary and other information obtained from NNC (or elsewhere) and/or in the light of expert evidence produced in connection with the claims.

4. NNUK refers to, relies on, and hereby incorporates and adopts, the contents of the Proof of Claim filed by NNUK against NNL ("the NNL Proof") including the claims identified in the NNL Proof together with the relief (and quantum of the same) to which NNUK is entitled.

5. In the NNL Proof, NNUK advances a number of claims against NNL on the basis of breach of fiduciary duty by NNL in its capacity as de facto, alternatively shadow, director of NNUK, together with related claims deriving from NNL's involvement in NNUK's decisions to enter the relevant transactions, in particular claims for:

   (a) Unjust enrichment;

   (b) Oppression;

   (c) Conspiracy; and

   (d) Contingent claims to a contribution, and claims in respect of taxation, recording of revenue and any FSD liability.

6.      NNUK advances the same claims against NNC, for the same relief, on the basis that NNC itself owed fiduciary duties to NNUK as a de facto, alternatively, shadow director of NNUK and that NNC was closely involved in and took responsibility for the management of NNUK's affairs.  In this context NNUK will rely, amongst other things, on the fact that NNC shared the same directing mind and will as NNL and that there was a co-identity in the decision-making individuals and processes at both entities.  NNUK contends that in all the circumstances the conduct of NNL as de facto or shadow director of NNUK (and its conduct more generally in respect of the management of and influence on the affairs of NNUK) can be taken to be the conduct of NNC as de facto or shadow director (or otherwise in respect of the management of and influence on the affairs) of NNUK.  NNUK accordingly refers to the matters relied in support of the above allegations against NNL as being also attributable to, or relevant to liability on the part of, NNC.

7.      Further, to the extent that NNC received (whether directly or indirectly) any of the benefits transferred from NNUK by reason of the matters set out in the NNL Proof referred to above, NNC is liable for unconscionable receipt in respect of the same, having the same knowledge as NNL. NNC was aware of the breaches of fiduciary duty, and received any such benefits with such knowledge, such that any such benefits (and/or the identifiable or traceable substitutes of such receipts) were received and are held on constructive trust for and on behalf of NNUK, and NNC is obliged to account for such sums to NNUK.

8.      NNUK further asserts against NNC its claims to the Lockbox as referred to in the NNL Proof mutatis mutandis.

9.      **This Proof of Claim and the Claims set out within it are submitted strictly subject to the various reservations of rights set out in the NNL Proof as if all references to NNL are to be taken to be references to NNC, mutatis mutandis, including but not limited to reservations in respect of applicable law, jurisdiction and forum.**

# TAB D

This is Exhibit.......D.......referred to in the

affidavit of.......ANNA VENTRESCA.

sworn before me, this.......7TH.......

day of.......OCTOBER.......20.11.

.......................................................

A COMMISSIONER FOR TAKING AFFIDAVITS

**NORTEL NETWORKS CORPORATION**

- and -

**THE HONOURABLE JOHN D. GROUND Q.C.**

---

**TRUST INDENTURE**

As of January 13, 2009

---

**TABLE OF CONTENTS**

**Page**

ARTICLE 1
INTERPRETATION 2
1.1 Definitions 2
1.2 Headings, etc 4
1.3 Articles; Sections; etc 4
1.4 Gender; Singular/Plural 4
1.5 Certain Phrases, etc 5
1.6 Directors and Officers of Subsidiaries 5
1.7 Business Day 5

ARTICLE 2
THE TRUST 5
2.1 Creation of Trust 5
2.2 Irrevocable 6
2.3 Name 6
2.4 Objects 6
2.5 Beneficiaries 6
2.6 No Right to Corpus of the Trust 6
2.7 D&O Qualifying Claims 6
2.8 Qualified Investments 7
2.9 Residence 7

ARTICLE 3
PAYMENT OF CLAIMS 7
3.1 Reserve for Trustee Fees and Expenses 7
3.2 Receipt and Analysis of Claims 7
3.3 Funding of Dispute 8
3.4 Payment of Claims 9
3.5 Settlement 9
3.6 No Liability for Insufficient Funds 10
3.7 Additional Deposits 10
3.8 Directions 10
3.9 Method of Disbursement and Delivery 10

ARTICLE 4
THE TRUSTEE 11
4.1 Fees and Expenses 11
4.2 Termination and Replacement 11
4.3 Additional or Replacement Trustees 12
4.4 Majority Decisions 13
4.5 Accounting 13
4.6 Liability of Trustee 13
4.7 Acceptance of Trusts 14

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| 4.8 | Indemnification | 14 |
| 4.9 | Financial Matters | 14 |
| 4.10 | Accumulation of Income | 14 |
| 4.11 | Professional Advisors | 15 |
| 4.12 | Application to Court | 15 |
| 4.13 | Certificate of Incumbency | 15 |
| 4.14 | Incidental Rights; Actions; Defences; etc | 15 |
| ARTICLE 5 RESTRICTIONS ON INDEMNITY | | 16 |
| 5.1 | Notice of Claims | 16 |
| ARTICLE 6 AMENDMENT | | 16 |
| 6.1 | Amendment Restrictions | 16 |
| ARTICLE 7 TERMINATION | | 17 |
| 7.1 | Termination Date | 17 |
| 7.2 | Consequence of Termination | 17 |
| 7.3 | Survival | 17 |
| ARTICLE 8 OTHER MATTERS | | 17 |
| 8.1 | Governing Law | 17 |
| 8.2 | Assignment | 18 |
| 8.3 | No Waiver, etc | 18 |
| 8.4 | Entire Agreement | 18 |
| 8.5 | Severability | 18 |
| 8.6 | Time of the Essence | 18 |
| 8.7 | Further Assurances | 18 |
| 8.8 | Counterpart Execution | 19 |
| 8.9 | Notice | 19 |

# TRUST INDENTURE

**THIS INDENTURE** made as of the 13th day of January, 2009.

**BETWEEN:**

**NORTEL NETWORKS CORPORATION**

- and-

**THE HONOURABLE JOHN D. GROUND Q.C.**

**WHEREAS:**

A. The Corporation and its subsidiaries constitute a complex enterprise, employing many thousands of employees throughout Canada and elsewhere, and providing a full range of products and services on which large numbers of people rely;

B. The magnitude and complexity of the Corporation's enterprise require that the Directors and Officers be committed to the performance of their duties without undue or inappropriate distractions;

C. Under Laws in the various jurisdictions in which the Corporation and its subsidiaries operate, the Directors and Officers may become personally liable for Liability Claims;

D. The Corporation maintains D&O Insurance that would be available, to the extent of the coverage and subject to the terms and exclusions thereof, to defend and indemnify Directors and Officers with respect to certain Liability Claims;

E. Concerns with respect to potential Liability Claims against the Directors and Officers may detract from their performance and contribution to the Corporation or lead to their resignations, which would disrupt the business and operations of the Corporation and would not be in the best interest of the Corporation;

F. The Corporation has determined that protection is required for the Directors and Officers in addition to that provided by the D&O Insurance; and

G. The Corporation has paid to the Trustee the sum of C$11,941,440 to establish a trust fund for the payment of Liability Claims to the extent such Liability Claims are not paid or satisfied out of D&O Insurance and the Corporation is unable to do so and for the payment of Maintenance Claims to the extent that the Corporation is unable to do so, in each case to the extent that the Trustee in its discretion determines to do so.

**NOW THEREFORE** in consideration of the foregoing and the mutual agreements contained herein (the receipt and adequacy of which are acknowledged), it is agreed and declared as follows:

## ARTICLE 1
## INTERPRETATION

### 1.1 Definitions

Where used in this Indenture, including in the recitals, the following terms shall have the following meanings:

**"Beneficiaries"** has the meaning ascribed thereto in Section 2.5;

**"Business Day"** means any day, other than Saturday, Sunday, on which Royal Bank of Canada in Toronto, Ontario is open for commercial banking business during normal banking hours;

**"C$"** means the lawful currency of Canada;

**"Costs"** includes all judgments, debts, liabilities, expenses, costs, damages, injuries, or losses (contingent or otherwise, whether liquidated or unliquidated, matured or unmatured, disputed or undisputed), professional fees, including fees and disbursements of legal counsel on a full indemnity basis, and all costs incurred in investigating or pursuing any Proceeding including all out-of-pocket expenses for attending discoveries, trials, hearings and meetings;

**"Corporation"** means Nortel Networks Corporation, a corporation governed by the laws of Canada, its successors (including successors by amalgamation) and permitted assigns;

**"D&O Insurance"** means the policy or policies of insurance maintained by the Corporation with respect to Director and Officer liabilities;

**"D&O Qualifying Claim"** is a Liability Claim that qualifies for coverage under the D&O Insurance whether or not the amount of the coverage available under the D&O Insurance is adequate to defend the Directors and Officers against, and to pay, the particular Liability Claim;

**"Derivative Proceeding"** has the meaning ascribed thereto in Section 3.3;

**"Directors"** means the individuals who:

(a) are on the date hereof directors of the Corporation or who on the date hereof serve at the Corporation's request as directors, or in a similar capacity, of another Person; and

(b) after the date hereof and at any time on or before the Termination Date are directors of the Corporation or who after the date hereof and at any time on or before the Termination Date serve at the Corporation's request as directors, or in a similar capacity, of another Person,

whether or not they shall at any time after the date hereof cease to be directors of the Corporation or cease to serve as directors, or in a similar capacity, of such other Person;

"**Governmental Authority**" means governments, regulatory authorities, governmental departments, agencies, commissions, bureaus, officials, ministers, Crown corporations, courts, bodies, boards, tribunals, or dispute settlement panels or other law, rule or regulation-making organizations or entities:

(a) having or purporting to have jurisdiction on behalf of any nation, province, territory, state or other geographic or political subdivision of any of them; or

(b) exercising or entitled or purporting to exercise any administrative, executive, judicial, legislative, policy, regulatory or taxing authority or power;

"**Indenture**" means this Trust Indenture, as amended or supplemented from time to time pursuant to the terms hereof;

"**Laws**" means applicable laws (including common law and civil law), statutes, by-laws, rules, regulations, Orders, ordinances, protocols, codes, guidelines, treaties, policies, notices, directions, decrees, judgments, awards or requirements, in each case of any Governmental Authority;

"**Liability Claim**" means any claim which may be asserted against any Director or Officer or for which the Directors or Officers, or any of them, are or may become personally liable arising from their status as Directors or Officers, (including any claim arising from or in respect of: (i) wages and benefits; (ii) termination and severance pay; (iii) vacation pay; (iv) amounts required to be withheld, deducted at source or remitted to any public authority or under any Laws; and (v) environmental matters), together with all legal expenses incurred in asserting that such a claim is covered by the D&O Insurance; provided that Liability Claim shall not include any claim or part thereof in respect of which, and solely to the extent that, the Corporation is prohibited by Law from providing indemnification to Directors or Officers, as applicable;

"**Maintenance Claim**" has the meaning ascribed thereto in Section 3.2;

"**Officers**" means the individuals who:

(a) are on the date hereof officers of the Corporation or who on the date hereof serve at the Corporation's request as officers, or in a similar capacity, of another Person; and

(b) after the date hereof and at any time on or before the Termination Date are officers of the Corporation or who after the date hereof and at any time on or before the Termination Date serve at the Corporation's request as officers, or in a similar capacity, of another Person,

whether or not they shall at any time after the date hereof cease to be officers of the Corporation or cease to serve as officers, or in a similar capacity, of such other Person;

"**Orders**" means orders, injunctions, judgments, administrative complaints, decrees, rulings, awards, assessments, directions, instructions, settlements, penalties or sanctions issued, filed or imposed by any Governmental Authority or arbitrator and includes remedial orders;

**"Person"** includes any individual, partnership, limited partnership, joint venture, syndicate, sole proprietorship, company or corporation with or without share capital, unincorporated association, trust, trustee, executor, administrator or other legal personal representative, Governmental Authority or organization or entity however designated or constituted;

**"Proceeding"** means any claim, action, suit, application, litigation, charge, complaint, prosecution, assessment, reassessment, inquiry, hearing or proceeding of any nature or kind whatsoever, whether civil, criminal, administrative or otherwise;

**"Qualified Investments"** means short-term bank instruments issued by a Schedule I or Schedule II Canadian chartered bank, or a banking institution in the United States of America that, in the opinion of the Trustee, has credit ratings equivalent to a Schedule I or Schedule II Canadian chartered bank, with a term to maturity of less than ninety (90) days; and treasury bills issued by the Government of Canada or the Government of the United States of America;

**"Termination Date"** has the meaning ascribed thereto in Section 7.1;

**"Trust"** means the trust created pursuant to this Indenture;

**"Trustee"** at any time means the Persons serving as trustees hereunder at such time and at the date hereof means The Honourable John D. Ground Q.C.;

**"Trustee Expenses"** has the meaning ascribed thereto in Section 4.1;

**"Trustee Fees"** has the meaning ascribed thereto in Section 4.1;

**"Trust Property"** means the sum of C$11,941,440 paid by the Corporation to the Trustee and any further deposits or amounts received by the Trustee to be held under the terms of this Trust Indenture together with interest and other revenues generated thereby and any property into which all the foregoing may be converted less amounts which have been paid or distributed pursuant to the terms of this Indenture;

**"US$"** means the lawful currency of the United States of America;

### 1.2 Headings, etc.

The provision of a table of contents, the division of this Indenture into articles and sections and the insertion of headings are for convenient reference only and are not to affect the interpretation of this Indenture.

### 1.3 Articles; Sections; etc.

Reference to articles, sections or other parts of this Indenture are to the specified article, section or part.

### 1.4 Gender; Singular/Plural

References to gender include all genders and, except where the context otherwise requires, the singular includes the plural and vice versa.

**1.5 Certain Phrases, etc.**

In this Indenture (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding", and (iii) the words "hereafter", "hereby", "herein", "hereof", "hereunder" and "herewith" refer to the entire Indenture, not just a particular article or section.

**1.6 Directors and Officers of Subsidiaries**

Any individual who is a director or officer of a subsidiary of the Corporation shall be deemed for the purposes of this Indenture to be serving as such at the Corporation's request unless the directors of the Corporation deliver to the Trustee a certified copy of a resolution of the directors confirming that such individual is not serving at the Corporation's request. For the purposes of this Indenture, a Person shall be deemed to be a subsidiary of the Corporation if, but only if,

(a) it is controlled by;

(i) the Corporation, or

(ii) the Corporation and one or more Persons each of which is controlled by the Corporation; or

(iii) two or more Persons each of which is controlled by the Corporation; or

(b) it is a subsidiary of a Person that is a subsidiary of the Corporation,

and for the purposes of this section "control" and any derivation thereof means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities or otherwise.

**1.7 Business Day**

Any action or payment required or permitted to be taken or made hereunder on a day which is not a Business Day may be taken or made on the next succeeding Business Day.

**ARTICLE 2**
**THE TRUST**

**2.1 Creation of Trust**

The Corporation hereby settles and deposits C$11,941,440 with the Trustee on the trusts provided for in this Indenture. The Trustee accepts and agrees to hold such amount together with any other amounts or property that may from time to time constitute Trust Property upon the trusts provided for in, and subject to and in accordance with the terms of, this Indenture. The Trustee agrees to distribute and deal with the Trust Property, and at all times agrees to keep the Trust Property segregated from the property and assets of the Trustee, the Corporation and any

other trust in which the Trustee may serve as a trustee, and in one or more segregated accounts, on the terms and subject to the conditions hereof.

**2.2 Irrevocable**

The Trust is intended and is hereby declared to be irrevocable. The Trust Property shall be held and applied solely for the objects of the Trust and, prior to the Termination Date and except as otherwise herein provided, the Trust Property shall not revert to or be applied for the benefit of the Corporation but shall be applied for the exclusive benefit of the Beneficiaries in accordance with the terms hereof.

**2.3 Name**

The name of the Trust shall be the "Nortel Directors' and Officers' Trust". Wherever lawful and convenient, the affairs of the Trust shall be conducted under such name, or any other name the Trustee deems appropriate.

**2.4 Objects**

The objects of the Trust are to provide financial support for:

(a) the defence of the Directors and Officers against Liability Claims and for the payment and satisfaction of Liability Claims, to the extent that the D&O Insurance, for any reason, does not do so and the Corporation is unable to do so; and

(b) the maintenance of the D&O Insurance, including its renewal or reinstatement, through the payment of premiums or other payments or necessary costs, to the extent that the Corporation is unable to do so.

**2.5 Beneficiaries**

Prior to the Termination Date, the beneficiaries of the Trust Property (collectively, the "**Beneficiaries**") are the Directors and Officers. On the Termination Date, the Corporation is the residuary beneficiary of the Trust Property.

**2.6 No Right to Corpus of the Trust**

Other than expressly provided, no Person shall have any right to the corpus of the Trust.

**2.7 D&O Qualifying Claims**

This Indenture and the Trust do not constitute insurance. Except as hereinafter expressly provided in this Section 2.7 and in Section 3.3, the Trust Property shall not be available to provide financial support for the defence of Liability Claims which are D&O Qualifying Claims or to pay Liability Claims which are D&O Qualifying Claims. Notwithstanding the foregoing, the Trust Property shall be available to provide financial support for defending Directors and Officers in any Proceeding with respect to a D&O Qualifying Claim and to pay a D&O Qualifying Claim (or a portion thereof) that the Trustee in his discretion is satisfied will not be

defended or paid by the D&O Insurance because coverage is inadequate, is disputed or is for some other reason unavailable in a timely fashion. Furthermore, the Trustee may determine in his discretion to make a payment in respect of a D&O Qualifying Claim and be subrogated to the relevant Director or Officer claim under the D&O Insurance if it appears, in the discretion of the Trustee, that the D&O Qualifying Claim is being disputed or delayed in settlement or recognition by the insurer or insurers.

**2.8    Qualified Investments**

Pending disbursement of the Trust Property, the Trustee shall hold, invest and reinvest the Trust Property in Qualified Investments denominated in C$ or US$ in such manner as may be directed by the Corporation and failing direction in Qualified Investments as the Trustee in his discretion determines to be appropriate. All Qualified Investments shall be held in trust by the Trustee subject to and in accordance with the terms hereof and, where any amounts are held in an interest-bearing bank or trust account, the trust nature of such account shall be clearly identified.

**2.9    Residence**

The residence of the Trust is the Province of Ontario.

**ARTICLE 3**
**PAYMENT OF CLAIMS**

**3.1    Reserve for Trustee Fees and Expenses**

The Trustee may reserve from the Trust Property, prior to paying any Liability Claims, amounts sufficient to fully pay and satisfy all Trustee Fees and the Trustee Expenses and other payments to be met from the Trust Property under this Indenture and is authorized to pay all Trustee Fees and Trustee Expenses from the Trust Property in accordance with the terms of this Indenture.

**3.2    Receipt and Analysis of Claims**

The Trustee may receive a claim or potential claim for payment or indemnity out of the Trust Property of a Liability Claim or a request for the payment of premiums or other payments or necessary costs under or for the maintenance, renewal or reinstatement of the D&O Insurance (a "Maintenance Claim") from the Corporation or any Beneficiary. The Trustee may require, in support of any such claim or request, any supporting information the Trustee considers relevant including the following information:

    (a)    the amount of the claim or potential claim, the circumstances in which it arose and the status of any Proceedings with respect to the subject matter of the claim;

    (b)    where the claim or potential claim is based on facts that might be the subject of dispute, such information as is reasonably available concerning the relevant facts and analyses thereof;

    (c)    the availability of any defence to the claim, or any procedure whereby damages may be mitigated, or any right of set-off, or any other matter that could reduce the quantum of the claim;

(d)     information relevant to a determination as to whether the particular claim or potential claim:

    (i)     constitutes, in whole or in part, a Liability Claim; or

    (ii)    if it constitutes, in whole or in part, a Liability Claim, whether it also constitutes a D&O Qualifying Claim;

(e)     any attempts that have been made to satisfy the claim from the D&O Insurance; and

(f)     information with respect to the D&O Insurance including as to the ability of the Corporation to pay or reimburse the Trust for any premiums, other payments or necessary costs should the Trustee determine to pay the same.

The Trustee is authorized to obtain from such advisors as he in his discretion may require in accordance with Section 4.11 such additional advice and analysis as the Trustee considers to be desirable in making a determination as to any of the matters set out above. Receipt by the Trustee of information as to a claim or potential claim or a request in accordance with this Section in no way commits the Trustee to pay or satisfy the claim or potential claim or to make any requested payment with respect to the D&O Insurance. Where the Trustee concludes that a particular claim or potential claim is only partially a Liability Claim or partially a D&O Qualifying Claim, then the Trustee in his discretion may treat the particular claim or potential claim as two or more separate claims only one of which is a Liability Claim eligible for payment. Nothing herein contained shall obligate the Trustee to maintain the D&O Insurance or to obtain a policy or policies of insurance with respect to Director and Officer liabilities should the D&O Insurance maintained by the Corporation be cancelled or not renewed.

**3.3     Funding of Dispute**

(a)     Where a Liability Claim is disputed as to:

    (i)     whether the Corporation or a Beneficiary is liable in whole or in part therefor; or

    (ii)    whether it is a D&O Qualifying Claim,

then the Trustee in his discretion may provide financial support from the Trust Property to any Beneficiary for legal fees and any other expenses necessary for such Beneficiary in connection with the dispute.

(b)     Notwithstanding any other provision hereof but subject to Section 3.3(c), the Trustee, to the extent that the D&O Insurance does not do so, shall advance financial support from the Trust Property with respect to the Costs of a Proceeding that is made or asserted against or affecting any Beneficiary or in which a Beneficiary is required by Law to participate or in which a Beneficiary participates at the request of the Corporation or in which the Beneficiary chooses to participate (based on the reasonable belief of the Beneficiary that he may be

subsequently named in the Proceeding or in any Proceeding related to it) if the Proceeding relates to, arises from or is based on the Beneficiary's service as a Director or Officer, in any case whether or not the Beneficiary has been named, prior to the resolution of the merits of such Proceeding provided that the Beneficiary has agreed that if a court or tribunal of competent jurisdiction in a final judgment that has become non-appealable determines that the Corporation is prohibited by Law from providing indemnification with respect to such claim, the Beneficiary shall repay such advances to the Trust.

(c)   In the case of a Proceeding by or on behalf of the Corporation or other entity in which a Beneficiary acted as a Director or Officer to procure a judgment in favour of the Corporation or other entity (a "Derivative Proceeding") to which a Beneficiary is made a party and in respect of which the approval of the court is required before the Trustee may provide financial support to the Beneficiary, the Trustee shall, subject to there being sufficient Trust Property to enable it to do so, apply for court approval to provide such financial support to such Beneficiary with respect to the defence of such Derivative Proceeding and with respect to any Liability Claim ensuing therefrom, to the extent that the D&O Insurance does not do so.

**3.4   Payment of Claims**

(a)   Subject to Section 2.7, prior to the Termination Date (or thereafter, in the case of outstanding commitments to pay Liability Claims), the Trustee in his discretion may pay any Liability Claim or any Maintenance Claim out of the Trust Property to any third Person in payment or satisfaction of such Liability Claim or a Maintenance Claim and/or directly to the relevant Beneficiary or Beneficiaries or, if applicable, to his or her personal representative, or to the Corporation to apply in payment or satisfaction of Liability Claims or Maintenance Claims.

(b)   Notwithstanding the foregoing, the Trustee may delay payment of a Liability Claim or a Maintenance Claim for a period as the Trustee in his discretion determines appropriate from the date which such claim was commenced by a claimant or submitted by a Beneficiary, pending a determination:

(i)   of a dispute or disputes, either as to a matter referred to in Section 3.3, or as to some other matter; or

(ii)   of the adequacy of the resources of the Trust Property to pay claims.

(c)   Nothing in this Indenture shall require the Trustee to make any payment if he believes in his discretion it may result in a claim against the Trustee personally.

**3.5   Settlement**

The Trustee has full discretion to negotiate the settlement of all Liability Claims, including through agreeing to a payment made out of the Trust Property with respect to a Liability Claim on the basis that a release of liability under the Liability Claim be given to the Directors and

Officers, the Corporation and/or any other Person with respect to whom the Directors or Officers serve as such at the Corporation's request. Such a settlement may comprise less than a full payment, all with the intention that the Trustee has the right to make use of the Trust Property to the maximum extent feasible towards the reduction or elimination of Liability Claims. The Trustee shall be entitled on behalf of the Trust to receive an assignment of any and all Liability Claims paid and/or to become subrogated for any such Liability Claims or Maintenance Claims as against the Corporation.

**3.6 No Liability for Insufficient Funds**

The Trustee shall not be liable to any Person (including any Beneficiary or the Corporation) in the event that the Trust Property is insufficient to pay in full or in part any Liability Claim or Maintenance Claim. Furthermore, the Trustee shall, in the event of any insufficiency of funds in the Trust Property, have no obligation to seek any further monies from the Corporation or any other Person.

**3.7 Additional Deposits**

The Trustee may request, but not require, the Corporation or any other Person to deposit with the Trustee on the trusts provided for in this Indenture any amounts and may enter into agreements with the Corporation or any other Person under which the Corporation or such other Person agrees to do so. For greater certainty, in the event the Trustee seeks further deposits hereunder from the Corporation or any other Person or enters into an agreement with the Corporation or another Person providing for the deposit of additional amounts with the Trustee on the trusts provided for in this Indenture, the Trustee shall have no liability for any failure of the Corporation or such other Person to deposit any additional amounts with the Trustee.

**3.8 Directions**

Subject to Section 4.13, the Trustee shall be protected in acting on any written direction of the Corporation as provided in this Indenture if signed by an individual purporting to be a Director or Officer of the Corporation without the Trustee having to confirm the correctness of such direction.

**3.9 Method of Disbursement and Delivery**

(a) All disbursements of money made under Section 3.4 or pursuant to this Indenture shall be made by cheque or bank draft drawn upon a Canadian Schedule I or II chartered bank made payable to the Persons entitled to disbursement and in the correct amount, and delivered, as determined by the Trustee in his discretion, to a third Person in payment or satisfaction of a Liability Claim or a Maintenance Claim or to a Beneficiary or to the Corporation to be applied by the Corporation in payment of a Liability Claim or a Maintenance Claim or in payment of any claim which if not paid by the Corporation would become a Liability Claim or a Maintenance Claim.

(b) The delivery of a cheque by the Trustee as required hereunder shall satisfy and discharge the liability for any amounts due to the extent of the sum or sums

represented thereby, unless such cheque is not honoured on presentation; provided that in the event of the non-receipt of such cheque by the payee, or the loss or destruction thereof, the Trustee, upon being furnished with reasonable evidence of such non-receipt, loss or destruction shall issue to such payee a replacement cheque for the amount of such cheque not received, lost or destroyed.

## ARTICLE 4
## THE TRUSTEE

### 4.1 Fees and Expenses

(a) Any Trustee who is a Beneficiary shall receive no fees for acting as Trustee but may be reimbursed for Trustee Expenses. Any other Person shall be entitled to fees for acting as Trustee in such amount as are agreed between the Corporation and such Trustee. Fees payable in accordance with this Section 4.1(a) are herein referred to as **"Trustee Fees"**.

(b) The Corporation shall reimburse the Trustee for all expenses (including taxes, except for any taxes payable with respect to any fees paid to the Trustee) and disbursements, including the cost and expense of any Proceeding of any character, including any Proceedings before any Governmental Authority, reasonably incurred in connection with his duties hereunder, but excluding expenses and disbursements paid, incurred or suffered by the Trustee in any Proceeding in which the Trustee is determined to have acted dishonestly, fraudulently or to have been guilty of wilful misconduct (such reimbursable expenses collectively, the **"Trustee Expenses"**).

(c) The Corporation shall pay the Trustee Fees and Trustee Expenses, provided however, if any are not paid by the Corporation within thirty (30) days from the date of the invoice thereof and are otherwise uncontested, the Trustee may satisfy such invoices from the Trust Property without seeking reimbursement from the Corporation.

### 4.2 Termination and Replacement

In the event that:

(a) any Trustee that is not an individual:

(i) resigns;

(ii) enters into liquidation, whether compulsory or voluntary (not being merely a voluntary liquidation for the purposes of amalgamation or reconstruction);

(iii) has a receiver or a receiver-manager appointed with respect to its affairs; or

(iv) becomes subject to any bankruptcy laws; or

225

(b) any Trustee, being an individual:

(i) dies;

(ii) refuses or becomes unable to act or to continue to act or becomes incapable of managing property. For the purposes of Section 4.2(b)(ii), a Trustee shall be deemed to be unable to act or to continue to act as a Trustee of the Trust if such Trustee is under a legal disability or if two (2) medical doctors licensed to practice in Canada notify the remaining or successor Trustee or Trustees of the Trust, then acting, that illness or physical or mental disability have rendered such a Trustee unable to give prompt and intelligent consideration to financial affairs;

(iii) resigns as a Trustee;

(iv) is declared bankrupt, insolvent, or mentally incompetent;

(v) ceases to be a resident of Canada within the meaning of the *Income Tax Act* (Canada); or

(vi) becomes a citizen of the United States of America or becomes a resident of the United States of America within the meaning of the Internal Revenue Code (U.S.);

such Trustee shall, immediately upon the happening of any such event other than a resignation, cease to be a Trustee hereof. A resignation by a Trustee shall be made by an instrument in writing and shall be effective from the date seven (7) days after the notice of such resignation has been delivered to the Corporation and the remaining Trustee or Trustees, as the case may be, if any. Each Trustee and former Trustee shall co-operate reasonably in effecting the transition to any additional or replacement Trustee.

**4.3 Additional or Replacement Trustees**

(a) The Trustee may at any time, by an instrument in writing, appoint an additional or replacement Trustee or Trustees hereunder.

(b) Where a Trustee's appointment is terminated pursuant to Section 4.2, the remaining Trustee or Trustees, as the case may be, or if there is no remaining Trustee, the Persons who are the existing Directors of the Corporation by a resolution signed by a simple majority of such Persons, or if there are no existing Directors of the Corporation, the Persons who were within twelve (12) months preceding the effective date of such termination Directors of the Corporation by a resolution signed by a simple majority of such Persons, or if such Persons fail to act, a court, may appoint some Person to replace such Trustee, if no replacement Trustee has been appointed previously pursuant to Section 4.3(a).

(c) Any Person appointed pursuant to Section 4.3 shall, upon acceptance of such appointment, be vested with the Trust Property and with all the trusts, powers,

authorities, duties and obligations herein contained, along with the continuing Trustee or Trustees, if any, without further assignment, transfer or conveyance of any kind or any order of any court or tribunal whatsoever as if such Person were an original party to this Indenture.

(d) All instruments in writing relating to the appointment of replacement or additional Trustees shall be attached to this Indenture and shall be sufficient evidence of the facts to which such instruments relate.

**4.4 Majority Decisions**

Where there are more than two (2) Trustees, all decisions in connection with the administration of the Trust may be made by a majority of the Trustees and shall be binding upon all Persons concerned.

**4.5 Accounting**

The Trustee shall maintain accurate books, records and accounts of the transactions effected or controlled by the Trustee hereunder and the receipt, investment, reinvestment and disbursement of the Trust Property, and shall provide to the Corporation records and written statements thereof periodically upon request.

**4.6 Liability of Trustee**

(a) The Trustee shall exercise the powers and discretions given to him in good faith in what he deems to be the best interests, whether monetary or otherwise, of the Beneficiaries, whether or not such exercise may have the effect of conferring an advantage on any one or more of the Beneficiaries at the expense of the other Beneficiaries or would otherwise, but for the foregoing, be considered as being other than an impartial exercise of his duties hereunder or as not being the maintenance of an even hand among the Beneficiaries, and all such exercise of his powers and discretions made in good faith shall be binding upon all the Beneficiaries and shall not be subject to any question by any Person whatsoever or whomsoever. In performing the trusts hereof and in exercising his powers hereunder the Trustee may act in his uncontrolled discretion and, provided the Trustee has acted honestly, he shall not be liable, answerable or accountable for any claims resulting from the exercise of a discretion or the refusal to exercise a discretion. The Trustee shall only be liable, answerable and accountable for his own dishonesty, fraud or wilful misconduct. The Trustee is liable, answerable and accountable only for money and securities for money actually received by such Trustee, even though the Trustee has signed a receipt or other instrument for the sake of conformity. A Trustee is not liable, answerable or accountable for the acts, receipts, negligence, defaults, dishonesty, fraud or wilful misconduct of any other Trustee, or of any other Person having custody of any part of the Trust Property and is not liable, answerable or accountable for any loss of money or security for money unless the same happens through the Trustee's own dishonesty, fraud or wilful misconduct. Honesty and good faith shall be presumed in favour of each Trustee unless such presumption is rebutted.

(b) Subject to his obligations hereunder to the Corporation and to the Beneficiaries with respect to the Trust Property, the Trustee shall have no personal liability to any other Person arising from commitments in this Indenture or contractual relationships arising out of his position as Trustee. The Trustee is authorized to require any such commitment or contractual relationship to include a provision confirming the foregoing sentence to the Trustee, the Beneficiaries or any other Person with respect to the performance of the responsibilities of the Trustee hereunder, except for damages that may be caused by the dishonesty, fraud or wilful misconduct of the Trustee.

**4.7 Acceptance of Trusts**

The Trustee hereby accepts the covenants, trusts and obligations in this Indenture declared and provided for and agrees to perform the same upon the terms and conditions herein set forth, and to hold and exercise the rights, privileges and benefits conferred upon the Trustee hereby in trust for the benefit of the Persons having an interest in the Trust Property.

**4.8 Indemnification**

Subject to Section 5.1, the Corporation shall indemnify and save harmless the Trustee (and its directors, officers and employees if the Trustee is a corporation) from and against all Costs arising in any manner out of or in connection with this Indenture and the Trust (including, without limitation, any investments made, retained or disposed of on the direction of the Corporation, Trustee Fees and Trustee Expenses) except to the extent that the same is attributable to the dishonesty, fraud or wilful misconduct of the Trustee. Subject to the foregoing, this entitlement to indemnification includes Costs incurred by the Trustee in enforcing his rights to indemnification hereunder. To the extent that the Trustee is not so indemnified by the Corporation, the Trustee shall be indemnified and saved harmless out of the Trust Property without being obligated to enforce his rights of indemnification hereunder against the Corporation.

**4.9 Financial Matters**

(a) The Trustee shall, to the extent required by Law, prepare and file tax returns or other applicable filings or reports in connection with the Trust Property and pay any taxes owing by the Trust from the Trust Property; and

(b) The Trustee shall for the purposes of the Indenture open, operate and maintain a bank account(s) at a Canadian Schedule I or II chartered bank and shall deposit all assets comprising the Trust Property with such bank and any cheques drawn upon such account(s) and all other instructions, as applicable, shall be signed by the Trustee or, if there shall be more than one Trustee, as determined by the Trustees.

**4.10 Accumulation of Income**

Any payments from the Trust Property made by the Trustee under the terms of this Indenture shall be made from the income or capital of the Trust Property as the Trustee considers advisable; any income not so paid in any year shall be added to and dealt with as part of the

228

capital of the Trust Property and any taxes payable on such income, to the extent not payable by the Corporation, shall be paid from the Trust Property.

**4.11 Professional Advisors**

The Trustee shall be entitled to take legal, accounting, tax or other advice and employ such assistance as in his judgement, acting reasonably, may be necessary for the proper discharge of his duties (including advice or assistance from any Person who provides advice or assistance to the Corporation) and, if acting in good faith, may rely upon the opinion, information or advice of any counsellor or any other independent expert or advisor retained by the Trustee and shall not be responsible for any loss resulting from any action or inaction taken in good faith in reliance upon such opinion, information or advice. Notwithstanding anything to the contrary herein, the reasonable payment for such legal, accounting, tax or other advice may be made from the Trust Property and paid directly to such third party advisor by the Trustee.

**4.12 Application to Court**

The Corporation or the Trustee may apply to a court at any time and from time to time for advice and direction in connection with any aspect of this Indenture and the administration of the Trust, and, in the case of the Trustee, the performance of any of its duties and responsibilities hereunder, including without limitation the appointment of a replacement trustee.

**4.13 Certificate of Incumbency**

The Corporation shall deliver to the Trustee a certificate of incumbency which certifies the incumbency and signatures of the Directors or Officers of the Corporation who have the authority to execute documents contemplated under this Indenture on behalf of the Corporation. The Trustee shall be entitled to rely on such certificate as to the matters certified therein and absent manifest irregularity in the manner of execution of any document deliverable under this Indenture, the Trustee shall have no obligation to verify the authenticity of any signatures on any document.

**4.14 Incidental Rights; Actions; Defences; etc.**

In addition to all other powers conferred upon it by the other provisions hereof or by any Law, and notwithstanding any restriction imposed upon it by Law, the Trustee, subject to the obligation to invest in Qualified Investments, shall have the following powers, authorities and discretion:

(a) to borrow such monies on such terms as the Trustee in the his discretion deems advisable;

(b) to exercise all rights incidental to the ownership of investments and property held as part of the Trust Property, and without limiting the generality of the foregoing, the right to vote upon and issue proxies respecting any investments held in the Trust Property, the right to sell, the right to consent to and join in any plan, reorganization, readjustment, amalgamation or consolidation with respect to any Person whose securities at any time form part of the Trust Property, and the right

to authorize the sale of the assets or undertaking of any Person whose securities at any time form part of the Trust Property;

(c) to make any agreement with any other Person, which agreement shall be binding upon the Trustee and all Persons concerned without the consent of any of the Beneficiaries;

(d) to join or take any action in connection with any investment or asset held by the Trustee as part of the Trust Property or to which the Trustee may be entitled in connection herewith and to exercise any rights, powers and privileges that at any time may exist or arise in connection with such investment or asset; and

(e) to take, institute, maintain or defend any action or other proceeding that may be necessary or advisable in the opinion of the Trustee for the preservation or protection of or realization upon any property forming part of the Trust Property.

## ARTICLE 5
## RESTRICTIONS ON INDEMNITY

### 5.1 Notice of Claims

In no case shall the Corporation be liable under the indemnity contained in Section 4.8 with respect to any claim against the Trustee unless the Corporation shall be notified by the Trustee of the written assertion of a claim against the Trustee or of any Proceeding commenced against the Trustee, promptly after the Trustee shall have received any such written assertion of the claim or shall have been served with a summons or other first legal process giving the Corporation information as to the nature and basis of the claim. The Corporation shall be entitled to participate at its own expense in the defence of any Proceeding. If the Corporation so elects at any time after receipt of such notice, it may assume the defence of any Proceeding brought to enforce such claim. If the Corporation assumes the defence of any Proceeding, it shall not be liable for the fees and expenses of any additional counsel thereafter retained by the Trustee.

## ARTICLE 6
## AMENDMENT

### 6.1 Amendment Restrictions

This Indenture may be amended, varied or supplemented only by written agreement executed by the Trustee and the Corporation, and, subject to Section 8.5, only:

(a) to add to the provisions hereof additional covenants or provisions for the benefit of the Corporation, the Beneficiaries and/or the Trustee; or

(b) for the purpose of correcting or rectifying ambiguities, defects, errors or omissions contained herein;

provided that any such amendment is not, in the opinion of the Trustee and the Corporation, based on the advice of legal counsel, inconsistent with the purposes hereof or prejudicial in any material respect to the interests of the Beneficiaries.

## ARTICLE 7
## TERMINATION

### 7.1 Termination Date

The Trust shall terminate upon the earliest to occur of:

(a) a date determined by the Trustee if the Trustee in his discretion determines that there is no further Trust Property available to pay or satisfy Liability Claims or Maintenance Claims,

(b) the latest to occur of:

(i) December 31, 2015, if the Trustee has not received a claim or potential claim with respect to a Liability Claim or a Maintenance Claim hereunder on or before such date; and

(ii) if the Trustee has received a claim or potential claim with respect to a Liability Claim or a Maintenance Claim hereunder, the date that is three (3) years after the date on which all Liability Claims and Maintenance Claims made have been satisfied or resolved, as determined by the Trustee in his discretion.

which earliest date shall be referred to as the **"Termination Date"**.

### 7.2 Consequence of Termination

Upon the termination of this Indenture in accordance with Section 7.1, the Trustee shall satisfy any commitments to pay Liability Claims or Maintenance Claims made under Article 3 and deliver the Trust Property then remaining, if any, to or on the direction of the Corporation.

### 7.3 Survival

Article 1, Sections 3.5, 3.6, 3.7, 3.8, 4.1, 4.6, 4.8, 4.11 and 7.3 and Article 8 shall survive the termination of the Trust and this Indenture and shall continue for the benefit of the Trustee.

## ARTICLE 8
## OTHER MATTERS

### 8.1 Governing Law

This Indenture shall be governed and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein. The Corporation and the Trustee submit to the exclusive jurisdiction of any Ontario courts sitting in Toronto in any action, application, reference or other proceeding arising out of or related to this Indenture and agree that all claims in respect of any such actions, application, reference or other proceeding shall be heard and determined in such Ontario courts.

**8.2 Assignment**

Subject to Section 4.2, the rights and obligations under this Indenture may not be assigned by either the Corporation or the Trustee without the prior consent in writing of the other party. This Indenture shall be binding upon and enure to the benefit of the Corporation and the Trustee and their respective heirs, estates, administrators, executors, legal personal representatives, successors and assigns.

**8.3 No Waiver, etc.**

(a) No waiver of any of the provisions of this Indenture shall be deemed to constitute a waiver of any other provision (whether or not similar), nor shall such waiver be binding unless executed in writing by the party to be bound by the waiver.

(b) No failure on the part of the Corporation or the Trustee to exercise, and no delay in exercising any right under this Indenture shall operate as a waiver of such right, nor shall any single or partial exercise of any such right preclude any other or further exercise of such right or the exercise of any other right.

**8.4 Entire Agreement**

This Indenture constitutes the entire agreement between the Corporation and the Trustee with respect to the issues contemplated herein and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of such parties. There are no conditions or other agreements, express or implied, collateral, statutory or otherwise, between the Corporation and the Trustee in connection with the subject matter of this Indenture, except as specifically set forth herein, and the Corporation and the Trustee have not relied and are not relying on any other information, discussion or understanding in entering into and completing the transactions contemplated by this Indenture.

**8.5 Severability**

If any provision of this Indenture shall be determined by an arbitrator or any court of competent jurisdiction to be illegal, invalid or unenforceable, that provision will be severed from this Indenture and the remaining provisions shall remain in full force and effect. The Corporation and the Trustee shall endeavour in good faith negotiations to replace the illegal, invalid or unenforceable provision with a valid provision which comes closest to the intention of the Corporation underlying the illegal, invalid or unenforceable provision.

**8.6 Time of the Essence**

Time is of the essence of this Indenture.

**8.7 Further Assurances**

The Corporation and the Trustee shall do or cause to be done all such acts and things and shall execute or cause to be executed all such documents, agreements and other instruments as may be reasonably necessary or desirable for the purpose of carrying out the provisions and intent of this Indenture.

**8.8 Counterpart Execution**

This Indenture may be executed in any number of counterparts and may be delivered by facsimile or other electronic transmission and all such counterparts taken together shall be deemed to constitute one and the same instrument.

**8.9 Notice**

Any notice, direction or other communication given under this Indenture shall be in writing and given by delivering it or sending it via facsimile, or other similar form of recorded communication, during normal business hours, addressed:

(a) to the Corporation at:

195 The West Mall
Toronto, ON M9C 5K1

Attention: Chief Legal Officer
Facsimile: (905) 863-8423

with a copy to:

Ogilvy Renault LLP
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, ON M5J 2Z4

Attention: Michael Lang
Facsimile: (416) 216-3930

(b) to the Directors or Officers at:

195 The West Mall
Toronto, ON M9C 5K1

Attention: Chairman
Facsimile: (905) 863-8423

with a copy to:

Osler, Hoskin & Harcourt LLP
First Canadian Place
100 King Street W., 61st Floor
Toronto, ON M5X IB8

Attention: Jean Fraser
Facsimile: (416) 862-6666

(c) to the Trustee at:

ADR Chambers
112 Adelaide Street East
Toronto, ON M5C 1K9

Facsimile: (416) 362-8825

Any such communication shall be deemed to have been validly and effectively given (i) if personally delivered, on the date of such delivery if such date is a Business Day and such delivery was made prior to 4:00 p.m. (Toronto time) and otherwise on the next Business Day, or (ii) if transmitted via facsimile, on the Business Day following the date of transmission. Any of the above parties may change his or its address for service from time to time by notice given in accordance with the foregoing and any subsequent notice shall be sent to such party at its changed address.

**IN WITNESS WHEREOF** this Indenture has been executed as of the date first written above.

**NORTEL NETWORKS CORPORATION**

By: ______________________________
Name:
Title:

By: ______________________________
Name:
Title:

______________________________
Name: **The Honourable John D. Ground Q.C.**

(c) to the Trustee at:

ADR Chambers
112 Adelaide Street East
Toronto, ON M5C 1K9

Facsimile: (416) 362-8825

Any such communication shall be deemed to have been validly and effectively given (i) if personally delivered, on the date of such delivery if such date is a Business Day and such delivery was made prior to 4:00 p.m. (Toronto time) and otherwise on the next Business Day, or (ii) if transmitted via facsimile, on the Business Day following the date of transmission. Any of the above parties may change his or its address for service from time to time by notice given in accordance with the foregoing and any subsequent notice shall be sent to such party at its changed address.

**IN WITNESS WHEREOF** this Indenture has been executed as of the date first written above.

**NORTEL NETWORKS CORPORATION**

By: [signature]
Name: GORDON A. DAVIES
Title: CHIEF LEGAL OFFICER AND CORPORATE SECRETARY

By: [signature]
Name: J Connelly McGilley
Title: Assistant Secretary

Name: **The Honourable John D. Ground Q.C.**

Court File No: 09-CL-7950

**IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at TORONTO

**AFFIDAVIT OF ANNA VENTRESCA**
**SWORN OCTOBER 7, 2011**

**NORTON ROSE OR LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street, P.O. Box 84
Toronto, Ontario M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: +1 416.216.4832
Email: derrick.tay@nortonrose.com

**Jennifer Stam LSUC#: 46735J**
Tel: +1 416.216.2327
Email: jennifer.stam@nortonrose.com

Fax: +1 416.216.3930

Lawyers for the Applicants

DOCSTOR: 2268355\5

Court File No: 09-CL-7950

**IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**MOTION RECORD OF NORTEL D&O POLICY MOTION**
**(returnable December 22, 2011)**

**NORTON ROSE OR LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: derrick.tay@nortonrose.com

**Jennifer Stam LSUC#: 46735J**
Tel: (416) 216-2327
Email: jennifer.stam@nortonrose.com

Fax: (416) 216-3930

Lawyers for the Applicants