**EXHIBIT A-2**
**SUPPLEMENTAL MOTION RECORD**

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL**
**NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**
**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**SUPPLEMENTAL MOTION RECORD OF THE APPLICANTS**
**D&O POLICY MOTION**
**(returnable May 30, 2012)**

May 16, 2012

**NORTON ROSE CANADA** LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street, P.O. Box 84
Toronto Ontario  M5J 2Z4

**Mario Forte  LSUC#: 27293F**

Email: mario.forte@nortonrose.com

Tel:   416.216.4000
Fax:   416.216.3930

Lawyers for the Applicants

**GOWLING LAFLEUR HENDERSON** LLP
Suite 1600,
First Canadian Place
100 King Street West
Toronto Ontario  M5X 1G5

**Derrick Tay  LSUC#: 21152A**
**Jennifer Stam  LSUC#: 46735J**

Email: derrick.tay@gowlings.com
Email: jennifer.stam@gowlings.com

Tel:   416.814.5697
Fax:   416.862.7661

Lawyers for the Applicants/Respondents on
Motion

TO:  Attached Service List

[SERVICE LIST REMOVED FOR THE PURPOSE OF THIS EXHIBIT]

# TABLE OF CONTENTS

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL**
**NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**TABLE OF CONTENTS**

| TAB | DOCUMENT | PAGE |
|---|---|---|
| 1 | Supplemental Affidavit of Anna Ventresca, sworn November 28, 2011 | 1 – 2 |
| A | Nortel Networks Corporation By-Law No. 1 | 3 – 22 |
| B | Letter from AIG Commercial Insurance Company of Canada to Marsh Canada Limited, dated December 1, 2008 | 23 – 24 |
| C | Letter from Ernst & Young Inc. to Nortel Networks Corporation, dated December 16, 2009 | 25 – 27 |
| 2 | Transcript of the cross-examination of Anna Ventresca, held on January 30, 2012 | 28 – 66 |
| 3 | Answers to Undertakings from the cross-examination of Anna Ventresca, held on January 30, 2012 | 67 – 68 |
| 4 | Initial Order of Justice Morawetz, dated January 14, 2009, as amended and restated on February 25, 2011 | 69 – 96 |

# TAB 1

Court File No.  09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED

SUPPLEMENTAL AFFIDAVIT OF ANNA VENTRESCA
(sworn November 28, 2011)

1.      I, ANNA VENTRESCA, of the city of Hamilton, in the Province of Ontario, MAKE OATH AND SAY AS FOLLOWS:

2.      I am the General Counsel - Corporate and Corporate Secretary of Nortel Networks Corporation ("NNC") and Nortel Networks Limited ("NNL") and have held this position since August 2009. From July 2007, to July 2009, I was the Assistant General Counsel – Corporate and Assistant Secretary. As such, I have personal knowledge of the matters to which I hereinafter depose in this Affidavit. Where I do not possess personal knowledge, I have stated the source of my information and, in all such cases, believe it to be true.

3.      I swear this affidavit to supplement the information contained in my affidavit sworn October 7, 2011 (the "October 7th Affidavit"), previously filed.  Capitalized terms used in this affidavit and not otherwise defined herein shall have the meanings given to those terms in the October 7th Affidavit.

4.      The basis of NNC's indemnification obligations as referred to in the D&O Policy is, among other things, the by-laws of NNC. For the assistance of the Court, I am attaching as Exhibit "A" to this affidavit the by-laws which detail the indemnification obligations.

5.      As described in the D&O Policy, attached to my October 7th Affidavit, a Retention Amount applies to Coverage B claims.  I understand that in response to a prior inquiry by Nortel, AIG (now Chartis) advised that the Retention Amount would not apply in the event of insolvency, but Chartis would expect Nortel to seek the Court's permission for such indemnification:

Normally, there is no retention applicable to Loss payable under Coverage A or Coverage C, "for which the Organization has neither indemnified nor is permitted or required to indemnity an Insured Person pursuant to law or contract or the charter, bylaws, operating agreement or similar documents of an Organization." When the Organization has indemnified or is permitted or required to indemnify an Insured Person pursuant to law or contract or the charter, bylaws, operating agreement or similar documents of an Organization then a retention applies.

However, if the Organization goes bankrupt and in a filing for bankruptcy protection (voluntarily or involuntarily) under Title 11 of the United States Code or under the Company Creditors' Arrangement Act [sic], R.S.C. 1985 c. C-36 (as amended), or any similar provincial or foreign law (collectively "Bankruptcy Law") the court prohibits indemnification by the Organization of Loss of the Insured Persons because of higher bankruptcy law priorities, then, generally, the Insurer would not consider indemnification of the Insured Persons for such Loss by the Organization to be "permitted or required." The result of this is that, as respects to such Loss of the Insured Persons under Coverage B (ii) of the Policy, the presumptive indemnification language found in the Definition of Idemnnifiable Loss would not apply and the Insurer would apply a zero retention (or the applicable retention) to such Loss. Of course, the Insurer would expect the Insured Persons to file on the behalf of the Insurer a Proof of Claim in the bankruptcy proceedings (or any appeal thereof) to the extent he or she had been entitled, but for the bankruptcy, to indemnification from the Organization. The Insurer would also expect and require the Organization to petition the bankruptcy court in good faith to permit indemnification of its Insured Persons.

The AIG Letter is attached as Exhibit "B".

6.      The Applicants did consider seeking such indemnification for Mr. Zafirovski and Mr. Binning's defence costs in relation to the Lucescu Claim. The Applicants' asked the Monitor for its view on any such relief. In response, the Monitor refused to consent to the advancement of the defence costs because (1) indemnification may constitute a preference at the expense of other creditors, and (2) would not be prudent due to Nortel's limited cash resources. The letter from the Monitor to NNC, dated December 16, 2009, is attached as Exhibit "C".

7.      In the circumstances, NNC considers it to have met any requirements to reasonably seek permission for indemnification.


**SWORN BEFORE ME** at the City of      )
Toronto, in the Province of Ontario,      )
this 28th day of November, 2011.         )
                                          )
                                          )
_____

A Commissioner, etc.

**Maureen R.A. Edwards**

**ANNA VENTRESCA**

# Tab A

3

# NORTEL NETWORKS CORPORATION

**BY-LAW**

**NO. 1**

This Is Exhibit........."A".............referred to in the
affidavit of....Anna Ventresca..........
sworn ........ ore me, this.....28th.................
day of.....November................20..11...

..........M̲c̲ ̲G̲...........................
A COMMISSIONER FOR TAKING AFFIDAVITS

Maureen R.A. Edwards

February 22, 2001

BY-LAW NO. 1

# TABLE OF CONTENTS

## ARTICLE 1
### DEFINITIONS

SECTION 1.1    DEFINITIONS ..................................................................................................1

## ARTICLE 2
### CORPORATE SEAL

SECTION 2.1    CORPORATE SEAL ..........................................................................................1

## ARTICLE 3
### SHAREHOLDERS

SECTION 3.1    ANNUAL MEETING .........................................................................................1
SECTION 3.2    SPECIAL MEETINGS........................................................................................1
SECTION 3.3    NOTICE OF MEETING .....................................................................................2
SECTION 3.4    ATTENDANCE.................................................................................................2
SECTION 3.5    QUORUM ........................................................................................................2
SECTION 3.6    CHAIRMAN AND SECRETARY OF MEETING..................................................2
SECTION 3.7    PROXIES .........................................................................................................3
SECTION 3.8    PROCEDURE AND VOTING AT MEETINGS .....................................................3
SECTION 3.9    SCRUTINEERS ................................................................................................4
SECTION 3.10   ADJOURNMENT OF MEETINGS ......................................................................4

## ARTICLE 4
### DIRECTORS

SECTION 4.1    POWERS...........................................................................................................4
SECTION 4.2    NUMBER OF DIRECTORS................................................................................4
SECTION 4.3    ELECTION .......................................................................................................4
SECTION 4.4    RESIGNATION AND VACANCY .......................................................................4
SECTION 4.5    REGULAR MEETINGS OF DIRECTORS ...........................................................5
SECTION 4.6    SPECIAL MEETINGS OF DIRECTORS..............................................................5
SECTION 4.7    PLACE OF MEETINGS .....................................................................................5
SECTION 4.8    NOTICE OF MEETINGS ...................................................................................5
SECTION 4.9    QUORUM .........................................................................................................5
SECTION 4.10   CHAIRMAN OF MEETING ...............................................................................5
SECTION 4.11   VOTING...........................................................................................................6
SECTION 4.12   PARTICIPATION IN MEETINGS.......................................................................6
SECTION 4.13   RESOLUTION IN LIEU OF MEETING................................................................6
SECTION 4.14   REMUNERATION OF DIRECTORS ...................................................................6

## ARTICLE 5
### EXECUTIVE COMMITTEE

SECTION 5.1    FORMATION .....................................................................................................6
SECTION 5.2    POWERS............................................................................................................6
SECTION 5.3    FURTHER PROVISIONS ...................................................................................6

### ARTICLE 6
### AUDIT COMMITEE

SECTION 6.1   FORMATION .................................................................................................................. 7
SECTION 6.2   POWERS ........................................................................................................................ 7
SECTION 6.3   FURTHER PROVISIONS ............................................................................................. 7


### ARTICLE 7
### OTHER COMMITTEE AND ADVISORY BODIES

SECTION 7.1   FORMATION .................................................................................................................. 7
SECTION 7.2   POWERS ........................................................................................................................ 7
SECTION 7.3   FURTHER PROVISIONS ............................................................................................. 7


### ARTICLE 8
### OFFICERS

SECTION 8.1   APPOINTMENT ............................................................................................................ 8
SECTION 8.2   TENURE OF OFFICE ................................................................................................... 8
SECTION 8.3   POWERS ........................................................................................................................ 8
SECTION 8.4   CHAIRMAN OF THE BOARD ..................................................................................... 8
SECTION 8.5   MANAGING DIRECTOR ............................................................................................. 9
SECTION 8.6   CHIEF EXECUTIVE OFFICER ................................................................................... 9
SECTION 8.7   PRESIDENT .................................................................................................................. 9
SECTION 8.8   CORPORATE SECRETARY ......................................................................................... 9
SECTION 8.9   CONTROLLER .............................................................................................................. 9
SECTION 8.10  TREASURER ................................................................................................................ 10
SECTION 8.11  OTHER OFFICERS ...................................................................................................... 10


### ARTICLE 9
### INDEMNIFICATION OF DIRECTORS AND OFFICERS

SECTION 9.1   LIMITATION OF LIABILITY ...................................................................................... 10
SECTION 9.2   INDEMNITY .................................................................................................................. 10
SECTION 9.3   INSURANCE .................................................................................................................. 11


### ARTICLE 10
### DISCLOSURE OF INTEREST BY DIRECTORS AND OFFICERS

SECTION 10.1  DISCLOSURE OF INTEREST AND VOTING .......................................................... 11


### ARTICLE 11
### FINANCIAL YEAR

SECTION 11.1  FINANCIAL YEAR ....................................................................................................... 11


### ARTICLE 12
### AUDITOR

SECTION 12.1  AUDITOR ...................................................................................................................... 11

## ARTICLE 13
### SECURITIES

SECTION 13.1 ISSUANCE ..................................................................................................................12
SECTION 13.2 SECURITY CERTIFICATES...................................................................................12
SECTION 13.3 SECURITIES REGISTERS .......................................................................................12
SECTION 13.4 LOST OR DESTROYED CERTIFICATES ...............................................................12
SECTION 13.5 PAYMENT OF DIVIDENDS AND OTHER AMOUNTS..........................................12
SECTION 13.6 JOINT HOLDERS......................................................................................................13
SECTION 13.7 UNCLAIMED DIVIDENDS .......................................................................................13

## ARTICLE 14
### EXECUTION OF DOCUMENTS

SECTION 14.1 DOCUMENTS .............................................................................................................13
SECTION 14.2 BANKING ARRANGEMENTS...................................................................................13
SECTION 14.3 CUSTODY OF SECURITIES......................................................................................13

## ARTICLE 15
### NOTICES

SECTION 15.1 METHOD OF GIVING NOTICES ...............................................................................14
SECTION 15.2 PROOF OF GIVING OF NOTICE ..............................................................................14
SECTION 15.3 ADDRESSES OF SHAREHOLDERS........................................................................14
SECTION 15.4 ACCIDENTAL OMISSION ........................................................................................14
SECTION 15.5 PERSONS ENTITLED BY DEATH OR OPERATION OF LAW ..............................14
SECTION 15.6 WAIVER OF NOTICE ................................................................................................15

## ARTICLE 16
### BORROWING

SECTION 16.1 BORROWING POWER................................................................................................15
SECTION 16.2 DELEGATION.............................................................................................................15

## ARTICLE 17
### ENACTMENT AND REPEAL

SECTION 17.1 EFFECTIVE DATE ......................................................................................................15

## ARTICLE 18
### INTERPRETATION

SECTION 18.1 INTERPRETATION......................................................................................................16

iii

7

## ARTICLE 1
## DEFINITIONS

#### SECTION 1.1   DEFINITIONS

In the by-laws of the corporation, unless the context otherwise requires:

"Act" shall mean the Canada Business Corporations Act, R.S.C. 1985, c. C-44, the Regulations enacted pursuant to the Act and any statute and regulations that may be substituted therefor, all as amended from time to time;

"by-laws" shall mean this by-law, as amended from time to time, and all other by-laws of the corporation in force and effect from time to time;

"corporation" shall mean Nortel Networks Corporation;

"meeting of shareholders" shall mean an annual meeting of shareholders or a special meeting of shareholders, and includes a meeting of the holders of one (1) or more of the classes or series of shares of the corporation;

"notice" shall include any communication or document; and

"special meeting of shareholders" shall mean any meeting of shareholders at which special business is to be conducted, and includes an annual and special meeting of shareholders.

## ARTICLE 2
## CORPORATE SEAL

#### SECTION 2.1   CORPORATE SEAL

The corporation may, but need not have, one (1) or more corporate seals. The corporate seal or seals of the corporation shall be in such form as the board of directors may adopt by resolution. An instrument or agreement executed on behalf of the corporation by a director, officer or agent of the corporation is not invalid merely because the corporate seal is not affixed thereto.

## ARTICLE 3
## SHAREHOLDERS

#### SECTION 3.1   ANNUAL MEETING

Subject to the Act, the annual meeting of shareholders shall be held at such place and on such date in each year and at such time as may be fixed by the board of directors.

An annual meeting of shareholders may also be constituted as an annual and special meeting of shareholders to consider and transact any special business, which may be considered and transacted at a special meeting of shareholders.

#### SECTION 3.2   SPECIAL MEETINGS

Subject to the Act, special meetings of shareholders may be called at any time by, or by the order of, the board of directors, the chairman of the board or the chief executive officer and shall be held at such place as may be determined by the person or body calling, or ordering the calling of, the special meeting.

## SECTION 3.3    NOTICE OF MEETING

A notice of meeting of shareholders or, to the extent required under the Act, notice of any adjournment or postponement thereof, shall be given as specified by the Act and other applicable law, and may be given in the manner provided in Article 15.

## SECTION 3.4    ATTENDANCE

The only persons entitled to attend a meeting of shareholders are those entitled to vote thereat, the directors, the auditor of the corporation and others who, although not entitled to vote, are entitled or required under the Act or other applicable law, the articles or the by-laws of the corporation to be present at such meeting. The chairman of a meeting of shareholders may permit or restrict attendance at such meeting by persons other than those enumerated above.

The chairman of a meeting of shareholders may order the removal from the meeting of any person whose conduct, in the opinion of the chairman, has prejudiced or is likely to prejudice, the orderly conduct of the meeting.

To the extent permitted by the Act, meetings of shareholders may be held by telephonic, electronic or other communication facility. A person participating in a meeting by such means is deemed to be present at the meeting. The board of directors may establish, by resolution, procedures regarding the holding of meetings of shareholders by such means as are permitted by the Act.

## SECTION 3.5    QUORUM

Unless otherwise provided in the articles of the corporation, a quorum at a meeting of shareholders shall be three (3) persons present in person and representing in their own right, or by proxy, or as the duly authorized representative of any shareholder that is a body corporate or association, not less than ten percent (10%) in number of the outstanding shares of the corporation carrying voting rights at the meeting of shareholders. At an adjourned meeting of shareholders, a quorum shall be the shareholders present in person or represented by proxy or by a duly authorized representative, holding shares carrying voting rights at the adjourned meeting of shareholders. Notwithstanding the foregoing, if the corporation has fewer than ten (10) shareholders of any class or series of shares, any two (2) persons present in person and representing in their own right, or by proxy, or as the duly authorized representative of any shareholder that is a body corporate or association, not less than ten percent (10%) in number of the outstanding shares of that class or series carrying voting rights at the meeting of that class or series of shareholders constitutes a quorum for such meeting.

If a quorum is present at the opening of a meeting of shareholders, the persons present may proceed with the business of the meeting, notwithstanding that a quorum is not present throughout the meeting.

## SECTION 3.6    CHAIRMAN AND SECRETARY OF MEETING

The chairman of the board or, in his or her absence or in case of his or her disability or refusal to act, the chief executive officer or, in his or her absence or in case of his or her disability or refusal to act, the president or, in his or her absence or in case of his or her disability or refusal to act, such other person that may have been designated by the board of directors to exercise such function, shall preside as chairman at meetings of shareholders. In the absence of the chairman of the board, the chief executive officer, the president and all such other persons designated by the board of directors, or in case of their disability or refusal to act, the persons present entitled to vote at a meeting of shareholders shall choose another director as chairman of the meeting and if no director is present or if all the directors present refuse to act, then the persons present entitled to vote shall choose one (1) of their number to be chairman of the meeting.

The corporate secretary shall act as secretary of meetings of shareholders or, in his or her absence or in the case of his or her disability or refusal to act, the chairman of the meeting shall appoint a person, who need not be a shareholder, to act as secretary of the meeting.

2

## SECTION 3.7 PROXIES

A shareholder is entitled to vote in person or by proxy or, if a body corporate or an association, by its duly authorized representative.

Proxyholders must be appointed by a form of proxy or other appropriate instrument in writing signed by the shareholder or his or her attorney duly authorized in writing that conforms with the requirements of the Act; provided, however, that if the Act permits the appointment of a proxyholder or attorney by telephonic or electronic or other means, the board of directors may establish, by resolution, procedures in respect of the delivery, completion, execution, submission and revocation of such instruments by such means.

To the extent permitted by the Act, the board of directors may establish, by resolution, procedures regarding the lodging of instruments appointing a proxyholder at some place or places other than the place at which a meeting or adjourned meeting of shareholders is to be held and for particulars of the means by which such instruments may be communicated prior to the meeting or adjourned meeting to the corporation or any agent of the corporation appointed for the purpose of receiving such particulars and providing that instruments appointing a proxyholder so lodged may be voted as though the instruments themselves were produced at the meeting or adjourned meeting and votes given in accordance with such procedures shall be valid and shall be counted. The chairman of a meeting of shareholders may, subject to any procedures made as aforesaid and applicable law, in his or her discretion accept telephonic, electronic or other communication as to the authority of anyone claiming to vote on behalf of and to represent a shareholder, notwithstanding that no instrument of proxy conferring such authority has been lodged with the corporation, and any votes given in accordance with such communication accepted by the chairman of the meeting shall be valid and shall be counted.

## SECTION 3.8 PROCEDURE AND VOTING AT MEETINGS

The chairman of a meeting of shareholders shall conduct the meeting and shall determine the procedure thereof in all respects. The chairman's decision on all matters or things, including, for greater certainty, any questions regarding the validity or invalidity of a form of proxy or other instrument appointing a proxy, shall be conclusive and binding upon the meeting of shareholders.

Unless otherwise required by the Act or other applicable law, or by the articles or by-laws of the corporation, the vote of the shareholders representing a majority of the votes attaching to all shares represented at a meeting of shareholders and entitled to vote thereat shall be sufficient for all purposes and shall be the decision of the meeting. In the case of an equality of votes, the chairman of the meeting shall have a casting vote in addition to the vote or votes to which the chairman is entitled as a shareholder, a proxyholder or a duly authorized representative of a shareholder.

Unless otherwise required by the Act, every matter submitted to a meeting of shareholders for decision shall be decided by a show of hands, unless a ballot thereon is required or demanded. The chairman of a meeting of shareholders may require, or any person entitled to vote may demand, a ballot on any matter either before or after any vote by a show of hands. A demand for a ballot may be withdrawn at any time prior to the taking of the ballot. A ballot so required or demanded shall be taken in such manner and either at once or after adjournment, as the chairman of the meeting shall direct. The result of the ballot shall be the decision of the meeting of shareholders, whether or not a vote by a show of hands shall have been taken previously on the same matter.

Subject to the Act, every person entitled to vote at a meeting of shareholders shall have one (1) vote on a show of hands. Upon a ballot, every person entitled to vote at a meeting of shareholders shall be entitled to the number of votes attached to the aggregate number of shares that such person holds or represents.

Whenever a vote by a show of hands shall have been taken, unless a ballot thereon is required or demanded, a declaration by the chairman of a meeting of shareholders that a particular resolution has been carried, or carried unanimously, or by any majority, or lost, or not carried by a particular majority, shall be conclusive evidence of that fact, without proof of the number or proportion of the votes recorded in favour of or against any resolution, and the result of the vote so taken shall be the decision of the shareholders on the resolution.

3

To the extent permitted by the Act, a vote at a meeting may be carried out by means of a telephonic, electronic or other communication facility.

## SECTION 3.9  SCRUTINEERS

The chairman of a meeting of shareholders may appoint one (1) or more persons who need not be shareholders to act as scrutineers at a meeting of shareholders or at any adjourned or postponed meeting of shareholders.

The scrutineers shall determine the number of shares held by shareholders present in person or represented by proxy or by a duly authorized representative at the meeting and the existence of a quorum. The scrutineers shall also receive, count and tabulate all ballots, determine the result of a vote by ballot, and do such acts as are necessary to conduct such vote in an equitable manner. The decision of a majority of the scrutineers shall be conclusive and binding upon the meeting and a declaration or certificate of the scrutineers shall be conclusive evidence of the facts declared or stated therein.

## SECTION 3.10  ADJOURNMENT OF MEETINGS

The chairman of a meeting of shareholders may adjourn such meeting from time to time and from place to place. Any adjourned meeting shall be duly constituted if held in accordance with the terms of the adjournment and a quorum is present thereat. Any business may be considered and transacted at any adjourned meeting, which might have been considered and transacted at the original meeting of shareholders.

## ARTICLE 4
## DIRECTORS

## SECTION 4.1  POWERS

Subject to the Act, the board of directors shall supervise the management of the business and affairs of the corporation.

The board of directors may exercise all such authority and powers of the corporation and do all such lawful acts and things as are not by law or otherwise directed or required to be exercised or done by the shareholders or in some other manner.

## SECTION 4.2  NUMBER OF DIRECTORS

Until otherwise determined in accordance with the Act, the board of directors shall consist of not fewer than the minimum number and not more than the maximum number of directors provided in the articles of the corporation, and within such minimum and maximum numbers, the board of directors shall from time to time determine the actual number of directors.

Unless otherwise permitted by the Act, a majority of the directors shall be resident Canadians and the corporation shall have at least two (2) directors who are neither officers nor employees of the corporation or of its affiliates.

## SECTION 4.3  ELECTION

The directors shall be elected at each annual meeting of shareholders, except as otherwise provided by the Act, the articles or the by-laws of the corporation.

Each director shall hold office until the close of the next annual meeting of shareholders or until he or she ceases to be a director as provided by the Act or until his or her resignation becomes effective.

## SECTION 4.4  RESIGNATION AND VACANCY

A director may resign by sending to the corporation a resignation in writing. A resignation of a director shall become effective at the time it is sent to the corporation or at the time specified in the resignation, whichever is later. The provisions of Article 15 with respect to the sending of notice by the corporation shall apply *mutatis mutandis*.

In addition to any power the directors may have pursuant to the Act to fill the vacancies among their number, but subject to the maximum number of directors provided for in the articles, the directors may appoint one or more additional directors, who shall hold office for a term expiring not later than the close of the next annual meeting of shareholders, provided that the total number of additional directors so appointed shall not exceed one third of the number of directors elected at the previous annual meeting of shareholders.

## SECTION 4.5   REGULAR MEETINGS OF DIRECTORS

Regular meetings of the board of directors may be held at such time or times as the board of directors or the chairman of the board may determine. Subject to the Act, no notice shall be required for any such regular meeting.

A meeting may be held without notice, except as otherwise provided by the Act, immediately after each annual meeting of shareholders or annual and special meeting of shareholders, by the directors as are then present, provided they shall constitute a quorum, for the appointment of certain officers of the corporation and for the consideration and transaction of such other business as may come before the meeting.

## SECTION 4.6   SPECIAL MEETINGS OF DIRECTORS

Special meetings of the board of directors may be called by, or by the order of, the chairman of the board, the chief executive officer, the president or any two (2) directors. Unless otherwise determined by the board of directors, notice of special meetings shall be given.

## SECTION 4.7   PLACE OF MEETINGS

Meetings of the board of directors may be held at any place within or outside of Canada. To the extent permitted by the Act, meetings of the board of directors may be held by means of a telephonic, electronic or other communication facility.

## SECTION 4.8   NOTICE OF MEETINGS

Unless otherwise determined by the board of directors, a notice of meeting of the board of directors, if required, shall be given at least twenty-four (24) hours before the hour fixed for the meeting and need not specify the purpose of, or the business to be considered and transacted at, the meeting, except as otherwise provided by the Act. Notices of meeting may be given by oral communication.

Directors may in any manner waive notice of any meeting of the board of directors, or any irregularity in any meeting or in the notice thereof, before or after the meeting is held.

## SECTION 4.9   QUORUM

The board of directors may determine the quorum for its meetings and, until otherwise so determined, three (3) directors shall constitute a quorum.

Unless otherwise permitted by the Act, no business shall be transacted at a meeting of the board of directors unless a majority of directors present are resident Canadians.

## SECTION 4.10   CHAIRMAN OF MEETING

Unless otherwise determined by the board of directors, the chairman of the board or, in his or her absence or in case of his or her disability or refusal to act, the chief executive officer, provided the chief executive officer is a director, or in his or her absence or in case of his or her disability or refusal to act, such other director who has been designated by the board of directors to exercise such function, shall preside as chairman at meetings of the board of directors.

/2

## SECTION 4.11  VOTING

Matters considered at a meeting of the board of directors shall be decided by a majority of the votes cast. In the case of an equality of votes, the chairman of the meeting shall have a casting vote in addition to the vote to which the chairman is entitled as a director.

## SECTION 4.12  PARTICIPATION IN MEETINGS

To the extent permitted by the Act, a director may, if all the directors of the corporation consent, participate in a meeting of directors by means of a telephonic, electronic or other communication facility. A director participating in such a meeting by such means is deemed to be present at the meeting. Any such consent shall be effective whether given before or after the meeting to which it relates and may be given with respect to all meetings of the board of directors.

## SECTION 4.13  RESOLUTION IN LIEU OF MEETING

A resolution in writing, signed by all the directors entitled to vote on that resolution at a meeting of the board of directors, is as valid as if it had been passed at a meeting of the board of directors.

## SECTION 4.14  REMUNERATION OF DIRECTORS

Each director shall be entitled to receive such remuneration for all services as a director as the board of directors shall determine.

The board of directors may also award additional remuneration to any director serving as a member of any committee of the board of directors and to any director undertaking special services on the corporation's behalf beyond the services ordinarily required of a director by the corporation.

The directors shall also be entitled to be reimbursed for such traveling and other expenses incurred by them in attending board of directors' meetings or board of directors' committee meetings or otherwise in connection with the business and affairs of the corporation as the board of directors may determine.

## ARTICLE 5
## EXECUTIVE COMMITTEE

## SECTION 5.1  FORMATION

The board of directors may appoint from its members an executive committee consisting of such number of members as the board of directors may determine. The chairman of the board and the chief executive officer, provided he or she is a director, shall be members of the executive committee.

Unless otherwise permitted by the Act, a majority of the members of the executive committee shall be resident Canadians.

The executive committee shall determine its own organization and procedure, including its quorum, except as may be otherwise determined by the board of directors.

## SECTION 5.2  POWERS

The executive committee shall possess and may exercise all the authority and powers of the board of directors, subject to any limitations or regulations the board of directors may make and except as otherwise provided by the Act or the by-laws.

## SECTION 5.3  FURTHER PROVISIONS

Unless otherwise determined, the provisions of Sections 4.7, 4.11, 4.12 and 4.13 shall apply to the executive committee mutatis *mutandis*.

*13*

## ARTICLE 6
## AUDIT COMMITTEE

### SECTION 6.1    FORMATION

The board of directors shall appoint annually from its members an audit committee consisting of such number of members as the board of directors may determine, but not less than three (3).

At least a majority of the members of the audit committee shall be neither officers nor employees of the corporation or of any of its affiliates.

Unless otherwise permitted by the Act, a majority of the members of the audit committee shall be resident Canadians.

Subject to the provisions of the Act and as may be otherwise determined by the board of directors, the audit committee shall determine its own organization and procedure, including its quorum.

### SECTION 6.2    POWERS

The audit committee shall possess and may exercise the authority and powers provided in the Act, as well as all further authority and powers that may be delegated to it from time to time by the board of directors.

### SECTION 6.3    FURTHER PROVISIONS

Unless otherwise determined, the provisions of Sections 4.7, 4.11, 4.12 and 4.13 shall apply to the audit committee *mutatis mutandis.*

## ARTICLE 7
## OTHER COMMITTEES AND ADVISORY BODIES

### SECTION 7.1    FORMATION

The board of directors may constitute one (1) or more such other committees of the board of directors as it may determine.

Unless otherwise permitted by the Act, a majority of the members of any such committee shall be resident Canadians.

The board of directors may also constitute such other advisory bodies as it may determine, whose members need not be directors of the corporation.

Each such other committee or advisory body shall determine its own organization and procedure, including its quorum, except as may be otherwise determined by the board of directors.

### SECTION 7.2    POWERS

Such other committees of the board of directors shall possess and may exercise all the authority and powers that may be delegated to them by the board of directors.

Each advisory body shall have the mandate determined by the board of directors.

### SECTION 7.3    FURTHER PROVISIONS

Unless otherwise determined, the provisions of Sections 4.7, 4.11, 4.12 and 4.13 shall apply to such other committees of the board and advisory bodies *mutatis mutandis.*

7

*14*

## ARTICLE 8
## OFFICERS

### SECTION 8.1    APPOINTMENT

The officers of the corporation shall be appointed by the board of directors. The chairman of the board may, but need not be, an officer of the corporation. The board of directors may appoint a chairman of the board, chief executive officer, president, chief operating officer, chief financial officer, chief legal officer, chief marketing officer, chief technology officer, one (1) or more presidents of business units, divisions or other organizations within the corporation, one (1) or more vice-presidents (to which title words may be added to indicate seniority or function), corporate secretary, controller and treasurer. The board of directors may also appoint such other officers, including assistants to any of the officers so appointed, as it may deem appropriate and they shall have such authority and powers and shall perform such duties as may be determined by the board of directors.

The same person may hold more than one (1) office in the corporation.

None of the officers of the corporation, except the chairman of the board, if an officer, is required to be a director of the corporation.

If no person has been appointed to the office of chief financial officer, the officer having senior financial responsibility for the corporation shall be the chief financial officer of the corporation.

### SECTION 8.2    TENURE OF OFFICE

The chairman of the board, if an officer, and any other officers who have also been elected as directors of the corporation may be appointed for a period not exceeding the period for which they have been elected as directors. All other officers shall be appointed at the pleasure of the board of directors and may be removed from office with or without cause. Unless removed from office by the board of directors, each officer shall hold office until a successor is appointed or until the officer resigns either orally or in writing.

### SECTION 8.3    POWERS

The officers of the corporation shall possess and exercise such authority and powers and shall perform such duties, in addition to those provided in the by-laws, as may be determined by the board of directors. Any of the powers and duties of an officer to whom an assistant has been appointed may be exercised and performed by such assistant, unless the board of directors, the chairman of the board or the chief executive officer otherwise determines.

In case of the absence or inability or refusal to act of any officer of the corporation or for any other reason that the board of directors may deem sufficient, the board of directors may delegate all or any of the powers of an officer to any other officer or employee, or to a director.

### SECTION 8.4    CHAIRMAN OF THE BOARD

The chairman of the board shall possess and exercise such authority and powers and perform such duties as may be determined by the by-laws and the board of directors. If a chief executive officer has not been appointed by the board of directors, unless the board of directors determines otherwise, the chairman of the board shall be the chief executive officer of the corporation and, as such, shall possess and exercise the authority and powers and perform the duties of the chief executive officer.

The board of directors may determine that the chairman of the board shall not be an officer of the corporation and shall act solely in a non-executive capacity. A non-executive chairman of the board shall possess and exercise such authority and powers and perform such duties as may be determined by the by-laws and the board of directors.

The board of directors may appoint from their number one (1) or more vice-chairmen of the board who shall possess and exercise such authority and powers and shall perform such duties as may be determined by the board of directors, including, if so determined, possession of any of the authority and powers and performance of any of the duties of the chairman of the board.

8

## SECTION 8.5   MANAGING DIRECTOR

The board of directors may appoint from their number a managing director who, unless otherwise permitted by the Act, shall be a resident Canadian. Subject to the Act, a managing director shall possess and exercise such authority and powers and shall perform such duties as may be determined by the by-laws and the board of directors. A managing director shall not be an officer of the corporation.

## SECTION 8.6   CHIEF EXECUTIVE OFFICER

The chief executive officer shall have, under the control of the board of directors, general supervision and direction of the business and affairs of the corporation. The chief executive officer shall possess and exercise such authority and powers and perform such other duties as may be determined by the by-laws, the board of directors and the chairman of the board.

## SECTION 8.7   PRESIDENT

Unless the board of directors determines otherwise, the president shall be the chief operating officer of the corporation and shall have, under the control of the board of directors and the chief executive officer, general supervision of the business of the corporation. The president shall possess and exercise such authority and powers and perform such other duties as may be determined by the by-laws, the board of directors, the chairman of the board and the chief executive officer.

## SECTION 8.8   CORPORATE SECRETARY

The corporate secretary shall possess and exercise such authority and powers and perform such duties as may be determined by the by-laws, the board of directors, the chairman of the board, the chief executive officer and the president.

The corporate secretary shall give or cause to be given, as and when instructed, notices to the board of directors, the shareholders, officers, auditors and members of committees and advisory bodies of the board of directors. Unless otherwise determined by the board of directors, the corporate secretary shall attend and record minutes of all meetings of the board of directors, committees of the board of directors, shareholders and advisory bodies. The corporate secretary shall have charge of the corporate seal or seals and of the corporate records required by law to be kept, except accounting records.

## SECTION 8.9   CONTROLLER

The controller shall possess and exercise such authority and powers and perform such duties as may be determined by the by-laws, the board of directors, the chairman of the board, the chief executive officer, the president and the chief financial officer.

The controller shall have charge of the accounts and accounting records of the corporation and shall keep or cause to be kept accurate accounts of all transactions affecting the financial position of the corporation. Subject to the control of the chief financial officer of the corporation, the controller shall determine the appropriate accounting procedures for the proper recording of the corporation's assets and liabilities.

The controller shall prepare for submission to the board of directors such financial statements as may be required by the board of directors and shall prepare after the close of each financial year financial statements in accordance with the requirements of any applicable laws.

The controller shall provide financial information and data to the board of directors of the corporation, whenever requested.

## SECTION 8.10 TREASURER

The treasurer shall possess and exercise such authority and powers and perform such duties as may be determined by the by-laws, the board of directors, the chairman of the board, the chief executive officer, the president and the chief financial officer.

The treasurer shall be responsible for the moneys and securities of the corporation, including the deposit of money, the safekeeping of securities and the disbursement of the funds of the corporation. The treasurer shall render to the board of directors, whenever required, an account of all transactions as treasurer and of the financial position of the corporation.

## SECTION 8.11 OTHER OFFICERS

The chief financial officer, chief legal officer, chief marketing officer, chief technology officer, president or presidents of a business unit, division or other organization within the corporation and the vice-president or vice-presidents, if appointed, shall possess and exercise such authority and powers and perform such duties as may be determined by the by-laws, the board of directors, the chairman of the board, the chief executive officer and the president.

## ARTICLE 9
## INDEMNIFICATION OF DIRECTORS AND OFFICERS

### SECTION 9.1 LIMITATION OF LIABILITY

No director or officer shall be liable for the acts, receipts, omissions, failures, neglects or defaults of any other director, officer or employee, or for joining in any receipt or act for conformity or for any loss, damage or misfortune whatever occasioned by any error of judgement or oversight on the part of such director or officer, or for any other loss, damage or misfortune which shall happen in the execution of the duties of office or in relation thereto, including any loss, damage or expense suffered or incurred by or happening to the corporation through the insufficiency or deficiency of title to any property acquired for or on behalf of the corporation, or for the insufficiency or deficiency of any security in or upon which any of the moneys of the corporation shall be placed out or invested, or for any loss or damage arising from the bankruptcy, insolvency or tortuous acts of any person with whom any of the moneys, securities or effects of the corporation shall be lodged or deposited. Nothing herein shall relieve any director or officer from the duty to act in accordance with the Act or from liability for any breach thereof. The directors of the corporation shall not be under any duty or responsibility in respect of any contract, act or transaction, made, done or entered into on behalf of the corporation, except such as shall have been submitted to and authorized or approved by the board of directors. If any director or officer of the corporation shall be employed by or shall perform services for the corporation otherwise than as a director or officer or shall be a member of a firm or a shareholder, director or officer of a body corporate which is employed by or performs services for the corporation, the fact of such director or officer being a shareholder, director or officer of the corporation shall not disentitle such director or officer or such firm or body corporate, as the case may be, from receiving proper remuneration for such services.

### SECTION 9.2 INDEMNITY

Subject to the limitations contained in the Act, the corporation shall indemnify a director or officer, a former director or officer, or a person who acts or acted at the corporation's request as a director or officer of a body corporate of which the corporation is or was a shareholder or creditor, or a person who undertakes or has undertaken any liability on behalf of the corporation or any such body corporate, and his or her heirs and legal representatives, against all costs, charges and expenses, including an amount paid to settle an action or satisfy a judgment, reasonably incurred by that person in respect of any civil, criminal or administrative action or proceeding to which such person is made a party by reason of being or having been a director or officer of the corporation or such body corporate, if:

    (a) such person acted honestly and in good faith with a view to the best interests of the corporation; and

    (b) in the case of a criminal or administrative action or proceeding that is enforced by a monetary penalty, such person had reasonable grounds for believing that his or her conduct was lawful.

The corporation shall indemnify any person referred to above who fulfills the conditions contained in (a) and (b) above and who has been substantially successful on the merits in the defense of any civil, criminal or administrative action or proceeding to which such person is made a party by reason of his or her being or having been a director or officer of the corporation or body corporate, against all costs, charges and expenses reasonably incurred by such person in connection with the defense of such action or proceeding.

The corporation may also indemnify such persons in such other circumstances as the Act or other applicable law permits or requires. Nothing in this by-law shall limit the right of any person entitled to indemnity to claim indemnity apart from the provisions of this by-law. The corporation is hereby authorized to execute agreements evidencing its indemnity in favour of the foregoing persons to the full extent permitted by law.

## SECTION 9.3   INSURANCE

To the extent permitted by the Act and other applicable law, the corporation may purchase and maintain insurance for the benefit of any person referred to in Section 9.2 against such liability as the board of directors may determine.

## ARTICLE 10
## DISCLOSURE OF INTEREST BY DIRECTORS AND OFFICERS

### SECTION 10.1   DISCLOSURE OF INTEREST AND VOTING

No director or officer shall be disqualified by virtue of being a director, or by holding any other office of, or having any other relationship with or pecuniary interest with respect to, the corporation or any body corporate, partnership or other person in which the corporation is a shareholder, partner or is otherwise interested, from entering into, or from being concerned or interested in any manner in, any contract, transaction or arrangement made, or proposed to be made, with the corporation or any body corporate, partnership or other person in which the corporation is a shareholder or is otherwise interested and no such contract, transaction or arrangement shall be void or voidable for any such reason. Subject to the Act, no director or officer shall be liable to account to the corporation for any profit arising from any such directorship, office, relationship or pecuniary interest or realized in respect of any such contract, transaction or arrangement. Except as required by the Act, no director or officer need make any declaration or disclosure of interest or, in the case of a director, refrain from voting in respect of any such contract, transaction or arrangement.

## ARTICLE 11
## FINANCIAL YEAR

### SECTION 11.1   FINANCIAL YEAR

Unless otherwise determined by the board of directors, the financial year of the corporation shall be the calendar year.

## ARTICLE 12
## AUDITOR

### SECTION 12.1   AUDITOR

At each annual meeting of shareholders, the shareholders shall appoint an auditor to hold office until the close of the next annual meeting of shareholders.

At least once in each financial year, the accounts of the corporation shall be examined and the auditor shall report on the financial statements of the corporation required by law.

*18*

## ARTICLE 13
## SECURITIES

### SECTION 13.1  ISSUANCE

Subject to the Act and to the articles of the corporation, the issuance of shares of the corporation shall be determined by the board of directors which may accept subscriptions for, allot, issue and grant rights and options in respect of the shares of the corporation to such persons, on such terms and conditions, and for such consideration as it may determine.

### SECTION 13.2  SECURITY CERTIFICATES

Unless otherwise permitted by the Act, every holder of a security of the corporation is entitled, at such holder's option, to a security certificate or a non-transferable written acknowledgement of such holder's right to obtain a security certificate.  Security certificates shall be in such form as the board of directors may determine.  Unless otherwise permitted under the Act, a security certificate shall be signed manually by at least one (1) director or officer of the corporation or by, or on behalf of, the registrar, transfer agent or branch transfer agent of the corporation, or by a trustee who certifies it in accordance with a trust indenture, and any additional signatures required on the security certificate may be printed or otherwise mechanically reproduced thereon.

### SECTION 13.3  SECURITIES REGISTERS

To the extent permitted under the Act, a central securities register shall be maintained by the corporation or by an agent at its registered office or at any other place designated by the board of directors for each class or series of securities.  Branch securities registers may be maintained by the corporation or by an agent at any place designated by the board of directors for each class or series of securities.

Offices for the transfer of securities of the corporation may be maintained at such places as the board of directors may determine.

### SECTION 13.4  LOST OR DESTROYED CERTIFICATES

New certificates for securities of the corporation may be issued upon such terms and conditions as the board of directors or any officer or agent designated by the board of directors may prescribe to replace any certificates theretofore issued by the corporation that have been defaced, mutilated, lost, destroyed or wrongfully taken.

### SECTION 13.5  PAYMENT OF DIVIDENDS AND OTHER AMOUNTS

Subject to the Act, the board of directors may declare dividends payable to the shareholders according to their respective rights and interests in the corporation.

Subject to the articles and by-laws of the corporation, any amount payable in cash to shareholders (including dividends payable in cash) may be paid by cheque drawn on a financial institution or by electronic means to or to the order of each registered holder of shares of the class or series in respect of which such amount is to be paid.  Cheques may be sent by delivery or first class mail to such registered holder at the holder's address appearing on the register of shareholders, unless that holder otherwise directs in writing.  The sending of a cheque, as herein provided, in the amount of the dividend less any tax that the corporation is require to withhold, shall discharge the corporation from its liability to pay the amount of that dividend, unless the cheque is not paid on due presentation.

Cheques payable to joint shareholders shall be made payable to the order of all such joint shareholders.  Such cheques may be sent to the joint shareholders at the address appearing on the register of shareholders in respect of that joint holding, to the first address so appearing if there is more than one (1), or to such other address as such joint shareholders direct in writing.

Dividends or other distributions payable in cash may be paid to shareholders in Canadian currency or in equivalent amounts of a currency or currencies other than Canadian currency.  The board of directors may declare dividends or

12

other distributions in any currency or in alternative currencies and make such provisions as it deems advisable for the payment of such dividends or other distributions.

## SECTION 13.6  JOINT HOLDERS

In case of several persons registered as the joint holders of any securities of the corporation, any one (1) of such persons may give effectual receipts for all dividends and payments on account of dividends, bonus, return of capital, principal, interest, redemption payments on redemption of securities (if any) subject to redemption, or other money or security payable or issuable in respect of such securities.

## SECTION 13.7  UNCLAIMED DIVIDENDS

To the extent permitted under applicable law, any dividend unclaimed after a period of five (5) years from the date on which it has been declared payable shall be forfeited and shall revert to the corporation.

## ARTICLE 14
## EXECUTION OF DOCUMENTS

## SECTION 14.1  DOCUMENTS

Any two (2) of the chairman of the board, the chief executive officer, the president, the chief operating officer, the chief financial officer, the chief legal officer, the chief marketing officer, the chief technology officer, the corporate secretary, the controller, the treasurer, any president of a business unit, division, or other organization within the corporation, or any vice-president, or any one (1) of the aforesaid officers together with any other officer of the corporation, or any one (1) of the aforesaid officers together with a director, or any other person or persons as the board of directors may authorize, are authorized and empowered to execute and deliver, in the name and on behalf of the corporation, any and all agreements, deeds, documents, instruments and writings. In addition, any two (2) officers that may execute agreements, deeds, documents, instruments and writings on behalf of the corporation may direct the manner in which and the person or persons by whom any particular agreement, deed, document, instrument or writing or class of agreements, deeds, documents, instruments and writings may or shall be executed and delivered on behalf of the corporation.

To the extent permitted by the Act or other applicable law, agreements, deeds, documents, instruments and writings on behalf of the Corporation may be executed by the authorized individuals using electronic signatures.  The board of directors may establish, by resolution, procedures in respect of the use of electronic signatures.

## SECTION 14.2  BANKING ARRANGEMENTS

The banking business of the corporation, including, without limitation, the borrowing of money and the giving of security therefor, shall be transacted in such manner and by such persons as the board of directors, or as an officer or officers designated by the board of directors, may determine, either generally or with respect to a particular instance.

All cheques, drafts or orders for payment of money and all notes, acceptances and bills of exchange shall be signed by such officer or officers or other person or persons, whether or not officers of the corporation, and in such manner as the board of directors, or as an officer or officers designated by the board of directors, may determine.

## SECTION 14.3  CUSTODY OF SECURITIES

The securities owned by the corporation shall be deposited for safekeeping with a bank or trust company or with such other financial institutions or depositories or in such other manner as may be selected by such officer or officers or other person or persons, whether or not officers of the corporation, and in such manner as the board of directors, or as an officer or officers designated by the board of directors, shall determine.  Any securities so deposited may be withdrawn from time to time only upon the written order of the corporation signed by such officer or officers or other person or persons, whether or not officers of the corporation, and in such manner as the board of directors, or an officer or officers designated by the board of directors shall determine.  Any such authority may be general or confined to specific instances.

20

## ARTICLE 15
## NOTICES

### SECTION 15.1 METHOD OF GIVING NOTICES

To the extent permitted by the Act or other applicable law, notice to be given, delivered or sent by the corporation to any director, officer, shareholder, auditor or other person entitled to it shall be sufficiently given, delivered or sent if delivered personally, or left at such person's recorded address, or sent by first class mail, telecopy, facsimile, or is otherwise communicated by electronic means capable of producing a copy that is accessible to the addressee at the recorded address of such person and is capable of being retained so as to be usable for subsequent reference. The board of directors may establish, by resolution, procedures to give, deliver or send a notice to any director, officer, shareholder, auditor or other person by any means of communication permitted by the Act or other applicable law.

Subject to the Act, a notice shall be deemed to have been given, delivered or sent when it is delivered personally or to the recorded address as aforesaid; when it has been deposited in a post office or post office letter box; or when it has been dispatched or delivered for dispatch by telecopy, facsimile, or is otherwise communicated by electronic means.

Notwithstanding the foregoing, if there are reasonable grounds for believing that a notice to be given, delivered or sent to shareholders, if sent by unregistered mail, will not be received in the ordinary course of mail, alternate methods may be authorized by the board of directors, such as depositing the notice at the offices at which the securities registers of the corporation are maintained or other places and publishing a notice of its availability at such places in appropriate publications, subject to applicable law.

For purposes of this Article 15, the recorded address of a shareholder is the address as recorded in the securities register, and the recorded address of a director, officer, auditor or other person entitled to receive a notice is the latest address as recorded in the records of the corporation.

Any such notice to be given, delivered or sent to shareholders by the corporation may, if two (2) or more persons are registered as joint holders of shares, be given, delivered or sent to whichever person is first named in the securities register of the corporation.

### SECTION 15.2 PROOF OF GIVING OF NOTICE

A certificate of the corporate secretary or any other officer of the corporation or of any agent appointed by the corporation, with respect to the giving, delivery or sending of any notice shall be conclusive evidence of the facts stated therein and shall be binding on every director, officer, shareholder, auditor or other persons, as the case may be.

### SECTION 15.3 ADDRESSES OF SHAREHOLDERS

Every shareholder shall furnish in writing to the corporation or to any agent appointed by the corporation an address where all notices intended for such shareholder may be given. In the absence of any such address being furnished, the address of the shareholder shall be deemed to be that of the office at which the central securities register of the corporation is maintained.

### SECTION 15.4 ACCIDENTAL OMISSION

The accidental omission to give, deliver or send any notice to any director, officer, shareholder, auditor or other person entitled thereto or the non-receipt of any notice by any such person or any irregularity or error in any notice or in the giving, delivery or sending thereof shall not invalidate any action taken at any meeting held pursuant to such notice or otherwise founded thereon.

### SECTION 15.5 PERSONS ENTITLED BY DEATH OR OPERATION OF LAW

Every person who, by operation of law, transfer, death of a security holder or any other means whatsoever, shall become entitled to any security, shall be bound by every notice in respect of such security which shall have been

14

duly given, delivered or sent to the security holder from whom such person derives title to such security prior to the name and address of such person being entered on the securities register (whether such notice was given before or after the happening of the event upon which such person became so entitled) and prior to such person furnishing to the corporation the proof of authority or evidence of entitlement prescribed by the Act.

## SECTION 15.6  WAIVER OF NOTICE

Any shareholder, proxyholder or other person entitled to attend a meeting of shareholders, and any director, officer, auditor or other person entitled to receive notice may at any time waive any notice, or waive or abridge time for any notice required to be given, delivered or sent to such person and such waiver or abridgement, whether given before or after the meeting or event, or other occurrence of which or in respect of which notice is required to be given, delivered or sent, shall cure any default in the giving, delivery or sending of such notice or in the length of such notice, as the case may be. Unless required by the Act or other applicable law, or by the articles or by-laws of the corporation, a waiver of notice of meeting of shareholders or of the board of directors or committee of directors may be given in any manner.

## ARTICLE 16
## BORROWING

### SECTION 16.1  BORROWING POWER

Without in any way limiting the borrowing powers of the corporation and of the board of directors of the corporation as set forth in the Act, but subject to the articles of the corporation, the board of directors may, on behalf of the corporation, without authorization of the shareholders:

(a)    borrow money upon the credit of the corporation;

(b)    issue, reissue, sell or pledge bonds, debentures, notes or other evidences of indebtedness or guarantee of the corporation, whether secured or unsecured;

(c)    to the extent permitted by the Act, give directly or indirectly financial assistance to any person by means of a loan, guarantee or otherwise on behalf of the corporation to secure performance of any present or future indebtedness, liability or obligation of any person; and

(d)    mortgage, hypothecate, pledge or otherwise create a security interest in all or any currently owned or subsequently acquired real or personal, movable or immovable, property of the corporation including book debts, rights, powers, franchises and undertakings, to secure any such bonds, debentures, notes or other evidences of indebtedness or guarantee or any other present or future indebtedness, liability or obligation of the corporation.

Nothing in this Section 16.1 limits or restricts the borrowing of money by the corporation on bills of exchange or promissory notes made, drawn, accepted or endorsed by or on behalf of the corporation.

### SECTION 16.2  DELEGATION

Unless the Act or the articles or by-laws of the corporation otherwise provide, the board of directors may delegate to a director or directors, a committee of the board of directors, or an officer or officers of the corporation any or all of the powers conferred on the board of directors by the Act and Section 16.1 to such extent and in such manner as the board of directors may determine at the time of such delegation.

## ARTICLE 17
## ENACTMENT AND REPEAL

### SECTION 17.1  EFFECTIVE DATE

This by-law shall come into force and effect when made by the board of directors in accordance with the Act.

## ARTICLE 18
## INTERPRETATION

**SECTION 18.1 INTERPRETATION**

This by-law shall be in both the English and French languages and both versions shall be equally authoritative. If there be a difference between the English and French texts of this by-law, that version shall prevail which is most consistent with the intention of the by-law and the ordinary rules of interpretation shall apply in determining such intention.

This by-law and all other by-laws are made pursuant to and are subordinate to the Act and should be read in conjunction with the Act. In case of conflict between a provision of any by-law and a provision of the Act, the applicable provision of the Act shall govern.

Words and expressions not defined in this by-law shall have the same meaning as ascribed by the Act, unless required otherwise by the context.

Words importing the singular number shall include the plural and vice versa and words importing gender shall include the masculine, feminine and neuter genders.

# Tab B

23

This is Exhibit...........$B$...............referred to in the

affidavit of.....Anne...Ventresca......

sworn before me, this.....26th................

day of.....November.................20...11..

M.—G—

A COMMISSIONER FOR TAKING AFFIDAVITS

~~Maureen R.A. Edwards~~

AIG Commcercail Insurance Company of Canada

145 Wellington Street West
Toronto, Ontario.
M5J 1H8

Date: December 1, 2008

Gregory Eskins
MARSH CANADA LIMITED
161 BAY ST
TORONTO, ON M5J-2S4

RE:    Nortel Networks Corp.
       DIRECTORS, OFFICERS AND ORGANIZATION LIABILITY INSURANCE POLICY
       D&O 2/2000
       Policy number: 01-335-76-98

You have requested an explanation of how the presumptive indemnification language
of policy referenced above ("Policy") as found in the definition of "Indemnifiable
Loss[1]" will work if the Named Entity becomes insolvent. Please note, that this letter
is being written for the purposes of a better understanding of the provisions of the
policy referred to above and is not applicable to other policies. Please note further
that terms appearing in bold shall have the same meaning attributed to them as they
do in the Policy.

Normally, there is no retention applicable to Loss payable under Coverage A or
Coverage C, "for which the Organization has neither indemnified nor is permitted or
required to indemnify an Insured Person pursuant to law or contract or the charter,
bylaws, operating agreement or similar documents of an Organization." When the
Organization has indemnified or is permitted or required to indemnify an Insured
Person pursuant to law or contract or the charter, bylaws, operating agreement or
similar documents of an Organization then a retention applies.

However, if the Organization goes bankrupt and in a filing for bankruptcy protection
(voluntarily or involuntarily) under Title 11 of the United States Code or under the
Company Creditors' Arrangement Act,R.S.C. 1985 c. C-36 (as amended), or any similar
provincial or foreign law (collectively "Bankruptcy Law") the court prohibits
indemnification by the Organization of Loss of the Insured Persons because of higher
bankruptcy law priorities, then, generally, the Insurer would not consider
indemnification of the Insured Persons for such Loss by the Organization to be
"permitted or required."  The result of this is that, as respects to such Loss of the
Insured Persons under Coverage B (ii) of the Policy, the presumptive indemnification

---

[1] Capitalized terms not otherwise defined herein are used with the same meaning as they have in the D&O
2/2000 form.

language found in the Definition of **Indemnifiable Loss** would not apply and the **Insurer** would apply a zero retention (or the applicable retention) to such **Loss**. Of course, the **Insurer** would expect the **Insured Persons** to file on the behalf of the **Insurer** a Proof of Claim in the bankruptcy proceedings (or any appeal thereof) to the extent he or she had been entitled, but for the bankruptcy, to indemnification from the **Organization**. The **Insurer** would also expect and require the **Organization** to petition the bankruptcy court in good faith to permit indemnification of its **Insured Persons**.

I hope that this satisfies your query. If there are any further questions I would be happy to answer them for you.

Sincerely,

Hano Pak
Vice President
Executive Liability, a division of AIU Holdings Inc.

# Tab C

 **Ⅎ ERNST & YOUNG**

Ernst & Young Inc.
Ernst & Young Tower
222 Bay Street, P.O. Box 251
Toronto, Ontario M5K 1J7

Tel: 416 864 1234
Fax: 416 943 3300
ey.com/ca

December 16, 2009

*This is Exhibit...........°C.....................referred to in the*

*affidavit of...Anna Ventresca..........*

*sworn before me, this.....28th.........................*

*day of....December.........................20.11...*

*................M̶— G̶........................*
A COMMISSIONER FOR TAKING AFFIDAVITS
Maureen R.A. Edwards

Nortel Networks Corporation
5945 Airport Road, Suite 360
Mississauga, Ontario
L4V 1R9

**Attention: John Doolittle**

Dear Sirs:

As the Monitor of Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL") and the other applicants (collectively with NNC and NNL, "Nortel") in the proceedings commenced on January 14, 2009 under the *Companies' Creditors Arrangement Act* (the "CCAA" Proceedings"), you have asked for our view as to whether Nortel is currently in a position to advance the defence costs of Messrs. Zafirovski and Binning in respect of the purported class action captioned *as David Lucescu, Individually and On Behalf of All Others Similarly Situated v. Mike Zafirovski and Pavi Binning*, filed in the U.S. District Court for the Southern District of New York (Case No. 1:09-cv-0461(SAS)). We understand that this issue is subject to ongoing discussions with Nortel's D&O insurers.

We refer you to the Third Amended and Restated Initial Order of the Ontario Superior Court of Justice (the "Court") dated January 14, 2009 issued in the CCAA Proceedings, as extended from time to time (the "Initial Order"). Paragraph 14 of the Initial Order imposes a stay of proceedings with respect to all creditors' claims against Nortel. During the stay period, which is currently in effect, the Initial Order prohibits any "proceeding or enforcement process" against or in respect of Nortel or affecting its business or property, unless Nortel and the Monitor consent in writing or the Court grants leave.

Paragraph 15 of the Initial Order stays and suspends all "rights and remedies" of any individual against or in respect of Nortel or affecting its business or property, unless Nortel and the Monitor consent in writing or the Court grants leave.

In our view, the Initial Order stays the rights of current and former directors and officers to advance claims of indemnification or for the advancement of defence costs, whether such rights arise pursuant to statute, by-law, contract or otherwise, except with the written consent of Nortel and the Monitor or with leave of the Court, with the sole exception of indemnification claims that are covered by paragraph 20 of the Initial Order (which does not appear to be applicable to the *Lucescu* action).

You have also asked whether the Monitor would consent to the advancement of defence costs in respect to the *Lucescu* action. We have carefully considered this request. However, we are not prepared to consent to any such payment at this time. We are of the view that such payment would not be justified for a couple of reasons. Firstly, such a payment may very well constitute



Ell ERNST & YOUNG

- 2 -

the granting of a preference to the director or officer in question at the expense of other creditors of Nortel.    Further, even if the Monitor considered such payment to be justified in the circumstances, the Monitor is of the view that such payment would not be prudent given Nortel's current limited cash resources.  This is especially the case where we understand that insurance coverage is available to the directors and officers with respect to this action under the D&O policy.  In this regard, we would also direct you to paragraph 22 of the Initial Order which makes it clear that directors and officers are to look to D&O coverage for indemnification. Accordingly, the Monitor would oppose any application by the insurer to the Court to lift the stay of proceedings to pursue this matter.

Please do not hesitate to contact the undersigned if the above requires further clarification.

Yours truly,

**ERNST & YOUNG INC. IN ITS CAPACITY
AS THE MONITOR OF NORTEL NETWORKS
CORPORATION ET AL. AND NOT IN ITS
PERSONAL CAPACITY**

Per: _____

        Murray A. McDonald
        President

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No:  09-CL-7950

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

Proceeding commenced at TORONTO

---

**SUPPLEMENTAL AFFIDAVIT OF ANNA VENTRESCA
SWORN NOVEMBER 28, 2011**

---

**NORTON ROSE OR LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street, P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: +1 416.216.4832
Email: derrick.tay@nortonrose.com

**Jennifer Stam LSUC#: 46735J**
Tel: +1 416.216.2327
Email: jennifer.stam@nortonrose.com

Fax: +1 416.216.3930

Lawyers for the Applicants

2300248

# TAB  2

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

RD/fm

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985. c.-C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF

NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION, and NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c.C-36, AS AMENDED

- - - - - - - - - -

This is the Cross-Examination of ANNA VENTRESCA, on her
affidavits sworn November 28th, 2011, and October 7th,
2011, taken at the offices of VICTORY VERBATIM REPORTING
SERVICES, Suite 900, Ernst & Young Tower, 222 Bay Street,
Toronto, Ontario, on the 30th day of January, 2012.

- - - - - - - - - -

APPEARANCES:

ALAN B. MERSKEY                    -- for Anna Ventresca

SEAN DEWART                        -- for Chartis
CHRIS DONOVAN

SCOTT A. BOMHOF                    -- for Nortel Networks
EMILY BUSSIGEL                     Inc., and U.S. Chapter 11
                                   Debtors

ELIZABETH PUTNAM                   -- for Board of Directors
                                   of Nortel Networks
                                   Corporation/Limited

ROBIN B. SCHWILL                   -- for Nortel Networks UK

Limited

A. Ventresca - 3

## INDEX OF PROCEEDINGS

|  | PAGE NUMBER |
|---|---|
| ANNA VENTRESCA, sworn | |
| Cross-Examination by Mr. Dewart | 1 - 34 |
| Index of Undertakings | 35 |
| Index of Under Advisements | 36 |
| Index of Refusals | 37 |
| Certificate | 38 |

ANNA VENTRESCA, sworn

CROSS-EXAMINATION BY MR. DEWART:

1.          Q.     Ms. Ventresca, do you understand
       that we are on the record now?

            A.     Yes, I do.

2.          Q.     And you're a lawyer qualified to
       practise in Ontario?

            A.     Yes.

3.          Q.     And you have sworn two affidavits on
       the pending application?

            A.     Yes.

4.          Q.     And you have had a chance to review
       those before we started this morning?

            A.     Yes.

5.          Q.     And if you look at Exhibit B, I
       think, to the first affidavit, you will see that it
       is the Lucescu, if I'm pronouncing it correctly,
       class action that was commenced on May 18th, 2009 or
       2010?

            A.     2009.

6.          Q.     And when did Nortel file for CCAA
       protection, January of the same year?

            A.     14, 2009.  Yes.

7.          Q.     So, can I safely assume from that
       that no amount was owing...or that no fees had been

A. Ventresca - 5

```
 1          incurred by or on behalf on the directors in
 2          response to that class action, the Lucescu class
 3          action at the time of the filing?
 4                    A.    That's my understanding.
 5    8.            Q.    And I gather there is not a copy of
 6          the initial order in the materials?  I'm going to
 7          show you my copy.  You have indicated in your
 8          affidavit that there are various provisions of this
 9          order dated January 14, 2009, that prevent Nortel
10          from indemnifying the directors?
11                    A.    That's correct.
12    9.            Q.    So, I just want to take that apart,
13          if I could, for a second.  If you look at paragraph
14          10, in light of what you just told me about the fact
15          that no fees have been incurred in respect of
16          Lucescu action at the time of filing, will you agree
17          with me that there is nothing in paragraph 10 of the
18          order that prevents indemnification?
19                    MR. MERSKEY:    Well, Mr. Dewart, I think
20          that all interpretation of the order is the
21          argument for the court, isn't it?
22   10.            MR. DEWART:    Well, she just told me that
23          she is a lawyer and she put it in her
24          affidavit they are not entitled to
25          indemnify.  So, she made it a matter of
```

1          evidence.  If you want to withdraw the
2          affidavit, that's fine.  But if you want to
3          rely on the affidavit, I'm going to
4          cross-examine on it.
5          MR. MERSKEY:    You can ask the question,
6          Mr. Dewart.
7   11.    MR. DEWART:    Okay, I did.  Could I get
8          an answer, please?
9          THE DEPONENT:    Can you please ask the
10          question again?
11

12   BY MR. DEWART:

13   12.          Q.    Okay, so you agree with me in the
14          light of what you just said that there is nothing in
15          paragraph 10 of the order which prevents NNC from
16          indemnifying the directors?
17          MR. MERSKEY:    Don't answer the question.          /R
18   13.    MR. DEWART:    All right.  So, what we are
19          going to do is we are going to adjourn and
20          we are going to get a ruling, and then we
21          are going to come back.
22

23   ---   DISCUSSION OFF THE RECORD
24

25          MR. MERSKEY:    Counsel, I'm asking you

1      this morning if you have any fact-based

2      questions for this witness, or whether all

3      of your questions relate to the

4      interpretation of the order.

5  14.      MR. DEWART:    My questions...they don't

6      all relate to the interpretation of the

7      order.  They relate to her affidavit.

8      MR. MERSKEY:    The questions you were

9      just putting to the witness clearly related

10      to the interpretation of the order, which

11      is definitely referenced in her affidavit.

12      Do you have any questions for her on the

13      evidence in the affidavit?

14  15.      MR. DEWART:    It's not referenced in the

15      affidavit.  She says in her affidavit that

16      the order prevents certain things.

17      MR. MERSKEY:    Yes, she does.  And we

18      have also...

19  16.      MR. DEWART:    Okay, am I...

20      MR. MERSKEY:    Am I entitled to finish my

21      answer?

22  17.      MR. DEWART:    Your answer?

23      MR. MERSKEY:    To your position.

24  18.      MR. DEWART:    Go ahead.

25      MR. MERSKEY:    We have also provided you

A. Ventresca - 8

1        with a detailed draft factum at your

2        request, which sets out the company's

3        entire legal position as to which portions

4        of the order apply, and why. Now, as I

5        understand it, it is your position that you

6        are still entitled to argue that with the

7        witness. I don't agree with that; if you

8        want to seek a direction from the court, go

9        ahead. But, I insist that you continue to

10       ask any other questions you have that don't

11       relate to that point, or I will take the

12       position that you have given up that

13       opportunity. So, do you have any questions

14       beyond the interpretation of the order?

15  19.     MR. DEWART:   I have lots of questions

16       that go beyond the interpretation of the

17       order.

18       MR. MERSKEY:   Then please put them

19       on...sorry, finish your statement. I

20       apologize for interrupting.

21  20.     MR. DEWART:   You put it...or, she,

22       rather, deposed in her affidavit to the

23       effect of the order. And you are

24       preventing me from cross-examining on what

25       she put in the affidavit. If you are

A. Ventresca - 9

1   prepared to withdraw the affidavit or those
2   portions of it which contain argument, I
3   don't need to cross-examine her.  But if
4   you are relying on an affidavit in which
5   she says the order has certain effect, I'm
6   entitled to cross-examine her on that.  She
7   just got through telling me that she is a
8   lawyer qualified to practise in Ontario.
9   I'm entitled to her interpretation of the
10  order.  You're the one who is relying on
11  it.  Do you not see that?
12  MR. MERSKEY:       I have raised an
13  objection, Counsel.  I have explained to
14  you the objection in that I think all you
15  wish to do with the witness is argue with
16  them, and we have given you the company's
17  detailed position.  However, a single
18  objection doesn't entitle you to adjourn a
19  cross-examination.  I assumed from the fact
20  of your intent to adjourn that you had no
21  other questions beyond this area that you
22  have just described.  If you have other
23  questions, put them on the record now,
24  please, or you won't get to examine on
25  them.

A. Ventresca - 10

21.     MR. DEWART:     I have lots of questions,
        and...

        MR. MERSKEY:     Yes, finish.  Sorry.

22.     MR. DEWART:     I have no interest in
        arguing with the witness.  I posed a
        question and you wouldn't let her answer.
        That's not arguing with the witness.

        MR. MERSKEY:     And yet you are seeking to
        adjourn the cross-examination over a single
        objection?

23.     MR. DEWART:     A completely ill-founded
        objection, which is going to affect the
        rest of the cross-examination.  I'm going
        to try one more time...one more time.  I
        would ask you to carefully to consider,
        before you interrupt me.


BY MR. DEWART:

24.     Q.     What relief is Nortel seeking on the
        pending motion?

        A.     It's requesting the court to
        determine whether the retention applies.

25.     Q.     And could you actually look at the
        notice of motion, which is in the record before you?
        And in particular, paragraph (b) of the prayer for

1       relief.

2               A.      M'hmm?

3   26.             Q.      Do you see that, in fact, what

4       Nortel is seeking is a declaration that the

5       retention does not apply?

6               A.      Correct.

7   27.             Q.      All right.  And you are familiar

8       with Mr. Pak's letter to Nortel, dated, as I recall,

9       December 1, 2008?  It's Exhibit B to your

10      supplementary affidavit.

11              A.      It's a letter, actually, I believe,

12      to Marsh.

13  28.             Q.      So, from Mr. Pak to the broker?

14              MR. MERSKEY:     If we can turn it up?

15

16  BY MR. DEWART:

17  29.             Q.      Do you see that?

18              A.      M'hmm.

19  30.             Q.      You are familiar with this letter?

20              A.      Yes, I am.

21  31.             Q.      All right, if you go to page 2, do

22      you see the last sentence before the final

23      paragraph,

24              "...The insurer would also expect..."

25              A.      M'hmm.

A. Ventresca - 12

32.      Q.    All right.  And you have had a
chance to read that?

         A.    Yes, I have.

33.      Q.    When did the organization in this
case, Nortel...when did it petition the court in
good faith to permit indemnification of its
insureds?

         A.    It did not.

34.      Q.    Why not?

         A.    Because its understanding from
counsel and the monitor is that under the stay
issued on January 14th, 2009, that such
indemnification is stayed.

35.      Q.    Right.  So, for that reason on the
basis of legal advice and advice from the monitor,
Nortel has declined to petition the court in good
faith?

         A.    Correct.

36.      Q.    And insofar as the monitor's request
is concerned, that is Exhibit C to the same
affidavit, I believe?

         A.    M'hmm.

         MR. MERSKEY:    It's the monitor's
         position, not the monitor's request.

A. Ventresca - 13

VICTORY VERBATIM

BY MR. DEWART:

37.              Q.      What is the date of that letter?

                  A.      December 16th, 2009.

38.              Q.      And do you know...I see that letter is addressed to a John Doolittle. Do you know what request Mr. Doolittle or anyone else made that gave rise to this letter from the monitor?

                  A.      There were several discussions amongst management of Nortel, namely John and myself, with the monitor and his team with...regarding, specifically, the fees that were being incurred by Pavi Binning.

39.              Q.      All right. So, are you telling me that you and Mr. Doolittle met with Murray McDonald or someone else at Ernst and Young?

                  A.      That's correct.

40.              Q.      More than once?

                  A.      I believe that I recall that there were several discussions.

41.              Q.      All right. I mean, obviously, on this topic I'm asking about. And did you keep notes of those discussions?

                  A.      I don't believe so.

42.              Q.      Do you know if Mr. Doolittle did?

                  A.      I don't know.

A. Ventresca - 14

43.          Q.     Do you have any present...who is
John Doolittle?

              A.     He left the company at the end of
2011, and he was...the position he held at that time
was the head of corporate...the corporate group and
the chief financial officer.

44.          Q.     Do you have a present recollection
of these meetings?  Were they meetings or telephone
calls with Ernst and Young?

              A.     Likely a combination.  I mean, we
were meeting daily with the monitor and his team on
a variety of matters, so I can't recall
specifically.

45.          Q.     All right.  So, I take it from what
you just said that you don't have a specific
recollection of these discussions?

              A.     I don't have a specific
recollection, I have a general recollection.  I do
know that they occurred.

46.          Q.     What do you remember?

              A.     That we presented...that we
basically spoke with the monitor to see if there was
a possibility for Pavi's legal fees to be covered by
the company.

47.          Q.     And did you encourage the monitor to

A. Ventresca - 15

permit this payment?

　　　　A.　　I wouldn't say we encouraged it.  It
was more so a discussion within the context of the
CCAA proceedings.

48.　　　　Q.　　So, tell me if this is fair: You
remember that some sort of request was made of the
monitor, but you don't remember what position Nortel
took?

　　　　A.　　I don't think Nortel took any
position.  I think Nortel was seeking advice as to
whether it was appropriate or permissible in the
circumstances for these fees to be covered by the
company.

49.　　　　Q.　　All right.  And the monitor's letter
speaks for itself, obviously.  What is the present
status of the CCAA proceeding?  Am I correct that
all, or essentially all of the assets have been
sold?

　　　　A.　　That's correct.

50.　　　　Q.　　So there is no...Nortel and its
subsidiaries don't have any operating businesses to
speak of?

　　　　A.　　Very, very limited.  We have a few
stranded contracts in our Asia operations, but apart
from that, the main operations are basically

1    concluding on the proceedings.

2    51.        Q.    And there is no intention of filing

3    a plan of compromise that sees Nortel carrying on

4    business in the future?

5             A.    That's correct.

6    52.        Q.    So we are in a liquidation at this

7    point?

8             A.    That's right.

9    53.        Q.    And the monitor indicates that the

10   payment of these fees would not be justified because

11   the monitor is of the view that such payment would

12   not be prudent given Nortel's current limited cash

13   resources.  Does it follow from what you just said

14   that the only impact of the payment of these amounts

15   will be on dividend ultimately received by some or

16   all of the creditors?

17            A.    I'm sorry, say that again.

18   54.        Q.    Let me try it a different way.  It's

19   not going to affect Nortel's ability to restructure

20   its affairs, because it is presently in liquidation,

21   right?

22            A.    M'hmm.

23   55.        Q.    If it makes this payment, is that

24   fair?

25            A.    Yes.

56.        Q.    All right.  So, the only effect that
it is going to have is on the amount of a dividend
received by a creditor?

           A.    Yes, and the...well, and also...my
interpretation of what Murray is saying here is that
it's not just the ultimate dividend, but it's also
the company's ability to do what it needs to do to
get to payment at the end.

57.        Q.    Right, and how do you measure the
materiality of payment of, in this case, I believe
it is approximately $70,000 or $80,000?

           A.    I think it matters...it all depends
on a point in time.

58.        Q.    Right, and it brings me exactly to
my point.  Has Nortel gone back to the monitor since
December 16th, 2009, to revisit this issue in light
of the present circumstances?

           A.    The issue has been open since then,
and we haven't made any further request because of
this ongoing discussion with Chartis and the motion
before the court.

59.        Q.    Sorry, you have not gone back to the
monitor?  Is that what you said?  I just didn't hear
you.

           A.    We have...were in constant contact

A. Ventresca - 18

with the monitor on the matter, and the matter is
open given the motion.

60.        Q.        No, no, but have you...I'm not,
perhaps, expressing myself clearly.  Have you asked
the monitor, since then, if you can make the
payment?

           A.        We don't feel there is a need to ask
the question.  To ask that question, the position is
clear, and our understanding is that it is
unchanged.

61.        Q.        What is the basis of that
understanding?

           A.        Because the basis for their position
has not changed.  They still have limited cash
resources, and the position of a possible
preference, if payment were to be made, remains
unchanged.

62.        Q.        And what is your understanding of
the purpose of the directors and officers trust?

           A.        It is to...it was protection for the
directors and officers of not only the Canadian
entities but all of the subsidiaries globally, the
D&Os of those subsidiaries, protection against
possible liability that those D&Os would fact during
the CCAA proceedings in the event that the insurance

A. Ventresca - 19

1    was either...was unavailable for any reason, but

2    unavailable if it was tapped out, basically, or, for

3    whatever reason, it was no longer in place.

4    63.           Q.    I guess I was asking sort of a more

5    generic question.  Is the reason for putting the

6    trust in place to ensure that there...if the

7    insurance isn't available, there is a form of

8    indemnity available for directors, first of all?  Is

9    that what you just said, in essence?

10                 A.    M'hmm.

11   64.           Q.    You need to say yes or no for the

12   record.

13                 A.    Yes.

14   65.           Q.    And the reason for that is that you

15   don't want all of the directors to resign in the

16   face of the CCAA proceeding?

17                 A.    Yes.

18   66.           Q.    Because it's critical to a

19   successful restructuring to have directors in place?

20                 A.    That's correct.

21   67.           Q.    And in light of the fact that Nortel

22   is now in restructuring, I believe that all of the

23   directors except three have resigned?

24                 A.    At the public entity level.

25   68.           Q.    And in the same way that you want

A. Ventresca - 20

1      meaningful indemnification there, if the insurance
2      is not in place, the initial order also provided
3      that the directors continued to be remunerated at
4      their then-current levels.  Do you remember that?
5                    A.     That is correct.
6  69.               Q.     And that is for the same reason,
7      that you need directors in order to restructure,
8      right?
9                    A.     That's exactly right, yes.
10 70.               Q.     And my understanding...so, in other
11     words, Nortel, for the reasons we have just
12     articulated, continued to remunerate directors as it
13     had in the ordinary course for the purposes of
14     restructuring?
15                   A.     Again, the three directors at the
16     public entity level.
17 71.               Q.     I am going back to when the order
18     was originally filed, in the early stages of the
19     proceeding.  You continued to remunerate them in the
20     ordinary course?
21                   A.     Yes.
22 72.               Q.     And deal with them in the ordinary
23     course?
24                   A.     Yes.
25 73.               Q.     Except for indemnifying them?

VICTORY VERBATIM

-18

A. Ventresca - 21

|  |  |  |  |
|---|---|---|---|
| 1 |  | A. | Yes. |
| 2 | 74. | Q. | Which you would have done...and the |
| 3 |  | words...I believe it is in your affidavit, in the |
| 4 |  | ordinary course you would have indemnified them? |
| 5 |  | A. | Absolutely. |
| 6 | 75. | Q. | All right.  If you could go to your |

1       A.    Yes.

74.     Q.    Which you would have done...and the
words...I believe it is in your affidavit, in the
ordinary course you would have indemnified them?

        A.    Absolutely.

75.     Q.    All right.  If you could go to your
initial affidavit, please?  It's just a point of
clarification; I don't think it is terribly
controversial.  Do you see in paragraph 6, you talk
about other creditors?

        A.    Yes.

76.     Q.    You say that,

              "...The effect of my client's position

              would be to require indemnification..."

I take it we are agreed...I'm not sure who the other
creditors are, or I'm not sure who they are distinct
from.  You're not suggesting that Chartis is a
creditor, are you?

        A.    No.

77.     Q.    That's a reference, I take it, then,
to the directors and officers?

        A.    The other creditors?

78.     Q.    Right.

        A.    No.

79.     Q.    Well, when you talk about the other

1       creditors...

2                   A.     M'hmm.

3    80.            Q.     ...who are they different from?

4                   A.     Oh, sorry.  They are different from

5        the directors and officers.

6    81.            Q.     Okay.  That's what I thought.  How

7        was the figure for the D&O trust arrived at?  It's

8        approximately $11,940,000?

9                   A.     I'm not aware.

10   82.            Q.     How would you find out?  How could

11       you find out?

12                  MR. MERSKEY:     Why is the figure relevant

13                  to the inquiry, Counsel?

14   83.            MR. DEWART:     I want to know if it

15                  pertains, in any way, to the retention.

16                  That's all.

17                  MR. MERSKEY:     I will take it under

18                  advisement.                              U/A

19

20   BY MR. DEWART:

21   84.            Q.     Do you know the answer to...without

22       knowing how the figure, itself, was arrived at, do

23       you know if it pertains in any way to the amount of

24       the retention?

25                  A.     My understanding is that it does

A. Ventresca - 23

1      not.

2  85.          Q.    What is the basis of that

3      understanding?

4              A.    Again, just general discussion.

5  86.          Q.    With whom?

6              A.    Various members of management,

7      counsel, the monitor's team...

8  87.          Q.    When?

9              A.    ...that would have been directly

10     involved.  Back in '09.

11 88.          Q.    Back, if I could, to your affidavit.

12     The original affidavit, paragraph 24.  Have you

13     reviewed it?

14             A.    Yes.

15 89.          Q.    Where has Chartis taken this

16     position?  When or where or what are the

17     particulars?

18             A.    As my understanding from discussions

19     that we have had with Marsh, I'm not sure if we have

20     had discussions directly with Chartis vis-a-vis Pavi

21     Bidding's fees regarding the Lucescu matter.  It's

22     my understanding that that position was expressed to

23     management, either directly or indirectly.

24 90.          Q.    Well, is there anything in writing

25     that you are aware of?

A. Ventresca - 24

1          A.      I'm not sure.  There could be email

2     traffic, but I don't have that before me today.

3   91.          Q.      Well, when did you swear this

4     affidavit?  You swore this affidavit in October, and

5     I assume it has the usual...do you have personal

6     knowledge of this topic?

7          A.      I believe I do, I just can't recall

8     it right now.

9   92.          Q.      And what effect...back to a question

10     I asked you a few moments ago, what effect will the

11     payment, in this case, of $100,000 more or less have

12     on Nortel's ability to complete the liquidation of

13     its assets and the distribution of funds to

14     creditors?

15          A.      That's not possible to answer.

16   93.          Q.      Why not?

17          A.      There are too many varying factors

18     at any point in time.  The total pool of creditors

19     is unknown at this point, and several factors in the

20     CCAA proceedings, including the allocation of the

21     proceeds from the sales of businesses is not yet

22     determined, so it would not be possible for me to

23     assess the impact of $100,000 on that.

24   94.          Q.      Are you suggesting there is any

25     scenario in which it could be material?  Are you

A. Ventresca - 25

seriously suggesting that?

        A.    I don't know.

95.        Q.    Are you able to think of one?  Such a scenario?

        A.    It's possible.  I'm not sure if it is even a question of materiality.

96.        Q.    It was a question of materiality. That's what the question was.  And tell me if this is fair: You, presently, are unable to think of any scenario in which a $100,000 payment would be material to the efforts to restructure.  Is that a fair way to put it?

        A.    No, I don't agree with that.

97.        Q.    Okay, so give me an example.

        A.    I can't think of a specific example. $100,000 is not an immaterial amount to the Canadian estate's cash flow.

98.        Q.    When is the...what is the date of the most recent report by the monitor dealing with cashflow?  Is it the December 2011 report?

        A.    That sounds right, but I don't have the date in front of me.

99.        Q.    Have you reviewed it?

        A.    I would have reviewed it, yes.

100.        Q.    Do you remember offhand how much

VICTORY VERBATIM

A. Ventresca - 26

1   cash was available...readily available to Nortel, as

2   of December 2011?

3           A.    No.

101.  4         Q.    Am I correct in my recollection that

5   it is somewhere in excess of $300 million?

6           MR. MERSKEY:    If it's a question of fact

7           it's in the monitor's report.

102.  8         MR. DEWART:    I don't have the monitor's

9           report with me.

10

11  BY MR. DEWART:

103.  12        Q.    Is that your understanding, it's in

13  that order of magnitude?  Is that a fair way to put

14  it?

15          A.    That's correct.

104.  16        Q.    And what provisions in the initial

17  order do you say prevent Chartis from

18  indemnifying...let me back up for a second.  Is

19  there anything that legally prevents Chartis from

20  indemnifying the directors apart from the provisions

21  in the initial order?

22          A.    Chartis?

23          MR. MERSKEY:    Chartis?

24

25  BY MR. DEWART:

A. Ventresca - 27

105.          Q.     Excuse me.  Nortel.

              A.     Not that I am aware of, no.

106.          Q.     Okay, and so what provisions in the
       initial order do you say prevent it?

              MR. MERSKEY;    Counsel, we have given you
              a detailed position on that in the draft
              factum that we gave you.

107.          MR. DEWART:    All right.


BY MR. DEWART:

108.          Q.     So, I'm asking the witness.

              A.     I think I need to see a copy of it.
       I don't have the order memorized; I would have to
       see a copy of the order.

109.          Q.     You have actually got my copy of the
       order in front of you, I think, unless you gave it
       back.  You did give it back.

              A.     Paragraph 15.

110.          Q.     Okay.

              A.     This is the second amended and
       restated initial order.  The court ordered...the
       court ordered that, during the estate period, all
       rights and remedies of any individual against the
       applicants or the monitor are stayed.

111.          Q.     There is nothing in there which

A. Ventresca - 28

1    prevents Nortel from making a payment.  There is

2    something in there which prevents persons from

3    advancing...in effect, from advancing claims against

4    Nortel.  Is that fair?

5             MR. MERSKEY:    Counsel.  I have already

6             said that I'm going to get into arguments

7             with the witness about what the order does

8             and doesn't say.  We have given you a

9             detailed position about it.  You can make

10            the arguments about whether that position

11            is right or not, but they are still

12            arguments.

13   112.     MR. DEWART:    Well, it's not...I'm not

14            arguing with her.  I'm just asking her a

15            question.  That, surely, isn't an argument,

16            first thing, right?

17            MR. MERSKEY:    It's all for the purpose

18            of argument, Counsel.

19   113.     MR. DEWART:    Well, no.  I have got a

20            follow-up question if you permit her to

21            answer it.

22            MR. MERSKEY:    Let me hear the follow-up

23            question.

24   114.     MR. DEWART:    No, that is not how

25            cross-examination works.

A. Ventresca - 29

1           MR. MERSKEY:    What was your previous

2           question?

3    115.    MR. DEWART:    She indicated, I think,

4           that paragraph 15 of the order prevented

5           the indemnification payment from being made

6           by Nortel.

7

8    BY MR. DEWART:

9    116.        Q.    First of all, is that fair, Ms.

10          Ventresca?

11               A.    That's fair that that was your

12          question.  I responded with paragraph 15, and I

13          believe there are other paragraphs.  Paragraph 15 is

14          relevant to your question.

15   117.        Q.    Okay, so we will obviously do them

16          one by one.  But you said...I asked you what

17          prevented it, what provisions in the order, and you

18          pointed me to paragraph 15.  And then I said, if I

19          have got it right, paragraph 15 prevents persons

20          from exercising their rights and remedies against

21          Nortel, does not prevent Nortel from doing anything?

22               A.    That's fair.

23   118.        Q.    Okay.  What other provisions in the

24          order do you say prevent Nortel from making the

25          indemnification payments?

|   |   |
|---|---|
| 1 | MR. MERSKEY:     Again, Counsel, I'm going |
| 2 | to ask you why this inquiry when we have |
| 3 | given you the detailed position about which |
| 4 | every provision in the order is that |
| 5 | prevents it? |
| 6 | 119.     MR. DEWART:     Because I want to |
| 7 | cross-examine..I don't have to justify |
| 8 | cross-examining a witness if you have |
| 9 | tendered her affidavit. |
| 10 | MR. MERSKEY:     I don't think this is the |
| 11 | proper subject matter of the |
| 12 | cross-examination.  I have allowed |
| 13 | dozens...more than dozens of questions |
| 14 | which I though were, at least, potentially |
| 15 | the proper subject matter.  Now, we just |
| 16 | have a difference of opinion, I think, as |
| 17 | to whether it is appropriate for you to get |
| 18 | into a blow-by-blow about the meaning of |
| 19 | provisions of the order with the witness. |
| 20 | 120.     MR. DEWART:     It doesn't...before you |
| 21 | call that an argument, these are just words |
| 22 | you are using.  It wasn't a blow-by-blow. |
| 23 | I asked her a question, she answered it, I |
| 24 | moved on. |
| 25 | MR. MERSKEY:     You are asking the witness |

|   |   |   |
|---|---|---|
| 1 |  | to go through each individual aspect of the |
| 2 |  | order that you ask supports the company's |
| 3 |  | position. Forget whether it is an argument |
| 4 |  | or not, that is what the subject matter of |
| 5 |  | your current examination is now. |
| 6 | 121. | MR. DEWART:    I asked her what prevented |
| 7 |  | the payments and she said, "Nothing outside |
| 8 |  | the order." I asked her what provisions in |
| 9 |  | the order, and she started to answer the |
| 10 |  | question. And we didn't get into an |
| 11 |  | argument, and we didn't get into a |
| 12 |  | blow-by-blow. And, in fact, we would be |
| 13 |  | done by now if you would stop interfering |
| 14 |  | with the cross-examination. |
| 15 |  | MR. MERSKEY:    How many more questions do |
| 16 |  | you have, Counsel? |
| 17 | 122. | MR. DEWART:    Well, I don't know.  It |
| 18 |  | depends what provisions she points me to. |
| 19 |  | MR. MERSKEY:    Well, it's hard for me to |
| 20 |  | accept that we would be done by now. |
| 21 | 123. | MR. DEWART:    Well, I rather expect we... |
| 22 |  | MR. MERSKEY:    ...if I, as you |
| 23 |  | characterize it, stopped interfering. |
| 24 |  |  |
| 25 | BY MR. DEWART: |  |

A. Ventresca - 32

124.          Q.      What other provisions in the order
do you say prevent the indemnification payment from
being made?
              MR. MERSKEY:     Don't answer the question,
              please.  I have expressed my objection.                /R
125.          MR. DEWART:      Could I see the order,
              please?


BY MR. DEWART:

126.          Q.      Tell me if you're happy with this:
Are there any provisions in the order which prevent
the indemnification payments from being made, apart
from those which are set out in the draft factum
you have provided to me?  I'm content for your
counsel to answer this question.
              MR. MERSKEY:     No, there are no other
              provisions that are relied on.


BY MR. DEWART:

127.          Q.      Has any request been made by either
the affected directors or their counsel for
indemnification in writing?
              A.      I would have some emails, email
correspondence from Pavi Binning.
128.          Q.      Sorry, that's the counsel that was

A. Ventresca - 33

1    retained?  Who is that?

2              A.    Sorry, no.  Pavi...

3         MR. MERSKEY:    Pavi is the former...

4         THE DEPONENT:    He is the...

5    129.    MR. DEWART:    Oh, sorry, the former...

6         MR. MERSKEY:    Just, can I clarify?  Pavi

7         Binning is the former CFO who is one of the

8         named defendants in the Lucescu proceeding.

9

10   BY MR. DEWART:

11   130.         Q.    Okay, and he has made the request of

12        you directly?  Or someone else at Nortel?

13             A.    He made the request to myself and to

14        John Doolittle to explore the possibility of having

15        his fees covered.

16   131.         Q.    And that was in an email, I think

17        you said?

18             A.    Yes, and phonecalls.

19   132.         Q.    And did you make notes of the phone

20        calls?

21             A.    Possibly.  I can't recall.

22   133.         Q.    Could I have production, please, of

23        the email or emails where the request was either

24        made or repeated and notes of any telephone

25        conversations if you have them.

A. Ventresca - 34

MR. MERSKEY:    We will make inquiries as
to what is available.  I have to review, if
there is anything available, the contents
first to see if there is anything
privileged in it.  If there is anything
that is privileged that we have concerns
over producing, we will advise you.  If
there is nothing there, we will let you
know there is nothing available.

134.    MR. DEWART:    Right.  Redacting for
privilege, how would work?

MR. MERSKEY:    I don't know, but I will
let you know if there is anything of
concern.                                                    U/T

<u>BY MR. DEWART:</u>

135.    Q.    And, I'm sorry, I just want to
clarify.  You did answer before, I just didn't
really understand what you were saying.  So, the
monitor set out its position in a letter dated
December 2009, as I recall.  And you said that it is
the subject of ongoing discussions.  I'm just not
clear what position Nortel has taken with the
monitor since that time?

A.    The company has taken the same

1    position as the monitor, that this needs to be

2    clarified through the court.

3    136.        Q.    And once again, you may have told

4    me.  I apologize if you did.  Is any of this in

5    writing, or is it all a matter of conversation

6    between you and Murray McDonald?

7            A.    My recollection is that it would

8    have been, likely, mainly discussion between the

9    various members of management and various members of

10   the monitor's team, including Murray.

11   137.        MR. DEWART:    All right, just give me a

12           second to look at my notes.  I think I'm

13           done.  All right.  Thank you, those are all

14           of my questions.

15           MR. MERSKEY:    Thank you.

16

A. Ventresca - 36

## INDEX OF UNDERTAKINGS

| REFERENCE NUMBER | PAGE NUMBER | QUESTION NUMBER |
|------------------|-------------|-----------------|
| 1 | 33 | 134 |

VICTORY VERBATIM

A. Ventresca - 37

## INDEX OF UNDER ADVISEMENTS

| REFERENCE NUMBER | PAGE NUMBER | QUESTION NUMBER |
|---|---|---|
| 1 | 21 | 83 |

ERNST & YOUNG TOWER, 222 BAY STREET, SUITE 900, TORONTO, ONTARIO, M5K 1H6
WWW.VICTORYVERBATIM.COM        (416) 360-6117        INFO@VICTORYVERBATIM.COM

VICTORY VERBATIM

A. Ventresca - 38

## INDEX OF REFUSALS

| REFERENCE NUMBER | PAGE NUMBER | QUESTION NUMBER |
|---|---|---|
| 1 | 5 | 12 |
| 2 | 31 | 124 |

ERNST & YOUNG TOWER, 222 BAY STREET, SUITE 900, TORONTO, ONTARIO, M5K 1H6
WWW.VICTORYVERBATIM.COM      (416) 360-6117      INFO@VICTORYVERBATIM.COM

66

A. Ventresca - 39

REPORTER'S NOTE:

   Please be advised that any undertakings, objections, under advisements and refusals are provided as a service to all counsel, for their guidance only, and do not purport to be legally binding or necessarily accurate and are not binding upon Victory Verbatim Reporting Services Inc.

   I hereby certify the foregoing to be a true and accurate transcription of the above noted proceedings held before me on the **30th DAY OF JANUARY, 2012** and taken to the best of my skill, ability and understanding.

}
}
}
}
}
}
}
}
}

**Certified Correct:**

**Ramin Daneshvar**
Verbatim Reporter



# TAB 3

Court File No.  09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(Commercial List)**

**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED**

**Under-advisements given at the Cross-examination of Anna Ventresca on her Affidavits sworn October 7, 2011 and November 28, 2011, which was held on January 30, 2012**

| No. | Page | Question | Under-advisement | Answer |
|-----|------|----------|------------------|--------|
| 1 | 22 | 81-83 | How was the figure for the D&O Trust arrived at? | The amount settled on the trust was not based upon a particular formula or calculation. It was premised on a number of factors, including NNC's available cash resources, the reasonableness of the amount in light of NNC's financial circumstances, the six year duration of the trust, the then current annual premium level of approximately $4.4 million of the D&O policy  (since the trust covers, among other things, claims for maintenance, renewal or reinstatement of the D&O insurance) and the amount of the retention under the D&O policy as indicative of the order of magnitude of unfunded indemnification provided by NNC pre-filing. |

| No. | Page | Question | Under-advisement | Answer |
|-----|------|----------|------------------|--------|
| 2 | 32-34 | 127-134 | To produce e-mails or notes of telephone conversations you have where requests were made by Pavi Binning and Mike Zafirovsky for their fees in the Lucescu Action to be covered by Nortel. | Upon reviewing her files, Ms Ventresca believes that the primary requests for indemnification were made verbally, either through face to face discussions, or by telephone. Attached is the only relevant email from Mr Binning or Mr Zafirovsky that has been located. Ms Ventresca has not been able to locate any notes recording such a request. |

# TAB  4

Court File No. 09-CL-7950

## ONTARIO
## SUPERIOR COURT OF JUSTICE

THE HONOURABLE     )  WEDNESDAY, THE 14TH

            )

MR. JUSTICE MORAWETZ   )  DAY OF JANUARY, 2009

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION (the
"Applicants")

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

### FIFTH AMENDED AND RESTATED INITIAL ORDER

THIS APPLICATION, made by the Applicants, pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the affidavit of John Doolittle sworn January 14, 2009 (the "Doolittle Affidavit") and the Exhibits thereto, the affidavit of John Doolittle sworn June 22, 2009 (the "June Affidavit") and the Exhibits thereto, the report dated January 14, 2009 of Ernst & Young Inc. ("E&Y"), the proposed monitor, and on hearing the submissions of counsel for the Applicants, counsel for the boards of directors of Nortel Networks Corporation and Nortel Networks Limited, counsel for E&Y, counsel for Export Development Canada ("EDC"), Flextronics

Telecom Systems Ltd., no one else appearing on this Application and on reading the consent of E&Y to act as the Monitor,

**SERVICE**

1.      THIS COURT ORDERS that the time for service of the Notice of Application and the Application Record is hereby abridged so that this Application is properly returnable today and hereby dispenses with further service thereof.

**APPLICATION**

2.      THIS COURT ORDERS AND DECLARES that each of the Applicants is a "debtor company" to which the CCAA applies.

**PLAN OF ARRANGEMENT**

3.      THIS COURT ORDERS that each of the Applicants shall have the authority to file and may, subject to further order of this Court, file with this Court a plan of compromise or arrangement (hereinafter referred to as the "Plan") between, *inter alia*, such Applicant and one or more classes of its secured and/or unsecured creditors as it deems appropriate.

**POSSESSION OF PROPERTY AND OPERATIONS**

4.      THIS COURT ORDERS that each of the Applicants shall remain in possession and control of its current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (the "Property"). Subject to further Order of this Court, each of the Applicants shall continue to carry on business in a manner consistent with the preservation of its business (the "Business") and Property. Each of the Applicants shall be authorized and empowered to continue to retain and employ the employees, consultants, agents, experts, brokers, accountants, legal counsel, financial advisors and such other persons (collectively "Assistants") currently retained or employed by such Applicant, with liberty to retain such further Assistants as such Applicant deems reasonably necessary or desirable for the Business or to carry out the terms of this Order or for the purposes of the Plan.

71

5.      THIS COURT ORDERS that the Applicants shall be entitled to continue to utilize the central cash management system currently in place as described in the Doolittle Affidavit or replace it with another substantially similar central cash management system (the "Cash Management System") and that any present or future bank or banks providing the Cash Management System shall not be under any obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by the Applicants of funds transferred, paid, collected or otherwise dealt with in the Cash Management System; shall be entitled to provide the Cash Management System without any liability in respect thereof to any Person (as hereinafter defined) other than the Applicants, pursuant to the terms of the documentation applicable to the Cash Management System; and shall be, in its capacity as provider of the Cash Management System, an unaffected creditor under the Plan with regard to any claims or expenses it may suffer or incur in connection with the provision of the Cash Management System.

6.      THIS COURT ORDERS that each of the Applicants, either on its own behalf or on behalf of another Applicant, shall be entitled but not required to pay the following expenses whether incurred prior to, on or after the date of this Order:

(a)      all outstanding and future wages, salaries and employee benefits (including, but not limited to, employee medical and similar benefit plans, relocation and tax equalization programs, the Incentive Plan (as defined in the Doolittle Affidavit) and employee assistance programs), current service, special and similar pension benefit payments, vacation pay, commissions and employee and director expenses, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements;

(b)      compensation to employees in respect of any payments made to employees prior to the date of this Order by way of the issuance of cheques or electronic transfers, which are subsequently dishonoured due to the commencement of proceedings under the CCAA;

(c)     all outstanding and future amounts owing to or in respect of individuals working as independent contractors in connection with the Business;

(d)     the fees and disbursements of any Assistants retained or employed in accordance with paragraph 4 hereof;

(e)     subject to the consent of the Monitor, amounts owing by one of more of the Applicants in respect of its Customer Programs (as defined in the Doolittle Affidavit);

(f)     subject to consent of the Monitor, amounts owing by one or more of the Applicants to any other Nortel Company (as defined in the Doolittle Affidavit) in order to settle their inter-company accounts and make inter-company loans in the ordinary course of business, including as a result of the Nortel Companies' Transfer Pricing Model (as defined in the Doolittle Affidavit); and

(g)     subject to the consent of the Monitor, amounts owing to the Applicants' carriers and warehousemen.

7.     THIS COURT ORDERS that, except as otherwise provided to the contrary herein, each of the Applicants shall be entitled but not required to pay all reasonable expenses incurred by it in carrying on the Business in the ordinary course on and after the date of this Order, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

(a)     all expenses and capital expenditures reasonably necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors and officers insurance) and maintenance and security services;

(b)     payment for goods or services actually supplied to the Applicants on or after the date of this Order;

(c)     with the written approval of the Monitor, the posting of additional cash collateral into existing cash collateral accounts (collectively, and together with the cash collateral posted as at February 10, 2009, the "LC Cash Collateral") held by either

or both of ABN AMRO Bank N.V., Canada Branch ("ABN") and Royal Bank of Canada ("RBC") as additional and continuing security for existing, renewed and new letters of credit, letters of guarantee, surety bonds, and similar instruments (collectively, "LCs") issued (whether before or after January 14, 2009) for the account of or requested by the Applicants or any of them to third parties pursuant to the existing letter of credit agreements between the Applicants and ABN and RBC and any amendments thereto made with the written approval of the Monitor, and for any foreign exchange losses incurred by ABN and its correspondent banks, if any, under LCs issued in currencies other than Canadian dollars, U.S. dollars, British pounds sterling and Euros, on the following basis:

    (i)    the posting of such additional cash collateral is for the purposes of paragraph 10 hereof specifically permitted herein and authorized hereby and shall not and will not constitute a fraudulent preference, fraudulent conveyance, oppressive conduct, settlement or other challengeable, voidable or reviewable transaction under any applicable law;

    (ii)    the aggregate of all cash collateral that may be posted (inclusive of the cash collateral posted as at February 10, 2009) in respect of LCs issued in Canadian dollars, U.S. dollars, British pounds sterling and Euros shall not exceed the amount of U.S.$40 million (converting Canadian dollars at the Bank of Canada's Noon spot exchange rate for any day), provided that the LC Banks shall have no liability in the event that cash collateral is posted in an amount that exceeds such maximum and the validity of their claims with respect to any or all of the LC Cash Collateral shall not be limited, lessened or otherwise impaired in any way as a result of such excess; and

    (iii)    cash collateral may be posted in respect of LCs issued by ABN in any other currencies in such amounts as are required by the provisions of the applicable letter of credit agreement, including any amendments thereto made with the written approval of the Monitor as security for ABN's exposure to foreign exchange losses;

(d)    if the same is not guaranteed by EDC, payment of any indebtedness of the Applicants to the LC Banks (as defined in paragraph 10A hereof) when due under the LC Agreements (as defined in paragraph 10A hereof) by way of set-off and transfer of LC Cash Collateral posted as at January 14, 2009 or posted thereafter pursuant to the LC Agreements and subparagraph (c) above;

(e)    without limiting (d), payment of costs and expenses of the LC Banks in connection with the amendment and enforcement of rights under the LC Agreements and any related guarantee bonds issued by EDC if so provided for under an applicable LC Agreement, whether incurred before or after February 10, 2009, including by way of set-off and transfer of LC Cash Collateral;

(f)    the posting of cash collateral in favour of Export Development Canada ("EDC") (collectively, the "EDC Cash Collateral") pursuant to the second amended and restated short-term support agreement between Nortel Networks Limited ("NNL") and EDC dated April 24, 2009, as amended by the amending agreement between NNL and EDC dated June 18, 2009, and the cash collateral agreement between NNL and EDC dated June 18, 2009 and any further amendments to the foregoing made with the written approval of the Monitor (collectively, the "EDC Support Agreements"), on the basis that the EDC Support Agreements are hereby ratified and approved and the posting of such cash collateral is for the purposes of paragraph 10 hereof specifically permitted herein and authorized hereby and shall not and will not constitute a fraudulent preference, fraudulent conveyance, oppressive conduct, settlement or other challengeable, voidable or reviewable transaction under any applicable law;

(g)    payment of any indebtedness of NNL to EDC under the EDC Support Agreements by way of set-off or transfer of EDC Cash Collateral posted as at June 29, 2009 or posted thereafter pursuant to the EDC Support Agreements and subparagraph (f) above; and

(h)     without limiting (g), payment of costs and expenses of EDC provided for under the EDC Support Agreements by way of set-off or transfer of EDC Cash Collateral, to the extent provided for in the EDC Support Agreements.

7A.   THIS COURT ORDERS that no provision of this Order shall require EDC to provide its approval for any proposed amendments to any of the LC Agreements pursuant to any agreement between EDC and any of the LC Banks.

8.   THIS COURT ORDERS that the each of the Applicants shall remit, in accordance with legal requirements, or pay:

(a)     any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from employees' wages, including, without limitation, amounts in respect of (i) employment insurance, (ii) Canada Pension Plan, (iii) Quebec Pension Plan, and (iv) income taxes;

(b)     all goods and services or other applicable sales taxes (collectively, "Sales Taxes") required to be remitted by such Applicant in connection with the sale of goods and services by such Applicant, but only where such Sales Taxes are accrued or collected after the date of this Order, or where such Sales Taxes were accrued or collected prior to the date of this Order but not required to be remitted until on or after the date of this Order; and

(c)     any amount payable to the Crown in right of Canada or of any Province or Territory thereof or any political subdivision thereof or any other taxation authority in respect of municipal realty, municipal business or other taxes, assessments or levies of any nature or kind which are entitled at law to be paid in priority to claims of secured creditors and which are attributable to or in respect of the carrying on of the Business by such Applicant.

9.   THIS COURT ORDERS that until such time as an Applicant delivers a notice in writing to repudiate a real property lease in accordance with paragraph 11(c) of this Order (a "Notice of Repudiation"), each Applicant shall pay all amounts constituting rent or payable as rent under

- 8 -

real property leases (including, for greater certainty, common area maintenance charges, utilities and realty taxes and any other amounts payable to the landlord under the lease) or as otherwise may be negotiated by such Applicant and the landlord from time to time ("Rent"), for the period commencing from and including the date of this Order, monthly on the first day of each month, in advance (but not in arrears). On the date of the first of such payment, any arrears relating to the period commencing from and including the date of this Order shall also be paid. Upon delivery of a Notice of Repudiation, such Applicant shall pay all Rent due for the notice period stipulated in paragraph 11(c) of this Order, to the extent that Rent for such period has not already been paid.

10.     THIS COURT ORDERS that, except as specifically permitted herein, each of the Applicants is hereby directed, until further Order of this Court: (a) to make no payments of principal, interest thereon or otherwise on account of amounts owing by such Applicant to any of its creditors as of this date unless such payments have been approved by the Monitor; (b) to grant no security interests, trust, liens, charges or encumbrances upon or in respect of any of its Property; and (c) to not grant credit or incur liabilities except in the ordinary course of business unless such obligation has been approved by the Monitor.

10A.   THIS COURT ORDERS that, notwithstanding paragraph 10 hereof,

(a)     the existing letter of credit agreements between the Applicants and ABN, RBC and Citibank, N.A. acting through its Canadian branch ("Citibank") and any amendments thereto made after January 14, 2009 with the written approval of the Monitor, together with any agreements entered into by the Applicants or any of them with any other lenders with the written approval of the Monitor providing letter of credit facilities or similar facilities to the Applicants or any of them (including those which may be the subject of EDC guarantee bonds issued pursuant to the EDC Support Facility) (collectively, the "LC Agreements"), and the issuance or renewal of LC's pursuant thereto by ABN, RBC, Citibank and any other lenders (collectively, the "LC Banks"), together with any payments made by the Applicants or EDC with respect thereto; and

(b)      the EDC Support Agreements and any amendments thereto made after June 18, 2009 with the written consent of the Monitor, together with any payments made by NNL with respect thereto,

are specifically permitted herein and authorized hereby and shall not and will not constitute fraudulent preferences, oppressive conduct, settlements or other challengeable, voidable or reviewable transactions under any applicable law

10B.    THIS COURT ORDERS that, notwithstanding any other provision in this Order, no LC Bank shall be required to issue a letter of credit to the Applicants or any of them and EDC shall not be required to provide any Secured Support to the Applicants or any of them.

**RESTRUCTURING**

11.    THIS COURT ORDERS that each of the Applicants shall, have the right to:

(a)      permanently or temporarily cease, downsize or shut down any of its business or operations and to dispose of redundant or non-material assets not exceeding CDN$10,000,000 in any one transaction or CDN$50,000,000 in the aggregate, subject to paragraph (c), if applicable;

(b)      terminate the employment of such of its employees or temporarily lay off such of its employees as it deems appropriate and to deal with the consequences thereof in the Plan or on further order of the Court;

(c)      in accordance with paragraphs 12 and 13, vacate, abandon or quit the whole but not part of any leased premises and/or repudiate any real property lease and any ancillary agreements relating to any leased premises, on not less than seven (7) days notice in writing to the relevant landlord on such terms as may be agreed upon between the Applicant and such landlord, or failing such agreement, to deal with the consequences thereof in the Plan;

(d)      repudiate such of its arrangements or agreements of any nature whatsoever, including, without limitation, any of its deferred compensation, or bonus plans, change of control plans, stock options or restructured stock unit plans and

shareholder rights plans whether oral or written, as such Applicant may deem appropriate on such terms as may be agreed upon between such Applicant or any one of them and such counter-parties, or failing such agreement, to deal with the consequences thereof in the Plan; and

(e)     pursue all avenues of refinancing and offers for material parts of its Business or Property, in whole or part, subject to prior approval of this Court being obtained before any material refinancing or any sale (except as permitted by subparagraph (a), above);

all of the foregoing to permit the Applicants to proceed with an orderly restructuring of the Business (the "Restructuring").

12.     THIS COURT ORDERS that each of the Applicants shall provide each of the relevant landlords with notice of such Applicant's intention to remove any fixtures from any leased premises at least seven (7) days prior to the date of the intended removal. The relevant landlord shall be entitled to have a representative present in the leased premises to observe such removal and, if the landlord disputes such Applicant's entitlement to remove any such fixture under the provisions of the lease, such fixture shall remain on the premises and shall be dealt with as agreed between any applicable secured creditors, such landlord and such Applicant, or by further Order of this Court upon application by such Applicant on at least two (2) days notice to such landlord and any such secured creditors. If such Applicant repudiates the lease governing such leased premises in accordance with paragraph 11(c) of this Order, it shall not be required to pay Rent under such lease pending resolution of any such dispute (other than Rent payable for the notice period provided for in paragraph 11(c) of this Order), and the repudiation of the lease shall be without prejudice to such Applicant's claim to the fixtures in dispute.

13.     THIS COURT ORDERS that if a Notice of Repudiation is delivered, then (a) during the notice period prior to the effective time of the repudiation, the landlord may show the affected leased premises to prospective tenants during normal business hours, on giving the Applicants and the Monitor 24 hours' prior written notice, and (b) at the effective time of the repudiation, the relevant landlord shall be entitled to take possession of any such leased premises without waiver of or prejudice to any claims or rights such landlord may have against the Applicants in

respect of such lease or leased premises and such landlord shall be entitled to notify the Applicants of the basis on which it is taking possession and to gain possession of and re-lease such leased premises to any third party or parties on such terms as such landlord considers advisable, provided that nothing herein shall relieve such landlord of its obligation to mitigate any damages claimed in connection therewith.

## NO PROCEEDINGS AGAINST THE APPLICANTS OR THE PROPERTY

14.    THIS COURT ORDERS that until and including February 13, 2009 or such later date as this Court may order (the "Stay Period"), no proceeding or enforcement process in any court or tribunal (each, a "Proceeding") shall be commenced, or continued against or in respect of any of the Applicants or the Monitor, or affecting the Business or the Property, except with the written consent of the affected Applicant and the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of the affected Applicant or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

## NO EXERCISE OF RIGHTS OR REMEDIES

15.    THIS COURT ORDERS that during the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "Persons" and each being a "Person") against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the affected Applicant and the Monitor, or leave of this Court, provided that nothing in this Order shall (i) empower the Applicants to carry on any business which the Applicants are not lawfully entitled to carry on, (ii) exempt the Applicants from compliance with statutory or regulatory provisions relating to health, safety or the environment, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien.

## NO INTERFERENCE WITH RIGHTS

16.    THIS COURT ORDERS that during the Stay Period, no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right,

contract, agreement, licence or permit in favour of or held by the Applicants, except with the written consent of the Applicants and the Monitor, or leave of this Court.

## CONTINUATION OF SERVICES

17.     THIS COURT ORDERS that during the Stay Period, all Persons having oral or written agreements with the Applicants or with third parties on behalf of the Applicants, or statutory or regulatory mandates for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll services, employment agency services, insurance, transportation services, utility, leasing or other services to the Business or to any of the Applicants, are hereby restrained until further Order of this Court from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the applicable Applicant and that such Applicant shall be entitled to the continued use of its current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case that the normal prices or charges for all such goods or services received after the date of this Order are paid by such Applicant, in accordance with normal payment practices of such Applicant, as applicable, or such other practices as may be agreed upon by the supplier or service provider and the affected Applicant and the Monitor, or as may be ordered by this Court.

## NON-DEROGATION OF RIGHTS

18.     THIS COURT ORDERS that, notwithstanding anything else contained herein, no creditor of the Applicants shall be under any obligation after the making of this Order to advance or re-advance any monies or otherwise extend any credit to the Applicants. Nothing in this Order shall derogate from the rights conferred and obligations imposed by the CCAA.

## PROCEEDINGS AGAINST DIRECTORS AND OFFICERS

19.     THIS COURT ORDERS that during the Stay Period, and except as permitted by subsection 11.5(2) of the CCAA, no Proceeding may be commenced or continued against any of the former, current or future directors or officers of the Applicants with respect to any claim against the directors or officers that arose before the date hereof and that relates to any obligations of the Applicants whereby the directors or officers are alleged under any law to be

liable in their capacity as directors or officers for the payment or performance of such obligations, until a compromise or arrangement in respect of the Applicants, if one is filed, is sanctioned by this Court or is refused by the creditors of the Applicants or this Court.

**DIRECTORS AND OFFICERS**

20.     THIS COURT ORDERS that each of the Applicants shall indemnify its directors and officers from all claims, costs, charges and expenses relating to the failure of such Applicant, after the date hereof, to make payments of the nature referred to in subparagraphs 6(a), 6(b), 8(a), 8(b) and 8(c) of this Order or for the Applicants' failure to make payments in respect of employer health tax or workers' compensation which they sustain or incur by reason of or in relation to their respective capacities as directors and/or officers except to the extent that, with respect to any officer or director, such officer or director has actively participated in the breach of any related fiduciary duties or has been grossly negligent or guilty of wilful misconduct.

21.     THIS COURT ORDERS that the directors and officers of the Applicants shall be entitled to the benefit of and are hereby granted a charge (the "Directors' Charge") on the Property, which charge shall not exceed an aggregate amount of CDN $45 million, as security for the indemnities provided in paragraph 20 of this Order as well as for fees and disbursements of their legal counsel. The Directors' Charge shall have the priority set out in paragraphs 42 and 44 herein.

21A.    THIS COURT ORDERS that, to the extent that any one or more of proven Claims (as defined below), together with the fees and disbursements of legal counsel to the directors and officers of the Applicants, individually or in the aggregate, exceed the amount of CDN $45 million, each such proven Claim against such directors and officers shall be reduced *pro rata* so that the aggregate of all such proven Claims, together with the fees and disbursements of legal counsel to such directors and officers, shall not exceed the amount of CDN $45 million and such excess amounts of all such proven Claims and any other Claims are hereby and shall be forever barred, disallowed, enjoined, released, discharged and extinguished as against the directors and officers of the Applicants. Provided, however, that nothing in this paragraph 21A shall operate to release any director or officer of an Applicant in respect of such excess amount of any such Claim where, in respect of such Claim, such director or officer has actively participated in the

*82*

breach of any related fiduciary duties or has been grossly negligent or guilty of wilful misconduct.

In this paragraph 21A, "Claim" shall mean any claim (contingent, liquidated or unliquidated, proven or unproven, known or unknown) or any legal proceeding or action of any nature or kind, in these proceedings or any subsequent receivership or bankruptcy proceedings or in any other proceedings or in any other forum whatsoever, against one or more of the directors or officers of any one or more of the Applicants relating to the failure of any of the Applicants, after the date of this Order, to make payments of the nature referred to in subparagraphs 6(a), 6(b), 8(a), 8(b) and 8(c) of this Order or the Applicants' failure to make payments in respect of employer health tax or workers' compensation, which are or may be directly or indirectly advanced, asserted, re-asserted, refiled or made by any person, governmental or regulatory authority or other entity against one or more of the directors or officers of any one or more of the Applicants, to the extent that such Claim is not covered under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 20 of this Order

22. THIS COURT ORDERS that, notwithstanding any language in any applicable insurance policy to the contrary, (a) no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge, and (b) each of the Applicants' directors and officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 20 of this Order.

23. THIS COURT ORDERS that each of NNC's and NNL's directors shall be entitled to receive remuneration in cash on a current basis at current compensation levels (less an overall U.S.$25,000 reduction) notwithstanding the terms of, or elections made under, the Directors' Compensation Plan.

**APPOINTMENT OF MONITOR**

24. THIS COURT ORDERS that E&Y is hereby appointed pursuant to the CCAA as the Monitor, an officer of this Court, to monitor the Property and the Applicants' conduct of the



Business with the powers and obligations set out in the CCAA or set forth herein and that each of the Applicants and its officers, directors, and Assistants shall advise the Monitor of all material steps taken by such Applicant pursuant to this Order, and shall co-operate fully with the Monitor in the exercise of its powers and discharge of its obligations.

25.    THIS COURT ORDERS that the Monitor, in addition to its prescribed rights and obligations under the CCAA, is hereby directed and empowered to:

(a)    monitor the Applicants' receipts and disbursements;

(b)    provide the consents contemplated herein;

(c)    report to this Court at such times and intervals as the Monitor may deem appropriate with respect to matters relating to the Property, the Business, and such other matters as may be relevant to the proceedings herein;

(d)    advise the Applicants in their preparation of the Applicants' cash flow statements and any other reporting to the Court or otherwise;

(e)    advise the Applicants in their development of the Plan or Plans and any amendments to such Plan or Plans;

(f)    assist the Applicants, to the extent required by the Applicants, with the Restructuring;

(g)    assist the Applicants, to the extent required by the Applicants, with the holding and administering of creditors' or shareholders' meetings for voting on the Plan or Plans;

(h)    have full and complete access to the books, records and management, employees and advisors of the Applicants and to the Business and the Property to the extent required to perform its duties arising under this Order;

(i)    be at liberty to engage independent legal counsel or such other persons as the Monitor deems necessary or advisable respecting the exercise of its powers and

performance of its obligations under this Order including, without limitation, one or more entities related to or affiliated with the Monitor;

(j)    consider, and if deemed advisable by the Monitor, prepare a report and assessment on the Plan or Plans;

(k)    assist the Applicants with respect to any insolvency proceedings commenced by or with respect to any other Nortel Company (as defined in the Doolittle Affidavit) in any foreign jurisdiction (collectively, "Foreign Proceedings") and report to this Court, as it deems appropriate, on the Foreign Proceedings with respect to matters relating to the Applicants;

(l)    apply as the foreign representative of the Applicants, for recognition of these proceedings as "Foreign Main Proceedings", pursuant to Chapter 15 of the United States Bankruptcy Code, 11 U.S.C. §101 (the "U.S. Bankruptcy Code") or similar legislation in any other jurisdiction; and

(m)    perform such other duties as are required by this Order or by this Court from time to time.

26.    THIS COURT ORDERS that the Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, be deemed to have taken or maintained possession or control of the Business or Property, or any part thereof.

27.    THIS COURT ORDERS that nothing herein contained shall require the Monitor to occupy or to take control, care, charge, possession or management (separately and/or collectively, "Possession") of any of the Property that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination including, without limitation, the *Canadian Environmental Protection Act*, the *Ontario Environmental Protection Act*, the *Ontario Water Resources Act*, or the *Ontario Occupational Health and Safety Act* and regulations

thereunder (the "Environmental Legislation"), provided however that nothing herein shall exempt the Monitor from any duty to report or make disclosure imposed by applicable Environmental Legislation. The Monitor shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and powers under this Order, be deemed to be in Possession of any of the Property within the meaning of any Environmental Legislation, unless it is actually in possession.

28.     THIS COURT ORDERS that that the Monitor shall provide any creditor of the Applicants with information provided by the Applicants in response to reasonable requests for information made in writing by such creditor addressed to the Monitor. The Monitor shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph. In the case of information that the Monitor has been advised by the Applicants is confidential, the Monitor shall not provide such information to creditors unless otherwise directed by this Court or on such terms as the Monitor and the Applicants may agree.

29.     THIS COURT ORDERS that, in addition to the rights and protections afforded the Monitor under the CCAA or as an officer of this Court, the Monitor shall incur no liability or obligation as a result of its appointment and the fulfilment of its duties or the carrying out of the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part. Nothing in this Order shall derogate from the protections afforded the Monitor by the CCAA or any applicable legislation.

30.     THIS COURT ORDERS that the Monitor, counsel to the Monitor, counsel to the Applicants and counsel to directors shall be paid their reasonable fees and disbursements incurred both before and after the making of the Order, in each case at their standard rates and charges, by the Applicants as part of the costs of these proceedings. Each of the Applicants is hereby authorized and directed to pay the accounts of the Monitor, counsel for the Monitor, counsel for the Applicants and counsel to directors on a weekly basis and, in addition, each of the Applicants is hereby authorized to pay to: (a) the Monitor and its Canadian and U.S. counsel a retainer in the aggregate amount of CDN$750,000; and (b) counsel to the Applicants a retainer in the amount of CDN$750,000 (collectively, the "Retainers") to be held by them as security for payment of their respective fees and disbursements outstanding from time to time.

31.    THIS COURT ORDERS that the Monitor and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Monitor and its legal counsel are hereby referred to a judge of the Commercial List of the Ontario Superior Court of Justice.

32.    THIS COURT ORDERS that the Monitor, counsel to the Monitor, if any, and the Applicants' counsel shall be entitled to the benefit of and are hereby granted a charge (the "Administration Charge") on the Property, which charge shall not exceed an aggregate amount of $5,000,000, as security for their professional fees and disbursements incurred at the standard rates and charges of the Monitor and such counsel, both before and after the making of this Order in respect of these proceedings. The Administration Charge shall have the priority set out in paragraphs 42 and 44 hereof.

**EDC**

33.    Intentionally Deleted.

**INTERCOMPANY LOANS**

34.    THIS COURT ORDERS to the extent that an Applicant receives a post-filing inter-company loan or other transfer (including goods and services) from a Chapter 11 Entity (as defined in the Doolittle Affidavit) (including as a result of the Applicants' cash management system or otherwise) (each such Applicant, a "Beneficiary Applicant"), and such post-filing inter-company loan or other transfer is made (each an "Advance") by a Chapter 11 Entity (together with NNL for the purposes of paragraph 34A below, a "Protected Entity"), then, subject to the limitations set forth in this paragraph:

(a)    the Protected Entity shall have a proven and valid claim against such Beneficiary Applicant for the amount of such Advance (each, an "Inter-company Reimbursement Claim"), which Inter-company Reimbursement Claim shall bear interest at a rate agreed between the applicable Beneficiary Applicant and Protected Entity from time to time for the period in accordance with past practice; and

(b)     all of the Property of the Beneficiary Applicant, is hereby charged by a mortgage, lien and security interest (such mortgage, lien and security interest, "Inter-company Charge") in favour of each of the Protected Entities as security for payment of the Inter-company Reimbursement Claim (including principal, interest and expenses) by the applicable Beneficiary Applicant to the corresponding Protected Entity.

34A.    THIS COURT ORDERS that the Inter-Company Charge shall also secure any Advances made by NNL to Nortel Networks Technology Corporation ("NNTC") on or after January 14, 2009 and that NNL shall be a "Protected Entity" and NNTC shall be a "Beneficiary Applicant" in respect of such Advances.

35.     THIS COURT ORDERS that the Inter-company Charge shall also secure the Remaining Revolver Claim (as defined in the Final Canadian Funding and Settlement Agreement dated as of December 22, 2009 among, *inter alia*, the Applicants and NNI) as also evidenced by the Secured Promissory Note dated as of February 16, 2010 in the principal amount of U.S.$62,700,000 given by NNL to NNI.

36.     THIS COURT ORDERS the Inter-company Charge shall be junior, subject and subordinate only to the other Charges (defined below), and any other future charges against such Beneficiary Applicant that, by the Court order creating them, are expressly stated to be senior to the Inter-company Charges entered after notice and a hearing.

37.     THIS COURT ORDERS that pending further order of this Court, an Inter-company Charge shall be a "silent" charge and the Protected Entity shall forbear from exercising, and shall not be entitled to exercise, any right or remedy relating to any Inter-company Reimbursement Claim held by such party, including, without limitation, as to seeking relief from the stay granted hereunder, or seeking any sale, foreclosure, realization upon repossession or liquidation of any Property of a Beneficiary Applicant, or taking any position with respect to any disposition of the Property, the business operations, or the reorganization of a Beneficiary Applicant. An Inter-company Charge automatically, and without further action of any person or entity of any kind, shall be released or otherwise terminated to the extent that Property subject to such Inter-company Charge is sold or otherwise disposed of in accordance with the terms of this Order or

further order of this Court after notice and a hearing, with respect to the effect of an Inter-company Charge on any sale of Property by any Beneficiary Applicant.

38.     THIS COURT ORDERS that the Beneficiary Applicants may sell Property, in accordance with the terms of this Order or further order of this Court after notice and a hearing, in each case free and clear of any Inter-company Charge, with such Inter-company Charge attaching to the proceeds of sale in the same priority and subject to the same limitations and restrictions as existed in respect of the Property sold.

## INTERIM GROUP SUPPLIER PROTOCOL AGREEMENT

39.     THIS COURT ORDERS that the Applicants be and are hereby authorized to enter into a group supplier protocol agreement (the "Interim GSPA") substantially in the form attached as Exhibit "C" to the Doolittle Affidavit which agreement shall be effective upon the appointment of the Administrators in the United Kingdom, and the Applicants are hereby authorized to perform each of their obligations, if any, under the Interim GSPA.  The obligations of the Applicants under the Interim GSPA shall be secured by the Inter-Company Charge.

## NNI LOAN

40.     THIS COURT ORDERS that the amended and restated loan agreement entered into between NNL, as borrower, NNTC and the other Applicants as guarantors, and Nortel Networks Inc. ("NNI") as lender (the "NNI Loan Agreement"), substantially in the form attached as Exhibit "B" to the Affidavit of John Doolittle sworn March 27, 2009 providing for a revolving loan facility of up to U.S.$200 million is hereby approved and each of the Applicants is hereby directed to execute and to comply with its obligations under the NNI Loan Agreement.

41.     Intentionally deleted.

41A.    Intentionally deleted.

41B.    Intentionally deleted.

41C.    Intentionally deleted.

**EXCESS FUNDING CHARGE**

41D.    THIS COURT ORDERS that as security for NNL's obligation to repay to NNI the Contingent Payment (as defined in the Interim Funding Agreement, as defined in the June Affidavit) along with interest, if any, NNI shall be entitled to the benefit of and is hereby granted a charge on the Property (the "Excess Funding Charge"). The Excess Funding Charge shall have the priority set out in paragraphs 42 and 44 hereof.

**SHORTFALL CHARGE**

41E.    THIS COURT ORDERS that as security for any obligation of NNL to make the Shortfall Payments (as defined in the Interim Funding Agreement, as defined in the June Affidavit), Nortel Networks UK Limited shall be entitled to the benefit of and is hereby granted a charge on the Property (the "Shortfall Charge").  The Shortfall Charge shall have the priority set out in paragraphs 42 and 44 hereof.

**VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER**

42.    THIS COURT ORDERS that the priorities of the Administration Charge, the Excess Funding Charge, the Directors' Charge, the Inter-company Charge, the Shortfall Charge, the Payments Charge and the Nortel Special Incentive Plan Charge on all Property shall be as follows:

> First – the Administration Charge;
>
> Second – the Excess Funding Charge
>
> Third – the Directors' Charge; and
>
> Fourth -
>
> (a)    the Inter-Company Charge;
>
> (b)    the Shortfall Charge,

which Inter-company Charge and Shortfall Charge shall rank *pari passu* with one another.

Fifth -

(a)     the Payments Charge (as defined in the employee Settlement Approval Order of this Court made on March 31, 2010); and

(b)     the Nortel Special Incentive Plan Charge (as defined in the order approving the Nortel Special Incentive Plan of this Court made on March 8, 2010),

which Payments Charge and Nortel Special Incentive Plan Charge shall rank *pari passu* with one another.

43.     THIS COURT ORDERS that the filing, registration or perfection of the Administration Charge, Excess Funding Charge, the Directors' Charge, the Inter-company Charge, the Shortfall Charge, the Payments Charge and the Nortel Special Incentive Plan Charge (collectively, the "Charges") shall not be required, and that the Charges shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered, recorded or perfected subsequent to the Charges coming into existence, notwithstanding any such failure to file, register, record or perfect. Notwithstanding anything herein, the Charges shall not attach to the Retainers.

44.     THIS COURT ORDERS that each of the Charges (all as constituted and defined herein), shall subject to this paragraph 44 and to paragraph 46 herein constitute a charge on the Property secured thereunder, and such Charges shall rank in priority to all other security interests, trusts, liens, charges and encumbrances, statutory or otherwise (collectively, "Encumbrances") in favour of any Person. For greater certainty,

(a)     the Charges shall attach to the LC Cash Collateral junior in priority to any rights or Encumbrances in favour of LC Banks in respect of LC Cash Collateral and only to the extent of the rights of the Applicants to the return of any LC Cash Collateral from the LC Banks following the exercise of the rights of the LC Banks

as against any such LC Cash Collateral pursuant to the LC Agreements or section 18.1 of the CCAA, and

(b)     the Charges shall attach to the EDC Cash Collateral junior in priority to any rights or Encumbrances in favour of EDC in respect of EDC Cash Collateral and only to the extent of the rights of NNL to the return of any EDC Cash Collateral from EDC following the exercise of the rights of EDC as against any such EDC Cash Collateral pursuant to the EDC Support Agreements or section 18.1 of the CCAA

notwithstanding anything to the contrary contained in this Order.

45.     THIS COURT ORDERS that except as otherwise expressly provided for herein, or as may be approved by this Court, the Applicants shall not grant any Encumbrances over any Property that rank in priority to, or *pari passu* with, any of the Charges charging such Property, unless the Applicants also obtain the prior written consent of the Monitor and the beneficiaries of such Charges, or by further Order of this Court.

46.     THIS COURT ORDERS that none of the Charges, the LC Agreements and the EDC Support Agreements shall be rendered invalid or unenforceable and the rights and remedies of the chargees entitled to the benefit of the Charges (collectively, the "Chargees") thereunder, the rights of the LC Banks under LC Agreements and the rights of EDC under the EDC Support shall not otherwise be limited or impaired in any way by (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) issued pursuant to BIA, or any bankruptcy order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (d) the provisions of any federal or provincial statutes; or (e) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents, lease, sublease, offer to lease or other agreement (collectively, an "Agreement") which binds the Applicants, and notwithstanding any provision to the contrary in any Agreement:

(a)     the creation of the Charges, the entering into of the LC Agreements and the issuance or renewal of LC's thereunder and the entering into of the EDC Support

Agreements and the provision of Secured Support, as defined and contemplated thereunder, shall not create or be deemed to constitute a breach by any of the Applicants of any Agreement to which it is a party;

(b)     none of the Chargees, the LC Banks and EDC shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from, the creation of the Charges, the entering into of the LC Agreements or the issuance or renewal of LC's thereunder or the entering into of the EDC Support Agreements and the provision of Secured Support; and

(c)     the payments made by the Applicants pursuant to this Order and the granting of the Charges and the entering into of the LC Agreements and the EDC Support Agreements do not and will not constitute fraudulent preferences, fraudulent conveyances, oppressive conduct, settlements or other challengeable, voidable or reviewable transactions under any applicable law.

47.     THIS COURT ORDERS that any Charge created by this Order over leases of real property in Canada shall only be a Charge in the Applicants' interest in such real property leases.

**FLEXTRONICS AMENDING AGREEMENT**

48.     THIS COURT ORDERS that the Flextronics Amending Agreement in the form attached as Exhibit "B" to the Doolittle Affidavit be and is hereby approved and NNL is hereby authorized and directed to comply with its obligations thereunder.

**CROSS-BORDER PROTOCOL**

49.     THIS COURT ORDERS that the cross-border protocol, as amended, in the form attached as Schedule "A" hereto be and is hereby approved and shall become effective upon its approval by the United States Bankruptcy Court for the District of Delaware and the parties to these proceedings and any other Person shall be governed by it and shall comply with the same.

**FOREIGN PROCEEDINGS**

50.    THIS COURT ORDERS that the Monitor is hereby authorized and directed to apply for recognition of these proceedings as "Foreign Main Proceedings" in the United States pursuant to Chapter 15 of the U.S. Bankruptcy Code.

51.    THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

52.    THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

**SERVICE AND NOTICE**

53.    THIS COURT ORDERS that the Monitor shall, within ten (10) business days of the date of entry of this Order, send notice of this Order and the commencement of the within proceedings to the Applicants' known creditors, other than employees and creditors to which the Applicants owe less than $5,000, at their addresses as they appear on the Applicants' records, and shall promptly send a copy of this Order (a) to all parties filing a Notice of Appearance in respect of this Application, and (b) to any other interested Person requesting a copy of this Order, and the Monitor is relieved of its obligation under Section 11(5) of the CCAA to provide similar notice, other than to supervise this process. The Monitor, on behalf of the Applicants, shall, in its discretion, be entitled to engage a third party mailing service in order to assist or complete the mailing. Any such service provider shall be considered an "Assistant" hereunder.

54.    THIS COURT ORDERS that the Applicants and the Monitor be at liberty to serve this Order, any other materials and orders in these proceedings, and any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery or electronic transmission to the Applicants' creditors or other interested parties at their respective addresses as last shown on the records of the Applicants and that any such service or notice by courier, personal delivery or electronic transmission shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

55.    THIS COURT ORDERS that the Applicants, the Monitor, and any party who has filed a Notice of Appearance may serve any court materials in these proceedings by e-mailing a PDF or other electronic copy of such materials to counsels' email addresses as recorded on the Service List from time to time, in accordance with the E-filing protocol of the Commercial List to the extent practicable, and the Monitor may post a copy of any or all such materials on its website at http://www.ey.com/ca/nortel.

**GENERAL**

56.    THIS COURT ORDERS that any of the Applicants or the Monitor may from time to time apply to this Court for advice and directions in the discharge of its powers and duties hereunder.

57.    THIS COURT ORDERS that nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the Applicants, the Business or the Property.

58.    THIS COURT ORDERS that any interested party (including the Applicants and the Monitor) may apply to this Court to vary or amend this Order on not less than seven (7) days notice to any other party or parties likely to be affected by the order sought or upon such other notice, if any, as this Court may order.

59.     THIS COURT ORDERS that this Order and all of its provisions are effective as of 12:01
a.m. Eastern Standard Time on the date of this Order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

FEB 2 5 2011

PER / PAR:

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No:  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**FIFTH AMENDED AND RESTATED INITIAL
ORDER**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

**IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

Court File No: 09-CL-7950

---

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

Proceeding commenced at Toronto

---

### SUPPLEMENTAL MOTION RECORD
### OF THE APPLICANTS
### D&O POLICY MOTION
### (returnable May 30, 2012)

---

**NORTON ROSE CANADA** LLP
Suite 3800, Royal Bank Plaza, South Tower
200 Bay Street, P.O. Box 84
Toronto, Ontario M5J 2Z4

**Mario Forte LSUC#: 27293F**

Tel: 416.216.4000
Fax: 416.216.3930

------------------------------------------------------------

**GOWLING LAFLEUR HENDERSON** LLP
Suite 1600, First Canadian Place
100 King Street West
Toronto, Ontario M5X 1G5

**Derrick Tay LSUC#: 21152A**
**Jennifer Stam LSUC#: 46735J**
Tel: 416 814.5697
Fax: 416.862.7661

Lawyers for the Applicants