**EXHIBIT A-3**
**CANADIAN APPLICANT FACTUM**

Court File No.  09-CL-7950

## ONTARIO
## SUPERIOR COURT OF JUSTICE
## (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED

## FACTUM OF THE APPLICANTS
## D&O POLICY MOTION
## (RETURNABLE MAY 30, 2012)

May 16, 2012

**NORTON ROSE CANADA LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street, P.O. Box 84
Toronto Ontario  M5J 2Z4

**Mario Forte LSUC#: 27293F**

Email: mario.forte@nortonrose.com

Tel:    416.216.4000
Fax:    416.216.3930

Lawyers for the Applicants

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600,
First Canadian Place
100 King Street West
Toronto Ontario  M5X 1G5

**Derrick Tay LSUC#: 21152A**
**Jennifer Stam LSUC#: 46735J**

Email: derrick.tay@gowlings.com
Email: jennifer.stam@gowlings.com

Tel:    416.814.5697
Fax:    416.862.7661

Lawyers for the Applicants/Respondents on Motion

TO:    The attached service list

[SERVICE LIST REMOVED FOR THE PURPOSE OF THIS EXHIBIT]

**ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985,
c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and
NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C.
1985, c. C-36, AS AMENDED**

**FACTUM OF THE APPLICANTS**

**PART I - OVERVIEW**

1.      The Applicants[1] bring this motion for a determination of the obligations of Chartis, Inc. ("Chartis")[2] as provider of an executive and organization liability insurance policy (the "D&O Policy") to the Applicants, their subsidiaries, and their directors and officers (the "Executives").

2.      The D&O Policy provides for a retention, or deductible, amount of $10,000,000 to be borne by NNC (the "Retention").[3]

3.      Notwithstanding the insolvency of the Applicants, Chartis has refused to provide coverage to the Executives until the Retention amount is exhausted and paid by NNC.

4.      The D&O Policy contains two relevant forms of coverage:

---

[1] Nortel Networks Corporation ("NNC"), Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation.
[2] Formerly AIG Commercial Insurance Company of Canada ("AIG").
[3] All figures set out herein are USD unless specified otherwise.

(a)    Coverage B, or organizational coverage ("Coverage B") for NNC and its subsidiaries; and

(b)    Coverage A, or individual coverage ("Coverage A") for protection directly to the Executives.

5.    Under Coverage B, Chartis is required to pay the Loss[4] of NNC, for indemnifying its Executives.

6.    Under Coverage A, Chartis is required to pay the Loss of the Executives where NNC has **not** indemnified the Executives.

7.    The Retention is not applicable to a Non-Indemnifiable Loss[5] under Coverage A. This includes a Loss[6] for which NNC is not permitted by law to indemnify the Executives.

8.    In the normal course, NNC would indemnify the Executives for many of the claims contemplated by the D&O Policy up through the amount of the Retention.  However, NNC is not operating in the normal course.  It has been under a broad stay of proceedings, rights and remedies (the "Stay"), pursuant to the CCAA[7] and the initial order[8] (the "Initial Order") granted thereunder since January 14, 2009.

9.    The Stay and related laws preclude NNC from indemnifying legal and related costs incurred by the Executives in connection with, among other things, claims based upon pre-filing actions.  As such, Coverage A and the Non-Indemnifiable Loss provisions of the D&O

---

[4] As defined in, and in accordance with the terms of the D&O Policy, in excess of the Retention Amount, D&O Policy at Clause 2(r), Exhibit "A" to the Affidavit of Anna Ventresca sworn October 7, 2011 ("Ventresca Affidavit"), Applicants' Motion Record, Tab 2A at 40. See also the Retention Clause, D&O Policy at Clause 6, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 45, amended by D&O Policy at Endorsement 4, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 61, amended by D&O Policy at Endorsement 8, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 67 and amended by D&O Policy at Endorsement 11, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 79.
[5] As defined in the D&O Policy, D&O Policy at Clause 2(u), Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 40-41.  See also the Retention Clause, D&O Policy at Clause 6, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 45, amended by D&O Policy at Endorsement 4, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 61, amended by D&O Policy at Endorsement 8, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 67 and amended by D&O Policy at Endorsement 11, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 79.
[6] As defined in the D&O Policy, D&O Policy at Clause 2(r), Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 40, amended by D&O Policy at Endorsement 22, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 93 and amended by D&O Policy at Endorsement 24, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 95.
[7] *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA")
[8] Dated January 14, 2009, as amended and restated on February 25, 2011, Applicants' Supplemental Motion Record, Tab 4.

Policy are triggered. This outcome directly accords with Chartis's own opinion, expressed before the filing of this proceeding, of the effect of a CCAA proceeding upon the Retention.

10.     NNC accordingly asks this Court for its direction that Chartis provide coverage to the Executives for Loss, without regard to the Retention.

## PART II - FACTS

### A.     Procedural Background

11.     On January 14, 2009, the Applicants were granted protection under the CCAA by order of this Honourable Court.[9]

12.     On that same day (and on July 14, 2009, in the case of Nortel Networks (CALA) Inc.), NNC's U.S. subsidiaries[10] (the "U.S. Debtors"), made voluntary filings in the U.S. Bankruptcy Court for the District of Delaware (the "U.S. Court") under Chapter 11 of the United States Bankruptcy Code. On January 15, 2009, Nortel Networks UK Ltd. ("NNUK") and certain subsidiaries of the Applicants incorporated in Europe, the Middle East and Africa ("EMEA") obtained administration orders from the High Court of England and Wales for the appointment of administrators under the UK *Insolvency Act, 1986.*

13.     The Initial Order granted by this Court contains a broad stay of proceedings, rights and remedies against the Applicants. The Initial Order provides, *inter alia*:

> [10] THIS COURT ORDERS that, except as specifically permitted herein, each of the Applicants is hereby directed, until further Order of this Court: (a) to make no payments of principal, interest thereon or otherwise on account of amounts owing by such Applicant to any of its creditors as of this date unless such payments have been approved by the Monitor; (b) to grant no security interests, trust, liens, charges or encumbrances upon or in respect of any of its Property; and (c) to not grant credit or incur liabilities except in the ordinary course of business unless such obligation has been approved by the Monitor.
>
> [14] THIS COURT ORDERS that until and including February 13, 2009 or such later date as this Court may order (the "Stay Period"),

---

[9] Ventresca Affidavit at para. 9, Applicants' Motion Record, Tab 2 at 29.
[10] Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc. are collectively the "U.S. Debtors".

no proceeding or enforcement process in any court or tribunal (each, a "Proceeding") shall be commenced, or continued against or in respect of any of the Applicants or the Monitor, or affecting the Business or the Property, except with the written consent of the affected Applicant and the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of the affected Applicant or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

[15]...**all rights and remedies of any individual**, firm, corporation, governmental body or agency, or any other entities ... against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, **are hereby stayed and suspended** except with the written consent of the affected Applicant and the Monitor, or leave of this Court...

[16]...**no Person shall** discontinue, **fail to honour**, alter, interfere with, repudiate, terminate **or cease to perform any right, renewal right, contract, agreement, licence or permit in favour of or held by the Applicants**, except with the written consent of the Applicants and the Monitor, or leave of this Court.[11]  [emphasis added]

14.    The period the Stay is in force continues to be extended during the course of these proceedings.

15.    The Initial Order also specifies particular circumstances in which the Applicants are entitled to indemnify Executives of the Applicants:

[20] THIS COURT ORDERS that each of the Applicants shall indemnify its directors and officers from all claims, costs, charges and expenses relating to the failure of such Applicant, after the date hereof, to make payments of the nature referred to in subparagraphs 6(a), 6(b), 8(a), 8(b) and 8(c) of this Order or for the Applicants' failure to make payments in respect of employer health tax or workers' compensation which they sustain or incur by reason of or in relation to their respective capacities as directors and/or officers except to the extent that, with respect to any officer or director, such officer or director has actively participated in the breach of any related fiduciary duties or has been grossly negligent or guilty of wilful [sic] misconduct.

[21] THIS COURT ORDERS that the directors and officers of the Applicants shall be entitled to the benefit of and are hereby granted a charge (the "Directors' Charge") on the Property, which charge shall not exceed an aggregate amount of CDN$90 million, as security for the indemnities provided in paragraph 20 of this Order as well as the fees and disbursements of their legal counsel. The Directors' Charge shall have the priority set out in paragraphs 42 and 44 herein.

---

[11] Initial Order, Applicants' Supplemental Motion Record, Tab 4 at 76-77, 79-80.

> [22] THIS COURT ORDERS that, notwithstanding any language in any applicable insurance policy to the contrary, (a) no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge, and (b) each of the Applicants' directors and officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 20 of this Order.[12]

Subject to these provisions, among others, NNC understands its obligation to indemnify the Executives in respect of pre-filing activities has been stayed by this Court.

## B.    Claims made against certain Executives

16.    On May 18, 2009, David Lucescu commenced an intended class proceeding in the U.S. District Court for the Southern District of New York against Michael Zafirovski and Pavi Binning (the "Lucescu Class Action"). Mr. Zafirovski was, at the material time, the Chief Executive Officer and a director of NNC. Mr. Binning was, at the material time, the Chief Financial Officer of NNC.

17.    The Lucescu Class Action alleges, among other things, that various statements made or permitted by Messrs. Zafirovsky and Binning in 2008 regarding Nortel's[13] performance and prospects were false and materially misleading.[14]

18.    NNC's ordinary course obligations to indemnify the Executives are set out in Article 9.2 of its By-Law No. 1:

> Subject to the limitations contained in the Act, the corporation shall indemnify a director or officer, a former director or officer, or a person who acts or acted at the corporation's request as a director or officer of a body corporate of which the corporation is or was a shareholder or creditor, or a person who undertakes or has undertaken any liability on behalf of the corporation or any such body corporate, and his or her heirs and legal representatives, against all costs, charges and expenses, including an amount paid to settle an action or satisfy a judgment, reasonably incurred by that person in respect of any civil, criminal or administrative action or proceeding to which such person is made a party by reason of being or having been a director or officer of the corporation or such body corporate, if:

---

[12] Initial Order, Applicants' Supplemental Motion Record, Tab 4 at 81-82.
[13] References herein to "Nortel" are to the global enterprise as a whole.
[14] Luscecu Claim at paras. 22-36, Exhibit "B" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2B at 110-115.

(a) such person acted honestly and in good faith with a view to the best interests of the corporation; and

(b) in the case of a criminal or administrative action or proceeding that is enforced by a monetary penalty, such person had reasonable grounds for believing that his or her conduct was lawful.

The corporation shall indemnify any person referred to above who fulfills the conditions contained in (a) and (b) above and who has been substantially successful on the merits in the defense of any civil, criminal or administrative action or proceeding to which such person is made a party by reason of his or her being or having been a director or officer of the corporation or body corporate, against all costs, charges and expenses reasonably incurred by such person in connection with the defense of such action or proceeding.

The corporation may also indemnify such persons in such other circumstances as the Act or other applicable law permits or requires. Nothing in this by-law shall limit the right of any person entitled to indemnity to claim indemnity apart from the provisions of this by-law. The corporation is hereby authorized to execute agreements evidencing its indemnity in favour of the foregoing persons to the full extent permitted by law.[15]

19.    The Lucescu Class Action is currently stayed by the Stay. However, counsel for Messrs. Zafirovsky and Binning have incurred legal fees in responding to the Lucescu Class Action. Because of the Stay, NNC has not provided indemnification to Messrs. Zafirovsky and Binning for the defence-related costs incurred by their counsel.[16]

20.    Despite Nortel's inability to indemnify Messrs. Zafirovsky and Binning, Chartis has refused to pay the legal accounts and related fees that have accrued with regard to the Lucescu Claim.[17] Chartis has not disputed that the D&O Policy generally applies to the costs and fees incurred by Messrs. Zafirovsky and Binning. Rather, Chartis's position is that it is not required to respond to such claims under the D&O Policy until the Retention amount is exhausted.[18]

21.    However, prior to the filing, AIG (now Chartis) expressed a contrary interpretation:

Normally, there is no retention applicable to Loss payable under Coverage A or Coverage C, "for which the Organization has neither indemnified nor is permitted or required to indemnify an Insured

---

[15] Nortel Networks Corporation By-Law No. 1, Exhibit "A" to the Supplemental Affidavit of Anna Ventresca sworn November 28, 2011 ("Supplemental Ventresca Affidavit"), Applicants' Supplemental Motion Record, Tab 1A at 16-17.
[16] Ventresca Affidavit at para. 18, Applicants' Motion Record, Tab 2 at 30.
[17] Ventresca Affidavit at para. 18, Applicants' Motion Record, Tab 2 at 30.
[18] Ventresca Affidavit at para. 18, Applicants' Motion Record, Tab 2 at 30.

Person pursuant to law or contract or the charter, bylaws, operating agreement or similar documents of an Organization." When the Organization has indemnified or is permitted or required to indemnify an Insured Person pursuant to law or contract or the charter, bylaws, operating agreement or similar documents of an Organization then a retention applies.

However, **if the Organization goes bankrupt** and in a filing for bankruptcy protection (voluntarily or involuntarily) under Title 11 of the United States Code **or under the Company Creditors' Arrangement Act** [sic], R.S.C. 1985 c. C-36 (as amended), or any similar provincial or foreign law (collectively "Bankruptcy Law") **the court prohibits indemnification by the Organization of Loss of the Insured Persons** because of higher bankruptcy law priorities, **then, generally, the Insurer would not consider indemnification of the Insured Persons for such Loss by the Organization to be "permitted or required." The result of this is that, as respects to such Loss of the Insured Persons under Coverage B (ii) of the Policy, the presumptive indemnification language found in the Definition of Indemnifiable Loss would not apply and the Insurer would apply a zero retention (or the applicable retention) to such Loss.** Of course, the Insurer would expect the Insured Persons to file on the behalf of the Insurer a Proof of Claim in the bankruptcy proceedings (or any appeal thereof) to the extent he or she had been entitled, but for the bankruptcy, to indemnification from the Organization. The Insurer would also expect and require the Organization to petition the bankruptcy court in good faith to permit indemnification of its Insured Persons.[19] [emphasis added]

22.    NNC has in fact sought the view of the Monitor on whether indemnification would be permissible in respect of the Lucescu Class Action. The Monitor advised that such indemnification could not be provided:

In our view, the Initial Order stays the rights of current and former directors and officers to advance claims of indemnification or for the advancement of defence costs, whether such rights arise pursuant to statute, by-law, contract or otherwise, except with the written consent of Nortel and the Monitor or with leave of the Court, with the sole exception of indemnification claims that are covered by paragraph 20 of the Initial Order (which does not appear to be applicable to the *Lucescu* action).

You have also asked whether the Monitor would consent to the advancement of defence costs in respect to the *Lucescu* action. We have carefully considered this request. However, we are not prepared to consent to any such payment at this time. We are of the view that such payment would not be justified for a couple of reasons. Firstly, such a payment may very well constitute the granting of a preference to the director or officer in question at the expense of other creditors of Nortel. Further, even if the Monitor considered such

---

[19] Letter from AIG (now Chartis) to Marsh Canada Limited, dated December 1, 2008, Exhibit "B" to the Supplemental Ventresca Affidavit, Applicants' Supplemental Motion Record, Tab 1B at 23-24.

payment to be justified in the circumstances, the Monitor is of the view that such payment would not be prudent given Nortel's current limited cash resources. This is especially the case where we understand that insurance coverage is available to the directors and officers with respect to this action under the D&O policy. In this regard, we would also direct you to paragraph 22 of the Initial Order which makes it clear that directors and officers are to look to D&O coverage for indemnification. Accordingly, the Monitor would oppose any application by the insurer to the Court to lift the stay of proceedings to pursue this matter.[20]

23.    The Applicants understand that the Monitor maintains its position in this regard:

> Q. 60   ...Have you asked the monitor, since then, if you can make the payment?
>
> A.      We don't feel there is a need to ask the question. To ask that question, the position is clear, and our understanding is that it is unchanged.
>
> Q. 61   What is the basis of that understanding?
>
> A.      Because the basis for their has not changed. They still have limited cash resources, and the position of a possible preference, if payment were to be made, remains unchanged.[21]

24.    In addition to the Lucescu Class Action, approximately 20 EMEA entities have filed claims against the various Executives in the claims process (the "EMEA Claims"). The EMEA Claims are based upon pre-filing actions. The Applicants anticipate that Chartis's position will be to not respond to eligible Losses (including defence costs) arising from these claims until the Retention amount is exhausted.[22]

## C.    Insurance Coverage Structure

### i.    Organizational and Individual Coverage

25.    The D&O Policy defines Loss to include the costs of damages, settlements, judgments and reasonable and necessary defence related fees, costs and expenses.[23]

---

[20] Letter from the Monitor to Nortel Networks Corporation, dated December 16, 2009, Exhibit "C" to the Supplemental Ventresca Affidavit, Applicants' Supplemental Motion Record, Tab 1C at 25-26.
[21] Cross-examination of Anna Ventresca, held January 30, 2012, Applicants' Supplementary Motion Record, Tab 2 at 45.
[22] Ventresca Affidavit at paras. 19-20, Applicants' Motion Record, Tab 2 at 30.
[23] D&O Policy at Clause 2(r), Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 40.

26.     The D&O Policy provides for organizational coverage (Coverage B) as well as for individual Executive coverage (Coverage A), as follows:

COVERAGE A:  EXECUTIVE LIABILITY INSURANCE

This policy shall pay the Loss of any Insured Person arising from a Claim (including, but not limited to, an Employment Practices Claim, a Canadian Pollution Claim and a Statutory Claim) made against such Insured Person for any Wrongful Act of such Insured Person, **except when and to the extent that an Organization has indemnified such Insured Person**.  Coverage A shall not apply to Loss arising from a Claim made against an Outside Entity Executive. [emphasis added]

COVERAGE B: ORGANIZATION INSURANCE

(i) *Organization Liability*:   This policy shall pay the Loss of any Organization arising from:

(a) a Securities Claim; or

(b) a Canadian Pollution Claim;

made against such Organization for any Wrongful Act of such Organization.

(ii) *Indemnification of an Insured Person*:  This policy shall pay the Loss of an Organization arising from a Claim made against an Insured Person (including an Outside Entity Executive) for any Wrongful Act of such Insured Person, but only to the extent that such Organization has indemnified such Insured Person.[24]

27.     Under the D&O Policy, an Insured[25] includes an "Insured Person" or an "Organization", which are defined as follows:

"Insured Person" means any:

(1) Executive of an Organization

(2) Employee of an organization; or

(3) Outside Entity Executive.[26]

…

---

[24] D&O Policy at Clause 1, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 37, amended by D&O Policy at Endorsement 8, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 66 and amended by D&O Policy at Endorsement 11, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 78.
[25] D&O Policy at Clause 2(p), Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 40, amended by D&O Policy at Endorsement 8, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record at 66 and amended by D&O Policy at Endorsement 11, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 79.
[26] D&O Policy at Clause 2(q), Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 40.

Organization means:

(1) the Named Entity;

(2) each Subsidiary; and

(3) in the event of a bankruptcy proceeding shall be instituted by or against the foregoing entities in the United States the resulting debtor-in-possession (or equivalent status outside the United States), if any.[27]

28.    Under the D&O Policy, an Executive is defined as follows:

"Executive" means any:

(1) past, present and future duly elected or appointed director, officer, trustee or governor of a corporation, management committee member of a joint venture and member of the management board of a limited liability company (or equivalent position), including a de facto director, officer, trustee, governor, management committee member or member of the management board of such entities;

(2) past, present and future person in a duly elected or appointed position in an entity organized and operated in a Foreign Jurisdiction that is equivalent to an executive position listed in Definition (l)(1); or

(3) past, present and future General Counsel and Risk Manager (or equivalent position) of the Named Entity.[28]

29.    In the normal course, in the event of a claim against an Executive, NNC would indemnify the Executive for Losses arising from their status as an Executive.  NNC would, either subsequently or contemporaneously, seek coverage from Chartis for such Losses in excess of the applicable Retention amount as provided by Coverage B.  This is because Coverage B applies to Losses incurred by NNC beyond the Retention amount, if it is applicable, as a consequence of claims made directly against it or as a result of its indemnification of an Executive.[29]

30.    In the event of Losses by an Executive for which the Executive is not indemnified, coverage applies under Coverage A.

31.    Coverage A is non-rescindable and cannot be deemed void:

SEVERABILITY OF THE APPLICATION ENDORSEMENT

---

[27] D&O Policy at Clause 2(w), Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 41.
[28] D&O Policy at Clause 2(l), Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 39.
[29] D&O Policy at Clause 1, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 37, amended by D&O Policy at Endorsement 8, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 66 and amended by D&O Policy at Endorsement 11, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 78.

(FULL INDIVIDUAL SEVERABILITY; NON-RESCINDABLE A SIDE COVER)

[...]

Solely with respect to any Non-Indemnifiable Loss of any Insured Person, under no circumstances shall the coverage provided by this Policy be deemed void, whether by rescission or otherwise, but such coverage will be subject to all other terms, conditions and exclusions of the Policy.[30]

32.    The D&O Policy further defines Non-Indemnifiable Loss as follows:

Loss for which an Organization **has neither indemnified nor is permitted or required to indemnify an Insured Person pursuant to law** or contract or memorandum, articles, bylaws, charter, operating agreement or similar documents of an Organization.[31] [emphasis added]

###    ii.    The Retention

33.    The Retention, or deductible, amount under the D&O Policy is $10,000,000. If the Retention applies, Chartis is only obliged to respond to a claim once the Retention amount has been exhausted.

34.    The Retention amount is defined as follows:

For each Claim, the Insurer shall only be liable for the amount of Loss arising from a Claim which is in excess of the applicable Retention amounts stated in items 4(a) through 4(e) of the Declarations, such Retention amounts to be borne by an Organization and/or the Insured Person and remain uninsured, **with regard to all Loss other than Non-Indemnifiable Loss.** The Retention amount specified in:

(i) Item 4(a) applies to Loss that arises out of a Securities Claim;

(ii) Item 4(b) applies to Loss that arises out of an Employment Practices Claim; and

[subparagraph (iii) – deleted]

(iv) Item 4(d) applies to loss that arises out of a Canadian Pollution Claim; and

(v) Item 4(e) applies to Loss that arises out of any Claim other than a Claim listed in Clause 6(i) through 6(iv) above.

---

[30] D&O Policy at Endorsement 15, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 86.
[31] D&O Policy at Clause 2(u), Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 40-41.

A single Retention amount shall apply to Loss arising from all Claims alleging the same Wrongful Act or related Wrongful Acts.

In the event a Claim triggers more than one of the Retention amounts stated in Items 4(a) through 4(e) of the Declarations, then, as to that Claim, the highest of such Retention amounts shall be deemed the Retention amount applicable to Loss (to which a Retention is applicable pursuant to the terms of this policy) arising from such Claim.

**No Retention amount is applicable to Crisis Loss or Non-Indemnifiable Loss.**

With respect to any Claim, the applicable Retention Amount shall only apply to the percentage of Loss which shall be payable by the Insurer and shall in no way be applicable to the percentage of Loss payable by the Organization.[32] [Emphasis added]

35.    The Retention does not apply in all cases where a claim is made under the D&O Policy. For instance, it does not apply in the event of a "Non-Indemnifiable Loss", which, as noted above, includes a Loss for which NNC has "**neither indemnified nor is permitted or required to indemnify an Insured Person pursuant to law** or contract or memorandum, articles, bylaws, charter, operating agreement or similar documents" of NNC. [emphasis added]

### iii.    In the event of bankruptcy or insolvency

36.    As set out above, it was AIG's expressed position in December 2008 that the Retention amount would not apply in the event of insolvency.[33]

37.    The D&O Policy makes other direct statements as to Chartis's obligations in the event of NNC's insolvency. Endorsement 8 to the D&O Policy provides:

Bankruptcy or insolvency of any Organization or any Insured Person shall not relieve the Insurer of any of its obligations hereunder.

The coverage provided under this policy is intended as a matter of priority to protect and benefit the Insured Persons such that, in the event of bankruptcy of the Organization, the Insurer shall first pay

---

[32] D&O Policy at Clause 6, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 45, amended by D&O Policy at Endorsement 4, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 61, amended by D&O Policy at Endorsement 8, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 67 and amended by D&O Policy at Endorsement 11, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 79.
[33] Letter from AIG to Marsh Canada Limited, dated December 1, 2008, Exhibit "B" to the Supplemental Ventresca Affidavit, Applicants' Supplemental Motion Record, Tab 1B.

Loss under Coverages A and C prior to paying Loss under Coverage B.[34]

## D.    The D&O Trust

38.    Immediately prior to the commencement of these proceedings, NNC established a trust fund for the benefit of individuals serving as directors and officers of NNC or directors and officers of other entities at NNC's request (collectively, "D&Os") (the "D&O Trust"), in the amount of approximately CDN$12 million.[35]  Chartis has taken the position that the D&O Trust should provide indemnity to the D&Os up to the amount of the Retention.

39.    The D&O Trust was established in recognition of the fact that the laws of various jurisdictions in which Nortel operated provide that directors and officers of companies may become personally liable for certain liability claims.  Accordingly, the intended purpose of the D&O Trust is to provide payment for, *inter alia*, the defence costs incurred by a D&O in responding to claims made against them personally and payment of liabilities found on such claims to the extent that D&O insurance policies maintained by NNC, for any reason, do not do so, and NNC is unable to do so itself.[36]  The D&O Trust may also be used for the maintenance of existing D&O insurance policies by NNC, including renewals or restatements, through the payment of premiums or other necessary costs, to the extent that NNC is unable to do so itself.[37]

40.    Under its own terms, the D&O Trust does not constitute insurance and "shall not be available to provide financial support for the defence of Liability Claims which are D&O Qualifying Claims or to pay Liability Claims which are D&O Qualifying Claims."[38]

41.    The Trust Indenture identifies "Liability Claims" as any claim that can be asserted against a D&O or for which a D&O can be held personally liable arising from his status as a D&O.  A "D&O Qualifying Claim" is defined as a Liability Claim that qualifies for coverage under Nortel's D&O insurance policy scheme.

42.    The Trustee has full discretion as to whether or not to provide funds from the D&O Trust in the case of Liability Claims that are so eligible.

---

[34] D&O Policy at Endorsement 8, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 71.
[35] Ventresca Affidavit at para. 21, Applicants' Motion Record, Tab 2 at 30.
[36] D&O Trust at section 2.4(a), Exhibit "D" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2D at 219.
[37] D&O Trust at section 2.4(b), Exhibit "D" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2D at 219.
[38] D&O Trust at section 2.7, Exhibit "D" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2D at 219.

**PART III - ISSUE**

43.    Does the Retention still apply when NNC is unable to indemnify the Executives because of the Stay?

**PART IV - LAW**

**A.    The Consequences of the Stay**

44.    The Stay prevents Nortel from indemnifying its Executives except in the limited circumstances set forth in the Initial Order, none of which are applicable in the current context.

45.    Under section 11(3) of the CCAA a:

> ...court may, on an initial application in respect of a company, make an order on such terms as it may impose, effective for such period as the court deems necessary not exceeding thirty days,
>
> (a) staying, until otherwise ordered by the court, all proceedings taken or that might be taken in respect of the company under [the Bankruptcy and Insolvency Act or the Winding-up and Restructuring Act];
>
> (b) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and
>
> (c) prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

Per section 11(4), the Court may extend the length of stay beyond the 30 days provided by an initial order.

46.    As recognized by the Court of Appeal, Section 11 is the engine that drives the broad and flexible statutory scheme of the CCAA.[39] As also noted by the Court of Appeal in this proceeding, exceptions to the stay should be narrowly interpreted.[40]

47.    Among other things, the stay provided by the CCAA and other insolvency regimes enables the centralization and maximization of a debtor's assets, for the benefit of all

---

[39] *Re Stelco Inc.*, [2005] O.J. No. 1171 at para. 36 (C.A.), Applicants' Book of Authorities, Tab 1.
[40] *Sproule v. Nortel Networks Corporation*, 2009 ONCA 833 at para. 17, Applicants' Book of Authorities, Tab 2.

creditors.[41] In the circumstances of Nortel's current liquidation, the stay continues to prohibit creditors from obtaining individual remedies.

48.    The entitlements of the Executives to indemnification are "rights and remedies of [an] individual" and accordingly, explicitly caught by Paragraph 15 of the Initial Order.[42] As neither the indemnification nor the claims in issue arise from post-filing services, there is no basis upon which to maintain NNC's payment obligations now.[43]

49.    This conclusion accords with the structure of the Initial Order and the CCAA jurisprudence on director and officer indemnification. The Initial Order already specifies the circumstances in which indemnification can continue: post-filing liabilities for, among other things, employee wages and benefits, statutory deemed trusts and taxes. As noted by the Court of Appeal in similar circumstances, exceptions to the stay are to be narrowly interpreted:

> Parliament has carved out defined exceptions to the court's ability to impose a stay. For example, s. 11.3(a) prohibits a stay of payments for goods and services provided after the initial order, so that while the company is given the opportunity and privilege to carry on during the *CCAA* restructuring process without paying its existing creditors, it is on a pay-as-you-go basis only. In contrast, there is no exception for statutory termination and severance pay. Furthermore, as the respondent Boards of Directors point out, the recent amendments to the *CCAA* that came into force on September 18, 2009 do not address this issue, although they do deal in other respects with employee-related matters.[44]

50.    Indemnification for pre-filing activities falls outside these narrow exclusions. Rather, such indemnification is usually understood to be an impermissible alteration of the status quo.[45] Accordingly, as Justice Ground observed in addressing claims upon a directors' charge:

> In any event, it seems to me that the court, in a CCAA proceeding, should interfere with existing priority rights only to the extent necessary in order for the CCAA proceedings to continue and to provide the company with an opportunity to work out a restructuring

---

[41] *Century Services Inc. v. Canada (Attorney General)*, 2010 SCC 60 at para. 22, Applicants' Book of Authorities, Tab 3.
[42] Initial Order at para. 15, Applicants' Supplemental Motion Record, Tab 4 at 79.
[43] *Sproule v. Nortel Networks Corporation*, 2009 ONCA 833 at paras. 10, 21, Applicants' Book of Authorities, Tab 2.
[44] *Sproule v. Nortel Networks Corporation*, 2009 ONCA 833 at para. 34, Applicants' Book of Authorities, Tab 2.
[45] *Re Westar Mining Ltd.*, [1992] B.C.J. No. 1816 (S.C.), Applicants' Book of Authorities, Tab 4; *Re Pacific National Lease Holding Corp.*, [1992] B.C.J. No. 3070 (S.C.), leave to appeal refused [1992] B.C.J. No. 2309 (C.A.), Applicants' Book of Authorities, Tab 5.

arrangement. There is no necessity to give the Insurer a superpriority right against the Directors' Charge Fund in order to accomplish this purpose.[46]

## B.    Consequence of the Stay Upon the D&O Policy

51.    The effect of the stay is that:

(a)    NNC has not indemnified the Executives; and

(b)    NNC is not permitted by law to indemnify the Executives.

In the circumstances, Chartis must provide coverage for Losses of the Executives under Coverage A, without reservation or deduction for the Retention.

52.    The principles applicable to the interpretation of insurance contracts have been summarized by the Court of Appeal as follows:

> [23]  The Supreme Court of Canada provided a useful review of the principles of construction in *Reid Crowther & Partners Ltd. v. Simcoe & Erie General Insurance Co.*, [1993] 1 S.C.R. 252 at 268-69:
>
>> In each case the courts must examine the provisions of the particular policy at issue (and the surrounding circumstances) to determine if the events in question fall within the terms of the coverage of that particular policy. This is not to say that there are no principles governing this type of analysis. Far from it. In each case, the courts must interpret the provisions of the policy at issue in light of general principles of interpretation of insurance policies, including, but not limited to:
>>
>>> (1) the *contra proferentum* rule;
>>>
>>> (2) the principle that coverage provisions should be construed broadly and exclusion clauses narrowly; and
>>>
>>> (3) the desirability, at least where the policy is ambiguous, of giving effect to the reasonable expectations of the parties.
>
> [24]  The principle that coverage should be interpreted broadly in favour of the insured and that exclusion clauses should be strictly and narrowly interpreted against the insurer was affirmed by Major J. on behalf of the Supreme Court of Canada in *Amos v. Insurance Corp. of British Columbia*, [1995] 3 S.C.R. 405 at 414. Citing as authority *Indemnity Insurance Co. v. Excel Cleaning Service*, [1954] S.C.R. 169, Major J. added at p. 414 that "the construction given to a policy of insurance must not nullify the purpose for which the insurance was sold".

---

[46] *Re General Publishing Co.*, [2003] O.J. No. 452 at para. 8 (S.C.J.), Applicants' Book of Authorities, Tab 6.

[25]  Of particular significance to this appeal is the oft-quoted passage from the reasons of Estey J. in *Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co.*, [1980] 1 S.C.R. 888 at 901-902:

> Even apart from the doctrine of contra preferentem as it may be applied in the construction of contracts, the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. *Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted.* Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. *Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation of the policy which promotes a sensible commercial result. It is trite to observe that an interpretation of an ambiguous contractual provision which would render the endeavour on the part of the insured to obtain insurance protection nugatory, should be avoided.* Said another way, the courts should be loath to support a construction which would either enable the insurer to pocket the premium without risk or the insured to achieve a recovery which could neither be sensibly sought nor anticipated at the time of the contract. [Emphasis in original.]

[...]

[28]  From *Weston Ornamental Iron Works* it is clear that this court has concluded that even though an exclusion clause may be clear and unambiguous, it will not be applied where: (1) it is inconsistent with the main purpose of the insurance coverage and where the result would be to virtually nullify the coverage provided by the policy; and (2) where to apply it would be contrary to the reasonable expectations of the ordinary person as to the coverage purchased. As I noted earlier in discussing the American authorities, these principles are used by American courts in interpreting the absolute pollution liability exclusion in CGL policies. See, also, *Re Pettit v. Economical Mutual Insurance Co.* (1982), 143 D.L.R. (3d) 752 (Ont. H.C.J.); *Wigle v. Allstate Insurance Co. of Canada* (1984), 49 O.R. (2d) 101 (C.A.), leave to appeal to S.C.C. refused (1985), 14 D.L.R. (4th) 404n; *Brissette v. Westbury Life Insurance Co.*, [1992] 3 S.C.R. 87.[47]

---

[47] *Zurich Insurance Company v. 686234 Ontario Limited*, [2002] O.J. No. 4496 at paras. 23-25, 28 (C.A.), Applicants' Book of Authorities, Tab 7.

53.    Further, as stated by the Supreme Court:

> ... an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation of the policy which promotes a sensible commercial result. It is trite to observe that an interpretation of an ambiguous contractual provision which would render the endeavour on the part of the insured to obtain insurance protection nugatory, should be avoided. Said another way, the courts should be loath to support a construction which would either enable the insurer to pocket the premium without risk or the insured to achieve a recovery which could neither be sensibly sought nor anticipated at the time of the contract.[48]

54.    The D&O Policy provides for a hierarchy of Coverages: Coverage A, Coverage B and so on:

> COVERAGE A: EXECUTIVE LIABILITY INSURANCE
>
> This policy shall pay the Loss of any Insured Person arising from a Claim (including, but not limited to, an Employment Practices Claim, a Canadian Pollution Claim and a Statutory Claim) made against such Insured Person for any Wrongful Act of such Insured Person, except when and to the extent that an Organization has indemnified such Insured Person. Coverage A shall not apply to Loss arising from a Claim made against an Outside Entity Executive.
>
> COVERAGE B: ORGANIZATION INSURANCE
>
> (i) *Organization Liability*: This policy shall pay the Loss of any Organization arising from:
>
>> (a) a Securities Claim; or
>>
>> (b) a Canadian Pollution Claim;
>
> made against such Organization for any Wrongful Act of such Organization.
>
> (ii) *Indemnification of an Insured Person*: This policy shall pay the Loss of an Organization arising from a Claim made against an Insured Person (including an Outside Entity Executive) for any Wrongful Act of such Insured Person, but only to the extent that such Organization has indemnified such Insured Person.
>
> COVERAGE C: OUTSIDE ENTITY EXECUTIVE LIABILITY INSURANCE
>
> This policy shall pay the Loss of any Outside Entity Executive arising from a Claim made against such Outside Entity Executive for any Wrongful Act of such Outside Entity Executive but only excess of any

---

[48] *Consolidated Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co.*, [1980] 1 S.C.R. 888 at 901-902, Applicants' Book of Authorities, Tab 8.

indemnification provided by an Outside Entity and any insurance coverage afforded to an Outside Entity or its Executives applicable to such Claim, except when and to the extent that an Organization has indemnified such Outside Entity Executive.

COVERAGE D: CRISISFUND INSURANCE

This policy shall pay the Crisis Loss (including Delisting Crisis Loss) of an Organization solely with respect to a Crisis (including a Delisting Crisis) occurring during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy, up to the amount of the respective CrisisFund, from first dollar; provided that payment of any Crisis Loss under this policy shall not waive any of the Insurer's rights under this policy or at law. This Coverage D shall apply regardless of whether a Claim is ever made against an Insured arising from such Crisis and, in the case where a Claim is made, regardless of whether the amount is incurred prior to or subsequent to the making of the Claim.[49]

55.    Coverage A provides direct protection to the Executives. Coverage B provides indirect protection to NNC, for protecting the Executives.[50]

56.    The D&O Policy specifically prioritizes the direct protection given to the Executives in certain circumstances including insolvency:

Bankruptcy or insolvency of any Organization or any Insured Person shall not relieve the Insurer of any of its obligations hereunder.

The coverage provided under this policy is intended as a matter of priority to protect and benefit the Insured Persons such that, in the event of bankruptcy of the Organization, the Insurer shall first pay Loss under Coverages A and C prior to paying Loss under Coverage B.[51]

and:

SEVERABILITY OF THE APPLICATION ENDORSEMENT
(FULL INDIVIDUAL SEVERABILITY; NON-RESCINDABLE A SIDE COVER)

[...]

---

[49] D&O Policy at Clause 1, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 37, amended by D&O Policy at Endorsement 8, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 66 and amended by D&O Policy at Endorsement 11, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 78.
[50] D&O Policy at Clause 1, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 37, amended by D&O Policy at Endorsement 8, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 66 and amended by D&O Policy at Endorsement 11, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 78.
[51] D&O Policy at Endorsement 8, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 71.

> Solely with respect to any Non-Indemnifiable Loss of any Insured
> Person, under no circumstances shall the coverage provided by this
> Policy be deemed void, whether by rescission or otherwise, but such
> coverage will be subject to all other terms, conditions and exclusions
> of the Policy.[52]

57.    As a result, the plain and ordinary meaning of the D&O Policy, read purposively and

contextually, and having regard to its text and structure is that:

(a)    NNC will, in the normal course of operation, provide for indemnification, and will

look to Chartis, subject to the application of the Retention, to provide

corresponding funding;

(b)    to the extent NNC is unable, or not permitted by law, to provide indemnification,

the Executives can look directly to Chartis; and

(c)    in those circumstances the Executives would not expect or be required to pay the

Retention.

58.    This interpretation was directly confirmed by AIG (now Chartis):

> Normally, there is no retention applicable to Loss payable under
> Coverage A or Coverage C, "for which the Organization has neither
> indemnified nor is permitted or required to indemnify an Insured
> Person pursuant to law or contract or the charter, bylaws, operating
> agreement or similar documents of an Organization." When the
> Organization has indemnified or is permitted or required to indemnify
> an Insured Person pursuant to law or contract or the charter, bylaws,
> operating agreement or similar documents of an Organization then a
> retention applies.
>
> However, if the Organization goes bankrupt and in a filing for
> bankruptcy protection (voluntarily or involuntarily) under Title 11 of the
> United States Code **or under the Company Creditors'
> Arrangement Act [sic], R.S.C. 1985 c. C-36 (as amended),** or any
> similar provincial or foreign law (collectively "Bankruptcy Law") the
> court prohibits indemnification by the Organization of Loss of the
> Insured Persons because of higher bankruptcy law priorities, then,
> generally, the Insurer would not consider indemnification of the
> Insured Persons for such Loss by the Organization to be "permitted or
> required." The result of this is that, as respects to such Loss of the
> Insured Persons under Coverage B (ii) of the Policy, **the
> presumptive indemnification language found in the Definition of
> Indemnifiable Loss would not apply and the Insurer would apply
> a zero retention (or the applicable retention) to such Loss.** Of
> course, the Insurer would expect the Insured Persons to file on the
> behalf of the Insurer a Proof of Claim in the bankruptcy proceedings
> (or any appeal thereof) to the extent he or she had been entitled, but
> for the bankruptcy, to indemnification from the Organization. The

---

[52] D&O Policy at Endorsement 15, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 86.

> Insurer would also expect and require the Organization to petition the
> bankruptcy court in good faith to permit indemnification of its Insured
> Persons.[53] [emphasis added]

59.     This meaning is both explicit and implied in the D&O Policy, which provides that

Coverage A does not apply unless NNC has not indemnified the Executives:

> COVERAGE A:  EXECUTIVE LIABILITY INSURANCE
>
> This policy shall pay the Loss of any Insured Person arising from a
> Claim (including, but not limited to, an Employment Practices Claim, a
> Canadian Pollution Claim and a Statutory Claim) made against such
> Insured Person for any Wrongful Act of such Insured Person, except
> when and to the extent that an Organization has indemnified such
> Insured Person.  Coverage A shall not apply to Loss arising from a
> Claim made against an Outside Entity Executive.[54]

60.     This meaning is confirmed by the further definition that is applied to circumstances

where indemnity is not provided:

> "Non-Indemnifiable Loss" means Loss for which an Organization has
> neither indemnified nor is permitted or required to indemnify an
> Insured Person pursuant to law or contract or memorandum, articles,
> bylaws, charter, operating agreement or similar documents of an
> Organization.[55]

61.     The United States Bankruptcy Court for the District of Delaware, in considering a

similar definition, has also concluded, as Chartis did previously, that an insolvency triggers a

Non-Indemnifiable Loss:

> This is so because a "Non-Indemnifiable Loss" includes any "Loss for
> which an Organization has neither indemnified nor is permitted to
> indemnify an Insured Person pursuant to law or contract."  Policy,
> Clause 2(s).    Once an organization files for bankruptcy, the
> Bankruptcy Code prohibits the debtor from indemnifying the officers
> and directors on an ongoing basis.  See 11 U.S.C. § 362(a)(3).  Thus,
> once an organization files for bankruptcy, defense costs incurred by
> officers and directors become covered Losses for which the
> organization is not permitted to indemnify the officers and directors
> "pursuant to law."[56]

---

[53] Letter from AIG to Marsh Canada Limited, dated December 1, 2008, Exhibit "B" to the Supplemental Ventresca
Affidavit, Applicants' Supplemental Motion Record, Tab 1B at 23-24.
[54] D&O Policy at Clause 1, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 37,
amended by D&O Policy at Endorsement 8, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab
2A at 66 and amended by D&O Policy at Endorsement 11, Exhibit "A" to the Ventresca Affidavit, Applicants'
Motion Record, Tab 2A at 78.
[55] D&O Policy at Clause 2(u), Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 40-41.
[56] In re: Downey Financial Corp., Debtor, 428 B.R. 595 at 601, Applicants' Brief of Authorities, Tab 9.

62.     The understanding that no deductible would apply in those circumstances is further confirmed by the explicit carve-out from the Retention for Non-Indemnifiable Loss:

> For each Claim, the Insurer shall only be liable for the amount of Loss arising from a Claim which is in excess of the applicable Retention amounts stated in items 4(a) through 4(e) of the Declarations, such Retention amounts to be borne by an Organization and/or the Insured Person and remain uninsured, **with regard to all Loss other than Non-Indemnifiable Loss.**
>
> [...]
>
> **No Retention amount is applicable to Crisis Loss or Non-Indemnifiable Loss.**[57] [emphasis added]

63.     The reasonable expectation of all concerned, embodied in the D&O Policy and confirmed by Chartis itself, is that the Executives will not have to pay defence costs from their own pocket in insolvencies, nor will the debtor be permitted to prefer the claims of Executives over those of other creditors of the debtors.

**C.     The D&O Trust is not an indemnity**

64.     While not directly relevant to the interpretation of the D&O Policy, Chartis has previously pointed to the D&O Trust as an additional basis upon which to excuse it from providing coverage before the Retention has been exhausted.[58] The exact basis for this position has not been expressed.  There is no support for it in the D&O Trust.  Indeed, the terms of the D&O Trust are to the contrary.

65.     By its explicit terms, the D&O Trust was established with the object of protecting against liability claims where insurance was not available:

> [...]
>
> D.     The Corporation maintains D&O Insurance that would be available, to the extent of the coverage and subject to the terms and exclusions thereof, to defend and indemnify Directors and Officers with respect to certain Liability Claims;
>
> [...]

---

[57] D&O Policy at Clause 6, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 45, amended by D&O Policy at Endorsement 4, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 61, amended by D&O Policy at Endorsement 8, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 67 and amended by D&O Policy at Endorsement 11, Exhibit "A" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2A at 79.
[58] Ventresca Affidavit at para. 24, Applicants' Motion Record, Tab 2 at 31.

F.    The Corporation has determined that protection is required for the Directors and Officers in addition to that provided by the D&O Insurance; and

G.    The Corporation has paid to the Trustee the sum of C$11,941,440 to establish a trust fund for the payment of Liability Claims to the **extent such Liability Claims are not paid or satisfied out of the D&O Insurance** and the Corporation is unable to do so and for the payment of Maintenance Claims to the extent that the Corporation is unable to do so, in each case to the extent that the Trustee in its discretion determines to do so.[59] [emphasis added]

[...]

"D&O Qualifying Claim" is a Liability Claim that qualifies for coverage under the D&O Insurance whether or not the amount of the coverage available under the D&O Insurance is adequate to defend the Directors and Officers against, and to pay, the particular Liability Claim;[60]

[...]

"Liability Claim" means any claim which may be asserted against any Director or Officer or for which the Directors or Officers, or any of them, are or may become personally liable arising from their status as Directors or Officers, (including any claim arising from or in respect of: (i) wages and benefits; (ii) termination and severance pay; (iii) vacation pay; (iv) amounts required to be withheld, deducted at source or remitted to any public authority or under any Laws; and (v) environmental matters), together with all legal expenses incurred in asserting that such a claim is covered by the D&O Insurance; provided that Liability Claim shall not include any claim or part thereof in respect of which, and solely to the extent that, the Corporation is prohibited by Law from providing indemnification to Directors or Officers, as applicable;[61]

[...]

Objects

The objects of the Trust are to provide financial support for:

(a)  the defence of the Directors and Officers against Liability Claims and for the payment and satisfaction of Liability Claims, **to the extent that the D&O Insurance, for any reason, does not do so** and the Corporation is unable to do so; and

(b)  the maintenance of the D&O Insurance, including its renewal or reinstatement, through the payment of premiums or other

---

[59] D&O Trust, preamble, Exhibit "D" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2D at 214.
[60] D&O Trust at section 1.1, Exhibit "D" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2D at 215.
[61] D&O Trust at section 1.1, Exhibit "D" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2D at 216.

23

payments or necessary costs, to the extent that the Corporation is unable to do so.[62] [emphasis added]

[...]

D&O Qualifying Claims

**This Indenture and the Trust do not constitute insurance.** Except as hereinafter expressly provided in this Section 2.7 and in Section 3.3, the **Trust Property shall not be available to provide financial support for the defence of Liability Claims which are D&O Qualifying Claims or to pay Liability Claims which are D&O Qualifying Claims.** Notwithstanding the foregoing, the Trust Property shall be available to provide financial support for defending Directors and Officers in any Proceeding with respect to a D&O Qualifying Claim and to pay a D&O Qualifying Claim (or a portion thereof) that the Trustee in his discretion is satisfied will not be defended or paid by the D&O Insurance because coverage is inadequate, is disputed or is for some other reason unavailable in a timely fashion. Furthermore, the Trustee may determine in his discretion to make a payment in respect of a D&O Qualifying Claim and be subrogated to the relevant Director or Officer claim under the D&O Insurance if it appears, in the discretion of the Trustee, that the D&O Qualifying Claim is being disputed or delayed in settlement or recognition by the insurer or insurers.[63] [emphasis added]

66.     Protections such as the D&O Trust, like director charges, are enacted as complements to existing insurance, not replacements. As noted by Justice Ground in considering the applicability of a directors' charge to insurance claims:

> ...If the claims made against the directors are claims which would have been covered by the Directors' Liability Policy in any event, they should not be claims which could be made against the Directors' Charge Fund in that the fund was put in place to give the directors further protection, over and above the protection accorded by the Directors' Liability Policy, as a result of the increased exposure of the directors due to the company's insolvency.
>
> What the Insurer is seeking in the order now sought before this Court is an additional benefit which the Insurer would not otherwise have in the event that a claim is paid pursuant to the policy. The subrogation right of the Insurer, in the event of such a payment, would be subrogation to the directors' claims against the company for indemnity and would be simply an unsecured claim in the bankruptcy of the company. The effect of granting subrogation rights to the Insurer to access the Directors' Charge Fund would elevate the Insurer's unsecured claim to a secured claim...[64]

---

[62] D&O Trust at section 2.4, Exhibit "D" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2D at 219.
[63] D&O Trust at section 2.7, Exhibit "D" to the Ventresca Affidavit, Applicants' Motion Record, Tab 2D at 219-220.
[64] *Re General Publishing Co.*, [2003] O.J. No. 452 at paras. 6-7 (S.C.J.), Applicants' Book of Authorities, Tab 6.

67.    NNC is the residuary beneficiary of the D&O Trust.  Any funds remaining at its termination revert to NNC's estate for distribution to its creditors in accordance with the applicable priority scheme.  Chartis's attempt to secure payment of the Retention Amount through the D&O Trust at this time would deprive those creditors of an asset that may otherwise be available.

68.    Ultimately, there is no basis in the objects and intent of the D&O Trust to suggest that it should replace Chartis's bargained for obligations under Coverage A.

## PART V - ORDER REQUESTED

69.    NNC therefore requests an order:

  (a)    That the Retention Amount (as defined in the D&O Policy) does not apply to claims made by the Executives against the D&O Policy.

  (b)    That Chartis is obligated to pay and respond to Losses (as defined in the D&O Policy) on behalf of the Executives without reference to or subtraction for the Retention Amount.

ALL OF WHICH IS RESPECTFULLY SUBMITTED this 16th day of May, 2012.

Norton Rose Canada LLP

Lawyer for the Applicants

25

**SCHEDULE "A"**
**LIST OF AUTHORITIES**

1.    *Re Stelco Inc.*, [2005] O.J. No. 1171 (C.A.).

2.    *Sproule v. Nortel Networks Corporation*, 2009 ONCA 833.

3.    *Century Services Inc. v. Canada (Attorney General)*, 2010 SCC 60.

4.    *Re Westar Mining Ltd.*, [1992] B.C.J. No. 1816 (S.C.).

5.    *Re Pacific National Lease Holding Corp.*, [1992] B.C.J. No. 3070 (S.C.), leave to appeal refused [1992] B.C.J. No. 2309 (C.A.).

6.    *Re General Publishing Co.,* [2003] O.J. No. 452 (S.C.J.).

7.    *Zurich Insurance Company v. 686234 Ontario Limited*, [2002] O.J. No. 4496 (C.A.).

8.    *Consolidated Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co.*, [1980] 1 S.C.R. 888.

9.    *In re: Downey Financial Corp., Debtor*, 428 B.R. 595, 2010 Bankr. LEXIS 1347.

**SCHEDULE "B"**
**RELEVANT STATUTES**

*__Companies' Creditors Arrangement Act__, R.S.C., 1985, c. C-36, as amended*

**11.** (3) A court may, on an initial application in respect of a company, make an order on such terms as it may impose, effective for such period as the court deems necessary not exceeding thirty days,

(a) staying, until otherwise ordered by the court, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (1);

(b) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

(c) prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

(4) A court may, on an application in respect of a company other than an initial application, make an order on such terms as it may impose,

(a) staying, until otherwise ordered by the court, for such period as the court deems necessary, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (1);

(b) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

(c) prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS
CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION,
NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at TORONTO

FACTUM OF THE APPLICANTS
(RETURNABLE May 30, 2012)

NORTON ROSE CANADA LLP
Suite 3800, Royal Bank Plaza, South Tower
200 Bay Street, P.O. Box 84
Toronto, Ontario M5J 2Z4

Mario Forte LSUC#: 27293F

Tel:   416.216.4000
Fax:   416.216.3930
--------------------

GOWLING LAFLEUR HENDERSON LLP
Suite 1600, , First Canadian Place
100 King Street West
Toronto Ontario M5X 1G5

Derrick Tay LSUC# 21152A
Jennifer Stam LSUC# 46735J

Tel:   416.814.5697
Fax:   416.862.7661

Lawyers for the Applicants

28

**EXHIBIT A-4**
**CHARTIS FACTUM**

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)


**IN THE MATTER OF THE** *COMPANIES' CREDITORS ARRANGEMENT ACT,* **R.S.C. 1985, C C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE** *COMPANIES' CREDITORS ARRANGEMENT ACT,* **R.S.C. 1985, C. C-36, AS AMENDED**

---

**RESPONDING PARTY'S FACTUM**
(D&O Policy Motion)

---

May 23, 2012

**DEWART GLEASON LLP**
Suite 102
366 Adelaide Street West
Toronto, ON
M5V 1R9

Sean Dewart
Tim Gleason
(416) 971-8000 (Tel.)
(416) 971-8001 (Fax)

Lawyers for Chartis Insurance Company of Canada

## I.    NATURE OF MOTION

1.      This is a motion by Nortel Networks Corporation for the determination of its rights and obligations under a policy of insurance issued by Chartis Insurance Company of Canada.

2.      Nortel's directors join in the motion, in support of the company's assertion that the terms of the contract of insurance were modified by this court's initial order imposing a stay of proceedings against Nortel.

3.      Nortel and the directors incorrectly equate a procedural order restraining creditors' remedies against Nortel, with the extinguishment of Nortel's substantive obligations.  In fact, Nortel's substantive obligation to indemnify its directors for the matters in issue on this motion continues to exist, notwithstanding the procedural stay.  Therefore, the losses Nortel seeks to recover from Chartis are uninsured.

4.      When the policy of insurance was issued, Nortel and Chartis expressly turned their minds to the situation which is before the court.  Chartis submits that the parties should be held to the bargain they made at the time.

## II.    THE FACTS

### *The Insurance Policy*

5.      On January 29, 2009, Chartis issued an Executive and Organization Liability Policy to Nortel Networks Corporation, which is defined in the policy as the 'Named Entity'.  Chartis agreed to insure the Named Entity, its subsidiaries and their officers and directors against certain

2

risks and losses.  The Named Entity and its subsidiaries are collectively described in the policy as the Organization.[1]

6.      The policy provides coverage for additional 'Insured Persons', being a term which is defined to include the Organization's directors and officers.   Among other things, Insured Persons are insured for legal fees incurred in defending proceedings brought against them in their capacities as officers and directors of the Organization.[2]

7.      The policy contains a retention clause which provides that the insurer is only liable for losses in excess of stated amounts.  The declarations page specifies retention amounts for various types of claims, and Endorsement #4 provides that these amounts are not insured by the policy:

> [The] Insurer shall only be liable for the amount of Loss arising from a Claim which is in excess of the applicable Retention amounts stated in … the Declarations, ***such Retention amounts to be borne by an Organization and/or the Insured Persons and remain uninsured*** ...[3]

8.      In this case, the parties bargained for a $10 million retention for almost every type of claim.[4]

9.      Contrary to Nortel's submissions, the retention is not a deductible.  That is, it is not an amount which is deducted from the coverage the insurer has agreed to provide.  Rather, as the very name suggests, and as the policy explicitly provides, the retention amount is a completely uninsured risk which the insureds 'retain' for themselves, and which the parties have agreed, is to "remain uninsured".

---

[1] Applicants' Motion Record, pp. 33 and 41
[2] *Ibid*, pp. 37 and 40
[3] *Ibid*, pp. 61-62 [Emphasis added]
[4] *Ibid*, p. 62

10.     Although there is no Ontario authority on point, U.S. courts have recognized the distinction between retentions and deductibles:

> A [self-insured retention] differs from a deductible in that at SIR is an amount that an insured retains and covers before insurance coverage begins to apply. ... In contrast, a deductible is an amount that an insurer subtracts from a policy amount, reducing the amount of insurance.  With a deductible, the insurer has the liability and defense risk from the beginning and then deducts the deductible amount from the insured coverage.  [Citations omitted]

> *In re September 11th Liability Insurance Coverage Cases*, 333 F Supp 2d 111 at 124 (SD NY 2004)

11.     Thus, pursuant to the contract of insurance, both the Organization (Nortel Networks and its subsidiaries) and the Insured Persons (the directors and officers) are "uninsured" for all losses until those losses exceed the amount of the risk which they have retained, i.e. $10 million.

12.     There is an exception:  The retention does not apply to a loss sustained by officers and directors if the company is neither permitted nor required to indemnify them for the loss. Specifically, the retention does not apply to a "non-indemnifiable loss".[5]

13.     The terms 'indemnifiable loss' and 'non-indemnifiable loss' are defined in the policy:

(a)     A loss is 'indemnifiable' if the Organization "has or is permitted or required to indemnify an insured person pursuant to law or contract or [pursuant to the Organization's] by-laws".

(b)     A loss is 'non-indemnifiable' if the Organization "has neither indemnified nor is permitted or required to indemnify an insured person pursuant to law or contract or … by-law".[6]

---

[5] *Ibid*, p. 61
[6] *Ibid*, pp. 39-41

*D&O Claims*

14.     The case at bar turns in its entirety on whether the following losses are indemnifiable or non-indemnifiable.

15.     On May 18, 2009, an intended class proceeding was commenced in New York against two of the Nortel's officers in their capacities as such.  They incurred defence costs in responding to the proceeding, which the directors and Nortel assert are recoverable under the policy, even though the amounts in issues (less than $100,000) are within the $10 million of risk they retained.[7]

16.     In 2011, the administrator of approximately 20 of the Nortel's overseas subsidiaries filed a proof of claim against the Nortel's directors and officers.[8]  There have been no payments at all with respect to these claims.[9]

17.     The parties have agreed that on this motion, the court will not adjudicate on coverage issues generally, but rather, will be asked to confine its ruling to the issue of the applicability of the retention to these claims.

*Losses Are Indemnifiable*

18.     As noted above, the retention does not apply if a claim is non-indemnifiable, that is, if Nortel has not indemnified its officers, and is not either permitted or required to do so.

---

[7] *Ibid*, p. 30
[8] *Ibid*
[9] In the result, the amount actually in issue on this motion is less than 0.0001% of Nortel's assets available for distribution among its creditors.  See *Jarndyce v. Jarndyce* (Unreported, U.K. Chancery Division, 1853)

19.    Nortel is incorporated pursuant to the *Business Corporations Act (Canada)*, which provides that a corporation may indemnify a director or officer against all costs, charges and expenses incurred by that individual in respect of any civil, criminal, administrative, investigative or other proceeding in which the individual is involved because of his or her association with the corporation.[10]

20.    Nortel's by-laws provide that it "shall" indemnify directors and officers for all costs, charges and expenses incurred in respect of any civil proceeding to which they are made parties by reason of being a director or officer.[11]

21.    That is, Nortel is both permitted and required to indemnify the directors, by the Act and the by-laws respectively.  This being the case, the loss is *prima facie* indemnifiable, and the retention applies.

### *Policy Terms <u>Not</u> in Issue*

22.    Both Nortel's factum and that of the directors include confusing and irrelevant details about the provisions in the policy, and in several places go so far as to misstate its provisions.

### *Coverage A Applies*

23.    The policy affords coverage for the officers and directors of Nortel and its subsidiaries (Coverage A), and affords coverage for the companies themselves (Coverage B).[12]

---

[10] *Business Corporations Act (Canada)*, R.S.C. 1985, c. C-44, s. 124(1)
[11] Applicant's Supplementary Motion Record, pp. 16-17
[12] Applicants' Motion Record, p. 37

6

24.     Coverage B provides two types of insurance for the Organization, which as noted, is defined to mean Nortel and its subsidiaries:

(a)     Coverage B(i) insures the Organization for claims made directly against the Organization for its own alleged wrongful acts.

(b)     Coverage B(ii) insures the Organization for claims made against its officers and directors, but only to the extent that the Organization has actually provided indemnity.[13]

25.     The case at bar concerns claims against individual officers and directors (not claims against Nortel or its subsidiaries) for those individuals' allegedly wrongful acts, for which Nortel and its subsidiaries have not provided indemnification. Coverage B is therefore irrelevant to this motion.[14]

26.     Coverage A provides executive liability insurance for claims against, *inter alia*, the Organization's officers and directors. This is the Coverage in issue.

*Endorsement 15 Not Material*

27.     Nortel refers in its factum to Endorsement No. 15, which provides that the policy is non-rescindable. Chartis has not purported to rescind the policy, and Endorsement No. 15 is irrelevant.

28.     (If Nortel wishes to rely on Endorsement No, 15, it should at least refer to all of it. Endorsement No. 15 sets out that Chartis relied on the statements, warranties and representations

---

[13] *Ibid*
[14] *Ibid*, p. 30

made by the insured when applying for the policy, and records the parties' agreement that the policy is void *ab initio* if there were any material misrepresentations.  It is in this context that the language appears on which the applicants rely, that the policy cannot be rescinded or voided with respect to non-indemnifiable losses of (*inter alia*) officers and directors.  As noted, Chartis has not sought to avoid the policy, either on the basis of material misrepresentation or otherwise).[15]

*Endorsement 8 Not Material*

29.    Nortel's reference to Endorsement No. 8, which provides that the insolvency of any insured does not relieve Chartis of its obligations under the policy, is equally misplaced.  Chartis does not take the position that it is relieved of its obligations under the policy by reason of Nortel's insolvency.

30.    Endorsement No. 8 provides that the coverage in the policy is intended as a matter of priority to protect and benefit officers, directors and employees etc., such that in the event of a bankruptcy of the Organization, the insurer shall first pay losses for the benefit of the individuals, as opposed to paying losses for the benefit of the corporations.

---

[15] *Ibid*, p. 86

31.     Nortel and the directors rely on this provision, which as noted is inapplicable to this motion as Chartis does not suggest that Nortel's insolvency has relieved Chartis of its obligations. It would have been more forthright if Nortel and the directors had included the provision in the endorsement immediately following the one on which they rely:

> It is further understood and agreed THAT IN NO EVENT SHALL THIS ENDORSEMENT HAVE THE EFFECT OF EXPANDING COVERAGE AS IS PROVIDED BY COVERAGE A ... OF THIS POLICY.
>
> ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.[16]

*The Parties' Bargain Concerning Nortel's Insolvency*

32.     Shortly before Nortel filed for creditor protection, its insurance broker asked Chartis how the indemnification language in the policy would be applied if Nortel became insolvent.

33.     Chartis responded to the broker's inquiry in a letter dated December 1, 2008.  Chartis advised that "if" Nortel and its subsidiaries filed for creditor protection "and the court prohibits indemnification" of officers and directors "because of higher bankruptcy law priorities", then "generally, the Insurer would not consider indemnification ... to be permitted or required".

34.     The letter explained that if the court prohibited Nortel from indemnifying the directors in a proceeding under the CCAA, Chartis would treat the loss as non-indemnifiable, meaning the retention would drop to zero.[17]

35.     Nortel relies on this letter as evidence of Chartis's "expressed position that the retention would not apply in the event of [Nortel's] insolvency", and Chartis's "direct confirmation" that

---

[16] *Ibid*, p. 71 [Emphasis in original]
[17] Applicants' Supplementary Motion Record, pp. 23-24

insolvency, by itself, "triggers a non-indemnifiable loss".[18]  This assertion, that Chartis agreed unconditionally that the retention would drop to zero if Nortel filed for creditor protection, ignores a key proviso in the letter:

> Of course, the Insurer would expect the Insured Persons to file on behalf of the Insurer a proof of claim in the bankruptcy proceedings ... .  ***The Insurer would also expect and require the Organization to petition the bankruptcy court in good faith to permit indemnification of the Insured Persons.***[19]

36.    Like Nortel, the directors falsely state in their factum that Chartis "confirmed" in its December 1, 2008 letter that "no retention would be applicable if [Nortel] were under CCAA protection".    Also like Nortel, the directors are selective in failing to refer to Chartis's requirement that Nortel petition the court in good faith to permit indemnification.[20]

37.    As noted, what Chartis actually said was in the letter was that ***if*** the court prohibited indemnification "because of higher bankruptcy law priorities", Chartis would not consider indemnification to be permitted, with the result that the retention would not apply, however Chartis would "expect and require" Nortel to petition this court to permit indemnification.

38.    It is one thing for Nortel and its directors to argue that the contingency referred to in the letter has materialized (i.e. the court has prohibited indemnification) and that the retention therefore does not apply.    It is another thing to misrepresent what was said and pretend that Chartis "agreed [that] the effect of a CCAA stay" was to prohibit indemnification.[21]

---

[18] Applicants' Factum, ¶¶21, 36, 57, 61 and 63
[19] *Ibid*, p. 24 [Emphasis added]
[20] Factum of the Directors and Officers, ¶47
[21] *Ibid*, ¶31

39.     The letter is material to this application, although not for the reasons which have been suggested.   Specifically, the letter provides compelling evidence of the parties' commercial expectations when the policy was issued.

40.     As noted, Chartis sent the letter to the applicants' insurance broker on December 1, 2008, shortly before the initial filing under the CCAA.  The letter was provided in response to a request made by Nortel's broker.  In the letter, Chartis clarified that the $10 million retention would not apply if the court prohibited Nortel from indemnifying its directors after Nortel had petitioned the court in good faith to permit indemnification.

41.     On January 13, 2009, about six weeks after Nortel received this letter, it settled $11,941,440 on a trustee "to provide financial support for defending officer and directors" and to satisfy claims made against them.  According to the recitals in the trust indenture, Nortel had "determined that protection is required for [its] officers and directors in addition to that provided by" the directors and officers insurance. [22]

42.     When asked on cross-examination how the figure for the *corpus* of the trust was arrived at, Nortel was cryptic if not evasive, but it did confirm that the $11 million-odd figure is related at least in part to the $10 million retention, and the cost of renewing the policy going forward.[23]

43.     Nortel and its directors correctly point out the Directors & Officers Trust does not constitute insurance.  Rather, according to its stated objects, the trust exists to provide financial

---

[22] Applicants' Motion Record, pp. 214 and 219-220
[23] Applicants' Supplementary Motion Record, p. 67

support for directors and officers with respect to indemnifiable claims and losses, to the extent that insurance does not do so, and the corporation is unable to do so.[24]

44.    On January 14, 2009 the day after the trust was settled for the additional protection of directors, the applicants applied for and obtained an initial order under the *Companies Creditors Arrangement Act*.

45.    Two weeks later, on January 29, 2009, Chartis renewed the policy.[25]

46.    Nortel's position on this motion is that the order made by the court at its request on January 14 does not permit indemnification.  For the reasons which follow, this is incorrect, however assuming *arguendo* that Nortel is correct, what it ought to be doing is moving in good faith to vary the initial order, to permit indemnification.  Instead, it has done the precise opposite, and petitioned this court to confirm that the existing order prohibits indemnification.

### *Initial Order*

47.    The order obtained by the applicants on January 14, 2009 contains various provisions which confirm that Nortel continues to be permitted or required to indemnify its officers and directors for claims made against them in their capacities as such.

48.    Paragraph 6 –Nortel and its subsidiaries are "entitled" but not required to pay various expenses "whether incurred prior to, on or after" the date of the order, including "director expenses … and consistent with existing compensation policies and arrangements".  The policies

---

[24] Applicants' Motion Record, p. 219
[25] Applicants' Motion Record p. 35

and arrangements which existed at the time of the order include Nortel's by-laws, which compel the applicants to indemnify officers and directors for expenses, including legal fees.[26]

49.    Paragraph 21 – Indeed, the initial order granted a $90 million charge (later reduced to $45 million) over the applicants' property in favour of the directors and directors as security for, among other things, "the fees and disbursements of their legal counsel".  In other words, insofar as the defence costs for the class action are concerned (i.e. the fees and disbursements of directors' legal counsel), Nortel and the directors contend that the initial order somehow prevents Nortel from indemnifying the directors, but simultaneously grants a substantial valuable charge to the directors, to secure the very same liability.[27]

50.    The charge in question is authorized by section 11.51 of the *Companies Creditors' Arrangement Act*, which permits the court to declare that a debtor's property is charged in favour of directors or officers, to indemnify them "against obligations and liabilities that they may incur as [directors or officers] after the commencement of proceedings under this Act".[28]

51.    Paragraph 7 - Nortel "… shall be entitled but not required to pay all reasonable expenses incurred by it in carrying on the Business in the ordinary course on and after the date of this order and in carrying out the provisions of this order, which expenses shall include without limitation all expenses … reasonably necessary for the preservation of the … Business including ...".[29]  The indemnification of a director for legal fees incurred in defending a claim brought against him or her *qua* director is entirely within the ordinary course of any business.

---

[26] Applicants' Supplementary Record, pp. 71-72
[27] *Ibid*, p. 21
[28] R.S.C. 1985, c. C-36
[29] Applicants' Supplementary Record, pp. 72-75

52.     Paragraph 10 – Nortel is "directed … to make no payments of principal, interest thereon or otherwise on account of amounts owing ... to any of its creditors *as of this date*".[30]  The class proceeding for which defence costs were incurred was commenced after the initial order. Similarly, the claims by the applicants' European subsidiaries, were filed long after the initial order was made.  Thus, by definition, any obligation on Nortel's part to indemnify the directors is a post-filing liability.

53.     Paragraph 20 - Nortel "shall" indemnify its directors and officers from all claims relating to the organization's failure to pay wages, or to remit amounts due to governmental authorities and other payments of this nature.[31]  This provision does not address the types of directors' obligations in issue on this motion, however it belies the suggestion that the initial order prohibits the indemnification of officers and directors.  If (as Nortel contends) there is something in the order which acts as a blanket prohibition to prevent it from indemnifying its directors and officers, paragraph 20 would have to provide that Nortel shall make the specific, listed indemnifications notwithstanding the general prohibition.

54.     Paragraph 23 – Nortel's directors "shall be entitled to receive remuneration in cash on a current basis at current compensation levels…".   There is nothing to suggest that this remuneration and compensation does not include the indemnification rights provided for in the Nortel's by-laws.  This is particularly so in light of the language in paragraph 6 of the order (reproduced above) which provides that director's "expenses" are to be reimbursed in accordance with "existing compensation" policies.[32]

---

[30] *Ibid*, p. 76
[31] *Ibid*, p. 81
[32] *Ibid*, p. 82

14

55.     Each of the foregoing provisions either contemplates or at a minimum is entirely consistent with Nortel continuing to be permitted and required to indemnify its directors and officers for claims made against them in their capacities as such.  None of these provisions purports to constrain or prohibit Nortel from indemnifying.

56.     The order contains other provisions on which Nortel relies which, it is submitted, are irrelevant to this motion.

57.     Paragraph 15 – The order stays "all rights and remedies" against or in respect of the debtors and their property.  This means that if this motion is dismissed, and Nortel does not honour its obligations voluntarily, the directors and officers must obtain leave before they can sue Nortel to enforce their indemnification rights.  Neither paragraph 15 of the initial order, nor any other provision purports to relieve Nortel of any of its obligations, including the obligation in its by-law to indemnify directors, nor is there any prohibition in paragraph 15 or elsewhere which restricts the power to indemnify directors granted by the *Business Corporations Act (Canada)*.

58.     Paragraph 16 – The order prohibits any person from discontinuing or failing to honour or perform any contract or agreement with the debtors.[33]  Chartis has not dishonoured the policy and is ready, willing and able to perform in accordance with its obligations.  A court order that requires Chartis to perform its obligations cannot augment those obligations. [34]

---

[33] Applicants' Supplementary Motion Record, pp. 79-80
[34] *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, s. 11.01

### III.    THE ISSUES AND THE LAW

59.    The issues on this motion are as follows:

    (a)    In what circumstances does the retention apply?

    (b)    Is Nortel <u>obliged</u> to indemnify its directors for the claims in issue on this motion?

    (c)    Is Nortel <u>permitted</u> to indemnify its directors for the claims in issue on this motion?

    (d)    Should the court hold Chartis and Nortel to the bargain they made in anticipation of Nortel's CCAA filing?

    (e)    What effect does the D&O Trust have on the rights of Nortel and its directors under the policy?

### *(a)    The Retention Applies Unless Claims Are Non-Indemnifiable*

60.    The retention clause in the policy provides that the first $10 million of risk for losses that are otherwise insured are retained by the Organization and Insured Persons, (i.e., Nortel, its subsidiaries and their officers and directors) and remain wholly uninsured.

61.    The retention clause does not apply if a loss is non-indemnifiable, which is defined to mean, a loss for which (in this case) Nortel is not required to indemnify a director, or is not permitted to indemnify a director.

62.    Shortly before Nortel filed for protection, Chartis agreed that it would treat a loss as non-indemnifiable if the court prohibited Nortel from indemnifying because of higher bankruptcy law priorities, provided that Nortel petitioned the court in good faith to permit indemnification.

### (b)      Nortel is Obliged to Indemnify

63.    Nortel's entire argument is premised on a fallacy, asserted as fact at the outset and repeated throughout, that it is not permitted or obliged to indemnify the officers and directors with respect to the losses in issue.

64.    There is no dispute that the applicants were both permitted and required to indemnify before the initial order was made.  There is nothing in the order which extinguishes, releases, compromises or otherwise relieves Nortel from the obligation to indemnify imposed by its by-law, nor is there anything which curbs the permission to indemnify, bestowed by section 124 of the *Business Corporations Act (Canada)*.

65.    Nortel can point to nothing in the initial order which restrains or prohibits it from indemnifying.  The most it can do is point to paragraph 15 of the order, which stays the directors' hands, however a stay does not prohibit Nortel from honouring its obligations.  It is elementary that a substantive liability or obligation cannot be extinguished by a procedural stay of proceedings.  Even if the directors' hands are stayed, Nortel's underlying obligation to indemnify is unaffected.  A debtor's obligations continue until the obligation is performed, compromised in a plan of arrangement, released by the obligee or otherwise legally discharged.[35]

66.    In this regard, the language in the contract of insurance is straightforward.  Whether or not a loss is indemnifiable is determined with reference to the Organization's obligation or permission to indemnify, and not with reference to an Insured Person's remedial rights if the Organization refuses to do so.

---

[35] *Re Nortel Networks Corporation* 2009 CanLII 43427 (Ont. S.C.J.) at ¶33
*Sproule v. Nortel Networks Corporation* 2009 ONCA 833 at ¶16
*Re Quinsam Coal Corp.* (2000), 20 C.B.R. (4th) 145 (B.C.C.A.) ¶9

67.     In other words, Nortel and the directors can only prevail on this motion if the court re-writes the policy, to strike the existing language and redefine a non-indemnifiable loss as one "for which Insured Persons must seek leave of the court before enforcing their indemnity rights".

68.     In short, Nortel's contention that the directors' defence costs are non-indemnifiable elides the distinction between what the order prohibits in paragraph 15 (proceedings *against* Nortel) and Nortel's legal obligations.  The language in the policy is concerned with and turns solely on Nortel's obligation to indemnify, which is unaffected by the stay.

### *(b)     Nortel is Permitted to Indemnify*

69.     Even if one were to interpret paragraph 15 of the initial order to mean that Nortel's obligation to indemnify has been discharged, Nortel would still be permitted to indemnify the directors as a proper restructuring expense.

70.     Nortel and the directors argue otherwise by characterizing the expenses as pre-filing liabilities.  More specifically, they argue that the claims against the directors are "based on [the directors'] pre-filing actions" and do not arise from services rendered by the director after January 14, 2009.[36]  Thus, they argue, indemnification is not the type of post-filing expense which must be paid to "keep the lights on" while the debtor restructures, (or in this case, liquidates).

71.     Both the facts giving rise to the claims against the directors and the date on which those facts occurred are irrelevant.  A lawsuit against directors commenced 6 months after Nortel filed for creditor protection, alleging wrongdoing 18 months earlier, may well concern pre-filing

---

[36] Applicants' Factum, ¶48

liabilities of the directors, however the nature of the directors' liability to the plaintiffs in the class action has absolutely nothing to do with this motion.

72.    Rather, this motion concerns Nortel's liability to its directors, to indemnify them for defence costs, or in the case of the EMEA claims, to potentially indemnify them at some unknown point in the future for liabilities that at this point are merely contingent.

73.    In considering when Nortel's obligation to indemnify a director arises, the proper focus is not on the occasion when the alleged directors' misconduct occurred (e.g. 2008), but rather on the moment when claims were actually made, and the directors actually incurred defence costs (2009), or in the case of the EMEA claims, are actually found liable (2020??).

74.    Nortel cannot possibly have been obliged to indemnify directors for their defence costs before they were sued in July 2009, and began to incur the very defence costs for which indemnity is sought.  Both Nortel's by-law and the CBCA provide for the indemnification of directors for amounts they "*have* paid" or liabilities the "*have* incurred", not for theoretic liabilities they might incur at some unknown date in the future.  Similarly, Chartis's policy provides insurance for defence costs which have been incurred in investigating and defending proceedings which have been commenced.

75.    For these reasons, it is untenable to characterize Nortel's obligation to indemnify the directors for the costs of defending a lawsuit that was commenced in mid-2009, as a pre-filing liability.  (If the court were to accept this curious argument, Chartis could presumably deny coverage, as the policy is a "claims made policy":  If Nortel's obligation to indemnify pre-dates

the expenses for which indemnification is being provided, it must also pre-date the issuance of the policy.)

76.    Chartis does not dispute Nortel's assertion that a stay of proceedings is critical to an insolvent debtor's efforts to restructure, and does not dispute that exceptions to stays should be construed narrowly to facilitate orderly and successful restructuring.

77.    The initial order was fashioned to facilitate an orderly and successful restructuring, and subsequently modified to facilitate an orderly and advantageous liquidation.  Paragraphs 6 and 7 permit the payment of expenses incurred in carrying out the provision of the order, including directors' expenses.  These provisions, and the various forms of protection established for the directors, such as a directors' stay, a directors' charge and the D&O Trust, are intended to keep the directors in place and avoid destabilization, with a view to increasing the likelihood of a successful restructuring, or maximizing the realization.[37]

78.    That is, the indemnification of directors for claims made against them while a company restructures, is precisely the type of expense which is required "to keep the lights on" or otherwise preserve value for creditors, a fact which has been recognized by both Nortel and this court in this case:  If the indemnification of directors for claims made during the insolvency proceeding were not a proper restructuring expense, the D&O trust would be an $11 million fraudulent conveyance and the directors' charge would be a $90 million fraudulent preference.

---

[37] *Re Canwest Global Communications Corp.* (2009), 59 C.B.R. (5th) 72 (Ont. S.C.J.)
*Re General Publishing Limited*, 2003 CanLII 7787 (Ont. S.C.J.)
*Re Nortel Networks Corporation*, 2009 CanLII 43427 (Ont. S.C.J.) at ¶36
*Sproule v. Nortel Networks Corporation*, 2009 ONCA 833 at ¶¶46-47

79.    In an attempt to obtain insurance coverage that it neither bargained nor paid for, Nortel engages in the tortured logic described above to mischaracterize its obligation to indemnify its directors as a pre-filing liability.  It petitions the court to conclude that it is not permitted to indemnify its directors.

80.    What Nortel should do is exercise the existing power it has under paragraphs 6 and 7 of the initial order to indemnify the directors for the expenses they incurred in defending the class action in and after July 2009, or may yet incur with respect to the EMEA claims, on the basis that these are proper post-filing expenses.  If any clarification is required, Nortel should petition the court in good faith to permit indemnification.

81.    If for some reason Nortel refuses to take these steps, the directors will have a compelling case for asking the court to lift the stay, and to grant additional appropriate relief, as Nortel's obligation to indemnify has, in fact, not been released, discharged, compromised or performed.

*(d)*    ***Nortel is Permitted and Obliged to Indemnify and Should Do So - The Parties' Bargain***

82.    The applicants refer at paragraph 51 of their factum to the Court of Appeal's decision in *Zurich Insurance Company v. 686234 Ontario Limited*.  Chartis does not dispute that coverage clauses should be interpreted broadly and exclusion clauses interpreted narrowly, however that has nothing to do with the case at bar:  The scope of the coverage is not in dispute and Chartis is not relying on an exclusion clause.

83.    That is, this case has nothing to do with the interpretation of the language in the policy.  The parties are in complete agreement that if a loss is non-indemnifiable, the retention clause

does not apply.  Further, the parties agree that a loss is non-indemnifiable if the applicants are neither permitted nor obliged to indemnify.

84.     The dispute is concerned solely with the question of whether indemnification is either permitted or legally required, which does not involve interpretation of the policy, but rather, a determination of whether or not the court has "prohibited" indemnification and whether Nortel has "petitioned the court in good faith" for permission to indemnify.

85.     In any event, *Zurich* is inapposite.  Nortel does not seek relief from the terms of the policy, presumably because the language is not one-sided, oppressive or commercially unreasonable.  Sophisticated commercial parties allocated the risks and recorded their agreement in precise language.

86.     To the extent that *Zurich Insurance* and *Consolidated Bathurst v. Mutual Boiler and Machinery Insurance Co.* (on which the applicants also rely) are of any application, they assist Chartis.

87.     *Consolidated-Bathurst* stands for the proposition that insurance contracts should be interpreted in a manner that "advances the true intent of the parties at the time of entry into the contract".  Courts should not interpret the contract in a manner that enables the insurer to pocket the premium without risk, or which permits "the insured to achieve a recovery which could neither be sensibly sought nor anticipated at the time of the contract".[38]

---

[38] *Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co.*, [1980] 1 S.C.R. 888 at 901-902

88.     It will be recalled that Nortel's broker inquired of Chartis immediately before filing, at which time Chartis clarified its expectations and requirements:

> "[If] in a filing ... under the *Companies' Creditors Arrangement Act* ... the court prohibits indemnification [of directors] because of higher bankruptcy law priorities, then generally, the Insurer would not consider indemnification to be 'permitted or required'. ... Of course, the Insurer would expect ... and require the Organization to petition the bankruptcy court in good faith to permit indemnification of its Insured Persons."

89.     On the basis of the foregoing, Nortel (in rapid succession) settled the Directors & Officers trust to provide "protection in addition to that provided by insurance", filed for creditor protection and renewed the policy.  The parties' expectation at the time was that the retention would apply unless the court prohibited Nortel from indemnifying its officers and directors, even after Nortel had petitioned the court in good faith for permission to do so.  The court would not be giving effect to anybody's expectations if it countenanced Nortel's refusal to carry out its end of this bargain.

90.     More generally, the parties' expectation was that Nortel and its directors would remain self-insured for the first $10 million of risk for (among other things) claims against officers and directors.  This is the policy of insurance the applicants purchased while in creditor protection, and Chartis asks that the court hold Nortel to its bargain.

*(e)*     ***The Significance of the D&O Trust***

91.     As repeatedly set out above, as a matter of simple contractual interpretation, the retention applies if Nortel continues to be permitted or obliged to indemnify the directors.  This is so even if the stay of proceedings leaves the directors without a remedy to enforce Nortel's obligation.

92.     That is, if Nortel and the directors are correct about the effect of the initial order as presently worded, and Nortel inexplicably persists in its refusal to petition the court in good faith to permit indemnification, the directors could find themselves without insurance and without indemnity from Nortel.  This would not be because the court has prohibited indemnification, but rather, because Nortel elected not to seek relief which is readily available.

93.     Fortunately, the directors are the beneficiaries of an $11 million trust established to protect them "to the extent they do not have coverage under any directors and officers insurance policy".

94.     Contrary to what Nortel and the directors suggest, Chartis does not seek "secure payment of the retention amount through the D&O Trust".  It is also not arguing that if it pays out under the policy, it is subrogated to the rights of the directors as beneficiaries of the trust.[39]  What Chartis does say is that if the retention applies (because Nortel is still permitted and/or obliged to indemnify) but Nortel cannot be compelled to honour that obligation (because of the stay), the directors are not without another form of protection.

95.     The directors' argument concerning the trust at paragraphs 54 to 56 of their factum is entirely circular.  The trust indenture provides that the *corpus* of the trust is not available to provide financial support to the directors for the costs of defending claims that qualify for coverage under an insurance policy, "except in certain circumstances".  The directors conclude that the class action for which defence costs were incurred is such a claim and therefore, "the trust property cannot be used" to pay the defence costs.

---

[39] Applicants Factum, ¶67, Directors' Factum, ¶52 to 59

96.      What this reasoning ignores is the "certain circumstances" in which trust assets **can** be used to provide financial support for directors, set out in articles 2 and 3 of the trust indenture. In brief, the trustee may provide support if he is satisfied that the claim will not be paid by the insurer because coverage is inadequate or disputed.[40]

97.      It would be absurd for Chartis to assert that the existence of the trust relieves it of its contractual obligations and Chartis does not do so, however the converse is equally true:  It is untenable to argue, as the directors do, that because relief is not available from the trust unless the directors find themselves without insurance, there must therefore be insurance.


## IV.      RELIEF SOUGHT

98.      Chartis therefore seeks an order dismissing the applicant's motion with costs.


23 May 2012                              _____

                                         Sean Dewart / Tim Gleason
                                         Counsel for Chartis Insurance Company of Canada

---

[40] Applicants' Record, pp. 220-222

SCHEDULE A
AUTHORITIES

*Re Nortel Networks Corporation* 2009 CanLII 43427 (Ont. S.C.J.)

*Sproule v. Nortel Networks Corporation* 2009 ONCA 833

*Re Quinsam Coal Corp.* (2000), 20 C.B.R. (4th) 145 (B.C.C.A.)

*Re Canwest Global Communications Corp.* (2009), 59 C.B.R. (5th) 72 (Ont. S.C.J.)

*Re General Publishing Limited*, 2003 CanLII 7787 (Ont. S.C.J.)

*Re Nortel Networks Corporation*, 2009 CanLII 43427 (Ont. S.C.J.)

*Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co.*, [1980] 1 S.C.R. 888

26

SCHEDULE B
STATUTES

*Business Corporations Act*, R.S.C. 1985, c. C-44

Indemnification

124. (1) A corporation may indemnify a director or officer of the corporation, a former director or officer of the corporation or another individual who acts or acted at the corporation's request as a director or officer, or an individual acting in a similar capacity, of another entity, against all costs, charges and expenses, including an amount paid to settle an action or satisfy a judgment, reasonably incurred by the individual in respect of any civil, criminal, administrative, investigative or other proceeding in which the individual is involved because of that association with the corporation or other entity.

---

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36

**11.01** No order made under section 11 or 11.02 has the effect of

(*a*)    prohibiting a person from requiring immediate payment for goods, services, use of leased or licensed property or other valuable consideration provided after the order is made; or

(*b*)    requiring the further advance of money or credit.

**EXHIBIT A-5**
**BOARD OF DIRECTORS OF NNC AND NNL FACTUM**

Court File No.: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES CREDITORS' ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

**FACTUM OF THE BOARD OF DIRECTORS OF NORTEL NETWORKS**
**CORPORATION AND NORTEL NETWORKS LIMITED**

(Motion returnable May 30, 2012)

| | |
|---|---|
| May 14, 2012 | **OSLER, HOSKIN & HARCOURT LLP**<br>Box 50, 1 First Canadian Place<br>Toronto, Ontario<br>M5X 1B8<br><br>**Lyndon A.J. Barnes LSUC#: 13350D**<br>Tel: 416-862-6679<br>Email: lbarnes@osler.com<br><br>**Adam Hirsh LSUC#: 55239Q**<br>Tel: (416) 862-6635<br>Email: ahirsh@osler.com<br><br>Lawyers for the Board of Directors of<br>Nortel Networks Corporation and Nortel<br>Networks Limited |

Court File No.: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED ("CCAA")

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES CREDITORS' ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

**FACTUM OF THE BOARD OF DIRECTORS OF NORTEL NETWORKS
CORPORATION AND NORTEL NETWORKS LIMITED**

(Motion returnable May 30, 2012)

## PART 1 - OVERVIEW

1.         Under the laws of various jurisdictions, directors and officers may become personally liable for certain claims. As officers of Nortel Networks Corporation ("NNC"), Michael Zafirovski and Pavi Binning are entitled to be wholly indemnified or otherwise compensated for claims arising out of their service to Nortel. In ordinary circumstances, this indemnity is provided by the company. If the company is insolvent, this compensation is provided by Chartis, Inc. ("Chartis"), as the provider of the executive and organization liability insurance policy (the "D&O Policy"). As a result, there are no circumstances in which Mr. Zafirovski or Mr. Binning incur personal expenses in connection with the defence of a covered claim so long as the D&O Policy has not expired or been exhausted.

2.         Mr. Zafirovski and Mr. Binning are defendants in a proposed class proceeding in the United States federal court that includes allegations relating to their conduct as officers of

- 3 -

NNC[1] in 2008. Although this action has been stayed, Mr. Zafirovski and Mr. Binning have incurred legal expenses in addressing the claim in question. The questions at issue on this motion are: (a) whether Chartis must provide immediate coverage in respect of such legal fees; or (b) whether a retention amount of $10,000,000 in the D&O Policy (the "Retention Amount") applies notwithstanding the fact that the Applicants are under CCAA protection.

3.        NNC and certain of its affiliates were granted creditor protection including a stay of proceedings pursuant to the Initial Order of this Honourable Court dated January 14, 2009. As a result of the stay and the terms of the Initial Order, NNC is not required or permitted to honour the indemnity provided to Mr. Zafirovski and Mr. Binning. In such circumstances, the D&O Policy provides that no Retention Amount will apply and Chartis will pay covered claims against "Insured Persons" (including NNC directors and officers) from the first dollar up to the policy limit. AIG Commercial Insurance Company of Canada ("AIG"), which is the original issuer of the D&O Policy and Chartis's predecessor, confirmed this interpretation of the D&O Policy in a letter dated December 1, 2008. The obligation now falls on Chartis to make good on its promise to pay.

4.        The only dispute before this Honourable Court is whether the Retention Amount is applicable in the circumstances of this proceeding. Chartis does not dispute that the D&O Policy is valid and the claim in question is covered. For the reasons set out below, the Board of Directors of NNC and Nortel Networks Limited ("NNL") support the Applicants' motion for an Order declaring, among other things, that the Retention Amount is not applicable.

---

[1] Capitalized terms not otherwise defined have the meanings ascribed to them in the Affidavit of Anna Ventresca sworn October 7, 2011, Applicants' Motion Record, Tab 2 (the "Ventresca Affidavit").

## PART II - FACTS

5.        The Board of Directors of NNC and NNL adopt the facts as described in the Applicants' factum.

## PART III - ISSUES

6.        The issue in this motion is whether the Retention Amount in the D&O Policy applies when the Applicants are prohibited by the stay of proceedings from indemnifying their directors and officers. This central issue implicates three sub-issues:

(a)    Is the Applicants' obligation to indemnify stayed by the stay of proceedings provided by the Initial Order?

(b)    Does the Retention Amount apply when the Applicants' obligation to indemnify is stayed?

(c)    Do the express terms of the trust indenture prohibit the use of trust property for payment of the legal fees in question?

## PART IV – LAW AND ARGUMENT

## Sub-Issue 1: The Applicants' obligation to indemnify is stayed by the stay of proceedings

7.        The overriding purpose of the CCAA is to allow a debtor company to restructure its affairs in order to negotiate a compromise with its creditors and avoid bankruptcy.[2]

> ...as the motion judge wrote at para. 47 of his reasons, the acknowledged purpose of the CCAA is to facilitate the making of a compromise or arrangement between an insolvent debtor company and its creditors, to the end that it is able to continue in business....[3]

---

[2] *Nova Metal Products Inc. v. Comiskey (Trustee of)* (1990), 1 C.B.R. (3d) 101, 1 O.R. (3d) 289 (Ont. C.A.), Board of Directors' Book of Authorities, Tab 7.

[3] *Sproule v. Nortel Networks Corporation*, (2009), 59 C.B.R. (5th) 23, 99 O.R. (3d) 708 [*Sproule*], para. 16 (Ont. C.A.), Board of Directors' Book of Authorities, Tab 11.

- 5 -

8.          The CCAA is to be given a broad and liberal interpretation so that it may achieve this and other policy objectives.

> ...I note that Parliament has in recent amendments changed the wording contained in s. 11(1), making explicit the discretionary authority of the court under the CCAA. Thus, in s. 11 of the CCAA as currently enacted, a court may, "subject to the restrictions set out in the Act, ... make any order that it considers appropriate in the circumstances" (S.C. 2005, c. 47, s. 128). Parliament appears to have endorsed the broad reading of CCAA authority developed by the jurisprudence.[4]

9.          The stay of proceedings is the primary instrument used to achieve the CCAA's objectives.[5] The stay provisions in an initial order are designed to provide the debtor company with "breathing room" while a plan of compromise or arrangement is prepared, filed and considered by the creditors and the court.[6]

10.         As Blair J. (as he then was) explained in *Campeau v. Olympia & York*:

> By its formal title the C.C.A.A. is known as "An Act to facilitate compromises and arrangements between companies and their creditors." To ensure the effective nature of such a 'facilitative' process it is essential that the debtor company be afforded a respite from litigious and other rights being exercised by creditors, while it attempts to carry on as a going concern and to negotiate an acceptable corporate restructuring arrangement with such creditors.[7]

11.         The version of the CCAA that was in effect at the time that the Applicants commenced this proceeding granted the court discretion to make an order, among other things, staying all proceedings taken or that might be taken against the debtor company.

> **11(3)** A court may, on an initial application in respect of a company, make an order on such terms as it may impose, effective for such period as the court deems necessary not exceeding thirty days,

[4] *Century Services Inc. v. Canada (Attorney General)*, 2010 S.C.C. 60, [2010] 3 S.C.R. 379 [*Century Services*], para. 68, Board of Directors' Book of Authorities, Tab 2.

[5] *Stelco Inc. (Re)*, [2005] O.J. No. 1171, para. 36, Board of Directors' Book of Authorities, Tab 9.

[6] *Lehndorff General Partner Ltd., Re* (1993), 17 C.B.R. (3d) 24 (Ont. Gen. Div.), para 5, Board of Directors' Book of Authorities, Tab 5.

[7] *Campeau v. Olympia & York* (1992), 14 C.B.R. (3d) 303 (Ont. Gen. Div.), p. 309, para 17, Board of Directors' Book of Authorities, Tab 1.

- 6 -

(*a*) staying, until otherwise ordered by the court, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (1);

(*b*) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

(*c*) prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

12.       The current version of the CCAA explicitly broadens this power and provides that:

**11.02 (1)** A court may, on an initial application in respect of a debtor company, make an order on any terms that it may impose, effective for the period that the court considers necessary, which period may not be more than 30 days,

(*a*) staying, until otherwise ordered by the court, all proceedings taken or that might be taken in respect of the company under the *Bankruptcy and Insolvency Act* or the *Winding-up and Restructuring Act*;

(*b*) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

(*c*) prohibiting, until otherwise ordered by the court, the commencement of any action, suit or proceeding against the company.

13.       The statutory power to grant the stay is "augmented by the Court's inherent jurisdiction to grant a stay in appropriate circumstances."[8]

14.       As noted by the Supreme Court of Canada in *Century Services*, the stay of proceedings helps the debtor to maximize its assets, ultimately for the benefit of all of its creditors.[9]

## Stay Provisions in the Initial Order

15.       On January 14, 2009, this Honourable Court granted the Initial Order which, among other things, provided for a stay of proceedings (the "Stay") against the Applicants and

---

[8] *SNV Group Ltd. (Re)*, [2001] B.C.J. No. 2497 (S.C.), para 14, Board of Directors' Book of Authorities, Tab 10.

[9] *Century Services, supra*, para. 22, Board of Directors' Book of Authorities, Tab 2.

- 7 -

their directors and officers. The Stay affects existing and potential litigation and any other actions or demands by creditors to enforce their respective claims against the Applicants.

**NO PROCEEDINGS AGAINST THE APPLICANTS OR THE PROPERTY**

14.    THIS COURT ORDERS that until and including February 13, 2009 or such later date as this Court may order (the "Stay Period"), no proceeding or enforcement process in any court or tribunal (each, a "Proceeding") shall be commenced, or continued against or in respect of any of the Applicants or the Monitor, or affecting the Business or the Property, except with the written consent of the affected Applicant or the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of the affected Applicant or affecting the Business or the Property are hereby stayed and suspended pending further Order of the Court.

**NO EXERCISE OF RIGHTS OR REMEDIES**

15.    THIS COURT ORDERS that during the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "Persons" and each being a "Person") against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the affected Applicant and the Monitor, or leave of this Court, provided that nothing in this Order shall (i) empower the Applicants to carry on any business which the Applicants are not lawfully entitled to carry on, (ii) exempt the Applicants from compliance with statutory or regulatory provisions relating to health, safety or the environment, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of lien claims.[10]

16.    The Stay has been extended on multiple occasions by this Honourable Court and is currently scheduled to expire on July 31, 2012.

17.    With few exceptions, the stay of proceedings applies to claims and actions by both pre-filing and post-filing creditors. Neither the CCAA nor the terms of the Initial Order restrict the scope of the Stay to debts or claims in existence as of the filing date.[11]

---

[10] *Re Nortel Networks Corporation et al.*, Ontario Superior Court of Justice Court File No. 09-CL-7950, Initial Order of the Honourable Mr. Justice Morawetz, dated January 14, 2009, as amended.

[11] *ICR Commercial Real Estate (Regina) Ltd. v. Bricore Land Group Ltd.*, 33 C.B.R. (5th) 50 (Sask. C.A.), Board of Directors' Book of Authorities, Tab 4.

- 8 -

18.        Courts have given extremely broad interpretations to the scope of the stay and have precluded creditors from taking virtually any step against a debtor under CCAA protection. In *Woodward's Ltd. (Re)*, the Supreme Court of British Columbia held that former executives were stayed from calling on a letter of credit issued by the debtor's lender and securing obligations owed to them by the debtor where the terms of the related trust agreement required that steps be taken vis-a-vis the debtor before the lender was required to honour the letters of credit. In that case, the trust agreement required, among other things, the delivery of a report to the debtor that the claim in question had not been paid before the letters of credit could be called on. In his decision, Tysoe J. determined that even this minor involvement of the debtor invoked and was prohibited by the stay and that, therefore, the calling on the letters of credit was stayed notwithstanding that the letters of credit would be paid by a third party.

> 27    If a step must be taken vis-a-vis the insolvent company before a creditor (or a trustee on behalf of a creditor) may enforce its rights, the form of the step should make no difference for the purposes of s. 11 of the CCAA. It should not matter whether the step is a demand for payment on the company, the delivery to the company of a notice of acceleration or the delivery to the company of some other type of document such as a copy of a certificate or a report. In the Meridian case, supra, Wachowich J. quoted the following portion of the definition of the word "proceeding" in Black's Law Dictionary, 5th ed. (1979) (at p. 582 of D.L.R. and p. 221 of W.W.R.):
>
> Term "proceeding" may refer not only to a complete remedy but also to a mere procedural step that is part of a larger action or special proceeding. Rooney v. Vermont Invt. Corp. (1973), 10 Cal. (3d) 351, 110 Cal. Rptr. 353, 515 P. (2d) 297 (Cal. S.C.).[12]

19.        On this reasoning, the invoking of an indemnity obligation of a debtor would likewise be prohibited by a stay of proceedings.

## Exceptions to the Stay

20.        There are a few statutory exceptions to the stay of proceedings, including an exception that requires a debtor to make payment in respect of post-filing liabilities for, among

---

[12] *Woodward Ltd. (Re)*, 17 C.B.R. (3d) 236, [1993] B.C.J. No. 42, para. 27, Board of Directors' Book of Authorities, Tab 12.

other things, employee wages, statutory deemed trusts and goods and services supplied to the

debtor after the filing date. Notwithstanding the comprehensive nature of the stay and the

overriding policy objectives of the CCAA, section 11 of the CCAA provides that the court

cannot compel a supplier to continue to extend credit to a debtor post-filing.

> **11.3** No order made under section 11 shall have the effect of
>
> (a) prohibiting a person from requiring immediate payment for goods, services,
> use of leased or licensed property or other valuable consideration provided after
> the order is made; or
>
> (b) requiring the further advance of money or credit.[13]

21.    The policy to this exception under section 11 is to encourage creditors that supply

goods and services to continue to do business with an insolvent company during the pendency of

a CCAA proceeding so that the debtor may continue to operate its business.[14]

22.    At the same time, this has the effect of permitting certain post-petition creditors

full payment where other pre-filing creditors, including secured creditors, may see their claims

compromised. As a result, this exception to the stay has been narrowly construed.

> ...we also agree with the motion judge when he stated at para. 66:
>
>> In my view, section 11.3 is an exception to the general stay provision
>> authorized by section 11 provided for in the Initial Order. As such, it
>> seems to me that section 11 should be narrowly construed.[15]

23.    In *Re Smoky River Coal*, the Alberta Court of Appeal considered what types of

goods and services should be eligible for a post-petition creditor charge in view of the fact that

exceptions to the stay are to be construed narrowly. The Court of Appeal agreed with the CCAA

---

[13] CCAA, section 11.3 (in force on filing date), substantively identical language is now contained in s. 11.01.

[14] Sarra, Janis, *Rescue! The Companies' Creditors Arrangement Act*, Toronto: Thomson Carswell, 2007, pp. 120-121.

[15] *Sproule, supra*, para. 16 *quoting* Morawetz J. (2009), 55 C.B.R. (5th) 68, para. 66, Board of Directors' Book of Authorities, Tab 11.

- 10 -

judge that the post-petition charge in question, which was intended for the benefit of creditors that would fall under section 11.3 of the CCAA, should include only those creditors whose goods and services are critical to "keeping the lights of the company on".[16] The analysis in *Smoky River Coal* is applicable to this case notwithstanding that there is no post-petition charge in the Nortel proceeding:

> The second criteria for eligibility [for the post-petition creditor charge] was that the debt in question was incurred in connection with the daily operating activities of Smoky River, as opposed to debts that arose from the cessation or termination of services. As stated by the CCAA judge (supra, at para. 40):
>
>> The main purpose of the charge was to encourage the creditors who supplied Smoky with goods and services to continue to deal with Smoky during the reorganization period. The critical characteristic of the service provided by the creditors must have been that it was essential to keeping "the lights of the company on". Thus, the costs or expenses incurred must be essential to the continued day-to-day operations of the mine. Penalties or obligations associated with the breach are not expenses associated with continued operations.[17]

24.        The Ontario Court of Appeal considered a similar issue in *Sproule* in this proceeding. In that case, certain former employees sought a direction from the Court requiring Nortel to make periodic retirement and severance payments pursuant to the terms of a collective agreement and applicable employment standards legislation. The union, on behalf of the former employees, argued that the services of continuing and former employees under the same collective agreement could not be severed into separate obligations and that therefore the obligations to the former employees fell within the scope of s. 11.3(a) of the CCAA. The Ontario Court of Appeal upheld the decision of this Honourable Court that it would frustrate the objectives of the CCAA if the stay of proceedings could not apply to statutory termination and severance payments owed to employees terminated pre-filing in respect of past services. As a

---

[16] *Montreal Trust Co. of Canada Ltd. v. Smoky River Coal Ltd.,* 28 CBR (4th) 127; 95 Alta LR (3d) 1 [*Re Smoky River Coal*], para. 13, Board of Directors' Book of Authorities, Tab 6.

[17] *Ibid.*

result, the statutory payments sought by the former employees were stayed by the terms of the Initial Order.[18]

## Lucescu Claim Legal Costs Give Rise to Lucescu Fees Claim

25.         In May 2009, intended class proceedings were commenced by David Lucescu (the "Lucescu Claim") against former NNC officers Michael Zafirovski and Pavi Binning in the United States District Court for the Southern District of New York. The Lucescu Claim includes allegations against Mr. Zafirovski and Mr. Binning relating to actions taken in 2008 in their respective capacities as Chief Executive Officer and Chief Financial Officer of NNC.[19]

26.         The Lucescu Claim is stayed by the Stay, however counsel for Mr. Zafirovski and Mr. Binning have incurred fees in connection with the Lucescu Claim.[20]

27.         Pursuant to s. 124 of the *Canada Business Corporations Act*[21] and the NNC bylaws, NNC is required to indemnify its directors and officers for losses and legal fees incurred in connection with claims of this nature.

## The Indemnity is Stayed by the Initial Order

28.         Mr. Zafirovski and Mr. Binning are entitled to be compensated for legal expenses incurred in connection with the Lucescu Claim. Nortel does not dispute the validity of this indemnity or that Mr. Zafirovski and Mr. Binning are entitled to full compensation for any legal fees incurred in connection with the Lucescu Claim. Mr. Zafirovski and Mr. Binning hold a claim against Nortel in the amount of the fees incurred in connection with the Lucescu Claim (the "Lucescu Fees Claim").

---

[18] *Sproule, supra.*

[19] Ventresca Affidavit at para. 17, Applicants' Motion Record, Tab 2.

[20] *Ibid.,* para. 18.

[21] R.S.C., 1985, c. C-44, as amended (the "CBCA").

- 12 -

29.        The Lucescu Fees Claim falls directly within paragraph 15 of the Initial Order, which stays the enforcement of the rights and remedies of any individual.

30.        The Lucescu Fees Claim does not trigger any exceptions to the Stay, either under law or pursuant to the Initial Order. There is no question that the provision of post-filing employment services would require immediate and full payment of their respective salaries. At the same time, exceptions to the Stay are to be construed narrowly, and the Lucescu Fees Claim is not a claim that can be directly tied to goods and services rendered by Mr. Zafirovski and Mr. Binning post-filing. On the contrary, the related indemnity obligation was hypothetical until the occurrence of an outside event: the commencement of the Lucescu Claim and the incurring of related legal fees. To paraphrase the words of the Alberta Court of Appeal in *Smoky River Coal*, the Lucescu Fees Claim is not derived from services required to "keep the lights on" at Nortel. The Lucescu Fees Claim is therefore stayed by the Initial Order.

31.        Significantly, AIG (which is now Chartis) agreed with this interpretation of the effect of a CCAA stay of proceedings on a hypothetical indemnity obligation of NNC in a letter to Marsh Canada Inc. dated December 1, 2008. As stated by AIG:

> However, if the **Organization** goes bankrupt and in a filing for bankruptcy protection (voluntarily or involuntarily) under Title 11 of the United States Code or under the Company Creditors' Arrangement Act,R.S.C. 1985 c. C-36 (as amended), or any similar provincial or foreign law (collectively "Bankruptcy Law")[,] the court prohibits indemnification by the **Organization** of **Loss** of the **Insured Persons** because of higher bankruptcy law priorities....[22] [Emphasis added.]

32.        Chartis is now maintaining a position that is directly contrary to the views expressed by AIG in respect of the very same D&O Policy. AIG's position on the interpretation of the D&O Policy should be dispositive of this motion.

---

[22] Letter from AIG (now Chartis) to Nortel Networks Corporation dated December 1, 2008 ("Chartis Letter"), Supplemental Ventresca Affidavit sworn November 25, 2011, Exhibit B.

33.          Ernst & Young Inc. (the "Monitor") also agrees that the Lucescu Fees Claim is stayed by the Initial Order. In December 2009, NNC sought the opinion of Ernst & Young Inc. (the "Monitor") as to whether an indemnity obligation relating to the Lucescu Claim would be stayed by the Initial Order. By letter dated December 16, 2009, the Monitor expressed its view that the Initial Order stays the rights of current and former directors and officers to advance claims of indemnification or for the advancement of defence costs.

> In our view, the Initial Order stays the rights of current and former directors and officers to advance claims for indemnification or for the advancement of defence costs, whether such rights arise pursuant to statute, by-law, contract or otherwise, except with the written consent of Nortel and the Monitor and with leave of the Court, with the sole exception of indemnification claims that are covered by paragraph 20 of the Initial Order (which does not appear to be applicable to the *Lucescu* action).
>
> You have also asked whether the Monitor would consent to the advancement of defence costs in respect of the *Lucescu* action. We have carefully considered this request. However, we are not prepared to consent to any such payment at this time. We are of the view that such payment would not be justified for a couple of reasons. First, such payment may very well constitute the granting of a preference to the director or officer in question at the expense of other creditors of Nortel. Further, even if the Monitor considered such payments to be justified in the circumstances, the Monitor is of the view that such payment would not be prudent given Nortel's current limited cash resources.[23]

## Sub-Issue 2: No Retention Applies Where NNC is Not Permitted or Required to Indemnify its Directors and Officers

34.          NNC holds the D&O Policy with AIG, which is now carrying on business as Chartis. The period covered by the D&O Policy is December 1, 2008 to December 1, 2009.[24]

35.          Chartis does not dispute that the D&O Policy is effective and applies to the Lucescu Claim and the Lucescu Fees Claim. The only disagreement between Nortel and Chartis in respect of the interpretation of the D&O Policy is whether the Retention Amount (as defined below) applies when NNC is under CCAA protection. The Board of Directors of NNC and NNL

---

[23] Letter from Monitor to Nortel Networks Corporation dated December 16, 2009, Supplemental Ventresca Affidavit, Exhibit "C".

[24] D&O Policy, Ventresca Affidavit, Applicants' Motion Record, Tab 2A.

- 14 -

submit that it would be contrary to the language and structure of the D&O Policy if NNC were required to pay the Lucescu Fees Claim.

## *Policy Coverage*

36.        The D&O Policy provides for four types of coverage, two of which are relevant to this motion:

     (a)        **Executive liability insurance** ("Side A" of the D&O Policy), which covers the directors and officers of NNC for losses relating to claims including reasonable and necessary costs incurred in the defence of a claim; and

     (b)        **Organization insurance** ("Side B" of the D&O Policy), which covers specified claims and losses of NNC arising from NNC's indemnification of an executive covered by the D&O Policy.[25]

37.        The Executive Liability Insurance does not apply when and to the extent that NNC has indemnified an executive that is covered by the D&O Policy. The D&O Policy provides that:

> This policy shall pay the Loss of any Insured Person arising from a Claim ... made against such Insured Person for any Wrongful Act of such Insured Person, except when and to the extent that an Organization has indemnified such Insured Person. [Emphasis added.][26]

38.        Pursuant to the CBCA and its bylaws, NNC is obligated to indemnify its directors and officers for losses relating to claims arising from the directors' and officers' association with NNC. There are only two circumstances in which NNC would not indemnify its directors and officers:

     (a)        because it is prohibited by law from doing so; or

     (b)        where it is incapable of doing so because of insolvency, bankruptcy or lack of funds.

---

[25] *Ibid.*, p. 1. Note that Side B of the D&O Policy also covers losses of NNC related to securities claims, oppressive conduct claims and Canadian pollution claims.

[26] *Ibid.*

- 15 -

39.         As a result, Side A of the D&O Policy would only be called upon if NNC were unable to satisfy its indemnification obligation to a director or officer, including in the case of an insolvency or bankruptcy. In any other event, NNC would indemnify the director and officer in question and then make a claim for reimbursement under Side B of the D&O Policy.

40.         The structure of the D&O Policy, in combination with NNC's obligation to indemnify its directors and officers whenever permitted and possible, ensures that there is never a circumstance in which individual directors and officers are personally liable for covered claims up to the maximum coverage under the D&O Policy. If NNC is able to indemnify, the directors are compensated directly by NNC; if NNC is unable to indemnify, the directors are compensated directly by Chartis through Side A of the D&O Policy.

41.         The D&O Policy also specifically addresses Chartis's obligations in the event of an insolvency:

> Bankruptcy or insolvency of any Organization or any Insured Person shall not relieve the Insurer of any of its obligations hereunder.
>
> The coverage provided under this policy is intended as a matter of priority to protect and benefit the Insured Persons such that, in the event of bankruptcy of the Organization, the Insurer shall first pay Loss under Coverage A and C prior to paying Loss under Coverage B.[27]

42.         There is no doubt, and Chartis is in agreement, that the D&O Policy is effective notwithstanding NNC's insolvency.

### The Retention

43.         The D&O Policy contains a retention clause (the "Retention Clause") that provides that Chartis is only responsible for the amount of loss in excess of a stated retention of $10,000,000. Except as otherwise provided in the Policy, losses of $10,000,000 (the Retention

---

[27] D&O Policy, Endorsement 8, Ventresca Affidavit, Applicants' Motion Record, Tab 2A.

- 16 -

Amount) must be incurred by NNC in respect of a claim before Chartis has any obligation to make payment pursuant to the D&O Policy.[28]

44.        There is a significant exception to this general rule: the Retention Clause expressly states that "No retention amount is applicable to...Non-Indemnifiable Loss."[29]

45.        Non-Indemnifiable Loss is defined in the D&O Policy as:

> ..Loss for which an Organization has neither indemnified _nor is permitted or required_ to indemnify an Insured Person _pursuant to law_ or contract or memorandum, articles, bylaws, charter, operating agreement or similar documents of an Organization. [Emphasis added.][30]

46.        Therefore, where NNC is either not permitted or not required to indemnify an Insured Person, no Retention Amount applies and Chartis is required to pay out on the D&O Policy from the first dollar of loss incurred. This provision is consistent with the purpose of the D&O Insurance: to provide immediate coverage in respect of a loss by an insured person where NNC cannot do so. The practical consequence of this provision is that no Retention Amount is applicable when a claim is made under Side A.

47.        AIG confirmed in its letter dated December 1, 2008 that no Retention Amount would be applicable if NNC were under CCAA protection because indemnification would not be "permitted or required".

> However, if the **Organization** goes bankrupt and in a filing for bankruptcy protection (voluntarily or involuntarily) under Title 11 of the United States Code or under the Company Creditors' Arrangement Act, R.S.C. 1985 c. C-36 (as amended), or any similar provincial or foreign law (collectively "Bankruptcy Law") the court prohibits indemnification by the **Organization** of **Loss** of the **Insured Persons** because of higher bankruptcy law priorities, then, generally, the Insurer would not consider indemnification of the **Insured Persons** for such Loss by the **Organization** to be "permitted or required." The result of this

---

[28] _Ibid._, p. 9, clause 6.

[29] _Ibid._

[30] _Ibid._, p. 4, subpara. (u).

- 17 -

is that, as respects to such **Loss** of the **Insured Persons** under Coverage B (ii) of the **Policy**, the presumptive indemnification language found in the Definition of **Indemnifiable Loss** would not apply and the **Insurer** would apply a zero retention (or the applicable retention) to such **Loss**.[31] [Emphasis added.]

48.        It is difficult to see how Chartis can maintain its current position where its predecessor has expressed an interpretation that squarely supports the position of the Applicants.

### *Interpretation of the Policy*

49.        The terms and structure of the D&O Policy support the Applicants' interpretation that where NNC is insolvent, the directors and officers would look to Side A of the policy for payment of the Lucescu Fees Claim and that no Retention Amount would apply in that circumstance. To the extent that the language of the policy is deemed ambiguous, however, it is submitted that the principle of *contra proferentum* applies such that the ambiguity should be resolved in favour of NNC, as the insured.[32]

50.        NNC is currently under CCAA protection pursuant to the terms of the Initial Order. The Initial Order includes a stay of proceedings that prohibits any person from taking steps to enforce a claim, including the Lucescu Fees Claim, while the Stay is in effect. In the present case, a claim is being made under Side A of D&O Policy. The D&O Policy clearly establishes that no Retention Amount is applicable when a claim is made under Side A. Chartis is therefore responsible for and required to make immediate payment in respect of the Lucescu Fees Claim.

---

[31] Chartis Letter, Supplemental Ventresca Affidavit, Exhibit "B".

[32] *Consolidated-Bathurst v. Mutual Boiler*, [1980] 1 S.C.R. 888, paras. 899-900, Board of Directors' Book of Authorities, Tab 3.

## Sub-Issue 3: The D&O Trust is not intended to stand in the place of the Policy or to fund the Retention

51.          Chartis has suggested that if NNC cannot honour the indemnity, the legal fees in question should be drawn from the D&O Trust (as defined below) established in January 2009 for the benefit of the directors and officers of NNC and its subsidiaries. The express language of the D&O Trust establishes that the D&O Trust is not insurance and was not intended to be used to compensate directors and officers for claims unless the claim in question was not otherwise covered by the D&O Policy.

### *The Trust Indenture*

52.          Pursuant to a trust indenture dated January 13, 2009 (the "Trust Indenture"), Nortel established a trust fund (the "D&O Trust") for the benefit of the directors and officers of NNC and its subsidiaries in the amount of $11,941,440.[33]

53.          The D&O Trust was established to compensate directors and officers in respect of the defence and satisfaction of liability claims where the D&O Policy, for whatever reason, did not and NNC could not compensate them:

> The objects of the Trust are to provide financial support for:
>
> > (a) the defence of the Directors and Officers against Liability Claims and for the payment and satisfaction of Liability Claims, to the extent that the D&O Insurance, for any reason, does not do so and the Corporation is unable to do so....[34]

54.          The Trust Indenture expressly provides that it and the D&O Trust do not constitute insurance.[35]

---

[33] D&O Trust Indenture, p.1, Ventresca Affidavit, Applicants' Motion Record, Tab 2D.

[34] *Ibid.*, p. 6, clause 2.4.

[35]*Ibid.*, p. 6, clause 2.7.

- 19 -

55.      The Trust Indenture further provides that except as expressly provided, the corpus of the D&O Trust shall not be available to provide financial support for the defence of liability claims that are D&O Qualifying Claims.[36]

56.      A "D&O Qualifying Claim" is defined as:

> ...a Liability Claim that qualifies for coverage under the D&O Policy whether or not the amount of the coverage available under the D&O Policy is adequate to defend the Directors and Officer against, and to pay, the particular Liability Claim.[37]

57.      The Lucescu Fees Claim is a D&O Qualifying Claim. Therefore, pursuant to the terms of the Trust Indenture, the trust property cannot be used for its satisfaction.

58.      In *Re General Publishing Co.*, this court considered an analogous situation in which the insurer sought an order that it asserted would permit it to subrogate itself to claims of the directors against the directors' charge on the estate in the amount of claims made under the directors' insurance policy. Justice Ground rejected this argument and dismissed the motion, holding that the requested relief would have the improper effect of elevating the insurer's unsecured claim to a secured claim:

> If the claims made against the directors are claims which would have been covered by the Directors' Liability Policy in any event, they should not be claims which could be made against the Directors' Charge Fund in that the fund was put in place to give the directors further protection, over and above the protection accorded by the Directors' Liability Policy, as a result of the increased exposure of the directors due to the company's insolvency.
>
> What the insurer is seeking in the order now sought before this Court is an additional benefit which the Insurer would not otherwise have in the event that a claim is paid pursuant to the policy. The subrogation right of the Insurer, in the event of such a payment, would be subrogation to the directors' claims against the company for indemnity and would simply be an unsecured claim in the bankruptcy of the company. The effect of granting subrogation rights to the Insurer to access the Directors' Charge Fund would elevate the Insurer's

---

[36] *Ibid.*

[37] *Ibid.*, p. 2, clause 1.1.

unsecured claim to a secured claim with priority over the first charge held by [the DIP Lender].[38]

59.        To permit Chartis to access the D&O Trust where the Lucescu Fees Claim is clearly covered by the D&O Policy would likewise improperly elevate Chartis above all unsecured creditors in contravention of the basic priority principles of insolvency law.

## The Use of Trust Property in the manner proposed by Chartis would also subvert the purpose of the D&O Trust

60.        The use of trust property to pay the Lucescu Fees Claim and other similar legal expenses would subvert the purpose of the D&O Trust to the detriment of its beneficiaries.

61.        As noted in the Ventresca Affidavit, the D&O Trust was established on the eve of the CCAA filing out of a concern that the D&O Policy would expire or be exhausted and Nortel would otherwise be unable to indemnify its directors and officers. The language of the Trust Indenture makes clear that the trust property should not be used to satisfy claims that would otherwise qualify for D&O Policy coverage.[39] The current and former directors and officers that are beneficiaries of the D&O Trust have relied on its availability in the event that the D&O Policy is insufficient or unavailable to satisfy claims against them.

62.        The Lucescu Claim is only one of a number of claims that have been and may be asserted in the future against the directors and officers of NNC and its subsidiaries. It is not possible to predict the nature or amount of these claims or their associated legal costs. There is a risk that the D&O Policy will expire before all claims against the directors and officers have been resolved. In that event, and if the trust property has been used other than for its express

---

[38] (2003), 39 C.B.R. (4th) 216, paras 6-7, Board of Directors' Book of Authorities, Tab 8.

[39] Ventresca Affidavit, paras 21-23, Applicants' Motion Record, Tab 2.

- 21 -

purposes, there may be insufficient funds to compensate the directors and officers for their associated losses.

## PART V – RELIEF REQUESTED

63.　　　　For the foregoing reasons, the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited support the Applicants' request for an Order, among other things, declaring that the Retention Amount is not applicable to the within proceedings.

## ALL OF WHICH IS RESPECTFULLY SUBMITTED,

May 14, 2012

Lyndon A.J. Barnes

Adam Hirsh

Lawyers for the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited

- 22 -

## SCHEDULE "A"

## LIST OF AUTHORITIES

1.  *Campeau v. Olympia & York* (1992), 14 C.B.R. (3d) 303 (Ont. Gen. Div.)

2.  *Century Services Inc. v. Canada (Attorney General),* 2010 S.C.C. 60, [2010] 3 S.C.R. 379

3.  *Consolidated-Bathurst v. Mutual Boiler,* [1980] 1 S.C.R. 888

4.  *ICR Commercial Real Estate (Regina) Ltd. v. Bricore Land Group Ltd.* (2007), 33 C.B.R. (5th) 50 (Sask. C.A.)

5.  *Lehndorff General Partner Ltd., Re* (1993), 17 C.B.R. (3d) 24 (Ont. Gen. Div.)

6.  *Montreal Trust Co. of Canada Ltd. v. Smoky River Coal Ltd.* (2001), 28 CBR (4th) 127; (2001) 95 Alta LR (3d) 1 (Alta C.A.)

7.  *Nova Metal Products Inc. v. Comiskey (Trustee of)* (1990), 1 C.B.R. (3d) 101, 1 O.R. (3d) 289 (Ont. C.A.)

8.  *Re General Publishing Co.,* (2003), 39 C.B.R. (4th) 216 (Ont. S.C.J.)

9.  *Stelco Inc. (Re),* [2005] O.J. No. 1171 (C.A.)

10. *SNV Group Ltd. (Re),* [2001] B.C.J. No. 2497 (S.C.)

11. *Sproule v. Nortel Networks Corporation,* (2009), 59 C.B.R. (5th) 23, 99 O.R. (3d) 708, para. 16 (Ont. C.A.)

12. *Woodward Ltd. (Re),* 17 C.B.R. (3d) 236, [1993] B.C.J. No. 42 (S.C.)

- 23 -

## SCHEDULE "B"

## STATUTORY PROVISIONS

*Canada Business Corporations Act,* R.S.C. 1985, c. C-44, as amended

Indemnification

124. (1) A corporation may indemnify a director or officer of the corporation, a former director or officer of the corporation or another individual who acts or acted at the corporation's request as a director or officer, or an individual acting in a similar capacity, of another entity, against all costs, charges and expenses, including an amount paid to settle an action or satisfy a judgment, reasonably incurred by the individual in respect of any civil, criminal, administrative, investigative or other proceeding in which the individual is involved because of that association with the corporation or other entity.

...

Right to indemnity

(5) Despite subsection (1), an individual referred to in that subsection is entitled to indemnity from the corporation in respect of all costs, charges and expenses reasonably incurred by the individual in connection with the defence of any civil, criminal, administrative, investigative or other proceeding to which the individual is subject because of the individual's association with the corporation or other entity as described in subsection (1), if the individual seeking indemnity

> (a) was not judged by the court or other competent authority to have committed any fault or omitted to do anything that the individual ought to have done; and

> (b) fulfils the conditions set out in subsection (3).

*Companies Creditors' Arrangement Act,* R.S.C. 1985, c. C-36, as amended

11 (3) A court may, on an initial application in respect of a company, make an order on such terms as it may impose, effective for such period as the court deems necessary not exceeding thirty days,

> (*a*) staying, until otherwise ordered by the court, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (1);
> (*b*) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and
> (*c*) prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

- 24 -

...

**11.3** No order made under section 11 shall have the effect of

(*a*) prohibiting a person from requiring immediate payment for goods, services, use of leased or licensed property or other valuable consideration provided after the order is made; or

(*b*) requiring the further advance of money or credit

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, C. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRAGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES CREDITORS' ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

*Ontario*

**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**
Proceeding commenced at Toronto

**FACTUM OF THE BOARD OF DIRECTORS O**
**NORTEL NETWORKS CORPORATION AND**
**NORTEL NETWORKS LIMITED**
( Motion returnable May 30, 2012 )

**OSLER, HOSKIN & HARCOURT LLP**
Box 50, 1 First Canadian Place
Toronto, Ontario, Canada  M5X 1B8

Lyndon Barnes LSUC#: 13350D
Tel: 416-862-6679
Email: lbarnes@osler.com

Adam Hirsh LSUC#: 55239Q
Tel: (416) 862-6635
Email: ahirsh@osler.com

Lawyers for the Board of Directors of Nortel Networks
Corporation and Nortel Networks Limited

**EXHIBIT A-6**
**U.S. DEBTOR FACTUM**

Court File No: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**FACTUM OF NORTEL NETWORKS INC.**
**AND THE OTHER U.S. DEBTORS**
**(Determination of the Obligations of Chartis, Inc.**
**(returnable May 30, 2012))**

TORYS LLP
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, Ontario
M5K 1N2  Canada

Scott Bomhof (LSUC # 37006F)
Andrew Gray (LSUC # 46626N)

Email: sbomhof@torys.com
agray@torys.com

Tel: 416.865.0040
Fax: 416.865.7380

Lawyers for Nortel Networks Inc.
and the other U.S. Debtors

Court File No: 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

FACTUM OF NORTEL NETWORKS INC.
AND THE OTHER U.S. DEBTORS
(Determination of the Obligations of Chartis, Inc.
(returnable May 30, 2012))

PART I – OVERVIEW AND FACTS

1.      This Factum is filed by Nortel Networks Inc. and certain of its affiliates (collectively, the
"U.S. Debtors") in connection with the motion (the "Chartis Motion") of Nortel Networks
Corporation ("NNC"), Nortel Networks Limited ("NNL"), and certain of their Canadian
affiliates (collectively, the "Canadian Debtors") for a determination of the obligations of Chartis,
Inc. (formerly known as AIG Commercial Insurance Company of Canada) ("Chartis") as
provider of an executive and organization liability insurance policy (the "D&O Policy") to the
Canadian Debtors, their subsidiaries and their directors and officers.  The U.S. Debtors and their
directors and officers are insureds under the D&O Policy.

2.      Detailed facts in respect of the Chartis Motion are contained in the Affidavit of Anna
Ventresca, sworn October 7, 2011 (the "Ventresca Affidavit")  and the Supplemental Affidavit
of Anna Ventresca, sworn November 28, 2011.

3.      The purpose of this Factum is to reserve the rights of the U.S. Debtors with respect to the law and argument relating to the following issues:

(1)      To the extent any party seeks findings or other relief beyond that set forth in the draft order attached hereto as Exhibit 1 (the "Draft Order"), the U.S. Debtors reserve the right to invoke a joint hearing (any such hearing, a "Joint Hearing") under the Cross-Border Insolvency Protocol in respect of the reorganization proceedings commenced by the U.S. Debtors under the Bankruptcy Code (the "Chapter 11 Proceedings") and these proceedings (the "Cross Border Protocol") with respect to the Chartis Motion. Additionally, the U.S. Debtors generally reserve the right to invoke a Joint Hearing with respect to any other issues related to the D&O Policy and issues regarding the D&O Trust, to the extent such trust becomes an issue to be litigated in connection with the Chartis Motion.

(2)      The U.S. Debtors reserve the right to seek relief from the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") regarding the application of the automatic stay of proceedings (the "Automatic Stay") pursuant to chapter 11 of title 11 of the *United States Code* (the "Bankruptcy Code") in connection with the D&O Policy and any claims or payments made thereunder, and any relief granted in connection with the Chartis Motion shall not prejudice such right.

## PART II – LAW AND ARGUMENT

**Issue 1: Reservation of Rights to Proceed by Way of Joint Hearing**

4.      On January 14, 2009, this Court made the Initial Order in these proceedings, which order approved the Cross Border Protocol, subject to its approval by the U.S. Court. On January 15, 2009, the U.S. Court made an order in the Chapter 11 Proceeding approving the Cross Border Protocol, making the Cross Border Protocol effective.

5.      Pursuant to Paragraph 15 of the Cross Border Protocol, to the extent any motion is filed or relief is sought in either this Court or the U.S. Court to seek relief from, *inter alia*, the Automatic Stay to pursue actions having a material impact on the assets, operations, obligations, rights property or business of at least one U.S. Debtor and one Canadian Debtor and involving damages in excess of US$30,000,000, then upon notice of such requested relief being provided to Core Parties (as such term is defined in the Cross Border Protocol), of which the U.S. Debtors are one, a Core Party will have not less than two business days from receipt of such notice (or such shorter period as the Court of the forum country where the requested relief is being sought

shall determine pursuant to the Cross Border Protocol) to request, in writing, that the filing party seek a Joint Hearing for the requested relief.

Cross Border Protocol, Factum of the U.S. Debtors, Schedule "C"

6.      The U.S. Debtors and the Canadian Debtors are insureds under the D&O Policy, which provides them with executive and organization liability insurance.  As such, matters pertaining to the D&O Policy have a material impact on the assets, operations, obligations, rights, property or business of each of the respective U.S. Debtors and Canadian Debtors, and the U.S. Debtors have the right to request a Joint Hearing under the Cross Border Protocol with respect to such matters.

7.      Furthermore, the D&O Trust (as defined in the Ventresca Affidavit) has been established for the benefit of (i) individuals serving as directors and officers of NNC; and, (ii) in accordance with section 1.6 of the trust indenture attached as Exhibit "D" to the Ventresca Affidavit, individuals serving as directors and officers of NNC's subsidiaries, including the U.S. Debtors. The U.S. Debtors have an interest in the interpretation and application of the D&O Trust and as such, have the right to request a Joint Hearing under the Cross Border Protocol with respect to such matters.

8.      In October 2011, the U.S. Debtors notified the Canadian Debtors of their intention to have the Chartis Motion heard at a Joint Hearing.  The U.S. Debtors subsequently consented to the Chartis Motion proceeding in this Court without the need for a Joint Hearing based on (i) the Canadian Debtors' representation that the only relief sought in connection with the Chartis Motion is the narrow relief set forth in the Draft Order, (ii) the Canadian Debtors' confirmation that in the event the relief sought in the Draft Order is granted, the Canadian Debtors will provide the U.S. Debtors with twenty (20) business days prior written notice in advance of any proposed payment under the D&O Policy, (iii) the Canadian Debtors' and Monitor's assurances that the D&O Trust, and right to payment from the D&O Trust, is unrelated to, and not implicated by, the Chartis Motion, and (iv) the Canadian Debtors' confirmation that they have no objection to the reservations set out herein.

9.      However, to the extent any party seeks findings or other relief beyond that set forth in the Draft Order, the U.S. Debtors have not waived, and expressly reserve their right, under the Cross Border Protocol to request a Joint Hearing in respect of the Chartis Motion and this factum shall constitute notice of a request for Joint Hearing on such matters.  Specifically, and without

limitation, the U.S. Debtors would require a Joint Hearing under the Cross Border Protocol if the relief to be granted in connection with the Chartis Motion included findings (i) authorizing or directing payments to the Canadian Debtors or third parties from the D&O Policy proceeds or the D&O Trust, (ii) regarding the ownership of or rights of individuals to receive payments from the D&O Policy or any trusts established for the benefit of Nortel directors and officers, including without limitation the D&O Trust, (iii) regarding whether specific claims are covered by the D&O Policy or any such trust, (iv) regarding the potential for exhaustion of the D&O Policy, or (v) that could be construed to constitute an admission or concession of the U.S. Debtors with respect to any issue raised in or relating to any claim that has been or may be filed by Chartis (or any predecessor or successor in interest) against the U.S. Debtors.

10.     Additionally, the U.S. Debtors generally reserve the right to invoke a Joint Hearing with respect to any other matters related to the D&O Policy, the D&O Trust or any other trusts established for the benefit of Nortel directors and officers, and the limited consent of the U.S. Debtors with respect to the Chartis Motion shall not prejudice such right.

<u>Issue 2:</u>  **The Automatic Stay Applies to any payments under the D&O Policy**
        *Automatic Stay*

11.     Pursuant to the Bankruptcy Code, the Automatic Stay is in place with respect to the U.S. Debtors.

> 11 U.S.C. § 362(a), Factum of the U.S. Debtors, Schedule "B"

12.     The Automatic Stay has been recognized in Canada pursuant to an Order of this Honourable Court dated January 14, 2009, and pursuant to paragraph 16 of the Cross Border Protocol.

> Order of the Honourable Mr. Justice Morawetz dated January 14, 2009 made in the CCAA proceedings of Nortel Networks Corporation et al. (Court File No. 09-CL-7950) (Ont. S.C.J.), Brief of Authorities of the U.S. Debtors, Tab 1
>
> Cross Border Protocol, Factum of the U.S. Debtors, Schedule "C"

        *Treatment of Insurance Policy Proceeds*

13.     Under U.S. law, a debtor's liability insurance policy is considered property of the estate. Additionally, where the relevant insurance policy provides coverage to both the debtor company

and its directors and officers, the proceeds of the policy are considered to be the property of the debtor company's estate if depletion of such proceeds would have an adverse effect on the estate.

14.    In *In re Downey Financial Corp.*, the Court found that insurance proceeds are property of the debtor company's estate if the relevant insurance policy only provides direct coverage to the debtor.  If the policy only provides coverage to the directors and officers, the proceeds are not property of the estate.  If the policy provides coverage to both the debtor and the directors and officers, the proceeds "will be property of the estate if depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminution."

> *In re Downey Financial Corp.*, 428 B.R. 595 at 603 (Bankr. D.
> Del. 2010), Brief of Authorities of the U.S. Debtors, Tab 2

15.    In *In re World Heath Alternatives, Inc.*, the Court also cited the general proposition that where an insurance policy provides coverage for the debtor and directors and officers, the insurance proceeds will be property of the estate if depletion of the proceeds would have an adverse effect on the debtor's estate.

> *In re World Heath Alternatives, Inc.*, 369 B.R. 805 at 809 (Bankr.
> D. Del. 2007), Brief of Authorities of the U.S. Debtors, Tab 3

16.    In the present case, the U.S. Debtors understand that claims have been asserted against the D&O Policy that, if fully allowed, could exceed the policy amounts.  Furthermore, since the period for making claims under the run-off provisions of the D&O Policy has not yet terminated and the entire universe of claims that could be made under the D&O Policy is unknown at this time, significant discovery would be required in order to determine whether there is a risk of policy exhaustion and the harm such exhaustion would do to the estates of the U.S. Debtors.

17.    The Court is not being asked to make findings regarding whether the D&O Policy could be exhausted, and to the extent there is any request for findings directly or indirectly related to this issue, the U.S. Debtors would invoke their right to a Joint Hearing under the Cross Border Protocol.  Moreover, the Court is not being asked to authorize or approve payments from the D&O Policy, which would implicate the Automatic Stay.  The U.S. Debtors reserve the right to seek relief from the U.S. Court regarding the application of the Automatic Stay in respect of the

D&O Policy and any claims or payments made thereunder, and any relief provided with respect to the Chartis Motion shall not prejudice such right.

## PART III - RELIEF REQUESTED

18.     This Factum is filed by the U.S. Debtors with respect to the reservation of the rights of the U.S. Debtors discussed herein.


ALL OF WHICH IS RESPECTFULLY SUBMITTED

Scott Bomhof

Andrew Gray

Lawyers for Nortel Networks Inc. and the other U.S. Debtors

**EXHIBIT 1**

**DRAFT ORDER**

Court File No.  09-CL-7950

**ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

THE HONOURABLE MR.                    )          THURSDAY, THE  22nd
                                                            )
JUSTICE MORAWETZ                      )          DAY OF DECEMBER, 2011

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS
CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

O R D E R

**THIS MOTION**, brought by Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, "Nortel Canada" or the "Applicants"), for an Order declaring that the Retention Amount as specified and defined in the executive and organizational insurance policy number 01-335-76-98 issued by Chartis Inc. ("Chartis") (the "D&O Policy") is not applicable to claims made by officers and directors of NNC and its subsidiaries (the "D&O") on the D&O Policy was heard this day at Toronto, Ontario.

**ON READING** the Motion Record of the Applicants and Factums of the Applicants and Chartis and on hearing the submissions of counsel for the Applicants and Chartis,

1.      **THIS COURT ORDERS AND DECLARES** that the Retention Amount (as defined in the D&O Policy) does not apply to claims made by the D&O against the D&O Policy.

2.    **THIS COURT FURTHER ORDERS AND DECLARES** that Chartis is obligated to pay and respond to Losses (as defined in the D&O Policy) on behalf of the D&O without reference to or subtraction for the Retention Amount.

_____

DRAFT

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at TORONTO

O R D E R

**NORTON ROSE OR** LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street, P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: +1 416.216.4832
Email: derrick.tay@nortonrose.com

**Jennifer Stam LSUC#: 46735J**
Tel: +1 416.216.2327
Email: jennifer.stam@nortonrose.com

Fax: +1 416.216.3930

Lawyers for the Applicants

3

## SCHEDULE A
## LIST OF AUTHORITIES

1.  Order of the Honourable Mr. Justice Morawetz dated January 14, 2009 made in the CCAA proceedings of Nortel Networks Corporation et al. (Court File No. 09-CL-7950) (Ont. S.C.J.)

2.  *In re Downey Financial Corp.*, 428 B.R. 595 (Bankr. D. Del. 2010)

3.  *In re World Heath Alternatives, Inc.*, 369 B.R. 805 (Bankr. D. Del. 2007)

# SCHEDULE B

# BANKRUPTCY CODE

**11 USC § 362 - Automatic stay**

(a) Except as provided in subsection (b) of this section, a petition filed under section <u>301</u>, <u>302</u>, or <u>303</u> of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

(8) the commencement or continuation of a proceeding before the United States Tax Court concerning a tax liability of a debtor that is a corporation for a taxable period the bankruptcy court may determine or concerning the tax liability of a debtor who is an individual for a taxable period ending before the date of the order for relief under this title.

...

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization;

(3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later—

**(A)** the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

**(B)** the debtor has commenced monthly payments that—

**(i)** may, in the debtor's sole discretion, notwithstanding section 363 (c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and

**(ii)** are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate; or

**(4)** with respect to a stay of an act against real property under subsection (a), by a creditor whose claim is secured by an interest in such real property, if the court finds that the filing of the petition was part of a scheme to delay, hinder, or defraud creditors that involved either—

**(A)** transfer of all or part ownership of, or other interest in, such real property without the consent of the secured creditor or court approval; or

**(B)** multiple bankruptcy filings affecting such real property.

If recorded in compliance with applicable State laws governing notices of interests or liens in real property, an order entered under paragraph (4) shall be binding in any other case under this title purporting to affect such real property filed not later than 2 years after the date of the entry of such order by the court, except that a debtor in a subsequent case under this title may move for relief from such order based upon changed circumstances or for good cause shown, after notice and a hearing. Any Federal, State, or local governmental unit that accepts notices of interests or liens in real property shall accept any certified copy of an order described in this subsection for indexing and recording.

…

## SCHEDULE C
## CROSS BORDER PROTOCOL

## CROSS-BORDER INSOLVENCY PROTOCOL

This cross-border insolvency protocol (the "Protocol") shall govern the conduct of all parties in interest in the Insolvency Proceedings (as such term is defined herein).

The Guidelines Applicable to Court-to-Court Communications in Cross-Border Cases (the "Guidelines") attached as Schedule "A" hereto, shall be incorporated by reference and form part of this Protocol. Where there is any discrepancy between the Protocol and the Guidelines, this Protocol shall prevail.

A.   Background

   1.   Nortel Networks Inc. ("NNI") is the wholly owned U.S. subsidiary of Nortel Networks Limited ("NNL"), the principal Canadian operating subsidiary of Nortel Networks Corporation ("NNC"). NNC is a telecommunications company headquartered in Toronto, Ontario, Canada. NNI is incorporated under Delaware law and is headquartered in Richardson, Texas.

   2.   NNI and certain of its affiliates (collectively, the "U.S. Debtors"),[1] have commenced reorganization proceedings (the "U.S. Proceedings") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court"), and such cases have been consolidated (for procedural purposes only) under Case No. 09-10138 (KG). The U.S. Debtors are continuing in possession of their respective properties and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the U.S. Proceedings. On January 22, 2009,

---

[1]   The Debtors in the U.S. Proceedings (as defined herein) are: NNI, Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., XROS, Inc., Sonoma Systems, QTERA Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

the Office of United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors Committee") in the U.S. Proceeding. An ad hoc committee of bondholders (the "Bondholders Committee") has also been organized.

3.      On January 14, 2009, the U.S. Debtors' ultimate corporate parent NNC, NNI's direct corporate parent NNL (together with NNC and their affiliates, including the U.S. Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors have obtained an initial order of the Canadian Court (as amended and restated, the "Canadian Order"), under which, inter alia: (a) the Canadian Debtors have been determined to be entitled to relief under the CCAA; (b) Ernst & Young Inc. has been appointed as monitor (the "Monitor") of the Canadian Debtors, with the rights, powers, duties and limitations upon liabilities set forth in the CCAA and the Canadian Order; and (c) a stay of proceedings in respect of the Canadian Debtors has been granted.

4.      The Monitor filed petitions and obtained an order in the U.S. Court granting recognition of the Canadian Proceedings under chapter 15 of the Bankruptcy Code (the "Chapter 15 Proceedings"). NNI also filed an application and obtained an order in the Canadian Court pursuant to section 18.6 of the CCAA recognizing the U.S. Proceedings as "foreign proceedings" in Canada and giving effect to the automatic stay thereunder in Canada. None of the U.S. Debtors or Canadian Debtors are applicants in both the U.S. Proceedings and Canadian Proceedings.

---

[2]    The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

5.     For convenience, (a) the U.S. Debtors and the Canadian Debtors shall be referred to herein collectively as the "Debtors," (b) the U.S. Proceedings and the Canadian Proceedings shall be referred to herein collectively as the "Insolvency Proceedings," and (c) the U.S. Court and the Canadian Court shall be referred to herein collectively as the "Courts", and each individually as a "Court."

B.     **Purpose and Goals**

6.     Though full and separate plenary proceedings are pending in the United States for the U.S. Debtors and in Canada for the Canadian Debtors, the implementation of administrative procedures and cross-border guidelines is both necessary and desirable to coordinate certain activities in the Insolvency Proceedings, protect the rights of parties thereto, ensure the maintenance of the Courts' respective independent jurisdiction and give effect to the doctrines of comity.  Accordingly, this Protocol has been developed to promote the following mutually desirable goals and objectives in the Insolvency Proceedings:

a.     harmonize and coordinate activities in the Insolvency Proceedings before the Courts;

b.     promote the orderly and efficient administration of the Insolvency Proceedings to, among other things, maximize the efficiency of the Insolvency Proceedings, reduce the costs associated therewith and avoid duplication of effort;

c.     honor the independence and integrity of the Courts and other courts and tribunals of the United States and Canada, respectively;

d.     promote international cooperation and respect for comity among the Courts, the Debtors, the Creditors Committee, the Estate Representatives (which include the Chapter 11 Representatives and the Canadian Representatives as such terms are defined below) and other creditors and interested parties in the Insolvency Proceedings;

e.     facilitate the fair, open and efficient administration of the Insolvency Proceedings for the benefit of all of the Debtors' creditors and other interested parties, wherever located; and

4

       f.     implement a framework of general principles to address basic administrative issues arising out of the cross-border nature of the Insolvency Proceedings.

As the Insolvency Proceedings progress, the Courts may also jointly determine that other cross-border matters that may arise in the Insolvency Proceedings should be dealt with under and in accordance with the principles of this Protocol.  Subject to the provisions of this Protocol, including, without limitation, those included in paragraph 15 hereof, where an issue is to be addressed only to one Court, in rendering a determination in any cross-border matter, such Court may:  (a) to the extent practical or advisable, consult with the other Court; and (b) in its sole discretion and bearing in mind the principles of comity, either (i) render a binding decision after such consultation; (ii) defer to the determination of the other Court by transferring the matter, in whole or in part to the other Court; or (iii) seek a joint hearing of both Courts.

C.     **Comity and Independence of the Courts**

       7.     The approval and implementation of this Protocol shall not divest nor diminish the U.S. Court's and the Canadian Court's respective independent jurisdiction over the subject matter of the U.S. Proceedings and the Canadian Proceedings, respectively.  By approving and implementing this Protocol, neither the U.S. Court, the Canadian Court, the Debtors nor any creditors or interested parties shall be deemed to have approved or engaged in any infringement on the sovereignty of the United States of America or Canada.

       8.     The U.S. Court shall have sole and exclusive jurisdiction and power over the conduct of the U.S. Proceedings and the hearing and determination of matters arising in the U.S. Proceedings.  The Canadian Court shall have sole and exclusive jurisdiction and power over the conduct of the Canadian Proceedings and the hearing and determination of matters arising in the Canadian Proceedings.

9.    In accordance with the principles of comity and independence recognized herein, nothing contained herein shall be construed to:

a.    increase, decrease or otherwise modify the independence, sovereignty or jurisdiction of the U.S. Court, the Canadian Court or any other court or tribunal in the United States or Canada, including the ability of any such court or tribunal to provide appropriate relief on an ex parte or "limited notice" basis to the extent permitted under applicable law;

b.    require the U.S. Court to take any action that is inconsistent with its obligations under the laws of the United States;

c.    require the Canadian Court to take any action that is inconsistent with its obligations under the laws of Canada;

d.    require the Debtors, the Creditors Committee, the Estate Representatives or the U.S. Trustee to take any action or refrain from taking any action that would result in a breach of any duty imposed on them by any applicable law;

e.    authorize any action that requires the specific approval of one or both of the Courts under the Bankruptcy Code or the CCAA after appropriate notice and a hearing (except to the extent that such action is specifically described in this Protocol); or

f.    preclude the Debtors, the Creditors Committee, the Monitor, the U.S. Trustee, any creditor or other interested party from asserting such party's substantive rights under the applicable laws of the United States, Canada or any other relevant jurisdiction including, without limitation, the rights of parties in interest to appeal from the decisions taken by one or both of the Courts.

10.    The Debtors, the Creditors Committee, the Estate Representatives and their respective employees, members, agents and professionals shall respect and comply with the independent, non-delegable duties imposed upon them, if any, by the Bankruptcy Code, the CCAA, the Canadian Order and other applicable laws.

D.    Cooperation

11.    To assist in the efficient administration of the Insolvency Proceedings and in recognizing that the U.S. Debtors and Canadian Debtors may be creditors of the others'

estates, the Debtors and their respective Estate Representatives shall, where appropriate: (a) cooperate with each other in connection with actions taken in both the U.S. Court and the Canadian Court and (b) take any other appropriate steps to coordinate the administration of the Insolvency Proceedings for the benefit of the Debtors' respective estates.

12.   To harmonize and coordinate the administration of the Insolvency Proceedings, the U.S. Court and the Canadian Court each may coordinate activities and consider whether it is appropriate to defer to the judgment of the other Court.  In furtherance of the foregoing:

a.   The U.S. Court and the Canadian Court may communicate with one another, with or without counsel present, with respect to any procedural matter relating to the Insolvency Proceedings.

b.   Where the issue of the proper jurisdiction of either Court to determine an issue is raised by an interested party in either of the Insolvency Proceedings with respect to a motion or application filed in either Court, the Court before which such motion or application was initially filed may contact the other Court to determine an appropriate process by which the issue of jurisdiction will be determined; which process shall be subject to submissions by the Debtors, the Creditors Committee, the Monitor, the Bondholders Committee (collectively the "Core Parties"), the U.S. Trustee and any interested party prior to a determination on the issue of jurisdiction being made by either Court.

c.   The Courts may, but are not obligated to, coordinate activities in the Insolvency Proceedings such that the subject matter of any particular action, suit, request, application, contested matter or other proceeding is determined in a single Court.

d.   The U.S. Court and the Canadian Court may conduct joint hearings (each a "Joint Hearing") with respect to any cross-border matter or the interpretation or implementation of this Protocol where both the U.S. Court and the Canadian Court consider such a Joint Hearing to be necessary or advisable, or as otherwise provided herein, to, among other things, facilitate or coordinate proper and efficient conduct of the Insolvency Proceedings or the resolution of any particular issue in the Insolvency Proceedings.  With respect to any Joint Hearing, unless otherwise ordered, the following procedures will be followed:

7

(i)    A telephone or video link shall be established so that both the U.S. Court and the Canadian Court shall be able to simultaneously hear and/or view the proceedings in the other Court.

(ii)    Submissions or applications by any party that are or become the subject of a Joint Hearing (collectively, "Pleadings") shall be made or filed initially only to the Court in which such party is appearing and seeking relief. Promptly after the scheduling of any Joint Hearing, the party submitting such Pleadings to one Court shall file courtesy copies with the other Court. In any event, Pleadings seeking relief from both Courts shall be filed in advance of the Joint Hearing with both Courts.

(iii)    Any party intending to rely on any written evidentiary materials in support of a submission to the U.S. Court or the Canadian Court in connection with any Joint Hearing (collectively, "Evidentiary Materials") shall file or otherwise submit such materials to both Courts in advance of the Joint Hearing. To the fullest extent possible, the Evidentiary Materials filed in each Court shall be identical and shall be consistent with the procedural and evidentiary rules and requirements of each Court.

(iv)    If a party has not previously appeared in or attorned or does not wish to attorn to the jurisdiction of a Court, it shall be entitled to file Pleadings or Evidentiary Materials in connection with the Joint Hearing without, by the mere act of such filings, being deemed to have appeared in or attorned to the jurisdiction of such Court in which such material is filed, so long as such party does not request any affirmative relief from such Court.

(v)    The Judge of the U.S. Court and the Justice of the Canadian Court who will preside over the Joint Hearing shall be entitled to communicate with each other in advance of any Joint Hearing, with or without counsel being present, (1) to establish guidelines for the orderly submission of Pleadings, Evidentiary Materials and other papers and for the rendering of decisions by the Courts; and (2) to address any related procedural, administrative or preliminary matters.

(vi)    The Judge of the U.S. Court and the Justice of the Canadian Court, shall be entitled to communicate with each other during or after any joint hearing, with or without counsel present, for the purposes of (1) determining whether consistent rulings can be made by both Courts; (2) coordinating the terms upon of the Courts' respective rulings; and (3) addressing any other procedural or administrative matters.

8

13.    Notwithstanding the terms of the paragraph 12 above, this Protocol recognizes that the U.S. Court and the Canadian Court are independent courts. Accordingly, although the Courts will seek to cooperate and coordinate with each other in good faith, each of the Courts shall be entitled at all times to exercise its independent jurisdiction and authority with respect to: (a) the conduct of the parties appearing in matters presented to such Court; and (b) matters presented to such Court, including, without limitation, the right to determine if matters are properly before such Court.

14.    Where one Court has jurisdiction over a matter which requires the application of the law of the jurisdiction of the other Court, such Court may, without limitation, hear expert evidence of such law or, subject to paragraph 15 herein, seek the written advice and direction of the other Court which advice may in the discretion of the receiving Court, be made available to parties in interest.

15.    Notwithstanding anything to the contrary herein contained, to the extent any motion is filed or relief is sought (collectively, "Requested Relief") in either Court relating to: (i) the proposed sale of assets for gross proceeds in excess of U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor; (ii) any motion to allocate sale proceeds which are in the aggregate more than U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor; (iii) matters relating to the advanced pricing agreement involving both the United States and Canadian taxing authorities; (iv) matters regarding transfer pricing methodology relating to an obligation for the transfer of goods and services between one or more U.S. Debtors and one or more Canadian

9

Debtors; (v) any matter relating to alleged fraudulent conveyance or preference claims in excess of U.S. $30 million and which may have a material impact on both one or more U.S. Debtors and one or more Canadian Debtors; (vi) matters relating to any proposal or approval of a disclosure statement, information circular, plan of reorganization or plan of compromise and arrangements in either the U.S. Proceedings or the Canadian Proceedings; (vii) any motion to appoint a Trustee or Examiner in the U.S. Proceedings, any motion to convert the U.S. Proceedings to a Chapter 7 proceeding, any motion to appoint a Receiver in the Canadian Proceedings, or any motion to convert the Canadian Proceedings to a bankruptcy or proposal proceeding under the Bankruptcy and Insolvency Act (Canada); (viii) any motion to substantively consolidate the Debtors' estates; (ix) matters impacting the material tax attributes of the U.S. Debtors, including the net operating losses of the U.S. Debtors in any prior fiscal year; (x) any motion to amend the terms of any of the Debtors' registered pension plans the effect of which would increase the liability of any Debtor thereunder; (xi) any motion to assume, ratify, reject, repudiate, modify or assign executory contracts having a material impact on the assets, operations, obligations, rights, property or business of both the U.S. and Canadian estates and accounting for annual gross revenue in excess of U.S. $30 million ("Material Contracts"); (xii) any motion seeking relief from the automatic stay in the U.S. Proceedings and/or the stay of proceedings in the Canadian Proceedings (1) involving any Material Contract or (2) to pursue actions having a material impact on the assets, operations, obligations, rights, property or business of at least one U.S. Debtor and one Canadian Debtor and involving damages in excess of U.S. $30 million; (xiii) any motion seeking to create or extend any program, plan, proposal or scheme relating to or authorizing payments to employees where the consideration relates to non-ordinary course incentive performance, retention, severance, termination or such like payments; and (xiv) any

10

motion regarding any program, plan proposal, scheme or similar course of action related to the wind-down of one or more of the Debtors' businesses;

Then the following procedures shall be followed:

    a.    unless otherwise consented to by the Core Parties, any and all documents, other than any Monitor's report related to the Requested Relief, shall be filed (as applicable) and served on the Core Parties on not less than seven days notice prior to the proposed hearing date for such Requested Relief in the Court of the forum country where the party seeking the Requested Relief intends the Requested Relief to be heard; *provided, however,* that to the extent the Requested Relief is necessary to avoid irreparable harm to the Debtors and/or the Debtors' bankruptcy estates, as may be determined by the Court of the forum country where the Requested Relief is being sought or such Court otherwise determines, such documents related to the Requested Relief shall be served on the Core Parties on such reasonable notice as such Court may determine;

    b.    upon notice of such Requested Relief being provided to the Core Parties, each of the Core Parties will have not less than two business days from receipt of such notice (or such shorter period as the Court of the forum country where the Requested Relief is being sought shall determine, as set forth in paragraph 15(a) herein) to request, in writing, that the filing party seek a Joint Hearing for the Requested Relief;

    c.    if the filing party agrees to seek a Joint Hearing, the Requested Relief shall be heard at a Joint Hearing conducted by the Courts in accordance with the procedures set forth in paragraph 12 herein; and

    d.    if the filing party does not agree to seek a Joint Hearing, the party seeking to have the Requested Relief heard at a Joint Hearing may file a notice of Joint Hearing dispute in both the Court of the forum country and the Court of the non-forum country and serve notice thereof on the remaining Core Parties, whereupon the respective Courts of the forum country and the non-forum country may consult with one another in accordance with paragraphs 6 and 12 hereof, in order to determine whether a Joint Hearing is necessary or may otherwise consult with the Core Parties prior to any party proceeding with the underlying Requested Relief in the original proposed forum country.

E.    **Recognition of Stays of Proceedings**

    16.    The Canadian Court hereby recognizes the validity of the stay of proceedings and actions against the U.S. Debtors and their property under section 362 of the

Bankruptcy Code (the "U.S. Stay"). In implementing the terms of this paragraph, the Canadian Court may consult with the U.S. Court regarding: (i) the interpretation, extent, scope and applicability of the U.S. Stay and any orders of the U.S. Court modifying or granting relief from the U.S. Stay; and (ii) the enforcement of the U.S. Stay in Canada.

        17.    The U.S. Court hereby recognizes the validity of the stay of proceedings and actions against the Canadian Debtors and their property under the Canadian Order (the "Canadian Stay"). In implementing the terms of this paragraph, the U.S. Court may consult with the Canadian Court regarding: (i) the interpretation, extent, scope and applicability of the Canadian Stay and any orders of the Canadian Court modifying or granting relief from the Canadian Stay; and (ii) the enforcement of the Canadian Stay in the United States.

        18.    Nothing contained herein shall affect or limit the Debtors' or other parties' rights to assert the applicability or nonapplicability of the U.S. Stay or the Canadian Stay to any particular proceeding, property, asset, activity or other matter, wherever pending or located. Subject to paragraph 15, herein, motions brought respecting the application of the stay of proceedings with respect to assets or operations of the Canadian Debtors shall be heard and determined by the Canadian Court. Subject to paragraph 15 herein, motions brought respecting the application of the stay of proceedings with respect to assets or operations of the U.S. Debtors shall be heard and determined by the U.S. Court.

**F.**    <u>Rights to Appear and Be Heard</u>

        19.    The Debtors, the Core Parties, and any other committee that may be appointed by the U.S. Trustee, and the professionals and advisors for each of the foregoing, shall have the right and standing: (i) to appear and to be heard in either the U.S. Court or Canadian Court in the U.S. Proceedings or Canadian Proceedings, respectively, to the same extent as creditors and other interested parties domiciled in the forum country, subject to any local rules or

regulations generally applicable to all parties appearing in the forum; and (ii) to file notices of appearance or other papers with the clerk of the U.S. Court or the Canadian Court in respect of the U.S. Proceedings or Canadian Proceedings, respectively; provided, however, that any appearance or filing may subject a creditor or interested party to the jurisdiction of the Court in which the appearance or filing occurs; provided further, that an appearance by the Creditors Committee in the Canadian Proceedings shall not form a basis for personal jurisdiction in Canada over the members of the Creditors Committee.  Notwithstanding the foregoing, and in accordance with the policies set forth above, including, inter alia, paragraph 12 above; (i) the Canadian Court shall have jurisdiction over the Chapter 11 Representatives (as defined below) solely with respect to the particular matters as to which the Chapter 11 Representatives appear before the Canadian Court; and (ii) the U.S. Court shall have jurisdiction over the Canadian Representatives (as defined below) solely with respect to the particular matters as to which the Canadian Representatives appear before the U.S. Court.

20.    In connection with any matter in the Canadian Proceedings in which the Creditors Committee seeks to become involved and which would otherwise require the Creditors Committee to execute a confidentiality agreement, the Creditors Committee, its individual members and professionals shall not be required to execute confidentiality agreements but instead the Creditors Committee and its members shall be bound by the confidentiality provisions contained in the Creditors Committee bylaws, and the Creditors Committee's professionals shall be bound by the terms of the confidentiality agreement with the Debtors dated February 2, 2009.

**G.    Claims Protocol**

21.    The Debtors anticipate that it will be necessary to implement a specific claims protocol to address, among other things and without limitation, the timing, process,

jurisdiction and applicable governing law to be applied to the resolution of intercompany claims filed by the Debtors' creditors in the Canadian Proceedings and the U.S. Proceedings. In such event, and in recognition of the inherent complexities of the inter-company claims that may be asserted in the Insolvency Proceedings, the Debtors shall use commercially reasonable efforts to negotiate a specific claims protocol, in form and substance satisfactory to the Debtors, the Monitor, and the Creditors Committee, which protocol shall be submitted to the Canadian Court and the U.S. Court for approval. In the event that the Debtors fail to reach agreement among such parties, the Debtors shall file a motion in both the Canadian Court and the U.S. Court seeking approval of such claims protocol as the Debtors shall determine to be in the best interest of the Debtors and their creditors.

H.    <u>Retention and Compensation of Estate Representative and Professionals</u>

22.    The Monitor, its officers, directors, employees, counsel and agents, wherever located, (collectively the "<u>Monitor Parties</u>") and any other estate representatives appointed in the Canadian Proceedings (collectively, the "<u>Canadian Representatives</u>") shall (subject to paragraph 19) be subject to the sole and exclusive jurisdiction of the Canadian Court with respect to all matters, including: (a) the Canadian Representatives' tenure in office; (b) the retention and compensation of the Canadian Representatives; (c) the Canadian Representatives' liability, if any, to any person or entity, including the Canadian Debtors and any third parties, in connection with the Insolvency Proceedings; and (d) the hearing and determination of any other matters relating to the Canadian Representatives arising in the Canadian Proceedings under the CCAA or other applicable Canadian law. The Canadian Representatives shall not be required to seek approval of their retention in the U.S. Court for services rendered to the Debtors. Additionally, the Canadian Representatives: (a) shall be compensated for their services to the Canadian Debtors solely in accordance with the CCAA, the Canadian Order and other applicable

14

Canadian law or orders of the Canadian Court; and (b) shall not be required to seek approval of their compensation in the U.S Court.

23.    The Monitor Parties shall be entitled to the same protections and immunities in the United States as those granted to them under the CCAA and the Canadian Order.  In particular, except as otherwise provided in any subsequent order entered in the Canadian Proceedings, the Monitor Parties shall incur no liability or obligations as a result of the Canadian Order, the appointment of the Monitor, the carrying out of its duties or the provisions of the CCAA and the Canadian Order by the Monitor Parties, except any such liability arising from actions of the Monitor Parties constituting gross negligence or willful misconduct.

24.    Any estate representative appointed in the U.S. Proceedings, including without limitation any examiners or trustees appointed in accordance with section 1104 of the Bankruptcy Code (collectively, the "Chapter 11 Representatives") shall (subject to paragraph 19) be subject to the sole and exclusive jurisdiction of the U.S. Court with respect to all matters, including:  (a) the Chapter 11 Representatives' tenure in office; (b) the retention and compensation of the Chapter 11 Representatives; (c) the Chapter 11 Representatives' liability, if any, to any person or entity, including the U.S. Debtors and any third parties, in connection with the Insolvency Proceedings; and (d) the hearing and determination of any other matters relating to the Chapter 11 Representatives arising in the U.S. Proceedings under the Bankruptcy Code or other applicable laws of the United States. The Chapter 11 Representatives shall not be required to seek approval of their retention in the Canadian Court and (a) shall be compensated for their services to the U.S. Debtors solely in accordance with the Bankruptcy Code and other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek

15

approval of their compensation for services performed for the U.S. Debtors in the Canadian Court.

       25.      Any professionals (i) retained by and being compensated solely by, or (ii) being compensated solely by, the Canadian Debtors including in each case, without limitation, counsel and financial advisors (collectively, the "Canadian Professionals"), shall be subject to the sole and exclusive jurisdiction of the Canadian Court. Such Canadian Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the Canadian Court under the CCAA, the Canadian Order and any other applicable Canadian law or orders of the Canadian Court with respect to services performed on behalf of the Canadian Debtors; and (b) shall not be required to seek approval of their retention or compensation in the U.S. Court.

       26.      Any professionals (i) retained by, or (ii) being compensated by, the U.S. Debtors including in each case, without limitation, counsel and financial advisors (collectively, the "U.S. Professionals") shall be subject to the sole and exclusive jurisdiction of the U.S. Court. Such U.S. Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the U.S. Court under the Bankruptcy Code and any other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek approval of their retention or compensation in the Canadian Court.

       27.      Subject to paragraph 19 herein, any professional retained by the Creditors Committee, including in each case, without limitation, counsel and financial advisors (collectively, the "Committee Professionals") shall be subject to the sole and exclusive jurisdiction of the U.S. Court. Such Committee Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the U.S. Court under the

16

Bankruptcy Code and any other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek approval of their retention or compensation in the Canadian Court or any other court.

I.    Notice

28.    Notice of any motion, application or other Pleading or paper (collectively the "Court Documents") filed in one or both of the Insolvency Proceedings involving or relating to matters addressed by this Protocol and notice of any related hearings or other proceedings shall be given by appropriate means (including, where circumstances warrant, by courier, telecopier or other electronic forms of communication) to the following: (a) all creditors and interested parties, in accordance with the practice of the jurisdiction where the papers are filed or the proceedings are to occur; and (b) to the extent not otherwise entitled to receive notice under clause (a) of this sentence, counsel to the Debtors; the U.S. Trustee; the Monitor; the Creditors Committee; the Bondholders Committee and any other statutory committees appointed in the Insolvency Proceedings and such other parties as may be designated by either of the Courts from time to time. Notice in accordance with this paragraph shall be given by the party otherwise responsible for effecting notice in the jurisdiction where the underlying papers are filed or the proceedings are to occur. In addition to the foregoing, upon request, the U.S. Debtors or the Canadian Debtors shall provide the U.S. Court or the Canadian Court, as the case may be, with copies of any orders, decisions, opinions or similar papers issued by the other Court in the Insolvency Proceedings.

29.    When any cross-border issues or matters addressed by this Protocol are to be addressed before a Court, notices shall be provided in the manner and to the parties referred to in paragraph 28 above.

17

**J.** **Effectiveness; Modification**

      30.    This Protocol shall become effective only upon its approval by both the U.S. Court and the Canadian Court.

      31.    This Protocol may not be supplemented, modified, terminated, or replaced in any manner except upon the approval of both the U.S. Court and the Canadian Court after notice and a hearing. Notice of any legal proceeding to supplement, modify, terminate or replace this Protocol shall be given in accordance with the notice provisions set forth above.

**K.** **Procedure for Resolving Disputes Under this Protocol**

      32.    Disputes relating to the terms, intent or application of this Protocol may be addressed by interested parties to the U.S. Court, the Canadian Court or both Courts upon notice in accordance with the notice provisions outlined in paragraph 28 above. In rendering a determination in any such dispute, the Court to which the issue is addressed: (a) shall consult with the other Court; and (b) may, in its sole and exclusive discretion, either: (i) render a binding decision after such consultation; (ii) defer to the determination of the other Court by transferring the matter, in whole or in part, to such other Court; or (iii) seek a Joint Hearing of both Courts in accordance with paragraph 12 above. Notwithstanding the foregoing, in making a determination under this paragraph, each Court shall give due consideration to the independence, comity and inherent jurisdiction of the other Court established under existing law.

      33.    In implementing the terms of this Protocol, the U.S. Court and the Canadian Court may, in their sole, respective discretion, provide advice or guidance to each other with respect to legal issues in accordance with the following procedures:

      a.    the U.S. Court or the Canadian Court, as applicable, may determine that such advice or guidance is appropriate under the circumstances;

      b.    the Court issuing such advice or guidance shall provide it to the non-issuing Court in writing;

c.    copies of such written advice or guidance shall be served by the applicable Court in accordance with paragraph 28 hereof;

d.    the Courts may jointly decide to invite the Debtors, the Creditors Committee, the Estate Representatives, the U.S. Trustee and any other affected or interested party to make submissions to the appropriate Court in response to or in connection with any written advice or guidance received from the other Court; and

e.    for clarity, the provisions of this paragraph shall not be construed to restrict the ability of either Court to confer as provided in paragraph 12 above whenever it deems it appropriate to do so.

## L.   Preservation of Rights

34.    Except as specifically provided herein, neither the terms of this Protocol nor any actions taken under the terms of this Protocol shall: (a) prejudice or affect the powers, rights, claims and defenses of the Debtors and their estates, the Creditors Committee, the Estate Representatives, the U.S. Trustee or any of the Debtors' creditors under applicable law, including, without limitation, the Bankruptcy Code the CCAA, and the orders of the Courts; or (b) preclude or prejudice the rights of any person to assert or pursue such person's substantive rights against any other person under the applicable laws of Canada or the United States.

19

Court File No. 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION,
NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at TORONTO

**FACTUM OF NORTEL NETWORKS INC.
AND THE OTHER U.S. DEBTORS
(Determination of the Obligations of Chartis, Inc.
(returnable May 30, 2012))**

Torys LLP
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, Ontario
M5K 1N2  Canada

Scott Bomhof (LSUC #: 37006F)
Andrew Gray (LSUC #: 46626N)

Email:  sbomhof@torys.com
        agray@torys.com

Tel:    416.865.0040
Fax:    416.865.8730

Lawyers for Nortel Networks Inc. and the other U.S.
Debtors

35873-2001 13711462.3