# Exhibit 7

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Nortel Networks Corporation, *et al.*, | ) | Case No. 09-10138(KG) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| _____ | ) | **Re: Dkt Nos. 2441, 2576** |

## <u>MEMORANDUM OPINION</u>[1]

The Court conducted an evidentiary hearing on February 26, 2010, on Debtors'[2]

Motion for Entry of an Order Enforcing the Automatic Stay Against Certain Claimants With

Respect to the U.K. Pension Proceedings (D.I. 2441) (the "Motion").  The Court was faced

with an impending deadline of March 1, 2010 (the next business day), by which Debtors

would have to take substantial action in the absence of the relief Debtors were seeking in the

Motion.  The Court granted the Motion based upon an oral ruling and entered an Order (D.I.

2576) with the understanding that it would issue a written opinion given the significance of

the issues.  Time does not permit the detailed opinion which the matter warrants but the

---

[1]  This Opinion constitutes the findings of fact and conclusions of law pursuant to Federal
Rule of Bankruptcy Procedure 7052.  To the extent any of the following findings of fact are
determined to be conclusions of law, they are adopted, and shall be construed and deemed,
conclusions of law.  To the extent any of the following conclusions of law are determined to be
findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.

[2]  The Debtors in these Chapter 11 cases, which are jointly administered, are: Nortel
Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems
International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks
Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel
Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc.,
Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks
(CALA) Inc..

Court will address the issues sufficiently to provide a reviewing court, if any, with the substance of the Court's findings and its rationale for granting the Motion and thereby enforcing the automatic stay.

## A.  The Motion

The Debtors seek an order pursuant to sections 362(a)(1) and (a)(6) of the Bankruptcy Code, enforcing the automatic stay against two parties, Nortel Networks UK Pension Trust Limited (the "Trustee") and The Board of the Pension Protection Fund (the "PPF") (collectively, the "Claimants"), with respect to certain U.K. Administrative Proceedings (the "U.K. Proceedings") initiated by the U.K. Pensions Regulator ("TPR").    The U.K. Proceedings relate to Nortel Networks Corporation ("NNI") and Nortel Networks (CALA) Inc. ("NN CALA"). The U.K. Proceedings will determine whether to issue a financial support direction ("FSD") against NNI, NN CALA, and the non-U.S. Nortel Entities that are identified by TPR as targets of the U.K. Proceedings.  The result may be to impose financial responsibility of as much as $3.1 billion on the targets for the statutory liability of Nortel Networks UK Limited ("NNUK") to the Trustee under section 75 of the U.K. Pensions Act 1995.  The Motion seeks to enforce the stay against the Claimants, who previously filed proofs of claim and thereby submitted the U.K. Pension Claim to the Court.

## B.  Relevant Background

On January 14, 2009 (the "Petition Date"), the Debtors (except for NN CALA, which filed on July 14, 2009) filed voluntary petitions for relief under chapter 11 of the Bankruptcy

2

Code.  Also on the Petition Date, the Debtors' ultimate corporate parent, Nortel Networks Corporation ("NNC"), NNI's direct corporate parent, Nortel Networks Limited ("NNL") (together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors") filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings").

On January 14, 2009, the Canadian Court entered an order recognizing these Chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA.  On February 27, 2009, this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

In addition, on January 14, 2009, after the filing by the U.S. Nortel Entities, the High Court of Justice in England placed nineteen of Nortel's European affiliates, including NNUK (collectively, the "EMEA Debtors") into administration.  On June 8, 2009, NNUK filed petitions in this Court for recognition of the English insolvency proceedings as foreign main proceedings under Chapter 15 of the Bankruptcy Code.  The need for coordination in the proceedings caused the Court to enter an order on June 26, 2009, recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Bankruptcy Code.

On June 9, 2009, to resolve, on an interim basis, certain allocation and post-petition cross-affiliate claims issues, pending the final allocation of the proceeds of the planned sales

of their businesses, the Canadian Debtors, the U.S. Debtors, and the EMEA Debtors, including NNUK (by the Joint Administrators), entered into an Interim Funding and Settlement Agreement (the "IFSA").  The Court approved the IFSA on June 29, 2009. Pursuant to section 12 of the IFSA, the parties agreed that the proceeds of any sale of their material assets (less taxes and costs) would be held in escrow until the parties either reached a consensual allocation of the proceeds, or:

> "in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol … applicable to the Sale Proceeds . . .which Protocol shall provide binding procedures for the allocation of Sales Proceeds…."

On September 30, 2009, NNUK, on behalf of itself, the Joint Administrators, and the other EMEA Debtors, filed proofs of claim against NNI and the other U.S. Debtors "in respect of any heretofore unknown, unliquidated, or unmatured claim or claims … against Nortel Networks Inc. or its affiliated debtors in these cases".

### The U.K. Pension Claim

NNUK is the employer under the Nortel Networks U.K. Pension Plan (the "NNUK Pension Plan"), a defined benefit occupational final salary pension scheme.  (Declaration of Richard Hitchcock, dated February 18, 2010 (the "Hitchcock Dec.") ¶ 5.4.)  On both November 21, 2006 and December 21, 2007, NNL executed guarantees regarding the NNUK Pension Plan.  No U.S. Nortel Entity provided any guarantee with respect to the NNUK Pension Plan.

The PPF is a U.K. statutory body established under the U.K. Pensions Act 2004 (the "U.K. Pensions Act").  NNUK's commencement of proceedings in the U.K. led to the NNUK Pension Plan entering a PPF "assessment period" pursuant to the U.K. Pensions Act. (*See* Hitchcock Dec. ¶ 5.5; Exhibit A to the Declaration of John Ray, dated February 18, 2010. ("Ray Dec.")  An "assessment period" means that the PPF is working with the Trustee to determine the NNUK Pension Plan's funding position.  To the best of the Debtors' understanding, the NNUK Pension Plan remains in an "assessment period."

On or about September 30, 2009, and January 25, 2010, the Trustee and the PPF jointly filed proofs of claim against the U.S. Nortel Entities.  The U.K. Pension Claim is based on allegations that (i) the NNUK Pension Plan is under-funded by an estimated amount alternatively stated to be £2.1 billion or $3.1 billion; and (ii) TPR may seek to require certain of the Debtors, as well as certain non-U.S. Nortel entities, to provide financial support for the NNUK Pension Plan.

According to the U.K. Pension Claim, by the time it was filed, TPR had concluded that grounds existed to issue certain warning notices ("Warning Notices") and to seek a FSD against certain members of the Nortel Group worldwide, including NNI and NN CALA, as companies allegedly "connected with or associates of" NNUK, with respect to the allegation that NNUK was "insufficiently resourced" on June 30, 2008, a date selected by TPR.  (*See* Exhibit A to Ray Dec.)  The U.K. Pension Claim also states that the indebtedness or liability of the relevant U.S. Nortel Entities arose no later than June 30, 2008, a date well prior to the

Petition Date.  In addition, the U.K. Pension Claim asserts that if a FSD is issued against any of the U.S. Nortel Entities, such entity could then be instructed under the U.K. Pensions Act to procure financial support for the NNUK Pension Plan, either alone or with other members of the Nortel Group.  The U.K. Pension Claim further asserts that if a U.S. Nortel Entity receives a FSD, but fails to put or keep in place financial support for the NNUK Pension Plan approved by TPR, then TPR could also exercise its power to impose on that U.S. Nortel Entity a liability to pay a specific amount, which could be all or some portion of the deficit in the NNUK Pension Plan.  (*See* Exhibit A to Ray Dec.)

## The U.K. Pensions Act

Under the U.K. Pensions Act, TPR has, in relation to a pension plan, a stated pecuniary purpose:  to protect the plan benefits of members and to reduce the risk that compensation would be required from the PPF.  (Hitchcock Dec. ¶ 41.)  Under the U.K. Pensions Act, the PPF imposes a levy like a private insurance premium on eligible pension plans as one of the ways of funding such compensation.

In furtherance of that pecuniary purpose, TPR may conduct an administrative process whereby it may issue, through TPR's Determinations Panel (the "Determinations Panel"), a FSD under section 43 of the U.K. Pensions Act, if it believes that the employer funding the pension plan (the "Employer") is either (a) a service company, or (b) "insufficiently resourced."  (*See* Hitchcock Dec. ¶¶ 37-38, 50 & Schedule 2.)

A FSD, which is preceded by a "Warning Notice," is a direction, issued to certain persons following a decision of the Determinations Panel to issue it, to secure financial support for a pension plan. A FSD may only be issued against a person who is either the Employer, or is "connected and/or associated with" the employer (the "Non-Employers"). The FSD specifies a certain time period during which the financial support is to be put in place, and directs that this support is to continue for as long as the pension plan is in existence. A FSD may only be issued if the Determinations Panel believes that it is reasonable to do so. (*See* Hitchcock Dec. ¶¶ 37.3 – 37. 4, 50 & Schedule 2.)

In deciding whether it is reasonable to issue a FSD against a Non-Employer, the Determinations Panel must consider such matters as it considers relevant, including: (a) the relationship between the Non-Employer and the Employer, including whether the Non-Employer controlled the Employer; (b) the value of any benefits received directly or indirectly by the Non-Employer from the Employer; (c) any connection or involvement of the Non-Employer with the pension plan; and (d) the financial circumstances of the Non-Employer. (Hitchcock Dec. ¶¶ 37.4, 50.)

In addition to its ability to issue a FSD, where the target has not complied with the FSD, and TPR believes that it is reasonable to do so, it is authorized to issue a CN. (Hitchcock Dec. ¶ 43.) A CN states that the persons to whom it is issued are under a liability to pay to the trustee of the pension plan the sum specified therein. The CN may be for all or part of the amount by which the pension plan is under-funded. This amount is treated as a

7

debt due to the trustee of the pension plan.  (U.K. Pensions Act, s. 49(3).)  While TPR can exercise such powers as the trustee of the pension plan to recover the debt under the CN, during the assessment period (which the NNUK Pension Plan has been in since it entered administration proceedings), only the PPF may exercise the trustee's rights and powers. (Hitchcock Dec. ¶¶ 5.5, 46 & Schedule 2.)

If a party to whom a FSD or CN is issued disputes that issuance, it may make a reference to the TPR Tribunal (the "Tribunal") within 28 days from the date of the issuance. The Tribunal will decide the appropriate action, if any, to take, including possibly revoking, confirming, or varying the FSD or CN.  After receiving the Tribunal's decision, the party may, with permission of the Tribunal or the U.K. Court of Appeal, appeal to the Court of Appeal on a point of law arising from a decision of the Tribunal.  (U.K. Pensions Act, s.103; Hitchcock Dec. ¶¶ 54-58.)

## FSD Warning Notice Addressed to NNI and NN CALA

By letters dated January 13, 2010 and addressed to NNI and NN CALA (along with certain non-U.S. Nortel entities), TPR issued a Warning Notice initiating an administrative proceeding regarding the alleged shortfall in the funding of the NNUK Pension Plan; the other U.S. Nortel Entities were not referred to in the Warning Notice.  The Warning Notice provides, in summary, that TPR believes it is reasonable to issue a FSD against the addressees (the "Targets") and references certain documents and witness statements as support for this determination, some of which were provided by NNUK, and others of which

are publicly available information.  It further provides, *inter alia*, that (i) the "relevant time" on which to measure the NNUK Pension Plan's funding position for the purpose of deciding whether to issue a FSD is June 30, 2008; and (ii) TPR believes it is reasonable to issue a FSD against the Targets, including NNI and NN CALA, for various reasons including TPR's analysis of certain benefits conveyed among affiliates.  The Warning Notice also reviews TPR's conclusion that benefits provided by certain affiliates to certain other affiliates provides a basis for issuing a FSD.  (Ray Dec. ¶ 10.)

TPR indicated that the Targets, as well as the U.K. Trustee and PPF, should respond in writing to the Warning Notice by midday on March 1, 2010, and that the Determinations Panel will consider all responses.  (Ray Dec. ¶ 12.)[3]

## Canadian Debtors' Motion to Stay U.K. Proceedings

On February 17, 2010, the Monitor filed an application with the Canadian Court seeking to stay the U.K. Proceedings on the ground that they violate the stay imposed by the Initial Order issued by the Canadian Court.  That application was heard on February 25, 2010.  The Canadian Court issued the stay on February 26, 2010.

## JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue over

---

[3] The Claimants indicated the Determinations Panel may have been amenable to an extension of the March 1 response date.  However, the Determinations Panel was statutorily required to rule by June 28, 2010, thus maintaining the time pressure on Debtors.

the Debtors' Chapter 11 cases and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and

1409.

The statutory bases for the relief requested herein are sections 362(a)(1) and (a)(6) of

the Bankruptcy Code and Rule 9014 of the Federal Rules of Bankruptcy Procedure.

## DISCUSSION

11 U.S.C. § 362(a)(1), provides , in part, that a "judicial, administrative, or other

proceeding against the debtor that was or could have been commenced before the

commencement of the case under this title, or to recover a claim against the debtor that arose

before the commencement of the case under this title," is stayed. *Constitution Bank v. Tubbs*,

68 F.3d 685, 691 (3d Cir. 1995) ("[t]he automatic stay is of broad scope, directing that 'all

judicial actions against a debtor seeking recovery on a claim that were or could have been

brought before commencement of a bankruptcy case, are automatically stayed'") (citation

omitted); *In re Spansion, Inc.*, 418 B.R. 84, 92 (Bankr. D. Del. 2009) ("the automatic stay

applies . . . because the claims asserted . . . 'could have been brought' and were, in fact,

brought, prepetition").  Any acts to "assess" a claim that arose before the case commenced

are similarly barred by the automatic stay. *See, e.g., Glenshaw Glass Co. v. Ontario Grape

Growers' Mktg. Bd.*, 67 F.3d 470, 477 (3d Cir. 1995).

Here, TPR has issued a Warning Notice to NNI and NN CALA, as well as to a

number of non-U.S. Nortel entities, triggering the U.K. Proceedings, on the basis of what is

described in the NNUK Pension Claim as the "financial insufficiency" of NNUK to fully

10

fund the NNUK Pension Plan as of June 30, 2008, six months before NNI filed its Chapter 11 petition, and over a year before the filing of NN CALA's Chapter 11 petition. Accordingly, the FSD proceeding, and any future proceedings by TPR or the Determinations Panel, could have been commenced prior to the filing of these Chapter 11 cases, and are subject to the automatic stay. *See* 11 U.S.C. §§ 362(a)(1), (a)(6); *see also ACandS, Inc. v. Travelers Cas. and Surety Co.*, 435 F.3d 252, 260 (3d Cir. 2006); *Constitution Bank v. Tubbs*, 68 F.3d 685, 693 (3d Cir. 1995).

Moreover, the Claimants have submitted to this Court's jurisdiction by filing proofs of claim against the Debtors, including NNI and NN CALA, and the subject of the U.K. Pension Claim is the very subject of the U.K. Proceedings. *See Lagenkamp v. Culp*, 498 U.S. 42, 44 (1990) (filing a claim against a bankruptcy estate subjects the claimant to the bankruptcy court's equitable jurisdiction). Post-petition attempts to assess, impose and/or liquidate a debt against a Chapter 11 debtor outside of the bankruptcy court go to the essence of the Chapter 11 claims process, and are the very reason why there is an automatic stay. *See, e.g., Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1207 (3d Cir. 1991).

### The Police Power Exception to the Automatic Stay Does Not Apply

An exercise of a governmental unit's police or regulator power exempts them from the automatic stay pursuant to Section 362(b)(4) of the Bankruptcy Code.[4] Here, neither of

---

[4] Section 362(b)(4) provides, in pertinent part: "The filing of a petition under section 301, 302, or 303 of this title, … does not operate as a stay: (4) under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit … to enforce such governmental unit's … police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's … police or regulatory power."

the Claimants is a "governmental unit," as defined in Section 101(27) of the Bankruptcy Code. The Trustee is a private party, and the PPF, while defined as "a statutory body" in paragraph 1.4 of the U.K. Pension Claim, during an assessment period exercises the rights and powers of the Trustee. PPF thus stands in the shoes of the Trustee, a private party. (See Exhibit A to the Ray Dec.; Hitchcock Dec. ¶ 22, 46.)

The police power exception is to be "narrowly construed," as reflected in the standards courts apply in determining whether or not a governmental unit's action or proposed action constitutes an exercise of its police power. There are two objective tests upon which courts rely in considering if the Section 362(b)(4) exception is applicable.

First, under the "pecuniary purpose" test, the issue is whether the governmental action or proceeding relates primarily to the protection of the government's pecuniary or financial interest in the debtor's property, as opposed to a matter of public safety or welfare. *See, e.g., Missouri v. U.S. Bankr. Court*, 647 F.2d 768, 776 (8th Cir. 1981) (denying Section 362(b)(4) defense where plaintiff sought to enforce state grain laws that "primarily relate to the protection of the pecuniary interest in the debtors' property and not to matters of public safety and health"); *In re Fairchild Corp.*, 2009 Bankr. LEXIS 3815, at *15 (Bankr.D.Del. Dec. 1, 2009) (concluding that agency's action sought solely to promote its pecuniary interest in being reimbursed for expenditures, and thus did not qualify as an exercise of police or regulatory power).

12

The U.K. Proceedings do not pass the "pecuniary purpose" test.  The stated purpose of the U.K. Proceedings is to address an alleged financial shortfall in a private pension plan, first by determining whether the Targets should provide financial support to the Trustee, and, then potentially by imposing and fixing a claim against NNI and NN CALA through a CN. This is purely an issue of determining which, if any, entities, on an after-the-fact basis, should be financially responsible for funding a pension shortfall.  It is clearly a pecuniary matter, and, notwithstanding the importance of the financial matter to the private Trustee, under the case law does not qualify as a matter of public safety or welfare.  *See, e.g.*, *Brock v. Morysville Body Works*, 829 F.2d 383 (3rd Cir. 1987) (holding that an order to abate violations of health and safety standards was enforceable by the Secretary of Labor under section 362(b)(4)'s exception to the automatic stay); *Penn Terra Ltd. v. Dep't of Envtl. Res.*, 733 F.2d 267 (3rd Cir. 1983) (police power exception applicable to allow a state court to issue an injunction ordering debtor to clean up environmental hazards); *see also In re James (James v. Draper)*, 940 F.2d 46 (3rd Cir. 1991) (civil forfeiture proceeding for alleged proceeds of drug sales falls within the police power exception to the automatic stay).

Further illustrative of the appropriate application of the police - regulatory exception and, by contrast, its inapplicability here, are several cases.  First, in *Safety-Kleen, Inc. (Pinewood) v. Wyche*, 274 F.3d 846, (4th Cir. 2001), the appeals court affirmed the ruling that the automatic stay did not bar action by South Carolina's Department of Health and Environmental Control to close a commercial hazardous waste site.  The court based its

ruling on the finding that the primary purpose of South Carolina's statute was to deter pollution, a health and safety concern.

Next, the Claimants rely heavily on Equal Employment Opportunity Commission ("EEOC") cases to argue that a pecuniary purpose does not extinguish the automatic stay exception. *EEOC v. McLean Trucking Company*, 834 F.3d 398 (4th Cir. 1987) is an example of a case in which the court found that the governmental exception applied even though the suit at issue included a pecuniary benefit, back pay. The court of appeals rejected the bankruptcy court's finding that because the debtor was in liquidation, the subject litigation was merely an action to recover back wages, an adjudication of private rights. *Id.* at 400. *McLean* and similar equal employment cases emphasize the significance of eliminating discrimination through injunctive relief and the imposition of penalties – deterrents – and, coincidentally, private causes of action. Here, the Claimants can obtain complete monetary relief in this Court at the appropriate time.

Finally, a recent decision of the Bankruptcy Court from the Eastern District of Virginia discusses the issue posed here clearly and concisely. In *In re Qimonda AG,* Slip Op., 2010 WL595654 (Bankr. E.D. Va., Feb. 16, 2010), the debtor was seeking a Section 362 stay of an International Trade Commission ("ITC") proceeding in which debtor was accused of patent infringement. The matter was ready for trial. The bankruptcy court precisely stated the issues as follows:

14

> Is the action pending before the ITC the continuation of an
> action **by** the ITC?  Is the action an enforcement of the ITC's
> police and regulatory power?

*Id.* at *2.  The court answered "no" to both questions because the action was being

prosecuted before, not by, the ITC.  Id. at *3.  As the *Qimonda* court explained,

> The reality is that the ITC and its administrative law judges are the
> forum before whom the action was brought by [the claimants]. . .and who are
> seeking the protection of their property rights.  The proceeding is adversarial
> and subject to the adjudicative provisions of the Administrative Procedure Act,
> 5 U.S.C. §§ 551, et seq.  The administrative law judge makes an initial
> determination which contains findings of fact and conclusions of law with
> respect to the issues in controversy.

> \*     \*     \*

> Rather than being the governmental unit that is enforcing the patents, the ITC
> is the forum before which private litigants are enforcing their patents.

Similarly, the TPR is the forum for the dispute in the UK Proceedings, in which private

parties are seeking to protect their property rights.

The bankruptcy court also analyzed the legislative history of Section 362(b)(4) and

concluded that the exception was explicitly limited to true governmental entities, "not to

organizations acting in a governmental capacity."  *Id.* at *2.  The Claimants are such

organizations acting in a governmental capacity.

What we have here are creditors who have filed claims in this Court and who are

seeking to litigate those claims clear of the Court's jurisdiction and the automatic stay.  Their

effort to do so is inimical to the Debtors' effort and those of non-U.S. debtors in a highly

complex liquidation to assemble the assets, reduce them to money, allocate those assets

15

among numerous entities in many countries and then distribute the assets. The Claimants'
pecuniary interest does not warrant the extraordinary standing above all others they seek.
The Claimants who implore this Court to give comity to the U.K. Proceedings are themselves
ignoring comity. They as much as say, "give the proceedings of our choice the respect we
are unwilling to show to other proceedings in which many debtors and creditors are working
tirelessly to formulate a coherent, equitable plan."

The U.K. Proceedings also fail the "public policy test." The issue under this test is
whether the governmental action is taken in furtherance of a matter of public policy, or
instead is intended primarily to adjudicate private rights. *See, e.g., Fairchild Corp.*, 2009
Bankr. LEXIS 3815, at *15 (action akin to private action to collect money damages does not
qualify as an exercise of police power under section 362(b)(4)); *Spansion*, 418 B.R. at 95
(administrative patent proceeding against debtors, prosecuted on behalf of the public by staff
attorney of the U.S. International Trade Commission, was primarily an adjudication of
private rights, only incidentally serving a public interest, and thus was not an exercise of
police or regulatory power exempt from automatic stay).

Here, TPR seeks not to protect the "safety or welfare" of the public in the U.K., but
rather to obtain financial support for the benefit of private parties -- the members of the
NNUK Pension Plan, represented by the Trustee -- and if that fails, to assert and liquidate a
claim to the property of the Debtors, on the Trustee's behalf. Any sum paid as a result of the
U.K. Proceedings would not go to benefit the public, but would be used to reduce the debt

16

owed by NNUK to the Trustee.  The Trustee as intended beneficiary, and PPF, filed the proofs of claim to recover from the Debtors the same financial support that is the subject of the U.K. Proceedings.

The provisions of the U.K. Pensions Act establish that the purpose of the FSD and CN proceedings is to vindicate the rights of private parties, that a FSD is a demand that financial support be provided for the benefit of a private pension plan (s. 43(3)); that in the event of non-compliance with the FSD, TPR can issue a CN requiring the payment of a specified sum that is "to be treated as a debt due from the person to the trustees or managers of the scheme" (s. 49(2), (3)); and that this debt can be enforced either directly by the trustees or by TPR on behalf of the trustees of the scheme (s. 49(4)) (emphasis supplied). (*See* Hitchcock Dec. ¶¶ 41, 46.)

The U.K. Pension Claim also shows that the focus of the U.K. Proceedings is to procure a pecuniary benefit, for a private party -- the Trustee.  The Claim recites the process under the U.K. Pensions Act, and that, if necessary, the TPR will attempt to impose and liquidate an enforceable debt, to be enforced by or on behalf of the Trustee, for an amount to be paid to the Trustee. (*See* Exhibit A to Ray Dec.)

### "Sea Containers" Decision

The Claimants argue that the decision in *In re Sea Containers Ltd.*, 2008 Bankr. LEXIS 2363 (Bankr.D. Del. Sept. 19 2008) supports their defense to the Motion.  In *Sea Containers*, the Determinations Panel issued a FSD against a single debtor, on the grounds

that: (i) the U.S. debtor against which the FSD was sought was a U.K. chartered company which, together with its subsidiary, the plan sponsor, operated primarily out of the U.K; (ii) the debtor had a clear control relationship with the employer-affiliate; (iii) the debtor had substantial assets in the U.K; and (iv) the Determinations Panel held a hearing on the FSD request, without a motion by the U.S. debtor to invoke or to lift the protections of the automatic stay, and at which one of the two U.S. creditors' committees encouraged the Panel to issue a FSD so that the plan trustee could rely on it to pursue their claims in the Chapter 11 proceedings.

Following the issuance of the FSD, a settlement was entered into among the debtors, affiliates, one of the creditors' committees and the pension trustee, and was approved by TPR, granting the trustee an allowed claim in the bankruptcy case. The matter never reached the CN stage.  The case came before the court on a motion under Bankruptcy Rule 9019 for approval of the settlement.

The court approved the settlement.  In so doing, it overruled a number of objections by the second creditors' committee, one of which was that the FSD proceeding had violated the automatic stay.  In this regard, the court did not treat the FSD as determinative but only ruled that the FSD "should not be ignored as invalid," because it "provide[d] guidance as to the . . . pertinent considerations in valuing the Schemes' claims." *Id*. at **26-27.  The court also relied on the fact that the Determinations Panel, as one would expect, did not view itself as being constrained by the automatic stay, not surprising given that the U.S. debtor had not

sought an order of the bankruptcy court enforcing the stay in connection with the proceeding.

In short, the court's ruling that the FSD proceeding did not violate the automatic stay was issued in an entirely different procedural context -- a Rule 9019 motion by the debtor to approve a settlement with TPR, where the debtor had not sought to invalidate the FSD -- and on entirely different facts. Furthermore, the facts reveal that the objecting creditors' committee never sought to enforce the automatic stay or formally objected to the proceedings in the U.K. Unlike in *Sea Containers*, the Debtors and the creditors' representatives here object to the U.K. Proceedings, and dispute TPR's right to proceed against the Debtors in the absence of relief from the automatic stay. Further, in contrast to *Sea Containers*, which involved only a FSD proceeding, here TPR is attempting to secure financial support for the benefit of the Plan Trustee through a FSD proceeding and, if necessary, a CN proceeding, which creates an enforceable debt. Also, the Trustee has already submitted to the jurisdiction of the Court for determination and liquidation of contingent and unliquidated claims for the very same financial support TPR seeks to obtain for them in the U.K. Proceedings. And here, unlike in *Sea Containers*, the Warning Notice makes plain that TPR is asserting a contingent claim, whereas in *Sea Containers*, integral to the court's ruling that there was no stay violation was its determination that there was no assertion of a claim. *Id*. at *26. Accordingly, *Sea Containers* is confined to its facts and is not controlling.

19

### Prejudice

An overriding issue in these cases -- as well as in the related insolvency proceedings in Canada and the U.K. -- is the allocation of the billions of dollars in proceeds of the post-petition asset sales.  This allocation will determine the amounts available for distribution to the creditors located in the various jurisdictions, in part based on the factual issue of the respective contributions of the various Nortel entities to the value of the assets sold. (Ray Dec. ¶14.)

In recognition of this fundamental question, the U.S. Debtors, the Canadian Debtors, and the EMEA Debtors (including NNUK) entered into the IFSA, pursuant to which they agreed, *inter alia*, (a) that all such sales proceeds will be held in escrow until the parties either agree on a consensual allocation, or, in the absence of such an agreement, obtain a binding determination on the allocation pursuant to an agreed upon allocation protocol; and (b) that they would negotiate in good faith to attempt to reach agreement on the terms that would govern the allocation protocol process. (IFSA §§ 12(b)-(c), Exhibit B to the Schweitzer Dec.)

In accordance with the IFSA, the parties have engaged in extensive negotiations regarding the terms of the allocation protocol.  The purpose of the protocol (called the "Protocol For Resolving Disputes Concerning Allocation of Sale Proceeds") is to ensure a fair allocation, to be determined (absent a consensual agreement) in a single cross-jurisdictional forum. (Ray Dec. ¶ 16.)

The Court is satisfied that the Claimants seek to litigate, in the context of an administrative proceeding before a U.K. administrative body whose sole focus is the financial protection of U.K. pension plan members and an insurance vehicle, the question of whether NNUK's contributions to the "global" Nortel business received inadequate financial recognition pre-filing so that now it is "reasonable" to impose financial responsibility on its affiliates. That issue overlaps heavily with the issues in the allocation dispute. The question of whether and to what extent affiliates of NNUK should be responsible for NNUK's obligations is part and parcel of the entire cross-affiliate benefit and contribution issue and the allocation process.  (Ray Dec. ¶ 14.)

Indeed, the resolution of the issues Claimants seek to litigate in the U.K.  Proceedings may involve consideration of the same factors -- including Nortel's transfer pricing arrangements, Nortel's Master Research and Development Agreement, the value of certain research and development, ownership rights to Nortel's intellectual property, and individual corporate assets and revenues -- as those that may be significant to the allocation process. (Ray Dec. ¶ 17.)

The Nortel debtors in Canada, the U.S., and the U.K. have agreed that these issues must be resolved, on a global basis, in a single cross-jurisdictional forum.  They should not be decided, even in part, by an administrative body in a single jurisdiction with a single constituency.

Moreover, the very premise for the U.K. Proceedings is that NNUK does not have the resources to fund the NNUK Pension Plan, and one of the key elements in determining the "reasonableness" of imposing a FSD and a CN against a Non-Employer under the U.K. Pensions Act is the financial condition of the Non-Employer. (U.K. Pensions Act s. 42(5); s. 47(3); *see* Hitchcock Dec. ¶¶ 37, 44.)   Until the allocation procedure is completed, however, the financial condition of the Employer, NNUK, and the Non-Employers, including the Debtors, cannot be determined. (Ray Dec. ¶ 19.)

## CONCLUSION

The Court finds that the automatic stay applies to the efforts of the Trustees and the PPF to "grab" at Debtors' assets when there is already a procedure in place for the allocation of the multi-national Debtors' assets.  The U.K. Proceedings are premature and prejudice the ultimate literally global resolution of these bankruptcy cases.  An order has already issued.

Dated: March 9, 2010

KEVIN GROSS, U.S.B.J.

22