## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- X
                       :

*In re*                           :        Chapter 11
                       :

Nortel Networks Inc., *et al.*,[1]     :        Case No. 09-10138 (KG)
                       :

                Debtors.   :        Jointly Administered
                       :
                       :        **Hearing date: July 11, 2012 at 10:00 a.m. (ET)**
                       :        **Objections due: July 3, 2012 at 4:00 p.m. (ET)**

-------------------------------------------------------- X

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING THE NON-FILED ENTITY SETTLEMENT AGREEMENT; (II) AUTHORIZING AND APPROVING THE DEBTORS TO TAKE CERTAIN ACTIONS IN CONNECTION THEREWITH; AND (III) GRANTING RELATED RELIEF

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of

an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a), 363

and 502 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 9014,

and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule

6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy

Court for the District of Delaware (the "Local Rules"), (a) approving that certain Allocation

Settlement Agreement dated as of June 19, 2012 (the "Non-Filed Entity Settlement

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

Agreement")[2], attached hereto as <u>Exhibit B</u> and entered into by and among (i) Nortel Networks

Corporation ("<u>NNC</u>"), Nortel Networks Limited ("<u>NNL</u>") and the other affiliated Canadian

entities set forth in Schedule 1 of the Non-Filed Entity Settlement Agreement (the "<u>Canadian</u>

<u>Debtors</u>")[3], (ii) the Debtors, (iii) Nortel Networks UK Limited (In Administration) and the other

affiliated European entities set forth in Schedule 3 of the Non-Filed Entity Settlement Agreement

(the "<u>EMEA Debtors</u>"), (iv) Nortel Networks (Northern Ireland) Limited (in liquidation) and

Nortel Networks Optical Components Limited (in liquidation) (the "<u>EMEA Liquidation</u>

<u>Debtors</u>"), (v) NNSA (as defined below), (vi) certain affiliates of NNC that have not commenced

insolvency or creditor protection proceedings as set forth in Schedule 4 of the Non-Filed Entity

Settlement Agreement (the "<u>APAC Entities</u>"),[4] (vii) certain affiliates of NNC that have not

commenced insolvency or creditor protection proceedings as set forth in Schedule 5 of the Non-

Filed Entity Settlement Agreement (the "<u>CALA Entities</u>,"[5] and, together with the APAC Entities,

the "<u>Non-Filed Entities</u>"), (viii) certain affiliates of the EMEA Debtors that have not commenced

insolvency or creditor protection proceedings as set forth in Schedule 6 of the Non-Filed Entity

Settlement Agreement (the "<u>EMEA NFEs</u>"), (ix) the Joint Administrators (as defined below), (x)

---

[2]     The description of the Non-Filed Entity Settlement Agreement set forth herein is for informational purposes only.  In the event of any discrepancy between the description and the terms of the Non-Filed Entity Settlement Agreement, the terms of the Agreement shall govern.

[3]     The Canadian Debtors include the following entities: NNC (1001), NNL (1002/1003), Nortel Networks Technology Corporation (1101), Nortel Networks Global Corporation (1104) and Nortel Networks International Corporation (1102).

[4]     The APAC Entities include Nortel Networks (Asia) Limited (7100), Nortel Networks Australia Pty. Limited (6100), Nortel Networks (India) Private Limited (6111), PT Nortel Networks Indonesia (6120), Nortel Networks Japan (Japanese name is Nortel Networks Kabushiki Kaisha) (6130), Nortel Networks Korea Limited (6140), Nortel Networks Malaysia Sdn. Bhd. (6160), Nortel Networks New Zealand Limited (6180), Nortel Networks Singapore Pte Ltd. (6210), Nortel Networks (Thailand) Limited (6220), Nortel Vietnam Limited (6231), Nortel Networks (China) Ltd. (7120), Nortel Networks Telecommunications Equipment (Shanghai) Co., Ltd. (7121) and Nortel Technology Excellence Centre Private Limited (6112).

[5]     The CALA Entities include Nortel Networks de Argentina S.A. (3100), Nortel Networks Chile S.A. (3130), Nortel Networks del Ecuador S.A. (3150), Nortel Networks de Guatemala Ltda. (3160), Nortel Networks de Mexico S.A. de C.V. (3170), Nortel Networks Peru S.A.C. (3200), Nortel Networks del Uruguay S.A. (3210), Nortel de Mexico, S. De R.L de C.V. (3171) and Nortel Trinidad and Tobago Limited (3280).

the NNSA Office Holder (as defined below), (xi) the Monitor (as defined below), (xii) certain

individuals from Ernst & Young LLP acting as joint liquidators of the EMEA Liquidation

Debtors (the "Joint Liquidators") and (xiii) the Committee (as defined below and, together with

the Canadian Debtors, the Debtors, the EMEA Debtors, the EMEA Liquidation Debtors, NNSA,

the Non-Filed Entities, the EMEA NFEs, the Joint Administrators, the NNSA Office Holder, the

Monitor, and the Joint Liquidators, the "Parties"); (b) resolving certain claims among the Parties

and authorizing the Debtors to take all necessary actions to enter into and fulfill their obligations

under the Non-Filed Entity Settlement Agreement; and (c) granting such other and further relief

as the Court deems just and proper.  In support of this Motion, the Debtors respectfully represent

as follows:

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105, 363 and 502

of the Bankruptcy Code, as supplemented by Rules 2002 and 6004, 9014 and 9019 of the

Bankruptcy Rules and Rule 6004-1 of the Local Rules.

## Background

3.      On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel

Networks (CALA) Inc.,[6] filed voluntary petitions for relief under chapter 11 of the Bankruptcy

Code, which cases are consolidated for procedural purposes only.  The Debtors continue to

operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[6]      Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code
on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases
for procedural purposes [D.I. 1098].

4.      The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors (the "Committee") in respect of the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized (the "Bondholder Group").

5.      On the Petition Date, the Debtors' ultimate corporate parent NNC, NNI's direct corporate parent NNL, and the other Canadian Debtors commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada), seeking relief from their creditors and a Monitor, Ernst & Young Inc., (the "Monitor") was appointed by the Canadian Court (the "CCAA Proceedings").

6.      Also on the Petition Date, the High Court of England and Wales placed the EMEA Debtors into administration (the "EMEA Proceedings") under the control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators").  Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency and dissolution proceedings around the world.

7.      Subsequent to the Petition Date, Nortel Networks S.A. (in Administration and liquidation judiciare) ("NNSA") commenced secondary insolvency proceedings pursuant to which Maître Cosme Rogeau was appointed Liquidateur Judiciaire of NNSA by the French Court (Docket No. 2009P00492) (the "NNSA Office Holder");

8.      Since the Petition Date, Nortel has sold its business units and other assets to various purchasers.  For further information regarding these chapter 11 cases, reference may be made to the Monthly Operating Reports filed by the Debtors and http://dm.epiq11.com/nortel.

## Relief Requested

9.      As the Court is aware, the Debtors and their worldwide affiliates, as well as certain creditor constituencies, have been engaged in discussions, mediations and related

litigation over the last two years focused on resolving the allocation of the approximately $7.5 billion of escrowed proceeds raised from the sale of Nortel's various business units and patents. While the various Nortel affiliates were unable to reach a global resolution of these allocation disputes at the prior mediation sessions conducted in November 2010 and April 2011, the Parties were able to reach a settlement in principle of the claims of twenty-three non-debtor Nortel affiliates – the Non-Filed Entities – to a share of the sale proceeds.  Since that time, the Parties have negotiated a settlement agreement that resolves those allocation claims as well as other claims held by and against the Non-Filed Entities.  While there is still significant work left to be done to resolve allocation globally, the settlement is a productive step forward for the Debtors and their affiliates, in that it reduces the number of parties at the table (or participating in litigation) in resolving the allocation of sale proceeds.

10.     By this Motion, the Debtors seek an order (a) authorizing the Debtors to enter into the Non-Filed Entity Settlement Agreement, (b) authorizing the Debtors to resolve other claims among the Parties and take all necessary actions to enter into and fulfill their obligations under the Non-Filed Entity Settlement Agreement including, without limitation, execution and delivery of the Escrow Amendments (as defined below) and Payment Instructions (as defined below) and (c) granting such other and further relief as the Court deems just and proper.

**<u>Facts Relevant to this Motion</u>**

**A.      The Non-Filed Entities**

11.     The Non-Filed Entities include four wholly- or majority-owned non-debtor subsidiaries of NNI – Nortel Networks Kabushiki Kaisha ("<u>NN Japan</u>"), Nortel Networks de Guatemala ("<u>NN Guatemala</u>"), Nortel Trinidad and Tobago Limited ("<u>Nortel Trinidad and Tobago</u>") and Nortel Technology Excellence Centre Private Ltd. ("<u>NTEC</u>" and, together with NN Japan, Nortel Trinidad and Tobago and NN Guatemala, the "<u>US Subsidiary Non-Filed</u>

Entities"). The remaining nineteen Non-Filed Entities are wholly- or majority-owned subsidiaries of NNL. All of the US Subsidiary Non-Filed Entities have ceased active operations and are preparing to commence liquidation or dissolution under the laws of their respective jurisdictions.

**B.  The Global Asset Sales**

12.   Certain Debtors, Canadian Debtors, EMEA Debtors, EMEA Liquidation Debtors, EMEA NFEs and Non-Filed Entities were sellers (the "Nortel Sellers") in sales of Nortel's global business lines, including: (i) the sale of certain Non-Core Assets to Radware [D.I. 539]; (ii) the sale of the CDMA and LTE businesses [D.I. 1205]; (iii) the sale of the Enterprise Solutions business [D.I. 1514]; (iv) the sale of the GSM/GSM-R business [D.I. 2065]; (v) the sale of the Metro Ethernet Networks business [D.I. 2070] (the "MEN Sale"); (vi) the sale of certain assets of its Carrier Voice Over IP and Communications Solutions business [D.I. 2632]; (vii) the sale of certain assets of the GSM/GSM-R business [D.I. 3048]; and (viii) the sale of certain assets of the Debtors' Multi-Service Switch business [D.I. 4054] (each a "Sale Transaction", and collectively the "Sale Transactions"). In total, over $2.8 billion in proceeds raised from the Sale Transactions (the "Sale Proceeds") are now held in separate escrow accounts (the "Escrow Accounts") which were established at the time of each Sale Transaction and are each governed by a separate escrow agreement (the "Escrow Agreements").[7] Each

---

[7]      The Escrow Agreements consist of the following: (i) Escrow Agreement dated as of December 18, 2009, and as amended from time to time, by and among NNC, NNL, NNI, the other entities identified therein as Sellers, the EMEA Filed Entities, the Committee, the Monitor (together with the Committee, the "Estate Fiduciaries") and JPMorgan Chase Bank, N.A. ("JPMorgan"), (ii) MEN Distribution Escrow Agreement dated as of March 19, 2010, and as amended from time to time, by and among NNC, NNL, NNI, the other entities identified therein as Sellers, the EMEA Sellers and certain of their Affiliates as identified therein, Nortel Networks S.A., the Estate Fiduciaries and JPMorgan, (iii) GSM/GSM-R Distribution Escrow Agreement dated as of March 31, 2010, and as amended from time to time, by and among NNC, NNL, NNI, the other entities identified therein as Sellers, the EMEA Sellers as identified therein, NNSA, Nortel Networks (Asia) Limited, the entities identified therein as North American ALT Selling Debtors, the entities identified therein as EMEA ALT Selling Debtors, the Estate Fiduciaries and JPMorgan, (iv) CVAS Distribution Escrow Agreement dated as of May 27, 2010, and as amended from time to time, by and among NNC, NNL, NNI, the other entities identified therein as Sellers, the EMEA Sellers and certain of their

Nortel Seller that participated in a Sale Transaction is a party (in such a capacity, a "<u>Depositor</u>")
to the Escrow Agreement governing the Escrow Account in which the Sale Proceeds from the
relevant transaction were placed.

13.     Following the closing of the Sale Transactions, in early 2011, Nortel undertook an
auction process for the sale of its patent portfolio.  As the result of a vigorous and competitive
auction, a sale transaction ultimately was approved and closed in July 2011, pursuant to which
Nortel received $4.5 billion for the patent assets.  Such amounts also are being held in escrow,
pending allocation of the proceeds among the Nortel Sellers that participated in that sale.  None
of the Non-Filed Entities were sellers or otherwise participated in the sale of the patent assets.

14.     Since 2010, the various Nortel estates have engaged in informal and formal
discussions regarding the allocation of the various sale proceeds among the estates, including
two formal mediation sessions in November 2010 and April 2011, and ongoing formal mediation
sessions that commenced in April 2012.  While the larger allocation process is still ongoing
among the Debtors, the Canadian Debtors, the EMEA Debtors, the EMEA Liquidation Debtors
and certain creditor constituencies, including the Committee, the prior mediations and
subsequent negotiations ultimately did lead to a negotiated settlement that fully and finally
resolves the claims of the Non-Filed Entities to the proceeds of the Sale Transactions and any

---

Affiliates as identified therein, NNSA, the Estate Fiduciaries and JPMorgan, (v) GSM Retained Contracts
Distribution Escrow Agreement dated June 3, 2010, and as amended from time to time, by and among NNL, NNI,
Nortel Networks (CALA) Inc., the other entities identified therein as Sellers, the Estate Fiduciaries and JPMorgan,
(vi) MSS Distribution Escrow Agreement dated as of March 11, 2010, and as amended from time to time, by and
among NNC, NNL, NNI, the other entities identified therein as Sellers, the EMEA Sellers and Certain of their
Affiliates as identified therein, NNSA, the Israeli Company, the Estate Fiduciaries and JPMorgan, (vii) Radware
Distribution Escrow Agreement dated as of March 1, 2009, and as amended from time to time, by and among NNI,
NNL, the other entities identified therein as Sellers, the entities identified therein as Non-Debtor Nortel Networks
Entities, the Estate Fiduciaries and JPMorgan, and (viii) CDMA/LTE Escrow Agreement dated as of November 11,
2009, and as amended from time to time, by and among NNC, NNL, NNI, the other entities identified therein as
Sellers, the EMEA Filed Entities, the Estate Fiduciaries and JPMorgan.

other sales of Nortel assets that have occurred or may occur, and resolves certain other intercompany claims relating to the Non-Filed Entities.

15.    A number of the Non-Filed Entities have indicated that they are ready to commence liquidation or dissolution procedures in their respective jurisdictions, and are only waiting for the resolution of the allocation negotiations with respect to their estates and the receipt of their allocated Sale Proceeds before doing so.[8]  In some instances, if liquidation were commenced, there could be additional obstacles or delays to obtaining such Non-Filed Entities' consent to disbursements from the Escrow Accounts or amendments to the Escrow Agreements, which further supports the benefit of settling these matters now.  The settlement of the claims of the Non-Filed Entities to Sale Proceeds also benefits the Debtors by removing from the allocation discussions twenty-three entities that otherwise could have claims to the Sale Proceeds.

**C.    Allocation of Sale Proceeds**

16.    The Debtors have concluded that it is in the best interests of the Debtors and their estates to settle the allocation of Sale Proceeds to the Non-Filed Entities on the terms that have been negotiated, which will simplify the logistics of the global allocation negotiations by reducing the number of participating Nortel Sellers and allow the Non-Filed Entities to efficiently resolve their remaining liabilities and liquidate without further delay.  Under the

---

[8]    The liquidation of certain Nortel entities to date has already resulted in a reduction in the number of sellers that are Depositors under certain of the Escrow Agreements.  Amendments were executed to certain Escrow Agreements in 2011 to remove three liquidating Nortel entities from the Escrow Agreements – Nortel Networks o.o.o. (Nortel Russia)" (5001) [D.I. 6193], Nortel Networks Israel (Sales and Marketing) Ltd. (5102) and Nortel Communications Holdings (1997) Ltd. (5001) (collectively, the "Israeli Entities") [D.I. 5603].  In addition, this Court provided the Debtors with the authority to take certain actions under the Escrow Agreement holding Sale Proceeds from the MEN Sale without the consent or participation of Nortel Networks de Colombia S.A. (3140), a liquidating entity that is a Depositor under that agreement [D.I. 5726].  It is a condition to effectiveness of the Non-Filed Entity Settlement Agreement that another liquidating Nortel entity, Nortel Networks del Paraguay S.A. (3190), shall have executed and delivered (i) a full and final acknowledgment of the matters in the Non-Filed Entity Settlement Agreement and (ii) its signature pages to the relevant Escrow Amendment and Payment Instructions (as defined below).

proposed settlement, the Parties have agreed that the Non-Filed Entities collectively will receive

a sale allocation (the "Settlement Shares") in consideration for the termination of their rights

under the relevant Escrow Agreements and their removal as Depositors under the related Escrow

Accounts, where the aggregate amount of sale proceeds proposed to be paid to the Non-Filed

Entities is US$44.9 million.  In addition, the Parties have agreed to a mutual release of all

obligations among the Non-Filed Entities and between the Non-Filed Entities and the other

Parties, except for certain specific surviving obligations including scheduled intercompany

balances, as described in further detail below.

**D.      The Asia Restructuring Agreement**

17.      Certain of the Non-Filed Entities, in their capacities as APAC Entities, are party

to that certain Asia Restructuring Agreement, dated November 5, 2009, as approved by this

Court on December 2, 2009 [D.I. 2061] (the "ARA").  The ARA was executed to facilitate the

participation of those APAC Entities that are parties to the ARA (the "APAC Debtors") in the

Sale Transactions, and provided for a standstill of certain intercompany payments to permit the

APAC Debtors to remain solvent during the consummation of the Sale Transactions.  The ARA

provides for the payment of intercompany obligations by the APAC Debtors based on a

determination, made on a monthly basis, of the estimated net cash balances available to pay such

obligations (the "Net Cash Balance Payments").  The Non-Filed Entity Settlement Agreement

provides for the satisfaction of certain claims provided for in the ARA through the payment of

portions of certain APAC Debtors' Settlement Shares to their intercompany creditors as Net

Cash Balance Payments.  The Non-Filed Entity Settlement Agreement also contains an

acknowledgement that the APAC Debtors have met certain obligations under the ARA with

respect to participation in the Sale Transactions and authorizes the release of collateral required

by the ARA to be pledged by certain APAC Debtors to secure their performance of those obligations.

**E.      Terms of The Non-Filed Entity Settlement Agreement**

18.      Following lengthy good-faith negotiations, on or about June 19, 2012, the Parties entered into the Non-Filed Entity Settlement Agreement.  The main terms of the Non-Filed Entity Settlement Agreement are as follows:[9]

- Disbursement of Sale Proceeds.  Under the Non-Filed Entity Settlement Agreement, the Parties agree to deliver instructions (substantially in the forms attached as Appendix F to the Non-Filed Entity Settlement Agreement, the "Payment Instructions") to JPMorgan Chase Bank, N.A. as distribution agent for each of the Escrow Agreements (the "Distribution Agent") to release $44,900,000 in aggregate (the "Settlement Payment") from the Escrow Accounts.  The Distribution Agent shall also be instructed to distribute the Settlement Payment to each Non-Filed Entity entitled to a Settlement Share, provided that, in the case of certain Non-Filed Entities that are APAC Entities, such Settlement Share shall be distributed to intercompany creditors as Net Cash Balance Payments, in each case in full satisfaction of such Non-Filed Entity's rights to the Sale Proceeds. Some of those Settlement Shares distributed as Net Cash Balance Payments shall be received by NNI as well as certain EMEA Debtors in full or partial satisfaction of certain intercompany liabilities that were scheduled under the ARA.

- Mutual Release.  The Non-Filed Entity Settlement Agreement provides for the mutual release of all claims and obligations arising prior to the date of the Non-Filed Entity Settlement Agreement among each of the Non-Filed Entities *inter se* and between each of the Non-Filed Entities and each of the other Parties to the Non-Filed Entity Settlement Agreement, including, but not limited to, all claims of the Non-Filed Entities to the Sale Proceeds or proceeds of any other Nortel asset sale, with the exception of certain surviving obligations including: (i) scheduled intercompany liabilities as of September 30, 2011, as may be reduced by subsequent payments (the "Surviving Intercompany Amounts"), (ii) intercompany obligations arising in the ordinary course of business through the trading of goods or the provision of services occurring on or after October 1, 2011, (iii) obligations arising under the ARA that are not otherwise terminated by the Non-Filed Entity Settlement Agreement and (iv) obligations arising under the Non-Filed Entity Settlement Agreement itself.  In addition, claims between the Debtors and the US Subsidiary Non-Filed Entities are carved-out from the release.  The Surviving Intercompany Amounts, as reduced in whole or in part by the Net Cash Balance Payments and any other payments made since September 30, 2011, shall supersede the amounts of any claims or schedules filed in the chapter 11 cases, CCAA Proceedings,

---

[9]      To the extent that there are inconsistencies between the summary description of the Non-Filed Entity Settlement Agreement contained herein and the terms and conditions of the Non-Filed Entity Settlement Agreement attached hereto as Exhibit B, the terms and conditions of the Non-Filed Entity Settlement Agreement shall control.

EMEA Proceedings, and NNSA Secondary Proceedings, and shall be deemed allowed in those proceedings in such amounts.

- <u>Escrow Amendments.</u>  In consideration for and as a condition to the release of the Settlement Payments and the effectiveness of the mutual release, the Non-Filed Entities shall execute and deliver amendments to each Escrow Agreement (substantially in the forms attached as Appendix E to the Non-Filed Entity Settlement Agreement, the "<u>Escrow Amendments</u>") to which they are a party.  The Escrow Amendments shall remove any reference to any of the Non-Filed Entities as Depositors, terminating all rights of the Non-Filed Entities under such Agreement, including any entitlement to remaining Sale Proceeds covered under such Escrow Agreement.

- <u>Acknowledgment Regarding Certain ARA Obligations.</u>  Upon transmission of the Settlement Shares, those Parties that are parties to the ARA will acknowledge and agree that the APAC Debtors have fully satisfied their obligations under Sections 10 and 11 of the ARA and that (i) such APAC Debtors shall have no further obligations under Sections 10 and 11 of the ARA, (ii) the obligations of such APAC Debtors to provide security interests in Collateral (as defined in the ARA) in accordance with Section 13(c) of the ARA shall be terminated and be of no further force and effect and (iii) those agreements providing for such security interests shall in each case be terminated and be of no further force and effect, and any and all security interests or liens on Collateral (as defined in the ARA) pledged or granted thereunder shall be released (the "<u>ARA Acknowledgment</u>").

- <u>Conditions to Effectiveness.</u>  The Debtors' participation in the Non-Filed Entity Settlement Agreement is subject to the approval of this Court.  The Canadian Debtors' participation in the Non-Filed Entity Settlement Agreement is subject to the approval of the Canadian Court.  The Canadian Debtors are seeking these respective approvals in a Joint Hearing conducted pursuant to that certain Cross-Border Insolvency Protocol approved by this Court pursuant to Section 105(a) of the Bankruptcy Code in an order dated January 15, 2009 and by the Canadian Court pursuant to an order dated January 14, 2009, as amended from time to time.

19.    The Non-Filed Entity Settlement Agreement represents an important step forward in the ultimate allocation of proceeds of the Sale Transactions and winding-down of the various Nortel estates.  By facilitating the timely and final payment of the Sale Proceeds to the Non-Filed Entities and crystallizing the intercompany balances between the Non-Filed Entities and the other Parties, the Non-Filed Entity Settlement Agreement removes a substantial barrier to the liquidation of the Non-Filed Entities and minimizes any risks to the larger allocation negotiations posed by those liquidations.  The mutual release of claims and the settlement of the Non-Filed

Entities' intercompany balances also simplify the process of settling intercompany claims for the Debtors and the other Parties.  Furthermore, by dramatically reducing the number of parties to the Escrow Agreements and entities entitled to proceeds from the Sale Transactions, the Non-Filed Entity Settlement Agreement simplifies the process for future cash distributions from the Escrow Accounts and will allow the remaining allocation parties to focus on the issues remaining among the Debtors, Canadian Debtors, EMEA Debtors and EMEA Liquidation Debtors.

## Basis for Relief

A.      **Entry into the Non-Filed Entity Settlement Agreement Is a Product of the Debtors' Reasonable Business Judgment**

20.      The Debtors submit that the relief requested herein is reasonable and necessary under the circumstances and justified by applicable law.

21.      The relief requested by the Debtors is authorized by sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.  Section 105(a) of the Bankruptcy Code provides that '[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section 363(b)(1) of the Bankruptcy Code provides that, after notice and a hearing, the trustee "may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1). The use or transfer of estate property under this provision must be supported by a sound business purpose.  Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Decora Indus., Inc., No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 152-53 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991); Travelers Cas. & Sur. Co. v. Future Claimants Representative, No. 07-2785 (FLW), 2008 WL 821088, at *4 (D.N.J. Mar. 25, 2008).

A court determining whether a sound business purpose justifies the transaction "should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." In re Montgomery Ward Holding Corp., 242 B.R. at 153-54 & n.1 (citing In re Lionel Corp., 722 F.2d at 1071). In addition, a Debtor must show that the transaction has been proposed in good faith, that adequate and reasonable notice has been provided and that it is receiving fair and reasonable value in exchange. See In re Decora Industries, Inc., 2002 WL 32332749, at *2; In re Delaware & Hudson Ry. Co., 124 B.R. at 176.

   22.  Bankruptcy Rule 9019 provides, in pertinent part, that, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019. Citing this authority, the Third Circuit has emphasized that "[c]ompromises are favored in bankruptcy." Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)); see also In re World Health Alternatives, Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006) (finding settlements "generally favored in bankruptcy"). Additionally, the Third Circuit has recognized that "[i]n administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts." In re Penn Cent. Transp. Co., 596 F.2d 1102, 1113 (3d Cir. 1979) (quoting Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968)). And courts in this District have recognized that the approval of a proposed compromise and settlement is committed to the sound discretion of the bankruptcy court. See, e.g., In re Coram Healthcare Corp., 315 B.R. 321, 329 (Bankr. D. Del. 2004).

23.     Before approving a settlement under Bankruptcy Rule 9019, a court must
determine whether "the compromise is fair, reasonable, and in the interest of the estate." In re
Marvel Entm't Gp., Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's, Inc., 211
B.R. 798, 801 (D. Del. 1997)).  Basic to the process of evaluating proposed settlements is "the
need to compare the terms of the compromise with the likely rewards of litigation." Protective
Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25
(1968).  The court need not be convinced that the settlement is the best possible compromise in
order to approve it. In re Coram Healthcare Corp., 315 B.R. at 330.  Rather, the court's
obligation is to "canvass the issues and see whether the settlement falls below the lowest point in
the range of reasonableness." Travelers Cas. & Sur. Co. v. Future Claimants Representative,
Civil Action No. 07-2785, 2008 WL 821088, at *5 (D.N.J. Mar. 25, 2008) (citing Matter of
Jasmine, Ltd., 258 B.R. 119 (D.N.J. 2000)); see also In re Coram Healthcare Corp., 315 B.R. at
330.  The Third Circuit has set out four criteria for a bankruptcy court to consider when
evaluating a settlement proposal (the "Martin Factors"): "(1) the probability of success in
litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved,
and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest
of the creditors." In re Martin, 91 F.3d at 393 (citing In re Neshaminy Office Bldg. Assocs., 62
B.R. 798, 803 (E.D. Pa. 1986)); see also Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.),
283 F.3d 159, 165 (3d Cir. 2002); In re eToys, Inc., 331 B.R. 176, 198 (Bankr. D. Del. 2005).

24.     The Debtors respectfully submit that the Non-Filed Entity Settlement Agreement
meets each of the requirements under section 363 of the Bankruptcy Code and Bankruptcy Rule
9019.  The Non-Filed Entity Settlement Agreement is proposed as a good faith means to mitigate
risks regarding the settlement of claims held by the Non-Filed Entities and final satisfaction of

14

the Non-Filed Entities' rights, if any, to the Sale Proceeds, and to facilitate the orderly wind-down of the Non-Filed Entities, including the US Subsidiary Non-Filed Entities. The Debtors also believe that the value that is proposed to be paid to the Non-Filed Entities is reasonable, in light of the various claims made, the complexity of the larger allocation dispute and the costs of further negotiation or litigation, to resolve the allocation claims of the Non-Filed Entities.[10]

25.    The Non-Filed Entity Settlement Agreement is proposed as a good faith means to avoid the potential cost and delay of litigation relating to the claims between the Non-Filed Entities and the other Parties as well as the Non-Filed Entities' rights to the Sale Proceeds. The settlement and removal of the Non-Filed Entities from the Escrow Agreements will simplify the process of negotiating a final settlement of the Debtors' entitlements to those proceeds and the handling of future disbursements of proceeds from the Escrow Accounts by removing twenty-three Non-Filed Entities from those discussions. It will also avoid litigation over the Non-Filed Entities' entitlement to those proceeds. Furthermore, under the Non-Filed Entity Settlement Agreement, NNI and its wholly-owned subsidiary NN Japan will be the recipients of over $12 million in aggregate Net Cash Balance Payments from APAC Debtors. In addition, Non-Filed Entity Settlement Agreement, by settling outstanding intercompany claims arising among the Non-Filed Entities *inter se* and those claims between the Non-Filed Entities and the other Parties, will avoid potential lengthy and costly litigation regarding those claims, which will facilitate the wind-down of the Non-Filed Entities as well as the administration of claims in the proceedings of the US Debtors and other Parties. Finally, the settlement of the US Subsidiary Non-Filed

---

[10]    As set forth in the Non-Filed Entity Settlement Agreement, the Parties (other than the Non-Filed Entities) expressly reserve all rights to present any arguments, methodologies, legal or factual theories in support of any subsequent allocation of the Sale Proceeds, acknowledge that nothing in the Non-Filed Entity Settlement Agreement shall constitute a waiver, modification or amendment of the rights of any Parties (other than the Non-Filed Entities) with respect to the allocation of the Sale Proceeds and agree that no Party shall use the Non-Filed Entity Settlement Agreement as evidence to support its right to a particular allocation of the remaining Sale Proceeds or any other sale proceeds.

Entities' claims to the Sale Proceeds, as well as the settlement of various other intercompany claims by or against the US Subsidiary Non-Filed Entities, will permit those entities to commence liquidation, thus assisting in the winding down of the Debtors' estates and the disposal of its assets.

26.     The Debtors have consulted with the Committee, which is a Party to the Non-Filed Entity Settlement Agreement, on the negotiation and entry into the Non-Filed Entity Settlement Agreement.  They have also consulted with the Bondholder Group and received its prior written consent to and approval of certain provisions of the Non-Filed Entity Settlement Agreement, including the ARA Acknowledgment and the Debtors' execution and delivery of the Escrow Amendments and the Payment Instructions.  Accordingly, the Debtors submit that the Non-Filed Entity Settlement Agreement is in the best interests of the Debtors, their estates and their creditors and therefore should be approved by the Court.

**B.      Waiver of Automatic Fourteen-Day Stay Under Bankruptcy Rule 6004(h)**

27.     Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order. The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

28.     Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, commentators agree that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure.  See generally 10 Collier on Bankruptcy ¶ 6004.11 (16th ed. 2012).  Furthermore, if an objection is

filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. <u>Id.</u>

29.      The Parties have requested that the Payment Instructions and Escrow Amendments be executed and delivered promptly after all closing conditions have been met, given the multitude of the Parties and the US Subsidiary Non-Filed Entities' desire to settle their outstanding rights and obligations as soon as possible so that they may commence their liquidation and dissolution.  Both the Bondholder Group and Committee have reviewed and approved the Non-Filed Entity Settlement Agreement.  Thus, waiver of any applicable stays is appropriate in this circumstance.

## Notice

30.      Notice of the Motion has been given via first class mail to (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) counsel to the other Parties; (v) JPMorgan Chase Bank, NA as Distribution Agent; and (vi) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

31.      No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  June 20, 2012
         Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*