## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| NORTEL NETWORKS, INC., *et al.* | ) | Case No. 09-10138 (KG) |
|  | ) | Jointly Administered |
| Debtors | ) |  |
|  | ) | **RE:  D.I. 7876** |
|  | ) |  |

### OBJECTION OF ROBERT HORNE, MASON JAMES YOUNG, ELLEN BOVARNICK, CHARLA CRISLER, BART KOHNHORST, BRIAN PAGE, BENJAMIN WARREN, AND THE AD HOC GROUP OF BENEFICIARIES OF THE NORTEL NETWORKS U.S. DEFERRED COMPENSATION PLAN TO DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT PROCEDURES TO RESOLVE CLAIMS OF BENEFICIARIES OF THE NORTEL NETWORKS U.S. DEFERRED COMPENSATION PLAN

Robert Horne ("Horne"), Mason James Young ("Young"), Ellen Bovarnick ("Bovarnick"), Charla Crisler ("Crisler"), Bart Kohnhorst (Kohnhorst"), Brian Page ("Page"), Benjamin Warren ("Warren"), individually and collectively as the steering committee of the Ad Hoc Group defined below, and the Ad Hoc Group of Beneficiaries of the Nortel Networks U.S. Deferred Compensation Plan (the "Ad Hoc Group"), for themselves and all other similarly situated participants in or beneficiaries of the Nortel Networks U.S. Deferred Compensation Plan (collectively, the "Beneficiaries"), by and through their undersigned counsel, hereby object to the Debtors' Motion for Entry of an Order Approving Settlement Procedures to Resolve Claims of Beneficiaries of the Nortel Networks U.S. Deferred Compensation Plan [D.I. 7876](the "Motion").  In further support of this Opposition, the Beneficiaries respectfully state as follows:

1

**Preliminary Statement**

1.      Ignoring their ethical obligations under the "no-contact rule," Del. R. Prof.

Conduct 4.2, the Debtors' counsel have publicly filed and personally served the Motion,

containing the Debtors' self-described "settlement offer," on all Beneficiaries of the

Nortel Networks U.S. Deferred Compensation Plan (the "DCP"), including Beneficiaries

individually and collectively represented by Blank Rome and Bernstein Shur under

standing engagement letters long ago filed with this Court as part of the Rule 2019

Statement.  As the Debtors and their counsel were fully aware prior to filing and serving

their Motion, each member of the Ad Hoc Group, which now totals one-hundred and

eighty nine individuals, are and have been represented on all DCP-related claims by the

undersigned counsel in this matter and the related class action adversary proceeding,

styled *Robert Horne et al. v. Nortel Networks, Inc., et. al.,* Ch. 11 Case No. 09-10138-KG, Adv.

Proc. 11-45007-KG (the "Adversary Class Action").[1]

2.      The Debtors' unilateral and public offer purports to provide individuals

who "do not wish to pursue further litigation the opportunity to monetize their deferred

compensation claims[.]"  Motion at ¶7.  As reflected in the Motion, by virtue of the

proposed "settlement procedures," the Debtors seek not only to eliminate further

involvement of opposing counsel in violation of Rule 4.2, but also this Court, requesting

authority to "settle *any* Beneficiary's claims that are related to the Plan or Trust…and

without the need for further notice or Court Order."  Motion at ¶17 (emphasis added).

The "offer" is directed to <u>all</u> Beneficiaries, and no attempt is made to distinguish between

---

[1] Coincidentally, the Motion was filed by the Debtors shortly after the Court, in connection with related pleadings in the Chapter 15 case, announced its desire to try the Adversary Class Action in September 2012.

136316.01600/40202057v.1

represented members of the Ad Hoc Group, the clients of Blank Rome and Bernstein Shur, and other members of the putative class.

3.     The Debtors' direct settlement offer is an egregious end-run around known and established attorney-client relationships that exist between each of the members of the Ad Hoc Group and their counsel, as well as an attack on this Court's authority to protect the other members of the proposed class pending class certification.  The Debtors did not request, nor did the Ad Hoc Group's counsel provide, any consent for the Debtors to engage in direct communications with the Ad Hoc Group members concerning settlement of their pending claims.  Such contacts with represented parties are wholly inappropriate and are clearly foreclosed under Del. R. Prof. Conduct 4.2.

4.     Apart from the ethical impropriety of serving a pleading and sending a settlement communication directly to represented parties in the first instance, the wrongful nature of the Debtors' settlement offer was compounded by the fact that it is materially misleading to all its intended recipients.

5.     Among other things, the Debtors' offer is entirely illusory in nature, only providing Beneficiaries with what they would receive in a worst-case scenario and without further action:  an unsecured claim equal to their nominal DCP account balance as of the Petition Date.[2]  The Motion also misleadingly suggests that the Debtors' aggregate offer to the Beneficiaries of $27.9 Million is the most favorable means of monetizing their DCP claims, while carefully avoiding disclosure that in the aggregate, the Beneficiaries' DCP accounts held in trust totaled more than $37.9 Million as of December 31, 2010, and that the current balance in the trust should be higher today.  The

---

[2] Capitalized terms used but defined herein shall have the same meanings ascribed to such terms in the Motion.

Motion fails to mention the Ad Hoc Group's contention, amply supported by discovery that the Debtors will not make public, that the Beneficiaries have an ownership interest in all of these trust funds.

6.      The Motion invites all Beneficiaries to "quickly" monetize their DCP claims based on Petition Date valuations, while portraying the Adversary Class Action as nothing more than a time-consuming impediment to settlement.  However, the Debtors studiously avoid any disclosure of the nature of the claims asserted in the Adversary Class Action, or that the Adversary Class Action seeks to recover, on behalf of all Beneficiaries, all of the DCP assets that are currently being held in trust, including the not less than $10 million difference that the Debtors prejudicially failed to disclose to Beneficiaries in their direct settlement offer.

7.      Moreover, unless the Debtors waive all protections as to the confidentiality of discovery, prior mediation statements and settlement discussions, the Beneficiaries will never possess the information necessary to make an informed judgment about a settlement offer outside of the class action process conducted by the Ad Hoc Group and its counsel.  As the Court is aware, most of the documents produced by the Debtors are marked "confidential" or "attorneys eyes only" and can only be reviewed by counsel to the Ad Hoc Group.  [D.I. 5689, 5631, 5866, 6370].  Counsel for the Ad Hoc Group believes those documents establish that the DCP is not a top-hat plan and that the Beneficiaries will prevail in the Adversary Class Action.  However, the basis for that position cannot be revealed pending further order of the Court.  Moreover, counsel to the Ad Hoc Group cannot reveal the mediation statements, the offers, and counteroffers made at mediation, or other settlement discussions.  Thus, the Beneficiaries will not know if the

4

"offer" in the Motion represents the best offer made to date, or whether other, superior offers have been made. These deficiencies cannot be cured by selectively posting pleadings on the Debtors' website, as the Debtors propose.

8.      In sum, the Debtors' direct communications with the Ad Hoc Group members violate Rule 4.2 and, to the extent directed at both the Ad Hoc Group and other members of the putative class, are otherwise improper insofar as they are misleading, incomplete, seek improperly to influence class members' decisions to participate in the Adversary Class Action, and otherwise undermine the integrity of the class action process. Damage has already been done by the service of this Motion, in that the Motion has created, at best, confusion among the Beneficiaries as to their legal rights and options. Accordingly, this Court should reject the Motion in its entirety, order the Debtors to issue a curative communication to be sent to the Beneficiaries to counteract the Debtors' misleading statements, and prohibit the Debtors (or their agents) from engaging in any further direct contact with members of the Ad Hoc Group and the members of the putative class proposed in the Adversary Class Action.[3]

**Factual And Procedural Background**

**A.    The Turnover Motion And Ad Hoc Group Members' Objections**

9.      The Beneficiaries are participants in and/or beneficiaries of the Nortel DCP. On December 22, 2010, the Debtors filed a "Motion for an Order Pursuant to 11 U.S.C. §§ 105, 541, 542 and 543 and Bankruptcy Rule 9019 (I) Approving the Stipulation By and Between NNI and U.S. Bank National Association, (II) Directing U.S. Bank National Association to Turn Over Property to NNI, and (III) Granting Related Relief Related to the Nortel Networks U.S. Deferred

---

[3] Under existing orders of the Court, the Beneficiaries' motion to certify the class in the Adversary Class Action will be filed on July 9, 2012. But for the Debtors' requests to put off its filing, the motion would have been filed and the class certified long ago.

Compensation Plan" (the "Turnover Motion"). [D.I. 4638].  The Turnover Motion sought, among other things, the turnover of the funds that are currently held in a trust by US Bank (the "Rabbi Trust") for the Beneficiaries of the DCP.

10.    The Turnover Motion represented that the amount of the funds held in the Rabbi Trust as of the date of the Turnover Motion was $37.9 Million [D.I. 4638 at ¶20].  In the Turnover Motion, the Debtors further asserted that the Nortel DCP qualifies as a "top hat" plan that is exempt from the Employee Retirement Income Security Act ("ERISA") and should be made available to satisfy the claims of the creditors of the Debtors, to the exclusion and detriment of the Beneficiaries.  *Id*.

11.    Individual members of the Ad Hoc Group, as well as the Ad Hoc Group collectively (by and through its undersigned counsel), filed objections to the Turnover Motion. These objections asserted, among other things, that the assets in the Rabbi Trust should not be surrendered to the Debtors' estates  because, among other reasons, (i) the DCP failed to comply with all of the "top hat" requirements needed for exemption from ERISA, including failure to limit participation to a select group of management or highly compensated employees; and (ii) the Debtors failed to meet the conditions for turnover of DCP assets under the Rabbi Trust Agreement, mandating that such assets must be held in trust for the exclusive benefit of the Beneficiaries.  [*See* D.I. 4897 and related entries].

**B.    The Rule 2019 Statement Of The Ad Hoc Committee's Counsel**

12.    The Debtors have been fully aware for over a year that the individual members of the Ad Hoc Group and the Ad Hoc Group itself retained the undersigned counsel to represent them in this matter.  On March 2, 2011, counsel for the Ad Hoc Committee filed a Rule 2019 Statement in this proceeding at the specific request of the Debtors.  *See* Verified Statement of

6

Blank Rome and Bernstein, Shur, Sawyer & Nelson Pursuant to Bankruptcy Rule 2019, a copy of which is attached hereto as **Exhibit 1**, at ¶4 (the "Rule 2019 Statement"). The Rule 2019 Statement makes clear that "Counsel has been or will be retained by each member of the [Ad Hoc] Group." *Id.* at ¶5.

13.    The Rule 2019 Statement also included as Exhibits the engagement letter for the Ad Hoc Group's counsel (with payment terms redacted), as well as a list of the one hundred thirty-seven members of the Ad Hoc Group who had signed the engagement letter (out of the total of one-hundred seventy one members of the Ad Hoc Group). Since the filing of the Rule 2019 Statement, membership in the Ad Hoc Group has grown to one hundred eighty-nine individual members, all of whom have contributed to the fees and expenses of counsel and one hundred sixty-six of whom have provided signed engagement letters. *See* **Exhibit 2** attached hereto (signature pages for Ad Hoc Group members).[4]

## C.    Litigation Of The Turnover Motion And Commencement Of The Adversary Class Action

14.    In response to the Ad Hoc Committee members' objections to the Turnover Motion, this Court granted leave for the Ad Hoc Group to conduct discovery in relation to the Nortel DCP and the basis, if any, for the relief requested by the Debtors in the Turnover Motion. It is the Debtors' evidentiary and legal burden to prove each of the required elements necessary to establish the existence of a top hat plan. In re New Century Holdings, Inc., 387 B.R. 95, 110 (Bankr. D. Del. 2008).

15.    As the Court is aware, most of the material discovery in the case has been marked "confidential" or "attorneys eyes only." *See* Agreed to Protective Order Between the Debtors

---

[4] Counsel to the Ad Hoc Group expects that it will receive signed engagement letters from the outstanding twenty-three members of the Ad Hoc Group.

and Certain Beneficiaries of the Nortel Networks U.S. Deferred Compensation Plan [D.I. 5689];
Motion to Compel Discovery from the Nortel Debtors [D.I. 5631]. Accordingly, it has not been,
and cannot be, shared with all of the Beneficiaries, including most members of the Ad Hoc
Group.

16. Concurrently with discovery, Ad Hoc Group members and the Debtors engaged
in confidential mediation on August 18, 2011. Confidential mediation statements were
exchanged as part of that process. Despite reasonable efforts, the parties were unable at
that time to come to terms on a full, final, and fair resolution of their dispute.

17. On December 23, 2011, following counsel's review and analysis of documents
produced by the Debtors in discovery, Horne, Young, Bovarnick, Crisler, Kohnhorst, Page, and
Warren (collectively, the "Individual Class Action Plaintiffs") and the Ad Hoc Group (the
Individual Class Action Plaintiffs and the Ad Hoc Group, collectively, the "Adversary Class
Action Plaintiffs"), on their own behalf and on behalf of all similarly situated participants in or
beneficiaries of the Nortel DCP, filed their Complaint in the Adversary Class Action. *See*
Adversary Class Action Complaint. [Adv. Proc. No. 11-540007 D.I. 1].

18. The Adversary Class Action Complaint makes clear, among other things, that (i)
the undersigned counsel presently represents the Individual Class Action Plaintiffs and the other
members of the Ad Hoc Group; and (ii) it is asserting a class action pursuant to Fed. R. Civ.
P. 23 (applicable through Fed. R. Bankr. P. 7023) to protect the interests of all Beneficiaries
in relation to all of the DCP assets held in trust. Attached as Exhibit A to the Adversary Class
Action Complaint is a then-current list of the all of the members Ad Hoc Group. [Adv. Proc. No.
11-540007 D.I. 1 at Exhibit A thereto].

19. As reflected in the Adversary Class Action Complaint, the Adversary Class

8

Action Plaintiffs maintain that the Nortel DCP is not, and never was, a "top hat" plan that was exempt from the substantive provisions of ERISA, mandating exclusion of DCP assets from the Debtors' bankruptcy estates.  Among other things, the Adversary Class Action Complaint avers that the DCP fails to meet the requirements of a top hat plan because:

(i)  In some or all of the Plan Years, substantial numbers of employees did not meet the Debtors' targeted compensation threshold for participation in the DCP, but were nevertheless deemed eligible to participate in the DCP;

(ii)  In some or all of the Plan Years, the actual compensation earned by a substantial number of Eligible Employees fell well short of the respective targeted compensation threshold for participation in the DCP;

(iii)  In some or all of the Plan Years, a significant proportion of employees who were neither "key management," nor "highly compensated" were still eligible for and invited to participate in the DCP;

(iv)  In some or all of the Plan Years, the percentage of Eligible Employees as compared to the total employee population was so high as to render the population of Eligible Employees not a "select group";

(v)  In some or all of the Plan Years, employees who were not employed by the "Employer" as defined in the DCP were, nevertheless, permitted to participate in the DCP;

(vi)  In some or all of the Plan Years, there was no well-established basis for determining which employees comprised a select group of highly compensated employees.  Rather, the DCP Committee reverse-engineered the eligibility criteria in order to attempt to have the number of eligible employees meet a specific target percentage relative to the total employee population;

(vii)  In all of the Plan Years, the pool of Eligible Employees was not distinguished in any meaningful way from the rest of the employee population, and therefore not a "select group."

[Adversary Class Action Complaint, D.I. 1, at ¶¶ 53-99].

20.    The Ad Hoc Group contends that these factual allegations are supported by current discovery.  In fact, the Ad Hoc Group would like to pursue a motion for summary judgment, and would ask the Court, as part of that process, for leave to file confidential and

"attorneys eyes only" documents as part of that process.

21.     On May 15, 2012, the Adversary Class Action Plaintiffs and the Debtors again met for confidential settlement negotiations seeking resolution of their dispute. Progress was made, but again the parties failed to reach agreement.

22.     On June 11, 2012, counsel to the Ad Hoc Group and the Debtors, among others, appeared before the Court in the related Chapter 15 case.  At the time, the Ad Hoc Group agreed, as it had previously, to postpone the answer deadline and the filing of the motion for class certification until the issue of whether or not the Canadian stay applied to the individual defendants was resolved or such defendants were dismissed from the Adversary Class Action.  At that hearing, the Court also expressed its desire to conduct a trial on the merits of the Adversary Class Action in September 2012.  The Debtors did not mention their intent to file the Motion.

23.     On or about June 19, 2012, the Court entered its amended scheduling order in the Adversary Class Action [D.I. 34], as well as its order in the Chapter 15 case [Case No. 09-10164, D.I. 505].   Since the Ad Hoc Group filed its notice voluntarily dismissing the individual defendants in the Adversary Class Action without prejudice on June 25, 2012, the motion for class certification in the Adversary Class Action can be filed as early as July 9, 2012.

**D.     Direct Communication Of The Debtors' Settlement Offer To The Beneficiaries**

24.     Shortly after the entry of the amended scheduling order, on June 20, 2012, the Debtors, without prior notice to the undersigned counsel, inexplicably filed and personally served the Motion on <u>all</u> Beneficiaries, unilaterally seeking authority to engage in direct settlement communications to resolve "<u>any</u> Beneficiary's claims that are

related to the Plan or the Trust[,]…without need for further notice or Court order." Motion at ¶16 (emphasis added). Significantly, the Debtors directly served the Motion and related Notice <u>on each of the represented members of the Ad Hoc Group,without obtaining prior consent of counsel for the Adversary Class Action Plaintiffs</u>. *See* **Exhibit 3** attached hereto [D.I. 7093].

25.     In the wake of the Debtors' unilateral filing and personal service of the Motion, the Individual Class Action Plaintiffs have received inquiries from other members of the Ad Hoc Group, which inquiries reveal substantial confusion engendered in the minds of the Beneficiaries by the Motion. Attached hereto as **Exhibit 4** are copies of several emails sent from members of the Ad Hoc Group to certain Individual Class Action Plaintiffs.

26.     The confusion experienced by these Ad Hoc Group members -- and likely many other Beneficiaries -- includes the incorrect perception that (i) "the Ad Hoc groups lawyers petitions ect [*sic*] are getting in the way of the these funds being paid"; (ii) the settlement offer "apparently outlines a 100% settlement offer"; and (iii) "it seems that a judge has made a decision affecting our claim." *See* **Exhibit 4**. Confusion exists for at least one Ad Hoc Group member because the motion "is written in incomprehensible legalese." *Id.* at p. 1.

27.     Other forms of widespread confusion among the Beneficiaries are nearly inevitable inasmuch as the Debtors' suggest that the aggregate settlement offer of $27.9 Million in DCP funds, valued as of the Petition Date, represents the "proper valuation" of the claims asserted in the Adversary Class Action. Motion at ¶15. The Debtors' Motion does not reference or address the $10 Million difference between their $27.9 Million direct "settlement offer" and the $37.9 Million in DCP funds they have previously

11

acknowledged as being held in trust as of the date of the Turnover Motion, or the greater likely current difference. *Compare* Turnover Motion, at ¶20 [D.I. 4638] and Motion at ¶10. The Debtors' Motion not only fails to acknowledge that their aggregate settlement offer is at least $10 Million less than the total amount of DCP assets held in trust, but also fails to disclose the Adversary Class Action Plaintiffs' long-standing position that the Beneficiaries, and not the Debtors, should be entitled to <u>all</u> DCP assets held in trust, including any gains on such assets after the Petition Date. Moreover, the Motion does not state that the Debtors' "settlement offer" merely proposes an allowed claim – and not a payment – despite the fact that all Beneficiaries <u>already have</u> an allowed claim. The only way for a Beneficiary to "monetize" such a claim would be to sell it at a substantial discount, a fact not noted in the Motion.

## <u>Argument</u>

### A.   **This Court Should Reject The Motion And Its Proposed Settlement Procedures Based On The Violation of  Del. R. Prof. Conduct 4.2**

28.    Del. R. Prof. Conduct. 4.2 provides that:

RULE 4.2 COMMUNICATION WITH PERSON
REPRESENTED BY COUNSEL

In representing a client, a lawyer shall not communicate about the
subject of the representation with a person the lawyer knows to be
represented by another lawyer in the matter, unless the lawyer has
the consent of the other lawyer or is authorized to do so by law or a
court order.

Del. R. Prof. Conduct. 4.2.[5]

29.    The Debtors' counsel have violated the "no-contact rule," Del. R. Prof.

---

[5] N.Y. R. Prof. Conduct 4.2 is substantially identical, providing that "[i]n representing a client, a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the other lawyer or is authorized to do so by law."

Conduct 4.2, by publicly filing the Motion setting forth their settlement proposal and then personally serving the Motion on all of the Beneficiaries, including each represented member of the Ad Hoc Group, all of whom are known by the Debtors to be represented by the undersigned counsel.

30.    Rule 4.2 means what it says: direct communication by counsel to a represented adverse party regarding the matter, without the consent of counsel for the represented party, is prohibited. *See* ABA Comm. on Ethics and Professional Responsibility, Informal Op. 83–1498 (1983) (no-contact prohibition is necessary to preserve the proper functioning of attorney-client relationship and to shield party from improper approaches). Direct contact is prohibited even if the represented client attempts to initiate the contact. *See also* Del. R. Prof. Conduct 4.2; Comment 3 (noting that Rule 4.2 applies even if the represented person initiates or consents to the communication).

31.    Rule 4.2 prohibits tendering a settlement offer to a represented party even where the offeror believes opposing counsel has failed to transmit the offer.   ABA Comm. On Ethics and Professional Responsibility, Formal OP. 92-362 (1992); ABA – BNA – MOPC 92; 362; 20XX WL 1971327 (ABA/BNA)(describing clear prohibition on mentioning settlement to a represented party).   *See also*, <u>Jackson v. BellSouth Communications</u>, 372 F. 3d 1250, 1273 (11th Cir. 2004)(noting that service of settlement offer by defendants on represented plaintiffs would violate Rule 4.2); Alaska Bar Ass'n, Ethics Comm. Op. 94-1 (Jan 1, 1994) (providing that Rule 4.2 barred lawyer for litigant against government agency from presenting the litigant's settlement position to the agency's managing board, absent specific authorization by law or consent of agency's counsel, even if the settlement offers on behalf of the litigant may not have been adequately communicated to the

13

board);  Rhode Island Eth. Adv. Panel, Op. 94-81 (Feb. 9, 1995) (even if lawyer suspects that opposing counsel did not fully communicate settlement offers to the client, Rule 4.2 prohibits lawyer from direct communication with inside counsel for opposing party absent consent of opposing counsel).[6]

32.      Similarly, direct service of pleadings on an opposing party after the retention of counsel violates Rule 4.2 and its analogues.  *See* In re Grand Union Co., 204 B.R. 864, 875-76 (Bankr. D. Del. 1997) (explaining that serving a bar-date notice directly on the client, rather than counsel, "violates the spirit, if not the letter, of Rule 4.2 of the Model Rules of Professional Conduct[,]"  and noting the no-contact rule's purpose of "preventing lawyers from taking advantage of uncounselled lay persons and to preserve the integrity of the lawyer-client relationship"); Cooky's Island Steak Pub, Inc. v. Yorkville Elec. Co., 130 Mis.2d 869, 870 (N.Y. Sup. Ct. 1986) (holding that direct service of a pleading on a defendant, rather than counsel, was improper and otherwise may violate D.R.7-104, which like Rule 4.2, prohibits communications with adverse parties known to be represented by an attorney).

33.      Neither the Debtors nor their counsel can credibly argue that they were unaware that the members of the Ad Hoc Group were represented in this matter and in the Adversary Class Action by their undersigned counsel.  The Rule 2019 Statement and the Adversary Class Action Complaint, as well as the supporting exhibits for these filings, make that point crystal clear.

34.      Yet, despite having actual knowledge that the members of the Ad Hoc

---

[6] Courts have not hesitated to find that Rule 4.2's no-contact rule applies to settlement offers made to represented parties in a class action. *See* Stratton v. Am. Indep. Ins. Co., CIVA 08C12012JRSCCLD, 2011 WL 2083933 (Del. Super. May 11, 2011) (holding that class action defendant's bypassing attorney by transmitting settlement check to "pick off" class representative to destroy standing arguably violated Del. R. Prof. Conduct. 4.2, but noting that there was no evidence that counsel was involved in the decision to directly contact the class representative);  Blanchard v. EdgeMark Financial Corp., 175 F.R.D. 293 (N.D. Ill. 1997) (holding that defense counsel violated Rule 4.2 by directly negotiating a settlement with class representative without consent of class counsel).

14

Group were represented by the undersigned counsel, the Debtors, through their counsel, publicly filed and then personally served the Motion and its related Notice on each of the Beneficiaries, including each member of the Ad Hoc Group.  *See* **Exhibit 3** (Debtors' Affidavit of Service for the Motion).

35.     In these circumstances, this Court should not hesitate to deny the Motion, order a curative communication, and enjoin Debtors' counsel from any further contact with any member of the Ad Hoc Group.

**B.    This Court Should Exercise Its Authority Under Rule 23(d) To Limit Further Communications From The Debtors To The Beneficiaries Because Of The Improper Service Of The Motion And Because The Debtors' Direct "Settlement Offer" Is Materially Misleading And Highly Prejudicial To The Integrity Of The Adversary Class Action**

36.     In addition to Rule 4.2, Fed. R. Civ. P. 23(d), made applicable to this proceeding pursuant to Fed. R. Bankr. P. 7023, provides this Court with ample authority to impose appropriate limitations on pre-class-certification contacts between defense counsel and members of the putative class in order to protect the interests of class members and the integrity of the class action.  *See* Fed. R. Civ. P. 23(d) (providing that the court may issue orders "to protect class members and fairly conduct the action").  "The Court's primary purpose in supervising communications is…to ensure that potential class members receive accurate and impartial information regarding the status, purposes and effects of the class action."  Hinds County Miss. v. Wachovia Bank, N.A., 790 F.Supp.2d 125, 134 (S.D.N.Y. 2011) (citation omitted).

37.     Addressing pre-certification communications between counsel and unrepresented putative class members, the United States Supreme Court has stated that "[b]ecause of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties."

15

Gulf Oil Co. v. Bernard, 452 U.S. 89, 100 (1981).[7]  In this respect, "courts have a responsibility to restrict communications, including offers of settlement, that are potentially coercive or misleading." Wu v. Pearson Edu., Inc., 2011 WL 2314778, at *6 (S.D.N.Y. June 7, 2011).

38.     Rule 23(d) orders are properly issued to limit pre-class certification contacts between defense counsel and putative class members that are aimed at improperly influencing potential class members' decision to participate in the litigation or at undermining class plaintiffs' cooperation with or confidence in class counsel.  For example, in Turner v. Bernstein, 768 A.2d 24 (Del. Ch. 2000), the Court addressed a situation where putative class members were unilaterally solicited to sign away their rights in advance of any receipt of a court-approved notice addressed to the class action. *Id.* at 28-29.  Through such unsupervised contacts, defense counsel was able to obtain a number of releases and affidavits from settling putative class members seeking to oppose certification. *Id.*  However, the Court refused to accept affidavits proffered by the defense that had been obtained from putative class members to oppose certification, noting that there was no basis to conclude that the affiants received a balanced rendition of their legal rights. *Id.* at 39-40.  The Turner Court declared that "'[u]nsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts without opportunity for rebuttal. The damage from misstatements could well be irreparable.'"  *Id.* At 39. (quoting Kleiner v. First Nat'l Bank, 751 F.2d. 1193, 1206-07 (11th Cir. 1985). *See also* Jenifer v. Delaware Solid Waste Authority, 1999 WL 117762, at *2 (D. Del. Feb. 25, 1999) (emphasizing

---

[7] As noted in Gulf Oil, a court's discretion to enter such orders must be exercised within the bounds of the First Amendment and the Federal Rules of Civil Procedure. *See* Gulf Oil Co., 452 U.S. at 101.  However, where, as here, there is ample evidence of materially misleading communications served in violation of applicable ethical rules, this Court may properly limit pre-certification communications in order to prevent further interference and undue confusion in this proceeding and in the Adversary Class Action. *Id.*  Included within the Court's authority is the ability to correct "communications with class members prior to certification [that] deceive or mislead class members[.]" *Id.*; *see also* Fed. R. Civ. P. 23(d).

concerns raised by communications between defendants and prospective class members and noting that "[t]his court has condemned a defendant's communications attempting to affect a class member's decision to participate in the litigation"); In re McKesson HBOC, Inc. Securities Litig., 126 F.Supp.2d 1239, 1243 (N.D.Cal.2000) (limiting pre-certification communications designed to generate opt-outs because there "is no meaningful opportunity to choose when a concerted multimedia effort is made to secure opt-out authorizations before any class is certified").

39.    Even where the actual settlement offer is not misleading, courts should prevent defendants from serving settlement offers on putative class members, or otherwise pursing direct contact for settlement purposes, where, due to protective orders and confidentiality agreements imposed at the request of the defendants, putative class members cannot access the information critical to make an informed judgment about settlement.  Addressing an attempt by a class action defendant to mail settlement letters to putative class members, the United States District Court for the Eastern District of Tennessee held as follows:

> As set forth above, plaintiffs put forth a number of arguments that the proposed communication between defendants and putative class members is abusive.  While it appears to the Court that defendants offer of settlement is neither misleading, confusing, nor coercive, a single overriding factor justifies the Magistrate Judge's order limiting communication by the defendants with putative class members.  That factor relates to whether or not the putative class members have, or can obtain, sufficient information to fairly evaluate the settlement offer.  Plaintiffs rightly argue that the protective order upon which defendants have insisted in this case shields a large volume of documents related to the issues raised by this case from public view and from the view of the putative class members.  Absent review of these documents by the putative class members and/or their independent legal counsel, these putative class members simply have no way to meaningfully evaluate the strengths and weaknesses of the claims asserted by the named plaintiffs.
> ...Likewise, counsel for the named plaintiffs, including interim lead counsel, are subject to the terms of the protective order and would be, by its terms, prohibited from discussing the content of these documents with

putative class members who contact them for information.  Thus, while on the surface of the communication it appears that the defendants are inviting dairy farmers to evaluate the settlement offers by seeking the advice of counsel, the terms of the protective order make such an invitation illusory and meaningless.  This problem is one of the defendants' own making and makes it unlikely that defendants can ever fashion an appropriate settlement offer to putative class members as long as documents crucial to a meaningful evaluation of the case are shielded from their view.  As long as the protective order continues to shield a vast volume of relevant documents from review by the members of the putative call and/or their counsel, settlement offers can only be fairly evaluated and pursued through the established mediation process already in place.

In re Southern Milk Antitrust Litigation, 2009 WL 3747130 *3 (E.D. Tenn, Nov. 3, 2009)(internal citation and footnotes omitted).  The same is true with the Motion.  All material discovery documents, as well as mediation statements and prior settlement offers, are protected by a protective order or confidentiality agreements.  Without the benefit of the information contained in these documents, The Beneficiaries, particularly those outside of the Ad Hoc Group, have no basis to make an informed judgment about settlement.  Such putative class members cannot be properly informed as to the strength of the Beneficiaries' claim to ownership of the funds in the Rabbi Trust or as to whether or not the offer in the Motion is lower than prior offers made in mediation or settlement discussions.  The circumstances - trying to tender an offer while maintaining as non-public all critical information – create a risk of serious abuse of the Beneficiaries.

40.    Where, as here, prior unauthorized and unsupervised communications are also misleading, Rule 23(d) limitations on communication are particularly warranted.  See Impervious Paint Industries v. Ashland Oil, 508 F.Supp. 720, 723 (W.D. Ky. 1981) ("In the course of [defendant's] contact of class members, the copy of the class notice was presented along with the oral legal advice which was specifically omitted from the notice prepared by the Court"); Pollar v. Judson Steel Corp., 1984 WL 161273 (N.D.Cal. Feb. 3, 1984) (finding defendant's notices

could seriously prejudice the rights of absent class members by failing to disclose material facts about the case); In re School Asbestos Litig., 842 F.2d 671, 683 (3d Cir.1988) (quoting Erhardt v. Prudential Group, Inc., 629 F.2d 843, 846 (2d Cir. 1980)) (prohibiting distribution booklet aimed at convincing class members to forego asbestos removal and holding that communications that are "factually or legally incomplete (or) lack objectivity and neutrality …will surely result in confusion and adversely affect the administration of justice.")

41.     Court-imposed limitations based on Rule 23(d) are also properly invoked where a defendant contacts putative class members solely for the purpose of altering the status of the pending litigation, such as communications aimed at reducing the scope of the class or available remedies. See In re Currency Conversion Fee Antitrust Litigation, 224 F.R.D. 555, 570 (S.D.N.Y. 2004) ("A district court may regulate communications that threaten the choice of remedies available to class members[.]");   In re School Asbestos Litig., 842 F.2d at 683 ("A district court's duty and authority under Rule 23(d) to protect the integrity of the class and the administration of justice generally is not limited only to those communications that mislead or otherwise threaten to create confusion and to influence the threshold decision whether to remain in the class.  Certainly communications that seek or threaten to influence the choice of remedies are ...within a district court's discretion to regulate."); Friedman v. Intervet Inc., 730 F. Supp. 2d 758, 765 (N.D. Ohio 2010) (quoting Burrell v. Crown Cent. Petroleum, Inc., 176 F.R.D. 239, 243 (E.D. Tex. 1997)) ("[T]he effect of a defendant attempting to influence potential plaintiffs not to join an embryonic class action would be just as damaging to the purposes of Rule 23 as a defendant that influences members of an already-certified class."); Kleiner, 751 F.2d at 1202 (citations omitted) ("When confronted with claims pressed by a plaintiff class, it is obviously in defendants' interest to diminish the size of the class and thus the range of potential liability ...

19

Such conduct reduces the effectiveness of the ... class action for no reason except to undermine the purposes of the rule.").

42.    The content of the settlement offer as set forth in the Motion is materially misleading and prejudicial to the Adversary Class Action Plaintiffs and putative class members in a number of respects.  For example, the Motion misleadingly asserts that the "Beneficiaries have no direct claim, whether by contract, or otherwise, to the DCP funds held in trust," Motion at ¶10.  Yet, the Motion fails to disclose the Ad Hoc Group's defenses raised in this matter and their claims made in the Adversary Class Action, including that the Debtors cannot meet their burden of establishing the DCP's top-hat status based on their lack of sufficient compensation data for multiple Plan Years, evidence of eligibility violations in relation to participation in the DCP, and a failure to comply with the terms of the operative Trust Agreement for the DCP.  Adversary Class Action Complaint ¶¶ 53-57; 62-65; 69-71; 76-79; 100-104.  In fact, the Ad Hoc Group believes that the Beneficiaries will be found to own the Rabbi Trust assets in their entirety, and that such a result is far more likely than the outcome suggested in the Motion.

43.    The Debtors' unilateral "settlement offer" also is entirely spurious, purporting to offer class members allowed unsecured claims based on their nominal account balances as of the Petition Date, Motion at ¶27, which allowed unsecured claims the Beneficiaries already possess. The Motion asserts that the Debtors' settlement offer provides a means of monetizing DCP claims "quickly," Motion at ¶27, and "expeditiously," *id.* at ¶17, but fails to disclose that such claims would not be paid out immediately by the Debtors, and that the only way to "monetize" such claims is to sell such claims at a substantial discount, and, in the case of the Ad Hoc Group members, to be further reduced by contingent fees due to counsel to the Ad Hoc Group.

20

44.     Moreover, the Motion asserts that "proper valuation" of the Beneficiaries' DCP claims is as of the Petition Date, totaling, in aggregate, $27.9 Million, Motion at ¶¶14, 10, while failing to disclose that the Beneficiaries' DCP assets appreciated to more than $37.9 Million as of the time of the Turnover Motion, Turnover Motion, at ¶ 20, and should be likely worth more than that now.

45.     The apparent goal of the Debtors' misleading settlement communication is to convince as many Beneficiaries as possible to accept a remedy for their DCP claims that is different from, and far less valuable than, the remedies sought in the Adversary Class Action and otherwise convince them not to join the proposed class, given that the Court is about to address class certification, and has announced an intention to quickly try the case.[8] If successful, the Debtors' gambit will have the effect of reducing both the size and the scope of the class action, primarily by inducing unrepresented parties outside the Ad Hoc Group – or a few claims traders – to act on the "offer".   Through these material misstatements and omissions, the Debtors, through their Motion, have interfered with the integrity of the class action.

46.     Where, as here, the Debtors' communications are aimed at inducing members of the Ad Hoc Group and other putative class members to resolve their claims based on incomplete information and on illusory terms, this Court should not hesitate to restrict the Debtors' interference and prohibit all further contacts with the Beneficiaries on the subject matter of the Adversary Class Action.

47.     In light of the foregoing, this Court should find that: (i) through the Motion, the Debtors unilaterally communicated their settlement offer to all of the Beneficiaries,

_____

[8] After class certification, all settlement communications, and any settlement, would be subject to strict procedures and court approval.  Fed. R. Bankr. Proc. 23; Fed. R. Civ. P. 23(e).

136316.01600/40202057v.1

including each member of the Ad Hoc Group, represented by the undersigned counsel in this proceeding and in the Adversary Class Action, in violation of Del. R. Prof. Conduct 4.2; and (ii) in their Motion, the Debtors' made numerous material misstatements and omissions of fact, including:

a)   Misleadingly asserting that the Beneficiaries have no direct claims, whether by contract or otherwise, to DCP funds held in trust, while failing to disclose the Ad Hoc Group's contrary defenses raised in this matter and their contrary claims made in the Adversary Proceeding;

b)   Misleadingly asserting the "proper valuation" of DCP claims is as of the Petition Date, while failing to disclose that the Debtors' settlement offer of $27.9 million in the aggregate, is less than the at least $37.9 million held in the Rabbi Trust as of the date of the Turnover Motion;

c)   Misleadingly asserting the Debtors' Motion provides a means of "quickly" and "expeditiously" monetizing DCP claims, while failing to disclose that such claims would not be paid out immediately and by the Debtors and that monetizing the claims would require sale at a substantial discount to face; and

d)   Misleadingly asserting that Debtors' settlement offer represents a means of avoiding the existing litigation, while failing to disclose that the Debtors' offer provides the Beneficiaries with only what they will necessary receive in a worst-case outcome:   allowed unsecured claims valued as of the Petition Date, in exchange for a release of valuable causes of action.

48.   Further, this Court should find and conclude that these material misstatements and omissions made by the Debtors in their Motion were aimed at interfering with and limiting the scope of the class, and that such acts have caused actual harm, material confusion, and actual prejudice to the integrity of the Adversary Class Action.

## **Conclusion**

For all of the foregoing reasons, the Adversary Class Action Plaintiffs, for themselves and all other similarly situated Beneficiaries in the Nortel Networks U.S. Deferred

Compensation Plan, respectfully request this Court to deny the Motion in its entirety as an attempt to end-run Rule 4.2, which rule has already been breached by the service of the Motion, and, pursuant to Fed. R. Civ. P. 23(d), to:

(i)     Order the Debtors to issue a corrective statement to counteract each of the Debtors' material misstatements and omissions, such statement to be subject to prior review and approval by counsel for the Adversary Class Action Plaintiffs and this Court, with said statement to be served on counsel for the Adversary Class Action Plaintiffs (to be sent to the Ad Hoc Group) and also served upon any unrepresented Beneficiaries, at the Debtors' expense;

(ii)    Order that the Debtors and their counsel are prohibited from any further contact with any Beneficiary with respect to the Adversary Class Action or its subject matter pending the Court's ruling on class certification and, in any event, without prior approval from this Court, after notice to and opportunity to be heard by counsel to the Ad Hoc Group; and

(iii)   Enter such other and further relief as the Court deems just.


Dated:   July 3, 2012                     **BLANK ROME, LLP**


                                          */s/ Victoria Guilfoyle*_____
                                          Bonnie Glantz Fatell (No. 3809)
                                          Victoria Guilfoyle (No. 5183)
                                          1201 Market Street, Suite 800
                                          Wilmington, Delaware 19801
                                          (302) 425-6400 (telephone)
                                          (302) 425-6464 (facsimile)
                                          Email:  fatell@blankrome.com
                                                     guilfoyle@blankrome.com

                                          -and-

23

**BERNSTEIN, SHUR, SAWYER & NELSON**

Robert J. Keach (Admitted *Pro Hac Vice*)
Paul McDonald (Admitted *Pro Hac Vice)*
Daniel J. Murphy (Admitted *Pro Hac Vice)*
100 Middle Street
P.O. Box 9729
Portland, ME 04104-5029
(207) 774-1200 (telephone)
(207) 774-1127 (facsimile)
Email: rkeach@bernsteinshur.com
        pmcdonald@bernsteinshur.com
        dmurphy@bernsteinshur.com


*Counsel for the Adversary Class Action Plaintiffs*

136316.01600/40202057v.1