## EXHIBIT A

Eighty-Sixth Report dated June 27, 2012

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION**

**EIGHTY-SIXTH REPORT OF THE MONITOR
DATED JUNE 27, 2012**

**INTRODUCTION**

1.    On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC"
      and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel
      Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"),
      Nortel Networks International Corporation and Nortel Networks Global
      Corporation (collectively the "Applicants") filed for and obtained protection under
      the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of
      this Court dated January 14, 2009, as amended and restated (the "Initial Order"),
      Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "Monitor")
      in the CCAA proceedings. The stay of proceedings was extended to July 31, 2012
      by this Court in its Order dated April 13, 2012.

2.    Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates
      concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy
      Code (the "Code") in the United States Bankruptcy Court for the District of
      Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings").

As required by U.S. law, an official committee of unsecured creditors (the "Committee") was established in January, 2009.

3.  An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Court dated May 27, 2009, July 22, 2009 and July 30, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries and each of these groups is participating in the CCAA proceedings.

4.  Nortel Networks (CALA) Inc. ("NN CALA" and together with NNI and certain of its subsidiaries and affiliates that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.  Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in EMEA were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators").

6.  Subsequent to the Filing Date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7.    The CCAA proceedings and the UK Administration proceedings of NNUK and the other EMEA Debtors have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.    Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

**PURPOSE**

9.    The purpose of this Eighty-Sixth Report of the Monitor (the "Eighty-Sixth Report") is:

   a)  to provide this Court with an overview of the Applicants' motion seeking approval of an Allocation Settlement Agreement (APAC/CALA) dated June 19, 2012, among the Applicants, the U.S. Debtors, the EMEA Debtors, Nortel Networks (Northern Ireland) Limited (in liquidation), Nortel Networks Optical Components Limited (in liquidation), NNSA, the APAC Entities, the CALA Entities, the EMEA NFEs, the Joint Administrators, the Joint Liquidators, the NNSA Office Holder, the Monitor and the Committee (the "Fourth Estate Settlement Agreement"); and

   b)  to provide the Monitor's support in respect thereof.

**TERMS OF REFERENCE**

10.   In preparing this Eighty-Sixth Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel.  The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of this information and accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Eighty-Sixth Report.

11. Unless otherwise stated, all monetary amounts contained herein are expressed in US dollars.

12. Capitalized terms not defined in this Eighty-Sixth Report are as defined in the Fourth Estate Settlement Agreement, the Affidavit of John Doolittle sworn on January 14, 2009, the Pre-Filing Report or previous reports of the Monitor.

13. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

## FOURTH ESTATE SETTLEMENT AGREEMENT OVERVIEW

14. Commencing in mid-2009, the Applicants along with certain of their affiliates sold Nortel's global business units to various purchasers in transactions previously approved by this Court. The proceeds of such sales  – approximately $2.8 billion in the aggregate plus a further $4.5 billion of proceeds related to the patent portfolio and related assets sale – were placed into separate escrow accounts pending agreement or resolution of the distribution of such proceeds among the various Nortel sellers. For the most part, each Nortel "seller" with respect to a particular global sale transaction is a "depositor" with respect to the related escrow account whose consent, along with the consent of the Monitor and the Committee, is required to effect a consensual distribution of the sale proceeds in such escrow account. Various APAC Entities and CALA Entities were sellers under certain of the Nortel global business unit sales and are therefore depositors with respect to such escrow accounts.

15. The Applicants, the U.S. Debtors, the EMEA Debtors, other Nortel entities and certain of their respective stakeholders have been engaged in efforts to resolve the allocation of the proceeds of Nortel's global sales as well as various other inter-estate disputes. Mediation before Chief Justice Winkler is ongoing in this regard.

4

Although a global resolution of these matters has yet to be reached, the Parties have reached an agreement as to the quantum of sale proceeds to be allocated to the APAC Entities and the CALA Entities (hereinafter, the "Non-Filed Entities") as reflected in the Fourth Estate Settlement Agreement. The Parties have also reached agreement on a number of related issues, the resolution of which will permit the Non-Filed Entities to commence liquidation or wind-down proceedings and otherwise assist in moving Nortel's global insolvency proceedings forward.

16.    A summary of the principal terms of the Fourth Estate Settlement Agreement is provided in the paragraphs that follow. For a complete understanding of its terms reference should be made directly to the Fourth Estate Settlement Agreement, a copy of which is attached as Appendix "A" hereto.[1]

### Settlement Amount and Distributions

17.    $44,900,000 of the global business unit sale proceeds (the "Settlement Amount") will be allocated to the Non-Filed Entities (each Non-Filed Entities' sale proceeds entitlement, a "Settlement Share"). The Settlement Amount will be released from the specified sale proceeds escrow accounts into an intermediate distribution escrow account from which the Settlement Shares will be paid to the Non-Filed Entities. In certain instances, all or a portion of an APAC Entity's Settlement Share (and, in some cases, amounts such APAC Entity is owed by another APAC Entity) will be paid directly to various inter-company creditors in accordance with such APAC Entity's obligations under the APAC Restructuring Agreement.[2] The

---

[1] Due to their voluminous nature, the forms of signature pages to the escrow amendments and escrow instructions appended as Appendices E, F and G to the Fourth Estate Settlement Agreement together with the exhibits to Appendix H (Form of Full and Final Acknowledgement of Release (Paraguay)) of the Fourth Estate Settlement Agreement have been excluded from the copy of the Fourth Estate Settlement Agreement appended hereto.

[2] Certain of the Nortel parties, including the Applicants, the U.S. Debtors, the EMEA Debtors and certain of the APAC Entities (the "APAC Debtors") previously entered into the Asia Restructuring Agreement dated November 5, 2009, approved by this Court in its Order dated December 2, 2009, which, *inter alia*, fixed the pre-filing amounts owing by the APAC Debtors to various inter-company creditors, subordinated the inter-company debt of such APAC Debtors to third-party debt, provided a scheme for the payment of

ultimate distribution of the Settlement Amount among the Nortel Parties is as specified on Appendix "B" to the Fourth Estate Settlement Agreement. The Applicants are the recipients of approximately $11.6 million under the Fourth Estate Settlement Agreement as a result of certain of the Non-Filed Entities directing portions of their Settlement Shares and other amounts to the Applicants in accordance with the APAC Restructuring Agreement.

18.    The agreed Settlement Amount (and each individual Settlement Share) was based on, among other things, an independent valuation of the value of the assets sold by the Non-Filed Entities in the global business unit sales that was obtained by the directors and officers of the Non-Filed Entities. The Parties acknowledge and agree that they are entering into the Fourth Estate Settlement Agreement for settlement purposes only and that nothing in the agreement shall constitute an acknowledgement or admission as to the correct methodology for determining allocation of the global sale proceeds.

*Agreement as to Pre-Filing and Post-Filing Balances*

19.    The net pre-filing and net post-filing balances owing as at September 30, 2011[3], between a Non-Filed Entity on the one hand and any other Nortel Party on the other, are agreed and fixed by the Fourth Estate Settlement Agreement, with such amounts, as may have been reduced in whole or in part by the Net Cash Balance Payments and any other payments made since September 30, 2011, superseding any claims that have been filed or scheduled in the various insolvency proceedings (with the exception of NNSA's secondary proceedings, where the claims as accepted in such proceedings will govern), and shall be deemed allowed in those

---

inter-company debts owing by the APAC Debtors and ensured the participation of the APAC Debtors in Nortel's global sales. A copy of the APAC Restructuring Agreement, excluding the schedules thereto, is attached hereto as Appendix "B".

[3] With the following exceptions:  (i) Nortel Networks (India) Private Limited which balances are as at November 30, 2011 to be consistent with an application made to the Royal Bank of India to allow the payment of net rather than gross inter-company positions; and (ii) Nortel Networks Australia Pty. Limited, which balances are as at March 28, 2012.

proceedings in such amounts. The amounts agreed to include recognition of pre-filing amounts owing by NNL to Nortel Networks (China) Limited ("NN China") and Nortel Networks Singapore Pte Ltd. ("NN Singapore") of approximately $104 million and $91 million, respectively, as well as a post-filing amount owing by NNL to NN China of approximately $9 million. NN China and NN Singapore are wholly owned subsidiaries of NNL. As with all pre-filing and post-filing amounts agreed to, these amounts were based on a review of the Company's books and records.

*Mutual Releases*

20.    With the exception of such pre-filing and post-filing balances and certain other specified surviving obligations, each Non-Filed Entity releases each of the other Parties from any and all claims, including any claims to the global sale proceeds and any other proceeds arising from a divestiture of assets by or on behalf of a Nortel Party. The other Parties, including the Applicants, provide a similar release in favour of the Non-Filed Entities. The Non-Filed Entities further agree they shall be prohibited from participating in any proceeding or discussion to resolve the allocation of the global sale proceeds.

*APAC Restructuring Agreement Matters*

21.    The APAC Restructuring Agreement Parties confirm the satisfaction, to date, of the APAC Debtors' obligations to enter into sale transactions and relinquish intellectual property licenses under the APAC Restructuring Agreement and agree to release the collateral held in support of such obligations. The APAC Restructuring Agreement Parties also confirm the outstanding pre-filing balances owing by the APAC Debtors to their inter-company creditors under the APAC Restructuring Agreement upon the payments contemplated by the Fourth Estate Settlement Agreement being made.

*Post-Execution Claims Against APAC Debtors*

22.    Each APAC Debtor preserves the ability to reduce the amount it is paying to its inter-company creditors under the Fourth Estate Settlement Agreement in the event it becomes aware of a claim against it between the signing of the Fourth Estate Settlement Agreement and the Effective Date of such agreement if such claim meets certain specified materiality thresholds. The exercise of this right by an APAC Debtor gives rise to termination rights on the part of an affected inter-company creditor who has its Aggregate Settlement Share reduced by an amount that is equal to or greater than the greater of (a) $1,000,000, and (b) twenty percent (20%) of its initial Aggregate Settlement Share.

*Escrow Amendments*

23.    Each of the necessary Parties agrees to deliver amendments to the relevant escrow agreements such that upon transmission of the payments contemplated by the Fourth Estate Settlement Agreement, the escrow agreements that govern the global sale proceeds escrow accounts will be amended as necessary to remove the Non-Filed Entities as depositors with respect to such escrow accounts.

*Conditions to Effectiveness*

24.    The Fourth Estate Settlement Agreement is subject to the approval of both this Court and the U.S. Court. The Monitor understands the Applicants and the U.S. Debtors will be seeking approval of the Fourth Estate Settlement Agreement at a joint hearing to be held on July 11, 2012.

25.    The effectiveness of the Fourth Estate Settlement Agreement is also subject to the delivery of certain documents by Nortel Networks del Paraguay S.A.[4], including a

---

[4] Nortel Networks del Paraguay S.A. is not a party to the Fourth Estate Settlement agreement nor will it receive any payment in connection with the Fourth Estate Settlement Agreement, but such documents have the practical effect of treating Nortel Networks del Paraguay S.A. in a manner analogous to the CALA Entities in all other respects.

release of any claim to certain sale proceeds, which the Monitor understands have been delivered to the Applicants and are being held in escrow.

26. Subject to this Court and the U.S. Court approving the Fourth Estate Settlement Agreement, the Monitor expects the transactions contemplated by the Fourth Estate Settlement Agreement to be completed by the end of July.

27. The principal benefits of the Fourth Estate Settlement Agreement to the applicants are as follows:

   a) by settling the Non-Filed Entities' entitlement to the global sale proceeds and removing the Non-Filed Entities as depositors, the number of parties participating in the global allocation settlement process is reduced and the procedure for consensually releasing sale proceeds from escrow is simplified;

   b) the Applicants achieve certainty with respect to the Non-Filed Entities' entitlement to sale proceeds and the amounts owing as between the Non-Filed Entities and the Applicants;

   c) crystallizing the inter-company balances between the Non-Filed Entities and the other Nortel Parties assists in putting many of the Non-Filed Entities on a footing to commence wind down and liquidation proceedings in their local jurisdictions. As many of the Non-Filed Entities are direct subsidiaries of NNL, their wind down and liquidation will assist in advancing the CCAA proceedings, including by facilitating the realization by the Applicants of certain inter-company receivables and any equity value in such Non-Filed Entities; and

   d) as noted above, the Applicants are the recipients of approximately $11.6 million under the Fourth Estate Settlement Agreement as a result of certain of the Non-Filed Entities directing portions of their Settlement Shares and other amounts to the Applicants in accordance with the APAC Restructuring Agreement.

## MONITOR'S RECOMMENDATION

28.   The Monitor has had extensive involvement in the negotiations leading to the Fourth Estate Settlement Agreement and is of the view it represents a fair and reasonable settlement of the Non-Filed Entities' entitlement to the global sale proceeds. The resolution of this and other inter-company matters in the Fourth Estate Settlement Agreement is a step towards the resolution of certain key issues that lie at the heart of Nortel's global insolvency proceedings and will assist in advancing the progress of these CCAA proceedings. Accordingly, for the reasons set forth herein, the Monitor supports the Applicants' request seeking approval of the Fourth Estate Settlement Agreement.

All of which is respectfully submitted this 27th day of June, 2012.

**ERNST & YOUNG INC.**
**in its capacity as Monitor of the Applicants**
**and not in its personal capacity**

Per:

Murray A. McDonald
President

APPENDIX "A"

FOURTH ESTATE SETTLEMENT AGREEMENT

[ATTACHED]

EXECUTION COPY

## ALLOCATION SETTLEMENT AGREEMENT
### (APAC/CALA)

This agreement (the **"Agreement"**) dated as of the 19th day of June, 2012 is entered into by and among the following parties:

(a) Nortel Networks Corporation (**"NNC"**), Nortel Networks Limited (**"NNL"**) and the other entities set forth in **Schedule 1** attached hereto (the **"Canadian Debtors"**),

(b) Nortel Networks Inc. (**"NNI"**) and the other entities set forth in **Schedule 2** attached hereto (the **"US Debtors"**),

(c) Nortel Networks UK Limited (In Administration) (**"NNUK"**) and the other entities set forth in **Schedule 3** attached hereto (the **"EMEA Debtors"**) which are acting by their joint administrators Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF (other than Nortel Networks (Ireland) Limited (**"NNIR"**),  for which David Hughes of Ernst & Young Chartered Accountants of Harcourt Centre, Harcourt Street, Dublin 2, Ireland and Alan Robert Bloom serve as joint administrators) (the **"Joint Administrators"**), who act as agents for the EMEA Debtors without any personal liability whatsoever,

(d) Nortel Networks (Northern Ireland) Limited (in liquidation) (**"NNNIR"**) and Nortel Networks Optical Components Limited (in liquidation) (**"NNOCL"**) (the **"EMEA Liquidation Debtors"**) which in the case of NNNIR, is acting by its joint liquidators Elizabeth Anne Bingham and Kerry Lynne Trigg of Ernst & Young LLP of 1 More London Place, London SE1 2AF and in the case of NNOCL is acting by its joint liquidators Samantha Keen and Kerry Lynne Trigg of Ernst & Young LLP of 1 More London Place, London SE1 2AF (the **"Joint Liquidators"**), who act as agents for the EMEA Liquidation Debtors without any personal liability whatsoever,

(e) Nortel Networks S.A. (In Administration and *liquidation judiciare*) (**"NNSA"**), a corporation incorporated under the laws of France, represented by the Joint Administrators and Maître Cosme Rogeau, 26, avenue Hoche, 78000 Versailles as the "Liquidateur Judiciaire" (the **"NNSA Office Holder"**), who act as agents for NNSA without any personal liability whatsoever,

(f) certain non-filed affiliates of NNC as set forth in **Schedule 4** attached hereto and identified as the APAC Entities, including their respective branch offices (the **"APAC Entities"**),

(g) certain non-filed affiliates of NNC as set forth in **Schedule 5** attached hereto and identified as the CALA Entities, including their respective branch offices (the

"**CALA Entities**", and together with the APAC Entities, the "**Non-Filed Entities**"),

(h)    certain non-filed affiliates of the EMEA Debtors as set forth in **Schedule 6** hereto and identified as the EMEA NFEs (the "**EMEA NFEs**"),

(i)    the Joint Administrators,

(j)    the Joint Liquidators,

(k)    the NNSA Office Holder,

(l)    Ernst & Young Inc. in its capacity as monitor (the "**Monitor**") in the Canadian Proceedings (defined below) of the Canadian Debtors, and

(m)    The Creditors' Committee (as defined below).

The Canadian Debtors, the US Debtors, the EMEA Debtors, the EMEA Liquidation Debtors, NNSA, the Non-Filed Entities, the Joint Administrators, the Joint Liquidators, the NNSA Office Holder, the EMEA NFEs, the Monitor and the Creditors' Committee are referred to herein each as a "**Party**" and collectively as the "**Parties**". The Canadian Debtors, the US Debtors, the EMEA Debtors, the EMEA Liquidation Debtors, NNSA, the EMEA NFEs, and the Non-Filed Entities are referred to herein each as a "**Nortel Party**" and collectively as "**Nortel**" or the "**Nortel Parties**". The Joint Administrators and the Joint Liquidators, in their respective personal capacities, shall be party to this Agreement as provided in **Sections 8.5** and **8.6** respectively and solely for the purpose of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to them and references to the Parties shall be construed accordingly.

**RECITALS:**

**WHEREAS**, on January 14, 2009 (the "**Filing Date**"), the Canadian Debtors commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") under the Companies' Creditors Arrangement Act (Canada), in connection with which Ernst & Young Inc. was appointed as Monitor (the "**Canadian Proceedings**"); and

**WHEREAS**, on the Filing Date, the US Debtors (other than Nortel Networks (CALA) Inc., whose filing date was July 14, 2009) filed petitions in the United States Bankruptcy Court for the District of Delaware (the "**US Court**" and, together with the Canadian Court, the "**Courts**") under chapter 11 of title 11 of the United States Code, (the "**US Proceedings**") and the official committee of unsecured creditors (the "**Creditors' Committee**") was appointed in such proceedings by the US Court on January 22, 2009; and

**WHEREAS**, on the Filing Date, NNUK, NNIR, NNSA and the other EMEA Debtors commenced administration proceedings before the High Court of Justice in London, England,

2

represented by individuals from Ernst & Young LLP, and, in the case of NNIR only, Ernst & Young Chartered Accountants, serving as administrators in such proceedings; and

WHEREAS, on April 28, 2010, NNNIR commenced a members' voluntary liquidation with individuals from Ernst & Young LLP serving as liquidators in such liquidation; and

WHEREAS, on July 29, 2011, NNOCL commenced a creditors' voluntary liquidation with individuals from Ernst & Young LLP serving as liquidators in such liquidation; and

WHEREAS, while the administration proceedings in respect of NNSA under the United Kingdom Insolvency Act 1986 are continuing, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which the NNSA Office Holder and Maître Franck Michel were appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA (the **"NNSA Secondary Proceedings"**); and

WHEREAS, as of the date hereof, the Non-Filed Entities and the EMEA NFEs are not subject to any insolvency, bankruptcy or other creditor protection proceedings; and

WHEREAS, subsequent to the Filing Date, Nortel, in consultation with its various creditor constituencies, determined to divest its various businesses and assets to third party buyers (each such sale as listed on **Schedule 7** hereof, a **"Global Sale"**); and

WHEREAS the Global Sales have now been completed and the net proceeds (the **"Sale Proceeds"**) of the Global Sales have been or will be deposited into various escrow accounts pursuant to various escrow agreements (the **"Global Sales Escrow Agreements"**) executed in connection with the Global Sales; and

WHEREAS certain of the Non-Filed Entities and the EMEA NFEs are **"Sellers"** under the various Global Sales and **"Depositors"** under certain of the Global Sales Escrow Agreements, as listed on **Schedule 8** attached hereto, (the **"Escrow Agreements"**, and the related escrow accounts the **"Escrow Accounts"**); and

WHEREAS various of the Parties, together with certain creditor constituencies, have entered into negotiations with respect to the resolution of the allocation of Sale Proceeds among the Sellers; and

WHEREAS pursuant to various settlements, all applicable escrow agreements have been amended to remove all references to each of o.o.o. Nortel Networks, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Ltd. as Depositors, such that none of those entities shall have any further rights or obligations under such escrow agreements and/or the rights and obligations of those entities under such Escrow Agreements have been assigned to certain of the Parties; and

WHEREAS pursuant to an order of the Canadian Court and the US Court, any term or condition of the MEN Distribution Escrow Agreement entered into as of March 19, 2010 that

3

explicitly or implicitly requires the consent or participation of Nortel Networks de Colombia S.A. is now forever deemed not to require such consent or participation; and

**WHEREAS** the Parties wish to agree upon the aggregate allocation of Sale Proceeds attributable to the Non-Filed Entities on the terms and conditions set out herein and resolve certain other issues outstanding among them; and

**WHEREAS** the Parties further wish to settle and resolve various amounts and balances in respect of outstanding amounts owing among the Non-Filed Entities, *inter se*, or between a Non-Filed Entity and any other Nortel Party;

NOW THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH IS HEREBY ACKNOWLEDGED, THE PARTIES HEREBY AGREE AS FOLLOWS:

## ARTICLE I — ALLOCATION OF SALE PROCEEDS

1.1    **Allocation to the Non-Filed Entities**

(a)    In full and final settlement of the claims of the Non-Filed Entities to the allocation of any Sale Proceeds, each of the Non-Filed Entities shall be entitled to an allocation of the Sale Proceeds in the amounts set forth on **Appendix A** attached hereto (each, a **"Settlement Share"**), which amounts for all the Non-Filed Entities aggregate to US$44,900,000 (the **"Settlement Amount"**). The Settlement Amount shall be drawn from the various Escrow Accounts as indicated on **Appendix A**.

1.2    Each Party acknowledges and agrees that, upon the Escrow Release Trigger Date (as defined below):

(a)    JPMorgan Chase Bank, N.A., in its capacity as the distribution agent for the Escrow Accounts and the Intermediate Distribution Account (as defined below) (the **"Escrow Agent"**), will be authorized and directed by the applicable Depositors and the Estate Fiduciaries (as defined in the Escrow Agreements) (the Depositors and the Estate Fiduciaries collectively, the **"Escrow Parties"**) to (i) establish a non-interest bearing intermediate distribution account (the **"Intermediate Distribution Account"**), (ii) withdraw the Settlement Amount from the Escrow Accounts in accordance with **Appendix A** and deposit it in the Intermediate Distribution Account, and (iii) disburse the Settlement Amount from the Intermediate Distribution Account to the Non-Filed Entities and those other Nortel Parties receiving Net Cash Balance Payments (as defined below) (each such entity, an **"Intercompany Creditor"** and, collectively with the Non-Filed Entities receiving distributions hereunder, the **"Settlement Payment Parties"**) in the amounts indicated on **Appendix B** attached hereto (each amount to be transmitted to a Settlement Payment Party, as may be adjusted in accordance with **Section 3.5** hereof, an **"Aggregate Settlement Share"**), which disbursements

4

shall, in the case of those made to Intercompany Creditors, satisfy the Net Cash Balance Payments.

(b)   Each Party acknowledges and agrees that withdrawals by the Escrow Agent from the Escrow Accounts and the transmission by the Escrow Agent of the Aggregate Settlement Shares shall be made in accordance with the Escrow Release Instructions described in **Sections 6.2** and **6.3** hereof.

(c)   Upon transmission by the Escrow Agent of all Aggregate Settlement Shares to each of the relevant Settlement Payment Parties (the date of such transmission, the **"Escrow Release Effective Date"**), the Escrow Agent shall have no further obligation or liability to the Parties for the allocation or division of the Settlement Amount among the Nortel Parties.

## ARTICLE II — FULL AND FINAL SETTLEMENT

2.1    The Parties hereby acknowledge and agree that **Appendix C-1** hereto lists both the pre-filing and post-filing intercompany payables and receivables among the Non-Filed Entities, inter se, and between a Non-Filed Entity and any other Nortel Party, as of September 30, 2011. The Parties further acknowledge and agree that, upon the Escrow Release Effective Date, (a) the pre-filing amounts set out in **Appendix C-1** under the heading "Net pre-filing balance as at September 30, 2011", are deemed partially or wholly satisfied to the extent paid through Net Cash Balance Payments as set forth on **Appendix C-1**, or to the extent otherwise paid under this Agreement; (b) the pre-filing amounts set out in **Appendix C-1** under the heading "Remaining Pre-filing balance", as such amounts may have been reduced by payments made after September 30, 2011, including, without limitation, the payments specified on **Appendix C-2** hereto, shall supersede (i) any amounts reflected in the schedules filed by the US Debtors in the US Proceedings with respect to pre-filing amounts owed to any Non-Filed Entity, (ii) any proofs of claim relating to a pre-filing Claim (as defined below) that have been or could have been filed by or on behalf of the Non-Filed Entities or any of their predecessors, successors and assigns, each in such capacities, in the US Proceedings, (iii) any assertion or allegation of a pre-filing Claim which any of the Non-Filed Entities or any of their predecessors, successors, and assigns, each in such capacities, may have against the Canadian Debtors whether filed pursuant to the Canadian Debtors' various claims procedures or otherwise, (iv) any assertion or allegation of a pre-filing Claim which any of the Non-Filed Entities or any of their predecessors, successors, and assigns, each in such capacities, may have against the EMEA Debtors whether filed pursuant to the EMEA Debtors' informal claims procedure or otherwise which could be the subject of a proof of claim in the administration or any subsequent insolvency process of the EMEA Debtors, and (v) any assertion or allegation of a pre-filing Claim which any of the Non-Filed Entities or any of their predecessors, successors, and assigns, each in such capacities, may have against NNSA in the administration proceedings whether filed pursuant to the EMEA Debtors' informal claims procedure or otherwise which could be the subject of a proof of claim in the administration or any subsequent insolvency process of NNSA, *provided that* any pre-filing Claim that has been or could have been filed by or on behalf of the Non-Filed Entities or any of their predecessors, successors, and assigns

5

in the NNSA Secondary Proceedings shall not be affected by this Agreement and shall only be admitted for proof in the NNSA Secondary Proceedings in the amount accepted by the NNSA Office Holder in the formal proof of debt process in the NNSA Secondary Proceedings (the "**NNSA Proof Process**") (as such amount may be adjusted in accordance with the applicable French law) and not to the extent any such pre-filing Claim has been rejected or disallowed or not previously filed or declared in such proceedings; (c) the post-filing amounts set out in **Appendix C-1** under the heading "Net post-filing position as at September 30, 2011", as such amounts may have been reduced by payments made after September 30, 2011, including, without limitation, the payments specified on **Appendix C-2** hereto, shall supersede (i) any proofs of claim relating to a post-filing Claim arising prior to September 30, 2011 that have been or could have been filed by or on behalf of the Non-Filed Entities or any of their predecessors, successors and assigns, each in such capacities, in the US Proceedings, (ii) any assertion or allegation of a post-filing Claim arising prior to September 30, 2011 which any of the Non-Filed Entities or any of their predecessors, successors and assigns, each in such capacities, may have against the Canadian Debtors whether filed pursuant to the Canadian Debtors' various claims procedures or otherwise, (iii) any assertion or allegation of a post-filing Claim arising prior to September 30, 2011 which any of the Non-Filed Entities or any of their predecessors, successors and assigns, each in such capacities, may have against the EMEA Debtors whether filed pursuant to the EMEA Debtors' informal claims procedure or otherwise which could be the subject of a proof of claim in the administration or any subsequent insolvency process of the EMEA Debtors and (iv) any assertion or allegation of a post-filing Claim arising prior to September 30, 2011 which any of the Non-Filed Entities or any of their predecessors, successors and assigns, each in such capacities, may have against NNSA in the administration proceeding whether filed pursuant to the EMEA Debtors' informal claims procedure or otherwise which could be the subject of a proof of claim in the administration or any subsequent insolvency process of NNSA, *provided that* any post-filing Claim that has been or could have been filed by or on behalf of the Non-Filed Entities or any of their predecessors, successors, and assigns in the NNSA Secondary Proceedings shall not be affected by this Agreement and shall only be admitted for proof in the NNSA Secondary Proceedings in the amount accepted by the NNSA Office Holder in the NNSA Proof Process (as such amount may be adjusted in accordance with applicable French law) and not to the extent any such post-filing Claim has been rejected or disallowed or not previously filed or declared in such proceedings; (d) that all such schedules, proofs of claim and allegations or assertions of such pre-filing and post-filing Claims are hereby (i) deemed amended such that they are superseded by the amounts set forth on **Appendix C-1** under the headings "Remaining pre-filing balance" and "Net post-filing position as at September 30, 2011", as the case may be, which shall be the only amounts owed by the US Debtors, the Canadian Debtors, the EMEA Debtors or NNSA to the Non-Filed Entities with respect to such Claims, and (ii) deemed (as so amended) approved, agreed, allowed or admitted (as applicable) in the amounts set forth on **Appendix C-1**, and otherwise deemed disallowed or rejected, *provided, however*, in each case, as such amounts on **Appendix C-1** are subject to reduction by payments made after September 30, 2011 including, without limitation, the payments specified on **Appendix C-2**, *provided, further, however*, in each case, that such pre-filing and post-filing Claims that

700081299 09242174

have been or could have been filed by or on behalf of the Non-Filed Entities or any of their predecessors, successors, and assigns in the NNSA Secondary Proceedings shall not be affected by this Agreement and shall only be admitted for proof in the NNSA Secondary Proceedings in the amount accepted by the NNSA Office Holder in the NNSA Proof Process (as such amount may be adjusted in accordance with applicable French law) and not to the extent any such post-filing Claim has been rejected or disallowed or not previously filed or declared in such proceedings, and *provided, further*, that nothing in this **Section 2.1** is intended to waive or release any Surviving Obligation (as defined below) or the US Estate Carve-Out (as defined below); and (e) that none of the Canadian Debtors, EMEA Debtors, US Debtors or other Nortel Parties will make, join or support in any objection to or rejection of all or any portion of the pre-filing and post-filing Claims in the amounts set forth on **Appendix C-1** or make, propose, file or support any plan, scheme of arrangement, or other arrangement, appeal, application, or request for relief in any court that is inconsistent with this Agreement.

2.2    In consideration of the obligations, covenants and rights of the Parties set forth in this Agreement, the Parties hereby agree that, upon transmission by the Escrow Agent of all Aggregate Settlement Shares to each of the relevant Settlement Payment Parties, this Agreement shall constitute a full and final settlement of any and all Claims (a) by the Non-Filed Entities as against the Releasees (as defined below) and (b) by each of the Parties to this Agreement as against the NFE Releasees (as defined below) in each case, up to the date of this Agreement, except for (i) the pre-filing amounts set forth on **Appendix C-1** under the heading "Remaining pre-filing balance", as such amounts may have been reduced by payments made after September 30, 2011, including, without limitation, the payments specified on **Appendix C-2** hereto, which for the avoidance of doubt constitutes only a partial and non-exhaustive listing of such payments (the **"Remaining Balances"**); (ii) the post-filing amounts set forth on **Appendix C-1** under the heading "Net post-filing position as at September 30, 2011", as such amounts may have been reduced by payments made after September 30, 2011, including, without limitation, the payments specified on **Appendix C-2** hereto, which for the avoidance of doubt constitutes only a partial and non-exhaustive listing of such payments, or increased by obligations arising in the ordinary course of business through the trading of goods or the provision of services occurring on or after October 1, 2011; (iii) obligations set forth on **Appendix C-3**; (iv) obligations arising under the APAC Restructuring Agreement (as defined below) as amended hereby; and (v) obligations arising under this Agreement ((i) through (v), collectively, the **"Surviving Obligations"**) and subject to the US Estate Carve-Out (as defined below).

## ARTICLE III — APAC RESTRUCTURING AGREEMENT AMENDMENTS AND RELATED MATTERS

3.1    Each Party hereto that is also a "Party" to the Asia Restructuring Agreement dated as of November 5, 2009 (the **"APAC Restructuring Agreement"**) among the Canadian Debtors, the US Debtors, the EMEA Debtors, NNSA, and the APAC Entities signatory thereto (collectively, the **"APAC Restructuring Agreement Parties"**) acknowledges and agrees that the APAC Restructuring Agreement shall remain in full force and effect

7

following the consummation of the transactions contemplated herein, except as expressly amended by this Agreement.

3.2    Upon transmission by the Escrow Agent of all Aggregate Settlement Shares to each of the relevant Settlement Payment Parties, the APAC Restructuring Agreement Parties acknowledge and agree that the APAC Debtors (as defined in the APAC Restructuring Agreement, the "**APAC Debtors**") have, to date, fully satisfied their obligations under **Sections 10** and **11** of the APAC Restructuring Agreement and that (i) such APAC Debtors shall have no further obligations under **Sections 10** and **11** of the APAC Restructuring Agreement, (ii) the obligations of such APAC Debtors to provide security interests in Collateral (as defined in the APAC Restructuring Agreement) in accordance with Section 13(c) of the APAC Restructuring Agreement shall be terminated and be of no further force and effect and (iii) (v) the Collateral Agency Agreement by and between the APAC Restructuring Agreement Parties, dated as of December 24, 2009, (w) the Security Agreement by and between certain APAC Entities and NNI, as Collateral Agent, dated as of December 24, 2009, (x) the Debenture by and between Nortel Networks (Asia) Limited as "Chargor" and NNI as "Chargee", dated as of December 24, 2009, (y) the Debenture by and between Nortel Networks Singapore Pte Ltd as "Chargor" and NNI as "Chargee", dated as of December 24, 2009, and (z) the General Security Deed by and between Nortel Networks New Zealand Limited and NNI as Secured Party, dated as of December 24, 2009, shall in each case be terminated and be of no further force and effect, and any and all security interests or liens on Collateral (as defined in the APAC Restructuring Agreement) pledged or granted  thereunder shall be released.   In connection with the foregoing, the APAC Restructuring Agreement Parties agree to execute such documents and instruments as may be reasonably requested by any such APAC Debtor for the purpose of releasing or evidencing the termination of any security interest imposed on the assets of such APAC Debtor in accordance with Section 13(c) of the APAC Restructuring Agreement.

3.3    Each APAC Restructuring Agreement Party acknowledges and agrees that all payments as set forth under the heading "4th Estate Settlement Net Cash Balance Payments" on **Appendix C-1** and as effected through **Section 1.2(a)** hereof, as may be adjusted in accordance with **Section 3.5** hereof (such payments, collectively, the "**Net Cash Balance Payments**"), made by an APAC Debtor represents payment of Net Cash Balances (as defined in the APAC Restructuring Agreement) on account of Subsequent Payment Amounts (as defined in the APAC Restructuring Agreement) in accordance with the APAC Restructuring Agreement.   Each APAC Restructuring Agreement Party acknowledges and agrees that the intercompany balances outstanding as of September 30, 2011 and the amounts of such Net Cash Balance Payments with respect to each APAC Restructuring Agreement Party are as set forth on **Appendix C-1**.   Each APAC Restructuring Agreement Party also acknowledges and agrees that, upon receipt of the Net Cash Balance Payments, the Remaining Balances related to such APAC Debtor are the outstanding balances of Pre-Filing Intercompany Debt (as defined in the APAC Restructuring Agreement).

3.4    Each APAC Restructuring Agreement Party acknowledges and agrees that execution of this Agreement (or with respect to the Bondholder Group (as hereinafter defined), the

8