delivery of a consent thereto) shall constitute prior written consent of the APAC Restructuring Agreement Parties, the Monitor, the Creditors' Committee, the Bondholder Group and the Joint Administrators to the APAC Restructuring Agreement Parties' entry into this Agreement, the performance of their obligations hereunder and all payments made and actions taken in accordance herewith.

3.5    **Post-Execution Claims against APAC Debtors**

(a)    In the event that any APAC Debtor (a **"Designated APAC Debtor"**) making a Net Cash Balance Payment becomes aware of a claim after the date hereof but prior to the Effective Date (each such claim, a **"Post-Execution Claim"** and, collectively, the **"Post-Execution Claims"**) and (i) such Designated APAC Debtor had no knowledge of such claim prior to the date hereof, (ii) the Board of Directors of such Designated APAC Debtor determines in good faith that such Post-Execution Claim, either individually or in the aggregate with other Post-Execution Claims of such APAC Debtor, could give rise to a liability greater than the lesser of (x) US$1,000,000 and (y) ten percent (10%) of the working capital requirement reserve of such APAC Debtor as set out in the December 16, 2011 Restructuring Manager's Report, and (iii) the Board of Directors of the Designated APAC Debtor determines in good faith that a reduction of the Net Cash Balance Payment (the amount of such reduction being the **"Reduction Amount"**) to be paid by the Designated APAC Debtor to its Intercompany Creditors hereunder (each an **"Affected Creditor"**) is necessary to adequately reserve for such Post-Execution Claim(s), such Designated APAC Debtor shall (x) promptly, and in no event later than the Effective Date, provide written notice of such Post-Execution Claim to each Party, including sufficient detail regarding the nature of the Post-Execution Claim for each Party to understand the basis for the need to reserve additional funds and the quantum of the Reduction Amount and (y) use commercially reasonable efforts to mitigate the Post-Execution Claim and reduce the Reduction Amount.

(b)    Upon the delivery of such notice, the Parties agree that (i) the Reduction Amount shall not be transmitted to any Affected Creditor but shall instead be transmitted to such Designated APAC Debtor and (ii) **Appendix B** and **Appendix C-1** hereto shall be amended to reflect the changes resulting from the preceding clause (i), including (x) the decrease in the Net Cash Balance Payments by the Designated APAC Debtor to its Affected Creditors and any resulting decreases (each, an **"Echo Decrease"**) in Net Cash Balance Payments payable by an Affected Creditor that is also an APAC Debtor (an **"Affected Creditor APAC Debtor"**) to its Intercompany Creditors (an **"Echo Affected Creditor"** and, with the Affected Creditors, the **"Affected Intercompany Creditors"**), (y) the increase in the Remaining Balances owing by the Designated APAC Debtor or the Affected Creditor APAC Debtor to their respective Affected Intercompany Creditors (such increased Remaining Balances to be governed by the provisions of the APAC Restructuring Agreement, as amended hereby) and (z) the decrease in the Aggregate Settlement Share payable to an Affected Intercompany Creditor; *provided that*, to the extent any Post-Execution Claim is mitigated in whole or in

part, the mitigation amounts shall be included in the Designated APAC Debtor's next subsequent calculation of its Net Cash Balance and shall be treated in accordance with the provisions of the APAC Restructuring Agreement; *provided, further,* that any Affected Intercompany Creditor which has its Aggregate Settlement Share reduced pursuant to this **Section 3.5** by an amount that is equal to or greater than the greater of (x) $1,000,000 and (y) twenty percent (20%) of such Affected Intercompany Creditor's initial Aggregate Settlement Share shall have the right to terminate this Agreement prior to the Escrow Release Effective Date by providing written notice to each of the other Parties hereto, whereupon this Agreement shall terminate and each Party shall have no further rights or obligations hereunder. The Parties agree that the reduction in Net Cash Balance Payments resulting from any Reduction Amount or Echo Decrease shall be borne by the respective Affected Intercompany Creditors of such Designated APAC Debtor or Affected Creditor APAC Debtor on a pro rata basis based on each such Affected Intercompany Creditor's share of the total Net Cash Balance Payments to be made by the applicable Designated APAC Debtor or Affected Creditor APAC Debtor, with each Affected Intercompany Creditor's Aggregate Settlement Share being reduced accordingly.

## ARTICLE IV — RELEASES

4.1    **Release**

(a)    Upon transmission by the Escrow Agent of all Aggregate Settlement Shares to each of the relevant Settlement Payment Parties, each of the Non-Filed Entities releases each of the other Parties to this Agreement and each of their respective directors, officers, employees, agents, attorneys, advisors, predecessors, successors and assigns (collectively, the **"Releasees"**) from (x) any and all claims, rights, debts, defenses, demands, liabilities, obligations, damages, actions, suits, causes of action, and setoffs, whether known or unknown, suspected or unsuspected, accrued or unaccrued, matured or unmatured, past or present, fixed or contingent, liquidated or unliquidated, whether sounding in contract, tort or otherwise (collectively, **"Claims"**), that such Non-Filed Entity now has, had, or may have against any of the Releasees up to the date of this Agreement other than the Surviving Obligations, including, without limitation, (i) in respect of Sale Proceeds, (ii) in respect of proceeds of sale arising from any other divestiture of assets by or on behalf of a Nortel Party or any of its affiliates including, without limitation, the transactions identified on **Schedule 9** hereto; (iii) obligations arising under that certain CDMA/LTE China Side Agreement entered into as of November 2, 2009 by and between Nortel Networks (China) Limited, NNL and NNI, and (iv) obligations arising under that certain Offer in connection with the payment of certain Sale Proceeds to Nortel Networks de Argentina S.A., dated as of March 19, 2010, and (y) any and all Claims in respect of any proceeds of sale of any future divestiture of assets by or on behalf of a Nortel Party or any of its affiliates other than those in which such Non-Filed Entity participates (collectively, the **"Released Claims"**) and agrees that it shall not allege, file or

10

otherwise assert any Released Claim against the Releasees or the Escrow Agent, or any of them, including in respect of an entitlement to or the allocation of Sale Proceeds or any other proceeds of sale in connection with any other divestiture of assets by or on behalf of a Nortel Party or any of its affiliates that has occurred or that may occur, or allege, file or otherwise assert a Claim against either the Releasees or any person which could result in a claim over or right of contribution or indemnity against any of the Releasees in respect of the Released Claims or that could otherwise impact upon a Releasee's entitlement to or the allocation of Sale Proceeds or any other proceeds of sale in connection with any other divestiture of assets by or on behalf of a Nortel Party or any of its affiliates that has occurred or that may occur; *provided, however*, that notwithstanding the foregoing, each of Nortel Networks Kabushiki Kaisha, Nortel Technology Excellence Centre Private Ltd., Nortel Networks de Guatemala, Ltda. and Nortel Trinidad and Tobago Limited (each a **"NFE US Subsidiary"**, and collectively the **"NFE US Subsidiaries"**) does not hereby release any Claims against any US Debtor other than (i) Claims in respect of Sale Proceeds, (ii) Claims in respect of any other proceeds of sale in connection with any other divestiture of assets by or on behalf of a Nortel Party or any of its affiliates and (iii) Claims which could otherwise impact a US Debtor's entitlement to or the allocation of Sale Proceeds or any other proceeds of sale in connection with any other divestiture of assets by or on behalf of a Nortel Party or any of its affiliates (such retained Claims, the **"NFE US Subsidiary Carve-out"**). Upon transmission by the Escrow Agent of all Aggregate Settlement Shares to each of the relevant Settlement Payment Parties, each of the Non-Filed Entities agrees that it shall be prohibited from participating in any court proceeding, mediation, arbitration or other proceeding or discussion to resolve the allocation of Sale Proceeds or any other proceeds of sale in connection with any other divestiture of assets by or on behalf of a Nortel Party or any of its affiliates that has occurred or that may occur.

(b)     Upon transmission by the Escrow Agent of all Aggregate Settlement Shares to each of the relevant Settlement Payment Parties, each of the Parties to this Agreement releases each of the Non-Filed Entities and each of their respective directors, officers, employees, agents, attorneys, advisors, predecessors, successors and assigns (the **"NFE Releasees"**) from any and all Claims that such Party now has, had or may have had against any of the NFE Releasees up to the date of this Agreement other than the Surviving Obligations, including, without limitation, (i) in respect of Sale Proceeds, (ii) obligations arising under that certain CDMA/LTE China Side Agreement entered into as of November 2, 2009 by and between Nortel Networks (China) Limited, NNL and NNI, and (iii) obligations arising under that certain Offer in connection with the payment of certain Sale Proceeds to Nortel Networks de Argentina S.A., dated as of March 19, 2010; *provided, however*, that notwithstanding the foregoing, each of the US Debtors does not hereby release any Claims against any NFE US Subsidiary other than Claims in respect of Sale Proceeds (such retained Claims, the **"US Debtor Carve-out"**, and together with the NFE US Subsidiary Carve-out, the **"US Estate Carve-out"**). For the avoidance of doubt, the release provided in this **Section 4.1(b)** shall not impact the rights of the Parties against those Non-Filed Entities of

11

which they are a holder of shares, stock, or other equity interests to the extent arising from the holding of such shares, stock or other equity interests in a Non-Filed Entity.

(c)     For the avoidance of doubt, nothing in this Agreement constitutes a waiver of the Canadian Debtors', the US Debtors', the EMEA Debtors', NNSA's, the EMEA Liquidation Debtors', the EMEA NFEs', the Joint Administrators' (as joint administrators of the EMEA Debtors and NNSA), the Joint Liquidators' or the NNSA Office Holder's right to pursue, allege, file or otherwise assert any and all Claims that such Party now has, had or may have had against any Party other than the NFE Releasees, including any claims in which the NFE Releasees may be or have been jointly, severally or concurrently liable with another Party, nor shall it constitute a waiver of any Party's right to defend, disallow or dispute any such Claims.

4.2     Notwithstanding anything to the contrary in this Agreement, each of the Non-Filed Entities covenants and agrees, if requested to do so, to enter into any license termination agreement with respect to the licenses and rights granted by other Nortel Parties for no further consideration; *provided that*, such Non-Filed Entity shall, in exchange for such license termination, receive a sublicense from the relevant Nortel Party that provides reasonably equivalent rights to the terminated licenses and rights.

## ARTICLE V — REPRESENTATIONS AND WARRANTIES

### 5.1     Representations and Warranties of the Parties

Subject to satisfaction of the Conditions (as defined below), each Party (but not, for the avoidance of doubt, the Joint Administrators, the Joint Liquidators or the NNSA Office Holder in their personal capacities) hereby severally represents and warrants to each other that, as of the date hereof:

(a)     it has the power and authority to enter into this Agreement and to carry out its obligations hereunder;

(b)     the execution of this Agreement, and the consummation of the transactions contemplated herein, have been authorized by all necessary approvals, and no other act or proceeding on its part is necessary to authorize the execution of this Agreement; and

(c)     this Agreement has been duly executed by it and constitutes a legal, valid and binding obligation of such Party that is enforceable against it under all applicable laws and regulations.

### 5.2     Representations and Warranties of the APAC Restructuring Agreement Parties

(a)     Each of the APAC Restructuring Agreement Parties (but not, for the avoidance of doubt, the Joint Administrators, the Joint Liquidators or the NNSA Office Holder

700081299 09242174

in their personal capacities) severally represents and warrants to each other and to the other Parties that, upon approval by the Canadian Court and the US Court, this Agreement will have been approved in accordance with the terms of the APAC Restructuring Agreement, and the APAC Restructuring Agreement Parties' execution of this Agreement and the performance of their obligations hereunder will not constitute a violation of any of the provisions of the APAC Restructuring Agreement.

5.3     **Representations and Warranties of the APAC Debtors**

(a)     Each of the APAC Debtors severally represents and warrants to the APAC Restructuring Agreement Parties that the Net Cash Balance Payments made by it hereunder are payments of Net Cash Balances for the purposes of the APAC Restructuring Agreement.

(b)     Each of the APAC Debtors severally represents and warrants to each other and to the other Parties that, as of the date hereof, each Net Cash Balance Payment made by it hereunder as described on **Appendix C-1** does not violate any foreign exchange control or other regulation, statute, rule or legal limitation applicable to the making of such Net Cash Balance Payment.

## ARTICLE VI — COVENANTS TO EXECUTE ESCROW AMENDMENTS AND RELEASE INSTRUCTIONS

6.1     Each of the Escrow Parties, the NNSA Office Holder, the Joint Administrators (acting on behalf of the EMEA Debtors and NNSA (as applicable)) and the Joint Liquidators (acting on behalf of the EMEA Liquidation Debtors (as applicable)) covenants and agrees to execute and deliver, no later than ten Business Days after the Effective Date (as defined below), an amendment, substantially in the form attached hereto as **Appendix E**, to each Escrow Agreement as necessary to remove all references to each of the Non-Filed Entities as a Depositor (as such term is defined in such Escrow Agreements) or otherwise, such that upon transmission by the Escrow Agent of all Aggregate Settlement Shares to each of the relevant Settlement Payment Parties none of the Non-Filed Entities shall have any further rights or obligations under such Escrow Agreement (the "**Escrow Amendments**"), and that any term or condition of an Escrow Agreement that explicitly or implicitly requires the consent or participation of a Non-Filed Entity shall be forever deemed not to require such consent or participation. For the avoidance of doubt, the Parties agree that the Escrow Agent is authorized to take all acts requiring the unanimous direction of the Depositors under the Escrow Agreements without the consent or participation of the Non-Filed Entities.

6.2     Each of the Escrow Parties covenants and agrees, no later than ten Business Days after the Effective Date, to execute and deliver to the Escrow Agent an escrow release instruction (each an "**Escrow Account Release Instruction**"), the form of which is attached hereto as **Appendix F**, directing the Escrow Agent to withdraw the Settlement Amount from each Escrow Account relating to each Escrow Agreement to which it is a

13

party and for the Escrow Agent to deposit the Settlement Amount in the Intermediate Distribution Account.

6.3 Each of the Escrow Parties covenants and agrees, no later than ten Business Days after the Effective Date, to execute and deliver to the Escrow Agent an escrow release instruction (the "**Intermediate Distribution Account Release Instruction**" and together with the Escrow Account Release Instructions, the "**Escrow Release Instructions**"), the form of which is attached hereto as **Appendix G**, directing the Escrow Agent to transmit the Aggregate Settlement Share from the Intermediate Distribution Account to the Settlement Payment Parties in accordance with **Appendix B** attached hereto (the date on which all obligations of each of the specified Parties under **Sections 6.1, 6.2** and **6.3** have been satisfied, the "**Escrow Release Trigger Date**").

6.4 Without limiting those obligations in **Sections 6.1, 6.2,** and **6.3**, each of the Parties covenants and agrees to use commercially reasonable efforts to effect the outcomes described in **Sections 6.1, 6.2,** and **6.3** above including, without limitation, promptly executing and delivering any further documentation that may be required by the Escrow Agent.

6.5 For the purpose of this Article VI, "**Business Day**" shall mean a day that is not a Saturday, Sunday or national public holiday in Canada, the United States or any part of the United Kingdom

## ARTICLE VII — CONDITIONS TO EFFECTIVENESS

7.1 **Court Approval and Delivery of Release**

(a) No provision of this Agreement except the provisions of this **Article VII** and **Article VIII** shall be effective until the satisfaction of all of the following conditions in this **Section 7.1(a)** (each, a "**Condition**" and collectively, the "**Conditions**", and the date of the satisfaction of all Conditions, the "**Effective Date**"):

(i) the Canadian Court shall have granted an order approving the entirety of this Agreement and all provisions hereof including, without limitation, the amendments to the APAC Restructuring Agreement contemplated herein, and such order shall have become final and non-appealable;

(ii) the US Court shall have granted an order approving the entirety of this Agreement and all provisions hereof including, without limitation, the amendments to the APAC Restructuring Agreement contemplated herein, and such order shall have become final and non-appealable; and

(iii) Nortel Networks del Paraguay S.A. shall have executed and delivered (i) the Full and Final Acknowledgement and Release (Paraguay) to the Nortel Parties, the form of which is attached hereto as **Appendix H** and (ii) its signature pages to the Escrow Amendment, the Escrow Account Release

14

Instructions for the Escrow Account of which it is a Depositor and the Intermediate Distribution Account Release Instruction.

(b)   The Canadian Debtors and the US Debtors (as applicable) shall:

    (i)   use commercially reasonable efforts to satisfy the Conditions set forth in **Sections 7.1(a)(i)** and **7.1(a)(ii)** above in their respective Courts as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement; and

    (ii)  keep all other Parties and counsel and financial advisors to the ad hoc committee of bondholders (the "**Bondholder Group**") reasonably apprised of the progress of the satisfaction of the Conditions and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties.

(c)   Each Party hereto shall not oppose the reasonable participation of any other Party or the Bondholder Group in connection with any proceedings in any Court related to the satisfaction of the Conditions to the extent such entity does not already have standing.

## ARTICLE VIII — MISCELLANEOUS

8.1   **Reservation of Rights**

(a)   The Parties hereby acknowledge and agree that they are entering into this Agreement for settlement purposes only and nothing herein or the actions taken as a result hereof shall constitute an acknowledgment or admission as to the correct methodology for determining allocation of the Sale Proceeds of a particular Global Sale or the proceeds of any other transaction, including, without limitation, the sale of assets, business or intellectual property, that could be subject to allocation among any of the Parties or their affiliates, and shall not constitute an amendment, modification or waiver of rights of any Party (other than by or with respect to the Non-Filed Entities) or bar, prohibit, terminate or in any way hinder or enhance the rights of the Parties to this Agreement (other than by or with respect to the Non-Filed Entities) to present any arguments, methodologies, legal or factual theories in support of a proposed allocation of the Sale Proceeds or the proceeds of any other transaction, including, without limitation, the sale of assets, business or intellectual property, that could be subject to allocation amongst any of the Parties or their affiliates, and such presentation shall not, or otherwise be deemed to, constitute in any way a violation of a Party's rights under any existing agreement. The Parties agree that no Party shall use as evidence, or otherwise rely upon, this Agreement or any part hereof (including, without limitation, the amount and/or payment of the Settlement Amount or a Party's Settlement Share) in any way to support its right to a particular allocation of the Sale Proceeds or any other sale proceeds.

(b)     The Parties hereby acknowledge and agree that, in the event the Escrow Release Effective Date does not occur or the Agreement is terminated pursuant to **Section 3.5**, nothing in this Agreement, including without limitation the provisions of **Section 2.1** hereof, shall constitute an acknowledgment, admission, amendment, modification or waiver of claims governed by this Agreement or any other rights or obligations of the Parties.

8.2     **Governing Law and Jurisdiction**

(a)     This Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction.

(b)     To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the jurisdiction of the US and Canadian Courts (including for purposes of a joint hearing conducted under the cross-border insolvency protocol, as amended and as the same may be further amended, approved by the US and Canadian Courts in their respective proceedings (the "**Cross-Border Protocol**")), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement; (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters in this Agreement must be commenced in (v) a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect any of the Canadian Debtors and any of the US Debtors, (w) the US Court for any claim, action or proceeding if such claim, action or proceeding would affect the US Debtors and not affect the Canadian Debtors, (x) the Canadian Court if such claim, action or proceeding would affect the Canadian Debtors, but not affect the US Debtors, (y) the courts of England and Wales if such claim, action or proceeding would affect the main administration proceedings of NNSA any of the EMEA Debtors or the Joint Administrators (including as joint administrators of NNSA) and any of the EMEA Liquidation Debtors or the Joint Liquidators, but not affect the US Debtors or the Canadian Debtors, or (z) the courts of France if such claim, action or proceeding would affect the NNSA Office Holder or the NNSA Secondary Proceedings but not any of the EMEA Debtors, the Joint Administrators, the EMEA Liquidation Debtors, the Joint Liquidators, the US Debtors or the Canadian Debtors; (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a court or any claim that any such action brought in such a court has been brought in an inconvenient forum; (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof; and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

8.3    **Amendments**

This Agreement may be amended, by means of a written amendment signed by all Parties, which amendments, if material, must be approved by the US Court and the Canadian Court.

8.4    **Counterparts**

This Agreement may be executed in separate counterparts (which may include counterparts delivered by facsimile or other electronic transmission) and all of said counterparts taken together shall be deemed to be an original and shall be binding on the Party who signed the counterpart and all of which together shall constitute a single agreement.

8.5    **Joint Administrators and NNSA Office Holder**

(a)    The Parties agree that the Joint Administrators and the NNSA Office Holder have negotiated and are entering into this Agreement as agents for the EMEA Debtors to which they are appointed and NNSA (as applicable) and that none of the Joint Administrators or the NNSA Office Holder, their respective firms, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

(b)    The Joint Administrators are a Party to this Agreement:

(i)    as agents of NNSA and the respective EMEA Debtors of which they are administrators; and

(ii)    in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and for the purposes of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Administrators and enforcing the obligations of certain other Parties to this Agreement.

8.6    **Joint Liquidators**

(a)    The Parties agree that the Joint Liquidators have negotiated and are entering into this Agreement as agents for the EMEA Liquidation Debtors to which they are appointed and that none of the Joint Liquidators, their respective firms, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

(b)    The Joint Liquidators are a Party to this Agreement:

700081299 09242174

(i)     as agents of the respective EMEA Liquidation Debtors of which they are liquidators; and

(ii)    in their own capacities solely for obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Liquidators and enforcing the obligations of certain other Parties to this Agreement.

## 8.7 Several Obligations

Except as specifically set forth in this Agreement, the obligations of each Party hereunder are several, and not joint and several.

## 8.8 Binding; Successors and Assigns

Except as otherwise expressly provided in this Agreement, all representations, warranties, covenants and agreements set forth in this Agreement by or on behalf of the Parties hereto will be binding upon and inure to the benefit of such Parties and their respective successors and permitted assigns, including, without limitation, any administrator, liquidator, trustee, receiver appointed as a successor or assign of any Party.

## 8.9 Specific Performance

The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, in addition to any other remedies to which the Parties are entitled at law or in equity, each of the Parties shall be entitled to equitable relief to prevent or remedy breaches of this Agreement, without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches.

## 8.10 Entire Agreement

(a)    This Agreement constitutes the entire understanding and agreement between the signatories hereto in relation to the subject matter of this Agreement.

(b)    Each Party acknowledges that it has not entered into this Agreement in reliance wholly or partly on any representation or warranty made by or on behalf of the other Party (whether orally or in writing) other than as expressly set out in this Agreement.

(c)    The settlements contained in this Agreement are integrated and mutually dependent. In the event that any provision herein shall be illegal, invalid, or unenforceable, the entire Agreement shall be rendered null and void.

18

8.11    **Consent of the Creditors' Committee**

Consistent with Section 12(g)(i) of the Interim Funding and Settlement Agreement, dated June 9, 2009 among certain of the Parties, the US Debtors acknowledge that they have consulted with the Creditors' Committee and obtained its consent prior to entering into this Agreement, which consent is evidenced by the signature of the Creditors' Committee below.

[SIGNATURE PAGES FOLLOW]

19

NORTEL NETWORKS LIMITED

By:_____
Name:  Anna Ventresca
Title:   General Counsel-Corporate and
Corporate Secretary


By:_____
Name:  Clarke Glaspell
Title:   Controller


NORTEL NETWORKS INC.

By:_____
Name:  John J. Ray, III
Title:  Principal Officer


NORTEL NETWORKS CORPORATION

By:_____
Name:  Anna Ventresca
Title:   General Counsel-Corporate and
Corporate Secretary


By:_____
Name:  Clarke Glaspell
Title:   Controller


ERNST & YOUNG INC. IN ITS
CAPACITY AS THE MONITOR OF
NORTEL NETWORKS CORPORATION
ET AL.,
AND NOT IN ITS PERSONAL
CAPACITY




By: :_____
Name:
Title:


THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF NORTEL
NETWORKS INC., ET. AL.

By:  AKIN GUMP STRAUSS HAUER &
FELD LLP, as Counsel to the Committee
and authorized signatory and not in its
individual capacity


By:_____
Name:
Title:


S-1

*APAC/CALA Settlement Agreement –Signature Page*

NORTEL NETWORKS LIMITED

By:_____
Name:
Title:

By:_____
Name:
Title:

NORTEL NETWORKS INC.

By:_____
Name:  John J. Ray, III
Title:  Principal Officer

ERNST & YOUNG INC. IN ITS
CAPACITY AS THE MONITOR OF
NORTEL NETWORKS CORPORATION
ET AL.,
AND NOT IN ITS PERSONAL
CAPACITY

By: :_____
Name:
Title:

NORTEL NETWORKS CORPORATION

By:_____
Name:
Title:

By: _____
Name:
Title:

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF NORTEL
NETWORKS INC., ET. AL.

By:  AKIN GUMP STRAUSS HAUER &
FELD LLP, as Counsel to the Committee
and authorized signatory and not in its
individual capacity

By:_____
Name:
Title:

S-1

*APAC/CALA Settlement Agreement –Signature Page*

NORTEL NETWORKS LIMITED

By:_____
Name:
Title:

By:_____
Name:
Title:

NORTEL NETWORKS INC.

By:_____
Name:  John J. Ray, III
Title:  Principal Officer

NORTEL NETWORKS CORPORATION

By:_____
Name:
Title:

By:_____
Name:
Title:


ERNST & YOUNG INC. IN ITS
CAPACITY AS THE MONITOR OF
NORTEL NETWORKS CORPORATION
ET AL.,
AND NOT IN ITS PERSONAL
CAPACITY

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF NORTEL
NETWORKS INC., ET. AL.

By:   AKIN GUMP STRAUSS HAUER &
FELD LLP, as Counsel to the Committee
and authorized signatory and not in its
individual capacity

By: _Sharon Hamilton_
Name:  Sharon Hamilton
Title:  Senior Vice-President

By:_____
Name:
Title:


S-1

*APAC/CALA Settlement Agreement –Signature Page*

NORTEL NETWORKS LIMITED

By:_____
Name:
Title:

By:_____
Name:
Title:

NORTEL NETWORKS INC.

By:_____
Name:  John J. Ray, III
Title:  Principal Officer

NORTEL NETWORKS CORPORATION

By:_____
Name:
Title:

By:_____
Name:
Title:

ERNST & YOUNG INC. IN ITS
CAPACITY AS THE MONITOR OF
NORTEL NETWORKS CORPORATION
ET AL.,
AND NOT IN ITS PERSONAL
CAPACITY

By: :_____
Name:
Title:

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF NORTEL
NETWORKS INC., ET. AL.

By:  AKIN GUMP STRAUSS HAUER &
FELD LLP, as Counsel to the Committee
and authorized signatory and not in its
individual capacity

By _____
Name: Laurel H. Butter
Title: Member of the Firm

S-1

*APAC/CALA Settlement Agreement –Signature Page*

NORTEL NETWORKS TECHNOLOGY CORPORATION

By:_____
Name:  Anna Ventresca
Title:  Director and Secretary

NORTEL NETWORKS DE MEXICO, S.A. DE C.V.

By:_____
Name:  Allan Bifield
Title:  Legal Representative

By:_____
Name:  Anna Ventresca
Title:  Legal Representative

NORTEL DE MEXICO, S. DE R.L. DE C.V.

By:_____
Name:  Allan Bifield
Title:  Legal Representative

By:_____
Name:  Anna Ventresca
Title:  Legal Representative

NORTEL NETWORKS PERU S.A.C.

By:_____
Name:  Luis Gastañeta Alayza
Title:  Legal Representative

NORTEL NETWORKS AUSTRALIA PTY. LIMITED

By:_____
Name:  Allan Bifield
Title:  Director

By:_____
Name:  Anna Ventresca
Title:  Director

S-2

*APAC/CALA Settlement Agreement – Signature Page*

NORTEL NETWORKS TECHNOLOGY CORPORATION

By:_____
Name:   Anna Ventresca
Title:   Director and Secretary

NORTEL NETWORKS DE MÉXICO, S.A. DE C.V.

By:_____
Name:   Allan Bifield
Title:   Legal Representative

By:_____
Name:   Anna Ventresca
Title:   Legal Representative

NORTEL DE MEXICO, S. DE R.L. DE C.V.

By:_____
Name:   Allan Bifield
Title:   Legal Representative

By:_____
Name:   Anna Ventresca
Title:   Legal Representative

NORTEL NETWORKS PERU S.A.C.

By:_____
Name:   Luis Gastañeta Alayza
Title:   Legal Representative

NORTEL NETWORKS AUSTRALIA PTY. LIMITED

By:_____
Name:   Allan Bifield
Title:   Director

By:_____
Name:   Anna Ventresca
Title:   Director

S-2

*APAC/CALA Settlement Agreement – Signature Page*

PT NORTEL NETWORKS INDONESIA

By: _____
Name:  Allan Bifield
Title:   Director

By: _____
Name:  Anna Ventresca
Title:   Director

NORTEL NETWORKS MALAYSIA SDN. BHD.

By: _____
Name:  Allan Bifield
Title:   Director

By: _____
Name:  Anna Ventresca
Title:   Director

NORTEL NETWORKS NEW ZEALAND LIMITED

By: _____
Name:  Allan Bifield
Title:   Director

By: _____
Name:  Anna Ventresca
Title:   Director

NORTEL NETWORKS SINGAPORE PTE. LIMITED

By: _____
Name:  Allan Bifield
Title:   Director

By: _____
Name:  Anna Ventresca
Title:   Director

NORTEL NETWORKS SINGAPORE PTE. LIMITED on behalf of NORTEL
NETWORKS SINGAPORE PTE. LIMITED – PHILIPPINES BRANCH

By: _____
Name:  Allan Bifield
Title:   Director

By: _____
Name:  Anna Ventresca
Title:   Director

S-3

NORTEL NETWORKS (ASIA) LIMITED

By: _____
Name:  Allan Bifield
Title:   Director

NORTEL NETWORKS (ASIA) LIMITED on behalf of NORTEL NETWORKS (ASIA)
LIMITED – PAKISTAN BRANCH

By: _____
Name:  Allan Bifield
Title:   Director

NORTEL NETWORKS (ASIA) LIMITED on behalf of NORTEL NETWORKS (ASIA)
LIMITED – TAIWAN BRANCH

By: _____
Name:  Allan Bifield
Title:   Director

NORTEL NETWORKS (CHINA) LIMITED

By: _____
Name:  Allan Bifield
Title:   Legal Representative

NORTEL NETWORKS (THAILAND) LIMITED

By: _____
Name:  Allan Bifield
Title:   Director

By: _____
Name:  Anna Ventresca
Title:   Director

NORTEL NETWORKS KOREA LIMITED

By: _____
Name:  Christopher Noel Vaughan John
Title:   Representative Director

S-4

*APAC/CALA Settlement Agreement – Signature Page*

NORTEL NETWORKS (ASIA) LIMITED

By:_____
Name:  Allan Bifield
Title:   Director


NORTEL NETWORKS (ASIA) LIMITED on behalf of NORTEL NETWORKS (ASIA) LIMITED – PAKISTAN BRANCH

By:_____
Name:  Allan Bifield
Title:   Director


NORTEL NETWORKS (ASIA) LIMITED on behalf of NORTEL NETWORKS (ASIA) LIMITED – TAIWAN BRANCH

By:_____
Name:  Allan Bifield
Title:   Director


NORTEL NETWORKS (CHINA) LIMITED

By:_____
Name:  Allan Bifield
Title:   Legal Representative


NORTEL NETWORKS (THAILAND) LIMITED

By:_____
Name:  Allan Bifield
Title:   Director

By:_____
Name:  Anna Ventresca
Title:   Director


NORTEL NETWORKS KOREA LIMITED

By:_____
Name:  Christopher Noel Vaughan John
Title:   Representative Director


S-4

*APAC/CALA Settlement Agreement –Signature Page*

NORTEL VIETNAM LIMITED

By:_____
Name:  Allan Bifield
Title:   General Director

NORTEL NETWORKS (INDIA) PRIVATE LIMITED

By:_____
Name:  Allan Bifield
Title:   Director

By:_____
Name:  Anna Ventresca
Title:   Director

NORTEL NETWORKS TELECOMMUNICATIONS EQUIPMENT (SHANGHAI)
CO. LIMITED

By:_____
Name:  Anna Ventresca
Title:   Legal Representative

NORTEL NETWORKS DE ARGENTINA, S.A.

By:_____
Name:  Jorge Nuñez
Title:   Legal Representative

NORTEL NETWORKS DEL ECUADOR, S.A.

By:_____
Name:  Allan Bifield
Title:   General Manager

S-5

*APAC/CALA Settlement Agreement -- Signature Page*

NORTEL VIETNAM LIMITED

By:_____
Name:  Allan Bifield
Title:   General Director

NORTEL NETWORKS (INDIA) PRIVATE LIMITED

By:_____
Name:  Allan Bifield
Title:   Director

By:_____
Name:  Anna Ventresca
Title:   Director

NORTEL NETWORKS TELECOMMUNICATIONS EQUIPMENT (SHANGHAI)
CO. LIMITED

By:_____
Name:  Anna Ventresca
Title:   Legal Representative

NORTEL NETWORKS DE ARGENTINA, S.A.

By:_____
Name:  Jorge Nuñez
Title:   Legal Representative

NORTEL NETWORKS DEL ECUADOR, S.A.

By:_____
Name:  Allan Bifield
Title:   General Manager

S-5

*APAC/CALA Settlement Agreement – Signature Page*

NORTEL NETWORKS GLOBAL CORPORATION

By: _____
Name:  Allan Bifield
Title:   Director and President

By: _____
Name:  Anna Ventresca
Title:   Director and Secretary

NORTEL NETWORKS INTERNATIONAL CORPORATION

By: _____
Name:  Allan Bifield
Title:   Director and President

By: _____
Name:  Anna Ventresca
Title:   Director and Secretary

NORTEL NETWORKS DEL URUGUAY, S.A.

By: _____
Name:  Allan Bifield
Title:   President of the Board of Directors

NORTEL NETWORKS CHILE S.A.

By: _____
Name:  Allan Bifield
Title:   Legal Representative

NORTEL NETWORKS DE GUATEMALA LTDA.

By: _____
Name: Luis-Fernando Guerra Sanz
Title: Sole Administrator and Legal Representative


NORTEL TRINIDAD & TOBAGO LIMITED

By: _____
Name: Luis-Fernando Guerra Sanz
Title: Director


NORTEL NETWORKS KABUSHIKI KAISHA

By: _____
Name: Stephen Givens
Title: Resident Director


NORTEL TECHNOLOGY EXCELLENCE CENTRE PRIVATE LIMITED

By: _____
Name: Luis-Fernando Guerra Sanz
Title: Director

*[PAC C I]. 1 Settlement Agreement -Signature Page*

NORTEL NETWORKS DE GUATEMALA LTDA.

By:_____
Name:  Luis-Fernando Guerra Sanz
Title:  Sole Administrator and Legal Representative

NORTEL TRINIDAD & TOBAGO LIMITED

By:_____
Name:  Luis-Fernando Guerra Sanz
Title:  Director

NORTEL NETWORKS KABUSHIKI KAISHA

By:____Stephen Givens_____
Name:  Stephen Givens
Title:  Resident Director

NORTELTECHNOLOGY EXCELLENCE CENTRE PRIVATE LIMITED

By:_____
Name:  Luis-Fernando Guerra Sanz
Title:  Director

*APAC/CALA Settlement Agreement –Signature Page*

NORTEL NETWORKS (CALA) INC.

By:_____
Name:  John J. Ray, III
Title:  Principal Officer


QTERA CORPORATION

By:_____
Name: John J. Ray, III
Title: Principal Officer


XROS, INC.

By:_____
Name:  John J. Ray, III
Title:  Principal Officer


CORETEK, INC.

By:_____
Name:  John J. Ray, III
Title:  Principal Officer


ARCHITEL SYSTEMS (U.S.) CORPORATION

By:_____
Name:  John J. Ray, III
Title:  Principal Officer