## SCHEDULE A - NORTEL PARTIES

| Canadian Debtors | U.S. Debtors |
|---|---|
| 1. Nortel Networks Corporation | 1. Nortel Networks Inc. |
| 2. Nortel Networks Limited | 2. Architel Systems (U.S.) Corporation |
| 3. Nortel Networks Global Corporation | 3. CoreTek, Inc. |
| 4. Nortel Networks International Corporation | 4. Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.") |
| 5. Nortel Networks Technology Corporation | 5. Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.") |
| | 6. Nortel Networks Applications Management Solutions Inc. |
| | 7. Nortel Networks Cable Solutions Inc. |
| | 8. Nortel Networks Capital Corporation |
| | 9. Nortel Networks (CALA) Inc. |
| | 10. Nortel Networks HPOCS Inc. |
| | 11. Nortel Networks International Inc. |
| | 12. Nortel Networks Optical Components Inc. |
| | 13. Northern Telecom International Inc. |
| | 14. Qtera Corporation |
| | 15. Sonoma Systems |
| | 16. Xros, Inc. |

| EMEA Debtors | APAC Entities |
|---|---|
| 1. Nortel Networks UK Limited (In Administration) | 1. Nortel Networks (Asia) Limited |
| 2. Nortel Networks (Ireland) Limited (In Administration) | 2. Nortel Networks Australia Pty. Limited |
| 3. Nortel Networks NV (In Administration) | 3. Nortel Networks (India) Private Limited |
| 4. Nortel Networks SpA (In Administration) | 4. PT Nortel Networks Indonesia |
| 5. Nortel Networks BV (In Administration) | 5. Nortel Networks Japan (Japanese name is Nortel Networks Kabushiki Kaisha) |
| 6. Nortel Networks Polska Sp z.o.o. (In Administration) | 6. Nortel Networks Korea Limited |
| 7. Nortel Networks Hispania, SA (In Administration) | 7. Nortel Networks Malaysia Sdn. Bhd. |
| 8. Nortel Networks (Austria) GmbH (In Administration) | 8. Nortel Networks New Zealand Limited |
| 9. Nortel Networks sro (In Administration) | 9. Nortel Networks Singapore Pte Ltd |
| 10. Nortel Networks Engineering Services Kft (In Administration) | 10. Nortel Networks (Thailand) Limited |
| 11. Nortel Networks Portugal SA (In Administration) | 11. Nortel Vietnam Limited |
| 12. Nortel Networks Slovensko, sro (In Administration) | 12. Nortel Networks (China) Ltd |
| 13. Nortel Networks Romania Srl (In Administration) | 13. Nortel Networks Telecommunications Equipment (Shanghai) Co., Ltd |
| 14. Nortel GmbH (In Administration) | 14. Nortel Technology Excellence Centre Private Limited |
| 15. Nortel Networks Oy (In Administration) | |
| 16. Nortel Networks AB (In Administration) | |
| 17. Nortel Networks International Finance & Holding BV (In Administration) | |
| 18. Nortel Networks France S.A.S. (In Administration) | |
| 19. Nortel Networks S.A. (In Administration and *liquidation judiciare*) | |

DOCSTOR: 2384685\1

| CALA Entities | EMEA NFEs |
|---|---|
| 1. Nortel Networks de Argentina S.A. | 1. Nortel Networks AS |
| 2. Nortel Networks Chile S.A. | 2. Nortel Networks AG |
| 3. Nortel Networks del Ecuador S.A. | 3. Nortel Networks South Africa (Pty) Limited |
| 4. Nortel Networks de Guatemala Ltda. | 4. Nortel Networks (Northern Ireland) Limited |
| 5. Nortel Networks de Mexico, S.A. de C.V. | 5. Nortel Networks Optical Components Limited |
| 6. Nortel Networks Perú S.A.C. | |
| 7. Nortel Networks del Uruguay S.A. | |
| 8. Nortel de Mexico, S. de R.L de C.V. | |
| 9. Nortel Trinidad and Tobago Limited | |

APPENDIX "B"

APAC RESTRUCTURING AGREEMENT

[ATTACHED]

*This is Exhibit ........ referred to in the*
*affidavit of ..... SOHN DOOLITTLE*
*sworn before me, this*
*day of ..... NOVEMBER ..... 20[X]*

**EXECUTION VERSION**

*A COMMISSIONER FOR TAKING AFFIDAVITS*

## ASIA RESTRUCTURING AGREEMENT

This agreement (including the Schedules and Annexes attached hereto and as amended or supplemented from time to time, this "<u>Agreement</u>") is entered into by and among Nortel Networks Limited ("<u>NNL</u>") and the other entities set forth in <u>Schedule 1</u> attached hereto, Nortel Networks Inc. ("<u>NNI</u>") and the other entities set forth in <u>Schedule 2</u> attached hereto, the Joint Administrators (as defined below) and the entities set forth in <u>Schedule 3</u> attached hereto (each, an "<u>EMEA Debtor</u>" and collectively, the "<u>EMEA Debtors</u>") and the entities set forth in <u>Schedule 4</u> attached hereto (each, an "<u>APAC Debtor</u>" and collectively, the "<u>APAC Debtors</u>"), dated as of November 5, 2009. The Canadian Debtors (as defined below), the US Debtors (as defined below), the EMEA Debtors and the APAC Debtors are sometimes referred to herein individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>". The Joint Administrators, in their personal capacity, shall be party to this Agreement as provided in Section 16 and solely for the purpose of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Administrators and references to the Parties shall be construed accordingly.

## RECITALS

1.      WHEREAS, on January 14, 2009 (the "<u>Filing Date</u>"), Nortel Networks Corporation ("<u>NNC</u>"), NNL and certain of NNC's other Canadian affiliates included in <u>Schedule 1</u> (collectively, the "<u>Canadian Debtors</u>," and NNC and its debtor and non-debtor affiliates are sometimes referred to herein as the "<u>Nortel Group</u>"), commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "<u>Canadian Court</u>") under the Companies' Creditors Arrangement Act (Canada) (the "<u>Canadian Proceedings</u>"), in connection with which Ernst & Young Inc. was appointed monitor (the "<u>Monitor</u>"); and

2.      WHEREAS, on the Filing Date and on July 14, 2009 (with respect to Nortel Networks (CALA) Inc.), NNI and certain of NNI's United States affiliates included in <u>Schedule 2</u> (collectively, the "<u>US Debtors</u>" and, together with the Canadian Debtors and the EMEA Debtors, the "<u>Filed Debtors</u>" and, together with the Canadian Debtors, the EMEA Debtors and the APAC Debtors, the "<u>Debtors</u>") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "<u>US Court</u>") under chapter 11 of title 11 of the United States Code (the "<u>US Proceedings</u>"); and

3.      WHEREAS, on the Filing Date, Nortel Networks UK Limited ("<u>NNUK</u>"), Nortel Networks (Ireland) Limited ("<u>NNIR</u>"), Nortel Networks S.A. ("<u>NNSA</u>") and certain of NNUK's affiliates in the Europe, Middle East and Africa ("<u>EMEA</u>") region, including those in <u>Schedule 3</u> attached hereto, commenced administration proceedings (the "<u>UK Proceedings</u>" and, together with the Canadian Proceedings and the US Proceedings, the "<u>Proceedings</u>") before the High Court of Justice in London, England (the "<u>UK Court</u>" and, together with the Canadian Court and the US Court, the "<u>Courts</u>"), and the UK Court appointed individuals from Ernst & Young LLP (the "<u>UK Administrator</u>"), and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "<u>NNIR Administrator</u>"), as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, and including their respective successors, replacements and any subsequent office holders appointed to the relevant EMEA Debtors, the "<u>Joint Administrators</u>"); and

1

4.    WHEREAS, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

5.    WHEREAS, prior to the Filing Date, certain members of the Nortel Group made quarterly payments (the "Transfer Pricing Payments") to other Nortel Group entities pursuant to a transfer pricing methodology ("Transfer Pricing") provided for in the Transfer Pricing Agreements, where "Transfer Pricing Agreements" means (i) the Master Research and Development Agreement dated as of December 22, 2004 (as amended by, and together with the related understandings contained in, the documents listed in Annex A hereto, the "Master R&D Agreement") and (ii) certain distribution agreements, whether written or oral, between one or more Nortel Group entities, including without limitation the agreements listed in Annex B and Annex H hereto and any other agreements similar to the agreements listed in Annex B and Annex H hereto (as amended, supplemented or otherwise modified, the "Distribution Agreements"); and

6.    WHEREAS, subsequent to the Filing Date, NNL, NNI and the Joint Administrators have accepted that, subject to this Agreement, the APAC Debtors will pay their respective third party and intercompany debts on the following basis:  (i) firstly, payment of all Third Party Liabilities (as defined below) and the Post-Filing Intercompany Debt (as defined below) on a pro rata basis, and (ii) secondly, payment of the Pre-Filing Intercompany Debt (as defined below) on a pro rata basis; and

7.    WHEREAS, the Parties intend to continue to meet their respective obligations to make the monthly payments in respect of the intercompany trading of goods and services supplied by Nortel Group entities subsequent to the Filing Date, pursuant to the arrangements existing prior to or entered into subsequent to the Filing Date; and

8.    WHEREAS, as a consequence of the Proceedings, certain amounts or balances of intercompany payables owing by the Filed Debtors to the APAC Debtors as of the Filing Date became impaired, and certain members of the APAC Debtors, although generating cash flow from continuing operations, have liquidity and/or balance sheet constraints after conducting a proper pre-filing setoff of the corresponding intercompany debt as of the Filing Date; and

9.    WHEREAS, on July 25, 2009, NNC announced that NNL and certain of NNL's subsidiaries, including NNI, had concluded a successful auction of substantially all of their CDMA business and LTE Access assets whereby Telefonaktiebolaget LM Ericsson emerged as the winning bidder for such assets, which bid was approved by the Canadian Court and the US Court on July 28, 2009, and on September 14, 2009, NNC announced that NNL and certain of NNL's subsidiaries, including NNI, had concluded a successful auction of their North American, Caribbean, Latin America and Asia Enterprise Solutions business and the EMEA portion of their Enterprise Solutions business whereby Avaya Inc. ("Avaya") emerged as the winning bidder for such assets, which bid was approved by the Canadian Court and the US Court on September 16, 2009; and

10.     WHEREAS, NNC has also announced that it is actively engaged in discussions with external parties to sell its other businesses and that it has determined that the sale of its businesses maximizes value while preserving innovation platforms, customer relationships and jobs to the greatest extent possible; and

11.     WHEREAS, to enable the APAC Debtors to address applicable solvency issues so as to continue their respective business operations and to preserve their assets and businesses in order to facilitate and participate in any potential sale of the assets, undertakings or businesses of the Nortel Group entities, an Asia-Pacific restructuring plan has been discussed and developed with the Filed Debtors, the Monitor, the Joint Administrators together with the Creditors' Committee (as defined below) and the Bondholders' Committee (as defined below), and this Agreement represents the outcome of those discussions.

NOW THEREFORE, THE PARTIES HEREBY AGREE THAT:

PART A – DEFINITIONS

| Term | Defined in Section |
|---|---|
| Adjustment Payments | 8 |
| Agreement | Preamble |
| Allocation Protocol | 11.c. |
| APAC Debtors | Preamble |
| APAC Debtor Person | 17.a. |
| APAC Distribution Agreements | 8 |
| APAC Selling Debtor | 11.a. |
| Asset Sale | 10.a. |
| Avaya | Recital 9 |
| Bondholders' Committee | 3.a. |
| BOT Condition | 12.a.iv. |
| Business Day | 14 |
| Canadian Court | Recital 1 |
| Canadian Debtors | Recital 1 |
| Canadian Proceedings | Recital 1 |
| Cash and Cash Equivalents | 2.a.i.(A) |
| Category I Pre-Filing Intercompany Debt | 1.a.i. |
| Category II Pre-Filing Intercompany Debt | 1.a.ii. |
| Category III Pre-Filing Intercompany Debt | 1.a.iii. |
| Collateral | 13.c. |
| Conditions | 12.a.iv. |
| Courts | Recital 3 |
| Covenant Event of Default | 13.a. |
| Creditors' Committee | 3.a. |
| Cross-Border Protocol | 15.b. |
| Debtors | Recital 2 |
| Determination Date | 3.b. |

3

40

| Term | Defined in Section |
|---|---|
| Distribution Agreements | Recital 5 |
| D&O Insurance | 18 |
| EMEA | Recital 3 |
| EMEA Debtors | Preamble |
| Escrow Account | 11.b. |
| Estimated Premise Reinstatement Costs | 2.a.ii.(y) |
| Estimated Restructuring Costs | 2.a.ii.(x) |
| Estimated Taxes | 2.a.ii.(z) |
| Estimated Working Capital Requirements | 2.a.ii.(w) |
| Excluded Affiliates | 2.a.ii.(v) |
| Excluded Affiliate Liabilities | 5 |
| Excluded Affiliate Pre-Filing Intercompany Debt | 2.a.ii.(v) |
| Excluded Affiliate Restructuring Agreement | 5 |
| Filed Debtors | Recital 2 |
| Filing Date | Recital 1 |
| Final Effective Date | 12.b. |
| Final Effective Date Payment Amount | 2.c. |
| Indemnified Liabilities | 17.b. |
| Identified Debtors | 4.a. |
| Indebtedness | 6.d.iii. |
| Initial Conditions | 12.a.ii. |
| Initial Determination Date | 2.a. |
| Initial Effective Date | 12.b. |
| Initial Effective Date Payment Amount | 2.b. |
| Initial Payment Amount | 2.c. |
| Intercompany Creditors | 1.a. |
| Joint Administrators | Recital 3 |
| License Termination Agreement | 10.b. |
| Master R&D Agreement | Recital 5 |
| Matured Indemnity Obligation | 2.a. |
| Monitor | Recital 1 |
| NCB Determination Procedure | 2.a. |
| NCB Items | 2.a. |
| Net Cash Balance | 2.a. |
| NN Asia Group | Schedule 4 |
| NN Australia | Schedule 4 |
| NN Australia Note Facility | 6.d.iii. |
| NN India (Private) | Schedule 4 |
| NN Indonesia | Schedule 4 |
| NN Japan | Schedule 4 |
| NN Korea | Schedule 4 |
| NN Malaysia | Schedule 4 |
| NN New Zealand | Schedule 4 |
| NN Singapore Group | Schedule 4 |

41

| Term | Defined in Section |
|---|---|
| NN Thailand | Schedule 4 |
| NN Vietnam | Schedule 4 |
| NNC | Recital 1 |
| NNI | Preamble |
| NNIR | Recital 3 |
| NNIR Administrator | Recital 3 |
| NNL | Preamble |
| NNSA | Recital 3 |
| NNSA Administrator | Recital 4 |
| NNSA Liquidator | Recital 4 |
| NNUK | Recital 3 |
| Non-Filed Affiliates | 11.c.i. |
| Nortel Group | Recital 1 |
| North American Court Condition | 12.a.i. |
| Ordinary Course Cash Collateral | 6.d.iii. |
| Parties | Preamble |
| Payment Event of Default | 13.a. |
| Permitted Severance Payments | 2.a.ii.(x) |
| Post-Filing Intercompany Debt | 4.a.ii. |
| Pre-Filing Intercompany Debt | 1.a. |
| Professional Advice | 2.a. |
| Proceedings | Recital 3 |
| Purchaser | 11.a. |
| RBI Condition | 12.a.iii. |
| Relevant Parties | 3.a. |
| Restructuring Manager | 7 |
| Reversion Date | 4.d. |
| Reverted Subordinated Debt | 4.d. |
| Sale Proceeds | 11.a. |
| Sale Transaction | 11.a. |
| Secured Obligations | 13.c. |
| Selling Debtor | 11.a. |
| Senior Indebtedness | 4.a. |
| Subordinated Debt | 4.a. |
| Subsequent Determination Date | 3.b. |
| Subsequent Payment Amount | 3.c. |
| Suspended Subordinated Debt | 4.d. |
| Suspension Date | 4.d. |
| Suspension Period | 4.d. |
| Third Party Liabilities | 4.a.i. |
| Transfer Pricing | Recital 5 |
| Transfer Pricing Agreements | Recital 5 |
| Transfer Pricing Payments | Recital 5 |
| UK Administrator | Recital 3 |

42

| Term | Defined in Section |
|------|--------------------|
| UK Court | Recital 3 |
| UK Court Condition | 12.a.ii. |
| UK Court's Directions | 12.a.ii. |
| UK Proceedings | Recital 3 |
| US Court | Recital 2 |
| US Debtors | Recital 2 |
| US Proceedings | Recital 2 |

## PART B – PRE-FILING INTERCOMPANY DEBT RESTRUCTURING

1. Pre-Filing Intercompany Debt.

   a. Each APAC Debtor acknowledges and confirms, and each Intercompany Creditor (as defined below) of such APAC Debtor acknowledges and confirms that Annex C-1 sets out the unpaid amount of loans, credits and obligations owing by such APAC Debtor to such Intercompany Creditor as of the Filing Date (after setting off against any receivables owing to such APAC Debtor by such Intercompany Creditor as of the Filing Date to the extent not prohibited or restricted under applicable laws and regulations) (the "Pre-Filing Intercompany Debt") and further sets out, as of the Initial Effective Date (as defined below):

      i. the amount of such Pre-Filing Intercompany Debt to be repaid with the aggregate Initial Payment Amount (as defined below) in accordance with Section 2 (the "Category I Pre-Filing Intercompany Debt"),

      ii. the amount of such Pre-Filing Intercompany Debt to be repaid with the aggregate Subsequent Payment Amount (as defined below) in accordance with Section 3 (the "Category II Pre-Filing Intercompany Debt"), and

      iii. the amount of such Pre-Filing Intercompany Debt to be subordinated in accordance with Section 4 (the "Category III Pre-Filing Intercompany Debt").

   For the purposes of this Agreement, with respect to each APAC Debtor, the Parties to whom such APAC Debtor owes any Pre-Filing Intercompany Debt shall be referred to individually as an "Intercompany Creditor" and collectively, as the "Intercompany Creditors".

   b. The Parties hereby agree that, effective as of the Final Effective Date (as defined below), the amounts of the Category I Pre-Filing Intercompany Debt, the Category II Pre-Filing Intercompany Debt and the Category III

43

Pre-Filing Intercompany Debt set out in <u>Annex C-1</u> shall be automatically revised to the corresponding amounts set forth in <u>Annex C-2</u>.

c.  The Parties hereby agree, that to the extent any APAC Debtor makes a Subsequent Payment Amount to its Intercompany Creditors between the Initial Effective Date and the Final Effective Date, <u>Annex C-2</u> shall be further revised on or prior to the Final Effective Date to give effect to the payment of such Subsequent Payment Amount.

d.  The Parties hereby agree, that to the extent NNSA does not become a Party to this Agreement in accordance with Section 6.a., the amounts set forth in the Annexes C-1, C-2, D, E-1 and E-2 hereto (which have been calculated based on the assumption that NNSA shall be a party to this Agreement), shall be further revised, in a manner consistent with the methodology and standards initially employed to calculate such amounts, on or prior to the Initial Effective Date to give effect to the exclusion of NNSA from the scope of this Agreement.

2.  <u>Initial Payments.</u>

a.  Each APAC Debtor having Category 1 Pre-Filing Intercompany Debt represents and warrants that as of July 10, 2009 (the "<u>Initial Determination Date</u>"), it has complied with the NCB Determination Procedure (as defined below) and determined its Net Cash Balance (as defined below) to be as set forth in <u>Annex D</u>. For the purposes of this Agreement, the "<u>Net Cash Balance</u>" means, as of each Determination Date (as defined below) and with respect to each APAC Debtor, without duplication:

i.  the sum of:

(A)  its (1) cash in U.S. dollars or other local currencies held by such APAC Debtor and (2) readily marketable government securities, certificates of deposit, time deposits and other readily marketable fixed income instruments, in each case, that are immediately available and freely remittable (the "<u>Cash and Cash Equivalents</u>") (for the avoidance of doubt, such Cash and Cash Equivalents shall not include any cash or cash equivalents that are considered to be restricted by reason of having been posted by such APAC Debtor as collateral to a third party), <u>plus</u>

(B)  (with respect to the calculation of the Net Cash Balance on each Subsequent Determination Date (as defined below) pursuant to Section 3 only) the net cash proceeds received by such APAC Debtor from a Sale Transaction (as defined below);

<u>minus</u>

ii.  the sum of:

7

44

(v)     the amount of loans, credits and obligations owing by such APAC Debtor to the entities set forth in <u>Schedule 6</u> as of the Filing Date (respectively, the "<u>Excluded Affiliate Pre-Filing Intercompany Debt</u>" and the "<u>Excluded Affiliates</u>"), <u>plus</u>

(w)     its estimated working capital required for the four (4) weeks immediately following such Determination Date to carry on its business and to satisfy its liabilities as they fall due, together with appropriate provision for any contingent liabilities and anticipated future liabilities, including, without limitation, the Third Party Liabilities, the Post-Filing Intercompany Debt and the Matured Indemnity Obligation (as defined below) of such APAC Debtor (the "<u>Estimated Working Capital Requirements</u>"), <u>plus</u>

(x)     its estimated costs and expenses arising from or in connection with the restructuring of its indebtedness and its business or potential eventual liquidation or winding down of the business of such APAC Debtor, including, but not limited to:

  (1)     potential statutory severance and redundancy payments,

  (2)     potential severance and redundancy payments pursuant to binding contractual commitments existing as of the Filing Date and

  (3)     other potential severance and redundancy payments disclosed to the Relevant Parties (as defined below) as of the date hereof or in such greater aggregate amount approved by the Relevant Parties from time to time

  (collectively, the "<u>Permitted Severance Payments</u>") (the "<u>Estimated Restructuring Costs</u>"; *provided, however,* any potential severance or redundancy payments in excess of the Permitted Severance Payments based on past or existing practices and/or policies of the Debtors or otherwise shall not be included in the calculation of the Estimated Restructuring Costs), <u>plus</u>

(y)     its estimated costs of reinstatement of premises under the leases to which such APAC Debtor is a party (the "<u>Estimated Premise Reinstatement Costs</u>"), <u>plus</u>

8

(z)     its estimated provision for all taxes, levies, duties, deductions, charges or withholdings and all penalties, costs and interest relating thereto, whether actual, contingent, present or future, imposed or which may be imposed by any governmental or regulatory authority, central bank or court of competent jurisdiction (the "Estimated Taxes").

For the purposes of determining the Net Cash Balance of any APAC Debtor, the amounts of the Excluded Affiliate Pre-Filing Intercompany Debt (subject to Section 5), the Matured Indemnity Obligation, the Estimated Working Capital Requirements, the Permitted Severance Payments, the Estimated Restructuring Costs, the Estimated Premise Reinstatement Costs and the Estimated Taxes (each, an "NCB Item" and collectively, the "NCB Items") have been and shall be determined by the board of directors of such APAC Debtor acting reasonably and in good faith after consultation with the Restructuring Manager (as defined below) and after taking into account any written opinions obtained from its legal, financial, tax or other professional advisors (such determination procedure, the "NCB Determination Procedure" and such opinions, the "Professional Advice"). Each APAC Debtor hereby agrees and covenants that the Net Cash Balance and the NCB Items to be determined on any Subsequent Determination Date shall be calculated using the same methodology and standards employed to calculate such amounts on the Initial Determination Date. In addition, in calculating its Net Cash Balance as of any Subsequent Determination Date, each APAC Debtor shall give effect to any material amount of cash received by such APAC Debtor during the period after such Subsequent Determination Date but prior to the delivery of its Net Cash Balance calculation to the Relevant Parties in accordance with Section 3.b. Furthermore, each APAC Debtor hereby agrees and covenants that, with respect to any indemnity obligations of such APAC Debtor pursuant to Section 17.b., the Net Cash Balance and the NCB Items shall only take into account (or otherwise hold amounts in reserve to provide for) solely bona fide claims for indemnity that have been made by any APAC Debtor Person (as defined below) of such APAC Debtor against such APAC Debtor in accordance with Section 17.b. and after taking into account the availability of any liability insurance as contemplated by Section 18 or otherwise available to cover such claims for indemnity and consistent with the applicable accounting standards (such amount, the "Matured Indemnity Obligation").

b.      Effective upon the Initial Effective Date, each APAC Debtor having Category I Pre-Filing Intercompany Debt as set forth in Annex C-1 shall make the cash payment (the amount of such cash payment, an "Initial Effective Date Payment Amount") to each of its Intercompany Creditors of its Category I Pre-Filing Intercompany Debt owing to such Intercompany Creditor utilizing its Net Cash Balance as of the Initial Determination Date on a pro rata basis according to the proportion in

9

which the Category I Pre-Filing Intercompany Debt of such APAC Debtor owing to each of its Intercompany Creditors bears to the aggregate amount of all Category I Pre-Filing Intercompany Debt of such APAC Debtor owing to all of its Intercompany Creditors, as set forth in Annex E-1. Annex E-1 sets forth the payment tranches for the Initial Effective Date Payment Amount to be paid by each APAC Debtor to each of its Intercompany Creditors and the respective deadlines by which payment of each tranche must be made.

    c.    Effective upon the Final Effective Date, each APAC Debtor having any remaining Category I Pre-Filing Intercompany Debt as set forth in Annex C-2 shall make the cash payment (the amount of such cash payment, a "Final Effective Date Payment Amount" and, together with an Initial Effective Date Payment Amount, an "Initial Payment Amount") to each of its Intercompany Creditors of its remaining Category I Pre-Filing Intercompany Debt owing to such Intercompany Creditor utilizing its Net Cash Balance as of the Initial Determination Date on a pro rata basis according to the proportion in which the remaining Category I Pre-Filing Intercompany Debt of such APAC Debtor owing to each of its Intercompany Creditors bears to the aggregate amount of all remaining Category I Pre-Filing Intercompany Debt of such APAC Debtor owing to all of its Intercompany Creditors, as set forth in Annex E-2. Annex E-2 sets forth the payment tranches for the Final Effective Date Payment Amount to be paid by each APAC Debtor to each of its Intercompany Creditors and the respective deadlines by which payment of each tranche must be made.

3.    <u>Subsequent Payments</u>.

    a.    Following the date of this Agreement, each APAC Debtor shall provide to the Relevant Parties, once every week and substantially in the form provided by such APAC Debtor to NNL as of the date hereof, (i) rolling 13-week cash flow forecasts and (ii) reports on actual weekly cash flow results. Each APAC Debtor shall hold conference calls from time to time with the Relevant Parties to discuss such financial information at the request of any of the Relevant Parties. For the purposes of this Agreement, the "Relevant Parties" means (1) NNL (on behalf of the Canadian Debtors), (2) the Monitor, (3) NNI (on behalf of the US Debtors), (4) the Official Committee of Unsecured Creditors appointed in the US Proceedings (the "Creditors' Committee"), (5) the steering committee members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with NNL (the "Bondholders' Committee"), (6) the Joint Administrators (on behalf of the EMEA Debtors) and (7) the Restructuring Manager (on behalf of the APAC Debtors).

47

b.    Each APAC Debtor shall, on a monthly basis, commencing on October 30, 2009 and on the last day of each month thereafter (each such date, a "Subsequent Determination Date," and each of the Initial Determination Dates and a Subsequent Determination Date, a "Determination Date"), calculate the amount of its Net Cash Balance and shall provide, no later than 14th calendar day following each Subsequent Determination Date, its calculation of its Net Cash Balance as of such Subsequent Determination Date to the Relevant Parties in reasonable detail, together with (A) a report by the Restructuring Manager which report shall provide its commentary regarding the basis for such APAC Debtor's calculation of its Net Cash Balance and such APAC Debtor's compliance with the NCB Determination Procedure and (B) any reasonably available supporting documents, including, without limitation, any material Professional Advice; *provided, however*, that if in the reasonable opinion of such APAC Debtor's counsel, the provision of any such Professional Advice would result in the loss or waiver of any lawful privilege that may be asserted with respect thereto, such APAC Debtor may provide, in lieu thereof, a summary of the conclusions set forth in such Professional Advice in a manner designed to preserve such lawful privilege. During the seven (7) calendar days following the delivery of its calculation of its Net Cash Balance as of each Subsequent Determination Date, each APAC Debtor shall consult, acting reasonably and in good faith, with the Relevant Parties in respect of its calculation of its Net Cash Balance. The determination by the board of directors of each APAC Debtor of its Net Cash Balance, if made in accordance with the NCB Determination Procedure and following such consultation process with the Relevant Parties, shall be final and binding on all Parties, absent manifest error.

c.    Each APAC Debtor shall, no later than the deadlines set forth in Annex F, make the cash payment (the amount of any such payment, a "Subsequent Payment Amount") to each of its Intercompany Creditors of a portion of its Category II Pre-Filing Intercompany Debt owing to such Intercompany Creditor utilizing its Net Cash Balance as of a Subsequent Determination Date on a pro rata basis according to the proportion in which the Category II Pre-Filing Intercompany Debt of such APAC Debtor owing to each of its Intercompany Creditors bears to the aggregate amount of all Category II Pre-Filing Intercompany Debt of such APAC Debtor owing to all of its Intercompany Creditors.

d.    Subject to Section 4, once all of its Senior Indebtedness (as defined below) has been paid or satisfied in full, each APAC Debtor shall, no later than the deadlines set forth in Annex F, make a Subsequent Payment Amount to each of its Intercompany Creditors of a portion of its Category III Pre-Filing Intercompany Debt owing to such Intercompany Creditor utilizing, and only to the extent of, its Net Cash Balance as of a Subsequent Determination Date on a pro rata basis according to the proportion in which the Category III Pre-Filing Intercompany Debt of such APAC

11

48

Debtor owing to each of its Intercompany Creditors bears to the aggregate amount of all Category III Pre-Filing Intercompany Debt of such APAC Debtor owing to all of its Intercompany Creditors.

e.    The obligations set forth in this Section 3 shall apply only to the APAC Debtors having Category II Pre-Filing Intercompany Debt or Category III Pre-Filing Intercompany Debt and shall cease to apply to such APAC Debtors once all of their respective Category II Pre-Filing Intercompany Debt and Category III Pre-Filing Intercompany Debt have been paid or satisfied in full.

4.    <u>Subordination</u>.

a.    Subject to Sections 4.d. and 12, the Category III Pre-Filing Intercompany Debt owing by each of NN Asia Group, NN Australia, NN Malaysia, NN India (Private), NN Singapore Group, NN Korea, NN Thailand and NN Vietnam (each, an "<u>Identified Debtor</u>," and collectively, the "<u>Identified Debtors</u>") to its Intercompany Creditors (the "<u>Subordinated Debt</u>") shall be subordinated and junior in right of payment to the prior payment in full of the following debts of such Identified Debtor (the "<u>Senior Indebtedness</u>"), and each Intercompany Creditor agrees not to enforce the Subordinated Debt prior to such payment of the Senior Indebtedness:

i.    subject to Section 5, all liabilities and obligations of such Identified Debtor, whether actual, contingent, present or future, to the Excluded Affiliates or non-affiliated third parties, in each case, whether incurred before or after the Filing Date (the "<u>Third Party Liabilities</u>");

ii.    subject to Section 8, all intercompany loans, credits and obligations owing by such Identified Debtor to its Intercompany Creditors incurred after the Filing Date after setting off against the receivables owing to it by the relevant Intercompany Creditors after the Filing Date to the extent not prohibited or restricted under applicable laws and regulations (the "<u>Post-Filing Intercompany Debt</u>");

iii.    all Category I Pre-Filing Intercompany Debt owing by such Identified Debtor to its Intercompany Creditors and to be repaid pursuant to Section 2; and

iv.    all Category II Pre-Filing Intercompany Debt owing by such Identified Debtor to its Intercompany Creditors and to be repaid pursuant to Section 3.

b.    Each of the Identified Debtors shall only be obligated to make payment of the Subordinated Debt (i) only if no Senior Indebtedness remains outstanding and (ii) subject to Section 4.c., only to the extent of its Net

12



Cash Balance (after full payment or satisfaction of all of its Senior Indebtedness) as of the applicable Subsequent Determination Date. Any such payment of the Subordinated Debt shall be made on a pro rata basis according to the proportion in which the Subordinated Debt of such Identified Debtor owing to each of its Intercompany Creditors bears to the aggregate amount of all Subordinated Debt of such Identified Debtor owing to all of its Intercompany Creditors.

c.  Upon any distribution of assets of an Identified Debtor in any dissolution, winding up, liquidation or reorganization of such Identified Debtor (whether in bankruptcy, insolvency or receivership proceedings or upon an assignment for the benefit of creditors or otherwise):

i.  the holders of all Senior Indebtedness of such Identified Debtor shall first be entitled to receive payment in full in cash of all Senior Indebtedness of such Identified Debtor before any Intercompany Creditor of the Subordinated Debt of such Identified Debtor is entitled to receive any payment of any kind or character on account of the principal of or interest on or any other amount owing in respect of such Subordinated Debt;

ii.  any payment or distribution of assets of such Identified Debtor of any kind or character, whether in cash, property or securities, to which any Intercompany Creditor of the Subordinated Debt of such Identified Debtor would be entitled except for the provisions of this Section 4, shall be paid by the liquidating trustee or agent making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or other trustee or agent, directly to the holders of Senior Indebtedness of such Identified Debtor to the extent necessary to make payment in full in cash of all Senior Indebtedness of such Identified Debtor remaining unpaid after giving effect to any concurrent payment or distribution to the holders of such Senior Indebtedness; and

iii.  in the event that, notwithstanding the foregoing provisions of this Section 4.c., any payment or distribution of assets of such Identified Debtor of any kind or character, whether in cash, property or securities, shall be received by any Intercompany Creditor of the Subordinated Debt of such Identified Debtor on account of the Subordinated Debt of such Identified Debtor before all Senior Indebtedness of such Identified Debtor is paid in full in cash, such payment or distribution shall be received and held by such Intercompany Creditor for the sole benefit of, and shall forthwith be paid over to, the holders of the Senior Indebtedness of such Identified Debtor remaining unpaid for application to the payment of such Senior Indebtedness until all such Senior Indebtedness shall have been paid in full in cash, after giving effect

13



to any concurrent payment or distribution to the holders of such Senior Indebtedness.

The applicable Identified Debtor shall give prompt written notice to each Intercompany Creditor of the Subordinated Debt of such Identified Debtor and the other Relevant Parties of any dissolution, winding up, liquidation or reorganization of such Identified Debtor (whether in bankruptcy, insolvency or receivership proceedings or upon assignment for the benefit of creditors or otherwise); *provided, however,* that failure to give such notice shall not affect the subordination effected hereby or in any way modify the provisions of this Section 4.

d.    Notwithstanding anything herein to the contrary, with respect to any Identified Debtor, during any period of time that a Payment Event of Default (as defined below) has occurred and is continuing under this Agreement (the date of the occurrence of such Payment Event of Default, the "Suspension Date"), the provisions of this Section 4 shall be suspended and not be applicable to the portion of Subordinated Debt of such Identified Debtor equal to the amount relating to such Payment Event of Default (the "Suspended Subordinated Debt") to the effect that the Suspended Subordinated Debt shall not be deemed to be Subordinated Debt during the Suspension Period (as defined below). In the event that on any subsequent date (the "Reversion Date"), such Identified Debtor cures such Payment Event of Default, the provisions of this Section 4 shall again be applicable to the Suspended Subordinated Debt equal to the amount so cured (the "Reverted Subordinated Debt") and the Reverted Subordinated Debt shall thereafter again be deemed to be Subordinated Debt. For the purposes of this Agreement, the period of time between the Suspension Date and the Reversion Date is referred to as the "Suspension Period". The applicable Identified Debtor shall deliver written notice promptly to the Relevant Parties notifying of any event set forth in this Section 4.d.

5.    Excluded Affiliate Liabilities. Notwithstanding anything herein to the contrary, if any Excluded Affiliate enters into an agreement with any APAC Debtor subsequent to the date of this Agreement (an "Excluded Affiliate Restructuring Agreement") which provides for a less favorable treatment with respect to such APAC Debtor's Third Party Liabilities owed to such Excluded Affiliate (the "Excluded Affiliate Liabilities") than the treatment thereof provided herein, then the treatment of such Excluded Affiliate Liabilities hereunder shall be in accordance with the terms of such Excluded Affiliate Restructuring Agreement from the effective date thereof and subsequent calculations of such APAC Debtor's Net Cash Balance shall give effect to such Excluded Affiliate Restructuring Agreement.

6.    Covenants.

a.    NNSA may, prior to the Initial Effective Date, by notice in writing to the Parties hereto, accede to this Agreement as an EMEA Debtor on the same

14



terms and conditions as an EMEA Debtor (such accession conditioned, if applicable, on French court approval), and the Parties shall forthwith on receipt of such notice enter into an appropriate form of accession agreement with NNSA. The Parties agree that the provisions of this Section 6.a. are for the benefit of NNSA and may be enforced by NNSA.

b.   Without limiting the generality of Section 11, each APAC Debtor hereby agrees, upon receipt of a written request from NNL, to enter into one or more asset sale agreements to transfer such APAC Debtor's assets relating to the Enterprise Solutions and Metro Ethernet Networks business units of the Nortel Group and any and all agreements and documents contemplated thereby and/or agreements between the Selling Debtors (as defined below) entered into in relation thereto.

c.   To the extent any APAC Debtor is restricted from remitting cash or making the Initial Payment or any Subsequent Payment by any applicable law or regulation, such APAC Debtor covenants to use its reasonable best efforts to undertake all necessary or desirable actions in order for such APAC Debtor to be able to freely remit cash and/or make the Initial Payment or the Subsequent Payment as soon as practicable.

d.   Each APAC Debtor hereby covenants that until such APAC Debtor's Pre-Filing Intercompany Debt has been paid or satisfied in full, such APAC Debtor shall not take any of the following actions without the prior written consent of the Monitor, the Creditors' Committee, the Bondholders' Committee and the Joint Administrators (which consent shall not be unreasonably withheld or delayed):

   i.   The distribution of profits among the shareholders of such APAC Debtor by way of dividend, return of capital or otherwise;

   ii.  The adoption or modification of any significant accounting policies of such APAC Debtor, except as required under any applicable laws, regulations or accounting standards;

   iii. Except as contemplated by this Agreement, the entry into any material agreements, including, without limitation, any contractual agreements to make any severance or redundancy payments, to incur any obligation for the payment or repayment of money borrowed (such obligation, the "Indebtedness"), or any financing or lease agreement, or by mortgaging or creating a security interest or other encumbrance over the assets of such APAC Debtor, in each case, other than (A) in relation to the standby note facility among NN Australia, NN Japan and NN New Zealand in the aggregate amount not exceeding US$7.0 million (the "NN Australia Note Facility") and the related security interest to be provided by NN Australia to secure its obligations thereunder, (B)

15

*62*

in relation to (1) any existing or future posting of any cash or cash equivalents by such APAC Debtor to banks or other third parties as collateral or (2) any escrow arrangements entered into or to be entered into between such APAC Debtor, its customers or vendors and any financial institutions, in each case, in connection with the provision or issuance of performance, advance payment, warranty, tax, customs duty or other types of bonds, guarantees or security in the ordinary course of business and/or in the fulfillment of any contractual obligation to provide the same ("Ordinary Course Cash Collateral") and (C) in the ordinary course of such APAC Debtor's business consistent with past practice and applicable corporate policies and procedures, as such practice and corporate policies and procedures may be modified from time to time to the extent necessary to enter or consummate any Sale Transaction or the Proceedings of the shareholders of such APAC Debtor; or

iv.   The payment of any Indebtedness of such APAC Debtor other than as specifically permitted by this Agreement.

e.   Each APAC Debtor hereby covenants that until such APAC Debtor's Pre-Filing Intercompany Debt has been paid or satisfied in full, such APAC Debtor shall use its reasonable best efforts to provide written notice to and to consult with the Monitor, the Creditors' Committee, the Bondholders' Committee and the Joint Administrators prior to taking any of the following actions: liquidate, commence bankruptcy proceedings, suspend payments, assign to or make any other arrangement with such APAC Debtor's creditors or put such APAC Debtor into judicial management or administration and/or consolidation, or merge or amalgamate such APAC Debtor with any other company and/or cease to conduct or carry on such APAC Debtor's business or any part thereof other than as a result of a Sale Transaction where such APAC Debtor is a Selling Debtor.

f.   Each Party which is a shareholder of any APAC Debtor hereby agrees that to the extent required or desirable and upon receipt of a written request from such APAC Debtor, such Party shall execute shareholder(s)' resolutions (solely in its capacity as a shareholder of such APAC Debtor) approving and/or ratifying the entry of this Agreement by such APAC Debtor and the consummation of the transactions contemplated by this Agreement.

7.   Appointment of Restructuring Manager. The APAC Debtors shall appoint, with effect from the date hereof, Ernst & Young Solutions LLP as the restructuring manager (the "Restructuring Manager") to carry out the duties set out in Annex G. The fees, costs and expenses of the Restructuring Manager shall be borne jointly and severally by NN Japan, NN India (Private), NN Australia, NN Singapore Group and NN Asia Group. If the Restructuring Manager resigns or is removed or a vacancy exists in the office of the Restructuring Manager for

16

any reason, then the APAC Debtors shall promptly appoint a successor Restructuring Manager in consultation with the other Relevant Parties.

8.     Full and Final Settlement.  In consideration of the obligations, covenants and rights of the Parties set forth in this Agreement, including without limitation the APAC Debtor's agreement to enter into the relevant sale agreements under Section 6.b. and to cooperate fully and participate in one or more Sale Transactions under Section 11, the Parties hereby agree that this Agreement shall constitute a full and final settlement of any and all Adjustment Payments (as defined below) owing and that may, or could be owing between (a) the APAC Debtors *inter se* and (b) an APAC Debtor, on the one hand, and a Canadian Debtor, on the other hand, under the APAC Distribution Agreements (as defined below) for all calculation periods or parts thereof during, or with respect to, the period from and including the Filing Date through and including December 31, 2009.  For the purposes of this Section 8, "Adjustment Payments" means the quarterly and/or annual adjustment payments payable pursuant to the APAC Distribution Agreements; and "APAC Distribution Agreements" means certain distribution agreements, whether written or oral, in effect between two or more APAC Debtors or between one or more APAC Debtors, on the one hand, and a Canadian Debtor, on the other hand, including without limitation, the agreements listed in Annex H (as amended, supplemented or otherwise modified from time to time).

PART C – PROVISIONS OF GENERAL APPLICATION

9.     Scope of this Agreement.  The Parties hereto agree that:

a.     this Agreement is not, and shall not be deemed to be, an acknowledgement by any Party of the assumption, ratification, adoption or rejection of the Transfer Pricing Agreements or any other Transfer Pricing methodology employed by the Nortel Group or its individual members for any purpose nor shall it be determinative of, or have any impact whatsoever on, the allocation of proceeds to any Debtor from any sale of assets, undertakings or businesses of Nortel Group entities;

b.     except as specifically provided herein, that payments required hereunder shall be made in accordance with the terms hereof regardless of any actual or purported right of offset or other defense;

c.     this Agreement shall not serve as the basis for any claim by any Party against any other Party in respect of Transfer Pricing or any other theory of cost reimbursement or allocation of any sale proceeds, or any ownership of intellectual property;

d.     each Party approves all payments to be made in accordance with this Agreement and all other matters contemplated hereby, to the extent that such Party is a creditor of the Party making such payment; and

e.     this Agreement shall not, and is not intended to, have any impact whatsoever on the rights and obligations of the various parties to the certain Interim Funding and Settlement Agreement dated June 9, 2009.



10.    <u>Relinquishment of Intellectual Property Licenses</u>.

    a.    Upon the written request of NNL, each of the APAC Debtors hereby agrees to enter into a License Termination Agreement (as defined below) with respect to the licenses and rights granted by NNL to such APAC Debtors for the purposes of facilitating, and in consideration of a right to an allocation, to be determined in accordance with Section 11, to such APAC Debtors of a portion of the sale proceeds from, the sale of any material assets of any of the Canadian Debtors and/or the US Debtors to a third party (an "<u>Asset Sale</u>"); *provided, however,* such APAC Debtor shall not be required to enter into any License Termination Agreement if a License Agreement (as defined in the License Termination Agreement) contains terms that are materially inconsistent with the terms of the License Termination Agreement.

    b.    For the purposes of this Agreement, the term "<u>License Termination Agreement</u>" means an agreement substantially in the form attached hereto as <u>Annex 1</u>.

    c.    Where any APAC Debtor enters into any License Termination Agreement in accordance with the provisions of this Section 10, such APAC Debtor shall be deemed to be a Selling Debtor (as defined below), and the proceeds of such Asset Sale shall be deemed to be Sale Proceeds (as defined below), for the purposes of Sections 11.b., 11.c. and 11.d., and Sections 11.b., 11.c. and 11.d. shall apply accordingly.

11.    <u>Entry into Sale Transactions</u>.

    a.    Subject to (i) compliance with applicable laws and regulations and (ii) the determination by the board of directors of each APAC Debtor, acting reasonably and in good faith and after consultation with the Relevant Parties, that the applicable Sale Transaction is in the best economic interests of such APAC Debtor's relevant stakeholders generally, each APAC Debtor hereby agrees to cooperate fully and participate in one or more Sale Transactions. Such cooperation shall include implementation of any reasonable operational or corporate structure changes required by the Filed Debtors or any purchaser (or, in the case of any auction, the successful bidder in any such auction) (a "<u>Purchaser</u>") and the execution of definitive documentation, including any ancillary or related documents necessary or reasonably desirable to participate in the Sale Transactions, with the Purchaser in accordance with the terms of such definitive documentation. Each APAC Debtor hereby agrees that its execution of definitive documentation with a Purchaser of, or closing of any sale of, material assets, undertakings or businesses of any of the APAC Debtors to which such APAC Debtor (an "<u>APAC Selling Debtor</u>") is proposed to be a party, together with each of the other Parties hereto that is proposed to be a party thereto (together with the APAC Selling Debtors, the "Selling

18