03ぅ

6.      Additionally, on January 15, 2009, NNUK and certain subsidiaries of the Nortel group incorporated in Europe, the Middle East or Africa (collectively, the "EMEA Debtors") and NNSA each obtained an administration order for the appointment of administrators from the English High Court of Justice under the Insolvency Act 1986 (the "Administration Proceedings").

7.      On February 27, 2009, the U.S. Court granted petitions recognizing the CCAA proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code.

8.      On May 28, 2009, the Commercial Court of Versailles, France (the "French Court") ordered the commencement of secondary insolvency proceedings in respect of NNSA, which consist of liquidation proceedings during which NNSA was originally authorized to continue to operate as a going concern for an initial period of three months which period was subsequently extended. In accordance with the European Union's Counsel Regulation, the English law proceedings remain the main proceedings in respect of NNSA.

9.      On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

10.     On July 14, 2009, Nortel Networks (CALA) Inc. made a voluntary filing with the U.S. Court under Chapter 11 of the Code.

11.     Further details regarding the background to these proceedings are set out in the affidavit of John Doolittle sworn January 14, 2009 previously filed in these proceedings and are therefore not repeated herein.

*Non-Filed Entities*

12.     The Non-Filed Entities include several wholly- or majority-owned subsidiaries of NNL. Most of these NNL subsidiaries have ceased active operations and many are preparing to commence liquidation or dissolution under the laws of their respective jurisdictions.

DOCSTOR: 2435416\5

*Nortel Asset Sales*

13.    Certain of the Applicants, U.S. Debtors, EMEA Debtors, and Non-Filed Entities, among others, were sellers (the "Nortel Sellers") in sales of Nortel's global business lines including the Layer 4-7 Application Delivery business, CDMA and LTE related assets, Enterprise Solutions business, Optical Networking and Carrier Ethernet businesses (associated with its Metro Ethernet Networks business), Carrier Voice Over IP and Application Solutions business, GSM/GSM-R business, certain retained GSM assets, and Multi-Service Switch business. Additionally, in 2011, Nortel undertook an auction process for the sale of its patent portfolio and other related assets. A sale transaction ultimately was approved and closed in July of 2011, pursuant to which Nortel received $4.5 billion for the patent assets (all such sales, collectively, the "Sale Transactions").

14.    In total over $7.3 billion in proceeds raised from the above transactions (the "Sale Proceeds") are now held in separate escrow accounts (the "Escrow Accounts") which were established at the time of each transaction and are each governed by a separate escrow agreement (the "Escrow Agreement"). Each Nortel Seller that participated in a given Sale Transaction is a party (in such a capacity, a "Depositor") to the Escrow Agreement governing the Escrow Account in which the Sale Proceeds from the relevant transaction were placed.

*Sale Proceeds Discussions*

15.    Soon after the commencement of the Applicants' CCAA Proceedings, the various Nortel estates engaged in informal and formal discussions regarding the allocation of the various sale proceeds among the estates, including two formal mediation sessions in November 2010 and April 2011, and ongoing formal mediation sessions that commenced in April 2012. While the larger allocation process is still ongoing among the Applicants, the U.S. Debtors, the EMEA Debtors and others, the prior mediations and subsequent negotiations ultimately did lead to a negotiated settlement that fully and finally resolves the claims of the Non-Filed Entities to the proceeds of the Sale Transactions and any other sales of Nortel assets that have occurred, or may occur (other than those sales that may occur and in which such Non-

035

Filed Entity participates), and resolves certain other inter-company claims relating to the Non-Filed Entities. The Monitor was actively involved in these negotiations.

16.     A number of the Non-Filed Entities have indicated that they intend to commence liquidation or dissolution procedures in the near future. Resolution of the allocation negotiations with the Non-Filed Entities and the delivery of their allocated Sale Proceeds prior to the commencement of these liquidation and dissolution procedures is an important step.[3]  In some instances, if liquidation were commenced prior to resolution of these matters with the Non-Filed Entities, there could be additional obstacles or delays to obtaining such Non-Filed Entities' consent to disbursements from the particular Escrow Accounts for which the Non-Filed Entities are Depositors or amendments to the particular Escrow Agreements to which the Non-Filed Entities are parties. The settlement of the claims of the Non-Filed Entities to Sale Proceeds will also simplify the remaining allocation process, removing over twenty entities that may otherwise have claims to the Sale Proceeds from the allocation discussions.

17.     The Applicants have concluded that it is in their best interests to settle the allocation of Sale Proceeds to the Non-Filed Entities on the terms that have been negotiated, which will greatly simplify the global allocation negotiations by reducing the number of participating Nortel Sellers and allow the Non-Filed Entities to efficiently resolve their remaining liabilities and liquidate without further delay.

18.     The Monitor, and the Monitor's counsel, have played an integral role in all stages of the negotiation of the settlement contemplated by the Fourth Estate Settlement Agreement, as well as the drafting of that agreement. I understand that the Monitor supports the completion of the proposed settlement.

19.     Under the proposed settlement, the parties thereto have agreed that most of the Non-Filed Entities will receive sale proceeds allocations (each such allocation, a "Settlement Share") in consideration for the termination of their rights under the relevant

---

[3] The liquidation of certain Nortel entities to date has already resulted in a reduction in the number of sellers that are Depositors under certain of the Escrow Agreements. Amendments were executed to certain Escrow Agreements in 2011 to remove three liquidating Nortel entities from those Escrow Agreements – Nortel Networks o.o.o., Nortel Networks Israel (Sales and Marketing) Ltd. and Nortel Communications Holdings (1997) Ltd. In addition, this Court provided the Applicants with the authority to take actions under a certain Escrow Agreement without the consent or participation of Nortel Networks de Colombia S.A., a liquidating entity that is a Depositor under that agreement.

Escrow Agreements and their removal as Depositors under the related Escrow Accounts, where the aggregate amount of Sale Proceeds proposed to be paid to the Non-Filed Entities is $44.9 million.[4]

20.    Certain of the APAC Entities are party to that certain Asia Restructuring Agreement, dated November 5, 2009, as approved by this Court on December 2, 2009 (the "ARA"). The ARA was executed to facilitate the participation of those APAC Entities that are parties to the ARA (the "APAC Debtors") in the Sale Transactions for which such participation was required, and provided for a standstill of certain inter-company payments to permit the APAC Debtors to remain solvent during the consummation of those Sale Transactions. The ARA provides for the payment of inter-company obligations by the APAC Debtors based on a determination, made on a monthly basis, of the estimated net cash balances available to pay such obligations (the "Net Cash Balance Payments"). The Fourth Estate Settlement Agreement provides for the satisfaction of certain inter-company obligations of the APAC Debtors through the payment of portions of certain APAC Debtors' Settlement Shares to their inter-company creditors as Net Cash Balance Payments. The Fourth Estate Settlement Agreement also contains an acknowledgement that the APAC Debtors have met certain obligations under the ARA with respect to participation in the Sale Transactions and authorizes the release of collateral required by the ARA to be pledged by certain APAC Debtors to secure their performance of those obligations.

*Fourth Estate Settlement Agreement*

21.    Following lengthy good-faith negotiations, on or about June 19, 2012, the Applicants, the U.S. Debtors, the EMEA Debtors, NNSA and the Non-Filed Entities

---

[4] Nortel Networks del Paraguay S.A. ("Nortel Paraguay") is a Depositor under one of the Escrow Agreements. Nortel Paraguay is not a party to the Fourth Estate Settlement Agreement but has agreed to a release substantially similar to that provided by, and to, the Non-Filed Entities in the Fourth Estate Settlement Agreement and has executed the applicable Payment Instruction and the Escrow Amendment (each as defined below). Nortel Vietnam Limited and Nortel Networks (China) Limited are parties to the Fourth Estate Settlement Agreement, but no Settlement Share is allocated to either of these parties.