## **EXHIBIT A**

Eighty-Seventh Report dated July 19, 2012

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**EIGHTY-SEVENTH REPORT OF THE MONITOR**
**DATED JULY 19, 2012**

**INTRODUCTION**

1.     On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to July 31, 2012 by this Court in its Order dated April 13, 2012.

2.     Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an official committee of unsecured creditors (the "Committee") was established in January, 2009.

3.     An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group").  In addition, pursuant to Orders of this Court dated May 27, 2009, July 22, 2009 and July 30, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries and each of these groups is participating in the CCAA proceedings.

4.     Nortel Networks (CALA) Inc. ("NN CALA" and together with NNI and certain of its subsidiaries and affiliates that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.     Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in EMEA were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors").  The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators").

6.     Subsequent to the filing date, Nortel Networks S.A. ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7.     The CCAA proceedings and the UK Administration proceedings of NNUK and the other EMEA Debtors have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.     Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

## PURPOSE

9.    The purpose of this eighty-seventh report of the Monitor (the "Eighty-Seventh Report") is to report to this Court on the following matters:

    a)  consolidated cash position and liquidity as at June 30, 2012;

    b)  actual receipts and disbursements from March 25, 2012 to June 30, 2012;

    c)  cash flow forecast for the period from July 1, 2012 to October 31, 2012;

    d)  status of the Applicants' claims process and cross-border claims matters and provide information to the Court in support of the Monitor's motion for an Order with respect to the treatment of misfiled claims;

    e)  consolidated Canadian entities' net intercompany position by region;

    f)  provide information to the Court in support of the Applicants' motion for an Order with respect to an intercompany claims process;

    g)  status of the Compensation Claims Process;

    h)  status of same/overlapping Compensation Claims;

    i)  status of the Health and Welfare Trust ("HWT");

    j)  provide information to the Court in support of the Monitor's motion for an Order with respect to the treatment of HWT stale-dated cheques;

    k)  status of the Termination Fund;

    l)  status of the Employee Hardship Application Process and Fund and provide information to the Court in support of the Applicants' motion with respect to a request for amendments to the eligibility criteria, an increase in the hardship fund by CAD 250,000 and to extend the Hardship Application Process through the stay extension period;

m) status of realization of remaining assets;

n) status of allocation matters and mediation;

o) status of environmental matters;

p) other matters;

q) status of foreign proceedings; and

r) the Applicants' request for an order that the stay of proceedings be extended up to and including October 31, 2012.

**TERMS OF REFERENCE**

10.  In preparing this Eighty-Seventh Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel.  The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of this information and accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Eighty-Seventh Report.

11.  Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

12.  Capitalized terms not defined in this Eighty-Seventh Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009, the Pre-Filing Report or previous reports of the Monitor. Capitalized terms relating to the Intercompany Claims Procedures are as defined in the Intercompany Claims Procedure Order.

13.  The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel.  The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

**CONSOLIDATED CASH POSITION AND LIQUIDITY AS AT JUNE 30, 2012**

14.   As at June 30, 2012, Nortel's consolidated cash balance was approximately $10.2 billion, including $2.8 billion of total treasury cash.   Nortel's consolidated cash balance is held globally in various Nortel entities and joint ventures.   The following is an overview of Nortel's consolidated cash position as at June 30, 2012:

| Region | Gross Cash | Restricted | Unavailable (JV's and Other Items) | Available Cash |
|---|---|---|---|---|
| NNL | 483 | (1) | (238) | 244 |
| Other Canada | 33 | (21) | - | 12 |
| NNI | 925 | (1) | - | 924 |
| Other US (excluding NN CALA) | 60 | - | - | 60 |
| **North America** | 1,501 | (23) | (238) | 1,240 |
| NN UK Limited | 351 | - | - | 351 |
| Other EMEA Filed Entities | 395 | - | - | 395 |
| JV - Netas | - | - | - | - |
| EMEA non-filed entities | 15 | - | - | 15 |
| **UK/Europe** | 761 | - | - | 761 |
| Greater China | 81 | - | - | 81 |
| Other ASIA PAC (excl JVs) | 181 | (5) | - | 176 |
| Other JVs | 144 | - | (144) | - |
| **ASIA** | 406 | (5) | (144) | 257 |
| NN CALA | 86 | - | - | 86 |
| Other CALA filed entities | - | - | - | - |
| CALA non-filed entities | 43 | - | - | 43 |
| **Cala** | 129 | - | - | 129 |
| **Total Treasury Cash** | **2,797** | **(28)** | **(382)** | **2,387** |
| **Divestiture Proceeds** | 7,346 | (7,346) | - | - |
| **Other Funds held in Escrow** | 35 | (35) | - | - |
| **Total Cash** | **10,178** | **(7,409)** | **(382)** | **2,387** |

15.   As at June 30, 2012, the Applicants had cash available for operations and post-filing intercompany settlements of approximately $256 million.

16. None of the Applicants' Restricted Cash and Unavailable Cash[1] is readily available to them. Restricted Cash relates primarily to: (i) $12 million held in the D&O Trust as detailed in the Pre-Filing Report; (ii) $10 million held in escrow related to the settlement of the Global Class Action; and (iii) $0.5 million of cash collateral posted with EDC in support of post filing performance bonding. Unavailable Cash relates primarily to: (i) $8.3 million of net proceeds from the sale of the Strandherd Lands; (ii) $229 million from the sale of NNL's interest in the LGN joint venture held in a single purpose bank account; and (iii) $1 million from the sale of NNL's interest in the Relay business held in a single purpose bank account.

17. The U.S. entities had cash available for operations and post-filing intercompany settlements of approximately $984 million. NNI's Restricted Cash relates to $1 million held in escrow for the benefit of utility providers in accordance with the First Day Order.

18. The Joint Administrators on behalf of NNUK and the other EMEA Debtors had available cash for operations and post–filing intercompany settlements of approximately $746 million. The EMEA non-filed entities had available cash of approximately $15 million which is expected to be used primarily to fund their in-country operations and intercompany settlements.

19. Nortel entities in the APAC region had approximately $257 million of available cash for operations and intercompany settlements. As a result of the regulatory regime in the People's Republic of China, the funds in Greater China of approximately $81 million are generally only available to fund operations within Greater China and intercompany settlements.

20. NN CALA and the CALA non-filed entities had available cash of $86 million and $43 million, respectively. This cash is expected to be used to fund their domestic operations and intercompany settlements.

---

[1] Unavailable Cash for NNL disclosed above excludes any proceeds received in respect of the sale of a certain number of internet protocol addresses. These proceeds are being held in a single purpose bank account. Information with respect to the purchase price and other aspects of these divestitures has been sealed pursuant to orders of this Court dated Feb 17, 2012, April 4, 2012 and May 7, 2012.

21.   On March 10, 2010, Nortel Networks Telecomunicacoes Do Brazil Ltda. filed for bankruptcy protection; on April 15, 2010, Nortel Networks de Colombia S.A. was placed into liquidation; on July 30, 2010, Nortel Networks de Venezuela C.A. ceased operations as its financial obligations exceeded its available funds and on November 9, 2011, Nortel Networks O.O.O. was placed into liquidation.  As such, funds held by these entities have not been reflected in the foregoing analysis.

22.   Divestiture proceeds of approximately $7.3 billion are being held in escrow by various escrow agents (the "Divestiture Proceeds").  As at June 30, 2012, the funds held in escrow included:

a)  approximately $7.3 billion held in escrow by JPMorgan Chase Bank, N.A. ("JP Morgan") until an agreement is reached or determination made regarding allocation of these proceeds among the various Nortel legal entities, including the Applicants. The current divestiture proceeds held in escrow include: (i) $4.454 billion from the sale of Nortel's patent portfolio and related assets (the "Residual IP"); (ii) $1.053 billion from the sale of CDMA/LTE Access assets; (iii) $18 million from the sale of the Layer 4-7 business; (iv) $10 million from the sale of the Next Generation Packet Core business; (v) $857 million from the sale of Enterprise assets; (vi) $625 million from the sale of the MEN assets; (vii) $113 million from the sale of GSM/GSM-R assets; (viii) $145 million from the sale of CVAS assets; and (ix) $46 million from the sale of MSS assets;

b)  $22 million held by CitiBank relating to the sale of MEN assets.  These divestiture proceeds include $8 million being held in support of the related TSA and $14 million being held subject to certain succession tax and other adjustments;

c)  $1 million held by Wells Fargo relating to the sale of CVAS assets.  These divestiture proceeds are being held subject to resolution of certain tax liabilities in EMEA; and

d)  $1 million held by JP Morgan relating to the sale of MSS assets.  These divestiture proceeds are being held in support of the related TSA.

23.    Other unavailable funds include $35 million transferred from the CDMA/LTE Access asset divestiture proceeds escrow to a separate trust account pursuant to the Cascade Trust Indenture as more fully described in the Forty-First Report.

## ACTUAL RECEIPTS AND DISBURSEMENTS FROM MARCH 25, 2012 TO JUNE 30, 2012

24.    The Applicants' actual consolidated net cash outflow for the period March 25 to June 30, 2012 was $6.6 million.  A summary of the actual receipts and disbursements as compared to the forecast filed with the Eighty-Fourth Report (the "Eighty-Fourth Report Forecast") is attached at Appendix "A".

25.    Actual net cash flow exceeded forecast by $17.5 million. Significant items contributing to this favourable variance were as follows:

    a)  a favourable timing variance of $1.0 million with respect to Other Receipts as a result of the release of cash collateral held in support of EDC performance bonds issued in exotic foreign currencies;

    b)  a favourable timing variance of $1.3 million with respect to non-inventory purchases as certain payments were retimed into Q3;  and

    c)  a favourable permanent variance of $15.3 million with respect to restructuring costs as professional fees were lower than originally forecast.

26.    Available Cash was also lower than forecast by approximately $6.3 million relating to an unfavourable foreign exchange translation on Canadian dollar denominated cash balances as a result of the depreciation of the Canadian dollar relative to the U.S. dollar.

27.    Unavailable Cash was lower than forecast by approximately $0.3 million relating to an unfavourable foreign exchange translation on Strandherd land proceeds held in Canadian dollars.

28.    Restricted Cash was lower than forecast by approximately $1.4 million primarily as a result of the following:

a) $1.0 million release from cash collateral held in support of the EDC performance bonds issued in exotic foreign currencies; and

b) $0.4 million relating to an unfavourable foreign exchange translation on restricted cash held in Canadian dollars.

**CASH FLOW FORECAST FOR THE PERIOD JULY 1, 2012 TO OCTOBER 31, 2012**

29.   The Applicants, with the assistance of the Monitor, have prepared an updated 18-week cash flow forecast for the period July 1, 2012 to October 31, 2012 (the "July 1st Forecast" and the "Forecast Period", respectively).   A copy of the July 1st Forecast is attached as Appendix "B".

30.   As at July 1, 2012, the Applicants had Available Cash balances of approximately $256.2 million, excluding Restricted Cash and Unavailable Cash of approximately $260.1 million.

31.   Based on the July 1st Forecast, it is anticipated the Applicants will have total receipts of $12.9 million and total disbursements of $34.9 million resulting in a net cash outflow of $22.0 million during the Forecast Period.

32.   Significant assumptions used in preparing the July 1st Forecast include the following:

a) Nortel has completed all of the TSAs. Accordingly, no material receipts are expected on account of transition services provided by the Applicants to the buyers of the various Nortel assets and businesses;

b) divestiture proceeds from the Layer 4-7, CDMA/LTE Access, Enterprise, Next Generation Packet Core, MEN, MSS, GSM/GSM-R, CVAS and Residual IP transactions are to be held in escrow and are not reflected in the July 1st Forecast;

c) no material collections are anticipated during the Forecast Period in respect of accounts receivable not acquired by the purchasers as part of the divestiture of the business units;

d) receipt of $11.6 million, pursuant to the Allocation Settlement Agreement (APAC/CALA) dated June 19, 2012, as approved by this Court and the U.S. Court on

July 11, 2012 (the "Fourth Estate Settlement Agreement").   The Fourth Estate Settlement Agreement is expected to close in early August 2012;

e) receipt of a $1.3 million dividend from Nortel Networks Communications Ltd. during the Forecast Period;

f) all pre-filing amounts owed to suppliers are stayed and post-filing amounts are paid on regular credit terms as a result of the CCAA proceedings;

g) intercompany trade accounts receivable and payable for post-filing transactions continue to settle on a cash basis between the Applicants, U.S. Debtors, EMEA Debtors and other Nortel entities.   Intercompany net pre-filing loans and trade accounts payable between the Applicants and all other Nortel filed and non-filed entities are stayed. Intercompany net pre-filing loans and trade accounts receivable owing to the Applicants by all other Nortel filed entities are stayed;

h) payroll disbursements include amounts anticipated to be paid during the Forecast Period in respect of the Nortel 2012 Retention Plan and AIP;

i) pursuant to the terms of the Amended and Restated Employee Settlement Agreement approved by this Court on March 31, 2010 (the "Employee Settlement Agreement"), there are no further current funding contributions to the Applicants' defined benefit pension plans.  Funding related to current employees' retirement savings plans are reflected in benefits disbursements. Funding for non-registered pension or other retirement plans is stayed;

j) all interest payments relating to the Company's pre-filing indebtedness are stayed; and

k) professional fees have been forecast based on current and anticipated run rates.

33. Based on the analysis prepared by the Monitor, the Applicants have sufficient cash resources to fund the CCAA proceedings through October 31, 2012.

**STATUS OF THE APPLICANTS' CLAIMS PROCESS AND CROSS-BORDER CLAIMS MATTERS**

34. On July 30, 2009, this Court issued an Order (as amended and restated, the "Claims Procedure Order") setting out the procedures for the filing of certain claims against the Applicants and a claims bar date of September 30, 2009 was established (the "Claims Bar Date").

35. By order dated August 4, 2009, the U.S. Court also established September 30, 2009 as its bar date for filing of claims in the Chapter 11 Proceedings.

36. The table attached as Appendix "C" (the "Claims Report") provides an update as to the status of claims filed against the Applicants as of July 10, 2012 pursuant to the Claims Procedure Order with the exception of claims filed by various EMEA entities pursuant to the EMEA Claim Procedure Order dated January 14, 2011 and claims filed pursuant to the Compensation Claims Procedure Order dated October 6, 2011. All claim amounts are in Canadian dollars using January 14, 2009 exchange rates.

37. Pursuant to the provisions of the Canadian Funding and Settlement Agreement, the Claims Report includes a claim by NNI against NNL for $2.0627 billion. This claim consists of two portions:

    a) $2.0 billion representing a pre-filing unsecured claim against NNL ranking pari passu with all other unsecured pre-filing claims; and

    b) $62.7 million representing a pre-filing secured claim pursuant to the provisions of the Initial Order relating to the Revolving Loan Agreement.

38. To date, 1,065 claims with a cumulative value of approximately CAD 36 billion have been filed against the Applicants pursuant to the Claims Procedure Order and the EMEA Claims Procedure Order. This includes potential duplicative claims filed against multiple Applicants and claims filed subsequent to the Claims Bar Date. The Monitor, in conjunction with the Applicants, has initially reviewed all 1,065 claims filed to date.

39. As at July 10, 2012, the Monitor has provisionally accepted 739 claims with a current claim value of approximately CAD 2.7 billion (original filed claim amount of approximately CAD 11.5 billion). In addition, 19 claims with a current claim value of CAD 94 million have been either partially or fully disallowed and a Notice of Dispute has been filed by the creditor.

40. The remaining 307 claims, representing a claim value of CAD 24.5 billion, primarily relate to bond claims, certain pension claims, original EMEA related entity claims and claims filed subsequent to the Claims Bar Date. These claims require further review, analysis and negotiation prior to finalization.

41. Pursuant to the provisions of a claims resolution order dated September 16, 2012 (the "Claims Resolution Order"), the Monitor has provided the U.S. Debtors with supporting detail for the Claims Report. A copy of the Claims Report has also been posted on the Monitor's website.

### Misfiled Claims

42. As more fully described in the Eightieth Report, certain claims were originally filed against a U.S. Debtor prior to the Claims Bar Date that should have been filed against an Applicant (the "Misfiled Claims"). By Order dated February 17, 2012, the Court deemed these Misfiled Claims as validly filed Pre-filing Claims against the appropriate Applicant in accordance with the Claims Procedure Order. Accordingly, these claims have been included in the Claims Report.

43. The Applicants, Monitor and U.S. Debtors have indentified three additional claims where the creditor filed claims or portions of a claim against the incorrect Nortel legal entity.

44. Attached as Appendix "D" to this Eighty–Seventh Report is a listing of two claims totalling approximately $46,000 and one claim in the amount of approximately CAD 377,000 filed against a U.S. Debtor in the Chapter 11 Proceedings prior to the September 30, 2009 claims bar date which, based upon a review of the books and records of the Company, are properly claims against an Applicant (the "Additional Misfiled Claims"). The Additional Misfiled

Claims relate to invoice based liabilities where an Applicant issued the purchase order for the goods or services underlying the claim in question.

45. To permit the timely resolution of the Additional Misfiled Claims, the Monitor is seeking an Order to deem such claims as validly filed against the appropriate Applicant in accordance with the Claims Procedure Order such that they may be resolved in accordance with the Claims Resolution Order.   Assuming such relief is granted, the Monitor understands the U.S. Debtors will then object to the corresponding claims in the Chapter 11 Proceedings.

46. Such relief will allow for the timely resolution of the Additional Misfiled Claims consistent with the manner in which substantively similar claims have been resolved and assist in advancing the claims processes in both these CCAA proceedings and the Chapter 11 Proceedings.  The Monitor is of the view such relief is appropriate as a result of the factors described above and because the claims at issue were timely filed by the September 30, 2009 claims bar date (albeit in the wrong jurisdiction).

47. The Monitor and the U.S. Debtors have spoken with each holder of the Additional Misfiled Claims and advised them of the foregoing.  The Monitor is not aware of any holder of an Additional Misfiled Claim expressing any concern or objection in respect of same.

48. The claims resolution process has progressed since the issuance of the Claims Resolution Order.  The Monitor in conjunction with the Applicants continues to review, revise and disallow claims, as applicable and the Monitor will report to this Court further on this process in subsequent reports.

**CONSOLIDATED CANADIAN ENTITIES' NET INTERCOMPANY POSITION BY REGION**

49. Summarized below are the preliminary net intercompany book balances (including trade and loan balances) as at March 31, 2012, rolled forward to reflect intercompany transactions up to June 30, 2012. For purposes of the summary, all Canadian entities (the Applicants and their Canadian non-filed subsidiaries) have been consolidated. These intercompany balances have been prepared by the Company in accordance with US GAAP, unless otherwise noted, and are subject to further adjustments. The Company has fully reserved against the net intercompany balances owing from filed entities. For presentation purposes, the full amount of the intercompany balance, before the reserve, has been reflected.

50. For purposes of calculating the net intercompany balances between trading pairs, balances owing between the same legal entities have been set-off provided such balances both arose prior to January 14, 2009 ("Pre-filing Balances") or both arose after January 14, 2009 ("Post-filing Balances). No Pre-filing Balances have been set-off against Post-filing Balances.

51. Unless otherwise noted Pre-filing Balances have been converted using January 14, 2009 foreign exchange rates. Post-filing Balances are converted using March 31, 2012 foreign exchange rates.

52. The net pre-filing intercompany payable position of $2.065 billion with the U.S. region includes a $62.7 million Revolver Claim by the U.S. Debtors which remains outstanding and is secured by a court-ordered charge in the CCAA proceedings. The balance of the pre-filing intercompany payable position is unsecured.

**Consolidated Canadian Net Inter-company positions by Region (including trade and loans)**
Balances reconciled to June 30, 2012
In millions of USD $

| Region | Pre-filing (Jan. 14, 2009 FX rates) | Post-filing (March 31, 2012 FX rates) |
|---|---|---|
| **Net Receivable Position** | (in millions) | |
| **Filed Entities** | | |
| CALA | – [2] | – |
| EMEA | 102 | – |
| US [1] | 57 [3] | – |
| **Filed Total** | **159** | **–** |
| | | |
| **Non Filed** | | |
| APAC | 60 | 7 |
| CALA | 29 [4] | 1 [4] |
| EMEA | – | – |
| US | 14 | 4 |
| **Non Filed Total** | **103** | **12** |
| | | |
| **Net Receivable Total** | **262** | **12** |
| | | |
| **Net Payable Position** | | |
| **Filed Entities** | | |
| CALA | – | – |
| EMEA | (203) | (2) |
| US | (2,065) | – |
| **Filed Total** | **(2,268)** | **(2)** |
| | | |
| **Non Filed** | | |
| APAC | (210) | (10) |
| CALA | – | – |
| EMEA | – | – |
| **Non Filed Total** | **(210)** | **(10)** |
| | | |
| **Net Payable Total** | **(2,478)** | **(12)** |
| | | |
| **Grand Total** | **(2,216)** | **–** |

1. Includes NN CALA Inc., a US entity that filed for Chapter 11 protection on July 14, 2009.
2. All pre-filing and post-filing amounts owed by CALA region entities in secondary proceedings have been valued at nil for the purposes of this report.
3. $57.0M of the pre-filing balance relates to amounts owing from NN CALA Inc. for the pre-filing period ending July 14, 2009 (converted at March 31, 2012 rates). Per NN CALA Inc's US GAAP records, these are considered pre-filing balances and are stayed.
4. CALA region entities' balances use local GAAP books and records, as reflected in the Allocation Settlement Agreement (APAC/CALA).

## PROPOSED INTERCOMPANY CLAIMS PROCESS

53. In addition to seeking an extension of the stay of proceedings, the Applicants' motion seeks an Intercompany Claims Procedure Order in the form appended to the Applicants' motion record.[2] Generally, the Applicants seek to:

   a) confirm that the claims of the APAC/CALA Affiliates against the Applicants are as specified in the Fourth Estate Settlement Agreement (as defined below) and bar any further claims of the APAC/CALA Affiliates against the Applicants; and

   b) establish a "reverse" claims process for the determination of claims by the Non-APAC/CALA Affiliates (which include the Nortel entities listed on Appendices 5 and 6 of the Intercompany Claims Procedure Order, the majority of which are non-filed subsidiaries of EMEA Debtors or non-filed subsidiaries of NNL, but exclude, among others, the EMEA Debtors, U.S. Debtors and certain non-filed subsidiaries of the U.S. Debtors) against the Applicants as at the Reconciliation Date (being September 30, 2011) and establish bar dates for the dispute of any stated claims or the filing of further claims by the Non-APAC/CALA Affiliates.

*Claims Process Background and Related Matters*

54. As noted above, pursuant to the Claims Procedure Order and the Claims Resolution Order (the process established by such Orders, the "General Claims Process"), this Court approved a process for the calling and resolution of various claims against the Applicants and their directors and officers. Certain types of claims were specifically excluded from the General Claims Process, including intercompany claims. In addition to the General Claims Process, pursuant to Orders of this Court dated January 14, 2011, and October 6, 2011, respectively, claims processes were established for claims by the EMEA Debtors (the "EMEA Claims Process") and employee compensation claims. Finally, this Court has also granted an Order Approving Cross-Border Claims Protocol dated September 16, 2010, which, *inter alia*, approved that certain Cross-Border Protocol on the Resolution of

---

[2] Capitalized terms used in this section of the Eighty-Seventh Report are as defined in the proposed Intercompany Claims Procedure Order included in the Applicants' motion record.

Claims (the "Cross-Border Claims Protocol") which is applicable to the resolution of certain filed claims against the Applicants where related claims have been filed against the U.S. Debtors.[3]

55.   Aside from the EMEA Claims Process, the Applicants have not, to date, instituted a process for the calling and resolution of claims of their affiliates.   However, pursuant to the provisions of the Final Canadian Funding and Settlement Agreement ("FCFSA") dated December 23, 2009, among the Applicants, Monitor and U.S. Debtors, the parties agreed on the resolution of all pre-filing claims between the U.S. Debtors (except NN CALA) and the Applicants.[4]   In addition, pursuant to the "Fourth Estate Settlement Agreement, claims by the APAC/CALA Affiliates against the Applicants were settled and fixed.

56.   In order to achieve certainty regarding any claims that may be asserted by certain of their other affiliates, the Applicants now bring a motion seeking approval of a process to determine such claims and bar any further claims by such affiliates.   In conjunction with the Orders and agreements noted above, such a process will assist the Applicants and the Monitor in confirming the quantum of intercompany claims against the Applicants and thereby assist the Applicants in moving towards the presentation of a plan of arrangement and distributions to creditors.[5]

*Summary Overview of Proposed Intercompany Claims Process*

57.   A summary overview of the proposed Intercompany Claims Procedure Order follows. The Monitor cautions that the description contained below is a summary overview only and that reference should be made directly to the proposed Intercompany Claims

---

[3] Copies of the aforementioned Orders, excluding the employee compensation claim orders, are attached at Appendix "E".

[4] The Monitor notes that pursuant to section 13 of the FCFSA, the US Debtors have the right to assert certain additional pre-filing claims against the Applicants; however, the exercise of such right would terminate the Applicants waiver of pre-filing claims against the US Debtors as provided for in section 12 of the FCFSA.

[5] Assuming approval of the proposed Intercompany Claims Procedure Order, to the knowledge of the Monitor the only active non-Canadian Nortel entities for which pre-filing intercompany claims have yet to be called for by an Order of this Court or addressed pursuant to an agreement with the Applicants are: (i) NN CALA; and (ii) non-filed subsidiaries of the U.S. Debtors.

Procedure Order, a copy of which is included in the Applicants' motion record, for a complete understanding of the proposed process.

a) The Proven Intercompany Claims of the APAC/CALA Affiliates (being the "Non-Filed Entities" party to the Fourth Estate Settlement Agreement) against the Applicants shall be as set forth in the Fourth Estate Settlement Agreement. Consistent with the provisions of the Fourth Estate Settlement Agreement, any other Claims of the APAC/CALA Affiliates are forever barred;

b) With respect to Non-APAC/CALA Affiliates, the Monitor will deliver an Intercompany Balance Statement (along with a Intercompany Proof of Claim Document Package) to each Non-APAC/CALA Affiliate indicating the net balance owing to or by such Non-APAC/CALA Affiliate as at the Reconciliation Date and, where the net balance shows an amount owing by an Applicant to a Non-APAC/CALA Affiliate, the resulting Claim amount against the Applicants (such Claim amount a "Stated Intercompany Claim");

c) To the extent a Non-APAC/CALA Affiliate disputes such Stated Intercompany Claim, it must file a Dispute Notice with the Monitor prior to a specified time (which, save for circumstances where the Monitor issues a Revised Balance Statement, will be the Intercompany Claims Bar Date, being 4:00 pm (prevailing Toronto time) on September 7, 2012.  If a Dispute Notice is not timely filed, the Stated Intercompany Claim shall constitute a Proven Intercompany Claim and the Non-APAC/CALA Affiliate shall be barred from making any Claim inconsistent with the Stated Intercompany Claim;

d) To the extent a Non-APAC/CALA Affiliate wishes to assert a Claim other than a Stated Intercompany Claim (i.e. an Additional Non-APAC/CALA Affiliate Claim), it shall be required to file an Intercompany Proof of Claim prior to the Intercompany Claims Bar Date. Any Non-APAC/CALA Affiliate that does not file such an Intercompany Proof of Claim on or before the Intercompany Claims Bar Date shall be forever barred from making or enforcing any Additional Non-APAC/CALA Affiliate Claim.  The Monitor will review all Intercompany Proofs of Claim and may accept or

disallow, in whole or in part, the Additional Non-APAC/CALA Affiliate Claim asserted therein. To the extent the Monitor disallows an Additional Non-APAC/CALA Affiliate Claim, the disallowed portion of that Additional Non-APAC/CALA Affiliate Claim shall not establish a Proven Intercompany Claim unless the Non-APAC/CALA Affiliate timely files a Dispute Notice and the Additional Non-APAC CALA Affiliate Claim is established in accordance with the proposed resolution procedures; and

e)  The proposed resolution of Dispute Notices (be they in respect of Stated Intercompany Claims or Additional Non-APAC/CALA Affiliate Claims) is substantially the same as in the General Claims Process; that is, the Monitor and the other specified parties shall attempt to consensually resolve and settle the dispute, failing which the Monitor may direct the dispute to a Claims Officer or this Court for resolution.

58.  In addition to the foregoing, the Monitor notes the following provisions of the proposed Intercompany Claims Procedure Order:

a)  the Order binds any current and future Representative (e.g. liquidators or administrators) of an Intercompany Creditor;

b)  Non-APAC/CALA Affiliate Claims that are Specific Claims (as defined in the Claims Resolution Order) will be subject to the applicable provisions of the Claims Resolution Order regarding Specific Claims;

c)  Non-APAC/CALA Affiliate Claims that are Same Creditor or Overlapping Claims (as defined in the Cross-Border Claims Protocol) will be subject to the Cross-Border Claims Protocol;

d)  all prior proofs of claim filed in respect of an Intercompany Claim against the Applicants or their Directors or Officers in respect of the call for claims in the General Claims Process or the EMEA Claims Process shall be of no force or effect whatsoever; and

e) reporting with respect to Intercompany Claims will be incorporated into the ongoing claims reporting being performed by the Monitor pursuant to the provisions of the Claims Resolution Order.

59. The Monitor notes that the process contemplated by the proposed Intercompany Claims Procedure Order is largely a "reverse" claims process in that the Monitor will issue Intercompany Balance Statements indicating, where applicable, the quantum of the Claim of a Non-APAC/CALA Affiliate against an Applicant (i.e. the Stated Intercompany Claim). The Monitor, in consultation with the Applicants, has conducted a review of the Applicants' books and records to reconcile Nortel's intercompany accounts. Accordingly, the Monitor is of the view that specifying a Non-APAC/CALA Affiliate's Claim, combined with giving such Non-APAC/CALA Affiliate the ability to dispute such a Stated Intercompany Claim and assert Additional Non-APAC/CALA Affiliate Claims, is the most efficient means of determining and resolving Non-APAC/CALA Affiliate Claims in the circumstances.

60. The approval of the Intercompany Claims Procedure Order will assist the Applicants in advancing these CCAA proceedings, including by facilitating the wind-down and liquidation of the Non-APAC/CALA Affiliates that are subsidiaries of NNL as well as providing further certainty as to the nature and quantum of claims asserted against the Applicants.

61. Accordingly, the Monitor recommends this Court grant the proposed Intercompany Claims Procedure Order.

## STATUS OF THE COMPENSATION CLAIMS PROCESS

62. To date, the Monitor has issued Information Statement Packages to over 14,000 individuals representing a claim value of approximately CAD 1 billion[6].   The Compensation Claims Procedure Order established a bar date of January 6, 2012 for Identified Claimants and a Rolling Bar Date for those who cease employment after December 31, 2010 and who receive an Information Statement Package  to:

    a)   return any Requests for Corrections; and/or

    b)   file a Form C Proof of Claim in respect of any other compensation related claims.

63. As of the date of this Eighty-Seventh Report, the Monitor has received approximately 1,500 Request for Corrections forms and approximately 780 Proofs of Claim from approximately 2,200 claimants.  The Monitor continues to provide copies of these requests and claims to Representative Counsel and counsel to the CAW, as appropriate.

64. Since the January 6, 2012 bar date, the Monitor has been reviewing the Requests for Corrections and Proofs of Claims received.  The process consists of reviewing supporting documentation, identifying the requested corrections or claim and communicating with the claimants for additional clarification or documentation.  This detailed process is necessary to ensure the Requests for Corrections and the Proofs of Claims are accurately and fully understood before any determinations are made regarding the claims.  Once the review has been finalized, Mercer will be requested to revalue the claim based on the accepted changes.

65. The Monitor has concluded its review of Requests for Corrections for approximately 850 individuals.  These individuals have received one of the following notices:

    a)   Notice of Acceptance – if all requested changes to personal data points were accepted but did not have any effect on the dollar value of the Compensation Claim;

---

[6] This amount will be reduced by distributions received from the corpus of the HWT and any other valid set-offs relating to amounts owing by the Compensation Creditor to an Applicant but reflects a reduction by payments received under the Termination Fund.  This amount does not include claims of Active Employees, Active Canadian Service Employees and Active Precision Employees as at the date they cease active employment.  In total, these claims are estimated to be less than the amount to be deducted for HWT distributions.

b) Revised Information Statement – if the Monitor has accepted all the requested changes to personal data points and a change in the dollar value of the original Compensation Claim results. These Revised Information Statements set out the final dollar value of the Compensation Claim in accordance with the Methodology based upon the corrected changes to the personal data;

c) Notice of Disallowance – if all requested changes to personal data points were disallowed;

d) Notice of Partial Disallowance – if some requested changes to personal data points were accepted and others were disallowed. These individuals will have 28 days from the date of the notice to file a Notice of Dispute. If the Monitor does not receive a Dispute Notice within the 28 day period, the Monitor will provide these individuals with a Revised Information Statement as discussed above or, if applicable, will notify the individual that the changes to personal data points did not have any effect on the dollar value of the Compensation Claim; or

e) Monitor Corrected Personal Information – if as a result of the acceptance of one or more of the requested changes to a personal data point provided by the individual claimant, the Monitor made additional/related changes to other data points. These individuals will have 28 days from the date of the Monitor Corrected Personal Information to make changes to the corrections made by the Monitor. If the Monitor does not receive any further changes from the individual within the 28 day period, the Monitor will provide these individuals with Revised Information Statements as discussed above or, if applicable, will notify the individual that the changes to personal data points did not have any effect on the dollar value of the Compensation Claim.

66.   The Monitor also has been reviewing Form C Proofs of Claim. The Monitor has concluded its review of 63 Form Cs and has issued Notices of Disallowance. These individuals have 28 days from the date of the notice to file a Notice of Dispute.

67.   As of the date of this Eighty-Seventh Report, the Monitor has received 40 Notices of Dispute.

68.   The Monitor has kept Representative Counsel informed of its progress through this process. The Monitor continues to provide copies of all notices sent to individuals and all Dispute Notices received from individuals to Representative Counsel and counsel to the CAW, as appropriate.  The Monitor will continue to review Requests for Correction, Form Cs and Notices of Dispute and keep this Court and Representative Counsel apprised of its progress.

69.   As of the date of this Eighty-Seventh Report, the Monitor has received approximately 70 Requests for Correction and Form C Proofs of Claim after the January 6, 2012 bar date or Rolling Bar Date, as applicable.  Upon completing a review of these claims, the Monitor will seek further direction from this Court.

70.   To date, there are approximately 98 Active Employees, Active Canadian Service Employees and Active Precision Employees.  Pursuant to the Compensation Claims Orders, the Monitor will mail an Information Statement Package or prescribed letter to any individual whose status changes, within 21 business days of being advised of the status change.

71.   As reported in the Eighty-Fourth Report, the Monitor continues to work with Representative Counsel, counsel for the CAW and the NRPC to obtain and confirm corrected mailing addresses for any notices that have been returned to the Monitor as a result of undeliverable mail.

## STATUS OF SAME/OVERLAPPING COMPENSATION CLAIMS

72. By Court Order dated November 8, 2011, this Court approved an amendment to the Compensation Claims Procedure Order to address Compensation Claims of Identified Claimants that are: (i) in excess of CAD 5 million and subject to the Claims Resolution Order; or (ii) potential Same-Creditor Claims or Overlapping Claims and subject to the Cross-Border Claims Protocol, which is described in more detail in the Seventy-Seventh Report.

73. Since the last update provided in the Eighty-Fourth Report, the Monitor and the U.S. Debtor have been consulting on a regular basis to resolve the Same-Creditor Claims to determine which of those claims are Overlapping Claims.

74. The Monitor has also consulted with the U.S. Debtors on Form C Proofs of Claim received from claimants identified as potential Same-Creditor Claims or Overlapping Claims.

75. With the assistance of Representative Counsel and counsel to the CAW as appropriate, certain Overlapping Creditors rescinded their claims in the Chapter 11 Proceedings.

76. As a result of these consultations and assistance, many Same-Creditor Claims have been determined not to constitute Overlapping Claims.  As of the date of this Eighty-Seventh Report the following claims remain under review:

    a) 17 Overlapping Claims; and

    b) four Same-Creditor Claims.

77. For those Same-Creditor Claims determined not to be Overlapping Claims, the Monitor has mailed Information Statement Packages to the holders of those claims.

78. As of the date of this Eighty-Seventh Report, five information statements contain total claims in excess of CAD 5.0 million. In addition, depending upon the final determination of the Requests for Correction and Form C Proofs of Claim received; there  may be additional creditors with claims exceeding CAD 5.0 million.  Pursuant to the

Compensation Claims Procedure Order, these claims require Court approval and where applicable the Monitor will seek such approval at a later date.

## STATUS OF THE HEALTH AND WELFARE TRUST

79.    By a series of Court Orders dated December 15, 2010, May 3, 2011, June 21, 2011 and March 2, 2012, this Court approved interim distributions from the HWT to Income Beneficiaries (as defined in such Orders).    Cumulative interim distributions in the amount of approximately CAD 34.4 million were made to 761 Income Beneficiaries (including 344 LTD Beneficiaries, 80 SIB Beneficiaries and 337 STB Beneficiaries) during the period from January 2011 to June 2012.

80.    By Court Order dated August 23, 2011, this Court approved a fourth interim distribution from the HWT to LTD Beneficiaries on account of their LTD Life and LTD Optional Life Benefit (the "Fourth Interim Distribution", as defined in that order).    The Fourth Interim Distribution, in the amount of approximately CAD 1.9 million, was made to 351 beneficiaries on or about September 30, 2011.

81.    By Court Order dated November 8, 2011, this Court approved a fifth interim distribution from the HWT to individuals on account of Pensioner Life (the "Fifth Interim Distribution", as defined in that Order).    The Fifth Interim Distribution, in the amount of approximately CAD 21.2 million, was made to 8,783 individuals (including 330 LTD Beneficiaries, 8,154 Pensioners and others) during the period from November 2011 to June 2012.

82.    The illustrative scenario reflecting the Approved HWT Allocation Methodology contained in the Supplemental Fifty-First Report shows 33.8% of the value of the Participating Benefits[7] being paid to Income Beneficiaries and LTD Beneficiaries on account of their LTD Life and LTD Optional Life benefit from the corpus of the HWT.    However, the Monitor now believes the total ultimate distribution from the HWT will exceed 33.8% of the value of the Participating Benefits.    As a result, through the series of interim distributions already approved by this Court and paid, the Income Beneficiaries and LTD

---

[7] With the value of Pensioner Life relating to Pensioners being reduced as a result of actual 2010 Pensioner Life premiums.