Beneficiaries have received 35% of the value of his or her Income Benefits, LTD Life and LTD Optional Life Benefits as the case may be.

83.   There remains a degree of uncertainty regarding the final amount that will be available to distribute from the HWT, as a result of matters referred to in previous reports of the Monitor.

84.   The Monitor will continue to work diligently with the Applicants, the Trustee, the LTD Beneficiaries' Representative and her advisors, the Former Employees' Representatives and their advisors, the CAW and others to finalize outstanding matters, including accounting and financial reporting thereon, to allow a final distribution from the HWT to be made to all Participating Beneficiaries.

**HWT STALE-DATED CHEQUES**

85.   The Fifty-First Report referred to a number of matters that impact on the final amount available for distribution from the HWT including the treatment of stale-dated cheques. Sun Life has advised that as of May 31, 2012 there are 5,146 stale-dated cheques (the "Stale-Dated Cheques") outstanding dating from January 1997 onward, with a total value of CAD 1,037,495.   Sun Life has advised the Monitor it has  a process in place for replacing stale-dated cheques in the normal course when payees come forward and make such a request.

86.   Furthermore, Sun Life has advised the Monitor that in November 2010 it undertook a process to locate individual payees of those Stale-Dated Cheques of CAD 100 or more. Stale-Dated Cheques excluded from the Sun Life review process included:

   a)   cheques less than CAD 100 – deemed not large enough to justify the cost that would be incurred to locate payees;

   b)   cheques written to third party providers – medical practitioners to whom payments had been assigned;

   c)   cheques written prior to September 1, 2003 – the date Sun Life took over from Clarica Life and therefore cannot be followed up due to system limitations; and

d) cheques written subsequent to December 31, 2008.

87. This process involved the review of stale-dated cheques valued at approximately CAD 145,000 for which Sun Life issued replacement cheques of approximately CAD 55,000.

88. There has been an insignificant change in the value of Stale-Dated Cheques during 2012 as activity related to the health plans administered by Sun Life was wound down during 2011. At present, there are an additional CAD 1,047 of current outstanding cheques which may subsequently become stale-dated.

*Recommendations with respect to Stale-Dated Cheques*

89. In order to provide greater certainty as to the ultimate cash available for distribution from the HWT, reduce administration efforts and costs dealing with potential claims of a large number of holders of small value Stale-Dated Cheques and given the low level of activity related to clearing of Stale-Dated cheques, the Monitor is recommending the following process be approved for dealing with the remaining Stale-Dated Cheques:

a) all Stale-Dated Cheques issued prior to September 1, 2003 be included in the HWT as trust property to be administered by the Monitor and available for distribution to the Participating Beneficiaries. As of May 31, 2012, this would consist of 3,081 cheques totalling CAD 751,139 of which one is payable to the plan sponsor in the amount of CAD 231,691. The average value of the cheques, excluding the one payable to the plan sponsor, is CAD 169;

b) all Stale-Dated Cheques issued on or subsequent to September 1, 2003 for an amount less than CAD 100 or payable to a third party medical practitioner be included in the HWT as trust property to be administered by the Monitor and available for distribution to the Participating Beneficiaries. As of May 31, 2012, this would consist of 1,200 cheques totalling CAD 82,297. The average value of the cheques is CAD 69; and

c) a reserve be established for all Stale-Dated Cheques issued on or subsequent to September 1, 2003 in an amount of CAD 100 or more to be administered by the

Monitor or the trustee upon direction of the Monitor.  As of May 31, 2012, this would consist of 865 cheques totalling CAD 204,059.  The average value of the cheques is CAD 236.

90.   The Monitor is of the belief that:

a)   the efforts and costs involved in attempting to locate and issue new cheques to these payees are not justified given the lack of access to necessary information for those payees included in (a) and (b) above, the small average value of the Stale Dated Cheques and the likelihood of success in locating the payees given how long they have been outstanding; and

b)   the age, value and availability of payee information with respect to the cheques in (c) above, warrants the establishment of a reserve.

**STATUS OF THE TERMINATION FUND**

91.   In accordance with the Employee Settlement Agreement the Applicants established a CAD 4.3 million fund for the benefit of former employees of the Applicants (the "Termination Fund").  Under the settlement agreement:

a)   a former employee is eligible to apply for payment from the Termination Fund to a maximum of  CAD 3,000, if: (i) employment was terminated on or prior to June 30, 2010; (ii) amounts are owing to the former employee for termination or severance pay; (iii) the former employee has not been offered employment with a purchaser of Nortel's assets; and (iv) the former employee did not receive certain other payments;

b)   any payments under the Termination Fund to former employees will be credited against allowed claims of such individuals and such claims will be correspondingly reduced; and

c)   to the extent that funds remain unused in respect of terminations prior to or on June 30, 2010, the Termination Fund may be used to make payments on account of terminations after June 30, 2010 to former employees who meet the eligibility requirements.

92.   By Court Order dated February 25, 2011, this Court extended the eligibility time period to those former employees terminated during the period from July 1, 2010 to and including December 31, 2010 and who otherwise meet the eligibility requirements ("Additional Former Eligible Employees"). The February 25, 2011 Order also amended the Employee Hardship Application Process to permit the use of a portion of the funds allocated to the Employee Hardship Application Process, in combination with the remaining funds in the Termination Fund, to make payments to the Additional Eligible Former Employees.

93.   As of June 30, 2012, 1,124 former employees terminated on or prior to June 30, 2010 have received payments totalling approximately CAD 3.4 million. The remaining former employees terminated on or prior to June 30, 2010 have a potential combined entitlement of CAD 99,000.

94.   As of June 30, 2012, 332 of the Additional Eligible Former Employees have received payments totalling CAD 996,000. The remaining Additional Eligible Former Employees have a potential combined entitlement of CAD 93,000. The Applicants continue to receive applications and make payments to eligible former employees pursuant to the above orders.

**STATUS OF AND PROPOSED AMENDMENTS TO THE HARDSHIP FUND AND PROCESS FOR APPLICATION FOR HARDSHIP PAYMENTS**

95.   On June 18, 2009, this Court issued an Endorsement directing the Monitor to "determine the feasibility of establishing a process by which certain creditors facing hardship might receive a partial distribution in advance of a general distribution to creditors", which was established by Order dated July 30, 2009 (the "Employee Hardship Order"). The Representatives, the Representative Counsel and CAW have now requested amendments to the eligibility criteria and amount available in the Hardship Fund. All payments from the Hardship Fund are advances against future distributions and are subject to applicable withholding taxes. A brief background, current status of this matter, analysis of present circumstances and the Monitor's recommendation follows.

96.   The employee hardship application process is more fully described in the Sixteenth Report and the Affidavit of John Doolittle dated July 24, 2009. To June 30, 2012 the Applicants

have made payments of CAD 146,000 on account of hardship. A further CAD 360,000 and CAD 180,000 respectively have been expended on termination and SIB/STB payments as discussed below. CAD 64,000 remains available for distribution.

97. On February 25, 2011, this Court approved the Applicants' request to:

    a) amend the employee hardship application criteria such that sufficient hardship funds (the "Required Funds") be made available for payment of CAD 3,000 to each of the Additional Eligible Former Employees when combined with the unused funds in the Termination Fund; and

    b) reduce the amount available for hardship applications by the Required Funds.

98. By Court Order dated April 8, 2011, this Court approved making sufficient funds available from the Employee Hardship process to pay each of the SIB Beneficiaries and the STB Beneficiaries entitled to STBs in Pay the maximum 10% distribution in accordance with the methodology used for the January Interim Distribution to a maximum of one month's benefits. The amount available for hardship applications was to be reduced by the amount required to effect this Order.

99. On April 13, 2012, this Court approved the Applicants' request to extend the Application Period until July 31, 2012.

*Current Status*

100. As a result of the Court Orders dated February 25, 2011 and April 8, 2011, the amount available for employee hardship applications as of June 30, 2012 is as follows:

| (in 000's) | | |
|---|---:|---:|
| Hardship Fund, Opening | | 750 |
| | | |
| Hardship Payments per Monitor's 84th Report | (139) | |
| Additional Hardship Payments to June 30, 2012 | (7) | |
| | | (146) |
| | | |
| Additional Eligible Former Employees-paid | (267) | |
| Additional Eligible Former Employees – reserved | (93) | |
| | | (360) |
| April SIB/STB Hardship | | (180) |
| | | |
| Hardship Fund, Remaining | | 64 |

101. The Monitor is continuing to administer the hardship payment application process and report thereon to the appropriate representative counsel. There currently remains available approximately CAD 64,000 to satisfy future hardship application requests. Applications continue to be received from former employees of the Applicants asserting financial hardship resulting from illness, healthcare costs or ineligibility for pension or employment insurance benefits.

102. Under the current process, receipt of pension income is a cause for ineligibility for the hardship payment application process. In August 2011, payments from the registered defined benefit pension plans to certain Nortel pensioners and survivors' of Nortel pensioners were reduced by Morneau Shepell Ltd., the Pension Plan Administrator. The pension reductions have now been in effect for approximately one year. Emerging situations have now been brought to the Monitor's attention where Nortel pensioners or their survivors are experiencing hardship as a result of the aforementioned reductions.

103. Furthermore, the receipt of government disability payments in and of itself precludes LTD beneficiaries from accessing the hardship fund.

*Proposed Amendments to Hardship Eligibility Criteria, Hardship Fund and Process for Application for Hardship Payments*

104.   To address situations where the receipt of pension income or CPP-D, QPP-D or ODSP or other government disability income programs is preventing access to the hardship fund the Monitor has worked closely with the Applicants, Representatives and Representative Counsel and CAW Canada to develop expanded criteria and amendments to conform and refine the process for submission, review and making of hardship payments.

105.   The proposed revisions to the qualifying criteria provide that an application may be made if a Nortel pensioner, a survivor of a Nortel pensioner or a long term disability beneficiary is:

  a)  in receipt of either:

     i.   pension income from the Nortel defined benefit plans and has had that income reduced; or

     ii.   CPP-D, QPP-D or Ontario Disability Supports Program Income or other similar government income, respectively; and

  b)  experiencing urgent financial hardship.

106.   The maximum amount payable to a pensioner or survivor qualifying under the expanded criteria would be limited to CAD 5,000 (payments to survivors applying on the basis of the pensioner's Compensation Claim will be made to the pensioner's estate).

107.   The process continues to include the following steps:

  a)  applications are reviewed and are either accepted or rejected by a person designated by the Monitor within 21 days of receipt of a completed claim form;

  b)  applications which are rejected will be reviewed by a committee,  now to be comprised of one appointee of the Monitor, one appointee of the Company and one appointee chosen by the Representatives,  if so requested by the individual making the application;

c) applications that are rejected by the three person review committee outlined above may be appealed to this Court; and

d) payment is to take place within seven business days of an application being accepted.

108. While the potential number of claimants is not known, the numbers, to date, have not been significant; however, the Applicants are seeking to increase the amount of Hardship Funds available by CAD 250,000, which will bring the total available to CAD 314,000.

109. The Monitor believes the proposed amended application form for hardship payments, the revised payment limits and total amount available under the hardship fund will provide some relief to those holding Compensation Claims and who are experiencing hardship.

110. The Monitor believes those who may need to avail themselves of the hardship payment process may already be aware that one exists as a result of ongoing reporting of the process in various newsletters and postings available to former employees including pensioners and their survivors and long term disability beneficiaries.  The Monitor believes updating the Eligibility Requirements and Procedure with Respect to Hardship Payment Applications on the Monitor's website, the NPRC website and the websites of Representative Counsel will make the application process readily accessible to the expanded pool of potential claimants.

111. The Monitor is also working closely with counsel to the CAW, LTD Beneficiaries' and Former Employees' Representative Counsel to facilitate access to programs and tax treatments that can offer relief to former employees, particularly with respect to healthcare costs.  The Monitor believes access to the hardship application procedure remains necessary and should be expanded as applications continue to be received as a result of the cessation of benefits to Former Employees, LTD Beneficiaries and Nortel pensioners and survivors' of Nortel pensioners.

112. A copy of the proposed revised Eligibility Requirements and the Procedure With Respect To Hardship Payment Applications and Application for Hardship Payments are attached as Appendix "F" to this Eighty-Seventh Report.

113. The Monitor supports:

    a) the Applicants' request for an extension of the deadline for submitting hardship applications to October 31, 2012;

    b) amendments to extend eligibility for payments to Nortel pensioners and survivors' of Nortel pensioners and to the long term disability beneficiaries receiving CPP-D, QPP-D and or payments under the Ontario Disability Supports Program or similar government programs;

    c) an increase of CAD 250,000 in the available funds; and

    d) the proposed changes to Eligibility Requirements and Procedure with Respect to Hardship Payment Applications and the Hardship Payments Applicant documents to conform with the changes to the criteria and effect minor modifications to the process to take into account the commencement of the Compensation Claims process.

## STATUS OF REALIZATION OF REMAINING ASSETS

114. While Nortel has now completed the sale of its operating units, the Applicants continue to assess the sale of their remaining assets in consultation with their legal and financial advisors.

### Residual IT Assets Sale Process

115. On March 25, 2011, this Court granted an order with respect to the process for the sale of the Applicants' remaining information technology infrastructure assets (the "Residual IT Assets"), including the Applicants' portfolio of IP addresses.

116. On April 4, 2012, this Court granted an order approving the sale of the Applicants' rights in a certain number of internet protocol addresses to Bell Aliant Regional Communications, Limited Partnership. This transaction closed on April 5, 2012.

117.  On May 7, 2012, this Court granted an order approving the sale of the Applicants' rights in a certain number of IP addresses to Vodafone Americas Inc.  This transaction closed on May 15, 2012.

118.  The Monitor understands that the American Registry for Internet Numbers ("ARIN"), the Regional Internet Registry ("RIR") for, among other countries, Canada and the United States, has recently approved new policies permitting inter-RIR transfers of IP addresses (i.e. transfers to jurisdictions outside of North America), subject to certain terms and conditions.  The Applicants and the Monitor are considering the implications of these policy developments on their continuing sale process for the Applicants' remaining IP addresses and expect to commence a further canvas of the market with a particular focus on non-North American buyers.  In the interim, the Applicants, with the assistance of the Monitor, continue to have discussions with various other parties with respect to potential additional transfers of IP addresses.

## STATUS OF ALLOCATION MATTERS AND MEDIATION

119.  As previously reported, Orders were issued by this Court and the U.S. Court dated June 17, 2011 pursuant to which various parties interested in the allocation of the Nortel global divestiture sale proceeds were ordered to mediate the issues raised in the allocation protocol motions heard on June 7, 2011 before this Court and the U.S. Court pending the release of the Courts' decisions on same.

120.  By their respective Orders dated June 29, 2011, this Court and the U.S. Court appointed The Honourable Warren K. Winkler, Chief Justice of Ontario, to serve as mediator (the "Mediator").

121.  On August 3, 2011, the U.S. Court entered an order requesting the appointed mediator to consider the postponement of the mediation until after the U.S. Court's decision on the U.S. Debtors' objections and motions to dismiss the claims of the EMEA Debtors against them.

122.  The U.S. Court hearing with respect to the EMEA Debtors' claims took place October 14, 2011.  On March 20, 2012, the U.S. Court entered an order and issued a memorandum

opinion granting in part and denying in part the U.S. Debtors' and Official Committee of Unsecured Creditors' joint objections and motions to dismiss the claims of NNUK, Nortel Networks (Ireland) Limited and NNSA.

123. On March 26, 2012 the parties to the mediation, including the Applicants and Monitor, received a letter from the Mediator indicating that parties were to file new or revised mediation briefs by April 16, 2012.  The Applicants and the Monitor filed a joint mediation brief on April 16, 2012.

124. A meeting of the parties to the mediation was held on April 24, 2012 in Toronto, Canada. Mediation discussions and information exchanged with the Mediator or among the parties to the mediation is confidential.

## STATUS OF ENVIRONMENTAL MATTERS

125. As previously reported in the Eighty-Fourth Report, the Applicants brought a motion seeking, inter alia, the approval of the repudiation of contracts relating to environmental monitoring and remediation at the Impacted Sites (as defined in the Sixty-Sixth Report) and a declaration that various Orders of the Ontario Ministry of the Environment (the "MOE Orders") and related proceedings before the Ontario Environmental Review Tribunal were subject to the stay of proceedings granted by this Court.  Further details with respect to that motion are contained in the related motion materials and the Sixty-Sixth and Seventy-Fourth Reports.

126. By Endorsement dated March 9, 2012 (the "Environmental Matters Decision"), this Court held that:

    a)  the MOE Orders are subject to the stay of proceedings;

    b)  all proceedings before the Ontario Environmental Review Tribunal in relation to the MOE Orders are stayed;

    c)  the Applicants are authorized to cease performing any remediation at or in relation to the Impacted Sites;

d) the Applicants are released from all contractual obligations to carry out remediation requirements at or in relation to the Impacted Sites; and

e) any claims in relation to such current or future remediation requirements by the MOE against any of the Applicants or their current or former directors or officers in relation to the Impacted Sites are subject to resolution and determination in accordance with the terms of the Claims Procedure Order and the Claims Resolution Order.

127. As advised in the Eighty-Fourth Report, on March 21, 2012, the Applicants gave notice to various interested parties of their intent to cease any remediation and monitoring activities at the Impacted Sites effective April 23, 2012.  On or about that date, the Applicants ceased any such remediation and monitoring activities, having provided transition assistance to interested parties with respect to such activities where requested.

128. On March 23, 2012, Her Majesty the Queen in right of Ontario as represented by the Ministry of the Environment served a notice of motion for leave to appeal the Environmental Matters Decision to the Ontario Court of Appeal.  On June 22, 2012, the Ontario Court of Appeal granted leave to appeal to the MOE and on July 3, 2012, the MOE served its notice of appeal.  As of the date of this Eighty-Seventh Report, the appeal is still pending and the hearing date has not yet been set.

**OTHER MATTERS**

*SNMP Research Matters*

129. As previously advised, on or about September 21, 2011, SNMP Research International, Inc. and SNMP Research, Inc. (collectively, "SNMP Research") gave notice of a motion seeking an order lifting the stay of proceedings, to permit SNMP Research to file a complaint with the U.S. Court against, inter alia, the Applicants relating to the alleged unlawful use, distribution, licence and sale of SNMP Research products after the Filing Date.

130. Following the service of the motion, the Applicants, the U.S. Debtors and SNMP Research engaged in good faith negotiations and agreed to mediate the matters at issue between SNMP Research and Nortel. In connection with such agreement, the Applicants and the Monitor consented to an Order of this Court dated October 26, 2011, lifting the stay for the sole purpose of permitting SNMP Research to move for relief in the U.S. Court to file its complaint under seal, to simultaneously file the complaint with the U.S. Court, and to complete service of the complaint on the Applicants. Such relief was granted in order to permit SNMP Research to seek to preserve its existing claims (if any) from becoming statute barred and on a without prejudice basis as to any and all matters that are or may be at issue between Nortel and SNMP Research, including, without limitation, the merits of SNMP Research's lift stay motion and the appropriate forum(s) for the hearing and determination of SNMP Research's claims.

131. The Applicants, the U.S. Debtors and SNMP Research are in the process of engaging former United States Bankruptcy Court judge James L. Garrity Jr. to act as mediator. No further steps have been taken in the mediation to date.

*Proceedings Commenced by the French Liquidator against NNC, NNL and the Monitor Before the Versailles Commercial Court*

132. NNSA is a majority owned subsidiary of NNL. It is an EMEA Debtor subject to the UK administration proceedings and under the control of the Joint Administrators in the context of such proceedings. In addition, as noted above, secondary insolvency proceedings were commenced in relation to NNSA in France such that Maître Cosme Rogeau (the "French Liquidator") was appointed as liquidator of NNSA and proceedings are pending before the Versailles Commercial Court.

133. During the week of June 11, 2012, each of NNC, NNL and the Monitor were served at their respective offices in Ontario with a document entitled "Summons to Appear Before the Commercial Court of Versailles" issued at the request of the French Liquidator that purports to require NNC, NNL and the Monitor to attend a hearing before the Versailles Commercial Court on July 27, 2012 (the "French Summons" and the proceedings commenced by same, the "French Proceedings").

134. The French Summons, a copy of which is attached as Appendix "G", alleges that NNC and NNL were the effective or de facto managers of NNSA, they mismanaged the affairs of NNSA, and such mismanagement led to any resulting deficiency of NNSA's assets relative to its liabilities such that NNC and NNL should be liable for such deficiency.

135. The deficiency amount claimed by the French Liquidator against each of NNC and NNL is presently specified at approximately €250 million but is subject to two significant contingencies: (i) the resolution of allocation of the Nortel global sale proceeds (and in particular the quantum of such proceeds to be allocated to NNSA), and (ii) whether or not the UK Pensions Regulator will have an enforceable claim against NNSA pursuant to a financial support direction ("FSD") issued by the Determinations Panel of the UK Pensions Regulator.  Based on these contingencies, the Monitor understands the alleged liability of NNC and NNL for the deficiency claim could theoretically be nil, or in excess of €2.4 billion.

136. The Monitor and the Applicants regard the commencement of the French Proceedings and the service of the French Summons on each of them in Canada as a breach of the stay of proceedings provided for in the Initial Order.

137. On June 19, 2012, counsel to the Monitor wrote to counsel to the French Liquidator advising of the foregoing and demanding the French Liquidator discontinue the French Proceedings immediately, failing which the Monitor would bring a motion seeking, inter alia, an Order declaring that service of the French Summons in Canada was in breach of the stay and declaring the French Proceedings null and void.  A copy of this letter, excluding enclosures, is attached as Appendix "H".

138. On June 26, 2012, counsel to the Monitor received correspondence from counsel to the French Liquidator indicating the French Liquidator does not intend to pursue the French Proceedings at present and will seek a stay of the proceedings from the Versailles Commercial Court at the hearing on July 27, 2012.  A copy of this letter is attached as Appendix "I".

139. On July 9, 2012, counsel to the Monitor wrote to counsel to the French Liquidator indicating that, although the Monitor maintained the positions it set out in its June 19, 2012, letter, it was prepared, on the basis of the representations made by counsel to the French Liquidator in its June 26, 2012 letter, not to bring the above mentioned motion on at present, but fully reserved its right to do so at a later date.  A copy of such letter is attached as Appendix "J" hereto.

140. The Monitor will monitor the status of the French Proceedings and will advise this Court of any developments regarding same.

## STATUS OF FOREIGN PROCEEDINGS

*Chapter 11*

141. The following is a summary of the court orders that have been issued and the financial information that has been filed in the Chapter 11 Proceedings since the last update provided in the Eighty-Fourth Report:

   a) on April 18, 2012, the U.S. Court entered an order appointing Richard Levin as a neutral mediator concerning the modification or termination of the Nortel Retiree Welfare Plans and the Nortel LTD Plans;

   b) on May 24, 2012, the U.S. Debtors obtained an order authorizing and approving procedures to resolve or otherwise settle claims of employees terminated by the U.S. Debtors after the Petition Date;

   c) on June 25, 2012, the Supreme Court of the United States denied the trustee of the Nortel Networks UK Pension Plan's petition for a writ of certiorari to review the decision of the U.S. Circuit Court of Appeals for the Third Circuit affirming the March 29, 2011 order of the United States District Court for the District of Delaware and the February 26, 2010 order of the U.S. Court;

   d) On July 11, 2012, the U.S. Debtors obtained an order authorizing and approving the Fourth Estate Settlement Agreement;

e) On July 11, 2012, the U.S. Court entered an order requiring the Nortel Networks U.K. Pension Trust Limited (as Trustee of the Nortel Networks U.K. Pension Plan) and the Board of the Pension Protection Fund to file amended claims against the Debtors on or before September 5, 2012 and to attach supporting documentation for such claims;

f) The U.S. Debtors filed Debtor-in-Possession Monthly Operating Reports for the months of January, February, March, April and May 2012 on April 2, April 9, May 14, June 5, and June 27, 2012, respectively; and

g) In addition, the U.S. Debtors obtained orders granting omnibus objections to claims, approving certain settlement and side agreements, authorizing and amending the retention and payment of professionals, authorizing and modifying the funding of the wind-down of certain subsidiaries and affiliates, and resolving certain claims and motions.

*Chapter 15*

142. The following is a summary of the filings in the Chapter 15 proceedings of the Applicants since the last update provided in the Eighty-Fourth Report:

a) on April 17, 2012, the Monitor filed notice of the order and endorsement of this Court dated April 13, 2012, which, among other things, extended the Stay Period to and including July 31, 2012;

b) on April 18, 2012, plaintiffs (comprised of current and former employees of the U.S. Debtors) in an adversary proceeding against the U.S. Debtors and certain current or former directors of the Applicants regarding the administration of a U.S. deferred compensation plan sought a determination from the U.S. Court that their action was permitted notwithstanding the stay in favour of directors and officers set forth in the Initial Order and enforced in the United States through the Chapter 15 proceedings. The Monitor had previously advised the plaintiffs their action against the directors violated the stay and requested the directors be dismissed as defendants. The Monitor opposed the plaintiffs' motion in the Chapter 15 case.

Following a hearing, the U.S. Court entered an order on June 19, 2012 directing the plaintiffs to seek relief from the Initial Order before this Court by June 25, 2012. Alternatively, the plaintiffs were invited to dismiss their complaint against the directors, without prejudice, provided the plaintiffs obtain permission from this Court before subsequently pursuing remedies against the directors during the period in which the Initial Order is effective in accordance with its terms. The plaintiffs chose to dismiss the directors and filed notice to that effect in the adversary proceeding on June 25, 2012; and

c) the Monitor has continued to file with the U.S. Court and serve on required parties notices of each of its Reports to this Court.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

143. The Monitor has assisted and continues to assist the Applicants in their efforts to efficiently complete the realization and maximization of value from their assets, wind down the Applicants' corporate, operational and IT infrastructure, conduct the claims processes and prepare a plan of arrangement. An extension of the Stay Period is required to permit these efforts to continue and to otherwise continue with an orderly wind-down of the Applicants' affairs. The Monitor believes the Applicants are working diligently and in good faith and continue to progress towards the development of a plan of arrangement.

144. For the reasons outlined in this Eighty-Seventh Report, the Monitor supports the Applicants' request for the following:

a) an extension of the stay up to and including October 31, 2012;

b) the Eligibility Requirements and the Procedure with Respect to Hardship Payments Applications be amended, the amount of the hardship fund be increased by CAD 250,000 and the Employee Hardship Application Process be extended through October 31, 2012; and

c) the proposed Intercompany Claims Procedure Order be approved.

145.  In addition, the Monitor supports the granting of the proposed Orders with respect to:

a)  the process outlined in paragraph 89 for dealing with the remaining Stale-Dated Cheques and the establishment of a reserve; and

b)  deeming certain Misfiled Claims as validly filed against the appropriate Applicant in accordance with the Claims Procedure Order.

All of which is respectfully submitted this 19th day of July, 2012.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**
**and not in its personal capacity**

Per:

Murray A. McDonald
President

APPENDIX "A"

[Attached]

**Nortel Networks - March 25 to June 30, 2012**
**CCAA Applicants**
**Forecast Cash Flow - Variances**
USD (Millions)

|  | Forecast | Actuals | Variances |
|---|---|---|---|
| Start of period | 25-Mar-12 | 25-Mar-12 | 25-Mar-12 |
| End of period | 30-Jun-12 | 30-Jun-12 | 30-Jun-12 |

## 1 . Receipts & Disbursements

**Receipts**

|  | | | |
|---|---|---|---|
| Collection of Accounts Receivable | - | - | - |
| Other Receipts | - | 1.0 | 1 0 |
| TSA Recoveries from Buyer | - | 0.3 | 0 3 |
| Payroll & AP reimbursement from Buyers | - | - | - |
| Intercompany Receipts | 11.2 | 12.2 | 1 0 |
| **Total Receipts** | 11.2 | 13.5 | 2 3 |

**Disbursements**

|  | | | |
|---|---|---|---|
| Payroll (Gross) | 2.0 | 2.8 | (0.8) |
| Benefits | 0.2 | 0.5 | (0.3) |
| Pension | - | - | - |
| Inventory Purchases | - | - | - |
| Non-Inventory Purchases | 5.6 | 4.3 | 1.3 |
| Payroll & AP payments on behalf of Buyers | - | - | - |
| Intercompany Disbursements | 0.1 | 0.4 | (0.3) |
| Restructuring Costs | 27.4 | 12.1 | 15.3 |
| **Total Disbursements** | 35.3 | 20.1 | 15.2 |
| **Net Cash Flow** | (24.1) | (6.6) | 17 5 |
| FX Impact | - | (6.3) | (6.3) |
| **Opening Available Cash Balance** | 269.1 | 269.1 | |
| **Closing Available Cash Balance** | 245.0 | 256.2 | 11.2 |
| Unavailable Cash | 238.5 | 238.2 | (0.3) |
| **Total Cash** | 483.5 | 494.4 | 10.9 |
| Restricted Cash | 23.3 | 21.9 | (1.4) |
| **Total Cash + Restricted Cash** | 506.8 | 516.3 | 9.5 |

# APPENDIX "B"

## [Attached]

APPENDIX B

## Nortel Networks - July 1, 2012
### CCAA Applicants
### Forecast Cash Flow
USD (Millions)

|  |  | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | | Jul 2012 | | | | | Aug 2012 | | | | |
|  | Start of period | 01-Jul-12 | 08-Jul-12 | 15-Jul-12 | 22-Jul-12 | 29-Jul-12 | 01-Aug-12 | 05-Aug-12 | 12-Aug-12 | 19-Aug-12 | 26-Aug-12 | 01-Sep-12 |
|  | End of period | 07-Jul-12 | 14-Jul-12 | 21-Jul-12 | 28-Jul-12 | 31-Jul-12 | 04-Aug-12 | 11-Aug-12 | 18-Aug-12 | 25-Aug-12 | 31-Aug-12 | 01-Sep-12 |
| **Receipts** | | | | | | | | | | | | |
| Collection of Accounts Receivable | | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts | | - | - | - | - | - | - | - | - | - | - | - |
| Reimbursement from Buyers | | - | - | - | - | - | - | - | - | - | - | - |
| Intercompany Receipts | | - | - | - | - | - | - | 11.6 | - | - | - | - |
| **Total Receipts** | | - | - | - | - | - | - | 11.6 | - | - | - | - |
| **Disbursements** | | | | | | | | | | | | |
| Payroll (Gross) | | - | 0.2 | - | 0.2 | - | - | 0.2 | - | 0.2 | - | - |
| Benefits | | - | - | - | - | - | - | - | - | - | - | - |
| Pension | | - | - | - | - | - | - | - | - | - | - | - |
| Inventory Purchases | | - | - | - | - | - | - | - | - | - | - | - |
| Non-Inventory Purchases | | 0.3 | 0.3 | 0.3 | 0.3 | - | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | - |
| Intercompany Disbursements | | - | - | - | - | - | - | - | - | - | - | - |
| Restructuring Costs | | 1.0 | 1.0 | 1.0 | 1.0 | - | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | - |
| **Total Disbursements** | | 1.3 | 1.5 | 1.3 | 1.5 | - | 1.3 | 1.5 | 1.3 | 1.5 | 1.3 | - |
| Net Cash Flow | | (1.3) | (1.5) | (1.3) | (1.5) | - | (1.3) | 10.1 | (1.3) | (1.5) | (1.3) | - |
| FX Impact | | | | | | | | | | | | |
| Opening Available Cash Balance | | 256.2 | 254.9 | 253.4 | 252.1 | 250.6 | 250.6 | 249.3 | 259.4 | 258.1 | 256.6 | 255.3 |
| Closing Available Cash Balance | | 254.9 | 253.4 | 252.1 | 250.6 | 250.6 | 249.3 | 259.4 | 258.1 | 256.6 | 255.3 | 255.3 |
| LG & Standherd Proceeds | | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 |
| Total Cash | | 493.1 | 491.6 | 490.3 | 488.8 | 488.8 | 487.5 | 497.6 | 496.3 | 494.8 | 493.5 | 493.5 |
| Restricted Cash | | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 |
| Total Cash + Restricted Cash | | 515.0 | 513.5 | 512.2 | 510.7 | 510.7 | 509.4 | 519.5 | 518.2 | 516.7 | 515.4 | 515.4 |

APPENDIX B

# Nortel Networks - July 1, 2012
## CCAA Applicants
### Forecast Cash Flow
USD (Millions)

| | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Sept 2012 | | | | | | Oct 2012 | | | |
| | Start of period | 02-Sep-12 | 09-Sep-12 | 16-Sep-12 | 23-Sep-12 | 30-Sep-12 | 01-Oct-12 | 07-Oct-12 | 14-Oct-12 | 21-Oct-12 | 28-Oct-12 | 01-Jul-12 |
| | End of period | 08-Sep-12 | 15-Sep-12 | 22-Sep-12 | 29-Sep-12 | 30-Sep-12 | 06-Oct-12 | 13-Oct-12 | 20-Oct-12 | 27-Oct-12 | 31-Oct-12 | 31-Oct-12 |
| **Receipts** | | | | | | | | | | | | |
| Collection of Accounts Receivable | | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts | | - | - | - | - | - | - | - | - | - | - | - |
| Reimbursement from Buyers | | - | - | - | - | - | - | - | - | - | - | - |
| Intercompany Receipts | | - | - | - | - | - | - | - | - | - | 1.3 | 12.9 |
| **Total Receipts** | | - | - | - | - | - | - | - | - | - | 1.3 | 12.9 |
| **Disbursements** | | | | | | | | | | | | |
| Payroll (Gross) | | 0.2 | - | - | - | - | 0.2 | - | 0.2 | - | 0.2 | 2.4 |
| Benefits | | - | - | 0.8 | - | - | - | - | - | 0.2 | - | 0.3 |
| Pension | | - | - | 0.1 | - | - | - | - | - | - | - | 0.3 |
| Inventory Purchases | | - | - | - | - | - | - | - | - | - | - | - |
| Non-Inventory Purchases | | - | - | - | - | - | - | - | - | - | 5.5 | 5.5 |
| Intercompany Disbursements | | 0.3 | 0.3 | 0.3 | 0.3 | - | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 5.4 |
| Restructuring Costs | | 1.2 | 1.2 | 1.2 | 1.2 | - | 1.2 | 1.2 | 1.2 | 1.2 | 1.5 | 19.8 |
| **Total Disbursements** | | 1.7 | 1.5 | 2.4 | 1.5 | - | 1.7 | 1.5 | 1.7 | 1.7 | 8.7 | 34.9 |
| Net Cash Flow | | (1.7) | (1.5) | (2.4) | (1.5) | - | (1.7) | (1.6) | (1.7) | (1.7) | (7.4) | (22.0) |
| FX Impact | | | | | | | | | | | | |
| Opening Available Cash Balance | | 255.3 | 253.6 | 252.1 | 249.7 | 248.2 | 248.2 | 246.5 | 245.0 | 243.3 | 241.6 | 256.2 |
| Closing Available Cash Balance | | 253.6 | 252.1 | 249.7 | 248.2 | 248.2 | 246.5 | 245.0 | 243.3 | 241.6 | 234.2 | 234.2 |
| LG & Standhered Proceeds | | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 |
| Total Cash | | 491.8 | 490.3 | 487.9 | 486.4 | 486.4 | 484.7 | 483.2 | 481.5 | 479.8 | 472.4 | 472.4 |
| Restricted Cash | | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 |
| Total Cash + Restricted Cash | | 513.7 | 512.2 | 509.8 | 508.3 | 508.3 | 506.6 | 505.1 | 503.4 | 501.7 | 494.3 | 494.3 |

# APPENDIX "C"

## [Attached]

50

Appendix C

# Nortel Networks - CCAA Applicants Overall Claims Status
July 10, 2012
All amounts in CAD $ millions

| Debtor / Claim Category | Filed Proof of Claim | | Current claim value - most recent stage (1) (2) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Under Review | | Accepted or Reviewed and unadjusted | | Value per Notice of Disallowance | | Value per Notice of Dispute | | Valued by Claims Officer | | Valued by Court | |
| | # | $ | # | $ | # | $ | # | $ | # | $ | # | $ | # | $ |
| **Nortel Networks Corporation** | | | | | | | | | | | | | | |
| Trade | 74 | 1,666.1 | 27 | 77.2 | 45 | 0.1 | - | - | 2 | 20.8 | - | - | - | - |
| Bonds | 2 | 4,808.7 | 2 | 4,808.7 | - | - | - | - | - | - | - | - | - | - |
| Term. & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 7 | 2,514.0 | 7 | 2,514.0 | - | - | - | - | - | - | - | - | - | - |
| Other | 163 | 769.6 | 43 | 306.2 | 117 | 1.8 | - | - | 3 | 1.2 | - | - | - | - |
| Total | 246 | 9,758.4 | 79 | 7,706.1 | 162 | 1.9 | - | - | 5 | 21.9 | - | - | - | - |
| **Nortel Networks Global Corporation** | | | | | | | | | | | | | | |
| Trade | 11 | 1,493.3 | 3 | 10.0 | 7 | - | - | - | 1 | 0.8 | - | - | - | - |
| Bonds | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Term. & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 6 | 2,510.3 | 6 | 2,510.3 | - | - | - | - | - | - | - | - | - | - |
| Other | 35 | 213.6 | 30 | 0.1 | 5 | - | - | - | - | - | - | - | - | - |
| Total | 52 | 4,217.2 | 39 | 2,520.4 | 12 | - | - | - | 1 | 0.8 | - | - | - | - |
| **Nortel Networks International Corporation** | | | | | | | | | | | | | | |
| Trade | 8 | 1,492.4 | 4 | - | 4 | - | - | - | - | - | - | - | - | - |
| Bonds | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Term. & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 6 | 2,510.3 | 6 | 2,510.3 | - | - | - | - | - | - | - | - | - | - |
| Other | 35 | 213.6 | 30 | 0.1 | 5 | - | - | - | - | - | - | - | - | - |
| Total | 49 | 4,216.4 | 40 | 2,510.4 | 9 | - | - | - | - | - | - | - | - | - |
| **Nortel Networks Limited** | | | | | | | | | | | | | | |
| Trade | 326 | 1,584.5 | 46 | 522.9 | 270 | 76.9 | - | - | 10 | 50.1 | - | - | - | - |
| Bonds | 4 | 5,243 | 4 | 5,243 | - | - | - | - | - | - | - | - | - | - |
| Inter-company (NNI claim) | 1 | 2,517 | - | - | 1 | 2,517 | - | - | - | - | - | - | - | - |
| Term. & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 7 | 2,511 | 7 | 2,511 | - | - | - | - | - | - | - | - | - | - |
| Other | 196 | 1,730 | 45 | 968 | 150 | 38.8 | - | - | - | - | - | - | - | - |
| Total | 534 | 13,585.7 | 103 | 9,244.8 | 421 | 2,632.7 | - | - | 10 | 50.1 | - | - | - | - |
| **Nortel Networks Technology Corporation** | | | | | | | | | | | | | | |
| Trade | 142 | 1,545.4 | 10 | 10.0 | 129 | 21.7 | - | - | 3 | 21.0 | - | - | - | - |
| Bonds | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Term. & Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension & Benefits | 6 | 2,510 | 6 | 2,510 | - | - | - | - | - | - | - | - | - | - |
| Other | 35 | 214 | 30 | 0 | 6 | - | - | - | - | - | - | - | - | - |
| Total | 184 | 4,269.3 | 46 | 2,520.4 | 135 | 21.7 | - | - | 3 | 21.0 | - | - | - | - |
| **Grand Total** | 1,065 | 36,047.0 | 307 | 24,502.0 | 739 | 2,656.2 | - | - | 19 | 93.8 | - | - | - | - |

Notes:
Note 1: The estimated value of individual claims is aggregated and shown in one claim stage only.
Note 2: All amounts (other than Accepted) are subject to potential material change (i.e. negotiation, appeal, etc.) as the process for the determination of claims proceeds.
Note 3: Excludes claims filed by various EMEA entities pursuant to the EMEA Claim Procedure Order dated January 14, 2011 and the employee compensation claim process with a bar date of January 6, 2011.

# APPENDIX "D"

## [Attached]

## APPENDIX "D"

Misfiled Claims – Additional Listing

| Claimant | Nortel Legal Entity | Filed proof of claim amount in $USD | Filed proof of claim amount in $CAD |
|---|---|---|---|
| Kelly Services Inc. | NNL | | $377,230 |
| Munck Carter, LLP | NNL | $40,446 | |
| nFusion Group, LLC | NNL | $5,750 | |
| **Total** | | **$46,196** | **$377,230** |

# APPENDIX "E"

## [Attached]

File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE- COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | THURSDAY, THE 30TH |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF JULY, 2009 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION (the "Applicants")

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

*AMENDED AND RESTATED*
**CLAIMS PROCEDURE ORDER**

THIS MOTION, made by the Applicants for an Order substantially in the form included in the Applicants' Motion Record was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the Applicants' Notice of Motion, the affidavit of John Doolittle sworn on July 24, 2009, the Sixteenth report of Ernst & Young Inc. (the "Monitor") dated July 24, 2009, and on hearing the submissions of counsel for the Applicants, the Monitor, and those other parties present, no one appearing for the other parties served with the Applicants' Motion Record, although duly served as appears from the affidavit of service of Marna McGeorge sworn July 24, 2009, filed:

- 2 -

**SERVICE**

1.    THIS COURT ORDERS that the time for service of the Notice of Motion and the Motion
       Record filed by the Applicants in support of this Motion be and it is hereby abridged such
       that the Motion is properly returnable today.

**MONITOR'S ROLE**

2.    THIS COURT ORDERS that the Monitor, in addition to its prescribed rights and
       obligations under the CCAA (as hereinafter defined) and under the Third Amended and
       Restated Initial Order of this Court dated January 14, 2009 (such Order, as further
       supplemented, amended or varied from time to time, is referred to herein as the "Initial
       Order"), is hereby directed and empowered to take such other actions and fulfill such
       other roles as are authorized by this Order, and that in taking such other actions and in
       fulfilling such other roles, the Monitor shall have the protections given to it in the Initial
       Order and this Order, including without limitation the protections provided in paragraph
       21 of this Order.

**DEFINITIONS**

3.    The following terms shall have the following meanings ascribed thereto:

       (a)    "Bond" means a bond, note or debenture issued pursuant to any of the Bondholder
               Trust Indentures and any bonds, notes or debentures issued in substitution or
               replacement thereof;

       (b)    "Bondholder" means a registered or beneficial holder of a Bond;

       (c)    "Bondholder Trustee" means a trustee in respect of any issue of Bonds, being The
               Bank of New York Mellon with respect to the first three Bondholder Trust

- 3 -

Indentures identified in paragraph 3(d) below and Law Debenture Trust Company of New York with respect to the fourth of such Bondholder Trust Indentures;

(d)    "Bondholder Trust Indentures" means collectively (i) the Indenture dated as of March 28, 2007 governing the 1.75% Convertible Senior Notes due 2012 and the 2.125% Convertible Senior Notes due 2014 issued by Nortel Networks Corporation and guaranteed by Nortel Networks Limited and Nortel Networks Inc.; (ii) the Indenture dated as of July 5, 2006, as supplemented by the First Supplemental Indenture dated as of July 5, 2006, the Second Supplemental Indenture dated as of May 1, 2007, and the Third Supplemental Indenture dated as of May 28, 2008, governing the Floating Rate Senior Notes due 2011, the 10.125% Senior Notes due 2013 and the 10.750% Senior Notes due 2016 issued by Nortel Networks Limited and guaranteed by Nortel Networks Corporation and Nortel Networks Inc.; (iii) the Indenture dated as of November 30, 1988, governing the 6.875% Notes due 2023 issued by Northern Telecom Limited (now Nortel Networks Limited); and (iv) the Indenture dated as of February 15, 1996, governing the 7.875% Notes due 2026 issued by Northern Telecom Capital Corporation (now Nortel Networks Capital Corporation) and guaranteed by Northern Telecom Limited (now Nortel Networks Limited);

(e)    "Business Day" means a day, other than a Saturday or a Sunday, on which banks are generally open for business in Toronto, Ontario;

(f)    "CCAA" means *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended;