Le 11 juillet 2011, le Juge Commissaire a autorisé Maître Cosme ROGEAU, ès qualités, à : **184**

*« - céder les actifs et droits incorporels, dont est titulaire NNSA, dans les brevets et actifs résiduels du groupe NORTEL — les « Actifs » (« Assets ») tels que définis dans l'accord dit de « Stalking horse » — et repris dans les actes définitifs de cession conclus à l'issue de la procédure d'enchères, au profit d'un Consortium américain dénommé ROCKSTAR BIDCO, LP, incluant la société APPLE Inc, pour un prix global de 4.500.000.000 USD (hors frais de vente et avant ajustements éventuels) conformément aux actes définitifs de cession*

*- et à signer tout acte s'y rapportant et/ou en facilitant la mise en œuvre et, notamment, la convention de séquestre à intervenir entre les entités venderesses du groupe, prévoyant que le prix global effectif de cession sera versé entre les mains d'un séquestre expressément mandaté à cette fin, dans l'attente de la répartition dudit prix à intervenir entre les entités venderesses du groupe NORTEL, le tout en application de l'accord dit « IFSA ». »* **(pièce n°7)**

Le produit total de la cession des activités globales, qui est maintenu dans une « lock box », c'est-à-dire, sous séquestre aux Etats-Unis, en attendant sa répartition au sein des différentes entités du Groupe, s'élève à environ 7,690 milliards de dollars US.

## II - DISCUSSION

L'article L.651-2 du Code du Commerce dispose que :

> *« Lorsque la liquidation judiciaire d'une personne morale fait apparaître une insuffisance d'actif, le tribunal peut, en cas de faute de gestion ayant contribué à cette insuffisance d'actif, décider que le montant de cette insuffisance d'actif sera supporté, en tout ou en partie, par tous les dirigeants de droit ou de fait, ou par certains d'entre eux, ayant contribué à la faute de gestion. En cas de pluralité de dirigeants, le tribunal peut, par décision motivée, les déclarer solidairement responsables. »*

Les conditions d'application de cet article sont donc les suivantes :

- les personnes poursuivies sont des dirigeants de droit ou de fait,
- qui ont commis des fautes de gestion ayant contribué à l'insuffisance d'actif de la société.

Or, les sociétés NNL et NNC, dirigeant de fait de NNSA ainsi que Monsieur Darryl EDWARDS et Monsieur Jean-Marie LESUR, dirigeants de droit, **(2.1)** ont commis des fautes de gestion en organisant la société au sein du groupe Nortel sans tenir compte de sa personne morale distincte et de son patrimoine propre **(2.2)**.

Ces fautes ont contribué à l'insuffisance d'actif de NNSA estimée, à ce jour, à 249.892.687 euros à parfaire par les résultats des actions en cours relatives au passif contesté et les produits des cessions d'actifs à l'issue du processus de répartition entre les sociétés du groupe **(2.3)**.



## 2.1 Sur les dirigeants de droit et de fait de NNSA

### a) Les dirigeants de droit de NNSA

Les dirigeants de droit sont les personnes régulièrement désignées en tant qu'organes légaux de la société tels que les membres du Conseil d'Administration et évidemment son Président.

Les dirigeants de droit peuvent être condamnés même s'ils ont cessé leurs fonctions avant l'ouverture de la procédure, si la situation de la société qui a abouti à la cessation des paiements, et/ou à l'insuffisance d'actif existait alors qu'ils étaient en fonction.

Ainsi, il convient d'indiquer au Tribunal que les administrateurs de NNSA actuels et passés au cours des 3 dernières années sont :

- Monsieur Darryl EDWARDS, qui a été nommé le 08/09/2006 et qui a démissionné le 14/01/2009,
- Monsieur Jean-Marie LESUR, qui a été nommé le 19/12/2006 et qui a démissionné le 14/01/2009,
- Et la société Nortel Networks International Finance and Holdings B.V, qui a été nommée le 30/11/2000 et qui a démissionné le 14/01/2009.

### b) Les dirigeants de fait de NNSA : NNC et NNL

Concernant les dirigeants de fait, il n'existe pas, en droit français, de définition légale mais selon la doctrine et la jurisprudence, il s'agit de personnes, physiques ou morales, qui ne sont pas régulièrement désignées en tant qu'organes légaux de la société, mais qui s'immiscent dans sa gestion en exerçant, en toute indépendance, des actes de gestion et en jouant un rôle décisionnel de premier plan dans la direction de l'entreprise.

Ces personnes accomplissent des actes positifs de gestion et de direction, comme le feraient un dirigeant de droit et exercent ces actes en toute liberté et indépendance, pour son propre compte.

Ainsi il a été jugé que : « *le dirigeant de fait est celui qui dirige et contrôle effectivement la société en lieu et place du dirigeant de droit* » (CA Lyon 13/02/2008 approuvé par la Cour de Cassation, Chambre Criminelle, 19/11/2008 n°08-82403).

La qualification de dirigeant de fait a été reconnue dans le cadre de groupe de sociétés et il a été jugé que doit être considérée comme dirigeante de fait la société mère qui exerce une influence prédominante sur sa filiale et dispose d'une autorité de fait sur la personne de ses responsables (CA Aix en Provence, 26/05/1981 D.1983 inf rap p 60 Obs Derrida, CA Paris 07/10/2008 n°07/13617).

Or, tel est précisément le cas en l'espèce :

- NNC était l'actionnaire majoritaire de NNL qui était l'actionnaire majoritaire de NNSA,

- L'approbation des contrats pour les ventes auprès des clients et les achats auprès des fournisseurs ayant lieu en dehors de la France ainsi que la stratégie, les objectifs et le budget pour les ventes et les questions connexes étaient systématiquement décidé au niveau de NNUK et, au Canada, de NNC et NNL.

Ainsi, à titre d'exemple, le consentement du Conseil d'Examen mondial des contrats était nécessaire pour les contrats d'un montant supérieur ou égal à 100.000 $ conclus avec un nouveau fournisseur et pour les contrats d'un montant supérieur ou égal à 500.000 $ conclus avec un fournisseur existant. Par conséquent, NNSA ne pouvait pas s'engager librement avec ses fournisseurs locaux ni conserver des fournisseurs en dehors de ces procédures.

- tous les intérêts immobiliers du Groupe Nortel étaient gérés au niveau mondial par les entités nord-américaines avec la société Jones Lang Lasalle, y compris le site de Châteaufort à Versailles loué par NNSA, où se situait son siège social.

- le Cabinet d'audit KPMG a été choisi comme Commissaire aux comptes de NNSA en vertu d'un accord global conclu avec les entités nord-américaines NNC et NNL, à la suite de la décision prise par ces dernières de ne plus travailler avec le Cabinet d'audit DELOITTE.

A cet égard, il convient de préciser que c'est un comptable situé hors de France qui supervisait la gestion et la comptabilité de NNSA qui était essentiellement tenue selon les règles US GAAP puis convertie aux normes françaises uniquement pour répondre aux dispositions fiscales et réglementaires françaises.

- L'accord dit MRDA a été défini et mis en place directement entre NNL et NNC sans que les dirigeants de droit de NNSA soient consultés ni son Conseil d'Administration saisi de la question. Cet accord était pourtant structurant pour NNSA puisqu'il modifiait substantiellement le fonctionnement de la société et ses rapports avec les autres sociétés du groupe en passant d'un système sans risque pour NNSA de remboursement par sa société mère de ses frais de R&D à une mise en commun de sa propriété intellectuelle assorti d'un engagement de partage des bénéfices et des pertes du groupe.

La conclusion de cet accord avec effet rétroactif au 1er janvier 2001 a, aussi, permis à NNL d'effacer rétroactivement sa dette à l'égard de NNSA au titre du remboursement des dépenses de R&D en 2001 et 2002.

Rappelons, aussi, qu'en application de cet accord, NNSA a versé à NNL une somme globale de 313 millions d'euros au titre de sa participation aux pertes du groupe de 2001 à 2009.

La décision de NNL et de NNC d'engager NNSA dans cet accord, sans même consulter les dirigeants de droits de cette dernière qui ont été mis par la suite devant le fait accompli, constitue un acte de gestion de NNSA déterminant l'avenir même de cette dernière et dépassant très largement les pouvoirs d'une société mère sur sa filiale.

- En février 2008, NNL a, aussi, décidé en lieu et place des dirigeants de NNSA, et à l'insu du Conseil d'Administration de cette dernière, le remboursement anticipé d'une somme de 25 millions d'euros, en violation des dispositions contractuelles du prêt conclu en septembre 2002 entre NNL et NNSA, et ceux alors même qu'à cette date, NNSA avait, alors, enregistré des pertes d'un montant de 77,4 millions d'euros au titre de l'exercice du 31/12/2007.

Il résulte de ce qui précède que NNC et NNL ont dépassé le contrôle inhérent à la structure d'un groupe de sociétés, en commettant des ingérences répétées et positives dans la gestion de leur filiale NNSA, et en exerçant une influence prédominante sur les décisions de NNSA, et se sont comportées comme les dirigeants de fait de NNSA.

MARA SCAGLIONE
Expert
Traducteur-Interprète
Cour d'Appel de Paris
Italien-Anglais-Français
Tél. 01 69 31 42 02

## 2.2 Sur la faute de gestion : la négation de la personne morale de NNSA

<span style="float:right">187</span>

En présence d'un groupe de sociétés, la mise en commun des moyens et la subordination à celui du groupe des intérêts des sociétés le composant ne doit pas dépasser le degré d'organisation inhérent à un tel ensemble économique et les sociétés contrôlées doivent conserver la maîtrise des fonctions essentielles à leur autonomie (CA Douai 02/10/2003, D 2003 AJ 2571 ; Act Proc Coll 2003/17 n°218 ; Rev Proc Coll 2004 p 313 ; LPA 28/01/2005 n°20 p 13 ; JCP E 2005. 721 p 796 ; Rev Proc Coll 2005/2 P 117).

L'autonomie de la personnalité morale de la société doit donc être respectée.

Or, tel n'a pas été le cas en l'espèce, compte tenu, on l'a vu, de l'organisation matricielle du Groupe Nortel, c'est-à-dire par ligne de métier (cf.1.2).

Cette organisation matricielle, a été imposée à NNSA au détriment de son autonomie locale et individuelle : NNSA s'est trouvée ainsi sous l'autorité et le contrôle des entités nord-américaines et britanniques qui ont agi en toute liberté et en toute indépendance, comme des dirigeants de fait de NNSA, sans tenir compte de la personnalité morale de cette dernière.

La société NNSA a été gérée principalement comme un centre de coûts au profit des autres entités du groupe sans considération de sa personnalité distincte, de son patrimoine propre et de ses créanciers.

La nature intégrée des activités du Groupe a, aussi, conduit à une véritable confusion des patrimoines dont il résulte que la détermination des actifs de chaque société est aujourd'hui difficile et incertaine.

C'est d'ailleurs la raison pour laquelle la cession des actifs des différentes entités du groupe n'est pas intervenue séparément société par société, mais, on l'a vu, globalement, au niveau du Groupe.

En outre, l'absence d'une comptabilité propre de NNSA, indépendante de celle du groupe tenue en US GAAP au niveau des entités canadiennes et anglaises, a empêché l'arrêté puis la certification des comptes de NNSA au titre des exercices 2007 à 2009.

En effet, comme indiqué au conseil d'administration de NNSA du 22 décembre 2008 :

> *« les services comptables du groupe rencontrent toujours des difficultés dans la conversation des comptes établis au niveau du groupe en norme US GAAP, aux normes en vigueur en France.*
>
> *De ce fait, les comptes ne peuvent être définitivement validés par les commissaires aux comptes. »* (pièce n°8)

En organisant le groupe sans respecter les personnalités morales particulières et les patrimoines propres des sociétés le composant dont NNSA, les dirigeants de droit et de fait de NNSA ont commis une faute de gestion en vertu de l'article L.651-2 du Code de Commerce.



2.3 <u>Sur l'insuffisance d'actif de NNSA</u>

Compte tenu des fautes de gestion précitées, Maître ROGEAU, ès qualités, est bien fondé à solliciter la condamnation des défendeurs à combler l'insuffisance d'actif que leurs fautes ont occasionnées, dès lors que celle-ci serait constatée.

Le total du passif admis est établi, à ce jour, à la somme de 249.892.687,65 €uros (pièce n°9).

La procédure secondaire ne dispose pas des fonds nécessaires pour payer tout ou partie de ce passif à ce jour également.

En conséquence, à ce jour toujours, l'insuffisance d'actif s'élève à 249.892.687,65 €uros.

Cette somme reste, toutefois à parfaire ou à diminuer pour tenir compte :

- du montant des créances contestées dont celle du Fond des Pensions déclarée à hauteur de la somme de 2.413.793 k€, ayant fait l'objet d'une proposition de rejet ;

- du montant devant revenir à la procédure secondaire de NNSA à l'issue du processus de répartition du produit des cessions d'actifs.

* * *

Enfin, le Tribunal, constatant que Maître ROGEAU, ès qualités, a dû engager des frais de procédure importants, qu'il serait manifestement inéquitable de laisser à sa charge, condamnera solidairement les défenderesses à lui verser la somme de 10.000 euros, en application de l'article 700 du CPC.



## PAR CES MOTIFS

Vu les articles L.651-2 et suivants du Code de Commerce;

Il est demandé au Tribunal de Commerce de Versailles de :

- ➢ **Dire et juger** que les sociétés NNL, NNC ainsi que Monsieur Darryl EDWARDS et Monsieur Jean-Marie LESUR ont commis une faute de gestion en organisant la société NNSA au sein du groupe Nortel sans tenir compte de sa personnalité morale, de son autonomie, de son patrimoine propres et de son intérêt social ;

- ➢ **Constater** que cette faute, directement à l'origine du dépôt de bilan de la société NNSA, a contribué très largement à son insuffisance d'actif ;

- ➢ **Constater** qu'au jour de la présente assignation, l'insuffisance d'actif s'élève à la somme de 249.892.687,65 euros à parfaire ou à diminuer pour tenir compte, d'une part, du montant des créances contestées dont celle du Fonds des Pensions déclarée à hauteur de la somme de 2.413.793 k€ et, d'autre part, du montant devant revenir à la procédure secondaire de NNSA à l'issue du processus de répartition du produit des cessions d'actifs;

- ➢ **Condamner** solidairement NNL, NNC ainsi que Monsieur Darryl EDWARDS et Monsieur Jean-Marie LESUR à payer à la procédure secondaire de NNSA la somme à parfaire ou à diminuer de 249.892.687,65 euros ;

- ➢ **Condamner** solidairement, les défendeurs à verser à Maître Cosme ROGEAU, ès qualité, la somme de 10.000 euros au titre de l'article 700 du Code de Procédure Civile ;

- ➢ **Condamner** les défendeurs aux entiers dépens.

SOUS TOUTES RESERVES

## PIECES VENANT A L'APPUI DE L'ASSIGNATION

1. Master R&D Agreement

2. Jugement de la *Chancery Division* de la High Court of Justice de Londres en date du 14 janvier 2009

3. Jugement du Tribunal de Commerce de Versailles en date du 28 mai 2009

4. Interim Funding and Settlement Agreement

5. Ordonnance du Juge Commissaire en date du 7 juillet 2009

6. Jugement du Tribunal de Commerce de Versailles en date du 30 mars 2010

7. Ordonnance du Juge Commissaire en date du 11 juillet 2011

8. Procès Verbal du Conseil d'Administration du 22 décembre 2008

9. Etat du passif déclaré et admis de NNSA

# SUMMONS TO APPEAR BEFORE THE COMMERCIAL COURT OF VERSAILLES

The Year Two Thousand and Twelve,

On thirty april

## Upon the request of:

Maître Cosme ROGEAU electing domicile for the purposes of these proceedings in his office located at 26 rue Hoche 78000 Versailles, represented ex officio by the Receiver of NORTEL NETWORKS SA, a public limited company with capital of €136,963,426.50, Registered in the Trade and Companies Register of Versailles under no. B 389 516 741, the head office of which is located at the Parc Lumière Business Centre, 46 avenue des Frères Lumières, 78190 Trappes,

Appointed in this capacity by Decision of the Commercial Court of VERSAILLES on 28 May 2009

## Having as Lawyer:

Maîtres Antoine TCHEKHOFF and Edouard FABRE
Barristers at the Paris Bar
SCP Foucaud Tchekhoff Pochet & Associés
1 bis, avenue Foch – 75116 Paris
Tel.: 01 45 00 86 20    Fax: 01 45 00 86 83 - Post Box P 010

I, the undersigned Bailiff,

have the honour of informing

Nous, SCP Geoffroy BRUNEEL et PATRICE GRAS, Huissiers de Justice associés à la Résidence de Versailles, 16 Bld de la Reine, l'un d'eux soussigné

1. The company Nortel Networks Corporation
   Under Canadian law
   5945 Airport Road Suite 360 Mississauga, Ontario Canada L4V 1R9
   Represented by their legal representatives domiciled in this capacity at the said head office
   COMME EN FIN D'ACTE

2. The company Nortel Networks Limited
   Under Canadian law
   5945 Airport Road Suite 360 Mississauga, Ontario Canada L4V 1R9
   Represented by their legal representatives domiciled in this capacity at the said head office
   PAR ACTE SEPARE

3. The company Ernst &Young Inc.
   Ernst &Young Tower, 222 Bay Street PO Box 251 Toronto, Ontario M5K 1J7
   ex officio "*Monitor*" of Nortel Networks Corporation and Nortel Networks Limited, Represented by their legal representatives domiciled in this capacity at the said head office
   PAR ACTE SEPARE

4. Mr Jean-Marie LESUR
   Born on 19 August 1955 in Aubervilliers (93)
   Of French nationality
   Residing at 29 rue de Rémusat – 75016 Paris

5. Mr Darryl EDWARDS
   Born on 12 May 1961 in Stoke on Trent
   Of British nationality
   Residing at 16 Alderman Way, Weston under Wetherley, Warwickshire, CV33 9GB (United Kingdom)

Who have been summoned to appear on 27 July 2012 at 2 p.m. at the hearing and before the Commercial Court of Versailles, 1 place André Mignot, 78000 VERSAILLES (France)

*The recipient(s) are reminded, in compliance with Articles 56, 853 and 861-2 of the Civil Procedure Code:*

*That the parties are defending themselves or that they have the option of being assisted or represented by any person of their choice; that their representative, if not a Lawyer, must prove that he has special authority.*

*That failing to appear or to be represented, they run the risk of having a decision made against them on the sole elements provided by their opponent(s)*

*That the exhibits on which the claim is based are indicated at the end of this writ.*

*Without prejudice to the provisions of Article 68, the incidental claim for the granting of a payment deadline in application of Article 1244-1 of the Civil Code can be formed by declaration made, handed in or addressed to the Court Registry where it is registered. The author of this claim must prove before the hearing that the opposing party was aware of this through registered letter with acknowledgement of receipt. The exhibits that the party relies on to support its claim for the payment deadline are attached to the declaration.*

*The author of this incidental claim cannot appear in court, in compliance with the second paragraph of Article 446-1. In this case, the judge will not allow the claims presented against this party unless he deems them to be lawful, admissible and well-founded.*

*When a claim is brought before a court of law which has its head office in metropolitan France, the deadlines to appear, appeal, raise an objection, appeal for review and to appeal in a higher court are increased by:*

1. *One month for persons residing in Guadeloupe, Guyana, Martinique, Reunion, Mayotte, Saint-Barthélemy, Saint-Martin, Saint-Pierre-et-Miquelon, in French Polynesia, in the Wallis and Futuna Islands, in New-Caledonia and in the French Southern and Antarctic Lands,*

2. *Two months for those residing abroad.*

*In addition, it is reminded that by virtue of Article R 651-5 of the Commercial Code:*

> *"For the application of Article L 651-4 of the Commercial Code, the judge appointed by the Court may be assisted by any person of his choice whose challenges are reflected in its report. This report is filed at the Court Registry and communicated to the District-Attorney by the Court Registrar.*
>
> *The manager(s) involved are informed by the Court Registrar that they can read the report and are invited at least eight days before their hearing in the council chamber by a bailiff's order or in the manner provided for in Article 173".*

*In compliance with the above-mentioned article, you will at a later stage be invited at least eight days in advance to be heard personally by the Court in the Council Chamber, in other words, not in the presence of the public. You must appear in person at this hearing in the Council Chamber, possibly with the assistance of a person of your choice. It this person is not a lawyer, he/she must have special authority.*

*As the hearing of the managers in the Council Chamber is a means for the Court to gather information, representation by a lawyer for this single hearing is not possible.*

*After your personal hearing, the Court will hear the parties or their lawyers in their arguments and pleadings.*

*The exhibits on which this summons is based are listed at the end of the writ.*

## PURPOSE OF THE CLAIM

Maître ROGEAU, in his capacity as official receiver of NORTEL NETWORKS SA (hereinafter referred to as "NNSA"), refers the case to this Court, for the purposes of seeking the conviction of the legal and effective managers of the company NNSA, to bear the excess of liabilities over assets of the company NNSA, in compliance with Articles L.651-1 et seq. of the Commercial Code.

Upon examination of the legal (I) and effective (II) elements which will be set out below, the Court could in fact only allow the claim of Maître ROGEAU, ex officio, after having noted that the legal managers of NNSA, as well as its effective managers, in other words the Canadian companies NORTEL NETWORKS CORPORATION (hereinafter referred to as "NNC") and NORTEL NETWORKS LIMITED (hereinafter referred to as "NNL") have mismanaged NNSA and in directing it without consideration for its legal personality and by neglecting its autonomy and its social interest.

Given the global sale of NNSA's assets worldwide and its current process of distributing the proceeds thereof, the existence of an excess of liabilities over assets still has to be completed and cannot be determined exactly at this time, especially as there are still pending cases before the various courts of law, and in particular, that concerning the Pension Fund credit declared in NNSA's liabilities of up to 2.4 billion Euros.

However, Maître ROGEAU, ex officio, from now on undertakes the action in damages for the excess of liabilities over assets in order to, in particular, interrupt the limitation period which expires on 28 May 2012, being three years after the decision ordering the compulsory liquidation.

## I   RESTATEMENT OF THE FACTS

### 1.1   Presentation of the Nortel Group and the company NNSA

Founded in 1895 under the name Bell Telephone Company of Canada, the Canadian Group Nortel is a provider of worldwide telecommunication solutions and IT networks, equipment, software and services established in the United States, Canada, Asia Pacific, Latin America, the Caribbean, Europe, the Middle East and in Africa (the "EMEA" zone which includes the NNSA)

The Group structured its activities around 4 business units, including:

- The "GSM and GSM-R" activity for the provision of equipment, maintenance of services related to mobile telephones, research and development of new technologies intended for mobile telephones.
- The "Business" activity concerning support services for other entities.
- The "Men" activity ("Men Ethernet Networks") aimed at technologies developed for landline telephones, including optical networks, ATM technology and the improvement of data traffic.
- The "Global services" activity for the design and installation of infrastructure solutions sold by the three business units of the Nortel Group. This activity was then integrated into the other three major business activities.

The global turnover for the financial year ending on 31 December 2007 reached approximately 11 billion USD, of which 25% was generated by the EMEA region.

The Canadian company NNC, parent company of the Nortel Group, was listed on the Toronto (Canada) Stock Exchange and on the New York (USA) Stock Exchange.

Its direct subsidiary, the Canadian company NNL is the main operational company of the Nortel Group and holds the majority of the 142 subsidiaries of the Nortel Group in the world, including NNSA.

In fact, NNSA is one of the French operational subsidiaries of the Nortel Group (the second being Nortel Networks France SAS - NNF), which is held 91.16% by the Canadian company NNL and 8.83% by the Dutch company Nortel Networks International Finance Holding BV.

NNSA was one of the centres carrying out a Research and Development activity to the advantage of the entire Nortel Group.

NNSA also carried out a sales activity. It is responsible for the supply of GSM products to the entire Nortel Group, in other words, a type of mobile telephone technology which is the current standard for wireless networks mainly in Europe but also in other countries in the world.

1.2   Matrix Organisation of the Nortel Group

The Nortel Group operated by field of activity, without respecting the legal entities of the various companies in the Group. This is indeed the reason why the sale of the Nortel Group's assets was organised, as we will see below, overall by type of activity and not by entity (cf.1.7).

The Nortel Group was thus managed as a global and integrated company, to the point that the legal and/or territorial existence and the status of the individual entities of the Group were ignored by the North American entities in the Group.

Thus, the management of the entire Group and strategic decision-making concerning the budget, investments and R&D applicable in all the local entities of the Group, such as NNSA, were in the hands of the Canadian and English entities.

The purpose of this type of organisation was to avoid the duplication of functions and to better deploy the strategy throughout the world as well as to use the company's functions more efficiently.

Since 2001 and the burst of the Internet bubble, the Nortel Group progressively refocused its activity on R&D with high added value, in particular by disposing of its aging activities and by increasingly sub-contracting the distribution and manufacturing functions.

The R&D activities of the Nortel Group were carried out across six international "Centres of Excellence", including NNSA.

This is how the Nortel Group mainly become an R&D company and how new agreements on the intra-group transfer price, taking into account this specificity, were drawn up.

1.3   The transfer price policy of the Nortel Group: from "Cost Sharing Agreement" to "Master R&D Agreement"

In the beginning, the transfer price agreements, called "Cost Sharing Agreement" (hereinafter referred to as "CSA"), made provision for the repayment by the Canadian company NNL for

...
amounts incurred by the entities conducting R&D, in compensation for the transfer of ownership of the patents associated with the NNL.

These agreements allowed the entities in the Nortel Group to conduct R&D without risks and at no costs. On the other hand, if an entity was led to use a patent issued from its own R&D, it nevertheless had to pay NNL for a user licence.

In this framework, NNL bore the risks and derived the possible benefit from the R&D of the Group thanks to the patents it held and through the licences it granted.

Given the refocusing of the Nortel Group on its R&D activities, a new agreement called the "Master R&D Agreement" (hereinafter referred to as "MRDA") was entered into on 22 December 2004, with retroactive effect to 1st January 2001, between 6 companies in the Nortel Group, including NNSA, NNL, NNInc, NNUK, Nortel Ireland and Nortel Australia (exhibit no. 1).

This agreement made provision for the pooling of the results issuing from the know-how of the R&D centres of excellence regarding intellectual property, each company being the holder of a share of the Intellectual Property of the entire group.

This pooling of the group's Intellectual Property was managed by NNL which granted licences free of charge allowing each of the companies involved to use the joint intellectual property rights from all the companies in the group.

The MRDA agreement also provided for the participation of each of the signatory companies, including NNSA, in the profits and losses of the Nortel Group calculated according to their share in the overall Intellectual Property of the group.

This system for sharing the profits and losses was called "Residual Profit Sharing" (hereinafter referred to as "RPS").

Yet, when these agreements were signed in 2004, the NORTEL group had largely been making losses since 2001.

This is how NNSA assumed the losses of the Nortel group from 2001 to 2009, for a total accumulated amount of more than 313 million Euros.

1.4 The source of the Nortel Group's difficulties

Although there was a recovery in 2003, the Nortel group's problems were accentuated from the 2007-2008 financial year. Over the first nine months of 2008, the Nortel Group suffered a net loss, after taxes, of 3.7 billion dollars, while the financial year ending 31 December 2007 ended with a net loss, after taxes, of 1 billion dollars.

As for the EMEA region, the net losses after taxes for the first nine months of the 2008 financial year increased to 261 million dollars, while the financial year ending 31 December 2007 saw a net loss after taxes of 134 million dollars.

The Nortel Group's difficulties can be explained in particular by a very competitive market which furthermore is in the middle of being restructured. Thus, for example, two of the Group's main competitors, Alcatel and Lucent Technologies Inc, merged in 2006, while two of its biggest clients, Verizon Wireless and Alltell Corporation, went the same way in 2008. Nortel thus has to face even more aggressive competition and a reduction it its outlets.

Due to the fact that it has had to face an increased price structure and high debt levels (approximately 4.2 billion USD), as well as a slowdown in its turnover following investment delays from its clients, the Nortel Group has suffered significant commercial pressure and was confronted with the depreciation of its available cash flow on both an international and a regional level.

Consequently, the Nortel Group sought protection against its creditors under the restructuring regimes applicable in Canada, the United States and the United Kingdom.

### 1.5 The initiation of main insolvency proceedings called "administration" in London, regarding each company in the Nortel Group located in the EMEA region including NNSA

By a decision dated 14 January 2009, main insolvency proceedings, or "Administration" were initiated, under Article 3 of Regulation (EC) no. 1346/2000 of the Council of 29 May 2000 by the *Chancery Division* of the High Court of Justice of London, regarding each company in the group located in the EMEA region including NNSA and its subsidiary NNF (exhibit no. 2).

In fact, the High Court of Justice of London typically ruled that the centre of main interest (the "COMI") of the companies located in the EMEA region were found in England, insofar as the strategic decisions regarding them were taken from the British head office in Maidenhead.

The mutual English administrators, Messrs Bloom, Hudson, Harris and Hill (hereinafter referred to as the "Joint Administrators"), members of the Ernst & Young London firm, were appointed for all the entities that were placed under the English administration proceedings.

On the same date, the administrators for the Canadian entities sought Court protection under the Canadian Companies' Creditors Arrangement Act (CCAA).

At the same time, the American entities sought the benefit of the procedure of Chapter 11 from the US Courts under the US Bankruptcy Code.

The underlying objective of the simultaneous triggering of these different insolvency proceedings was to promote the search for a global solution for the entire group.

### 1.6 The initiation of secondary compulsory liquidation proceedings in France against NNSA

By a decision on 28 May 2009, upon request from the English Administrators and in application of the above-mentioned EC Regulation, the Commercial Court of Versailles initiated secondary compulsory liquidation proceedings, with authorisation to continue activity against NNSA (exhibit no. 3).

By the same decision, Maître MICHEL was appointed in the capacity of Receiver of NNSA and Maître Cosme ROGEAU in the capacity of Official Receiver of NNSA.

### 1.7 The transfer proceedings of NNSA's activities on a global scale

The integration of various activities on a global scale made it impossible to transfer the group's activities company by company without a substantial loss in value.

This is why the different entities in the group as well as their unions decided to enter into an agreement called an "Interim Funding and Settlement Agreement" (hereinafter referred to as

"IFSA") (exhibit no. 4), on 9 June 2009 which, in order to facilitate the disposal of the Nortel group's assets on a global level and the future process of distributing the disposal price between the different entities in the group, in particular makes provisions for:

- licences related to the transferred activities, of which each of the signatory companies of the "MASTER R&D AGREEMENT" are beneficiaries, are made to the advantage of the transferee, for the needs of and as and when the transfers occur;
- the disposal of assets can occur independently from the negotiation process underway on the future distribution between the different companies in the group in order to prevent disagreements on these distributions from blocking the disposal;
- the price of the group's asset disposal will be paid to an escrow agent and the latter will be in charge of distributing this according to the future distribution agreement;
- the companies in the group undertake to negotiate an agreement in good faith that will allow the distribution of the transfer price, and failing an agreement, to provide a binding procedure that will allow them to continue with distribution by an expert.

On 7 July 2009, the Supervisory Judge authorised the secondary proceeding organisms of NNSA to sign the IFSA and to participate in the planned transfers (**exhibit no. 5**).

The NNSA membership agreement to the IFSA was signed on 11 September 2009 with a retroactive effect to 9 June 2009.

This is how in application of the ISFA and the above-mentioned Order of 7 July 2009, the secondary proceedings by NNSA participated in the worldwide transfers in the four business units of the group, concluded the licence termination and escrow agreements for NNSA relating to it which makes it a selling party in its own right, in particular in its intellectual property rights resulting from the MRDA agreement.

In addition, on 30 March 2010, parallel to the global transfer of the GSM/GSM-R activity, the Commercial Court of Versailles authorised the transfer of part of this activity carried out by NNSA, to Kapsch CarrierCom France (**exhibit no. 6**).

On 30 March 2010, the Court also appointed Maître Frank MICHEL in the capacity of ad hoc representative of NNSA (his task as Receiver having come to an end) and ordered Maître Cosme ROGEAU to carry out the liquidation of NNSA's residual assets (**exhibit no. 6**).
On 7 May 2010, NNSA went out of business.

In addition, the secondary proceedings by NNSA were also part of the transfer of the residual patent Rights of the Nortel Group.