On 11 July 2011, the Supervisory Judge authorised Maître Cosme ROGEAU, ex officio, to:

*"- dispose of the assets and intangible rights, of which NNSA is the holder, in the patents and residual assets of the NORTEL group - the "Assets" as defined in the "Stalking horse" agreement - and included in the final transfer deeds concluded at the end of the auctioning procedures, to the benefit of an American Consortium named ROCKSTAR BIDCO, LP, including the company APPLE Inc, for a total price of 4,500,000,000 USD (excluding sales costs and before possible adjustments) in compliance with the final transfer deeds*

*- and to sign any documents relating to it and/or facilitating the implementation and, in particular, the future escrow agreement between the selling parties of the group, providing that the total effective transfer price will be paid to an escrow agent who is expressly appointed for this purpose, while awaiting the distribution of the said future price between the selling entities of the NORTEL group, all in application of the "IFSA" agreement." (exhibit no. 7)*

The total proceeds from the overall transfer of activities, which are kept in a "lock box", in other words escrowed in the United States, while awaiting its distribution within the various entities in the Group, comes to about 7.690 billion US dollars.

# II - DISCUSSION

Article L.651-2 of the Commercial Code sets out that:

> *"Where the liquidation of a legal entity reveals an excess of liabilities over assets, the court may, in instances where mismanagement has contributed to this excess of liabilities over assets, decide that this amount will be borne, in whole or in part, by all or some of the de jure or de facto managers, who have contributed to the mismanagement. If there are several managers, the court may, by way of a reasoned ruling, declare them jointly and severally liable."*

The conditions of application of this article are thus the following:

- the accused persons are legal or effective managers,
- whose mismanagement has contributed to the excess of liabilities over the company's assets.

Yet, the companies NNL and NNC, effective manager of NNSA as well as Mr Darryl EDWARDS and Mr Jean-Marie LESUR, legal managers, **(2.1)** committed mismanagement in organising the company within the Nortel group without keeping in mind its separate legal entity and its own assets **(2.2)**.

This mismanagement contributed to the excess of liabilities over assets of NNSA estimated at present at 249,892,687 Euros to be completed by the results of actions underway regarding the disputed liabilities and the proceeds of the asset disposal after the distribution process between the companies in the group**(2.3)**.



## 2.1   On the legal and effective managers of NNSA

### a) On the legal managers of NNSA

The legal managers are the persons who are lawfully appointed as legal organisms of the company such as the members of the Board of Directors and obviously its Chairman.

The legal managers can be sentenced even if they have ceased their functions before the initiation of the proceedings, if the company's situation which led to the payment transfers, and/or the excess of liabilities over assets existed while they were in office.

Thus, it should be indicated to the Court that the current and past directors of NNSA over the last 3 years are:

- Mr Darryl EDWARDS, who was appointed on 08/09/2006 and who resigned on 14/01/2009,
- Mr Jean-Marie LESUR, who was appointed on 19/12/2006 and who resigned on 14/01/2009,
- And the company Nortel Networks International Finance and Holdings B.V, which was appointed on 30/11/2000 and which resigned on 14/01/2009.

### b) The effective managers of NNSA:  NNC and NNL

Regarding effective managers, under French law there is no legal definition but according to doctrine and case law, these are legal entities or natural persons who are lawfully appointed as legal organisms of the company, but who are involved in its management by independently carrying out management activities and playing a key decision-making role in the company's management.

These persons perform positive management and direction activities, as an effective manager would do and carry out these actions in complete freedom and independence on their own behalf.

Thus it was considered that: *"the effective manager is the one who actually manages and controls the company instead of the legal manager"* (CA Lyon 13/02/2008 approved by the Court of Cassation, Criminal Division, 19/11/2008 no. 08-82403).

The qualification of effective manager was recognised within the group of companies and it was considered that the parent company, who exercises a predominant influence on its subsidiary and which has the effective authority over its officers, must be considered as an effective manager (CA Aix en Provence, 26/05/1981 D.1983 inf rap p 60 Obs Derrida, CA Paris 07/10/2008 no. 07/13617).

Now, this is exactly the case in question:

- NNC was the majority shareholder of NNL, who was the majority shareholder of NNSA,

- The approval of agreements for sales to clients and purchases from suppliers that took place outside of France as well as the strategy, objectives and budget for the sales and the related questions were systematically decided on by NNUK and, in Canada, by NNC and NNL.

  Thus, for example, the consent by the global Examination Board for agreements was required for the agreements with amounts higher or equal to $100,000 entered into with a new supplier and for agreements of an amount higher or equal to $500,000 entered into with an existing supplier. Consequently, NNSA could not freely engage with its local suppliers or keep suppliers outside of these procedures.

- All the real estate interests of the Nortel Group were managed on a global level by the North American entities with the company Jones Lang Lasalle, including the Châteaufort site in Versailles rented by NNSA, where its head office was located.

- The KPMG auditing firm was chosen as the statutory auditor of NNSA under a global agreement entered into with the North American entities NNC and NNL, following the decision made by the latter to no longer work with the DELOITTE auditing firm.

In this regard, it should be specified that it is an accountant located outside of France who supervised the management and accounting of NNSA which was essentially kept according to the US GAAP rules then converted to the French standards only to meet the French tax and regulatory provisions.

- The MRDA agreement was defined and implemented directly between NNL and NNC and the NNSA legal managers were not consulted nor was the Board of Directors informed of the matter. Yet this agreement was important for NNSA's structure as it substantially modified the company's operation and its relations with other companies in the group by changing from a no-risk system for NNSA of repayment by its parent company of its R&D costs to the pooling of its intellectual property together with an undertaking to share the profits and losses of the group.

The conclusion of this agreement with retroactive effect to 1st January 2001, also, allows NNL to retroactively clear its debt towards NNSA through the repayment of R&D expenditure in 2001 and 2002.

It should also be remembered that in application of this agreement, NNSA paid NNL a total amount of 313 million Euros for its participation in the losses of the group from 2001 to 2009.

NNL and NNC's decision to involve NNSA in this agreement, without even consulting the legal managers of the latter who were then presented with a fait accompli, constitutes a management action by NNSA which determines the very future of the latter and very largely exceeds the powers of a parent company over its subsidiary.

- In February 2008, NNL also decided on the expected repayment of an amount of 25 million Euros in lieu of the NNSA managers, without the knowledge of the latter's Board of Directors, in violation of the contractual provisions of the loan entered into in September 2002 between NNL and NNSA, while at this date even NNSA had then recorded losses in the amount of 77.4 million euros for the financial year 31/12/2007.

It follows from the above that NNC and NNL exceeded the inherent control of the structure of a group of companies by committing repeated and positive interference in the management of their subsidiary NNSA, and by exercising a predominant influence on the decisions of NNSA and acted as effective managers of NNSA.

2.2   On the mismanagement: the negation of the legal entity of NNSA

In the presence of a group of companies, the pooling of resources and the group's subordination to this regarding the companies' interests of which it consists must not exceed the inherent organisational degree of such an economic group and the controlled companies must keep control of the functions that are essential to their autonomy (CA Douai 02/10/2003, D 2003 AJ 2571; Act Proc Coll 2003/17 no. 218; Rev Proc Coll 2004 p 313; LPA 28/01/2005 no. 20 p 13; JCP E 2005. 721 p 796; Rev Proc Coll 2005/2 P 117).

The autonomy and the legal personality of the company must thus be respected.

Yet, this was not the case in the matter in question, given, we have seen, the matrix organisation of the Nortel Group, in other words per business line (cf.1.2).

This matrix organisation was imposed upon the NNSA to the detriment of its local and individual autonomy. NNSA thus found itself under the authority and control of the North American and British entities who acted in complete freedom and independence, as the effective managers of NNSA, without taking the legal personality of the latter into account.

The company NNSA was mainly managed as a cost centre to the benefit of the other entities in the group without consideration for its separate legal personality, its own assets and its creditors.

The integrated nature of the Group's activities, also, led to a real confusion of the assets, as a result of which it is difficult and uncertain to determine the assets of each company.

This is furthermore the reason why the disposal of the assets of the various entities in the group did not occur separately company by company, but, as we have seen, overall, on a Group level.

In addition, the lack of NNSA's own accounting, independently from that of the group according to US GAAP for the Canadian and English entities, hindered the closure and then the certification of NNSA's accounts for the 2007 to 2009 financial years.

In fact, as indicated to the board of directors of NNSA on 22 December 2008:

> *"the group's accounting services are still experiencing difficulties in converting the accounts drawn up for the group in the US GAAP standard to the standards in force in France.*
>
> *Due to this, the accounts cannot be finally validated by the statutory auditor."* (exhibit no. 8)

By organising the group without respecting the specific legal personalities and the assets of the companies making up the group, including NNSA, the legal and effective managers of NNSA have committed a management fault under Article L.651-2 of the Commercial Code.



2.3    On the excess of liabilities over assets of NNSA

Given the above-mentioned mismanagement, Maître ROGEAU, ex officio, is well-founded in seeking the sentence of the defendants to make good the excess of liabilities over assets that was caused by their mismanagement, as soon as it would be ascertained.

The total liabilities admitted is determined to date in the amount of 249,892,687.65 Euros (exhibit no. 9).

The secondary proceedings also do not have the necessary funds at this time to pay for all or part of these liabilities.

Consequently, still to this date, the excess of liabilities over assets amounts to 249,892,687.65 Euros.

This amount, however, remains to be completed or reduced taking into account:

- the amount of the receivables contested including that of the Pension Fund declared to the amount of €2,413,793 k, which was the subject of a rejection proposal;

- the amount that must go to the secondary proceedings of NNSA after the distribution process of the proceeds of the assets disposal.

* * *

Finally, the Court, noting that Maître ROGEAU, ex officio, had to incur significant legal costs, which it would clearly be unfair for him to pay, will jointly and severally sentence the defendants to pay him the amount of 10,000 Euros, in application of Article 700 of the CPC.



# ON THESE GROUNDS

Given Articles L.651-2 et seq. of the Commercial Code;

The Commercial Court of Versailles is requested to:

> **Say and judge** that the companies NNL, NNC as well as Mr Darryl EDWARDS and Mr Jean-Marie LESUR committed a management fault in organising the company NNSA within the Nortel group without considering its legal personality, its autonomy, its own assets and its social interest;

> **State** that this fault, the direct cause of the voluntary liquidation of NNSA, very largely contributed to its excess of liabilities over assets;

> **State** that at the time of this summons, the excess of liabilities over assets amounts to 249,892,687.65 Euros to be completed or reduced to take into account, on the one hand, the amount of receivables noted including that of the Pension Fund declared in the amount of €2,413,793 k, and on the other hand, the amount that must go to the secondary proceedings of NNSA at the end of the distribution process of the proceeds of the asset disposal;

> **Sentence** NNL, NNC as well as Mr Darryl EDWARDS and Mr Jean-Marie LESUR jointly and severally to pay the secondary proceedings of NNSA in the amount to be completed or reduced of 249,892,687.65 Euros;

> **Sentence** the defendants, jointly and severally, to pay Maître Cosme ROGEAU, ex officio, the amount of 10,000 Euros under Article 700 of the Civil Procedure Code;

> **Sentence** the defendants to pay all legal costs.

**WITHOUT PREJUDICE**



## EXHIBITS IN SUPPORT OF THE SUMMONS

1. Master R&D Agreement

2. Decision by the *Chancery Division* of the High Court of Justice of London on 14 January 2009

3. Decision by the Commercial Court of Versailles on 28 May 2009

4. Interim Funding and Settlement Agreement

5. Order by the Supervisory Judge on 7 July 2009

6. Decision by the Commercial Court of Versailles on 30 March 2010

7. Order by the Supervisory Judge on 11 July 2011

8. Report from the Board of Directors on 22 December 2008

9. State of NNSA's liabilities declared and admitted



Certifié conforme à l'original
N° d'inscription : 12-2610
Écrit en langue : française
Fait le : 19/04/2012

# APPENDIX "H"

## [Attached]

Goodmans LLP

Barristers & Solicitors

Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7

Telephone: 416.979.2211
Facsimile: 416.979.1234
goodmans.ca

Direct Line: 416.597.4216
jpasquariello@goodmans.ca

June 19, 2012

**BY EMAIL AND COURIER**

SCP Fouchaud Tchekhoff Pochet & Associés
1 bix, avenue Foch – 75116 Paris
France

**Attn: Maîtres Antoine Tcheckhoff and Edouard Fabre**

Dear Sirs:

Re:    **CCAA Proceedings of Nortel Networks Corporation, *et al.* – Summons to Appear Before the Commercial Court of Versailles Issued Against Nortel Networks Corporation, Nortel Networks Limited and Ernst & Young Inc.**

As you know, we act for Ernst & Young Inc. in its capacity as the Court-appointed monitor (the "**Monitor**") of Nortel Networks Corporation ("**NNC**"), Nortel Networks Limited ("**NNL**") and certain of their Canadian affiliates (collectively, the "**Applicants**") in proceedings (the "**CCAA Proceedings**") pending before the Ontario Superior Court of Justice (the "**Canadian Court**") under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended to January 14, 2009.

Each of NNC, NNL and the Monitor are in receipt of a "Summons to Appear Before the Commercial Court of Versailles" issued at the request of your client, Maître Cosme Rogeau (the "**French Liquidator**") in his capacity as the liquidator of Nortel Networks SA ("**NNSA**"), that purports to require NNC, NNL and the Monitor to attend a hearing before the Versailles Commercial Court on July 27, 2012 (the "**Summons**"). We understand that the Summons, a copy of which is enclosed, relates to a proceeding commenced by the French Liquidator against, among others, NNC, NNL and the Monitor before the Versailles Commercial Court which alleges that NNC and NNL were the effective managers of NNSA and that they mismanaged its affairs, and seeks, *inter alia*, to hold NNC and NNL liable for any deficiency of NNSA's assets relative to its liabilities (the "**French Proceeding**").

As you are no doubt aware, the Initial Order of the Canadian Court dated January 14, 2009 (as amended and restated, the "**Initial Order**") provides that no proceeding shall be commenced against the Applicants or the Monitor except with the written consent of the affected Applicant and the Monitor, or with leave of the Canadian Court. Further, Paragraph 15 of the Initial Order stays the exercise of any rights and remedies by any person against the Applicants or the Monitor, or affecting the business or the property of the Applicants. A copy of the Initial Order is enclosed.

207

Goodmans<sup>LLP</sup>                                                      Page 2

This letter is to confirm that the commencement of the French Proceeding and the service of the Summons in Canada is in violation of the stay of proceedings provided for in the Initial Order. As such, your client may be in contempt of the Canadian Court.

Moreover, the French Liquidator has already filed claims against NNC and NNL in the CCAA Proceedings, including claims substantially similar to the mismanagement claims advanced in the Summons, and has thereby attorned to the jurisdiction of the Canadian Court with respect to such claims. The commencement of the French Proceeding is therefore duplicative and an abuse of process.

Further, as ordered by the Canadian Court and the United States Bankruptcy Court for the District of Delaware, the Applicants, the Monitor, NNSA and the French Liquidator are parties to the ongoing sale proceeds allocation and inter-estate disputes mediation before Chief Justice Winkler. Given the pendency of such mediation, we regard the commencement of the French Proceeding, especially without any prior notice to the Applicants or the Monitor, as counter-productive and not consistent with the good faith conduct expected of the parties to the mediation. We also note that, despite your client's involvement in the CCAA Proceedings and your dealings with the Applicants, the Monitor and their respective counsel, you chose not to communicate with any of these parties before or after the issuance of the Summons.

As you are also no doubt aware, in a case similar to the present matter where the UK Pensions Regulator commenced foreign proceedings against NNC and NNL, the Canadian Court ordered that such proceedings be treated as null and void, that they not have any force or effect in the CCAA Proceedings and that they not be capable of creating or forming the basis of any valid or enforceable rights, remedies or claims against the Applicants or any of their respective assets, property or undertakings in Canada.

Separate and apart from the improper commencement of the French Proceeding generally, it was also improper for the Monitor to be named as a defendant in the French Proceeding. The role of the Monitor is not analogous to that of a receiver, liquidator or administrator as the Monitor is not in possession or control of the Applicants' property or business, and the Monitor is not the legal representative of NNC or NNL. As such, the Monitor should not have been named as a defendant in the French Proceeding regardless of whether the French Liquidator wishes to pursue a claim against NNC and NNL in France.

In light of all of the foregoing, this letter is to demand that the French Liquidator immediately discontinue, with prejudice, the French Proceeding as against each of NNC, NNL and the Monitor. In the absence of us receiving confirmation and evidence of such discontinuance by no later than 4:00 pm (Toronto time) on June 26, 2012, be advised that the Monitor intends to bring a motion to the Canadian Court seeking:

   i.    a declaration that the French Proceeding is null and void, that it not have any force or effect in the CCAA Proceedings and that it not be capable of creating or forming the

# Goodmans LLP

basis of any valid or enforceable rights, remedies or claims against the Applicants, the Monitor or any of their respective assets, property or undertakings in Canada;

ii.    costs of such motion against the French Liquidator in his personal capacity on a full indemnity basis; and

iii.    such further and other relief as the Monitor considers appropriate.

The Applicants and the Monitor reserve all rights in relation to the French Proceeding.

Yours very truly,

Goodmans LLP

Joseph Pasquariello
JP/cag

cc.

Murray A. McDonald/Tom C. Ayres, *Ernst & Young Inc.*
Derrick Tay/Jennifer Stam, *Gowlings LLP*
Michael Lang/Alan Merskey, *Norton Rose LLP*
Ken Coleman/Lisa Kraidin, *Allen & Overy LLP*
J.A. Carfagnini/Chris Armstrong, *Goodmans LLP*

\6090596

# APPENDIX "I"

## [Attached]



S. Antoine TCHEKHOFF
Philippe POCHET
Bruno ROBIN
Antoine GAUTIER-SAUVAGNAC
Fabrice LORVO
Nathalie YOUNAN (*)
Piera CAVANNA
Edouard FABRE
Laurent ARCHAMBAULT
Laurence LEPINOIX
Emmanuel d'ANTIN
Robert CORCOS
Rajeev SHARMA FOKEER (**)
Nicolas MESSAGE
Coralie OGER

Gita PATERSON (of counsel)
Samia BENDJENNA (counsel)
Alexandre OMAGGIO (counsel) (*)
Alexandre EBTEDAEI (counsel)
Boriana GUIMBERTEAU (counsel)
Marie-Hélène LAPP (counsel)

Caroline BELOTTI
Hélène LEFEVRE
Audrey WEISSBERG
Bénédicte BOUCHARD
Caroline DUGUET
Anne-Laure JACQUEMART
Pelin AKYUZALP
Marion CHOUKROUN
Emilie JOST
Florence SIMEON
Jean-Pierre PAUNOVITCH
Vuslat TURGUT
Julie ADAMJEE
Damien EIZAGUIRRE
Lovisa SODERBERG
Charles MOUCHEL ***

Yannick Le PORT ****
Bénédicte G-T du MONTCEL ****

Goodmans LLP

**Bay Adelaide Centre 333 Bay Street**

**Suite 3400**

**Toronto Ontario M5H 2S7**

**CANADA**

Attention: <u>Joseph Pasquariello</u>

Paris, 26 June 2012

<u>*In the matter of:*</u>
*NNSA v/ NNC, NNL & others - Tribunal de
commerce de Versailles*

<u>*Hearing of 27 July 2012 at 2PM (French time)*</u>

<u>*By registered letter anticipated by fax and email*</u>

**Dear Sirs,**

In our capacity as French Counsel for Maître Cosme Rogeau (the "French Liquidator"), the French Court-appointed Liquidator of Nortel Networks SA ("NNSA"), we are writing with reference to your letter dated 19 June 2012 and the attached writ of summons ("*assignation*" or the "Writ") served on Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL") and the Canadian Monitor of NNC and NNL.

As you noted, by the Writ, your clients have been summoned to appear on 27 July 2012, date of the first procedural hearing before the Versailles Commercial Tribunal (*Tribunal de commerce*).

You state that service of the Writ contravenes the terms of the Order dated 14 January 2009 of the Canadian Court such that our client may, in your view, be "*in contempt of the Canadian Court*", suggesting further that the commencement of such proceedings is an "*abuse of process*" to the extent you consider that the French Liquidator has "*attorned to the jurisdiction of the Canadian Court*" and lastly, that it was improper for the Canadian Monitor to be named as a defendant.

The French Liquidator entirely disagrees with and wholly contests the position expressed in your letter of 19 June. In particular, we cannot agree how our client could be held to be "*in contempt*" of a foreign Order to which he is not a party.

Our client reserves all rights and remedies to respond fully as and when appropriate in due course.

SCP FOUCAUD, TCHEKHOFF, POCHET ET ASSOCIÉS Avocats à la Cour de Paris - 1 BIS, AVENUE FOCH 75116 PARIS · RCS Paris D 323 005 488
Tél. : +33 (0)1 45 00 86 20 · Fax : +33 (0)1 44 17 41 65 · www.ftpa.com · Palais P 010
En liaison avec le cabinet POSTACIOGLU, Istanbul.

1

(*) Également Avocat au Barreau de New York
(**) Également Barrister
(***) Avocat au Barreau de Washington
(****) Réseau FTPA




FTPA soutient l'action de l'Institut Curie

FTPA

However, we observe, at this point, that service has been properly effected in accordance with the Hague Convention of 15 November 1965 on service abroad of judicial and extra judicial documents in civil and commercial matters, to which both France and Canada are a signatory.

Furthermore, whilst the relief sought on the terms of the Writ have been included in the claims filed on behalf of the French Liquidator in the pending Canadian CCAA proceedings relating to NNC and NNL, we recall, as you are no doubt aware, that such claims have been filed with express preliminary reservations formulated, in particular, in favour of the French Courts, who have exclusive jurisdiction to hear the merits of such claims, as outlined on behalf of the French Liquidator.

As to timing of such proceedings in France, as you may already know, the French Liquidator has a mandatory duty under applicable statutory provisions, enshrined in the French *Code de commerce*, to bring claims before the competent French jurisdiction against any persons and/or entities he considers acted as *de jure* and/or *de facto* directors of the debtor in liquidation and by so acting, contributed to a shortfall in assets. Such claims must be started within a mandatory timeframe of three years as of the opening of the French liquidation proceedings.

Notwithstanding the commencement of such proceedings, which stems strictly from the exercise by our client of his mandatory duties as an appointed Officer of the French Court, the French Liquidator remains committed to participating in good faith and cooperating in the context of the pending judicial mediation in respect of sale proceeds allocation conducted by Chief Justice Winkler.

In the circumstances, our client does not intend to pursue on the merits, at this time, the proceedings started before the commercial Court of Versailles.

Rather the French Liquidator expects to seek, at the first procedural hearing of 27 July from the Versailles commercial Court that the examination of the matters set out in the Writ served on your clients be stayed *de facto* until the earlier of:

- an amicable settlement is reached in respect of the allocation of the asset sales proceeds currently held in escrow to the respective Nortel entities, including NNSA, or

- a definitive and binding award/ruling/judgment is entered in respect of the same, or

- the consent of NNL and NNC to such matters being heard by the French Courts.

If you have any questions or anything is unclear, please do not hesitate to contact us directly or via our French colleagues acting on your behalf.

Antoine Tchekhoff
*Avocat à la Cour*

Rajeev Sharma Fokeer
*Avocat à la Cour*

Cc :    Derrick Tay, Gowlings LLP

# APPENDIX "J"

## [Attached]

Barristers & Solicitors

Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7

Telephone: 416.979.2211
Facsimile: 416.979.1234
goodmans.ca

Direct Line: 416.597.4216
jpasquariello@goodmans.ca

Goodmans

July 9, 2012

**BY EMAIL AND COURIER**

SCP Fouchaud Tcheckhoff Pochet & Associés
1 bix, avenue Foch – 75116 Paris
France

**Attn: Maîtres Antoine Tcheckhoff and Edouard Fabre**

Dear Sirs:

Re:    CCAA Proceedings of Nortel Networks Corporation, *et al.* – Summons to Appear
       Before the Commercial Court of Versailles Issued Against Nortel Networks
       Corporation, Nortel Networks Limited and Ernst & Young Inc.

We are in receipt of your letter dated June 26, 2012. Needless to say, we disagree with the positions taken in it. The Monitor stands by the views outlined in our letter to you dated June 19, 2012.

Having said that, on the understanding as outlined in your letter, that your client will not pursue the French Proceedings on its merits at this time, the Monitor will not, at this time, bring a motion in the CCAA Proceedings to deal with the French Proceedings. The Monitor and the Applicants, however, reserve all of their rights in respect of the French Proceedings, including without limitation, seeking relief from the Canadian Court to declare the French Proceedings null and void. Furthermore, the Monitor's accommodation in not bringing a motion immediately before the Canadian Court in respect of this matter is not to be interpreted in any way as wavering from its positions outlined in our June 19, 2012 letter to you, nor shall the Monitor or the Applicants be prejudiced in any way by the passage of time should this matter be brought before the Canadian Court in the future.

We trust that you will provide us with a copy of the Order or the like that the French Court issues stemming from the request you will make to it to stay the French Proceedings, as outlined in your letter, and that you will advise the French Court at the July 27, 2012 hearing of the position of the Applicants and the Monitor as outlined in our exchange of correspondence.

**Goodmans**

If you have any issues with any of the foregoing, please contact me immediately.

Yours very truly,

**Goodmans LLP**

Joseph Pasquariello
JP/cag

cc.

Murray A. McDonald/Tom C. Ayres, *Ernst & Young Inc.*
Derrick Tay/Jennifer Stam, *Gowlings LLP*
Michael Lang/Alan Merskey, *Norton Rose LLP*
Ken Coleman/Lisa Kraidin, *Allen & Overy LLP*
J.A. Carfagnini/Chris Armstrong, *Goodmans LLP*

\6098919

215

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

| | |
|---|---|
| *ONTARIO*<br>SUPERIOR COURT OF JUSTICE<br>(COMMERCIAL LIST)<br><br>Proceeding commenced at Toronto | EIGHTY-SEVENTH REPORT OF<br>THE MONITOR DATED<br>JULY 19, 2012<br><br>GOODMANS LLP<br>Barristers & Solicitors<br>Bay Adelaide Centre<br>333 Bay Street, Suite 3400<br>Toronto, ON  M5H 2S7<br><br>Jay A. Carfagnini  (LSUC#: 22293T)<br>Joseph Pasquariello (LSUC# 38390C)<br>Christopher G. Armstrong (LSUC# 55148B)<br><br>Tel: 416.979.2211<br>Fax: 416.979.1234<br><br>Lawyers for the Monitor, Ernst & Young Inc. |