**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-----------------------------------------------------------X
:       
*In re*                                  :        Chapter 11
:       
Nortel Networks Inc., *et al.*,[1]          :        Case No. 09-10138 (KG)
:       
                     Debtors.     :        Jointly Administered
:       
:        **Hearing date: To be determined**
:        **Objections due: To be determined**

----------------------------------------------------------- X

**DEBTORS' MOTION FOR ENTRY OF AN
ORDER TERMINATING RETIREE BENEFITS AND
APPROVING A SETTLEMENT PROPOSAL PURSUANT TO 11 U.S.C. § 1114**

Nortel Networks Inc. ("<u>NNI</u>") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "<u>Debtors</u>"), hereby move this Court (the "<u>Motion</u>"), for the entry of an order substantially in the form attached hereto as <u>Exhibit A</u>, pursuant to sections 105(a) and 1114(g) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), (i) authorizing the Debtors to terminate the Retiree Welfare Plans (as defined herein); (ii) approving the Proposal (as defined herein); and (iii) granting them such other and further relief as the Court deems just and proper. In support of this Motion, the Debtors rely upon the declaration of John Ray, dated July 30, 2012, attached hereto as <u>Exhibit B</u> (the "<u>Ray Declaration</u>"), and respectfully represent as follows:

---

[1]        The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

**Preliminary Statement**

1.      Since filing for chapter 11 protection over three and a half years ago, the Debtors have worked diligently to liquidate their assets, wind down operations and complete the transition services necessary to support the transfer of their business lines.  Now that the Debtors' operations have been reduced to only those most basic functions essential to the completion of the bankruptcy process, the Debtors have determined that it is necessary to seek approval for the termination of their Retiree Welfare Plans before the end of the plan year on December 31, 2012.  Recognizing the importance of the benefits provided to their retired employees under the Retiree Welfare Plans (as defined below), the Debtors have worked tirelessly since the appointment of the Retiree Committee almost one year ago to reach a consensual agreement regarding the plan termination process.  To that end, the Debtors have provided significant information to the advisors to the Retiree Committee, have exchanged multiple proposals and, in conjunction with the Bondholder Group and UCC (each, defined below), have negotiated with the Retiree Committee in good faith.  When it became clear those negotiations were not progressing, the Debtors sought the appointment of a neutral third-party Mediator (as defined below) by this Court in April.  Since that time, with the Mediators' assistance, the Debtors have continued to engage in negotiations with the Retiree Committee in an effort to push toward a mutually agreeable solution.  Indeed, despite the filing of this Motion, the Debtors remain open to reaching a settlement with the Retiree Committee on reasonable terms.  However, at this advanced stage in their restructuring process, where the Debtors have been unable to reach agreement with the Retiree Committee after a year and the end of a plan year is quickly approaching, the Debtors simply cannot allow time to continue to slip by hoping for a settlement, all the while continuing to expend substantial amounts of money providing Benefits (as defined below) to the Retirees (as defined below).

2.      The Debtors therefore bring this Motion seeking Court approval to terminate the Retiree Welfare Plans on the terms described herein.  The Debtors have satisfied the provisions of section 1114(g) of the Bankruptcy Code necessary for the termination of the Retiree Welfare Plans, and have the clear right to terminate the Benefits under both the law and the terms of the Retiree Welfare Plan documents themselves.  Accordingly, the Debtors submit this Motion for authorization to terminate the Retiree Welfare Plans effective as of December 31, 2012.

**Jurisdiction**

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105(a) and 1114(g) of the Bankruptcy Code.

**Background**

5.      On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc.,[2] filed voluntary petitions for relief under chapter 11 of title 11 of the Bankruptcy Code, which cases are consolidated for procedural purposes only.  The Debtors continue to operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors (the "UCC") in respect of the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized (the "Bondholder Group").

---

[2]      Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

7.      On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their

Canadian affiliates (collectively, the "Canadian Debtors")[3] commenced a proceeding with the

Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors

Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the

"Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by

the Canadian Court.  Also on the Petition Date, the High Court of England and Wales placed

nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[4] into administration

(the "English Proceedings") under the control of individuals from Ernst & Young LLP

(collectively, the "Joint Administrators").  Other Nortel affiliates have commenced and in the

future may commence additional creditor protection, insolvency and dissolution proceedings

around the world.

8.      Since the Petition Date, Nortel has sold its business units and other assets to

various purchasers.  For further information regarding these chapter 11 cases, reference may be

made to the Monthly Operating Reports filed by the Debtors and http://dm.epiq11.com/nortel.

**Relief Requested**

9.      Although the Debtors have made every effort to agree with the Retiree Committee

on mutually acceptable terms to govern the termination of the Retiree Welfare Plans, no

---

[3]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[4]      The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A.,
Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel
Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks
B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel
Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks
Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

agreement has been reached.  Given the passage of time and the stage of the Debtors'

restructuring process, the Debtors are now compelled to seek relief from the Court in order to

ensure that the Retiree Welfare Plans are terminated effective as of the end of the year.

10.      By this Motion, the Debtors seek an order, pursuant to sections 105(a) and 1114

of the Bankruptcy Code, (i) authorizing the Debtors to terminate the Retiree Welfare Plans

effective as of December 31, 2012; (ii) approving the Proposal (as defined herein); and (iii)

granting them such other and further relief as the Court deems just and proper.  Under the

proposed termination, the Debtors propose, among other things, to give Retirees six months to

submit claims for reimbursement of claims incurred prior to the Termination Date (as defined

herein) under the relevant Retiree Welfare Plans, starting on December 31, 2012.

<u>**Facts Relevant to this Motion**</u>

A.      <u>**THE RETIREE WELFARE PLANS**</u>

11.      The Debtors historically have provided a number of benefits to their retired

employees, as well as such employees' surviving spouses and eligible dependents,[5] through

various benefit plans and other programs, including (as amended from time to time) the Nortel

Networks Inc. Retiree Medical Plan, the Nortel Networks Inc. Retiree Life Insurance and Long-

Term Care Plan, predecessor plans and other formal or informal benefit plans, agreements,

arrangements or programs (including plans, agreements, arrangements or programs that are

funded through the purchase of insurance) or arrangements for current or future retired

employees, their surviving spouses and eligible dependents, including plans, arrangements,

agreements or programs for medical, surgical, or hospital care benefits, or benefits in the event of

sickness, accident, disability, or death (collectively and in each case as amended or modified

---

[5]      For purposes of this Motion, "<u>Retirees</u>" include the Debtors' retired employees, their surviving spouses and
eligible dependents, and current employees of the Debtors eligible for benefits under the Retiree Welfare Plans.

from time to time, the "Retiree Welfare Plans").[6]  During the course of these chapter 11 cases,

the Debtors have continued to provide benefits under the Retiree Welfare Plans (the "Benefits")

in the ordinary course under the plan terms, including as authorized by this Court's January 15,

2009 *Order Authorizing, But Not Directing, Debtors to Pay Certain Prepetition (I) Wages,*

*Salaries and Other Compensation, (II) Reimbursable Expenses, and (III) Medical, Retirement*

*and Similar Benefits* [D.I. 59].  There currently are over 4,500 Retirees receiving Benefits under

the Retiree Welfare Plans.

12.    The Debtors previously sought to terminate the Retiree Welfare Plans and LTD

Plans by a motion filed in June 2010 (the "Plan Termination Motion").[7]  In connection with that

proposed termination of the Retiree Welfare Plans and the LTD Plans, the Debtors had

negotiated with a health insurance provider to provide the Retirees and LTD Employees with

replacement medical coverage that is not readily available to individuals on the open market.

Shortly thereafter, the Nortel US Retirement Protection Committee, an ad hoc steering

committee of retired executives of the Debtors (the "Ad Hoc Retiree Committee"), filed a motion

seeking authorization to form a voluntary employee benefit association as an alternative option

---

[6]    The Debtors maintain separate benefits plans for their long-term disabled employees (the "LTD Employees") and other current employees, including the Nortel Networks Inc. Long-Term Disability Plan, the Nortel Networks Inc. Medical Plan, the Nortel Networks Inc. Dental, Vision, and Hearing Care Plan, the Nortel Networks Inc. Life Insurance Plan, the Nortel Networks Inc. AD&D Insurance Plan, the Nortel Networks Inc. Health Care Reimbursement Account Plan, the Nortel Networks Inc. Dependent Day Care Reimbursement Account Plan, the Nortel Networks Inc. Long-Term Investment Plan, predecessor plans and other formal or informal benefit plans, agreements, arrangements or programs (including plans, agreements, arrangements or programs that are funded through the purchase of insurance) or arrangements for disabled employees, their surviving spouses and eligible dependents, including for medical, surgical, or hospital care benefits, income continuation benefits or any other benefits in the event of sickness, accident, disability, or death (collectively, and in each case as such plans have been amended or modified from time to time, the "LTD Plans").  The modification of the LTD Plans is subject to the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Terminate the Debtors' Long-Term Disability Plans and the Employment of the LTD Employees* (the "LTD Plan Termination Motion") filed contemporaneously with this Motion.

[7]    See *Debtors' Motion for Entry of an Order Authorizing Debtors to Terminate Certain Retiree and Long-Term Disability Plans*, dated June 21, 2010 [D.I. 3204].

for providing health insurance (the "VEBA Motion").[8]  Based on discussions with counsel to the

Ad Hoc Retiree Committee, their rejection of the alternative insurance and the Third Circuit's

ruling in IUE-CWA  v. Visteon Corp. (In re Visteon Corp.), 612 F.3d 210 (3d. Cir. 2010), the

Debtors ultimately withdrew the Plan Termination Motion without prejudice in July 2010 [D.I.

3651].  Thereafter, in October 2010, the Nortel US Retirement Protection Committee withdrew

the VEBA Motion without prejudice [D.I. 4104].

13.    While the Debtors historically have provided various welfare benefits to their

Retirees, they have not committed themselves under the Retiree Welfare Plans to provide such

benefits indefinitely.  On the contrary, the governing Retiree Welfare Plans specifically reserve

the Debtors' right to amend or terminate the Retiree Welfare Plans, including in circumstances

such as the Debtors now face.  For example, the 1991 Northern Telecom Inc. Retiree Medical

Plan and Retiree Life Insurance and Long-Term Care Plan provides:

> The Company hopes and expects to continue the Retiree Welfare
> Plan, but necessarily *reserves the right to amend the Retiree
> Welfare Plan from time to time or terminate the Retiree Welfare
> Plan at any time*. Any amendment to the Retiree Welfare Plan may
> reduce or eliminate benefits payable under the Retiree Welfare
> Plan to persons who are Employees or Retirees as of the effective
> date of the amendment.   1991 Northern Telecom Inc. Retiree
> Medical Plan and Retiree Life Insurance and Long-Term Care Plan
> at 14 (emphasis added), attached to the Ray Declaration as Exhibit
> 1.

By further example, the 2004 Nortel Networks Inc. Retiree Medical Plan provides:

> Although the benefits currently available (in the 2004 Plan Year)
> are described in this summary for the Company's Retiree Medical
> Plan, *the Company reserves the right to change or end the plan
> described in this summary at any time*. Any plan changes will
> result from actions taken and approved by the Company. *The*

---

[8]        See *Motion for an Order Authorizing Formation of a Voluntary Employee Benefit Association to Provide
Tax Credit-Eligible Retiree Benefits*, dated July 16, 2010 [D.I. 3671].

> ***Company may adopt such changes or terminate the plan at any time and for any reason.*** The Company's practices, policies, and benefits are outlined here for your information as required by law. 2004 Nortel Networks Inc. Retiree Medical Plan Summary Plan Description at 96 (emphasis added), attached to the Ray Declaration as <u>Exhibit 2</u>.

While the precise language contained in the Retiree Welfare Plan documents varies slightly across the years, the right to amend or terminate always existed.

**B.      THE WIND DOWN OF THE DEBTORS' ESTATES**

14.      In the several months following the Debtors' decision to postpone seeking termination of their Retiree Welfare Plans, the Debtors worked diligently to wind down their remaining operations, including completion of the transition services provided to the buyers of the various businesses.  The Debtors also undertook the sale of their patent portfolio which closed in July 2011, and have sought to advance the resolution of the other remaining material claims in their cases through the filing of various motions.  During this time, the Debtors also sought to identify other possible alternative insurance arrangements for the Retirees.

15.      In June 2011, the Debtors sought the appointment of the Retiree Committee to negotiate the termination or modification of the Retiree Welfare Plans, which committee was appointed in August 2011.  Since that time, the Debtors have continued to wind down all other aspects of their estates, to the point where they remain skeletal companies at best.  At the time the bankruptcy cases were filed, the Debtors employed approximately 3,000 individuals.  Nearly all of the Debtors' workforce (other than the LTD Employees) either took employment with the buyers of the Debtors' businesses or were terminated by the Debtors in their various rounds of layoffs over the last three and a half years.

16.      The Debtors currently employ only eighteen active employees, other than the LTD Employees, and that number is expected to drop to approximately five employees by year-

end.  As a result of the divestitures and wind down, it has become increasingly difficult to

maintain and administer the Retiree Welfare Plans and, once the Debtors dissolve as

corporations, there will be no company even in name to continue the Benefits.  Moreover, while

the Retiree Welfare Plans are administered by third-party vendors, the Debtors maintain the

plans as self-insured plans and, as such, the Debtors bear the economic risk of the plans and the

claims filed thereunder.

17.    Over the last two years since July 2010, when the prior Plan Termination Motion

was withdrawn, the Debtors have continued to provide benefits under the Retiree Welfare Plans,

at an approximate cost of $25.6 million to their estates.  The current cost to the Debtors of

providing the Benefits under the Retiree Welfare Plans is between approximately $1.1 and $1.3

million per month, although the Debtors expect that the costs would go up as the current

population ages, if premiums were increased, if health care costs rise and/or if a greater number

of claims were filed.

18.    The Debtors also seek to terminate the Retiree Welfare Plans at this time in order

to be able to plan for the administrative process involved in winding down the Retiree Welfare

Plans.  The Debtors will need to allow for time to notify the Retirees regarding the

discontinuation of the Plans, to work with the various vendors to terminate the Plans and resolve

any remaining liabilities thereunder, and to process and pay for the remaining claims submitted

under the Plans that were incurred but not reported prior to the termination of the Plans.

Moreover, it is important to the Debtors to be able to terminate the Retiree Welfare Plans by year

end to avoid the additional costs and risks associated with renewal of the Retiree Welfare Plans

for an additional year.

C.    <u>**NEGOTIATIONS WITH THE RETIREE COMMITTEE**</u>

19.    On June 2, 2011, the Debtors sought the appointment of a retiree committee to engage in discussions regarding the modification or termination of the Retiree Welfare Plans by filing the *Debtors' Motion for Entry of an Order Pursuant to Section 1114 of the Bankruptcy Code Appointing an Official Committee of Retired Employees*, dated June 2, 2011 [D.I. 5568]. Thereafter, the Court issued an order directing the U.S. Trustee to appoint a retiree committee for the sole purpose of serving as the authorized representative of the Retirees in connection with their rights under section 1114 of the Bankruptcy Code and for no other purpose (the "<u>Retiree Committee</u>"), dated June 21, 2011 [D.I. 5783].  On August 2, 2011, the United States Trustee appointed the members of the Retiree Committee [D.I. 6074].

20.    Since the appointment of the Retiree Committee last year, the Debtors have devoted significant resources and attention to negotiating in good faith with the Retiree Committee to seek the termination of the Retiree Welfare Plans and a settlement that would provide a fair and equitable resolution of any potential claims or rights held by the Retirees.

21.    The Debtors also have acted diligently to provide the Retiree Committee with all of the information necessary to evaluate the Debtors' settlement proposals.  On September 29, 2011, the Retiree Committee sent the Debtors initial broad requests for documents and information (the "<u>Requests</u>").[9]  The Debtors began providing the requested documents and information to the Retiree Committee on September 29, 2011.  The Debtors regularly have sent additional documents and information to the Retiree Committee over the last year.  To date, the Debtors have provided the Retiree Committee with various Retiree Welfare Plan documents and other information regarding the Debtors' employees and their estates, assets and claims,

---

[9]    Since receiving the Requests, the Debtors have received numerous additional requests from the Retiree Committee, including requests received on November 9, 2011 and December 6, 2011.

including by compiling various benefit-related information in response to the Requests. In addition, the Debtors' professionals and the Retiree Committee's advisors have spent numerous hours on conference calls since the appointment of the Retiree Committee discussing and clarifying the data that the Debtors have produced to the Retiree Committee.[10]

22.    Although the purpose for the formation of the Retiree Committee was to facilitate the negotiation of settlements with the Debtors regarding the modification or termination of the Retire Welfare Plans, for the first six months after the appointment of the Retiree Committee, only two substantive meetings took place between the Debtors and the Retiree Committee, on October 6, 2011 and February 27, 2012. Both meetings were at the request and insistence of the Debtors.

23.    At the October 6, 2011 meeting, the Debtors provided the Retiree Committee with substantial financial information regarding the Retiree Welfare Plans. Representatives of a potential alternative insurer also attended the meeting and were prepared to make a presentation on the insurance program they could offer, but the Retiree Committee declined to meet with the insurer despite being informed that further delays would increase the cost of the replacement insurance because the insurance company would be unable to honor rates indefinitely.

24.    On January 19, 2012, the Debtors provided a term sheet containing a settlement proposal to the Retiree Committee and shortly thereafter sought to meet with the Retiree Committee on January 31, 2012 regarding the Debtors' proposal. The meeting with the Retiree Committee, attended by members of the Retiree Committee and the LTD Committee, their legal and financial advisors, the Debtors' professionals and advisors of the UCC and Bondholder Group, ultimately occurred on February 27, 2012. At the February 27, 2012 meeting, counsel to

---

[10]    Calls between the Debtors' professionals and the Retiree Committee's professionals occurred on November 15, 2011, December 12, 2011, January 19, 2012, and March 12, 2012.

the Retiree Committee stated that they were still unprepared to engage in substantive

negotiations regarding the Debtors' proposals.

25.     Frustrated by the slow progress of the negotiations and concerned that alternative

benefits options could become more costly or unavailable over time, on March 28, 2012, the

Debtors filed a motion (the "Mediation Motion"), seeking to have a mediator appointed to

facilitate settlement discussions between the Debtors and the Retiree Committee.[11]  On April 18,

2012, the Court entered an order granting the Mediation Motion and appointed Richard Levin,

Esq., of Cravath, Swaine & Moore LLP, as mediator (the "Mediator").[12]  In connection with the

appointment of the Mediator, the Debtors agreed to a further 60-day standstill during which they

would not take any action to modify or terminate the Retiree Welfare Plans.  That standstill

expired on June 18, 2012.

26.     Despite the best efforts of the Mediator, the Debtors and the Retiree Committee

still have been unable to reach written agreement on a consensual termination of the Retiree

Welfare Plans.  The Debtors received the first written response to the January 19, 2012

settlement proposal on May 30, 2012.  Later, on June 4, 2012, the Debtors made a further

settlement proposal, substantially in the form attached as Exhibit 3 to the Ray Declaration (the

"Proposal"),  in an attempt to continue to move the negotiations forward.  The Debtors met with

the Retiree Committee on June 14, 2012 regarding the Debtors' June 4th proposal.  During the

course of the rigorous discussions in which the Debtors engaged with the Retiree Committee and

the Mediator at that meeting, the Debtors made several offers to the Retiree Committee through

---

[11]     See Motion for Entry of an Order (I) Appointing a Neutral Mediator Concerning the Modification or Termination of the Nortel Retiree Welfare Plans and the Nortel Long-Term Disability Plans; (II) Authorizing the Debtors to Pay the Costs of Engagement; and (III) Granting Related Relief [D.I. 7463].

[12]     See Order (I) Appointing a Neutral Mediator Concerning the Modification or Termination of the Nortel Retiree Welfare Plans and the Nortel Long-Term Disability Plans; (II) Authorizing the Debtors to Pay the Costs of Engagement; and (III) Granting Related Relief [D.I. 7560].

the Mediator.  The Retiree Committee responded to each offer with a substantially higher counterproposal, leaving the parties unable to reach a consensus.  A further negotiation session was held on July 19, 2012, as a final effort to reach settlement and with the intention that the parties actively engage in discussions before that date.  Although both parties made confidential, non-binding proposals and counter-proposals to each other during the July 19th meeting, again no agreement could be reached.

27.    At this time, almost a year to the day from the formation of the Retiree Committee, over 100 days after the appointment of the Mediator and after several attempts, in conjunction with the Bondholder Group and the UCC, to negotiate a consensual settlement with the Retiree Committee, the Debtors have concluded that it is necessary to seek formal termination of the Retiree Welfare Plans, in order to ensure the plans will be terminated by December 31, 2012.  While the Debtors would remain open to a settlement on reasonable terms, the Debtors have been unable to reach such an agreement despite devoting substantial time and resources in an effort to do so, and the Debtors now need certainty as to the future of the Retiree Welfare Plans.

D.    **THE PROPOSAL**

28.    As noted above, on June 14, 2012, the Debtors made the Proposal to the Retiree Committee and it was rejected.  For the reasons stated herein, the Debtors now seek approval of the termination of the Retiree Welfare Plans on the following material terms, which are consistent with the terms of the Proposal as clarified through the course of negotiations:[13]

- Termination of Retiree Welfare Plans.  The Debtors will terminate all Retiree Welfare Plans including, for the avoidance of doubt, all coverage and benefits provided

---

[13]    As explained above, the Debtors and the Retiree Committee continued to make confidential, non-binding settlement proposals to each other through the Mediator.  The Debtors would consider waiving the confidentiality of the non-binding proposals they made through the Mediator to the Retiree Committee if the Retiree Committee would agree to do the same for the counter-proposals they offered through the Mediator to the Debtors.

thereunder on December 31, 2012 (the "Termination Date").  The Debtors shall continue to pay the Retiree Benefits that arise in the ordinary course and are payable under and in accordance with the Retiree Welfare Plans until the Termination Date.

- Retiree Welfare Plans Run Off Period.  The time period for making a claim for reimbursement for benefits covered by and approved pursuant to the relevant Retiree Welfare Plans for claims incurred prior to the Termination Date shall be reduced to six months, commencing on the Termination Date.

- Retiree Claim Consideration.

  o The Retiree Payment Amount shall be equal to $40 million (the "Gross Settlement Amount"), minus all documented amounts paid by the Debtors for the purpose of providing Retiree Benefits on or after July 1, 2012 through and including December 31, 2012 (the "Retiree Benefit Expenses").

  o Within thirty (30) days of entry of an order that has become a final and non-appealable order that binds all individuals with Retiree Claims (the "Payment Date"),[14] the Debtors shall pay the Retiree Committee or its designee, which designee shall be acceptable to the Debtors,[15] an amount (the "Termination Date Payment") equal to $40 million minus (x) the Retiree Benefit Expenses paid by the Debtors on or prior to the Termination Date, and (y) the Debtors' estimated amount (the "Holdback Amount") of additional Retiree Benefit Expenses incurred but not paid by the Debtors on or prior to the Termination Date (the "Incurred Benefit Expenses").

  o The amount of the Incurred Benefit Expenses actually paid or owing by the Debtors shall be determined by the Debtors no more than nine (9) months after the Termination Date.  If the actual amount of the Incurred Benefit Expenses is less than the Holdback Amount, then the Debtors shall pay the difference to the Retiree Committee or its designee.  If the actual amount of the Incurred Benefit Expenses is greater than the Holdback, then the Retiree Committee, its agent or any trust or vehicle established to hold the Termination Date Payment shall pay or direct the payment of the difference (the "Debtor True-up Amount") to the Debtors; provided, however, that the Debtors' sole recourse for payment of the Debtor True-up Amount shall be any Retiree Payment Amount funds that remain undistributed by the Retiree Committee or its agents on the date the Retiree Committee receives written notice of the Debtor True-Up Amount.

  o The Gross Retiree Payment Amount shall constitute full and final satisfaction of any and all Retiree Claims (as defined below).

  o The Retiree Payment Amount shall be used to satisfy the Retiree Claims, where the Retiree Committee shall determine the allocation of the Retiree Payment

---

[14]    The payment terms of the Retiree Payment Amount are to be determined.

[15]    The Debtors will not consent to the use of a VEBA to administer or distribute the Retiree Payment Amount.

Amount among the Retirees and any costs to doing so shall be satisfied from the Retiree Payment Amount.

- <u>Satisfaction of Retiree Claims.</u>  The termination of the Retiree Welfare Plans and the payment of the Settlement Amount shall fully satisfy the Retiree Claims, and the Retirees shall be stopped from asserting any further Retiree Claims.  As used herein, the "<u>Retiree Claims</u>" shall include any and all actual and potential claims, demands, causes of action, debts, liabilities or obligations, whether based on any legal or equitable theory or otherwise, including, but not limited to suits in contract, tort or equity, whether arising under contract, the Employee Retirement Income Security Act of 1974 (ERISA), the Consolidated Omnibus Budget Reconciliation Act (COBRA), or any other statute, rule, regulation, common law or otherwise, and whether arising under the laws of the United States, any political subdivision thereof or the laws of any other jurisdiction, in all cases relating to:

    i.    Any benefits, other obligation or other claims arising under or relating to the Retiree Welfare Plans (the "<u>Retiree Benefits</u>");

    ii.   The administration of the Retiree Welfare Plans, including, but not limited to, the calculation of Retiree Benefits, the application of offsets against Retiree Benefits, the denial of Retiree Benefits, the determination of eligibility to receive Retiree Benefits, the interpretation of the Retiree Welfare Plans and the drafting of the Retiree Welfare Plans; and

    iii.  The amendment, modification and/or termination of any of the Retiree Welfare Plans and/or any benefits or coverage thereunder, whether done previously or as provided for under the terms of the Proposal.

- For the avoidance of doubt, Retiree Claims shall exclude the following claims:

    o    Claims arising from or relating to the Nortel Networks Severance Allowance Plan or the Nortel Networks Enhanced Severance Allowance Plans, including related fringe benefits;

    o    Claims arising under or relating to the Nortel Networks U.S. Deferred Compensation Plan or the Northern Telecom Inc. Senior Management Incentive Award Program;

    o    Claims for qualified pension benefits arising under or relating to the Nortel Networks Retirement Income Plan, Nortel Networks Pension Service Plan, Nortel Networks Cash Balance Plan, Northern Telecom Inc. Retirement Plan for Employees or the Nortel Networks Capital Accumulation and Retirement Program, which are properly asserted only against the Pension Benefit Guaranty Corporation;

    o    Claims for non-qualified pension benefits arising under or relating to the Nortel Networks Retirement Income Plan Restoration Plan, Nortel Networks Cash Balance Restoration Plan, Northern Telecom Inc. Excess Pension Plan,

15

Nortel Networks Long-Term Investment Restoration Plan, Nortel Networks Supplementary Executive Retirement Plan, the Nortel Networks Special Pension Benefits Plan and the Nortel Networks Special Pension Credit Plan;

o   Except to the extent described above, valid claims for reimbursement for benefits covered by and approved pursuant to the Retiree Welfare Plans incurred prior to the Termination Date that are properly brought prior to the expiration of the run-off period (as amended);

o   Claims for expatriate benefits and relocation expenses;

o   Claims for the account balance currently vested in an individual's account under the Nortel Networks Long-Term Investment Plan or Northern Telecom Inc. Thrift Savings Plan; and

o   Claims directly arising under a written employment agreement between an individual Retiree and the Debtors that are wholly unrelated to life insurance, death benefits, retirement payments, medical insurance, long-term care insurance or any other Retiree Claims.

- **Final Resolution.**  Any and all Retiree Claims shall be enforceable only against the Settlement Amount and shall be satisfied by the amounts determined by the Retiree Committee to be paid with respect to each such claim.  The Retiree Payment Amount shall be the sole source of recourse for any and all Retiree Claims.

- **Proofs of Claim.**  Any and all proofs of claim filed by individual Retirees on account of Retiree Claims shall be disallowed and expunged from the Debtors' claims register as of the date an order approving the Proposal becomes final and non-appealable (the "Effective Date"), solely with respect to the portion of the proof of claim relating to Retiree Claims.

- **Retirement Eligible Employees.**  The Order shall not result in the loss or waiver of any right of current employees of the Debtors as of the Effective Date, including those currently receiving employer-paid long-term disability benefits (the "LTD Employees"), or former employees of the Debtors to participate in the Proposal, which right to participate and receive benefits or payments thereunder shall be based on the individual's eligibility to receive Benefits under the Retiree Welfare Plans as of the Effective Date, provided that in order to preserve any such right, such employees must make an election to participate in the Retiree Welfare Plans for which they are eligible within thirty (30) days after the Effective Date and any such election made from the Effective Date through the Termination Date shall be effective as of the Termination Date.  In order for a current employee, including an LTD Employee, to elect to receive benefits under the Retiree Welfare Plans as of the Effective Date, such employee must voluntarily terminate their employment with the Debtors (unless such employee was terminated pursuant to the LTD Plan Termination Motion) and relinquish the right to receive benefits under the plans and programs available to current employees, including, without limitation, income continuation

benefits pursuant to the Nortel Networks Inc. Long-Term Disability Plan, consistent with the plan terms and prior practice.

- <u>Continuation of the Retiree Committee</u>.  After the Effective Date, the Retiree Committee shall exist solely for the purpose of administering the allocation, distribution and payment of the Retiree Payment Amount to the holders of Retiree Claims, and shall cease to exist upon the date of distribution of the entire Retiree Payment Amount.[16]  The Debtors shall not be liable to pay fees, expenses or costs incurred by the Retiree Committee or its professionals, advisors or agents after the Effective Date, and any such amounts shall instead be paid out of the Retiree Payment Amount.

- <u>Final Settlement</u>.  The Proposal is being entered into, and the payment of the Retiree Payment Amount is being made in full and final satisfaction of the Retiree Claims and upon the occurrence of the Effective Date shall supersede any prior obligations of the Debtors with respect to the Retiree Welfare Plans, such that the Retiree Committee and all holders of Retiree Claims shall be forever estopped and barred from seeking further relief pursuant to section 1114(g) of the Bankruptcy Code related to the Retiree Welfare Plans, the Retiree Claims or the Proposal.

### **Basis for Relief**

29.     To date, the Retiree Committee has failed to agree to terminate the Retiree Welfare Plans on terms reasonable to the Debtors.  Given the Debtors' need for finality as they proceed with the wind down of their operations, the Debtors seek authority to terminate the Retiree Welfare Plans if no consensual resolution can be reached by the date of the hearing on this Motion.  Achieving such closure, whether voluntarily or through the Court-approved modification process, is necessary for the Debtors to successfully move their cases forward toward the approval and implementation of a plan of reorganization.

30.     As described in greater detail below, the Debtors have satisfied the legal standard for the termination of the Retiree Welfare Plans under section 1114 of the Bankruptcy Code.  First, the Retirees' right to receive the Benefits is neither vested by law nor under the terms of the Retiree Welfare Plan documents.  Accordingly, the Retiree Welfare Plans are terminable at

---

[16]     Note that the Retiree Committee may be able to be disbanded on the Termination Date, where they will be superseded by the management of the new vehicle or if the money is fully distributed then.

will without liability to the Debtors beyond the length of these chapter 11 proceedings.  In addition, the Debtors have fulfilled every element set forth in section 1114(g) of the Bankruptcy Code for the approval of a modification or termination of retiree benefits.  Thus, the Debtors are entitled to an order terminating the Retiree Welfare Plans.

## A.      <u>THE RETIREE WELFARE PLANS ARE TERMINABLE AT WILL</u>

31.      The Retiree Welfare Plans are terminable at will by the Debtors because the Benefits are not vested benefits.  The law is clear that benefits provided pursuant to welfare benefit plans (including all the Benefits at issue) do not vest pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 <u>et seq</u>. ("<u>ERISA</u>"), except as expressly provided under the terms of the Retiree Welfare Plans.  Here, the Debtors have provided the Benefits to the Retirees subject to the Debtors' ***express right to unilaterally amend or terminate*** the various Retiree Welfare Plans.  As described above, the Debtors specifically reserve in the various Retiree Welfare Plan documents the Debtors' unilateral right to amend or terminate the various Retiree Welfare Plans at any time and for any reason.  Because the Benefits have not vested pursuant to ERISA, the Retiree Committee has the burden of proving by a preponderance of the evidence that the terms of the Retiree Welfare Plans provide the Beneficiaries with vested benefits.  They cannot do so.

(i)     *WELFARE BENEFITS DO NOT VEST AS A MATTER OF LAW UNDER ERISA*

32.      The Benefits have not vested pursuant to ERISA because the Retiree Welfare Plans are "welfare benefit plans," and such plans, unlike pension plans, are not subject to the vesting provisions of ERISA.

33.      The Supreme Court has made clear that an employer is not required under ERISA to provide retiree welfare benefits at all.  <u>See, e.g.</u>, <u>Curtiss-Wright Corp. v. Schooneiongen</u>, 514 U.S. 73, 78 (1995) ("[W]e are mindful that ERISA does not create any substantive entitlement to

employer-provided health benefits or any other kind of welfare benefits."). Accordingly, when a

company does choose to provide welfare benefits to its retirees, the law does not create a vested

entitlement to the continuation of such benefits. The Third Circuit has specifically addressed this

issue and is clear on this point. For example, in In re Lucent Death Benefits ERISA Litig., 541

F.3d 250, 253 (3d Cir. 2008), plaintiffs, former employees of defendant, argued that defendant

could not terminate a pensioner death benefit that had been provided to the plaintiffs. The Third

Circuit held that because the death benefit was a welfare benefit and not a pension benefit, the

benefit had not vested pursuant to ERISA, explaining that:

> ERISA provides elaborate requirements for the vesting of pension
> benefits, but it does not provide automatic vesting of welfare
> benefits. An accrued pension benefit is protected by ERISA's anti-
> cutback provision without any showing that it has vested. In
> contrast, a welfare benefit is protected from elimination only if the
> plaintiff proves by a ***preponderance of the evidence*** that the plan
> provider had intended the welfare benefit to have vested (despite
> not being obligated to do so by ERISA). Id. at 253-54 (citations
> omitted) (emphasis added).

34.    Because benefits provided under welfare benefit plans do not vest under ERISA,

they are terminable at will unless the plans specifically provide otherwise. As the Third Circuit

explained, "an employer's commitment to vest such benefits is not to be inferred lightly and

must be stated in clear and express language" in the governing plan documents. Int'l Union,

United Auto., Aerospace & Agric. Implement Workers of Am. v. Skinner Engine Co., 188 F.3d

130, 139 (3d Cir. 1999)(internal citations omitted); see also, DiFelice v. Aetna U.S. Healthcare,

346 F.3d 422, 455 (3d Cir. 2003) (Becker, A., concurring) (noting that welfare benefit plans are

"exempt from the substantive vesting and funding requirements" of ERISA and that "[i]ndeed,

courts have held that the absence of a vesting provision allows employers to amend their plans

virtually at will, even in discriminatory fashion"); Int'l Union, U.A.W. v. Skinner Engine Co.,

188 F.3d at 138 (employers are "generally free . . . for any reason at any time, to adopt, modify

or terminate welfare plans' . . . [unless they agree] to relinquish their right to unilaterally terminate those benefits and provide for lifetime vesting" (quoting <u>Curtiss-Wright</u>, 514 U.S. at 78)); <u>In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.</u>, 58 F.3d 896, 901 (3d Cir. 1995) ("In rejecting the automatic vesting of welfare plans, Congress evidenced its recognition of the need for flexibility with regard to an employer's right to change medical plans").

35.     It is uncontroverted that the Retiree Welfare Plans are welfare benefit plans and not pension plans, and therefore, the Benefits did not vest as a matter of law.  Thus, in order for the Retiree Committee to prevail on their argument that the Benefits have vested, the Retiree Committee must meet their burden of proving by a preponderance of the evidence that the Debtors intended the Benefits to have vested.  As explained below, the Retiree Committee cannot meet this burden.

(ii)     *THE RETIREE WELFARE PLANS PERMIT THE WELFARE PLANS TO BE TERMINATED*

36.     The Benefits have not vested pursuant to the terms of the Retiree Welfare Plans because the plain language of the Retiree Welfare Plan documents does not provide that the Benefits were intended to vest.  To the contrary, the various Retiree Welfare Plan documents do not contain any provisions stating, or even suggesting, that any benefits provided to the Retirees are vested.  Instead, they expressly provide that the Debtors have the right to modify or terminate the Retiree Welfare Plans at any time in their sole discretion.

37.     Each Retiree Welfare Plan document expressly gives the Debtors the unilateral right to terminate the Retiree Welfare Plans at any time, using language similar to the below:

> Although the benefits currently available (in the 2004 Plan Year) are described in this summary for the Company's Retiree Medical Plan, ***the Company reserves the right to change or end the plan described in this summary at any time***. Any plan changes will result from actions taken and approved by the Company. ***The***

> ***Company may adopt such changes or terminate the plan at any
> time and for any reason.*** The Company's practices, policies, and
> benefits are outlined here for your information as required by law.
> 2004 Nortel Networks Inc. Retiree Medical Plan Summary Plan
> Description at 96 (emphasis added).

38.     Because a company's intent to provide vested benefits must be express, it is not
enough to show a company historically provided such benefits, or that it hoped to continue to do
so in the future.  Indeed, courts have specifically held that when a company reserves the right to
change or terminate benefits, even those benefits promised for "life" are not vested.  <u>Unisys</u>, 58
F.3d at 904 (explaining that a plan containing language both describing welfare benefits as being
provided for "life" and a reservation of rights is not ambiguous or inconsistent because, "[a]n
employer who promises lifetime medical benefits, while at the same time reserving the right to
amend the plan under which those benefits were provided, has informed plan participants of the
time period during which they will be eligible to receive benefits *provided* the plan continues to
exist.") (emphasis in original); <u>Vallone v. CNA Fin. Corp.</u>, 375 F.3d 623, 634 (7th Cir. 2004)
(holding that a health care allowance benefit provided to encourage early retirement and
described as a "lifetime" benefit was not vested because a reservation of rights clause in the plan
documents allowed amendment or modification even after retirement).  Thus, in <u>Vallone</u>, the
court notes that, "The reservation of rights clauses . . . allow CNA to *prospectively* alter or
amend its welfare benefits offered to retirees, even after retirement, and that is what it did."  <u>Id.</u>
at 638.

39.     Additionally, the Retiree Committee has suggested that the Benefits may have
vested because documents were provided to certain Retirees that were not clearly limited by an
asserted right to modify or terminate.  Although the Retiree Committee has yet to provide an
example of such a document despite the Debtors' repeated requests, whether or not such
documents exist is of no significance because such documents cannot modify the Retiree

Welfare Plans.  The Third Circuit has repeatedly held that ERISA precludes an employer from

making "oral or informal amendments" to employee benefits plans and that the only way to

effect a modification of such a plan is through a valid amendment executed "according to formal

procedures."  See Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1163 (3d Cir. 1990); Confer

v. Custom Eng'g Co., 952 F.2d 41, 43; Depenbrock v. Cigna Corp., 389 F.3d 78, 81 (3d. Cir.

2004).  Therefore, regardless of whether any such documents could be argued to exist, they

would be incapable of modifying the Retiree Welfare Plan documents in which the Debtors

clearly reserve their right to modify or terminate the Retiree Welfare Plans.

40.     Furthermore, the Third Circuit's ruling in Visteon does not alter the application of

this rule.  Although the Visteon court held that section 1114 applies even where a retiree benefit

plan reserves the employer's right to amend or terminate the benefits provided, the court made

clear that section 1114 is a procedural right, "neither entirely nor permanently in derogation of

underlying contractual rights."  Visteon, 612 F.3d at 236.  As a result, the Visteon holding does

not vest benefits that would otherwise be terminable at will – it merely provides retirees with a

procedural right to use as a "microphone" should such changes take place during the course of a

former employer's chapter 11 proceedings.  Id.  Moreover, the law is clear that after a company

has emerged from bankruptcy, it retains any existing contractual right to terminate benefits.  See

id. ("Additionally, it must be remembered that § 1114's protections terminate upon plan

confirmation," and noting that section 1129(a)(13) does not vest benefits.).  Accordingly, the

Court has authority to approve the termination of the Retiree Welfare Plans under section 1114 at

this time.

41.     Therefore, since the Retiree Welfare Plans do not provide that the Benefits are

vested, and the Retiree Committee has failed to produce *any* evidence, much less a

preponderance of evidence, that the Benefits have vested, the Benefits are not vested and thus

they are terminable at will.

**B.     MODIFICATION OF RETIREE BENEFITS IS GOVERNED BY 11 U.S.C. § 1114**

42.     Section 1114(g) of the Bankruptcy Code provides that:

> The court shall enter an order providing for modification of the payment of retiree
> benefits if the court finds that –
>
> (1)     the trustee has, prior to the hearing, made a proposal that fulfills the
>         requirements of subsection (f);
>
> (2)     the authorized representative of the retirees has refused to accept such
>         proposal without good cause; and
>
> (3)     such modification is necessary to permit the reorganization of the debtor
>         and assures that all creditors, the debtors, and all of the affected parties are
>         treated fairly and equitably, and is clearly favored by the balance of the
>         equities….

11 U.S.C. § 1114(g).

43.     When the debtor demonstrates compliance with these provisions, the Court is

authorized to approve modification or termination of retiree health and life insurance benefits.

See Visteon, 612 F.3d at 217.

44.     As noted above, the first requirement of section 1114(g) is that the debtor has,

prior to the hearing, "made a proposal that fulfills the requirements of subsection (f)."  That

subsection, in turn, provides that:

> (1)     Subsequent to filing a petition and prior to filing an application seeking
>         modification of the retiree benefits, the trustee shall –
>
>         A.     make a proposal to the authorized representative of the retirees,
>                based on the most complete and reliable information available at
>                the time of such proposal, which provides for those necessary
>                modifications in the retiree benefits that are necessary to permit the
>                reorganization of the debtors and assures that all creditors, the
>                debtors and all of the affected parties are treated fairly and
>                equitable; and

      B.      provide, subject to subsection (k)(3), the representative of the retirees with such relevant information as is necessary to evaluate the proposal.

    (2)      During the period beginning on the date of the making of a proposal provided for in paragraph (1), and ending on the date of the hearing provided for in subsection (k)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such retiree benefits.

11 U.S.C. § 1114.

## C.    <u>THE DEBTORS HAVE SATISFIED THE REQUIREMENTS OF SECTION 1114</u>

45.    Section 1114's requirements are derived from 11 U.S.C. § 1113, which permits the court to allow a debtor to reject collective bargaining agreements.  Therefore, courts have applied to section 1114 proceedings the same standards developed in connection with section 1113. <u>See</u> <u>In re Ionosphere Clubs, Inc.</u>, 134 B.R. 515, 519-20 (Bankr. S.D.N.Y. 1991) ("[c]ompliance with § 1114 is substantively and procedurally the same as compliance with § 1113"); <u>United Food & Commercial Workers Union v. Family Snacks, Inc.</u> (<u>In re Family Snacks, Inc.</u>), 257 B.R. 884, 896 (B.A.P. 8th Cir. 2001) (applying same standard to both section 1113(c) and 1114(g) requests).

46.    The Third Circuit has adopted a nine-factor test to evaluate the requirements of section 1113(c). <u>Wheeling-Pittsburgh Steel Corp. v. United Steelworkers of Am.</u>, 791 F.2d 1074, 1080-81 (3d. Cir. 1986); <u>see also</u> <u>In re Nat'l Forge Co.</u>, 289 B.R. 803, 809-10 (Bankr. W.D. Pa. 2003); <u>Bowen Enters., Inc. v. United Food & Commercial Workers Int'l Union</u> (<u>In re Bowen Enters., Inc.</u>), 196 B.R. 734, 741 (Bankr. W.D. Pa. 1996).  Those factors are: (1) the debtor in possession must make a proposal to the authorized representative to modify or terminate retiree benefits; (2) the proposal must be based on the most complete and reliable information available at the time of the proposal; (3) the debtor must provide the authorized representative with

24

relevant information necessary to evaluate the proposal; (4) the debtor must meet at reasonable times with the authorized representative after making the proposal but before the time of the hearing; (5) the debtor must confer with the authorized representative in good faith in an attempt to reach an agreement; (6) the authorized representative must have refused to accept the proposal without good cause; (7) the proposal must be necessary for accommodating the confirmation of a chapter 11 plan of reorganization; (8) the proposal must assure that all creditors, the debtor, and all affected parties are treated fairly and equitably; and (9) the balance of the equities clearly must favor modifications or termination of retiree benefits.  Wheeling-Pittsburgh Steel Corp., 791 F.2d at 1080-81.

47.     As explained below, and as will be established at the hearing on this Motion, the Debtors have fully complied with the requirements of section 1114 of the Bankruptcy Code.[17]

(i)     *THE DEBTORS HAVE MADE A PROPOSAL TO THE RETIREE COMMITTEE*

48.     As described above, the Debtors have made several proposals to the Retiree Committee, including the Proposal.  The Retiree Committee rejected each of the Debtors' proposals.  Therefore, the Debtors have satisfied the requirement that they present the Retiree Committee with a settlement proposal.

(ii)    *THE DEBTORS' PROPOSAL IS BASED UPON THE MOST COMPLETE AND RELIABLE INFORMATION AVAILABLE*

49.     The Proposal is based on the most complete and reliable information available regarding the facts of the Debtors' cases.  A debtor need not defer making a section 1114 modification until more complete or final information is developed.  7 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 1114 (16th ed. 2011).  The Debtors have carefully considered the Retiree Welfare Plan documents, the Debtors' need to terminate the Retiree

---

[17] The Debtors intend to continue their good faith efforts to reach an agreement with the Retiree Committee in the period before the hearing on this Motion.

Welfare Plans in order to complete the wind-down process, the treatment of other creditors –

including thousands of other employees, suppliers and customers – without a contractual right to

further claims against the Debtors and the continued cost of providing the Benefits in

formulating the Proposal.  While the Debtors maintain that the terms of the Retiree Welfare

Plans allow the Debtors to unilaterally terminate the Retiree Welfare Plans at any time and

without any liability to the Debtors, the Debtors recognize that there are always costs, devotion

of resources, and some nominal risk to any litigation, and also have taken into account the

significant monthly cost of continuing to provide the Benefits on an ongoing basis pending any

final resolution of these matters.  The Debtors have also provided the Retiree Committee

voluminous information regarding the Retiree Welfare Plans and have considered such data in

formulating the Proposal.

      50.    Given the Debtors' reliance on such information and analysis, the Debtors have

satisfied this requirement because the Proposal is based on the most complete and reliable

information available.  Ass'n of Flight-Attendants-CWA, FL-CIO v. Mesaba Aviation, Inc., 350

B.R. 435, 454 (D. Minn. 2006) (applying the standard under § 1113); In re Nat'l Forge Co., 289

B.R. at 810 (applying the standard under section 1113).

      (iii)    *THE DEBTORS PROVIDED THE RETIREE COMMITTEE WITH ALL*
               *RELEVANT INFORMATION NECESSARY TO EVALUATE THE PROPOSAL*

      51.    The Retiree Committee has been provided with all relevant information necessary

to evaluate the Settlement Agreement.

      52.    Since receiving the Requests, the Debtors have worked diligently to provide the

Retiree Committee with all of the requested information in the Debtors' possession.  In addition,

substantial volumes of documents and other information were produced to the Retiree

Committees' advisors, as described above.  These materials provided the Retiree Committee with

information regarding a wide variety of issues including, but not limited to, the Debtors' assets

and liabilities, the Debtors' financial information, the Retiree Welfare Plans, the Debtors' past

practices with regard to Benefits and the Retiree population census and claims history data.

53.    Courts in this circuit have found that providing the company's current financial

information alone is sufficient to meet this requirement. See In re Sol-Sieff Produce Co., 82 B.R.

787, 794 (Bankr. W.D. Pa. 1988). Given that the Debtors have supplied not only this

information, but also all information requested by the Retiree Committee available without

undue burden, the Debtors have clearly satisfied this requirement.

(iv)    *THE DEBTORS HAVE MET AT ALL REASONABLE TIMES WITH THE
RETIREE COMMITTEE*

54.    The Debtors have met in person with the Retiree Committee on four occasions

over the course of the past year, *albeit* each time at the insistence of the Debtors. The Debtors

have been willing and available to meet with the Retiree Committee throughout the negotiations

and, also have participated in multiple telephone calls and one-off meetings with counsel to the

Retiree Committee, sometimes on less than one day's notice.  Indeed, the Debtors have never

declined a meeting with the Retiree Committee or its advisors, and would be willing to meet with

the Retiree Committee in the future if there were an expectation a reasonable settlement could be

reached.  In addition, the Debtors, the UCC and the Bondholder Group all participated in several

months of mediation with the Retiree Committee.  Given these facts, the Debtors have clearly

met and surpassed their burden to meet with the Retiree Committee at all reasonable times.

(v)    *THE DEBTORS HAVE CONFERRED WITH THE RETIREE COMMITTEE IN
GOOD FAITH*

55.    Among the factors the Debtors must satisfy, the Debtors must evince "conduct

indicating an honest purpose to arrive at an agreement as the result of the bargaining process." In

re Bowen Enters., Inc., 196 B.R. at 744 (quoting In re Walway Co., 69 B.R. 967, 973 (Bankr.

E.D. Mich. 1987)).  It is sufficient to find good faith to negotiate that the debtor met with the committee many times, added new information when it became available and was generally willing and able to negotiate issues.  In re Matter of Sol-Sieff Produce Co., 82 BR at 794-95.

56.     As described in detail above, the Debtors have met with the Retiree Committee on several occasions and had discussions and exchanged information with the Retiree Committee since negotiation with the Retiree Committee began almost a year ago.  The Debtors attended each of these meetings ready and willing to enter into a settlement agreement.  Additionally, when it initially appeared that settlement negotiations were at a standstill, the Debtors sought the appointment of the Mediator rather than immediately seeking to terminate the Retiree Welfare Plans.  The Debtors continued to participate in mediation and negotiate with the Retiree Committee for more than a month after their agreed 60 day standstill in pursuing relief expired. Moreover, the Debtors have provided several bona fide settlement proposals to the Retiree Committee and each has been rejected by the Retiree Committee.

57.     Because the evidence demonstrates good faith on the Debtors' part, it is the Retiree Committee's burden to establish that the Debtors' did not negotiate in good faith.  See In re Carey Transportation, Inc., 50 B.R. 203, 211 (Bankr. S.D.N.Y. 1985) (noting in the context of section 1113 proceeding that "Once the debtor has shown that is has met with the Union representatives, it is incumbent on the Union to produce evidence that the debtor did not confer in good faith") (quoting In re Am. Provision Co., 44 B.R. 907, 910 (Bankr. D. Minn. 1984)).  No basis exists for such a showing.

     (vi)     *THE RETIREE COMMITTEE HAS FAILED TO ACCEPT THE PROPOSAL WITHOUT GOOD CAUSE*

58.     The Retiree Committee has no good cause to reject the Proposal.  By their terms, the Retiree Welfare Plans are terminable at will without any liability to the Debtors.  Unlike

thousands of other laid-off employees, suppliers and customers, the Retirees have continued to receive Benefits (amounting to approximately $43.7 million) and protection throughout these cases.  The Proposal would provide the Retirees with the cash equivalent of approximately five years of additional continued Benefits.  The continuation of Benefits to year end provides the Retirees sufficient time to make arrangement for alternative benefits as needed.  Similarly, the proposed cash payment would more than compensate the Retirees for any Benefits they could reasonably expected to receive during the pendency of these cases, to the extent the Retirees could even establish that Benefits should continue during these cases.

59.     The Debtors understand the importance of the Benefits to the Retirees and regret that it is not feasible to continue the Retiree Welfare Plans as in prior years.  However, given the law and facts of these cases, it is clear that the Proposal is fair and that the Retiree Committee has no good cause to reject it.  The burden is now on the Retiree Committee to establish good cause existed to reject the Proposal.  See id., 44 B.R. at 910 ("[O]nce the debtor has shown that the [retiree representative] has refused to accept its proposal, the [retiree representative] must produce evidence that it was not without good cause").

(vii)    *TERMINATION OF THE RETIREE WELFARE PLANS IS NECESSARY TO PERMIT THE DEBTORS' REORGANIZATION .*

60.     The termination of the Retiree Welfare Plans is necessary to permit the Debtors' reorganization, even though the Debtors will not emerge from these proceedings as an operating business.  Various courts, including bankruptcy courts in the district of Delaware, have permitted the termination of benefits under section 1114 by liquidating chapter 11 debtors.  See, e.g., In re Fruehauf Trailer Co., Final Order Authorizing Debtors to Modify Certain Retiree Benefits Pursuant to Section 1114 of the Bankruptcy Code, (Bankr. D. Del. May 29, 1997) (No. 96-1563) D.I. 859; In re LTV Steel Co., Inc., Order Authorizing Termination of Retiree Benefits for

Certain Retirees, Pursuant to Section 1114 of the Bankruptcy Code, (Bankr. N.D. Ohio Jan. 22,

2002) (No. 00-43866) D.I. 2289; In re Penn Traffic Co., Case No. 09-14078 (PJW), 2010 Bankr.

LEXIS 5387, *20 (Bankr. D. Del. Oct. 27, 2010) (citing section 1114 in a confirmation order to

show the debtors had resolved all outstanding claims relating to the termination of their

participation in and contributions to various retiree benefit funds).  As the court pointed out in In

re Ionosphere Clubs, Inc., it would create an anomalous result to suggest that a chapter 11 debtor

must continue to pay benefits on a priority basis after deciding to liquidate, when they could

terminate such plans under chapter 7.  In re Ionosphere Clubs, Inc., 134 B.R. 515, 523 (Bankr.

S.D.N.Y. 1991).  Rather, courts have interpreted the requirement to mean a debtor must show the

modification or termination is "necessary to accommodate confirmation of a Chapter 11 plan"

when applied in the context of a liquidating chapter 11 case.  Id. at 5226 (interpreting the

standard to mean that "without modification or termination of the benefits, the retirees will

receive a maximum recovery in Chapter 11 while the other unsecured creditors will receive their

maximum recovery in Chapter 7"); In re Family Snacks, 257 B.R. at 897 (interpreting similar

language in section 1113).

   61.  It is necessary for the Debtors to terminate the Retiree Welfare Plans in order to

begin the wind down of the Retiree Welfare Plans.  The Debtors currently have only eighteen

employees and will be down to five employees by the end of the year.  As described above,

maintaining the Retiree Welfare Plans is costly and time consuming.  Furthermore, the self-

insured nature of the Retiree Welfare Plans forces the Debtors  -- and their other creditors -- to

bear the risk of large medical claims and increased costs, to the extent such benefit arrangements

continue to be available to the Debtors at all.  For these reasons, continuing to pay the Benefits

under the Retiree Welfare Plans places a disproportionate risk and expense on the Debtors'

estates given the businesses' current wound down state, and impacts the Debtors' ability to

resolve the remaining claims and formulate a final chapter 11 plan, to the detriment of Nortel's

other creditors who likely would recover more in a chapter 7 liquidation if the Debtors were

forced to maintain the Retiree Welfare Plans in their chapter 11 cases.

62.     Termination of the Retiree Welfare Plans is also a necessary precursor to the

confirmation of the Debtor's chapter 11 plan.  First, given the size of the Retiree Committee's

asserted claims, the Debtors need finality in order to accurately establish plan reserves and

estimate potential creditor recoveries for disclosure in the plan approval process.  Similarly,

given the significant size of the claims asserted by the Retiree Committee, an accurate

assessment of the value of these claims and their potential effects on other creditors' recoveries

is also necessary for the Debtors to have better clarity regarding their assets and liabilities in

resolving the remaining disputes pending in these cases.  Therefore, the termination of the

Retiree Welfare Plans is "necessary to permit the reorganization of the Debtors."

(viii)    *THE PROPOSAL ASSURES THAT ALL PARTIES ARE TREATED FAIRLY AND EQUITABLY*

63.     Section 1114 authorizes modifications to retiree benefits that assure "that all

affected parties are treated fairly and equitably." 11 U.S.C. § 1114(f)(1)(A), (g)(3).  Thus, as

courts have noted in the context of section 1113 proceedings, section 1114's standard prevents a

debtor from saddling retirees with "a disproportionate share of the financial burden of avoiding

liquidation."  In re Nat'l Forge Co., 289 B.R. at 811 (quoting In re Bowen Enters., Inc., 196 B.R.

at 743); see Wheeling-Pittsburgh Steel Corp., 791 F.2d at 1091.  "The burden must be spread

fairly and equitably among all affected parties," rather than imposed exclusively on retirees.  In

re Nat'l Forge Co., 289 B.R. at 811 (quoting In re Bowen Enters., Inc., 196 B.R. at 743);

Wheeling-Pittsburgh Steel Corp., 791 F.2d at 1091.  Nonetheless, the "fairness and equity"

element of section 1114 does not require that all parties must be treated equally in all respects. See In re Bowen Enters., Inc., 196 B.R. at 743-44; In re Sol-Sieff Produce Co., 82 B.R. at 794 (modifications appropriate where each party had been asked to sacrifice as much as they could within reason).

64.     Here, the Retirees are being treated fairly and equitably as compared to other creditors in these cases because the Proposal provides a substantial payment to the Retirees even though the Debtors maintain that they have *no* post-termination liability regarding the Retiree Welfare Plans.  Visteon, 612 F.3d at 224.  In addition to the Benefits provided to the Retirees pursuant to the Proposal, the Retirees have continued to receive full benefits through the entire course of the Debtors' chapter 11 cases, which amounts to 44 months of continued Benefits. This treatment is indeed arguably superior to other unsecured creditors, such as active employees who have been laid off without receiving any such additional benefits and customers who no longer do business with the Debtors and generally do not have claims for that lost business. Additionally, unsecured creditors have received no payments from the Debtors on account of their claims for over three and a half years and it is uncertain as to when such creditors will receive any such distributions.  Therefore, since the Retirees are treated fairly and equitably under the terms of the Proposal, this requirement is satisfied.

(ix)    *THE BALANCE OF THE EQUITIES CLEARLY FAVORS TERMINATION OF THE RETIREE WELFARE PLANS AND THE APPROVAL OF THE PROPOSAL*

65.     In general, "bankruptcy courts have broad authority to act in a manner that will prevent injustice or unfairness in the administration of bankruptcy estates." In re Kaiser Aluminum Corp., 456 F.3d at 328, 340 (3d Cir. 2006) (citing to the balancing of the equities analysis done under section 1114(g)(3) as an example of the importance of equitable principles to bankruptcy courts).  As described above, the Retirees have no vested claim for benefits under

32

the terms of the Retiree Welfare Plans.  Prior to the Third Circuit's ruling in Visteon, the

majority of courts found section 1114 inapplicable to the termination of retiree benefits where

the governing plans unambiguously provided the debtor company the right to modify or

terminate benefits at any time.  See, e.g., Retired W. Union Employees Ass'n v. New Valley

Corp. (In re New Valley Corp.), 1993 WL 818245 (D.N.J.); In re Delphi Corp., No. 05-44481

(RDD), 2009 WL 637315 (Bankr. S.D.N.Y. Mar. 10, 2009); LTV Steel Co. v. Conners (In re

Chateaugay Corp.), 111 B.R. 399, 404-05 (Bankr. S.D.N.Y. 1990) (holding that debtor was not

obligated to make continued payments because section 1114 was aimed at preventing unilateral

cancellation of bargained-for benefits, not the operation of contract provisions mutually agreed

upon).  The Third Circuit's ruling in Visteon, while granting all Retirees the procedural

protections of section 1114, was not intended to expand the Retirees' right to pursue a claim for

future benefits where no such right otherwise exists under the relevant contract. Visteon, 612

F.31 at 224 ("[T]he sole source of durational obligations is the underlying contractual

agreements, and if the debtor has no obligations under those agreements, as is the case here,

§ 1129(a)(13) does not require continuation of benefit payments upon the debtor's emergence

from bankruptcy.").  Based on this language, the Debtors would be able to terminate the Retiree

Welfare Plans the day after emerging from bankruptcy with no liability whatsoever.

Consequently, the Retirees cannot reasonably assert a claim in excess of their best estimate of the

length of this case.  The Debtors' Proposal offers cash now rather than an unsecured claim to be

paid at the conclusion of these cases in an amount equal to almost four years of benefits.  Yet,

the Retiree Committee seeks even more.  Denying the approval of the Proposal under

section 1114 would unfairly allow the Retirees to recover far in excess of any potential claim, to

the detriment of the Debtors' other creditors and their restructuring process as a whole. Certainly, balancing the equities in this instance would preclude such a result.

## Notice

66.     Notice of the Motion has been given via overnight mail to (i) the U.S. Trustee; (ii) counsel to the Retiree Committee; (iii) counsel to the LTD Committee; (iv) the LTD Employees (v) counsel to the Bondholder Group; (vi) counsel to the UCC; and (vii) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

67.     Except as described therein, no prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached as Exhibit A hereto; (iii) authorize the Debtors to terminate, pursuant to section 1114, the Retiree Welfare Plans on the terms described in the Proposal; and (iv) grant such other and further relief as it deems just and proper.

Dated:   July 30, 2012
        Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

   - and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*