**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-----------------------------------------------------------X
              :
*In re*             :   Chapter 11
              :
Nortel Networks Inc., *et al.*,[1]    :   Case No. 09-10138 (KG)
              :
        Debtors.  :   Jointly Administered
              :
              :   **Hearing date: To be determined**
              :   **Objections due: To be determined**
-----------------------------------------------------------X


**DEBTORS' MOTION FOR ENTRY OF AN ORDER
PURSUANT TO 11 U.S.C. §§ 105, 363 AND 1108 AUTHORIZING THE
DEBTORS TO TERMINATE THE DEBTORS' LONG-TERM
DISABILITY PLANS AND THE EMPLOYMENT OF THE LTD EMPLOYEES**

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a), 363(b) and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), (i) authorizing the Debtors to terminate the LTD Plans (as defined herein) effective as of December 31, 2012 so as to cease providing employer-paid benefits, including for long-term disability income continuation benefits, to current and future participants as of that date, (ii) terminating the employment of the LTD Employees (as defined herein), and (iii) granting them such other and further relief as the Court deems just and proper. In support of this Motion, the Debtors rely

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

upon the declaration of John Ray, dated July 30, 2012, attached hereto as <u>Exhibit B</u> (the "<u>Ray Declaration</u>"), and respectfully represent as follows:

<u>**Preliminary Statement**</u>

1.      Since filing for chapter 11 protection over three and a half years ago, the Debtors have worked diligently to liquidate their assets, wind down operations and complete the transition services necessary to support the transfer of their business lines.  Now that the Debtors' operations have been reduced to only those most basic functions essential to the completion of the bankruptcy process, the Debtors have determined in an abundance of caution to move for relief under sections 105(a), 363(b) and 1108 of the Bankruptcy Code to terminate the employment of the LTD Employees and the LTD Plans before the end of the plan year on December 31, 2012.  Recognizing the importance of the benefits provided to their LTD Employees under the LTD Plans (as defined below), the Debtors have worked tirelessly since the appointment of the LTD Committee almost one year ago to reach a consensual agreement regarding the plan termination process.  To that end, the Debtors have provided significant information to the advisors to the LTD Committee, have exchanged multiple proposals and, in coordination with the Bondholder Group and UCC (each, defined below), have negotiated with the LTD Committee in good faith.  When it became clear those negotiations were not progressing, the Debtors sought the appointment of a neutral third-party Mediator (as defined below) by this Court in April.  Since that time, with the mediator's assistance, the Debtors have continued to engage in negotiations with the LTD Committee in an effort to push toward a mutually agreeable solution.  Indeed, despite the filing of this Motion, the Debtors remain open to reaching a settlement with the LTD Committee on reasonable terms.  However, at this advanced stage in their restructuring process, where the Debtors have been unable to reach agreement with the LTD Committee after a year and the end of a plan year is quickly

approaching, the Debtors simply cannot allow time to continue to slip by hoping for a settlement, all the while continuing to expend substantial amounts of money providing Benefits (as defined below) to the LTD Employees (as defined below).

2.      The Debtors therefore bring this Motion in an abundance of caution seeking Court approval to terminate the LTD Plans and the employment of the LTD Employees.  The Debtors have the clear right to terminate the Benefits under both the law and the terms of the LTD Plan documents themselves.  In addition, the LTD Employees are "at will" employees of the Debtors and may generally be terminated at any time without cause.  Accordingly, the Debtors submit this Motion for authorization to terminate the LTD Plans and the employment of the LTD Employees effective as of December 31, 2012.

## Jurisdiction

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105(a), 363(b) and 1108 of the Bankruptcy Code.

## Background

5.      On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc.,[2] filed voluntary petitions for relief under chapter 11 of title 11 of the Bankruptcy Code, which cases are consolidated for procedural purposes only.  The Debtors continue to operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[2]      Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

6.     The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors (the "UCC") in respect of the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized (the "Bondholder Group").

7.     On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[3] commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by the Canadian Court.  Also on the Petition Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[4] into administration (the "English Proceedings") under the control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators").  Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency and dissolution proceedings around the world.

---

[3]     The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[4]     The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

8.     Since the Petition Date, Nortel has sold its business units and other assets to various purchasers.  For further information regarding these chapter 11 cases, reference may be made to the Monthly Operating Reports filed by the Debtors and http://dm.epiq11.com/nortel.

**Relief Requested**

9.     By this Motion, the Debtors seek an order, pursuant to sections 105(a), 363(b) and 1108 of the Bankruptcy Code, (i) authorizing the Debtors to terminate the LTD Plans effective as of December 31, 2012 so as to cease providing employer-paid benefits, including for long-term disability income continuation benefits, for current and future participants as of that date, (ii) terminating the employment of the LTD Employees, and (iii) granting them such other and further relief as the Court deems just and proper.  Although the terms of the LTD Plans authorize the Debtors to take such actions, the Debtors seek relief from this Court in an abundance of caution.

**Facts Relevant to this Motion**

A.    **THE LTD PLANS**

10.    The Debtors historically have provided a number of benefits to their long-term disabled employees (the "LTD Employees") through benefit plans and other programs, including (as amended or modified from time to time) the Nortel Networks Inc. Long-Term Disability Plan, the Nortel Networks Inc. Medical Plan, the Nortel Networks Inc. Dental, Vision, and Hearing Care Plan, the Nortel Networks Inc. Life Insurance Plan, the Nortel Networks Inc. AD&D Insurance Plan, the Nortel Networks Inc. Health Care Reimbursement Account Plan, the Nortel Networks Inc. Dependent Day Care Reimbursement Account Plan, the Nortel Networks Inc. Long-Term Investment Plan,[5] predecessor plans and other formal or informal benefit plans,

---

[5]     The Nortel Networks Inc. Long-Term Investment Plan was terminated effective as of June 30, 2012, for all of the Debtors' employees.  The Nortel Networks Inc. Health Care Reimbursement Account Plan and the Nortel

agreements, arrangements or programs (including plans, agreements, arrangements or programs

that are funded through the purchase of insurance) or arrangements for disabled employees, their

surviving spouses and eligible dependents, including for medical, surgical, or hospital care

benefits, income continuation benefits or any other benefits in the event of sickness, accident,

disability, or death (collectively, and in each case as such plans have been amended or modified

from time to time, the "LTD Plans").[6]  These plans are offered to current employees of the

Debtors, and the LTD Employees are treated as current employees as a condition to their

continued eligibility to receive benefits under the LTD Plans.  During the course of these chapter

11 cases, the Debtors have continued to provide certain benefits under the LTD Plans (the

"Benefits"), including as authorized by this Court's January 15, 2009 *Order Authorizing, But Not*

*Directing, Debtors to Pay Certain Prepetition (I) Wages, Salaries and Other Compensation,*

*(II) Reimbursable Expenses, and (III) Medical, Retirement and Similar Benefits* [D.I. 59].  While

the Debtors rely on third party vendors to administer the LTD Plans, the plans are generally self-

funded by the Debtors, such that the Debtors bear the economic risk of claims filed by the LTD

Employees.

11.     There are currently 215 LTD Employees receiving Benefits under the LTD Plans.

As an administrative matter, and consistent with the terms of the LTD Plans, the Debtors list

employees on long-term disability under the LTD Plan as "current" employees even though the

---

Networks Inc. Dependent Day Care Reimbursement Account Plan were previously terminated for all of the Debtors' employees, effective as of December 31, 2010.

[6]     For  retired employees of the Debtors (the "Retirees"), the Debtors maintain various benefit plans and other programs including (as amended or modified from time to time) the Nortel Networks Inc. Retiree Medical Plan, the Nortel Networks Inc. Retiree Life Insurance and Long-Term Care Plan, predecessor plans and other formal or informal benefit plans, agreements, arrangements or programs (including plans, agreements, arrangements or programs that are funded through the purchase of insurance) or arrangements for current or future retired employees, their surviving spouses and eligible dependents, including plans, arrangements, agreements or programs for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death (collectively and in each case as amended or modified from time to time, the "Retiree Welfare Plans").

employees are not presently actively working full-time or part-time at the Debtors.  Although

there are currently 142 LTD Employees who are eligible to elect to retire and thus receive

benefits under the Retiree Plans, those employees have not yet made such an election, which

would entitle them to benefits under the Retiree Welfare Plans but cause them to lose their

Benefits.

12.    The Benefits currently enjoyed by the LTD Employees, such as income

continuation, as well as the specific medical benefits provided under the LTD Plans, are not

available to Retirees.  In order for an individual to have been eligible to receive short-term and

long-term disability benefits (and thus be eligible to receive Benefits under the LTD Plans), he or

she would have to have been a "regular Employee working 20 or more hours per week" at the

time of the disability.  See, e.g., 2006 Nortel Networks Inc. Short-Term Disability and Long-

Term Disability Plan Summary Plan Description, at 8, attached to the Ray Declaration as Exhibit

1.  The LTD Plans further provide that the Benefits end when a person's employment is

terminated or the part of the plan providing the coverage ends.  See, e.g., 2010 Nortel Networks

Inc. Long-Term Disability Plan Summary Plan Description, at 12, attached to the Ray

Declaration as Exhibit 2.  Therefore, given the LTD Employees' status generally as "at will"

employees, the Debtors could terminate the employment of the LTD Employees at any time and

such termination would result in the termination of the LTD Employees' Benefits provided under

the LTD Plans.  However, upon termination of such employment, those LTD Employees eligible

to receive Retiree benefits could elect to become "Retirees" for purposes of the Retiree Welfare

Plans, to the extent those Retiree Welfare Plans have not been previously terminated.[7]

---

[7]    Contemporaneous with the filing of this Motion the Debtors have filed the *Debtors' Motion for Entry of an Order Terminating Retiree Benefits and Approving a Settlement Proposal Pursuant to 11 U.S.C.§ 1114*, to approve a settlement proposal (the "Proposal") with the Retirees and to seek the termination of the Retiree Welfare Plans. Under the terms of the Proposal the Debtors propose, among other things, to give LTD Employees who are eligible

13.     The Debtors previously sought to terminate the Retiree Welfare Plans and LTD

Plans by a motion filed in June 2010 (the "Plan Termination Motion").[8]  In connection with that

proposed termination of the Retiree Welfare Plans and the LTD Plans, the Debtors had

negotiated with a health insurance provider to provide the Retirees and LTD Employees with

replacement medical coverage options not readily available on the open market.  Shortly

thereafter, the Nortel US Retirement Protection Committee, an ad hoc steering committee of

retired executives of the Debtors (the "Ad Hoc Retiree Committee"), filed a motion seeking

authorization to form a voluntary employee benefit association as an alternative option for

providing health insurance (the "VEBA Motion").[9]  Based on discussions with counsel to the Ad

Hoc Retiree Committee, their rejection of the alternative insurance and the Third Circuit's ruling

in IUE-CWA  v. Visteon Corp. (In re Visteon Corp.), 612 F.3d 210 (3d. Cir. 2010), the Debtors

ultimately withdrew the Plan Termination Motion without prejudice in July 2010 [D.I. 3651].

Thereafter, in October 2010, the Nortel US Retirement Protection Committee withdrew the

VEBA Motion without prejudice [D.I. 4104].

14.     While the Debtors historically have provided various welfare benefits to their

LTD Employees, they have not committed themselves under the LTD Plans to provide such

benefits indefinitely.  On the contrary, the governing LTD Plans specifically reserve the Debtors'

right to amend or terminate the LTD Plans, including in circumstances such as the Debtors now

face.  For example, the 1989 Nortel Networks Inc. Group Benefits Plan provides:

---

to receive Retiree benefits the opportunity to make an election to participate in the Retiree Welfare Plans for which
they are eligible, and thus the Proposal, within thirty (30) days after the date on which an order approving the
Proposal becomes final and non-appealable (the "Effective Date").  Any such election made from the Effective Date
through December 31, 2012, shall be effective as of December 31, 2012.

[8]     See Debtors' Motion for Entry of an Order Authorizing Debtors to Terminate Certain Retiree and Long-
Term Disability Plans, dated June 21, 2010 [D.I. 3204].

[9]     See Motion for an Order Authorizing Formation of a Voluntary Employee Benefit Association to Provide
Tax Credit-Eligible Retiree Benefits, dated July 16, 2010 [D.I. 3671].

> While the employer intends to maintain this group benefits plan indefinitely, the employer has no obligation whatsoever to maintain the plan or to provide any benefits pursuant to the plan (including, but not limited to, medical expense benefits for retired employees) for any given length of time, and ***reserves the right to amend the plan at any time or from time to time or to terminate the plan***.  1989 Nortel Networks Inc. Group Benefits Plan at 67 (emphasis added), attached to the Ray Declaration as <u>Exhibit 3</u>.

By further example, the 2004 Nortel Networks Inc. Medical Plan provides:

> Although the benefits currently available (in the 2004 Plan Year) are described in this summary for the Company's Medical Plan, ***the Company reserves the right to change or end the plan described in this summary at any time***. Any plan changes will result from actions taken and approved by the Company. **The Company may adopt such changes or terminate the plan at any time and for any reason**.  The Company's practices, policies, and benefits are outlined here for your information as required by law. However, this does not constitute an implied or expressed contract or guarantee of employment.  2004 Nortel Networks Inc. Medical Plan Summary Plan Description at 92 (emphasis added), attached to the Ray Declaration as <u>Exhibit 4</u>.

While the precise language contained in the LTD Plan documents varies slightly across the years, the right to amend or terminate always existed.

## B.    THE WIND DOWN OF THE DEBTORS' ESTATES

15.     In the several months following the Debtors' decision to postpone seeking termination of their LTD Plans, the Debtors worked diligently to wind down their remaining operations, including completion of the transition services provided to the buyers of the various businesses.  The Debtors also undertook the sale of their patent portfolio which closed in July 2011, and have sought to advance the resolution of the other remaining material claims in their cases through the filing of various motions.  During this time, the Debtors also sought to identify other possible alternative insurance arrangements for the LTD Employees.

16.     The Debtors currently employ only eighteen active employees, other than the LTD Employees, and that number is expected to drop to approximately five employees by year-

end.  As a result of the divestitures and wind down, it has become increasingly difficult to maintain and administer the LTD Plans and, once the Debtors dissolve as corporations, there will be no company even in name to continue the Benefits.  Moreover, while the LTD Plans are administered by third-party vendors, the Debtors maintain the plans as self-insured plans and, as such, the Debtors bear the economic risk of the plans and the claims filed thereunder.

17.    Over the last two years since July 2010, when the prior Plan Termination Motion was withdrawn, the Debtors have continued to provide benefits under the LTD Plans, at an approximate cost of $21.1 million to their estates.  The current cost to the Debtors of providing the Benefits under the LTD Plans is approximately $800,000 to $1,000,000 per month, although the costs could go up as the current population ages, if premiums were increased, if health care costs rise and/or if a greater number of claims were filed.

18.    The Debtors also seek to terminate their LTD Plans at this time in order to be able to plan for the administrative process involved in winding down the LTD Plans.  The Debtors will need to allow for time to notify the LTD Employees of the discontinuation of the LTD Plans, to work with the various vendors to terminate the LTD Plans and resolve any remaining liabilities thereunder, and to process and pay for the remaining claims submitted under the LTD Plans that were incurred but not reported prior to the termination of the LTD Plans.  Moreover, it is important to the Debtors to be able to terminate the LTD Plans by year end to avoid the additional costs and risks associated with renewal of the LTD Plans for an additional year.

C.    **NEGOTIATIONS WITH THE LTD COMMITTEE**

19.    On June 3, 2011, several LTD Employees filed the *Motion for Entry of an Order Pursuant to Section 1102(a)(2) of the Bankruptcy Code Appointing an Official Committee of Long-Term Disability Plan Participants* [D.I. 5595] (the "LTD Committee Motion").  Although the Debtors believed then, as they do now, that the LTD Plans were terminable at will and that,

10

as current employees, the LTD Employees are not conferred with the protections afforded to

retired employees under Bankruptcy Code section 1114, the Debtors did not oppose the LTD

Committee Motion other than to seek to clarify the scope of the LTD Committee's appointment

so that the Debtors could engage in discussions with the LTD Employees in the hope of reaching

a consensual agreement regarding the modification or termination of their Benefits.

20.    Thereafter, the Court issued an order directing the U.S. Trustee to appoint a

committee of long-term disability participants for the sole purpose of serving as the authorized

representative of the LTD Employees in connection with negotiations regarding the modification

or termination of the LTD Plans, and for no other purpose (the "LTD Committee") [D.I. 5790].

On August 2, 2011, the U.S. Trustee appointed the members of the LTD Committee [D.I. 6073],

as amended on August 4, 2011 [D.I. 6080].

21.    Since the appointment of the LTD Committee last year, the Debtors have devoted

significant resources and attention to negotiating in good faith with the LTD Committee to seek

the termination of the LTD Plans and a settlement that would provide a fair and equitable

resolution of any potential claims or rights held by the LTD Employees.

22.    The Debtors also have acted diligently to provide the LTD Committee with all of

the information necessary to evaluate the Debtors' settlement proposals.  On September 12,

2011, the LTD Committee sent the Debtors initial broad requests for documents and information

(the "Requests").[10]  The Debtors began providing the requested documents and information to

the LTD Committee on September 16, 2011.  The Debtors regularly have sent additional

documents and information to the LTD Committee over the last year.  To date, the Debtors have

provided the LTD Committee with various LTD Plan documents and other information regarding

---

[10]    Since receiving the Requests, the Debtors have received numerous additional requests from the LTD
Committee, including requests received on November 9, 2011 and December 7, 2011.

the Debtors' employees and their estates, assets and claims, including by compiling various

benefit-related information in response to the Requests.  In addition, the Debtors' professionals

and the LTD Committees' advisors have spent numerous hours on conference calls since the

appointment of the LTD Committee discussing and clarifying the data that the Debtors have

produced to the LTD Committee.[11]

23.      Although the purpose for the formation of the LTD Committee was to facilitate

the negotiation of settlements with the Debtors regarding the modification or termination of the

LTD Plans, for the first six months after the appointment of the LTD Committee, only two

substantive meetings took place between the Debtors and the LTD Committee, on October 6,

2011 and February 27, 2012.  Both meetings were at the request and insistence of the Debtors.

24.      At the October 6, 2011 meeting, the Debtors provided the LTD Committee with

substantial financial information regarding the LTD Plans.  Representatives of a potential

alternative insurer also attended the meeting and were prepared to make a presentation on the

insurance program they could offer, but the LTD Committee declined to meet with the insurer

despite being informed that further delays would increase the cost of the replacement insurance

because the insurance company would be unable to honor rates indefinitely.

25.      On January 19, 2012, the Debtors provided a term sheet containing a settlement

proposal to the LTD Committee and shortly thereafter sought to meet with the LTD Committee

on January 31, 2012 regarding the Debtors' proposal.  The meeting with the LTD Committee,

attended by members of the LTD Committee and the Retiree Committee, their legal and financial

advisors, the Debtors' professionals and advisors of the UCC and Bondholder Group, ultimately

occurred on February 27, 2012.  At the February 27, 2012 meeting, counsel to the LTD

---

[11]      Calls between the Debtors' professionals and the LTD Committee's professionals occurred on November 15, 2011, December 12, 2011, January 19, 2012, and March 12, 2012.

Committee stated that they were still unprepared to engage in substantive negotiations regarding the Debtors' proposals.

26.     Frustrated by the slow progress of the negotiations and concerned that alternative benefit options could become more costly or unavailable over time, on March 28, 2012, the Debtors filed a motion (the "Mediation Motion"), seeking to have a mediator appointed to facilitate settlement discussions between the Debtors and the LTD Committee.[12]  On April 18, 2012, the Court entered an order granting the Mediation Motion and appointed Richard Levin, Esq., of Cravath, Swaine & Moore LLP, as mediator (the "Mediator").[13]  In connection with the appointment of the Mediator, the Debtors agreed to a further 60-day standstill during which they would not take any action to modify or terminate the Retiree Welfare Plans.  That standstill expired on June 18, 2012.

27.     Despite the best efforts of the Mediator, the Debtors and the LTD Committee still have been unable to reach an agreement on a consensual termination of the LTD Plans.  The Debtors received the first written response to the Debtors' January 19, 2012 settlement proposal on May 9, 2012.  Later, on June 4, 2012, the Debtors made a further settlement proposal in an attempt to continue to move the negotiations forward.  The LTD Committee did not attend a mediation session scheduled for June 14, 2012 that went forward with the Retiree Committee, but the Debtors ultimately met with the LTD Committee on June 27, 2012 regarding the Debtors' June 4th proposal.  Despite engaging in rigorous discussions with the Mediator and the LTD Committee at that meeting, the parties still were unable to reach a consensus.  A further

---

[12]     See *Motion for Entry of an Order (I) Appointing a Neutral Mediator Concerning the Modification or Termination of the Nortel Retiree Welfare Plans and the Nortel Long-Term Disability Plans; (II) Authorizing the Debtors to Pay the Costs of Engagement; and (III) Granting Related Relief* [D.I. 7463].

[13]     See *Order (I) Appointing a Neutral Mediator Concerning the Modification or Termination of the Nortel Retiree Welfare Plans and the Nortel Long-Term Disability Plans; (II) Authorizing the Debtors to Pay the Costs of Engagement; and (III) Granting Related Relief* [D.I. 7560].

negotiation was scheduled for July 19, 2012, as a final effort to reach settlement and with the intention that the parties actively engage in discussions before that date.  Again, no agreement could be reached at that meeting.

28.     At this time, almost a year to the day from the formation of the LTD Committee, over 100 days after the appointment of the Mediator and after several attempts, in conjunction with the Bondholder Group and the UCC, to negotiate a consensual settlement with the LTD Committee, the Debtors have concluded that it is necessary to seek formal termination of the LTD Plans, in order to ensure the plans will be terminated by December 31, 2012.  While the Debtors would remain open to a settlement on reasonable terms, the Debtors have been unable to reach such an agreement despite devoting substantial time and resources in an effort to do so, and the Debtors now need certainty as to the future of the LTD Plans.

### Basis for Relief

29.     While the Debtors recognize the importance of the Benefits provided under the LTD Plans to their LTD Employees, the Debtors have determined that it is necessary to terminate the LTD Plans at this stage in the restructuring.  Given that the LTD Employees are current employees of the Debtors, the Debtors also seek to terminate their employment in connection with the termination of the LTD Plans as of December 31, 2012.

### A.     THE LTD PLANS ARE TERMINABLE AT WILL

30.     The LTD Plans are terminable at will by the Debtors because the Benefits are not vested benefits.  The law is clear that benefits provided under welfare benefit plans (including all the Benefits at issue) do not vest pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. ("ERISA"), except as expressly provided under the terms of the LTD Plans.  Here, the Debtors have provided the Benefits to the LTD Employees subject to the Debtors' ***express right to unilaterally amend or terminate*** the various LTD Plans.  As described

14

above, the Debtors specifically reserve in the various LTD Plan Documents the Debtors'

unilateral right to amend or terminate the various LTD Plans at any time and for any reason.

Because the Benefits have not vested pursuant to ERISA, the LTD Committee has the burden of

proving by a preponderance of the evidence that the terms of the LTD Plans provide the

Beneficiaries with vested benefits.  They cannot do so.

    (i)  *WELFARE BENEFITS DO NOT VEST AS A MATTER OF LAW UNDER ERISA*

    31.  The Benefits have not vested pursuant to ERISA because the LTD Plans are

"welfare benefit plans," and such plans, unlike pension plans, are not subject to the vesting

provisions of ERISA.

    32.  The Supreme Court has made clear that an employer is not required under ERISA

to provide employee welfare benefits at all.  See, e.g., Curtiss-Wright Corp. v. Schoonejongen,

514 U.S. 73, 78 (1995) ("[W]e are mindful that ERISA does not create any substantive

entitlement to employer-provided health benefits or any other kind of welfare benefits.").

Accordingly, when a company does choose to provide welfare benefits to its employees, the law

does not create a vested entitlement to the continuation of such benefits.  The Third Circuit has

specifically addressed this issue and is clear on this point.  For example, in In re Lucent Death

Benefits ERISA Litig., 541 F.3d 250, 253 (3d Cir. 2008), plaintiffs, who were former employees

of the defendants, argued that the defendants could not terminate a pensioner death benefit that

had been provided to the plaintiffs.  The Third Circuit held that because the death benefit was a

welfare benefit and not a pension benefit, the benefit had not vested pursuant to ERISA,

explaining that:

> ERISA provides elaborate requirements for the vesting of pension
> benefits, but it does not provide automatic vesting of welfare
> benefits.  An accrued pension benefit is protected by ERISA's anti-
> cutback provision without any showing that it has vested.  In
> contrast, a welfare benefit is protected from elimination only if the

plaintiff proves by a ***preponderance of the evidence*** that the plan provider had intended the welfare benefit to have vested (despite not being obligated to do so by ERISA).  *Id*. at 253-54 (emphasis added) (citations omitted).

33.    Because benefits provided under welfare benefit plans do not vest under ERISA, they are terminable at will unless the plans specifically provide otherwise.  As the Third Circuit explained, "an employer's commitment to vest such benefits is not to be inferred lightly and must be stated in clear and express language. . . [in the documents that provide] the employee welfare benefits."  Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Skinner Engine Co., 188 F.3d 130, 139 (3d Cir. 1999)(internal citations omitted).  See also, DiFelice v. Aetna U.S. Healthcare, 346 F.3d 422, 455 (3d Cir. 2003) (Becker, A., concurring) (noting that welfare benefit plans are "exempt from the substantive vesting and funding requirements" of ERISA and that "[i]ndeed, courts have held that the absence of a vesting provision allows employers to amend their plans virtually at will, even in discriminatory fashion"); Skinner, 188 F.3d at 138 (employers are "'generally free . . . for any reason at any time, to adopt, modify or terminate welfare plans' . . . [unless they agree] to relinquish their right to unilaterally terminate those benefits and provide for lifetime vesting'" (quoting Curtiss-Wright, 514 U.S. at 78); In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig., 58 F.3d 896, 901 (3d Cir. 1995) ("In rejecting the automatic vesting of welfare plans, Congress evidenced its recognition of  the need for flexibility with regard to an employer's right to change medical plans").

34.    It is uncontroverted that the LTD Plans are welfare benefit plans and not pension plans, and therefore, the Benefits did not vest as a matter of law.  Thus, in order for the LTD Committee to prevail on their argument that the Benefits have vested, the LTD Committee must

meet their burden of proving by a preponderance of the evidence that the Debtors intended the

Benefits to have vested.  As explained below, the LTD Committee cannot meet this burden.

       (ii)     *THE LTD PLANS PERMIT THE LTD PLANS TO BE TERMINATED*

35.     The Benefits have not vested pursuant to the terms of the LTD Plans because the

LTD Plan documents do not contain any provisions stating, or even suggesting, that any Benefits

provided to the LTD Employees are vested or were intended to vest.  Instead, each LTD Plan

document expressly provides that the Debtors have the unilateral right to modify or terminate the

LTD Plans at any time in the Debtors' sole discretion, using language similar to the below:

> Although the benefits currently available (in the 2004 Plan Year)
> are described in this summary for the Company's Medical Plan,
> **the Company reserves the right to change or end the plan
> described in this summary at any time**. Any plan changes will
> result from actions taken and approved by the Company. ***The
> Company may adopt such changes or terminate the plan at any
> time and for any reason***. The Company's practices, policies, and
> benefits are outlined here for your information as required by law.
> However, this does not constitute an implied or expressed contract
> or guarantee of employment.  2004 Nortel Networks Inc. Medical
> Plan Summary Plan Description at 92 (emphasis added).

36.     Because a company's intent to provide vested benefits must be express, it is not

enough to show that a company historically provided such benefits, or that it hoped to continue

to do so in the future.  Indeed, courts have specifically held that when a company reserves the

right to change or terminate benefits, even those benefits promised for "life" are not vested.

Unisys, 58 F.3d at 904 (explaining that a plan containing language both describing welfare

benefits as being provided for "life" and a reservation of rights is not ambiguous or inconsistent

because, "[a]n employer who promises lifetime medical benefits, while at the same time

reserving the right to amend the plan under which those benefits were provided, has informed

plan participants of the time period during which they will be eligible to receive benefits

*provided* the plan continues to exist."); Vallone v. CNA Fin. Corp., 375 F.3d 623, 634 (7th Cir.

2004) (holding that a health care allowance benefit provided to encourage early retirement and described as a "lifetime" benefit was not vested because a reservation of rights clause in the plan documents allowed amendment or modification even after retirement).  The court notes that, "[t]he language at issue here prevented CNA from amending its retirement plan to require retirees to pay back HCA allowances already paid out, or retroactively terminating coverage for a claim to medical benefits to avoid paying such a claim.  The reservation of rights clauses, on the other hand, allow CNA to *prospectively* alter or amend its welfare benefits offered to retirees, even after retirement, and that is what it did."  Id. at 638.

37.     Additionally, the LTD Committee has suggested that the Benefits may have vested because documents were provided to certain LTD Employees that were not clearly limited by an explicit right to modify or terminate.  Whether or not such documents exist is of no significance because such documents cannot modify the LTD Plans.  The Third Circuit has repeatedly held that ERISA precludes an employer from making "oral or informal amendments" to employee benefits plans and that the only way to effect a modification of such a plan is through a valid amendment executed "according to formal procedures."  See Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1163 (3d Cir. 1990); Confer v. Custom Eng'g Co., 952 F.2d  41, 43 (3d Cir. 1991); Depenbrock v. CIGNA Corp., 389 F.3d at 78, 81 (3d Cir. 2004).  Therefore, regardless of whether any such documents exist, they would not modify the express terms of the LTD Plan documents in which the Debtors clearly reserved their right to modify or terminate the LTD Plans.

38.     Therefore, since the LTD Plans do not provide that the Benefits are vested, and the LTD Committee has failed to produce ***any*** evidence, much less a preponderance of evidence, that the Benefits have vested, the Benefits are not vested and thus they are terminable at will.

B.    **SECTION 1114 OF THE BANKRUPTCY CODE IS INAPPLICABLE TO THE LTD PLANS BECAUSE THE LTD EMPLOYEES ARE NOT RETIREES**

39.    Over the last year, the Debtors have exchanged information and engaged in settlement discussions with the LTD Committee in parallel to their negotiations with the Retire Committee appointed under section 1114 of the Bankruptcy Code to represent the interests of the Retirees.  Those discussions have not resulted in an agreement, and the Debtors now seek Court authorization for the termination of the LTD Plans.  While the Debtors seek this relief in an abundance of caution, the Debtors are not required to prove compliance with the separate and additional requirements imposed by section 1114 because, simply put, the LTD Employees are current employees of the Debtors, not Retirees.  Section 1114 by its terms only applies to "retiree benefits," which is defined to mean "payments to any entity or person for the purpose of providing or reimbursement payments **for retired employees and their spouses and dependents**. . ."  11 U.S.C. § 1114(a) (emphasis added).

40.    The Debtors maintain employees on long-term disability under the LTD Plans as "current" employees under the terms of the relevant plans, including for the purpose of eligibility of employee benefits.  The Benefits currently enjoyed by the LTD Employees, such as income continuation, as well as the specific medical benefits provided under the LTD Plans, are not available to the Debtors' Retirees.  Indeed, the Retiree Welfare Plans are entirely separate and distinguishable from the LTD Plans in their terms and administration.  In fact, numerous LTD Employees who are retirement-eligible have opted to not retire and receive benefits under the Retiree Welfare Plans, but instead to remain current employees of the Debtors in order to receive the additional benefits, such as income continuation payments, available only to LTD Employees.

41.     In order for an individual to have been eligible to receive short-term and long-term disability benefits (and thus be eligible to receive Benefits under the LTD Plans), he or she would have to have been a "regular Employee working 20 or more hours per week" at the time of the disability.  See 2006 Nortel Networks Inc. Short-Term Disability and Long-Term Disability Plan Summary Plan Description, at 8.  Many of the LTD Plans further provide that the income continuation benefits end when a person's employment is terminated or the part of the plan providing the coverage ends.  See, e.g., 2010 Nortel Networks Inc. Long-Term Disability Plan Summary Plan Description at 12.  Therefore, the provision of Benefits under the LTD Plans is directly tied to continued status as a "current" employee of the Debtors.  Moreover, consistent with their classification as current employees, employees receiving disability benefits may actively return to work if their conditions improve and positions remain open.  LTD Employees also are asked to provide information supporting their disabled status on an ongoing basis to continue receiving income continuation benefits, as in some cases an individual's eligibility for LTD Benefits changes over time.  See, e.g., 2004 Nortel Networks Inc. Short-Term Disability and Long-Term Disability Plan Summary Plan Description at 21, attached to Ray Declaration as Exhibit 5.

42.     Accordingly, section 1114 is not applicable to the termination of the LTD Plans, because the LTD Employees are not "retired employees."[14]

---

[14]     Although the Debtors were not required to comply with section 1114, the Debtors have negotiated with and provided information to the LTD Committee to the same extent that the Debtors have done so with the Retiree Committee.  Therefore, the Debtors believe that they have met all requirements to modify the LTD Plans under section 1114 even if it were applicable, but it is not, and the Debtors expressly reserve all rights to submit supplemental evidence as to this matter.

C.    **AS AT WILL EMPLOYEES OF THE DEBTORS, THE LTD EMPLOYEES MAY BE TERMINATED.**

43.    The LTD Employees are "at will" employees of the Debtors and thus their employment may be terminated at any time and for any reason without incurring liability to the Debtors.  Indeed, to the best of the Debtors' information and belief, upon commencing employment with the Debtors, each LTD Employee signed an agreement substantially similar to those attached as <u>Exhibits 6, 7 and 8</u> to the Ray Declaration, specifically acknowledging his or her status as an "at will" employee.  For example, the 2008 Nortel Employment Agreement signed by new employees required that each employee certify that: "[m]y employment with the Employer is one of employment at will and my continued employment is not for a definite period of time but instead may be terminated at any time and for any reason by the Employer or me."  <u>See</u> 2008 Nortel Employment Agreement ¶ 9.  To the best of their knowledge, the Debtors are unaware of any employment agreements between the Debtors and an LTD Employee defining the terms of his or her employment as anything other than an at will arrangement.

44.    It is a matter of well-established law that "at will" employment may be generally terminated at any time by either the employer or the employee for either cause or no cause at all. An individual's employment is generally governed by the state law of the state in which the employee provides services.  Restatement (Second) of Conflict of Laws § 196 (2012).  All of the states in which the Debtors maintained their primary operations have adopted the doctrine of at-will employment.  <u>See</u>, <u>e.g.</u>, Cal. Lab. Code § 2922 (West 2011) ("An employment, having no specified term, may be terminated at the will of either party on notice to the other."); <u>Wal-Mart Stores, Inc. v. Canchola</u>, 121 S.W.3d 735, 740 (Tex. 2003) (holding that employer could terminate disabled employee who was also an "at will" employee stating "[a]s long as its reason for terminating [employee] was not illegal, Wal-Mart could have fired [employee] . . . for no

21

reason at all"); <u>Linafelt v. Bev, Inc.</u>, 662 So. 2d 986, 989 (Fla. Dist. Ct. App 1995) ("An

employee may be terminated at will, without a showing of cause, where the employment contract

between the parties is indefinite as to the period of employment"); <u>Folmsbee v. Tech Tool</u>

<u>Grinding & Supply, Inc.</u>, 630 N.E.2d 586, 590 (Mass. 1994) ("The general rule is that an

employment-at-will contract can be terminated at any time for any reason or for no reason at

all."); <u>Roberts v. Wake Forest Univ.</u>, 286 S.E.2d 120, 123 (N.C. Ct. App. 1982) ("It is a settled

rule of law in North Carolina and other jurisdictions that employment for an indefinite term is

regarded as an employment at will which may be terminated at any time by either party."). An at

will employee may be terminated without liability to his or her employer for such termination.

<u>See</u>, <u>e.g.</u>, <u>Folmsbee</u>, 630 N.E.2d at 590-91 (holding employer was not liable for terminating

employment of "at will" employee).

45.     The Debtors are permitted by applicable law to terminate the employment of the

LTD Employees at any time and the Debtors must do so at this time. As this Court is well

aware, at this stage in their restructuring, the Debtors have liquidated their operations and have

already terminated virtually all of their non-LTD active employees. As the below chart

indicates, the number of non-LTD active employees of the Debtors has sharply declined, while

the number of LTD Employees has remained substantially the same.


[*Remainder of the page left intentionally blank*.]



The few remaining active employees are essential to completing the remainder of the Debtors' wind down operations, including liquidation of remaining claims and completion of the Debtors' bankruptcy cases.  With all of the Debtors' businesses divested, their other employees laid off and the Debtors' relationships with their suppliers and customers long ago terminated, the Debtors can no longer justify continuing their operations solely to employ and provide Benefits to the LTD Employees.  Therefore, the Debtors should be permitted to terminate the LTD Employees not only because the LTD Employees are at will employees, but also because such terminations are necessary.

**D.    TERMINATING THE LTD PLANS AND THE LTD EMPLOYEES' EMPLOYMENT SATISFIES THE BUSINESS JUDGMENT TEST**

46.    Section 1108 of the Bankruptcy Code authorizes the Debtors to operate their businesses.  11 U.S.C. § 1108.  Section 363(b)(1) of the Bankruptcy Code further permits a

23

debtor-in-possession to use property of the estate "other than in the ordinary course of business"

after notice and a hearing.  11 U.S.C. § 363(b)(1).  Although the Debtors believe that the exercise

of their right to terminate the LTD Plans and the employment of the LTD Employees is in the

ordinary course of their business, to the extent that such terminations are determined to be

outside the ordinary course of business such that Court approval is required, then the Court

should grant the requested relief under Section 363 of the Bankruptcy Code because the Debtors

have demonstrated a sound business justification for the proposed transaction.  See Dai-Ichi

Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward), 242 B.R.

147, 155 (D. Del. 1999).

47.    Relief is proper under section 363(b)(1) where the Debtors show a legitimate

business justification for the proposed action.  See Comm. of Equity Sec. Holders v. Lionel

Corp. (In re Lionel Corp.), 722 F.2d 1063 (2d Cir. 1983); In re Del. & Hudson Ry. Co., 124 B.R.

169, 175-76 (D. Del. 1991) (noting that the Third Circuit has adopted the "sound business

purpose" test for section 363(b)(1)).  If a valid business justification exists, the law vests a

debtor's decision to use property out of the ordinary course of business with a strong

presumption "that in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company."  Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.

(In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom,

488 A.2d 858, 872 (Del. 1985)).

48.    After careful deliberation, the Debtors have determined, in the exercise of their

reasonable business judgment, that at this time they must eliminate their current and future costs

associated with non-essential wind-down personnel, including providing Benefits under the LTD

Plans in order to preserve and maximize the value of the Debtors' estates.  Absent termination of

the LTD Plans, the Debtors project they would spend approximately $800,000 to $1,000,000 per

month providing Benefits under the LTD Plans, not including the additional costs of maintaining

employees and data systems necessary to continue the administration of the LTD Plans.  As

discussed above, it is not at all certain that the Debtors will be able to find third-parties willing to

administer the LTD Plans and, even if the Debtors could find such providers, the Debtors would

face the risk of substantially increased premiums and other costs.  The Debtors also would bear

the economic risk of increased claims being filed in future periods, which risk becomes

disproportionate when the LTD Employees predominate the Debtors' remaining workforce.

Providing these benefits is a significant financial burden that does not provide any concomitant

benefit to the Debtors' estates because the individuals currently receiving the benefits of such

expenditures are not providing services to the Debtors.  Furthermore, terminating the LTD Plans

and the LTD Employees is also an important step forward in the Debtors' efforts to complete

their bankruptcy cases and move closer to confirming a plan of reorganization.  Given the

lengthy process required to wind down the LTD Plans, as well as the uncertainty regarding the

Debtors' ability to continue to provide Benefits into 2013 and beyond, the Debtors must end the

LTD Plans now.

   49.  In order to advance the resolution of claims submitted under the LTD Plans, the

Debtors further request the time period for making a claim for reimbursement for benefits

covered by and approved pursuant to the relevant LTD Plans for claims incurred prior to

December 31, 2012 be reduced to six months, commencing on December 31, 2012.

   50.  Thus, terminating the LTD Plans and the employment of the LTD Employees will

generate significant cost savings for the Debtors.  For the foregoing reasons, the Debtors submit

that the termination of the LTD Plans and the employment of the LTD Employees is appropriate and in the best interests of the Debtors, their bankruptcy estates and their creditors.

51.      Notice of the Motion has been given via overnight mail to (i) the U.S. Trustee; (ii) counsel to the LTD Committee; (iii) the LTD Employees; (iv) counsel to the Bondholder Group; (v) counsel to the UCC; and (vi) the general service list established in these chapter 11 cases.

## No Prior Request

52.      Except as described therein, no prior request for the relief sought herein has been made to this or any other court.

[*Remainder of the page left intentionally blank.*]

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached as Exhibit A hereto; (iii) authorize the Debtors to terminate the LTD Plans and the employment of the LTD Employees effective as of December 31, 2012 so as to cease providing employer-paid benefits, including for long-term disability income continuation benefits, for current and future participants as of that date; and (iv) grant such other and further relief as it deems just and proper.

Dated:  July 30, 2012
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Ann C. Cordo*_____
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*