## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
----------------------------------------------------------X
                                                          :
                                                          :
                                                          :
                                                          :      Chapter 11
                                                          :
*In re*                                                   :      Case No. 09-10138 (KG)
                                                          :
Nortel Networks Inc., *et al.*,[1]                        :
                                                          :      Jointly Administered
                   Debtors.                               :
                                                          :      **Hearing Date:**
                                                          :      August 22, 2012 at 10:00 am ET
                                                          :      **Objections Due:**
                                                          :      August 13, 2012 at 4:00 pm ET
                                                          :
----------------------------------------------------------X
```

## JOINT MOTION FOR A SCHEDULING ORDER
## BIFURCATING PROCEEDINGS AND STAYING CERTAIN
## DISCOVERY ON CLAIMS BY THE EMEA CLAIMANTS

Nortel Networks Inc. ("NNI") and its affiliated debtors, as respective debtors and

debtors in possession (collectively, the "Debtors" or the "U.S. Debtors"), jointly with the Official

Committee of Unsecured Creditors (the "Committee" and collectively with the U.S. Debtors, the

"Movants") hereby move this Court (the "Motion"), pursuant to Sections 105 and 502 of Title 11

of the United States Code (the "Bankruptcy Code") and Rules 3001, 3002, 3003, 3007, 7042, and

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of a

scheduling order in the form attached as Exhibit A, bifurcating proceedings relating to the

EMEA claims to prioritize discovery and resolution of certain claims brought by Nortel

Networks UK Limited ("NNUK") pursuant to Claim No. 7786 (the "NNUK Claim"), and

---

[1]     The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

staying discovery on the remaining claims brought on behalf of NNUK and its affiliates Nortel

Networks (Ireland) Limited ("NN Ireland"), Nortel Networks S.A. ("NNSA"), and those other

claimants identified in Exhibit A to the attached declaration of Luke Barefoot submitted in

support of this Motion (collectively, the "EMEA Claimants," and their claims, the "EMEA

Claims").  In support of this Motion, the Movants respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      Prompt resolution of the EMEA Claims is critical to the ultimate goal

shared by all constituents – distributions to creditors.  This Court's March 2012 order

significantly winnowed those claims, dismissing all claims based on allegations that the Debtors

owed fiduciary duties or duties of care to NNUK, NN Ireland, and NNSA, as well as any claims

predicated on any financial support directive or contribution notice issued in proceedings

concerning the NNUK pension scheme.  Although the Movants had demonstrated "the weakness

and unlikelihood of ultimate success" on the other causes of action asserted, the Court found it

was unable to dismiss those claims based solely on the pleadings.   See In re Nortel Networks,

Inc., 469 B.R. 478, 509-10 (Bankr. D. Del. 2012).

2.      As indicated during the hearing held before this Court on July 11, 2012,

and the status conference held before the Court on August 1, 2012, the Movants and the EMEA

Claimants are in agreement that it is time to progress litigation on the remaining claims that

survived the motion to dismiss.  Despite this shared goal, the Movants and the EMEA Claimants

disagree on how best to progress this litigation.  The EMEA Claimants propose broad, unfettered

discovery whereas the Movants have identified a handful of threshold gating issues that can be

resolved with limited discovery and, once resolved, will dispose of the most material and broad-

ranging of the EMEA Claims.  Specifically, most of NNUK's Claim can and should be rejected

through determinations that (1) NNUK was solvent at the times relevant to its claims, such that

the challenged transactions between NNUK and its parent, Nortel Networks Limited ("NNL"), were ratified; and (2) NNI did not receive funds traceable, or otherwise causally related, to payments or transfers made by NNUK.  Resolving these issues will dispose of the vast bulk of both the NNUK Claim itself and the EMEA Claims overall as the NNUK Claim is by far the largest of the EMEA Claims.  NNUK's Claim, which seeks damages upwards of approximately $2.5 billion is five times as large as the next largest claim.  Even in the unlikely event that NNUK prevails on the threshold issues that the Movants seek to have the Court hear first, this will have the effect of narrowing the issues for further proceedings, thereby facilitating the prompt resolution of the EMEA Claims.  By contrast, the EMEA Claimants' proposal – to have the parties engage in exhaustive, far-reaching discovery on all of the remaining claims asserted by NNUK, NNSA and NN Ireland through an open-ended process, cabined only by a placeholder August 2013 date for completing discovery – is ill suited to the needs of the Debtors' cases and the nature of the remaining EMEA Claims.  Most importantly, their proposal does nothing to facilitate a prompt resolution of these claims.

3.      Prioritizing the overarching issues of solvency and tracing – which can be accomplished expeditiously and with limited fact discovery – will potentially eliminate more than $2.45 billion in claims against the Debtors in approximately seven months.  Front-loading these issues for prompt determination makes particular sense where the necessary fact and expert discovery will be undertaken in any event.  Moreover, the Movants' approach will limit the extent of third-party discovery that would be sought from the Canadian Debtors (defined hereinafter).  At base, this approach encourages and promotes the prospects for a consensual resolution of the remaining EMEA Claims and presents the best use of the Debtors' resources.  To that end, discovery on remaining issues should be stayed pending a hearing on the threshold

issues.  Such a limited stay will cause no prejudice to the EMEA Claimants as it simply channels

and prioritizes discovery on those issues central to a resolution of their most material claims.

Following presentation of the threshold issues to the Court, the EMEA Claimants can pursue

reasonable discovery on all of their remaining claims.

## BACKGROUND & PROCEDURAL HISTORY

**A.      Proceedings to Date**

4.      On January 14, 2009, the Debtors other than Nortel Networks (CALA)

Inc.[2] filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, which cases

are consolidated for procedural purposes only.

5.      Also on January 14, 2009, the Debtors' ultimate corporate parent Nortel

Networks Corporation ("NNC"), NNI's direct corporate parent NNL, and certain of their

Canadian affiliates (collectively, the "Canadian Debtors")[3] commenced a proceeding with the

Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors

Arrangement Act (Canada), seeking relief from their creditors (collectively, the "Canadian

Proceedings") and a Monitor, Ernst & Young Inc., was appointed by the Canadian Court.

6.      On September 30, 2009, the general bar date for filing proofs of claim

against the Debtors other than NN CALA, NNUK and the other EMEA Claimants filed over

three hundred proofs of claim against NNI and the other U.S. Debtors.  Given the lack of any

allegations sufficient to provide notice of the basis for the claims asserted, the Debtors objected

---

[2]      Nortel Networks (CALA) Inc. filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' Chapter 11 cases for procedural purposes [D.I. 1098].

[3]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation.

to the EMEA Claimants' claims, and sought an order requiring the EMEA Claimants to amend their proofs of claim to provide a more definite statement.[4]

7.      On May 10, 2011, this Court granted the U.S. Debtors' objection and ordered the EMEA Claimants to serve more definite statements of their claims.[5]  The Court's order made clear that absent timely amendment, any such claims would be dismissed and expunged with prejudice.  After this Court granted an extension of time,[6] the EMEA Claimants, including NNUK, filed thirty-eight (38) amended proofs of claim on June 3, 2011.  See Barefoot Decl. Ex. A (listing the 38 amended proofs of claim).[7]

8.      These amended claims included the claims asserted by NNUK, NNSA and NN Ireland.  The NNUK Claim, in addition to contingent and unliquidated amounts, asserts damages of nearly $2.5 billion.  Barefoot Decl. Ex. B ¶ 218.  Although NN Ireland and NNSA also asserted amended claims, the damages they assert stand at a fraction of those asserted by NNUK, with NN Ireland asserting approximately $291 million, and NNSA asserting approximately $473 million, in each case with additional contingent and unliquidated amounts. See Barefoot Decl. Ex. C ¶ 202; Barefoot Decl. Ex. D ¶ 187.

9.      On July 15 and 22, 2011, the Movants filed joint objections and motions to dismiss the amended proofs of claim filed by NNUK, NN Ireland and NNSA (the "Motions to Dismiss").  After briefing and oral argument, this Court granted in part the Motions to Dismiss

---

[4]      See Debtors' Objection to the Proofs of Claim Filed by the EMEA Claimants and Motion for an Order Requiring a More Definite Statement of Claim and Setting a Deadline for the Filing of Any Proofs of Claim by the EMEA Claimants, dated April 1, 2011 [D.I. 5200].

[5]      See Order Requiring EMEA Claimants to File a More Definite Statement of Claim and Setting a Deadline for the Filing of Any Proofs of Claim by the EMEA Claimants, dated May 10, 2011 [D.I. 5402].

[6]      See Order Approving Extension of Deadline for EMEA Claimants to File a More Definite Statement of Claim and to File Any Proofs of Claim, dated June 3, 2011 [D.I. 5588].

[7]      Over 300 remaining claims originally filed by the EMEA Claimants that were not timely amended were disallowed and expunged with prejudice.

on March 20, 2012.[8]  Specifically, the Court dismissed all claims predicated on allegations that (i) NNI acted as a director or shadow director of NNUK, NN Ireland, or NNSA; (ii) that NNI owed a duty of care to NNUK or NN Ireland; or (iii) that NNI was liable as a result of any financial support directive or contribution notice issued in proceedings in the United Kingdom concerning the NNUK pension scheme.[9]

## B.    The Remaining NNUK Claims

10.    Although this Court held that it was precluded from resolving all of the claims via the Motions to Dismiss, it stated that the Debtors' arguments were "persuasive in showing the weakness and unlikelihood of ultimate success" of the remaining EMEA Claims.[10]

11.    For NNUK, the vast majority of those remaining claims fall into two categories:  (1) those that depend upon an underlying breach of fiduciary duty by the directors of NNUK; and (2) those that depend upon NNI having either received funds traceable to NNUK or causally related to payments or transfers made by NNUK.

12.    As to the claims that turn upon a breach of fiduciary duty (the "Fiduciary Duty-Dependent Claims"),[11] both English and U.S. law are clear that there can be no claim for aiding and abetting a breach of fiduciary duty, dishonest assistance, or conspiracy to breach a

---

[8]      See Nortel, 469 B.R. at 485.

[9]      Importantly, the Movants have yet to move to dismiss or otherwise object to the EMEA Claims other than claims asserted by NNUK, NNSA and NN Ireland against NNI.  Indeed, many such claims not only require initial briefing on the relevant foreign law, but are not material in the context of the Debtors' cases.  See, e.g., Barefoot Decl. Ex. E ¶ 115 (claim no. 7753, asserted by Nortel Networks Oy in the amount of $67,946).  As such, while the EMEA Claimants and the Movants disagree concerning the appropriate time and sequencing for discovery for the claims asserted by NN Ireland, NNSA and NNUK, the parties agree that the claims asserted against the Debtors by the other EMEA Claimants are not yet ripe for discovery.

[10]     Nortel, 469 B.R. at 509.

[11]     The Fiduciary Duty-Dependent Claims consist of: (i) NNUK's parallel claims for aiding and abetting a breach of fiduciary duty under U.S. state law (Claims 6, 13, 20, 31, and 34) and dishonest assistance under English law (Claims 4, 10, 18, and 35); and (ii) NNUK's parallel claims for civil conspiracy under U.S. state law (Claims 7, 11, and 21) and unlawful means conspiracy under English law (Claims 5, 12, and 19). See Barefoot Decl. Ex. B.

fiduciary duty, absent proof of an underlying fiduciary breach.[12]  Moreover, NNUK conceded

during briefing for the Motions to Dismiss that under English law, if a company is solvent, a

shareholder may ratify a transaction otherwise entered into in breach of a fiduciary duty.  See

Decl. of Philip Marshall QC in Opposition to Joint Objection and Motion to Dismiss Claims of

Nortel Networks UK Limited, filed Sept. 14, 2011 ("Marshall Decl."), ¶ 35.5.3 [D.I. 6374].

NNL was NNUK's parent and its sole shareholder during the time period at issue, see Barefoot

Decl. Ex. B ¶ 2, and NNI has established that ratification by such a shareholder need not take any

particular form or formality, see Decl. of Michael Todd Q.C. in Support of Joint Objection and

Motion to Dismiss Claims of Nortel Networks UK Limited, filed July 15, 2011, ¶ 74 [D.I. 5971].

Thus, if NNUK was solvent and NNL ratified the transactions underlying the Fiduciary Duty-

Dependent Claims, those claims are untenable.[13]

13.     As to the claims that require NNI to have received funds traceable to

NNUK (the "Tracing-Dependent Claims"),[14] NNUK conceded in its papers that such tracing is a

requirement under English law.  See Marshall Decl. ¶¶ 50.1-50.2.  Similarly, NNUK has

acknowledged that U.S. law requires a relation between NNI's alleged enrichment and NNUK's

impoverishment.  See Barefoot Decl. Ex. B ¶ 149.  Accordingly, if discovery shows no receipt of

funds by NNI that can be traced or otherwise causally attributed to NNUK, the Tracing-

Dependent Claims fail.

---

[12]     See Barefoot Decl. Ex. B ¶103 (dishonest assistance requires that "a fiduciary breach[] a fiduciary duty"); Brug v. Enstar Grp. Inc., 755 F. Supp. 1247, 1256 (D. Del. 1991) (aiding and abetting requires an underlying wrongful act); LaSalle Nat'l Bank v. Perelman, 82 F. Supp. 2d 279, 296 (D. Del. 2000) (granting summary judgment on civil conspiracy to breach fiduciary duty "[b]ecause the court has found that the defendants did not breach any fiduciary duties they may have owed").

[13]     Establishing NNUK's solvency will also of necessity eliminate the transaction at undervalue cause of action asserted in Claim 27, which depends on a finding of insolvency.  Marshall Decl. ¶ 62; see also Barefoot Decl. Ex. B.

[14]     The Tracing-Dependent Claims consist of NNUK's parallel claims for unjust enrichment under U.S. law (Claims 15 and 23) and unconscionable/knowing receipt under English law (Claims 14, 22, and 29).  See Barefoot Decl. Ex. B.

## BASIS FOR RELIEF REQUESTED

14.     This Court should exercise its inherent authority to stage discovery and the

resolution of the EMEA Claims by focusing first on those threshold issues that are not only

determinative, but also present the opportunity for the Court and the parties to resolve the vast

majority of the EMEA Claims in an expeditious and cost-effective manner.  Specifically, this

Court should bifurcate discovery on and resolution of the claims brought by the EMEA

Claimants to evaluate first (1) whether NNUK was solvent at the time of the transactions

underlying the Fiduciary Duty-Dependant Claims, such that those transactions were therefore

properly ratified by NNL; and (2) whether NNI received any funds traceable to NNUK, as

required for the Tracing-Dependent Claims.  Resolution of the Fiduciary-Duty Dependent

Claims and Tracing-Dependent Claims alone would eliminate over $2.45 billion of claims.  See

Barefoot Decl. Ex. B

¶ 218.b-d.[15]  The impact of resolving of such a significant portion of the outstanding EMEA

Claims cannot be understated.

15.     Prioritizing discovery on and resolution of these issues of solvency,

ratification, and traceability would "permit deferral of costly and possibly unnecessary discovery

proceedings pending resolution of potentially dispositive preliminary issues."  Akzona Inc. v. E.I.

Du Pont De Nemours & Co., 607 F. Supp. 227, 236 (D. Del. 1984) (quoting Ellingson Timber

Co. v. Great N. Ry. Co., 424 F.2d 497, 499 (9th Cir. 1970), cert. denied, 400 U.S. 957 (1970)).[16]

---

[15]     Indeed, this would eliminate the vast majority of NNUK's alleged claims. The only NNUK claims that would remain after such a process would be Claim 1, which is NNUK's trading debt claim for $18,835,960.35, and Claims 24-26, which generally seek unspecified damages related to unspecified prepetition asset sales.  See Barefoot Decl. Ex. B. ¶ 218.a, e. In its pleading, NNUK mentions only a single prepetition asset sale – the Alcatel sale. NNUK has declined to specify the method of allocation to which it believes it is entitled, but its pleading alleges that applying the alternative revenue-only basis of allocation to the $240 million in total Alcatel sale proceeds results in an alleged undervalue to NNUK of, at most, approximately $106.6 million. Id. ¶ 83.

[16]     Importantly, it is the potential that bifurcation would result in the resolution of dispositive preliminary issues that makes bifurcation appropriate. See Akzona, 607 F. Supp. at 236 (bifurcating because "resolution of

Bifurcating the claims to resolve the Fiduciary Duty-Dependant Claims and the Tracing-

Dependant Claims first will also dramatically simplify the remaining litigation in other ways.

Notably, the Movants' proposal significantly limits the parties' need to seek documents from the

Canadian Debtors.[17]   Further, resolution of these threshold issues may promote a consensual

resolution of any remaining issues with respect to the EMEA Claims, and, indeed, with respect to

allocation as well.    See Emerick v. U.S. Suzuki Motor Corp., 750 F.2d 19, 22 (3d Cir. 1984)

(bifurcation appropriate where it promotes "convenience, . . . expedition, and economy of

resources"); Pennzoil Co. v. Dep't of Energy, 480 F. Supp. 1126, 1132 (D. Del. 1979)

(bifurcation appropriate where resolution of threshold issue has the potential to make further

discovery "unnecessary and a waste of resources").   Bifurcation thus would serve the twin goals

of promoting a mediated resolution and protecting "the estates of both the U.S. Debtors and the

Canadian debtors" that the Court is "hopeful . . . can be attained."  Nortel, 469 B.R. at 518.

           16.    The Court has inherent authority to bifurcate discovery and other

proceedings under Bankruptcy Rule 7042.  See Bandai Am. Inc. v. Bally Midway Mfg. Co., 775

F.2d 70, 74 (3d Cir. 1985) (holding that Rule 42(b) authorized magistrate's bifurcation order

requiring "that the fraud issue would be disposed of first, and that discovery would be limited,

initially, to the fraud issue");  Eurand Inc. v. Mylan Pharm. Inc., Civ. No. 08-889-SLR, 2009 WL

3172197, at *1 (D. Del. Oct. 1, 2009) (bifurcation order granting motion "to sever and stay

discovery" on certain counterclaims); Akzona, 607 F. Supp. at 232 (judge's power to limit

---

potentially dispositive preliminary issues" would "permit deferral of costly and possibly unnecessary discovery
proceedings" (internal quotation marks and citation omitted) (emphasis added)); Pennzoil Co. v. Dep't of Energy,
480 F. Supp. 1126, 1132 (D. Del. 1979) (bifurcating because "[s]hould [the court] sustain Pennzoil's claim, it may
be unnecessary and a waste of resources to consider the enforcement counterclaim" (emphasis added)).  The Court
need not, at this time, resolve the merits of any of these issues, but only conclude that resolution of these issues first
is a sensible way to promote judicial efficiency and the expeditious resolution of these claims.

[17]       The parties will still need limited discovery from the Canadian Debtors with respect to these threshold
issues, but by significantly limiting the scope of that discovery, the Movants' proposal would enhance the prospects
for cooperation from the Canadian Debtors and Canadian Court with respect to such third-party discovery.

discovery "implicit in 42(b)"); <u>see also</u> Fed. R. Bankr. P. 9014 (providing that Rule 7042 is

applicable as of right in contested matters, such as the U.S. Debtors' objection to the NNUK

Claim).[18]  Bankruptcy courts routinely exercise this authority to issue bifurcation orders.[19]

17.     Bifurcation here would not prejudice the EMEA Claimants.  <u>See</u> <u>Emerick</u>,

750 F.2d at 22 (noting prejudice to the parties as a factor to be weighed alongside convenience,

expedition and economy of resources).  To the contrary, because discovery on the issues of

ratification, solvency, and traceability are essential to the outcome of this dispute in any event, a

bifurcation order prioritizing resolution of those issues carries no risk of causing additional

discovery that would not happen otherwise.  Nor would it prolong the proceedings; to the

contrary, it will ultimately expedite these proceedings, as resolution of these issues will either

largely eliminate NNUK's claims or otherwise resolve key issues to permit the parties to proceed

expeditiously on any remaining issues after these threshold gating issues are resolved.  Indeed,

none of the relevant factors weigh against bifurcation.  <u>See</u> <u>id.</u> (propriety of bifurcation governed

by balancing test); <u>Akzona</u>, 607 F. Supp. at 232 (same).

18.     For the same reasons it should order bifurcation, the Court should also

stay discovery on the remaining EMEA Claims until discovery and a hearing on the Fiduciary

---

[18] <u>See also</u> <u>Rafter Seven Ranches L.P. v. WNL Invs. L.L.C.  (In re Rafter Seven Ranches L.P.)</u>, 414 B.R. 722, 737-38 (B.A.P. 10th Cir. 2009) (bankruptcy court's bifurcation "permitted by Rule 42(b) and . . . particularly useful where, as in this case, the court is the ultimate trier of fact and can quickly and economically resolve a dispositive issue").

[19] <u>See</u> <u>Malloy v. Transp. Alliance Bank, Inc. (In re Arrow Trucking Co.)</u>, Bankr. No. 10-10041-R, 2011 WL 3800126, at *1 (Bankr. N.D. Okla. Aug. 29, 2011) (exercising authority under Fed. R. Civ. P. 42(b) and FRBP 7042 to bifurcate and stay discovery on issue of alleged tortious conduct of debtor's principals because bifurcation of "the less fact intensive claims from the claims based on fraud will expedite discovery . . . and also might render the subordination claim moot"); <u>Epixtar Corp. v. McClain & Co., L.C. (In re Epixtar Corp.)</u>, Bankr. Nos. 05-42040-BKC-AJC et al., 2009 WL 2500463, at *3 (Bankr. S.D. Fla. Aug. 13, 2009) (Because "the distinct possibility exists that the issue of damages will never be reached, bifurcating discovery as to liability from that of damages will serve the goals of convenience, expedition and economy."); <u>F.C.C. Nat'l Bank v. Lokotnicki (In re Lokotnicki)</u>, 232 B.R. 583, 589 (Bankr. W.D.N.Y. 1999) (bifurcating discovery and trial on issues of misrepresentation, reliance and loss from scienter and holding that "[o]nly if the creditor is successful on that first trial will the court allow the defendant to be burdened with discovery that relates to the issues of the second trial").

Duty-Dependent Claims and Tracing-Dependent Claims is complete.[20]  Such an order would

minimize the risk of wasteful discovery into fact-intensive issues that will likely end up being

moot.  See Bandai, 775 F.2d at 72-73 (approving a stay of discovery on all but the issue of fraud

where plaintiff could not prevail without a favorable outcome on the fraud issue);  Smith v.

Allstate Ins. Co., 403 F.3d 401, 407 (6th Cir. 2005) (bifurcation and stay of discovery proper

where "the merits of the bad faith claim depended on whether the limitations provision was valid,

[so] it was reasonable for the court to resolve the validity question before allowing the bad faith

claim to proceed").  Again, it is the potential for simplifying litigation and promoting judicial

economy that justifies the Court in ordering a stay on discovery unrelated to the Fiduciary-Duty

Dependent Claims and Tracing-Dependent Claims.  See Masimo Corp. v. Philips Elecs. N. Am.

Corp., Civ. Act. No. 09-80-JJF-MPT, 2010 WL 925864, at *3 (D. Del. Mar. 11, 2010) ("[T]here

is a possibility that a trial on Masimo's patent claims will potentially eliminate or simplify

Philips' antitrust counterclaims . . . .  It follows that discovery on such claims should be stayed.");

Eurand, Inc. 2009 WL 3172197, at *2 (ordering bifurcation and stay in the interest of

"conserving judicial economy" where the "antitrust and patent misuse claims may be rendered

moot by resolution of the patent infringement issues").

        19.     As detailed more fully in the proposed order attached as Exhibit A, the

Movants propose a schedule for discovery and resolution of these threshold issues that will

expeditiously resolve the NNUK claims at issue.  Limited, tailored discovery will be sufficient to

resolve the issues of solvency and tracing upon which the Fiduciary-Duty Dependent Claims and

Tracing-Dependent Claims depend.  Accordingly, the proposed order anticipates: (i) an exchange

of document requests and limited interrogatories within two weeks of the date of the order; (ii)

---

[20]    Although there is no need for separate discovery at this time into NNUK's  transaction at undervalue cause of action asserted in Claim 27, establishing NNUK's solvency will also of necessity eliminate the transaction at undervalue claim, which depends on a finding of insolvency.  Marshall Decl. ¶ 62.

approximately twelve weeks for responses to interrogatories and rolling document productions; (iii) a period of ten weeks for the preparation and exchange of expert reports, rebuttal reports, and expert depositions; (iv) eight weeks for briefing a summary judgment motion (or for pre-trial briefing); and (v) a further two weeks to prepare for a hearing, if necessary, which could thus occur as early as March 2013, roughly seven months from the date of the proposed order.  By contrast, the EMEA Claimants' proposal would provide only for an exchange of document requests and responses, with no limits on discovery other than a loose placeholder date for the close of fact discovery in August 2013 – a full year away.

20.    In short, because it would promote judicial efficiency, avoid time-consuming and unnecessary discovery, protect the estates of the U.S. and Canadian Debtors, and also would do so without prejudice to any party, this Court should order bifurcation to prioritize resolution of NNUK's Fiduciary Duty-Dependent Claims and Tracing-Dependent Claims as described above, and should stay discovery on the remaining EMEA Claims.

## NO PRIOR REQUEST

21.    No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Movants respectfully request that the Court (i) enter the proposed

order bifurcating proceedings relating to the EMEA Claims to prioritize resolution of the NNUK

Fiduciary-Duty Dependent Claims and Tracing-Dependent Claims, and staying discovery as to

all other EMEA Claims; and (ii) grant such other and further relief as the Court deems just and

proper.


Dated:  August 6, 2012
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Howard Zelbo (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*

- and -

13

AKIN GUMP STRAUSS HAUER & FELD LLP

Fred Hodara (admitted *pro hac vice*)
David Botter (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

 - and -

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Christopher M. Samis*
Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile: (302) 651-7701

Counsel for the Official Committee
of Unsecured Creditors

14