# EXHIBIT C

**(NN Ireland Proof of Claim No. 7774)**

B10 (Official Form 10) (12/07) – Cont.

| UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE | AMENDED PROOF OF CLAIM |
|---|---|

| Name of Debtor:<br>Nortel Networks, Inc. | Case Number:<br>09-10138 (KG) |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

**Name of Creditor:**
Nortel Networks (Ireland) Limited and/or any Court-appointed administrator or liquidator thereof

☒ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____
(if known)

**Name and address where notices should be sent:**

| Young Conaway Stargatt & Taylor, LLP<br>The Brandywine Building, 17th Floor<br>1000 West Street<br>Wilmington, Delaware 19801<br>Attention: Edwin J. Harron<br>(302) 571-6600 | Hughes Hubbard & Reed LLP<br>One Battery Park Plaza<br>New York, New York 10004<br>Attention: Michael Luskin<br>(212) 837-6000 | Herbert Smith LLP<br>Exchange House<br>Primrose Street<br>London EC2A 2HS<br>UNITED KINGDOM<br>Attention: Stephen Gale<br>44-20-7374-8000 |
|---|---|---|

Telephone number: See above

Filed on: _____

Name and address where payment should be sent (if different from above):

Telephone number:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor trustee in this case.

**1. Amount of Claim as of Date Case Filed:** <u>See attached Rider</u>

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:** <u>See attached Rider to Proof of Claim of Foreign Administrators</u>
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identified debtor:** _____

3a. Debtor may have scheduled account as:
(See instruction #3a on reverse side.)

**4. Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe:

Value of Property: $_____   Annual Interest Rate ___%

Amount of arrearage and other charges as of time case filed included in secured claim.

If any: $_____   Basis for perfection: _____

Amount of Secured Claim: <u>Unknown</u>   Amount Unsecured: <u>Unknown</u>

**6. Credits:** The am~~~
**7. Documents:** Atta~~~ invoices, itemized sta~~~ also attach a summary~~~ may also attach a sum~~~

DO NOT SEND ORI~~~ SCANNING.

If the documents are not available, please explain:

Filed: USBC - District of Delaware
Nortel Networks Inc., Et Al.
09-10138 (KG)        0000007774

[barcode]

: of making this proof of claim.

promissory notes, purchase orders, security agreements. You may ~~~ction of a security interest. You

ESTROYED AFTER

**5. Amount of claim Entitled to Priority under 11 U.S.C.§ 507(a).** If any portion of your claim falls in one of the following categories check the box and state the amount.

Specify the priority of this claim.
Unknown

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a) (__).

**Amount entitled to priority:**

Unknown

*Amounts are subject to adjustment on 4-1-10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

| Date: 6/3/11 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>ALAN BLOOM<br>JOINT ADMINISTRATOR | FOR COURT USE ONLY |
|---|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

FILED / RECEIVED

JUN – 3 2011

EPIQ BANKRUPTCY
SOLUTIONS, LLC

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NORTEL NETWORKS, INC., | Case No. 09-10138 (KG) |
| Debtor. | Jointly Administered |

RIDER TO PROOF OF CLAIM OF NORTEL NETWORKS (IRELAND) LIMITED

PRELIMINARY STATEMENT

      1.     Alan Robert Bloom and David Martin Hughes in their capacity as the court-appointed administrators and authorized foreign representatives (the "Joint Administrators") of Nortel Networks (Ireland) Limited ("NN Ireland") and its affiliates located in the region known as EMEA (Europe, Middle East, and Africa) (collectively the "EMEA Companies")[1] in proceedings under the Insolvency Act of 1986 (the "English Insolvency Act"), pending before the High Court of Justice of England and Wales (the "English Court"), hereby submit this rider (the "Rider") to the amended proof of claim (the "Claim"), which amends, and provides a more definite statement of, the timely filed proof of claim submitted by the Joint Administrators on behalf of NN Ireland against Nortel Network Inc. ("NNI") and its affiliated debtors in these Chapter 11 cases (collectively, the "Debtors") on September 20, 2009 (the

---

[1]   The following EMEA Companies commenced insolvency proceedings under the English Insolvency Act in the English Court on January 14, 2009: Nortel Networks UK Limited, Nortel GmbH; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska SP Zoo; Nortel Networks Hispania SA; Nortel Networks (Austria) GmbH; Nortel Networks sro; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko sro; Nortel Networks Oy; Nortel Networks Romania SRL; Nortel Networks AB; Nortel Networks International Finance & Holding BV; NN Ireland; Nortel Networks SA and Nortel Networks France SAS. With the exception of NN Ireland, Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris are the court-appointed administrators and foreign representatives for all of the EMEA Companies that have commenced insolvency proceedings in the English Court. Alan Robert Bloom and David Martin Hughes are the court-appointed administrators and foreign representatives of NN Ireland.

"Original Proof of Claim").[2]  This Rider is an integral part of the Claim and is hereby incorporated into the Claim in full and for all purposes.

## FACTUAL BACKGROUND

### A.    THE NORTEL GROUP AND ITS ORIGINS

2.      NNI, its parent Nortel Networks Limited ("NNL"), its ultimate corporate parent, Nortel Networks Corporation ("NNC"), and its affiliates and subsidiaries (collectively, "Nortel" or the "Nortel Group") were one of the leading worldwide groups in the telecommunications industry, including networking solutions, computer networks and software.

3.      The Nortel Group was originally founded in Canada in 1895, subsequently expanded into the US and, by 1990, had become one of the leading telecommunications companies in all of North America. From this pan-North American base, Nortel sought to expand overseas.

4.      In 1991 the Nortel Group acquired 100% of STC plc, a major UK public telecommunications company. This represented the Nortel Group's first major step into the UK market and brought customer relationships with large European carriers such as British Telecom, Cable & Wireless and Telefonica. From this base Nortel was able to expand into the wider European markets, including Ireland. In fiscal year 1991 European revenues were US$ 1.35 billion, an increase of 514% from the previous year. These revenues accounted for 17% of the Nortel Group's total revenue, a figure which was to grow in subsequent years.

5.      The European market was therefore a very important source of revenue for the Nortel Group.

### B.    THE INSOLVENCY OF THE NORTEL GROUP

6.      Beginning in 2001, the demand for the Nortel Group's products dropped dramatically in the wake of the "Dot-Com" crisis.  Competition also increased.  In 2001 alone the

---

2.  The Joint Administrators amend the Original Proof of Claim under compulsion of the Order Requiring EMEA Claimants to File a More Definite Statement of Claims and Setting a Deadline for the Filing of Any Proofs of Claim by the EMEA Claimants, entered by the Court on May 10, 2011 (the "Order").

Nortel Group reported losses of $25.7 billion. Nortel itself described the downturn as "severe" and "dramatic".

7.      In an attempt to revive its fortunes, the Nortel Group undertook a major restructuring. By 2008, the Nortel Group had reduced its employee numbers by two-thirds and outsourced its manufacturing. This restructuring did not solve the Nortel Group's financial troubles, which continued. Nevertheless it helped provide a stay of execution and had the effect of ensuring that the collapse of the Nortel Group did not occur until early 2009. In the period leading up to the collapse, the cash resources of NN Ireland were depleted at the direction of NNL and NNI.

8.      By January 2009, after such assets had been very significantly depleted, formal insolvency proceedings were commenced.

### C.      REMOVAL OF VALUE FROM THE EMEA COMPANIES

9.      At all relevant points the Nortel Group was operated in such a manner that cash and value were improperly removed from NN Ireland and the other EMEA Companies and transferred to NNL. The claims in this Rider concern such improper value transfers and NNI's involvement in the same.

10.      Value removal from NN Ireland occurred pursuant to a general policy to the effect that value and cash within the Nortel Group should be transferred to NNL. Indeed, pursuant to this policy the EMEA Companies were instructed to identify new schemes which would enable the transfer of cash and value to NNL.

11.      Particular transactions pursuant to which value was improperly removed from the EMEA Companies and which form the basis of various claims set out in this Rider, include:

> a.  the Nortel Group's transfer pricing arrangements which failed to
>     comply with the arm's length standard;

b.  the non-commercial interest free and unsecured inter-company loans which were advanced by NN Ireland to NNL (the "Irish Loans"); and

c.  various dividends declared by NN Ireland in NNL's favour (the "Irish Dividends").

12.     Although NNL was the primary beneficiary of such value removal, NNI also benefited on certain occasions.  These occasions include when NNI received regular repayments in cash from NNL in respect of its interest bearing inter-company loan facility at a time when NN Ireland was not being paid interest on the Irish Loans and, in relation to the second of the Irish Loans, was not repaid in cash.

**D.      CONTROL BY AND INVOLVEMENT OF NNI**

13.     Control of the Nortel Group's operations was highly centralized and, on a general basis, was maintained primarily by NNC and NNL (the "Canadian Entities").

14.     NN Ireland has submitted separate claims against those entities pursuant to the Canadian EMEA Claims Process.

15.     While the Canadian Entities controlled the Nortel Group on a general basis, NNI was also involved in jointly controlling certain aspects of the Nortel Group's operation together with the Canadian Entities.  The control exerted by NNI related to Nortel Group tax matters, in particular transfer pricing, and to Nortel Group treasury matters.  These group tax and treasury functions in turn were responsible for the transactions pursuant to which value was improperly removed from NN Ireland.

**Transfer pricing**

16.     NNI was heavily involved in the implementation and operation of the transfer pricing arrangements that deprived NN Ireland of so much value (as explained below). NNI was also heavily involved in the advance pricing agreement negotiations with the Internal Revenue Service ("IRS"), Canadian Revenue Authority ("CRA") and Her Majesty's Revenue and Customs ("HMRC") (and, together with the IRS and CRA, the "Revenue Authorities") pursuant

4

to which the approval of those Revenue Authorities was being sought to the transfer pricing arrangements.

17.    The key individuals involved included in particular John Doolittle of both NNI and the Canadian Entities and Mark Weisz, Mike Orlando, Laurie Krebs and John Payne of NNI as well as representatives from the Canadian Entities.

18.    NN Ireland had no substantive involvement in transfer pricing.  Its role was limited to providing information for the above individuals as and when required and implementing the decisions which had been taken by NNI and the Canadian Entities.  In this regard:

a.    The policy decision to change from the previous cost sharing arrangements and to implement the RPSM was taken by NNI and NNL.  NN Ireland was not involved or consulted in relation to this decision.  NN Ireland was only informed of the change to the RPSM after the RPSM had been implemented.

b.    The process by which the RPSM electronic model was created and structured was also one which was handled by NNI and NNL.

c.    The terms of the Master Research and Development Agreement ("MRDA") were determined by NNI and NNL.  NN Ireland was not consulted in relation to, or involved in, the decision to implement the MRDA or in the decision regarding what the terms of the MRDA would be.  NNI and NNL were also responsible for instructing the legal advisers in relation to the MRDA and transfer pricing generally.

d.    Once the terms of the MRDA had been decided by NNI and NNL, NN Ireland was simply instructed to sign the MRDA. There was no arm's length negotiation of its terms.  NN Ireland first received a copy of the

5

draft MRDA in or around December 2004 by which point its terms had already been decided.

e.  NNI and NNL controlled the all-important advanced pricing arrangement/agreement ("APA") application process (referred to above).  Mark Weisz of NNI, Mike Orlando of NNI and John Doolittle took the lead in the negotiations with the IRS, the CRA and HMRC.  This team ran the negotiations until around 2006 when Peter Look joined the Nortel Group as Vice President of Global Tax.  He replaced John Doolittle alongside Mark Weisz and Mike Orlando. Later John Payne, also of NNI, joined the lead team together with Peter Look.  NNI and NNL also took sole responsibility for instructing Nortel's professional advisers in relation to the APA application process.

f.  Once more, NN Ireland and its directors and officers, were excluded from the process.

19.    The Nortel Group Tax Department was effectively a joint function between NNI and the Canadian Entities.  Many of the key individuals within the Tax Department were NNI personnel.  This was particularly so in respect of the members of the Tax Department who had responsibility for NN Ireland and the EMEA Companies.  It was also particularly so in relation to the transfer pricing function, which was heavily dominated by individuals from NNI. For example, at various times, the International Tax Director of Nortel was Mark Weisz; Mike Orlando was the Global Transfer Pricing Leader (and right hand man of Peter Look, Vice President of Global Tax); John Payne was responsible for Global Transfer Pricing; Claire Barbieri was responsible for Global Tax Accounting; and even the EMEA Tax Leader on the ground in the EMEA Region (responsible for NN Ireland), Ryan Smith was seconded to Nortel Networks UK Limited ("NNUK") from NNI.

**Treasury matters – Irish Loans and the Irish Dividends**

20.     NNI, through its personnel, was, together with the Canadian Entities, fully involved and aware of the implementation of the initiative described above, pursuant to which Nortel companies were instructed to identify opportunities to transfer cash and value to NNL. It was in accordance with this initiative that the idea for the Irish Loans and the Irish Dividends ("the Irish Cash Repatriation Strategy") came about.

21.     The Irish Loans and the Irish Dividends were established and declared for the benefit of the NNI and the Canadian Entities to the detriment of NN Ireland. Both the Canadian Entities and NNI were involved in the implementation of these arrangements for this very purpose. Numerous NNI individuals were aware of and/or participated in the initial discussions relating to these arrangements and the later decisions made as to the use and repayment of the Irish Loans, including the related treatment of the Irish Dividends.

22.     The implementation of the Irish Cash Repatriation Strategy was conducted under the ultimate direction of Katharine Stevenson (Group Treasurer and a director of NNI). Not only was she involved in promoting initiatives to move cash to NNL on a general basis across EMEA, but she was also more specifically aware of and involved in the transactions relating to NN Ireland which formed part of the Irish Cash Repatriation Strategy.

23.     Ryan Smith ("Leader of Global Tax Planning" and an employee of NNI) took a lead role in identifying and exploiting relevant opportunities, including the establishment of the Irish Loans and the Irish Dividends. His particular role appears to have focussed on supervising a team which identified cash that could be transferred to NNL and then considered the most tax efficient way of transferring that cash to NNL.

24.     Mark Weisz ("Director of International Tax" and an employee of NNI) was responsible for approving and supervising the implementation of the various initiatives that Mr Smith and his team identified.

25.     Furthermore, as described below, the second of the Irish Loans (which included the balance of one of the Irish Dividends which was repaid) was deemed to be repaid through the declaration of transfer pricing adjustments in NNL's favour (which were then offset against the balance of the loan). These transfer pricing adjustments were not justified and deprived NN Ireland of significant value to which it was entitled (see section G.5. below). NNI was heavily involved in the operation of the RPSM which governed the calculation of these adjustments (see paragraphs 16 to19 above). As such, NNI was heavily involved in the mechanism via which the second of the Irish Loans was purportedly repaid.

26.     In a similar way to the Tax department, Nortel Treasury also performed a central role in relation to the strategic management of the Nortel Group. Nortel Treasury was also involved in most of the significant transactions affecting the Nortel Group, and NN Ireland and the EMEA Companies in particular. The key individuals within Nortel Treasury were from NNI. For example, as stated above, Katherine Stevenson, was Treasurer and had overall responsibility for global treasury matters within the Nortel Group. John Doolittle was Treasurer from 2008. Mr Doolittle was also an officer of NNI. Paul Karr was Controller of the Nortel Group and a director of NNI.

**E.     NNI ACTING AS DE FACTO / SHADOW DIRECTOR**

27.     For the reasons set out above (and as explained further in paragraphs 87 to 89 below), NNI was a de facto or shadow director of NN Ireland under Irish law by virtue of NNI making decisions in relation to treasury and tax issues which could only properly be made by a director of NN Ireland, or by causing the de jure directors to act in accordance with its directions in relation to such issue, in particular regarding NN Ireland's involvement in:

a.   the Nortel transfer pricing arrangements; and

b.   the Irish Loans and the Irish Dividends;

As a de facto or shadow director NNI owed fiduciary duties and a duty of skill and care to NN Ireland in relation to these specific tax and treasury related matters. Notwithstanding this, NNI in

any case assumed such fiduciary duties and such duty of skill and care with regard to these matters.

28.     By reason of the fact that NNI jointly controlled these transactions and that the transactions themselves improperly removed value from NN Ireland and were contrary to its interests, NNI breached the duties it owed to NN Ireland.  NNI is therefore liable to NN Ireland on the bases set out below.

**F.      THE NN IRELAND DE JURE DIRECTORS**

29.     In addition, the de jure directors of NN Ireland also owed fiduciary duties and a duty of skill and care to NN Ireland (as set out below).

30.     By causing or allowing NN Ireland to be involved in the prejudicial transfer pricing arrangements, the Irish Loans and the Irish Dividends, all of which resulted in NN Ireland suffering losses, and by allowing NNI (and NNL) to control decision making in relation to those transactions, the de jure directors of NN Ireland also breached the duties which they owed.

**G.      TRANSFER PRICING SYSTEMS**

**G.1.    Overview**

31.     Transfer pricing arrangements are implemented in order to ensure that intra-group trading of a multinational group is undertaken on a basis that enables an allocation of profit in each of the countries where group companies do business (and across the entities within the group) in a manner that replicates the profits that would be earned in arm's length transactions.  The guiding principle, recommended by the Organization for Economic Cooperation and Development and followed by most tax authorities, is that transactions between companies within a group should, so far as possible, be priced as if they were arm's length transactions between independent companies. This is straightforward for routine transactions, such as the sale of manufactured goods, but much more difficult for "intangibles," such as R&D,

where the value added and contribution to profits made by different companies within an integrated group are difficult to measure.

### G.2. Cost Sharing and RPSM Arrangements

32.     The Nortel Group's first set of transfer pricing arrangements consisted of a cost-sharing arrangement ("CSA") or cost contribution agreement ("CCA") between the Nortel Group's main R&D centres, to which NN Ireland was admitted in 1995.   From 2001, the transfer pricing methods were revised and a residual profit split method ("RPSM") was adopted.  The RPSM methodology was amended in 2006.

33.     The decision to implement the RPSM was taken by the Canadian Entities and NNI.  It was primarily motivated by a desire to allocate more profit to the Canadian Entities in order to benefit NNL at the expense of NN Ireland and the EMEA Companies.  Both NNL and NNI knew or should have known that this was the case.

34.     NN Ireland and the other EMEA Companies which lost out as a result of RPSM were not involved in the decision to change from the previous CSA to RPSM.

35.     The RPSM distinguished between two types of participants, Residual Profit Entities ("RPEs") and Limited Risk Entities ("LREs").  NN Ireland was an RPE. NNL, NNI, Nortel Networks SA ("NNSA") and NNUK were the other RPEs. The other categories of company within the Nortel Group were classified as (1) LREs, (2) Cost Plus Entities, (3) At Risk Entities and (4) holding companies.

36.     The RPSM divided the participants' available pooled profits into two main elements:  (i) routine profits to be allocated to the participants as measured by market returns, *i.e.* based on their own direct earnings from sales to third parties, and, (ii) the "residual" or remaining profits (or losses) which were treated as attributable to the Nortel Group's intangible development activities (*i.e.* R&D).  Both the RPEs and LREs were rewarded with a routine return, whereas residual profits (or losses) were divided between the RPEs only.

37.     For the period 2001 to 2005, the LREs' routine return was based on an operating margin profit level indicator, while the RPEs' routine return was calculated using an adjusted return on net assets ("RONA"). From 2006 onwards, both the LREs and the RPEs received a routine return of an adjusted operating margin of 1% of third party sales. The residual profits were then divided between the RPEs based on their proportional contribution to R&D activity. From 2001 to 2005, the residual profit or loss was allocated to each of the RPEs on the basis of their relative proportion of consolidated R&D capital stock in a given year. From 2006 onwards, an RPE's allocation was determined by its relative proportion of Nortel's consolidated R&D expenditure over the preceding five years.

38.     From 2006 onwards those RPEs, such as NN Ireland, which provided regional central services and other extra-territorial services to other companies in the Nortel Group, *e.g.* on sales and marketing, received a mark-up on their "excess" costs incurred in relation to those services. The mark-up on excess costs was around 15%.

39.     The Nortel Group registered losses or at best broke even during the entire period in which the RPSM was in force.

### G.3.    Master Research and Development Agreement ("MRDA")

40.     The MRDA was entered into on 22 December 2004, effective from 1 January 2001, between NNL, NNI, NN Ireland, NNSA, NN Australia and NNUK (defined in the MRDA as the "Participants"). The MRDA provided the architecture and contractual basis to enable the RPSM to be applied.

41.     NN Ireland was not involved in the decision to implement the MRDA or in negotiating its terms. The terms of the MRDA were determined by NNI and NNL based mainly on the requirements of Canadian and U.S. tax laws, in negotiations with the Canadian and U.S. taxing agencies.

42.     Under the MRDA, in exchange for the performance of R&D activity, each Participant would be entitled to receive payments in the manner explained above, purportedly as

the measure of the benefit to which it was entitled commensurate with its performance of, and contribution to, R&D Activity (MRDA Art. 3(a)).

43.    The MRDA provided that legal title to all intellectual property of the Nortel Group then in existence or thereafter to be acquired or developed would be vested in NNL, including intellectual property created by the three EMEA RPEs.  However, the MRDA expressly provided that each of the RPEs would retain a beneficial or economic interest in the intellectual property.  This continued the parties' agreement under the pre-2001 CSA.  Accordingly the MRDA confirms that each RPE owns the intellectual property in the Nortel Group in proportion to the direct or indirect contribution that entity made to the creation of that intellectual property.

44.    NNL agreed to enter into licenses with each of the other Participants, but in fact profits (or losses) from all territories were divided in accordance with the RPSM.  NNL was obliged to administer the agreement and the determinations required under the RPSM with respect to its interests and the interests of the Participants, and in particular to compute the amount of any R&D allocations due to, and payments due from, each Participant on a periodic basis (Article 3(d) of the MRDA).

### G.4.    The Arm's Length Principle

45.    A fundamental requirement of a valid transfer pricing method is that it should ensure that each of the entities within the group acts in an arm's length manner in its dealings with another.

46.    This principle is expressly referred to in the MRDA. This defined the RPSM at all material times as "the transfer pricing methodology which establishes the fair market value of the compensation to be received by each Participant for its R&D Activity and shall have the meaning defined in Schedule A."  Schedule A to the MRDA in turn provided that the RPSM was adopted at the request of certain Revenue Authorities as the most appropriate method for determining the arm's length compensation due to each Participant for its respective R&D Activity.  "R&D Allocation" was defined as "Arm's Length R&D Allocation."  Schedule A then

set out the basis of calculation of residual profit, and of its division between the

Participants/RPEs. Schedule A was subsequently amended, including by the Third Addendum to

the MRDA, to reflect the revised RPSM in fact employed from 2006 onwards.

47.      Accordingly, the MRDA is to be interpreted and applied, so far as

possible, to give effect to the arm's length principle.

### G.5.    Nortel's RPSM failed to properly reward NN Ireland

48.      The RPSM as applied under the MRDA did not comply with the arm's

length principle. It deprived certain entities (including NN Ireland) of revenue, and resulted in an

intentional and improper transfer of value away from NN Ireland and the other EMEA

Companies and towards NNL. NNI facilitated this transfer of value.

49.      Particularly, the RPSM arrangement did not adequately reward NN

Ireland. The RPSM arrangement was flawed for reasons including the following[3]:

     a.  First, pursuant to the MRDA, from 2006 onwards, the RPEs,

including NN Ireland, had a contractual right to receive a routine

return which reflected an arm's length compensation for its

distribution function.  In practice, NN Ireland received a distribution

return of only 1% of its third party sales.  This level of return failed to

recognize inter-company sales, significant customer intangibles, the

service element performed alongside the distribution function or the

risks and costs borne outside the routine return.

     b.  Second, as set out at paragraph 38 above, NN Ireland only received a

return in respect of "excess" regional central services and costs

incurred to support other Nortel entities outside of its territory from

2006 onwards.  Although NN Ireland incurred such costs from 2001

---

3.   The precise nature of the flaws in the RPSM arrangements will be a matter for expert evidence in due
    course.

to 2005, during this period the RPSM did not contain a specific provision for these costs to be reimbursed. An independent entity in the position of NN Ireland should have been remunerated for providing such services.

c.  Third, the RPSM model did not reflect NN Ireland's high restructuring costs during the period because restructuring costs were ignored in the calculation of the RPEs' profits.

d.  Fourth, NN Ireland incurred losses associated with bad debts arising from vendor financing that NNL required NN Ireland to provide to its customers. A credit committee within NNL made the credit decisions for the Nortel Group. An independent party should not and would not have accepted these losses. As such, NN Ireland should have been reimbursed these losses to produce an arm's length result.

e.  Finally, pursuant to the MRDA, for the period 2006 onwards, stewardship costs were to be excluded from the calculation of the RPEs' residual profits. However, in practice these costs were not excluded. Further, the RPSM also allocated NNL and NNI's corporate costs to the residual profit pool. As a result, the amount of loss to be shared among the RPEs, including NN Ireland, was increased. Given the industry decline and the sudden reduction in volume of business, the corporate costs of NNL and NNI were significantly in excess of what was necessary to oversee and manage the global Nortel Group, and in particular the EMEA region, given that EMEA had its own head office. An independent party in the position of NN Ireland acting at arm's length should not and would not have agreed to effectively bear these costs (or be charged a higher charge for

14

services).  In addition, a significant portion of these costs provided no benefit to NN Ireland as they duplicated the head office functionality that already existed within the region.

50.      The IRS successfully challenged the RPSM model on the basis that it did not comply with the arm's length requirement. Pursuant to a settlement approved by the Court, the IRS required that NNL decrease the amount of income reported on its Canadian income tax returns by $2 billion, and that NNI increase the amount of income reported on its US income tax returns by $2 billion.  These adjustments were said to reflect net overpayments made by NNI to NNL for those tax years.  The settlement is an admission that the RPSM model did not comply with the arm's length principle.

## H.      NN IRELAND'S INTERCOMPANY LOANS AND DIVIDENDS

51.      The Irish Loans and Irish Dividends, the subject of this claim, were in practice made and declared at the behest of NNL with the participation and assistance of NNI. NNL and NNI's strategy, operating at all material times from at least the year 2000, was to structure NN Ireland's affairs with the intention of channelling cash and profit to NNL (the Irish Cash Repatriation Strategy referred to above). The Irish Cash Repatriation Strategy was in the interest of NNL and NNI (see paragraph 60 below), but not in the interests of NN Ireland and its creditors. The policy giving rise to it resulted from a Group Treasury project headed by Katharine Stevenson of NNI, and NNI personnel were actively involved in devising and implementing the resulting initiatives to remove cash from NN Ireland and move it to NNL (as described above at 20 to 25).

### H.1.     Background and intention to benefit NNL

52.      NNL, with the participation and assistance of NNI, took particular steps from 2006 onwards pursuant to the Irish Cash Repatriation Strategy.

53.      First, in or around June 2006, NNL obtained from NN Ireland the first of the Irish Loans, namely an interest free loan facility with a maximum facility amount of

€80,000,000.00 ("the June 2006 Loan").   This loan, which was drawn down in full before being repaid without interest on or about 19 July 2006, was made for no proper commercial purpose and was improper.

54.      Second, on 20 December 2007, Nortel Networks International Finance and Holding BV sold the issued share capital of NN Ireland to NNL.  The sale was completed on 20 December 2007. The reasons for the sale of the shares in NN Ireland to NNL included that:

    a.   NN Ireland had considerable liquid cash resources.  In particular, at the end of 2007, NN Ireland had cash of US $100 million, and had made interest-bearing loans to affiliates totalling US $49 million.

    b.   If NNL became the shareholder in NN Ireland, NN Ireland would be permitted to make interest free loans to NNL and pay dividends to NNL without incurring withholding taxes under Irish law.

    c.   Accordingly, it was proposed that NNL should become the direct shareholder in NN Ireland, and that NN Ireland would then make interest-free loans to NNL and pay dividends to NNL.

55.      Thirdly, following this restructuring, by resolution dated 22 April 2008, the de jure directors of NN Ireland determined that the first of the Irish Dividends, namely an interim dividend of €23.40 on each Ordinary Share (representing a total aggregate interim dividend of €21,600,000.00) and an interim dividend of 7% on each Preference Share (representing a total aggregate dividend of €8,750.00) should be declared payable by reference to the distributable reserves (€23,580,699.00) shown in NN Ireland's audited financial statements for the year ending 31 December 2006 ("the April 2008 dividends"). It was resolved that such dividends should be paid to NNL by NN Ireland on the first business day following the passing of the resolution.

56.      Fourthly, by resolution dated 22 April 2008, the de jure directors of NN Ireland purported to approve and "*to the extent necessary*" ratify the term of the second of the

16

Irish Loans, namely a draft revolving loan agreement between NN Ireland and NNL by which

NNL was provided with a 364-day revolving interest-free loan facility with a maximum facility

amount of €100,000,000.00. The sum of €100,000,000.00 appears to have in fact already been

drawn down by NNL on 21 April 2008 ("the April 2008 loan"). Again, this loan (on the terms

made) was for no proper commercial purpose and was improper. On or about 23 April 2008, the

balance of the April 2008 Loan was purportedly reduced to €78,391,250.00, as a result of the

offsetting of the sum of €21,608,750.00 payable as dividends from NN Ireland to NNL (i.e. the

April 2008 dividends).

57.    Fifthly, at a board meeting on 10 June 2008, the board of directors of NN

Ireland resolved that the second of the Irish Dividends, totalling €20,008,750, be declared in

NNL's favour ("the June 2008 dividends"). The June 2008 dividends were paid in cash by NN

Ireland to NNL on 23 June 2008. However, in or around September 2008, as a result of a

purported transfer pricing adjustment of €17,638,410.00 in NN Ireland's financial statements for

the year ending 31 December 2007 (which had not been approved by the auditors), it became

apparent that there had been insufficient distributable profits to have declared the June 2008

dividends in NNL's favour. The June 2008 dividends were accordingly unlawful.

58.    To deal with this, NNL and NNI determined that rather than repaying the

unlawful June 2008 dividends in cash, which would have been in the interests of NN Ireland and

its creditors, the unlawful June 2008 dividends would be treated as a loan to NNL, or would be

treated as being "repaid" and then advanced again to NNL through the sum of €20,008,750.00

being added to the stated balance of the April 2008 Loan and treated as a further advance under

that facility. As result, NN Ireland added the amount of the dividend to the April 2008 Loan,

increasing it to €98,400,000, with effect from 30 September 2008. This approach was adopted so

that cash would not need to pass from NNL to NN Ireland.

59.    This approach of avoiding repaying the April 2008 Loan in cash was

continued going forward. On or about 23 October 2008, the balance of the April 2008 Loan was

purportedly reduced to €56,683,642.85 as a result of a €41,716,357.15 transfer pricing adjustment declared in NNL's favour. Further, on or about 25 November 2008, the April 2008 Loan was purportedly reduced to €20,677,402.00, as a result of a €36,006,239.96 transfer pricing adjustment in NNL's favour. Finally, on or about 16 December 2008, the outstanding amount under the April 2008 Loan was purportedly settled, as a result of the offsetting of a €20,677,402.89 transfer pricing adjustment in NNL's favour.

60.     During the period that NNI was involved in the establishment of the Irish Loans and the Irish Dividends, NNI also made a number of loans to NNL (the "NNI Loans"). Unlike the interest free loan facilities provided by NN Ireland, the loans provided by NNI were made on an interest-bearing basis. Further, the balances under the NNI Loans, along with the interest which accrued under the same, were regularly repaid in cash by NNL. The effect of this was that NN Ireland lost value whilst NNI benefitted from value and received cash. The treatment of the NNI Loans by NNL contrasts starkly with the treatment of the Irish Loans. Particularly, the fact that NNL was able to make cash repayments in relation to the NNI Loans was because it did not make cash repayments in relation to the April 2008 Loan. The directors, officers and senior employees of NNI were, or should have been, aware of this. Either way, NNI benefitted as a result.

### H.2.    Loan agreements and dividends contrary to NN Ireland's best interests

61.     The Irish Loans and the Irish Dividends had no legitimate commercial purpose for NN Ireland and were not in NN Ireland's best interests.

62.     The Irish Loans amounted to unsecured, interest-free obligations which deprived NN Ireland of the commercial value it was due. Furthermore, the deemed repayment of the April 2008 Loan via transfer pricing adjustments deprived NN Ireland of value and was not in its best interests.

63.     The Irish Dividends were (in the case of the June 2008 dividends) declared when there were insufficient distributable reserves and (in the case of both dividends)

were declared at a time when the financial position of NN Ireland and the Nortel Group was such as to dictate that the company's – and its creditors' – best interests would have been best served if the Irish Dividends had not been declared. Furthermore, the deemed repayment of the unlawful June 2008 dividends via transfer pricing adjustments deprived NN Ireland of value and was not in NN Ireland's best interests.

64.   More particularly:

a.   At the time the April 2008 Loan was made to NNL, and at all times thereafter, NNL was not in a position to make repayment on any adequately timely or commercial basis and it was not intended to do so. NNI, acting through its directors, officers and senior employees, was or should have been aware of this. As the sums under this loan were advanced to NNL in cash, the effect of the April 2008 Loan was to transfer cash from NN Ireland to Canada.

b.   Instead of repaying the April 2008 Loan in cash, NNL deemed it to be partly repaid by setting off the April 2008 dividends against the loan balance. The declaration of the April 2008 dividends occurred at a time when NN Ireland was of doubtful solvency and/or at risk of insolvency. As such, the April 2008 dividends should not have been declared and this set-off was not justified. NNI, acting through its directors, officers and senior employees, was or should have been aware of this.

c.   Instead of repaying the remainder of the April 2008 Loan in cash, NNL deemed it to be repaid by setting off various amounts purportedly owed by NN Ireland to NNL pursuant to the Transfer Pricing Agreement. These set-offs were not justified (see section G.5. above) and so NN Ireland did not recover any of the value it advanced

to NNL under the April 2008 Loan. NNI, acting through its directors, officers and senior employees, was or should have been aware of this.

d.  The declaration of the June 2008 dividends occurred at a time when NN Ireland was of doubtful solvency and/or at risk of insolvency. As such, the June 2008 dividends should not have been declared. NNI, acting through its directors, officers and senior employees, was or should have been aware of this.

e.  NNL determined that NN Ireland should accept, in purported repayment from NNL of the unlawful June 2008 dividends, the addition of the amount of such sums to the outstanding April 2008 Loan balance, rather than require repayment in full in cash to NN Ireland. Alternatively, NNL determined that NN Ireland should treat the unlawful June 2008 dividends as having been repaid and then re-advanced to NNL, rather than require repayment in full in cash to NN Ireland. By doing so, NNL was able to avoid returning the cash value it had extracted from NN Ireland. NNI, acting through its directors, officers and senior employees, was or should have been aware of this.

f.  In order for an inter-company loan to be at arm's length it was necessary to charge interest on the inter-company loan arrangements. NN Ireland was not paid interest on the amounts it provided under either the June 2006 Loan or the April 2008 Loan in spite of the fact that this:

    i.  was uncommercial and of no, or no acceptable, benefit to NN Ireland; and

    ii.  was contrary to Nortel group's general practice that interest should be charged in respect of inter-company

loans. Particularly, this contrasted sharply with the

beneficial treatment that NNI received under the NNI

Loans on which interest was charged and which were

repaid regularly by NNL in cash.

### H.3.    Summary of Value extracted from NN Ireland as a result of the Irish Cash Repatriation Strategy

65.    In summary, the effect of the Irish Cash Repatriation Strategy as

described above was to extract from NN Ireland:

a.    the value of the interest that should have been charged on the June
2006 Loan;

b.    the value of the April 2008 dividends which, given the financial
position of NN Ireland and the Nortel group, should not have been
declared;

c.    the value of the interest that should have been charged on the April
2008 Loan;

d.    the value of the April 2008 Loan itself: this loan was deemed to be
repaid by off-setting transfer pricing adjustments in NNL's favour
against it. These transfer pricing adjustments were not justified (see
section G.5. above) and, as a result, these deemed repayments had no
value to NN Ireland; and

e.    the value of the unlawful June 2008 dividends: (a) first, given the
financial position of NN Ireland and the Nortel group, these should
not have been declared; and (b) secondly, on discovering that these
dividends could not have been declared because they were unlawful,
their value was added to the balance of the debt due under the April
2008 Loan. As above, the balance of this loan was deemed to be

repaid via transfer pricing adjustments which were not justified and, as a result, these deemed repayments had no value to NN Ireland.

## I.    BUSINESS SALES

66.    Prior to 14 January 2009, NN Ireland entered into various global business sales with other Nortel entities, including NNI, whereby a particular business line was sold by those Nortel entities to a third party purchaser.

67.    The parties agreed as required by law and international accounting regulations that the various selling Nortel entities agreed to allocate the proceeds of sale amongst themselves on the basis of an arm's length legal entitlement that each had to the proceeds.  In this way, the allocation of the proceeds of this sale had to correspond with the arm's length principles discussed above in relation to transfer pricing.  The agreed allocation was set out in a statement dated 24 July 2007.

68.    The allocation that was applied as between the various selling Nortel entities did not accord with the arm's length principles discussed above.  Rather, allocation was attempted on the erroneous assumptions that were contained in the transfer pricing structure that prevailed within the Nortel Group at the time.  Further, it appears that in fact the allocation was not even applied in conformity with these erroneous assumptions.

69.    As a consequence of the allocation method adopted, NN Ireland received significantly less, and NNI received significantly more, than it was entitled to on an arm's length basis.

70.    Further, and in the alternative, NN Ireland understands that NNI will seek to argue that the appropriate arm's length basis on which to allocate the post petition business sale proceeds is solely on the basis of the revenue lines generated.  For the avoidance of doubt, NN Ireland disagrees that this is the correct method for the allocation of these proceeds.  However, if this method had been adopted in relation to the allocation of the proceeds from the pre-petition

business sales, it would reveal that NN Ireland received an extremely large undervalue from the proceeds of these sales.

### J.    TAXATION MATTERS

71.    As explained above, NN Ireland's taxation affairs were controlled by NNI and NNL.  This was particularly so in relation to transfer pricing matters, but also the case more generally.

72.    To the extent that any Revenue Authority were to make a claim against NN Ireland in relation to a failure to pay the proper level of taxation in any years (whether because of an under recording of revenue or otherwise), then NNI and NNL would be responsible for any penalties, interest and other loss payable by NN Ireland.

### K.    FSD PROCEEDINGS

73.    By a Determination Notice dated 25 June 2010, the Determinations Panel ("the DP") of the UK Pensions Regulator ("the UK Regulator") determined that a Financial Support Direction ("FSD") requiring the provision of financial support to the Nortel Networks UK Pension Plan ("the Scheme") should be issued in respect of certain EMEA Companies[4] (the "EMEA Targets"). NN Ireland is an EMEA Target.

74.    By two References dated 23 July 2010, the EMEA Targets have referred the decision of the DP to the Upper Tribunal (Tax and Chancery Chamber).  The References have not yet been heard.

75.    As well as the EMEA Targets, the DP referred to above determined that an FSD should be issued in respect of NNI.  NNI has not referred the decision of the DP to the Upper Tribunal.  Following an application by the UK Regulator, the Upper Tribunal issued

---

4.    *Inter alia,* Nortel GmbH, Nortel Networks N.V., Nortel Networks S.p.A, Nortel Networks B.V., Nortel Networks Hispania S.A., Nortel Networks Polska Sp. z.o.o., Nortel Networks International Finance & Holdings B.V., Nortel Networks France S.A.S., Nortel Networks (Ireland) Limited, Nortel Networks S.A., Nortel Networks A.G., Nortel Networks O.O.O., Nortel Networks (Austria) GmbH, Nortel Networks South Africa (Proprietary) Limited, Nortel Networks Slovensko s.r.o, Nortel Networks Engineering Service Kft, Nortel Networks A.B., Northern Telecom France S.A., Nortel Networks s.r.o., Nortel Networks Portugal S.A, and Nortel Networks A.S..

directions on 3 February 2011 that confirmed that FSDs can be issued by the UK Regulator as against NNI.

### The basis for and effect of an FSD

76.    The basis for and effect of an FSD are matters which are governed by English law.  As a matter of English law, the power of the UK Regulator to issue an FSD is derived from section 43 of the UK Pensions Act 2004 ("the 2004 Act").  Under that section, the UK Regulator may only issue an FSD to a particular person in relation to a particular pension scheme if a number of conditions are satisfied.  One of those conditions is that the UK Regulator must be of the opinion that it is reasonable to impose the requirements of the FSD on the person in question.

77.    In deciding whether it is reasonable to impose the requirements of the FSD on a particular person, the UK Regulator is required to give regard to such matters as it considers to be relevant, including, where relevant, the following:

> a.  the relationship which the person has or has had with the sponsoring employer of the pension scheme in question (including, where the person is a company, whether the person has or has had control of the employer);
>
> b.  the value of any benefits received directly or indirectly by the person from the employer;
>
> c.  any connection or involvement which the person has or has had with the scheme; and
>
> d.  the financial circumstances of the person.

78.    The principal effect of an FSD is to require the persons to whom it is issued to secure that "financial support" for the pension scheme in question is put in place within the period specified in the FSD, and maintained in place thereafter.  By section 45 of the 2004

Act, "financial support" means one or more arrangements falling within section 45(2) of the 2004 Act, the details of which are approved by a notice issued by the UK Regulator.

79.     In the event that there is non-compliance with an FSD, the UK Regulator has power under section 47 of the 2004 Act to issue a contribution notice (a "CN") to any one or more of the persons to whom the FSD was issued stating that the person is under a liability to pay to the trustees or managers of the pension scheme the sum specified in the CN.  The UK Regulator may only issue a CN to a particular person if it is of the opinion that it is reasonable to impose liability on the person to pay the sum specified in the CN.

<u>CLAIMS</u>

**A.     INTER-COMPANY TRADING DEBT CLAIMS**

**Claim 1.     <u>Contractual claim</u>**

80.     NN Ireland has claims against NNI in respect of the outstanding intercompany trading debts as between the two entities.

81.     As at 14 January 2009, the balance of the intercompany trading debts owed by NNI to NN Ireland stood at US$ 2,902,547.59. These debts were carried on the books and records of NN Ireland and NNI pursuant to an express or implied agreement that they would be repaid.

82.     As such, to the best of NN Ireland's knowledge, this amount is contractually due and payable to NN Ireland by NNI, together with pre and post judgment interest.

83.     Alternatively, NN Ireland is entitled to damages in this amount for breach of contract.

**B.     TRANSFER PRICING CLAIMS**

**Claim 2.     <u>Breach of Fiduciary Duties by NNI as De Facto or Shadow Director of NN Ireland under Irish Law</u>**

84.     Under Irish law, each of the directors of NN Ireland (whether de facto, shadow or de jure) owed fiduciary duties to the company.

85.    These included duties (inter alia):

    a.  to exercise their power in good faith and in the interests of the company as a whole;

    b.  not to make a secret profit out of its position as a director and to account to the company for any benefit so obtained, regardless of whether the company has suffered any loss;

    c.  to avoid conflicts of interest; and

    d.  to exercise skill, due diligence and care in the discharge of its functions.

86.    Further, given the doubtful solvency (and/or risk of insolvency) of NN Ireland from 2000 onwards, in carrying out their fiduciary duties to NN Ireland, the directors were obliged at all times to consider the best interests of the creditors of NN Ireland as paramount and to take those interests fully into account in exercising their powers and discretions.

87.    NNI itself owed these fiduciary duties to NN Ireland under Irish law. This is due to the involvement of NNI's directors, officers and senior employees with the direction of the affairs of NN Ireland and the fact that they undertook the decision-making function in respect of NN Ireland (see section D above). In so doing, NNI assumed the role of a de facto director and/or a shadow director of NN Ireland at all material times from, or about, 2000 in relation to tax and treasury matters.

88.    In particular NNI assumed the role of de facto director and/or shadow director and/or owed such duties in relation to NN Ireland's participation in the RPSM by virtue of the fact that NNI was involved in all decision-making in relation to the transfer pricing arrangements, as explained at paragraphs 16 to 19 above.

89.    As a result, under Irish law, NNI assumed the role of de facto director and/or shadow director of NN Ireland in relation to tax and treasury matters, including NN

Ireland's participation in the RPSM, by virtue of the fact that NNI was involved in all decision making in relation to the transfer pricing arrangements.

90.     For the reasons described in section G.5. above, the implementation and operation of the RPSM and MRDA were clearly not in NN Ireland's best interests.  As a result NNI breached its fiduciary duties in causing NN Ireland to participate under such arrangements and in failing to ensure that NN Ireland received an arm's length return under the RPSM.

91.     As a result of NNI's breach of duty, NN Ireland suffered significant loss and/or damage in an amount to be established at trial but in any event no less than US$ 96,000,000 plus pre and post judgment interest. NNI is accordingly liable to NN Ireland for damages and/or liable to compensate NN Ireland in equity for this amount.

**Claim 3.**     <u>**Breach of duty of care under Irish law**</u>

92.     In order to bring a claim under Irish law for breach of duty of care it must be established that:

> a.  NNI was a de facto or shadow director of NN Ireland or NNI otherwise owed NN Ireland a duty of care;
>
> b.  NNI breached the duty of care which it owed to NN Ireland; and
>
> c.  the breach caused NN Ireland loss.

93.     As a de facto or shadow director of a second company, the first company will owe a duty to the second company to act with due skill and care in relation to the second company.

94.     Further, the first company will owe a duty of care to the second company whether or not it is a de facto or shadow director of the second company if there is a relationship of sufficient proximity between the two, the harm in question was reasonably foreseeable and it is appropriate in the circumstances to impose a duty of care.

95.     The second company would be able to bring a claim against the first company if it can establish a breach of such a duty of care and that such a breach caused loss to the second company.

96.    For the reasons stated in paragraphs 87 to 89 above, NNI owed a duty as a de facto or shadow director to take reasonable care in and about its dealing with the affairs of NN Ireland (and/or the particular business and transactions referred to in this document) particularly in respect of transfer pricing.  In any event, in the circumstances described above in section D, NNI stood in such proximity to NN Ireland as to owe it a duty of care with regard to those parts of NN Ireland's business with which NNI involved itself.

97.    Without prejudice to the generality of the previous paragraph, NNI acted as such and/or owed such duties in relation to NN Ireland's participation in the RPSM and MRDA and the steps taken in the implementation of the same by virtue of the fact that NNI was involved in all decision-making in relation to the transfer pricing arrangements, as explained in paragraphs 16 to 19 above.

98.    For the reasons described in section G.5. above, the implementation and operation of the RPSM and MRDA was clearly not in NN Ireland's best interests.  NNI breached its duty of care in causing NN Ireland to participate under such arrangements and in failing to ensure that NN Ireland received an arm's length return under the RPSM.

99.    As a result of NNI's breach of duty, NN Ireland suffered significant loss and/or damage in the amount set out at paragraph 91 above. NNI is accordingly liable to NN Ireland for damages to compensate NN Ireland for that amount.

**Claim 4.**    **Dishonest Assistance under Irish Law**

100.    Under Irish common law a defendant will be liable for dishonest assistance where:

    a.  a fiduciary breaches a fiduciary duty:

    b.  the defendant procures or assists in that breach of duty; and

    c.  the defendant does so dishonestly.

101.    The standard of dishonesty required is an objective standard of dishonesty, which in a commercial setting simply means conduct which is 'commercially unacceptable'.

102.    For the reasons described in section G.5. above, in causing or allowing NN Ireland to participate in the non arm's length compliant RPSM and MRDA arrangements, the directors of NN Ireland (including de jure, de facto and shadow directors) breached their fiduciary duties.

103.    That breach of duty caused NN Ireland to suffer significant damage and/or loss in the approximate amount set out in paragraph 91 above.

104.    NNI, through the involvement of its personnel in the design, implementation and operation of the MRDA and RPSM (as described in paragraphs 16 to 19 above), advocated or assisted the conduct by NN Ireland's directors which led to the breaches of fiduciary duties. Further, NNI acted dishonestly as it appreciated that the implementation and operation of the MRDA and RPSM were contrary to NN Ireland's interests and that the directors of NN Ireland were acting in breach of duty by allowing NN Ireland to participate in such arrangements.

105.    NNI is accordingly liable to NN Ireland for damages to compensate NN Ireland for the amount stated in paragraph 91 above.

**Claim 5.    <u>Conspiracy under Irish Law</u>**

106.    Under Irish law, the tort of conspiracy requires at least two parties to combine deliberately for an agreed purpose. There must be an agreement between the parties and this agreement must be implemented but the parties need not act together or at the same time. In order to be actionable, the conspiracy must either have an unlawful purpose or involve the use of unlawful means to attain an otherwise lawful objective.

107.    NNI and NNL, alternatively NNI and the de jure directors of NN Ireland, alternatively NNI, NNL and NN Ireland's directors, engaged in a conspiracy together by

implementing and operating the RPSM and MRDA in relation to the transfer pricing arrangements with the predominant unlawful purpose of damaging the economic interests of NN Ireland (the requirement of unlawful purpose being satisfied by the breach of fiduciary duty arising from the arrangements (see paragraph 90 above)).

108.    NNI's actions as part of this conspiracy meant that NN Ireland was not provided with the arm's length return which it would have otherwise received.

109.    This caused NN Ireland loss as described at paragraph 91 above. NN Ireland is entitled to recover this amount from NNI.

**Claim 6.**    **Aiding and Abetting Breach of Fiduciary Duty or Tortious Conduct under State Law**

110.    To recover for aiding and abetting breach of fiduciary duty or a tortious act under the law of Delaware, Texas or any other state whose law might arguably apply, a party must plead and prove:

    a.    the existence of a fiduciary relationship;

    b.    that the fiduciary breached its duty to the plaintiff;

    c.    that the defendant, who is a non-fiduciary, knowingly participated in the breach with knowledge that the conduct advocated or assisted constituted such a breach; and

    d.    that damages resulted from the concerted action of the fiduciary and non-fiduciary.

111.    As regards the breach of fiduciary duty in question, under Irish law, each of the directors of NN Ireland (whether de jure and/or, in the case of NNL,[5] de facto/shadow) owed NN Ireland the fiduciary duties set out above at paragraph 85.

---

5.  In this context NNL maintained a high degree of control over NN Ireland and its affairs (including the transactions referred to in this Rider) and at all material times assumed and exercised the functions of a director in respect of NN Ireland's affairs. Further or alternatively NNL was a person in accordance with whose instructions the de jure directors of NN Ireland were accustomed to act, In all the circumstances NNL was at all material times a de facto, further or alternatively, shadow director of NN Ireland. In any

112.    Further, given the doubtful solvency (and/or risk of insolvency) of NN Ireland from 2000 onwards, in carrying out their fiduciary duties to NN Ireland, the directors were obliged at all times to consider the best interests of the creditors of NN Ireland as paramount and to take those interests fully into account in exercising their powers and discretions.

113.    For the reasons described in section G.5. above, it is clear that in bringing about and allowing NN Ireland's participation in the RPSM and MRDA and the steps taken in the implementation of the same, the directors of NN Ireland breached their fiduciary duties by allowing NN Ireland to participate under such arrangements.

114.    That breach of duty caused NN Ireland to suffer significant damage and/or loss in the amount described at paragraph 91 above.

115.    NNI, through the involvement of its personnel in the design, implementation and operation of the MRDA and RPSM (as described in paragraphs 16 to 19 above), advocated or assisted the conduct by NN Ireland's directors (whether de jure, de facto and/or shadow) which led to these breaches of fiduciary duties.

116.    As such, NN Ireland is entitled to recover the amount set out at paragraph 91 above from NNI.

**Claim 7.    Civil Conspiracy under State Law**

117.    To recover for civil conspiracy under the law of Delaware, Texas or any other state whose law might arguably apply, a party must plead and prove:

    a.  The existence of a confederation or combination of two or more persons, including the defendant;

    b.  That a tortious or unlawful act was done in furtherance of the conspiracy; and

    c.  Actual damages.

---

event, by reason of the controlling function it assumed in relation to the transactions the subject of this Rider, NNL assumed fiduciary duties in respect of those transactions.

118.    In relation to the Nortel transfer pricing arrangements, NNI and NNL, alternatively NNI, NNL and the de jure directors of NN Ireland, alternatively NNI and the de jure directors of NN Ireland, acted together by implementing and operating the RPSM and MRDA with the objective of removing value from NN Ireland and in a manner which, as NNI, NNL and NN Ireland's de jure directors were aware, operated contrary to NN Ireland's interests in a way that caused NN Ireland's directors (who also included NNL, which was itself a de facto or shadow director of NN Ireland) to breach their fiduciary duties, as set out in paragraph 85 above, and breach their duties of care under Irish law, as set out in paragraph 94 above. The conduct of NNI and NNL, alternatively NNI, NNL and the de jure directors of NN Ireland, alternatively NNI and NN Ireland's de jure directors, amounts to a civil conspiracy to injure NN Ireland through the improper operation of the MRDA and RPSM and the breaches of duty by NN Ireland's directors inherent in such operation.

119.    This caused significant loss and/or damage to NN Ireland in the amount described at paragraph 91 above.

120.    As such, NN Ireland is entitled to recover this amount from NNI.

C.    **CLAIMS IN RESPECT OF THE INTER-COMPANY LOANS AND DIVIDENDS**

Claim 8.    **Breach of Fiduciary Duties by NNI as De Facto or Shadow Director of NN Ireland under Irish Law**

121.    In order to bring an Irish law claim against NNI for breach of fiduciary duty, one of the duties described at paragraph 85 above must be shown to have been breached.

122.    For the reasons stated in section D above, NNI was a de facto or shadow director of NN Ireland and in any event owed NN Ireland fiduciary duties in respect of tax and treasury matters including NN Ireland's participation in the Irish Loans and the Irish Dividends.

123.    Without prejudice to the generality of the previous paragraph, NNI acted as such and/or owed such duties in relation to NN Ireland's participation in the Irish Loans and

the Irish Dividends by virtue of the fact that NNI was involved in all decision making in relation to the those arrangements, as explained in paragraph 20 to 26 above.

124.    For the reasons described in section H.2. above, the implementation and operation of the Irish Loans, the Irish Dividends and the Irish Cash Repatriation Strategy were clearly not in NN Ireland's best interests.  NNI breached its fiduciary duties in causing or allowing NN Ireland to enter and act in accordance with these arrangements.

125.    NNI's breach of duty caused loss and/or damage to NN Ireland in an amount to be established at trial and currently estimated as:

a.  The value of the interest that should have been charged on the June 2006 Loan: US$ 49,067.31.

b.  The value of the April 2008 dividends, namely €21,608,750.00 plus interest. According to the exchange rate operating on 14 January 2009, this amounts to US$28,566,767.50.

c.  The value of the interest that should have been charged on the April 2008 Loan. This has been estimated at approximately US$ 5,000,000.

d.  The value of the April 2008 Loan itself, namely €100,000,000 plus interest. According to the exchange rate operating on 14 January 2009, this amounts to US$ 132,200,000.

e.  The value of the unlawful June 2008 dividends, namely €20,008,750.00 plus interest.  According to the exchange rate operating on 14 January 2009, this amounts to US$ 26,451,567.50.

126.    As such, the total loss suffered by NN Ireland will be established at trial but in any event will be no less than US$ 192,267,402.31 plus pre and post judgment interest.

127.    NNI is accordingly liable to NN Ireland for damages and/or liable to compensate NN Ireland in equity for that amount.

**Claim 9.    Breach of duty of care under Irish Law**

128.    In order to bring a claim under Irish law for breach of duty of care the elements explained in paragraphs 92 to 95 above must be established.

129.    For the reasons stated in paragraph 116 above, NNI owed a duty as a de facto or shadow director to take reasonable care in and about its dealing with the affairs of NN Ireland (and/or the particular business and transactions referred to in this document).  In any event, in the circumstances described above, NNI stood in such proximity to NN Ireland as to owe it a duty of care with regard to those parts of NN Ireland's business with which NNI involved itself (including the matters dealt with in section D above).

130.    Without prejudice to the generality of the previous paragraph, NNI acted as such and/or owed such duties in relation to NN Ireland's participation in the Irish Loans and the Irish Dividends by virtue of the fact that NNI was involved in all decision making in relation to those arrangements, as explained in paragraphs 20 to 26 above.

131.    For the reasons described in section H.2. above, the implementation and operation of these arrangements was clearly not in NN Ireland's best interests.  NNI breached its duty of care in causing or allowing NN Ireland to enter into and act in accordance with these arrangements.  As a result of NNI's breach of duty, NN Ireland suffered significant loss and/or damage in the amount stated at paragraph 126 above.

132.    NNI is accordingly liable to NN Ireland for damages to compensate NN Ireland for that amount.

**Claim 10.    Dishonest assistance under Irish law**

133.    Under Irish common law a defendant will be liable for dishonest assistance in the circumstances explained in paragraph 100 above.

134.    For the reasons described in section H.2. above, it is clear that the Irish Loans and the Irish Dividends were not in NN Ireland's interests and that, accordingly, the

directors of NN Ireland (including de facto and shadow directors) breached their fiduciary duties by allowing NN Ireland to participate under such arrangements.

135.    That breach of duty caused NN Ireland to suffer significant damage and/or loss in the amount of stated at paragraph 126 above.

136.    NNI, through the involvement of its personnel in the design and implementation of the Irish Loans and the Irish Dividends, advocated or assisted the conduct by NN Ireland's directors which led to the breaches of fiduciary duties.  Further, NNI acted dishonestly as it appreciated that the Irish Loans and Irish Dividends were contrary to NN Ireland's interests and that the directors of NN Ireland were acting in breach of duty by allowing NN Ireland to participate in such arrangements.

137.    NNI is accordingly liable to NN Ireland for damages to compensate NN Ireland for that amount.

### Claim 11.    Unconscionable receipt under Irish law

138.    A claim under Irish law for unconscionable receipt to the extent that NNI received value:

      a.   which truly belonged to NN Ireland;

      b.   which came to NNI by virtue of breaches of fiduciary duty by NN Ireland's (de jure, de facto and/or shadow) directors; and

      c.   in circumstances where NNI was aware that this was the case.

139.    As described at paragraph 60 above, NNL was only able to make certain cash repayments of the NNI Loans due to the fact that it did not have to repay the April 2008 Loan and/or the June 2008 dividends in cash. As such, NNI received value which truly belonged to NN Ireland.

140.    For the reasons described at paragraph 124 above, this value came to NNI by virtue of breaches of NN Ireland's directors' fiduciary duties.

141.    Due to NNI's involvement and participation (as described in paragraphs 20 to 26 above) in the Irish Cash Repatriation Strategy, it was sufficiently aware of these matters to render its receipt of the value unconscionable under Irish law.

142.    NNI is accordingly liable to compensate NN Ireland for the value it received, being the amount described at paragraph 126 above.

**Claim 12.    <u>Irish Law Conspiracy</u>**

143.    Under Irish law, the tort of conspiracy has the requirements set out at paragraph 106 above.

144.    NNI and NNL, alternatively NNI, NNL and NN Ireland's de jure directors, alternatively NNI and NN Ireland's de jure directors, acted in relation to the Irish Loans and the Irish Dividends with the predominant unlawful purpose of damaging the economic interests of NN Ireland (the requirement of unlawful purpose being satisfied by the breach of fiduciary duty arising from the arrangements as described at paragraph 124 above).

145.    NNI's role in this conspiracy in relation to the Irish Loans and the Irish Dividends meant that NN Ireland was deprived of value to which it was entitled.

146.    This caused NN Ireland loss as described at paragraph 126 above. NNI is accordingly liable to NN Ireland for damages to compensate NN Ireland for that amount.

**Claim 13.    <u>Aiding and Abetting Breach of Fiduciary Duty under State Law</u>**

147.    The elements of the aiding and abetting a breach of fiduciary duty cause of action under State law are set out in paragraph 110 above.

148.    NN Ireland's directors (either de jure, shadow or de facto) owed NN Ireland fiduciary duties as set out in paragraph 85 above.

149.    For the reasons described in section H.2. above, the Irish Loans and the declaration of the Irish Dividends were manifestly not in NN Ireland's interests.  The directors of NN Ireland breached their duties by causing or allowing NN Ireland's entry into and/or implementing these arrangements.

36

150. NNI, through the involvement of its directors, officers and senior employees, as explained in paragraphs 20 to 26 above, advocated or assisted the conduct by NN Ireland's directors which led to these breaches.

151. This caused NN Ireland loss as described at paragraph 126 above. NNI is accordingly liable to NN Ireland for damages to compensate NN Ireland for that amount.

**Claim 14.**    **Civil Conspiracy under State Law**

152. The elements of the civil conspiracy cause of action under state law are set out in paragraph 117 above.

153. In relation to the Irish Loans and the Irish Dividends, NNI and NNL, alternatively NNI, NNL and NN Ireland's de jure directors, or alternatively NNI and NN Ireland's de jure directors, acted together by implementing and operating the arrangements in a manner which, as NNI, NNL and NN Ireland's de jure directors were aware, operated contrary to NN Ireland's interests in a way that (as can be seen by the other claims in this section) amounted to an unlawful act (see paragraphs 121 to 132). This unlawful act included a breach of fiduciary duty on the part of NNL which was a de facto or shadow director of NN Ireland. NNI and NNL's conduct, alternatively NNI, NNL and NN Ireland's de jure directors, alternatively NNI and NN Ireland's de jure directors' conduct, amounted to a civil conspiracy to injure NN Ireland.

154. This caused NN Ireland loss as described at paragraph 126 above. NNI is accordingly liable to NN Ireland for damages to compensate NN Ireland for that amount.

**Claim 15.**    **Unjust Enrichment**

155. To recover for unjust enrichment under the law of Delaware, Texas or any other state who law might arguably apply, a party must plead and prove:

   a. the defendant was enriched;

   b. enrichment was at the plaintiff's expense;

   c. a relation between the enrichment and the impoverishment;

   d. an injustice would result from the defendant's retention of the benefit.

156.    An unjust enrichment lies where the defendant either procured a consideration through a wrongful act or passively received a benefit that would be unconscionable to retain.

157.    As described in detail above, NNI's officers and directors were actively involved in the devising and implementing of the Irish Loans and the Irish Dividends, one of the initiatives to remove cash from NN Ireland and move it to NNL.

158.    As described at paragraph 60 above, NNL was able to make certain cash repayments of the NNI Loans due to the fact that it did not have to repay the April 2008 Loan and/or the June 2008 dividends in cash. As such, NNI was enriched by value at NN Ireland's expense. NNI's retention of the benefits conferred on it by NN Ireland would be unconscionable.

159.    NN Ireland seeks restitution from NNI of the benefits wrongfully received by BBI in the amount described at paragraph 126 above.

## D.    CLAIMS IN RESPECT OF PAST DISPOSITIONS OF BUSINESS

160.    To the extent that NN Ireland did not receive from any pre-petition business sale, a fair and appropriate allocation of the proceeds for the assets it has sold ("Pre-Petition Sale Proceeds"), based on the arm's length principle, NN Ireland has various claims which will be further particularized following discovery. These claims include:

**Claim 16.    Contractual claim – implied contract**

161.    Given that the requirements of law and international accounting principles dictate that the Pre-Petition Sale Proceeds must be allocated on an arm's length basis as between the selling Nortel entities and pursuant to the agreement as between the selling Nortel entities that such a fair allocation would be applied, there was an implied contract as between the selling Nortel entities that the Pre-Petition Sale Proceeds would be distributed as amongst them in accordance with the arm's length principle.

162.    In the circumstances, the Pre-Petition Sale Proceeds were not distributed on an arm's length basis, to the detriment of NN Ireland. NNI's participation in the decision

making in relation to the allocation of sale proceeds is explained above. NNI's involvement in this regard constituted a breach of the implied contract fairly to allocate the Pre-Petition Sale Proceeds by NNI.

**Claim 17.      Contractual claim – implied term**

163.    A claim under the relevant sale contracts pursuant to the governing law applicable to the sale contracts that NN Ireland would receive a fair and appropriate allocation, based on the arm's length principle, of the Pre-Petition Sale Proceeds.

**Claim 18.      Breach of Fiduciary Duties by NNI as De Facto or Shadow Director of NN Ireland under Irish Law**

164.    In order to bring an Irish law claim against NNI for breach of fiduciary duty it must be shown that one of the duties described at paragraph 85 above has been breached.

165.    For the reasons stated in section D above, NNI was a de facto or shadow director of NN Ireland and owed NN Ireland fiduciary duties in respect of its dealing with the affairs of NN Ireland (and/or the particular business and transactions referred to in this document).

166.    Without prejudice to the generality of the previous paragraph, NNI acted as such and/or owed such duties in relation to NN Ireland's participation in the sales of pre-petition businesses by virtue of the fact that NNI was involved in all decision making in relation to those sales, as explained in paragraph 66 to 67 above.

167.    For the reasons described in section I above, the sale of pre-petition businesses in respect of which NN Ireland did not receive a proper allocation of sales proceeds was clearly not in NN Ireland's best interests and NNI breached its duties as a result.

168.    As a result of NNI's breach of duty, NN Ireland suffered significant loss and/or damage in an amount to be determined at trial.  NNI is accordingly liable to NN Ireland for damages and/or liable to compensate NN Ireland in equity for that amount.

**Claim 19.**     **Breach of Duty of Care under Irish Law**

169.    In order to bring a claim under Irish law for breach of duty of care the elements explained in paragraphs 92 to 95 above must be established.

170.    For the reasons stated in paragraph 165 above, NNI owed a duty as a de facto or shadow director to take reasonable care in and about its dealing with the affairs of NN Ireland (and/or the particular business and transactions referred to in this document).  In any event, in the circumstances described above, NNI stood in such proximity to NN Ireland as to owe it a duty of care with regard to those parts of NN Ireland's business with which NNI involved itself (including the matters dealt with in section D above).

171.    Without prejudice to the generality of the previous paragraph, NNI acted as such and/or owed such duties in relation to NN Ireland's sales of those pre-petition businesses in respect of which NN Ireland did not receive a proper allocation of sales proceeds by virtue of the fact that NNI was involved in all decision making in relation thereto, as explained in paragraphs 66 to 67 above.

172.    For the reasons described in section I above, the sales of pre-petition businesses in respect of which NN Ireland did not receive a proper allocation of sales proceeds was clearly not in NN Ireland's interests.  NNI breached its duty of care in allowing NN Ireland to enter into those sales.

173.    As a result of NNI's breach of duty, NN Ireland suffered significant loss and/or damage in an amount to be determined at trial.  NNI is accordingly liable to NN Ireland for damages to compensate NN Ireland for that amount.

**Claim 20.**     **Mistake under Irish law**

174.    Alternatively, NN Ireland did not receive a fair allocation of the Pre-Petition Sale Proceeds due to a mistake (either of fact or law) as to the full extent to which NN Ireland is entitled. As a consequence of this mistake, NNI received considerably more from the

allocation than it was intended to receive.  NNI is therefore obliged to repay the overpayment to NN Ireland.

### Claim 21.    Unconscionable receipt under Irish law

175.    A claim under Irish law for unconscionable receipt to the extent that NNI received Pre-Petition Proceeds of Sale which (a) truly belong to NN Ireland; (b) by virtue of the breaches of duty by NN Ireland's directors (as explained in paragraph 167 above); and (c) of which NNI was aware due to its involvement and participation (as described in paragraphs 66 to 67 above).

### Claim 22.    Transaction at an undervalue / fraudulent disposition

176.    As a result of the allocations of the Pre-Petition Sale Proceeds made within two years prior to the onset of insolvency, NNI received sums of money that were properly due to NN Ireland, without NN Ireland receiving appropriate value in return.  These diversions of cash from NN Ireland to NNI therefore constitute transactions at an undervalue in accordance with section 238 of the Insolvency Act 1986.

177.    As NNI is a related party, there is a presumption that NN Ireland was insolvent at the time that the transaction took place.

178.    As a result, the Court may make any order that it sees fit, including an account from NNI to NN Ireland of the sums that it received by way of the undervalue transaction.

179.    If a liquidator were to be appointed in Ireland in relation to NN Ireland, a similar claim could be brought on the basis that these diversions of cash from NN Ireland to NNI constituted fraudulent dispositions pursuant to section 139 of the Irish Companies Act 1990.

### Claim 23.    Aiding and Abetting Breach of Fiduciary Duty under State Law

180.    The elements of the aiding and abetting a breach of fiduciary duty cause of action under state law are set out in paragraph 110 above.

181.    NN Ireland's directors (either de jure or, in the case of NNL, de facto/shadow) owed NN Ireland fiduciary duties as set out in paragraph 85 above.

182.    For the reasons described in section I above, it was manifestly not in NN Ireland's interests for NN Ireland to enter into sales in respect of which NN Ireland did not receive a proper allocation of the sale proceeds.  The directors of NN Ireland breached their duties by causing and/or allowing NN Ireland to enter into sales in respect of which NN Ireland did not receive a proper allocation of the Pre-Petition Sale Proceeds.

183.    As a result of these breaches NN Ireland suffered losses in an amount to be determined at trial.

184.    NNI, through the involvement of its directors, officers and senior employees, as explained in section D above, advocated or assisted the conduct by NN Ireland's directors which led to these breaches.

185.    NNI is accordingly liable to NN Ireland for damages to compensate NN Ireland for that amount.

E.      **TAXATION MATTERS**

186.    As explained in paragraph 19 above, at all material times, NNI (together with NNL) controlled NN Ireland's tax affairs.

187.    In such circumstances, by causing and/or allowing NNI and NNL such control NN Ireland's directors (including its de facto and/or shadow directors) will have breached the fiduciary duties and duties of skill and care which they owe.

188.    To the extent that NN Ireland suffers loss as a result of a claim by a tax authority and or the imposition of any form of penalty in relation to its tax affairs NN Ireland claims against NNI in respect of any losses, penalties and interest which it has suffered (or will suffer) on the below bases.

**Claim 24.    Breach of Fiduciary Duties by NNI as De Facto or Shadow Director of NN Ireland under Irish Law**

189.    A claim under Irish law for breach of fiduciary duty owed by NNI as a de facto or shadow director of NN Ireland (as explained in paragraph 85 above) as a result of NNI's control over NN Ireland's tax affairs.

**Claim 25.    Breach of Duty of Care under Irish Law**

190.    A claim under Irish law for breach of the duty of skill and care owed by NNI as a de facto or shadow director of NN Ireland, or otherwise as a result of the proximity of relationship between NNI and NN Ireland (as explained in paragraphs 92 to 95 above), as a result of NNI controlling NN Ireland's tax affairs.

**Claim 26.    Dishonest Assistance under Irish Law**

191.    A Claim under Irish law in respect of NNI dishonestly assisting the breaches of duty set out above, by virtue of NNI's involvement and participation (together with NNL, alternatively NN Ireland's de jure directors, and as explained in paragraph 19 above) in controlling NN Ireland's tax affairs.

**Claim 27.    Aiding and Abetting Breach of Fiduciary Duty under State Law**

192.    A claim under state law in respect of NNI aiding and abetting the breaches of duty set out in paragraph 85 above, by virtue of NNI's involvement and participation (together with NNL, alternatively NN Ireland's de jure directors, and as explained in paragraph 19 above) in controlling NN Ireland's tax affairs.

**F.    CLAIMS IN RESPECT OF FSD LIABILITY**

193.    At the present time, it is not yet known:

      a.    whether any one or more of the EMEA Targets will ultimately be required pursuant to an FSD or CN to make a payment or series of payments to the trustee of the Scheme ("the Trustee") or otherwise provide financial support for the Scheme;

43

b.  whether NNI will ultimately be required pursuant to an FSD or CN to
make a payment or series of payments to the Trustee or otherwise
provide financial support for the Scheme; or

c.  if one or more of the EMEA Targets and NNI are ultimately required
pursuant to an FSD or CN to make a payment or series of payments to
the Trustee or otherwise provide financial support for the Scheme,
what the relationship between their respective obligations will be.

**Claim 28.**    **Contribution**

194.    However, in the event that NN Ireland is ultimately required pursuant to
an FSD or CN to make a payment or series of payments to the Trustee or otherwise provide
financial support for the Scheme, NN Ireland will or may be entitled as a matter of English law,
Irish law or alternatively as a matter of US law, to recover a contribution from NNI, including
without limitation pursuant to the UK Civil Liability (Contribution) Act 1978, under common
law, general equitable principles, under English, Irish and US statute and/or by reason of breaches
of the duties owed by NNI to NN Ireland referred to in this Proof of Claim.

195.    In this respect it is just and equitable for NN Ireland to recover from NNI
having regard to the extent of NNI's responsibility for the damage in question.

**Claim 29.**    **Claims against NNI on the basis of unjust enrichment and/or
subrogation**

196.    In the event that NN Ireland is ultimately required pursuant to an FSD or
CN to make a payment or series of payments to the Trustee or otherwise provide financial
support for the Scheme, NN Ireland will or may have claims for recoupment or contribution
against NNI arising under English law, Irish law, or alternatively under US law, on the basis that
NN Ireland will have been required by compulsion of law to satisfy in whole or in part an
obligation owed by NNI to the Trustee, and NNI will therefore have been unjustly enriched at the
expense of NN Ireland.

**Claim 30.**     **Subrogation**

197.    In the event that NN Ireland is ultimately required pursuant to an FSD or CN to make a payment or series of payments to the Trustee or otherwise provide financial support for the Scheme, NN Ireland will or may be entitled under English law, Irish law, or alternatively under US law, to be subrogated in whole or in part to any claim which the Trustee would otherwise have had against NNI pursuant to an FSD or CN or otherwise.

**Claim 31.**     **Obligation to repay**

198.    In the event that NN Ireland is ultimately required pursuant to an FSD or CN to make a payment or series of payments to the Trustee or otherwise provide financial support for the Scheme, NNI is otherwise obliged under English, Irish and US law to repay, in whole or in part that obligation.  Full particulars of such claim are subject to the circumstances leading to NN Ireland's obligation.  The quantum of these claims is not capable of determination at the present time.

**G.     FUTURE AND CONTINGENT RIGHTS**

199.    In the event that a claim is made by any third party whatsoever or intimated against NN Ireland after the bar date (whether on the basis of matters currently known or unknown, and whensoever occurring), NN Ireland will assert and hereby asserts all claims it has (or may have), all rights of contribution and indemnity under whatever applicable law against NNI.  NN Ireland's position is that such claims are not subject to this bar date but for completeness and the avoidance of doubt hereby includes all claims, rights to contribution or indemnity in respect of all claims, liabilities, costs and expenses from any person or persons, whensoever occurring and whether arising before or after the bar date, to the fullest extent possible and without limitation.  NN Ireland reserves the right to further identify, particularize and modify all its entitlements in this respect in due course.

200.    NN Ireland further claims in respect of any future, prospective or contingent claims against NNI that NN Ireland or any office-holder or future office-holder may

have.  NN Ireland reserves the right to advance any prospective, contingent or future claims

which may arise or become crystallized at any time hereafter.

### H.    PROPRIETARY CLAIMS

201.    If and to the extent that (a) NNI has obtained or derived any property or

profit by reason of the breaches of duty or other improper conduct identified above, (b) any of

NN Ireland's property has come into NNI's hands by reason of the breaches of fiduciary duty by

NN Ireland's other directors identified above, (c) any profit or gain made by any such directors

by reason of such breaches has come into NNI's hands, NN Ireland hereby asserts a proprietary

claim to the same, and reserves the right to seek turnover and restitution of all such property or

profits, and/or an accounting for the same pursuant to a separate proceeding under Section 541 of

the Bankruptcy Code.  NN Ireland reserves its rights in respect of all liens to which it may be

entitled in connection with the same.

### RELIEF REQUESTED

WHEREFORE, NN Ireland claims the following relief:

202.    All equitable, common law, civil law, statutory and other remedies

available under the applicable laws of any jurisdiction including, but not limited to, damages,

equitable compensation, an equitable account of profits, restitution and/or any other recovery

in respect of the matters the subject of:

      a.  Claim 1 relating to intercompany debts in an amount to be determined
        at trial but in any event no less than US$ 2,902,547.59.

      b.  Claims 2, 3, 4, 5, 6 and 7 relating to transfer pricing losses in an
        amount to be determined at trial but in any event no less than US$
        96,000,000.00.

      c.  Claims 8, 9, 10, 11, 12, 13, 14 and 15 relating to inter-company loans
        and dividends in an amount to be determined at trial but in any event
        no less than US$ 192,267,402.31.

d. Claims 16, 17, 18, 19, 20, 21, 22 and 23 relating to past dispositions of

business in an amount to be determined at trial.

e. Claims 24, 25, 26 and 27 relating to taxation matters in an amount to

be determined at trial.

f. Claims 28, 29, 30 and 31 relating to FSD liability in an amount which

is not capable of determination at the present time.

203.    Pre and post judgment interest on these amounts; and

204.    An accounting for, and restitution of, the identifiable or traceable sums, or

substitutes of the above amounts, that are held on trust for and on behalf of NN Ireland.

## RESERVATIONS

**A.    Reservation regarding jurisdiction, applicable law and forum**

205.    For the avoidance of doubt:

a. All claims and disputes with regard to the allocation of the

"Lockboxes" are to be determined in accordance with the dispute

resolution mechanisms to be set up pursuant to the IFSA Allocation

Process and nothing herein shall be considered a waiver of NN

Ireland's right to have allocation disputes determined by the dispute

resolver appointed under the IFSA;

b. In so far as this Rider is silent as to applicable law, this is not to be

taken as acceptance that Delaware Law is, or is necessarily, the

applicable law, and NN Ireland reserves the right further to identify

appropriate foreign law as being the law applicable to its claims.

**B.    Reservation in respect of claims from NNI and alleged set-off**

206.    Nothing in this Claim is to be taken as acceptance that any claim from

NNI against NN Ireland exists, is valid or is eligible for set off against any of NN Ireland's

claims. Further nothing in this Claim is to be taken as acceptance that the appropriate forum or

proper jurisdiction for considering any claim by NNI against NN Ireland is the Delaware

Bankruptcy Court (or any other US Court) (or the proof of claims process in the US), whether in

the context of an allegation that such claim has been or should be the subject of a set off against

any claim by NN Ireland or otherwise.

### C.    Reservation in respect of proprietary claims

207.    NN Ireland's proprietary claims constitute claims and rights which fall

outside the proof of claims process, being claims in respect of property which NNI does not own.

208.    As such, NN Ireland's proprietary claims are included in this Rider subject

to the same general reservations below without prejudice to NN Ireland's rights to claim this

property in other proceedings or processes and to asserts its rights to seize this property without

reference to the Delaware Bankruptcy Court proceedings (or those of any other US Court).

209.    For the avoidance of doubt all references herein to NN Ireland's

proprietary claims are to be read as including a personal claim over against NNI (both for the

amount of the claims and for interest thereon) to the extent that those proprietary claims are not

fully satisfied out of the assets to which they attach.

### D.    Reservation in respect of claims against other parties

210.    For the avoidance of doubt, all claims and allegations made against NNI

made in this Rider are made without prejudice to all claims and allegations that NN Ireland has

made or may make in this proof of claims process or otherwise against any other person

(including NNC, NNL, and any present or former officer of NN Ireland, NNL, or any other

natural or corporate person whomsoever).

### E.    General Reservation of Rights

211.    The execution and filing of the Claim are not (i) a waiver or release of any

of the rights against any entity or person liable for all or part of the Claim held by the Joint

Administrators or NN Ireland; (ii) a waiver of the right to withdraw the reference with respect to

the subject matter of the Claim, any objection or other proceeding commenced with respect

thereto or any other proceeding commenced in this case against or otherwise involving the Joint

Administrators or NN Ireland; (iii) an election of a remedy which waives or otherwise affects any

other remedy; or (iv) a waiver or release of any rights against any third party on behalf of the

Joint Administrators or NN Ireland.

212.    The Joint Administrators and NN Ireland expressly reserve their rights to

further amend or supplement the Rider in any respect.

### MISCELLANEOUS

213.    Supporting Documents:  The writings upon which this Claim is based are

in the possession of NNI, the Canadian Entities, the US and Canadian creditor committees and

the Canadian Monitor and include, without limitation, the MRDA and other agreements referred

to herein.  Such documents will be made available to other interested parties, upon request, under

an appropriate confidentiality order.

214.    Notice.  All notices to the claimants concerning the Claim should be

sent to:

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Attention: Edwin J. Harron
(302) 571-6600

Herbert Smith LLP
Exchange House
Primrose Street
London  EC2A 2HS
UNITED KINGDOM
Attention: Kevin  Lloyd
+44-20-7374-8000

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004
Attention: Michael Luskin
(212) 837-6000

215.    Protective Filing/Amendments.  The Claim is filed to amend the Original

Proof of Claim to provide a more particularized statement of NN Ireland's claims as required by

the Order, and is filed to protect the Joint Administrators, NN Ireland, and the EMEA Companies

from forfeiture of their claims.

49

H
A
N
D

D
E
L
I
V
E
R
Y

_____
RECEIVED BY:

6/3/11
DATE

3:30 pm
TIME