# **<u>EXHIBIT E</u>**

**(Nortel Networks Oy Proof of Claim No. 7753)**

| UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE | AMENDED PROOF OF CLAIM |
|---|---|

| Name of Debtor: <br> Nortel Networks, Inc. | Case Number: <br> 09-10138 (KG) |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| Name of Creditor: <br><br> Nortel Networks Oy and/or any Court-appointed administrator or liquidator thereof | ☑ Check this box to indicate that this claim amends a previously filed claim. |
|---|---|

| Name and address where notices should be sent: <br><br> Young Conaway Stargatt & Taylor, LLP    Hughes Hubbard & Reed LLP    Herbert Smith LLP <br> The Brandywine Building, 17th Floor    One Battery Park Plaza    Exchange House <br> 1000 West Street    New York, New York 10004    Primrose Street <br> Wilmington, Delaware 19801    Attention: Michael Luskin    London EC2A 2HS <br> Attention: Edwin J. Harron    (212) 837-6000    UNITED KINGDOM <br> (302) 571-6600      Attention: Stephen Gale <br>     44-20-7374-8000 <br> Telephone number: See above | Court Claim Number: _____ <br> *(If known)* <br><br><br> Filed on: _____ |
|---|---|

| Name and address where payment should be sent (if different from above): <br><br><br> Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. <br><br> ☐ Check this box if you are the debtor trustee in this case. |
|---|---|

| 1.   Amount of Claim as of Date Case Filed: <u>See attached Rider</u> <br><br> If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4. <br><br> If all or part of your claim is entitled to priority, complete item 5. <br><br> ☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | 5.   **Amount of claim Entitled to Priority under 11 U.S.C.§ 507(a). If any portion of your claim falls in one of the following categories check the box and state the amount.** <br><br> Specify the priority of this claim. <br> Unknown <br><br> ☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). |
|---|---|
| 2.   Basis for Claim:   <u>See attached Rider to Proof of Claim of Foreign Administrators</u> <br> (See instruction #2 on reverse side.) | |
| 3.   Last four digits of any number by which creditor identified debtor:_____. <br><br> 3a. Debtor may have scheduled account as: <br>     (See instruction #3a on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507 (a)(4). |
| 4.   Secured Claim (See instruction #4 on reverse side.) <br> Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information. <br> Nature of property or right of setoff: ☐ Real Estate    ☐ Motor Vehicle    ☐ Other <br> Describe: <br> Value of Property: $_____   Annual Interest Rate ___% <br> Amount of arrearage and other charges as of time case filed included in secured claim. <br> If any: $_____   Basis for perfection: _____ <br> Amount of Secured Claim: <u>Unknown</u>    Amount Unsecured: <u>Unknown</u> | ☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5). <br><br> ☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7). <br><br> ☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8). <br><br> ☐ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a) (__). |

| 6.   Credits: The amoun̶̶ ̶ ̶    Filed: USBC - District of Delaware    making this proof of claim. <br> 7.   Documents: Attach i    Nortel Networks Inc., Et Al.    missory notes, purchase orders, <br> invoices, itemized statem    09-10138 (KG)     0000007753    urity agreements. You may <br> also attach a summary. A      n of a security interest. You <br> may also attach a summar̶ <br> DO NOT SEND ORIGIN    [barcode]    ROYED AFTER <br> SCANNING. <br> If the documents are not av̶a̶i̶l̶a̶b̶l̶e̶, please explain: | **Amount entitled to priority:** <br><br> Unknown <br><br> *Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |
|---|---|

| Date: 6/3/11 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. <br><br> *(signature)* C. CHRISTOPHER HILL <br> JOINT ADMINISTRATOR | FOR COURT USE ONLY |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

FILED / RECEIVED

JUN – 3 2011

EPIQ BANKRUPTCY
SOLUTIONS, LLC

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NORTEL NETWORKS, INC., | Case No. 09-10138 (KG) |
| Debtor. | Jointly Administered |

## RIDER TO PROOF OF CLAIM OF NORTEL NETWORKS OY

### PRELIMINARY STATEMENT

1.          Nortel Networks Oy ("NN Finland") hereby submit this rider (the "Rider") to the amended proof of claim (the "Claim"), which amends, and provides a more definite statement of, the timely filed proof of claim submitted by NN Finland against Nortel Network Inc. ("NNI") and its affiliated debtors in these Chapter 11 cases (collectively, the "Debtors") on September 30, 2009 (the "Original Proof of Claim").[1]  This Rider is an integral part of the Claim and is hereby incorporated into the Claim in full and for all purposes.

### FACTUAL BACKGROUND

A.          **The Nortel Group and its Origins**

2.          NNI, its parent Nortel Networks Limited ("NNL"), its ultimate corporate parent, Nortel Networks Corporation ("NNC" and together with NNL, the "Canadian Entities"), and its affiliates and subsidiaries (collectively, "Nortel" or the "Nortel Group") formed one of

---

1.   NN Finland amends the Original Proof of Claim under compulsion of the Order Requiring EMEA Claimants to File a More Definite Statement of Claims and Setting a Deadline for the Filing of Any Proofs of Claim by the EMEA Claimants, entered by the Court on May 10, 2011 (the "Order").

the leading worldwide groups in the telecommunications industry, including networking solutions, computer networks and software.

3.      The Nortel Group was originally founded in Canada in 1895, subsequently expanded into the US and, by 1990, had become one of the leading telecommunications companies in all of North America. From this pan-North-American base, Nortel sought to expand overseas.

4.      In 1991 the Nortel Group acquired STC plc ("STC"), a major UK public telecommunications company. This represented the Nortel's Group's first major step into the UK market and brought customer relationships with large European carriers such as British Telecom, Cable & Wireless and Telefonica. From this base Nortel was able to expand into the wider European markets. In fiscal year 1991 European revenues were $1.35 billion, an increase of 514% from the previous year. These revenues accounted for 17% of the Nortel Group's total revenue, a figure which was to grow in subsequent years.

5.      The European market was therefore a very important source of revenue for the Nortel Group.

**B.      The Insolvency of the Nortel Group**

6.      Beginning in 2001, the demand for the Nortel Group's products dropped dramatically in the wake of the "Dot-Com" crisis. Competition also increased. In 2001 alone the Nortel Group reported losses of $25.7 billion. Nortel itself described the downturn as "severe" and "dramatic".

7.      In an attempt to revive its fortunes, the Nortel Group undertook a major restructuring. By 2008, the Nortel Group had reduced its employee numbers by two-thirds and outsourced its manufacturing. This restructuring did not solve the Nortel Group's financial troubles which continued. Nevertheless it helped provide a stay of execution and had the effect

of ensuring that the collapse of the Nortel Group did not occur until early 2009. In the period

leading up to the collapse the cash resources of NN Finland were, at the direction of NNL and

NNI, depleted.

8.      By January 2009, after such assets had been very significantly depleted

formal insolvency proceedings were commenced.

**C.      Removal of value from the EMEA companies**

9.      At all relevant points the Nortel Group was operated in such a manner that

cash and value was improperly removed from NN Finland and the other EMEA Companies and

transferred to NNL. The claims in this Rider concern such improper value transfers and NNI's

involvement in the same.

10.     Value removal from NN Finland occurred pursuant to a general policy to

the effect that value and cash within the Nortel Group should be transferred to NNL. Indeed,

pursuant to this policy the EMEA Companies, together with their personnel, were instructed to

identify new schemes which would enable the transfer of cash and value to NNL.

11.     Particular transactions pursuant to which improper value removal

occurred, and which form the basis of the claims set out in this Rider, include the Nortel Group's

transfer pricing arrangements which failed to comply with the arm's length standard.

12.     Although NNL was the primary beneficiary of value removal from

EMEA, on occasions NNI also benefitted.

**D.      Control by and involvement of NNI**

13.     Control of the Nortel Group's operations was highly centralized and, on a

general basis, was maintained primarily by the Canadian Entities.

14.     While the Canadian Entities controlled the group on a general basis, NNI was also involved in jointly controlling certain aspects of the Nortel Group's operation together with the Canadian Entities.  The control exerted by NNI related to Nortel Group Tax matters, in particular transfer pricing, and to Nortel Group Treasury matters.  The Nortel Group Tax function was responsible for the transactions pursuant to which value was improperly removed from NN Finland.

**Transfer pricing**

15.     NNI was heavily involved in the implementation and operation of the transfer pricing arrangements that deprived NN Finland of value (as explained below).  NNI was also heavily involved in the advance pricing agreement negotiations (explained below) with the US Internal Revenue Service ("IRS"), Canadian Revenue Agency ("CRA") and Her Majesty's Revenue and Customs ("HMRC") (and together with the IRS and CRA, the "Revenue Authorities") pursuant to which the approval of those Revenue Authorities was being sought to the transfer pricing arrangements.

16.     The key individuals involved included in particular John Doolittle of both NNI and the Canadian Entities and Mark Weisz, Mike Orlando, Laurie Krebs and John Payne of NNI as well as representatives from the Canadian Entities.

17.     NN Finland had no substantive involvement in the formulation, implementation and operation of the RPSM transfer pricing arrangements as applied under the distribution agreement between NNL and NN Finland (the "Distribution Agreement") and the Master Research and Development Agreement (the "MRDA").  Its role was limited to providing information for the above individuals as and when required and implementing the decisions which had been taken by NNI and the Canadian Entities.  In this regard:

a.  The terms of the Distribution Agreement were determined by NNI and
NNL.  NN Finland was not consulted in relation to, or involved in, the
decision to implement the Distribution Agreement or in the decision
regarding what the terms of the Distribution Agreement would be.
NNI and NNL were also responsible for instructing the legal advisers
in relation to the Distribution Agreement and transfer pricing
generally.

b.  Once the terms of the Distribution Agreement had been decided by
NNI and NNL, NN Finland was simply instructed to sign the
Distribution Agreement. There was no arm's length negotiation of its
terms.

c.  NN Finland was not involved in the decision regarding the rate of
return that it was provided each year under the Distribution
Agreement. This was imposed by NNI and NNL.

d.  NNI and NNL controlled the all-important advanced pricing
arrangement/agreement ("APA") application process (referred to
above).  Despite the fact that the APA application was intended to
shape the transfer pricing arrangements for the whole Nortel Group
(ultimately including NN Finland), NN Finland was not involved in
this process. The triumvirate of Mark Weisz of NNI, Mike Orlando of
NNI and John Doolittle took the lead in the negotiations with the IRS,
the CRA and HMRC.  This team ran the negotiations until around
2006 when Peter Look joined the Nortel Group as Vice President of

Global Tax. He replaced John Doolittle alongside Mark Weisz and Mike Orlando. Later, John Payne, also of NNI, joined the lead team together with Peter Look. NNI and NNL also took sole responsibility for instructing Nortel's professional advisers in relation to the APA application process, in particular Horst Frisch and Ernst & Young.

18.    The Nortel Group Tax Department was effectively a joint function between the NNI and the Canadian Entities. Many of the key individuals within the Tax Department were NNI personnel. This was particularly so in respect of the members of the Tax Department who had responsibility for NN Finland and EMEA. It was also particularly so in relation to the transfer pricing function, which was heavily dominated by individuals from NNI. For example, at various times, the International Tax Director of Nortel was Mark Weisz; Mike Orlando was the Global Transfer Pricing Leader (and right hand man of Peter Look, Vice President of Global Tax); John Payne, was responsible for Global Transfer Pricing; Claire Barbieri was responsible for Global Tax Accounting; and even the EMEA Tax Leader on the ground in the EMEA Region, Ryan Smith, was seconded to NNUK from NNI.

19.    In a similar way to the Tax department, Nortel Treasury also played a central role in relation to the strategic management of the Nortel Group. Nortel Treasury was also involved in most of the significant transactions affecting the Nortel Group, and NNUK and EMEA in particular. The key individuals within Nortel Treasury were from NNI. For example, Katherine Stevenson, a director of NNI, was Treasurer and had overall responsibility for global treasury matters within the Nortel Group. John Doolittle succeeded Ms Stevenson as Treasurer in 2008. Mr Doolittle was an officer of NNI. Paul Karr was Controller of the Nortel Group and a director of NNI.

E.      **NNI acting as a de facto / shadow director of NN Finland**

20.      For the reasons set out above (and as explained further below), by virtue of NNI making decisions in relation to treasury and tax issues which could only be properly be made by a director of NN Finland, or causing the de jure directors to act in accordance with its directions, in relation to such issues, in particular regarding NN Finland's involvement in the Nortel transfer pricing arrangements, NNI was a de facto or shadow director of NN Finland under Finnish law.

21.      As a de facto or shadow director, NNI owed fiduciary duties and a duty of skill and care to NN Finland in relation to these specific tax and treasury related matters.

22.      By reason of the fact that NNI jointly controlled each of those transactions and the transactions themselves (for the reasons below) improperly removed value from NN Finland and were contrary to its interests, NNI breached the duties which it owed. NNI is therefore liable to NN Finland as a result on the bases set out below.

F.      **The NN Finland de jure directors**

23.      In addition, the de jure directors of NN Finland also owed fiduciary duties and a duty of skill and care to NN Finland (as set out below).

24.      By causing or allowing NN Finland to be involved in the prejudicial transfer pricing arrangements which resulted in NN Finland suffering losses, and by allowing NNI (and NNL) to control decision-making in relation to those transfer pricing arrangements, the de jure directors of NN Finland also breached the duties which they owed.

G.      **Transfer Pricing Systems**

1.      **Overview**

25.      Transfer pricing arrangements are implemented in order to ensure that intra-group trading of a multinational group is undertaken on a basis that enables an allocation of

profit in each of the countries where group companies do business (and across the entities within the group) in a manner that replicates the profits that would be earned in arm's length transactions. The guiding principle, recommended by the Organization for Economic Cooperation and Development and followed by most tax authorities, is that transactions between companies within a group should, so far as possible, be priced as if they were arm's length transactions between independent companies. This is straightforward for routine transactions, such as the sale of manufactured goods, but much more difficult for "intangibles," such as R&D, where the value added, and contribution to profits made, by different companies within an integrated group are difficult to measure.

**2.    Cost Sharing and RPSM Arrangements**

26.    The Nortel Group's first set of transfer pricing arrangements consisted of a cost-sharing arrangement ("CSA") or cost contribution agreement ("CCA") between the Nortel Group's main R&D centers. From 2001, the transfer pricing methods were revised and a residual profit split method ("RPSM") was adopted. The RPSM methodology was amended in 2006.

27.    The decision to implement the RPSM was taken by the Canadian Entities and NNI. It was primarily motivated by a desire to allocate more profit to the Canadian Entities in order to benefit NNL at the expense of NN Finland. Both NNL and NNI knew that this was to be the case.

28.    NN Finland and the other EMEA Companies which lost out as a result of RPSM were not involved in the decision to change from the previous cost sharing arrangement to RPSM.

29.    The RPSM distinguished between two types of participants, Residual Profit Entities ("RPEs") and Limited Risk Entities ("LREs"). NN Finland was an LRE then

became a Cost Plus Entity ("CPE") in July 2002. NNL, NNI, Nortel Networks SA ("NN France SA") and Nortel Networks (Ireland) Limited ("NN Ireland") and Nortel Australia were the other IEs/RPEs. The other categories of company within the Nortel Group were classified as (1) At Risk Entities and (2) holding companies.

30.     The RPSM divided the participants' available pooled profits into two main elements: (i) routine profits to be allocated to the participants as measured by market returns, *i.e.* based on their own direct earnings from sales to third parties, and, (ii) the "residual" or remaining profits (or losses) which were treated as attributable to the Nortel Group's intangible development activities (*i.e.* R&D). Both the RPEs and LREs were rewarded with a routine return, whereas residual profits (or losses) were divided between the RPEs only.

31.     For the period 2001 to 2005, the LREs' routine return was based on an operating margin profit level indicator, while the RPEs' routine return was calculated using an adjusted return on net assets ("RONA"). From 2006 onwards, both the LREs and the RPEs received a routine return of an adjusted operating margin of 1% of third party sales, which in almost all cases was based on US GAAP. The residual profits were then divided between the RPEs based on their proportional contribution to R&D activity, as evidenced by their respective R&D spend.

32.     The Nortel Group registered losses or at best broke even during the entire period in which the RPSM was in force.

### 3.     Master Research and Development Agreement ("MRDA")

33.     The MRDA was entered into on December 2004, effective from January 1, 2001, between NNL, NNI, NNUK, Nortel Networks SA, Nortel Networks Australia and Nortel Networks Ireland Limited (defined in the MRDA as the "Participants"). The MRDA provided the architecture and contractual basis to enable the RPSM to be applied.

34.     Although the LREs (such as NN Finland) were not Participants to the MRDA, the MRDA provided (in Schedule A, as substituted by the Third Addendum) that LREs (defined as "Nortel Distribution Entities") would be provided with a "Functional Routine Return" as compensation for their distribution function and ancillary services.  This was said to be generally a nominal amount of operating earnings ranging from 0% to 4% of sales under US GAAP, as determined "based on current industry standards and third party studies".

35.     NN Finland was not involved in the decision to implement the MRDA or in negotiating its terms.  The terms of the MRDA were determined by NNI and NNL based mainly on the requirements of Canadian and US tax laws, in negotiations with the Canadian and US taxing agencies.

36.     The original MRDA provided that NNL would administer the agreement and the determinations required under the RPSM with respect to its interests and the interests of the Participants, and in particular to compute the amount of any R&D Allocations due to, and payments due from, each Participant on a periodic basis (Article 3(d) of the MRDA).

**4.     The Distribution Agreement**

37.     NN Finland and NNL entered into a Distribution agreement, effective as of 1 January 2001, which set out the specific transfer pricing arrangements to which NN Finland was subject.

38.     NN Finland was not involved in the decision to implement the Distribution Agreement or in negotiating its terms.  The terms of the Distribution Agreement were determined by the Canadian Entities and NNI based mainly on the requirements of Canadian and U.S. tax laws.

39.     Under the Distribution Agreement, in exchange for the performance of various distribution and service-related activities (including engineering, customer support and

training), NN Finland would be entitled to receive a "reasonable arm's length rate of return". A "reasonable arm's length rate of return" stated to be equal to an operating margin between 0% and 4%, determined using NN Finland's US GAAP financial results in US Dollars. It was provided to be determined by NNL (with the assistance of NN Finland), based on relevant factors including the functions performed by NN Finland, the risks undertaken by NN Finland, the returns employed by comparable companies to NN Finland and the concepts and directions provided by the OECD Guidelines.

40.     If NN Finland's actual return (based on its operating income) for a particular year was less than a reasonable arm's length rate of return, NNL was required to pay the difference to NN Finland. Any amount payable by NNL to NN Finland was to be adjusted by transactional foreign exchange gains and losses.

41.     If NN Finland's actual return was greater than a reasonable arm's length rate of return, NN Finland would pay the difference to NNL.

42.     The Distribution Agreement was to commence on 1 January 2001, and would end on 31 December 2002, but was to be automatically renewed for additional one year terms after 31 December 2002, unless terminated pursuant to Article 6 of the Distribution Agreement.

5.     **The Arm's Length Principle**

43.     A fundamental requirement of a valid transfer pricing method is that it should ensure that each of the entities within the group acts in an arm's length manner in its dealings with another.

44.     This principle is expressly referred to in the Distribution Agreement, which provides that the Parties will ensure that NN Finland earns a reasonable arm's length rate of return for its distribution and service-related activities.

45.    Accordingly, the Distribution Agreement is to be interpreted and applied, so far as possible, to give effect to the arm's length principle.

**6.    The Nortel RPSM failed to properly reward NN Finland**

46.    The transfer pricing arrangements as applied under the MRDA and the Distribution Agreement did not comply with the arm's length principle[2]. They were designed in order to deprive certain entities (including NN Finland) of revenue, and resulted in an intentional and improper transfer of value away from NN Finland and the other EMEA entities and towards the Canadian Entities and NNI, and NNL in particular.

47.    The ways in which the RPSM system took funds from NN Finland, for the benefit of the North American Entities, include but are not limited to the examples set forth in the subsequent paragraphs:

48.    Pursuant to the Distribution Agreement, NN Finland had a contractual right to receive a routine return which reflected an arm's length compensation for its distribution function.  In practice, NN Finland received an adjusted distribution return of 1.30% in 2001. This level of return failed to recognize, significant customer intangibles, the service element performed alongside the distribution function or the risks and costs borne outside the routine return (for example, translational foreign exchange risks and hedging gains / losses).  As a result of these factors, NN Finland was not properly rewarded for its functions, which is inconsistent with an arm's length approach.

49.    The tax authorities in Italy have investigated the level of returns paid to NN Italy, and they have asserted that an arm's length return would be approximately 3%.  The

---

[2] The precise nature of the flaws in the transfer pricing arrangements will be a matter of expert evidence in due course.

tax authorities in Poland and Hungary also questioned the transfer pricing arrangements which the LREs in those countries were subject to.

50.     NN Finland's claims in relation to routine returns (as set out below) are advanced on the basis that an arm's length return for its distribution and service activities would have been a return of approximately 3% of sales, as has been asserted by the tax authorities. This represents the best current assessments on the part of NN Finland and its officeholders, but is subject to the reservation below.

51.     The transfer pricing arrangements did not properly take into account NN Finland's high restructuring costs during the period from 2001 to 2008 because restructuring costs were ignored in the calculation of the LREs' operating margin.  It is not consistent with the role and characterization of NN Finland as a limited risk entity that it should have borne the costs of restructuring activities.  This is particularly so given the regularity with which these costs did in fact have to be incurred, and given that such costs resulted from decisions taken by, and instructions given by, the Canadian Entities and NNI.  An independent party acting at arm's length would not have agreed to bear the full amount of these costs.

52.     After the Nortel Group's bankruptcy filings, the IRS successfully challenged the 2001 to 2005 RPSM model on the basis that it did not comply with the arm's length requirement.  Pursuant to a settlement approved by this Court, the IRS required that NNL decrease the amount of income reported on its Canadian income tax returns by $2 billion, and that NNI increase the amount of income reported on its US income tax returns by $2 billion. These adjustments were said to reflect net overpayments made by NNI to NNL for those tax years.  The settlement is an implicit admission that Nortel's transfer pricing arrangements did not comply with the arm's length principle.

53.    The flaws in the transfer pricing arrangements as described above gave rise to NN Finland incurring a loss of US$67,946.  The claims and the quantification of the same represent the best current assessments on the part of NN Finland and its officeholders.  NN Finland reserves the right to add to and/or modify its claims, the nature of the claims, the facts relied on in support of those claims, and their quantum, including as a result of documentary and other information obtained from NNI (or elsewhere) and/or in the light of expert evidence produced in connection with the same.

**H.    Business sales**

54.    Prior to 14 January 2009, NN Finland entered into various global business sales with other Nortel entities, including NNI, whereby a particular business line was sold by those Nortel entities to a third party purchaser.  The most significant of these business sales was the sale of Nortel's UMTS business to Alcatel Lucent S.A. for an adjusted purchase price of approximately US$291m.  This sale agreement for this deal was signed on 4 December 2006 and the sale completed on 31 December 2006.

55.    The parties agreed as required by law and international accounting regulations that the various selling Nortel entities agreed to allocate the proceeds of these sales amongst themselves on the basis of an arm's length legal entitlement that each had to the proceeds.  In this way, the allocation of the proceeds of this sale had to correspond with the arm's length principles discussed above in relation to transfer pricing.  The allocation applied in relation to the Alcatel sale was set out in a statement dated 24 July 2007.

56.    The allocation that was applied to the proceeds of each of these business sales was decided upon almost entirely by NNI and NNL.  NN Finland had no involvement in deciding the allocation methodology that was applied to the proceeds of the business sales.  Accordingly, the allocation methodology applied and the proportion of proceeds that NN Finland

received was decided on its behalf by NNI and NNL. In the event, the allocation that was applied as between the various selling Nortel entities did not accord with the arm's length principles discussed above. Rather, allocation was attempted on the erroneous assumptions that were contained in the transfer pricing structure that prevailed within the Nortel group at the time. Further, it appears that in fact the allocation was not even applied in conformity with these erroneous assumptions.

57.    As a consequence of the allocation method adopted, NN Finland received significantly less and NNI received significantly more than each was entitled to on an arm's length basis.

I.        **FSD Proceedings**

58.    By a Determination Notice dated 25 June 2010, the Determinations Panel ("the DP") of the UK Pensions Regulator ("the UK Regulator") determined that a Financial Support Direction ("FSD") requiring the provision of financial support to the Nortel Networks UK Pension Plan ("the Scheme") should be issued in respect of certain EMEA entities[3] (the "EMEA Targets"). NN Finland is an EMEA Target.

59.    By two References dated 23 July 2010, certain EMEA Targets have referred the decision of the DP to the Upper Tribunal (Tax and Chancery Chamber). The References have not yet been heard.

60.    As well as the EMEA Targets, the Determination Notice referred to above determined that an FSD should be issued in respect of NNI. NNI has not referred the decision of

---

[3] *Inter alia,* Nortel GmbH, Nortel Networks N.V., Nortel Networks S.p.A, Nortel Networks B.V., Nortel Networks Hispania S.A., Nortel Networks Polska Sp. z.o.o., Nortel Networks International Finance & Holdings B.V., Nortel Networks France S.A.S., Nortel Networks (Ireland) Limited, Nortel Networks S.A., Nortel Networks A.G., Nortel Networks O.O.O., Nortel Networks (Austria) GmbH, Nortel Networks South Africa (Proprietary) Limited, Nortel Networks Slovensko s.r.o, Nortel Networks Engineering Service Kft, Nortel Networks A.B., Northern Telecom France S.A., Nortel Networks s.r.o., Nortel Networks Portugal S.A. and Nortel Networks A.S.

the DP to the Upper Tribunal.   Following an application by the UK regulator ("TPR"), the

Upper Tribunal issued directions on 3 February 2011 that confirmed that FSDs can be issued by

the TPR as against NNI.

61.    The basis for and effect of an FSD are matters which are governed by

English law.  As a matter of English law, the power of the UK Regulator to issue an FSD is

derived from section 43 of the UK Pensions Act 2004 ("the 2004 Act").  Under that section, the

UK Regulator may only issue an FSD to a particular person in relation to a particular pension

scheme if a number of conditions are satisfied.  One of those conditions is that the UK Regulator

must be of the opinion that it is reasonable to impose the requirements of the FSD on the person

in question.

62.    In deciding whether it is reasonable to impose the requirements of the FSD

on a particular person, the UK Regulator is required to have regard to such matters as it considers

to be relevant, including, where relevant, the following matters:

      a.  the relationship which the person has or has had with the sponsoring

          employer of the pension scheme in question (including, where the

          person is a company, whether the person has or has had control of the

          employer);

      b.  the value of any benefits received directly or indirectly by the person

          from the employer;

      c.  any connection or involvement which the person has or has had with

          the scheme; and

      d.  the financial circumstances of the person.

63.     The principal effect of an FSD is to require the persons to whom it is issued to secure that "financial support" for the pension scheme in question is put in place within the period specified in the FSD, and maintained in place thereafter.  By section 45 of the 2004 Act, "financial support" means one or more arrangements falling within section 45(2) of the 2004 Act, the details of which are approved by a notice issued by the UK Regulator.

64.     In the event that there is non-compliance with an FSD, the UK Regulator has power under section 47 of the 2004 Act to issue a notice (a "Contribution Notice" or "CN") to any one or more of the persons to whom the FSD was issued stating that the person is under a liability to pay to the trustees or managers of the pension scheme the sum specified in the CN. The UK Regulator may only issue a CN to a particular person if it is of the opinion that it is reasonable to impose liability on the person to pay the sum specified in the CN.

65.     NNI is jointly and severally liable to NN Finland for any sums NN Finland may be ultimately be required to pay to provide financial support to the UK Scheme, whether pursuant to an FSD or CN.  As set forth below, NN Finland hereby asserts a contingent claim for this liability.

I.      **Taxation matters**

66.    As explained above, NN Finland's taxation affairs, particularly in respect of transfer pricing, were controlled by NNI and NNL.

67.     NNI is jointly and severally liable for any sums NN Finland may be required to pay in the event that any tax authority makes a claim against NN Finland in relation to a failure to pay the proper level of taxation in any years (whether because of an under recording of revenue or otherwise).  As set forth below, NN Finland hereby asserts a contingent claim to recover for such liability.

## THE CLAIMS

### I.    TRANSFER PRICING CLAIMS.

#### Claim 1 - Aiding and Abetting Breach of Fiduciary Duty or Tortious Conduct under State law

68.    To recover for aiding and abetting breach of fiduciary duty under the law of Delaware, Texas or any other state whose law might arguably apply, a party must plead and prove:

a.   the existence of a fiduciary relationship

b.    that the fiduciary breached its duty to the plaintiff

c.   that the defendant, who is a non-fiduciary, knowingly participated in the breach with knowledge that the conduct advocated or assisted constituted such a breach; and

d.   that damages resulted from the concerted action of the fiduciary and non-fiduciary.

69.    As regards the breach of fiduciary duty in question, under Finnish Law NN Finland's directors (de jure and/or, in the case of NNL[4], de facto/shadow) owed NN Finland fiduciary duties.

---

[4] In this context NNL maintained a high degree of control over NN Finland and its affairs (including the transactions referred to in this rider) and at all material times assumed and exercised the functions of a director in respect of NN Finland's affairs.  Further or alternatively NNL was a person in accordance with whose instructions the de jure directors of NN Finland were accustomed to act. In all the circumstances NNL was at all material times a de facto, further or alternatively shadow director of NN Spain.  In any event, by reason of the controlling function it assumed in relation to the transactions the subject of this rider, NNL assumed fiduciary duties in respect of those transactions.

70.     For the reasons described above, it is clear that in allowing NN Finland to participate in the Distribution Agreement and RPSM arrangements, the directors of NN Finland breached their duties by failing to perform their Finnish law fiduciary duties set out above.

71.     Further, given the doubtful solvency (and/or risk of insolvency) of NN Finland from 2000 onwards, in carrying out their duties to NN Finland, the directors were obliged at all times to consider the best interests of the creditors of NN Finland as paramount and to take those interests fully into account in exercising their powers and discretions.

72.     For the reasons described above, it is clear that in bringing about and allowing NN Finland's participation in the Distribution Agreement and RSPM arrangements and the steps taken in the implementation of the same, the directors (both de jure and, in the case of NNL, de facto/shadow) of NN Finland breached their duties by failing to ensure that NN Finland received an arm's length return under the transfer pricing arrangements.

73.     Those breaches of duty caused NN Finland to suffer significant damage and/or loss in the amount of approximately US$614,231 (plus pre and post filing interest).

74.     NNI, through the involvement of its personnel in the design, implementation and operation of the Distribution Agreement, MRDA and RPSM (as described above), advocated or assisted the conduct by NN Finland's directors (de jure and/or, in the case of NNI, de facto/shadow) which led to the breaches of fiduciary duties.

**Claim 2 – Damages for breach of fiduciary duty under Finnish law**

75.     Further, by reason of the following facts and matters, NNI was a de facto director of NN Finland, and in particular acted as such in relation to NN Finland's participation in the RPSM and entry into and performance of the Distribution Agreement:

a.  All decision making in relation to the entry into and operation of the Distribution Agreement and the RPSM was not in practice taken by NN Finland but was instead taken by NNL and NNI.

b.  The key individuals responsible for strategic decision making in relation to the Group's transfer pricing arrangements, including in respect of the treatment of NN Finland under such arrangements included NNI personnel.

c.  The decision to implement the RPSM was taken by NNL and NNI jointly.

76.  Accordingly, NNI owed fiduciary duties to NN Finland, including (but not limited to) duties:

a.  to act loyally and in good faith in the interests of the company;

b.  to act with diligence;

c.  to avoid conflicts of interest and not to favour the interests of itself or any other person over the interests of the company;

d.  not to profit from its fiduciary position at the expense of the company.

77.  In breach of its fiduciary duties, NNI:

a.  caused NN Finland to act in accordance with the Nortel Group's RPSM transfer pricing arrangements from 2001 onwards, in particular insofar as they related to routine returns, which arrangements were contrary to the interests of NN Finland and represented an unjust loss of value for NN Finland;

b.  failed to ensure that NN Finland received reasonable, arm's length compensation for its distribution and service activities by way of routine returns under the Nortel Group's transfer pricing arrangements from 2001 onwards, including under the Distribution Agreement, but rather caused NN Finland to accept NNI's and NNL's own determination of such returns;

c.  failed to ensure that restructuring costs were appropriately reimbursed to NN Finland so as to achieve an arm's length result;

d.  caused NN Finland to make payments to NNL and/or give credit to NNL in intercompany accounts in respect of the difference between its actual return and the routine return it was allowed by NNL and NNI, which (or part of which) should have been retained by NN Finland in order for NN Finland to receive an arm's length compensation for its distribution and service activities.

78.    As a result of the above breaches of fiduciary duty, NN Finland has suffered loss and/or damage.

79.    NNI is accordingly liable to NN Finland for damages in respect of such losses.

**Claim 3 - Civil Conspiracy under state law**

80.    To recover for civil conspiracy under the law of Delaware, Texas or any other state whose law might arguable apply, a party must plead and prove:

a.  the existence of a confederation or combination of two or more persons, including the defendant;

b.  the existence of an object to be accomplished;

c.  there was a meeting of minds on the object or course of action;

d.  that a tortious or unlawful act was done in furtherance of the

conspiracy; and

e.  actual damages.

81.  In relation to the Nortel transfer pricing arrangements, NNI and NNL, alternatively NNI and the de jure directors of NN Finland, alternatively NNI, NNL and the de jure directors of NN Finland, acted together by causing or allowing the implementation or operation of RPSM, MRDA and Distribution Agreement with the objective of removing value from NN Finland and in a manner which, as NNI, NNL and NN Finland's directors (who also included NNL, which was itself a de facto or shadow director of NN Finland) were aware, operated contrary to NN Finland's interests in a way that amounted to breaches of fiduciary duties, as set out above.  The conduct of NNI and NNL, alternatively NNI and NN Finland's de jure directors, alternatively NNI, NNL and NN Spain's de jure directors, amounted to a civil conspiracy to injure NN Finland through the improper operation of the RPSM, MRDA and Distribution Agreement and the breaches of duty by NN Finland's directors inherent in such operation.

82.  This caused significant loss and/or damage to NN Finland in the amount of approximately US$614,231 (plus pre and post filing interest).

## II    CLAIMS IN RESPECT OF PAST DISPOSITIONS OF BUSINESS

83.  To the extent that NN Finland did not receive from any pre-petition business sale a fair and appropriate allocation of the proceeds, based on the arm's length principle, for the assets it sold as part of any pre-petition business sale ("Pre-Petition Sale

Proceeds"), baed on the arm's length principle, NN Finland has various claims which will be further particularized following discovery. These claims include:

### Claim 4 – Contract Claim – Implied contract

84.     Given that the requirements of law and international accounting principles require that the Pre-Petition Sale Proceeds must be allocated on an arm's length basis as between the selling Nortel entities and pursuant to the agreement as between the selling Nortel entities that such a fair allocation would be applied, there was an implied contract as between the selling Nortel entities that the Pre-Petition Sale Proceeds would be distributed as amongst them in accordance with the arm's length principle.

85.     In the circumstances, the Pre-Petition Sale Proceeds were not distributed on an arm's length basis, to the detriment of NN Finland. NNI's participation in the decision making in relation to the allocation of sale proceeds is explained above. NNI's involvement in this regard constituted a breach of the implied contract fairly to allocate the Pre-Petition Sale Proceeds by NNI.

### Claim 5 - Contractual claim – Implied term

86.     A claim under the relevant sale contracts pursuant to the governing law applicable to the sale contracts that NN Finland would receive a fair and appropriate allocation, based on the arm's length principles, of the Pre-Petition Sale Proceeds;

### Claim 6 - Mistake

87.     Alternatively, NN Finland did not receive a fair allocation of the Pre-Petition Sale Proceeds due to a mistake (either of fact or law) as to the full extent of NN Finland's entitlement. As a consequence, of this mistake, NNI received considerably more from the allocation than it was intended to receive. NNI is therefore obliged to repay the overpayment to NN Finland.

**Claim 7 - Breach of Fiduciary Duties by NNI as De Facto or shadow Director of NN Finland under Finnish Law**

88.     For the reasons stated above, NNI was a de facto or shadow director of NN Finland and owed NN Finland fiduciary duties in respect the allocation of Pre-Petition Sale Proceeds by virtue of the fact that NNI was involved in all decision making in relation to the settlement of the allocation methodology and allocation amounts, as explained above.

89.     NNI breached its fiduciary duties in causing NN Finland to be allocated a proportion of the Pre-Petition Sale Proceeds that was far below the proportion that it should have received on an arm's length basis in clear contradiction to NN Finland's interests. Further, by ensuring that NN Finland received a lower allocation than it legally should have done under the arm's length test, NNI favoured its own interests and profited as this resulted in a larger proportion of the Pre-Petition Sale Proceeds being paid to NNI instead.

90.     As a result of NNI's breach of duty, NN Finland suffered significant loss and/or damage.  NNI is accordingly liable to NN Finland for damages and/or liable to compensate NN Finland in equity for that amount.

**Claim 8 – Aiding and Abetting Breach of Fiduciary Duty under state Law**

91.     The elements of the aiding and abetting a breach of fiduciary duty cause of action under the law of Delaware, Texas or any other state whose law might arguably apply are set out above.

92.     NN Finland's directors (either de jure or, in the case of NNL, de facto/shadow) owed NN Finland fiduciary duties as set out above.

93.     For the reasons described above, it was manifestly not in NN Finland's interests for it to enter into sales in respect of which it did not receive a proper allocation of the sale proceeds.  The directors of NN Finland breached their duties by causing and/or allowing NN

Finland to enter into pre-petition sales and/or to receive an allocation of the Pre-Petition Sale Proceeds in respect of which NN Finland did not receive appropriate value.

94.     NNI, through the involvement of its personnel, as explained above, advocated or assisted the conduct by NN Finland's directors which led to these breaches.

95.     As such, NN Finland is entitled to the remedies claimed in section VIII below.

96.     This caused significant loss and/or damage to NN Finland.

**III     FUTURE AND CONTINGENT RIGHTS**

97.     In the event that a claim is made by any third party whatsoever or intimated against NN Finland after the bar date (whether on the basis of matters currently known or unknown, and whensoever occurring), NN Finland will assert and hereby asserts all claims it has (or may have), all rights of contribution and indemnity under whatever applicable law against NNI. NN Finland's position is that such claims are not subject to this bar date but for completeness and the avoidance of doubt hereby includes all claims, rights to contribution or indemnity in respect of all claims, liabilities, costs and expenses from any person or persons, whensoever occurring and whether arising before or after the bar date, to the fullest extent possible and without limitation. NN Finland reserves the right to further identify, particularize and modify all its entitlements in this respect in due course.

98.     NN Finland further claims in respect of any future, prospective or contingent claims against NNI that NN Finland or any office-holder or future office-holder may have. NN Finland reserves the right to advance any prospective, contingent or future claims which may arise or become crystallized at any time hereafter.

**IV      PROPRIETARY CLAIMS**

> **99.**      If and to the extent that (a) NNI has obtained or derived any property or profit by reason of the breaches of duty or other improper conduct identified above, (b) any of NN Finland's property has come into NNI's hands by reason of the breaches of fiduciary duty by NN Finland's other directors identified above, (c) any profit or gain made by any such directors by reason of such breaches  has come into NNI's hands, NN Finland hereby asserts a proprietary claim to the same, and reserves the right to seek turnover and restitution of all such property or profits, and/or an accounting for the same pursuant to a separate proceeding under Section 541 of the Bankruptcy Code.  NN Finland reserves its rights in respect of all liens to which it may be entitled in connection with the same.

**V      CLAIMS IN RESPECT OF FSD LIABILITY**

> 100.    NN Finland refers to the matters stated above.

> 101.    At the present time, it is not yet known:

> a.  whether any one or more of the EMEA Targets will ultimately be required pursuant to an FSD or CN to make a payment or series of payments to the trustee of the Scheme ("the Trustee") or otherwise provide financial support for the Scheme;

> b.  whether NNI will ultimately be required pursuant to an FSD or CN to make a payment or series of payments to the Trustee or otherwise provide financial support for the Scheme; or

> c.  if one or more of the EMEA Targets and NNI are ultimately required pursuant to an FSD or CN to make a payment or series of payments to the Trustee or

otherwise provide financial support for the Scheme, what the relationship between their respective obligations will be.

102.    However, in the event that NN Finland is ultimately required pursuant to an FSD or CN to make a payment or series of payments to the Trustee or otherwise provide financial support for the Scheme NN Finland has the following claims against NNI which it hereby asserts:

### Claim 9 - Contribution

103.    A claim under English law, Finnish law or alternatively as a matter of US law to recover a contribution from NNI, including without limitation pursuant to the UK Civil Liability (Contribution) Act 1978, under common law, general equitable principles, under English, Finnish and US statute and/or by reason of breaches of the duties owed by NNI to NN Finland referred to elsewhere in this Proof of Claim.

104.    In this respect it is just and equitable for NN Finland to recover from NNI having regard to the extent of NNI's responsibility for the damage in question.

### Claim 10 - Claims against NNI on the basis of recoupment, contribution and or unjust enrichment

105.    A Claim for recoupment or contribution against NNI arising under English law, Finnish law, or alternatively under US law, on the basis that NN Finland will have been required by compulsion of law to satisfy in whole or in part an obligation owed by NNI to the Trustee, and NNI will therefore have been unjustly enriched at the expense of NN Finland.

### Claim 11 - Subrogation

106.    A Claim under English law, Finnish law, or alternatively under US law, to be subrogated in whole or in part to any claim which the Trustee would otherwise have had against NNI pursuant to an FSD or CN or otherwise.

**Claim 12 - Obligation to repay**

107.    A claim against NNI on the basis that it is otherwise obliged under English, Finnish or alternatively US law to repay, in whole or in part that obligation.  Full particulars of such claim are subject to the circumstances leading to NN Finland's obligation.

108.    The quantum of these claims is not capable of determination at the present time.

## VI    TAXATION MATTERS

109.    As explained above, at all material times, NNI (together with NNL) controlled NN Finland's tax affairs.

110.    In such circumstances, by causing and/or allowing NNI and NNL such control NN Finland's directors (including its de facto and/or shadow directors) will have breached the fiduciary duties and duties of skill of care which they owe (as set out above).

111.    To the extent that NN Finland suffers loss as a result of a claim by a tax authority and/or the imposition of any form of penalty in relation to its tax affairs NN Finland claims against NNI in respect of any losses, penalties and interest which has suffered (or will suffer) on the below bases.

**Claim 13 – Aiding and abetting breach of fiduciary duty or tortuous conduct under state law**

112.    A claim under the law of Delaware, Texas or other potentially applicable state law in respect of NNI aiding and abetting the breaches of duty set out above, by virtue of

NNI's involvement and participation (together with NNL, and as explained above) in controlling NN Finland's tax affairs.

### Claim 14 – Conspiracy under state law

113.    A Claim under the law of Delaware, Texas or other potentially applicable state law for conspiracy by virtue of NNI and NNL acting together (as explained above) to harm NN Finland's interests in controlling NN Finland's tax affairs.

### Claim 15 – Claim under Finnish law for breach of fiduciary duty

114.    A claim under Finnish law for breach of fiduciary duty owed by NNI as a de facto or shadow director of NN Finland (as explained above) as a result of NNI controlling NN Finland's tax affairs.

## VI.    RELIEF REQUESTED

WHEREFORE, NN Finland claims the following relief:

115.    All equitable, common law, civil law, statutory and other remedies available under the applicable laws of any jurisdiction including, but not limited to, damages, equitable compensation, an equitable account of profits, restitution and/or any other recovery in respect of the matters the subject of:

      a.  Claims 1 to 3 relating to transfer pricing losses in an amount to be determined at trial but in any event no less than US$67,946.00.

      b.  Claims 4 to 8 relating to past dispositions of business in an amount to be determined at trial.

      c.  Claims 9 to 12 relating to FSD liability in an amount yet to be determined.

       d.  Claims 13 to 15 relating to taxation matters in an amount to be determined at trial.

116.    Pre and post judgment interest on these amounts; and

117.    An accounting for, and restitution of, the identifiable or traceable sums, or substitutes of the above amounts, that are held on trust for and on behalf of NN Finland.

## VII. RESERVATIONS

### A.    Reservation regarding jurisdiction, applicable law and forum

118.    For the avoidance of doubt:

       a.  all claims and disputes with regard to the allocation of the "Lockboxes" are to be determined in accordance with the dispute resolution mechanisms to be set up pursuant to the IFSA Allocation Process, and nothing herein shall be considered a waiver of NN Finland's rights to have allocation disputes determined by the dispute resolved appointed under the IFSA.

       b.  In so far as this Rider is silent as to applicable law, this is not to be taken as acceptance that Delaware Law is, or is necessarily, the applicable law, and NN Finland reserves the right further to identify appropriate foreign law as being the law applicable to its claims.

### B.    Reservation in respect of claims from NNI and alleged set-off

119.    Nothing in this Claim is to be taken as acceptance that any claim from NNI against NN Finland exists, is valid or is eligible for set off against any of NN Finland's claims. Further nothing in this Claim is to be taken as acceptance that the appropriate forum or proper jurisdiction for considering any claim by NNI against NN Finland is the Delaware Bankruptcy Court (or any other US Court) (or the proof of claims process in the US), whether in

the context of an allegation that such claim has been or should be the subject of a set off against any claim by NN Finland or otherwise.

## C.    Reservation in respect of proprietary claims

120.    NN Finland's proprietary claims constitute claims and rights which fall outside the proof of claims process, being claims in respect of property which NNI does not own.

121.    As such, NN Finland's proprietary claims are included in this Rider subject to the same general reservations above without prejudice to NN Finland's rights to claim this property in other proceedings or processes and to asserts its rights to seize this property without reference to the Delaware Bankruptcy Court proceedings (or those of any other US Court).

122.    For the avoidance of doubt all references herein to NN Finland's proprietary claims are to be read as including a personal claim against/over NNI (both for the amount of the claims and for interest thereon) to the extent that those proprietary claims are not fully satisfied out of the assets to which they attach.

## D.    Reservation in respect of claims against other parties

123.    For the avoidance of doubt, all claims and allegations made against NNI made in this Rider are made without prejudice to all claims and allegations that NN Finland has made or may make in this proof of claims process or otherwise against any other person (including NNC, NNL, and any present or former officer of NN Finland, NNL, or any other natural or corporate person whomsoever).

## E.    General Reservation of Rights

124.    The execution and filing of the Claim are not (i) a waiver or release of any of the rights against any entity or person liable for all or part of the Claim held by NN Finland; (ii) a waiver of the right to withdraw the reference with respect to the subject matter of the

Claim, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving NN Finland; (iii) an election of a remedy which waives or otherwise affects any other remedy; or (iv) a waiver or release of any rights against any third party on behalf of NN Finland.

125.    NN Finland expressly reserves its rights further to amend or supplement the Rider in any respect.

## VII.    MISCELLANEOUS

126.    <u>Supporting Documents</u>:  The writings upon which this Claim are based are in the possession of NNI, the Canadian Entities, the US and Canadian creditor committees and the Canadian Monitor and include, without limitation, the MRDA and the other agreements referenced herein.  Such documents, will be made available to other interested parties upon request under an appropriate confidentiality order

127.    <u>Notice</u>:  All notices to the claimants concerning the Claim should be sent to:

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Attention: Edwin J. Harron
(302) 571-6600

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004
Attention: Michael Luskin
(212) 837-6000

Herbert Smith LLP
Exchange House
Primrose Street
London  EC2A 2HS
UNITED KINGDOM
Attention: Kevin Lloyd
+44-20-7374-8000

128.    <u>Protective Filing/Amendments</u>.  The Claim is filed to amend the Original Proof of Claim to provide a more particularized statement of NN Finland's claims as required by

the Order, and is filed to protect the Joint Administrators, NN Finland, and the EMEA Companies from forfeiture of their claims.

**H
A
N
D

D
E
L
I
V
E
R
Y**

RECEIVED BY:

DATE  6/3/11

TIME  3:30 pm