UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., et al., | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |
| | **Hearing Date:**<br>**August 22, 2012 at 10:00 am ET**<br>**Reply Due: August 17, 2012** |

**JOINT ADMINISTRATORS' OPPOSITION TO JOINT MOTION
FOR A SCHEDULING ORDER BIFURCATING PROCEEDINGS AND
STAYING CERTAIN DISCOVERY ON CLAIMS OF THE EMEA CLAIMANTS**

## TABLE OF CONTENTS

PAGES

INTRODUCTION ...................................................................................................1

THE CLAIMS AND REQUIRED DISCOVERY .........................................................6

ARGUMENT .......................................................................................................8

I.    ADDRESSING THE "GATING ISSUES" IDENTIFIED BY THE US DEBTOR
      CANNOT RESULT IN RESOLUTION OF THE BULK OF THE EMEA
      CLAIMS. ....................................................................................................8

      A.    The EMEA Debtors Are Not Required To Prove That NNUK Was
            Insolvent At The Relevant Times In Order To Succeed On Their Claims
            for Dishonest Assistance Under English Law Or Aiding and Abetting
            Under US Law. .....................................................................................9

      B.    The EMEA Debtors Are Not Required To Prove That NNUK Was
            Insolvent At The Relevant Times In Order To Succeed On Their Claims
            For Conspiracy Under US or English Law. ...........................................11

      C.    The "Gating Issues" Do Not Provide Arguable Defenses To Any Claims
            Of The Other Eighteen EMEA Debtors. ...............................................12

II.   BROAD DISCOVERY WILL BE NEEDED IN ORDER TO ADDRESS THE
      US DEBTOR'S PURPORTED DEFENSES BASED ON SOLVENCY AND
      RATIFICATION. .......................................................................................14

      A.    The Test For Solvency Requires A Broader Inquiry Than The US Debtor
            Suggests. ............................................................................................14

      B.    The Applicable Test Under West Mercia Is "Doubtful Solvency." .......15

      C.    The Test For Doubtful Solvency Requires An Even Broader Inquiry Than
            That For Solvency. ..............................................................................17

      D.    In Order To Determine Whether The Key Transactions Were Ratified By
            NNL, The Court Will Need To Consider The Overall Circumstances
            Under Which The Transactions Were Negotiated And Approved. ........18

III.  THE US DEBTOR OVERSIMPLIFIES THE ISSUES RELATED TO
      TRACING. ...............................................................................................19

IV.   Delaying Discovery Will Cause Prejudice To The EMEA Debtors. ................21

CONCLUSION ...................................................................................................21

The court-appointed administrators and authorized foreign representatives (collectively, the "Joint Administrators")[1] for Nortel Networks UK Limited ("NNUK") and certain of its affiliates (collectively, the "EMEA Debtors")[2] located in the region known as EMEA (Europe, Middle East, and Africa) in proceedings under the *Insolvency Act 1986*, pending before the High Court of Justice of England and Wales (the "English Court"), submit this Opposition to the Joint Motion For A Scheduling Order Bifurcating Proceedings And Staying Certain Discovery On Claims By The EMEA Claimants (the "Motion") of Nortel Networks, Inc. ("NNI") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"),[3] and the Official Committee of Unsecured Creditors (the "Committee" and, together with the Debtors, the "US Debtor.[4]

## INTRODUCTION

The US Debtor argues that there are two "gating issues" that, if addressed over the next eight months while staying all other discovery, are likely to dispose of substantial parts of NNUK's claims. These issues are (i) whether NNUK was solvent at the relevant times, and

---

1.  The administrators in the UK proceedings for all of the EMEA Debtors, with the exception of Nortel Networks (Ireland) Limited, are: Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, and Stephen John Harris. The administrators in the UK proceedings for Nortel Networks (Ireland) Limited are: Alan Robert Bloom and David Martin Hughes.

2.  The EMEA Debtors are: Nortel Networks UK Limited; Nortel GmbH; Nortel Networks (Austria) GmbH; Nortel Networks (Ireland) Limited; Nortel Networks AB; Nortel Networks B.V.; Nortel Networks Engineering Service Kft; Nortel Networks France S.A.S.; Nortel Networks Hispania, S.A.; Nortel Networks International Finance & Holding B.V; Nortel Networks N.V.; Nortel Networks OY; Nortel Networks Polska Sp. z.o.o.; Nortel Networks Portugal S.A.; Nortel Networks Romania SRL; Nortel Networks S.A.; Nortel Networks S.p.A.; Nortel Networks Slovensko, s.r.o.; Nortel Networks, s.r.o.

3.  The Debtors in these Chapter 11 cases are: Nortel Networks Inc., Nortel Networks Capital Corporation, Alteon WebSystems, Inc., Alteon WebSystems International, Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

4.  Capitalized terms used but not otherwise defined are defined in NNUK's Amended Proof of Claim.

(ii) whether, in connection with the transactions that form the basis for the EMEA Claims, funds can be traced from NNUK to NNI.[5]  The US Debtor suggests that proving NNUK's solvency will constitute a complete defense to the claims that are based on NNI's having provided assistance to or participated in breaches of duty owed to NNUK in connection with the relevant transactions.  This is based on the English legal principle that, in certain circumstances, breaches of duty by the directors of a company can be ratified by subsequent action of the company's shareholders or parent company.  With respect to tracing, the US Debtor notes that the movement of funds from NNUK to NNI is an element of NNUK's claims for unconscionable receipt under English law and unjust enrichment under US law.  If it can show that there was no such movement, the US Debtor argues, these claims must fail as a matter of law.

The US Debtor concedes that there is no scenario in which _any_ of the claims of the EMEA Debtors other than NNUK (or even all of NNUK's claims), will be disposed of pursuant to the proposed limited discovery exercise.  It is therefore inevitable that there will have to be full disclosure of the circumstances surrounding the transactions by which billions of dollars were transferred from the EMEA Debtors to other Nortel entities.  The US Debtor has articulated no benefit that will be gained by further delaying such disclosure.

In addition, the US Debtor's arguments are based on an incorrect and oversimplified view of the nature of NNUK's claims and the legal elements under the applicable law:

_First_, certain of the underlying breaches of duty NNUK claims for are not, as a matter of law, capable of ratification.  As explained in greater detail below, the transactions by which value was transferred from NNUK to NNL and other Nortel entities constituted unlawful

---

[5]    References in this Opposition to the "gating issues" are to these two issues.

returns of capital in violation of English corporate law.  The directors of NNUK breached their

duties to NNUK by approving such unlawful transactions.  Under English law, such breaches

cannot be ratified by the shareholders.  Inasmuch as NNUK's claims for aiding and abetting

breach of fiduciary duty, dishonest assistance and conspiracy are premised in part on such

breaches of duty, a finding of solvency and ratification can never dispose of those claims.

Discovery with respect to the circumstances surrounding the relevant transactions is therefore

inevitable.

Second, a finding of solvency and ratification will not dispose of NNUK's claims

for conspiracy because the objects of the conspiracies in question were not limited to causing

NNUK's directors to breach their fiduciary duties to NNUK.  As detailed in the claims, the

objects of the conspiracies included  breaches of contract, and other tortious or inequitable

conduct.  Further, the breaches of fiduciary duty were concerned with unlawful returns of capital

and cannot be ratified in any case.  Thus the conspiracy claims will necessarily survive a finding

of solvency and ratification.  These claims cannot be resolved without full discovery on the

underlying transactions.

Third, the "gating issues" do not provide even arguable defenses to all of

NNUK's claims or to the claims that have been filed by the 18 EMEA Debtors other than

NNUK.  Once again, full disclosure of the circumstances surrounding the challenged transactions

will be necessary before these claims can be resolved.  There is no reason to delay inevitable

discovery on these issues for another nine months while the parties pursue piecemeal discovery

and motion practice addressed to issues that cannot possibly dispose of the bulk of the EMEA

Debtors' claims.

01:12365986.1

3

Fourth, the test for determining solvency, and the evidence needed to address this issue, are not as simple as the US Debtor suggests. Further, it will not even be necessary for the Joint Administrators to demonstrate that NNUK was actually insolvent at the relevant times in order to trigger the duty to give the interests of creditors precedence over the interests of shareholders. Under the *West Mercia* line of cases, it is sufficient to demonstrate that NNUK was in financial difficulties, i.e. approaching insolvency. This test requires an in depth factual inquiry into all aspects of the company's financial affairs, including what the directors knew and considered at the time of each transaction. Nor is the relevant financial analysis limited to looking at NNUK alone. The financial position of the whole of the group will be relevant in relation to the issues of NNUK's financial health. This is not a discrete inquiry. Even if it were, there is no reason to believe the US Debtor has any prospect of succeeding on the merits as to this point.

Fifth, the US Debtor mistakenly appears to assume that a finding of ratification flows automatically from a finding of solvency.[6] This is incorrect. In order to establish a defense of ratification, NNI bears the burden of demonstrating that NNL made an actual act of ratification with respect to each of the subject transactions. This will require an examination of the circumstances surrounding the negotiation, approval and implementation of each of the transactions, i.e. precisely the areas of disclosure the US Debtor proposes to defer. The fact that discovery on these areas will be needed in order to address one of the "gating issues" wipes out the rationale for limiting disclosure.

---

[6]  (*See* Motion at ¶ 2 ("most of NNUK's Claim can and should be rejected through demonstrations that (1) NNUK was solvent at all times relevant to its claims, such that the challenged transactions between NNUK and its parent, Nortel Networks Limited ("NNL") were ratified; . . . .")

Finally, the disclosure needed in order to determine whether NNI received funds traceable to NNUK will also necessarily involve taking a broad look at the history, nature and circumstances of each of the transactions that form the basis for NNUK's claims. Once again, this eliminates the rationale for limiting disclosure.

In sum, the discovery exercise proposed by the US Debtor will be much broader than the US Debtor suggests. Because of the overlap between the facts relevant to the "gating issues" and the facts relevant to all other issues, limiting disclosure offers no actual efficiency. More importantly, the US Debtor does not dispute that full disclosure will eventually be necessary in order to address the several broad NNUK claims for which the "gating issues" present no arguable defense, and the claims of all of the other EMEA Debtors, which the US Debtor does not propose to address at this time. Delaying disclosure on these issues will prejudice the EMEA Debtors, *inter alia*, because witnesses are scattering, memories are fading and, as the Nortel entities cease to function, documents and information will be increasingly difficult to retrieve.

The need for discovery from Canada presents a complicating factor that should be considered in relation to any proposed schedule. Whether disclosure proceeds on a broad or limited basis, there is no question that the parties will need a substantial amount of discovery from NNL. NNL personnel played a central role in the transactions that form the basis for the claims, and a substantial proportion of the relevant records will be held in Canada. One reason the EMEA Debtors have suggested allowing a year to complete discovery is to allow time for obtaining discovery from Canada in a coordinated manner. The US Debtor acknowledges this issue, and suggests that limiting discovery will make it easier to get cooperation from Canada.[7]

---

[7]    (*See, e.g.,* Motion at 9 n.17.)

Since the limited disclosure proposed by the US Debtor cannot achieve its stated purpose of allowing certain claims to be dealt with in the summary manner proposed, and given the considerable overlap in the factual grounds for the claims the EMEA Debtors have asserted against NNL and the claims they have asserted against NNI, the most efficient approach would be if mutual disclosure for all purposes could be conducted in a coordinated manner in both jurisdictions.  However the discussions over the past few weeks raise serious doubts about whether it will be feasible to pursue disclosure from Canada at any time in the near future.  It appears that (i) the mediation process will be actively pursued and will be the center of efforts in the next several months, (ii) the courts and the mediator want the parties to focus on the mediation process rather than pursuing any litigation on allocation or claims, and (iii) because of this, the Canadian Debtor and the Canadian Court are likely not to be amenable to allowing discovery from Canada while the mediation is in progress.  Before confirming any discovery schedule, the Joint Administrators respectfully suggest it would be appropriate to schedule a joint conference with the two courts in order to properly coordinate these issues.  If there is truly no prospect for obtaining disclosure from Canada while the mediation is in progress, the better approach may be to stay all disclosure here until after the mediation has been concluded.

## THE CLAIMS AND REQUIRED DISCOVERY

In its March 20, 2012 Opinion addressing the US Debtor's objection and motion to dismiss the EMEA claims (the "Opinion"), the Court held that the EMEA Debtors are entitled to proceed to disclosure on the following claims (i) aiding and abetting NNL's breach of fiduciary duty under US law (Opinion at 46-47); (ii) Dishonest assistance under English and Irish law (*id.* at 48-50); (iii) conspiracy, under the laws of England, Ireland and the US (*id.* at 50-52); (iv) NNSA's claim under French tort law(*id.* at 53-54); (v) implied contract under English, Irish

and French law (*id.* at 54); (vi) mistake under English, Irish and French law (*id.* at 55-56);
(vii) transaction at undervalue under English and Irish law (*id.* at 57-58); (viii) unconscionable
receipt under English and Irish law (*id.* at 58-60); and (ix) unjust enrichment under US law (*id.* at
60-61).

The Court noted that the claims arise from a series of transactions by which cash
and other value were improperly transferred from the EMEA Debtor to their Canadian parent and
their sister subsidiary in the US. The mechanisms by which these improper transfers of cash and
value took place include: (i) the transfer pricing arrangements (the RPSM and the MRDA)
(Opinion at 9-10), (ii) purported loans from the EMEA Debtors to NNL (*id.* at 11-13);
(iii) Project Swift (*id.* at 13-14), and (iv) failure to properly distribute proceeds from pre-petition
business activity (*id.* at 14). Accordingly, the primary area for discovery will be the events that
led to the implementation of each of these transactions, in particular the decision-making
processes by which they were conceived and approved, as well as the economic impact of each
transaction. As alleged in the EMEA claims, these transactions were imposed from above as a
result of management decisions in which NNL and NNI were primarily involved. Key
documents and information relevant to the origin through to the implementation of the relevant
transactions are therefore in the exclusive control of NNL and NNI. To date, the EMEA Debtors
have had very limited access to such evidence and will need to gain access to it through the
discovery process.

In addressing the US Debtor's earlier motion, the Court recognized that the
underlying transactions are "enormously complex"[8] and that on the current record it was "unable,
unwilling and precluded from determining the validity of" the EMEA Debtor's secondary

---

[8]    (Opinion at 2 n.4.)

01:12365986.1

claims.[9]  The Court noted the factual issues that would need to be addressed in order to

determine the EMEA claims, including:

> (1) Claimants' insolvency at the relevant times;
>
> (2) Whether Claimants' directors acted in bad faith;
>
> (3) [the US Debtor's] mental state, i.e., what they knew and when;
>
> (4) whether NNL and Claimants' directors breached duties to Claimants[; and]
>
> (5) If [the US Debtor had] any understandings with NNL relating to Claimants and diversion of assets through pricing arrangements, interest free loans and Project Swift.

(Opinion at 45.)

These are the core matters as to which EMEA Debtors require discovery in order

to advance their claims.

## ARGUMENT

## I.    ADDRESSING THE "GATING ISSUES" IDENTIFIED BY THE US DEBTOR CANNOT RESULT IN RESOLUTION OF THE BULK OF THE EMEA CLAIMS.

The US Debtor suggests that proving NNUK's solvency at the relevant times will

provide a complete defense to NNUK's claims for aiding and abetting breaches of fiduciary duty

under US law, dishonest assistance under English law, and conspiracy under US and English

law.  This is based on the English legal principle that, in certain circumstances, breaches of duty

by the directors of a company can be ratified by subsequent action of the company's

shareholders.

Contrary to the US Debtor's arguments, the defense of solvency/ratification offers

no prospect for resolving any of NNUK's claims.  First, the US Debtor overlooks the fact that

certain of the underlying breaches of duty upon which NNUK's claims are based are breaches of

---

[9]    (Opinion at 45.)

duty which cannot be ratified as a matter of English Law.  Second, NNUK's conspiracy claims are not based exclusively on alleged breaches of fiduciary duty.  Third, solvency/ratification does not offer even an arguable defense to NNUK's other six claims.

Nor does the US Debtor propose to deal in any way with the claims of any of the other 18 EMEA Debtors, which total at least $1.1 billion.

Discovery on the core issues of the case will therefore necessarily have to proceed in due course.  The US Debtor makes no persuasive argument why it would be efficient or beneficial to delay the inevitable discovery on these issues for another nine months while the parties pursue piecemeal discovery and motion practice addressed to issues that cannot possibly dispose of the bulk of the EMEA Debtors' claims, and have no realistic prospect of even disposing of the $2.45 billion of NNUK's claims.

A.    **The EMEA Debtors Are Not Required To Prove That NNUK Was Insolvent At The Relevant Times In Order To Succeed On Their Claims for Dishonest Assistance Under English Law Or Aiding and Abetting Under US Law.**

The US Debtor incorrectly suggests that solvency and ratification will present a complete defense to any of NNUK's claims based on NNI's having played a role in an underlying breach of duty owed to NNUK.  Certain breaches of duty that took place in connection with the transactions that form the basis for NNUK's claims are not subject to potential ratification.  In particular, NNUK will demonstrate that NNL and NNUK's directors breached their duties by engaging in transactions that constituted unlawful returns of capital from NNUK to its parent NNL.  These claims do not depend on insolvency, and such unlawful transactions cannot be ratified.

Under English law, a company can only make a distribution where it has "distributable reserves."  See Companies Act 1985 s.263(1); Companies Act 2006 s.830(1).

Where a company makes a distribution out of profits that are not available for that purpose, it will be treated as an improper transfer of the company's assets to its shareholders in breach of the Companies Act and will be unlawful.

Where a subsidiary company enters into a transaction with its parent pursuant to which the subsidiary does not receive adequate value, that transaction will constitute a distribution. *See Aveling Barford Ltd v Perion Ltd* [1989] BCLC 626. A distribution also includes every description of distribution of a subsidiary's assets to its members, whether in cash or otherwise. *See* Companies Act 1985 s.263(2); Companies Act 2006 s.829(1). If the subsidiary does not have sufficient distributable reserves, any distribution will be unlawful. It is irrelevant whether the distribution was in the best interests of the company. The directors responsible for the purported distribution in question will have breached their duties to the subsidiary company and will be liable to the company accordingly. *See Re Exchange Banking Co, Flitcroft's Case* (1882) L.R. 21 Ch D 519; *Bairstow v Queens Moat Houses* plc [2001] EWCA Civ 712. The directors will be liable for breach of duty regardless of whether the subsidiary company is solvent or insolvent. The shareholders of a company do not have any power to ratify a distribution made in breach of the Companies Acts. The US Debtor's English law expert has conceded this. (*See* Todd Reply Decl. [¶ 60.1].)

The breaches of duty underlying NNUK's dishonest assistance or aiding and abetting claims are concerned with transactions which constituted, amongst other things, an unlawful return of capital to NNUK's parent NNL. (*See* Marshall Decl. [¶ 35.5.3].) As such, NNUK's solvency is irrelevant to the determination of these claims and a finding on solvency would leave open in its entirety the question as to the validity of the dishonest assistance and

01:12365986.1

aiding and abetting claims. The process advocated for by the US Debtor therefore cannot facilitate the final resolution of the $2.45 billion of NNUK claims.

With regard to discovery, in order to determine whether there has been a breach of duty as a result of an unlawful return of capital discovery will be needed regarding all elements of the underlying breach of duty claim. It will not be possible to carve out any issues for preliminary discovery with a view to a summary determination. And it will also be essential to obtain disclosure from NNL, given its central role in the underlying issues and the fact that it was the initial recipient of the relevant returns of capital.

NNUK is highly likely to succeed on its claims based on breaches of duty in relation to unlawful distributions. It has already been established that NNUK did not have distributable reserves to enable any form of distribution to its parent company during the relevant periods:

|  | 2001 | 2002[10] | 2003 | 2004[11] | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|
| Retained profit/(loss)[12] | 318.6 | (259.5) | (357.5) | (672.2) | (599.4) | (523.3) | (457.3) |

### B. The EMEA Debtors Are Not Required To Prove That NNUK Was Insolvent At The Relevant Times In Order To Succeed On Their Claims For Conspiracy Under US or English Law.

Although NNUK's claims for conspiracy can be based on showing that NNI was part of a conspiracy to cause persons who owed fiduciary duties to NNUK to breach their duties, demonstrating a breach of fiduciary duty is not a required element of these claims under either US or English law.

---

[10] Restated from the NNUK Financial Statements for year ended 31 December 2003.

[11] Restated – taken from NNUK Financial Statements for year ended 31 December 2005.

[12] This account entry is shown under the heading "Reserves" in NNUK's accounts for each relevant period.

01:12365986.1

Under English law, recovery for unlawful means conspiracy simply requires the plaintiff to satisfy the element of "unlawfulness." This can be based on a breach of fiduciary duty, *see, e.g., British Midland Tool Ltd v Midland International Tooling Ltd* [2003] 2 BCLC 523 at [93] (Hart, J.), but can also include a breach of contract, breach of a statutory obligation, a breach of duty of care or other tortious or inequitable conduct. *See Thames Valley Housing Association Ltd v Elegant (Guernsey) Ltd* [2011] EWHC 1288 (Ch) at [103] (Lewison, J.) *(*"The unlawful means can consist of another tort, or of a breach of contract: *Kuwait Oil Tanker Co. v Al Bader* [[2000] 2 All ER (Comm) 271] (§ 130); *Meretz Investments NV v ACP Ltd [2008] Ch 244 ; Aerostar Maintenance International Ltd v Wilson* [2010] EWHC 2032 (Ch) (§ 172)."); *see also Lonrho Ltd v Shell Petroleum Co Ltd (No.2)* [1982] AC 173. The same is true under US law, which requires only an agreement to undertake "at least one unlawful act which caused actual damage to a plaintiff." (Opinion at 52.)

Here, NNUK asserts conspiracy claims based upon unlawful breaches of contract and breaches of duty of care, in addition to breaches of fiduciary duty (derived both from common law and the Companies Acts). (*See* NNUK Claims 5, 12 & 19.) In addition, because the underlying breaches of duty supporting the conspiracy claims include breaches of duty based on unlawful returns of capital, which are not subject to potential ratification, the US Debtor's solvency/ratification defense cannot in any event result in outright dismissal of the conspiracy claims.

### C. The "Gating Issues" Do Not Provide Arguable Defenses To Any Claims Of The Other Eighteen EMEA Debtors.

Even if the US Debtor is successful in proving that (i) the transactions underlying NNUK's claims did not constitute unlawful returns of capital, (ii) the EMEA Debtors were solvent at all relevant times, (iii) the Canadian Debtor ratified any underlying breaches of duty

upon which the EMEA Debtor's claims are founded, and (iv) no funds from the EMEA Debtors

can be traced to the US Debtor, these findings will not dispose of any of the other EMEA

Debtors' claims.  The findings in relation to the NNUK claims would have no relevance to any

of the other EMEA claims.

Findings as to the solvency of NNUK will in no way be determinative of the

question of whether the directors of NNSA, NN Ireland or the 16 other EMEA claimants

breached the duties they owed under the relevant national laws upon which their claims are

based.  Even to the extent that solvency is relevant to any such local law requirement, the

solvency position of each of these entities would have to be considered individually, following

the necessary detailed factual enquiry.

Similarly, a determination as to whether the Canadian Debtor ratified a breach of

duty committed by a director of NNUK in respect of a transaction involving NNUK will be

irrelevant to the question of whether a breach of duty has been committed by a director of any

other EMEA Debtor.  Putting to one side the fact that the principle of ratification is an English

law concept, and that the EMEA claims include claims based upon the laws of 17 other nations,

even if the defense of ratification is available under the applicable local law in each case it would

be necessary to have a full factual investigation into the relevant circumstances of each

individual company in order to determine the factual matrix relevant to each individual claim

and, in particular, the decision-making process in respect of the transaction in question.  To the

extent they can be quantified, these claims total at least $1.1 billion.  It is difficult to see how the

US Debtor can dismiss $1.1 billion of claims as somehow insignificant.

The disclosure needed in order to litigate the remaining EMEA claims will have

to proceed in any event.  Importantly, much of the disclosure needed in order to litigate these

claims will be the same as the disclosure the US Debtor is trying to avoid by bifurcating. Accordingly, the US Debtor's approach will unnecessarily delay discovery on these points, and the wider resolution of the claims, leading to an inefficient process and the consequent waste of funds available to pay creditors.

## II.   BROAD DISCOVERY WILL BE NEEDED IN ORDER TO ADDRESS THE US DEBTOR'S PURPORTED DEFENSES BASED ON SOLVENCY AND RATIFICATION.

Even if solvency and ratification did offer a defense to any of NNUK's claims, the disclosure that will be needed in order to address these issues will be substantially broader than the US Debtor suggests and will require examining the core issues underlying the claims, i.e. the circumstances surrounding each of the transactions that form the basis for NNUK's claims. No efficiency will therefore be gained from attempting to limit disclosure. Indeed, adopting the US Debtor's proposal is likely to embroil the parties and the Court in needless discovery disputes regarding whether particular items of disclosure are relevant to the "gating issues."

### A.   The Test For Solvency Requires A Broader Inquiry Than The US Debtor Suggests.

Putting to one side the question of whether the relevant test is actual insolvency, near insolvency or doubtful solvency, the scope of the process that would be necessary to determine the formal solvency position of NNUK would be much more complicated than the US Debtor suggests. Not only would it involve discovery regarding all aspects of NNUK's affairs, and expert evidence on insolvency, it would also require discovery from third parties. As part of any consideration of the formal solvency position of NNUK it will be necessary to investigate the level of deficit under the NNUK pension scheme. This is a very complicated exercise. Not

only will it involve expert actuarial evidence, it will also require third party discovery, most likely from the UK Pension Trustee and from the Canadian Debtor as the repositories of relevant information regarding the NNUK pensions scheme. Once these matters are factored in, the process can be seen to be significantly wider than that envisaged by the US Debtor.

  **B.**  **The Applicable Test Under *West Mercia* Is "Doubtful Solvency."**

  When a company is in sound financial health, the interests to which the directors of the company must have regard when exercising their duties to the company are the interests of the shareholders. (*See* Companies Act 2006 s.172(1).) In such circumstances, if the directors breach their duties it is in principle open to the shareholders to ratify such breach of duty, unless the breach relates to an unlawful return of capital as explained above. The reason for this is that the duties to which the directors are subject exist to protect the shareholders and it is therefore open to the shareholders to forgive the directors if they so wish.

  The situation is different, however, not just where a company is formally insolvent but also where it is "near solvency" or of "doubtful solvency".

  A company can be formally insolvent under English law if it fails either the "cash-flow" test or the "balance sheet" test under Section 123 of the Insolvency Act 1986. (*See* Second Todd Decl. ¶ 54.) When the US Debtor refers to the "solvency" of NNUK it is referring to whether NNUK passes these formal tests.

  In a situation of formal insolvency, the directors are obliged, when exercising their duties, to consider the interests of creditors as paramount. Creditors' interests therefore intrude and take precedence over the interests of shareholders. *See Brady v Brady* [1988] BCLC 20 ("where the company is insolvent . . . the interests of the company are in reality the interests of the existing creditors alone"). It is not open to the shareholders to ratify any breach of duty by

the directors in such circumstances because the duties which the directors owe now exist to protect the interests of creditors.

Under English law, directors are under a duty to have regard to the interests of creditors not just when the company is formally insolvent, but also as the company approaches insolvency. The US Debtor's English law expert has conceded this. (*See* Todd First Decl. ¶ 71 ("the interests of creditors might also intrude where the company is near insolvent or of doubtful solvency").) In such circumstances the shareholders can no longer ratify any breach of duty by the directors. *See Nicholson v Permacraft* (NZ) Ltd [1985] 1 NZLR 242 ("In a situation of marginal commercial solvency such creditors may fairly be seen as beneficially interested in the company or contingently so ... [I]n such cases the unanimous assent of the shareholders is not enough to justify the breach of duty to the creditors. The situation is really one where those conducting the affairs of the company owe a duty to creditors. Concurrence by the shareholders prevents any complaint by them, but compounds rather than excuses the breach as against the creditors.")[13]

NNUK's claims are not based only on the allegation that NNUK was insolvent at the time of the relevant transactions, but also on the allegation that the company was of "doubtful solvency (and/or risk of insolvency)." *See* e.g. NNUK Amended Proof of Claim ¶ 87(b)(v).[14]

---

[13]  The *Nicholson* decision was cited with approval in *Kinsela v Russell Kinsela* (1986) NSWLR 722 ("It is, to my mind, legally and logically acceptable to recognise that, where directors are involved in a breach of their duty to the company affecting the interests of shareholders, then shareholders can either authorise that breach in prospect or ratify it in retrospect. Where, however, the interests at risk are those of creditors I see no reason in law or in logic to recognize that the shareholders can authorize the breach. Once it is accepted, as in my view it must be, that the directors' duty to the company as a whole extends in an insolvency content to not prejudice the interests of creditors...the shareholders do not have the power or authority to absolve the directors from that breach.") which was in turn cited with approval in *West Mercia Safetywear Ltd v. Dodd* [1988] BCLC 250, 252. The Debtors' English law expert cites all of these cases with approval. (*See* First Todd Decl. ¶ 71.)

[14]  This is cross-referred to in NNUK's other claims based on breach of that duty.

To determine whether a company was near insolvency or of doubtful solvency, it is necessary for the Court to perform a detailed factual inquiry into all aspect of the company's financial affairs and into the consideration given by its directors to its financial position. The Court will need to consider factors such as the likelihood of certain liabilities arising, how soon they might arise, the relevant directors' knowledge and views in respect of these, and the assessments that they made. Further, where the company is a member of a corporate group that is also near insolvent or of doubtful solvency (as was the case with NNUK), a court must consider the financial circumstances of the entire group. (*See* Marshall Decl. ¶ 35.5.2 and n.21 (citing *Facia Footwear v Hinchcliffe* [1998] 1 BCLC 218 at 228c; *see also* Second Todd Decl. ¶ 53.)

### C.   The Test For Doubtful Solvency Requires An Even Broader Inquiry Than That For Solvency.

When the need to deal with the "near solvency" and "doubtful solvency" issues are also taken into account, the discovery and determination process become yet wider again. As explained above, in order to consider whether a company was "near insolvent" or of "doubtful insolvency" it is necessary to consider all relevant factors which go to the issue of whether the company was in financial difficulty. This will necessitate a complete review of all aspects of NNUK's financial affairs from 2001 to January 2009.

More importantly, however, in determining whether NNUK was "near insolvent" or of "doubtful solvency" it will also be necessary to consider the financial health of the Nortel Group as a whole, in order to determine whether the clear financial difficulties suffered by the Nortel Group lead to the conclusion that NNUK itself was of doubtful solvency. NNUK's position is that the Group's financial affairs were in such a parlous state that NNUK was thereby

rendered "near insolvent" or "of doubtful solvency."[15]  Clearly, the discovery process that would

need to be undertaken would be wide ranging at the NNUK level, but, more importantly, would

involve wide ranging discovery from (at least) the Canadian Debtor as well as the US Debtor

itself.  Expert evidence would also be required, the scope of which would be wider than for a

more traditional solvency review.  Again, expert actuarial evidence at least would also be

required regarding the NNUK pension scheme.

> **D.    In Order To Determine Whether The Key Transactions Were Ratified By NNL, The Court Will Need To Consider The Overall Circumstances Under Which The Transactions Were Negotiated And Approved.**

Even if a breach of duty is capable in principle of being ratified, the process to

establish whether or not ratification has occurred is not straightforward.  While it is true that

"approval or ratification do not require any particular formality," it is necessary that the

ratification be "unanimous" and "clearly expressed."  (Marshall Deposition at 181:20.)  For the

US Debtor to succeed in this line of defense to NNUK's claim it will be necessary for the US

Debtor to prove that NNL "approved of the transactions from the point of view of NNUK and

expressed a clear consent vis-à-vis its position as shareholder of NNUK in relation to them."

(Marshall Deposition at 182:7-12.)  Ratification cannot be implied.  Rather, there must be an

actual act of ratification – the shareholders must turn their mind to the ratification.  *See Re D'Jan*

*of London Ltd* [1994] 1 BCLC 561.

---

[15]  By way of (non-exhaustive) example, between 2001 and 2009, the accumulated deficit of the Nortel group increased from $29.972 billion to $41.876 billion.  During that period, the group made several write downs, including of $12.4 billion in 2001, and its credit rating declined, which would be a relevant factor in considering the group's financial circumstances.  *See Weir v Secretary of State for Transport* (No. 2) [2005] EWHC 2192 (Ch) at [275].  As set out above, the group's financial circumstances will be a factor in determining when NNUK's directors owed a duty to have regard to NNUK's creditors.  At the same time, NNUK's turnover was declining, from $1.62 billion in 2001 to $665 million in 2007.  In 2001, NNUK had an accumulated profit of $318.6 million.  By 2007 that had become an accumulated loss of $457.3 million.

The scope of the process that would be necessary to determine the ratification issue is therefore far broader than suggested by the US Debtor. For the purposes of determining whether NNL actually ratified the transactions in question on an informal basis it will be necessary to obtain discovery about all of the relevant circumstances surrounding each of the transactions in question. It will be necessary to determine what each of the relevant representatives of NNL knew of each transaction and what their thought processes were, in order to determine whether NNL was acting in the capacity of a shareholder considering and approving a transaction as such, whether it was fully informed, whether it properly addressed its mind to the necessary issues acting through its individual representatives, etc. This will require discovery relevant to the core issues underlying the NNUK claims, i.e. the circumstances surrounding each transaction and the manner in which it was conceived and approved. Such disclosure must not only come from NNI.[16] Disclosure from NNL in Canada will also be essential. And it will be impossible to try to distinguish the evidence relevant to ratification and the evidence relevant to the other core issues to which the secondary claims give rise, namely the Canadian Debtor's, the US Debtor's and the NNUK directors' involvement in and knowledge of the process by which each transaction was originated and ultimately implemented.

## III.    THE US DEBTOR OVERSIMPLIFIES THE ISSUES RELATED TO TRACING.

The US Debtor correctly notes that tracing of assets from NNUK to NNI will be relevant to the claims for unconscionable receipt and unjust enrichment. But the US Debtor incorrectly suggests that the question of how funds moved in relation to the relevant transactions can be treated in isolation from other aspects of those transactions. In fact, there will be

---

[16]    Given the cross over in the major management functions for the Group (particularly the Tax and Treasury Departments) the US Debtor will undoubtedly hold documents relevant to these issues.

01:12365986.1

considerable overlap between the evidence related to tracing and the other evidence that will need to be examined in relation to each transaction.

In English law, the claimant in an unconscionable receipt claim is required to locate property, which was subject to a fiduciary duty owed to the claimant, in the hands of the recipient. It is sufficient to locate the original property or its product, even if that property or product is now part of a mixed fund. (*See* Marshall Decl. ¶ 50.1; Second Todd Decl. ¶ 78.) Similarly, the US claim for unjust enrichment requires only a showing of "unjust retention of a benefit to the loss of another," including that "identifiable funds removed from NNUK were subsequently transferred to NNI." (Opinion at 60-61.) Accordingly, complete discovery will be required regarding each of the relevant transactions and the resulting movements of funds. It is not plausible to suggest that it will be possible to view such movements of funds in isolation from the overall circumstances of each transaction. Thus, once again, there is considerable overlap between this purported "gating issue" and the core issues relevant to NNUK's claims. No efficiency will be gained by trying to parse out the disclosure relevant to tracing while delaying discovery related to the broader issues. And, because NNL is likely to be the initial recipient of much of the funds transferred from NNUK, obtaining discovery from Canada will be essential on any issues relevant to tracing.

Nor would dismissal of the unconscionable receipt and unjust enrichment claims necessarily eliminate over $2.45 billion of claims, as the US Debtor suggests. NNUK has claimed the same sums under the headings of aiding and abetting breach of fiduciary duty, dishonest assistance, conspiracy and breach of contract, which do not require NNUK to establish that funds traceable to NNUK were received by NNI.

## IV.   DELAYING DISCOVERY WILL CAUSE PREJUDICE TO THE EMEA DEBTORS.

Deferring discovery on issues related to the core elements of the EMEA Debtors' claims will cause them substantial prejudice.  A considerable amount of time has already passed. Documents and information, particularly when stored in electronic form, are perishable.  The operations of the Nortel entities that hold documents and information are being shut down.  The memories of key witnesses will fade over time.  Important witnesses have already left the companies, and more will leave over the coming months.

### CONCLUSION

For the foregoing reasons, the Court should deny the Motion and permit discovery to proceed in accordance with the timetables established by the Federal Rules of Civil Procedure, and as may be agreed by the parties, with a deadline for completing discovery of August 31, 2013.

Dated:   Wilmington, Delaware
August 13, 2012

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Maris J. Kandestin*

James L. Patton (No. 2202)
Edwin J. Harron (No. 3396)
John T. Dorsey (No. 2988)
Maris J. Kandestin (No. 5294)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571–6600
Facsimile: (302) 571–1253

- and –

01:12365986.1

21

**HUGHES HUBBARD & REED LLP**
Derek J.T. Adler
Gabrielle Glemann
Charles Huberty
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837–6000
Facsimile: (212) 422–4726

- and -

**HERBERT SMITH LLP**
Kevin Lloyd
John Whiteoak
Richard Lawton
Exchange House
Primrose Street
London
EC2A 2HS

*Counsel for the Joint Administrators*

01:12365986.1