# TAB 1

01:12365497.1

Butterworths Company Law Cases/BCLC 1989 /Aveling Barford Ltd v Perion Ltd and others - [1989] BCLC 626

[1989] BCLC 626

# Aveling Barford Ltd v Perion Ltd and others

**CHANCERY DIVISION**

**HOFFMANN J**

**13, 14, 17 APRIL 1989**

*Ultra vires - Unlawful return of capital - Breach of fiduciary duty - Sale of company's property at alleged undervalue - Sale to company controlled by person who controlled vendor company - Whether purchasing company was a constructive trustee - Whether transaction could be ratified by the shareholders of the plaintiff company.*

The balance sheet of the plaintiff company (now in liquidation) showed that on a going concern basis its assets exceeded its liabilities but that it had an accumulated deficit on its profit and loss account and therefore was not in a position to make any distribution to its shareholders. The plaintiff company sold property, valued by an independent valuer at £650,000, to the first defendant company, a company which was controlled by L who also controlled the plaintiff company. The purchase price of the property was £350,000. The purchase was to be financed in part by a mortgage and the mortgagee company valued the property at £1,150,000. It also appeared that the plaintiff and the defendant had agreed that should the defendant sell the property within a year of the transaction then the defendant would pay the plaintiff £400,000 if the sale price exceeded £800,000. Within a year of the transaction the defendant sold the property for £1,526,000. The plaintiff obtained judgment in default on the ground that the first defendant was a constructive trustee of the proceeds of the sale of the property. The first defendant sought to have the judgment set aside.

**Held** - As L knew that the property was worth £650,000, it was a breach of L's fiduciary duty to arrange to sell the property for £350,000 and, since the first defendant was aware of the facts constituting the breach, it was accountable as a constructive trustee. The sale to the defendant was not a genuine exercise of the power of the plaintiff to sell its property. It was a sale at an undervalue for the purpose of enabling L, the sole beneficial owner of the plaintiff, to obtain an unauthorised return of capital and hence was ultra vires and unratifiable. As there was no arguable defence to the plaintiff's claim, the motion to set aside the judgment must be dismissed.

### Cases referred to in judgment

*Halt Garage (1964) Ltd, Re* [1982] 3 All ER 1016.

*Ridge Securities Ltd v IRC* [1964] 1 All ER 275, [1964] 1 WLR 479.

*Rolled Steel Products (Holdings) Ltd v British Steel Corp* [1984] BCLC 466, [1985] 3 All ER 52, [1986] Ch 246, [1985] 2 WLR 908, CA.

**Cases also cited**

*A-G's Reference* (*No 2 of 1982*), *Re* [1984] BCLC 60, [1984] 2 All ER 216, [1984] QB 624, CA.

*Express Engineering Works Ltd, Re* [1920] 1 Ch 466, CA.

*Horsley & Weight Ltd, Re* [1982] 3 All ER 1045, [1982] Ch 442, CA.

*Multinational Gas & Petrochemical Co v Multinational Gas & Petrochemical Services Ltd* [1983] BCLC 461, [1983] 2 All ER 563, [1983] Ch 258, CA.

*Newman George & Co, Re* [1895] 1 Ch 674, CA.

*Precision Dippings Ltd v Precision Dippings Marketing Ltd* [1985] BCLC 385, [1986] Ch 447, CA.

*West Mercia Safetywear Ltd* (*in liq*) *v Dodd* [1988] BCLC 250, CA.

*Winkworth v Edward Bacon Development Co Ltd* [1987] BCLC 193, [1987] 1 All ER 114, HL.

**Motion**

By motion dated 19 January 1989, Perion Ltd, the first defendant to an action brought by the plaintiff, Aveling Barford Ltd, against Perion Ltd, Royal Trust Bank and Swiss Cantobank (International), applied to the court to set aside an order made in default of defence in the action on 19 October 1988 by Knox J, and for leave to put in a defence. The facts are set out in the judgment.

*Simon Mortimore* for Aveling Barford.

*Edward Bannister* for the defendants.

**17 April 1989. The following judgment was delivered.**

**HOFFMANN J.**

This is a motion to set aside a judgment in default of defence ordering certain payments and an inquiry as to damages and compensation on the footing that the first defendant (Perion) is accountable as constructive trustee for the proceeds of sale of a property in Grantham which it acquired from the plaintiff (Aveling Barford), nominally for £350,000, in February 1987 and sold for £1,560,000 in August of the same year. The main question to be decided is whether Perion has shown that it has a good arguable defence.

Aveling Barford is a well-known Grantham company, now in liquidation, whose most famous product was steam-rollers. In late 1986 its entire issue share capital was directly or indirectly owned or controlled by a Singapore businessman called Dr Lee Kin Tat. The company was in financial difficulties and had exhausted its credit facilities with its bankers, Standard Chartered Bank. The company's balance sheet as at 31 March 1987 shows that if one ignores the sum of £22,804,310 owed to its holding company, a Liberian corporation controlled by Dr Lee called Aveling Barford (Hong Kong) (AB (HK)), the assets exceeded liabilities by £5,726,604. The auditors, Messrs Coopers & Lybrand, had quite properly disregarded the AB (HK) debt for

the purpose of certifying the accounts on a going concern basis because Dr Lee had agreed that the debt should be interest free and subordinated to the claims of all other creditors. The assets included substantial sums owing by connected companies and investments in subsidiaries which may not turn out to be recoverable and there may therefore be a question about how far the balance sheet can be taken at face value. But for the purposes of this motion I think that it must be taken as showing that at all material times, ignoring the AB (HK) debt, Aveling Barford was solvent. On the other hand, it had made a heavy loss over the period of the accounts and had an accumulated deficit on

*[1989] BCLC 626 at 628*

profit and loss account of nearly £18m. It was therefore plainly not in a position to make any distributions to shareholders.

The property in question was a site of about 18 acres including a Georgian mansion and sports fields called 'Arnoldfield' which in happier days Aveling Barford had used as a sports and social centre for its employees. In 1985 it was decided to sell the property and during 1986 the company negotiated through Messrs Strutt & Parker with the planning authority for permission to build houses on the former sports grounds. By October 1986 the planning authority had agreed in principle that in exchange for a gift of part of the land with bowling greens and tennis courts it would grant permission to build houses on 13.2 acres. In this basis Strutt & Parker in a letter to Aveling Barford dated 20 October 1986 valued the property at £650,000.

Perion is a Jersey company which has at all material times been controlled by Dr Lee. It is held through the familiar mechanism of a Jersey trustee company holding the shares on the trusts of a settlement for the benefit of Dr Lee's family. On 24 October 1986, at a meeting of its Jersey directors, Perion resolved to acquire Arnoldfield from Aveling Barford for £350,000. The minutes recorded that £250,000 would be raised on mortgage from Business Mortgages Trust plc (BMT) and that the rest would be provided by Dr Lee as an interest free loan.

The mortgage had been arranged by Mr Robin Chapman of Messrs Albery Chapman & Co, who acted as solicitors both to Aveling Barford and to Perion. On 4 November BMT sent a formal offer approving the loan subject to a satisfactory valuation. The valuation on behalf of BMT was carried out by Messrs Humberts, who valued the property at £1,150,000. On 20 November they sent a copy of their report to Mr Conder of Aveling Barford under a cover of a letter saying:

> 'Our valuation has obviously been prepared from a mortgage point of view but we feel strongly that the property if widely marketed will attract considerable interest and may well achieve a figure in excess of those we have outlined.'

This optimism, although amply justified by the event, may not have been unconnected with Humbert's proposal that they should market the development land instead of Strutt & Parker.

On 24 November Dr Lee signed on behalf of Perion accepting the mortgage offer from BMT. Arnoldfield was charged to Standard Chartered Bank to secure Aveling Barford's substantial indebtedness. On 12 December Messrs Albery Chapman sent a peremptory telex to the manager of the bank's Nottingham branch, where the account was kept, asking for release of the deeds. They said that a sale had been agreed at £350,000 and that unless the bank acted immediately 'the company will be in breach of contract'. There is no evidence that any binding contract had yet come into existence but the telex had the desired effect: the bank consented to the sale on condition that the proceeds were paid into Aveling Barford's overdrawn account. On 5 January 1987 Albery Chapman sent the engrossed conveyance from Aveling Barford to Perion to Mr Murphy, the managing director of Aveling Barford, to be executed and returned 'so that I may be in a position to complete the sale as soon as the ... planning permission has been finally resolved'. The conveyance was duly executed.

On 26 January 1987 planning permission was formally granted and the deed

*[1989] BCLC 626 at 629*

of gift in favour of the planning authority was executed. In the same day Mr Chapman wrote on behalf of

Perion to Royal Trust Co of Canada requesting a further loan of £500,000 on the security of Arnoldfield, which he said Perion had already acquired. By way of encouragement, Mr Chapman enclosed a copy of Humberts' valuation. On 30 January Arnoldfield was insured in the names of Perion and BMT in the sum of £1,163,840.

On 3 February 1987 Mr Chapman wrote to Mr Murphy telling him that the BMT money would be received that day and that he needed £105,708.48 to enable the transaction to be completed. This money would be returned to Aveling Barford through payment of the proceeds into the Standard Chartered Bank account but Mr Chapman would then need £85,000 back to cover costs including stamp duty, provide £40,000 to Perion to enable it to pay interest on the BMT loan and another £10,000 for Perion's account in Jersey. These payments were made the following day but the conveyance was dated 3 February. It was executed by Mr Chapman and Dr Lee on behalf of Perion and expressed to be in consideration of £350,000. Stamp duty was paid on a consideration of £350,000. On completion, therefore, Perion provided no money for the purchase. Nor did Dr Lee provide the loan contemplated by Perion's board resolution. The whole consideration came either from BMT or Aveling Barford itself. Aveling Barford also paid the costs and the interest on the BMT loan. It was only when Perion resold the property in August that it was able to repay these monies.

In the summer of 1987 Strutt & Parker marketed Arnoldfield and received a tender dated 25 June in the sum of £1,400,000 from Barratt East Midland Ltd. At about this time Messrs Coopers & Lybrand were auditing the accounts to 31 March 1987, which of course included the sale to Perion. Mr Murphy told the accountants on 10 July that he believed that there was an agreement under which Perion was to pass back to Aveling Barford any profits it realised on the sale of Arnoldfield to a third party. Inquiry of Mr Chapman about this alleged agreement produced on 17 July a faxed copy of what purported to be a contract dated 10 January 1987 between Aveling Barford and Perion for the sale of Arnoldfield. The consideration was expressed to be £350,000 but cl 9 read as follows:

> 'In addition to the consideration referred to herein, the Purchaser shall pay to the Vendor the further sum of £400,000 in the event that the purchaser shall sell the property within one year from the date hereof at a sum in excess of £800,000, and this clause shall not merge upon completion.'

There is, to put it mildly, some doubt about the authenticity of this document. It purports to be signed by Mr Chapman on behalf of Perion. No copy signed on behalf of Aveling Barford has ever been found and no one at Aveling Barford knew anything about it. There is no reference to such a contract in any of the papers before July 1987. It post-dates the engrossment of the conveyance which was sent to Mr Murphy for execution on 5 January. It also pre-dates the commencement of Perion's insurance policy by 20 days. It is inconsistent with the board minute of Perion authorising a purchase at £350,000. No stamp duty on the additional consideration was ever paid. 10 January was a Saturday and the contract names 3 February as the date for completion, showing remarkable

*[1989] BCLC 626 at 630*

prescience since it was only on that day that Albery Chapman asked for the money to enable completion to take place. But I need not dwell on these inconsistencies because I am willing for the purposes of this motion to assume that the contract was an authentic document.

On 5 August 1987 Perion sold Arnoldfield to Barratt East Midland for £1,526,000. In response to further inquiries from Coopers & Lybrand, Mr Chapman told them that the price of £750,000 had been based on the Strutt & Parker valuation. On the basis of a representation letter from Dr Lee to this effect, Coopers & Lybrand signed off the accounts on 28 November. They showed a £668,498 profit over book value on the sale of Arnoldfield as an exceptional item. The accounts were unanimously approved on behalf of all shareholders at the annual general meeting held on 7 December 1987.

Dr Lee says on affidavit that he never saw Humbert's valuation. Nor did he know, at the time when the conveyance was executed, that planning permission had been granted. I find both these contentions surprising but I do not propose to disbelieve Dr Lee on affidavit. Mr Chapman, however, was fully aware of the facts and he was the person who acted on behalf of both Aveling Barford and Perion in carrying out the transaction. It seems to me that for the purpose of deciding whether Perion was entitled to retain the benefit

of the sale, Mr Chapman's knowledge must be imputed to both Perion and Dr Lee. But even without this knowledge and accepting everything that Dr Lee says he knew and did not know, the sale cannot in my judgment stand. If the value of the land was £650,000 as Dr Lee says he believed, Perion could have sold it next day for that sum to a third party or even a related company and made an immediate profit of £300,000 at the expense of Aveling Barford. Only if it was sold for more than £800,000 would cl 9 have come into operation. To sell on these terms must in my judgment have been a breach of fiduciary duty.

Counsel for the defendants (Mr Bannister) said that even if the 10 January contract was a rewriting of history in the summer of 1987, when it was plain that Perion would be reselling for more than £800,000, it was reasonable for the parties retrospectively to affirm the sale at £750,000, which would have been a proper sum to fix as the value in February 1987. I do not agree. If the February sale was, as I think, a breach of duty and liable to be set aside at the time, Dr Lee or Mr Chapman on his behalf had no right to confirm it retrospectively as a sale at £750,000 at a time when they knew the value to be over £1,400,000. It was the duty of the directors to set aside the February sale and obtain the full value of the land for Aveling Barford. On any view, therefore, the sale was a breach of fiduciary duty by Dr Lee. Perion, through Dr Lee and Mr Chapman, knew all the facts which made it a breach of duty and was therefore accountable as a constructive trustee.

In the alternative, counsel for the defendant, submitted that whether or not the sale to Perion was a breach of fiduciary duty by Dr Lee, it cannot be challenged by the company because it was unanimously approved by the shareholders. This approval was both informal and formal. Informal approval was given at the time of the sale by virtue of the fact that Dr Lee owned or controlled the entire issued share capital. Formally, a sale at £750,000 was approved when the 1987 accounts were adopted at the company's annual general meeting. For the purposes of this motion I shall assume that shareholder consent was given in both these ways.

The general rule is that any act which falls within the express or implied

*[1989] BCLC 626  at 631*

powers of a company conferred by its memorandum of association, whether or not a breach of duty on the part of the directors, will be binding on the company if it is approved or subsequently ratified by the shareholders: see *Rolled Steel Products* (*Holdings*) *Ltd v British Steel Corp* [1984] BCLC 466 at 507, [1985] 3 All ER 52 at 85, [1986] Ch 246 at 296. But this rule is subject to exceptions created by the general law and one such exception is that a company cannot without the leave of the court or the adoption of a special procedure return its capital to its shareholders. It follows that a transaction which amounts to an unauthorised return of capital is ultra vires and cannot be validated by shareholder ratification or approval. Whether or not the transaction is a distribution to shareholders does not depend exclusively on what the parties choose to call it. The court looks at the substance rather than the outward appearance. Thus in *Ridge Securities Ltd v IRC* [1964] 1 All ER 275, [1964] 1 WLR 479 Pennycuick J was concerned with a tax avoidance scheme by a solvent company which involved the grant of a debenture to its parent under which very large and uncommercial sums were payable, purportedly as interest. He said that the 'interest' payments were ultra vires because they were dressed-up gifts of capital to the parent company ([1964] 1 All ER 275 at 288, [1964] 1 WLR 479 at 495):

> 'A company can only lawfully deal with its assets in furtherance of its objects. The corporators may take assets out of the company by way of dividend, or, with the leave of the court, by way of reduction of capital, or in a winding up. They may of course acquire them for full consideration. They cannot take assets out of the company by way of voluntary disposition, however described, and if they attempt to do so, the disposition is ultra vires the company.'

That case was followed by Oliver J in *Re Halt Garage* (*1964*) *Ltd* [1982] 3 All ER 1016. In that case the liquidator of the company challenged payments of £30 a week purporting to be director's remuneration to a director and shareholder who had rendered no services to the company. Oliver J decided that so far as the payments exceeded £10 a week, which he considered to be the maximum remuneration reasonably payable to someone who merely held the office of director, they were dressed-up returns of capital to a shareholder and therefore ultra vires. The test, said the learned judge, was--

> 'whether the transaction in question was a genuine exercise of the power [to pay remuneration]. The motive is more important than the label. Those who deal with a limited company do so on the basis that its affairs will be conducted in

accordance with its constitution, one of the express incidents of which is that the directors are entitled to be paid remuneration. Subject to that, they are entitled to have the capital kept intact. They have to accept the shareholders' assessment of the scale of that remuneration but they are entitled to assume that, whether liberal or illiberal, what is paid is genuinely remuneration and that the power is not used as a cloak for making payments out of capital to the shareholders as such.'

*[1989] BCLC 626 at 632*

(See [1982] 3 All ER 1016 at 1039.) This did not mean that the payments need to have been made fraudulently or in bad faith: 'bona fides (in the sense of absence of fraudulent intention) and genuineness are [not] necessarily the same thing.' Applying his test, the learned judge said that no challenge could be made to the payments made at a time when the company had enough distributable reserves to have made equivalent payments by way of dividend. But thereafter -

'the sums paid to [the director] were so out of proportion to any possible value attributable to her holding of office that the court is entitled to treat them as not being genuine payments of remuneration at all but dressed-up dividends out of capital, like the dressed-up payments of 'interest' in *Ridge Securities* case.'

(See [1982] 3 All ER 1016 at 1042.) So it seems to me in this case that looking at the matter objectively, the sale to Perion was not a genuine exercise of the company's power under its memorandum to sell its assets. It was a sale at a gross undervalue for the purpose of enabling a profit to be realised by an entity controlled and put forward by its sole beneficial shareholder. This was as much a dressed-up distribution as the payment of excessive interest in *Ridge Securities* or excessive remuneration in *Halt Garage*. The company had at the time no distributable reserves and the sale was therefore ultra vires and incapable of validation by the approval or ratification of the shareholder. The fact that the distribution was to rerun rather than to Dr Lee or his other entities which actually held the shares in Aveling Barford is in my judgment irrelevant.

Counsel for the defendants relied on a passage in the judgment of Slade LJ in *Rolled Steel Products* (*Holdings*) *Ltd v British Corp* [1984] BCLC 466 at 507 [1985] 3 All ER 52 at 85, [1986] Ch 246 at 296:

'... if a particular act ... is of a category which, on the true construction of the company's memorandum, is *capable* of being performed as reasonably incidental to the attainment or pursuit of its objects, it will not be rendered ultra vires the company merely because in a particular instance its directors, in performing the act in its name, are in truth doing so for purposes other than those set out in its memorandum. Subject to any express restrictions on the relevant power which may be contained in the memorandum, the state of mind or knowledge of the persons managing the company's affairs or of the persons dealing with it is irrelevant in considering questions of corporate capacity.' (Slade LJ's emphasis.)

Counsel for the defendants says that this was an act within the terms of the memorandum. It may have been a sale at an undervalue, but it was certainly a sale: a conveyance in exchange for a payment in money. It was not a sham. The terms of the transaction were in no way different from those appearing on the face of the documents. The purpose for which it was done was therefore irrelevant. Counsel submits that the test for the genuineness of the transaction proposed by Oliver J in *Re Halt Garage* admits by the back door all the questions about the motives, state of mind and knowledge of the company' directors which the Court of Appeal appeared to have expelled by the front door in the *Rolled Steel* case.

*[1989] BCLC 626 at 633*

It is clear however that Slade LJ excepted from his general principle cases which he described as involving a 'fraud on creditors' (see [1984] BCLC 466 at 508, [1985] 3 All ER 52 at 86, [1986] Ch 246 at 296). As an example of such a case, he cited *Re Halt Garage*. Counsel for the defendants said that frauds on creditors meant transactions entered into when the company was insolvent. In this case Aveling Barford was not at the relevant time insolvent. But I do not think that the phrase was intended to have such a narrow meaning. The rule that capital may not be returned to shareholders is a rule for the protection of creditors and the evasion of that rule falls within what I think Slade LJ had in mind when he spoke of a fraud on creditors. There is certainly nothing in his judgment to suggest that he disapproved of the actual decisions in *Re Halt Garage* or *Ridge Securities*. As for the transaction not being a sham, I accept that it was in law a sale. The false dressing it wore was that of a sale at arms' length or at market value. It was the fact that it was known and intended to be a sale at an undervalue which made it an unlawful distribution.

It follows that in my judgment even on the view of the facts most favourable to Perion, it has no arguable defence and the motion to set aside the judgment must be dismissed.

*Order accordingly.*

Solicitors: *Cameron Markby Hewitt* (for the plaintiff); *Payne Hicks Beach* (for the defendants).

Evelyn M C Budd Barrister.