# **TAB 2**

No. A2/2000/0638/0639/0640, Neutral Citation Number: [2001] EWCA Civ 712

IN THE SUPREME COURT OF JUDICATURE
IN THE COURT OF APPEAL (CIVIL DIVISION)
ON APPEAL FROM THE HIGH COURT OF JUSTICE
QUEENS BENCH DIVISION (NELSON J)

Royal Courts of Justice
Strand, London, WC2A 2LL

Thursday 17th May, 2001

B e f o r e:

THE VICE-CHANCELLOR
LORD JUSTICE ROBERT WALKER
AND
LORD JUSTICE SEDLEY

- - - - - - -

BAIRSTOW & ORS

Appellants

- v -

QUEENS MOAT HOUSES PLC

Respondent

- - - - - - - - -

(Transcript of the Handed Down Judgment of
Smith Bernal Reporting Limited, 190 Fleet Street
London EC4A 2AG
Tel No: 020 7421 4040,   Fax No:   020 7831 8838
Official Shorthand Writers to the Court)

- - - - - - - - - - - - - - - - - - - - -

Mr C Purle QC (instructed by Gouldens for the first appellant Mr Bairstow)
the second and third appellants Mr Marcus and Mr Porter in person
Mr D Richards QC and Mr P Downes (instructed by Allen & Overy for the respondent)

- - - - - - - - - - - - - - - - - - - - -

J U D G M E N T
As Approved by the Court

Crown Copyright ©

LORD JUSTICE ROBERT WALKER:

Introduction

1.　　　　The background to this appeal is very clearly summarised in the judgment of Rix LJ given on 26 October 2000 when this court (Simon Brown and Rix LJJ) gave permission to appeal, on strictly limited grounds, against orders of Nelson J made on 23 September 1999. The appellants are three former directors of Queens Moat Houses plc ("Queens Moat"): Mr John Bairstow (who was chairman and managing director), Mr Martin Marcus (who was deputy chairman and joint managing director) and Mr Alan Porter (who was assistant finance director).　Mr David Hersey, the former finance director, was a party to the first-instance litigation but is not a party to the appeals.　The same is true of the trustees of Mr Bairstow's occupational pension scheme.

2.　　　　The brief summary that follows is based on the judgment of Rix LJ, to which reference may be made for further detail.　In 1993 the four directors named above ("the former directors") were dismissed by Queens Moat and brought separate proceedings against Queens Moat for wrongful dismissal.　This followed a major crisis in the financial affairs of Queens Moat and its group of companies, which had carried on a rapidly-expanding hotel business both in the United Kingdom and elsewhere.

3.　　　　Queens Moat defended the proceedings brought by the former directors on the grounds that they had between 1991 and 1993 committed serious breaches of contractual, fiduciary and statutory duties as directors of Queens Moat.　Queens Moat counterclaimed under various heads, the most important of which (and the only head directly relevant to this appeal) being a claim for payment to the company of preference and ordinary dividends paid out on the strength of the company's statutory accounts for 1990 and 1991 (Queens Moat's accounting date was at all material times the 31st December).

4.　　　　After a trial spread over about a year (during which the former directors appeared in person) Nelson J handed down a judgment in July 1999 ("the main judgment") dismissing the claims for wrongful dismissal and making findings of fact relevant to the counterclaim. In September he heard three days of further argument at which Mr Bairstow and Mr Marcus were represented by leading counsel and in December 1999 Nelson J handed down two further judgments, one relating to the counterclaim for payment of dividends ("the dividends judgment") and the other relating to costs (the former directors other than Mr Hersey were ordered to pay costs on the indemnity basis; Mr Hersey was ordered to pay them on the standard basis).

5.　　　　The effect of the order on the dividends counterclaim was that the former directors were jointly and severally liable to pay to Queens Moat, with interest, the sum of £26.728m being the aggregate of ordinary dividends paid out on 28 May 1992 (a final dividend of 1.54p per share for 1991 amounting to £13.834m) and on 23 October 1992 (an interim dividend of 1.395p per share for 1992 amounting to £12.894m).　The judge declined to make an order for payment in respect of any ordinary dividends paid out during 1991 (the final dividend for 1990 of 1.40p per share, amounting £12.460m, paid on 29 May 1991 and the interim for 1991 of 1.342p per share, amounting to £12.048m, paid on 21 October 1991) or any preference dividends paid at any time.　There are respondent's notices seeking to vary the judge's order in relation to (i) dividends received by the former directors personally between May 1991 and January 1993 and (ii) seven preference and ordinary dividends paid between October 1991 and January 1993.

6.　　　　At 1 January 1990 Queens Moat had an allotted and fully-paid capital of approximately 727m ordinary shares of 5p each and 24m 7 per cent convertible cumulative redeemable preference shares of £1 each.   At 1 January 1991 the comparable figures were 890m and (as a result of the conversion of 7 per cent preference shares) 20m.   At 1 January 1992 the comparable figures were 898m and 19m.   Moreover during 1991 Queens Moat made a rights issue of approximately 189m 7.5 per cent convertible cumulative redeemable preference shares of £1 each, which first ranked for dividend on 21 October 1991.

7.　　　　Although this appeal is directly concerned only with the dividends which Queens Moat claims were paid unlawfully, it will be necessary to make some reference to the judge's findings in his main judgment (running to nearly 500 pages) which he handed down in July 1999.   Nelson J found that all four former directors had committed serious breaches of their contracts and had been guilty of gross misconduct and wilful neglect.

8.　　　　In relation to the all-important statutory requirements that individual company accounts and consolidated group accounts shall give "a true and fair view" (see ss.226(3) and 227(3) of the Companies Act 1985 as amended - "the Act" - set out below) the judge found, in Rix LJ's summary, that the former directors

> " ... had each been responsible for the fact that the company's 1991 accounts did not present a true and fair view.   Mr Bairstow and Mr Marcus had signed them, and Mr Porter and Mr Hersey had prepared them.   Instead of published pre-tax profits of some £90 million for the year, a true and fair view ought to have limited profits to some £32 million only.   He also found that in 1992 and the first three months of 1993 the claimants had dishonestly sought to foster false expectations of annual profits for 1992 of around £80/85 million, when in truth underlying profits were running at a very much lower level: so much so that, without exceptional or extraordinary profits, or artificial profits created by dubious or dishonest transactions, the company's profits would have turned out to be plus or minus zero.   Ultimately, on 1 April 1993 the company had to ask for its shares to be suspended.   The 1992 accounts were not completed until 1994, when the company had long been under new management."

9.　　　　This court gave permission to appeal on the limited grounds mentioned in paras 51, 52 and 53 of the judgment of Rix LJ.   Those grounds are, in brief summary, the contention that directors' liability to restore unlawfully-paid dividends arises only in the case of an insolvent company (since otherwise shareholders might get a windfall by receiving the same dividend twice); the significance of a sufficiency of distributable profits in the group (although not in Queens Moat, the holding company); and (following on from the last point) the judge's exercise of his discretion to grant relief under s. 727 of the Act.   This court specifically refused permission to appeal against the findings of breaches of duty and the former directors' responsibility for the deficiencies of the 1991 accounts.

10.　　　　At the appeal hearing Mr Bairstow was represented by Mr Charles Purle QC.   Mr Marcus and Mr Porter appeared in person.   Queens Moat was represented by Mr David Richards QC and Mr Paul Downes.

The statutory provisions

11.     In the course of the appeal hearing reference was made, naturally enough, to a large number of provisions of the Act.  At this point it is convenient to set out or summarise the provisions which are of central importance to the appeal; some other provisions of less importance are referred to later.  Part VII of the Act (ss.221-262A) is concerned with accounts and audit.  Part VIII (ss.263-281) is concerned with distribution of profits and assets.  The statutory safeguards in Part VIII are closely linked to the statutory requirements in Part VII.

12.     Section 226 (duty to prepare individual company accounts) provides as follows:

"(1)  The directors of every company shall prepare for each financial year of the company -

(a)     a balance sheet as at the last day of the year, and

(b)     a profit and loss account.

Those accounts are referred to in this Part as the company's "individual accounts".

(2)  The balance sheet shall give a true and fair view of the state of affairs of the company as at the end of the financial year; and the profit and loss account shall give a true and fair view of the profit and loss of the company for the financial year.

(3)   A company's individual accounts shall comply with the provisions of Schedule 4 as to the form and content of the balance sheet and profit and loss account and additional information to be provided by way of notes to the accounts."

Subsections (4) and (5) contain further provisions not directly relevant to these appeals. Section 227 (duty to prepare group accounts) provides as follows:

"(1)  If at the end of a financial year a company is a parent company the directors shall, as well as preparing individual accounts for the year, prepare group accounts.

(2)  Group accounts shall be consolidated accounts comprising -

(a)     a consolidated balance sheet dealing with the state of affairs of the parent company and its subsidiary undertakings, and

(b)     a consolidated profit and loss account        dealing with the profit or loss of the parent    company       and      its subsidiary       undertakings.

(3)  The accounts shall give a true and fair view of the state of affairs as at the end of the financial year, and the profit or loss for the financial year, of the undertakings included in the consolidation as a whole, so far as concerns members of the company.

(4)   A company's group accounts shall comply with the provisions of Schedule 4A as to the form and content of the consolidated balance sheet and consolidated profit and loss account and additional information to be provided by way of notes to the accounts."

Again, subsections (5) and (6) are not directly relevant.

13.        Section 230 (treatment of individual profit and loss account where group accounts prepared) provides as follows:

"(1)   The following provisions apply with respect to the individual profit and loss account of a parent company where -

(a)     the company is required to prepare and does prepare group accounts in accordance with this Act, and

(b)     the notes to the company's individual        balance sheet show the company's profit and        loss    for    the financial year determined in   accordance with this Act.

(2)   The profit and loss account need not contain the information specified in paragraphs 52 to 57 of Schedule 4 (information supplementing the profit and loss account).

(3)   The profit and loss account must be approved in accordance with section 233(1) (approval by board of directors) but may be omitted from the company's annual accounts for the purposes of the other provisions below in this Chapter.

(4)   The exemption conferred by this section is conditional upon its being disclosed in the company's annual accounts that the exemption applies."

This section explains why the published consolidated accounts of Queens Moat and its group did not contain an individual profit and loss account.   (It was not demonstrated to the court that all the conditions for the exemption had been satisfied, but Mr Richards did not make any positive case that those conditions had not been satisfied.)

14.        By section 262(1) "annual accounts" are defined for the purposes of Part VII and (see section 742(1)) Part VIII as -

"(a)     the individual accounts required by section 226, and

(b)     any group accounts required by section 227.

(but see also section 230 (treatment of individual profit and loss account where group accounts prepared))"

Section 262(3) defines "realised profits" and "realised losses" for the purposes of Part VII and (see section 742(2)) Part VIII, in relation to a company's accounts, as

"... such profits and losses of the company as fall to be treated as realised in accordance with principles generally accepted, at the time when the accounts are prepared, with respect to the determination for accounting purposes of realised profits or losses.

This is without prejudice to -

> (a)    the construction of any other expression (where appropriate) by reference to accepted accounting principles or practice, or

> (b)    any specific provision for the          treatment          of profits or losses of any description as realised."

15.    Section 263 (certain distributions prohibited) provides in subsection (1):

> "A company shall not make a distribution except out of profits available for the purpose."

Subsection (2) contains an elaborate definition of "distribution"; for present purposes it is sufficient that it includes a dividend.   Subsection (3) provides:

> "For purposes of this Part, a company's profits available for distribution are its accumulated, realised profits, so far as not previously utilised by distribution or capitalisation, less its accumulated, realised losses, so far as not previously written off in a reduction or reorganisation of capital duly made."

Section 264 contains rather more far-reaching restrictions applicable to a public company (in that they impose requirements as to net assets also).  These restrictions applied to Queens Moat but no reliance has been placed on them in these appeals.  The assets of Queens Moat were drastically revalued downwards in the 1992 accounts (when eventually published in 1994) but that is not an issue in these appeals.  Sections 265 and 266 contain special provisions applicable to investment companies.

16.    Section 270 (distribution to be justified by reference to company's accounts) is of central importance.  It is the main link between the restrictive safeguards in Part VIII and the mandatory requirements of Part VII and Schedules 4 and 4A.  It provides as follows:

> "(1)   This section and sections 271 to 276 below are for determining the question whether a distribution may be made by a company without contravening sections 263, 264 or 265.

> (2)   The amount of a distribution which may be made is determined by reference to the following items as stated in the company's accounts -

>> (a)    profits, losses, assets and liabilities,

>> (b)    provisions of any of the kinds mentioned in paragraphs 88 and 89 of Schedule 4  (depreciation, diminution in value of assets,          retentions     to     meet liabilities, etc) and

(c)      share capital and reserves (including undistributable reserves).

(3)      Except in a case falling within the next subsection, the company's accounts which are relevant for this purpose are its last annual accounts, that is to say those prepared under Part VII which were laid in respect of the last preceding accounting reference period in respect of which accounts so prepared were laid; and for this purpose accounts are laid if section 241(1) has been complied with in relation to them.

(4)      In the following two cases -

(a)      where the distribution would be found to contravene the relevant section if reference were made only to the company's last annual       accounts, or

(b)      where the distribution is proposed to        be declared       during the company's        first    accounting reference       period, or before any accounts are laid in respect       of that period,

the accounts relevant under this section (called "interim accounts" in the first case, and "initial accounts" in the second) are those necessary to enable a reasonable judgment to be made as to the amounts of the items mentioned in subsection (2) above.

(5)      The relevant section is treated as contravened in the case of a distribution unless the statutory requirements about the relevant accounts (that is, the requirements of this and the following three sections, as and where applicable) are complied with in relation to that distribution."

(Section 241(1) requires the directors to lay the accounts, with directors' and auditors' reports, before the company in general meeting.)

17.          Section 271 (requirements for last annual accounts) provides as follows:

"(1)      If the company's last annual accounts constitute the only accounts relevant under section 270, the statutory requirements in respect of them are as follows.

(2)      The accounts must have been properly prepared in accordance with this Act, or have been so prepared subject only to matters which are not material for determining, by reference to items mentioned in section 270(2), whether the distribution would contravene the relevant section; and, without prejudice to the foregoing -

(a)      so much of the accounts as consists of a balance sheet must give a true and fair view of the state      of the company's affairs as at the balance       sheet date, and

> (b)     so much of the accounts as consists of a profit
> and loss account must give a true and fair view      of
> the company's profit or loss for the period in      respect of
> which the accounts were prepared."

Subsections (3), (4) and (5) contain requirements about auditors' reports which are not directly relevant to these appeals.    Section 272 contains requirements about interim accounts prepared for a proposed distribution by a public company.    No such accounts were prepared in this case (although the interim figures published by Queens Moat on 14 August 1991 have been relied on by Mr Richards in some of his submissions).

18.         Section 277 (consequences of unlawful distribution) provides, so far as relevant, as follows:

> "(1)   Where a distribution, or part of one, made by a company to one of its members is made in contravention of this Part and, at the time of the distribution, he knows or has reasonable grounds for believing that it is so made, he is liable to repay it (or that part of it, as the case may be) to the company or (in the case of a distribution made otherwise than in cash) to pay the company a sum equal to the value of the distribution (or part) at that time.
>
> (2)   The above is without prejudice to any obligation imposed apart from this section on a member of a company to repay a distribution unlawfully made to him ..."

19.         Finally section 727(1) (in Part XXV, miscellaneous and supplementary provisions) provides as follows:

> "(1)   If in any proceedings for negligence, default, breach of duty or breach of trust against an officer of a company or a person employed by a company as auditor (whether he is or is not an officer of the company) it appears to the court hearing the case that that officer or person is or may be liable in respect of the negligence, default, breach of duty or breach of trust, but that he has acted honestly and reasonably, and that having regard to all the circumstances of the case (including those connected with his appointment) he ought fairly to be excused for the negligence, default, breach of duty or breach of trust, that court may relieve him, either wholly or partly, from his liability on such terms as it thinks fit."

Detailed chronology of the dividends

20.         During the hearing in this court a lot of time was taken up - more than should have been taken up at an appellate hearing - in establishing the basic facts as to what was shown by the published accounts of Queens Moat, on the basis of which the various disputed dividends were paid.    One reason for this was the absence of Queens Moat's individual profit and loss accounts; apart from some limited information in notes they were excluded (under s.230 of the Act) from the published annual accounts, and apparently they were not put in evidence before the judge.    Moreover the calculations at pp.19-20 of the dividends judgment are incorrect.    It is therefore necessary to enlarge on the summary in para 5 above in what would otherwise be tedious detail.

21.        Until its affairs were finally engulfed in crisis at the end of March 1993, Queens Moat's financial affairs were conducted according to a very regular annual timetable.   After the end of its accounting year on 31 December, it published its annual accounts at the end of April and held its annual general meeting at the end of May.   Dividends on the 7 per cent preference shares were paid half-yearly in January and July and dividends on the 7.5 per cent preference shares (after their issue in mid-1991) were paid half-yearly in April and October. An interim ordinary dividend was paid in October (on account of profits for the then current accounting period, but on the basis of the accounts for the accounting period which had ended on the previous 31 December)   The final ordinary dividend was (in 1991 and 1992) paid on the very same day as the AGM was held, so that the company's declaration of the final dividend must have been taken for granted, at any rate as regards the practicalities of preparing dividend warrants (this point emerged only on the second day of the hearing, and neither side sought to make anything of it).

22.        As from the beginning of 1991 and down to the crisis at the end of March 1993 the dividends paid by Queens Moat can be summarised as follows (A in the right-hand column indicating that the appellants challenge the judge's order that it was unlawful and should not be relieved, and X indicating a cross-appeal by Queens Moat):

| date | type of dividend | amount £m | based on accounts for | status in appeal | |
|---|---|---|---|---|---|
| 1991 | | | | | |
| 7 Jan | 7% pref | c 0.700 | 1989 | | |
| 29 May | final ord (1.4p) | 12.460 | 1990 | | |
| 7 July | 7% pref | 0.651 | 1990 | | |
| 1 Oct | 7.5% pref | 3.013 | 1990 | 1 | X |
| 21 Oct | interim ord (1.342p) | 12.048 | 1990 | 2 | X |
| 1992 | | | | | |
| 7 Jan | 7% pref | 0.651 | 1990 | 3 | X |
| 1 Apr | 7.5% pref | 7.050 | 1990 | 4 | X |
| 28 May | final ord (1.54p) | 13.834 | 1991 | 5 | A |
| 7 July | 7% | 0.321 | 1991 | 6 | X |
| 1 Oct | 7.5% pref | 7.045 | 1991 | 7 | X |
| 23 Oct | interim ord (1.395p) | 12.894 | 1991 | 8 | A |
| 1993 | | | | | |

| 7 Jan | 7% pref | 0.321 | 1991 | 9 | X |

23.  The judge (having set out these figures in a slightly different format) stated that the 1990 accounts showed that Queens Moat had (individual company) distributable reserves of £11.9m but paid total dividends of £35.873m on the basis of those accounts, and on the 1991 accounts had distributable reserves of £11.5m but paid total dividends of £34.420m on the basis of those accounts.   In my judgment that analysis is not correct, because it disregards provision for unpaid dividends proposed to be paid on the basis of the accounts in question. In the accounts for 1990 (notes 7 and 17) this provision appears as £13.164m, which can be recognised as providing (in full) for the proposed final dividend and (on an accruals basis) for the 7 per cent preference dividend due on 7 January 1991.   Similarly the accounts for 1991 (notes 7 and 15) provided for unpaid dividends of £18.0, which can be recognised as the proposed final dividend of £13.834m and about £4.2m for accruing preference dividends (on both 7 per cent and 7.5 per cent preference shares).

24.  The judge's presentation of the figures for dividends paid on the basis of the 1990 accounts must therefore be amended as in the following summary:

|  | £m |
|---|---|
| ordinary dividends | 24.508 |
| preference dividends | 11.365 |
|  | 35.873 |

|  | £m |
|---|---|
| distributable reserves | c 11.900 |
| unpaid divs (provided for) | 13.164 |
| shortfall | c 10.809 |
|  | 35.873 |

25.  Similarly the summary for dividends paid on the basis of the 1991 accounts should be:

|  | £m |
|---|---|
| ordinary dividends | 26.728 |
| preference dividends | 7.687 |
|  | 34.415 |

|  | £m |
|---|---|
| distributable reserves | c 11.500 |
| unpaid divs (provided for) | c 18.000 |
| shortfall | c   4.915 |
|  | 34.415 |

These figures may still not be wholly satisfactory if (as the court was told) the preference dividends were provided for on an accruals basis. But they give a much better general idea of the position. The total shortfall for the two years was a little under £16m rather than being in excess of £46m. The difference is significant, especially on the cross-appeal in relation to dividends paid on the basis of the 1990 accounts (see para 67 below).

26.        In the course of discussion of the accounts Mr Richards pointed out, correctly, that until a dividend has been formally declared by the company in general meeting, a shareholder does not actually become a creditor capable of suing for the dividend as a debt. But Schedule 4, para 3(7) of the Act requires proposed dividends to be disclosed in the accounts (either in the profit and loss account or in a note) and it was not suggested that there was anything wrong in the treatment in Queens Moat's account of proposed dividends which were unpaid at the year-end accounting date.

27.        The figures mentioned above for distributable reserves are those of Queens Moat itself. The figures for distributable reserves in the group as a whole were £129.8m as at 31 December 1990 and £151.0m as at 31 December 1991, as appears from the consolidated balance sheets as at those respective dates. That has led Mr Purle to submit that any breaches of Part VIII of the Act could be regarded as technical. He also submitted that even a technical breach might be avoided under the principle in *Re Duomatic Ltd* [1969] 2 Ch 365, on the basis that the action of Queens Moat in declaring dividends in excess of its own distributable reserves must be taken to have amounted to the informal declaration of dividends from its wholly-owned subsidiaries sufficient to cover Queens Moat's dividends.

28.        That is the first main issue in the appeals. The second main issue is whether the rule in *Flitcroft's Case* (see *Re Exchange Banking Co, Flitcroft's Case* (1882) 21 Ch D 519) applies to a company which is not in insolvent liquidation. The third main issue is whether the appellants' liability is limited (as a matter of principle rather than discretionary relief) to the difference between any unlawful dividends which they caused to be paid, and the dividends which could lawfully and would in fact have been made. The fourth main issue is relief under s.727 of the Act. There is some degree of overlap between these issues.

Unlawful dividends

29.        It is important to note that although the judge found that unlawful dividends had been paid on the basis of both the 1990 accounts and the 1991 accounts, he reached these conclusions by significantly different routes. This difference was reflected in the pleadings (for example para 17C(3) of Queens Moat's re-re-amended defence and counterclaim in Mr Bairstow's action). It was also reflected in the judge's decisions about relief under s.727. In relation to the first group of dividends (numbered 1, 2, 3 and 4 in the table at para 22 above) the judge held that they were unlawful because there was an insufficiency of distributable profits so that they infringed s.263 of the Act. He did not hold (indeed, it was not Queens Moat's case) that the 1990 accounts themselves failed to give a true and fair view so as to infringe s.227(3). But the judge did hold that the 1991 accounts infringed s.227(3), with the consequence that the dividends in the second group (numbered 5, 6, 7, 8 and 9) were unlawful not only because of s.263 but also because of s.270(5). Nevertheless he gave relief in respect of preference dividends (numbered 6, 7 and 9).

30.        In this court Mr Richards has not sought to attack the 1990 accounts but he has mounted a strong attack on the former directors in respect of all dividends paid after the publication of the group's interim results (showing profits of £36.2m pre-tax, £30.8m after tax) for the first half of 1991. His contention is that those interim results are the real

watershed since they depended on extraordinary and artificial transactions, not disclosed in the results, entered into for no purpose other than to inflate the group's apparent profits.   It will be necessary to come back to that in connection with relief under s.727.   At this stage it serves to explain why the battle lines have been drawn as they are.

31.        The provisions of s.270 of the Act are of central importance to this appeal.   They ensure that a company's power to pay dividends (or make other distributions within s.263) is linked to and controlled by the very detailed codes for accounts laid down by ss.226 and 227 and Schedules 4 and 4A.   These codes (originally enacted by the Companies Act 1980 and the Companies Act 1989 respectively) represent the implementation of the Fourth and Seventh Company Law Directives (78/660/EEC and 83/349/EEC).

32.        The purpose of those directives is (as appears from their recitals and also from *Tomberger v Gebrüder von der Wettern* [1996] 2 BCLC 457, 468 (para 17) ECJ) to build on the basic need for "a true and fair view" by requiring a company's financial statements to conform to a uniform layout and terminology and to contain an irreducible minimum of information in the notes to the accounts.   In the past it was often, as the Earl of Halsbury LC said in *Dovey v Cory* [1901] AC 477, 486-7, difficult or even impossible to tell whether a distribution was being paid out of profit or out of capital.   The stringent new accounting codes avoid that difficulty.   As the judge said,

> "The statutory code is designed to avoid that difficulty by making it
> entirely clear on the face of the accounts whether or not a payment of
> a dividend is properly made.   Furthermore the code is designed to be
> a major protection for creditors and members, as Dillon LJ stated in
> *Precision Dippings*."

In relation to the adjustments described in paras 23 to 25 above Mr Richards argued, relying on the stringency of the new codes, that these adjustments would amount to an impermissible reconstruction which offended s.270(2).   I cannot accept that submission since the unpaid dividends declared on the basis of the previous year's accounts were correctly shown as such (see Schedule 4, para 3(7) referred to in para 26 above).

33.        The judge's reference was to *Precision Dippings Ltd v Precision Dippings Marketing Ltd* [1986] Ch 447 in which Dillon LJ said of ss.39 and 43 of the Companies Act 1980 (the predecessors of ss.263 and 270 of the Act), at p.455

> "The term "distribution" includes a dividend such as the dividend in
> the present case, and the effect of [s.39(1)] is clearly, in my judgment,
> to make it ultra vires for a company to pay a dividend except out of
> profits available for the purpose, just as it has long been held to be
> ultra vires for a company to pay a dividend out of capital: see *In re
> Exchange Banking Co (Flitcroft's Case)* (1882) 21 Ch D 519."

34.        Dillon LJ then discussed s.43 in its application to the facts of the case before him, and the argument that the absence of an auditors' statement (under what is now s.271(4) of the Act) was a mere irregularity.   He continued at p.457,

> "I do not, however, regard compliance with section 43(3)(c) as a mere
> procedural matter which can be waived or dispensed with by the
> members entitled to vote.   The group of sections beginning with
> section 39 and including section 43 is a major protection for creditors,

> and the requirement of paragraph (c) of an auditors' written statement,
> where the auditors' report in the relevant accounts has been qualified,
> is an important part of that protection."

35.    In the same way the requirement that any distribution should be made only in accordance with a company's financial statements, drawn up in the proper format and laid before the company in general meeting, cannot be regarded as merely a procedural technicality. Mr Purle made some submissions based on s.271(2), but that provision could assist only in relation to items which are not material to the process required by s.270(2). The items mentioned in s.270(2) are so comprehensive as to leave little room for immaterial items (particulars of staff numbers under Schedule 4 para 56 is arguably an example of an item which would not be material). Section 271(2) cannot assist the appellants in this case.

36.    The strict and mandatory character of s.270 must be fatal to Mr Purle's argument based on *Duomatic*, not only in relation to the dividends based on the 1991 accounts but also in relation to those based on the 1990 accounts. The former directors could not go behind the figures for Queens Moat's distributable profits disclosed by the accounts which they had prepared (and in the case of Mr Bairstow and Mr Marcus, signed) and laid before the company in general meeting. Even if it could be shown that wholly-owned subsidiaries had distributable profits which could lawfully and prudently have been paid up by way of dividend to Queen's Moat, that would go to the issue of relief, not to that of liability.

The principle in Flitcroft's case

37.    This court has in *Precision Dippings* confirmed that directors are accountable to the company for unlawful dividends paid in contravention of the provisions of what is now Part VIII of the Act, whether or not the dividends are demonstrably paid out of capital. But Mr Purle (with support from Mr Marcus and Mr Porter, who concentrated their brief oral submissions on this point) has submitted that that principle, which is sometimes called the principle in *Flitcroft's case*, applies only in the case of an insolvent company, where the payment of an unlawful dividend directly prejudices the interests of the company's creditors.

38.    *Flitcroft's case* (1882) 21 Ch D 519 was a case of an insolvent banking company. The liquidator issued a summons against five former directors who had between 1873 and 1878 been concerned, in varying degrees, in paying half-yearly dividends totalling £3,192 at a time when they knew that some items in the balance sheet were bad debts and irrecoverable, and that the company had no distributable profits. The company in general meeting declared the dividends, but on the basis of the misleading accounts presented by the directors. This court (affirming the order of Bacon V-C but with a variation as to the nature of the liability) held the directors jointly and severally liable for the amount of the dividends.

39.    Sir George Jessel MR expressed his conclusion as follows (at p.534),

> "It follows then that if directors who are *quasi* trustees for the company improperly pay away the assets to the shareholders, they are liable to replace them. It is no answer to say that the shareholders could not compel them to do so. I am of opinion that the company could in its corporate capacity compel them to do so, even if there were no winding-up. They are liable to pay, and none the less liable because the liquidator represents, not only shareholders, but creditors. The body of the shareholders no doubt voted for a declaration of

dividend on the faith of the misrepresentation of the directors, so that there really was no ratification at all."

40.      Brett LJ agreed with that view.   He said (at p.535),

"In my opinion the corporation could at any time before the winding-up have compelled the directors to replace the moneys thus improperly expended, and the liquidator now can do so.  Even if the shareholders had all sanctioned what was done, and had remained the same throughout, still the company could have sued the directors for a breach of trust.   They are trustees for the company not for the individual shareholders."

41.      Cotton LJ expressed himself rather differently, and there has been some debate as to the real significance of what he said at p.536:

"The argument that the money has in fact been received by the company, and that the company cannot get it back, is ingenious but unsound.   The corporation is not a mere aggregate of shareholders.  If the corporation were suing for the purpose of paying over again to the shareholders what the shareholders had already received the Court would not allow it.   But that is not the case here, the company is insolvent, and there is no objection to allowing it to get back its funds for the purpose of paying debts.   The case of the liquidator is stronger, for in some respects he, as a *quasi* trustee for creditors as well as shareholders, stands in a different position from the company.  But I rely on this, that the money was not paid to the corporation, but was paid improperly to individuals, and the corporation can sue the directors to get it back that it may be applied in payment of the debts of the corporation.   I do not see how to make any distinction between what the directors retained and what they paid to other shareholders."

42.      Mr Richards suggested that Cotton LJ may have been directing his remarks to a particular situation, that is of a company which is in liquidation but which is expected to have surplus assets after paying all its creditors in full.   In such a situation it might be either pointless or oppressive for a liquidator to cause the company to embark on a course of action which might in the end prove circuitous.   If that was what Cotton LJ had in mind (Mr Richards submitted) then his remarks were correct.   If not, his remarks were contrary to the views of the Master of the Rolls and Brett LJ, and this court should prefer the latter views.

43.      It is impossible to be confident whether that is what Cotton LJ had in mind.   Neither he nor any other member of the court was proceeding on the basis that the delinquent directors could recover the unlawful dividends from other shareholders who had innocently received them.   Cotton LJ, like the other members of the court, emphasised that the shareholders had been deceived.   Yet he saw no difference between dividends paid to directors and dividends paid to other shareholders.

44.      In my judgment the point must be decided by reference to principle rather than authority.   Queens Moat's case is founded on the fundamental proposition (which was affirmed by the House of Lords in *Salomon v Salomon* [1897] AC 22 and which Cotton LJ had well in mind in *Flitcroft's case*) that a corporation is a legal person separate from the persons who are from time to time its members (in the case of a company limited by shares,

the shareholders).   The basic rules about lawful and unlawful dividends, developed from the earliest days of company law and now elaborated in accordance with Community legislation, exist not only for the protection of creditors but also for the protection of shareholders.   If directors cause a company to pay a dividend which is *ultra vires* and unlawful because it infringes these rules, the fact that the company is still solvent should not be a defence to a claim against the directors to make good the unlawful distribution.   Against that both Mr Purle and the litigants in person pressed the court with the prospect of shareholders receiving an unmerited windfall, if the amounts of unlawful dividends which they have received in the past were now restored to Queens Moat by the former directors and were again to be distributed (this time lawfully) by way of dividend.

45.       In considering this windfall objection it is no doubt right to ignore the fact that the appellants are in practice unlikely, in view of the very large sums involved and the costs orders already made against them, to be able to meet even a small part of any judgments against them.   It is not so easy to ignore the fact that the present shareholders in Queens Moat are probably a very different body of investors than those who received the unlawful dividends ten years ago.   Some of those early investors may have cut their losses by selling their shares at the bottom of the market.   Some of the present investors may have been astute enough or lucky enough to have bought their shares at the bottom of the market. Some may even have formed a view, in deciding to invest in Queens Moat, as to the prospects of a successful recovery on the counterclaim.   These considerations put some flesh on the *Salomon v Salomon* point.   They are matters which the court cannot easily take into account, however strong its instinct to achieve a fair result and avoid anything which resembles double recovery.   Nevertheless it may be assumed that some of the present shareholders did receive and benefit from unlawful dividends paid between 1991 and 1993.

46.       Even in relation to those long-term investors the objection taken by Mr Purle and the litigants in person is in my judgment misconceived.   If there is any unfairness in the situation it does not arise from the so-called windfall which (if and so far as it occurs) will be a distribution lawfully made on the basis of properly prepared accounts for 2001 or some later accounting period.   It will be made out of distributable profits which are disclosed in those accounts. Any unfairness would, on the contrary, arise from long-term investors not being required to account for the unlawful dividends which they received in the past.

47.       The prospect of the former directors being able to claim contribution from innocent recipients of unlawful dividends was debated (somewhat inconclusively) in the course of the appeal hearing.   The statutory remedy in s.277 of the Act is not in point (since it is available only to the company, and only against a shareholder with actual or constructive knowledge of the unlawfulness of this dividend).   But it is stated to be without prejudice to any other obligation to repay an unlawful dividend.   In *Moxham v Grant* [1900] 1 QB 88 this court considered that the principle of equitable contribution as between delinquent trustees (*Chillingworth v Chambers* [1896] 1 Ch 685) could apply as between company directors and shareholders who had received unlawful dividends with notice of the facts.   Long-term investors in Queens Moat now know the facts as to the unlawful dividends, even though they did not at the time of their receipt.   But they may long since have changed their positions.

48.       The debate was bound to be inconclusive since the possible liability of long-term investors was not an issue in the appeals.   They were not parties to the appeals and the court heard no argument on their behalf.   Conceivably the point may have to be considered, at some time in the future, in the context of the insolvency of one or more of the former directors.   It is therefore better to say no more about it than that the possibility of such

claims cannot be excluded.    For all these reasons the windfall argument must in my judgment be rejected.

The measure of compensation

49.      Mr Purle boldly attacked the proposition that delinquent company directors should be equated with trustees for the purposes of measuring their liability to make good losses caused by breaches of fiduciary duty.  He submitted that all the earlier authorities on the topic must now be read in the light of the decision of the House of Lords in *Target Holdings v Redferns* [1996] AC 421.   He also submitted that, if the court applies what is now seen to be the appropriate test, it is apparent that no actionable loss was occasioned by the unlawful dividends, since they could have been declared and paid in a lawful manner (that is, by first paying up distributable profits from subsidiaries).

50.      There is ample authority, spanning well over a century, establishing that although company directors are not strictly speaking trustees, they are in a closely analogous position because of the fiduciary duties which they owe to the company.   Lord Porter put the matter succinctly in *Regal (Hastings) v Gulliver* (1942) [1967] 2 AC 134n, 159:

> "Directors, no doubt, are not trustees, but they occupy a fiduciary
> position towards the company whose board they form."

51.      There is no need to multiply citations.   One of the most recent reviews of the authorities is in the judgment of Nourse LJ in *Re Duckwari* [1998] Ch 253, 262, citing *Re Lands Allotment Co* [1894] 1 Ch 616, 631, *Belmont Finance Corporation v Williams Furniture* [1980] 1 AER 393, 405 and (in relation to the measure of compensation appropriate to a delinquent trustee) *Knott v Cottee* (1852) 16 Beav. 77.

52.      The facts of *Target Holdings* are well known and it is not necessary to set them out in detail.   The case concerned a claim against a firm of solicitors sued for its involvement in a mortgage fraud.   Fraud as well as negligence was pleaded.   On completion of the transaction the solicitors had (in breach of their instructions) parted with the mortgage advance before obtaining the security.   Within a month, however, they did obtain the security.   The claimant, as a possible short cut to having to prove fraud at trial, sought summary judgment on the basis of the unauthorised payment, despite the solicitors having obtained the security (which subsequently proved hopelessly inadequate).   That is the explanation of the references in the speech of Lord Browne-Wilkinson (at pp.437 and 439) to 'stopping the clock'.

53.      The result reached by the House of Lords in *Target Holdings* has been generally welcomed but the route to that result has been much debated (see in particular Sir Peter Millett, Equity's Place in the Law of Commerce (1998) LQR 114 p.214-227; Professor C E F Rickett, Where are We Going with Equitable Compensation? in Trends in Contemporary Trust Law (1996) pp.183-9).   In my view it is unnecessary to go far into that debate, since whereas the trust in *Target Holdings* was (as Professor Ricketts puts it) simply an aspect of a wider commercial transaction involving agency, the fiduciary obligations undertaken in this case by the former directors involved heavy and continuing responsibilities for the stewardship of the company's assets.   They were not strictly speaking trustees, as title to the assets was not vested in them; but they had trustee-like responsibilities, because they had the power and the duty to manage the company's business in the interests of all its members.   It may be that a more satisfactory dividing line is not that between the traditional trust and the commercial trust, but between a breach of fiduciary duty in the wrongful disbursement of

funds of which the fiduciary has this sort of trustee-like stewardship and a breach of fiduciary duty of a different character (for instance a solicitor's failure to disclose a conflict of interest as in *Canson Enterprises v Boughton & Co* (1991) 85 DLR (4th) 129, a decision of the Supreme Court of Canada discussed by Lord Browne-Wilkinson at pp.438-9).

54.        These points were not fully explored in the course of argument and it would not be right to express any definite view on points which are not necessary to the determination of this appeal.   It is sufficient, in my view, to observe that this is a wholly different case from *Target Holdings*, in which (so far as concerned the application for summary judgment) the solicitors were shown to have done no more than to have acted imprudently in disbursing client's funds before they obtained their client's security.   In this case the former directors are liable for deliberately and (at least in relation to the 1991 accounts) dishonestly paying unlawful dividends out of the company's funds which were in their stewardship. Those unlawful payments have never been reimbursed.   Queens Moat's case does not depend on any artificial exercise in 'stopping the clock'.   The judge (at p.42 of the dividends judgment) rejected the submission that there was no loss because lawful dividends could and would have been paid, had the 1991 accounts reflected the true position.   But even in the absence of such a finding, the submission was in my view bound to fail.

55.        As a footnote to this part of the case I should mention a section of the judge's dividend judgment (at p.36) which is headed: 'Breach of Contract (a) Fiduciary Duty'.   The judge found no breach of fiduciary duty in relation to 'dividends paid under the 1990 accounts and the 1991 accounts when there were insufficient funds', but he did find a breach in relation to ' dividends paid under the 1991 accounts when they did not give a true and fair view'.

56.        The judge had a truly daunting task in preparing his three judgments in this case and I would be slow to criticise any presentational format which he adopted in order to ensure that he had covered all relevant issues.   But I think that here and at some other points in his dividends judgment the multiplicity of sub-headings may not have assisted him.   He had already considered 'Breach of trust' under a separate heading (at p.29), similarly subdivided, and had concluded that the breach of trust in relation to dividends paid on the basis of the 1990 accounts (but not the 1991 accounts) could be termed a merely technical breach.   Mr Richards suggested, without dissent from Mr Purle, that the heading 'Breach of Contract (a) Fiduciary Duty' was addressed to the contractual duty of good faith or loyalty which every employee owes to an employer.   These points are mainly relevant to the cross-appeal and the issue of relief, which are discussed next.

Relief under s.727 of the Act

57.        As indicated in the summary at para 22 above, the judge found that nine dividends had been unlawfully paid, but he granted relief under s.727 of the Act in respect of seven of them: the interim ordinary dividend paid on 21 October 1991, and the six preference dividends (three in respect of the 7 per cent and three in respect of the 7.5 per cent preference shares) paid between 1 October 1991 and 7 January 1993.

58.        The judge's reasons appear at pp.43-9 of the dividends judgment.   He began by directing himself, correctly, that the burden of proving honesty and reasonableness was on those who were asking for relief.   He also directed himself that s.727 enabled the court "to consider the matter from an essentially subjective point of view".   That cannot, with respect, be right as regards reasonableness.   It is questionable whether it is right as regards honesty. As Lord Nicholls said in *Royal Brunei Airlines v Tan* [1995] 2 AC 378, 389,

> "The standard of what constitutes honest conduct is not subjective. Honesty is not an optional scale, with higher or lower values according to the moral standards of each individual. If a person knowingly appropriates another's property, he will not escape a finding of dishonesty simply because he sees nothing wrong in such behaviour."

59.     The judge then considered the conduct of the former directors in relation to the various dividends which were challenged. Again he subdivided his consideration not only by reference to the two different years' accounts but also by reference to the type of dividend (preference or ordinary) and by reference to the reasons why the dividends were unlawful. Again, I respectfully question whether this approach was not over-schematic and unhelpful.

60.     The judge decided in relation to the 1990 accounts and the insufficiency of reserves that the former directors had left that matter to Queens Moat's auditors, Bird Luckin, to deal with. He was prepared to accept that an honest and reasonable director might overlook his statutory obligations because he placed too much reliance on the auditors. He concluded, on the balance of probabilities, that the former directors

> " ... were neither dishonest nor unreasonable in being unaware that there were insufficient reserves available in the parent company to pay the dividends on the basis of the 1990 accounts, and that this rendered them unlawful under the Act."

Accordingly he gave relief in respect of the first four disputed dividends. This is challenged on the cross-appeal, especially by reference to the interim results for 1991 which had been published before any of these four dividends was paid.

61.     In relation to the dividends paid on the basis of the 1991 accounts the judge noted that they overstated the group's real profit very substantially (it was common ground that the true figure for the year's pre-tax profit should have been about £32.2m, against the published figure of £90.4m). He also held that none of the former directors had shown that he was acting honestly or in good faith; on the contrary, he was satisfied that their conduct had been dishonest. He refused relief in respect of the two ordinary dividends paid on the basis of the 1991 accounts. Nevertheless he granted relief in respect of the three preference dividends. He stated his reasons for this as follows:

> "In relation to preference dividends however it would have been possible, on the basis of Mr Spence's evidence, for an honest and reasonable director to have considered that the preference dividends should be paid, even on the basis of reduced profit, breach of the banking covenants and rising debt."

62.     Mr Purle's appeal on the judge's refusal of relief for the last two ordinary dividends is in my view quite hopeless. The judge considered the 1991 final accounts in great detail (pp.57-170 of his main judgment). He reached clear conclusions which covered the personal involvement of each of the former directors. His conclusions were fully justified by the evidence (and there can be no appeal against them). His summary of his conclusions was as follows (pp.168-70 of the main judgment, with a few annotations):

"On the basis of the evidence as a whole I have come to the clear conclusion that the 1991 accounts do not give a true and fair view. The following matters are relevant: -

1   Incentive fees - the front loading and double counting was contrary to the concept of prudence under paragraph 12 schedule 4 of the Act and SSAP 2.   Non-compliance with this principle is a breach of the true and fair view requirement as the departure from the principle should have been disclosed but was not.

[2]   UK sale and leasebacks - the treatment of the loss hotels and profit hotels was inconsistent and contrary to paragraph 11 of schedule 4 of the Act and SSAP 2.   This departure from the principle of consistency was not disclosed and constitutes a breach of the requirement of true and fair.

The profits were overstated by £7.6 million.

[3]   HIM [the French hotels] - the £10.3 million profit was misstated.

[4]   HIF [Holiday Inn, Frankfurt] - the profit of £8.2 million was misstated.

The transaction was unlawful in that it was a breach of sections 317, 320, 330 and 232 of the Act.

The transaction was a class 4 transaction of the Yellow Book rules but not reported to the Stock Exchange.

[5]   Capitalisation and rationalisation costs - the profit was overstated by £5.4 million.

[6]   The Sloane Club - there was a material misstatement of £13.2 million.

[7]   Non-disclosure [of extraordinary items] - none of the claimed profits from UK sale and leasebacks, HIM, HIF or the Sloane Club were disclosed in the accounts as they should have been.   It was the policy of the Executive Board of QMH and hence Mr Bairstow, Mr Marcus and Mr Hersey, accepted and followed by Mr Porter, that hotel disposals would not be separately disclosed.   Active steps were taken to ensure that the market were not aware that the group profit included such disposals; the sale proceeds of the sale and leasebacks were included in QMH's group turnover without disclosure so as to prevent the profit claimed from them being spotted; the HIM profit was placed in the wrong geographical breakdown section at note 2 of the accounts; the HIF transaction was not disclosed to the market or the shareholders in the Chairman's statement or accounts, nor were its details disclosed to the main Board, the non-executives or the merchant bank Charterhouse; the Sloane Club turnover was included without disclosure in QMH group turnover so that the profit would not be spotted.

The combination of the breach of the requirements of the Act and SSAPs in relation to fundamental accounting principles, the misstatements and the non-disclosures, result in the accounts not giving a true and fair view. Even if the only breaches were those of the failure to disclose the double counting and front loading of the incentive fees (£13.2 million) and the non-disclosures of the property sales (£26 million) I would still hold that the accounts did not give a true and fair view. They would have been neither accurate enough or comprehensive enough to satisfy the reasonable expectations of the analysts or other informed reader.

On the basis of my findings, however, the accounts were seriously misleading. Had they given full disclosure of the matters they ought to have disclosed, the reasonable analyst would have concluded that there were breaches of fundamental accounting principles (the incentive fees and UK sale and leasebacks), serious doubt about whether any profit could properly be claimed (HIM, HIF and Sloane Club), and that the capitalisation of rationalisation of costs policy was unjustified."

63.     The judge made a specific finding that the former directors were dishonest in the preparation of the 1991 accounts, in order to deceive the market into the belief that the group was much more profitable than it actually was. Honesty and reasonableness are absolutely necessary preconditions for relief under s.727 (see, if authority is needed, *National Trustees Co of Australia v General Finance Co of Australia* [1905] AC 373, 381, a case on the equivalent provision in the Trusts Act 1901 of Victoria). It was not open to the judge, having found that the former directors were guilty of dishonestly preparing false accounts for 1991, to find that they had acted honestly and reasonably in paying any dividends on the strength of those accounts. That disposes of the last point in the appeal, and it means that the Queens Moat must succeed on the cross-appeal in relation to the last three payments of preference dividends.

64.     Mr Richards' case in relation to the other four dividends challenged on the cross-appeal is that although they were paid on the basis of the 1990 accounts, they were paid at a time when the former directors were well aware that the group's businesses (both in the United Kingdom and on the continent) were encountering very adverse trading conditions, and when they had already embarked on a large number of improper expedients in order to give a false picture of continuing profitability. Mr Richards pointed to the interim results for 1991 (published on 14 August 1991) as the watershed after which the appellants could not be said to have been acting either honestly or reasonably.

65.     The judge considered the 1991 interim accounts (as to their factual content) at pp.35-56 of his main judgment and (as to the former directors' responsibility for the accounts) later in that judgment. He held that the accounts were misleading in respects which he summarised as follows:

"(i)  They purported to be in respect of hotel trading in accordance with the Chairman's statement when they were not, in that £10.3 million of the £36.189 million (28%) were in respect of material non-recurring items unrelated to hotel trading and £11.6 million in respect of anticipated incentive fees which had not then been agreed.

(ii)   They included £11.6 million in respect of anticipated incentive fee income contrary to the stated accounting policy in 1(d).

(iii)   They purported to have been prepared on the discrete basis, ie in respect of the first six months trading, when in fact they had been prepared on a different basis, akin to an integral basis, which took into account anticipated as well as actual profit for the first trading period."

Some of the most blatantly improper transactions such as the Sloane Club episode (see pp.45-8 of the main judgment) had taken place during this half-year.  The judge held that each of the appellants was personally responsible for the misleading accounts.  Those findings of the judge are not open to appeal.

66.        How then did the judge conclude that he could and should grant relief in respect of any dividends paid after August 1991?   I have already set out (in paras 60 and 61 above) the passage (at pp.44-6 of the dividends judgment) in which the judge set out his reasons.   With great respect to the judge, who shouldered a huge burden in trying and deciding this difficult case, this part of his reasoning cannot stand.   It involves the proposition that directors could act honestly and reasonably in paying one type of dividend, but not in paying another type of dividend, when all the dividends were paid either on the basis of annual accounts, or in informal reliance on interim accounts, which the directors had prepared in a way which was neither honest nor reasonable.   That sort of schizophrenia is an impossible concept.   The judge's reasoning also contains a false syllogism: the former directors paid preference dividends (based on false results); honest and reasonable directors might have paid preference dividends (based on true results); therefore the former directors were acting honestly and reasonably.

67.        So far as the appellants needed relief under s.727 I think the judge was wrong to grant it on any dividend paid after August 1991.   But it is important to bear in mind that the judge did not find (and had not been asked to find) that the 1990 accounts failed to give a true and fair view; and that the judge substantially overestimated the shortfall in the distributable reserves because he overlooked the £13.164m provision for unpaid dividends as at 31 December 1990.   The £11.9m of distributable reserves covered the preference dividends of £0.651m and £3.013m paid on 7 July and 1 October 1991.   It also covered £8.236m (or thereabouts) of the interim dividend of £12.048m paid on 21 October 1991.   Those distributions have not therefore been shown to be unlawful and it is not necessary for the appellants to make out a claim to relief in respect of them.   I would allow the cross-appeal but only in relation to (i) the unfranked balance of the interim dividend, (ii) the two preference dividends paid in January and April 1992 and (iii) the three preference dividends paid in July and October 1992 and January 1993.   It is not necessary to consider separately the claim (which is unanswerable) in respect of dividends received by the appellants themselves.

Conclusion

68.        For these reasons I would dismiss the appellants' appeal and allow Queens Moat's cross-appeal to the extent indicated above.   Counsel should try to agree the figures to be inserted in the order on the cross-appeal.

LORD JUSTICE SEDLEY:

69.        I agree.

THE VICE-CHANCELLOR:

70.        I also agree.


ORDER: Appeal dismissed with costs; cross-appeal allowed; Judgment in favour of Queens Moat in the sum of £78,565,710.56; leave to appeal refused; a stay on £78 million unless parties lodge their permission to appeal application to the House of Lords within 28 days, until outcome of that application; thereafter stay continues if permission to apply granted until determination of appeal.

(Order does not form part of approved Judgment)