# **TAB 3**

Butterworths Company Law Cases/BCLC 1988 /Brady and another v Brady and another - [1988] BCLC 20

[1988] BCLC 20

# Brady and another v Brady and another

**COURT OF APPEAL, CIVIL DIVISION**

**O'CONNOR, CROOM-JOHNSON AND NOURSE LJJ**

**31 MARCH, 1, 2, 3 APRIL, 29 JULY 1987**

*Scheme to reorganise company to divide it between the two principal shareholders - Whether the scheme involved the improper use of the company's funds - Whether the scheme was ultra vires - Financial assistance by a company in the purchase of its own shares - Companies Act 1985, ss 151-153*

Two brothers carried on a business through a number of companies. There were two principal activities carried on by the business: road haulage which was carried on by T Brady & Sons Ltd (Brady) and the distribution of drinks which was carried on by Thomsons Soft Drinks Ltd (Thomsons), a wholly-owned subsidiary of Brady. The brothers were unable to co-operate in the running of the business and it was resolved that the business should be split up, one brother acquiring the road haulage business and the other the drinks business. Brady was valued at £1,254,116 and it was agreed that to give effect to the principle of equal division half of the value of Brady (£627,057) would have to be transferred to the drinks side of the business and to this end the following scheme was arranged. O Ltd was incorporated, with the brothers owning one share each, and O Ltd acquired Thomsons from Brady and then acquired Brady for shares in itself. O Ltd then incorporated M Ltd which acquired Brady for shares and loan stock valued at £627,057. After various debts had been set off the loan stock was valued at £614,859. 0 Ltd then incorporated A Ltd to which it transferred Thomsons and the M Ltd loan stock in exchange for A Ltd shares. M Ltd redeemed its loan stock from A Ltd by transferring to it certain Brady assets and it in turn became indebted to Brady for the value of the loan stock. The final step in the scheme was for M Ltd to be transferred to one brother and A Ltd to be transferred to the other. One of the brothers objected to the taking of the formal steps necessary to complete the transaction and the other brother commenced an action for specific performance. The defence was raised that the proposed corporate reorganization was void for illegality on the grounds that it required Brady in contravention of its constitution to give away part of its assets for no consideration or was a misfeasance on the part of the directors, or alternatively it involved Brady in financing the purchase of its shares which was contrary to what is now s 151 of the Companies Act 1985. The trial judge found that the transaction was not ultra vires and did not involve a gratuitous transfer of the company's assets. The defendants appealed.

**Held -** Appeal allowed (Croom-Johnson LJ dissenting).

(1) (per O'Connor LJ) In entering into the transaction to use Brady assets to redeem the M Ltd loan stock, the principal purpose of Brady was not to help M Ltd to acquire its shares but to enable Brady to continue in business by ending the deadlock between its two principal shareholders and thus avoiding liquidation and preserving its good will. Accordingly the transaction, although accepted by the parties as falling within the prohibition in s 151(2) of the 1985

Act against a company providing financial assistance in connection with the acquisition of its shares, nevertheless satisfied the requirements of s 153(2)(*a*) as not having as its principal purpose the provision of such prohibited financial assistance. However, since M Ltd had no assets and no foreseeable prospects of

obtaining any, the transaction involved a massive gift to a person who was one of the principal shareholders and a director of Brady, and as such it constituted a misfeasance on the part of the Brady directors. Such a transaction could not possibly be said to be in the interests of Brady and therefore the requirement of s 153(2)(*b*) that any transaction involving financial assistance to be valid must, inter alia, be 'in the interests of the company' was not satisfied (*post* pp 26a-b, e-f).

(2) (per Nourse LJ, O'Connor LJ concurring). The transaction entered into by Brady involved the disposition of half of its assets for the benefit of its two principal shareholders and this would only be valid if expressly authorised by the company's objects or if the company received consideration for the assets. As the company's objects did not authorise gratuitous dispositions of the company's assets and as it received no consideration in connection with the disposition of its assets, the debts received from M Ltd being worthless and the benefit to the company of continuing in existence not being good consideration or reasonably incidental to the continuation of the company's business, the transaction was ultra vires and therefore void. In addition the transaction constituted the giving of financial assistance by Brady in connection with the purchase of its shares and was not shown to be in the 'interests of the company' within the meaning of s 153(2)(*b*) of the 1985 Act. To satisfy this test it would have been at the minimum necessary for Brady to have shown that the directors of the company considered whether half of the company's assets would on all eventualities have been sufficient to discharge all the company's existing debts. Since this question was not asked, the transaction did not satisfy the requirements of s 153(2)(*b*) of the 1985 Act (*post* pp 39d-40c, 41b-c).

(3) (per Croom-Johnson LJ, dissenting): Although the transaction involved the giving of financial assistance by Brady in the purchase of its own shares, the assistance was given in good faith and in the interests of the company as it was made to enable Brady to continue trading (and not primarily to defray the cost of purchasing its shares) and was authorised by sub-clause 3H of Brady's objects. Accordingly the transaction was valid within the terms of s 153(2)(*b*) and the appeal should be dismissed. However, if the transaction was not authorised by sub-cl 3H of Brady's objects, it was not authorised by sub-cl 3U of its objects, as this only authorised Brady to enter into transactions that were supported by consideration and on the facts of the case the promise of M Ltd to pay Brady was worthless as M Ltd had no money with which to make payment. Also, even it could be said that the ending of the deadlock within Brady could be said to be consideration for Brady's promise, the benefit accruing to Brady in this respect was only by way of an incidental consequence of reorganization of the group of companies and therefore neither could it be held to constitute consideration (*post* pp 32d, 34e-h, 36c-g).

### Cases referred to in judgment

*Horsley & Weight Ltd, Re* [1982] 3 All ER 1045, [1982] Ch 442, [1982] 3 WLR 431, CA.

*Hutton v West Cork Rly Co* (1883) 23 ChD 654, CA.

*[1988] BCLC 20  at  22*

*Newman* (*George*) *& Co, Re* [1895] 1 Ch 674, CA.

*Oceanic Steam Navigation Co Ltd Re* [1938] 3 All ER 740, [1939] Ch 41.

*Ridge Securities Ltd v IRC* [1964] 1 All ER 275, [1964] 1 WLR 479.

*Rolled Steel Products* (*Holdings*) *Ltd v British Steel Corp* [1985] 3 All ER 52, [1986] Ch 246, [1984] BCLC 466, CA; *affg* [1982] 3 All ER 1057, [1982] Ch 478.

*Smith & Fawcett Ltd, Re* [1942] 1 All ER 542, [1942] Ch 304, CA.

*York and North Midland Rly Co v Hudson* (1845) 16 Beav 485, 51 ER 866.

### Appeal

The defendants, Robert Brady and John James Brady, appealed against the order of his Honour Judge Blackett-Ord V-C sitting as a judge of the High Court, made on 17 March 1986, granting the plaintiffs, John James Brady and Robert Anthony Brady, specific performance of an agreement made under a scheme of reorganisation of T Brady & Sons Ltd (the company) whereby half of the value of the net assets of the company would be transferred to the defendants, on the grounds that the agreement was not ultra vires the memorandum of the company and Athersmith Bros Ltd, that the transfer did not amount to a gratuity, but was for a proper and valuable consideration and that it did not constitute a breach of duty or misfeasance by the directors within the meaning of ss 151 and 153 of the Companies Act 1985. The facts are set out in the judgment of O'Connor LJ.

*Leolin Price QC* and *Ian Leeming* for the defendants.

*Alexander Irvine QC*, *Nicholas Stewart QC* and *N Ward* for the plaintiffs.

*Cur adv vult*

**29 July 1987. The following judgments were delivered.**

**O'CONNOR LJ.**

This case arises out of a quarrel between two brothers, John James Brady ('Jack') and Robert Brady ('Bob') who owned and operated a family business in Barrow-in-Furness. By the beginning of 1983 their animosity and mutual intransigence had put the existence of their business in jeopardy. Matters were brought to a head in March when Jack issued a petition under s 75 of the Companies Act 1980 asking for an order that he be permitted to buy out Bob or, alternatively, that the main family company, T Brady & Sons Ltd ('Brady') be wound up. Bob asked for the same relief against Jack and, as the judge said, there were two buyers, but no seller.

The deadlock was broken in July 1983 when under pressure from their respective advisers, solicitors and accountants, the brothers agreed to divide the business in half and go their separate ways. This decision was made easier by the fact that there were two arms to the business, road haulage with associated activities and distribution/wholesaling of beers, wines and soft drinks. Jack was to have the haulage arm, and Bob the drinks arm. It was always recognised that in order to achieve equality between the brothers there would have to be some movement of assets presently locked in the haulage arm to the drinks arm.

Despite the fact that the business was carried on through a number of corporate bodies, there should have been no difficulty in achieving the agreed

*[1988] BCLC 20  at  23*

result. Unfortunately, as it seems to me, the professional advisers, in their anxiety to save possible charges, put together a very complicated scheme which has resulted in this litigation.

I must digress for a moment. Bob has two sons, Robert Anthony and John James, who each own 50% of the shares in Tanda Transport Ltd ('Tanda'). Robert Anthony has joined forces with his uncle Jack, whereas John James has sided with his father, and it is for this reason that these two men appear on the opposite sides of the record.

The agreement between the two brothers is to be found in two documents: 'Heads of Agreement' dated 2 July 1983, and a letter from Jack's solicitors dated 2 December 1983. To achieve equality it was necessary

to value the assets of the business and the July document made provision for that to be done. By December the valuations had been made and agreed, and the corporate reorganisation was all but complete. In fact the two arms of the business had been separated, and from the beginning of 1984 each brother has carried on his own business and both are flourishing. It seems that early in 1984 Bob came to the conclusion that his advisers had not paid sufficient care to his interests and that the net asset value had been understated so that he had been deprived of some £300,000. In the result, he objected to the formal steps necessary to conclude the agreement and Jack started proceedings for specific performance of the agreement between them. In lengthy pleadings a number of defences were raised, but it is unnecessary to examine any of these for at the trial Bob stood on a single defence, namely that the agreed corporate reorganisation was void for illegality.

On behalf of Bob it was contended that the reorganisation agreed to by the professional advisers was unlawful for two reasons: (i) It required Brady to give away half its assets for no consideration, something not authorised by its constitution and/or which was misfeasance by the directors. (ii) It required Brady to finance the purchase of its shares contrary to what is now s 151 of the Companies Act 1985.

At the trial the judge rejected both contentions and ordered specific performance of the agreement as prayed for by Jack. Bob appeals to this court.

I must state as shortly as possible the scheme of reorganisation. The haulage side of the business was operated by Brady itself and through five wholly owned subsidiary companies. In addition Furness Transport Ltd (owned equally by Jack and Bob, with Tanda having a small minority interest) was in haulage. The drinks side was in Thomsons Soft Drinks Ltd, a wholly-owned Brady subsidiary, and in Marsh's Sass Ltd owned equally by Jack and Bob. A straight exchange of shares got Bob out of Furness and Jack out of Marsh's Sass.

For the purposes of the reorganisation the agreed value of Brady was £1,254,116. The parties also agreed that the shares in Thomsons Soft Drinks Ltd were worth £12,200. Furness Transport and Marsh's Sass were of equal value and cancelled each other out. It follows that in order to give effect to the equal division between the brothers required by the July heads of agreement, half the value of Brady would have to pass from haulage to drinks, namely £627,057. This transfer was effected in the following way: (i) Ovalshield Ltd was incorporated. Jack and Bob each holding one share. (ii) Ovalshield acquired Brady for shares in itself issued to Jack, Bob and Tanda. (iii) Ovalshield acquired Thomsons Soft Drinks from Brady for £12,200, leaving that amount outstanding on loan account. (iv) Ovalshield incorporated Motoreal Ltd as a

wholly owned subsidiary. (v) Motoreal acquired Brady from Ovalshield in exchange for shares and £627,057 of loan stock. (vi) The £12,200 owing by Ovalshield to Brady was set off against loan stock, leaving Ovalshield in possession of £614,857 loan stock. (vii) Ovalshield incorporated Actavista Ltd as a wholly-owned subsidiary. Actavista was destined for Bob just as Motoreal was destined for Jack. (viii) Activista acquired Thomsons Soft Drinks and the Motoreal loan stock from Ovalshield in exchange for shares. (ix) Motoreal redeemed the loan stock by transferring to Actavista Brady assets to the value of £614,857 and became indebted to Brady in the sum of £627,057 because the whole of the loan stock had in fact been redeemed by the transfer of Brady assets. The later stages of the scheme gave Jack beneficial control of Motoreal and Bob of Actavista.

Although the Companies Act 1981 was in force at the time of these transactions, it is more convenient to consider their legality against the provisions of the Companies Act 1985. Section 151 provides:

'(1) Subject to the following provisions of this Chapter, where a person is acquiring or is proposing to acquire shares in a company, it is not lawful for the company or any of its subsidiaries to give financial assistance directly or indirectly for the purpose of that acquisition before or at the same time as the acquisition takes place.

(2) Subject to those provisions, where a person has acquired shares in a company and any liability has been incurred (by that or any other person), for the purpose of that acquisition, it is not lawful for the company or any of its subsidiaries to give financial assistance directly or indirectly for the purpose of reducing or discharging the liability so

incurred.

> (3) If a company acts in contravention of this section, it is liable to a fine, and every officer of it who is in default is liable to imprisonment or a fine, or both.'

It is not disputed that the transfer of Brady assets is in breach of sub-s (2) unless it is saved by sub-s (2) of s 153 which provides:

> 'Section 151(2) does not prohibit a company from giving financial assistance if - (*a*) the company's principal purpose in giving the assistance is not to reduce or discharge any liability incurred by a person for the purpose of the acquisition of shares in the company or its holding company, or the reduction or discharge of any such liability is but an incidental part of some larger purpose of the company, and (*b*) the assistance is given in good faith in the interests of the company.'

Judge Blackett-Ord V-C dealt with this matter:

> 'Anyway, in the present case the transfers were not gratuitous. Brady's loss of assets will be replaced by debts of equal amount due to it from Motoreal: see Brady's directors' report for the year to 31 October 1984. Whether it gets a good bargain or not is for the directors and members. As I have emphasised, the real purpose of the transfer of assets was to enable Brady to function independently and to free it from the deadlock

*[1988] BCLC 20  at  25*

> in which it was held. As was said in the course of the argument, better perhaps a smaller profitable company than one with greater assets but no effective management. In my judgment, the force of this is not affected by the fact that the shareholders would or might also benefit under the reconstruction. The scheme was a sophisticated one, as these things tend to be, but it was no sham, and in my judgment it was perfectly valid unless forbidden by s 42 of the Companies Act 1981'.

After setting out the relevant provisions, he said:

> 'I find in this case that the principal purpose of the giving of the financial assistance was not to reduce or discharge any liability incurred by any person for the purpose of the acquisition of the shares, but was incidental to the larger purpose of the scheme of arrangement and was given in good faith.'

Counsel for the defendants (Mr Price QC) submitted that this part of the judge's decision cannot be supported. He submitted that the reality was that Bob was being bought out of Brady, the consideration being half the value of Brady. The vehicle for achieving this objective was for Motoreal to redeem the loan stock issued as a consideration for the purchase of Brady so that it could not be said that Brady's principal purpose in giving assistance to Motoreal was other than to discharge Motoreal's liability. It will be seen that the judge has elided the two parts of sub-s (2)(*a*) into one. For, as I read the section, even where the principal purpose in giving assistance is to discharge a liability it is not illegal if the giving of the assistance for that purpose is but an incidental part of some larger purpose of the company. Here it is said that the larger purpose of the company was to avoid liquidation and remain in being and trading.

Counsel for the plaintiffs (Mr Irvine QC) submits that there was unchallenged evidence that the reason for setting up the scheme to give effect to the July heads of agreement in this way was to enable Brady to avoid liquidation, maintain its goodwill and continue trading. He submits that the Vice-Chancellor was entitled to hold that the discharge of Motoreal's liability was incidental to a larger purpose of Brady and that the assistance was given in good faith in the interests of Brady as required by s 153(2)(*b*).

I do not find s 153(2) easy to construe. In the present case, if we look at the prohibition in s 151(2), Motoreal had acquired shares in Brady and incurred the liability of the loan stock for the purpose of that acquisition and Brady gave financial assistance directly for the purpose of discharging that liability. The financial assistance as defined by s 152 was either (i) financial assistance given by way of gift, or (iv) any other financial assistance given by a company the net assets of which are thereby reduced to a material extent. The subsection clearly evisages that Brady might have more than one purpose for discharging Motoreal's

liability. In order to ascertain the principal purpose for discharging the liability, I think that one should quite simply ask 'why did Brady do it?' If the answer were 'to help Motoreal acquire its shares', then it could not be said that it was not the principal purpose of Brady to discharge the liability. I think that it is obvious that in the present case no such answer would be correct; Brady had no interest whatsoever in helping Motoreal. The judge has answered

*[1988] BCLC 20  at  26*

the question 'to enable Brady to function independently and to free it from the deadlock in which it was held'. That answer embraces avoiding liquidation, preserving its goodwill and the advantages of an established business. There was ample evidence to support this finding and I see no reason to disturb it. It follows that Brady satisfies the first part of para (*a*) of the subsection and it becomes unnecessary to consider whether the assistance given was 'an incidental part of some larger purpose' of Brady. I would, if necessary, hold that it was.

I turn now to consider whether para (*b*) of the subsection is satisfied. The judge found that the assistance was given in good faith and there is no dispute about this. He made no finding as to whether it was in the interests of the company except by inference. First, with respect to the judge, I must disagree with the finding that the transfer of Brady's assets was not gratuitous. Motoreal had no assets whatsoever other than Brady and no foreseeable prospects of achieving any assets other than Brady. Any debt from Motoreal would in fact be a debt from Brady and this could not amount to consideration for the transfer of Brady's assets. I will assume that the gratuitous transfer of assets was within the powers of Brady for otherwise the transaction would be unlawful quite apart from s 151 of the 1985 Act. Counsel for the defendants submitted (1) that in no circumstances could it be in the interests of a company to give away half its assets; (2) that it cannot be in the interests of a company to do something which would lay the directors authorising the transaction open to a charge of misfeasance. Without coming to any firm conclusion on the first proposition, I find the second proposition compelling. The test for misfeasance is to ask whether in the event of Brady being wound up the liquidator could recover the assets or their value from the donee and/or the directors. The facts disclose that even accepting that the principal purpose for making the gift was to keep Brady in being, the real donee was Bob who at the time of the genesis of the scheme of which the transfer of assets was an integral part, was a director and shareholder in Brady. In my judgment no general power to make gratuitous transfers of assets could protect this massive gift to Bob, and the liquidator would establish misfeasance. In coming to this conclusion I am fortified by what was said by Lindley LJ delivery the judgment of this court in *Re George Newman & Co* [1895] 1 Ch 674 at 685-686:

> 'A registered company cannot do anything which all its members think expedient, and which, apart from the law relating to incorporated companies, they might lawfully do. An incorporated company's assets are its property and not the property of the shareholders for the time being; and, if the directors misapply those assets by applying them to purposes for which they cannot be lawfully applied by the company itself, the company can make them liable for such misapplication as soon as any one properly sets the company in motion ... The Court is bound to recognise the company as incorporated, and to give effect to all the consequences of such incorporation. What, then, are the consequences as regards presents to directors? The cases on the subject are few. The law will be found discussed in *York and North Midland Railway Company v Hudson* ((1845) 16 Beav 485, 51 ER 866) and *Hutton v West Cork Railway Company* ((1883) 23 ChD 654), but there is no case which quite covers this. Directors have no right to be paid for their services, and cannot pay themselves or each other, or make presents to themselves out

*[1988] BCLC 20  at  27*

> of the company's assets, unless authorized so to do by the instrument which regulates the company or by the shareholders at a properly convened meeting. The shareholders, at a meeting duly convened for the purpose, can, if they think proper, remunerate directors for their trouble or make presents to them for their services out of assets properly divisible amongst the shareholders themselves. Further, if the company is a going concern, the majority can bind the minority in such a matter as this. But to make presents out of profits is one thing and to make them out of capital or out of money borrowed by the company is a very different matter. Such money cannot be lawfully divided amongst the shareholders themselves, nor can it be given away by them for nothing to their directors so as to bind the company in its corporate capacity.'

I conclude that this transfer of assets which is admittedly in breach of s 151(2) of the 1985 Act is not saved by the provisions of s 153(2).

I have had the advantage of reading the judgments prepared by Croom-Johnson and Nourse LJJ. I agree with Nourse LJ that the depositions were ultra vires Brady, for the reasons given by him. I also wish to associate myself with what he says in that part of his judgment headed 'General'.

I would allow this appeal.


**CROOM-JOHNSON LJ.**


T Brady & Sons Ltd (whom I shall refer to as 'Brady') was incorporated on 23 July 1959 under the Companies Act 1948 as a private company. It trades at Barrow-in-Furness. It was established to carry on business as garage proprietors and transport freight and haulage. Over the years it acquired some wholly-owned subsidiaries and some partly-owned associated companies. In 1980 it formed another, called Thomsons Soft Drinks Ltd ('Thomsons') to take over a local business in distribution of beers, wines and soft drinks.

The first plaintiff is John James Brady, referred to throughout this case as 'Jack'. The first defendant, Robert Brady has been referred to as 'Bob'. They are brothers. The second plaintiff and the second defendant are both the sons of Bob, and they have equal holdings in a small family company called Tanda Transport Ltd. They do not really play any significant part in this case. One of them sides with Jack, the other sides with Bob. Besides Thomsons there was another soft drinks company called Marsh's Sass Ltd in which Jack and Bob were equal shareholders. Otherwise the other companies concerned, which were subsidiaries of Brady, were all concerned with the haulage side of the business.

Bob had one more share in Brady than Jack. Bob and Jack owned all the shares save for a small number held by Tanda Transport Ltd. For some years the relationship between Jack and Bob had been appalling and although the companies were running as a group there was a management deadlock. Bob was chairman of Brady, and Jack would not attend board meetings because he would be out voted. As the judge put it:

> 'The financial position [by 1982] of the group was seriously deteriorating. Its bankers were pressing for a reduction of the group overdraft, and although the bank loan was still well covered by assets, it was steadily increasing because the group was not profitable.'

*[1988] BCLC 20 at 28*

In March 1983 Jack issued a petition under the Companies Act 1981, s 75, in which he sought an order either that he should buy out Bob or, alternatively, for the liquidation of Brady. It is common ground that this petition would have been strenuously opposed by Bob and that the likelihood would have been liquidation. Neither brother would sell to the other and, in any case, there was considerable doubt whether either could raise the necessary finance on his own.

It was agreed in principle that the only way in which a liquidation could be avoided would be by dividing the group into two, with Jack taking on the haulage side and Bob taking on the drinks.

On 8 July 1983, at a meeting between Jack, Bob and their legal and financial advisers, a document called 'Heads of Agreement' was drawn up. I quote part of it:

> '(1) (i) The parties agree that the business presently carried on by T Brady & Sons Limited and its subsidiaries, together with Marsh's Sass Limited and Furness Transport Limited shall be divided between them so that Bob senior acquires that part of the business comprising the manufacture and sale of alcoholic and soft drinks and Jack acquires that part of the business comprising haulage car distribution and warehousing.'

Later comes:

> '(2) (iii) A reconstruction will take place under the provisions of s 287 Companies Act 1948 ...'

that section being one which covered certain events in a voluntary winding up.

After setting out some proposed arrangements comes:

> '(5) ... it is hereby agreed that all necessary steps will be taken so that by 1st August 1983 the business has been divided between two new subsidiary companies of T Brady & Sons Ltd. and that by 1st September 1983 each of the parties shall have assumed complete responsibility for running the subsidiary [comprising] that part of the business which they are to acquire.'

It is clear that this arrangement would have involved the liquidation of Brady. It was referred to in the judgment as a 'hiving down' process.

Soon afterwards, as the judge found, it was decided to keep Brady in existence for commercial reasons. Evidence was given about this by Mr Lewis, of Binder Hamlyn the accountants advising Jack, and by Mr Cole, Jack's solicitor. The precise effect of that evidence has been challenged by counsel appearing on behalf of the defendants (Mr Price QC), but I am satisfied that the judge's finding is supported by it. I will return to this subject later. Moreover, the decision seems to have been made not later than 2 September 1983. On that day, Binder Hamlyn wrote to the Inland Revenue in the course of a correspondence in which some revenue clearances were being sought, and they wrote:

> '... A new company (H) will be incorporated by JJ and R Brady which will acquire the whole of the issued share capital of T Brady and Sons

*[1988] BCLC 20  at  29*

> Ltd. in exchange for shares in itself. The purpose of this transaction is to enable T Brady & Sons Ltd to continue to trade after the re-organisation and to avoid the necessity of transferring the existing trade to a new subsidiary company which is not desirable for commercial reasons.'

Since a great deal depends on whether the continued existence of Brady was really and truly kept for commercial reasons, or whether it was stated to be so as a cloak for the arrangements which were ultimately made, it is of interest to consider what the benefits of so continuing were. A liquidation would have involved the break-up and disposal of the assets at uncertain and possibly disadvantageous valuations. Among other complications it would have dissipated goodwill, and involved the redundancy of staff, winding up hire-purchase contracts, and the repayment of bank loans. Brady and its subsidiaries were at all times solvent, and common sense suggests that good businesses should be kept in being if possible, rather than closed down.

As the result of the decision to keep Brady in existence, a new and complicated scheme for the re-organisation of the group was worked out by the advisers to both brothers. It involved a number of transactions, most of which were to be put into effect on 2 December 1983. Following on those transactions the assets of the group would be divided between the two brothers, whereby Jack would be in control of haulage and Bob in control of drinks. Some of these arrangements were evidenced in a letter dated 2 December 1983, signed by the solicitors for both, and which gave effect to the division originally contemplated in the heads of agreement of 8 July 1983. The letter of 2 December does not contain all the processes of re-organisation, and although it gives effect to the heads of agreement it must be remembered that it is a consequence of the intervening decision to keep Brady in existence, and of certain steps which had been taken in the meantime.

Among those steps were the incorporation in October 1983 of three new companies, called Ovalshield, Motoreal, and Activista.

There has been some uncertainty in this court about what has happened since 2 December 1983. By that date the two proposed halves of the group had their own bank accounts. We were initially told that since then the halves have gone their separate ways and that each has prospered, thereby proving the commercial sense of the re-organisation. But we are told by counsel for the defendants in the course of his reply that certain important agreed provisions relating to the transfer of assets have still not been carried out and are

awaiting the outcome of this litigation. The financial adjustments set out in the letter were all agreed by both firms of accountants concerned. However, Bob later come to consider that the scheme had not properly taken into account some tax reserves of the haulage side of the business, and he refused to complete whatever was unfinished in executing the agreement. The result was that the two plaintiffs began these proceedings, asking for an order for specific performance of the agreement with consequential relief. The defendants answered with a defence and counterclaim which put a great deal at issue: this was amended a number of times. Most of these were abandoned at trial, and in the end the issues which remained alive were those made by their re-amended and further re-amended pleading. These are that the agreement is void for illegality on the grounds (a) that it would amount to an unlawful stripping of assets from Brady without proper consideration being given and (b) that it amounted

*[1988] BCLC 20  at  30*

to the giving of financial assistance by Brady to Motoreal, its parent company at the time, to reduce the debt incurred by Motoreal in buying Brady shares, contrary to the Companies Act 1981, s 42.

The scheme was very complicated, but certain relevant parts must be described.

The original idea, which had involved the liquidation of Brady, required the hiving down of Brady and its subsidiaries into new companies, each acquiring half the group assets and business. The new scheme, which kept Brady alive, involved what the judge called a 'hiving-up'. Ovalshield was owned by Jack, Bob and Tanda. Ovalshield has almost no money, but was to buy Thomsons from Brady for £12,200 (its book value), owing that sum to Brady. Ovalshield would then buy the shares in Brady from Jack, Bob and Tanda in return for shares in Ovalshield. Brady thus would become a subsidiary of Ovalshield. Motoreal, which had been formed, became a subsidiary of Ovalshield. Motoreal was to buy Brady from Ovalshield. It had nothing with which to pay for the purchase, so it created loan stock (which it issued to Ovalshield) to the value of £627,057. That figure represented half the agreed asset value of Brady.

By now the situation would be that Brady (together with its wholly-owned haulage subsidiaries) was separated from the drinks business. The drinks were in Ovalshield, whose assets consisted of Thomsons, Motoreal's loan stock, and some shares in Motoreal.

Activista was a wholly-owned subsidiary of Ovalshield. The idea was for Ovalshield to transfer Thomsons to Activista. It would also set off the £12,200 which it owed to Brady against Motoreal's loan stock, and the balance of £614,857 of loan stock would be transferred to Activista. In return, Activista would allot its own shares to Ovalshield.

The position would then be that Motoreal owed to Activista the debt represented by the £614,857 of its loan stock, and in order to cancel that debt Motoreal would transfer to Activista enough of Brady's assets to do so. The situation was complicated because after some inter-company debts had been taken into account the value of the assets which needed to be transferred was £341,838. When that had been done, the debt on the loan stock would be extinguished. On the agreed figures, what would need to be transferred would be £39,838 in cash, £142,000 being half the value of the group's central garage, and the group's haulage depot owned by a Brady subsidiary called Athersmiths, which was valued at £160,000. Ovalshield would then be put into liquidation. We have been told that those sums have not yet been transferred, although Ovalshield has been put into liquidation. As the judge put it:

> 'At the meeting on 2 December 1983 the necessary resolutions were passed and documents signed to carry the scheme into effect as far as was then possible, that is to say Ovalshield bought Brady and Brady sold Thomsons to Ovalshield, and Motoreal bought Brady from Ovalshield for shares and the loan stock, which (figures having then been agreed) amounted to some £627,000 nominal, as being half Brady's agreed asset value. The loan stock was reduced and Activista bought Thomsons and the balance of the loan stock from Ovalshield in exchange for shares.'

The question now to be considered is whether this arrangement was illegal.

*[1988] BCLC 20  at  31*

The Companies Act 1981 was in force at the time, but the relevant provisions were re-enacted in different form without material alterations in the Companies Act 1985. The provisions of s 42 of the 1981 Act are now

to be found in ss 151 and 153 of the 1985 Act, and it is the later statute which it is convenient to use. The material provisions are as follows:

> '151(1) Subject to the following provisions of this Chapter, where a person is acquiring or is proposing to acquire shares in a company, it is not lawful for the company or any of its subsidiaries to give financial assistance directly or indirectly for the purpose of that acquisition before or at the same time as the acquisition takes place.

> (2) Subject to those provisions, where a person has acquired shares in a company and any liability has been incurred (by that or any other person), for the purpose of that acquisition, it is not lawful for the company or any of its subsidiaries to give financial assistance directly or indirectly for the purpose of reducing or discharging the liability so incurred ...

> 152(1) In this Chapter - (a) 'financial assistance' means ... (iv) any other financial assistance given by a company the net assets of which are thereby reduced to a material extent or which has no net assets ...'

Section 151(1) covers the situation where the shares are in process of being acquired. Section 151(2) covers the situation where the shares have already been acquired. Since all the transactions concerning Brady took place at once it does not matter which subsection is applied. The acquiring person is Motoreal, which was acquiring shares in Brady and thereby its subsidiary Athersmiths, and the form of the financial assistance was that Brady transferred half its assets to Activista to pay off (on behalf of Motoreal) the debt which Motoreal had incurred to Ovalshield by the issue of loan stock in order to buy the shares in Brady which Motoreal had purchased from Ovalshield.

There is, however, in each case, a saving provision. Section 153(1)(a) and (b) or s 153(2)(a) and (b) would allow Brady to give assistance if Brady's purpose in so doing was 'but an incidental part of some larger purpose' of Brady, and it was 'given in good faith in the interests of the company'.

It was not really contested that the financial assistance had been given. The issue before the judge and before us has been whether the saving provisions of s 153 rescue it from illegality.

Good faith is not in question. The two points are, therefore, was it (i) incidental to some larger purpose of the company and (ii) in the interests of the company. The first of these points has given rise to discussion whether the 'purpose' was to keep Brady trading for commercial reasons or whether it was to divide the group between the two brothers. I see no reason why it should not be both. The commercial reasons unquestionably existed, as the judge found. At the same time, it was understandably preferable to turn the Brady group into two live entities instead of one dead one. In the evidence of Mr Cole one finds:

> 'Q. I must put it to you the real object of all was to bring about the equity between the brothers rather than necessarily to keep the businesses as

*[1988] BCLC 20  at  32*

> such alive? A. You cannot. The shareholders [form] the company, the fight they were fighting, and we had the disastrous results from the company, and I assume (and it is not unreasonable to assume) the shareholders were fighting. Therefore one would have to resolve the shareholders' differences in order to preserve the companies. If we did not resolve the differences between the shareholders then the companies would have gone into liquidation ... the whole purpose of having the structure of Ovalshield on top of T Brady was to enable T Brady to remain in business and not be liquidated.

> Q. The purpose was to effect a split between the two? A. I keep repeating myself. The purpose of the structure set up was to enable T Brady & Sons to remain in existence and not to be liquidated. The whole purpose of arranging for the division of the business between the brothers was to enable two businesses to succeed and be carried on ... The major effect of the scheme is now a thriving company called T Brady & Sons.'

There can be no doubt that the reorganisation of the whole group was a larger purpose than the financial assistance, which was incidental to it. Keeping Brady alive was an essential part of that purpose.

The second point, which was whether the assistance and the form it took was in the interests of Brady, has given rise to considerations of difficulty.

To begin with, no action can be in the interests of a limited company if it is outside the powers of the company as set out in its memorandum of association. In Brady's memorandum the objects are in cl 3, which is itself divided into sub-clauses. Sub-clause 3(A) contains the list of several dozen different businesses, which it is permissible for Bradys to carry on with emphasis on haulage, garaging and motor vehicle and allied activities.

Sub-clause 3(H) reads:

> 'To improve, manage, cultivate, develop, exchange, let on lease or otherwise, mortgage, charge, sell, dispose of, turn to account, grant rights and privileges in respect of, or otherwise deal with all or any part of the property and rights of the Company.'

Sub-clause 3(U) reads:

> 'To sell or otherwise dispose of the whole or any part of the business or property of the Company, either together or in portions, for such consideration as the Company may think fit, and in particular for shares, debentures, or securities of any company purchasing the same.'

Sub-clause 3(X) reads:

> 'To do all such other things as may be deemed incidental or conducive to the attainment of the above objects or any of them.'

At the end is an express declaration that -

> 'each Sub-Clause of this Clause shall be construed independently of the other Sub-Clauses hereof, and that none of the objects mentioned in

*[1988] BCLC 20  at  33*

> any Sub-Clause shall be deemed to be merely subsidiary to the objects mentioned in any other Sub-Clause.'

There is no evidence that there was an irregularity in the passing of the necessary resolutions by Brady's directors, or that any formality was unfulfilled, and no argument has been addressed to us on those lines. In examining the powers of the company it is a matter of construing the memorandum. Sub-clause 3(U) expressly requires that consideration should pass. Sub-clause 3(H) and (X) do not require that. The defendants submit that gratuitous dispositions are not allowed.

In *Re Horsley & Weight Ltd* [1982] 3 All ER 1045 at 1050-1052, [1982] Ch 442 at 448-450 there is a detailed consideration by Buckley LJ of the way in which the objects clause in a company's memorandum of association should be construed. He drew a distinction between those objects which are to be regarded as the true objects of the company and those which are no more than powers which are ancillary to its dominant or main objects. He said ([1982] 3 All ER 1045 at 1051, [1982] Ch 442 at 449):

> 'So also, in the case of express "objects" which, on construction of the memorandum or by their very nature, are ancillary to the dominant or main objects of the company, an exercise of any such power can only be intra vires if it is in fact ancillary or incidental to the pursuit of some such dominant or main object. On the other hand, the doing of an act which is expressed to be, and is capable of being, an independent object of the company cannot be ultra vires, for it is by definition something which the company is formed to do and so must be intra vires.'

Later, in discussing the memorandum in that case, he said:

> 'The question, therefore, is whether cl 3(O) of the company's memorandum of association in the present case contains

> a substantive object or merely an ancillary power. Having regard to the presence of the separate objects clause, the former of these alternatives must be the case unless the subject matter of cl 3(O) is of its nature incapable of constituting a substantive object.'

He said ([1982] 3 All ER 1045 at 1052, [1982] Ch 442 at 450):

> 'The objects of a company do not need to be commercial; they can be charitable or philanthropic; indeed, they can be whatever the original incorporators wish, provided that they are legal. Nor is there any reason why a company should not part with its funds gratuitously or for non-commercial reasons if to do so is within its declared objects.'

This passage was followed and applied by Slade LJ in *Rolled Steel Products* (*Holdings*) *Ltd v British Steel Corp* [1985] 3 All ER 52, [1986] Ch 246, [1984] BCLC 466.

In the present case, the defendants adopt what was submitted in the *Rolled Steel* case that there is a general principle of company law that a transaction, which ostensibly falls within the scope of the wording of a company's mem-

*[1988] BCLC 20  at  34*

orandum but is in fact entered into for some purpose not authorised by that memorandum will be ultra vires in the 'wider sense'.

But if one is looking at the memorandum in order to see whether the transaction is within it, one cannot begin the investigation by assuming that it is not. Counsel for the defendants (Mr Price QC) has always been arguing from the assumption that the real object of this reorganisation was to do no more than divide the assets. The judge found that the object was to keep Brady in existence, and in my view he was justified in doing so on the evidence, even though the motives may have been mixed.

Accordingly, one must construe this memorandum simply by seeing if distributing Brady's assets is within the objects. Slade LJ said in *Rolled Steel Products* (*Holdings*) *Ltd* [1985] 3 All ER 52 at 80, [1986] Ch 246 at 288, [1984] BCLC 466 at 500 that full force must be given, so far as possible, to the provisions at the end of cl 3 of the memorandum which directs that each sub-clause shall be construed independently of the other sub-clauses.

In Brady's objects clause, there is such a provision.

Sub-clause 3(U) expressly requires consideration moving to Brady for the transactions therein mentioned, and must be dealt with on that basis. Sub-clause 3(H) does not. Sub-clause 3(X) is what Buckley LJ called merely an ancillary power, even though expressed to be an independent object. I shall indicate later that in my view Brady would receive no consideration for the transfer of its assets. Therefore, the investigation to see whether the transfers can be brought within sub-cl 3(H) must begin with asking whether sub-cl 3(H) confers what Buckley LJ called 'substantive objects' or only ancillary powers.

My reading of the sub-clause is that its terms are indeed 'substantive objects'. It certainly contemplates that in carrying on its multifarious businesses Brady will acquire and possess property and rights of many kinds. But the object of sub-cl 3(H) is to give the directors full powers in their discretion, exercised in good faith, to deal with them. In *Re Horsley & Weight Ltd* [1982] 3 All ER 1045 at 1054, [1982] Ch 442 at 452, Buckley LJ said:

> 'Of course, if the memorandum of association expressly or by implication provides that an express object only extends to acts which benefit or promote the prosperity of the company, regard must be paid to that limitation; but, where there is no such express or implied limitation, the question whether an act done within the terms of an express object of the company will benefit or promote the prosperity of the company or of its business is, in my view, irrelevant.'

Sub-clause 3(H) contains no such limitation express or implied, and the transfers will therefore be intra vires the company. Even if such a limitation ought to be implied, the transfers will in any event benefit and promote the prosperity of Brady.

If I am wrong about that, the question of 'consideration' for the purpose of sub-cl 3(U) is more complicated.

The judge found that these transfers of assets would not be gratuitous because their value would be replaced by debts of equal amount due to Brady from Motoreal, a solution which was set out in Brady's directors' report attached to the accounts for the year ending 31 October 1984. If that is correct,

*[1988] BCLC 20  at  35*

then in return for the assets to be transferred to Activista, Brady was acquiring a debt which would be owed to itself from Motoreal. This conclusion needs examination in order to see whether Motoreal had any assets capable of being used to pay off that debt.

In transactions of this nature, which necessarily involved the artificial creation of a number of corporations which dealt among themselves in each others shares, it is necessary to look at the realities.

When Ovalshield sold Thomsons to Activista, it transferred all the issued Thomsons share capital (worth £12,200) and £614,857 of the Motoreal loan stock, which was simply a debt owed to Ovalshield by Motoreal. In return, Ovalshield received from Activista shares in Activista. The result of this transaction was that Motoreal now owed the £614,857 to Activista, and this represented the value of the Brady assets which had yet to be transferred to the drinks group, and that is how the loan notes were to be redeemed. The situation now was that Brady was owed £614,857 by Motoreal, which had no other assets but its ownership of the share capital of Brady. This debt was a worthless asset to Brady, because Motoreal had no money with which to pay it. In whatever way it might be treated in the accounts of Brady, the debt due to it from Motoreal could never be paid. The loan notes retrieved from Activista were in reality 'paper' brought into existence to represent the value of the assets which were being transferred to the drinks group. To say that they eventually represented a debt due from Motoreal to Brady is to say that Motoreal owed Brady its own money. They could not amount to consideration to Brady for the transfer of its own assets.

In my opinion this book entry was not capable of amounting to consideration moving to Brady for the disposal of half its assets to Activista, and the judge's reason for saying that the disposal of the assets was for value was wrong.

If one accepts the defendants' submission that in order to comply with the objects of sub-cll 3(H) and 3(U) any disposition by Brady of any of its property had to be for some kind of consideration, it is necessary to deal with alternative arguments put forward by the plaintiffs. They say that nevertheless there was consideration although not in precise money's worth. They also rely on objects cl 3(X) which reads: 'To do all such other things as may be deemed incidental to the attainment of the above objects or any of them'; which by cl 3 itself has, like each sub-clause, to be construed independently of any other sub-clause.

I will take the other form of consideration first. This, it is submitted, is that the benefit accruing to Brady as a result of this parcel of transactions was the removal of the management deadlock which was preventing it from trading profitably and was threatening the demise of the company under the s 75 petition.

What is meant by 'consideration' in sub-clause 3(U)? It must mean such consideration as would be capable of supporting a contract, and in my view the conferring of such a benefit as the removal of the deadlock would be sufficient. As the judge put it, whether Brady got a good bargain or not was a question for decision by the directors and members. If the proposed transfer of the assets was to enable Brady to function profitably by freeing it from the deadlock in which it was held -

*[1988] BCLC 20  at  36*

'better a small but profitable company than one with greater assets but no effective management ... the force of this is not affected by the fact that the shareholders would or might also benefit under the reconstruction.'

So far, so good. But was that benefit one which came to Brady in return for the assets, or did it only accrue to Brady incidentally in the course of the total reorganisation of the group? The defendants submit that such a benefit was not received by Brady from any transaction to which Brady was a party: the assets were not given in exchange for any liability of Brady itself, but in order to discharge a liability which Motoreal owed to

Activista. Brady and Activista were not in any direct contractual relations under which Activista could have sued Brady to enforce the transfer of assets which were either owned or (like Athersmith's haulage depot) controlled by Brady.

Counsel for the defendants (Mr Price QC) objects that such a consideration would, however, not move from the promisee, Activista. Brady and Activista were not in a direct contractual relationship with each other. There was no privity between them.

The answer to counsel's objection could only be that when the package of interlocking bargains was struck (whether before 2 December or on that day) the promises which were given between Brady, Ovalshield, Motoreal, Activista and Thomson were all dependent on each other, so that they were all joint promises. When that was done the directors and shareholders of each of the companies participating in the reconstruction of the group was present and consenting. It is right to assume that everything was done in due order. Ovalshield, Motoreal and Activista had all been incorporated in October 1983, so that there is no question that at the material date of 2 December they were not capable of being contracting parties to the making of the whole common arrangement.

There is, however, no finding that what took place was other than a series of transactions each of which required its own consideration to validate it. I can see no justification for implying from what happened that in return for a promise by Brady to transfer its assets to Activista there was a corresponding act by Activista to remove the deadlock on Brady's board of directors. Without that, the transfer of the assets will indeed be gratuitous, and if that is not within the memorandum, then the transfer will be outside the powers in Brady's memorandum. If it is outside the powers in Brady's memorandum, then it will not be in the interests of the company, and the defence of illegality is made out.

A further objection which was raised by the defendants was that Jack and Bob were acting in breach of their fiduciary duty as directors by transferring the company's assets to themselves. Accordingly, it is said, they would be guilty of misfeasance and liable in the future to creditors or to a liquidator of Brady. This may be taken shortly, because there were no creditors to be affected by these transactions. Brady was and is solvent, and the fact that the directors by their behaviour might be making themselves liable at some future date to outsiders does not invalidate the contract on the ground of illegality.

I have dealt so far with the main criticism made by the defendants of the agreement, that of illegality. However it occurs, and in whatever form, an allegation of illegality must be met because if it is not met it is fatal. But other matters have been put forward. It must be borne in mind that these are private

*[1988] BCLC 20  at 37*

companies. The only people who are directly involved financially are the plaintiffs and the defendants, Jack, Bob and Bob's two sons. Brady has at all times been solvent, and there have been no creditors whose interests required protection. The other matters are discretionary objections. Before Bob re-amended his defence to raise illegality, his complaints had all been centred round his view that the valuation and disposal of the assets of Brady would be unfair to him, notwithstanding that his accountants and other professional advisers and he himself have all agreed that it would be fair. His complaint was not that it was wrong to transfer Brady's assets to Activista (and thus to him), but that not enough assets were being transferred. He asked for rectification of the agreement, but abandoned this at trial.

Now he objects that this scheme is not being put through the court for its approval. He says there should have been either a reconstruction under the Companies Act 1948, s 206, or under s 287. Both of these methods would have involved the liquidation of Brady, which is what was desired to be avoided. Jack's s 75 petition, which was being resisted tooth and nail by Bob, was asking for the affairs of Brady to be regulated by the court, or a division of the assets and reduction of capital accordingly, and failing which, in the last resort, a winding up. It was these results which the agreement now sued on was designed to avoid. In the absence of bad faith on Jack's part (and none is alleged) Bob's complaint has no weight.

Bob's other objections are that the carrying out of this agreement would involve both himself and Jack in a potential liability in the future to creditors who may arise hereafter, because both he and Jack would have

been in breach of their fiduciary duty to their own private company by dividing its assets among themselves as shareholders. Bearing in mind the construction of the company, this objection is fanciful and should not carry any weight. If Bob was not prepared to let the court adjudicate on the s 75 petition, or on his claim for rectification, then he has no good ground for asking the court not to exercise its discretion to order specific performance.

Once the issue of illegality is disposed of, as I think it should be (although not for the same reason as was given by the judge) this appeal should be dismissed. The result depends for its efficacy on the construction of the memorandum of Brady as authorising the gratuitous transfer of Brady's assets.

The saving provision of either s 153(1)(*a*) and (*b*), or s 153(2)(*a*) and (*b*) will apply, because the help given by Brady in buying its own shares will have been given 'in the interests of the company'. I would therefore dismiss the appeal.


**NOURSE LJ.**


*Introduction*: Broadly stated, the question in this case is whether a trading company's disposition of half its assets for the benefit of one two major shareholders was valid. The disposition is objected to on two main grounds. First, it is said that it was ultra vires the company. Second, it is said that it involved the giving of unlawful financial assistance for the purposes of an acquisition of the company's shares, contrary to s 151 of the Companies Act 1985. If either objection is valid, the disposition was void.

The answer made to both objections is that the disposition was necessary in order to free the company from the deadlock which, if continued, would have brought it into liquidation. Thus it is said, in the one case, that there was consideration for the disposition or that it was reasonably incidental to the continuation of the company's business; and, in the other, that the financial

*[1988] BCLC 20  at  38*

assistance was an incidental part of the company's larger purpose of keeping itself alive and was given in good faith in the interests of the company, within the saving provisions of s 153 of the 1985 Act.

I am of the opinion that both objections are made out and that the attempted answer, if correct, would cast grave doubts on accepted principles of company law.

I need not repeat the various steps in the complicated scheme of which the dispositions form part, but I will proceed throughout on the convenient, if inaccurate, assumption that they have all been completed.

*Ultra vires*

A valuable starting point is the following statement of principle by Pennycuick J in *Ridge Securities Ltd v IRC* [1964] 1 All ER 275 at 288, [1964] 1 WLR 479 at 495:

> 'A company can only lawfully deal with its assets in furtherance of its objects. The corporators may take assets out of the company by way of dividend or, with leave of the court, by way of reduction of capital, or in a winding up. They may of course acquire them for full consideration. They cannot take assets out of the company by way of voluntary disposition, however described, and, if they attempt to do so, the disposition is ultra vires the company.'

In its broadest terms the principle is that a company cannot give away its assets. So stated, it is subject to the qualification that in the realm of theory a memorandum of association may authorise a company to give away all its assets to whomsoever it pleases, including its shareholders. But in the real world of trading companies, charitable or political donations, pensions to widows of ex-employees and the like apart, it is obvious that such a power would never be taken. The principle is only a facet of the wider rule, the corollary of limited liability, that the integrity of a company's assets, except to the extent allowed by its constitution,

must be preserved for the benefit of all those who are interested in them, most pertinently its creditors. Each of the three ways in which Pennycuick J said that shareholders may lawfully take assets out of a company is one with inherent limitations and procedures which protect the interests of creditors. A unanimous resolution of all the shareholders authorising a company, however solvent, to perform an ultra vires act can no more withstand a liquidator's trumpet than the walls of Jericho. However unworthy may be his conduct or discreditable his motives, a shareholder who afterwards regrets his vote may shout as loudly as the creditors.

It is evident that the principle requires us to start with no predisposition to construe the memoranda of association of T Brady & Sons Ltd (Brady) and Athersmith Bros Ltd (Athersmith) so as to authorise gratuitous dispositions of their assets. Thus, while I will certainly proceed on the footing that the sub-clauses of the objects clause of each memorandum declare independent objects and not mere ancillary powers, I cannot construe expressions such as '... otherwise deal' (Brady sub-cl (H); Athersmith sub-cl (e)) or '... or otherwise deal ... upon such terms as the Company may approve' (Athersmith sub-cl (m)) so as to include gratuitous dealings. Sub-clause (U) of Brady's objects clause is in these terms:

*[1988] BCLC 20 at 39*

> 'To sell or otherwise dispose of the whole or any part of the business or property of the Company, either together or in portions, for such consideration as the Company may think fit, and in particular for shares, debentures, or securities of any company purchasing the same.'

Here again, counsel for the plaintiffs (Mr Irvine QC) submitted in the first instance that the words 'for such consideration as the Company may think fit' include a disposition for no consideration, if thought fit, but it did not surprise me that the submission was not strongly pressed. I think it clear that each of the four sub-clauses is restricted to dispositions for consideration. This is confirmed by the express, but limited, powers to make charitable and other subscriptions and to grant pensions and other superannuation benefits (Brady sub-cl (s); Athersmith sub-cl (v)). It is possible that some reliance was also placed on sub-cl (v) of Brady's objects clause and sub-cl (x) of Athersmith's objects clause (distribution of assets in specie or distribution in specie among members), but there can be no doubt that those provisions are restricted to dividends in specie or distributions in specie in a liquidation. Finally, so far as express objects are concerned, it was suggested that advantage could be taken of the powers to do all such other things as may be incidental or conducive to the attainment of the other express objects or any of them (Brady sub-cl (x); Athersmith sub-cl (y)). It was said that to dispose of one side of the business was incidental or conducive to the attainment of carrying on the other side of the business. I am not able to construe general and subsidiary powers of this nature so as to authorise gratuitous dispositions of such magnitude.

In my judgment therefore the only real question which arises in regard to the express objects is whether the dispositions were made for some consideration. Blackett-Ord V-C thought that they were because the assets disposed of would be replaced by debts of equal amount due to Brady from Motoreal Ltd. For the reasons given by Croom-Johnson LJ, I respectfully agree that those debts were worthless and were incapable of amounting to consideration received by Brady. Then it was submitted that the freeing of Brady and Athersmith from deadlock was consideration received by those companies, at least in a broad sense. It may be that no great significance ought to be attached to the technical objection that the consideration, if there was one, did not move from the promisee. The substantial objection is that the submission involves the bizarre proposition that to afford a trading company the means of survival in reduced circumstances can by itself be consideration for a disposition of half its assets. If that proposition is correct, where is the line to be drawn? Suppose a similar case to the present, but one where there was deadlock amongst four individuals who owned and controlled the company. It could not seriously be suggested that the freeing of the company from deadlock so as to enable it to continue business with one quarter of its assets as consideration, either in a broad or in any other sense, for the disposition of the other three quarters. The fallacy in the proposition lies in its assumption that it is in the interests of a company to survive at any cost. That cannot be correct. In some circumstances it must be in the interests of a company that it should be put into liquidation. This is a point which will recur later in this judgment.

That is not quite an end of the ultra vires question, because it was also submitted that the freeing of Brady and Athersmith from deadlock was something which was reasonably incidental to the business of those

companies and

that the dispositions were accordingly within their implied powers. A company has an implied power to perform any act which is reasonably incidental to the business which it exists to carry on through the medium of its express objects. I would also accept that an act which is reasonably incidental to the *continuation* of a company's business is for this purpose reasonably incidental to its business. However, I cannot see how a disposition of half its assets can be said to be reasonably incidental to the continuation of a company's business. I would have thought that the most that can be said of it is that the disposition is reasonably incidental to the continuation of *half* the business. In any event, for reasons similar to those which I have canvassed in relation to the companies' express objects, it is clear to me that the dispositions were not within their implied powers. You cannot imply a power to give away assets any more than you can so construe an express object which is not clearly to that effect.

For these reasons I conclude that the dispositions were ultra vires Brady and Athersmith and were void accordingly.

### Sections 151 and 153 of the 1985 Act

It has not been suggested that the dispositions did not involve the giving of financial assistance which was prima facie within s 151. That again makes it unnecessary to trace the various complicated arrangements which took place between the parties. The question then is whether the financial assistance was an incidental part of Brady's larger purpose of keeping itself alive and was given in good faith in the interests of Brady, within s 153.

It is not suggested that the dispositions were not made in good faith. There was much debate as to whether the dispositions can be said to have been made as an incidental part of Brady's larger purpose of keeping itself alive. With some hesitation I am prepared to accept that they were. What I am quite unable to accept is that the dispositions were made 'in the interests of' Brady.

The expression 'the interests of the company' is one which is often used but rarely defined. It seems quite likely that it is sometimes misunderstood and it is possible that it has slightly different meanings in different contexts. Here I confine myself to a consideration of its meaning in a statutory provision whose object is to make a particular exception to the general prohibition against a company's giving financial assistance for the purposes of an acquisition of its own shares. The object of the prohibition is to protect the integrity of the company's assets.

The interests of a company, an artificial person, cannot be distinguished from the interests of the persons who are interested in it. Who are those persons? Where a company is both going and solvent, first and foremost come the shareholders, present and no doubt future as well. How material are the interests of creditors in such a case? Admittedly existing creditors are interested in the assets of the company as the only source for the satisfaction of their debts. But in a case where the assets are enormous and the debts minimal it is reasonable to suppose that the interests of the creditors ought not to count for very much. Conversely, where the company is insolvent, or even doubtfully solvent, the interests of the company are in reality the interests of existing creditors alone.

The expression 'the interests of the company' is most frequently used in connection with the duty which the general law imposes on every director to act in good faith in the interests of the company. There it is well established that the duty is to act in good faith in what the director, and not the court,

considers is in the interests of the company; see *Re Smith and Fawcett Ltd* [1942] 1 All ER 542, [1942] Ch 304. I will assume, without deciding, that s 153 applies the same subjective test. It is nevertheless important to emphasise that the test remains a twofold one. What is accepted here is that Brady remained solvent after the dispositions had taken place and also that they were made in good faith, that is to say without any positive intention to defraud creditors. But there is no evidence which shows that the interests of creditors

were ever considered. The directors never asked themselves whether *half* the assets would *in all eventualities* be sufficient to discharge *all* the existing debts. The proportion of the assets being removed was so large as to make it essential for that question to be asked. Since it was not asked, it cannot in my view be said, for the purposes of an exception to the provisions of s 151, that the directors considered that the dispositions were in the interests of the two companies. The most which can be said is that they considered that they were in the interests of the shareholders.

For these reasons, I think that the dispositions offended against s 151 and were void on that ground also.

### General

The third and subsidiary ground on which the dispositions are objected to assumes that they were not ultra vires the two companies, but that they were nevertheless made in breach of the directors' fiduciary duties to them. Having now held that the dispositions were void on two grounds, I do not propose to deal with this third objection beyond saying that I am very doubtful whether it is made out.

While holding that the law is in the appellants' favour, I am very conscious that their case is in all other respects unmeritorious. They do not wish to reverse the arrangements upon which both sides have acted. It is very difficult to see how they could be reversed. Their object is to achieve a better bargain than that with which they were formerly content. The court would gladly refuse them the release which they seek if a refusal could be justified. But there is a higher principle at stake, which is that the formalities of company law must be rigorously upheld. If these dispositions were to be sustained, the door would be opened to other informal and irregular dispositions of the assets of limited companies whose effect might be far more serious.

I can well understand that a scheme which involved the liquidation of Brady was undesirable on good commercial grounds. Counsel for the defendants said that the correct method of implementing a scheme which kept Brady in being would have been to seek the sanction of the court to an arrangement under s 425 of the 1985 Act (formerly s 206 of the Companies Act 1948). That is another form of proceeding in which the interests of creditors are considered and protected. Although the court has no jurisdiction to sanction an arrangement involving an act which is ultra vires the company (see *Re Oceanic Steam Navigation Co Ltd* [1938] 3 All ER 740, [1939] Ch 41), we heard nothing to suggest that it would have been impossible to devise a scheme which avoided that objection and still kept Brady alive. Instead, as O'Connor LJ has pointed out, the professional advisers, in their anxiety, so it seems, to save stamp duty, produced a scheme whose complications succeeded only in obscuring the fundamental objections to it in company law.

I agree with O'Connor LJ that this appeal must be allowed.

*[1988] BCLC 20 at 42*

*Appeal allowed.*

Solicitors: *Alexander Tatham & Co*, Manchester (for the plaintiffs); *Slater Heelis*, Manchester (for the defendants).

Azza Abdallah Barrister.