# **TAB 4**

Butterworths Company Law Cases/BCLC 2003 2/British Midland Tool Ltd v Midland International Tooling Ltd and others - [2003] 2 BCLC 523

[2003] 2 BCLC 523

# British Midland Tool Ltd v Midland International Tooling Ltd and others

[2003] EWHC 466 (Ch)

**CHANCERY DIVISION**

**HART J**

**10, 11, 15-18, 21-25, 28-30 OCTOBER, 1, 5-8, 11-15, 18-20, 22, 25-28 NOVEMBER, 16-19 DECEMBER 2002, 12 MARCH 2003**

*Director - Breach of fiduciary duty - Four directors conceiving and developing plan to leave jobs in company and set up rival company - Plan kept secret from company and fellow directors - One of directors retiring as managing director leaving remaining three directors with company - Managing director recruiting workforce for new enterprise and poaching skilled workers from company - Most of skilled workers leaving company to work for rival company - Remaining three directors not alerting company to fact that workforce was being poached - Remaining three directors later resigning from company to work for rival company - Company unable to operate and finally closing down - Whether directors in breach of duty - Whether recruitment of workforce conducted unlawfully - Whether company entitled to damages for conspiracy - Assessment of damages.*

The claimant (BMT) was a specialised engineering company based in Staffordshire which carried on the business of manufacturing and supplying cutting tools to the motor industry. Its business which had originally been founded by the third defendant had been bought from receivers by BMT, which had been formed for that purpose by another company (Holdings), based in Kent, which wholly owned a number of engineering subsidiaries. Four of the directors of BMT (ie the third, fourth, fifth and sixth defendants) who had all been with the business long before its acquisition by Holdings became dissatisfied with their relationship with Holdings, following redundancies and a pay freeze, and they conceived and developed a plan to leave their jobs with BMT and set up a rival company. The plan was kept secret from Holdings and its representatives on the board of BMT. Following the retirement of the third defendant as managing director of BMT an advertisement appeared in the local paper inviting applications from fully skilled personnel for jobs with a 'Specialist Cutting Tool Manufacturer'. It gave no name and address for the prospective employer but invited applications to a box number. Shortly after the other three directors gave notice to BMT of their resignation as directors and of the termination of their employment with BMT. The former were with immediate effect and the latter on one month's notice. None of them had written service contracts. A few days later 12 of BMT's skilled workers tendered their resignations to the company each through the fourth defendant. The managing director of Holdings (TA) being unable to

persuade the three directors of BMT and the resigning workforce to stay brought in additional managers from Kent and made arrangements to fulfil BMT's order book under sub-contract. TA and the new management team soon learned that premises had been acquired next door to BMT's own and members of the resigning force could be seen there. Soon after two more of BMT's employees left to join the new enterprise next door, ie the first defendant company (MIT). A core component of BMT's business was the cutting tools it supplied to Ford Motor Co. In the event BMT was unable to retain this business and eventually in August 2001 its business finally closed down. BMT brought an action against the defendants alleging conspiracy to damage BMT by (i) the setting up of MIT as a vehicle to carry on a competitive business with BMT; (ii) using

confidential information belonging to BMT; (iii) inducing a sub-contractor to supply MIT with numerous drawings produced by it for BMT; (iv) enticing away 19 of BMT's employees; (v) approaching BMT's customers to advise them of the secession of BMT's management and workforce and of MIT's desire to service their needs instead of BMT; and (vi) concealing from the other directors of BMT and Holdings the steps which they were taking. BMT claimed compensatory damages for the loss of its business, for trading losses incurred and closure costs, all claimed as having been caused by the unlawful conspiracy.

**Held** - (1) The conduct of the third defendant, following his resignation as a director, in soliciting the resignations of the employees of BMT did not necessarily involve him in a breach of duty since he was perfectly free to proceed to set up MIT and invite employees of BMT to join it (see at [90], [93] post).

(2) However, the continuing in office of the remaining three directors without disclosing to their fellow directors that a determined attempt was being made by a potential competitor to poach BMT's workforce necessarily involved them in breaches of their fiduciary duties. Those breaches could be identified, not as the acts of enticement of employees but the keeping of the whole plan secret from the other directors of BMT and their connivance in the solicitation of employees by the third defendant once he had ceased, but each of them continuing, to hold office. Those duties required them to take active steps to avert the process by alerting their fellow directors to what was going on. Moreover, the fact that any one of the directors was himself in breach of duty did not absolve him from his duty to report breaches by the others since the four directors were the executive directors of BMT, charged and trusted by the owners with its management on a semi-autonomous basis and having the primary responsibility for relations between the company and the workforce. Furthermore, the seventh defendant was liable as a conspirator in relation to the unlawful actions of the three directors since he had bankrolled the whole operation (see at [90]-[93] post).

(3) Furthermore, the conduct of the three directors during the period when to their knowledge the third defendant was conducting a poaching exercise was inconsistent with their duty of fidelity as employees to their employer, BMT (see at [94], [95] post).

(4) On the evidence the defendants' recruitment of the workforce was conducted unlawfully and the damage thereby suffered by BMT by the loss

*[2003] 2 BCLC 523  at  525*

of its business was recoverable. In principle BMT was entitled to have damages assessed under the three heads claimed. However, the unlawful conduct of the defendants did not justify an award of punitive damages. Accordingly, the first and the third to seventh defendants were liable to BMT in damages in the assessed sums (see at [200], [237], [245], [250], post).

### Cases referred to in judgment

*A v Bottrill* [2002] UKPC 44, [2003] 1 LRC 777, [2003] 1 AC 449, [2003] 3 WLR 1406, PC.

*A-G v Blake* (*Jonathan Cape Ltd, third party*) [1998] 1 All ER 833, [1998] Ch 439, [1998] 3 WLR 805, CA.

*Balston Ltd v Headline Filters Ltd* [1990] FSR 385, Ch D.

*Banco de Portugal v Waterlow & Sons Ltd* [1932] AC 452, [1932] All ER Rep 181, HL.

*Bell v Lever Bros Ltd* [1932] AC 161, [1931] All ER Rep 1, HL.

*Cia Financiera Soleada SA v Hamoor Tanker Corp Inc, The Borag* [1981] 1 All ER 856, [1981] 1 WLR 274, CA.

*CMS Dolphin Ltd v Simonet* [2001] 2 BCLC 704.

*Faccenda Chicken Ltd v Fowler* [1985] 1 All ER 724, Ch D; *affd* [1986] 1 All ER 617, [1987] Ch 117, [1986] 3 WLR 288, CA.

*Hivac Ltd v Park Royal Scientific Instruments Ltd* [1946] 1 All ER 350, [1946] Ch 169, CA.

*Horcal Ltd v Gatland* [1983] BCLC 60, Ch D; *on appeal* [1984] BCLC 549, CA.

*In Plus Group Ltd v Pyke* [2002] EWCA Civ 370, [2002] 2 BCLC 201, CA.

*Island Export Finance Ltd v Umunna* [1986] BCLC 460, QBD.

*Item Software* (*UK*) *Ltd v Fassihi* [2003] 2 BCLC 1.

*Kuwait Oil Tankers Co SAK v Al Bader* [2000] EWCA Civ 160, [2000] 2 All ER (Comm) 271, CA.

*London and Mashonaland Exploration Co Ltd v New Mashonaland Exploration Co Ltd* [1891] WN 165, Ch D.

*Parker v McKenna* (1874) LR 10 Ch App 96, LC and LJJ.

*Perry v Scherchen* [2001] EWCA Civ 1192, [2002] 1 P & CR D13, [2001] All ER (D) 305 (Jun).

*Scottish Co-operative Wholesale Ltd v Meyer* [1958] 3 All ER 66, [1959] AC 324, [1958] 3 WLR 404, HL.

*Searle* (*GD*) *& Co Ltd v Celltech Ltd* [1982] FSR 92, CA.

*Swain v West* (*Butchers*) *Ltd* [1936] 3 All ER 261, CA; *affng* [1936] 1 All ER 224, KBD.

*Sybron Corp v Rochem Ltd* [1983] BCLC 43, [1983] 2 All ER 707, [1984] Ch 112, [1983] 3 WLR 713, CA.

*Universal Thermosensors Ltd v Hibben* [1992] 3 All ER 257, [1992] 1 WLR 840.

**Action**

The claimant, British Midland Tool Ltd, brought an action against the defendants: (1) Midland International Tooling Ltd; (2) Bradford Tool and Gauge Ltd; (3) Donald Allen; (4) Alan Morley; (5) Wayne Allen; (6) Alan

*[2003] 2 BCLC 523  at  526*

Smith and (7) William McGrath, seeking damages for conspiracy to damage the claimant and other torts and breaches of duty. The facts are set out in the judgment.

*John Martin QC, Thomas Lowe* and *Nikki Singla* (instructed by *Cripps & Shone*) for the claimant.

*Jane Giret QC* and *Tina Kyriakides* (instructed by *Whitaker Firth*) for the defendants.

**Contents**

| | | |
|---|---|---|
| I | INTRODUCTION | [1]-[29] |
| | *The claims* | [10]-[17] |
| | *The principal personalities* | [18]-[24] |
| | *The witnesses* | [25]-[27] |
| | *A background of tension* | [28]-[29] |
| II | THE DEVELOPMENT OF THE PLAN | [30]-[76] |
| | *Autumn 1999* | [30]-[42] |
| | *The seeds of the plan* | [43]-[49] |
| | The nature of Mr Mcgrath's participation | [50]-[52] |
| | Legal advice is taken | [53]-[55] |
| | *January, February and March 2000* | [56]-[72] |
| | The recruitment of a workforce | [60]-[72] |
| | *April 2000* | [73]-[76] |
| III | LEGAL ISSUES ARISING ON FINDINGS THUS FAR | [77]-[92] |
| IV | CONCLUSIONS ON LIABILITY | [93]-[95] |
| V | ELECTRONIC COPYING | [96]-[141] |
| | *MIT's HP Brio computer ('the Brio')* | [96]-[103] |
| | *BMT's Eagle Computer* | [104]-[107] |
| | *BMT's SSC Computer ('the SSC')* | [108]-[109] |
| | *Issues on the electronic drawings* | [110]-[134] |
| | *Liability in relation to the electronic drawings* | [135]-[141] |
| VI | HARD COPY DRAWINGS | [142]-[158] |
| | *14/15 Hard Copies* | [157]-[158] |
| VII | CONFIDENTIALITY OF THE DRAWINGS | [159]-[168] |
| VIII | THE CADDRAUGHT DISC | [169]-[175] |
| IX | PRICING INFORMATION | [176]-[179] |
| X | SOLICITATION OF CUSTOMERS | [180]-[185] |
| XI | CORPORATE OPPORTUNITY | [186]-[187] |
| XII | DAMAGES | [188]-[252] |
| | *Principles* | [188]-[200] |
| | *The value of the business* | [201]-[237] |
| | The claimant's valuation evidence | [201]-[204] |
| | The defendants' valuation evidence | [205]-[208] |
| | Main points of disagreement | [209]-[210] |
| | What is being valued | [211]-[214] |
| | How should interest be dealt with | [215]-[219] |

*[2003] 2 BCLC 523 at 527*

| | | |
|---|---|---|
| | The significance of the revised budget | [220]-[224] |
| | Appropriate adjustments | [225]-[233] |
| | Conclusions on adjustments | [234] |
| | The multiple | [235]-[236] |
| | Conclusion on value of the business | [237] |
| | *Losses* | [238]-[246] |
| | *Additional costs of closure* | [247]-[250] |
| | *Exemplary damages* | [251]-[252] |
| XIII | CONCLUSIONS | [253] |

*Cur adv vult*

**12 March 2003. The following judgment was delivered.**


**HART J.**

**I. Introduction**

**[1]** By this action the claimant (BMT) seeks damages for conspiracy and other torts and breaches of duty against the defendants. BMT was a specialised engineering company which carried on the business of manufacturing and supplying cutting tools to the automotive industry. The business had originally been founded by the third defendant Donald Allen and had traded for many years as Grinding Aids Ltd, which in the late 1980s changed its name to British Midland Tools. That company went into receivership in 1989, but its business was bought from the receivers by BMT, which had been formed for that purpose by M J Allen Holdings Ltd (Holdings). Holdings was owned by Michael Allen - no relation of Don Allen - and wholly owned a number of engineering subsidiaries, collectively referred to as the Allen Group. By late 1999 the managing director of Holdings was Michael Allen's son Tim. The board of BMT consisted of Michael Allen, Tim Allen, Alan Gibson (Holdings' recently appointed finance director), Don Allen who was managing director, the fifth defendant Wayne Allen (Don Allen's son) who served as administrative director, the fourth defendant Alan Morley who served as works director and the sixth defendant Alan Smith who served as sales director. Holdings was based in Ashford, Kent. BMT was based in Tamworth, Staffordshire where it had deep roots in the local community, employing some 30 or so workers on its shop-floor, most of whom were highly-skilled operators of the various different types of specialist tool-making machinery used in BMT's business and many of whom had been with the business from well before its acquisition by the Allen Group. Don Allen, Wayne Allen, Alan Morley and Alan Smith (to whom it is convenient to refer collectively as 'the Tamworth 4', a soubriquet invented by Mr McGrath (see below) and which I adopt because of the reminder it gives of their geographical location and relative isolation from the rest of the largely Kent based Allen Group), had all been with the business from a period long prior to its acquisition by Holdings.

**[2]** Dissatisfied with their relationship with Holdings, the Tamworth 4 in late 1999 and the early weeks of 2000 conceived and developed a plan to leave their jobs with BMT and to set up a rival company. Don Allen was in any event due to retire in the course of 2000 (he was to be 65 on March 14 2000) and in the event did so (with Holdings' consent) on Friday, 17 March

*[2003] 2 BCLC 523  at  528*

2000. The plan was kept secret from Holdings and its representatives on the board of BMT.

**[3]** On the Thursday (23 March) following Don Allen's retirement a small advertisement appeared in the local paper, The Tamworth Herald, inviting applications from 'fully skilled personnel' for jobs with a 'Specialist Cutting Tool Manufacturer'. The advertisement stated that the requirement was 'urgent'. It gave no name or address for the prospective employer, but invited applications in writing to a box number.

**[4]** On Friday, 30 March 2000 Wayne Allen, Alan Smith and Alan Morley gave notice to BMT of their resignation as directors and of the termination of their employments by BMT. The former were with immediate effect and the latter on one month's notice. None of them had written service contracts. The notices (addressed to Mr Gibson as the company secretary of BMT) were delivered to head office in Kent by courier late in the afternoon that day.

**[5]** Tim Allen travelled up to Tamworth on the Saturday and spoke with Wayne Allen, Alan Morley and Alan Smith with a view to persuading them to change their minds. In this he was unsuccessful. When he met them again in Tamworth on the Monday morning (3 April) he was presented by Alan Morley with resignations from 12 of BMT's skilled workers. Each gave notice that they would be leaving at the end of that week. Attempts by Tim Allen to persuade the local directors and the resigning workforce to stay proved unavailing. Each time Tim Allen ventured on to the shop-floor the seceding elements in the workforce whistled the theme tune from The Great Escape. Tim Allen brought in additional managers from Kent, and made arrangements with a local competitor of BMT (Mercian Toolmaking) to fulfil BMT's order book under sub-contract. Wayne Allen, Alan

Morley and Alan Smith were told that they would have to work out their notice (ie until the end of April), but were not to be permitted to have contact with suppliers or customers. Alan Smith in fact ceased to come into work after Friday, 7 April, being advised by his doctor to avoid the stress of attendance.

[6] On Monday, 10 April, Tim Allen and his new management team learned more of the plans of the Tamworth 4. Premises had evidently been acquired right next door to BMTs own, and members of the resigning workforce could be seen there. During the succeeding week or so a further two BMT employees left to join the new enterprise next door, the first defendant Midland International Tooling Ltd (MIT).

[7] A core component of BMT's business was the cutting tools it supplied to Ford Motor Co, either directly or through the medium of one or other of Ford's intermediary suppliers (Cross Hueller, Lamb Technicon and Sandvik being the principal ones). This work made up between 50% and 60% of BMT's total turnover of some £2-2.5m pa. In the event BMT found itself unable to retain this business. BMT continued to retain some of its other customer base, and was able to continue an increasingly limp existence until August 2001 when its business finally closed down.

[8] MIT had, by contrast, some success in attracting custom from BMT customers, including Ford. But major miscalculations of some kind appear to have been made in connection with the working out of its business plan. The finance for the enterprise had been raised by the local directors from the second defendant Bradford Tool and Gauge Ltd (BTG) and/or BTG's

*[2003] 2 BCLC 523  at  529*

founder and moving spirit the seventh defendant Bill McGrath (in whose wife's name the share capital of MIT was registered). By the autumn of 2000 it had become apparent that MIT had substantial trading losses, and BTG then moved to take control of its management. At the same time Don Allen and Wayne Allen resigned from MIT. Other redundancies followed. MIT continues in existence with a turnover of some £1.2m.

[9] These proceedings were commenced in December 2000. In April 2001 BMT sought and obtained a search order of MIT's premises.

### The claims

[10] The principal pleading (in paras 9, 10 and 11 of the amended particulars of claim) is one of conspiracy to damage BMT, the conspiracy being alleged against all the defendants and involving the following steps:

(i) the setting up of MIT as a vehicle to carry on a competitive business with BMT; (ii) the copying and/or taking for use in MIT's competing business of (a) numerous drawings in hard copy and electronic form, (b) CNC computer programs for the control of relevant machine tools, (c) BMT pricing information and (d) information relating to BMT's customers; (iii) inducing CADdraught (a company subcontracted by BMT to produce drawings for it) to supply MIT with numerous drawings produced by it for BMT; (iv) enticing away 19 of BMT's employees; (v) approaching BMT's customers to advise them of the secession of BMT's management and workforce and of MIT's desire to service their needs instead of BMT; (vi) concealing from the other directors of BMT and Holdings the steps which they were taking.

[11] Paragraph 12 of the pleading re-pleads those allegations as breaches of the implied terms of their employment contracts and/or breaches of duties as directors by the Tamworth 4, but adds in this context an additional specific allegation that they had spread false information among the employees so as to cause disaffection.

[12] Paragraphs 13-14 of the pleading charges the Tamworth 4, and through them MIT, with having used confidential information belonging to BMT, namely the four heads of such information mentioned at [10] (ii) above.

[13] Paragraph 15 pleads a case in conversion in relation to the manufacturing drawings, media containing the CNC programs, the price lists and the Toshiba laptop, and also in relation to 22 steel backends, a compressor and a pressure washer.

**[14]** Paragraph 16 makes the allegation against BGT and MIT that they knowingly induced the breaches of duty alleged against the Tamworth 4 or, alternatively dishonestly assisted in a fraudulent design.

**[15]** Compensatory damages are claimed for the loss of BMT's business (put in the expert's report at £1.8m), for trading losses totalling £854,370, incurred in the period following the exodus of the seceding workforce and the Tamworth 4 and ending with the closure of the business in August 2001, and £576,357 in respect of costs of closing down the business.

**[16]** Various other potential claims began to emerge once witness statements had been exchanged. In particular it appeared that allegations might be made that the local directors had caused tools to be made while still at BMT with a view to providing MIT with an initial stock for supply to customers. It became clear however that BMT had no intention of

*[2003] 2 BCLC 523  at  530*

pleading this as part of its case, and I thereafter disallowed evidence in relation to this point. It will be noted that no claim is made that Don Allen's resignation on 17 March 2000 was ineffective. Nor is any claim made that the notices given either by the other local directors or by the employees was insufficient to terminate their employments. Nor is any claim made that BMT enjoyed any copyright in the drawings, database right in relation to information stored electronically or design right in the tools which was breached by the acts alleged: the claim is simply that the drawings were confidential to BMT and/or that some drawings were converted, and that the acts alleged constituted breaches of directors' and/or employees' duties.

**[17]** The claims for conversion in respect of the laptop, the compressor, the pressure washer and the steel back ends were not pursued in the closing submissions made on BMT's behalf. Nor was the claim for dishonest assistance in a fraudulent design.

### The principal personalities

**[18]** Michael Allen, whose evidence is directly relevant only to the events of Autumn 1999, is an experienced and capable businessman. He started working life as a pattern maker at the age of 15 and has spent the last 50 years of his working life in engineering businesses of various kinds. He had no specialist knowledge of the manufacture of cutting tools. He had effectively retired from running the Allen Group business in 1996-1997, handing that role to his son Tim Allen. He clearly felt that he had been 'taken' by the defendants, describing the events as embarrassing and very upsetting. I suspect that this was an understatement of his feelings. He plainly did not believe that the Tamworth 4 were fit to run the financial side of a business ('They did not have any kind of idea on how to produce budgets or any financial abilities at all. They were obviously very good engineers, which is why I was attracted to the company, but they had no financial management experience at all, which is probably why they went bankrupt'). His own attitude to business was that it was a simple matter: 'Running a business is not really very difficult. It is a question of trying to earn more than you spend, and it really is as simple as that.'

**[19]** Tim Allen began work in his father's business in about 1979 having obtained an HNC in Business Studies at Canterbury Technical College. He also had no experience in the manufacture of cutting tools, although was familiar with the various uses to which they are put. He gave his evidence in a straightforward way, apart from a somewhat disconcerting tendency never to look at Mrs Giret when under cross-examination by her. I suspect that this was the result of his having been told to address his evidence to me. Nothing in his demeanour as a witness suggested to me that he was the kind of man who was capable of the serious misconduct of which he was to be accused by Mrs Giret in her closing submissions. The impression I received from employee evidence was that he was perceived as a fair employer, and the attitude of the Tamworth 4 to him was not, as in the case of Michael Allen, baleful.

**[20]** Don Allen. He had, as mentioned above, been the founding father of the business in its original guise as Grinding Aids. The circumstances in which the business foundered in 1989 were not explored, but Don Allen was anxious to assert that it had not been his fault but that of a partner. He had himself paid the wages of the workforce prior to the rescue of the

*[2003] 2 BCLC 523  at  531*

business by the Allen Group. He described himself to me as a team builder. He was clearly a well known and respected figure in the industry, and enjoyed the loyalty of all those (management and shop-floor) who had been with him over many years. During the period following his resignation from MIT (November 2000) he has suffered from ill-health. It was difficult to square the picture of the person he must have been in 1999 with the figure he presented in the witness box. He gave me the impression of being a beaten man, and, moreover, one with a very bad memory. Age, ill-health, and the trauma of the debacle at MIT probably provide much of the explanation for his inability to help me more in his oral evidence.

[21] Wayne Allen. He has worked in the business for all his working life and is obviously very close to his father. Indeed they still live together. Of the Tamworth 4 he was the only one who pretended to any financial ability, and was the man who put together such business plan as there was for MIT (no documents apparently survive). He was described by Mr McGrath as someone who could 'talk for England' and as having 'two brains', but I saw no sign of either phenomenon in his oral evidence. The impression I had was of a man much chastened by his experiences following the exodus and in the course of this litigation.

[22] Alan Smith. He was a long-standing friend and colleague of Don Allen, having been with him in the business from the early beginnings of Grinding Aids. Plainly very knowledgeable in his field, he has no feeling for figures or finance whatsoever. Mr McGrath described him as a legend in the industry. His relationship with Ford, and in particular its engineers, was obviously a very good one ('If you ask Mr Smith to jump his response is to ask how high?' as one Ford witness put it). His disenchantment with the Allen Group appears to have stemmed from the period when he was off work following a heart attack in 1998-1999. He felt marginalised by the scant concern then shown by the Allen Group for his well-being, in contrast to the numerous expressions of support from colleagues and customers. He told me that during the autumn of 1999 and in early 2000 he was seriously considering giving up working in the engineering business and moving with his wife to the Lake District to run a pub. I think this may well have been the case. Certainly I formed the view that both he and Alan Morley were very much dragged along in the slipstream of Don and Wayne Allen's enthusiasm for setting up a new company. However, I doubt whether Don and Wayne Allen (or Mr McGrath) would have perceived the venture to be viable unless they had thought that Alan Smith and Alan Morley were on board.

[23] Alan Morley presented in a similar way to Alan Smith. He also had no feeling for or understanding of the finances of the business, but came fully alive when describing to me the characteristics and uses of the various cutting tools produced by the business. His particular source of dissatisfaction with BMT lay in his remuneration package, which had never, he felt, caught up with that of the other directors despite assurances he believed he had received from the Allen Group that it would. He too said that he had determined to leave BMT in any case at about the time the plan was formulated and had been looking at alternatives. It was clear to me that the whole process of being responsible for running MIT and being the main person responsible for conducting the litigation had been extremely stressful for him.

*[2003] 2 BCLC 523 at 532*

 [24] Mr McGrath, the last of the individual defendants to give his oral evidence, made a welcome change from the strained and unforthcoming effect created by the others. He gave his evidence in a lively and apparently candid manner, preserving (and sharing) his good humour throughout. The adage that 'you can tell a Yorkshireman anywhere, but you can't tell him much' might have been invented for him. Although involved with engineering businesses for most of his working life, he confessed ignorance of the technical side, priding himself rather on his financial nous. Like Michael Allen he regarded the ingredients of a successful business as being comparatively simple to work out, while acknowledging that his gifts were not widely spread. At the period I am concerned with he had retired from all formal positions in Bradtool Ltd and its subsidiary BTG, but continued to be actively involved in the direction of its affairs. In 1997 he had become interested in the acquisition of BMT, having heard on the grapevine that Michael Allen might be interested in selling it. Sufficiently interested to inspect the Tamworth site, he nevertheless did not pursue the matter. Discussions with Michael Allen over a possible price got no further than his being told that the business would cost 'three boats' (Michael Allen's interests included a yacht building business). I formed the impression that Mr McGrath had experienced this conversation as a put-down. Aside from that, I preferred his account of the reasons why he did not pursue his interest to the account given by Michael Allen.

*Witnesses*

**[25]** In addition to the principal personalities evidence was given by the following witnesses of fact.

**[26]** For the claimants:

**Employees**

(1) Paul Bland. He was the CAD operator at BMT and left to join MIT as from 10 April 2000. He left his employment with MIT on 22 December 2000. The principal thrust of his evidence was that he had been supplied by Alan Pearce in May 2000 with a CD (possibly two) containing a large number of drawings taken from the BMT CAD system, and had, with Wayne Allen's express approval, embarked on the task of loading these on to the MIT computer converting them in the process into drawings bearing a MIT logo and other indicia of MIT origin. Both Alan Pearce and Wayne Allen deny all knowledge of this episode. It is the case, however, that the MIT computer contained numerous drawings which had a BMT origin and which had been subjected to some such process of conversion.

(2) John Crofts. He was a long-standing employee (a surface and cutter grinder) of BMT who did not join the exodus but stayed with BMT until its closure in August 2001. His evidence was that he had had conversations with Alan Smith, Alan Morley and Wayne Allen about the possibility of his joining MIT but had decided against doing so. He also gave evidence of a conversation he had with Vince Mosson, in which the latter admitted that he had made 'huge amounts of photocopies of drawings for next door'.

(3) David Sutton. He worked at BMT from early 1998 as a cylindrical grinder and joined the exodus. He was eventually made redundant by MIT on 30 November 2001, finally settling an unfair dismissal claim against MIT in May 2002. He gave evidence that Vince Mosson had admitted to

*[2003] 2 BCLC 523  at  533*

him that he had photocopied numerous BMT drawings prior to the exodus. He gave evidence of management ordering 'doubling up' of tooling in the early months of 2000 (an allegation not pursued) and of a conversation with Alan Smith in which he was advised to apply for the job advertised in the Tamworth Herald. He claims that he did apply, but that the application form disclosed by the defendants is a forgery. He claims that Alan Morley told the seceding workforce to confront Tim Allen with difficult questions at the meeting held on 3 April 2000 and that Alan Smith told those who were leaving to take with them what they needed, and that he had taken certain items (including some drawings for Albon tools, having been told by Alan Morley that 'we will be getting Albon work next door'). He also gave evidence as to the 'lifting' of the BMT compressor and the Toshiba laptop, as well as other items in relation to which there were no pleaded allegations. He gave evidence that Alan Smith had indicated that the Ford work could be expected to come to MIT. He also gave evidence of a mass shredding exercise that had taken place at MIT following the service of the proceedings.

(4) Victor Tunley. He was another relatively long-standing employee of BMT, working since 1993 as packer and dispatcher who responded to the advertisement as a result, he claims, of advice from Vince Mosson, but who was not offered a job with MIT. He gave evidence of drawings having gone missing from BMT following the exodus, and of a post-exodus conversation with Alan Smith in which Alan Smith had suggested that he make deliberate mistakes in the despatch of BMT tools to customers.

(5) Peter Possee. He was another long-standing employee of BMT who worked as a surface grinder until 1995 when he moved into administration, becoming an assistant buyer. He is a cousin of Alan Morley. He gave evidence as to the dissatisfaction of management with head office, and the reluctance with which the Foreman computerised accounting system was installed. His evidence was that there was some shop-floor talk about the advertisement before it actually appeared, and that when it did Wayne Allen was at first cagey with him, then encouraged him to apply, but later told him that the new company could not afford him. He therefore did not join the exodus. He deposed to some 14/15 drawings having gone missing, and also gave evidence about the compressor. He also deposed to conversations with Jackie Yates in which she had told him that copying of drawings had taken place. He says that on about six occasions he was asked by Jackie

Yates (then at MIT) to supply drawings from BMT's files and did so. He (together with Ian Jackson) was offered, and accepted, a job at MIT in August 2000. He gave evidence as to the use at MIT of BMT originated drawings, the use by MIT of BMT pricing information, the disposal of a compressor and the shredding of documentation following service of the proceedings. He also recounted a graphic incident when Don Allen had allegedly produced some finished tools from a ceiling space. He was dismissed from MIT in October 2001, having become increasingly unhappy with the regime there following the departure of Don Allen and Wayne Allen.

(6) David Sales. He had been an employee of BMT since 1988. He responded to the advertisement but was not offered a post and he therefore stayed with BMT. His evidence went to the compressor issue.

In addition to the above I had read (as requested) a witness statement and

*[2003] 2 BCLC 523  at  534*

affidavit of Philip Baxter (an employee who joined the exodus but who became rapidly disenchanted with MIT and rejoined BMT in late May 2000, and whose evidence was relied upon by BMT in obtaining the search order); and a witness statement of Russell Greenhalgh (an employee who did not join the exodus). They were neither in the event called.

### Allen Group employees

(7) Marcus Nye. An Allen Group employee, he was responsible for copying files on to CDs from the BMT computers (an Eagle and an SSC) in July and September 2001.

(8) Terence Nye. An Allen Group employee, he was brought in by Tim Allen as part of the management team at BMT on and following 3 April 2000.

### Customers

(9) Paul Male. He was employed by Ford in its Commercial Vehicles Purchasing Department and was involved in Ford's decision (taken in July 2000) to cease to use BMT as a supplier. He also gave evidence as to his dealings with Mr McGrath and Ford's practices with regard to price information, drawings and quality control standards. He also gave a witness statement on behalf of the defendants.

(10) Dr David Lupton. He is employed by Aston University. Drawings done by BMT for Aston University were found on MIT's computer. His evidence that these had not been supplied to MIT by the university was agreed.

(11) Derek Waugh. His evidence, to the like effect in relation to a drawing done by BMT for his company BSK Aluminium (formerly Transtec Cast Products) was agreed.

(12) Trevor Mitchell of Metalocast. His evidence was that Metalocast had never received hard copies of drawing R2AR1 from BMT or MIT. Metalocast had sent a copy of drawing R2AR-3 to MIT in May 2000. This evidence was agreed.

(13) Keith Griffiths of Microbore Tooling Systems. His evidence (again agreed) was that his company had not received electronic drawings from BMT and had not supplied MIT with any BMT drawing. In relation to a drawing (2159 21 03 00) originated by Devlieg Microbore and later adapted he said that both BMT and MIT would have had it available.

(14) Cecil Craig of Calcast Ltd (formerly Transtec Automotive). He gave evidence (again agreed), in relation to nine paper drawings and 33 electronic drawings, that BMT had not supplied them to Transtec and that Transtec had not supplied MIT with BMT drawings.

(15) John McLarty of Fielding & Platt. He gave evidence (again agreed) in relation to 16 electronic drawings that there was no traceable record of them having been sent to MIT.

(16) Timothy Ladbrooke of Cromwell Tools. His (agreed) evidence was, in relation to two electronic drawings, that Cromwell Tools had not been supplied with them by BMT in either paper or electronic form and had not supplied them to MIT.

(17) John Claypole of Mapal. His evidence, in relation to nine paper and one electronic drawing, was that none had been supplied to Mapal by BMT or by Mapal to MIT. In cross-examination he conceded that the ultimate

*[2003] 2 BCLC 523  at  535*

customer had been KTH/Transtec and that Mapal would not have known of the transmission of drawings between that company and MIT.

I had also read (as requested) the witness statement Roy Arthurton of Lamb Technicon, but his evidence was not in the event led.

**Solicitors**

(18) Ms Furniss of Cripps & Shone, BMT's solicitors, gave evidence in relation to certain matters arising out of the search, as also did her supervising partner Stephen Robins.

(19) Stephen Robins. His evidence related principally to certain documents which he claimed to have seen in the course of the search but which the defendants suggested had been planted by him.

**Miscellaneous**

(20) Edna Possee. Her agreed evidence was that Alan Smith had attempted to contact Peter Possee in August 2002 with what appeared to be an offer of help finding employment.

(21) Peter Hicks. He was the estate agent who introduced Don Allen to what became MIT's premises. His evidence was agreed.

(22) Peter Rollin. As an employee of Mercian Training Ltd he had been responsible for devising and documenting a Quality Assurance system conforming to the ISO 9002 Quality Management Standard at BTM and subsequently performing the same work for MIT. He also gave a witness statement on behalf of the defendants.

(23) Alexander Lawrence. He was the founder of Mercian Toolmaking who was brought in to assist Tim Allen at BMT in the period following the exodus. He gave evidence in relation to that period and also as to industry practice with regard to the use of manufacturing drawings.

**[27]** For the defendants:

**Employees**

(1) Vince Mosson. A long-standing employee of BMT he had by 1998 been promoted from the shop-floor to be production supervisor, which included the role of 'inspector' for the purposes of BMT's ISO 9002 approved quality management system. He was part of the exodus. As appears from the above he was the target of a number of allegations that he had been directly involved in copying BMT's library for the purpose of use at MIT. He denied these charges, while admitting that he had taken photocopies of some quality control forms devised by himself.

(2) Alan Pearce. He was also a long-standing BMT employee who joined the exodus. While at BMT only he and Paul Bland had the necessary expertise to use the AutoCAD software. He denied having supplied Paul Bland at MIT with CDs containing files taken from BMT's computer.

(3) Jackie Yates. She had been the office manager of BMT for some 11 years and was the long-term partner of Wayne Allen. Her resignation from BMT was transmitted together with those of the Tamworth 4, but she

did not work out her notice on health grounds. She was alleged to have made various incriminating statements (see Peter Possee above) but denied having done so. She also denied having requested him to supply her with drawings from BMT.

(4) Ian Jackson. He was a long-standing employee of BMT, working

*[2003] 2 BCLC 523  at  536*

latterly in Purchase Administration. He applied to join MIT in response to the advertisement but was not offered a job. He later, in August 2000, was offered, and accepted, employment by MIT.

(5) Neil Hirst. He was an OPG (optical profile grinder) and surface grinder operator at BMT for some six years prior to the exodus of which he was a part. He gave evidence as to the events leading up to the exodus and Tim Allen's meeting with the seceding employees on 3 April, as well as commenting on the relative merits of the machinery operated by him at BMT and MIT.

(6) David Holden. He was employed by BMT as a universal grinder for six years before the exodus of which he was part. His evidence was similar to that of Neil Hirst.

(7) Christopher Lakin. He was a surface and external grinder operator with BMT for some 25 years prior to the exodus of which he was part. His evidence ran along similar lines.

(8) Robert Lunn. He had worked at BMT as a CNC cutter grinder and universal miller for some 16 years at the time of the exodus. He did not respond to the advertisement and continued to work at BMT until 29 May 2000 when he moved to MIT. He was already committed to emigrating to New Zealand and wanted to spend his last few months with colleagues whose company he enjoyed. He said he was unaware of anything having been removed from BMT by those who were part of the exodus. His evidence was given by videolink from New Zealand where he has lived since October 2000.

In addition I had read before the trial, as requested, statements from David Engley, Steve Marklew and Peter Arnold, but in the event none of them was called.

**Customers**

I had evidence from the following Ford witnesses, namely:

(9) Steve Hammond, a senior tool engineer based in Basildon, who was involved in the 14/15 project and gave evidence as to Ford's practice in making orders and supplying drawings to manufacturers;

(10) Trevor Everett, a senior engineer at Ford Dagenham, who gave evidence as to the reasons underlying that plant's switch of supplier from BMT to MIT;

(11) Michael Jones, a tooling engineer at Ford's Bridgend plant who gave similar evidence in relation to that plant's decision, and also as to Ford's practice in relation to drawings;

(12) Paul Male (see under claimant's witnesses). His witness statement on behalf of the defendants gave a much fuller account of the events leading to the Ford decision no longer to use BMT, and deposed to Ford's practices in relation to drawings;

(13) Alan Payne, the head of Group Staff Tool Engineering at Basildon. His evidence (which was agreed) went to the 14/15 project, and Ford's practice in relation to drawings.

I also had evidence from the following Albon plc employees:

(14) David Saul, who testified that Albon's decision to switch to MIT in May 2000 was largely due to the quality of its relationship with Alan Morley;

(15) Ian Lomas, an engineer, who gave evidence that Alan Morley had

obtained from him discs containing Albon drawings which had previously been supplied to Albon by Alan Morley in 1999 acting then on behalf of BMT.

I had also read (as requested) a witness statement from Harry Nisbet of Fin Machine Co Ltd who was not in the event called.

**Suppliers**

(16) Paul Moore, an executive with ANCA Ltd, manufacturers of CNC cutter machines, who gave evidence about the purchase of machines. by MIT in April 2000 (the first contact having been made by Don Allen in January 2000).

(17) Martin Cross, ANCA's technical sales manager, whose witness statement, covering similar ground, was (with one excision) agreed.

**Solicitors**

(18) David Ford, of Argyles, gave evidence by a witness statement (which was agreed) of the advice which he had given to the Tamworth 4 in the period from 16 December 1999 to May 2000.

**Miscellaneous**

(19) Warren Bradford. He was a friend of Wayne Allen who had originally supplied BMT with its SST computer and who was called in by Tim Allen in May 2000 to repair BMT's Eagle computer. His evidence was that the chip in that computer had been removed. He was also responsible for supplying MIT with computers in May 2000, and in loading a new operating system on MIT's CAD computer in November 2000.

(20) Peter Rolin. See under claimant's witnesses.

(21) John Gold. He is a director of another engineering firm in Tamworth, who gave a witness statement (which was agreed) that he had been approached by Alan Morley around Christmas 1999 with a view to Alan Morley obtaining alternative employment.

(22) Brian Yates. An old friend of Don Allen he gave evidence by a witness statement (which was agreed) that he was approached in November/December 1999 by Don Allen who was looking for money to set up his own small cutting tool business.

(23) Antonio Fontanella. This occupant of neighbouring premises gave evidence by an agreed witness statement of an event he had witnessed in May or June 2000, the relevance of which escaped me.

***A background of tension***

**[28]** I heard a good deal of evidence as to the reasons for the dissatisfaction of the Tamworth 4 with their lot at BMT as well as to various ways in which their conduct of BMT's business was viewed as unsatisfactory by Holdings. The Tamworth 4 had, or developed, a keen sense of grievance that their personal skills were insufficiently valued by head office in Kent. This manifested itself in a variety of ways. For Alan Morley, the main complaint lay in what he saw as inadequate remuneration and the failure by head office to make good indications, or promises, that had been made that it would improve. For Alan Smith, the turning point had been the attitude displayed to him when he had had a heart attack, with a consequent prolonged absence from work in 1998-1999. All of them

sought in their evidence to make a case that Holdings, through its alleged ignorance of BMT's business, had imposed a variety of bad management decisions and, by its parsimony in capital expenditure, missed a number of opportunities to grow the business. From its side, Holdings had complaints about the way in which

Don Allen accounted for his expenses, and the lack of enthusiasm displayed by the local management in implementing a new computerised accounting system (the Foreman system) which had been introduced on a group basis.

[29] These background sources of tension raised a number of issues of fact the resolution of which is unnecessary for deciding the issues which arise in this action. In cross-examination, the Tamworth 4 had difficulty in justifying some of the criticisms made in their witness statements of the head office management decisions. It is not in dispute that relations between the local management and head office had become strained by the autumn of 1999. Who was ultimately to blame for this state of affairs is immaterial to the question whether the damage ultimately suffered by BMT was caused by unlawful action on the part of one or more of the defendants. The background is only of relevance in identifying the date at which the operative decisions were made. In that respect BMT advanced a suggestion that the Tamworth 4's planning of their coup began much earlier than their own account would have it. On that account the plan had its seeds in events in the autumn of 1999 when, following the unexpectedly poor results of the quarter ending 30 September 1999 (1999 Q4), the Tamworth 4 were subjected to what they perceived to be insulting remonstrations from Michael Allen, and when the decision was taken that some of the BMT workforce would have to be made redundant. These events do raise issues which require to be resolved.

## II. The development of the plan

### *Autumn 1999*

[30] The main issues to be resolved in relation to this period are (1) whether the plans of the Tamworth 4 had their genesis in this period and were, in part at least, a reaction to certain events which took place, or whether those events should rather be seen as having happened in the context of, and in part as a consequence of, a plan which had already been made. The claimant's case is that the willingness of the workforce to follow the Tamworth 4 to MIT was its misperception that redundancies which were declared at the end of the year had been forced on the local management by the Allen Group, and that the Tamworth 4 had deliberately fostered this false belief as part of their plan in order to sow seeds of disaffection from which they could subsequently benefit.

[31] In broad terms the issues which need to be resolved are as follows: first, who was responsible for the policy decision to declare redundancies amongst the BMT shop staff? Secondly, why was there a need for a revised budget (which included those redundancies), and, in particular, what was the explanation for the poor results in 1999 Q4 (see at [29] above)? In the course of the trial, a theory was advanced by Mr Gibson that the 1999 Q4 results could be explained by fraud on the part of the Tamworth 4, the fraud consisting of the 'doubling up' of orders during this period with a view to looting the stock so created for the purposes of the new venture. A related question, of some importance on issues of quantum, concerns the

*[2003] 2 BCLC 523  at  539*

extent to which either Q4 1999 or the revised budget should be taken into account in assessing the damage done to BMT's business by the exodus. The claimant's thesis is that Q4 1999 should be ignored for this purpose, and their expert (Mr Campbell) attaches considerable weight to the revised budget in his calculation of the value of BMT's business in March 2000. The defendants' expert (Mr Mawer) treated Q4 1999 as relevant to his valuation, but regarded the revised budget as unreliable for that purpose.

[32] The budget for the year 1998-99 had forecast sales of £2.2m, direct labour costs of £670,000 and a net profit of £208,099. The management accounts for Q3 1999 appeared to show that these were roughly on target as at the end of June 1999. Against that background Wayne Allen and Mr Gibson (who was due to take over from Mr Gordon as group finance director that October) met on 26 August 1999 to agree a budget for 1999-2000. That budget, eventually finalised on 29 October 1999, showed sales at £2.3m, labour costs of £689,000 and a net profit of some £201,000. The final figures were close to those discussed in August, although an additional £100,000 of sales was now forecast.

[33] When the Q4 1999 figures were finally collated, which is likely to have been in early November 1999, the figures came as a rude shock to the Allen Group. Sales for that quarter had been budgeted at £549,959

but only £425,052 appeared to have been achieved. Labour costs had remained steady at £169,404 (budgeted at £167,487). Administrative and selling overheads came in significantly over budget. The bottom line figure showed a net loss for the quarter of some £60,000 against a budgeted profit of £52,000. The effect on the figures for the year was to turn a budgeted profit of £208,099 into a profit of only £94,889 based on a turnover which fell short of the budgeted £2.2m by some £200,000.

[34] The management accounts which presented this sorry picture were put together by Mr Gibson in Kent in the early part of November. They clearly called for explanation. When he learned of them Michael Allen was, in his words to me, 'absolutely astounded and shocked. I knew there must be something wrong' and that it was 'an extremely urgent case'. The upshot of this concern was that Mr Gibson prepared a revised budget for 1999-2000 and certain meetings took place at BMT's premises. There is much dispute as to what meetings took place, what happened at those meetings, and what role they played, if any, in the decisions made by the Tamworth 4 as to their future.

[35] There is common ground that there was a meeting on either 2 or 3 December at which Tim Allen, Mr Gibson, Wayne Allen and Alan Morley were present. There was also an earlier meeting at which Michael Allen had discussed the Q4 1999 figures with Don Allen, Wayne Allen and Alan Morley. This was probably on 24 November. There is some common ground that one of the concerns voiced by Michael Allen at this meeting was the level of entertainment and travel expenses being incurred by the Tamworth 4 (see Michael Allen's witness statement and Don Alien), and also that the question of Alan Morley's salary was raised by him at the meeting and squashed by Michael Allen (Michael Allen's witness statement and Alan Morley's). Both Wayne Allen and Alan Morley remember a third meeting with Michael Allen at which only they were present. They say that it was at this meeting that Michael Allen insisted that redundancies should

*[2003] 2 BCLC 523  at  540*

take place, and that they believe it took place sometime between 24 November and 2 December.

[36] I accept that Wayne Allen's and Alan Morley's belief in the existence of this third meeting is genuine. If it happened, however, I think it highly unlikely that this was the first occasion on which redundancies had been mentioned. Mr Gibson had produced a revised budget for 1999-2000 on 22 November following telephone conversations he had had with Wayne Allen over the preceding few days. Manuscript jottings made by him on a print-out of the original budget appear to show a revised sales forecast of £2.1m and direct labour costs of £670,000. By 22 November the sales forecast had become £2.005m and the direct labour costs had been reduced to £620,000. By the following day this budget had been further refined by breaking down the figures on a quarterly basis. These showed the following for, respectively, sales and direct labour: Q1 £430,000, £170,000; Q2 £480,000, £150,000; Q3 £540,000, £150,000; and Q4 £555,000, £150,000. That document was faxed to BMT on 23 November.

[37] It seems quite clear that the labour costs savings in these figures represent the effect of redundancies. Although his witness statement is completely silent on the point, Mr Gibson suggested in cross-examination that these proposals for redundancies emanated from Wayne Allen on the telephone between 18 and 23 November. This seems to me to be unlikely for a number of reasons. The principal one is that Mr Gibson's account is not only not supported by, but is inconsistent with, the account given by Michael Allen himself. On his account, as given in his first witness statement, he introduced the subject of *possible* redundancies on 24 November after berating (not his word) the Tamworth 4 for their extravagant entertainment expenditure, and the Tamworth 4 subsequently came up with a plan for such redundancies. On this account, therefore, it was the Allen Group (by him), which first raised the subject of redundancies. This account cannot itself be wholly accurate since the revised budget which he had with him (and which had been faxed to Wayne Allen the day before) already assumed redundancies. In this connection it is clear that there has been confusion in the preparation of Michael and Tim Allen's witness statements which both assumed (contrary to the case) that Michael Allen did not have a draft revised budget with him on 24 November. It is now admitted that he did. Michael Allen's statement in his witness statement that he introduced the subject of redundancies as a possibility at the meeting on 24 November does, however, in my judgment correctly reflect the reality that it had been the Allen Group which was insistent on cost savings which might have to include redundancies. The idea that Michael Allen specifically objected to redundancies being made (as Michael Allen insists in his first witness statement) seems to me inherently implausible. It was common ground that the Tamworth 4

were holding out the hope that the new year would see a resurgence of work, in particular of 14/15 work from Ford. They could not sensibly both have taken this position and yet argued the case *for* redundancies with sufficient force to overcome objections from an owner who himself took a different view and had no respect for their business abilities.

[38] That the proposals for redundancies were firmly on the table on 24 November is further reinforced by the fact that on 28 November Wayne Allen faxed Mr Gibson a draft of a letter to be sent to redundant

employees. Wayne Allen says that this draft was itself based on a draft sent to him by Alan Gibson. However that may be, the draft referred to a shop-floor meeting held on 25 November at which the staff had been informed that due to the low level of sales the Allen Group had little option but to make redundancies. The contents of that draft excited no demur from Kent. That again supports the inference that the proposals themselves emanated from Kent. Once again there is doubt, on both sides, as to the chronology at this point. Most of the oral evidence pointed to a shop-floor meeting having taken place in December, although there is no documentary evidence for this. If, however, the meeting did take place on 25 November, that would be consistent with a more or less final decision having been made prior to that date that there would have to be some redundancies. That points to the 'difficult' meeting of 24 November as having been the critical one.

[39] That position (ie that the proposals emanated from Kent) was confirmed by Tim Allen to a meeting of the seceding employees held on 3 April 2000. Tim Allen explains both episodes as an attempt by him to deflect blame away from the Tamworth 4 by allowing the Allen Group to be seen as the instigators of the redundancies. While that is a plausible explanation, a simpler hypothesis is that the Allen Group had indeed been the instigators, just as it had been they who decided that there should be no pay rises. It is also difficult to see what motive Tim Allen had on 3 April 2000 for trying to 'protect' the Tamworth 4 from the odium of having been the architects of the redundancies.

[40] I do not overlook the fact that Wayne Allen had undoubtedly had an input into the revised budget. In particular it was he who had supplied the £2.1m figure for sales on 18 November and proposed a reduction from £689,000 to £670,000 in labour costs (I infer by reducing overtime). My reconstruction is that the reaction to this from the Allen Group was that the labour costs needed to be further reduced so as to reduce them to approximately 30% of sales (as budgeted for in the 1998-1999 budget and in the original 1999-2000 budget) so as to produce a respectable net profit target. Wayne Allen's initial shot on 18 November had not gone far enough in the desired direction. He was also not in a position to justify the £2.1m figure for sales which he had given Mr Gibson, and was asked by Mr Gibson to justify it on a quarterly basis. He did so by sitting down with Alan Morley and attempting a month-by-month forecast. His calculations showing stepped increases of £10,000 per month in Q2, and £5,000 per month in Q3 with a levelling out in Q4 at a peak (£555,000) never before targeted by a budget. There are reasons to be extremely sceptical about the factual premises for this forecast. At this point it is sufficient to note Wayne Allen's method. The figure of £2.1m seems to have been plucked from the air (no doubt drawing heavily on what had actually been achieved the previous year and was being achieved in the current quarter) before any serious attempt had been made to see whether, or how, it could be justified. In the event Wayne Allen's quarterly breakdown only supported a figure of £2,005,000.

[41] An additional reason for preferring the defendants' case on the redundancies issue is that their account at trial closely corresponds with what they told their solicitor on 16 December 1999. They had no particular motive for misleading their solicitors in this respect.

 [42] It follows that on the broad question of who proposed or requested the redundancies I prefer the evidence tendered on behalf of the defendants. That finding reflects poorly on the general credibility of the claimant's witnesses on this issue. Their accounts are in my judgment flawed in this respect by a desire to reconstruct the past so as to cast the Tamworth 4 in the least favourable light possible. On this issue I am persuaded that their account is the reverse of the truth. I also prefer the defendants' evidence as to the general atmosphere in which the critical (and perhaps only) meeting with Michael Allen was conducted, although it may well be coloured by some exaggeration. Their evidence has Michael Allen 'ranting and

raving' at them and being personally insulting. However that may be, I have no doubt that Michael Allen was angry and that his conduct of the meeting left them feeling humiliated. On his own account he roundly criticised them for their attitude to expenditure. He also had every reason to ask the most searching questions as to Q4 1999 and none of the Tamworth 4 was able to offer any convincing explanation. It is not surprising that he accused them of incompetence. So far as financial controls and forecasting were concerned that was near the mark. Wayne Allen admitted as much in his evidence in cross-examination and Mr McGrath was later to discover the same phenomenon to his (and BTG's) great cost. I accept Alan Morley's account that Michael Allen added the charge of immorality when he sought to raise the question of a salary increase for himself. This was in a context where a decision had been made to make some redundancies and to deny the shop-floor any wage increases in the forthcoming year.

### The seeds of the plan

**[43]** The defendants' account of how the plan for a new company evolved is broadly as follows. Don Allen says that he himself conceived the idea of setting up a new company in November before any visit by Michael Allen, and mentioned it to Wayne Allen. Don Allen thought of it as something to do following his retirement. He knew that Wayne Allen, Alan Morley and Alan Smith were fed up working under the Allen Group umbrella but did not speak to Alan Smith and Alan Morley at this stage. On his account, his initial contact with Mr McGrath had no direct connection with any meeting with Michael Allen.

**[44]** We know, however, from phone records that a contact was made on 24 November on the afternoon of the day on which the difficult meeting with Michael Allen had taken place, and I infer that it was prompted by it. Don Allen rang BTG, to be told by Mr Sheldon that Mr McGrath was at his villa in Spain.

**[45]** Mr McGrath's account is that Don Allen rang him at his villa in Spain. In cross-examination Mr McGrath gave the following account of it:

'Q. So Don does ring you?

A. He did, yes, and that were about half five, quarter to six, Spanish time. I was on the verandah reading my Daily Mail. I were expecting his call.

Q. Okay, so what does Don say?

A. More or less he'd had enough of working for Mike Allen. He was very derogatory about him and he just wanted to get away, and he thought the other wanted to get--well, he said the others wanted to get

*[2003] 2 BCLC 523 at 543*

away to start their own small business in a small shed with low overheads, and just do enough to earn a living. There were no numbers at this stage regarding turnover or investments, or what have we.

Q. Not even ball park figures?

A. No, nothing. No, nothing at all, and would I be interested in financing the project. I said: "Well, what's the details?" Well, he didn't have any details: "Well, I'll need two surface grinders, three universal"--he didn't have any detail, how many men. I could tell he were upset. I said: "Well, look, get sorted out, so the answer is provisionally, yes, I'll look into it, so you can ring me any time you want in Spain or England, I'll be back at my desk on December 6th in England, but, you can ring me any time you want, either Spain or England, to clarify a bit more what it is you want to do". He didn't want a blank cheque. He wouldn't have got one either.

Q. No. So you made it clear that if it were to be taken any further it needed some degree of detail--fair enough?

A. Yes. Not detail, but outline detail, yes.

Q. When you get back from Spain--

A. No, I got a phone call before I left Spain.

Q. While you are still in Spain you get another phone call. Who is it from this time?

A. This is Wayne. This is late November or early December. I think it were early December that one.

Q. What has Wayne got to say?

A. Oh, he's irate. I've known Wayne about ten years, I have known Don nearly 30. He were wanting to do it now. He were really irate, were Wayne, "wah, wah, wah", and generally absolutely determined to leave Mike Allen and Tim Allen and the M D Allen Group. Again, no details, they wanted to start on their own, and I said "Well, really, we can't just talk here, me in Spain and you over there, we'll have to have a meeting, so work out your proposals", and we decided that the Saturday morning of 11 December were the right time to do it. That were the last I heard until I got there then.'

**[46]** According to the defendants it was only after Wayne Allen had fixed up the meeting with Mr McGrath on 11 December that he mentioned to Alan Morley and Alan Smith the possibility of their joining a new venture. Having fixed up that meeting and had those conversations Wayne Allen, on 10 December made an appointment for all three of them to see solicitors, Argyles on 16 December.

**[47]** I accept this account of how the plan germinated. In accepting it, I reject the claimants' theory that the plan had a much longer history and that the redundancy situation had been manipulated by the defendants so as to cause disaffection on the shop-floor. Disaffection undoubtedly was caused by the redundancies and was exacerbated by the pay freeze insisted on by the Allen Group at the same time.

**[48]** I also accept Mr McGrath's account of his meeting with Wayne Allen, Alan Morley and Alan Smith on 11 December 1999. From this it appeared that by that stage Wayne Allen was projecting an operation with a turnover of some £800,000. They needed to find £150,000 to buy machinery and finance start up costs. They also needed to acquire two 10 axis Anca machines which would cost somewhere in the region of

*[2003] 2 BCLC 523 at 544*

£220,000. Mr McGrath told them that he would support them by lending £150,000 at 20% pa interest, but that there was no way in which he would assist in the purchase of the two Anca machines: the Tamworth 4 would have to look elsewhere to finance that critical element of the proposals. Mr McGrath was not impressed by the financial acumen demonstrated by Wayne Allen at the meeting. Wayne Allen's financial projections, which he spoke to but did not table at the meeting, were detailed but, to Mr McGrath's ear, missed the essential point. It is not possible to exaggerate Mr McGrath's respect for his own business grasp when compared with that of other mortals. In his view, which he expanded to the meeting and repeated in court, budgets and cash-flows are not worth the paper they are written on: what is required is seven lines on the back of an envelope, namely (1) turnover in terms of manufacturing sales, (2) wages, (3) purchases, (4) sub-contracting profit, (5) gross profit, (6) overheads and (7) trading profits. The trading profits have to be large enough to pay finance costs, director's salaries and depreciation (although depreciation itself is not a cash cost). The key, according to Mr McGrath, is to keep the sum of (2) and (3) at 60% or less of (1). At BTG Mr McGrath was accustomed to (2) and (3) each being 30%, but he was aware that (3) in Wayne Allen's head was nearer 35%. He seems to have been satisfied that this higher raw material cost was justified by the nature of the cutting tool business, and that wages could be kept down to 25%. On that basis he was satisfied that the venture could 'float', although he surmised (to himself) that there would be too many chiefs trying to feed off the trading profit.

**[49]** From Mr McGrath's perspective the Tamworth 4 at this stage still appeared to be very hesitant and doubtful about their plans. He also perceived them to be naive. He knew enough about Don Allen and Alan Smith to believe that they had the technical competence and trade connections to make a go of the proposed business, and he was satisfied on the basis of the rudimentary financial projections which he was given to

suppose that he had a realistic prospect of obtaining a 20% return on the £150,000 loan which he was being asked to make.

## The nature of Mr McGrath's participation

**[50]** The claimant's theory is that Mr McGrath's motivation for participating in the plan was from the outset to appropriate BMT's business for his own company BTG. In support of that theory they point to the fact that in the early 1990's BTG had been a direct competitor of BMT for certain Ford cutting tool business, but had lost that custom. As mentioned above, in 1997 Mr McGrath had entered into discussions with the Allen Group concerning a possible purchase by BTG of BMT but these discussions had come to nothing. This background has excited a natural suspicion on the part of Michael Allen that the nature of Mr McGrath's participation in the plan from the outset was a considerably more active one than he would have me believe, and that it was primarily designed to further the commercial interests of BTG. The suspicion has been exacerbated by the fact that there had been earlier meetings between Don Allen and Mr McGrath in early 1999.

**[51]** I am satisfied on the basis of Mr McGrath's own oral evidence to me that this theory is a mistaken one. His position was that he had retired from all formal roles in BTG in November 1997 and he then received a tax-free

*[2003] 2 BCLC 523  at 545*

lump sum of £300,000. He had used £200,000 of this to lend to his sons at 7% pa to reduce their building society mortgages.

> 'The private money I'd got, there was very little point shoving it in a building society, the bank, and filling tax forms in and God knows what else, and it were far easier just to put it into my sons' situations. Then when an opportunity came along like this, I thought: Yes, thank you very much, that'll do nicely. And that's why I did it.'

**[52]** I accept that the proposal was seen by him, at this initial stage, simply as an interesting way of investing spare private capital. It was perhaps all the more interesting because of the opportunity it presented of cocking a snook at Michael Allen, and I have no doubt that he perceived that it might give rise to useful synergies between the business of BTG and the new business, not least in the possible access to Ford as a customer which might be afforded. I am not satisfied that at this stage Mr McGrath envisaged that the result of his investment would be that BMT would be destroyed and that he (or BTG) would succeed to its business.

## Legal advice is taken

**[53]** On 16 December 1999 the Tamworth 4 took advice from Mr Ford of Argyles. I quote in full from the introductory paragraphs of Mr Ford's attendance note where he records what he was told of the background of the matter:

> 'The clients are all directors of British Midland Tools Limited. The company was originally Grinding Aids and was owned by Don Allen, but he sold out several years ago but the buyers of his company were not successful and it went into receivership and was then acquired by a private group of companies, the Allen Group. It had been in the ownership of the Allen Group for around nine years and in that time the clients had built-up the business successfully and it had made good profits notwithstanding charges made by the group for the benefit of the parent and other group companies which were detailed by Wayne Allen. In the last trading year the company had returned profits of £107,000 but in the last quarter of the year it had lost money and it was expected that it would loose [sic] money in the current quarter. There were a number of special circumstances which had lead [sic] to the reduced profit which Wayne Allen detailed, mentioning particularly increased pension contributions and depreciation and loan charges on a very expensive machine which BMT did not require. Also the performance was affected by ordinary market conditions and particularly a lack of demand from their main customer Ford. The proprietor of the group had made his displeasure known in a way which Don Allen considered to be inappropriate having regard to the team's performance over several years and all of them were upset by his attitude. He was critical that they had not taken steps earlier to reduce overhead expenditure and in particular cutting staff and he required them to do this. It was their view that the adverse factors which had affected profitability were temporary and that they should retain labour for a recovery which they were confident would come. The confrontation with the proprietor of the group had lead [sic] them all to

*[2003] 2 BCLC 523 at 546*

conclude that their futures did not lie with BMT and they were resolved to quit the company and set up their own business in the same line. Wayne Allen said that if the four of them left BMT it was likely that a large number of the employees would follow them and the company would suffer considerable commercial damage. They were all concerned therefore as to what claims might be made against them by Allen/BMT. He confirmed that none of them had written service contracts and none of them were subject to any restrictive provisions as to competition following termination of their employment. He also confirmed that the position was the same in relation to the employees, i.e. none of them were subject to restrictions once they left the company. He added that they had located a backer who was prepared to provide the funding to enable them to purchase another small company in a nearby town and to acquire the necessary machinery to enable them to carry out a similar business to that currently conducted by BMT. The backer was prepared to provide the finance upon the basis that he would receive a return of 20% upon the capital provided and 'he would also derive an ancillary benefit as a result of certain of the work coming into the new company being sub-contracted to a company belonging to him. DHF enquired whether they had considered making a bid for BMT themselves and Don Allen said that they had asked the proprietor of the group if he was prepared to sell but he had given them a blank refusal. He knew that he was willing to sell the company and was looking for £3 million which he felt was excessive and in any event beyond what they could fund.'

**[54]** As against BGT and Mr McGrath reliance is placed by the claimants on the reference to the ancillary benefit to be obtained from sub-contracting. This was a matter which was to reappear in discussions with Mr Ford on 28 February and 10 March 2000. It is clear that at this stage the Tamworth 4 perceived their backer as being Bradtool Ltd (the holding company of BTG) and were assuming that Mr McGrath was motivated by a desire to advance BTG's commercial interests. I am, however, satisfied that Mr McGrath envisaged his investment primarily as a personal one (see at [51] above). It was only later that circumstances obliged Mr McGrath to switch the investment into the name of BTG (see at [74] below).

**[55]** Mr Ford advised the Tamworth 4 of the legal constraints to which they were subject. It is necessary to quote substantial parts of that advice as recorded in the attendance note; since it is the case of the Tamworth 4 that they relied heavily on it in the succeeding months and were anxious at all times to follow it to the letter:

'1. The policy of English law was to encourage and promote competition in the market-place. In these circumstances it was well established that an employee of a business, once he had properly terminated his employment contract, was free to immediately go into competition with his previous employer, to solicit his "customers for business and to solicit his employees". This was subject to any restrictions against such activities that might be contained in their service contracts, but in this case he was instructed that there were no such restrictions.

*[2003] 2 BCLC 523 at 547*

2. Consequently provided each of them gave proper notice to terminate their service contracts then, immediately those service contracts terminated, they were free to do precisely what they had in mind doing and even if this caused substantial commercial damage to BMT. This was an inevitable consequence of freedom of competition which the law encouraged.

3. This principle was not affected at all by the fact that all four of them gave in notice together.

4. However; it was essential for each of them to realise that whilst they remained employees and directors of BMT, they owed that Company a duty of good faith and in those circumstances it was critical that they did nothing until their employment contracts were actually terminated, i.e. their notices had expired, which was contrary to the interests of BMT: If they did so, they would lay themselves open to a claim for damages. It was inevitable that the proprietor of the group would be upset by their mass departure and it was therefore important that they provided him with no ammunition that he could use to attack them with once they left. The last thing they would want was to be bogged down in the law suit and incurring heavy expenditure when they ought to be getting on with promotion of the new business.

Having regard to this they must not, whilst still employed and directors, seek to divert away from BMT business which would otherwise likely go to that company, nor must they solicit employees. They must continue to perform their duties as employees and directors in the best interests of BMT and subordinate their own interests as prospective competitors, but only until such time as their employment contracts were terminated.

5. They, owed no particular additional duty to BMT as directors, as distinct from employees. Directors had wider

responsibilities, e.g. also towards other employees, creditors and shareholders but, provided they resigned their directorships by the time their employment contracts terminated, the fact that they were directors made no difference to the advice which DHF was giving.

There was nothing to prevent them doing the ground work in connection with the setting up of a new operation provided that they did nothing which conflicted with their duties as continuing employees as last mentioned. They could for example locate premises, negotiate a deal with their financial backer, but they must not actually commence business or start competing in any way until termination of their contracts.

6. DHF suspected that the proprietor of the group would realise immediately what was occurring when they all resigned and might well put in replacement management to avoid them working their notice period. If this occurred, their obligations would still continue until the expiration of their notices. Although the proprietor would no doubt huff and puff, provided they did not breach the duties which DHF had detailed, there would be nothing he could do about their quitting and setting up in competition.

7. DHF felt the problems of leaving the company, provided his advice was followed, would not be a major problem, but he was concerned that they did not jump out of the frying pan and into the fire and

*[2003] 2 BCLC 523  at  548*

therefore it was important that the deal with the backer was documented and signed up so everyone knew what that deal was. His experience was that, very often these matters were left upon verbal understandings and with the passage of time and often the success of a business, there were then arguments as to what precisely was agreed ...

DHF also explained the way in which, in litigation, a plaintiff could enforce production of documents and even in extreme circumstances make raids on premises to seize documents (i.e. the Anton Piller procedure). It was important that no documents were created that could be interpreted, as, showing that any of them were acting in breach of their duty of good faith to the company during the period of their employment, e.g. correspondence with existing customers or existing employees. He also explained that documents such as customer lists, details of pricing, drawings and so forth were the property of the company and must not be removed or copied. He also advised that as employees they had a duty of confidentiality to the company in respect of all information which was of a confidential nature, i.e. not generally available in the market place, and this duty of confidentiality would continue even after their employment contracts had terminated.

Therefore if they were aware of secret processes or sensitive financial information concerning BMT, they should not utilise it for their own benefit otherwise they would expose themselves to claims. For example if BMT had tendered for a particular contract and they were aware of the basis and prices of the tender, they should not, even after they had left the company, tender for the same contract because they would be utilising confidential information which came into their possession as employees of BMT, i.e. particular tender prices put in for a specific contract. They needed however to distinguish between information which was confidential to BMT and their general knowledge of the market and price levels and so forth. This was their intellectual property and they were entitled to take it with them and utilise it for their own benefit once their employment contract was terminated.'

## January, February and March 2000

**[56]** During this period further steps were taken to implement the plan. It is not in dispute that Don Allen identified premises and began the process of identifying the necessary plant, in particular negotiating terms with Anca for the supply, on hire purchase, of two 10 axis machines (which represented a technical advance on the 7 axis machines operated at BMT). On 29 January a further meeting was held with Mr McGrath and Mr Sheldon. By this time, the intentions of the Tamworth 4 were much firmer. I can revert to Mr McGrath's own words for the way in which the financial relationship between himself and the Tamworth 4 was worked out:

'Q. Right. Now, you did not ask them to provide any security themselves --

A. Oh, I did. That were the first thing. "How much are you putting in?"

Q. What was the answer?

A. "Well, we ain't got owt." "What do you mean you ain't got owt? You can't have been in life all this time". "No, we haven't got owt."

"Well, a guarantee to bank then. You don't have to have any money but"--"No, I can't do that. My wife won't let me do that". Alan Morley hadn't got owt and still hasn't got owt. Alan Smith had something in his house with his wife but there were no way she could--she were a poorly woman. "Oh, hey Alan, will you sign the house away?" Wayne were a single lad, lives with his parents. He'd had a few bob but that's all, and they spend it on cars and beer and meals, don't they, young lads? And Don, he weren't into signing guarantees. So I said: "Right, fair enough, I'm on me own then".

Q. Just explain that last bit. "Don weren't into signing guarantees"?

A. This is the January 29th meeting.

Q, Did he have anything to offer by way of security? You have told us the others did, but Don did, did he not?

A. No, Alan Smith had some equity in his house.

Q. What about Don?

A. Well, I didn't know at the time that--what his house and equity--I've since discovered it. But I don't know at the time. But, no, they weren't prepared to do it. I said: "Well, fair enough then, if you're not going to do that, then I'll tell you rules of the game. I will, through me wife"--and if you say why I'm doing it through me wife, because of my retirement thing and having to sever my link with the company, that's why I use me-- because she was still a director of the thing. "Well, these will be the rules. She will own 100% of the shares. Don, you will be the only director. My wife, Anne, will be the company secretary". So that gave a safeguard on the form signing. "And my auditors will be the auditors. My bank will be the bank. You will have a credit account only at Tamworth and the cheque signing facilities will be me and my wife, any two from four, Don and Wayne". So I laid the rules. Once they weren't putting owt in, the rules were going to be like exactly my way. If not, we weren't going to play ...

Q. The buy-back arrangement that you had in relation to the shares, that was a separate matter from repayment of the loan, was it not, as Wayne told us?

A. Could have been all in one package because we discussed this, that they wanted to own their own company. I said: "Well, look, there's no reason why you can't buy this. As long as I get me 150 grand back plus me interest, you can have the 1,000 shares for £1,000. I've got my deal as a business angel, I've got my package, I've had a very handsome return, and there's your company", and they generate it or found another backer or won the lottery, or whatever. I had no interest in continuing running the company. You know, that were just bail them out for three years and send them on their way with a kiss and a fond farewell.'

**[57]** Once again I accept Mr McGrath's evidence as to his motivation, essentially one of securing his position as a creditor, in insisting on the shareholding being in his wife's name. At the same time he would have appreciated that his agreement that the Tamworth 4 could have the shares for a nominal sum once he had recovered his investment was binding in honour only, and that, should they prove unable to service and repay his investment (as in fact happened) the new company would be his.

**[58]** At the beginning of February MIT was incorporated, and a bank

account opened. Don Allen was named as a director of MIT, and the bank mandate was in the names of Don Allen, Wayne Allen, Mr McGrath and his wife (Ann, in whose name the shareholding in MIT was held). Soon afterwards money began to flow into the MIT bank account from BTG (in whose books it was treated as money advanced to Mr McGrath). On 7 February Mr McGrath had occasion to visit Paul Male of Ford and felt

it advisable to warn him that in the near future:

> 'It might sound a bit Chinese or gobbledygook to you, but I'm going to be involved in a commercial transaction which may disrupt your tooling supplies, it may not, but it may. However, don't forget that Ford have used our 24-hour service for manufacturing tools since we introduced it ten years ago all the time and that may be well worth remembering, but I can't tell you any more of the circumstances regarding it, but in the next few weeks everything will become apparent." And he says, "You're right, it is a bit gobbledygook". I said the objective of that was so that I did not lose my credibility, because he could say, "Well, you never said anything to me when you were there". A smart move.'

**[59]** It is clear from this that the plan was by now fully formed, and that at least Don Allen, Wayne Allen and Mr McGrath were proceeding on the basis that it was to be carried into execution within a period of weeks. Alan Morley and Alan Smith both sought to maintain in their evidence that at this stage they had made no final commitment personally to join the others. It is clear, however, that the collective assumption must have been that the latter were on board, and by this stage they undoubtedly were (although either could have changed his mind at any stage). Their names were put forward, together with Don and Wayne Allen's, as guarantors of MIT's liabilities under the proposed lease of the new premises. By the end of February, 1 April had been identified as the date on which possession of the new premises would be available.

**The recruitment of a workforce**

**[60]** The principal element of the plan which, on their evidence, remained to be put in place was the recruitment of a workforce. The Tamworth 4 appreciated, as a result of the legal advice which they had received and continued during this period to receive, that they should do nothing while still employed by, and/or directors of, the claimant to entice its employees to resign to work for a competitor. They were also reasonably confident that the employees would be persuaded to leave in sufficient numbers not only to make MIT viable but also to cause BMT serious damage. The probability that, if they left, they would be followed by a large number of BMT's employees had been mentioned by them at the meeting with Mr Ford on 16 December 1999 (see at [53] above). A telephone attendance note of Mr Ford dated 28 February 2000 records Wayne Allen as saying:

> '... he was convinced BMT would collapse when they left. They would take all the customers. Allen may then try and sell it and McGrath may well buy it cheap. He would have to do it in co-operation with Wayne etc.'

**[61]** A strategy was developed, designed to ensure that the recruitment of

*[2003] 2 BCLC 523  at  551*

the workforce would not involve any of the Tamworth 4 in a breach of his obligations to the claimant. This was not admitted in those terms by any of them in their evidence, but is the only inference which can sensibly be drawn from the events which in fact took place. The plan was to secure the early and lawful termination of Don Allen's employment and directorship ahead of that of the others. This, it was perceived, would leave him as a completely free agent, able to devote himself to the setting up of the factory, the recruitment of a workforce, and to have contact with customers.

**[62]** Don Allen's original projected date of retirement had been in September 2000. The 1999-2000 budget (both in its original and revised forms) had assumed this. He had, however, given Tim Allen some indication in a telephone call in November 1999 that he would leave earlier, on his 65th birthday in March. Wayne Allen confirmed to Tim Allen and Alan Gibson at a meeting on 22 February 2000 that Don Allen would be leaving at the end of March 2000. This news was received without demur by the men from Kent, although there is some dispute as to whether Wayne Allen agreed to take over as managing director (his case being that there was no need for one: the remaining three could decide issues by majority vote). Over the next fortnight or so the decision was taken that Don Allen should seek to retire even earlier than the end of March, and that the remaining three would aim to leave as from 1 April. On 13 March Don Allen therefore gave notice to Alan Gibson that he wished to advance the date of his retirement to Friday, 17 March. This again was accepted in Kent without demur. As from that date, therefore, Don Allen was perceived by the Tamworth 4 to be a free agent.

**[63]** It is clear from Argyles' attendance notes from this period that it was appreciated that there was some artificiality about the way in which Holdings had been manoeuvred into accepting Don Allen's resignation (see in particular Argyle's attendance notes of 10 March and 13 March), and that there remained an anxiety that Holdings would seek to hold the remaining three to a longer period of notice than the one month on which their plans depended. They decided, however, that this was a risk which could be run.

**[64]** The process of recruiting a workforce now falls to be considered. This was done (ostensibly at least) by means of the advertisement. On the version of events which the defendants would have me accept, Don Allen placed the advertisement on 21 March (it appeared on 23 March), and applications were thereafter received from among the BMT workforce (the advertisement appears to have elicited 26 replies, only three of which were from non-BMT employees). On Wednesday, 29 March he made a series of telephone calls to selected applicants (all of them BMT employees) offering them jobs with MIT as from 10 April. The latter then appreciated that they would have to give one week's notice to the claimant and each duly did so in time for Alan Morley to be able to collate them and present them to Tim Allen on the morning of 3 April. According to the way in which Don Allen described it in cross-examination, all or much of this occurred without any particular communication by him to the other three of the steps which he was taking.

**[65]** If this is anything like what really happened, a huge risk was being run that insufficient numbers of the workforce would be persuaded to reach the necessary decision in the 48 hours or less allowed them for that purpose

*[2003] 2 BCLC 523  at 552*

by this process. Don Allen suggested in cross-examination that this was a risk which could be run since, if the worst came to the worst, the Tamworth 4 would be able to open for business with just themselves operating the machinery: Grinding Aids had itself started from similarly small beginnings all those years ago. This was an implausible suggestion. The degree of capital investment already committed to in principle or in the pipeline, and the turnover and projected workforce discussed with Mr McGrath, were quite inconsistent with such a scenario having been contemplated as a realistic possibility.

**[66]** I was left quite convinced that I had not been given a full picture by the Tamworth 4 of what really happened. None of their accounts gives any sense of the degree of excitement and exhilaration which they must each have been experiencing at the time. Each shared a remarkable degree of amnesia for the details of what occurred during this period.

**[67]** There is a strong possibility, in my judgment, that key and trusted members of the workforce were let into the secret at an early stage, well in advance of the appearance of the advertisement. It is difficult to see how the Tamworth 4 could have gone so far down the road leading to their own departure without being satisfied, as a result of personal approaches, that a core of key employees would be prepared to follow them. With their agreement to participate in the plan secure, care then had to be taken to make sure that none of the workforce outside this inner circle received anything which could be interpreted as a direct approach from anyone other than Don Allen as a consequence of a response to the advertisement. To make this work it was necessary to ensure that as many of the right people saw the advertisement, and that when they did so they would draw correct conclusions as to where their interests lay.

**[68]** I have described the scenario of approaches to key employees in terms of its being a strong possibility. In the case of Jackie Yates it is admitted that she was let into the secret by Wayne Allen and assured of her own future in the new venture. This can be explained and possibly excused on the ground of their domestic relationship. In two other cases (Vince Mosson and Alan Pearce) there are grounds for strong suspicion that they would have been approached and their co-operation secured. Both had important roles and skills. Vince Mosson had been production supervisor since 1998 (with long experience as a horizontal miller) and was the 'Inspector' for the purposes of BMT's quality control system. As such he was the keeper of BMT's 'library' of drawings. Alan Pearce was a fully-skilled production engineer of some 21 years experience, and the only person at BMT (other than Paul Bland) who was able to operate the CAD software. Both enjoyed social relationships outside the workplace with one or more of the Tamworth 4. It would have required a quite unusual degree of compunction on the part of the Tamworth 4 not to have revealed their plans to these men once those plans had acquired the momentum which they had by late February. Nevertheless, the possibility

also exists that the Tamworth 4 knew their men well enough to know that if presented with the fact of the management all leaving, and with the opportunity of continuing in effectively the same business next door under the former management but with new machines and freed from the perceived shackles of membership of the Allen Group, sufficient of the workforce (including these key employees) would be prepared without any advance notice to make the

*[2003] 2 BCLC 523  at  553*

decision on receipt of the telephone call from Don Allen. So far as Vince Mosson and Alan Pearce are concerned, I think that the former possibility is more likely to represent the reality of the matter. Their dogged denials of any foreknowledge of the plan sat oddly with the absence of any evidence from them that they were surprised to discover what lay behind the advertisement. I am further reinforced in that conclusion by the findings I make elsewhere in this judgment as to their respective roles in the copying of documents and AutoCAD files.

[69] A further person likely to have been privy to the plan prior to Don Allen's retirement was Tony Brown, the works manager. He ceased to work at BMT on 17 March, taking holiday entitlement for the period of his notice. By 3 April he had returned from holiday and was on the payroll of MIT, assisting Don Allen in the setting up of the new premises. The natural inference would be that this new employment had been planned before his departure. Don Allen maintained that there had been no previous discussion with him, but that he had telephoned him on his mobile in Gran Canaria following his own departure from BMT and then made a successful offer of new employment. A natural scepticism as to the truth of this account was increased by the defendants' failure to call him as a witness in relation to this (or any other) episode. He remains an MIT employee at a relatively high level of management. His evidence from the other side of the hill during the period from his resignation in April onwards as to how he was himself recruited, as to the steps being taken by Don Allen and himself to prepare the new premises and to solicit custom, as to the extent to which the remaining three of the Tamworth 4 were involved in such matters, and as to the reception (if any) of BMT documentation into MIT, would (if favourable to the defendants) have greatly assisted their case. I think that justifies me in drawing an adverse inference on all those matters from the failure to call him.

[70] I was, however, satisfied that, so far as the majority of the workforce was concerned, there was no earlier intimation of what was afoot than the advertisement itself. The evidence from this section of the workforce (from both sides in the litigation) revealed a picture of a rapid 'word of mouth' transmission of the existence of the advertisement, excited speculation as to its significance, a rapid drawing of the correct conclusion and their submission to a herd instinct to apply for the jobs for which 'everyone else' was applying.

[71] Some witnesses gave evidence of specific acts of intervention in the process by one or other of the three remaining Tamworth directors. Mr Sutton said that his attention was drawn to the advertisement by Alan Smith (vehemently denied by the latter) and that it had been Alan Morley who (following the job offer from Don Allen) had advised him when to hand it in his notice. Mr Crofts also said that he was put on to the advertisement by Alan Smith and was later told by Vince Mosson that 'everyone else' had applied. Mr Tunley also spoke of being encouraged by Vince Mosson to get his application in quickly. Mr Possee said that he only became aware of the advertisement as a result of a conversation with his colleague Phil Baxter and then got the impression that it had already been anticipated by most of the shop-floor. As an administrator he was unclear whether it applied to him and remembers having asked Wayne Allen (who was supposed by rumour to be in the know) whether he should apply. His

*[2003] 2 BCLC 523  at  554*

account of Wayne Allen's response had to me the ring of truth: Wayne Allen felt inhibited about admitting any involvement or advising him one way or the other but was keen to reassure him.

[72] Criticisms can be and were made of the accuracy of some of these recollections. It was plainly difficult for witnesses to be sure when they first learned particular pieces of information and from whom, especially when relevant conversations may have taken place both before and after the three remaining directors themselves resigned. The speed at which rumour travels in a small workplace and the confusion, and false memory, as to who first heard what from whom in relation to events which subsequently transpire is familiar

to us all. It is clear, however, that the shop-floor proceeded (in some cases more rapidly than others) on the hypothesis that the local management was behind the mystery company which had placed the advertisement. When challenged as to whether this was true, all the management had to do, to confirm the truth of the rumour, was to say that their duties as directors of BMT forbade them to comment. This, on their evidence, is the kind of response which they did give to such queries. Only one conclusion could be, and was, drawn. Very shortly after the advertisement appeared it became common knowledge on the shop-floor that the management was behind the new company and in no way discouraging applications being made for employment by it. By this means a flood of applications in fact resulted, of whom 12 were offered and accepted jobs with MIT commencing on 10 April. An uncertain number of others (such as Mr Possee and Mr Crofts) were told that in due course jobs might become available for them.

### April 2000

**[73]** So far as the narrative is concerned, this period saw the fitting out of the MIT premises by the new workforce until by the end of the month they were ready to receive their first orders. During this period Wayne Allen, Alan Morley and Alan Smith remained captive to BMT while they worked out their one-month's notice. In Alan Smith's case the captivity was eased by his absence from the BMT premises through ill-health. All had mobile telephones, bought by MIT, with which they could communicate with each other freely and with the outside world. The two who remained at BMT were excluded by Tim Allen and the new management which he had called in from dealing directly with customers. That new management made the decision pro tem to use the services of Mercian Tooling to complete BMT's outstanding contracts while it sought (unsuccessfully) to recruit additional employees with the requisite skills (particularly cutter grinders) to make good its losses. There is an issue as to whether this was necessary or wise in the circumstances. The chief issues which arise in relation to this period are, however, (1) the extent to which Mr McGrath's (and BTG's) increased financial involvement in the affairs of MIT was, from their point of view, an unfortunate and unexpected accident rather than a natural or intended consequence of the original plan; and (2) the extent to which the remaining three of the Tamworth 4 (now no longer directors of BMT but still employed by it) in breach of contract solicited custom on behalf of MIT. At this stage I deal only with the first of these questions (the second I return to at [180] below).

**[74]** Mr McGrath's account of how he became sucked in to a greater

*[2003] 2 BCLC 523  at  555*

involvement with MIT than he had originally envisaged, and of how BTG became involved is, in summary, as follows. By 7 April 2000 advances from BTG to the MIT bank account had reached the £150,000 limit which Mr McGrath had agreed to in January. On 12 April Don Allen rang Mr McGrath to say that more money was needed. Mr McGrath agreed to lend his last £50,000 of free capital. By that stage a point of no return appeared to have been reached: the premises had been acquired, machinery purchased and the newly recruited workforce was on site. In the following week further demands were made on Mr McGrath. It transpired that the arrangements which had been made by Don Allen with Anca for the hire-purchase of two 10 axis machines for £230,000 had never been finalised, and that Lombard Finance (who were to finance the purchase) were unwilling to lend to MIT. On 17 April Don Allen telephoned Mr McGrath with this unwelcome news. Mr McGrath was upset, but the following day offered his personal guarantee of the transaction (the terms of the arrangement provided for Anca to re-purchase the machines at cost less 20% pa so that the risk was limited). Lombard refused to agree to this, and insisted that the purchase would have to be in the name of BTG supported by Mr McGrath's personal guarantee.

**[75]** With hindsight, Mr McGrath considers that it was at this point that he should have considered more seriously drawing back and cutting his losses. Once, however, the fateful decision had been made to purchase the Anca machines in BTG's name there was nowhere to go but forward. Over the succeeding weeks further requests for funds were made and satisfied by BTG. As I understand it these continued to be debited in BTG's books to Mr McGrath's loan account. Mr McGrath was given encouraging reports as to MIT's progress. The crunch came in early October when Mr McGrath put in an independent accounts consultant to write up MIT's books. This led to the discovery that losses of some £224 000 had been made in the first five months trading (the accounts to 31 October as finally audited showed a loss of £247,228 on a turnover of £396,010 for the seven-month period). The upshot was that Mr McGrath and Steve Sheldon

gathered the reins of MIT into their own hands, Don Allen and Wayne Allen resigned, and steps were taken (including the making of redundancies) to improve productivity at MIT. Following advice from its accountants BTG took over Mr McGrath's lending and Bradtool Ltd acquired from his wife her shareholding in MIT.

**[76]** I broadly accept Mr McGrath's evidence on these matters while noting that the timing (and associated formalities) of BTG's acquisition of the MIT debt are obscure. Bradtool Ltd is owned by Mr McGrath, and his ability to distinguish it (or BTG) from himself is not an instinctive one. The broad picture of the investment being envisaged by him as a private one initially, but transmuting into a BTG investment following the purchase of the Anca machines, is, however, in my judgment correct.

## III. Legal issues arising on findings thus far

**[77]** The claim is primarily put as an unlawful means conspiracy. The requirements of that tort are that the claimant proves that it--

> 'has suffered loss or damage as a result of unlawful action taken pursuant to a combination or agreement between the defendant and

*[2003] 2 BCLC 523  at  556*

> another person or persons to injure him by unlawful means, whether or not it is the predominant intention of the defendant to do so.' (See *Kuwait Oil Tankers Co SAK v Al Bader* [2000] EWCA Civ 160, [2000] 2 All ER (Comm) 271 at [108] (Nourse, Potter and Clarke LJJ).)

The three essential ingredients for present purposes are (1) unlawful means taken pursuant to an agreement, (2) loss suffered as a result of that, and (3) the intention to injure by the unlawful means.

**[78]** The claimant undoubtedly suffered some damage in the present case as the result of the secession of the Tamworth 4 together with a large part of the workforce. There is also no doubt, in my judgment, that such damage was not only foreseeable but actually foreseen (see [55] and [63] above) by the Tamworth 4. By virtue of that fact they may be said, for the purposes of the tort, to have intended that damage. I did not understand the contrary to have been argued by Mrs Giret. The debate before me has principally been as to whether the means by which that secession was achieved involved unlawful action.

**[79]** I am satisfied that the Tamworth 4 did not, when deciding upon the elements of their plan so far outlined, agree to use unlawful means in its implementation in the sense that I am satisfied that the means which they decided upon were not known by them to be unlawful. On the contrary they took legal advice in order to be able to understand where the borderline lay between lawful and unlawful conduct, and my conclusion is that they were collectively determined to follow that advice. My findings as to the solicitation of key personnel (see at [67] and [69] above) mean that they lapsed from the standard which they set themselves. Whether such lapses suffice to change a lawful combination into an actionable conspiracy may be arguable. The real question is as to the causative potency of the particular unlawful acts in the context of the implementation of the overall plan. If the implementation of the plan necessarily involved the commission of unlawful acts then the damage suffered as a result of the implementation of the plan is recoverable as damages for unlawful means conspiracy. If it did not necessarily involve those acts, but such acts were in fact carried out in the course of implementing what would otherwise have been a lawful (albeit damage causing) plan, the question arises whether the whole of the damage suffered is properly attributable to what may have been purely incidental unlawful acts; and there may also be an issue as to the extent to which all parties to the otherwise lawful plan are to be treated as parties to such incidental unlawful acts. The point can be illustrated by considering, at one end of a possible spectrum of possibilities, what the position would be if the only unlawful act capable of being identified by the claimant as having occurred in the implementation of the plan were, say, that Alan Smith had drawn Mr Sutton's attention to the advertisement and had done so without the knowledge of his colleagues.

**[80]** On the view I take of the law, the possible difficulties mentioned in the preceding paragraph do not in fact arise. In my judgment, the plan of the Tamworth 4 necessarily involved them in a breach of their duties as directors, and the loss suffered by the claimant as the result of implementation of the plan is therefore

recoverable from them as damages for conspiracy. Those breaches can be identified, not as the acts of enticement of employees mentioned at [67]-[72] above (which were arguably not an essential element in the plan), but the keeping of the whole

plan secret from the other directors of the claimant and their connivance in the solicitation of employees by Don Allen once he had ceased, but each of the remaining three continued, to hold office.

**[81]** It is a fundamental duty of the director, of a limited company to 'do his best to promote its business and to act with complete good faith towards it': see *Scottish Co-operative Wholesale Ltd v Meyer* [1958] 3 All ER 66 at 88, [1959] AC 324 at 366 per Lord Denning. It is also his duty not to embark on a course of conduct in which his own interests will conflict with those of the company: see *Parker v McKenna* (1874) LR 10 Ch App 96 at 118 per Lord Cairns LC. He is also, like an employee, under a duty of fidelity to his company: see *Hivac Ltd v Park Royal Scientific Instruments Ltd* [1946] 1 All ER 350 at 353, [1946] Ch 169 at 174 per Lord Greene MR. On the face of it, therefore, one might think it a simple proposition that a director would be under a duty to alert his fellow board members to a nascent commercial threat to the future prospects of the company, and that the duty would be all the greater (and certainly no less) when he himself was planning to be part of that threat.

**[82]** It is clear, however, that that simple proposition cannot be sustained in the light of the authorities. In the first place the duty not to place oneself in a position of conflict has to be read subject to the qualification to be found in the decision of Chitty J in *London and Mashonaland Exploration Co Ltd v New Mashonaland Exploration Co Ltd* [1891] WN 165, approved by Lord Blanesburgh (with whom Lord Atkin and Lord Thankerton agreed) in *Bell v Lever Bros Ltd* [1932] AC 161 at 195, [1931] All ER Rep 1 at 17 and recently considered by the Court of Appeal in *In Plus Group Ltd v Pyke* [2002] EWCA Civ 370, [2002] 2 BCLC 201. The limited proposition for which that case stands is that there is nothing inherently objectionable in the position of a company director who, in the absence of contractual restraints or disclosing confidential information, becomes engaged either personally or as a director of another company in a competing business. As Sedley LJ pointed out in *In Plus Group Ltd v Pyke* [2002] 2 BCLC 201 at [88]) it should not be treated as a 'licence for directors or other fiduciaries to put themselves or stay put in situations where their duties and/or interests can come into conflict'.

**[83]** Secondly, and more significantly for present purposes, it was held in *Balston Ltd v Headline Filters Ltd* [1990] FSR 385 (Falconer J) that an intention by a director to set up business in competition with the company after his directorship had ceased was not to be regarded as an interest which conflicts with his duty to the company; that the taking of preliminary steps during the directorship to investigate or forward that intention while he remains a director is also not to be so regarded so long as there is no actual competitive activity; and that a director who is contemplating resignation and subsequent competitive activity, and is taking such preliminary steps is under no duty to disclose those facts to the company.

**[84]** Falconer J's conclusions in *Balston*'s case were founded partly on an analysis of *Bell v Lever Bros Ltd* (in particular the acceptance therein by Lord Blanesburgh of the *Mashonaland* principle and the observations of Lord Atkin as to the absence of any duty on a servant to report his own misconduct to an employer) and partly on 'rules of public policy as to restraint of trade' (see [1990] FSR 385 at 412). These had been referred to in a judgment of Hutchinson J (from which he had quoted) in *Island Export*

*Finance Ltd v Umunna* [1986] BCLC 460 at 482 where he had said:

> 'It would, it seems to me, be surprising to find that directors alone, because of the fiduciary nature of their relationship with the company, were restrained from exploiting after they had ceased to be such any opportunity of which they had acquired knowledge while directors. Directors no less than employees, acquire a general fund of knowledge and expertise in the course of their work, and it is plainly in the public interest that they should be free to exploit it in a new position.'

**[85]** At its widest, the decision in *Balston*'s case is authority for the propositions both (a) that the forming of

the competitive intention and the taking of the preliminary steps is not itself a breach of duty by the director/employee, and (b) that, even if it were, the director/employee would be under no duty to disclose the same to the company/employer. So far as the second of these propositions is concerned *Balston*'s case is plainly distinguishable from the present case. *Balston*'s case was concerned with the duty of the director/employee to disclose his own conduct. Falconer J does not seem to me to have dealt explicitly with the general submission made by counsel for the plaintiff ([1990] FSR 385 at 403) that, as a director, the defendant was under a duty to report any knowledge he acquired concerning competition. He had in fact accepted the second defendant's evidence (see [1990] FSR 385 at 392) that he had made no decision on whether or not to compete prior to his resignation as a director, so that the point strictly did not arise. What the case does not deal with is the duty of a director, or an employee, to report the misconduct of a fellow director/employee. That question had been considered by the Court of Appeal (Stephenson, Fox and Kerr LJJ) in *Sybron Corp v Rochem Ltd* [1983] BCLC 43, [1984] Ch 112.

**[86]** In *Sybron Corp v Rochem Ltd* the Court of Appeal held, after analysing the decision in *Bell v Lever Bros Ltd* and its own decision in *Swain v West* (*Butchers*) *Ltd* [1936] 3 All ER 261, that, while there is no general duty to report a fellow servant's misconduct, the question whether there is such a duty depends on the contract and on the terms of employment of the particular servant. Stephenson LJ put it in the following terms ([1983] BCLC 43 at 55-57, [1984] Ch 112 at 126-128):

> 'It follows from [*Swain*'s case], which is consistent with *Bell*'s case and is binding on us, that there is no general duty to report a fellow servant's misconduct or breach of contract; whether there is such a duty depends on the contract and on the terms of employment of the particular servant. He may be so placed in the hierarchy as to have a duty to report either the misconduct of his superior as in *Swain*'s case, or the misconduct of his inferiors, as in this case. Counsel for Mr and Mrs Roques (Mr Munby) will not have it that Mr Roques' "No 2" was subordinate to Mr Roques, or that the other managers involved in the conspiracy were his subordinates or inferiors; but on this point I agree with the judge and I refer, again without apology and with approval, to the way in which he put the matter in his judgment below: "I do not think that there is any general duty resting on an employee to inform his master of the breaches of duty of other employees; the law would do industrial relations generally no great service if it held that such a duty did in fact exist in all cases. The duty must, in my view, depend on all

*[2003] 2 BCLC 523  at  559*

> the circumstances of the case, and the relationship of the parties to their employer and inter se. I think it would be very difficult to have submitted, with any hope of success, that Bell and Snelling, having been appointed to rescue the affairs of their employers' African subsidiary in effect jointly, ought to have denounced each other." That is a reference to the finding that Bell and Snelling were, according to the report of the case in the House of Lords ([1932] AC 161, [1931] All ER Rep 1), in joint management and therefore one was not subordinate to the other. The judge continued: "However, where there is an hierarchical system, particularly where the person in the hierarchy whose conduct is called into question, is a person near the top who is responsible to his employers for the whole of the operation of a complete sector of the employers' business - here the European zone - then in my view entirely different considerations apply. That the principle of disclosure extends at least as far as I think it extends (and perhaps further, but that is of no consequence for present purposes) has been decided once and for all, so far as this court is concerned, by *Swain v West* (*Butchers*) *Ltd* [1936] 3 All ER 261, a decision of the Court of Appeal. *Bell v Lever Bros Ltd* [1932] AC 161, [1931] All ER Rep 1 was very much in the forefront of everybody's mind in that case, but none of the Lords Justices thought it had any bearing on the case before them." After reading, pretty well in full, the judgment of Greene LJ, from which I have read extracts, the judge went on: "This judgment has, if I may respectfully say so, the great merit of common sense. A person in a managerial position cannot possibly stand by and allow fellow servants to pilfer the company's assets and do nothing about it, which is really what [the] submissions [of counsel for Mr Roques and others (Mr Munby)] would come to when applied to the present type of case. Certainly at all events where the misconduct is serious and the servant is not discharged immediately it must be quite obvious that, as part of his duties generally, the senior employee is under a duty to report what has happened as soon as he finds out, and further to indicate which steps (if any) he has taken to prevent a repetition thereof. Of course, this all depends upon the duties of the relevant employee under his contract of service. In the present case there was a well-recognised reporting procedure, whereunder the zone controller, Mr Roques, was expected to make reports as to the state of matters in his zone every month. It may possibly be argued that in such a case the duty to report was not an immediate duty but one to be fulfilled at the next reporting date; so be it, because even if this is correct no such report was ever made by Mr Roques to his superiors. I therefore reach the not very surprising conclusion that Mr Roques was under a duty to report all he knew about the misdeeds of his subordinate employees, commencing with those of Mr Bove, as soon as he found out about them, and that he did not do so, deliberately and fraudulently, because he was one of the conspirators himself. The duty which lay upon him was, I repeat, not a duty to report his own misdeeds - this may well be regarded as negative by *Bell v Lever Bros Ltd* - but to report those of his fellow conspirators." '

**[87]** Fox LJ agreed, placing some emphasis on the distinction between a case such as *Bell v Lever Bros Ltd*

which was concerned with past breaches of duty and a case, such as that before him, concerning continuing breaches

of duty (see [1983] BCLC 43 at 57, [1984] Ch 112 at 128). Kerr LJ also agreed, doubting whether *Bell v Lever Bros Ltd* applied to a case of fraudulent concealment of a past breach of duty (see [1983] BCLC 43 at 59, [1984] Ch 112 at 130).

**[88]** This line of authority (with the exception of *Balston Ltd v Headline Filters Ltd* [1990] FSR 385 which does not appear to have been cited to him) has recently received further consideration in a recent decision of Mr Nicholas Strauss QC sitting as a deputy High Court judge in this division in *Item Software (UK) Ltd v Fassihi* [2003] 2 BCLC 1. In that case, the learned deputy judge, after a penetrating examination of the authorities, identified certain circumstances in which an employee/director (not there acting in concert with other employees or directors) might come under a duty to disclose his own misconduct. For present purposes the decision is relevant for the distinction it draws between the position of an employee and an employee who is also a director. On that issue (in the context of the effect of a failure to disclose an earlier breach of fiduciary duty as director on the validity of a contract terminating a service agreement), different views had been expressed, obiter, by Glidewell J, at first instance, and Robert Goff LJ, on appeal, in *Horcal Ltd v Gatland* [1983] BCLC 60 (Ch D); [1984] BCLC 549 (CA). While accepting that the position of a director should be the same as that of an employee in relation to the duty to disclose his own past breaches when negotiating an agreement to vary or terminate his service contract, Mr Strauss QC's view was that in the case of a present breach, which it was in the interests of the company to know for the protection of its business, a distinction should be drawn.

**[89]** On this issue (which it is unnecessary to decide here where the threatened activities were not those of one director alone) I agree with the view expressed by Mr Strauss QC. A director's duty to act so as to promote the best interests of his company prima facie includes a duty to inform the company of any activity, actual or threatened, which damages those interests. The fact that the activity is contemplated by himself is, on the authority of *Balston*'s case, a circumstance which may excuse him from the latter aspect of the duty. But where the activity involves both himself and others, there is nothing in the authorities which excuses him from it. This applies, in my judgment, whether or not the activity in itself would constitute a breach by anyone of any relevant duty owed to the company. It does not, furthermore, seem to me that the public policy of favouring competitive business activity should lead to a different conclusion. A director is free to resign his directorship at any time notwithstanding the damage that the resignation may itself cause the company: see *CMS Dolphin Ltd v Simonet* [2001] 2 BCLC 704 at [95] per Lawrence Collins J. By resigning his directorship he will put an end to his fiduciary obligations to the company so far as concerns any future activity by himself (provided that it does not involve the exploitation of confidential information or business opportunities available to him by virtue of his directorship). A director who wishes to engage in a competing business and not to disclose his intentions to the company ought, in my judgment, to resign his office as soon as his intention has been irrevocably formed and he has launched himself in the actual taking of preparatory steps. Although this might seem inconsistent with the wide statement of principle in *Balston*'s case, it is not inconsistent with the decision in that case on its particular facts: as already

noted (see [86] above) the intention to compete does not appear to have been formed prior to the resignation as a director.

**[90]** I have so far been dealing with the duty to disclose in relation to the conduct of others which is potentially damaging but which does not necessarily involve a breach of duty. In the present case the conduct of Don Allen following his resignation as a director in soliciting the resignations of the employees, was, viewed on its own, conduct of that kind. He was perfectly free to proceed to set up MIT and invite employees of BMT to join it. The conduct of the remaining three did, however, in my judgment involve them in breaches of their fiduciary duty. The situation was one, quite simply, where to the knowledge of three of the six members of the board of BMT, a determined attempt was being made by a potential competitor to poach the former company's workforce. The remaining three at best did nothing to discourage, and at worst actively promoted, the success of this process. In my judgment this was a plain breach of their duties as

directors. Those duties required them to take active steps to thwart the process. Plainly their plan required the opposite. Active steps should have included alerting their fellow directors to what was going on. Their plan required, on the other hand, that their fellow directors be kept in the dark. This plan was formed, at the very latest, by 13 March when Don Allen gave notice of retirement. At least from that date in my judgment the continuance in office of the remaining three without disclosing to their fellow directors what was afoot necessarily involved them in a breach of their duties.

**[91]** Mrs Giret submitted that there was no breach in not disclosing the plans to the rest of the board since the authorities showed only that a subordinate employee might be obliged to disclose the misconduct of a superior (as in *Swain*'s case) or someone at or towards the top of the hierarchy that of an inferior (as in *Sybron*'s case), whereas here the misconduct (if any) was that of equals. It is true that, in the passage of Walton J's judgment at first instance in *Sybron* 's case set out in the passage quoted above (see [86] above), he seems to have supposed that the explanation for it not having been argued in *Bell v Lever Bros Ltd* that Bell should have denounced Snelling and vice versa lay in their co-equal status. However, the more important lesson to be learned from the judgments in *Sybron*'s case seems to me to be that the extent of the duty to inform will depend on the circumstances of each case. In the present case the Tamworth 4 were the executive directors of BMT, charged and trusted by the owners with its management on a semi-autonomous basis and having the primary responsibility for relations between the company and its workforce. In those circumstances I do not think that the fact that any one of them was himself involved in a breach of duty absolved him from his duty to report breaches by the others.

**[92]** In any event Mrs Giret's submission, even if correct, would not meet the point that the (at best) passive standing by (by the three remaining directors) while Don Allen poached the workforce was itself, whether disclosed or not, a breach by them of their duties.

## IV. Conclusions on liability

**[93]** For these reasons I have concluded that the implementation of the Tamworth 4's plans as they stood immediately prior to 13 March necessarily involved a breach by the three who were to remain directors for

*[2003] 2 BCLC 523  at  562*

the time being of their duties as directors, and that they are therefore liable to the claimant for damages for conspiracy. Moreover implementation of the plan was not possible without the active co-operation both of MIT and of Mr McGrath. MIT obviously knew (by Don Allen) of the facts which made that implementation unlawful. It is less obvious that Mr McGrath need necessarily have known, but I am satisfied that he did. By this stage he was the owner of the new enterprise (through his wife), whatever informal arrangements existed for a subsequent buy-out by the Tamworth 4. He was bankrolling the whole operation. The telephone logs between the Tamworth 4 and himself or BTG reveal constant contact during the relevant period. It is impossible to suppose that he was not being kept up to date with the development of the plan as it proceeded. It is impossible to suppose that he could have made any other assumption than that it was being kept a secret from the claimant and its owners. In my judgment therefore he is liable as a conspirator in relation to the unlawful actions which I have identified up to this point. Taking the view that I have as to the personal nature of his investment at this stage, there is, however, no basis for holding BTG liable as a conspirator in respect of these matters.

**[94]** That conclusion renders it strictly unnecessary for me to consider separately the question whether implementation of the plans also necessarily involved any of them in breaches of their service contracts. As to that, I do not think that exactly the same analysis applies. The employee's duty of fidelity to his employer, although in some respects similar in content to the director's fiduciary duty to the company and although it is itself sometimes described as a fiduciary duty (see, eg *A-G v Blake* (*Jonathan Cape Ltd, third party*) [1998] 1 All ER 833 at 842, [1998] Ch 439 at 454 per Lord Woolf MR), is by no means identical. Importantly it does not include, in the usual case, any prohibition as such on being in a position where his duty as employee and his self-interest may conflict. Moreover, so far as public policy considerations of restraint of trade are concerned, a situation which has to be catered for is the case where the employee has given notice of termination of his employment and wishes during the period of his notice to take preparatory steps (in his own time) with a view to undertaking a competing business when he is free to do so (the situation in *Balston'*

s case). Mrs Giret also reminded me of the statement by Cumming-Bruce LJ in *G D Searle & Co Ltd v Celltech Ltd* [1982] FSR 92 at 101-102 that:

> 'The law has always looked with favour upon the efforts of employees to advance themselves, provided they do not steal or use the secrets of their former employer. In the absence of restrictive covenants, there is nothing in the general law to prevent a number of employees in concert deciding to leave their employer and set themselves up in competition with him.'

**[95]** While not disagreeing with that last quotation as a general statement, in relation to the central point which I have considered (ie the behaviour of the remaining three senior management employees during the period when to their knowledge Don Allen was conducting the poaching exercise) I think it impossible to hold that their conduct was consistent with their duty of fidelity to their employer.

*[2003] 2 BCLC 523  at  563*

## V. Electronic copying

I begin by summarising the evidence in relation to the physical equipment available, and the installed software.

### MIT's HP Brio computer ('the Brio')

**[96]** The contents of this computer were imaged by Mr Dearsley during the search. Its hard drive is partitioned into four drives (C, D, E and F). The Brio at that date was running on a Windows NT operating system loaded on to the C drive. Other program files (the AutoCAD 2000, Anca software, and Microsoft Office) were also stored on the C drive. The data files were mostly on the E drive. The E drive contained AutoCAD drawings grouped together by customer names.

**[97]** According to Mr Dearsley's written evidence the AutoCAD program, described by him as 2000i (version 15), was installed on the C drive on 17 December 2000. During closing speeches he communicated with the court (at my request) to explain that the reference to AutoCAD 2000i was a mistake: what had in fact been installed on that date had been AutoCAD 2000 (that program also containing version 15 of AutoCAD), it appearing that that installation had in fact replaced an earlier installation of the same program on 17 November 2000. It is also known, independently of Mr Dearsley, that Autocad 2000 had been supplied and installed by Mr Bradford in April or May 2000. Mr Dearsley's evidence was that no version of AutoCAD earlier than 2000 had ever existed on the hard drive of the Brio.

**[98]** Under the Windows operating system there are normally three dates associated with a file: Date Created, Date Last Modified and Date Last Accessed. The date (and in the first two cases also the time) is dependent on the date and time settings on the computer. If files remain in their original locations then Date Created will show the date and time on which the file was first created on the drive. Date Last Modified will show the date and time when the file was last modified or saved (when a file is first created there will be typically be a time difference of one or two seconds between Dated Created and Date Last Modified). Date Last Accessed will change whenever a file is either opened and viewed, or scanned by a virus detector, or accessed for its properties. When a file is *moved* from one location to another only the Date Last Accessed changes. If the file is *copied* from one location to another, the Date Created will change to the time at which it is created in the new location (as will the Date Last Accessed) but the Date Last Modified will remain the same. The same applies if a file is copied from a floppy disc drive to the hard drive.

**[99]** A large percentage of the files on the Brio show a Created Date of 16 or 20 November 2000, which is later in time than their Last Modified Dates. This demonstrates an 'en bloc' saving of files to their current locations on those dates. It does not exclude the possibility that the files had been on the system prior to that date but had been copied to another external medium and then re-loaded. Examination of the various date and time stamps also reveals that groups of files had the same Last Modified Date stamps, showing an activity concentrated on relatively few days.

**[100]** The AutoCAD data files are all, in version 15 format. AutoCAD version 15 includes a facility to migrate

drawings done in earlier versions in bulk. AutoCAD files maintain their own *internal* record of date created and

updated (respectively 'idc' and 'idu'). The idc shows the date of original creation of the file and the idu shows the date of the most recent amendment. The idc will not change when the file is copied to another computer or converted from one version of autocad to another. The idu will, however, change on conversion from AutoCAD 14 to AutoCAD 15. A large number of files on the Brio have the same idc in November 1996. Examination of the idus of all the (973) files reveals that they fall into identifiable groups. For example 55 files were opened and updated between 7.01 and 14.20 hours on 18 May 2000 and 54 files were updated on 29 August 2000. Mr Dearsley's opinion is that the most likely explanation for this is that the updating in these cases occurred as a result of a migration of the files from version 14 to 15.

[101] Two puzzles present themselves. First, there are a number of cases where the idu is different from the system Date Last Modified. This is most easily seen where a number of files have a system Last Modified Date of 17 May 2000 but an idu of the following day. There is indeed, one - to which Mr Dearsley was not taken - where the Date Last Modified is 17 May 2000 but the idu is 22 September 2000. Mr Dearsley was unable to account for this phenomenon, although he suggested that the effect might be produced by amending the document on 17 May and printing it on 18 May. He appeared to reject my suggestion that the effect could be produced by an amendment of the file on 17 May and a conversion to version 15 on 18 May. The difference could not, as I understood his evidence, be accounted for by the different ways in which the Windows and AutoCAD software respectively calculates dates and times (Windows counts in nanoseconds from 1 January 1601 and AutoCAD counts days since 4713 BC using the Julian calendar).

[102] Secondly, there are some 164 files which show an idc of 12 December 2000 (at 10.40.53). This would be consistent with their having been created from a template of that date. However, of these files some 40 have an *earlier* Created Date of 20 November 2000. Mr Dearsley's evidence was that this could only have happened in two ways. Either the files were created on a computer where the clock was wrongly set at 12 December and then copied to the Brio when it had the correct date of 20 November. Or the files were created on 12 December 2000 and then saved onto the Brio when its clock was (wrongly) set to 20 November. The possibility that the phenomenon might have had something to do with the installation of the AutoCAD program itself, first on 17 November and secondly on 17 December (see [97] above) was not explored with Mr Dearsley.

[103] Mr Dearsley found references in large numbers of the files (when converted to DXF binary format) to a BMT origin (in the form of the words British Midland, BMT or a telephone number). These references ('template traces') are embedded in the templates on which the drawings were created and do not appear on the screen or the print-out of the drawing. The equivalent hard copy drawings do not therefore show this information. This is consistent with references in an original BMT file having been removed on screen and the modified file then saved.

## BMT's Eagle computer

[104] This ran on Windows 95. The drive was partitioned into three drives, C, D and E. Drive C contained the operating system and the program files, including a copy of Autocad 14. The data files were mainly on Drive D. The drive contained a program for the creation of CD-ROMs (Adaptec EasyCD creator).

[105] The AutoCAD data files are all stored in AutoCAD version 14.

[106] The contents of the Eagle were downloaded on to CD-ROM in November 2000 by Alan Johnson of Allen Group for the purpose (I was told) of obtaining expert computer advice. Mr Dearsley imaged the contents of the Eagle two days after the search in April 2001 and his evidence is based on that, rather than the Johnson CD-ROM. He was told that the Eagle was the machine on which the BMT drawings were done, as appeared to be the case from the fact that it was to this machine (rather than the newer SSC) that the AutoCAD 'dongle' was then attached.

**[107]** Following the exodus it was discovered that one of BMT CAD room computers did not work. Tim Allen called in Warren Bradford who advised that the defect was that its processor had been removed. It is not entirely clear from the evidence whether this was the Eagle or the SSC.

### BMT's SSC computer ('the SSC')

**[108]** This computer, together with the Eagle, was removed to Allen Group in July 2001 (after the search). Marcus Nye backed up its contents onto CD-ROM ('the Nye CD-ROM') and then commenced the process of installing a new operating system (Windows 2000) in place of the then existing Windows 98. Shortly after commencing this operation he had realised that this might corrupt the evidentiary value of the computer and had aborted the installation. When Mr Dearsley subsequently (in early 2002) inspected the SSC he found that all the data files had been obliterated but that there was some fragmentary evidence of their once having existed. He attributed this to the aborted installation and excluded the possibility that this could have been the result of deliberate deletion of files or directories. Mrs Giret commented that it was extraordinary that Mr Dearsley had not been given access to the SSC until after Mr Nye had accidentally wiped out its data files.

**[109]** The Nye CD-ROM shows that the SSC contained a directory called 'qman'. There are fragmentary references on the Brio hard drive to a file 'a:qman.doc'. This is evidence that a Word document with that file name was at some point loaded onto the Brio from a floppy disc.

### Issues on the electronic drawings

**[110]** Following the search it was established that MIT had 973 AutoCAD files on the Brio. BMT had 1516 AutoCAD drawings on the Eagle. BMT's case is that of those 1516 files it can identify 524 files as being also on the Brio.

**[111]** The defendants' case is that the vast majority of the drawings on the Brio have a legitimate source as being either (i) received in electronic form from customers, or (ii) derived from a CD-ROM supplied to MIT by CADdraught, or (iii) drawn by MIT. A relatively small proportion fall into the last category since, as has been pointed out by BMT (and not seriously challenged) about 408 of the MIT CAD drawings are exact copies of BMT

*[2003] 2 BCLC 523 at 566*

drawings (save for re-badging and dates) and about 57 are close adaptations.

**[112]** The defendants concede that a certain number of the 524 files on the Brio cannot be explained in any of the ways suggested in the last paragraph. In relation to these the defendants concede that they appear to be copies of BMT's electronic drawings and that there was no legitimate way in which they could have found their way onto the Brio. They can be conveniently labelled 'the illicit drawings'. The defendants contend that, whatever was the route by which the illicit drawings found their way onto the Brio, they had no knowledge of it, and had not consented to it.

**[113]** The exact number of illicit drawings is not agreed. The defendants put the figure at 77 (possibly 81). The small discrepancy, if any, in the count made by the claimants is immaterial. The important point is the existence of the category.

**[114]** BMT's case as to what happened provides a relatively straightforward explanation for the presence of the illicit (and other) drawings. It relies principally on the evidence of Paul Bland. He gave evidence that he was handed one, perhaps two, CD-ROMs by Alan Pearce in May 2000, that those CD-ROMs contained BMT's AutoCAD data files, that he was instructed by Alan Pearce to put them on the Brio, and that he did so over the succeeding weeks and months with the knowledge and approval of Wayne Allen. In the course of doing so he undertook what I have described as a 're-badging' exercise, namely removing references to BMT, substituting for them references to MIT and changing the dates on the drawings. If that evidence is accepted then the illicit drawings simply formed part of a larger batch of drawings deliberately copied by Paul Bland at this period. The significance of the illicit drawings is that, if this case is not correct, some other explanation has to be offered for their presence on the Brio.

**[115]** The only explanation which has been ventured by the defendants is that they were deliberately planted with a view to incriminating the defendants. It will be recalled that a large number of the Brio files have a system Created Date in November 2000 (see at [99] above) whereas their icds and idus are earlier. This indicates that the files were all loaded onto the Brio when its clock was set to that date. That is consistent with an event which is known to have occurred, namely the loading of a new operating system (Windows NT) on to the Brio in November 2000. The probability is that, in connection with this operation, the files on the Brio were backed up on some other medium (which, in the absence of CD writing software on the Brio would have had to be on to floppies, or on to the Iomega Zip drive), and then re-loaded following the installation of the new operating system. There are, however, the 40 files (see at [102] above) where the icds are 20 December 2000 but the system Created Dates are prior to 20 November 2000, a phenomenon which Mr Dearsley was only able to explain on the basis either of the files having been created with an incorrect system date of 12 December and copied on to the Brio when it had the correct date of 20 November, or of their having been created on 12 December and saved on to the Brio when its clock was (incorrectly) set to 20 November.

**[116]** The defendants contended that the second explanation was more likely (Mr Dearsley had opined that one was no more likely than the other).

*[2003] 2 BCLC 523 at 567*

The criticism made of the first scenario is that the file loading times are recorded as having started at 7.31 am, and it is known that the drives on to which the files were loaded were themselves created on 20 November. The argument was that there would simply not have been time to conduct the necessary operations, viz (a) creation of the drives, (b) adjustment of the clock to 12 December, (c) creation of the files, (d) re-adjustment of the clock and (e) saving to the drive. In their closing submission Mrs Giret and Miss Kyriakides suggested that--

> 'someone loaded on to [the Brio] on or shortly after 12 December 2000 the illegitimate drawings and turned the clock back to make it look as if those files had been copied on at an earlier date; they then copied off all of [MIT's] files onto a CD-ROM or onto the zip drive, set the clock to 20 November 2000 (which is the date when the files may genuinely have been re-loaded back onto the computer as the result of the installation of Windows NT) and re-loaded all of the files back.'

**[117]** This adventurous speculation only emerged fully fledged in their closing speech. It was not tested for its technical possibilities with Mr Dearsley, nor was it put either to Mr Bland (who would have had to have been the perpetrator of this attempt to pervert the course of justice) or to Tim Allen (as the presumed instigator of the plot). It was produced as the only suggested scenario consistent with the defendants' case that they did not know of the presence of the illicit drawings on the system. Corroborative support for it is said to be found in the fact that Mr Bland's own account of how the Brio came to have such a large number of illicit drawings on it is demonstrably inaccurate.

**[118]** I did not find this scenario at all plausible although I accept that, on the technical evidence so far as it was explored, it is a possible one. From the purely technical point of view, however, it has to be accepted that the way in which the Brio has dated a number of matters defies explanation (without necessarily admitting of a possibly malicious manipulation). All the files on the Brio were probably backed up in November when Windows NT was installed, and there was some evidence that the Brio was sent away for the purposes of the latter installation. It is likely that at that stage the need to reset the computer clock arose. Something odd certainly seems to have happened in November in connection with this event: this is evident from the fact that there are traces of an AutoCAD program installation on 17 November some three days before the creation of the drives in connection with the new installation. There is the further consideration that the probable explanation for the need to re-install the AutoCAD program files on 17 December (see at [97] above - another curious date) was that the earlier version had become corrupt. I do not know whether corruption in the AutoCAD program and/or its reinstallation could itself produce false idcs. To argue successfully that the technical evidence pointed towards a malicious plant in December or shortly thereafter required, in my judgment, technical evidence to support it, such evidence examining in particular exactly what did take place in November. There was none, save for the scraps elicited from Mr Dearsley in cross-examination when his attention was not specifically directed to the hypothesis which the defendants

were later to advance. One may note in addition that the premise for preferring the second of the two alternative scenarios assumes that, under the first

*[2003] 2 BCLC 523  at  568*

scenario, the computer's clock will have been set absolutely accurately. I am unclear why that assumption should be made. Certainly my own experience (as a user) of computer clocks does not encourage it.

**[119]** The alleged 'planter' of the illicit files has also, in this respect, shown himself to be unsophisticated enough to make the mistake of including these 40 files with an unacceptably late idc. This is something of a contrast with the comparative sophistication with which he would have had to embark on the process of giving the 77 illicit files system Last Modified Dates in May 2000 (in order to make it look as if the re-badging exercise had taken place then). That in itself (on the defendants' hypothesis) was a botched job, since the form which the 'planting' in fact took did not correspond with the evidence which the 'planter' subsequently gave as to the way in which the files had in reality been loaded. That disparity was itself made the foundation for the defendants' attack on Mr Bland's credibility, and I now turn to it.

**[120]** The defendants point to what the computer records as having been the first drawings loaded onto the Brio on 17 and 18 May down to Aston-Uni and including the one Fin drawing shown as saved to the system in the middle of a clutch of Accrapak drawings. The drawings have not been loaded alphabetically (albeit that down to Aston-Uni a reverse alphabetical order can be discerned), and do not include either all BMT files of the customers whose files do appear or all the BMT customers whose names might be expected to be found in the alphabetical constellation which does appear. Moreover the relevant customer files were not ones for which MIT had any obvious use, and there is no evidence that they were printed out for the purposes of being taken into inspection. Furthermore the time gap between the saving of each drawing to the system does not allow for the process described by Paul Bland of his opening a drawing from the CD-ROM, re-badging it, and saving it to the Brio's drive: the re-badging must have taken place in relation to the whole batch before saving to the Brio in a batch.

**[121]** These criticisms were largely accepted by Mr Martin on behalf of BMT. He pointed out, however, that Paul Bland had been far from dogmatically certain about exactly how he had gone about the tedious task which had been set him, as the following exchange (admittedly resiling from earlier evidence) made clear:

'MS GIRET: I suggest to you again it is consistent with them all going on at the same time.

A. It could be in this file but I was developing it so I could change these files as quickly as possible. It's not unfeasible that I didn't --

MR JUSTICE HART: You were working out the best way of going about it.

A. Yes. I wouldn't know how I did it now but I did set up a -- It was very tedious and I was looking for the shortest route to do it.'

**[122]** In his closing submissions Mr Martin was able to suggest a perfectly plausible explanation for why the first drawings loaded onto the Brio should have appeared in reverse alphabetical order. That effect would be produced if Mr Bland had opened a series of windows in alphabetical order, making the necessary changes as he went along, and then, at a certain stage, saved back modified drawing. On this scenario the adapted drawings would

*[2003] 2 BCLC 523  at  569*

have been saved in quick succession in reverse alphabetical order.

**[123]** Nothing in the way Mr Bland presented his evidence to me, or in the circumstances in which he came to give evidence, made me think that it was at all likely that Mr Bland was lying when he gave evidence that he had been supplied by Alan Pearce with BMT AutoCAD files on CD-ROM in May 2000, that he had been instructed to 're-badge' and copy them to the Brio, and that he had proceeded to comply with this instruction

after first clearing the propriety of doing so with Wayne Allen. Mr Bland had no discernible motive for having invented this story. Moreover, the hypothesis on which the defendants' case proceeds is not merely that Mr Bland invented this story but that he conspired with Tim Allen in November and December 2000 actually to plant evidence on the Brio to support the false evidence. As I have already pointed out this was not put either to him or to Tim Allen and the technical feasibility of the supposed manipulation was not supported by any expert evidence.

[124] The weakness of the defendants' case against Mr Bland in relation to the illicit drawings is, by the same token, a weakness in relation to all the MIT electronic drawings which can be shown to derive ultimately from BMT. The defendants' case is that, apart from the illicit drawings, these copies were all supplied on floppy discs by customers. That is contradicted by Mr Bland, who has no recollection of loading such drawings from floppy disc. It is, moreover, not supported (with one exception) by any evidence from customers. It is extremely difficult to see why, if it be the case that all these drawings were supplied by customers on floppy disc, the defendants have been unable either to point to a single piece of corroborative written evidence or to call direct evidence to that effect from customers.

[125] The paucity of the defendants' evidence in support of their positive case that they were supplied with discs containing the relevant drawings by customers is striking. In only a minority of cases can the drawings be associated with a specific order, and in none of those cases is there any contemporary evidence that an electronic version of the drawing was supplied by the customer. The defence, as expanded by a Pt 18 answer, contented itself with alleging that discs had been supplied by Accrapak in May 2000, by Lamb Technicon in about June 2000, by Cross Hueller in May/June 2000 and by Albon in May 2000. Those allegations were supplemented by further allegations in the amended Scott Schedule in relation to the supply of electronic drawings by the Ford plants at Bridgend, Swansea and Dagenham, the specific allegation being made in relation to the Swansea drawings that one Dumelow of Ford had supplied a disc to MIT. In relation to the Dagenham drawings (in relation to the Puma project) the defendants speculated, through the medium of Alan Smith, that these had been included on the disc obtained by Mr Smith from CADdraught of the 14/15 drawings. No evidence was led by the defendants of the fact, as opposed to the possibility, of the supply of floppy discs from the Ford customers, and there was nothing in the evidence led concerning the contents of the CD-ROM supported by CADdraught to MIT to support the speculation that it had contained anything other than the 14/15 drawings which had been requested.

[126] The defendants neither called nor gave any evidence in relation to the Accrapak electronic drawings which the computer records as having been saved onto the Brio on 18 May 2000. It was contended on behalf of

*[2003] 2 BCLC 523  at  570*

the defendants that the mere assertion by them in the amended Scott Schedule of receipt of discs by Accrapak, coupled with the failure by the claimant to test this in cross-examination, amounted to an acceptance by the claimant of the 'evidence' contained in the Scott Schedule. That appeared to me to be a complete misunderstanding of the function of the Scott Schedule which, notwithstanding its verification by a statement of truth, at all times retained its status as a pleading rather than as evidence. The case was not improved by reliance on the further assertion in the defence that the drawings were supplied for the purposes of enabling MIT to quote for particular tooling for Accrapak. This again was not supported either by documentary or oral evidence. The same position was taken by the defendants, and the same comment applies, to the Cross Hueller and Lamb Technicon copies.

[127] Once one accepts, as I have, the improbability of Mr Bland having lied, further detailed examination of the possibility or probability of the defendants having independently been supplied by customers with any of the relevant drawings is rendered largely unnecessary. The evidence contained on the computer itself points to just the kind of copying, unfocused on any particular order from a particular customer, to which Mr Bland deposed.

[128] The only customer in respect of which the defendants sought to advance positive evidence of the supply of discs was Albon. The evidence which they led was that Alan Morley had supplied Albon with a set of discs in May 1999 and had subsequently, in May 2000, retrieved these discs from Mr Lomas of Albon. The

further evidence was that at a later date discs containing the drawings had been returned to Mr Lomas. This evidence was supported by Mr Lomas. After he had given evidence Mr Lomas produced to the defendants' solicitors the discs. Examination of the physical discs by the claimant apparently showed them to have been manufactured in August 2002. They were thus clearly not the discs which had allegedly been retrieved by Alan Morley in May 2000. No doubt had the August 2002 date been known by the claimants at the time when Alan Morley and Mr Lomas were cross-examined on this issue, their lack of clarity as to the date when discs were allegedly returned to Albon would have been further explored.

[129] There were, however, other reasons for doubting the account given by Alan Morley and by Mr Lomas. In the first instance, the earliest date in May 2000 at which Alan Morley would have retrieved the discs would have been 4 May 2000 whereas Albon's first order, which must have been manufactured by reference to a drawing identical to BMT's drawing at K10/692, was manufactured on 2 or 3 May. Secondly, one of the Albon drawings (K10/715 and 716 Scott Sch 481) contains a change recorded as having been made in January 2000. This could not have derived from a drawing supplied on disc to Albon in summer 1999 and returned to Alan Morley in May 2000 unless Albon had itself replicated the change in the interval. Moreover no entirely satisfactory explanation was ever given as to why the discs had been supplied to Albon in the first place, or why in May 2002 Mr Lomas had written an e-mail which gave the impression that only one disc had been given by him to Alan Morley in May 2000 (when the expert evidence was that between six and nine discs would have been required).

*[2003] 2 BCLC 523  at  571*

 [130] A puzzling feature of the Albon drawings is that on BMT's Eagle many of them have idcs of 3 April 1998 whereas the MIT versions on the Brio have idcs of 11 November 1996. That supported a suggestion that the MIT versions were earlier versions than those which would have been copied by Mr Bland (if his evidence were true) from the Pearce CD-ROM and was said by the defendants to support their case that Mr Bland's evidence could not be accepted in relation to the Albon drawings. The force of this point is however lessened, if not undermined altogether, by the fact that Alan Morley's evidence was that there had been tooling trials for Albon in July 1999 which had prompted Albon's request to be supplied with all BMT's Albon drawings. If, however, that was what prompted the request, it would presumably have led to Albon having been supplied with what were then the most up-to-date versions of the BMT Albon drawings, including those saved onto a template or templates dated 3 April 1998. The discrepancy in the template dates accordingly provides no independent corroboration of Alan Morley's version of events, or reason to doubt Mr Bland's evidence that he did not load the Albon drawings from floppy disc. The alternative explanation for the template discrepancy is that the relevant Albon drawings were copied by Mr Bland onto the 1996 template during the re-badging process. That seems to me both plausible and probable.

[131] I also accept in this connection the claimant's submission that there is nothing in the evidence from the Brio, and in particular the evidence of the sequence and timing of the copying which took place, which supports the theory that the Albon drawings were loaded by Mr Bland from floppy discs.

[132] My conclusion is that none of the allegations made by or on behalf of the defendants provides any sound basis for rejecting Mr Bland's evidence. Furthermore there is other evidence, so far only touched upon, which unquestionably supports the thesis that the defendants were prepared to, and did, make electronic copies of BMT documentation at the time of the exodus. This is the presence in the slack space of the Brio's hard drive of the remnants of a deleted file with the name 'a:.doc' consisting of text from the table of contents page of the BMT Quality Control Manual.

[133] Mr Dearsley's evidence was that the files copied onto CD-ROM on 25 July 2001 from the hard drive of the SSC computer included a file named 'Qman.doc' which consisted of the BMT Quality Control Manual issue 2 Revision 1. His examination of the file fragment on the Brio led him to conclude that it originated from an earlier version of the file 'Qman.doc', and that the 'a:' prefix pointed to copying having taken place on a floppy disc.

[134] This was clear evidence of copying having taken place unless the defendants could plausibly suggest an innocent route for the transmission of the file represented by the fragment. This they sought to do. The suggestion was that they had inadvertently been supplied with the file by Mr Rollin of Mercian Training Ltd.

He had been responsible for supplying both MIT and BMT with hard and electronic copies of their respective Quality Control Manuals. His evidence, however, was that he worked only in Lotus Word Pro format. The 'Qman.doc' file was, as the suffix indicates, in Word format, having been converted from Lotus Word Pro format. To maintain the suggestion that this file had been supplied to MIT by Mr Rollin the

*[2003] 2 BCLC 523 at 572*

defendants were compelled to advance a case that the Word file 'Qman.doc' was on the disc supplied by Mr Rollins to MIT. That however was contradicted by Mr Rollin's own evidence that he worked only in Lotus Word Pro format. This seems to me yet another example of the defendants having constructed an ingenious but ultimately unworkable theory to contradict the prima facie evidence of copying.

### Liability in relation to the electronic drawings

**[135]** It does not necessarily follow from my finding that Alan Pearce supplied Paul Bland with the CD-ROM that any or all of the defendants are liable to the claimant for any damage thereby occasioned. One can readily infer that the copying by Alan Pearce must have taken place while he was still employed by BMT, and was therefore a breach by him of his duties as an employee. It will also have involved him in tortious conduct, namely trespassory use of the BMT computer for a purpose for which he was not licensed. I doubt whether the act of copying, or the subsequent use of the copied material amounted to conversion (conversion of what?). Leaving aside, for the moment, the question of the confidentiality of the information, the question in relation to Alan Pearce's unlawful act is the extent to which it was authorised by all or any of the defendants at the time. It seems to me that, only if they knew of it, and expressly or impliedly authorised it at the time, can they be vicariously liable for it, or directly liable as conspirators in relation to it.

**[136]** It may be thought that the obvious inference to draw is that they did, and that it was all part and parcel of the plan. There were certainly potential advantages to MIT in having the drawings in electronic form (see at [166] below). On the other hand, I do not think that the advantages of possessing it would necessarily have been perceived as sufficiently pressing to outweigh the danger that this illicit abstraction of information might give Allen Group precisely the kind of 'ammunition' which Mr Ford had counselled against. Possession of BMT's electronic drawings (or for that matter hard copy drawings) was not a necessary ingredient of MIT being put in a position in which it could compete with BMT. What they would need would be hard copy drawings, and these could be obtained from customers.

**[137]** A scenario which is at least possible is that Alan Pearce, the CAD operator, took his own decision to make a copy of the files, knowing that by doing so he would be saving himself time and trouble in the future. By the time he produced the disc (in May) the exodus had taken place, no writ had been served nor interlocutory injunctive proceedings taken. He could well have taken the view at that stage that the immediate danger had passed, and that, since he took the view that the information was not confidential, there was nothing wrong in using it.

**[138]** I am not sure that such a conclusion is open to me, at least in relation to Wayne Allen. Having found that he has not told the court the truth about the Pearce disc, the obvious inference is that its production in May came as no surprise to him. On that basis I find that he is liable in respect of the copying done by Alan Pearce. It follows that MIT, on whose behalf Wayne Allen was acting at the time, is also liable. Moreover, if Wayne knew it seems probable that Don Allen also did.

**[139]** I am, however, much less sure about the position of Alan Morley

*[2003] 2 BCLC 523 at 573*

and Alan Smith. In the normal course of events neither would have known precisely what was on the system by way of electronic drawings: their interest would have lain in having hard copies to put onto the shop-floor, or to discuss with customers. How the hard copies were being produced would have been a matter for the front office (Wayne Allen), the CAD operators (Pearce and Bland) and Inspection (Mosson).

**[140]** The way in which the defendants have run their case both in relation to electronic and hard copy drawings may be thought to tell against the honesty of the denials by Alan Smith and Alan Morley that they

knew at the time that BMT electronic drawings had been copied onto the Brio. On the other hand, the way that the case has been run can also be said to support the view that they were not originally aware. It must be remembered that by the time these proceedings were commenced, Wayne Allen had left MIT and left, moreover, under a cloud. If Alan Morley and Alan Smith had been aware all along of what was to be found on the Brio, it is surprising that they took no steps to 'clean' the Brio. Neither would himself have had the technical expertise to do so, but Alan Pearce would have been available to assist in the process. Had they looked into the matter at that stage it would have been apparent that there was material on the Brio which must have come from BMT, and which would have either to be made to disappear or to have its presence explained in due course. Without taking any steps to eliminate the material, the defendants simply denied that copying had taken place. The defendants collectively having dug for themselves that ultimately undefendable bunker, Alan Morley and Alan Smith can fairly be criticised for having subsequently lent themselves to the process of digging deeper still. But I do not think that it follows that they knew all along that this copying had taken place and I am doubtful, and not prepared to find, that they did know about it at the time at which it was authorised.

[141] I am also not satisfied that Mr McGrath (or through him BTG) knew about it at that time and it was not put to him that he did. There was no reason for him to have been concerned in what would have been a purely operational matter.

## VI. Hard copy drawings

[142] The drawings which the defendants are alleged to have taken are the 250 identified by a circle in Annex 1 to the claimants' response dated 18 February 2002 to the defendants' request for further information, that annexe itself containing a list of all the hard copy drawings found at MIT during the course of the search. The defendants' response is that the source of all these drawings was customers, it being the usual practice for such drawings to accompany requests for quotations, enquiries or orders.

[143] The evidence does not establish that drawings did usually accompany requests for quotations, inquiries or orders. So far as it is possible to generalise, the evidence showed that the typical order or request for quotation in, for instance, the case of Ford, would be by reference to a drawing number and that there might well be a delay before the customer produced the physical drawing. That however in no way by itself undermines the defendants' basic proposition that the drawings in question were in fact supplied by customers.

[144] The claimant's contention that the defendants had copied its

*[2003] 2 BCLC 523  at  574*

drawings and taken the copies to MIT was based partly on the direct evidence of witnesses, partly on inferences to be drawn from the documents themselves, and partly on forensic evidence.

[145] The direct evidence consisted principally of the evidence of Mr Possee, Mr Crofts and Mr Sutton. Mr Possee's evidence was that Jackie Yates had had a conversation after he came to work at MIT in which she had referred to the amount of photocopying which had been done at BMT prior to, and in anticipation of, the exodus. He also said that, while still at BMT, he had been asked by Jackie Yates (by then at MIT) to provide her with drawings and had done so. Mr Crofts gave evidence of a conversation he had had with Mr Mosson shortly after the exodus in which the latter had spoken of having done a lot of photocopying 'for next door'. Mr Sutton gave evidence that he had personally taken with him some Albon drawings which were marked up with some manuscript notes helpful to him for his own processes, having been encouraged to do so by Alan Smith. In para 19 of his witness statement he deposed to a conversation he had had with Mr Mosson while both were working at MIT in which Mr Mosson had indicated that the drawings at MIT were the product of a photocopying exercise done by Mr Mosson while at MIT. In cross-examination he gave evidence of a further conversation he had had with Mr Mosson after he had been made redundant by MIT in which Mr Mosson had implied that the reason why he Mr Mosson had not been selected for redundancy was because he had photocopied the drawings. This particular conversation was not put to Mr Mosson in cross-examination.

[146] Both Mr Possee and Mr Sutton also gave evidence of a shredding exercise having been undertaken

following service of the claim form (referred to by all witnesses as 'the writ') in December 2000. Mr Possee's evidence in his witness statement of this episode was in the following terms:

> '86. There was a lot of shredding that took place at MIT. I cannot remember much shredding going on before the proceedings were commenced in December 2001 [sic]. Tim Allen came over and served this writ on the factory and this caused a great deal of tension. In the end it took about three weeks to do all the shredding. But for the first couple of days it was a question of finding everything. Over these days it was a massive search exercise within the factory, for things that needed to be shredded.

> 88. I remember Tony Brown gave me a thick folder, which contained documentation like quality control standards and letters relating to BMT and drawings. I was told to go through that file to find anything that was relevant to BMT, if it had BMT on it in any shape or form, shred it. I remember going through it page by page, removing and shredding the relevant documents. And after about half an hour or so I got tired of this and just shredded the lot, ripped up all the pages from the folder and shredded the whole thing. It became a joke on the shop floor when people walked past us, seeing Ian Jackson and I walk past with bales of shredded paper.

> It was obvious why we were doing this; this was stuff that had been taken from BMT and I knew that shredding was wrong. I just got on with it and did as I was told. No one really questioned Alan Smith or Alan Morley, because everyone was so tense and so anxious at that

*[2003] 2 BCLC 523 at 575*

> point in time. This shredding took at least a couple of days. But later after this exercise had been completed we would still find material which should have been shredded. Alan Smith would normally be of the opinion that it did not really matter but Alan Morley always wanted to play safe and instructed me to shred the documentation. In the end, we ended up with several dustbin liners full of shredded paper. This was not put in a skip outside or in a bin but was used for packing tools. The shredded paper was taken to the packing department and used for packing tools, which were then sent off to customers.'

**[147]** I have already commented on the defendants' failure to adduce evidence from Mr Brown (see at [69] above).

**[148]** Mr Sutton also deposed to this episode, although he himself was not directly involved in any shredding. He spoke of there having been a panic after the writ was served and being told to get rid of any BMT documentation. In that context he obtained further copies of the Albon drawings with MIT badging from Mr Mosson, and copied on to them his manuscript notes. His BMT versions were then sent to the office for shredding. Mr Mosson agreed in evidence that there had been an occasion on which at Mr Sutton's request he had printed off some Albon drawings for Mr Sutton to annotate, but asserted his ignorance of any shredding exercise.

**[149]** This direct evidence of documentation having been taken from BMT to MIT was supported by evidence that some original BMT documentation had found its way to MIT. Tim Allen gave evidence that in September 2000 he had found original BMT documentation (which he produced in evidence) in an MIT dustbin. One of the drawings identified by Dr Giles had an original BMT stamp on it and another shows stamps on the back. In addition Mr Robins gave evidence that in the course of the search he had seen original BMT documentation in a drawer in Mr Mosson's office (found underneath an old haversack). Since the search order only covered drawings, this find (to the extent that it did not consist of drawings) was not preserved in accordance with the terms of the search order, and has given rise to much subsequent controversy. The explanation for the presence of the documents favoured by the defendants was that the documents had been planted by Mr Robins in the course of the search. Having heard Mr Robins' evidence on the point I reject that inherently implausible explanation.

**[150]** A substantial number of the documents have BMT 'inspection received' stamps on them. The claimant's case was that in the normal course the copy bearing this stamp would not be sent to the customer. This was accepted by the defendants as being generally the case, but their evidence was that it could happen that customers would receive such a copy and even that a drawing bearing an original BMT stamp might find its way onto a customer's file. The claimant had taken steps to obtain from customers their copies of the challenged drawings, and this process had in no case produced an example of the phenomenon relied

on by the defendants. The defendants contented themselves with producing two or three isolated examples (apparently obtained from customers during the course of the trial) to support their case.

[151] The forensic evidence was said to support the claimant's case in two ways. First, it was clear from Dr Giles' report that a significant number of

*[2003] 2 BCLC 523  at  576*

the drawings had been re-badged so as to convert the copy from a BMT drawing to an MIT drawing. The defendants accepted that this exercise had been carried out. It was Mr Mosson's evidence that this was his standard practice both at BMT and subsequently at MIT when a customer supplied a drawing having on it the stamps of another manufacturer. I saw no reason not to accept his evidence as to the essentially innocent nature of this process.

[152] Secondly, Dr Giles' analysis revealed that a significant number of photocopy drawings held by MIT had 'trashmarks' from which it could be deduced that they were all copies made on the same photocopier. Since more than one customer was involved, it followed that the 'trashmark' photocopies inspected by her could not have been the actual copies supplied by the customer. The inference to be drawn was that the copies had been made either on a BMT photocopier or on an MIT photocopier. If the latter, where (asked Mr Martin rhetorically) were the originals from which these copies had been made? A possible answer to that question is that the originals could have been destroyed having become dirty and unusable in the photocopying process.

[153] Had it stood alone I should have found the internal evidence and the forensic evidence inconclusive on the question which I have to determine. In particular it is difficult to judge the significance of the number of the copies bearing the BMT 'inspection received' stamps when judged against the total number of drawings in the MIT library. I was satisfied that such stamps might sometimes appear on drawings supplied by customers and even that there could be circumstances in which a customer might have a copy bearing an original BMT stamp which it had subsequently supplied to MIT. What is difficult to determine is how often the former process would be likely to occur (only one or two instances of the latter phenomenon have to be explained). The defendants can certainly be criticised for not having obtained better evidence than they did from customers on this issue, but the criticism does not by itself justify my drawing the adverse inference that their hypothesis is to be rejected. The trashmark evidence appears to me to be inconclusive since the inference which I am asked to draw as to the BMT origin of the trashmarks could have been, but was not, tested by examining other photocopies produced at BMT at the relevant period.

[154] What I am, however, persuaded by is the direct evidence of Mr Possee, Mr Sutton and Mr Crofts both as to the admissions alleged by them to have been made by Jackie Yates and Mr Mosson and, in the case of Mr Possee and Mr Sutton, as to the shredding exercise which took place. No plausible reason for their having invented this evidence was suggested, and, while accepting that criticisms could be made in certain respects of the accuracy of their evidence, I was left in no doubt from the way in which they gave their evidence that it was honestly given. Mr Possee was careful in his oral evidence not to give an account which he felt unable to support from direct recollection, and for that reason withdrew one damaging allegation which he had made in his written evidence. He had no discernible motive for inventing a false story apart from bitterness at the circumstances in which he finally left MIT. I did not, however, form the impression that his evidence could be explained on this basis. I was similarly unpersuaded that Mr Crofts' evidence was motivated by any animosity he may have had

*[2003] 2 BCLC 523  at  577*

for Mr Mosson, or that Mr Sutton's undoubted bitterness at the way in which he had been treated by MIT would have led him to invent his evidence about the shredding or Mr Mosson's admissions in relation to photocopying. Both Miss Yates and Mr Mosson on the other hand did have motives for supporting the defendants' total denial that any copying and taking away had taken place. Neither impressed me as witnesses whose first aim was to give a candid account to the best of their recollection of the events which led up to the exodus. The defendants' response to the shredding allegations was that the only shredding which had taken place had been in the weeks following Don Allen's and Wayne Allen's resignation from MIT, or had been referable to an undocumented change in quality control procedures. This seemed to me lame. It

did not answer the very specific evidence given by Mr Possee which I have quoted.

[155] My conclusion is that significant photocopying of drawings by Mr Mosson did take place at BMT in the period leading up to the exodus, and that the photocopies were taken by Mr Mosson to MIT. I think it quite possible that this exercise may have been embarked on by Mr Mosson on his own initiative. As the person who was to be responsible for inspection and ISO 9002 certification, he would know that he would be able to spare himself some labour in the future if he could get together a filing and quality control system at the outset without having to develop it piecemeal as drawings came in from customers. Again, it does not seem to me to have been a necessary element in MIT's ability to compete with BMT at an early date that any of the drawings should have been taken. However, in the case of the hard copy drawings I think it probable that all the Tamworth 4 knew what Mr Mosson was doing. They can hardly have missed the arrival of the photocopies, or doubted their source. Had they wanted to make a case that the first they knew of it was after they had left BMT's employment, and that they then decided to take advantage of the product of Mr Mosson's unlawful activity, they would no doubt have done so. The inference which I draw is that, taking the view they correctly did as to the likelihood of their being able to obtain the drawings from customers, taking the drawings involved little if any wrong to BMT and little chance of being found out.

[156] I do not, however, find it proved on a balance of probabilities that Mr McGrath or BGT knew about this copying and (in the case of originals) conversion. It was not put to them that they did.

### 14/15 hard copies

[157] An issue (not specifically pleaded) arose in the evidence as to whether the defendants had taken from BMT master copies of the 14/15 drawings which BMT had. Mr Possee gave evidence that BMT kept a set of these to which were attached post-it notes giving useful information as to quantities of materials associated with each tool. In the aftermath of the exodus these were, discovered to be missing (or at least could not be found). When he came to work at MIT he saw what appeared to be the same documents, post-it notes included. I was not, however, persuaded that these documents had been taken at the defendants' behest from MIT. My reasons for doubting the thesis are as follows. First, we are here concerned with BMT's original documents. Their disappearance would have been noticed at a very early stage, and immediately attracted suspicion. Fearful as they were of leaving any evidence of wrongdoing, it seems unlikely that the defendants

*[2003] 2 BCLC 523  at  578*

would have wanted to expose themselves so obviously to a charge of theft. Secondly, had these documents been taken, there would have been no need for Alan Smith to have later sought an electronic version of the documents from CADdraught. It seems probable that the electronic version obtained from CADdraught would have been 'read only'. It would have been printable, but not capable of electronic amendment. Alan Smith sought the CADdraught version because he wanted to be able to take a hard copy with him to Mexico to pitch for 14/15 work at the Chihuaha plant. If MIT had already possessed hard copy versions the whole episode (discussed below) of his obtaining a disc from CADdraught would have been unnecessary. Thirdly, the inference which I am asked to draw from the disappearance of the documents from BMT was not, it seems, an inference drawn by BMT at the time: no complaint was made to MIT and the allegation never found its way into any pleading.

[158] In this respect therefore I think that Mr Possee's evidence is an example of an assumption having been made that the defendants had simply taken BMT documents, without proper allowance having been made for the possibility that they had possession of some, perhaps many, 'BTG' documents without having been guilty of taking them directly from BMT. I would add that in deciding that some BMT documents (or copies) had been illegitimately taken from BMT, I have borne in mind the possibility that witnesses (including Mr Possee) have been similarly mistaken in their evidence on similar matters. Some people enjoy the thought that underhand dealings are the explanation of everything which they see, and memory is easily contaminated by wishful thinking. The conclusions which I have reached above as to the defendants' taking of hard copies have been reached with what I hope has been a proper degree of alertness to the dangers of accepting the evidence to which I have referred.

## VII. Confidentiality of the drawings

**[159]** In his closing submissions Mr Martin claimed that there had been an actionable breach of confidence in three respects, first in relation to drawings created by BMT, secondly in relation to its library (which consisted not only of drawings in the first category but also of drawings originally done by other manufacturers), and thirdly in relation to BMT's pricing information. He submitted that all three categories of information fell within Class 3 of the categorisation to be found in the judgment of Goulding J in *Faccenda Chicken Ltd v Fowler* [1985] 1 All ER 724 at 731-732 and discussed by the Court of Appeal (Kerr, Neill and Nourse LJJ) (see [1986] 1 All ER 617 at 623-626, [1987] Ch 117 at 133-137), in that they fell within the category of 'specific trade secrets so confidential that, even though they may necessarily have been learned by heart and even though the servant may have left the service, they cannot lawfully be used for anyone's benefit but the master's'.

**[160]** No difficulty in principle arises in applying this test to BMT's pricing information. Nor, I was persuaded, does it in the case of drawings produced by BMT. It appeared at one stage that it might be the defendants' contention that little specialist skill went into the production of the manufacturing drawings, but that they were more or less mechanical translations of the tooling layout drawings supplied by the customer. It became apparent, however, that the production of a manufacturing drawing

*[2003] 2 BCLC 523  at  579*

would frequently involve a significant degree of judgment by the manufacturer whose specialist contribution would be reflected in it. Alan Morley conceded that his own knowledge skill and experience in relation to backing off/clearance angles, drill point angles, web thickness and the helix angles contributed to the final form of the manufacturing drawing.

**[161]** In relation to its own drawings (ie those drawn by it) the claimant's difficulty was, as it seemed to me that it could not claim that the information contained in them was confidential to the claimant alone. On the contrary Mr Martin's closing submissions asserted that the drawings were confidential to the claimant *and its customer*. This was an inevitable concession to make in the case of Ford, where the contractual documentation made it clear that drawings created by the manufacturer were to become for all purposes Ford's property. It was also in my judgment properly made in respect of other customers given the overwhelming evidence of trade custom to the effect that customers in this market were regarded as free to disclose one manufacturer's drawings of their tools for the purposes of negotiating or obtaining an alternative source of supply, and to do so without the consent of the manufacturer who had originally made the drawing.

**[162]** The only use to which the defendants could put the information was use in connection with the solicitation of a customer (where the information would be relevant in pricing a quotation) or in fulfilling an order from a customer. If, however, that customer itself has or can obtain the information, and is legally competent to authorise its use without reference to the claimant, I find it difficult to see how use of the information by a third party such as MIT for the purposes and with the consent of the customer can amount to an actionable breach of confidence.

**[163]** The point is in some respects of largely academic interest only so far as liability is concerned. The copying which I have found took place with the contemporary knowledge of Wayne Allen, Alan Smith and Alan Morley, undoubtedly involved breaches of duties by them as directors and employees regardless of any question whether it separately involved any actionable interference with the claimant's right to assert the confidentiality of the information contained in the drawings. The point is, however, a live one in so far the allegation of conspiracy relates, not to the unlawful *taking* of the information, but to its subsequent unlawful *use*.

**[164]** Does the point only apply to the hard copy drawings? While the evidence did establish that customers would in general have hard copies of their drawings (and that, if they did not, they would be able to obtain them from BMT), the same cannot be said of the evidence in relation to electronic versions.

**[165]** Taking Ford once again as a paradigm case, one does not find any contractual provision entitling Ford to insist on being supplied with an *electronic* version of its drawings and there was no evidence that Ford at the material time had any system for being supplied by its manufacturers with electronic versions. In the one case where the defendants led evidence of a customer having been supplied with electronic versions

(Albon), the circumstances of that supply (if it was made as alleged) indicate a happenstance rather than a system. Certainly the electronic versions possessed by Albon would not necessarily have been the most up to date versions available at BMT.

*[2003] 2 BCLC 523  at  580*

**[166]** If the customers were not in a position to supply electronic versions of BMT's drawings to other manufacturers, and not legally able to require BMT to provide them with such versions, I can see the possibility of an argument (although the case was not in fact put in this way) that BMT's position as to the confidentiality of the electronically stored information is different from that in relation to the hard copies. The particular value to BMT of possessing the information in electronic form lay in the ease with which the information could be stored, amended, and printed. That, coupled with the lack of any certainty that they would be able to obtain such versions from customers, provided ample motive for MIT to obtain these versions by the illegitimate copying process which I have found to have occurred.

**[167]** I do not, however, consider that the position of the electronic drawings is different from that of the hard copy drawings so far as the law of confidence is concerned. The law of confidence is concerned with the claimant's entitlement to control the use of the information, not to protect the particular method by which the information has been stored.

**[168]** The difficulty faced by the claimant in relation to the confidentiality of the information contained in individual drawings does not arise in relation to the claim to confidentiality in the drawings when seen as part of a library. Here the submission was that the confidentiality resided in the totality of the information comprising technical know-how, available to the claimant in an accessible *library* form. I think that the main point of putting the case in this way was to bring under the umbrella of confidentiality those hard copy drawings which were in the claimant's possession although not produced by it. I do not think that this claim can succeed in relation to the hard copy library, if only because the evidence falls short of establishing that anything approaching the totality of BMT's library (which consisted of thousands of documents) or even a significant proportion of it was copied. That factual position is different in the case of the electronic library, where a much larger proportion albeit still less than the totality was copied. However, in the final analysis, what the electronic library consisted of was simply a collection of individual drawings containing information which the claimant is unable to assert was confidential to it alone. The fact that they were stored compendiously and accessibly in folders created by the AutoCAD system does not, in my judgment, remedy that defect in the claim.

## VIII. The CADdraught disc

**[169]** The raw facts here are not in dispute. In May 2000 Alan Smith asked CADdraught to supply him with a disc of 14/15 drawings. These had been produced by CADdraught for BMT: CADdraught was persuaded by Alan Smith that he had Ford's authority to obtain them, and duly supplied Alan Smith with a disc.

**[170]** A number of points are not clear. First, the versions which BMT had on its computer, as, supplied by CADdraught, were 'read only' versions. It seems that, in order to protect their own future business, CADdraught were alive to the desirability of ensuring that, if amendments were required to the drawings, they would be the only persons with the immediate ability to achieve this. In their closing submissions, Mr Martin and his juniors submitted that the likelihood was that MIT had already

*[2003] 2 BCLC 523  at  581*

illicitly obtained BMT's 'read only' copies of the CADdraught disc, and that the purpose of Alan Smith's request was to obtain an amendable version. This was based, not on expert computer evidence, but on the fact that Alan Smith in his witness statement, put the date of his request in late May. It seems to me unlikely that CADdraught would have produced an amendable version to Alan Smith: it would have been against its own interests to do so, and there is no reason to suppose that what Alan Smith needed or sought *was* an amendable version. What he wanted were hard copies which he could take to Mexico and mark up following discussions (in fact when he got there he discovered that his own versions had been superseded and was able to obtain more up-to-date electronic versions.

[171] Secondly, it is not clear that Ford had authorised Alan Smith to obtain this disc from CADdraught, still less that it had authority to do so. Mr Hammond's witness statement was silent on the point, and the supplementary evidence which he gave in chief did not suggest to me that any conversation he may have had with Alan Smith on the subject went further than to say that it was alright by him if Alan Smith sought the drawings from CADdraught: no doubt it was, since the task of interrupting his own work to run off his own set of copies for Alan Smith would have been irksome. In any case Ford had no direct contractual relationship with CADdraught. The strict legal position was that Ford could insist on being supplied by BMT with hard copies of the documents, which BMT could obtain from its sub-contractor CADdraught.

[172] It is accordingly the claimant's case that this episode represented a procurement by Alan Smith of a breach by CADdraught of its contract with BMT to store the information on its behalf. The proposition is that it was an obvious term of the contract that CADdraught would not supply the drawings to anyone other than BMT. I agree that it would be an obvious term that CADdraught should not supply to anyone (apart from Ford) other than BMT but not that it is obvious that CADdraught should not supply to Ford or at Ford's direction without BMT's consent. CADdraught knew that they were being sub-contracted by BMT to produce drawings for BMT for the purposes of its contract with Ford: this would have been apparent if from nothing else from the Ford templates which they must have been using. Given industry practices they can be taken to have known that Ford was entitled, as against BMT, to their product. BMT needed no protection in its contract with CADdraught as against Ford since it had none in its own contract with Ford. The only party in the chain who needed protection was CADdraught, which it achieved by supplying its product on a CD-ROM which was designed to be read only. Accordingly I reject the proposition that the implied term contended for existed.

[173] Mr Martin QC submitted that I should not accept Alan Smith's evidence that he sought Ford's authority before making the request of CADdraught, making much of the fact that in a pleading the defendants had asserted that Ford had asked him to make the request, and of the fact that Mr Hammond had not mentioned the episode in his witness statement but had, rather, sworn to it (albeit in somewhat vague terms) in supplementary evidence-in-chief. I was not much impressed by these criticisms. I was satisfied that Alan Smith had asked Mr Hammond for 14/15 drawings, mentioning to him that CADdraught were a possible source, and had been asked by Mr Hammond to go to CADdraught to save

*[2003] 2 BCLC 523  at  582*

Mr Hammond the bother of sorting out a set for him from his end.

[174] Even if I am wrong both about the implied term and the question of whether Ford gave the particular authority, I am wholly unable to see that any damage to BMT flowed from the episode. BMT's only contract in relation to 14/15 related to the initial and one repeat set of tooling, whereafter it was expressly contemplated that other suppliers would be approached (and indeed that BMT would co-operate in that process).

[175] A further point needs to be added in relation to this allegation. Given my finding that all Alan Smith obtained from CADdraught was the ability to obtain a hard copy of the 14/15 drawings, the whole episode points away from there having been much, if any, coherent planning on the part of the Tamworth 4 so far as concerns the taking of BMT documentation prior to their departure. Had there been such a plan, it would surely have included taking the 14/15 drawings. Indeed the claimant's case (possibly correct) was that MIT had in fact already got these drawings on the HP Brio via the Alan Pearce disc. If that is right, it strongly suggests that Alan Smith did not know that. That reinforces the strong suspicion which I have that the degree of copying which in fact took place was not an orchestrated phenomenon but was, rather, the result of largely self-directed enthusiasm on the part of Mr Pearce and Mr Mosson.

## IX. Pricing information

[176] Mr Martin's closing submissions did not focus on the taking of pricing information as a claim separate from the general one of taking documents. As I understand it, the evidence relied on to show that the defendants took such information with them is based essentially on the fact, which was admitted by Alan Smith in the witness box, that MIT had price lists showing the prices charged by BMT to Ford, and used them in soliciting custom from Ford Dagenham, the Chihuaha and Dearborne plants, and Cross Hueller. The pitch

made by MIT was to offer these customers an across-the-board percentage discount on the prices. Alan Smith's evidence was that the price lists derived from Ford's blanket purchase orders with BMT, and that he had obtained them, after he had left BMT, from a source within Ford whom he was not prepared to name for fear of getting that person into trouble. He also gave evidence that in practice there was no difficulty in getting such pricing information from Ford.

[177] The direct evidence that the defendants had taken pricing information with them is based on evidence from Mr Robins as to what he saw under Mr Mosson's haversack when conducting the search (see at [149] above). This is a very muddled story. Briefly, Mr Robins' account is that when he found these documents he noticed that they included original 'pink purchase orders' to BMT from Lamb Technicon. However, in his early correspondence on the subject he referred only to copy documentation. Alan Morley says that the documents which Mr Morley claimed to have found were sent by him to Whittaker Firth on the following day: these documents were BMT copy documents. He also found on the table a blue counsel's notebook with a page torn out (left there by Mr Robins, the page having been torn out following advice from the supervising solicitor that he should not continue to list the documents found under the haversack), and underneath it further BMT copy documents. Photographs were taken of this

*[2003] 2 BCLC 523 at 583*

state of affairs. The photographs show, that there were pink documents elsewhere on the table. The copy documents underneath the blue notebook were also sent to Whittaker Firth. The defendants later produced the blue notebook at inspection, but it seems that Mr Robins took it away with him. Ms Furniss claims that after inspection she found in her briefcase *her* blue counsel's notebook, which she said she had left behind at the search. These facts gave rise to the suggestion that Mr Robins had planted the BMT copy documents alleged by him to have been found underneath the haversack, and that Whittaker Firth had planted Ms Furniss' mislaid notebook in her briefcase.

[178] Both suggestions are inherently unlikely. Ms Furniss may or may not have left her notebook at the premises in the course of the search, or subsequently mislaid it. If she did I can see no earthly reason why Whittaker Firth or the defendants should have chosen to return it to her surreptitiously. If I entertained for a moment the suspicion that Mr Robins had sought to plant incriminating documents at MIT during the search I see nothing in the documents themselves to suggest that they had been selected with such an end in view. I do not think that any planting took place. I think it likely that this miscellaneous collection of copy documents (20 pages from under the haversack and six from under the blue notebook) were documents which were lying about in the inspection room at BMT and were swept up with other documents by Mr Mosson when he was clearing up in preparation for his departure (he admits that he did take some documents with him). They ended up in the drawer because at some stage Mr Mosson looked at them with a view to disposing of them but for some reason did not do so (perhaps because there was no obvious place to file them, perhaps because the waste-paper basket was full or perhaps because someone else was using the shredder at the time). They were then completely forgotten about until they were found by Mr Robins.

[179] None of this proves that the defendants deliberately took BMT pricing information with them when they left. I find that they had no need to do so. In relation to Ford, I accept Alan Smith's evidence that he expected in practice to be able to obtain the relevant information from the customer and did in fact do so. He also knew that this was a fact which should be concealed from higher management at Ford. That corresponds with Mr Male's evidence that it was not Ford's policy to supply prices being quoted by existing suppliers. One can see obvious reasons why this should be so: it is not to protect the existing supplier's information but Ford's chances of obtaining the most competitive quotation. BMT prices were not, in my judgment, confidential to BMT as between Ford and BMT. Ford could if it chose, supply them to a competing supplier. Alan Smith's conduct in obtaining the prices from Ford did not, accordingly, involve any breach of confidence actionable by BMT.

## X. Solicitation of customers

[180] So far as any breach of duty is concerned the pleaded allegation relates only to Ford. There are general allegations that MIT solicited customers from May onwards, but provided that no confidential information, or maturing business opportunity, was being exploited, this would not have been a breach by

any of the defendants of any duty owed to BMT. So far as Ford is concerned, the pleaded allegation, relies on the

*[2003] 2 BCLC 523 at 584*

conversation which Mr McGrath had with Paul Male in early February, of which I have set out Mr McGrath's account (at [58] above), on the fact that Paul Male was informed on or before 11 April of the fact that the Ford experienced part of the BMT workforce was leaving to join MIT which was being financed by Mr McGrath and run by Wayne Allen, and that it would have the capacity within about two weeks to service Ford orders with the assistance of BTG, on the fact that Mr Male was informed on 17 April that two more employees had left BMT to join MIT.

**[181]** The meeting with Mr McGrath was dealt with by Mr Male in the evidence he gave on behalf of the claimants. He also mentioned a further meeting at BTG's premises on 28 March 2000, which had also been attended by Don Allen, at which it was again said that--

> 'something would be happening to one of Ford's suppliers and that there would be potential for some disruption. They stated that if this happened they would support Ford with a 24 hour turnaround for the supply of cutting tools to ensure Ford's production would not be affected.'

It is clear that no further details were given as to what was about to happen save that it would soon become obvious.

**[182]** By 12 April it is clear that Mr Male had a general picture of what had happened. He had been to visit BMT the day before, and this prompted a flurry of internal e-mails within Ford as to what was to happen next, particular concerns being expressed being whether either Mercian or BTG were up to the job, whether Wayne Allen's new company would really be able to cope, whether it might not be better to switch to supply by Mohawk (another cutting tool manufacturer). One suggestion (emanating from Iain Miller at Dagenham) was that the new company should be prompted to invite Ford to inspect them. It is clear from these e-mails that by this time Paul Male and (to greater or lesser degrees) other Ford personnel had a general, although not in every respect accurate, picture of what was happening and a reasonable inference that the information had come from various sources (including the new management of BMT itself). By 17 April Ford had reached the conclusion that BMT had effectively merged with Mercian, and that there was little labour left on the BMT site, and Paul Male was intending to visit the MIT site within the next two or three weeks. Mike Jones (from Swansea) suggested switching from BMT (Mercian) to MIT 'as soon as they give us the green light to do so'. Trevor Everett (Dagenham) made a similar recommendation. There are no further internal e-mails during April after 18 April.

**[183]** Alan Smith made several telephone calls to Ford personnel during this period (5, 6 and 10 April 2000 to Paul Male, 10 April to Watson and Mike Jones (Ford Engineers), on 17 April 2000 to Everett and 19 April to Mel Wright). The claimant's suggestion was that in these telephone conversations Alan Smith must have been keeping the recipients informed as to developments and encouraging them to make a switch to MIT once MIT was ready. Alan Smith's evidence was that these conversations related to ongoing Ford business at BMT, and that when asked what was happening at MIT he declined for legal reasons to be drawn into discussion save to say that he would be free to talk openly at the end of the month, and that the recipients respected his reluctance to be drawn.

*[2003] 2 BCLC 523 at 585*

**[184]** While not able to accept that Alan Smith observed the degree of Trappist silence on the subject which he claimed in the witness box, I see no reason not to accept his general account. The fact is that Ford already had all the information which was at this stage relevant. They knew of the basic facts of the exodus from the visit to BMT on 11 April, and they had also learned from BMT of the arrangements it was having to make with Mercian for the sub-contracting of Ford work. Without asking Alan Smith to break his employment contract, they could find out all they needed to about MIT's potential as an alternative source of supply from Don Allen or Mr McGrath neither of whom were under any constraints. I do not think that anything which could be said to have been an active solicitation of Ford as a customer was done by Alan Smith. Once it was clear that BMT was sub-contracting the Ford work to Mercian, it was clear to Ford that it needed to consider

as a matter of some urgency the possible need to switch suppliers. MIT, once it was up and running, was an obvious (but not the only) candidate to be considered since it included all the skills and experience with which Ford had been accustomed to deal. In the event Ford did not inspect the MIT operation until the second week of May, and made no final decision not to place new orders with BMT until the middle of July. I am satisfied that, if and to the extent that Alan Smith did anything which can be described as soliciting of Ford while he was still employed by BMT, it contributed nothing significant to the process by which Ford (UK) arrived at its eventual decision to cease ordering from BMT and commence ordering from MIT. That was a hard-headed decision made by Ford in July on the basis of its assessment and experience of the relative capabilities of BMT and MIT in the period from May onwards. I would add, in this connection, that despite Paul Male's assertion that price was a factor in the ultimate decision to switch supplier, there is very little evidence in the contemporary documentation to indicate that this had any great significance: of much more concern seems to have been the quality of the product and the ability of BMT to meet delivery dates. In evidence to me Tim Allen admitted that he did have a severe problem in meeting Ford's requirements (largely due to his inability to hire labour with the requisite skill) and sought unsuccessfully to persuade Ford that all would in due course be well.

**[185]** There was evidence before the court strongly suggesting that the first Albon order (received and executed in the first week of May) must have been solicited in the course of April, the probability being that Alan Morley would have been the relevant contact point (both because he was the person accustomed to deal with Albon and because he made telephone calls to Albon on 13 and 26 April). This was not, however, a pleaded allegation.

## XI. Corporate opportunity

**[186]** It is settled that a director may be liable even after he has resigned if he then exploits a maturing business opportunity of the company. The authorities are usefully reviewed in the judgment of Lawrence Collins J in *CMS Dolphin Ltd v Simonet* [2001] 2 BCLC 704. The claimant made a generalised claim that the Tamworth 4 had wrongly enabled MIT to make improper use of the claimant's corporate opportunities which they later particularised as 'simply the opportunities afforded by the claimant's

*[2003] 2 BCLC 523 at 586*

goodwill whereby it would continue to manufacture and design goods for its existing and potential customer base'. I am unable to see how this amounted to more than an allegation that the Tamworth 4 had resigned in order to enable MIT to compete with the claimant in relation to its existing and potential customer base, something they were perfectly entitled to do.

**[187]** Mr Martin QC sought in his closing submissions to develop a distinction between BMT's ordinary repeat business with its non-Ford customers and the 'discrete and readily identifiable opportunity' to bid for the 14/15 work. However, the claimant's only claim to exclusivity in relation to such work arose out of the Ford order in December 1998 for setting up the project, doing the initial tooling and one repeat set of tools. Thereafter it was contemplated that other suppliers would be competing with BMT for such business as there was at the relevant plants in America and Spain. There was no evidence that this was in any sense a secret, or that BMT had any special way in to this work of which the defendants were able to take advantage (except by advertising themselves as the same people who had previously been working for BMT). In particular there appear to have been no ongoing negotiations in relation to this work between BMT and any of the potential customers which were in any sense taken over by MIT.

## XII. Damages

### *Principles*

**[188]** The heads of compensatory damage claimed are set out at [15] above, namely (1) loss of BMT's business (2) trading losses subsequently incurred, and (3) closure costs, all claimed as having been caused by the unlawful conspiracy. The defendants' submission was that I should take a circumspect approach to what damage was in fact caused. It was submitted that I should assess in respect of each unlawful act found to have been committed the loss which the claimant has suffered as a result of that unlawful act and that the

allegation of conspiracy adds little to the primary act, save to render liable parties who did not actually commit the act itself. It was submitted that in assessing damages, the court should apply the following principles: (a) the aim of damages is to put a claimant into the same position he would have been in had the wrong not been committed; (b) the policy of the law is to encourage competition; (c) if confidential information belonging to a claimant has been wrongfully obtained for the purposes of enabling a defendant to compete with the claimant, and it is not information which a claimant would normally have either sold or licensed, the damages, if any, which a claimant will be entitled to claim are for any resulting loss of profits; (d) to succeed in a claim for loss of profits, the claimant must show that the relevant business of the defendant was obtained as a result of misuse of the claimant's confidential information and that but for the defendant obtaining the business in question, the claimant would have obtained it, in whole or in part; (e) similar principles, should be applied in the case of wrongful solicitation of customers and employees. It was further submitted that as the ability of C to have obtained any relevant order would have depended upon the act of a third party (the customer), the court should assess in percentage terms the chance that the claimant would have obtained that order but for the defendants' wrongful acts; (f) if the relevant confidential information was capable of being obtained from another source without recourse to the claimant's information, no or

*[2003] 2 BCLC 523  at  587*

minimal loss of profits will be shown to have been suffered by the claimant as a result; (g) the springboard doctrine only applies to misuse by a defendant of confidential information; (h) if in the absence of the unlawful act the claimant would have suffered the loss, in any event, the damages recoverable by a claimant should only be nominal; (i) damages will not be recoverable, alternatively, will be reduced if it is shown that they were caused by or contributed to by C's own conduct; (j) any loss suffered by a claimant which was avoidable by reasonable action on his part, will not be recoverable: although phrased in terms of a duty to mitigate, this is really another aspect of causation.

**[189]** The defendants submitted that application of these principles produced the following results in relation to the following unlawful acts. If it were found that the Tamworth 4, in breach of their duties to the claimant, wrongly solicited customers, employees, stole drawings, took pricing information and/or procured CADdraught to act in breach of confidence or contract, the loss should be limited to period ending with the time when the defendants could legitimately have carried out those acts or obtained the relevant information, and the claimant must show that during the relevant period it lost customers as a result of the unlawful acts. In support of these submissions I was referred to a good deal of authority. I do not think I need rehearse it, save to note that the decision in *Universal Thermosensors Ltd v Hibben* [1992] 3 All ER 257 esp at 267-269, [1992] 1 WLR 840, esp at 852-853, provides a good illustration of the approach which might be taken on appropriate facts.

**[190]** In the case of customers, it was submitted that Don Allen was entitled to solicit customers from 18 March 2000 onwards and the remaining three were entitled to solicit customers from 1 May 2000 onwards. It was submitted that the claimant had not shown that it lost any customers or any particular orders as a result of any wrongful acts on the part of the defendants nor that MIT got any orders, which otherwise would have gone to BMT: any loss, therefore, suffered by the claimant was merely nominal.

**[191]** In so far as this submission relates to the pleaded allegations of solicitation of customers, I agree with it. I would add that Mr McGrath was, like Don Allen, under no obligation not to solicit custom on behalf of MIT (and in fact did so in relation to one Ford order during April 2000).

**[192]** As to drawings (both hard and electronic copies), it was submitted that they could easily have been obtained from customers. It was, therefore, submitted that any losses sustained by claimant in this respect must be nominal, or at most minimal. It was further submitted that in any event the claimant had to show (but had not done so) that the drawings taken were, in fact, used by MIT in the course of its business and that as a result of such use, orders were obtained by MIT, which would otherwise have gone to the claimant.

**[193]** As to this submission I agree with the first proposition in the case of hard copies. For reasons already given I do not think it has been shown that electronic versions could easily have been obtained from customers. I have found that the taking of the electronic drawings involved a breach by Wayne Allen of his duties to BMT for which he, Don Allen and MIT are liable. I am, however, unable to see any causal

connection, even as a minor

contributory factor, between this breach and the damage which BMT claims to have suffered.

[194] In the case of pricing information, that too was (it was submitted) obtainable from customers. It was, therefore, submitted that the ability to price tools would not have delayed the placing of orders with MIT and, therefore, that the claimant's loss was nominal; and that to the extent that orders were found to have been obtained by MIT as a result of unfairly using the claimant's pricing information it was submitted that the claimant must prove (and had not done so) that it would have obtained the relevant orders or that it would not have lost any relevant customer.

[195] In my judgment this is a correct submission. As indicated above, I do not think that pricing was a real issue so far as Ford UK was concerned when making its decision. So far as the 14/15 work in Dearborne and Chihuaha was concerned, I think that MIT might have been at a disadvantage in competing had it been unable to obtain details of the prices (including US$ exchange rates) at which BMT had quoted. But, as I have found, it acquired this information through the customer.

[196] As to the loss of claimant's management team and 15 employees it was submitted that any damage was, in any event, minimal, because (1) the management team left lawfully and a substantial amount of goodwill attached to the management team personally and, in particular, to Alan Smith (Ford) and Alan Morley; (2) after leaving their employment with the claimant, the Tamworth 4 were entitled to solicit the claimant's employees. It was submitted that it was almost inevitable that employees would have followed, because this is what they in fact did, and that it could not be presumed that Tim Allen would have succeeded in retaining them in light of his singular failure to do so during the week commencing 3 April. It was therefore submitted that the claimant's loss should be restricted to losses, which it could prove were suffered in the period of one week after 1 May 2000, since the employees were only required to give one week's notice.

[197] Finally, it was submitted that if any of the Tamworth 4 had informed claimant of their activities, it would have made no difference because: (i) they all had decided to leave in any event; and (ii) for the reasons stated above, it was very unlikely that claimant would have succeeded in retaining the employees who left.

[198] In my judgment, the submissions made in the last two paragraphs fail. They are premised on a counter-factual scenario which I am not satisfied can be supported. On the view which I have taken of the law, the Tamworth 4 ought to have resigned as directors by 13 March 2000 at the very latest and done so without having taken any steps to alert the BMT workforce to their plans. The consequence, had they done so, would have been that Allen Group would have been in a better position than it in fact was to prevent its workforce being poached by MIT acting for Don Allen. That, as it appears to me, is the main reason why in the events which actually happened the remaining three directors did not resign their offices (and serve notices determining their service contracts) until the process of recruiting the workforce had been successfully undertaken and they were able to present Allen Group with the fait accompli of a significant portion of the workforce having already handed in their resignations. To have alerted the Allen Group in any way to their plans before they had completed their seduction of the workforce would have risked the failure of

the whole enterprise. I am not persuaded that the remaining three directors would have been willing to run the risk of burning their own boats before the recruitment of the MIT workforce had taken place. The secrecy with which that exercise was in fact conducted was, in my judgment, perceived by them to be an essential part of their joint plan. If that is correct, I do not think that I am justified in assuming in their favour that, had they gone about the matter more openly and more correctly, precisely the same consequences would have followed as did in fact occur.

[199] If I am right that the defendants' recruitment of the workforce was conducted unlawfully, and that they cannot show that had it been done lawfully MIT would none the less have been launched at the time and in the manner it was launched, I see no obstacle to the claimant's claim that the damage thereby suffered by BMT is recoverable. The essence of the claim is that the damage was the loss of BMT's business. In my

judgment that claim is supported by the evidence. Once the Tamworth 4 had departed with a key section of the workforce, it was highly probable that BMT would fail. This had been foreseen by the Tamworth 4. Tim Allen, with the assistance of the management which he was able to recruit strove mightily (and for perhaps too long) to keep it afloat, but, as he admitted in evidence, even had he been able to recruit the skilled cutter grinders which BMT needed, he thought with hindsight that he would not have succeeded in retaining the Ford business against the competition from the old BMT management and the former BMT workforce represented by MIT. Without the Ford custom, the heart of BMT's business had gone.

**[200]** In principle therefore the claimant is, on these findings, entitled to have damages assessed under the three heads which are claimed. I should add that I have felt troubled by the possibility that there could be an element of double counting in awarding damages to BMT both for the value of the business as at March 2000 and for the losses subsequently incurred by BMT. Mrs Giret limited her attack on the second head to questions of causation and mitigation, and did not suggest that (subject to these points) there was anything wrong in principle in claiming both heads cumulatively. I do not therefore consider the matter further.

### *The value of the business*

#### The claimant's valuation evidence

**[201]** This was given by AHF Campbell, FCA, a partner in Littlejohn Frazer with extensive experience, both in practice and as an expert witness, in advising on business valuations.

**[202]** In his report dated 16 August 2002 he set out to value the goodwill of BMT's business as at March 2000. He did so by assessing the ongoing maintainable earnings of the business as £326,000 before taxation, basing that figure on the revised budget (see at [35] and following above). He then adjusted that assessment by adding back £60,000 in respect of interest and deducting £25,000 in respect of additional depreciation charges. He examined whether any adjustment needed to be made in respect of Allen Group's management charges, and concluded that it was not. He was thus left with a figure of £360,000 maintainable pre-tax profits.

**[203]** He considered what was the correct multiplier to apply to this, concluding that it lay somewhere in a range of 3-10. (Both experts referred to the multiplier as the 'multiple', a usage which in deference to their

*[2003] 2 BCLC 523  at  590*

expertise I hereafter adopt.) Having examined various factors likely to influence an open market sale, in particular the heavy dependence of BMT on Ford work and its uncertain future, he concluded that an appropriate multiple would be 5.

**[204]** He therefore valued ('... the value of the business is ...') the business at £1.8m. In a supplemental report produced during the course of the trial and dated 7 November 2002, made after seeing certain additional evidentiary material and following discussions with the defendants' expert Mr Mawer, he 'remained of the view that the value of BMT's business at March 2000 may be reasonably stated as £1,800,000'. He rejected Mr Mawer's approach of using past performance in arriving at maintainable earnings, and had various criticisms to make of Mr Mawer's approach to the past figures. His own approach to using past figures would have been to make adjustments to 1999 Q4, and in respect of productivity improvements. This gave him an average figure of £323,000 for before interest and tax maintainable profits. If, contrary to his view, interest fell to be deducted, the amount by which the figure should be reduced was £51,000, giving a figure of £272,000. During his cross-examination he accepted that one of the figures used in the calculation of the average had itself been miscalculated. Correctly calculated the figures were £313,000 (which on a multiplier of 5 would give a value of £1.565m) and £262,000. If the latter, post-interest, figure were used, Mr Campbell thought that the appropriate multiplier was 6 (implying a value of £1.572m).

#### The defendant's valuation evidence

**[205]** This was given by Mr Mawer, FCA, a partner in Grant Thornton. His principal area of practice is in the fraud and insolvency field. In his report he acknowledges the assistance he has had from others within his firm, including Alan Garratt, a senior business valuations manager.

**[206]** His valuation was expressed as being a valuation of BMT rather than as a valuation of the goodwill of its business. Leaving that on one side, his approach to a valuation of the latter was to use past performance as the primary guide to maintainable earnings, but to make adjustments to the historic figures for (i) directors remuneration and bonuses, (ii) notional interest on inter-company loans and (iii) for the group management charge. Making these adjustments reduced an (unweighted) average pre-tax profit from some £175,000 to £62,603. Applying a weighting to the averaging reduced the average profit to £43,007. If no adjustments were made to directors' remuneration the equivalent figure was £57,350.00 (see paras 5.23 to 5.26 of Mr Mawer's report: the figure of £62,603 is my own calculation of the unweighted average).

**[207]** By a process somewhat different from that used by Mr Campbell he arrived at an appropriate multiple of in the lower end of the range 4-6.

**[208]** Applying that multiple to his figures for maintainable profits he arrived at valuations on the alternative bases of £215,000 (the low to mid-point of a range between £172,000 and £258,000) and £290,000 (the low to mid-point of a range between £230,000 and £348,000).

**Main points of disagreement**

**[209]** There were three main points of disagreement in the respective approaches of these experts: (1) a difference as to what was being valued;

*[2003] 2 BCLC 523  at  591*

 (2) a difference as to how interest should be dealt with; and (3) a difference as to the use which could properly be made of the revised budget.

**[210]** I found both experts of great assistance in the witness box. So far as their written reports were concerned, Mr Campbell's struck me as much the more polished and sophisticated. Mr Mawer's suffered from a number of defects, not least that he started from a position that he was valuing, not the business, but BMT itself. This led him into an almost passionate exposition (and denunciation) of the fact that BMT as a company was and always had been insolvent on a balance sheet basis. Much of this was totally irrelevant. Notwithstanding this, Mr Mawer satisfied me in cross-examination that, while he had less experience than Mr Campbell in providing formal valuations of businesses, he had plenty of relevant experience as an insolvency practitioner in selling businesses.

**What is being valued**

**[211]** Mr Campbell's approach assumed a notional open-market transaction in which the purchaser was buying the tangible assets of the company at their value and then agreeing an additional price for the intangibles (in this case the skills and experience of the transforming workforce, and the existing and hoped for customers). He pointed out that this latter element corresponded to what, from an accounting point of view, would be regarded as goodwill: namely 'the extra price that you pay over a given bundle of tangible assets to buy the business and that extra price recognises the earnings potential'. It was this element which his equation (maintainable earnings x multiple) valued. He accepted that the transaction being envisaged was an artificial one, in the sense that a sale of this additional element separately from the rest of the undertaking was not one encountered in the real world, but maintained that it was a valid valuation exercise for the purposes of identifying what BMT had lost by virtue of its having lost its management team and a key section of its employees. He said that he could not see that Mr Mawer had done anything different in his valuation, which he interpreted as also having excluded tangible assets from its calculations.

**[212]** Mr Mawer's equation sought, however, to value the undertaking as a whole. He accepted as accurate my crude characterisation that his approach put a price on the 'lock stock and barrel' of the business as being a multiple of maintainable earnings and that that would be the price for which the business as a whole might be sold (unless, of course, a better price could be achieved by selling off the tangibles separately). I should add that, in accepting my crude phrase 'lock stock and barrel' it was clear that Mr Mawer was not including 'stock' in his valuation. The implication of this approach, in a case like the present, where BMT's goodwill was damaged by the actions of the defendants but it retained all its fixed assets would be that, in

assessing damages, one should theoretically deduct from the product of the equation the value of the fixed assets which BMT retained. Mr Mawer's valuation did not in fact do that, but I think that it is logically implied by his approach. The caveat must be that the fixed assets for this purpose would necessarily have to be valued at their break-up value, rather than their book value as a going concern, since, ex hypothesi, the business has gone.

**[213]** Mr Mawer's approach corresponds with what I understand to be

*[2003] 2 BCLC 523  at  592*

normal valuation practice in valuing income generating assets, and seems to me to be logically implied by the concept of maintainable earnings itself. A succinct exposition of the normal approach is given in the judgment of Chadwick LJ in *Perry v Scherchen* [2001] EWCA Civ 1192 at [24], [2002] 1 P & CR D13, [2001] All ER (D) 305 (Jun), to which I was referred by Mr Martin's closing written submissions. Maintainable earnings are not simply the product of the skills of the workforce and the trade connections of the business. They are the product of the marriage of those intangibles with the use of the plant and machinery, which together enable the business to be conducted. The costs of all those items are necessarily taken into account in the assessment of maintainable earnings. It seems to me to follow that a valuation methodology employing the equation is necessarily seeking to put a value on the whole of the profit earning elements of the business, ie all the elements of the business which combine to produce the maintainable earnings.

**[214]** On this difference in principle I therefore prefer Mr Mawer's approach.

**How should interest be dealt with**

**[215]** The issue here concerns the extent to which the working capital and capital expenditure requirements of the business should be taken account of in arriving at its value.

**[216]** Mr Mawer believed that, in order to arrive at a fair assessment of the level of BMT's maintainable profits, it was necessary to adjust for the notional interest which would be payable in respect of loans required to fund BMT's working capital requirement and the purchase of the plant and equipment required. He made the assumption (para 5.21 of his report) that the working capital requirement was the same as the amount of debt shown in BMT's accounts as owed to Holdings (£1.3m). Holdings did not charge any interest on this lending (although some interest appears to have been reflected in the management charge paid by BMT to Holdings) and Mr Mawer thought that a notional interest charge should be brought into the calculation of maintainable earnings.

**[217]** Mr Campbell disagreed. His ground for doing so (para 5.34-5.36 of his report) was that:

> '5.34. My reason for adopting this approach is that the interest cost on fixed and working capital used to finance the business is directly influenced by the type of capital provided. For example, if all of the Group support and overdraft had been provided in the form of share capital, no interest cost would have been incurred in BMT's Profit and Loss Account. Conversely, if it had all been provided by a bank on a loan or overdraft (perhaps with a parent company guarantee for security), a larger interest cost would have probably been incurred than is reflected in my maintainable profits of £326,000.

> 5.35. Thus, if interest was to be recognised in my assessment of the profits for valuation purposes, different values would emerge depending on the financing policy that is assumed.

> 5.36. In this context, it is appropriate to repeat that it is only the business that is being valued, not the shares of BMT. The capital and/or loan or other financial liabilities used to finance the business will not be

*[2003] 2 BCLC 523  at  593*

> acquired by the purchaser who buys only the business; the purchaser will finance it as he chooses and it is not possible to say with certainty how a purchaser would approach it.'

**[218]** So far from deducting a sum in respect of notional interest on the inter-company debt he added back

all actual finance costs in his calculation of maintainable earnings. In his second report, while not resiling from that view, he accepted that 'to recognise interest is an acceptable approach' (para 3.4.8). In the course of his oral evidence he spoke of the issue as being a 'difficult' one, and at certain points in his evidence he appeared to me to be accepting that the financing of the capital requirements of the business did need to be accounted for in some way.

[219] On this issue of principle, I again preferred Mr Mawer's approach. It seems to me obvious that a purchaser, in calculating the price he is willing to pay for a business, will necessarily wish to take account of what it will cost him in the future in order to achieve the maintainable earnings at which he is aiming. It does not seem to me to be material to consider whether that additional capital will be provided by debt or equity: in either case it represents an additional cost to the purchaser. Whether the appropriate means of reflecting this factor in a valuation calculation is to recognise it as a deduction in arriving at maintainable earnings (as per Mr Mawer) or as a deduction from them (as per a reluctant Mr Campbell - see para 3.4.21 of his second report) was not the subject of much argument before me. I suspect that it may make a difference because of the weighting in the averaging: if interest is deducted in arriving at maintainable profits for 1999, a loss is produced for that year which is then magnified by the weighting. I have thought it safer to adopt Mr Campbell's method of allowing for the interest.

**The significance of the revised budget**

[220] Mr Campbell had arrived at his assessment of maintainable earnings by placing primary reliance on the figures projected for 1999-2000 Q3 and Q4 in the revised budget. In essence his justification for doing so was that they represented the best available contemporary evidence as to how the business was expected to perform by those most closely involved in its management. He ignored 1999-2000 Q1 and Q2 (a) because they represented the past and not the future, and (b) because they were themselves infected by the anomaly which had produced the odd figures for 1999 Q4.

[221] By contrast Mr Mawer's valuation took no account of the revised budget, albeit that he agreed that the exercise being conducted was essentially one that was directed to assessing future maintainable earnings. With the perhaps jaundiced eye of a practitioner whose principal experience lay in advising bank creditors in their relationship with business debtors, he regarded the revised budget as having the classic characteristics of a budget produced by managers of companies that were under financial stress. They--

> 'would produce a budget like this, and typically it would show a loss declining, then returning to profitability, normally supported by forecasts; balance sheets and cash-flows, and would usually show the bank debt being re-paid over a period, and a not very long period.

*[2003] 2 BCLC 523  at  594*

> What you see as you monitor the performance of that company going forward is that the budgets are not achieved ... But it's producing new forecasts that show exactly the same trend of reducing the losses ... So you have a curve that is like a hockey stick, and all that happens [in] reality in my experience is the hockey stick moves along in time.'

[222] His scepticism was reinforced by the fact that the document was unaccompanied by the usual projected balance sheets and cash flow forecasts, and that there was no supporting documentation to which resort could be had in justifying the forecast. On two points in particular he felt that it needed to be queried. The first was in relation to the projected sales figures. The second related to the projected productivity improvements. His doubts are best captured by the following extract from his evidence:

> 'I don't have a major problem with the overall sales forecast at 2,005,000. It's not adrift from what had been achieved in prior years. My problem with that line is merely the growth that's shown from quarter one to quarter four. That's a fantastic turn around in turnover for this company, bearing in mind also the seven redundancies that had been made. Now, we've talked about productivity gains. No evidence has been shown to me as to how those productivity gains were to be achieved. If it was such a simple matter, why didn't we do it before? That's a feature that's typical of the hockey stick mentality.'

[223] In my judgment this scepticism was justified and was such as might have been expected from a

purchaser. I have already commented (see at [40] above) on the rudimentary nature of the sales forecast. There was no attempt to break down the sales customer by customer. I have also already commented on Wayne Allen's general business abilities, an area where he himself in retrospect accepted criticism. As to the productivity savings, it is correct that there is no evidence as to how the business was expected to return to (and exceed) previous levels of turnover with a workforce that remained depleted by the redundancies which had been effected at the beginning of 2000. The defendants say (and I accept) that, when they had protested in the autumn of 1999 that the redundancies were unnecessary because of the probability that sales would pick up in the new year, Michael Allen's response had been that that situation could be met by re-hiring. That does not suggest that any genuine increase in productivity was being contemplated by the existing management. There may have been room for productivity gains: Mr McGrath in his evidence disparaged what he called 'the Brummie mentality' of insisting that one man should only operate one machine at a time. There is no evidence, however, that the revised budget contemplated any change in this method of operation. Mr McGrath's evidence suggested, indeed, that the changes in working practices which he would have envisaged would not in fact have been practical given the lay-out of the machinery at BMT. Mr Campbell, basing himself on some evidence from Mr Gibson, explained the productivity gain as being the result of an increase, or revival, of 14/15 work which did not affect the area in which the redundancies had taken place. If that is right, however, it suggests, first, that margins must have been inherently better on 14/15 work than on other areas of work, and, secondly, that the downturn in turnover which justified the redundancies was contemplated by the revised budget as

being permanent in relation to that other work. The explanation seems to me flawed because, as Mr Mawer pointed out, the contribution of 14/15 work to the turnover figures was at best insufficient to account for the revival in sales which the hockey stick of the revised budget assumed.

**[224]** Against that background a safer starting point for the assessment of maintainable earnings is in my judgment to look primarily at past performance. Here, the relevant figures for turnover and pre-tax profits as per the audited accounts for 1996-1999 (the revised budget figures being stated in the final column) can be taken as follows:

|                  | 1996 | 1997 | 1998 | 1999 | [2000] |
|------------------|------|------|------|------|--------|
| Turnover         | 2.1m | 2.5m | 2.4m | 2.5m | [2.05] |
| Profit before tax | 179  | 259  | 164  | 95   | [145]  |

(The figures in square brackets for 2000 are taken from the revised budget. The figures actually used by Mr Campbell are higher because of his disregard of Q1 and Q2 2000.)

## Appropriate adjustments

**[225]** I turn now to the various adjustments, considered as appropriate to these figures by Mr Campbell and Mr Mawer respectively.

**[226] Q4 1999**. Mr Campbell thought it appropriate to adjust the profit figure for 1999 from £95,000 to £205,000 in order to bring it into line with what had been budgeted for Q4 1999 rather than what had been achieved. His justification for that was that the achieved figure was an anomaly: the only explanation which had been given for it was that it was the result of certain Ford sales having been delayed; they should therefore be written back with the figures to eliminate what was simply an accident of timing. Even if that were not the true explanation, then on any view Q4 1999 was anomalous and should be ignored.

**[227]** Mr Mawer disagreed: the results for Q4 1999 were a fact. Although they were not audited figures, they were reflected in the figures for the year as a whole which had been audited. Unless a purchaser could be persuaded that this 'blip' represented a phenomenon which could be explained as one which was not likely to be repeated, he could not safely accept a mere assertion from the seller that this was the case. In so far as he was relying at all on past figures as a guide to future performance he (and his advisors) would have to assume that the results were not anomalous in the sense that there was no risk of their being repeated in future.

[228] Mr Mawer's approach made more sense to me than Mr Campbell's. In addition, if the true reason for the 'blip' (if blip it was) was a *delay* in anticipated sales, that blip (a) would not result in the long run in any overall *increase* in sales and (b) would not be a phenomenon which could be assumed would not occur in the future. I would therefore adopt the actual figure. I do not ignore the fact that the claimant's case was that the explanation for the 1999 Q4 results might be that the Tamworth 4 had been deliberately adopting practices in this period (doubling up of tooling) in preparation for their departure. They were, however, unable to adduce even a scrap of direct evidence in relation to this period which supported the suggestion.

[229] **Don Allen's salary**. Mr Campbell makes the assumption that because Don Allen left in March 1999 and there were no plans to replace

*[2003] 2 BCLC 523 at 596*

him, the prior years' figures should be appropriately adjusted by adding back in his remuneration costs to those figures. To the objection that Don Allen had in fact been employed in those years, and could be assumed to have made an appropriate contribution to the profits in those years, he responded (correctly in my judgment) that this was irrelevant: the task was to assess maintainable earnings as from April 2000, and to the extent to which the prior years were being used as a guide to what was achievable in the future it was appropriate to adjust for a cost which by then had been perceived as unnecessary. The essential premise of the argument must, however, be not only that Don Allen did not need to be replaced at director level, but that the contribution he had made as a salesman did not require the appointment of any staff at any level in order to maintain sales. There is in fact evidence that the local management were pressing for the appointment of an additional salesman, and I have no reason to suppose that this need would not have been perceived as all the more pressing following Don Allen's departure. Looking at the matter with a broad brush, it seems to me that *some* adjustments would be likely to be made in respect of this item, but that the seller's negotiating position (that one could discount the whole of Don Allen's salary in looking at the figures) would not be accepted by a purchaser (who would want to make some allowance for the need to replace his contribution either at management, or sales staff, level).

[230] **Productivity improvements**. Mr Campbell would add in to the prior years the productivity improvements recognised as achievable in the revised budget. The methodological issues are here the same as in relation to Don Allen's salary. However, for the reasons already indicated, I am not satisfied on the evidence that these productivity gains were in fact (or would have been perceived by a purchaser) as achievable. I would not therefore make this adjustment.

[231] **Interest**. I have already discussed this issue in principle, deciding it in favour of Mr Mawer's approach. Assuming (but not conceding) the correctness of Mr Mawer's approach Mr Campbell criticised the actual figures used on three grounds. First, he took the point, correctly, that allowance should be made for the interest in fact charged to BMT through the management charge. Secondly, he said that the interest rate to be applied in adjusting the figures should be taken as that prevailing in March 2000. This seems to me to be correct. Thirdly he considered that the interest should be calculated as if only half of the finance provided by Holdings to BMT had been provided in the form of debt, the other half being treated as provided by way of risk capital. I have already indicated why I think that this is a mistaken approach, but I accept Mr Campbell's calculation of the relevant interest figure. Mr Campbell had a further point in this connection, which I discuss below (see at [235]) in connection with the selection of the multiplier.

[232] **Depreciation**. Mr Campbell made an allowance beyond that already included in the figures for an additional £25,000 pa in respect of depreciation. The defendants did not quarrel with this.

[233] **Directors' salaries**. Mr Mawer thought it appropriate to adjust the historical profits by notionally increasing (in one case decreasing) the remuneration so as to equate it to the market rate required to attract replacement directors of equivalent experience and expertise. I do not think

*[2003] 2 BCLC 523 at 597*

that Mr Campbell would have quarrelled with the principle of such an adjustment had it been shown that the

directors' salaries were significantly below the market rate. He made, however, telling criticisms of the comparables in fact used by Mr Mawer. I was not persuaded by Mr Mawer's evidence that adjustment was required in this respect. What I think does need to be recognised, however, is (a) that one of the reasons why the directors (in particular Mr Morley) were unhappy with their lot was their level of remuneration (including perks) and (b) that their service contracts permitted each to resign on one months' notice without any subsequent restraint on their ability to compete. I am quite sure that this would be a matter which an intending purchaser would recognise that he would have to deal with, either by coming to suitable arrangements with the management as part of the purchase transaction or by factoring the inherent risks of the existing rather fragile arrangements into the price which he was prepared to pay. As a matter of valuation methodology this seems to me a job in the present case rather for the multiple than for the assessment of maintainable earnings.

## Conclusions on adjustments

[234] My conclusions on these issues lead to the following broad picture expressed in tabular form (adapting the table in Mr Campbell's second report at para 3.4.28):

|  | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|
| Profit before tax | 179 | 259 | 164 | 95 |
| Add back actual interest | 16 | 18 | 15 | 38 |
| Pre-interest profits | 195 | 277 | 179 | 133 |
| Add Don Allen's savings say | 31 | 33 | 35 | 37 |
|  | 226 | 310 | 214 | 170 |
| Less depreciation | (25) | (25) | (25) | (25) |
|  | 201 | 285 | 189 | 145 |
| Weighting | x1 | x2 | x3 | x4 |
|  | 201 | 570 | 567 | 580 |
| Weighted Average of pre-interest earnings |  |  |  | 191.8 |
| Less interest (1.27m at 8%) |  |  |  | 101.6 |
|  |  |  |  | 90.2 |

## The multiple

[235] If the correct multiple to use is 5 that gives a value for the business of £451,000. Mr Campbell's view was that, if interest was to be taken into account, the appropriate multiple should be 6 (which on the above figures gives a value of £541,200). His justification for doing so was that, if he were to follow Mr Mawer down the route of using p/e ratios in the PCPI Index as appropriate comparators, one needed to adjust the notional debt to equity ratio of BMT's business so that it approximated to what might be assumed to be the debt/equity ratios in the index companies. I see the logic of this. On the other hand I agree with him that deriving the appropriate multiple in this case from the PCPI Index is not a safe process. I do not myself think, therefore, that the inclusion of interest in the calculation should be allowed to affect the choice of multiple.

[236] As already noted Mr Campbell and Mr Mawer differed somewhat in their approach to the choice of the multiple but arrived at conclusions on this point which were not strikingly different. In his report Mr Campbell listed ten positive factors in relation to BMT's business and four negative ones. His conclusion that the appropriate multiple lay at 5 in a range of 3-10 reflected the greater weight to be placed on the downside factors. Those were: (1) its reliance on a small management team none of whom had written service contracts or were subject to post-termination restraints on competition; (2) the doubts as to ownership of its drawings; (3) its heavy dependence on Ford business, and the limited, number of its other customers. With none of its customers did it have long-term contracts; (4) the fact that, although occupying a niche position in

the market, it was exposed to competition from others. These did indeed seem to me to be powerful points in favour of a relatively low multiple.

**Conclusion on value of the business**

**[237]** Accordingly, subject to Mr Mawer's point that credit should be given by BMT for the break-up value of the fixed assets it retained, I find that the value of the business as at March 2000 was £451,000. The only figure which I have for that break-up figure are the prices achieved on the actual break-up which occurred in September 2001 shown in Mr Campbell's App 15, namely £45,808, £37,500 and £76,875 (total £160,183). Subject to any further argument which counsel may wish to put (and which I invite) as to the correctness of this deduction, I therefore find that the value of the business, shorn of its fixed assets, was £290,817.

*Losses*

**[238]** During the period from April 2000 until September 2001 BMT continued to trade. Mr Campbell's report, not in this respect controverted by Mr Mawer, said that there had been trading losses amounting to a cumulative £748,886 during this period (this is my own calculation derived from Mr Campbell's figures which take a period from January, rather April, 2000. His App 13 is confusing in the way in which it distinguishes profits and losses. My figure is derived by deducting from his total of £767,991 the £19,105 cumulative losses as at April 2000).

**[239]** The defendants submitted that the losses should be seen as having been incurred as a result of the claimant's own conduct and that if reasonable steps had been taken by the claimant such losses would have been avoided.

**[240]** It was argued that Ford was lost as a customer in July 2000, not because of any wrongful acts on the part of the defendants but because of the claimant's failure properly to service Ford, which had very exacting standards, and also because of the claimant's use of Mercian, who were not approved suppliers of Ford. The claimant was given every opportunity by Ford to show that it could fulfil the requirements. In my judgment, these matters may well be true, but I do not think that they enable the defendants to escape liability. The reason why the claimant was in the position of having to resort to arrangements with Mercian, and for its difficulties in servicing Ford orders, was precisely because of the defendants' actions. There might have been other ways of coping with the crisis in BMT's fortunes, but I am not persuaded that the arrangements with Mercian were

*[2003] 2 BCLC 523 at 599*

so unwise as to break the chain of causation or render the claimant guilty of a failure to mitigate.

**[241]** It was next submitted that once the claimant had lost its main customer, it should have ceased to trade. It was further submitted that losses were sustained by the claimant as a result of other acts which were not attributable to any wrongful acts on the part of the defendants, including (1) MIT lawfully obtaining orders from customers of BMT, (2) the recession in the manufacturing industry which was continuing, (3) the failure of the management of the claimant to manage its business properly.

**[242]** I accept that there was a good deal of evidence in support of the thesis that without Ford as a customer, the claimant could not survive (eg from Tim Allen, Alan Gibson and Mr Campbell). Indeed it is this very fact which I have found leads to the conclusion that the defendants were responsible for inflicting a mortal wound on BMT. It was a foreseeable consequence of the defendants' actions that BMT's business would fail, especially if it lost Ford as a customer. What was, however, much less foreseeable was that BMT would continue in business for as long as it did after Ford's custom was lost. Nor is it easy to see why it is fair either that the defendants should be held liable for all the losses incurred by BMT during this long period however they may in fact have been caused, or to assume against the defendants that the losses were all ultimately attributable to the events of April 2000. Looking at the losses which were being accumulated on a monthly basis (summarised in Mr Campbell's App 13 and supplemented by a consideration of the customer turnover figures) one sees a striking picture when one compares the monthly turnover figures with the monthly losses being incurred, and the cumulative position in relation to those losses. It must have been

clear well before the end of 2000 that short of a miracle occurring this business was going to continue to accrue losses. I was also puzzled and not convinced by Mr Campbell's evidence that the accounts show a picture of an orderly running down of the business: very high levels of stock in relation to turnover seem to persist throughout.

[243] I was not satisfied with the explanations which I received from Tim Allen as to how this situation was allowed to continue for as long as it did. He told me that Ford UK had told him in July that they would be giving no new orders, but that he felt that they had left the door ajar for him to come back to them when he could satisfy them that BMT's problems were in the past. There is evidence that BMT was still in difficulties in September in fulfilling old Ford orders to its satisfaction. As I understood his evidence, Tim Allen sought unsuccessfully to speak to Ford with a view to resuming business in October 2000, but was not able to secure a meeting with a decision maker until March 2001, following which he made the decision that BMT would have to wind down its operations and close the business (many of the workforce required 12 weeks notice). In the meantime he had been exploring the possibility of launching BMT into an altogether new line of toolmaking business.

[244] There is some evidence that the decision to continue trading BMT was in connection with this litigation. An Allen Group Strategy Outline produced in October 2001 records that in addition to attempting to salvage the trading future of BMT 'it was also regarded as beneficial to a potential out of court settlement if BMT could continue to trade'. Unless there was

*[2003] 2 BCLC 523  at  600*

some such motive, it appears to me that the losses incurred from September 2000 were being incurred in a spirit of Micawberism.

[245] I accept that the claimant's conduct in dealing with the crisis in its fortunes caused by the defendants unlawful actions is not to be too finely judged (see eg *Banco de Portugal v Waterlow & Sons Ltd* [1932] AC 452, [1932] All ER Rep 181). Nevertheless, doing the best I can to keep afloat in the murky pool of mitigation, causation and remoteness (cf per Templeman LJ in *Cia Financiera Soleada SA v Hamoor Tanker Corp Inc, The Borag* [1981] 1 All ER 856 at 863, [1981] 1 WLR 274 at 284), in my judgment the defendants should not be held liable for the claimant's trading losses incurred from January 2001 onwards. It seems to me that, whether one expresses the matter in terms of mitigation of damage or causation, the reasonable course for BMT to have taken having regard to its own trading prospects was to have made the decision in late September 2001 which it does not appear to have taken until about April the following year. Allowing a three-month period to wind down the business takes one to the end of the year. On the figures in Mr Campbell's App 13, that would have meant cumulative losses for the period from April 2000 to 31 December 2000 of £435,560.

[246] *Management charges.* The claimant sought to increase the trading losses by the inclusion ex post facto of an additional management charge of £86,379 to reflect the costs on a time basis of Allen Group employees in dealing with BMT's affairs during a period from April 2000 to March 2001. These charges were not included in BMT's accounts, management or statutory. I suppose that the basis of the claim is a quantum meruit claim by Holdings. Given, however, the failure to recognise the claim in any relevant set of accounts, and the fact that the employees concerned were, as I understand it, remunerated from elsewhere within the Allen Group, I am sceptical as to the viability of such a claim. In reality, the time spent by Allen Group's employees is more readily categorisable as time spent on Holding's behalf at its request in an effort to protect its investment. I would not therefore include this item in the damages awarded under this head.

### Additional costs of closure

[247] Mr Campbell's evidence was that the additional losses on closure, arising primarily from the disposal of plant equipment and stock at less than the net book value, were as follows:

| | |
|---|---|
| (i) Fixed asset disposals | £286,247 |
| (ii) Stock disposals | £205,668 |
| (iii) Additional costs of closure | £84,442 |
| | £576,357 |

**[248]** The figure themselves have not been challenged. However, if I am correct that the figure arrived at for the value of the business includes the going concern value of the fixed assets (ie the £451,000 at [237] above), there seems to me no room for awarding the claimant a further sum for the write-off of these assets on closure. To put the point in another way, if what the claimant was left with in April 2000 was fixed assets with a break-up value of £160,183, and it has been fully compensated for the loss of its business valued as at March 2000, it suffers no further loss when it finally sells off those assets for £160,183. Subject to any further argument which

*[2003] 2 BCLC 523  at 601*

may be addressed to me on this point, I would therefore only award damages for the stock losses and the additional costs of closure under this head.

**[249]** A logical knock-on effect of my finding that the business should have been closed down by 31 December 2000 is that the stock levels would probably then have been higher. The write-off of stock at September 2001 equated to approximately 80% of the book value of the stock at that date (see Mr Campbell's first report at para 7.12). If that is the correct percentage write-off for a notional closure at 31 December 2000, what should one take the level of stocks to be at that date? Mr Campbell's App 13 gives an actual figure for stock at that date of £383,619. Subject to further argument this seems to me an appropriate figure to take, since having regard to the sales pattern it seems unlikely that, given a closure decision in, September, it would have been possible to run down stocks below, that level. That implies a loss on realisation of stock on a closure as at December 2000 of 80% of £383,619, namely £306,895.

**[250]** Accordingly, subject to further argument, the damages I would award under this head are £306,895 + £84,442 = £391,337.

### *Exemplary damages*

**[251]** The claimant seeks exemplary damages on the ground that the conduct by the defendants has been calculated by them to make a profit which may well exceed the compensation payable to BMT referring me to the following passages in the judgment of Lord Nicholls of Birkenhead delivering the majority judgment of the Privy Council in *A v Bottrill* [2002] UKPC 44 at [23], [25], [2003] 1 LRC 777 at [23], [25], [2003] 1 AC 449:

> '[23] ... in the nature of things, cases satisfying the test of outrageousness will usually involve intentional wrongdoing with additionally, an element of flagrancy or cynicism or oppression or the like: something additional rendering the wrongdoing or the manner or circumstances in which it was committed particularly appalling. It is these features which make the defendant's conduct outrageous ...
>
> [25] It is not surprising therefore that when describing conduct meet for an award of exemplary damages judges have often used adjectives or phrases primarily, or even solely, aimed at advertent conduct. These include: malicious, vindictive, high handed, wanton, wilful, arrogant, cynical, oppressive, and contumelious disregard of the plaintiffs rights.'

**[252]** Interesting though the discussion in that case is, I am not clear what it has to do with this one. The issue there was the extent to which in the law of New Zealand there is jurisdiction to award exemplary damages in cases of non-intentional wrongdoing. In my judgment the conduct of the defendants in this case which I have found to be unlawful does not meet the necessary criterion, however it be expressed. The Tamworth 4 did not execute their plan in the belief that it would result in a greater profit for themselves than the compensation payable to the claimant. Their principal motive was to be able to work for themselves rather than the Allen Group. Had MIT in fact made profits which exceeded the compensation payable to the claimant, there would have been nothing, given the nature of causes of action relied on, to stop the claimant from claiming an account of those profits. The claim for exemplary damages has plainly been conceived in a

*[2003] 2 BCLC 523  at 602*

punitive spirit. If the adjectives 'vindictive' and 'oppressive' fit anything in this case they fit best this head of claim. I do not think that it is justified.

### XIII. Conclusions

**[253]** For the reasons given, subject to giving counsel the opportunity to address me further on the three points I have mentioned and on any claim for interest on all or part of the damages, I would hold the first and the third to seventh defendants liable to the claimant in damages in the sums mentioned above, ie the sums of £290,817 (at [237]), £435,560 (at [245]) and £391,337 (at [250]). I am affording the opportunity for further argument on those three points, since they were not specifically addressed by counsel in their closing submissions.

*Order accordingly.*

Mary Rose Plummer Barrister.