# **TAB 5**

VOL. XXI.]          CHANCERY DIVISION.                          519

a deliberate opinion—but a view thrown out in the course of the
argument and not acted upon.   Had it been otherwise, I should
still have been prepared to join in deciding against the objection,
for a decision of Lord *Chelmsford* as to the meaning of the clause
in the earlier Act cannot bind us. as to the construction of a
clause expressed in very different terms.

COTTON, L.J. :—

I also think that the objection should not prevail.   I think so,
for the reasons given by the Master of the Rolls, and I prefer
resting my judgment on them to resting it on the ground that the
decision of Lord *Chelmsford* was not a decision on the words of the
later Act.   With all deference, it appears to me that to decide
on the latter ground would be frittering away his decision without
looking at the reason of it.   The plain meaning of each of the
clauses referred to is, that none of the provisions of the Act shall
apply to certain specified charities, and I think that Lord *Chelms-*
*ford* never intended finally to decide the contrary.

Solicitors for Plaintiffs: *Young & Son.*
Solicitors for Defendants: *Smith & Wood.*

H. C. J.

C. A.
1882
GLEN
*v.*
GREGG.

---

## *In re* EXCHANGE BANKING COMPANY.

### FLITCROFT'S CASE.

*Companies—Directors—Payment of Dividends out of Capital—Set-off—Statute*
*of Limitations.*

The directors of a limited company for several years presented to the
general meetings of shareholders reports and balance-sheets in which various
debts known by the directors to be bad were entered as assets, so that an
apparent profit was shewn though in fact there was none.   The shareholders,
relying on these documents, passed resolutions declaring dividends, which the
directors accordingly paid.   An order having been made to wind up the
company the liquidator applied, under sect. 165 of the *Companies Act,* 1862,
for an order on the directors to replace the amount of dividends thus paid out
of capital :—

*Held,* by *Bacon,* V.C., and by the Court of Appeal, that as regards each
half-yearly dividend the persons who were directors when it was paid were
liable for the whole amount paid for the dividends of that half-year, and that

C. A.
1882
V.-C. B.
*April* 18.

C. A.
*July* 26.

CHANCERY DIVISION. [VOL. XXI.

O. A.
1882

FLITCROFT'S
CASE.

*In re National Funds Assurance Company* (1) is in no way affected by *Coventry and Dixon's Case* (2).

The order of *Bacon*, V.C., declared them to be jointly liable, but this was varied on appeal by declaring them jointly and severally liable :—

*Held*, that even if the shareholders had known the true facts, so that their ratification of the payment of dividends would have bound themselves individually, they could not bind the company, for that the payment of dividends out of *corpus* was *ultrà vires* the company, and incapable of ratification by the shareholders :

*Held*, further, that the fact that the capital thus improperly applied was distributed *pro ratâ* among the whole body of shareholders did not protect the directors, for that the shareholders were not the corporation, and that payment to them would not prevent the corporation before winding-up, or the liquidator after winding-up, from compelling the directors to replace the money that it might be applied to proper purposes :

*Held*, further, that the directors could not set off any money due from the company to them against the amounts which they were ordered to replace :

*Held*, also, that the claim was for a breach of trust, and that the *Statute of Limitations* could not be set up.

THIS was a summons by the official liquidator, under sect. 165 of the *Companies Act*, 1862, asking to have the directors declared liable to make good to the assets of the company sums amounting in all to £3192, improperly paid by way of half-yearly dividend to the shareholders from the 22nd of July, 1873, to the 30th of July, 1878, both inclusive. The half-yearly sums so paid varied from £214 to £324.

The case established was that though the directors had made out half-yearly balance sheets which shewed an apparent profit, this result was arrived at by treating as assets sums which were in fact bad debts, the acceptances for them having been dishonoured, and that the whole of the dividends had in reality been paid out of capital to the knowledge of the directors for the time being.

The persons sought to be made liable were five, viz., *Simpson* and *Flitcroft*, who were directors throughout, *Grundy*, who retired in January, 1874, *Bardsley*, who became a director in July, 1873, and retired in April, 1878, and *Ramwell*, who became a director in January, 1878, and retired in February, 1879. The summons sought to make *Simpson* and *Flitcroft* jointly and severally liable for the whole £3192, *Grundy* for one dividend of £225, *Bardsley*

(1) 10 Ch. D. 118.                    (2) 14 Ch. D. 660.

for £2749, and *Ramwell* for £2476, the amounts of dividend declared while they were respectively directors.

*Simpson* had become bankrupt. *Flitcroft, Bardsley*, and *Ramwell* set up the case that they had respectively paid moneys for the company under a guarantee which they and *Simpson* had entered into for a debt of the company, and that the company was also indebted to them respectively in other sums of money. They claimed respectively to set off what was thus owing ·to them respectively by the company against anything for which they might be held liable on the summons, and they claimed the benefit of the *Statute of Limitations* as to all dividends paid more than six years before the issue of the summons.

The summons was heard before Vice-Chancellor *Bacon*, on the 18th of April, 1882.

*Davey*, Q.C., and *Ryland*, for the official liquidator, in support of the summons :—

It is clear that the whole transaction with regard to the payment of dividends was illegal. The directors misled the shareholders by representing as good debts which they knew to be bad, and they knowingly paid dividends out of capital which was a misapplication of the company's funds. As to the defence of a set-off, it will be time to talk about that when they bring in their claim under the winding-up. The doctrine of set-off is a mere creature of statute, and you cannot set off a joint debt against a several debt. If you bring an action against a man for debt, he cannot set off a joint liability.

Then there is the plea of the *Statute of Limitations*, an answer to which is to be found in *Burdick* v. *Garrick* (1). The only statute which can apply is that of 21 Jac. 1, c. 16, which does not extend to equitable claims. Courts of Equity adopt the statute by analogy, but they never admit an analogy where the claim is by a person in a fiduciary position. Did one ever hear of the statute being allowed to prevail against a breach of trust ?

That a director is chargeable on the ground of his being in a fiduciary position will not be disputed : *Parker* v. *McKenna* (2).

(1) Law Rep. 5 Ch. 233.                 (2) Law Rep. 10 Ch. 96.

C. A.

1882

FLITCROFT'S
CASE.

CHANCERY DIVISION.                    [VOL. XXI.

C. A.

1882

FLITCROFT'S
CASE.

*Hemming,* Q.C., and *Edge,* appeared for *Grundy,* but before the conclusion of the argument the case, as affecting him, was compromised with the sanction of the Court.

*Warrington,* for the directors *Flitcroft, Bardsley* and *Ram-well* :—

Admitting that the debts were bad, all that the Respondents were guilty of was an error in judgment; they were misled. They derived no personal advantage which was not shared by the other shareholders.   Fraud is not alleged, or at any rate not proved; and hence the debt, if any, is not an equitable debt; it is a misfeasance: *In re Forest of Dean Coal Mining Company* (1).   They were not agents, as was the solicitor in *Burdick* v. *Garrick* (2); and if the remedy in Equity be merely supplementary to that at Common Law, the Court will act by analogy to the statute : *Knox* v. *Gye* (3).

Supposing they have mismanaged, or even been guilty of a tort, they have not taken the company's money.   Directors cannot be compelled to refund exaggerated dividends, nor are they liable for having unknowingly represented bad debts to be good : *Turquand* v. *Marshall* (4).   As in *Coventry* and *Dixon's Case* (5) the Respondents have been guilty of no more than misconduct.

As to the set-off; the official liquidator's application is not against the directors jointly ; he has asked for a separate declaration against each.   The liability, if it exists, being joint and several, and the liquidator not making merely a joint claim (or only joint as to *Simpson* and *Flitcroft*) there is a set-off.   Moreover, the set-off arises from a guarantee ; and it is said that the guarantee was improperly given for the purchase-money of an estate.   In truth it was given to recover the banking balance, which was a much larger sum.   It is objected that we have not proved in the winding-up ; but a claim of this sort is not barred by sect. 158 : *In re Trent and Humber Company* (6).   At the winding-up there was an existing liability which has since ripened

(1) 10 Ch. D. 450.                     (4) Law Rep. 4 Ch. 376; reversing
(2) Law Rep. 5 Ch. 233.            the decree below, Law Rep. 6 Eq. 112.
(3) Law Rep. 5 H. L. 656.             (5) 14 Ch. D. 660.
                     (6) Law Rep. 6 Eq. 396, 400, n.

into a debt: *Barrett's Case* (No. 2) (1).   The liquidator has had the    C. A.
benefit of the sums paid by the respondents on guarantee; he    1882
ought not to be paid twice over.   As to the £259 11s., it was    FLITCROFT'S
money lent by *Simpson* and *Ramwell,* but the debt is now due to    CASE.
*Ramwell* alone.   *Flitcroft* is in the same position to the extent of
£200, and also of a sum of £75 paid in discharge of pressing
creditors.   There is a further sum of £262 10s. due to *Flitcroft* on
a sub-mortgage.   As to *Bardsley,* he claims to a set-off of £100
in respect of a payment made on the guarantee, and £40 paid for
the use of the company.

Then there is a claim for a large amount against *Simpson,* who
is a bankrupt.   If that sum were paid, it would reduce the
amount whereby these respondents are liable.   In that respect an
allowance should be made to them; it is not their fault, but owing
to an accident, that *Simpson* has not made any claim.

As to interest, what has happened is too remote a consequence
of the directors' acts to induce the Court to charge them with
interest.

*Horton Smith,* Q.C., and *Russell Roberts,* for *Kevan,* the trustee
in bankruptcy of *Simpson :*—

We adopt the argument that this claim is for a mere tort; and
damages recovered in an action of tort are not provable in a bank-
ruptcy: *Ex parte Brooke* (2).   It may be that *Simpson* himself
remains personally liable: *Emma Silver Mining Company* v.
*Grant* (3).

BACON, V.C., asked for a reply on the 165th section.

*Davey,* in reply :—

It has not been even argued that these directors were justified
in making the payments they have made.   The misapplication is
admitted.   They chose to make out their balance-sheets so as to
shew a fictitious profit.   That was quite as much a misapplication
as if they had paid away the money without any such formality,
or thrown it into the sea.   They were responsible managers,

(1) 4 D. J. & S. 756.                (2) 3 Ch. D. 494.
            (3) 17 Ch. D. 122.

C. A.
1882

FLITCROFT'S
CASE.

fiduciary agents; and this was a misappropriation of money with knowledge of the facts, which is clearly within sect. 165 according to the Master of the Rolls' decision in *In re National Funds Assurance Company* (1). There was no question there as to the *bona fides* of the directors. In *Joint Stock Discount Company* v. *Brown* (2) directors were made jointly and severally liable for a breach of trust; and the same principle was acted upon in *Emma Silver Mining Company* v. *Grant* (3). Lord *Westbury* never laid it down that a fiduciary agent could shelter himself from a decree under the *Statute of Limitations*. *Coventry and Dixon's Case* (4) was a plain case of misfeasance by directors in not properly qualifying; fraud or breach of trust was out of the question.

As to the trustee in bankruptcy the summons is wrong, if and so far as it seeks relief against him personally.

As to the set-off, three points are urged; first, that the three are entitled to set off the sums paid by them respectively on their guarantee; secondly, as to sums paid by *Flitcroft* and *Bardsley* respectively to certain creditors; thirdly, as to a sum of £259 11s. lent to the company by *Ramwell*, and a sum of £262 10s. lent to the company by *Flitcroft*. As to the first, Mr. *Warrington* admits that a separate claim cannot be set off against a joint liability; but he says the liability the liquidator seeks to enforce is several as well as joint. The liquidator then elects to waive the several claim, and to claim jointly only; and that point fails. Independently of that, are these payments sums which they are entitled to recover against the company at all? The guarantee was given to a bank, from which was borrowed a sum of £6600, for the purpose of committing a fraud on the company. As to the second, these sums were paid to certain preferred creditors. The directors are entitled, it may be, to stand in the shoes of those creditors whom they have paid, but that does not entitle them to a set-off. All they can have a right to is to take a dividend with the rest. As to the third, the £259 11s. was again a personal claim made at first by *Ramwell* and *Simpson* in partnership, afterwards by *Ramwell* alone, and as before, a personal claim cannot be set off against a joint liability; and as to the £262 10s., an alleged

(1) 10 Ch. D. 118.                    (3) 17 Ch. D. 122.
(2) Law Rep. 8 Eq. 381.              (4) 14 Ch. D. 660.

mortgage debt, the evidence is unsatisfactory, and if necessary an inquiry should be directed.

C. A.

1882

FLITCROFT'S
CASE.

BACON, V.C. :—

The case is, no doubt, one of great importance; it puts the 165th section on its trial; and it is necessary to consider with care what the meaning of the Legislature is, as expressed in that section.

One must have regard to the position of directors of a joint stock company. It is said they are not trustees. Answering that objection in general, I should say they are trustees and nothing else. They have interests of their own, but they are trustees of the money which may be collected by subscriptions, and of all the property that may be acquired; they have the direction and management of that property, and at the same time they have incurred direct obligation to the persons who have so intrusted them with their money. What difference there can be in principle between the case of *Burdick* v. *Garrick* (1) and this case I am at a loss to conceive. A man going abroad says to another person: " You take charge, possession, and management of all my property and account to me for it when I come back." What do the subscribers to a joint stock company say ? " We select you as directors ; we entrust you with all our moneys now paid, and all that we are liable to pay hereafter, and with the management of all our interests, and we look upon you to account to us for them ;" and they do account at their general meetings, and by their balance sheets, and so on. That the relationship of trustee and *cestui que trust* subsists between the directors of joint stock companies and the shareholders, I do not entertain the slightest doubt. If I had any doubt it would be removed by reading the 165th section, which applies directly to breaches of trust. [His Lordship read the section.] Having attended with the utmost care to the arguments which have been addressed to me, I repeat I can entertain no doubt, first, that the directors are, in the most general sense, trustees for the company, and next, they are the very persons who are meant, pointed at, and spoken of, in this 165th section.

(1) Law Rep. 5 Ch. 233.

CHANCERY DIVISION.    [VOL. XXI.

C. A.

1882

FLITCROFT'S
CASE.

V.-C. B.

Now, the facts of the case are not in the slightest degree in question. This was a company not very successful, but the directors did, on the occasions mentioned in the balance sheets, state to the subscribers what the condition of their property was. They put down among the assets a number of debts which they knew were not good, or at least did not know to be good, treating them as the actual assets of the company ; and upon that statement and representation to the shareholders they recommended a dividend which the company approved. They had no means of paying a dividend, they never had any moneys arising except from two sources—one the contributions of the shareholders, the other such money as they might borrow on their own credit. In either case it was capital and capital only, that they had ; and they had not the means of paying the dividends, if declared, without resorting to that capital ; so that, in the words of the Master of the Rolls in a case which has been referred to (1), they paid back to the shareholders their capital, and of course at the same time paid back to themselves a part of the capital which they had themselves contributed. The case is, in my opinion, upon these grounds, wholly unarguable. Of the several cases which have been referred to, that of *In re National Funds Assurance Company* (2) seems to be the most directly in point. No doubt in *In re Forest of Dean Coal Mining Company* (3), which Mr. *Warrington* cited to me, the Master of the Rolls speaks with great indulgence and forbearance of the character of directors, and declines to carry their liability further than the law requires it should be carried. But the *National Funds Assurance Company's Case* is identical with the present. There the directors were accused of having paid back to the shareholders their capital, that is to say, paid their dividend out of the capital. That is precisely what they have done here. The Master of the Rolls, in terms which I need not repeat, decided that they came clearly within the 165th section, and accordingly, it being admitted that the directors here did misapply moneys of the company, it follows that they have exposed themselves to the consequences of the 165th section.

(1) *In re National Funds Assurance Company*, 10 Ch. D. 118, 126.
(2) 10 Ch. D. 118.         (3) 10 Ch. D. 450.

CHANCERY DIVISION.

Then it has been gravely argued that because one of the
Respondents has become bankrupt, no order can be made against
him or his estate, inasmuch as all that he did was to commit a
tort.   It is no tort whatever ; it cannot be called a tort, nor is this
an action for damages.   If you establish that the man committed
a breach of trust you have only to count what is the amount of the
liability arising out of that breach of trust, and there is the decree
and the order made at once.   No inquiry has to be made ; no jury
to be empannelled ; no witnesses have to be examined ; nothing is
required to be done in order to ascertain who was to blame, as in
the case of tort, or whether there are circumstances which take
away from the tort its most severe character.   The thing is ascer-
tained by itself; it is a breach of trust plainly available against
the estate of the bankrupt, as well as against all the others; and
considering that a trust has been created, and that the relation-
ship of trustee and *cestui que trust* subsisted between the directors
and shareholders, and that it was abused by the directors, there is
an end of any question of the *Statute of Limitations.*   The *Statute
of Limitations* is a very good answer to a mere action of tort; it
may be that you cannot prove in bankruptcy unless you have a
judgment signed and completed before the bankruptcy.   But
that has nothing to do with the case before me.

Upon the general substance of the liquidator's summons I think
that the demand he makes is perfectly justified, and it is in mere
discharge of his duty that he should endeavour to compel pay-
ment.   " Compel him to repay any moneys so misapplied or
retained " is the wording of the statute (not " any damages ").

So that all that remains is the consideration of the set-off which
is pleaded.   Now I cannot properly import into this case,
although I cannot forget them, the circumstances relating to the
purchase of what is called the *Cheadle Hall* estate ; and I cannot
shut my eyes to the suspicion that the money which was borrowed
and guaranteed was not for the express purpose of paying for that
estate.   But whether that be so or not is perfectly indifferent,
because the demand of the liquidator being against these persons
jointly, he has a right to prosecute it also severally, and there can
be no right at law to set off several demands against that joint
demand, which in my opinion has been thoroughly established.

O. A.

1882

FLITCROFT'S
CASE.

V.-C. B.

CHANCERY DIVISION.                [VOL. XXI.

C. A.

1882

FLITCROFT'S
CASE.

V.-C. B.

Of the two sums which have been mentioned, one has been proved, and Mr. *Davey* does not require any further order as to that at present. As to the other he is not unwilling that that should be inquired into, to see if there is anything in the circumstance of the mortgage, which has been discharged, which would entitle the person to be charged with that sum to any allowance by way of set-off or otherwise in respect of it. I think the justice of the case in that respect would be met by declaring that the order now to be made is without prejudice to any application which Mr. *Flitcroft* may make respecting the mortgage.

That seems to dispose of this summons excepting only the question of costs. I can make no distinction as to the costs. The assignee in bankruptcy of Mr. *Simpson* had no ground for coming and disputing the right to prove against the estate; this is not the place in which that question must be decided. He has a right if he likes to be present at the taking of the account, if an account has to be taken; but that is the utmost extent of his right. That right he has not attempted to exercise; he has only sat by and disputed everything that has been said. I think I can make no difference in the order that is made against all the Respondents. I think therefore that the order must be, subject to the reservation I have mentioned, in the terms of the summons.

Judgment accordingly, declaring the Respondents to be jointly liable in respect of the dividends declared and paid during their respective tenures of office; interest to be paid at 4 per cent. from the respective dates of payment of the dividends to the date of actual repayment; costs against all the Respondents.

The order was drawn up in the following way: *Simpson* and *Flitcroft* were declared jointly liable for £225 the amount of dividends improperly paid in July, 1873, with interest at £4 per cent., from the time of payment (after deducting a sum which had been paid by *Grundy*, who had entered into a compromise which was sanctioned by the Court). *Simpson*, *Flitcroft*, and *Bardsley* were declared jointly liable for £490, the amount of dividends improperly paid from the 30th of January, 1874, to the 28th of July, 1874, both inclusive, with interest from the time of payment. *Simpson*, *Flitcroft*, *Bardsley*, and *Ramwell* were declared jointly

liable for £2260, the amount of dividends improperly paid from the 26th of January, 1875, to the 29th of January, 1878, inclusive, with interest from the times of payment, and *Simpson, Flitcroft,* and *Ramwell* were declared jointly liable for £217, the amount of dividends improperly paid on the 30th of July, 1878, with interest, and payment was ordered accordingly, liberty being given to the liquidator to carry in a proof against the estate of *Simpson* for the moneys due from him under the order.

C. A.

1882

FLITCROFT'S
CASE.

V.-C. B.

J. B. D.

*Flitcroft, Bardsley,* and *Ramwell,* appealed. The appeal was heard on the 26th of July, 1882.

C. A.

*Warrington,* for the Appellants :—

We do not dispute that dividends were paid out of capital, and that the Appellants are subject to some liability. The first point taken by the Appellants was intended to be that they were entitled to a set-off, but after the case of *Pelly, In re Anglo-French Co-operative Society* (1), decided by this Court yesterday after full argument, I cannot contend that directors can set off anything against what is found due from them under sect. 165, though that decision appears to conflict with *Grissell's Case* (2). The only ground, however, on which set-off was disallowed before the Vice-Chancellor was that there could be no set-off of a separate debt against a joint liability, and regard ought to be had to that on the question of costs, if we fail on the other grounds.

The decision on the other part of the case was given against us on the authority of *In re National Funds Assurance Company* (3). But that decision I contend is virtually overruled by *Coventry and Dixon's Case* (4).

[JESSEL, M.R. :—That case merely decided that a person was not liable to be proceeded against under sect. 165 unless he was guilty of some misconduct for which he might have been sued apart from that section.]

I contend that it lays down this principle, that the directors are

(1) *Ante* p. 492.           (3) 10 Ch. D. 118.
(2) Law Rep. 1 Ch. 528.      (4) 14 Ch. D. 660.

CHANCERY DIVISION.

C. A.

1882

FLITCROFT'S
CASE.

trustees for the company, and for nobody else.   If, therefore, the company has debarred itself from complaining of the acts done, there is no liability for them.   The proceeding must be treated as an action by the company, and all members of the company have acquiesced by receiving the dividends.

[JESSEL, M.R.:—Your argument would go to this, that if the directors had divided the whole capital among the then share-holders, they would have been under no liability.   Have you any authority for such a proposition?]

No direct authority.

[JESSEL, M.R.:—I am not prepared to say that apart from winding-up a creditor might not have a remedy against the directors individually for such a misapplication of assets.]

We admit our liability for what we have put into our own pockets, but we complain of being held liable to pay over again what we have paid to other shareholders.   If the company proves solvent, they will get their money twice over.   *Coventry and Dixon's Case* (1) decides that sect. 165 creates no new rights.

[JESSEL, M.R.:—But it does not decide that a winding-up creates no new rights.]

This is a proceeding in the nature of an action for tort, and the *Statute of Limitations* applies to all dividends paid to other shareholders more than six years before the application.   If it was a breach of trust it was acquiesced in.   If it was a tort the *Statute of Limitations* applies.   It cannot be treated as a breach of trust, for the shareholders were the only *cestuis que trust.*

[BRETT, L.J.:—Can the *Statute of Limitations* be a bar to any demand under sect. 165?]

I submit that it can where the demand is merely for a tort.

[BRETT, L.J.:—It seems arguable that everything struck at by sect. 165 is in the nature of a breach of trust, but at all events is not a misfeasance by a director a breach of trust?]

*Davey*, Q.C., and *Ryland*, for the liquidator :—

We dispute the proposition that the company could not apart

(1) 14 Ch. D. 660.

CHANCERY DIVISION.                          531

from sect. 165 compel the directors to replace moneys improperly
expended.   Suppose the company brought an action for the pur-
pose it would be no defence to say that the money had been paid
to persons who were shareholders on the register.   The persons
now on the register may all be different, and acquiescence by a
transferor does not bind a transferee who knows nothing about the
transaction.   *Ashbury Railway Carriage and Iron Company* v.
*Riche* (1) laid down nothing new, but is useful to be referred to as
laying down distinctly that where an act is *ultrà vires* the company
with the consent of all the shareholders will not effectually
ratify it.

   [COTTON, L.J. :—How can any consent at all be made out.
The shareholders had wrong balance-sheets before them.

   JESSEL, M.R. :—They assented to payment of dividends out of
profits which they were told existed, and how can that be taken to
be an assent to payment of dividends out of capital ?]

   The decision in *In re National Funds Assurance Company* (2), if
correct, decides the present case.   The Appellants say that it ought
to be reviewed on the ground of *Coventry and Dixon's Case* (3) ; but
that case is in no way inconsistent with it.   *Evans* v. *Coventry* (4)
is undistinguishable from the present case.

   [COTTON, L.J. :—Was there not there an agreement in the
policies which gave the policy-holders a right to insist that the
assets should not be misapplied ?]

   It came to nothing more than the ordinary provisions in articles
of association that the assets shall be applied for the purposes of
the company.   Every creditor trusts a company on the faith of
the statutory conditions to which the company is subject.   No
acquiescence whatever by shareholders can be shewn.   An astute
accountant might perhaps have made out from the balance-sheets
that there had in reality been no profits, but an ordinary share-
holder could not.

   [JESSEL, M.R. :—The directors made an express representation
to the shareholders that profits had been made, and the effect of

C. A.

1882

FLITCROFT'S
CASE.

(1) Law Rep. 7 H. L. 653.          (3) 14 Ch. D. 660.
(2) 10 Ch. D. 118.                 (4) 8 D. M. & G. 835.

CHANCERY DIVISION.              [VOL. XXI.

C. A.
1882
FLITCROFT'S
CASE.

that representation cannot be taken away by shewing that docu-
ments were laid before the shareholders a thorough investigation
of which would have shewn that the representation was untrue,
unless it is also shewn that they did investigate them and discover
the untruth.]

   We say that even if they did discover it, and if every shareholder
in the company had acquiesced in the most distinct way in the
misapplication of the capital, that would have been no defence.
*Society of Practical Knowledge* v. *Abbott* (1) lays down a principle
which governs the present case, and shews strongly the difference
between a corporation and the aggregate of the individual members
of it.

   *Warrington*, in reply:—

   A liquidator is merely substituted for the company and has no
better right than the company : *Waterhouse* v. *Jamieson* (2).

   [COTTON, L.J.:—You admit that the directors must repay what
they themselves received.   How do you make any distinction
between what they retained for their own dividends and what they
paid away to other people.   There was as much acquiescence by
the shareholders in one as in the other.]

   JESSEL, M.R. :—

   This is an appeal from an order of Vice-Chancellor *Bacon*, that
certain directors who had improperly paid dividends to the share-
holders out of capital should pay to the liquidator the amount of
the sums so paid.   The question is whether he had authority to
make such an order.
   The facts are these.   The directors had for several years been
in the habit of laying before the meetings of shareholders reports
and balance-sheets which were substantially untrue, inasmuch as
they included among the assets as good debts a number of debts
which they knew to be bad.   They thus made it appear that the
business had produced profits when in fact it had produced none.
The meetings acting on these reports declared dividends which the
directors paid.   The liquidator has taken out a summons to compel

(1) 2 Beav. 559.                    (2) Law Rep. 2 H. L., Sc. 29.

CHANCERY DIVISION.                        5£3

the directors to replace the sums so paid, and the Vice-Chancellor,

C. A.

1882

FLITCROFT'S
CASE.

Jessel, M.R.

following the decision in *In re National Funds Assurance Com-*
*pany* (1), made the order.   Even if he had himself entertained a
different view he was not likely to refuse to follow that case, and
the object of the present appeal is in fact to have that case over-
ruled.   It is said that it is not consistent with *Coventry and*
*Dixon's Case* (2).   This latter case decides that under sect. 165
directors cannot be made liable for anything (except perhaps for
interest) for which they could not be made liable independently
not of the Act, but of that particular section.   If then the decision
in *In re National Funds Assurance Case* had been founded on some
new equity arising under sect. 165, it could not be relied upon.   It
is not, however, founded on any such equity, but on the law inde-
pendently of that section, and I entirely adhere to the judgment
given in it.   A limited company by its memorandum of association
declares that its capital is to be applied for the purposes of the
business.   It cannot reduce its capital except in the manner and
with the safeguards provided by statute, and looking at the Act
40 & 41 Vict. c. 26, it clearly is against the intention of the
Legislature that any portion of the capital should be returned to
the shareholders without the statutory conditions being complied
with.   A limited company cannot in any other way make a return
of capital, the sanction of a general meeting can give no validity
to such a proceeding, and even the sanction of every shareholder
cannot bring within the powers of the company an act which is
not within its powers.   If, therefore, the shareholders had all been
present at the meetings, and had all known the facts, and had all
concurred in declaring the dividends, the payment of the dividends
would not be effectually sanctioned.   One reason is this—there is
a statement that the capital shall be applied for the purposes of
the business, and on the faith of that statement, which is sometimes
said to be an implied contract with creditors, people dealing with
the company give it credit.   The creditor has no debtor but that
impalpable thing the corporation, which has no property except
the assets of the business.   The creditor, therefore, I may say,
gives credit to that capital, gives credit to the .company on the
faith of the representation that the capital shall be applied only

(1) 10 Ch. D. 118.                    (2) 14 Ch. D. 660.

534                          CHANCERY DIVISION.                [VOL. XXI.

C. A.

1882

FLITCROFT'S
CASE.

Jessel, M.R.
for the purposes of the business, and he has therefore a right to
say that the corporation shall keep its capital and not return it
to the shareholders, though it may be a right which he cannot
enforce otherwise than by a winding-up order. It follows then
that if directors who are *quasi* trustees for the company improperly
pay away the assets to the shareholders, they are liable to replace
them. It is no answer to say that the shareholders could not
compel them to do so. I am of opinion that the company could
in its corporate capacity compel them to do so, even if there were
no winding-up. They are liable to pay, and none the less liable
because the liquidator represents, not only shareholders, but
creditors. The body of the shareholders no doubt voted for a
declaration of dividend on the faith of the misrepresentation of
the directors, so that there really was no ratification at all. It is
impossible to say to what extent the company and the share-
holders may have been injured by these proceedings. It may be
that this reduction of capital has been the cause of the ruin of
the company, in which case the shareholders as such may have a
right to complain of what has been done. It is not necessary,
therefore, to refer to previous decisions to shew the principle on
which the directors are held liable. If it be necessary to resort to
the doctrine of implied contract *Evans* v. *Coventry* (1) is in point.
The order of the Vice-Chancellor will therefore be affirmed, but
with this variation, that the directors in each case are to be
declared jointly and severally liable and not only jointly liable.

BRETT, L.J. :—

    In this case the directors paid away part of the capital of the
company for purposes not authorized by the memorandum or
the articles of association. I cannot doubt that their doing so
was a breach of trust. It is argued that the shareholders by
accepting the dividends which were paid out of capital ratified
what the directors had done, so that their acts cannot be treated
as breaches of trust. I think that there was no ratification at all,
because the assent of the shareholders was procured by improper
accounts, the untruthfulness of which the shareholders did not
know. But suppose they had known it, I think that what was

(1) 8 D. M. & G. 835.

CHANCERY DIVISION.

done was a breach of trust which they could not ratify.   If they
had with full knowledge assumed to ratify what was done, they
could not individually have complained, but the shareholders are
not the corporation.   In my opinion the corporation could at any
time before the winding-up have compelled the directors to re-
place the moneys thus improperly expended, and the liquidator
now can do so.   Even if the shareholders had all sanctioned what
was done, and had remained the same throughout, still the com-
pany could have sued the directors for a breach of trust.   They
are trustees for the company not for the individual shareholders.
The liquidator represents the company, and is bound to discharge
towards the creditors all the duties which the company owes them.
It is therefore his duty when such a breach of trust as this is dis-
covered to get a return of the assets improperly expended that
they may be applied in payment of debts.   The act of the
directors is impeached as a breach of trust, not on the ground of
tort or misfeasance.   There are persons who may be made liable
under sect. 165, without having been guilty of a breach of trust;
but where the person charged under that section is a trustee, the
act which brings him within the section is a breach of trust.   That
being so, no Statute of Limitations nor any bar by analogy to the
statute can be relied on.   The question of set-off is disposed of by
our decision of yesterday in *Pelly's Case* (1).   Everything that could
be urged for the Appellants has been well put, but their case fails.

COTTON, L.J.:—

    The first point to be considered is, whether this was a breach of
trust and a misapplication of the funds of the company.   I am of
opinion that it was.   The assets of a company are to be dealt
with only for the purposes of its business.   The application of
the capital in paying dividends was therefore a misapplication,
and the Court has power under sect. 165 to order a return of the
moneys so expended.   Several objections to this have been urged.
It was contended that though the directors might be ordered to
repay what they had themselves retained, they ought not to be
ordered to refund what they had paid to the other shareholders.
But directors are in the position of trustees, and are liable not

(1) *Ante,* p. 492.

C. A.

1882

FLITCROFT'S
CASE.

C. A.

1882

FLITCROFT'S
CASE.

Cotton, L.J.

only for what they put into their own pockets, but for what they in breach of trust pay to others. Then it was said that general meetings confirmed these payments, and that the shareholders all received the dividends, and that therefore the company, which only consists of the aggregate of shareholders, cannot get them back. I am of opinion that there was no confirmation which could bind the shareholders as individuals, for there can be no effectual confirmation where the parties are under a mistake of fact. Here the directors had issued false returns and balance sheets which made it appear that the company had made a profit, and there is not even an allegation that the shareholders knew *aliunde* that these documents were incorrect. But even if the shareholders had known it they could only bind the company to things which were within the powers of the corporation. Now a payment of dividends out of capital is contrary to the constitution of the company, and is incapable of ratification.

The argument that the money has in fact been received by the company, and that the company cannot get it back, is ingenious but unsound. The corporation is not a mere aggregate of shareholders. If the corporation were suing for the purpose of paying over again to the shareholders what the shareholders had already received the Court would not allow it. But that is not the case here, the company is insolvent, and there is no objection to allowing it to get back its funds for the purpose of paying debts. The case of the liquidator is stronger, for in some respects he, as a *quasi* trustee for creditors as well as shareholders, stands in a different position from the company. But I rely on this, that the money was not paid to the corporation, but was paid improperly to individuals, and the corporation can sue the directors to get it back that it may be applied in payment of the debts of the corporation. I do not see how to make any distinction between what the directors retained and what they paid to other shareholders.

The question of set-off is disposed of by our decision in *Pelly's Case* yesterday, and I should not have referred to it had not *Grissell's Case* (1) been cited as conflicting with it. But that case only related to the question whether directors who were creditors

(1) Law Rep. 1 Ch. 528.

CHANCERY DIVISION.

of the company should be postponed to other creditors, which is
quite a different question.

The *Statute of Limitations* can in no way apply to a case like
the present, for the ground of our decision against the directors is
that they have misapplied funds as to which they stood in the
position of trustees.

C. A.
1882
FLITCROFT'S
CASE.

Solicitors for Liquidator : *Clarke, Woodcock, & Ryland.*
Solicitors for Appellants: *Goldring & Mitchell.*
Solicitors for other parties : *Hamlin & Grammer.*

                                                                    H. C. J.

---

### *Ex parte* HARPER.  *In re* TAIT.

C. A.
1882
July 27.

*Proof in Bankruptcy—Admission by Trustee—Right to apply to expunge—*
*Lapse of Time—Bankruptcy Rules, 1870, rr. 72, 73.*

> Under rule 73 of the Bankruptcy Rules, 1870, as under the previous
> practice, a trustee in bankruptcy who has admitted a proof against the estate
> is entitled at any time afterwards to apply to the Court to expunge the
> proof, on the ground that it was originally wrongly admitted. Mere lapse
> of time is no objection to the application, but, though the proof is expunged,
> the creditor will be entitled to retain any dividend which he may have pre-
> viously received.

THIS was an appeal from a decision of Mr. Registrar *Pepys,*
acting as Chief Judge in Bankruptcy.

On the 23rd of December, 1869, Sir *Peter Tait, George Cannock,*
*Robert Thomas Tait,* and *Balfour Logie,* who carried on in partner-
ship the business of army clothiers and contractors, under the
firm of *Tait & Co.,* executed a deed which provided for the
winding-up of their affairs under the inspection of certain persons
named in the deed. The deed provided that the joint and sepa-
rate estates of the debtors should be administered as in bank-
ruptcy, and there was a declaration that the deed was intended
to be and operate as a deed of inspectorship for the benefit of all
the creditors of the debtors within the meaning of the provisions
of the 192nd section of the *Bankruptcy Act,* 1861, in that behalf.

*George Cannock,* one of the debtors, held seventy shares, of the