# TAB 6

01:12365497.1

Butterworths Company Law Cases/BCLC 1998 1/Facia Footwear Ltd (in administration) and another v Hinchliffe and another - [1998] 1 BCLC 218

[1998] 1 BCLC 218

# Facia Footwear Ltd (in administration) and another v Hinchliffe and another

CHANCERY DIVISION

SIR RICHARD SCOTT V-C

23, 24, 25 JUNE, 7, 30 JULY 1997

*Administration - Misfeasance - Administration - Duties of directors of insolvent company - Summary judgment - Administrators seeking summary judgment in misfeasance proceedings against directors for repayment of sums allegedly improperly paid away - Whether directors had arguable defence to misfeasance claim - RSC Ord 14.*

Facia Footwear Ltd was party to group treasury and joint security arrangements with the Facia group of companies which the defendants, SH and CH, had assembled (although Facia Footwear Ltd was a £1 company whose sole shareholder was SH). In June 1996 the court appointed administrators of Facia Footwear Ltd and in September 1996 the company (acting by the administrators) commenced a misfeasance action against the defendant directors, claiming reimbursement by the defendants of sums which it was alleged they had improperly caused the company to pay to third parties. The commencement of proceedings was accompanied and followed by applications for and the grant of Mareva injunctions against the two defendants. In November 1996 the company issued a summons under RSC Ord 14 seeking summary judgment against the defendants. The repayment claims related to payments made to or for the benefit of Facia group companies. Facia Footwear Ltd alleged that in view of the financial difficulties of the group and of the individual group companies to which payments were made, no realistic expectation could have been entertained that the payments would ever be repaid and submitted that in those circumstances the directors should never have permitted them to be made. The defendants' answer was, first, that the payments were made in the normal course of implementation of the group treasury arrangements, and were not made for any private purposes of the directors or in breach of any statutory obligations of the directors, or otherwise than for the trading purposes of the recipient companies. If the group had ceased trading and collapsed it would have dragged down Facia Footwear Ltd in the fall. It was in the interests of Facia Footwear Ltd to keep the group afloat. Second, the directors believed, throughout the period that the payments were being made, that the group had a reasonable chance of weathering its financial difficulties. The directors deposed that at the critical time, April and May 1996, it was not obvious to them either that refinancing efforts would fail to reach fruition in time or that the administrators' appointment was imminent. They remained optimistic to the end.

**Held** - (1) If the Facia group, and Facia Footwear Ltd as an individual company, were in a dangerous financial position, the directors owed a duty

*[1998] 1 BCLC 218 at 219*

to take account of the interests of creditors. But if the refinancing arrangements were to be brought to fruition, the group had to continue trading in the meantime. The submission that the refinancing prospects were negligible if not hopeless and should have been seen to be so by the directors could not be accepted at the Ord 14 stage. The benefit of hindsight was not available to the directors at the time. There had been no attack on their bona fides in that regard. As to Facia Footwear Ltd in particular, its fate had, by reason of joint security arrangements, become inextricably tied to the fate of the group. Since no attack was made on the

directors' decision that Facia Footwear Ltd should enter into the joint security arrangement, the continued use thereafter of Facia Footwear Ltd's cash flow for the purposes of the group treasury arrangements, a use necessary to enable the group to continue trading, could not be described as misfeasance. Trial and cross-examination might produce a different result but so far as the treasury arrangement payments made from Facia Footwear Ltd's funds to group companies were concerned, this was not a summary judgment case. In respect, therefore, of the payments made by Facia Footwear Ltd to trading companies in the Facia group, the summary judgment application failed.

(2) The application also failed in relation to three payments not to group companies. Two could be justified at the Ord 14 stage as part of the group treasury arrangements. One of those had arguably caused no or negligible loss to Facia Footwear Ltd. In relation to the other payment it was impossible on the summary judgment application to set aside the commercial judgment of the directors that it was for the benefit of the group and of Facia Footwear Ltd, or to conclude that the directors had no defence to a misfeasance claim.

### Cases referred to in judgment

Kinsela v Russell Kinsela Pty Ltd *(1986) 4 NSWLR 722.*

Nicholson v Permakraft (NZ) Ltd *[1985] 1 NZLR 242.*

Walker v Wimborne *(1976) 137 CLR 1.*

West Mercia Safetywear Ltd v Dodd *[1988] BCLC 250, CA.*

#### Summons

Facia Footwear Ltd (acting by its administrators) applied by summons dated 28 November 1996 for summary judgment under RSC Ord 14 in misfeasance proceedings commenced on 25 September 1996 by the company against Stephen Hinchliffe and Christopher Harrison, directors of the company, for the repayment of sums which it was alleged the directors had improperly caused the company to pay to third parties. The facts are set out in the judgment.

Michael Crystal QC *and* Stephen Atherton *(instructed by* Wilde Sapte*) for the plaintiffs.*

Michael Briggs QC *and* Nicholas Harrison *(instructed by* Peters & Peters*) for Mr Hinchliffe.*

*Mr Harrison appeared in person.*

*Cur adv vult*
*[1998] 1 BCLC 218  at  220*

**30 July 1997. The following judgment was delivered.**

**SIR RICHARD SCOTT V-C.**

On 3 June 1996 Mr Alan Barrett and Mr Dipankar Ghosh, partners in Price Waterhouse, were appointed administrators of Facia Footwear Ltd and of Wisebird Ltd. On 25 September 1996 the two companies (acting by the administrators) commenced a misfeasance action against Mr Stephen Hinchliffe and Mr Christopher Harrison, the directors of the companies. Facia Footwear Ltd claimed reimbursement by the defendants of sums of £23,368,795.45, £150,000 and £155,867.53 that, it was alleged, the directors had improperly

caused the company to pay to third parties. Wisebird Ltd made a similar claim in relation to payments of some £12m.

The commencement of proceedings was accompanied and followed by applications for and the grant of Mareva injunctions against the two defendants. Substantial evidence was filed on those applications. Considerable costs must have been incurred.

On 28 November 1996 the two companies issued a summons under RSC Ord 14 seeking summary judgment against the defendants for the sums to which I have referred with interest thereon. Wisebird Ltd subsequently abandoned its application. The summary judgment application by Facia Footwear Ltd continued, however, to be prosecuted and in due course came on for hearing. This is the judgment on that application.

There have been several affidavits sworn on behalf of Facia Footwear Ltd on this application. Mr Hinchliffe and Mr Harrison have each sworn a lengthy affidavit in answer. The exhibits to these affidavits are voluminous, and, with the other documents got together for the hearing, comprise some nine lever arch files. I mention these details in order to demonstrate the very considerable costs and time that this application must have entailed. In the period since the summons was issued the attention of the parties and their lawyers must inevitably have been concentrated on the pending summary judgment application rather than on preparing for the trial. This sort of diversion of resources and of time can be justified only by a summary judgment case that appears overwhelming in its strength. Otherwise it imposes a quite unjustifiable burden on the respondents. That result is a matter of particular concern where, as here, the respondents are individuals facing litigation by a corporate opponent that, whatever may be the extent of its liabilities, is not short of assets to fund expensive litigation. Mr Harrison, one of the defendants, has found himself unable to obtain legal aid but unable to afford legal representation. He has therefore had to appear in person. Mr Hinchliffe has been represented before me by leading counsel but for him, too, the costs implications of an action such as this must be horrific. The uneven financial playing field on which individuals are obliged to defend themselves against corporate plaintiffs may be unavoidable but at least obliges the court to pay particular attention to the propriety of summary judgment applications in complex cases.

Let me now describe the background circumstances which led to the financial collapse of Facia Footwear Ltd and to this litigation.

I must start with a description of Mr Hinchliffe's entrepreneurial vision and ambitions which underlie the tale. Mr Hinchliffe formulated and endeavoured to carry into effect a business strategy the object of which was

*[1998] 1 BCLC 218 at 221*

to select and put together a range of complementary retail businesses which, although fundamentally sound and profitable at store level, had become loss-making as a result of excessive central head office, warehousing, distribution and other administrative costs. By combining these businesses in one corporate group and providing centrally on a group basis head office and administrative services and warehousing and distribution facilities, it was hoped to enable substantial reductions in costs to be made. The benefit of these reductions coupled with merchandising improvements would, it was hoped, enable a profitable group to be created.

Mr Hinchliffe, after 20 years or so of experience in retail businesses, began in about 1992 to put together the envisaged group of companies. Mr Harrison, who had been associated with Mr Hinchliffe in previous business enterprises, became financial director of the group companies. The holding company was Facia Ltd and the group became known as the Facia Group.

By August 1995 the Facia Group consisted of eight trading subsidiaries of Facia Ltd, namely, (i) Salisburys Ltd (Salisburys), which owned a chain of luggage and leather goods retail stores; (ii) Sock Shop Holdings Ltd (Sock Shop), which sold socks at various outlets; (iii) Torq Fashion Ltd (Torq), which owned a chain of costume jewellery stores; (iv) Oakland Menswear Ltd (Oakland), which owned a chain of menswear stores; (v) Contessa (ladies wear) Ltd (Contessa), which owned a chain of ladies lingerie stores; (vi) Mayfair Trunks Ltd (Mayfair), which owned a single store retailing high quality luggage; (vii) Red or Dead Ltd (Red or Dead),

which was a high fashion design house; and (viii) Dovetail Cabinetmakers Ltd (Dovetail), which carried out shopfitting for the entire group.

The board of directors of Facia Ltd which controlled the group, consisted of Mr Hinchliffe, Mr Harrison and Mr Gary O'Brien, each of whom was an executive director, and Mr David MacLellan. Mr MacLellan was a non-executive director who represented the interests of a substantial investor in the group and had joined the board in October 1994 after the acquisition of Sock Shop. Mr Harrison was the group finance director and also company secretary. All senior accountants in the subsidiary companies reported to him. Management accounts, cash-flow forecasts and profitability forecasts in relation to each of the trading subsidiaries were, Mr Hinchliffe has deposed, prepared and presented by Mr Harrison and reviewed by the board at most Facia Ltd board meetings.

The group had high level advice available to it. The group solicitors were Hammond Suddards, who undertook many of the secretarial functions required within the group. Touche Ross were the group auditors.

Mr Hinchliffe has deposed in his affidavit sworn on 22 May 1997 to the steps taken regarding the financing of the group. Short-term loans were made available by United Mizrahi Bank (UMB) secured by a charge over the group's assets. But the main difficulty lay in securing arrangements for working capital. UMB was not a clearing bank and could not provide current account overdraft facilities. Around the beginning of 1995 discussions were held with Midland Bank with a view to obtaining a working capital facility. But Facia was told that a full year's trading would be required before a facility could be made available. During 1995, therefore, none of the trading subsidiaries had overdraft facilities. As Mr Hinchliffe put it:

*[1998] 1 BCLC 218  at  222*

   'This represented a considerable inconvenience in that many of the Facia businesses had sharply fluctuating cash-flow
   requirements due to factors such as seasonal trading variations.'

In the absence of any clearing bank group overdraft facility, each subsidiary's current account had to remain in credit at all times. In order to deal with this requirement a group treasury arrangement was operated. The treasury arrangement is described by Mr Hinchliffe as follows:

   '... a common treasury arrangement was operated, whereby positive balances were transferred within the Group to
   prevent negative balances arising, with all companies keeping a running account with Facia and with each other.
   Payments were also on occasion made directly by one Group company to discharge a liability on behalf of another; this
   again would be reflected in the relevant companies' current accounts. The required inter-company transfers were
   ascertained and arranged for the most part by Mr O'Brien and Mr Harrison. Each company within the Group would
   produce every two weeks a forecast of its cash-flow requirements for the next three months. Each company would in
   turn be given forecasts of the overall Group position and would be informed of requirements which were likely to be
   made of it and/or the level of funds likely to be available to it. Mr Harrison would then calculate the required transfers
   and, when necessary, ask me to sign the necessary instructions for the transfers to be made ...'

In the summer of 1995 the possibility of acquiring the Freeman Hardy & Willis (FHW) chain of 245 shoe shops arose. The shops were owned by British Shoe Corp Ltd, a wholly owned subsidiary of Sears. Mr Hinchliffe was attracted by the possibility because 'the businesses were big brand names which fitted well into the Facia Group concept of providing a full range of clothing and accessories, offering potential for cross-fertilisation with the existing Facia businesses, and particularly with Salisburys' leather goods range'. Negotiations were fruitful. Non-binding heads of agreement were signed on 8 August 1995. A company, Facia Footwear Ltd, was acquired off-the-shelf as the company into which the FHW business would be transferred. The terms finally agreed with Sears were fairly complex. Under them an initial payment of £2.5m had to be made. UMB were not willing to make any further loans to the group but Singer & Friedlander agreed to advance the funds. A complication was that Singer & Friedlander was unwilling to advance the funds to a Facia Group company as UMB already had a first charge on the group assets. Accordingly, Facia Footwear Ltd, which had been incorporated as a £1 company with Mr Hinchliffe as the sole shareholder, was, formally at least, kept outside the group. Singer & Friedlander obtained a first charge over the shops and the business and a personal guarantee from Mr Hinchliffe as security for its loan. I should record Mr Hinchliffe's explanation of the position of Facia Footwear Ltd, vis-à-vis the Facia Group.

'The basis on which I held this [Facia Footwear Ltd] share was never made entirely clear. The intention from the outset was that Facia

*[1998] 1 BCLC 218  at  223*

Footwear should in substance be part of the Facia Group; indeed this was the whole rationale for the purchase of the FHW businesses ... Hammond Suddards were well aware of the problem and indeed Mr Jolly was subsequently asked to advise on it specifically, but it was ultimately left unresolved. It was initially believed that the problem would only be a short term one because it was intended that I should transfer the share to Facia as soon as the Singer & Friedlander loan had been repaid, which was to be within a matter of weeks. However, in the event, although the Singer & Friedlander loan was indeed quickly repaid, the formal transfer of the share to Facia never took place ... Nevertheless, Facia Footwear was from the very beginning always treated, in commercial terms, as part of the Facia Group ... Although the position was never formally agreed or recorded in any document, I regarded myself as holding the share on trust for Facia.'

The acquisition of the FHW business was completed on 26 August 1995. As part of the overall transaction with Sears a stock supply agreement and a common services agreement were entered into. The parties to these two agreements included Facia Footwear Ltd, Facia Ltd and Sears (or a Sears subsidiary). The object of the agreements was to ensure that for an interim period of at least 12 months the Sears Group would continue to supply and administer the chain of shoe shops. The interim period was intended to give the Facia Group time to put in place its own supply and administrative infrastructure for the purposes of the shoe shop business that had been acquired. The stock supply agreement imposed, of course, an obligation on Facia Footwear Ltd to reimburse Sears for the cost of the stock supplied to the shops and, under cl 9, enabled Sears to terminate the agreement forthwith in the event of a failure to make payments due after the expiry of a formal 14 day notice. Charges were to be paid by Facia Footwear Ltd to Sears for the administrative services provided under the common services agreement. Facia Footwear Ltd's obligations under the two agreements were guaranteed by Facia Ltd. Facia Footwear Ltd was, after all, simply a £1 company.

Mr Hinchliffe, and the whole of the Facia board, regarded the deal with Sears as very highly beneficial both to Facia Footwear Ltd and to the Facia Group. Mr Hinchliffe has described the benefit of the arrangements as he saw it in paras 67, 68 and 69 of his affidavit. I need not set out at length his views expressed in those paragraphs. Whether at trial they will be subjected to critical analysis time may tell. For the present, however, on this summary judgment application, they have to be accepted at their face value. It is of particular importance, however, to notice that it was an important part of Mr Hinchliffe's intentions, and Mr Harrison's too for that matter, that Facia Footwear Ltd should from the outset participate in the Facia Group treasury arrangements that I have described. It was intended that Facia Footwear Ltd's considerable cash flow should be available to assist the group's working capital requirement. Some figures given to me by Mr Harrison are of interest. He told me that the Facia Group had an annual turnover of £250m of which about one-quarter was derived from Facia Footwear Ltd.

Facia Ltd had guaranteed Facia Footwear Ltd's obligations under the Sears agreements. Without that support Facia Footwear Ltd could not have entered into the agreements, highly beneficial to Facia Footwear Ltd as they

*[1998] 1 BCLC 218  at  224*

were thought to be. The use of Facia Footwear Ltd's cash flow in the group treasury arrangements is presented as a reasonable quid pro quo for Facia Ltd enabling Facia Footwear Ltd to obtain the benefit of the agreements. There has been no challenge before me to the propriety of the decision by Facia Footwear Ltd's directors to commit the company to taking its place in the group treasury arrangements.

Following the completion of the deal with Sears, the financing of the group continued to be precariously based on short-term loans made available by UMB. By the end of September 1995 the group debt to UMB was in the region of £15m. By December repayments had reduced the debt to about £10.5m. But in mid-December a new manager of the London office of UMB informed the Facia board that UMB would require repayment of all its facilities by the end of the year. A number of meetings between the bank, the Facia board and their respective solicitors then took place. In his affidavit Mr Hinchliffe has said that:

'It was made clear to UMB ... that if full repayment was indeed required immediately, the Group would be insolvent.'

However, further meetings with UMB led to UMB offering to allow the group a new facility for a period of a year on the footing that a strict programme of repayments over the year would be put into effect. This offer was, however, made subject to a number of conditions. One of these conditions was that UMB be granted full security by way of fixed and floating charges over the assets of all the trading companies in the group, including Facia Footwear Ltd. Consideration was given to UMB's proposal by the Facia Ltd board. It was expressly noted that separate consideration needed to be given to the proposal by Mr Hinchliffe and Mr Harrison in their capacity as directors of Facia Footwear Ltd. It was decided to accept the UMB proposal, heads of terms were signed in January 1996 and the arrangements were finally completed on 7 February 1996. A new facility for Facia Ltd of just under £9m was agreed upon, with each of the Facia subsidiaries, including Facia Footwear Ltd, entering into cross-guarantees for the repayment of the indebtedness. The effect of this arrangement on Facia Footwear Ltd was that the fate of the company became dependent on the fate of the group. Mr Hinchliffe in his affidavit has deposed as follows:

> 'Mr Harrison and I decided in principle ... that it was in the interests of Facia Footwear ... to enter into the joint security arrangement.'

It is of critical, and in my view determinative, importance that on this summary judgment application the propriety of Mr Hinchliffe's and Mr Harrison's decision that Facia Footwear Ltd should become a party to the joint security arrangement made between Facia Ltd and UMB is not challenged. It is accepted that the decision was one that a director endeavouring to pursue the best interests of Facia Footwear Ltd could reasonably have made. Whatever challenge to the propriety of the decision may be mounted at trial there is none at this stage in the proceedings.

Mr Hinchliffe summed up the result of Facia Footwear Ltd's participation in the joint security arrangement in the following passage from his affidavit:

*[1998] 1 BCLC 218  at  225*

> 'The result of the joint security arrangement was that any positive cash balance held by Facia Footwear was in any event pledged to secure a contingent liability of up to £9 million, a contingent liability which made securing the survival of the Group a commercial necessity. Accordingly, from this date onwards the essential issue in relation to the question whether Facia Footwear should make further short term advances to the Group was whether the Group appeared to have a reasonable prospect of survival.'

I would emphasise Mr Hinchliffe's reference to 'a reasonable prospect of survival'.

Against that background, I must now turn to the specific payments made by Facia Footwear Ltd, the repayment of which by the two directors is now sought.

The main claim relates to payments made to or for the benefit of Facia Group companies. In para 3.2.1 of the statement of claim it is alleged that between 25 August 1995 and 3 June 1996 Mr Hinchliffe and Mr Harrison authorised payments totalling £24.5m-odd to be made from Facia Footwear Ltd's bank account to the other companies in the Facia Group. In para 1(a) of the Ord 14 summons, judgment against the two defendants for the sum of £20.7m is sought. I am not clear what explains the difference between the £24.5m and the £20.7m, but it does not matter. Before me, Mr Crystal QC, counsel for Facia Footwear Ltd, has limited the summary judgment claim to the payments made in April and May 1996. These payments total £10,734,531.25. It is alleged that in view of the financial difficulties of the group and of the individual group companies to which payments were made, no realistic expectation could have been entertained that the payments would ever be repaid. In those circumstances, it is submitted, the directors should never have permitted them to be made. Mr Crystal has submitted, in the alternative, that summary judgment should be ordered in respect of the April and May 1996 payments made to Salisburys, to Oakland and to Red or Dead. These sums total about £9m. This claim is made on the footing that these three companies were, on uncontested evidence, hopelessly insolvent at the time the payments were made. Mr Crystal has submitted, as a further alternative, that, at the very least, summary judgment against Mr Hinchliffe and Mr Harrison should be given in respect of four payments, namely a payment of £900,000 made to Salisburys on 28 May and payments of £100,000 to Oakland, £190,000 to Red and Dead and £5,000 to Dovetail each made on 23 May 1996. As to these payments, it was submitted, the defendants can have no possible answer.

The defendants' answer to the case advanced against them consists, in its essentials, of two points. First, the payments of which complaint is made were made in the normal course of implementation of the group treasury arrangements. It is not suggested that any of these payments to group companies were made for any private purposes of the directors or were in breach of any statutory obligations of the directors, or were otherwise than for the trading purposes of the recipient companies. If the group had ceased trading and collapsed it would have dragged down Facia Footwear Ltd in the fall. It was in the interests of Facia Footwear Ltd to keep the group afloat. Second, the directors believed, throughout the period that these payments

*[1998] 1 BCLC 218  at  226*

were being made, that the group had a reasonable chance of weathering its financial difficulties. Discussions had been held with a US entity, Texas American Group Inc (TAG), with a view to a merger which would, as one of its features, have raised and made available to the Facia Group a substantial sum of working capital. In addition, discussions had been taking place with US securities brokers, Rodman & Renshaw, with a view to raising funds in the US. Mr Harrison, in his affidavit, has described his attitude to these discussions:

'Throughout the period, strenuous efforts were made to obtain the necessary new finance, as is evidenced by the Facia Board Minutes. I met with representatives of both [TAG] and Rodman and Renshaw to review the forecasts and other documentation which was in final form in the case of Texas American and well advanced in the case of Rodman & Renshaw and I was and remain convinced that both of these sources of finance were close to being finalized at the time of the appointments [of the administrators].'

Mr Crystal has endeavoured to pour scorn on these expectations which, he has suggested, no reasonable director could have supposed lead to a financial rescue in time to avert inevitable insolvency. It is, of course, a fact that a rescue did not come in time. The collapse of the Facia Group was brought about in the end by a dispute which arose between the group and Sears. Up to the end of March 1996 the sums due to Sears under the two agreements of 26 August 1995 had been duly paid. There then emerged a compensation claim, put forward on behalf of Facia Footwear Ltd against Sears, for breach by Sears of its obligations under the agreements. It seems that the 245 shoe shops were seriously under-achieving and it was alleged that this was due to Sears' failure to supply them with the requisite quality of goods. A damages claim of some £9m was being discussed with Sears. On 3 May 1996 Sears served on Facia Footwear Ltd a 14 day notice to pay all sums outstanding under the stock supply agreement. The discussions with Sears that then took place are described by Mr Hinchliffe in his affidavit:

'Sears suggested (without prejudice) a figure [of compensation to Facia Footwear] of around £4 million, but proposed that the compensation take the form of an ongoing 15% discount on future purchases of stock. I indicated that this was not an acceptable solution as the losses had already been suffered. As far as Sears' concern about the Group's financial position was concerned, we discussed our cash flow projections and refinancing prospects, and Sears expressed what seemed genuine desire to sort out our difficulties ... I received the impression that they were extremely keen that a refinancing package should be permitted to proceed.'

Mr Hinchliffe went on to refer to 'considerable shock when we learned on 24 May 1996 of Sears' intention to present a creditors' administration petition on 3 June 1996 unless all payments which they claimed to be due were made by 31 May 1996'. The directors all appreciated that Sears' decision that had been communicated on 24 May meant that the group could

*[1998] 1 BCLC 218  at  227*

not continue to trade unless there were an immediate refinancing. At its board meeting on 30 May, the board decided the current refinancing proposals could be taken no further and the administrators were appointed on the next day.

Mr Crystal has referred me to a number of authorities describing the duty that a director owes to a group company in financial difficulties.

In *Walker v Wimborne* (1976) 137 CLR 1 at 6-7 Mason J said:

'... the payment of money by company A to company B to enable company B to carry on its business may have

> derivative benefits for company A as a shareholder in company B if that company is enabled to trade profitably or realize its assets to advantage. Even so, the transaction is one which must be viewed from the standpoint of company A and judged according to the criterion of the interests of that company ... the emphasis given by the primary judge to the circumstance that the group derived a benefit from the transaction tended to obscure the fundamental principles that each of the companies was a separate and independent legal entity, and that it was the duty of the directors of Asiatic to consult its interests and its interests alone in deciding whether payments should be made to other companies.'

Mason J went on to stress that 'directors ... in discharging their duty to the company must take account of the interest of its shareholders and its creditors'.

In *Nicholson v Permakraft (NZ) Ltd* [1985] 1 NZLR 242 at 249 Cooke J provided the following résumé of the duties owed by directors to their company:

> 'On the facts of particular cases this may require the directors to consider inter alia the interests of creditors. For instance creditors are entitled to consideration, in my opinion, if the company is insolvent, or near-insolvent, or of doubtful solvency, or if a contemplated payment or other course of action would jeopardise its solvency.'

In *Kinsela v Russell Kinsela Pty Ltd* (1986) 4 NSWLR 722 Street CJ, too, directed his attention to the nature of the duty owed by a director of a company in danger of insolvency. He said (at 730):

> '... where a company is insolvent the interests of the creditors intrude ... It is in a practical sense their assets and not the shareholders' assets that, through the medium of the company, are under the management of the directors pending either liquidation, return to solvency, or the imposition of some alternative administration.'

and (at 733):

> 'Courts have traditionally and properly been cautious indeed in entering boardrooms and pronouncing upon the commercial justification of particular executive decisions. Wholly differing value considerations might enter into an adjudication upon the justification for a particular decision by a speculative mining company of doubtful

*[1998] 1 BCLC 218  at  228*

> stability on the one hand, and, on the other hand, by a company engaged in a more conservative business in a state of comparable financial instability. Moreover, the plainer it is that it is the creditors' money that is at risk, the lower may be the risk to which the directors, regardless of the unanimous support of all the shareholders, can justifiably expose the company.'

The former of the two passages cited above was cited with approval by Dillon LJ in *West Mercia Safetywear Ltd v Dodd* [1988] BCLC 250.

These authorities and the principles expressed in them entitle Mr Crystal to submit that the duty owed by Mr Hinchliffe and Mr Harrison to Facia Footwear Ltd in April and May 1996 was a duty that required them to take into account the interests of creditors. The whole Facia Group, and Facia Footwear Ltd as an individual company, were in a very dangerous financial position. The future of the group probably depended on satisfactory refinancing arrangements becoming available.

But if the discussions about refinancing arrangements were to be brought to fruition, the group would have to continue trading in the meantime. Mr Crystal has contended that the refinancing prospects were negligible if not hopeless and should have been seen to be so by Mr Hinchliffe and Mr Harrison. That is a submission that seems to me to be quite unacceptable at this stage in the proceedings. The benefit of hindsight was not available to the directors at the time. It is clear enough that in continuing trading throughout April and May they were taking a risk. But the boundary between an acceptable risk that an entrepreneur may properly take and an unacceptable risk the taking of which constitutes misfeasance is not always, perhaps not usually, clear cut. It is, in my opinion, quite unrealistic for Mr Crystal to argue, in the face of the explanations given by the directors in their respective affidavits, that the continuation of trading by the Facia Group companies up to 30 May shows such a dereliction of duty on the part of the directors as to expose them to liability for

misfeasance. I accept that, given the parlous financial state of the group, the directors had to have regard to the interests of creditors. But the creditors of the group, and of Facia Footwear Ltd in particular, would clearly have been best served by a refinancing that could support a continuation of profitable trading. The cessation of trading followed by the disposal of the assets of the companies on a forced sale basis would, it was always realised, lead to heavy losses for the creditors. The creditors' only chance of being paid in full lay in a continuation of trading. A continuation of trading might mean a reduction in the dividend eventually payable to creditors but it represented the creditors' only chance of full payment. It is, therefore, not in the least obvious that in continuing to trade in April and May the directors were ignoring the interests of creditors.

The directors have deposed that at the critical time, April and May 1996, it was not obvious to them either that the refinancing efforts would fail to reach fruition in time or that Sears would pull the plug on them in the manner that eventually happened. They retained optimism to the end. There has been no attack on their bona fides in this regard. As to Facia Footwear Ltd in particular, its fate had, by reason of the 7 February 1996 refinancing arrangements, become inextricably tied to the fate of the group. If the group

fell, Facia Footwear Ltd would fall. Since no attack is made on the directors' decision that Facia Footwear Ltd should enter into the February refinancing arrangements with UMB, the continued use thereafter of Facia Footwear Ltd's cash flow for the purposes of the group treasury arrangements, a use necessary to enable the group to continue trading, cannot in my opinion be described as misfeasance. Trial and cross-examination may produce a different perspective and yield a different result but so far as the treasury arrangement payments made from Facia Footwear Ltd's funds to group companies are concerned, this is not, in my opinion, a summary judgment case. The directors are entitled to maintain in the witness box the propriety of their business decision to use those funds to enable the group to continue trading.

There is, however, one particular payment to which I should make specific reference. On 28 May 1996 Facia Footwear Ltd paid £900,000 to Salisburys. The payment was authorised by Mr Harrison. The payment was made four days after the communication by Sears on 24 May of its decision to petition for the appointment of administrative receivers unless all sums due to it under the stock supply agreement were paid by 31 May. How, Mr Crystal asked, could this payment of £900,000 on 28 May to Salisburys possibly be justified?

Mr Crystal's submissions were made on the footing that the £900,000 was a loan made for the purpose of enabling Salisburys to continue trading and made at a time when there could have been no expectation that Salisburys could repay it. The evidence of Mr Harrison, however, showed that the payment was not made by way of loan. Mr Harrison was based at offices at Crawley that were Salisburys' headquarters. Facia Ltd's headquarters in Bond Street, London, were used also as the headquarters of Facia Footwear Ltd. Payments needed regularly to be made to Sears in respect of goods supplied by Sears to Facia Footwear Ltd under the stock supply agreement. It was sometimes convenient for Mr Harrison, who had all his records at Crawley, to use cheques from Salisburys in order to make payments due from Facia Footwear Ltd to Sears. Accordingly, a Salisburys cheque dated 23 May 1996 for £881,794.11 was sent to Sears in respect of debts due to Sears from Facia Footwear Ltd. 23 May 1996 was a Thursday. Monday, 27 May was a Bank Holiday. Mr Harrison expected the cheque to be banked on 24 May but not to be debited against Salisburys' account until Tuesday 28 May. So on 28 May he gave instructions for £900,000 to be transferred from Facia Footwear's bank account to Salisburys bank account. The payment was not a loan to Salisburys. It was made in order to repay Salisburys the money that had been expended by Salisburys in paying a debt owed by Facia Footwear Ltd. That being so, and no point being taken about fraudulent preference, it seems to me impossible to describe the authority given for the payment as misfeasance. The position is somewhat further complicated, however, by the fact that Salisburys' cheque of £881,794.11 in favour of Sears was stopped. I was told by Mr Harrison that that had been done on either 30 or 31 May. But unless the cheque had been stopped prior to the 28 May transfer of £900,000 by Facia Footwear Ltd to Salisburys, the stopping of the cheque would, as it seems to me, have no bearing on the question whether in authorising or allowing the £900,000 to be paid the directors were guilty of misfeasance. I find it difficult to understand why the summary judgment

application in respect of this £900,000 was persisted in after Mr Harrison's explanation of the payment had been given.

In respect, therefore, of the payments made by Facia Footwear Ltd to trading companies in the Facia Group, the summary judgment application fails. It became, in my view, untenable once the decisions were taken not to challenge the propriety of Facia Footwear Ltd's participation in the Facia Group treasury arrangements and not to challenge the propriety of Facia Footwear Ltd's participation in the refinancing arrangements with UMB. Whether or not the application was justified in the first place it ought not, in my opinion, to have been persisted in after Mr Hinchliffe's and Mr Harrison's affidavits had been received.

I now come to payments made by Facia Footwear Ltd that were not payments to group companies. There are three of these, namely, (i) a payment of £150,000 to Sheffield United Football Club; (ii) payments totalling £155,000-odd made to the previous shareholders of Red or Dead, and (iii) payments totalling £35,000-odd made to French & Scott Ltd. These payments were, it is submitted, payments that could not have been regarded as payments for the benefit of Facia Footwear Ltd and could not be justified as being payments necessary to enable the trading of the Facia Group companies to continue. Hence, it is submitted, the directors can have no defence to a misfeasance claim based on the authorising of these payments. Let me take them in turn.

### Sheffield United

£150,000 was paid by Facia Footwear Ltd to Sheffield United Football Club on 23 February 1996. Mr Hinchliffe, in para 138 of his affidavit, confirms that on 23 February 1996 he 'instructed Midland Bank to transfer £150,000 from the account of Facia Footwear Ltd to that of Sheffield United Football Club'. It was Mr Hinchliffe who authorised the payment, but Mr Harrison has made it clear that he knew of the proposed payment and raised no objection to it.

The explanation for the payment that has been offered by Mr Hinchliffe and Mr Harrison requires mention of Chase Montagu Ltd, and the part played by that company in the affairs of the Facia Group.

Chase Montagu Ltd was a company owned and controlled by Mr Hinchliffe. Facia Ltd, in its capacity as holding company of the group, provided administrative and management services to the group companies, including Facia Footwear Ltd, for which it charged the companies an annual management fee. Chase Montagu Ltd provided services to Facia Ltd. Mr Hinchliffe, in para 139 of his affidavit, has described the services as follows:

> 'Chase supplied a variety of services to Facia, including not only the arrangement of finance and the negotiation of acquisitions, for which finders fees and arrangement fees were charged, but a variety of other services such as, for example, the utilization of a helicopter. As a result of the provision of these services by Chase to Facia, there was from time to time, and in any event in February 1996, a substantial balance outstanding on the Chase current account with Facia.'

*[1998] 1 BCLC 218  at  231*

Mr Harrison has estimated that at the time the payment to Sheffield United was made, Chase was owed over £500,000 by Facia for finders' fees and actual expenses.

Mr Hinchliffe was a director of Sheffield United. He desired to assist the club by making a loan to it. The loan was to be made by and to stand in the name of his company, Chase Montagu Ltd. So Mr Hinchliffe caused Facia Footwear Ltd to pay £150,000 to the club. In the books of Facia Ltd, the £150,000 was credited to Facia Footwear Ltd's account, so as to increase the debt owed by Facia Ltd to Facia Footwear Ltd, and debited to Chase Montagu Ltd so as to reduce Facia Ltd's indebtedness to Chase Montagu Ltd. This explanation of the payment, which seems to me a credible one, leaves one question still to be addressed. In effect, the £150,000 payment was a loan by Facia Footwear Ltd to Facia Ltd to enable a debt owing by Facia Ltd to Chase Montagu Ltd to be paid. Was it a misfeasance for the directors on 23 February 1996 to allow Facia Footwear Ltd's money to be used in this way?

Mr Harrison has described the payment as being 'nothing more than a transaction within Group treasury arrangements'. I find that explanation rather difficult. It was in the interests of Facia Footwear Ltd to keep the group trading and to allow its cash flow to be used within the group treasury arrangements for that purpose. But this was not a loan to Facia Ltd for the trading purposes of the subsidiaries. It was a loan to Facia Ltd in

order apparently to place Mr Hinchliffe in a position to make a generous loan available to his football club. It is true that Facia Ltd owed the sum to Chase Montagu Ltd. But there was no risk that Chase Montagu Ltd, controlled as it was by Mr Hinchliffe, would take aggressive steps to recover its debt. Moreover, at the time of the payment, shortly after the completion of the refinancing arrangements with UMB, the financial position of the group remained precarious and the directors of Facia Footwear Ltd had to take into account the interests of the company's creditors before parting with a substantial sum of money destined to be a loan to a football club.

Despite these misgivings, however, I am not prepared, for a number of reasons, to make an order for summary judgment in respect of this sum. First, I have no real idea, from the evidence before me, of the value to Facia Ltd and the group of the services Chase Montagu Ltd was able to provide. I have read the relevant passage from Mr Hinchliffe's evidence and there is really nothing else. Ordinarily, of course, it is for a defendant on a summary judgment application to set out any facts on which he relies. It may be said that the paucity of evidence to which I have referred should have been remedied by the defendants. But this is a case in which summary judgment has been sought for sums in excess of £20m paid to group companies as part of the group treasury arrangements. Mr Hinchliffe's affidavit runs to some 62 pages and 144 paragraphs; Mr Harrison's covers 37 pages and has 101 paragraphs. Faced with a summary judgement claim of the magnitude of this one, I am not disposed to be critical of the defendants' efforts to prepare evidence in response. They have done all that could reasonably be expected of them. Second, if the Chase Montagu services were of real, substantial value to the Facia Group the payment to Chase of part of the £500,000 said to be owing to it may be viewed as a reasonable step to ensure the continued supply of those services to the group. If that is so, the payment can properly

*[1998] 1 BCLC 218  at  232*

be viewed as part of the continuing treasury arrangements. Third, Sheffield United is willing to repay the money to whoever is entitled to it. If the payment by Facia Footwear Ltd involved misfeasance, and since, given the common elements in the directorships of Facia Footwear Ltd, Facia Ltd and Chase Montagu Ltd, those companies must be taken to have been aware of all the facts constituting the misfeasance, it seems to me highly arguable that it is Facia Footwear Ltd that is entitled to recover the money from the Football Club. In which case the misfeasance will have caused Facia Footwear Ltd no, or negligible, loss.

For these reasons, the summary judgment claim fails in respect of the £150,000 paid to Sheffield United.

### The Red or Dead shareholders

The contractual arrangements between Facia Ltd and the shareholders of Red or Dead under which Facia Ltd acquired the shares in the company included an option agreement dated 17 February 1995 under which the vendor shareholders acquired put options exercisable against Facia Ltd in respect of shares in the company. Pursuant to this option agreement £52,274.64 was paid on 20 March 1996, £52,455.59 was paid on 15 April 1996 and £51,137.30 was paid on 13 May 1996 to the vendor shareholders. The payments were made by Facia Footwear Ltd and credited to Facia Footwear Ltd's running account with Facia Ltd. Both Mr Hinchliffe and Mr Harrison have explained the payments as having been made as part of the group treasury arrangements. If it were proper for the group treasury arrangements and for Facia Footwear Ltd's participation in those arrangements to be continued down to the end of May 1996, the authorising of these payments would not constitute misfeasance on the part of the directors. I have already expressed my opinion that the continued participation by Facia Footwear Ltd in the group treasury arrangements down to 31 May cannot be held at this stage in the proceedings to have involved misfeasance on the part of its directors. The summary judgment application in respect of these payments therefore fails.

### French & Scott Ltd

Payments totalling £35,000-odd were made by Facia Footwear Ltd to French & Scott Ltd. French & Scott Ltd was a company owned and controlled by Mr Hinchliffe. Mr Hinchliffe, in para 142 of his affidavit, has described the reasons for which the payments were made:

'French & Scott was a company which manufactured cosmetics and toiletries. Although not part of the Facia Group, the company did supply toiletries to Sock Shop and was in the process of developing a variety of other bespoke products

for other members of the Group. Since the company did not itself have access to the funds required for the product development programme which it wished to undertake, and from which ultimately the Group would benefit, the decision was taken to advance limited sums to it. The loans in question were advanced in part in a series of small advances recorded in Facia Footwear's ledger. In any event, following negotiations between the plaintiffs' solicitors and my solicitors

*[1998] 1 BCLC 218  at  233*

in December 1996, the plaintiffs settled the outstanding debt due from French Scott for £25,000 which funds were advanced by Chase.'

Mr Harrison, in his submissions to me, told me that the range of products being developed by French & Scott would have been made available only to Facia Group companies and could have brought a substantial benefit to the group. He said that the amount of the sums being advanced to French & Scott was simply not significant.

It is, in my judgment, impossible on this summary judgment application to set aside the commercial judgment of Mr Hinchliffe and Mr Harrison that it was for the benefit of the Facia Group and of Facia Footwear Ltd as part of the group that loans for product development should be made to French & Scott or to conclude that the directors have no defence to a misfeasance claim.

For the reasons I have given this summary judgment application fails. I regard it as a great pity that the application was brought to a hearing. It may be that the application was made in the first place in order to flush out at an early stage the defendants' justification for the use that they had authorised to be made of Facia Footwear Ltd's money. If that was the tactic, it succeeded. Substantial affidavits describing the policy behind their decisions and seeking to justify the sense and propriety of those decisions were sworn by the defendants. The cost of preparing those affidavits has not necessarily been wasted. They can stand as witness statements and, perhaps, as the deponents' evidence-in-chief at trial. But the affidavits having been received, to press on to a three and half day hearing in order to persevere with the summary judgment claim was, in my view, unjustified and oppressive.

The application is dismissed. I will hear counsel on costs.

*Application dismissed.*

Kenneth Dow Esq Barrister.