# TAB 7

01:12365497.1

722                       **SUPREME COURT**                       [(1986) 4

A

## KINSELA AND ANOTHER v RUSSELL KINSELA PTY LTD (In Liq)

### Court of Appeal: Street CJ, Hope and McHugh JJA

#### 19 August 1985, 15 April 1986

B

*Companies — Directors — Fiduciary position — Duty to act for benefit of the "company as a whole" — Scope of duty in context of liquidation.*

*Companies — Directors — Powers — Exercise of powers for benefit of the "company as a whole" — Duty may extend to interests of creditors.*

*Companies — Directors — Misfeasance proceedings — Act within power — Whether power validly exercised — Lease entered into with directors — Company near liquidation — Interests of creditors prejudiced — Whether act may be validated by shareholders.*

C

*Held*: (1) Directors of a company must exercise their powers for the benefit of the company as a whole. (729E)

*Mills v Mills* (1938) 60 CLR 150 at 185 and *Richard Brady Franks Ltd v Price* (1937) 58 CLR 112 at 135, followed.

(2) In cases involving internal disputes between shareholders, the phrase "the company as a whole" means the corporators as a general body; it does not mean the company as a commercial entity distinct from the corporators. (729E)

D

*Greenhalgh v Arderne Cinemas Ltd* [1951] Ch 286 at 291, adopted and applied.

(3) The approval by all the shareholders validates an act which would otherwise be beyond the powers of the directors provided that there has been full and frank disclosure to the shareholders of all the circumstances relevant to the proposed transaction. (729F)

*Bamford v Bamford* [1970] Ch 212 at 238-242 and *Winthrop Investments Ltd v Winns Ltd* [1975] 2 NSWLR 666 at 679, 680-689, followed.

E

*Russell Kinsela Pty Ltd (In Liq) v Kinsela* [1983] 2 NSWLR 452, affirmed.

(4) Where the company is insolvent or near insolvent the duty to the company as a whole may, in appropriate cases, require the directors to consider the interests of the creditors: in such a case the duty of the directors extends to not prejudicing the interests of the creditors, and the shareholders do not have the power or authority to absolve the directors from any breach. (730B, 731F, 732G-733D)

*Nicholson v Permakraft (NZ) Ltd (In Liq)* (1985) 3 ACLC 453 and at 457-460, approved and applied.

F

*Walker v Wimborne,* (1976) 137 CLR 1, considered and followed.

(5) Accordingly, where the directors of a company which was at the time in severe financial difficulties and was some three months later ordered to be wound up as insolvent, entered into a leasing agreement with the company at a rent substantially below the real value, the lease not being ultra vires and albeit with the unanimous approval of all of the shareholders, the leasing agreement was nevertheless entered into in breach of the duty to the company in that it indirectly prejudiced the creditors of the company and was voidable.

G

Decision of Powell J in *Russell Kinsela Pty Ltd (In Liq) v Kinsela* [1983] 2 NSWLR 452, affirmed on different grounds.

CASES CITED

The following cases are cited in the judgments:

A    *Australian Metropolitan Life Assurance Ltd v Ure* (1923) 33 CLR 199.
     *Bamford v Bamford* [1970] Ch 212.
     *Greenhalgh v Arderne Cinemas Ltd* [1951] Ch 286.
     *Mills v Mills* (1938) 60 CLR 150.
     *Nicholson v Permakraft (NZ) Ltd* (In liq) (1985) 3 ACLC 453.
     *Richard Brady Franks Ltd v Price* (1937) 58 CLR 112.
     *Rolled Steel Products (Holdings) Ltd v British Steel Corporation* [1985] 2 WLR 908; [1985]
        3 All ER 52.
B    *Russell Kinsela Pty Ltd (In Liq) v Kinsela* [1983] 2 NSWLR 452.
     *Walker v Wimborne* (1976) 137 CLR 1.
     *Winthrop Investments Ltd v Winns Ltd* [1975] 2 NSWLR 666.

     The following additional cases were cited in argument:

     *Farrant v Blanchford* (1863) 1 De GJ & Sm 107; 46 ER 42.
     *Ring v Sutton* (1980) 5 ACLR 546.
C    *Peters' American Delicacy Co Ltd v Heath* (1939) 61 CLR 457.

     APPEAL

     This was an appeal from a decision of Powell J reported as *Russell Kinsela
     Pty Ltd (In Liq) v Kinsela* [1983] 2 NSWLR 452.

     *P M Biscoe*, for the appellant.

     *B W Walker*, for the respondent.
D

                                                                        *Cur adv vult*

     15 April 1986

     **STREET CJ.** This is an appeal from the decision of Powell J in the Equity
     Division in which he made a declaration and consequential orders that a lease
     of business premises owned by Russell Kinsela Pty Ltd (in liquidation), which
E    I shall call the company, was voidable and had been duly avoided: see *Russell
     Kinsela Pty Ltd (In Liq) v Kinsela* [1983] 2 NSWLR 452. The lease was
     between the company as lessor and the appellants, Mr Russell Kinsela and
     his wife Mrs Joan Kinsela, as lessees. They were directors of the company at
     the time.
        The lease was entered into on 26 January 1981 at a time when the
     company's financial position was, to say the least, precarious. The company
     was ordered to be wound up as an insolvent company on 24 April 1981. In
F    order to place the lease in its context it will be necessary to refer in a little
     detail to the circumstances of the company.
        For a great many years members of the Kinsela family have been engaged
     in the business of funeral directors. Russell Kinsela Pty Ltd was incorporated
     on 15 December 1953. It took over and continued thereafter to carry on the
     already established business. Under the articles of association Mr Russell
     Kinsela held office as governing director with all-embracing powers in
G    relation to the conduct of the company's business. On 26 January 1981 he
     held all of the twenty-five issued governing director's shares together with
     1,214 of the ordinary shares. The remaining 1,108 issued ordinary shares
     were held in varying numbers by Mrs Joan Kinsela, three other members of
     the Kinsela family and the appellants in the capacity of legal personal
     representatives of a fourth member of the family.

724                          SUPREME COURT                        [(1986) 4

On 26 January 1981 the directors of the company were the appellants and    A
two other members of the family.

Between 1953 and 1961 three other companies were incorporated by the
family group. They can conveniently be described as the three related
companies. Their affairs were interlocked with those of the company. The
learned judge was not able to identify what role each of the three related
companies performed in the overall business enterprise in the light of a great
many inter-company financial transactions. His Honour found, however,    B
that it was not unlikely that each of the three related companies carried on
some form of business which offered some form of contributory insurance
against the cost of clients' ultimate funerals. There is no present relevance,
seeking to identify their part in the overall business activities. All that needs
to be stated is that his Honour found that the company itself at some stage
also commenced to offer some form of contributory insurance against the
cost of clients' ultimate funerals. Both directly through this participation, and
idirectly through responsibility for the contributory insurance undertaken    C
by the related companies, the company built up a substantial commitment for
the future provision of funeral services.

The general nature of this contributory insurance appears to have been
that payments would be received from clients, presumably of comparatively
small regular sums, in return for which the clients became entitled to cost-free
funerals. The financial arrangements for the contributory insurance venture
were not properly structured. It is axiomatic that present payment for    D
deferred future delivery of goods or services needs to make full provision to
cover the rising costs of inflation. This the company failed to do. It was the
crisis created by this deficiency in the financial planning that ultimately led to
the company's demise.

The immediate circumstances leading up to the execution of the lease
under challenge in the present litigation may be regarded as having
commenced when the *Funeral Funds Act* 1979 was passed. The purpose of    E
that Act was to control and regulate, in the interests of contributors, pre-
ranged funeral funds such as those conducted by the company and the
three related companies. The legislature sought to protect contributors who
had made payments from losing the benefit of their contracts by reason of
companies engaged in this business becoming unable or unwilling to fulfil
their part of the arrangement when the time for their performance arose. The
Act contained provisions requiring the disclosure of the financial position of    F
such companies and conferred powers upon a statutory officer to intervene in
the affairs of defaulting companies with a view to protecting contributors.

The financial position of the company at 30 June 1979 was that it was
party to 4,952 contributory funeral insurance contracts. It had in the year
ending 30 June 1979 sustained a loss on operations of $12,231. His Honour
found that prior to that year the company had sustained regular and perhaps
increasing trading losses. The accounts as at 30 June 1979 show that its
liabilities exceeded its assets by $195,483. His Honour noted that this figure    G
had been arrived at after revaluing assets to the extent of $255,296 and
writing back some $2 million which had previously been provided for
"contracted future funeral costs". If these two adjustments had not been
made, the liabilities of the company would have exceeded its assets by

A   something in the order of $2,458,766. These accounts were prepared in October 1980.

In short, as at 30 June 1979 there was, on any view of the matter, a substantial excess of liabilities over assets and the company had for some years past been trading at a loss. Moreover the company was committed to providing in the future funeral services in return for payments already received in the past. Plainly enough the scene was set in which it was

B   virtually inevitable that the provisions of the *Funeral Fund Act* should and would be invoked against the company. Although the Act did not come into operation until October 1980, it had been on the Statute Book since its enactment on 17 May 1979 and, as his Honour held, it would thereafter have been readily apparent to anyone carrying on funeral fund business that in the fullness of time there would be an obligation to comply with its provisions. His Honour observed in this regard that:

C
> "It does not require a very fertile imagination to make one think that the passing of the Act caused a chill wind to blow around those such as the company, Purple Shield, Funeral Fund and Benefit Fund which had theretofore carried on a funeral fund business; nor . . . does it require too fertile an imagination to think that, perhaps, the revaluation of the company's assets and the change in the company's accounting procedures reflected in the company's financial statements for the year ended 30 June 1979 — in fact not signed until 30 October 1980 — were

D
> not entirely unrelated to the passing and later proclamation of the date of operation of the Act."

In the latter part of 1980 several letters were sent by the officer responsible for administering the Act to Mr Kinsela seeking information regarding the financial position of the company. In the months running up to January 1981 alternative steps were considered by Mr Kinsela with a view to holding at bay the imposition of the statutory constraints and at the same time to enabling the family business of funeral directors to continue. His Honour has

E   examined the events of those months in meticulous and helpful detail. It is not necessary, however, for the purposes of the present appeal to do more than to summarise the objective history as has been done and then to come directly to the particular leasing transaction under challenge.

The lease was executed on 26 January 1981. It names the company as landlord and Mr Kinsela and Mrs Kinsela as tenants. It relates to the land and premises at Narrabeen used by the company for the purpose of carrying

F   on its business. It is for a term of three years with an option to the tenants to renew for a further term of three years. The rent is $300 per week with no provision for escalation to take account of inflation. It requires that the premises "shall be used only as premises of funeral directors, offices, chapel, residence, garage, mortuary, and workroom". It was signed by Mr Kinsela and Mrs Kinsela as tenants in the presence of Mr Barry Kinsela, one of the family shareholders. It bears the common seal of the company authenticated by the signatures of Mr Kinsela and Mrs Kinsela.

G
The lease document itself is a printed form. It appears not to have been filled in with the assistance of competent legal advice, there being some imprecision in identification of the subject premises. Of greater significance, however, is his Honour's finding that the rental of $300 per week was substantially below rentals suggested by various real estate agents whose

estimates of market rentals had been obtained by the company in November    A
and December 1980. His Honour noted the inclusion in the lease of an option
to purchase part of the subject premises at any time during the term of the
lease or any renewal thereof for $180,000, and commented that even by the
date of the hearing (6 September 1982) the market value of the property
covered by the option to purchase would have increased by about 20 per cent.

His Honour found that this lease was preceded in January 1981 by what he
described as a family council of war called by Mr Kinsela. His Honour
described the proposal put by Mr Kinsela at that meeting in the following    B
terms:

> "... he proposed that the Church Point property and, if need be, the
> Narrabeen properties, be sold, the business scaled down to that of a
> funeral director only, and, if need be taken over by himself and
> Mrs Kinsela, a lease being given to himself and Mrs Kinsela so that, if
> the worst came to the worst, he and Mrs Kinsela could carry on the
> family business as before until a new company could be formed and,    C
> then, rise Phoenix-like from the ashes of the apparently inevitable
> funeral pyre of the company. If this statement of what was proposed —
> and agreed upon — appears a little confusing, I can but say that it is
> merely because it reflects what I believe was Mr Kinsela's muddled
> thinking at the time.
>
> Having obtained the family's approval, at least in principle, to his
> proposal, Mr Kinsela then set about putting it into effect...."
> D

It is common ground that all of the shareholders in the company with the
exception of Mr Graham Kinsela were present and approved the proposal
that was carried into effect by the lease of 26 January. Mr Graham Kinsela
was apparently ill and unable to attend but he was consulted and approved of
what was proposed. There was accordingly unanimous support and authority
from all shareholders for the lease transaction.

As has already been mentioned, the company was ordered to be wound up
on 24 April 1981. The present proceedings were brought in the name of the    E
company on the initiation of the liquidator challenging the lease on three
ounds. The first related to what was said to be an irregularity in the affixing
f the company's seal. His Honour held against that ground and it does not
require further mention. The other two grounds were summarised by his
Honour (at 457):

> "2. alternatively, the company's power of leasing its property having
> been exercised for a purpose which was not in the best interests of the    F
> company as a whole, the lease was voidable at the option of the
> company;
>
> 3. further, alternatively, Mr and Mrs Kinsela, being directors of the
> company, were its fiduciary agents, it following that, when they joined
> in the grant of the lease to themselves, they acted in breach of their
> fiduciary duties to the company, and, so, ought to be held constructive
> trustees of the lease for the benefit of the company."

The defence advanced by Mr Kinsela and Mrs Kinsela to the liquidator's    G
challenge was that, the granting of the lease being the act of the company
with the unanimous knowledge and approval of all its shareholders, there
could be no question of it not being in the best interests of the company or of
it being a breach of fiduciary duty.

A    His Honour's actual finding of fact on the major question of breach of duty was in the following terms (at 464-465):

"... I do not believe that the object which the directors of the company had in mind when they approved the granting of the lease was the furtherance of the company's interests in one or more of the ways which I have suggested above. On the contrary, so it seems to me, it was the intention of the directors that, if, as seemed almost inevitable, the company were to go to the wall, the family business should be preserved and Mr and Mrs Kinsela enabled to carry it on. There was, I am sure, no element of dishonesty — in the sense of seeking to obtain a personal pecuniary advantage for themselves — in the object which the family sought to achieve and the means of achieving it which they resolved upon; rather, I am sure that they were motivated by their wish to preserve the Kinsela family reputation by keeping faith — as they believed, wrongly, in my view, they would be able to do — with the people who had dealt with them over the years. But, understandable — perhaps even admirable — though the object which they wished to achieve may have been, and honest in purpose though the directors may have been, that object was not one for which the powers conferred by cl (x) of the memorandum of association could properly be exercised. The necessary consequence of this is, in my view, that the powers having been exercised for an impermissible purpose, and Mr and Mrs Kinsela having been privy to the wrongful exercise of those powers, the company may, at its option, avoid the lease unless it can be said that the decision of the family had the effect of absolving the directors, and, thus, Mr and Mrs Kinsela, from what would otherwise have been the consequence of the impermissible exercise of power."

His Honour felt constrained by authority to hold that, if the lease were authorised by all of the shareholders after full disclosure to them, then the directors could not be held to have been guilty of a breach of duty as having exercised their powers otherwise than for the benefit of the company as a whole. He went on, however, to find that there had not been full disclosure to Mr Graham Kinsela. On this finding, the informed approval of the shareholders was not established and the lease was declared to be voidable.

The appellants challenge his Honour's finding of absence of full disclosure and seek to rely upon the unanimous approval of all the shareholders as placing the transaction beyond successful attack by the company whether on the initiation of the liquidator or otherwise.

Whilst it has been appropriate to set out the facts in broad detail, the essential elements can be stated succinctly: this insolvent company, in a state of imminent and foreseen collapse, entered into a transaction which plainly had the effect, and was intended to have the effect, of placing its assets beyond the immediate reach of its creditors; it did this by means of a lease of its business premises entered into with the intention that two of its directors, as lessees, would use those premises for the purpose of continuing to conduct a business of the nature of that which the family of the directors and all of the shareholders had carried on for many years; the lease was executed on behalf of the company by the two directors who were to be lessees with the unanimous approval of all the shareholders of the company; it may be added,

**728**                    **SUPREME COURT**                    [(1986) 4

for what it is worth, that the terms of the lease were, to say the least,   A
commercially questionable.

The challenge by the liquidator is to be evaluated against the background
of the memorandum and articles of the company. The memorandum does not
appear to have been specifically drawn for the company in anticipation of its
carrying on business as a funeral director; rather, it has the hallmarks of a
"shelf" company. Interestingly, the objects do not confer express power to
carry on business as funeral directors, but this has apparently passed
unnoticed, or certainly unremedied, since the company took over the funeral   B
directing business on or shortly after its incorporation in 1953. Clause 2
commences with the customary "the objects for which the Company is
formed are:—". Paragraph (a) is "To act as an investment company" with
expanded activities in that connection. Paragraph (b) is "To acquire any such
shares", also with some expansion relevant to that activity.

Paragraph (c) is:

> "To acquire by purchase exchange lease or otherwise land buildings   C
> and other property of any tenure or description and any interest therein
> and to create sell deal in freehold and leasehold ground rents and to
> make advances upon the security of land buildings or other property or
> any interest therein."

The ensuing paragraphs follow on with the multiplicity of activities that
one expects to find within the wide-ranging objects of any self-respecting shelf
company. Paragraph (x) is important and I quote it:   D

> "To sell lease subdivide place under option exchange convert into
> money or otherwise dispose of or deal with absolutely or conditionally
> the whole or any part of the undertaking lands property assets rights and
> effects of the company for such consideration as the company may think
> proper and in particular for fully or partly paid shares in or debentures or
> securities of any other company."

Finally, following upon par (oo) which is "to do all such other acts and
things" as may be considered incidental or conducive to the preceding objects,   E
the concluding portion of the objects clause states inter alia:

> "... that the intention is that the objects specified in each paragraph
> of this clause except where otherwise expressed in such paragraph shall
> be in no wise limited or restricted by reference to or inference from the
> first or any other paragraph or the name of the company."

Where, as here, a question arises regarding the extent to which a company
is bound by a transaction entered into by it there are two separate questions,   F
namely, is the transaction within the power or capacity of the company and,
secondly, if it is, has that power been validly exercised so as to bind the
company?

Upon the first of these questions it is not necessary to make wide ranging
reference to authority. An act which is ultra vires and void is one which is
beyond the corporate capacity of the company. That capacity is to be derived
from the objects stated in the memorandum. As Slade LJ said in *Rolled Steel
Products (Holdings) Ltd v British Steel Corporation* [1985] 2 WLR 908   G
at 946; [1985] 3 All ER 52 at 85:

> "... The basic rule is that a company incorporated under the
> Companies Acts only has the capacity to do those acts which fall within
> its objects as set out in its memorandum of association or are reasonably

A incidental to the attainment or pursuit of those objects. Ultimately, therefore, the question whether a particular transaction is within or outside its capacity must depend on the true construction of the memorandum."

The commercial necessity of recognising, in the interests of third parties, the capacity of a company to do any act authorised by the memorandum of association on its ordinary construction needs no emphasis. It pervades the
B history of company law and provides the basis upon which has developed the jurisprudence governing dealings with companies.

There being in the present memorandum no dominant objects clause such as to carry on the business of a funeral director, it is to some extent easier to give full effect to the independent main objects provision at the end of cl 2 of the memorandum. The power of leasing contained in par (x) is not limited in its terms or in its context by any other power. Accordingly, even within the most narrowing application of the principles that at times require a power in
C an objects clause to be read down as incidental or ancillary to other objects, there is no basis whatever within the present objects clause to restrict the untramelled power of leasing conferred in par (x).

Accepting, then, as in my opinion one must, that the lease was not ultra vires — that is to say that it lay within the legal power or capacity of the company — the essential question is whether that power has been validly exercised. If it has, then, of course, that is an end of the liquidator's claim. If
D it has not, conversely, the transaction is voidable as against the appellants and that spells the end of the lease. I turn, then, to the question of whether the power of leasing was validly exercised by the appellants as directors.

It is, of course, trite that directors must exercise their powers for the benefit of the company: *Mills v Mills* (1938) 60 CLR 150 at 185; *Richard Brady Franks Ltd v Price* (1937) 58 CLR 112 at 135. In cases involving internal disputes between groups of shareholders, the concept of the benefit or interests of the company has been more particularly stated by reference to the
E interests of the shareholders as a whole: *Australian Metropolitan Life Assurance Co Ltd v Ure* (1923) 33 CLR 199 at 217. For example in *Greenhalgh v Arderne Cinemas Ltd* [1951] Ch 286, Evershed MR said (at 291):

"... the phrase 'the company as a whole', does not (at any rate in a case such as the present) mean the company as a commercial entity, distinct from the corporators: it means the corporators as a general
F body."

The learned judge at first instance held, as I have noted, that he was bound by authority to hold that the approval by all of the shareholders validated an action which would otherwise be beyond the powers of the directors provided that there had been a full and frank disclosure to the shareholders of all of the circumstances relevant to the proposed transaction: *Bamford v Bamford* [1970] Ch 212 at 238-242; *Winthrop Investments Ltd v Winns Ltd* [1975] 2
G NSWLR 666 at 679, 680-689. He added, however, an express reservation of his own in accepting that such a statement of principle could have been intended to exclude a challenge based upon an allegation of misuse of a director's power deliberately to prejudice or encumber creditors. This reservation in my view was well-founded.

The authorities to which his Honour submitted, notwithstanding the

generality of their enunciations of principle, were not intended to, and do not,   A
apply in a situation in which the interests of the company as a whole involve
the rights of creditors as distinct from the rights of shareholders. In a solvent
company the proprietary interests of the shareholders entitle them as a
general body to be regarded as the company when questions of the duty of
directors arise. If, as a general body, they authorise or ratify a particular
action of the directors, there can be no challenge to the validity of what the
directors have done. But where a company is insolvent the interests of the
creditors intrude. They become prospectively entitled, through the mechan-   B
ism of liquidation, to displace the power of the shareholders and directors to
deal with the company's assets. It is in a practical sense their assets and not
the shareholders' assets that, through the medium of the company, are under
the management of the directors pending either liquidation, return to
solvency, or the imposition of some alternative administration.

In a later part of his judgment in *Rolled Steel Products (Holdings) Ltd v
British Steel Corporation* (at 947-948; 86-87) Slade LJ acknowledged that the   C
inciple of a company's action being validated by the unanimous consent of
all the shareholders "is not an unqualified one". Generally expressed
statements of principle regarding the validating effect of shareholder approval
are directed to solvent companies:

"First, if an act is beyond the corporate capacity of a company it is
clear that it cannot be ratified. As against the company itself 'an ultra
vires agreement cannot become intra vires by means of estoppel, lapse of   D
time, ratification, acquiescence, or delay': *York Corporation v Henry
Leetham and Sons Ltd* [1924] 1 Ch 557, 573 *per* Russell J. However, the
clear general principle is that any act that falls within the corporate
capacity of a company will bind it if it is done with the unanimous
consents of all the shareholders or is subsequently ratified by such
consents: see, for example, *Salomon v A Salomon & Co Ltd* [1897] AC
22, 57 *per* Lord Davey; *In re Horsley & Weight Ltd* [1982] Ch 442, 454
*per* Buckley LJ and *Multinational Gas and Petrochemical Co v*   E
*Multinational Gas and Petrochemical Services Ltd* [1983] Ch 258. This
last-mentioned principle certainly is not an unqualified one. In particu-
lar, it will not enable the shareholders of a company to bind the company
itself to a transaction which constitutes a fraud on its creditors: see, for
example, *In re Halt Garage (1964) Ltd* [1982] 3 All ER 1016, 1037, *per*
Oliver J. But none of the authorities which have been cited to us have
convinced me that a transaction which (i) falls within the letter of the   F
express or implied powers of a company conferred by its memorandum,
and (ii) does not involve a fraud on its creditors, and (iii) is assented to by
all the shareholders, will not bind a fully solvent company merely
because the intention of the directors, or the shareholders, is to effect a
purpose not authorised by the memorandum. The recent decision of this
court in the *Multinational* case [1983] Ch 258 seems to me to point to a
contrary conclusion: see also *Attorney-General's Reference (No 2 of
1982)* [1984] QB 624, 640 per Kerr LJ."   G

There has been a recent comprehensive and authoritative analysis in New
Zealand by Cooke J, of the principles of law to be applied in a case such as
that presently under consideration: *Nicholson v Permakraft (NZ) Ltd (In Liq)*
(1985) 3 ACLC 453. In that case the directors of a manufacturing company

A   which was facing liquidity problems adopted a reconstruction scheme which had the effect of prejudicing the creditors of the company. The informed assent of all of the shareholders to the reconstruction was established and this was relied upon by the directors as a defence to a claim brought by the company on the initiation of its liquidator seeking to have the transaction set aside. The case was not so straightforward as is the present: the degree of the company's financial stability was open to some debate; also, the directly

B   prejudicial effect on creditors was not so plainly apparent at the time the transaction was entered into.

Cooke J drew upon English, Australian and New Zealand case law as well as upon other learned writings in formulating a series of principles that provide valuable and illuminating guidance in resolving problems within this area. He stated those principles (at 457-460) in his judgment. That entire passage could well be cited in full as pointing to the fate of the present litigation but I shall quote only a few brief extracts:

C   " (i)   A company is bound in a matter intra vires by the unanimous agreement of its members. . . .

(ii)   The principle about assent has a particular application in matters of procedure. As *Buckley* J put it in *In re Duomatic Limited* [1969] 2 Ch 365, at 373:

D   '. . . where it can be shown that all shareholders who have a right to attend and vote at a general meeting of the company assent to some matter which a general meeting of the company could carry into effect, that assent is as binding as a resolution in general meeting would be.'

. . .

A fortiori the creditors in the present case, who of course had no right to attend general meetings of the company or directors' meetings, cannot take advantage — directly or indirectly through

E   an action by the liquidator in the name of the company — of the informality in the declaration of the dividend. It is cured by the unanimous assent of the shareholders.

(iii)   The duties of directors are owed to the company. On the facts of particular cases this may require the directors to consider inter alia the interests of creditors. For instance, creditors are entitled to consideration, in my opinion, if the company is insolvent, or near insolvent, or of doubtful solvency, or if a contemplated payment

F   or other course of action would jeopardise its solvency. . . .

To translate this into legal obligation accords with the now pervasive concepts of duty to a neighbour and the linking of power with obligation. It is also consistent with the spirit of what Lord *Haldane* said. In a situation of marginal commercial solvency such creditors may fairly be seen as beneficially interested in the company or contingently so. . . .

G   . . . in such cases the unanimous assent of the shareholders is not enough to justify the breach of duty to the creditors. The situation is really one where those conducting the affairs of the company owe a duty to creditors. Concurrence by the shareholders prevents any complaint by them, but compounds rather than excuses the breach as against the creditors.

SUPREME COURT                               [(1986) 4

(vi)   The foregoing principles relate to actions by the company against      A
        directors, whether or not in truth brought by the liquidator."

Richardson J expressed his agreement with the conclusion reached by
Cooke J but stated his preference to reserve to another day what he described
as "the controversial question of the nature and scope of the duties owed by
directors and shareholders to creditors of the company". His concern,
however, to leave open this point stemmed rather from the far more difficult
state of facts which were under consideration in that case. He made this plain
in a passage (at 463):                                                      B

"... If a company is solvent in the sense of its assets exceeding its
liabilities there can, I think, be no question of a separate duty to
creditors: they have their ordinary remedies if their accounts are not
paid. If it is insolvent the creditors have an interest in the company and
the directors might be said to have a duty to them for creditors' money is
then at stake. It is in the intermediate situation of near insolvency or
doubtful insolvency that greater difficulties of legal principle arise."       C

The third member of the Bench in that case, Somers J, was likewise
conscious of the difficulties presented by the particular facts under consider-
ation. He said (at 464):

"In the case of an insolvent company, at least in the sense that its
liabilities exceed its assets, directors in the management of a company
must have regard to the interests of creditors. That is because according
to the order of the application of assets on a winding up they are trading     D
with the creditors' money. It has been suggested that when the solvency
of a company is doubtful or marginal it will be a misfeasance (probably
not capable of being ratified or exonerated by shareholders) to enter into
a transaction which directors ought to know is likely to cause a loss to
creditors — see, eg, *In re Horsley & Weight Ltd* [1982] 1 Ch 442 at 455
per *Cumming-Bruce* LJ and *Templeman* LJ. Whether that is so does not
in my view fall to be decided now for in the instant case I am satisfied
the company was solvent at the material times."                             E

The obligation by directors to consider, in appropriate cases, the interests
of creditors has been recognised also in the High Court of Australia. In
*Walker v Wimborne* (1976) 137 CLR 1 Mason J said (at 6-7):

"... it should be emphasized that the directors of a company in
discharging their duty to the company must take account of the interest
of its shareholders and its creditors. Any failure by the directors to take
into account the interests of creditors will have adverse consequences for    F
the company as well as for them."

Barwick CJ concurred in the judgment of Mason J.

It is, to my mind, legally and logically acceptable to recognise that, where
directors are involved in a breach of their duty to the company affecting the
interests of shareholders, then shareholders can either authorise that breach
in prospect or ratify it in retrospect. Where, however, the interests at risk are
those of creditors I see no reason in law or in logic to recognise that the
shareholders can authorise the breach. Once it is accepted, as in my view it     G
must be, that the directors' duty to a company as a whole extends in an
insolvency context to not prejudicing the interests of creditors (*Nicholson v
Permakraft (NZ) Ltd* and *Walker v Wimborne*) the shareholders do not have
the power or authority to absolve the directors from that breach.

A    I hesitate to attempt to formulate a general test of the degree of financial instability which would impose upon directors an obligation to consider the interests of creditors. For present purposes, it is not necessary to draw upon *Nicholson v Permakraft* as authority for any more than the proposition that the duty arises when a company is insolvent inasmuch as it is the creditors' money which is at risk, in contrast to the shareholders' proprietary interests. It needs to be borne in mind that to some extent the degree of financial instability and the degree of risk to the creditors are inter-related. Courts have

B    traditionally and properly been cautious indeed in entering boardrooms and pronouncing upon the commercial justification of particular executive decisions. Wholly differing value considerations might enter into an adjudication upon the justification for a particular decision by a speculative mining company of doubtful stability on the one hand, and, on the other hand, by a company engaged in a more conservative business in a state of comparable financial instability. Moreover, the plainer it is that it is the creditors' money

C    that is at risk, the lower may be the risk to which the directors, regardless of the unanimous support of all of the shareholders, can justifiably expose the company.

The foregoing, and like, considerations point to the desirability of avoiding an attempt to enunciate principles in wide-ranging terms. Having said that, however, I reiterate my own respectful agreement with the passage in the judgment of Cooke J (at 457-460) to which I have already referred.

D    In the view that I hold the challenge by the company is made good and the defence advanced by the appellants must fail. The case presents an unusually straightforward factual pattern. The company was plainly insolvent at the date of the lease and its collapse on that ground was imminent; thus, no occasion arises to analyse the degree of financial instability which may be necessary to impose upon directors the obligation to consider the position of creditors. Secondly the prejudice to the creditors was the direct and calculated result of the lease; its purpose was to place the company's assets beyond the

E    reach of the creditors; there is thus no occasion to examine on a value basis the commercial wisdom or unwisdom of the decision of the directors.

The lease was not ultra vires and void as exceeding the capacity of the company. It was, however, entered into by the directors (albeit with unanimous approval of all of the shareholders) in breach of their duty to the company in that it directly prejudiced the creditors of the company. It was accordingly a voidable transaction and, no third party rights having

F    intervened, the company on the initiation of the liquidator is entitled to the aid of the court to avoid it. This conclusion renders it unnecessary to consider the decision at first instance that there had not been full disclosure to Mr Graham Kinsela.

I propose that the appeal be dismissed with costs.

**HOPE JA.** I agree with the orders proposed by Street CJ and with his

G    reasons.

**McHUGH JA.** I agree with the order proposed by the Chief Justice and with the reasons which he gives for making that order.

*Appeal dismissed*

Solicitors for the appellant: *John M Fitzgerald & Associates.*

Solicitors for the respondent: *Hunt & Hunt.*

N J HAXTON,
*Barrister.*