# TAB 8

A [HOUSE OF LORDS]

LONRHO LTD. AND ANOTHER . . . . . APPELLANTS
AND
SHELL PETROLEUM CO. LTD. AND ANOTHER . . RESPONDENTS
(No. 2)

B 1981 May 5, 6;                Lord Diplock, Lord Edmund-Davies,
    June 4                   Lord Keith of Kinkel, Lord Scarman
                                     and Lord Bridge of Harwich

*Tort—Cause of action—Whether arising from breach of statutory prohibition—Contract for construction of pipeline and carriage*
C *to oil refinery in Southern Rhodesia—Criminal offence to supply oil after U.D.I.—Oil supplied otherwise than by pipeline—Loss to parties operating pipeline—Whether cause of action in respect of resultant damage—Southern Rhodesia Act 1965 (c. 76), ss. 1, 2—Southern Rhodesia (Petroleum) Order 1965 (S.I. 1965 No. 2140), arts. 1, 4*

    The appellants' claim arose out of the construction and operation of an oil refinery in Southern Rhodesia by the
D respondents and other participating companies and the construction and operation of a pipeline from a port in Mozambique by the appellants, the enterprise being governed by complex interconnected contracts entered into in 1962. The commercial expectation of all the parties was that all the oil for the refinery would be shipped to Mozambique and pass through the pipeline in accordance with a shippers' agreement made between the appellants and the participating companies.
E The refinery and pipeline were completed in January 1965. In November 1965 the government of Southern Rhodesia declared unilateral independence (U.D.I.). Immediately the United Kingdom passed the Southern Rhodesia Act 1965, pursuant to which the Southern Rhodesia (Petroleum) Order 1965 made it a criminal offence to supply oil to Southern Rhodesia, prescribing punishment for infringement. No further oil was supplied to Southern Rhodesia through the pipeline with consequent loss
F of revenue to the appellants, but it was alleged by the appellants that before the Order the participating companies had assured Southern Rhodesia of a continual supply of oil and that, after it, through associated companies which they controlled, they did maintain the supply. The appellants claimed that their alleged actions had influenced the inception of U.D.I. and had prolonged the period of disuse of the pipeline.
G In an arbitration they sought damages against the respondents, the principal participating companies. Parker J. and the Court of Appeal held that the appellants had no cause of action for breach of contract or in tort.
    On appeal: —
    *Held,* dismissing the appeal, that the alleged breaches of the Order gave the appellants no cause of action in tort, since breach of a mere prohibition upon members of the public
H from doing what would otherwise be lawful was not enough to found such a right, and, further, there was no such right based on the civil tort of conspiracy, which was not to be extended to cover acts done in execution of an agreement by persons to protect their own interests and not for the purpose

of injuring the appellants, even when the acts agreed to be done amounted to criminal offences under a penal statute (post, pp. 185A–C, 186B–C, 189C–H, 190A–C).

*Ex parte Island Records Ltd.* [1978] Ch. 122, C.A. distinguished.

The following cases are referred to in their Lordships' opinion:

*Anton Piller KG v. Manufacturing Processes Ltd.* [1976] Ch. 55; [1976] 2 W.L.R. 162; [1976] 1 All E.R. 779, C.A.
*Beaudesert Shire Council v. Smith* (1966) 120 C.L.R. 145.
*Benjamin v. Storr* (1874) L.R. 9 C.P. 400.
*Boyce v. Paddington Borough Council* [1903] 1 Ch. 109.
*Butler (or Black) v. Fife Coal Co. Ltd.* [1912] A.C. 149, H.L.(Sc.).
*Crofter Hand Woven Harris Tweed Co. Ltd. v. Veitch* [1942] A.C. 435; [1942] 1 All E.R. 142, H.L. (Sc.).
*Cutler v. Wandsworth Stadium Ltd.* [1949] A.C. 398; [1949] 1 All E.R. 544, H.L.(E.).
*Doe d. Murray v. Bridges* (1831) 1 B. & Ad. 847.
*Dunlop v. Woollahra Municipal Council* [1982] A.C. 158; [1981] 2 W.L.R. 693; [1981] 1 All E.R. 1202, P.C.
*Island Records Ltd., Ex parte* [1978] Ch. 122; [1978] 3 W.L.R. 23; [1978] 3 All E.R. 824, C.A.
*Kitano v. Commonwealth of Australia* (1974) 129 C.L.R. 151.
*Mogul Steamship Co. Ltd. v. McGregor, Gow & Co.* (1888) 21 Q.B.D. 544; (1889) 23 Q.B.D. 598, C.A.; [1982] A.C. 25, H.L.(E.).
*Quinn v. Leathem* [1901] A.C. 495, H.L.(I.).

The following additional cases were cited in argument:

*Allen v. Flood* [1898] A.C. 1, H.L.(E.).
*Bournemouth and Boscombe Athletic Football Club Co. Ltd. v. Manchester United Football Club Ltd.,* The Times, May 22, 1980, C.A.
*Chamberlaine v. Chester and Birkenhead Railway Co.* (1848) 1 Exch. 870.
*Gouriet v. Union of Post Office Workers* [1978] A.C. 435; [1977] 3 W.L.R. 300; [1977] 3 All E.R. 70, H.L.(E.).
*Groves v. Lord Wimborne* [1898] 2 Q.B. 402, C.A.
*Luxor (Eastbourne) Ltd. v. Cooper* [1941] A.C. 108; [1941] 1 All E.R. 33, H.L.(E.).
*Rhodes v. Forwood* (1876) 1 App.Cas. 256, H.L.(E.).
*Stirling v. Maitland* (1864) 5 B. & S. 840.
*Ware and De Freville Ltd. v. Motor Trade Association* [1921] 3 K.B. 40, C.A.

APPEAL from the Court of Appeal.

This was an appeal from a judgment of the Court of Appeal (Lord Denning M.R., Eveleigh and Fox L.JJ.) given on March 6, 1981, in which they answered a number of questions of law arising in the course of an arbitration, which was still pending. Substantially the issue was whether the points of claim in that arbitration disclosed any and, if so, what cause of action. The Court of Appeal affirmed a decision of Parker J. in a case stated, which raised for the determination of the court certain questions of law on assumed facts. The arbitration was between the

A  appellants, Lonrho Ltd. and Compania do Pipeline Moçambique Zimbabwe S.A.R.L. (a Portuguese company) and the respondents, Shell Petroleum Co. Ltd. and British Petroleum Co. Ltd.

The claimants in the arbitration and the appellants in the House of Lords were Lonrho and the Portuguese company. They claimed as the owners of a crude oil pipeline from the port of Beira in Mozambique to a refinery at Feruka near Umtali in Eastern Zimbabwe (which was

B  at the material times called Rhodesia). The refinery was owned and operated by a Rhodesian company (the refinery company) the shares of which were held by seven oil companies (the participating oil companies) including the respondents. As between the appellants, the refinery company and the participating oil companies the use of the pipeline was governed by an agreement (the shippers' agreement) dated October 30, 1962. It was this agreement from which the arbitrators derived their

C  powers.

The facts are stated in Lord Diplock's opinion.

*Jonathan Parker Q.C.* and *Timothy Lloyd* for the appellants. The assumed basis for the argument is that there was actual knowledge that U.D.I. would cause the pipeline to be closed and that damage would be

D  caused to the claimants. There were implied obligations in the shippers' agreement not to import oil otherwise than through the pipeline if the oil was within the capacity of the refinery to produce. In the conduct which has been pleaded and which must be assumed the respondents were in breach of an implied agreement not to prejudice the continued operation of the refinery. What is alleged is that the participating oil

E  companies were limited to the refinery as the means of supplying domestic demand by imports of oil; any such imports should be made through the pipeline whether by sea or otherwise. Two aspects of the implied term were (1) whether the participating oil companies or their associates were entitled to satisfy domestic demand otherwise than by means of the refinery and (2) whether they were entitled to import crude oil to the refinery otherwise than by means of the pipeline. (The latter did not

F  arise because no crude oil was supplied to the refinery otherwise than through the pipeline.) It is alleged that refined oil was imported direct into Rhodesia. Following the sanctions Order of 1965 the refinery and pipeline were unused. In the arrangements made there was more than intention and contemplation; there was obligation. The question is as to the acts to be done or refrained from being done. It is accepted that an

G  implied term must be necessary to make the contract work, not simply something which is reasonable. The shippers' agreement must be viewed against the background of the other elements of the overall venture, the refinery agreement, the federation agreement and the two concessions. From these four points emerge:

(1) Under the refinery agreement the participating oil companies

H  were obliged to operate the refinery within certain limits and subject to certain qualifications. It was more than a matter of hope or expectation.

(2) It was implicit in the refinery agreement that the individual oil companies would not compete with the refinery company which was

then being agreed to be set up. This agreement would have been unworkable if one of the participating oil companies could have competed with the refinery or restricted its share of the domestic market for refined products.

(3) The provisions for remuneration were based on the estimated domestic demand for refined products for the ensuing ten years. The target figures in the shippers' agreement relating to the expected carriage of oil for each year represented the estimated domestic demand for those years. There was a direct link between the demand and the carriage of oil.

(4) The only way the pipeline companies could earn any return on their investment or recover their capital cost was through supplying the refinery with crude oil. The provision for refined oil was never actually operated.

As to (1), the obligation under the terms of the refinery agreement was subject to freedom on the part of the refining company to vary the output of the refinery if demand should not come up to the expected level. It was also subject to the provision at all times of assured transport facilities and other services and to force majeure, so there was no absolute obligation. The parties to the agreement were the federal government and the oil companies. The basic obligation on the part of the oil companies was to construct the refinery and it also covered its operation, once constructed. It was to be capable of expansion to meet the estimated increase in requirements for such products during a ten year period. The estimated cost of the refinery was £10m. and of required expansion £3m. The refinery was to be owned and operated by the refining company. There was express provision that the refinery company should have the right to vary from time to time the output of the refinery to meet changes in the quantity and quality of the petroleum products required. The government was to use its best endeavours to provide land, rights and services and to ensure transport facilities from the port of discharge to the refinery. The document was called "agreement for the construction and operation of an oil refinery" and that was what it was. Had the government merely been concerned to get from the oil companies an obligation to supply refined products that would not have needed detailed provisions for the building and operation of a refinery. What was being given was a secure market for the oil companies to operate the refinery.

As to (2), all the major oil companies were parties to the agreement and were substituting co-operation for competition to satisfy a domestic demand. There would be chaos if one company refused to use the refinery and imported refined oil from South Africa into Rhodesia. The refinery agreement not only contemplated but required that these companies, previously competing with one another, should co-operate in a joint venture. There was a legal obligation. If one company were free to ignore the refinery, it would undercut it and drive it out of business because of the price control provisions in the refinery agreement. The necessary basis for the successful and workable operation of the venture was that the companies should combine to use the refinery. At the date

A    of the refinery agreement no final agreement had been reached as to the means by which the refinery was to be supplied. That came under the shippers' agreement. The participating oil companies were obliged to supply the refinery company with the crude oil it required. If the refining company had commercial freedom to run the refinery down to nil and close it, the undertaking given to the government by the oil companies would be worthless. It would be meaningless if the supply of crude oil

B    were purely in the discretion of the refining company and therefore in effect of the oil companies themselves.

     The provisions for price control are only workable if the parties subject to it are not free to act outside the terms of the venture where no price control applies rendering the venture a commercial fiasco for the remaining oil companies.

     As to (3), the refinery agreement set out the maximum rate which

C    the oil companies were prepared to accept for transporting oil by rail or pipeline. The pipeline project was not then in final form. The relevant document on this point was the federation agreement between the federal government and Lonrho which represented the results of the government's best endeavours to make available the various facilities, including transport facilities. It recited the basic transportation rate.

D    There was provision for variation of the basic transportation rate. It worked by seeing how many tons were actually carried through the pipeline and a rate was applied to those tons which would produce the target figure set out in the clause for the operational year. If more was carried, the rate came down; if less, it increased. The federal government was concerned, not with the commercial requirements of the refinery, but with the estimated demand for refined products within the

E    federation. By inference the figures must be related to the projected increase in domestic demand. There is a link between demand at one end and the rate for the use of the pipeline at the other.

     As to (4), reliance is placed on the limited periods of the concessions, which were in each case for 25 years with two possible renewals. In each case there was a provision that at the end of the period the whole

F    undertaking, including the pipeline, reverted to the territorial government.

     So far as the shippers' agreement was concerned it was implicit in it that the refinery company would use the pipeline for all the requirements of imported crude oil. Everybody contemplated that.

     Under the shippers' agreement the refinery company entered into an obligation with the pipeline companies to construct a refinery, the same obligation it owed to the federal government. There was an obligation

G    of the pipeline companies to build the pipeline. It was provided that the refinery company should pay damages if the completion of the refinery was delayed. That shows that there was more than a hope that the refinery would be built.

     The pipeline companies were Lonrho and, by definition, any subsidiary having rights under the concession agreements, but only Lonrho

H    was a party. The shipper was the refinery company itself. There were reciprocal undertakings, an undertaking by the pipeline companies to transport to the refinery such petroleum requirements as the refinery company should notify and an undertaking by the shipper not to use

alternative methods of transport, save when the pipeline was blocked or unusable or the pipeline companies were in breach.

Under the shippers' agreement the pipeline companies were to have notification of the estimated requirements of the refinery up to two years in advance of actual tender. If the refinery company had a complete discretion to close itself down or reduce its requirements at any time if it found some more profitable way of satisfying the domestic demand that would be inconsistent with the provision for notice of estimated requirements.

The shippers' agreement provided a formula for varying the basic rate. The target figures reflected the estimated increase of demand within the federation. The provision for variation from year to year would not work if in any year the refinery elected not to use the pipeline but to import crude oil from other sources. To make the formula workable some petroleum must be transported through the pipeline in each operational year.

It was an implied term of the shippers' agreement that each of the parties would ensure that neither it nor any associated company in its group would do or permit anything to be done which would be likely to contribute to closure of the pipeline, impede the transport of oil through it or prolong any closure, prevention or impediment. The respondent's and other parties materially contributed to the closure of the pipeline and the prolongation of the period of closure. If a party enters into an agreement which can only take effect by the continuance of a certain existing state of circumstances there is an implied engagement on his part that he will do nothing to end that state of circumstances: *Stirling v. Maitland* (1864) 5 B. & S. 840, 852. Only necessary terms will be implied. This is a necessary term. The existing circumstances here were the continued operation of the refinery. The oil companies and their associates were not to do anything to prejudice that situation. The pipeline companies provided an asset, viz., the availability of the pipeline to carry the refinery's requirements and an obligation to do so. The quid pro quo for that was the rate of transportation with no guaranteed minimum, so that if nothing was transported, nothing was paid: see *Bournemouth and Boscombe Athletic Football Club Co. Ltd. v. Manchester United Football Club Ltd.*, The Times, May 22, 1980, per Lord Denning M.R. and Donaldson L.J. The respondents rely on *Rhodes v. Forwood* (1876) 1 App.Cas. 256 but the admission made in that case by counsel formed an unsound basis for argument that there was an implied term. They also relied on *Luxor (Eastbourne) Ltd. v. Cooper* [1941] A.C. 108 but in that case the agent undertook no obligations to his principal.

Questions arose whether, even if there were breaches by the respondents of the Southern Rhodesia (Petroleum) Order 1965 and the Southern Rhodesia (United Nations Sanctions) (No. 2) Order 1968 (S.I. 1968 No. 1020), (a) those breaches gave rise to a right of action in the appellants for damage caused by the breaches and (b) the appellants had a cause of action for damages alleged to have been caused by such breaches by virtue only of the allegation that there was an agreement to effect them.

As to (a) the relevant provisions of the Order of 1965 were articles 1 and 4. This was superseded by article 16 (6) of the Order of 1968, which

A was in all respects to the same effect. This question only arose if the appellants had no claim for damages for breach of contract. It is submitted, (1) that a person who suffers special damages as a result of a breach of a statute can recover that damage at common law without joining the Attorney-General unless the statute takes away the common law right; (2) that the Orders did not take away that right and (3) that it is open to the appellants to prove damages which is special for that purpose. Alternatively

B the breaches were an unlawful interference with, and resulted in damage to, the appellants' rights of property in relation to the pipeline and the contractual rights under the shippers' agreement. It is conceded that the Orders were not passed for the protection of any particular section of the public and give rise to no special duty to the appellants. A plaintiff may be within a class for the particular protection of which the statute was enacted: *Groves* v. *Lord Wimborne* [1898] 2 Q.B. 402. But a plaintiff

C may also establish his special position by showing special damage not suffered by the generality of the Queen's subjects; *Chamberlaine* v. *Chester and Birkenhead Railway Co.* (1848) 1 Exch. 870, 876–877 and *Boyce* v. *Paddington Borough Council* [1903] 1 Ch. 109, 113, 114–115; *Gouriet* v. *Union of Post Office Workers* [1978] A.C. 435, 482, 483, 518. An Act is passed for the benefit of the public. It imposes obligations on everyone,

D but grants no protection for a particular class. That is enough, provided the appellants can put themselves in a special position by showing that the damage they suffer as a result of the breach is special. As to *Cutler* v. *Wandsworth Stadium Ltd.* [1949] A.C. 398, 407, *Doe d. Murray* v. *Bridges* (1831) 1 B. & Ad. 847, 859 cited there was not concerned with an Act which cited criminal penalties. In *Cutler* [1949] A.C. 398, 399, 403, 408 *Chamberlaine* case, 1 Exch. 870 and *Boyce's* case [1903] 1 Ch. 109 were not

E cited and the whole of the argument revolved round the question whether bookmakers were a special defined class for whose protection the Act there relevant was passed. If the appellant then had alleged that he had suffered special damage and had satisfied the court that he had, he could have recovered in respect of it.

In the public nuisance cases where a highway is blocked, so that a

F detour has to be made, if the plaintiff can show particular damage to his trade in that he must incur extra cost transporting his goods by some other route, he comes within a special class and is entitled to recover. In the present case the difference between the appellants and all the rest of the Queen's subjects affected by the embargo is that the special investment which the pipeline companies have made in the pipeline was wholly tied up with the refinery and they could not earn any return on it otherwise than by

G supplying the refinery under the shippers' agreement. They were therefore in a separate position from any other trader who might have wished to trade with Rhodesia and were in a special position. The appellants built an asset for the single purpose of supplying the refinery and it was unusable and valueless for any other purpose.

Reliance is placed on *Beaudesert Shire Council* v. *Smith* (1966) 120

H C.L.R. 145, 149, 150, 151–153, 155–156. That case was distinguished in *Dunlop* v. *Woollahra Municipal Council* [1982] A.C. 158, 170, on the ground that in that case nothing positive which was unlawful had been done. That ground of distinction is not present in this appeal, where there

is a positive act of wrongdoing. To recover damages for breach of a statute the plaintiff must show that he is special in some way; otherwise the multiplicity of actions would make the whole system unworkable.

In *Ex parte Island Records Ltd.* [1978] Ch. 122, 133–134, 137, 141A–B, 144–145 the emphasis is on rights of property or rights akin to property. There the court acknowledged that damages could be awarded under the Act in question to protect a right of property or akin to property; the only rights available there were the contractual rights between the two parties. If those rights were susceptible of protection as property rights, then a fortiori the contractual rights of the pipeline companies are susceptible of such protection and damages can be awarded if they are infringed.

The question of conspiracy assumes no breach of contract, no private rights arising out of breach of the sanctions Orders and no allegations of intention to injure. All that is alleged is actual knowledge that damage would be suffered. A conspiracy to do an unlawful act which is carried into effect and causes reasonably foreseeable damage is actionable as a conspiracy although the act may not have been tortious in itself. There is conspiracy where an unlawful act is done pursuant to agreement. Here there was actual knowledge that the acts done would cause damage to the appellants. The appellants have pleaded that the historical development of the tort of conspiracy from the crime of conspiracy indicates that a combination or agreement to do an act unlawful in itself gives a cause of action if it results in foreseeable damage: see *Mogul Steamship Co. Ltd.* v. *McGregor, Gow & Co.* (1888) 21 Q.B.D. 544, 549 where the judge by the expression " legal injury " did not mean actionable tortious injury, which would be actionable anyway in the absence of a combination, but had in mind damage resulting from an unlawful act. This appears from the argument, not reported at first instance but reported on the appeal to the House of Lords [1892] A.C. 25, 30–35. In that case the court and the House of Lords were concerned with the limits the law places on the freedom of a man engaged in trade rivalry to damage his rival's business. In trade competition there is an inherent intention to damage another's business by building up one's own. That case, being concerned with damage to trade, was dealing with a state of facts where what was done was directed at the plaintiff. The issue was whether there was a just excuse for what was done. The courts accepted that there must be freedom to compete and take business from a rival and the only question was how far that could be pressed. But there can be no lawful excuse in the present case where the act done was per se unlawful and so the tort of conspiracy is established. The original conception of civil conspiracy was a criminal conspiracy resulting in damage. There was grafted onto it the kind of conspiracy in *Quinn* v. *Leathem* [1901] A.C. 495 where nothing unlawful in itself or otherwise unlawful was done but the requisite element of unlawfulness was supplied by the proved intention to injure. It was an extension of the tort of conspiracy and not a delimiting decision requiring in every case an intention to injure. As to the *Mogul* case, both at first instance 21 Q.B.D. 544 and in the Court of Appeal (1889) 23 Q.B.D. 598 what was being considered was how far intention to injure was legitimate in the context of trade competition.

A   In *Allen* v. *Flood* [1898] A.C. 1, it was held that a malicious intent on the part of an individual would not render an act unlawful which would not otherwise have been unlawful. In *Quinn* v. *Leathem* [1901] A.C. 495 it was held that a combination with intent to injure could nevertheless be an actionable conspiracy even though nothing unlawful was done. Against this anomaly subsequent decisions must be read. In *Ware and De Freville Ltd.* v. *Motor Trade Association* [1921] 3 K.B. 40, 56, Bankes L.J.

B   set out two types of conspiracy, unlawful conspiracy to do an act resulting in damage and the *Quinn* v. *Leathem* [1901] A.C. 495 type of conspiracy, an agreement to do a lawful act but with an unlawful intention. *Crofter Hand Woven Harris Tweed Co. Ltd.* v. *Veitch* [1942] A.C. 435, 439–441, 441, 461, 462 was simply concerned with elaborating on the class of conspiracy established by *Quinn* v. *Leathem* [1901] A.C. 495.

C   *Peter Curry Q.C.*, *Brian Davenport Q.C.* and *Gordon Langley* for the first respondents were not called on to argue.

*Robert Alexander Q.C.*, *Roger Buckley Q.C.* and *Jonathan Sumption* for the second respondents were not called on to argue.

Their Lordships took time for consideration.

D   June 4. LORD DIPLOCK. My Lords, this appeal arises out of a consultative case stated under section 21 (1) (*a*) of the Arbitration Act 1950 by the umpire (Lord Cross of Chelsea) and the arbitrators (Sir Henry Fisher and Dr. Jorge Mota) in an arbitration between the appellants (to which I shall refer together as "Lonrho") and the respondents (to which I shall refer together as "Shell and B.P."). Lonrho were the

E   claimants in the arbitration. The facts which they alleged and upon which they relied as the foundation of their claim to recover damages in excess of £100m against Shell and B.P. are disputed by the latter who also contend that even if the facts alleged in Lonrho's points of claim, which runs to 93 pages, were true, they would not disclose any cause of action in law against Shell and B.P. If those facts that were in issue had to be decided in the arbitration the cost in time and money

F   would have been immense; the parties accordingly agreed as a first step in the reference to invite the umpire and the arbitrators, who for this purpose sat together, to answer nine questions of law on the assumption that all the allegations of fact in the points of claim were true. If all of them were answered in the negative Lonrho's claim in the arbitration would be doomed to fail.

G   Lonrho's claim arose out of the construction and operation of an oil refinery near Umtali in Southern Rhodesia by a company ("the refinery company") of which Shell and B.P., and other major oil companies (to which I will refer collectively as "the participant companies"), held all the shares, and the construction and operation by Lonrho of a pipeline connecting the refinery with an ocean terminal near the port of Beira in

H   Mozambique. The construction and operation of the refinery and the pipeline were the subject of a number of complicated interconnected contracts and concessions entered into in 1962 between various parties which included the Governments of Mozambique and of what was then the

Federation of Rhodesia, the refinery company, the participating companies and Lonrho. The refinery on completion would be the only producer of petroleum products situated in the Federation of Rhodesia and the commercial expectation of all the parties to these agreements and concessions was that the refinery would obtain its requirements of crude oil for refining from supplies shipped by sea to the ocean terminal of the pipeline by participating companies or other companies forming part of their respective " groups," and thence transported through the pipeline to Umtali. The terms upon which this was to be done were contained in an agreement of October 30, 1962, made between Lonrho and the participating companies, which in these proceedings has been referred to as " the shippers' agreement."

The refinery and pipeline were completed and came into operation in January 1965; thereafter all proceeded according to expectations until on November 11, 1965, the Government of Southern Rhodesia unilaterally declared independence (" U.D.I. "). Five days later the United Kingdom Parliament passed the Southern Rhodesia Act 1965, and pursuant to that Act on December 17, 1965, the Southern Rhodesia (Petroleum) Order 1965 was made, in terms which I shall have to set out later, prohibiting Shell and B.P. as companies incorporated in the United Kingdom, from supplying any crude oil or petroleum products to Southern Rhodesia. This was replaced in 1968 by a more comprehensive Order which made no significant change so far as crude oil and petroleum products were concerned. I will refer to the 1965 and 1968 Orders together as " the sanctions Orders."

From the beginning of December 1965 no further oil was shipped to the ocean terminal of the pipeline at Beira by Shell and B.P. or, for that matter, by any other of the participating companies. The pipeline remained unused throughout the period of U.D.I. and consequently Lonrho received no fees under the shippers' agreement for transporting oil and no return on its investment in the pipeline.

For the purpose of disposing of this appeal the alleged conduct of Shell and B.P. on which Lonrho rely as constituting their cause of action can be stated in a couple of sentences: (1) before the making of the sanctions Order of 1965 Shell and B.P., by assuring the illegal regime that an adequate supply of petroleum products would reach Southern Rhodesia even if sanctions were imposed by other nations, influenced the regime to declare and to continue to give effect to U.D.I.; and (2) after the sanctions Order had been made, Shell and B.P. themselves and through associated companies which they controlled, supplied petroleum products to Southern Rhodesia and thereby prolonged the period for which the pipeline was prevented from operating, because of U.D.I. and the sanctions imposed by the United Kingdom and other nations in consequence of it. Those, in a nutshell, are the facts which must be assumed to be true for the purposes of answering the questions of law that come before your Lordships on the consultative case.

Not all of the original nine questions which the umpire and arbitrators were invited by the parties to answer found their way into the case stated for the opinion of the High Court. Of those that did questions 1 and 2 were directed to determining whether upon the true construction of the

A  shippers' agreement, which was governed by English law, the conduct alleged would constitute a breach by Shell and B.P. of any of its express or implied terms. The shippers' agreement was tailor-made by expert legal draftsmen in 1962 to meet the peculiar circumstances of the case, which are unlikely ever to occur again. To ascertain its meaning calls for the application to the actual language used by the draftsmen of well-known canons of construction as to which there can be no real dispute. It is of
B  great importance to the parties but of no wider legal interest whatever. Your Lordships have had the benefit of reading no less than five meticulous analyses of the language of the agreement and of the surrounding circumstances which accompanied its making, one by Lord Cross of Chelsea, the umpire, one by Parker J. by whom the stated case was first heard in the Commercial Court, and one each by Lord Denning M.R.,
C  Eveleigh L.J. and Fox L.J. in the Court of Appeal. They are unanimous, and without repeating any of them or adding yet a sixth analysis in words of my own choosing, I am content to say that I agree with them and for the reasons that they give I too would hold that the matters pleaded in Lonrho's points of claim disclose no cause of action for breach of contract.

   The next two questions for your Lordships, numbered 5 (a) and 5 (b), are directed to determining whether, notwithstanding that no breach of con-
D  tract was involved, delivery to Southern Rhodesia by Shell and B.P. of petroleum products contrary to the sanctions Order gives to Lonrho a right of action in tort against them, assuming that Lonrho did suffer a loss in consequence of what they did. The claim is put in the alternative; either as an innominate tort, committed by Shell and by B.P. severally, of causing foreseeable loss by an unlawful act; or as a joint tort of conspiring
E  together to do an unlawful act which caused damage to Lonrho. The phrasing of the questions is as follows:

   "Even if there were breaches by the respondents of the 1965 and 1968 Orders" [sc. the sanctions Orders] "(a) whether breaches of those Orders would give rise to a right of action in the claimants for damage alleged to have been caused by those breaches and (b)
F       whether the claimants have a cause of action for damage alleged to have been caused by such breaches by virtue only of the allegation that there was an agreement to effect them."

   My Lords, it is well settled by authority of this House in *Cutler* v. *Wandsworth Stadium Ltd.* [1949] A.C. 398 that the question whether legislation which makes the doing or omitting to do a particular act a
G  criminal offence renders the person guilty of such offence liable also in a civil action for damages at the suit of any person who thereby suffers loss or damage, is a question of construction of the legislation.

   So first it is necessary to set out the relevant provisions of the Southern Rhodesia Act 1965 and of the sanctions Order.

H  *The Act*

   "1. It is hereby declared that Southern Rhodesia continues to be part of Her Majesty's dominions, and that the Government and

Parliament of the United Kingdom have responsibility and jurisdiction as heretofore for and in respect of it.

" 2 (1) Her Majesty may by Order in Council make such provision in relation to Southern Rhodesia, or persons or things in any way belonging to or connected with Southern Rhodesia, as appears to Her to be necessary or expedient in consequence of any unconstitutional action taken therein. (2) Without prejudice to the generality of subsection (1) of this section an Order in Council thereunder may make such provision . . . (c) for imposing prohibitions, restrictions or obligations in respect of transactions relating to Southern Rhodesia or any such persons or things, as appears to Her Majesty to be necessary or expedient as aforesaid; and any provision made by or under such an Order may apply to things done or omitted outside as well as within the United Kingdom or other country or territory to which the Order extends."

*The sanctions Order*

" Restriction on supply of petroleum to Southern Rhodesia

" 1 (1) Except under the authority of a licence granted by the Minister, no person shall—(a) supply or deliver or agree to supply or deliver to or to the order of a person in Southern Rhodesia any petroleum which is not in that country; (b) supply or deliver or agree to supply or deliver such petroleum to any person knowing or having reasonable cause to believe that it will be supplied or delivered to or to the order of a person in Southern Rhodesia; or (c) do any act calculated to promote the supply or delivery of petroleum in contravention of the foregoing provisions of this paragraph. (2) Any person who contravenes the foregoing provisions of this article shall be guilty of an offence against this Order and, in the case of a person who—(a) is a body incorporated under the law of the United Kingdom; or (b) is a citizen of the United Kingdom and colonies or a British protected person and is ordinarily resident in the United Kingdom shall be guilty of such an offence wherever the contravention takes place.

" Penalties and proceedings

" 4 (1) Any person guilty of an offence under this Order shall be liable—(a) on conviction on indictment to imprisonment for a term not exceeding two years or to a fine or to both; or (b) on summary conviction to imprisonment for a term not exceeding six months or to a fine not exceeding £500 or to both. (2) Where any body corporate is guilty of an offence under this Order and that offence is proved to have been committed with the consent or connivance, or to be attributable to any neglect on the part of, any director, manager, secretary, or other similar officer of the body corporate or any person who was purporting to act in any such capacity he, as well as the body corporate, shall be guilty of that offence and shall be liable to be proceeded against and punished accordingly."

185

A     "*Interpretation*

"'6 (1) . . . 'petroleum' means mineral oil and natural gas and hydrocarbons derived wholly or mainly therefrom or from coal, bituminous shale or other mineral but excludes pharmaceutical, insecticide and pesticide products."

B     The sanctions Order thus creates a statutory prohibition upon the doing of certain classes of acts and provides the means of enforcing the prohibition by prosecution for a criminal offence which is subject to heavy penalties including imprisonment. So one starts with the presumption laid down originally by Lord Tenterden C.J. in *Doe d. Murray* v. *Bridges* (1831) 1 B. & Ad. 847, 859, where he spoke of the "general rule" that "where an Act creates an obligation, and enforces the performance in a specified manner . . . that performance cannot be enforced in any other

C     manner"—a statement that has frequently been cited with approval ever since, including on several occasions in speeches in this House. Where the only manner of enforcing performance for which the Act provides is prosecution for the criminal offence of failure to perform the statutory obligation or for contravening the statutory prohibition which the Act creates, there are two classes of exception to this general rule.

D     The first is where upon the true construction of the Act it is apparent that the obligation or prohibition was imposed for the benefit or protection of a particular class of individuals, as in the case of the Factories Acts and similar legislation   As Lord Kinnear put it in *Butler (or Black)* v. *Fife Coal Co. Ltd.* [1912] A.C. 149, 165, in the case of such a statute:

        "There is no reasonable ground for maintaining that a proceeding by
E       way of penalty is the only remedy allowed by the statute . . . We are
        to consider the scope and purpose of the statute and in particular for
        whose benefit it is intended. Now the object of the present statute is
        plain. It was intended to compel mine owners to make due provision
        for the safety of the men working in their mines, and the persons for
        whose benefit all these rules are to be enforced are the persons
F       exposed to danger. But when a duty of this kind is imposed for the
        benefit of particular persons there arises at common law a correlative
        right in those persons who may be injured by its contravention.

    The second exception is where the statute creates a public right (i.e. a right to be enjoyed by all those of Her Majesty's subjects who wish to avail themselves of it) and a particular member of the public suffers what
G   Brett J. in *Benjamin* v. *Storr* (1874) L.R. 9 C.P. 400, 407, described as "particular, direct, and substantial" damage "other and different from that which was common to all the rest of the public." Most of the authorities about this second exception deal not with public rights created by statute but with public rights existing at common law, particularly in respect of use of highways. *Boyce* v. *Paddington Borough Council* [1903]
H   1 Ch. 109 is one of the comparatively few cases about a right conferred upon the general public by statute. It is in relation to that class of statute only that Buckley J.'s oft-cited statement at p. 114 as to the two cases in which a plaintiff, without joining the Attorney-General, could himself sue

Case 09-10138-MFW    Doc 8156-8    Filed 08/13/12    Page 15 of 19
186
Lord Diplock          Lonrho Ltd. v. Shell Petroleum (No. 2) (H.L.(E.))                    [1982]

in private law for interference with that public right, must be understood. The two cases he said were: "... first, where the interference with the public right is such as that some private right of his is at the same time interfered with ... and, secondly, where no private right is interfered with, but the plaintiff, in respect of his public right, suffers special damage peculiar to himself from the interference with the public right." The first case would not appear to depend upon the existence of a public right in addition to the private one; while to come within the second case at all it has first to be shown that the statute, having regard to its scope and language, does fall within that class of statutes which creates a legal right to be enjoyed by all of Her Majesty's subjects who wish to avail themselves of it. A mere prohibition upon members of the public generally from doing what it would otherwise be lawful for them to do, is not enough.

My Lords, it has been the unanimous opinion of the arbitrators with the concurrence of the umpire, of Parker J., and of each of the three members of the Court of Appeal that the sanctions Orders made pursuant to the Southern Rhodesia Act 1965 fell within neither of these two exceptions. Clearly they were not within the first category of exception. They were not imposed for the *benefit* or *protection* of a particular class of individuals who were engaged in supplying or delivering crude oil or petroleum products to Southern Rhodesia. They were intended to put an end to such transactions. Equally plainly they did not create any public right to be enjoyed by all those of Her Majesty's subjects who wished to avail themselves of it. On the contrary, what they did was to withdraw a previously existing right of citizens of, and companies incorporated in, the United Kingdom to trade with Southern Rhodesia in crude oil and petroleum products. Their purpose was, perhaps, most aptly stated by Fox L.J.:

> "I cannot think that they were concerned with conferring rights either upon individuals or the public at large. Their purpose was the destruction, by economic pressure, of the U.D.I. regime in Southern Rhodesia; they were instruments of state policy in an international matter."

Until the United Nations called upon its members to impose sanctions on the illegal regime in Southern Rhodesia it may not be strictly accurate to speak of it as an international matter, but from the outset it was certainly state policy in affairs external to the United Kingdom.

In agreement with all those present and former members of the judiciary who have considered the matter I can see no ground on which contraventions by Shell and B.P. of the sanctions Order though not amounting to any breach of their contract with Lonrho, nevertheless constituted a tort for which Lonrho could recover in a civil suit any loss caused to them by such contraventions.

Before parting from this part of the case, however, I should mention briefly two cases, one in the Court of Appeal of England, *Ex parte Island Records Ltd.* [1978] Ch. 122, and one in the High Court of Australia *Beaudesert Shire Council v. Smith* (1966) 120 C.L.R. 145, which counsel

A for Lonrho, as a last resort, relied upon as showing that some broader principle has of recent years replaced those long-established principles that I have just stated for determining whether a contravention of a particular statutory prohibition by one private individual makes him liable in tort to another private individual who can prove that he has suffered damage as a result of the contravention.

B *Ex parte Island Records Ltd.* was an unopposed application for an *Anton Piller* order (*Anton Piller KG v. Manufacturing Processes Ltd.* [1976] Ch. 55) against a defendant who, without the consent of the performers, had made records of musical performances for the purposes of trade. This was an offence, punishable by a relatively small penalty under the Dramatic and Musical Performers Protection Act 1958. The application for the *Anton Piller* order was made by performers whose performances
C had been " bootlegged " by the defendant without their consent and also by record companies with whom the performers had entered into exclusive contracts. So far as the application by performers was concerned, it could have been granted for entirely orthodox reasons. The Act was passed for the protection of a particular class of individuals, dramatic and musical performers; even the short title said so. Whether the record companies
D would have been entitled to obtain the order in a civil action to which the performers whose performances had been bootlegged were not parties is a matter which for present purposes it is not necessary to decide. Lord Denning M.R., however, with whom Waller L.J. agreed (Shaw L.J. dissenting) appears to enunciate a wider general rule, which does not depend upon the scope and language of the statute by which a criminal offence is committed, that whenever a lawful business carried on by one individual
E in fact suffers damage as the consequence of a contravention by another individual of any statutory prohibition the former has a civil right of action against the latter for such damage.

My Lords, with respect, I am unable to accept that this is the law; and I observe that in his judgment rejecting a similar argument by the appellants in the instant appeal the Master of the Rolls accepts that the
F question whether a breach of the sanctions Orders gives rise to a civil action depends upon the object and intent of those Orders, and refers to *Ex parte Island Records Ltd.* [1978] Ch. 122 as an example of a statute passed for the protection of private rights and interests, viz. those of the performers.

*Beaudesert Shire Council v. Smith*, 120 C.L.R. 145 is a decision of
G the High Court of Australia. It appeared to recognise at p. 156 the existence of a novel innominate tort of the nature of an " action for damages upon the case " available to " a person who suffers harm or loss as the inevitable consequence of the unlawful, intentional and positive acts of another." The decision, although now 15 years old, has never been followed in any Australian or other common law jurisdiction. In subse-
H quent Australian cases it has invariably been distinguished—most recently by the Privy Council in *Dunlop v. Woollahra Municipal Council* [1982] A.C. 158, on appeal from the Supreme Court of New South Wales. It is clear now from a later decision of the Australian High Court in

*Kitano* v. *Commonwealth of Australia* (1974) 129 C.L.R. 151 that the adjective " unlawful " in the definition of acts which give rise to this new action for damages upon the case does not include *every* breach of statutory duty which in fact causes damage to the plaintiff. It remains uncertain whether it was intended to include acts done in contravention of a wider range of statutory obligations or prohibitions than those which under the principles that I have discussed above would give rise to a civil action at common law in England if they are contravened. If the tort described in *Beaudesert* was really intended to extend that range, I would invite your Lordships to declare that it forms no part of the law of England.

I would therefore answer Question 5 (a): " No."

Question 5 (b), to which I now turn, concerns conspiracy as a civil tort. Your Lordships are invited to answer it on the assumption that the purpose of Shell and B.P. in entering into the agreement to do the various things that it must be assumed they did in contravention of the sanctions Order, was to forward their own commercial interests; *not* to injure those of Lonrho. So the question of law to be determined is whether an intent by the defendants to injure the plaintiff is an essential element in the civil wrong of conspiracy, even where the acts agreed to be done by the conspirators amount to criminal offences under a penal statute. It is conceded that there is no direct authority either way upon this question to be found in the decided cases; so if this House were to answer it in the affirmative, your Lordships would be making new law.

My Lords, conspiracy as a criminal offence has a long history. It consists of " the agreement of two or more persons to effect any unlawful purpose, whether as their ultimate aim, or only as a means to it, and the crime is complete if there is such agreement, even though nothing is done in pursuance of it."  I cite from Viscount Simon L.C.'s now classic speech in *Crofter Hand Woven Harris Tweed Co. Ltd.* v. *Veitch* [1942] A.C. 435, 439. Regarded as a civil tort, however, conspiracy is a highly anomalous cause of action. The gist of the cause of action is damage to the plaintiff; so long as it remains unexecuted the agreement, which alone constitutes the crime of conspiracy, causes no damage; it is only acts done in execution of the agreement that are capable of doing that. So the tort, unlike the crime, consists not of agreement but of concerted action taken pursuant to agreement.

As I recall from my early years in the law first as a student and then as a young barrister, during its chequered history between Lord Coleridge C.J.'s judgment at first instance in *Mogul Steamship Co. Ltd.* v. *McGregor, Gow & Co.* (1888) 21 Q.B.D. 544, and the *Crofter* case, the civil tort of conspiracy attracted more controversy among academic writers than success in practical application. Why should an act which causes economic loss to A but is not actionable at his suit if done by B alone become actionable because B did it pursuant to an agreement between B and C? An explanation given at the close of the 19th century by Bowen L.J. in the *Mogul* case when it was before the Court of Appeal (1889) 23 Q.B.D. 598, 616 was:

A  "The distinction is based on sound reason, for a combination may make oppressive or dangerous that which if it proceeded only from a single person would be otherwise."

But to suggest today that acts done by one street-corner grocer in concert with a second are more oppressive and dangerous to a competitor than the same acts done by a string of supermarkets under a single ownership or that a multinational conglomerate such as Lonrho

B  or oil company such as Shell or B.P. does not exercise greater economic power than any combination of small businesses, is to shut one's eyes to what has been happening in the business and industrial world since the turn of the century and, in particular, since the end of World War II. The civil tort of conspiracy to injure the plaintiff's commercial interests where that is the predominant purpose of the agreement between the defendants

C  and of the acts done in execution of it which caused damage to the plaintiff, must I think be accepted by this House as too well-established to be discarded however anomalous it may seem today. It was applied by this House 80 years ago in *Quinn* v. *Leathem* [1901] A.C. 495, and accepted as good law in the *Crofter* case [1942] A.C. 435, where it was made clear that injury to the plaintiff and not the self-interest of the

D  defendants must be the predominant purpose of the agreement in execution of which the damage-causing acts were done.

My Lords, in none of the judgments in decided cases in civil actions for damages for conspiracy does it appear that the mind of the author of the judgment was directed to a case where the damage-causing acts although neither done for the purpose of injuring the plaintiff nor actionable at his suit if they had been done by one person alone, were neverthe-

E  less a contravention of some penal law. I will not recite the statements in those judgments to which your Lordships have been referred by the appellants as amounting to dicta in favour of the view that a civil action for conspiracy does lie in such a case. Even if the authors' minds had been directed to the point, which they were not, I should still find them indecisive. This House, in my view, has an unfettered choice whether to confine

F  the civil action of conspiracy to the narrow field to which alone it has an established claim or whether to extend this already anomalous tort beyond those narrow limits that are all that common sense and the application of the legal logic of the decided cases require.

My Lords, my choice is unhesitatingly the same as that of Parker J. and all three members of the Court of Appeal. I am against extending the

G  scope of civil tort of conspiracy beyond acts done in execution of an agreement entered into by two or more persons for the purpose not of protecting their own interests but of injuring the interests of the plaintiff. So I would answer Question 5 (b): " No."

The only remaining question, Question 9, is whether the answers to the previous questions, now reduced to Questions 1 and 2 and 5 (a) and

H  (b) lead to the conclusion that any cause of action is disclosed by the points of claim. Since I would give negative answers to each of those four questions, it follows that I would also answer Question 9: " No " and would dismiss the appeal.

LORD EDMUND-DAVIES. My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend, Lord Diplock. I am in respectful and complete agreement with him and cannot usefully add any observations of my own. For the reasons he gives, I would uphold the unanimous judgments of the Court of Appeal and dismiss this appeal.

LORD KEITH OF KINKEL. My Lords, I have had the benefit of reading in draft the speech prepared by my noble and learned friend, Lord Diplock. I agree with it entirely, and for the reasons which he gives I too would dismiss the appeal.

LORD SCARMAN. My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Diplock. For the reasons he gives I would dismiss the appeal.

LORD BRIDGE OF HARWICH. My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Diplock. I entirely agree with it and accordingly would dismiss the appeal.

*Appeal dismissed.*

Solicitors: *Cameron Markby; Slaughter & May; Linklaters & Paines.*

F. C.

---

[PRIVY COUNCIL]

DESMOND GRANT AND OTHERS . . . . APPELLANTS
AND
DIRECTOR OF PUBLIC PROSECUTIONS
AND ANOTHER . . . . . . . . RESPONDENTS

[APPEAL FROM THE COURT OF APPEAL OF JAMAICA]

1981 March 23, 24;    Lord Diplock, Lord Elwyn-Jones,
April 29    Lord Fraser of Tullybelton, Lord Roskill
and Sir John Megaw

*Jamaica—Constitution—Human rights and fundamental freedoms —Pre-trial publicity extending over whole island—Detention of applicants on indictments preferred in circuit court without preliminary hearing—Director of Public Prosecutions' power to prefer indictments—Whether contrary to natural justice— Whether infringements of applicants' rights to fair hearing and personal liberty—Jamaica (Constitution) Order in Council 1962 (S.I. 1962 No. 1550), Sch. 2, ss. 15 (1), 20 (1)—Criminal Justice (Administration) Act, s. 2 (2)*

Section 15 of the Constitution of Jamaica provides:
" (1) No person shall be deprived of his personal liberty save as may in any of the following cases be authorised by law— . . . (f) upon reasonable suspicion of his having committed or of being about to commit a criminal offence; . . ."