# **TAB 9**

01:12365497.1

## Nicholson v Permakraft (NZ) Ltd

Court of Appeal Wellington
11, 12, 13, 14 February; 14 March 1985
Cooke, Richardson and Somers JJ

*Companies—Directors—Duties of directors—Liability to creditors—Directors restructured company which was under-capitalised and suffering liquidity problems—As part of the restructuring, directors paid a capital dividend of $148,323 to shareholders—Dividend was not formally declared but shareholders had unanimously assented to plan of restructuring including payment of dividend—After restructuring company was solvent—Two years later company was wound up—Liquidator sought repayment of the $148,323 from the directors—Whether directors were liable—Whether, when making the dividend payment, the directors were under a duty to consider likely loss to creditors.*

Permakraft was a furniture-manufacturing company and one of a group of three companies in a family enterprise. During the 1970s its sales had increased and in most years Permakraft made net profits in addition to remuneration for the working shareholders. Nevertheless, Permakraft was under-capitalised and had liquidity problems, and so was restructured in 1975. A basic feature of the restructuring was the formation of a new holding company. Permakraft's shareholders provided the holding company with $160,000 equity capital; and further funds were borrowed. The holding company purchased nearly all Permakraft's shares and bought Permakraft's land and buildings for more than their book value. The restructuring provided a capital profit for Permakraft of $148,323, which was distributed pro rata to the shareholders as a capital dividend. The dividend was not formally declared at a general meeting of shareholders, and it was not entered in the company's minute book in compliance with s 362 of the Companies Act 1955. However, all the directors and shareholders had participated in the discussions on the proposed plan and had agreed to the restructuring, including payment of the dividend. After the restructuring, Permakraft leased the land and buildings from the holding company, and the rent paid became an added cost which justified Permakraft increasing its manufacturing prices; an increase that would otherwise have been prevented by the Price Stabilisation Regulations 1974. All trade debts were paid; and the company's unaudited accounts showed a net profit of $26,622 for the year ended 31 March 1976.

In the latter part of 1976 Permakraft encountered difficulties and in the year ended 31 March 1977 it made a loss of $135,960. Permakraft went into receivership in April 1977, at which time it had an estimated deficiency of $135,942. In November 1977 the High Court ordered that Permakraft be wound up. Further losses had been incurred during the receiver's trading and on the winding up the Official Assignee reported an estimated deficiency of $227,156. This meant that, although secured and preferential creditors would be paid in full or virtually so, nothing would remain for unsecured creditors. In an attempt to improve the position of unsecured creditors, the liquidator of Permakraft commenced an action to recover from the company's directors the $148,323 which had been paid to the shareholders. In the High Court the Judge held that in making the payment the

defendants had been in breach of their duties as directors and that they should refund the whole amount to the company with interest. The Judge excused two of the defendants under s 468 of the Companies Act but refused relief under that section to the other three defendants who were the company's principal directors and shareholders. These three directors appealed from that part of the judgment which found them to be in breach of their duties as directors.

**Held:** The directors were not liable to refund the dividend payment and the appeal was allowed for the following reasons:

1 (per totam curiam) The transaction was intra vires, and the directors had acted honestly. There was ample evidence that the plan for restructuring had received the informed assent of all shareholders; and the unanimous assent of the shareholders had cured the procedural defect caused by the fact that the dividend had not been formally declared at a shareholders' meeting or entered in the minute book (see p 249 line 4, p 254 line 8, p 256 line 16).

*Salomon v Salomon & Co* [1897] AC 22, 57, *Attorney-General for Canada v Standard Trust Company of New York* [1911] AC 498, 503-505 and *Re Duomatic Ltd* [1969] 2 Ch 365, 373; [1969] 1 All ER 161, 168 applied.

*Re Avon Chambers Ltd* [1978] 2 NZLR 638 distinguished.

2 (per Richardson and Somers JJ) There were sound commercial reasons for the restructuring that was carried out. A major purpose in the whole transaction was the improvement of the company's profitability. Immediately following the restructuring, all creditors were paid, the company was solvent, and those closest to it—the directors, the shareholders and the secured creditors asked to provide further finance—all believed that the assets of the company would substantially exceed its liabilities. There was no basis in the evidence for a finding that, immediately following the restructuring, the company's commercial solvency was doubtful (see p 254 line 35, p 255 line 25).

(per Cooke J) In the circumstances obtaining in mid-1975 Permakraft's directors, as part of their duties to the company, were bound to consider the interests of unsecured creditors. A payment made to the prejudice of current or continuing creditors, when a likelihood of loss to them ought to have been known, was capable of constituting misfeasance by the directors for which they might be made liable in an action by the company. The unanimous assent of the shareholders was not enough to justify a breach of duty to the creditors. However, the evidence showed that the directors had given actual consideration to Permakraft's trading interests. Further, the evidence did not justify a conclusion that, at the time of the payment of the dividend, the directors should have appreciated or ought to have known that it was likely to cause loss to creditors or threatened the existence of the company. There was ample evidence that a genuine optimism as to Permakraft's trading future prevailed amongst the directors and shareholders at the time of the sale of the company's land and buildings. Viewed at the time they were made, the decisions of the directors and shareholders were reasonable and not unfair to creditors (see p 249 line 37).

Observations of Cumming-Bruce and Templeman LJJ in *Re Horsley & Weight Ltd* [1982] Ch 442, 454-456; [1982] 3 All ER 1045, 1055-1056 adopted.

Observations of Pennycuick J in *Charterbridge Corporation Ltd v Lloyds Bank Ltd* [1970] Ch 62, 74; [1969] 2 All ER 1185, 1194 considered.

*Walker v Wimborne* (1976) 137 CLR 1, 6-8; 50 ALJR 446, 449-450, per Mason J, referred to.

**Other cases mentioned in judgments**
*Day-Nite Carriers Ltd, Re* [1975] 1 NZLR 172.
*Smith and Fawcett Ltd, Re* [1942] Ch 304; [1942] 1 All ER 542.

**Appeal**
This was an appeal from part of a judgment of White J (Napier, A 26/78, 15 February and 4 June 1982).

    *I L McKay* and *R A Lamont* for the appellants (T L Nicholson, J C Nicholson and B S Nathan).
    *R J Craddock QC* and *G W Calver* for the respondent (Permakraft (NZ) Ltd (in liquidation)).

*Cur adv vult*

**COOKE J.** On 16 November 1977 Permakraft (NZ) Ltd, a furniture-manufacturing company, was ordered by the High Court to be wound up, on the petition of its principal unsecured creditor, the timber merchant Odlins Ltd. The manufacturing company had been in receivership since April 1977; a resolution for voluntary winding up had also been recorded at that time but there was some doubt as to whether it had been properly executed. The statement of affairs in April had estimated a deficiency of $135,942 but apparently there were further losses during the receiver's trading; and on the winding up the preliminary report of the Official Assignee under the Companies Act 1955, s 232, reported an estimated deficiency of $227,156. This would mean that, while secured and preferential creditors would be paid in full or virtually so, nothing would remain for unsecured creditors.

In an attempt to improve the position of unsecured creditors, the liquidator commenced an action in March 1978 in the name of the company against five directors or alleged directors to recover the sum of $148,323 which had been paid to the shareholders on or about 30 June 1975. The payment had been intended to be, and was accepted by the trial Judge (White J) to have been, a dividend by way of distribution of a capital profit. It was a key part of a restructuring of the company carried out at about that time.

In his main judgment in the action, delivered on 15 February 1982, White J held that in making the payment the defendants had been in breach of their duties as directors and that they should refund the whole amount to the company with interest. He declined to relieve the principal directors and shareholders, Trevor Leonard Nicholson and Bernard Scott Nathan, under s 468 of the Companies Act. His view was that, although their personal honesty was not in issue, breach of their duties as directors should not be excused when they had personally received thereby an asset which should have remained an asset of the company. In a supplementary judgment, delivered on 4 June 1982 after further argument, the Judge fixed the basis of the award of interest and under s 468 excused the defendants Peter Stirling Ericksen and Alan Herbert Govan — in effect on the ground that they were not prime movers in the reconstruction. Whether Mr Ericksen was ever a director was in doubt, but the Judge did not find it necessary to resolve that point. In the result judgment was given against Mr Nicholson and his wife and Mr Nathan (who is Mrs Nicholson's brother) for the total sum claimed, with certain interest and costs. They appeal from that judgment but limit their appeal to the question of breach of duty as directors, not challenging White J's refusal of relief under s 468 if his finding of breach stands.

Since 1974 the authorised and subscribed capital of the manufacturing company had been $25,000. Mr Nicholson had held 16,969 shares, his wife 1406 shares, Mr Nathan and Mr Nicholson jointly (as trustees of the Nathan family trust) 6250, and Mr Ericksen (an employee) 375. The manufacturing company owned 50% of the shares in Nathan & Associates Ltd, the remaining shares in which were held by Mr Nathan's parents. The manufacturing company also held one third of the shares in a retail company, Colonial Craft Ltd, the remainder being held by Mr and Mrs Nicholson and Mr Nathan. Mr Nicholson was governing

director of the manufacturing company and in charge of the business. He concentrated more particularly on the production side, while Mr Nathan managed the financial side. Mrs Nicholson did some work in the office; she and Mr Nathan were also directors. Mr Govan, who did not become a director until about the
5 time of the reconstruction, was another brother-in-law of Mr Nicholson. It is evident that the enterprise consisting of the three companies was very much a family one.

During the 1970s the manufacturing company enjoyed steadily increasing sales and in most years net profits in addition to remuneration for the working
10 shareholders, although in the year ended 31 March 1975, while sales had reached $520,865, the net profit had fallen to $565. The company was under-capitalised and had liquidity problems. It was factoring the trade debts owed to it. Customarily it had been paying major suppliers such as Odlins two or three months late and sometimes more. There had been some complaints and threats but in practice
15 delayed payment had been tolerated and supplies were not withheld. In 1974-1975 unsecured creditors were becoming more pressing as their own liquidity tightened in the general economic conditions. Inflation was at a high level. Increases in the manufacturing company's prices were obviously a partial answer to the problem, but the ceiling and time restrictions imposed by the Price Stabilisation Regulations
20 1974 prevented this under the existing company structure. However, if instead of owning its land and buildings the company were to lease them, the rent would be an added cost justifying an increase. The land and buildings — at Onekawa, Napier — had appreciated considerably in value by comparison with the value shown in the company's books. A registered valuer in a report dated 20 February 1975
25 put their current mortgage value at $226,750, which was more than $140,000 above the book value.

Against that background Mr Nathan worked out an elaborate reconstruction scheme. Its basic feature was that a new holding company, Permakraft Holdings Ltd, would be formed to acquire nearly all the shares in the manufacturing and
30 retailing companies. The holding company would buy the manufacturing company's land and buildings for $226,750, and also that company's shares in Colonial Craft Ltd for more than their book value. The manufacturing company's shares in Nathan & Associates Ltd would likewise be sold at a profit to family trusts. In the result there would be a total capital profit for the manufacturing company of $148,323,
35 which would be distributed pro rata to the shareholders as a capital dividend. With that dividend and a lesser amount from the sale of their existing shares they would provide all the capital in the holding company, $160,000. Thus the holding company would have more subscribed capital than the manufacturing company, which would facilitate increased borrowing. The holding company would charge the
40 manufacturing company a rent, and prices would be increased. This would increase the income flowing into the group as a whole. It was also contemplated that further subsidiary companies would be established as retail outlets, with local managers as shareholders. One such project was in fact subsequently established, Colonial Furniture Store (Hastings) Ltd. With the consent of the secured creditors —
45 Provident Life Assurance Co Ltd, the Bank of New Zealand and Marac Finance Ltd — the existing mortgage and debenture liabilities and the responsibility for interest and capital repayments would be taken over by the holding company. Limited further funds would be borrowed from the bank, Marac and the Nicholson family trust (formed contemporaneously). It was envisaged that in the result the
50 holding company would have an equity capital of $160,000 and borrowings of approximately $149,000. From these funds the acquired land, buildings and shares would be paid for.

This scheme was discussed with the secured creditors and was acceptable to them. It was carried out in substance in late June and early July 1975. The financial transactions were largely by exchange of cheques, but the bank overdraft advance

was increased by $3000 and Marac's advance by $20,000 (secured then by mortgage as well as debenture). The Judge found, and the finding is not contested on appeal, that the capital dividend was not formally declared at a general meeting of shareholders as required by article 114 of the company's articles of association, nor by an entry in the minute book complying with s 362 of the Companies Act. There is an entry in the minute book resolving on the dividend, dated 1 July 1975 and signed by Mr and Mrs Nicholson and Mr Nathan, but the evidence is that it was in fact signed months later. The Judge found, however, that the informality did not matter, as all the shareholders had given informed assent at the time. A transfer of the land to the holding company was executed on 1 July 1975, the cheques exchanged including cheques to the manufacturing company to cover the $226,750.

Once he had obtained the bank's approval to the scheme, and in anticipation of the actual restructuring, Mr Nathan increased the manufacturing company's prices by 17½% — an increase which did not correspond to the proposed rent alone but apparently took into account other increased overheads and a profit margin. The price increase and possibly the injection of new borrowed funds into the group as a whole led to an improvement in the manufacturing company's liquidity. Supplies were paid for more promptly. It is clear that none of the unsecured debts owing at the dates of the later receivership or winding up had been incurred before the restructuring; all trade debts outstanding at that time have long since been paid. The company's accounts (unaudited) showed a net profit of $26,622 for the year ended 31 March 1976. There was a vigorous contest at the trial as to whether that figure represented an over-optimistic assessment of the value of stocks and work in progress. But the trial Judge made no finding that it did and, having read the various opinions and explanations given in evidence, I think that it would be altogether unjustifiable to make such a finding on appeal.

In the latter part of 1976 the manufacturing company encountered difficulties. In part this was symptomatic of conditions in the industry generally; there is evidence, for instance, that two major furniture manufacturers went into liquidation. A long-term contract which the company had obtained for manufacturing legs for television sets ceased. Wages increased disproportionately to sales. There was a high staff turnover. The company made a loss of $135,960 in the year ended 31 March 1977. Various steps were taken, including an offer to Odlins of security over the holding company, but this offer was rejected because the shareholders were not prepared to give personal guarantees as well. The receivership and later the liquidation followed.

*The High Court judgment*

The judgment under appeal is quite long, but some 50 of its 65 pages are devoted to narrating the pleadings, the arguments of counsel and a part of the evidence. The Judge's findings were stated by him quite briefly and may be enumerated as follows:

1. Having heard and weighed the evidence and assessed the witnesses, he did not find it established that there was a deliberate intention at the time of restructuring to remove the company's major asset from the reach of creditors. Later, in dealing with relief, he said that the honesty of the directors was not in issue.

    It is convenient to say at once that those findings distinguish such a case as *Re Avon Chambers Ltd* [1978] 2 NZLR 638 (Casey J), and probably also *Re Day-Nite Carriers Ltd* [1975] 1 NZLR 172 (White J), where there is fraud or something so close to the borderline of fraud as to constitute plain misfeasance.

2. He found that there was ample evidence establishing agreement between the defendants as to the plan for restructuring; and that informed assent by all

1 NZLR        *Nicholson v Permakraft (NZ) Ltd (Cooke J)*        247

the shareholders was established.

On the hearing of the appeal Mr Craddock for the respondent attacked those findings, but I think that they were well justified on the evidence and should not be disturbed. There were discussions over a period of months in which all the directors and shareholders participated in varying degrees. In particular there was a meeting in the office of the company's solicitor on 24 June 1975 at which all concerned were present, namely Mr and Mrs Nicholson, Mr Nathan, Mr Govan and Mr Ericksen. No doubt, as White J indicated, some had less understanding of the details than others; but, as Mr McKay put it in argument in this Court, an assent is not the less a true assent because in giving it one is voluntarily relying on the judgment of another, whether a solicitor, friend or associate. The suggestion that there might not have been unanimity if more formality had been observed is unrealistic and contrary to the tenor of the evidence. I also respectfully accept White J's view that the unanimous assent cured any formal defects; it will be necessary to return to this point shortly.

3. White J saw the crux of the case in a distinction between the interests of the group of companies and the interests of the manufacturing company only. He cited on this point *Walker v Wimborne* (1976) 137 CLR 1, 6-8. In that case Mason J, saying that directors in discharging their duty to the company must take account of the interests of the shareholders and its creditors, held (with the concurrence of Barwick CJ) that directors were in breach of duty because, at a time when the company was insolvent, they moved funds to other companies in the group "completely disregarding" the interests of the insolvent company. White J also relied particularly on some obiter observations of Pennycuick J in *Charterbridge Corporation Ltd v Lloyds Bank Ltd* [1970] Ch 62, 74, another group case. Pennycuick J there proposed a test to be applied where in fact directors have failed to give separate consideration to the position of the individual company: namely whether an intelligent and honest man in his position could, in the whole of the existing circumstances, have reasonably believed that the transactions were for the benefit of the company. Applying the tests indicated by those authorities, White J concluded here "that the only reasonable inference is that the defendants in considering the group did not consider the interests of the company and that, considering it as a separate entity, the action of the defendants was to the detriment of the company". He also put the first limb in a slightly different way by saying that he was satisfied that the interest of the trading company as an entity was in fact disregarded. It is on the correctness or otherwise of this part of the judgment that I see the appeal as turning.

*The principles*

In the course of the full arguments on the appeal counsel traversed the English, Australian and New Zealand case law and there were helpful references to textbooks, articles and case notes. Counsel were invited to and did make submissions on the issues of philosophy or policy involved. In the result I think that the principles to be applied in this case can be stated fairly simply, with express reference to comparatively few authorities.

(i) A company is bound in a matter intra vires by the unanimous agreement of its members. Lord Davey's statement of that proposition in *Salomon v Salomon & Co* [1897] AC 22, 57, is well known. For another highly authoritative enunciation of it, marked by Viscount Haldane's lucidity and conciseness, one can turn to the judgment of the Privy Council in *Attorney-General for Canada v Standard Trust Company of New York* [1911] AC 498, 503-505, where directors of a company which later became insolvent had personally acquired a railway as a syndicate and

had sold it to the company and assigned the debt for the balance of the purchase price to the respondents:

> "The appellant contends, on the footing of being an unsecured creditor of the Quebec Southern Railway Company as amalgamated, that the fund arising from the sale directed by the Exchequer Court ought not to be diminished by admitting the claim of the respondents. He alleges that the price of $648,000 paid in 1894 to the syndicate for the railway was excessive, that the transaction was ultra vires, and that, apart from this, the members of the syndicate, being also directors, were in a fiduciary position towards the South Shore Company, such that the transaction cannot stand. In the view of the case taken by their Lordships, it is not necessary to enter into the question whether the price of $648,000 was excessive. The referee, after hearing evidence, decided that it was not, and this finding of fact is not dissented from by any of the judges in the Courts below, except Idington J. But whatever may have been the character of this transaction, it was approved, with full knowledge of the facts, by all of those who owned, or were beneficially interested in, the stock of the company at the time. It, therefore, does not matter, for the purposes of a case such as the present, that these persons were also promoters and vendors. If the transaction had been ultra vires in the sense of being outside the legal capacity of the company, and accordingly not its act, the case would have been different. But, although this has been suggested, their Lordships can find no foundation for the argument. Under the provisions of the statute of the Quebec Legislature incorporating it, the company had power to purchase the Montreal and Sorel Railway, and was authorized to take payment for the amount subscribed for its stock in bonds of any railway company. The transaction was actually carried out in this form, and was on the face of it within the powers conferred by the statute on the company. If, therefore, what the directors did is to be impeached, it must be on the ground, not of its having been ultra vires of the company, but of its having been a breach of duty by the directors. Now, although the capital of the company was $1,000,000, the only stock issued was to the amount of $300,000, and this was taken up and owned by the members of the syndicate and no one else. They and they alone were interested in the capital of the company. This is not a case of winding up, but even if it were, it would make no difference. In proceedings of the character of the present the title of a liquidator as representing creditors cannot be higher than the title of the company against whom the creditors claim. In this case the interests of the company and of the syndicate were identical. The only persons beneficially interested in the company were the four members of the syndicate. The law gave them the complete control of its action. Under that control the company gave effect to the policy of the only persons who had any beneficial interest in its capital. The case is not one in which the apparent procedure can be said to have been unreal, or to have been a cloak under which a conspiracy to defraud was concealed. Under these circumstances, their Lordships are of opinion that the company, notwithstanding that no general meeting, apart from the meeting of directors, appears to have been held for the purpose, was completely bound by the transactions sought to be impeached, and that the appellant, who has certainly no title higher than that of the company against the assets of which he claims, is bound likewise.
>
> "In the course of the argument for the appellant the well-known case of *Erlanger v New Sombrero Phosphate Co* 3 App Cas 1218 was much relied on, as shewing that the action of the directors could not stand. It is sufficient to observe that, for the reasons given in the House of Lords in *Salomon v Salomon* [1897] AC 22, the doctrine of the former case has no application to circumstances such as those of the present case, where every one interested

Case 09-10138-MFW   Doc 8156-9   Filed 08/13/12   Page 9 of 17

in the capital of the company has, with full knowledge, concurred in the act impeached."

No real question of anything ultra vires the company arises in the present case. The amended statement of claim includes an uninformative general allegation that the purported capital dividend was ultra vires, but in essence the argument in both Courts has been that it was ultra vires the directors because not in the interests of the company (including its creditors). We explored fully with counsel for the respondent whether there was any claim that the payment was unlawful as a return of capital. Mr Craddock made it clear that this is no part of his case. There were no revenue profits available for such a dividend, but a sufficient capital profit had been made. Or at least the liquidator does not allege otherwise. The company's objects in its memorandum of association included the division of capital profits. Whether there is any distinction in law between realised capital profits and unrealised capital profits on a revaluation of assets has no practical significance on the facts of this case. Mr Craddock disclaimed any reliance in these proceedings on s 62 of the Companies Act (as to financial assistance by a company for the subscription of its own or its holding company's shares).

(ii) The principle about assent has a particular application in matters of procedure. As Buckley J put it in *Re Duomatic Ltd* [1969] 2 Ch 365, 373:

". . . where it can be shown that all shareholders who have a right to attend and vote at a general meeting of the company assent to some matter which a general meeting of the company could carry into effect, that assent is as binding as a resolution in general meeting would be. The preference shareholder, having shares which conferred upon him no right to receive notice of or to attend and vote at a general meeting of the company, could be in no worse position if the matter were dealt with informally by agreement between all the shareholders having voting rights than he would be if the shareholders met together in a duly constituted general meeting."

A fortiori the creditors in the present case, who of course had no right to attend general meetings of the company or directors' meetings, cannot take advantage — directly or indirectly through an action by the liquidator in the name of the company — of the informality in the declaration of the dividend. It is cured by the unanimous assent of the shareholders.

(iii) The duties of directors are owed to the company. On the facts of particular cases this may require the directors to consider inter alia the interests of creditors. For instance creditors are entitled to consideration, in my opinion, if the company is insolvent, or near-insolvent, or of doubtful solvency, or if a contemplated payment or other course of action would jeopardise its solvency.

The criterion should not be simply whether the step will leave a state of ultimate solvency according to the balance sheet, in that total assets will exceed total liabilities. Nor should it be decisive that on the balance sheet the subscribed capital will remain intact, so that a capital dividend can be paid without returning capital to shareholders. Balance sheet solvency and the ability to pay a capital dividend are certainly important factors tending to justify proposed action. But as a matter of business ethics it is appropriate for directors to consider also whether what they do will prejudice their company's practical ability to discharge promptly debts owed to current and likely continuing trade creditors.

To translate this into a legal obligation accords with the now pervasive concepts of duty to a neighbour and the linking of power with obligation. It is also consistent with the spirit of what Lord Haldane said. In a situation of marginal commercial solvency such creditors may fairly be seen as beneficially interested in the company or contingently so.

On the other hand, to make out a duty to future *new* creditors would be much more difficult. Those minded to commence trading with and give credit to a limited liability company do so on the footing that its subscribed capital has not been returned to the shareholders, but otherwise they must normally take the company as it is when they elect to do business with it. Short of fraud they must be the guardians of their own interests.

In the case of a supplier who already has an established trade relationship with a company, there is of course a distinction between current and future debts. It seems to me neither necessary nor desirable, however, to use that distinction so as to limit the duties of the directors of the debtor company to considering whether debts already incurred can be paid. If the company's financial position is precarious the fortunes of such suppliers may be so linked with those of the company as to bring them within the reasonable scope of the directors' duties. They may continue to give credit in ignorance of a change damaging to their prospects of payment.

The recognition of duties to creditors, restricted as already outlined, is justified by the concept that limited liability is a privilege. It is a privilege healthy as tending to the expansion of opportunities and commerce; but it is open to abuse. Irresponsible structural engineering—involving the creating, dissolving or transforming of incorporated companies to the prejudice of creditors—is a mischief to which the Courts should be alive. But a balance has to be struck. There is no good reason for cultivating a paternal concern to protect business people perfectly able to look after themselves.

For those reasons, among the many authorities cited to us I would respectfully adopt the approach of Cumming-Bruce and Templeman LJJ in *Re Horsley & Weight Ltd* [1982] Ch 442, 454-456. Both Lord Justices favoured an objective test: whether at the time of the payment in question the directors "should have appreciated" or "ought to have known" that it was likely to cause loss to creditors or threatened the continued existence of the company. In my opinion, a payment made to the prejudice of current or continuing creditors when a likelihood of loss to them ought to have been known is capable of constituting misfeasance by the directors; and they may be made liable for it in an action of the present kind. Alternatively an application may be made under s 321 of the Companies Act, which in the substituted form enacted in 1980 extends to "any negligence, default, or breach of duty or trust in relation to the company".

I also share the view to which Cumming-Bruce and Templeman LJJ evidently inclined in their obiter observations that in such cases the unanimous assent of the shareholders is not enough to justify the breach of duty to the creditors. The situation is really one where those conducting the affairs of the company owe a duty to creditors. Concurrence by the shareholders prevents any complaint by them, but compounds rather than excuses the breach as against the creditors.

(iv) The foregoing principles relate to actions by the company against directors, whether or not in truth brought by the liquidator. It does not exclude the possibility of an action by a particular creditor against the directors or the company for breach of a particular duty of care arising on ordinary negligence principles. For example, directors might obtain credit for the company when they ought to know that the creditor incorrectly understood a valuable asset to belong to the company. But that is territory which need not be explored in the present case. No attempt has been made to construct the action on that footing. Nor is it suggested, for instance, that Odlins gave the manufacturing company credit on the understanding that it owned an equity in the factory land and buildings.

*Applying the principles*

Probably there is no difference material to the decision in this case between White J's view of the principles and mine. I agree with him that in the circumstances

obtaining in mid-1975 the directors of the manufacturing company, as part of their duties to that company, were bound to consider the interests of unsecured creditors. As the liquidator, Mr P R Howell, stressed in his evidence, the company's dilatoriness in paying current trade debts suggested a struggle for survival, putting in doubt its commercial solvency. White J did not advert to any distinction between existing and future unsecured creditors, and as they were likely to include continuing suppliers such as Odlins I accept that it was unnecessary to do so. But from this point onwards the evidence forces me in a different direction when applying the principles to the facts.

In the first place, taken literally the finding that the interests of the manufacturing company were not considered is contrary to the evidence. Mr Nathan acknowledged in cross-examination that he did not act solely in the interests of the manufacturing company; but I think that any view of the law which insisted on so cloistered an approach, an ignoring of the interests of the group as a whole and the shareholders as individuals, should be put aside as out of touch with reasonable commercial practice. Nor does White J appear to have subscribed to that extreme view—at any rate in terms. What Mr Nathan maintained was that he acted in the interests of all three parties—manufacturing company, group and shareholders; and that he regarded the manufacturing company's trading position as much better as a result of the restructuring. The other prime mover, Mr Nicholson, said that he strongly believed it was in the best interests of the manufacturing company "who, after all, . . . was my pride and joy". On the printed page this evidence rings true. And, more importantly, the Judge appears to have regarded these men as honest witnesses.

Their honesty is well supported by the documentary evidence. Mr Nathan submitted to the Bank of New Zealand at Napier, in a letter dated 7 April 1975 and accompanying documents, an extensive explanation of the whole scheme. It referred to the under-capitalisation and liquidity problems of the manufacturing company, and specified as one of the objects "to be able to increase profitability without upsetting the Price Stabilisation Regulations". The material submitted to the bank included among its references to the manufacturing company the following:

"What is required at this stage is an indication as to the possibility of granting the extra $3,000 plus of course, permission to proceed with the accompanying scheme. An indication is fairly urgent as at present Permakraft (NZ) Limited has the opportunity of branching successfully into export. Two trial shipments have been sent totalling over $3,000 F.O.B. Value and have been well received. A further order for $25,000 F.O.B. will be forthcoming if we indicate an ability to produce. This ability will be forthcoming if we have sufficient liquidity.

. . .

"*Ultimate result of move:*

"For three to four months our profitability but not our turnover would rise due to increased liquidity. This would be followed then by a rise in turnover, still strictly limited but at a much more profitable figure. To this end we have notified our customers of an 18% price increase from the beginning of May which has been well received. In fact, since first drafting this application the demand for our furniture has climbed dramatically and there is every indication that it will rise still further.

"We are of course limited still by the price regulations to a maximum net profit on sales of 3%, but under the new Company structure this figure will be struck AFTER paying the Parent Holding Company a substantial rent. This of course is one of the major reasons for the change and justifies the outlay of $3,000 in legal fees and stamp duties.

. . .

"*Permakraft (NZ) Limited Ability to Pay:*
"Under our new costing system an extra 5% profit on sales is included (legally) which on minimum sales of

| | |
|---|---|
| $400,000 | = $20,000.00 |
| +Stock reduction (conservatively) | = $10,000.00 |
| +Interest and capital payments already being made but will cease | = $10,000.00 |
| | $40,000.00" |

Further, having obtained the approval of the secured creditors and the Inland Revenue Department, by letter dated 15 May 1975 Mr Nathan instructed the company's solicitor to proceed with the scheme. The letter set out 13 steps, carefully detailed, and concluded with particulars showing how the shares of the manufacturing company and the two subsidiaries had been valued for the purpose of the reconstruction. As to the manufacturing company the particulars given were:

"Basis of Share Valuations
PERMAKRAFT (NZ) LIMITED
After sale of Land and Buildings
　　Investments
and the distribution of capital gains
Balance Sheet will read:
　　Shareholder Funds

| | |
|---|---|
| Authorised Capital | 25000.00 |
| P & L Account (31 March 1975) | 12789.00 |
| Depreciation Reserve | 5996.00 |
| | 43785.00 |
| Estimated Goodwill | 6215.00 |
| Share Valuation | 50,000.00" |

It is to be noticed especially that the valuation was after payment of the capital dividend and the sale of the land and buildings and shares in the subsidiaries. In a sense the figures were notional, being incidental to the working out of the scheme, and the $6215 for goodwill was clearly a balancing item, bringing the company's worth up to a round $50,000 or $2 per $1 share. But Mr Nathan's good faith in arriving at and working on that valuation has not been challenged. The plaintiff did not even set out to show that the valuation was unjustified at the time.

In the face of that documentary material, read together with the oral evidence, clearly one cannot say that the interest of the trading company as an entity was literally ignored. Mr Craddock suggested that the Judge may not have meant that it was ignored or disregarded in the literal sense, but merely that it was put on one side or no weight given to it. With respect, however, any such finding would seem to me equally untenable on the evidence already mentioned. It seems possible that, preparing his reserved judgment for delivery in February after hearings in August (evidence) and November (submissions), he did not have in mind the significance of the documentary evidence to which I have referred.

As the directors gave actual consideration to the manufacturing company's interests, the passage already mentioned in Pennycuick J's judgment in the *Charterbridge* case is not strictly in point. But I think that in fact the test there suggested, invoking the standard of a hypothetical honest, intelligent and reasonable director, is satisfied in this case; for the following reasons.

I have already expressed adherence to the objective test whether the directors ought to have realised that their action was likely to cause loss to existing and continuing creditors. If anything, this is more favourable to creditors than the *Charterbridge* test; for the wording of the latter focuses on the company as a whole

rather than the creditors in particular. It may well be that White J would have answered the likelihood-of-loss-to-creditors test unfavourably to the defendants here, just as he applied the *Charterbridge* test unfavourably to them. But I cannot avoid the conclusion that his finding that the restructuring including the capital
5 dividend was to the detriment of the company was coloured by the view that its interests were not in fact considered. It is important to remember that directors have a legitimate sphere of discretion. Given good faith and a decision which could reasonably be regarded as in the interests of the company as a whole and not likely to cause loss to the creditors, the matter was one for the directors, not the Court.
10 See the observations of Lord Greene MR on an analogous subject in *Re Smith and Fawcett Ltd* [1942] Ch 304, 306, a case concerning consent to the registration of share transfers in a private company. Here the company's unsatisfactory liquidity and under-capitalisation meant that some radical change had to be made.
   The defendants called as an expert witness Mr B J Martin, chartered
15 accountant. He gave evidence which White J commended as careful. In cross-examination he expressed the opinion that the manner in which the $150,000 (in round figures) was distributed was reasonable. In evidence-in-chief, speaking of the second quarter of 1975 and necessarily with limited information, he said that the prospects on the information he could assess appeared good; sales were
20 continuing, the company had solved its liquidity problem, the rental was being recovered as part of the increased prices, and the company appeared to be "back on a satisfactory plane". He was adamant that there was no direct connection between the restructuring and the collapse of the company. The liquidator, who is also a chartered accountant, was much more critical; but he was in the position
25 of a plaintiff. There would certainly be no reason to give his evidence more weight than that of Mr Martin.
   The course that was in fact taken, while removing the land and buildings from the company's ownership, at least kept them within the group and helped to make further loan funds available to the group as a whole. I would not be prepared
30 to dismiss that as an unreasonable course or as one which the directors ought to have foreseen as likely to cause loss to creditors. The directors were entitled to consider the long-term position. Although a sale of the land and buildings to an outsider would have produced immediate cash, in the long term it was obviously advisable to keep these valuable and appreciating assets within the group — unless
35 indeed the manufacturing company's trading prospects were so poor that this would amount to sacrificing the interests of its creditors. There is ample evidence that a genuine optimism as to the manufacturing company's trading future prevailed at the time among the directors and shareholders. It was by no means unfounded, in the light of the history of the increasing sales and the recent Philips television
40 contract. The subsequent downturn in trading fortunes makes it easy to criticise the directors. Hindsight, though, can lead to a subconscious applying of too severe a standard.
   The Courts have to be ready to scrutinise and if necessary condemn dubious transactions in this general field. As the collapse occurred within about two years
45 from the restructuring, and as the ultimate deficit and the sale price of the realty virtually coincided, it is perhaps not surprising that the liquidator should bring the present action. Evidently he had the sanction of the committee of inspection. But after thorough investigation the decisions of the directors and shareholders have in the end, in my opinion, emerged as reasonable at the time and not unfair
50 to creditors.
   The Court being unanimous that the appeal should be allowed, it will be allowed and the High Court judgment will be vacated and replaced by judgment for the defendants. Leave is reserved to counsel to submit memoranda as to costs in both Courts.

**RICHARDSON J.** I have had the opportunity of reading the judgment of Cooke J in draft. I agree in the result but—for reasons which I can express quite briefly—in one important respect on narrower grounds; and so I prefer to reserve to another day the controversial question of the nature and scope of the duties owed by directors and shareholders to creditors of the company. In these circumstances I shall confine myself to this one branch of the case: on all other issues I agree with the judgment of Cooke J.

In these proceedings the liquidator has sought recovery of a dividend of $148,323 paid by the directors over two years prior to liquidation to themselves as shareholders. The dividend was a distribution of a capital profit on the sale of land and buildings. Although the capital dividend was not formally declared at a general meeting of members of the company as required by article 114 of its articles of association nor resolved on at the time of the actual distribution by entry in the minute book satisfying s 362 of the Companies Act, it was an integral step in the restructuring arrangements and had the informed assent of all the shareholders. So that aspect can now for present purposes be put to one side.

The sale itself has not been impugned and it is not suggested that the distribution of the resulting capital profit could be regarded as a return of capital. It must be accepted too, as White J expressly found, that the personal honesty of the directors was not in issue, and in particular that it was not established that there was a deliberate intention at the time of restructuring to remove that asset from the reach of creditors. Clearly, then, this is not a case of a deliberate fraud on creditors. Nevertheless it was argued that this capital profit which in terms of the Companies Act requirements governing distributions to shareholders was lawfully available for distribution had to be retained within the company in the interests of present or future creditors.

This argument was advanced on the footing that the company was in a state of near insolvency at the critical time. If a company is solvent in the sense of its assets exceeding its liabilities there can, I think, be no question of a separate duty to creditors: they have their ordinary remedies if their accounts are not paid. If it is insolvent the creditors have an interest in the company and the directors might be said to have a duty to them for creditors' money is then at stake. It is in the intermediate situation of near insolvency or doubtful insolvency that greater difficulties of legal principle arise.

White J made no findings as to solvency and on my assessment of the evidence that starting premise of near insolvency is not justified. As is apparent from the analysis of the evidence in the judgment of Cooke J there were sound commercial reasons for the restructuring and for carrying it through in that particular way. An important feature of the case is that the nature and purpose of the scheme and the detailed steps contemplated were all set out in a letter and enclosures sent to the company's banker on 7 April 1975. Following agreement by the secured creditors who were asked to provide further term finance totalling $23,000—essentially to improve liquidity—and with some minor changes the detailed scheme was sent to the company's solicitors for implementation and was then carried through step by step. It was not until over two years later that the company went into liquidation and I am satisfied that the best evidence of the financial position of the company in mid-1975 is reflected in the documentation of the restructuring proposal, accepted as it was by the secured creditors and all the shareholders. It was expressly stated (and documented) that the basis of the valuation of shares in the company was that, after sale of land and buildings and investments and the distribution of capital profits, shareholders' funds would total $50,000. Certainly there had been liquidity problems—understandably given a fivefold increase in sales in the previous five years—and some chronically late payment of trade accounts. But there can, I think, be no doubt that those closest to the company, the directors, shareholders and the secured creditors asked to provide

1 NZLR   *Nicholson v Permakraft (NZ) Ltd (Richardson J)*   255

further finance, all believed that following restructuring the assets of the company would substantially exceed its liabilities.

That evidence was not controverted. What the liquidator pointed to was the company's previous difficulties in paying its debts promptly and the subsequent substantial deterioration in its financial affairs and he expressed reservations about the profit figure of $26,622 for the year ended 31 March 1976, during the early part of which the restructuring was implemented. However I cannot see any basis in the evidence for a finding that immediately following the restructuring, and so after taking into account the capital distribution to the shareholders, the company had lost its capital and had no shareholders' funds; or that its commercial solvency was doubtful.

Turning now to the wider legal issue, the traditional view has been that apart from statutory obligations to take into account the interests of creditors (in particular s 320 and also ss 311B, 311C, 315A, 315B, 315C and 364 of the Companies Act 1955) and the general obligation to maintain the company's capital, directors are not required to have regard to the interests of creditors in exercising their responsibilities: their concern is with the financial interests of the shareholders. In recent years a wider view of directors' responsibilities has been expressed in some of the cases in a number of common law jurisdictions (see (1984) 11 NZULR 68). If this Court is to move in that direction its decision to do so would need to be based on a thorough examination of the scheme and purpose of the companies' legislation. I prefer to leave that for a case where this question, itself a difficult amalgam of principle, policy, precedent and pragmatism, must be decided.

**SOMERS J.** The financial collapse of Permakraft so soon after the transaction which is impeached in the action necessarily gave rise to suspicion and inquiry. But before the directors can be found liable they must be shown to be guilty of some misfeasance, something in the nature of a breach of trust. In the present context it must be a misapplication of the company's property. The fact that the claim is stated to be one for judgment for a sum of money does not alter that requirement.

The conclusion of the Judge that the directors were liable to the liquidator, that is the company, depended upon his central findings that they "did not consider the interests of the company" and that "the interest of the trading company as an entity was in fact disregarded". I am of opinion that these conclusions cannot be sustained upon the evidence.

The letter of 7 April 1975 to the Bank of New Zealand written by Mr Nathan, one of the directors, together with the proposals for the reconstruction of the company which were enclosed with it, provide contemporary evidence on this issue. Those papers refer in several places to the then state of the company and its expected position following the proposed changes. It is also evident that a major purpose in the whole transaction was the improvement of the company's profitability.

The Judge's finding was perhaps intended to convey that no or no adequate consideration was given to the interests of the creditors of the company. It was at least part of the respondent's case in this Court that the directors were required to consider the interests of creditors and did not do so.

In the case of an insolvent company, at least in the sense that its liabilities exceed its assets, directors in the management of a company must have regard to the interests of creditors. That is because according to the order of application of assets on a winding up they are trading with the creditors' money. It has been suggested that when the solvency of a company is doubtful or marginal it will be a misfeasance (probably not capable of being ratified or exonerated by shareholders) to enter into a transaction which directors ought to know is likely to cause a loss to creditors—see eg *Re Horsley & Weight Ltd* [1982] Ch 442, 455 per Cumming-Bruce LJ, and Templeman LJ. Whether that is so does not in my

view fall to be decided now for in the instant case I am satisfied the company was solvent at the material times.

It is true that the liquidator in evidence said that the company was insolvent to the extent it was not paying its debts as they fell due. This opinion was apparently based on the fact that accounts were commonly some two or three months in arrear. The evidence is that this was by arrangement, that such accounts were not due before the expiry of such period. The contrary evidence includes the concurrence of secured creditors in the arrangements; the increase in lending facilities; Mr Nathan's assessment which was not impugned that the value of the shares after the transfer of the land would be $2 each; and the inferences to be drawn from the financial state of the company as exhibited in the figures put to the bank. Then there is the fact that all creditors at the time of the impeached transaction were paid. The directors' own state of mind is revealed by their application to the bank. Obviously they believed the company to be solvent. An objective consideration of the evidence leads to the same conclusion.

Considerable weight was put by Mr Craddock on the admitted failure to comply with the statutory requirements and the provisions of the articles of association as to declaration of dividends. But the transaction was within the powers of the company and the consent of all shareholders having been given non-compliance with the statutory and other formalities provides no ground for complaint by the company whose representative the liquidator now is.

I would allow the appeal.

*Appeal allowed.*

Solicitors for the appellants: *Dowling & Co* (Napier).
Solicitors for the respondent: *Bate, Hallet & Partners* (Havelock North).