# **TAB 11**

01:12365497.1

Case No: TLC677/09

<u>Neutral Citation Number: [2011] EWHC 1288 (Ch)</u>
**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 24/05/2011

**Before** :

**THE HONOURABLE MR JUSTICE LEWISON**
- - - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **THAMES VALLEY HOUSING ASSOCIATION LTD & ANR** | **Claimant** |
| - and - | |
| **(1)ELEGANT (GUERNSEY) LTD & ORS** | **Defendant** |
| **(2) WILLMETT SOLICITOR** | |
| -and- | |
| **(3)HOWARD MACPHERSON** | **Part 20 Defendant** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**David Halpern QC** (instructed by **Barlow Lyde & Gilbert LLP**) for the **Second Defendant Willmett Solicitors**
**Nicholas Stewart QC** (instructed by **Ahmud & Co Solicitors**) for the **Third party, Howard MacPherson**

Hearing dates: 10 -13 & 16 May 2011
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

THE HON MR JUSTICE LEWISON

**Mr Justice Lewison:**

Introduction .......................................................................................................................2
Elegant: the constitutional position ................................................................................3
Mr Macpherson ................................................................................................................3
Willmett ............................................................................................................................4
The BOS witnesses ...........................................................................................................4
Non-witnesses ..................................................................................................................5
Evidential matters ...........................................................................................................5
  Burden and standard of proof ......................................................................................5
  Failure to call witnesses ...............................................................................................6
  Disclosure .....................................................................................................................6
  Lies ................................................................................................................................7
Mr Macpherson as a witness ...........................................................................................7
The acquisition of the site ...............................................................................................9
The loan from BOS .........................................................................................................12
The sale to TVHA ...........................................................................................................15
The litigation ..................................................................................................................27
The claim against Mr Macpherson ................................................................................27
  Procuring a breach of contract ...................................................................................27
  Conspiracy to injure by unlawful means ....................................................................28
Mr Macpherson's true role ............................................................................................28
Did Mr Macpherson procure a breach of contract? .....................................................29
Did Mr Macpherson and Elegant conspire to injure TVHA by unlawful means?...................30
Are Willmett entitled to contribution from Mr Macpherson? .................................31
Willmett's direct causes of action .................................................................................32
  Unlawful means conspiracy ........................................................................................32
  Procuring breach of retainer .......................................................................................32
Result ..............................................................................................................................33

## Introduction

1.  In 2007 Elegant Homes (Guernsey) Ltd ("Elegant") acquired a site at 264-270 Windsor Road, Bray, Maidenhead, Berkshire. It was a development site with planning permission for 30 dwellings, including 9 affordable dwellings. On 1 June 2007 Elegant granted a charge ("the Charge") over the whole site to Bank of Scotland ("BOS") to secure an overdraft facility under which Elegant borrowed £6.277 million for its purchase and development. On 11 April 2008 Elegant exchanged contracts with Thames Valley Housing Association Ltd and Thames Valley Charitable Housing Association Ltd (together called "TVHA") for the sale of the affordable housing part of the site (known as Plots 1-9) in 2 tranches for £675,000. Transfers were executed on the same day.

2.  Willmett, a firm of solicitors, had acted for Elegant on its purchase and also acted for it on the sale to TVHA. In the course of the sale, Willmett gave an undertaking to TVHA's solicitors (Andersons) to procure the release of Plots 1-9 from the Charge. This reflected terms in the sale contract, which obliged Elegant to transfer the plots free from encumbrances and with full title guarantee. However, Elegant did not pay off the Charge to BOS; and BOS refused to release the Plots from the Charge without payment. The upshot was that Willmett were held to be in breach of their undertaking; and liable to

procure the release of the Plots from the Charge. On 27 October 2009 Willmett (by its insurers) paid the sum of £1,355,433.13 to BOS, which then released Plots 1-9; thus enabling the transfer to TVHA to be registered.

3.      Willmett now seeks to recover that sum from Mr Howard Macpherson. Mr McPherson is not a *de jure* director of Elegant. Nor is he a direct shareholder in that company. But Willmett say that he was the "directing mind" of Elegant or, more colloquially, "the man behind" it. This allegation is hotly disputed by Mr Macpherson and is the main dispute of fact that I must resolve. If Willmett succeed in establishing this factual allegation, they say that Mr Macpherson is liable for inducing or procuring Elegant to be in breach of contract with TVHA and/or for conspiring with Elegant to injure TVHA by unlawful means. They also allege that Mr Macpherson is liable for inducing or procuring Elegant to commit a breach of its contract of retainer with Willmett; and/or for conspiring with Elegant to injure Willmett by unlawful means.

4.      Mr David Halpern QC presented the case for Willmett; and Mr Nicholas Stewart QC presented the case for Mr Macpherson.

**Elegant: the constitutional position**

5.      It must be said at the outset that Elegant is in liquidation and has taken no part in the trial. At earlier stages in the litigation it was ordered to give disclosure. It produced one slim file of documents. But these disclosed documents did not include the counterparts of documents disclosed by Willmett which had been sent to or from Elegant. Nor did they include any additional documents (such as communications relating to business decisions). It is plain that disclosure was inadequate. Mr Macpherson's initial disclosure was limited to three documents.

6.      Elegant was registered in Guernsey on 27 April 2004. It had two corporate directors (CCD Alpha Ltd and CCD Beta Ltd) and a corporate secretary (Consec Ltd). Its memorandum and articles of association were unremarkable. The directors of Alpha and Beta were Mike Brown and Rudi Falla, respectively.  Neither of them gave evidence. Both these individuals are directors of Confiance Ltd, a provider of offshore company management services.  Alpha, Beta and Consec all operate out of the Guernsey premises of Confiance.

7.      The publicly accessible documents do not reveal the identity of the shareholders in Elegant. This is common in offshore corporate structures.

**Mr Macpherson**

8.      Mr Howard Macpherson left school at 16. He ran a successful car business. He began property development in 1996. His development activities were carried out through the medium of Howard Construction Ltd. That company was incorporated in 1999 and Mr Macpherson was the sole director. His father, Iain Macpherson, was the company secretary. Mr Macpherson has also been a director (often the sole director) of and shareholder (often the sole shareholder) in a large number of other companies. He is clearly no stranger to the corporate world.

9.      Mr Macpherson says that in 2004 he was advised to consider setting up an offshore tax saving pension scheme. His bank manager, Mr Baker, introduced him to a Mr

Bradley of Mazars, who in turn put him in touch with Mr Mike Brown of Confiance Ltd. His witness statement continues:

> "Confiance was instructed in 2004 to set up Elegant Homes and corporate structure for the initial purpose of building new build properties in West London."

10.    He does not say who gave those instructions, although it is obvious that he did. Mr Macpherson claims that he does not understand the corporate structure or how it works. He says that he has never been a shareholder in Elegant; and says that it is important from a tax point of view that he should not be personally involved in the day to day operation and management of that company. He says that during the whole set up and running of Elegant "I have employed professional directors to run Elegant" (note the singular first person pronoun); and that "I have had no personal involvement in the running of Elegant". He says that "all relevant business decisions on behalf of Elegant … were taken, and the decision making process was carried out by the two directors and the team at Confiance running Elegant". Mr Macpherson says that the shares in Elegant are owned by IM Investments Ltd which is in turn owned by IM FURBS, a pension company. He says that he does not control or run the fund in any way. Confiance are trustees of the fund. But Mr MacPherson acknowledges that he is the only beneficiary of that fund. Thus, even on his own case he is the only person with an economic interest in Elegant. In addition the pension fund has made loans to him amounting to between £1 million and £2 million. According to Mr Macpherson's lawyers there is no money left in the fund.

11.    These general assertions about Mr Macpherson's role must be tested against the contemporaneous documents.

**Willmett**

12.    Jonathan Gilbert was the partner at Willmett who acted for Elegant. He acted both on the purchase of the site and on the sale of Plots 1-9. It was he who gave the undertaking which led to Willmett's liability. On 2 March 2009 Mr Gilbert failed to turn up for work and sent a note to his partners resigning from the partnership effectively admitting that he had acted dishonestly. It transpired that, amongst other things, he had made up conversations with BOS in order to justify his actions. He had also been involved in other acts of dishonesty involving property and mortgage advances. In consequence of Mr Gilbert's misdeeds Willmett went into administration; and the individual equity partners were all either made bankrupt or forced to enter into IVAs.

13.    In the course of this litigation Willmett received no co-operation from Mr Gilbert; but found at its offices a substantial number of documents from Mr Gilbert's files relating to Elegant.  Unfortunately, Mr Gilbert had removed his laptop and this has never been recovered, despite proceedings by Willmett against him.  Mr Gilbert did not give evidence.

**The BOS witnesses**

14.    I heard evidence from Mr David Squire (who left to work for Lloyds Bank, although it is now part of the Lloyds Banking Group together with BOS); Mr Tony Manwaring

and Mrs Sue Steele. All gave evidence under compulsion of a witness summons so as not to compromise the bank's duty of confidentiality.

15.     Each of them gave evidence honestly, clearly and fairly; and were obviously doing their best to assist the court. Understandably, given the lapse of time they were unable to remember in specific detail the provenance of certain pieces of information recorded in contemporaneous documents which they prepared and which remained on the bank's file. But save where I expressly state the contrary, I accept their evidence as accurate and reliable.

## Non-witnesses

16.     No evidence was given by Mr Brown or Mr Falla who, according to Mr Macpherson, were the decision makers in Elegant. Their evidence would have shed light on the decision making structure. No evidence was given by Mr Isles, the accountant. It would have been illuminating to have learned from whom he took his instructions. Mr Macpherson did, however, give one significant piece of evidence about Mr Isles. He said that Mr Isles acted as the finance director of Elegant, even though he was not in fact a director of that company. The significance of that piece of evidence is twofold. First, it recognises that the formal corporate structure of Elegant did not necessarily coincide with reality. Second, it recognises that persons outside the formal corporate structure carried out functions normally performed by *de jure* directors. No evidence was given by Mr Walker, who attended at least one important meeting with BOS. No evidence was given by Mr Dale Reynolds who was involved in the negotiations for the onward sale to TVHA.

## Evidential matters

*Burden and standard of proof*

17.     Willmett accepts that the burden and standard of proof are as set out by Lord Hoffmann in *Re B (Children)* [2009] AC 11. He said (§ 2):

> "If a legal rule requires a fact to be proved (a "fact in issue"), a judge or jury must decide whether or not it happened. There is no room for a finding that it might have happened. The law operates a binary system in which the only values are 0 and 1. The fact either happened or it did not. If the tribunal is left in doubt, the doubt is resolved by a rule that one party or the other carries the burden of proof. If the party who bears the burden of proof fails to discharge it, a value of 0 is returned and the fact is treated as not having happened. If he does discharge it, a value of 1 is returned and the fact is treated as having happened."

18.     He added (§ 15):

> "There is only one rule of law, namely that the occurrence of the fact in issue must be proved to have been more probable than not. Common sense, not law, requires that in deciding this question, regard should be had, to whatever extent appropriate, to inherent probabilities. If a child alleges sexual abuse by a parent, it is

common sense to start with the assumption that most parents do not abuse their children.  But this assumption may be swiftly dispelled by other compelling evidence of the relationship between parent and child or parent and other children. It would be absurd to suggest that the tribunal must in all cases assume that serious conduct is unlikely to have occurred.  In many cases, the other evidence will show that it was all too likely.  If, for example, it is clear that a child was assaulted by one or other of two people, it would make no sense to start one's reasoning by saying that assaulting children is a serious matter and therefore neither of them is likely to have done so.  The fact is that one of them did and the question for the tribunal is simply whether it is more probable that one rather than the other was the perpetrator."

*Failure to call witnesses*

19.     I have already said that there were a number of persons who might have been called by Mr Macpherson but who were not. The most important of these were Mr Brown, Mr Isles and Mr Reynolds. In *Wisniewski v Central Manchester Health Authority* [1998] P.I.Q.R. 324 the Court of Appeal held:

   i)      In certain circumstances a court may be entitled to draw adverse inferences from the absence or silence of a witness who might be expected to have material evidence to give on an issue in an action.

   ii)     If a court is willing to draw such inferences, they may go to strengthen the evidence adduced on that issue by the other party or to weaken the evidence, if any, adduced by the party who might reasonably have been expected to call the witness.

   iii)    There must, however, have been some evidence, however weak, adduced by the former on the matter in question before the court is entitled to draw the desired inference: in other words, there must be a case to answer on that issue.

   iv)     If the reason for the witness's absence or silence satisfies the court, then no such adverse inference may be drawn. If, on the other hand, there is some credible explanation given, even if it is not wholly satisfactory, the potentially detrimental effect of his/her absence or silence may be reduced or nullified.

20.     I was given no satisfactory reason for the failure to call either Mr Brown or Mr Isles; or, indeed, any of the other potential witnesses I have mentioned. I take this failure into account in deciding whether Willmett have proved their case.

*Disclosure*

21.     There are seven files of case papers running to well over a thousand pages. Mr Macpherson's disclosure consists of three documents (plus one page of a JCT contract that he produced on the third day of the trial and a further three documents that he produced in the course of his re-examination at the end of the trial). Mr Macpherson's explanation was that he did not keep e-mails but forwarded them to Mr Isles, his accountant; and that he routinely destroyed documents. There is clear evidence in the

case papers that Mr Macpherson received letters and e-mails. There is equally clear evidence that he received, among other things: a copy of an environmental search; copies of planning decision notices; copies of the loan agreement (which included his personal guarantee) and the contract of purchase; the heads of terms agreed with TVHA; the draft contract and transfer to TVHA, and a draft variation of a section 106 agreement. He disclosed none of these documents. Nor did he disclose any documents relating to his dealings with Elegant or his pension fund (although the trust deed itself was provided in response to a specific request).

22.    CPR 31.2 says that a party discloses a document by stating that the document "exists or has existed". CPR 31.8 says that a party's duty to disclose documents is limited to documents "which are or have been" in his control. Mr Macpherson ignored completely the obligation to disclose documents which he once had but no longer has.

23.    In *The Ophelia* [1916] 2 A.C. 206, 229, Sir Arthur Channel, giving the advice of the Privy Council, said:

> "In the cases as to spoliation of documents, the point has frequently arisen on the preliminary hearing on documents, and the question has been debated whether or not further proof should be allowed. This point cannot arise under the present procedure, and it may be that in some respects the old doctrine was rather technical. The substance of it, however, remains and is as forcible now as ever, and it is applicable not merely in prize cases, but to almost all kinds of disputes. If any one by a deliberate act destroys a document which, according to what its contents may have been, would have told strongly either for him or against him, the strongest possible presumption arises that if it had been produced it would have told against him, and even if the document is destroyed by his own act, but under circumstances in which the intention to destroy evidence may fairly be considered rebutted, still he has to suffer. He is in the position that he is without the corroboration which might have been expected in his case."

24.    I bear this proposition in mind.

*Lies*

25.    I must also remind myself that even where a witness lies about a matter of importance, that does not necessarily mean that he is guilty of whatever it is that he is accused of doing. People tell lies for a number of reasons, including attempting misguidedly to bolster a genuine case (cf. *R v Lucas* [1981] QB 720).

## Mr Macpherson as a witness

26.    A theme that ran through Mr Macpherson's evidence was that he did not read e-mails that were sent to him; he did not read documents that were sent to him, and he routinely destroyed almost every document that he received. He said that he employed no staff apart from one part time secretary. Yet he produced a brochure describing his home, which contains a separate office block consisting of a reception area and four

offices. This accommodation is inconsistent with the professed minimalist business lifestyle that Mr Macpherson claimed to lead. Mr Macpherson's frequent protestations of ignorance of things that had plainly been drawn to his attention at the time often resembled the most uninformative of "no comment" interviews.

27.    In other parts of his evidence Mr Macpherson gave evidence that I would not have expected from a witness doing his best to assist. Two examples will suffice to illustrate the point. The paperwork reveals that Alpha and Beta were replaced as directors of Elegant by a Mr Charles McLaughlin shortly before Elegant went into liquidation. Mr Macpherson was asked about him:

> "Q.  Who is Charles McLaughlin?
>
> A.  A director of the company.
>
> Q.  Have you ever met him?
>
> A.  No, I haven't, no.
>
> Q.  Does he exist?
>
> A.  I imagine he would -- of course he would exist."

28.    It is that last answer that is of interest, because some ten minutes later Mr Macpherson asserted that he had spoken to Mr McLaughlin on the telephone. A witness genuinely doing his best to assist the court would have recalled a telephone conversation in response to the question "Does he exist?"; or at least answered the question with a straightforward "Yes".

29.    On other occasions Mr Macpherson gave contradictory evidence. One of the issues was whether Mr Macpherson was the real decision maker; and whether he negotiated the acquisition of the site in Bray. One passage in his cross-examination went like this:

> "Q.    You have denied, haven't you, that you were the directing mind and will of Elegant.
>
> A.    That's correct, yes.  Apart from, obviously, when I did the acquisition and negotiated the deal in the beginning.  After that, it all got passed on to Mike Brown.
>
> …
>
> MR JUSTICE LEWISON:  Can I just make sure I am understanding your evidence, Mr Macpherson.  You told me that you found the site, and I take that to mean the site at Bray?
>
> A.  I did.  I negotiated the deal.  Because Mike Brown, being a director of the company in Guernsey, wouldn't be able to go out and find developments.  So with my

knowledge of the area and individuals that I know within certain industries, yes.

 MR JUSTICE LEWISON:  So you negotiated the deal with Mr Gray.

 A.  Mr Gray, yes."

30.    About ten or fifteen minutes later, another passage went like this:

"Q.   Why does Mr Gilbert talk about you making the repayments?  "Howard" rather than "Elegant".

A.    Obviously Mr Gilbert thought that because I was negotiating the deal, that I was going to be buying the site.  But it wasn't me.  Mr Gilbert did other work for me as well.

 Q.  What you just said is because you were negotiating the deal --

A.  No, thought I was negotiating the deal.  Thought I was negotiating the deal.

 Q.  He thought you were negotiating.

A.  Yes.

Q.  Who was negotiating it?

 A.  Mike Brown makes the ultimate decision, doesn't he?"

31.    This was an example of Mr Macpherson attempting to repair a damaging admission that he had made, and made clearly.

32.    On yet other occasions Mr Macpherson made allegations in his evidence that had not been put to witnesses who preceded him; and on one occasion he made allegations that directly contradicted what Mr Stewart had put on his behalf (and in his presence).

33.    In my judgment Mr Macpherson was doing his best to conceal the truth. As the narrative will reveal, he has a case to answer on the question whether he was the real decision maker. When I add to that his failure to call any witness to corroborate his version of events, and his failure to make any real disclosure of documents, I have no hesitation in drawing adverse inferences against him.

**The acquisition of the site**

34.    The site was owned by Fil Gray and Geoffrey Bryant as trustees of a pension fund. Mr Gray was an acquaintance of Mr Macpherson from the motor trade. On 18 December 2006 Mr Macpherson sent Mr Gilbert a copy of intended plans for the site. On 20 December 2006 Mr Gilbert wrote to Mr Macpherson. He sent him copies of the vendors' title to the land and reported on a possible ransom strip and on covenants burdening the land. There is nothing to suggest that a copy of the letter or its

enclosures was sent to Elegant's directors in Guernsey. On the following day Mr Gilbert sent Mr Macpherson the filed plan relating to the possible ransom strip. Again, there is nothing to suggest that a copy of the letter or its enclosures was sent to Elegant's directors in Guernsey. On 4 January 2007 Mr Gilbert e-mailed Mr Simon Gardner, who was the finance director of the trading company whose pension fund trustees were selling the site. The email referred to the heads of terms "that Howard and Fil discussed in some detail prior to the Christmas Break." He made some points about the financing of the deal and ended by suggesting that "Howard and Fil meet up when they hopefully can before the weekend." In turn Mr Gardner raised a point about net equity in the residential units. His comment was that he did not fully understand the point; and added "I think this needs checking with Howard". Mr Gilbert told Mr Gardner on 8 January that he had "advised Howard that VAT is technically payable". On 15 January Mr Gilbert e-mailed Mr Gardner to say that he understood "that Fil and Howard have now spoken on a number of occasions and finalised the Heads of Terms". Mr Bryant also had a meeting with Mr Macpherson on 15 January 2007. One of the terms agreed in the Heads of Terms was that the purchase price would be left outstanding on loan until 31 May 2007 and that Mr Macpherson would enter into a personal guarantee to secure payment of the purchase price plus interest. The purchase price was £4.8 million. The terms of the contract also included a warranty by Mr Macpherson that Elegant had power and legal capacity to enter into the contract. A draft contract was prepared; and Mr Gilbert faxed a copy of it to Mr Macpherson on 16 January 2007. Mr Macpherson said that because he was not going to give the personal guarantee he put the contract in the bin or shredded it. There is nothing on the file to suggest that Mr Gilbert sent a copy to Mr Brown in Guernsey. Exchange of contracts took place on 17 January 2007; and the sale was completed on the same day. Thus all the evidence is that Mr Brown took no part in giving instructions to Mr Gilbert on the acquisition of the site; the terms on which it would be acquired; the arrangements for leaving the purchase price outstanding on loan; the giving of the personal guarantee by Mr Macpherson or the approval of the final form of contract. All these things were done on the instructions of Mr Macpherson. In his oral evidence (in passages I have already quoted) Mr Macpherson appeared to accept that he negotiated the deal; but when this was pointed out to him he almost immediately attempted to resile from that evidence. The contemporaneous documents show clearly that Mr Macpherson was the driving force.

35.    Elegant's part of the contract was executed by Mr Gilbert, acting under a power of attorney. Mr Macpherson suggested that despite the terms of the contract he had not in fact given the contemplated personal guarantee. I reject that evidence. It is plainly contradicted by Mr Bryant's letter to Mr Gilbert of 17 January; Mr Gilbert's letters to Mr Macpherson and Mr Bryant of the same date; Mr Bryant's e-mail to Mr Gilbert of 16 April 2007; and Mr Gilbert's e-mail to Mr Macpherson of 17 April 2007 in which Mr Macpherson was asked to sign a revised guarantee following a reduction in the sale price. The fact that Mr Macpherson gave a personal guarantee of a loan made to Elegant is of considerable significance. There is no credible reason for Mr Macpherson having entered into an onerous liability of that nature unless he was the man behind Elegant and the man making the business decisions. In addition it gives the lie to Mr Macpherson's assertion that he binned or shredded the contract that had been faxed to him.

36.     Also on 17 January 2007 Mr Gilbert reported to Mr Macpherson that contracts had
        been exchanged and the sale completed.  He concluded his letter by saying:

> "For my file and to back up the authority I previously received
> from Elegant … please could you arrange for Mike Brown to
> authorise me to conclude all necessary contractual and Transfer
> documentation in respect of this property."

37.     There is nothing to suggest that Mr Gilbert reported exchange and completion to
        Elegant's directors in Guernsey at that time; nor that he took instructions from them
        directly. Mr Gilbert clearly regarded Mr Macpherson as the man who would
        "arrange" for Mr Brown to provide the necessary documents. This, too, is quite
        inconsistent with Mr Macpherson's evidence that Mr Brown took the decisions or that
        he gave instructions to Mr Gilbert. On 22 January Mr Gilbert wrote to Mr
        Macpherson to tell him that he had received a clear local search in respect of the site.
        There is nothing to suggest that he told Elegant's directors in Guernsey. Significantly,
        Mr Gilbert said in his letter that he thought he would advise Mr Macpherson of this
        because "we will need a clear search to complete funding". Plainly, from Mr Gilbert's
        perspective, Mr Macpherson was the person concerned with funding. Mr Macpherson
        denied that this was so; but his denial flies in the face of this letter and the absence of
        a comparable letter to Mr Brown. A few days later Mr Gilbert wrote to Mr
        Macpherson with a copy of the environmental site check search. Again he told Mr
        Macpherson that this search would be required "when we come to refinance the Site";
        and again there is no comparable letter to Mr Brown. There was some difficulty
        obtaining a drainage search; and Mr Gilbert commented to Mr Gardner on 30 January
        2007 that he was sure that it would be required "by Howard's Funders in due course".
        Clearly Mr Gilbert continued to regard Mr Macpherson as being in charge of
        arranging funding. This, too, is inconsistent with Mr Macpherson's attempt to
        distance himself from the transaction. If Mr Gilbert had got the wrong end of the stick
        it would have been easy for Mr Macpherson to have told him so; but he did not. It was
        the reference to "Howard's Funders" that caused Mr Macpherson to change his
        evidence in the course of his cross-examination.

38.     On 6 February 2007 Mr Gilbert wrote to Mr Brown in Guernsey. He informed him
        that the purchase had been completed on 17 January; and he asked for a cheque to pay
        the stamp duty and VAT. This was some three weeks after both contract and
        completion; and there is nothing to suggest that Mr Brown was notified any earlier.
        This long gap contradicts Mr Macpherson's case that it was Mr Brown who made the
        decisions. Mr Gilbert did not then supply Mr Brown with any of the documents that
        he had told Mr Macpherson would be needed to obtain funding. It was not until 27
        February 2007, another three weeks later, that Mr Gilbert sent a copy of the contract,
        the loan agreement and the completion statement to Elegant in Guernsey in response
        to a request for "documentation for your file". He still did not provide Mr Brown with
        any of the documents that he had told Mr Macpherson would be needed to obtain
        funding. There is no indication on the file that he ever did.  Following completion in
        mid-April 2007 it was agreed that the purchase price would be retrospectively reduced
        to £4 million plus VAT. The reduction in price was agreed between Mr Macpherson
        and Mr Gray. The reasons for it are mysterious. Mr Brown was not involved.

39.     The reduction in the purchase price also meant that the associated documentation needed to be amended. On 17 April 2007 Mr Gilbert sent an e-mail to Mr Macpherson, enclosing copy documents. In his e-mail he said:

> "Please could you urgently check the VAT situation with Andrew Isles.
>
> Please could you also sign the variation of the Loan Agreement where marked … so I can then sign it on behalf of Elegant Homes and complete this documentation….
>
> Needless to say stamp duty … will then be owed… I am assuming that you will be happy for me to discharge this out of the loan facility offered against this Development assuming you are not in funds now to deal with this."

40.     There is nothing to suggest that Mr Gilbert made any similar request to the directors of Elegant in Guernsey. Thus Mr Gilbert was seeking instructions from Mr Macpherson about the way in which he was to discharge the stamp duty. In other words Mr Macpherson had control over the money.

41.     On 27 April 2007 Elegant and Howard Construction Ltd entered into a JCT form of building contract for the construction of 30 dwelling units on the site for the contract price of £3.721 million. Mr Macpherson said that he "negotiated" the contract price directly with Mr Brown. But Mr Brown had no personal experience of property development; and according to Mr Macpherson himself when the deal was first presented to Elegant it was he (Mr Macpherson) who provided Mr Brown with information about building costs, sale prices and land values. In my judgment it is fanciful to regard this as an arms' length deal. Mr Brown simply agreed to what Mr Macpherson put into the contract.

42.     Drafting problems arose over the revised TR1. Mr Gilbert faxed copy correspondence about this to Mr Macpherson. Mr Brown was not involved in this.

**The loan from BOS**

43.     The purchase price had been left outstanding on loan to Elegant, backed by Mr Macpherson's personal guarantee. This is where BOS comes into the picture. Mr David Squire of BOS made a site visit on 26 February 2007.  He was accompanied by Mr Macpherson, who he thought was a representative of Elegant on the sales side. He regarded Mr Macpherson as a "relatively experienced property guy". Mr Squire prepared a report on the proposed loan some time in the following month. In order to prepare that report he talked to both Mr Macpherson and Mr Brown.  But the only person he met face to face in all his dealings with Elegant was Mr Macpherson. Mr Macpherson suggested in his evidence that Mr Brown attended a meeting with Mr Squire. This was not put to Mr Squire in cross-examination; and I reject the suggestion. In Mr Squire's introduction he said:

> "[Elegant] was formed in 2004 for the purpose of property development in areas west of London. The company is an offshore company operating out of Guernsey. It is managed by

> Mike Brown of Confiance Ltd – well known to BOS (ICF) for their experience and expertise in the establishment of tax efficient offshore structures, on behalf of Howard Macpherson who is the beneficiary and only shareholder.
>
> The Howard Macpherson group of companies (including [Elegant]) have been BoS customers since May 2001 and have successfully completed over 5 property developments of their own with us. HM has a number of smaller UK based development companies through which he previously undertook developments, establishing a separate banking relationship for each company…
>
> The UK companies have not been used for the past couple of years due to tax advantages of using [Elegant]
>
> With these tax advantages running out at the end of the year, from 2008 HM will be undertaking all development work through one UK based company, Howard Homes Ltd.
>
> By maintaining our relationship with [Elegant], BOS will be in pole position to deal with future development funding for Howard Homes Ltd."

44.  This information came either from Mr Macpherson or Mr Brown. Which of the two does not matter; because whichever of them gave the information to Mr Squire, it is clear that Mr Squire was told that Elegant was managed on behalf of Mr Macpherson; and that Elegant was part of Mr Macpherson's group of companies. He went on to describe Mr Macpherson's previous development experience and his considerable personal wealth. In describing the former he said that Mr Macpherson had "built up cash reserves to an extent that he was able to purchase the Bray site (covered in this application) for circa £4.8m in cash." This was doubly untrue. In the first place no cash had been paid for the site, because the whole of the purchase price had been left outstanding on loan from the vendors. Second, the headline price was no longer £4.8 million, because it had been reduced to £4 million. If Mr Macpherson is to be believed, there was a third false statement, namely that "he" was able to purchase the Bray site. Since these statements are made in the course of describing Mr Macpherson's personal experience and wealth it is very unlikely that Mr Squire obtained this information from Mr Brown. He must have got it from Mr Macpherson, who fed him lies. But if he got this information from Mr Brown, it only goes to show that even Mr Brown was unaware of the true details of the transaction. Either way, it puts Mr Macpherson firmly in the driving seat.

45.  Under the heading "management" Mr Squire commented:

> "HM has built up a good team at [Elegant] including an experienced construction team (in HCL), project management team and sales team."

46.  He noted that Elegant was close to agreeing the sale of the 9 social housing units to a housing association. This information came from Mr Macpherson. He referred to

valuations and appraisals of construction costs. The bank's valuer had put a value on the site of £4.45 million. Mr Squire commented that this was to be compared with the "figure of £4.8m that HM has paid for the site". This information came from Mr Macpherson. As I have said both components were untrue. Mr Squire proposed security which would include a first charge over the whole site. His recommendation included the following:

> "We have had a successful relationship with HM and his development companies since 2001… We now have an excellent opportunity to provide funding on his new development site in Bray…"

47.    The purpose of the loan was the refinancing and development of 30 units at the site in Bray; and the restructuring of another loan secured on a site at Farnham Common which Elegant also owned. The term of the loan was 18 months; but there was to be "bullet repayment on sales of finished units." Mr Squire explained that this meant that if a finished unit were sold, and the net proceeds of sale paid over to BOS, then BOS would release that unit from the charge. However, this commercial expectation was not reflected in the formal legal documents, under which BOS was entitled to repayment of the entirety of the loan on demand. The loan was to be limited to 75 per cent of land value and building costs as confirmed in QS certificates. Mr Squire was sure that Mr Macpherson understood the purpose of the loan; and of the expectation of bullet repayments. Mr Macpherson professed ignorance about the terms of the loan. I did not believe him; and I accept Mr Squire's evidence. It is quite clear that, despite his denials, Mr Macpherson was instrumental in arranging funding for the development and that it was because of BOS' relationship with him personally that they were willing to advance the money.

48.    In my judgment it is plain that Mr Squire regarded Mr Macpherson as being effectively the man behind Elegant:

i)    He was the only person that Mr Squire met face to face;

ii)    He was the provider of much of the information about Elegant that Mr Squire included in his report;

iii)    Mr Squire described Mr Macpherson as the sole shareholder and beneficiary of Elegant;

iv)    Either Mr Brown or Mr Macpherson told him that Elegant was managed on behalf of Mr Macpherson;

v)    He described Elegant as being one of the Howard Macpherson group of companies;

vi)    He referred to Mr Macpherson having built up a good management team at Elegant;

vii)    Mr Squire referred to the price "that HM" had paid for the site; and referred to the site as "his new development site at Bray."

viii)   Although he said that Mr Brown was known to the bank as having experience and expertise in the establishment of tax efficient offshore structures, he did not say that Mr Brown was known to have any experience of property development in the UK.

49.    It is true that Mr Squire accepted in cross-examination that when it came to the "nitty-gritty of financial matters" he would be in touch with people in Guernsey. But that does not, in my judgment, detract from the overall picture. As Mr Squire said of Mr Macpherson and Elegant: he always "put the two together". I find, therefore, that Mr Macpherson negotiated and agreed the terms of the loan from BOS, just as Mr Gilbert had foreshadowed.

50.    BOS accepted Mr Squire's recommendation; and made an offer of a loan on 30 April 2007. The amount offered was £6.2 million. The purpose of the loan was to refinance the property and to fund development costs. Field Fisher Waterhouse dealt with the legal side of things for BOS. Mr Loeser of Confiance had asked Mr Gilbert to comment on Field Fisher's fee proposal; which he did on 6 March. In anticipation of the offer of a facility Elegant was required to provide a legal opinion from Guernsey lawyers about its capacity to enter into the transaction. Mr Gilbert corresponded with Mr Loeser about that.

51.    The signed facility letter contained the following relevant provisions:

"The Borrower may only use the Term Loan to help refinance the Property and to fund Development Costs." (Clause 2.1)

"…the Borrower shall be entitled to utilise the Term Loan only if (a) the Borrower has served at least two Business Days' written notice of its intention to drawdown; (b) … the notice … is accompanied by evidence acceptable to BoS … that the proposed drawdown is to pay a sum which is properly due and payable by the Borrower as part of the Development Costs …" (Clause 2.3)

"In accordance with normal banking practice the Term Loan will be repayable on demand at all times." (Clause 2.5)

52.    There was also a covenant not without the consent of BOS to "dispose of or part with control of … any asset or undertaking…" (Schedule 3 para 3.3).

53.    The Charge was put in place on 1 June 2007 and Elegant immediately drew down the funds needed to pay the purchase price. Thus all the cash for the purchase was provided by BOS, despite the fact that BOS had only intended to lend 75 per cent of the purchase price; and had not been told that the purchase price had been reduced from £4.8 million to £4 million.

**The sale to TVHA**

54.    On 7 August 2007 TVHA made a written offer, subject to contract, of £1.64 million for the acquisition and development of 9 new affordable homes for social rent and shared ownership at the site in Bray. The offer was addressed to Mr Mike Brown in

Guernsey. The documents do not reveal how this offer came to be made. Mr Dale Reynolds appears to have fronted the negotiations. He was described as Elegant's sales agent. But he did not give evidence; and his files were not disclosed. On 2 January 2008 he sent a copy of the heads of terms to Mr Gilbert. The aggregate price had been split into two components. The purchase price for the land was now £775,000; and it was a term of the agreement that the purchasers would engage Howard Homes Construction to carry out the building works. The distribution list included both Mr Macpherson and Mr Loeser (misspelled as Loussier). If Mr Macpherson was as uninvolved in the sale and as indifferent to it as he professed, the fact that he was on the distribution list is inexplicable. Within a few days Mr Gilbert contacted Mr Ainsworth at Andersons, TVHA's solicitor. On 8 January Mr Gilbert sent Mr Loeser in Guernsey a client care letter, which was the basis of Willmett's retainer. It thanks Mr Loeser for instructing Willmett. Interestingly the letter was not sent to Mr Brown. Mr Loeser does not appear to have had any official role in Elegant or, indeed, in either of its corporate directors. It was common ground that he was very junior within the organisation of Confiance. The inference I draw is that the client care letter was simply part of the paper trail.

55.     In the following few days TVHA raised some questions about Howard Homes Construction which were the subject of e-mail traffic between TVHA and Mr Reynolds. Mr Reynolds passed these on to Mr Gilbert on 21 January. His suggestion was that instead of TVHA entering into a JCT contract with Howard Construction, the contract should be made between TVHA and Elegant. On 5 February Mr Gilbert sent an e-mail to both Mr Reynolds and Mr Macpherson. It read:

>       "Instructions please.
>
>       Can we ensure that the HOT's are properly negotiated and agreed on the other o/s units before I am instructed unless Howard specifically requires my input on the terms."

56.     It is plain from this e-mail that Mr Gilbert was looking to Mr Macpherson for instructions. There is no comparable e-mail to Mr Brown. In his oral evidence Mr Macpherson said that he did not normally deal with the negotiation of heads of terms; and that Mr Gilbert might have wanted his input because he was the builder. I did not believe this evidence. In my judgment Mr Gilbert was recognising that Mr Macpherson was the person to give him instructions. Mr Reynolds was concerned about the structure of the contract and suggested that the contract should be a conditional one subject to a section 106 agreement. He said that he had "copied in Howard so he is aware". The e-mail was not copied to Elegant's directors in Guernsey. This e-mail exchange gives the lie to Mr Macpherson's protestations that the sale to TVHA was nothing to do with him.

57.     In his e-mail of 6 February Mr Reynolds raised further points with Mr Gilbert. Mr Macpherson was copied in but Elegant's directors were not. E-mails about the correct method of accounting for VAT passed between Mr Gilbert, Mr Reynolds and Mr Isles. Many of these e-mails were copied to Mr Macpherson. None was copied to Mr Brown. Discussions were also proceeding about the building contract to be made between TVHA and Elegant. In the course of those discussions Mr Reynolds reported to Mr Russell Stevens (the QS who worked for Howard Construction Ltd) that he would agree land values and the contract price "with Howard". Mr Reynolds copied

in Mr Macpherson on almost all his e-mails. He did not copy in any of Elegant's directors in Guernsey. There was no reason for Mr Macpherson to be involved in agreeing land values or the contract price for a contract to which neither he nor Howard Construction Ltd were to be party, unless he was the real decision maker for Elegant.

58.     Mr Ainsworth of Andersons prepared a draft contract and transfer for the sale by Elegant to TVHA. He e-mailed them to his client on 14 March. TVHA forwarded them to Mr Reynolds and he, in turn, forwarded them to Mr Macpherson and Mr Gilbert (among others) on 17 March. Mr Brown was not on the distribution list. Mr Reynolds said that he would be in touch later that day. On 26 March Mr Reynolds forwarded to Mr Gilbert and Mr Macpherson (among others) a draft deed of variation to a section 106 agreement that would need to be finalised before the sale to TVHA. Mr Brown was not on the distribution list.

59.     On 27 March 2008 Elegant executed a power of attorney in favour of Mr Gilbert and Ms Burns authorising them to execute documents relating to the onward sale of Plots 1-9. Accompanying that power of attorney was a minute of a board meeting of Elegant attended by Mr Brown and Mr Falla, at which the grant of the power was approved. The minute recorded that the attorney was to enter into a JCT design and build contract (and ancillary documents). The power of attorney itself was tabled; but the minute does not record that any other document was tabled. It appears, therefore, that the meeting was not shown the contract with TVHA or any of the other conveyancing documents. This is consistent with an inference that Mr Macpherson was the real decision maker.

60.     On 1 April 2008 Ms Burns of Willmett e-mailed a number of people (including Mr Macpherson and Mr Reynolds, but not Mr Brown) raising queries. One of these related to the amenity land, which had to be defined in the transfer to TVHA. Mr Macpherson professed in evidence to have been uninterested in this e-mail; but when Mr Reynolds e-mailed to say that he did not know its precise location, Mr Macpherson supplied the answer by e-mail six minutes later. He must have been keeping a very close eye on things. His prompt action gives the lie to his evidence that he did not pay attention to e-mails and that many e-mails were copied to him by mistake. He tried to explain his response to this e-mail by saying that it was a question of building, and that he was the building contractor. Not only was it not a question of building; but even if it had been he would have had to have read all e-mails sent to him in order to distinguish between those that related to building and those that did not.  Mr Reynolds e-mailed Mr Macpherson half an hour later about the location of the amenity land; and the identity of the management company which would manage it. He said that he had arranged a meeting with a Mr Power and would "continue to keep you posted".

61.     Discussions between the respective solicitors were continuing over the form of the documentation. On 2 April 2008 Andersons sent Willmett requisitions on title on the standard Oyez form. On 4 April 2008 Willmett replied, but by reference to a different set of standard requisitions. Requisition 6.1 asked:

> "Please list the mortgages or charges secured on the property which you undertake to redeem or discharge to the extent that

they relate to the property on or before completion (this includes repayment of any discount under the Housing Acts)."

62.     Requisition 6.2 is accompanied by a warning:

"WARNING: A reply to requisition 6.2 is treated as an undertaking. Great care must be taken when answering this requisition."

63.     The requisition itself asks:

"Do you undertake to redeem or discharge the mortgages and charges listed in reply to 6.1 on completion and send us Form DS1, DS 3, the receipted charge(s) or confirmation that notice of release or discharge in electronic form has been given to the Land Registry as soon as you receive them?"

64.     The replies were:

"6.1 We undertake only in respect of the Charge in favour of Bank of Scotland plc dated 1st June 2007 and registered on 16th January 2008. If your official copy of register entries or search at the Land Registry reveals any other subsisting charges, please let us know immediately.

6.2 Confirmed."

65.     Mr Halpern did not rely on anything in the file to show that Mr Gilbert obtained specific instructions at that time from Elegant (or anyone else) to give that undertaking. His covering letter described the replies as "our standard Replies to Requisitions on Title". Nor did he rely on anything in the file to suggest that Mr Gilbert enquired of BOS what they would require in order to release Plots 1-9 from the charge. However, Mr Gilbert gave an account of what had happened in subsequent instructions to counsel which he prepared. Those instructions contained the following assertions:

i)      Mr Gilbert's instructions in the transaction came from Mr Macpherson "of Elegant";

ii)     Before giving the undertaking Mr Gilbert's instructions from Mr Macpherson were that BOS had agreed to provide form DS 3 and release the land from the charge without "submission of any funds" on the basis that the transaction was a sale of land only and Elegant were to enter into a JCT contract with TVHA;

iii)    Mr Gilbert confirmed these instructions with Mr Squire by telephone.

66.     It is accepted by Willmett that the last of these assertions was false. In a chronology appearing on the file, which may also have been provided to counsel, it is said in relation to the undertaking:

"JG instructed prior to this that HMc has agreed with David Squire at BOS that 1-9 can be released on sale without any

payment being necessary due to transaction being a sale of land
with JCT."

67.    It is difficult to know what to make of these instructions and chronology, in the light
of Willmett's acceptance that at least part of it was untrue. So I have not relied on
them in reaching my conclusions.

68.    In his oral evidence Mr Macpherson accepted that he knew that:

i)    The seller of land is expected to discharge any mortgage over the land to be
sold;

ii)    The mortgagee will not release the charge until he has been paid;

iii)    The potential impasse between a buyer who does not want to part with his
money until the charge has been released and a mortgagee who does not want
to release his charge until he has received the money needed to discharge the
secured debt is overcome by the giving of an  undertaking by the seller's
solicitors to the buyer's solicitors to procure the discharge of the charge on
completion.

69.    In my judgment Mr Macpherson knew that Willmett would give the undertaking as a
matter of routine conveyancing practice. He also knew that BOS would not release its
charge over the Plots unless it was paid an appropriate sum. As I have said, it was Mr
Macpherson who had arranged and agreed the initial loan from BOS; and he was the
man with whom Mr Squire dealt. The responsibility for agreeing how much of the
loan needed to be repaid in order for BOS to release its charge over Plots 1-9 was not
Mr Gilbert's. It was Elegant's; and for this purpose that means Mr Macpherson. Mr
Macpherson took no step to agree with BOS how much should be repaid in order for
the charge to be released over the plots.

70.    Contracts were exchanged on 11 April 2008. Completion was scheduled to take place
on the same day. Clause 8.1 of the contract required Elegant to transfer the property
with full title guarantee. Clause 9 of the contract required Elegant to sell free from
charges securing the repayment of money. In their letter to Mr Gilbert of that date
Andersons enclosed TVHA's part of the contract and said that they looked forward to
receiving (among other things) "form DS1 executed by Bank of Scotland in
accordance with the Undertaking contained in your replies to Requisitions." Transfers
(in form TR1) were executed on the same day, and recorded that Elegant transferred
the property with full title guarantee.

71.    The effect of the Law of Property (Miscellaneous Provisions) Act 1994 is that a full
title guarantee includes:

i)    A covenant that the seller is selling the property free from all charges and
incumbrances (other than those which he does not know and could reasonably
be expected to know about) (section 3 (1)) and

ii)    A covenant that the seller will at his own cost do all that he reasonably can to
give the buyer the title he purports to give (section 2 (1)(b)).

72. On 21 April 2008 Mr Loeser of Elegant sent an e-mail to Mr Gilbert. It said that Mr Brown had requested him to give Mr Gilbert Elegant's bank details; and he gave them. The e-mail ended:

> "Please confirm how much you are sending to the account and I
> shall confirm receipt once it has been received."

73. It is, to my mind, significant that Mr Loeser's e-mail did not instruct Mr Gilbert to make any payment: it assumes that instructions had already been given. There is no trace of Mr Brown having given any instructions to make a payment: the e-mail simply says that Mr Brown had asked Mr Loeser to supply bank details. Two days later he asked whether Mr Gilbert had "made the payment" to Elegant's account with Barclays. That e-mail was headed "Funds". Mr Gilbert forwarded that e-mail to Mr Macpherson under the same heading. Mr Gilbert added:

> "Status on the rbs second charge?"

> To which Mr Macpherson replied

> "I was out with rbs yesterday he's on the case"

74. Mr Macpherson said that he did not read Mr Loeser's e-mail and that the RBS charge was a charge that he was contemplating in connection with another transaction. But I find it significant that Mr Gilbert forwarded Mr Loeser's e-mail to Mr Macpherson under the same heading (Funds) and attached his own query. The obvious inference is that they were linked in some way. The likely explanation is that Mr Macpherson needed money from one source or another; and that the two possible sources were either a payment by Elegant or the raising on money on a second charge from RBS.

75. On 25 April Mr Gilbert paid the net proceeds of sale (£667,366.61) from Willmett's client account to Elegant. The money did not go towards redemption of the BOS charge. Mr Macpherson says not only that the request for payment was nothing to do with him; but also that he was unaware of it until October 2008. I do not believe him. In my judgment he instigated the instructions to make the payment to Elegant. It is not the sort of decision that Mr Brown would have made.

76. At some time in April Howard Construction Ltd went into insolvent liquidation. Mr Macpherson, who was its sole director and principal shareholder, told no one. But he incorporated another company called Howard Construction (Southern Ltd) which "took over" the building contract. Mr Macpherson was the initial subscriber for the shares in Howard Construction (Southern) Ltd, and its sole director. There is no evidence of any negotiation or discussion about this "take over". It appears simply to have been something that Mr Macpherson decided to do. Mr Macpherson confirmed in his oral evidence that the JCT contract between Elegant and Howard Construction Ltd was never revised. The contract would (or should) have been a profitable one for Howard Construction Ltd. So the diversion of the remaining benefit of the contract to Howard Construction (Southern) Ltd was, on the face of it, a fraud on Howard Construction Ltd's creditors. About six months later the shares were re-registered in the name of Russell Stevens, the quantity surveyor who worked for Mr Macpherson and his companies. Mr Macpherson said, in effect, that he gave the company to Mr Stevens. Yet Mr Macpherson continued to guarantee that company's bank loan and continued to carry out

work (unpaid according to his evidence) on its behalf. The obvious inference is that Mr Stevens was simply a front for Mr Macpherson. Mr Stevens was one of those who was not called to give evidence.

77.    Some time in April, or possibly in early May 2008, Mr Squire produced a follow up report. The occasion for this report was a request by Elegant to increase the facility by £391,000. Mr Macpherson took Mr Squire to see the site, and explained that there was more contamination of the soil than had been anticipated. Mr Squire's report commented that construction on the private units had progressed well. He commented that:

> "Construction on the 9 affordable units did not commence until an exchange took place with [TVHA] on 31/3/08."

78.    In two other places in this report he also said that TVHA had exchanged on the affordable units. In one of them he said:

> "The asking price figure for the affordable units is the agreed sale price on which [TVHA] has exchanged. Under this agreement stage payments will be made as certain construction stages are reached. These funds will be used to reduce the development facility."

79.    The information about the contractual structure was given to Mr Squire by Mr Macpherson. Again it was Mr Macpherson who negotiated and agreed the increase in the loan. Mr Squire was unaware that the arrangement included a separate JCT contract covering the construction works; he thought that TVHA had agreed to buy the completed units, and that any stage payments would be used to reduce the loan rather than going straight into the corporate pocket of Elegant. He was also unaware that the contract with TVHA had in fact been completed. If he had known the true facts, BOS would not have agreed to increase the facility and would not have allowed further drawdowns. There is also on the bank's file a schedule which bears the date 21 April 2008. This purports to be a schedule of the situation as regards the progress towards sale of the various units on the site. In relation to Plots 1-9 it says that they are "currently under offer to Housing Association". If this document had been supplied to the bank after 11 April, it would have been untrue. Ms Steele produced the schedule during the course of her evidence, after Mr Squire had left the witness box. She had no personal knowledge of how it came to be on the bank's file; but she expressed the view that the date it bore was likely to have been the date on which the bank received it. That seems to me to be the correct inference to draw. The conclusion it leads to is that BOS had been given untrue information. In addition despite the fact that there was in place a JCT contract between TVHA and Elegant under which TVHA paid the building costs of the social housing units direct to Elegant, Elegant continued to claim drawdowns from BOS against QS certificates that included the cost of that work. Elegant were thus being paid twice for the same work. None of this was known to BOS at the time.

80.    Andersons began to chase for the form of partial release by BOS of the Charge over Plots 1-9 (Form DS 3 rather than DS1).  On 27 May Mr Gilbert confirmed that he was chasing BOS for the required form. Correspondence with BOS produced no results.

81.     Mr Squire had left BOS sometime in mid-May 2008. His role was taken up by Mr Manwaring and Ms Steele. They arranged a meeting on about 10 June 2008 "to meet the company". Elegant were, according to the minutes of the meeting, represented by Mr Walker and Mr Macpherson. Mr Manwaring thought that Mr Macpherson was the human being who "was the company".  Ms Steele thought he was "the guy behind" Elegant. Mr Walker was the sales man who had an office on site. The meeting discussed the site at Bray among others. The bank were told that discussions were at an advanced stage with TVHA but that no agreement had been signed. Since contracts had been exchanged on 11 April, and the transaction had already been completed, this was untrue. The bank were also told that the potential value of that part of the site was £1.7 million. That was also untrue. It had been sold for £675,000; and the payments made under the JCT contract were going direct to Elegant. Neither Mr Manwaring nor Ms Steele could remember which of Mr Walker and Mr Macpherson gave them that information; but both recalled that it had been given to them at that meeting. The information also contradicted what BOS had previously been told, as recorded by Mr Squire: namely that TVHA had already exchanged contracts on the nine affordable units. Although Mr Manwaring queried this at the time, he appears to have accepted what he was told. Neither he nor Ms Steele contacted Mr Squire to see whether there was an explanation for the discrepancy. This meeting is also of considerable significance in evaluating the veracity of Mr Macpherson's evidence. When Mr Stewart was cross-examining Mr Manwaring and Ms Steele he made it clear that he was not suggesting that Mr Walker might have said something at the meeting out of earshot of Mr Macpherson. Mr Macpherson was present in court throughout those cross-examinations. But when Mr Macpherson came to give his own evidence that was precisely the suggestion that he made. He also gave an elaborate account of how the meeting progressed round the site while he pointed out the various stages that construction had reached. None of that was put to Mr Manwaring or Ms Steele. In my judgment Mr Macpherson made it up in the witness box.

82.     On 18 July Mr Manwaring e-mailed Mr Isles commenting on a number of sites. As regards Bray he said that he would welcome an update; and suggested a meeting with Mr Isles and Mr Macpherson to discuss progress. He wanted to meet Mr Macpherson because he thought that he was involved in the running of the company. He gave a number of potential dates. On 29 July Mr Manwaring e-mailed Mr Isles and Mr Macpherson. He said that he had had a request from Confiance to make a further drawdown on the Bray facility "which I am disinclined to make until we have spoken/met and I am fully updated with regard to the various positions". He also said that since the main contractor on site was Howard Construction Ltd, he could see no reason to make a payment to Howard Construction (Southern) Ltd. No one had told him that Howard Construction Ltd had gone into insolvent liquidation; and that Howard Construction (Southern) Ltd had "taken over" the contract. Mr Manwaring chased this up on 7 August.

83.     By the beginning of August Andersons were concerned that their clients' registration of title would be rejected as a result of the failure to provide form DS3. On 1 August 2008 they escalated the matter to the senior partner of Willmett, threatening to report the firm to the Law Society for breach of its undertaking. Towards the end of the month Mr Melvin Berryman, Willmett's managing partner, became involved.

84.     Towards the end of August arrangements were in hand for a meeting between BOS and Messrs Macpherson and Isles. No one suggested that Mr Brown should attend. The meeting was arranged for 18 September. It took place at Mr Macpherson's home and was attended by Messrs Macpherson and Isles; and by Mr Manwaring and Ms Steele. Neither Mr Manwaring nor Ms Steele had a detailed recollection of that meeting. One of the topics of the discussion was another site at Jordans which Howard Homes were developing. That development had run into trouble because there were restrictive covenants which prevented the implementation of the planning permission. But Mr Manwaring also said that they would have enquired about the position of the social housing units at Bray; and I accept that evidence. He was still unaware that the sale to TVHA had been completed and that there was a separate JCT contract in place. Mr Manwaring's recollection was that he was told at that meeting that Willmett were holding £667,000 of funds from TVHA. I accept that evidence. Following the meeting Mr Isles e-mailed Mr Manwaring to thank him for the meeting. He said:

> "Howard and I are both aware of the Bank's position and we hope that we can all move forward in a positive frame of mind."

85.     He referred to the three ventures (Jordans, Farnham Common and Bray) indiscriminately and explained to Mr Manwaring that there had been a change of strategy at Bray which included renting out the remaining flats. There is nothing to indicate that Mr Brown was involved in this change of strategy as regards Bray. I infer that the change was instigated by Mr Macpherson. Willmett were continuing to press BOS for form DS3. Ainsworth were continuing to press Willmett. On 22 September Ms Steele e-mailed Ms Burns at Willmett to say that they were still waiting for details of the housing association contract to be checked by their lawyers. She added that "We have been asked to release the security for these plots but have received no funds and no detailed information." Mr Berryman now took a closer interest in what was going on. He had thought until late September that there was simply an administrative problem; but by the end of the month he realised, having spoken to Ms Steele, that the problem was more serious. At this stage however, he still believed the false information that Mr Gilbert was feeding him about his (fictitious) agreement with Mr Squire which would have allowed the release of Plots 1-9 from the Charge without any concomitant payment to BOS. In early October Ms Steele seems to have become aware that there was a separate JCT contract relating to Plots 1-9 and that BOS were due funds in that respect. Mr Gilbert sent a copy of the JCT contract to the bank's lawyers on 7 October. Mr Berryman said that in early October he and Mr Gilbert went to see Mr Macpherson at his home. Mr Macpherson denied that any such meeting had taken place. This is a stark conflict of fact. In my judgment it cannot be explained by a failure of recollection. One or other of these witnesses was deliberately not telling the truth. Mr Berryman said that he and Mr Gilbert went to see Mr Macpherson because they believed that he was, for all practical purposes, Elegant ("the owner, manager, director, whatever"). As Mr Berryman put it in another passage of his oral evidence, Mr Macpherson "pulled all the strings for Elegant". Mr Berryman's account is recorded in a contemporaneous attendance note made by Mr Ainsworth of Andersons recording that Mr Berryman had told him that he had been to see one of Elegant's directors at his home in Buckinghamshire (which is where Mr Macpherson lives). This is, of course, a

previous consistent statement and thus is not technically corroboration; but it tends to undermine any contention that Mr Berryman's evidence is a recent fabrication. Mr Berryman had no reason for making up this meeting. In addition Mr Berryman gave a number of peripheral circumstantial details which, in my judgment, gave verisimilitude to his account. In the course of his re-examination Mr Macpherson produced documents which, he said, contradicted some of those circumstantial details. Mr Halpern had no opportunity to cross-examine him on those documents, which did not strike me as decisive. In the light of my overall impression of Mr Macpherson I have no hesitation in preferring Mr Berryman's evidence to his. Mr Berryman said that the purpose of the meeting was to see if Mr Macpherson would refund the money to Willmett. Mr Macpherson said that he would see what he could do; but no promises were made.

86.    On 7 October 2008 TVHA contacted Mr Morellec at Confiance in Guernsey to ask what the problem was with obtaining the DS3. Mr Morellec in turn asked Mr Gilbert and Ms Burns. His e-mail went unanswered. After a chasing e-mail Mr Gilbert gave a stalling answer. Mr Brown was not involved in this exchange; and the Confiance personnel were asking questions rather than making decisions.

87.    Mr Manwaring complained to Mr Isles in his e-mail of 8 October 2008 that the level of information about Bray was "pitiful". He complained that:

> "The Bank has received no funds in respect of the Social housing element at Bray, notwithstanding that we are led to believe that a contract is in place and the land sale proceeds are held by Willmett solicitors. We are requested to sign the Deed releasing the security of the social site from our charge which we are not prepared to consider until we have sight of the contract of sale ... and until we can "secure" the proceeds of the development funding provided by the HA …"

88.    The essence of Mr Isles' unhelpful response (copied to Mr Macpherson but not to Mr Brown) was that it was Wilmett's problem rather than the Bank's. In his reply of 9 October Mr Manwaring disagreed. He pointed out that £315,000 of the bank's money had been drawn "on an element of the site where we are now unsure of the contractual position especially with Willmetts holding c. £667k of funds from the HA presumably relating to the cost of the land!" He said that the bank had been requesting copies of the contract for weeks, and had still not received it; and that they were becoming increasingly exasperated at the lack of meaningful information "from the sols/Guernsey". He asked both Mr Isles and Mr Macpherson to "bring some pressure to bear". Plainly he thought that Mr Macpherson had pressure that he could bring to bear if he chose to. It is equally clear that those in Guernsey did not know what was going on.

89.    Mr Gilbert sent the sale contracts to BOS' lawyers on 10 October together with another copy of the JCT. His calculation was that just over £1 million needed to be transferred to BOS in order to obtain the release. Ms Steele's reply was that that was £700,000 less than the bank were due; but overall her response was not unhelpful. It now emerged that BOS had been funding the construction costs, even though TVHA were paying those costs directly through the building contract with Elegant. Mr Gilbert continued to press for form DS 3. On 13 October 2008 BOS' solicitors wrote

to Mr Gilbert. BOS' position was that BOS had agreed a facility of £6.3 million with the initial drawdown covering the purchase cost. They continued:

> "The deal was structured around the fact that your client would construct dwellings on Plots 1-9 and would sell the land and dwellings to [TVHA] for £1,750,000 from which our client would be repaid approximately £1,700,000."

90.    They intimated that BOS required payment of £1.6 million (being the aggregate of the total consideration payable by TVHA under the sale contracts and the JCT contract), and to retain security over the rest of the land before they would release the land. Mr Gilbert's response was that Elegant were not prepared to proceed on that basis. There is no evidence that he took instructions from Mr Brown before replying. In an e-mail to Mr Isles and Mr Macpherson of 16 October 2008 Mr Manwaring reaffirmed the Bank's position. He added:

> "As it would appear that Willmett's hold some of the build contract monies, it would suggest that the HA are paying these over and yet the Bank has advanced funds against the Social development upon receipt of QS reports – hence my previous comments in emails that I will not be advancing further drawdowns in this regard until we resolve the position. I spoke to Michael Brown at Confiance on Tuesday morning to try to resolve and he said he would come back to me - 48 hrs later no contact."

91.    Mr Gilbert wrote to Ms Steele on 16 October 2008. He said that he had agreed with Mr Steele that BOS would release the plots from the charge and that he gave Willmett's undertaking in reliance on that agreement. Mr Squire denies that any such agreement was made. Willmetts accept his denial; and accept that Mr Gilbert's allegation of an agreement was a dishonest lie. Mr Gilbert's letter also revealed to BOS for the first time that he had "released funds" to Elegant on completion of the sale to TVHA in April. They had previously thought that Willmett still retained that money.

92.    In the following week Mr Manwaring pressed for a meeting with Mr Isles and Mr Macpherson. He asked them to contact Willmett to request the immediate transfer to BOS of funds that they held in respect of sale proceeds at Farnham Common, which he understood amounted to over £500,000. It was only now that he made real contact with Mr Brown in Guernsey. He asked Mr Brown to instruct Willmetts to pass over to the Bank monies that they were holding as the sale proceeds of units on a different site in Farnham. Mr Brown replied that he would get onto it right away. Mr Manwaring responded by saying that BOS "only had confirmation last week" that Elegant had entered into a separate contract with TVHA for the social development on the site. He complained that the sale proceeds of £675,000 had been paid over to Elegant instead of to the bank; and that he had been told by Mr Isles that the money had been used to fund the development and that Elegant could not pay it back. He said that he was urgently seeking a meeting "with the company UK representatives". Elegant's UK representatives included Mr Macpherson. He also complained that BOS had been making payments against QS certificates in ignorance of the JCT contract under which TVHA were also paying for building costs; and said that the effect of

this was that Elegant were being paid twice for the same work. On 20 October Mr Brown e-mailed Mr Gilbert. He said that he understood that Willmett were holding money from the sale of a unit at Farnham Common and told him to remit the sale proceeds to BOS. It was a direct response to Mr Manwaring's complaint. He followed this with another e-mail on the following day insisting that the payment be made that day. These are the first recorded instructions that Mr Brown gave Mr Gilbert.

93.     On 21 October Mr Manwaring e-mailed Mr Brown again. He set out the bank's position:

> "The Bank, in initially agreeing to make the advance available, considered all constituent parts of the deal including, inter alia, anticipated sales income from the sale of the social units to a RSL and, under its security, is entitled to have received the proceeds of sale for that part of the site upon which the social housing units are situated, together with other appropriate amounts which would include any profit from the agreement with TVHA, as well as any other sale proceeds of other parts of the greater site until Elegant's indebtedness to the bank has been cleared. In other words, by disposing of part of the site and entering into a separate contract for the construction of the social units the company is in direct breach of the terms of its agreement with the Bank and has prejudiced the Bank's position."

94.     The file does not disclose a reply from Mr Brown.

95.     On 22 October BOS' solicitors wrote to Mr Gilbert demanding a transfer of funds to the banks and also threatening to take the matter up with the SRA. The sum of £515,000-odd was transferred to BOS that day. Towards the end of the month Elegant withdrew their instructions from Willmett.

96.     Mr Manwaring and Ms Steele met Mr Brown, Mr Macpherson and Mr Isles in London on 27 October. In his follow up e-mail Mr Manwaring said:

> "I have to admit that I am completely at a loss to understand the stance of the company which appears to be one of indifference to the Bank given (a) the lack of contact, (b) absence of any meaningful proposal to address the position at Bray (including the unwillingness of the main beneficiary to support the position), (c) the stated view that it is Willmett's with the problem and (d) no update/feedback on the Farnham Common site where a number of units have seemingly been let without the Bank's agreement."

97.     He pointed out that while Willmett had been at fault, it was Elegant that had requested the drawdown of funds, even though TVHA were paying the same amounts directly. He also recorded that at the meeting "the principal advised that Elegant had no funds available to inject into the scheme." The "principal" and "the main beneficiary" can only have been Mr Macpherson. Mr Brown did not contradict Mr Manwaring's reference to "the principal" or the "main beneficiary".

**The litigation**

98.     On 12 December 2008 TVHA began proceedings against both Elegant and Willmett. The claim against Elegant was a claim for breach of contract. That against Willmett was a claim for breach of the undertaking. Willmett brought a Part 20 claim against Elegant and Mr Macpherson, which were the claims before me. On 29 October 2009 Mann J gave judgment for TVHA against Willmett for breach of the undertaking: [2009] EWHC 2647 (Ch). Willmett's insurers paid the amount required to satisfy BOS (£1,355,433.13) and the charge was released over Plots 1-9. The transfer to TVHA was then registered. The remainder of the money secured by that charge has since been paid; and the charge released.

99.     Elegant failed to comply with unless orders made by Chief Master Weingarten on 13 April 2011, with the consequence that its Defence and Counterclaim was struck out. At the conclusion of Mr Halpern's opening on behalf of Willmett, he applied for judgment in default of Defence against Elegant; which I granted.

**The claim against Mr Macpherson**

100.    Willmett's claim against MacPherson is put in several different ways. Willmett needs to succeed on only one of them, although its case is that it should succeed on all of them.    At the heart of each way of putting the claim is the contention that Mr MacPherson committed an intentional tort.    In essence it is said that Mr Macpherson induced or procured Elegant to commit a breach of its contract with TVHA; or that Mr Macpherson conspired with Elegant to injure TVHA by unlawful means. Thus Willmett and Mr Macpherson are liable to TVHA for the same damage; with the consequence that Willmett are entitled to contribution from Mr Macpherson. In the alternative Willmett assert their own causes of action against Mr Macpherson. They say that Mr Macpherson conspired with Elegant to injure Willmett by unlawful means; namely a breach of an implied term of Willmett's retainer to the effect that Elegant would not deliberately cause Willmett to be in breach of an undertaking given in the normal course of a conveyancing transaction.

*Procuring a breach of contract*

101.    Liability under this head is a form of secondary or accessory liability. Its ingredients are found in the speech of Lord Hoffmann (which commanded the agreement of the majority) in *OBG Ltd v Allen* [2008] 1 AC 1. I can summarise them as follows:

   i)      The defendant must actually know that he is inducing a breach of contract. It is not enough that he ought to have realised that. (§ 39);

   ii)     Actual knowledge, "blind-eye" knowledge and recklessness are all sufficient states of mind (§ 41);

   iii)    The breach of contract must be either an end in itself or the means to an end. If it is merely a foreseeable consequence that is not enough (§ 43);

   iv)     It is not necessary that the defendant intended to cause damage to the claimant: an intention to cause a breach of contract (in the sense described above) is both necessary and sufficient (§ 8);

v)   There must be an actual breach of contract; merely hindering performance of a contract is not enough (§ 44);

vi)  The defendant's encouragement, threat, persuasion and so forth must have a sufficient causal connection with the breach by the contracting party (§ 36).

*Conspiracy to injure by unlawful means*

102.  Liability under this head is a form of primary liability. The ingredients of a conspiracy to injure by unlawful means were concisely and accurately summarised by the Court of Appeal in *Kuwait Oil Tanker Co v. Al Bader* [2002] 1 All ER (Comm) 271 (§ 108) as follows:

> "A conspiracy to injure by unlawful means is actionable where the claimant proves that he has suffered loss or damage as a result of unlawful action taken pursuant to a combination or agreement between the defendant and another person or persons to injure him by unlawful means, whether or not it is the predominant purpose of the defendant to do so."

103.  The unlawful means can consist of another tort, or of a breach of contract: *Kuwait Oil Tanker Co v. Al Bader* (§ 130); *Meretz Investments NV v ACP Ltd* [2008] Ch 244; *Aerostar Maintenance International Ltd v Wilson* [2010] EWHC 2032 (Ch) (§ 172). But non-criminal acts against a third party only count if they are actionable by that third party: *OBG Ltd v Allen* [2008] 1 AC 1 (§ 49).

104.  As in the case of procuring or inducing a breach of contract, the requisite mental element is an intention to cause damage, either as a means to an end or (unusually) as an end in itself. Usually the conspirators will seek their own gain; and the causing of damage to the claimant will simply be the other side of the coin, in the sense of being the inevitable concomitant.

**Mr Macpherson's true role**

105.  In his witness statement Mr Macpherson said that his role was that of building contractor, rather than having had anything to do with the running of Elegant. I am quite sure that this was a deliberately misleading impression. A constant theme that ran through his evidence was that Mr Brown made the decisions. But as Mr Macpherson himself said, Mr Brown "ran" another thousand companies apart from Elegant. His business was running offshore companies, in the sense of providing the formal structure. It is incredible that he was the decision maker in relation to a thousand companies. There is no evidence of any instructions having been given by Mr Brown to Mr Gilbert at any point before he was pressured by BOS into causing Mr Gilbert to transfer monies to BOS in October 2008. There is no evidence of Mr Brown having taken any commercial decision on Elegant's behalf. It was Mr Macpherson, rather than Mr Brown, who was copied in on important e-mails. On the other hand there is considerable evidence of Mr Macpherson's personal involvement. I have commented on this in the course of the narrative. There is, in my judgment, a strong case for Mr Macpherson to answer that he was in effective control of Elegant. When I add to this his failure to call any witness in support of his case, and his failure to give disclosure of documents, the scales come down firmly on Willmett's side. I

have already said that Mr Macpherson's own evidence was that Mr Isles was the *de facto* finance director of Elegant. I do not find it difficult to infer, and I do infer, that Mr Macpherson was the power behind the throne. It was he who found the sites, made the decisions, arranged the JCT contracts and so on. As far as BOS and Willmett were concerned he was Elegant. He unsuccessfully attempted in evidence to conceal the extent of his role. In my judgment the inevitable inference is that Elegant did whatever Mr Macpherson decided it should do, even though he was outside the formal governance structure of that company.

### Did Mr Macpherson procure a breach of contract?

106.   It is plain that by failing to discharge the Charge on completion Elegant was in breach of its contract to transfer the property free from incumbrances; and also in breach of its full title guarantee. Elegant's continuing failure to discharge the charge was a breach of its full title guarantee which included an obligation at its own cost to do all it reasonably could to give TVHA the title it purported to give. Primary liability is thus established.

107.   In considering whether any personal secondary liability attaches to Mr Macpherson it is a fact of vital importance that he had no formal role in the corporate governance of Elegant. The law must be wary of imposing personal liability on directors of companies who perform their constitutional role in good faith. There is, in this respect, a considerable overlap with the principles upon which a company director may be held liable as a joint tortfeasor with the company of which he is a director. In *MCA Records Inc v. Charly Records Ltd* [2003] 1 BCLC 93 Chadwick LJ reviewed the authorities comprehensively. His conclusions, so far as relevant to the present case were:

   i)      a director will not be treated as liable with the company as a joint tortfeasor if he does no more than carry out his constitutional role in the governance of the company--that is to say, by voting at board meetings. That is what policy requires if a proper recognition is to be given to the identity of the company as a separate legal person.

   ii)     there is no reason why a person who happens to be a director or controlling shareholder of a company should not be liable with the company as a joint tortfeasor if he is not exercising control through the constitutional organs of the company; and the circumstances are such that he would be so liable if he were not a director or controlling shareholder. In other words, if, in relation to the wrongful acts which are the subject of complaint, the liability of the individual as a joint tortfeasor with the company arises from his participation or involvement in ways which go beyond the exercise of constitutional control, then there is no reason why the individual should escape liability because he could have procured those same acts through the exercise of constitutional control.

108.   At best, from Mr Macpherson's perspective similar principles apply in deciding whether a director is personally liable for procuring or inducing a breach of contract by a company. Here, however, Mr Macpherson did not exercise control over Elegant through the constitutional organs of the company. He pulled the strings from the shadows. Elegant did whatever Mr Macpherson wanted it to do.

109.   In my judgment:

    i)    Mr Macpherson knew that by exchanging contracts and executing transfers on 11 April 2008 Elegant would commit a breach of contract unless it discharged the BOS charge over the Plots;

    ii)    He took no step to agree with BOS how much BOS would require in order to release the charge over the Plots, even though he was the person responsible for dealing with funding;

    iii)    He also knew that Elegant had made no arrangements to do so and, on the contrary, he had instigated the instruction to Mr Gilbert to transfer the sale proceeds to Elegant's own bank account;

    iv)    Far from taking steps to reduce Elegant's bank borrowings, he negotiated and agreed an increase in those borrowings later in the month;

    v)    The breach of contract was intentional or, if not, was the means to an end viz. the obtaining of the sale proceeds for the benefit of Elegant;

    vi)    Mr Macpherson caused Elegant to commit that breach, because Elegant did whatever Mr Macpherson decided it should do;

    vii)    The breach caused loss to TVHA.

110.   I hold, therefore, that Mr Macpherson would have been liable to TVHA for the tort of inducing a breach of contract by Elegant.

**Did Mr Macpherson and Elegant conspire to injure TVHA by unlawful means?**

111.   Given that Mr Macpherson was not part of the formal corporate governance of Elegant, I cannot see that there is any legal impediment to him and Elegant being co-conspirators.

112.   In the present case:

    i)    TVHA suffered loss as a consequence of Elegant's breach of contract;

    ii)    The breach of contract was "unlawful means" for the purposes of this tort;

    iii)    The breach of contract was the result of a combination between Mr Macpherson and Elegant in the sense that Elegant did whatever Mr Macpherson wanted it to do;

    iv)    It was the inevitable result of executing the transfers in circumstances where Elegant did not pay BOS sufficient to discharge the charge over Plots 1 to 9 that the loss would be caused to TVHA.

113.   Thus the claim in conspiracy is also made out. I am, however, inclined to agree with Mr Stewart that this way of putting the case adds little, if anything to the case based on procuring or inducing a breach of contract.

**Are Willmett entitled to contribution from Mr Macpherson?**

114.    Section 1 (1) of the Civil Liability (Contribution) Act 1978 provides:

> "…any person liable in respect of any damage suffered by another person may recover contribution from any other person liable in respect of the same damage (whether jointly with him or otherwise)."

115.    Section 2 (1) provides:

> "…in any proceedings for contribution under section 1 above the amount of the contribution recoverable from any person shall be such as may be found by the court to be just and equitable having regard to the extent of that person's responsibility for the damage in question."

116.    Section 6 (1) provides:

> "A person is liable in respect of any damage for the purposes of this Act if the person who suffered it (or anyone representing his estate or dependants) is entitled to recover compensation from him in respect of that damage (whatever the legal basis of his liability, whether tort, breach of contract, breach of trust or otherwise)."

117.    In the present case the damage caused to TVHA was the failure to discharge the BOS Charge, with the result that TVHA received property encumbered by that charge when it should have received unencumbered property. The concurrent causes of that damage were Elegant's breach of contract procured by Mr Macpherson and Willmett's failure to comply with its undertaking. Thus both Willmett and Mr Macpherson were liable to TVHA for the same damage.

118.    It follows that Willmett is entitled to contribution from Mr Macpherson. The extent of that contribution is that which is just and equitable having regard to the extent of their respective contributions to the damage. If the contest were between Willmett and Elegant there is no doubt, in my judgment, that Elegant should contribute 100 per cent. The effect of Willmett (or its insurers) having complied with the undertaking was that as against BOS Elegant was relieved of liability to repay part of a debt which it had incurred as principal debtor for the purposes of its own business. Although Willmett gave their undertaking as principal, they did so in the course of their ordinary role as solicitors acting on behalf of their client. As between them and their client justice requires that the client indemnifies his solicitor against proper liabilities incurred during the course of an overall agency. In addition Elegant had the benefit of the sale proceeds of the transaction with TVHA which Willmett paid to it; and Elegant also had the benefit of double payment for the costs incurred under the JCT contract between it and TVHA. Between them these sums amount to more than the amount that Willmett paid in compliance with their undertaking.

119.    Does it make any difference that contribution is sought, not against Elegant, but against Mr Macpherson? In my judgment it does not. Mr Macpherson is the only

person with an economic interest in Elegant. As he eventually accepted he is its ultimate beneficial owner. It was he who caused Elegant to be in breach of contract; and the reason why Willmett was unable to honour its undertaking was Elegant's failure to pay BOS which was, in turn, caused by Mr Macpherson.

120.    Accordingly I conclude that Mr Macpherson's contribution to the loss should be 100 per cent.

121.    Mr Stewart argued that the maximum loss that TVHA could have suffered was the sale price that they paid for Plots 1-9; and that any award against Mr Macpherson should be similarly limited. I do not agree. In the first place land can have a negative value; and prima facie TVHA were entitled to that sum which would have placed them in the position in which they would have been if the contract had been performed: i.e. the sum necessary to release the Charge over the Plots. Second, following purported completion of the sale TVHA paid for building work to be carried out on the land. It is a reasonable inference that the expenditure on building work increased the value of the land. There was no direct evidence of this or of the extent of the increase. But in my judgment if Mr Macpherson had wished to argue for a cap on damages, the burden was on him to prove it.

**Willmett's direct causes of action**

*Unlawful means conspiracy*

122.    The variant between this unlawful means conspiracy and the unlawful means conspiracy I have already considered is that in the case of this unlawful means conspiracy Willmett (rather than TVHA) was the victim. The unlawful means is Elegant's breach of contract with TVHA in failing to transfer the land free from incumbrances and breach of the full title guarantee.

123.    Mr Macpherson knew that Willmett would, in the ordinary course of events, give an undertaking to discharge the BOS charge over the Plots. He also knew that if Elegant did not do so, Willmett would be left high and dry, exposed on their undertaking. That was the concomitant consequence of Elegant's receipt of the sale proceeds without having discharged the BOS charge over the Plots.

124.    Given the findings of fact I have already made, I am satisfied that Mr Macpherson and Elegant acted in concert; and that the tort of conspiracy to injure Willmett by unlawful means is made out.

*Procuring breach of retainer*

125.    It is common ground that it was an implied term of Willmett's retainer that if Willmett gave a solicitor's undertaking on behalf of Elegant, Elegant would not deliberately cause Willmett to be in breach of it.

126.    By executing the transfer in circumstances in which Elegant could not discharge the BOS charge over the Plots, Elegant committed a breach of that term. Mr Macpherson knew that Willmett would, in the ordinary course of events, give an undertaking to discharge the BOS charge over the Plots. He also knew that if Elegant did not do so, Willmett would be left high and dry, exposed on their undertaking. That was the

concomitant consequence of Elegant's receipt of the sale proceeds without having discharged the BOS charge over the Plots.

127.    In my judgment Mr Macpherson, for the reasons given, procured or induced that breach. In consequence Willmett suffered loss, because they were called upon to honour their undertaking.

128.    Consequently I am satisfied that Willmett have made out their case under this head also.

**Result**

129.    I find that Mr Macpherson is liable to contribute 100 per cent of the loss incurred by TVHA as a result of Elegant's breach of contract. The amount of that loss is the amount that Willmett were called upon to pay in compliance with their undertaking. Alternatively, I find that Mr Macpherson is directly liable to Willmett for conspiring with Elegant to injure Willmett by unlawful means; alternatively for inducing or procuring a breach by Elegant of an implied term of Willmett's retainer.

130.    Whichever of these analyses is correct, Mr Macpherson is liable to pay Willmett the amount that they paid in compliance with their undertaking, plus interest.