# TAB 12

01:12365497.1

Case No: HC03C04185

<u>**Neutral Citation Number: [2005] EWHC 2192 (Ch)**</u>
**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

<u>Royal Courts of Justice</u>
<u>Strand, London, WC2A 2LL</u>

<u>Date: Friday, 14th October 2005</u>

**Before** :

<u>**MR JUSTICE LINDSAY**</u>
– – – – – – – – – – – – – – – – – – – –
**Between :**

| | |
|---|---|
| **GEOFFREY RUTHERFORD WEIR and Others** | <u>**Claimants**</u> |
| **– and –** | |
| **(1)   THE SECRETARY OF STATE FOR                         TRANSPORT** | <u>**Defendants**</u> |
| **(2)     THE DEPARTMENT FOR× TRANSPORT**× × × × | |

– – – – – – – – – – – – – – – – – – – –
– – – – – – – – – – – – – – – – – – – –

**Mr Keith Rowley Q.C. and Mr Mark West** (instructed by **Edwin Coe**) for the Claimants
**Mr Jonathan Sumption Q.C. and Mr Pushpinder Saini** (instructed by **Clyde & Co.**) for the Defendants

Hearing dates: 27th June 2005 – 1st July 2005, 4th July 2005 - 8th July 2005, 11th July 2005 - 15th July 2005, 20th July 2005 and 21st July 2005
– – – – – – – – – – – – – – – – – – – –

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

.............................

MR JUSTICE LINDSAY

**Mr Justice Lindsay :**

## A.  Introduction

1.    The infrastructure of our railways is now owned by Network Rail Ltd., a company
      limited by guarantee (a "CLG"), formed, after a good deal of thought, in a shape and
      with a membership determined by the government.  It was not always so; the
      infrastructure had immediately previously been owned by Railtrack plc ("Railtrack")
      a wholly owned subsidiary of Railtrack Group plc ("Group"), a company at the
      relevant time listed on the London Stock Exchange.  In this action some 48,105
      individuals, all shareholders in or representatives of shareholders in Group as at 7th
      October 2001, raise two types of claims broadly connected with that movement of
      assets and business away from Railtrack.

2.    The first of the claims is in tort.  The tort alleged is that of misfeasance in public
      office.  The claim is that the Secretary of State for Transport, Local Government and
      the Regions at the time, the Rt. Hon. Mr Stephen Byers M.P., acted with what is
      called "targeted malice" against the shareholders in Group, including the Claimants.
      I shall return to the subject of "targeted malice".  It is a serious form of dishonesty
      for a public officer, such as Mr Byers then was, to act with such malice.  It is a form
      of abuse of office.  If Mr Byers did so act (and he denies that he did) then it is
      accepted by the Defendants, the present Secretary of State for Transport and the
      Department of Transport, that they will be accountable on his behalf.  I shall use the
      term "the Department" to cover whichever of the earlier DTLR or the later DoT is
      appropriate.

      No one but Mr Byers is accused of the misfeasance alleged.   This claim in tort thus
      needs to be chiefly concerned with *why* Mr Byers acted as he did, with particular
      regard to his state of mind in that regard between July 2001 and 7th October 2001
      when Railtrack was, by Order of the Court, put into administration.

3.    The second head of claim is very different.  It derives from the Human Rights Act
      1998.  Under that Act (the "HRA"), in conjunction with the European Convention on
      Human Rights, persons are entitled to peaceful enjoyment of their possessions.
      Under this head of claim the Claimants say that peaceful enjoyment of their shares in
      Group was, without due compensation, denied them by the government.  The chief
      concern here has been whether the Claimants have the proper status to mount this
      type of claim.

## B.  The Scheme of this Judgment

4.    I shall begin with a general section, which will include a setting of the scene for both
      the tort and HRA claims.  I shall, within that heading, comment on such witnesses as
      I can without having to descend into detail, leaving others to later.

5.     I shall then turn to the claim in tort, first going to the law on misfeasance in public office and I shall follow that with what I fear will be a very lengthy section representing a detailed chronology from even before the Hatfield rail–crash in October 2001 down to the launch of these proceedings in 2003.  It is the Claimants' case, ably presented by Mr Rowley Q.C. and Mr West, that one can *infer* from the events in the chronology, properly examined, that Mr Byers did act with targeted malice against the shareholders in Group.

       Mr Sumption Q.C. and Mr Saini, who appear for the Defendants, say that Mr Rowley's careful analysis of the unfolding chronology (with which, in any event, they disagree) all goes to the irrelevant question (they say) of *when* Mr Byers acted as he did rather than *why* .  There is a good deal of force in that objection but Mr Rowley says in answer that a detailed look at the chronology will disclose firstly, as he puts it, that Mr Byers had something to hide and, secondly, that what it was that he was hiding can be inferred to be the very targeted malice which Mr Rowley accepts he has to prove.  Out of respect for Mr Rowley's and Mr West's argument, based on an exemplary command of the massive paperwork (a command all the more praiseworthy given that they were not the original pleaders of the Claimants' case but came in to the matter relatively late) and out of respect also for the huge number of individual Claimants wanting to see how their claim has fared, I see no alternative but to go through the chronology at length, though I fear it will prove a wearisome read for many.  Even at such length I shall leave out many meetings and papers but will attempt to cover the more relevant or disputed ones.

6.     After the chronology I shall comment on the evidence of such witnesses a review of whose evidence I had earlier deferred and then I shall come to a conclusion on the claim in tort.

7.      That done I shall set out the law on the HRA claim.  It requires no separate chronology.   I shall then conclude the HRA claim.

8.     Finally, having by then dealt with both heads of claim, I shall come to a conclusion on the question of the Defendants' liability to the Claimants.  The case so far has been limited by agreement between the parties to the question of liability.  If either the tortious or the HRA claim succeeds then, in the absence of agreement between the parties as to quantum, there would need to be a separate hearing to deal with the amount for which the Defendants would in that event be liable.

## C.  General

**Group and Railtrack**

9.      The privatised railway system in the 1990's included that there should be a network operator which would own and manage the infrastructure and also that there should be "Train Operating Companies" ("TOCs").   The TOCs would pay for access to the network operator's infrastructure.    The operator, owning such assets as lines, signalling provisions and stations, came to be Railtrack, a company at all material times until June 2002 wholly owned by Group.   At material times to June 2002 its holding in Railtrack was outstandingly the chief asset of Group.   In May 1996 Group was floated on the London Stock Exchange;  its shares were offered to the public at £3.80 per share.   The prospectus had indicated that Group:–

> "×.. does not receive direct revenue subsidy from H.M. Government but is indirectly dependent on the significant amounts of public sector financial support received by its principal customers, the TOCs."

The prospectus added that the Labour Party and the Liberal Democrat Party had each expressed both opposition to the privatisation of Railtrack and a commitment to a railway which was owned by and accountable to the public.   The party political risk that lay behind the flotation was described in the prospectus by reference to the then Conservative Government's narrow overall majority of 1 in what was then the next preceding General Election and to the fact that the next General Election would have to be held not later than May 1997.   The prospectus included passages as to the then–published policies of both the Labour Party and the Liberal Democrat Party. The Labour Party's approach had included that:–

> "Dependent upon the availability of resources, and as priorities allow, [a Labour Government] would seek, by appropriate means, to extend public ownership and control over Railtrack."

In May 1997 the General Election returned a Labour Government.

**Ministers, Civil Servants and Special Advisers**

10.    Until a policy decision is made, at which point the government can be expected to present a united front in support of that policy, there are likely to be very different and often conflicting arguments within the several ministries or departments likely to be affected by the decision.   Traditionally, the Treasury might be expected to argue against unbudgeted expenditure or against excesses over budgeted provisions. Where, as here, the Department was the body charged with development and implementation of policy, it could be expected, possibly in conflict with the Treasury, to have in mind improvement in transport generally, including, of course, in the railways.   No. 10, no doubt responding to the particular concerns of the incumbent of the day, possibly in conflict with one or both of the Treasury and the Department, might be chiefly concerned with the way in which the given policy would be likely to be perceived by the electorate generally.   One can thus expect, before a policy issue becomes a decision of government, that Ministers will be found to be expressing very different views as the prospective policy is thrashed out.   At that stage such views will not be the views of the government.   Still less, at that or any stage, will views expressed by Ministers' respective Special Advisers be the views of government rather than their commonly being their individual attempts to argue their corner in support of what they know to be or what they hope to be their Minister's inclinations or with a view to leading the Minister to the inclination which the Special Adviser prefers.

11.    Nor, either, do comments made in internal discussions by Senior Civil Servants prior to a decision or policy represent the views of government.   Senior Civil Servants are careful to leave policy decisions to the elected Ministers although, of course, they will feed to them the fruits of their researches, for example, as to the lawfulness of the prospective policy, its practicability, the alternatives to it, its likely cost and its ability to attain whatever goal is hoped for.   Just as Ministers in different departments or ministries will approach a prospective policy issue from different starting points and with different aims, so also will the Civil Servants in the respective ministries.   Mr Sumption was thus right to urge caution upon me when I am asked, as Mr Rowley asks me, to interpret or give weight to the many hand−written and other notes of meetings and contemporary e−mails to which I have been referred as parts of the unfolding chronology.   The fact that, for example, one contemporary note made by a Civil Servant or Special Adviser to one department seems to put a quite different slant on what was said at a meeting or on what was decided at the meeting to have to be done does not necessarily reflect anything other than the very different concerns of the various departments or that different departments, in consequence, needed to do different things.   The weight to be given to contemporary e−mails, of course, varies from one to another but it would be quite wrong generally, before a Ministerial policy decision has emerged, to regard them, especially those of unrelated Special Advisers, as reflective of government policy as opposed to being the views of someone successfully or otherwise arguing a case.   For example, Mr Rowlands, a senior career Civil Servant, then Director General of Railways, Aviation, Logistics and Maritime and now Permanent Secretary of the Department of Transport, in his oral evidence to me, commenting on e−mails from Miss Vadera, an adviser at the Treasury, said, with an asperity he otherwise kept at bay, that she constantly bombarded people with

e–mails, many of which were blithely ignored by the recipients;  he added "I was used to being bombarded by this woman with e–mails".

12.    Finally under this heading I caution against analogies with the private sector.  Firstly, a financier such as a bank, determining that it has lent enough to a client and should lend no more but instead should call in what is owing, whilst, no doubt, concerned at the effect on the client, generally has no greater duty than to its own shareholders.  A government, however, which withdraws support has to look far more widely.  A recurring theme in the government's evidence was that it could not leave the railways in a shambles;  if support was to be withdrawn the consequences would need to be foreseen and, where deleterious, would need to be striven to be avoided.  Moreover, a government, unlike a banker, would need to consider its policy in the light of the Human Rights Act, of the probability of Judicial Review and of the likelihood of attack in Parliament or at the hustings.  In consequence, a government can be expected to look far more widely and in greater detail at consequences and alternatives than would even the most thoughtful of financiers.  In consequence, too, Civil Servants, charged with the task of ensuring that all alternatives are considered so that, should there be attack, all can be seen to have been considered, are likely to include even improbable options amongst their considerations.

13.    Secondly, there is no real analogy between the Minister and his senior Civil Servants and a board of directors in relation to decision–making on matters of government policy.  A board of directors, whilst no doubt containing persons of different seniority and persuasiveness in the company, are likely to vote, one vote each, as to the adoption of this or that policy.  By contrast, no corresponding collective decision is taken by a Minister and his senior Civil Servants.  The latter, of course, advise and will wish to ensure, whatever policy is decided upon, that it and alternatives will have been fully considered and that it is rationally arrived at but will be scrupulously careful to leave the policy decision itself to the Minister, who, alone amongst them, will be answerable for it to Parliament and to the electorate.  It is thus not to be wondered at that the point of arriving at a policy decision in government is likely to be later than it would be in a corresponding case, if one could be found, in the private sector;  much more is likely to be at stake, the vulnerability to attack is far greater and the mechanisms for the advising of the decision–maker are so well–developed that, even where a particular policy outcome is hoped for and even strongly preferred, the point of actual decision is likely to be later rather than early.

**The Witnesses**

14.    There are a number of witness statements from Claimants dealing, for example, with when and for how much they acquired their respective holdings in Group, on what material they relied in doing so and how much they lost in the venture.  None of such material, going chiefly to the individual's status as a Claimant, was put in issue but none, either, does more than establish that status, the sense of grievance and the fact of loss common to the Claimants.  It does not, of itself, advance the Claimants' case in tort with which I shall need to deal.  Such evidence apart, the Claimants relied on 4 further witnesses.  Mr Tom Winsor, the erstwhile Rail Regulator, first completed a Witness Summary responding, question by question, to questions put to him in

writing on behalf of the Claimants but then, on 21st June 2005, put in a much fuller Witness Statement which he, a Solicitor, himself prepared.  The Defendants elected not to cross–examine Mr Winsor, whose veracity was thus not put in issue.  Two witnesses, Martin Minns and Pamela Warren, put in witness statements as to a meeting of the Paddington Survivors Group on the 12th September 2001.  Of the two, only Mr Minns was called to give oral evidence, that of Pamela Warren's witness statement being accepted as it was.  I will deal with their evidence when I come to 12th September 2001 in the chronology.  The only other individual's evidence relied on by the Claimants was a witness statement from Mr John Harris Robinson who on 12th June 2001 joined the boards of both Group and Railtrack and who took over as Chairman of both on 18th June 2001.  Mr Robinson was cross–examined at some length by Mr Sumption and an assessment of his evidence is best left to after I have dealt with the chronology.

15.    There were 2 minor flurries as to evidence on the Claimants' side.  They had considered calling Mr Daniel Corry, a  Special Adviser to Mr Byers at relevant times, by way of a witness summons but at a late stage Mr Corry supplied a proposed witness statement to them and the Claimants then chose not to call him.  There was thus nothing in evidence from him.  The other flurry concerned the Office of National Statistics, "the ONS", which, as will appear, played an important rôle in classifying whether certain proposed ventures would be classified, for government borrowing purposes, to the public or to the private sector.  The Claimants obtained a witness summons requiring attendance at trial of an officer of the ONS.  The ONS moved to have the witness summons set aside and I was expecting to have to rule on arguments on the question.  In the event there was no argument but a consent order by which the witness summons was set aside and a sum in respect of costs paid by the Claimants to the ONS.  There was thus no evidence from the ONS.

16.    The Defendants relied on 4 witnesses, each of whom was cross–examined.  Sir Richard Mottram, a career Civil Servant, was Permanent Secretary of the Department throughout the period, June to October 2001, on which the Claimants concentrate.  At the time of the hearing before me he was Permanent Secretary of the Department of Works and Pensions.  Judith–Anne MacKenzie, a barrister in the Legal Services Directorate, was Divisional Manager of its Railways Division from September 1998 to November 2001.  She is now Head of the Road Vehicles & Devolution Co–Ordination Division of that Directorate.  Neither Sir Richard's nor Miss Mackenzie's evidence is criticised by the Claimants.

17.    Another career Civil Servant, Mr David Rowlands, was, as I have mentioned, at the material times Director General of Railways, Aviation, Logistics and Maritime in the Department and at present is Permanent Secretary of the Department for Transport.  He was first of the Defendants' witnesses to give evidence, followed by Mr Stephen Byers, Secretary of State for Transport, Local Government and the Regions from 8th June 2001 to 28th May 2002.  He is now Member of Parliament, in the Labour interest, for North Tyneside.

18.     No one but Mr Byers is said by the Claimants to have harboured the necessary "targeted malice" against the Claimants and so it is Mr Byers who alone is cast by the Claimants as the villain of the piece; his veracity is put heavily in issue but Mr Rowlands, too, has had his candour criticised to some degree so I shall leave the assessment of their evidence until later.   As for Sir Richard and Miss Mackenzie, I found them to be direct, accurate and truthful witnesses.

19.     There has been an immense disclosure on the Defendants' part and I have heard no objections that it has been inadequate.   The disclosure has included that of legal advice given to the Defendants, as to which legal professional privilege was waived.


## D.   The alleged tort;  misfeasance in public office

### The law

20.     As there is very little difference between the parties as to the nature of this tort it is unnecessary for me to delve into its earlier history and into older cases.   The person accused of it has to be a public officer.   He must have exercised whatever power is in issue as a public officer.   The tort has two forms but the only form with which I am concerned is what is called the first limb of the tort, which arises where the accused person's conduct is on its face lawful in the sense that, objectively regarded, there is a power for him or her to act or to fail to act as he or she has done.   There is no dispute but that, so regarded, Mr Byers had in 2001 the power both to choose that the Department should not further finance Railtrack other than as it was then contractually or otherwise legally bound to do and had power also to present and pursue a petition for Railtrack to be put into Railway Administration.   Given, then, that Mr Byers' acts or omissions were on their face lawful, the case alleged, being in the first limb of the tort, is such that there will be liability under the tort only if his acts or omissions in the exercise of his relevant powers were such that he had *specifically intended* them to injure the Claimants or a class of persons to which the Claimants belong.   This important requirement is commonly described as being that proof is necessary of "targeted malice".   Although, on appropriate facts, targeted malice can be inferred, save where the facts speak for themselves "targeted malice", it hardly needs to be said, is likely not to be easy of proof especially where motives other than such malice may be credible.   Mr Rowley has at several points himself referred to the difficulties the Claimants thus face but a particular difficulty arises out of the consideration that one of the ways in which intent is commonly proved is not open in this tort.   In much of the law a person will be taken to have intended the ordinary and natural consequences of his acts or omissions.   In such cases it suffices, to prove the necessary intent, to prove the knowledge or obviousness, the foreseeability, of the consequences.   Proof of the foreseeability of the consequences thus suffices.   Were such a mode of proof to be here open to the Claimants they would be faced with the task of proving that Mr Byers knew or must be taken to have known that amongst the consequences of decisions not further to support Railtrack or to have sought its administration would be an inability to trade, or reduction in the trading price of, their shares in its parent, Group.   But it is central to this case to have in mind that that form of proof is not open to the Claimants in their claim under this tort.   The required "targeted malice" cannot be proved by reference

only to the knowledge or obviousness of consequences; a *specific intent* to harm the Claimants or the class to which they belong has to be proved.

21.    In point of pleading, the specific intent alleged and the specific intent which therefore has to be proved is that in implementing an alleged "Administration Plan" (which I shall return to), including his petitioning for an administration, Mr Byers acted for the purpose of expropriating the assets of Group without either paying compensation to its shareholders or obtaining the approval of Parliament and with the specific intention of injuring the Claimants as shareholders in Group by impairing the value of their financial interests in that company - see the re−re−re−amended Particulars of Claim paragraph 81.   That is the form of "targeted malice" which is pleaded and it is proof of that and only that form of "targeted malice" which will enable the Claimants to succeed under the heading of this tort.

22.    It will have been seen from this that purpose or motive is of real importance; it is an area of the law where, unusually, a bad motive can make unlawful that which otherwise would have been lawful; as to the tort and generally see *Three Rivers DC -v− Governor and Company of the Bank of England (No. 3) [2003] 2 A.C. 1 (C.A.) and 176 H.L* . per Lord Steyn at *p. 188 f−g* , *190 g to the foot, 191 e−f, 195 g−h;* Lord Hope *197 c−d;* Lord Hutton *219−220 a;* Lord Hobhouse *228 g, 230 g−h, 231 d−e;* Lord Millett *235 a, 235 e and g* and see reflections on the tort in *Douglas -v− Hello! [2005] EWCA Civ 595, 18th May 2005 at paragraphs 159 and 210* , now reported at *[2005] 4 All ER 128 CA.*

23.    So far there is no difference on the law between the parties; the only difference is as to whether it suffices to establish the tort if the specific intent to injure the Claimants is *a* purpose of the defendant or whether it has to be at least the predominant purpose of the defendant.   I see force in Mr Rowley's analogy with the position as to reliance in misrepresentation - see *Redgrave -v Hurd (1881) 20 Ch D 1 C.A.* − and shall assume, without deciding, that it suffices that the specific intent to injure is *a* purpose of the Defendant, so long as it is above the level of being de minimis.

**The Administration Plan - the alleged facts**

24.    It is the Claimants' case in tort that "in or about July 2001" and "in or about September 2001" Mr Byers devised "the Administration Plan".   It is alleged that by that Plan he intended to bring about a situation in which he could present to the relevant Court evidence that Railtrack was insolvent for the purposes of the appropriate test, that he would then present a petition for the administration of Railtrack, that following the making of the order for administration the assets of Group and/or Railtrack would be "removed" without either approval of Parliament and without the Government paying a purchase price for or compensation in respect of the shares in Group to Group's shareholders and that ownership and control of the railway infrastructure would thus be transferred away from Group to another company, one without shareholders, which came to be known as Network Rail Ltd - see re−re−re−amended Particulars of Claim paragraph 50.

25.     There are some aspects of the alleged Plan which have received little attention. There has been nothing said as to the assets of *Group* being "removed"; even its important asset, its shareholding in Railtrack, remained in its ownership until Group chose (and, as it seems, freely chose) to sell it in what has not been shown to be other than an arms' length sale.  Nor does the description of the "Plan" take account of the fact that, as I shall come on to, Group received a substantial purchase price for its holding in Railtrack that has not been shown to be other than a price as between a willing vendor and a willing purchaser.  It has, rather, been the alleged "engineering" by Mr Byers (and, at his direction, by the Department) of a situation in which it is alleged Railtrack could not usefully resist an administration petition that has attracted most of the Claimants' complaints.


## E.  The Chronology

### The Government's 10 year plan

26.     In July 2000 the Department published its 10–year plan, called "Transport 2010".  So far as concerned railways, it contemplated, inter alia, modernisation of the West Coast and East Coast Main Lines and completion of the Channel Tunnel Rail Link. There were to be new train safety systems.  The private sector - usually Railtrack or TOCs - was to carry out the investment in the new infrastructure but the plan recognised that substantial government financial support would be needed.  Total government funding to 2010 on the railways was put as £29 billion, which included £4 billion chiefly to cover the West Coast Main Line ("WCML") and £5 billion related to the Channel Tunnel Rail Link.  But there was also to be some £34 billion of private capital to be raised and spent;  plainly the ability of Railtrack or Group to raise money in the market as the 10 years proceeded was to be a key factor in implementation of the 10 year plan, as was also the ability to contain expenditure on the WCML and on the Channel Tunnel Rail Link within the figures contemplated.

### The System of the Public Financing of the Railways in 2000 and 2001

27.     Leaving aside the ordinary routes by which a listed company such as Group or a subsidiary such as Railtrack might earn income or raise or borrow money, Railtrack had open to it special routes by which it could call, directly or indirectly, on the public purse.  These consisted of "Access Charges" and "Network Grants".  Each requires some explanation.

28.     Access Charges were the sums paid by TOCs under Access Agreements, to which they were party, for access to and use of Railtrack's infrastructure.  They were crucially important to Railtrack;  in the year 2000/2001 they amounted to some 84.4% of Railtrack's total income.  But they were not fixed by ordinary negotiation between payor and payee;  they were, in substance, fixed by the Rail Regulator.  His was an office that had been created by the Railways Act 1993.  His statutory duties included the development to the greatest extent that he considered practicable of the railway network and the promotion of efficiency and economy in the provision of

railway services. Whilst he was independent of Government, he was, from the taking effect of the Transport Act 2000, to have regard to any *general* guidance given to him about railway services by the Secretary of State.

29.    The legislative and other structures surrounding the Rail Regulator included a labyrinthine system by which Access Charges were periodically arrived at so as to cover 5 year "Control Periods" and by which they might be changed even during the currency of whatever Access Agreements contained them. As for such Control Periods ("CPs") , CP1 expired on the 31st March 2001. CP2, with which I shall principally be concerned, ran from the 1st April 2001 to the 31st March 2006 and CP3 was intended to run immediately thereafter. In the computation and payment of Access Charges the Rail Regulator, as his statutory duties might suggest, was entitled to expect and require improvements to be made to the efficiency of operations. The Access Charges for CP2 were published by the Rail Regulator on the 23rd October 2000. They had been fixed at a lower level than Railtrack had pressed for, although about 50% up on the corresponding figures for CP1. Although, on the face of things, Access Charges (so far as here relevant) were payable only by TOCs, they represented an indirect call on the public purse by reason of the great extent to which TOCs had to be subsidised by the Government.

30.    As for Network Grants, they came to Railtrack by way of the Strategic Rail Authority ("the SRA"), a body called into existence by the Transport Act 2000 and funded by the Treasury. It was not a servant or agent of the Crown. Its Chairman throughout the time with which I shall be concerned was the late Sir Alistair Morton. Amongst its statutory purposes was the promotion of the use of the railway network for the carriage of passengers and goods and the securing of development of the railway network. The SRA, broadly subject to direction by the Secretary of State, was enabled at its discretion to make Network Grants to Railtrack under the provisions of Section 211 of the 2000 Act. The overall position is well summarised by the witness statement of Mr Tom Winsor, the Rail Regulator throughout the periods with which I am concerned, where he says:–

> "××. The Rail Regulator determines what is the net overall income required of Railtrack, i.e. how much money it needs for the competent and efficient operation, maintenance and renewal of the network. The income the company receives from Access Charges and Network Grants has to add up to that figure. If Network Grants paid direct by the SRA are higher, Access Charges can be lower and vice versa. The important thing is that the company is certain of receiving that total amount as long as it meets its legal obligations to its customers (the Train Operators) and under its Network Licence (enforceable by the Rail Regulator)."

31.    Any periodic 5–year review by the Rail Regulator, intended, as it was, to anticipate and provide for such things as railway performance and demand and supply in a very complicated industry over a prospective 5–year period, was inevitably such as to require much negotiation and study and a good deal of time. The periodic review

completed on the 23rd October 2000 had, for example, begun in July 1999.  The draft conclusions of the Rail Regulator had been published in July 2000.  They had led to further negotiations between Railtrack and the Regulator and changes were made.  Then the final conclusions were published.  But Railtrack, even then, was not obliged to accept them;  it was open to it within a prescribed period to ask for a reference to the Competition Commission.  It did not do that but on the 15th January 2001 it accepted the provisions which the Rail Regulator had made for it.  It did so, however, on the basis that the Rail Regulator had indicated the possibility of *interim* reviews, that is to say reviews during the currency of the CP, should there be a material change of circumstances.  The Regulator expected this general kind of interim review to be utilised only in exceptional circumstances.

32.     But, beyond that general kind of interim review, the possibility had been held out to Railtrack of what became known as "Hatfield Re−openers".  The rail disaster at Hatfield had occurred on the 17th October 2000, namely between the Regulator's draft and his final conclusions.  4 persons had been killed, 34 injured.  Derailment had been caused by "gauge corner cracking".  Immediate measures were required to be taken all over the network to identify and repair the cracking and very many temporary speed restrictions were introduced.  The immediate cost to Railtrack, down to 31st March 2001, was £644m but because of the timing of the disaster its effects could not be taken into account in the Regulator's final conclusion .  Whilst the Regulator saw it to be right that costs directly attributable to the Hatfield derailment should be borne by Railtrack and not by the taxpayer, he did see that it might be appropriate for the conclusions of his 5−year periodic review to be reviewed and adjusted by way of the "Hatfield re−openers", which were to be interim reviews of a particular kind.  The first, if requested by Railtrack, was intended to be directed to the *timing* of Railtrack receipts, so as to bring forward receipts which would otherwise have been received later and also to review the mix between access charges and network grants.  The first Hatfield re−opener, if applied for by Railtrack and if successful, would thus not have yielded more money than, overall, it was to receive but would have accelerated the receipt of some of what it would otherwise have received later.  The second type of Hatfield re−opener, if sought by Railtrack, was to look at any longer term financial implications of the Hatfield disaster for Railtrack's expenditure and revenue requirements.

33.     Even the processes needed to be completed for the relatively simple first Hatfield re−opener, let alone for any more general interim review, would inevitably require effort likely to be spread, at least, over several days or weeks.

34.     As for Network Grants, Schedule D to the conclusions of 23rd October 2000 made provision for grants of £5.67 billion, conditional on Railtrack's acceptance of those conclusions, to be made throughout CP2.  They were to begin with a payment of £162m on 1st October 2001.

35.     Thus it was that by the 15th January 2001, subject only to any interim reviews either of the Hatfield re−opener or of the more general kind, the extent to which Railtrack was intended to be financed by the taxpayer until March 2006 had been prescribed as

some £14.5 billion made up of £5.67 billion in Network Grants and £8.83 billion in Access Charges.  Such provision represented some £2.3 billion more than had been contemplated in the government's 10–year plan; that plan had an unallocated provision which, with Treasury permission, had been allocated to cover what would otherwise have been a funding gap.  The provision also contemplated that Railtrack or Group would itself fund expenditure by their own borrowings and part of the government's funding was put back to the end of CP 2 on that basis.

**Consideration of radical changes - February 2001**

36.    Lest it be thought that consideration of radical change in the structure of the railways and of Railtrack's and Group's places in that structure was not seen to be appropriate until Mr Byers became the responsible minister, it is worth recording others' views. Post–Hatfield, said Mr Rowlands, the railways were a shambles and both the Prime Minister and the Deputy Prime Minister had expressed dissatisfaction with Railtrack.  As early as February 2001, the Department, responding to a view, which the Hatfield crash had only served to underline, that Railtrack was performing poorly and that Group's monopoly of the railway infrastructure might, in turn, need to be re–thought through, had a paper prepared by Mr Phil Carey in the Railway Sponsorship Division and then sent on to Mr Gareth Evans in the legal department. The paper set out 6 options for the future of Group and its wholly–owned subsidiary, Railtrack, giving the benefits and drawbacks for each.  Re–nationalisation was one of the six, as was converting Group into a not–for–profit trust.  Both had the drawback that, as there could be no expropriation without adequate compensation, a price (at the then share–price of Group shares) of some £4.7 billion would be involved.  The background paper emphasised that, for HRA reasons, it would need to be demonstrated that *all* other avenues had been addressed.  That becomes a recurring theme.  It is not, though, to be thought that because a particular course appears amongst the options that it was therefore one that had a real prospect of being adopted.  The Civil Servant's job, said Sir Richard Mottram, was to identify *every* possibility "and to analyse the pros and cons of them.  That is what we do".  Hence re–nationalisation was included amongst the six options even though, in Sir Richard's view, it was completely against the underlying philosophy of the Government and was, in his view, never going to be "a runner".  Miss MacKenzie, too, spoke of neither her Ministers nor her policy colleagues thinking that acquisition of Railtrack or its re–nationalisation was a serious consideration at that time.  At this stage the Government, whilst seeing it to be appropriate to consider what the options for radical structural change might be, was content to adopt the structure as it was for the time being and to work, as Miss MacKenzie put it, "with the grain they had inherited, rather than against it".

37.    The 6 options do not include any relating to Railtrack's insolvency if only because the belief in the Department was then that over the immediate term in CP 2 the company's financial position had been stabilised.  However, soon after there was some reason to fear for Railtrack's finances, as the next sub–heading suggests.

**Concern in March 2001 in the Department at Railtrack's finances**

38.     Amongst Railtrack or Group's officers was one given the particular task of liaison with government.   On 16th March 2001 he, Mr J.W. Smith, wrote to the Department, stressing Group's need to maintain an "A" credit rating, which, in his view, required the announcement of a package confirming government support for Group.   "It is this", he wrote, "which will enable us to raise £5bn by 2003".   That would be bound to cause concern at the Department as it would imply support, unascertainable in amount, for an individual company, a very thing which, as will appear from the April Agreement agreed only a little later, as I shall come on to, was a thing which the Government wished expressly to be seen not to undertake.   At least as concerning to the Government was a table that Mr Smith included.   It did two things;  firstly, whilst emphasising the market sensitivity of this analysis, it valued Group's shares, then trading at about 800p, at only 60p and, secondly, implicit in it, in Mr Rowland's view, was an accounting problem such as, in his view, whilst "they [Railtrack] would be able to get through CP 2 ×.. they were going to be bust in spades as soon as they got into CP 3".   A false amortisation approach as to signalling expenditure inflated apparent profit in the initial year of account whereas the ongoing expense of the works would be spread beyond CP 2 and into CP 3.   There was, as Mr Rowlands put it, "a looming problem in CP 3 you would need to fix in CP 2 but it was not a problem in CP 2".   Yet further concern in the Department was because the Rail Regulator's assessment of Railtrack's needs had been based on its achieving efficiency improvements at 3.1% per annum over the 5 years of CP 2.   The Department regarded that as "challenging";  it was not thought that Railtrack would achieve the 15% or 16% the Regulator had had in mind.

**Railtrack's business plan**

39.     On 31st March 2001 Railtrack's business plan for the 5 years to March 2006 was finalised.   It is a remarkable document both as it looks over the past and as it contemplates the future.   It accepts that processes for maintaining and renewing the railway to an acceptable standard had clearly been broken and that there had not been robust plans in place to live within the Rail Regulator's targets even before the lessons of Hatfield.   There was a significant *higher* unwillingness by managers to live within budgets and plans and the business plan could not "be regarded as an acceptable plan in financial terms".   Even such planning as it aspired to involved key assumptions which included £3bn of bond finance being raised in Summer 2001 with a further £4.1bn being raised by March 2006.   The key assumptions also included the creation of a Special Purpose Vehicle, "Renewco" as it came to be described, to be used to bring forward funding otherwise not to be received until the latter part of CP 2.   Moreover, the business plan, requiring expenditure of £19.7bn, was already contemplating some 23% more expenditure than had been budgeted for, only 6 months earlier, at £16bn. It is difficult fairly to describe as a business plan a document which itself said it could not be regarded as acceptable in financial terms but even so, as Mr Robinson (not, of course, yet in office at Railtrack at the time of the plan) accepted, it stated as an assumption which he regarded as critical to Railtrack's financial fortunes that it would be able to raise the £7.1bn bond issues I have described.   Probably critical to the making of such bond issues, as Mr Robinson agreed, was the need for Railtrack to maintain an "A" rating for its (or Group's) bonds.   Another key assumption was that a Hatfield re–opener would yield Railtrack at least £2bn of extra revenue at £667m per annum from 2003 to 2006.   These key assumptions were, at lowest, close to speculative.

40.     Plainly Railtrack was heading into difficult times, being both unable accurately to establish its financial needs and dependent upon somewhat speculative consequences to satisfy them, whatever they transpired to be.

**The "April Agreement" and "Renewco"**

41.     Although the Rail Regulator's final proposals had been accepted only a few months before, Railtrack and Group, seeking further public funding, opened negotiations not with the Regulator by way of a Hatfield Re–opener but directly with the SRA.   The Department, which stood behind the SRA, was aware of the course of the negotiations, which led to a comprehensive agreement called either "the April Agreement" or "Project Endeavour".   It provided for the possible bringing–forward of £1.5bn of network grants and also for the possible related creation of a company given the convenient name, during the negotiations, of "Renewco".   Renewco was to be carefully constructed as a company with access to a large revolving credit facility but control of which was to be deadlocked between its equal shareholders, the SRA and Railtrack.   Renewco, if called into existence, was intended to be able to borrow, in particular against the prospective streams of public funding to Railtrack, but in such a way that its borrowings would be off–balance sheet so far as concerned Railtrack and yet also would not be classified as public sector borrowing.   In such a way, if Renewco was eventually used, Railtrack would, in effect, receive, ahead of what would otherwise have been the due dates, public funding otherwise intended to be spread under Schedule D over the latter parts of CP 2 or into CP 3.   But Renewco was not certain to be created.   If it were not created by 30th June 2001, Group was to be given a further 21 days to consult on an acceptable alternative but if none emerged then Railtrack would then (but not before) be able to apply to the Rail Regulator for the first Hatfield Re–opener.

42.     It was foreseen that there were many loose–ends that would need to be tied down if an acceptable Renewco were to emerge, a crucial one of which, on the Department's side, as I have mentioned, being that Renewco's borrowings would not be treated as public sector borrowing.   As the ONS, as arbitrator of such matters, would not be likely finally to classify such borrowings until Renewco's corporate structure and its proposals were ascertained in some detail, the possibility was always present that even if the SRA and Railtrack had successfully negotiated a Renewco format that suited them respectively (a thing which itself, despite mutual best endeavours, was not necessarily achievable) even so Renewco might transpire to be unusable for want of its being classified by the ONS to outside the public sector.   Some provisions of the April Agreement were framed as legally binding, others as deliberately not.   Thus, whilst both Group and the SRA were to use their best endeavours to set up an acceptable Renewco, Group agreed that its only remedy for a breach as to that on the SRA side would be that it would be freed to apply for a Hatfield Re–opener ahead of the expiry of 21 days after 30th June 2001.   It never did so.

43.     It is not necessary to go in detail into the April Agreement but amongst its important provisions were what were called the "Statement of Principles" agreed between the Government and Group.   These principles were expressly excepted from the confidentiality agreed to affect other parts of the April Agreement.   The first 3 principles provided as follows, with my emphasis:–

                    "1.     The Government stands behind the rail system *but not behind individual rail companies and their*

> *shareholders, who need to be full aware of the projected liabilities of the companies in which they invest* and the performance risks they face.

> 2.     [Group] recognises that it *must intensify its efforts* and raise the performance of its core business in the safer operation, maintenance and renewal of the existing railway.

> 3.     [Group] needs to raise funds from the financial markets in order to meet its obligations to customers and stakeholders.  The company *also needs to receive sufficient government funding as determined by the Regulator.* "

The principles reiterated that Group had accepted that the immediate consequence of Hatfield must fall to Group's shareholders.

44.    These principles thus made very clear that there was to be no bottomless government support for Railtrack, that Railtrack needed to improve its performance, that Group's shareholders should be alive to the liabilities of and the risk inherent in their involvement in rail companies and that government funding would be limited to what the Rail Regulator determined to be sufficient.

45.    Although, no doubt, concern remained in the Department as to Railtrack's financial future, the view in the Department was that Railtrack, once the April Agreement had been made offering it, inter alia, the alternatives of a Hatfield Re−opener or assistance by way of Renewco, itself considered its financial position over the next one or two years to be adequate.

**Mr Robinson is appointed**

46.    On 10th May 2001 Mr John Robinson became chairman−designate of Group and he joined the boards of both Group and Railtrack and a little later became Chairman of both on 18th June 2001.  He met several Board Members during May.  He saw Railtrack to be in the middle of a public slanging match, as he put it, involving itself, the Rail Regulator and the SRA, each accusing either or both of the others of being responsible for the then−perceived poor state of the railway industry and for passenger dissatisfaction.  The Rail Regulator had declined to meet him until his formal appointment but he had met Sir Alastair Morton, when both acknowledged that Railtrack was facing some serious financial issues.  He had been unable to meet the then−responsible Minister, Lord Macdonald, or the Prime Minister because by then the General Election campaign was under way but he did meet senior officials and felt that he had been given positive signals that the Government was prepared to support the rail network and Railtrack's management (which included, as new recruits, not only him as new Chairman but a recently appointed Chief Executive Officer and a new Finance Director).

**Railtrack's audited results for the year end 31st March 2001**

47.   These were published on 24th May 2001.  The Group had made a loss after taxation of £559 million, down from the previous year's profit of £295 million.  It was the first time that the Group had reported a post–taxation loss.  A gap of £3.6 bn was disclosed between budgeted income and expenditure during CP 2.  The projected cost of the WCML had increased to £6.3 bn.  As at 24th May 2001 the companies' boards expected, said Mr Robinson, to be able to fill that gap by obtaining additional funds from the Rail Regulator, by cost–cutting, by efficiency gains and by expected adjustments to the "Regulated Assets Base", a key figure in the Regulator's computation of what provision should be available to Railtrack.  The accounts had been prepared on a "going concern" basis but they recognised that Group's financial position could be seriously prejudiced if contingent liabilities matured into present or prospective ones and the Boards recognised that much work needed to be done to resolve uncertainties.   "The Hatfield Re–opener", said Mr Robinson, "in particular, was crucial to our future" although he always regarded Renewco, the alternative to the first Hatfield Re–opener, as a "given".  The Boards had concluded that Group's and Railtrack's accounts could be prepared on the going concern basis.  It would not, in my view, be unfair to comment that a company which needed, as did Railtrack, to give very careful attention to whether its accounts could properly be prepared on a going concern basis was a company which was likely to be in or heading towards seriously difficult times.

**ABN–Amro**

48.   On 4th June 2001 the brokers ABN–Amro circularised a "sell" recommendation in relation to Group's shares.  Group's position was analysed in some detail.  There were dire warnings;  investors should be in no doubt that their equity was in danger of being wiped out;  the rising levels of debt threatened to engulf the value of its regulated assets, rendering the equity worthless.  The then–current share price, 438p, implied wildly optimistic outcomes.  The then–recent balance sheet under–estimated Group's debt position which ABN–Amro took to have increased by a massive £1.2bn to £2.5bn so far as concerned creditors due within one year.  In their initial summary of the 16 page report ABN–Amro wrote:–

> "We believe there is a realistic possibility that the equity could be wiped out.  Based on our expectations of performance, we value the shares at only 58p."

That figure, of course, was barely different from the 60p which Group itself, by its Mr J.W. Smith, had indicated to the Department in March 2001.

49.   It is not to be thought that other advisers took the same view as ABN–Amro;  several still regarded Group shares as being of far greater value than 58p but the detailed ABN–Amro survey caught the eye of the financial press and, hardly surprisingly, depressed the trading price of Group shares.

**The 6ᵗʰ June 2001**

50.    The ABN−Amro report came, as one might expect, to the Treasury's notice and to the notice of Miss Shriti Vadera, an erstwhile investment banker who was a member of the Council of Economic Advisers at the Treasury.   She was not a career Civil Servant nor either only a conventional Special Adviser to the Chancellor but her office had more the characteristics of the latter than the former.   The fact that ABN−Amro had valued the shares as low as 58p had led her, mindful also of the Railtrack earlier valuation by Mr Smith at 60p, to reflect on the possibilities of a takeover by a third party (a "raider" or "a sensible company") should such values come to be the trading price of Group shares.   On 6ᵗʰ June 2001, Miss Vadera, Mr Kemsley of Public Transport Policy at the Treasury and Mr Martin Wheatley, Head of Housing and Urban Transport at the Treasury,  met Mr Rowlands, and Mr Linnard, Director of Railways at the Department.   Mr Kemsley's note of the meeting includes the phrase "So why not "engineer" a takeover?" and "Doing Renewco loses us two options", both remarks, certainly the latter, being likely to have come from Miss Vadera.   In context "takeover" referred to the possibility of someone, *not* government, making a bid should the share price of Group shares fall to the very low level contemplated by Mr Smith and by ABN−Amro.   The takeover to be "engineered", if the shares ever did fall so low, would have been one by a "sensible company", encouraged to bid in order to keep "raiders" out.   The remark cannot suggest even an inkling of the conception of some policy as to acquisition of Railtrack or Group by some government body.   Nor, either, was there then the first dawning of a notion that, despite the unbinding obligation to use "best endeavours" in that behalf, Renewco would not be implemented.   I accept Mr Rowlands' evidence that the meeting did not consider not doing Renewco.   It is to be remembered, too, that no Minister was present at the meeting.   Had there been a decision to *advise*  the incoming Minister that it could be advantageous that Renewco should or might not be implemented one would expect a minute to have been promptly prepared to such effect.   None was shown to me.

**Mr Byers becomes Secretary of State**

51.    The General Election of 7ᵗʰ June 2001 returned Labour to power.   Renationalisation of the railways had not been raised as an issue on which a mandate was invited.   Mr Byers became Secretary of State in the Department of Transport, Local Government and the Regions replacing Mr John Prescott M.P..   Mr Byers held this office until 28ᵗʰ May 2002.   The message given to him by the Prime Minister, said Mr Byers, was that "*delivery*  was the issue.   We wanted to raise performance but really the issue then is how do we achieve improved performance".

52.     On the same day Mr Robinson attended his first Board meetings in Group and Railtrack.   He felt, and the Board shared his view, that more time needed to be devoted to finding a new strategic way forward.   He had in mind consulting a single financial adviser.   The names of Credit Suisse First Boston ("CSFB") and Mr John Nelson of that group (with whom he had worked previously) were in his mind.

**Railway Administration**

53. Because the first view of the possible relevance of a Railway Administration Order to Railtrack's condition has been attributed to Mr Byers, an attribution for which he is in part to blame, it is worth mentioning that on the 8th June, only the day after his appointment and plainly commissioned before then, there was circulated in the Department a paper on the subject of Railway Administration. Its kinship with ordinary Administration was explained. A Court Order would be required. The Court would have to be satisfied, as one alternative, that the subject–company was or was likely to be unable to pay its debts, using the definition of that condition provided by *section 123 of the Insolvency Act 1986.* During the administration - see the *Railways Act 1993 section 59* - its business was to be managed by the Administrator appointed by the Court "in a manner which protects the respective interests of the members and creditors of the company" and with a view to achieving the statutory purpose of transfers as a going concern. *The Railways Act 1993* , which created this form of relief, contemplated there being "Railway Administration Order Rules" which had to be made by the Lord Chancellor with the concurrence of a Department Minister. They were ready in draft but had not formally been made. Nothing barred a Railway Administration Order being made against Railtrack in point of jurisdiction and, if one were made, the Secretary of State was empowered, at his discretion but with Treasury consent, on terms to make grants and loans and give guarantees in order that the Railway Administrator could manage the assets until there could be transfer to another or others such that its relevant activities could continue to be carried on - *section 63 of the 1993* . In effect, unless funding came from ordinary commercial sources, it would thus be the government, and hence the taxpayer, that would fund the continuing operation of the railway infrastructure if such an Order came to be made against Railtrack.

**Mr Byers is briefed**

54. Mr Rowlands wrote a submission to his incoming Secretary of State on 8th June 2001. He wrote of a sizeable funding gap appearing from Railtrack's 2000/2001 financial results and of its hopes of persuading the Regulator to assist. He warned that:–

> "Even if he does agree, the full cost will pass through to increased SRA support payments, for which there is at present no budget cover."

Renewco, said Mr Rowlands, (though not calling it that) would require both Treasury and ONS approval; "the omens at present are not good". Without Renewco, Railtrack's new debts would rise "to a probably insurmountable £5.4bn". The efficiency savings required of Railtrack would be a major challenge. There was a risk that the Department could have to find an additional £1.4bn over the next 2 years.

55. No less worrying was a paper of the 11th June prepared by Mr Linnard. Railtrack, he wrote, was "frankly, in a mess". It did "not have a grip on its core assets. Its

management was weak, with deep−seated problems which the new Chief Executive and Chairman will struggle to overcome".  It share price was shrinking.  Mr Linnard also prepared a comprehensive brief headed "Railways: background and issues".  Railtrack's medium−term financial projects were shaky.  Even if they could get from the Regulator all they hoped for (which could not be guaranteed) Railtrack's debt burden may even so be unsustainable in the longer term.  "Some form of financial restructuring", wrote Mr Linnard, "within the next 5 years looks inevitable if the company is to survive and we are to avoid further substantial increases in support requirements".  He made the point, too, that if the Regulator did give Railtrack all it sought, the full cost would be passed to the SRA for extra support "for which there is at present no public expenditure cover".

56.     Mr Byers was seriously concerned and asked for an option paper to be prepared on the future of Railtrack covering all options short of re−nationalisation, although even its "pros and cons" might as well be included.  That, though, did not of itself suggest that there would be some ministerial decision as to some fundamental change;  it was, said Mr Rowlands, as I accept, merely a newly−arrived Minister not unreasonably asking, given the concerns about Railtrack's performance both before and after Hatfield, what the options were.  "That", said Mr Rowlands, "is a standard piece of the internal workings of government".  Mr Byers wanted there to be a meeting to take matters further once the options paper was to hand.

**Mr Coulshed's Options paper**

57.     On 12th June Mr Mark Coulshed, Divisional Manager of Railways Sponsorship at the Department, produced a paper called "Railtrack:  Options for Action by Government".  It recommended that Mr Byers should meet key railway industry figures, in particular Mr Robinson, before forming a view, though the paper commented on Railtrack's bad reputation, its being pilloried for bad management and its balance sheet being so weak that it was completely unable to contribute to the development of the network and even had difficulty in funding the regular maintenance programme.  The paper recited that the Prime Minister had only recently re−iterated the arguments against full re−nationalisation, the cost of which, in any event, was "an immense hurdle".  The other options raised, as they had been before in February, included conversion into a not−for−profit trust.  Another option, indicating a governmental lack of confidence in Railtrack and one which was speculative as to its consequences, was the prompting of a third−party acquisition of Railtrack, although such was the scale of Railtrack's problems that the "Government might have to provide further funding than currently envisaged to get a suitable new owner on board".  Administration was not specified as an option.

**The Regulator's "begging bowl" speech**

58.     On the evening of the 12th June Mr Winsor made a speech to the Institute of Electrical
        Engineers.   It painted a bleak picture of Railtrack.   The WCML project had not been
        properly worked out;  things had got steadily worse even after the Ladbroke Grove
        crash and the Hatfield derailment; it was not trusted to deliver, its share price had
        fallen beneath the 1996 offer price, it had published its first loss, its essential skills
        base of engineers had been diminished and so on.   The company, said Mr Winsor in
        a phrase that gave the speech its name, "should put away the begging bowl and stop
        spending valuable management time hawking themselves unwanted round Whitehall
        and knuckle down to getting train services back to a sustainable level of reliability
        and quality of service".   But all was not lost; Railtrack could apply to him for an
        interim review but a compelling case had to be made if there was to be one.
        "However", added Mr Winsor, "I have told Railtrack not to bother making any such
        application until they have sorted out the recovery".

59.     The market reacted badly to the speech.   The share price fell further.   Mr Robinson
        believed the speech had made it more difficult for Group to obtain further funding
        from the bond market.

**15th June Meeting**

60.     The Departmental meeting Mr Byers had called for took place on 15th June.   There
        was a wide–ranging discussion which included Mr Linnard's views that the Rail
        Regulator had a vendetta against Railtrack and that there was Treasury unhappiness at
        public expenditure being in effect controlled by the Rail Regulator but the phrase to
        which Mr Rowley most drew attention was one attributed to Mr Byers, namely that
        he had said that Railtrack "looks a basket case".   Mr Byers was content to be taken to
        have said that but he resisted that it had meant that as early as 15th June he had
        determined that Railtrack had no future.   I accept his evidence;  a view that Railtrack
        had no future would have been inconsistent with his view, expressed at the same
        meeting, that the *existing*  structure should be made to work better, including ways of
        getting those involved working to a common agenda and with the Rail Regulator "on
        board and working [in a] collegiate fashion".   Sir Richard Mottram also resisted the
        interpretation sought to be put on the reference to a "basket case" and Mr Rowlands,
        also at the meeting, gave evidence that Mr Byers did not then convey to him the
        message that Railtrack was a lost cause.

**Mr Byers meets the Rail Regulator**

61.    On 19th June Mr Byers had what he called a "getting to know you" meeting with Mr Winsor, who was asked to explain his view of the industry and its problems.  Mr Byers had begun by saying it was not the time for some huge restructuring, which, he said, would have led to a period of stagnation and paralysis.  Rather "delivery" was to be Mr Byers' primary task.  Perhaps reverting to the theme of his "begging bowl" speech,  Mr Winsor said it was important that Railtrack did not get the message that they would always be bailed out.

**19th June 2001**

62.    CSFB made a "pitch" to become key investment banking advisers to Railtrack on 19th June and were successful.  They were given open access to the whole of Railtrack.  Amongst matters requiring attention were Railtrack's relations with the Regulator.  Only two days later it was reported back to Mr Robinson that when senior Railtrack management had met Mr Winsor he had said "Insolvent liquidation could be the best thing for the rail industry".  Mr Robinson keenly saw that relations had to be improved.

63.    On the same day Lord Cullen's first report on the Ladbroke Grove rail disaster was published.  It seemed to draw fresh attention to Railtrack's shortcomings and spoke of its "institutional paralysis".

64.    At about this time Mr John Smith of Railtrack prepared a note to arm Mr Robinson for his first meeting with Mr Byers in their respective new offices.  It throws light on a Railtrack management view as to its predicament;  the situation was worse than expected, neither the Regulator nor Railtrack could estimate the costs of running and maintaining the infrastructure with any certainty, the assumptions on which the settlement with the Regulator for CP 2 had been based were completely unworkable, major cost over–runs on the WCML and the Channel Tunnel Rail Link were still not under control, Railtrack's "bloating" operating costs were not being addressed.  If the subsidy and pricing regime was left unchanged, the company was heading for liquidation.  Railtrack needed Government support in order to maximise its private sector funding.  As it turned out, Mr Robinson, although he considered Mr Smith's note prior to his meeting with Mr Byers, did not work his way through it at the meeting, as I shall come on to.  But he did not in his evidence to me distance himself from Mr Smith's views.  On the contrary, when aspects of it were put to him he agreed with Mr Smith's views.  For example, whilst Railtrack had an assets register, it did not have an adequate knowledge of *the state* of its assets, something he regarded as fundamental.  True also was it, he said, that there was a huge gap of £3.7bn between Railtrack's current projections and the amount allowed to it by the Regulator, a gap which if unplugged would lead the company towards liquidation.  True also that Railtrack had made commitments as to the WCML that were probably undeliverable and had incurred considerable cost over–runs.  No attempt had been made, either, to address the bloating operating costs.  An "extra chunk" of £1–2bn would have to be found in CP 2, even if all other issues were properly managed.  It is

a notable comment on Railtrack's financial uncertainties that the range – £1–2bn - should be so wide.

**A second Departmental meeting:  20ᵗʰ June 2001**

65.     At this meeting Mr Byers suggested that the Treasury should be brought into discussions about Railtrack.  They would be better equipped in knowing how to restore City confidence in it.  Mr Rowlands said he would get in touch with Miss Vadera about joint work being done.  Mr Byers said he wanted work on Renewco to be done quickly, with a view to his then putting options to the Prime Minister at some stage but Mr Rowlands did not understand that work was required urgently with a view to being capable of early implementation.  Such views were inconsistent with a judgment that Railtrack had no future or that Renewco was to be dropped, although it was recognised that, in effect, the Treasury had a veto over Renewco.  It had not to "score" as public spending but if the SRA was perceived as standing behind Railtrack then Renewco would so "score".  Renewco plainly had its problems.  A workable model had to be found for it but, if immitigable objections to it were encountered, Railtrack would have immediately to be told.  But at this date it was nothing beyond *options*  that were being intended to be looked at; Mr Byers, said Mr Rowlands, was asking for what Ministers frequently ask for, which is a piece of interdepartmental work looking at what the options might be.   He added:–

> "We were looking at what might be the options should the Government ever want to do something different in relation to the industry. It is what governments do. It is what departments do."

**Miss Vadera's E–mail**

66.     Either on 20ᵗʰ or 21ˢᵗ June Miss Vadera met Mr Byers and on 21ˢᵗ June she sent an e–mail to a Treasury colleague that spoke of Mr Byers having asked for work to be done "on options for Railtrack involving alternative owners and management".   On the basis of that Mr Rowley put to Mr Byers that his version of the Departmental meeting of 20ᵗʰ June, with its references to restoring City confidence and going forward to find an acceptable model for Renewco, was plainly wrong and that what he had truly wanted was, and, in effect, was *only* , work as to "alternative owners and management".   Mr Byers denied that was the case and I accept that denial;  the note of the meeting of the 20ᵗʰ shews Mr Byers having concerns beyond those referred to in Miss Vadera's e–mail.   If he had been minded to conceal his true wishes from his Departmental colleagues he would hardly have then immediately disclosed them to the Treasury when at the same time arranging for both Ministries to work together. It may be that Miss Vadera's e–mail reflected what *she*  thought would prove to be the most practical solutions to Railtrack's problems but I accept that her e–mail did not reflect Mr Byers' state of mind at the time.

**22nd June 2001**

67.     On this day the Prime Minister wrote to Mr Byers.   Transport must, he said, be a top priority.   "We clearly need", he wrote, "to review the architecture of the rail industry".   Was the framework right?   What were the likely costs and benefits of further structural change?   The Prime Minister noted, too, that both TOCs and others had called for a more radical restructuring of the industry.   That options were already being widely considered in the Department was plainly not because of some initiative supported only by Mr Byers;  it was in line with governmental thinking at the highest level.   There is no hint in the Prime Minister's letter that options should be confined to alternative owners and management.

**Barclays Capital**

68.      Mr Robinson's evidence included that on or about 26th June Railtrack had it confirmed to it by Barclays Capital, the likely lead banker in any prospective Railtrack bond issue, that access to the bond markets was still possible.   He did not himself identify the particular letter and it would seem, from another part of his written evidence, that the advice as to access to the bond market was "absent other bad news".   I could not take that to be a reliable or uncontingent assurance as Barclays Capital would be unlikely to say that the bond market, in respect of an issue still then several months away, would not be accessible unless that had become categorically and irrevocably already obvious.   There is a letter, which Mr Robinson may have had in mind, from Barclays Capital to Mr Harding of Railtrack on 22nd June 2001 which emphasises the need for Railtrack to maintain the "A" credit rating and which said "Put simply, the markets are unlikely to provide funds if it believes the Government will not".   The letter cannot be regarded as any form of assurance that access to the bond market would be open in the Autumn although neither does it say that it would not be.

**Mr Byers and Mr Robinson meet:  27th June 2001**

69.     The meeting was friendly but there are disputes as to what was said.  Having decided not to speak from the note which Mr Smith had prepared for him, Mr Robinson intended to speak from his own brief note.   He considered the meeting to have gone very well.   He undoubtedly drew (literally) a picture of Railtrack as a "Gulliver" restricted by ties including those of the Regulator, the Health & Safety executive and the Government but the contemporary note made by Mr David Hill, Mr Byers' Private Secretary, records Mr Robinson saying "Situation worse than expected".   In cross−examination Mr Robinson, without, I think, meaning to be, was a little equivocal;  he did not clearly deny that he had said as he was so recorded as saying. Mr Rowlands' evidence was that Mr Robinson had indicated that the *financial* position was rather worse than he had thought when he had taken up his position. Mr Robinson's memory of the meeting was not sharp;  he confessed to have tried to put Railtrack affairs out of mind over the intervening years.   I hold that Mr Robinson did say that the situation was worse than he had expected, though without his necessarily intending thereby to limit himself to the *financial*  situation.

70.     He accepted that he probably did say that the Regulator was Railtrack's biggest problem and that relations with him were appalling.   He accepted that he was by then well aware that the Regulator had said that Railtrack need not bother to apply for the second Hatfield Re–opener until it had sorted out the recovery.   He did not seek to challenge the note's record of his saying (as was his belief) that the subsidy pricing regime was unworkable and that without an interim review Railtrack was likely to run out of money in 18 month's time.   He believed an additional funding stream was required in CP 2.   He accepted, too, that he probably had said that lots of routine maintenance had not been done and that the company had a huge training need.   He told the Department that CSFB had been approached by Railtrack but that further work was needed before Railtrack could take advantage of their advice.

71.     Mr Robinson also spoke, as both the note and Sir Richard Mottram's oral evidence touched on, about the company's need to raise money in the Autumn, that that would be impossible if people were scared off and about his concern that both the Regulator and the Chairman of SRA were creating a climate which made it impossible for it to access its agreed financing, a reference, as I understood it, to Railtrack's undrawn existing borrowing resources.   For his part, Mr Byers said relatively little at the meeting but he did not speak of structural change but of working with the very structure which, for better or for worse, was the one that existed and of the need to avoid a "blame culture" between Railtrack and the Regulator.   Mr Byers and Mr Robinson were, it was agreed, to meet on a monthly basis or reasonably frequently.
It had not yet become clear that Railtrack's proposals, when they emerged, would leave the Regulator on the sidelines in the sense that Railtrack would be proposing directly to the Department rather than to the Regulator in connection with its financial needs.

**Mr Adonis**

72.     Also on 27th June Mr Adonis, as he then was, then head of No. 10's Policy Unit, wrote a note to Mr Jeremy Heywood, Principal Private Secretary to the Prime Minister, favouring a fundamental internal review looking at all viable options (including a possible return to the public sector) for Railtrack, which he took to be at its nadir, leading to an opportunity that required consideration.   The note illustrates the dangers of treating internal notes or memoranda of the Civil Servants or Advisers of any one department as being the government's view.   Neither Mr Byers nor the Department would at the time have known of this note.   Mr Rowlands' evidence was that the Department still believed that the April Agreement had stabilised Railtrack's position at least for the short term and Mr Byers' was that he was not thinking on the same lines as Mr Adonis;  he was, rather, seeking stability for Railtrack and to find if the Department could work with the *existing*  structure.

73.     Sir Richard Mottram further diminished the relevance of the Adonis note by saying, of the people in the Policy Unit, that they were scanning the horizon all the time looking at things they should be thinking about to put to the Prime Minister "but they do not necessarily consult the Departments and their views are not necessarily that well informed", a comment he neatly underlined by referring to Mr Adonis' having twice called the SRA the "SRB", which Sir Richard thought "probably instructive".

There was, in my judgment, at this time, no view of Mr Byers or in the Department that Railtrack was at some such nadir that amounted to an opportunity, not to be missed, to take it back into public ownership.  Their view, to revert to Miss MacKenzie's earlier phrase, was still to work with the grain rather than against it.

**CSFB report to members of the Railtrack board**

74.     CSFB had assembled an impressive team under Mr Nelson to look into and report on Railtrack's position, which they did on 28th June.  Mr Robinson recollected that the "headlines", so to speak, of CSFB's report were that Railtrack's solvency was a real issue without government support, that the financial markets were closed to Railtrack (a view on which the Board members were at odds with CSFB), that application to the Rail Regulator for an interim review would be unsatisfactory (it would involve much work, would take 12–18 months and would create uncertainty) and that instead application should be made direct to government, a strategy given the name "Project Rainbow".   Rainbow was to be worked up to become a form to attract or at least to be acceptable to government and was to be presented as a "one option" strategy rather than allowing various options to be presented, which would be likely to lead to no consensus being reached.   Mr Harding, Railtrack's recently appointed Finance Director, felt that Railtrack could  "muddle on" as it was for at least 18 months, perhaps the first mention of that possibility as a strategy, but it was plainly not a long–term solution and CSFB's view was that it was not a viable option and would not be acceptable to government.

**Mr Harding's concerns**

75.     By 29th June Mr Harding was concerned at the risk of Railtrack losing its "A" rating.  It was increasingly at risk.   Indeed, its existing deals were trading at the lower level of "triple B" despite the theoretical "A" which Railtrack had achieved from 2 key credit rating agencies.   À propos solvency, Mr Harding told the Rail Regulator that "The cliff's edge is closer than you may realise"  and that the Board was obliged to take a view of the Company's solvency on an on–going basis and explicitly as to a "going concern" basis in each half–year result's announcement.   He sent a copy of his letter to Mr Rowlands and to the SRA.   I do not see it as possible to discount the letter as being just alarmist as if, for example, for the merely tactical reason of more thoroughly encouraging the Regulator's cooperation;  the phrasing of the letter suggests that legal or accounting advice had been already taken such that solvency and the going concern basis had to be focussed on as the letter describes.   These concerns of Mr Harding do suggest, though, that if "muddle on" was a strategy he could espouse, it was at best precarious.

**The first Renewco deadline is passed**

76.    It will be remembered that if Renewco had not been set up by 30th June then Group was to have a further 21 days to consult on an acceptable alternative, failing which it would be able to apply to the Regulator for a Hatfield Re−opener.   30th June came and went with no Renewco but also with no application to the Regulator.   Railtrack's board considered an interim review a waste of time at that point.   Mr Robinson thought not only that application to the Regulator would very probably not have produced enough cash quickly enough but also that Renewco would eventually be set up.

**The Transport "stocktake" of 5th July 2001**

77.    On 5th July the Prime Minister met, inter alios, Mr Byers, Mr John Spellar, Minister of State at the Department, Mr Andrew Smith, Chief Secretary at the Treasury and Lord Macdonald for a "stocktake" on transport issues.   Miss Vadera attended.   The meeting provides a good example of a special adviser expressing views which are neither those of her own department nor that of the responsible department as Miss Vadera's view, that Railtrack could not be stabilised in the short term and required radical change to its structure, was not adopted by either the Treasury Minister present nor by anyone else.   Sir Richard Mottram, also present, in his oral evidence summarised the gist of the meeting being that both the Prime Minister's and Mr Byers' emphasis was that the priority was to get punctuality and reliability back to normal, that Mr Byers went on to regard structural options as needing to be looked into but that a careful balance had to be struck as embarkation on structural change could itself dilute the necessary concentration on improvement in performance.   I do not accept that Miss Vadera's views at the stocktake represented the government's policy or even its wish at the time.

78.    Mr Byers had on 29th June written a brief to the Prime Minister in connection with this stocktake (then thought to be for 3rd July) in which, after describing the SRA as unfocused and unrealistic in its ambitions and whilst describing the Regulator as uncompromising and legalistic, he wrote of Railtrack being "a mess".   At that stage he saw the problems not as structural but as of management, not as to Mr Robinson and the senior colleagues who had recently joined with him but, he explained in his oral evidence, as to Railtrack's zonal directors and as to Railtrack's quasi−federal and geographically divided management structure, which made its problems both complex and such as required urgent attention.   As Mr Rowlands put it, "There is a real need to do something about the management rather than the company.   This, after all, is a company that allowed Britain's railways to become a complete shambles".   He added "× even at this stage, 5 years after privatisation, we still had no asset register, it still had no knowledge of the state of its assets, it did not know what its unit costs were, it did not understand its costs base.   Those were essentially management problems".   What Mr Rowlands was then and thereafter expecting was that the Department would produce an options paper by the end of July, as the Prime Minister had requested, the sort of thing that Ministers take away to read on their holidays in August with a view to saying, in September, which plans were to be developed.   I do not detect any significant differences between what Mr Byers was

saying relatively privately to the Prime Minister in his briefing and what he said to the wider audience at the stocktake itself.  It had become clear, though, by the time the briefing was written, that Mr Robinson wished to deal direct with the Department rather than with the SRA or the Regulator and that if CSFB as Railtrack's new advisers were to make proposals it could be that the Department would need to bring in corresponding City advisers for itself.

**The Scoping Group**

79.     In early July occasional meetings began between Civil Servants and Special Advisers from the Department, No. 10 and the Treasury to consider Railtrack's position, both in finance and performance terms, and possible options to deal with that position, which was regarded as unsatisfactory on both accounts.  Membership of the Group (perhaps attendance at its meetings would be a better description) varied; it had no formal membership or constitution and minutes were generally not kept although papers were distributed.  I shall not find it necessary to make findings as to each of the Scoping Group meetings.

**Railtrack's board meeting:  12th July**

80.     CSFB attended to explain that they had been instructed to analyse and advise upon the whole corporate finance strategy for Railtrack and Group.  Advice had been taken from leading Counsel and the Auditors that a dividend could be paid to shareholders.  It was expected that *existing* credit lines could last until early to mid−2002 and that "absent other bad news" Group would still be able to launch its proposed bond issue.  It was resolved that a dividend should be paid.  It is difficult to square Mr Robinson's evidence of the relative lack of concern at the meeting with Mr Harding's concerns of only a fortnight or so before.

**Mid−July e−mails**

81.     On 12th July David Hill, Mr Byers' Private Secretary, e−mailed Mr Rowlands on the subject of joint work (that is, between No. 10, the Treasury and the Department) on options for Railtrack, adding, of Mr Byers, "He is keen to make quick progress on this.  He thinks Cullen II may provide the opportunity for quick action".  The message seems to have bemused Mr Rowlands.  He took 8 days to reply and said he was not sure what Mr Byers had in mind by way of an "opportunity for quick action", adding that he was still aiming to put an options paper to Mr Byers by the end of the month for it to go on to the Prime Minister and the Chancellor "and from which Ministers can decide what they would like further worked up".

82.     "Cullen II" is a reference to the publication of the second part of Lord Cullen's report into the Ladbroke Grove Rail disaster, expected in September 2001.  In cross−examination Mr Byers accepted he had always seen Cullen II as a peg on which could be hung changes to the rail industry but I understand him to resist that amongst the changes then specifically in mind as to which "quick progress" was to be

made was a change in the status of Group or Railtrack as a listed company (Railtrack never was one) but rather referred to changes such as to punctuality, safety, comfort and railway performance generally. I accept his answer; such subjects would seem more naturally capable of being hung on the peg of Cullen II than would structural corporate change and Mr Rowlands' reaction to the e−mail showed no awareness that anything but work on options was being required, though it was then the case that Mr Byers then and thereabouts wanted to receive the work on options so as to be able to have decided the way forward by the first week in September. The way forward, he pointed out, in relation to this and to a later e−mail, could have been *any* of the options to emerge from the work on options, or none. I cannot take the Hill e−mail as an indication of a mind already made up on the subject of structural reform, still less on an indication that already an administration of Railtrack was being "engineered".

**Group's AGM: 24th July 2001**

83.    Mr Robinson's first AGM as Chairman took place on 24th July. He spoke of railway's poor performance and heavy bureaucracy, of low staff morale and of poor performance on many of its investment projects. The industry squabbled too much; it had to work together. As for short−term finance, it would have to be raised in the market. Major projects would have to be financed directly or indirectly or be underwritten by the Government.

84.    The AGM was followed by a Group board meeting. CSFB reported that without *additional* government support, the equity was unlikely, on certain assumptions, to have any significant value. Differing from Mr Robinson's view of what Barclays Capital had said or written, CSFB's view was that the debt markets were closed or limited and that there was limited, if any, availability of new bank finance. A government "comfort letter" was likely to be required in the short term, but, said Mr Nelson, the board was not in a position in which it needed to seek legal advice about adoption of the going concern approach. Mr Robinson's view (though not, I think, expressed at the time) was that the bond market would always remain open to Railtrack *provided* that the market believed that the Government was supporting Railtrack.

**Mr Byers meets the SRA Chairman**

85.    On 24th July Mr Byers met Sir Alastair Morton, their first meeting since Mr Byers had taken office. Sir Alastair said "Railtrack can't hack it" and expressed doubt as to where the finance it needed could come from. Mr Byers said he was looking for a period of stability rather than coming to some immediate view of how to deal with Railtrack.

86.    On the following day Mr Byers' Private Secretary, Mr Hill, e−mailed, inter alios, Mr Rowlands saying that "the Secretary of State wants to have decided the way forward by the first week in September". That sentence was under the heading "Options for

Railtrack".  It was consistent (said Mr Rowlands, as I accept) with a paper being needed in order that it should go to the Prime Minister at the end of July for it to be taken away as summer reading with a view to some decision in September.  The "way forward", as Mr Byers said in  cross–examination, as I have already noted, could have been any of the options put forward or none;  the e–mail cannot be taken as an indication that Mr Byers had already espoused any particular course of action relating to Railtrack.

**Mr Byers again meets Mr Robinson:  25th July**

87.    Mr Robinson and Mr Byers met a second time on Railtrack affairs on 25th July.  There is unresolved uncertainty as to how the meeting came to be arranged.  At the Department it was thought Railtrack had sought the meeting but it may be it was part of the intended pattern of monthly or regular meetings.  There are some debated issues as to what was said by Mr Robinson at this meeting concerning the accessibility of the bond markets to Railtrack, the terms in which a "soft" letter of comfort was spoken of and whether there was mention of a possible inability of Railtrack to make a "going concern" statement come its interim results in November.  Another issue was whether Mr Robinson spoke of things being worse than had been expected.

88.    There is no doubt that the subject of the bond markets came up and that access to them was more difficult (so said Mr Robinson to me) than it would earlier have been.  Further, although Mr Robinson regarded the "outline speaking brief" (which he had been provided with by CSFB for the meeting) as over–pessimistic, that brief did warn that without a definable basis for Government support and without a cap on WCML exposure, CSFB's concern "is that accessing international public debt markets [in full] is not currently a viable option".  For Mr Robinson to have spoken of possible difficulties in the debt market would thus have had not only been consistent with what Railtrack's own advisers were telling him but also a tactically likely subject to mention to strengthen his case for a letter of comfort.  I hold that Mr Robinson did speak of such access being difficult.

89.    The need for a "soft" comfort letter from the Government was also brought up by Mr Robinson but it is said by the Claimants (as their case was put orally to witnesses) that it was said only to be required if the "climate" did not improve.  Mr Byers' evidence was that that condition was not added (nor any other) and that he expressed concern about the idea.  I prefer Mr Byers' evidence;  if the letter was to be required only if the "climate" did not improve one could expect some inquiry into what that vague condition was intended to mean, yet there seems to have been none.  Moreover, nothing would have been more natural to a Government which had agreed the principle that, whilst it would stand behind the railway industry, it would not stand behind any particular company in the industry, than that it would express concern at the notion of being required to give some seemingly bottomless and general letter of comfort, however "soft".  The contemporary note, moreover, attributes to Mr Byers, à propos a comfort letter, the remark "concept does not please him".  Mr Rowlands' evidence was also that the condition about the "climate" was not added.

90.     As for the "going concern" statement, Mr Byers recollects Railtrack's possible inability to make one being mentioned by Mr Robinson although the contemporary note contains no supporting mention.  The note does not aspire to be verbatim but I would have expected the "going concern" point to have appeared in it if it had been expressly raised and I might have had difficulty in accepting Mr Byers' evidence that Mr Robinson had asked for no minute to be made of disclosures on the financial aspects then raised.  I cannot think that Mr Robinson would have so presumed on a subject as to which the Government would plainly wish to have some record. However, it may well be that Mr Byers was right and that there *was* talk about the going concern basis in relation to the November interim results.  Mr Robinson accepted in cross−examination that the notion of a comfort letter was raised both as to drawdown of existing facilities *and* "for the interim results".  It is difficult to see the relevance of a comfort letter to the interim results if it was not in order to avoid "going concern" difficulties.

91.     However, in a sense it matters little whether the subject was *expressly* referred to or not or agreed or not agreed to be minuted because it would have been plain from the admittedly more difficult position as to the bond markets and the admitted request for a letter of comfort, conditional or not, that the "going concern" basis was heading towards being a real difficulty for the company by November.  The Government side, told by Mr Robinson, as the contemporary note records, that the company would run out of money in September or October, could fairly have *inferred* that there would be a going concern problem, whether or not it was expressly said that there would be and on that basis the difference in the evidence is not so much between one version and another but an understandable confusion between what was said and what was reasonably inferred at the time from what was said.  I hold that the Government side did, at the conclusion of the meeting, believe, and had reasonable grounds to believe, that the company was likely to have difficulty in making a "going concern" statement on publication of its interim accounts in November.  Indeed, it was Mr Robinson's own belief (though I do not say it was mentioned at the time) that without a soft comfort letter Railtrack itself would have had to announce that it could not draw even on its *existing* facilities and could not be regarded as a going concern.

92.     As for things being worse than Mr Robinson had expected, Mr Robinson's own evidence suggests that that was so.  He accepted that the "climate" had changed for the worse since April and, as I have mentioned, that that made access to the bond market more difficult.  Mr Rowlands' evidence was that Mr Robinson had said things had got worse, beyond the "climate", and that he had said that the financial position was far worse than he had first thought.  Mr Byers' evidence was to the same effect. I prefer the Defendants' and Mr Byers' evidence;  not only is their evidence clear, it would have been a natural approach on Mr Robinson's part, pressing for help, opening negotiations in which new and further provision - be it a comfort letter, accelerated payment or direct negotiations not involving either the Regulator or the SRA - was being sought, to make a case for it by saying that his task was difficult and that things were worse than he had earlier expected or, more generally, worse than anyone had earlier expected.

93.    In practical terms a main object of the 25th July meeting, so far as concerned Railtrack, was to arrange that its advisers, CSFB, would meet directly with the Department (and its advisers, if it brought any in) to develop a strategy to remedy Railtrack's difficulties, a strategy, still then only in embryo, which would, as I have mentioned, be called "Rainbow" and that this form of meeting would be acceptable to the Department.   For its part the Department was willing to meet with CSFB but, because Mr Robinson had spoken only generally so far, it had not realised that what was going to be proposed was a strategy that was hoped by Railtrack entirely to by–pass the Regulator and the SRA.   I do not say it would have vetoed such a strategy;  it simply had not yet realised that that was what was going to emerge. Because of that this meeting on 25th July was not, I think, a watershed in the Department's view of Railtrack;  that came only later, after meetings with CSFB further spelled out Railtrack's condition and what Railtrack had in mind.

94.    Mr Rowley emphasised Mr Robinson's evidence that he had left the meeting of the 25th July feeling that the Government was supportive of Railtrack, as if it was wrong for the Department to have allowed that to occur.    The Government was supportive of Railtrack;  what was more significant was the level to which it could be taken that it would be so supportive.   Mr Rowlands' evidence was that Mr Robinson had no reason to believe that the Department was not ready to engage with CSFB.   That was a limited form of potential support.   I do not hold the Department to have indicated at the meeting that any particular form of support, still less any particular form which infringed Principle I of the April Agreement, would necessarily be extended to Railtrack.   If Mr Robinson left feeling that some support necessarily going beyond a willingness to engage with CSFB and to entertain their proposals had been indicated I would regard that more as a fault in Mr Robinson than a fault in the Department.

**Mr Robinson's assessment of Railtrack's position**

95.     Mr Robinson, though he did not say so at the meeting of the 25th July, knew that the proposals, when they emerged, could involve additional subsidy of Railtrack in order for it to sustain an "A" rating.   He was looking to *additional*  funding of between £1–2bn (he had no precise figures) but not in the immediate term.   Moreover, some form of government support such as a comfort letter would be needed even in the short term if by, say, September or October, Railtrack wished to draw down on its existing facilities and if the "climate" was such that it was felt that the Government might not support the company.   At worst the company could "bumble on" for another 18 months but then it would, absent Renewco and absent interim provision from the Regulator, have such problems as could well lead to administration.   But that, he thought, no sensible person would allow.   "It never entered my head", he said, "that, as a result of sensible discussions with sensible people, Government would do anything other than support Railtrack ×.".   Without *additional* Government support (meaning, in context, other than was already in place and other than the high percentage of the companies' income that in the ordinary way came directly or indirectly from government) Railtrack, he acknowledged, would at some stage cease to be a going concern.   The government support needed would have to go beyond Hatfield Re–opener relief and address what, by then, he regarded as deficiencies in the original settlement with the Regulator in January, the settlement the company had elected not to challenge.   It was unlikely that the Regulator would give the company what it wanted - the begging bowl speech had set an unhelpful tone - so there had either to be a Rainbow strategy negotiated direct with the Department or some other visible government support such as by the comfort letter that had been spoken of, something sufficient to re–assure the companies' bankers.   The comfort letter would be needed to give some re–assurance to the bond market that the Government was standing behind Railtrack.   It would thus need to be, I interpose, a letter that required the Government to depart from principle 1 of the April Agreement.   It was to be left to CSFB to work up a Rainbow strategy and, so to say, to "sell" it to the Government.

**Mr Rowlands meets CSFB**

96.    As had been contemplated at the end of the meeting of 25th July, Mr Rowlands met CSFB, on 27th July.   He reported on his meeting to Sir Richard Mottram on 30th July.   CSFB had made a presentation using "flip" charts of which no copies were given out and which CSFB retained.   They painted a very worrying picture.   There was an impending financial crisis;  the next major drawdown on Railtrack's *existing* lines of credit was "problematic".   Access to the bond market was "doubtful".   There would be an issue as to the Board's ability to sign−off on a prospectus for a bond issue.    The options were "the Three Rs" - renationalisation, receivership or re−structuring.   A manuscript note was made of Mr Rowlands' meeting with Sir Richard Mottram.   It makes plain that CSFB had told him that Railtrack's auditors had already considered qualifying its accounts on the "going concern" basis, that Railtrack's ability to draw down on its existing facilities in October was dubious and that a bond issue prospectus might not be capable of being signed−up to.   Mr Rowlands raised with Sir Richard the question of whether Railtrack was trading whilst insolvent and whether Railway Administration might not require examination.

97.    Mr Robinson had approved the CSFB presentation.   He accepted it indicated a projected net debt, absent additional government funding, of £12.2bn, £2.5bn more than the business plan had projected less than 4 months earlier.   He accepted, too, that it proposed that £1.8bn of that projected net debt should be replaced by some direct and additional grant from the Government.   Indeed, over CP 2, he accepted, an additional £2.2bn would be needed.   Even with that support, the value of the company's equity would have been entirely consumed by debt.   These projections, he acknowledged, were not known to the market.   Had they been known, he said, as is obvious, that the effect on the market would have been very damaging to Group shareholders.

98.    CSFB's proposals to deal with this exceptionally grave position were not yet formulated beyond an outline; there were to be other meetings with them.   But their objective was to devise a plan which was "fair to Government (e.g. value for money) and "fair" to our stakeholders (but no unjust enrichment)" and which allowed Railtrack a period in order to recover before being restored to the normal regulatory regime.

99.    In effect the Department, although no detail was put in front of it, was going to be asked to override or suspend both Principle 1 and (in the sense that ordinary regulation was to be postponed) Principle 3 of the April Agreement.   But Mr Rowlands had not expected this first meeting to disclose what CSFB's and Railtrack's "bottom line" would be.

100.    A recurring line in Mr Rowley's cross−examinations was that if, in fairly conducted negotiations, one party found the other's proposals totally unacceptable in some part, then commercial fairness demanded that the proposing party should forthwith be so told so that it could have the opportunity to amend its proposals accordingly.   I did

not take Sir Richard Mottram, Mr Rowlands or Mr Byers to dissent from that general view of fair negotiations but there were, in effect and to summarise, 3 qualifications. Firstly, it would sometimes be necessary, said Mr Byers and Mr Rowlands, to find if the potentially unacceptable provision was, indeed, an inescapable part of the proposer's (CSFB's or Railtrack's) "bottom line" or final unchangeable position. Secondly, on some key issues the Defendants did in any event indicate, as will appear, that some proposals were unacceptable. Thirdly, I am by no means certain, in the grim financial situation which the continuing talks on and from 27th July disclosed and in the course of discussions which the Treasury had to be brought into, that anyone could be sure, until the final decision was made on 5th October, that a breach of the April Principles might not have to be swallowed, however indigestible and unwelcome in principle, as the least unattractive of the achievable solutions. What it was that was "totally unacceptable" was thus not immutably fixed or might prove not to have been. I do not hold the Defendants or Mr Byers to have conducted themselves unfairly on this account or with a view to making an administration harder for Railtrack to avoid, nor can I take their conduct relative to this issue as any ground for an inference that there was targeted malice against Railtrack shareholders in Mr Byers.

**Renewco**

101.    One of the forms of unfairness in its negotiations which is alleged against Mr Byers and the Department is that it failed to indicate that it would not sign up to Renewco. Had only it done so, the Claimants' argument runs, Railtrack could and would have gone back to the Regulator for an interim review that might have saved it. But the argument depends upon there having been some early decision by Mr Byers that Renewco was immutably unacceptable, whatever other options might or might not be chosen by or be forced on the government. There is no hint that that was so and pointing against it is that on 29th July Mr Byers himself wrote to the Chief Secretary at the Treasury explaining what Renewco was to be and asking for Treasury consent to its adoption so that the whole April Agreement should not collapse. It was put to Mr Byers that, in writing the letter he was dissimulating, pretending that he wanted Treasury consent whilst secretly intending and hoping that he would not get it. He denied that. He would have needed to warn the Chief Secretary that the letter did not mean what it said and the Chief Secretary would have needed to be willing to join in the ruse. There is no evidence whatsoever of either being the case and no reason in evidence, either, why the Chief Secretary should not have taken the letter at face value or why I also should not do so. Again, there is no material basis for any relevant inference against Mr Byers.

**Miss Vadera's Scoping Group paper**

102.    On 31st July Miss Vadera circulated officials at No. 10, the Treasury and the Department with a comprehensive paper headed "Project Ariel: whether and how to restructure the industry, Questions to be addressed by advisers with evidence and analysis".  "Ariel" was the code–name she gave to Group and Railtrack and "Project Ariel" was her name for a government strategy to cope with what she perceived to be the problems inherent in the railway industry and Railtrack, which included that in financial terms it seemed to be a bottomless pit.  Should there be a takeover?  Could there be vertical integration?  Could renationalisation or a not–for–profit trust model be engineered through insolvency?  Should Renewco be approved (which might enable Railtrack to avoid the very insolvency which could provide a convenient path to renationalisation or a not–for–profit trust)?  These were serious questions but they were only that; questions in which Miss Vadera, as Mr Rowlands said and as I accept, was merely putting forward her thoughts.  At the time there was no Government, No. 10, Treasury or Department policy formulated as answer to any of her questions.  Only two days before, for example, Mr Byers, as I have just described, had written asking for Treasury consent to Renewco.

**Mr Rowlands reports to Mr Byers**

103.    On 30th July Mr Rowlands reported to Mr Byers that he and his officials were working with both the Treasury and No. 10 on an analysis of the options for Railtrack.  He sent a note of work already done.  There was no mention in it of administration followed by a CLG.  On the following day Mr Rowlands reported to Mr Byers on his meeting with CSFB.  It was put to Mr Byers that thereafter he was engaging (or authorising or permitting his officials to engage) in what he knew would be pointless negotiations or discussions as to Rainbow, a strategy which would have put Railtrack's financing, unacceptably, outside the range of the Regulator's decisions.  He answered, as I accept, that there was no way he could have known on 31st July that the proposals which Railtrack would ultimately put forward would be unacceptable and, in particular, the Prime Minister having been personally very concerned about the regulatory system, he added that it *could* have been that a proposal to by–pass the Regulator could have proved acceptable.

104.    In the course of the meeting a Railway Administration was discussed as an option, Mr Rowlands pointing out that the Administrator would have a duty to keep the railways running and that it would be for the Administrator to look to the creditors' interests.  Mr Byers spoke of administration as being a thing which could be "left" to happen and, in that context, I take the later reference by Mr Byers to "Should bring to a crunch in Sept/Oct" as not meaning anything such as that the Department should procure that the company would go into administration in those months but rather that the financial pressure already on Railtrack would bring its affairs to a crisis about then and that the Department would then need to be in a position to manage the situation.  His final conclusion on 31st July was that he wanted all options, including administration, "worked up a.s.a.p.".

**1st August 2001**

105.   On this day Mr Nelson of CSFB made a presentation to the Department in the presence of both No. 10 and Treasury representatives.  Mr Byers was not there.  He said Railtrack had virtually no management control, it was the worst case he had seen for a period and that there was management paralysis.  It had major projects without the skills to manage them.  The Regulator's approach was to grind it down, which made matters worse.

**Mr Byers' submission to the Prime Minister**

106.   On his last day before his August holiday Mr Byers on 3rd August sent a submission to the Prime Minister (with a copy to the Chancellor).  Options for Railtrack were still being looked at but with added urgency because of its deteriorating financial position.  Mr Byers' view was that there may be only 3 options which were realistic; a restructuring of the company, a takeover or a conversion into a not–for–profit trust.  Help from outside advisers could be used over August.  "It may be advisable to take Railtrack into protective special railway administration and events could even mean it is inevitable, as a prelude to moving to the chosen option.  This needs to be looked at in more detail".

107.   Mr Byers summarised the stark message which CSFB had given; the financial problems were perhaps overwhelming and the company was bereft of effective management but the Department was not yet in a position to decide fully between the available options.  He summarised CSFB's Rainbow proposal as then understood; the share price was to be reduced to a nominal level and dividends would not be paid in return for some kind of yearly interest payment to shareholders and the regulatory regime would be suspended and be replaced by performance targets set by government.  The submission does not suggest that a suspension of the regulatory regime was immutably unacceptable;  indeed it figures as an express possibility in relation to the takeover option.  If targets were not met the government would receive equity in exchange for continuing financial support.  Mr Byers wrote, correctly as I would see it, that it was for Railtrack and CSFB to lead on this restructuring proposal.  Plainly that is what he expected.  He stated that he did not rule out the Rainbow proposal although he was not convinced it would either be acceptable politically or would address the company's fundamental problems.

108.   He specifically addressed railway administration as a subject on which work was in hand, adding:–

> "It is clear that we ought not to contemplate taking Railtrack into administration, which we could achieve by withdrawing government support, without being equally clear about how we would like it to come out of administration and therefore which option we want to pursue."

Mr Byers was cross–examined on the basis that the objection to renationalisation or the use of a not–for–profit trust was one of cost; shareholders would, at great expense, have to be bought out but that, by contrast, administration then followed by a not–for–profit trust offered a cheap route to the same end. I accept Mr Rowlands' evidence that there had been no discussion on the lines that administration should be used because it represented a cheaper way. Indeed, there was no basis in fact for the suggestion, put to Mr Byers, that he had realised that he could arrive at a not–for–profit trust solution "at no cost" via administration. Not only would the administration need to be funded whilst the administrator considered the commercial alternatives open to him but the government, were it to try to purchase Railtrack assets so as to emerge with a not–for–profit trust solution, would have to ensure it was, in effect, the highest bidder so that the Administrator could properly accept its offer. That this would all be "at no cost" would have been grossly improbable.

109.   It was not put to Mr Byers that he was dissembling in the terms in which he made his submission of 3rd August to the Prime Minister and I am entitled, I think, to take the submission as representing what was then his view. In any event there is no good reason not to. On that basis, the Department was going to continue to entertain such restructuring proposals as Railtrack and CSFB put before it whilst working up the alternatives. Railway Administration was not an end in itself but, even if adopted, would be but a step on the road to one. There was no decision directly or indirectly to procure an administration although it was sensibly recognised, in the light of what Railtrack and CSFB had been saying, that for the government merely to withdraw its support could achieve an administration. Leaving aside takeover (the viability of which was to be explored) and the equity restructuring (which awaited CSFB's more detailed proposals) what needed work on the remaining possibility, in case neither takeover or CSFB's proposals proved viable or acceptable, was what was the best attainable model for the next owner and manager of the infrastructure should there be no additional funding for Railtrack and how, if at all, could the government achieve that model. That needed working up, but none of Mr Byers' three options was yet abandoned nor any yet settled on.

**CSFB's further Rainbow proposals**

110. CSFB had met Department officials, as I have noted, on 1st August and on 7th made a further presentation by way of "flip" charts.  A transitional period of 3–5 years was proposed.  Government support would be given so as to maintain an "A" rating.  There would be a fixed return to shareholders by way of dividend or some equivalent and at the end of the transitional period the equity would be owned between the shareholders and the government in a proportion which depended on the company's achievement of certain as–yet–to–be–specified performance targets.  There would be a guaranteed minimum value ("the floor price") to current equity holders at the end of that period.  When Mr Rowley described the proposals of 7th August as putting some flesh on the bones on the proposal of 27th July Mr Rowlands fairly replied "perilously little skin here".  I agree.  There were still no numbers given, for example, as to the intended guaranteed share price at the end or the return to shareholders in the meantime.  As then framed the proposals were unacceptable as totally lacking in detail but it was contemplated that detail would later be provided and whilst they were unattractive as then put, there was no Department view that, in principle, no equity solution could be acceptable in principle.

111. I accept Mr Rowlands' evidence that there had been no decision that suspension of the regulatory regime was unacceptable and that at the 7th August the Department's view was still that it should try to find what the company's bottom line was as to its Rainbow proposal.  It could not be pretended that an equity solution would be easy to achieve; on the one hand the Treasury argument, not hardened into a conclusion, was that the shares were already worthless; on the other hand, in order to get the broad shareholder consent that would be necessary if any proposal of the Rainbow type were to be implemented, *something* would have to be dangled before the existing shareholders, many of whom were already nursing heavy losses on their holdings.  It may be that even on 7th August the Department mentioned reservations about there being a floor price or interim dividends but the Department did not then say that Rainbow was unacceptable as it had not been decided that it was and CSFB's own bottom line was still being sought.  CSFB were told, as was the case, that the Department would instruct or had instructed Schroder Salomon Smith Barney ("SSSB") as its own advisers, which, as it seems to me, would have been a wasteful or eccentric course had it already been decided that both a takeover and Rainbow were immutably unattractive.

**10th August 2001**

112.    SSSB met the Department with a Treasury representative present.  The Treasury manuscript note of the meeting includes the line (without attributing it to anyone in particular) "Must not let them" [i.e. Railtrack] "waste time on unacceptable Rainbow".  Mr Rowley took this to be an indication that Rainbow (meaning, I think, here some equity solution to be developed from the initial proposals) was all along immutably unacceptable.  I do not accept that.  The Department (and the Treasury) certainly could see no justification for a floor price and a fixed dividend at any substantial levels but, until Railtrack's "bottom line" was found, it was not clear that either a substantial floor price or dividend would be insisted on by Railtrack.  There was, though, an unwillingness to allow Railtrack to delay by spending time developing any forms of Rainbow which, by incorporating a substantial floor price or dividend, would inevitably prove unacceptable.  CSFB or Railtrack or both would therefore need to be told (and were later told) not that they were, as it was put, barking up the wrong tree with any equity solution but, as Mr Rowlands said in evidence, that "We did not want to buy a concept called the floor price and that is why we were worried, for example, about the dividend".  The Department could undoubtedly have been more categoric and earlier with indications that a fixed price or dividend at any substantial level, if insisted on in any equity solution, would lead to that solution being rejected but I do not see it as having been unreasonable for the Department to have held back such comment until a more developed version of Railtrack was laid before them.  I certainly do not see their delay as part of some Department or Byers' plot to increase Railtrack's difficulties, to lure it into developing no solution other than Rainbow or to make its administration more likely.

**Meetings in mid–August**

113.    Whilst the politicians were on holiday, the advisers continued their work.  On 13th August a meeting was held which introduced Mercers as advisers brought in to assist and advise the Department on the structures best deployed in the railway industry - what was called "railway architecture".  Miss Vadera attended and said "We", meaning the Treasury, "do not want to compensate the shareholders".  She saw Railtrack's difficulties as an opportunity to re–nationalise but I accept Mr Rowlands' evidence that the Department had still come to no view of how to proceed.

114.    On 14th August there was another departmental meeting at which Mr Rowlands is recorded in the contemporary manuscript note as saying Railtrack "is finished".  In cross–examination he explained;  Railtrack was finished if there was no further government support, a belief he took to be CSFB's own view.   Without that it would be unable to draw on its bridge financing and unable to launch a bond issue.  I do not see the note as assisting the Claimants.

115.    It was at this meeting there first emerged the idea that legislation might be necessary to undo the Regulator's ability to conduct an interim review giving money to Railtrack.   The idea, which did not come from Mr Rowlands or Mr Byers, was that *if* the government decided as a matter of policy not to give further financial support to

Railtrack in its current form with a view to a structural change in the industry, it would, at lowest, be frustrating to find the Regulator then bolstering that current form by awarding it new money.  It could be, therefore, that the Regulator's powers would need to be limited but it was recognised that that would need Parliament's approval.

116.    On 15th August there was yet another departmental meeting at which SSSB, Mercers, Treasury advisers and CMS Cameron McKenna, newly brought in as the Department's Solicitors, all attended.  Mr Challen of SSSB spoke of Railtrack as a "failed privatisation" but I take the view that Mr Rowlands did in his cross−examination, namely that that did not signify that Rainbow in whatever form it might finally emerge was a proposal that was never going to be accepted;  Railtrack's and CSFB's "bottom line" was still awaited.  Certainly there is no hint that Mr Byers, still on holiday, had come to any decision that the equity option generally or Rainbow in particular was never going to be acceptable, still less that the Department, in his absence, should nonetheless pretend to CSFB that it might be acceptable.  The Department was at this holiday stage being neither steered by nor reporting to Mr Byers.

**Further Rainbow developments**

117.    On 20th August CSFB put a more detailed form of Rainbow to the Department and its advisers.  The interim period was to be 4 years.  Group's dividends would be capped at 20p (down from the 26p they had been enjoying).  At the end of the period the shares would be relaunched at a floor price between 350p and 500p depending on a performance regime to be agreed.  The Government was to subsidize Railtrack's or Group's revenue to achieve earnings giving a coverage rate of 2.5 times (presumably to keep an "A" rating and hence to facilitate bond issues).  The WCML was to be re−financed by Government.  Government support was to be unconditional and uncapped.

118.    Even if, because of its very grave difficulties, Railtrack needed huge but unquantified and unquantifiable government assistance in ways that broke the April Agreement Principle 1 and required the regulatory regime to be set aside and even if, because of those very difficulties, the government was willing to go to its aid, it would be difficult to see why Group's shareholders should be so sheltered from those difficulties as to continue to receive a dividend only mildly reduced, to have its "A" rating propped up at public expense and to benefit from a re−launch at a guaranteed floor price.  Even without Miss Vadera pushing the Treasury against shareholder support it is difficult to see how, *on the figures supplied to it on 20th August* , the Defendants could have accepted Rainbow as it then was and I accept Mr Rowlands' evidence that objection was raised to the floor price and dividend proposals (although he did not remember whether it had been raised at this stage or at a previous meeting).

119.    But to reject Rainbow as to some of its details and to allow CSFB to try to come up with something better was not to withdraw government support in all its possible forms from Railtrack and, as I have mentioned, the alternatives to Rainbow could be found, for example, to be so inconvenient, expensive or unachievable as to make even

Rainbow, albeit probably at adjusted levels, the least unattractive possibility. There had as yet been no decision to limit government assistance to only that which it was legally bound to give. There had not even been a decision to abandon Renewco. The Secretary of State was still on holiday. Accordingly, the Department, having had all along undertaken to CSFB that it would tell it if it elected not to support Railtrack (as, if that was so, Group would have had promptly to make an announcement to the Stock Exchange) left CSFB to see if it could change or develop its proposals for Railtrack's salvation (including their turning from the financial to the performance and management issues required to be dealt with in Rainbow). But plainly the equity re−structuring option was fading fast.

**Mr Corry's e−mail**

120.  Mr Daniel Corry was Mr Byers' Special Adviser, someone in whom Mr Byers could and did confide on political matters inappropriate for discussion between him and his Civil Servants. Mr Corry remained in London whilst Mr Byers was on holiday. On 22nd August they spoke. Mr Byers was in Crete. According to Mr Byers Mr Corry said he was encountering a sentiment at the Department that the not−for−profit trust option was fading as a viable option amongst officials. Mr Byers' response, he said, was that it was not to be closed down but that Mr Corry, as Mr Byers put it, was to "Go in hard, make sure you keep this as an option for me to look at when I get back".

121.  The e−mail which, in consequence, Mr Corry sent to Mr Linnard at the Department took a very different shape. It speaks of Mr Byers being "very attracted to the option of pushing them into administration. It does not cost too much, allows us to signal a big change. He cannot imagine us putting more money into Ariel ××.". Mr Corry adds that Mr Byers felt that "we would not lose that much control if Ariel" [i.e. Railtrack] "went into administration ××" and that Ariel was by then no more than a conduit of government money.

122.  Mr Byers was adamant he had not talked about being very attracted by the idea of pushing Railtrack into administration. His credibility was stretched thin here but it could just have been that, told to go in hard to preserve the not−for−profit trust option to which administration would be seen as a convenient pre−cursor, Mr Corry had mistakenly over−stressed the pre−cursor rather than the need to preserve the end option. But even if I disbelieve Mr Byers' explanation I must note two things; firstly, in context, the pushing into administration would seem to have consisted of nothing more than not putting more money into Railtrack, a course the Government was, within broad limits, fully entitled to consider and adopt and secondly, that Mr Byers' message to Mr Corry, a message which on this basis, was an unguarded and undissembling communication of Mr Byers' intentions, provides no hint of malice against Group's shareholders.

123.  I should add that Mr Rowlands (to whom, presumably, Mr Linnard reported the contents of Mr Corry's e−mail) telephoned Mr Corry and told him never again to send such an e−mail because it seemed to him to pre−judge work that the Department had not yet completed. A recurring theme in Civil Service advices to Mr Byers was that

it was important not to close down options until a final fully–informed decision was made and I have no reason to think he ignored such advice.   Politicians can change their minds.   Even if, away on holiday, Mr Byers, had expressed himself in a way that suggested a mind made up, it does not follow that later, back in the Department and receiving the advices that he did, his mind remained made up;  his conduct on his return, so far as that throws light on his state of mind, suggested that no decision as to Railtrack's administration had yet been arrived at.

124.    Mr Rowley invited me to draw adverse inferences from the Defendants' failure to call Mr Corry, still in government employ.   I decline to do so;  firstly because his evidence would be likely to go more to credibility only than to the real issue in the case, secondly because even if Mr Byers' views had been as Mr Corry had described them, I would have been far from sure, for the reason I have given, that they remained so once he was back from holiday and, thirdly and chiefly, because, as I have mentioned, until a late stage it was the Claimants' plan that they should call Mr Corry, a plan not abandoned, I apprehend, until he supplied a witness statement of what he proposed as his evidence.

**No. 10's understanding**

125.    On 23rd August Mr Jeremy Heywood, the Prime Minister's Principal Private Secretary, wrote a note to Dr Brian Hackland, Senior Policy Adviser on Transport at No. 10, saying, after speaking to Mr Rowlands, that a paper was being put together for Mr Byers' return and that it would propose (or was likely to propose) that Railtrack be put into administration to allow the government to restructure it by way of a CLG owned by persons such as the TOCs, the Trade Unions and others.   Mr Rowlands told me that he regarded Mr Heywood's note as inaccurate in that at that date the analysis they were doing in the Department had not got to any such point.   I accept that that was so but I would also accept that an administration which the government would strive to see was followed by a CLG was already being seen as a lively possible future course, though not yet to the exclusion of others.

**Takeover as an option**

126.    It will be remembered that one of the three options being chiefly considered was Railtrack being taken over by some other company.   Mr Rowley sought to make something of this option not having been seriously explored even though (as was the case) it had seemed to be the Prime Minister's preference.   Mr Rowlands' evidence, which I accept, was that he had looked into the possibility with Bechtel and with investment banking advisers J.P. Morgan and that, to use his phrase, "It did not run".   There was no evidence from the Claimants that it might or could have "run" and in the circumstances I cannot see that the Defendants were at fault in not pursuing it further and their failure to do so provides no ground for any relevant inference against Mr Byers.

**Ernst & Young enter**

127.    On 23rd August the Department instructed Ernst & Young to advise it, chiefly on whether or not Railtrack was insolvent within the meaning of the Railway Administration legislation and as to the practical steps that would need to be taken by administrators, if they were to be any.  CMS Cameron McKenna, I apprehend, were looking at such issues for the Department from a Solicitors' angle.

**Mr Marshall's presentation**

128.    On 28th August there was a meeting fully attended by advisers at which Mr Marshall as Railtrack's Chief Executive presented his plan for the restoring of normal railway service.  Insolvency and courses of action deriving from it, in other words strategies for Railtrack *other*  than Rainbow, were plainly within contemplation at the meeting as Mr Marshall spoke of how administration or receivership would represent a backward step and Mr Robinson also spoke against such action.  As noted by Mr Page of CSFB Mr Robinson said that in "his view the Company was free to continue to trade without the need for any announcement" to the Stock Exchange, "however it was clearly dependent on continued Government support of the Equity option", meaning Rainbow.  Mr Rowlands confirmed that should that change (meaning, I apprehend, that should the Government decide to reject Rainbow) then the Department would inform the company, although he pointed out that he had been without formal instructions over the last few weeks as the Ministers were on holiday.  Some "iterations" would be likely to be needed to Rainbow, said Mr Rowlands, but whilst the Ministers were away he was not in a position to discuss it further.

129.    His private position was that Rainbow as it had been fleshed out with the floor price and dividend figures given on 20th August was unacceptable but he resisted that there was never any possibility of the discussions bearing fruit from Raitrack's point of view.  Foreshadowing Sir Richard Mottram's evidence as to the comparative nature of choosing between options, he said that if there had been no other option left then *some*  version, perhaps a very cut down version of Rainbow, would have had to have been put in place;  "one thing we could never have contemplated was another shambles on the railway.  After all we had had one only in October the previous year", a reference, I took it, to the disruption, ballooning expense and delays consequent on the Hatfield disaster.

130.    A point about Mr Robinson's evidence arises out of the note of the meeting taken, as I have mentioned, by one of Railtrack's own advisers.  Mr Robinson said that he remembered the meeting reasonably well and accepted that he had strongly believed at the time that the sense of the note was correct where it said that administration would be a major step backward and that managing a company in such a position would lead to escalation of costs and a deterioration in service.  Nonetheless he could not accept that he had said what Railtrack's own adviser's note attributed to him.  What was attributed to him reflected his views, he agreed, and was in the note and there was no reason given as to how the note–taking adviser could have been

mistaken but, for all that, Mr Robinson would not accept that he had said what the note attributed to him.  His witness statement had not disclosed that the note, which he himself exhibited, was incorrect, nor was it put to Mr Rowlands in cross−examination that Mr Robinson had not in fact said what the note attributed to him.  I thus have little reason not to prefer the note.  The episode does not reflect badly on Mr Robinson's honesty;  if he had been dishonest he would have disavowed his belief in the correctness of the sentiments attributed to him.  But it does reflect poorly on his memory even of a meeting which he claimed to remember reasonably well.  Mr Robinson did accept, though, that by this time Railtrack's directors were taking legal advice from Simmons & Simmons on the procedure for railway administration and on other forms of insolvency, that by now at every board meeting the Board raised with its advisers whether it was proper to continue to trade without any announcement to the market and that Mr Rowlands had made it perfectly clear that the Department *was* considering options as well as the equity option.

**The Government takes Counsels' advice**

131.   On 29th August the Department took advice from Lord Grabiner Q.C. and Mr Jonathan Crow.  The Government, said Counsel, could not assume that it had an unwritten power to acquire shares in Group.  Given that Parliament had specified railway administration to deal with a situation in which Railtrack could not pay its debts, use of some other procedure (such as buying Group shares at the reduced price then obtaining) would be likely to be regarded as contrary to the intention of Parliament.  There were thus two alternative ways for government to proceed;  an "equity route" or a "non−equity route", the latter contemplating the assets ultimately being transferred to a not−for−profit company after using the Railway Administration procedure.  The Government had to decide which route to adopt and then tell the company's board.  If it decided not to fund the company beyond its existing commitment, the decision should speedily be passed on to the Railtrack board.  There was no legal obligation on the government to go beyond its existing commitment.  It was acknowledged that the fact that no more money would be forthcoming would obviously lead to an immediate collapse in Group's share price.  However, the advice did not preclude Rainbow - the SRA could acquire the shares in place of the government - although the Rainbow plan might have needed amendment accordingly.  Mr Rowlands appreciated that the advice did not preclude adoption of Rainbow if it were it chosen to be the option adopted.

132.   In a follow−up telephone consultation on 31st August Lord Grabiner advised that Renewco could not proceed ahead of a decision on the main question as to use of the equity or non−equity route.  Proceeding with Renewco could give the Board of Railtrack a confidence that it was to be supported, a confidence which, if the main decision were later to be that it was not, could give rise to difficulties.  As Mr Byers not unreasonably understood the advice as passed on to him, it was that if Renewco was done it would suggest that the Government was standing behind Railtrack and that that could be taken as being a decision that the non−equity option had been closed down without that having in fact being decided.

133.    Miss MacKenzie, who was at the consultation with Counsel, gave evidence that if, contrary to the manner in which she would have expected Group's board to behave, it failed, on being told that there would be no additional government funding, to make an announcement to the market to comply with the Stock Exchange listing rules, then the Department would have had to consider whether *it* should itself make an announcement.  She would have expected the Department to consult Lord Grabiner again as a matter of urgency if that occurred.

**SSSB's proposals**

134.    On 31st August SSSB, who had been working in conjunction with Mercers, put forward to the Department lengthy and detailed proposals to meet the problem, which it plainly understood to be the case, that Group would be unable to make the "going concern" representations that were required to enable it to draw down on its credit facilities and was heading to an illiquidity crisis.  It was SSSB's advice that without confirmation of government support, Railtrack would almost certainly go into administration.  It is not necessary to go in detail into the proposals save to say that the advisers saw an "equity route" to be possible, adopting what SSSB called "a concept of dormant equity".  The plan differed greatly from CSFB's Rainbow proposals, which SSSB thought not to be viable, but it would leave Group as a listed company.  The significance of the SSSB–cum–Mercer proposal is that unless there is some reason (and I have seen none) to regard their work as part of a charade (no doubt a very costly one) it tends to indicate that no decision had yet been made either that an equity solution was not to be pursued or that administration was already the chosen route.

**A paper for Mr Byers on his return from holiday**

135.    On 31st August Mr Rowlands wrote a paper to report to Mr Byers, for his return from holiday on 3rd September, on what progress had been made over the prior four weeks and to prepare him for his forthcoming meeting with the Prime Minister and Chancellor.  In heavy type Mr Rowlands began:–

> "It is essential that you do not close your mind or take decisions on any options for Railtrack at this stage.  Each of the options still needs careful analysis with a view to determining the most appropriate solution.  Any decision would need to be communicated to the company and then by the company to the Stock Exchange, probably precipitating a crisis which we are not ready to handle."

In his opening Mr Rowley, in response to a question of mine, described this as "window dressing" meaning, as I took it, that the Claimants' case was that a decision had in truth already been made, be it either to withdraw further funding, to reject Rainbow and any other equity solution or to manipulate Railtrack towards administration.  However, when Mr Rowlands came to be cross–examined none of those possibilities was put to him in relation to this paper.  I have no reason,

therefore, not to regard this heavy–type advice as genuine bona fide advice intending to convey and convey only what its words made plain.  So far, at least, as Mr Rowlands was concerned, none of the possibilities had yet been a matter of decision by the Department or by Mr Byers;  the options still required careful analysis.

136.  Mr Rowlands' heavy–type passage throws further light on the earlier Corry e–mail.  If, contrary to his interpretation of the Corry e–mail, Mr Byers had earlier already rejected any option or had already decided on any particular course, Mr Rowlands was here ensuring or attempting to ensure, wittingly or not, that that earlier rejection or decision would be undone by his insisting that the time for decision had not yet arrived.  So long as Mr Byers accepted that advice and acted on it (as I would expect) then even if Mr Byers' interpretation of the Corry e–mail was flawed, even if Mr Corry's understanding of what he had been told had been correct, then, even so, Mr Byers' original message to his Special Adviser would by now have become no indication of Mr Byers' current intentions.

137.  Mr Rowlands reported the advice received as to Renewco, a favourable decision as to which in any event could not be made before 19th September when the answer to an application for State Aid clearance was expected from Brussels.  He also summarised CSFB's equity proposals, saying, of Rainbow, that only a very much tougher version would be likely to be acceptable.  He reported on SSSB's "dormant equity" structure.  Turning to "non–equity", he felt there were strong arguments for it but that more work was needed.  He touched on administration, pointing out that the Administrator would be independent.  Of the Regulator, he advised that he could not see a way of proceeding without side–lining him and that legislation would be necessary to do that.

138.  Takeover had fallen away as a practical option;  it was not going to run.

139.   Mr Byers was taxed in cross–examination on the subject of the legislation contemplated in order to side–line the Regulator.  It was put to him that it was to be directed, if there was to be any such legislation, to preventing the Regulator from providing funding for Railtrack in circumstances in which he, Mr Byers, wished to push Railtrack into administration.  Mr Byers denied that;  he added:–

> "× it would have had to have the approval of both the House of Commons and the House of Lords.  It would have required primary legislation, but you are right to say that the reason why consideration was being given to a bill was because, if an elected Secretary of State on behalf of the Government takes a major public policy decision, he would not want that to be undermined by the Rail Regulator ×.  If I arrived at a decision not to provide more money to Railtrack [still meeting our legal obligations to pay any money over to Railtrack that we were obliged to do] then we would not want that decision undermined by the Rail Regulator ×. [it] would be subject to full democratic debate in the House of Commons and the House of Lords ×.."

It is to be remembered that I am not here concerned with whether that approach would have been adequate against attack by way of Judicial Review or under the HRA (which I shall come on to). But, for the purposes of the tort I am considering, that, as it seems to me, was a perfectly acceptable line for Mr Byers to take; I do not see that he or the Department can be fairly criticised for anticipating that *if* there was to be no funding beyond Railtrack's present legal entitlement then legislation *might* be needed to be sure that that important policy decision could not be undermined. I see no ground for any material inference against Mr Byers.

**Hard–headed analysis**

140.    The Claimants complain that, despite reference on the Government's side to the need for hard–headed analysis of the Rainbow proposals, that was never done and that the Government's work was, at least from the 31st August, addressed and addressed only to an examination of the non–equity (and hence administration) alternative. There was no indication that any amount of analysis, however hard–headed, would have led to the equity proposals coming from CSFB to have been so altered as to have become acceptable, as would have needed to be the case, both to a substantial voting majority of Group shareholders and to the Government *once* , as later appeared, it had transpired that administration–cum–CLG was an achievable option but, in any event, whilst a failure adequately to have considered alternatives is a familiar ground for complaint in Judicial Review or HRA proceedings, unless there are grounds for seeing it here as part of a deliberate intent on Mr Byers' part to inflict harm on Group's shareholders it is difficult to regard it as material to this action. Had there been some instruction from Mr Byers that on no account should the equity option be analysed one might have perhaps found some reason for supposing that such a deliberate intent was in his mind but no such message was given by him to his officials and I see this argument as not contributing to the Claimants' case.

**A 4th September meeting and "Grannies"**

141.    On 4th September there was a meeting involving the Department, No. 10 and the Treasury. Mr Byers was present. The position at this meeting, as Mr Rowlands explained and as I accept, was that it was acknowledged that both the equity and the non–equity models still needed further analysis. They were to be thoroughly tested. As for the former, CSFB had been told that a dividend at any significant level during the proposed recovery period and a significant floor price being ensured for shareholders at its end was unattractive and would lead to huge difficulties but it was still necessary to find from CSFB what was their "bottom line", some minimum proposal which they felt could be put to Railtrack shareholders yet with a real prospect of its achieving the necessary voting support. As for non–equity, could a CLG, a fairly unorthodox model, work in the railway industry and what would the public expenditure consequences be?

142.    It was at this meeting that there was reference to some Railtrack shareholders as "grannies". If there was to be an administration but, of course, with the railway continuing to operate, provision would need to be made for existing creditors who, by

withdrawing their credit or services, could disrupt that operation.  The point being made was that it would look unattractive if lending institutions were thus bailed out but that small individual shareholders - the "grannies" - lost out.  It is a familiar aspect of administrations that shareholders, large or small, take a lowly place in the order of priorities and it is quite impossible to take the reference to "grannies" as indicative of any form of indifference to, let alone malice towards, small individual shareholders.  The reference was not dismissive of them or derogatory;  on the contrary it reflects a concern (though not, I think, one about which much could be done short of providing substantially for *all* shareholders) at the likely public perception of the fate the small shareholders might suffer were there to be an administration.  I should add that whereas the Claimants amount together to a healthy majority of the number of small shareholders, they hold only a very small percentage of the totality of Group's shares (under 5%), which were largely held by institutions.

**The "Trilateral":  5th September**

143.    On 5th September Mr Byers met the Prime Minister and the Chancellor.  Mr Byers said that work done had identified 2 lead options but a lot more work was needed before a decision could be taken.   Both the equity and the non–equity route (the latter involving administration at least as a first step) required hard–headed analysis.  The Chancellor was concerned at the possibility of a huge additional bill for government; neither option, he said, should "score" as public sector spending.  If nothing was done, though, said Mr Byers, Railtrack would go on asking for more money.  The Prime Minister said the decision should be based on which option would deliver the most effective management.  He preferred there being a single regulator rather than the then system of there being both the SRA and the Rail Regulator.  The Chancellor's view (as had been Mr Rowlands' view earlier) was that a "White Knight takeover" was ruled out by Railtrack's financial position.

144.    Mr Rowley draws attention to a manuscript note of the 5th September in which someone, likely to be either Mr Rowlands or Sir Richard Mottram, said "Equity solution proposed unacceptable".  It is important not to drop the word "proposed".  What was being said was that the equity solution as then being proposed was unacceptable.  The note cannot be taken as a view that all along no equity solution could have been acceptable although, as the note of 5th September goes on to say, it was always difficult to imagine an ability to arrive at an outcome that was acceptable both to Group shareholders and to the Government.

**Arthur Andersen**

145. At a Department steering committee meeting on 7th September it was noted that, Ernst & Young having already been instructed to advise on the process leading to administration, Arthur Andersen had by now been retained to advise on accounting matters. SSSB, who had been meeting CSFB, had encouraged Railtrack to put its "best foot forward" by revising Rainbow if it wished the equity option not to be dismissed and re−affirmed that the equity option was still under active consideration. Mr Rowlands expected the equity option to be worked on by CSFB whilst the Department concentrated on the non−equity.

**Another Corry e−mail**

146. Mr Byers told Mr Corry, after the trilateral of the 5th September, that the Prime Minister was interested in what he had called the "dead" equity option and had wanted it worked up. Mr Byers told Mr Corry that that was the Prime Minister's preference. On 7th September, at the level of one Special Adviser to another and without copies to others, Mr Corry told Miss Vadera of that preference and added "We need a bloody good effort to show why this is the wrong option". It is notable that, unlike the case of his earlier e−mail, he does not suggest that Mr Byers had asked him to do what he was doing. The e−mail thus is no more than an expression of a Special Adviser's own view but it does suggest that as far as he knew the equity option was far from discarded.

**SSSB has met CSFB**

147. On 10th September Mr Linnard informed Mr Byers that SSSB had met CSFB and had told the latter that a Rainbow package which gave a guaranteed floor price of more than its then current price - around £3 - was unlikely to be acceptable to government and that the proposed performance measures which would apply needed to be fleshed out. To anticipate a little, on a similar subject, Mr Linnard reported on Friday 14th September to Mr Byers that Mr Robinson had already been asked to see if he could offer a revised version by early in the next week. Mr Byers thus had good reason to think that Railtrack knew that there were possible difficulties as to a floor price and that some revision of it could be expected.

**Mr Harding meets Department officials**

148.    On 10th September Mr Harding met Mr Rowlands and others.  Mr Rowlands said he
did not see how the government could accept a guaranteed floor price for Railtrack
shares.  Mr Robinson accepted in cross–examination that the Department had raised
concerns about the extent to which public funds should be used to support a dividend
and Railtrack's share price in addition to supporting the operation of the railway
itself.  But Mr Harding's response was such that it left Mr Rowlands (to his surprise,
as I would think) with the impression that Railtrack did not need Rainbow as it could
manage and carry on without it.  Mr Rowlands telephoned Mr Robinson to say that
the message the Department had thus got from Mr Harding was very different from
that presented by CSFB.  Mr Robinson then spoke to Mr Harding emphasising
Railtrack's "one option" strategy; one principal option only (Rainbow) should be
presented to the Department as the way forward.  Mr Harding was apologetic; he
had, indeed, spoken of "muddling on" but, he told Mr Robinson, he had nonetheless
spoken of Rainbow as being the best option.

149.    The next day, 11th September, Mr Robinson spoke to Mr Linnard and (according to
Mr Linnard's note) said that Mr Harding had been completely out of line and had
offered Mr Robinson his resignation (as he had).  Railtrack *could*  muddle on, Mr
Linnard was told, but Mr Robinson did not want to do that.

150.    Mr Robinson's memory of these events was very poor and not good enough to deny
the note;  there was no way in which Mr Linnard could have known of Mr Harding's
offered resignation other than from Mr Robinson and I thus accept the accuracy of the
note;  "muddle through" was never a policy (whether or not it could have worked)
propounded by Railtrack.  On the contrary, the "one option" within its "one option"
strategy remained an equity plan.

**10th–11th September 2001**

151. The Claimants seek to make something of a failure by the Department to have told
Railtrack or its advisers at or about this time that a non–equity solution was being
seriously considered by Government.    The evidence on the question on the
Department's side is not clear, depending, as it does, on hearsay.   However, I find it
impossible to regard the point of any real significance.    Mr Robinson never
contemplated administration as being likely, not for want of not being told that
non–equity solutions were being seriously considered (he accepted, à propos the 28th
August, that Mr Rowlands had made it clear that the Department was considering
other options than the equity one) but because all along he thought administration
would be crazy.    Railtrack's or CSFB's actions were more likely to have been
conditioned by that belief of his than by an absence of their being told or told earlier
that non–equity solutions were indeed being considered.    There was no evidence of
any effective material step Railtrack would have taken or would have taken earlier (as
it had no faith in an approach to the Regulator) if only it had been told sooner that
non–equity solutions were being considered, nor did the Government ever say that it
was not considering alternatives to an equity solution.    Nor, either, is there anything
to suggest that if there had been a failure to tell Railtrack it was either by reason of
some decision by Mr Byers or was known to him.

**A meeting is cancelled**

152.  It had been intended that Mr Robinson and Mr Byers should meet on 11th
September.    However, the tragic events in America on "9/11" led to the meeting
being cancelled at Mr Byers' request as he had had pressingly to turn to other issues
than the railways.    Sir Richard Mottram said that both Mr Byers and he had, on and
after 11th September 2001, to deal with events which pre–occupied them for many
weeks.    Mr Robinson suggested (though not, I apprehend, on the basis of personal
knowledge) that thereafter calls from Railtrack were not returned.    Mr Byers (again,
without, I assume, personal knowledge on the point) said he was sure calls would
have been returned.    The issue is incapable of resolution but it would have been
remarkable if, finding themselves repeatedly spurned, as it would have seemed to
them, Railtrack officers would not have made *some*  comment on the point by e–mail
or in writing.    Nothing such was shown to me.

**A third Corry e–mail**

153.   On 12th September Mr Corry sent an e–mail to Mr Linnard saying, of the Department's lawyers, "× they worry me.  They need to be asking how we can deliver what our [Secretary of State] wants, not why it may be difficult.  Let's keep them up to the mark".  Mr Rowley somewhat ambitiously tried to build that into an indication that Mr Byers had already divulged to Mr Corry that what he wanted was to push Railtrack into administration and for the exit from the administration to be a CLG.  Mr Byers, who was clear that he had not yet decided what to do, also denied that he had had any private discussion with Mr Corry to the effect suggested by Mr Rowley.  I accept that.  It is notable that Mr Corry does not identify what it was, that, in his view, "our [Secretary of State] wants"; I take the e–mail to be no other than something corresponding to the familiar bleat on behalf of a client that his lawyers seemed more interested in pointing to difficulties than to early solutions.

**The Paddington Survivors Group meet Mr Byers**

154.   On 12th September this Group, formed to get support for the survivors of the Ladbroke Grove rail crash, met Mr Byers and his Parliamentary Private Secretary, Mr Hill.  Two witnesses gave evidence for the Claimants on what was said at the meeting.  Pamela Warren said that members were not happy that the commercial aspect of Railtrack provided the right atmosphere for safety to be of primary concern.  She continued:–

> "Mr Byers and Mr Hill sat back, exchanged a glance and smiled.  Mr Byers said, again to the best of my recollection, that Railtrack would not be a problem for much longer and that we should watch out for around the early part of October 2001 when we would have some news that would be "very pleasing to us".  While I cannot recall the precise words he used, I am very clear that he was suggesting to us that decisions had already been made and Railtrack would cease to exist as a viable entity in October 2001.  I made this assumption on the basis that, having run a business myself (as others in the PSG had done) there was no other explanation for Mr Byers' statement as far as I could see and as was subsequently proved."

155.   Leaving aside whether those last words indicate that Pamela Warren was relying on later events to found an assumption made at the time, I do not see how, on the safety issue, an announcement that pleasing news was to be released in October could justify an *assumption* that Railtrack would cease to be a viable entity in that month.  Whatever option was chosen by Mr Byers, there would either be stringent new performance targets for a re–structured Railtrack under Rainbow, with Railtrack's "commercial aspect" reduced by way of a controlled dividend or, if there was an administration, the Company would still exist but with its management in new and different hands.  Mrs Warren, who did not give any oral evidence, does not suggest that Mr Byers mentioned any particular date for the release of the good news.

156.    Mr Martin Minns, also at the PSG meeting, whilst in his witness statement saying that he did not recall Mr Byers' precise words, said that Mr Byers had said words to the effect that Railtrack would not be a problem for much longer and, "watch out for October 8th for an announcement which I think you will find very interesting and to your liking".  He adhered to that in his cross–examination.  He, too, had Mr Byers and Mr Hill exchanging a smile as the remark was made.

157.    Mr Byers had no memory of the conversation at all and accordingly Mrs Warren's and Mr Minns' evidence goes uncontradicted but even so I am unable to treat it as evidence that by 12th September Mr Byers had already decided to put Railtrack into administration; still less can I accept it as any evidence on the more material question of *why* Mr Byers should have so decided, at all events if it was not being suggested by the Claimants that it was for rail safety reasons.  By 12th September Mr Byers had had no advice as to whether Railtrack was, in Insolvency Act terms, insolvent, whether he was in a position to petition for an administration and whether it would be delayed or resisted if he did.  It would have been quite impossible for him on 12th September to specify 8th October as the date on which Railtrack's administration was to be announced even though that was the date on which that announcement was in fact made.  Moreover, although this is a very minor point, the evidence of the exchange of smiles between Mr Byers and Mr Hill would seem to hint, if administration had indeed already been decided on, that Mr Hill may already and might thereafter have been complicit in later dissimulation, namely that no decision had yet been made whereas one had been and was such that arrangements were already in place to lead to an announcement on or about the 8th October.  There is nothing to suggest he was so complicit nor would have been willing to be.

158.    Accordingly, whilst I do not doubt that Mrs Warren and Mr Minns were giving their honest recollections, their evidence does not materially assist the Claimants or damage the Defendants.

**A Departmental Meeting**

159.    It was suggested to Mr Rowlands in cross–examination that at a departmental meeting on 13th September Mr Byers had indicated that there was to be no more financial support for Railtrack.  The suggestion was based on a cryptic passage in a contemporary manuscript note.  The note could equally suggest that that was a subject which, with others, would need to be addressed before the next meeting with the Prime Minister.  Mr Rowlands resisted the suggestion on the basis, which I accept, that if Mr Byers had said as was suggested, then Mr Rowlands would have had to tell him that the Department would accordingly have had immediately to advise Railtrack that that was the case.  Mr Rowlands did not then so advise Mr Byers and Mr Rowlands' evidence was that Mr Byers had not then said as it was being suggested he had.  Mr Byers' evidence was also that there was no such decision at this meeting and I accept that to have been the case.

160.    Sir Richard Mottram, also at the meeting, is attributed in the note as saying, of Renewco, "Slow it down".  This, he explained, was not merely because State Aid

clearance for it was still awaited but because of the advice received that going ahead with Renewco could be premature, in the sense of sending what could transpire to be the wrong signal to the Market and to Railtrack. It could suggest that the Government was standing behind Railtrack even if that had not yet been decided. To avoid what Sir Richard called piecemeal decisions, a decision on Renewco had to be or might need to be slowed down. I accept this reasoning; delay in implementation of Renewco was not part of some cynical manipulation intended to exacerbate Railtrack's difficulties but was attributable to a wish not to send out the message that the Government was supporting Railtrack at any time prior to that having been formally decided. A slowing down of Renewco thus provides no ground for any material inference against Mr Byers.

161.    On the same day, 13th September, Arthur Andersen were requested to consider whether the government could successfully petition for a Railway Administration Order.

**Both sides' advisers meet**

162.    On 13th September CSFB and Deloitte & Touche on the Railtrack side and SSSB and Arthur Andersen on the Department side met to discuss issues affecting Railtrack's liquidity and its going concern status. The Department side were told that the uncertainties faced by Railtrack, including those as to the WCML and the outcome of a Hatfield Re−opener, meant that its directors were highly unlikely to be able to sign off on the prospectus that would be necessary for the bond issue that Railtrack needed in the first or second quarter of 2002 in order to keep going until settlement of a substantial Hatfield Re−opener. On that basis the November 2001 interim accounts, needed to be settled by late October 2001, would be likely to have to include a strong going concern qualification. Because of that, Railtrack was unlikely to be able to draw down on existing but undrawn "bridge" facilities and hence would experience a "liquidity squeeze" from early December. All this worrying news was despite its being assumed that Renewco would go ahead.

**Mr Linnard's Memorandum**

163.  On 14th September the Department's Director of Railways, Mr Linnard, wrote a memo to Mr Byers.  Of the so−called "muddling through" option which had been thought to have emerged, he advised that both Mr John Robinson and he thought it very unattractive.  He looked at both equity and non−equity solutions.  The non−equity route, only achievable through administration, had the advantages that there would be no shareholders so the CLG could be run in the interests of the public, passengers and the industry;  TOCs as members could make the CLG responsive to the TOCs' demands and the SRA and the Office of the Rail Regulator could be merged.  He added, though, that "We cannot pretend to have got to the bottom of these issues".  It was hoped to be able by the 18th September to answer questions such as what were the best equity models, whether one could be certain that Renewco did not *have* to be proceeded with and whether was there enough evidence to put Railtrack into administration.  He plainly did not take it that equity solutions had been already ruled out or that administration had already been decided upon as either as an acceptable or as the already−chosen course.

**Renewco as the kiss of death**

164.  On 17th September Miss Vadera sent to Mr Corry an e−mail which said "I don't think we can sign Renewco - it's the kiss of death for the admin option".  It would, she thought, send the market a signal that Railtrack was going to be bailed out by the government and the government would then not be able not to bail it out.  *Her* reason (not identified as anything but that) for not doing Renewco might have had different causes than those of the Department but her e−mail was not inconsistent with Sir Richard Mottram's wish to avoid piecemeal decisions in order not to risk misleading both Railtrack and the market.

**A meeting between the Department and No. 10 Officials**

165.  On 17th September Mr Rowlands chaired such a meeting.  By now the government perception of Railtrack's position as disclosed by CSFB was that, whilst modifications to Rainbow were still awaited, if no additional government support was given the company was not going to be able to go on.  If there was to be no such support the question became whether, if no equity model was chosen, Railtrack was to be allowed simply to collapse into administration or whether the Government had some part to play.  It was emerging by now that there could very well be a decision not to adopt an equity model.  If that was to be the case and there was to be no additional funding, should the government itself take steps under the Railways Act?

166.  Mr Byers by now, according to Mr Corry as he said at the meeting in Mr Byers' absence, had indicated that he *preferred* the non−equity model (not that he had decided on it or against any other) but, consistent with the notion that one could not decide on administration, a first step, without knowing what the consequential steps would be, that it was necessary to know whether a CLG was "a runner".  It is of little

importance but I would be inclined not to accept Mr Byers' evidence that at this stage he still did not have a preference as between the equity and non−equity options if, by the equity option, he meant Rainbow.  When Mr Corry said what was his Minister's preference at this meeting no one seems to have dissented and it was a simple enough message for Mr Byers to have given to Mr Corry and for Mr Corry to have passed on.  Mr Linnard's recent memos had given reason to prefer a non−equity solution. Mr Rowlands, too, spoke of the general feeling, about mid−September, that the non−equity option was more attractive than either the equity route or than simply handing over yet more money.  Whilst I accept that as yet Mr Byers had made no *decision* and that he wanted further work done to establish feasibility, I prefer Mr Rowlands' view, that, without there being any clear point at which, as if on the road to Damascus, a clear realisation suddenly emerged that the non−equity model was alone the one that had to be followed, the position, in my judgment, was that by now the non−equity model was, so to speak, the front−runner as between it and Rainbow so far as the Minister's *wishes* were concerned and that Mr Corry had been right to say so.

167.   However, if, by saying to me that he had then had no preference, Mr Byers had meant none as between *some* equity solution and the non−equity option (which is, I think, what he meant) rather than limiting the equity route to Rainbow, then I would accept Mr Byers' evidence that he would have welcomed an equity proposal from Railtrack that was politically acceptable.  "What I was unprepared to sign up to", he said "was a commitment to give a taxpayers' guarantee to the payment every year to Railtrack shareholders, which was part of Rainbow, to give a guarantee that there would be a floor price for the shares × when they had come out of their period of convalescence × The only circumstance in which I would have been prepared to do so is if we had been able to achieve some very good performance target out of Railtrack, and there then is a possibility that in political terms one could perhaps have deployed arguments in favour of using taxpayers' money that way".  Preference apart, until a wholly reliable alternative to Rainbow appeared, Rainbow could not, as Sir Richard Mottram said in evidence, be ruled out.

168.   It was put to Mr Byers on the strength of a passage in the contemporary note of this meeting that he had refused to meet Mr Robinson.  He said there had been no policy of avoiding such a meeting and that in any event Mr Robinson would have had access to Department officials.  I have not been taken to any contemporary but declined requests for a meeting and I accept Mr Byers' answer on this point, especially given the pressures after "9/11".  I add that the reason given for the suggested decision to avoid meeting Mr Robinson was that it was to avoid Mr Robinson having the opportunity to put in place an alternative to Rainbow once told it was unacceptable. But even now an equity option had not yet been fully ruled against and all along it had been chiefly CSFB rather than Mr Robinson alone who had presented Rainbow and amendments to it and the Department was already awaiting further refinements to CSFB's proposals as to an equity option.  The reason given for the suggested policy of avoiding meeting makes no sense.

**Mr Robinson:  kept at bay?**

169.  On a similar issue, it was asked of Sir Richard Mottram whether the Department had deliberately tried to keep Mr Robinson at arms' length so that Railtrack would not discover the government's thinking until it was too late for it to devise some alternative strategy (to Rainbow) in order to get out of its difficulties.  He denied that had been the case;  if it had been, he would have been told of it (presumably to prevent him making or accepting contact with Mr Robinson) and hence would have known of such a plan had it existed.  I accept his evidence.  Railtrack was in contact with the Department by way of several individuals, not just Mr Robinson, and any plan to ensure that it was kept in the dark would have required not merely a decision that there should be such a plan but a circulation of the decision to ensure it was implemented.  The absence of any evidence of the latter suggests the non–existence of the former.

**CSFB's proposals on the 18th September**

170.  On 18th September CSFB in Mr Robinson's presence presented an amended "Project Rainbow", a version which Mr Robinson described as its first really worked–up version.  Railtrack, it said, was in a precarious financial position.  Without agreement on direct government support this position would come to a head at the latest on 8th November when it had to publish a going concern statement.  An alternative for the company was an early approach to the Regulator "which may well result in administration".  Against that background the earlier Rainbow proposals were further developed.  Over the contemplated 3–4 years of the proposed plan dividends would be capped at 15p per annum and there were now sub–models, one with a floor price and one without.  Beyond what was already contemplated within the Endeavour–cum–Renewco plans, some £1bn would be needed from government.  CSFB felt that this was a proposal which Group shareholders and its Board should support.

171.  There was a sting in the tail which in effect said that if this plan proved unacceptable the likelihood was that CSFB would have to pursue other options, including administration.  It was CSFB's own position that Railtrack was not in a position to forecast its financial future with an acceptable degree of accuracy, that the Regulator had been clear that he would not accept an approach from it at the time and that only with government support could the necessary going concern statement be made in its 8th November accounts so as to enable Railtrack to draw down on existing facilities at about the same time.  Without the going concern statement it was most likely that a prospectus for a bond issue would not be possible now and that that might precipitate administration.

172.  Mr Robinson in his written evidence had felt that this picture painted by CSFB was unnecessarily gloomy but it was the picture that was presented on Railtrack's behalf and in cross–examination he was unable materially to disagree with it.  "We had always believed", he said, "that going down that route", namely seeking an interim review by the Regulator without the company being satisfied it had government

support, "could in the long run take us into administration".  Mr Robinson could not accept that it could ever have been contemplated that Railtrack might itself seek its administration but that, I think, was more a reaction based on his feeling that administration would, in his word, be "crazy" than on a study of the text of the proposals which he himself introduced and which plainly hint at that as a possible Railtrack ultimate position.

173.    Mr Rowlands took these lengthy proposals to be Railtrack's long−awaited "bottom line" but the Department side did not respond immediately.  They took the proposals away to digest.  Mr Rowley sought to criticise Mr Rowlands for not saying there and then that the proposals were unacceptable;  I do not see it as unreasonable for them instead to have been taken away and studied.

**The bottom line is reported to Mr Byers:  18th September**

174.    On the afternoon of the 18th September Mr Rowlands reported to Mr Byers, in the presence of representatives of No. 10, the Treasury and SSSB, on the meeting earlier that day when an amended Rainbow had been presented.  No one thought this new Rainbow, Rainbow II, was materially better than Rainbow I.  Mr Linnard told Mr Byers, as was the case, that the Department's legal advice was that the Government was not committed to proceeding with Renewco, as to which a decision from the European Commission was still awaited, and that Renewco was in any event pregnant with the difficulty that it might "score" as public expenditure.  Administration was briefly discussed and Mr Rowlands turned to discuss the hypothetical position that could arise if it were decided, on public policy grounds, that the right course was administration.  It was not thought that the Department "held all the cards" such that it could force an administration.  Indeed, Mr Rowlands advised that there was no prospect of the government unilaterally putting Railtrack into administration - a negotiated solution seemed essential.  Mr Byers said, as I accept, that he had not yet reached a final decision as to the way forward.  He would hardly have decided that there should be an administration if only because he was given the advice that an administration could not be forced on Railtrack and that it would require negotiation.  Moreover, as Mr Rowlands pointed out in evidence, to decide that the new form of Rainbow, Rainbow II, was unacceptable did not of itself mean that there would be no further financial support for Railtrack as if there was no acceptable option so far identified *some*  further alternative would have to be found.

**A "muddle through" option**

175.    By now "muddle through" could not be considered, if it ever could have been, as an option which had either been in fact presented to the Department or which could be seriously supported by Railtrack.   When it had earlier been hinted at by Mr Harding it had immediately been disavowed to the Department by Mr Robinson as a Railtrack proposal.   Nor could it have now been revived;  Mr Robinson in his evidence to me candidly gave sound reasons why doing nothing was not a viable option from Railtrack's perspective.   In any event there is nothing to suggest that it would have attracted Department support, where the perception was, as Mr Rowlands spoke to in evidence, that Railtrack was shameless in asking for more money.

**The Prime Minister and the Chancellor are briefed by their officials**

176.    Mr Atter, who had moved from the Department to the Treasury and who had been at the earlier meeting on the 18th, reported on the same day to the Chancellor recommending, subject to Mr Byers clearing a number of outstanding issues with the Chancellor, that it should be agreed to put Railtrack into administration and replace it, so said his summary, with a not–for–profit trust (although his fuller text refers to a CLG).   Although his summary thus spoke of putting Railtrack into administration his text acknowledged that the government did not have sufficient information to do so without the company's agreement.   It was plainly in mind that the *threat* of a short emergency bill to override any intervention from the Regulator would be likely to procure from Railtrack the cooperation from the company which would be needed.   He added that the current view, now that the "small print" of Renewco had been examined, was that it would "score" as public sector borrowing.   He drew up a list of 10 Treasury issues that needed to be resolved.

177.    At much the same time Dr Hackland reported to the Prime Minister that Mr Byers was convinced that a CLG via administration was the best way forward but that the lawyers had advised that a contested application for one might fail.   He, too, wrote of quick legislation to close off any attempt by Railtrack to re–open its settlement with the Regulator.   Negotiations with Mr Robinson, he suggested, should be begun.

178.    Dr Hackland was of the view that by touching on administration if Rainbow were not accepted, CSFB were, in effect, hoping to pressurise the government towards Rainbow.   If so, it was a dangerous strategy; it depended on the government regarding administration as virtually unthinkable, as "crazy" as Mr Robinson did.   That plainly was not the case.

179.    I have no doubt but that by now Mr Byers, as Dr Hackland reported, was convinced that administration followed by a CLG was the best way forward but it was still uncertain whether that would be possible and accordingly no decision had yet been reached that it was to be sought.   At the Department, said Mr Rowlands, in the remainder of September what was looked at was, *if* administration was to be the chosen route, how could a point be arrived at which Railtrack would agree with the

Department that it should go into administration, as the Department was not sure that it held all cards needed to procure an administration without that agreement.

180.    At about this time there is a manuscript note of Mr Rowlands having said at an inter–departmental meeting that "Govt int is to collapse the share price".  The abbreviation "Int" has been taken to be for "interest" rather than, for example, "intent".  There is an argument which Mr Rowlands developed in his re–examination that it could have been in the Government's interest to collapse the share price; although, in ordinary circumstances, whether or not there should be an administration would be unrelated to a share price, it could have been that if the share price had been greatly reduced its Board might have been less willing and able to resist administration than it would have been had the price remained high.  On that basis it could have been in the government's interest to collapse the price but, as I see it, nothing can be made of the point.  It is not said that the Government did collapse or attempt to collapse the share price or that Mr Byers required that to be attempted.  Nor does it even establish, as the Claimants' final submissions sought to say, that it showed that efforts were being made to devise a strategy from which Railtrack had no escape which, of itself,  would in any event not have been a wrong in relation to the tort I am here considering.

**The Second Trilateral**

181.    On 19th September Mr Byers met the Prime Minister and the Chancellor to discuss Railtrack's affairs.  Mr Byers ran through the options.  Rainbow was "unlikely to deliver" and "muddle through" was clearly inadequate.  A CLG, by contrast would ensure that the public interest was paramount and it could be best to get there by administration but that would require Railtrack's cooperation and would necessitate difficult talks with Mr Robinson.  The Chancellor, concerned with costs, put forward a list of 10 key issues ("the ten commandments") which needed to be resolved before any decision was taken.  There was support for a CLG from No. 10, subject to the 10 Treasury issues being met.  The CLG would need to be off the public balance sheet but would offer improved performance although it could take 2–3 years to sort Railtrack out.  The Prime Minister asked Mr Byers to aim to be ready to begin negotiations with Mr Robinson by 28th September.  It was agreed that urgent legislation to prevent the Regulator's intervention could be necessary.

182.    Mr Byers' evidence that even now there had been no *decision*  to go down a particular route was plainly right.  The Administration–cum-CLG route required negotiations, possibly legislation and in any event satisfaction of the Chancellor's "ten commandments";  the negotiations might fail, legislation could be delayed and one or more of the "commandments" might be failed.  It could still be that some other route would have to be found and, however unwelcome, would have to be tolerated.  As for Renewco, whereas the Department felt that it would not "score" as public borrowing, the Treasury thought that it would.  If it did "score" as public then one of the "ten commandments"  would be broken and there would have to be fresh thinking.  Just as there was no decision yet on the route to take, so also was there no decision on the closely related subject of whether there was to be any finance for Railtrack beyond its present legal entitlement or any other indication of general

financial support for it.   At the Trilateral Mr Byers had deliberately said that Renewco was not closed off as, so far as he was concerned, no doubt taking his Department's view, it was possible that it would not "score" as public.   But thereafter the work of the professional advisers (as opposed to that of the Department itself) was directed exclusively to the Administration−cum−CLG route.

**Arthur Andersen report**

183.    On 26th September Arthur Andersen, who had been instructed on the 13th, as I have noted, reported.   They had had no access to Railtrack staff or documents.   They set out the Insolvency Act test.   Railtrack's balance sheet, they said, appeared solvent but, given a number of uncertainties to which they referred, they were unable to conclude whether or not Railtrack was or was likely to be unable to pay its debts as they fell due.   Mr Rowley suggested that this was a blow to the Department.   I accept Mr Rowlands' evidence that it was not so regarded, but was consistent with the Department's view that *if* there was to be an administration it would best be done by co−operation;  he had in mind a joint petition of the company and the Secretary of State.   It could, of course, have been  that fuller recourse to Railtrack's books would have shewn the insolvency that a limited view had hidden.

**SSSB report: 26th September**

184.    On 26th September SSSB reported to the Department with a preliminary valuation of Railtrack and its implications for the treatment of shareholders if there were to be an administration of Railtrack.   The enterprise value of Railtrack, they said, approximately corresponded to the total net value of its debts and their preliminary valuation (though the valuation range was wide) indicated no clear present grounds to justify the government making an offer to a prospective administrator which would result in *any*  value (my emphasis) being realised by Group shareholders.

**A submission to Mr Byers**

185.   On 26th September Mr Rowlands made a detailed progress report to Mr Byers.  He reported that the Department had devised a workable structure for a CLG intended to "incentivise" the CLG in delivering the core railway.  It was still dubious, though, whether the CLG would be classified to the private sector, as was necessary if it was to be implemented.  Given the professional advice received, it was thought that Railtrack's value roughly matched its debt and there was thus no clear economic ground for the government to offer to buy out its shareholders.  Ernst & Young, whom the Department would ask the Court to appoint as administrators should Railtrack be insolvent, had made progress in preparing for the rôle but were asking for an indemnity even from criminal prosecution, an issue that would probably need to be taken to the Law Officers.  There were public law risks in any decision *not* to fund Railtrack but two Leading Counsel, he reported, had advised they they could be robustly defended provided, inter alia, that the action taken was in the public interest.  As for Renewco, it was recommended that it should not go ahead if there was a prospect that Railtrack could go into Administration but that the grants of £162 million and £335 million should be paid on 1st October as there would be a legal obligation to pay them.  There was a risk, though, said Mr Rowlands in his report, that the SRA would refuse to pay the grants.  "In broad outline", though, recommended Mr Rowlands "we have now assembled a set of proposals that, subject to Railtrack not coming up with some entirely unexpected factor, and if insolvency is established, has the potential to deliver a better core for the future of the railways" − but the ten commandments had to be satisfied before a decision was made to proceed down *any* path.  The crucial outstanding points were that the CLG would be acceptable in policy terms to its potential members and would score to the private sector.  More time was still needed.

186.   Mr Rowlands' advice was framed in language consistent only with there having been, as far as he knew, no final decision not to entertain any further proposals put by CSFB, no final decision not to fund Railtrack beyond its present legal entitlement and no final decision to seek, alone or with the company, the administration of Railtrack.

187.   Mr Rowlands was taxed in cross−examination with his view, in this submission, that Railtrack had "not yet sought seriously to engage with us" on its proposals for an equity solution.  He reluctantly accepted but then withdrew that there had been a lack of serious engagement on both sides.  It is a small point but I do not see the chronology as leading to any blame on the Department.  It was entitled to expect, if CSFB and Railtrack were truly anxious, even desperate, to develop and present an acceptable equity solution, that they would, as Mr Rowlands said, have been on the Department's doorstep every day, which they plainly were not.  Unacceptable aspects of Rainbow I and II had been pointed out.  Group, Railtrack and CSFB were the persons best able to judge what would or would not be acceptable to Group's shareholders.  It was thus, as Mr Byers said, incumbent on CSFB and Railtrack to come up with a package which was going to be acceptable to the government.  I re−iterate that I do not hold the course of negotiations on Rainbow to reveal any ground for any material inference against Mr Byers.

188.    The copy of Mr Rowlands' submission bears, in Mr Byers' handwriting, the words
        "Rainbow to be killed off".   "To be" suggests it had not already met its death.   Mr
        Rowley sought to say that the words indicated that the time had come to bring
        discussions with Railtrack and its advisers to an end.   In my view Mr Byers was right
        to deny that;  it was Rainbow not discussions or negotiations generally that the words
        suggested were to be at an end and in any event negotiations with Mr Robinson about
        a possible co–operative approach to administration were contemplated as necessary.
        Mr Rowley bolstered his approach by referring to another Corry e–mail, also of 26th
        September, which said "There is a view that we should get the discussion of Rainbow
        out of the way before [28th September]" but that does not assist him;  it suggests that
        discussion of Rainbow was not yet out of the way and again it is only discussions of
        Rainbow rather than either discussions generally or discussions on some other equity
        route that were to be got out of the way.   There is no evidence that the "view" to
        which it refers was Mr Byers', nor, I add, any evidence that Mr Byers had ever told
        his officials either to conceal from CSFB and Railtrack that Rainbow (or *any* equity
        solution) was unacceptable or to pretend that it might be acceptable.

**An inter–departmental meeting**

189.    On 27th September Mr Byers with his officials had a meeting at which Miss Vadera
        represented the Treasury and Mr Challen SSSB.   The principal task of the meeting
        was to work through the ten commandments.   Mr Byers is recorded as saying, of
        Rainbow, "need to kill it off".     Mr Rowlands accepted that by now Rainbow as
        proposed had no life in it but the position, he said, was still, that if the CLG "scored"
        as public, then they would have to go back to some other version.   He was thus
        proposing to have a last meeting on Rainbow as to performance targets.   The plan to
        have a last meeting on Rainbow was not overruled.

190.    Mr Byers made it plain, as, in effect, had the Treasury, that if the CLG "scored" as
        public it would not go ahead.   If the Chancellor would not agree to it, it simply could
        not go ahead.

191.    On the same day Mr Byers advised his officials and others that the forthcoming
        substantial payments shortly to become due to Railtrack had to be paid irrespective of
        any final decision on Railtrack's case.   It is difficult to see that as the act of a man
        determined to harm Group's shareholders.

192.    It was put to Mr Byers in cross–examination that he was stalling Railtrack on
        Renewco, meaning, I apprehend, that Railtrack was not being told that Renewco
        would not go ahead lest that might prompt it forthwith to seek an interim review from
        the Regulator.   But Mr Byers, credibly in my view, and consistently with the
        Department's earlier approach, said that he did not want to take a *separate* decision
        on Renewco;  legal advice was that adopting Renewco if there could still be a
        decision not to finance Railtrack would give the wrong message to the market and, he
        could have added, telling Railtrack that Renewco would not go ahead at a time when
        it could still be decided further to finance the company could precipitate a crisis
        within the company.   The idea of legislation to prevent the Regulator intervening and

undoing the political decision, if there was to be one, not further to fund Railtrack was acknowledged as something which, the Department thought, Railtrack would regard as a hammer blow. Mr Byers wanted that to be the case; if there was to be a decision not further to fund Railtrack, Mr Robinson was to be left with no option, none other, I take it, than to cooperate in seeking administration. It was at this point in his course through the chronology that Mr Rowley put point blank to Mr Byers in cross–examination that his intention was to injure the shareholders in Group by removing the assets of Railtrack plc without paying compensation to shareholders. Mr Byers answered that there was no such plan.

**Grant monies**

193. On 28th September the Department paid the SRA £336,590,000 as the "Endeavour" grant for passing on to Railtrack. On the 1st October Sir Richard Mottram indicated to the SRA that if the Schedule D grant of £162,000,000 payable under the Regulator's 2000 review was requested by Railtrack, then that, too, would be paid to the SRA. The Department was meeting its existing commitments to Railtrack.

**Railtrack and CSFB meet the Department**

194. On 3rd October there was such a meeting. SSSB attended. By now the Department was confident that Railtrack had reached its "bottom line" as to Rainbow's structural terms but it had always been intended, as I have mentioned, that there should also be performance targets or requirements as part of the quid pro quo of the government's support. CSFB accordingly made a presentation on performance. There is a dispute as to whether someone on the company side - Mr Robinson or Mr Nelson - said that if no action was taken within the next few weeks then administration would become a real possibility. Mr Rowlands believed that that was said and SSSB's note records the gist of it. I accept that it was; firstly, that it should have been said was consistent with CSFB's presentation of 18th September that if an alternative to Rainbow was intended (and doing nothing would be an alternative) Railtrack might need itself to pursue administration. Secondly, the timing - the next few weeks - broadly fitted in with the need to complete the Railtrack November interim accounts, which would need a going concern statement, by late October. Thirdly, if Dr Hackland's interpretation of CSFB's and Railtrack's negotiating strategy was right - that a wholly unacceptable (as Railtrack thought) administration was being used in terrorem to drive the government towards Rainbow – then one would expect the possibility of administration to be mentioned by the Railtrack side to remind the government of the dire alternative to Rainbow. Finally I did not take Mr Robinson's evidence to be that it was not said, rather that it was not said by him. SSSB's note attributes it to Mr Nelson.

195. Renewco was touched on. Mr Harding asked if it was still on the table? Mr Rowland said it was "but there were issues to be resolved. Stephen Byers had made clear that he would decide whether Renewco should proceed". He was undoubtedly playing his cards close to his chest but he had to; to say it *might* be rejected could panic Railtrack into a stock market announcement that government support might be

withdrawn;  to say it would be adopted could mislead Railtrack that that support was forthcoming.   In any event the reference to "issues" and to a decision not as to *when* it would proceed but *whether* it should ought to have conveyed the message that Renewco could not assuredly be relied on.

196.    Mr Robinson left the meeting in a mood of optimism about government support but I would attribute that more to his conviction that a deliberately−sought administration was so unthinkable as to be crazy than to an analysis of what was being said.

**That meeting is reported to Mr Byers**

197.    Still on 3rd October there is a document which Mr Rowley treated as made after the meeting on that day with CSFB and Railtrack.   I shall treat it as such although some of its grammar suggests to me that it was made before the CSFB meeting.   In it Mr Rowlands still described Rainbow as an alternative.   He believed a CLG could score as private.   He spoke of the possibility of legislation to avoid intervention by the Regulator as a key part of the Department's negotiating hand.   Presumably consideration of legislation to circumvent the Regulator undoing what would by then, if adopted, be government policy - no more funding for Railtrack beyond the present entitlement - was on the unspoken assumption that Railtrack would *apply* for an interim review.   In fact, to anticipate, Railtrack never did so apply.   Mr Rowlands raised the question of whether the final decision on Railtrack's funding was only for Mr Byers and the Chancellor or whether the Prime Minister should also be brought in.   If the CLG route was adopted he recommended that Mr Robinson should be called in and be so told, as should the Rail Regulator.   The language of the paper is consistent only with no decision having yet been reached, so far as Mr Rowlands understood, either on further funding or administration−cum−CLG, though he felt that Railtrack would have little choice but to cooperate with whatever route the government favoured.   The government, if needs be, should be ready, he said, to put out a statement that as a matter of policy it would provide no further financial support beyond Railtrack's present entitlement.   That would be to deal with the case as it would be if Railtrack did not cooperate on a *joint* petition for administration.   That would pull the rug from under Railtrack;  it would avoid them dragging the process out.

198.    There was also a report by Mr Rowlands on 3ʳᵈ October to Mr Byers and others that was unequivocally after the CSFB meeting.   The ONS's ruling on how the proposed CLG would score was expected on Friday 5ᵗʰ.   Mr Byers said he would formally decide then.   A decision by the ONS as to the scoring of Renewco was also awaited. The ruling on the CLG was asked by the Treasury to be given priority over the one for Renewco.

199.    Mr Rowlands was in no doubt as to the message that had been conveyed to the Department by Railtrack and CSFB on 3ʳᵈ October.   In cross−examination he said, as I accept, that " ×. We were told at the meeting of 3ʳᵈ October that there was a crisis coming within a fortnight.   We would have had to have done something, because we

were in danger of them simply collapsing possibly unprepared into administration and all of the difficulties that that might have resulted in".

**Miss MacKenzie's evidence**

200.    Her evidence, not challenged, was that at a meeting at 5.30 p.m. on 3rd October Mr Byers confirmed he had reached  no decision on whether or not to provide further funding to Railtrack.   She advised Mr Byers (and was satisfied that he understood the advice) that the decision as to additional funding had to be made on the basis of the issues relevant to *that* decision and must not be confused with later–arising issues such as the desirability or otherwise of the CLG route.

**A meeting is arranged**

201.    On the 4th October Mr Robinson was asked if he could meet Mr Byers at 4.45 p.m. on the 5th.   Presumably Mr Byers had been confident that the ONS classification would be known by then though doubtless the meeting could have been postponed were it not.   On the 4th CSFB prepared a "talk sheet" to prepare Mr Robinson for the meeting.   Mr Robinson did not agree with the talk sheet; he regarded it as unhelpful but it throws further light on what the experienced team at CSFB, who had had full access to Railtrack papers and staff, appeared to think was the company's position at the time.

202.    CSFB advised that an approach to the Regulator could result in an administration; the attitude of the Regulator was such and the time likely to be needed for a review meant that that was so.   It was almost impossible to envisage the Regulator responding quickly enough to save the company from administration.   Without government support it would not be possible to continue trading as a going concern and the company would be forced to go into administration immediately.

203.    It could have been that CSFB's talksheet exaggerated the danger Railtrack was in as a negotiating tactic to be adopted by Mr Robinson but the sheet gives no hint that the views expressed were other than its true views and they were consistent with CSFB's views as presented to the Department and its advisers at the meetings.   I hold them to have been CSFB's true views.

**Mr Byers speaks to the Prime Minister**

204.    On 4th October Mr Byers telephoned the Prime Minister to say that he was close to reaching a decision and that the final piece which had to fall into place was the ONS classification.   The Prime Minister was content to leave the final decision to Mr Byers but said that Mr Byers would need to speak to the Chancellor as to the level of funding needed if he was to decide to let Railtrack "muddle through" or, alternatively, to show that the 10 commandments were satisfied if Mr Byers elected for administration–cum–CLG.

**A decision is made**

205.   On 5th October Mr Byers telephoned the Chancellor.   The ONS classification was still awaited.   Mr Byers was keen to keep the CLG option open and would, within limits, have striven to meet whatever requirements the ONS might have specified to ensure that it should be "scored" private, as had all along been essential if the Chancellor was to sanction it.   It was agreed that until the scoring was known Mr Byers could reach no final decision.   So, as Mr Rowlands accepted, efforts were made on the morning of Friday the 5th to get that classification.   Further, Mr Linnard provided Mr Byers with a summary paper.   It invited Mr Byers to reach a decision on whether or not to agree to Railtrack's request for a package of financial and other assistance.   It described the timing as "urgent".   Plainly, Mr Linnard did not think a decision on that point had yet been made.

206.   Just short of 1.40 p.m. the message was received at the Department that, in effect, the CLG proposed would be classified by the ONS as private and that the Treasury took that to be a sufficient assurance that the Department could move ahead on the basis that the CLG would formally be so classified.   Without awaiting the formal decision of the ONS, not received till later that afternoon, Mr Byers made his final decision on funding in the afternoon of the 5th.   He was satisfied there should be no further funding for Railtrack (meaning, I apprehend, funding beyond its then present entitlement).   He had not so decided earlier.   A decision that there was to be an administration of Railtrack or that that should be attempted was not made earlier than the 5th.

207.   In a passage in his witness statement not put to him in cross−examination he said:−

> "I decided against supporting the "Rainbow" option favoured by Railtrack and pouring more public money into the company.   We had funded Railtrack in the past and made it clear we did not stand behind individual companies.   I had to consider how many more times they would come back for a further handout.   There had to be a time to say no.   Railtrack had not controlled its costs - there were many deep−seated problems.   It would not be right, I felt, to provide further funds for it.   I did wonder whether it was worth the pain as, politically, more funding had an attraction.   However, it could not have solved the problem.   If we had given increased funding to Railtrack at this stage (i.e. used the muddle through option to get through the interim result stage) Railtrack's funding difficulties with the West Coast Main Line (and, indeed, every major project it was involved in) would have been the cause of further concern."

208.   The decision made, the Regulator and the Company had to be told.

**Mr Byers tells the Regulator**

209.   At 4.0 p.m. on the 5th the Regulator met Mr Byers and Mr Rowlands at Mr Byers' office.   The meeting had been arranged on the 4th but Mr Winsor had not been told what it was to be about.   Mr Winsor was told that there would be no further financial support for Railtrack, that its administration would be sought that weekend and that Renewco could not proceed.   It became apparent to Mr Winsor that Railtrack had been deliberately keeping him in the dark.   He said that Mr Robinson's reaction would be likely to be an immediate application for an early interim review.   Mr Byers said that that had been thought of and that if such an application were made he had the authority (as he had) of the Prime Minister and Chancellor immediately to introduce emergency legislation to entitle the Secretary of State to give instructions to the Regulator.   Mr Winsor pointed out what adverse effects such legislation would have not just on railway financing but on regulated industries generally.   He spoke, too, of implications under the Human Rights Act.   He made no headway;  Mr Byers said an application to put the company into Railway Administration would be made on Sunday.

210.   In the course of the conversation Mr Byers had given to the Regulator a summary of the Rainbow proposal as put by Mr Robinson.   The Regulator asked in what conceivable circumstances would the government ever find a proposal of that kind acceptable.   His evidence was that in answer Mr Rowlands (not, be it noted, Mr Byers) replied "Quite!".   It was from that alone, as it would seem, that Mr Winsor felt it was clear that so far as the government was concerned Rainbow had been a non–runner from the start.   I do not accept it was the government's view that no form of equity solution could ever have been acceptable.   If, for example, the CLG that was in mind had "scored" public then equity solutions would have had to be revived as what might then have been regarded as the least unattractive of achievable options.   Of course, by the date of the meeting with the Regulator it was known that the CLG scored private, there was a real prospect that one way or another an administration would be likely to be ordered and there was thus no longer any need to contemplate the possible acceptability of an equity solution as the lesser or least of several evils.   It was not put to Mr Byers that he also must have meant whatever Mr Rowlands had meant.

211.   In the circumstances I believe Mr Winsor was reading far too much into the one word "Quite" and I cannot on the basis of that one word discount all the other evidence that Rainbow was given consideration by the government, including by Mr Byers, in good faith.   In other words I reject the view, which I think was being suggested on the basis of Mr Winsor's evidence, that Rainbow had been all along simply entertained on the false pretence that it might become acceptable so as to lure Railtrack into a view that it could safely rely on it and need formulate no alternatives.   If, as Mr Rowley's cross–examination seemed also or alternatively to suggest, Mr Rowlands' "Quite" had indicated only that a suspension of the then–established regulatory regime had all along been unacceptable, then, firstly, I do not read Mr Winsor's evidence so as to take it that "Quite" referred only to that and, secondly, as Mr Byers said in his evidence, the Prime Minister himself had doubts about what he had called "this crazy

system of regulation".   In context a mere suspension of it could not, in my view, have been regarded as always beyond the pale.

**Mr Byers gives the news to Mr Robinson**

212.   Shortly after meeting with Mr Winsor, Mr Byers then met Mr Robinson.   Mr Robinson was told that the government was not going to proceed with Rainbow and was withdrawing support for Railtrack.   Mr Byers asked whether there could be a *joint* petition for administration and said that he hoped that after an administration there would be a CLG.   What the shareholders would receive, he said, was still up for consideration, though Mr Rowlands, present throughout, in explaining what administration implied, said that what the Group shareholders got would depend on the course the administration took.   Mr Byers foresaw difficulties with shareholders; there were United States class actions that had been budgeted for.   He said either that the government had spoken to the chairman of all major banks that day or that it would shortly do so and either had briefed them or would brief them on what he, Mr Robinson, was now being told.   I have not been taken to what they were told or when.   Mr Robinson was angry but Mr Byers made it plain he would not change his mind.   He added that he had seen the Regulator and had told him not to react to an interim review application and that if he attempted to do so, emergency legislation would be rushed through Parliament to stop him.

213.   Mr Robinson said to Mr Byers that Railtrack had taken the position that so long as Rainbow was being discussed, it thought it was trading legally.   Mr Robinson said that Railtrack had been taking regular legal advice - weekly or monthly - as to whether it was trading legally.   It seemed therefore to Mr Byers that Mr Robinson was now accepting, now hearing that Rainbow was not to proceed, that it could no longer trade.   Mr Byers indicated that *if necessary* , namely if there was no cooperation on an agreed administration over the weekend, he would probably announce on Monday 8th that the government would not provide further support.   Mr Robinson left to consult his Board colleagues and advisers.

214.   How that public announcement would have been framed and whether the government, had there been no administration over the weekend, would either have *had* to make it or could, without impropriety, have chosen to make it would have been subjects of further legal advice to the Department but no further work was done on that because, as the events unfolded, it was seen that an administration would be likely to emerge.   Mr Byers well recognised that such an announcement would, of itself, have been likely to push Railtrack into administration.

215.   It has been argued that Mr Byers' unwillingness at this stage to change his mind and to allow Mr Robinson to explore new possibilities is material from which, when joined with other factors, the necessary targeted malice in Mr Byers can be inferred. I cannot agree.   Months had already been spent, with the help of skilled and experienced advisers on both sides, and a policy had at last emerged.   There must be some finality and it is not as if Mr Robinson then had nor has since claimed to have had any alternative solution that had any prospect of both working and being

acceptable to government.  Even if Mr Byers was then peremptory and intransigent that may have laid him open to a Judicial Review or to an HRA claim but it would not, in my judgment, have furnished grounds for any adverse inference against him relevant to the tort I am here considering as such conduct (in the absence of some contrary explanation) would more have pointed to a wish promptly to proceed with a not–unreasonable chosen government policy than to a wish (for which no grounds were given) deliberately to harm Group shareholders.

216.   There was, at this stage, no decision that the Department would necessarily alone petition for Railtrack's administration over the weekend.  It could have been Railtrack alone that would petition or there could be a joint petition, one by the Department alone, or none.  If none, then a Monday announcement by the Department, subject to legal advice, would be likely to go ahead although it was recognised that if there was no petition but an announcement then there could be disruption on the railways.  Thus there had had to be pressure brought on the company to cooperate in, or at least not to resist, the administration process.  There might yet have been no decision to petition but contingent arrangements had already been made; Ernst & Young who had been familiarising themselves with the case for weeks, were, as I have mentioned, to be the government's proposal as the Administrators and, as it was put later by SSSB to Railtrack's board, a Judge had been "lined up" to hear a petition.  The likelihood is that the duty judge that weekend, Lightman J., was merely warned that a hearing on Sunday might be necessary.

**Renewco "scores" public**

217.   On 5th October the ONS indicated to the Treasury, albeit provisionally, that Renewco would "score" as public.  I have mentioned earlier that by consent the Claimants abandoned their attempt to require a representative of the ONS to attend to give evidence.  In the light of this "score", the Department would not have been able to implement Renewco quite independent of Mr Byers' decision not further to finance Railtrack.

**Railtrack takes advice**

218.    Railtrack board members had a series of meetings with advisers on Sunday 6th.. Deloitte & Touche advised on accounting matters, Mr Richard Adkins Q.C., Leading Counsel with particular experience in such areas, advised as to insolvency, administration and procedure.  Mr Adkins advised that a Railway Administration Order should be opposed only if the Board had some viable alternative.  Only the day before Mr Harding had been clear that Railtrack was solvent but the news had changed things and Mr Harding now felt that Railtrack could neither oppose a petition or ask for further time.  The Board was resolute, though, that it would not *support* the Petition.  The government had a draft Petition at hand which could easily enough have been by Railtrack, by the Department or by both but I do not read the evidence as suggesting that the Railtrack board ever had in mind the Company alone presenting a Petition;  at most it was either that there might be a joint Petition or one by the Department alone.  When the Board resolved neither to oppose or support *the*  Petition they meant that, as I understand the evidence, in relation to a petition by the Department alone.  Railtrack's advisers CSFB, Deloittes and Simmons & Simmons supported the Board's approach.

219.    The subject of an approach to the Regulator came up.  Mr Marshall thought the interim review process not to be a realistic source of funding, especially given the threat to disable the Regulator from intervening.  Railtrack were advised, though, to apply to the Regulator in the interests of completeness and to test his response.

**Railtrack speaks to the Regulator**

220.    At about 7.0 p.m. on the 6th Mr Robinson and Mr Marshall broke out of their meetings to speak to Mr Winsor.  He confirmed he had been threatened with legislation by Mr Byers.  Mr Marshall asked him if he would assist Railtrack by conducting an emergency interim review.  Mr Winsor said he would have to consult his colleagues.  Later he said he would be unable to conduct one in such a short space of time, meaning, it would seem, by Monday morning on the 8th October.  That is Mr Robinson's recollection of the discussion and, in a sense, that is what is important but Mr Winsor's note of that conversation adds further points.  He felt that Railtrack was merely going through the motions;  they had no expectation he would provide them with any cause for hope.  They had no properly justified application anywhere near ready.  Mr Winsor said that whilst he could immediately announce the *initiation*  of an interim review, he did not think it possible to complete it within 24 hours.  Railtrack said it needed cash in hand on Monday but could not say how much beyond saying "hundreds of millions of pounds".  They said, remarkably, that unless he could promise them an unspecified number of millions of pounds on the Monday there would be no point in having an interim review.  Mr Winsor, on the subject of the threatened legislation, pointed out that it would take time to be passed and was a difficult card for the government to play.  It would be likely to be resisted by reason of its effect on other regulators and other regulated industries.  It would be hard fought and might not be passed at all, but, despite that, Railtrack showed no interest.  He suggested they might call the government's bluff but Mr Robinson just repeated that the government would do it.  He did not have the will to take on the government.  Mr Winsor asked if they wanted a statement from him saying that he was going to carry out an interim review;  they said no.  Nothing short of cash on Monday would do.

221.    Both the history of other reviews (albeit not interim ones) and the need for the Regulator to consult others made Mr Winsor's view that he could not complete it, even a Hatfield re–opener, by Monday 8th undeniably correct.  Mr Robinson in cross–examination gave as his impression of the conversation with Mr Winsor that an interim review would take "an awful long time".

**A Press Release in draft**

222.    Very late on the 6th SSSB (for the Department) received a draft press release from CSFB (for Railtrack).  A difficulty the Department was in was that despite all the work done by its professional advisers (work that had been done without direct recourse to Railtrack's most recent and unpublished books and papers) the picture as to whether Railtrack was truly unable to pay its debts as they fell due or was likely to be unable so to pay them was, it felt, less than conclusive.  The draft Petition so asserted, basing itself on a draft witness statement of Mr Rowlands and a draft report (on assumptions) from Arthur Andersen, but plainly some comfort on the issue from Railtrack would be valuable.  The draft press release contemplated there being a hearing of a Department petition on Sunday 7th and said that:–

> "Railtrack plc was not in a position to oppose this petition
> given the Government's decision to provide no further direct
> financial support beyond that in the regulatory settlement.
> Railtrack plc therefore reluctantly accepted there was no
> credible alternative to administration,"

223.    That must have been the outcome of advice taken by Railtrack from its accountancy
and legal advisers, including its Leading Counsel.

**Mr Robinson's letter**

224.    On 7th Mr Robinson faxed to Mr Byers and Mr Rowlands a letter above his signature
that indicated that in the circumstances as he saw them it was his view and that of the
Executive Directors of Railtrack that it would be difficult for Railtrack to draw on its
bridging facilities or to access the public bond market in the short term.   Without the
government support on which the markets had previously relied, now not
forthcoming, there was no realistic prospect of its raising further finance or
refinancing its existing commitments.   To delay administration, said the letter, would
cause severe operational difficulties.   In the letter Railtrack, importantly, waived the
2 days' notice of the Petition to which it would otherwise have been entitled.

**The Petition is presented and an Order is made**

225.    Work on the case proceeded on both sides late on 6th and into Sunday the 7th..
Leading Counsel for the Department–petitioner, Mr David Richards Q.C., had
prepared a skeleton argument.   The papers were supplied to Railtrack's Solicitors.
The Petition was unopposed.   The hearing before Lightman J. began at 5.45 p.m..
He indicated he had read the relevant papers.   Leading Counsel - Mr Adkins Q.C. -
appeared for Railtrack and Mr Moss Q.C. for the prospective administrators.   Mr
Richards presented the case for an administration.   He drew attention to the passage I
have cited from the draft Press Release as supplied by Railtrack's own advisers.
Arthur Andersen's projections, in the evidence and not opposed by Railtrack, were
that further funding of at least £700 million by December 2001 rising to some £1.7
billion  by the end of March 2002 was needed by Railtrack, that its ability to use
overdrafts to fill the gap was likely to depend on its making a £2.3 billion bond issue
and that SSSB had advised that it was highly unlikely that that could be done in the
then–present situation.   The Learned Judge accepted that the Company either was or
was likely to be unable to pay its debts.   He observed that administration was not
only appropriate but absolutely essential.   In his evidence to me Mr Robinson
accepted that without government support Railtrack was unable to pay its debts and
that that had been true for a long time.   He accepted, too, that its financial position
before his meeting with Mr Byers on the 5th was the same as it had been after and the
same in Spring 2001 as it was in September 2001.

226.    A Railway Administration Order was made on 7th October.   Mr Adkins spoke only as
to Railtrack's costs, which were awarded to it.

227.    Mr Rowley for the Claimants has more than once said that no criticism is made of the Judge; on the material presented to him, the Claimants accept, the Judge could have done no other than as he did. Four senior members of Ernst & Young LLP became Joint Special Railway Administrators of Railtrack.

**A Railtrack Plan B?**

228.    One of the criticisms of the government's conduct of negotiations over Rainbow was, as I have mentioned, that by its not indicating that Rainbow was, however adjusted, bound to be unacceptable, the Department and Mr Byers deliberately lured Railtrack into a situation in which it did not, until it was too late to do so, devise a "Plan B", a plan to cope with a situation in which Rainbow (or Renewco) was not to proceed. I have dealt with the argument in relation to particular incidents but I now reject that criticism generally. Whilst the portents for Rainbow were never good, there was, in my judgment, no deliberate intent to lure Railtrack into not devising its own Plan B; Rainbow, had the dividend and floor price levels moved downwards, *could* have become possible, perhaps would have had to become possible, especially so if the CLG alternative had "scored" to the public sector. There were good reasons to decide on Rainbow, Renewco and the administration–cum–CLG all at once, as Sir Richard Mottram pointed out. Delay was for those reasons, not in order to lure Railtrack.

229.    In any event, nothing stopped Railtrack from putting further alternatives to the government except its own decision, with CSFB, to adopt a "one–option" strategy and nothing at all stopped it trying to develop a "Plan B" to be revealed if and when Rainbow or Renewco came to be rejected. What really stood in the way of a credible Plan B were the facts. Railtrack had tried to find one but nothing emerged save for "muddle through", which CSFB had advised was not a viable option and was not acceptable even to Railtrack's chairman. Railtrack never had a Plan B that even got as far as being written down. I would add that Mr Adkins' advice that the Petition should only be opposed if Railtrack had a viable alternative to administration, coupled with Railtrack's waiver of 2 days' notice of the Petition and the decision not to oppose the Petition, all taken together, suggest that Railtrack accepted that even given time there was no real prospect of its being able to present a credible "Plan B". Mr Robinson accepted that he was told that if Railtrack's board needed more time to consider the evidence presented in support of the Petition they could have it. No request for further time was made.

**The aftermath**

230.    On Monday 8th October trading in Group shares was suspended at the Stock Exchange at the Company's request. The price at suspension was 280p.

231.    On 15th October Mr Byers made a statement to the House of Commons. A debate followed. Mr Byers said that on 25th July 2001 Mr Robinson had said that unless extra financial assistance was provided it would be clear that in November 2001

Railtrack would be unable to make the critical statement that it was a going concern. Mr Byers was cross–examined before me on the dubious basis that Mr Robinson had not then asked for financial assistance but only for a "soft comfort letter".  In my judgment such a letter would have been of assistance to and would have been intended to assist Railtrack.  It was a letter that would have been drafted in terms such as would have been intended to encourage and reassure banks, brokers and the financial market generally that the government stood, financially, behind Railtrack. That kind of assistance could fairly be described as "financial".

232.    On 5th November 2001 Mr Byers responded in the House of Commons to a private notice question put by Mrs May M.P..  I have not understood that it is being said that his answers, which, as he rightly said, descended, upon the intervention of others, to "a bit of House of Commons knockabout", were misleading or untruthful and in any event I have not seen them either to add to the analysis I have so far conducted of the events as they unfolded or to provide any material from which targeted malice against Railtrack shareholders could be inferred.  I cannot take his remark that the time had come to put delivery to passengers before dividend to shareholders as an indication of such or any malice but rather as a not irrational preference for a railway system that yielded "delivery" to passengers.

**Parliamentary privilege**

233.    Mr Byers was cross–examined before me for some 2Œ days.  Towards the end of it, Mr Rowley Q.C. turned to consider the answers which Mr Byers is recorded in Hansard as having given, after the Administration Order, to questions put to him by Members of a sub–committee of the Parliamentary Select Committee on Transport, Local Government and the Regions.  Mr Rowley turned to the sub–committee's business of the 14th November 2001 and to a question put to Mr Byers by a member of that sub–committee, Mr Chris Grayling M.P..  At question No. 857 Mr Grayling and Mr Byers are recorded as follows:–

    "857.    Was there any discussion, theoretical or otherwise, in
    your Department before 25th July about the possibility of a
    future change in status for Railtrack, whether nationalisation,
    the move into a company limited by guarantee, or whatever?

    (Mr Byers)    Not that I am aware of."

234.    In his cross–examination Mr Rowley took up questions with Mr Byers and received answers as follows:–

    "Q. Do you see that question?

     A. I do.

     Q. You see your answer;   "Not that I am aware of."

     A.  Yes.

Q.   That answer was untrue, was it not, Mr Byers?

A.   It is true to say there was work going on, so, yes, that      was untrue.

Q.   That was untrue?

A.   It was."

235.    Mr Rowley then ran through what he called the most prominent examples of discussion about the possibility of a future change in status of Railtrack, referring to events or papers of the 12th, 20th and 29th June and 12th, 25th and 27th July.   Mr Rowley continued his questioning and received answers as follows:–

"Q.      Amidst that welter of documentation you could not possibly have believed that the answer you gave to Mr Grayling was true, could you?

A.      I accept this is not an accurate statement.

Q.      It was deliberately not an accurate statement, was it not, Mr Byers?

A.      It was such a long time ago, I cannot remember, but it is not a truthful statement and I apologise for that.   I cannot remember the motives behind it.

Q.      Let me suggest the motive, Mr Byers:  you did not want to know, you did not want the sub–committee to know that options for Railtrack, including renationalisation and changes in its status, was something that you had asked your officials to examine within three days of your taking office. That is why you deliberately made that untrue statement in response to Mr Grayling's question?

A.      I am sure that was not the reason.

Q.      There is no other possible reason, is there, Mr Byers?

A.      In the context of a select committee hearing, there are other reasons but they are - none of them are acceptable, I would accept that.

Q.      You knew that if you told the truth, far from this being put to bed, there would be further investigations, further questions and further statements, did you not?

A.      No, I was - I would be very happy to debate the pros and cons of the various options that were available to us and I am very clear in my own mind about the reasons for my decision on October 5th.

Q.      Not the pros and cons, Mr Byers, an investigation into your conduct.   You knew that if you told the truth, there would be more questions, more investigations and more statements about your conduct.

A.      No, I do not accept that.

Q.      The truth would have been revealed that you had planned from July that if you could achieve it, you would put Railtrack into administration?

A.      That was not the case."

236.    Mr Byers having referred in the course of those answers, to "other reasons", Mr Sumption Q.C. took that up in re−examination as follows:−

"Q.      You said in giving that answer that there were other reasons why one might be tempted to say that sort of thing in answer to that question.   They were not reasons [which you said would excuse you] but there were others.   I know that this is a difficult matter for you, Mr Byers, but can you please tell us what those other reasons were?

A.      They might be in a Select Committee under pressure, not wanting to - having thought actually that most people would regard those issues as having been considered, but replying in a way which would allow the question to move on to other issues but not to conceal any conspiracy or plot.

Q.      Yes.   Is there anything else you want to add on that question?

A.      Simply I think, looking back at the question, which is the one about a range of options, I think most people would have - I cannot understand why I gave the reply I did really but most people would have expected that those options would be under consideration and ××.. ."

Mr Byers continued by referring to an article in the Guardian which he thought had made it clear that the issue of possible nationalisation would be looked at.

237.    All that was on the 14th July 2005 (Day 14 of the hearing).   On the 20th July (Day 16) Mr Sumption added a supplementary bundle of authorities to the existing bundle and, basing himself upon them, drew attention to one of the privileges of the House of Commons in the following terms:−

"My learned friend suggested to Mr Byers that he had deliberately lied to the House of Commons sub−committee in answer to Mr Grayling's question about the period before the

25th July in order, he said - my learned friend's suggestion - to conceal the fact that he had already by then decided upon what the Claimants call "the Administration Plan".  What Mr Byers said to the sub–committee was factually incorrect, that is beyond question, and he candidly admitted that the moment the point was raised, which in my submission does credit to his evidence here, the only question with which the present trial is concerned.

Mr Byers did not accept that he intended to mislead the Transport sub–Committee.  That depends on how much he recalled about the precise sequence of events at the stage when he had to answer on–the–hoof Mr Grayling's question.  But he did not accept that.  That is a distinct question which is a matter for the House of Commons in due course and may not, in our submission, be debated here.

Your Lordship ought to be aware of the case law about the limits of the Court's function in this exceptionally delicate area.  I should make it clear that the Secretary of State for whom I appear has absolutely no desire to inhibit Your Lordship's consideration of any matters that Your Lordship may consider relevant, but he is not in a position, particularly in the office that he occupies, to waive the privileges of the House of Commons which are part of the general law, and the authorities are absolutely clear that this is not a matter which may be relied upon by my learned friend, suggested to a witness or the subject of a finding by Your Lordship."

238.    Mr Sumption referred me to *Prebble -v– New Zealand Television [1995] 1 A.C. 321 P.C.*  and also to *Hamilton -v– Al Fayed [2001] 1 A.C. 395 H.L.*.

239.    In his final speech on the 21st July (Day 17) Mr Rowley said that in addressing the subject of Mr Byers' integrity he was clearly going to have to tread carefully:–

"×. in the light of the Parliamentary privilege points that my learned friend raised with Your Lordship yesterday afternoon, and having considered the authorities on that overnight, because I saw them for the first time shortly before Your Lordship sat yesterday morning, having considered the position overnight, it does seem that Your Lordship is left with what on the face of it appears to be an unsatisfactory position, but a position [in which] Your Lordship can and should heed the fact that Mr Byers did make a factually incorrect statement to the Transport Committee on the 14th November 2001, but in the light of the authorities that is as far as I can properly invite Your Lordship to go,  and as far as Your Lordship can properly go in relation to that particular point when Your Lordship is considering Your Lordship's judgment."

I then raised a possibility with Mr Rowley and the transcript continues as follows:–

> "Mr Justice Lindsay:  I suppose there is nothing to prohibit me from assuming the worst from Mr Byers' point of view.
>
> Mr Rowley:  I think that might ×...
>
> Mr Justice Lindsay:  Even that might fall foul ×
>
> Mr Rowley:  To the extent Your Lordship is now offering me a gift–horse, I am equally reluctant to spurn it.  But if I am not permitted to probe with Mr Byers the reasons for that incorrect statement, and it is not a matter on which Your Lordship should be deliberating in the course of Your Lordship's judgment ×.
>
> Mr Justice Lindsay:  Anyhow, you do not invite me to make that assumption.
>
> Mr Rowley:  I do not think I can on the authorities, my Lord, much as I would like to and it also follows that in respect of the other answers that Mr Byers gave to the sub–committee and also the House to which I drew his attention, equally I cannot invite Your Lordship to make adverse findings against him in respect of those answers, because of the Parliamentary privilege point.  So that is where one is.  So the position is that the statement was untrue.  It clearly puts his reliability as a witness in these proceedings squarely in play, but I am not permitted to address Your Lordship on the basis that it enables Your Lordship to draw an adverse inference as to his integrity."

240.  On the authorities cited to me I hold Mr Rowley to have been right to concede that the privileges of Parliament are such that he could not, at the hearing before me, question Mr Byers with a view to showing that Mr Byers had deliberately told an untruth in Parliament and could not address me on the basis that Mr Byers had done so.

241.  Stepping aside from the case at hand, the position is unsatisfactory in that it puts both Parliament and the Courts to some disadvantage.  Parliament is at a disadvantage because, if it is right, as I have been told, that as a matter of convention it does not turn to questions such as have arisen in the case before me until the relevant Court has completed its proceedings, Parliament thus suffers a delay before embarking upon on its own examination.  The Court, too, is at a disadvantage; the cases in which such questions arise cannot simply be adjourned until Parliament has ruled on the question (inconvenient as that would generally be) because, as I have said, Parliament conventionally awaits the Court's decision before itself acting.  Moreover, the Court is at the disadvantage that in considering the credibility of a witness it cannot accept or rule upon an argument that, having deliberately lied to Parliament, he or she is likely also to have lied in Court.  I mention this unsatisfactory position at some

length because (difficult though it may be to find a solution) it may be that Parliament (which alone can deal with the issue) will wish to attend to it.  At the moment both Parliament and the Courts are so respectfully intent on not treading upon the other's toes that both stumble.

242.    I add only this.  I am quite sure that Mr Rowley, questioning Mr Byers as he did, intended no inroad into Parliamentary privilege;  no objection had been raised to the questions as he asked them and the relevant authorities had by then not even been collected let alone cited.  When the point as to Parliamentary privilege was taken, Mr Rowley, having considered the matter overnight, conceded the issue as I have described.  I, too, intended neither to permit nor to make any such encroachment and would hope to excuse myself in a similar way.  Judges are loath to intervene in a well–ordered cross–examination, especially at points where the witness *may* be put into some revealing difficulty, but I should, no doubt, have been far quicker to have seen the road–block to which Mr Rowley was heading and to have warned him to divert.  I apologise to Parliament for not having done so.

243.    The outcome, though, is that Mr Rowley's argument as to, and my assessment, which I shall come on to, of Mr Byers' credibility, is to some extent circumscribed.

**Group's results**

244.    On 17th December 2001 Group published its interim results for the 6 months to 30th September 2001.  Profit before tax for the Group was £292 million.  It had undrawn, committed facilities of about £1900 million.  There is there, though, nothing that necessarily signifies that Railtrack had not been insolvent on 7th October.

**Dinner at the House of Commons**

245.    On 6th February 2002 Mr Byers and Mr Winsor had dinner, at Mr Byers' invitation, at the House of Commons.  In the course of it Mr Byers said that in the Summer of 2001 he had been looking through the Railways Act and that it was he, not officials, who had first come up with the idea of putting Railtrack into administration.  He did not put a clear date to his coming up with the idea, which could thus have differed from the date of his looking through the Act.  He had then, he said, asked officials to work up the idea to see if it was a flyer.  He did not put date to that either.  Mr Byers was cross–examined on that.  He had, indeed, he said, come across the idea of a Railway Administration and "would" have said to someone in his private office to do him a note.  When it was put to him that he had raised it with a view to putting Railtrack into administration he denied that, though he was not in a position to deny Mr Winsor's version of what he had said.

246.    Given, as I have noted, that a paper on Railway Administration emerged in completed form in the Department only the day after Mr Byers became Secretary of State, I doubt that it was he who was first to consider it *generally* .  He could, though, have

been the first to consider it relative to putting Railtrack into administration so there is added reason to believe Mr Winsor's record of what Mr Byers said but, whatever the truth, I fear I fail to see that Mr Byers' boastfulness, if such it was, is something that evidences or even tends to point towards targeted malice against Group's shareholders. There plainly can have been, indeed, as I shall come on to, were many legitimate policy reasons in favour of Railtrack's administration, reasons other than an intent to harm its shareholders.

**Network Rail and the Network Rail Agreement**

247.    In March 2002 Network Rail was incorporated as a CLG. Creditors of Railtrack were paid in full in the course of the administration by way of funding provided to the Administrators by the Government. I do not know the extent of such support although it was a recurring theme of asides made by Mr Robinson in the course of his evidence that the outlay by the government to fund the Administration was far more than would have been needed to save Railtrack.

248.    Network Rail began to negotiate with Group to buy from it its 100% holding in Railtrack.

249.    On 28th May 2002 Mr Byers resigned from his office as Secretary of State.

250.    On 27th June 2002 Group contracted to sell its holding in Railtrack to Network Rail for £500 million. The sale obtained the necessary approval of Group shareholders on 23rd July 2002. It was a term of the agreement that Group waived or withdrew any "Administration claims". "Administration claims" were defined to include any claims against any Secretary of State or government department arising out of or in connection with the making of the Administration Order or the circumstances or events leading to it. Plainly, therefore, Group could not have brought the claims now before me but nothing in the Network Rail Agreement could or did preclude the Claimants from doing so.

251.    The shares in Railtrack were never, of course, an asset in the Administrators' hands. By dealing direct with Group, Network Rail in effect by–passed any need or further need on the Administrators' part, the creditors having been paid and Group no longer owning the Railtrack shares, to see what Railtrack's assets and businesses could fetch and to sell them at the best price reasonably obtainable.

**The Administration ends.**

252.    On 3rd October 2002 there took effect an Order of Ferris J which brought the administration to an end,

**Group is "delisted"**

253.    On 27th October 2002, Group's shares having remained suspended, Group ceased to be listed at the Stock Exchange.

**Proceedings are launched**

254.    On 2nd December 2003 these proceedings were launched but doubt hung over the HRA claim  for a while until late June 2004 when an extension of time defeated the Defendants' argument that it was out of time and should be struck out.

**Distributions to Group and to Group's shareholders**

255.    In January and August 2003 and in December 2004 Group was enabled to make distributions to its shareholders, including such of the Claimants as were then its shareholders, which included distribution out of the sums paid to it by the Administrators.   In all Group's shareholders received £2.52 per share, some 90% of the price of their shares on the morning of 8th October 2001 when their suspension began and the Administration became known,  although that value fell well short of the average price (£9.90) which the shares had commanded in the 3 years preceding their suspension.

256.    So much for a chronology.   As I said at its outset, I would not attempt to cover every event, every communication or every issue raised but I hope I have covered the more important ones.

257.    At a number of points the Claimants' argument speaks of administration as a route which avoided payment having to be made to shareholders as if that was a commanding advantage that lay behind administration.    In the event the administration did not avoid payment to shareholders;  Group, as shareholder in Railtrack, was paid £500m for its holding.    But, in any event, whilst payment *to shareholders*  might be avoided by administration, payment itself was unlikely to be. If, instead of buying Railtrack's shares, it had been Railtrack's assets that had been bought, the Government's offer for them would have had to have been the best price reasonably obtainable for the assets by the Administrators.    So payment would not have been avoided.    No doctrinal or other reason was ever given why avoiding payment to shareholders should have been regarded as fiercely attractive whereas payment of what could have perhaps have been a corresponding sum to the Administrators would not be.    There was no evidence as to this but it surely might reasonably be thought that it was the *amount*  to be paid that would chiefly concern Government rather than the identity of the recipients and, as to that, there was no evidence that the Railtrack assets would have fetched either less or more than the £500m paid for the Railtrack shares.    I would add that there was no proof that the achievable value of Railtrack's shares had been depressed because of the administration itself, as opposed to the withdrawal of government support, nor did that speak for itself.    When the shares were sold in June 2002 Railtrack, funded under

administration by the government and managed under the administrators, could well have more assuredly been regarded as a going concern than due diligence might have disclosed it to be in October 2001.

258.    Amongst the Claimants' complaints is that Railtrack was not kept informed about events concerning Renewco.  I have no evidence that anything was deliberately kept from Railtrack on the subject of Renewco;  no ignored request for information on the subject was drawn to my attention and put to any witness and in any event withholding of information on the subject would have been relevant against Mr Byers only if, expressly or by implication, he had told his staff to procure that information on Renewco was to be withheld.  There is no evidence whatsoever that that was the case.

## F.  The remaining witnesses

259.    There are 3 witnesses who have so far been left over for comment.

260.    I would not for a moment doubt Mr Robinson's honesty as a witness.  I am sure he was quite free of any intent to obscure or mislead but his evidence was weakened by two features.  Firstly, as he himself said, and not, I think, merely in jest, he had been trying, understandably, over the intervening years to forget the events of 2001.  His memory in some areas was poor and without fully repeating them I remind myself of my findings as to the meeting of the 28th August 2001.

261.    Secondly, his evidence was coloured by his firmly held belief that administration would cause chaos and was so poor a solution to any problem as to have been "on another planet".  It never entered his head, he said, that the government could do otherwise than support Railtrack.  This led him to persist with optimistic interpretations of events that a mind that did not harbour such fixed ideas would not have entertained.  He always believed Renewco would come to fruition, for example, simply because, although there was no legally binding obligation on the Department to bring it to that point, although the April Agreement made express provision for the case that it was not brought into existence and although, because it might "score" as public, the Department, might be unable to do so, the government had said it would use its best endeavours.  Although in the negotiations with Railtrack the Department had never expressly or impliedly said to Railtrack that it would give it funding in excess of the regulatory settlement and the Endeavour Agreement, it was reasonable, he thought, to *assume*  there would be a reasonable outcome.  Viewing things, so to speak, through glasses coloured to exclude any sight of the possibility of an absence of government support, he could see nothing to indicate that such support would not be forthcoming.  For all his honesty and directness, his evidence was thus in some respects unreliable and I have in some instances preferred other evidence.

262.    As for Mr Rowlands, his honesty is not challenged nor is it said that he was guilty of any deception or sharp practice.  It is, though, said that he had been less than frank in his dealings with Mr Robinson, leaving the latter to leave the meetings of 28th August

and 3rd October believing that Rainbow was the Department's preferred option, one to which the Department's response was positive. It was not established to my satisfaction that he knew Mr Robinson was of that belief or that he had either deliberately or falsely done or said anything to cause him to have such a belief. That Mr Robinson left with such views is, in my judgment, more an indication of the shortcomings in Mr Robinson's mind, as I have mentioned, than of any want of frankness in the Civil Servant. I found Mr Rowlands to be a calm and thoughtful witness whose evidence I had no reason to disbelieve.

263.   The Claimants say in their written final argument (overtaken by the point as to Parliamentary privilege and hence not relied on in their oral final argument) that Mr Byers is a proven liar, basing that on his answers to Mr Grayling in the House of Commons. He accepted to me that he had then told an untruth but that, of itself, does not brand him a liar if a liar is someone who tells an untruth knowing it is untrue or being reckless to its truth or falsity. Whether he was a liar within that meaning is not for me; I must leave it to the House of Commons. I cannot therefore proceed on the basis that he is a proven liar.

264.   Of, course, that he had lied to the House of Commons, should the House so find, would not, of itself, indicate that he had lied to me. Looking at that, and notwithstanding the lengthy analysis of Mr Byers' veracity attempted in the Claimants' closing material, I do not find Mr Byers generally to have been an untruthful witness. On many issues it would not be possible to attack Mr Byers' evidence without impugning also Mr Rowlands', which, where attempted, was not successful. I have at some points in the chronology cast doubt on Mr Byers' evidence but never to the point of finding him to have sought to deceive or mislead the Court on any issue probative or even persuasive, alone or cumulatively with other issues, one way or another as to his state of mind on the crucial issue of the presence or absence in him of the alleged targeted malice. His demeanour throughout (no doubt the Claimants would say that this was yet more successful dissembling) was of a witness confident in the rightness of his case. The only time his answers descended to unreason was in his answer, in re−examination, as to his reasons for the admitted untruth in Parliament. His explanation as then given seemed to me little above gibberish but it will be for Parliament to assess what he meant. That answer apart, he was not, in my view, truly "caught out" in any way that threw light on the presence of the necessary targeted malice, despite a long, very well−researched and skilful cross−examination. I add only that even if, contrary to Mr Rowley's warning, I were to *assume* that Mr Byers had lied to Parliament in answer to Mr Grayling, my conclusion on the issue of his truthfulness before me would very probably remain the same, not, I hope, because of any obstinacy on my part but because I could not fairly jump from his being held to be a liar in and by Parliament to his being a liar to this Court without some reason to do so and I cannot see that such enquiry as Parliament may make into his behaviour will be concerned to find that reason (it being of no concern to Parliament as to whether or not he had lied to me).

265.   The only remaining issue as to witnesses is whether adverse inference should be drawn from the Department's failure to call Mr Linnard, their Director of Railways. *Wisniewski -v− Central Manchester Health Authority [1998] PIQR 324 at 340 CA*

was cited to me.  Mr Linnard's notes and reports were already fully in evidence and have been examined in some detail where of possible relevance.  There has been no evidence of anything said or done between Mr Linnard and Mr Byers that might throw any light, not available from those notes and reports and from the evidence of Mr Byers, Mr Rowlands, Miss MacKenzie and Sir Richard Mottram, on the important and central issue of Mr Byers' state of mind and in particular as to whether a component within it, when he was deciding when and how to act, was targeted malice against Railtrack shareholders.  In the circumstances I do not read *Wisniewski* as obliging me to draw any adverse inference and I do not.  I add only that there has been no suggestion that Mr Linnard would not have been willing and able to respond to a witness summons from the Claimants had they chosen to obtain one.

## H.  A conclusion on the Claimants' claim in tort

266.  The Administration Plan which Mr Byers is accused of devising and then implementing is a mixture of allegations about "ordinary" facts and allegations about intention.

267.  As to the ordinary factual element, Mr Byers is accused of engineering a situation in which he could present evidence that Railtrack was or was unlikely to be able to pay its debts as they fell due.  But that needed no "engineering".  Throughout Mr Byers' time in office down to the point of Administration Railtrack's financial position was such that if the Government told it that it would limit its financial support to only that to which Railtrack was then in law entitled (a message that Group would have had to pass on to the Stock Exchange) Railtrack would have been unlikely to be able to pay its debts as they fell due.  The impact of such a message on Railtrack's ability to make a November going concern statement, on its "A" credit rating, on its ability to go successfully to the bond market and on its ability either to draw down existing facilities or replace them with new ones was such that insolvency of the kind required if there was to be an administration would have been immediately demonstrable had full access to Railtrack's situation been available.  Mr Robinson's heart–felt evidence that the Government created Railtrack's insolvency is not acceptable.  Not only did he, in so saying, ignore his own evidence and that of others that without government support Railtrack was unable to pay its debts but in any event a provider of funds does not "create" an insolvency by providing only that to which the recipient is entitled.  The Government can be said to have failed to avert Railtrack's insolvency but that cannot be said to be a fault in the Government unless one can postulate a duty on government to have funded Railtrack without limit and without condition, a hopeless proposition.

268.  Another alleged factual element in the Plan is that after the Administration Order "assets of [Group] and/or Railtrack would be removed×..".  There was, firstly, no way in which the administration of Railtrack could "remove" assets of Group.  The relevant assets of Group were its shares in Railtrack, assets quite outside the disposition of the Administrators of Railtrack and which remained, notwithstanding the Administration, exactly where they had been before it, in Group.  As for, secondly, "removal" of the assets of Railtrack, the Administrators, independent of

government and owing duties to the creditors and shareholders of Railtrack, could have "removed" Railtrack's assets only by disposing of them for the best value they could reasonably obtain.   In fact, though, no such dispositions, as far as I was told, were made as instead Group, as it could not have been forced to do, rendered such dispositions redundant by choosing to sell its holding in Railtrack.   No assets of Railtrack were "removed" and the "removal" of Group's assets can hardly be complained of by its shareholders as it was effected by what was (in the absence of any contrary evidence) by way of an arm's length sale freely entered into by its Board for £500,000,000.   It is true that the government paid no price for and did not acquire any shares in Group but it is hard to see why, if not acquiring shares in Group, it should have to pay for them, still less why it should pay for them in addition to paying the £500,000,000 it did pay for the shares in Railtrack, a sum which then became distributable by Group to its shareholders.

269.    Nor, as I have touched on above, have I any evidence of what the assets of Railtrack would have fetched if the Administrators had needed to realise them.   Presumably, as the government funded the Administrators to keep the railways going, the assets could have been sold (if Group's sale of its holding had not rendered this unnecessary) on a favourable going concern basis.   It does not follow that Group's board must have thought that no more than £500 million would be fetched as they may have chosen the certainty and timing of their share sale over the possible uncertainties and delays in an assets sale.   I cannot be certain, therefore, even if Mr Byers had been pressing towards an administration, that he must necessarily have foreseen that it would harm Group shareholders, at all events relative to the then price of the shares in the Summer and early Autumn of  2001.

270.    Yet another factual element relied on by the Claimants as a component of the Administration Plan was that by the government's threatening of primary legislation the Rail Regulator had been effectively prevented from exercising his statutory power to come to Railtrack's aid by way of an Interim Review.   But a mere *threat* of legislation could not undo Mr Winsor's existing powers, nor did he think they could.   On the contrary, he pointed out to Railtrack that any such legislation would take a long time, would be a difficult card for the government to play, would be resisted and might not pass at all.   It was indicated to him that Railtrack believed that it had no real expectation that an interim review could help in any case.

271.    I add, on the factual side of the alleged Administration Plan, that the government did not think it could force Railtrack into administration.   It thought that it would need cooperation from Railtrack and when the Administration did come it was with a measure of cooperation.   Railtrack, fully advised by its own Accountant, Solicitors and Counsel, chose not to ask for time to oppose the Petition, chose to waive the notice period to which it was entitled, supplied the draft press release and the letter of 7th October, chose not to challenge any of the evidence on which the Department relied and chose, though fully represented at the hearing, not to oppose the Petition.

272.    That there are glaring weaknesses, indeed failures in the Claimants' case on the "ordinary" factual side of the alleged "Administration Plan" is clear but I am far from

sure that, even if any parts of the Plan as pleaded were made good, the pleaded tort I am considering would be made out as that requires, as I have several times mentioned, proof (direct or by inference) of the specific intent to impair the financial interests of the shareholders in Group, including the Claimants. It would not be enough that Mr Byers well knew that his action would cause that impairment, even if he did know that. It is to that part of the case - the alleged specific intent in Mr Byers to harm, inter alios, the Claimants – that I now turn.

273. Governments often have to decide on policy by reference to what is currently and, one hopes, reasonably perceived rather than what necessarily is or later transpires to be fact. That is not a criticism; it is inevitable and could be denied only by those with very short memories. What, then, in government, was the reasonable perception of Railtrack in 2000 and 2001? I shall collect some of the things said of it in the evidence.

274. In terms of railway performance, it had suffered not only Ladbroke Grove but Hatfield and the disruption that followed it. It was thought that some restructuring of it within the next 5 years was inevitable. It was seen as "frankly a mess", with weak management at the zonal levels. It was pilloried in the Press for bad management. It had difficulty even in funding the necessary regular maintenance. It had major projects without the skills to manage them. It was being ground down by the Regulator (so said its own advisers). Its own business plan accepted that it had not maintained and renewed the railway to an acceptable standard. Its skills base as to engineers had diminished and its training fell short of what was needed. It was reported on as suffering from institutional paralysis. It had no knowledge of the state of its assets. It had allowed the railways to become a complete shambles. Both the Prime Minister and the Deputy Prime Minister had expressed dissatisfaction with its performance.

275. On the financial side the perception, as the Government saw things, was, if anything, even worse. Its own financial plan acknowledged the unreliability of its own estimates and a persistent inability to keep within budgets. It had virtually no management control; there was management paralysis. The Department had identified an amortisation error which, it thought, meant that it would be bust "in spades" in CP 3. Railtrack itself as well as brokers had identified an intrinsic value in its shares way below the market price. Its debts threatened that its equity would become worthless. It had made its first (and substantial) loss. Its own management had acknowledged that it was facing serious financial issues. Its expenses on WCML and the Channel Tunnel Rail Link were not under control; its operating costs generally were such that it could not reliably estimate them and they were bloating. Some form of financial restructuring looked inevitable if it was to survive. Its balance sheet was so weak that it was unable to contribute to the development of the network. The Rail Regulator said it was handing out a begging bowl; the Chairman of the SRA said it "couldn't hack it" and had doubts about where the finance it needed could come from. It did not think that an approach to the Regulator would be satisfactory. Its "A" credit rating was insecure. It was in effect trading as "BBB". Its ability to go to the bond market was in doubt, its going concern status in jeopardy. Things had steadily got worse even since Ladbroke Grove and Hatfield: it

was not trusted to deliver. Its ability to drawdown its existing facilities was problematic. Its relations with the Regulator were appalling and the Regulator had said that its insolvent liquidation could be the best thing for the rail industry. He had told it not to bother to apply for a substantial re–opener until it had sorted out recovery. Its own experienced advisers said there was an impending financial crisis; it was unlikely to be able to sign off on the bond prospectus needed if a going concern qualification was to be awarded and if no additional government support was given it would be unable to go on. Its regulated assets value was no greater than its debts, so there was no reason for payment to its shareholders. Its own board was having to take regular legal advice as to its solvency and its ability to trade. It could not forecast its own financial needs with any acceptable degree of accuracy. Its stated needs seemed only to increase and it was shameless in asking for more. A Treasury adviser regarded it as a bottomless pit. The cliff's edge was, as its own Finance Director acknowledged, nearer than one might realise. By the 3rd October, there was a crisis coming within a fortnight.

276.    Against such a perception in both railway performance and financial terms, there were plainly ample and sound policy reasons for the government wishing to be rid of Railtrack and for the railway assets to be passed into the control of another or others. There were good avowable and avowed public reasons for Mr Byers to develop a policy to that end. He did so, drawing on advices given to him by Civil Service and other advisers whose skill, honesty and competency has not been called in question. He was aware that the policy ran some risk of litigation; United States class actions were particularly foreseen as was some HRA challenge, but he was advised they could be robustly defended. If he had good public reasons for the policy, as I hold he had, I do not see it as a fault in him (or, at any rate, not one relevant to the tort I am considering) to have said that if necessary he would ask Parliament to legislate so that the policy could not be thwarted. Moreover for Mr Byers to have sought to procure that control of the Railtrack assets should pass out of its Board's control and into more acceptable hands at as low a cost to the public purse as he could arrange, whilst possibly running into trouble on other grounds such as Judicial Review or Human Rights grounds, of itself does nothing to prove the tort I am now considering.

277.    I add that at no stage was he advised that the reasons ostensibly being given for his actions (reasons either given by him unaided or given to him by his advisers) were improper. His proposal, fully explained to them, attracted the support of No. 10 and the Treasury, against whom nothing is said.

278.    All that, though, say the Claimants, is of no avail because Mr Byers' ostensible reasons were not his real reasons; from a date in July on he was, they say, dissembling and then acted with the specific intent of impairing the financial interests of Group shareholders. As to such an intent, no one gave evidence of it. No witness said they detected it or suspected it either at the time or since. Mr Robinson, speaking of the government decision to put Railtrack into administration, said he was sure the government believed it was the right thing to do. I am thus not looking at actions which can only be reasonably explained if one postulates the existence of the alleged improper motive. On the contrary, Mr Byers had sound motives available to him. The Claimants' case thus prompts this question: with good and avowable

reasons available to support his actions and in the absence of any direct evidence on the point, why should it be thought that Mr Byers harboured the dishonest one attributed to him, either as his sole, the predominant or as *any* reason for his acting as he did?

279.    No answer to that question was seriously attempted, let alone that it has been put to rest.  No publications or utterances of his, for example, showing a distaste in Mr Byers for capitalism or for shareholders or for shareholders in Group were put to him. One does not prove that such an intent to harm is present merely from a wish to avoid the taxpayers having to pay more than they need, especially where also present were grounds for believing that the shares in Railtrack had no great value, coupled, given that administration was the chosen route, with the obvious facts that if the assets of or shares in Railtrack were to be acquired they would have to be paid for, as, indeed, as it transpired, the shares were paid for.  Nor was Mr Byers cross−examined on the notion, one which it had seemed from Mr Rowley's opening might be developed, that he had been motivated by a view that a company owing duties to shareholders was inherently unsuitable as a vehicle for provision of a safety−rather−than−profit conscious railway.

280.    It is not as if there was some hidden re−nationalisation agenda.  As its attitude to "scoring" exemplified, the last thing the Government wanted was Railtrack's needs being regarded as within the public borrowing and I accept Sir Richard Mottram's evidence which I mentioned earlier that re−nationalisation was completely against the underlying philosophy of the Government.  Mr Byers, too, said that the Prime Minister would not have considered re−nationalisation at any great length.  Indeed, apart from the bald assertion to him that Mr Byers acted with the pleaded ill−intent, which he denied, the only other impugnable reason put to him as a reason for his acting as he did was that he did so to curry favour with Labour back−benchers.  He denied that but even if he had not, it would not have helped the Claimants;  a secret intent to curry favour with Party colleagues is not an intent to harm Railtrack shareholders.

281.     It was said that Mr Byers had in 1996 been overtly hostile to Railtrack's privatisation.  Mr Byers accepted that and that he had voted against it in 1996.  He accepted, too, that the Labour Party's attitude had been vigorously to oppose the privatisation when it was *in opposition* .  Neither answer suggests that on party loyalty or doctrinaire grounds Mr Byers was still hostile to the status quo as it was in 2001 when the Labour Party was, of course, in Government and had no plan to undo that privatisation.

282.     Further, it would be reasonable to think that, if Mr Byers had been so keenly motivated against the shareholders that he had studiously dissembled over 2 or 3 months, then he would surely have demonstrated that determination not to be thwarted that had animated his threat to legislate against the Regulator and would have gone on to ensure that the shareholders would derive as little as possible from the Administration.  One could have expected him to harry the Administrators with the need for early realisations of the assets, to have limited the funding of the

administration to the same end or to have sought to impose limits or conditions calculated to depress the prices the assets might fetch so that his intent to harm the shareholders might not be thwarted and that the harm to them should be maximised. No evidence of anything such was adduced;  there was no evidence that he took any steps to restrict the Administrators' due performance of their duties.

283.    It is not unreasonable, either, to ask whether it could be that an intention to procure that Group and its shareholders should receive nothing for the holding in Railtrack (even if that had been the case) could be taken to represent an intention in Mr Byers to harm Group's shareholders, given that he had been advised by Mr Rowlands, on the basis of the Department's professional advisers' work, that the enterprise value of Railtrack roughly matched its debt.

284.    Despite there being no reason established for Mr Byers to have had the unlawful intent he is alleged to have had, the Claimants ask me to *infer* that he had it.  It is not enough for them merely to say, to use Mr Rowley's phrase, that he had something to hide.  They need to shew, on a balance of probabilities, that he had the pleaded intent without which the tort here asserted does not exist - see *Hornal -v– Neuberger [1957] 1 QB 247 at 258 CA*  as to the case where the allegation in issue, as here, is serious.  Mr Rowley's and Mr West's final written submissions, basing themselves on anticipated findings of fact against Mr Byers on many of the issues that I have dealt with in the chronology, invite me to infer from a number of suggested incidents the presence of the improper and dishonest intent.  Even taking the incidents cumulatively, I feel quite unable to do so;  as will have been seen, there are many issues I have not decided against Mr Byers and there simply is no sufficient material available, in the absence also of any direct evidence on the issue, to infer that Mr Byers, to whom were available good policy grounds for his acting as he did, should, without any reason being given for his having such an intent, have nonetheless acted with a specific intent to impair the financial interests of Group shareholders.

285.    Even if Mr Byers, for example, had refused further funding and had manipulated events in order to make it difficult for Railtrack to resist administration, even if he had deliberately dallied as to Renewco or in indicating that Rainbow was unacceptable or had encouraged a view that it might become acceptable, in either case in order to deny Railtrack an opportunity to develop a "Plan B", even if he had failed to explore alternatives such as takeover and notwithstanding that he had threatened to seek legislation from Parliament and to announce the withdrawal of additional funding with a view to ensuring that his policy decision was not thwarted, all that would be of no avail to the Claimants for the purposes of this tort unless from all the facts and surrounding circumstances, in the absence of direct evidence on the point, the Court could infer there to have been present not merely an awareness in him of harm to the shareholders in Group but a specific intent to harm them.  As I say, no direct evidence was given that he had that intent, no good reason why he should have had it was established and there were many and various other and acceptable reasons why he should have acted as he did.  In all the circumstances I am quite unable to hold that he had the required intent.

286.    I shall come on to HRA considerations and I am not here concerned with whether his actions would have survived a timely Judicial Review attack by Group or by the anticipated U.S. class action.  Limiting myself, therefore, to the particular tort here in issue, and leaving aside the Claimants' failure, for reasons I have given and as I hold to be the case, to have proved what I have called the "ordinary" factual side of the "Administration Plan", I have no sufficient reason to find an intent to impair the financial interests of the shareholders in Group as being the sole, the predominant or as any intent lying behind Mr Byers' actions.  I must therefore dismiss the claim based on the tort of misfeasance in public office.

## I.  **Human Rights**

287.    Article I of the First Protocol to the European Convention on Human Rights ("the Convention") provides, so far as material:–

> "Every natural or legal person is entitled to the peaceful enjoyment of his possessions."

288.    By way of section 1 (1) (c) of the HRA 1998 and section 1 (2), that right, a "Convention Right", is to have effect subject to any relevant derogation (there is none).  By section 6 it is made unlawful for a public authority - here the Secretary of State and Department - to act in a way which is incompatible with a Convention Right.  Persons claiming that a public authority has so acted may bring proceedings against the public authority "but only if he is (or would be) a victim of the unlawful act" - section 7 (1) (b).  To be a "victim" for that purpose the claimant has to be such that he would be a victim for the purposes of Article 34 of the Convention if proceedings were brought in the European Court of Human Rights in respect of the act complained of.  The domestic Court is granted wide powers to grant appropriate relief where it has found the claim justified - section 8.

289.    In their re–re–re amended Particulars of Claim the Claimants allege that in implementing the alleged "Administration Plan" and petitioning for an Administration Order the Defendants, as one or more public authorities, acted incompatibly with the Claimants' respective Convention rights.  The incompatibility as so alleged was that the Defendants had conducted a de facto expropriation, without compensation, of the value of their interests as shareholders, alternatively had deprived them of the right to sell their shares or, in a further alternative, were responsible for a disproportionate interference with their possessions.  It is pleaded that the Claimants were victims because damage to their position as shareholders in Group was an inevitable consequence of the implementation of the Administration Plan and that it was the intention of the Secretary of State and Department to damage such interests.

290.    In the course of the hearing the Claimants dropped the claim that there had been a de facto expropriation.

291.  The Defendants' argument in response is threefold.  First, they look at the leading case on Article I of the First Protocol, namely *Sporrong & Lonnroth  -v– Sweden (1982) SEHRR 35*  which, at its *paragraph 61*  explains the practical effect of the Article.  It comprises 3 distinct rules:  the first is entirely general - the principle of peaceful enjoyment of property – and the third is concerned with State rights, with which we are not here concerned.  It is the second of the three rules that is in play:  deprivation of (including interference with) possession of property.  As expropriation is no longer claimed, the only remaining claim is that there has been unlawful interference with the Claimants' possession of their shares.

292.  But, say the Defendants, wherein lies that interference?  Before the "Administration Plan" (had there been one, which there was not) the Claimants had shares in Group. After the implementation of the alleged Plan, they remained shareholders in Group and the numbers of their shares remained unchanged.   Before the alleged implementation Group held 100% of the shares in Railtrack, exactly as it did after the alleged implementation.   If there had been any "Plan" as alleged, it would have worked no material alteration in anyone's rights unless and until a Railway Administration Order was made but that process, if it represented any interference by anyone, was not by any Defendant but by the Judge.   But it is accepted that the Judge acted entirely properly.   True it was that Group shares were suspended at the London Stock Exchange but that was a consequence of the combined effect of the Judge's Order, the Exchange's Rules and the Company's own request that the shares should be suspended;  it involved nothing unlawful on the Defendants' part.   There was no unlawful interference with possession of the Claimants' property by the Defendants.

293.  Secondly, the Defendants say that it could perhaps have been that *Group*  could have asserted a breach of Article 1 but it never did so and instead it sold the Railtrack shares in what was not said not to have been a proper arms' length transaction for £500 million.  It did so in an agreement which had as part of its terms a waiver or abandonment of all Group's rights in respect of the administration process.  If Group had ever had an ability to complain under the Article (which the Defendants would doubt), it then gave it up.  If, therefore, Group cannot complain under the Article, how can the Claimants, who can only claim *through*  Group, (at all events unless they were deliberately targeted as to be harmed) have any maintainable claim - *Johnson -v– Gore–Wood & Co [2003] AC 1 * ?  They cannot, say the Defendants, unless the Court finds in the Claimants' favour on the tort claim, which requires that sort of targeting.  But, say the Defendants, if (contrary to their arguments) the tort was found proven, the Article 1 claim would even so be redundant as adding nothing to whatever relief would be appropriate to remedy the tort.

294.   Thirdly, the Claimants, so the Defendants assert, are not "victims" in the required sense - see *Agrotexim and Others -v– Greece (1996) EHRR 250* .  The applicants in that case were companies which were shareholders in a brewery company which owned land it wished to develop.  The local Council took steps to expropriate the land.  The shareholders complained that the Brewery's rights had been violated and that, in turn, that had adversely affected their rights because of the resulting fall in the value of their shares.  Their complaint was based exclusively on the proposition that the alleged violation of the Brewery's rights to peaceful enjoyment of its possessions

had affected their own financial interests because of the resulting fall in the value of their shares - see para 62 of the Judgment. The Court held that a lifting of the corporate veil so as to disregard the fact that the person directly affected - there the Brewery - was a separate legal personality and was (if anyone was) the victim, would be justified only in exceptional circumstances such as where it itself could not have raised the complaint. There is, of course, no such issue here; the Board of Group *could* have complained but did not do so and *chose*, of its own decision and for reward, to give up whatever right they would have had to do so.

295.    There had, before *Agrotexim*, been cases which suggested that where the complainant was the majority shareholder in the "victim", the person directly affected, or where it could be said that the complainant was in reality conducting his business through that "victim" then the complainant could, too, be regarded as a victim but that, short of that, it was only the direct victim which could complain - see e.g. *Yarrow plc and Others -v- UK (1983) EHRR App No. 9266/81* and the cases there cited. However, that possibility does not assist the Claimants: firstly, the Court in *Agrotexim* disapproved of the relaxation where it was a majority shareholder in the victim who complained and secondly, even in aggregate, the Claimants' own only a very small percentage of the shares in Group.

296.    The reasoning in *Agrotexim* was adopted by Neuberger J. in *Humberclyde Finance Group Ltd -v- Hicks, 14th November 2001 (HC 1998 02156) paragraphs 43–46* and *Agrotexim* was followed in *GJ -v- Luxembourg (2003) 36 EHRR 40–710 paragraph 23*.

297.    Thus, if there was any victim, say the Defendants, it was Group not the Claimants and the Claimants, under *Agrotexim*, cannot be regarded as victims within the required definition.

298.    The Claimants have, in my judgment, no answer to these arguments. In particular I see no force in their attempt to distinguish *Agrotexim*. I accept the Defendants' arguments on the Human Rights issue and accordingly dismiss that part of the Claimants' case.

## J.  Conclusion

299.    I have now dealt with both heads of claim as advanced by the Claimants. I have, for the reasons I have given, found each to fail. Accordingly I dismiss the Claimants' action. If a further hearing is necessary to deal with costs or any other matters then that can, of course, be arranged.