## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------------x
                                          :
In re:                                    :        Chapter 11
                                          :
                                          :        Case No. 09-10138(KG)
Nortel Networks Inc., et al.,[1]          :
                                          :        (Jointly Administered)
                        Debtors.          :
                                          :
-----------------------------------------------------------------x
```

### THE OFFICIAL COMMITTEE OF RETIRED EMPLOYEES' FIRST
### REQUESTS FOR ADMISSION DIRECTED TO THE DEBTORS

PLEASE TAKE NOTICE, pursuant to Rules 26 and 36 of the Federal Rules of

Civil Procedure, Rules 7026, 7036 and 9014 of the Federal Rules of Bankruptcy

Procedure, and the Local Rules of the United States Bankruptcy Court for the District of

Delaware, that the Official Committee of Retired Employees of the above-captioned

Debtors hereby requests that Nortel Networks Inc. and certain of its affiliates, as debtors

and debtors in possession, provide written responses to the requests for admissions

below (each, an "RFA") so as to be received at the offices of Togut, Segal & Segal, LLP,

One Penn Plaza, Suite 3335, New York, NY 10119, no later than August 24, 2012 in

accord with the Court's scheduling order dated August 1, 2012  [Docket No. 8084].

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax
identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620),
Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma
Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications
Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks
HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358),
Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel
Networks (CALA) Inc. (4226).

## DEFINITIONS

1.     "1991 Plan" means the 1991 Northern Telecom Inc. Retiree Medical Plan and Retiree Life Insurance and Long-Term Care Plan.

2.     The use of the singular form of any word includes the plural and vice versa.

3.     "All," "any," and "each" shall each be construed to include all, any and each.

4.     "And" and "or" shall be construed either disjunctively or conjunctively as necessary to give each RFA its broadest scope.  "And" and "or" shall also be construed either disjunctively or conjunctively in any definition as necessary to give the definition its broadest scope.

5.     "Bondholder Group" means the ad hoc group of bondholders holding claims against certain of the Debtors that is jointly represented by the Milbank Tweed firm in the Chapter 11 case.

6.     The term "Chapter 11 Case" means the above-captioned, jointly administered chapter 11 cases.

7.     The term "Chapter 11 plan" means a plan of reorganization or liquidation approved under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*

8.     The term "communication" means any transmission of words, images, facts, numbers or ideas, including but not limited to any transmission in or by means of a document (as defined below), spoken word, conversation, conference, discussion,

interview, audio or video recording, report or meeting, or any email, telephone, facsimile or other electronic transmission.

9.      The term "concerning" means relating to, referring to, describing, mentioning, evidencing or constituting.

10.      The terms "Debtor" and "Debtors" refer to any one or more of the debtors in the Chapter 11 Case, any of their predecessor entities, any parents, subsidiaries, members or affiliates of any of the foregoing, and any directors, officers, employees, representatives, advisors, agents, attorneys, associates or persons acting for or on behalf of any of the foregoing.

11.      The term "document" shall be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), and includes any written, printed, typed, electronic, or other recorded matter of any type or nature, however produced or reproduced, including information recorded in paper, digital, analog, graphic, electronic or photographic form; writings; emails; drawings; graphs; tables; photographs; telephone logs and records; electronic or computerized information, data or data compilations; term sheets; pitch books; financial records and books of account; journals; ledgers; audio recordings; video recordings; transcripts; memoranda; calendars; tables; invoices; appointment books; computer databases; PowerPoint or other presentations; CDs or DVDs; pamphlets; personnel files; correspondence; notes; bills; invoices; and communications of any kind.  A draft or non-identical copy is a separate document within the meaning of this term.

12.      The term "identify," when used in reference to:

(a)    a person, means to state (i) his, her, or its full name; present or last known address, present or last known email address and telephone number; and (ii) if a natural person, his or her present business affiliation and position or title;

(b)    a document or communication, means to state (i) the date; (ii) the author(s), signatory or signatories; (iii) the recipient(s) or addressee(s); (iv) the type of document (i.e., correspondence, memorandum, etc.); (v) the contents with sufficient particularity to enable the propounding party to confirm the document's identification; and (vi) its present or last known custodian and location.

13.    The term "includes" means "includes but is not limited to," and "including" means "including but not limited to."

14.    "NNI" means Nortel Networks, Inc. and its predecessor entities.

15.    "NNL" means Nortel Networks Limited and its predecessor entities, including Northern Telecom Limited.

16.    The term "person" means any natural person or legal entity, including but not limited to any partnership, corporation, unincorporated association, professional association or other form of business or governmental entity or association.

17.    The term "Plan" means any agreement, plan, fund or program which offers, promises or provides "Retiree Benefits" as defined below through the purchase of insurance or otherwise, or any employee welfare benefit plan, fund or program established or maintained to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death

or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services.

18.     The term "Potential Retiree" means any current employee of the Debtors who (i) was age 50 or older with at least five years of service as January 1, 2006; or (ii) was not age 50 or older with at least five years of service as January 1, 2006, but (a) was hired after January 1, 2008, (b) is age 50 or older with at least five years of service as of the date of retirement, and (c) is a member of the active employees' medical plan immediately before retirement.

19.      "Proposal" refers to the document identified as the "Proposal" in the Debtors' Termination Motion (as defined below).

20.     The term "Retiree" means (a) any former employee of the Debtors who has retired, (b) any Potential Retiree, and (c) any present or former spouse or dependent of a former employee of the Debtors who has retired or of a Potential Retiree.

21.     The term "Retiree Benefit" means any payment to any entity or person for the purpose of providing or reimbursing payments for retired employees, or their spouses or dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death.

22.     The term "Retiree Claim" means any and all actual or potential claims, demands, causes of action, debts, liabilities or obligations, whether based on any legal or equitable theory or otherwise, including, but not limited to suits in contract, tort or equity, whether arising under contract, the Employee Retirement Income Security Act of 1974 (ERISA), the Consolidated Omnibus Budget Reconciliation Act (COBRA), or any other statute, rule, regulation, common law or otherwise, and whether arising under the

laws of the United States, any political subdivision thereof or the laws of any other

jurisdiction, in all cases relating to:

    i.  Any benefits, other obligation or other claims arising under or relating to Retiree Welfare Plans (as defined below) or Retiree Benefits;

    ii. The administration of Retiree Welfare Plans, including, but not limited to, the calculation of Retiree Benefits, the application of offsets against Retiree Benefits, the denial of Retiree Benefits, the determination of eligibility to receive Retiree Benefits, the interpretation of Retiree Welfare Plans and the drafting of Retiree Welfare Plans; or

    iii. The past, present or future amendment, modification and/or termination of any Retiree Welfare Plan and/or any benefits or coverage thereunder.

23.    The term "Retiree Claim Exclusions" means:

    (a) Claims arising from or relating to the Nortel Networks Severance

Allowance Plan or the Nortel Networks Enhanced Severance Allowance

Plans, including related fringe benefits;

    (b) Claims arising under or relating to the Nortel Networks U.S. Deferred

Compensation Plan or the Northern Telecom Inc. Senior Management

Incentive Award Program;

    (c) Claims for qualified pension benefits arising under or relating to the

Nortel Networks Retirement Income Plan, Nortel Networks Pension Service

Plan, Nortel Networks Cash Balance Plan, Northern Telecom Inc. Retirement

Plan for Employees or the Nortel Networks Capital Accumulation and

Retirement Program, which are properly asserted only against the Pension

Benefit Guaranty Corporation;

    (d) Claims for non-qualified pension benefits arising under or relating to the

Nortel Networks Retirement Income Plan Restoration Plan, Nortel Networks

Cash Balance Restoration Plan, Northern Telecom Inc. Excess Pension Plan,

Nortel Networks Long-Term Investment Restoration Plan, Nortel Networks

Supplementary Executive Retirement Plan, the Nortel Networks Special

Pension Benefits Plan and the Nortel Networks Special Pension Credit Plan;

(e) Except to the extent described above, valid claims for reimbursement for

benefits covered by and approved pursuant to the Retiree Welfare Plans

incurred prior to the Termination Date that are properly brought prior to the

expiration of the run-off period (as amended);

(f) Claims for expatriate benefits and relocation expenses;

(g) Claims for the account balance currently vested in an individual's account

under the Nortel Networks Long-Term Investment Plan or Northern Telecom

Inc. Thrift Savings Plan; and

(h) Claims directly arising under a written employment agreement between

an individual Retiree and the Debtors that are wholly unrelated to life insur-

ance, death benefits, retirement payments, medical insurance, long-term care

insurance or any other Retiree Claims.

24.     "Retiree Committee" means the Official Committee of Retired Employees

of the Debtors appointed in the Chapter 11 Case by the Office of the United States

Trustee for the District of Delaware on August 2, 2011.

25.     The term "Retiree Welfare Plans" means the Nortel Networks Inc. Retiree

Medical Plan, the Nortel Networks Inc. Retiree Life Insurance and Long-Term Care

Plan, predecessor plans and other formal or informal benefit plans, agreements,

arrangements or programs (including plans, agreements, arrangements or programs

that are funded through the purchase of insurance) or arrangements for current or

future retired employees, their surviving spouses and eligible dependents, including

plans, arrangements, agreements or programs for medical, surgical, or hospital care

benefits, or benefits in the event of sickness, accident, disability, or death collectively

and in each case as amended or modified from time to time.

26.     The term "SPD" means "summary plan description."

27.     The term "Termination Motion" means the Debtors' Motion For Entry Of

An Order Terminating Retiree Benefits And Approving A Settlement Proposal Pursuant

To 11 U.S.C. § 1114 dated July 30, 2012.

28.     The term "UCC" means the Official Committee of Unsecured Creditors

appointed in the Chapter 11 Case by the Office of the United States Trustee for the

District of Delaware on January 26, 2009.

29.     The term "VEBA" means a voluntary employees' beneficiary association

within the meaning of section 501(c)(9) of the Internal Revenue Code of 1986, as

amended.

30.     "You" means, and "your" refers to, the Debtors.

## INSTRUCTIONS

1.      These RFAs call for all information in the Debtors' possession, custody, or

control, including but not limited to all information in the actual or constructive

possession, custody, or control of any attorney, agent or other representative of the

Debtors.

2.      If you do not admit any of the RFAs, your response must specifically deny the RFA or state in detail why you cannot truthfully admit or deny it.  A denial must fairly respond to the substance of the matter, and when good faith requires that you qualify an answer or deny only part of a matter, the answer must specify the part admitted and qualify or deny the rest.  You may assert lack of knowledge or information as a reason for failing to admit or deny only if you state that you have made reasonable inquiry and that the information you know or can readily obtain is insufficient to enable you to admit or deny.

3.      If the Debtors maintain that there is any ambiguity in any RFA, definition, or instruction, the claimed ambiguity shall not be a basis for refusing to provide a response to the RFA, and the Debtors shall set forth as part of their response the language deemed to be ambiguous and the interpretation they have used in responding to the RFA.

4.      If any information responsive to an RFA is withheld, or if you fail to provide a complete answer to any RFA, based on a claim of privilege or immunity from disclosure, comply with Rule 26(b)(5) of the Federal Rules of Civil Procedure, made applicable here by Bankruptcy Rule 7026, and:

a.      identify the nature of the privilege (including work product) which is being claimed and, if the privilege is governed by state law, indicate the state's privilege rule being invoked;  and

b.      Provide the following information in the objection, unless divulgence of such information would cause disclosure of the allegedly privileged information:

    i.  For documents:  (A) the type of document, *e.g.*, letter or memorandum;  (B) the general subject matter of the document;  (C) the date of the document;  and (D) such other information as is sufficient to identify the document for a *subpoena duces tecum*, including, where appropriate, the author of the document, the addressees of the document, and any other recipients shown in the document, and, where not apparent, the relationship of the author, addressees, and recipients to each other;  and

    ii.  For oral communications:  (A) the name of the person making the communication and the names of persons present while the communication was made and, where not apparent, the relationship of the persons present to the person making the communication;  (B) the date and place of communication;  and (C) the general subject matter of the communication.

5.    Unless otherwise noted, each RFA calls for information and documents dated, created, sent, received, reviewed or concerning any date after December 31, 1981. To the extent that any information responsive to an RFA concerns a retiree who retired prior to January 1, 1982, that information also should be provided.

6.    These RFAs shall be continuing, and supplemental responses shall be served in accord with Rule 26 of the Federal Rules of Civil Procedure and Rule 7026 of the Federal Rules of Bankruptcy Procedure.

## **REQUESTS FOR ADMISSION**

PLEASE ADMIT:

1.      Exhibit 1 to the Declaration of John Ray in support of the Termination Motion is a copy of the 1991 Plan.

2.      The 1991 Plan was approved by a vote of the NNL board of directors.

3.      The document annexed hereto as Exhibit A is a copy of an SPD.

4.      The document annexed hereto as Exhibit A is a copy of the SPD concerning the Retiree Welfare Plans in effect as of their adoption in 1991 (the "1991 SPD").

5.      The Debtors did not produce a revised SPD for the 1991 Plan or any successor to the 1991 Plan before 2002.

6.      As of the date of these RFAs, the Debtors have not produced a copy of Exhibit A to the Retiree Committee.

7.      As of the date of these RFAs, the Debtors have not produced a copy of any document substantially similar to Exhibit A to the Retiree Committee.

8.      As of the date of the Termination Motion, the Debtors had made no request for documents concerning Retiree Welfare Plans to any Nortel affiliate in Canada.

9.      As of the date of these RFAs, the Debtors have not requested any documents concerning Retiree Welfare Plans from any Nortel affiliate in Canada.

10.     The Debtors distributed the 1991 SPD to the employees of the Debtors who were or might become eligible for the benefits described therein during the period in which the 1991 SPD was the Debtors' operative SPD.

11.     The Debtors distributed the 1991 SPD to the employees of the Debtors who were or might become eligible for the benefits described therein annually.

12.    The Debtors did not take steps to distribute the 1991 Plan to the employees of the Debtors who were or might become eligible for the benefits described therein at any time during the period in which the 1991 SPD was the Debtors' operative SPD.

13.    As of the date of the Termination Motion, the Debtors had not agreed to distribute any sums in connection with termination or modification of the Retiree Welfare Plans through any structure that would allow Retirees to receive the sums on a tax-free basis.

14.    As of the date of the Termination Motion, the Debtors had not agreed to provide any benefits in connection with termination or modification of the Retiree Welfare Plans through any structure that would allow Retirees to receive the benefits on a tax-free basis.

15.    As of the date of the Termination Motion, the Debtors did not know whether the Retirees for whom Retiree Committee was appointed to negotiate would be able to obtain a group life insurance program if the Retiree Committee accepted the Proposal.

16.    As of the date of the Termination Motion, the Debtors did not know whether the Retirees for whom Retiree Committee was appointed to negotiate would be able to obtain a group health insurance program if the Retiree Committee accepted the Proposal.

17.    As of the date of the Termination Motion, the Debtors did not know whether the Retirees for whom Retiree Committee was appointed to negotiate would be

able to obtain a group long-term care insurance program if the Retiree Committee accepted the Proposal.

18.     As of the date of the Termination Motion, no insurance carrier had agreed to offer the Retirees for whom Retiree Committee was appointed to negotiate with any group long-term care insurance program.

19.     As of the date of the Termination Motion, no insurance carrier had agreed to offer the Retirees for whom Retiree Committee was appointed to negotiate with any group life insurance program.

20.     Based on the best current information, the Debtors expect to have sufficient assets to be able to confirm a Chapter 11 plan.

21.     Based on the best current information, the Debtors do not expect to be able to confirm a Chapter 11 plan before January 1, 2013.

22.     Based on the best current information, the Debtors do not expect to be able to confirm a Chapter 11 plan before July 1, 2013.

23.     Based on the best current information, the Debtors do not expect to be able to confirm a Chapter 11 plan before January 1, 2014.

24.     Based on the best current information, the Debtors expect to have sufficient assets to be able to pay all administrative priority claims in full.

25.     Based on the best current information, the Debtors expect NNI to have sufficient assets to be able to pay all administrative priority claims in full.

26.     Based on the best current information, the Debtors expect to have sufficient assets to be able to pay all secured claims in full.

27.     Based on the best current information, the Debtors expect NNI to have sufficient assets to be able to pay all secured claims in full.

28.     Based on the best current information, the Debtors expect to have sufficient assets to be able to pay more than 60% of the allowed value of unsecured claims against NNI.

29.     Based on the best current information, the Debtors expect to have sufficient assets to be able to pay more than 70% of the allowed value of unsecured claims against NNI.

30.     Based on the best current information, the Debtors expect to have sufficient assets to be able to pay more than 80% of the allowed value of unsecured claims against NNI.

31.     Based on the best current information, the Debtors expect to have sufficient assets to be able to pay more than 90% of the allowed value of unsecured claims against NNI.

32.     Based on the best current information, the Debtors expect to have sufficient assets to be able to pay more than 95% of the allowed value of unsecured claims against NNI.

33.     The current cost to the Debtors of providing the Benefits under the Retiree Welfare Plans as those terms are used in the Termination Motion is between approximately $1.1 and $1.3 million per month.

34.     The Proposal will not provide Retirees with the cash equivalent of approximately five years of additional continued Benefits as the term "Benefits" is used in the Termination Motion.

35.     The Proposal will not provide Retirees with the cash equivalent of four or more years of additional continued Benefits as the term "Benefits" is used in the Termination Motion.

36.     The Proposal will not provide Retirees with the cash equivalent of three or more years of additional continued Benefits as the term "Benefits" is used in the Termination Motion.

37.     As of the date of the Termination Motion, the Debtors had not determined whether there is a mechanism by which they could continue to fund the Retiree Welfare Plans without employing one or more full-time employees to administer those Plans.

38.     As of the date of the Termination Motion, the Debtors had not determined whether there is a mechanism by which they could continue to fund the Retiree Benefits substantially in the form in which they are currently being provided without employing one or more full-time employees to administer those Retiree Benefits.

39.     As of the date of the Termination Motion, the Debtors had not determined whether any of the Debtors' employees who have performed services in connection with administering the Retiree Welfare Plans would be willing to continue providing those services while employed by a different employer.

40.     As of the date of the Termination Motion, the Debtors had not determined whether any of the services currently performed by the Debtors' employees in connection with administering the Retiree Welfare Plans could be performed instead by non-employee personnel.

41.     As of the date of the Termination Motion, the Debtors did not provide the Retiree Committee with any legal authority to explain why they would not consent to

the use of a VEBA to administer or distribute the "Retiree Payment Amount" as that term is used in the Proposal.

42.    As of the date of the Termination Motion, the Debtors did not identify any precedent to the Retiree Committee to explain why they would not consent to the use of a VEBA to administer or distribute the Retiree Payment Amount as that term is used in the Proposal.

43.    As of the date of the Termination Motion, the Debtors did not identify to the Retiree Committee any case in which the use of a VEBA subjected a Debtor or its officers to liability in connection with retirees' welfare benefits.

44.    Prior to the date of the Termination Motion, the Debtors did not communicate to the Retiree Committee in writing that they would not consent to the use of a VEBA to administer or distribute the Retiree Payment Amount as that term is used in the Proposal.

45.    As of the date of the Termination Motion, the Proposal was not the highest settlement offer the Debtors had caused to be communicated to the Retiree Committee.

46.    The settlement proposal that the Debtors made to the Retiree Committee on June 4, 2012 was not substantially in the form of the Proposal.

47.    The Debtors are currently employing one or more companies that are not staffed by the Debtors' employees to provide services in connection with the Retiree Welfare Plans.

48.     As of the date of the Termination Motion, the Debtors did not ask any company providing services in connection with the Retiree Welfare Plans whether it would agree to continue to provide services after January 1, 2013.

49.     As of the date of the Termination Motion, the Debtors did not ask any company providing services in connection with the Retiree Welfare Plans whether they would be willing to expand the services they currently provide in connection with those Plans.

50.     As of the date of the Termination Motion, the Debtors did not estimate the administrative costs of continuing to provide benefits under the Retiree Welfare Plans from January 1, 2013 through January 1, 2014 as likely to be more than $10 million.

51.     As of the date of the Termination Motion, the Debtors did not estimate the administrative costs of continuing to provide benefits under the Retiree Welfare Plans from January 1, 2013 through January 1, 2014 as likely to be more than $8 million.

52.     As of the date of the Termination Motion, the Debtors did not estimate the administrative costs of continuing to provide benefits under the Retiree Welfare Plans from January 1, 2013 through January 1, 2014 as likely to be more than $5 million.

53.     Prior to the date of the Termination Motion, the Retiree Committee asked the Debtors to inform them exactly where the Debtors had searched for documents the Retiree Committee had requested.

54.     Prior to the date of the Termination Motion, the Debtors did not inform the Retiree Committee whether they had searched in North Carolina for documents the Retiree Committee had requested.

55.    Prior to the date of the Termination Motion, the Debtors did not inform the Retiree Committee whether they had searched in Tennessee for documents the Retiree Committee had requested.

56.    As of the date of the Termination Motion, the Debtors had available sufficient resources to pay more than $40 million to or for Retirees in satisfaction of their claims for Retiree Benefits.

57.    As of the date of the Termination Motion, the Debtors had available sufficient resources to pay more than $40 million in satisfaction of Retirees' claims for Retiree Benefits.

58.    As of the date of the Termination Motion, the Debtors had available sufficient resources to pay more than $80 million in satisfaction of Retirees' claims for Retiree Benefits.

59.    As of the date of the Termination Motion, the Debtors had available sufficient resources to pay more than $170 million in satisfaction of Retirees' claims for Retiree Benefits.

60.    As of the date of the Termination Motion, the Debtors expected that they would be able to pay $170 million in satisfaction of Retirees' claims for Retiree Benefits and still pay administrative priority claims against the Debtors through the end of the Chapter 11 case in full.

61.    As of the date of the Termination Motion, the Debtors expected to have more than $80 million in excess of the financial resources necessary to pay administrative priority claims against the Debtors in full as of the conclusion of the Chapter 11 case.

62.     As of the date of the Termination Motion, the Debtors expected to have more than $125 million in excess of the financial resources necessary to pay administrative priority claims against the Debtors in full as of the conclusion of the Chapter 11 case.

63.     As of the date of the Termination Motion, the Debtors expected to have more than $150 million in excess of the financial resources necessary to pay administrative priority claims against the Debtors in full as of the conclusion of the Chapter 11 case.

64.     As of the date of the Termination Motion, the Debtors expected to have more than $170 million in excess of the financial resources necessary to pay administrative priority claims against the Debtors in full as of the conclusion of the Chapter 11 case.

65.     As of the date of the Termination Motion, the Debtors expected to have more than $170 million in excess of the financial resources necessary to be able to confirm a Chapter 11 plan.

66.     The Debtors reconciled the two censuses of retiree data that they provided to the Retiree Committee prior to the date of the Termination Motion by stating, in part, that the data contained errors.

67.     The census of retiree data as of July 2011 that the Debtors provided to the Retiree Committee erroneously omitted data concerning certain Retirees' Retiree Benefits claims.

68.     The census of retiree data as of September 2011 that the Debtors provided to the Retiree Committee erroneously omitted data concerning certain Retirees' Retiree Benefits claims.

69.     Prior to the date of the Termination Motion, the Retiree Committee asked the Debtors to inform them where the Debtors had searched for documents the Retiree Committee had requested.

70.     The Debtors promised one or more Retirees in writing that the Retiree's beneficiaries would receive benefits upon the Retiree's death of more than $100,000.

71.     The Debtors promised one or more Retirees in writing that the Retiree's beneficiaries would receive benefits upon the Retiree's death of more than $200,000.

72.     The Proposal requires certain claims to be paid from the amount offered in the Proposal that are not claims for "Retiree Benefits" as that term is defined in 11 U.S.C. § 1114.

73.     As of the Date of the Termination Motion, the Debtors did not provide the Retiree Committee with any estimate of the total amount of the claims that the Proposal requires to be paid from the amount offered in the Proposal that are not "Retiree Benefits" as that term is defined in 11 U.S.C. § 1114.

74.     As of the Date of the Termination Motion, the Debtors did not provide the Retiree Committee with any estimate of any of the claims that the Proposal requires to be paid from the amount offered in the Proposal that are not "Retiree Benefits" as that term is defined in 11 U.S.C. § 1114.

75.     The Proposal requires certain claims to be paid from the amount offered in the Proposal that are not claims for "Retiree Benefits" within the ordinary English meaning of the definition of that term stated in 11 U.S.C. § 1114.

76.     As of the Date of the Termination Motion, the Debtors did not provide the Retiree Committee with any estimate of the total amount of the claims that the Proposal requires to be paid from the amount offered in the Proposal that are not "Retiree Benefits" within the ordinary English meaning of the definition of that term stated in 11 U.S.C. § 1114.

77.     As of the Date of the Termination Motion, the Debtors did not provide the Retiree Committee with any estimate of any of the claims that the Proposal requires to be paid from the amount offered in the Proposal that are not "Retiree Benefits" within the ordinary English meaning of the definition of that term stated in 11 U.S.C. § 1114.

78.     At least 10% of the Retirees receiving Retiree Benefits under the Retiree Welfare Plans are likely to be unable to obtain individual health insurance.

79.     At least 15% of the Retirees receiving Retiree Benefits under the Retiree Welfare Plans are likely to be unable to obtain individual health insurance.

80.     The Debtors' experts, Mercer Health & Benefits LLC, estimated as of October 2011 that a substantial percentage of Retirees receiving Retiree Benefits under the Retiree Welfare Plans would be unable to obtain individual health insurance because nationwide studies showed that approximately 19% of certain populations seeking individual health insurance coverage were unable to obtain it.

81.     As of the date of these RFAs, the Debtors have not produced any employee handbooks to the Retiree Committee.

82.     As of the date of these RFAs, the Debtors have not produced any brochures to the Retiree Committee entitled "Retirement Benefits at a Glance."

83.     As of the date of these RFAs, the Debtors have not produced any communications from the Debtors addressed to any Retiree concerning the Retiree's benefits.

84.     As of the date of the Termination Motion, the Debtors did not provide the Retiree Committee with any SPD for any part of the period from January 1, 1991 through August 31, 2003.

85.     The Debtors are legally required to retain copies of all SPDs they distributed from January 1, 1990 to the present.

86.     From January 1, 1990 to the present, as a matter of standard business practice, NNI routinely conducted exit interviews of retiring employees.

87.     From January 1, 1990 to the present, as a matter of standard business practice, NNI routinely discussed Retiree Benefits during exit interviews of retiring employees.

88.     As of the date of these RFAs, the Debtors have not produced any documents concerning exit interviews with retiring employees to the Retiree Committee.

89.     Based on the information available to date, terminating the Retiree Welfare Plans as of April 1, 2013 rather than as of December 31, 2012 is not likely to cause any delay in the Debtors' confirmation of a Chapter 11 plan.

90.     Based on the information available to date, terminating the Retiree Welfare Plans as of July 1, 2013 rather than as of April 1, 2013 is not likely to cause any delay in the Debtors' confirmation of a Chapter 11 plan.

91.     Based on the information available to date, terminating the Retiree Welfare Plans as of December 31, 2013 rather than as of July 1, 2013 is not likely to cause any delay in the Debtors' confirmation of a Chapter 11 plan.

92.     Based on the information available to date, terminating the Retiree Welfare Plans as of December 31, 2013 rather than as of December 31, 2012 is not likely to cause any delay in the Debtors' confirmation of a Chapter 11 plan.

93.     The Debtors' experts estimated as of October 2011 the present value of Retirees' Retiree Benefits would be greater than $165 million.

Dated: August 10, 2012          **MCCARTER & ENGLISH, LLP**
      Wilmington, DE

/s/ William F. Taylor, Jr.

William F. Taylor, Jr. (DE Bar I.D. #2936)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
wtaylor@mccarter.com

-and-

Albert Togut, Esq.
Neil Berger, Esq.
Richard K. Milin, Esq.
Togut, Segal & Segal LLP
One Penn Plaza
New York, New York 10119
(212) 594-5000
(212) 967-4258 Facsimile
altogut@teamtogut.com
neilberger@teamtogut.com
rmilin@teamtogut.com

*Counsel to the Official Committee of Retired
Employees*

# EXHIBIT A

# Retiree Medical Plan and
# Life Insurance and Long-Term Care Plan

E • M • P • L • O • Y • E • E



B E N E F I T S • P R O G R A M



1991

**SUMMARY PLAN DESCRIPTIONS**

**NORTHERN TELECOM INC. RETIREE MEDICAL PLAN AND NORTHERN TELECOM INC. LIFE INSURANCE AND LONG-TERM CARE PLAN**

The Northern Telecom Inc. Retiree Medical Plan is available to provide medical expense protection for you during your retirement years. In addition the and Northern Telecom Inc. Life Insurance and Long-Term Care Plan provides a death benefit to your survivors upon your death and optional long-term care insurance to you and your eligible spouse.

## I. MEDICAL PLAN

### Questions and Answers

1. **Who is eligible to participate?**

   If you, as an employee, retire directly from the Company, you are entitled to participate in this plan (unless you are covered by a collective bargaining agreement which does not specifically provide for participation in the Plan).

   **Qualified Dependents**

   You may also elect coverage for your qualified dependents if they are covered by Northern Telecom medical plan when you retire.

2. **How do I begin participation?**

   Prior to your official retirement date, you will be given information and forms to complete concerning your participation in this Plan. You will also be given the option to choose single or dependent coverage (if eligible) at that time.

1

3. **What medical plan or plans may I choose?**

The initial medical plan you, as a retiree, may choose will be designated by the Company. For 1991 the medical plan available to retirees is the Northern Telecom Indemnity Plan administered by Prudential.

In the future the Company may designate more than one medical plan in which retirees may participate. When there is more than one plan available, retirees will be given a choice of medical plans in which to participate.

4. **What is the coverage of the Plan if I retire before age 65?**

The coverage is the same as active employees in the Northern Telecom Indemnity Plan.

5. **How does the coverage change when I reach age 65?**

At age 65 the available medical coverage is a supplement to Medicare. This coverage is a supplement to Medicare Parts A and B. With the combination of Medicare and NTI's Medicare Supplement, retirees' benefits should be equal to benefits of active employees.

6. **What is the coverage of the Plan if I retire at age 65 or later?**

The coverage is a supplement to Medicare Parts A and B. With the combination of Medicare and NTI's Medicare Supplement, retirees' benefits should be the same as active employees' benefits.

7. **How are the company contributions for this coverage determined?**

The amount of company contributions toward your retiree medical coverage premium is determined by (1) the years of vesting service recognized for you under Northern Telecom Inc Retirement Plan for Employees (or its successor plan); (2) the type of coverage you choose (single or family); and (3) whether you are eligible for Medicare.

You will be given credit for company contributions for each year of service up to a maximum of twenty years.

If you qualify for the <u>Rule of 65,</u> you will be given credit for company contributions for each year of service as if you had completed twenty

2

(20) years of service. The <u>Rule of 65</u> is met if your age plus years of vesting service equal 65 on December 31, 1991.

8.    **What are the dollar amounts of company contributions?**

The chart below shows the company contribution toward your premium for each year of service for the retiree medical plan:

o    <u>Single Coverage</u>

|  |  |
|---|---|
| Prior to Medicare Eligibility | $10.50 |
| Medicare Eligibility | 1.00 |

o    <u>Family Coverage</u>

|  |  |
|---|---|
| Prior to Medicare Eligibility | $26.00 |
| Medicare Eligible | 3.00 |

To determine the Company contribution for a covered family unit whose members differ as to Medicare eligibility, group the family into sub-groups by Medicare eligibility. If a sub-group has only one member, the single coverage company contribution table will be used. If a sub-group has more than one member, the family coverage company contribution table will be used.

For example, if the retiree is age 63 (not Medicare eligible) and the retiree's spouse is age 66 and is covered by Medicare, the company contributions would be $10.50 per year of service for the retiree and $1.00 per year for the spouse. When both are covered by Medicare, the company contribution would be $3.00 for each year of service.

Another example, if a retiree is age 66 (Medicare eligible) and his spouse is also age 66 (Medicare eligible) and he has two other qualified dependents who are not Medicare eligible, the Company contribution would be $26.00 per year of service for the two qualified dependents and $3.00 per year of service for the retiree and his spouse.

9.    **How are my contributions for this coverage determined?**

Your contributions for this coverage are the remaining premium cost after subtracting the company contributions.

3

**10. How are the annual premiums established?**

The premiums are established by Northern Telecom based on historic costs plus an expected medical trend rate in accordance with standard procedures for establishing medical coverage premiums. These premiums will be established at least annually.

**Premiums**

The annual premiums for 1991 are shown below:

Single
| | |
|---|---|
| Prior to Medicare Eligibility | $210.00 |
| Medicare Eligibility | 43.00 |

Family Coverage
| | |
|---|---|
| Prior to Medicare Eligibility | $555.00 |
| Medicare Eligibility | 106.00 |

**Retiree Cost**

Your cost is the difference between the premium and the company contributions. Examples:

Retiree, age 65 with 15 years of vesting service, family coverage:

| | |
|---|---|
| Premium | $106.00 |
| Credit toward premium | |
| 15 years x $3.00 | 45.00 |
| Retiree Cost | $61.00 |

Retiree, age 62 with 20 years of vesting service, single coverage:

| | |
|---|---|
| Premium | $210.00 |
| Credit toward premium | |
| 20 years x $10.50 | 210.00 |
| Retiree Cost | -0- |

4



11. **If I decide not to elect any retiree medical coverage, is the company contribution converted into cash or another benefit?**

No. If you decide not to elect retiree medical coverage, the company contribution is forfeited.

12. **Are there any requirements for me to be eligible for Medicare supplement coverage?**

Yes. To be eligible for the Medicare supplement coverage, you must enroll for benefits under Medicare Part A and Part B.

13. **What happens to my qualified dependent(s) when I die?**

The company will continue to make a company contribution toward retiree medical coverage for your dependent(s) who are covered by the plan even after your death provided your dependents continue to be qualified and continue to make their required contribution.

14. **What happens to my required contributions if my qualified dependent(s) die first?**

You will make contribution payments only for yourself and any remaining dependents covered by the plan.

15. **Can I be covered under the dental and vision plans after my retirement from the Company?**

No. Dental and vision coverage ceases at your retirement date.

16. **How do I file claims for medical coverage?**

Claims are filed through The Prudential Insurance Company, Northern Telecom Unit, P. O. Box 10125, High Point, NC 27261

## II. LIFE INSURANCE AND LONG-TERM CARE PLAN

1. **Who is eligible to participate?**

If you, as an employee, retire directly from the Company at normal

retirement age, you are entitled to participate in this plan (unless you are covered by a collective bargaining agreement which does not specifically provide for participation in the Plan). If you retire before age 65, you must have ten years of service in order to be eligible to participate in this plan.

**Eligible Spouse**

Your spouse is also eligible for long-term care coverage if on your retirement date your spouse either is (1) covered by the Company's plan or (2) is not confined for medical care or treatment at home or in any institution.

2.   **How do I begin participation?**

Prior to your official retirement date, you will be given information and forms to complete concerning your participation in this Plan.

3.   **What options for life insurance and life insurance combined with long-term care do I have?**

You have the following options:

1.   For employees who began employment prior to January 1, 1991, life insurance equal to your base pay and commissions as of December 31, 1990. This insurance amount will be reduced by 10% of the initial amount each year for five years. After five years, the life insurance coverage shall be equal to one-half of the initial amount with a maximum amount of $50,000.

2.   $35,000 life insurance coverage

3.   $10,000 life insurance coverage plus long-term care coverage for you up to $100/day with a maximum benefit of $180,000

4.   $10,000 life insurance coverage for you plus long-term care coverage for both you and your spouse for up to $70/day with a combined maximum benefit of $125,000

4.      **What is my cost for this coverage?**

There is no cost to you for this coverage. This benefit is totally paid by Northern Telecom.

5.      **What is the coverage of the plan if I retire before age 65?**

If under the Northern Telecom Inc. Retirement Plan for Employees (or its successor) you have credit for ten years of vesting service, you are eligible to participate in this Plan.

## LONG-TERM CARE

6.      **What kind of benefits are paid under the long-term care option?**

The long-term care option is designed to pay benefits not covered by either Medicare or the NTI Retiree Medical Plan. The key coverages are:

- Nursing Home Care of a custodial nature
- Home Health Care
- Adult Day Care

7.      **Who administers the benefits of this plan?**

This plan is administered through The Prudential Insurance Company long-term care unit.

8.      **If I have chosen the long-term care option, what must happen for me or my spouse (if covered) to receive benefits?**

The following events must happen for you to receive benefits under the long-term care plan:

- An insurable event must occur. You or your covered spouse must be assessed by Prudential to be dependent in two or more of the five Activities of Daily Living:
    1. Bathing
    2. Dressing
    3. Toileting
    4. Eating
    5. Transferring from bed to chair

- A 60-day waiting period must be completed. This waiting period is from the date Prudential determines the insurable event occurred.

### 9. What are the specific benefit limits for the services covered?

After coordination with other eligible payments, the specific benefits paid under this plan are as follows:

|  | Employee Only | Employee Plus Spouse |
|---|---|---|
|  | $ per day for each person | |
| Nursing home services | $100 | $70 |
| Home Health Care | 50 | 35 |
| Adult Day Care | 50 | 35 |

### 10. Where do I file claims for the long-term care benefit?

The Prudential Insurance Company is the claims administrator. Claims may be submitted to:

The Prudential Insurance Company
Long-Term Care Services
GHCD 1
1201 New Road
Linwood, NJ 08221

Phone: (609) 293-2532

## Plan Name and Identification Numbers

The formal names and plan numbers of the two plans are the Northern Telecom Inc. Retiree Medical Plan, plan number 517, and Northern Telecom Inc. Retiree Life Insurance and Long-Term Care Plan, plan number 518. In any formal correspondence about the plan you should make reference to the employer identification number assigned by the Internal Revenue Service. Northern Telecom Inc.'s number is EIN: 04-2486332.

## Employer and Address:

Northern Telecom Inc.
200 Athens Way
Nashville, TN 37228-1803

8



Northern Telecom Inc. is the plan administrator.

**Claims Administrator:**

The Prudential Insurance Company
Long-Term Care Services
GHCD 1
1201 New Road
Linwood, NJ 08221

Phone: (609) 293-2532

## Type of Plan, Plan Year, and Funding

The Northern Telecom Inc. Retiree Medical Plan, and Northern Telecom Inc. Life Insurance and Long-Term Care Plan are welfare plans. Company costs, including premiums and contributions, are paid out of current or accumulated earnings and profits. Records for the plans are maintained on a plan-year basis, from January 1 through December 31.

## Legal Process

Legal process may be served on Northern Telecom Inc., 200 Athens Way, Nashville, TN 37228-1803, as plan administrator.

## Appeal Rights:

If you make a claim for benefits under the Plans, and all or part of it are denied, you may appeal this action to the Employe Benefits Committee. The committee will notify you by certified mail of the decision reached. If the claim is denied by the committee, the communication will also tell you how to appeal this decision.

## Continuation of the Plan

The Company intends to continue the Plans indefinitely. However, to protect against unforeseen situations, changes in the law, and changes in the financial environment, the Company does reserve the right to change the Plans and, if necessary, discontinue either of the plans at any time. Amendments will be made by appropriate actions of the Company.

## Plan Documents

This description of the Northern Telecom Inc. Retiree Medical Plan and Northern Telecom Inc. Life Insurance and Long-Term Care Plan summarizes the official Plan documents. We have tried to write this summary in clear, understandable and nontechnical language. To the extent this summary conflicts with the plan documents, the plan documents will control.

## How to Request Information

Requests for information or benefits should be made to your Human Resources department. They can provide any forms you may need to complete. Remember to include your name, social security number and location on all forms. Complete information will be given to you.

## Your Rights under the Employee Retirement Income Security Act of 1974 (ERISA)

ERISA contains certain requirements about disclosing plan information to plan participants and beneficiaries who are currently receiving plan benefits. We've made sure that this summary clearly describes the Northern Telecom Inc. Retiree Medicare Plan and Northern Telecom Inc. Life Insurance and Long-Term Care Plan and contains the information required by law to be included in a summary of your Plans.

This section of your booklet contains a statement of the rights granted to plan participants by ERISA. Some of these rights have already been discussed in other sections of this booklet. We have summarized them here for your convenience.

As a participant of the Northern Telecom Inc. Retiree Medical Plan and Northern Telecom Inc. Life Insurance and Long-Term Care Plan, you are entitled to:

- Examine, without charge, copies of all Plan documents including those filed with the U. S. Department of Labor, such as detailed annual reports and Plan description. These are located at the plan administrator's office and at your Human Resources department office.
- Obtain copies of all plan documents and other plan information upon written request to the plan administrator. A reasonable charge may be made for these copies.
- Receive a summary of the plan's annual financial report. The plan administrator is required by law to furnish each participant with a copy of this summaryual report.

10

ERISA not only creates rights for plan participants, it also imposes duties upon the people who are responsible for operation of the Plan. These people are called "fiduciaries"; their duty is to operate the Plan prudently and in the interest of you and other plan participants and beneficiaries.

No one, including your employer, or any other person may discriminate against you in any way intended to prevent you from obtaining a plan benefit or exercising your rights under ERISA.

If your claim for a benefit is denied in whole or in part by the plan administrator, you must receive a written explanation of the reason for the denial. You have the right to have your claim reviewed.

Under ERISA, you can take steps to enforce your rights. For instance, if you ask for materials from the Plan and do not receive them within 30 days, you may file suit in federal court. In such a case, the court may require the plan administrator to provide the materials and pay you up to $100 a day until you receive the materials, unless they were not sent for reasons beyond the control the plan administrator.

If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. If it should happen that plan fiduciaries misuse the plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in federal court.

The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees if, for example, it finds your claim is frivolous.

If you have any questions about the Plans, you should contact the plan administrator or your local Human Resources department. If you have any questions about your rights under ERISA, you should contact the nearest Area Office of the U. S. Labor-Management Services Administration, Department of Labor.

## Claims Administration

The Prudential Insurance Company, provides claims related administration services under the Plans.

11