### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------X

| | |
|---|---|
| *In re* | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |
| | **Hearing Date:** |
| | August 22, 2012 at 10:00 am ET |
| | **RE: DI 8104, 8105, 8155, 8156, 8188** |

-----------------------------------------------------------X

### JOINT REPLY IN FURTHER SUPPORT OF MOTION FOR A SCHEDULING ORDER BIFURCATING PROCEEDINGS AND STAYING CERTAIN DISCOVERY ON CLAIMS BY THE EMEA CLAIMANTS

The Movants respectfully submit this reply (the "Reply")[2] in further support of

the Joint Motion for a Scheduling Order Bifurcating Proceedings and Staying Certain Discovery

on Claims by the EMEA Claimants [D.I. 8104], and in response to the (i) Joint Administrators'

Opposition to Joint Motion for a Scheduling Order Bifurcating Proceedings and Staying Certain

Discovery on Claims of the EMEA Claimants [D.I. 8155] (the "Opposition" or "Opp.") and (ii)

Response of the Monitor of the Canadian Nortel Debtors to Joint Motion for a Scheduling Order

Bifurcating Proceedings and Staying Certain Discovery on Claims by the EMEA Claimants [D.I.

8188] (the "Monitor's Response"):

---

[1]     The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion or the proposed order attached thereto, as applicable.

## PRELIMINARY STATEMENT

1.     Although the EMEA Claimants professed a desire to progress resolution of their claims through litigation, their Opposition suggests otherwise.  On one hand, the EMEA Claimants suggest staying discovery altogether may be the best course.  Opp. at 6.  On the other hand, they propose extremely broad discovery related to all 38 EMEA Claims against various U.S. Debtors (including claims to which the Movants have not yet objected).  They propose no specific schedule, but instead request only that the Court "permit discovery to proceed in accordance with the timetables established by the Federal Rules of Civil Procedure, and as may be agreed by the parties, with a deadline for completing discovery of August 31, 2013."  Opp. at 21.  Neither of these options reflects the needs and circumstances of the U.S. Debtors' cases.

2.     Given the paramount goal of facilitating distributions to creditors, and while pursuing a parallel mediation track, Movants propose that there must be some targeted steps taken to progress resolution of the EMEA Claims.  These claims were filed by the EMEA Claimants against the U.S. Debtors in these Chapter 11 cases – they can only be resolved by this Court, which has exclusive jurisdiction.  Movants thus respectfully suggest that the Canadian Monitor's misplaced views on this Motion and these U.S. claims should not sway this Court. Similarly, there is no basis for the EMEA Claimants' suggestion that before the Court rules on the Motion, there need be a joint conference with the U.S. and Canadian Courts.  The relief the Motion seeks is consistent with the Movants' continued efforts to mediate allocation disputes in accordance with the Court's direction.  Movants' proposed schedule will potentially facilitate a consensual resolution because Movants' proposal is capable of resolving almost $2.5 billion of NNUK's Claim, which is more than five times larger than any of the other EMEA Claims.

3.     Nothing in the Opposition disputes the standard to bifurcate and prioritize resolution of the issues of solvency and tracing for the NNUK Claim, which requires only that

Movants' proposal provide the <u>potential</u> for simplifying the litigation and promoting judicial economy.  Mot. at 8, 11.  Instead, in an effort to obscure the efficiencies of the Movants' proposed schedule, the EMEA Claimants raise collateral issues.  The EMEA Claimants point to purported discovery overlap with claims which Movants have not yet moved to dismiss.  Not only are many of those claims non-material, but many are not cognizable under foreign law, are barred under the terms of the Court's March 2012 opinion, or are otherwise subject to dismissal without discovery.  Until those issues are raised and determined, there is no contested matter that even entitles the EMEA Claimants to discovery under the Federal Rules.

4.      The EMEA Claimants' arguments regarding English law need not and cannot be resolved in the context of this procedural Motion.  Movants have shown that English law provides a prospect for vastly simplifying the litigation.  Although the EMEA Claimants now raise other issues of English law, as the proceedings on the Motions to Dismiss show, the parties will be able to brief their positions on foreign law in due course without extensive evidentiary proceedings.  In any event, the Opposition concedes that tracing will resolve the basis for nearly $1.4 billion in claims for unjust enrichment and knowing receipt, and, NNUK's protestations notwithstanding, the question of solvency or even "doubtful solvency" is an objective test that can be resolved by expert submissions without inquiries into subjective intent.  Finally, even if a claim for unlawful distributions of capital was pled (and it is not), that claim can be resolved as a matter of law.

5.      The EMEA Claimants also have it backwards insofar as they suggest that the need for documents from the Canadian Debtors should somehow open the doors to discovery on all issues of possible relevance.  The issues presented by the need for targeted third party discovery from the Canadian Debtors are mitigated by Movants' proposal which limits the

universe of documents that parties need to access, while the EMEA Claimants' proposal for broad discovery would only require more discovery from Canada.  Movants recognize that the Canadian Monitor has expressed the view that all discovery regarding the EMEA Claims should be stayed, but Movants are hopeful that, when presented with the limited discovery that the Movants' proposal requires, the parties can cooperate to obtain the basic documents at issue.

6.    The Movants' proposal best balances the need for progress in resolving the EMEA Claims with the interests shared by the Court and each of the Nortel estates in avoiding protracted discovery and litigation.  Movants respectfully request that the Court grant the Motion, prioritizing the issues of tracing and solvency on the NNUK Claim and staying discovery on the remaining claims brought by the EMEA Claimants.

## ARGUMENT

### I.
### THE CLAIMS OF OTHER EMEA CLAIMANTS HAVE NO BEARING ON THE EFFICIENCIES GAINED BY RESOLVING NNUK'S CLAIMS

7.    The EMEA Claimants' proposal to simultaneously pursue discovery on all of the EMEA Claims is unworkable and inefficient.[3]  Particularly when coupled with their failure to propose a concrete schedule and their contradictory assertion that any form of discovery should be stayed indefinitely pending further progress in mediation, it is clear that their true goal is to delay a resolution of the merits of the EMEA Claims as long as possible.  Where this Court has recognized the "weakness and unlikelihood of ultimate success" of those claims,[4] this delay is only to the detriment of the U.S. Debtors and their creditors.

8.    Indeed, there is no basis for the EMEA Claimants' assertion that discovery

---

[3]    Notably, the Opposition provides the first mention of discovery on any claims other than the three claims subject to the Motions to Dismiss.  During the meet and confer process, the EMEA Claimants sought discovery only as to NN Ireland, NNUK and NNSA.  See Mot. at 6 n.9 ("[T]he parties agree that the claims asserted against the Debtors by the other EMEA Claimants are not yet ripe for discovery.").

[4]    In re Nortel Networks Inc., 469 B.R. 478, 509-10 (Bankr. D. Del. 2012).

regarding "the claims of the EMEA Debtors other than NNUK" is "inevitable."  Opp. at 2.

Many of these claims assert relatively small amounts or are not cognizable either under foreign

law or the terms of this Court's prior rulings.  See, e.g., Barefoot Decl. Ex. E (claim of Nortel

Networks Oy, asserting less than $68,000 in damages); Supplemental Barefoot Decl. Ex. 1

(claim of Nortel Networks South Africa (Proprietary) Limited, asserting only claims relating to

the UK pension proceedings identical to those that this Court already has dismissed).  The

Movants will address those issues at the appropriate time, thereby limiting, if not averting, the

need for the costs and burdens of the broad discovery the EMEA Claimants prematurely propose.

In any event, until the Movants object or move to dismiss those additional claims, there is no

contested matter that even provides a basis for discovery under the Federal Rules.  See, e.g., In re

Rimsat, Ltd., 223 B.R. 345, 346 n.3 (Bankr. N.D. Ind. 1998) ("[U]ntil a proof of claim has been

objected to there is no contested matter to which . . . any of the . . . 7000 series [R]ules [of

Bankruptcy Procedure] (including the discovery rules) can be applied.").[5]

       9.     Even as to NNSA and NN Ireland's remaining claims, a decision on

solvency and tracing for NNUK could establish a framework for further proceedings and narrow

their scope.[6]  Resolving $2.45 billion of NNUK's claims through the issues of solvency and

tracing thus has obvious value – it potentially eliminates the need for substantial additional

discovery and moves the parties closer to consensual resolution.

---

[5]     As the Motion indicated, there are 38 EMEA proofs of claim that have not yet been expunged.  Mot. at 5; Barefoot Decl. Ex. A.  The Opposition mentions the claims of "18 EMEA Debtors other than NNUK," Opp. at 3, evidently referring only to the EMEA Claimants that are currently in administration before the High Court in London.

[6]     A decision on the issues of tracing and solvency will be directly relevant to a resolution of NN Ireland's claim against NNI.  See, e.g., Declaration of Aidan Redmond SC in Support of the Joint Objection and Motion to Dismiss the Claims of Nortel Networks Ireland (Nortel Ireland) [D.I. 6023] ¶ 56 ("Unconscionable or Knowing Receipt under Irish law . . . is a restitutionary remedy and does require a plaintiff to trace its property to the custody of the defendant."); Joint Objection and Motion to Dismiss Claims of Nortel Networks (Ireland) Limited [D.I. 6022] at 38-41 (arguing that in the absence of allegations of NN Ireland's insolvency, the actions could not constitute a breach of fiduciary duty to creditors).

## II.
## THE EMEA CLAIMANTS CONCEDE THAT TRACING RESOLVES
## NNUK'S CLAIMS FOR UNCONSCIONABLE RECEIPT AND UNJUST ENRICHMENT

10. The EMEA Claimants devote little more than a single page of their twenty-one page brief to one of the two gating issues identified by the Movants, and more importantly, concede that a tracing analysis would resolve NNUK's claims for unconscionable receipt and unjust enrichment. Opp. at 19. NNUK asserts damages of "no less than US $890,250,037.69" for its unjust enrichment claim based on intercompany loans (Barefoot Decl. Ex. B (Claim ¶ 151)) and "no less than US[ ]$478,266,584.27" for its unjust enrichment claim based on Project Swift (Id. ¶ 183).[7] Accordingly, tracing alone has the ability to eliminate roughly $1.4 billion in claims for unjust enrichment or knowing receipt.

11. Unable to credibly argue that the resolution of a basis for $1.4 billion in claims would not promote "convenience, . . . expedition, and economy of resources," see Emerick v. U.S. Suzuki Motor Corp., 750 F.2d 19, 22 (3d Cir. 1984), the EMEA Claimants' only response is to suggest – without citation to authority or other support – that "complete discovery will be required regarding each of the relevant transactions and the resulting movement of funds" such that "[n]o efficiency" would be gained by focusing on tracing. Opp. at 20.

12. The Opposition provides no support for this notion because there is none. Tracing is a straightforward exercise that will involve expert examination of bank account statements, general ledgers and other similar documents – not "complete discovery" regarding all of the facts and circumstances for each of the relevant transactions. See id.

13. The EMEA Claimants' reference to the need for discovery from Canada – a mantra invoked repeatedly throughout the Opposition to suggest that bifurcated discovery will

---

[7] NNUK does not quantify damages for its parallel English law claims for unconscionable or knowing receipt, but these claims are based on the same factual allegations concerning the same underlying transactions and are also resolved by tracing. See, e.g., Barefoot Decl. Ex. B (Claim ¶¶ 148, 180).

be difficult – is a red herring.  As an initial matter, the only issue relevant to the Motion is the need for third-party discovery from the Canadian Debtors to resolve the EMEA Claims pending before this Court against the U.S. Debtors – not the availability of discovery on their separate claims against the Canadian Debtors.  In any event, the EMEA Claimants' non-specific plan for wide-ranging discovery on all issues relevant to each of the EMEA Claims will require far <u>more</u> discovery from Canada that, as they point out, may be difficult to obtain.  On this point, the timing of the Monitor's Response is telling.  Only after the Opposition set forth the EMEA Claimants' proposal for wide-ranging, unfettered discovery was the Monitor compelled to take a position.  By contrast, the tailored discovery that may be necessary for a tracing exercise reduces the burden on the Canadian Debtors, and notwithstanding the Monitor's reservation of rights, Movants hope that the parties can cooperate to obtain the limited number of necessary documents.

### III.
### RESOLUTION OF NNUK'S SOLVENCY WILL PROMOTE JUDICIAL EFFICIENCY AND AVOID UNNECESSARY DISCOVERY

14.     NNUK's solvency is also a "potentially dispositive preliminary issue[]" whose resolution warrants "deferral of costly and possibly unnecessary discovery proceedings" on other matters.  <u>See</u> <u>Akzona Inc. v. E. I. Du Pont De Nemours & Co.</u>, 607 F. Supp. 227, 236 (D. Del. 1984) (citation omitted).  The EMEA Claimants' preview of their likely merits arguments relating to solvency does not change this, since it is the <u>potential</u> that bifurcation would resolve dispositive issues that makes bifurcation appropriate.  <u>Id.</u>[8]  In any event, the

---

[8]     <u>See also</u> cases cited in Motion at 8 n.16, 10 n.19.

EMEA Claimants' new contentions under English law will not require exhaustive discovery to establish ratification of the alleged breaches that underlie nearly all of NNUK's claims.[9]

**A.    NNUK's Conspiracy Claims May Be Resolved By Solvency and Ratification Despite NNUK's Allegations of Breach of the Duty of Care and Breach of Contract**

15.    While they concede that ratification can cure a breach of fiduciary duty, the EMEA Claimants point out that certain of NNUK's conspiracy claims are premised not only upon alleged breaches of fiduciary duty but, in the alternative, upon alleged breaches of the duty of care (Claims 12 and 19) or breach of contract relating to the Master Research and Development Agreement ("MRDA") (Claim 5).  Opp. at 11-12.  As to the duty of care, this Court has already determined that English law does not impose a duty of care between companies in a group, foreclosing that basis for NNUK's conspiracy claims to the extent founded on actions of NNL.  Nortel, 469 B.R. at 503, 519.  Moreover, to the extent those claims are founded on the actions of NNUK's directors, both the English Companies Act 2006 and the very case law cited in the Opposition indicate that breaches of the duty of care, like breaches of fiduciary duty, may be cured through ratification.  See Companies Act 2006 § 239(1); Re D'Jan of London Ltd, [1994] 1 BCLC 561, 564 (acknowledging that shareholders may "formally or informally, mandate[] or ratif[y]" an act alleged to be a breach of the duty of care).  The duty of care allegations in Claims 12 and 19 thus pose no barrier to Movants' proposal for streamlined resolution of those claims.

16.    Likewise, to the extent based upon an alleged breach of contract, Claim 5 for conspiracy can be resolved as a matter of law within the Movants' proposed framework.  If

---

[9]    To the extent that the parties' positions on insolvency reflect differing views on the content of English law, this Court's experience with Motions to Dismiss should indicate that any differences are likely to be narrow ones, readily capable of resolution through expert briefing on any disputed foreign law issues.

U.S. law applies to Claim 5,[10] it is clear that breach of contract cannot form the basis for conspiracy.[11]  Further, the contract on which NNUK's allegations are based – the MRDA – is governed by Ontario law, which requires that each conspirator in an unlawful means conspiracy must be chargeable with an unlawful act.  See Agribrands Purina Canada Inc. v. Kasamekas, [2011] 106 O.R. (3d) 427,438-39 (no conspiracy to breach contract where the alleged conspirators had not themselves breached any contractual duties).  NNUK does not allege that NNI breached any contractual obligation it owed to NNUK, see Barefoot Decl. Ex. B (Claim ¶ 109 n.5) ("The failure of NNL to provide NNUK with an arm's length return constitutes a breach of NNL's contractual obligations under the MRDA." (emphasis added)), and this Court has already held that NNI owed no fiduciary duties or duties of care to NNUK, Nortel, 469 B.R. at 504-05, 519.[12]

**B.    NNUK's Solvency Will Be Determined by Objective Evidence**

17.    The EMEA Claimants also try to suggest that an inquiry into NNUK's solvency will necessarily swallow the whole, Opp. at 14-17, but this ignores the fact that NNUK's financial condition will be determined with the aid of expert testimony through objective evidence, both for the tests of formal insolvency and "doubtful" solvency.[13]  The Opposition cites no English authorities that require an inquiry into "the relevant directors'

---

[10]    That NNUK pled Claim 5 under English law does not, of course, resolve the choice-of-law question as to which jurisdiction's law governs.

[11]    See, e.g., Kuroda v. SPJS Holdings, L.L.C., 971 A.2d 872, 892 (Del. Ch. 2009); Deaton v. United Mobile Networks, L.P., 926 S.W.2d 756, 760-61 (Tex. App. Texarkana 1996), aff'd in part, rev'd in part on other grounds, 939 S.W.2d 146 (Tex. 1997) (citing Tilton v. Marshall, 925 S.W.2d 672, 681 (Tex. 1996)).  The EMEA Claimants ignore this precedent in suggesting that "[t]he unlawful means [supporting a conspiracy claim] can consist of another tort, or of a breach of contract" and that "[t]he same is true under US law."  Opp. at 12 (citing only English cases).

[12]    Even if, for some reason, Claim 5 cannot be resolved as a matter of law to the extent it alone is based on breach of contract, bifurcation would still potentially resolve all of NNUK's other claims for conspiracy which together assert nearly $1.5 billion in damages.  See Barefoot Decl. Ex. B (Claim ¶ 110).

[13]    The Opposition fails to even contest that a solvency finding would bar NNUK's claim for transaction at undervalue (Claim 27).  See Mot. at 7 n.13.

knowledge and views . . . and the assessments that they made" in order to analyze a corporation's solvency.  Id. at 17.  The other necessary discovery cited by the EMEA Claimants to examine NNUK's solvency – an "inquiry into all aspects of the company's financial affairs" or "the likelihood of certain liabilities arising, [and] how soon they might arise," id. – are matters this Court is well equipped to address based on submissions from the parties' experts, without resort to testimony on individuals' intentions or states of mind.  Nor does the prospect of third party discovery on the liabilities of NNUK or NNL – whether from the Canadian Debtors or others – foreclose the efficiencies set out in the Movants' proposal.[14]

## C.    Proof of Ratification Also Turns on Objective Evidence

18.    All that is required to establish ratification is that all shareholders unanimously express their assent to the subsidiary's actions.  As the Opposition reiterates, "[a]pproval or ratification do not require any particular formality."  Id. at 18 (quoting Marshall Dep. at 181:20).  The sole shareholder of NNUK – NNL – clearly expressed that assent by signing and entering into the transactions that underlie NNUK's claims.  This alone provides the "actual act of ratification" that the Opposition suggests will somehow require such far-reaching discovery.  Id.  Nor do the EMEA Claimants provide any support for the assertion that ratification somehow requires a detailed inquiry into "what each of the relevant representatives of NNL knew of each transaction and what their thought processes were."  Id. at 19.[15]

---

[14]    The EMEA Claimants make passing reference to the need for testimony from an actuarial expert to determine the extent of NNUK's pension liabilities.  Opp. at 14-15.  It is not clear at this stage in the proceedings whether such expert testimony is required, particularly given the accounting assessment of those pension liabilities in the NNUK financials relied upon in the Opposition.  In any event, the Movants' proposal would permit such expert submissions if necessary, and even actuarial testimony would not require an open-ended inquiry into the knowledge and views of NNUK and NNL actors.

[15]    The case of Re D'Jan of London Ltd, [1994] 1 BCLC 561 is not to the contrary.  The D'Jan court clearly stated the test as whether shareholders had "formally or informally, mandated or ratified the act in question," and found that test was not satisfied only because the shareholder had provided the authorization by mistake, without being aware of the act he was authorizing.  Id. at 564.  Where NNUK's claims are each predicated on allegations of intentional, knowing acts by its sole shareholder NNL, D'Jan is entirely inapposite.

**D.      NNUK's Attempt to Amend Its Pleadings Does Not Reduce the Efficiency of Bifurcation**

19.      Nor need the Court seriously consider the EMEA Claimants' argument that the transactions are not ratifiable because "NNL and NNUK's directors breached their duties by engaging in transactions that constituted unlawful returns of capital."  Opp. at 9.  This attempt to avert ratification relies on a claim that NNUK did not plead, either in its initial claim or in its amendment or at any point since, despite access to the NNUK financials they now cite.  As NN Ireland's Amended Proof of Claim makes clear, the EMEA Claimants knew how to plead the existence of an unlawful distribution when they desired to do so.  See, e.g., Declaration of Tomislav A. Joksimovic [D.I. 6024] Ex. A (NN Ireland Amended Proof of Claim ¶¶ 57, 63, alleging that a certain transfer to NNL was an unlawful distribution on the basis of NN Ireland's inadequate distributable reserves).

20.      Perhaps in awareness of this point, the Opposition suggests that "[i]t has already been established that NNUK did not have distributable reserves to enable any form of distribution to its parent company," Opp. at 11, and cites to a single figure from each of NNUK's financial statements from 2001 through 2007, presented to the Court for the first time in the Opposition without the underlying financials themselves.  While the Opposition fails to demonstrate that anything "has already been established," these same financial statements show that NNUK was solvent, during each of these years, with billions in shareholder equity.

21.      Even if the EMEA Claimants were permitted to amend NNUK's proof of claim to add new allegations that, for example, NNUK had insufficient distributable reserves, the transactions at issue here consist of intercompany loans, asset sales, transfer pricing arrangements, and corporate reorganizations – not distributions to NNL in its capacity as an equity holder – and the EMEA Claimants provide no authority to suggest that any English court

11

has ever reclassified transactions of this sort as unlawful returns of capital.  Any belated unlawful

distribution claim can thus be resolved as a matter of law.

## IV.
## THE EMEA CLAIMANTS WILL NOT BE PREJUDICED BY BIFURCATION

22.     In asserting that bifurcation would cause "substantial prejudice," the

EMEA Claimants raise only generic concerns, such as fading memories.  These are present in

any litigation, and are not materially affected by the difference in the parties' proposals.  Indeed,

the EMEA Claimants suggestion that "the better approach may be to stay all disclosure here until

after the mediation has been concluded," Opp. at 6, belies any concern about prejudice through

delay.  By contrast, delay in resolving the most material of the EMEA Claims will prejudice and

delay the U.S. Debtors in their efforts to enable distributions to creditors.  The EMEA Claimants

also fail to address that the discovery necessary on the issues of solvency and tracing will be

undertaken in any event; Movants' proposal only front-loads that exercise.

23.     Even if all of the Tracing-Dependent Claims or Fiduciary Duty-Dependent

Claims are not disposed of through the limited discovery process set out in the Motion, Movants'

proposed discovery plan will, far from causing prejudice, put all parties in a better position to

address the remaining claims and facilitate a consensual resolution.

WHEREFORE, the Movants respectfully request that the Court (i) grant the

Motion; (ii) overrule the objections set forth in the Opposition; (iii) enter the proposed order

attached to the Motion; and (iv) grant such other and further relief as the Court deems just and

proper.

Dated:  August 17, 2012              CLEARY GOTTLIEB STEEN & HAMILTON LLP
        Wilmington, Delaware

Howard Zelbo (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*

- and -

13

AKIN GUMP STRAUSS HAUER & FELD LLP

Fred Hodara (admitted *pro hac vice*)
David Botter (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002


    - and -

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Christopher M. Samis*
Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile: (302) 651-7701

*Counsel for the Official Committee
of Unsecured Creditors*