## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Nortel Networks Inc., *et al.*,[1] | ) | Case No. 09-10138 (KG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Objection Deadline:** Oct. 22, 2012 at 10 a.m. |
| | ) | **Hearing Date:** Feb. 13, 2012 at 10 a.m. |
| | | **RE:** D.I. # 8067 |

## OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 363 AND 1108 AUTHORIZING THE DEBTORS TO TERMINATE THE DEBTORS' LONG-TERM DISABILITY PLANS AND THE EMPLOYMENT OF THE LTD EMPLOYEES

Brent Beasley (the "[Define Party]") of the above-captioned debtors and debtors-in-possession (the "Debtors"), hereby submits this Objection to Debtors' Motion for entry of an order authorizing the Debtors to terminate the Debtors' Long-Term Disability Plans and the employment of the LTD employees. In support of this Objection, Brent Beasley respectfully represents as follows:

### BACKGROUND

1. In 2001, I had a transient ischemic attack (TIA), which is like a mini-stroke. I realized it when I awoke in the morning and was unable to move the left side of my body. I fully recovered from this within 25 minutes. I went to work that day. Being concerned, I visited my primary care physician. He referred me to a specialist. After some tests were

---

[1] The Debtors, along with the last four digits of each Debtors' federal tax identification number, are: Nortel Networks Inc (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc (0358), Northern Telecom International Inc (6286), Nortel Networks Cable Solutions Inc. (0657) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

performed, the specialist suspected that a patent foramen ovale (PFO) was the cause of the TIA. After telling me about the PFO, the specialist basically said there was nothing left to do and that I should go ahead and just live my life. Though that is what I did, it was always in the back of my mind that it could happen again. In fact, sometimes I would wake-up at night, and move my fingers, toes, and limbs to make sure I was ok. Therefore, going forward, I was very concerned that I always had more than sufficient medical and disability coverage. [See Exhibit A]

2.    I was hired on by Nortel and started to work on March 5, 2007. I was hired as a Senior Sales Compensation Analyst. My compensation was an annual salary of $68,000 with benefits. My job responsibilities included calculating sales commissions and paying the sales individuals for which I was responsible, researching and resolving issues brought forward by sales people and providing ad hoc analysis.

3.    I used the employee hand out, which was given to employees to help make choices determining their benefit selections, to make my health benefit selections. To make sure I had sufficient coverage, I signed up for the highest level of medical health and disability offered. I even elected to select an additional optional coverage of 66 2/3% of my income pay for LTD, for which I paid a monthly premium. I chose the highest level of medical coverage and additional LTD coverage, because of my previous TIA and concern for my financial stability if I ever had a health problem. All this was done in good faith by me, with an understanding that I would have coverage unless I left the company, and that the company would not just arbitrarily drop the coverage. I solely relied on these benefits to provide for my medical and income needs if anything ever happened that I was unable to work. Because of my previous medical history of having a TIA, having full and complete medical benefits, life insurance and disability insurance was of paramount importance to me. If I had been told, and it had been made clear to me, that I

didn't have an actual LTD insurance policy, I would have purchased additional LTD insurance coverage from a 3rd party source.

4.      I quickly accelerated in learning and doing my job.  For example, after nearly a year, of all the sales analysts in my department, I had the 2nd highest number of sales people for which I was responsible for compensating. Life was good – I had a great job, enjoyed life, was in a strong financial position, and had the necessary medical and disability coverage in case something happened.

5.      I completed benefits enrollment for 2008 in late 2007, and continued to sign-up for the highest level of medical and disability coverage at 66 2/3 % LTD pay.

6.      I received confirmation of benefits for 2008.

7.      Before the stroke, I was happy, healthy and active, and living completely independent. I enjoyed my job, and I was, at the time, at the top of my career. I was extremely happy with my life.  I was a productive member of society.  I worked a typical work week, enjoyed being with family and friends doing leisure activities, maintained my house and yard, and just enjoyed life being very independent.  I regularly exercised and enjoyed my hobbies. As for my financial situation, by being raised to live below my means, I paid my bills on time, had a credit rating over 760+, and had a nice amount of savings ($20,000+).  I did not have any debt, except for my house and car, and was on track to have my car paid off 3 years early.

8.      On February 10, 2008, I had a cryptogenic stroke, which paralyzed my entire left side.  Though progress was slow, the start of my rehab consisted of me having to relearn to move my entire left side.  Progress was measured by small achievements, like getting excited by being able to very slightly move a finger with a lot of difficulty.  I was experiencing fatigue and shortness of breath throughout rehab and would have to frequently stop and rest.  Of

things that I could work to improve, I made significant recovery in my movements after about six months of extensive rehab. However, there was also stroke damage to my autonomic nerve system, of which I could not improve through rehab. This has resulted in significant debilitating disabilities, such as shortness of breath, fatiguing easily, light headed and dizziness, and difficulty concentrating with any activity sitting or just standing doing nothing. I also have to stop and rest frequently and for long periods of time and I take naps throughout the day. [See Exhibit B]

9.      Due to my continued disabilities as a result of my autonomic nerve system being damaged by the stroke, I have had to make significant lifestyle changes. I had to sell my house because I could not independently maintain my dwelling, grounds, or even prepare and cook meals as I previously did prior to the stroke. I sold my house and moved into a house beside my parents where they help take care of me. My mom does cooking and cleaning, and my dad does yard work and general upkeep and maintenance of the house. My parents also take me to my doctor appointments.

10.     I was approved by Prudential for Short Term Disability on March 11th, 2008, with benefits effective beginning on February 11th, 2008 and running through April 13th, 2008. I was approved again on August, 1st 2008, with benefits effective beginning on February 11th, 2008 and running through August 10th, 2008. [See Exhibit C]

11.     To help prevent future strokes, I had the first heart surgery to close the PFO on April 18th, 2008. The heart surgery to close the PFO would only help prevent future strokes, and would not fix any neurological damage caused by the stroke.

12.     I received and completed "Nortel United States Benefits Personalized Enrollment Worksheet" form in early October 2008. [See Exhibit D]

13.    I was approved by Prudential for Long Term Disability on October 11th, 2008 with benefits effective beginning on August 11th, 2008. [See Exhibit E]

14.    During or around 2009, I contacted Nortel and Prudential and was told, by both, my benefits would not be affected by the bankruptcy and continue until age 65, as long as I met the requirements for being disabled. [See Exhibit F]

15.    Received the Benefit enrollment in '2009 Health and Group Benefits Enrollment Overview Guide' from Nortel. [See Exhibit G]

16.    A year later, I still had a residual shunt in my heart, and had the second heart surgery on April 3rd, 2009 to complete closure of the PFO. The second surgery completely closed the PFO. Again, to reiterate, closing the PFO only reduced my chances of having a future stroke. It did not correct any damage done by the stroke, such as damage to my autonomic nerve system, which is causing my symptoms of shortness of breath, fatiguing easily, light headed and dizziness, and difficulty concentrating with any activity sitting or just standing doing nothing.

17.    Because of my continued symptoms of shortness of breath, fatiguing easily, light headed and dizziness, and difficulty concentrating, I saw a cardiologist specialist (Dr. Kanter at Duke), who was an expert in the field of autonomic dysregulation. Dr. Kanter diagnosed that the stroke left me stricken with an autonomic disorder called Postural Orthostatic Tachycardia Syndrome (POTS). My body doesn't correctly regulate basic body functions, such as heart rate, blood pressure, adrenaline, and adequate blood flow to my brain. This autonomic dysregulation is not something I can work to improve through rehab. It was determined during testing, my blood vessels don't constrict like they are supposed to so blood pools in my extremities (legs, arms), my brain doesn't get enough oxygen, my heart rate increases drastically, my blood pressure goes way up, my adrenaline kicks in and I burn through that and then my

blood pressure collapses, and this dysregulation leaves me with symptoms of fatiguing easily, shortness of breath and lightheaded dizziness. This diagnosis was arrived at through extensive testing as well. The only way for me to recover from my symptoms of shortness of breath, light headedness and dizziness, and fatigue is to lie down and rest frequently for long periods of time and take naps throughout the day.

18.     Received letter on April 17th, 2009 from Prudential saying I had to file for Social Security disability or they would deduct the estimated Social Security income amount from my monthly pay check.

19.     Prudential hired ALLSUP to represent me in filing for Social Security disability.

20.     Saw Doctor Goldstein at Duke, who is an expert with stroke patients to see if he could find any other cause for the stroke other than the PFO. He was unable to find anything else that may have caused the stroke.

21.     Received termination package from Nortel on June 17th, 2010, stating they intended to terminate my benefits on August 31st, 2010. Included in the package was a document stating "Severance Eligibility." I didn't receive a detailed explanation but, Nortel withdrew their termination plans on their own. [See Exhibit H]

22.     Dr. Rhodes, my surgeon, wrote a letter saying I was totally disabled and could not work on July 2nd, 2010. [See Exhibit I]

23.     Dr. Kanter, of Duke, referred me to a neurologist Dr. Kline, of UNC, who is an expert in the field of autonomic dysregulation. She confirmed my POTS diagnosis. During a follow-up visit, Dr. Kline told me I will have this condition the rest of my life and I would never again be normal as I was before the stroke. Also, Dr. Kline said there weren't really

anymore treatment options she was willing to suggest. In addition, Dr. Kline said that due to my "medical condition", I would be "unable to function at a physical level to sustain employment at any job position." [See Exhibit J]

24. I was Awarded Social Security Disability on January, 4th 2011. [See Exhibit K]

25. Paid Social Security overpayment back to Prudential through ALLSUP on April 11th, 2011. [See Exhibit L]

26. Prudential made me see an Independent Medical Examiner (IME), who did little more than ask questions and preform a simple evaluation, and said I could go back to work. All the while, all my doctors, who are specialist in the fields of autonomic dysregulation, cardiology, and neurology, said I was disabled and could not work.

27. In a letter dated May 25th, 2011, Prudential terminated my LTD benefits effective June 1st, 2011.

28. With the help of an attorney, Mr. Vance Jennings, I filed an appeal to Prudential on August 31st, 2011. [See Exhibit M]

29. My disability benefits from Prudential were reinstated on October 11th, 2011. [See Exhibit N]

30. Received latest doctor notes from visit on July 2, 2012 with Dr. Carr saying I still have POTS, and I am disabled. [See Exhibit O]

31. On August 13th, 2012, I called the Pension Benefit Guaranty Corp. (PBGC) and spoke with Virginia Higgins to inquire about receiving benefits or some type of relief since I was disabled and would not be able to work. Virginia's scripted response was "Disability retirement only applies to plan that have a disability benefit. PBGC has determined

that there is no disability benefit payable under Nortel Networks plan until age 55." There is nothing the PBGC can do in terms of relief for my situation.

32.    Received letter on October 2, 2012 from Prudential stating my LTD income would continue until August 1, 2038 which is the day before I turn age 65. [See Exhibit P]

33.    Flex Enrollment confirmation statements (2011 & 2012) [See Exhibit Q]

34.    2010 LTD Summary Plan Description (SPD) [See Exhibit W]

## RELIEF REQUESTED

35.    According to the Visteon case Nortel should not be allowed to terminate me until the Bankruptcy ends.

36.    And to the extent Nortel wants to terminate me, since they won't be in business anymore after the bankruptcy ends, I maintain I have a legitimate claim to my benefits.

37.    Order to compel Debtors to compensate Brent Beasley in full for his Total Claim.

38.    My Total Claim is $2,730,889.18, which is a projection to age 65 for LTD benefits, welfare benefits (adjusted for inflation) and severance benefit taking into account the tax implications of receiving a lump sum amount. [Exhibit V]

## BASIS FOR RELIEF REQUESTED

39.    ERISA (Employee Retirement Income Securities Act) is a law to protect participants and employee welfare benefit plans.

40.     Voluntary Employee Beneficiary Association (VEBA) is a trust fund and is considered to be an employee welfare benefit plan. VEBA Trust funds are funds from which short-term and long-term disability, medical and dental, etc. benefits are paid.

41.     Since VEBA's are considered to be employee benefit plans, they are subject to ERISA's fiduciary responsibility, disclosure, reporting, administration and enforcement rules.

42.     Under ERISA rules if there is ambiguity in the contract, then other outside sources maybe consulted and used for reference and guidance.

43.     Language across the LTD summary plan description (SPD), both for the year I was hired in 2007 and the year I was forced onto Long-Term Disability in 2008, fed the reliable & repeatable understanding that I was to receive LTD benefits until age 65. Ambiguities and errors of omission do exist in the SPD; these were injected by the Plan Administrator.

**(I) Language in the '2009 Health and Group Benefits Enrollment Overview Guide' state that the benefits for the year 2008, for which I went on disability, are frozen for the plan year 2008.** [See Exhibit G] **In addition, language in the 'United States Benefits Personalized Enrollment Worksheet', prepared on September 29, 2008 for year 2009, state LTD benefits are frozen for the plan year 2008.** [See Exhibit D]

A.  P.10, 2ʳᵈ Bullet.  "If you're on STD or LTD on January 1, 2009 (regardless of your annual enrollment choices), your 2008 STD, LTD, optional life insurance and optional AD&D insurance choices will stay in effect until you return to work for 30 consecutive days." [See Exhibit G]

44.     This language states that my 2008 LTD benefits plan is applicable to me, since I went out on disability in 2008 and have not returned to work.

B. <u>P.2, Long Term Disability Section</u>. "You cannot make changes to this benefit until you have returned to Active Work for 30 consecutive days." [See Exhibit D]

45.     This language reinforces the understanding that LTD benefits are frozen for the plan year for which you go out on LTD.

**(II) Presentation to Employees at time of hiring.**

46.     The Benefits Package which was verbally communicated as being a priority to have the best competitive benefits offered to employees. Employees were considered to be vital to the overall success of the company.

47.     All documentation available on internal HR server, as well as in common area "information centers", pointed to 3 claims forms – all labeled "INSURANCE." This includes the FMLA, STD Prudential Insurance Company, and LTD Prudential Insurance Company.

48.     I never received notification of any modifications/updates to the LTD Plan from the date of hire version to date of LTD entry or thereafter.

**(III) Language across the LTD Summary Plan Description (SPD) for the last year I was an active employee and made my benefits choices before I was forced onto Long-Term Disability fed the <u>reliable & repeatable understanding that I was to receive LTD benefits until age 65 should I ever become disabled.</u> Apparently ambiguities/errors of omission injected by Nortel do exist in the SPD; it is not equitable for me to have my life so detrimentally impacted by miscues the Debtors' own. [See Exhibit R]**

**2008 LTD SPD - Language throughout document supports benefits to age 65**

A.     <u>P.6, 3rd Paragraph</u>. "Your disability benefits are designed to continue all of your income for a period of time and a portion of your income for an additional period if you are unable to work due to Illness or Injury and meet specific definitions of "Disabled" under the plans. The Company has chosen The Prudential Insurance

Company of America (Prudential) to administer the Short-Term and Long-Term Disability Plans."

B.    P.9, 2nd Paragraph "LTD", 3rd Bullet Point. "You will continue to be eligible for LTD benefits under the selections in which you were enrolled when your LTD began."

C.    P.20, 2nd Paragraph "Long-Term Disability (LTD) Plan Benefits. *LTD Plan benefits will be paid to you for a period of time (up to the applicable maximum period) if you become Totally Disabled by an accidental bodily Injury or Illness while you are covered under the plan and if you remain Totally Disabled (as defined under the LTD Plan)."*

D.    P.22,1st Paragraph "When Benefits Begin And End ... Benefits end when your period of Total Disability ends. This happens when the first of the following occurs: *You are no longer Totally Disabled; *You die; *You are no longer under the care of a Physician; *You fail to furnish the latest required proof of the continuance of your Total Disability to the Claims Administrator or refuse to be examined by a Physician designated by the plan; *You reach the end of the maximum benefit period for any one period of Total Disability as shown in the chart under Maximum Benefit Period, or; *Your employment with the Company ends."

49.    The policy # 39900 is both the policy number for our LTD plan as well as the policy number for our fully-insured group life insurance policy with Prudential Life Insurance.  Implication of insurance policy standing for both.

50.    Error of Omission wherein Nortel recognizes that it is critical to employee *comprehension of the terms of the LTD Plan with their inclusion of a Glossary and Nortel*

explicitly stating its' importance.    However, critical & core concepts such as defining self-insured which is key to ensuring repeatable & reliable understanding is omitted.

E.    <u>P. 38, Section Three-Glossary.</u>    Shaded Box at Top Right Flags "Sometimes to describe a benefit plan accurately, some technical terms must be used. Here, to help you understand them, are brief definitions in alphabetical order."

51.    Nortel feels it necessary to define "Doctor", "Hire Date", etc. But they fail to define critical terms unique to what has come to be understood as a "self-funded" LTD Plan, failure to define terms such as "self-funded" or an insightful definition of "Plan Administrator" is glaring in their omission.

52.    <u>Error of Omission</u> wherein Nortel fails to identify the risks of a self-insured LTD plan.

53.    <u>Nortel's Self-Contradiction Of "Active" Employee Terminology.</u>  Nortel currently likes to refer to the LTD as "active" employees. This is a convenient spin given their own glossary contradicts this identification as Nortel LTD in no way fit Nortel's own formal definition of "Active."

F.    <u>P. 38, Section Three-Glossary.</u>    "Active Work, Actively At Work:   You will be considered Actively at Work on any of the Company's scheduled work days if you are performing regular duties of your job on that day in accordance with your regularly scheduled hours, either at a Company defined place of business or at some location to which you are required to travel for Company business."

G.    <u>P36, 2nd Paragraph, ln 1.</u>    "The people who supervise the operation of your plans, called "fiduciaries," have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries."

H.    P36, 2nd Paragraph, ln 2. "No one, including your employer or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA."

54.    This section of the SPD plan expressly prohibits Nortel from firing me to prevent me from obtaining a welfare benefit. The excerpt even goes so far as to clarify 'who' can't do 'what' and for 'what purpose'. It clarifies that 'your employer' can't 'fire' you 'to prevent you from obtaining a welfare benefit'; which is in essence, what Nortel is trying to do to me. This plan language provides a false sense of security, and by Nortel trying to terminate me, they are acting in bad faith. I maintain the language in this section indicates it wasn't the original intent for Nortel to be able to terminate those receiving benefits. This section should preclude Nortel from being able to terminate me to end my benefits. If this section doesn't take precedent, then it definitely contributes to the ambiguity of the terms in the SPD. If it was intended for Nortel to be able to fire me to terminate my benefits, why would they have clarifying language that expressly prohibits me being fired to terminate my benefits? The sentence could have easily been reworded to avoid confusion and ambiguity of the terms of the SPD. Nortel's incorrect claim to be able to terminate me and my benefits doesn't make any logical sense.

55.    Material facts that were not disclosed include, the plans did not clearly state they were not fully insured plans and that Nortel could terminate them while an individual was receiving benefits. As an example, I purchased the optional LTD coverage at 66 2/3%, thinking that I would be fully covered by an insurance policy in the event I became disabled. This was misleading. It gave me a false sense of security. I believe the option to purchase additional LTD coverage was misleading because, since I was paying a premium, it meant I

would be receiving a product, in this case LTD insurance coverage. So, not only was the option of additional coverage misleading, but the fact I was paying a premium was as well. It was a significant omission of error for Nortel to not clearly state the plan was not fully insured. It was also a significant omission of error for Nortel to not clearly state they could terminate employees, covered under the plan, while the employees, under the plan, were receiving benefits. These aforementioned non-disclosed facts show the plan terms are ambiguous and Nortel was not transparent in its SPD language.

**(IV) Other Salient Self-Contradictory Points within the LTD Summary Plan Description.**

56.     Failed to define "self-funded." Nortel shows a critical lack of transparency in failing to define the term "self-funded", and the ramifications of being "self-funded." Such as Nortel being able to unilaterally terminate disabled individuals receiving LTD benefits.

57.     Failed to identify risks. By these risks not being fully identified, it implies that the funds were set aside, and secure, to meet the long term financial obligations in full to the disabled LTD recipients.

58.     Nortel was not acting in a fiduciary role responsible for the best outcome for recipient offering a plan that was not "long-term." Thereby denying "valued" employees the ability to make an informed decision about whether or not to purchase a "3rd Party" open-market LTD insurance policy for a worst case scenario, like if Nortel were to become insolvent, and the employees became disabled. This omission of crucial information was even more severe given the past financial turmoil Nortel had experienced.

**(V) Nortel had liabilities of a significant and material amount for LTD plan participants, whom were considered totally disabled and for whom it was known would never be able to return to work, that were not properly recognized, accrued for when incurred and appropriately maintained as liabilities in the VEBA trust fund.** [See Exhibit S]

59.    The VEBA Trust funds are running at a deficit according to the VEBA trust fund plan statements.

60.    It is a significant inconsistency and a gross misrepresentation by Nortel to state the employee welfare benefit plans are self-funded, and then for Nortel to not have adequately provided funding in the VEBA Trust Fund.  Nortel did not adequately provide funding for liabilities in the VEBA Trust Fund by not having recognized, accrued for when incurred, and appropriately maintained liquid funds for the liabilities.  To meet its fiduciary responsibility, Nortel should have provided these funds for the liabilities when it was known by Nortel that LTD plan participants were considered totally disabled and would never be able to return to work.

61.    By not properly recognizing liabilities and accruing for them in the VEBA trust fund, Nortel is failing in their fiduciary responsibilities.

62.    The VEBA is in effect promising a benefit will be available to an employee if they were to suffer a hardship.  I paid additional premiums to receive my LTD benefit payments at 66 2/3%.  How is a self-insured benefit plan in fact providing a benefit when it is unfunded or substantially underfunded?  How are fiduciary responsibilities served if a benefit is not properly recognized and maintained in the VEBA Trust and unavailable to a LTD plan participant when it is needed?  How can Nortel charge me premiums for a benefit, which I paid in good faith for the benefit, and then cancel the benefit and deny me the benefit, while the

same benefit is in the process of fulfilling the contractual obligations of paying a legitimate claim?

**(VI) From the first day I was on medical leave, all communication from Prudential carried banners of "Prudential Insurance Company": claims forms, correspondence from Claims Managers, paystubs, W2's, direct reimbursement requirement to Prudential from my SS award, etc.**

63.     Please notice "Prudential Group Disability Insurance Information" on documents. [See Exhibit T]

64.     W2's also carry language stating "Prudential Insurance Company." [See Exhibit U]

65.     After the stroke, over the course of a period of time dealing with Prudential through correspondence, I understood that I was covered by the "Prudential Insurance Company", because it was being represented to me from the information in the letterhead and labeling.  Since the insurance policy was not actually through Prudential, this misrepresentation gave me a false sense of security.

**(VII) Both Nortel & Prudential spokespersons confirmed I would receive LTD benefits to age 65.**

66.     Sworn affidavit statement by me of Nortel and Prudential representatives stating that the Nortel bankruptcy would not affect my benefits and I would receive benefits until age 65 as long as I met the criteria for being disabled. [See Exhibit F]

67.     There is a significant amount of evidence from documents, notes, and statements that exist from other people saying Nortel and Prudential representatives said that our LTD benefits would continue until age 65.

68.     Nortel and Prudential representatives understood and communicated LTD benefits would be paid to LTD people for the rest of their lives, or until age 65, with all their

knowledge, expertise, training, and experience, as well as access to documents and records. If the Nortel and Prudential representatives understood and communicated to LTD people that their benefits would continue until age 65, and these are people who understand these rules, policies, plans, etc. and provide guidance in their job for a living, then how am I as a layperson expected to understand anything different?

69.    Received letter on October 2, 2012 from Prudential stating my LTD income would continue until August 1, 2038 which is the day before I turn age 65. Due to the financial turmoil I am going through, the purpose of this letter is to show proof of income continuance to my bank, for me to restructure my finances. [See Exhibit P] If this letter provided to me by Prudential is intended for a 3rd party to reasonably rely on the benefits provided to me until age 65, then why shouldn't I be able to rely on the income continuance letter?

A. P. 6, Last Line "Claims Administrator Information Used In Claim Determinations ...,
The Plan Administrator delegated the exclusive authority to interpret and administer the provisions of the Disability Plans, including discretionary authority to: ... make final, binding determinations concerning the availability of benefits under the Disability Plans."

70.    The language states the "income continuation" letter from Prudential is binding, and based on the "exclusive authority delegated to the Plan Administrator", I will receive my LTD benefits until age 65. Since this "income continuance" letter is "binding", Nortel should not be allowed to terminate me and discontinue my benefits. [See Exhibit R]

**(VIII) Fiduciary obligations are not served when an essentially insolvent benefit is offered. Nor are fiduciary obligations served when the same agent seeks to terminate my employment to expressly deny me LTD benefits.** [See Exhibit R]

A. P. 36, 2ⁿᵈ Paragraph "The people who supervise the operation of your plans, called "fiduciaries", have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries."

71.    How is Nortel serving the best interest of me and other plan beneficiaries when they seek to terminate the existing plan and hold it up as "their right"?

B. P.29, 2ⁿᵈ Paragraph "Section Two – Administrative Information" ... Funding Method: Self-funded with contributions held in trust".

72.    This implies that once Nortel & Prudential received a determination from five physicians, each diagnosing separate total disability that at a minimum, my projected income, based on my LTD benefit should have been placed in a trust, if Nortel had been acting as a responsible fiduciary.

**(IX) Quantified impact of loss of LTD benefits to me should Nortel deny my already validated claim.**

73.    Since the stroke, medical bills and expenses have completely wiped out all of my savings and I am now more than $30,000 in debt. I have lost my house that I lived in for over 10 years. I have had to move close to my parents and am unable to take care of myself like before. I am a shell of my former self and feel like a 39 year old man in a 90 year old man's body. I am near financial destitution.

74.    If I lose my LTD benefits, I will suffer even more hardship than I am in right now, not only would I have reached the bottom, but I will be digging deeper. Losing my benefits would mean my monthly income would be cut by over 50%, and I would lose the current level of health benefits that I receive. For which by the way, I would also lose the LTD

benefits I paid for to have 66 2/3% pay if I ever became disabled. I would not be able to afford

the same level medical coverage for the medical treatment I am receiving.

**(X) Nortel is well within their financial means to meet the contractual obligations with myself and all the LTD employees that generated the assets the Debtors are liquidating. This is life and death for the LTD base that invested their skills that built Nortel versus the portfolio health of others. My Total Claim is $2,730,889.18 for my LTD benefits that became a financial obligation to the Debtor as soon as my Long-Term Disability claim was approved by Prudential. Indeed, they knew my disabilities were identified as totally disabling by all of my attending physicians. [See Exhibit V]**

75.    Nortel and Prudential must have felt they could have met their contractual

obligations since they told me that I would continue to receive my benefits until age 65.

76.    Both LTD and Retiree plans were presented under ERISA rules. I do not

understand why the LTD employees are not afforded the same protections as the retirees under

ERISA.

77.    Nortel is not restructuring; they are liquidating. Nortel is not planning to

emerge from bankruptcy. Nortel has the more than sufficient funds to cover their obligation to

me and the other LTD employees.

78.    Even though I had surgery to help prevent future strokes, Dr. Rhodes, my

Cardiologist and surgeon, said since I have already had a stroke, I am at a higher risk for having

another stroke, even after the heart surgery to close the PFO. If Nortel is allowed to terminate

my LTD benefits, it would leave me very vulnerable, since I would not be able to afford the

coverage to provide the same level of medical care as if my benefits remained untouched. By

way of a 50% reduction in my income, along with increased medical expenses, this would have a

net effect of substantially reducing my monthly net income. This would leave me vulnerable and

create an even worse financial hardship for me.

79.    Because of my young age at 39 and the number of years until I turn age 65, I am extremely vulnerable and susceptible to the tax implications of receiving a lump sum amount, increases in medical costs, and the fluctuations of inflation for Medicare premiums, medical benefits cost, prescription plan cost, and dental and vision costs. A small increase in cost may not seem like much when viewed by itself, but when compounded and added up over a long period of years, it will total a lot. For this reason, I ask that any amounts I am entitled to are adjusted for inflation and tax implications for being forced by Nortel to receive a lump sum amount. A modest 3.9% adjustment for medical cost and inflation increases has been taken into account for any costs it would apply to and be appropriate for in my Proof of Claim (POC). The 3.9% adjustment is an average over the last 10 years of the medical care costs inflation rate. Also, I should not be penalized and disadvantaged by taxes, for having to receive my benefits I am rightfully entitled to until age 65 in a lump sum amount, because Nortel wants to incorrectly and wrongfully terminate me before I turn age 65. Therefore, my POC takes into account the estimated tax implications for both Federal and State. [Exhibit V]

80.    I maintain the 2008 LTD Summary plan description is misleading, incoherent, confusing and ambiguous.

81.    In Nortel's communication to its employees, such as handouts, orientations, and the SPD plan, Nortel led employees to believe through LTD benefit plans, the employees would be provided for both financially and medically in the event the employees suffered a hardship. As well as, constant reassurance through Nortel HR representatives and Prudential representatives stating the bankruptcy would not negatively affect LTD recipients and LTD recipients would be provided for until age 65. I and other LTD recipients relied on these communications to our detriment, with Nortel now acting in bad faith to unjustly terminate the

LTD recipients. I also relied on information provided in the 2008 LTD SPD as well as other communication from Nortel to my detriment. Nortel profited and benefited through cost savings from not providing fully insured insurance policies to their employees at the expense of their employees. Nortel also benefited because they underfunded the VEBA Trust fund since they did not adequately recognize, accrue for, and maintain liabilities in total in the VEBA trust when it was known an LTD recipient was considered totally disabled and would never be able to return to work. Now, once again, Nortel is trying to maliciously and unjustly financially benefit in an obscene and egregious way to the detriment of the LTD recipients.

82.    What Nortel is trying to do is insidious and fundamentally unfair. Nortel is abusing their power of authority, because it was not originally intended for the 'Future of the Plan' section [Exhibit R – Pg. 37] to be interpreted as Nortel is trying to claim in that they can just terminate me to cancel my benefits. Nortel is taking the 'Future of the Plans' section out of context from the rest of the SPD and only considering it in isolation in order to refuse to perform their contractual obligations. Nortel's misinterpretation of the 'Future of the Plans' section is not in keeping with the overall tone of the SPD, maliciously dismisses their fiduciary responsibilities as stated in the SPD and ERISA, discounts and conflicts with the understanding of trained Nortel and Prudential representatives' understanding and communications about the SPD, and completely ignores explicit parts of the SPD contract that say "No one, including your employer…may fire you…to prevent you from obtaining a welfare benefit or exercising your rights under ERISA." [See Exhibit R – Pg. 36, 2nd Paragraph, ln 2] Nortel is acting grievously and in bad faith by trying to grossly profit from my gravely disadvantaged condition and the hardship from which I suffer. It would be grossly unjust and severely detrimental to me if Nortel is allowed to terminate me in order to deny me the LTD benefits for which I am rightly entitled.

83.     Nortel has a moral obligation to pay me for the benefits to which I am rightfully entitled.

84.     I am disputing the denial of information I appropriately requested in my 'Fact Discovery' request that the Debtors have said they are not going to provide me.  As well as, other information which I requested the Debtors did not address.  I reserve the right to ask for anything I am entitled to under the law.

85.     I reserve all of my rights.

86.     My parents prepared nearly all this objection with help of my sister.

## EXHIBITS

Exhibit A – 2001 Medical Records

Exhibit B – 2008 Medical Records

Exhibit C – STD Approval by Prudential

Exhibit D - Nortel United States Benefits Personalized Enrollment Worksheet

Exhibit E – LTD Approval by Prudential

Exhibit F – Sworn Affidavit Statement

Exhibit G – 2009 Health and Group Benefits Enrollment Guide

Exhibit H – Severance Eligibility Document

Exhibit I – Dr. Rhodes' Total Disability Letter

Exhibit J – Dr. Kline's Total Disability Letter

Exhibit K – Award Letter for Social Security Disability

Exhibit L – Proof of Payment of Social Security Overpayment Back To ALLSUP

Exhibit M – Appeal to Prudential for Re-Instatement of Benefits

Exhibit N – Letter from Prudential Re-Instating Benefits

Exhibit O – Notes from Dr. Carr Confirming POTS and Disability

Exhibit P – Prudential Income Continuance Letter

Exhibit Q – Flex Benefit Enrollment Confirmation Statements

Exhibit R – 2008 LTD Summary Plan Description (SPD)

Exhibit S – VEBA Trust Fund Statements

Exhibit T – Prudential Insurance Title Documents

Exhibit U – W2's

Exhibit V – Proof of Claim

Exhibit W – 2010 LTD Summary Plan Description (SPD)

## NOTICE

1.    Notice of this Objection has been provided to (a) counsel to the Debtors (Cleary); (b) the United States Trustee for the District of Delaware; and (c) counsel to the LTD 1102 Committee (Elliott Greenleaf) via first class mail.  Other parties will receive notice through the Court's electronic filing system.   Brent Beasley respectfully submits that, given the nature of the relief requested, no other notice of the relief requested herein need to be given.

**WHEREFORE**, Brent Beasley respectfully requests the entry of an Order, in the form attached:

1.    According to the Visteon case, Nortel should not be allowed to terminate me until the Bankruptcy ends.

2.    And to the extent Nortel wants to terminate me, since they won't be in business anymore after the bankruptcy ends, I maintain I have a legitimate claim to my benefits.

3.    Order to compel Debtors to compensate Brent Beasley in full for his Total Claim, taking into consideration his years to age 65 for Medical cost inflation and tax implications.

4.    Total Claim is $2,730,889.18, which is a projection to age 65 for LTD benefits, welfare benefits (adjusted for inflation) and severance benefit taking into account the tax implications of receiving a lump sum amount.   [Exhibit V]

Dated:  _10/15/2012_

Brent Beasley
541 Ammons Rd
Dunn, NC 28334

*Appearing Pro Se*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Nortel Networks Inc., *et al.*,[1] | ) | Case No. 09-10138 (KG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Re: Docket No.  8067** |

## ORDER GRANTING BEASLEY'S OBJECTION TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. SS105, 363 AND 1108 AUTHORIZING THE DEBTORS TO TERMINATE THE LONG-TERM DISABILITY PLANS AND THE EMPLOYMENT OF THE LTD EMPLOYEES

Upon consideration of the Objection to entry of an order authorizing the Debtors to terminate the Debtor's Long-Term Disability plans and the employment of the LTD employees (the "Objection") and any response thereto; and it appearing that sufficient notice of the Objection has been given; and in good cause having been shown, it is hereby

ORDERED that the Objection is granted.

ORDERED that Nortel will provide an allowed claim in the total amount of $2,730,889.18.

---

[1]  The Debtors, along with the last four digits of each Debtors' federal tax identification number, are: Nortel Networks Inc (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc (0358), Northern Telecom International Inc (6286), Nortel Networks Cable Solutions Inc. (0657) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

ORDERED that Nortel will continue to pay benefits to Brent Beasley until they close the

Bankruptcy case.


Dated: _____, 2013
      Wilmington, Delaware

                                  _____
                                  HONORABLE KEVIN GROSS
                                  CHIEF UNITED STATES BANKRUPTCY JUDGE