# EXHIBIT K

# Social Security Administration
# **Retirement, Survivors, and Disability Insurance**
## Notice of Award

Office of Central Operations
1500 Woodlawn Drive
Baltimore, Maryland  21241
Date:  January 04, 2011



BRENT E BEASLEY
541 AMMONS ROAD
DUNN NC  28334-6253

We are writing to let you know that you are entitled to monthly
disability benefits from Social Security beginning August 2008.

### What We Will Pay

- Your first check is for $1,192.50.

- This is the money you are due through December 2010.

- Your next scheduled payment of $1,745.00 which is
  for January 2011, will be received on or about the
  second Wednesday of February 2011.

- After that, you will receive $1,745.00 on or
  about the second Wednesday of each month.

We are withholding your Social Security benefits for August 2008
through November 2008.  We may have to reduce these benefits if you
receive Supplemental Security Income (SSI) for this period.  When we
decide whether or not we have to reduce your Social Security
benefits, we will send you another letter.  We will pay you any
Social Security benefits you are due for this period.  However, we
will withhold part of any past due benefits in case we have to pay
your representative.

ENCLOSURES:

SEE NEXT PAGE

## Your Benefits

The following chart shows your benefit amount(s) before any
deductions or rounding.  The amount you actually receive may differ
from your full benefit amount.  When we figure how much to pay you,
we must deduct certain amounts, such as Medicare premiums and
worker's compensation offset.  We must also round down to the nearest
dollar.

| Beginning Date | Benefit Amount | Reason |
|---|---|---|
| August 2008 | $1717.00 | Entitlement began |
| December 2008 | $1816.50 | Cost-of-living adjustment |
| January 2009 | $1861.20 | Credit for additional earnings |

## Information About Medicare

You are entitled to hospital and medical insurance under Medicare
beginning August 2010.

We will send you a Medicare card.  You should take this card with
you when you need medical care.  If you need medical care before
receiving the card and your coverage has already begun, use
this letter as proof that you are covered by Medicare.


If you do not want medical insurance, please complete the enclosed
card and return it to us in the envelope we have provided.  You will
need to do this by the date shown on the card.  If you decide you do
not want the insurance, we will return any premiums that you have
paid.

## Prescription Drug Plan Enrollment

Now that you are eligible for Medicare, you can enroll in a
Medicare prescription drug plan (Part D).

To learn more about the Medicare prescription drug plans and when
you can enroll, visit www.medicare.gov or call 1-800-MEDICARE
(1-800-633-4227; TTY 1-877-486-2048).  Medicare also can tell you
about agencies in your area that can help you choose your
prescription drug coverage.
If you have limited income and resources, we encourage you to apply
for the extra help that is available to assist with Medicare
prescription drug costs.  The extra help can pay the monthly

C

**SEE NEXT PAGE**

premiums, annual deductibles and prescription co-payments. To learn more or apply, please visit www.socialsecurity.gov, call 1-800-772-1213 (TTY 1-800-325-0778) or visit the nearest Social Security office.

## Information About Lawyer's or Representative's Fees

We have approved the fee agreement between you and your representative.

## Other Social Security Benefits

The benefits described in this letter are the only ones you can receive from Social Security. If you think that you might qualify for another kind of Social Security benefit in the future, you will have to file another application.

## Your Responsibilities

The decisions we made on your claim are based on information you gave us. If this information changes, it could affect your benefits. For this reason, it is important that you report changes to us right away. We have enclosed a pamphlet, "When You Get Social Security Disability Benefits...What You Need to Know". It will tell you what must be reported and how to report. Be sure to read the parts of the pamphlet which explain what to do if you go to work or if your health improves.

## Things To Remember

The doctors and other trained personnel who decided that you are disabled expect your health to improve. Therefore, we will review your case in December 2013. We will send you a letter before we start the review. Based on that review, your benefits will continue if you are still disabled, but will end if you are no longer disabled.

## Do You Think We Are Wrong?

If you disagree with this decision, you have the right to appeal. We will review your case and consider any new facts you have. A person who did not make the first decision will decide your case. We will correct any mistakes. We will review those parts of the decision which you believe are wrong and will look at any new facts you have. We may also review those parts which you believe are correct and may make them unfavorable or less favorable to you.

- You have 60 days to ask for an appeal.

C                        **SEE NEXT PAGE**

- The 60 days start the day after you get this letter.  We assume you got this letter 5 days after the date on it unless you show us that you did not get it within the 5-day period.

- You must have a good reason for waiting more than 60 days to ask for an appeal.

- You have to ask for an appeal in writing.  We will ask you to sign a form SSA-561-U2, called "Request for Reconsideration".  Contact one of our offices if you want help.

Please read the enclosed pamphlet, "Your right to Question the Decision Made on Your Social Security Claim".  It contains more information about the appeal.

### If You Have Any Questions

We invite you to visit our website at www.socialsecurity.gov on the Internet to find general information about Social Security. If you have any specific questions, you may call us toll free at 1-800-772-1213, or call your local Social Security office at 1-866-964-6485.  We can answer most questions over the phone.  If you are deaf or hard of hearing, you may call our TTY number, 1-800-325-0778. You can also write or visit any Social Security office.  The office that serves your area is located at:

            SOCIAL SECURITY
            145 ROWAN ST
            FAYETTEVILLE NC   28301

If you do call or visit an office, please have this letter with you.  It will help us answer your questions.  Also, if you plan to visit an office, you may call ahead to make an appointment. This will help us serve you more quickly when you arrive at the office.

We are sending a copy of this letter to your representative.


c

Michael J. Astrue
Commissioner
     of Social Security

# EXHIBIT L

 **Prudential**

The Prudential Insurance Company of America
Group Insurance
Disability Tax Reporting
PO Box 70190
Philadelphia, PA 19176

BRENT BEASLEY
541 Ammons RD
Dunn, NC 28334

Control Number:    39900

Date:    1/24/2012

Dear BRENT BEASLEY :

Thank you for returning $50,357.90 of the overpaid disability benefits you received for the following year(s). We are sending this Claim of Right letter to provide you with the information necessary for you to either claim credit on your current income tax return for taxes paid on your prior income tax return(s) or, take a deduction on your current income tax return.

| Year | Amount Overpaid |
|------|-----------------|
| 2010 | $21,144.00 |
| 2009 | $21,144.00 |
| 2008 | $8,069.90 |

If you previously included the overpayment in your reported income, you may be entitled to a deduction on your prior year tax return(s). You may report the overpayment as an income tax deduction this year under the Claim of Right if you:

1. Had to repay the amount that was previously included in your income, and
2. Included the repayment in your gross income because you thought you had an unrestricted right to it.

If your overpayment was more than $3,000, you may be able to claim a credit for prior year taxes paid instead of taking an income tax deduction. An example of how to calculate your taxes is in IRS Publication 525, "Taxable and Nontaxable Income."

Please note that this letter is not a guarantee that you are, in fact, entitled to a tax deduction. Neither are we attempting to provide legal or tax advice. We suggest that you refer any questions about the Claim of Right, tax deductions and the completion of your return to your tax adviser. Because each situation is unique, neither we nor our representatives can provide tax advice.

If you have questions regarding overpayment of disability benefits, please contact me. You can reach me between 8:00 a.m. and 5:00 p.m. EST, Monday through Friday.

Sincerely,

Tax Technician
Disability Tax Reporting
866-648-2225



March 2, 2011

BRENT E. BEASLEY
541 AMMONS ROAD
DUNN  NC   28334

Dear Brent Beasley:

As you know, a favorable disability benefit award has been granted by Social Security; therefore, creating an overpayment on the disability benefit plan with Prudential Financial.  You have elected for Allsup to facilitate the repayment of the overpayment obligation with the private disability benefit plan.  Allsup will forward the repaid funds to Prudential Financial to be applied to the overpayment.

Prudential Financial has computed the disability benefit overpayment to be $50,357.90 for the period of 8/11/0 through 12/31/10.

Repayment toward the obligation can be by either of the following two methods:

**1. Contact Allsup at 1-888-554-6771 and authorize Allsup to initiate an electronic funds transfer from a designated bank account.**  This method offers a convenient, stress-free method of repayment.  The repayment is made quickly, with Prudential Financial immediately being notified by Allsup of the repayment.  Also, it eliminates any worries of a check being misrouted in the mail. The electronic funds transfer is of no cost to you, and only takes a few minutes to arrange with an Allsup specialist.

2. Send a check made payable to Allsup for the amount due listed on the enclosed invoice and return it to Allsup within 10 days.  Enclosed is a self-addressed, postage-paid envelope for your convenience.

Thank you for your attention to this matter.  For questions regarding the repayment, please call an Allsup specialist at 1-888-554-6771.

Sincerely,

Overpayment Reimbursement Services

Enclosure



300 Allsup Place  |  Belleville, IL 62223  |  www.allsup.com



# Allsup

March 11, 2011


BRENT E. BEASLEY
541 AMMONS ROAD
DUNN NC 28334


Dear Brent Beasley:

As you know, Allsup is assisting you with Social Security Disability
representation, and facilitation of the repayment of your overpayment
obligation with Prudential Financial.

An Allsup specialist needs to discuss with you an issue regarding the
services being provided to you.  Please call Allsup at 1-888-554-6771
as soon as possible to discuss an additional matter.

Thank you for your assistance.


Sincerely,


Overpayment Reimbursement Services



# EXHIBIT M



Brenton D. Adams

Sheila W. Chavis

Vance E. Jennings *

Cameron V. Frick

**BRENT**
**& ADAMS**
ASSOCIATES
**PERSONAL INJURY LAWYERS**
*We make things right*

P.O. Box 1389
Dunn, NC 28335

\* Board Certified Specialist In
Security Disability Law

August 31, 2011

<u>Via Facsimile and United States Mail</u>

The Prudential Insurance Company of America
Disability Management Services
P.O. Box 13480
Philadelphia, PA 19176

Re:   Our Client:  Brent Beasley

Dear Appeals Analyst:

I represent Mr. Brent Beasley in regard to his claim for long-term disability benefits.  I have previously enclosed an authorization.

In a letter dated May 25, 2011, Mr. Beasley's disability benefits were wrongfully terminated by Prudential effective June 1, 2011.  To support termination of benefits, Prudential states Mr. Beasley no longer meets the definition of disability under the policy, as he can perform the duties in his job as a Senior Sales Compensation Analyst as well as an Office Manager.  In the denial letter, Prudential relies on the erroneous opinion of Dr. Kimmel, who is a consultant physician.  Dr. Kimmel states Mr. Beasley can perform a full range of sedentary work and also states she is not convinced the claimant has POTS.

Dr. Kimmel's opinions regarding the claimant's ability to work and the POTS diagnosis are contradicted by all of the claimant's treating physicians including: (1) Dr. Klein, a specialist in autonomic nervous system at UNC; (2) Dr. Kantor, a Neurologist at Duke; and (3) Dr. Rhodes a Cardiologist.  In fact, Dr. Kantor wrote a letter dated 7/8/11, specifically outlining the mistakes and errors that exist in Dr. Kimmel's finding.  Dr. Kimmel's opinion is also contradicted by Steve Carpenter, a Vocational Rehabilitation Specialist and the opinion of a Federal Administrative Law Judge who found the claimant is not capable of performing even a full range of sedentary work.

The claim file contains abundant objective and clinical evidence contradicting Prudential's finding.  This favorable evidence is overlooked and not even considered by Prudential in a manner consistent with bad faith.

1

I am enclosing with this letter the following:
1. Records from Raleigh Neurology Associates;
2. Fully Favorable Decision from the Social Security Administration;
3. A Vocational Rehabilitation Evaluation by Steve Carpenter;
4. Records from Duke Medical Center;
5. Records from Piedmont Medical Associates;
6. Records from Wake Heart;
7. Records from UNC Hospitals;
8. Resumes from Treating Physicians;
9. Letter from Gary Beasley;
10. Letter from Cynthia Watkins;
11. Letter from Stan Hannen;

## MEDICAL EVIDENCE PROVING DISABILITY

Mr. Beasley had a transient ischemic attack in 2001 and a right-sided stroke in February of 2008 leaving him with residual left sided weakness requiring in and outpatient rehabilitation. He was hospitalized at WakeMed from 2/16/09 – 3/8/08. The discharge diagnoses were as follows: (1) right cerebrovascular accident; (2) large patent foramen ovale with right to left shunt; (3) left hemiparesis; (4) history of TIA; (5) history of migraine with aura. This stroke was consistent with an embolic event. During the stroke work-up a large aneurismal paten foramen ovale (PFO) with a right to left shunt was found. A cardiac catheterization on 4/18/08 showed an 18 mm aneurismal PFO and a transcatheter device closure of PFO was successfully placed.

Since this stroke, Mr. Beasley has consistently suffered from extreme fatigue, extreme shortness of breath, dizziness, heaviness in his arms and legs, lightheadedness, palpitations, cognitive deficits, and dyspnea on exertion with even minimal activity. These symptoms can occur numerous times a day upon minimal exertion and at rest. He needs to take frequent rest breaks throughout the day just to be able to handle his daily affairs. He has not responded to medical treatment.

On 4/18/08, the claimant presented to Duke for a Catheterization Report. The diagnostic impression was as follows: (1) history of TIA and subsequent cerebrovascular accident; (2) large (18mm) aneurismal patent foramen ovale with bidirectional shunting; (3) successful transctheter patent foramen ovale closure using a 35 mm Amplatzer cribriform occluder. He had a residual shunt and returned for a catheterization and complete closure of the PFO on 4/3/09 that involved placement of a vascular plug in the residual tunnel shaped defect in the atrium septum. Mr. Beasley called Dr. Rhodes at Duke on 4/7/09 with persistent shortness of breath and he was sent to Southpoint Duke Clinic for placement of a 48-hour holter monitor.

**Letter From Treating Source**: Heather Chasarik, PA-C, at Carolina Rehabilitation & Surgical Associates, wrote a letter to Prudential on 2/20/09. She states the claimant is recovering from his stroke and is limited by residual symptoms form his stroke as well as his cardiac condition. The letter states the claimant wants to return to work, but it is not feasible at this time.

Mr. Beasley presented to Duke on 4/28/09 with continued fatigue and dizziness. Dr. Rhodes states the claimant symptoms appear to be an autonomic disregulation potentially related to his right-sided stroke. Dr. Rhodes mentions the possibility of a referral to an expert in autonomic regulation.

**Attending Physician Statement**: On 5/29/09, Dr. Rhodes filled out a physician statement from Prudential. He states the claimant cannot work a full-time or part-time job, cannot sit or stand for 8 hours a day, and needs to have the ability to stop and rest when he deems necessary.

On 9/4/09, Mr. Beasley was seen at Duke with continued complaints of lightheadedness, dizziness, and fatigue. These episodes occur when he is sitting or standing, and they occur without fail if he has been up for any significant amount of time. This was attested to by the claimant's father and sister who accompanied him to the

appointment. Mr. Beasley described feeling like weights were attached to his arms and legs. Shortness of breath, pallor, and palpitations are associated with these symptoms as well. Dr. Kantor states the claimant's symptoms are most compatible with severe postural intolerance. CV autonomic nervous system testing was recommended, to include tilt table testing. Dr. Kantor also recommended for Mr. Beasley to be seen by Dr. Caroline Klein, who is an adult neurologist at UNC, who specializes in the autonomic nervous system.

A Transcranial Doppler Tilt Table Report was performed at Duke on 10/27/09. The results were ABNORMAL and demonstrated fluctuations in flow velocity and pulsatility that coincided with blood pressure changes. This is consistent with impaired autoregulation and concerning for dysautonomia.

On 10/27/09, Mr. Beasley underwent further testing at Duke Cardiology for a Cardiovascular Autonomic Nervous System Report. As many as nine tests were performed to include baseline data, sinus arrhythmia, valsalva maneuver, mental arithmetic, cold pressor test, papillary reflex, head up tilt test, graded doses of Phenylephrine, and graded doses of Isoproterenol. The results revealed an ABNORMAL cardiovascular autonomic nervous system testing suggestive of postural orthostatic tachycardia syndrome.

Dr. Kantor explained the test results to Mr. Beasley and his family on 11/6/09. He explained that Mr. Beasley has POTS with secondary hyperventilation and secondary vasovagal syncope. The claimant was referred to Dr. Kussin, an adult Pulmonologist at Duke.

Mr. Beasley as seen at Duke again on 2/5/10 and evaluated by Dr. Kantor. He continued to experience shortness of breath with chest pain, fatigue, and lightheadedness both on exertion and at rest. Also associated with these symptoms is decreased cognition. He has these symptoms even while lying in bed after using the telephone. Dr. Kantor referred the claimant to Dr. Caroline Klein at UNC, who is an adult neurologist with expertise in autonomic nervous system. She trained with Dr. Phillip Lowe at the Mayo Clinic.

**Attending Physician Statement**: Dr. Rhodes, a Cardiologist at Duke, filled out a treating physician form on 3/11/10 that was sent by Prudential. He states the claimant is not able to work and his time to return to work is undetermined. Dr. Rhodes state the claimant has residual impairments and dysfunction from his stroke to include positional tachycardia and autonomic dysregulation.

Dr. Goldstein, a Duke Neurologist, evaluated the claimant on 5/18/10. The diagnostic impression was as follows: (1) cerebrovascular disease with a neurological evaluation notable left sided corticospinal tract signs and difficulty with dexterity in his left hand; (2) spells consistent with postural tachycardia syndrome with a physical examination consistent with postural hypotension with disproportionate tachycardia. Mr. Beasley was encouraged to see Dr. Klein at UNC.

Dr. Klein, a specialist in autonomic nervous system, evaluated the claimant on 5/20/10 at UNC. The notes are positive for frequent symptoms of shortness of breath, lightheadedness, dizziness, and fatigue occurring with any physical activity and even when sitting down. These symptoms get worse as the day progresses. He must rest very often throughout the day to perform his activities of daily living. Dr. Klein performed orthostatic testing on the claimant in the examination room. His blood pressure varied from position to position and after the testing he became even more symptomatic and his pulse had dramatically increased. Dr. Klein states these symptoms of orthostatic and exercise intolerance is consistent with POTS. Dr. Klein conferred with her mentor Dr. Phillip Low at the Mayo Clinic, regarding the claimant's condition. Dr. Klein, an expert in autonomic disease, states she is satisfied the claimant has POTS.

**Attending Physician Statement**: Dr. Rhodes, a Cardiologist, filled out a medical statement from Prudential on 8/24/10. He states the claimant has ongoing difficulty with shortness of breath, palpitations, and severe fatigue limiting his ability to perform his daily activities. Dr. Rhodes concludes the claimant is not able to work in any capacity.

A Neurophysiology Report was performed at UNC on 8/25/10. The test results were ABNORMAL and revealed evidence of significant orthostatic tachycardia meeting the full criteria for Postural Orthostatic Tachyardia Syndrome (POTS). Dr. Klein interpreted this test.

Dr. Klein saw Mr. Beasley on 9/23/10 for a neurological follow up. Dr. Klein reviewed copious recordings of the claimant's heart rate and blood pressures and she states this is clear evidence the claimant is tachycardic with standing or after exercise, and symptoms at rest as well. The claimant's father states his son's condition continues to deteriorate and he is unable "to do anything" without feeling bad. Lying down throughout the day helps to minimize his symptoms. The diagnostic impression was POTS.

**Letter From Treating Physician**: Dr. Klein wrote a letter dated 11/12/10 to the attention of Dr. Neuren, a doctor hired by Prudential. Dr. Klein specifically states she does not agree the claimant's POTS is due to anxiety, volume depletion, or deconditioning. Dr. Klein educates Dr. Neuren on POTS and states it is a form of autonomic dysfunction, the symptoms of which can be exacerbated by anxiety, volume depletion, or deconditioning, not caused by them. Dr. Klein comments on the claimant's ability to work. She states she cannot imagine how he could function to any reasonable degree in a work environment, even if he is allowed to sit down most of the time. She further states that Mr. Beasley's endurance level is so diminished that he would have to work for very short intervals of time and be allowed to lie down frequently to alleviate his symptoms. Even with these accommodations, Dr. Klein states his work capacity would be limited at best. Dr. Klein also states the claimant clearly could not be required to get up and down on a regular basis or be required to stand for any reason or do any physical activity that requires exertion. This opinion is from a specialist, it is consistent with both objective and clinical data, and from a doctor that specializes in the autonomic nervous system. Therefore, it is entitled to controlling weight.

In a decision dated 12/14/10, the Social Security Administration rendered a decision in the claimant's case. The Administrative Law Judge found the claimant is disabled within the meaning of the Social Security Act in that he lacks the residual functional capacity to perform the requirements of sedentary work. This is an extremely restrictive definition of disability.

Duke Cardiology records on 5/31/11 confirm continued episodes of tachycardia associated with fatigue and shortness of breath multiple times per day when changing positions. This significantly limits his activities of daily living. Dr. Rhodes attributes these symptoms to posterior orthostatic tachycardic syndrome.

Stephen D. Carpenter, a certified Rehabilitation Counselor and Medical Exercise Specialist performed a Vocational Rehabilitation Evaluation on July 25, 2011. Mr. Carpenter reviewed the claimant's educational background, vocational background, and the medical evidence of record. The Wide Range Achievement Test 4 (WRAT 4) was administered. Prior to the test, the claimant was severely fatigued and severely short of breath coupled with dizziness. He needed a 20 minute break in order to lay supine prior to starting the test. Mr. Beasley then attempted to perform the test, but developed marked shortness of breath, became pale in the face, his body appeared tremulous, and appeared presyncopal. Therefore, the test was terminated. Mr. Carpenter opined the claimant's physical ability for completing vocational testing is extremely limited as Mr. Beasley was not functionally capable of completing even sedentary work on a consistent and routine basis. Mr. Carpenter concludes the claimant does not have the ability to engage in any type of sedentary or higher level functional work that is unskilled requiring only simple work orders and simple work tasks. In conclusion, Mr. Carpenter states, **"Based on the medical and vocational findings presented, it is the opinion of this Rehabilitation Counselor, within a reasonable degree of rehabilitation/vocational certainty, that Brent Beasley is not employable in any job at any functional level."** The symptoms experienced during the testing are consistent with the symptoms Mr. Beasley has been consistently reporting to his doctors for last few years.

Dr. Kantor, a Cardiologist at Duke, evaluated the claimant again on 7/8/11. Dr. Kantor notes the claimant remains severely symptomatic due to orthostatic intolerance, debilitating fatigue, shortness of breath, presyncope, and trouble concentrating. These symptoms can occur on exertion and at rest. After a review of the records and a physical exam, Dr. Kantor states the following: "I believe that Brent still has severe postural orthostatic tachycardia syndrome. This disease is known to begin following a variety of physiologic and traumatic stresses. It is also known to be associated with various chronic inflammatory illnesses."

**Letter From Treating Cardiologist**: Dr. Kantor wrote a letter dated 7/8/11, in reference to Prudential's denial of Mr. Beasley's long term disability claim. He gives a summary of the claimant medical history of specifically

addresses the comments made by Dr. Sandy Kimmel, Prudential's hired medical consultant. Dr. Kantor states numerous medical findings and statements advanced by Dr. Kimmel are in fact false, misleading, and incorrect. For example, Dr. Kimmel states the claimant urine sodium of 123 meq is not indicative of low blood volume. Dr. Kantor states neurologists who are experts in the area of autonimic nervous system and POTS identify urine sodium less than 175 meq per 24 hours indicative of excessive sodium. Dr. Kimmel states Mr. Beasley's inactivity exacerbates his POTS and recommended an increased in exercise in the form of aerobic exercise and lower extremity strength training. Dr. Kanor states the approaches recommended by Dr. Kimmel are "notoriously unsuccessful in patients with POTS because virtually all traditional exercise require sitting and standing posture." Also, Dr. Kantor states Dr. Kimmel did not demonstrate a heart rate increase when the claimant changed positions in her office. He further states the notes show a heart rate of 100 upon entering the office in a seated position and on orthostatis testing a heart rate of 98, followed by a heart rate of 74, followed by a heart rate of 70, followed by a heart rate of 60. This letter proves Dr Kimmel's medical report is inaccurate, misleading, and should not be relied upon to in good faith.

Mr. Beasley presented to Raleigh Neurology on 7/15/11, and was evaluated by Dr. Thomas Perkins. Dr. Perkins reviewed the claimant's medical history and performed a physical and neurological examination. The examinations showed a subdued affect, social withdrawal, marked hyperreflexia on the left and on the right, decreased sensation on the left side of his lip, asymmetric arm roll decreased on the left, and slower rapid movements on the left as well. The diagnostic impression was as follows: (1) previous right hemisphere stroke resulting in left hemiparesis; (2) PFO status post Amplatzer closure times two; (3) multiple autonimic symptoms consistent with postural orthostatic tachycardia syndrome (POTS) confirmed by neurophysiology testing at UNC by Dr. Klein.

Despite the above evidence, Prudential states the claimant can perform his past work and a full range of sedentary work. This is an abuse of discretion. Prudential simply turns the other cheek to the abundant evidence above in a way that constitutes bad faith.

## THE DENIAL LETTER IS INSUFFICIENT TO DENY BENEFITS

Prudential's letter dated May 25, 2011, is insufficient to terminate and deny benefits.

ERISA (29 U.S.C. 1133) requires that upon a denial of benefits, the administrative review procedure must include adequate notice in writing setting forth the specific reasons for the denial of benefits and a reasonable opportunity for a full and fair review by the appropriate named fiduciary of the decision denying the claim. The Department of Labor regulations for minimum requirements are set forth in 29 C.F.R. 2560-503-1. In determining whether the claimant was provided adequate notice, the courts will look to whether the claimant was provided with a statement of reasons that allows a clear and precise understanding of the grounds for the administrator's position. Halpin v. W.W. Grainger, 962 F.2d 685 (7th Cir. 1992).

29 CFR 2560-503-1(f) *Content of Notice*, provides:

A plan administrator or, if paragraph (c) of this section is applicable, the insurance company, insurance service, or other similar organization, shall provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant:

    (1) The specific reason or reasons for the denial;
    (2) Specific reference to pertinent plan provisions on which the denial is based;
    (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and
    (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

In determining whether adequate notice has been provided, the courts will look to whether the claimant was provided with a statement of reasons that allows a clear and precise understanding of the grounds for the administrator's position. Halpin v. W.W. Grainger, 962 F.2d 685 (7th Cir. 1992). In Olive v. American Express, 2002 WL 171290 (C.D. Cal.), the court held that the denial letter did not provide adequate notice to the plaintiff regarding the specific medical information needed to perfect her claim. The court held the denial letter must be precise, unambiguous, and must clearly articulate any procedural or medical reasons for the denial.

The reasons in the denial letter must be precise and unambiguous and must clearly articulate procedural and/or medical reasons for the denial. General statements are insufficient.

In the case at hand, Prudential denial does not explain the specific reason the claimant's benefits are terminated, what he needs to submit to perfect the claim and why he needs this, and what limitation the claimant fits into. Prudential also does not explain how it dealt with any favorable medical evidence in the file and falls far short of the requirements of ERISA (29 U.S.C. 1133) and the Department of Labor's regulations.

## THE DENIAL OF THE CLAIM IS NOT SUPPORTED BY SUFFICIENT EVIDENCE

The denial of the claim is not supported by sufficient evidence. Prudential conveniently denies this claim and relies on a non-examining physician who ignores abundant favorable evidence in the case and whose opinion is based on speculation and is not ground in fact or medicine. MetLife and Dr. Jares ignore a mountain of evidence proving that claimant's disabilities including radiculopathy, neuropathy, and possible myelopathies, prevent him from performing any gainful activity. This favorable evidence has been ignored in a fashion that could be characterized as bad faith. A disinterested decision maker would not completely discount this favorable evidence in such a manner. Case v. Continental Casualty Co., Civil Action No. 02-1081-A (E.D. Va. 2003).

When an insurance company pays, then terminates benefits, the insurance company has a heightened duty and must show that the evidence supports a change in medical condition. See Regula v. Delta Family – Care Disability Survivorship, 266 F.3d 1130, 1146 (9th Cir. 2001), on appeal to the United States Supreme Court. [The court held that termination was arbitrary and capricious where the plan awarded benefits for eight years and there is no new evidence or a significant change in the participant's condition.]

Here, there is a clear absence of any evidence to suggest that Mr. Beasley is able to work at his past occupation, or any occupation on a sustained and continuous basis. To the contrary, abundant evidence and opinions from treating physicians, specialists, and vocational experts state he is not capable of any gainful activity.

It is unreasonable to ignore the expert opinions of doctors who, using the very best method of diagnosing the impairments, have concluded that Mr. Beasley suffers from is not capable of any full time employment. This is an abuse of discretion.

## FIDUCIARY DUTIES IMPOSED BY ERISA

According to case law, a claims administrator such as Prudential "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Black & Decker Disability Plan v. Nord, 528 U.S. 822, 834 (2003). "An administrator operating under a conflict of interest does not act reasonably in denying benefits if faced, on the one hand, with substantial evidence of disability and, on the other, with only tentative and ambiguous evidence that might, or might not, favor denial of benefits." Stup v. UNUM Life Ins. Co. of America, 390 F.3d 301, 309 (4th Cir. 2004). If a claimant satisfies her initial burden of presenting credible evidence that she is entitled to benefits, the claims administrator may deny the claim only if it has substantial evidence that the claimant is able to work.

6

ERISA imposes fiduciary duties on any person who exercises any discretionary authority or control respecting management or disposition of plan assets or has any discretional authority or responsibility in the administration of the plan. 29 USC Section 1002(21)(A); 29 CFR Section 2560.503-1(g)(2). A "prudent person" standard is imposed on ERISA fiduciaries. A fiduciary is also under a duty of loyalty and care to the beneficiaries of the plan. 29 USC Section 1104(a)(1). Under ERISA: (1) A fiduciary must discharge his or her duties solely in the interest of the plan participants and beneficiaries and for the exclusive purpose or providing plan benefits to them; (2) A fiduciary must act with care, skill, prudence and diligence; and (3) a fiduciary may not act in any capacity involving the plan, on behalf of a party whose interests are adverse to the interests of the plan, its participants, or its beneficiaries.

Prudential's actions are not those of one in a fiduciary position. They clearly did not act solely in Mr. Beasley's best interest.

## ERISA BENEFICIARIES DO NOT HAVE UNBOUNDED DISCRETION

Under the holding of Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113, 103 L.Ed 2d 80, 109 S. Ct. 948 (1989) a court is to conduct review de novo, unless the benefit plan gives the plan administrator or fiduciary discretion to interpret the plan, in which case a deferential standard of review may apply. Id at 115. However, even assuming the plan documents do give Prudential discretion to interpret the plan, under the prevailing case law, that discretion is not unfettered. The plain language of the plan control. See: Booton v. Lockheed Medical Benefit Plan, 110 F.3d 1461 (9th Cir. 1997) U.S. App. LEXIS 6664 at 6. ("ERISA plan administrators for not have unbounded discretion")

## CONCLUSION

In conclusion, we believe that Mr. Beasley has provided abundant evidence that he meets Prudential's definition of disability. The handling of this claim has been grossly improper. The decision to deny Mr. Beasley's claim and terminate his benefits was made despite a mountain of evidence supporting complete and total disability. Please consider the new evidence attached and the arguments made herein and add them to the Administrative Record. This evidence and the medical records clearly establish that the claimant is disabled within the policy's definition of disability. Prudential's finding should be reversed and benefits reinstated.

On the basis of the foregoing, this will serve as a request for administrative review of Mr. Beasley's long-term disability claim. After such review is completed, I request that Prudential immediately reverse the denial of this claim, pay Mr. Beasley benefits, and pay all accrued back benefits with interest. Alternatively, if the claim denial is upheld, I request that Prudential issue a proper decision on review, setting forth a detailed statement of specific reasons why the claim has been denied, and citing specific provisions of the plan to support its position, pursuant to ERISA. If, in light of this letter, any new reasons to continue to deny benefits are introduced, then, of course, we are entitled to address those issues in a subsequent appeal before filing suit. All of the medical information listed above should be in the file. If Prudential does not have any of the above information that should be in the file, please contact me and I will provide this to you. Thank you for your consideration of this matter.

Sincerely,


Vance E. Jennings, Esq.
*Board Certified Specialist in Social Security Disability*
BRENT ADAMS & ASSOCIATES

7

# EXHIBIT N

RECEIVED OCT 1 9 2011

Claims Services Provided by

**The Prudential Insurance Company of America**

James E Furman
Sr. Appeals Analyst

The Prudential Insurance Company of America
Disability Management Services
PO Box 13480
Philadelphia. PA 19176

Phone: (800) 842-1718 Ext: 87423
Fax: (866) 285-8569
Website:  www.prudential.com/mybenefits

October 11, 2011

Vance Jennings
Brent & Adams Associates
2920 Highwoods Blvd, Suite 125
Raleigh. NC  27604

Claimant: Brent Beasley

Control No./Br.: 39900  /  0B057

ldldludllallulululll

Dear Mr. Jennings:

We have completed our review of Mr. Beasley's claim for Long Term Disability (LTD) benefits under Group LTD Plan No. 39900 issued to Nortel Networks. Inc.  We have determined that he is eligible for additional benefits and have reinstated his claim.

We will continue to obtain records from Mr. Beasley's attending physician to support his continued eligibility for benefits.

In order to receive benefits. under Group Plan No. 39900, covered employees must meet all contractual requirements including the following definition of "Disability":

### Definition of "Disability" for LTD Plan Purposes

You are entitled to benefits from the LTD Plan only if you are considered "Totally Disabled". You are considered Totally Disabled initially when the Claims Administrator determines that you are unable to perform the essential functions of your job and this finding is supported by documentation from your Physician. This means that you cannot perform the work you were normally performing at the time of your disability, with or without reasonable accommodations. due to the limitations resulting from your Illness or Injury. In addition, you must be under the regular care of a Physician who certifies your Total Disability and who must have treated you personally for the Illness or Injury causing the Total Disability for at least 31 days before making the certification. You must continue to be under the regular care of a Physician who certifies your Total Disability throughout the period when you claim to be Totally Disabled to receive a benefit from the LTD Plan. The Claims Administrator has the discretion to make the decision regarding whether you are Totally Disabled—not your Physician.

The proof that your Physician submits must be written proof of objective clinical documentation (i.e., lab tests. x-rays, medical reports. etc.) of your Total Disability. The Claims Administrator will approve or deny your Claim for LTD benefits at its discretion. Independent Medical Evaluations (IMEs) may also be required (either additional physical examinations and medical testing or file reviews of existing medical records). at the Company's expense. in order to arrive at this final determination. Your benefit will be denied if you do not provide such objective proof of your Claim within the required timeframe.

During the first 18 months of a covered Total Disability (from the first day of STD), you will be considered unable to work if you cannot perform the work you were normally performing at the time of your disability, with or without reasonable accommodations, due to the limitations resulting from your Illness or Injury.

After the first 18 months of covered Total Disability (from the first day of STD), you will be considered unable to work if you are unable to perform any reasonable occupation. A "reasonable occupation" is any job you are or could become qualified to do with your education, training, or experience.

Disabilities due to an Illness or Injury that, as determined by the Claims Administrator, are primarily based on self-reported symptoms, have a limited pay period during your lifetime. The pay period limitations are at the discretion of the Claims Administrator. If objective medical and clinical evidence is not submitted or changes in the treatment plan or more aggressive treatment is not commenced within a reasonable period, the benefit will be terminated.

**Reasonable Accommodations**

Reasonable accommodations may be made for the limitations resulting from your Illness or Injury which would allow you to return to active work. If a reasonable accommodation has been identified, but you choose not to accept the accommodation, your STD benefit may be discontinued. If the Company is unable to accommodate limitations resulting from your Illness or Injury, your benefit will not be affected. Reasonable accommodations may include, but are not limited to:

- General accommodations — the removal of structural, communication, or other barriers, and
- Job-related accommodations, such as:
    - o Part-time or modified work schedules,
    - o Home-based work,
    - o Reassignment to vacant positions,
    - o Acquisition or modification of tools, equipment, and/or furniture, and
    - o Modifications to business travel schedules.

**When Benefits Begin and End**

You are eligible for LTD Plan benefits after you have been Totally Disabled and have received STD Plan benefits for 26 consecutive weeks, provided you give written proof of the continuation of your Total Disability beyond 26 weeks within the required timeframe and that proof is satisfactory to the Claims Administrator. The Claims Administrator remains in frequent contact with you during STD. Towards the end of your STD the Claims Administer will contact you and conduct a clinical review of your condition. If additional medical documentation is required to approve LTD, the Claims Administrator will request it from treating physicians and/or request you to submit. If medical documentation is not received by the Claims Administrator within 30 days your monthly LTD benefits and any retroactive payments could be delayed If Claims Administrator approves continued disability, your claim will be automatically transitioned from STD to LTD and you will be notified of change.

Benefits end when your period of Total Disability ends. This happens when the first of the following occurs:

- You are no longer Totally Disabled.
- You die.
- You are no longer under the care of a Physician.
- You fail to furnish the latest required proof of the continuance of your Total Disability to the Claims Administrator or refuse to be examined by a Physician designated by the plan.

- You reach the end of the maximum benefit period for any one period of Total Disability as shown in the chart under Maximum Benefit Period, or
- Your employment with the Company ends.

If you have questions about our decision on Mr. Beasley's claim, you may call the number listed above.

Sincerely,

**James E Furman**

James E Furman
Sr. Appeals Analyst

# EXHIBIT O

# Progress Note

**Patient Name:**   Brent Beasley

**Sex:**   Male

| | |
|---|---|
| **Visit Date:** | July 2, 2012 |
| **Provider:** | Josiah M. Carr, II MD |
| **Location:** | Piedmont Medical Associates PA |
| **Location Address:** | 3400 Executive Drive Suite 205 Raleigh, NC 276097476 |
| **Location Phone:** | ▮▮▮▮▮▮ |

## Chief Complaint

- Follow up Pots
- f/u s/p stroke
- Painful knees

## History Of Present Illness

Heart/ Stroke Data Points:

He last had a lipid profile: 07/08/2008 He last had an EKG: 01/01/2010 Does he smoke: no. Does he take their medications as directed: yes.

Patient is here for follow up of ischemic stroke. He reports that they currently have been stable without any recent changes in their condition. His stroke was 4 years ago. He report taking medications for this issue at this time. They are currently taking: aspirin Oral Tablet, Delayed Release (E.C.) 81 mg. He denies any other new or related respiratory symptoms or problems at this time.

The patient also reports a 4 weeks history of moderate, sharp bilateral knee . The current knee symptoms are sharp pain esp while trying to sleep. -

The patient states that his symptoms developed suddenly while the patient was doing rehab for POTS but not during rehab- at night aftere exercise and 9 months into rehab. -

He denies any additional joint symptoms. - The patient denies radicular pain, true locking and catching, weakness, and feelings of instability. -

He stopped rehab for 2 weeks and knee pain resolved but returned after restarting rehab. Rehab was for POTS to try to build up his endurance. He was doing recumbant bike 10 min and some leg wt lifting (low wts and higher reps) 5-6 days/week. No hx of knee problems

The patient, a 38 year old White male , follows up regarding POTS - postural orthostatic tachycardia syndrome. He was seen in this clinic 6 months ago. Since last being seen he state the problem or issue has been constant but waxed and waned in intensity. He reports the following things seem to aggravate it; light or strenuous activity w increased sx if he pushes himself. They report the following improve the condition or problem: rest. He reports that they have no other new or associated symptoms or problems. The problem or condition was first noticed 4 years ago. They report that they have not had this problem before this episode. He denies any other respiratory, CV, and neurologic complaints not reported elsewhere in this note.

It is felt it is a complication of the 2/08 CVA. He gets SOB, easy fatiguabillity, decreased concentration and dizziness. The sx have not improved. He has seen Dr Kantor and tried pseudophedrine tx but after a few weeks had SE: sleep issues/awakeningw muscles tensing up and epigastric burning. He stopped the pseudophed and SE resolved.
Dr Kantor then rec above rehab- sounds like only got a little further than the PT he had been doing when knee sx have stopped him

## Past Medical History

Significant for Asthma; CVA (Cerebrovascular accident); PFO;Atrial Septal Defect, Ostium Secundum Type; POTS;Autonomic Nervous System Disorder; Rhinitis, Allergic; Transient Ischemic attack [TIA]

[ Progress Note] [Brett Beasley] ▓▓▓▓▓

## Review of Systems

**Constitutional**
- o Admits : fatigue
- o Denies : weight gain, weight loss, additional constitutional symptoms except as noted in the HPI

**HENT**
- o Admits : lightheadedness
- o Denies : headaches, nasal congestion, nasal discharge, sore throat, additional HENT symptoms except as noted in the HPI

**Cardiovascular**
- o Admits : shortness of breath w exertion
- o Denies : chest pain/pressure, irregular/rapid heart beats, have to sleep on >2 pillows, fainted, woke up short of breath, leg swelling, leg pain w walking, additional cardiovascular symptoms except as noted in the HPI

**Respiratory**
- o Admits : shortness of breath
- o Denies : wheezing, cough, additional respiratory symptoms except as noted in the HPI

**Gastrointestinal**
- o Denies : nausea, heartburn/reflux, additional gastrointestinal symptoms except as noted in the HPI

**Integument**
- o Denies : rash, additional symptoms except as noted in the HPI

**Neurologic**
- o Denies : muscular weakness, radicular pain, additional symptoms except as noted in the HPI

**Musculoskeletal**
- o Denies : additional symptoms except as noted in the HPI

## Vitals

| Date | Time | BP | Position | Size | L\R | Cuff Size | HR | RR | TEMP(°F) | WT | HT | BMI kg/m² | BSA m² | O2 Sat | HC |
|------|------|-----|----------|------|-----|-----------|-----|-----|----------|-----|-----|-----------|--------|--------|-----|
| 07/02/2012 | 01:29 PM | 100/64 | Sitting | | | | 94 - R | | 98 | 168lbs 0oz | 6' 2" | 21.57 | 1.99 | | |

laying down P=75  BP= 120/70
sitting    P=90   BP= 100/60
standing   P=90   BP= 90/60

## Physical Examination

**Constitutional**
- o Appearance : well-nourished, well developed, alert, in no acute distress

**Head and Face**
- o Head :
  - ■ Inspection : atraumatic, normocephalic
- o Face :
  - ■ Inspection : no facial lesions

**Eyes**
- o Conjunctivae : conjunctivae normal
- o Sclerae : sclerae white
- o Eyelids/Ocular Adnexae : eyelid appearance normal, no exudates present

**Ears, Nose, Mouth and Throat**
- o Ears :
  - ■ External Ears : appearance within normal limits, no lesions present
  - ■ Hearing : intact to conversational voice both ears
- o Nose :
  - ■ External Nose : appearance normal
- o Oral Cavity :
  - ■ Lips : lip appearance normal

**Neck**
- o Inspection/Palpation : normal appearance, no masses or tenderness, trachea midline
- o Thyroid : gland size normal, nontender, no nodules or masses present on palpation
- o Jugular Veins : no venous distention

**Respiratory**
- o Respiratory Effort : breathing unlabored
- o Inspection of Chest : normal appearance, no retractions
- o Auscultation of Lungs : normal breath sounds throughout

**Cardiovascular**
- o Heart :
  - ■ Auscultation of Heart : regular rate and rhythm, no murmurs, gallops or rubs
- o Peripheral Vascular System :
  - ■ Carotid Arteries : normal pulses bilaterally, no bruits present
  - ■ Abdominal Aorta : aortic pulse normal without bruits
  - ■ Pedal Pulses : pulses 2 bilaterally
  - ■ Extremities : no cyanosis, clubbing or edema; less than 2 second refill noted

**Gastrointestinal**
- o Abdominal Examination : abdomen nontender to palpation, tone normal without rigidity or guarding, no masses present
- o Liver and spleen : no hepatomegaly present, liver nontender to palpation

**Lymphatic**
- o Neck : no lymphadenopathy present

**Skin and Subcutaneous Tissue**
- o General Inspection : no rashes or lesions present, no areas of discoloration

**Neurologic**
- o Mental Status Examination :
  - ■ Attention : attention normal, concentration abilities appear normal
- o Motor Examination : lower extremity motor strength intact
- o Reflexes : DTRs 2 bilaterally, knees

[Digital Signature Validated]

    o **Gait and Station** : normal gait, able to stand without difficulty
**Psychiatric**
    o **Mood and Affect** : mood normal, affect appropriate during visit

## Assessment

- Cerebrovascular Accident (CVA) 436
- Knee, Internal Derangement Of 717.9
- POTS;Autonomic Nervous System Disorder 337.9
- Tachycardia 785.0

## Plan

    **Orders**
      o TDAP VACCINE >7 IM (90715) - - 07/02/2012
    **Instructions**
      o Vascular disease – discussed and reviewed with patient at this time, importance of risk factor control, continue as presently doing and follow up for routine checks or with any related new or increased symptoms or problems
      o f/u 6 months
      o s/p CVA- patient is stable clinically, no changes made in their regimen
      o knee appears over use- despite limited exercise ?deconditioning) he will try longer period of rest and then retry rehab. if no better consider ortho eval
      o POTS- pt remains quite symptomatic and disabled. As noted in HPI sx start quickly w physical and mental exertion- he has had extensive w/u at both Duke and UNC continue q 6 month checks no changes made

Electronically Signed by: Josiah M. Carr, II MD -Author on July 3, 2012 09:17:03 AM

[Digital Signature Validated]

# EXHIBIT P

Claims Services Provided by

**The Prudential Insurance Company of America**

Alycea Tetto
Sr. Disability Claim Examiner

The Prudential Insurance Company of America
Disability Management Services
PO Box 13480
Philadelphia, PA 19176

Phone: (800) 842-1718  Ext: 87703
Fax: (877) 889-4886
Website: www.prudential.com/mybenefits

October 2, 2012

Brent Beasley
541 Ammons Rd
Dunn, NC  28334

Claimant: Brent Beasley

Control No./Br.: 39900  /  0B057

|ull|l|l|ul|ull|ull|l|lul|lll|ul|

Dear Mr. Beasley:

We are writing to you to confirm that you are receiving Long Term Disability benefits under the
Nortel Networks, Inc. Group Plan with Prudential.

You are receiving $2126.30 per month. This benefit will remain the same provided your income
from other sources does not change. Your benefits will continue through August 1, 2038,
provided you remain totally disabled as defined by the Plan and continue to meet all other
contractual requirements.

If you have questions about our decision on your claim, you may call the number listed above. If
you wish to check the status of your claim, you may access our *website* at the address listed
above, or call our *Interactive Voice Response System* at the number listed above.

Sincerely,
**Alycea Tetto**
Alycea Tetto
Sr. Disability Claim Examiner

# EXHIBIT Q



**United States Benefits
Confirmation Statement**

This confirms your Benefits selections and costs, which take effect 01/01/2011. These selections remain in effect unless your eligibility changes or you make changes due to a Status Change. If any information on this Confirmation Statement is not accurate, please call HR Shared Services at ESN 355-9351, 919-905-9351 or toll-free at 1-800-676-4636 immediately.

This also confirms that, as part of your ongoing participation in Nortel's compensation and benefit programs, you agree to disclosure of personal information by Nortel and its plan and program administrators and custodians to third parites, as required, to facilitate administration and reporting.

| | |
|---|---|
| Name: | Brent Beasley |
| Pay Frequency: | US Bi-weekly |
| Benefits Earnings: | $ 68000.00 |
| Event:s | Annual Enrollment |
| Event Date: | 11/29/2010 |
| Prepared On: | 12/17/2010 |

## Total Cost Summary

This summary is for Benefits that are already approved. If any coverage is pending, your costs may change later when approval is received. **Please make sure your dependent information (listed on the next page) is accurate.**

### CONFIRMED AFTER-TAX SELECTIONS

| Benefit/Option | Coverage Level | Employee Cost Per Pay Period | Employee Cost Per Year | Nortel Cost Per Year |
|---|---|---|---|---|
| **Medical Care** | | | | |
| 90/70 PPO, Anthem | EE Only | $ 41.88 | $1,088.88 | $4,373.20 |
| **Dental/Vision/Hearing Care** | | | | |
| COMP | EE Only | $ 5.43 | $ 141.18 | $ 297.18 |
| **Short-Term Disability** | | $ 0.00 | $ 0.00 | $ 0.00 |
| **Long-Term Disability** | | | | |
| Raise-66 2/3%of Cov.Amt.Shown | | $ 2.88 | $ 74.88 | $ 0.00 |
| **Total Cost of Your Before-Tax Selections:** | | $ 50.19 | $1,304.94 | $4,670.38 |

### CONFIRMED AFTER-TAX SELECTIONS

| Benefit/Option | Employee Cost Per Pay Period | Employee Cost Per Year | Nortel Cost Per Year |
|---|---|---|---|
| **Core Employee Life Insurance** | | | |
| 1x Benefits Earnings | $ 0.00 | $ 0.00 | $ 106.08 |
| **Optional Employee Life Insurance** | | | |
| 3x BENE Earnings Non-Smoker | $ 4.24 | $ 110.24 | $ 0.00 |
| **Dependent Life Insurance - Spouse/DP** | | | |
| No Spousal Coverage | $ 0.00 | $ 0.00 | $ 0.00 |
| **Dependent Life Insurance - Child(ren)** | | | |
| No Dependent Coverage | $ 0.00 | $ 0.00 | $ 0.00 |
| **Accidental Death & Dismemberment** | | | |
| 5x Benefits Earnings Single | $ 1.73 | $ 44.98 | $ 0.00 |
| **Total Cost of Your After-Tax Selections:** | $ 5.97 | $ 155.22 | $ 106.08 |

** If an increase was selected for Optional Life and/or Spousal/DP Life Insurance, a Health Statement must be completed and returned to the address listed on the form within 31 days of the date you made your selections. Once approved for this increased coverage, the higher cost shown will be deducted from your pay check.



**United States Benefits
Confirmation Statement**

This confirms your Benefits selections and costs, which take effect 01/01/2012. These selections remain in effect unless your eligibility changes or you make changes due to a Status Change. If any information on this Confirmation Statement is not accurate, please call HR Shared Services at ESN 355-9351, 919-905-9351 or toll-free at 1-800-676-4636 immediately.

This also confirms that, as part of your ongoing participation in Nortel's compensation and benefit programs, you agree to disclosure of personal information by Nortel and its plan and program administrators and custodians to third parites, as required, to facilitate administration and reporting.

| Name: | Brent Beasley |
|---|---|
| Pay Frequency: | US Bi-weekly |
| Benefits Earnings: | $ 68000.00 |
| Event:s | Annual Enrollment |
| Event Date: | 10/28/2011 |
| Prepared On: | 11/30/2011 |

## Total Cost Summary

This summary is for Benefits that are already approved. If any coverage is pending, your costs may change later when approval is received. Please make sure your dependent information (listed on the next page) is accurate.

### CONFIRMED AFTER-TAX SELECTIONS

| Benefit/Option | Coverage Level | Employee Cost Per Pay Period | Employee Cost Per Year | Nortel Cost Per Year |
|---|---|---|---|---|
| **Medical Care** 90/70 PPO, Anthem | EE Only | $ 41.88 | $1,088.88 | $4,373.20 |
| **Dental/Vision/Hearing Care** COMP | EE Only | $ 5.43 | $ 141.18 | $ 297.18 |
| **Short-Term Disability** | | $ 0.00 | $ 0.00 | $ 0.00 |
| **Long-Term Disability** Raise-66 2/3%of Cov.Amt.Shown | | $ 2.88 | $ 74.88 | $ 0.00 |
| **Total Cost of Your Before-Tax Selections:** | | $ 50.19 | $1,304.94 | $4,670.38 |

### CONFIRMED AFTER-TAX SELECTIONS

| Benefit/Option | Employee Cost Per Pay Period | Employee Cost Per Year | Nortel Cost Per Year |
|---|---|---|---|
| **Core Employee Life Insurance** 1x Benefits Earnings | $ 0.00 | $ 0.00 | $ 106.08 |
| **Optional Employee Life Insurance** 3x BENE Earnings Non-Smoker | $ 4.24 | $ 110.24 | $ 0.00 |
| **Dependent Life Insurance - Spouse/DP** No Spousal Coverage | $ 0.00 | $ 0.00 | $ 0.00 |
| **Dependent Life Insurance - Child(ren)** No Dependent Coverage | $ 0.00 | $ 0.00 | $ 0.00 |
| **Accidental Death & Dismemberment** 5x Benefits Earnings Single | $ 1.73 | $ 44.98 | $ 0.00 |
| **Total Cost of Your After-Tax Selections:** | $ 5.97 | $ 155.22 | $ 106.08 |

** If an increase was selected for Optional Life and/or Spousal/DP Life Insurance, a Health Statement must be completed and returned to the address listed on the form within 31 days of the date you made your selections. Once approved for this increased coverage, the higher cost shown will be deducted from your pay check.