# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Nortel Networks Inc., *et al.*,[1] | ) Case No. 09-10138 (KG) |
| | ) |
| Debtors. | ) Jointly Administrated |
| | ) |
| | ) **Objection Deadline: Oct. 22, 2012** |
| | ) **at 10 a.m.** |
| | ) **Hearing Date:     Feb. 12, 2013** |
| | **at 10 a.m.** |
| | **RE:               D.I. # 8067** |

## OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 363 AND 1108 AUTHORIZING THE DEBTORS TO TERMINATE THE DEBTORS' LONG-TERM DISABILITY PLANS AND THE EMPLOYMENT OF THE LTD

I, Chae S. Roob (fka Chae S. Livingston), a twenty-four year participant under a Long Term Disability Plan, established as part of my compensation package during my eight year employment contract with Northern Telecom, Inc., one of the above-captioned debtors and debtors-in- possession (the "Debtors"), hereby submit this Objection to Debtors' Motion for entry of an order authorizing the Debtors to terminate the Debtors Long-Term Disability Plans and the employment of the LTD employees. In support of this Objection, Chae S. Roob respectfully represents as follows:

---

[1] The Debtors, along with the last four digits of each Debtors' federal tax identification number, are: Nortel Networks Inc (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc (0358), Northern Telecom International Inc (6286), Nortel Networks Cable Solutions Inc. (0657) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

# BACKGROUND

1. I was born in South Korea on December 1, 1952. My only formal education was completion of grades 1 through 6, elementary school in South Korea, where I received grades in the "C-" range. Thereafter, beginning at about age 15, while still in South Korea I worked as a housekeeper, a light duty laborer and as a seamstress.

2. In 1975, while still living in Korea, I met and married a U. S. soldier, Daniel Livingston. In 1976, I came to the United States with my then husband and one child. I had a second child in 1979. After coming to the United States, I did not work outside my home at any time until after I separated from Mr. Livingston in early 1980. I became a U.S. citizen in 2000.

3. The only schooling I received sense leaving Korea has been limited short courses in "English as a second language." Although I can understand spoken English, and over time manage to make myself understood verbally in English, I have great difficulty reading and writing in English. My entire work life has involved manual labor in homes and factories. I have had no clerical training or other training that qualifies me for light work. I cannot operate computers.

4. In March 1980 I accepted an "on-the-job" training program doing entry-level factory assembly work with Northern Telecom, Inc. in Minnetonka, Minnesota. I quickly progressed to full time regular assembly work as a permanent Northern Telecom employee. I was employed by Northern Telecom Inc. as an electronic equipment assembler from March 1980 until I became totally disabled in August 1988. My work at Northern Telecom Inc. during all eight years consisted primarily of the assembly of electronic equipment such as printers, computers, CTRs, etc.

5. Most all my work at Northern Telecom required me to engage in intense repetitive motion activities with awkward stretching of my hands, arms, neck, back and upper body. This also required me to do a lot of difficult grasping, pushing, and twisting with my hands, wrists, arms, neck and back, as I held heavy parts in place while wiring, screwing and soldering using basic hand tools. These intense, difficult, awkward stretching and grasping postures were required of me most all day long and day after day, including a lot of overtime.

---

"Objection To Nortel Motion To Terminate LTD Plan & LTD Employees" Page 2

6. My decision to accept Northern Telecom's periodic employment offers, and to continue working there for over eight years, was based on both my wages, as periodically agreed on (usually annually), and the employee benefits identified by Northern Telecom year after year. See "Group Benefits Plan, Revised Plan 1-1-87", produced by Nortel # NNI-LTD-00005678, and "Your Personal Report of Benefits", produced by the LTD Committee, #LTD-000155, which are similar to what I received.

7. On or about February 23, 1981, I suffered a "mid-lower back injury" at work, which has caused me chronic low back pain and discomfort to this very day. See Airport Clinic record May 30, 1986, which is attached hereto as Exhibit A.

8. Beginning in about the summer of 1985, I began receiving medical care for weakness and pain in my left thumb and wrist, which I recall was initially diagnosed by the doctors as tendinitis. I continued working as best I could, with the restrictions prescribed by my doctors. However, during the next three years the ongoing work seemed to aggravate the problems, and the symptoms continued to progress up through my upper extremities, shoulders, neck and back.

9. During these three years I was examined numerous times by doctors at the Park Nicollet and Airport Clinics in Minneapolis. The doctors noted swelling, inflammatory problems and muscle wasting in my upper extremities. I was treated with various medications, a series of cortisone injections, splints, etc. I was diagnosed with chronic tenosynovitis, defuse sensory deficit, with non-surgical thoracic outlet syndrome, and symptoms caused by a protrusion of the C5-6 disc. See Exhibit A.

10. I tried my best to do what was asked of me in spite of the irritation, discomfort and actual pain the work cause me in my back and upper body. Over the last several years at Northern Telecom, when one arm/hand became tired and unable to do the work, I would switch to the other arm/hand until it also became week and useless from the work. My neck and shoulders also became sore, fatigued and useless because of the intense work. My co-workers were not only aware of my hard work ethic and my injuries but several of them suffered similar hand, wrist, arm and upper back problems.

"Objection To Nortel Motion To Terminate LTD Plan & LTD Employees" Page 3

11. I took great pride in my work it Northern Telecom, and was a conscientious and hard worker. Each year I received very good reviews from my supervisors, as shown on my SNE evaluations, a sample of which is attached as Exhibit B, which are part of my personnel records kept by Northern Telecom. I never received any complaints, nor were there ever any disciplinary problems brought to my attention by my supervisors or executives at Northern Telecom. I wanted to continue working for Northern telecom in spite of my injuries and pain, but I could not physically do so.

12. Following a number of intermittent weeks in which I received Temporary Workers Compensation disability benefits and several periods of light duty work, in the summer of 1988 Northern Telecom's nurse, Pam Hart, directed me away from seeking Permanent Total Workers Compensation insurance benefits and instead directed me into into Northern Telecom's Long-Term Disability program, administered by Prudential Insurance Co. Nurse Hart assisted me with all the paper work. I remain totally disabled and don't expect improve.

## LONG TERM DISABILITY

**13. I was directed into Long-term Disability by Northern Telecom as of August 4, 1988. This was validated by Prudential and I began receiving payments effective that date. I have continued to receive LTD payments to date. At that tine I was earning $1,698.67 per month and I am entitled to 70% of that, or $1,189.06 a month in LTD benefits. See Exhibit C.**

## RELIEF REQUESTED

14. I request that the Debtors motion to terminate the LTD Plans and LTD Employees [DI#8067] be rejected.

15. I request the Debtors compensate me in full for my LTD benefits until I reach the age of 65 on December 1, 2017. I believe Nortel became fully liable for these once I became totally disabled. My total claim is for an additional five years of benefits plus interest on any delayed payment. I am entitled to 60 months LTD at $1,189.06, which is $71,344.14, plus compensation for all other benefits, such as Life Insurance, Retirement benefits, etc. that I am entitled to from Northern Telecom by reason of my continuing status as an employee under the Long Term Disability Plan. My full claim is hard for me to fully calculate at this time.

"Objection To Nortel Motion To Terminate LTD Plan & LTD Employees" Page 4.

16. I request that there be no interruption in disbursement of my LTD benefits (or compensation of same) as the impact to me would be both financially and medically devastating.

## BASIS FOR RELIEF

17. At the time I was hired by Northern Telecom I was a divorced single mother of two young children, ages 5 months and 4 years. When I was placed on LTD I was still single and my children were only 9 and 13. Therefore, the package of employee benefits provided by Northern Telecom was very important to me. I had looked over the Summary of benefits given to me before I applied for LTD and I listened to what I was told about these benefits by the company representatives. I understood this would provide long-term protection and security for me, and my family. I remain totally disabled and I need this continuing benefit to survive to 65.

18. While helping me apply for LTD benefits, Northern Telecom's in house nurse, Pam Hart, confirmed my understanding the LTD Plan would pay me benefits as long as I remained totally disabled, up to age 65 when I would qualify for Social Security and the Retirement Plan benefits. This was consistent with the many Northern Telecom Group Benefits documentation I had been given over the years. As an example, see page 6, Northern Telecom's 1988 Retirement Plan "Summary Plan Description," attached as Exhibit D.


19. I understood from the LTD Summary Plan Descriptions (SPD) that if I remained disabled I would receive LTD benefits until age 65. and I feel it would be unjust for me to be penalized for any ambiguities in the plan documents, as the Nortel people were the ones that introduced these ambiguities and contradictory statements in the documents.

20. I relied on Northern Telecom's representations, therefore did not apply for Workers Compensation Permanent Total Disability in 1988.

21. Nortel is well within their means to meet its LTD obligations with all the LTD employees that helped generate the Debtors assets. Fulfilling the LTD benefits obligation is in no way detrimental to the ability of Nortel to "recover" as they are indeed liquidating.

"Objection To Nortel Motion To Terminate LTD Plan & LTD Employees" Page 5

## EXHIBITS

A – Airport Clinic medical record dated May 30.1986 through January 19, 1990.

B – Northern Telecom's SNE evaluation of Chae Livingston Roob dated 01/13/1988.

C – Northern Telecom's Mini Profile on Chae S. Roob showing her earnings and LTD status.

D – Northern Telecom's 1988 Retirement Plan "Summary Plan Description."

See also: Documents produced by Nortel and by Counsel to the LTD 1102 Committee.

## NOTICE

Notice of this Objection has been provided by US Mail to (a) counsel to the Debtors; (b) the United States Trustee for the District of Delaware; (c) counsel to the LTD 1102 Committee; and (d) all parties required to receive service under Rule 2002-1(b) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware through the Court's electronic filing system. Chae S. Roob respectfully submits that, given the nature of the relief requested, no other notice of the relief requested herein need to be given.

**WHEREFORE,** Chae S. Roob respectfully requests the entry of an Order that includes the following relief:

1. Rejects the Debtors motion to terminate the LTD Plans and LTD Employees [DI#8067].

2. Compels the Debtors to compensate Chae S. Roob in full for LTD benefits projected to age 65, and other benefits due under her employee disability status; Total Claim to be calculated..

3. Orders that there is no interruption in disbursement of LTD benefit (or compensation for same) to Chae S. Roob.

---

"Objection To Nortel Motion To Terminate LTD Plan & LTD Employees" ,Page 6

Dated: October 16, 2012

**Submitted by: Chae S. (Livingston) Roob**
**Address: 8584 Chanhassen Hills Drive South,**
**            Chanhassen, MN 55317**

**Phone #: 952 949 0890**

**Signature:** _____
**Appearing Pro Se**


**With assistance of: Richard J. Chadwick, Esq.**
**9530 Foxford Rd. Chanhassen, MN 55317**
**Phone: 952 445 2425; Cell:  952 297 4873; Florida 305 872 4776**
**E-mail: Chadwickassociatespa@mchsi.com**

---

"Objection To Nortel Motion To Terminate LTD Plan & LTD Employees", Page 7.

# EXHIBIT: A

**AIRPORT
MEDICAL
CLINIC**    *PREVENTIVE AND OCCUPATIONAL MEDICINE*

7775-26TH AVENUE SOUTH, SUITE 100
MINNEAPOLIS, MINNESOTA 55450
(612) 726-1771
FAX (612) 726-1467

David C. Zanick, M.D., M.P.H.
Charles J. Hipp, M.D., M.P.H.
Dean W. Erickson, M.D., M.P.H.
Michael N. Goertz, M.D., M.P.H.
Kevin T. O'Connell, M.D., M.P.H.

John L. Kipp, M.D.
Daniel H. Lussenhop, M.D., M.P.H.
William R. Isaksen, M.D.
Julia U. Halberg, M.D., M.P.H.
Craig H. Mattice, Adm.
Holly J. Winick, M.P.H.
Alex G. Webb, M.D., Emeritus.

## REPORT OF EVALUATION PHYSICAL

PATIENT:  CHAE S. LIVINGSTON          CHART: 930-66445   DOB: 12/1/52

ADDRESS:  4644 Stevens Avenue         CITY-STATE-ZIP: Minneapolis, MN

EMPLOYER:  Northern Telecom           SEND COPY TO: Northern Telecom
                                                    P.O. Box 1222 M130
                                                    Mpls, MN 55440

OFFICE VISIT:  1/19/90                REQUESTED BY:

1/19/90  Chae returns for follow-up.  It is unclear to me exactly the
mechanism by which she re-scheduled, but she did indicate that both
Prudential, the long-term disability insurance carrier, and Liberty
Mutual, the work comp insurance carrier, want to know her current status
with respect to her disability.  Of note, I did fill out for Prudential,
a disability claim and indicated that this information was based on
November of 1988.  They did request updated information in a letter to
Ms Livingston.  She presented this to me.

Chronologically, this woman has multiple diagnoses including the
following.  (1) Chronic neck pain secondary to cervical disc disease.
(2) Thoracic outlet syndrome.  (3) Chronic thumb pain with thumb
tendonitis.  (4) Chronic pain syndrome.  Her diagnostic evaluation is
consisted of CT scan, structural studies of her neck and hand, showing
the above noted diagnoses, vascular studies for the thoracic outlet
syndrome and chronic pain evaluation.  She has seen 2 neurosurgeons,
including Dr. Theinprasit and Dr. Harry Rogers, with respect to the
thoracic outlet syndrome and chronic neck pain with disc disease and has
been felt to not have a surgical problem.  She has seen Dr. Chris
Tountas for chronic hand problems and is felt not to have a surgical
problem with respect to that.

In the 15 months since I have seen Chae last, she recounts the
following.  To begin with, she has not found alternative work within her
restrictions.  She states she worked with Mark Giancola for awhile and
then apparently, was assigned another QRC through Liberty Mutual.  She
had an administrative hearing at the State of Minnesota.  Apparently
regarding the continuation of benefits, although I must admit, I am not
exacetly clear.  Regardless, she states that the outcome of that was
apparently she did not receive a permanent disability on her hand, based
on a follow-up IME by Dr. Chris Tountas.  She actually states that that
is fine with her, in that, her only goal in the whole process is to be
able to get back to some type of work.  She was told after the hearing
that she had no further benefits, but in fact, when Prudential, the
long-term disability carrier and Liberty Mutual, the work comp carrier,
apparently resolved the issue.

She was given 6 months more TTD, which apparently is running out in February. At that point, she goes on some type of long term disability policy through Prudential. She states that she has been distraught and frustrated and depressed over the whole situation of not being able to work. She's not really doing much of anything in the way of treatment. She uses her TENS unit on occasion and does try to do her exercises. She has apparently been working out at Northwest Racquet Club and needs to have that continued. Finally, with respect to her symptoms, she continues to have chronic hand pain, left greater than right without carpal tunnel syndrome symptoms. Chronic neck pain radiating down her arm and a dead feeling in her left arm.

OBJECTIVE: Examination is pertinent for the following positive findings. She has tenderness in both the first MCP and over the thumb extensor tendons and the carpal metacarpal joint on the left hand, much less so on the right hand. She has no findings for reflex sympathetic dystrophy. TOS findings are as follows. She has positive Addson's maneuver. I really cannot reproduce Bruits today. Addson's manuever reproduces symptoms of feeling of deadness and pain and numbness in her arm. Neurologic exam of the upper extremities is otherwise normal. She has decreased neck motion on left rotation. She has tenderness in the left posterior neck.

CONCLUSION: (1) Cervical disc disease-non-surgical with continued active symptoms. (2) Thoracic outlet syndrome-non-surgical with continued symptoms. (3) Chronic left hand pain secondary to inflammation without evidence of functional disability with continued symptoms. (4) Chronic pain syndrome with a significant depression and frustration.

I indicated to Chae in a comprehensive discussion that I did not really see anything new in terms of physical findings or symptoms that would require more aggressive surgical management. I did suggest, however, that we again try Elavil as an anti-depressant for her chronic pain. She will follow-up in 3 weeks.

Sincerely,

Dean W. Erickson, M.D., M.P.H.
Diplomate of the American Boards of
Internal and Preventive Medicine

DE/laj

**MEDICAL CLINIC**   *PREVENTIVE AND OCCUPATIONAL MEDICINE*

7501-26TH AVENUE SOUTH, SUITE 100
MINNEAPOLIS, MINNESOTA 55450
(612) 726-1771

Alex G. Webb, M.D., Emeritus.
David C. Zanick, M.D., M.P.H.
Charles J. Hipp, M.D., M.P.H.
Dean W. Erickson, M.D., M.P.H.
Michael Goertz, M.D.
Kevin T. O'Connell, M.D.

John L. Kipp, M.D.
Daniel H. Lussenhop, M.D.
William Isaksen, M.D.
John C. Conrad, PhD.
Craig Mattice, Adm.
Holly Winick, M.P.H.

September 13, 1988

Dr. Harry Rogers
825 S. 8th St., #1106
Minneapolis, MN   55404

RE:  Chae Livingston, AMC #66445

Dear Dr. Harry Rogers:

I appreciate your seeing Ms. Chae Livingston for a second opinion
regarding her multiple neck and upper extremity neurovascular problems.
Please find enclosed a copy of her medical records over the last several
years. Basically this woman has had chronic right upper extremity pain
and neck pain that have been felt to be due primarily to left thoracic
outlet syndrome and minimal degenerative disc disease at C5-6 in her neck.
It has been my opinion, as well as those of other specialists, that at
this point this woman is not a surgical candidate. She has been through a
chronic pain program. Because a major commitment will need to be made
with respect to rehabilitation in that Chae can no longer do her regular
work, all those interested in her situation have felt it appropriate to
get a second opinion regarding further diagnostic testing and management
of her situation.

Please feel free to contact me regarding questions you may have.

Sincerely,

Dean Erickson, M.D., M.P.H.,
Diplomate of the American Boards of
Internal Medicine and Preventive Medicine

DE/sg

cc:  Chae Livingston

ABROMSBICAL CLINIC
7775 - 26th AVE. SO.
MPLS., MN 55450

Chae Livingston, AMC #93-066445   Work Comp Follow-up   Northern Telecom

WRIST

9-6-88  Chae Livingston is in for follow-up.  She continues to have
symptoms consistent with her left arm pain.  She is unable to get into
Mayo Clinic, and I will have her see Dr. Harry Rogers on 9-26-88 at
10:00 a.m. for a second opinion.  A letter is sent to Dr. Rogers.  Follow-
up with me in the second week of October to review this.
DEAN ERICKSON, M.D./sg

9-30-88  Chae Livingston returns for follow-up.  She saw Dr. Rogers.  I
don't have the report yet.  Chae reports that she was advised that she
does not have a surgical problem and that he suggested a trial of traction
to see if this is helpful.  He also discussed the possibility of a health
club.  She is depressed about her situation.  She still has a lot of
symptoms, although she thinks she is generally feeling better since she
hasn't been working.  IMP: Chronic neck pain due to cervical disc and
thoracic outlet syndrome.  CONCL:  A long discussion ensued today with
Chae and Mark Giancola, QRC.  She may be on vacation for two weeks.  If
that's the case, she will then schedule a two week course of intensive
traction to see if that's helpful.  If it gets worse, which would not be
surprising given her thoracic outlet syndrome diagnosis, we would back-off
right away.  If she does have some benefit from it, we will consider a
home traction unit.  She will follow-up with Dr. Conrad on 10-28-88 for a
Functional Capacity Evaluation with the results to be discussed with Mr.
Giancola and myself on 10-31-88.  DEAN ERICKSON, M.D./an

10-14-88  Chae Livington returns for follow-up.  He feels the traction was
not helpful at all.  She is having significant neck pain today.  EXAM:
Shows marked decrease in neck range of motion and the left thoracoscapular
motion.  She has only 25 percent left rotation.  She has marked spasm in
the left posterior trap.  IMP:  Chronic neck pain and arm pain.  CONCL:
She has a functional capacity scheduled with Dr. Conrad on 10-28.  She
will follow-up with myself and Mark Giancola on 11-4-88 to review and fill
out an R33 and start job search.  DEAN ERICKSON, M.D./an
cc:  Mark Giancola, QRC.



**AIRPORT
MEDICAL
CLINIC**

*PREVENTIVE AND OCCUPATIONAL MEDICINE*

2501 26TH AVENUE SOUTH, SUITE 100
MINNEAPOLIS, MINNESOTA 55450
(612) 726-1771

Alex G. Wenn, M.D., Emeritus
David C. Zanick, M.D., M.P.H.
Charles E. Hipp, M.D., M.P.H.
Dean W. Erickson, M.D., M.P.H.
Michael Goertz, M.D.
Kevin T. O'Connell, M.D.

John E. Kopp, M.D.
Daniel H. Lussenhop, M.D.
William Isaksen, M.D.
John C. Conrad, PhD
Craig Mattice, Adm
Holly Winick, M.P.H.

## WORKER'S COMPENSATION FOLLOW-UP VISITS

PATIENT: Chae Livingston        CHART#: 93066445

EMPLOYER: Northern Telecom

DATE OF INJURY:                 INJURY: Wrist

8/8/88: Chae Livingston returns for follow up. She worked for about a
week at the end of June and continued to have problems. She took five
weeks of vacation, spending it with her children who came from out east.
She noted improvement in her neck symptoms at this time, but certainly
she still had some problems. She attempted to return to work last week
with the following scenario; on 8/1/88, she was bagging PC boards,
reaching back to her right. She did this for 8 hours and had
significant bilateral neck pain. On 8/2/88 she tried filing some parts
doing overhead work. By 9:00 in the morning she had increased pain and
went to Pilling Pain Program. There is some confusion as to why she was
there. This was frustrating to her. On 8/3/88 she worked the whole day
with pain, primarily bagging PC boards. On 8/4/88, by 1:30 p.m. she had
significant pain. It was her understanding that in order to do the job
rotation between several jobs that she had to do the bagging of PC
boards on a full-time basis for 4 months. This protocol has not been
verified with her supervisor. Regardless, she is having alot of
problems, was unable to work on Friday, and as per Pam Hart, R.N., it
has been determined between Northern Telecom and Liberty Mutual that
Chae will be assigned a QRC and placed into job search. Part of this
decision has been because she has little, if any, in the way of clerical
skills and has language problems that would preclude other service rep
type work, etc. EXAM: On examination today, Chae appears to be in
discomfort. She has very limited motion in her neck. TOS signs are
positive on the left with loss of pulse and development of bruit in the
subclavian area. She has some development of numbness in the ulnar half
of her hand with this maneuver. She has tenderness in the first carpal
metacarpal of the left hand and diffusely into the right thumb.
Positive Finkelstein's on the right. CONCL: Multiple problems
including degenerative disc disease in the neck, left thoracic outlet
syndrome, and thumb tendonitis with chronic pain syndrome. Discussed
extensively with Chae and her friend, Ray, was her current situation.
Through discussions with Pam Hart, R.N., in agreement with Chae, she
will go ahead and get a second opinion. I have recommended Dr. Cherry
at the Mayo Clinic in that they are interested in the Mayo Clinic. I
will try and make some contacts this week to see if it is reasonable to
get in in a short period of time. Essentially, she is disabled at this
time and will be getting the services of a QRC through Liberty Mutual.
In that things are still in a bit of flux with the second opinion, I
would not make an MMI statement at this point. Follow up in four weeks.
DEAN ERICKSON, M.D./rmc

**AIRPORT MEDICAL CLINIC**

*PREVENTIVE AND OCCUPATIONAL MEDICINE*

7501 - 26TH AVENUE SOUTH, SUITE 100
MINNEAPOLIS, MINNESOTA 55450
(612) 726-1771

Alex G. Webb, M.D.
David C. Zanick, M.D., M.P.H.
Thomas C. Tetzer, M.D., M.P.H.
Charles J. Hipp, M.D., M.P.H.
Dean W. Erickson, M.D., M.P.H.

Michael Guertz, M.D.
Kevin T. O'Connell, M.D.
Craig Mattice, Adm.
Barbara Deede, O.H.S.

## REPORT OF EVALUATION PHYSICAL

PATIENT: Chae Livingston

CHART: 66445     DOB: 12/1/52

ADDRESS: 4644 Stevens Ave. So.

CITY-STATE-ZIP: Mpls., MN 55409

EMPLOYER: Northern Telecom

SEND COPY TO:

OFFICE VISIT: 5/30/86

REQUESTED BY:

Northern Telecom
P.O. Box 1222  M130
Mpls., MN 55440
Pam Hart

Chae Livingston is a 33 year old vin⌐ assembler with Northern Telecom who presents for evaluation of her thumb discomfort. This woman states that her past medical history is significant for some chronic low back discomfort for which she was treated at this clinic in 1981 and continues to have some ongoing problems. She had wrist tendinitis and was seen by physicians at Park Nicollet last summer and she responded well to appropriate use of splinting, anti-inflammatory medications and work restrictions. Her current problem dates back approximately 2 months to late March, early May at which time she states she had 2 incidents that involved straining her thumb. She states the first incident was were she did a significant amount of repetitive appositional pinching type motion with her left thumb and her fingers. She has noted discomfort in the MCP joint of her thumb and also some discomfort with extending her thumb after this. At some point after that she had an episode where she was sliding a 25 to 30 pound power supply into a plastic bag and this started to fall and she caught the entire unit with her left hand and she felt that her thumb was strained backwards. She did not report this at the time in that she felt with these minor problems the thumb discomfort would certainly go away. Unfortunately, it has not and now her symptoms are primarily generalized achiness in the dorsal aspect of her thumb MCP joint and inability to fully extend her thumb due to discomfort. She denies any avocational activities or injuries that may aggravate this. Her position up until 6 months ago involved a significant amount of repetitive motion in her wrists and hands but her work does not involve so much repetitive motion at this point.

PAST MEDICAL HISTORY: Is noted above.

PHYSICAL EXAMINATION: Chae Livingston is 5'2", weighing 114 pounds with a normal pulse of 80 and blood pressure of 110/64. She is cooperative and appears healthy. Examination of the hand reveals no evidence for carpal tunnel syndrome. She has no evidence of epicondylitis in her forearms. Her left wrist has a slight amount of tenderness on palpation dorsally. She has full range of motion, however, with some discomfort on full flexion and extension. Examination of the thumb shows full range of motion and significant discomfort on full extension. She has tenderness in the thumb extensor tendons, primarily at the MCP and just proximal to this. There is no significant swelling. There are no neurovascular problems noted. The thumb is stable.

Chae Livingston, AMC #66445      Evaluation Physical    Northern Telecomm
5/30/86                                                 Page 2

X-RAYS:  X-rays of the thumb reveal no abnormality.

CONCLUSION:  This woman has low grade tenosynovitis in her left thumb
            extensor's and very minimal wrist joint symptoms. At this point,
I think her main problem is in her thumb.  She is started on Naprosyn anti-
inflammatory medication, advised warm soaks prior to activity and ice after.
She has a thermoplast splint form in that this will stabilize her thumb and
she can perform appositional functions with her hand without aggravating the
tendinitis.  This woman will be seen in follow-up with myself on 6/16/86.  No
permanent disability is anticipated.

Sincerely,

Dean Erickson, M.D., M.P.H.
Diplomate of the American Boards of
Internal and Preventive Medicine

DE/ms

# EXHIBIT: B



SNE evaluation and
development review

**Confidential, for internal use only.**

Refer to Manager's Guide for all instructions and definitions.

| Surname | Initials | Dept. No. | Dept. Name | Location |
|---|---|---|---|---|
| Livingston | C | 5940 | Repair | Minnetonka |

| Present job title | On present job since | Period covered by review |
|---|---|---|
| MFE II | 0 5 8 7 Mo. Yr. | From 0 7 8 7 To 0 1 8 8 Mo. Yr. Mo. Yr. |

### 1. Key Responsibilities/Objectives

Update, Cleanup, and testing of keyboards

Update, Cleanup, and testing of mechanical assemblies

Useage of paper work such as RMRs and tracking logs

### Major Results

Chae is very knowledgable on all keyboards currently being done in repair and refurb.

Chae does a very good job on any mechanical assemblies that she is able to perform within her restrictions

Chae completes paper work neatly and accurately

### 2. Performance Indicators (Comment and Give Specific Examples)

**Quantity of Work**

Chae always completes tasks within the expected time period

**Quality/Thoroughness/Accuracy of Work**

Chae work is done thoroughly and accurately

**Initiative**

Chae take the initiative to find work to do or to ask her supervisor for work during slow periods

**Attendance and Punctuality**

Chae has a satisfactory attendance record

**Dependability/Reliability**

Chae is very dependable and can be counted on to put forth what ever effort is nessesary to accomplish goals.

**Cooperation/Working Relationships**

Chae is very cooperative and gets along well with fellow employees.

### 3. Overall Performance Rating

| | | | |
|---|---|---|---|
| .0 ☐ Consistently and significantly exceeded all position requirements. | .1 ☐ Consistently met and often significantly exceeded all position requirements. | .2 ☒ Fully met all position requirements. | |
| .3 ☐ Some improvement needed to meet all position requirements. | .4 ☐ Position requirements clearly not met. | | |

31-525-9 (02/86)

Name: Chae Livingston

Confidential, for internal use only.

## 4. Skills/Qualities
### Strengths

Chae is very willing to try new tasks.
Is familiar with documentation used on older products

### Requiring Development

None at this time

## 5. Career Goals
### Employee

### Manager's Comments

## 6. Developmental Activities
### Completed During Review Period
Activity:                                                      Date:

### Planned for Next Review Period
Activity:                                                      Date:

| Evaluated by | Date | | | Approved by | Date | | |
|---|---|---|---|---|---|---|---|
| Bruce J. Kennedy | 0 1 | 1 4 | 8 8 | Whice | 0 1 | 1 3 | 8 8 |
| | Mo. | Da. | Yr. | | Mo. | Da. | Yr. |

| Employee's Signature (Does Not Imply Agreement) | Date | | |
|---|---|---|---|
| | | | |
| | Mo. | Da. | Yr. |

Employee's Comments (Optional)

# EXHIBIT: C

## Mini-profile



| | | |
|---|---|---|
| 71 | 0517927250 | Effective date |

**ADP CAL** 6AL | **Employee I.D. no.** 0000018986 | Date 9021 | Profile date 05/14/91

**First name** CHAE | **M.I.** S | **Last name** ROOB

**City** MINNEAPOLIS | **State** MN 55409 | **Zip code** 40

Supplemental address

**Number and street** 4644 STEVENS AVE

8684 Chanhassen Hills Dr Chanhassen MN 55310

**Home phone no.** 612 827-4877 | **Emergency contact name** RAY ROOB | **Emergency no.** 612 827-4877

**Relationship** NO RELN 42

**LID** A 6279021 | **Dept. no.** 9021 | **Entity code** 430 | **Grp. cd.** 3 | **Name code** GA

**Location code** 6279021 | **Reason** C | **Location name** MNTKA LTD 38

**Branch** 65 | **Medical** 02 | **Effective date** 05/01/91 | **Deduction** 0.00 | **MTI** B | **Fix med** | **Fix dep** | **Sup lif** 6 BW | **Skip opt** | **Coverage** $51,000 | **Effective date** 03/17/80 | **Ca life** 6 A6 | **Fix tot** | **Fix leg** | **Benefit stop dev** | **Thrift ded** 00 | **Coverage** 03/17/80 | **Pen** 9

**Travel** C1 | **Effective date** 03/17/80 | **Coverage** 100,000 | **Spousal** NN | **Effective date** 03/01/84 | **Thrift** 4 | **Deduction** 0 | **Thrift** | **Effective date** 06/26/89 | **Veg** 0

**Recent CS/Hire date** 03/17/80 | **Prev. CS/Hire date** 03/17/80 | **Adjusted CSD** 03/17/80 | **Bridging date** | **Seniority date** | **Canadian emp. no.** | **Visa** 1 | **Visa exp. date** | **Hire** 1 | **Transfer from**

**Trans code** 166 | **Trans off date** 08/04/86 | **Transaction name** TO LTD W/O PAY | **Car code** 13 | **L/A expect. ret. date** 0 | **Rehire** 8 | **Scheduled hrs.** 40,00 | **Incentive rate** | **Lead hand pay rate** 1 | **Shift premium** 5 | **PSU expand** | **Job expand** MRX004

**Shift** 9 | **Exp cat** 1 | **Effective date** 100V0 | **Job code** | **Job title** C LONG-TERM DISABILITY | **EEO** 000 | **Eval** H | **Eval. date** | **Monthly equiv** 1,698,47 | **Weekly equiv** 392.00 | **Comb.-ret.** 0.00 | **Annual equiv** 20,384 | **Monthly salary** | **Pen** 6

**Grade off date** 08/04/88 | **Grade** MRX00 | **HSN** 33 | **Range midpoint** 00 | **Range maximum** 00 | **H.R. use only**

change to employee home address effectur

| | New base salary amount | | | Period freq. | Amount of change | | Effective date | | % Change | | Effective date | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Reason | 23 | | | 31 | 34 | | 42 | | | | | | | |

**Base salaries** / **Period freq.**

Approved by — date

Approved by Paula Radder 6-7-91 — date

**Effective date** change to employee home address effectur 7-1-91 — date

Personnel confidential

1-8 (8/86)

# EXHIBIT: D

## Retirement Plan

---

# Summary Plan Description

---

 northern telecom

1988

# table of contents

What Does the Northern Telecom Inc.
Retirement Plan For Employees Mean to Me? .................. 2

When Do I Become a Member of the Plan? ....................... 2

Who Pays for My Benefits? ...................................... 2

What Words Have Special Meanings that
I Should Know? ................................................ 2/3

When May I Retire? ............................................. 3

How Will My Benefit Be Paid When
I Retire? ...................................................... 3/4

How Much Will My Benefit Be If I
Retire At Age 65? ............................................. 4/5

What Will My Benefit Be If I Retire Early? ........................ 5

What is the Rule of 85? ......................................... 6

What if I become Disabled? ...................................... 6

What is Vesting? How Do I Become Vested
in the Benefits of My Retirement Plan? .......................... 6/7

What Are the Different Ways My Benefit
Can be Paid? .................................................. 7

What if I Should Die? ........................................... 7/8

What Can I Expect from Social Security? .......................... 8

Can I Lose Any of My Benefits from This Plan?
If So, Can I Get Them Back? ................................... 8

How is My Plan Administered? ................................... 8/9

How Do I File a Claim for Benefits Under
My Plan? ..................................................... 9

If a Claim is Denied, How Do I File an Appeal? ................... 9

Is There Anything Else I should Know About My Plan? .......... 9/10

Other Important Names, Addresses and Information .............. 10

## WHAT DOES THE NORTHE. J TELECOM INC. RETIREMENT PLAN FOR EMPLOYEES MEAN TO ME?

The Northern Telecom Inc. Retirement Plan for Employees is designed to provide employees who are vested in the Plan with a monthly retirement benefit for life (in addition to any social security benefits they may be entitled to). The normal retirement age under the Plan is age 65. Early retirement is permitted as early as age 55. The Plan also permits employees who become totally and permanently disabled to continue to accrue benefit service. Under certain circumstances, an employee's spouse is entitled to survivor benefits.

## WHEN DO I BECOME A MEMBER OF THE PLAN?

If you were hired on or after January 1, 1980, and before your 60th birthday, you became a Plan member on the later of the first anniversary of your employment and (a) your 25th birthday, if you attained age 25 before January 1, 1985; (b) January 1, 1985, if you were at least age 21 but not yet age 25 on December 31, 1984, or (c) your 21st birthday if you attained age 21 after January 1, 1985, if you were hired as

> a salaried employee, or
> an hourly employee, or
> an employee who is covered by a collective bargaining agreement which specifies participation in the Plan.

If you were hired on or after January 1, 1979, but before January 1, 1980, you became a member of the Plan when you met the above conditions, except that you need not have reached your 25th birthday to be a member.

If you were a member of the Northern Telecom Inc. Pension Plan for Hourly employees, you became a Plan member on January 1, 1986. If you were an hourly employee (other than an "installer") and either were hired after January 1, 1986 or attained age 21 after January 1, 1986, you became a Plan member on the later of (a) your date of employment and (b) your 21st birthday.

## WHO PAYS FOR MY BENEFITS?

Your retirement benefits are provided at no cost to you. The Company pays the entire cost. The Company's contributions to the Plan are based on actuarial information from its pension consultants.

## WHAT WORDS HAVE SPECIAL MEANINGS THAT I SHOULD KNOW?

You will come across certain words and terms in this booklet that    help you to better understand your benefits. Remember to keep them in mind as you read the rest of the booklet.

### Affiliate

This means Northern Telecom Limited, Bell Canada Enterprises Inc. and all subsidiaries of either of those companies which have signed an agreement regarding recognition of service among all companies signing the agreement.

### Break In Service

You will have a break in service if you are paid by the Company for less than 501 hours in a calendar year. However, for purposes of determining if you have a break in service, time spent away from work under the following circumstances will be counted towards your 501 hours:

- time spent in military service, if you return to work while you have re-employment rights under the law; and
- time spent on layoff due to a temporary plant closing or business downturn if you return to work immediately after you are recalled; and
- time spent on an authorized leave of absence, if you return to work immediately after your authorized leave is over.

### Company

This refers to Northern Telecom Inc. and any Participating Companies, such as BNR Inc., which are companies named by the Board of Directors of Northern Telecom Inc. and which elect to cover their employees under this Plan.

A list of Participating Companies is kept on file by the Company and is available for inspection. If you would like a copy of the list, write to the Company and one will be sent to you. There may be a charge to cover copying costs.

### Earnings

This means your base earnings plus sales incentive earnings. Any other forms of compensation such as overtime and bonuses are excluded.

### Final Average Earnings

This normally means your earnings for the 36 consecutive calendar months out of your last 120 consecutive calendar months with the Company that give you the highest annual average.

### Social Security Benefit

This refers to the anticipated Social Security benefit payable at age 65 based on the Social Security law in effect when you leave the Company and assuming your earnings continue at that same level until you reach age 65.

### Total and Permanent Disability

You are normally considered to be totally and

2

permanently disabled if you are eligi    for a disability insurance benefit under Social Security, or if the Company determines that you are prevented from engaging in any occupation for which you are reasonably qualified. That determination will be based on medical evidence satisfactory to the Company.

## WHAT IS BENEFIT SERVICE AND VESTING SERVICE?

### Benefit Service

Benefit service is your completed continuous period of service with the Company. You will earn one year of benefit service for each calendar year in which the Company pays you for at least 1,000 hours of service. If you are paid by the Company for less than 1,000 hours in a calendar year, you will not earn any benefit service for that year. In general, benefit service will start to be counted at the later of your date of hire or the date your employer becomes a Participating Company.

In certain instances, you may be credited with benefit service while you are not actively working for the Company.

- Total and permanent disability—If you become totally and permanently disabled after you have completed at least one year of vesting service, you will earn benefit service for the duration of your disability up to age 65 or the age you start to receive a retirement benefit, if earlier.
- Employees who transfer from certain affiliates— if you transfer to the Company directly from certain affiliates, your benefit service may also include part or all of your term of employment with the affiliate.

Your benefit service is used to calculate your pension benefit. Pursuant to the Plan, benefit service is limited to 30 years.

### Vesting Service

Vesting service determines your right to receive benefits. Your vesting service is equal to your benefit service (excluding periods of disability) plus

- the time you work for an affiliate of the Company that is not credited as benefit service.
- the time you work for the Company in a job classification not covered by the Plan.
- the years of service not otherwise credited during the period of your employment between your 18th birthday and the date you became a member of the Plan.

Your vesting service is used to determine when your rights under the Plan become irrevocable, even if you should subsequently leave the Company.

Vested employees are eligible for an automatic preretirement survivor annuity (PSA) and an automatic joint and survivor (J&S) benefit, each of which provides a benefit to your surviving spouse. In both cases, spousal consent (in writing) must be obtained

before you can wa    the automatic benefit.

A J&S annuity can be waived only with the 90-day period before the annuity starting date. PSA waivers can be made only after the beginning of the plan year in which a participant turns 35. (If you were 35 or older before January 1, 1985, your spouse may consent to a PSA waiver at any time.) Younger workers with vested rights cannot waive this coverage except when they terminate employment.

## WHEN MAY I RETIRE?

### Normal Retirement

Your normal retirement date is the first day of the month following your 65th birthday. However, if your birthday is on the 1st day of the month, your normal retirement date is your 65th birthday.

### Early Retirement

If you are between 55 and 65 years old with at least 10 years of vesting service and you want to retire before you reach 65, you may do so. However, the amount of your pension benefit may be reduced by a fraction of a percent for each month you will receive benefits before your normal retirement date (see page 5).

### Late Retirement

You may choose to postpone your retirement beyond your normal retirement date. If you do, you will continue to accrue benefit service until you have accrued 30 years of benefit service.

### Disability Retirement

Regardless of your age, if you become totally and permanently disabled and remain disabled, you may become entitled to a benefit at age 65.

## HOW WILL MY BENEFIT BE PAID WHEN I RETIRE?

Both PSA and J&S coverage are automatically provided to married workers with a vested benefit who have an hour of service or are on paid leave after August 23, 1984, unless both spouses agree to waive those benefits within specified election periods. The consent of a participant's spouse must be made in writing at the time the election is made and must be either notarized or witnessed by a plan representative.

The Joint and Survior annuity option is mandatory for members who have been married at least one year before their death. If you do not waive the J&S option, you will receive a somewhat smaller monthly benefit for as long as you live. After your death, one-half of your benefit will be paid to your surviving spouse for the rest of his or her lifetime.

If you and your spouse waive the J&S option, you

3

will receive a monthly benefit for your lifetime only, with no benefit payable to any spouse or beneficiary. This is called the life only benefit.

Unmarried retirees receive a monthly benefit for life unless they choose an alternative form of benefit. These benefits are described on page 7.

If you wish, you may choose to receive your retirement benefit in one of the other ways which are discussed on page 7.

## HOW MUCH WILL MY BENEFIT BE IF I RETIRE AT AGE 65?

When you retire, the amount of your monthly benefit will be based on your benefit service and either your final average earnings or a fixed dollar rate. In addition to benefits you'll receive from the Plan, you're also likely to receive valuable benefits from the Social Security program. (See page 8 for a description of these benefits.) The Plan will provide additional benefits related to the part of your earnings that are not covered by the Social Security program. The monthly income you will receive from the Plan if you receive a life only benefit is figured as follows:

$15.00 x Years of Benefit Service up to 30 years
OR

1.5% x Benefit Service up to 30 years x Final Average Earnings in excess of anticipated Social Security Benefit divided by 12. You will receive the Greater of the two Benefit Calculations.

That benefit will then be reduced by any benefit which is payable to you by an Affiliate for service counted as benefit service under this Plan.

If you and your spouse do not waive the J&S option, your surviving spouse will continue to receive a benefit equal to one half of your benefit after your death. Your spouse will receive this benefit for the rest of his or her life. Because this arrangement will usually result in benefit payments being paid over a longer period of time than under the life only benefit, the amount of your benefit is reduced according to

certain actuarial calculations so that your probable total payments remain the same. See the sample 50% Survivor Benefit factors table at the bottom of this page. The factor that is used takes into account your spouse's age and your age at the time of your retirement.

**EXAMPLE:** Normal retirement (Age 65)

Suppose you retire at age 65 with 30 years of benefit service and final average earnings of $15,000. Let's assume you were born in 1921 and that you'll retire in 1988 with an estimated Social Security benefit of $6,408 per year or $534 payable monthly.

**Example 1**

| | |
|---|---|
| $450.00 | from the Plan ($15 x 30 Yrs) |
| $534.00 | Social Security |
| $984.00 | equals your expected total monthly retirement income at age 65. |

**OR**

**Example 2**

| | |
|---|---|
| $15,000 | Final Average Earnings |
| -6,408 | Social Security |
| $ 8,592 | equals the Final Average Earnings in excess of your Social Security benefit |

**Now, compute the Plan benefit: (Service Percentage = 30 years Benefit Service x 1.5% = 45%)**

| | |
|---|---|
| $8,592.00 | Final Average Earnings in excess of Social Security |
| x45% | the Service Percentage |
| $3,866.40 | equals the annual benefit from the Plan, or |
| $322.20 | per month |
| +534.00 | Social Security |
| $856.20 | equals your expected total monthly retirement income at age 65. |

You would receive the amount calculated in Example #1 because it would provide you with a greater monthly benefit.

## SAMPLE 50% SURVIVOR BENEFIT FACTORS

| Spouse's Age | Retiring Employee's Age | | | | |
|---|---|---|---|---|---|
| | 55 | 57 | 60 | 62 | 65 |
| 50 | 87.50% | 86.50% | | | |
| 52 | 88.50% | 87.50% | 85.00% | 84.00% | 82.50% |
| 55 | 90.00% | 89.00$ | 86.00% | 85.00% | 83.50% |
| 57 | 91.00% | 90.00% | 87.50% | 86.50% | 85.00% |
| 60 | 92.50% | 91.50% | 88.50% | 87.50% | 86.00% |
| 62 | 93.50% | 92.50% | 90.00% | 89.00% | 87.50% |
| 65 | 95.00% | 94.00% | 91.00% | 90.00% | 88.50% |
| | | | 92.50% | 91.50% | 90.00% |

**Case #1:** If you are not married, and do not choose another method of payment, you would be entitled to receive the following benefits at age 65:

| | |
|---|---|
| $450.00 | from the Plan |
| $534.00 | from Social Security |
| $984.00 | equals your expected total monthly retirement income at age 65. |

**Case #2:** If you are married and do not choose another method of payment, your life only benefit will be reduced by the 50% Survivor Benefit factor from the table on page 5. Assuming your spouse is age 62.

| | |
|---|---|
| $450.00 | life only annuity |
| x88.50% | 50% Surviving Benefit Factor |
| $398.25 | equals your expected total monthly retirement income at age 65. |

You would receive the following benefits starting at age 65:

| | |
|---|---|
| $398.25 | from the Plan |
| +534.00 | from Social Security |
| $932.25 | equals your expected total monthly retirement income at age 65. |

After your death, your surviving spouse would receive one-half of your Plan benefits, or $199.13 for the rest of his or her life. In addition, your spouse may receive benefits from Social Security. (See page 8).

## WHAT WILL MY BENEFIT BE IF I RETIRE EARLY?

Your early retirement benefit is figured using the same formula as is used to calculate the normal retirement benefit, which is then reduced as described below.

If you retire early, you can choose to start receiving your benefit any month after your early retirement, but no later than the first of the month coincident with or next following your 65th birthday.

Unless you qualify under the Rule of 85, a reduction will be made if you start to receive a benefit before reaching age 65. Your early retirement benefit will be your normal retirement benefit reduced by 5/12 of one percent for each month (5% for each year) you are under age 62 and 1/4 of one percent for each month (3% for each year), between the ages of 62 and 65. (The maximum reduction is 44%.)

**EXAMPLE:** Early Retirement

Suppose you retire at age 58 with 24 years of both benefit service and vesting service and with final average earnings of $20,000. Let's assume you were born in 1930 so that you'll retire in 1988 with a Social Security benefit of $8,088 per year or $674 per month starting at age 65. Also assume that you are not married.

First compute your Service Percentage:

| | |
|---|---|
| 24 | years of benefit service |
| x  1.5% | |
| 36.00% | equals your Service Percentage. |

Next, compute the amount of your Final Average Earnings which exceed the anticipated Social Security benefit:

| | |
|---|---|
| $20,000 | Final Average Earnings |
| 8,088 | Social Security Benefit |
| $11,912 | equals your Final Average Earnings in excess of Social Security. |

Now determine your Plan benefit payable at age 65:

| | |
|---|---|
| $11,912.00 | Final Average Earnings in excess of Social Security |
| x   36.00% | Service Percentage |
| $ 4,288.32 | per year, or |
| $    357.36 | per month, starting at age 65. |

**Case #1:** If you wait until age 65 to start receiving your benefit, you would receive $357.36 per month at that time, payable for the rest of your life.

**Case #2:** If you begin to receive your retirement benefit immediately upon retirement at age 58, your benefit would be reduced by 5/12 of one percent for each month you are under age 62 (5/12% x 48 = 20%) and 3/12 of one percent for each month from age 62 to 65 (3/12% x 36= 9%). Total reduction-29%.

| | |
|---|---|
| $357.36 | Monthly age 65 life only benefit |
| -103.63 | Reduction for early retirement ($357.36 x 29%) |
| $253.73 | Equals your monthly life only benefit beginning at age 58. |

In this instance, you would receive $253.73 starting at age 58 and payable for the rest of your life. In either case, you could expect to receive a Social Security benefit of $674 per month starting at age 65, or a reduced amount starting as early as age 62.

**Note:** If you are married, the life only benefit will be further reduced by the 50% survivor benefit factor unless you choose another form of payment.

5

## WHAT IS THE RULE OF 85?

If an employee qualifies under the Rule of 85, he or she can retire and receive a benefit with no reduction for early retirement. An employee who has completed at least 25 years of employment with the Company and/or with an affiliated company and is age 60, or whose combination of age above 60 and service equals at least 85, may elect to retire early with no reduction in the normal retirement benefit.

## WHAT IF I BECOME DISABLED?

If you become totally and permanently disabled after completing at least one year of vesting service, you will receive credit for benefit service in the Plan while you remain disabled until your benefit starts.

When you become disabled, monthly benefits will be paid to you from the Company's Long Term Disability Plan. (Refer to the booklet entitled "Group Benefits Plan Booklet" for a description of your LTD benefits.) If you remain disabled until age 65, you will then start to receive a monthly retirement benefit. If you have 10 or more years of vesting service at the time your disability began, you may choose to start receiving retirement benefits in any month after you reach age 55 until the month of your 65th birthday. However, if you elect to receive an early retirement benefit, the only additional monthly benefit you will receive at age 65 will be the excess of your disability retirement benefit over your age 65 vested benefit.

Your disability retirement benefits are based on the same formulas used for normal and early retirement, based on final average earnings at the time of disability, your anticipated Social Security benefit, and your benefit service at the time your benefit starts.

### EXAMPLE: Disability

Assume you become totally and permanently disabled when you are 50 years old with 15 years of benefit service. Also assume your final average earnings are $17,000 and you were born in 1934 so that your Social Security benefit at age 65 is expected to be $7,248 per year. If your disability continues to age 65, and you wait until then to start receiving retirement benefits, you will receive 15 more years of benefit service to give you a total of 30 years of benefit service.

### Example 1

| | |
|---|---|
| $ 450.00 | from the Plan ($15 x 30 Yrs) |
| + 604.00 | from Social Security |
| $1,054.00 | expected monthly income |

($450.00 x 12 = $5400/Year from the Plan)

**OR**

### Example 2

| | |
|---|---|
| $17,000.00 | Final Average Earnings |
| - 7,248.00 | less Social Security |
| $ 9,752.00 | Excess Earnings |
| x45% | Service Percentage (1.5% x 30) |
| $ 4,388.40 | Annual Benefit |
| $ 365.70 | Monthly Benefit |
| + 604.00 | from Social Security |
| $ 969.70 | Expected Monthly Income |

**Note:** You would receive a Plan benefit of $450 per month as calculated in Example 1 because it exceeds the amount of the Plan benefit calculated in Example 2.

## WHAT IS VESTING? HOW DO I BECOME VESTED IN MY RETIREMENT PLAN BENEFITS?

Vesting is making your right to receive a retirement benefit irrevocable. You become vested in your retirement benefit after completing 10 years of vesting service with the Company, not counting any years during which you were disabled and eligible to receive disability benefits under Social Security.

If you leave the Company after becoming vested, you are entitled to a monthly benefit starting at age 65. This benefit is calculated using the same formula as is used to calculate your normal retirement benefit, but using your benefit service, final average earnings when you terminate employment, and expected benefit from Social Security, all as in effect at the time you leave the company.

Your Social Security benefit is estimated based upon your earnings upon termination of employment assuming that such earnings will continue until your normal retirement date (with modest percentage increases each year). You will have the opportunity to produce a complete record of your past earnings covered by Social Security which can be used to make a more accurate estimate of your Social Security benefit. You may present this record of earnings at any time within 90 days following the date you are notified of your vested benefit. If you do not provide your actual record of covered earnings during this time period, the estimate will be presumed correct and the calculation of your pension will become final. If use of your actual earnings record would result in a lower retirement benefit than use of estimated earnings, your final benefit will be calculated with estimated earnings. You may choose to have your monthly payments begin as early as age 55, but in a reduced amount. This reduction is calculated the same as early retirement reductions for active employees (see page 5).

If you are not vested when you leave the Company

before retirement, you will not give any benefit from the Plan.

benefit, unless you choose another form of payment before you retire.

## WHAT ARE THE DIFFERENT WAYS MY BENEFIT CAN BE PAID?

For various personal reasons, you may prefer to receive your benefit in some form other than the 50% survivor benefit if you are married, or the life only benefit if you are not married. If you want your benefit paid to you in a different way, you can choose one of the benefits described below. You may indicate your choice in writing (on a form you can get from your Human Resources Department) at any time before you retire. However, if you choose an optional payment method within 90 days before you retire, you may be required to give evidence of your good health or your beneficiary's good health which is satisfactory to the Company before approval of the payment selected. If you are married and wish to elect certain of the options described below, both you and your spouse will be required to sign the Surviving Spouse Declination Form before a notary public. This Form can be obtained from your Human Resources Department.

### Life Only Benefit

This is the benefit normally paid to an employee who is not married at retirement. It provides a monthly payment to you for the rest of your life. Upon your death, no payments are continued to a beneficiary, regardless of how few payments you received before your death. If you are married, you may want a life only benefit. However, no benefits would be payable to your spouse or any other beneficiary after your death.

### Ten Year Certain Benefit

Under this method, you will receive a benefit for the rest of your life; however, your benefit payments are guaranteed for a minimum of 10 years. That is, if you die within 10 years after you retire, your beneficiary would continue to receive the same benefit you were getting for the balance of 10 years. If you make this choice, your life only benefit will be reduced to provide this guaranteed benefit.

### 100%, 75% or 50% Survivor Benefit

This form of benefit payment provides a reduced benefit during your lifetime with a percentage of your retirement benefit continued to your surviving spouse or other beneficiary for the rest of his or her lifetime. You can choose to have 100%, 75% or 50% of your reduced benefit paid to your surviving spouse or other beneficiary after your death. The higher the survivor benefit chosen, the greater the reduction in your lifetime benefit. As explained previously, if you are married on your actual retirement date, it is automatically paid according to the 50% survivor

### Social Security Leveling Benefit

This type of payment method may be available if you start receiving benefits from the Plan before reaching age 62, the age Social Security retirement benefits are first available. Under this method, your retirement benefit (regardless of the benefit option you choose) will be increased before you reach age 62 and reduced after you reach age 62 so that your total monthly retirement income (from both the Plan and Social Security) will not change substantially after you retire.

### Payments of Small Benefits

If the actuarial equivalent of your benefit on your date of retirement is $3,500 or less, the Company may distribute your benefit to you or your beneficiary in one lump sum rather than in the form of an annuity.

These distributions often qualify to be rolled over to an IRA or another qualified plan tax free, or may qualify for some other favorable income tax treatment.

## WHAT IF I SHOULD DIE?

### Before Retirement

A preretirement survivor annuity (PSA) will be paid to your spouse in the event your death occurs after you are vested, regardless of age and regardless of whether you are actively employed at death, unless this option has been waived in writing by you and your spouse.

Your surviving spouse will receive one-half of the reduced monthly benefit you would have received if you had retired as of the day of your death with a 50% survivor benefit in effect.

Your eligibility for this benefit stops automatically if your spouse dies before you do, if you are divorced, if you retire or if you terminate your employment.

### After Retirement

Unless you choose otherwise with your spouse's consent, your surviving spouse will automatically get an annuity benefit after your death of one-half of your benefit. This benefit is your spouse's share of the 50% survivor benefit (as explained on page 5), and it would be paid to your spouse for the rest of his or her life.

### Can Anyone Else Reach My Benefits?

Generally, your accrued benefits under the Plan cannot be assigned or transferred to another party. This means you cannot voluntarily transfer your rights to creditors or others, and they cannot obtain any of your benefits through a bankruptcy suit or other legal action (although there are certain limited exceptions to this general rule). As of August 23, 1984, federal law created a statutory exception to this rule. Under

certain circumstances, a dome. relations order can transfer all or a portion of your rights to benefits to your spouse, ex-spouse, child or other dependent.

## WHAT CAN I EXPECT FROM SOCIAL SECURITY?

During your work career, both you and the Company pay an equal amout of tax on your behalf to the Social Security program. You may receive benefits from Social Security in addition to the benefit you will get from the Plan. Social Security benefits may be payable in the event of your death or disability as well as retirement. With the amendments made to the Social Security Act in recent years, these benefits have become a substantial part of most people's total retirement benefits.

This section of your pension booklet is meant to give you a brief introduction to Social Security. Your actual Social Security benefits are based on certain of your earnings subject to Social Security tax. you may go to your local Social Security office for a record of your past wages that were subject to Social Security tax. You can also request from them a booklet which explains in detail how to figure your Social Security benefits.

### Retirement Benefits

You may be entitled to receive unreduced Social Security monthly income benefits when you reach age 65. When your spouse reaches age 65, he or she is entitled to a benefit equal to one-half of your age 65 benefit, or, if greater, benefit based on his or her own work record. Social Security retirement benefits are payable as early as age 62, but at a permanently reduced amount.

### Disability Benefits

If you become disabled, you and your family may be entitled to Social Security disability benefits. They would become payable after you have been totally disabled for 5 full calendar months. Your spouse may be entitled to additional benefits from Social Security if he or she is at least age 62 or is caring for a child under age 18 who is eligible for children's Social Security benefits. Additional children's Social Security benefits may be payable if you have any dependent children under age 18 (under age 22 if they are full-time students).

### Death Benefits

Your family may also be entitled to Social Security benefits after your death. Your surviving spouse may be entitled to benefits from Social Security if he or she is at least age 60. Your spouse may be entitled to additional benefits before reaching age 60 if caring for a child under age 18 who is eligible for children's Social Security benefits. Additional children's Social

Security benefit may be payable if you die with dependent children under age 18 (under age 22 if they are full-time students.)

## CAN I LOSE ANY OF MY BENEFITS FROM THIS PLAN? IF SO, CAN I GET THEM BACK?

You should be aware that you can lose your benefits under this Plan. You may also be able to regain some of these lost benefits.

### Break In Service

If you have a break in service before completing 10 years of vesting service with the Company, you will lose whatever benefit service and vesting service you have in the Plan.

If you are rehired after a break in service, your prior benefit service and vesting service will be restored if:

- your break in service occurred on or after January 1, 1975 (January 1, 1977, if you are a former member of the Pension Plan for Hourly Employees), and
- You work 1,000 hours or more in a calendar year after your break in service.

### Reemployment After Retirement

If you are reemployed by the Company after you retire, you will not receive a monthly benefit for any calendar month for which you are paid for more than 40 hours. When you stop working, your retirement benefits will begin again and will take into account any additional earnings and service, as well as any retirement payments already made to you before you were reemployed.

### Employees Who Transfer From The Plan

If you transfer directly from this Plan to a job classification not covered by the Plan or to an affiliate not covered by the Plan, you will stop getting credit for benefit service under this Plan. Any future benefits payable from the Plan will not be less than those based on your benefit service, final average earnings and Social Security benefits determined at time of transfer.

## HOW IS THIS PLAN ADMINISTERED?

The Plan is a defined benefit pension plan. The Company is the Plan Administrator. Consequently, the Plan may only be altered, amended, or revoked by action of the Company's Board of Directors. The day to day administration of the Plan is carried out by the Company's Human Resources Department. The Board of Directors also appoints the Employee Benefits Committee which is responsible for hearing appeals of benefit determinations as more fully explained below.

## HOW DO I FILE A CLAIM FOR BENEFITS UNDER MY PLAN?

If you wish to file a claim for benefits under the Plan, the Human Resources Department will supply you with all the forms necessary for the proper filing of your claim.

## IF A CLAIM IS DENIED, HOW DO I FILE AN APPEAL?

If you make a claim for benefits under the Plan, and all or part of it is denied, you may appeal this determination to the Employee Benefits Committee. The Committee will notify you by certified mail of the reasons for the denial, with specific reference to the appropriate Plan provisions, and a description of any additional information which is necessary (and the reasons why that information is necessary). The Committee will also tell you how to appeal this decision.

Within 60 days after the Committee's determination letter is mailed, you or your authorized representative may appeal the decision by requesting in writing, by certified or registered mail, a review of the decision. You and your representative will be given the opportunity to appear before the Committee. In addition, you may review pertinent documents and submit issues and comments in writing to the Committee.

Within 50 days after your appearance before the Committee, the Committee will notify you by certified mail of its final decision and the specific reasons for its decision.

## IS THERE ANYTHING ELSE I SHOULD KNOW ABOUT MY PLAN?

### Continuation of the Plan

The Company fully intends to continue the Plan indefinitely. However, to protect against any unforeseen situations, the Company does reserve the right to change the Plan and, if necessary, discontinue it at any time. Amendments will be made by appropriate actions of the Board. No amendment shall have the effect of reducing the nonforfeitable percentage (determined as of the later of the date the amendment is adopted or effective) of the right of a Member to his accrued retirement benefit. If the Plan is terminated, the assets of the Fund will be allocated, subject to provision for the expense of administration of liquidation, for the following pension purposes and in the following manner and order, to the extent of the sufficiency of such assets:

- First, equally among benefits of individuals in the following two (2) subcategories:
  1. In the case of benefits in pay status three (3) years prior to termination (at the lowest pay level in period and at the lowest benefit level under the Plan during the five (5) years prior to termination) and
  2. In the case of benefits which would have been in pay status three (3) years prior to termination had the Member been retired and his benefits commenced then, (at the lowest benefit level under the Plan during the five (5) year period prior to termination).
- Second, among all other benefits (if any) of individuals under the Plan guaranteed under the termination insurance provisions of the Employee Retirement Income Security Act of 1974, determined without regard to Sections 4022 (b) (5) and 4022 (b) (6) (relating to benefits of owner-employees),
- Third, among all other non-forfeitable (i.e., uninsured, vested) benefits under the Plan, and
- Fourth, among all other benefits under the Plan.

If the assets of the Fund available for allocation under any priority category described above are insufficient to satisfy, in full, the benefits of all individuals in that priority category, the assets will be allocated pro rata among such individuals on the basis of the present value of their respective benefits as of the date of the Plan's termination. To the extent funded, the rights of all Members to benefits accrued as of the date of the Plan's termination or partial termination are non-forfeitable. Any residual assets of the Plan remaining after the above allocation will be distributed to the Employer provided all liabilities of the Plan to Members and their beneficiaries have been satisfied.

If the Plan is merged into, or consolidated with, any other plan, or if the Plan's assets or liabilities are transferred to any other plan, each member will be entitled to receive a benefit immediately after the merger, consolidation, or transfer (if the Plan was then terminated) which shall be equal to, or greater than, the benefit he would have received had the Plan been terminated immediately before the merger, consolidation or transfer.

### Plan Documents

The description of the Plan summarizes the official Plan documents. We have tried to write this summary in clear, understandable and informal language. However, you should refer to the official Plan documents for more extensive information about your benefits. In the event of any conflict between the information we have summarized here (or elsewhere) and the official Plan documents, the official Plan documents will govern.

### Summary Annual Report and Plan Changes

You will receive a summary of the annual report of the Plan once each year at no charge. As modifications to the Plan are made, you will be notified.

9

## Assignment of Benefits

For the protection of your interests and those of your dependents, your benefits under the Plan cannot be assigned and, to the extent permitted by law, are not subject to garnishment or attachment.

## Fiscal Year of the Plan

The Plan's Fiscal Year is the calendar year January 1 through December 31.

Employee Number—04-2486332

Plan Number—001

# OTHER IMPORTANT NAMES, ADDRESSES AND INFORMATION

## PLAN SPONSOR

Northern Telecom Inc.
Northern Telecom Plaza
200 Athens Way
Nashville, TN 37228-1803

## PLAN ADMINISTRATOR

Northern Telecom Inc. is the Plan Administrator as well as the agent for legal service. Service of legal process may be made on Northern Telecom Inc. or the Plan Trustee. Any questions you have about the Plan may be addressed to the Company as follows:

Northern Telecom Inc. Retirement Plan for Employees
Northern Telecom Inc.
Northern Telecom Plaza
200 Athens Way
Nashville, TN 37228-1803
Phone: (615) 734-4000

## Plan Trustee

The Pension Fund is maintained by the Plan Trustee:

The Chase Manhattan Bank, N.A.
Trust Department
1211 Avenue of the Americas
New York, New York 10036

# PENSION BENEFIT GUARANTY CORPORATION

Benefits under this Plan are insured by the Pension Benefit Guaranty Corporation (PBGC) if the Plan is terminated. Generally, the PBGC guarantees most vested normal retirement age benefits, early retirement benefits, and certain disability and survivor's pension. However, PBGC does not guarantee all types of benefits under covered plans, and the amount of benefit protection is subject to certain limitations.

The PBGC guarantees vested benefits at the level in effect on the date of plan termination. However, if a plan has been in effect less than five years before it terminates, or if benefits have been increased within the five years before plan termination, the whole amount of the plan's vested benefits or the benefit increase may not be guaranteed. In addition, there is a ceiling on the amount of monthly benefit that PBGC guarantees, which is adjusted periodically.

For more information on the PBGC insurance protection and its limitations, ask your Plan Administrator or the PBGC. Inquiries to the PBGC should be addressed to the Office of Communications, PBGC, 2020 K Street, N.W., Washington, D.C. 20006. The PBGC Office of Communications may also be reached by calling (202) 254-4817. (This is not a toll-free number).

## Your Rights Under the Employee Retirement Income Security Act of 1974

The Employee Retirement Income Security Act of 1974 (ERISA) contains certain requirements concerning the disclosure of plan information to all plan members and also to plan beneficiaries who are currently receiving plan benefits. We have made sure that the description of your Plan contains all the information required by law to be included in a summary of your plan benefits.

This section of your booklet contains a statement of the rights granted to plan members by ERISA. Some of these rights have already been discussed in other sections of your booklet. They are listed here so that you will be able to read about all of them at once.

As a member of the Plan, you are entitled to:
- Examine, without charge, at the Plan administrator's office and at your Human Resources Department, copies of all plan documents including those filed by the plan with the U.S. Department of Labor, such as detailed annual reports and plan descriptions.
- Obtain copies of all plan documents and other plan information upon written request to the plan administrator. The administrator may make a reasonable charge for the copies.
- Receive a summary of the plan's annual financial report. The plan administrator is required by law to furnish each participant with a copy of this summary annual report.
- Obtain a statement telling you whether you have a right to receive this retirement benefit at normal retirement age (age 65) and if so, what your benefits would be at normal retirement age if you stop working under the plan now. If you do not have a right to a retirement benefit, the statement will tell you how many more years you

have to work to get a rig    o a retirement benefit. This statement must be requested in writing and is not required to be given more than once a year. The plan must provide the statement free of charge.

In addition to creating rights for plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiares.

No one, including your employer, or any other person may fire you or otherwise discriminate against you in any way to prevent you from obtaining a plan benefit or exercising your rights under ERISA.

If your claim for a plan benefit is denied in whole or in part, you must receive a written explanation of the reason for the denial. You have the right to have your claim reviewed.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request materials from the plan and do not receive them within 30 days, you may file suit in federal court. In such a case, the court may require the plan administrator to provide the materials and pay up to $100 a day until you receive the materials, unless the ma-

terials were not    because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. If it should happen that plan fiduciaries misuse the plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court.

The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

If you have any questions about your Plan, you should contact your Human Resources Department. If you have any questions about this statement or about your rights under ERISA, you should contact the nearest Area Office of the U.S. Labor-Management Services Administration, Department of Labor.

Gary R. Donahee
Chairman, Employee Benefits Committee

11

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| | ) |
| Nortel Networks Inc., *et al.*,[1] | ) Case No. 09-10138 (KG) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) **Re: Docket No. 8067** |

## ORDER GRANTING OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 363 AND 1108 AUTHORIZING THE DEBTORS TO TERMINATE THE DEBTORS' LONG-TERM DISABILITY PLANS AND THE EMPLOYMENT OF THE LTD EMPLOYEES

Upon consideration of the Objection to entry of an order authorizing the Debtors to terminate the Debtors' Long-Term Disability Plans and the employment of the LTD employees (the "Objection") and any responses thereto; and it appearing that sufficient notice of the Objection has been given; and in good cause having been shown, it is hereby

ORDERED that the Objection is granted.

Dated: _____, 2013
      Wilmington, Delaware

                                        _____
                                        HONORABLE KEVIN GROSS
                                        CHIEF UNITED STATES BANKRUPTCY JUDGE

---

[1] The Debtors, along with the last four digits of each Debtors' federal tax identification number, are: Nortel Networks Inc (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc (0358), Northern Telecom International Inc (6286), Nortel Networks Cable Solutions Inc. (0657) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

# CHADWICK AND ASSOCIATES, P.A.

### Attorneys at Law
9530 FOXFORD ROAD
CHANHASSEN, MN 55317
TELEPHONE: 952-445-2425
FACSIMILE: 952-445-2425
E-MAIL: CHADWICKASSOCIATESPA@MCHSI.COM

October 17, 2012

David D. Bird, Clerk of Court
**United States Bankruptcy Court**
District of Delaware
824 North Market Street, 3rd Floor
Wilmington, DE 19801

Robert J. Ryan
**Cleary Gottlieb Steen & Hamilton LLP**
One Liberty Plaza
New York, NY 10006

Rafael X. Zahralddin-Aravena, Esq.
**Elliott Greenleaf**
1105 North Market Street, Suite 1700
Wilmington, DE 19801

Re: Nortel Networks Inc. Bankruptcy, Chapter 11
    Case No: 09-10138 (KG)
    Chae S. Livingston Roob, LTD Participant

Gentlemen:

Attached hereto for filing, and as service, is LTD participant Chae S. Roob's Objection to Debtors' Motion for Entry of an Order -- Authorizing the Debtors to Terminate the Debtors' Long-Term Disability Plans and the Employment of the LTD, with Exhibits and proposed Order.

Sincerely,

CHADWICK AND ASSOCIATES, P.A

Richard J. Chadwick, in behalf of Chae S. Roob

cc:    Chae S. Livingston Roob