IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Nortel Networks Inc., *et al.*,[1] | ) | Case No. 09-10138 (KG) |
|  | ) |  |
| Debtors. | ) | Jointly Administrated |
|  | ) |  |
|  | ) | Objection Deadline: Oct. 25, 2012 at 10 a.m. |
|  | ) | Hearing Date:      Feb. 13, 2012 at 10 a.m. |
|  | ) | RE:                D.I. # 8067 |

## JANETTE M. HEAD OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 363 AND 1108 AUTHORIZING THE DEBTORS TO TERMINATE THE DEBTORS' LONG-TERM DISABILITY PLANS AND THE EMPLOYMENT OF THE LTD EMPLOYEES

Janette M. Head, of the above-captioned debtors and debtors-in-possession (the "Debtors"), hereby submits this Objection to Debtors' Motion for entry of an order authorizing the Debtors to terminate the Debtors' Long-Term Disability (LTD) Plans and the employment of the LTD employees. In support of this Objection, Janette M. Head respectfully represents as follows:

---

[1] The Debtors, along with the last four digits of each Debtors' federal tax identification number, are: Nortel Networks Inc (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc (0358), Northern Telecom International Inc (6286), Nortel Networks Cable Solutions Inc. (0657) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

## BACKGROUND

1) On February 14, 1983, I was hired by the Debtor in Nashville, TN, as a financial analyst in their Northern Telecom Finance Corporation (NTFC) division.
    a. During my career advancement search in Nashville, I was offered several opportunities with other solid companies; my comparative analysis of the Debtor to those companies included salaries, upward mobility, and benefits packages. It was clear that the Debtor stood out as the leader in all cases, and I felt fortunate to be given the opportunity to contribute to their continued success.

2) When I was hired, the Debtor benefits package included the best Long Term Disability (LTD) Insurance available on the market, with a maximum benefit of 70% of salary upon date of disability, to be paid until age 65. This is similar to fire insurance on my house; it is there and available until the unfortunate event occurs.
    a. I signed up for 70% of salary insurance coverage offered with the satisfaction that there would be no financial worries as long as I was employed with the Debtor. At the time, I had no notion that I should pursue outside LTD coverage. No reference was made to any risk involved in counting on the coverage to be as described, ie until my retirement at age 65.

3) During my active employment with the Debtor, I worked hard and was honored with outstanding annual reviews and promotions. Positions I held in Nashville, TN, Raleigh, NC, and Dallas, TX, include Budget Manager – NTFC, Manager - Internal Audit, Controller - Southwest Region, International Controller, and Director of International Marketing Operations - Northern Telecom World Trade. During that time, I also passed the Certified Public Accountant exam to enhance my fiduciary standards and ethics in my various positions in Audit, Control, and Marketing with the Debtor.

4) In March, 1991, I was diagnosed with Chronic Fatigue Immune Dysfunction Syndrome (CFIDS), also known as Chronic Fatigue Syndrome (CFS), and Fibromyalgia.
    a. According to the "Centers for Disease Control and Prevention" (CDC),the case definition for CFS and Fibromyalgia include extreme exhaustion and sickness, problems with sleep, difficulties with memory and concentration, persistent muscle pain

(Fibromyalgia), joint pain, headache, tender lymph nodes in the neck or armpit, and sore throat. According to the CFIDS Association of America, other symptoms include short term memory loss, loss of up to 45 IQ points, and sudden onset. I have experienced all of the symptoms referenced.

5) In January, 1993, after two unsuccessful returns to work, I was placed on Short Term Disability (STD) for six (6) months and eventually LTD in July, 1993. Throughout the STD and LTD process, I complied with all NTI policies including paperwork, letters from physicians, and application for Social Security Disability (SSD) benefits. Other than providing periodic requested physician reports confirming my condition, I had no direct contact with Cigna, the insurance carrier at the time. Rather, I worked directly with Human Resources personnel in Dallas, TX, the Health Services personnel in Raleigh, NC, and my direct supervisors at both locations.

   a. In dealing with this illness, one thing that saved me from totally giving up was that I wouldn't have to worry about finances. I was so grateful I'd chosen a company with such comprehensive LTD Plan Insurance and that I'd purchased the extended benefit to support 70% of my salary. There was never a time when I was made aware of possible impact to my benefits such as a change in insurance, whether through an insurance carrier or self-insurance. Correspondence in late 1999 indicated a change of insurance from Cigna to Prudential, but there was no mention as to any change in coverage or terms.

   b. From the start of my diagnosis with CFIDS, I performed extensive research to determine the best possible care available in the country. My research led me to Dr. Charles Lapp at the Cheney Clinic in Charlotte, NC. The clinic is named for Paul Cheney, one of the physicians who originally discovered the existence and validity of CFIDS as a legitimate illness. During 1997 I voluntarily participated in an FDA drug trial in Charlotte, NC. We personally incurred all expenses associated with the trial including the drug (Ampligen) and living expenses to relocate to Charlotte, NC for eight months. I did everything humanly possible to get well so I could return to work.

6) My legal name when hired in February, 1983 was Janette M. Jerkens; in 1987, my name was legally changed to Janette S. Markes; and in July, 1993, my name changed to and remains Janette M. Head.

7) The bottom line to this whole situation is that for as long as I can remember, I've been covered under Long Term Disability Insurance. Everyone involved in the process has contributed to this belief, up to and including Prudential as of October 12, 2012, when they wrote a letter confirming my benefits are payable through age 65, August 22, 2020. See <u>Exhibit A</u> for the letter from Prudential verifying my coverage to age 65.

## **RELIEF REQUESTED**

8) I request an Objection to the Debtors' motion to Terminate the LTD Plans and LTD Employees [DI#8067].

9) I request that the Court Compel the Debtors to compensate me, Janette M. Head in full for my purchased LTD benefits projected to age 65; Total Claim being $577,308.22. See <u>Exhibit B</u> for the Proof of Claim (POC) calculation and supporting documents.

10) I request an Order that there is no interruption in disbursement of LTD benefit (or compensation for same) to me, Janette M. Head.

11) Note: A possible alternative could be to provide an independent trust to continue payments and medical benefits to age 65. The trustee would be monitored by a committee of LTDers until all LTDers reach retirement at age 65. This idea would require research as to money required to run the group and other administrative details.

## **BASIS FOR RELIEF**

12) To provide adequate documentation for my "Basis for Relief" there are documents I recall having that are not currently available. I submitted a "Fact Discovery Request" to the Debtor who replied with an objection. Accordingly, within the following points, I reference some exhibits still "pending discovery" from the Debtor for items not yet received through Discovery. See <u>Exhibit C</u> for fact discovery process documentation.

13) **POINT # 1  Coverage through Age 65:** When hired in February, 1983, one of the most important benefits to me was Disability Insurance coverage. I chose the Debtor as my employer among a group of candidates due in part to the benefits package they offered, including Long Term Disability (LTD). See <u>Exhibit D</u> for "Pending Discovery" from the Debtor, referring to

the 1983 Summary Benefits Plan. I've maintained a certain level of self-sufficiency my entire life; I relied on LTD insurance to be available if and when I ever needed this benefit. Upon becoming total disabled in 1993, of all the concerns associated with having a debilitating illness, financial stability (except for the 30% loss of salary) was not among them. I worked hard for ten (10) years to personally advance and keep the Debtor competitive. Based on written company policy, the Summary Plan Description (SPD) that governs my disability is for 1993, the year I became totally disabled. I have met the requirements laid out in the Plan with regard to eligibility, timing, qualification, and benefit payable through age 65. See Exhibit E for the 1993 SPD.

14) The following paraphrases are provided from the 1993 SPD:

15) P.1. 1st Paragraph "Eligibility and Effective Date" For Long Term Disability Benefits, your coverage begins on your first day of enrollment. (I purchased the extended maximum benefit of 70% of salary for LTD insurance.)

16) P.7. 1st Paragraph "Long Term Disability Benefits Monthly Income Benefits are payable under LTD after you've been totally disabled for six (6) months. (The onset of my illness and final STD was January 6, 1993, with LTD starting July 6, 1993.)

17) P.7. 2nd Paragraph "Total Disability You are considered totally disabled if you are unable to work because of a disease or injury." (Documentation was provided from medical specialists after exhausting all possible tests to rule out other diseases, such as Multiple Sclerosis, Polio, and other immune dysfunction disorders.)

18) P.7. 3rd Paragraph For the first twenty-four (24) months, after completion of the first six (6) month wait, you're considered disabled if unable to work at what you normally perform. (As in P.7. 2nd Paragraph, Documentation was provided from medical specialists.)

19) P. 7. 4th Paragraph After a twenty four (24) month waiting period, you're disabled if you can't perform any reasonable occupation. (I was unable to work at all, and was bedridden 70% to 80% of the time.)

20) P. 7. 5th Paragraph "Monthly Income Benefit The Plan will pay 70% of your earnings, subject to a maximum, to be reduced by any "other income benefits".

21) P7. 6th Paragraph "When Benefits Begin  Monthly benefits will start as soon as you complete the first six (6) month waiting period and furnish written proof of your disability.

22) P. 7. 7th Paragraph "How Long Benefits are Paid  You will continue to receive Monthly Income Benefits while you remain totally disabled, up to the end of the Maximum Benefit Period shown."

23) P. 8. 1st Paragraph "Maximum Benefit Period for any one period of total disability:"

| Age At Commencement of Disability | Your Maximum Benefit Period |
|---|---|
| "Under age 61" | "To Age 65 but not less the 60 months" |
| Age 61 | 60 months |
| Age 62 | 60 months |
| Age 63 | 60 months |
| Age 64 | 60 months |
| Age 65 | To Age 70 |
| Age 66 | To Age 70 |
| Age 67 | To Age 70 |
| Age 68 | To Age 70 |
| Age 69-74 | 12 months |
| Age 75 and over | 6 months |

(I am "Under age 61" for this benefit calculation.)

24) P. 8 4th Paragraph "Period of Total Disability"  Your benefits period during total disability will end when: you cease to be totally disabled or die, you start working at your given occupation, and you cease to be under the care of a physician

25) Not only did the Debtor not apprise me as to any risk in their disability insurance coverage, there was no incentive for me to consider researching additional disability insurance on the open market. As with SSD benefits, any "Other Income Benefits" received are to be reimbursed to the Debtor; accordingly, any incremental LTD insurance coverage would be reimbursed should disability occur. My SSD reimbursement check was made payable to the Debtor, and mailed to Cigna at Cigna's request.

26) **POINT # 2 Authenticity of Insurance Coverage:** During the entire time of Long Term Disability, I believed that the payments I received were the result of an insurance policy originally with Cigna, and then Prudential as of 2000, as the Debtor had consistently

represented in benefit documents. Not once was the concept of self-insurance provided. There was never any question as to the status of the LTD coverage to age 65.

27) Correspondence from Cigna over the course of my disability was on printed stationery, representing them as "Cigna Insurance Company", with the Policyholder as "Northern Telecom Inc.", and the Insured as "Janette M Head". See <u>Exhibit F</u> for correspondence from Cigna. There is reference to a Cigna Policy #2059005, but I have not seen a copy of said policy. See <u>Exhibit G</u> "Pending Discovery" from the Debtor, referring to the Cigna Policy. During the time I was actively employed, my payroll deductions included the costs of extended LTD benefits from 1983 – 1993. See <u>Exhibit H</u> "Pending Discovery" from the Debtor, referring to pay stubs showing payroll deductions for LTD insurance premiums.

28) At all times throughout my disability periods my good faith assumption was that payments I received were claims against the policy. The notification that there would be a change from Cigna to Prudential was general, without details. Also, pay stubs from the end of 1999 and beginning 2000 only show a difference with the payer. See <u>Exhibit I</u> for pay stubs from December, 1999 and January, 2000.

29) **POINT # 3 Mortgage Approvals based on coverage through age 65:** While disabled, due to my spouse's business we moved three (3) times, buying a home in each location. When we applied for a mortgage for the homes, we completed application forms as required. In all three (3) cases, I included my disability income as revenue which was verified by the lenders to be counted on until I reached age 65. The mortgages were approved. See <u>Exhibit J</u> for mortgage approval paperwork.

30) In conversations with the mortgage officer from the Bedford, NH purchase, I was told that according to Federal National Mortgage Association regulations, the mortgage lender was required to retain all documents used in verifying income flow for approval purposes. Unfortunately, due to the mortgage company changing hands four (4) times since the loan origination, the records are no longer available. See <u>Exhibit K</u> "Pending Discovery" from the "Debtor", referring to complete mortgage approval documents for all four home procurements.

31) **POINT # 4  Lack of Coordination and Support from the "Debtor":** Throughout the process of applying for and being awarded Disability benefits, I was concerned and nervous with what felt like lack of coordination and support between Human Resources (HR) departments of the Debtor and Cigna.

32) When I originally went out on disability in January, 1993, my physician and I completed all forms required by Cigna. When I was ultimately approved for LTD, I again completed all forms required and was informed by the nurse employed by the Debtor that I'd been approved. I never heard directly from Cigna in the form of an "Approval Letter". See Exhibit L for "Pending Discovery" from the Debtor, referring to the original LTD approval letter from Cigna.

33) During the early period of my disability, my supervisors contacted me at home regularly, causing me excessive stress and concern. Neurological damage from my illness allows for limited concentration and causes short term memory loss within any time period. Getting better and coping with travel and expenses associated with physicians and clinics monopolized my life. It never occurred to me that the actual soundness of my insurance coverage could ever be compromised, nor did I have time or energy to think about it.

34) Upon qualifying for LTD, still living in Raleigh, NC, I was required to apply for SSD benefits, to be reimbursed upon approval. In April, 1993, at Cigna's urging, I started the process to apply for SSD. With my first application, SSD required that I be examined by a physician of their choice to provide a report. Also submitted to SSD were reports from my current physician in Raleigh, NC along with the specialist in Charlotte, NC who was treating me at the time. The first application for SSD, submitted in June, 1993, was denied in September, 1993.

35) With my second application for SSD benefits, I was again required to be examined by a psychologist of their choice to provide a report, along with the previously submitted physician and doctor reports. The second application, submitted in October, 1993, was again denied in February, 1994.

36) In February, 1994, I appealed the two (2) previous denials, and was required to appear before an Administrative Law Judge (ALJ). During this time, we relocated to Dallas, TX. In March, 1994, Cigna contacted me regarding my application for SSD benefits. They assigned

an attorney to me for help with the complicated process. See <u>Exhibit M</u> for the letter from Cigna regarding appointment of an attorney. Cigna personnel were surprised that I'd gone this far into the process without legal representation; they surmised that there must have been a disconnect in the Raleigh, NC HR and Legal Departments. Another repercussion to the Raleigh, NC departmental mix-ups, was that the reports from the physicians I'd been examined by at their request in Raleigh, NC had gone missing. As a result of the missing files, in February, 1995, I was required to be examined by three new physicians and psychologists in Dallas, TX for submission to the ALJ in the upcoming hearing.

37) With the help from the attorney, I appeared before the ALJ in May, 1995, and received a "Notice of Favorable Decision". See <u>Exhibit B</u> for POC documentation for letter from ALJ. Cigna's first notice to me about the requirement to apply for SSA benefits was on April 13, 1993; the final decision was reached on May 24, 1995. I understand the complexity and back log in the SSD organization and associated ALJ courts, but I have to wonder if part of the two (2) year delay was due to lack of direction and organization between the Debtor and Cigna.

38) For year-end 1993, the final W2 received from the Debtor's corporate office was delayed. As per their letter in February, 1994, they were revising the data on the W2 forms previously submitted to me because they were "working closely with Cigna" to obtain the proper figures. See <u>Exhibit M</u> for letter from the Debtor regarding incorrect W2 submissions.

39) Due to my qualification for SSD benefits in 1995, I was placed on Medicare for my health insurance coverage. The Group Cigna coverage already in place was to remain the primary coverage, with Medicare to act as secondary. In October, 1996, I received a letter copy written by Cigna to Medicare Administration saying that effective August, 1993 Medicare should have been my primary insurance carrier. See <u>Exhibit M</u> for letter from Cigna to Medicare. In July, 1998, I received a letter from Allsup Inc. (Healthcare and Disability Reimbursement Services) saying they were conducting an audit of all health insurance claims from August 10, 1993 through the July 28, 1998. See <u>Exhibit M</u> for letter from Allsup. They stated they would be requesting a copy of all relevant medical claims for review and correction to Medicare and Cigna records. To my knowledge nothing further was done toward this goal nor had any of my health care providers heard of the issue. It appears that

they identified a possible serious and material discrepancy in the records, but ultimately did nothing to correct the problem.

40) **POINT # 5 Summation:** My spouse and I rely on my LTD benefits; if lost, the life change for us would be considerable. Our mortgage lenders relied on my share of household revenue to meet monthly mortgage payments and if we aren't fairly compensated by the Debtors we risk a lot including a negative credit rating and losing our home. For the past twelve (12) years, we've lived in a safe neighborhood with caring neighbors. While my spouse is working, he doesn't need to worry about me in his absence because of where we live. Any change to our housing status would be unsettling for our lives.

41) Per published financial reports, the Debtor made more for the sale of their patents than originally projected. Materially, the effect on their bottom line to satisfy the LTD claims appears to be feasible.

42) When I signed on with the Debtor in 1983, we had an agreement; they offered me LTD benefits through age 65 and I would work hard, be loyal, and commit to excellence. According to that agreement, I dedicated my career to the Debtor and did my part.

43) See Exhibit N for Order Granting Objection to the Debtors for signature.

## **EXHIBITS**

44) A) Letter from Prudential

B) Proof of Claim (POC)

C) Fact Discovery Process

D) Pending Discovery from the Debtor; Summary Plan Description (SPD), 1983

E) Summary Plan Description (SPD), 1993

F) Cigna Insurance Correspondence

G) Pending Discovery from the Debtor; Cigna Insurance Policy

H) Pending Discovery from the Debtor; Pay Stubs

I) Cigna to Prudential Transition

J) Mortgage Approval Documents

K) Pending Discovery from the Debtor; Mortgage Approval Documents

L) Pending Discovery from the Debtor; LTD Approval

M) Correspondence with the Debtor

    a. Attorney Assignment

    b. 1993 W2 Forms

    c. Cigna & Medicare Correspondence

    d. Allsup Inc. Letter

N) Order Granting Objection to Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363 and 1108 Authorizing the Debtors to Terminate the Debtors' Long-Term Disability Plans and the Employment of the LTD Employees

## NOTICE

45) Notice of this Objection has been provided to (a) counsel to the Debtors; (b) the United States Trustee for the District of Delaware; (c) counsel to the LTD 1102 Committee; and (d) all parties required to receive service under Rule 2002-1(b) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware through the Court's electronic filing system. Janette M. Head respectfully submits that, given the nature of the relief requested, no other notice of the relief requested herein need to be given.

**WHEREFORE**, Janette M. Head respectfully requests the entry of an Order, in the form attached:

1. Objection to the Debtors' motion to Terminate the LTD Plans and LTD Employees [DI#8067].

2. Compel the Debtors to compensate Janette M. Head in full for her purchased LTD benefits projected to age 65; Total Claim being $577,308.22. See Exhibit B

3. Order that there is no interruption in disbursement of LTD benefit (or compensation for same) to Janette M. Head.

Dated: October 22, 2012

*Janette M. Head* (signature)
Ms. Janette M. Head
16 Gleneagle Drive
Bedford, NH 03110
Telephone:   (603) 626-6938
Facsimile:    (603) 935-7571
Email: nette.head@headnetworks.com

*Appearing Pro Se*