

Claims Services Provided by

## The Prudential Insurance Company of America

**Sophie Costanza**
Disability Claim Manager

The Prudential Insurance Company of America
Disability Management Services
PO Box 13480
Philadelphia, PA 19176

Phone: (800) 842-1718  Ext: 87641
Fax: (877) 889-4685
**Website: www.prudential.com/mybenefits**

September 20, 2012

Roger G Carlsen
390 E Paseo Celestial
Sahuarita, AZ 85629

Claimant: Roger G Carlsen
Claim No.: ████████
Date of Birth: ████████
Control No./Br.: 39900 / 0B057

‖ılıılıılıllıılıllıllıl

Dear Mr. Carlsen:

We are writing to you to confirm that you are receiving Long Term Disability benefits under the Nortel Networks Inc. Group Policy with Prudential.

You are receiving $5,388.49 per month. This benefit will remain the same provided your income from other sources does not change. Your benefits will continue through ███, 2020, provided you remain totally disabled as defined by the Policy and continue to meet all other contractual requirements.

Sincerely,
*Sophie Costanza*
Sophie Costanza
Disability Claim Manager

**Claim Number :** ▓▓▓▓▓

**Claimant SSN:**  ### ###-7555

**Claimant Name :** CARLSEN

10/05/2012

Allsup ORS recovered the $29,423.12 net overpayment on 12/17/2008. Funds are in transit to Prudential.

ORS has completed the SSDB overpayment recovery in full.

Allsup ORS closed.

Thank you.

| | | | |
|---|---|---|---|
| **Reason:** | E-Claim status inquiry | **Direction:** | Incoming |
| **Call Date/Time:** | 09/25/2009 | **Contact Name:** | ROGER T CARLSEN |
| **Made/Rec'd by:** | Muhammad, Rafiah | | |

Subject: Ctrl# 039900 Claim: 10937433

Epiphany Call Doc ID: 4630176  Request Type: Claim Information
Caller Type: Employee
Caller Phone: 541-6888617   Ext.   Type: Home
Caller Address: 755 NOTTINGHAM AVE
        EUGENE, Oregon  97404
 United States
        Type: Home
Escalated: NO
Complaint: NO

| | | | |
|---|---|---|---|
| **Reason:** | E-Claim status inquiry | **Direction:** | Incoming |
| **Call Date/Time:** | 09/25/2009 | **Contact Name:** | ROGER T CARLSEN |
| **Made/Rec'd by:** | Muhammad, Rafiah | | |

Subject: Ctrl# 039900 Claim: 10937433

\*\*\* 9/25/09 6:02 PM by: Muhammad, Rafiah \*\*\*

ee called to find out if nortel going out of business will affect clm
adv ee no

Epiphany Call Doc ID: 4630182  Request Type: Claim Information
Caller Type: Emp
loyee
Caller Phone: 541-6888617   Ext.   Type: Home
Caller Address: 755 NOTTINGHAM AVE
        EUGENE, Oregon  97404  United States
        Type: Home
Escalated: NO
Complaint: NO

| | | | |
|---|---|---|---|
| **Reason:** | Other | **Direction:** | Incoming |

*Page 52*
Telephone Call Log
ClaimId = 10937433





555 Clyde Avenue
Mountain View, CA 94043

T 415-937-1370
F 415-937-1399
info@rapid-city.com
www.rapid-city.com

Roger Carlsen
755 Nottingham Ave
Eugene, OR 97404

Dear Roger,

Your qualifications are impressive and I believe you would make an excellent addition to the Rapid City team. I therefore would like to extend an offer of employment to you for the position Staff Hardware Engineer reporting to Van Hunter. In this position your monthly base salary will be $7,083.33.

One of the advantages of a startup is knowing your work will directly contribute to the success of the operation. To compensate you for your contribution, subject to the approval of the company's board of directors, and at a price to be determined by them, you will be offered an opportunity to purchase 25,000 shares of the company's common stock. So long as you stay employed by the company, this stock will vest at a rate of 25% after one year of employment, the remaining amount being equally vested over the next 36 months.

I think you'll enjoy the opportunity to be a part of a creative working environment. Benefits include, but are not limited to, medical, long-term disability, paid time off, stock options and eligibility to participate in the 401 (k) Retirement Savings Plan.

In your important position with Rapid City Communications, you may have direct or indirect access to a substantial amount of confidential material, data, trade secrets, know-how and information whether or not described as such. Accordingly, you will be required not to divulge in any manner any such material, data, trade secrets, know-how or information during or subsequent to your employment. In this respect, it is requested that you sign specific documents regarding conflict of interest and business ethics. These documents will be included in your orientation package. It is also requested that in connection with your acceptance of this offer letter, you execute an Employee Proprietary Information Agreement, enclosed.

So long as you remain employed by another company in our industry, Rapid City does not anticipate receiving any advice or assistance from you of any kind until after you have terminated your existing employment relationship and have actually began working at Rapid City. Rapid City understands that you have a duty of loyalty to your existing employer, and will do nothing to interfere with your obligations to your existing employer. By accepting this offer you agree to not, either prior to or during your employment with Rapid City, (i) improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity, or (ii) bring onto the premises of Rapid City any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

For purposes of federal immigration law, you will be required to provide documentary evidence of your identity and eligibility for employment in the United States. This documentation must be provided within three (3) business days of your data of hire. Rapid City Communications

Highly Confidential - LTD Committee Advisor Eyes Only

JSK121096.2

reaffirms its commitment to the concept and practice of equal opportunity and affirmative action in all aspects of employment.

Understand that this is not a contract for a fixed term. Also understand that employment with Rapid City Communications is "at will", which means that either you or the Company can terminate the employment relationship at any time, with or without prior notice and for any reason not prohibited by statute. The provisions stated above supersede all promises expressed or implied.

Please acknowledge this letter by signing below. The original offer letter and completed Employee Proprietary Information Agreement should be returned within seven (7) days.

This offer of employment is contingent upon verification of your application information and is in effect until 5:00 PM Friday, December 27th, 1996.

If you have any further questions or wish to discuss this offer, please contact me at (415) 937-1373.

Sincerely,

Rapid City Communications
Joseph S. Kennedy
Chief Executive Officer



X Accepted

Roger Carlson

12/12/96
Date

12/12/96
Start Date

Highly Confidential - LTD Committee Advisor Eyes Only



# Bay Networks U.S. Benefits Program
# 1999 Confirmation Statement

Carlsen, Roger G
755 Nottingham Ave
Eugene, OR 97404

Employee No:   24164
Date of Birth:   ▮▮▮▮▮
Submission Status:  No 1999 Changes Submitted

This statement reflects your 1999 benefit plans, coverage levels, and dependent and beneficiary information.  Please review this statement carefully.  The elections on this statement go into effect January 1, 1999.  Please keep this copy for your records. If you have any questions about this statement, contact the Benefits Help Line at 800-735-8023, ext. 57499 by 12/31/1998.

## Benefit Elections

| Benefit | Plan Selection | Coverage Level / Amount | Your Cost Per Pay Period |
|---|---|---|---|
| Medical | United HealthCare | You + 2 or More Dependents | $30.00 |
| Dental | MetLife | You + 2 or More Dependents | Included in Med. Cost |
| Vision | VSP | You + 2 or More Dependents | Included in Med. Cost |
| Basic Employee Life Insurance | 2x Annual Salary | $202,000 | Company Paid |
| Basic AD&D Insurance | 2x Annual Salary | $202,000 | Company Paid |
| Business Travel Accident Insurance | 4x Annual Salary | $404,000 | Company Paid |
| Supplemental Employee Life Insurance | Decline Coverage | $0 | $ 0.00 |
| Spouse Life Insurance | Decline Coverage | $0 | $ 0.00 |
| Child(ren) Life Insurance | Decline Coverage | $0 | $ 0.00 |
| Short-Term Disability | STD 70 Plan | 70% | Company Paid |
| Long-Term Disability | Pre-Tax | 60% | Company Paid |
| Health Care FSA | Decline Coverage | $  0.00 | $ 0.00 |
| Dependent Day Care FSA | Decline Coverage | $  0.00 | $ 0.00 |

**Total Cost Per Pay Period in 1999:**   $ 30.00

## Dependent Information

| Enrollee Name | Relationship | Gender | | Birth Date | Covered Under Medical/Vision? | Covered Under Dental? |
|---|---|---|---|---|---|---|
| Carlsen, Cindy L | Spouse | F | Redacted – Personal Information | ▮▮▮ | Yes | Yes |
| Carlsen, Donald L | Child | M | | ▮▮▮ | Yes | Yes |
| Carlsen, Tina M | Child | F | | ▮▮▮ | Yes | Yes |
| Carlsen, Michael G | Child | M | | ▮▮▮ | Yes | Yes |
| Carlsen, Christopher A | Child | M | | ▮▮▮ | Yes | Yes |

## Beneficiary Information

| Beneficiary Name | Relationship | SSN | Percent |
|---|---|---|---|
| Carlsen, Cindy L | Spouse | | 100.00 |

Redacted – Personal Information

*See Other Side for Additional Messages*

Highly Confidential - LTD Committee Advisor Eyes Only





# New Benefits for the 1990s

## Choice, Flexibility and Improvements Characterize Benefits Changes

Northern Telecom and BNR are pursuing Vision 2000 and excellence in everything we do. To achieve our objectives, we must provide total customer satisfaction, technological leadership, and marketing and service excellence. We also have to attract and retain the most talented and capable people available.

In meeting these goals, our human resources programs and systems are continuously reviewed to ensure they are appropriate to delivering solutions for employee and business needs. For example, last year we enhanced the Managing For Achievement (MFA) process. This year, we strengthened the Key Resource Development (KRD) program. Now we are instituting the new organization bands and compensation structure. In 1991, we are introducing a new strategy for employee benefits for the 1990s.

This benefits strategy is based on increasing choice and flexibility for you and your family and providing new benefits and improvements to existing programs, while improving business and cost-effectiveness. Often overlooked or not fully understood is the fact that employee and family benefits can significantly enhance your quality of life by sheltering you from high medical costs, providing low cost life insurance, and helping you plan for your retirement years.

We are launching a new benefits strategy for the decade of the '90s by introducing a number of enhancements over the next several years. The benefits are designed to add new services, hold down costs, and give you more options in selecting benefits which suit your individual needs.

We will implement the first of these changes during 1991. They include new options in **Medical Coverage**, a new program of **Vision Care**, enhancements to the **Employee Thrift/Savings Plan**, additional **Family Care** benefits, and new options for **Post-retirement** benefits.

This brochure has been mailed to your home to alert you and your family to these changes. Detailed information on each benefit will be provided at special meetings at work and through additional communications in your business newsletters. You will have the opportunity to sign up for these benefits at a later date.

Please look inside to learn more about the 1991 benefits enhancements. They are part of the company's effort to attract and retain people like you, the most talented and capable people available.



NNI-LTD-00005798

## Sheltering Employees and Families With Medical Protection

Protection from unexpected medical expenses: that is probably the number one benefits requirement of most employees. It is also the greatest challenge to the company. Medical costs are one of the fastest rising expenses in the United States. Currently, medical expenditures nationwide total some $600 billion. That's more than the government spends on the defense budget.

In 1989, the company's revenues increased some 13%. But medical care expenditures per employee jumped 24%. Over the last five years, this has been the pattern: medical costs growing at approximately twice the rate of revenues. And we expect this trend to be repeated in 1990. Clearly, something must be done to slow the growth of medical costs, which are shared by you and the company.

At the same time, the makeup of employees in the workforce is changing, making it harder to design one program which best fits all employees' needs.

As a result, in 1991 the company will offer you three different medical coverage options from which to choose. The three options are the Indemnity Plan, the 80% Plan, and the Managed Care Plan. Each of these options, as you can see on the adjoining chart, is priced differently to reflect, in part, the overall cost of the insurance, both to the company and to the employee and/or family. In addition, employees in some locations will continue to have the choice of a Health Maintenance Organization (HMO). Your Human Resources representative will tell you if this additional option is available to you.

The Indemnity Plan, administered by Prudential, is what most



people refer to when they talk about medical coverage. An employee incurs a medical expense, files a claim, and is reimbursed according to the provisions of the plan. Some expenses are reimbursed at 100%, others at 80%, and others according to the type of procedure. This type of plan has experienced very rapid growth in medical costs; accordingly, the cost for both the employee and the company has gone up.

The 80% Plan is a new type of indemnity plan, being introduced for the first time. In exchange for lower employee contributions and deductibles, the plan covers 80% of actual costs for physicians' charges, hospitalization, and other covered expenses.

The third option, Managed Care, is a new type of coverage. With Managed Care, you choose your physician and hospital from a network of qualified physicians and facilities with a history of providing quality care in a cost-effective manner. This program pays 100% of covered expenses, except for a $10 per office visit charge. Moreover, unlike HMOs, Managed Care will pay 70% of covered costs even if you choose a physician or hospital which is not on the network.

The cost to the employee and family has been kept deliberately low for Managed Care in-network coverage, based on our expectation of quality treatment and effective service. Maintaining this low employee/family cost for the future will depend upon the medical providers, the Managed Care administrators, and benefits recipients, who share responsibility for cost-effectiveness.

These options give you the opportunity to decide which factors are most important to you. The chart on the next page will help you compare the three options available to all employees in some key areas of interest.



# *Evaluating Your Medical Insurance Options**

| | Indemnity Plan | | Managed Care Plan | |
| --- | --- | --- | --- | --- |
| | | | In-Network | Out-of-Network |
| Employee Monthly Payment | $30 individual $85 family | $30 individual $85 family | $10 individual $35 family | |
| Deductible | $200 individual $400 family | $200 individual $400 family | (none) | $50 individual $150 family |
| Benefits | 100% in-hospital 80% other | 100% in-hospital 80% other | 100% of covered expenses ($10 copayment per visit to doctor's office) | 70% of covered expenses |
| Maximum Annual Employee Out-of-Pocket Expense | $1,500 | $1,500 | none | $3,000 |
| Choice of Physicians and Hospitals | Any physician, any hospital | Any physician, any hospital | Any physician and hospital on Managed Care list | Any physician or hospital |
| Claims Form | Employee must submit claims form | Employee must submit claims form | No claims form required | Employee must submit claims form |
| Conversion Coverage | Yes | Yes | Yes | No |

*An HMO also will be available in some locations.

NNI-LTD-00005800

## Building Your Retirement "Nest Egg"

Every person, regardless of age, should be planning for retirement. The average person can expect to live at least 15 to 20 years after reaching age 65, and improvements in health care and life habits can make those rich and rewarding years — if retirees have provided for themselves financially.

For financial retirement planning, you have three different



sources to consider: the government through Social Security, the company, and your own savings. All three should work together.

Both you and the company pay into Social Security. At Northern Telecom and BNR, the Retirement Plan provides income based on years of service at retirement; the company pays 100% of this benefit. And, your contributions to the Thrift/Savings Plan, combined with the company match, can add substantially to your financial well-being and retirement income, depending upon how you use these savings.

Your contributions to the Thrift/Savings Plan are in pre-tax

dollars. This means that no taxes are owed on your contribution until you withdraw the funds. And, as your funds accumulate, they continue to be untaxed as long as they are untouched. As a result, Thrift Savings contributions grow much faster than if they were placed in a taxable investment at the same rate.

More importantly, the company matches your contribution. The plan matches your contribution up to 6% of your compensation. Until now, the company match has been 50% of your contribution. In other words, if you contribute $1,000 to your Thrift Savings account, the company adds another $500.

Beginning in April 1991, however, the company will significantly increase that matching payment. The new rate at which your savings will be matched will now be 60%. That same $1,000 contribution mentioned above will now be matched by $600 from the company. If you take advantage of this opportunity over a normal 30-year career, you can add dramatically to your available income at retirement. When this income is added to Social Security benefits, the monthly retirement benefit, and your personal savings, you can hopefully enjoy greater financial security in retirement.



## Vision Care: New Benefit for Employees and Families

One area of medical care which the company has not previously covered is vision care — eye examinations, glasses, and contact lenses. After considering numerous employee suggestions, alternative programs, and the cost versus benefit of vision care compared to other benefits improvements, we will add vision care to the other benefits being offered for 1991.

Under the new plan, the company will cover 80% of charges for examinations, lenses, and frames. The new benefit is limited to one eye examination and one pair of lenses per employee (and family member, if family coverage is cho-



sen) every two years. When the coverage becomes effective in 1991, it will offer a maximum payment of $200 for a pair of glasses or contacts.

tion toward the coverage will be based on the employee's length of service. Employees who retire with 20 years or more will be eligible for full medical benefits.

For employees currently near retirement, the company will introduce a "Rule of 65." Under this rule, employees whose age and



- the option of a $10,000 death benefit plus long-term nursing home care at $70 per day for up to 5 years for you and your spouse.

The $35,000 benefit is an enhancement for most employees. Those employees who, under the existing plan, would be entitled to a greater benefit will maintain the additional coverage so that no employee will receive less than he or she would have been entitled to if retiring in 1990 under the current formula.

The new long-term care benefit is totally new and almost unprecedented in industry. It is a significant protection against catastrophic financial loss late in life.



## Continuing Benefits After Retirement

Another important aspect of retirement planning is health, medical, and life insurance and long-term care provisioning. Northern Telecom and BNR have historically provided medical care and life insurance for pensioners, and plan to continue to do so. New features, covered below, are being added as well, beginning in April 1991.

### Medical Coverage

The retiree medical plan currently provides that retiring employees will continue to have access to medical coverage. However, the company's contribu-

years of service add up to 65 or more (by the end of 1991) will also be eligible for full medical benefits even with less than 20 years of service.

### Long-Term Care Option

The company will introduce three new options for post-retirement insurance available to those who retire May 1, 1991, or later. Each of these new options is provided at no retiree cost. At the time of your retirement, you may choose:

- the option of a $35,000 death benefit;
- the option of a $10,000 death benefit plus long-term nursing home care up to $100 per day for up to 5 years for you; or

## Meeting Changing Family Needs

Factors that affect employee performance and peace of mind are not limited to the job. Family concerns can seriously affect an employee's ability to achieve his or her objectives. We recognize more and more the need to balance family and personal issues with the demands of your work life. The ability to deal with these concerns, whether a newborn or newly adopted baby, a sick or disabled child, or the needs of an infirm parent, is sometimes not just a day-to-day problem, but a full-time and energy-consuming necessity.

In April 1991, the company will introduce a new Family Care Leave policy. If you need to care



for a newborn or newly adopted child, or a seriously ill member of your immediate family, you may apply for Family Care Leave for up to a year. The company will continue your medical, dental, vision, and life insurance coverage throughout the leave, protecting you against serious financial loss from a medical problem. (Of course, you'll need to continue paying your monthly premiums.) Moreover, the company will guarantee reinstatement to your same position for Family Care Leave up to 60 days, and will return you to the same or a similar position from a longer leave, if possible.

This new policy gives you the ability to address special family needs without having to worry about your job or about losing your insurance coverage.

Adoption can be a way for a childless couple to share the joys of having a family and, at the same time, give opportunities to a baby who lacks a family. But the cost of adopting a child has risen substantially. Accordingly, in April the company is increasing its adoption expense reimbursement from $1,000 to $1,500.

The Family Care Leave policy is just one of the ways that the company tries to help employees outside of work. Another program designed to help you is the Flexible Spending Account (FSA). This program permits you to pay for medical insurance premiums, day care, or other child or elder dependent care expenses with pre-tax dollars. That means that you are not taxed on the dollars which pay for these expenses. In 1991, the company will incorporate your medical plan contributions into



the FSA unless you specifically choose otherwise. This will be done automatically for medical contributions; employees who wish to include the cost of other permissible services in their FSAs will need to fill out a form available from their benefits coordinators.

❦

## For the Future

The company relies entirely on employees like you. These benefits changes are part of a 1990's strategy to help keep you and your family healthy, productive, and happy, while holding down rising medical care costs. They are also intended to assist you in planning for future retirement and financial security, and to help protect you from medical and financial catastrophe late in life. Finally, they aim to help you in times of personal or family crisis. This benefits strategy for the '90s is one more example of our commitment to you, both now and in the future.

❦

*E*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------X
                                              :
In re                                         :        Chapter 11
                                              :
Nortel Networks Inc., et al.,¹                :        Case No. 09-10138 (KG)
                                              :
                        Debtors.              :        Jointly Administered
                                              :
                                              :
------------------------------------------------------------X
```

## DEBTORS' RESPONSES AND OBJECTIONS TO
## REQUEST FOR PRODUCTION OF DOCUMENTS OF ROGER G. CARLSEN
## <u>DIRECTED TO THE DEBTORS</u>

Nortel Networks Inc. and certain of its affiliates, as debtors and debtors in

possession (collectively, the "Debtors"), by their undersigned attorneys, hereby respond pursuant

to Rule 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to the

*Request for Production of Documents Directed to the Debtors* (the "Supplemental Document

Requests"), as follows:

---

[1]       The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification
number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc.
(9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation
(0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks
Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826),
Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable
Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the
Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

*The Debtors' general and specific responses and objections to the Supplemental Document Requests herein are subject to the following reservations of rights:*

1) These objections are based upon information now available to the Debtors and are made without in any way waiving or intending to waive but, on the contrary, intending to reserve and reserving: (a) the right to object on any ground at any time to a demand for any further response to the requests or any other discovery request; and (b) the right at any time to revise, supplement, withdraw, correct or clarify these responses and objections.

2) Any responses by the Debtors shall not be deemed or construed in any way to be an adoption, admission or agreement by the Debtors of or to any such definition or term used in the Request, or the materiality, admissibility or relevance thereof.

3) The Debtors reserve all objections to the use of these responses and of any documents or electronically stored information ("ESI") the Debtors produce. All such objections may be interposed by the Debtors at any hearing or other court appearance, or as otherwise required by the Order, the applicable rules or any other order of the Court.

4) Insofar as the intentional production of any document or ESI by the Debtors pursuant to the Request may be deemed to be a waiver of any privilege or right, such waiver shall be deemed to be a limited waiver with respect to that particular document or ESI only. Any inadvertent production of any document or ESI shall not be deemed or construed to constitute a waiver of any privilege or right of the Debtors, and the Debtors reserve their right to demand that you return to them any such document or ESI and all copies thereof.

5) The Debtors reserve the right to redact from any documents produced pursuant to the Request any confidential research, development, commercial, financial, trade secret or personally sensitive information not relevant to the subject matter of this contested matter.

*The Debtors hereby respond and object to the Supplemental Document Requests as follows:*

1) The Debtors object generally to each document request in the Supplemental Document Requests to the extent that it: (i) purports to impose obligations beyond those required or permitted by the Civil Rules, the Bankruptcy Rules or the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), or that exceeds the scope of the Order or of any applicable order entered by the Court; (ii) seeks information, documents or ESI that are not relevant to this contested matter nor reasonably calculated to lead to the discovery of admissible evidence; (iii) is vague, ambiguous, overbroad, unduly burdensome, harassing or oppressive; (iv) seeks information from outside the time period relevant to this contested matter; (v) requires that the Debtors draw legal conclusions in producing certain documents; (vi) calls for the production of documents or ESI already in the possession of the LTD Committee or that is otherwise available from public sources including documents that are on file with the Court; (vii) seeks documents or ESI that are protected from disclosure by the attorney-client privilege, the work product doctrine, a joint defense or common interest privilege, a

2

right to privacy pursuant to the Health Insurance Portability and Accountability Act Privacy Rule ("HIPAA") or any other applicable privilege or immunity from discovery, or whose disclosure is prohibited by any law, regulation or order of any state, the United States or any other country or jurisdiction; and (viii) seeks the production of documents or ESI from sources that are not reasonably accessible because of undue burden or cost.

2) Subject to the foregoing general objections[2], the Debtors have previously produced or will produce to the LTD Committee for posting to the limited access website (to the extent not deemed Confidential or Highly Confidential) any reasonably accessible, non-privileged documents in the Debtors' possession, custody or control responsive to the following Supplemental Document Requests:

  • Long Term Disability Summary Plan Documents and Flex Benefit Enrollment Guides[3]

  • Employee Benefits Binders

  • A copy of all annual 5500 Financial Forms that Nortel filed with regard to the LTD Plans

  • Flex Benefit Documents for Medical, Subsidized Prescription, Dental, Vision, Hearing and Retirement Plan Documents

  • All Nortel HR Communications that were transmitted to employees regarding explicitly Notification of Changes to all of the above documents/benefits identified in Section #1 of your Request

3) The Debtors specifically object to the following Supplemental Document Requests on the grounds that the information the requests seek is not relevant to this contested matter nor reasonably calculated to lead to the discovery of admissible evidence:

  • Any communications regarding the benefits of employees hired via the June 1998 acquisition of Bay Networks

  • A copy of all Medical, Subsidized Prescription, Dental, Vision, Hearing claims that Nortel paid for me as well as for any dependents for the last three (3) years; i.e. Sept. 2009 through Sept. 2012[4]

  • A dump of detailed call logs for all calls I placed into Nortel HR

---

[2] In addition, the Debtors incorporate by reference the General and Specific Objections set forth in the Debtors' Responses and Objections to the Official Committee of Long Term Disability Plan Participants' Request for Production of Documents Directed to Debtors, dated August 20, 2012.

[3] With respect to the request for Flex Benefit Enrollment Guides, the Debtors are continuing to review potentially responsive documents and will produce non-privileged responsive documents to the extent any are identified.

[4] To the extent documents responsive to this request have been produced by the Debtors to the LTD Committee, the Debtors do not object to the LTD Committee sharing such documents with you.

4) The Debtors specifically object to the following Supplemental Document Requests on the grounds that they are vague and ambiguous, and/or the Debtors are unable to identify what is being requested:

- A copy of Group LTD Plan No. 39900 issued to Nortel Networks, Inc. by Prudential Insurance Co.[5]

- A copy of Group Life Insurance Plan No. 39900 issued to Nortel Networks, Inc.[6]

- Copies of all my Flex Benefits Confirmation Statements

- Copies of the Medical Leave of Absence Process for 2005, 2006, and 2007

5) The Debtors specifically object to the following Supplemental Document Requests on the grounds that they are overbroad in time and scope and unduly burdensome:

- Any communications regarding the benefits of employees hired via the June 1998 acquisition of Bay Networks

- Any other communications to the acquired employees of the June 1998 Bay Network acquisition

- Copies of all communications/data transmitted to Prudential regarding my STD & LTD benefits

- A dump of detailed call logs for all calls I placed into Nortel HR

6) To the extent the Request includes requests for documents or information from Prudential Disability Management Services and/or Cigna, or any affiliates of Prudential or Cigna, the Debtors will provide no further response to such requests in this letter as such requests are not directed to the Debtors.

---

[5] To the extent this request seeks production of the Administrative Services Agreement between the Prudential Insurance Company of America and Nortel Networks Inc., which is identified on its face as Prudential Agreement No. 39900-4, the Debtors respond, based on information and belief, that this agreement is not a group LTD plan. The Administrative Services Agreement has been produced to the LTD Committee with the designation of "Confidential Information" and the Debtors are not authorized at this time to share this document with individual LTD employees.

[6] To the extent this request seeks production of the Administrative Services Agreement between the Prudential Insurance Company of America and Nortel Networks Inc., which is identified on its face as Prudential Agreement No. 39900-4, the Debtors respond, based on information and belief, that this agreement is not a group Life Insurance plan. The Administrative Services Agreement has been produced to the LTD Committee with the designation of "Confidential Information" and the Debtors are not authorized at this time to share this document with individual LTD employees.

7) Per the terms of the Order, the Debtors need not respond to any request deemed to constitute requests for admission or interrogatories – as opposed to a request for the production of documents – and therefore will provide no further response to such requests in this letter.

*[Remainder of page intentionally left blank.]*

Dated: October 4, 2012
Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9238
Facsimile: (302) 658-3989

*Counsel for the Debtors
and Debtors in Possession*





AdChoices [>

**Dispute & Fix Your Credit**

LexingtonLaw.com/Cr...

Improve Your Credit.
Remove Errors! Free
Credit Report & Score
Analysis



# Nortel Networks Corporation History

**10 Best Credit Cards**

www.comparecards.com

Compare Credit Cards with 0% APR. Lock-in 0%
APR for 18 Months Today!



AdChoices [>

| | |
|---|---|
| **Address:** | **Public Company** |
| 8200 Dixie Road | **Incorporated:** 1914 as Northern Electric Company, Limited |
| Suite 100 | **Employees:** 70,000 |
| Brampton, Ontario L6T 5P6 | **Sales:** US$22.22 billion (1999) |
| Canada | **Stock Exchanges:** New York Toronto |
| | **Ticker Symbol:** NT |
| **Telephone:** (905) 863-0000 | **NAIC:** 334210 Telephone Apparatus Manufacturing; 334220 Radio |
| **Fax:** (905) 863-3408 | and Television Broadcasting and Wireless Communications |
| | Equipment Manufacturing; 334290 Other Communications |
| **Website:** www.nortelnetworks.com | Equipment Manufacturing; 334419 Other Electronic Component |
| | Manufacturing; 511210 Software Publishers; 541512 Computer |
| | Systems Design Services |

**Share This Page**

0            0

Tweet      Like

0

Share

## Company Perspectives:

Nortel Networks is a global leader in telephony, data, wireless, and wireline solutions for the Internet. Today, Nortel Networks is creating a high-performance Internet that is more reliable and faster than ever before. It is redefining the economics and quality of networking and the Internet through Unified Networks that promise a new era of collaboration, communications, and commerce. Key Dates:

## Key Dates:

**1880:** Bell Canada is founded.
**1882:** Bell Canada establishes its mechanical department.
**1895:** Bell Canada creates Northern Electric & Manufacturing Company, Limited to take over the mechanical department's work.
**1899:** The Wire & Cable Company, an electrical wire maker, is incorporated.
**1911:** Wire & Cable changes its name to Imperial Wire & Cable Company.
**1914:** Northern Electric and Imperial Wire merge to form Northern Electric Company, Limited, which is primarily owned by Bell Canada and Western Electric.
**1956:** Under U.S. Justice Department consent decree, Western Electric agrees to divest its interest in Northern.
**1958:** Company forms Northern Electric Laboratories as an R & D arm.
**1962:** Bell Canada completes its purchase of shares held by Western Electric, and now owns 99.99 percent of Northern.

**1964:**

Northern Electric becomes 100 percent owned by Bell Canada.

**1971:** Northern Electric Laboratories is incorporated as a separate entity called Bell-Northern Research Ltd.

**1973:** Northern Electric goes public through an IPO, with Bell Canada retaining a 90.1 percent stake.

**1976:** Northern Electric changes its name to Northern Telecom Limited and introduces the first fully digital switch.

**1979:** Bell Canada's stake in Northern has been reduced to 54.5 percent.

**1983:** BCE Inc. is created as the new parent of Bell Canada; holds 53.4 percent stake in Northern.

**1993:** Jean C. Monty takes over as CEO of the company, sparking a company turnaround and moving the company well beyond its phone equipment roots.

**1997:** John A. Roth succeeds Monty and begins focusing the company on the Internet.

**1998:** Bay Networks is acquired.

**1999:** Company changes its name to Nortel Networks Corporation.

**2000:** Company acquires Qtera Corporation; Clarify, Inc.; Promatory Communications, Inc.; Xros, Inc.; and CoreTek, Inc.; BCE distributes the bulk of its stake in Nortel to its shareholders, reducing its ownership to less than four percent.

## Company History:

Nortel Networks Corporation is one of the world's leading providers of networking products and services, with a particular emphasis on the Internet but also active in both public and private voice, data, and video networks. Serving Internet service providers, telecommunications carriers, large to small businesses, and dot-coms, Nortel offers a full range of products and services in several areas of networking: Internet protocol, high-speed access, long distance, optical, and wireless. Nortel was founded as the telephone equipment arm of Bell Canada, and for much of its history it acted in that capacity. During the final decades of the 20th century Nortel gained more and more independence from Bell Canada and its eventual parent, BCE Inc., and by 2000 BCE's interest in Nortel had been reduced to less than four percent. Meantime, Nortel's astonishingly rapid emergence at the forefront of Internet technology by the early 21st century resulted from a more than $30 billion acquisition spree that began in late 1997.

### Founded As Arm of Bell Canada in Late 1800s

Nortel's origins can be traced back to 1880, four years after Alexander Graham Bell invented the telephone in 1876. In that year Bell Telephone Company of Canada (Bell Canada) was founded. To develop adequate telephone equipment for the fledgling company, Bell established its mechanical department on July 24, 1882, in Montreal, Canada, with a staff of three that soon expanded to 11. Success came early to the company, and five years later the mechanical department moved to a larger facility to accommodate a staff that had increased to 54.

The growth led to Bell Canada taking out a charter in 1895 for a separate company to take over the mechanical department's work. On December 7 of that year, Northern Electric and Manufacturing Company, Limited was incorporated under the dominion charter. With C.F. Sise as president, the company called its first general meeting of stockholders on March 24, 1896. By 1902 Northern Electric employed 250 people and occupied a 48,000-square-foot plant, which it leased from Bell Canada. That plant had expanded to 241,000 square feet in 1912, the year Northern Electric and Bell Canada worked out a deal whereby Northern would become the storekeeper and purchasing agent for Bell. Meantime, Western Electric Company, the manufacturing arm of National Bell (predecessor of American Telephone and Telegraph [AT & T]), had purchased a stake in Northern in 1906.

In 1895 C.F. Sise had bought a small plant from Alexander Barrie that was involved in manufacturing rubber-coated wire for the fast-growing electrical industry. In turn, Sise offered the company to Bell Canada for what it had cost him. Bell Canada accepted the offer, and on December 19, 1899, the Wire & Cable Company, as the enterprise became known, was granted a province of Quebec charter. Sise was appointed president and Barrie superintendent. In 1901 Western Electric bought a stake in Wire & Cable. A big success, Wire & Cable replaced its provincial charter with a dominion charter in 1911 and changed its name to Imperial Wire & Cable Company.

By then both Northern Electric and Imperial Wire & Cable were playing vital roles as Canada's major suppliers of telephone equipment. In many operational areas, however, their needs and interests overlapped. The management of both companies realized that to increase efficiency and to reduce overhead, the two enterprises should amalgamate. On July 5, 1914, they consolidated under the laws of Canada into Northern Electric Company Limited, which was initially owned primarily by Bell Canada (50 percent) and Western Electric (43.6 percent). Bell Canada increased its stake to 56.3 percent in 1929.

While the general sales division continued to be located in Montreal, the company established supply and repair divisions for western Canada in 1929 and for the Maritime region in 1944. Despite the Great Depression, which forced Northern to cut back production, the company still managed to grow. It established the electronics division in 1931 and expanded its base of operations by purchasing a majority interest in Amalgamated Electric Company Ltd. in 1932 and, in 1935, by launching Dominion Sound Equipment Ltd., a wholly owned subsidiary that supplied Canada with electric sound equipment, acoustic and sound proofing supplies, radio and broadcasting sound equipment, and other lines of electrical equipment.

When the Depression ended, Northern became involved in Canada's World War II effort, converting 95 percent of its operation to war production. By 1944 most of the company's 9,325 employees were engaged in this activity. Soon after the war's end in

1945, Northern immediately began a flurry of construction to meet the expanding communications needs of Canada's growing communities. As a measure of its continuing growth, Northern's workforce expanded to 12,775 by 1948.

## Achieving Independence from Western Electric: 1950s–60s

As a result of being partially owned by Western Electric, Northern Electric operated much like a 'branch plant' of the U.S. firm. Consequently, Northern had a small research and development staff, and its sales efforts were confined to Canada. As its main function was to manufacture Western Electric products for Bell Canada, Northern Electric's product line generally lagged behind Western Electric's by two to three years.

Northern Electric ceased operating like a branch plant in 1956 when Western Electric signed a consent decree with the U.S. Department of Justice in which it agreed to relinquish its interest in Northern Electric. Bell Canada acquired most of Western Electric's interest in Northern Electric in 1957 and the remainder in 1962, at which point Bell Canada held 99.99 percent of Northern's stock. By 1964, Bell Canada had purchased the remaining shares, making Northern Electric 100 percent Bell Canada-owned.

With no product line of its own, and with management knowing that it had to start one to remain competitive, Northern Electric stepped up its research and development efforts, establishing Northern Electric Laboratories–with a staff of 30 to 40 people–in 1958. In 1965 the company made a commitment to develop a switching device known as SP-1, a stored program switch system, which it believed would meet the needs of the Canadian market and spur economic growth. From 12 researchers in 1965, the product development team working on SP-1 grew to more than 100 by the end of the decade. The commitment paid off when Northern put its product on the market. By 1975 not only had every major telephone company in Canada bought the switch, but 25 percent of all sales were being made in the United States.

## 1970s and Early 1980s: Increasingly Independent, Rolling Out the First Digital Switch

Northern Electric's research and development division had become a conglomerate itself, mushrooming to more than 2,000 employees, and eventually incorporating as a separate entity. On January 1, 1971, Northern Electric's subsidiary, Bell-Northern Research Ltd. (BNR) was formed. In 1973 Bell Canada sold a portion of Northern Electric's shares to the public through an initial public offering, while retaining a majority holding of 90.1 percent. Bell Canada continued to reduce its stake over the remainder of the decade, from 89.9 percent in 1974 to 54.5 percent in 1979. After BCE Inc. was created as the new parent company of Bell Canada in 1983, BCE then held a 53.4 percent stake in Northern.

During the 1970s the company established many new subsidiaries, such as Northern Telecom (International) B.V. in Amsterdam, and Northern Telecom (Asia) Limited in Singapore and Hong Kong, both established in 1974. These subsidiaries reflected its increasingly strong presence in the international marketplace. In 1976 the company's name was changed to Northern Telecom Limited (Northern) to reflect the great advances it had made in manufacturing modern telecommunications equipment.

That same year Northern introduced the first fully digital switch. Although AT & T did not immediately authorize its affiliates to buy the switches, independent U.S. telephone companies quickly did, and by 1978 Northern's sales had jumped by 130 percent from the previous year. The demand for the company's digital switches received a big boost in 1981 when AT & T approved the purchase of the switches for its affiliates. In 1984 the U.S. government broke up AT & T, and sales of Northern's digital switches skyrocketed, with volume increasing 1,200 percent over that of 1976.

Northern had ignored conventional business wisdom and taken chances to rise within the industry. As one company official said, 'When we started to work on the digital central office switches in the 1970s, we were advised to follow AT & T and continue making old analog switches since digital switches would be too expensive.' Fortunately for Northern, it did not, and the introduction and marketing of the switch proved to be a major milestone in its history. By 1990 one research firm estimated that the company held close to one-third of the U.S. market for the digital switches.

## Mid-1980s to Early 1990s: Declining Fortunes

Northern's fortunes, however, began to change by the mid-1980s. While AT & T was making a comeback with its own switch, Northern made a technological blunder. It began selling new software to provide its phone company subscribers with advanced service capabilities based on new technology. Poor marketing, bugs in the software, and the fact that the processor in Northern's switch could not keep up with all the new tasks the expanded software had to do alienated many company customers. One disgruntled business executive told *Business Week* in 1987, 'Their software and capacity problems are still driving us wild. We're giving our orders to AT & T.'

Northern launched a public relations campaign to reassure its customers that it had solved the software problems. It also announced the availability of Supercore, a new processor that cost $50 million to develop. '[Supercore] will double the capacity of our switches and eventually increase it to whatever we want,' maintained Northern President David G. Vice.

Many in the telecommunications market remained skeptical, however, and rival telecommunications companies such as Japan's NEC Corporation, Sweden's Telefonaktiebolaget LM Ericsson, and Germany's Siemens AG began to make a move for Northern's

markets. Despite the setbacks, Northern had become one of the giants in the telecommunications industry. Consolidated revenues for 1989 were US$5.41 billion.

Northern repositioned in 1988 because of concerns that the intense global competition combined with the money it had invested in product and market development had affected its financial performance. Under newly elected Chairman, CEO, and President Paul G. Stern, who took over in March 1989, Northern embarked on a program to restructure the corporation.

Stern's association with Northern began in April 1988 when the company elected him to its board of directors and to membership on the executive committee. He brought to the job a strong background in advanced-technology company management and a reputation for making tough cost-cutting decisions at large corporations. He had previously served as an executive for Burroughs, Unisys, IBM, and Rockwell. Within nine months after Stern assumed the helm, Northern had reshuffled management, cutting 2,500 jobs; closed four of its 41 plants, selling one-fifth of the plants to employees; and changed its bonus system, tying employee incentives in each business unit to company performance.

The dramatic changes caused a stir in Canada. Northern's plans to move its research and development operations from Toronto to Texas and California made Canadians wonder if the company would move its headquarters as well.

Northern, however, quickly saw positive results from the tough measures it took. In 1989 company expenses fell 18.5 percent from the year before, while profits jumped 18 percent on a 13 percent increase in sales. By 1990 Northern was the world's sixth largest telecommunications company, but Stern publicly stated that he was preparing for an even more ambitious goal for Northern&mdash;become the world's leading supplier of telecommunications equipment by the year 2000. Soon after, it took a major step in that direction in January 1991 when it purchased STC PLC, a large British telecommunications company specializing in undersea cable for about US$2.6 billion. The acquisition put Northern in third place behind Alcatel NW of Belgium and U.S.-based AT & T. Northern had already owned 27 percent of STC PLC when it made the deal.

The purchase increased Northern's total debt to C$4.3 billion, 50 percent of its equity, compared to 29 percent before the buyout. Northern said, however, that it planned to help relieve the debt using the C$1.6 billion from the sale of STC's computer's division, ICL Ltd., to Fujitsu Ltd. of Japan.

Behind Northern's seeming turnaround, however, were continuing problems at the company, particularly with its key U.S. customers. While Stern was concentrating on controlling expenses and expanding overseas, several major U.S. phone companies began experiencing problems with the software in Northern's switches. Customers were further irked when Northern was slow in fixing the glitches. Further dissatisfaction, and lost sales, resulted from delays in issuing new versions of the tremendously complicated switch software. With his focus primarily on short-term profitability, Stern had cut R & D spending from 13 percent of revenue to 11 percent, thus jeopardizing the company's longer term viability in the rapidly changing technological environment of telecommunications. In October 1992 the Northern board of directors, growing increasingly aware of these behind-the-scenes problems, installed Jean C. Monty, a longtime Bell Canada executive, as president and chief operating officer, the number two position behind Stern's. Within months, Monty had replaced Stern as CEO, with Stern–who later told Business Week, "Nobody is going to shove a president down my throat"–resigning from his position of chairman, the apparent victim of a power struggle. In June 1993 Monty announced that Northern would take a US$1.2 billion pretax restructuring charge covering the cost of fixing the switching software, closing several facilities, and eliminating about nine percent of the workforce. As a result of the sale of STC to Alcatel-Alsthom for US$906 million, the charge also covered a US$500 million writedown in goodwill from the STC acquisition. The charge sparked the company's first quarterly loss in five years, and a 1993 full-year loss of US$884 million. In the wake of the announcement of the charge, Northern's market value was cut nearly in half during one three-week period.

# Mid-1990s and Beyond: An Impressive Turnaround and a New Internet Focus

Monty quickly turned Northern Telecom's fortunes around with the help of a man who soon held the number two position, John A. Roth. Roth had joined the company in 1969 as a design engineer, was later instrumental in the establishment of Northern's wireless business, and then served as head of the company's North American operations from 1993 to 1995. He was named chief operating officer in 1995 and then president in February 1997. Monty and Roth were quickly able to mollify the company's angry customers with assurances that the switching software would be rewritten and simplified by the end of 1995, with US$250 million earmarked for this effort. Although the company was unable to meet this timeline, the job was 95 percent complete by mid-1996.

The new leadership also bolstered the R & D budget to nearly 15 percent of revenue, which amounted to US$1.58 billion in 1995. As the digital switching market matured, much of the research dollars went into new specialized areas. With this diversification came a parallel restructuring of the company into four separate businesses, each serving a distinct set of customers and each delivering products tailored for those customers. The first business was Northern's traditional switching operations which served old-line phone companies; the others were: a unit focused on broadband networks, which served cable companies and the upstart long-distance companies that were burgeoning in the wake of industry deregulation; one specializing in enterprise networking, which served large organizations–including corporations and government departments–using internal communications networks; and one concentrating on wireless networks, which mainly served the rapidly expanding cellular telephone firms.

The signs of an impressive turnaround were soon unmistakable. Revenue increased smartly, to US$10.67 billion in 1995 to US$12.85 billion in 1996 to US$15.45 billion in 1997. Net income showed a similar upward trajectory, standing at US$473 million, US$623 million, and US$829 million for those three years, respectively. With his job at Northern Telecom complete, Monty moved on to become president and CEO of BCE while maintaining a seat on Northern's board of directors. He turned the Northern reins over to Roth, who was named president and CEO in October 1997.

Roth wasted no time in mapping out the next step in the evolution of Northern Telecom, betting the company's future on the Internet and what he called 'web tone.' Roth saw that networks were going to increasingly migrate from being telephone-based to being Internet-based. He wanted Northern Telecom to be at the center of the building up of the Internet into a technology as reliable and as instantly accessible as the telephone and its dial tone—thus the concept of web tone. Needing to move quickly to beat out the competition, Roth turned largely to acquisitions rather than attempting to rely only on in-house R & D efforts. The company's soaring stock facilitated the completion of stock-swap acquisitions.

Four major acquisitions were completed in 1998, including Winnipeg-based Broadband Networks Inc., a designer and manufacturer of broadband wireless communications networks (purchased for US$593 million); Chelmsford, Massachusetts-based Aptis Communications, Inc., a start-up firm that concentrated on remote-access data networking (US$290 million); and Kanata, Ontario-based Cambrian Systems Corporation, maker of an innovative technology to speed up Internet traffic (US$300 million). These purchases were dwarfed, however, by the US$9.1 billion stock-swap for Santa Clara, California-based Bay Networks, Inc., which was completed in August 1998. Bay Networks served the corporate market with a host of data networking products and services that meshed well with Northern Telecom's existing corporate operations. The addition of Bay provided Northern with the ability to offer corporate customers integrated networks for sending voice, video, and data over the Internet. With the company focusing increasingly on networking, Northern Telecom was renamed Nortel Networks Corporation in April 1999.

Acquisitions continued in 1999 and 2000; the former year featured three major buyouts but was followed by an accelerating purchasing pace in the latter. Nortel also showed an increasing appetite for optical networking firms. In January the company paid US$3.25 billion in stock for Boca Raton, Florida-based Qtera Corporation, producer of long-distance optical networking systems. Two months later Nortel completed two acquisitions: the US$2.1 billion purchase of San Jose-based Clarify, Inc., which specialized in customer relationship management software used in Internet communications; and the US$778 million buyout of Fremont, California-based Promontory Communications, Inc., developer of high-speed digital subscriber line (DSL) Internet access platforms. The purchase of optical networking firms took center stage in mid-2000 as Nortel spent US$3.25 billion for Xros, Inc., a Sunnyvale, California-based firm that was developing optical switches; and US$1.43 billion for Wilmington, Massachusetts-based CoreTek, Inc., a start-up that was working to perfect specialized lasers to transmit light beams over fiber-optic lines. Neither Xros nor CoreTek at the time of their acquisition had either revenue or a marketable product but were working on promising optical technologies that Nortel hoped to use to speed up data traffic and increase its volume, while simultaneously reducing costs.

Also in mid-2000 Nortel largely gained its independence from BCE after the latter distributed most of its remaining 40 percent stake to its shareholders. Following the completion of this transaction, BCE held less than four percent of Nortel's stock. In July 2000 Nortel entered into discussions with Corning Inc. about selling its optical components unit to Corning in a stock swap that some observers valued at about US$100 billion and that could have resulted in Nortel owning a significant stake in Corning; the talks faltered, however. One day after the companies confirmed that the negotiations had failed, Nortel announced another blockbuster acquisition. It agreed to acquire San Jose-based Alteon WebSystems, Inc. for more than US$7 billion in stock. Alteon was a leading maker of specialized Internet switches used to speed response times at web sites. In August 2000 Nortel announced that it had agreed to buy Sonoma Systems Inc. for as much as US$540 million in stock. Sonoma, based in Marina del Rey, California, produced integrated access devices for Internet access providers enabling them to simultaneously deliver high-speed video, data, and voice communications over a single connection.

Soon after the announcement of the Sonoma acquisition, Nortel Networks' market capitalization hit US$240 billion, a sixfold increase since Roth had taken over as CEO. Roth planned to continue the breathtaking acquisition pace, vowing to spend ten percent of the company's market cap each year to purchase the new technology it would need to keep pace with the other heavyweights of networking, most notably Cisco Systems, Inc.; Ericsson; and Lucent Technologies Inc. (the equipment arm of AT & T that had been spun off in 1996). Nortel's emphasis on new technology was demonstrated by its generating 60 percent of its revenues from products less than 18 months old. In addition to its clear focus on optical technology, Nortel at the turn of the millennium was also working to establish a more significance presence in the undersea-fiber business and was gaining a reputation as a leader in the area of wireless Internet technologies. The wireless operations were one of the responsibilities of COO Clarence Chandran, who appeared to be in line to succeed Roth.

**Principal Subsidiaries:** Matra Nortel Communications S.A.S. (France; 50%); Nortel Government Services Inc. (U.S.A.); Nortel Matra Cellular SCA (France); Nortel Networks (Asia) Limited (Hong Kong); Nortel (CALA) Inc. (U.S.A.); Nortel Networks (Dublin) Limited (Ireland); Nortel Networks (Ireland) Limited; Nortel Networks (Luxembourg) S.A.; Nortel Networks Aptis Inc. (U.S.A.); Nortel Networks Capital Corporation (U.S.A.); Nortel Networks de Colombia S.A.; Nortel Networks Inc. (U.S.A.); Nortel Networks International Finance and Holding B.V. (Netherlands); Nortel Networks NA Inc. (U.S.A.); Nortel Networks plc (U.K.); Northern Telecom do Brasil Comercio e Servicos Ltda. (Brazil).

**Principal Competitors:** ADC Telecommunications, Inc.; Alcatel; Ascom Holding Ltd.; British Telecommunications plc;

Cabletron Systems, Inc.; CIENA Corporation; Cisco Systems, Inc.; Corvis Corporation; Deutsche Telekom AG; Telefonaktiebolaget LM Ericsson; Fujitsu Limited; Harris Corporation; Inter-Tel, Incorporated; InterVoice-Brite Inc.; Juniper Networks, Inc.; Lucent Technologies Inc.; Marconi Communications; Motorola, Inc.; NEC Corporation; Nokia Corporation; Oki Electric Industry Company, Limited; ONI Systems Corp.; PeopleSoft, Inc.; QUALCOMM Incorporated; Redback Networks Inc. Remedy Corporation; Scientific-Atlanta, Inc.; Siebel Systems, Inc.; Siemens AG; Sycamore Networks, Inc.; Tellabs, Inc.

## Further Reading:

- Austen, Ian, 'Hooked on the Net,' *Canadian Business*, June 26/July 10, 1998, pp. 95+.
- Blackwell, Gerry, 'Northern Lights,' *Canadian Business*, March 1990, pp. 40+.
- Campanella, Frank W., 'A Switch in Time: Northern Telecom's New Equipment Is Sparking an Earnings Resurgence,' *Barron's* October 26, 1981, pp. 43+.
- Chisholm, Patricia, and John Daly, 'A Giant Cuts Costs,' *Maclean's* September 18, 1989, p. 50.
- Hardy, Quentin, 'Lighting Up Nortel,' *Forbes*, August 21, 2000, pp. 52–53.
- Hawkins, Chuck, 'Is Paul Stern Tough Enough to Toughen Up Northern Telecom?,' *Business Week*, August 14, 1989, pp. 84+.
- Heinzl, Mark, 'Buying into the New Economy: CEO Uses Acquisitions to Turn Nortel into a Huge Player in Technology for the Web,' *Wall Street Journal*, July 25, 2000, pp. B1, B4.
- ——, 'Nortel Networks Is Following a Daring Strategy to Recast the Company for Internet Commerce,' *Wall Street Journal*, November 1, 1999, p. B13D.
- Keller, John J., and Edith Terry, 'How Northern Telecom Is Riding Out the Storm,' *Business Week*, January 26, 1987, pp. 84+.
- Laver, Ross, 'Nortel's Driving Force,' *Maclean's* August 2, 1999, pp. 13–17+.
- McMurdy, Deirdre, 'Ringing in a Change: Financial Shocks Hit Northern Telecom,' *Maclean's* July 12, 1993, pp. 32+.
- Morrison, Scott, 'An Engineer Tuned to the Market,' *Financial Times*, August 14, 2000, p. 11.
- 'Northern Telecom's All-Out Attack on Western Electric's Turf,' *Business Week*, December 5, 1983, pp. 178+.
- Palmer, Jay, 'A Comeback Coming?: Until Now, the Telephony Craze Has Bypassed Northern Telecom,' *Barron's* February 21, 1994, pp. 12–13.
- Reingold, Jennifer, 'A Dose of Humility,' *Financial World*, October 11, 1994, pp. 56–57.
- Stoffman, Daniel, 'Mr. Clean,' *Canadian Business*, June 1996, pp. 59+.
- Symonds, William C., 'He Came, He Saw, He Cleaned Up ... He Left,' *Business Week*, February 15, 1993, p. 36.
- Symonds, William C., et al., 'High-Tech Star: Northern Telecom Is Challenging Even AT & T,' *Business Week*, July 27, 1992, pp. 54–58.
- Weber, Joseph, Andy Reinhardt, and Peter Burrows, 'Racing Ahead at Nortel,' *Business Week*, November 8, 1999, pp. 93+.
- Wickens, Barbara, 'Becoming a Global Giant,' *Maclean's*, January 14, 1991.
- Ziegler, Bart, 'What Really Happened at Northern Telecom,' *Business Week*, August 9, 1993, pp. 27–28.

Source: *International Directory of Company Histories*, Vol. 36. St. James Press, 2001.

## Hold These Stocks Forever

www.GlobalDividends.com

The 3 best stocks for a lifetime of rich cash dividends.



AdChoices [>

Terms of Service    Privacy Policy    Licenses

# Timeline of Nortel

From Wikipedia, the free encyclopedia

Timeline of major events for Nortel.

## Contents

- 1 Bell Telephone Company of Canada
- 2 Northern Electric and Manufacturing Company
- 3 Northern Electric Company
- 4 Independence from Western Electric
- 5 Northern Telecom and "Digital World"
- 6 Deregulation
- 7 Optical boom and the Right Angle Turn
- 8 After the Internet bubble
    - 8.1 Frank Dunn CEO - accounting restatements
    - 8.2 Owens and Zafirovski
- 9 Liquidation
    - 9.1 Protection from creditors
    - 9.2 Wind-up
- 10 References

## Bell Telephone Company of Canada

- 1882: A mechanical department is created within Bell Telephone Company of Canada to manufacture telephone equipment for Canada,[1][2]
- 1886: The mechanical department starts manufacturing its first switchboard, a 50 line Standard Magneto Switchboard.[1][3]
- 1888: The mechanical department has 50 employee .[4]
- 1890: The mechanical department has 200 employees and a new factory is under construction.[1]
- 1895: Northern Electric and Manufacturing Company Limited is spun off from Bell Canada [1]

## Northern Electric and Manufacturing Company

- 7 December 1895: Northern Electric and Manufacturing Company Limited is incorporated with initial stock capital of $50,000 at $100 per share, with 93 percent held by Bell Canada [5]
- March 24, 1896: The first general stockholders meeting
- December 1899: Bell Telephone Company of Canada buys a cabling company for $500,000 later named *The Wire and Cable Company*.[6]

- 1900 Northern Electric and Manufacturing manufactures the first Canadian wind-up gramophones .[7]
- 1911: The Wire and Cable company changes its name to the *Imperial Wire and Cable Company*.[8]

# Northern Electric Company

- 1913: The construction of a new manufacturing plant started at Shearer Street in Montreal, Canada, as preparations began for the two manufacturing companies' integration.
- January 1914: the Northern Electric and Manufacturing Company and the Imperial Wire and Cable Company merge into the *Northern Electric Company*,
- 1915: the new company opens the doors on a new manufacturing plant in January. This facility at Shearer Street was the primary manufacturing center until the mid-1950s.[7] Edward Fleetford Sise was the president and his brother Paul Fleetford Sise was the vice-president and general manager.[9]
- During the First World War Northern Electric manufactured the Portable Commutator, a one-wire telegraphic switchboard for military operations in the field.
- 1922: Northern starts to produce, for $5, the "Peanut" vacuum tube, which required only a single dry-cell battery. The use of alternating current was still under development during this time. The "Northern Electric Peanut tube was the smallest tube made, and drew only one-tenth of an ampere and was the most remarkable radio frequency amplifier ever made."[10]
- During the 1920s: Northern Electric made kettles, toasters, cigar lighters, electric stoves, and washing machines.[11]
- January 1923: Northern Electric starts operating an AM radio station with call letters CHYC, in the Shearer Street plant, and much of the programming was religious services for the Northern Electric employees and families in the community.
- July 1923: CHYC-AM was the first radio station to provide entertainment to the riders of the transcontinental train, in a parlor car fitted with a radio set to receive the broadcast as it left Montreal and traveled west.[12]
- Later1920s: Northern creates the first talking movie sound system in the British Empire for a theater in Montreal.[11]
- 1930 – 1933 (Great Depression ): Sales drop from $34 million to $8.2 million, and the number of employees dropped from 6,100 to 2,400.[13]

# Independence from Western Electric

Northern Electric to Bell Canada: Deprived of its Western Electric tie, Northern starts developing its own products.

- 1953: Northern Electric produces its first television sets using tubes made by RCA.[14]
- 1964: Bell Canada acquires 100 percent of Northern Electric
- 1966: the Northern Electric research lab, Northern Electric Laboratories (the predecessor to Bell-Northern Research), starts looking into the possibilities of fiber optic cable
- 1969: work begins on digitizing telephone communications.
- 1969: Northern begins making inroads into the U.S. market with its switching systems.
- 1972: Northern opens its first factory in the U.S. in Michigan.
- 1975: Northern begins shipping its first digital switching systems, one of the earliest such systems to be sold.
- Early 70': Northern Telecom is, with Bell-Northern Research, a part owner of MicroSystems International a

semiconductor manufacturer based in Kanata, outside Ottawa.

# Northern Telecom and "Digital World"

- 1976: Northern Electric Company name changed to Northern Telecom Limited.
- 1976: "Digital World" three-page advertisement appears in major trade publications
- 1977, Nortel introduces its DMS line of digital central office telephone switches
- 1984: AT&T breakup
- [year missing] Northern Telecom becomes the first non-Japanese supplier to Nippon Telegraph and Telephone

# Deregulation

- 1983: Due to deregulation, Bell Canada Enterprises is formed as the parent company to Bell Canada and Northern Telecom. Bell-Northern Research is jointly owned 50-50 by Bell Canada and Northern Telecom. The combined three companies are referred to as the tricorporate.[15][16][17]

- 1995: Northern Telecom becomes Nortel, the streamlined identity it adopts for its 100th anniversary.

# Optical boom and the Right Angle Turn

- 1998: company's name is changed to Nortel Networks
- 1998: Nortel acquires of Bay Networks
- 1998: BCE ceases to be the majority shareholder of Nortel.
- late 1990s: share price of Notel stock reaches unheard-of levels despite the company's repeated failure to turn a profit.
- 2000: Nortel accounts for more than a third of the total valuation of all the companies listed on the Toronto Stock Exchange (TSX), employing 94,500 worldwide, with 25,900 in Canada alone.[18]
- 2000: BCE spins out Nortel, distributing its holdings of Nortel to its shareholders. Bell-Northern Research is gradually absorbed into Nortel.
- 2000: John Roth (CEO) cashes in his own stock options for a personal gain of C$135 million[19]
- 2000-2002: Nortel's market capitalization feall from C$398 billion in September 2000 to less than C$5 billion in August 2002, as Nortel's stock price plunges from C$124 to C$0.47.
- 2001: CEO John Roth retires, replaced by Chief financial officer Frank Dunn [20]

decided to quit, however.[21]

# After the Internet bubble

## Frank Dunn CEO – accounting restatements

- 2001-2003: Two-thirds of Nortel's workforce (60,000 staff) are laid off
- 2001: writedowns of nearly US$16 billion
- 2003: temporary return to profitability resulting in $70 million in bonuses awarded to the top 43

managers,[22] with $7.8 million going to Dunn alone,[23] $3 million to chief financial officer Douglas Beatty, and $2 million to controller Michael Gollogly.[24]

- Independent auditor Deloitte & Touche advises audit committee chairman John Cleghorn and board chairman "Red" Wilson to look into the suspicious results, who promptly hired the law firm WilmerHale to vet the financial statements.[25]
- October 2003, Nortel announces its intention to restate approximately $900 million of liabilities carried on its previously reported balance sheet resulting in a reduction in previously reported net losses for 2000, 2001, and 2002 and an increase in shareholders' equity and net assets previously reported on its balance sheet.
- A dozen of the company's most senior executives return $8.6 million of bonuses they were paid based on the erroneous accounting.
- Investigators find about $3 billion in revenue was booked improperly in 1998, 1999, and 2000.
- More than $2 billion is moved into later years, about $750 million pushed forward beyond 2003 and about $250 million is wiped away completely.[25]
- 2003: Nortel reaches an agreement with Export Development Canada for it to provide Nortel with a credit support facility of up to US$750 million.[26]

[27] .

- April 28, 2004 : Dunn, Beatty, and Gollogly fired for financial mismanagement, and later charged with fraud by the RCMP, with a trial date scheduled for January 16, 2012.[28][29]
- The SEC files charges against seven Nortel executives for civil fraud.[28]

## Owens and Zafirovski

- After Dunn's firing, retired United States Admiral Bill Owens – at the time a member of the board of directors – was appointed interim CEO.
- Nortel Networks subsequently returned to using the Nortel name for branding purposes only (the official company name was not changed).
- June 2005: Nortel acquires PEC Solutions, a provider of information technology and telecommunications services to various government agencies and departments, and renames it Nortel Government Solutions Incorporated (NGS).[30][31]
- August, 2005: LG Electronics and Nortel formed a joint venture, with Nortel owning 50% plus one share, to offer telecom and networking solutions in the wireline, optical, wireless and enterprise areas for South Korean and global customers.

- Peter W. Currie, previously the Chief Financial Officer (CFO) of the Royal Bank of Canada, was named CFO of Nortel in 2005, having previously served as Northern Telecom's CFO in the 1990s.
- Gary Daichendt, the former Chief Operating Officer of Cisco Systems, was hired as President and COO, and was expected to succeed Owens as CEO.
- Shortly afterward, Daichendt appointed ex-Cisco Chief Science Officer Gary Kunis as Chief Technology Officer (CTO). Both Garys were concerned about the overall direction of Nortel, especially when compared to Cisco, their previous employer.
- Just three months later, Daichendt resigned after both his restructuring plan and his suggestion that Owens and Currie leave the company immediately were rejected by the board of directors.
- Kunis quit shortly thereafter.[32]

- At the year's end, directors Lynton "Red" Wilson and John Cleghorn retired from the board.

- Mike S. Zafirovski, who had served as President and CEO of GE Lighting and then as Motorola President and COO, succeeded Owens as president and CEO on November 15, 2005.[33]

• Motorola filed a suit against Zafirovski's hiring, alleging that his new position would break the terms of the non-disclosure agreement he had signed. Nortel agreed to pay $11.5 million on his behalf to settle the lawsuit.[34]

- Nortel also paid out US$575 million and 629 million common shares in 2006 to settle a class-action lawsuit that accused the company of misleading investors about the company's health.
- Peter W. Currie stepped down as Executive Vice President and CFO in early 2007.
- February 2007: Nortel announces its plans to reduce its workforce by 2,000 employees, and to transfer an additional 1,000 jobs to lower-cost job sites.
- The Securities and Exchange Commission files civil fraud charges against Nortel for accounting fraud from 2000 to 2003; the fraud was allegedly to close gaps between its true performance, its internal targets and Wall Street expectations.
- Nortel settles the case, paying $35 million, which the Commission distributes to affected shareholders, and reportes periodically to the Commission on remedial measures to improve its financial accounting.
- Dunn, Beatty, and Gollogly were charged in June 2008 by the RCMP for criminal fraud related to their activities in 2002–2003.[35]

- Nortel announces plans in February 2008 to eliminate 2,100 jobs, and to transfer another 1,000 jobs to lower-cost centres.[36]
- As part of the reductions, Nortel shut down its Calgary campus in 2009.[37]

- During its reporting of third quarter 2008 results, Nortel announced it would restructure into three vertically-integrated business units: Enterprise, Carrier Networks, and Metro Ethernet Networks.
- As part of the decentralization of its organization, four executive positions were eliminated, effective January 1, 2009: Chief Marketing Officer Lauren Flaherty, Chief Technology Officer John Roese, Global Services President Dietmar Wendt, and Executive Vice President Global Sales Bill Nelson.
- A net reduction of 1,300 jobs was also announced.[38] As its stock price dropped below $1, the New York Stock Exchange notified Nortel that it would be delisted if its common shares failed to rise above $1 per share within 6 months.[39]
- Rumours continue to persist of Nortel's poor financial health, amid the late 2000s recession, and its bids for government funds are turned down.[40]

# Liquidation

## Protection from creditors

- January 14, 2009: Nortel files for protection from creditors, in the United States under Chapter 11 of the United States Bankruptcy Code, in Canada under the Companies' Creditors Arrangement Act, and in the United Kingdom under the Insolvency Act 1986.[41][42][43]
- Nortel's share price falls more than 79% on the Toronto Stock Exchange.
- Nortel is the first major technology company to seek bankruptcy protection in this global downturn.[44]

- Nortel had an interest payment of $107 million due the next day, approximately 4.6% of its cash reserves of approximately $2.3 billion.[45]
- Export Development Canada agrees to provide up to C$30 million in short-term financing through its existing credit support facility with Nortel.
- The Canadian government resistes characterizing its position on Nortel as a bailout.[46]

- Nortel pays out retention bonuses to almost 1,000 top executives, totalling up to US$45 million.[47]
- Severance payments to employees laid off prior to the creditor protection filing are being withheld.

- End of January 2009: Nortel announces that it would be discontinuing its WiMAX business and its joint agreement with Alvarion.[48][49]
- Nortel sells its Layer 4–7 application delivery business to Israeli technology firm Radware for $18 million, after Radware has initially placed a stalking horse bid.[50][51] Nortel had acquired the application switch product line in October 2000 when it purchased Alteon WebSystems.[52]

## Wind-up

- June 2009: Nortel announces that it no longer plans to emerge from bankruptcy protection, and is seeking buyers for all of its business units.

[53] [54]

- June 26, 2009 : Nortel shares are delisted from the Toronto Stock Exchange at a price of $0.185 per share.

[54][55][56]

- August 2009: Mike Zafirovski resigns
- August 2009: Nortel's board of directors reorganized with three members instead of nine.[57]
- 2009: Nortel hands out $14.2 million in cash compensation to seven executives
- 2009: Nortel pays out $1.4 million to 10 former and current directors
- 2009: Nortel pays $140 million to lawyers, pension, human resources and financial experts helping to oversee the company's bankruptcy proceedings.[58]
- July 2009: Ericsson purchases Nortel's CDMA and LTE assets for $1.13 billion in an auction.

[59] [60][61]

- July 20, 2009: Avaya wins an auction for Nortel's Enterprise Solutions business, including Nortel's stake in Nortel Government Solutions and DiamondWare, for $900 million,[62]

after having placed a stalking horse bid of $475 million.[63]

- November 2009: Nortel sells its MEN (Metro Ethernet Networks) unit to Ciena Corporation for US$530 million in cash and US$239 million in convertible notes,[64][65]
- November 2009: Nortel sells its GSM business at auction to Ericsson and Kapsch for US$103 million.[66][67][68][69]
- December 8, 2009: Hitachi purchases the Next Generation Packet Core assets.[70]

- December 2009: John Roth (former CEO )files for a US$1 billion indemnification from Nortel, joining the list of U.S. creditors.[71]
- February 2010: Ernst & Young, the court-appointed monitor of Nortel's Canadian bankruptcy proceedings, reports that the assets of Nortel's Health and Welfare Trust had a shortfall of $37 million in its net assets as of December 31, 2008. The trust supports pensioners' medical, dental and life insurance benefits, as well as income support for some groups such as long-term disability recipients.[72]
- February 2010: Nortel negotiates a $57-million deal to wind up the health care and other benefits provided to former Canadian employees.
- February 2010: Nortel proposes spending $92.3M on retention bonuses for 1,475 employees in its Nortel Business Services and Corporate groups, with $2.5 million in incentives going to Christopher Ricaute, president of Nortel Business Services; $27 million allocated for Canadian employees; and $55 million allocated for U.S. employees.[73][74]
- March 2010: US trustee Roberta DeAngelis objects to the payment of $55.6 million to 866 employees.[75]
- Court-appointed representatives for Nortel's former employees in Canada, who are creditors in the Ontario bankruptcy court, have signed an agreement to not oppose any employee incentive program.
- May 2010: Genband purchases the Carrier VoIP and Application Solutions (CVAS) unit, as Nortel accepted its stalking horse bid of $282 million, with adjustments that decreased the net sale price to about $100 million, without a formal bidding process.[76][77][78]
- June 2010: Ericsson purchases Nortel's share in its joint venture with LG Electronics for US$242 million, forming LG-Ericsson.[79][80]
- September 2010 : Ericsson purchases Nortel's final operating unit, the Multi-Service Switch division, for US$65 million.[81][82][83]
- October 2010 : Nortel's Ottawa campus on Carling Avenue is purchased by Public Works and Government Services Canada (PWGSC) for a cash purchase price of CDN$208 million.[84]

- December 2010: Nortel's 53.13% stake in Turkish company Nortel Netaş was acquired by One Equity Partners (OEP) and Rhea Investments for $68 million.[85][86]
- approximately 6,000 patents and patent applications encompassing technologies such as wireless, wireless 4G, data networking, optical, voice, Internet, and semiconductors, are sold for $4.5 billion to a consortium including Apple, EMC, Ericsson, Microsoft, Research In Motion, and Sony, pending American and Canadian court approval.[87][88](Google had placed the initial stalking horse bid of $900 million[89] and later upped the bid to $1,902,160,540, then $2,614,972,128, and eventually $3.14159 billion, which are references to Brun's constant, Meissel–Mertens constant, and pi.)[90]
- October 2011: Bankruptcy filings state that Nortel owes former Canadian engineers $285,000 for patent awards that were not paid.[91]
- October 2011, the administrators of Nortel's British subsidiary lose their appeal to overturn a court order requiring them to pay £2.1 billion into Nortel's underfunded pension plan.[92]

# References

1. ^ a b c d Nortel Networks (2008). "Corporate information: Nortel History – 1874 to 1899" (http://www.nortel.com/corporate/corptime/1874.html) . Nortel Networks. http://www.nortel.com/corporate/corptime/1874.html. Retrieved April 30, 2009.
2. ^ Murphy, George Joseph (1993). *A History of Canadian Accounting Thought and Practice*. Taylor & Francis. p. 82. ISBN 978-0-8153-1248-2.

3. ^ Rens & Roth 2001, p. 129.

4. ^ Rens & Roth 2001, p. 129-132.

5. ^ Canadian Parliament (1896). *Sessional Papers*. 29. C. H. Parmelee. p. 34.

6. ^ Babe, Robert E. (1990). *Telecommunications in Canada: technology, industry, and government*. University of Toronto Press. p. 177. ISBN 0-8020-6738-7, 9780802067388.

7. ^ [a] [b] Nortel Networks (2009). "Corporate information: Nortel History – 1900 to 1919" (http://www.nortel.com/corporate/corptime/1900.html) . Nortel Networks. http://www.nortel.com/corporate/corptime/1900.html. Retrieved April 3, 2009.

8. ^ Rens & Roth 2001, p. 132.

9. ^ Rens & Roth 2001, pp. 129–132.

10. ^ Lewis, H. Spencer (1998). *The Mystic Triangle: A Modern Magazine of Rosicrucian Philosophy*. Kessinger Publishing. ISBN 0-7661-0705-1, 9780766107052.

11. ^ [a] [b] Nortel Networks (2009). "Corporate information: Nortel History – 1920 to 1929" (http://www.nortel.com/corporate/corptime/1920.html) . Nortel Networks. http://www.nortel.com/corporate/corptime/1920.html. Retrieved April 3, 2009.

12. ^ Rens & Roth 2001, p. 197.

13. ^ Chapuis, Robert J.; Joel, Amos E. (2003). *100 Years of Telephone Switching: Manual and Electromechanical Switching, 1878-1960's* (2, illustrated ed.). IOS Press. p. 282. ISBN 1-58603-349-2, 9781586033491.

14. ^ Nortel Networks (2007). "Corporate information: Nortel History – 1950 to 1959" (http://www.nortel.com/corporate/corptime/1950.html) . Nortel Networks. http://www.nortel.com/corporate/corptime/1950.html. Retrieved November 17, 2007.

15. ^ "Northern Electric – A Brief History" (http://www.porticus.org/bell/northern_electric_history.html) . http://www.porticus.org/bell/northern_electric_history.html Retrieved September 12, 2006.

16. ^ Rens, Jean-Guy (2007). "Canada and the Birth of the Digital World: The Contributions of R. Charles Terreault" (http://www.telecomhall.ca/index.php?page=92) . Canada's Telecommunications Hall of Fame. http://www.telecomhall.ca/index.php?page=92. Retrieved October 14, 2007.

17. ^ Oliver, Richard; Scheffinan, David (1995). "The Regulation of Vertical Relationships in the US Telecommunications Industry" (http://www.richardwoliver.com/PDFs/VerticalRelationships.pdf) (PDF). *Managerial and Decision Economics* 16 (4): 327–348. doi:10.1002/mde.4090160407 (http://dx.doi.org/10.1002%2Fmde.4090160407) . http://www.richardwoliver.com/PDFs/VerticalRelationships.pdf.

18. ^ Wahl, Andrew (March 24, 2009). "The good, the bad and the ugly: Nortel Networks" (http://ca.finance.yahoo.com/personal-finance/article/canadianbusiness/1037/the-good-the-bad-and-the-ugly-nortel-networks) . *Canadian Business magazine*. http://ca.finance.yahoo.com/personal-finance/article/canadianbusiness/1037/the-good-the-bad-and-the-ugly-nortel-networks. Retrieved July 28, 2009.

19. ^ "New board 'is an improvement by a mile'" (https://secure.globeadvisor.com/servlet/ArticleNews/story/gam/20050112/RNORTBOARD12) . *Globe and Advisor*. January 12, 2005. https://secure.globeadvisor.com/servlet/ArticleNews/story/gam/20050112/RNORTBOARD12. Retrieved March 12, 2011.

20. ^ "Nortel COO takes medical leave" (http://www.cbc.ca/news/story/2001/03/13/ott_nortelleave010313.html) . *CBC News* (Canadian Broadcasting Corporation). March 13, 2001. http://www.cbc.ca/news/story/2001/03/13/ott_nortelleave010313.html Retrieved December 15, 2011.

21. ^ Karleff, Ian (May 21, 2001). "Search for New CEO Launched by Nortel" (http://articles.latimes.com/2001/may/12/business/fi-62550) . Los Angeles Times. http://articles.latimes.com/2001/may/12/business/fi-62550. Retrieved December 15, 2011.

22. ^ McFarland, Janet (January 20, 2012). "No business reason to release Nortel reserves, court told" (http://www.theglobeandmail.com/report-on-business/no-business-reason-to-release-nortel-reserves-court-told/article2309645/) . *The Globe and Mail* (Toronto). http://www.theglobeandmail.com/report-on-business/no-business-reason-to-release-nortel-reserves-court-told/article2309645/.

23. ^ Lewis, Michael (January 18, 2012). "Nortel trial: Letters show Nortel execs knew they were getting bonuses fraudulently, Crown alleges" (http://www.thestar.com/article/1117383---nortel-trial-letters-show-nortel-execs-knew-they-were-getting-bonuses-fraudulently-crown-alleges) . *The Star* (Toronto).

http://www.thestar.com/article/1117383--nortel-trial-letters-show-nortel-execs-knew-they-were-getting-bonuses-fraudulently-crown-alleges.

24. ^ "Nortel execs were getting bonuses fraudulently: Crown |"
(http://www.ctv.ca/CTVNews/Canada/20120118/nortel-exec-fraud-trial-120118/#ixzz1jrHQEEzQ) . *CTV News.*
January 18, 2012. http://www.ctv.ca/CTVNews/Canada/20120118/nortel-exec-fraud-trial-
120118/#ixzz1jrHQEEzQ. Retrieved 2012-05-26.

25. ^ *a b* [1] (http://www.financialpost.com/story.html?id=2173704)

26. ^ "Nortel Networks Announces US$750 Million Support Facility with EDC and Details of Special Matters to be
Considered at Upcoming Shareholders Meeting"
(http://www.nortel.com/corporate/news/newsreleases/2003a/02_14_03_edc_credit_facility.html) (Press release).
Nortel Networks Corporation. February 14, 2003.
http://www.nortel.com/corporate/news/newsreleases/2003a/02_14_03_edc_credit_facility.html. Retrieved
December 9, 2009.

27. ^ McKibbon, Sean (February 16, 2003). "Bailout Billion; Taxpayers to prop up mega-loser Nortel". *Winnipeg Sun*
(Winnipeg: Sun Media): p. 8.

28. ^ *a b* "Top former Nortel execs charged with fraud" (http://www.canada.com/ottawacitizen/news/story.html?
id=c0d441c3-223a-4855-b3ad-09f6144727fa) . *Ottawa Citizen* (CanWest MediaWorks Publications). June 20,
2008. http://www.canada.com/ottawacitizen/news/story.html?id=c0d441c3-223a-4855-b3ad-09f6144727fa.
Retrieved October 7, 2011.

29. ^ Postmedia News (October 3, 2011). "Nortel criminal trial to begin Jan. 16"
(http://www.montrealgazette.com/news/Nortel+criminal+trial+begin/5496356/story.html) . *Montreal Gazette.*
http://www.montrealgazette.com/news/Nortel+criminal+trial+begin/5496356/story.html. Retrieved October 3,
2011.

30. ^ Nortel Government Solutions (2008). "Corporate Information: Nortel Government Solutions"
(http://nortelgov.com/corporateinfo.asp) . Nortel Government Solutions. http://nortelgov.com/corporateinfo.asp.
Retrieved June 1, 2008.

31. ^ "Nortel to Buy PEC Solutions For $448 Million" (http://www.washingtonpost.com/wp-
dyn/content/article/2005/04/26/AR2005042601432.html) . *Washington Post.* April 27, 2005.
http://www.washingtonpost.com/wp-dyn/content/article/2005/04/26/AR2005042601432.html. Retrieved January
11, 2012.

32. ^ [2] (http://www.nationalpost.com/related/links/story.html?id=2180163)

33. ^ "Nortel Announces Mike Zafirovski as President and CEO"
(http://www.ccnmatthews.com/news/releasesfr/show.jsp?action=showRelease&actionFor=562714) (Press
release). Nortel Networks. October 17, 2005. http://www.ccnmatthews.com/news/releasesfr/show.jsp?
action=showRelease&actionFor=562714. Retrieved June 1, 2008.

34. ^ McMillan, Robert (October 31, 2005). "Motorola, Nortel settle Zafirovski dispute"
(http://www.infoworld.com/article/05/10/31/HNmotorolanortel_1.html) . *infoworld.com.*
http://www.infoworld.com/article/05/10/31/HNmotorolanortel_1.html. Retrieved September 5, 2006.

35. ^ Austen, Ian (June 20, 2008). "3 Ex-Nortel Executives Are Accused of Fraud"
(http://www.nytimes.com/2008/06/20/technology/20nortel.html) . *The New York Times.*
http://www.nytimes.com/2008/06/20/technology/20nortel.html. Retrieved June 25, 2008.

36. ^ "Nortel cutting 2,100 jobs" (http://www.cbc.ca/canada/ottawa/story/2008/02/27/nortel-jobs.html) . *CBC News*
(Canadian Broadcasting Corporation). February 27, 2008.
http://www.cbc.ca/canada/ottawa/story/2008/02/27/nortel-jobs.html. Retrieved June 1, 2008.

37. ^ "Nortel to close Calgary operations" (http://www.cbc.ca/canada/calgary/story/2008/05/27/cgy-nortel.html) .
*CBC News* (Canadian Broadcasting Corporation). May 27, 2008.
http://www.cbc.ca/canada/calgary/story/2008/05/27/cgy-nortel.html. Retrieved June 1, 2008.

38. ^ "Nortel Reports Financial Results for the Third Quarter 2008" (http://www2.nortel.com/go/news_detail.jsp?
cat_id=-8055&oid=100248517&locale=en-US) (Press release). Nortel Networks. November 10, 2008.
http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100248517&locale=en-US. Retrieved November
11, 2008.

39. ^ "Nortel gets delisting warning from NYSE"

(http://www.bizjournals.com/triangle/stories/2008/12/08/daily53.html?ana=from_rss) . *Triangle Business Journal*. December 12, 2008. http://www.bizjournals.com/triangle/stories/2008/12/08/daily53.html?ana=from_rss. Retrieved December 14, 2008.

40. ^ "Who killed Nortel?" (http://www.nationalpost.com/rss/story.html?id=2164470) . *National Post*. January 9, 2009. http://www.nationalpost.com/rss/story.html?id=2164470. Retrieved August 14, 2010.

41. ^ "Nortel Obtains Court Orders for Creditor Protection" (http://biz.yahoo.com/iw/090114/0466136.html) (Press release). Nortel Networks Corporation. January 14, 2009. http://biz.yahoo.com/iw/090114/0466136.html. Retrieved January 14, 2009.

42. ^ Ricknäs, Mikael (January 14, 2009). "Nortel files for Chapter 11 bankruptcy protection" (http://www.computerworld.com/action/article.do?command=viewArticleBasic&articleId=9125922&source=NLT_BNA&nlid=1) . *Computerworld* (International Data Group). http://www.computerworld.com/action/article.do?command=viewArticleBasic&articleId=9125922&source=NLT_BNA&nlid=1. Retrieved January 15, 2009.

43. ^ Greene, Tim (January 14, 2009). "Nortel bankruptcy filings are last-ditch effort" (http://www.networkworld.com/news/2009/011409-nortel-bankruptcy.html?hpg1=bn) . *Network World*. http://www.networkworld.com/news/2009/011409-nortel-bankruptcy.html?hpg1=bn. Retrieved January 15, 2009.

44. ^ "Canada's Nortel to sell itself off in pieces" (http://www.jpost.com/Business/BusinessNews/Article.aspx?id=146314) . *Jerusalem Post*. June 22, 2009. http://www.jpost.com/Business/BusinessNews/Article.aspx?id=146314. Retrieved March 12, 2011.

45. ^ "Nortel Networks files for bankruptcy protection" (http://www.cbc.ca/canada/story/2009/01/14/nortelbankruptcypro.htm) . *CBC News* (Canadian Broadcasting Corporation). January 14, 2009. http://www.cbc.ca/canada/story/2009/01/14/nortelbankruptcypro.htm. Retrieved January 14, 2009.

46. ^ Palmer, Randall (January 14, 2009). "Canada government pledges to help Nortel" (http://www.reuters.com/article/idCAN1446286920090114) . *Reuters*. http://www.reuters.com/article/idCAN1446286920090114.

47. ^ Hill, Bert (March 1, 2009). "Nortel pays big bonuses to keep execs" (http://www.nationalpost.com/story.html?id=1342517) . *National Post*. http://www.nationalpost.com/story.html?id=1342517. Retrieved March 3, 2010.

48. ^ "Nortel Refines Focus of Carrier Business: Ends Joint Agreement with Alvarion for Mobile WiMAX" (http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100251997&locale=en-US) (Press release). Nortel Networks. January 29, 2009. http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100251997&locale=en-US. Retrieved January 31, 2009.

49. ^ Drew, Jeff (January 30, 2009). "Nortel getting out of WiMAX" (http://www.bizjournals.com/triangle/stories/2009/01/26/daily68.html?ana=from_rss) . *Triangle Business Journal* (American City Business Journals). http://www.bizjournals.com/triangle/stories/2009/01/26/daily68.html?ana=from_rss. Retrieved January 31, 2009.

50. ^ "Radware buys Nortel product line" (http://www.globes.co.il/serveen/globes/docview.asp?did=1000427704&nl=1380) . *Globes [online]*. February 32, 20092. http://www.globes.co.il/serveen/globes/docview.asp?did=1000427704&nl=1380. Retrieved February 21, 2009.

51. ^ "Nortel Completes Divestiture of Certain L4-7 Data Assets to Radware" (http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100252878&locale=en-US) (Press release). Nortel Networks. March 31, 2009. http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100252878&locale=en-US. Retrieved July 25, 2009.

52. ^ "Nortel to Divest Layer 4-7 Data Portfolio: Enters into Asset Purchase Agreement with Radware" (http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100252878&locale=en-US) (Press release). Nortel Networks. February 19, 2009. http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100252878&locale=en-US. Retrieved February 22, 2009.

53. ^ "NP Story" (http://www.nationalpost.com/related/links/story.html?id=2197179) . *National Post*. http://www.nationalpost.com/related/links/story.html?id=2197179. Retrieved August 14, 2010.

54. ^ *a* *b* "Nortel To Sell CDMA Business and LTE Assets; Company Advancing in Its Discussions With External Parties To Sell Other Businesses" (http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100257883&locale=en-US) (Press release). Nortel Networks. June 19, 2009. http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100257883&locale=en-US. Retrieved June 19,

2009.

55. ^ "It's official: Nortel shares are worthless" (http://www.theglobeandmail.com/blogs/streetwise/its-official-nortel-shares-are-worthless/article1191739/) . *The Globe and Mail*. June 22, 2009.
http://www.theglobeandmail.com/blogs/streetwise/its-official-nortel-shares-are-worthless/article1191739/.
Retrieved June 22, 2009.

56. ^ Tedesco, Theresa; Sturgeon, Jamie (June 27, 2009). "Nortel: Cautionary tale of a former Canadian titan"
(http://www.canada.com/business/fp/NORTEL+Cautionary+tale+former+Canadian+titan/1739799/story.html) .
*Canada.com* (Canwest Publishing).
http://www.canada.com/business/fp/NORTEL+Cautionary+tale+former+Canadian+titan/1739799/story.html.
Retrieved July 25, 2009.

57. ^ "Nortel Announces Board of Directors, Management Team and Organizational Changes"
(http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100260088&locale=en-US) (Press release). Nortel
Networks Corporation. August 10, 2009. http://www2.nortel.com/go/news_detail.jsp?
cat_id=-8055&oid=100260088&locale=en-US. Retrieved August 10, 2009.

58. ^ "Bankrupt Telecom Company Doled Out $8.6M in Bonuses Last Year"
(http://www.phoneplusmag.com/hotnews/nortel-paid-mike-zafirovski-2-3m-resigned.html) . *Phone Plus
Magazine*. March 19, 2010. http://www.phoneplusmag.com/hotnews/nortel-paid-mike-zafirovski-2-3m-
resigned.html. Retrieved March 12, 2011.

59. ^ Bagnall, James (July 24, 2009). "Moment of truth for Nortel's wireless unit"
(http://www.canada.com/technology/Moment+truth+Nortel+wireless+unit/1822699/story.html) . *Ottawa Citizen*.
http://www.canada.com/technology/Moment+truth+Nortel+wireless+unit/1822699/story.html. Retrieved July 25,
2009.

60. ^ "Nortel Selects Ericsson as Successful Bidder For CDMA Business and LTE Access Assets"
(http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100259793&locale=en-US) (Press release). Nortel
Networks. July 25, 2009. http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100259793&locale=en-
US. Retrieved July 25, 2009.

61. ^ Bagnall, James (July 25, 2009). "Ericsson prevails in fight for Nortel's wireless business with $1.13B bid"
(http://www.ottawacitizen.com/business/Ericsson+wins+Nortel+wireless+business+with/1828785/story.html) .
*Ottawa Citizen*.
http://www.ottawacitizen.com/business/Ericsson+wins+Nortel+wireless+business+with/1828785/story.html.
Retrieved July 25, 2009.

62. ^ "Nortel selects Avaya as successful bidder for Enterprise Solutions Business."
(http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100261422&locale=en-US) (Press release). Nortel
Networks Corporation. September 14, 2009. http://www2.nortel.com/go/news_detail.jsp?
cat_id=-8055&oid=100261422&locale=en-US.

63. ^ "Nortel To Sell Enterprise Solutions Business" (http://www2.nortel.com/go/news_detail.jsp?
cat_id=-8055&oid=100259133&locale=en-US) (Press release). Nortel Networks Corporation. July 20, 2009.
http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100259133&locale=en-US. Retrieved July 21,
2009.

64. ^ "Nortel Selects Ciena as Successful Bidder for Optical Networking and Carrier Ethernet Businesses"
(http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100263404&locale=en-US&lcid=-1) (Press
release). Nortel Networks Corporation. November 23, 2009. http://www2.nortel.com/go/news_detail.jsp?
cat_id=-8055&oid=100263404&locale=en-US&lcid=-1. Retrieved December 20, 2009.

65. ^ Musgrove, Mike (November 24, 2009). "Ciena buys Nortel unit to expand footprint"
(http://www.webcitation.org/5IWbnieop) . *The Washington Post*. Archived from the original
(http://www.washingtonpost.com/wp-dyn/content/article/2009/11/23/AR2009112303889.html?
wpisrc=newsletter&wpisrc=newsletter&wpisrc=newsletter) on November 24, 2009.
http://www.webcitation.org/5IWbnieop. Retrieved November 24, 2009. "*subtitle*: $769 million deal to triple
Maryland tech firm's market share"

66. ^ "Nortel Selects Ericsson and Kapsch as Successful Bidders for GSM/GSM-R Business"
(http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100263526) (Press release). Nortel Networks
Corporation. November 25, 2009. http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100263526.
Retrieved December 20, 2009.

67. ^ "Nortel Announces Plans to Sell its GSM/GSM-R Business" (http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100262122&locale=en-US) (Press release). Nortel Networks Corporation. September 30, 2009. http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100262122&locale=en-US. Retrieved October 1, 2009.

68. ^ "Nortel to sell Entire GSM Business" (http://business2press.com/2009/10/01/nortel-to-sell-gsm-business-assets/) . Business2press. http://business2press.com/2009/10/01/nortel-to-sell-gsm-business-assets/. Retrieved March 12, 2011.

69. ^ "Nortel Provides Update on Auction Date for the Sale of its GSM/GSM-R Business; Obtains Further Extension of Stay Period Under CCAA; and Obtains Canadian and U.S. Court Approval for Sale of Packet Core Assets" (http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100262713&locale=en-US) (Press release). Nortel Networks Corporation. October 28, 2009. http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100262713&locale=en-US. Retrieved November 14, 2009.

70. ^ "Nortel Completes Sale of Assets of Next Generation Packet Core Network Components to Hitachi" (http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100263758&locale=en-US&lcid=-1) . Nortel Networks Corporation. August 10, 2009. http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100263758&locale=en-US&lcid=-1. Retrieved March 12, 2011.

71. ^ "John Roth seeks $1B protection from lawsuits" (http://www.cbc.ca/news/canada/ottawa/story/2009/12/17/nortel-john-roth-lawsuits.html) . CBC News (Canadian Broadcast Corporation). December 17, 2009. http://www.cbc.ca/news/canada/ottawa/story/2009/12/17/nortel-john-roth-lawsuits.html.

72. ^ Hill, Bert (February 23, 2010). "Nortel leaves $37M health-fund gap" (http://www.ottawacitizen.com/life/Nortel+leaves+health+fund/2600350/story.html) . Ottawa Citizen. http://www.ottawacitizen.com/life/Nortel+leaves+health+fund/2600350/story.html. Retrieved January 3, 2010.

73. ^ Hill, Bert (February 12, 2010). "Nortel allots $92.3M for top staff; Retention bonuses 'standard procedure' for key workers in bankruptcy proceedings". Ottawa Citizen: p. F.1.

74. ^ Hill, Bert (February 24, 2010). "Retention plan gives Nortel added flexibility". Ottawa Citizen: p. C.1.

75. ^ "Nortel's Proposed Incentive Payments Opposed by U.S. Trustee" (http://www.businessweek.com/news/2010-03-02/nortel-s-proposed-incentive-payments-opposed-by-u-s-trustee.html) . Business Week. March 3, 2010. http://www.businessweek.com/news/2010-03-02/nortel-s-proposed-incentive-payments-opposed-by-u-s-trustee.html. Retrieved March 12, 2011.

76. ^ "Nortel Completes Sale of Carrier VoIP and Application Solutions Business to GENBAND" (http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100267654&locale=en-US&lcid=-1) (Press release). Nortel Networks Corporation. May 28, 2010. http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100267654&locale=en-US&lcid=-1. Retrieved October 20, 2010.

77. ^ "Nortel to Sell Carrier VoIP and Application Solutions Business" (http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100264793&locale=en-US) (Press release). Nortel Networks Corporation. December 23, 2009. http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100264793&locale=en-US. Retrieved January 5, 2010.

78. ^ Le Maistre, Ray (December 23, 2009). "Genband Bids $282M for Nortel's VoIP Unit" (http://www.lightreading.com/document.asp?doc_id=186124) . Light Reading. http://www.lightreading.com/document.asp?doc_id=186124. Retrieved January 5, 2010.

79. ^ "Acquisition of Nortel's stake of LG-Nortel completed" (http://www.ericsson.com/news/1428285) (Press release). Ericsson. June 30, 2010. http://www.ericsson.com/news/1428285. Retrieved October 20, 2010.

80. ^ "Nortel Completes Sale of Shares in LG-Nortel to Ericsson" (http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100268778&locale=en-US) (Press release). Nortel Networks Corporation. June 29, 2010. http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100268778&locale=en-US. Retrieved October 20, 2010.

81. ^ "Acquisition of Nortel's Multi-Service Switch business" (http://www.ericsson.com/news/1446864) (Press release). Ericsson. September 25, 2010. http://www.ericsson.com/news/1446864. Retrieved October 20, 2010.

82. ^ "Nortel Announces Ericsson as Successful Acquirer of Its Multi Service Switch Business" (http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100269667&locale=en-US) (Press release). Nortel Networks Corporation. September 25, 2010. http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100269667&locale=en-US. Retrieved October 20, 2010.

83. ^ Hill, Bert (September 26, 2010). "Ericsson beats Ottawa bidders for last big Nortel division" (http://www.ottawacitizen.com/Ericsson+beats+Ottawa+bidders+last+Nortel+division/3582155/story.html) . *Ottawa Citizen*. http://www.ottawacitizen.com/Ericsson+beats+Ottawa+bidders+last+Nortel+division/3582155/story.html. Retrieved October 20, 2010.

84. ^ "Nortel To Sell Ottawa Carling Campus To Public Works and Government Services Canada" (http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100269828&locale=en-US) (Press release). Nortel Networks Corporation. October 19, 2010. http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100269828&locale=en-US. Retrieved December 31, 2010.

85. ^ "One Equity continues pursuit of liquidated Nortel assets" (http://www.privateequityconnect.com/NewsContent.aspx?iid=56807) . privateequityconnect.com. http://www.privateequityconnect.com/NewsContent.aspx?iid=56807. Retrieved April 21, 2011.

86. ^ "Nortel Networks (Netas) Acquisition by OEP" (http://www.legal500.com/firms/14006-paksoy/press_releases/12513) (Press release). Paksoy. http://www.legal500.com/firms/14006-paksoy/press_releases/12513. Retrieved April 21, 2011.

87. ^ Musil, Steven (June 30, 2011). "Apple, RIM in group buying Nortel patents for $4.5B" (http://news.cnet.com/8301-1001_3-20075977-92/apple-rim-in-group-buying-nortel-patents-for-$4.5b/?part=rss&subj=news&tag=2547-1_3-0-20) . *CNET* (CBS Interactive). http://news.cnet.com/8301-1001_3-20075977-92/apple-rim-in-group-buying-nortel-patents-for-$4.5b/?part=rss&subj=news&tag=2547-1_3-0-20. Retrieved October 7, 2011.

88. ^ "Nortel sells patents to consortium for $4.5B" (http://www.google.com/hostednews/ap/article/ALeqM5hy96xdAe1B7P0qvWIFBC-C7hwzvg?docId=03166dd1084a4fb8a9c099a14cc6c346) . Associated Press. July 1, 2011. http://www.google.com/hostednews/ap/article/ALeqM5hy96xdAe1B7P0qvWIFBC-C7hwzvg?docId=03166dd1084a4fb8a9c099a14cc6c346.

89. ^ Marlow, Iain (April 4, 2011). "Bid for Nortel patents marks Google's new push into mobile world" (http://www.theglobeandmail.com/report-on-business/google-bids-900-million-for-nortel-patents/article1969788/) . *The Globe and Mail* (Toronto). http://www.theglobeandmail.com/report-on-business/google-bids-900-million-for-nortel-patents/article1969788/.

90. ^ Damouni, Nadia (July 1, 2011). "Dealtalk: Google bid "pi" for Nortel patents and lost" (http://www.reuters.com/article/2011/07/02/us-dealtalk-nortel-google-idUSTRE76104L20110702) . *Reuters*. http://www.reuters.com/article/2011/07/02/us-dealtalk-nortel-google-idUSTRE76104L20110702. Retrieved July 2, 2011.

91. ^ Hill, Bert (October 5, 2011). "In patent wars, the casualty is progress" (http://www.ottawacitizen.com/touch/story.html?id=5502955) . *Ottawa Citizen*. http://www.ottawacitizen.com/touch/story.html?id=5502955. Retrieved October 20, 2011.

92. ^ Chellel, Kit (October 15, 2011). "Lehman, Nortel lose $3.5B pension appeal" (http://www.ottawacitizen.com/business/Lehman+Nortel+lose+pension+appeal/5554405/story.html) . *Ottawa Citizen*. http://www.ottawacitizen.com/business/Lehman+Nortel+lose+pension+appeal/5554405/story.html. Retrieved October 20, 2011.

Retrieved from "http://en.wikipedia.org/w/index.php?title=Timeline_of_Nortel&oldid=504806500"
Categories: Nortel | Technology company timelines | Company histories

- This page was last modified on 29 July 2012 at 18:57.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. See Terms of use for details.
  Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.



# Understanding Your Fiduciary Responsibilities Under a Group Health Plan

OCTOBER 2008



**U.S. Department of Labor**
**Employee Benefits Security Administration**

## WHO IS A FIDUCIARY?

Many of the actions involved in operating a plan make the person or entity performing them a fiduciary. Using discretion in administering and managing a plan or controlling the plan's assets makes that person a fiduciary to the extent of that discretion or control. Thus, fiduciary status is based on the functions performed for the plan, not just a person's title.

As noted above, group health plans can be structured in a variety of ways. The structure of the plan will affect who has fiduciary responsibilities. Most employers sponsoring fully or partially self-funded group health plans exercise some discretionary authority and therefore are fiduciaries. If the employer sponsors a fully insured plan, fiduciary status depends on whether the employer exercises discretion over the plan.

A plan must have at least one fiduciary (a person or entity) named in the written plan, or through a process described in the plan, as having control over the plan's operation. The named fiduciary can be identified by office or by name. For some plans, it may be an administrative committee or a company's board of directors.

A plan's fiduciaries will ordinarily include plan administrators, trustees, investment managers, all individuals exercising discretion in the administration of the plan, all members of a plan's administrative committee (if it has such a committee), and those who select committee officials. Attorneys, accountants, and actuaries generally are not fiduciaries when acting solely in their professional capacities. Similarly, a third party administrator, recordkeeper or utilization reviewer who performs solely ministerial tasks is not a fiduciary; however, that may change if he or she exercises discretion in making decisions regarding a participant's eligibility for benefits. The key to determining whether individuals or entities are fiduciaries is whether they are exercising discretion or control over the plan.

A number of decisions are not fiduciary actions but rather are business decisions made by the employer. For example, the decisions to establish a plan, to determine the benefit package, to include certain features in a plan, to amend a plan, and to terminate a plan are employer business decisions not governed by ERISA. When making these decisions, an employer is acting on behalf of its business, not the plan, and, therefore, is not a fiduciary. However, when an employer (or someone hired by the employer) takes steps to implement these decisions, that person is acting on behalf of the plan and, in carrying out these actions, may be a fiduciary.

## WHAT IS THE SIGNIFICANCE OF BEING A FIDUCIARY?

Fiduciaries have important responsibilities and are subject to standards of conduct because they act on behalf of participants in a group health plan and their beneficiaries. These responsibilities include:

- Acting solely in the interest of plan participants and their beneficiaries and with the exclusive purpose of providing benefits to them;
- Carrying out their duties prudently;
- Following the plan documents (unless inconsistent with ERISA);
- Holding plan assets (if the plan has any) in trust; and
- Paying only reasonable plan expenses.

2

The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas. Lacking that expertise, a fiduciary will want to hire someone with that professional knowledge to carry out those functions. Prudence focuses on the process for making fiduciary decisions. Therefore, it is wise to document decisions and the basis for those decisions. For instance, in hiring any plan service provider, a fiduciary may want to survey a number of potential providers, asking for the same information and providing the same requirements. By doing so, a fiduciary can document the process and make a meaningful comparison and selection.

Following the terms of the plan document is also an important responsibility. The plan document serves as the foundation for plan operations. Employers will want to be familiar with their plan document, especially when it is drawn up by a third-party service provider, and periodically review the document to make sure it remains current. For example, if a plan official named in the document changes, the plan document must be updated to reflect that change.

## LIMITING LIABILITY

With these fiduciary responsibilities, there is also potential liability. Fiduciaries who do not follow the basic standards of conduct may be personally liable to restore any losses to the plan, or to restore any profits made through improper use of the plan's assets resulting from their actions.

However, fiduciaries can limit their liability in certain situations. One way fiduciaries can demonstrate that they have carried out their responsibilities properly is by documenting the processes used to carry out their fiduciary responsibilities.

A fiduciary also can hire a service provider or providers to handle fiduciary functions, setting up the agreement so that the person or entity then assumes liability for those functions selected. If an employer contracts with a plan administrator to manage the plan, the employer is responsible for the selection of the service provider, but is not liable for the individual decisions of that provider. However, an employer is required to monitor the service provider periodically to assure that it is handling the plan's administration prudently.

## OTHER PLAN FIDUCIARIES

A fiduciary should be aware of others who serve as fiduciaries to the same plan, since all fiduciaries have potential liability for the actions of their co-fiduciaries. For example, if a fiduciary knowingly participates in another fiduciary's breach of responsibility, conceals the breach, or does not act to correct it, that fiduciary is liable as well.

## BONDING

As an additional protection for plans, every person, including a fiduciary, who handles plan funds or other plan property generally must be covered by a fidelity bond. A fidelity bond is a type of insurance that protects the plan against loss by reason of acts of fraud or dishonesty on the part of persons covered by the bond. Many persons dealing with group health plans that pay benefits from the general assets of an employer or union (unfunded) or group health plans

that are insured (benefits are paid through the purchase of a group health insurance contract from a licensed insurer) may be eligible for exemptions from the fidelity bonding requirements.

## HOW DO THESE RESPONSIBILITIES AFFECT THE OPERATION OF THE PLAN?

Even if employers hire third-party service providers or use internal administrative committees to manage the plan, there are still certain functions that can make an employer a fiduciary.

## EMPLOYEE CONTRIBUTIONS

If a plan provides for salary reductions from employees' paychecks for contribution to the plan or participants make payments directly, such as the payment of COBRA premiums, then the employer must deposit the contributions in a plan trust in a timely manner. The law requires that participant contributions be deposited in the plan as soon as it is reasonably possible to segregate them from the company's assets, but no later than 90 days from the date on which the participant contributions are withheld or received by the employer.[2]  If employers can reasonably make the deposits sooner, they need to do so.

For participant contributions to cafeteria plans (also referred to as (Internal Revenue Code) Section 125 plans), the Department will not assert a violation solely because of a failure to hold participant contributions in trust. Other contributory health plan arrangements may obtain the same trust relief if the participant contributions are used to pay insurance premiums within 90 days of receipt.

## HIRING A SERVICE PROVIDER

Hiring a service provider in and of itself is a fiduciary function. When considering prospective service providers, provide each of them with complete and identical information about the plan and what services you are looking for so that you can make a meaningful comparison.

Some actions fiduciaries need to consider when selecting a service provider include:

- When searching for a firm, get information from more than one provider;
- Compare firms based on same information – services offered, experience, costs, etc.;
- Obtain information about the firm itself: financial condition and experience with group health plans of similar size and complexity;
- Evaluate information about the quality of the firm's services: the identity, experience, and qualifications of professionals who will be handling the plan or providing medical services; any recent litigation or enforcement action that has been taken against the firm; and the firm's experience or performance record; ease of access to medical providers and information about the operations of the health care provider; the procedures for timely consideration and resolution of patient questions and

---

[2] A proposed rule provides a safe harbor period for plans with fewer than 100 participants. If the salary reduction contributions are deposited with the plan no later than the 7th business day following withholding by the employer, they will be considered contributed in compliance with the law. Pending the adoption of a final rule by the Department of Labor, the Department's Employee Benefits Security Administration (EBSA) will not assert a violation of ERISA regarding participant contributions where such contributions are deposited with a small plan within 7 business days. Because the final rule may change, periodically check www.dol.gov/ebsa for the publication of the final rule.

## MAINTAINING THE PLAN'S BENEFITS CLAIMS PROCEDURE

Group health plans must establish and maintain reasonable claims procedures that allow participants and beneficiaries to apply for and receive the plan's promised benefits. Fiduciaries must maintain the plan's procedures. The Department of Labor issued rules setting minimum standards for benefit claims determinations for ERISA plans (including insured and self-funded plans). While many plans hire benefits professionals or insurance companies to process claims, it is important for an employer to understand the requirements before selecting a service provider who can comply with the standards.

A claim for benefits is a request for a plan benefit made in accordance with the plan's procedures by a claimant (participant or beneficiary) or a claimant's authorized representative. Questions concerning plan benefits, coverage and eligibility questions, and casual inquiries are generally not considered claims for benefits.

The key issues to become familiar with are the timeframes for deciding claims, the contents for the notices of benefit denials, and the standards for appeals of benefit denials.

Once a claim is received by the plan, the timeframe for making and providing notice of the claim determination varies based on the type of claim filed –

- urgent care, as soon as possible but not later than 72 hours after the plan receives the claim;
- pre-service claims, within a reasonable period of time not later than 15 days after the plan receives the claim;
- post-service claims, within a reasonable period of time not later than 30 days after the plan receives the claim; and
- disability claims, within a reasonable period of time not later than 45 days after the plan receives the claim.

In the case of pre- and post-service claims, 15 day extensions may be available.

For claims that are appealed, the timeframe also varies based on the type of claim –

- urgent care claims, as soon as possible but not later than 72 hours after the plan receives the request to review a denied claim;
- pre-service claims, within a reasonable period of time not later than 30 days after the plan receives the request to review a denied claim;
- post-service claims, as soon as possible but not later than 60 days after the plan receives the request to review a denied claim; and
- disability claims, within a reasonable period of time but not later than 45 days after the plan receives the request to review a denied claim.

No extensions are available for making decisions on appeals unless the claimant consents.

The notice of a claim denial, referred to as an adverse benefit determination, must contain the following information:

- Specific reasons for denial (for example, not medically necessary, not covered by the plan, or reached maximum amount of treatment permitted under the plan);
- A reference to the specific plan provision(s) relied upon for the denial;
- If denied for a lack of information, the notice must include a description of any additional material(s) needed to perfect the claim and an explanation of why such additional material is necessary;
- A description of the plan's review procedures (for example, how appeals work);
- If used, either a description of rules, guidelines, or protocols relied upon in denying the claim, or that a copy of such items will be provided free upon request;
- If denial is based on medical necessity or experimental treatment or similar exclusion or limit, an explanation of the scientific or clinical judgment for the denial, applying the terms of the plan to the claimant's medical circumstances, or a statement that an explanation will be provided free of charge upon request; and
- A description of the claimant's right to go to court to recover benefits due under the plan.

The notice of a claim denial on appeal must include the same information as noted above (except the description of the plan's appeal process) as well as:

- A statement of the claimant's right to receive, free of charge, relevant documents (documents and records upon which the decision is based and other documents prepared or used during the process); and
- A description of any voluntary processes offered by the plan to resolve claims disputes.

The plan's claims procedure must provide for a full and fair review of a benefit claim if a claimant files an appeal of the denial. The minimum standards for appeals are:

- Claimants must be given 180 days to file an appeal;
- A *de novo* review, that is, a review that affords no deference to the initial determination, must be conducted;
- When the denial is based on determinations of whether a particular treatment, drug or other item is experimental, investigational, or not "medically necessary," the reviewer must consult with a qualified health professional (and others as needed);
- No more than 2 appeals levels are allowed; and
- Mandatory binding arbitration of claims is generally prohibited. However, non-binding arbitration would be permissible if done within the required timelines.

For more information, request a copy of *Compliance Assistance - Group Health and Disability Plans Benefit Claims Procedure Regulation* (see **Resources**).

complaints; the procedures for the confidentiality of patient records; and enrollee satisfaction statistics; and

■ Ensure that any required licenses, ratings or accreditations are up to date (insurers, brokers, TPAs, health care service providers).

An employer should document its selection (and monitoring) process, and, when using an internal administrative committee, should educate committee members on their roles and responsibilities. Read, understand, and keep a copy of all contracts.

## FEES

Fees are just one of several factors fiduciaries need to consider in deciding on service providers. When the fees for services are paid out of plan assets, fiduciaries will want to understand the fees and expenses charged and the services provided. While the law does not specify a permissible level of fees, it does require that fees charged to a plan be "reasonable." After careful evaluation during the initial selection, the plan's fees and expenses should be monitored to determine whether they continue to be reasonable.

In comparing estimates from prospective service providers, ask which services are covered for the estimated fees and which are not. Some providers offer a number of services for one fee, sometimes referred to as a "bundled" services arrangement. Others charge separately for individual services. Compare all services to be provided with the total cost for each provider. Consider whether the estimate includes services you did not specify or want. Remember, all services have costs.

Some services providers may receive additional fees from third parties, such as insurance brokers. Employers should ask prospective providers whether they get any compensation from third parties, such as finder's fees, commissions or revenue sharing.

Who pays the fees? Plan expenses may be paid by the employer, the plan, or both. In any case, the plan document should specify how fees are paid, and the fiduciary must ensure that those fees and expenses are reasonable, necessary for the operation of the plan, and not excessive for the services provided.

## MONITORING A SERVICE PROVIDER

An employer should establish and follow a formal review process at reasonable intervals to decide if it wants to continue using the current service providers or look for replacements. When monitoring service providers, actions to ensure they are performing the agreed-upon services include:

- Reviewing the service providers' performance;
- Reading any reports they provide;
- Checking actual fees charged;
- Asking about policies and practices (such as a TPA's claims processing systems);
- Ensuring that plan records are properly maintained; and
- Following up on participant complaints.

## ARE THERE SOME TRANSACTIONS THAT ARE PROHIBITED? IS THERE A WAY TO MAKE THEM PERMISSIBLE IF THE ACTIONS WILL BENEFIT THE PLAN?

Certain transactions are prohibited under the law to prevent dealings with parties who may be in a position to exercise improper influence over the plan. In addition, fiduciaries are prohibited from engaging in self-dealing and must avoid conflicts of interest that could harm the plan.

### PROHIBITED TRANSACTIONS

Who is prohibited from doing business with the plan? Prohibited parties (called parties in interest) include the employer, the union, plan fiduciaries, service providers, and statutorily-defined owners, officers, and relatives of parties in interest.

Some of the prohibited transactions are:

- A sale, exchange, or lease between the plan and party in interest;
- Lending money or other extension of credit between the plan and party in interest; and
- Furnishing goods, services, or facilities between the plan and party in interest.

Other prohibitions relate solely to fiduciaries who use the plan's assets in their own interest or who act on both sides of a transaction involving a plan. Fiduciaries cannot receive money or any other consideration for their personal account from any party doing business with the plan related to that business.

### EXEMPTIONS

There are a number of exceptions (exemptions) in the law that provide protections for the plan in conducting necessary transactions that would otherwise be prohibited. The Labor Department may grant additional exemptions.

Exemptions are provided in the law for many dealings that are essential to the ongoing operations of the plan. One exemption in the law allows the plan to hire a service provider as long as the services are necessary to operate the plan and the contract or arrangement under which the services are provided and the compensation paid for those services is reasonable.

The exemptions issued by the Department can involve transactions available to a class of plans or to one specific plan. Both class and individual exemptions are available at www.dol.gov/ebsa under Compliance Assistance. For more information on applying for an exemption, request a copy of *Exemption Procedures Under Federal Pension Law* (this publication and the procedures also apply to group health plans - see **Resources**).

# How Do Employees Get Information About The Plan? How Are Employers Required To Report Plan Activities?

ERISA requires plan administrators to furnish plan information to participants and beneficiaries and to submit reports to government agencies.

## Informing Participants And Beneficiaries

The following documents must be automatically furnished to participants and beneficiaries.

The **Summary Plan Description (SPD)** — the basic descriptive document — is a plain language explanation of the plan and must be comprehensive enough to apprise participants of their rights and responsibilities under the plan. It also informs participants about the plan features and what to expect of the plan. Among other things, the SPD must include basic information such as:

- Plan name, address, and contact information;
- What the plan benefits are;
- How to get the benefits; and
- Duties of the plan and/or employee.

More specific information must also be provided, including:

- The plan's claims procedure (either in the document or as separate attachment);
- A participant's basic rights and responsibilities under ERISA (model language is provided in the SPD rules);
- Information on any applicable premiums, cost-sharing, deductibles, co-payments, etc.;
- Any caps (annual or lifetime) on benefits;
- Procedures for using network providers (if PPO/HMO) and composition of network;
- Conditions regarding pre-certification;
- A description of plan procedures governing Qualified Medical Child Support Orders (see below); and
- Notices and descriptions of certain rights under the Health Insurance Portability and Accountability Act (HIPAA) and other health coverage laws, described below.

This document is given to employees within 90 days after they are covered by the plan. SPDs must also be redistributed every 5th year and provided within 30 days of a request. The SPD must be current within 120 days.

The **Summary of Material Modification (SMM)** apprises participants and beneficiaries of material changes to the plan or to the information required to be in the SPD. The SMM or an updated SPD for a group health plan must be furnished automatically to participants within 210 days after the end of the plan year in which such material change was adopted. However, if the changes to the plan or changes to the required information in the SPD result in a material reduction in covered services or benefits, then the SMM must be distributed no later than 60 days from the date the change was adopted. A material reduction is any plan change that eliminates benefits, reduces benefits payable, increases premiums, deductibles, coinsurance or co-payments, reduces the service area covered by an HMO, or establishes new conditions or requirements (such as pre-authorization) for obtaining services or benefits.

A **Summary Annual Report (SAR)** outlines in narrative form the financial information in the plan's Annual Report, the Form 5500 (see below for those plans required to file this report), and is furnished annually to participants in plans that are required to file the Form 5500.

## OTHER GROUP HEALTH PLAN NOTICES

There are notices required under other provisions in ERISA (i.e., the Consolidated Omnibus Budget Reconciliation Act (COBRA), the Health Insurance Portability and Accountability Act (HIPAA), the Newborns' and Mothers' Health Protection Act (Newborns' Act), the Womens' Health and Cancer Rights Act (WHCRA), and the Mental Health Parity Act (MHPA)). Some of these notices may be included in the SPD and others must be provided separately due to the timeframes for when they are required to be provided. For more information on these notices, see the Resources section to obtain a copy of the *Reporting and Disclosure Guide for Employee Benefit Plans*. For more information on COBRA, HIPAA, and the other provisions in ERISA related to group health plans, see **Resources** for publications on these provisions.

## DISCLOSURES UPON REQUEST

In addition to the SPD, participants can also request the plan document, insurance contracts, and other documents under which the plan is operated. A reasonable copying fee may be charged.

## QUALIFIED MEDICAL CHILD SUPPORT ORDERS (QMCSO)

Plans may receive either private Medical Child Support orders (MCSO) or an order from a state agency regarding an employee's medical child support obligations. Plans must have procedures to receive, process, and implement qualified medical child support orders. If a plan receives an MCSO, the plan administrator has to provide a notice to the participant and any child named in the MCSO (and the child's representative) of the receipt of the MCSO and the plan administrator's determination whether the MCSO is qualified. The notice must be furnished within a reasonable time period after receipt of the MCSO. For more information on QMCSO's and the standards plans must use to determine whether MCSOs are qualified, request a copy of *Qualified Medical Child Support Orders* (see **Resources**).

## REPORTING TO THE GOVERNMENT

Plan administrators generally are required to file a Form 5500 Annual Return/Report with the Federal Government. The Form 5500 reports information about the plan, its finances, and its operation. This information is used by the U.S. Department of Labor, the Internal Revenue Service (IRS), other government agencies, organizations, and the public. Participants and beneficiaries can receive a copy of the Form 5500 upon request from the plan. Depending on the number of participants covered and plan design, there may be exemptions from the full filing requirements. A group health plan with fewer than 100 participants that is either fully insured or self-funded (or a combination of both) does not need to file an annual report. Plans with 100 or more participants that are fully insured or self-funded (or a combination) can file a limited report. Plans that have relief from the trust requirement discussed in **Employee Contributions** above are treated as self-funded.

The form is filed and processed under the ERISA Filing Acceptance System (EFAST). For more information on the forms, their instructions, and the filing requirements, see www.efast.dol.gov and request the publication *Reporting and Disclosure Guide for Employee Benefit Plans*. See the **Resources** section to obtain a copy.

Administrators of multiple employer welfare arrangements (MEWAs) generally are required to file a Form M-1 Report with the Federal Government. The Form M-1 reports information about compliance by MEWAs with the requirements of Part 7 of ERISA (which includes HIPAA, the Newborns' Act, WHCRA, and MHPA). This one-page form is generally required to be filed once per year. For more information on the Form M-1, see www.dol.gov/ebsa and request the publication *Multiple Employer Welfare Arrangements under the Employee Retirement Income Security Act (ERISA): A Guide to Federal and State Regulation*.

There are penalties for failing to file required reports and for failing to provide required information to participants.

## How Do Other Laws Affect Fiduciary Responsibilities?

As noted above, there are other provisions in ERISA, as well as other Federal and State laws that affect group health plans. A fiduciary's responsibilities include making sure the plan complies with ERISA, which includes the COBRA, HIPAA, and other group health plan provisions in the law.

The COBRA continuation coverage provisions require that participants and their covered dependents have the opportunity to maintain coverage under their group health plan for a limited period of time, which they may be required to pay for, upon the occurrence of certain qualifying events that would otherwise result in a loss of coverage. For a more detailed discussion of COBRA requirements, see *An Employer's Guide to Group Health Continuation Coverage Under COBRA – The Consolidated Omnibus Budget Reconciliation Act of 1986* (See **Resources** to obtain a copy).

The HIPAA provisions place limits on preexisting condition exclusions; provide for special enrollment rights for certain events; and prohibit discrimination in eligibility, benefits, or premiums based on a health factor. Other group health plan provisions in ERISA include the Newborns' and Mothers' Health Protection Act, which provides protections for mothers and their newborn children relating to the length of their hospital stays following childbirth; the Women's Health and Cancer Rights Act, which provides protections for individuals who elect breast reconstruction or certain other follow-up care after a mastectomy; and the Mental Health Parity Act, which provides for parity in the application of annual or lifetime dollar limits on mental health benefits with dollar limits on medical/surgical benefits. For more detailed information on these provisions, see the **Resources** section to obtain a copy of *Health Benefits Coverage Under Federal Law*.

With respect to other laws, ERISA generally supersedes State laws as they relate to employee benefit plans. However, State insurance laws applicable to health insurance coverage often continue to apply. Therefore, if health coverage is offered through an HMO or insurance policy, check with your State insurance department for more information on that State's insurance laws.

## CAN A FIDUCIARY TERMINATE ITS FIDUCIARY DUTIES?

Yes, but there is one final fiduciary responsibility. Fiduciaries who no longer want to serve in that role cannot simply walk away from their responsibilities, even if the plan has other fiduciaries. They need to follow plan procedures and make sure that another fiduciary is carrying out the responsibilities left behind. It is critical that a plan has fiduciaries in place so that it can continue operations and participants have a way to interact with the plan.

## WHAT HELP IS AVAILABLE FOR EMPLOYERS WHO MAKE MISTAKES IN OPERATING A PLAN?

The Department of Labor's Voluntary Fiduciary Correction Program (VFCP) encourages employers to comply with ERISA by voluntarily self-correcting certain violations. The program covers 19 transactions, including failure to timely remit participant contributions and some prohibited transactions with parties in interest. The program includes a description of how to apply, as well as acceptable methods for correcting violations. In addition, the Department gives applicants immediate relief from payment of excise taxes under a class exemption.

In addition, the Department's Delinquent Filer Voluntary Compliance Program (DFVCP) assists late or non-filers of the Form 5500 in coming up to date with corrected filings.

For an overview of both programs, visit Corrections Programs at www.dol.gov/ebsa.

# TIPS FOR EMPLOYERS WITH GROUP HEALTH PLANS

Understanding fiduciary responsibilities is important for the security of a group health plan and compliance with the law. The following tips may be a helpful starting point:

- Have you identified your plan fiduciaries, and are they clear about the extent of their fiduciary responsibilities?

- If you are hiring third-party service providers, have you looked at a number of providers, given each potential provider the same information, and considered whether the fees are reasonable for the services provided? Have you documented the hiring process?

- Are you prepared to monitor your plan's service providers?

- Are you aware of the schedule to deposit participant contributions and payments by participants to the plan and forwarding them to the insurance company, and have you made sure it complies with the law?

- Have you reviewed your plan document in light of current plan operations and made necessary updates? After amending the plan, have you provided participants with an updated SPD or SMM?

- Does your plan have a reasonable claims procedure that is being followed by plan fiduciaries?

- Does your plan have a procedure for handling QMCSOs?

- Have you identified parties in interest to the plan and taken steps to monitor transactions with them?

- Are you aware of the major exemptions under ERISA that permit transactions with parties in interest, especially those key for plan operations (such as hiring service providers)?

- Have required reports (i.e. Form 5500) been filed timely with the government?



**U.S. Department of Labor**
**Employee Benefits Security Administration**

13

## RESOURCES

The U.S. Department of Labor's Employee Benefits Security Administration offers more information on its Web site and through its publications. The following are available by contacting EBSA at 1.866.444.EBSA (3272) or on the EBSA Web site (www.dol.gov/ebsa).

<u>For Employers</u>

Compliance Assistance Guide – Health Benefits Coverage Under Federal Law

An Employer's Guide to Group Health Continuation Coverage Under COBRA – The Consolidated Omnibus Budget Reconciliation Act of 1986

Reporting and Disclosure Guide for Employee Benefit Plans

Exemption Procedures under Federal Pension Law

Qualified Medical Child Support Orders

Compliance Guide – Group Health and Disability Plans Benefit Claims Procedure Regulation

VFCP Fact Sheet • FAQs

DFVCP Fact Sheet • FAQs

<u>For Employees</u>

Top 10 Ways To Make Your Health Benefits Work For You

Life Changes Require Health Choices-Know Your Benefit Options

Work Changes Require Health Choices-Protect Your Rights

An Employee's Guide to Health Benefits Under COBRA

Your Health Plan And HIPAA...Making The Law Work For You

Filing A Claim For Your Health Or Disability Benefits

10/05/2012

**Claim Number :**  **10937433**
**Claimant SSN:**  **### ###-7555**
**Claimant Name : CARLSEN**

From: "Dansey, Steve (SC100:TI70)" <SDANSEY@nortel.com>
To: "Lafountain, Danielle (GWRTP:T850)" <DLAFOUNT@nortel.com>
Cc: "Dansey, Steve (SC100:TI70)" <SDANSEY@nortel.com>
Content-Type: text/plain; charset="US-ASCII"

Danielle,

Roger's Job Descrip
tion includes the following:

Role:
Principal Hardware Engineer
Hardware Architect for Next Generation Ethernet Switching Platforms

Responsibilities:
- Interfacing with System Architects and Product Line Managers to
ascertain requirements for nex
t generation hardware product. Requires
considerable interactions/discussions around complex requirements.
- Supplier and technology investigations to determine effective
technical solutions. Requires considerable interactions with multiple
suppliers
through conference calls and review of supplier
specifications.
- Development of comprehensive hardware/system architectural
specifications, providing traceability to requirements. Requires
extensive periods at computer developing many documents.
- T
echnical guidance to extended hardware teams in the
design/development of hardware solutions. Requires regular meetings/conf
calls.
- Quality control of hardware solutions through extensive reviews of
detailed specifications, schematics, and test plan
s/results. Requires
much off-line review of data and follow-up meetings for
clarification/questions.
- Evaluation/development of improved engineering processes/tools

Let me know if you need anything else regarding any specifics of the
above.

Reg

Page 23
Telephone Call Log
ClaimId = 10937433







# AVAYA

# Avaya Ethernet Routing Switch 8600

**A resilient, flexible, scalable solution delivering network virtualization, exceptional value per port, and one of the Industry's highest 10G Ethernet densities per module and rack.**



Companies turn to technology to help boost the bottom line and to increase productivity. Technology advances in one area often lead to real challenges in others. Virtualization is a case in point, particularly when it comes to efficiently connecting a myriad of disparate applications and systems – many now virtualized – across multiple locations.

Unified Communications enables collaborative business processes that are required for resource sharing across an organization, improves day-to-day operational practice, and deliver cost-effective communication with customers, partners and suppliers.

Virtualization can transform your IT infrastructure and your business by providing a clear path to advanced applications that create a Unified Communications environment. Virtualization delivers flexibility and scalability, and enables faster activation of new services in data centers and the campus core. Without compromising high-availability and high-performance, virtualizing servers and consolidating services, management and security delivers benefits such as simplified management, accelerated decision making, decreased recurring costs, and increased productivity. Providing one of the Industry's highest 10G Ethernet densities per module and rack, the Avaya Ethernet Routing Switch 8600 (ERS 8600) can turn infrastructure

into a highly reliable network that drives Unified Communications and other business-critical applications.

Recently updated, the Avaya ERS 8600 offers multiple options that enable IP Virtual Private Networking solutions across the entire enterprise. Avaya Layer 3 virtualization is simple, flexible, and easy to deploy – and doesn't require adjustments to your existing core infrastructure, adding no additional capital equipment expenditures. Because the solution is standards-based and uses well-understood IP techniques, less training time is required. This can reduce operational costs when compared to training required for service provider-centric, Multi-Protocol Label Switching (MPLS) solutions.

avaya.com

# Resiliency, intelligence & scalability without design complexity

The ERS 8600 is a proven, tested, resilient intelligent network solution that scales, delivering hundreds of Gigabits per second (Gbps) and hundreds of millions of packets per second (Mpps) of performance to the core. This flexible switch reduces the complexity of network design, making it ideal for midsize-to-large enterprise campuses and data centers.

Its switching architecture is based on Network Processing Units (NPU) rather than generic ASIC technology. NPUs are large-scale CPU arrays specifically designed for network-related functions such as efficient examination and manipulation of packet headers. Avaya's specialized high-performance NPU is known as the Route Switch Processor (RSP). It delivers fast-path flexibility and investment protection based on its ability to support in-life firmware upgrades and provides 10Gbps line rate switching and routing capabilities regardless of standards evolution.

The ERS 8600 is a balanced solution, unconstrained by bottlenecks imposed by inferior designs. In addition to establishing a solid foundation for Unified Communications, the ERS 8600 delivers a flexible networking infrastructure that fosters growth by enabling businesses to leverage new, emerging applications and technologies.

The Ethernet Routing Switch 8600

- Is available in a 3-, 6- and 10-slot Chassis, supporting dedicated 1G and 10G pluggable modules, and 10/100 and 10/100/1000 copper and fiber modules

- Delivers high resiliency with optional redundant, high-availability Switch Fabrics, N+1 Power Supplies, and optional dual AC Power Supplies that enhance redundancy by providing separate mains inputs

- Delivers non-stop, end-to-end application availability as the flagship SMLT/RSMLT-based product for Avaya's "switch cluster" technology

## Ethernet Routing Switch 8600 highlights

- Increases resiliency through switching clustering (Split Multi-Link Trunking/Routed Split Multi-Link Trunking) for the most demanding applications and networks and boosts performance because all links forward traffic at Layer 2 & 3
- Includes virtualized Layer 3 with device and network solutions (e.g., VRF-Lite, IP VPN-Lite, & MPLS)
- Provides cost-effective, simplified multicast virtualization (IGMP, PIM-SM/SSM) and unicast traffic combined with switch clustering resiliency for multiple customers and communities
- Enables IP VPN services across campus or metro through existing IP infrastructure with no additional equipment or complex setup and management required
- Streamlines IP VPN and MPLS solutions through high-performance R/RS modules
- Offers high-density 10G, high-density Gigabit and 10/100/1000 Ethernet for enterprise core and aggregation applications, delivering competitive high value
- Delivers best-in-class resiliency with switch clustering support for VMware server virtualization in an iSCSI environment
- Provides increased value, flexibility, and slot conservation through a new combo module with copper 10/100/1000, 100/1000 SFP and 10GbE XFP interfaces
- Benchmarks network traffic and identifies anomalous behavior using IP Flow Information eXport (IPFIX) IETF RFC 3917
- Supports high-performance IPv6 – a key scalability tool for demanding and expanding networks
- Identifies attack patterns through optional application-aware service modules for deep packet inspection
- Enables traffic analysis and IDS/TPS clustering through sophisticated mirroring capabilities (i.e., many-to-one, one-to-many, and many-to-many)
- Supports large-scale convergence deployments, expanding DWDM Fiber capacity to 20 wavelengths using 10GbE XFP optics

2

avaya.com

The Ethernet Routing Switch 8600 meets demanding enterprise-class requirements for scalability, simplification, maximized application uptime, value, and security. It reduces network design complexity by simplifying network architecture and increasing per port value with advanced features on high-density modules.

## Business Continuity

Network resiliency is the most basic requirement when implementing a converged network. The ERS 8600 supports redundant connectivity for virtualized solutions such as VRF-Lite, VPN-Lite for Edge/Core, and MPLS LER IP-VPN for Edge networks. With Avaya's VRF-Lite, businesses can use the same hardware platform to create multiple Layer 3 routing domains supporting numerous customer environments. Avaya's innovative IP VPN-Lite solution facilitates deployment of resilient, fault-tolerant IP VPNs over an existing IP infrastructure (campus or metro).

To provide maximum protection, the ERS 8600 addresses resiliency at multiple levels. At the hardware level, the switch provides hot-swappable modules and fan trays along with N+1 and dual input power supplies. Its software delivers resiliency for the core with industry-leading features that include VLACP (Virtual Link Aggregation Control Protocol) for Layer 1-2 link failure detection, BFD (Bi-directionally Forwarding Detection) for Layer 3 link failure detection, and switching clustering that leverages our pioneering Split Multi-Link Trunking (SMLT), Routed Split Multi-Link Trunking (R-SMLT), and VRRP Active/Active technologies.

Additionally, organizations are encouraged to dual-connect servers and, with minimum additional investment, the sub-second failover advantage is automatically extended beyond the boundary of the networking equipment, all the way to the application host. Competitive solutions, basing their failure recovery model on variations of the Spanning Tree Protocol, do not compare

## Intelligence for a smarter way to do business

Network devices must be able to distinguish different traffic types and to handle different traffic requirements. This sense of traffic class awareness, combined with the ability to process each type differently, sets intelligent networks apart from commonplace LANs. The ERS 8600 combines intelligence and performance to create a next-generation intelligent network solution.

## Keeping information secure

All devices on the network must ensure network element security as well as data integrity. The ERS 8600 employs several layers of embedded security for access to the switch and for network data. Avaya, through the Identity Engines product line, offers seamless secure access for internal end users (wired and wireless networks) or external users. Firewalls, passwords, access policies, secure protocols, address and port filtering, routing policies and DoS prevention mechanisms help ensure that the network and its data stay secure. The ERS 8600 supports up to eight unique user sessions for simultaneous login, and leverages TACACS+ to centralize and manage user validation.



ERS 8006



RS Modules



ERS 8010

3



avaya.com

# Avaya Ethernet Routing Switch 8300 Series

## Modular solution delivering compelling performance & features for mid-tier enterprise core & high-end wiring closet applications

The Avaya Ethernet Routing Switch 8300 continues to evolve into the core switch of choice for the mid-sized enterprise campus, delivering simplified yet superior networking, creating one network using less but more intelligent equipment — increasing availability and performance while minimizing costs. In addition, the Ethernet Routing Switch 8300 remains a premier wiring closet switch for large networks, meeting and exceeding the requirements of enterprises embarking on convergence as part of their strategic plan for success.

### Flexible deployment options

The highly versatile Ethernet Routing Switch 8300 (ERS 8300) offers a wide range of capabilities that integrate easily into many network designs. With its performance

and network resiliency features, the ERS 8300 provides an excellent option for the core of the medium-sized enterprise network — offering high-density 1GbE and 10GbE interface options, individual device redundancy, and delivering overall network and application resiliency. Established and newly-enhanced Access Switch features contributes to the ERS 8300 remaining the platform of choice for large-scale, enterprise-class deployments that value performance, density, security and convergence-friendly capabilities. The introduction of BGP-Lite and availability of VRF-Lite for virtualized IP Routing provide a sophisticated set of capabilities — accommodating, for example, operations within airport authorities, city and state government, and post merger and acquisition requirements in large enterprises.

For network designs that require a third "distribution" tier, the ERS 8300 is an ideal option with high density interface options and high performance delivered on a relatively small footprint.



Ethernet Routing Switch 8300

## ETHERNET ROUTING SWITCH 8300 HIGHLIGHTS

- Virtualized and advanced IP Routing for network design flexibility

- Enables large-scale convergence deployments of IP Telephony, Unified Communications and Wireless **LAN** mobility

- Simplified, automated optimization of application performance

- Supports Avaya's "Switch Cluster" technology for delivering **99.999%** end-to-end resilient application availability

- 6- & 10-slot chassis, with 1GbE & 10GbE pluggable, and **10/100 & 10/100/1000** copper modules; class-leading 10GbE port density

- Optional redundant N-1 Switch Fabric and **N+1** power supplies

- "Pay-as-you-grow" options for both hardware & software capabilities

- Standards-based Power-over-Ethernet with Dynamic Power Management

- Enhanced network security with access control and host integrity checking delivered via Avaya's Identity Engines solution

avaya.com

NPUs are large-scale CPU arrays specifically designed for network-related functions such as efficient examination and manipulation of packet headers. Avaya's specialized high-performance NPU is known as the Route Switch Processor (RSP) and is an in-house development. It delivers fast-path protection through its ability to support in-life firmware upgrades and provides 10Gbps line rate switching and routing capabilities regardless of Standards evolution. Avaya has been able to leverage this re-programmable capability to deliver new innovative features, such as IPv6 and our flexible IP VPN suite, and is unique in being able to help ensure emerging functionality is continuously delivered at hardware-based performance levels.

The ERS 8800 reduces complexity and risk in network design by simplifying the network architecture and increasing value with advanced features on high-density modules. High port density, combined with rich capabilities and leading reliability technologies, deliver exceptionally high value to the enterprise. Avaya's RSP technology, based on this flexible NPU architecture, offers investment protection with the in-field firmware upgrade capability, and helps ensure that the ERS 8800 remains ever-green, always delivering hardware-based performance.

## Innovative and versatile options

### Flexible and scalable

The ERS 8800 is available in multiple Chassis options: 10-slot featuring eight slots for interface modules; 6-slot featuring four slots for interface modules; 3-slot featuring two slots for interface modules. This enables the ERS 8800 to be deployed in a variety of deployment scenarios, helping to ensure the optimum mix of flexibility, capacity, and cost-effectiveness. There is also the 8010co – Central Office – 10-Slot Chassis, which is NEBS-compliant for deployments scenarios that require a Carrier-class platform.

The new 8895SF Switch Fabric/CPU Module is the latest version and offers significant enhancements in terms of CPU performance and memory capacity; it is also 33% more energy-efficient. These advances allow the 8895SF to natively support the new and emerging services and applications that place intense demands on the networking infrastructure. The 8895SF is functionally equivalent to the existing 8692SF Switch Fabric/CPU Module when upgraded with the SuperMezz CPU daughterboard.

The v7.0 software release also brings support for the new 8003R 3-Slot Chassis; for the first time this pocket option supports the R/RS-Series new-generation modules and therefore the new and emerging applications that leverage their re-programmable NPU capabilities.

### One module with many uses

The ERS 8800 supports an innovative hybrid combination module that concurrently supports 10G Ethernet (x2), 1000BASE-X (x24), and 1000BASE-T (x8) ports; economical, flexible and a class-first, this combination module meets the demands of smaller aggregation sites. It is an affordable solution providing all the functionality many enterprises need in one convenient module.

Also recent additions to the existing range of high-performance I/O module options offer a number of practical benefits. These include a high-density 10G Ethernet (12 ports per module and up to 96 ports per chassis) and higher-density 1000BASE-X 48-port module that complements the existing 30-port model. RS-Series Interface Modules enable the ERS 8800 to deliver enhanced mirroring capabilities, including enabling one-to-many, many-to-one and many-to-many mirroring for sophisticated traffic analysis and IDS/IPS clustering.



ERS 8303R Switch



ERS 8806 Switch



RS-Series Modules



ERS 8810 Switch

# AVAYA

# Virtual Services Platform 9000

## Expanded Views



| Expanded Front View | Expanded Rear View |
| --- | --- |
| Side-to-Side Fans | Switch Fabric Module |
| Control Process Module | 48 Port Copper Module |
| 48 Port 1GE I/O Module | 24 Port 10GE I/O Module |

Click over ● for more detail

## Product Features

- 12-slot chassis
- Supports 10 I/O modules
- Carrier-grade resiliency
- 27 Tbps architecture and over 100 Tbps in a quad switch cluster mode
- All components are hot swappable

## Carlsen, Roger [CPOC:0380:EXCH]

**From:** Dansey, Steve [SC100:TI70:EXCH]
**Sent:** Monday, May 09, 2005 5:50 PM
**To:** Carlsen, Roger [CPOC:0380:EXCH]
**Subject:** FW: Disability administrators

Roger,

I spoke to Mark Green who forwarded me the link details below, as I'm sure you've viewed.

He mentioned that there's no need to call him unless you have any HR specific question and that you should contact the STD administrator at the number below to discuss any questions you may have.

-Steve

-----Original Message-----
**From:** Green, Mark-HR [SC100:8275:EXCH]
**Sent:** Monday, May 09, 2005 5:44 PM
**To:** Dansey, Steve [SC100:TI70:EXCH]
**Subject:** Disability administrators

Hi Steve

The # for TOPS, who administer STD, is 877-664-8677

The link to the policy is...

http://services-canada.ca.nortel.com/Livelink/livelink.exe/fetch/-13095/2246/1196108/9688/23887/Medical%2BLeave%2Bof%2BAbsence%2BProcess?vernum=0

Please feel free to forward to Roger Carlsen.

Mark

**Mark Green**
**Human Resources**
**Enterprise Data Networks**

tel: (408) 495 2274 - ESN 265
fax: (408) 495 5028
email: magreen@nortel.com 

## N⊘RTEL

Issued: Jan 1, 1997
Modified: Nov 15, 2004

# U.S. - LEAVES OF ABSENCE

# Medical Leave of Absence Process

---

## Contents

- Introduction
- Eligibility
- Duration
- Approval
- Process
- Extension
- Return to Work from Leave
- Benefits
- Short-Term and Long-Term Disability Plan
    - Short-Term Disability (STD) Coverage
    - Long-Term Disability (LTD) Coverage
- Definitions

---

**Effective January 1, 2004 all Family Care Leaves and all short-term and long-term disability leaves will be administered by a third party, Gates McDonald using TOPS (Time Off Planning System). Gates McDonald partners with The Prudential Insurance Company of America to provide intake services on short-term disability claims. Prudential approves and monitors all short-term and long-term disability claims. Effective January 1, 2004, all requests for Family Care Leave (FCL), short-term disability (STD), and long-term disability (LTD) will be processed by the TOPS Leave Administrator.**

## Introduction

This document presents the guidelines and process information for an approved U.S. Medical Leave of Absence that may be taken by employees with serious health conditions due to illness or accidental injury for treatment and recovery. The U.S. Medical Leave of Absence relates to employees on Short-Term Disability (STD) or Long-Term Disability (LTD).

Keep in mind that the Family and Medical Leave Act of 1993 (FMLA) requires that certain employers provide to their employees up to twelve (12) weeks of unpaid leave per calendar year with job protection:

- due to the employee's own serious health condition;
- to care for a newborn, newly adopted or placed foster child;
- to care for an immediate family member or domestic partner with a serious health condition

As a result, any time an employee is away from work on an approved short-term disability leave, they are also considered to be on an approved Family Care Leave. Since the Family Care Leave runs concurrent with the STD leave, the time the employee is out of work on STD is applied against the 12 weeks of Family Care Leave.

For more information and details on Family Care Leave, refer to the Family Care Leave of Absence Process.

## Eligibility

All regular full-time or regular part-time (working 20-37.5 hours per week) employees of Nortel Networks are eligible for the Medical Leave of Absence.

## Duration

A Medical Leave of Absence may be granted for an illness, injury or birth of a child that requires an absence longer than 5 consecutive work days (the 5 day waiting period) or more than one full week of work (Monday through Sunday regardless of the number of hours worked) for a <u>Reduced Work Schedule</u>. The entire period of absence will be considered to be part of the leave under the Family and Medical Leave Act of 1993 or applicable state law.

The duration of the Medical Leave of Absence will be determined by the nature of your illness or injury, the necessity of the absence from your job and your continued timely submission of the required documentation for the leave. The claims administrator, Prudential Insurance Company, will regularly review your documentation to ensure that the clinical evidence continues to support total disability. You are responsible for informing Prudential and your manager of any change in the expected duration of the leave or leave status.

A Medical Leave of Absence involving a <u>Reduced Work Schedule</u> Reduced Work Schedule may be granted or continued solely at the discretion of Nortel Networks when your combined periods of Medical Leave and Family Care Leave period(s) exceed 12 weeks in the calendar year.

If your absence is less than the required duration for a Medical Leave of Absence (i.e., 5 days or less) but otherwise meets all the requirements of such a leave, including documentation, your leave will be treated according to the attendance requirements of your business unit. If your absence occurs at a time when your combined periods of Medical Leave and Family Care Leave are 12 weeks or less in the calendar year, the absence will not adversely affect your employment status, such as your attendance record, availability record or performance assessment.

The Medical Leave of Absence will terminate when you are released to return to work, or when the claims administrator determines the medical evidence no longer supports total disability, or after a continuous period of absence of 26 weeks, whichever is earlier. STD benefits begin on the first day of absence and continue through the 26th week of absence. As long as the clinical evidence continues to support total disability, LTD benefits begin on the 27th week of absence and continue as long as you remain totally disabled, up to age 65 or for the <u>Maximum Benefit Period</u> if you are age 60 or over.

 **If you do not return to work when your Medical Leave of Absence ends, you will be considered to have voluntarily terminated employment effective the first working day following the expiration of the leave.**

## ⬒Approval

As of January 1, 2004, two companies work together to provide administration services to Nortel Networks for Family Medical Leaves and Disability Leaves. Gates McDonald, the TOPS Leave Administrator, has responsibility for approving and administering all Family Care Leaves as well as providing in-take of all short-term disability claims. Prudential has responsibility for approving and monitoring all claims for short-term and long-term disability, as well as providing medical clearance for your return to work.

## ⬒Process

The process for requesting a Medical Leave of Absence is as follows:

1. Contact the TOPS Leave Administrator at 877-664-8677 to initiate the process. You will need to follow all prompts to record your Family Care Leave of Absence. Once completed, you will be transferred to an agent that will conduct an interview to obtain all necessary information for your short-term disability claim.

2. Prudential will contact your treating physician(s) to obtain all medical information. Once obtained, Prudential will review all documentation and notify you of the decision to approve or deny your request for Medical Leave.

   **For new claims, if Prudential is unable to obtain from your physician the medical information that certifies you as being disabled within 7 days and you do not return to work, Prudential will request that you obtain and submit the required medical information. If the medical information is not provided to Prudential within 30 days from your first day out of work, your claim will be invalidated and you will be moved to an unpaid leave of absence status. For active/approved claims, when updated medical information is requested and not received by the claims administrator within 30 days, your claim and any additional benefits will be suspended. Should this occur, your pay will be suspended and you will be responsible for repaying any outstanding overpayments that may result. You must also contact Global Employee Services to make arrangements to pay your benefit premiums in order for your other benefits to continue during the unpaid leave of absence. Remember that you do not have coverage for short-term or long-term disability while you are on an unpaid leave of absence.**

3. Prudential may request additional updated medical information for each 30-day period that the leave continues, or if the circumstances described by the original or subsequent certifications change significantly, or after receiving information that is inconsistent with your previous certifications.

⚠ 4. **Failure to provide additional certification within the specified time will result in termination of the Medical Leave of Absence. If you do not return to work at that time, you will be considered to have voluntarily terminated your employment as of the date the form was due..**

5. Prudential may request an Independent Medical Evaluation (IME) to provide a second opinion at the company's expense, if the information submitted for the Medical Leave is insufficient for approval of Short-Term Disability. The objective of the IME is to obtain information from an

independent source that can be used in making the decision about eligibility for Short-Term Disability. This independent evaluator will not be affiliated with or utilized by the company on a regular basis. This evaluation may be requested at any time during the period of disability.

6. At any point that your claim is denied or terminated, you will be notified of your appeal rights via a letter from Prudential.

If you are requesting Medical Leave of Absence with a <u>Reduced Work Schedule</u>, you must follow the requirements of the leave. In addition, this leave must be scheduled so that the disruption to Nortel Networks operations is minimal. In this case, Nortel Networks may assign you to an <u>equivalent position</u> that better accommodates the Reduced Work Schedule. The Reduced Work Schedule will consist of regularly worked hours and days, whenever possible.

 Note that if you are on a full-time Medical Leave of Absence and wish to change to leave on a <u>Reduced Work Schedule</u>, you must contact the TOPS Leave Administrator to request another leave. Follow all prompts.

##  Extension

If you are not medically able to return to work on the indicated return to work date, you may request an extension by contacting the TOPS Leave Administrator before the indicated return to work date. **The extension must be approved by Prudential** and will be processed following the <u>Process</u> for the original request.

 **If you do not obtain an approved extension when your Medical Leave of Absence ends and you do not return to work, you will be considered to have voluntarily terminated employment, effective the first working day following the expiration date of your leave.**

##  Return to Work from Leave

You must notify Prudential at least 5 days before your desired return to work date or 5 days before the return to work date indicated on the qualification letter, whichever is earlier. At that time, you must obtain from your Health Care Provider a Return to Work Statement. The statement should provide the date that you may return to work along with any restrictions or accommodations that may be required. **The Return to Work statement must be submitted to Prudential before you return to work.** Prudential will verify that you are medically able to perform the essential duties of the position to which you are reinstated, with or without accommodations. If Prudential determines that you are medically able to return to work, they will inform your manager of the need for any job-related restrictions and will advise you as to whether or not your manager can accommodate those restrictions. You must also call the TOPS Leave Administrator at 877-664-8677 to report your "Actual Return to Work Date" so that your Family Care Leave is properly closed. Remember that Family Care Leave runs concurrent to your STD leave.

 **After confirmation of your return to work, Prudential will notify Global Employee Services so you are returned to *active* status.**

If your combined Medical Leave and Family Care Leave period(s) totaled 12 weeks or less in a calendar year **and**, in the case of the Family Care Leave, you have worked 1250 hours in the 12 months before

Case 09-10138-MFW Doc 8917-4 Filed 11/18/12 Page 63 of 70

the leave began, you will be placed in your same position, an equivalent position or any position for which you are qualified, depending on availability. If no position is available, you will be terminated. Reinstatement to employment is not required if your position has been eliminated or if your leave was obtained fraudulently. If the applicable state law requires reinstatement following longer period of absence or contains less stringent eligibility requirements, Nortel Networks will comply with the state law.

If your leave has been longer than 12 weeks, you may be placed in any available position for which you are qualified, as determined solely by Nortel Networks. If there are no positions available within 30 days of the time you are eligible to return to work, you will be terminated.

## Compensation & Benefits while on Medical Leave of Absence

The following benefits will continue as noted during your Medical Leave of Absence if you are eligible for these benefits under the terms and conditions of the benefit plans and if you continue to make all necessary and timely contributions for the applicable coverage. However, Nortel Networks retains the unilateral right to change its benefit plans, including reducing or eliminating such plans, at any time; these changes will apply to employees on Medical Leave of Absence.

- **Compensation** - You will receive 100% of your pay for the first 6 weeks of your absence. During weeks 7-26 of your leave, your pay will be determined by the level of STD coverage you have chosen.

  For part-time employees, your pay for the first 6 weeks of leave is determined by the number of hours you regularly work. The number of hours you are regularly scheduled to work, based on the number of hours you averaged over the last 12 weeks preceding your disability, will be used in determining the amount of your disability benefit.

  **Note:** If at any time your STD claim is not approved, invalidated, suspended, or terminated, and you do not return to work, your pay will be suspended. You will be responsible for repaying any overpayments that may occur as a result of your unapproved absence. Global Employee Services will arrange billing of your benefit premiums in order to continue your benefit coverages until your pay is reinstated.

  If there is a conflict between this Nortel Networks leave policy and the Country Specific Requirement No. US.017 - Pay Deductions For Time Not Worked by Exempt Employees regarding deduction or withholding of pay for time not worked by an exempt employee, the applicable provisions of the Country Specific Requirement No. US.017 will take precedence.

- **Holidays** - Any holiday that occurs during the approved short-term disability leave will be treated as any other day, and you will be compensated according to the STD benefit level you chose.

- **Life Insurance** - Life and accidental death and dismemberment (AD&D) insurance, including spouse and dependent coverage, continues.

- **Long-Term Investment Plan (401(k))** - If you are participating in this plan when your leave begins, you will continue as a participant during the leave. As long as you are receiving partial pay from Nortel Networks, your contributions to the plan will continue to be deducted from your paycheck, unless you contact the Nortel Networks Long-Term Savings Center at 1-800-726-0026 and notify them to suspend your deductions or change your contribution rate to 0% at the Nortel

Networks Long-Term Savings Center online at http://resources.hewitt.com/nortelnetworks. If you stop your contributions while you are on leave, you must contact Nortel Networks Long-Term Savings Center at 1-800-726-0026 when you return to work in order to resume your contributions through payroll deductions or visit the Nortel Networks Long-Term Savings Center online at http://resources.hewitt.com/nortelnetworks.



If you have an outstanding loan against your 401(k) plan and you are repaying this loan through payroll deductions, you may need to contact the Nortel Networks Long-Term Savings Center to arrange to continue making loan payments. As long as you are receiving pay from Nortel Networks, your loan payments will continue to be deducted from your paycheck. However, if your paycheck is not enough to cover the amount of the scheduled loan payments, you must contact the Nortel Networks Long-Term Savings Center at 1-800-726-0026 to arrange to continue making the loan payments yourself. If you are going on LTD, you'll receive written notice from the Nortel Networks Long-Term Savings Center to arrange payment of your loan.

- **Medical and Dental/Vision/Hearing Care Coverage** - Medical and dental/vision/hearing care coverage, including spouse and dependent coverage, continues.

- **Merit Increase** - If your salary is planned for a merit increase while you are on leave and you return to work during the same salary plan year, the merit increase will automatically take place when you return to work.

- **Reimbursement Accounts** - If you are participating in these accounts when your leave begins, you may choose to continue or discontinue participation during your leave. As long as you are receiving partial pay from Nortel Networks, contributions to the accounts will continue unless you contact Global Employee Services (ESN 352-4636 or 1-800-676-4636) to suspend your deductions. If you return to work during the same calendar year and wish to resume your contributions through payroll deductions, you must call Global Employee Services.

- **Retirement Plan** - The accrual of benefit and vesting service is determined by the retirement plan in effect at the time of leave.

- **Short-Term Disability (STD) and Long-Term Disability (LTD)** - STD and LTD coverage remain at the level of coverage you have when you begin the leave until you return to work. If you are on a Reduced Work Schedule and receiving partial pay from Nortel Networks, STD and LTD coverage is continued during the approved leave. If at any time your status is changed to Unpaid Leave of Absence, you do not have STD or LTD coverage during the unpaid leave. Your STD and LTD coverage will be reinstated once you have returned to active work.

- **Vacation** - You will continue to accrue vacation during the leave as long as you meet the following 2 requirements:
  - You are receiving STD benefits.
  - You return to work when your leave ends.

If you are receiving LTD benefits, you will not continue to accrue vacation during the leave. Any vacation accrued and unused prior to the start of STD will be paid out at the beginning of the approved LTD leave.

## Short-Term Disability and Long-Term Disability Plan

YYour disability benefits are designed to continue all or part of your income if you are unable to work due to illness or injury. The Company provides you with Short-Term Disability (STD) and Long-Term Disability (LTD) coverage as part of your Core FLEX Benefits. In addition, you may choose supplemental coverage for STD and LTD.

To ensure you understand all details and requirements of the disability plans, read and thoroughly review the disability plan Summary Plan Description (SPD) located in the Employee Benefits and Programs folder on Services@Work.

## Plan Highlights

| Short-Term Disability (STD) | |
| --- | --- |
| **Core STD Benefits** | **Supplemental STD Benefits** |
| 100% of your FLEX Earnings for up to 6 weeks, followed by 70% of your FLEX Earnings for up to the next 20 weeks | 100% of FLEX Earnings for up to 6 weeks, followed by 90% of your FLEX earnings for up to the next 20 weeks |

| Long-Term Disability (LTD) | |
| --- | --- |
| **Core LTD Benefits** | **Supplemental LTD Benefits** |
| 60% of FLEX Earnings after 26 weeks of total disability | 70% of FLEX Earnings after 26 weeks of total disability |

## Short-Term Disability (STD) Benefits

- **When STD Benefits Begin** - Benefits for an approved STD begin when you have been absent from work for more than 5 consecutive work days or more than one full work week (Monday through Sunday regardless of the number of hours worked) for a Reduced Work Schedule. The 5-day waiting period is counted in the total time away from work on Medical Leave of Absence. If the leave is not approved, the first 5 days must be taken as vacation time, incidental time off without pay or sick days, if available in areas outlined by local attendance policy.

- **Benefit Reduction** - STD benefits are reduced by any Social Security or Workers' Compensation payments for which you are eligible.

  **You must notify Prudential of any Social Security or Workers' Compensation payments received while receiving short-term or long-term disability benefits. Failure to report this information to Prudential could result in your future benefit payments being reduced or eliminated.**

- **Maternity Leave** - Leave taken for the birth of a child is considered an STD event. For a normal, vaginal delivery, you receive 6 weeks of leave (from the onset of your leave) paid at 100% of your FLEX Earnings. For a Cesarean section, you receive 6 weeks of leave (from the onset of your leave) paid at 100% of your FLEX earnings and up to 2 more weeks at 70% or 90% of your FLEX Earnings (depending on the level of STD Benefit you have chosen), upon recommendation by your Health Care Provider (see the chart below).

| Maternity Leave (STD) | | | |
|---|---|---|---|
| **Type of Delivery** | **First 6 Weeks** | **Next 2 Weeks** | **Continued Leave** |
| Vaginal Delivery | 100% of pay | Vacation and/or Unpaid Family Care Leave of Absence | |
| Cesarean Section | 100% of pay | 70% or 90% of pay, depending on FLEX level chosen | Vacation and/or Unpaid Family Care Leave* |

*Residents of California - Please see information on additional leaves available to you on Services@Work at: http://services-canada.ca.nortel.com/Livelink/livelink.exe/fetch/-13095/2246/7/9688/1080294/Leaves%2Bof%2BAbsence%2B%252D%2BCalifornia%2BBased%2BEmployees%2BOnly?vernum=0

- **FLEX Benefits Enrollment** - If you are on STD during an annual FLEX Benefits enrollment period and remain on STD when your newly chosen coverage is supposed to begin, the following provisions apply:
  - o You may change your FLEX Benefits selections, including your Supplemental STD and/or Supplemental LTD selections during the enrollment period.
  - o You will continue to be eligible for disability benefits under your current plan selections.
  - o After you have returned to active work for 2 consecutive weeks, you will be covered under your new selections.

  **Note: You must be an active Employee at the time an Illness or Injury occurs to qualify for STD benefits. Therefore, once a period of Total Disability has ended (by your recovery, a finding by Prudential that benefits are no longer payable to you, or by payment of the maximum STD benefit), you will have no STD coverage until you return to Active Work status. You will be considered Actively at Work on any of the Company's scheduled work days if you are performing the regular duties of your job on that day in accordance with your regularly scheduled hours, either at the Company's place of business or at some location to which you are required to travel for Company business.**

- **Work Related Injury** - If you experience a work related injury and require a medical leave of absence, you must contact your local Health Services professional to initiate your Workers' Compensation claim. Contact information for your local Health Professional is shown below.

| **Employee Work Location** | **Internal Phone Number** | **External Phone Number** |
|---|---|---|
| Alpharetta/Atlanta | ESN 268-4874 | 770-708-4874 |
| Billerica, Nashville, Rochester | ESN 222-4058 | 615-432-4058 |
| Raleigh | ESN 352-8360 | 919-992-8360 |
| Richardson | ESN 444-5947 | 972-684-5947 |
| Santa Clara | ESN 265-0412 | 408-495-0412 |
| Sunrise | ESN 228-7876 | 954-858-7876 |
| All other locations & field installers | ESN 222-4058 | 615-432-4058 |

**Long-Term Disability (LTD) Benefits**

 **If you are a newly hired Employee, you will not be covered if Total Disability occurs within 12 months after coverage is effective and if the disability is caused or in any way related to a "Preexisting Condition" that existed within 90 days of your coverage Effective Date.**

- **When LTD Benefits Begin** - LTD benefits begin after you have been totally disabled for longer than 26 consecutive weeks. If your STD coverage ends but your LTD coverage is not yet approved, you will be placed on an unpaid leave of absence/sickness (not to exceed 1 year) until **one of the following** occurs:

    1. Your long-term disability (LTD) coverage is approved.
    2. You return to work.
    3. You terminate from the company.

  LTD benefits will provide you with either 60% or 70% of your FLEX earnings (based on the level of LTD FLEX Benefits you have chosen).

- **Benefit Reduction** - LTD benefits are reduced by any Social Security or Workers' Compensation payments for which you are eligible.

    > **You must notify Prudential of any Social Security or Workers' Compensation payments received while receiving short-term or long-term disability benefits. Failure to report this information to Prudential could result in your future benefit payments being reduced or eliminated.**

- **Duration of Benefits** - LTD benefits are payable as long as clinical evidence supports total disability up to age 65 or for the <u>Maximum Benefit Period</u> if you are age 60 or over.

- **Holidays** - Any holiday that occurs during the LTD will be treated as any other day, and you will be compensated according to the LTD benefit level you chose.

- **FLEX Benefits Enrollment** Enrollment - If you are on LTD during an annual FLEX Benefits enrollment period, you are not eligible to enroll in STD or change your current LTD selection. In addition, the following provisions apply:
    - You may change your Medical coverage, Dental/Vision/Hearing Care coverage and Dependent Life Insurance selections.
    - You continue to be eligible for LTD benefits under your current plan selection.
    - you have returned to active work for 30 consecutive days, you may change your enrollment selections, because this is considered a <u>Status Change</u>.

    **NOTE: You must be an active Employee at the time an Illness or Injury occurs to qualify for STD benefits. Therefore, once a period of Total Disability has ended (by your recovery, a finding by Prudential that benefits are no longer payable to you, or by payment of the maximum LTD benefit) you will have no STD or LTD coverage until you return to Active Work Status. You will be considered Actively at Work on any of the Company's scheduled work days if you are performing the regular duties of your job on that day in accordance with your regularly scheduled hours, either at the Company's place of business or at some location to which you are required to**

**travel for Company business.**

 **Any employee who engages in work anywhere for pay or profit during an approved Medical Leave of Absence will be considered to have voluntarily terminated employment with Nortel Networks, and the Medical Leave will automatically end.**

## Definitions

- **Benefits-** The benefits, if any, as specified in the Nortel Networks Group Benefits Plan that are in effect when the Medical Leave of Absence begins.

- **Diability-** You are considered Totally Disabled for STD and LTD purposes when a Physician submits documentation that is approved by the Claims Administrator as establishing that you are unable to perform the essential functions of your job. This means that you cannot perform the work you were normally performing at the time of your disability with or without reasonable accommodations for the limitations resulting from your Illness or Injury. In addition, you must be under the regular care of a Physician who certifies your Total Disability and that Physician must have treated you personally for the Illness or Injury causing the Total Disability for at least 31 days before making the certification. The proof that your Physician submits must be written proof of objective clinical documentation (i.e., lab tests, x-rays, medical reports, etc.) of your Total Disability. The Claims Administrator will approve or deny your Claim for LTD benefits at its discretion. Independent Medical Evaluations (IMEs) may also be required, at the Company's expense, in order to arrive at this final determination. Your benefit will be denied if you do not provide such objective proof of your Claim within the required timeframe.

- **Equivalent Position** - A position having equivalent pay, benefits and working conditions and involving the same or substantially similar duties and responsibilities as the job that the eligible employee held just prior to the beginning of the Medical Leave of Absence.

- **Health Care Provider** Provider - A doctor of medicine or osteopathy authorized to practice medicine or surgery in the state where the practice occurs, or any other person capable of providing health care services as determined by the Secretary of the Department of Labor. The latter includes:
  - podiatrists
  - dentists
  - clinical psychologists
  - optometrists
  - o chiropractors (limited to treatment consisting of manual manipulation of the spine to correct a subluxation as demonstrated by X-ray to exist)
  - o nurse practitioners and nurse-midwives who are authorized to practice in the state and who are performing within the scope of their practice as defined by state law
  - o Christian Science practitioners listed with the First Church of Christ, Scientist, in Boston, MA.

- **Maximum Benefit Period** - The maximum length of time benefits will be paid, depending on your age when your Total Disability begins, according to the following schedule:

| *If your disability begins at age:* | *LTD benefits will continue no longer than:* |
| --- | --- |
| under 60 | to age 65 |
| 60 | 60 months |

| | |
|---|---|
| 61 | 48 months |
| 62 | 42 months |
| 63 | 36 months |
| 64 | 30 months |
| 65 | 24 months |
| 66 | 21 months |
| 67 | 18 months |
| 68 | 15 months |
| 69 to 74 | 12 months |
| 75 or over | 6 months |

- **Prudential Insurance Company of America** - The claims administrator for all short-term and long-term disability leaves. Prudential is responsible for approving and monitoring your STD and LTD leave, as well as providing medical clearance prior to your return to work.

- **Reduced Work Schedule Leave** - A type of Medical Leave of Absence that involves, when medically necessary, a reduction in the number of an employee's usual work hours. The Reduced Work Schedule consists of regularly scheduled work hours and days whenever possible.

- **Serious Health Condition** - An illness, injury, impairment, or physical or mental condition that:
  - o affects the eligible employee's health to the extent that the employee is unable to perform the essential functions of his/her job or any job **and**
  - o requires inpatient care and/or continuing treatment by or under the supervision of a Health Care Provider.

  **Examples of Serious Health Conditions** include but are not limited to the following:
  - heart attacks
  - heart conditions requiring heart bypass or valve operations
  - most cancers
  - back conditions requiring extensive therapy or surgical requirements
  - strokes
  - severe respiratory conditions
  - spinal injuries
  - appendicitis
  - pneumonia
  - emphysema
  - severe arthritis
  - severe nervous disorders
  - injuries caused by serious accidents on or off the job
  - severe morning sickness
  - the need for prenatal care
  - childbirth
  - recovery from childbirth

- **TOPS Leave Administrator** - The claims administrator for all Family Care Leaves. Since all STD leaves are considered part of the leave under the Family and Medical Leave Act, you must first request your leave through the TOPS Leave Administrator, prior to completing your application for the short-term disability leave. At the conclusion of your leave, you must also

Case 09-10138-MFW    Doc 18440-12    Filed 10/24/12    Page 70 of 70

report your 'Actual Return to Work Date' to the TOPS Leave Administrator in order to close your Family Care Leave and STD absence.