## ATTACHMENTS

A-1 – 1995 Cancelation Letters from CIGNA

A-2 – Retaining Letter from Attorney

A-3 – January, 1996 Attorney letter regarding ERISA issues

A-4 – Reinstatement of LTD Benefits Letter

A-5 – Social Security Notice of Decision/Evaluation of the Facts (page 2of4)

B. – 1984 Benefits at a Glance

C. – 1993 LTD Benefits Connection Plan

D. – Northern Telecom Inc. 1992 Health & Welfare Benefits Trust

E. – Nortel Networks 2009 Welfare Benefits Plan

F. – Northern Telecom Inc. 1994 Severance Allowance Plan

G. – Prudential Conversion Info/2011-2012 Cobra Rates/Rate Calculations/Incurred Vision & Dental Expenses

## ATTACHMENT A

**A-1 – 1995 Cancelation Letters from CIGNA**

**A-2 – Retaining Letter from Attorney**

**A-3 – January, 1996 Attorney letter regarding ERISA issues**

**A-4 – Reinstatement of LTD Benefits Letter**

**A-5 – Social Security Notice of Decision/Evaluation of the Facts (page 2of4)**

*A-1*

May 24, 1995

**CIGNA Group Insurance**
Life · Accident · Disability

Carmel T. Totman
7212 Shellburne Dr.
Raleigh, NC 27612

12225 Greenville Avenue
Suite 655, LB179
Dallas, TX  75243-9384
Telephone 214.907.6500
1.800.352.0611

RE:    Carmel T. Totman
       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
       Northern Telecom, Inc.
       Policy #:  2059005
       Connecticut General Life Insurance Company

Dear Ms. Totman:

This company is currently making payments to you for Long Term Disability benefits based on your claim application.  Therefore, this letter will serve to advise you of the maximum future benefits payable under the Northern Telecom, Inc. group insurance plan.

Under the Northern Telecom, Inc. plan, the insurance company will pay monthly benefits for no more than 24 months during the employee's lifetime for a total disability caused or contributed by a mental illness or functional nervous disorder while the employee is not confined in a hospital.  An employee will be considered confined in a hospital only if he is confined continuously for at least 14 days in a hospital licensed to provide care and treatment for the condition causing the total disability.

According to the medical information provided to this office by both you and your attending physician, we have considered the payment of disability benefits to you, subject to the above mentioned policy limitations.  In view your benefit payments started a July 06, 1993, the 24 month period will end on July 05, 1995.

Should you have any questions, please feel free to contact me at this office.

Sincerely,

Andy Gaither
Senior Benefit Analyst
1-800-352-0611 Ext. 174
Dallas Claim Services

AG/lc

cc:  Northern Telecom, Inc.

Y:\USERDATA\WPFILES\BALETTER.MAY\AGTOTMAN.CAR

Life Insurance Company of North America
Connecticut General Life Insurance Company
Insurance Company of North America
TNA Life Insurance Company of New York
Subsidiaries of CIGNA Corporation

*A-1*

June 19, 1995

**CIGNA** Group Insurance
Life · Accident · Disability

12225 Greenville Avenue
Suite 655, LB179
Dallas, TX 75243-9384
Telephone 214.907.6500
1.800.352.0611

Carmel T. Totman
7212 Sheilburne Dr.
Raleigh, NC 27612

RE:   Carmel T. Totman
      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
      Northern Telecom, Inc.
      Policy #: 2059005
      Connecticut General Life Insurance Company

Dear Ms. Totman:

After carefully reviewing your claim for continuous disability benefits, we regret to advise you that we cannot consider any further benefits payable to you after July 05, 1995.

Under the terms of your long term group insurance policy, it is provided under the section entitled "Limitations":

> The insurance under the policy does not cover, and no benefits will be paid for, disability caused or contributed to by mental illness or functional nervous disorder while the employee is not confined in a hospital, after monthly income has been payable for a total of 24 months for all such disabilities during the employee's lifetime while he is not confined in a hospital. (An employee will be considered to be confined in a hospital if he is continuously confined in a legally constituted hospital for 14 days or more).

We have received a copy of the letter written by Dr. Lengowski dated June 01, 1995. Dr. Lengowski indicates your mental disorder is secondary to a head injury you sustained in 1987. However, the medical information in our file indicates your only problem has been a mental condition, not a physical condition. In fact, our information indicates that you suffered from depression and received treatment as far back as 1971. In view of the above information, the mental diagnosis must be considered your primary diagnosis and we can not consider benefits payable to you after July 05, 1995.

We realize there may be factors of which we are unaware and if you feel this determination is incorrect, we shall be pleased to review any objective medical evidence either you or your attending physician may wish to submit and, if the information warrants, alter our decision. If you will be submitting additional medical information, we respectfully request that you have a medical narrative which objectively discusses the basis of the physician's opinion.

Life Insurance Company of North America
Connecticut General Life Insurance Company
Insurance Company of North America
INA Life Insurance Company of New York
Subsidiaries of CIGNA Corporation

Carmel T. Totman
June 19, 1995
page 2

*A1*

You may request a review of this denial by writing to the Connecticut General Life Insurance Company Representative signing this letter. The written request for a review must be sent within 60 days of receipt of this letter and state the reason why you feel your claim should not have been denied. Include any documentation (e.g. medical data) that you feel supports your claim. Under normal circumstances, you will be notified of the final decision within 60 days of the date your request for review is received. If there are special circumstances requiring delay, you will be notified of the final decision no later than 120 days after your request is received.

Nothing contained in this letter should be construed as a waiver of any rights or defenses under the policy. This determination has been made in good faith and without prejudice under the terms and conditions of the contract, whether or not specifically mentioned herein. Should you have any information which would prove contrary to our findings, please submit it to us. We will be pleased to review any objective information you may wish to submit.

Should you have any questions regarding the handling of your claim, please feel free to contact this office.

Sincerely,

Jana M. Bezdek
Product Consultant
1-800-352-0611 Ext. 111
Dallas Claim Services

JMB/lc

cc: Northern Telecom, Inc.

Y:\USERDATA\WPFILES\BALETTER.JUN\JBTOTMAN.CAR

December 14, 1995

A-1

**CIGNA** Group Insurance
Life · Accident · Disability

Carmel T. Totman
7212 Shellburne Drive
Raleigh, NC 27612

12225 Greenville Avenue
Suite 655, LB179
Dallas, TX 75243-9384
Telephone 214.907.6500
1.800.352.0611

RE:    Carmel T. Totman
       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
       Northern Telecom, Inc.
       Policy #: 2059005
       Connecticut General Life Insurance Company

Dear Ms. Totman:

We have now completed our review of your Long Term Disability claim under the Employee Retirement Income Security Act of 1974 (ERISA), and we must regretfully reconfirm our previous denial of benefits.

Under the terms of the Northern Telecom group long term disability plan, it is provided under the section entitled "Limitations":

> The insurance under the policy does not cover, and no benefits will be paid for, disability caused or contributed to by mental illness or functional nervous disorder while the employee is not confined in a hospital, after monthly income has been payable for a total of 24 months for all such disabilities during the employee's lifetime while he is not confined in a hospital. (An employee will be considered to be confined in a hospital if he is continuously confined in a legally constituted hospital for 14 days or more.)

According to your doctor, your mental disorder is secondary to a head injury you sustained in 1987. However, the medical information in our file indicates your only problem has been a mental condition, not a physical condition. In addition, an independent medical examination done on September 19, 1995, was unable to associate your condition with the 1987 accident. In view of the above information, the mental diagnosis must be considered your primary diagnosis and we must regretfully redeny your claim.

Nothing contained in this letter should be construed as a waiver of any rights or defenses under the policy. This determination has been made in good faith and without prejudice under the terms and conditions of the contract, whether or not specifically mentioned herein. If you do not agree with the results of this appeal review, you may request another review of this denial by writing directly to Nortel at the following address:

Life Insurance Company of North America
Connecticut General Life Insurance Company
Insurance Company of North America
INA Life Insurance Company of New York
Subsidiaries of CIGNA Corporation

A-2

LAW OFFICES OF
# GREGORY P. CHOCKLETT
711 HARVEY STREET
RALEIGH, NORTH CAROLINA 27608

TELEPHONE
(919) 856-0100

FACSIMILE
(919) 856-0799

ADMITTED TO PRACTICE:
NORTH CAROLINA BAR
SOUTH CAROLINA BAR

January 4, 1996

Ms. Carmel Totman
7212 Shellburne Dr.
Raleigh, NC 27612

Re:   Totman v. Northern Telecom & Cigna

Dear Carmel:

This letter is to summarize our agreement to represent you in your ERISA action and possible ADA case against Northern Telecom and Cigna. You have paid a $5,000.00 non-refundable fee which I will immediately deposit in my account. You have also paid $200.00 towards costs. Further costs will be paid by you as they are incurred. I will contact you before incurring significant costs.

In addition to the non-refundable fee, I will receive thirty-three and one-third (33-1/3%) percent of any lump sum awards by the court for back benefits or other lump sum damages. I will also receive thirty-three and one-third (33-1/3%) percent of any settlement amounts. In addition to the contingency, I will receive any attorney's fees awarded by the court or paid by the defendants.

I will contact you sometime within the next several weeks to discuss our strategy. Thank you very much for the opportunity to represent you.

Yours truly,

Gregory P. Chocklett

GPC/jid

*A-2*

LAW OFFICES OF
# GREGORY P. CHOCKLETT
711 HARVEY STREET
RALEIGH, NORTH CAROLINA 27608

ADMITTED TO PRACTICE:
NORTH CAROLINA BAR
SOUTH CAROLINA BAR

TELEPHONE
(919) 856-0100

FACSIMILE
(919) 856-0799

January 25, 1996

Northern Telecom, Inc.
Employee Benefits Committee
Attn: Robin Petro
200 Athens Way
Nashville TN 37228-1397

Re:    Carmel T. Totman
SS# 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
Policy No. 2059005
Connecticut General Life Insurance Company
Final Appeal – Long Term Disability Denial

Dear Ms. Petro:

I have been retained by Carmel T. Totman, an employee of Northern Telecom, Inc. This is her final appeal of CIGNA's denial of her long-term disability benefit. To assist you in your review, I will summarize significant events in chronological order.

## CHRONOLOGY

1.    Ms. Totman began work as an administrative assistant on March 26, 1984 with full benefits, including short-term disability and long-term disability.

2.    Ms. Totman's attendance and performance is excellent through 1987. See employee attendance records from 1985 to 1988 and employee reviews through 1987. She received "commendable" ratings in 1985, 1986, and 1987. She received the attached certificate for successfully completing a stress management course in 1984.

3.    On October 2, 1987, Ms. Totman was in a serious automobile accident, suffering severe head injuries, numerous broken ribs, punctured lungs,

*A-3*

remain open until we could further discuss the language of the release. Ms. Totman will not relinquish her right to litigate the ERISA claim.

27.    On December 14, 1995, CIGNA sent a letter denying LTD benefits and informing Ms. Totman of her right to appeal. In response, we have submitted this appeal.

## REINSTATEMENT OF BENEFITS

We are aware that this is Ms. Totman's final administrative appeal, and we want to make every effort to seek reinstatement of her long-term disability benefits without the need for litigation. I trust that you will give a full review to all of the documents we have provided, as well as CIGNA's disability file and your own employment files. I encourage you to call Ms. Totman's former supervisor, John Beagley, at 1-800-779-8616 Ext. 117 to verify his testimony. We will certainly use him in court if necessary.

Fiduciaries of the long-term disability plan must make benefits determinations after a good faith review of the facts. We do not feel that CIGNA has processed Ms. Totman's application in good faith. CIGNA referenced medical treatment in 1971 to support its decision to terminate benefits in 1995. They ignore the fact that Ms. Totman was living a fully productive life prior to the automobile accident of October, 1987 when she suffered severe head injuries. All of the medical records support a finding of closed head injury with secondary symptoms of depression. The depression she suffers is from a physical origin, and is not a mental illness as contemplated by the policy exclusions. Ms. Totman's doctors unanimously confirmed the diagnosis of closed head injury before Ms. Totman ever considered making application for long-term disability benefits. In fact, Ms. Totman always intended to return to work at full capacity when she fully recovered. Unfortunately, her physical injuries have rendered her totally disabled.

CIGNA has been inconsistent in its analysis of Ms. Totman's application. They encouraged a finding of Social Security "disability" to reduce their own obligation for the first 24 months of payment. Even though Social Security found physical causes for her disability, CIGNA ignored the finding when they excluded Ms. Totman for mental illness.

**Northern Telecom**
200 Athens Way
Nashville, TN 37228-1397

Tel 615 734-4000

July 1, 1996          *A-4*

**N☾RTEL**
NORTHERN TELECOM INC.

Ms. Carmel Totman
7212 Shelburne Drive
Raleigh, North Carolina  27612

Re:  Appeal of Termination of Long-Term Disability Benefits

Dear Ms. Totman:

The Employee Benefits Committee met to review additional information concerning your request for reinstatement of the long-term disability benefit which was terminated in July, 1995.  Upon completion of their review of that additional information, including the review by independent medical evaluators of additional medical records and medical opinions submitted by your attorney after CIGNA's determination to terminate your benefit, the Committee determined that your disability benefits should be restored retroactive to the date of its termination.

You will be required periodically to submit medical proof of the continuation of your disability for your benefit from the plan to continue.  You must also be under the care of a physician throughout the period of your disability.  If your disability ceases or if you stop being under a physician's care, your benefit will cease.

The Human Resources Information Center has been notified to restore your coverage under the Northern Telecom Flex Benefits under the same rules and restrictions as previously applied to those benefits.  CIGNA, the long-term disability benefit administrator, has been notified to make back payments of the disability benefits which were not paid to you.  CIGNA has been informed that your daughter's Social Security benefit has been terminated.  However, they will not be able to adjust the amount of your monthly benefit from the Northern Telecom Inc. plan until they receive a copy of the written termination notice from Social Security from you.  Please supply that to Mr. Andy Gaither at the following address as soon as possible:  Mr. Andy Gaither, Senior Benefit Analyst, CIGNA, 12225 Greenville Ave., Suite 655, D212, Dallas, TX  75243

If you have any questions about this determination, you may contact me either directly or through your attorney.

Sincerely,

*Ruth Hillis*

Ruth Hillis
Senior Benefits Counsel

cc:  Employee Benefits Committee
     Gregory Chocklett, Esq.

**CIGNA COMPANIES**
**MEMORANDUM OF CONVERSATION**

INSURED: Carmel T. Totman                    DATE: 6/28    TIME

FILE #: 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                          INCOMING ☑  OUTGOING

PHONE #: 615  734-4298                        LOCAL ☐  LONG DISTAN

INDIVIDUAL: Ruth Hillis —                     PHONE ☑  MEETING

RE: (If other than insured) _____

SUMMARY: Employee Benefits Committee - REINSTATED - they
SEND Decision.

_____

_____

_____

_____

_____

RESPONSE EXPECTED:  ☑ YES      ☐ NO

IF YES,
WHAT?   HER ATTORNEY - Gregory Chocolatte
                711 HARVEY ST
                        Raleigh, NC  27608

ACTION TAKEN   they feel it was NOT proved to be men
Impairment primary

_____

they Approved based on SSA Law judge decision.

_____

_____

DATE COMPLETED: _____    BY: _____ A. GAITHER _____

204

A-5

CARMEL T. TOTMAN
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

2

## EVALUATION OF THE EVIDENCE

After a thorough evaluation of the entire record, it is concluded
that the claimant has been disabled since January 6, 1993, and
met the insured status requirements of the Social Security Act on
that date and through the date of this decision.

The claimant has not engaged in any substantial gainful activity
since the disability onset date.  The claimant has depression,
traumatic brain injury, anxiety, and a personality disorder,
which are considered to be "severe" under the Social Security
Regulations.  The claimant's impairments are attended with the
same findings as Medical Listing 12.04A. and B, 20 C.F.R. Part
404, Appendix 1 to Subpart P.  The claimant's depression would
cause her to have severe restrictions in her ability to make
personal, social, and occupational adjustments.  In addition, her
anxiety and personality disorder would further impact her ability
to perform work activity.  The claimant is disabled within the
meaning of the Social Security Act and Regulations.

## FINDINGS

After consideration of the entire record, the Administrative Law
Judge makes the following findings:

1.    The claimant met the insured status requirements of the Act
      on January 6, 1993.  The claimant has not performed any
      substantial gainful activity since January 6, 1993.

2.    The claimant's impairments which are considered to be
      "severe" under the Social Security Act are depression,
      traumatic brain injury, anxiety, and a personality disorder.

3.    The claimant's impairments are attended with the same signs
      and findings as those published in 20 C.F.R. Part 404,
      Appendix 1 to Subpart P (Listing of Impairments).

4.    The claimant has been under a disability since January 6,
      1993.

**DEPARTMENT OF HEALTH & HUMAN SERVICES    Social Security Administration**

**Refer to:** 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

**Office of Hearings and Appeals**
**4110 Wake Forest Rd., Ste. 310**
**Raleigh, NC  27609**
**Telephone:(919)790-2938**
**Date:** OCT 2 5 1994

### NOTICE OF DECISION -- FULLY FAVORABLE

CARMEL T. TOTMAN
7212 SHELLBURNE DRIVE
RALEIGH, NC 27612

I have made the enclosed decision in your case.  Please read this
notice and the decision carefully.

### This Decision Is Fully Favorable To You

Another office will process the decision and send you a letter
about your benefits.  Your local Social Security office or
another office may first ask you for more information.  If you
do not hear anything for 60 days, contact your local office.

### The Appeals Council May Review The Decision On Its Own Motion

The Appeals Council may decide to review my decision even
though you do not ask it to do so.  To do that, the Council
must mail you a notice about its review within 60 days from the
date shown above.  Review at the Council's own motion could
make the decision less favorable or unfavorable to you.

### If You Disagree With The Decision

If you believe my decision is not fully favorable to you, or if
you disagree with it for any reason, you may file an appeal
with the Appeals Council.

### How To File An Appeal

To file an appeal you or your representative must request the
Appeals Council to review the decision.  You must make the
request in writing.  You may use our Request for Review form,
HA-520, or write a letter.

**See Next Page**

CARMEL T. TOTMAN
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

3

## DECISION

Based on the Title II application filed on August 2, 1993, the claimant is entitled to a period of disability beginning on January 6, 1993, and to disability insurance benefits under sections 216(i) and 223, respectively, of the Social Security Act, and the claimant's disability has continued through at least the date of this decision.

H. CLAYTON ADAMS
Administrative Law Judge

OCT 2 5 1994

Date

A

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

## Do You Have Any Questions?

If you have any questions, you may call, write or visit any
Social Security office.  If you visit an office, please bring
this notice and decision with you.  The telephone number of the
local office that serves your area is (919)790-2782.  Its
address is SUITE 150 4405 BLAND RD., P. O. BOX 27168, RALEIGH,
NC.  27611.

H. CLAYTON ADAMS
Administrative Law Judge

Enclosure

cc:
  ADDIE E. TOMLINSON

  4505 FALLS OF NEUSE # 540
  RALEIGH, NC 27609

<u>NOTE TO PROCESSING CENTER</u>
<u>FURTHER ACTION NECESSARY</u>

**DEPARTMENT OF**
**HEALTH AND HUMAN SERVICES**
Social Security Administration
**OFFICE OF HEARINGS AND APPEALS**

**DECISION**

<u>**IN THE CASE OF**</u>                          <u>**CLAIM FOR**</u>

Period of Disability and
Disability Insurance Benefits

CARMEL T. TOTMAN
(Claimant)

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
(Wage Earner)                              (Social Security Number)

## PROCEDURAL HISTORY

This case is before the Administrative Law Judge on a request for hearing filed by the claimant, who is dissatisfied with the previous determinations finding that she is not disabled.

The claimant appeared and testified at the hearing, represented by Addie E. Tomlinson, a non-attorney representative. In a statement dated August 18, 1994, the claimant's representative, on behalf of the claimant, changed the onset date to January 6, 1993 (Exhibit 27).

## ISSUES

The issues in this case are whether the claimant is under a disability as defined by the Social Security Act and if so, when her disability commenced, the duration of the disability, and whether the insured status requirements of the Act are met for the purpose of entitlement to a period of disability and disability insurance benefits.

**ATTACHMENT B**



**northern
telecom**

# Benefits
# at a
# Glance

# For Salaried
# Employees of
# Northern Telecom
# Inc.



1-1-84

NNI-LTD-00005771

# Contents

| | |
|---|---|
| Thrift/Savings Plan | 1/2 |
| Retirement Plan | 3/4 |
| Basic Medical | 5 |
| Major Medical | 6 |
| Dental | 7 |
| Group Life Insurance | 8 |
| Dependent Spouse Life Insurance | 9 |
| Accidental Death and Dismemberment | 9 |
| Short Term Disability | 10 |
| Long Term Disability | 11 |
| Business Travel Accident Insurance | 12 |
| Matching Gifts Program | 12 |
| Holidays and Vacation | 13 |
| Educational Assistance | 13 |
| Adoption Expense Reimbursement | 13 |

NNI-LTD-00005772

# Thrift / Savings Plan

The Thrift/Savings Plan offers an opportunity to employees to accumulate personal savings to meet financial emergencies during their working years and to enjoy a higher standard of living during retirement.

## Eligibility

This plan is available to eligible employees who have worked at Northern Telecom and its participating subsidiaries for six (6) months or more.

## Membership

As an employee of Northern Telecom, you may elect to participate the first of the month following six months of employment.

## Contributions

You may contribute from 2% to 10% of your earnings. The Company will match 50% of your contributions up to a maximum of 6% of your base pay. All employee contributions will earn interest which is credited to your account. You have the option of having the company match made in NTL stock.

Effective 1-1-84, the participant may elect to purchase NTL Common Shares with his contribution. The election may be made at the beginning of any fiscal quarter and may be elected in increments of 25%. This would allow the participant to elect from 0 to 100% of his contribution to be made in Stock. This option will not affect the option that allows for company match to be made in NTL Common Shares.

## Vesting

You are always fully vested in your own contributions and interest earned on those contributions. You become 100% vested in all Company contributions on December 31 of the second year following the year in which the Company contributions were made to your account. You will vest 100% in all Company contributions and earnings if you retire, become permanently and totally disabled, or die.

Effective January 1, 1982, a participant who has five years of employment service shall vest on the December 31 which falls at the end of the first full calendar year following the year for which contributions are made. For example, company matching contributions made in 1982 will vest on December 31, 1983 for employees with five years or more of service. Contributions made prior to January 1, 1982, will continue to vest on the two-class-year basis.

NNI-LTD-00005773

# Thrift/Savings Plan

## Withdrawals

There are two types of withdrawals-hardship and in-service. When a participant makes an in-service withdrawal, he or she will not be eligible to make any further contributions under the plan until the first day of any month which falls at least six months after the withdrawal date.

Hardship withdrawals do not require the six months suspension. A hardship withdrawal must be approved by a member of the Employee Benefits Committee. Written notice requesting a hardship withdrawal must be given to your Human Resources Department.

Participants may withdraw any part (but not less than $100) of the value of their contributions on the first of any month provided 30 days notice is given prior to the effective date. A withdrawal notice is provided by the Human Resources Department for this purpose.

For an in-service withdrawal, you should allow 45 to 60 days from the effective date (60 to 90 days from the date of request) until you receive the check. For active employees who are requesting an in-service withdrawal, two years of Company contributions must always remain in the Trust.

For hardship withdrawals, you should receive your check within three weeks from the date the Wyatt Company receives the approved form.

Your contributions made after 1/1/83 are not eligible for in-service withdrawal. These funds can only be made available through the hardship withdrawal provision; retirement, death or disability.

## Tax Sheltered

All taxes are deferred on interest earned and Company contributions until you receive the money. Many retirees will be in a lower tax bracket when benefits are paid, with a resulting lessening of tax consequences.

Contributions made after 1-1-83 are on a pre-tax basis.

## Enrollment

Forms are available at your Human Resources Office to enroll in the Thrift/Savings Plan when you become eligible to participate.

## Summary Plan Description

A copy of the Summary of the Plan is available at the Human Resources Office. This Summary Plan description will provide more information on the Plan, including investment of Plan funds.

2

# Retirement Plan

The Retirement Plan helps to provide financial security during your retirement years. It provides you with regular retirement income for life which is entirely in addition to Social Security retirement benefits.

## Plan Membership and Cost

As a full-time salaried employee, you are automatically included in this Plan after one year of service and age 25, provided you were hired before age 60.

Also, part-time salaried employees who work at least 1000 hours in any 12-month period are eligible for membership in this Plan.

The company pays the entire cost of this Plan, plus half the cost of your Social Security Benefits.

## Retirement Dates

Normal Retirement — On the first day of the month coinciding with or following your 65th birthday.

Early Retirement — At any time between the ages of 55 and 65 if you have 10 or more years of credited service.

Rule of 85 — An active member who has completed at least 25 years of employment service by age 60, or any combination of age and service after age 60 that equals at least 85, may elect to retire early with no reduction for early retirement.

## At Normal Retirement

If you retire at age 65, the Plan will provide yearly income equal to:

1.5% x Final Average Earnings x Benefit Service (up to 30 years)

offset by

1.5% x Primary Insurance Amount x Benefit Service (up to 30 years)

As you can see, your benefits from this Plan are based on three important factors:

*Your final average compensation*—This means your average annual base salary during your five consecutive years of highest earnings during the last ten years with the company.

*Primary Insurance Amount*—This is the anticipated Primary Social Security Benefit based on your earnings projected to age 65 and based on the Social Security law in effect upon your date of retirement or termination.

*Your Benefit Service*—This generally means all of your service with Northern Telecom from your date of hire to the earlier of age 65 or retirement.

3

NNI-LTD-00005775

## At Early Retirement

If you retire before age 65, your plan income will be determined using the same calculations as normal retirement. That amount will then be reduced, by 5% per each year your benefits start before age 62, and 3% per each year that your benefits start between age 62 and age 65, to reflect the longer period of time you may expect to receive benefits.

## Social Security Too

As noted, Social Security retirement benefits are entirely *in addition* to the income you receive from the Plan. Social Security retirement benefits are payable in full starting at age 65, while reduced retirement benefits are payable as early as age 62.

## How Benefits Are Paid

The normal form of retirement pay for a married employee is a 50% joint and Survivor benefit. This means that when you retire, your plan income is actuarially reduced to provide that after your death your spouse receives 50% of your reduced income for his or her lifetime.

If you do not want this method of payment or if you are not married, when you retire you may elect payment of a monthly income for life. Payments begin when you retire and continue for the remainder of your life.

Other options providing 50%, 75% or 100% of your actuarially reduced income to your beneficiary after your death are also available.

## Spouse's Benefit

The Plan feature will provide continuing income to your spouse if you should die before retirement. This additional protection is effective as soon as you reach age 55, provided you have completed at least 10 years of credited service. The Company pays the cost of providing this benefit.

The Spouse's Benefit equals 50% of the pension you would have received if you retired on the date of your death.

## Disability

If you have been with the Company for at least one year and you become totally and permanently disabled, your membership in the Retirement Plan will continue throughout your disability. This means you will continue to earn credit for benefit service as long as you are disabled and are receiving Social Security disability benefits. Normally, this benefit is payable at your normal retirement date.

## Vested Benefits

If you terminate employment after completing 10 or more years of service, you are vested in this plan. This means you are entitled to receive income from the Plan at age 65, based on your compensation and service at the time of termination. Should you leave the Company before completing 10 years of service, you receive no benefits from this Plan. You may receive a lumpsum payment from the Plan at termination if the present value of your (future) benefit is less than $1750.00.

4

NNI-LTD-00005776

# Basic Medical

Your Basic Medical Benefits cover a wide range of medical expenses. This broad coverage helps pay the cost of non-occupational illnesses and injuries for you and your eligible dependents.

## Eligibility

You are eligible for Basic Medical Benefits if you are a full-time salaried employee. Your coverage begins your first day of work.

## Cost

The Company pays the total cost of the Basic Medical coverage for you and over 80% of the cost for your eligible dependents. Your contribution for dependent coverage will be re-evaluated annually.

## Summary of Benefits

*Hospital Benefits — Room and Board:* semi-private charges are paid in full for up to 365 days during each hospital confinement due to the same or related causes.

*Convalescent Facility:* semi-private charges are paid in full for up to 365 days during any one period of hospital confinement.

*Special Services:* While you or an insured dependent are receiving hospital room and board benefits, hospital services are paid in full. These services include anesthesia, X-ray and laboratory tests while hospitalized, general nursing services and most other services and supplies received as a hospital inpatient. Also, if emergency outpatient treatment for an accident is required, or if you have a surgical procedure performed as an outpatient at a hospital, you receive the same hospital benefit coverage as if you were an inpatient in the hospital.

*Surgical Benefits:* pays all reasonable and customary charges if you or an eligible dependent need an operation. Payable whether the charge is incurred "in" or "out" of the hospital.

*In-Hospital Physician Visits:* when your doctor treats you or an eligible dependent in the hospital, all reasonable and customary charges will be paid.

*Diagnostic X-rays and Laboratory Fees:* pays all reasonable and customary charges for diagnostic X-rays and laboratory services (payable for expenses incurred while not "hospital" confined). Does not cover "routine" examinations, X-rays and lab charges.

*Supplementary Accident Benefits:* provides additional full payment up to a maximum of $300 for many hospital and medical expenses resulting from a non-occupational injury that exceeds the coverage provided by the Basic Medical Benefits listed above. Payments under this benefit will be made only for expenses incurred within 90 days of the accident. No benefits are payable for medical supplies such as prescription drugs and medicines (which are covered under Major Medical). Supplementary accident benefits are payable for both "in" and "out of" hospital expenses.

## Reasonable and Customary

Reasonable and Customary basically means the prevailing rates in your area for various surgical procedures and other covered services as determined by periodic insurance company surveys.

5

NNI-LTD-00005777

# Major Medical

Major Medical starts when Basic Benefits are used up—or if you have expenses not covered by them—such as prescribed drugs and doctors' visits for treatment outside the hospital. It is designed to pay the larger share of your medical expenses in case of a serious or prolonged illness or injury.

## Eligibility

You are eligible for Major Medical if you are a full-time salaried employee. Your Major Medical coverage begins your first day of work.

## Cost

As with Basic Medical coverage, the Company pays the total cost of Major Medical coverage for you and over 80% of the cost for your eligible dependents. Your contribution is approximately 20% and will be re-evaluated annually.

## Summary of Benefits

Briefly, this is the way your Major Medical Benefits work:

Each calendar year, you pay the first $100 of your eligible medical expenses which are not covered by Basic Benefits. The deductible for an entire family is $200 per calendar year.

Then, the Plan pays 80% of the remaining eligible medical expenses up to a lifetime maximum of $500,000 for each person. The used-up portion of the lifetime maximum is restored by up to $2000 each January 1.

(Eligible expenses are limited to not more than $62.50 per treatment and to not more than 52 treatments per calendar year for "outpatient" care of mental and nervous disorders.)

Should the 20% you pay in combined eligible medical expenses in a given year exceed $1,000, this Plan pays 100% of any remaining expenses for the rest of that year, and after the deductible for the entire next calendar year.

*Eligible Medical Expenses:* include most reasonable and customary charges in excess of (or not covered by) Basic Benefits, such as: hospital room and board and services beyond 365 days, services of doctors for home and office visits, x-ray and radioactive therapy, private nursing services (R.N.), prescribed drugs and medicines purchased while not hospital confined.

## Second Surgical Opinion Program

This program is aimed at providing information which may lead to a decision to use alternative treatment for the medical condition involved, before someone decides to have elective surgery. The Program gives you access to the advice of one or two Board Certified Specialists to consider along with the opinion of your own surgeon. This advice will make you better able to determine the medical advisability of the proposed elective surgery.

6

NNI-LTD-00005778

# Dental

## Eligibility

You are eligible for Dental Benefits if you are a full-time salaried employee. Your Dental coverage begins your first day of work.

NOTE:

The Plan does not cover dental expenses for work in process when you became an employee of the Company.

## Cost

As with basic Medical coverage, the Company pays the total cost of Dental coverage for you and over 80% of the cost for your eligible dependents. Your contribution is approximately 20% and will be re-evaluated annually.

## Summary of Benefits

Briefly, this is the way your Dental Benefits work:

Each calendar year, you pay the first $25 of your eligible dental expenses. The deductible for an entire family is $50 per calendar year.

Then, the Plan pays 80% of the remaining eligible expenses except for Orthodontia which is paid at 50% rather than 80% of the usual and customary fee.

The maximum dental benefit in a calendar year is $1000 per individual, and the Lifetime Benefit payable for Orthodontia is $1000 per individual.

## Health Maintenance Organizations (HMO)

If you live in an area served by a "Health Maintenance Organization" (HMO) which has arranged with our organization to make available to employees a dual choice of health care benefits, you may enroll yourself and eligible dependents for the benefits provided by the HMO, in place of the Medical Expense Benefit under our Plan. This choice is available to new employees upon becoming eligible under our Plan. For those already covered under our Plan, it will be possible to transfer to the HMO during established annual enrollment periods.

7

# Group Life Insurance

Group Life Insurance Benefits provide financial protection for you and your family during your working years.

## Eligibility

If you are a full-time salaried employee, you are eligible for this protection beginning on your first day of work.

## Cost

This Plan is non-contributory. The Company pays all premiums for your Group Life Insurance.

## Summary of Benefits

Your life insurance coverage is two times your base rate to the next multiple of $1,000.

EXAMPLE:

| Your Annual Salary | Insurance |
|---|---|
| $ 9,200. | $19,000. |
| 12,000. | 24,000. |
| 15,000. | 30,000. |
| 20,000. | 40,000. |
| 25,000. | 50,000. |
| 30,000. | 60,000. |

## To Whom Benefits are Paid

Your Group Life Insurance is payable to your designated beneficiary.

## Contributory Life Insurance Coverage

You may, if you so elect, obtain a Supplemental amount of Contributory Life Insurance equal to either one or two times your base rate to the next multiple of $1,000.

Your monthly contribution toward the cost is based on your age as outlined:

| If you are | Your Per $1,000 Monthly Cost is |
|---|---|
| Less than age 40 | $ .12 |
| 40 but less than 50 | .25 |
| 50 but less than 60 | .50 |
| 60 and Over | .85 |

Your combined company paid life insurance amount and supplemental life insurance amount cannot exceed $600,000.

## Dependent Group Life Insurance

In addition to the life insurance provided you by the company, each member of your family which is insured under the company's basic medical plan is also covered for $4,000 life insurance. This applies to your spouse and each eligible child over 6 months. Children 14 days but less than 6 months are insured for $400.

8

NNI-LTD-00005780

# Accidental Death and Dismemberment

Accidental Death & Dismemberment Coverage (AD&D) provides additional financial protection should you lose a limb, the use of a limb or die as the result of an accident. AD&D coverage is entirely in addition to any benefits you receive from your Group Life Insurance.

## Eligibility

This Plan is non-contributory. The Company pays all premiums for your AD&D benefits.

## Summary of Coverage

### Accidental Death

If you should die as a result of injuries suffered in an accident, your beneficiary would receive an amount equal to two times your base pay to the next multiple of $1,000.

| EXAMPLE: | Your Annual Salary | AD&D Benefits |
|---|---|---|
| | $ 7,800. | $16,000. |
| | 12,000. | 24,000. |
| | 20,000. | 40,000. |
| | 30,000. | 60,000. |

### Loss of Limb Coverage

If you lose a limb or the use of a limb as the result of an accident, you would receive benefits under this Plan. The amount of benefit you are eligible for is determined according to a schedule, available from your Personnel Department.

## Limits of the Benefit

There are some losses such as self-inflicted injuries and acts of war that are not covered by AD&D benefits. Your Personnel Department can specify what limitations apply to AD&D coverage.

## Additional Coverage

If you elect to be covered by Contributory Life Insurance, you are also covered by an equal incremental amount of AD&D. Your total Accidental Death and Dismemberment coverage cannot exceed $300,000.

## Dependent Spouse Life Insurance

You may elect to obtain Dependent Spouse Life Insurance in the amount of $10,000 or $20,000. The amount selected for your spouse cannot exceed 50% of the amount of Total Life Insurance currently in force on the employee.

Your monthly contribution for this coverage is:

| | |
|---|---|
| $10,000 | $2.35 |
| $20,000 | $4.70 |

9

# Short Term Disability

If you are ill or injured, Short-Term Disability benefits (STD) provide income continuation.

## Eligibility

As a full-time salaried employee you are eligible for this disability benefit from the date of your employment.

## Cost

The Company pays the entire cost of your Short-Term Disability benefits.

## Summary of Benefits

*Disability Income* — If you are absent from work due to a non-occupational illness or injury,
Short-term Disability benefits will provide the following income:

- First there is a five day waiting period. This waiting period may be satisfied by using paid sick leave.

- Then, on the sixth day, you are entitled to disability benefits as provided in the following schedule.

### Service Schedule

| Service | 100% | 60% |
|---|---|---|
| Less than 6 months | 0 week(s) | 26 weeks |
| 6 months | 1 | 25 |
| 1 year | 2 | 24 |
| 2 | 4 | 22 |
| 3 | 6 | 20 |
| 4 | 8 | 18 |
| 5 | 10 | 16 |
| 6 | 12 | 14 |
| 7 | 14 | 12 |
| 8 | 16 | 10 |
| 9 | 18 | 8 |
| 10 | 20 | 6 |
| 11 | 22 | 4 |
| 12 | 24 | 2 |
| 13 | 26 | 0 |

*Duration of Benefits* — Short-term disability benefits continue as long as you remain disabled up to a maximum of 26 weeks per incident. If your disability lasts longer than 26 weeks, you may become eligible for Long-Term disability benefits.

*Statutory Disability Benefits* — If you work in a state which provides temporary disability benefits under law, your benefits from this Plan will be integrated with those provided under state law.

10

# Long Term Disability

Long-Term Disability benefits (LTD) provide continuing income for you and your family if you are disabled and unable to work for a long period of time due to illness or injury.

## Eligibility

As a full-time salaried employee, you are automatically covered under the Plan from the date of your employment.

## Cost

The Company pays the full premium for LTD coverage.

## Summary of Benefits

*Disability Income:* after you have been disabled for six months, this coverage will pay you a monthly income equal to approximately:

— 70% of your pay

— unlimited benefit per month

If you are receiving any other Company-provided disability benefits, pension, Social Security or Worker's Compensation, these amounts will be offset against your monthly income benefit under this plan.

*Duration of Benefit:* LTD benefits will start after you have been disabled for six months.

Generally, benefits will continue:

— for the next two years if you cannot perform the duties of your regular job, and

— thereafter up to age 65 if you are unable to engage in any gainful occupation for which you are or could become qualified by training, education or experience. If disability occurs after age 65, benefits will be paid for one year but not beyond age 70.

11

NNI-LTD-00005783

# Business Travel Accident Insurance

Business Travel Accident Insurance provides extra financial protection to you in case of death or permanent total disability resulting from an accident while traveling on authorized Company business. Benefits from the Insurance are in addition to any amounts payable from Group Life Insurance.

## Eligibility

As a full-time salaried employee, you are automatically covered under the Plan from the date of your employment.

## Cost

The Company pays the full cost of this valuable protection.

## Insurance Coverage

Your coverage starts the minute you leave your home or office—whichever is last—and continues until you return to your home or office—whichever is first. Business calls within the city where you are employed and regular commuting between your home and office are *not* covered by this insurance.

## Insurance Amounts

The Business Travel Accident Insurance Program provides the following coverage for death or permanent total disability:

- for employees earning $10,000 or less, coverage is $75,000.
- for employees earning over $10,000, coverage equals $75,000 *plus* an additional $1,000 for each $1,000 of salary or portion thereof in excess of $10,000, to a limit of $100,000 per employee.

The limit of insurance coverage payable as a result of any one accident is $2,000,000. If the total insurance claim from all authorized employees in any one accident exceeds $2,000,000, then the amount applicable to each employee shall be proportionately reduced.

# Matching Gifts Program

The Northern Telecom Matching Gifts Program was established on July 1, 1982. Personal cash gifts, made by full-time employees are matched on a dollar-to-dollar basis by Northern Telecom. The program matches gifts from $50 to a maximum of $1,000. Northern Telecom will match two gifts per calendar year per eligible employee, and the gifts may be made to either one or two Universities.

12

NNI-LTD-00005784

# Holidays and Vacation

## Vacations

As a full-time salaried employee, you are eligible for vacation time according to the following schedule:

| Length of Continuous Service (as of June 30 each year) | Amount Vacation |
|---|---|
| 1-11 mos | up to 10 days prorated |
| 1- 4 years | 2 weeks |
| 5-14 years | 3 weeks |
| 15-24 years | 4 weeks |
| 25 years or more | 5 weeks |

## Holidays

NTI observes a total of 12 holidays annually. All locations observe New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving and Christmas. Additional holidays are observed based on local business practices and are announced at the beginning of each year.

# Educational Assistance

To encourage employee educational growth and self-development, the Company assists financially in the payment of approved educational courses.

## Eligibility

Full-time salaried employees are eligible for benefits under the Program after completing the probation period.

## Summary of Program

The Education Assistance program provides 100% reimbursement for tuition, registration fees, laboratory fees and books for courses taken at an accredited institution including colleges, technical schools, and post-high schools. To be eligible for reimbursement, the courses taken must be job-related or taken in connection with a job-related degree and must be taken after normal working hours.

To apply for reimbursement, you must obtain approval—prior to enrolling—from your supervisor and your Human Resources Department. You will be reimbursed after submitting receipt of payments and proof that you successfully completed the course with at least a passing grade.

# Adoption Expense Reimbursement Program

The company will provide financial assistance toward employee expenses incurred in the adoption of children up to age 18. All permanent full time non-bargaining unit employees are eligible for this benefit. Reimbursement will be made for the actual and reasonable expenses incurred as a direct result of an adoption, up to a maximum of $1,000 per child.

13

NNI-LTD-00005785

**ATTACHMENT C**

# WEEKLY DISABILITY AND LONG TERM DISABILITY PLAN







# BENEFITS CONNECTION

# WEEKLY DISABILITY AND LONG TERM DISABILITY PLAN

# TABLE OF CONTENTS

Page

Eligibility and Effective Date ...................................................................................... 1

Weekly Disability Benefits ......................................................................................... 2

    Non-Occupational Disability Benefit ...................................................................... 2

    Occupational Disability Benefit ............................................................................... 3

Long Term Disability Benefits .................................................................................... 7

Benefit Modification for Third Party Liability ......................................................... 13

Termination of Coverage ............................................................................................ 15

ERISA Information ...................................................................................................... 16

## ELIGIBILITY AND EFFECTIVE DATE

If you are a regular full-time, non-union employee of Northern Telecom Inc., BNR or a participating affiliate ("Company"), you will become covered for Weekly Disability and Long Term Disability benefits under this coverage on your first day of employment provided you have enrolled for the coverage.

If you are both disabled and away from work on the date you would otherwise become covered, your coverage will not start until you return to active work.

The Company pays the entire cost for Weekly Disability and Long Term Disability Benefits.

## WEEKLY DISABILITY BENEFITS

Weekly Disability benefits will be paid to you for a specified period of time if you become totally disabled by an accidental bodily injury or disease while covered. Benefits commence on the sixth consecutive working day of total disability due to sickness or accident.

### Non-Occupational Disability Benefit

You are considered totally disabled when:

(1)   you cannot work because of sickness or accidental injury,

(2)   you are under the regular care of a physician, and

(3)   the Company has received satisfactory proof of your total disability. No benefits will be payable for any day on which you are doing any work, anywhere, for pay or profit other than part-time work for the Company which has been approved by the Company and your physician.

For purposes of weekly disability coverage, the term "physician" has the same meaning as defined in the Long Term Disability coverage section on page 10.

While you are totally disabled, benefits will continue for up to the Maximum Period of Payments shown for any one period of total disability.

Successive periods of total disability separated by less than two consecutive weeks of full-time, active work will be considered one period of disability, unless the subsequent period of disability results from causes unrelated to the causes of the earlier period and you have returned to one day of full-time active work between the periods.

This Non-Occupational Disability benefit is only paid for disabilities which are not Occupational Disabilities. Occupational Disabilities are those caused by:

(1)   an injury arising out of or in the course of, any employment for wage or profit, or

(2)   a disease covered with respect to such employment, by any workers' compensation law, occupational disease law or similar legislation.

You may receive benefits for an Occupational Disability as described on the following page.

2

## Occupational Disability Benefit

Weekly Disability benefits may also be payable to you for a total disability which is an Occupational Disability as defined on the previous page. This benefit is provided on the same terms as the benefit for non-occupational disability. The amount of Weekly Disability benefit payable, however, is equal to the excess of the Non-Occupational Weekly Disability benefit over the benefits payable under any workers' compensation law, occupational disease law, or similar legislation.

### Amount of Weekly Disability Benefit

The amount of Weekly Disability benefits is determined according to your length of credited service with the Company, as follows:

| _Service_ | _100% of your Weekly Basic Earnings are paid for the following number of weeks:_ | _60% of your Weekly Basic Earnings are paid for the following number of weeks:_ |
|:---:|:---:|:---:|
| Less than 6 months | 0 weeks | 26 weeks |
| 6 months | 1 | 25 |
| 1 year(s) | 2 | 24 |
| 2 | 4 | 22 |
| 3 | 6 | 20 |
| 4 | 8 | 18 |
| 5 | 10 | 16 |
| 6 | 12 | 14 |
| 7 | 14 | 12 |
| 8 | 16 | 10 |
| 9 | 18 | 8 |
| 10 | 20 | 6 |
| 11 | 22 | 4 |
| 12 | 26 | 2 |
| 13 | 26 | 0 |

If your physician and the Company approve your return to work on a part-time basis while you are still eligible for Weekly Disability benefits equal to 100% of your Weekly Basic Earnings, the amount of your Weekly Disability benefits will be reduced by the amount of your part-time wages and the benefit savings which result will be used to extend the number of weeks for which you are eligible for a 100% benefit.

During the weeks that your benefit would be 60% of your Weekly Basic Earnings, the amount of your benefit will be reduced by the amount of your part-time wages. However, the benefit savings you accumulated while you were eligible for a 100% benefit will be used to increase your benefit to 100% of your Weekly Basic Earnings until all the savings are exhausted.

If any of your accumulated benefit savings remain at the end of the maximum period of payments, the maximum period will be extended until all of the benefit savings are used ("Extension Period").

At any time that Federal Social Security, Workers' Compensation benefits or any other statutory disability benefits are payable to you, the amount of Weekly benefits will be reduced to the extent necessary so that the sum of such Weekly benefits and any benefit payable to you under the Federal Social Security Act, Workers' Compensation Law or any other statutory disability benefits will not exceed 100% or 60% (as applicable pursuant to the above chart) of your Weekly Basic Earnings.

The word "payable" is not limited to the other statutory disability benefits described above actually received by you, but includes such other statutory disability benefits which would have been available if you had complied with the provision for making claim for such benefits.

This benefit is reduced by any "other income benefits" you receive for that week, or which you would be entitled to receive if timely claim for them had been made by you.

**Other Income Benefits**

This Plan defines "other income benefits" as:

(1) income received from any employer or from any occupation for compensation or profit.

(2) any disability, retirement, or unemployment benefits required or provided for under any law of any government — for example:

(a) unemployment compensation benefits,

(b) no-fault wage replacement benefits,

(c) statutory disability benefits, or

(d) benefits under the Federal Social Security Act, the Canada Pension Plan, and the Quebec Pension plan, including dependents benefits, but not counting any increase in benefits enacted after the Weekly Disability Benefit payments have started under this Plan.

4

(3)   disability, retirement or unemployment benefits provided under any group insurance or pension plan or any other arrangement of coverage for individuals in a group (whether on an insured or uninsured basis), and

(4)   any benefits received under workers' compensation law or any other similar law, excluding payments received for legal fees incurred in the claim process.

Benefits of the type listed above which are payable to you or any of your or dependents because of your disability or retirement are included as "other income benefits".

For the purposes of this Plan, "other income benefits" will be treated as follows:

(1)   any periodic payments will be allocated to weekly periods,

(2)   any single lump sum payment including any periodic payments which you or your dependents have elected to receive in a single lump sum will be allocated to weekly periods with the exception of workers' compensation benefits.  Any single lump sum payment under workers' compensation laws will be fully offset in its entirety against any benefits otherwise payable by this Plan, and

(3)   any periodic or single lump sum payments received as a retroactive award may be allocated retroactively.

## Estimated Other Income Benefits

"Other income benefits" also include benefits that would be payable if timely claim for them had been made by you. In the case of Social Security benefits under the Federal Social Security Act, this includes timely and diligent pursuit of benefits through each of these steps:

(1)   application for such benefits,

(2)   appeal at the reconsideration level, if benefits are denied, and

(3)   appeal at the Administrative Law Judge level, if benefits are again denied.

Until you give this Plan written proof that you have completed the application process for other income benefits, and benefits are finally denied, this Plan may:

(1)   estimate your weekly Social Security and other income benefits, and

(2)   use that amount to determine your weekly benefit.

Your Social Security or other income benefits will not be estimated while your application and appeals are pending if you sign a Reimbursement Agreement on a form satisfactory to the Claims Administrator.

If the Claims Administrator finds that the amount of other income benefits that should have been used to determine your Weekly Disability Benefit differs from the amount actually used, these rules apply:

(1)   if Weekly Disability Benefits have been underpaid, this Plan will make a lump sum payment to bring the total payments to the amount that should have been paid.

(2)   if Weekly Benefits have been overpaid, this Plan may either require a lump sum reimbursement payment to this Plan, or at its option, reduce or eliminate future payments.

## Maximum Period of Payments

The maximum period of payment is twenty-six (26) weeks, subject to any Extension Period.

## Weekly Basic Earnings

Your Weekly Basic Earnings are determined as described below:

For all regular hourly and salaried employees — your Weekly Basic Earnings shall be your basic weekly pay rate in effect for the last complete payroll period before the start of the period of total disability, excluding bonuses, overtime pay or any other form of compensation. If you are a piece worker, your average weekly piece-work earnings over your basic weekly pay rate for the three (3) weeks before the start of the period of total disability will be added to your weekly basic earnings.

For an Employee in a Sales Compensation Program — your weekly Basic Earnings shall be one fifty-secondth of your total basic income consisting of base salary and commissions, but excluding bonuses or any other form of compensation for the last full calendar year just before the start of the period of total disability. If you have not been employed for a full calendar year prior to the commencement of the period of total disability, your weekly Basic Earnings shall be your total basic income for your actual period of employment divided by the number of weeks of such employment.

## Exclusions

You are not covered for any disability which is in any way caused by any of the following:

1.   intentionally self-inflicted injuries,

2.   your participation in the commission of an assault or felony, and

3.   war or any act of war (whether war is declared or not), insurrection, rebellion, or participation in a riot or civil commotion.

# LONG TERM DISABILITY BENEFITS

Monthly Income Benefits are payable to you after you have been totally disabled due to an accidental bodily injury or disease for at least the Benefit Waiting Period of six (6) months.

## Total Disability

You are considered totally disabled if you are unable to work because of a disease or injury.

During the first twenty-four (24) months of a period of a covered total disability (after your completion of the six (6) month Benefit Waiting Period), you will be considered unable to work if you cannot perform the work you normally perform.

After the first twenty-four (24) month period of covered total disability (after your completion of the six (6) month Benefit Waiting Period), you will be considered unable to work if you are unable to work at any reasonable occupation. A reasonable occupation is any gainful activity for which you are fitted by your education, training or experience, or for which you could reasonably become fitted.

## Monthly Income Benefit

The Plan will pay you 70% of your "Monthly Basic Earnings" before you become totally disabled, but in no event more than the Maximum Monthly Benefit, $7,000. This benefit is reduced by any "other income benefits" you receive for that month, or which you would be entitled to receive if timely claim for them had been made by you, but in no event shall this benefit be less than the Minimum Monthly Benefit, $50.

## When Benefits Begin

Your Monthly Income benefits will start as soon as you complete the requisite six (6) month Benefit Waiting Period, provided that written proof of your total disability satisfactory to the Claims Administrator is furnished within six (6) months following completion of the waiting period. Otherwise, Monthly Income benefits will commence on the day six (6) months following the date written proof of your total disability is furnished.

## How Long Benefits are Paid

You will continue to receive Monthly Income Benefits while you remain totally disabled, up to the end of the Maximum Benefit Period shown.

7

Maximum Benefit Period for any one period of total disability:

| Your Age at Commencement of Disability | Your Maximum Benefit Period |
|---|---|
| Under age 61 | To Age 65, but not less than 60 months |
| Age 61 | 60 months |
| Age 62 | 60 months |
| Age 63 | 60 months |
| Age 64 | 60 months |
| Age 65 | To Age 70 |
| Age 66 | To Age 70 |
| Age 67 | To Age 70 |
| Age 68 | To Age 70 |
| Age 69 - 74 | 12 months |
| Age 75 and over | 6 months |

## Period of Total Disability

Since benefits are payable only during a period of total disability, it is important that you understand when this period begins and ends.

Each period of total disability will start as soon as you are both totally disabled and under the care of a physician. You will not be considered to be under the care of a physician until he has been seen and treated you personally for the disease or injury causing the total disability for at least thirty-one (31) days. The Claims Administrator shall have the right to require that you be examined by a physician of his or her choosing.

Your benefit period during total disability will end when the first of the following occurs:

1.    you cease to be totally disabled or die; or as otherwise provided for in this booklet, or

2.    you actually start working at the type of occupation in which you normally engage or at any reasonable occupation. (Work at an Approved Rehabilitation Program as defined below will not count as work at the type of occupation in which you normally engage or at a reasonable occupation), or

3.    you cease to be under the care of a physician, or

4.    you fail to furnish the latest required proof of the continuance of your total disability or refuse to be examined by a physician designated by the Plan.

Once a period of total disability has ended, any new period of total disability will be treated separately. However, if you return to work for less than three (3) consecutive months, and then become disabled again due to the same or a related illness or injury, monthly benefits will begin as a continuation of the original disability.

This combining of two periods of total disability into one period will also apply to any successive additional periods of total disability resulting from the same or relating causes separated by less than three (3) months. Two periods will not be combined unless you were covered for this benefit at the start of the earlier period.

## Other Income Benefits

This Plan defines "other income benefits" as:

(1) income received from any employer or from any occupation for compensation or profit.

(2) any disability, retirement, or unemployment benefits required or provided for under any law of any government — for example:

    (a) unemployment compensation benefits,

    (b) no-fault wage replacement benefits,

    (c) statutory disability benefits, or

    (d) benefits under the Federal Social Security Act, the Canada Pension Plan, and the Quebec Pension plan, including dependents benefits, but not counting any increase in benefits enacted after the Weekly Disability Benefit payments have started under this Plan.

(3) disability, retirement or unemployment benefits provided under any group insurance or pension plan or any other arrangement of coverage for individuals in a group (whether on an insured or uninsured basis), and

(4) any benefits received under workers' compensation law or any other similar law, excluding payments received for legal fees incurred in the claim process.

Benefits of the type listed above which are payable to you or any of your or dependents because of your disability or retirement are included as "other income benefits".

For the purposes of this Plan, "other income benefits" will be treated as follows:

(1) any periodic payments will be allocated to monthly periods,

(2) any single lump sum payment including any periodic payments which you or your dependents have elected to receive in a single lump sum will be allocated to sixty (60) monthly periods with the exception of workers' compensation benefits. Any single lump sum payment under workers' compensation laws will be fully offset in its entirety against any benefits otherwise payable by this Plan, and

(3) any periodic or single lump sum payments received as a retroactive award may be allocated retroactively.

## Estimated Other Income Benefits

"Other income benefits" also include benefits that would be payable if timely claim for them had been made by you. In the case of Social Security benefits under the Federal Social Security Act, this includes timely and diligent pursuit of benefits through each of these steps:

(1)   application for such benefits,

(2)   appeal at the reconsideration level, if benefits are denied, and

(3)   appeal at the Administrative Law Judge level, if benefits are again denied.

Until you give this Plan written proof that you have completed the application process for other income benefits, and benefits are finally denied, this Plan may:

(1)   estimate your monthly Social Security and other income benefits, and

(2)   use that amount to determine your monthly benefit.

Your Social Security or other income benefits will not be estimated while your application and appeals are pending if you sign a Reimbursement Agreement on a form satisfactory to the Claims Administrator.

If the Claims Administrator finds that the amount of other income benefits that should have been used to determine your Monthly Income benefit differs from the amount actually used, these rules apply:

(1)   if Monthly Income benefits have been underpaid, this Plan will make a lump sum payment to bring the total payments to the amount that should have been paid.

(2)   if Monthly Income benefits have been overpaid, this Plan may either require a lump sum reimbursement payment to this Plan, or at its option, reduce or eliminate future payments. If this Plan reduces or eliminates future payments, the Minimum Monthly benefit of $50 will not apply.

## Monthly Rate of Basic Earnings

Your Monthly Basic Earnings will be determined by using provisions which follow separately, for each period of total disability. A change in your earnings will be considered to take effect on the date the new rate is determined.

For all regular hourly and salaried employees — your Monthly Basic Earnings shall be your basic monthly pay rate in effect for the last complete payroll period before the start of the period of total disability, excluding bonuses, overtime pay or any other form of compensation. If you are a piece worker, your average monthly piece-work earnings over your basic monthly pay rate for the three (3) months before the start of the period of total disability will be added to your monthly basic earnings.

For an Employee in a Sales Compensation Program — your Monthly Basic Earnings shall be one twelfth of your total basic income consisting of base salary and commissions, but excluding bonuses or any other form of compensation for the last full calendar year just before the start of the period of total disability. If you have not been employed for a full calendar year prior to the commencement of the period of total disability, your Monthly Basic Earnings shall be your total basic income for your actual period of employment divided by the number of months of such employment.

## Approved Rehabilitation Program

An "approved rehabilitation program" means:

(1) a program of vocational rehabilitation, or

(2) a period of part-time work with the Company for purposes of rehabilitation, which will be considered to begin only when the Claims Administrator approves such program, in writing, and to end when the Claims Administrator withdraws its approval.

This Plan includes this rehabilitation program to help you get back to work. With the Claims Administrator's approval, you may continue receiving Long Term Disability benefits for a limited time while on an approved rehabilitation program. Thus, you may get back into a gainful occupation with the assurance that for a specified period you will not lose your eligibility for benefits. During this period, your Monthly Income Benefit will be your regular Monthly Income Benefit payment less 80% of your earnings from the rehabilitative job.

| Example | | | |
|---|---|---|---|
| Monthly Income Benefit from the Plan | Monthly Earnings While You are Disabled | 80% Reduction | Net Monthly Income Benefit from the Plan |
| $1,600 | $300 | $240 | $1,360 |

Also, certain expenses of a vocational rehabilitation program may be paid by this Plan at the discretion of the Plan Administrator. If this Plan determines that a program that should make you self-supporting is within your ability, you will be notified of the type and duration of the expenses covered, and the conditions for payment. If you agree to undertake the program, the charges for the approved covered expenses will be paid, up to a maximum benefit of $10,000.

## Physician

"Physician" means a licensed practitioner of the healing arts acting within the scope of his practice; except that with respect to a period of total disability, or any portion thereof, during which total disability is caused by any condition other than a medically determinable physical impairment, "physician" shall mean a legally qualified physician who either specializes in the practice of psychiatric medicine or has, by reason of training or experience, a specialized competency in the field of psychiatric medicine sufficient to render the necessary evaluation and treatment of mental illness.

## Mental Illness Limitation

For total disabilities due to mental or nervous disorders, the benefit period will be limited to twenty-four (24) months; however, if hospital confinement exists, or commences within ninety (90) days following the date ending that twenty-four (24) month period, benefits will continue for the duration of the hospital confinement (subject to the Maximum Benefit Period described in page 6).

## Pre-Existing Condition Exclusion

No monthly benefits will be payable for any disability caused or contributed to by, or resulting from, a pre-existing condition. This limitation will not apply if your disability starts after you have been covered by the plan for twelve (12) months.

The term "pre-existing condition" means any condition for which you:

    (1)   receive treatment,

    (2)   incur expenses,

    (3)   receive a diagnosis, or

    (4)   take prescribed medication within ninety (90) days prior
          to the effective date of your insurance.

## Other Exclusions

You are not covered for any disability which is in any way caused by any of the following:

    1.   intentionally self-inflicted injuries,

    2.   your participation in the commission of an assault or felony, or

    3.   war or any act of war (whether war is declared or not), insurrection,
          rebellion, or participation in a riot or civil commotion.

# BENEFIT MODIFICATION FOR THIRD PARTY LIABILITY

## Third Party Liability

In the event that you ("Claimant") suffer an injury or illness covered by this Plan which injury or illness is caused by a third party, that is, by a person, corporation or other legal entity other than the Claimant ("Responsible Third Party"), you agree in good faith to pursue a claim against such Responsible Third Party for recovery of the value of the benefits paid by this Plan in connection with such injury or illness.

To the extent payments for lost wages or the like resulting from such injury or illness are made to a Claimant or his/her legal representative, or may be made to a Claimant or his/her legal representative in the future, by or for the Responsible Third Party (as a result of a legal judgment, settlement or in any other manner), such expenses are excluded from the Claimant's coverage under this Plan.

When a Claimant files a claim for benefits under this Plan which benefits would be payable but for the above exclusion, this Plan will pay such benefits provided:

    (1)  that payment for such benefits has not yet been made to the Claimant or his/her representative by or for the Responsible Third Party, and

    (2)  that the Claimant (or, if incapable, his/her legal representative) agrees in writing, using a form designated by this Plan, to promptly pay back to this Plan the amounts of any benefits paid by this Plan in connection with such injury or illness to the extent of any payments made to the Claimant or his representative by or for the Responsible Third Party. This agreement shall apply:

        (a) whether or not liability for the injury or illness is admitted by the Responsible Third Party, and

        (b) whether or not the payments from the Responsible Third Party itemize what they are for. A reasonable apportionment of the fees and costs incurred by the Claimant in pursuing a recovery from the Responsible Third Party may be deducted from amounts to be repaid to this Plan.

When any payments are made to a Claimant or his representative by or for a Responsible Third Party, such payments shall first be applied to reimburse this Plan for benefits previously paid by this Plan in connection with the injury or illness. To the extent such payments to a Claimant or his representative by the Responsible Third Party exceed such reimbursable amount, the future benefits payable under this Plan in connection with the injury or illness shall be redetermined by reducing the amount of such benefits by the amount of the payments made or to be made to the Claimant or his representative by or for the Responsible Third Party.

# ERISA INFORMATION

| | |
|---|---|
| *Plan Name* | The Northern Telecom Inc.<br>Weekly Disability and Long Term Disability Plan |
| *Employer Identification Number* | 04-2486332 |
| *Plan Number* | 509 |
| *Plan Sponsor* | Northern Telecom Inc.<br>200 Athens Way<br>Nashville, Tennessee 37228 |
| *Type of Plan* | Welfare |
| *Plan Year* | January 1 to December 31 |
| *Plan Administrator* | Northern Telecom Inc.<br>200 Athens Way<br>Nashville, Tennessee 37228<br>Tel: (615) 734-4000 |
| *Agent for Service of Legal Process* | Plan Administrator |
| *Claims Administrator for*<br>*Long Term Disability Plan* | CIGNA<br>Hartford, CT 06152 |

Benefits under this Plan are provided by Northern Telecom Inc. Company costs are paid out of current or accumulated earnings and profits.

## Plan Changes and Termination

The Company expects to continue this Plan, but necessarily reserves the right to amend this Plan from time to time or terminate this Plan at any time. Any amendment to this Plan may reduce or eliminate benefits payable under the Plan to persons who are Employees as of the effective date of the amendment.

## Claims

This booklet contains information on reporting claims. Forms for submitting claims may be obtained from your Human Resources Department.

If your claim is denied in whole or in part, you will receive a written notice of the denial explaining the reason for the denial.

You may request a review of the denied claim. The request must be submitted, in writing, within sixty (60) days after you receive the notice. Include your reasons for requesting the review and submit your request to the same office to which you submitted your claim. Your claim will be reviewed, and you will ordinarily be notified of the final decision within sixty (60) days of the receipt of your request for review. The final decision will be made by CIGNA which is providing claim services under this Plan.

## Your Rights under ERISA

As a participant in this Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 ("ERISA"). ERISA provides that all Plan participants shall be entitled to:

Examine, without charge, at the Plan Administrator's office and at other specified locations, such as work sites and union halls, all Plan documents, including insurance contracts, collective bargaining agreements, and copies of all documents filed by this Plan with the U.S. Department of Labor, such as detailed annual reports and plan descriptions.

Obtain copies of all Plan documents and other Plan information upon written request to the Plan Administrator. The Plan Administrator may make a reasonable charge for the copies.

Receive a summary of this Plan's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.



NOTES

**ATTACHMENT D**

## NORTHERN TELECOM INC.
### HEALTH & WELFARE BENEFITS TRUST

THIS AGREEMENT, made and entered into at Chicago, Illinois, dated this 12 day of March , 1992 by and between Northern Telecom Inc., a Delaware corporation (hereinafter referred to as the "Corporation") and CONTINENTAL BANK, NATIONAL ASSOCIATION, a national banking association, and its successor or successors and assigns in the trust hereby evidenced, as trustee (hereinafter referred to as the "Trustee"):

### WITNESSETH THAT:

WHEREAS, the Northern Telecom Inc. Health & Welfare Benefits Trust (hereinafter referred to as the "Trust") is being established by the Corporation to provide sickness, accident, life, disability, or other welfare benefits from time to time under The Northern Telecom Inc. Voluntary Employee Beneficiary Association Plan ("Plan") for employees (as defined in the Plan); and

WHEREAS, in order to implement and carry out the provisions of the Plan, the Corporation desires to establish a trust which will be maintained in connection with the Plan, will form a part of the Plan and which is intended to meet the requirements of a tax exempt organization under Section 501(c)(9) of the Internal Revenue Code of 1986, as amended, or under any comparable section or sections of any future legislation that amends, supplements, or supersedes said Section and this Agreement is designed for that purpose;

NOW THEREFORE, in consideration of the mutual undertakings of the parties hereto, IT IS AGREED as follows:

-2-

## SECTION I

### NAME

This Agreement and the trust hereby evidenced, as amended from time to time, shall be known as the Northern Telecom Inc. Health & Welfare Benefits Trust.

## SECTION II

### RELATING TO THE CORPORATION

The Plan and all component Plans (as defined in the Plan) will be administered by the Corporation. Except as provided in Section 5.2 hereof, the Trustee shall make such payments and distributions, and act upon such directions, as specified by the Corporation's duly authorized officers and agents.

## SECTION III

### MANAGEMENT AND CONTROL OF TRUST FUND ASSETS

3.1 The Trust Fund. The term "Trust Fund" comprises all property of every kind held or acquired by the Trustee under this Agreement. The Corporation shall make the necessary contributions to provide the benefits expected to become payable under this Trust to Participants (as defined in the Plan).

3.2 General Management Powers. With respect to the Trust Fund and subject only to the limitations expressly provided in this Agreement, the Trustee shall have the following powers, rights, and duties in addition to those vested in it elsewhere in this Agreement or by law:

NNI-LTD-00002006

-3-

(a) To receive and hold all contributions paid to it; provided, however, that the Trustee shall have no duty to require any contributions to be paid to it, or to determine that the contributions received by it comply with the Plan or with any resolution of the Board of Directors of the Corporation providing therefor, and further provided that the Trustee shall have no responsibility with respect to the operation or administration of the Plan or any component Plan.

(b) To have the exclusive authority and discretion to invest and reinvest the Trust Fund in property of any kind, real or personal, which authority shall be exercised in accordance with the written investment policy of the Corporation as provided to the Trustee and subject to applicable law, including ERISA.

(c) To manage, operate, sell, contract to sell, grant options with respect to, convey, exchange, partition, transfer, abandon, improve, repair, insure, lease for any term (although commencing in the future or extending beyond the term of this Trust Agreement) and otherwise deal with all property, real or personal, in such manner, for such considerations, and on such terms and conditions as the Trustee shall decide, subject to the approval of the Corporation.

(d) To borrow from anyone such amount or amounts of money as the Trustee considers desirable to carry out the purpose of this Trust and for that purpose to mortgage or pledge all or any part of the Trust Fund, subject to the approval of the Corporation.

NNI-LTD-00002007

-4-

(e) To retain in cash (pending investment, reinvestment, or payment of benefits) any reasonable portion of the Trust Fund and to deposit cash in any depositary selected by it, including Continental Bank, National Association or any other bank or financial institution.

(f) To compromise, contest, arbitrate, settle, or abandon claims and demands (exclusive of claims and demands arising under a Plan), subject to the approval of the Corporation.

(g) To begin, maintain, or defend any litigation necessary in connection with the investment, reinvestment, and administration of the Trust, subject to the approval of the Corporation,

(h) To have all rights of an individual owner, including the power to give proxies to vote stocks, to join in or oppose (alone or jointly with others) voting trusts, mergers, consolidations, foreclosures, reorganizations, recapitalizations, or liquidations, and to exercise or sell stock subscription or conversion rights.

(i) To hold securities or other property in the name of the Trustee or its nominee, or nominees, or in such other form as it determines best, with or without disclosing the trust relationship, provided the records of the Trustee shall indicate the actual ownership of such securities or other property.

NNI-LTD-00002008

-5-

(j) To pay any estate, inheritance, income or other tax, charge or assessment attributable to any benefit, which in the Trustee's opinion and with the approval of the Corporation, it shall or may be required to pay out of such benefit; and to require before making any payment such release or other document from any taxing authority and such indemnity from the intended payee as the Trustee shall deem necessary for its protection.

(k) To employ agents, attorneys, investment counsel, accountants, or other persons (who also may be employed by or represent the Corporation) for such purposes as the Trustee considers desirable.

(l) To pay any income taxes on any earnings of the Trust Fund.

(m) To furnish the Corporation with such information in the Trustee's possession as the Corporation may need for tax or other purposes.

(n) To perform any and all other acts in its judgment necessary or appropriate for the proper and advantageous management, investment, and distribution of the Trust Fund.

(o) When directed by the Corporation, to procure and become a policyholder or contractholder under a group insurance policy or policies, or a hospital, surgical or medical service contract or contracts issued by an insurance company, hospital, surgical or medical service corporation and to accept an assignment from the Corporation of and become the policyholder or contractholder under any such policy or contract issued to the Corporation,

-6-

and to have with respect to any such policy or contract all of the rights, powers, options and privileges of a policyholder or contractholder. However, the Trustee shall exercise the rights, discretions, and elections of the policyholder or contractholder under such policy or policies only as the Corporation shall direct in writing from time to time.

(p) To deposit securities with a corporate depositary. The certificates representing securities, including those in bearer form, may be held in bulk form with and may be merged into certificates of the same class of the same issuer which constitute assets of other accounts or owners, without certification as to the ownership attached. Utilization of a book-entry system may be made for the transfer or pledge of securities held by the Trustee or by a corporate depositary. The Trustee shall at all times, however, maintain a separate and distinct record of the securities owned by the Trust Fund.

(q) To participate in and use the Federal Book-Entry Account System, a service provided by the Federal Reserve Bank for its member banks for deposit of securities.

(r) To invest all or any portion of the Trust Fund in savings accounts, time deposit accounts, including time deposit open accounts, and money market accounts of Continental Bank, National Association or any other bank or financial institution, as long as these investments are within the investment guidelines provided to the Trustee.

NNI-LTD-00002010

-7-

(s) To open bank accounts in a bank or banks, including Continental Bank, National Association in the name of the Trust and to make such deposits therein, as provided in Section 5.2 hereof, as the Corporation shall direct in order to facilitate the payment of benefits. The Trustee shall not be further accountable for amounts so deposited.

(t)    The Corporation may appoint a Qualified Investment Manager to manage, invest and reinvest any part or all of the assets of the Trust Fund in the same manner and to the same extent as the Trustee is empowered pursuant to Section 3.2 (b).

3.3  Compensation and Expenses. The Trustee shall be entitled to reasonable fees for its services hereunder in accordance with the regular schedule of fees applied to health and welfare benefit trust accounts which is in effect from time to time. The Corporation has received a copy of the current fee schedule applicable to this account. If the Corporation terminates this Trust within one year of the date first above written, the Trustee shall be entitled to receive a fee under the regular schedule prior to such termination. Such fees and any expenses incurred by the Trustee in connection with the assets held hereunder, including expenses and fees of persons employed by it in accordance with Section 3.2 (1), may be charged to the Trust Fund or paid by the Corporation.

NNI-LTD-00002011

-8-

3.4 Treatment Under Internal Revenue Code. Until advised in writing to the contrary, the Trustee shall assume that this Trust constitutes an organization described in Section 501(c)(9) and is entitled to exemption from taxation under Section 501(a) of the Internal Revenue Code of 1986, as amended, or under any comparable section or sections of future legislation that amends, supplements, or supersedes one or both of these Sections of the Internal Revenue Code. Until advised in writing to the contrary, the Trustee is hereby directed to treat the Trust as an organization exempt from income tax withholding on payments of interest and dividends to the Trust. The Corporation shall indemnify the Trustee for and hold it harmless against all liabilities, penalties, charges, and costs that may be imposed on, incurred by, or levied upon the Trustee at any time by reason of the failure of the Trust to constitute a Section 501(c) (9) Organization.

3.5 Exercise of Trustee's Duties. The Trustee shall discharge its duties hereunder solely in the interest of the Participants and other persons entitled to benefits under the Plan, and:

(a) For the exclusive purpose of:

(i) providing benefits to Participants and other persons entitled to benefits under the Plan; and

(ii) defraying reasonable expenses of administering the Trust and the Plan;

(b) With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

NNI-LTD-00002012

-9-

## SECTION IV

### PLAN

4.1  The Plan. The Plan may be amended from time to time by the Corporation. The Corporation may from time to time adopt one or more component plans to provide life, sick, medical, accident, or disability benefits for employees of the Corporation and/or one or more affiliates or subsidiaries of the Corporation.

4.2  Delivery of Plan to Trustee. The Corporation shall deliver to the Trustee a copy of the Plan and each component Plan and each amendment thereto for convenience of reference, but the rights, powers, titles, duties, and discretions of the Trustee shall be governed solely by this Trust without reference to any plan.

## SECTION V

### DISTRIBUTIONS AND BENEFITS PAYMENTS

5.1  Corporation to Direct Distributions. Except as provided in Section 5.2 hereof, distributions shall be made from the Trust Fund by the Trustee to such persons or other entities, in such manner, at such times, in such amounts, and for such purposes as the Corporation or the Corporation's authorized agent shall direct in writing. The Corporation shall identify to the Trustee the officers or agents of the Corporation authorized from time to time to direct the Trustee regarding distributions from the Trust Fund. The Trustee shall have no duty or responsibility to see to the application of distributions so made from the Trust Fund, or to ascertain whether any such

NNI-LTD-00002013

-10-

directions comply with any plan, or to ascertain that the disposition of distributions by the Corporation or any agent of the Corporation complies with any plan.

     5.2   <u>Benefit Payments</u>. The Corporation or its duly authorized agent may make any benefit payment required under the terms of the Plan. The Trustee shall make deposits from the Trust Fund to a checking account in a bank, including Continental Bank, National Association at such times and in such amounts as the Corporation or its agent shall direct in writing. The Trustee shall not be further accountable for amounts so deposited and shall not have any duty, responsibility, or liability to see to the application made of such funds by the Corporation or by any person or agent authorized by it to draw checks or drafts on the checking account, or to ascertain that the application made of such funds complies with the terms of the Trust or the Plan. Funds held in any such checking account shall be held by the Corporation or its agent for the benefit of those entitled to benefits under the provisions of the Plan. The Corporation shall designate each person or agent authorized to draw checks or drafts on any such account and the Corporation shall have the power to make ordinary and customary arrangements regarding banking services and other authorities for the account.

-11-

## SECTION VI

### ACCOUNTS AND REPORTS OF THE TRUSTEE

6.1   Records and Accounts of the Trustee.  The Trustee shall maintain
accurate and detailed records and accounts of all transactions hereunder.
Within thirty (30) days following the close of each month, or following the
close of such other reporting period as may be agreed upon by the Trustee and
the Corporation, the Trustee shall file with the Corporation a written account
setting forth the balance in the Trust Fund at the beginning of the period,
current period contributions, income, distributions and expenses from the
Trust Fund, and the balance in the Trust Fund at the end of the period.  The
Trustee shall maintain separate records identifying contributions made on
behalf of employees in connection with the Northern Telecom Inc. Flexible
Spending Account Plan.  The Trustee shall also file a written account listing
the property held in the Trust Fund at cost and market value as of the close
of each period.

6.2   Annual Report.  As soon as practicable following the close of each
fiscal year of the Trust and following the effective date of the removal or
resignation of any trustee, the Trustee shall file with the Corporation a
written report setting forth all transactions with respect to the Trust Fund
during each fiscal year or during the period from the close of the last fiscal
year to the date of such removal or resignation and listing the assets of the
Trust Fund at cost and market value as of the close of the period covered by
such report.

NNI-LTD-00002015

-12-

6.3   <u>Approval of Reports</u>.   Upon the receipt by the Trustee of the Corporation's written approval of any such written account or report, or upon the elapse of one hundred eighty (180) days after the Corporation's receipt of each written account or report, said written account or report shall be deemed to be approved by it except as to matters, if any, covered by written objections theretofore delivered to the Trustee by the Corporation regarding which the Trustee has not given an explanation or made adjustments satisfactory to it.  The Trustee, to the extent permitted by law, shall be released and discharged as to all items, matters, and things set forth in such written account or report other than the matters covered in such written objections as provided herein.  The Trustee, nevertheless, shall have the right to have its accounts approved by judicial proceedings if it so elects, in which event the Trustee and the Corporation shall be the only necessary parties.  Further, in the event that the Corporation duly delivers to the Trustee written objections to any matters set forth in any such written account or report and said objections are not explained or adjusted to the satisfaction of the Corporation, each shall likewise have the right to have the Trustee's accounts reviewed by judicial proceedings if it so elects, in which event the Trustee and the Corporation shall be the only necessary parties.

NNI-LTD-00002016

-13-

## SECTION VII

### MISCELLANEOUS

7.1    Persons Dealing with Trustee.   No person dealing with the Trustee
shall be required to see to the application of any money paid or property
delivered to the Trustee, or to determine whether or not the Trustee is acting
pursuant to any authority granted to it under the Trust Agreement.

7.2    Indemnification of the Trustee by the Corporation.   The
Corporation hereby agrees to indemnify the Trustee for and to hold it harmless
against any and all liabilities, losses, costs, or expenses (including legal
fees and expenses) of whatsoever kind and nature which may be imposed on,
incurred by, or asserted against the Trustee at any time by reason of the
Trustee's acting upon the directions of the Corporation's duly authorized
officers and agents if the Trustee did not act dishonestly or in willful or
negligent violation of the law or regulation under which such liability, loss,
cost or expense arose.

7.3    Indemnification of the Corporation by the Trustee.   The Trustee
hereby agrees to indemnify the Corporation for and to hold it harmless against
any and all liabialities, losses, costs, or expenses (including legal fees and
expenses) of whatsoever kind and nature which may be imposed on, incurred by,
or asserted against the Corporation at any time by reason of the trustee's
acting dishonestly or in willfull violation of the law or regulations
underwhich such liability, loss, cost or expense arose.

NNI-LTD-00002017

-14-

7.4   <u>Waiver of Notice</u>.  Any notice required under this Trust Agreement
may be waived by the person entitled thereto.


7.5   <u>Counterparts</u>.  This Trust Agreement may be executed in any number
of counterparts, each of which shall be deemed an original and no other
counterpart need be produced.


7.6   <u>Governing Laws</u>.  This Trust Agreement shall be construed and
administered according to the laws of Illinois to the extent that such laws
are not preempted by the laws of the United States of America.


7.7   <u>Successors, etc.</u>  This Trust Agreement shall be binding on the
Corporation, the Trustee and its successor, and on all persons entitled to
benefits under the plan and their respective heirs and legal representatives.


7.8   <u>Successor</u>.  If a successor to the Corporation or a purchaser of
all or substantially all of the Corporation's assets elects to continue the
plan, such successor or purchaser shall be substituted for the Corporation
under this Trust Agreement.


7.9   <u>Assignment of Interest in Trust</u>.  Continental Bank, N.A., as
Trustee, may at any time assign and transfer to its wholly-owned subsidiary,
Continental Trust Company, an Illinois trust company, and its successors and
assigns, all of its rights, title, interest, duties and obligations under the
Trust Agreement, subject to Continental Trust Company's acceptance of such
assignment and transfer.  From and after the effective date of such assignment

NNI-LTD-00002018

-15-

and transfer, Continental Trust Company shall be substituted for Continental Bank, N.A. as the Trustee under the Trust Agreement. All other provisions of the Trust Agreement shall remain in full force and effect until otherwise modified in accordance with Trust Agreement.

7.10 Proxy Policy. The Trustee shall upon execution of this Trust Agreement provide the corporation with a copy of its proxy voting policy.

## SECTION VIII

## NO REVERSION TO CORPORATION

No part of the corpus or income of the Trust Fund shall revert to the Corporation to be used for, or diverted to, purposes other than the exclusive benefit of Participants under the Plan.

NNI-LTD-00002019

-16-

## SECTION IX

### CHANGES OF TRUSTEE

9.1   Resignation.  The Trustee may resign at any time by giving ninety (90) days' advance written notice to the Corporation.

9.2   Removal of Trustee.  The Corporation may remove the Trustee by giving ninety (90) days' advance written notice to the Trustee subject to providing the removed Trustee with proof of the appointment of a successor trustee and of the successor trustee's acceptance of the trusteeship.

9.3   Duties of Resigning or Removed Trustee and of Successor Trustee. If the Trustee resigns or is removed, it shall promptly transfer and deliver the assets of the Trust Fund to the successor trustee, after the Corporation and the Trustee have approved expenses and any sums chargeable against the Trust Fund for which it may be liable. Within one hundred twenty (120) days, the resigned or removed trustee shall furnish to the Corporation and the successor trustee an account of its administration of the Trust from the date of its last account. Each successor trustee shall succeed to the title to the Trust Fund vested in its predecessor without the signing or filing of any further instrument, but any resigning or removed trustee shall execute all documents and do all acts necessary to vest title in any successor trustee. Each successor shall have all the powers, rights, and duties conferred by this Agreement as if originally named trustee. No successor trustee shall be personally liable for any act or failure to act of a predecessor trustee.

NNI-LTD-00002020

-17-

## SECTION X

### AMENDMENT AND TERMINATION

10.1 <u>Amendment</u>.  The Corporation reserves the right to amend the Trust Agreement at any time by action of its Board of Directors, or otherwise, except that no amendment shall change the rights, duties, and liabilities of the Trustee under this Trust Agreement without its written consent.

10.2 <u>Termination</u>.  The Corporation may terminate the Trust by delivering to the Trustee, at least thirty (30) days prior to the effective date of termination, a resolution of its Board of Directors.  If the Trust is terminated, all of the provisions of the Trust evidenced by this Trust Agreement, nevertheless, shall continue in effect  until the Trust Fund has been distributed by the Trustee in accordance with the Plan as directed by the Corporation or its duly authorized agent.  However, under no condition shall the termination of the Trust result in a distribution to the Corporation of any portion of the Trust Fund.

NNI-LTD-00002021

-18-

IN WITNESS WHEREOF, the Corporation and the Trustee have caused these presents to be signed by their duly authorized officers and their corporate seals to be hereunder affixed, the day and year first above written.

NORTHERN TELECOM INC.

ATTEST:

By _Davell K Peterson_

Its _VP Finance_
      (Seal)

Its _Assistant Secretary_

CONTINENTAL BANK, NATIONAL ASSOCIATION,
As Trustee

ATTEST:

By _Frank E. Phler_

Its _Vice President_
      (Seal)

Its _Trust Officer_

5072PHEL.PER

**ATTACHMENT E**

# NORTEL NETWORKS

# WELFARE BENEFITS PLAN

M PRO 1969476 v3
2789126-000005

## TABLE OF CONTENTS

Page

**ARTICLE I    GENERAL TERMS AND CONDITIONS** ............................................................... 1
Section 1    Purpose ................................................................................................. 1
Section 2    Definitions .............................................................................................. 1
Section 3    General .................................................................................................. 2

**ARTICLE II    SECTION 125 CAFETERIA PLAN** ............................................................... 7
Section 1    General ................................................................................................. 7
Section 2    Eligibility ............................................................................................... 7
Section 3    Irrevocable Elections ............................................................................ 7
Section 4    Additional Required Terms .................................................................. 7

**ARTICLE III    HEALTH BENEFIT PROGRAMS** ............................................................... 7
Section 1    Health Benefit Programs ...................................................................... 7
Section 2    HIPAA Privacy and Security Standards ................................................ 7
Section 3    Family and Medical Leave Act .............................................................. 9
Section 4    COBRA ................................................................................................. 9
Section 5    USERRA ............................................................................................. 10
Section 6    Qualified Medical Child Support Order Procedures ............................. 10
Section 7    Medicaid ............................................................................................. 10
Section 8    Coverage of Dependent Children in Case of Adoption ....................... 10
Section 9    HIPAA Portability and Nondiscrimination Requirements ..................... 11
Section 10    Newborn and Mothers Health Protection Act ..................................... 11
Section 11    Mental Health Parity Act .................................................................... 12
Section 12    Women's Health and Cancer Rights Act ............................................. 12
Section 13    Subrogation and Recovery ................................................................. 12
Section 14    Coordination of Benefits ..................................................................... 12
Section 15    Claims Procedures ............................................................................. 13

**ARTICLE IV    FULLY INSURED BENEFIT PROGRAMS** ............................................... 14
Section 1    General ............................................................................................... 14
Section 2    Claims Procedures ............................................................................. 14

## ARTICLE I

## GENERAL TERMS AND CONDITIONS

**Section 1    Purpose**

This Nortel Networks Welfare Benefits Plan is maintained for the purpose of providing the employee welfare benefits listed herein for the benefit of the Employer's eligible employees and dependents. It is intended that the Plan encompass as a single ERISA welfare benefit plan the various elements of an overall welfare benefit program which are funded in whole or in part through the Nortel Networks Health & Welfare Benefits Trust, which constitutes a voluntary employees' beneficiary association ("VEBA") for tax law purposes, This Plan, together with the governing documents for each element program described on Appendix A constitutes the written plan document required by ERISA § 402(a), and is an employee welfare benefit plan (within the meaning of ERISA § 3(l)). Some or all of the benefit programs may be offered through a cafeteria plan arrangement under Code § 125.

**Section 2    Definitions**

The following capitalized terms shall have the meanings set forth below.

2.1    "Administrator" means the Company or such other person or committee as may be appointed from time to time by the Company to supervise the operation and administration of the Plan. The Administrator shall be the "named fiduciary" under the Plan. However, discretionary authority to make the final fiduciary decision about claims determinations may be delegated to an Insurer or a Claims Administrator.

2.2    "Benefit Program" means an arrangement providing employee welfare benefits (within the meaning of Section 3(l) of ERISA), maintained or established by the Company or an Employer, which is a part of this Plan; provided, neither a Cafeteria Plan Arrangement nor a flexible spending account offering dependent care or adoption assistance expense reimbursements shall be deemed to be an employee welfare benefit plan. The Benefit Programs that are a part of this Plan are listed in Appendix A.

2.3    "Cafeteria Plan Arrangement" means a Benefit Program that meets the requirements of Internal Revenue Code § 125, and pursuant to which an Employee can choose between cash or other taxable benefits and the Benefit Programs on a non-taxable basis.

2.4    "Claims Administrator" means the person or entity designated by the Administrator in accordance with Section 3.1 of this Article I to manage the payment of claims under a Benefit Program. If authority and responsibility to determine adverse claims determinations (within the meaning of ERISA § 503) is delegated by the Administrator to the Claims Administrator, the Claims Administrator shall act as claims fiduciary.

2.5    "Code" means the Internal Revenue Code of 1986, as amended.

2.6    "Company" means Nortel Networks Inc. and any successor corporation resulting from a merger or consolidation with the Company or transfer of substantially all of the assets of the Company, if such successor or transferee shall adopt and continue the Plan.

2.7    "Dependent" means any person eligible for dependent coverage under a Benefit Program.

2.8    "Employee" means each common-law employee of an Employer who is eligible to become a Participant under a Benefit Program which is a part of this Plan. Except to the extent specifically provided otherwise in the Governing Documents of a Benefit Program, "Employee" shall not include any individual designated or considered by an Employer as an independent contractor; a leased

employee within the meaning of Code § 414(n); or a temporary or seasonal employee; even if such designation is found to be in error by a court or administrative agency of competent jurisdiction.

2.9    "Employer" means an entity, including the Company, that adopts the Plan for the benefit of its eligible Employees, and the Dependents of such Employees, as provided in Section 3.6 of this Article I. Employers other than the Company may participate in the Plan with the consent of the Company. Participating Employers are listed on Appendix B to the Plan.

2.10    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the applicable regulations and rulings thereunder.

2.11    "Fully Insured Benefit Program" means a Benefit Program that provides benefits solely under an insurance contract or policy, which benefits are paid directly to or on behalf of the Participant.

2.12    "Governing Documents" means, with respect to a Benefit Program and as applicable, the insurance contracts, certificates of coverage, summary plan description and any other document which governs the terms of the Benefit Program.

2.13    "Health Benefit Program" means a Benefit Program which is a group health plan and which provides benefits for health care (directly or otherwise) to Employees, former Employees, and their families, as provided under the terms of such Health Benefit Program.

2.14    "HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as amended, and the applicable regulations and rulings thereunder.

2.15    "Insurer" means the insurance company issuing the contract or policy with respect to a Fully Insured Benefit Program.

2.16    "Participant" means any individual (including a Dependent) who is enrolled in and participates in a Benefit Program in accordance with Section 3.2 of this Article I.

2.17    "Plan" means this Nortel Networks Welfare Benefits Plan and the covered Benefit Programs, as described herein.

2.18    "Plan Year" means the calendar year.

2.19    "Program Year" means the calendar year.

## Section 3    General

3.1    **Administration of Plan and the Benefit Programs.**    The Administrator shall be responsible for the general administration of the Plan, including the Benefit Programs, and shall be the "plan administrator" and "named fiduciary" within the meaning of ERISA under the Plan and the Benefit Programs (except to the extent another person or entity is specifically designated in the Governing Documents to perform fiduciary functions); provided, however, for Fully Insured Benefit Programs, unless specifically provided otherwise in the Governing Documents, the Insurer shall be the "named fiduciary," and claims fiduciary responsible for administering and determining benefits under such Benefit Program, and shall have full authority and discretion to interpret the terms of the Benefit Program for those purposes. With respect to the Plan, including the Benefit Programs, the Administrator shall have, without limitation, the following discretionary authority, duties and powers:

(a)    To make and enforce such rules and regulations as it deems necessary or proper for the efficient administration of the Plan, including the establishment of any claims procedures that may be required by applicable provisions of law;

(b)      Except to the extent reserved to the Insurer with respect to a Fully Insured Benefit Program or to a Claims Administrator with respect to a Benefit Program under which the Governing Documents so delegate such authority, to interpret the provisions of the Plan, make findings of fact, and correct errors in, supply omissions from, and resolve inconsistencies or ambiguities in the language of the Plan, and to decide all claims and appeals arising under the Plan;

(c)      To decide all questions concerning the Plan and the eligibility of any person to participate in the Plan;

(d)      To appoint such agents, counsel, accountants, consultants and other persons as may be required to assist in administering the Plan; and

(e)      To allocate and delegate its fiduciary and administrative responsibilities under the Plan and to designate other persons to carry out any of its responsibilities under the Plan, any such allocation, delegation, or designation to be in writing. Without limitation, the Administrator may designate other organizations or persons (who also may be employed by an Employer) to carry out the following:

(1)      pursuant to an administrative services or claims administration agreement, the responsibility for administering and managing a Benefit Program or Programs, including the processing and payment of claims under the Program and the recordkeeping related thereto;

(2)      the responsibility to prepare, report, file and disclose any forms, documents and other information required to be reported and filed by law with any government agency or to be prepared and disclosed to Employees, Participants or other persons entitled to disclosure under the Benefit Programs; and

(3)      the responsibility to review claims or claim denials under the Benefit Programs, including discretionary authority to act as claims fiduciary to determine adverse claims determinations within the meaning of Department of Labor Regulation § 2560.503-1.

Subject to applicable law, any interpretation of the provisions of the Plan and the Benefit Programs and any decisions on any matter within the discretion of the Administrator made by the Administrator in good faith shall be binding on all persons. A misstatement or other mistake of fact shall be corrected when it becomes known, and the Administrator shall make such adjustment on account thereof as it considers equitable and practicable. The Administrator shall not be liable in any manner for any determination of fact made in good faith. This paragraph shall also apply to the interpretations and decisions of an Insurer or a Claims Administrator to the extent that authority to make discretionary decisions has been delegated to such Insurer or Claims Administrator by a Governing Document.

3.2      **Eligibility**. Each Employee (and his or her Dependents) will become Participants, and will be eligible for the benefits provided by the Plan, solely in accordance with the terms of the Benefit Program, including any enrollment and premium payment requirements, applicable to the group or classification of Participants of which a Participant is a member. Participation in a Benefit Program will cease in accordance with the terms of such Benefit Program. Participation in the Plan will cease upon termination of the Plan or upon amendment of the Plan to exclude a group or classification of which a Participant is a member.

Retired Employees are not eligible to participate in the Plan, except as may be specifically provided under the terms of a Benefit Program.

Former Participants will become Participants again if and when they meet the eligibility requirements of the applicable Benefit Program.

M PRO 1969476 v3
2789126-000005

3.3    **Benefits**.  The benefits provided under the Plan for each group or classification of Participants are those set forth in the Governing Documents for the applicable Benefit Program.

3.4    **Contributions**.

(a)    **Employer Contributions**.  For each Plan Year, each Employer shall make such contributions under the Benefit Programs in such amounts and at such times as the Company shall determine are appropriate to fund the Benefit Programs.  Benefits may also be provided through a VEBA funded in whole or part by Employer contributions.

(b)    **Employee Contributions**.  As a condition of eligibility under a Benefit Program, a Participant may be required to make contributions, in amounts and at times specified by the Company and the applicable Benefit Program, applicable to the coverage option selected and the group or classification of Participants of which such Participant is a member.  Such contribution requirements may be adjusted from time to time.  Contributions shall be made in such manner as the Administrator shall specify.

3.5    **Amendment and Termination**.

(a)    **Amendment**.  The Company reserves the right to amend any part or all of the Plan or a Benefit Program at any time or from time to time by written instrument.

(b)    **Termination**.  The Company reserves the right to terminate the Plan or a Benefit Program at any time by written instrument.  The Plan or Benefit Program, as applied to any single Employer, may be terminated at any time by such Employer, subject to consent of the Company.

3.6    **Additional Employers**.  Any affiliate of the Company may, with the consent of the Company, adopt the Plan and become an Employer hereunder, and designate any one or more existing plans or programs as a Benefit Program, applicable to its Employees or a group of its Employees or establish one or more Benefit Programs as applicable to such Employees.

3.7    **Discrimination**.  To the extent any provision of ERISA, the Code or other applicable law or regulation prohibits discrimination in eligibility, benefits or other feature of a Benefit Program, the Administrator reserves the right to adjust, terminate or otherwise modify the terms and operation of the Benefit Program to the extent necessary to avoid, reduce or eliminate such discrimination.

3.8    **Claims Procedures**.

(a)    **Claims**.  All claims for benefits under the Plan and any assignment of benefits to a provider shall be made, processed and paid in accordance with Department of Labor Regulations § 2560.503-1 and the terms and conditions of the applicable Benefit Program and the related provisions of the summary plan description for such program.  The Administrator shall be the claims fiduciary unless this function is delegated to another person or entity under this Section 3.

(b)    **No Estoppel of Plan**.  No person is entitled to any benefit under the Plan except and to the extent expressly provided under the terms and conditions of the applicable Benefit Program.  The fact that payments have been made from the Plan in connection with any claim for benefits does not (a) establish the validity of the claim; (b) provide any right to have such benefits continue for any period of time; or (c) prevent the Plan from recovering the benefits paid to the extent that the Administrator determines that there was no right to payment of the benefits under the Plan.  Thus, if a benefit is paid and it is thereafter determined that such benefit should not have been paid (whether or not attributable to an error by the Participant or any other person), then the Administrator may take such action as it deems necessary or appropriate to remedy such situation, including without limitation, by deducting the amount of any overpayment theretofore made to or on behalf of such Participant from any succeeding payments to or on behalf of such Participant under the Plan or from any amounts due or owing to such Participant

M PRO 1969476 v3
2789126-000005

by the Company or under any other plan, program or arrangement benefiting the Employees or former Employees of the Company, or otherwise recovering such overpayment from whomever has benefited from it.

If the Administrator determines that an underpayment of benefits has been made, then the Administrator shall take such action as it deems necessary or appropriate to remedy such situation.

### 3.9   Miscellaneous

(a)   Information to be Furnished by Participants.  Participants under the Plan must furnish the Administrator with such evidence, data or information as the Administrator considers necessary or desirable to administer the Plan and the Benefit Programs.  A fraudulent or knowing misstatement or omission of fact made by a Participant or Dependent in an enrollment form, a claim for benefits or similar manner may result in cancellation of coverage and/or denial of claims for benefits.

(b)   Records.  As a condition of receiving benefits payable under a Benefit Program, a Participant may be required to provide the Administrator with any evidence and records of expenses incurred by such Participant and each of such Participant's Dependents in such form as the Administrator shall from time to time specify.

(c)   Uniform Rules.  The Administrator shall administer the Program and the Benefit Programs on a reasonable and nondiscriminatory basis and shall apply uniform rules to all persons in similar situations.

(d)   Waiver of Notice.  Any notice required under the Plan or a Benefit Program may be waived by the person entitled to such notice.

(e)   Gender and Number.  Where the context permits, words in the masculine gender shall include the feminine and neuter genders, the singular shall include the plural, and the plural shall include the singular.

(f)   Controlling Law.  Except to the extent superseded by the laws of the United States, the laws of the state of Tennessee shall be controlling in all matters relating to the Plan and the Benefit Programs.

(g)   Interests Not Transferable.  Except as otherwise expressly permitted by a Benefit Program or as may be required by the tax withholding provisions of the Internal Revenue Code or any state's income tax act, benefits under the Plan and the Benefit Programs are not in any way subject to the debts or other obligations of the persons entitled thereto and may not be voluntarily or involuntarily sold, transferred, alienated, assigned or encumbered.  Any attempt to accomplish the same is void.  If the Administrator finds that such an attempt has been made, it may, in its sole discretion, elect to pay the benefits due the covered person to the covered person's spouse, parent, adult child, legal guardian of a minor child, sibling or other relative.  Any such payment constitutes a complete discharge of the liability of the Plan, the Administrator and all Employers with respect to such benefits.

(h)   Facility of Payment.  When any person entitled to benefits under the Plan or a Benefit Program is under legal disability or in the Administrator's opinion is in any way incapacitated so as to be unable to manage his or her affairs, the Administrator, in its sole discretion, may cause such person's benefits to be paid to such person's legal representative for his benefit, or to be applied for the benefit of such person in any other manner that the Administrator may determine.  Such payment shall constitute a full discharge of liability of the Plan, the Benefit Programs, the Administrator and all Employers for such benefits.

(i)   No Vested Interest.  No person shall have any right, title or interest in or to any contributions made under the Plan and the Benefit Programs, such contributions being made for the sole

M PRO 1969476 v3
2789126-000005

purpose of providing benefits under the Programs in accordance with their terms. Neither the Company, the Administrator, nor any Employer shall in any way guarantee the payment of any benefit that may be or become due to any person under the Plan or the Benefit Programs.

(j)    **Employment Rights.** Employment rights of an Employee shall not be deemed to be enlarged or diminished by reason of establishment of, or participation in, the Plan or any Benefit Program, nor shall establishment of the Plan and the Benefit Programs confer upon any Employee any right to be retained in the service of an Employer.

(k)    **Cost of Plan and Program Administration.** The costs and expenses incurred in the administration of the Plan and the Benefit Programs shall be paid, in the discretion of the Administrator, (i) from assets accumulated under the Plan and the Benefit Programs, if any; (ii) from Employee contributions; or (iii) by the Employers in such proportion as the Company or the Administrator shall determine.

(l)    **Evidence.** Evidence required of anyone under the Plan and the Benefit Programs may be by certificate, affidavit, document or other information which the Administrator considers pertinent and reliable, and signed, made or presented by the proper party or parties.

(m)    **Physical Examination and Autopsy.** In addition to any rights and privileges granted under a Benefit Program, the Administrator, at its own expense, shall have the right and opportunity to have a physician, designated by the Administrator, examine any individual whose injury or sickness is the basis of a claim under the Plan and the Benefit Programs, when and as often as it may reasonably require during the pendency of a claim or any period of benefits under the Plan and the Benefit Programs and to make an autopsy in case of death, provided it is not otherwise prohibited by law.

(n)    **Recovery of Benefits.** If, because of fraud, mistake or any other reason, a person receives a benefit payment under the Plan and the Benefit Programs that exceeds the benefit payment that should have been made, the Administrator shall have the right to recover the amount of such excess from such person. The Administrator may, however, at its option, deduct the amount of such excess from any subsequent benefits payable to, or for, the Participant or such Participant's Dependents to whom or on whose behalf the excess payment was made.

(o)    **Lawsuits Concerning Benefits.** No lawsuit may be brought by any person or entity to recover benefits under the Plan or any Benefit Program more than one year from the date Plan or benefit Program benefits are finally denied.

(p)    **Workers' Compensation Not Affected.** The Plan is not in lieu of, and does not affect any requirement for, coverage under Workers' Compensation.

(q)    **Severability.** In case any provisions of the Plan or any Benefit Program shall be held illegal or invalid for any reason, such illegality or invalidity shall not affect the remaining provisions of the Plan or any Benefit Program, and the Plan and all Benefit Programs shall be construed and enforced as if such illegal and invalid provisions had never been set forth in the Plan or Benefit Program.

(r)    **Failure to Enforce.** Failure to enforce any provision of the Plan shall not affect the Employer's or Administrator's right thereafter to enforce such provision, nor shall such a failure affect the Employer's or Administrator's right to enforce any other provision of the Plan.

(s)    **Indemnification.** In addition to whatever rights of indemnification the members of the board of directors of the Employer or any Employee or Employees of the Employer to whom any power, authority, or responsibility is delegated pursuant to this Plan or any Benefit Program, may be entitled under the articles of incorporation, by-laws or regulations of the Employer, under any provision of law, or under any other agreement, the Employer shall satisfy any liability actually and reasonably incurred by any such person or persons, including expenses, attorneys' fees, judgments, fines, and

6

amounts paid in settlement (other than amounts paid in settlement not approved by the Employer in connection with any threats and pending or completed action, suit, or proceeding that is related to the exercising or failure to exercise by such person or persons of any of the powers, authority, responsibilities, or discretion as provided under the Plan or a Benefit Program, or reasonably believed by such person or persons to be provided hereunder, and any action taken by such person or persons in connection therewith, unless the same is judicially determined to be the result of such person or persons' gross negligence or willful misconduct.

## ARTICLE II

## SECTION 125 CAFETERIA PLAN

**Section 1    General**

The Benefit Programs may include a Cafeteria Plan Arrangement which shall permit Employees to choose between cash (or other taxable benefits) and the Benefit Programs on a non-taxable basis, subject to the requirements of Code § 125 and the regulations thereunder.

**Section 2    Eligibility**

Notwithstanding anything to the contrary contained in the Governing Documents, participation in the Cafeteria Plan Arrangement shall be restricted to Employees, which may include former Employees if permitted in the Governing Documents.

**Section 3    Additional Required Terms**

Additional terms required under Code § 125 shall be set forth in the Governing Documents for the Cafeteria Plan Arrangement.

## ARTICLE III

## HEALTH BENEFIT PROGRAMS

**Section 1    Health Benefit Programs**

The Plan shall include the Health Benefit Programs identified in Appendix A.  Such Health Benefit Programs are designated as the health care component of the Plan within the meaning of the Standards for Privacy of Individually Identifiable Health Information (45 CFR Part 164, the "Privacy Standards") and the Security Standards for the Protection of Electronic Protected Health Information (45 CFR Part 164.300 et. seq., the "Security Standards").  Each reference to the "Plan" in Section 2 below shall mean the health care component of the Plan.

**Section 2    HIPAA Privacy and Security Standards**

2.1    **General.**  If a Health Benefit Program is not exempted from the requirements of the Privacy Standards and the Security Standards, then this Section shall apply.

2.2    **Privacy and Security Standards.**

(a)    The Plan shall not disclose Protected Health Information to any member of an Employer's workforce unless each of the conditions set out in this Section are met.  "Protected Health Information" shall have the same definition as set forth in the Privacy Standards but generally shall mean individually identifiable information about the past, present or future physical or mental health or condition of an individual, including information about treatment or payment for treatment.  "Electronic Protected

Health Information" shall have the same definition as set out in the Security Standards, but generally shall mean Protected Health Information that is transmitted by or maintained in electronic media.

(b)     Protected Health Information disclosed to members of Employer's workforce shall be used or disclosed by them only for purposes of Plan administrative functions. The Plan's administrative functions shall include all Plan treatment, payment functions and health care operations. The terms "treatment," "payment" and "health care operations" shall have the same definitions as set out in the Privacy Standards, but the term "payment" shall include activities taken to determine or fulfill Plan responsibilities with respect to eligibility, coverage, provision of benefits, or reimbursement for health care.

(c)     The Plan shall disclose Protected Health Information only to members of the Employer's workforce, who are authorized to receive such Protected Health Information, and only to the extent and in the minimum amount necessary for that person to perform his or her duties with respect to the Plan. "Members of the Employer's workforce" shall refer to all employees and other persons under the control of the Employer. The Employer shall keep an updated list of those authorized to receive Protected Health Information.

(1)     An authorized member of the Employer's workforce who receives Protected Health Information shall use or disclose the Protected Health Information only to the extent necessary to perform his or her duties with respect to the Plan.

(2)     In the event that any member of the Employer's workforce uses or discloses Protected Health Information other than as permitted by this Section and the Privacy Standards, the incident shall be reported to the Plan's privacy officer. The privacy officer shall take appropriate action, including:

(i)     investigation of the incident to determine whether the breach occurred inadvertently, through negligence or deliberately; whether there is a pattern of breaches; and the degree of harm caused by the breach;

(ii)     appropriate sanctions against the persons causing the breach which, depending upon the nature of the breach, may include oral or written reprimand, additional training, or termination of employment;

(iii)     mitigation of any harm caused by the breach, to the extent practicable; and

(iv)     documentation of the incident and all actions taken to resolve the issue and mitigate any damages.

(d)     The Company and each Employer agrees to:

(1)     Not use or further disclose the information other than as permitted or required by the Plan documents or as required by law;

(2)     Implement reasonable and appropriate administrative, physical and technical safeguards to protect the confidentiality, integrity and availability of Electronic Protected Health Information that the Employer creates, maintains or transmits on behalf of the Plan.

(3)     Ensure that any agent or subcontractor, (i) to whom it provides Protected Health Information received from the Plan, agrees to the same restrictions and conditions that apply to the Employer with respect to such information, and/or (ii) to whom it provides Electronic Protected Health Information shall agree, in writing, to implement reasonable and appropriate security measures to protect the Electronic Protected Health Information.

8

(4)     Not use or disclose Protected Health Information for employment-related actions and decisions or in connection with any other benefit or employee benefit plan of the Employer;

(5)     Report to the Plan any use or disclosure of the Protected Health Information of which it becomes aware that is inconsistent with the uses or disclosures permitted by this Section, or required by law;

(6)     Make available Protected Health Information to individual Plan members as required by Section 164.524 of the Privacy Standards;

(7)     Make available Protected Health Information for amendment by individual Plan members and incorporate any amendments to Protected Health Information as required by Section 164.526 of the Privacy Standards;

(8)     Make available the Protected Health Information required to provide an accounting of disclosures to individual Plan members as required by Section 164.528 of the Privacy Standards;

(9)     Make its internal practices, books and records relating to the use and disclosure of Protected Health Information received from the Plan available to the Department of Health and Human Services for purposes of determining compliance by the Plan with the Privacy Standards;

(10)    If feasible, return or destroy all Protected Health Information received from the Plan that the Employer still maintains in any form, and retain no copies of such information when no longer needed for the purpose for which disclosure was made, except that, if such return or destruction is not feasible, limit further uses and disclosures to those purposes that make the return or destruction of the information infeasible; and

(11)    Ensure the adequate separation between the Plan and members of the Employer's workforce, as required by Section 164.504(f)(2)(iii) of the Privacy Standards and set out in (d) above, and to use reasonable and appropriate security measures to comply with this provision.

**Section 3     Family and Medical Leave Act**

If an Employer is subject to the Family and Medical Leave Act of 1993, as amended (FMLA), then this Section shall apply. A Participant who is on an approved leave of absence under the FMLA shall be entitled to continue his participation in the Health Benefit Programs during such leave to the extent required by and in accordance with the FMLA and applicable regulations.

**Section 4     COBRA**

If the Health Benefit Program is not exempted from the requirements of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), and the regulations thereunder, the Health Benefit Program shall be operated in accordance with such requirements, as set out in the Governing Documents of such Benefit Program.

9

**Section 5      USERRA**

If the Health Benefit Program is not exempted from the requirements of the Uniformed Services Employment and Reemployment Rights Act and the regulations thereunder, the Health Benefit Program shall be operated in accordance with such requirements. This Section 5 shall be interpreted to comply with USERRA and any pertinent regulations. USERRA provisions may vary slightly among the various Health Benefit Programs. To the extent consistent with applicable law, the specific USERRA provisions in any Health Benefit Program shall govern over the terms of this Section 5.

Unless otherwise specifically provided in the applicable Governing Documents:

    (1)    a Participant must notify the Employer of his intention to elect USERRA prior to the expiration of the COBRA election period provided under the Health Benefit Program; and

    (2)    any period of USERRA continuation of coverage shall run concurrently with COBRA continuation coverage.

**Section 6      Qualified Medical Child Support Order Procedures**

If a Health Benefit Program is subject to ERISA § 609(a), then this Section shall apply. Such Health Benefit Program shall provide benefits in accordance with the terms of a qualified medical child support order that meets the requirements of ERISA § 609(a). Each Health Benefit Program shall establish reasonable written procedures to determine whether a medical child support order is a qualified medical child support order. Such procedures shall be made available upon request of a Participant at no charge.

**Section 7      Medicaid**

If a Health Benefit Program is subject to ERISA § 609(b), then this Section shall apply.

    7.1    Payment for benefits with respect to a Participant under a Health Benefit Program will be made in accordance with any assignment of rights made by or on behalf of such Participant or a beneficiary of the Participant as required by a State plan for medical assistance approved under title XIX of the Social Security Act pursuant to Section 1912(a)(1)(A) of such Act (as in effect on the date of the enactment of the Omnibus Budget Reconciliation Act of 1993).

    7.2    The fact that a Participant is eligible for or is provided medical assistance under a State plan for medical assistance approved under title XIX of the Social Security Act will not be taken into account in enrolling such Participant or in determining or making benefit payments for such Participant.

    7.3    To the extent that payment has been made under a State plan for medical assistance approved under title XIX of the Social Security Act in any case in which a Health Benefit Program has a legal liability to make payment for items or services constituting such assistance, payment for benefits under such program will be made in accordance with any State law which provides that the State has acquired the rights with respect to a Participant to such payment for such items or services.

**Section 8      Coverage of Dependent Children in Case of Adoption**

If a Health Benefit Program is subject to ERISA § 609(c), then this Section shall apply.

    8.1    With respect to any such Health Benefit Program that provides coverage for the dependent children of Employees, such Health Benefit Program shall provide benefits to dependent children placed with an Employee for adoption (as defined by ERISA Section 609(c)) under the same terms and conditions as apply to the natural children of the Employee, irrespective of whether the adoption has become final.

10

8.2     Such Health Benefit Program shall not restrict coverage of a child adopted or placed for adoption by an Employee, solely on the basis of a preexisting condition of such child at the time such child would otherwise become eligible for coverage under the Health Benefit Program, if the adoption or placement for adoption occurs while the Employee is eligible for coverage under the Health Benefit Program.

## Section 9     HIPAA Portability and Nondiscrimination Requirements

If a Health Benefit Program is not exempted from the HIPAA portability and nondiscrimination requirements as set out in ERISA §§ 701 through 706 and the regulations thereunder, the Health Benefit Program shall be operated in accordance with such requirements.

## Section 10     Newborn and Mothers Health Protection Act

If a Health Benefit Program is subject to ERISA § 711, then this Section shall apply.

10.1     If such Health Benefit Program provides benefits for hospital lengths of stay in connection with childbirth for a mother or her newborn child, such Health Benefit Program shall not:

> (a)     Except as provided in subsection (b):
>
> > (i)     restrict benefits for any hospital length of stay in connection with childbirth for the mother or newborn child, following a cesarean section, to less than 96 hours or following a vaginal delivery to less than 48 hours; or
> >
> > (ii)     require that a provider obtain authorization from the Health Benefit Program or the health insurance issuer for prescribing any length of stay required under clauses (i) and (ii).

> (b)     Paragraph (a) shall not apply in connection with any Health Benefit Program or health insurance issuer in any case in which the decision to discharge the mother or her newborn child prior to the expiration of the minimum length of stay otherwise required under paragraph (a) is made by an attending provider in consultation with the mother.

10.2     Such Health Benefit Program shall not:

> (a)     deny to the mother or her newborn child eligibility, or continued eligibility, to enroll or to renew coverage under the terms of the Health Benefit Program, solely for the purpose of avoiding the requirements of Section 10.1 above.

> (b)     provide monetary payments or rebates to mothers to encourage such mothers to accept less than the minimum protections available under Section 10.1 above.

> (c)     penalize or otherwise reduce or limit the reimbursement of an attending provider because such provider provided care to an individual Participant or beneficiary in accordance with Section 10.1 above.

> (d)     provide incentives (monetary or otherwise) to an attending provider to induce such provider to provide care to an individual Participant or beneficiary in a manner inconsistent with Section 10.1 above; or

> (e)     restrict benefits for any portion of a period within a hospital length of stay required under Section 10.1 above in a manner which is less favorable than the benefits provided for any preceding portion of such stay; provided, nothing herein shall be construed to limit the terms of the Health

11

Benefit Program with respect to deductibles, copayments or other cost-sharing provisions and limitations, except that such terms may not impose greater limits or cost sharing on any length of stay required under Section 10.1 above than for any preceding portion of such stay.

## Section 11    Mental Health Parity Act

If a Health Benefit Program is subject to ERISA § 712, then the terms of this Section shall apply.

A Health Benefit Program that provides both medical and surgical benefits and mental health benefits shall not impose any lifetime or annual limits on mental health benefits that violate the requirements of ERISA § 712. In accordance with the Mental Health Parity and Addiction Equity Act of 2008, effective January 1, 2010, such Health Benefit Programs will not impose any caps or limitations on mental health treatment or substance abuse benefits that are not applied to medical and surgical benefits. Requirements such as co-payments and deductibles and limitations such as number of visits or frequency of treatments will be no more restrictive on mental health and substance use disorder benefits than the requirements or limitations imposed on medical and surgical benefits.

## Section 12    Women's Health and Cancer Rights Act

If a Health Benefit Program is subject to ERISA § 713 and provides medical and surgical benefits with respect to a mastectomy, then this Section shall apply. Such Health Benefit Program shall, with respect to a Participant who is receiving benefits in connection with a mastectomy, and who elects breast reconstruction in connection with such mastectomy, provide coverage for the following (subject to applicable deductibles, copayments and other Health Benefit Program limitations):

  (1)    reconstruction of the breast on which the mastectomy has been performed;

  (2)    surgery and reconstruction of the other breast to produce a symmetrical appearance; and

  (3)    prostheses and physical complications for all stages of mastectomy, including lymphedemas;

in a manner determined in consultation with the attending physician and the patient.

## Section 13    Subrogation and Recovery

If a Participant incurs covered expenses or receives benefits under a Benefit Program with respect to an injury or illness for which a third party (or its insurer) may be liable, the Plan retains all rights of subrogation, recovery and reimbursement as set out more specifically in the Governing Documents for each Benefit Program.

## Section 14    Coordination of Benefits

  14.1    **Coordination of Benefits**. When a Participant is covered by this Plan and another plan, the plans will coordinate benefits when a claim is received. The terms of this Section 14 shall apply, except to the extent specifically provided otherwise in the Governing Documents of a Health Benefit Program.

The plan that pays first according to the rules will pay as if there were no other plan involved. If this Plan is secondary or subsequent, it will pay the amount it would have otherwise paid, minus whatever the primary plan paid, so that benefits are not duplicated. The total reimbursement will never be more than the amount that would have been paid if this Plan had been the primary plan.

  14.2    **Benefit Plan**. This provision will coordinate the health benefits of a benefit plan. The term benefit plan means this Plan or any one of the following plans:

(1)     Group or group-type plans, including franchise or blanket benefit plans.

(2)     Blue Cross and Blue Shield group plans.

(3)     Group practice and other group prepayment plans.

(4)     Federal government plans or programs. This includes, but is not limited to, Medicare and Tricare.

(5)     Other plans required or provided by law. This does not include Medicaid or any benefit plan like it that, by its terms and applicable law, does not allow coordination.

(6)     No Fault Auto Insurance, by whatever name it is called, when not prohibited by law.

14.3    **Allowable Charge**. For a charge to be allowable it must be a Usual and Reasonable Charge and at least part of it must be covered under this Plan.

14.4    **Claims Determination Period**. Benefits will be coordinated on a yearly basis. This is called the claims determination period.

14.5    **Right to Receive or Release Necessary Information**. This Plan may give or obtain needed information from another insurer or any other organization or person. This information may be given or obtained without the consent of or notice to any other person. A Participant must give this Plan the information it asks for about other plans and their payment of Allowable Charges.

14.6    **Facility of Payment**. This Plan may repay other plans for benefits paid that the Administrator determines it should have paid. That repayment will count as a valid payment under this Plan.

14.7    **Right of Recovery**. This Plan may pay benefits that should be paid by another benefit plan. In this case this Plan may recover the amount paid from the other benefit plan or the Covered Person. That repayment will count as a valid payment under the other benefit plan.

Further, this Plan may pay benefits that are later found to be greater than the Allowable Charge. In this case, this Plan may recover the amount of the overpayment from the source to which it was paid.

**Section 15    Claims Procedures**

15.1    **Claims Procedures**. The specific guidelines for filing a claim or a request for a review of a denied claim shall be set out in the summary plan description for each Health Benefit Program.

M PRO 1969476 v3
2789126-000005

## ARTICLE IV

## FULLY INSURED BENEFIT PROGRAMS

**Section 1      General**

The Plan may include any Fully Insured Benefit Programs identified in Appendix A.

**Section 2      Claims Procedures**

The specific guidelines for filing a claim or a request for a review of a denied claim shall
be set out in the summary plan description for each Benefit Program.

M PRO 1969476 v3
2789126-000005

# APPENDIX A

## COMPONENT PROGRAMS

Nortel Networks FLEX Benefits Program

Nortel Networks Health Care Reimbursement Account Plan

Nortel Networks Inc. Dental/Vision/Hearing Care Plan

Nortel Networks Inc. Medical Plan

Nortel Networks Inc. Short-Term Disability Plan

Nortel Networks Inc. Long-Term Disability Plan

Nortel Networks Retiree Medical Plan

Nortel Networks Retiree Life Insurance and Long-Term Care Plan

Nortel Networks Life Insurance and AD&D Insurance Plan


Nynex Meridian Systems Medical Coverage Plan for Bargaining Unit Employees

Nynex Meridian Systems Dental Plan for Bargaining Unit Employees

Nynex Meridian Systems Term Life Insurance and AD&D Plan for Bargaining Unit Employees

Nynex Meridian Systems Short-Term Disability and Long-Term Disability Plan for Bargaining Unit Employees

M PRO 1969476 v3
2789126-000005

# APPENDIX B

## COVERED EMPLOYERS

Nortel Networks Inc.

Nortel Altsystems Inc.

16

IN WITNESS WHEREOF, this Plan is hereby executed by a duly authorized officer of Nortel Networks Inc. on this ____ day of November 2009 to be effective as of January 1, 2009.

NORTEL NETWORKS INC.

By:_____

Title: _____

**ATTACHMENT F**



**NORTHERN TELECOM**

March, 1998

U.S. Benefits Eligible Employees:

Last year we distributed three ring binders entitled "Employee Benefits and Programs" to all U.S. FLEX eligible employees. This handbook contained various sections of information (referred to as Summary Plan Descriptions) relating to your Nortel benefits. Please read the information below regarding an update to this binder.

Enclosed you will find three additional inserts that you should add to your benefits handbook: "The Severance Allowance Plan", "The Long-Term Investment Plan" and "The Retirement Plan for Employees". Your binder should already contain the appropriate tabs for these three sections. **Please insert these sections into your binder** so that your handbook will be as comprehensive as possible. There remains only one section that you have not received to date. That section is the "Retiree Medical, Life, and Long-Term Care Plan". We expect to deliver that section to you by the end of 1998.

You will periodically receive updates or inserts to include in this handbook. It is imperative that you insert or replace any pages as you receive them so that your handbook will be as current as possible.

We hope you find your "Employee Benefits and Programs" binder to be an informative and useful tool. If you have any questions regarding the information contained in the enclosed inserts or would like to request a copy of the handbook, please contact the U.S. Information Center at (800)676-4636 or ESN 255-4636.

EXHIBIT A
## NORTHERN TELECOM INC. SEVERANCE ALLOWANCE PLAN

### ARTICLE 1

### INTRODUCTION

1.1    The Northern Telecom Inc. Severance Allowance Plan is hereby established, effective as of September 1, 1986, to provide a severance allowance to assist certain terminated employees, as defined in Section 2.1 hereof. This Plan supersedes in its entirety Northern Telecom Inc. Corporate Procedure 80019.01 and such procedure is hereby revoked in its entirety.

1.2    This Plan is applicable to all Employees, as defined below, who have six (6) months or more of Service and whose employment is terminated as specified in Section 2.1.

1.3    Whenever used in this Plan, the following terms shall have the following meanings:

   a.    "Affiliate" shall mean Northern Telecom Limited and any company wholly or partially owned, directly or indirectly, by Northern Telecom Limited, excluding any Employer.

   b.    "Base Weekly Salary" shall mean, as determined solely by the Plan Administrator, an Employee's basic gross weekly salary in effect on the day immediately prior to the effective date of the termination of an Employee's employment with an Employer, and excluding any other compensation, including, without limitation, bonus or incentive compensation payments, overtime pay, interest differential payments or other relocation allowances, or the value of any other benefits to which an Employee may be entitled; provided, however, that if: (i) an employee is a Part-Time Employee, "Base Weekly Salary" as defined in this Section 1.3(b) shall be computed on the basis of a twenty-five (25) hour work week irrespective of the number of hours such Part-Time Employee actually works or is scheduled to work; and (ii) an Employee receives all or a portion of his compensation in the form of sales commissions and/or sales bonuses, "Base Weekly Salary" shall be calculated on the basis of such Employee's Total Targeted Compensation divided by fifty two (52).

   c.    "Board" shall mean the Board of Directors of Northern Telecom Inc.

   d.    "Employee" shall mean any Full-Time Employee or Part-Time Employee, as defined herein, of an Employer, excluding employees covered by a collective bargaining agreement unless such agreement specifically provides for their inclusion in this Plan.

   e.    "Employer" shall mean Northern Telecom Inc. or any of its United States subsidiaries and affiliates that have adopted this Plan. A subsidiary or affiliate for purposes of this definition shall include any entity of which Northern Telecom

9/1/94

Inc., directly or indirectly, owns greater than fifty percent of the voting shares, for a corporation, or value, for any other type of entity.

     f.    "Full-Time Employee" shall mean an employee who is regularly scheduled to work at least thirty-five (35) hours per week, as determined solely by the Employer.

     g.    "Part-Time Employee" shall mean an employee who is regularly scheduled to work at least twenty (20) hours but less than thirty-five (35) hours per week, as determined solely by the Employer.

     h.    "Reduction In Force" shall mean the termination of employment of an Employee resulting from a reduction in an Employer's work force and/or from the elimination or consolidation of job functions of an Employer due to economic or other business reasons.

     i.    "Plan" shall mean this Northern Telecom Inc. Severance Allowance Plan.

     j.    "Plan Administrator" shall mean Northern Telecom Inc.

     k.    "Service" shall mean the total cumulative period of an Employee's employment with any Employer or Affiliate; provided, however, that, if there has been a break in such employment other than due to medical or other authorized leave of absence, the period of time prior to such break in employment shall be included in the calculation of Service only if either (i) such break in employment was for thirty (30) days or less, or (ii) in the case where the break in employment was for more than thirty (30) days, the Employee has been in the employment of an Employer or an Affiliate, as applicable, subsequent to the break in employment for a period of time equal to the break in employment or one (1) year, whichever is less.

     l.    "Severance Period" shall mean the period of time beginning on the Employee's effective date of termination of employment from an Employer and ending upon the expiration of the number of weeks used to calculate the Employee's Severance Allowance as provided in Section 2.6 of this Plan.

     m.    "Total Targeted Compensation" shall mean an Employee's basic gross annual salary in effect on the day immediately prior to the effective date of the termination with an Employer plus incentive compensation payments for which the Employee would have been eligible if 100% of the Employee's business objectives had been achieved in the year of termination, but excluding, without limitation, sales bonuses, sales commissions or incentive compensation payments earned or paid, overtime pay, interest differential payments or other relocation allowances, or the value of any other compensation or benefit to which the Employee may be entitled.

1.4    The masculine pronoun, whenever used in this Plan, shall include the feminine gender.

9/1/94                  - 2 -

## ARTICLE 2

## SEVERANCE ALLOWANCE

2.1    Employees with at least six (6) months of Service whose employment with an Employer is terminated for any of the following reasons shall qualify for a severance allowance in accordance with this Article 2, subject to Sections 2.2, 2.3 and 2.4:

a.    Termination of employment with an Employer as part of a Reduction in Force; or

b.    Any other termination of employment with an Employer initiated by an Employer except when the Plan Administrator determines in its discretion that the termination arises out of conduct and/or inaction by the Employee which was not in the best interests of the Employer.

2.2    Notwithstanding Section 2.1, no severance allowance shall be paid to an Employee who is terminated as a result of a Reduction In Force if, either:

a.    Prior to such termination, the Employee is offered and accepts a position as a Part-Time or Full-Time Employee with an Employer, an Affiliate, or BCI Incorporated irrespective of any differences between the new position and the former position, including, without limitation, any resulting change in the location of the new position from that of the former position, any difference in the manner or amount of the compensation between the new position and the former position, any difference in work schedule or number of hours in the work week, or otherwise; or

b.    Prior to such termination, a Full-Time or a Part-Time Employee is offered and refuses a transfer to another position as a Full-Time or Part-Time Employee, respectively, with an Employer, an Affiliate or BCI Incorporated, for which the Employee was qualified in the same or reasonably contiguous location as his former position, which new position has a Base Weekly Salary which is not less than eighty percent (80%) of the Base Weekly Salary of the Employee's former position.

2.3    Notwithstanding Section 2.1, no severance allowance shall be paid to an Employee where his employment with an Employer is terminated in connection with the sale of an Employer's business, or portion thereof, whether by virtue of the sale of assets or otherwise, if, either:

a.    The terminated Employee is offered and accepts a position as a Part-Time or Full-Time Employee with the company acquiring the business, or portion thereof, irrespective of any differences between the new position and the former position, including, without limitation, any resulting change in the location of the new position from that of the former position, any difference in the manner or amount of the compensation between the new position and the former position, any difference in work schedule or number of hours in the work week, or otherwise; or

9/1/94                                  - 3 -

b.    The terminated Full-Time or Part-Time Employee is offered and refuses another position as a Full-Time or Part-Time Employee, respectively, for which he is qualified by the company acquiring the business, or portion thereof, at the same or reasonably contiguous location as his former position with the Employer and with a Base Weekly Salary which is not less than ninety percent (90%) of the Base Weekly Salary of the Employee's former position.

2.4    As a condition precedent to an Employee's entitlement to receive a severance allowance, each Employee who qualifies for a severance allowance in accordance with Sections 2.1, 2.2 and 2.3 shall, at the time of his termination, execute and tender to the Employer a release in the appropriate form attached hereto as Attachment A, B, C, or D.  As a further condition precedent to an Employee's entitlement to receive a severance allowance, each Employee who qualifies for a severance allowance in accordance with Sections 2.1, 2.2 and 2.3 must be an Employee of the Employer on the day immediately preceding the effective date of his termination. Any Employee who otherwise qualifies for a severance allowance in accordance with Sections 2.1, 2.2 and 2.3 but who fails or refuses to execute and tender such a release, who revokes such a release, or who is not an Employee on the day immediately preceding the effective date of his termination of employment shall not receive a severance allowance.

2.5    No severance allowance shall be paid to an Employee whose employment with an Employer is terminated for any reason other than as specified in Section 2.1, as qualified by Sections 2.2 and 2.3, including, without limitation, voluntary resignation, voluntary retirement, etc.  No severance allowance or any other benefits under this Plan shall be paid to any Employee who, in exchange for other compensation or benefits to which the Employee is not otherwise entitled, releases, waives or otherwise gives up his rights under this Plan.

2.6    Provided an Employee qualifies for a severance allowance in accordance with Sections 2.1, 2.2 and 2.3, and provided further that the Employee fulfills the requirements of Section 2.4, the severance allowance payable to each such Employee shall be four (4) weeks plus, for each full year of Service, one (1) additional week paid at the rate of the Employee's Base Weekly Salary, plus such additional severance allowance, if any, as the appropriate Northern Telecom Inc. Assistant Vice-President, Human Resources, may determine at his or her discretion; provided, however, that in no event shall the total severance allowance paid to any Employee under this Plan exceed an amount equal to twice the Employee's total annual compensation for the year immediately prior to the date of his or her termination. In calculating years of Service for purposes of this Section 2.6, a partial year of service exceeding six (6) months shall constitute a full year of Service.

2.7    Payment of severance allowances shall be made in weekly or bi-weekly installments on the same regular pay days as applied to each Employee immediately prior to his termination; provided, however, that payment of severance allowances shall be completed within twenty-four (24) months after the effective date of termination.  At the request of an Employee, the Employee's severance allowance

9/1/94                                    - 4 -

may be paid to the Employee in a single lump sum at or about the time of the Employee's termination of employment. All severance allowance payments shall be subject to applicable F.I.C.A. and federal, state and/or local income tax withholding as determined solely by the Employer.

2.8    If an Employee receiving a severance allowance dies before receiving full payment of his severance allowance, the balance of such Employee's severance allowance remaining unpaid at the time the Plan Administrator is notified of the Employee's death shall be paid in a single lump sum to the beneficiary(ies) most recently designated by the Employee in connection with the Employee's participation in the group term life insurance coverage under the Northern Telecom Inc. FLEX Benefits Program (whether or not the Employee is then covered for such group term life insurance) or, if no such beneficiary(ies) have been so designated, to the Employee's estate.

2.9    With respect to terminated Employees who qualify for a severance allowance pursuant to this Article 2, in addition to such severance allowance, the Employee shall elect to continue all of the following benefit coverages which he had in effect as of the day immediately preceding the effective date of termination for a period which is the longer of (i) ninety (90) days from the effective date of termination or (ii) the Severance Period, but in no event exceeding six (6) months from the effective date of the Employee's termination, under the conditions set forth below, or such Employee shall elect to revoke all such benefit coverages effective as of the end of the calendar month in which his termination occurs.

    a.    Group term life insurance coverage as provided under the Northern Telecom Inc. FLEX Benefits Program (including, if enrolled at the time of termination, optional group term life insurance coverage for the Employee, his spouse, and/or his dependent children) and the Employee contributions for such continued coverage shall be at the net active employee contribution rate, as determined solely by the Employer, and shall be deducted from severance allowance payment(s) as provided in Section 4.6; and

    b.    Medical, dental, vision, and hearing coverage, the Employee Assistance Program and the Health Care Reimbursement Account as provided under the Northern Telecom Inc. FLEX Benefits Program (including, if enrolled at the time of termination, dependent and domestic partner coverage under the foregoing plans), and the Employee contributions for such continued coverage shall be at the net active employee contribution rate, as determined solely by the Employer, and shall be deducted from severance allowance payment(s) as provided in Section 4.6. Such period of coverage shall be considered to be part of the period of continued coverage required to be offered under the Consolidated Omnibus Budget Reconciliation Act ("COBRA").

2.10    If a terminated Employee receiving a severance allowance under this Plan in installment payments pursuant to Section 2.7 is subsequently reemployed prior to the expiration of the Severance Period as a Full-Time or Part-Time Employee by an Employer, an Affiliate or BCI Incorporated, irrespective of any differences between the new position and the former, including, without limitation, any resulting change

in the location of the new position from that of the former position, any difference in the manner or amount of the compensation between the new position and the former position, any difference in work schedule or number of hours in the work week, or otherwise, the obligation to pay any remaining unpaid installments of such Employee's severance allowance shall cease as of the effective date of the Employee's reemployment and such unpaid amounts shall be forfeited. If a terminated Employee receiving a severance allowance under this Plan in a lump sum pursuant to Section 2.7 is subsequently so reemployed by an Employer, an Affiliate, or BCI Incorporated prior to the expiration of the Severance Period, the reemployed Employee shall refund to the Employer that portion of the lump sum severance allowance equal to the number of weeks remaining in the Severance Period when the reemployment commences times the Base Weekly Salary of the Employee used to calculate the lump sum severance allowance.

2.11    If a terminated Employee receiving a severance allowance under this Plan subsequently obtains gainful employment prior to the expiration of the Severance Period other than with an Employer, an Affiliate, or BCI Incorporated, remaining unpaid amounts of such Employee's severance allowance, as well as any benefits provided pursuant to Section 2.9, shall not be affected.

2.12    If a terminated Full-Time or Part-Time Employee receiving a severance allowance under this Plan in installment payments pursuant to Section 2.7 subsequent to his termination by an Employer and prior to the expiration of the Severance Period is offered and refuses reemployment by an Employer, an Affiliate, or BCI Incorporated, as a Full-Time Employee or Part-Time Employee, respectively, in a position for which the Employee is qualified in the same or reasonably contiguous location as the Employee's former position, which new position has a Base Weekly Salary which is not less than eighty percent (80%) of the Base Weekly Salary of the Employee's former position, then the obligation to pay any remaining unpaid installments of such Employee's severance allowance shall cease as of the date such Employee refused reemployment and such unpaid amounts shall be forfeited. If such a terminated Employee received severance allowance under this Plan in a lump sum pursuant to Section 2.7, the Employee shall refund to the Employer that portion of the lump sum severance allowance equal to the number of weeks remaining in the Severance Period when the Employee refused reemployment times the Base Weekly Salary of the Employee used to calculate the lump sum severance allowance. Such Employee's benefits, if elected pursuant to Section 2.9, shall not be affected.

2.13    If payment of an Employee's severance allowance ceases or repayment of a portion of the lump sum is required pursuant to Section 2.12, extended benefit coverages provided for in Section 2.9 shall cease and terminate simultaneously.

2.14    Notwithstanding the definition of Service in Section 1.3(k), if an Employee's employment with an Employer is terminated under circumstances where the Employee is paid a severance allowance under this Plan, any predecessor plan or procedure or any agreement for, among other things, the payment of severance or termination pay by any Affiliate, former Affiliate or BCI Incorporated, and the

Employee is subsequently reemployed by an Employer and at a later date is again terminated from employment under circumstances where the Employee qualifies for a severance allowance under this Plan, the period of Service used to calculate the severance allowance paid in connection with the earlier termination of employment shall be excluded in determining the period of Service to be applied in calculating the severance allowance payable in connection with the subsequent termination of employment.

## ARTICLE 3

## ADMINISTRATION AND FUNDING

3.1     This Plan shall be administered by the Plan Administrator who shall be the named fiduciary. The Plan Administrator may delegate responsibility for administrative tasks required under this Plan to designated employees of an Employer and/or to other agents. The Plan Administrator shall have discretionary authority to interpret the terms and benefits under this Plan and to make determinations regarding factual matters pertaining to the Plan and any benefits thereunder.

3.2     The Plan Administrator shall rule upon all questions concerning the application or interpretation of the provisions of this Plan. Entitlement to benefits under this Plan shall be determined in accordance with the provisions of this Plan in effect at the time of the termination of an Employee's employment with an Employer.

3.3     This Plan is an unfunded plan and all severance allowances and other benefits payable under this Plan and all administrative expenses shall be paid from the general assets of the applicable Employer.

3.4     All claims relating to benefits under this Plan will be directed in writing to the attention of the Plan Administrator. If the Plan Administrator determines that any individual who has claimed a right to receive benefits under this Plan is not entitled to receive all or any part of the benefits claimed, he shall inform the claimant by certified mail of this determination and the reasons therefor in layman's terms, with specific reference to pertinent Plan provisions and with a description of the review procedures set forth below. The claimant may, within sixty (60) days of receipt of such determination, submit to the Plan Administrator by certified mail such further information as will, in the claimant's opinion, establish the claimant's right to such benefits. Within sixty (60) days after receipt of this further information, the Plan Administrator shall render his decision, with the specific reasons therefore, in writing, and shall transmit same to the claimant by certified mail, which decision shall be final subject to the right of the claimant to pursue such legal remedies, if any, as may be available.

## ARTICLE 4

## MISCELLANEOUS

4.1    The Employers hope and expect to continue this Plan, but necessarily reserve the right to amend this Plan from time to time or terminate this Plan at any time. Any amendment to this Plan may reduce or eliminate benefits payable under the Plan to persons who are Employees as of the effective date of the amendment. Amendments shall be made or a termination effected by the President of Northern Telecom Inc.

4.2    Nothing contained in this Plan shall be deemed to give any Employee the right to be retained in the service of an Employer or to interfere with the right of an Employer to discharge any Employee at any time for any reason, nor shall it be deemed to give an Employer the right to require any Employee to remain in its service, nor shall it interfere with any Employee's right to terminate his service at any time.

4.3    This Plan is intended to qualify as a welfare plan within the scope of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). This Plan shall be construed in accordance with the provisions of ERISA and, to the extent not preempted by ERISA, the laws of the State of Tennessee.

4.4    An Employer may reduce any severance allowance owing to any Employee under this Plan by any amount (including, but not limited to, any advances, loans, overpayments, excess commissions, or any other monies) determined by the Plan Administrator to be owing to any Employer by such Employee as of his or her employment termination date.

4.5    An Employer, in its sole discretion, shall be free to withhold from any severance allowance whatever amounts it shall determine to be appropriate concerning any and all applicable federal, state and local tax withholding.

4.6    An Employer shall make deductions from severance allowance payment(s) for benefit continuation elected by the Employee at the net active employee rate as provided in Section 2.9 of this Plan.

**ATTACHMENT G**



**Nortel**
**HR Shared Services**
4001 E. Chapel Hill-Nelson Hwy.
P. O. Box 13010
Research Triangle Park, NC 27709

Tel: 1-800-676-4636

Carmel Totman
164 Berton Street

Boone, North Carolina  28607

*I MED*
*website*

June 16, 2010

Name of employee:  Carmel Totman

Global ID:  200522

Termination date of life insurance:  August 31, 2010

Total amount of core life insurance eligible to convert:  $58,780

Total amount of supplemental life insurance eligible to convert: $30,000

Name of spouse:  n/a

Total amount of spousal life insurance eligible to convert:  n/a

Name of dependent (s):  n/a

Total amount of dependent life insurance eligible to convert:  n/a

Life Insurance Group/Policy # with Prudential: 39900

To convert coverage, you must submit application and pay the first premium within 31 days after your group coverage ends or within 15 days after you receive written notice of the conversion privilege, whichever is later.  However, under no circumstances may you convert your coverage to an individual policy if you do not apply for individual coverage and pay the first premium within 92 days after your group coverage ends.

### Please contact a local Prudential Agent, or call 1-877-889-2070 for conversion information.

HR Shared Services
1-800-676-4636

*Jahisha*
*convert*
*yet?*

# Converting Group Term Life Insurance to Individual Insurance

A Prudential representative can assist you, without cost or obligation, with the conversion process and answer any questions you may have. If you do not have a Prudential representative currently handling your insurance and financial needs, you can locate the Prudential office most convenient to you in the telephone directory or through our website, www.prudential.com/giconversions.

Under the terms of your group life policy, some or all of your insurance coverage may be converted to permanent insurance. If you are age 76 and above, your only conversion option is for a Single Pay Life Policy. Please carefully read the provisions in your Booklet-Certificate which describe your conversion privilege, if any.

If you were insured for Accidental Death Benefits (ADB) under the group plan, you may be eligible to add an Accidental Death Benefit rider to the conversion policy. Subject to approval by Prudential, the amount of ADB is equal to the amount of life insurance coverage you are converting and may be included in policies issued at age 70 and under. The ADB is available for amounts between $25,000 and $500,000. Conversion rates are shown in the Rates Tables under the heading "With ADB."

You should submit your application and first premium within the 31-day period specified in your Booklet-Certificate.

Premium rates for the Prudential Guaranteed Life Insurance policy, issued by The Prudential Insurance Company of America, are included in this brochure. These are standard rates per $1,000 of insurance and apply to most individuals who are converting. The right to convert to a Prudential Guaranteed Life Insurance policy is guaranteed, provided the terms as described in your Booklet-Certificate are met.

### Servicemembers/Reservists:

If you wish to convert Servicemembers' Group Life Insurance (SGLI) to a Prudential individual life insurance policy, you must submit your application, first month's premium, the letter you received from the Office of Servicemembers' Group Life Insurance, and the proof of SGLI as defined in the above mentioned letter to a Prudential office within 120 days of your release from uniformed service or release from assignment to the Ready Reserves.

### Veterans:

If you wish to convert Veterans' Group Life Insurance (VGLI) to a Prudential individual life insurance policy, you must submit your application, first month's premium, and your VGLI Conversion Notice, SGL 183, to a Prudential office.

**Like most insurance policies, Prudential's policies contain exclusions, limitations, reductions of benefits, and terms for keeping them in force. A Prudential representative can provide you with costs and complete details.**

# Policy Description

The following is a brief description of the policy available as a conversion for which rates are included in this brochure. Additional information regarding the policy described below may be obtained from a Prudential representative.

## Prudential Guaranteed Life Insurance

Prudential Guaranteed Life Insurance is a whole life product with a guaranteed cash value and a guaranteed death benefit for the lifetime of the insured, provided premiums are paid when due and there are no outstanding loans or withdrawals. The face amount is payable at death.

The basic premiums are level and payable to the policy anniversary when the insured is age 85, or until death, if earlier. If the insured survives the premium payment period, the policy is continued with no further premium required. Prudential Guaranteed Life Insurance is a non-participating policy, which means dividends will **not** be paid on the policy.

Guarantees are based on the claims-paying ability of The Prudential Insurance Company of America.

If you have any questions, call the number indicated on the cover letter. When requesting information, please state your date of birth, your group policy number, and the name of the organization through which your group insurance was obtained.

Acceptance and negotiation of your conversion premium payment by The Prudential Insurance Company of America is not a guarantee that an individual conversion policy will be issued as requested on the Conversion Request Form. All conditions precedent to issue of an individual conversion policy, including, without limitation, confirmation of your eligibility for conversion coverage, confirmation of the maximum amount of coverage eligible for conversion, completion of all reasonably required paperwork, and payment of any additional conversion premiums, must be received by Prudential in a timely manner. A delay in submitting required information, documentation, or additional premium will not extend the conversion time period specified above.

# Instructions for Calculating Premiums

**ALL CONVERSION APPLICATIONS MUST BE ACCOMPANIED BY THE ENTIRE FIRST PREMIUM.**

## How to Calculate Prudential Premiums

Premiums are payable annually, semi-annually, quarterly, or by pre-authorized monthly check draft (Prumatic). The mode of payment selected must produce a minimum premium of $15.00.

Use standard rates per $1,000 shown on pages 5–7 in this brochure. After determining the premium for the amount of insurance being converted, add the following policy constant to obtain the premium for the policy:

- $85.00 for annual mode of payment
- $45.00 for semi-annual mode of payment
- $23.00 for quarterly mode of payment
- $8.00 for monthly (Prumatic) mode of payment

The example below illustrates a premium calculation for a $25,000 Prudential Guaranteed Life Insurance policy with Accidental Death Benefit (ADB) for someone who is 40 years old. The payment mode is quarterly. (The rates for $25,000-$99,999 are contained on page 6.)

1. The rate per $1,000 with ADB for a quarterly payment shown on page 6 is $4.61.

2. Multiply the amount of insurance being converted (i.e., the number of $1,000 units) by the rate per $1,000 and add the quarterly policy constant:

**25 x $4.61 = $115.25 + $23.00 = $138.25**

## Prudential Guaranteed Life (For Policies $25,000-$99,999)

Standard rates per $1,000 - A policy constant must be added to the total premium.
Please refer to the section "HOW TO CALCULATE PRUDENTIAL PREMIUMS"

### UNISEX

| Issue Age | Annual | | Semi-Annual | | Quarterly | | Prumatic | |
|---|---|---|---|---|---|---|---|---|
| | Without ADB | With ADB | Without ADB | With ADB | Without ADB | With ADB | Without ADB | With ADB |
| 15 | 6.91 | 7.71 | 3.59 | 4.01 | 1.83 | 2.04 | 0.61 | 0.68 |
| 16 | 7.16 | 7.96 | 3.72 | 4.14 | 1.90 | 2.11 | 0.64 | 0.71 |
| 17 | 7.41 | 8.21 | 3.85 | 4.27 | 1.96 | 2.17 | 0.66 | 0.73 |
| 18 | 7.62 | 8.41 | 3.96 | 4.37 | 2.02 | 2.23 | 0.68 | 0.75 |
| 19 | 7.78 | 8.55 | 4.05 | 4.45 | 2.06 | 2.26 | 0.69 | 0.76 |
| 20 | 7.96 | 8.72 | 4.14 | 4.54 | 2.11 | 2.31 | 0.71 | 0.78 |
| 21 | 8.23 | 8.98 | 4.28 | 4.67 | 2.18 | 2.38 | 0.73 | 0.80 |
| 22 | 8.53 | 9.27 | 4.44 | 4.82 | 2.26 | 2.46 | 0.76 | 0.83 |
| 23 | 8.85 | 9.58 | 4.60 | 4.98 | 2.35 | 2.54 | 0.79 | 0.85 |
| 24 | 9.17 | 9.89 | 4.77 | 5.14 | 2.43 | 2.62 | 0.82 | 0.88 |
| 25 | 9.52 | 10.24 | 4.95 | 5.32 | 2.52 | 2.71 | 0.85 | 0.91 |
| 26 | 9.85 | 10.58 | 5.12 | 5.50 | 2.61 | 2.80 | 0.88 | 0.94 |
| 27 | 10.19 | 10.93 | 5.30 | 5.68 | 2.70 | 2.90 | 0.91 | 0.98 |
| 28 | 10.55 | 11.30 | 5.49 | 5.88 | 2.80 | 3.00 | 0.94 | 1.01 |
| 29 | 10.94 | 11.70 | 5.69 | 6.09 | 2.90 | 3.10 | 0.97 | 1.04 |
| 30 | 11.33 | 12.10 | 5.89 | 6.29 | 3.00 | 3.20 | 1.01 | 1.08 |
| 31 | 11.75 | 12.53 | 6.11 | 6.52 | 3.11 | 3.32 | 1.05 | 1.12 |
| 32 | 12.18 | 12.97 | 6.33 | 6.74 | 3.23 | 3.44 | 1.08 | 1.15 |
| 33 | 12.64 | 13.45 | 6.57 | 6.99 | 3.35 | 3.56 | 1.12 | 1.19 |
| 34 | 13.13 | 13.96 | 6.83 | 7.26 | 3.48 | 3.70 | 1.17 | 1.24 |
| 35 | 13.62 | 14.46 | 7.08 | 7.52 | 3.61 | 3.83 | 1.21 | 1.28 |
| 36 | 14.14 | 15.00 | 7.35 | 7.80 | 3.75 | 3.98 | 1.26 | 1.34 |
| 37 | 14.69 | 15.57 | 7.64 | 8.10 | 3.89 | 4.12 | 1.31 | 1.39 |
| 38 | 15.27 | 16.17 | 7.94 | 8.41 | 4.05 | 4.29 | 1.36 | 1.44 |
| 39 | 15.86 | 16.78 | 8.25 | 8.73 | 4.20 | 4.44 | 1.41 | 1.49 |
| 40 | 16.47 | 17.42 | 8.56 | 9.05 | 4.36 | 4.61 | 1.47 | 1.55 |
| 41 | 17.10 | 18.07 | 8.89 | 9.39 | 4.53 | 4.79 | 1.52 | 1.61 |
| 42 | 17.76 | 18.76 | 9.24 | 9.76 | 4.71 | 4.98 | 1.58 | 1.67 |
| 43 | 18.44 | 19.47 | 9.59 | 10.13 | 4.89 | 5.16 | 1.64 | 1.73 |
| 44 | 19.14 | 20.20 | 9.95 | 10.50 | 5.07 | 5.35 | 1.70 | 1.79 |
| 45 | 19.87 | 20.96 | 10.33 | 10.90 | 5.27 | 5.56 | 1.77 | 1.87 |
| 46 | 20.78 | 21.90 | 10.81 | 11.39 | 5.51 | 5.81 | 1.85 | 1.95 |
| 47 | 21.72 | 22.88 | 11.29 | 11.89 | 5.76 | 6.07 | 1.93 | 2.03 |
| 48 | 22.68 | 23.87 | 11.79 | 12.41 | 6.01 | 6.33 | 2.02 | 2.13 |
| 49 | 23.65 | 24.88 | 12.30 | 12.94 | 6.27 | 6.60 | 2.10 | 2.21 |
| 50 | 24.66 | 25.94 | 12.82 | 13.49 | 6.53 | 6.87 | 2.19 | 2.30 |
| 51 | 25.75 | 27.07 | 13.39 | 14.08 | 6.82 | 7.17 | 2.29 | 2.41 |
| 52 | 27.07 | 28.44 | 14.08 | 14.79 | 7.17 | 7.53 | 2.41 | 2.53 |
| 53 | 28.51 | 29.94 | 14.83 | 15.57 | 7.56 | 7.94 | 2.54 | 2.67 |
| 54 | 30.08 | 31.57 | 15.64 | 16.41 | 7.97 | 8.36 | 2.68 | 2.81 |
| 55 | 31.78 | 33.33 | 16.53 | 17.34 | 8.42 | 8.83 | 2.83 | 2.97 |
| 56 | 33.39 | 35.01 | 17.36 | 18.20 | 8.85 | 9.28 | 2.97 | 3.11 |
| 57 | 35.14 | 36.84 | 18.27 | 19.15 | 9.31 | 9.76 | 3.13 | 3.28 |
| 58 | 37.05 | 38.83 | 19.27 | 20.20 | 9.82 | 10.29 | 3.30 | 3.46 |
| 59 | 39.16 | 41.03 | 20.36 | 21.33 | 10.38 | 10.88 | 3.49 | 3.66 |
| 60 | 41.50 | 43.46 | 21.58 | 22.60 | 11.00 | 11.52 | 3.69 | 3.86 |
| 61 | 43.86 | 45.93 | 22.81 | 23.89 | 11.62 | 12.17 | 3.90 | 4.08 |
| 62 | 46.45 | 48.63 | 24.15 | 25.28 | 12.31 | 12.89 | 4.13 | 4.32 |
| 63 | 49.28 | 51.59 | 25.63 | 26.83 | 13.06 | 13.67 | 4.39 | 4.60 |
| 64 | 52.36 | 54.81 | 27.23 | 28.50 | 13.88 | 14.53 | 4.66 | 4.88 |
| 65 | 55.17 | 57.77 | 28.69 | 30.04 | 14.62 | 15.31 | 4.91 | 5.14 |
| 66 | 59.89 | 62.66 | 31.14 | 32.58 | 15.87 | 16.60 | 5.33 | 5.58 |
| 67 | 65.23 | 68.18 | 33.92 | 35.45 | 17.29 | 18.07 | 5.81 | 6.07 |
| 68 | 71.28 | 74.45 | 37.07 | 38.72 | 18.89 | 19.73 | 6.34 | 6.62 |
| 69 | 78.34 | 81.75 | 40.74 | 42.51 | 20.76 | 21.66 | 6.97 | 7.27 |
| 70 | 84.90 | 88.58 | 44.15 | 46.06 | 22.50 | 23.48 | 7.56 | 7.89 |
| 71 | 92.32 | N/A | 48.01 | N/A | 24.46 | N/A | 8.22 | N/A |
| 72 | 100.65 | N/A | 52.34 | N/A | 26.67 | N/A | 8.96 | N/A |
| 73 | 110.11 | N/A | 57.26 | N/A | 29.18 | N/A | 9.80 | N/A |
| 74 | 120.98 | N/A | 62.91 | N/A | 32.06 | N/A | 10.77 | N/A |
| 75 | 133.79 | N/A | 69.57 | N/A | 35.45 | N/A | 11.91 | N/A |

**6**  These rates are effective 1/1/09 and are subject to change at Prudential's discretion. Your rate is based on your age on the effective date of your policy.

HOME » CURRENT EMPLOYEES » MAKING THE TRANSITION FROM NORTEL » *2011 / 2012 COBRA RATES*

# 2011 / 2012 COBRA Rates

| COBRA Plan | Description | Employee Only per Month | Employee & Child(ren)/DP Children per Month | Employee & Spouse/DP per Month | Employee & Family/DP Family per Month |
|---|---|---|---|---|---|
| Medical | PPO 80/60 | 421.63 | 758.95 | 885.45 | 1,307.10 |
| Medical | PPO 90/70 | 464.27 | 835.66 | 974.95 | 1,439.20 |
| Medical | Comprehensive | 728.9 | 1,311.99 | 1,530.68 | 2,259.55 |
| EAP | Employee Assistance Program | 2.89 | 2.89 | 2.89 | 2.89 |
| Dental | Comprehensive | 37.26 | 75.36 | 76.29 | 114.58 |
| Dental | Plus | 75.03 | 151.12 | 152.19 | 228.31 |

This document was retrieved from http://www.nortel-us.com/current/making-the-transition-from-nortel/cobra-rates/ on Sat, 20 Oct 12 14:27:12 -0400.

Copyright © 2009-2012 Nortel Networks Inc. All Rights Reserved.

# Rate Calculation Sheet

Number of Units per $1,000
(E.g. $10,000 = 10 Units)

*88*

Rate per $1,000
(Refer to rate charts based on
amount of coverage being converted)

*816.⁴⁴*

Policy constant per premium mode
(Refer to page 4:

*23.⁰⁰*

- $85.00 = annual mode
- $45.00 = semi-annual mode
✓ - $23.00 = quarterly mode
- $8.00 = monthly mode (Prumatic))

Number of Units x Rate per $1,000 + Policy Constant = Premium

*839.⁴⁴*

Please note that your rate will be based on your age on the
effective date of your policy.

8

HOME » CURRENT EMPLOYEES » MAKING THE TRANSITION FROM NORTEL » 2011 / 2012 COBRA RATES

# 2011 / 2012 COBRA Rates

| COBRA Plan | Description | Employee Only per Month | Employee & Child(ren)/DP Children per Month | Employee & Spouse/DP per Month | Employee & Family/DP Family per Month |
|---|---|---|---|---|---|
| Medical | PPO 80/60 | 421.63 | 758.95 | 885.45 | 1,307.10 |
| Medical | PPO 90/70 | 464.27 | 835.66 | 974.95 | 1,439.20 |
| Medical | Comprehensive | 728.9 | 1,311.99 | 1,530.68 | 2,259.55 |
| EAP | Employee Assistance Program | 2.89 | 2.89 | 2.89 | 2.89 |
| Dental | Comprehensive | 37.26 | 75.36 | 76.29 | 114.58 |
| Dental | Plus | 75.03 | 151.12 | 152.19 | 228.31 |

This document was retrieved from http://www.nortel-us.com/current/making-the-transition-from-nortel/cobra-rates/ on Sat, 20 Oct 12 14:27:12 -0400.

Copyright © 2009-2012 Nortel Networks Inc. All Rights Reserved.

$$421.63 \qquad 421.63$$
$$37.26 \qquad 75.03$$
$$458.89 \qquad \$496.66$$

# STATEMENT OF SERVICES RENDERED

Richard M Forbes, DMD, PA
516 New Market Blvd., Ste 2
Boone, NC 28607

(828)265-4867

| CHART NO. | PAGE NO. |
|---|---|
| TO0068 | 1 |

**BILLING DATE**
05/23/2012

**GUARANTOR NAME AND MAILING ADDRESS**

Carmel T Totman
164 Burton Street
Boone, NC 28607

| PATIENT | TOOTH | SURF | DESCRIPTION | CHARGE | CREDIT |
|---|---|---|---|---|---|
| Carmel | 3 | | Clinic crown lengthen-hard tiss | 950.00 | |
| Carmel | | | Credit Card Payment -Thank You | | -500.00 |
| Carmel | | | CareCredit Payment-Thank You | | -450.00 |

| PRIOR BALANCE | CURRENT CREDITS | CURRENT CHARGES | NEW BALANCE | DENTAL INS. EST. | PLEASE PAY |
|---|---|---|---|---|---|
| 0.00 | - 950.00 | + 950.00 | = 0.00 | - 0.00 | 0.00 |

| PATIENT | DATE | TIME | REASON |
|---|---|---|---|
| Carmel T | Thursday – May 31, 2012 | 10:30 am | PostTx Ev  cm. lengthening #3 |

Cigna Dental
CONNECTICUT GENERAL LIFE INSURANCE COMPANY 10128-NEW Doc 8831-1    Filed 10/25/12    Page 114 of 116
P.O. BOX 188037
CHATTANOOGA, TN 37422

**Cigna.**

Page 1 of 3

As administrator for NORTEL NETWORKS INC CGLIC AS ADMIN 3203196          *THIS IS NOT A BILL*

CARMEL TOTMAN
164 BERTON STREET
BOONE, NC 28607-6027

FOR CUSTOMER SERVICE:

**1.800.Cigna24 (1.800.244.6224)
or visit www.myCigna.com**

*Please have your Participant ID (U0925443250)
or the employee's social security number
available when calling Customer Service,
visiting your dental care provider, or
writing to us.*

# Your explanation of dental benefits (for the claim processed on Mar 21, 2012)

## Your current account summary

$50 has been applied towards your $50 individual deductible
$50 has been applied towards your $150 family deductible
$1,003 has been applied towards your $2,000 individual maximum
$0 has been applied towards your $2,000 lifetime ortho maximum

*The balances shown above are as of Mar 21, 2012, the day the claim was finalized.
However, the balances on the website are updated daily, so the balances shown here
may not match those listed on your participant website at myCigna.com.*

## Your payment summary

| | |
|---|---|
| Paid to: | JULIA TYSON DDS PA |
| Amount: | $600.60 |

## Did you know that your overall health can be impacted by your oral health?

Did you know that your oral health and certain medical conditions are closely
associated? Through the **Cigna Dental Oral Health Integration Program,**
customers with the following medical conditions can get 100% reimbursement of
their out-of-pocket payment to their dentist for certain procedures: Diabetes; Heart
Disease; Maternity; Stroke; Head and Neck Cancer Radiation; Organ Transplants;
Chronic Kidney Disease. Program Participants can also get discounts on certain
prescription dental products through Cigna Home Delivery Pharmacy. Go to
*myCigna.com* to find out more about the **Cigna Dental Oral Health Integration
Program.**

The Cigna Dental Oral Health Integration Program is a registered trademark of the
Cigna Corporation.

GD5001A    0016790

**Cigna.**

As administrator for NORTEL NETWORKS INC CGLIC AS ADMIN 3203196                    *THIS IS NOT A BILL*

CARMEL TOTMAN
164 BERTON STREET
BOONE, NC 28607-6027

FOR CUSTOMER SERVICE:
**1.800.Cigna24 (1.800.244.6224)**
**or visit www.myCigna.com**

*Please have your Participant ID (U0925443250)*
*or the employee's social security number*
*available when calling Customer Service,*
*visiting your dental care provider, or*
*writing to us.*

# Your explanation of dental benefits  (for the claim processed on Jan 31, 2012)

## Your current account summary

$50 has been applied towards your $50 individual deductible
$50 has been applied towards your $150 family deductible
$402.40 has been applied towards your $2,000 individual maximum
$0 has been applied towards your $2,000 lifetime ortho maximum

*The balances shown above are as of Jan 31, 2012, the day the claim was finalized.*
*However, the balances on the website are updated daily, so the balances shown here*
*may not match those listed on your participant website at myCigna.com.*

## Your payment summary

Paid to:        JULIA TYSON DDS PA
Amount:        $402.40

## Did you know that your overall health can be impacted by your oral health?

Did you know that your oral health and certain medical conditions are closely
associated? Through the **Cigna Dental Oral Health Integration Program,**
customers with the following medical conditions can get 100% reimbursement of
their out-of-pocket payment to their dentist for certain procedures: Diabetes; Heart
Disease; Maternity; Stroke; Head and Neck Cancer Radiation; Organ Transplants;
Chronic Kidney Disease. Program Participants can also get discounts on certain
prescription dental products through Cigna Home Delivery Pharmacy. Go to
*myCigna.com* to find out more about the **Cigna Dental Oral Health Integration**
**Program.**

The Cigna Dental Oral Health Integration Program is a registered trademark of the
Cigna Corporation.

GD5001A  0017586

* Current Dental Terminology© American Dental Association

# EyeMed
### VISION CARE.

EyeMed Vision Care
Administered by: First American Administrators, Inc.
4000 Luxottica Place
Mason, OH 45040

## EXPLANATION OF BENEFITS
## ***THIS IS NOT A BILL***

| | |
|---|---|
| Claim Number: | 99916341453 |
| Provider Name: | MICHAEL E. VOLLMER |
| Group/Policy #: | |
| Group Name: | NORTEL |
| Patient Name: | TOTMAN, CARMEL T. |
| Subscriber Name: | CARMEL T. TOTMAN |
| Member ID: | |
| Acct #: | 000000000000000 |
| | 09/02/2011 |

Iallldadallallaalaalldladlaaaldlaalllaaldaldalll
TOTMAN, CARMEL T
164 BERTON STREET
BOONE, NC 28607-6027

Check #: 3261867     Check Date: 08/29/11          Payee Name: MICHAEL VOLLMER OD

| Date of Service | Svc Code | Provider Name | Submitted Chgs | Covered Chgs | Discount | Paid Amt | Copay | Pt Responsibility (incl. Copay) | Reason Code |
|---|---|---|---|---|---|---|---|---|---|
| **COMPREHENSIVE EXAM** | | | | | | | | | |
| 08/25/11 | 92004 | MICHAEL E. VOLLMER | $135.00 | $125.00 | $95.00 | $30.00 | $10.00 | $10.00 | |
| **DELUXE FRAME** | | | | | | | | | |
| 08/25/11 | V2025 | MICHAEL E. VOLLMER | $98.00 | $98.00 | $44.10 | $53.90 | $0.00 | $0.00 | |
| **PROGRESSIVE LENS** | | | | | | | | | |
| 08/25/11 | V2781 | MICHAEL E. VOLLMER | $229.00 | $90.80 | $45.80 | $45.00 | $75.00 | $138.20 | 119 |
| **NONSTANDARD LENS** | | | | | | | | | |
| 08/25/11 | S0581 | MICHAEL E. VOLLMER | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| **NOT OTHERWISE CLASSIFIED** | | | | | | | | | |
| 08/25/11 | V2799 | MICHAEL E. VOLLMER | $130.00 | $26.00 | $26.00 | $0.00 | $0.00 | $104.00 | 96, N30 |

## REASON CODE EXPLANATION

119 = Benefit maximum for this time period or occurrence has been reached.   96 = Noncovered charge(s).   N30 = Patient ineligible for this service.

EyeMed Vision Care is providing you with this explanation of benefits as a service to our members. If you have questions regarding benefit application, please contact us via the internet at www.eyemedvisioncare.com or by calling 1-866-539-3633.

Claim Information:

Annual Benefit Limit:
   Exam: No remaining benefits for the calendar year in which this service was obtained
   Frames: No remaining benefits for the calendar year in which this service was obtained
   Lenses: No remaining benefits for the calendar year in which this service was obtained

## EYEMED VISION CARE OFFERS

☆ Great savings on eye examinations, contact lenses, lens options, and accessories.
☆ Your choice of ophthalmologists, optometrists, opticians, and chain retail locations throughout the country.
☆ Many providers are open evenings and weekends to accommodate busy lifestyles.
☆ Choice of frames available at provider locations.
☆ Customer Service Representatives available to answer your questions 7 days a week, including evenings.

## Questions about EyeMed Vision Care? Visit our website at www.eyemedvisioncare.com

Insured by, Fidelity Security Life Insurance Company, Kansas City, Missouri

 Private Practitioners          LensCrafters          PEARLE VISION           Sears Optical          ◎ OPTICAL          

9218