## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| NORTEL NETWORKS INC., *et al.*,[1] | ) |
| | ) Case No. 09-10138 (KG) |
| Debtors. | ) |
| | ) Jointly Administered |
| | ) |
| | ) **Re: Docket Nos. 8067** |
| | ) |
| | ) **Objection Deadline: October 25, 2012** |
| | ) **(extended by agreement)** |
| | ) **Hearing Date: February 12, 2013** |

### THE OFFICIAL COMMITTEE OF LONG TERM DISABILITY PARTICIPANTS' OBJECTION TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 363 AND 1108 AUTHORIZING THE DEBTORS TO TERMINATE THE DEBTORS' LONG TERM DISABILITY PLANS AND THE EMPLOYMENT OF THE LTD EMPLOYEES

The Official Committee of Long Term Disability Participants (the "LTD Committee")

hereby objects (the "Objection")[2] to the *Debtors' Motion for Entry of an Order Pursuant to 11*

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

[2] By submitting this Objection in accordance with the Court's Scheduling Order, the LTD Committee does not agree or in any way concede that the draconian relief sought in the Debtors' Motion to Terminate (as defined herein) is properly before the Bankruptcy Court, that the Debtors have standing to seek the relief sought in their Motion to Terminate, that this Court has jurisdiction to resolve a matter requiring enforcement of the terms of an ERISA plan, or that this Court can enter an order granting relief.  29 U.S.C. §1132(a)(3); 11 U.S.C. §157(d).  The LTD Committee intends to address these matters in an expeditious manner in a separate application to the Bankruptcy Court, in accordance with the appropriate procedures for addressing such objections.

*U.S.C. §§ 105, 363 and 1108 Authorizing the Debtors to Terminate the Debtors' Long Term Disability Plans and the Employment of the LTD Employees* (Docket No. 8067) (the "<u>Motion to Terminate</u>") filed on July 30, 2012.   In support of this Objection, the LTD Committee respectfully submits as follows:

## I.    PRELIMINARY STATEMENT

1.    The Debtors' Motion to Terminate is an attempt to disregard clearly prescribed Congressional limits adopted to protect fiduciary and contractual obligations owing to the 215 permanently and long term disabled employees (the "<u>LTD Participants</u>") of the Debtors by participating in the enormous shell game to hide the contents of long term disability plans (the "<u>LTD Plans</u>") providing benefits to these employees.   The Debtors seek, without standing to do so and in direct violation of their fiduciary duties to the LTD Participants, an unprecedented ruling that implicates much more than a purportedly reserved prerogative.   To dispose of the Motion to Terminate before it, the Court must see the Debtors' motion for what it really is; a deceptive argument that is not supported by either the facts or the law, albeit temptingly simple and simplistic, that will obliterate reasonably understood expectations securing the lives of the LTD Participants.

2.    Despite a vague general statement addressing the future of its employee benefit plans, the Debtors never disclosed any authority to retroactively terminate long term disability ("<u>LTD</u>") benefits for those who are already disabled and in pay status and cannot cite to a single clause in any document reserving such a right.   In fact, the plan documents specifically provide for the continuation of LTD benefits for those who are already disabled when the plans terminate.   Additionally, not a single case authority supports a retroactive termination of LTD benefits for those who are already disabled under the language the Debtors rely upon in their

Motion to Terminate. Nevertheless, the Debtors engage in nothing more than obfuscation that ignores the key issue, ignores the language in their own documents, and ignores analogous case law all in an effort to obtain a ruling beyond the Court's power to award.[3]

3.      Even if the Court accepts the Debtors' argument that "plan" language permits them to terminate the LTD Plans at any time and for any reason – even for those who are already disabled – such a reading only creates an ambiguity in the plan documents, which this Court must resolve by a review of extrinsic evidence. As is more fully set forth below, the Debtors routinely provided their employees with enrollment "workbooks" and "guides" with statements regarding the duration and nature of the LTD benefits, such as "you're covered until you're 65," "benefits will continue throughout your disability" and "LTD benefits are payable as long as clinical evidence supports total disability up to age 65," but without any warning or notification that these assured benefits could be terminated even after an employee became disabled. The Debtors would have this Court believe that when their employees elected LTD benefits as part of their compensation package, after receipt of information assuring the employees that LTD benefits would continue to age 65 as long as they remained disabled, these employees willfully entered into what Third Circuit case law has called an "illusory contract" that would allow the Debtors, at their whim, to simply terminate benefits even <u>after</u> the employee became disabled.

---

[3]  On October 2, 9, 10, and 15, the Debtors produced approximately <u>22,000 pages of documents</u> to the LTD Committee. These are documents that the LTD Committee requested over a year ago and include documents previously represented by the Debtors as non-existent. These are also documents responsive to the LTD Committee's Requests for Production of Documents served upon Debtors on <u>August 6, 2012</u>, which should have been produced under the Federal Rules of Civil Procedure within thirty (30) days of service of the LTD Committee's Requests. The Debtors, despite assurances to the contrary, delivered the 22,000 pages of documents in the weeks prior to the LTD Committee's deadline to respond to the Motion to Terminate. The LTD Committee reserves its right to address these additional documents upon further review and analysis, and to supplement this Objection, to the extent necessary.

All of this must be considered by the Court when determining the validity of the Debtors' argument.

4.      The Debtors' campaign to deprive the LTD Participants of benefits and claims already incurred, also includes the termination of the employment of the LTD Participants based on a representation that "many of the LTD Plans" condition receipt of benefits on continued employment.  As is more fully set forth below, this is inaccurate and there is no governing plan document that conditions the receipt of LTD income continuation benefits and medical benefits on employment.  Moreover, the Debtors' express intention to terminate the employment of the LTD Participants so as to deprive them of benefits constitutes retaliation for exercising, or interference with, all rights safeguarded by ERISA in violation of section 510 of ERISA, 29 U.S.C. § 1140.

## II.    **BACKGROUND**

5.      On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc.,[4] filed in the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under chapter 11 the Bankruptcy Code.  The Debtors' bankruptcy cases (the "Cases") are consolidated for procedural purposes only.  The Debtors continue to operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      Since the Petition Date, the Debtors have sold their business units and other assets to various purchasers.

---

[4]  Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes (Docket No. 1098).

7.    On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "UST") appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee") (Docket Nos. 141 and 142); an *ad hoc* group of bondholders was also organized.

8.    On June 2, 2011, the Debtors filed a motion seeking appointment of a committee of retirees (the "Retiree Committee") to serve as the official representatives for the retirees to engage in good faith negotiations regarding the termination or modification of the retiree welfare and benefit plans, pursuant to section 1114 of the Bankruptcy Code (Docket No.5568) (the "Retiree Committee Appointment Motion").

9.    On June 3, 2011, a significant number of LTP Participants filed a joinder to the Retiree Committee Appointment Motion (Docket No. 5595).  Contemporaneously, certain LTD Participants filed a motion seeking appointment of a committee as the official representative for LTD Participants (Docket No. 5595) (the "LTD Committee Appointment Motion"). Additionally, multiple other LTD Participants filed correspondence with the Court supporting the relief sought in the Retiree and LTD Committee Appointment Motions. (*See, e.g.,* Docket Nos. 5659-61, 5670-76, 5678-81, 5694-5701, 5703-5708, 5712-5716 and 5760-5764).

10.    On June 21, 2011, the Court ordered the appointment of the Retiree Committee (Docket No. 5783) On September 20, 2011, this Court entered an Order authorizing the employment and retention of Togut, Segal & Segal LLP as Retiree Committee counsel, *nunc pro tunc* to August 22, 2011 (Docket No. 6412).  On September 20, 2011, this Court entered an Order authorizing the employment and retention of McCarter & English, LLP as local counsel to the Retiree Committee *nunc pro tunc* to August 26, 2011 (Docket No. 6413).

11.    On June 22, 2011, the Court authorized the appointment of the LTD Committee (Docket No. 5790) (the "LTD Committee Appointment Order").  On August 2, 2011 (the

"Retention Date"), the LTD Committee was formed and selected Elliott Greenleaf ("EG") as proposed counsel to the committee. The LTD Committee consists of the following members: Wendy Boswell Mann, Daniel D. David, Dianna L. Irish, Paul E. Morrison, Barbara Gallagher, Michael Stutts, and Deborah Jones. *See Amended Notice of Appointment of Unsecured Creditors* (Docket No. 6080). Prior to the Retention Date, EG acted as counsel to Barbara Gallagher and 58 other LTD Participants. On September 20, 2011, the Court entered an Order authorizing the employment and retention of EG as LTD Committee counsel, *nunc pro tunc* to August 2, 2011 (Docket No. 6415) (the "EG Retention Order").

12.    The LTD Committee was appointed under Bankruptcy Code section 1102(a)(2) "for the sole purpose of serving as the authorized representative of the LTD Participants in connection with negotiations regarding the modification or termination of the LTD Plan, and any claims relating thereto and for no other purpose . . . ."[5] *See EG Retention Order* (emphasis added). EG and the LTD Committee have a fiduciary duty to examine any claims related to modification and termination of the LTD Plans, and to both analyze any proposal put forth by the Debtors, *ad hoc* committee of bondholders or Creditors' Committee, as well as develop a legal position and financial analysis to negotiate with these constituencies.

13.    On October 24, 2011, the Court entered an Order authorizing the employment and retention of Alvarez & Marsal Healthcare Industry Group, LLC ("A&M") as Financial Advisors to both the Retiree Committee and the LTD Committee *nunc pro tunc* to September 8, 2011 (Docket No. 6679). The LTD Committee Appointment Order provides that the Retiree Committee and the LTD Committee share financial advisors and actuarial services.

---

[5] The Court has expanded the role of the LTD Committee and its counsel in order to assist the LTD constituency so it can participate in the Motion to Terminate proceedings, including, but not limited to the discovery process.

14.     Soon after, in order to enter into negotiations in an informed manner and as quickly as possible, the LTD Committee, pursuant to Rule 2004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, participated in several conferences with the Debtors regarding a pending 2004 request for an examination and production of documents. In lieu of an examination, the parties agreed to respond to document requests related to the LTD constituency's benefits and claims. These requests were supplemented by data requests in order for A&M to prepare the complicated analysis necessary to allow the LTD Committee and its professionals to both 1) evaluate any proposal by the Debtors or the Creditors' Committee and 2) to provide for the LTD Committee the basis for alternatives and options related to the negotiations.

15.     The parties have subsequently participated in multiple mediation sessions[6] and are currently engaged in formal discovery pursuant to Court Order.

16.     The Debtors are currently in the process of winding down their operations. This is significantly not a reorganization.

### III.    RELEVANT FACTS

#### A.    The LTD Plan Participants

17.     The LTD Participant group consists of a total of 215 disabled employees of the Debtors who are unable to work because of their disabilities and who receive income continuation benefits under the Debtors' LTD Plans.[7] The Debtors offered these benefits as part of what they represented to be a comprehensive menu of benefits and even encouraged and

---

[6]  Due to various confidentiality agreements in place and the general impropriety of disclosing settlement negotiation details, the LTD Committee will refrain from refuting the Debtors' self-serving version of events concerning previous mediation attempts contained in its Motion to Terminate.

[7]  The LTD Plans are employee welfare benefit plans as defined by ERISA, 29 U.S.C. §1002(1).

induced the LTD Employees to "buy up" the LTD benefit by purchasing a higher level of income protection with their own funds. (*See infra* ¶24).

18.     The LTD Participants, including many with dependent children, rely on the monthly receipt of LTD income continuation along with Social Security Disability Income ("SSDI") to meet basic expenses – housing, food and the costs of daily living.  Many of the LTD Participants are seriously ill with conditions that require frequent medical treatment and medication and that certainly preclude them from performing **any** gainful employment. The LTD monthly income continuation benefit is also used to pay the cost of these attendant medical and pharmaceutical expenses arising from their disabling condition. Termination of these benefits would be nothing less than catastrophic for the LTD Participants who can never work again and cannot replace the supposed disability benefit with new coverage.

19.     The LTD Participants consist of a diverse group of individuals who have each suffered a disabling event at separate times, ranging from as early as 1981 up through 2010. Over half of the group became disabled more than 10 years ago, while every individual has continuously suffered from permanently disabling conditions, including various forms of cancer, blindness, organ failure, and other life-threatening diseases. *See* Exhibit "A" for a demographic breakdown of the LTD Participants by age and year of disability.

20.     It is not entirely clear what type of program the Debtors used to provide income continuation to disabled employees.  The Debtors assert that the LTD Plans are "generally self-funded" (*see* Motion to Terminate at ¶10), meaning that the Debtors pay for the LTD benefits out of their general assets and into the Nortel Networks Inc. Health & Welfare Benefits Trust (the "Trust"), which funds the benefits under the LTD Plans. The Trust is a Voluntary Employees' Benefits Association ("VEBA").

21.    However, there is documentary evidence that the Debtors insured the LTD benefit. For example, a 1977 Northern Telecom Group Insurance Plan specifically states that "This plan is underwritten by the Aetna Life Insurance Company of Hartford, Connecticut" and "The following pages of this booklet-certificate describe NTI's Group Insurance Plan which is underwritten by Aetna Life Insurance Company."[8] *See* Exhibit "B" at NNI-LTD-00005731 (emphasis added). Additionally, the 2006 "FLEX Enrollment Guide" provided by the Debtors to its employees as a "summary" to "assist" with "making benefit selections," specifically states that "Long Term Disability coverages are issued by The Prudential Insurance Company of America" and that the LTD Plan is a "policy that provides disability income insurance only" (as opposed to health benefits). *See* Exhibit "C" at NNI-LTD-00013551-00013630 (pp. 00013553, 00013604) (emphasis added).    Similarly, the 2005 "Flex Enrollment Guide for U.S. Flex Participants" states that "Long Term Disability coverag[e]" is issued by Prudential (NNI-LTD-00013436) and refers to LTD as a "policy provid[ing] disability income insurance"(NNI-LTD-00013476). *See* Exhibit "D."

---

[8] The Debtors' conversion from a traditional form of disability insurance to a self-funded plan, if at all, raises questions as to the adequacy of disclosures it made to employees about the differences in the new form of coverage and whether it made representations that the self-funded plan offered substantially less protection than disability insurance.  In comparing the benefits program when the insured plan was in effect, it is clear that the program included "extension of benefits" for benefits that were not covered by insurance.  Such an extension in the event of plan amendment or termination would not have been required for long term disability, because once an employee qualified for insurance, his need for income continuation would not change and his income stream would not be affected by such changes.  When the Debtors converted to the self-funded plan, they adopted similar extension language for LTD benefits.  If the Debtors had not done so, they should have been required to disclose that the coverage they were providing was illusory and could evaporate on the Debtors' whim, and should have suggested to employees to purchase other coverage to protect their income. Nothing in the documents produced by the Debtors or the LTD Plans or summaries provides any hint of the dire consequences of amendments or later plan terminations that the Debtors claimed they reserved the right to make.

22.     In an effort to establish the most basic fact of whether a policy of insurance applies to any of the benefits currently being received by any LTD Participant, the LTD Committee provided the Debtors with documents suggesting that the LTD income continuation benefits were at some point insured by CIGNA.  To date, the Debtors have not responded to repeated requests by the LTD Committee for clarification of this issue.  Presumably, even the Debtors do not know if any of the benefits they are trying to terminate are actually covered by a policy or policies of insurance.

23.     The LTD Plans also provide the participants with medical benefits, dental/vision/hearing benefits, life insurance and accidental death and dismemberment ("AD&D") benefits.  The Debtors self-insured the medical and dental/vision/hearing benefits and provided the life insurance and AD&D benefits under a policy of insurance.

24.     The LTD Participants receive LTD monthly income continuation in an amount representing a percentage of their pre-disability earnings (the "core" monthly benefit). The amount of core monthly benefit depends upon the provisions of the plan in effect at the time of the individual's disabling event and whether the individual opted to purchase increased LTD coverage with their own funds. Over the various plan years, the Debtors provided "core" coverage, at no cost to the employee, ranging from 50% to 70% of pre-disability earnings. Depending on the provisions of the LTD Plan in effect, employees could purchase, at their own expense, "optional" LTD coverage to increase the "core" monthly benefit.  Under certain LTD Plans covering various years, this "optional" benefit increased the monthly benefit to 70% of pre-disability earnings.

25.     The LTD Plan in effect at the time an employee became disabled governs the benefits received by the LTD Participants are defined by the terms of the LTD plan in effect at

the time the disability incurred.  This is significant because the Debtors are attempting to use

recent <u>summary plan descriptions</u> to control the terms of benefits for the LTD Participants who

became disabled as far back as 1981 up through 2010.  The Debtors do not explain how

summary plan descriptions from 2006 and 2010 could apply to define the benefits for any

individual who became disabled before that time.  And, in fact, the Debtors' own documents

specifically state that the benefit plan in effect at the time of disability govern the benefits

received by the individual LTD Participants.

   26. The Debtors specifically committed to such a timing rule in documents that they,

themselves, authored and distributed to employees, in which they clearly state that the benefits

that were in effect at the time of disability control the benefits received by the LTD participant.

For example: [9]

  • A 2003 Nortel Networks document entitled "Navigating Your FLEX Benefits Enrollment For Employees Not Actively at Work" stated: "A Note About Your Disability Coverage Selection:  If you're on an LTD leave on January 1, 2003, <u>you'll continue to receive disability benefits under your 2002 coverage until you return to work</u>. **Any new coverage you select during this annual enrollment period will become effective, and your payroll deductions will begin, after you've returned to active work for 30 days**." (underlined emphasis added) (bolded emphasis in original).  *See* <u>Exhibit "E"</u> at NNI-LTD-00013275.

  • Similarly, a 2005 Nortel Networks document entitled "FLEX Enrollment Guide For U.S. FLEX Participants Not Actively Working" stated: "Special Note for Employees Not Actively at Work - If you're on an LTD leave on January 1, 2005, <u>you'll continue to receive disability benefits under the coverage level that was in effect at the onset of your disability</u>, until you satisfy the plans' actively at work provisions.  Any new coverage you select during the FLEX 2005 Benefits enrollment period will begin after you've returned to work for 30 consecutive days." (emphasis added).  *See* <u>Exhibit "E"</u> at NNI-LTD-00013535.

  • In a Nortel Networks document entitled "U.S. Leaves of Absence Medical Leave of Absence Process,"[10] issued January 1, 1997 and modified January 12, 2006, the term

---

[9]  The documents referred to here are collected at <u>Exhibit "E."</u>

[10]  The Introduction to the U.S. Leaves of Absence Policy states that the document "presents the guidelines and process information for a U.S. Medical Leave of Absence that may be taken by employees with serious health conditions due to illness or accidental injury" and that the policy

"benefits" is defined as "The benefits, if any, as specified in the Nortel Group Benefits Plan that are in effect when the Medical Leave of Absence begins." (emphasis added). *See* Exhibit "E" at LTD-002928.

27.     Accordingly, the plan document in effect at the time the individual became disabled controls what benefits any one LTD Participant receives. Again, the dates of disability for the LTD Participants range from 1981 through 2010.[11] *See* Exhibit "A."

28.     The Debtors have failed to produce **any** governing plan documents for this time period with the exception of the 1987 and 1989 Group Benefits Plans. These are the controlling plan documents and, as more fully set forth below, provide for the extension of LTD income continuation and medical benefits in the event of plan termination.

**B.     Statutory Requirements for ERISA Welfare Benefit Plans**

29.     Significantly, as a threshold matter, ERISA requires that "every employee benefit plan shall be established and maintained pursuant to a written instrument." *See* 29 U.S.C. §1102(a)(1) (emphasis added). The written instrument constitutes the governing or controlling document that sets out the terms of the employee welfare benefit plan. Moreover, the written instrument must "(1) provide a procedure for establishing and carrying out a funding policy and method consistent with the objectives of the plan and the requirements of this subchapter, (2) describe any procedure under the plan for the allocation of responsibilities for the operation and administration of the plan . . . ; (3) provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan, and (4) specify the basis on which

---

"relates to employees on Short-Term Disability (STD) or Long-Term Disability (LTD)." *See* Exhibit "E" at LTD-002912.

[11] The Debtors rely upon select language from five documents to support the request relief in their Motion to Terminate. These include the 2004 Medical Plan SPD, (as defined herein) the 2004 SPD for LTD, the 2006 SPD for LTD, the 2010 SPD for LTD, and the 1989 Group Benefits Plan. Of these documents, only the 1989 Group Benefits Plan is a plan document.

payments are made to and from the plan." 29 U.S.C. §1102(b) (emphasis added). The Debtors

failed to produce any documents evidencing any material amendment of any LTD Plan.

30.     Separate from the governing plan document, are the summary plan descriptions

("SPDs"). Importantly, the SPD is not the governing plan document and there is a legal

difference between the two documents. *See Cigna v. Amara*, 131 S.Ct. 1866, 1878, 179 L.Ed.2d

842 (2011).

31.     SPDs for employee benefit plans, which by definition and by virtue of a stated

disclosure in the document itself contain only a *summary* of the governing plan document, "shall

be furnished to participants and beneficiaries" and "shall be written in a manner calculated to be

understood by the average plan participant, and shall be sufficiently accurate and comprehensive

to reasonably apprise such participants and beneficiaries of their rights and obligations under the

plan." *See* 29 U.S.C. §1022(a).

32.     Section 102(b) of ERISA, 29 U.S.C. §1102, and its federal regulations, set out the

information that all SPDs must include, *inter alia*, "the plan's requirements respecting eligibility

for participation and benefits" and the "circumstances which may result in disqualification,

ineligibility, or denial or loss of benefits." *Id.*[12] An SPD for an employee welfare benefit plan

---

[12]  The full text of §102(b) of ERISA, 29 U.S.C. §1022(b), is as follows:

(b) The summary plan description shall <u>contain</u> the following information: The
name and type of administration of the plan; in the case of a group health plan (as
defined in section 1191b(a)(1) of this title), whether a health insurance issuer (as
defined in section 1191b(b)(2) of this title) is responsible for the financing or
administration (including payment of claims) of the plan and (if so) the name and
address of such issuer; the name and address of the person designated as agent for
the service of legal process, if such person is not the administrator; the name and
address of the administrator; names, titles, and addresses of any trustee or trustees
(if they are persons different from the administrator); a description of the relevant
provisions of any applicable collective bargaining agreement; <u>the plan's
requirements respecting eligibility for participation and benefits</u>; a description of
the provisions providing for non-forfeitable pension benefits; **circumstances**

must also include, *inter alia*, "a summary of any plan provisions governing the authority of the plan sponsors or others <u>to terminate the plan</u> or <u>amend or eliminate benefits under the plan</u> <u>and the circumstances</u>, if any, <u>under which the plan may be terminated or benefits may be amended or eliminated</u>" and a "summary of any plan provisions governing the benefits, rights and obligations of participants and beneficiaries under the plan <u>on termination of the plan or amendment or elimination of benefits under the plan</u> . . .." *See* 29 C.F.R. §2520.102-3(l) (emphasis added).

33.    A plan administrator, such as the Debtors, must also furnish a summary of any material modification ("<u>SMM</u>") in the terms of the plan and any change in the information required by § 102(b), 29 U.S.C. §1102(b), to plan participants and must also disclose such changes "written in a manner calculated to be understood by the average plan participant." *See* 29 C.F.R. §2520.104b-3. The Debtors failed to produce any SMMs that alter the material terms of the only two governing plan documents the Debtors have produced, including the 1989 Plan, in the record, upon which the Debtors rely in their Motion to Terminate.

---

<u>which may result in disqualification, ineligibility, or denial or loss of benefits</u>; the source of financing of the plan and the identity of any organization through which benefits are provided; the date of the end of the plan year and whether the records of the plan are kept on a calendar, policy, or fiscal year basis; the procedures to be followed in presenting claims for benefits under the plan including the office at the Department of Labor through which participants and beneficiaries may seek assistance or information regarding their rights under this chapter and the Health Insurance Portability and Accountability Act of 1996 with respect to health benefits that are offered through a group health plan (as defined in section 1191b(a)(1) of this title), the remedies available under the plan for the redress of claims which are denied in whole or in part (including procedures required under section 1133 of this title), and if the employer so elects for purposes of complying with section 1181(f)(3)(B)(i) of this title, the model notice applicable to the State in which the participants and beneficiaries reside. (emphasis added).

C.     **History of the Debtors' Delay and Obstruction in the Identification and Production of Plan Related Documents**

34.     Locating documents containing the terms of the Debtors' employee benefits has been hindered by the Debtors' conduct in producing critical plan documents.  The identification of controlling plan documents and SPDs in this case has been complicated by the manner in which the Debtors produced documents.  The Debtors produced governing plan documents - and only two were produced - and the SPDs in a year long "rolling production," including a 22,000-page document dump that included the production of plan-related documents made over several days as the LTD Committee's deadline to respond to the Debtors' Motion to Terminate approached.  Ironically, the Debtors previously had affirmatively declared many of these documents non-existent. Such representations are egregious because the Debtor Nortel Networks Inc., as the Plan Administrator of the LTD Plans, is obligated under ERISA to maintain such plan documents in order to provide such documents and SPDs to plan participants and beneficiaries upon request.  Moreover, the Debtors failed to identify which documents are governing plan documents and which are SPDs, and has taken over a year to produce basic plan documents.

35.     Initially, the Debtors claimed to have no plan document or SPD prior to 1999, except one small part of, and not the complete, 1982 Group Benefits Plan document.  In fact, the Debtors represented that they "did not possess any SPDs prior to 1999" and that other documents were "not readily available."  By December 23, 2011, three months after the LTD Committee's informal requests for documents, the Debtors represented that "[a]t this time, the Debtors believe

that all of the Requests have been fully satisfied. Of course, the Debtors will continue to produce any new relevant documents that become available."[13]

36.     Notwithstanding the affirmative representation that all of the LTD Committee's requests had "been fully satisfied," the Debtors continued to produce documents for months thereafter, and even as recently as the first two weeks in October, 2012, often producing the very documents originally claimed not to exist.  For example, the Debtors affirmatively represented on December 23, 2011, that the 2003 SPD did not exist in response to a question from the LTD Committee regarding the missing 2003 SPD:

> During the relevant time period, the Debtors only published a new SPD plan if there was a change to the LTD plan. No changes were made to the LTD Plan in 2001 or in 2003, and as such, no SPDs were published in those years. Thus, the 2000 SPD covered the years 2000 and 2001 and the 2002 SPD covered the years 2002 and 2003.

However, eight months later, on August 23, 2012, the 2003 SPD – previously represented as non-existent - was produced.

37.     In another example, the Debtors represented that no plan documents existed for the LTD benefit, specifically stating: (a) "Please note that because the LTD Plan has been self-funded, there are no separate LTD Plan documents, and the SPDs served as the plan of record for ERISA purposes" and (b) "To clarify our prior statement regarding whether there are additional LTD benefit plan documents, the LTD SPDs for each of the years provided contain the terms describing the LTD benefits.  There is no separate LTD plan document for these years setting forth additional terms of the LTD benefit" (emphasis in original). However, these representations are belied by the Debtors' own documents and their reliance on the 1989 Group Benefits Plan

---

[13] The following paragraphs are quotations from statements made by the Debtors' counsel in various written communications to counsel for the LTD Committee.  The LTD Committee is prepared to produce these written communications if so requested by the Court.

for the position in their Motion to Terminate.  For example, the 1999 SPD for the LTD benefit

states:

> This information is a summary plan description (SPD) under the terms of [ERISA]. <u>The complete terms of the Short-Term and Long-Term Disability Plan can be found in the plan document. If there is a difference between the information in this summary and the plan document, the plan document will govern.</u> . . .

(emphasis added).  Similarly, the "Administrative Information" section produced by the Debtors

purporting to govern the LTD plan from 2000 to 2004 states:

> Plan Documents - In accordance with the disclosure requirements of ERISA, <u>this guide serves as a summary plan description</u> of all the Company's employee benefit plans. <u>As such, this information is a summary of your benefit plans; it does not replace the official plan documents or insurance contracts, which govern in all cases.</u>

(emphasis added).  Thus, despite the Debtors' representation that no plan documents exist, the

Debtors' own SPDs refer to the "official plan documents."

38.    While the Debtors originally represented that they did not possess and documents

prior to 1999, they produced numerous documents from the 1980s and 1990s - such as SPDs,

"Benefits at a Glance," "Enrollment Workbooks," and "FLEX Benefits Highlights" and other

documents provided to the Debtors employees to inform their decisions about benefits – in the

early weeks of October, just before the LTD Committee's objection deadline for the Motion to

Terminate.

39.    It is against this backdrop of misstatements, reversals of positions regarding the

existence of documents, missing plan documents and SPDs, and what appears to be a

fundamental ignorance (or intentional misrepresentation) by the Debtors of the contents of their

own plan documents and the legal effect of them, that the Debtors seek an order from this Court

terminating the LTD Plans and the employment of the LTD Participants which, as more fully set

out below, is being sought to deprive the LTD Participants of their benefits under ERISA in violation of section 510 of ERISA.

40.     Despite the fact that a large number of documents exist and that the Debtors fail to explain or distinguish the significance of plan documents, SPDs and other disclosures to plan participants, the Debtors heedlessly suggest that the Court can nevertheless proceed to cut off the only lifeline the LTD Participants retain.

### IV.     ARGUMENT

**A.     There is No Authority in the Plan Documents for the Termination of LTD Benefits for Those Already Disabled and in Pay Status**

41.     The Debtors argue that the plans providing benefits that the LTD Participants receive subject already disabled employees to the "Debtors' express right to unilaterally amend or terminate the various LTD Plans." *See* Motion to Terminate at ¶30. The Debtors rely solely on a single provisions dealing with the "future of the plan" containing the amendment/termination language and **nothing else**, as if the LTD Plans and SPDs contained no other terms, and certainly no terms bearing of this single general provision.

### (i)     Principles of Contract Construction Apply to the Interpretation of ERISA Plans

42.     As a matter of law, ERISA requires a plan document in the form of a "written instrument" pursuant to which the plan is established and maintained. *See* §402(a), 29 U.S.C. §1102(a), which makes the starting point for this Court's determination of whether the Debtors can "unilaterally amend or terminate" the LTD Plans is the language of the governing plan document – a contract. And, in fact, the Debtors have identified what they claim to be the governing plan document – the 1989 Plan.

43.    In interpreting an ERISA plan, courts will apply the principles of contract interpretation. *See Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 75 (3d Cir. 2011). Under Third Circuit law, "[c]laims for benefits based on the terms of an ERISA plan are contractual in nature and are governed by federal common law contract principles." *Id.*

44.    Under principles of contract interpretation, specific terms in a document addressing particularized circumstances or situations outweigh vague language intended to have general application. *See Great Am. Ins. Co. v. Norwin Sch. Dist.*, 544 F.3d 229, 247 (3d Cir. 2008). "Breach of contract principles, applied as a matter of federal law, govern claims for benefits due under an ERISA plan…and straightforward language in an ERISA plan document should be given its natural meaning. To the extent that a specific provision conflicts with a general provision, the specific provision controls." (external citations omitted). *See Saltzman v. Independence Blue Cross,* 634 F. Supp. 2d 538, 561 (E.D. Pa. 2009); *see also, Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 823 (7th Cir. 2010).

45.    Similarly, the Third Circuit has repeatedly applied principles of contract law to ERISA claims, including the basic principle of interpretation that a contract is taken as a whole. *See Senior Exec. Benefit Plan Participants v. New Valley Corp. (In re New Valley Corp.*), 89 F.3d 143, 150 (3d Cir. 1996).

### (ii)    The 1989 Group Benefits Plan Specifically Provides for the the Extension of Benefits for Those Already Disabled

46.    Here, the Court is asked to interpret the 1989 Group Benefits Plan relied up by the Debtors as the "governing LTD Plans." *See* Motion to Terminate; at ¶14. *See also* 1989 Group

Benefits Plan attached as Exhibit "F."[14]   The Debtors cite no other governing plan document other than the 1989 Group Benefits Plan.

47.    Contrary to the Debtors' Motion to Terminate, the 1989 Group Benefits Plan specifically addresses what happens to disabled employees who are already disabled and in pay status at the time a plan terminates and does not permit the Debtors to "unilaterally amend or terminate" benefits for those individuals.   In fact, the 1989 Group Benefits Plan specifically provides, in a section entitled "Extension of Benefits," the continuation of benefits for those who are disabled at the time of plan termination.

48.    The 1989 Group Benefits Plan (as well as the 1987 Group Benefits Plan which is substantially similar) contains four (4) sections that pertain to the duration of LTD benefits and that the Court must read together in accordance with federal common law contract interpretation principles.   Under these principles, the specific provisions trump the general language that the Debtors seek to advance in isolation.

49.    First, the 1989 Plan contains a specific section entitled "Extension of Benefits." This section directly addresses the continuation of LTD benefits when "coverage terminates." The relevant sections of the 1989 Group Benefits Plan conclusively dispel the Debtors' misleading and simplistic reliance on one general provision, as set forth below.

50.    The **"Extension of Benefits"** section provides:

Long Term Disability Coverage

---

[14]  The only other governing plan document produced in this case is a 1987 Nortel Networks Inc. Group Benefits Plan. In their original Motion to Terminate the LTD Plans, filed in June 2010, and later withdrawn after the Third Circuit's decision in In re Visteon, 612 F.3d 210 (3d Cir. 2010), the Debtors cited a 2006 Nortel Networks FLEX  Benefits Program and a 2009 Nortel Networks Welfare Benefits Plan. Significantly, the Debtors have abandoned these documents - because they too fail to support their current Motion – in favor of the 1989 Group Benefits Plan and three deficient and non-controlling SPDs.

> If a period of total disability is in progress when your coverage
> terminates, you will continue to be eligible to receive the Long
> Term Disability Benefits as long as they would otherwise be
> available under the plan.

*See* Exhibit "F" at NNI-LTD-00003944 (1989 Plan) (emphasis added). The plan treats

"coverage termination" as a term of art and specifically defines it in the document.

51.    The **"Termination of Coverage"** provision provides:

> When your employment with your Employer terminates or you
> cease to be a member of a class eligible for coverage under any
> part of this Plan, your coverage under this Plan or the applicable
> part thereof will cease. If you are required to make contributions
> for any of the coverages provided under this Plan and you fail to
> make such contributions, such contributory coverage(s) will cease.
>
> Your coverage under a particular part or parts of this Plan will also
> terminate if this Plan or the applicable part thereof is discontinued.

*See* Exhibit "F" at NNI-LTD-00003939 (emphasis added). While the Debtors may run from this

language, they cannot hide or legitimately contend that a "discontinuance" is not a "termination"

or that the plan does not use the terms interchangeably.

52.    The **"How Long Benefits are Paid"** section provides:

> You will continue to receive Monthly Income Benefits while you
> remain totally disabled (as described herein), up to [age 65].
>
> Period of Total Disability
>
> Since benefits are payable during a period of total disability, it is
> important that you understand when this period begins and ends.
>
> Each period of total disability will start as soon as you are both
> totally disabled and under the care of a physician. . . .
>
> Your period of total disability will end when any one of the
> following occurs: 1. You cease to be totally disabled or you die; or
> 2. You actually start working at the type of occupation in which
> you normally engage or at any reasonable occupation. . . .; or 3.
> You cease to be under the care of a physician; or 4. You fail to
> furnish the latest required proof of the continuance of your total

> disability to the Plan or refuse to be examined by a physician
> designated by this Plan.

*See* Exhibit "F" at NNI-LTD-00003918.   An average plan participant would not derive any

suggestions from these terms that the LTD benefits were merely illusory.  The Debtors disclosed

only four circumstances that would cause benefits to end, **none of which** involved plan

termination.

53.    The **"Change or Discontinuance of Plan"** provision – contained in the "General

Provisions" section of the 1989 Group Benefits Plan – provides:

> While the employer intends to maintain this group benefits plan
> indefinitely, the employer has no obligation whatsoever to
> maintain the plan or to provide any benefits pursuant to the plan
> (including, but not limited to, medical expense benefits for retired
> employees) for any given length of time, and reserves the right to
> amend the plan at any time or from time to time or to terminate the
> plan.

*See* Exhibit "F" at NNI-LTD-00003945.

54.    Applying the principles of contract construction, which requires a reading of the

contract as a whole and the application of a specific term over the general, the specific

"Extension of Benefits" provision clearly extends LTD income continuation benefits to those

with "a period of total disability in progress" when coverage terminates, which includes "if the

Plan is discontinued" and "if your employment with your Employer terminates."  For people

with "a period of total disability in progress" at the time coverage terminates, LTD income

continuation benefits continue "as long as they would otherwise be available under the plan."

55.    The continued receipt of benefits "as long as they would otherwise be available

under the plan" is determined by "How Long Benefits are Paid" section.  That section, as set

forth above, states that an individual will continue to receive LTD income benefits while he/she

remains totally disabled up to age 65. An individual's "disability" will end <u>only</u> when the person is no longer disabled or dies, the person starts working again, the person ceases to be under the care of a physician, or the person fails to provide proof of disability or refuses to be examined by the plan's physician. These are the only circumstances under which disability benefits will be discontinued prior to age 65.

56.    The Debtors pointedly ignore the "Extension of Benefits" provision and instead focus only on the "Change or Discontinuance of Plan" section of the 1989 Group Benefit Plan. The "Change or Discontinuance of Plan" section is silent as to any intention to effect LTD benefits and it <u>does not</u> reserve the right to terminate benefits for those who are <u>already disabled</u>. Moreover, the language is contained in the "General Provisions" section and cannot, as a matter of contract interpretation, control over the more specific "Extension of Benefits" provision. The terms "retroactive," "cancel" or "extinguish" do not appear in this section.

57.    The 1987 and 1989 Plans do not pre-condition the receipt of LTD and medical benefits on the continued existence of the plan and do not predicate the receipt of these benefits on continued employment. To the contrary, these plans specifically provide for continued LTD and medical benefits for those individuals with a disability "in progress" even where coverage is terminated, including when the plan is "discontinued" or "employment with your Employer terminates."

58.    There is <u>no evidence</u> that the Debtors ever amended or changed the "Extension of Benefits" provision. The Debtors produced corporate actions in response to the LTD Committee's discovery requests, but <u>none</u> evidence any change to the Extension of Benefits provision found in the 1987 and 1989 Group Benefit Plans <u>or</u> the 1982 and 1986 SPDs, all of which also contain the same Extension of Benefits provision.

### (iii)    The Debtors Did Not Reserve Their Right to "Unilaterally Amend or Terminate" the LTD benefits for Those Already Disabled

59.    Citing no other plan document, the Debtors turn to the 2004 SPD for the LTD benefit, 2006 SPD for LTD benefit, the 2010 SPD for LTD benefit, and the 2004 SPD for the Medical Plan, as evidence of the reservation of rights in the Debtors to amend or terminate the LTD Plans.

60.    The Debtors would have this Court believe that the "while the precise language contained in the LTD Plan documents varies slightly across the years, the right to amend or terminate always existed." *See* Motion to Terminate at ¶14.

61.    This is hardly the case. For example, in a 1991 document entitled "Weekly Disability and Long Term Disability Plan" the Debtors stated:

> Plan Changes and Termination: The Company expects to continue this Plan, but necessarily reserves the right to amend this Plan from time to time or terminate this Plan at any time. Any amendment to this Plan may reduce or eliminate benefits payable under the Plan to persons who are Employees as of the <u>effective date</u> of the amendment.

*See* <u>Exhibit "G"</u> at NNI-LTD-00005115 (emphasis added).[15]

62.    This clause is consistent with the 1989 Group Benefits Plan by limiting any "amendment" to "reduce or eliminate benefits" as of the "effective date of the amendment." As is more fully set forth in subsection (iii), *infra*, there is no legal authority to support the Debtors' attempt to amend or terminate the terms of an LTD Plan so as to <u>retroactively</u> discontinue claims

---

[15] Similarly, a document entitled "Weekly Disability and Long Term Disability Plan" that appears to be from 1992, contains the same language as the 1991 document regarding "Plan Changes and Termination," stating: "The Company expects to continue this Plan, but necessarily reserves the right to amend this Plan from time to time or terminate this plan at any time. Any Amendment to this Plan may reduce or eliminate benefits payable under the Plan to persons who are Employees as of the effective date of the amendment."

incurred by those who are already disabled and in pay status. The Debtors' own practice demonstrates that when changes were made to the LTD benefits, for example, the elimination of the cost-of-living adjustment ("COLA") in 2000, such change was effected *prospectively*. *See* paragraph ¶ 73, *infra.*

63.     Moreover, the language in the 1991 document pertaining to an "amendment of the Plan" to "reduce or eliminate benefits" applies to "Employees" – which is not defined anywhere in the document. In fact, a person who becomes disabled is referred to as a "Claimant" (*see* Exhibit "G" at NNI-LTD-00005112), not an "Employee." Thus, any amendment applies to "Employees" who are not yet disabled and not to "Claimant[s]" who are already disabled.

64.     The 2004, 2006 and 2010 SPDs for the LTD benefits and the 2004 SPD for the Medical Plan[16] do not reserve the right to terminate benefits for those who are already disabled and in pay status. The so-called "reservation of rights" states only: "[T]he Company reserves the right to change or end the plans described in this summary at any time. Any plan changes will result from actions taken and approved by the Company. The Company may adopt such changes or terminate the plan at any time and for any reason." *See* Motion to Terminate at ¶¶14, 35. This language does not unambiguously reserve the right to change or end plans for those already disabled and in pay status.

65.     Moreover, this language is set forth under the heading "The Future of the Plan," which, by its terms, does not address benefits being paid on claims the Debtors' administrator has already approved.

---

[16] To the extent the Debtors rely on the 2004 SPD for the Medical Benefit, that SPD provides for the "Extension of Health Care Protection" for those who are disabled by extending medical coverage to those who are "totally disabled" for the "time you remain disabled (as defined in the Disability Summary Plan Description) from a Sickness or Injury and under a Doctor's care." *See* 2004 Medical Plan SPD, attached to the Motion to Terminate as Exhibit 4, at NNI-LTD-00001029.

66.    Additionally, this language, at the very least, conflicts with the description of the benefits and the commitment in these documents as to when benefits begin and end.

67.    Under ERISA and its applicable regulations, SPDs are required to inform participants of both their rights under an ERISA plan and the circumstances which may result in the denial or loss of benefits. The Debtors must point to an SPD to support its position that it can terminate benefits as to the LTD Participants at any time. Significantly, the Debtors failed to do so. The Debtors merely rely upon a generalized, nonspecific statement relating to the "Future of the Plan," not addressing the treatment of incurred losses, a statement that directly conflicts with their commitment to provide benefits to age 65, benefits which a disabled person could not possibly replace simply by purchasing disability insurance. The Debtors appear to suggest that the parties inhabit a universe in which a consumer can easily buy coverage for risks that have already occurred. Would any insurer sell coverage for a building that had already burned down?

68.    Additionally, to the extent the Debtors may argue that they have amended the terms of any plan to reduce or eliminate benefits at some point over the years, it must have done so according to the procedure provided in the plan document for any such amendment. Under ERISA "[o]nly a formal written amendment, executed in accordance with the Plan's own procedure for amendment, could change the Plan." *Confer v. Custom Engineering Co.*, 952 F.2d 41, 43 (3d Cir. 1991). "Thus, an amendment is ineffective if it is inconsistent with the governing instruments." *Depenbrock v. CIGNA Corp.*, 389 F.3d 78, 82 (3d Cir.2004). *See also, Baker v. Pennsylvania Economy League, Inc. Retirement Income Plan*, 811 F.Supp.2d 1136, 1142 (E.D. Pa. 2011). There are no plan documents containing an adequately detailed provision, as required by ERISA, stating the procedure by which a plan can be amended or terminated and who has the

authority to do so and certainly no unambiguous disclosure that Nortel could extinguish LTD benefits on a whim, so that it could refuse to cover claims in pay status.

> **(iv)** **The Existing Case Law Supports the Argument that LTD Benefits May Not Be Terminated for Those Already Disabled and in Pay Status**

69.    The case law cited by the Debtors fails to address the issue of the retroactive termination of <u>benefits</u> under a plan versus the prospective termination of <u>coverage</u> under a plan by virtue of its discontinuance. The "Change or Discontinuance of Plan" provision of the 1989 Group Benefits Plan and the "reservation of rights" clauses in the SPDs cited by the Debtors, to the extent they are at all relevant, <u>do not</u> contain language to support the Debtors' argument that <u>benefits</u> for those already disabled and in pay status end on plan termination. In fact, the "Extension of Benefits" section specifically states that those who are disabled at the time coverage ceases due to discontinuance <u>will continue to receive benefits</u>.

70.    The Debtors' reliance on the "Change or Discontinuance of Plan" provision is designed to relieve the plan of any obligation to pay LTD benefits that arises from a disability that occurs **after** termination of the plan.  This section does not control the continuation of benefits for those who are already disabled and in pay status prior to and at the time of plan termination. *See, e.g., Govindarajan v. FMC Corp.*, C.A. No. 86 C 5448, 1988 WL 118876 (N.D. Ill. Nov. 1, 1988).

71.    The Debtors cannot unilaterally terminate benefits after the date of disability without expressly stating so in the plan document. *See Feifer v. Prudential Ins. Co. of America,* 306 F.3d 1202 (2d Cir. 2002), *Gibbs v. Cigna Corp.,* 440 F.3d 571 (2d Cir. 2006).  If the Debtors' argument that they can do so without explicitly disclosing such an intention to plan participants is accepted by this Court, the Court will have ruled that the promise by an employer

to its employees that benefits will be provided in the event of disability to age 65, as long as the individual remains disabled, is a meaningless and illusory promise that can be voided by the employer in a post-hoc fashion at any time and for any reason without having to clearly inform employees of the possibility. The Court will have allowed this without **any language** in the plan documents providing for such a post-hoc withdrawal of benefits after disability is incurred, a result that is in direct violation of ERISA.

72.    The Debtors either purposely ignore or entirely miss this issue and instead cite cases for the general proposition that employee welfare benefit plans do not "vest." These cases do not address the issue of whether the Debtors' reservation of rights to amend or terminate the plan in the 1989 Group Benefits Plan can be applied retroactively to those already disabled and in pay status, and are distinguishable. For example, in support of the proposition that welfare benefits do not vest as a matter of law under ERISA, the Debtors cite *In re Lucent Death Benefits ERISA Litigation*, 541 F.3d 250 (3d Cir. 2008) and *DiFelice v. Aetna*, 346 F.3d 442 (3d Cir. 2003). The LTD Committee does not contest the general legal principle that welfare benefits – as distinguished from pension benefits – do not automatically vest under ERISA. The issue in the case of a welfare benefit is what does the contract say and whether the plan clearly and unambiguously disclosed the possible dire consequences relating to loss of benefits. The Court cannot resolve the issue merely by looking at one clause in the 1989 Group Benefits Plan, particularly one in which the Debtors do not assert their rights to terminate benefits for those already disabled and in pay status under the terms of the 1989 Group Benefits Plan that specifically provides for an "Extension of Benefits" for those already disabled at the time coverage ends, either by plan termination or termination of employment. These cases do not

address this legal issue and, to the extent they are applicable at all, do not support the Debtors'

argument.[17]

73.      There is no legal authority for the proposition that the Debtors could <u>retroactively</u>

amend disability benefits by terminating benefits for those who have already become disabled

and are receiving benefits under the terms of the LTD Plans.  While the language of the 1989

Group Benefits Plan allows the Debtors to amend the plan, any such amendment could only be

applied *prospectively*.  *See Confer v. Custom Engineering Co.*, 952 F.2d at 43; *Depenbrock v.*

*Cigna Corp.*, 389 F.3d 78.

74.      Moreover, the Debtors' reference to amendments to the LTD Plans in the past -

although no documents were produced to evidence any such amendments - demonstrate that the

Debtors have only applied previous plan amendments prospectively as, for example, in the

elimination of a cost-of-living adjustment ("<u>COLA</u>") increase effective in 2000 for those who

---

[17] Neither *Lucent* nor *DiFelice* address this issue. In fact, *Lucent* supports an inference that benefits would "vest" at the time of the insurable event. In *Lucent*, the plaintiff pensioners brought an action against Lucent for its termination of the pensioners' death benefit. Under the Lucent pension plan, a death benefit was provided to those who were receiving a pension at the time of death. Lucent, having reserved the right to amend or terminate the plan, amended the plan to eliminate the death benefit. The Third Circuit found that the plan language did not vest the death benefit during the life of the pensioner; that is, the Third Circuit found that the death benefit vested upon the death of the pensioner. *Lucent*, 541 F.3d at 256-257.  Because the pensioners had not yet died, the death benefit had not vested. Significantly, the Third Circuit <u>did not hold</u> that the death benefit could never or would never vest – in fact, it found that vesting occurred at the time of death. *Id.*  Applying this reasoning, if death triggered the vesting of the death benefit, then disability triggered the vesting of the disability benefits. To the extent *Lucent* is even relevant to the issue of the vesting of LTD benefits, it suggests that benefits in fact vest upon the event's happening. The *DiFelice* case has nothing to do with vesting and specifically the issue of vested LTD benefits at the time of disability. In *DiFelice*, the issue before the court was whether a medical malpractice claim is preempted by ERISA. *DiFelice*, 346 F.3d at 444. Judge Becker's concurrence, cited by the Debtors, simply discussed the differences in the vesting requirements of ERISA to pension plans versus welfare benefit plans in the context of examining ERISA preemption. None of this has anything to do with whether the Debtors can terminate the benefits of the LTD Participants who are already disabled and in pay status.

became disabled after January 1, 2000.[18] Similarly, the Debtors amended and also prospectively applied changes to the percentage of the core income replacement benefit which over the years ranged from 50% to 70% depending upon the plan year. Thus, the Debtors' own conduct demonstrates that its previous plan amendments only had prospective affect.

### (v)    Alternatively, the Debtors' Argument Creates an Ambiguity in the Documents That Cannot Be Resolved By the Relief Sought by the Debtors and this Court May Look to Extrinsic Evidence to Resolve the Issue

75.    Even if this Court accepted the Debtors' argument that the 1989 Group Benefits Plan "reserve[d] the Debtors' right to amend or terminate the LTD Plans," (*see* Motion to Terminate at ¶14), the Debtors have only succeeded in creating an ambiguity in the 1989 Group Benefits Plan. The Debtors' reliance on the "Change or Discontinuance of Plan" provision as authority for extinguishing benefits under the LTD Plans, in the face of the specific "Extension of Benefits" provision as set forth above, creates, at the very least, an ambiguity. This Court may look to extrinsic evidence to resolve this ambiguity. *See Senior Exec. Benefit Plan Participants v. New Valley Corp. (In re New Valley Corp.)*, 89 F.3d 143, 150 (3d Cir. 1996); *see also Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 76 (3d Cir. 2011).[19]

---

[18]   Prior to 2000, the LTD benefits were credited with a COLA. In 2000, the SPD states that COLA will be eliminated for all those people who became disabled after January 1, 2000 and made that change to the plan effective as of 1/1/2000 — thus changing prospectively the terms of the plan. *See* Exhibit "I," 2000 SPD at NNI-LTD-00000103-104.

[19]   "A term is ambiguous if it is subject to reasonable alternative interpretations." *Taylor v. Continental Group Change in Control Severance Pay Plan*, 933 F.2d 1227, 1232 (3d Cir. 1991). A finding of ambiguity in an ERISA plan permits a court to "ascertain the meaning" of the plan by "examining many factors, which may include considering how the plan was understood by its beneficiaries." *Id.* In *Taylor*, the Third Circuit found a term in a severance plan to be ambiguous. The court found that the ERISA plan at issue was essentially a unilateral contract because it was not "the product of explicit bargaining between [employer] and its employees." *Id.* Accordingly, the court found that the "reasonable understanding of the beneficiaries, as well as the intent of the employer, may be admissible to clarify ambiguities" and directed the district court, on

76.     Moreover, the Third Circuit has specifically rejected the Debtors' position. The court held that the so-called "reservation of rights" relied upon by Debtors – which states "the Company reserves the right to change or end the plan described in this summary at any time" – (*see* Motion to Terminate at ¶¶14, 35) – is ambiguous. *See In re New Valley*, 89 F.3d at 151. In *In re New Valley*, the Third Circuit found that while the plan documents contained language that "could be interpreted as reserving a right" for the company to terminate a deferred compensation plan even after retirement by using the words terminated "at any time," the phrase was nevertheless ambiguous.

77.     In rejecting the Company's argument that it "reserved its rights" to terminate the plan in question "at any time," the Third Circuit provided the following example:

> A common example shows that the meaning of "at any time" depends on the context. Suppose an employer and employee enter into a contract stating that employee will work forty hours per week for $500, payable at the end of the week. The contract further states that employment is at will and employer can change employee's wages "at any time." After working a week, employee goes to pick up her pay check. Employer informs employee that it has exercised its right to change her wages "at any time," and will be paying her $300 for that week's work. Despite the seemingly unambiguous "at any time" language, it seems reasonable that an employee would not expect the reduction in salary to take place post-performance. Although this is not our situation, it makes clear that the words "at any time" may admit of more than one reasonable interpretation.

*In re New Valley* at 151 (emphasis added).

78.     Continuing, the Third Circuit, in an example similar to the situation here, stated:

> The appropriate question, then, is whether "at any time" is unambiguous in this context. The benefits at issue in this case, like the wages in our hypothetical case, are payable entirely after performance. As in the wage scenario, agreeing to allow New Valley to terminate the benefits even after retirement would make this "contract" largely illusory. Although parties are free to

remand, to "consider interpretive statements made by [employer], past practices, customary usage in the trade, and other competent evidence bearing on the understanding of the parties." *Id.* at 1232-33.

enter into illusory agreements, the unlikelihood that they will do so when significant benefits are at stake may render a term ambiguous. In this context, the unlikelihood that the Appellants agreed to allow New Valley to terminate their retirement benefits at its whim, coupled with Appellants' reasonable alternative interpretation of "at any time" (until performance), supports the argument that the term is ambiguous. If New Valley desired to clearly indicate its ability to terminate benefits even after performance, in the face of likely expectations to the contrary, it could have simply added the words "including after retirement" to the plan.

*Id.*

79.    Similarly here, the use of the phrase "the Company reserves the right to change or end the plan described in this summary at any time" is ambiguous. The Debtors would have this Court believe that when their employees elected LTD benefits as part of their compensation package – after receipt of information provided by the Debtors both orally and in writing assuring employees that LTD benefits would continue to age 65 as long as they remained disabled - the LTD employees willingly entered into what the Third Circuit has called an "illusory contract" that would allow the Debtors, at their whim, to simply terminate benefits even after an employee became disabled. This is nonsensical and cannot be considered unambiguous.

80.    The Debtors' own policies demonstrate that benefits continued for those who were already disabled and in pay status for as long as the individual remained disabled to age 65 and this was not qualified with a statement that benefits could be terminated "at any time" as Debtors argue. From 1997 through 2006, the Debtors provided employees with medical leaves of absence policies made applicable to the LTD benefits.[20]   For example, the Debtors' "U.S. Leaves of Absence Medical Leave of Absence Process" states, as to the "Duration of Benefits"

---

[20]   The Debtors' medical leave policies are collected at Exhibit "H," including "U.S. Leaves of Absence – Medical Leave of Absence Process" issued January 1, 1997 and modified January 12, 2006; "U.S. Leaves – Clarification of Short Term Disability (STD) and Long Term Disability (LTD) Process" issued April 12, 1999 and modified December 7, 2000; and "U.S. Leaves of Absence – Medical Leave of Absence Process" issued January 1, 1997 and modified June 10, 2002.

for LTD: "LTD benefits are payable as long as clinical evidence supports total disability up to age 65 . . . ." *See* Exhibit "H" at LTD-002912-2930. This document does not condition the duration of the LTD benefit on any factors other than clinical evidence supporting disability and age. There is no limitation on the continuance of benefits. There is no mention that benefits cease when the plan is terminated or for any other reason. The affirmative statement is that benefits continue as long as the individual remains totally disabled, up to age 65, as long as the clinical evidence supports the total disability.

81.     Documents provided to employees regarding LTD benefits, including FLEX Benefit programs, Personal Reports of Benefits, and Enrollment Workbooks all communicated statements such as, with respect to LTD income continuation, "You're covered to the end of your approved disability or age 65." Documents provided by the Debtors to their employees assuring the continuation of benefits while disabled until age 65 are collected in summary form and attached as Exhibit "J."

82.     Additionally, numerous LTD Participants were provided letters from Prudential Insurance Company, the claims administrator for the LTD disability benefit and Nortel's delegated authority to interpret and construe the LTD Plans, confirming and verifying income to banks and lenders that individuals would continue to receive LTD benefits for the length of disability until age 65. These letters confirming LTD benefits are collected and attached hereto as Exhibit "K."

83.     Finally, LTD Participants were advised by personnel in the Debtors' Human Resources departments, prior to becoming disabled, both individually and in group "town hall" benefits meetings, that LTD benefits would continue to age 65 if the employees became permanently disabled with no limiting or qualifying language.

84.    Curiously, the Debtors argue, in paragraph 37 of their Motion to Terminate, that the LTD Committee cannot rely on documents provided to employees which, admittedly, "were not clearly limited by an explicit right to modify or terminate" because "such documents cannot modify the LTD Plans." However, the documents provided to employees are not "modifications," but <u>interpretations</u> of the plan contents and benefits by the Debtors' delegated agent. To the contrary, the Debtors are the only party trying to modify the plans by virtue of a limited  selective reading of the terms by relying on SPDs from 2004, 2006 and 2010 to modify terms of the 1989 Group Benefit Plan – the only governing plan document of record – by reading out the "Extension of Benefits" provision.[21]

85.    The communications to participants setting forth the interpretation and/or construction of the plan can be considered by Courts in determining whether an ambiguity in documents creates rights to benefits in welfare plans specifically for those already disabled. *See Jensen v. SIPCO, Inc.*, 38 F.3d 945 (8th Cir. 1994), *Barker v. Ceridian Corp.*, 122 F.3d 628 (8th Cir. 1997) (*Barker I*), *Barker v. Ceridian Corp.*, 193 F.3d 976 (8th Cir. 1999) (*Barker II*), and *Halbach v. Great-West Life & Annuity Ins. Co.*, 561 F.3d 872 (8th Cir. 2009). In *Halbach*, the

---

[21]  The cases cited by the Debtors in paragraph 37 of their Motion to Terminate do not support their argument. The Debtors cite *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155 (3d Cir. 1990), *Confer v. Custom Engineering Co.*, 952 F.3d 41 (3d Cir. 1991) and *Depenbrock v. Cigna Corp.*, 389 F.3d 78 (3d Cir. 2004) for the proposition that the "plain language" of the LTD Plans cannot be informally modified. The LTD Committee is not seeking to apply or enforce an "informally modified" plan.  To the contrary, the LTD Committee's position is that the 1989 Group Benefits Plan – which specifically extends benefits to those who are already disabled at the time coverage terminates, including plan termination and employment termination – has <u>never</u> been amended and <u>cannot</u>, as a matter of law, be amended by SPDs.  The written and oral publications made by the Debtors constitute extrinsic evidence to resolve any ambiguity in the 1989 Group Benefits Plan in the event the Court finds an ambiguity in that plan document. Furthermore, the Debtors' delegated agent construed and interpreted the LTD Plan in a manner consistent with the LTD Participants' position - changes to the plan were not retroactively enforced and benefits are governed by the terms of the plan in effect on the date of disability. *See* paragraph 24, *supra*.

court found plan language ambiguous where a reservation of rights clause, along with the durational language in an SPD, when construed together was, "at best" ambiguous. The court considered extrinsic evidence to determine the employer's intent. *Id.* at 880.

86.     Accordingly, this Court must find that the so-called "reservation of rights" in the 1989 Group Benefits Plan and SPDs cited by the Debtors, when read with the "Extension of Benefits" provision, creates an ambiguity requiring this Court to consider extrinsic evidence to resolve the issue.

### (vi)     The Continuation of LTD Benefits is Not Conditioned on Employment

87.     The Motion to Terminate additionally seeks to terminate the employment of the LTD Participants because they are "at will" employees. *See* Motion to Terminate at ¶¶43-45.  In an effort to mislead this Court, the Debtors state that "many of the LTD Plans further provide that the income continuation benefits end when a person's employment is terminated or the part of the plan providing coverage ends." *See* Motion to Terminate, ¶¶12, 41.

88.     There is <u>no</u> governing plan document that conditions the receipt of LTD income continuation benefits and medical benefits on employment.  In fact, and as fully set forth above, the 1987 and 1989 Group Benefit Plans specifically state otherwise and <u>extend</u> benefits to those with "a disability in progress" when either employment ends or the plan terminates. The 1987 and 1989 Group Benefits Plan documents – the only governing plan documents produced to date – provide that benefits continue while an individual is disabled to age 65, even if employment is terminated and even if the plan terminates. *See* ¶¶ 46-58, *supra.*

89.     Further, <u>no</u> SPD prior to 2002 mentions the receipt of LTD <u>benefits</u> – as opposed to coverage – in conjunction with continued employment status.  The Debtors ignore that over half of those in the LTD group became disabled <u>prior</u> to 2002.  The SPDs prior to 2002 clearly

state that "benefits end when your period of total disability ends, which happens when the first of the following occurs: 1. You stop being Totally Disabled or die; 2. You are able to return to work at any reasonable occupation (other than an approved rehabilitation program) after the first 24 months of LTD; 3. You are no longer under the care of a Physician; 4. You fail to furnish the latest required proof of the continuance of Total Disability or refuse to be examined by a Physician designated by the plan; 5. You reach [age 65]." *See, e.g.* Exhibit "I," 2000 SPD for LTD at NNI-LTD-00000098.

90.     For the LTD Participants who became disabled after 2002, the SPDs condition receipt of benefits on "employment with the Company." The Debtors are attempting to use an SPD to impose a condition on receipt of LTD benefits for those already disabled and in pay status when the SPDs from 2002 and later are not, as a matter of law, governing plan documents and where there is no evidence to demonstrate how and when any such condition – which clearly did not exist prior to 2002 and constitutes an amendment of the material terms of the 1987 and 1989 Group Benefit Plans – was legitimately and properly amended, imposing a new requirement on the terms of the 1987 and 1989 Group Benefits Plans.

91.     Again, the Debtors failed to produce any documents evidencing any change, modification or amendment to the material terms of the 1987 and 1989 Group Benefits Plans to eliminate the "Extension of Benefits" provisions – which expressly provide the continuation of benefits to those who are already disabled even if they are terminated form employment or if the plan is terminated. Any failure by the Debtors to properly amend or change the LTD Plan in 2002 or subsequent years gives rise to equitable relief under *Cigna v. Amara*, 131 S.Ct. at 1875, 1880, which includes reformation of the SPDs containing this amendment to the continued receipt of benefits even if the SPDs controlled here, which they do not.

92.     Moreover, to the extent the Debtors seek the termination of the employment of the LTD Participants now and through the Motion to Terminate, such an effort is designed solely to interfere with these LTD Participants' ERISA rights.  This constitutes a violation of section 510 of ERISA, 29 U.S.C. §1140. *See Lessard v. Applied Risk Management,* 307 F.3d 1020 (9th Cir. 2002).

93.     It is a violation of ERISA's retaliation and discrimination section to terminate an individual to interfere with the attainment of an ERISA right.  Section 510 provides: "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . ."

94.     Even if the SPDs beginning in 2002 governed the terms of the benefits for those who became disabled in 2002 and later, which they do not, the Debtors' attempt to terminate all the LTD Participants' employment in their Motion to Terminate is clearly an attempt to discriminate against the LTD Participants for exercising rights to which they are entitled under ERISA.  The Debtors' Motion to Terminate admits that this is why they are seeking to terminate the employment of the LTD Participants.

**B.      The Debtors Lack Standing to Terminate the LTD Plans**

95.     The Debtors relied, in their June 2010 Motion to Terminate, and rely in their instant Motion to Terminate, on various provisions of a governing plan or SPDs, and in particular language that they contend permits them to terminate the plans.  *See* Motion to Terminate at ¶¶12-14, 29, 41, 43-45.

96.     The Debtors suggest that the language setting forth the reservation relating to the obligation to continue providing benefits prospectively necessarily permits them to extinguish any obligations under the LTD Plans to the LTD Participants regardless of the contents of the plan, the procedures for qualifying for benefits or plain language specific to the continuation of benefits.  Additionally, the Debtors propose to erase, by virtue of a court Order granting their Motion to Terminate, any and all rights of LTD Participants, which would effectively disallow and expunge any claims of the LTD Participants arising under or related to the LTD Plans.

97.     The Debtors do not point to a single provision in any LTD Plan that in any manner gives retroactive effect to post-hoc changes to plans that would affect benefits that are already in pay status or to claims that have been approved for losses previously incurred.

98.     Moreover, the Debtors' position seeks to perpetrate a fraud upon the Court because the Debtors do not even have the authority to undertake any action to affect the status of benefits under the LTD Plans.  The Debtors' own documents, specifically the 2006 and 2010 SPD make clear that the Debtors delegated such authority to its Claims Administrator and cannot undertake the extinguishment of rights under the LTD Plans.

99.     Specifically, both the 2006 and 2010 SPDs contain the following language:

> In connection with the appointment of Prudential as the Claims Administrator of the Long-Term Disability Plan and the Short-Term Disability Plan (the "Disability Plans"), the Plan Administrator [i.e. Nortel] delegated the <u>exclusive authority to interpret and administer the provisions of the Disability Plans, including discretionary authority to</u>:
>
> -     <u>construe and interpret the terms of the Disability Plans;</u>
> -     determine the validity of charges submitted under the Disability Plans; and
> -     <u>make final, binding determinations concerning the availability of benefits under the Disability Plans.</u>

*See* 2006 SPD at p. 6, attached as Exhibit 1 to Debtors' Motion to Terminate; 2010 SPD at p. 5, attached as Exhibit 2 to Motion to Terminate. (emphasis added).

100.   Under this delegation, which currently encompasses the authorities at issue here, the Debtors have relinquished any authority to exercise power over any determination concerning the meaning of the LTD Plans and the construction of the rights thereunder.  The delegation makes clear that the Claims Administrator has assumed the Debtors' fiduciary plan administration responsibilities relating to interpreting and administering the plans.

101.   Prudential is the sole fiduciary who can dispose of questions involving construction or interpretation of the LTD Plans.  Prudential is not a party to this action and has not moved, and is not advancing, the Debtors' interpretation or joining in the Motion to Terminate.  The Debtors have no standing under their plan documents to terminate rights requiring construction of the plan.  The Debtors, therefore, have mislead the Court by suggesting that the matter at issue arises from a single clause of the LTD Plans and that the consequences suggested "automatically" follow from that, when there are numerous plans and numerous provisions that both extend rights upon termination and reserve administration of benefits in pay status to parties other than the Debtors. Moreover, those other parties, in this case Prudential, have the authority to make the determination at issue and that party's determination is binding under the plan documents.

102.   The Debtors contend that their Motion to Terminate is appropriate at this time because "the Debtors will need to allow for time to notify the LTD Employees of the discontinuation of the LTD Plans, to work with the various vendors to terminate the LTD Plans and resolve any remaining liabilities thereunder, and to process and pay for the remaining claims

submitted under the LTD Plans that were incurred but not reported prior to the termination of the LTD Plans." *See* Motion to Terminate at ¶18.

103.    This proposition discounts that Prudential would construe "remaining liabilities" or claims that "were incurred" to include the LTD benefits that were previously approved and continuously paid despite subsequent amendments, a proposition that is inconsistent with the claims procedures in the LTD Plans, the LTD Plans' "Extension of Benefits" provision, and with the fact that not a single plan or SPD states that LTD benefits automatically terminate with plan termination.    Further, nothing in the LTD Plans makes changes to the plans retroactive, as discussed herein.    Presumably, the Debtors propose to enlist the Court in their efforts to highjack the LTD benefits.

104.    The Motion to Terminate calls into question the interpretation of the terms of the LTD Plans and requires a determination as to the terms of the plans in order to enforce them. The Debtors gave up the authority to direct the circumstances under and the procedures by which the plan is interpreted to extinguish the contractual rights of the Plan Participants arising prior to the termination.    The Debtors' reservation of the right to amend does not encompass this authority.

105.    The SPDs, the Debtors' communications with LTD Participants and the Debtors' actions in effectuating purported "amendments" establish that such changes were never retroactive and did not alter the liability fixed under previous LTD Plans.    For example, the relied upon reservations in the 2006 and 2010 SPDs allow the Nortel Company to "change or end the plans described in this summary at any time." (emphasis added).    The language does not say "your LTD benefits will terminate when the plan terminates," or that "changes to the plans will be retroactive."    Additionally, these plan descriptions do not state, as to "When Benefits Begin

and End," that benefits are extinguished by discontinuance of the LTD Plan. Similarly, the "Extension of Benefits" provision in the 1989 Group Benefits Plan does not equate **plan** termination with **benefit** discontinuance "if a period of total disability is in progress when your coverage terminates." *See* ¶¶46-58, *supra.*

106. The Debtors' practice of only enforcing benefit changes prospectively (*see* ¶¶ 62-63, 73-74, *supra*) demonstrates the limited scope of their claimed reservations of rights.

107. Over the years, the Debtors or its agents have regularly informed LTD Participants that their rights to benefits arise from the plan in place at the time they become disabled and not based upon any subsequent amendments or replacement plans, and that changes to the plans, consistent with the change to COLA, are not retroactive.

108. The Debtor's Motion to Terminate encompasses more than thirty years of plans and apparent amendments with no evidence of any communications explaining changes to plan participants or warning plan participants that they could lose their benefits on the whim of the Debtors. Furthermore, it is unclear which language covers the LTD Participants since their rights are determined by the plan in effect at the time of the triggering event—*i.e.*, their date of disability. *Gibbs v. Cigna Corp.*, 440 F.3d at 577.

109. The Debtors' Motion to Terminate seeks equitable relief from the Debtors' obligations pursuant to or in accordance with an ERISA plan, which can only be pursued in accordance with the enforcement provisions of ERISA. The only persons permitted to obtain enforcement of the terms of an ERISA plan are plan participants, beneficiaries and fiduciaries. 29 U.S.C. §1132(a)(3). The Debtors delegated the fiduciary authority to administer the LTD Plans as far as construing and interpreting the plan documents and making benefit determinations to Prudential.

110.    Moreover, a party may only be deemed to act in a fiduciary capacity with respect to an ERISA plan if it "discharges [its] duties with respect to a plan solely in the interest of the participants and beneficiaries and - -    (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan. 29 U.S.C. §1104(a)(1).

111.    Admittedly, the Debtors are not seeking relief in this capacity, but confirm that relief would be based upon a determination that "[t]he Debtors have demonstrated compelling and sound business justifications for termination of the LTD Plans, including the Benefits provided thereunder" (*see* Debtor's proposed Order attached to Motion to Terminate, ¶F), and that the Debtors are acting in the "best interests" of themselves and their "estates and creditors." *See* Debtors' proposed Order attached to Motion to Terminate, p. 2, ¶H).

112.    Accordingly, the Debtors do not have standing in such capacity to seek a ruling to enforce the terms of the LTD Plans.

## C.    The Debtors Have Breached their Fiduciary Duties to LTD Participants

113.    Debtor Nortel Networks, Inc. is the Plan Administrator, and is a fiduciary under the LTD Plans. *See* Exhibit "F," 1989 Group Benefits Plan at NNI-LTD-00003959-3960.  Under section 404 of ERISA, 29 U.S.C. §1104, a "fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."  The duties of a fiduciary are those of the "prudent man standard" and are to be exercised "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.*

### (i)    The Debtors' Attempt to Terminate Benefits for Those Already in Pay Status is a Breach of Fiduciary Duty

114.    The Debtors' attempt to alter the terms of the plans by terminating benefits to those who are already disabled and in pay status, by relying on a so-called "reservation of rights" that do not authorize such a termination of benefits and is contrary to the express "Extension of Benefits" provision in the 1989 Group Benefits Plan, constitutes a breach of their fiduciary duty.

115.    While the Debtors may act in their capacity as plan sponsor to terminate the LTD Plans prospectively and for those who are not already disabled, it is a breach of the Debtors' fiduciary duty as plan administrator – who must act for the exclusive purpose of providing benefits - to attempt to extinguish benefits for the LTD Participants who are already disabled and in pay status under the terms of the 1989 Group Benefit Plan. *See* § 404(a) of ERISA, 29 U.S.C. § 11044(a).

116.    Additionally, the Debtors abdicated their role as plan administrator and delegated the duty to interpret and administer the LTD Plans to Prudential. Significantly, Prudential has never interpreted the operative plan in the way the Debtors are attempting to do here. In fact, Prudential issued confirming and verifying income to banks and lenders that individuals would continue to receive LTD benefits for the length of disability until age 65 without any qualification that those benefits would cease at the time the plan terminated or if employment was terminated. *See* ¶82 *supra*, and Exhibit "K."

      (ii)     **The Debtors' Misrepresentations Regarding the LTD Plans
Constitute a Breach of Fiduciary Duty**

117.    As more fully set forth in paragraph 81, *supra*, and Exhibit "J," documents

provided by the Debtors to their employees and statements made by the Debtors acting through

their human resource representatives affirmatively represented that LTD benefits would continue

to age 65 once an employee became disabled, with no limiting or qualifying language. The

Debtors' oral and written representations did not advise its employees, when considering benefits

decisions prior to becoming disabled, that the Debtors "reserved" a "unilateral right to modify or

terminate the LTD Plans at any time in the Debtors' sole discretion." *See* Motion to Terminate at

¶35.

118.    The Debtors, as plan administrator, had a fiduciary duty owed to employee plan

participants to communicate truthfully. "An ERISA 'fiduciary may not, in the performance of

[its] duties, 'materially mislead those to whom the duties of loyalty and prudence are owed.' This

responsibility encompasses 'not only a negative duty not to misinform, but also an affirmative

duty to inform when the trustee knows that silence might be harmful.'" (citations omitted). *In re*

*Unisys*, 579 F.3d 220 (3d Cir. 2009) (*Unisys IV*).[22]

119.    Moreover, the Third Circuit in *Unisys IV* additionally stated: "In short, 'when a

fiduciary speaks, it must speak truthfully, and when it communicates with plan participants and

beneficiaries it must convey complete and accurate information that is material to their

circumstance.'" *Unisys IV* at 228 (citation omitted).

---

[22] The Debtors are fond of citing *Unisys I*, 58 F.3d 896 (3d Cir. 1995) for the general proposition
regarding the vesting of welfare benefit plans. However, the general proposition of *Unisys I* is
inapplicable here and does not address the question of whether the Debtors may terminate
benefits for those who are disabled and in pay status. In fact, in *Unisys IV*, the Third Circuit held
that the plaintiff retirees established that Unisys breached its fiduciary duty to them by
misrepresenting the nature and duration of retiree medical benefits and it ordered appropriate
equitable relief to remedy Unisys' violation of ERISA. *Unisys IV*, 579 F.3d at 231-232.

120.    The Third Circuit rejected Unisys' argument that it satisfied its obligations under ERISA by disclosing its right to amend or terminate the retiree medical plan in SPDs and found that Unisys' "failure to disclose" to its employees Unisys' "ability to modify or wholly eliminate the plaintiffs' medical benefits at any point in the future, despite its unambiguous reservation of rights clause contained in the summary plan description, resulted in an inadequate disclosure of information" and  "Unisys arguments that it disclosed its reservation of rights in the summary plan descriptions and other documentation is unavailing because Unisys did not present this information when it was counseling its employees on their retirement decisions." *Unisys IV* at 231-232 (emphasis added).

121.    The Third Circuit affirmed the district court's award of equitable relief, in the form of an injunction against Unisys by reinstating the "old" retiree medical plan for the plaintiffs and enjoining Unisys from making and changes to the plan. *Id.* at 236.

122.    Here, the Debtors attempt to use clauses in SPDs as a "unilateral right" to modify or terminate LTD benefits while at the same time they misinformed the LTD Employees concerning the nature of the LTD benefits constitutes a breach of fiduciary duty for which this court may award a remedy under *Unisys IV* and the Supreme Court's decision in *Cigna v. Amara*, 131 S.Ct. at 1876–80, including reforming the LTD Plans to provide the LTD employees with the benefits that they reasonably expected to receive.

### (iii)  The Debtors' Breach of Fiduciary Duty Regarding Funding

123.    The Debtors' conduct in the funding of the self-insured program of insurance as well as their conduct in seeking to extinguish the LTD Participants' benefits and employment is designed solely for the stated purpose of interfering with the LTD Participants' receipt and exercise of ERISA benefits and right and constitutes a breach of fiduciary duties.

124.    Under section 404 of ERISA, "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and-- (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries" and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. §1104(a)(1)(A), (B).

125.    The Debtors also breached their fiduciary duty to properly reserve funds for individuals once they became disabled. Although ERISA exempts welfare benefit plans from ERISA's funding requirements, it does require that there be a plan for funding. section 402 of ERISA mandates that every employee benefit plan shall "provide a procedure for establishing and carrying out a funding policy and method consistent with the objectives of the plan and the requirements of this title." 29 U.S.C. §1102(b)(1).

126.    As the plan language set forth above demonstrates, the objective of the Debtors' self-insured LTD benefit plans was to function as the equivalent of a disability insurance policy and to provide continuing coverage and an income stream once an employee became disabled until the disability ended, regardless of whether the plan terminated. The Debtors acknowledged the binding nature of their funding obligations when, year after year on the financial statements for the plan, Nortel reported both the amount spent on current benefits for LTD Employees and the amount, enumerated as "other obligations for current benefit coverage" at present value, the estimated millions in incurred disability benefits. These are not reported as "contingencies," but "current obligations." Accordingly, Nortel was required to have a plan for funding these obligations and to fulfill section 402, and its fiduciary duties required it to provide a policy and a method to ensure these obligations would be met.

127.    The record in this matter clearly reflects that the Debtors failed to meet the requirements of ERISA to have a funding policy and method that would fulfill its obligations to LTD Participants, obligations which it duly reported and acknowledged every year in the financial statements for the LTD Plans.  In fact, the Debtors would appear to have recklessly had no funding policy or method. In 2009, Nortel's self-described "manager" for the short-term and long-term disability plan, Nancy Gell, swore under oath that "funding for the VEBA is made on an *ad hoc* contribution basis by Nortel, and such contributions by Nortel are made on what is predicted as needed for current claims."[23]  This statement and the financials certainly confirm that Nortel had incurred liabilities for disability claims that were fixed, owing and in process, but made no effort to adequately fund the VEBA to pay acknowledged liabilities other than on a year-to-year basis.

128.    An employer can be sued under ERISA where it maintains authority or control over the management of a plan's assets, management of the plan in general or administration of the plan. *Curcio v. John Hancock Mutual Life Insurance*, 33 F.3d 226, 233 (3d Cir. 1994). The suggestion that the Debtors had control over contributions and had only an "*ad hoc*" funding policy demonstrates that the Debtors had the type of control that imposed a continuing fiduciary obligation. Moreover, ERISA section 402 establishes that employers in such a position have an obligation to attempt to maintain sufficient funds with which to properly administer the plan. *See Local Union 2134 United Mine Workers of Am v. Powhatan Fuel, Inc.*, 828 F.2d 710, 713 (11th Cir. 1987); *GIW Industries, Inc. v. Trevor, Steward, Burton & Jacobsen, Inc.*, 895 F.2d 729, 730 (11th Cir. 1990). At a minimum, the Debtors acknowledged an obligation that involves no

---

[23] Declaration of Nancy Gell in *Demel v. Group Benefits Plan for Employees of Northern Telecom, Inc.*, United States District Court for the Southern District of New York, No. 07-00189, dated June 12, 2009.

contingency and that could not be extinguished and, on the basis of the record, has not been extinguished. ERISA required it to put measures in place to meet that obligation and their "*ad hoc*" approach does not allow the Debtors to simply claim that they never provided funding and should not have to do so now.

**D.    The Debtors have Conflicting Fiduciary Duties Under ERISA and the Bankruptcy Code**

129.    The Debtors' attempt to extinguish its liability to the LTD Participants pursuant to Bankruptcy Code section 363 and the business judgment rule is in direct conflict with the fiduciary duty owed by the Debtors to the LTD Participants imposed by section 1104 of ERISA, as already set forth herein.

130.    Pursuant to ERISA, the Debtors must discharge their duties with respect to the LTD Plans solely in the interest of the LTD Participants and their beneficiaries.  29 U.S.C. § 1104.  "ERISA is designed to protect employee pensions and benefit plans by, among other things, 'setting forth certain general fiduciary duties applicable to the management of both pension and nonpension benefit plans.'"  *In re Worldcom, Inc.*, 263 F. Supp. 2d 745, 756-57 (S.D.N.Y. 2003) (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996)).  Congress wanted to ensure that if an employee was promised a benefit, the employee would receive it.  *Worldcom*, 263 F. Supp. 2d at 757 (quoting *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996)).

131.    ERISA creates fiduciary responsibilities in two ways.  An entity or individual may be an ERISA fiduciary as either a "named fiduciary" or under ERISA's functional test.  29 U.S.C. § 1102(a)(2) and § 1102(21)(A).  Here, the Debtors as the plan administrator owe fiduciary duties to the LTD Participants and their beneficiaries.  As the plan administrator, the Debtors are "named fiduciaries" and their fiduciary duties under ERISA are implicated.

132.    The Debtors and their officers and directors are also fiduciaries to the LTD Participants and their beneficiaries under the functional test.    ERISA defines a fiduciary functionally, providing in relevant part: "[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A); *see also Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 63 (2d Cir. 2006); *In re Worldcom*, 262 F. Supp. 2d at 757 ("ERISA defines a fiduciary in <u>functional</u> terms of control and authority over the plan." (internal quotation marks omitted)).

133.    ERISA defines the standard to which fiduciaries of a plan are held as that of a "prudent man." *In re Worldcom*, 263 F. Supp. 2d at 758. Section 404 (a)(1) of ERISA provides:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and
>
> (a)    for the exclusive purpose of:
>
>> (i) providing benefits to participants and their beneficiaries; and
>>
>> (ii) defraying reasonable expenses of administering the plan;
>
> (b) with care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . .

29 U.S.C. § 1104(a)(1).

134.    Section 404(a)(1) of ERISA thus imposes three overlapping standards: to act "solely in the interests of the participants and beneficiaries," to act "for the exclusive purpose" of providing benefits to them, and to act with the care of a "prudent man*. " Sommers Drug Stores*

*Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc.*, 793 F.2d 1456, 1468 (5th Cir. 1986); *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982). These duties have been described as "the highest known to the law." *Kuper v. Iovenko*, 66 F.3d 1447, 1453 (6th Cir. 1995); *In re Worldcom*, 263 F. Supp. 2d at 758 (quoting *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001)). ERISA fiduciaries must manage the plan with "an eye single" to the interest of the plans participants and beneficiaries. *In re Worldcom*, 263 F. Supp. 2d at 758 (quoting *Donovan*, 680 F.2d at 271).

135.    ERISA section 502(a)(3) sets forth a remedy for breach of fiduciary obligations, providing that a participant or beneficiary may bring an action to "(A) enjoin any act or practice which violates any provision of this subchapter or terms of the plan, or (B), to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of this subchapter or the terms of a plan." 29 U.S.C. § 1132(a)(3); *see also Varity v. Howe*, 516 U.S. 489 (1996).

136.    The Debtors seek to terminate the LTD Plans and employment of the LTD Participants pursuant to section 363(b)(1) of the Bankruptcy Code. The Debtors assert that termination of the LTD Plans and LTD Participant employment should be authorized "because the Debtors have demonstrated a sound business justification for the proposed transaction." Motion to Terminate at ¶ 46.

137.    The LTD Committee does not dispute the general idea that most 363 motions are evaluated according to the business judgment standard. In order to enjoy the protections of the business judgment rule, the following elements must be present: (1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets." *In re Integrated Res., Inc.*,

147 B.R. 650, 656 (S.D.N.Y. 1992). The Court should also examine state law applicable to corporate governance decisions. *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046 (4th Cir. 1985).

138. Under Delaware law, a board of directors is responsible for management of the business and affairs of the corporation and, in doing so, the directors owe fiduciary duties of loyalty and care to the corporation and its shareholders. Good faith[24] is viewed as a key component of the duties of care and loyalty. *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *The Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 52-53 (Del. 2006).

139. The LTD Committee also recognizes the fiduciary duty imposed upon the Debtors by Bankruptcy Code section 363 in connection with their asserted exercise of the business judgment rule. It is exactly this fiduciary duty to the estate and its creditors which is inherently in conflict with its fiduciary duty imposed by ERISA to administer and interpret the LTD Plans in the sole interest of the LTD Participants.

140. To be clear, the Debtors' decision of *whether* to terminate the LTD Plans does not create the conflict, but rather it is the inherent conflict the Debtors in administering the LTD Plans for the sole benefit of the plan participants pursuant to ERISA while at the same time administering their bankruptcy Cases pursuant to the requirements of the Bankruptcy Code. ERISA requires a fiduciary to administer a plan based on the best interest of the plan

---

[24] All decisions made in accordance with the business judgment rule must be made in good faith. Indeed, before a court may approve a debtor's decision, the Court must find that the decision is not the product of bad faith or a gross abuse of discretion. *In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003) (citing *Enterra Corp. v. SGS Assocs.*, 600 F. Supp. 678, 684-85 (E.D. Pa. 1985)). Where a debtor's decision is made in bad faith, its decision is afforded no deference and is not protected by the business judgment rule. *In re Integrated Res., Inc.*, 147 B.R. at 656 (citing *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d at 1047).

participants. The Debtors' attempt to interpret and administer the LTD Plans in order to avoid pre-existing obligations under the plans is a clear violation of ERISA, as already set forth herein.

141.   By the Motion to Terminate, the Debtors seek to terminate the LTD Plans pursuant to section 363(b) of the Bankruptcy Code. However, the Debtors' obligations arising from an ERISA plan – not the Bankruptcy Code – sets forth their obligations to the LTD Participants and restricts their termination of plans. As explained above, the Debtors must discharge their duties with respect to the administration and interpretation of the LTD Plans for the exclusive benefit of the LTD Participants and their beneficiaries. 29 U.S.C. §1104 (a)(1)(A).

142.   Moreover, even if the Debtors could terminate the LTD Plans without regard to the contents of the plans pursuant to section 363(b) of the Bankruptcy Code, the Debtors have not satisfied their burden of proof.

143.   First, the Debtors' Motion to Terminate fails to demonstrate that the LTD Plans are "property of the estate" and that the termination of such plans is a proper "use" of such property.[25] Second, even if the Debtors are able to convince the Court that section 363(b) of the Bankruptcy Code is applicable to the extinguishment of the LTD Plans benefits (as opposed to coverage), the Debtors fail to meet the standard applicable to section 363.

144.   To discharge their duties of loyalty and care, director must, *inter alia*, act in good faith and in the best interests of the corporation and its shareholders, and inform themselves of all material information reasonably necessary and available before making a business decision. *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 179-80 (Del. 1986); *Smith*

---

[25] Section 363(b) of the Bankruptcy Code provides, in part, that "[t]he trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. . .". 11 U.S.C. § 363(b). The LTD Committee does not concede that the Debtors' pre-existing obligations to the LTD Participants can be deemed property of the estate pursuant to Bankruptcy Code section 541.

*v. Van Gorkom*, 488 A.2d 858, 872-73 (Del. 1985); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983). When a corporation is insolvent, fiduciary duties are owed to creditors as well. *Geyer v. Ingersoll Pub. Co.*, 621 A.2d 784, 789 (Del. Ch. 1992). In order to satisfy the business judgment standard, the Debtors must demonstrate that they have fulfilled these very basic duties. The Debtors have failed to do so in their Motion to Terminate.

145.    In support of the Motion to Terminate, the Debtors state only that "[a]fter careful deliberation, the Debtors have determined, in exercise of their reasonable business judgment, that at this time they must eliminate their current and future costs associated with non-essential wind-down personal, including providing Benefits under the LTD that the termination of the LTD Plans and the employment of the LTD employees is appropriate and in the best interests of the Debtors, their bankruptcy estates and their creditors." Motion to Terminate at ¶50. In support of this bare-bones statement, the Debtors offer no Declaration, make no proffer and cite no evidence in support of that conclusion. Accordingly, the Motion to Terminate is deficient on its face and does not support the Debtors' business judgment in terminating the LTD Plans.

146.    The Debtors' conclusory statements also lack evidentiary support. Even the relatively low standard of the business judgment rule requires that a debtor present something more that unsupported assertions. Rather, the business judgment rule requires that the Debtors demonstrate that the decision was made in good faith, with a valid business justification, and will benefit both the estate and its creditors. Termination cannot be authorized by this Court on the record before it.

147.    Additionally, the LTD Committee disputes that the business judgment standard is appropriate here because of the Debtors' conflicting fiduciary duties as explained above. This Court should apply a stricter standard than the Debtors' business judgment. *See Bildisco &*

*Bildisco*, 465 U.S. 513, 525-26 (1984) (applying a standard stricter than the business judgment rule in the rejection of a collective bargaining agreement); *see also, Nixon v. Blackwell*, 626 A.2d 1366, 1375-76 (Del, 1993) (holding that transactions approved by managers who stood to benefit from such transactions and were, therefore, on both sides of the transactions were subject to the "entire fairness" test) (citing *Sinclair Oil Corp., v. Levien*, 280 A.2d 717 (Del. 1971), *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del 1983)); *In re Bidermann Indus.*, 203 R.R. 547, 551 (Bankr. S.D.N.Y. 1997) (applying heightened scrutiny to transaction because chief executive officer was conflicted and finding debtors were "completely misguided" in asserting that the business judgment rule should apply in light of "manifest self-dealing"), *In re Integrated Res., Inc.*, 147 B.R. at 650-58 (finding Delaware corporate law principles have "vitality by analogy for chapter 11 debtors incorporated in Delaware and holding appropriate test for debtors' business decision is entire fairness, not business judgment, when a predominantly interested board has "financial interest in the transaction adverse to the corporation.").

148.    Accordingly, in the event that the Court finds that Bankruptcy Code section 363 is applicable, it must apply a heightened level of scrutiny. As already articulated herein, the Debtors have failed to meet the lower business judgment standards; therefore, it will be impossible for the Debtors to satisfy a higher standard of scrutiny.

**E.     The LTD Committee Should Be Afforded the Protections of Section 1114 of the Bankruptcy Code**

**(i)     Bankruptcy Code Sections 1114**

149.    Section 1114 of the Bankruptcy Code was enacted to protect the retirees of chapter 11 debtors. *Gen. DataComm Indus., Inc. v. Arcara (In re Gen. DataComm Indus., Inc.)*, 407 F3d 616, 620 (3d Cir. 2005) (quoting 7 *Collier on Bankruptcy*, ¶ 1114.02[1] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. 2002)).   Section 1114, along with its counterpart

section 1129(a)(13), are the primary substantive components of the Retiree Benefits Protection Act of 1988 ("RBBPA"), Pub. L. 100-334, 102 Stat. 610 (1988) (codified as amended at 11 U.S.C. §§ 1114, 1129(a)(13)); *see In re Visteon*, 612 F.3d 210.  Congress enacted the RBBPA in response to LTV Corporation's termination of the health and life insurance benefits of 78,000 retirees during its 1986 bankruptcy, with no advance notice to the affected retirees.  *See* S. Rep. No. 100-119 (1987), reprinted in 1988 U.S.C.C.A.N. 683, 683.

150.    Pursuant to section 1114, a debtor is required to timely pay and is not permitted to modify retiree benefits, with certain exceptions.  11 U.S.C. § 1114(e)(1).  Upon motion of the debtor, and after notice and hearing, the court may order modification of such payments or the debtor and the authorized representative of the recipients of those benefits may agree to modification of such payments.  11 U.S.C. § 1114(e)(1)(A) & (B).  Subsequent to filing a petition for bankruptcy relief and prior to filing an application seeking modification of the retiree benefits, the debtor must make a proposal to the authorized representatives which provides for those necessary modifications in the retiree benefits that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably.  11 U.S.C. § 1114(f)(1)(A).

151.    Additionally, the debtor's proposal must be based on the most complete and reliable information available at the time of such proposal; the debtor must provide the representative of the retirees with such relevant information as is necessary to evaluate the proposal.  11 U.S.C. § 1114(f)(1)(A) & (B).

152.    The court shall enter an order[26] providing for modification in the payment of retiree benefits if the court finds that: (1) the debtor has, prior to the hearing, made a proposal that fulfils the requirements set forth above; (2) the authorized representative of the retirees has refused to accept such proposal without good cause; and (3) such modification is necessary to permit the reorganization of the debtor and assures that all creditors, the debtor, and all of the affected parties are treated fairly and equitably, and is favored by the balance of equities. 11 U.S.C. § 1114(g)(1), (2) & (3).

### (ii)    The Benefits Provided Under the LTD Plans Constitute Retiree Benefits Covered by Bankruptcy Code Section 1114

153.    Retiree benefits are defined under section 1114 of the Bankruptcy Code as "payment to any entity or person for the purpose of providing or reimbursing payments for retired employees, their spouses and dependents, for medical, surgical or hospital care, or benefits in the event of sickness, accident, _disability_ or death under any plan, fund or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title." 11 U.S.C. § 1114(a) (emphasis added). Thus, the plain language of the statute provides, in relevant part, that "retiree benefits" are payments to a person or entity for the purpose of providing or reimbursing payments for benefits in the event of disability under any plan, fund or program maintained or established by the debtor. _Id._

---

[26] Should the court enter an order modifying the retiree benefits, in no case will the court enter an order providing for such modification which provides for a modification to a level lower than that proposed by the debtor in the proposal found by the court to have complied with the requirements of section 1114(g)(1),(2) & (3). Further, any payment for retiree benefits required to be made before a plan confirmed under section 1129 of title 11 of the Bankruptcy Code has the status of an allowed administrative expense as provided in section 503 of the Bankruptcy Code. 11 U.S.C. § 1114(e)(2).

154. Section 1114 applies to payments for the purpose of providing beefits in the event of disability under any "plan, fund, or program." The courts have interpreted "plan, fund, or programs" as it is used in ERISA in connection with Bankruptcy Code section 1114 to require that the benefits accumulate over a period of time and are contingent upon the occurrence of a defined event. *See In re Exide Techs.*, 378 B.R. 762, 768-69 (Bankr. D. Del. 2007) (citing *In re New York Trap Rock Corp.*, 126 B.R. 19, 22 (Bankr. S.D.N.Y. 1991) (ERISA is typically characterized by benefits that accumulate over a period of time and are contingent on an event occurring that is outside the employee's control)).

155. The plans at issue here are disability benefits plans for persons who are suffering from a "long term disability" and were established by the Debtors in order to provide the income security in the event of an employee becoming disabled and unable to work. Such persons are presumptively permanently disabled, and, in practical effect, retired from active employment by virtue of their securing coverage under the LTD Plans. Thus, the LTD Plans provide "retiree benefits." Therefore, those benefits meet the literal definition of "retiree benefits" protected by Bankruptcy Code section 1114, and should be protected by section 1114.

156. The income continuation provided under the LTD Plans puts the LTD Participants in the same position as a retiree receiving income continuation through a pension. Thus, the LTD Plans clearly contemplate that LTD Participants are retired in fact -- just as a retiree under a qualified pension plan would be.

157. The foregoing conclusion is inevitable. Limiting the scope of "disability" in section 1114 only to individuals on formal retirement receiving a pension (who presumably would then not receive disability income) simply reads the word "disability" out of the statute.

After all, "disability" in the employment context can only mean disabled <u>from work</u>. To say that 1114 does not cover a disability plan would render that this part of the 1114 is meaningless.

158.    Further, a statute should not be construed so as to nullify an express provision of law. *See, e.g., Rosado v. Wyman*, 397 U.S. 397 (1970) (court should construe statutes to give them some meaning); *Wilshire Oil Co. of California v. Costello*, 348 F.2d 241, 243 (9th Cir.1965) (statutes should not be construed as to be rendered meaningless).

159.    In addition, case law dictates that the definition of "retiree benefits" in section 1114(a) should be construed broadly. *See In re A.C.E. Elevator Co.*, 347 B.R. 473, 486 (Bankr. S.D.N.Y. 2006) (citing *In re Certified Air Technologies*, 300 B.R. 355, 367-69 (Bankr. C.D. Cal. 2003). "This broad construction of § 1114(a)'s text is consistent with the legislative history of the statute." *In re Certified Air*, 300 B.R. at 371. Importantly, the court in *In re Certified Air* accepted the broad definition of section 1114 "to include direct payments to retirees, as well as indirect payments to any person or entity for the purpose of providing or reimbursing payments for medical, surgical, hospital care and other benefits." *Id.*

160.    The possibility that a long term disabled employee might recover and return to work - thereby suspending LTD benefits does not mean this is not a retiree benefit. Indeed, a regular pension plan may lawfully provide that a "garden variety" pension may suspend benefits upon return to work. ERISA § 203(a)(3)(B), 29 U.S.C. §1053(a)(3)(B).

161.    The Debtors refute that the LTD Plans at issue are covered by section 1114. The Debtors' argument that its own artificial characterization of the LTD Participants as "active employee" – apparently for tax purposes -- prevents the LTD Plans from being considered a "retiree benefit" fails in the face of the statute's clear language including disability payments. The Debtors' interpretation, though tempting in its utter simplicity, ignores the plain language of

the statute and principles of statutory construction, as well as the reality of the LTD Participants employment status.

### (iii)    Section 1114 Does Not Exclude Employees on Disability From Receiving Its Protections

162.    Additionally, case law supports a finding that the LTD Participants can be deemed retired employees.   For example, the Third Circuit's holding in *In re General DataComm Industries,* provides that the Court can look to the contractual basis for retirement and to the policy consideration behind section 1114 to define "retiree" as the term is not defined in the Bankruptcy Code. *See In re General DataComm*, 407 F.3d 616.

163.    The definition of "retiree" is not defined in the plans that govern the ERISA plans of the LTD Participants.  "Retiree" also is not defined in the Nortel Networks Retirement Income Plan (now administered by the PBGC).   "Retiree" also is not defined in the Nortel Networks Retirement Income Plan (now administered by the PBGC).

164.    "Retiree" is also undefined in the United States Bankruptcy Code, as is "long term disabled employee."   In addition to a distinct lack of legislative guidance as to the definition of retiree, no case law exists that excludes the long term disabled from the class of retirees.

165.    The definition provided in the 2012 SPD for the Retiree Medical Plan, however, supports the position that the LTD Participants are retirees for purposes of section 1114 of the Bankruptcy Code.  "Retired Employee, Retiree" is defined as: "An employee of the Employers who has retired from the active service of the Employers according to the provisions of the previously available Nortel Networks, Inc. Retirement Plan." *See* Glossary section at NNI-LTD-00003840.[27]

---

[27]  The 2012 SPD for the Retiree Medical Plan is marked as NNI-LTD-00003723-00003851 and attached as Exhibit "L."

166.   "Active service" is undefined.  However, the Supreme Court's decision in *Allied Chemical & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157 (1971) is instructive here for its common sense interpretation of the difference between an active and a retired employee, noting that the general definition of "employee" is "someone who works for another for hire" in its holding that current retirees were not employees under the National Labor Relations Act because "retired employees have ceased to work for another for hire." *Id.* at 178.

167.   Likewise, the LTD Participants have ceased working for the Debtors for hire.  To define them as "active employees" for purposes of eligibility of section 1114 protections defies common sense.  The LTD Participants are not actively working or providing active service; they are treated as having retired from work.

168.   The LTD Participants are retirees in fact or by law, and at minimum a substantial number of the LTD Participants qualify as retirees pursuant to the terms of the ERISA plans. The Third Circuit has directed that form should not be elevated over substance when determining if an employee is a "retiree."  "The procedural protections of § 1114 apply to 'retiree benefits,' which are defined with reference to the class of persons entitled to the benefits, *i.e.*, 'retired employees.'"  *General DataComm*, 407 F.3d at 616.  The *General DataComm* Court examined the question of whether an employer could disqualify from section 1114 protection certain employees, terminated without cause and on the verge of retirement, merely because they never officially retired.  *Id.* at 620.  The Third Circuit remarked that: "We are persuaded that [denying these employees retiree status]. . . elevates form over substance, and is thus unavailing and unacceptable." *Id.*

169.    Moreover, Third Circuit in *In re General DataComm* also considered the inequitable treatment of certain employees should they be denied "retiree" status. *Id.* at 623. The Court indicated that it would reserve its judgment to situations different from the one before it on a case by case basis, but that the inequitable treatment of the employees in question, coupled with the terms of their plan, which required termination for cause to invalidate their retiree status, justified the treatment of the employees as retirees. *Id.*

170.    Even outside the boundaries of section 1114, bankruptcy adjudication is often likened to proceedings of historic "Courts of Equity." *See Granfinanciera v. Nordberg*, 492 US 33, 81 (1989) ("Bankruptcy courts are inherently proceedings in equity."). Congress specifically intended Bankruptcy Judges to introduce equitable principles into the bankruptcy deal-making. *See In re Ira Haupt & Co.*, 361 F.2d 164, 168 (2d Cir. 1966) ("conduct of bankruptcy proceedings not only should be right but must seem right."). Further, the Bankruptcy Code enables the Bankruptcy Court to *sua sponte* shift the course of an inequitable proceeding. section 105(a) of the Bankruptcy Code specifically authorizes the Bankruptcy Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

171.    This court should consider the fact that no other group of potential creditors of the Debtors are as vulnerable as the LTD Participants.  Section 1114 was created specifically for the purpose of protecting what Congress believed to be the most vulnerable of entities in a bankruptcy case: retirees.  "[R]etired employees are the most vulnerable and worst-off creditors of a Chapter 11 debtor." *In re Consolidated Freightways, Corp. of Delaware*, 363 B.R. 110, 122 (Banr. C.D. Cal. 2007).  Congress believed that it was entirely unequitable to effectively cut off the benefits of workers who were in many cases dependent on the benefits provided in the retirement plans.

"Active employees[28] may be able to find new jobs and continue to work.  However, retired individuals are completely out of the workforce .... To deny their medical and insurance claims could force many retiree into poverty or bankruptcy."  *Id.* at 122 (emphasis added).

172.    More dire is the situation of the long term disabled, who cannot work yet incur substantial medical expenses.  For some LTD Participants, it is literally a matter of life of death.  For example, there is the possibility that they will be unable to pay for the medications that keep them alive, such as post-organ transplant medications, if they do not continue to receive their LTD Plan benefits.  *See, e.g.*, Joyce Ann Robertson's Objection to Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363 and 1108 Authorizing the Debtors to Terminate the Debtors' Long-Term Disability Plans and the Employment of the LTD Employees, filed October 25, 2012 (Docket No. 8824) ("To be quite honest with you, that is exactly what it will come to, a death sentence if my LTD benefits are terminated.").

173.    To the extent the LTD Participants are described or treated as active employees because they were included in an active employee plan for the financing convenience of, and tax benefits to, the Debtors or treated as such for the convenience of the Debtors' human resources department, the language of the applicable plans are far from clear.  In fact, there are ample plan-related documents evidencing that the Debtors did not hold themselves out as treating the LTD Participants as "active employees."  It would not be equitable in this situation to deny LTD Participants the protection under section 1114 due to the Debtors' artificial characterization of their employment status purely for tax advantage purposes.

---

[28]  Even the Bankruptcy Court equates an "active employee" with a person who is able to work.  Such is not the case for the LTD Participants; characterizing them as "active employees" for purposes of denying them Bankruptcy Code protection makes little sense.

### (iv) Reservation of Rights are Irrelevant for Purposes of Section 1114

174.    The Debtors ignore the Third Circuit's holding that a reservation of rights clause does not avoid the restrictions of Bankruptcy Code section 1114. *In re Visteon Corp.*, 612 F.3d 210.

175.    In re *Visteon*, the Third Circuit held that section 1114 is unambiguous and clearly applies to any and all retiree benefits. *Id.*; *see also In re Farmland Indus. Inc.*, 294 B.R. 903 (Bankr. W.D. Mo. 2003) (court concluded that benefits must continue during bankruptcy regardless of whether they could have been terminated outside of bankruptcy).

176.    The Third Circuit also held that the statute is not ambiguous simply because it is broad. "In employing intentionally broad language, Congress avoids the necessity of spelling out in advance every contingency to which a statute could apply." *Visteon,* 612 F.3d at 221 (quoting *In re Philadelphia Newspapers*, 599 F3d at 310). "By using the word 'any' three separate times, Congress ensured that the statute would apply to all benefits, absent the few exceptions directly addressed, without its having to itemize that entire universe of benefits." *Visteon. Id.*

177.    The LTD Committee is cognizant that section 1114 does not prohibit the termination of benefits during a bankruptcy proceeding. Rather, it creates an equitable procedure through which the debtor can argue the economic necessity of doing so, and the retirees can counter with their own arguments about economics, fairness, and equity. The specter of this process may, by itself, foster an agreement about continuing or modifying the LTD benefits that would otherwise be impossible to reach. However, if no agreement is reached, a court can, and in fact must, order modification (or termination) of benefits if doing so is necessary to the

reorganization, fair to all affected, and clearly favored by the equities. *See Visteon,* 612 F.3d at

235. "This is a high standard to reach…." *Id.* Additionally, the LTD Participants' benefits

would remain protected during the process by the virtue of the continuation of their benefits

while the parties attempt to reach an agreement.

178.     Courts generally require that all parties must share in the burdens of the

bankruptcy, but that the share need not be exactly equal. *In re Garofalo's Finer Foods, Inc.*, 117

B.R. 363, 370 (Bankr. N.D. Ill. 1990) ("The requirement of fair and equitable treatment under

the proposal to modify does not equate with identical or equal treatment"). "Bankruptcies are

painful for workers, communities, small business suppliers and others. *But the burden of turning*

*a company around should not rest on the backs of retirees.*" *Visteon,* 612 F.3d at 228 (quoting

134 Cong. Rec. S6823-02 (daily ed. May 26, 1988) (statement of Sen. Metzenbaum, Senate

sponsor of the RBBPA) (emphasis added).  Denial of section 1114 protection would impose an

unusually heavy burden upon the LTD Participants under the circumstances.

179.     Moreover, without a reorganization, the determination of whether the LTD

Participants benefits should be modified or terminated does not have the health of the

reorganized debtor to weigh down the scales of equity to tip in their favor.  Considerations for

other constituencies are still important, but must be weighed against the harm to the LTD

Participants in a much more measured manner, because there will be no reorganized business to

save from the legacy burdens of the LTD Participants legacy costs.  The LTD Committee is

aware that there are cases outside of the Third Circuit that indicate that the term "confirmation"

can be substituted for reorganization, but these do not change the circumstances as there is no

argument that payment of the legacy costs, even in full, would render this plan unconfirmable.

(v)     **Even if Nortel Were to Satisfy the Standards of Proof Required by Section 1114 to Terminate the LTD Plans, the Result Would Still Be to Treat the LTD Plan as a Rejected Contract, Generating a General Unsecured Claim**

180.    Even if the LTD Participants are not considered retirees, they are still creditors and have at minimum an unsecured claim,[29] by virtue of the fact that they are already disabled and the vesting event for their benefits has already occurred.

181.    Retirees have a general unsecured claim where benefits are modified in bankruptcy; the claim is not limited by section 502(b)(7). 11 U.S.C. §1114(j).   Upon a bankruptcy filing, and absent modification in accordance with the statute, the debtor "shall timely pay" retiree benefits. 11 U.S.C. §1114(e)(1). Such payments have the status of allowed administrative expenses. 11 U.S.C. §1114(e)(2).  The court in *Tower Automotive* pointed out that section 1114 by its nature gives the retiree medical benefit claim, even though it is unsecured, a special status that is greater than that of the general unsecured creditor.  *See Tower Auto.*, 241 F.R.D. at 167; see also 11 U.S.C. § 1114 (2006); *In re Ionosphere Clubs, Inc.*, 134 B.R. 515, 517 n.1 (Bankr. S.D.N.Y. 1991) (indicating status of claims for retirees' benefits is elevated during chapter 11 case).

182.    Bankruptcy Code section 1114 was modeled on section 1113.   Before the enactment of those sections, labor agreements and retiree benefit plans were treated as executory contracts subject rejection under Bankruptcy Code section 365 applying the "business judgment"

---

[29]  The fact that the LTD Committee has been appointed as an 1102 Committee contradicts the notion that the LTD Participants are not creditors.  Bankruptcy Code Section 1102(a)(1) states "the court may order the appointment of additional committees of creditors."  Bankruptcy Code Section 101(5) defines a "claim" to include: (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.  In order to be appointed as a Committee there must be a determination, by definition that you are a creditor.  11 U.S.C § 101(5)(A).

rule. Congress decided that rejection of labor agreements should meet a higher standard of need, creating the section 1113 model. And the same decision led to section 1114. Both sections were enacted as adjuncts of the rejection rule of section 365 of the Bankruptcy Code -- and a therefore a rejection of a labor agreement or a retiree benefit plan was intended to cause the allowance of an executory contract claim, just as if the contract were rejected under section 365. Accordingly, if the LTD Plans are terminated, the LTD Participants should have an allowed claim against the Debtors' estate.

183.    Judge Gross appointed the LTD Committee to be an 1102 committee of limited scope, like the Retirees Committee, and to fully participate in process of negotiating a solution to the LTD constituency's issues and claims. However, it is apparent that the Debtors do not believe they need to comply with the requirements of section 1114, which has not promoted meaningful negotiations. A determination that the LTD Participants are protected by the Bankruptcy Code section 1114 would be far more efficient in regards to the administration of the case as it would compel the Debtors to participate in meaningful negotiations with the LTD Committee and would better allow for the LTD Committee to assist in reaching a binding global solution or settlement for the LTD Participants as opposed to protracted individual litigations against the Debtors by individuals in that constituency.

*[Remainder of Page Intentionally Blank]*

## V.    CONCLUSION

WHEREFORE, the LTD Committee respectfully submits this Objection and requests that

the Court deny the relief requested in the Debtors' Motion to Terminate, and grant such other

and further relief as it deems just and proper.

Dated:  October 25, 2012                           **ELLIOTT GREENLEAF**

Rafael X. Zahralddin-Aravena (DE Bar No. 4166)
Shelley A. Kinsella (DE Bar No. 4023)
Eric M. Sutty (DE Bar No. 4007)
1105 North Market Street, Suite 1700
Wilmington, Delaware  19801
Telephone:  (302) 384-9400
Facsimile:  (302) 384-9399
Email:  rxza@elliottgreenleaf.com
Email:  sak@elliottgreenleaf.com
Email:  ems@elliottgreenleaf.com

*Counsel to the Official Committee of
Long Term Disability Participants*