# Exhibit A

## OBJECTION TO  DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 363 AND 1108 AUTHORIZING THE DEBTORS TO TERMINATE THE DEBTORS' LONG-TERM DISABILITY PLANS AND THE EMPLOYMENT OF THE LTD EMPLOYEES

## Mark Alan Phillips



WEEKLY DISABILITY AND
LONG TERM DISABILITY PLAN

1992

# ONTENTS

...................................................

...................................................

b .................................................

...................................................

...................................................

d .................................................

...................................................

...................................................

## ELIGIBILITY AND EFFECTIVE DATE

If you are a regular full-time, non-union employee of Northern Telecom Inc., BNR or a participating affiliate ("Company"), you will become covered for Weekly Disability and Long Term Disability benefits under this coverage on your first day of employment provided you have enrolled for the coverage.

If you are both disabled and away from work on the date you would otherwise become covered, your coverage will not start until you return to active work.

The Company pays the entire cost for Weekly Disability and Long Term Disability Benefits.

1



specified period of time if you
isease while covered. Benefits
bility due to sickness or accide...

ccidental injury.

cian. and

roof of your total disability. N
a are doing any work, anywhe
e Company which has been a...

erm "physician" has the same
tion on page 10.

inue for up to the Maximum F
bility.

by less than two consecutive w
riod of disability, unless the su...
d to the causes of the earlier p...
work between the periods.

y paid for disabilities which ar
lities are those caused by:

t of any employment for wage

employment, by any workers'
ar legislation.

Disability as described on the f...

2

## Occupational Disability Benefit

Weekly Disability benefits may also be payable to you for a total disability which is an Occupational Disability as defined on the previous page. This benefit is provided on the same terms as the benefit for non-occupational disability. The amount of Weekly Disability benefit payable, however, is equal to the excess of the Non-Occupational Weekly Disability benefit over the benefits payable under any workers' compensation law, occupational disease law, or similar legislation.

## Amount of Weekly Disability Benefit

The amount of Weekly Disability benefits is determined according to your length of credited service with the Company, as follows:

| Service | 100% of your Weekly Basic Earnings are paid for the following number of weeks: | 60% of your Weekly Basic Earnings are paid for the following number of weeks: |
|---|---|---|
| Less than 6 months | 0 weeks | |
| 6 months | 1 | 26 weeks |
| 1 year(s) | 2 | 25 |
| 2 | 4 | 24 |
| 3 | 6 | 22 |
| 4 | 8 | 20 |
| 5 | 10 | 18 |
| 6 | 12 | 16 |
| 7 | 14 | 14 |
| 8 | 16 | 12 |
| 9 | 18 | 10 |
| 10 | 20 | 8 |
| 11 | 22 | 6 |
| 12 | 26 | 4 |
| 13 | 26 | 2 |
| | | 0 |

If you are able to return to work on a part-time basis with an amount which is equal to 100% of your Weekly Basic Benefits or less, any benefits will be reduced by the amount of such result will be used to extend the total weekly benefit.

[illegible] value of your Weekly Basic Earnings. [illegible] amount of your part-time wages. However, [illegible] or a 100% benefit will be used to [illegible] earnings until all the savings are exhausted.

[illegible] at the end of the maximum per [illegible] until all of the benefit savings [illegible].

[illegible] Compensation benefits or any [illegible] amount of Weekly benefits w[illegible] weekly benefits and any benefit pay[illegible] Compensation Law or any other [illegible] applicable pursuant to the above [illegible].

[illegible] Statutory disability benefits desc[illegible] statutory disability benefits which [illegible] provision for making claim for [illegible].

"[illegible] Benefits" you receive for that week, [illegible] claim for [illegible] had been made by you.

[illegible]

[illegible] from any occupation for compens[illegible]

[illegible] placement benefits required or provided for [illegible] not [illegible]:

[illegible] benefits.

[illegible]

[illegible]

[illegible] Security Act, the Canada Pension [illegible] dependents benefits, but not co[illegible] the Weekly Disability Benefit payment[illegible]

(3)  disability, retirement or unemployment benefits provided under any group insurance or pension plan or any other arrangement of coverage for individuals in a group (whether on an insured or uninsured basis), and

(4)  any benefits received under workers' compensation law or any other similar law, excluding payments received for legal fees incurred in the claim process.

Benefits of the type listed above which are payable to you or any of your or dependents because of your disability or retirement are included as "other income benefits".

For the purposes of this Plan, "other income benefits" will be treated as follows:

(1)  any periodic payments will be allocated to weekly periods,

(2)  any single lump sum payment including any periodic payments which you or your dependents have elected to receive in a single lump sum will be allocated to weekly periods with the exception of workers' compensation benefits. Any single lump sum payment under workers' compensation laws will be fully offset in its entirety against any benefits otherwise payable by this Plan, and

(3)  any periodic or single lump sum payments received as a retroactive award may be allocated retroactively.

### Estimated Other Income Benefits

"Other income benefits" also include benefits that would be payable if timely claim for them had been made by you. In the case of Social Security benefits under the Federal Social Security Act, this includes timely and diligent pursuit of benefits through each of these steps:

(1)  application for such benefits,

(2)  appeal at the reconsideration level, if benefits are denied, and

(3)  appeal at the Administrative Law Judge level, if benefits are again denied.

Until you give this Plan written proof that you have completed the application process for other income benefits, and benefits are finally denied, this Plan may:

(1)  estimate your weekly Social Security and other income benefits, and

(2)  use that amount to determine your weekly benefit.

Your Social Security or other income benefits will not be estimated while your application and appeals are pending if you sign a Reimbursement Agreement on a form satisfactory to the Claims Administrator.

...ount of other income benefits th... ... ...
... ... ... ability Benefit differs from the ... ... ...

... ... ...nderpaid, this Plan will make ... ... ... ...
... ... ... ... ...he amount that should have be... ... ... ...

... ... ... ...is Plan may either require a ... ... ... ...
... ... ... ...at its option, reduce or elimina... ... ... ...

... ... ... ...26) weeks, subject to any Exter... ... ... ...

... ... ... ... ...escribed below:

... ... ... ... your Weekly Basic Earnings ... ... ... ...
... ... ... ...ete payroll period before the st... ... ... ...
... ... ... ...pay or any other form of comp... ... ... ...
... ... ... ...work earnings over your basic ... ... ... ...
... ... ... ...period of total disability will be a... ... ... ...

... ... ... ...am — your weekly Basic Earn... ... ... ...
... ... ... ...nsisting of base salary and com... ... ... ...
... ... ... ...sation for the last full calenda... ... ... ...
... ... ... ...have not been employed for a ... ... ... ...
... ... ... ...of total disability, your weekly ... ... ... ...
... ... ... period of employment divide... ... ... ...

... ... ... ...in any way caused by any of t... ... ... ...

... ...ny

... ... ...of an assault or felony, and

... ... ... declared or not), insurrection, ... ... ...
... ...tion.

6

## LONG TERM DISABILITY BENEFITS

Monthly Income Benefits are payable to you after you have been totally disabled due to an accidental bodily injury or disease for at least the Benefit Waiting Period of six (6) months.

### Total Disability

You are considered totally disabled if you are unable to work because of a disease or injury.

During the first twenty-four (24) months of a period of a covered total disability (after your completion of the six (6) month Benefit Waiting Period), you will be considered unable to work if you cannot perform the work you normally perform.

After the first twenty-four (24) month period of covered total disability (after your completion of the six (6) month Benefit Waiting Period), you will be considered unable to work if you are unable to work at any reasonable occupation. A reasonable occupation is any gainful activity for which you are fitted by your education, training or experience, or for which you could reasonably become fitted.

### Monthly Income Benefit

The Plan will pay you 70% of your "Monthly Basic Earnings" before you become totally disabled, but in no event more than the Maximum Monthly Benefit, $7,000. This benefit is reduced by any "other income benefits" you receive for that month, or which you would be entitled to receive if timely claim for them had been made by you, but in no event shall this benefit be less than the Minimum Monthly Benefit, $50.

### When Benefits Begin

Your Monthly Income benefits will start as soon as you complete the requisite six (6) month Benefit Waiting Period, provided that written proof of your total disability satisfactory to the Claims Administrator is furnished within six (6) months following completion of the waiting period. Otherwise, Monthly Income benefits will commence on the day six (6) months following the date written proof of your total disability is furnished.

### How Long Benefits are Paid

You will continue to receive Monthly Income Benefits while you remain totally disabled, up to the end of the Maximum Benefit Period shown.

7

While you ... ... total disability:

| ... | Your Maximum Benef... | | |
|---|---|---|---|
| | To Age 65, but not less than ... | | |
| | 60 months | | |
| | 60 months | | |
| | 60 months | | |
| | 60 months | | |
| | To Age 70 | | |
| | To Age 70 | | |
| | To Age 70 | | |
| | To Age 70 | | |
| | 12 months | | |
| | 6 months | | |

during a period of total disability, it is important ... ...
explanation of ...

... as long as you are both totally disabled ... ... ... 
... ... ... be under the care of a physician ... ...
that's on the disease or injury causing the total disability ... ...
... Administrator shall have the right to require ... ...
... ... ...

... policy ... end when the first of the following ... ...

... ... or as otherwise provided for in ... ...

... ... or occupation in which you norm... ...
... (Work at an Approved Rehab ...
... ... as work at the type of occupation ...
... reasonable occupation), or

... physician, or

... proof of the continuance of your ... ...
... of a physician designated by the Plan.

If ... new period of total disability w... ...
... less than three (3) consecutive ... ...
... or the same or a related illness or injury, month ... ...
you ... ability.

This combining of two periods of total disability into one period will also apply to any successive additional periods of total disability resulting from the same or relating causes separated by less than three (3) months. Two periods will not be combined unless you were covered for this benefit at the start of the earlier period.

**Other Income Benefits**

This Plan defines "other income benefits" as:

(1) income received from any employer or from any occupation for compensation or profit.

(2) any disability, retirement, or unemployment benefits required or provided for under any law of any government — for example:

   (a) unemployment compensation benefits,

   (b) no-fault wage replacement benefits,

   (c) statutory disability benefits, or

   (d) benefits under the Federal Social Security Act, the Canada Pension Plan, and the Quebec Pension plan, including dependents benefits, but not counting any increase in benefits enacted after the Weekly Disability Benefit payments have started under this Plan.

(3) disability, retirement or unemployment benefits provided under any group insurance or pension plan or any other arrangement of coverage for individuals in a group (whether on an insured or uninsured basis), and

(4) any benefits received under workers' compensation law or any other similar law, excluding payments received for legal fees incurred in the claim process.

Benefits of the type listed above which are payable to you or any of your or dependents because of your disability or retirement are included as "other income benefits".

For the purposes of this Plan, "other income benefits" will be treated as follows:

(1) any periodic payments will be allocated to monthly periods,

(2) any single lump sum payment including any periodic payments which you or your dependents have elected to receive in a single lump sum will be allocated to sixty (60) monthly periods with the exception of workers' compensation benefits. Any single lump sum payment under workers' compensation laws will be fully offset in its entirety against any benefits otherwise payable by this Plan, and

(3) any periodic or single lump sum payments received as a retroactive award may be allocated retroactively.

9

ies

*these ...... that would be payable if timely ca ...... **if th**
... ... ... urity benefits under the Federa ...........
... ... ....... benefits through each of these s...p..

... 1...

... ... ... ...nefits are denied, and

... ... ... ... level, if benefits are again der. ... ...

... ... ... ....ave completed the application ... ...
.... ... ... ...... enied, this Plan may:

... ... ... ... .nd other income benefits, and

... ... ... ...thly benefit

... ... ... ...s will not be estimated while y.. ... ...
... ... ... ...ursement Agreement on a form ........... ....

... ... ... aount of other income benefits ......... **.e b..**
... ... ... ... income benefit differs from the ........

... ... ...t underpaid, this Plan will make ...........
... ... to the amount that should have b... ... ....

... ... ... ...overpaid, this Plan may either ........ ... p
... ... ... ...an, or at its option, reduce or ...............
... ... ...nates future payments, the M.......... ... ... ...

... ...

... ... ... ...ned by using provisions which f... ... ... ...
... ... ... ... your earnings will be consider... ... ... ...
... ... ...

... ... ... ...your Monthly Basic Earning ... ... ...
... ... ... ....plete payroll period before the ... ... ...
... ... ... ...ertime pay or any other form ... ... ... ...
... ... ... ...piece-work earnings over y... ... ... ...
... ... ... ...t of the period of total disabili... ... ... ...
... ...

10

● For an Employee in a Sales Compensation Program — your Monthly Basic Earnings shall be one twelfth of your total basic income consisting of base salary and commissions, but excluding bonuses or any other form of compensation for the last full calendar year just before the start of the period of total disability. If you have not been employed for a full calendar year prior to the commencement of the period of total disability, your Monthly Basic Earnings shall be your total basic income for your actual period of employment divided by the number of months of such employment.

## Approved Rehabilitation Program

An "approved rehabilitation program" means:

(1) a program of vocational rehabilitation, or

(2) a period of part-time work with the Company for purposes of rehabilitation, which will be considered to begin only when the Claims Administrator approves such program, in writing, and to end when the Claims Administrator withdraws its approval.

● This Plan includes this rehabilitation program to help you get back to work. With the Claims Administrator's approval, you may continue receiving Long Term Disability benefits for a limited time while on an approved rehabilitation program. Thus, you may get back into a gainful occupation with the assurance that for a specified period you will not lose your eligibility for benefits. During this period, your Monthly Income Benefit will be your regular Monthly Income Benefit payment less 80% of your earnings from the rehabilitative job.

| Example | | | |
|---|---|---|---|
| Monthly Income Benefit from the Plan | Monthly Earnings While You are Disabled | 80% Reduction | Net Monthly Income Benefit from the Plan |
| $1,600 | $300 | $240 | $1,360 |

Also, certain expenses of a vocational rehabilitation program may be paid by this Plan at the discretion of the Plan Administrator. If this Plan determines that a program that should make you self-supporting is within your ability, you will be notified of the type and duration of the expenses covered, and the conditions for payment. If you agree to undertake the program, the charges for the approved covered expenses will be paid, up to a maximum benefit of $10,000.

●

11

... healing arts acting within the ...
... otal disability, or any portion f...
... other than a medically determ...
... ialified physician who either s...
... n of training or experience, a s...
... sufficient to render the necessi...

... isorders, the benefit period wi...
... confinement exists, or commenc...
... -four (24) month period, benef...
... bject to the Maximum Benefit...

... sability caused or contributed ...
... will not apply if your disabilit...
... months

... condition for which you...

... nety (90) days prior
...

... is in any way caused by any o...

... ot an assault or felony, or

... is declared or not), insurrectio...
... r civil commotion.

12

## BENEFIT MODIFICATION FOR THIRD PARTY LIABILITY

### Third Party Liability

In the event that you ("Claimant") suffer an injury or illness covered by this Plan which injury or illness is caused by a third party, that is, by a person, corporation or other legal entity other than the Claimant ("Responsible Third Party"), you agree in good faith to pursue a claim against such Responsible Third Party for recovery of the value of the benefits paid by this Plan in connection with such injury or illness.

To the extent payments for lost wages or the like resulting from such injury or illness are made to a Claimant or his/her legal representative, or may be made to a Claimant or his/her legal representative in the future, by or for the Responsible Third Party (as a result of a legal judgment, settlement or in any other manner), such expenses are excluded from the Claimant's coverage under this Plan.

When a Claimant files a claim for benefits under this Plan which benefits would be payable but for the above exclusion, this Plan will pay such benefits provided:

(1) that payment for such benefits has not yet been made to the Claimant or his/her representative by or for the Responsible Third Party, and

(2) that the Claimant (or, if incapable, his/her legal representative) agrees in writing, using a form designated by this Plan, to promptly pay back to this Plan the amounts of any benefits paid by this Plan in connection with such injury or illness to the extent of any payments made to the Claimant or his representative by or for the Responsible Third Party. This agreement shall apply:

(a) whether or not liability for the injury or illness is admitted by the Responsible Third Party, and

(b) whether or not the payments from the Responsible Third Party itemize what they are for. A reasonable apportionment of the fees and costs incurred by the Claimant in pursuing a recovery from the Responsible Third Party may be deducted from amounts to be repaid to this Plan.

When any payments are made to a Claimant or his representative by or for a Responsible Third Party, such payments shall first be applied to reimburse this Plan for benefits previously paid by this Plan in connection with the injury or illness. To the extent such payments to a Claimant or his representative by the Responsible Third Party exceed such reimbursable amount, the future benefits payable under this Plan in connection with the injury or illness shall be redetermined by reducing the amount of such benefits by the amount of the payments made or to be made to the Claimant or his representative by or for the Responsible Third Party.

The Claimant ... to this Plan in accordance with ... ... ... ...
... ... ... or his representative from or fo... ...
... ... ... ... other benefits payable by the Plan t... ... ... ...

When ... ... ... is received from or for the Resp... ... ... ... ...
... ... ... ... ... that no future or additional p... ... ... ... ...
... ... ... ... ... and when, based on such final ... ... ... ...
... ... ... ... ... to this Plan and a redetermin... ... ... ...
... ... ... ... of the Claimant in conn... ... ... ... ...
... the ... ... agrees to and shall continue to ... ... ... ...
... ... ... ... of the payments from the Res... ... ... ...
... ... ... ... representative, for any subseq... ... ... ...
... ... ... ... within twenty-four (24) mo... ... ... ...
... ... ... the final judgment or settlement ... ... ...
...

... ... ... promptly notify the Plan of the ... ... ...
... ... ... ... or illness for which the Claimant ... ...
... ... ... shall keep the Plan fully infor... ... ...
... ... ... ... recovery from the Responsible ... ... ...
... ... ... ... received from the Responsible ... ... ...
... ... ... ... ...ponsible Third Party or any dis... ... ...
... ... ... ... ment of the claim.

... the ... ... ... oposed settlement of the Claim... ... ... ...
... ... ... ... or... this Plan shall have the expres... ... ...
... ... ... ... ... s not adequately provide for th... ... ...
... ... ... ... to be paid by this Plan to the C... ... ...
... ... The ... ...enant agrees not to enter into an... ... ...
... ... has been reasonably rejected by this ... ... ...

... ... ... ... as a gift assignment. The Claim... ... ...
... ... ... ... validity of a purported assignmen... ... ...
... ... ... ...ledge of an assignment unless it ... ...

... ... ... ...nefits previously paid to you ... ... ...
... ... ... reimbursement of such incorrect be... ... ...
... ... ... ...ants Administrator or by deduct... ... ...
... ... ...ent benefit payments payable to you ... ... ...
... ... ... ...pany.

14

## TERMINATION OF COVERAGE

Your benefits under the Weekly Disability and Long Term Disability Plan will end on the earliest of the following dates:

- the date your employment ends or you cease to qualify for the coverage, or

- the date the part of the Plan providing the coverage ends.

For coverage purposes, your employment will end when you are no longer a full-time, active Employee.  If you are on an unpaid medical leave of absence because of injury or sickness, your coverage may be continued.

If you stop active, full-time work for any reason, you should contact the Company at once to determine what arrangements, if any, have been made to continue any of your coverage.

RMATION

rthern Telecom Inc.
Disability and Long Term Dis.

rn Telecom Inc.
ıens Way
lle, Tennessee 37228

r 1 to December 31

vothern Telecom Inc.
ıens Way
lle, Tennessee 37228
5) 734-4000

dministrator

rd, CT 06152

ıern Telecom Inc. Company

## Plan Changes and Termination

The Company expects to continue this Plan, but necessarily reserves the right to amend this Plan from time to time or terminate this Plan at any time. Any amendment to this Plan may reduce or eliminate benefits payable under the Plan to persons who are Employees as of the effective date of the amendment.

## Claims

This booklet contains information on reporting claims. Forms for submitting claims may be obtained from your Human Resources Department.

If your claim is denied in whole or in part, you will receive a written notice of the denial explaining the reason for the denial.

You may request a review of the denied claim. The request must be submitted, in writing, within sixty (60) days after you receive the notice. Include your reasons for requesting the review and submit your request to the same office to which you submitted your claim. Your claim will be reviewed, and you will ordinarily be notified of the final decision within sixty (60) days of the receipt of your request for review. The final decision will be made by CIGNA which is providing claim services under this Plan.

## Your Rights under ERISA

As a participant in this Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 ("ERISA"). ERISA provides that all Plan participants shall be entitled to:

Examine, without charge, at the Plan Administrator's office and at other specified locations, such as work sites and union halls, all Plan documents, including insurance contracts, collective bargaining agreements, and copies of all documents filed by this Plan with the U.S. Department of Labor, such as detailed annual reports and plan descriptions.

Obtain copies of all Plan documents and other Plan information upon written request to the Plan Administrator. The Plan Administrator may make a reasonable charge for the copies.

Receive a summary of this Plan's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

17

, ERISA imposes duties upon
people who operate this Plan
ly and in the interest of you ar
the Company, your union, or
nate against you in any way to
ur rights under ERISA. If you
must receive a written explar
your claim reviewed. Under
s. For instance, if you request
30) days, you may file suit in a
dministrator to provide the ma
rials, unless the materials were
n Administrator  If you have
in part, you may file suit in a
misuse the Plan's money, or if
y seek assistance from the U.S.
he court will decide who shou
order you to pay these costs ar
ou have any questions about t
irector of Human Resources, o
any questions about this state
he nearest Area Office of the U
ment of Labor.

ry authority to determine the i
visions of this Plan and to mal

18

# Exhibit B

**OBJECTION TO  DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11
U.S.C. §§ 105, 363 AND 1108 AUTHORIZING THE DEBTORS TO TERMINATE THE
DEBTORS' LONG-TERM DISABILITY PLANS AND THE EMPLOYMENT OF THE LTD
EMPLOYEES**

## Mark Alan Phillips

SOCIAL SECURITY ADMINISTRATION

Date: October 9, 2012
Claim Number: 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A

MARK A PHILLIPS
6117 TREVOR SIMPSON DR
LAKE PARK NC 28079-9545

You asked us for information from your record. The information that you requested is shown below. If you want anyone else to have this information, you may send them this letter.

Other Important Information

THIS CONFIRMS MARK A PHILLIPS DATE OF ENTITLEMENT FOR SOCIAL SECURITY BENEFITS IS 07/92, RECEIVED FIRST PAYMENT IN THE AMT OF $972.00 IN 08/92. PREPARED BY CDM.

If You Have Any Questions

If you have any questions, you may call us at 1-800-772-1213, or call your local Social Security office at 888-383-1598. We can answer most questions over the phone. You can also write or visit any Social Security office. The office that serves your area is located at:

SOCIAL SECURITY
SUITE 300
5800 EXECUTIVE CTR DR
CHARLOTTE, NC 28212

If you do call or visit an office, please have this letter with you. It will help us answer your questions.

OFFICE MANAGER
Rose Mary Buehler

# Exhibit C

**OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 363 AND 1108 AUTHORIZING THE DEBTORS TO TERMINATE THE DEBTORS' LONG-TERM DISABILITY PLANS AND THE EMPLOYMENT OF THE LTD EMPLOYEES**

## Mark Alan Phillips

Claims Services Provided by

**The Prudential Insurance Company of America**

**Sophie Costanza**
Disability Claim Manager

The Prudential Insurance Company of America
Disability Management Services
PO Box 13480
Philadelphia, PA 19176

Phone: (800) 842-1718  Ext: 87641
Fax: (877) 889-4885
**Website:  www.prudential.com/mybenefits**

October 12, 2012

Mark A Phillips
6117 Trevor Simpson Drive
Lake Park, NC  28079

Claimant: Mark A Phillips
Claim No.: 10280751
Date of Birth: 6/27/1960
Control No./Br.: 39900 / 000RA

ln.ldl.ldl.l.n.l.n.ll.l.n.l.n.ll

Dear Mr. Phillips:

We are writing to you to confirm that you are receiving Long Term Disability benefits under the Nortel Networks Group Policy with Prudential.

You are receiving $1275.54 per month.  This benefit will remain the same provided your income from other sources does not change.  Your  benefits will continue through June 26, 2025, provided you remain totally disabled as defined by the Policy and continue to meet all other contractual requirements.

Sincerely,
*Sophie Costanza*
Sophie Costanza
Disability Claim Manager

# Exhibit D

**<u>OBJECTION TO  DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11
U.S.C. §§ 105, 363 AND 1108 AUTHORIZING THE DEBTORS TO TERMINATE THE
DEBTORS' LONG-TERM DISABILITY PLANS AND THE EMPLOYMENT OF THE LTD
EMPLOYEES</u>**

Mark Alan Phillips

PATIENT:
DOSSIER-CHART:
ADMISSION (DATE):
CONGÉ-DISCHARGE (DATE):
DICTÉ PAR-DICTATED BY:
CHIRURGIE-SURGERY (DATE):
MÉDECIN TRAITANT-ATTENDING PHYSICIAN:

681231-7
15-01-92
23-01-92
Dr. C. Aabi

Dr. M.T. Richard
Dr. Michael Richard

**OTTAWA GENERAL HOSPITAL**
501, Ottawa, Ontario K1H 8L6

SOMMAIRE AU CONGÉ
DISCHARGE SUMMARY
CONSULTATION
RAPPORT CHIRURGICAL
OPERATIVE REPORT

COPIE-COPY

## ADMISSION DIAGNOSIS:
Cervical spine injury.

## FINAL DIAGNOSIS:
Traumatic spinal cord injury, C5-6.

## HISTORY OF PRESENT ILLNESS:
This 32-year-old man was skiing on the day of admission and apparently went over a mogul and was thrown up in the air and landed on his head. There was no loss of consciousness but he was immediately aware of being quadriplegic. He was given resuscitative care and transferred to the Emergency Room.

## PAST MEDICAL HISTORY:
Unremarkable.

## MEDICATIONS ON ADMISSION:
None.

## ALLERGIES:
None known.

## PHYSICAL EXAMINATION:
Vitals: His pulse was 80 and his blood pressure was 140/80. His heart sounds were well heard.
Chest: Chest movements were decreased and he was carrying on only abdominal breathing. Air entry was equal and adequate on both sides.
Abdomen: No significant finding. There was no clinically evident long bone injury.
Neurological: He was alert and oriented in three spheres. There was no cranial nerve abnormality.
Extremities: The upper extremities showed that his deltoid and biceps were of grade 4/5 strength. The triceps were 0/5 and wrist extension was 2/5. All of the muscle groups were 0/5. The abdominal muscles were flaccid as were the muscles of the lower extremities. There was complete sensory loss below the level of C7. The C6-7 sensation was abnormal but present. Sensory loss above it was normal.
Rectum: Rectal sphincters were patulous with no tone. There was priapism.
Local examination did not show any significant bruising at any point. There was however marked tenderness in the cervical region.

A clinical diagnosis of traumatic quadriparesis at the C6 spinal level was made.

## INVESTIGATIONS/COURSE IN HOSPITAL:
The patient was investigated with plain x-rays and a stat CT scan. This revealed a burst fracture of C5 and C6 with retropulsion of the bony pieces encroaching inside the canal. A stat MRI scan was obtained and this confirmed the marked cord compression at the level of C5-C6 due to retropulsion of the burst bodies of C5 and, to a lesser extent, C6. High signal intensity was demonstrated within the spinal cord just above the level and below the level of the compression.
....

44-01 (01/89) CAT: 420408

MÉDECIN TRAITANT — ATTENDING PHYSICIAN

PATIENT:
DOSSIER-CHART:                                681231-7
ADMISSION (DATE):                             15-01-92
CONGÉ-DISCHARGE (DATE):                       23-01-92
DICTÉ PAR-DICTATED BY:                        Dr. C. Agbi
CHIRURGIE-SURGERY (DATE):
MÉDECIN TRAITANT-ATTENDING PHYSICIAN:         Dr. M.T. Richard

Page 2

COPIE-COPY

The patient was started on Methylprednisolone and was given 2 g over the first hour and the Methylprednisolone was then continued at 5.4 mg/kg/hr. for the next 23 hours. Arrangements were immediately made for surgical decompression.

An indwelling catheter was inserted and the patient was resuscitated to further enhance the hemodynamic status.

The patient was taken to the Operating Room and, through an anterior approach, the bust bodies of C5 and C6 were removed through a generous corpectomy. The dura was decompressed. Although the dura was not opened, it was obvious that the underlying cord was contused. After adequate decompression, the space was grafted with a strut graft taken out of the iliac crest. Postoperative MRI scanning was carried out and this showed satisfactory decompression.

The neurological status remained unchanged postoperatively. The patient completed his dose of Methylprednisolone and was seen in consultation by the physiotherapist and by Occupational Therapy. He was also started on a regime of intermittent catheterization to empty the bladder. He was started on the usual bowel regime. The patient's condition remained stable. Since the patient was visiting from North Carolina, arrangements were made to transfer him back to his home. The patient was discharged, to be picked up by air ambulance for transfer back to North Carolina.

FOLLOW-UP:
Follow-up will be carried out by a local neurological surgeon. Arrangements for this have been made.

Dictated by:    C. Agbi, M.D./mp
Dictated:       23-01-92
Transcribed:    23-01-92

                M.T. Richard, M.D.

                Michael Richard, M.D.

01/89) CAT: 420408

MÉDECIN TRAITANT — ATTENDING PHYSICIAN

CENERAL
OTTAWA HOSPITAL
Smith, Ottawa, Ontario K1H 8L6

PATIENT: PHILLIPS Mark
DOSSIER-CHART: 681231-7
ADMISSION (DATE):
CONGÉ-DISCHARGE (DATE):
DICTÉ PAR-DICTATED BY: Dr. M.T. Richard
CHIRURGIE-SURGERY (DATE): 15-01-92
MÉDECIN TRAITANT-ATTENDING PHYSICIAN: Dr. M.T. Richard
cc: Dr. C. Agbi

☐ SOMMAIRE AU CONGÉ
DISCHARGE SUMMARY
☐ CONSULTATION
☒ RAPPORT CHIRURGICAL
OPERATIVE REPORT

COPIE-COPY

Surgeon:     Dr. M.T. Richard
Assistant:   Dr. C. Agbi/Dr. R. Benaissa

## PREOPERATIVE DIAGNOSIS:

Traumatic cervical myelopathy - C6 with paraplegia secondary to fracture subluxation cervical spine.

## POSTOPERATIVE DIAGNOSIS:

Same.

## OPERATIVE PROCEDURE:

1. APPLICATION HALO TONGS.
2. ANTERIOR CERVICAL VERTEBRECTOMY - C5 and C6 - WITH STRUT GRAFT FUSION.

## CLINICAL NOTE:

This young gentleman had been skiing on the day of his admission to our hospital (15th of January, 1992) and had incurred what sounded like an acute flexion injury to his cervical spine when he fell onto his head. I had been contacted by Dr. Ho of the Wakefield Hospital where he was first seen and he was immediately transferred to our institution on a fracture board completely immobilized. He mentioned at the time of arrival that he had some partial sensation in his hands and arms but nothing below that.

Immediately upon arrival in our Emergency Room, I brought him over to our CT scan unit where a scout film and initial scans were carried out of C4, C5 and C6 and this revealed multiple fractures involving C5 and C6. He was then brought directly over to the magnetic resonance imaging unit where more detailed imaging was obtained which showed a comminuted type of fracture of C5 with gross retropulsion of bone fragments into the canal as well as disc herniation at the C4-5 level and some involvement of the 5-6 level as well. From there, he was brought directly to our Operating Theatre for definitive decompression and fusion. Throughout this time, he had been given 2 g of Methylprednisolone which had been initiated within one half hour of his admission to our hospital.

## DESCRIPTION OF PROCEDURE:

Following satisfactory induction of general endotracheal anesthesia with the patient in the supine position, a graphite-type halo ring was applied to the patient's head after the areas had been clipped of hair and prepped in the usual fashion. This ring was then secured to traction to be used during the procedure. The front of the neck as well as the right iliac area were prepped and draped in the usual fashion. A linear incision was made on the right side of the neck anterior to the sternomastoid muscle, carried down through the skin, subcutaneous tissue and platysma, bleeding points being cauterized as they were encountered.

...../2

COPIE-COPY

| | |
|---|---|
| DOSSIER-CHART: | 681231-7 |
| ADMISSION (DATE): | |
| CONGÉ-DISCHARGE (DATE): | |
| DICTÉ PAR-DICTATED BY: | Dr. M.T. Richard |
| CHIRURGIE-SURGERY (DATE): | 15-01-92 |
| MÉDECIN TRAITANT-ATTENDING PHYSICIAN: | Dr. M.T. Richard |

Page 2

The anterior edge of sternomastoid was then freed and we progressively dissected
our way down to the anterior surface of the spine. The longus colli muscles were
grossly swollen, bruised and contused. We readily identified the fracture site
by simple palpation and we progressed with the dissection and inserted our
Cloward-type retractors.

I then proceeded with removal of some of the comminuted fragments anteriorly and
incised the disc at C4-6 as well as at C5-6. Using the high speed drill as well
as rongeurs, we progressively removed the comminuted retropulsed fragments of
bone of C5 on the upper part of C6. We then came down upon the anterior surface
of the spinal canal and proximal ligamentum flavum had to be removed. The canal
was widened using the high speed drill. The entire disc at C4-5 was removed and
the inferior portion of C4 was curetted and slightly drilled away to form a
trough for receiving the donor graft. The superior part of C6 had to be removed.
When this had been accomplished, we could readily pass a Penfield no. 3 up and
down the spinal canal both superiorly and inferiorly, confirming our
decompression.

We had inserted, prior to this, the Casper distracting instruments into the body
of C4 and in the inferior part of the body of C6. These were distracted. In the
meantime, we had also exposed the right iliac crest. We obtained a 4.3 cm graft,
a little longer than necessary, to bridge the defect. This was fashioned using
the high speed drill and Leksell rongeurs. The Casper distractors were widened,
the graft was inserted and then the bones were allowed to return to normal
position compressing the graft into position.

Both wounds were copiously irrigated, bleeding points controlled. A Hemovac
drain was placed in the iliac area and a simple Penrose in the cervical wound.
These were brought out through separate stab wounds. Dressings were applied and
the patient was then sent to the our Recovery Room in satisfactory condition.
Prior to that, however, control x-ray had been obtain on the operating table to
show the posteroperative status which appeared to be very satisfactory.

Dictated by: MTR/mf
Dictated: 16-01-92
Transcribed: 16-01-92

M.T. Richard, M.D.



**Shepherd**
**Spinal Center**

2020 Peachtree Road, NW
Atlanta, Georgia 30309
(404) 352-2020

June 24, 1992

To Whom It May Concern:

Mr. Mark A. Phillips (SSN #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) sustained a C-6 level spinal cord injury on January 15, 1992 which resulted in quadriplegia. His condition is expected to be permanent.

Sincerely,

Allen P. McDonald, MD
Attending Physician

APM:ml

# Supplementary Claim
# Disability Benefits

Connecti... ...neral Life Insurance Company of North America
Insurance Company of North America
INA Life Insurance Company of New York
Subsidiaries of CIGNA Corporation



Any person who knowingly and with intent to defraud any insurance company or other person files a statement containing any materially false information. or conceals for the purpose of misleading. information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## TO BE COMPLETED BY THE CLAIMANT

**NAME OF CLAIMANT** (Last Name) Phillips (First Name) Mark (Middle Initial) A.    **SOCIAL SECURITY NUMBER** 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    **TELEPHONE NUMBER** (704) 545-2872

**ADDRESS** (Street) 9706-P Stoney Glen Drive, (City) Charlotte    (State) North Carolina    Zip Code

**LIST STATES IN WHICH YOU MAY BE LIABLE FOR FILING TAX RETURNS**  Virginia

**NAME OF EMPLOYER/ASSOCIATION** Nortel    **POLICY NUMBER**

NAME OTHER SOURCES OF INCOME TO WHICH YOU AND YOUR DEPENDENTS ARE ENTITLED BY CHECKING THE APPROPRIATE SOURCES LISTED BELOW. SHOW AMOUNTS RECEIVED AND INDICATE PAYMENT FREQUENCY, IF YOU HAVE NOT PREVIOUSLY PROVIDED US WITH A COPY OF THE AWARD LETTER. PLEASE ATTACH A COPY. INDICATE "NONE" IN THE APPROPRIATE BLOCKS IF YOU DO NOT RECEIVE INCOME FROM A NAMED SOURCE

| ☐ Social Security | ☐ Pension | ☒ Governmental | ☐ Workers' Compensation | ☐ Other, Identify |
|---|---|---|---|---|
| $ | $ | $ | $ | $ |

**ARE YOU CURRENTLY WORKING?** ☐ YES ☒ NO
If yes, please provide name and address of employer, job title, number of hours worked per week, and wage rate.

**ARE YOU INTERESTED IN A VOLUNTARY REHABILITATION/RETRAINING PROGRAM?**    ☐ YES ☒ No

### AUTHORIZATION TO RELEASE INFORMATION

I certify that the information shown above is correct to the best of my knowledge and belief. I authorize any Health Care Provider, Insurance Company, Employer, Person or Organization to release any information regarding medical, dental, mental, alcohol or drug abuse history. treatment or benefits payable, including disability or employment related information, to any CIGNA company, the Plan Administrator, or their employees and authorized agents for the purpose of validating and determining benefits payable. This data may be extracted for use in audit or statistical purposes. I understand that I or my authorized representative will receive a copy of the authorization upon request. This authorization or a photostatic copy of the original shall be valid for the duration of the claim.

**SIGN HERE** Mark A. Phillips    **CLAIMANT'S SIGNATURE**    December 1, 1998 **DATE**

## TO BE COMPLETED BY ATTENDING PHYSICIAN
The claimant is responsible for the completion of this form without expense to the company.

### 1. PRESENT CONDITION

**DIAGNOSIS** Paraplegia    1st Visit this office    **DATE OF LAST VISIT**    **FREQUENCY OF VISITS**

**SUBJECTIVE SYMPTOMS** poor up ext moment, paralyzed lower ext

**OBJECTIVE FINDINGS** (X-RAYS, E.K.G.'S, LABORATORY DATA AND ANY CLINICAL FINDINGS)

### 2. PROGRESS

(a) Has patient ☐ Recovered? ☐ Improved? ☒ Unchanged? ☐ Retrogressed?

(b) Is patient ☐ Bed Confined? ☐ Hospital Confined? ☐ Ambulatory? ☐ House Confined? wheelchair bound

(c) Has patient been hospital confined? ☒ Yes ☐ No    If yes, give Name and Address of Hospital  11/97 - ...T.I

Confined from 7 days through

### 3. CARDIAC (If Applicable)

(a) Functional capacity
(American Heart Ass'n.)   ☒ Class 1 (No limitation)   ☐ Class 2 (Slight limitation)
                          ☐ Class 3 (Marked limitation)   ☐ Class 4 (Complete limitation)

(b) Blood Pressure (last visit)   80 SYSTOLIC   50 DIASTOLIC

LIMITATION (If there is a limitation, indicate and describe below)

Standing ___ Climbing ___ Bending ___ Use of hands ___ Sitting ___

Walking ___ Stooping ___ Lifting ___ Psychological ___ Other (state which) ___

**5. PHYSICAL IMPAIRMENT** ( * as defined in Federal Dictionary of Occupational Titles)

☐ Class 1 - No limitation of functional capacity; capable of heavy work*  No restrictions (0 - 10%)
☐ Class 2 - Medium manual activity*  (15 - 30%)
☐ Class 3 - Slight limitation of functional capacity; capable of light work*  (35 - 55%)
☐ Class 4 - Moderate limitation of functional capacity; capable of clerical/administrative (sedentary*) activity (60 - 70%)
☒ Class 5 - Severe limitations of functional capacity; incapable of minimal (sedentary*) activity (75 - 100%)
☐ Remarks:

**6. MENTAL/NERVOUS IMPAIRMENT** (if applicable)

(a) Please define "stress" as it applies to this claimant.

☐ Class 1 - Patient is able to function under stress and engage in interpersonal relations (no limitations)
☐ Class 2 - Patient is able to function in most stress situations and engage in most interpersonal relations (slight limitation)
☐ Class 3 - Patient is able to engage in only limited stress situations and engage in only limited interpersonal relations (moderate limitations)
☐ Class 4 - Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitations)
☐ Class 5 - Patient has significant loss of psychological, physiological, personal and social adjustment (severe limitations)
☐ Remarks:

N/A

Do you believe the patient is competent to endorse checks and direct the use of proceeds thereof?     ☐ YES   ☐ NO

**7. EXTENT OF DISABILITY**

Patient's Regular Occupation          Any Occupation

When was patient able to go to work?     Mo. ___ Day ___ 19 ___     Mo. ___ Day ___ 19 ___

Never

**8. REHABILITATION**

(a) Is patient a suitable candidate for further rehabilitation services?     ☐ YES  ☒ NO

(b) Can present job be modified to allow for handling with impairment?     ☐ YES  ☒ NO

(c) When could trial employment     ___/___/___     PATIENT'S JOB                    ANY OTHER WORK
    commence? ___                    Mo.  Day  Yr.   Full-time ☐   ___/___/___     Full-time ☐
                                                     Part-time ☐   Mo.  Day  Yr.    Part-time ☐

(d) Would vocational counseling and/or retraining be recommended?     ☐ YES  ☐ NO

**9. REMARKS**

Permanently Disabled

---

12/10/98 ___     PRINT NAME ___     SIGNATURE (ATTENDING PHYSICIAN) ___     DEGREE ___     TELEPHONE ___
DATE

STREET ADDRESS          CITY OR TOWN          STATE (OR PROVINCE)          ZIP CODE

**Shepherd
Spinal Center, Inc**

2020 Peachtree Road, NW
Atlanta, Georgia 30309
(404) 352-2020

March 30, 1993

Re:  Mark Phillips

To Whom It May Concern:

Your client, Mark Phillips, was rendered a quadriplegic at the C5-6 level as a result of a snow skiing accident on 1/15/92.  This condition has resulted in permanent paralysis of muscles below his injury level.  In addition to the extremity paralysis, he is unable to feel below his injury level.  He has also lost normal control of his bowel and bladder.

Because of these deficits, certain items are necessary to ensure your client's continued good health.  Listed below is the equipment needed for your client monthly:

     30 condoms
      1 leg bag
      1 Hollister strap
      1 petroleum jelly
     20 underpad Chux
      1 bedside bag
      2 posey
      1 Bard wipes (box)
      5 boxes of nonsterile gloves

Your immediate attention to these items that are essential to your client's continued health and independence is appreciated.

Sincerely,

Donald Peck Leslie, M.D.
Medical Director
Outpatient Services

DPL/LB:sfo

SHEPHERD SPINAL CENTER
ATLANTA, GEORGIA

D:
T:   06/08/92

NAME:  MARK A PHILLIPS
MEDICAL RECORD NUMBER:  49-46
ATTENDING PHYSICIAN: Allen McDonald, M.D.
DICTATOR:  THOMAS R. ROSS, M.D.
AGE/SEX:  31/M
                              D.O.B:
                              SS#:

ADMITTED:  02/03/92
DISCHARGED:  05/29/92

ROOM NUMBER:

## DISCHARGE SUMMARY

DISCHARGE DIAGNOSIS:     C6 complete quadriplegia

BRIEF HISTORY AND PHYSICAL:  Mr. Phillips is a 31-year-old white male status post anterior decompression of C5 after a snow skiing accident.  The patient apparently had complete paralysis at the scene of both upper and lower extremities.  The patient was transferred to Ottawa General Hospital and underwent emergent anterior decompression of C5 burst fracture and placement of a halo.  According the op note, the patient underwent a C5 chorpectomy with iliac strut graft.  Postoperative course has been uncomplicated and the patient was transferred to Raleigh, North Carolina initially.  He is transferred at this time to Shepherd Spinal Center for definitive rehabilitive care.  Examination at Shepherd Spinal was consistent with C6 complete quadriplegia.

HOSPITAL COURSE:  The patient was admitted to Shepherd Spinal Center on 02/03/92.  The patient's initial blood flow studies were positive therefore, he was started on heparin and remained at bed rest.  He was scheduled to resume program on 02/14/92 pending negative blood flow study.  Initially physical therapy began working with sitting tolerance.  On 02/28/92 the halo was removed.  Occupational therapy fitted the patient with Ateno-Desis brace for both grooming and feeding skills.  At this time he was on every four hour IC program as well as every evening digital stimulation bowel program.  Physical therapy continued to meet their goals early in his rehabilitative program with strengthening, wheelchair mobility skills, mat mobility skills and sliding board transfers.  On 03/12/92 it was noted that Mark was requiring a maximal assistance to perform his transfers.  Mark was using his Ateno-Desis brace in order to aid his self IC program.  He was making excellent progress with both feeding and grooming.  During this time Mark persisted to make excellent gains in both physical and occupational therapy programs.  It was noted at the end of April the patient had some swelling of his hands which was felt to be due to local trauma from wheelchair.  He was fitted for tight fit gloves to minimize the swelling.  By early May the patient was in

NAME:   MARK A PHILLIPS
MEDICAL RECORD NUMBER:   49-46
PAGE 2


phase III rehabilitation and continued to progress well.   The
patient experienced no further medical problems and was discharged
on 05/29/92.

The patient's bladder program consisted of reflex program.   Bowel
program consisted of dilatations every other evening.

MEDICATIONS ON DISCHARGE:   Hytrin 2 mg q.h.s.   He was discharged
with a regular diet.   Mode of transportation is wheelchair.   His
next clinic visit was scheduled for 07/27/92 at 8:45 a.m.



APM:TRR:wt7                        ALLEN P. MCDONALD, M.D.

SHEPHERD SPINAL CENTER
ATLANTA, GEORGIA

L  02/05/92
T:  02/05/92

NAME:  Mark Phillips                              ADMITTED:
MEDICAL RECORD NUMBER: 49-46                      DISCHARGED:
ATTENDING PHYSICIAN:  Allen McDonald, M.D.
DICTATOR:  John H. Cathcart, M.D.
AGE/SEX:          D.O.B:
                                    SS#:          ROOM NUMBER:

## HISTORY AND PHYSICAL

HISTORY OF PRESENT ILLNESS:  The patient is a 31 year old white male,
status post anterior decompression of C5 after snow skiing accident.
The patient apparently jumped a mogul, lost control of his arms and
legs and it is not understood whether it is the result of jumping or
that he just lost his balance.  The patient stated that he fell face
forward and with this he states he snapped his neck back.  The
patient had complete paralysis at the scene of upper and lower
extremities.  The patient was transferred to Ottawa General Hospital
and underwent emergency anterior decompression of C5 burst fracture,
placement of halo.  Op note stated that the patient underwent a
C5    ectomy with iliac strut graft.  Postoperative course has been
uncomplicated and the patient was transferred to Raleigh, North
Carolina and now is transferred to Shepherd Spinal Center for
definitive rehabilatation.

PAST MEDICAL HISTORY:  The patient underwent left knee arthroscopy in
the past, he has no medical problems.

ALLERGIES:  No known drug allergies.

MEDICATIONS:  None preinjury.

SOCIAL WORK:  Is a computer operator.  Denies ETOH, denies tobacco
use.

REVIEW OF SYSTEMS:  The patient states that he is feeling some return
of sensation in the soles of his feet and his left thigh.

PHYSICAL EXAMINATION:
GENERAL:  The patient is a white male in no acute distress, halo in
place, pin sites clean.
HEENT:  Pupils equal, reactive to light and accommodation,
extraocular movements are intact.  Pin sites were without
complications as stated.
NECK:  Anterior vertical incision scar of the right side, healing
without complications.
CHEST:  Clear to auscultation in all lung fields.
HEART:  Regular rate and rhythm without murmur.

NAME:  Mark Phillips
MEDICAL RECORD NUMBER: 49-46                          ADMITTED:
PAGE 2:                                               DISCHARGED:

ABDOMEN:  Positive bowel sounds, nondistended.
RECTAL:  No sensation to touch.  There is no motor and voluntary
conconstriction.  There is positive bulbocavernosus.
PELVIS:  Right iliac incision scar without complications.
EXTREMITIES:  Upper extremities were without abrasions.  The patient
shows spontaneous movements in the shoulders, elbow and wrist.  Range
of motion was without crepitation.
Lower:  The patient shows a well healed laceration scar right knee,
no other contusions noted.  Spontaneous movement to the lower
extremities.  Motor examination:  Upper, the right-the patient
exhibits grade 5, deltoid bilaterally grade 5, biceps bilaterally,
triceps 0 bilaterally, extensors are 5 bilaterally to wrist
extension.  The patient is showing 1+ trace of wrist flexion,
intrinsics are 0 bilaterally.  Lower examination is 0/5 bilaterally.
Sensation is intact C7 and C8 bilaterally, C8 distally there is no
sensation.  No propioception.

X-rays: X-rays showed the graft in good position, no instrumentation
had been used.  Halo was maintained in good alignment.

ASSESSMENT:          1.   The patient is a C6 quad, complete Frankel A,
                          halo in place, status post anterior
                          decompression with vertebrectomy and C5 strut
                          graft placed.
                     2.   The patient is suffering neurogenic bowel and
                          bladder.
                     3.   The patient is suffering an uncomplicated
                          postoperative course.

PLAN:                1.   The patient is to be brought into Shepherd
                          Spinal Center and go into definitive
                          rehabilitation.
                     2.   The patient will have follow up x-rays of the
                          cervical spine.
                     3.   The patient will undergo DVT prophylaxis and
                          will be gotten up as soon as blood flow
                          studies are negative.



                    _____
                          Allen McDonald, M.D.

JHC/bas

SHEPHERD SPINAL CENTER
ATLANTA, GEORGIA

D:  06/05/92
T:  06/10/92

NAME:  MARK A. PHILLIPS
MEDICAL RECORD NUMBER:  49-46
ATTENDING PHYSICIAN:  ALLEN P. MCDONALD, M.D.
DICTATOR:  DEBI ROSENBLATT, OTR/L
AGE/SEX:  31/M

ADMITTED:  02/03/92
DISCHARGED:  05/29/92

D.O.B:
SS#:

ROOM NUMBER:

## OCCUPATIONAL THERAPY DISCHARGE SUMMARY

HISTORY:  The patient is a 31-year-old male status post anterior decompression of C5, as a result of a snow skiing accident.  The patient was transferred to Ottawa General Hospital and underwent emergency anterior decompression of C5 burst fracture and placement of a halo device.  Post operative course was uncomplicated and the patient was transferred to Raleigh, North Carolina.  The patient was admitted for comprehensive rehabilitation to Shepherd Spinal Center on 02/03/92 as a C6 quadriplegic.  Patient underwent comprehensive rehab and was discharged on 05/29/92.

AREA I
COGNITIVE/PERCEPTUAL:  The patient was oriented x3 and demonstrated appropriate behaviors throughout rehabilitative stay.

AREA II
RANGE OF MOTION:  The patient has a limitation in right and left upper extremities and MP joints only.  Please see goniometry eval for details.  The patient states that he has some pain in bilateral wrists and shoulders especially after pushing the wheelchair for a full day and after several transfers.

AREA III
MOTOR:  Patient is a functional and neurological C6 quadriplegic.
Patient is right hand dominant.

AREA IV
SENSORY:
a.   SHARP/DULL:  Right upper extremity impaired C7 and below.
     Left upper extremity absent C8 and T1 and impaired T2, T1, C8
     and C7 ventral surface.
b.   LIGHT TOUCH:  Left upper extremity impaired C8 and C7 ventral
     surface; right upper extremity impaired T2, absent C8 and
     impaired C7.
c.   PROPRIOCEPTION:  Intact bilateral upper extremities.
d.   STEREOGNOSIS:  Intact bilateral upper extremities.

NAME: MARK A. PHILLIPS
MEDICAL RECORD NUMBER: 49-46
PAGE 2

AREA IV
ENDURANCE: The patient was able to sit up to 90 degrees for a full day. Patient is up in chair 12 to 16 hours per day. The patient had good to fair tolerance for program. Patient fatigued easily some days especially after morning program of wet runs and dressing.

AREA V
SKIN: Patient performed forward leaning weight shifts every 30 minutes in wheelchair. The patient is independent with weight shifts and has zero areas of redness or decubiti.

AREA VI
ACTIVITIES OF DAILY LIVING:
a.   FEEDING: Modified independent with Teno-Desis brace.
b.   DRESSING/UNDRESSING: Min assist pants, dependent shoes, independent shirt.
c.   GROOMING: Modified independence with Teno-Desis brace.
d.   BATHING: Min assist to bath back and bottom; patient requires moderate assist to bath lower extremities.
e.   COMMUNICATION: Independent.
f.   HOME MANAGEMENT: Min assist light home management.
g.   BOWEL/BLADDER: Modified independent bladder; moderate assist bowel.
h.   CHILD CARE: Not applicable.
i.   HOME ACCESSIBILITY FOR ADL PERFORMANCE: Patient is going go do home mods once home.
j.   WHEELCHAIR: Patient was discharged home in manual Kuschall wheelchair with airplane tires and rigid frame. Patient also has on order a Quickie P300 power chair.
k.   DRIVING/TRANSPORTATION: The patient had a driving evaluation and plans to purchase a van once home that is equipped with hand controls.

AREA VIII
UPPER EXTREMITY BRACING: The patient was issued bilateral upper extremity Teno-Desis braces to be able to perform his job as a computer software tester. The patient is completely independent with use of braces. Patient wears braces for all functional activity, but cannot wear them when he pushes his wheelchair.

AREA IX
POSTURE AND POSITIONING: The patient is independent positioning self in chair.

AREA X
VOCATIONAL/AVOCATIONAL:
a.   WORK/EDUCATIONAL HISTORY: The patient works as a software engineer for a company in Raleigh, North Carolina. The

NAME:  MARK A. PHILLIPS
MEDICAL RECORD NUMBER:  49-46
PAGE 3

patient's job sometimes sends him to Japan for months at a
time.  The patient plans to return to work immediately once
home although patient does not plan to go to Japan until he
feels he has adjusted to his injury.

## AREA XI
PSYCHOSOCIAL:  The patient was discharged to his home in Raleigh,
North Carolina with his girlfriend Margaret.

## AREA XII
FAMILY TRAINING:  Family training took place at first pass family
training and at discharge with patient's girlfriend Margaret.
Margaret demonstrated understanding of topics covered.  Please
refer to family training work sheet for details.

## AREA XIII
HOME PROGRAM:  The patient was issued two Jobst gloves to wear at
home as much as possible to decrease edema in hands.  The patient
also instructed to push wheelchair when he could and to get
passively ranged especially in fingers on a daily basis.

## AREA XIV
GOALS:  Patient surpassed goal #3 as he is independent upper
extremity dressing.  Patient also surpassed goal #17 as he is
modified independent with bladder care.  Patient achieved all other
goals.

## AREA XV
EQUIPMENT ISSUED:  Alson shower hose, quad-quip flex sponge,
dressing stick, quad-quip phone holder x2, Caudex cup holder,
utility belt, button aid/zipper pull, leg lifter, pencil wedge,
chain loops, dressing loops x3, loop scissors, quad-quip deluxe
meat cutter, built up phone, 24 inch webbing strap, Wanchik writer,
typing sticks, U-cuff, teaspoon, triangle pencil grips x5, feeding
equipment, make up mirror and bilateral Teno-Desis braces.

DEBI ROSENBLATT, OTR/L

DR:wt7

| TO | : | Mark R. Counselor, Raleigh VR Unit |
|----|---|---|
| FROM | : | Philip R. Protz, Rehab. Engineer, SC Region |
| CLIENT | : | Mark A. Phillips, VR # 1846064 |
| RE | : | Evaluation For Van Modification |
| DATE | : | 11-4-92 |

## REFERRAL INFORMATION:

Mark is a 32-year-old individual who has quadriplegia at the C-5,6 level as the result of a spinal cord injury. On 10-23, I met with Mark at his house to evaluate his physical abilities and make recommendations for both the purchase of a van to be modified for his use both as a driver and passenger when necessary. He has been evaluated by Shepherd Spinal Center in Atlanta, and has received a few itemized quotations from vendors specializing in vehicle modifications. Mark is requesting assistance from this agency with the modifications.

Mark is presently a software engineer with Northern Telecom, working on a part-time basis from his home until he acquires transportation that he can operate independently.

## OBSERVATIONS:

### A. Wheelchair Data:

Mark presently uses two wheelchairs: a Kuschall "Champion 3000", which is a lightweight, rigid-frame (non-folding) manual wheelchair outfitted with a standard-height Jay Back. He uses a Jay "Medical" cushion that measures 3.5 inches thick. The front casters are fitted with 5"D solid wheels. The wheelchair is set up to give him a 6-degree recline. Mark's second chair is a Quickie "P300" power wheelchair with 10"D wide pneumatic tires. There is a 5-degree recline and he uses both a standard-height Jay Back and the same Jay "Medical" cushion with this wheelchair. The joystick is on the right. Please see the Anthropometrics Sheet for additional measurements.

### B. General Physico-Functional Assessment:

1. **Posture Stability:** Very good stability for a quadriplegic individual. Mark uses a chest strap, and states that it is possible for him to fall forward fairly easily.

2. **Overall Strength:** Mark is very strong for his injury level. His strength has improved since his 6-27-92 assessment at Shepherd.

3. **Dexterity:** Mark has no effect grip. He can flex his wrist, which gives him some tendonesis ability. He states that he can manage most knobs and feels lever extensions should prove to be adequate.

4. **Transfer Ability:** Mark uses a sliding board and some assistance when transferring. He has no effective use of his triceps. He prefers to drive from his wheelchair.

5. **Temperature Regulation:** Mark states that he overheats fairly easily, and may be interested in either a remote-start or maximum-duty (auxiliary A/C & heat) temperature control system in the van.

6. **Head Rotation Ability:** Mark has complete ability to rotate his head.

7. **Muscle Tone:** Mark states that he has no problems with spasms and has spasms primarily when lying down or when transferring. I noticed no spasms during my visit. Mark does not need to take medication to control them.

C. DMS Evaluation Observations/Results:

1. Steering Ability: Values measured for which smooth, full rotation clockwise and counterclockwise was achieved using a tri-pin grip and the right hand:

       <u>14" Steering Wheel:</u>
       Angle      :          57-60 degrees
       DMS Value:            700+ ("oz-in")
       Calibrated Force:    57+ oz.
       System Requirements: Standard Power Steering

2. Brake/Accelerator Strength Measurements: The hand control lever was positioned to simulate the MPD model 3500 hand control unit (push, right-angle pull). Mark's right hand was in the steering spinner. No trunk support was provided.

       <u>Left Hand Push (brake):</u>
       Net DMS reading:   1710 ("lb-in")
       Calibrated Force:   480 +/- 8 oz. (30 lbs)

       <u>Left Hand Pull (accelerator):</u>
       Net DMS reading:   530 ("lb-in")
       Calibrated Force:   235 +/- 8 oz. (14.7 lbs)

## RECOMMENDATIONS:

1. BASE VEHICLE: Refer to the attached guide entitled "Vans For Drivers Using Wheelchairs." Also refer to the agency policy manual entry entitled "Vehicle Modification and Insurance" for exact requirements and protocol. Note that the policy states that there are minimum mileage requirements for the vehicle to be modified, and that "The Division will not modify a vehicle that is not within the recommendations of the engineer." The recommendation sheet must be signed by the client and the original returned to the counselor, with a copy of the signed original given to the engineer.

2. MODIFICATIONS TO THE VAN

<u>Van Access Modifications:</u>

2.1   Install a standard 6" drop floor from the driver's compartment to the front of the rear wheel wells.

2.2   Install wheelchair flooring and low-pile, tight-weave carpeting in all areas where the wheelchair shall travel.

2.3   Install a raised roof similar to the Viking sport roof. This is to accommodate raised doors. If van with auxiliary A/C ducts is purchased, remount duct and diffuser system and trim out nicely. Install interior lights.

2.4   Extend the height of the bifold doors in the conventional way.

2.5   Install a fully-automatic fold-out wheelchair platform lift, similar to the Ricon Uni-lite, Ricon S-1001, or Braun L400U (or updated equivalent) at the side "cargo" entrance. This lift is to have a platform of 42" length minimum. THE LIFT MUST BE RATED TO EASILY HANDLE THE WEIGHT OF THE POWER WHEELCHAIR.

2.6   Install fully-automatic electric door opener(s) at the side "cargo" entrance.

2.7   Install magnetic controls with a "lockout" keyed switch to prevent
      unauthorized use/entry on the outside rear of the vehicle. This type
      of control shall be set up to sequentially operate the door openers and
      the lift. A remote control system is also acceptable.

## Wheelchair Driving Adaptations:

2.8   A center-mounted, VA-approved electric wheelchair lock down device such
      as the "EZ Lock" system should be installed in the driver's area. Note
      that Mark needs a male component for both his manual Kuschall Champion
      3000 and his Quickie P300 power chair.

2.9   A lap and shoulder belt and chest restraint in the driver's area should
      be specially modified for the client's use while in a wheelchair.

## Vehicle Control Modifications:

2.10  Install a steering column extension for standard wheel and factory
      tilt-steering.

2.11  A quick-release tri-pin spinner knob for the **right hand** should be
      installed on the standard 14" steering wheel at the 5 o'clock
      position.

2.12  Install backup steering and brake units.

2.13  Install push, right-angle pull hand controls modified for use with a
      quadriplegic (similar to MPD # 3502) for use with the LEFT HAND.

2.14  Install reduced-effort brakes with automatic backup.

2.15  An electric parking brake with dash-mounted control switch should be
      installed.

2.16  An elbow-actuated 4-quadrant Digipad-type touch pad array should be
      mounted on the driver's door to control the turn signals and cruise
      control.

2.17  An extension attachment for gear selector (right hand use) should be
      installed.

2.18  Dash control extensions, t-bars, or loops should be installed as
      needed for climate controls, lights, washer/wiper, hood latch release,
      and radio/tape deck.

2.19  Power windows and door locks should be modified as needed.

2.20  (2) quad-key turners (duplicates) that are easily used by the client
      should be provided. An MPD-brand adjustable quad-key turner is
      preferred. On one end, the ignition key shall be placed, and on the
      other end a key to the lockout for the magnetic entry (if applicable).

2.21  Install lift, automatic door, and auxiliary/dome light controls in the
      driver's area as appropriate.

## Passenger Use Adaptations:

2.22  A 4-point wheelchair tie down similar to the Kinedyne system with 3-point wheelchair passenger restraint meeting FMVSS and U of Michigan crash test standards should be installed in the mid-section of the van opposite the lift, facing forward.

2.23  An quick-disconnect auxiliary driver's seat should be provided with anchoring installed in both the driver's area and toward the rear of the van.  Both should meet FMVSS standards.

## Miscellaneous Modifications:

2.24  Install a dual battery system with a charging isolator. The auxiliary battery should be rated at 700 CCA minimum.  If the second battery will not fit under the hood, it is to be mounted under the van in a sturdy, enclosed box with a door giving access from inside the van.

cc: Mark Phillips

Enclosure: Anthropometric measurements

1. Head controls

2. Tripod attachment to steering wheel

3. Chest strap

4. Automatic transmission



# ANTHROPOMETRICS

Client: __Mark Phillips__

Date: __10-23-92__

2) wheelchair ...

1) Quickie (...) ... Jay Back (std
   6° Casters
   6° recline
2) Quickie P300
   10 Ballon Casters
   Some Jay cushion — Jay Back (std) m.
   (B) Joystick

Wheelchair description:

**DIMENSIONS RE-LATING TO RANGE OF COMFORTABLE REACH ARE BASED ON THE INDIVIDUAL'S CAPABILITIES WHILE SITTING ERECT. MOST INDIVIDUALS' EFFECTIVE REACH IS CONSIDERABLY GREATER WHEN HE OR SHE LEANS FORWARD FROM THE WAIST.**

E=Electric Chair   M= Manual

UPWARD SIDE REACH          L=65"   R=64"
(11" offset from armrest)

HORIZONTAL SIDE REACH      L=73"   R=24"
(from armrest)

CHAIR ARMREST LEVEL/       M=28½"  E=29"
counters, tables

THIGH LEVEL/tables, sinks,  M=25½"   E=27"
lavatories, work area

CHAIR SEAT LEVEL/          M=18½" at high on seat top
(include cushion; describe)     3½"H for both chairs
   Jay Medical (gel)
   while looking arm : M=0?

DOWNWARD REACH/shelves, outlers    M=15"  without backing
FOOT HEIGHT/toe recesses   M=6"    E=9½"

OVERALL WIDTH =
(include pegs, control
box, etc.)                  M=26"   E=25"

Jay Back height :   M=25" , E=34"
Seat : M=19½"D , 18"W

— Joystick

ANTHROPOMETRICS
Page 2



|  | Left | Right |
|---|---|---|
| VERTICAL REACH/shelves, lifting aids | 65" | 65" |

FORWARD VERTICAL REACH/switches, shelves $M = 52$" $E = 52\frac{1}{2}$"

HEAD HEIGHT/shower fixtures $M = 48$" $E = 48\frac{1}{2}$"

EYE LEVEL/windows, mirrors $M = 30-31$" $E = 35-36$"

EYE TO TOE/driving, reaching $M = 30-31$" $E = 35-36$"

SHOULDER LEVEL $M = 41$" $E = 41\frac{1}{2}$"

PUSH HANDLE HEIGHT $M = 36\frac{1}{2}$" $E =$

FORWARD REACH (from chest) $M = 21\frac{1}{2}$"

ELBOW LEVEL/counters, tables $M = 27$" $E = 27\frac{1}{2}$"

Rear axle to toe :
$M = 30$"

TOE EXTENSION (from front post) / from front post $E = 20\frac{1}{2}$

ANTI TIPPER CLEARANCE (to floor) $M = 1\frac{3}{4}$" $E = \frac{1}{2}$"

BATTERY CASE CLEARANCE (to floor) $E = 2\frac{1}{2}$"

FOOTPLATE CLEARANCE (to floor) $M = 2$" $E = 2\frac{1}{2}$"

OVERALL LENGTH $M = 40\frac{1}{2}$" $E = 51\frac{1}{2}$

# Exhibit E

**OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 363 AND 1108 AUTHORIZING THE DEBTORS TO TERMINATE THE DEBTORS' LONG-TERM DISABILITY PLANS AND THE EMPLOYMENT OF THE LTD EMPLOYEES**

## Mark Alan Phillips

# Borrower's Certification & Authorization

## Certification

The undersigned certify the following:

One Mortgage Corporation
2100 Rexford Road, Suite 204
Charlotte, North Carolina 28211

1. I/We have applied for a mortgage loan from  ONE  MORTGAGE
in applying for the loan,

I/We completed a loan application containing various information on the purpose of the loan, the amount and source of the downpayment, employment and income information, and assets and liabilities.  I/We certify that all of the information is true and complete.  I/We made no misrepresentations in the loan application or other documents, nor did I/We omit any pertinent information.

2. I/We understand and agree that  ONE  MORTGAGE
reserves the right to change the mortgage loan review process to a full documentation program.  This may include verifying the information provided on the application with the employer and/or the financial institution.

3. I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements when applying for this mortgage, as applicable under the provisions of Title 18, United States Code, Section 1014.

## Authorization to Release Information

To Whom It May Concern:

1. I/We have applied for a mortgage loan from  ONE  MORTGAGE
As part of the application process,  ONE  MORTGAGE
may verify information contained in my/our loan application and in other documents required in connection with the loan, either before the loan is closed or as part of its quality control program.

2. I/We authorize you to provide to  ONE  MORTGAGE
and to any investor to whom  ONE  MORTGAGE
may sell my mortgage, any and all information and documentation that they request.  Such information includes, but is not limited to, employment history and income; bank, money market, and similar account balances; credit history; and copies of income tax returns.

3. ONE  MORTGAGE
to any party named in the loan application. _____  or any investor that purchases the mortgage may address this authorization

4. A copy of this authorization may be accepted as an original.

5. Your prompt reply to  ONE  MORTGAGE
or the investor that purchased the mortgage is appreciated.

One Mortgage Corporation
2100 Rexford Road, Suite 204
Charlotte, North Carolina 28211

| | | |
|---|---|---|
| _Borrower's Signature_ | 11/9/99 <br> Date | 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 <br> Social Security Number |
| Margaret I. Smith <br> Borrower's Signature | 11/9/99 <br> Date | 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 <br> Social Security Number |

GENESIS 2000, INC. ™ V9.3/W11.0 ™ (818) 223-3250

Fannie Mae Form 1097 Dec. 86