## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTEL NETWORKS, INC., *et al.*,[1] | ) | Case No. 09-10138 (KG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| OFFICIAL COMMITTEE OF LONG | ) | |
| TERM DISABILITY PLAN | ) | |
| PARTICIPANTS, on behalf of and as | ) | |
| agent for a class of individual participants | ) | |
| and beneficiaries under various NORTEL | ) | Adversary No. 12-_____ |
| NETWORKS HEALTH AND | ) | |
| WELFARE BENEFIT PLANS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NORTEL NETWORKS, INC., *et al.*, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The Official Committee of Long Term Disability Participants (the "LTD Committee"),

on behalf of and as agent for a class of individual participants and beneficiaries (the "Individual

---

[1]   The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226) (hereafter collectively referred to as "Nortel" or "Nortel Networks, Inc.").

Class Members") (jointly referred to as the "Plaintiffs") under various health and welfare benefits plans (the "Plans") of the above-captioned debtors (collectively, the "Debtors"), which class herein asserts claims and rights against the Plans and against Nortel Networks Inc. ("Nortel"), a debtor in the above-captioned Chapter 11 case and the Defendant in this proceeding, as administrator of such Plans and in conjunction with its fiduciary responsibilities under such Plans, and which in accordance with such plans and rights give rise to an action for declaratory judgment, an action for injunctive relief, an action for reformation and such other relief as permitted under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001, *et seq.* In connection with the assertion of such claims and rights, the LTD Committee, on behalf of and as agent for the Individual Class Members, alleges for the Verified Complaint as follows:

## SUMMARY OF THE ACTION

1.    This is an adversary proceeding brought pursuant to Rule (b)(2) of the Federal Rules of Civil Procedure (the "Federal Rules") and (3), as made applicable pursuant to Rule 7023 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as well as Bankruptcy Rules 7001 and 7065, for declaratory and injunctive relief to determine the rights of the Individual Class Members under certain ERISA welfare benefit plans maintained by the Debtors of which such members are currently receiving benefits and as to which the Debtors have violated and are currently violating their fiduciary obligations to the Plaintiffs and to prevent an imminent injury to the Individual Class Members as a result of the Debtors' issuance of confusing and anxiety-producing communications requiring them to waive their ERISA rights in order to receive benefits to which they are otherwise entitled. The purpose of the relief sought is to prevent the Debtors' current breach of fiduciary duty and to provide a remedy for past

breaches of fiduciary duty, to enjoin their misleading communications, to obtain a declaration of the Plaintiffs' rights under the Plans, or, in the alternative to obtain reformation of the Plans. The disposition of the foregoing claims and rights in summary fashion, without sufficient notice and opportunity for the Individual Class Members to be heard would result in a denial of due process and an illegal usurpation of their rights under ERISA to bring this action within the exclusive jurisdiction of the United States District Court. 29 U.S.C. §1132(a)(3), §1132(e).

2.      This matter is a non-core proceeding pursuant to Section 157, as the substantive rights at issue herein arise exclusively pursuant to ERISA, preceded the Debtors' filing under Chapter 11, with the exception of the Debtors' action that give rise to Count I, as set forth herein, and relate to the rights arising from employee welfare benefit plans governed exclusively by ERISA.

**JURISDICTION AND VENUE**

3.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§157(c)(1) and 1334 and 29 U.S.C. §§1001, 1132(e)(1). Pursuant to Rule 7008(a) and 28 U.S.C. §157(c)(1), the Plaintiffs do not consent to entry of final judgment by the bankruptcy judge.

4.      The venue in this action is proper in this district pursuant to 28 U.S.C. §1409 and 29 U.S.C. §1132(e)(2).

5.      The statutory predicates for the relief sought herein arise from ERISA §§402(b)(3), 404(a)(1), and 502(a)(3), 29 U.S.C. §§1102(b)(3), 1104(a)(1), and 1132(a)(3), (3)(1) and regulations promulgated thereunder, including 29 C.F.R. §2520.102-2(a), 2520.102-3(l).

## THE PARTIES

6.    The Plaintiffs are The LTD Committee -- seven individuals selected in their capacity to represent the interests of Long Term Disabled Employees of the Debtors, who are similarly situated to all Long Term Disabled Employees of the Debtors who are receiving benefits under the Plans (the "LTD Plan Participants").

7.    The Committee Members and each and every one of the Individual Plaintiffs worked for the Debtors.

8.    The Committee Members and each and every one of the Individual Plaintiffs are participants in the Debtors' various welfare benefit plans providing long term disability ("LTD") and other benefits.

9.    The Defendant is a business corporation organized and existing of the laws of the State of Delaware, and previously operated in all 50 states, including Delaware.

10.    On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc.,[2] filed in the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§101, et al. (the "Bankruptcy Code"). The Debtors' bankruptcy cases (the "Bankruptcy Cases") have been consolidated for procedural purposes only. The Debtors continue to operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11.    The Debtors have functioned as the "plan sponsor" and "plan administrator" of the Plans, within the meaning of ERISA. The Debtors, through their Department of Shared

---

[2]  Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes (Docket No. 1098).

Services and its Employee Benefits Committee, also functions as a "named fiduciary" for the

Plans within the meaning of ERISA.

## CLASS ACTION ALLEGATIONS

12.    The Plaintiffs bring this action as a class action in accordance with Bankruptcy

Rule 7023 and Federal Rule 23 to resolve disputes under ERISA.  Judicial economy dictates that

the issues be resolved in a single action.

13.    The proposed class is defined as any and all persons who:

(a)    Are currently classified as employees of the Debtors not actively working;

       (b)    Have participated in the Debtors' welfare benefit Plans;

       (c)    Became disabled prior to the filing of the Bankruptcy Cases;

       (d)    Applied for and were qualified to receive long term disability benefits in accordance the requirements of the Debtors' welfare benefit Plan in effect at the time of their disability;

       (e)    Were determined to meet the requirements for eligibility for such benefits, were approved to receive, have received and continue to receive such benefits;

       (f)    Have been notified by the Debtors of their intention to terminate its Plans; and

       (g)    Have received misleading disclosures from the Debtors regarding the contents of and benefits under the Plans.

14.    The proposed class covers all LTD Plan Participants.

15.    The proposed class covers approximately 215 individuals.  The class is so

numerous that joinder of all members as plaintiffs to an adversarial procedure is impracticable.

16.    There are common questions of law and fact affecting the rights of the members

of the class.  The claims of the members of the LTD Committee, individually, are typical of the

claims of the class.  The LTD Committee as agent for and representative of the class will fairly and adequately protect the interests of the class.

17.    This action is maintainable as a class action under Federal Rule 23(b)(2) because the Defendant has acted and/or refused to act on grounds generally applicable to the class, thereby making appropriate final declaratory, injunctive and other equitable relief in favor of the class.

18.    This action is maintainable as a class action under Federal Rule 23(b)(3) because questions of law or fact common to class members predominate over any questions affecting only individual class members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## STATEMENT OF FACTS

19.    Upon information and belief, the Debtors originally provided their employees with income continuation protection in the form of LTD coverage under an insured plan.

20.    In or about 1980, the Debtors converted their welfare benefit plans from insured to self-funded plans, including income continuation protection for employees who became disabled.

21.    At the time the Debtors converted their Plans to self-funded, the Debtors did not provide full and complete disclosures regarding the nature of the benefits that they now claim the Plans were intended to provide sufficient to enable their employees to assess the coverage that they were receiving or to evaluate the necessity of pursuing other insurance to protect themselves against risks the Debtors failed to disclose were not covered.

22.    Over the years, the Debtors have provided their employees with various "plan documents," "summaries," "plan booklets," "summary plan descriptions ("SPDs")," "enrollment

workbooks," "enrollment guides," policies on leaves of absences, which included the LTD policy, and other forms of information regarding the benefits available under the Plans.

23.     Additionally, the Debtors have, through their human resources employees and other managers, held meetings with employees to explain the benefits available under the Plans prior to their election of benefits under the Plans.

24.     The Debtors have sent through mail and electronic mail various correspondence to LTD Plan Participants regarding their coverage.

25.     The Debtors have further represented to employees that the plan in effect at the time they become disabled is the plan that governs their benefits.

26.     The Debtors have continued to classify the Individual Class Members as employees in order to obtain the tax and other advantages of funding the welfare benefits through a Voluntary Employee Benefit Association ("VEBA").

27.     The Individual Class Members consist of approximately 215 disabled employees of the Debtors who are unable to work because of their disabilities and who receive income continuation benefits under the Debtors' long term disability plans ("LTD Plans").[3] Nortel offered these benefits as part of what it represented to be a comprehensive menu of benefits and even encouraged and induced the Individual Class Members to "buy up" the LTD benefit by purchasing a higher level of income protection with their own funds. (See infra ¶32).

28.     The Individual Class Members, including many with dependent children, rely on the monthly receipt of LTD income continuation along with Social Security Disability Income ("SSDI") to meet basic expenses – housing, food and the costs of daily living.  Many of the Individual Class Members are seriously ill with conditions that require frequent medical

---

[3]  The LTD Plans are employee welfare benefit plans as defined by ERISA, 29 U.S.C. §1002(1).

treatment and medication and that certainly preclude them from performing **any** gainful employment. The LTD monthly income continuation benefit is also used to pay the cost of these attendant medical and pharmaceutical expenses arising from their disabling condition. Termination of these benefits would be nothing less than catastrophic for the Individual Class Members who can never work again and cannot replace the supposed disability benefit with new coverage.

29.   The Individual Class Members consist of a diverse group of individuals who have each suffered a disabling event at separate times, ranging from as early as 1981 up through 2010. Over half of the group became disabled more than 10 years ago, while every individual has continuously suffered from permanently disabling conditions, including various forms of cancer, blindness, organ failure, and other life-threatening diseases.

30.   It is not entirely clear what type of program the Debtors used to provide income continuation to disabled employees. There is evidence that the Debtors at one time fully insured -- as opposed to self-funding or "self-insuring" - the LTD benefits. The Debtors asserts that the LTD Plans are "generally self-funded" (*see Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363 and 1108 Authorizing the Debtors to Terminate the Debtors' Long Term Disability Plans and the Employment of the LTD Employees* (Docket No. 8067) (the "Motion to Terminate") filed on July 30, 2012 at ¶10), meaning that the Company pays for the LTD benefits out of its general assets and into the Nortel Networks Inc. Health & Welfare Benefits Trust (the "Trust"), which funds the benefits under the LTD Plans. The Trust is a VEBA. However, even after they adopted this funding mechanism, the Debtors referred to the LTD benefits as "self-**insured**."

31.    The LTD Plans also provide the participants with medical benefits, dental/vision/hearing benefits, life insurance and accidental death and dismemberment (AD&D) benefits. The Debtors self-insured the medical and dental/vision/hearing benefits and provided the life insurance and AD&D benefits under a policy of insurance.

32.    The Individual Class Members receive LTD monthly income continuation in an amount representing a percentage of their pre-disability earnings (the "core" monthly benefit). The amount of core monthly benefit depends upon the provisions of the plan in effect at the time of the individual's disabling event and whether the individual opted to purchase increased LTD coverage with their own funds. Over the various plan years, the Debtors provided "core" coverage, at no cost to the employee, ranging from 50% to 70% of pre-disability earnings. Depending on the provisions of the LTD Plan in effect, employees could purchase, at their own expense, "optional" LTD coverage to increase the "core" monthly benefit. Under certain LTD Plans covering various years, this "optional" benefit increased the monthly benefit to 70% of pre-disability earnings.

33.    The Individual Class Members have received from the Debtors an annual enrollment form for the medical benefits, dental/vision/hearing benefits, life insurance and accidental death and dismemberment (AD&D) benefits that were provided as part of the LTD Plans.

34.    These enrollment forms contained no qualifying language or any expression suggesting that the benefit being provided pursuant to the Plans were in any way contingent or illusory.

35.    In 2008, before the Debtors had filed their Chapter 11 petitions, the Debtors mailed to the Individual Class Members a 2009 "benefits enrollment package," which stated: "If

you're on LTD or STD on January 1, 2009 (regardless of your annual enrollment choices), your 2008 STD, LTD, optional life insurance and optional AD&D insurance choices will stay in effect until you return to work for 30 consecutive days." The enrollment forms do not qualify the benefits provided in any way or disclose any contingencies or forfeiture rights that would extinguish benefits in pay status.

36.    The 2009 package included a 21-page booklet entitled "Building a Healthier Future … Starts Today – Your 2009 Health & Group Benefits Enrollment Overview Guide." In the section entitled "Get Informed … What's New for 2009," it states: "**Clear communication.** As part of our renewed commitment to taking the mystery out of benefits communication . . . Rest assured, our benefits program isn't changing—it's just a matter of making benefits communication simpler and more straightforward for you and your family."

37.    Beginning with the enrollment form for the 2011 Plan year, mailed to the Individual Class Members by letter dated November 15, 2010, after the Debtors had sought leave of the Bankruptcy Court to terminate their Plans through the Motion to Terminate, the Debtors for the first time qualified the re-enrollment process and issued the following statement in the cover letter accompanying the enrollment form:

> The company continues to review benefit programs. Receipt of this enrollment information does not guarantee eligibility or benefit coverage. Nortel continues to reserve the right to change, amend, and reduce or terminate the Health & Welfare plans, at any time, without prior notice to, or consent by, employees, retirees or surviving beneficiaries, in accordance with the terms of the plans and applicable law.

This language is misleading and fails to accurately represent the contents of the Plans in question. See letters collected and attached as Exhibit A.

38.    The Debtors mailed enrollment forms for the 2012 Plan year to Individual Class Members on November 4, 2011. The cover letter accompany the enrollment materials contained

the same reservation language as that set forth above and contained in the November 2010 cover letter.

39.    The enrollment forms attached to the 2010 and 2011 cover letters for the 2011 and 2012 Plan Years allow Individual Class Members to elect different types of coverage, and set forth the amount of the Individual Class Members' contributions to purchase the coverage.

40.    At no time prior to 2012 and specifically in the 2011 and 2012 Plan year enrollment forms, did the Debtors require Individual Class Members to accept their post-petition assertion of rights as a condition to their enrollment for benefits.

41.    On November 2, 2012, the Debtors prepared a cover letter to the Individual Class Members purporting to "notify [them] that this year's benefits annual enrollment period is from November 9 through November 21, 2012."

42.    The Individual Class Members began receiving the cover letter and enrollment forms on or about November 8, 2012.

43.    The cover letter dated November 2, 2012, further qualifies the re-enrollment process, well beyond the statements the Debtors made in conjunction with the two prior enrollment, with language that is not contained in any plan document or summary plan description and not only overstates, but also misrepresents, the Debtors' rights under plan language that the Debtors themselves had offered to this Court as setting forth its prerogatives as plan sponsor. Specifically, the letter states:

> The company continues to review benefit programs. *Receipt of this enrollment information does not guarantee eligibility or benefit coverage. Nortel continues to reserve the right to change, amend, and reduce or terminate the Health & Welfare plans and the coverage and benefits provided thereunder,* at any time, without prior notice to or consent by, employees, retirees or surviving beneficiaries, in accordance with the terms of the plans and subject to applicable law.

The language in bold represents additional qualifications well beyond the misleading representations the Debtors previously made in the November 2010 and 2011 cover letters. The language is not a quotation from any Plan or summary plan description, but, rather, represents the statement of a legal position arising from an adverse interest that the Debtors have adopted to the detriment of the rights of the Individual Class Members, in derogation of the rights of plan participants and in contravention of their obligations as a fiduciary to provide accurate information to the Plaintiffs.

44.     Ironically, the Debtors state in the November 2, 2012 letter that they are "committed to providing you with the **right** information to help you make the most informed decision ...." (emphasis added).

45.     The language contained in the November 2, 2012 letter relating to the Debtors' continued reservation is confusing, concerning and worrisome to the Plaintiffs.

46.     Furthermore, the Debtors improperly and inappropriately couple their misleading and intimidating "reservation statement" with a lengthy reminder that the Debtors have filed a motion to terminate the LTD Plans <u>and</u> the employment of the Individual Class Members, that it claims, if approved, would terminate all LTD benefits.

47.     The Debtors additionally refer to their Motion for Entry of an Order Terminating Retiree Benefits and Approving a Settlement Proposal Pursuant to 11 U.S.C. §1114 seeking "the termination of certain retiree benefit plans, including those providing medical insurance, life insurance and long-term care insurance" and states that the "rights of all current and prospective retirees to receive such benefits would be affected if the Retiree Benefit Termination Motion is approved."

48.    The Individual Class Members who have received this correspondence with language not contained in any Plans or summary plan descriptions, set forth in conjunction with assertions about litigation are confused and concerned by the representations made by the Debtors. *See* Declaration attached as Exhibit B.

49.    Additionally, the enrollment form enclosed with the cover letter dated November 2, 2012, contains the following language in bold print that has **never** previously appeared in **any** enrollment form:

> **Important Note:  Nortel Networks, Inc. may further amend or discontinue the Benefit Plan(s) and the coverage and benefits provided thereunder at any time without prior or notice or consent, in accordance with the terms of the plan and subject to applicable law.**

The form contains the participant's name, global ID, date of birth, pay frequency and benefit earnings and thereafter shows the participant's benefit selections an the cost per pay period for those benefits.  The participant's name appears on the very bottom of the last page, an apparent electronic signature.

50.    As the cover letter indicates, the Individual Class Members are required to complete the enclosed "personalized 2013 Annual Enrollment worksheet" and return it postmarked **no later than November 21, 2012** for those who are covering spouses, or they will be penalized with the imposition of a spousal access fee of $108.33 per month.

51.    The Individual Class Members are unwilling to return an enrollment worksheet containing the language in the **"Important Note,"** as such submission suggests an acceptance of the Debtors' position. *See* Exhibit B.

52.     Until the present enrollment worksheet, the Debtors have never imposed any such language upon an LTD Plan Participant's receipt of benefit to which he or she is entitled under the terms of benefits for which they have been determined to be eligible.

53.     In the section of the enrollment cover letter entitled "Why do I need to review the 2013 Annual Enrollment Guide?" the Debtors state that the materials provided in connection with the annual enrollment process "are in all cases **subject to the terms of the relevant Health & Welfare Plans**" (emphasis added).

54.     Individual Class Members recently contacted the Debtors' HR Shared Services, as directed in the 2012 enrollment cover letter, to obtain information regarding the "terms" the Debtors reference and to obtain the "relevant Health & Welfare Plans." *See* Declaration attached as Exhibit C.

55.     The Debtors' HR Shared Services representative spoken to (a) was not familiar with the November 2, 2012 enrollment cover letter, and (b) responded that the "Health and Welfare Plans" are the benefits that the participant selected and could not cite to or provide the identity of the "Health and Welfare Plans" referred to in the November 2, 2012 letter.

56.     The Debtors have sought to use the re-enrollment process to engage in an impermissible effort to retroactively alter the language of previous Plan documents.

57.     The statements contained in the 2010, 2011 and 2012 cover letters misleadingly suggest that the Debtors have the authority to construe the Plans so as to advance an interpretation that deprives the Individual Class Plaintiffs of their rights and benefits under the Plans.

58.     The Debtors' own documents, specifically the 2006 Summary Plan Description and the 2010 Summary Plan Description upon which it relies in its Motion to Terminate, make

clear that the Debtors delegated the authority to interpret the plans and to make determinations regarding the obligation to provide benefits to their Claims Administrator and cannot undertake the extinguishment of rights under the LTD Plans and cannot communicate to the Individual Class Members concerning these matters.

59.    Specifically, both documents contain the following language:

In connection with the appointment of Prudential as the Claims Administrator of the Long-Term Disability Plan and the Short-Term Disability Plan (the "Disability Plans"), the Plan Administrator [i.e. Nortel] delegated the **exclusive authority to interpret and administer the provisions of the Disability Plans, including discretionary authority to:**

-    **construe and interpret the terms of the Disability Plans;**

-    determine the validity of charges submitted under the Disability Plans; and

-    **make final, binding determinations concerning the availability of benefits under the Disability Plans.**

2006 Summary Plan Description at p. 6; 2010 Summary Plan Description at p. 5.  (emphasis added).

60.    Under this delegation, which currently encompasses the actions at issue here to interpret the terms of the plans, to make benefit determinations and to communicate with plan participants regarding their rights thereunder the Plans, the Debtors have relinquished **any** authority to exercise power over any determination concerning the meaning of the Plans and the construction of the rights there under to deprive a participant of benefits.

61.    The delegation makes clear that the Claims Administrator has assumed the Debtors' fiduciary plan administration responsibilities relating to interpreting and administering the plans.

62.    The Debtors have no standing under their Plan documents to communicate regarding the termination of benefits or to terminate[4] rights requiring construction of the Plan.

63.    The Debtors have misled the Individual Class Members by suggesting that the matter at issue in enrolling in the 2013 benefit Plans and in the Motion to Terminate arises from a single clause of the LTD Plans and that the consequences suggested "automatically" follow from that, when there are numerous plans and numerous provisions that both extend rights upon termination, prohibit retroactive changes and reserve administration of benefits in pay status to parties other than the Debtors.

64.    Moreover, those other parties, in this case Prudential, have the authority to make the determination at issue and that party's determination is binding under the Plan documents. Moreover, the Debtors have advanced this position in conjunction with their fiduciary obligations to provide benefits and to enroll the plan participants in the Plans for which the claims administrator has determined that they qualify.

65.    The Debtors' Motion to Terminate calls into question the interpretation of the terms of the LTD Plans and requires a determination as to the terms of the plan in order to enforce them and to direct the circumstances under and the procedures by which a plan administrator may not simply terminate a plan but require its delegated authority to extinguish the contractual rights of plan participants arising prior to the termination.

66.    The SPDs, the Debtors' communications with LTD Plan Participants and the Debtors' actions in effectuating purported "amendments" establish that such changes were **never** retroactive and did not alter the liability fixed under previous LTD Plans.

---

[4] The Debtors' delegation did not encompass termination of the Plan, a settlor function. Accordingly, they may be able to seek Plan termination but any further actions relating to determination of rights under the plan involve plan administrator, which they expressly relinquished.

67.     For example, the relied upon reservations in the 2006 and 2010 SPDs allow the Company to "change or end **the plans** described in this summary at any time" (emphasis added). The language does not say "your LTD benefits will terminate when the plan terminates," or that "changes to the plans will be retroactive." Additionally, these plan descriptions do not state, as to "When Benefits Begin and End," that benefits are extinguished by discontinuance of the Plan. Similarly, the 1989 Group Benefits Plan document attached to the Debtors' Motion to Terminate contains an "Extension of Benefits" provision that creates an exception to termination of coverage by virtue of plan termination "if a period of total disability is in progress when your coverage terminates."

68.     The Debtors' conduct is consistent with their commitment to restrict changes to future claims. For example, Debtors amended the LTD benefits to eliminate the automatic cost of living adjustment (COLA) increase to participants' income replacement payment. However, the change only affected employees who became disabled after the change. Additionally, the Debtors have described the affect of this change in the 2006 and 2010 SPDs as follows: "For disabilities beginning on or after July 1, 1994 but before January 1, 2000, prior plan provisions provide a cost-of-living adjustment (COLA) for LTD benefits. ... The LTD plan does not provide a COLA increase for LTD benefits for disabilities beginning on or after January 1, 2000." This apparent amendment only had prospective effect.

69.     Over the years, the Debtors or their agents have regularly informed LTD Plan Participants that their rights to benefits arise from the plan in place at the time they become disabled and not based upon any subsequent amendments or replacement plans, and that changes to the plans, consistent with the change to COLA, are not retroactive.

70.    Moreover, over the years, the Debtors or their agents have regularly and consistently informed LTD Plan Participants that once they become disabled their LTD benefits will continue until their disability ends, they reach age 65, they die, or they fail to provide certification of their continuing disability.

71.    After filing for bankruptcy, the Debtors solicited proposals from several insurance carriers for the cost to transfer the ongoing liability to the Individual Class Members under the Plans.

72.    Upon information and belief, after receiving the proposals, the Debtors rejected the cost as excessive and thereafter changed its position and its representation to LTD Plan Participants as to when their LTD benefits could end, asserting that it could retroactively affect claims that had already been submitted and approved and were in pay status.

73.    In June 2010, the Debtors notified the Individual Class Members of their intention to terminate the Plans, suggesting that such an action allowed it to cease paying LTD benefits. In aid of such an action, the Debtors filed their Motion to Terminate.

74.    Despite vague general statements in the Plans it referenced addressing the future of its employee benefit plans, the Debtors have never disclosed any authority to retroactively terminate LTD benefits for those who are already disabled and in pay status and cannot cite to a single clause in any document reserving such a right.  In fact, the plan documents specifically provide for the continuation of LTD benefits for those who are already disabled when the Plans terminate.

75.    The Debtors' own policies demonstrate that benefits continued for those who were already disabled and in pay status for as long as the individual remained disabled to age 65 and this was not qualified with a statement that benefits could be terminated "at any time" as the

Debtors argue in their Motion to Terminate. From 1997 through 2006, the Debtors provided employees with medical leaves of absence policies made applicable to the LTD benefits. For example, the Debtors' "U.S. Leaves of Absence Medical Leave of Absence Process" states, as to the "Duration of Benefits" for LTD: "LTD benefits are payable as long as clinical evidence supports total disability up to age 65 . . .." This document does not condition the duration of the LTD benefit on any factors other than clinical evidence supporting disability and age. There is no limitation on the continuance of benefits. There is no mention that benefits cease when the plan is terminated or for any other reason or that benefits can be retroactively terminated even after disability. The affirmative statement is that benefits continue as long as the individual remains totally disabled, up to age 65, as long as the clinical evidence supports the total disability. The language does not state that the Debtors could retroactively reduce **benefits** or terminate **coverage**, as the Debtors now state in their enrollment cover letter.

76.     Documents provided to employees regarding LTD benefits, including FLEX Benefit programs, Personal Reports of Benefits, and Enrollment Workbooks, until the Debtors abandoned their fiduciary obligation and adopted an adversarial position to the Individual Class Members, all communicated statements such as, with respect to LTD income continuation, "You're covered to the end of your approved disability or age 65."

77.     Additionally, numerous LTD Plan Participants were provided letters from Prudential Insurance Company, the claims administrator for the LTD disability benefit and the Debtors' delegated authority to interpret and construe the LTD Plans, confirming and verifying income to banks and lenders that individuals would continue to receive LTD benefits for the length of disability until age 65.

78.     Finally, LTD Plan Participants were advised by personnel in the the Debtors' Human Resources departments, <u>prior to becoming disabled</u>, both individually and in group "town hall" benefits meetings, that LTD benefits would continue to age 65 if the employees became permanently disabled with no limiting or qualifying language.

**COUNT I**
(Injunctive Relief)

79.     The Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

80.     The Debtors, as Plan Administrator, owe a fiduciary duty to LTD Plan Participants to communicate truthfully and accurately, and may not materially mislead LTD Plan Participants. "An ERISA 'fiduciary may not, in the performance of [its] duties, 'materially mislead those to whom the duties of loyalty and prudence are owed.' This responsibility encompasses 'not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful.'" (citations omitted). *In re Unisys*, 579 F.3d 220 (3d Cir. 2009) (*Unisys IV*).

81.     In short, 'when a fiduciary speaks, it must speak truthfully, and when it communicates with plan participants and beneficiaries it must convey complete and accurate information that is material to their circumstance.'" *Unisys IV* at 228 (citation omitted).

82.     The 2013 benefit enrollment packages not only violates the Debtors' duty under ERISA to communicate truthfully, but the Debtors have also distressed and confused the Individual Class Members, causing them to fear enrolling for benefits, to which they are legally entitled, under an enrollment letter and worksheet that purports to reserve an unfettered right to the Debtors to terminate **benefits** at any time even for those who are disabled and in pay status.

83.     Such a right has never been reserved by the Debtors and their attempt to insert a reservation of rights to retroactively terminate benefits through a benefits enrollment package the

Plaintiffs as disabled employees of the Debtors are desperate to obtain, is contrary to the Debtors' fiduciary duty to Plaintiffs.

84.     Under ERISA, a plan participant may bring an action to enjoin any act or practice that violates any provision of the law or the terms of the plan. 29 U.S.C. §1132(a)(3)(A).

85.     The Individual Class Members will suffer irreparable injury if the Debtors' misleading communications are not enjoined so that they are able to meet **the Debtors'** deadline to submit their enrollment worksheets.

86.     The Plaintiffs have demonstrated a reasonable likelihood of success on the merits.

87.     The likelihood of irreparable harm to the class in the absence of injunctive relief far outweighs any harm to the Debtors that would result from having to correct their misrepresentations.

88.     The injunctive relief requested herein will serve the public interest by furthering the purposes of ERISA and enforcing its disclosure requirements.

### COUNT II
(Declaratory Judgment)

89.     The Plaintiffs incorporate herein the foregoing allegations as if fully set forth.

90.     The Plaintiffs are all beneficiaries and plan participants of the Debtors' LTD Plans.

91.     ERISA provides a cause of action for a plan participant or beneficiary to enforce rights under the terms of the plan or to clarify the right to future benefits. 29 U.S.C. §502(a)(1)(b).

92.     There are no governing plan documents permitting the Debtors to terminate benefits for those **already disabled**. To the contrary, the governing plan documents provide benefits to the Plaintiffs as long as they remain disabled to age 65.

93.    The Debtors' claim in their Motion to Terminate that their prerogatives as plan sponsor allow them to retroactively alter the terms of prior benefit plans and to extinguish rights that arise from the Plans depends upon an interpretation and construction of the relevant plan language.

94.    The Plaintiffs dispute that the Debtors have reserved the rights they claim.

95.    The Debtors' actions to terminate the LTD Plans are in derogation of the rights of the Plaintiffs to receive benefits under the Plans.

96.    The Plaintiffs are entitled to a determination declaring their rights under the Plans and directing the Debtors to comply with the obligations set forth in the Plans to provide benefits to disabled employees for the duration of their disability until age 65.

### COUNT III
(Equitable Relief)

97.    Plaintiffs incorporate herein the foregoing allegations as if fully set forth.

98.    Under ERISA, SPDs must be distributed to participants that disclose the circumstances that may result in disqualification, denial, loss, or forfeiture of any benefits that a participant might otherwise reasonable expect to receive on the basis of the description of the benefits offered by the plan. 29 C.F.R. 2520.102-3(l).

99.    The disclosure must written in a manner calculated to be understood by the average plan participant and must warn employees of adversity and the circumstances which may result in disqualification, ineligibility, or denial or loss of benefits. *See* 29 C.F.R. 2520.102-2(a), 29 U.S. C. §1022.

100.    The SPDs, the Debtors' communications with LTD Plan Participants and the Debtors' actions in effectuating purported "amendments," establish that such changes were never retroactive and did not alter the liability fixed under previous LTD Plans. For example, the

relied upon reservations in the 2006 and 2010 SPDs allow the Debtors to "change or end the plans described in this summary at any time." (emphasis added). The language does not say "your LTD benefits will terminate when the plan terminates," or that "changes to the plans will be retroactive." Additionally, these plan descriptions do not state, as to "When Benefits Begin and End," that benefits are extinguished by discontinuance of the LTD Plan.

101.    The Debtors' communications violate their disclosure obligations under ERISA.

102.    Under ERISA, the Plaintiffs may bring an action to enjoin any practice that violates the law or the terms of the plan. 29 U.S.C. §1132(a)(3).

**COUNT IV**
(Equitable Relief)

103.    The Plaintiffs incorporate herein the foregoing allegations as if fully set forth.

104.    The relied-upon language in the Plans read in conjunction with the Debtors' other communications with the LTD Plan Participants and the Debtors' conduct in implementing amendments to the plans, at best, demonstrates that the terms of the plans are ambiguous.

105.    The Debtors' disclosures did not reveal the possibility of a dire result in the event of Plan termination.

106.    The Debtors' claimed interpretation would render the benefits provided under the LTD Plan illusory.

107.    The Debtors' claimed interpretation is in derogation of the commonly understood meaning of an income replacement benefit for a long term disabled employee.

108.    Individual Class Members, once disabled, cannot replace the coverage and benefits that they could easily have purchased prior to becoming disabled.

109.    In other words, assuming that the Debtors have correctly stated their prerogatives under the LTD Plans, it is clear that their version is unenforceable because they failed to

communicate that the Debtors' reserved rights encompassed such a broad scope that could produce such dire consequences.

110.    ERISA allows the Plaintiffs to obtain equitable relief to enforce any provisions of the statute or to enforce the terms of the plan.  29 U.S.C. §1132(a)(3)(B)(ii).

111.    The Plaintiffs are entitled to obtain reformation of the Plans to provide the coverage that an ordinary plan participant would have understood to constitute to protect them in the event of a long term disability.

### COUNT V
(Equitable Relief)

112.    The Plaintiffs incorporate herein the foregoing allegations as if fully set forth.

113.    Pursuant to ERISA, the Debtors must discharge their duties with respect to the LTD Plans solely in the interest of the Individual Class Members, as plan participants, and the interest of the class members' beneficiaries.  29 U.S.C. § 1104.

114.    "ERISA is designed to protect employee pensions and benefit plans by, among other things, 'setting forth certain general fiduciary duties applicable to the management of both pension and nonpension benefit plans.'"  *In re Worldcom, Inc.*, 263 F. Supp. 2d 745, 756-57 (S.D.N.Y. 2003) (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996)).

115.    ERISA creates fiduciary responsibilities in two ways.  An entity or individual may be an ERISA fiduciary as either a "named fiduciary" or under ERISA's functional test.  29 U.S.C. § 1102(a)(2) and § 1102(21)(A).  Here, the Debtors as the Plan Administrator owe fiduciary duties to the LTD Plan Participants and their beneficiaries.  As the Plan Administrator, the Debtors are a "named fiduciary" and their fiduciary duties under ERISA are implicated.

116.    Section 404(a)(1) of ERISA thus imposes three overlapping standards: to act "solely in the interests of the participants and beneficiaries," to act "for the exclusive purpose" of providing benefits to them, and to act with the care of a "prudent man. "

117.    ERISA section 502(a)(3) sets forth a remedy for breach of fiduciary obligations, providing that a participant or beneficiary may bring an action to "(A) enjoin any act or practice which violates any provision of this subchapter or terms of the plan, or (B), to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of this subchapter or the terms of a plan." 29 U.S.C. § 1132(a)(3); *see also Varity v. Howe*, 516 U.S. 489 (1996).

118.    The Debtors' attempt to alter the terms of the plans by terminating benefits to those who are already disabled and in pay status, by relying on a so-called "reservation of rights" that do not authorize such a termination of benefits, is contrary to express language of the Plans and constitutes a breach of their fiduciary duty. *See* § 404(a) of ERISA, 29 U.S.C. § 11044(a).

### COUNT VI
(Equitable Relief)

119.    The Plaintiffs incorporate herein the foregoing allegations as if fully set forth.

120.    The Debtors are equitably estopped from taking a position regarding their alleged reservation of rights that is inconsistent with representations made to the Debtors' employees both verbally and in written publications regarding benefits, pursuant to 29 U.S.C. §1132(a)(3).

121.    The Debtors made material representations to their employees that LTD benefits would continue for as long as an individual remained disabled until age 65.

122.    The Debtors' policies demonstrate that benefits continued for those who were already disabled and in pay status for as long as the individual remained disabled to age 65 and this was not qualified with a statement that benefits could be terminated "at any time." For

Case 09-10138-MFW    Doc 8961    Filed 11/19/12    Page 26 of 30

example, from 1997 through 2006, the Debtors provided employees with medical leaves of absence policies made applicable to the LTD benefits. The Debtors' "U.S. Leaves of Absence Medical Leave of Absence Process" states, as to the "Duration of Benefits" for LTD: "LTD benefits are payable as long as clinical evidence supports total disability up to age 65 . . .." This document does not condition the duration of the LTD benefit on any factors other than clinical evidence supporting disability and age. There is no limitation on the continuance of benefits. There is no mention that benefits cease when the Plan is terminated or for any other reason. The affirmative statement is that benefits continue as long as the individual remains totally disabled, up to age 65, as long as the clinical evidence supports the total disability.

123.    Documents provided to employees regarding LTD benefits, including FLEX Benefit programs, Personal Reports of Benefits, and Enrollment Workbooks all communicated statements such as, with respect to LTD income continuation, "You're covered to the end of your approved disability or age 65."

124.    In the LTD benefits section of "Enrollment Workbooks" sent to the Debtors' employees, employees were asked to "Think About" what would happen "If you become permanently disabled and unable to work, do you have any other sources of income to support you and your family?" and encourages employees to purchase the additional "optional" coverage to, in essence, "buy up," a higher percentage of LTD income continuation. Although recognizing that income replacement is important, the Debtors never advised employees anywhere in this "workbook" used to select benefits that these critical benefits could be terminated even after becoming disabled -- the very event employees believed they were insuring against.

125.    The Debtors' employees were advised by personnel in the Debtors' Human Resources departments, prior to becoming disabled, both individually and in group "town hall"

benefits meetings, that LTD benefits would continue to age 65 if the employees became permanently disabled with no limiting or qualifying language.

126.   The Plaintiffs reasonably relied on these representations by the Debtors to their detriment.

127.   Employees, who could have purchased prior to becoming disable, disability insurance through outside insurance companies, did not 'do so, in reliance on the Debtors' representations to Plaintiffs' detriment.

128.   The Plaintiffs, who are all disabled from any gainful employment, cannot now purchase disability insurance because they are already disabled and cannot obtain any source of income replacement from any policy of insurance, thus rendering them a particularly vulnerable class of individuals constituting extraordinary circumstances.

129.   Termination of these benefits on which the Plaintiffs, and in many cases their dependents, rely and need to survive would be nothing less than catastrophic because the Plaintiffs are unable to work and cannot replace the disability benefit with new coverage, all of which constitutes extraordinary circumstances.

130.   The Debtors must be equitably estopped from asserting a reservation of rights to terminate benefits retroactively for those that are already disabled that is not supported by any Plan document and which is contrary to the Debtors' previous representations and assurances that LTD benefits will continue for as long as one remained disabled to age 65.

## COUNT VII

131.   The Plaintiffs incorporate herein the foregoing allegations as if fully set forth.

132.   The Debtors have asserted that their "business interests" trump the rights of Individual Class Members and allow it to relinquish its fiduciary obligations to them.

133.    The Debtors have cooperated with creditors and bondholders to displace the Individual Class Plaintiffs in favor of the creditors and bondholders.

134.    The Debtors' actions demonstrate that they have a conflict of interest and are incapable of acting as a fiduciary in the best interests of plan participants.

135.    Pursuant to §502(a)(3) of ERISA, 29 U.S.C. §1132(a)(3), the court is entitled to award such equitable relief as is necessary to redress violations of fiduciary obligations.

136.    The Plaintiffs are entitled to the appointment of an independent fiduciary to replace the Debtors as plan administrator and to act in the best interest of LTD Plan Participants.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that the Court:

(a)    enjoin the Debtors from proceeding with the current enrollment process;

(b)    direct the Debtors to issue a new enrollment package;

(c)    direct the Debtors to extend the deadline for Individual Class Members to submit enrollment worksheets;

(d)    enforce the rights of Individual Class Members to benefits under the Plans;

(e)    enjoin the Debtors from making and continuing to make misleading disclosures regarding the benefits under the Plans;

(f)    reform the Plans to ensure that the Debtors cannot terminate payment of benefits in pay status;

(g)    determine that the Debtors have breached the fiduciary duty to LTD Plan Participants;

(h)    determine that the Debtors' conflict of interest prevents them from fulfilling their fiduciary obligations to LTD Plan Participants;

(i)    equitably estop the Debtors from asserting their purported "reservation rights" to retroactively terminate benefits for those already disabled;

(j)    appoint an independent fiduciary to assume the Debtors' fiduciary obligations to the LTD Plan Participants;

(k)    Grant such other and further relief as is appropriate, just and proper under the circumstances.

Dated: November 19, 2012

**ELLIOTT GREENLEAF**

Rafael X. Zahralddin-Aravena (DE Bar No. 4166)
Shelley A. Kinsella (DE Bar No. 4023)
Eric M. Sutty (DE Bar No. 4007)
1105 North Market Street, Suite 1700
Wilmington, Delaware  19801
Telephone:  (302) 384-9400
Facsimile:  (302) 384-9399
Email:  rxza@elliottgreenleaf.com
Email:  sak@elliottgreenleaf.com
Email:  ems@elliottgreenleaf.com

*Counsel to the Official Committee of
Long Term Disability Participants*

## VERIFICATION

I, Barbara S. Gallagher, hereby verify that I am authorized to make this Verification on behalf of the Official Committee of Long Term Disability Plan Participants, on behalf of and as agent for a class of individual participants and beneficiaries under various Nortel Networks Health and Welfare Benefits Plans, in this action and verify under penalty of perjury that the statements in the foregoing Verified Complaint for Declaratory and Injunctive Relief are true and accurate to the best of my knowledge, information and belief.

**Official Committee of Long Term Disability Plan Participants, on behalf of and as agent for a class of individual participants and beneficiaries under various Nortel Networks Health and Welfare Benefits Plans**

By: _Barbara Gallagher_

Name:  BARBARA S. GALLAGHER

Title:  Chair of the Official Committee of Long Term Disability Plan Participants

Date: _11/19/12_