**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

----------------------------------------------------------X
:
*In re*                                          :     Chapter 11
:
Nortel Networks Inc., *et al.*,[1]                :     Case No. 09-10138 (KG)
:
                                   Debtors.       :     Jointly Administered
:
:     **Hearing date: January 23, 2013 at 10:00 a.m. (ET)**
:     **Objections due: January 9, 2013 at 4:00 p.m. (ET)**
---------------------------------------------------------- X

**JOINT MOTION FOR ORDER: (I) APPROVING COMPROMISE
AMONG THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS, AND THE AD HOC GROUP OF BENEFICIARIES OF
THE NORTEL NETWORKS U.S. DEFERRED COMPENSATION PLAN
(FOR THEMSELVES AND ALL SIMILARLY
SITUATED PARTICIPANTS IN AND BENEFICIARIES OF THE
NORTEL NETWORKS U.S. DEFERRED COMPENSATION PLAN)
PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY
PROCEDURE; (II) DIRECTING PAYMENTS PURSUANT TO
11 U.S.C. § 503(b)(1)(A) AND RULE 9019; (III) DIRECTING U.S. BANK
NATIONAL ASSOCIATION TO TURN OVER ASSETS TO THE DEBTORS;
AND (IV) RELEASING AND SETTLING CLAIMS OF
THE DEFERRED COMPENSATION PLAN PARTICIPANTS**

Nortel Networks Inc. ("NNI") and its affiliates that are debtors and debtors in possession

in the above-captioned cases (collectively, the "Debtors") and the Official Committee of

Unsecured Creditors (the "Committee"), together with Robert Horne ("Horne"), Mason James

Young ("Young"), Ellen Bovarnick ("Bovarnick"), Charla Crisler ("Crisler"), Bart Kohnhorst

("Kohnhorst"), Brian Page ("Page"), Benjamin Warren ("Warren"), individually and collectively

as the steering committee (the "Steering Committee") of the Ad Hoc Group (as defined below),

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

and the Ad Hoc Group of Beneficiaries of the Nortel Networks U.S. Deferred Compensation

Plan (the "Ad Hoc Group"), for themselves and all other participants in or beneficiaries

(collectively, with the Ad Hoc Group, the "Participants") of the Nortel Networks U.S. Deferred

Compensation Plan (the "DCP" or "Plan") who have positive nominal account balances under

the Plan as of the Petition Date (as defined below), by and through their undersigned counsel,

respectfully request that the Court enter an Order approving the settlement (the "Settlement") to

resolve all claims of any Participant concerning or arising out of the Plan, including all claims

against the Plan Trust (as such term is defined below) and the disputes among the Debtors, the

Committee, the Ad Hoc Group, (each, a "Party," and collectively, the "Parties"), as set forth

more fully in the Settlement Agreement attached hereto as **Exhibit A** (the "Settlement

Agreement"), pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules*"). As detailed below the Settlement will pay to each of the Participants, in*

*cash on the Effective Date (as defined below), the greater of (a) 97% of his/her balance in the*

*Plan as of the Petition Date or (b) 73.65% of his/her balance in the DCP as of December 31,*

*2010. The Settlement will bind all Participants (including, without limitation, any transferee,*

*purchaser or assignee of a Participant's claim relating to the Plan), regardless of whether or*

*not a Participant is a member of the Ad Hoc Group, and result in complete satisfaction of all*

*claims arising out of the DCP, including all claims against the irrevocable trust (the "Plan*

*Trust") created by the Nortel Networks U.S. Deferred Compensation Plan Trust Agreement*

*dated January 1, 2000, as amended (the "Trust Agreement"), and the assets held by the Plan*

*Trust (the "Trust Assets"), held by any Participant (and the holders of their claims, if*

*transferred, sold or assigned), including the release and discharge of such claims held by any*

*Participant against the Debtors and other third parties.  (The Settlement is explained in detail*

2

*below.)*  The Debtors, the Committee, and the Ad Hoc Group submit that the Settlement

Agreement represents a reasonable resolution and settlement of the Parties' disputes that is fair to

the Participants and that it is in the best interest of the Debtors, their estates, and their creditors.

Additionally, the Parties respectfully request that the Court enter an order directing the payments

to counsel for the Ad Hoc Group and to members of the Steering Committee described in the

Settlement Agreement pursuant to 11 U.S.C. § 503(b)(1)(A) and Bankruptcy Rule 9019.  In

support of this motion (the "Motion"), the Debtors, the Committee and the Ad Hoc Group further

represent and state as follows:

### I.      JURISDICTION, VENUE, AND STATUTORY BASIS FOR RELIEF

1.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and

1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding as

defined in 28 U.S.C. § 157(b)(2)(A), (B), and (M).  The relief requested is premised, *inter alia*,

on Bankruptcy Rule 9019 and 11 U.S.C. §§105(a), 363(b), 503(b)(1)(A), 541(a) and 542(a).

### II.      BACKGROUND

**A.      Procedural Background**

2.      On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel

Networks (CALA) Inc.,[2] filed voluntary petitions for relief under chapter 11 of title 11 of the

Bankruptcy Code, which cases are consolidated for procedural purposes only.  The Debtors

continue to operate as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.

3.      The Office of the United States Trustee for the District of Delaware (the "U.S.

Trustee") has appointed an Official Committee of Unsecured Creditors (the "UCC") in respect of

---

[2]      Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code
on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases
for procedural purposes [D.I. 1098].

the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized (the "Bondholder Group").

4.    On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[3] commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by the Canadian Court.  In connection with the Canadian Proceedings, the Canadian Court issued an initial order (the "Initial Order"), which Initial Order has been amended from time to time.

5.    Also on the Petition Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[4] into administration (the "English Proceedings") under the control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators").  Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency and dissolution proceedings around the world.

6.    Since the Petition Date, Nortel has sold its business units and other assets to various purchasers.  For further information regarding these chapter 11 cases, reference may be made to the Monthly Operating Reports filed by the Debtors and http://dm.epiq11.com/nortel.

---

[3]    The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[4]    The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

7.      On or about February 27, 2009, this Court entered the Order Granting Recognition and Related Relief [D.I. 40, Case No. 09-10164 (KG)] (the "Recognition Order"), which, at the request of the Monitor, recognized the Canadian Proceedings pursuant to 11 U.S.C. § 1517 and which, *inter alia*, gives full force and effect in the United States to the Initial Order and any amendments or extensions of the Initial Order as granted by the Ontario Court. Recognition Order ¶ 3.

8.      The related chapter 15 case (the "Chapter 15 Case") of the Canadian Debtors is currently pending as Case No. 09-10164 (KG).

**B.      The DCP and Related Litigation**

9.      Prior to the Petition Date, on or about January 1, 2000, Nortel Networks, Inc. ("NNI") established the DCP.  The DCP was subsequently amended several times, including on or about March 13, 2000; on or about January 1, 2001; on or about January 1, 2005; on or about January 18, 2008; on or about December 23, 2008; and on or about December 4, 2009.

10.      In connection with the establishment of the Plan, NNI, as grantor, and U.S. Bank, National Association ("US Bank") as trustee, established the Plan Trust, pursuant to the Trust Agreement.  From time to time, NNI set aside funds in the Trust with respect to deferred compensation elections by participants in the Plan.  The balance of the Trust Assets was, as of October 31, 2012, approximately $42,137,471.

11.      The Ad Hoc Group, a group of Participants who have retained Bernstein, Shur, Sawyer & Nelson to represent them in connection with claims concerning the Plan, asserts an interest in the Trust Assets on its behalf and purportedly on behalf of 325 employees or former employees of the Debtors who participated in the DCP and have positive nominal account

balances under the Plan as of the Petition Date and who constitute all of the putative plaintiffs in the Adversary Proceeding (as defined below).

12.     On December 22, 2010, the Debtors filed the Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 105, 541, 542 and 543 and Bankruptcy Rule 9019 (I) Approving the Stipulation By and Between NNI and U.S. Bank National Association, (II) Directing U.S. Bank National Association to Turn Over Property to NNI, and (III) Granting Related Relief Related to the Nortel Networks U.S. Deferred Compensation Plan [D.I. 4638] (the "Turnover Motion"). The Debtors sought, by the Turnover Motion, a turnover of the Trust Assets to the estates of the Debtors, as well as approval of a stipulation between NNI and US Bank as the trustee of the Plan Trust.

13.     The Plan states that it was "intended to be an unfunded, deferred compensation plan, which is not qualified under Section 401(a) of the Internal Revenue Code" and that "Plan participants shall have the status of unsecured creditors of the Company with respect to the payment of Plan benefits," and the Trust Agreement provides that participants in the Plan "have no preferred claim on, or any beneficial ownership interest in, any assets of the Trust," and "[a]ny rights created under the Plan and this Trust Agreement shall be unsecured contractual rights of Plan participants and their beneficiaries against the Employers."  Therefore, the Debtors asserted in the Turnover Motion that the DCP qualifies as a "top hat" plan that is exempt from the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and, accordingly, the Trust Assets are property of the Debtors' bankruptcy estates and should be made available to satisfy the claims of creditors of the Debtors.

14.     Individual Participants, including individual members of the Ad Hoc Group, as well as the Ad Hoc Group (as it was then comprised) collectively (by and through its

undersigned counsel), filed objections to the Turnover Motion.  These objections asserted, among other things, that the Trust Assets should not be surrendered to the Debtors' estates because, among other contentions, (i) the DCP failed to comply with all of the "top hat" requirements needed for exemption from ERISA, including failure to limit participation to a select group of management or highly compensated employees; and (ii) the Debtors failed to meet the conditions for turnover of DCP assets under the Trust Agreement, mandating that such assets must be held in trust for the exclusive benefit of the Participants.  [See D.I. 4897 and related entries].

15.     In response to the objections to the Turnover Motion, this Court granted leave for the Ad Hoc Group to conduct discovery in relation to the DCP and the basis, if any, for the relief requested by the Debtors in the Turnover Motion.  Concurrently with discovery, the Ad Hoc Group and the Debtors engaged in confidential mediation on August 18, 2011.  No resolution was reached as a result of this mediation.

16.     On or about October 6, 2011, in relation to the Canadian Debtors, the Ontario Court entered a Compensation Claims Procedure Order (the "Compensation Claims Order"), which established a claims process and bar date (the "Canadian Claims Bar Date") with respect to certain employee and employment-related claims as defined, *inter alia*, to exclude claims arising out of or related to the DCP.

17.     On December 23, 2011, subsequent to counsel's review and analysis of documents produced by the Debtors in discovery, Horne, Young, Bovarnick, Crisler, Kohnhurst, Page, and Warren and the Ad Hoc Group, on their own behalf and on behalf of the Participants, filed a complaint (the "Complaint") against the Debtors, US Bank, and certain individuals in their capacities as members of the Board of Directors Compensation Committee that functioned

as the plan administrator of the DCP (the "Plan Committee"), thereby commencing Adversary

Proceeding No. 11-54007 (the "Adversary Proceeding").[5]  The Ad Hoc Group asserts that the

Adversary Proceeding was filed only to ensure that the Court could award full relief as to all of

the matters raised by the Turnover Motion and to bring the claims against the Plan Committee

and its members.  The Complaint alleges that the DCP is not, and never was, a "top hat" plan that

was exempt from the substantive provisions of ERISA because, among other allegations:[6]

    (i)      In some or all of the Plan Years (as defined below), substantial numbers of employees did not meet the Debtors' targeted compensation threshold for participation in the DCP, but were nevertheless deemed eligible to participate in the DCP;

    (ii)     In some or all of each plan year—the twelve-month period beginning on January 1 and ending on December 31 of each calendar year (the "Plan Year")—the actual compensation earned by a substantial number of employees eligible to participate in the DCP (the "Eligible Employees") fell well short of the respective targeted compensation threshold for participation in the DCP;

    (iii)   In some or all of the Plan Years, a significant proportion of employees who were neither "key management," nor "highly compensated" were still eligible for and invited to participate in the DCP;

    (iv)   In some or all of the Plan Years, the percentage of Eligible Employees as compared to the total employee population was so high as to render the population of Eligible Employees not a "select group";

    (v)    In some or all of the Plan Years, employees who were not employed by the "Employer" as defined in the DCP were, nevertheless, permitted to participate in the DCP;

    (vi)   In some or all of the Plan Years, there was no well-established basis for determining which employees comprised a select group of highly compensated employees.  Rather, the DCP Committee reverse-engineered the eligibility criteria in order to attempt to have the number of eligible employees meet a specific target percentage relative to the total employee population;

---

[5] Pursuant to an agreement of the parties to the Adversary Proceeding, US Bank was dismissed as a defendant on or around April 2, 2012.  *See* Adv. Proc. D.I. 16.

[6] The Debtors dispute the allegations in the Complaint, and the recital of such allegations in this Motion should not be construed as a concession of any factual or legal issue by the Debtors or the Committee or as an admission by such parties to any liability of any kind.

(vii)   In all of the Plan Years, the pool of Eligible Employees was not distinguished in any meaningful way from the rest of the employee population, and therefore not a "select group."

Complaint [Adv. Proc. D.I. 1] ¶¶ 53-99.  The Debtors dispute all contentions that the DCP does not constitute a "top hat" plan and is subject to the substantive provisions of ERISA.

18.     Subsequent to filing the Complaint, and prior to the Canadian Claims Bar Date, the Ad Hoc Group and the members of the Steering Committee filed protective claims (the "Canadian Proofs of Claim") in the Canadian Cases pursuant to the Compensation Claims Order. The Canadian Proofs of Claim were filed against the individual members of the Plan Committee solely in their capacity as members of the Plan Committee for, among other things, breach of their fiduciary duties with respect to the Plan.

19.     Pursuant to a letter dated January 24, 2012, counsel to the Monitor requested that the Ad Hoc Group and the Steering Committee amend the Complaint to remove the Plan Committee members as defendants.  The Monitor based its request on the alleged fact that the Recognition Order (which incorporates and gives full force and effect to the Initial Order) stays any proceeding against the Plan Committee members on the basis that such Plan Committee members are former and current directors of certain of the Canadian Debtors, and that the Complaint allegedly states causes of action against them solely in their capacity as present or former directors or officers of the Canadian Debtors.

20.     Counsel to the Ad Hoc Group and the Steering Committee responded to the Monitor's request pursuant to a letter dated March 21, 2012, which argued, *inter alia*, that neither the Recognition Order nor the Initial Order stayed or otherwise affected the relief requested in the Complaint with respect to the Plan Committee members, who, counsel to the Ad Hoc Group and the Steering Committee alleged, were being sued solely in their capacity as

members of the Plan Committee and not as the former or current directors or officers of the Canadian Debtors.

21.    Unable to resolve this dispute with the Monitor, the Ad Hoc Group filed a motion in the Chapter 15 Case, seeking a determination that the relief sought against the Plan Committee members in the Adversary Proceeding was not stayed or otherwise affected by the Recognition Order or the Initial Order, or, alternatively, seeking a modification of the Recognition Order to permit prosecution of the Adversary Proceeding against the Plan Committee members [D.I. 480, Chapter 15 Case] (the "Motion for Determination").  The Debtors filed a limited response, and the Canadian Debtors objected to, the Motion for Determination.  See D.I.s 482, 483, Chapter 15 Case.

22.    On May 15, 2012, the Ad Hoc Group and the Debtors again met for confidential settlement negotiations seeking resolution of their dispute; again, the parties failed to reach agreement.

23.    On June 11, 2012 counsel to the Ad Hoc Group and the Debtors, among others, appeared before the Court in the related Chapter 15 Case.  At the time, the Ad Hoc Group agreed, as it had previously, to postpone the answer deadline in the Adversary Proceeding and the filing of the motion for class certification until the issue of whether or not the Canadian stay applied to the Plan Committee defendants was resolved or such defendants were dismissed from the Adversary Proceeding.  The Court directed the Ad Hoc Group to seek a ruling from the Canadian Court on the issue and further indicated that it would defer hearing the Motion for Determination.

24.     Subsequent to this hearing, on June 25, 2012, the Ad Hoc Group and the Steering Committee voluntarily dismissed the Plan Committee members as defendants in the Adversary Proceeding, without prejudice.  Adv. Proc. D.I. 35.

25.     On June 20, 2012, the Debtors filed a Motion for Entry of an Order Approving Settlement Procedures to Resolve Claims of Beneficiaries of the Nortel Networks U.S. Deferred Compensation Plan (the "Settlement Procedures Motion").  [D.I. 7876].  Under the Settlement Procedures Motion, the Debtors sought, *inter alia*, authority to settle with individual Participants by granting such Participants an allowed, unsecured claim equal to their nominal balance in the DCP as of the Petition Date; payment of such allowed claims would have occurred at the same time and in the same percentage as other allowed, unsecured claims against the Debtors.  The Ad Hoc Group filed an Objection to the Settlement Procedures Motion on July 3, 2012.  [D.I. 7937] After a hearing on July 11, 2012, the Court deferred decision on the Settlement Procedures Motion, pending a hearing on the Class Certification Motion (as defined below).

26.     On July 9, 2012, the Debtors filed a motion to dismiss the Adversary Proceeding [Adv. Proc. D.I. 37] (the "Motion to Dismiss") pursuant to Bankruptcy Rule 7012(b) and Rule 12(b) of the Federal Rules of Civil Procedure.

27.     The Ad Hoc Group and the Steering Committee filed the Motion for Class Certification and Appointment of Class Counsel (the "Class Certification Motion") on July 10, 2012 [Adv. Proc. D.I. 40].  Pursuant to the Class Certification Motion, the Ad Hoc Group and the Steering Committee sought certification in accordance with Rule 23 of the Federal Rules of Civil Procedure, made applicable by Bankruptcy Rule 7023, of "an appropriate class of plaintiffs that would include all DCP participants and/or their beneficiaries who may have claims to monies in the Rabbi Trust."  Opening Brief in Support of Plaintiffs' Motion for Class Certification and

11

Appointment of Class Counsel [Adv. Proc. D.I. 41] (the "Class Certification Brief") ¶ 6.

Specifically, the Ad Hoc Group and the Steering Committee proposed certification of a class

consisting of the following:

> all former and current employees, and the beneficiaries of all deceased former
> employees, of the Debtors and/or their affiliates who participated at any time in
> the Nortel Plan, including as same was amended, reinstated or merged from prior
> deferred compensation plans, from January 1, 1996 through the present, and who
> had, as of the date of commencement of these chapter 11 cases, undistributed
> assets in the Nortel Plan and its accompanying trust . . . .

Id. ¶ 7.  The Class Certification Motion currently is pending before the Court.

28.     On August 3, 2012, the Committee filed a motion to intervene in the Adversary

Proceeding with the consent of the Ad Hoc Group, the Steering Committee and the Debtors and

on the basis, *inter alia*, that the outcome of the Adversary Proceeding would have an impact on

the ultimate recoveries available for general unsecured creditors.  [Adv. Proc. D.I. 53] (the

"Motion to Intervene").  This Court granted the Motion to Intervene pursuant to an order entered

on August 22, 2012 [Adv. Proc. D.I. 68].  The Committee then joined in the Debtors' Motion to

Dismiss.  [Adv. Proc. D.I. 69].

29.     The Ad Hoc Group and the Steering Committee filed their answering brief in

opposition to the Motion to Dismiss on September 28, 2012 [Adv. Proc. D.I. 90].  The Motion to

Dismiss currently is pending before the Court.

30.     The Parties have continued to engage in discovery in connection with the

Turnover Motion and the Adversary Proceeding, and anticipate having to engage in even more

costly and time-consuming discovery to resolve the issues raised in the Turnover Motion and the

Adversary Proceeding if these matters are not settled.

### III.   SUMMARY OF SETTLEMENT AGREEMENT

31.    After extensive negotiations among the Parties, the Parties now desire to (i) resolve the Adversary Proceeding and the issues raised in the Turnover Motion and subsequent, related proceedings; and (ii) exchange releases without incurring further litigation costs on the terms and conditions set forth in the Settlement Agreement and as summarized in this Motion.  The Ad Hoc Group and Steering Committee have conditioned such settlement on entry of an order that finally settles and resolves the claims of all Participants in the manner contemplated by the Settlement Agreement, and the Debtors and the Committee have agreed to seek such relief by way of this Motion.  Accordingly, the Parties seek a final resolution of the claims and relief sought in the Turnover Motion and the Adversary Proceeding, including all objections and defenses that have been or could be asserted by any Participant thereto, pursuant to the terms set forth in this Motion.

32.    As a full and final resolution of the Turnover Motion, the Adversary Proceeding and the various claims thereunder, the Parties seek approval of the following settlement terms (the "Resolution Terms"), which would be binding on all Participants, whether or not members of the Ad Hoc Group, by way of entry of an order approving this Motion (and which terms also are contemplated by the Settlement Agreement):[7]

a)    The Debtors will make the payments described below:

i.    Within sixty (60) days following the occurrence of the Effective Date (as defined below) of the Settlement Agreement, except as expressly set forth below, an aggregate of $31,166,369.13 (the "Settlement Amount"), minus any withholdings for applicable taxes, shall be paid to the Participants in the Plan.  Each Participant shall receive a distribution (after withholdings for any applicable taxes) of the greater of (a) 97% of his/her nominal account balance in the Plan as of the Petition Date or (b) 73.65% of his/her

---

[7] The summary of the Settlement Agreement in this Motion is provided solely for the benefit of the Court and parties in interest.  To the extent that the summary and the terms of the Settlement Agreement are inconsistent, the terms of the Settlement Agreement shall control.

nominal account balance in the Plan as of December 31, 2010, as more particularly set forth on Exhibit 3 to the Settlement Agreement (each Participant's share of the Settlement Amount, minus any withholdings, an "Individual Distribution"), provided, however, that in the event that a notice of transfer has been filed in the Bankruptcy Case disclosing that a Participant (such Participant, a "Transferring Participant") has transferred his or her claim relating to the Plan in accordance with Bankruptcy Rule 3001(e) and no timely objection to such transfer has been filed as of the Effective Date or any objections thereto have been resolved on or prior to the Effective Date, the Participant's transferee as disclosed in such notice of transfer (such transferee, a "Transferee") shall be paid the Transferring Participant's Individual Distribution. The term "Participant" as used in the Settlement Agreement shall include such Transferee and such Transferee shall be bound as a Participant by the Resolution Terms and all releases set forth in the Settlement Agreement by operation of the Approval Order (as defined below). The Transferring Participant shall not receive any distributions under the Settlement Agreement but shall remain a Participant for all other purposes and remain bound by the Resolution Terms and all releases set forth in the Settlement Agreement by operation of the Approval Order. For the avoidance of doubt, the Debtors shall have no obligation to make a payment or distribution to any Participant or Transferee other than the amounts (minus any withholdings) listed on Exhibit 3 to the Settlement Agreement. Each Individual Distribution shall be paid, without reduction (other than withholdings) or penalty as may otherwise be required under the Plan, in accordance with the Approval Order. The Debtors shall issue or cause to be issued a form W-2 or 1099, as appropriate, to each Participant who receives an Individual Distribution. Each Participant shall submit to the Debtors a fully completed form W-4 and agree that any Individual Distribution will be subject to the appropriate tax rate for all appropriate federal, state, and local taxes related to such distribution, except that if a Participant is a Transferee, such Transferee shall submit to the Debtors a fully completed form W-9 within 30 days after the Effective Date rather than a form W-4. If, by 30 days after the Effective Date, the Debtors have not received a fully completed form W-4 from any Participant, then the Debtors shall withhold from such Participant's Individual Distribution at the tax rate as if such Participant were single and claimed zero allowances for all appropriate federal, state and local taxes related to such distribution, unless such Participant is a Transferee, in which case the Debtors will not withhold from the Transferee's Individual Distribution, and the Transferee shall be solely responsible for the reporting of wage payments and the withholding of applicable federal, state and local taxes. If, by 30 days after the Effective Date, the Debtors have not received a fully completed form W-9 from any Transferee, the Debtors shall have no obligation to pay such Transferee's Individual Distribution until 30 days after the Debtors' receipt of a fully completed form W-9 from such Transferee. The Parties

agree that for tax purposes each Individual Distribution shall be treated as payment of compensation.  All taxes arising from payment of the Settlement Amount and Individual Distributions shall be borne by the Participants; the Debtors and U.S. Bank shall have no liability for any taxes associated with, and no such party makes any guarantee as to the tax treatment of, these distributions.

ii.    Within three (3) business days following the occurrence of the Effective Date, $3,083,630.87 shall be paid to counsel for the Steering Committee and the Ad Hoc Group, Bernstein, Shur, Sawyer & Nelson, in payment of legal fees and expenses, including, without limitation, to be used for payment of fees and expenses of local counsel Blank Rome (the "Attorney's Fees Amount").  This amount will not be treated as a distribution to the Participants in the Plan, but rather as a separate award of attorneys' fees and costs agreed to be paid by the Debtors in connection with the settlement of these disputes.  Bernstein, Shur, Sawyer & Nelson and Blank Rome shall have no further claim against the Debtors for any fees or expenses either under the Settlement Agreement, as counsel to the Steering Committee and the Ad Hoc Group, pursuant to § 503(b) of the Bankruptcy Code or otherwise. To the extent permitted under the Order approving this Motion, Bernstein, Shur, Sawyer & Nelson shall pay out of the Attorney's Fees Amount the sum of $5,000 to each member of the Steering Committee as reasonable compensation for having served in that capacity and as a named plaintiff in the Adversary Proceeding, including in regard of expenses that may have been incurred in connection therewith.

b)    Upon the Effective Date, by way of the Settlement Agreement and entry of an Order approving this Motion, each of the Participants (including, without limitation, the Transferring Participants and the Transferees), the Steering Committee, the Ad Hoc Group and each of their respective individual members, and their respective beneficiaries, estates, heirs, transferees, successors, assigns, advisors, attorneys, and all persons acting by or through them, on behalf of themselves and all predecessors, successors, assigns, agents, employees, trustees, estates, heirs, transferees and assigns, fully and forever release and discharge, and waive any argument, assertion, and claim against the Debtors, US Bank, the Plan Committee Defendants, the Committee, and their respective past and present estates, parents, subsidiaries, affiliates, general partners, limited partners and each of their past and present shareholders, administrators

15

(including plan administrators), liquidators, officers, directors, agents, employees, trustees,

managers, advisors, attorneys, accountants, fiduciaries (including plan fiduciaries), solicitors,

trustees, divisions, affiliates, related companies, and all persons acting by, through or in concert

with them, and each of their predecessors, successors and assigns (all of the foregoing,

collectively, the "Debtor Released Parties"), from, and acknowledge full and complete

satisfaction of, any and all actual and potential claims, disputes, objections, litigations, demands,

debts, liabilities, obligations and causes of action of any kind whatsoever, whether in law or in

equity, known or unknown, currently viable or arising hereafter, accrued or unaccrued, matured

or unmatured, past or present, fixed or contingent, liquidated or unliquidated, suspected or

unsuspected by the Steering Committee, the Ad Hoc Group, or the Participants, whether or not

asserted in the Complaint and whether or not concealed or hidden, which the Steering

Committee, the Ad Hoc Group, and the Participants now have, own or hold, had, owned or held,

may have had, held or owned, or hereafter may have, own or hold against the Debtor Released

Parties, and each of them or any of them, by reason of any matters which: (a) arise out of, or are

in any way connected with or related to the Plan, the Bay Networks Plan, the SMIAP (each as

defined in the Settlement Agreement), the Plan Trust or the Trust Assets, including, without

limitation, by reason of the administration of the Plan, the Bay Networks Plan or the SMIAP, the

sponsorship and ownership of the Plan, the Bay Networks Plan or the SMIAP, the calculation of

deferred compensation and nominal account balances under the Plan, the Bay Networks Plan or

the SMIAP, eligibility determinations under the Plan, the Bay Networks Plan or the SMIAP, the

ownership, use or distribution of the Trust Assets, any payments or distributions made or not

made to the Steering Committee, the Ad Hoc Group, or the Participants or their beneficiaries,

estates, heirs, transferees, successors and assigns from or on account of the Plan, the Bay

16

Networks Plan or the SMIAP, the Plan Trust or the Trust Assets prior to the date of the

Settlement Agreement or payments or distributions made pursuant to the Settlement Agreement;

or (b) are the subject of the Turnover Motion or the Adversary Proceeding, including any and all

allegations, claims and/or objections made thereunder; or (c) were the subject of the Adversary

Proceeding and were voluntarily dismissed and/or are set forth in the Canadian Proofs of Claim

(as defined in the Settlement Agreement); or (d) relate to the calculation of any Participant's

Individual Distribution (collectively, the "Participants' Release").  The Participants' Release

shall be construed as broadly and as generally as possible and as permitted by law, provided,

however, that such release shall not affect, reduce or discharge any obligations arising under the

Settlement Agreement.

c)    Upon the Effective Date, the Adversary Proceeding will be dismissed against each

and every defendant, with prejudice and without costs, and all Proofs of Claim filed by any

Participant asserting any claim released by the Participants' Release in the proceedings involving

Nortel Networks Corporation and certain affiliates under Canada's Companies' Creditors

Arrangement Act, R.S.C. 1985, c. C-36, as amended, pending in the Ontario Superior Court of

Justice, including, without limitation, the Canadian Proofs of Claim, will be withdrawn, with

prejudice.

d)    Upon the Effective Date, the Debtors and the Committee, on behalf of themselves

and their respective estates, subsidiaries, predecessors, successors, assigns, officers, directors,

agents, employees, trustees, advisors, attorneys, divisions, and all persons acting by, through or

in concert with them, fully and forever release and discharge, and waive any argument, assertion,

and claim against the Participants, the Steering Committee, the Ad Hoc Group and each of its

members, and their respective beneficiaries, predecessors, transferees, successors, assigns,

17

agents, employees, trustees, estates, advisors, attorneys, and all persons acting by or through

them (all of the foregoing, collectively, the "Ad Hoc Group Released Parties") from, and

acknowledge full and complete satisfaction of, any and all claims, disputes, objections,

litigations, demands and causes of action of any kind whatsoever, whether in law or in equity,

known or unknown, currently viable or arising hereafter, suspected or unsuspected by the

Debtors or the Committee, and whether or not concealed or hidden, which the Debtors or the

Committee  now have, own or hold, had, owned or held, may have had, held or owned, or

hereafter may have, own or hold against the Ad Hoc Group Released Parties, and each of them

or any of them, by reason of any matters which: (a) arise out of, or are in any way connected

with or related to the Plan, the Bay Networks Plan, the SMIAP, the Plan Trust or the Trust

Assets, including, without limitation, by reason of the administration of the Plan, the Bay

Networks Plan or the SMIAP, the sponsorship and ownership of the Plan, the Bay Networks Plan

or the SMIAP, the calculation of deferred compensation and nominal account balances under the

Plan, the Bay Networks Plan or the SMIAP, eligibility determinations under the Plan, the Bay

Networks Plan or the SMIAP, the ownership, use or distribution of the Trust Assets, any

payments or distributions made or not made to the Steering Committee, the Ad Hoc Group, or

the Participants or their beneficiaries, estates, heirs, transferees, successors and assigns from or

on account of the Plan, the Bay Networks Plan or the SMIAP, the Plan Trust or the Trust Assets

prior to the date of the Settlement Agreement or payments or distributions made pursuant to the

Settlement Agreement and the Order; or (b) are the subject of the Turnover Motion or the

Adversary Proceeding, including any and all allegations, claims and/or objections made

thereunder (collectively, the "Debtors Release").  The Debtors Release shall be construed as

broadly and as generally as possible and as permitted by law, provided, however, that such

release shall not affect, reduce or discharge any obligations arising under the Settlement
Agreement.

e)      Upon the Effective Date, the Approval Order will deem the Turnover Motion and
all objections thereto dismissed and withdrawn, with prejudice and without costs, on the basis
that the relief set forth in the Approval Order has been granted.

f)      Each Party is aware that it may hereafter discover claims or facts in addition to, or
different from, those it now knows or believes to be true.  Nevertheless, it is the intention of each
of the Debtors, the Committee, the Steering Committee, and the Ad Hoc Group to fully, finally,
and forever settle and release any and all controversies between them related to the subject
matter hereof, and all claims relative thereto, that do not yet exist, may exist, or heretofore have
existed against each other to the extent described in the above Debtors Release and Participants'
Release.  In furtherance of such intention, the releases given in the Settlement Agreement and
through the Order approving this Motion shall be and remain in effect as full and complete
releases of all such matters, notwithstanding the discovery or existence of any additional or
different claims or facts relative thereto, except as expressly stated in the Settlement Agreement.

g)      The Steering Committee, the Ad Hoc Group, on its own behalf and on behalf of
the Participants, the Debtors, and the Committee covenant that they shall not sue or otherwise
prosecute in any way any of the Debtor Released Parties or the Ad Hoc Group Released Parties
with respect to any and every claim released by the Debtors Release and/or the Participants'
Release.

h)      The Parties to the Settlement Agreement acknowledge that each individual and
entity released pursuant to the Settlement Agreement other than the signatories to the Settlement

Agreement is intended to be a third party beneficiary of the Settlement Agreement.  There shall be no other third party beneficiaries of the Settlement Agreement.

i)       The terms and conditions of the Settlement Agreement will only be effective upon entry by the Bankruptcy Court of an Order approving this Motion and such Order becoming final and not subject to further modification, reversal or appeal (the "<u>Final Order</u>").  For the avoidance of doubt, and without limiting the foregoing, the Approval Order shall not be deemed a Final Order until the expiration of the period for filing a notice of appeal of the Approval Order with no appeal having been filed, or, if an appeal concerning the Approval Order has been filed, such appeal has been fully resolved and the time for any further appeal has expired, which date shall be deemed the effective date of the Settlement Agreement (the "<u>Effective Date</u>").

j)       In the event that the Approval Order does not become a Final Order on or before September 30, 2014, any Party shall have the right to terminate this Settlement Agreement upon written notice to the other Parties.

## IV.    <u>RELIEF REQUESTED</u>

33.     By this Motion, the Debtors, the Committee, and the Ad Hoc Group respectfully request that this Court enter an order: (i) approving the Resolution Terms, and the terms and conditions of the Settlement Agreement, pursuant to Bankruptcy Rule 9019; (ii) directing the payments set forth in the Settlement Agreement and under the Resolution Terms pursuant to 11 U.S.C. § 503(b)(1)(A) and Bankruptcy Rule 9019; (iii) directing US Bank to turn over the Trust Assets to NNI; and (iv) granting the Parties such other and further relief as the Court deems just and proper.

## V.    BASIS FOR RELIEF

34.    The relief requested in this Motion is authorized by sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.  Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

35.    Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease the property of the estate outside of the ordinary course of business after notice and a hearing.  11 U.S.C. § 363(b).  Section 363 applies when an agreement involves the disposition of the estate's assets in such a way that it ventures beyond an ordinary course transaction.  Myers v. Martin (In re Martin), 91 F.3d 389, 394-95 (3d Cir. 1996).

36.    The use or transfer of estate property under this provision must be supported by a sound business purpose.  Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Decora Indus., Inc., No. 00-4459 JJF, 2002 WL 32332749, at *2 (D. Del. May 20, 2002); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991); Travelers Cas. & Sur. Co. v. Future Claimants Representative, No. 07-2785 (FLW), 2008 WL 821088, at *4 (D.N.J. Mar. 25, 2008).  A court determining whether a sound business purpose justifies the transaction "should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike."  In re Montgomery Ward Holding Corp., 242 B.R. at 153-54 & n.1 (quoting In re Lionel Corp., 722 F.2d at 1071).  In addition, a Debtor must show that the transaction has been proposed in good faith, that adequate and reasonable notice has been provided and that it is receiving fair and reasonable value in

exchange.  See In re Decora Indus., Inc., 2002 WL 32332749, at *2; In re Del. & Hudson Ry.

Co., 124 B.R. at 176.

37.     Bankruptcy Rule 9019 provides, in pertinent part, that, "[o]n motion by the trustee

and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R.

Bankr. P. 9019.  Citing this authority, the Third Circuit has emphasized that "[c]ompromises are

favored in bankruptcy."  In re Martin, 91 F.3d at 393 (alteration in original) (quoting 9 Collier on

Bankruptcy ¶ 9019.03[1] (15th ed. 1993)); see also In re World Health Alternatives, Inc., 344

B.R. 291, 296 (Bankr. D. Del. 2006) (finding settlements "generally favored in bankruptcy").

Additionally, the Third Circuit has recognized that "'[i]n administering reorganization

proceedings in an economical and practical matter it will often be wise to arrange the settlement

of claims as to which there are substantial and reasonable doubts.'"  In re Penn. Cent. Transp.

Co., 596 F.2d 1102, 1113 (3d Cir. 1979) (alteration in original) (quoting Protective Comm. for

Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson), 390 U.S. 414, 424 (1968)).  And

courts in this District have recognized that the approval of a proposed compromise and

settlement is committed to the sound discretion of the bankruptcy court.  See, e.g., In re Coram

Healthcare Corp., 315 B.R. 321, 329 (Bankr. D. Del. 2004).

38.     Before approving a settlement under Bankruptcy Rule 9019, a court must

determine whether "'the compromise is fair, reasonable, and in the interest of the estate.'"  In re

Marvel Entm't Grp., Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's, Inc., 211

B.R. 798, 801 (D. Del. 1997)).  Basic to the process of evaluating proposed settlements is "the

need to compare the terms of the compromise with the likely rewards of litigation."  Protective

Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25

(1968).  The court need not be convinced that the settlement is the best possible compromise in

order to approve it.  <u>Coram Healthcare</u>, 315 B.R. at 330.  Rather, the Court's obligation is to

"canvass the issues and see whether the settlement falls below the lowest point in a range of

reasonableness."  <u>Travelers Cas. & Sur. Co.</u>, 2008 WL 821088, at \*5 (citing <u>In re Jasmine, Ltd.</u>,

258 B.R. 119 (D.N.J. 2000)); <u>see also</u> <u>Coram Healthcare</u>, 315 B.R. at 330.

39.    The Third Circuit has set out four criteria for a bankruptcy court to consider when

evaluating a settlement proposal (the "<u>Martin Factors</u>"):  "(1) the probability of success in

litigation; (2) the likely difficulties in collection; (3) the complexity of litigation involved, and

the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of

the creditors."  <u>In re Martin</u>, 91 F.3d at 393 (citing <u>In re Neshaminy Office Bldg. Assocs.</u>, 62

B.R. 798, 803 (E.D. Pa. 1996)); <u>see also</u> <u>Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.)</u>,

283 F.3d 159, 165 (3d Cir. 2002); <u>In re eToys, Inc.</u>, 331 B.R. 176, 198 (Bankr. D. Del. 2005).

40.    The Debtors, the Committee and the Ad Hoc Group respectfully submit that the

Settlement Agreement meets each of the requirements under section 363 of the Bankruptcy Code

and Bankruptcy Rule 9019.  The Settlement Agreement is proposed as a good faith means to

avoid the potential cost and delay of further litigation relating to the claims between the Parties.

The Settlement Agreement and the Resolution Terms ensure that the Parties can avoid any

further litigation with respect to the issues raised in the Adversary Proceeding and the Turnover

Motion, which litigation is already entering its second year.  In the event the Settlement

Agreement and Resolution Terms are not approved, the Parties will have to continue their

litigation in the Adversary Proceeding and on the Turnover Motion, including preparing and

filing extensive briefs, as well as continuing to conduct discovery, and, potentially, preparing for

a trial of the issues in the Adversary Proceeding and on the Turnover Motion.  While the Debtors

believe there is strong legal support for the relief they have sought in the Turnover Motion and

the positions they have taken in the litigation, such litigation could take months longer to resolve, with no guarantee or certainty that any benefit would be received by the Debtors or their creditors.

41.     Instead, the Settlement Agreement and Resolution Terms would fully and finally resolve the claims of 325 Participants in an amount that is reasonable given the benefits of reaching a full and final settlement and the full and final release of any other potential claims the Parties may hold against each other and related third parties.  Accordingly, the third and fourth of the Martin Factors are met.

42.     The first Martin Factor also supports approval of the Settlement Agreement.  As demonstrated by the length of time this dispute has been pending, the Ad Hoc Group is willing to litigate to resolve these issues absent a settlement.  While the Debtors feel confident in their legal positions, there can be no guarantees as to how the Court ultimately would rule on the various litigation issues at stake.  A global settlement and resolution of these issues in accordance with the Resolution Terms and the Settlement Agreement, coupled with the turnover of the Trust Assets to the Debtors' estates, would eliminate any risk regarding the ultimate resolution of these disputes and avoid the incurrence of further legal fees and costs related to litigation of the same.

43.     The second Martin Factor is also met to the extent it even applies here.  While there is no risk of collection from the Participants, the settlement effectuates the turnover of the Trust Assets to the Debtors' estates without the need for further litigation.

44.     Resolution terms such as those at issue here, which bind all Participants regardless of whether or not they are signatories to a settlement agreement, have been approved under Rule 9019 by other courts in this District.  See, e.g., Order Approving Global Settlement Agreement Among Alan M. Jacobs As Trustee Of The New Century Liquidating Trust And The

Beneficiaries Of The New Century Corporation Deferred Compensation Plan And/Or Supplemental Executive Retirement/Savings Plan, <u>Schroeder v. New Century Holdings, Inc. (In re New Century Holdings, Inc.)</u>, Case No. 07-10416 (KJC), Adv. Proc. No. 07-51598 (Bankr. D. Del. Oct. 14, 2009) [D.I. 203]; Order On Debtors' Motion For An Order, Pursuant To Rule 9019 Of The Federal Rules Of Bankruptcy Procedure Authorizing The Debtors To Enter Into A Settlement Agreement With The Ad Hoc Committee Of Participants In The Homebanc Mortgage Corporation Deferred Compensation Plan; And Resolving Prior Motion To Terminate Deferred Compensation Plan, <u>In re Homebanc Mortgage Corporation</u>, Case No. 07-11079 (KJC) (Bankr. D. Del. Oct. 31, 2008) [D.I. 1196].

45.     In summary, the Resolution Terms and the terms and conditions of the Settlement Agreement are fair and reasonable.  The Settlement Agreement has been proposed in good faith upon reasonable and adequate notice, and is in the best interests of the Debtors, their estates, their creditors and other stakeholders and should, therefore, be approved by the Court.

## VI.   <u>NOTICE</u>

46.     Notice of this Motion has been given via facsimile, electronic transmission, or first-class United States mail to the following: (i) the United States Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) all Participants, (v) U.S. Bank, and (vi) the general service list established in these chapter 11 cases.  The Debtors, the Committee, and the Ad Hoc Group submit that no further notice is required.

## VII.   <u>NO PRIOR REQUEST</u>

47.     No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors, the Committee, and the Ad Hoc Group respectfully request that this Court: (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached to the Settlement Agreement as <u>Exhibit 2</u>; and (iii) grant such other and further relief as it deems just and proper.

[*REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK*]

Dated:  December 14, 2012          Respectfully submitted:

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

-and-

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
David H. Herrington (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

*Counsel for the Debtors*
*and Debtors in Possession*

**BLANK ROME, LLP**

*/s/ Victoria A. Guilfoyle*
Bonnie Glantz Fatell (No. 3809)
Victoria A. Guilfoyle (No. 5183)
1201 Market Street, Suite 800
Wilmington, Delaware 19801
(302) 425-6400 (telephone)
(302) 425-6464 (facsimile)
Email:  fatell@blankrome.com

    -and-

**BERNSTEIN, SHUR, SAWYER & NELSON**

Robert J. Keach
Paul McDonald
Daniel J. Murphy
100 Middle Street
P.O. Box 9729
Portland, ME 04104-5029
 (207) 774-1200 (telephone)
(207) 774-1127 (facsimile)
Email:  rkeach@bernsteinshur.com
       pmcdonald@bernsteinshur.com
       dmurphy@bernsteinshur.com
       Admitted *Pro Hac Vice*

*Counsel for the Ad Hoc Group and the Steering Committee*

**RICHARDS, LAYTON & FINGER, P.A.**

*/s/ Christopher M. Samis*
Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile: (302) 651-7701

-and-

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Fred S. Hodara (*pro hac vice*)
David H. Botter (*pro hac vice*)
Lisa G. Beckerman (*pro hac vice*)
Joshua Y. Sturm (*pro hac vice*)
One Bryant Park
New York, NY 10036
Telephone:  (212) 872-1000
Facsimile: (212) 872-1002

*Counsel for the Official Committee of Unsecured Creditors*