# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X
                                      :

*In re*                                 :        Chapter 11

Nortel Networks Inc., *et al.*,[1]        :        Case No. 09-10138 (KG)

                 Debtors.     :        Jointly Administered

                                     :

                                     :        **Hearing date:  January 9, 2013 10:00 AM (ET)**

                                     :        **Objections due:  January 2, 2013 4:00 PM (ET)**

-------------------------------------------------------X

## DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO (A) GRANT AWARDS PURSUANT TO THE NORTEL NETWORKS INC. INCENTIVE PLAN; AND (B) ENTER INTO CERTAIN SPECIAL INCENTIVE PAYMENT AGREEMENTS

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105, 363(b) and 503 of title 11 of the United States Code (the "Bankruptcy Code"), authorizing the Debtors to (i) grant awards pursuant to the Nortel Networks Inc. Incentive Plan (as described below); and (ii) enter into individual special incentive payment agreements with certain key personnel of the Debtors.  In support of this Motion, the Debtors respectfully represent as follows:

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

**Jurisdiction**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory basis for the relief requested herein is sections 105 and 363(b) of the

Bankruptcy Code.

**Background**

3.      On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel

Networks (CALA) Inc.,[2] filed voluntary petitions for relief under chapter 11 of the Bankruptcy

Code, which cases are consolidated for procedural purposes only.  The Debtors continue to

operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      The Office of the United States Trustee for the District of Delaware (the "U.S.

Trustee") has appointed an Official Committee of Unsecured Creditors (the "Committee") in

respect of the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized

(the "Bondholder Group").

5.      On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their

Canadian affiliates (collectively, the "Canadian Debtors")[3] commenced a proceeding with the

Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors

Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the

---

[2]      Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code
on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases
for procedural purposes [D.I. 1098].
[3]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

"Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by the Canadian Court.  Also on the Petition Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[4] into administration (the "English Proceedings") under the control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators").  Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency and dissolution proceedings around the world.

6.      Since the Petition Date, Nortel has sold its business units and other assets to various purchasers.  For further information regarding these chapter 11 cases, reference may be made to the Monthly Operating Reports filed by the Debtors and http://dm.epiq11.com/nortel.

**Relief Requested**

7.      By this Motion, the Debtors seek entry of an order authorizing the Debtors to (i) grant awards pursuant to the Nortel Networks Inc. Incentive Plan (as described below); and (ii) enter into individual special incentive payment agreements with certain key personnel of the Debtors.

**Facts Relevant to the Motion**

A.      **Background**

8.      On February 11, 2010, the Debtors filed the Debtors' Motion for an Order (A) Approving the Nortel Special Incentive Plan (the "NSIP"); (B) Authorizing Certain Payments under the Key Employee Retention Plan and Key Executive Incentive Plan; and (C) Approving Certain Employment Agreements  [D.I. 2400] (the "NSIP Motion").  On March 4, 2010, the

---

[4]      The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

Court granted the NSIP Motion and entered the Order (A) Approving the Nortel Special

Incentive Plan; (B) Authorizing Certain Payments under the Key Employee Retention Plan and

Key Executive Incentive Plan; and (C) Approving Certain Employment Agreements [D.I. 2400].

9.      The NSIP served to incentivize employees to support the Debtors during their

restructuring, including the sale of certain intellectual property for $4.5 billion approved by this

Court on July 11, 2011.  Because a number of significant goals remained with respect to the

Debtors' wind-down and the completion of these chapter 11 cases following the period originally

contemplated by the NSIP, the Debtors developed the Nortel Networks Inc. Incentive Plan (the

"Incentive Plan") and awards to be granted pursuant to the Incentive Plan in 2012 (the "2012

Incentive Awards"), and the certain other incentive payment agreements with certain Key

Personnel (as defined below) of the Debtors (the "2012 SIP Agreements").

10.      On October 25, 2011, the Debtors filed the Debtors' Motion for an Order

Authorizing the Debtors to (A) Implement the Nortel Networks Inc. 2012 Incentive Plan; and (B)

Enter into Certain Incentive Payment Agreements  [D.I. 6689] (the "2012 Plan Motion").  On

November 14, 2011, the Court granted the 2012 Plan Motion and entered the Order Authorizing

Debtors to (A) Implement the Nortel Networks Inc. 2012 Incentive Plan; and (B) Enter into

Certain Incentive Payment Agreements [D.I. 6764], which, among other things, authorized the

implementation of the Incentive Plan, the 2012 Incentive Awards, and the entry of the 2012 SIP

Agreements.[5]  A copy of the Incentive Plan was attached to the 2012 Plan Motion.

11.      The Incentive Plan was designed to provide cash incentive payments to certain

employees of the Debtors to encourage the achievement of certain performance targets and other

business goals important to the Debtors, including the successful conclusion of these chapter 11

---

[5]      As described in the 2012 Plan Motion, the total cost of the 2012 Incentive Awards to the Debtors was estimated at $3,485,570, while the total cost of the 2012 SIP Agreements was estimated at $973,000.

cases, compliance with the Debtors' obligations under transition services agreements with the purchasers of their businesses, the wind-down of the business unit that oversaw the transition services of various other Nortel entities, as well as preserving the integrity of the Debtors' financial and other records as the Debtors are wound down.  In addition, the 2012 SIP Agreements were designed to provide incentive payments to certain Key Employees of the Debtors who were tasked with substantially increased roles and broader responsibilities as the Debtors' wind-down progressed.

12.     The Incentive Plan, the 2012 Incentive Awards and 2012 SIP Agreements have served to incentivize employees to support the Debtors during the liquidation and wind-down of the Debtors' businesses and estates.  However, the continuation of these chapter 11 cases beyond 2012 has created the need for the Debtors to extend the time frame for completion of certain goals and to establish additional critical goals that the Debtors must meet to successfully conclude these chapter 11 cases and complete the wind-down of the Debtors' operations.  Because so much has been accomplished under the NSIP, the 2012 Incentive Awards and 2012 SIP Agreements, a very small number of employees remain who will be covered by the 2013 Incentive Awards and 2013 SIP Agreements (each as defined below).  For that very reason, however, the employees who remain are crucial to the completion of the Debtors' key goals.

**B.     2013 Incentive Awards**

13.     The Debtors expect that the services of certain current participants in the Incentive Plan who are employees of the Debtors, including some who have received 2012 Incentive Awards, will be needed in 2013 in order to meet the Debtors' remaining restructuring goals and see those goals to completion.  As a result, the Debtors have developed and are asking the Court to authorize the Debtors to grant cash incentive awards under the Incentive Plan to

certain employees of the Debtors in respect of the 2013 calendar year (the "2013 Incentive Awards").   The Debtors note that, identical to the 2012 Incentive Awards, the Debtors are proposing that recipients of the 2013 Incentive Awards will be limited to employees of the Debtors.  In designing and implementing the 2013 Incentive Awards, the Debtors have consulted with the Committee and the Bondholder Group.

14.    After substantial diligence, the Debtors identified the areas and skill sets that would be required in order to support their remaining activities, which include their execution of critical tax, financial and regulatory responsibilities, the completion of the wind-down of the Debtors' subsidiaries, the completion of the wind-down of benefit plans, the management and leasing of certain remaining real estate, as well as data retention and information technology support and the completion of these chapter 11 cases.  The Debtors then carefully identified the employees necessary to assist with these efforts (the "2013 Plan Participants") as well as specific goals for each of them ("Performance Goals") and a schedule for their completion.  As a result of the nature of the tasks in question, at the time an employee accomplishes his or her Performance Goals, such employee will have his or her employment terminated by the Debtors.  In order to incentivize the 2013 Plan Participants to remain with the Debtors and strive to complete their assigned Performance Goals in a timely fashion, the Debtors have identified a 2013 Incentive Award amount for each proposed 2013 Plan Participant to be granted under the Incentive Plan. There will be approximately seven (7) 2013 Plan Participants and the aggregate amount of the 2013 Incentive Awards paid will not exceed approximately $1,081,915.[6]  None of the 2013 Plan Participants is an "insider" of the Debtors.[7]

---

[6]    NNI will initially pay this cost; however, NNI reserves all of its rights to seek reallocation among the Debtors.

[7]    Separately, as with the 2012 Plan Motion, the Debtors are seeking authority to enter into the 2013 SIP Agreements (as defined below) with three insiders.  The details of the 2013 SIP Agreements are discussed below.

15.     Under the proposed 2013 Incentive Awards, each 2013 Plan Participant will receive a letter (each, a "Participation Letter") that sets forth the 2013 Incentive Award that he or she may be eligible to receive under the Incentive Plan, as well as his or her Performance Goals and the expected achievement date for such Performance Goals (and corresponding expected date of termination of employment).  However, the Participation Letter will clearly state that such expected date is provided for guidance only, is not binding upon the Debtors, and that the actual achievement date (and corresponding date of termination of employment) will be determined by the NNI Principal Officer in his sole discretion.  All Performance Goals are anticipated to be achieved by no later than December 31, 2013, although the Debtors realize changes in the time line may occur.

16.     Each 2013 Plan Participant's 2013 Incentive Award will be conditioned upon his or her accomplishment of his or her Performance Goals.  Each 2013 Plan Participant's 2013 Incentive Award will vest in full on the date the NNI Principal Officer designates as the achievement date of his or her Performance Goals and corresponding date of termination of employment, as determined in the sole discretion of the NNI Principal Officer (such date, the "Vesting Date").  Each 2013 Plan Participant's 2013 Incentive Award will be paid to such 2013 Plan Participant in a lump sum cash payment as soon as practicable, but no later than 30 days, following the applicable Vesting Date.  Upon termination of employment of a 2013 Plan Participant for any reason other than involuntary termination by the Debtors without cause prior to the Vesting Date, the right to any outstanding unvested 2013 Incentive Award will be forfeited on the date of such employment termination.  Upon the involuntary termination of employment of a 2013 Plan Participant by the Debtors without cause prior to the Vesting Date, any outstanding unvested 2013 Incentive Award will vest and be paid in a lump sum cash payment as

soon as practicable, but no later than 30 days, following the date of termination of employment. For purposes of the Incentive Plan, "cause" shall mean inappropriate actions or inactions, misconduct, breach of an agreement with the NNI or the 2013 Plan Participant's unsatisfactory performance or "cause" as legally defined, if at all, in the relevant jurisdiction, as determined by the NNI Principal Officer in his sole discretion.

## C.    2013 Special Incentive Payment Agreements

17.    Many of the Debtors' senior employees have terminated their employment with the Debtors, and those who remain are responsible for overseeing the wind-down efforts, ensuring that the Debtors' tax, regulatory and financial responsibilities are executed properly and ensuring a successful completion of these chapter 11 cases.  In order to meet these demands, such key personnel have been taking on substantially increased roles and broader responsibilities.  As a result, the Debtors are asking the Court to authorize the Debtors to enter into special incentive payment agreements with the following key personnel of the Debtors (the "2013 SIP Agreements")[8]:  Timothy Ross, Allen Stout and Luis Guerra Sanz (the "Key Personnel").[9]  The Debtors believe that the 2013 SIP Agreements are necessary to adequately incentivize the Key Personnel to meet the demands of the roles and responsibilities that they are undertaking in order to achieve the Debtors' business objectives.  The aggregate amount of payments authorized for the Key Personnel under the 2013 SIP Agreements is approximately

---

[8]    The summaries and descriptions of the terms and conditions of the 2013 SIP Agreements set forth in the Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such.  The summaries and descriptions are qualified in their entirety by the 2013 SIP Agreements.  In the event there is a conflict between the Motion and the 2013 SIP Agreements, the 2013 SIP Agreements shall control in all respects.

[9]    The 2013 SIP Agreements have been provided to the counsel to the Committee and the Bondholder Group and will be provided to the U.S. Trustee.

$774,750.[10]  The 2013 SIP Agreements are separate from the Incentive Plan, and none of the Key Personnel are participating in the Incentive Plan.

18.     The Committee and the Bondholder Group were consulted regarding the 2013 SIP Agreements and offered an opportunity to review and evaluate them.  A description of the roles of the three Key Personnel is provided below.

19.     *Timothy Ross.*  As Chief Financial Officer of NNI, Mr. Ross will be accountable for the financial, administrative, and risk management operations of NNI and its branches and subsidiaries, including the other Debtors.  He will oversee all financial planning, preparation and interpretation of financial reports, and the establishment and monitoring of controls designed to preserve assets of the Debtors and to report accurate financial information.  Mr. Ross will also directly manage the finance and administrative functions, including treasury, finance and accounting, tax, information technology, human resources, and physical infrastructure.  He will also advise internal and external parties on financial affairs of the Debtors.  Mr. Ross also currently is the sole director of each of the Debtors.

20.     *Allen Stout.*  As Controller, it is Mr. Stout's responsibility to ensure that the books and records of NNI and the other Debtors, and their branches and subsidiaries, are maintained in compliance with generally accepted accounting principles (GAAP) in support of U.S. and local tax reporting and filing requirements.  He will provide financial support for the wind-down and liquidation of NNI and the other Debtors and their branches and subsidiaries with a primary focus on the orderly disposition of the Debtors' balance sheet in compliance with GAAP and identifying and mitigating financial risk.

---

[10]     NNI will initially pay this cost; however, NNI reserves all of its rights to seek reallocation among the Debtors.

21.      *Luis Guerra Sanz.*  As Entity Liquidation and Wind-Down Leader, Mr. Guerra Sanz will be responsible for the effective operational liquidation and wind-down of NNI and the other Debtors, and their branches and subsidiaries, including the other Debtors, leading a cross functional team of legal, finance, and tax professionals.  Mr. Guerra Sanz also has director and officer responsibilities for non-Debtor entities and branches in various international jurisdictions.

22.      Under each of the 2013 SIP Agreements, each Key Personnel will receive his special incentive payment upon the achievement of such reasonable performance objectives established by the NNI Principal Officer (in consultation with the Committee and the Bondholder Group), and communicated to such Key Personnel prior to January 1, 2013.  Under the 2013 SIP Agreements, the special incentive payment will vest in full on the date the NNI Principal Officer designates as the achievement date of such performance objectives and corresponding date of termination of employment, as determined in the sole discretion of the NNI Principal Officer (such date, the "Vesting Date").  The special incentive payment will be paid to the Key Personnel in a lump sum cash payment as soon as practicable, but no later than 30 days, following the Vesting Date.

23.      Upon a Key Personnel's termination of employment for any reason other than involuntary termination by the Debtors without cause prior to the Vesting Date, he will forfeit right to any payment under his 2013 SIP Agreement on the date of such employment termination.  Upon a Key Personnel's involuntary termination of employment by the Debtors without cause prior to the completion of his performance objectives, he will be paid his special incentive payment in a lump sum cash payment as soon as practicable, but no later than 30 days, following the date of termination of employment.  For the purposes of the 2013 SIP Agreements, "cause" shall mean inappropriate actions or inactions, misconduct, breach of an agreement with

10

the NNI or the Key Personnel's unsatisfactory performance or "cause" as legally defined, if at all, in the relevant jurisdiction, as determined by the NNI Principal Officer in his sole discretion.

24.    The Debtors believe that the payments under the 2013 SIP Agreements contemplated for the Key Personnel is fair and reasonable in light of industry practice, market rates both in and out of chapter 11 proceedings and the scope of work to be performed.

## Basis for Relief

25.    The Debtors seek authority pursuant to sections 105, 363(b) and 503 of the Bankruptcy Code to (i) grant the 2013 Incentive Awards; and (ii) enter into the 2013 SIP Agreements with certain Key Personnel of the Debtors.  The Debtors submit that the relief requested is reasonable and necessary under the circumstances and justified.

**A.    The 2013 Incentive Awards and the 2013 SIP Agreements Satisfy the Standards of Section 363(b) of the Bankruptcy Code**

26.    Section 363(b)(1) of the Bankruptcy Code permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1).  Use of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a "sound business purpose" for it.  See In re Lionel Corp., 722 F. 2d 1063, 1071 (2d Cir. 1983) ("[t]he rule we adopt requires that a judge determining a 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant [the] application."); In re Delaware Hudson Ry. Co., 124 B.R. 169, 176-178 (Bankr. Del. 1991).

27.    Once a debtor articulates a valid business justification for a particular form of relief, the Court reviews the debtor's request under the "business judgment rule."  The business judgment rule "is a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best

interests of the company."  Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985) (quoting

*Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 811 (1984).).   The business judgment rule has

vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing.

See In re Martin, 91 F.3d 389, 395 (3d Cir. 1996) (citing Fulton State Bank v. Schipper (In re

Schipper), 933 F.2d 513, 515 (7th Cir. 1991)); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery

Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999)

(asserting that to determine "whether to authorize the use, sale or lease of property of the estate

under this section, courts require the debtor to show that a sound business purpose justifies such

actions.").

28.      The 2013 Incentive Awards and the 2013 SIP Agreements are appropriate to

properly incentivize and motivate the few remaining employees critical to winding down the

Debtors' operations in 2013 and successfully concluding these chapter 11 cases.  The Debtors

strongly believe that without the 2013 Incentive Awards and the 2013 SIP Agreements, the

morale of these essential employees will be impaired and they likely will leave their jobs to

pursue more stable employment elsewhere, at a time when their continued service is most

critical.  The Debtors believe that the 2013 Incentive Awards and the 2013 SIP Agreements will

create a meaningful level of stability, morale and motivation in the workplace and will allow the

Debtors to retain those employees they need to wind down the Debtors' operations effectively.

29.      For all of the reasons that were applicable at the time of the filing of the 2012

Plan Motion in respect of the 2012 Incentive Awards, attrition among these necessary employees

would result in a significant burden on the Debtors in finding and training temporary employees,

and any such temporary employees would lack the experience and knowledge to perform their

duties efficiently and effectively.  These concerns are even more pronounced given that even fewer employees remain with the Debtors at this time.

**B.    The 2013 Incentive Awards and the 2013 SIP Agreements Comply With Section 503(c) of the Bankruptcy Code**

30.    The 2013 Incentive Awards and the 2013 SIP Agreements comply with section 503(c) of the Bankruptcy Code.  Section 503(c) restricts transfers or payments by debtors for retention or severance and payments that are considered outside of the ordinary course and not justified by the facts and circumstances.

31.    Sections 503(c)(1) and (c)(2) of the Bankruptcy Code are inapplicable to these circumstances.  Section 503(c)(1) of the Bankruptcy Code limits payments to "insiders" to the extent such payments are made "for the purpose of inducing such person to remain with the debtor's business."  11 U.S.C. § 503(c)(1).  Section 503(c)(2) of the Bankruptcy Code places restrictions on "severance payment[s]" to "insider[s]."  11 U.S.C. § 503(c)(2).  Neither section 503(c)(1) nor 503(c)(2) of the Bankruptcy Code applies here because the 2013 Incentive Awards and the SIP Agreements do not include retention payments or severance payments to insiders of the Debtors.

32.    First, the 2013 Plan does not provide for retention payments or severance payments to insiders of the Debtors because no 2013 Plan Participant is an "insider" of the Debtors.  Even with respect to the 2013 SIP Agreements for the three Key Personnel, however, sections 503(c)(1) and (c)(2) of the Bankruptcy Code are inapplicable to these circumstances because the payments under the 2013 SIP Agreements do not include retention or severance payments.  Payments under both the 2013 Incentive Awards and the 2013 SIP Agreements are incentive payments that are tied to the achievement of performance goals, and therefore the 2013

Incentive Awards and the 2013 SIP Agreements are not in the nature of retention or severance agreements.

33.     Moreover, to the extent sections 503(c)(1) and (c)(2) were even applicable, the 2013 Incentive Awards and the 2013 SIP Agreements would satisfy the requirements of section 503(c)(3) of the Bankruptcy Code.  Section 503(c)(3) of the Bankruptcy Code prohibits "transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case."  11 U.S.C. § 503(c)(3).  The Debtors submit that the 2013 Incentive Awards and the 2013 SIP Agreements are justified by the "facts and circumstances" of this case and thus satisfy the applicable standards of section 503(c)(3) of the Bankruptcy Code.

34.     The standard for approval under the "facts and circumstances" test of section 503(c)(3) is similar to the business judgment standard for approval under section 363(b)(1) of the Bankruptcy Code. See, e.g., In re Global Home Products, LLC, 369 B.R. 778, 783-84 (Bankr. D. Del. 2007) ("Compensation issues are normally governed by the business judgment standards, i.e., proof that there is a broad business purpose for an action."); In re Nobex Corp., No. 05-20050 (MFW), 2006 WL 4063024, at *3 (Bankr. D. Del. Jan. 19, 2006) (section 503(c)(3) standard is that of the business judgment of the debtor); see also In re Dana Corp., 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006) ("Dana II") (acknowledging the sound business judgment test as the standard of review for key employee incentive programs); In re Silicon Graphics, Inc., Case No. 06-10977 (BRL) (Bankr. S.D.N.Y. July 27, 2006) (approving employee incentive plan under business judgment standard pursuant to section 363 of the Bankruptcy Code); In re Movie Gallery, Inc., Case No. 07-33849 (DOT) (Bankr. E.D. Va. Feb. 29, 2008) (approving the debtor's key employee incentive plan under sections 363(b) and 503(c)(3)).

35.    Courts have examined certain factors to determine if incentive-based compensation programs are appropriate under section 503(c)(3). Among some of the factors on which courts have focused are:

    (a)        whether the plan is calculated to achieve the desired performance;

    (b)        whether the cost of the plan is reasonable within the context of the debtor's assets, liabilities, and earnings potential;

    (c)        whether the scope of the plan is fair and reasonable;

    (d)        whether the plan is consistent with industry standards;

    (e)        whether the debtor engaged in due diligence related to the need for the plan, the employees that needed to be incentivized, and what types of plans are generally applicable in a particular industry; and

    (f)        whether the debtor received independent counsel in performing due diligence and in creating and authorizing the incentive compensation.

See, e.g., In re Global Home Prods., LLC, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (citing Dana II, 358 B.R. at 576-77).  Courts will balance the foregoing factors, and a debtor need not satisfy every factor to demonstrate that its proposed compensation structure should be approved.  See, e.g., Global Home Prods., 369 B.R. at 786 (holding that the debtors' performance-based compensation structure was a proper exercise of the debtors' business judgment even though, for instance, the debtors did not use a benefits consultant to structure the program).

36.    The Debtors submit that the overall aggregate cost of the 2013 Incentive Awards and the 2013 SIP Agreements is reasonable because they will provide significant value to the Debtors' estates at a relatively small cost.  In light of the very small number of employees being asked to support the ongoing financial and technological needs of the Debtors and to accomplish the wind-down of the Debtors and their successful completion of their chapter 11 cases, the Debtors submit that the amounts that they seek authority to pay under the 2013 Incentive Awards and the 2013 SIP Agreements are reasonable and responsibly targeted.  The 2013 Incentive

Awards and the 2013 SIP Agreements were designed by NNI's Principal Officer, in consultation with the Committee and the Bondholder Group, after extensive diligence regarding what tasks remained to accomplish and the employees best suited to accomplish them.   The Debtors, therefore, respectfully submit that the 2013 Incentive Awards and the 2013 SIP Agreements satisfy all or nearly all of the factors considered by courts in approving such incentive schemes.

37.     The 2013 Incentive Awards and the 2013 SIP Agreements also are consistent with employee incentive plans approved in other chapter 11 cases.  See, e.g., In re Sharper Image Corp., No. 08-10322 (KG) (Bankr. D. Del. June 26, 2008) (approving incentive plan to employees and senior management for performance related to a wind-down process); In re American Home Mortgage Holdings, Inc., No. 07-11047 (CJS) (Bankr. D. Del. Nov. 28, 2007) (approving incentive plan to senior management for, among other things, performance related to wind-down process); In re New Century TRS Holdings, Inc., No. 07-10416 (KJC) (Bankr. D. Del. May 25, 2007) (approving sale-related incentive plan to senior management and retention and incentive pay to certain nonmanagement employees); In re Global Home Products, LLC, No. 06-10340 (JG) (Bankr. D. Del. May 30, 2006) (order authorizing payment of a one-time incentive bonus to certain management employees upon the closing of the going-concern sale); In re Nobex Corp., No. 05-20050 (MFW) (Bankr. D. Del. Jan. 19, 2006) (approving sale-based incentive compensation where plan participants' sale efforts would extend beyond their ordinary duties).

38.     For the foregoing reasons, the Debtors believe that approval of the 2013 Incentive Awards and the 2013 SIP Agreements is appropriate and in the best interests of the Debtors, their bankruptcy estates and all parties in interest, and that the incentives proposed in the 2013 Incentive Awards and the 2013 SIP Agreements are reasonable and necessary to motivate their

critical employees to maximize the value of the Debtors' estates.  Throughout these chapter 11 cases, the Debtors have been focused on ensuring the best outcome for the greatest number of people, including not only their creditors, but also their employees, customers and other stakeholders, in order to maximize the value of the Debtors' estates to be distributed to their creditors.  The remaining work for the Debtors requires knowledgeable and experienced employees and is important to the Debtors' ability to bring these cases to a successful conclusion.  The grant of 2013 Incentive Awards under the Incentive Plan and awards under the 2013 SIP Agreements will provide the incentive necessary for the employees essential to completing the remaining tasks.  Authorization of the 2013 Incentive Awards and the 2013 SIP Agreements requested in this Motion is therefore in the best interests of the Debtors, their estates and their creditors.

## Notice

39.     Notice of the Motion has been given via hand delivery or first class mail to the (i) U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; and (iv) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

40.     The Debtors have engaged in discussions regarding the relief requested in this Motion with the Committee and the Bondholder Group.  The Committee and the Bondholder Group do not oppose the relief requested.

## No Prior Request

41.     No prior request for the relief sought herein has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

17

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the

relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other

and further relief as it deems just and proper.

Dated:  December 19, 2012          CLEARY GOTTLIEB STEEN & HAMILTON LLP
       Wilmington, Delaware

                                         James L. Bromley *(admitted pro hac vice)*
                                       Lisa M. Schweitzer *(admitted pro hac vice)*
                                       One Liberty Plaza
                                       New York, New York 10006
                                       Telephone:  (212) 225-2000
                                       Facsimile:  (212) 225-3999

                                            - and -

                                       MORRIS, NICHOLS, ARSHT & TUNNELL LLP

                                       */s/  Ann C. Cordo*
                                       Derek C. Abbott (No. 3376)
                                       Eric D. Schwartz (No. 3134)
                                       Ann C. Cordo (No. 4817)
                                       1201 North Market Street
                                       P.O. Box 1347
                                       Wilmington, Delaware 19801
                                       Telephone:  (302) 658-9200
                                       Facsimile: (302) 658-3989

                                       *Counsel for the Debtors*
                                       *and Debtors in Possession*