## Exhibit B

**The Amended Claim**

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE | PROOF OF CLAIM |
|---|---|

| Name of Debtor:<br><br>**Nortel Networks Capital Corporation (f/k/a Northern Telecom Capital Corporation)** | Case Number:<br><br>**09-10139** |
|---|---|

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
**Law Debenture Trust Company of New York**

**COURT USE ONLY**

Name and address where notices should be sent:
**James D. Heaney**
**Managing Director**
**Law Debenture Trust Company of New York**
**400 Madison Avenue**
**New York, New York 10017**

Telephone number:                    email:
        **(646) 747-1252**                    **james.heaney@lawdeb.com**

**Patterson Belknap Webb & Tyler LLP**
**1133 Avenue of the Americas**
**New York, New York 10036-6710**
**Attn: Daniel A. Lowenthal, Esq.**

☒ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number ____3946____
*(If known)*

Filed on: __September 28, 2009__

Name and address where payment should be sent (if different from above):
**James D. Heaney**
**Managing Director**
**Law Debenture Trust Company of New York**
**400 Madison Avenue**
**New York, New York 10017**

Telephone number:
**(646) 747-1252**

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:** __$150,986,875.00 (liquidated—see attached Addendum for explanation of liquidated and unliquidated claims)__

If all or part of your claim is secured, complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☒ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** _____**See attached Addendum**_____
    (See instruction #2)

| **3. Last four digits of any number** by which creditor identifies debtor: | **3a. Debtor may have scheduled account as:**<br><br>_____<br>(See instruction #3a) | **3b. Uniform Claim Identifier (optional):**<br><br>___ ___ ___ ___ ___ ___<br>(See instruction #3b) |
|---|---|---|

**4. Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate ☐ Motor Vehicle ☐ Other
**Describe:**

**Value of Property:**$_____

**Annual Interest Rate**_____% ☐ Fixed  or  ☐ Variable
(when case was filed)

Amount of arrearage and other charges as of time case filed included in secured claim, if any:
                        $_____

Basis for perfection: _____

Amount of Secured Claim:    $_____

Amount Unsecured:    $_____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a).** **If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

☐ Domestic support obligations under 11 U.S.C. § 507 (a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).

**Amount entitled to priority:**

$_____

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 503 (a)( ).

*Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim (See instruction #6)

**7. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #7, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:
**See attached Exhibits A and B.**

**8. Signature:** (See instruction #8)

Check the appropriate box.

☐ I am the creditor.    ☒ I am the creditor's authorized agent.    ☐ I am the trustee, or the    ☐ I am a guarantor, surety, indorser, or other codebtor.
                   (Attach copy of power of attorney, if any.)    debtor, or their authorized agent.    (See Bankruptcy Rule 3005.)
                                                     (See Bankruptcy Rule 3004.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:    James D. Heaney
Title:    Managing Director
Company:    Law Debenture Trust Company of New York
Address and telephone number (if different from notice address above):    (Signature)    (Date)

Telephone number:    email:

## ADDENDUM TO AMENDED PROOF OF CLAIM

1.       On September 28, 2009, Law Debenture Trust Company of New York, ("Law Debenture") filed a proof of claim (the "Original Claim") against Nortel Networks Capital Corporation ("NNCC") f/k/a Northern Telecom Capital Corporation, Case No. 09-10139. A copy of the Original Claim is attached as <u>Exhibit A</u>. Law Debenture repeats and re-alleges the Original Claim as if fully set forth herein.[1]

2.       Law Debenture amends the Original Claim pursuant to paragraph 5 of the Addendum thereto, entitled "Reservation of Other Claims and Rights." The purpose of this Amended Proof of Claim is to (a) provide the Court with documents (the "Documents," and, together with the Indenture, the "Governing Documents") relating to the Debt Securities that were not included with the Original Claim, copies of which are attached as <u>Exhibit B</u>, and (b) clarify the damages relevant to Law Debenture's claim against NNCC in light of developments in the US Debtors' cases that occurred after the September 30, 2009 general bar date (the "Bar Date").

The Documents are:

- The global security representing the Debt Securities, issued in connection therewith (the "Global Security");

- The Prospectus, dated as of May 2, 1996;

- The Prospectus Supplement, dated as of June 12, 1996;

- The Revolving Loan Agreement, dated as of June 15, 2008; and

- The Support Agreement between NNI and NNCC, dated as of February 15, 1996.

---

[1]       Capitalized terms not defined herein have the meanings ascribed to them in the Original Claim.

3.      Monthly Operating Report No. 7, filed on September 28, 2009 [Dkt No. 1566], two days prior to the Bar Date, indicated that the US Debtors were likely insolvent. Thereafter, the US Debtors, together with NNC, NNL, and other parties (collectively, "Nortel"), completed a series of successful asset sales that brought $7.3 billion into the Nortel estates, including the sale of the residual patent assets held by Nortel in July 2011 for ~$4.5 billion.

4.      Law Debenture clarifies that the Law Debenture Claim consists of (a) the outstanding principal balance ($150,000,000) and interest amount ($984,375.00) due and owing under the Indenture on the Debt Securities; (b) amounts due and owing to The Bank of New York and/or the Successor Trustee for fees and expenses under the Indenture ($2,500.00); (c) the amounts due and owing for fees and expenses of agents and counsel of The Bank of New York and/or the Successor Trustee incurred post-petition, in amounts to be determined, in connection with the enforcement of The Bank of New York's and the Successor Trustee's respective rights and remedies under the Governing Documents;[2] (d) in the event that the US Debtors are determined or otherwise deemed to be solvent – or for any other legal or equitable reason – (i) all amounts due on account of all post-petition interest due and payable under the Governing Documents in accordance with applicable law, and (ii) pursuant to the Global Security and the Prospectus Supplement, any and all other amounts determined to be due and owing should NNCC "redeem" the Debt Securities "before the Stated Maturity of their principal amount," in violation of the Governing Documents; and (e) any and all other amounts that are determined to be due and owing under the Governing Documents.

---

[2]      Law Debenture is not aware of any fees and expenses of agents and counsel of The Bank of New York and/or the Successor Trustee that were incurred prior to the Petition Date, but, to the extent that any such fees and expenses are outstanding, Law Debenture reserves the right to assert them.

## Exhibit A

**The Original Claim**

B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT   District of Delaware | PROOF OF CLAIM |
| --- | --- |

| Name of Debtor: Nortel Networks Capital Corporation f/k/a Northern Telecom Capital Corporation | Case Number: 09-10139 |
| --- | --- |

**NOTE:** *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
| --- | --- |
| Name of Creditor (The person or other entity to whom the debtor owes money or property): Law Debenture Trust Company of New York | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent: Law Debenture Trust Company of New York c/o Robert L. Bice, II, Senior Vice President 400 Madison Avenue, 4th Floor, New York, NY 10017; Fax: (212) 750-1361 | Court Claim Number:_____ *(If known)* |
| Telephone number: (212) 750-6474            Email: robert.bice@lawdeb.com | Filed on:_____ |
| Name and address where payment should be sent (if different from above): Same as above. Information regarding the claim can also be emailed Mr. Bice at: robert.bice@lawdeb.com. Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. ☐ Check this box if you are the debtor or trustee in this case. |

| | |
| --- | --- |
| **1. Amount of Claim as of Date Case Filed:** $ 150,986,875.00  (Liquidated) See attachments for explanation of Liquidated and Unliquidated Claim. If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4. If all or part of your claim is entitled to priority, complete item 5. ☑ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. See attached Addendum | **5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.** Specify the priority of the claim. ☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| **2. Basis for Claim:**  See attached Addendum (See instruction #2 on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4). |
| **3. Last four digits of any number by which creditor identifies debtor:**  N/A **3a. Debtor may have scheduled account as:**  See Addendum (See instruction #3a on reverse side.) | ☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5). |
| **4. Secured Claim** (See instruction #4 on reverse side.) Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information. **Nature of property or right of setoff:** ☐ Real Estate  ☐ Motor Vehicle  ☐ Other **Describe:** **Value of Property:** $_____  **Annual Interest Rate**_____% **Amount of arrearage and other charges as of time case filed included in secured claim, if any:** $_____  **Basis for perfection:** _____ **Amount of Secured Claim:** $_____  **Amount Unsecured:** $_____ | ☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7). ☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8). |
| **6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. | ☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__). |
| **7. Documents:** Attach redacted copies of any documents ... orders, invoices, itemized statements of running accounts ... You may also attach a summary. Attach redacted copies of documents that support a security interest. You may also attach a summary. DO NOT SEND ORIGINAL DOCUMENTS. ATTACHMENTS MAY BE DESTROYED AFTER SCANNING. If the documents are not available, please explain: Please see attached Addendum | **Amount entitled to priority:** $_____ *Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |

Filed: USBC - District of Delaware
Nortel Networks Inc., Et Al.
09-10138 (KG)            0000003946

| | FOR COURT USE ONLY |
| --- | --- |
| **Date:** 09/25/2009    **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. Mr. Robert L. Bice, II, Senior Vice President, Law Debenture Trust Company of New York | **FILED / RECEIVED** SEP 28 2009 EPIQ BANKRUPTCY SOLUTIONS, LLC |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§152 and 3571.

## ADDENDUM TO PROOFS OF CLAIM

Law Debenture Trust Company of New York, ("Law Debenture") hereby submits this addendum (the "Addendum") in support of and incorporated by this reference within and expressly made a part of each of its proofs of claim (the "Proofs of Claim") against each of Nortel Networks Capital Corporation ("NNCC") f/k/a Northern Telecom Capital Corporation., Case No. 09-10139 and Nortel Networks Limited ("NNL") f/k/a Northern Telecom Limited, Case No. 09-CL-7950, and in support thereof states as follows.

1.      On January 14 2009 (the "Petition Date"), Nortel Networks, Inc. ("NNI") and fourteen of its subsidiaries, including NNCC (collectively, the "US Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "US Bankruptcy Court"). The US Debtors' cases are being jointly administered for procedural purposes under Nortel Networks Inc., Case No. 09-10138 (collectively, the "US Proceedings"). Also on January 14, 2009, the US Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNL, and certain of their affiliates (collectively, the "Canadian Debtors") filed an application with the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) ("CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings").

2.      The US Proceedings are being managed by the US Debtors as debtors-in-possession. The Canadian Court appointed Ernst & Young Inc. to serve as Monitor for the Canadian Debtors in the Canadian Proceedings. On January 14, 2009, Ernst & Young Inc., as foreign representative for the Canadian Debtors, filed petitions for recognition of the

CH 28489.4 100386 000004 9/25/2009 09:49am

Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code with the Bankruptcy Court for the District of Delaware.

3.    On July 15, 2009, the US Debtors filed a motion ("Bar Date Motion") seeking entry of an Order establishing deadlines and procedures for filing proofs of claim or interest in the US Proceedings (Dkt. No. 1084). In an Order dated August 4, 2009 (the "US Claims Procedure Order"), the US Bankruptcy Court set September 30, 2009 at 4:00 p.m. (prevailing Eastern Time) as the deadline for creditors to assert claims against the US Debtors arising prior to the Petition Date. On July 30, 2009, the Canadian Court approved and issued the Claims Procedure Order (the "Canadian Claims Procedure Order") setting a general claims bar date against the Canadian Debtors of September 30, 2009 at 4:00 p.m. (prevailing Eastern Time).

4.    Law Debenture is successor indenture trustee ("Successor Trustee")[1] to The Bank of New York Mellon, formerly known as The Bank of New York,[2] with respect to $150,000,000 in 7.875% senior unsecured debt securities due June 15, 2026 (the "Debt Securities") issued by NNL and NNCC, and guaranteed by NNL. A true and correct copy of the Indenture dated February 15, 1996 by and between NNL and NNCC as Issuers, NNL as Guarantor, and The Bank of New York as Trustee, as amended and supplemented from time to time (the "Indenture"), with respect to the Debt Securities is attached hereto for reference purposes at "Exhibit B".

---

[1]    Under the Indenture, as defined below, the Successor Trustee is vested with the same rights, powers and obligations as the predecessor Trustee. The Indenture provides that "every such successor Trustee . . . shall execute, acknowledge and deliver to [NNCC and NNL] and to the retiring Trustee an instrument accepting such appointment, and thereupon . . . the successor trustee, without any further act, deed or conveyance, shall become vested with all of the rights, powers, trusts and duties of the retiring Trustee. See, e.g., Indenture, Section 607(f), pp. 42-43.

[2]    See Agreement of Resignation, Appointment and Acceptance dated February 12, 2009 (the "Successor Trustee Agreement") by and between NNCC, NNL, The Bank of New York, and Law Debenture, a true and correct copy of which is attached hereto for reference purposes at "Exhibit A."

5. As Successor Trustee, Law Debenture is entitled to file proofs of claim on behalf of the holders of the Debt Securities under the Indenture[3] as well as under the US and Canadian Claims Procedure Orders.[4] As of the Petition Date, the amount outstanding on the Debt Securities under the Indenture was **$150,986,875.00** (the "Liquidated Claim"). The Liquidated Claim consists of (i) the outstanding principal balance ($150,000,000) and interest amount ($984,375.00)[5] due and owing under the Indenture on the Debt Securities; (ii) amounts due and owing to The Bank of New York and/or the Successor Trustee[6] for fees and expenses under the Indenture, $2,500.00;[7] and (iii) amounts due and owing for fees and expenses of agents and counsel of The Bank of New York and/or the Successor

---

[3]  Specifically, the Indenture provides that in case of bankruptcy of the Issuers, "the Trustee may file such proofs of claim and other papers or documents as may be necessary or advisable to have the claims of the Trustee and the Holders allowed in any judicial proceedings relative to the applicable Issuer or the Guarantor . . . its creditors or its property." Indenture, Section 510, p. 38.

[4]  *See, e.g.*, Order Establishing Deadlines for Filing Proofs of Claims and Approving Form and Manner of Notice Thereof entered in the US Proceedings on August 4, 2009 (Paragraph 6(j) authorizing and requiring Indenture Trustees to file "a single proof of claim pursuant to section 501(a) of the Bankruptcy Code, on or before the General Bar Date, on account of the Note Claims against the Debtors under their respective Note Indentures." *See also* Claims Procedures Order entered in the Canadian Proceedings on July 30, 2009 (Paragraph 13 providing that each "Bondholder Trustee is authorized and directed to file one or more Proofs of Claim on or before the Prefiling Claims Bar Date (September 30, 2009 at 4 p.m. Eastern Time) in respect of all of the Bonds for which such Bondholder Trustee acts . . .").

[5]  For purposes of the Proofs of Claim, the Successor Trustee has included only interest due and payable as of the Petition Date. Interest was calculated at 7.875% for a period of 30 days from the date of last interest payment (December 15, 2008) through the Petition Date (January 14, 2009). *See also* Reservation of Rights below.

[6]  Law Debenture was appointed as Successor Trustee after the Petition Date. As described below, given Law Debenture's continuing role as Successor Trustee, the amount of its fees and expenses continues to accrue and is unliquidated at this time.

[7]  The amount noted above includes fees and expenses payable as of the Petition Date for The Bank of New York, as preceding trustee. The Indenture provides that the " the Issuers shall pay to the Trustee from time to time compensation for its services as agreed separately by the Issuers and the Trustee." Indenture, Section 606(a), p.41. The Indenture further provides that "the Issuers agree to reimburse the Trustee upon its request for all reasonable and documented expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture (including the reasonable and documented compensation, expenses and disbursements of its agents and counsel) . . . ." Indenture, Section 606(c), p.41. *See also* Section 505 of the Indenture which provides that any money collected by the Trustee under Article five of the Indenture (dealing with defaults) shall be applied "first: to the payment of all amounts due the Trustee under Section 606."

CH 28489.4 100386 000004 9/25/2009 09:49am          3

Trustee under the Indenture, $0.00.[8]  In addition, Law Debenture asserts an unliquidated

claim (the "Unliquidated Claim," and, together with the Liquidated Claim, the "Law

Debenture Claim") in the amount of the Successor Trustee's fees and expenses and its

counsel and agents' fees and expenses incurred post-petition in the enforcement of rights

and remedies under the Indenture.[9]  Law Debenture asserts a general unsecured claim

against each of NNCC[10] and NNL[11] in the amount of the Law Debenture Claim.  The Law

Debenture Claim is jointly and severally payable by each of NNCC and NNL.[12]

---

[8]      As of the date of the filing of the Law Debenture Claim, Law Debenture was not aware of any pre-
petition agents and counsel fees incurred by The Bank of New York as preceding trustee.  To the extent any
such amounts are discovered to be due and outstanding, Law Debenture reserves the right to supplement its
claims.  The Successor Trustee has retained Dewey & LeBouef LLP to represent it in the US and Canadian
Debtors' bankruptcy cases.  As noted in the reservation of rights below, to the extent any such amounts are
later brought to the attention of Law Debenture, Law Debenture reserves the right to amend and supplement
its Proofs of Claim to include such amounts.

[9]      See, e.g., Travelers Cas. & Sur. Co. of Am. v. PG&E, 549 U.S. 443 (2007) (providing for allowance
and payment of post-petition attorneys fees and expenses asserted as part of a pre-petition contract and
claim); see also Ades & Berg Group Investors v. Breeden (In re Ades & Berg Group Investors), 550 F.3d 240
(2d Cir. 2008) (same).  But, see, Reservation of Rights below regarding assertion of such claims as
administrative expenses as provided under the Indenture.  As noted above, Law Debenture's agents and
counsel fees continue to accrue during the pendency of the US and Canadian Proceedings.

[10]     The Indenture provides that "the applicable Issuer (NNCC and NNL) covenants and agrees for the
benefit of each particular series of Debt Securities that it will duly and punctually pay the principal of (and
premium, if any) and interest on the Debt Securities in accordance with their terms and this Indenture.
Indenture, Section 1001, p. 51.  Schedule F-1 for NNCC lists a general, unsecured claim for Law Debenture
in the aggregate amount of $150,951,562.50.

[11]     The Indenture provides that "the Guarantor (NNL) by its execution of this Indenture hereby agrees
with each Holder of a Guaranteed Debt Security of each series authenticated and delivered by the Trustee and
with the Trustee on behalf of each such Holder, to be unconditionally bound by the terms and provisions of
the Guarantees set forth below and authorizes the Trustee to confirm such Guarantees to the Holder of each
such Guaranteed Debt Security . . . ."  Indenture, Section 203, p.15.  The Indenture further provides, in that
same section, the terms of the guaranty, which includes, in relevant part, the following: "for value received,
[NNL] . . . hereby unconditionally guarantees to the Holder of the Guaranteed Debt Security . . . and to the
Trustee . . . the due and punctual payment of the principal of, premium, if any, and interest on such
Guaranteed Debt Security . . . when and as the same shall become due and payable . . . In case of the failure
of [NNCC] . . . punctually to make any such payment of principal, premium, if any, or interest . . . the
Guarantor hereby agrees to cause any such payment to be made punctually when and as the same shall
become due and payable . . . ."  Indenture, Section 203, pp. 15-16.

[12]     The Indenture further provides, for example, that "the Guarantor hereby agrees that its obligations . .
. shall be as if it were principal debtor and not merely surety, and shall be absolute and unconditional,
irrespective of, and shall be unaffected by, any invalidity, irregularity or unenforceability of such Guaranteed
Debt Security or such Indenture . . . ."  Indenture, Section 203, pp. 15-16.  The Indenture also provides that
the "Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the
event of merger or bankruptcy . . . any right to require a proceeding first against the Borrower (NNCC) . . .

## Reservation of Other Claims and Rights

1.      Nothing contained in the Proofs of Claim or herein shall affect the right of any holder of a Debt Security to file its own proof(s) of claim against one or more of the US or Canadian Debtors, including, but not limited to NNCC and NNL, or to separately vote the amount of its respective claim(s) with regard to any plan of reorganization (or liquidation) or similar process for which solicitation of acceptances will be sought in the US Proceedings or in the Canadian Proceedings.

2.      Nothing in or relating to the Proofs of Claim or this Addendum is intended to or shall limit or affect the right of Law Debenture as Successor Trustee to seek payment and reimbursement of its fees and expenses and its agents and counsel's fees and expenses as administrative expenses in the US Proceedings or the Canadian Proceedings.[13]

3.      Nothing in this Addendum or the Proofs of Claim shall be deemed to waive the Successor Trustee or any individual holders' arguments toward payment in full of all post-petition interest due and payable under the Indenture (or at the legal rate)[14] to the extent subsequently permitted in the US Proceedings or Canadian Proceedings, whether as a result that some or all of the US Debtors or Canadian Debtors, including NNCC and NNL, are deemed solvent (payable, for instance, under section 726(a)(5) of the Bankruptcy Code made applicable to chapter 11 cases) or for any other legal or equitable reason.

---

and covenants that this Guarantee will not be discharged except by payment in full of the principal of, premium, if any, and interest on such Guaranteed Debt Security." *Id.*

[13]     The Indenture provides that "when the Trustee incurs expenses or renders services in connection with an Event of Default specified in Section 501(5) (dealing, for example, with involuntary bankruptcy) or Section 501(6) (dealing, for example, with voluntary bankruptcy), the reasonable and documented expenses (including the reasonable and documented charges and expenses of its counsel) and compensation for the services are intended to constitute expenses of administration under any applicable Federal or state bankruptcy, insolvency or other similar law." Indenture, Section 606(d), p. 41.

[14]     *See, e.g.,* 11 U.S.C. §726(a)(5).

4.    In addition to the foregoing, Law Debenture expressly reserves its rights, remedies, interests, priorities, protections, and claims against each of the US and Canadian Debtors, including, but not limited to NNCC and NNL, under the Bankruptcy Code, including Sections 510, 544, 545, 548, 549, and 550 thereof, and any applicable provisions under the CCAA.

5.    Law Debenture reserves the right to amend and/or supplement each Proof of Claim and to file additional claims against any of the US or Canadian Debtors, including, but not limited to, NNCC and NNL, whether arising from the Indenture or otherwise, for any reason whatsoever.

6.    The filing of these Proofs of Claim is not and shall not be construed as (1) an election of remedy; (2) a waiver of jury trial rights; or (3) a waiver or limitation of any right, interest, or cause of action held by Law Debenture in the US or Canadian Proceedings.

*[Space Left Intentionally Blank]*

7.    Law Debenture further reserves any and all rights against parties other than

the US and Canadian Debtors based on the foregoing facts and circumstances.

Law Debenture Trust Company of New York

By:  Robert L. Bice II
Its:  Senior Vice President
Dated:  September 25, 2009

## Exhibit B

**The Documents**



Northern Telecom Capital Corporation
7.40% Note Due 2006

**Northern Telecom Capital Corporation**
7.875% Note Due 2026

## GUARANTEE OF NORTHERN TELECOM LIMITED

Northern Telecom Limited

By: _____          By: _____

Peter W. Currie                              William R. Kerr
Senior Vice-President and                    Vice-President and Treasurer
Chief Financial Officer

The following abbreviations, when used in the inscription on the face of this Security, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM — as tenants in common
TEN ENT — as tenants by the entireties
JT TEN — as joint tenants with right of survivorship
and not as tenants in common

UNIF GIFT MIN ACT— _____ Custodian _____
                         (Cust)              (Minor)
Under Uniform Gifts to Minors
Act _____
     (State)

Additional abbreviations may also be used though not in the above list.

FOR VALUE RECEIVED, the undersigned sells, assigns and transfers unto

PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

[ _____ ]

_____
(please print or typewrite name and address of assignee)

_____

the within Debt Security of Northern Telecom Capital Corporation and does hereby irrevocably constitute and appoint

_____

to transfer said Debt Security on the books of said Corporation, with full power of substitution in the premises.

Dated: _____

NOTICE: The signature to this assignment must correspond with the name as it appears upon the face of the within Debt Security in every particular, without alteration or enlargement or for any change whatsoever, and be guaranteed by the endorser's bank or broker.

No person has been authorized to give any information or to make any representations other than those contained in this Prospectus Supplement or the Prospectus, and, if given or made, such information or representations must not be relied upon as having been authorized. Neither this Prospectus Supplement nor the Prospectus constitutes an offer to sell or the solicitation of an offer to buy any securities other than the securities described in this Prospectus Supplement or an offer to sell or the solicitation of an offer to buy such securities in any circumstances in which such offer or solicitation is unlawful. Neither the delivery of this Prospectus Supplement or the Prospectus nor any sale made hereunder or thereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Corporation since the date of the Prospectus or this Prospectus Supplement or that the information contained herein or therein is correct as of any time subsequent to the date of such information.

**TABLE OF CONTENTS**
**Prospectus Supplement**

| | Page |
|---|---|
| Ratio of Earnings to Fixed Charges of the Guarantor | S-2 |
| Use of Proceeds | S-2 |
| Incorporation of Certain Documents by Reference | S-2 |
| Description of Offered Notes | S-3 |
| Underwriting | S-5 |
| Experts | S-6 |
| Legal Opinions | S-6 |

**Prospectus**

| | |
|---|---|
| Available Information | 2 |
| Incorporation of Certain Documents by Reference | 2 |
| The Corporation | 3 |
| The Finance Subsidiary | 3 |
| Ratio of Earnings to Fixed Charges of the Corporation | 3 |
| Use of Proceeds | 4 |
| Description of Debt Securities and the Guarantees | 4 |
| Description of Warrants | 12 |
| Canadian Federal Income Tax Considerations | 13 |
| Plan of Distribution | 15 |
| Experts | 15 |
| Legal Opinions | 16 |

**$300,000,000**

# Northern Telecom Capital Corporation

**$150,000,000**
**7.40% Notes Due 2006**

**$150,000,000**
**7.875% Notes Due 2026**

**Unconditionally Guaranteed as to Payment of Principal, Premium, if any, and Interest by**

## Northern Telecom Limited



**Goldman, Sachs & Co.**

**Lehman Brothers**

**J.P. Morgan & Co.**

**Salomon Brothers Inc**

# NORTHERN TELECOM LIMITED   NORTHERN TELECOM CAPITAL CORPORATION

### Debt Securities and Warrants to Purchase Debt Securities

Northern Telecom Limited (the "Corporation") and Northern Telecom Capital Corporation (the "Finance Subsidiary" and, together with the Corporation, the "Issuers", and each, an "Issuer") from time to time may offer their debt securities consisting of unsecured debentures, notes, bonds and/or other similar evidences of indebtedness (in the case of the Corporation, "Corporation Debt Securities", and in the case of the Finance Subsidiary, "Guaranteed Debt Securities" and, collectively, "Debt Securities") and warrants to purchase such Debt Securities ("Warrants") up to an aggregate initial public offering price of $1,000,000,000 or the equivalent thereof in one or more foreign currencies or composite currencies, including European Currency Units ("ECU"). Each Guaranteed Debt Security will be unconditionally and irrevocably guaranteed (the "Guarantees") by the Corporation (in its capacity as guarantor of the Guaranteed Debt Securities, the "Guarantor") as to the payment of all amounts of principal and premium, if any, and interest on such Guaranteed Debt Security, and the sinking fund or analogous payments referred to therein, if any, and thereon due. Debt Securities and Warrants may be offered, separately or together, in separate series in amounts, at prices and on terms to be set forth in supplements to this Prospectus.

The Corporation Debt Securities and the Guarantees will be direct, unconditional and unsecured obligations of the Corporation and will rank pari passu without preference among themselves and at least pari passu with all other unsecured obligations of the Corporation, except to the extent prescribed by law. The Guaranteed Debt Securities will be direct, unconditional and unsecured obligations of the Finance Subsidiary and will rank pari passu and ratably without preference among themselves and at least pari passu with all other unsecured obligations of the Finance Subsidiary, except to the extent prescribed by law. See "Description of Debt Securities".

Debt Securities of a series will be issued in individual registered form or in the form of one or more global securities (each, a "Global Security"). Warrants will be issued only in registered form. Neither Debt Securities nor Warrants may be offered or sold, directly or indirectly, in Canada or to, or for the account of, any resident thereof in contravention of the securities laws of Canada or any province or territory thereof.

The terms of Debt Securities and/or Warrants, including, where applicable, the Issuer thereof, the specific designation, aggregate principal amount, currency, denominations, maturity, premium, rate (which may be fixed or variable) and time of payment of interest, terms for redemption at the option of the Issuer or the holder, terms for sinking fund payments, terms for exercising Warrants, the initial public offering price, any listing on an exchange, the names of, and the principal amounts to be purchased by, underwriters and the compensation of any agents and underwriters and other terms in connection with the offering and sale of Debt Securities and/or Warrants in respect of which this Prospectus is being delivered, will be set forth in a prospectus supplement (the "Prospectus Supplement").

The Issuers may offer and sell Debt Securities and Warrants, separately or together, to or through underwriters or groups of underwriters, and also may offer and sell Debt Securities and Warrants, separately or together, directly to other purchasers or through agents. See "Plan of Distribution". If any agents or underwriters are involved in the sale of the Debt Securities and/or Warrants, the names of such agents or underwriters and any applicable commissions will be set forth in the Prospectus Supplement. The net proceeds to the applicable Issuer from such sale also will be set forth in the Prospectus Supplement.

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

The date of this Prospectus is May 2, 1996.

The Corporation is a Canadian corporation. A substantial portion of the Corporation's assets is located in Canada and a majority of its directors and officers, and the experts named herein, are residents of Canada. As a result, it may be difficult to effect service within the United States of America upon the Corporation or upon such directors, officers and experts. Execution by United States courts of any judgment obtained against the Corporation or any such person in United States courts would be limited to the assets of the Corporation or such person in the United States. Clive V. Allen, Senior Vice-President and General Counsel of the Corporation, has advised that there is doubt as to the enforceability in Canada of United States judgments or of liabilities in original actions in Canadian courts predicated solely upon the civil liability provisions of the federal securities laws of the United States. The agent for service in the United States for notices sent to the Corporation is Bank of Montreal Trust Company, 77 Water Street, New York, New York 10005.

## AVAILABLE INFORMATION

The Corporation is subject to the informational requirements of the Securities Exchange Act of 1934 (the "Exchange Act") and in accordance therewith files reports and other information with the Securities and Exchange Commission (the "Commission"). Such reports and other information can be inspected and copied at the public reference facilities maintained by the Commission at Judiciary Plaza, Room 1024, 450 Fifth Street, N.W., Washington, D.C. 20549 and at the Commission's Regional Offices located at Citicorp Center, 500 West Madison Street, Suite 1400, Chicago, Ill. 60661, and at 7 World Trade Center, Suite 1300, New York, New York 10048. Copies of such material can be obtained from the Public Reference Section of the Commission at Judiciary Plaza, Room 1024, 450 Fifth Street, N.W., Washington, D.C. 20549, at prescribed rates. Such material can also be inspected at the offices of The New York Stock Exchange, Inc., 20 Broad Street, New York, New York 10005 on which the Corporation's common shares are listed. No separate financial information on the Finance Subsidiary will be provided, as permitted by the rules and regulations of the Commission. This Prospectus does not contain all of the information set forth in the Registration Statement, of which this Prospectus forms a part, and exhibits thereto which the Issuers have filed with the Commission under the Securities Act of 1933 (the "1933 Act") and to which reference is hereby made.

## INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The following documents, which were filed by the Corporation (Commission File No. 1-7260) with the Commission under the Exchange Act, are incorporated herein by reference and made a part hereof:

    (1)   the Corporation's Annual Report on Form 10-K for the year ended December 31, 1994;

    (2)   the Corporation's Quarterly Reports on Form 10-Q for the quarters ended March 31, June 30 and September 30, 1995; and

    (3)   the Corporation's Current Report on Form 8-K dated January 26, 1996.

All documents filed by the Corporation pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of this Prospectus and prior to the termination of the offering made hereby shall be deemed to be incorporated in and made a part of this Prospectus by reference from the date of filing of such documents. Any statement contained herein or contained in a document incorporated or deemed to be incorporated by reference herein shall be deemed to be modified or superseded for purposes of this Prospectus to the extent that a statement contained herein, in the accompanying Prospectus Supplement or in any other subsequently filed document which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement.

The Corporation and, in the case of Guaranteed Debt Securities and Warrants to purchase Guaranteed Debt Securities, the Finance Subsidiary will provide without charge to each person, including any beneficial owner, to whom a copy of this Prospectus is delivered, upon written or oral request of any such person, a copy of any or all of the documents incorporated by reference herein (not including the exhibits to such documents, unless such exhibits are specifically incorporated by reference in such documents). Written requests to the Corporation for such copies should be directed to: Northern Telecom Limited,

2920 Matheson Boulevard East, Mississauga, Ontario, Canada, L4W 4M7, Attention: Corporate Secretary. Telephone requests may be directed to (905) 238-7000. Written requests to the Finance Subsidiary should be directed to: Northern Telecom Capital Corporation, Northern Telecom Plaza, 200 Athens Way, Nashville, Tennessee, United States, 37228-1397, Attention: Secretary. Telephone requests may be directed to (615) 734-4000.

All dollar amounts in this Prospectus are in United States dollars unless otherwise stated.

## THE CORPORATION

The Corporation was incorporated under the laws of Canada on January 5, 1914 and was amalgamated with two wholly-owned subsidiaries on January 4, 1982 under the Canada Business Corporations Act. The Corporation is a leading global supplier of telecommunications equipment, the only business segment in which it operates. The telecommunications business consists of the research and the design, development, manufacture, marketing, sale, financing, installation, servicing and support of switching networks, enterprise networks, wireless networks, broadband networks and other products and services. The Corporation's principal executive offices are located at 2920 Matheson Boulevard East, Mississauga, Ontario, Canada, L4W 4M7; telephone number (905) 238-7000.

The identity of an Issuer with respect to a particular series of Debt Securities or Warrants will be determined by the Corporation in light of considerations related to the funding requirements of the Corporation and its subsidiaries, including the anticipated use of proceeds and the cost-effectiveness of the financing.

## THE FINANCE SUBSIDIARY

The Finance Subsidiary was incorporated under the laws of Delaware on February 1, 1996. The Finance Subsidiary is a wholly-owned subsidiary of Northern Telecom Inc. ("NTI"), a wholly-owned subsidiary of the Corporation incorporated under the laws of Delaware. The Finance Subsidiary has no independent operations other than acting as a finance company for its affiliates. The Finance Subsidiary's principal executive offices are located at Northern Telecom Plaza, 200 Athens Way, Nashville, Tennessee, United States, 37228-1397; telephone number (615) 734-4000. The Finance Subsidiary and NTI have entered into a support agreement (the "Support Agreement") under which NTI has agreed to cause the Finance Subsidiary to have and to maintain a net worth of at least $1.00. The Support Agreement, however, specifically provides that it shall not constitute or be deemed to constitute a guarantee by NTI to any person of the payment of any indebtedness, liability or obligation of the Finance Subsidiary.

## RATIO OF EARNINGS TO FIXED CHARGES OF THE CORPORATION

The following table sets forth the ratio of earnings to fixed charges of the Corporation for the periods indicated:

| Nine Months Ended September 30, 1995 | Year Ended December 31,* | | | | |
|---|---|---|---|---|---|
| | 1994 | 1993 | 1992 | 1991 | 1990 |
| 3.0 | 3.2 | ** | 3.6 | 3.6 | 4.9 |

\*   The ratio of earnings to fixed charges of the Corporation for each of the years 1990 through 1992 has been restated due to the reclassification of investment tax credits from income tax provision to research and development expense commencing January 1, 1993.

\*\*  The calculation of the ratio of earnings to fixed charges of the Corporation results in an amount that is less than one. The amount of earnings coverage deficiency for the year ended December 31, 1993 was $400 million.

3

The ratio of earnings to fixed charges of the Corporation is computed, on a consolidated basis, by dividing earnings before fixed charges and income taxes by the fixed charges. For the purpose of computing the ratio of earnings to fixed charges, earnings are determined by adding back fixed charges to consolidated earnings (losses) from continuing operations before income taxes and excluding losses and undistributed earnings from less than 50 percent owned associated companies. Fixed charges consist of: (i) interest expense; (ii) amortization of bond and other debt issue costs and discounts; (iii) fixed charges of finance subsidiaries; and (iv) one-third of rental expense on operating leases deemed to be representative of interest expense.

## USE OF PROCEEDS

Except as otherwise set forth in the Prospectus Supplement: (i) the net proceeds from the sale of Corporation Debt Securities and Warrants will be used for general corporate purposes, including the refinancing of the Corporation's short-term borrowings incurred for general corporate purposes, which as of January 31, 1996 had an average term of 21 days and were bearing interest at an average rate of 5.10 percent; and (ii) the net proceeds from the sale of Guaranteed Debt Securities and Warrants will be advanced to, or otherwise invested in, other subsidiaries or affiliates of the Corporation in the United States to be used for general corporate purposes.

## DESCRIPTION OF DEBT SECURITIES AND THE GUARANTEES

The following description of the terms of Debt Securities and the Guarantees sets forth certain general terms and provisions of Debt Securities to which any Prospectus Supplement may relate and the terms and provisions of the Guarantees. The particular terms and provisions of Debt Securities offered by any Prospectus Supplement and the extent, if any, to which such general provisions may apply to Debt Securities so offered will be described in the Prospectus Supplement related to such Debt Securities.

The Debt Securities are to be issued under, and the Guarantees are made pursuant to, an Indenture dated as of February 15, 1996 (the "Indenture") among the Corporation, as Issuer and Guarantor, the Finance Subsidiary, as Issuer, and The Bank of New York, as trustee (the "Trustee"). The Indenture is an exhibit to the Registration Statement of which this Prospectus forms a part. The following summary of certain provisions of the Indenture does not purport to be complete and is qualified in its entirety by reference to the provisions of the Indenture. Numerical references in parentheses below are to sections of the Indenture. Sections of the Indenture referred to herein shall be incorporated herein by reference. Unless otherwise defined herein, capitalized terms contained herein shall have the meanings ascribed to such terms in the Indenture.

**General**

Debt Securities offered by this Prospectus (together with any Warrants offered separately or together with Debt Securities) will be limited to an aggregate initial public offering price of $1,000,000,000 or the equivalent thereof in one or more foreign currencies or composite currencies, including ECU, $500,000,000 principal amount of which may be issued only by the Corporation and $500,000,000 principal amount of which may be issued by the Corporation or the Finance Subsidiary. The Indenture provides that Debt Securities in an unlimited amount may be issued thereunder from time to time in one or more series. Not all Debt Securities of any one series need be issued at the same time, and, unless otherwise provided, a series may be reopened for issuances of additional Debt Securities of such series. (Section 301)

The Corporation Debt Securities and the Guarantees will be direct, unconditional and unsecured obligations of the Corporation and will rank pari passu and ratably without preference among themselves and at least pari passu with other unsecured obligations of the Corporation, except to the extent prescribed by law. The Guaranteed Debt Securities will be direct, unconditional and unsecured obligations of the Finance Subsidiary and will rank pari passu and ratably without preference among themselves and at least pari passu with all other unsecured obligations of the Finance Subsidiary, except to the extent prescribed by law. The Finance Subsidiary's obligations under Guaranteed Debt Securities issued under the Indenture will be unconditionally guaranteed by the Guarantor, as more fully described below under "Guarantees".

4

The Indenture does not contain any covenants or provisions that would afford Holders of the Debt Securities protection in the event of a highly leveraged transaction.

The Prospectus Supplement related to the particular series of Debt Securities offered thereby will describe the terms of such Debt Securities, including, where applicable: (i) whether the Debt Securities are Corporation Debt Securities or Guaranteed Debt Securities; (ii) the designation, aggregate principal amount and denominations of such Debt Securities; (iii) the price (expressed as a percentage of the aggregate principal amount thereof) at which such Debt Securities will be issued; (iv) the date or dates on which such Debt Securities will mature; (v) the currency or currencies in which such Debt Securities are being sold and in which the principal of (and premium, if any), and any interest on, such Debt Securities will be payable, whether the Holder of any such Debt Securities may elect the currency in which payments thereon are to be made and, if so, the manner of such election; (vi) the rate or rates (which may be fixed or variable) per annum at which such Debt Securities will bear interest; (vii) the date from which such interest on such Debt Securities will accrue, the date or dates on which such interest will be payable and the date on which payment of such interest will commence; (viii) the dates on which and the price or prices at which such Debt Securities will, pursuant to any mandatory sinking fund provision or required repayment provisions, or may, pursuant to any repurchase or redemption provisions, be repurchased, redeemed or repaid and the other terms and provisions of any such optional repurchase, redemption or required repayment; (ix) whether such Debt Securities are to be issued in whole or in part in the form of one or more Global Securities and, if so, the identity of the Depositary (defined below) for such Global Security or Global Securities; (x) any special provisions for the payment of additional interest with respect to such Debt Securities; (xi) if a temporary Global Security is to be issued with respect to such series, the manner in which, the extent to which and the terms upon which any interest thereon payable on an interest payment date prior to the issuance of a definitive Global Security or individual Debt Securities will be credited to the account of the persons entitled thereto on such interest payment date; (xii) if a temporary Global Security is to be issued with respect to such series, the terms upon which interests in such temporary Global Security may be exchanged for interests in a definitive Global Security or for individual Debt Securities of the series and the terms upon which interests in a definitive Global Security, if any, may be exchanged for individual Debt Securities of the series; (xiii) any additional restrictive covenants of the applicable Issuer or of the Guarantor included for the benefit of Holders of such Debt Securities; (xiv) any additional Events of Default provided with respect to such Debt Securities; (xv) the terms of any Warrants offered together with such Debt Securities; (xvi) any exchange on which Debt Securities of a series will be listed; (xvii) material United States and Canadian tax consequences of owning such Debt Securities; and (xviii) any other terms.

The Debt Securities will only be issued in registered form. Debt Securities of a series may be issuable in whole or in part in the form of one or more Global Securities, as described below under "Global Securities". Unless otherwise specified by the Issuer and set forth in the related Prospectus Supplement, Debt Securities denominated in United States dollars will be issued in integral multiples of $1,000. If applicable, one or more Global Securities will be issued in a denomination or aggregate denominations equal to the aggregate principal amount of Outstanding Debt Securities of the series to be represented by such Global Security or Global Securities. The Prospectus Supplement related to a series of Debt Securities denominated in a foreign or composite currency will specify the denomination thereof. No service charge will be made for any registration of transfer or exchange of Debt Securities, but the Issuer may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. At the option of the Holder upon request confirmed in writing, and subject to the terms of the Indenture, Debt Securities of any series (other than a Global Security) may be exchanged for an equal aggregate principal amount of Debt Securities of the same series (with the same interest rate and maturity date) of different authorized denominations. *(Sections 302 and 305)*

Debt Securities may be presented for exchange and transfer (with the form of transfer endorsed thereon duly executed), at the office of any transfer agent or at the office of the Security Registrar, without service charge and upon payment of any taxes and other governmental charges as described in the Indenture. Such transfer or exchange will be effected upon the transfer agent or the Security Registrar, as the case may be, being satisfied with the documents of title and identity of the person making the request. *(Section 305)*

5

Debt Securities may be issued under the Indenture as Original Issue Discount Securities (defined below) to be offered and sold at a discount below their stated principal amount. Canadian and United States federal income tax consequences and other special considerations applicable to any such Original Issue Discount Securities will be described in the Prospectus Supplement related thereto. An "Original Issue Discount Security" means any Debt Security that is issued with "original issue discount" within the meaning of Section 1273(a) of the United States Internal Revenue Code of 1986 (the "Code") and the regulations thereunder and any other Debt Security designated by the applicable Issuer as issued with original issue discount for United States federal income tax purposes. *(Section 101)*

## Guarantees

The Guarantor will unconditionally and irrevocably guarantee that if, for any reason, the Finance Subsidiary does not pay the principal and premium, if any, and interest on any Guaranteed Debt Securities and the sinking fund or analogous payments referred to therein, if any, when payable by it under the Indenture in connection with any Guaranteed Debt Securities by the time and on the date specified for such payment (whether on the normal due date, on acceleration, redemption or otherwise), the Guarantor will cause any such payment to be made to or to the order of the Trustee. The Holder of a Guaranteed Debt Security will be entitled to payment under the Guarantee without taking any action whatsoever against the Finance Subsidiary. *(Section 203)*

## Global Securities

The Debt Securities of a series may be issued in whole or in part in the form of one or more Global Securities that will be deposited with, or on behalf of, a depositary (the "Depositary") identified in the Prospectus Supplement related to such series. Global Securities will only be issued in registered form and in either temporary or definitive form. Unless and until it is exchanged in whole or in part for the individual Debt Securities represented thereby, a Global Security may not be transferred except as a whole by the Depositary for such Global Security to a nominee of such Depositary or by a nominee of such Depositary to such Depositary or another nominee of such Depositary or by such Depositary or any such nominee to a successor of such Depositary or a nominee of such successor Depositary. *(Sections 303 and 305)*

The specific terms of the depositary arrangement with respect to any Debt Securities of a series will be described in the Prospectus Supplement related to such series. The Issuers expect that the following provisions will apply to all depositary arrangements.

Upon the issuance of a Global Security, the Depositary for such Global Security or its nominee will credit, on its book-entry registration and transfer system, the respective principal amounts of the individual Debt Securities represented by such Global Security to the accounts of institutions that have accounts with such Depositary ("participants"). The accounts to be credited shall be designated by the underwriters or agents of such Debt Securities or by the applicable Issuer, if such Debt Securities are offered and sold directly by such Issuer. Ownership of beneficial interests in a Global Security will be limited to participants or persons that may hold interests through participants. Ownership of beneficial interests in such Global Security will be shown on, and the transfer of that ownership will be effected only through, records maintained by the Depositary or its nominee or by participants or persons that hold through participants. The laws of some jurisdictions require that certain purchasers of securities take physical delivery of such securities. Such limitations and such laws may impair the ability to transfer beneficial interests in a Global Security.

So long as the Depositary for a Global Security, or its nominee, is the Holder of such Global Security, such Depositary or such nominee, as the case may be, will be considered the Holder of the Debt Securities represented by such Global Security. Except as set forth below, owners of beneficial interests in a Global Security will not be entitled to have Debt Securities of the series represented by such Global Security registered in their names, will not receive or be entitled to receive physical delivery of any such Debt Securities and will not be considered Holders thereof under the Indenture.

Payments of principal of (and premium, if any) and any interest on individual Debt Securities represented by a Global Security will be made to the Depositary or its nominee, as the case may be, as the

6

Holder of such Global Security. None of the Issuers, the Trustee for such Debt Securities, any Paying Agent or the Security Registrar for such Debt Securities will have any responsibility or liability for any aspect of the records related to or payments made on account of beneficial interests in such Global Security or for maintaining, supervising or reviewing any records related to such beneficial interests.

The Issuers expect that the Depositary for Debt Securities of a series or its nominee, upon receipt of any payment of principal of (and premium, if any) or interest in respect of a definitive Global Security representing any of such Debt Securities, will immediately credit participants' accounts with amounts proportionate to their respective beneficial interests in the principal amount of such Global Security as shown on the records of such Depositary or its nominee. The Issuers also expect that payments by participants to owners of beneficial interests in such Global Security held through such participants will be governed by standing instructions and customary practices, as is now the case with securities registered in "street name", and will be the responsibility of such participants.

If the Depositary for Debt Securities of a series is at any time unwilling or unable to continue as depositary and a successor depositary is not appointed by the applicable Issuer within 90 days, such Issuer will issue individual Debt Securities of such series in exchange for the Global Security or Global Securities representing such Debt Securities. In addition, the applicable Issuer may at any time and in its sole discretion determine not to have any Debt Securities of a series represented by one or more Global Securities and, in such event, will issue individual Debt Securities of such series in exchange for the Global Security or Global Securities representing such Debt Securities. Further, if the applicable Issuer so specifies with respect to the Debt Securities of a series, an owner of a beneficial interest in a Global Security representing Debt Securities of such series may, on terms acceptable to such Issuer and the Depositary for such Global Security, receive individual Debt Securities in exchange for such beneficial interest. In any such instance, an owner of a beneficial interest in a Global Security will be entitled to physical delivery of individual Debt Securities of the series represented by such Global Security equal in principal amount to such beneficial interest and to have such Debt Securities registered in its name. Individual Debt Securities of such series so issued will be issued in denominations, unless otherwise specified by the applicable Issuer, of integral multiples of $1,000. *(Sections 302, 303 and 305)*

**Payment and Paying Agents**

Payment of principal of (and premium, if any) on Debt Securities will be made in the designated currency against surrender of such Debt Securities at the Corporate Trust Office of the Trustee in The City of New York. Unless otherwise indicated in the applicable Prospectus Supplement, payment of any installment of interest on Debt Securities will be made to the person in whose name such Debt Security is registered at the close of business on the Regular Record Date for such interest. Unless otherwise indicated in the applicable Prospectus Supplement, payments of such interest will be made at the Corporate Trust Office of the Trustee in The City of New York, by a wire transfer or by a cheque in the designated currency mailed to such Holder at such Holder's registered address. *(Sections 307 and 1001)*

The Paying Agent or Paying Agents initially appointed by the applicable Issuer for a series of Debt Securities will be identified in the applicable Prospectus Supplement. The applicable Issuer may terminate the appointment of any of the Paying Agents from time to time, except that each Issuer will maintain at least one Paying Agent in The City of New York for payments with respect to Debt Securities of any series payable in Dollars issued thereby. *(Sections 101 and 1002)*

All moneys paid by an Issuer or the Guarantor to a Paying Agent for the payment of principal of (or premium, if any) or interest on any Debt Security that remains unclaimed at the end of two years after such principal, premium or interest shall have become due and payable will be repaid to such Issuer or to the Guarantor and the Holder of such Debt Security will thereafter look only to such Issuer or to the Guarantor, if any, for payment thereof. *(Section 1003)*

7

**Negative Pledge**

As long as any Debt Securities remain outstanding, the Corporation will not, and will not permit NTI and, as long as any Guaranteed Debt Securities remain outstanding, the Finance Subsidiary (the "Restricted Subsidiaries") to issue, assume or guarantee any indebtedness for borrowed money, whether of the Corporation or of a third person ("Funded Debt"), secured by, and will not secure any Funded Debt by, a mortgage, hypothec, pledge, lien, security interest, privilege, floating charge, conditional sale or other title retention agreement or other similar encumbrance (collectively, a "mortgage" or "mortgages") upon any property of the Corporation or a Restricted Subsidiary (whether now owned or hereafter acquired) without in any such case effectively providing concurrently therewith that the Debt Securities shall be secured equally and ratably with such Funded Debt. *(Section 1004)*

The Indenture contains exceptions to the foregoing covenant to permit: (i) any mortgage on property existing at the time of acquisition of the property by the Corporation or a Restricted Subsidiary; (ii) any mortgage on any property acquired, constructed or improved by the Corporation or a Restricted Subsidiary incurred after the date of issuance of the Debt Securities which is created or assumed contemporaneously with, or within 180 days after, such acquisition, or completion of such construction or improvement, to secure or provide for the payment of the purchase price thereof or the cost of construction or improvement thereon incurred after the date of issuance of the Debt Securities, including the cost of any underlying real property (excluding any property previously owned by the Corporation or a Restricted Subsidiary other than substantially unimproved real property and machinery or equipment installed as a fixture on the real property); (iii) mortgages on property of a corporation existing at the time such corporation is liquidated or merged into, or amalgamated or consolidated with, the Corporation or any Restricted Subsidiary or at the time of the sale, lease or other disposition to the Corporation or a Restricted Subsidiary of the properties of such corporation as, or substantially as, an entirety; (iv) mortgages securing inter-company indebtedness among the Corporation and any Restricted Subsidiary; (v) certain mortgages in connection with public obligations; and (vi) any extension, renewal or replacement (or successive extensions, renewals or replacements) in whole or in part of any mortgage existing at the date of the Indenture or referred to in the above clauses (i) through (v) inclusive (provided the principal amount of Funded Debt secured thereby does not exceed in principal amount the Funded Debt so secured at the time of such extension, renewal or replacement and is limited to all or part of the property (plus improvements and construction on such property) which secured the mortgage so extended, renewed or replaced) (collectively the "Permitted Exceptions"). Notwithstanding the foregoing, the Corporation or any Restricted Subsidiary may issue, assume or guarantee Funded Debt secured by a mortgage upon any property of the Corporation or such Restricted Subsidiary that would otherwise be subject to the foregoing restrictions, and may carry out any other transactions that would otherwise be subject to the foregoing restrictions, provided the aggregate amount of (x) all such Funded Debt and (y) Attributable Debt (defined below) in respect of all Financing Leases (defined below) entered into on or after February 15, 1996 would not, after giving effect thereto, exceed 15 percent of the Corporation's Consolidated Net Tangible Assets (defined below). *(Section 1004)*

The term "Consolidated Net Tangible Assets" shall mean the total amount of assets after deducting therefrom (i) all current liabilities and (ii) all goodwill, tradenames, trademarks, patents, unamortized debt discount and expense and other like intangible assets, all as shown in the then most recent consolidated balance sheet of the Corporation and its subsidiaries prepared in accordance with Canadian accounting principles applied on a consistent basis contained in the Corporation's annual or quarterly report to shareholders; assets shall include an amount equal to the present value of the obligations of the lessee under Financing Leases (described below) for rental payments during the remaining term of such leases not capitalized on such balance sheet (such present value being "Attributable Debt"). *(Section 101)*

The Corporation will not, and will not permit any Restricted Subsidiary to, enter into any Financing Leases (defined in the Indenture to mean sale and leaseback transactions, except for: (a) temporary leases for a term, including any renewal thereof, of not more than three years; (b) inter-company leases among the Corporation and any Restricted Subsidiary; and (c) leases for properties executed within one year of the latest of acquisition, completion of construction and commencement of commercial operation thereof) covering any property of the Corporation or a Restricted Subsidiary unless: (i) immediately thereafter the sum of

8

(x) Attributable Debt in respect of all Financing Leases entered into on or after February 15, 1996 and (y) the aggregate amount of all Funded Debt secured by a mortgage (exclusive of any secured Funded Debt permitted by the Permitted Exceptions) does not exceed 15 percent of the Corporation's Consolidated Net Tangible Assets; (ii) the Corporation or such Restricted Subsidiary would (at the time of entering into such arrangement) be entitled pursuant to the Permitted Exceptions, without equally and ratably securing the Debt Securities, to issue, assume or guarantee indebtedness secured by a mortgage on such property; or (iii) the Corporation or a Restricted Subsidiary shall apply, within 360 days of the effective date of any such arrangement, an amount equal to the Attributable Debt in respect of such Financing Leases to the prepayment or retirement of indebtedness which matures more than 12 months after the date of the creation of the indebtedness. *(Section 1004)*

### Modification of the Indenture

The Indenture permits the applicable Issuer of the series of Debt Securities, the Guarantor, in the case of Guaranteed Debt Securities, and the Trustee, with the consent of the Holders of not less than a majority in principal amount of Debt Securities at the time outstanding thereunder and affected thereby, to execute a supplemental indenture modifying the Indenture or the rights of the Holders of such Debt Securities; *provided* that no such modification shall, without the consent of the holder of each Debt Security affected thereby: (i) change the maturity of any Debt Security, or reduce the principal amount or any premium payable on redemption thereof, or reduce the rate or change the time of payment of interest thereon, or change any Place of Payment or change the currency in which a Debt Security is payable or affect the right of any Holder to institute suit for the enforcement of payment in accordance with the foregoing; (ii) reduce the aforesaid percentage in principal amount of outstanding Debt Securities, the consent of the Holders of which is required for any such modification to certain provisions of the Indenture or for the waivers of certain covenants or defaults under the Indenture or reduce the requirements for quorum or voting; or (iii) in the case of Guaranteed Debt Securities, change the terms and conditions of the obligations of the Guarantor in respect of the payment of principal, premium or interest or any additional amounts or any sinking fund or analogous payments provided in respect thereof. *(Section 902)*

The Indenture contains provisions for convening meetings of the Holders of Debt Securities of a series. *(Section 1401)* A meeting may be called at any time by the Trustee, or upon the request of the applicable Issuer or the Guarantor (in the case of Guaranteed Debt Securities) or the Holders of at least 10 percent in principal amount of the Outstanding Debt Securities of such series, in any such case upon notice given in accordance with the Indenture. *(Section 1402)* Except as limited by the circumstances in the preceding paragraph, any resolution presented at a meeting or adjourned meeting at which a quorum is present may be adopted by the affirmative vote of the Holders of a majority in principal amount of the Outstanding Debt Securities of that series; *provided however* that, except as limited by the provisions described in the preceding paragraph, any resolution with respect to any request, demand, authorization, direction, notice, consent, waiver or other action that may be made, given or taken by the Holders of a specified percentage, which is less than a majority, in principal amount of Outstanding Debt Securities of a series may be adopted at a meeting or adjourned meeting duly reconvened and at which a quorum is present by the affirmative vote of the Holders of such specified percentage in principal amount of the Outstanding Debt Securities of that series.

Any resolution passed or decision taken at any meeting of Holders of Debt Securities of any series duly held in accordance with the Indenture will be binding on all Holders of Debt Securities of that series whether or not present or represented at the meeting. The quorum at any meeting of the Holders of Debt Securities of a series called to adopt a resolution, and at any reconvened meeting, will be persons holding or representing a majority in principal amount of the Outstanding Debt Securities of a series. *(Section 1404)*

### Events of Default

The Indenture provides that any one or more of the following events shall constitute an Event of Default with respect to any series of Debt Securities thereunder: (i) default in payment of principal of (and premium, if any, on) any Debt Security of such series when due; (ii) default in payment of interest on any Debt Security of such series when due and payable and the continuance of such default for 30 days; (iii) default in the

deposit of any sinking fund payment on any Debt Security of such series when due; (iv) default in performing or observing any of the covenants, agreements or other obligations of the applicable Issuer or, in the case of Guaranteed Debt Securities, the Guarantor, in the Indenture for 90 days after written notice to such Issuer or the Guarantor, as the case may be, by the Holders of not less than 25 percent in principal amount of Outstanding Debt Securities of such series; (v) certain events of bankruptcy, insolvency, reorganization or arrangement of the applicable Issuer or, in the case of Guaranteed Debt Securities, the Guarantor, under bankruptcy, insolvency or analogous applicable law; and (vi) the occurrence of an event of default as defined in any evidence of indebtedness for borrowed money of the applicable Issuer or, in the case of Guaranteed Debt Securities, the Guarantor, exceeding on its face $100,000,000 in principal amount, which results in such indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become or be due and payable and such acceleration is not rescinded or annulled within 10 days. *(Section 501)* No Event of Default with respect to a particular series of Debt Securities under the Indenture necessarily constitutes an Event of Default with respect to any other series of Debt Securities. The applicable Issuer of the series of Debt Securities and the Guarantor, in the case of Guaranteed Debt Securities is required to file with the Trustee an annual Officers' Certificate as to the absence of certain defaults under the Indenture. *(Section 1005)*

The Indenture provides that if an Event of Default specified therein shall occur and be continuing with respect to a series of Debt Securities issued thereunder, either the Trustee or the Holders of not less than 25 percent in principal amount of the Outstanding Debt Securities of such series may declare the principal of (and premium, if any), together with accrued interest on, all Debt Securities of such series to be due and payable. *(Section 501)* In certain cases, the Holders of a majority in principal amount of the Outstanding Debt Securities of such series may on behalf of the Holders of all such Debt Securities waive any past default or Event of Default and rescind and annul any such declaration and its consequences. *(Sections 502 and 503)*

The Indenture contains a provision entitling the Trustee, subject to its duty during a default to act with the required standard of care, to be indemnified by the Holders of Debt Securities of such series before proceeding to exercise any right or power under the Indenture at the request of such Holders. *(Sections 601 and 606)* The Indenture provides that no Holder of any Debt Securities may pursue a remedy with respect to the Indenture except in the case of failure of the Trustee to act for 60 days after it is given notice of default by such Holder together with both a request to enforce the Indenture by the Holders of not less than 25 percent in aggregate principal amount of all of the then Outstanding Debt Securities (treated as a class) and an indemnity to the Trustee, satisfactory to the Trustee, and during such 60 day period the Holders of a majority in principal amount of all of the Outstanding Debt Securities (treated as a class) do not give a direction inconsistent with such request. *(Section 507)* This provision will not prevent any Holder of Debt Securities from enforcing payment of the principal thereof (and premium, if any) and interest thereon at the respective due dates thereof. *(Section 508)* The Holders of a majority in principal amount of the Outstanding Debt Securities of any series may (i) direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on it with respect to the Debt Securities of such series and (ii) take any other action authorized to be taken under the Trust Indenture or under applicable law. However, the Trustee may refuse to follow any direction that conflicts with law or the Indenture or is unduly prejudicial to the rights of other Holders. *(Section 506)*

The Indenture provides that if an Event of Default with respect to a series of Debt Securities occurs and is continuing, the Trustee will mail to Holders of Debt Securities of such series a notice of the Event of Default within 90 days after it occurs, but, except in the case of a default in the payment of principal of (or premium, if any), or interest on, any Debt Securities, the Trustee shall be protected in withholding such notice if it determines in good faith that the withholding of such notice is in the interests of the Holders of such Debt Securities. *(Section 605)*

10

**Defeasance**

*Defeasance of Certain Obligations*

The Corporation, in the case of Corporation Debt Securities, or the Guarantor, in the case of Guaranteed Debt Securities, and any Restricted Subsidiary may omit to comply with the terms, provisions or conditions of the Negative Pledge and any such omission shall not be an Event of Default, provided: (i) the applicable Issuer or the Guarantor (in the case of Guaranteed Debt Securities) has, at least 91 days prior thereto, irrevocably deposited with the Trustee, as specific security pledged for, and dedicated solely to, the due payment and ultimate satisfaction of the obligations of the applicable Issuer or the Guarantor under the Indenture with respect to the Debt Securities of the series affected, (a) funds in the currency, currencies or currency units in which the Debt Securities are payable, and/or (b) an amount of direct obligations of, or obligations the payment of principal of and interest, if any, on which are fully guaranteed by, the government that issued the currency or currencies in which Debt Securities of such series are payable, and that are not subject to prepayment, redemption or call, as will together with the predetermined and certain income to accrue thereon without consideration of any reinvestment thereof, be sufficient (in the case of such obligations, through the payment of interest and principal thereunder) to pay (x) the principal of (and premium, if any) and interest on the Outstanding Debt Securities of the particular series on their stated maturity, and (y) any mandatory prepayments on the day on which such prepayments are due and payable; (ii) such Issuer or the Guarantor, as the case may be, shall have delivered to the Trustee an Opinion of Counsel to the effect that Holders of the Debt Securities affected will not recognize income, gain or loss for United States federal income tax purposes as a result of such deposit and defeasance in respect of such Issuer's or the Guarantor's obligations and will be subject to United States federal income tax as if such deposit and defeasance had not occurred; (iii) such Issuer or the Guarantor, as the case may be, shall have delivered to the Trustee an Opinion of Counsel to the effect that the Holders of the Debt Securities affected will not recognize income, gain or loss for Canadian federal income tax purposes as a result of such deposit and defeasance in respect of such Issuer's or the Guarantor's obligations and will be subject to Canadian federal income tax as if such deposit and defeasance had not occurred; (iv) such deposit will not result in a breach or violation of, or constitute a default under, the Indenture or any other material agreement or instrument to which such Issuer or the Guarantor is a party or by which it is bound; (v) no Event of Default with respect to the Debt Securities of such series or event that, with notice or lapse of time, would become such an Event of Default shall have occurred and be continuing on the date of such deposit; (vi) if the Debt Securities affected are listed on the New York Stock Exchange, such Issuer shall have delivered to the Trustee an Opinion of Counsel to the effect that such deposit and defeasance will not cause such Debt Securities to be delisted; (vii) such Issuer or the Guarantor, as the case may be, shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating compliance with all conditions precedent to the defeasance; and (viii) any deposit made by such Issuer or the Guarantor, as the case may be, in this regard shall not cause the Trustee to have a conflicting interest, within the meaning of the Indenture and the Trust Indenture Act of 1939. *(Section 1302)*

*Other Defeasance Arrangements*

If so described in the Prospectus Supplement related to Debt Securities of a specific series, the applicable Issuer or the Guarantor (in the case of Guaranteed Debt Securities) may enter into certain other arrangements providing for the due payment and ultimate satisfaction of its obligations with respect to such Debt Securities by the deposit with the Trustee of funds or obligations of the type referred to under "Defeasance of Certain Obligations". The Prospectus Supplement will more fully describe the provisions, if any, relating thereto.

**Amalgamation, Consolidation, Conveyance, Transfer or Lease**

Each Issuer and the Guarantor has covenanted in the Indenture not to amalgamate with any other corporation or enter into any reorganization or arrangement or effect any conveyance, transfer or lease of all or substantially all of its assets, unless, in any such case: (i) either such Issuer or the Guarantor, as the case may be, shall be the continuing corporation, or the successor corporation (or the person that leases or that acquires

11

by conveyance or transfer all or substantially all of such Issuer's or Guarantor's assets) shall expressly, by supplemental indenture, assume the obligations of such Issuer or Guarantor under the terms of the Indenture; and (ii) such Issuer, Guarantor or such a successor corporation shall not immediately thereafter be in default under the Indenture or the Debt Securities. Any such successor corporation shall agree to be bound by the terms of the Indenture as principal obligor or guarantor in place of such Issuer or Guarantor as if such successor had been named in the Indenture as such Issuer or Guarantor, respectively. *(Section 801)*

### Concerning the Trustee

The Bank of New York is the Trustee under the Indenture. An affiliate of the Trustee maintains normal banking relations, including the maintenance of depository accounts, with the Corporation and its affiliates. The Trustee is also a successor trustee under indentures dated as of May 3, 1988 and November 30, 1988 with the Corporation.

## DESCRIPTION OF WARRANTS

The following description of the terms of the Warrants sets forth certain general terms and provisions of the Warrants to which any Prospectus Supplement may relate. The particular terms of the Warrants offered by a Prospectus Supplement and the extent, if any, to which such general provisions may apply to the Warrants so offered will be described in the Prospectus Supplement related to such Warrants.

Warrants may be offered independently, or together with any series of Debt Securities offered by a Prospectus Supplement, and may be attached to or separate from such Debt Securities. Each series of Warrants will be issued under a separate warrant agreement (a "Warrant Agreement") to be entered into between the applicable Issuer and a bank or trust company as Warrant Agent (the "Warrant Agent"), all as set forth in the Prospectus Supplement related to such series of Warrants. The Warrant Agent will act solely as the agent of such Issuer in connection with the certificates for the Warrants (the "Warrant Certificates") of such series and will not assume any obligation or relationship of agency or trust for or with any holders of Warrant Certificates or beneficial owners of Warrants. Copies of the forms of Warrant Agreements, including the forms of Warrant Certificates, are filed as exhibits to the Registration Statement of which this Prospectus forms a part.

The following summaries of certain provisions of the forms of Warrant Agreements and Warrant Certificates do not purport to be complete and are subject to, and are qualified in their entirety by reference to, all the provisions of the Warrant Agreements and the Warrant Certificates. Numerical references in parentheses below are to sections of the Warrant Agreements. Sections of the Warrant Agreements referred to herein shall be incorporated herein by reference. Unless otherwise defined herein, capitalized terms contained herein shall have the meaning ascribed to such terms in the Warrant Agreements.

### General

The Prospectus Supplement related to the particular series of Warrants, if any, offered thereby will describe the terms of such Warrants, including, where applicable: (i) whether the Warrants are offered by the Corporation or the Finance Subsidiary; (ii) the offering price; (iii) the currency or currencies in which such Warrants are being offered; (iv) the designation, aggregate principal amount, currency or currencies, denominations and terms of the series of Debt Securities that may be purchased upon exercise of such Warrants; (v) the designation and terms of the series of Debt Securities with which such Warrants are being offered, if any, and the number of such Warrants being offered with each such Debt Security; (vi) the date or dates on or after which such Warrants and the related series of Debt Securities, if any, will be transferable separately; (vii) the principal amount of the series of Debt Securities that may be purchased upon exercise of each such Warrant and the price at which and currency or currencies in which such principal amount of Debt Securities of such series may be purchased upon such exercise; (viii) the date on which the right to exercise such Warrants shall commence (the "Exercise Date") and the date on which such right shall expire (the "Expiration Date"); (ix) material United States and Canadian tax consequences of owning such Warrants; and (x) any other terms of such Warrants.

12

Warrant Certificates of each series will only be issued in registered form. At the option of the Holder upon request confirmed in writing, and subject to the terms of the relevant Warrant Agreement, Warrants of any series will be exchangeable into Warrants of the same series representing in the aggregate the number of Warrants surrendered for exchange. Warrant Certificates may be presented for exchange and transfer (with the form of transfer endorsed thereon duly executed), at the corporate trust office of the Warrant Agent for such series of Warrants (or any other office indicated in the Prospectus Supplement related to such series of Warrants), without service charge and upon payment of any taxes and other governmental charges as described in the relevant Warrant Agreement. Such transfer or exchange will be effected upon the Warrant Agent for such series of Warrants being satisfied with the documents of title and identity of the person making the request. *(Section 4.01)*

Prior to the exercise of their Warrants, Holders of Warrants will not have any of the rights of Holders of the series of Debt Securities that may be purchased upon such exercise, including, without limitation, the right to receive payments of principal of (and premium, if any) or interest, if any, on the series of Debt Securities that may be purchased upon such exercise, or to enforce any of the covenants in the Indenture. *(Section 3.01)*

## Exercise of Warrants

Each Warrant will entitle the holder thereof to purchase such principal amount of the related series of Debt Securities at such exercise price as shall in each case be set forth in, or calculable as set forth in, the Prospectus Supplement related to such Warrant. Warrants of a series may be exercised at the corporate trust office of the Warrant Agent for such series of Warrants (or any other office indicated in the Prospectus Supplement related to such series of Warrants) on or after the Exercise Date until the time on the Expiration Date set forth in the Prospectus Supplement related to such series of Warrants. After such time on the Expiration Date related to such series of Warrants (or such later date to which such Expiration Date may be extended by the applicable Issuer), unexercised Warrants of such series will become void. *(Sections 2.02 and 2.03)*

Warrants of a series may be exercised by delivery to the appropriate Warrant Agent of payment, as provided in the Prospectus Supplement related to such series of Warrants, of the amount required to purchase the principal amount of the series of Debt Securities that may be purchased upon such exercise, together with the duly completed and executed form of election to purchase such Debt Securities as set forth on the reverse side of the Warrant Certificate evidencing such Warrants. Such Warrants will be deemed to have been exercised upon receipt of the exercise price and the Warrant Certificate. Upon receipt of such payment and such Warrant Certificate, properly completed and duly executed, at the corporate trust office of the appropriate Warrant Agent (or any other office indicated in the Prospectus Supplement related to such series of Warrants), the applicable Issuer will, as soon as practicable, issue and deliver the principal amount of the series of Debt Securities that may be purchased upon such exercise. If fewer than all of the Warrants represented by a Warrant are exercised, a new Warrant will be issued and delivered for the remaining amount of Warrants. *(Section 2.03)*

## CANADIAN FEDERAL INCOME TAX CONSIDERATIONS

Stikeman, Elliott, Toronto, Ontario, have advised that the following is a summary of the principal Canadian federal income tax considerations under the Income Tax Act (Canada) (the "Act") and the Income Tax Regulations (the "Regulations") in effect at the date hereof generally applicable to holders of Debt Securities and Warrants who acquire their Debt Securities and Warrants in an offering contemplated by this Prospectus, deal at arm's length with the Corporation and are neither residents nor deemed to be residents of Canada for purposes of the Act and the Regulations. This summary takes into account such counsel's understanding of the administrative practices and policies of (and published officially by) Revenue Canada applied by it in interpreting and administering the Act and also all specific proposals (the "Proposals") to amend the Act and the Regulations announced by the Minister of Finance prior to the date hereof. This summary assumes that the Act and the Regulations will be amended in accordance with the Proposals as so announced although there can be no assurance given in this regard.

13

The following is a general summary only with respect to the securities described in this Prospectus as Debt Securities and Warrants because the attributes of Debt Securities and Warrants which may be offered by a Prospectus Supplement have not been determined and are not described in this Prospectus. It does not purport to be a complete analysis or listing of all potential tax consequences under the Act, the Regulations and the Proposals of holding Debt Securities and Warrants, does not take into account or anticipate and is not a summary of tax considerations under the Act, the Regulations and the Proposals applicable to or arising from particular attributes of Debt Securities and Warrants, is not and is not intended to be and should not be construed to be or relied upon as legal or tax advice in respect of or to any holder of Debt Securities or Warrants and does not deal with Canadian provincial or territorial tax considerations or tax considerations under the legislation of countries other than Canada. This summary assumes that all relevant facts and circumstances are, and will continue to be, as described in this Prospectus, and does not take into account or anticipate any other facts or circumstances. Also, except as specifically stated, this summary does not take into account or anticipate any changes in law, whether by legislative, regulatory, judicial or administrative action.

Prospective holders of Debt Securities and Warrants are advised to consult their own tax advisors as to the tax consequences of their acquisition and holding of Debt Securities and Warrants. **Canadian federal income tax considerations applicable to Debt Securities and Warrants will be described particularly (and then only to the extent material) in the Prospectus Supplement related thereto if they are not addressed by the comments following, and, in that event, the comments following will be superseded thereby to the extent indicated therein.**

**Withholding Tax**

Any amount paid or credited, or deemed to be paid or credited, as, on account or in lieu of payment of, or in satisfaction of interest on Corporation Debt Securities issued under the Indenture to non-residents of Canada (other than certain persons carrying on business in Canada, to the extent provided in the Act and the Regulations) generally will be subject to a 25 percent non-resident withholding tax in accordance with Part XIII of the Act and the Regulations. The rate of such tax may be reduced through the application of international tax treaties or conventions to which Canada is a party, usually to a rate of 10 percent or 15 percent. There is an exemption from such tax for interest (other than certain interest described in the Act) payable by a corporation resident in Canada to non-residents of Canada who deal at arm's length with the corporation on an obligation issued by the corporation after June 23, 1975 if under the terms of the obligation or any related agreement, the corporation may not under any circumstances be obliged to pay more than 25 percent of the principal amount of the obligation (or the aggregate principal amount of a number of obligations, identical in all respects but for their separate principal amounts, that comprise a single debt issue of obligations) within five years from the date of its issue except in the event of a failure or default under such terms or agreement, if the terms of the obligation or such agreement become unlawful or are changed by virtue of legislation or by a court, statutory board or commission, or if such a non-resident person exercises a right under the terms of the obligation or such agreement to convert the obligation into, or exchange the obligation for, a "prescribed security" under the Act and the Regulations for this purpose.

On the assumption that the Finance Subsidiary is and continues to be a non-resident of Canada which does not carry on business in Canada for purposes of the Act, payments on the Guaranteed Debt Securities by the Finance Subsidiary will not be subject to Canadian non-resident withholding tax. However, were the Corporation to pay amounts in accordance with the Guarantees, in satisfaction of any amounts that may reasonably be regarded as being or being attributable to interest payable under the Guaranteed Debt Securities, such amounts may be subject to non-resident withholding tax at the rate of 25 percent or such lower rate as may be provided for under the terms of any applicable bilateral tax treaty.

**Other Income Tax**

No other taxes on income or capital gains generally are payable in respect of Debt Securities or the interest or premium, if any, thereon, or the Warrants, by holders who do not use or hold and are not deemed or considered to use or hold, and to whom amounts have not been attributed in respect of, the Debt Securities or the Warrants, by or for purposes of the Act and the Regulations, in carrying on business in Canada.

14

## PLAN OF DISTRIBUTION

The Issuers may offer and sell Debt Securities and Warrants, separately or together, to or through underwriters or groups of underwriters, acting as principals for their own accounts and/or as agents, and also may offer and sell Debt Securities and Warrants, separately or together, directly to dealers or other purchasers. Any such underwriter and/or agent will be identified and the terms of its agreement with the applicable Issuer and its compensation will be described in the Prospectus Supplement in connection with the Debt Securities and/or Warrants offered thereby.

The sale of Debt Securities and Warrants may be effected from time to time in one or more transactions at a fixed price or prices, which may be changed, or at market prices prevailing at the time of sale, at prices related to such prevailing market prices or at negotiated prices.

In connection with the sale of Debt Securities and Warrants, dealers may receive compensation from the applicable Issuer or from purchasers of Debt Securities or Warrants for whom they may act as agents, in the form of commissions. The dealers that participate in the sale of Debt Securities or Warrants may be deemed to be underwriters and any commissions received by them and any profit on the resale of Debt Securities or Warrants by them may be deemed to be underwriting commissions under the 1933 Act. Any such compensation will be described in the Prospectus Supplement related thereto.

Under agreements that may be entered into with the Issuers and/or the Guarantor, underwriters, dealers and agents may be entitled to indemnification by such entities against certain liabilities, including liabilities under the 1933 Act. Underwriters, dealers and agents may be customers of, engage in transactions with, or perform services for the Issuers in the ordinary course of business.

If so indicated in the Prospectus Supplement, the applicable Issuer will authorize dealers or other persons acting as such Issuer's agents to solicit offers by certain institutions to purchase Debt Securities or Warrants from such Issuer pursuant to contracts providing for payment and delivery on a future date. Institutions with which such contracts may be made include commercial and savings banks, insurance companies, pension funds, investment companies, educational and charitable institutions and others, but in all cases such institutions must be approved by the applicable Issuer. The obligations of any purchaser under any such contract will not be subject to any conditions except that: (i) the purchase of Debt Securities or Warrants shall not at the time of delivery be prohibited under the laws of the jurisdiction to which such purchaser is subject; and (ii) if the series of Debt Securities or Warrants being sold to such institutions are also being sold to underwriters, the applicable Issuer shall have sold to such underwriters the Debt Securities or Warrants. The dealers and such other persons will not have any responsibility in respect of the validity or performance of such contracts.

Underwriters and agents may from time to time purchase and sell Debt Securities or Warrants in the secondary market, but are not obligated to do so, and there can be no assurance that there will be a secondary market for the Debt Securities or Warrants or liquidity in the secondary market if one develops. From time to time, underwriters and agents may make a market in the Debt Securities or Warrants.

Neither Debt Securities nor Warrants will be offered or sold to a resident of Canada in contravention of the securities laws of Canada or any province or territory thereof.

## EXPERTS

The financial statements and the financial statement schedule contained in the Corporation's Annual Report on Form 10-K incorporated herein by reference have been examined by Deloitte & Touche, independent chartered accountants, whose reports thereon are also included in such Form 10-K. Such financial statements and financial statement schedule which are incorporated herein by reference have been so incorporated in reliance upon such opinions given upon the authority of that firm as experts in auditing and accounting.

15



96 12 0495

**$300,000,000**

NORTHERN TELECOM

# Northern Telecom Capital Corporation

RECD S.E.C.
JUN 14 1996
036

**$150,000,000 7.40% Notes Due 2006**
**$150,000,000 7.875% Notes Due 2026**

Unconditionally Guaranteed as to Payment of Principal, Premium, if any, and interest by

## Northern Telecom Limited ✳ 333-1720

The 7.40% Notes will mature on June 15, 2006 and the 7.875% Notes will mature on June 15, 2026. Interest on the 7.40% Notes and the 7.875% Notes (collectively, the "Offered Notes") is payable semiannually on June 15 and December 15 of each year commencing December 15, 1996. The Offered Notes may not be redeemed prior to maturity and do not provide for any sinking fund. Payment of the principal of, and premium, if any, and interest on, the Offered Notes will be unconditionally and irrevocably guaranteed (each, a "Guarantee" and collectively, the "Guarantees") by Northern Telecom Limited (the "Guarantor"). See "Description of Offered Notes". Unless the context indicates otherwise, the "Corporation" refers to Northern Telecom Capital Corporation.

The 7.40% Notes and the 7.875% Notes will each be represented by one or more Global Securities registered in the name of the nominee of The Depository Trust Company (the "Depository"). Interests in the Global Securities will be shown on, and transfers thereof will be effected only through, records maintained by the Depository and its participants. Except as provided herein, Offered Notes in definitive form will not be issued. Settlement for the Offered Notes will be made in immediately available funds. The Offered Notes will trade in the Depository's Same-Day Funds Settlement System until maturity, and secondary market trading activity for the Offered Notes will therefore settle in immediately available funds. All payments of principal and interest will be made by the Corporation in immediately available funds. See "Description of Offered Notes".

**THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS SUPPLEMENT OR THE PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

PROCESSED BY
23·23·?
JUN 17 1996
DISCLOSURE INC.

|  | Initial Public Offering Price (1) | Underwriting Commissions (2) | Net Proceeds to Corporation (1)(3) |
|---|---|---|---|
| Per 7.40% Note | 99.325% | .650% | 98.675% |
| Total | $148,987,500 | $975,000 | $148,012,500 |
| Per 7.875% Note | 99.531% | .875% | 98.656% |
| Total | $149,296,500 | $1,312,500 | $147,984,000 |

(1) Plus accrued interest, if any, from June 17, 1996.
(2) The Corporation and the Guarantor have agreed to indemnify the Underwriters against certain liabilities, including liabilities under the Securities Act of 1933.
(3) Before deducting estimated expenses of $500,000 payable by the Corporation.

The Offered Notes are offered severally by the Underwriters, as specified herein, subject to receipt and acceptance by them and subject to their right to reject any order in whole or in part. It is expected that the Offered Notes will be ready for delivery in New York, New York on or about June 17, 1996, against payment therefor in immediately available funds.

## Goldman, Sachs & Co.
### Lehman Brothers
#### J.P. Morgan & Co.
##### Salomon Brothers Inc

The date of this Prospectus Supplement is June 12, 1996.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY OVER-ALLOT OR EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICE OF THE SECURITIES OFFERED HEREBY AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

## RATIO OF EARNINGS TO FIXED CHARGES OF THE GUARANTOR

The following table sets forth the ratio of earnings to fixed charges of the Guarantor for the periods indicated:

| Three Months Ended March 31, 1996 | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 1995 | 1994 | 1993 | 1992* | 1991* |
| 3.2 | 4.0 | 3.2 | ** | 3.6 | 3.6 |

* The ratio of earnings to fixed charges of the Guarantor for 1991 and 1992 has been restated due to the reclassification of investment tax credits from income tax provision to research and development expense commencing January 1, 1993.

** The calculation of the ratio of earnings to fixed charges of the Guarantor results in an amount that is less than one. The amount of earnings coverage deficiency for the year ended December 31, 1993 was $400 million.

The ratio of earnings to fixed charges of the Guarantor is computed in accordance with Canadian generally accepted accounting principles, on a consolidated basis, by dividing earnings before fixed charges and income taxes by the fixed charges. For the purpose of computing the ratio of earnings to fixed charges, earnings are determined by adding back fixed charges to consolidated earnings (losses) from continuing operations before income taxes and excluding undistributed earnings (losses) from less than 50 percent owned associated companies. Fixed charges consist of: (i) interest expense; (ii) amortization of bond and other debt issue costs and discounts; (iii) fixed charges of finance subsidiaries; and (iv) one-third of rental expense on operating leases deemed to be representative of interest expense.

## USE OF PROCEEDS

The net proceeds to be received by the Corporation from the sale of the Offered Notes, will be loaned or advanced to, or otherwise invested in, Northern Telecom Inc. ("NTI"), the parent of the Corporation and a wholly owned subsidiary of the Guarantor, to be used for general corporate purposes; approximately $150,000,000 of such proceeds will replenish cash deposits which NTI will loan or advance to, or otherwise invest in, Elder Corporation ("Elder"), a wholly owned subsidiary of NTI, to finance the consideration to be paid by Elder in connection with the tender offer to purchase all outstanding shares of common stock of MICOM Communications Corp., a Delaware corporation, which offer is scheduled to expire at midnight on June 14, 1996, unless extended.

## INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The following documents, which were filed by the Guarantor (Commission File No. 1-7260) with the Securities and Exchange Commission (the "Commission") under the Securities Exchange Act of 1934 (the "Exchange Act"), are incorporated herein by reference and made a part hereof:

(1) the Guarantor's Annual Report on Form 10-K for the year ended December 31, 1995; and

(2) the Guarantor's Quarterly Report on Form 10-Q for the quarter ended March 31, 1996.

All documents filed by the Guarantor pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of this Prospectus Supplement and prior to the termination of the offering made hereby shall be deemed to be incorporated in and made a part of this Prospectus Supplement by reference from the date of filing of such documents. Any statement contained herein or contained in a document incorporated or deemed to be incorporated by reference herein shall be deemed to be modified or superseded for purposes of this Prospectus Supplement to the extent that a statement contained herein or in any other subsequently filed document which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement.

The Corporation and the Guarantor will provide without charge to each person, including any beneficial owner, to whom a copy of this Prospectus Supplement is delivered, upon written or oral request of any such person, a copy of any or all of the documents incorporated by reference herein (not including the exhibits to such documents, unless such exhibits are specifically incorporated by reference in such documents). Written requests to the Guarantor for such copies should be directed to: Northern Telecom Limited, 2920 Matheson Boulevard East, Mississauga, Ontario, Canada, L4W 4M7, Attention: Corporate Secretary. Telephone requests may be directed to (905) 238-7000. Written requests to the Corporation should be directed to: Northern Telecom Capital Corporation, Northern Telecom Plaza, 200 Athens Way, Nashville, Tennessee, United States, 37228-1397, Attention: Secretary. Telephone requests may be directed to (615) 734-4000.

## DESCRIPTION OF OFFERED NOTES

*The following description of the particular terms of the Offered Notes offered hereby supplements, and to the extent inconsistent therewith replaces, the description of the general terms and provisions of the Guaranteed Debt Securities and the Guarantees set forth in the Prospectus, to which description reference is hereby made.*

### General

The Offered Notes are to be issued under an Indenture, dated as of February 15, 1996 (the "Indenture"), among the Corporation, as issuer, Guarantor, as issuer and guarantor, and The Bank of New York, as trustee (the "Trustee").

The 7.40% Notes will be limited to an aggregate principal amount of $150,000,000 and will mature on June 15, 2006. The 7.875% Notes will be limited to an aggregate principal amount of $150,000,000 and will mature on June 15, 2026. Each Offered Note will bear interest at the applicable rate per annum shown on the cover page of this Prospectus Supplement from June 17, 1996, or from the most recent Interest Payment Date to which interest has been paid or provided for, payable semiannually on June 15 and December 15 of each year, commencing December 15, 1996, to the person in whose name such Offered Note is registered at the close of business on June 1 or December 1, as the case may be, next preceding such Interest Payment Date. Principal of and interest on the Offered Notes will be payable at the Corporate Trust Office of the Trustee in the Borough of Manhattan, The City of New York and such other office or agency of the Corporation maintained for such purpose; *provided, however,* at the option of the Corporation, payment of interest may be made by check mailed to the address of the person entitled thereto as such address shall appear in the Security Register or by wire transfer to an account designated by such person.

The Guarantor will unconditionally and irrevocably guarantee that if, for any reason, the Corporation does not pay the principal of, and premium, if any, and interest on, any Offered Notes when payable by the Corporation, the Guarantor will cause any such payment to be made to or to the order of the Trustee.

Payment of the purchase price of each Offered Note may be made, and the payment of the principal of and interest on each Offered Note will be made, only in United States dollars.

The defeasance provisions of the Indenture described under "Description of Debt Securities and the Guarantees — Defeasance" in the accompanying Prospectus will apply to the Offered Notes.

The Offered Notes will rank pari passu with other debt of the Corporation and the Guarantees will rank pari passu with other debt of the Guarantor.

### Redemption

The Offered Notes may not be redeemed prior to maturity and do not provide for any sinking fund.

### Book Entry Offered Notes

The Depository will act as securities depository for the Offered Notes. The 7.40% Notes and the 7.875% Notes will each be issued only as Global Securities registered in the name of Cede & Co. (the Depository's nominee). One or more Global Securities will be issued for each issue of the Offered Notes, each in the aggregate principal amount of such issue, and will be deposited with the Depository.

The laws of some jurisdictions require that certain purchasers of securities take physical delivery of securities in definitive form. Such laws may impair the ability to transfer beneficial interests in the Offered Notes as represented by the Global Securities.

The Depository is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act. The Depository holds securities that its participants ("Participants") deposit with the Depository. The Depository also facilitates the settlement among Participants of securities transactions, such as transfers and pledges, in deposited securities through electronic computerized book-entry changes in Participants' accounts, thereby eliminating the need for physical movement of securities certificates. Direct Participants include securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations ("Direct Participants"). The Depository is owned by a number of its Direct Participants and by the New York Stock Exchange, Inc., the American Stock Exchange, Inc., and the National Association of Securities Dealers, Inc. Access to the Depository's system is also available to others such as securities brokers and dealers, banks, and trust companies that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). The Rules applicable to the Depository and its Participants are on file with the Commission.

Purchases of Offered Notes under the Depository system must be made by or through Direct Participants, which will receive a credit for the Offered Notes on the Depository's records. The ownership interest of each actual purchaser of each Offered Note ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from the Depository of their purchase, but Beneficial Owners are expected to receive written confirmations providing details of the transactions, as well as periodic statements of their holdings, from the Direct or Indirect Participants through which the Beneficial Owners entered into the transaction. Transfers of ownership interests in the Offered Notes will be accomplished by entries made on the books of Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in Offered Notes, except in the event that use of the book-entry system for the Offered Notes is discontinued.

To facilitate subsequent transfers, all Offered Notes deposited by Participants with the Depository are registered in the name of the Depository's partnership nominee, Cede & Co. The deposit of Offered Notes with the Depository and their registration in the name of Cede & Co. will effect no change in beneficial ownership. The Depository will have no knowledge of the actual Beneficial Owners of the Offered Notes; the Depository's records reflect only the identity of the Direct Participants to whose accounts such Offered Notes are credited, which may or may not be the Beneficial Owners. The Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by the Depository to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Neither the Depository nor Cede & Co. will consent or vote with respect to Offered Notes. Under its usual procedures, the Depository mails an Omnibus Proxy to the Corporation as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Offered Notes are credited on the record date (identified in a listing attached to the Omnibus Proxy). The Guarantor and the Corporation believe that the arrangements among the Depository, Direct and Indirect Participants, and Beneficial Owners will enable the Beneficial Owners to exercise rights equivalent in substance to the rights that can be directly exercised by a holder of an Offered Note.

Principal and interest payments on the Offered Notes will be made to the Depository. The Depository's practice is to credit Direct Participants' accounts on the relevant payment date in accordance with their respective holdings shown on the Depository's records unless the Depository has reason to believe that it will not receive payment on such payment date. Payments by Participants to Beneficial Owners will be governed

S-4

by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of the Depository, the Corporation or the Guarantor, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal and interest to the Depository is the responsibility of the Corporation, disbursement of such payments to Direct Participants shall be the responsibility of the Depository, and disbursement of such payments to the Beneficial Owners shall be the responsibility of Direct and Indirect Participants.

Except under the circumstances described in the Prospectus under "Description of Debt Securities and the Guarantees — Global Securities", a Beneficial Owner in a Global Security will not be entitled to receive physical delivery of the Offered Notes. Accordingly, each Beneficial Owner must rely on the procedures of the Depository, the Direct Participants and the Indirect Participants to exercise any rights under the Offered Notes.

The Depository may discontinue providing its services as securities depository with respect to the Offered Notes at any time by giving reasonable notice to the Corporation. Under such circumstances, in the event that a successor securities depository is not obtained, certificates for Offered Notes are required to be printed and delivered.

The Corporation may decide to discontinue use of the system of book-entry transfers through the Depository (or a successor securities depository). In that event, certificates for Offered Notes will be printed and delivered.

The information in this section concerning the Depository and the Depository's book-entry system has been obtained from sources that the Corporation and the Guarantor believe to be reliable, but neither the Corporation nor the Guarantor takes responsibility for the accuracy thereof.

**Same-Day Settlement**

Settlement for the Offered Notes will be made by the Underwriters in immediately available funds.

Secondary trading in long-term notes and debentures of corporate issuers is generally settled in clearing-house or next-day funds. In contrast, the Offered Notes will trade in the Depository's Same-Day Funds Settlement System until maturity, and secondary market trading activity in the Offered Notes will therefore be required by the Depository to settle in immediately available funds. No assurance can be given as to the effect, if any, of settlement in immediately available funds on trading activity in the Offered Notes.

**Concerning the Trustee**

The Trustee maintains normal banking relations, including the maintenance of depository accounts, with the Guarantor and certain of its affiliates. The Trustee is also successor trustee under indentures dated as of May 3, 1988 and November 30, 1988 with the Guarantor.

## UNDERWRITING

Subject to the terms and conditions set forth in the Underwriting Agreement, the Corporation has agreed to sell to each of the Underwriters named below, and each of the Underwriters has severally agreed to purchase, the principal amount of the Offered Notes set forth opposite its name below:

| Underwriter | Principal Amount of 7.40% Notes | Principal Amount of 7.875% Notes |
|---|---|---|
| Goldman, Sachs & Co. | $ 37,500,000 | $ 37,500,000 |
| Lehman Brothers Inc. | 37,500,000 | 37,500,000 |
| J.P. Morgan Securities Inc. | 37,500,000 | 37,500,000 |
| Salomon Brothers Inc | 37,500,000 | 37,500,000 |
| Total | $150,000,000 | $150,000,000 |

Under the terms and conditions of the Underwriting Agreement, the Underwriters are committed to take and pay for all of the Offered Notes, if any are taken.

The Underwriters propose to offer the Offered Notes in part directly to the public at the initial public offering prices set forth on the cover page of this Prospectus Supplement and in part to certain securities dealers at such prices less a concession of 0.40% and 0.50% of the principal amount of the 7.40% Notes and 7.875% Notes, respectively. The Underwriters may allow, and such dealers may reallow, a concession not to exceed 0.25% of the principal amount of the Offered Notes to certain brokers and dealers. After the Offered Notes are released for sale to the public, the offering price and other selling terms may be varied by the Underwriters from time to time.

The Offered Notes are a new issue of securities with no established trading market. The Corporation has been advised by the Underwriters that the Underwriters intend to make a market in the Offered Notes but are not obligated to do so and may discontinue market making at any time without notice. No assurance can be given as to the liquidity of a trading market for the Offered Notes.

The Corporation and the Guarantor have agreed to indemnify the several Underwriters against certain liabilities, including liabilities under the Securities Act of 1933.

## EXPERTS

The financial statements and the financial statement schedule contained in the Guarantor's Annual Report on Form 10-K incorporated herein by reference have been examined by Deloitte & Touche, independent chartered accountants, whose reports thereon are also included in such Form 10-K. Such financial statements and financial statement schedule which are incorporated herein by reference have been so incorporated in reliance upon such opinions given upon the authority of that firm as experts in auditing and accounting.

## LEGAL OPINIONS

Roger A. Schecter, Secretary of the Corporation, will pass upon the legality of the Offered Notes offered hereby. Roger A. Schecter beneficially owned 45 common shares of the Guarantor as of May 31, 1996. Clive V. Allen, Senior Vice-President and General Counsel of the Guarantor, will pass upon the legality of the Guarantees offered by the Guarantor hereby. Clive V. Allen beneficially owned 10,956 common shares of the Guarantor as of May 31, 1996. The legality of the Offered Notes and the Guarantees offered hereby will be passed upon for the Underwriters by Skadden, Arps, Slate, Meagher & Flom, New York, New York, who will rely as to all matters of Canadian law on the opinion of Mr. Allen. Certain members of Skadden, Arps, Slate, Meagher & Flom in aggregate beneficially own less than one percent of the common shares of the Guarantor.

## REVOLVING LOAN AGREEMENT

THIS REVOLVING LOAN AGREEMENT (the "**Agreement**") is entered as of this 15th day of June 2008 ("**Effective Date**"), by and between NORTEL NETWORKS CAPITAL CORPORATION, a Delaware corporation with its registered office at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, USA 19801 (the "**Lender**") and NORTEL NETWORKS INC., a Delaware corporation with its registered office at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, USA 19801 (the "**Borrower**").

WHEREAS, the Lender desires to make periodic loan advances to the Borrower to support on-going working capital funding for general corporate purposes in exchange for an interest bearing obligation payable to the Lender at a future date.

AND WHEREAS, the Borrower had previously delivered a Promissory Note dated 23rd July 1996 (the "**1996 Promissory Note**") to the Lender to evidence its borrowing of a loan from Lender with a current outstanding principal balance of USD 296,671,383.90

AND WHEREAS, effective as of February 14, 2006, the Lender returned the 1996 Promissory Note to the Borrower and the Borrower and the Lender entered into a Revolving Loan Agreement evidencing the rights and obligations of the Borrower and the Lender relating to the loan in the principal amount of USD 296,671,383.90 previously evidenced and governed by the 1996 Promissory Note (the "**February 2006 Agreement**"), which superseded and replaced the 1996 Promissory Note for all purposes with respect to actions occurring either before or after the effective date thereof, including without limitation, evidencing the principal amount thereof.

AND WHEREAS, the Lender and Borrower had then entered into a Revolving Loan Agreement dated 15th June 2006 (the "**June 2006 Agreement**") with respect to a credit facility of USD 146,671,383.90, of which USD 146,671,383.90 was drawn as at 15th June 2008.

AND WHEREAS, the June 2006 Agreement matures on June 15, 2008 by its terms.

AND WHEREAS, it is the intention of the Lender and Borrower that, as of the Effective Date, this Agreement shall replace the June 2006 Agreement.

NOW THEREFORE, in consideration of the obligations described herein, the Lender and the Borrower agree as follows:

## ARTICLE 1 - DEFINITIONS

**Section 1.1    Defined Terms.** As used in this Agreement, the following terms have the following meanings:

"**Advance**" means any amount advanced by the Lender to the Borrower pursuant to Section 2.2;

"**Agreement**" means this revolving loan agreement between the parties hereto, including the Funding Report referred to herein and attached hereto, as the same may be amended or supplemented in writing from time to time;

"**Banking Day**" means any day (other than a Saturday or Sunday) on which the banks are open for business in the United States of America and Canada.

"**Effective Date**" has the meaning set forth for such term in the first paragraph of this Agreement;

"**Funding Report**" means the schedule substantially in the form attached as Exhibit A hereto reflecting all Advances made under this Agreement, and for each such Advance, its respective Interest Rate, Interest Payment Dates and related calculations, and whether interest shall be compounded for such Advance;

"**Interest Payment Dates**" means each June 15 and December 15 during the term of this Agreement;

"**Interest Rate**" means 7.875%;

"**Maximum Facility Amount**" means USD 146,671,383.90 (One hundred and forty-six million, six hundred and seventy-one thousand, three hundred and eighty-three and ninety one hundredths United States Dollars); and

"**Term**" has the meaning set forth for such term in Section 2.4 hereof.

## ARTICLE 2 – THE FACILITY, REPORTS, TERM, COVENANT

**Section 2.1    The Maximum Facility Amount:** The Lender agrees to make Advances to the Borrower during the Term from time to time in accordance with this Agreement. The outstanding principal amount of all Advances may not exceed the Maximum Facility Amount.

**Section 2.2    Advances:** The Lender shall make the Advances available to the Borrower on any Banking Day upon the Lender's receipt of a written request from the Borrower specifying the amount and date of a particular Advance, together with the bank account details. On the Effective Date, the Lender shall be deemed to have made an

Advance to the Borrower in an amount equal to the principal balance outstanding under the June 2006 Agreement and the accrued but unpaid interest thereon.

**Section 2.3    Funding Report:** The Funding Report shall be prepared on any Banking Day and updated by the Lender within five (5) days following any changes in the amount under any Advance. A copy of the Funding Report shall be provided to the Borrower upon request. Each of the Borrower and the Lender hereby acknowledge, confirm and agree that all amounts set out in each Funding Report shall be considered true and correct, and shall be accepted by the Borrower and Lender and become a part of this Agreement, absent manifest error. However, the failure to prepare such Funding Report shall not affect the liability of the Borrower to the Lender in respect of the relevant indebtedness.

**Section 2.4    Term:** This Agreement shall continue in full force and effect from the Effective Date until the earlier of (the "Term"):

(a)    June 15, 2010;

(b)    The effective date of any notice delivered by either party to this Agreement to the other declaring a termination of this Agreement for any reason whatsoever, which effective date shall be no earlier than five (5) days following the other party's receipt of such notice;

(c)    Automatic termination without notice upon the occurrence of any of the following events:

(i)    The Borrower shall fail to pay any principal due with respect to any Advance made hereunder, or any interest payable hereunder, within five (5) business days of the due date thereof (unless such failure is cured, and this provision waived by the Lender);

(ii)    The Borrower generally does not pay its debts as they become due or shall admit in writing its inability to pay its debts generally or makes a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against the Borrower in any such case, seeking to adjudicate it bankrupt or insolvent, or seeking liquidation, winding up, reorganisation, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganisation or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or any substantial part of its property, and such proceeding shall remain undismissed or unvacated for a period of thirty (30) days, or any of the actions sought in any such proceeding shall be granted;

(iii)    The Borrower shall take any corporate action to authorise any of the actions set forth in clause (ii) above in this Section 2.4(c); or

(iv)    The Borrower shall fail to observe the covenant set forth at Section 2.5 hereof.

**Section 2.5    Covenant—Material Adverse Change:**  During the period in which any Advances are outstanding, the Borrower shall notify the Lender of any material adverse change in the business, financial position or results of operations of the Borrower, within ten (10) business days after any director or officer of the Borrower obtains actual knowledge of such material adverse change.  Notwithstanding the foregoing, nothing contained in this Agreement shall prevent the Borrower, from amalgamating, merging or consolidating with or into any related party, affiliate or subsidiary.

## ARTICLE 3 - INTEREST

**Section 3.1    Interest on Advances:**  The Borrower shall pay interest on the unpaid principal amount of each Advance from the date of the Advance until the principal amount of the Advance is repaid in full at the end of its respective Interest Payment Date, at the Interest Rate applicable to each Advance.  Interest on each Advance shall be calculated and payable at the end of each Interest Payment Date based on a 360 day year and the actual number of days elapsed.  If interest on an Advance is not paid on the Interest Payment Date, then, at the request of the Borrower and at the sole and absolute discretion of the Lender, such interest may be capitalized and added to the outstanding principal amount of such Advance as of such date.  Such capitalization of interest, if any, shall be reflected in the related Funding Reports.  The Lender shall provide notice to the Borrower of such capitalization of interest, through delivery of the Funding Report(s) or otherwise.  All accrued interest that remains unpaid at the end of the applicable Interest Payment Date and has not been capitalized shall be paid in full when the outstanding principal amount of all Advances is repaid in full.

**Section 3.2    Maximum Rate:**  No interest rate specified in this Agreement shall at any time exceed the maximum rate permitted by applicable law (the "**Maximum Rate**"). Notwithstanding anything to the contrary contained in this Agreement, none of the terms and provisions of this Agreement shall ever be construed to create a contract or obligation to pay interest at a rate in excess of the Maximum Rate; and the Lender shall not ever charge, receive, take, collect, reserve or apply, as interest on the obligations evidenced by this Agreement (the "**Obligations**"), any amount in excess of the Maximum Rate.  The parties hereto agree that any interest, charge, fee, expense or other obligation provided for in this Agreement which constitutes interest under applicable law shall be, *ipso facto* and under any and all circumstances, limited or reduced to an amount equal to the lesser of (i) the amount of such interest, charge, fee, expense or other obligation that would be payable in the absence of this Section 3.2 or (ii) an amount, which when added to all other interest payable under this Agreement, equals the maximum amount of interest that would be payable if calculated at the Maximum Rate.  If, notwithstanding the foregoing, the Lender ever contracts for, charges, receives, takes, collects, reserves or applies as interest any amount in excess of the amount permitted at the Maximum Rate, such amount which would be deemed excessive interest shall be deemed a partial payment or

prepayment of principal of the Obligations and treated hereunder as such; and if the Obligations, or applicable portions thereof, are paid in full, any remaining excess shall promptly be paid to the Borrower. In determining whether the interest paid or payable, under any specific contingency, exceeds the Maximum Rate, the Borrower and the Lender shall, to the maximum extent permitted by applicable law, (i) characterize any nonprincipal payment as an expense, fee or premium rather than as interest, (ii) exclude voluntary prepayments and the effects thereof, and (iii) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the entire contemplated term of the Obligations, or applicable portions thereof, so that the interest rate does not exceed the Maximum Rate at any time during the term of the Obligations; provided that, if the unpaid principal balance is paid and performed in full prior to the end of the full contemplated term thereof, and if the interest received for the actual period of existence thereof exceeds the Maximum Rate, the Lender shall refund to the Borrower the amount of such excess and, in such event, the Lender shall not be subject to any penalties provided by any laws for contracting for, charging, receiving, taking, collecting, reserving or applying interest in excess of the Maximum Rate.

## ARTICLE 4 - REPAYMENT

**Section 4.1    Repayment:**  The principal and interest outstanding in respect of all Advances, as documented in the Funding Report, is due and payable by the Borrower to the Lender on the earlier of the last day of the relevant Interest Payment Date or the last day of the Term.

**Section 4.2    Prepayment:** The Borrower may, in its sole and absolute discretion, from time to time without notice, bonus or penalty, make prepayments in any amounts desired, on account of the principal and interest outstanding on any Advance. If more than one Advance is outstanding at the time the Borrower elects to make a prepayment, the Borrower shall be entitled to specify the Advance to which the prepayment will apply. All prepayments will be applied first on account of interest and then on account of principal due hereunder for the Advance to which the prepayment applies. In the sole discretion of the Lender, amounts prepaid hereunder may be re-borrowed during the Term, so long as the total amount of Advances borrowed and not yet pre-paid does not at any time exceed the Maximum Facility Amount.

**Section 4.3    Repayment upon Early Termination:**  Upon the early termination of this Agreement pursuant to Section 2.4(b) or Section 2.4(c) hereof, a final Funding Report shall be prepared which shall indicate the Advances outstanding and the amount of interest attributable to such Advances. The Borrower shall repay the total amount due in a manner and by a date agreed to by the parties but not later than the last day of the Term.

## ARTICLE 5 REPRESENTATIONS AND WARRANTIES

**Section 5.1    Representations of the Borrower:**   The Borrower represents and warrants to the Lender on the date hereof and on each date of an Advance that:

(a)    the Borrower is a corporation duly incorporated and validly existing under the laws of the State of Delaware;

(b)    the execution, delivery and performance by the Borrower of this Agreement (i) are within its corporate powers, has been duly authorized by all necessary corporate action, (ii) requires no action by or in respect of or filing with, any governmental body, agency or official and (iii) do not contravene any provision of applicable law or its certificate of incorporation or by-laws or any contractual restriction, order, decree or other instrument binding upon the Borrower, except, in the case of (ii) and (iii) above, any such action, filing or contravention which would not have a material adverse effect on the Borrower;

(c)    as of the date hereof and the date of each Advance, the Borrower has not ceased paying its current obligations in the ordinary course of business as they generally become due.

**Section 5.2    Representations of the Lender:**  The Lender represents and warrants to the Borrower on the date hereof and on each date of an Advance that:

(a)    the Lender is a corporation duly formed and validly existing under the laws of the State of Delaware; and

(b)    the execution, delivery and performance by the Lender of this Agreement (i) are within its corporate powers, has been duly authorized by all necessary corporate action, (ii) requires no action by or in respect of or filing with, any governmental body, agency or official and (iii) do not contravene any provision of applicable law or its certificate of incorporation or by-laws or any contractual restriction, order, decree or other instrument binding upon the Lender, except, in the case of (ii) and (iii) above, any such action, filing or contravention which would not have a material adverse effect on the Lender.

## ARTICLE 6 - GENERAL PROVISIONS

**Section 6.1    Amendments to this Agreement:**  This Agreement may be amended only by written agreement signed by both parties.

**Section 6.2    Waiver:** The Lender may waive in writing any breach by the Borrower of any of the provisions contained in this Agreement or any default by the Borrower in the observance or performance of any covenant or condition required to be observed or performed by the Borrower under this Agreement; provided that no act or omission by the Lender with regard to any such breach or default by the Borrower will be taken in any manner whatsoever to affect any subsequent breach or default or the rights resulting therefrom.

**Section 6.3    Notices:** Any request, notice or demand made or given in connection with this Agreement must be in writing and delivered to the relevant party at its address or facsimile number set forth below, or any other address or facsimile number that a party may direct:

if to the Borrower:        Nortel Networks Inc.,
                           220 Athens Way, Suite 300,
                           MS 438/03/01,
                           Nashville, Tennessee USA 37228
                           Attention: Legal Department

With copy to:              European Treasury Department
                           Facsimile number: +44 1628 432884

if to the Lender:          Nortel Networks Capital Corporation,
                           220 Athens Way, Suite 300,
                           MS 438/03/01,
                           Nashville, Tennessee USA 37228
                           Attention: Legal Department

With copy to:              European Treasury Department
                           Facsimile number: +44 1628 432884

**Section 6.4    Assignment of Agreement:** All of the covenants, stipulations, promises and agreements in this Agreement shall bind the parties' respective successors and permitted assigns, whether so expressed or not; provided, however, that neither party may, without the prior written consent of the other, assign any rights, powers, duties, or obligations under this Agreement.

**Section 6.5    Headings:** The headings of this Agreement are included for convenience of reference only and do not constitute a part of this Agreement for any other purpose.

**Section 6.6    Governing Law:**   This Agreement and all other documents and instruments referred to will be construed in accordance with and governed by the internal laws of the State of New York.

**Section 6.7    Severability:**   If any term or provision of this Agreement shall be determined to be invalid or unenforceable in any situation in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remaining terms and provisions hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Revolving Loan Agreement to be executed by their duly authorized persons as of the Effective Date.

NORTEL NETWORKS CAPITAL CORPORATION

By: _____
Name: _____ Lynn C. Egan _____
Title: _____ Secretary _____
Date: _____

NORTEL NETWORKS INC.

By: _____
Name: _____ Lynn C. Egan _____
Title: _____ Assistant Secretary _____
Date: _____

## SUPPORT AGREEMENT

This Agreement (hereinafter the "Agreement") dated as of February 15, 1996 is entered into between Northern Telecom Inc. ("NTI"), a Delaware corporation, and Northern Telecom Capital Corporation (the "Company"), a Delaware corporation.

WHEREAS, the Company is a wholly-owned subsidiary of NTI and has no independent operations other than as acting as a finance company for its affiliates; and

WHEREAS, NTI and the Company desire to provide certain assurances with respect to performance of the Company's obligations in connection with the Company's offer of debt securities consisting of debentures, notes, bonds and/or other evidences of indebtedness (collectively, the "Debt Securities") to be issued under an Indenture dated as of February 15, 1996 among the Company, as issuer, Northern Telecom Limited, as issuer and guarantor, and The Bank of New York, as trustee, and warrants to purchase Debt Securities to be issued under one or more warrant agreements to be entered into between the Company and a bank or trust company, as warrant agent;

NOW THEREFORE, in consideration of the mutual promises herein contained, the parties hereto agree as follows:

1.    <u>Ownership of the Company Stock</u>. At all times prior to the termination of this Agreement, NTI shall directly or indirectly own and hold, unencumbered, not less than two-thirds of the voting shares of the outstanding capital stock of the Company.

2.    <u>Maintenance of Net Worth</u>. At all times prior to the termination of this Agreement, NTI shall cause the Company to have and to maintain a net worth of at least $1.00. For purposes hereof, "net worth" shall mean a sum equal to the Company's tangible net worth, as determined in accordance with generally accepted accounting principles.

3.    <u>Not a Guarantee</u>. This Agreement does not constitute a guarantee by NTI of the payment of any indebtedness, obligation or other liability of any kind or character whatsoever incurred by the Company, nor shall any action taken by NTI or the Company pursuant to the terms of this Agreement be deemed to create or constitute a guarantee by NTI of the payment of any such indebtedness, obligation or other liability.

4.    <u>Successors</u>. This Agreement will inure to the benefit of and be mutually binding upon the parties hereto and their respective successors and assigns.

5.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers as of the date first written above.

NORTHERN TELECOM INC.

By: _____
    Robert L. Robson
    Vice-President, Finance

NORTHERN TELECOM CAPITAL CORPORATION

By: _____
    Roger A. Schecter
    Secretary