## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- X

*In re*

Nortel Networks Inc., *et al.,*[1]

                          Debtors.

-------------------------------------------------------- X

:
:
:
:
:
:
:
:
:
:

Chapter 11

Case No. 09-10138 (KG)

Jointly Administered

**Hearing date: January 23, 2013 at 10:00 a.m. (ET)**
**Objections due: January 16, 2013 at 4:00 p.m. (ET)[2]**

## DEBTORS' MOTION FOR ENTRY OF ORDERS
## PURSUANT TO 11 U.S.C. §§ 105, 363 AND 1114 AND
## FED. R. BANKR. P. 9019 (A) APPROVING SETTLEMENT
## NOTIFICATION PROCEDURES AND, SUBSEQUENTLY,
## (B) APPROVING A SETTLEMENT AGREEMENT
## WITH THE OFFICIAL COMMITTEE OF RETIRED EMPLOYEES

Nortel Networks Inc. ("NNI")[3] and certain of its affiliates, as debtors and debtors in

possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of

orders, pursuant to sections 105(a), 363 and 1114(e)(1)(B) of title 11 of the United States Code

(the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), (i) approving the form and manner of certain noticing procedures,

substantially in the form attached hereto as **Exhibit A** (the "Notice Procedures Order"),

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

[2]     These dates relate only to the hearing with respect to approval of the settlement notification procedures.  As set forth in this Motion, separate notice will be provided regarding the hearing date and objection deadline with respect to the approval of the Settlement Agreement (as defined in the Motion).

[3]     Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Settlement Agreement, annexed hereto as Exhibit B.

subsequently, (ii) authorizing the Debtors' entry into and approving the settlement agreement,
attached hereto as **Exhibit B** (the "Settlement Agreement") with the Official Committee of
Retired Employees (the "Retiree Committee," and together with the Debtors, the "Parties") (such
order, substantially in the form attached hereto as **Exhibit C**, the "Settlement Order"); and (iii)
granting them such other and further relief as the Court deems just and proper.  In support of this
Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      Since the appointment of the Retiree Committee in August 2011, the Debtors and
the Retiree Committee have worked steadily to explore a consensual termination of the Debtors'
Retiree Welfare Plans.  After the exchange of thousands of pages of information, multiple in
person and telephonic meetings over the last year, the appointment of a neutral third-party
Mediator (as defined below), the filing of a motion seeking termination of the benefits if an
agreement could not be reached, and long hours of vigorous negotiations, the Parties have
reached an agreement concerning the resolution of the Retiree Welfare Plans, which agreement is
embodied in the Settlement Agreement attached to the Motion as **Exhibit B**.  Under the terms of
the proposed Settlement Agreement, the Debtors would terminate the Retiree Welfare Plans as of
May 31, 2013, and would pay the Retiree Committee $66,879,000 in settlement of all claims
related to the Retiree Welfare Plans, to be allocated by the Retiree Committee or its Successors
among the holders of Retiree Claims (as defined below).  Holders of Retiree Claims would
release the Debtors and others from further liability on account of the Retiree Claims.

2.      In entering into the Settlement Agreement, the Debtors have balanced the
importance of the Retiree Benefits (as defined below) to the Retirees (as defined below) and their
families against the reality that continuing to provide the Retiree Benefits is simply no longer
practicable or feasible where the Debtors' operations have been reduced to only those most basic

2

functions essential to complete their wind down and bankruptcy process.  The Debtors believe that the terms of the Settlement Agreement provide the Retirees with a fair and reasonable settlement that will facilitate a smooth transition for the Retirees following the termination of the Retiree Welfare Plans.

## JURISDICTION

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105(a), 363(b) and 1114(e)(1)(B) of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules.

## FACTUAL BACKGROUND

**A.**     **Case Background**

5.      On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc.,[4] filed voluntary petitions for relief under chapter 11 of title 11 of the Bankruptcy Code, which cases are consolidated for procedural purposes only.  The Debtors continue to operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors (the "UCC") in respect of the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized (the "Bondholder Group").

---

[4]       Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

3

7.      On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[5] commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by the Canadian Court.  Also on the Petition Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[6] into administration (the "English Proceedings") under the control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators").  Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency and dissolution proceedings around the world.

8.      Since the Petition Date, Nortel has sold its business units and other assets to various purchasers.  For further information regarding these chapter 11 cases, reference may be made to the Monthly Operating Reports filed by the Debtors and http://dm.epiq11.com/nortel.

**B.      The Retiree Welfare Plans**

9.      The Debtors historically have provided a number of benefits to their retired employees, as well as such employees' surviving spouses and eligible dependents, through

---

[5]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[6]      The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

various benefit plans and other programs, including the Nortel Networks Inc. Retiree Medical

Plan,[7] the Nortel Networks Inc. Retiree Life Insurance and Long-Term Care Plan for Retirees,

certain predecessor plans, and other formal or informal benefit plans, agreements, arrangements

or programs (including plans, agreements, arrangements or programs that are funded through the

purchase of insurance) or arrangements for current or future retired employees, their surviving

spouses and eligible dependents, including plans, arrangements, agreements or programs for

medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident,

disability, or death, in each case as such plans, agreements, arrangements or programs have been

amended or modified from time to time (collectively and in each case as amended or modified

from time to time, the "Retiree Welfare Plans").[8]  During the course of these chapter 11 cases,

the Debtors have continued to provide benefits under the Retiree Welfare Plans (the "Retiree

Benefits") in the ordinary course under the plan terms, including as authorized by this Court's

January 15, 2009 *Order Authorizing, But Not Directing, Debtors to Pay Certain Prepetition*

*(I) Wages, Salaries and Other Compensation, (II) Reimbursable Expenses, and (III) Medical,*

*Retirement and Similar Benefits* [D.I. 59].  As of June 30, 2012, there were over 4,400 Retirees

---

[7]      The Nortel Networks Inc. Retiree Medical Plan includes the Employee Assistance Program and the Prescription Drug Benefits Program.

[8]      The Debtors maintain separate benefits plans for their long-term disabled employees (the "LTD Employees") and other current employees, including the Nortel Networks Inc. Long-Term Disability Plan, the Nortel Networks Short-Term Disability Plan, the Nortel Networks Inc. Medical Plan, the Nortel Networks Inc. Dental, Vision, and Hearing Care Plan, the Nortel Networks Inc. Life Insurance Plan, the Nortel Networks Inc. AD&D Insurance Plan, the Nortel Networks Inc. Health Care Reimbursement Account Plan, the Nortel Networks Business Travel Accident Insurance Plan, the Nortel Networks Inc. Dependent Day Care Reimbursement Account Plan, the Nortel Networks Inc. Long-Term Investment Plan, such plans, as well as predecessor plans and other formal or informal benefit plans, agreements, arrangements or programs (including plans, agreements, arrangements or programs that are funded through the purchase of insurance) or arrangements for disabled employees, their surviving spouses and eligible dependents, including for medical, surgical, or hospital care benefits, income continuation benefits or any other benefits in the event of sickness, accident, disability, or death (in each case as such plans have been amended or modified from time to time, are collectively referred to herein as the "LTD Plans").

who received or may have been eligible for various Retiree Benefits under the Retiree Welfare Plans.[9]

10.    The Debtors previously sought to terminate the Retiree Welfare Plans and LTD Plans by a motion filed in June 2010 (the "Plan Termination Motion").[10]  In connection with that proposed termination of the Retiree Welfare Plans and the LTD Plans, the Debtors had negotiated with a health insurance provider to provide the Retirees and LTD Employees with replacement medical coverage that was not readily available to individuals on the open market. Shortly thereafter, the Nortel US Retirement Protection Committee, an ad hoc steering committee of retired executives of the Debtors (the "Ad Hoc Retiree Committee"), filed a motion seeking authorization to form a voluntary employee benefit association as an alternative option for providing health insurance (the "VEBA Motion").[11]  Based on discussions with counsel to the Ad Hoc Retiree Committee, their rejection of the alternative insurance and the Third Circuit's ruling in IUE-CWA v. Visteon Corp. (In re Visteon Corp.), 612 F.3d 210 (3d Cir. 2010), the Debtors ultimately withdrew the Plan Termination Motion without prejudice in July 2010 [D.I. 3651].  Thereafter, in October 2010, the Ad Hoc Retiree Committee withdrew the VEBA Motion without prejudice [D.I. 4104].

11.    While the Debtors historically have provided various welfare benefits to their Retirees, the Debtors assert that the governing Retiree Welfare Plans specifically reserve the Debtors' right to amend or terminate the Retiree Welfare Plans.  Solely by way of an example of

---

[9]    For purposes of this Motion, "Retirees" include the Debtors' retired employees, their surviving spouses, domestic partners and eligible dependents, and current employees of the Debtors (including, for the avoidance of doubt, LTD Employees) who may be eligible for benefits under the Retiree Welfare Plans.

[10]    See Debtors' Motion for Entry of an Order Authorizing Debtors to Terminate Certain Retiree and Long-Term Disability Plans, dated June 21, 2010 [D.I. 3204].

[11]    See Nortel US Retirement Protection Committee's Motion for an Order Authorizing Formation of a Voluntary Employee Benefit Association to Provide Tax Credit-Eligible Retiree Benefits, dated July 16, 2010 [D.I. 3671].

the types of provisions contained in the plans, the 1991 Northern Telecom Inc. Retiree Medical

Plan and Retiree Life Insurance and Long-Term Care Plan provides:

> The Company hopes and expects to continue the Retiree Welfare
> Plan, but necessarily *reserves the right to amend the Retiree
> Welfare Plan from time to time or terminate the Retiree Welfare
> Plan at any time*. Any amendment to the Retiree Welfare Plan may
> reduce or eliminate benefits payable under the Retiree Welfare
> Plan to persons who are Employees or Retirees as of the effective
> date of the amendment.

1991 Northern Telecom Inc. Retiree Medical Plan and Retiree Life Insurance and Long-Term

Care Plan at 14 (emphasis added), attached to the Ray Declaration as Exhibit 1.  By further

example, the 2004 Nortel Networks Inc. Retiree Medical Plan provides:

> Although the benefits currently available (in the 2004 Plan Year)
> are described in this summary for the Company's Retiree Medical
> Plan, *the Company reserves the right to change or end the plan
> described in this summary at any time*. Any plan changes will
> result from actions taken and approved by the Company. *The
> Company may adopt such changes or terminate the plan at any
> time and for any reason.*  The Company's practices, polices [sic],
> and benefits are outlined here for your information as required by
> law.

2004 Nortel Networks Inc. Retiree Medical Plan Summary Plan Description at 96 (emphasis

added), attached to the Ray Declaration as Exhibit 2.

12.    While the precise language contained in the Retiree Welfare Plan documents

varies slightly across the years, the Debtors contend that the right to amend or terminate always

existed and continues to exist.  The Retiree Committee has asserted that, *inter alia*, the Debtors

did not preserve a right to unilaterally terminate the Retiree Welfare Plans.

**C.    The Wind Down Of The Debtors' Estates**

13.    In the several months following the Debtors' decision to postpone seeking

termination of their Retiree Welfare Plans, the Debtors worked diligently to wind down their

remaining operations, including completion of the transition services provided to the buyers of

7

their various businesses.  The Debtors also undertook the sale of their patent portfolio, which

closed in July 2011, and have sought to advance the resolution of the other remaining material

claims in their cases through the filing of various motions.  During this time, the Debtors also

sought to identify other possible alternative insurance arrangements for the Retirees.

14.     Meanwhile, the Debtors continued to wind down all other aspects of their estates,

to the point where they now have limited residual operations and employees, which remain

solely in order to complete their wind down.  At the time the bankruptcy cases were filed, the

Debtors employed approximately 3,000 individuals.  Nearly all of the Debtors' workforce (other

than the LTD Employees) either took employment with the buyers of the Debtors' businesses or

elsewhere or were terminated by the Debtors in the various rounds of layoffs conducted over the

last almost four years.

15.     The Debtors currently employ only approximately ten active employees, other

than the LTD Employees.  As a result of the divestitures and wind down, the maintenance and

administration of the Retiree Welfare Plans (and benefits provided to active employees,

including the LTD employees) now takes a disproportionate amount of time and resources

compared to prior years.  Once the Debtors dissolve as corporations, there will be no company

even in name to continue the Retiree Benefits.  Moreover, while the Retiree Welfare Plans are

administered by third-party vendors, the Debtors generally maintain the Retiree Welfare Plans as

self-insured plans (other than certain life insurance benefits) and, as such, the Debtors bear the

economic risk of the plans and the claims filed thereunder.

16.     Over the last two and a half years since July 2010, when the prior Plan

Termination Motion was withdrawn, the Debtors have continued to provide benefits under the

Retiree Welfare Plans, at an approximate cost of $28 million to their estates.  The average

current cost to the Debtors of providing the Retiree Benefits under the Retiree Welfare Plans is approximately between $707,000 and $1 million per month, and there is no assurance that the administrative cost of these plans will not increase over time.

**D.    Negotiations With The Retiree Committee**

17.    On June 2, 2011, the Debtors sought the appointment of a retiree committee to engage in discussions regarding the modification or termination of the Retiree Welfare Plans by filing the *Debtors' Motion for Entry of an Order Pursuant to Section 1114 of the Bankruptcy Code Appointing an Official Committee of Retired Employees*, dated June 2, 2011 [D.I. 5568]. Thereafter, the Court issued an order directing the United States Trustee to appoint the Retiree Committee for the sole purpose of serving as the authorized representative of the Retirees in connection with their rights under section 1114 of the Bankruptcy Code and for no other purpose, dated June 21, 2011 [D.I. 5783].  On August 2, 2011, the United States Trustee appointed the members of the Retiree Committee [D.I. 6074].

18.    Since the appointment of the Retiree Committee over a year ago, the Debtors and the Retiree Committee have devoted significant resources and attention to negotiating in good faith to try to seek the termination of the Retiree Welfare Plans and a settlement that would provide a fair and equitable resolution of any potential claims or rights held by the Retirees concerning the Retiree Welfare Plans.  The Debtors held an in person meeting with the Retiree Committee on October 6, 2011, in order to provide them information about the Retiree Welfare Plans and the proposed termination of benefits, and engaged in the regular production of documents and other information and held telephonic discussions and periodic meetings before and after that time.

19.    Despite the Debtors and Retiree Committee's efforts, a consensual settlement was not reached in the first several months.  In order to assist the parties' efforts to reach a

consensual resolution, on March 28, 2012, the Debtors filed a motion (the "Mediation Motion"), seeking to have a mediator appointed to facilitate settlement discussions between the Debtors and the Retiree Committee.[12]  On April 18, 2012, the Court entered an order granting the Mediation Motion and appointed Richard Levin, Esq., of Cravath, Swaine & Moore LLP, as mediator (the "Mediator").[13]  In connection with the appointment of the Mediator, the Debtors agreed to a 60-day standstill during which they would not take any action to modify or terminate the Retiree Welfare Plans.  That standstill expired on June 18, 2012.

20.    Negotiations among the parties reached an impasse, and on July 30, 2012, the Debtors filed the *Debtors' Motion for Entry of an Order Terminating Retiree Benefits and Approving a Settlement Proposal Pursuant to 11 U.S.C. § 1114* [D.I. 8066] (the "1114 Termination Motion"), which sought authority to terminate the Retiree Welfare Plans and the approval of a settlement proposal similar to the last settlement offer made to the Retiree Committee prior to the 1114 Termination Motion being filed.

21.    On August 1, 2012, this Court entered the *Scheduling Order for Hearing on Debtors' Process to Terminate Retiree Benefits Pursuant to 11 U.S.C. § 1114* [D.I. 8084], and on August 30, 2012, this Court entered the *Amended Scheduling Order for Hearing on Debtors' Process to Terminate Retiree Benefits Pursuant to 11 U.S.C. § 1114* [D.I. 8365], which modified the timeline for discovery and briefing related to the 1114 Termination Motion to allow for the Parties to continue their efforts to mediate over the substance of the 1114 Termination Motion and scheduled a trial on the 1114 Termination Motion to commence on January 22, 2012.

---

[12]      See *Motion for Entry of an Order (I) Appointing a Neutral Mediator Concerning the Modification or Termination of the Nortel Retiree Welfare Plans and the Nortel Long-Term Disability Plans; (II) Authorizing the Debtors to Pay the Costs of Engagement; and (III) Granting Related Relief* [D.I. 7463].

[13]      See *Order (I) Appointing a Neutral Mediator Concerning the Modification or Termination of the Nortel Retiree Welfare Plans and the Nortel Long-Term Disability Plans; (II) Authorizing the Debtors to Pay the Costs of Engagement; and (III) Granting Related Relief* [D.I. 7560].

22.     Notwithstanding the filing of the 1114 Termination Motion, the Debtors and the

Retiree Committee continued to work towards a consensual settlement to allow the Debtors to

terminate the Retiree Welfare Plans while providing acceptable terms to the Retiree Committee.

In addition to numerous telephone calls and discussions, the Parties' advisors met in person on

August 20, 2012.  Finally, the Debtors and the Retiree Committee participated in an all-day

mediation session with the Mediator on September 21, 2012.  After more than ten hours of

negotiation, together with the UCC, Bondholder Group and LTD Committee, the Parties were

able to reach the primary terms of a settlement in principle.  The Settlement Agreement

embodies that agreement, as ultimately memorialized by the parties.

23.     The Debtors also have acted diligently to provide the Retiree Committee with the

information necessary to evaluate the Debtors' settlement proposals.  On September 29, 2011,

the Retiree Committee sent the Debtors initial broad requests for documents and information (the

"Initial Requests").[14]  On August 10, 2012, following the filing of the 1114 Termination Motion,

the Retiree Committee sent the Debtors broad formal requests for documents, interrogatories and

requests for admission (the "Formal Requests," and together with the Initial Requests, the

"Requests").  The Debtors began providing the requested documents and information to the

Retiree Committee on September 29, 2011.  The Debtors regularly have sent additional

documents and information to the Retiree Committee over the last year, including by providing

over 11,000 pages of documents in response to the Requests.  To date, the Debtors have provided

the Retiree Committee with various Retiree Welfare Plan documents, retiree communications,

claims histories, and other information regarding the Debtors' employees and their estates, assets

and claims, including by compiling various benefit-related information in response to the

---

[14]     Since receiving the Initial Requests, the Debtors have received numerous additional informal requests from
the Retiree Committee, including requests received on November 9, 2011 and December 6, 2011.

Requests.  In addition, the Debtors' professionals and the Retiree Committee's advisors have

spent numerous hours on both regularly scheduled and individual conference calls since the

appointment of the Retiree Committee regarding the data that the Debtors have produced to the

Retiree Committee.

**E.**     **Summary Of The Settlement Agreement**

24.     The following description is a summary only of certain material aspects of the

Settlement Agreement and does not purport to summarize all of the key terms of the Settlement

Agreement.  Moreover, because the following description summarizes complex terms, it is by

nature neither as detailed nor as precise as the Settlement Agreement.  Accordingly, the

following description is qualified in its entirety by reference to the Settlement Agreement, which

controls any interpretations of the Settlement Agreement, and to which the reader is respectfully

directed:

- Termination of Retiree Welfare Plans.  The Debtors will terminate all Retiree Welfare Plans including, for the avoidance of doubt, all coverage and benefits provided thereunder, on May 31, 2013 (the "Termination Date").[15]

- Retiree Welfare Plans Run Off Period.  The time period for making a claim for payment or reimbursement of benefits covered by the relevant Retiree Welfare Plans for claims incurred prior to the Termination Date shall be reduced to six months following the Termination Date (the "Run Off Period").  Claims for reimbursement of benefits covered by the relevant Retiree Welfare Plans for claims incurred prior to the Termination Date which are not properly made in accordance with the relevant Retiree Welfare Plans prior to the earlier of (i) the current run off period under the relevant Retiree Welfare Plan or (ii) expiration of the Run Off Period, shall be disallowed for all purposes (and the Debtors' Claims Agent will be authorized to make an appropriate notation on the Official Claims Register maintained in the Debtors' cases, as necessary) (the "Untimely Run Off Claims").

- Settlement Amount.  The Settlement Amount shall be equal to $66,879,000 (the "Settlement Amount"), subject to adjustment if the Termination Date is extended beyond June 30, 2013.[16]

---

[15]     In the event the Debtors and the Retiree Committee agree in writing to extend the Termination Date to June 30, 2013, the Settlement Amount would be reduced to $66,172,000.

- <u>Payment of the Settlement Amount</u>. [17]

  o The Retiree Committee and its Successors shall have sole responsibility for applying the Apportionment Methodology and the calculation of Retiree Claims for purposes of distributing the Settlement Amount.

  o The Retiree Committee intends to divide the Settlement Amount amongst the Retirees in accordance with the following "<u>Apportionment Methodology</u>":

  o The Retiree Committee has determined that it intends to allocate the Settlement Amount less the Settlement Administration Costs to all eligible holders of Retiree Claims based upon each holder's pro rata share of the aggregate value of Retiree Claims for each of the enumerated categories of benefits below through the provision of insurance benefits and/or Health Reimbursement Arrangement ("<u>HRA</u>") accounts:

    ▪ the Retiree Committee intends to have the VEBA attempt to obtain a group medical insurance policy (the "<u>Medical Policy</u>") for the benefit of the holders of Retiree Claims who are eligible for medical insurance bene-fits under the applicable Retiree Welfare Plans or the terms of the Settlement Agreement.  The Retiree Committee intends that the amount that the VEBA will expend for this benefit will be based on the aggregate actuarial liability for the medical benefits provided under the Retiree Welfare Plans as a percentage of the aggregate actuarial liability for all types of benefits for which the Settlement Amount is intended to compensate, subject to the decisions of the Retiree Committee's Successors and the additional terms stated in the Settlement Agreement;

    ▪ the Retiree Committee or its Successors may, in their discretion, choose to allocate to HRAs portions of the Settlement Amount that are based in whole or in part on the proportionate actuarial valuation of each claim for post-Termination Date Retiree Benefits under the Nortel Networks Inc. Retiree Life Insurance and Long-Term Care Plan for Retirees, and in the event that a Medical Policy is not obtained, the Nortel Networks Inc. Retiree Medical Plan, or any predecessor of either plan, each as amended or modified from time to time;

    ▪ the Retiree Committee or its Successors may, in their discretion, choose to allocate a portion of the Settlement Amount to additional Retiree Claims in such amounts that the Retiree Committee determines in its reasonable

---

[16]      In the event the Debtors and the Retiree Committee agree in writing to extend the Termination Date to June 30, 2013, the Settlement Amount would be reduced by $707,000 per month for each month between May 31, 2013, and the ultimate Termination Date that is agreed upon by the Parties.

[17]      The Debtors intend that NNI shall pay the Settlement Amount, but the Debtors reserve the right to reallocate the Settlement Amount payment among the Debtors, after consultation with the UCC and the Bondholder Group, either before or after the date such payment is made.

discretion to be valid, provided that such claims are supported by written documentation and qualify as a Retiree Claim as set forth in section 10 of the Settlement Agreement; and

- ▪ the Retiree Committee or its Successors shall allocate a portion of the Settlement Amount to any additional Retiree Claims in the manner and to the extent that the Bankruptcy Court requires such Retiree Claims to be included under section 1114 of the Bankruptcy Code or Bankruptcy Rule 9019 in accordance with such Bankruptcy Court order.

- **Effective Date**: The Effective Date is the date the Approval Order has become final and non-appealable.  If this does not occur by April 19, 2013, then the Settlement Agreement shall have no effect and the Parties reserve all of their rights and defenses.  The Parties also reserve their right to consummate the Settlement Agreement even if the Court Approvals are not achieved, if all Parties mutually agree in writing to do so.

- **Satisfaction of Retiree Claims**.  **AS PART OF THE SETTLEMENT, HOLDERS OF RETIREE CLAIMS WILL HAVE THOSE CLAIMS AGAINST THE DEBTORS AND OTHER THIRD PARTIES RELEASED AND EXPUNGED, SUBJECT ONLY TO THE ENTITLEMENT (IF ANY) TO RECEIVE PAYMENT OF A PORTION OF THE SETTLEMENT AMOUNT.  THE TERMINATION OF THE RETIREE WELFARE PLANS AND THE PAYMENT OF THE SETTLEMENT AMOUNT SHALL FULLY SATISFY THE RETIREE CLAIMS, AND THE RETIREES SHALL BE BARRED AND ESTOPPED FROM ASSERTING ANY FURTHER RETIREE CLAIMS AGAINST THE DEBTOR RELEASEES (DEFINED BELOW).**  As used herein, "Retiree Claims" shall include any and all actual and potential claims, demands, causes of action, debts, liabilities or obligations, whether based on any legal or equitable theory, including fiduciary or equitable duties, or otherwise, including, but not limited to suits in contract, tort or equity, whether arising under contract, ERISA, COBRA, the Tax Code or any other statute, rule, regulation, common law or otherwise, and whether arising under the laws of the United States, any political subdivision thereof or the laws of any other jurisdiction, in all cases arising out of or relating to:

  - o Any past, current or future benefits or any other obligation or claim arising under or relating to the Retiree Welfare Plans or the provision of Retiree Benefits thereunder;

  - o The administration of the Retiree Welfare Plans, including, but not limited to, the calculation of Retiree Benefits, the application of offsets against Retiree Benefits, the denial of Retiree Benefits, the determination of eligibility to receive Retiree Benefits, the interpretation of the Retiree Welfare Plans, and the drafting of the Retiree Welfare Plans;

  - o The amendment, modification and/or termination of any of the Retiree Welfare Plans and/or any benefits or coverage thereunder, whether done previously or as provided for under the provisions of the Settlement Agreement;

14

o  Claims for punitive damages, equitable relief, attorneys' fees or other expenses related to the foregoing.

o  For the avoidance of doubt, Retiree Claims shall **exclude** the following claims and any and all defenses thereto, which claims shall not be enforceable against the Settlement Amount, the Retiree Committee, its Successors, or their advisors, in each case in their capacity as such (and which claims and related defenses collectively shall be referred to as the "Excluded Claims"):[18]

- Claims arising under or relating to the Nortel Networks Severance Allowance Plan or the Nortel Networks Enhanced Severance Allowance Plans, including related fringe benefits;

- Claims arising under or relating to the Nortel Networks U.S. Deferred Compensation Plan or the Northern Telecom Inc. Senior Management Incentive Award Program;

- Claims for qualified pension benefits arising under or relating to the Nortel Networks Retirement Income Plan, Nortel Networks Pension Service Plan, Nortel Networks Cash Balance Plan, Northern Telecom Inc. Retirement Plan for Employees or the Nortel Networks Capital Accumulation and Retirement Program, that are properly asserted only against the Pension Benefit Guaranty Corporation;

- Claims for non-qualified pension benefits or other benefits arising under or relating to the Nortel Networks Retirement Income Plan, Nortel Networks Pension Service Plan, Nortel Networks Cash Balance Restoration Plan, Northern Telecom Inc. Excess Pension Plan, Nortel Networks Long-Term Investment Restoration Plan, Nortel Networks Supplementary Executive Retirement Plan, the Nortel Networks Special Pension Benefit Plan and the Nortel Networks Special Pension Credit Plan;

- Timely Run Off Claims approved pursuant to the relevant Retiree Welfare Plans;

- Claims for expatriate benefits and relocation expenses;

- Claims for the account balance currently vested in an individual's account under the Nortel Networks Long-Term Investment Plan or Northern Telecom Inc. Thrift Savings Plan; and

- Claims arising directly under a written employment agreement between an individual Retiree and the Debtors that are unrelated to life insurance,

---

[18]    Nothing in the Settlement Agreement or in this Motion shall constitute an admission by the Debtors regarding the validity of any of the Excluded Claims.

death benefits, retirement payments, medical insurance, long-term care insurance or any other Retiree Claims.

- **Final Resolution.** Any and all Retiree Claims shall be enforceable only against the Settlement Amount, and shall be satisfied in accordance with the Apportionment Methodology, which shall be the sole source of recourse for any and all Retiree Claims.

- **Proofs of Claim.** Any and all proofs of claim filed by individual Retirees on account of or to the extent they include Retiree Claims shall be disallowed and expunged from the Debtors' claims register on the Effective Date, solely with respect to the portion of the proof of claim relating to Retiree Claims.

- **Releases.**

  o Upon the Effective Date, for the good and valuable consideration provided by the Debtors in connection with the Settlement Agreement, and except as provided for by the terms of the Settlement Agreement, the Retiree Committee, on behalf of each holder of a Retiree Claim and each of his or her respective spouses, dependents, heirs, distributees, executors, administrators, officers, directors, agents, representatives, successors and assigns of his or her Retiree Claim, and each of the members of the Retiree Committee in his or her capacity as such (all, the "<u>Retiree Parties</u>") shall knowingly and voluntarily release and forever discharge the Debtors, their estates, the Retiree Welfare Plans, the Retiree Welfare Plan administrators, the members of all Nortel benefit plan committees (including, without limitation, the Employee Benefits Committee, the Joint Leadership Resources Committee, the Compensation and Human Resources Committee and any predecessors thereto), the UCC and the Bondholder Group and each of their respective past and present parents, subsidiaries, affiliates, general partners, limited partners, shareholders, administrators, liquidators, directors, officers, employees, managers, agents, attorneys, solicitors, trustees, fiduciaries, accountants and advisors, and each of their predecessors, successors and assigns (collectively, the "<u>Debtor Releasees</u>"), from any and all Retiree Claims and Untimely Run Off Claims, whether known or unknown, suspected or unsuspected, accrued or unaccrued, matured or unmatured, past or present, fixed or contingent, liquidated or unliquidated, that the Retiree Parties now have, had, may have had, or hereafter may have against any of the Debtor Releasees. This Release provides for and effectuates a discharge of the Debtor Releasees to the full extent permitted by applicable law with respect to any and all Retiree Claims.

  o Upon the Effective Date, except as provided for by the terms of the Settlement Agreement, the Debtors, their estates, successors and assigns (the "<u>Debtor Parties</u>") will knowingly and voluntarily release and forever discharge the Retiree Parties and all of their advisors (the "<u>Retiree</u>

16

**Releasees")) from any and all Retiree Claims and Untimely Run Off Claims, whether known or unknown, suspected or unsuspected, accrued or unaccrued, matured or unmatured, past or present, fixed or contingent, liquidated or unliquidated, that the Debtor Parties now have, had, may have had, or hereafter may have against any of the Retiree Parties (the "Retiree Released Claims").  This Release provides for and effectuates a discharge of the Retiree Releasees to the full extent permitted by applicable law with respect to any and all Retiree Released Claims.**

- <u>Retirement Eligible Employees</u>.  All current and former employees of the Debtors who are or may become eligible to receive benefits under the Retiree Welfare Plans, including, for the avoidance of doubt, those employees currently receiving employer-paid long-term disability benefits (the "<u>LTD Employees</u>") and those former employees currently receiving medical benefits under the Consolidated Omnibus Budget Reconciliation Act ("<u>COBRA</u>") (the "<u>COBRA Employees</u>"), shall be permitted to participate in the Retiree Committee settlement set forth in the Settlement Agreement, provided such current and former employees are eligible as of January 31, 2013 to receive benefits under the Retiree Welfare Plans.  For purposes of determining eligibility to receive benefits under the Retiree Welfare Plans under the Settlement Agreement, current and former employees' years of service shall be frozen as of January 31, 2013, except to the extent a former employee is a COBRA Employee, in which case, such COBRA Employee's years of service shall be determined as of the end of the COBRA benefit period (but, in any event, no later than January 31, 2013) rather than the date on which his or her employment was terminated; provided further, and without affecting or waiving service requirements, that a current or former employee's age for purposes of eligibility shall be determined at the latest of the conclusion of: (i) the employee's active service, (ii) the period during which the employee received employer-paid long-term disability benefits, (iii) the period during which the employee received COBRA benefits, or (iv) any additional period that would be necessary for the employee to achieve the minimum age required for eligibility to receive benefits under each of the Retiree Welfare Plans.  In order for a current employee of the Debtors, including an LTD Employee, to elect to receive benefits under the Retiree Welfare Plans as of the Effective Date, such employee must, by a written document to be received by the Debtors within thirty (30) days after the Effective Date (the "<u>Election Document</u>"), voluntarily terminate his or her employment with the Debtors and irrevocably relinquish his or her right to receive benefits under the plans, arrangements, agreements and programs available to current employees, including, without limitation, income continuation benefits pursuant to the Nortel Networks Inc. Long-Term Disability Plan (unless otherwise agreed to by the Debtors in writing in connection with consensual resolution regarding the termination of such long-term disability benefits).  The Election Document shall not permit employees to add dependents who are not already covered by the Nortel Networks Inc. Medical Plan under the Retiree Medical Plan.

- <u>Continuation of Retiree Committee</u>.  After the Effective Date, the Retiree Committee shall exist solely for the purpose of providing LTD Employee Information, enforcing and implementing the Settlement Agreement and administering the allocation,

distribution and payment of the Settlement Amount to the holders of Retiree Claims, or transitioning any of the foregoing responsibilities to a Successor, and shall cease to exist upon the date of distribution of the entire Settlement Amount to the LLC. The Debtors shall not be liable to pay fees, expenses or costs incurred by the Retiree Committee or its professionals, advisors, Successors, designees or agents after the Effective Date, which amounts shall instead be paid out of the Settlement Amount. The Debtors shall be liable to pay fees, expenses or costs incurred by the Retiree Committee, its professionals, advisors, Successors, designees or agents after the Effective Date to the extent that such fees, expenses or costs are incurred in connection with the drafting or presentation of LTD Employee Information, subject to approval of such fees, expenses or costs by the Bankruptcy Court. For the avoidance of doubt, the Debtors shall not be liable to pay fees, expenses or costs incurred by the Retiree Committee or its professionals, advisors, Successors, designees or agents in connection with the Settlement Administration Costs, whenever incurred.

- <u>Final Settlement</u>. Except as expressly provided therein, the Settlement Agreement is being entered into, and the payment of the Settlement Amount is being made, in full and final satisfaction of the Retiree Claims and upon the occurrence of the Effective Date shall supersede any prior obligations of the Debtors relating to the provision of Retiree Benefits or payment of Retiree Claims under the Retiree Welfare Plans, such that from and after the Effective Date, the Retiree Committee and all holders of Retiree Claims shall be forever estopped and barred from seeking further relief pursuant to section 1114(g) of the Bankruptcy Code related to the Retiree Welfare Plans, the Retiree Claims or the Settlement Agreement. For the avoidance of doubt, nothing therein releases or otherwise affects the Debtors' liability for the Excluded Claims, to the extent such liability otherwise may exist.

## F.    **The Proposed Notice Procedures**

25.    To ensure that each Retiree and each individual with a Retiree Claim receives proper notice of the proposed Settlement Agreement, the date of the hearing scheduled to approve the Settlement Agreement and the deadline to file objections, the Debtors propose to mail a copy of this Motion and a notification substantially in the form attached as <u>Exhibit 1</u> to the Notice Procedures Order (the "<u>Settlement Notice</u>") to each such individual and to publish a notice substantially in the form attached as <u>Exhibit 2</u> to the Notice Procedures Order (the "<u>Publication Notice</u>") in <u>The Wall Street Journal</u> (National Edition), <u>Toronto Globe and Mail</u> (National Edition), <u>USA Today</u> (National Edition), <u>Raleigh News & Observer</u>, <u>Charlotte Observer</u>, <u>Dallas Morning News</u>, <u>Houston Chronicle</u>, <u>Tampa Bay Times</u>, <u>Orlando Sentinel</u>,

Miami Herald and San Jose Mercury News.  The Settlement Notice and the Publication Notice

(together, the "Notices") are reasonably calculated to provide notice of the Settlement

Agreement to those impacted by the Settlement Agreement and inform them of the key

provisions of the Settlement Agreement and the manner in which such parties may object to the

approval of the Settlement Agreement and the remaining relief under the Motion.  Exhibits

attached to the Settlement Notice will include lists of all proofs of claim filed by individual

Retirees on account of Retiree Claims that shall be disallowed and expunged from the Debtors'

claims register on the Effective Date, solely with respect to the portion of the proof of claim

relating to Retiree Claims.  The Debtors also respectfully request that the Court set a hearing to

consider approving the Settlement Agreement on April 2, 2013 (the "Approval Hearing"), and

set March 12, 2013 as the deadline by which interested parties may file an objection (the

"Objection Deadline," and collectively with the Notices and the Approval Hearing, the "Notice

Procedures").

    26.    Moreover, the Retiree Committee intends to send to each Retiree and each

individual with a Retiree Claim, a Statement in Support of the proposed Settlement Agreement,

in a form substantially similar to that attached hereto as Exhibit 3 to the Notice Procedures Order

(the "Statement").  The Statement explains, among other things: (i) the composition and role of

the Retiree Committee and its work throughout the section 1114 process; (ii) the significant

terms of the proposed settlement and how it was reached; (iii) how the Settlement Amount will

be apportioned among and distributed to persons eligible to participate in the settlement; and

(iv) why the Retiree Committee supports the proposed Settlement Agreement.

    27.    In addition, the Retiree Committee has identified one insurance carrier that may

be willing to provide alternative medical coverage, but not life insurance or long-term care

insurance, as an alternative to the Nortel Retiree Medical Plan that is being terminated.  The Retiree Committee has, in its business judgment, established certain thresholds that need to be met in order for the alternative medical coverage to be offered as a benefit (the "<u>VEBA Sponsored Medical Plan</u>"), as opposed to a distribution of cash on account of lost benefits under the Nortel Retiree Medical Plan.  To determine whether eligible participants are interested in a VEBA Sponsored Medical Plan, and whether the thresholds can be met, the Retiree Committee intends to send a form of confidential ballot, substantially in the form attached hereto as <u>Exhibit 4</u> to the Notice Procedures Order (the "<u>Ballot</u>") to each eligible participant who has a claim on account of medical benefits.  The Ballot is intended to allow the Retiree Committee to determine whether eligible participants prefer  to  have  their  share  of  settlement proceeds allocable to lost medical benefits used to (a) subsidize a portion of the insurance premiums that would be payable under the Substitute Medical Plan or (b) fund a tax-efficient Health Reimbursement Arrangement Account.

28.     To assist eligible Retirees in filling out the Ballot, the Retiree Committee also intends to send a summary of the VEBA Sponsored Medical Plan, along with a confidential individual claim form to each eligible Retiree.  Templates of those forms are attached to the Notice Procedures Order as <u>Exhibit 5</u> (the "<u>Templates</u>," together with the Statement and Ballot, the "<u>Retiree Committee Communications</u>").

29.     The Debtors propose that objections, if any, must be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 on or before the Objection Deadline.  Each Objection shall state the legal and factual basis of such objection.  The Objection must be in writing and signed by the objecting party or its counsel.  The Objection must be in conformity with the Bankruptcy Rules

Case 09-10138-MFW    Doc 9224    Filed 12/31/12    Page 21 of 35

and the Local Rules for the United States Bankruptcy Court for the District of Delaware, and be served on the following parties so as to be received on or before the Objection Deadline: (i) counsel to the Debtors: Cleary Gottlieb Steen & Hamilton LLP, Attn: Lisa M. Schweitzer, Esq., One Liberty Plaza, New York, New York 10006, Facsimile: (212) 225-3999, (ii) counsel to the Retiree Committee: Togut, Segal & Segal LLP, Attn: Albert Togut, Esq. and Neil Berger, Esq., One Penn Plaza, Suite 3335, New York, New York 10119, Facsimile: (212) 967-4258 (iii) counsel to the UCC: Akin Gump Strauss Hauer & Feld LLP, Attn: Lisa Beckerman, Esq., One Bryant Park, New York, New York 10036, Facsimile: (212) 872-1002, (iv) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy LLP, Attn: Thomas J. Matz, Esq., One Chase Manhattan Plaza, New York, New York 10005, Facsimile: (212) 822-5885 and (v) the Office of the United States Trustee: Attn: Mark Kenney, Esq., 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Facsimile: (302) 573-6497.

## RELIEF REQUESTED

30.     By this Motion, the Debtors seek, pursuant to sections 105(a), 363(b) and 1114(e)(1)(B) of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules, (i) entry of an order approving the form and manner of the Settlement Notice and the Publication Notice (the "Notice Procedures Order"); (ii) entry of an order authorizing the Debtors' entry into and approving the Settlement Agreement (the "Settlement Order"); and (iii) granting them such other and further relief as the Court deems just and proper.

## BASIS FOR RELIEF

### A.     The Notice Procedures Are Reasonable Under The Circumstances

31.     By this Motion, the Debtors first seek entry of an order in the form attached hereto as Exhibit A, approving the Notices.  Bankruptcy Code section 1114 authorizes the Retiree Committee, as an authorized representative of the Retirees, to reach an agreement with

the Debtors regarding the modification of the Retiree Welfare Plans, and authorizes the Court to approve such modifications.  Similarly, Bankruptcy Rule 9019 authorizes the Court to approve settlements "after notice and a hearing."  Bankruptcy Rule 2002 generally provides for at least 21 days notice by mail of the hearing or approval of the settlements of a controversy.

32.     Under the Notice Procedures, the Debtors propose to set the hearing to consider approval of the Settlement Agreement and the remaining relief under this Motion for April 2, 2013 and to set March 12, 2013 as the deadline by which interested parties may file an objection. In addition to serving the Motion on the Retirees at the time of its filing, the Debtors propose to serve the Settlement Notice, substantially in the form attached hereto as <u>Exhibit 1</u> to the Notice Procedures Order, and the Retiree Statement and Ballot on the Retirees by regular mail.

33.     The Debtors submit that the Notice Procedures are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Settlement Agreement and their ability to object to the approval of the Settlement Agreement.  In addition to service of the Motion, the Retirees would be given nearly sixty days advance notice of the Approval Hearing through the service of the Settlement Notice, which will attach a copy of the Settlement Agreement.  Therefore, the Debtors respectfully request that the Court enter the Notice Procedures Order approving the Notices and Notice Procedures and setting the Approval Hearing for April 2, 2013 and the Objection Deadline for March 12, 2013.

**B.     The Settlement Agreement Should Be Approved Under Section 1114 And Rule 9019**

34.     The Settlement Agreement should be approved in order to effectuate the termination of the Retiree Welfare Plans and the resolution of the Retiree Claims on a consensual basis, on terms that are fair and equitable to the Debtors and the Retirees.  After extensive and good faith discussions with the Retiree Committee over the consensual termination of the Retiree Welfare Plans, stretching over more than one year, the Debtors and the Retiree Committee have

reached a settlement as embodied in the Settlement Agreement, which the Debtors believe represents a fair and equitable compromise and will serve as a key development to further the Debtors' successful wind down and eventual plan confirmation.

35.    Approval is warranted under section 1114.  Section 1114(e) of the Bankruptcy Code sets forth the framework for a debtor-in-possession's proposed modification or termination of retiree benefits while in bankruptcy.  It provides as follows:

(1) Notwithstanding any other provisions of this title, the debtor in possession, or the trustee if one has been appointed under the provisions of this chapter (hereinafter in this section "trustee" shall include a debtor in possession), shall timely pay and shall not modify any retiree benefits, except that--

(A) the court, on motion of the trustee or authorized representative, and after notice and a hearing, may order modification of such payments, pursuant to the provisions of subsections (g) and (h) of this section, or

(B) the trustee and the authorized representative of the recipients of those benefits may agree to modification of such payments, after which such benefits as modified shall continue to be paid by the trustee.

11 U.S.C. § 1114(e).

36.    Section 1114(f) of the Bankruptcy Code provides as follows:

(1) Subsequent to filing a petition and prior to filing an application seeking modification of the retiree benefits, the trustee shall--

(A) make a proposal to the authorized representative of the retirees, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the retiree benefits that are necessary to permit the reorganization of the debtors and assures that all creditors, the debtors and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (k)(3), the representative of the retirees with such relevant information as is necessary to evaluate the proposal.

11 U.S.C. § 1114(f).

37.      By its terms, section 1114(e) specifies two different ways by which retiree benefits may be modified.  The first is by court order pursuant to a motion that complies with the provisions of section 1114(g) and (h).  The second is by agreement between the debtor and the authorized representative of the retirees.[19]  Thus, under section 1114(e)(1)(B), the debtor may modify retiree benefit payments if the debtor and authorized representative of the retirees (namely the Retiree Committee) reach an agreement to do so.

38.      By its terms, section 1114(f) provides that, prior to filing an application seeking modification of retiree benefits, five elements must be satisfied.  First, the debtor must make a proposal to the retiree representative based on the most complete and reliable information and based on the facts of the case.  Second, the proposal must provide for modifications that are necessary to permit the debtor's reorganization.  Third, the proposal must treat all parties fairly and equitably.  Fourth, the debtor must provide the retiree representative with relevant information necessary to evaluate the proposal.  Fifth, the debtor must meet with the retiree representative and negotiate in good faith about the proposed modifications.

39.      The Parties have reached an agreement to terminate the Retiree Welfare Plans, as provided in subsection 1114(e)(1)(B), and to settle their long-running dispute over the termination of the Retiree Benefits provided under the Retiree Welfare Plans.  Accordingly, the Settlement Agreement satisfies section 1114(e).

40.      While not required, it is the Debtors' position that they have satisfied the five factors contained in section 1114(f), as described herein.  First, the Settlement Agreement is based on a proposal made to the Retiree Committee by the Debtors that the Retiree Committee

---

[19]      Section 1114(b) defines the term "authorized representative," as used in subsection 1114(e), as "the authorized representative designated pursuant to subsection (c) for persons receiving any retiree benefits covered by a collective bargaining agreement . . . ."  11 U.S.C. § 1114(b)(1).  Here, the statutorily authorized representative of the Retirees is the Retiree Committee, which was appointed by the U.S. Trustee pursuant to an order of this Court to work with the Debtors to negotiate the modification or termination of the Retiree Welfare Plans.

accepted.  That proposal was based on the most complete and reliable information available to

the Debtors at the time of the Debtors' proposal to the Retiree Committee.  The Debtors have

carefully considered the Retiree Welfare Plans and the continued cost of providing the Retiree

Benefits absent a consensual resolution in reaching the Settlement Agreement.  The Debtors also

have reviewed their budgets, financial statements and the projected costs in determining the

feasibility of continuing to provide the Retiree Benefits, and the terms of a proposal that will

benefit the Debtors' estates while treating the Retirees fairly.  While the Debtors maintain that

the terms of the Retiree Welfare Plans allow the Debtors to unilaterally terminate the Retiree

Welfare Plans at any time and without any liability to the Debtors, the Retiree Committee

disputes that assertion and both parties recognize that litigation on these issues presents certain

risks and costs, including the continued cost of providing the Retiree Benefits while these issues

are litigated.

        41.     Second, the Settlement Agreement is necessary to permit the Debtors'

reorganization.  Numerous courts, including bankruptcy courts in the District of Delaware, have

permitted the termination of benefits under section 1114 by liquidating chapter 11 debtors.  See,

e.g., Final Order Authorizing Debtors to Modify Certain Retiree Benefits, Pursuant to Section

1114 of the Bankruptcy Code, In re Fruehauf Trailer Co., Case No. 96-1563 (PJW) (Bankr. D.

Del. May 29, 1997), D.I. 859; Order Approving Agreement Between Debtor LTV Steel

Company, Inc. and the Official Committee of Nonunion and Certain Union Retirees Authorizing

the Termination of Certain Retiree Benefits, Pursuant to Section 1114 of the Bankruptcy Code,

In re LTV Steel Co., Inc., Case No. 00-43866 (Bankr. N.D. Ohio Jan. 22, 2002), D.I. 2289; In re

Penn Traffic Co., Case No. 09-14078 (PJW), 2010 Bankr. LEXIS 5387, at *20 (Bankr. D. Del.

Oct. 27, 2010) (citing section 1114 in a confirmation order to show the debtors had resolved all

outstanding claims relating to the termination of their participation in and contributions to various retiree benefit funds).  As the court pointed out in In re Ionosphere Clubs, Inc., it would create an anomalous result to suggest that a chapter 11 debtor must continue to pay benefits on a priority basis after deciding to liquidate, when they could terminate such plans under chapter 7. In re Ionosphere Clubs, Inc., 134 B.R. 515, 523 (Bankr. S.D.N.Y. 1991).  Rather, courts have interpreted the requirement to mean a debtor must show the modification or termination is "necessary to accommodate confirmation of a Chapter 11 plan" when applied in the context of a liquidating chapter 11 case.  Id. at 525-26 (interpreting the standard to mean that "without modification or termination of the benefits, the retirees will receive a maximum recovery in Chapter 11 while the other unsecured creditors will receive their maximum recovery in Chapter 7"); see also United Food & Commercial Workers Union, Local 211 v. Family Snacks, Inc. (In re Family Snacks, Inc.), 257 B.R. 884, 897 (B.A.P. 8th Cir. 2001) (interpreting similar language in section 1113).  Here, termination of the Retiree Welfare Plans is necessary to accommodate the ultimate confirmation of the Debtors' chapter 11 plan.  First, while the Debtors are of the view that the Retiree Welfare Plans may be terminated without liability, the Retiree Committee has taken a contrary view, and would argue that the value of future benefits under the Retiree Welfare Plans would well exceed the proposed Settlement Amount.  Given the size of the claims that could be asserted by Retirees (whether or not ultimately meritorious) and amounts that would have to be spent on Retiree Benefits absent a consensual resolution, it is important for the Debtors to have an accurate assessment of the value of these claims, and their potential effects on other creditors' recoveries under a chapter 11 plan, and to make necessary administrative arrangements to resolve the outstanding Retiree Benefits and Retiree Claims.  Moreover, providing the Retiree Benefits is a significant financial burden, and terminating the Retiree

Welfare Plans would preserve cash to be distributed to all of the Debtors' creditors on a fair and equitable basis.

42.    Further to that point, the Debtors must terminate the Retiree Welfare Plans now because of the lengthy wind down process associated even with termination of the Retiree Welfare Plans, which may take several months to complete.  For example, following the termination of the medical plan, participants still will be able to submit claims for reimbursement during the relevant run-off periods, and the Debtors need to allocate the necessary administrative and financial resources to resolve such claims.

43.    For these reasons, continuing to pay the Retiree Benefits under the Retiree Welfare Plans places a disproportionate risk and expense on the Debtors' estates and, to the detriment of Nortel's other creditors, impacts their ability to resolve allocation matters and to formulate a final chapter 11 plan.

44.    Third, the Debtors have concluded that the Settlement Agreement treats the Retirees fairly and equitably as compared to other creditors in these cases because the Settlement Agreement provides a substantial payment to the Retirees even though the Debtors maintain that they have *no* post-termination liability regarding the Retiree Welfare Plans.  IUE-CWA v. Visteon Corp. (In re Visteon Corp.), 612 F.3d 210, 224 (3d Cir. 2010) ("[I]f the debtor has no obligations under [the underlying contractual] agreements. . . § 1129(a)(13) does not require continuation of benefit payments upon the debtor's emergence from bankruptcy.").  In addition to the Retiree Benefits provided to the Retirees pursuant to the Settlement Agreement, the Retirees have continued to receive full benefits through the entire course of the Debtors' chapter 11 cases, which amounts to four years of continued Retiree Benefits.  This treatment is indeed arguably superior to other unsecured creditors, such as previously active employees who have been laid

27

off without receiving any such additional benefits, and customers who no longer do business

with the Debtors and generally do not have claims for that lost business.  Additionally, unsecured

creditors have received no payments from the Debtors on account of their claims for over nearly

four years and it is uncertain as to when such creditors will receive any such distributions.  By

contrast, under the Settlement Agreement, the Settlement Amount would be paid to the Retiree

Committee in cash.  Therefore, since the Retirees are treated fairly and equitably under the terms

of the Settlement Agreement, this requirement is satisfied.

45.     Fourth, it is the Debtors' position that the Retiree Committee has been provided

with all relevant information necessary to evaluate the Settlement Agreement.  As described

above, since receiving the Requests, the Debtors have worked diligently to provide the Retiree

Committee with relevant information in the Debtors' possession.  These materials provided the

Retiree Committee with information regarding a wide variety of issues including, but not limited

to, the Debtors' assets and liabilities, the Debtors' financial information, the Retiree Welfare

Plans, the Debtors' past practices with regard to Retiree Benefits and the Retiree population

census and claims history data.  Courts in this circuit have found that providing the company's

current financial information alone is sufficient to meet this requirement. See In re Sol-Sieff

Produce Co., 82 B.R. 787, 794 (Bankr. W.D. Pa. 1988).  Given that the Debtors have supplied

not only this information, but also a significant amount of other information requested by the

Retiree Committee, the Debtors have clearly satisfied this requirement.

46.     Finally, the Debtors have negotiated the terms of a consensual termination of the

Retiree Welfare Plans with the members of the Retiree Committee in good faith over the course

of more than a year.  The Debtors met formally in person with the Retiree Committee on four

occasions, including on October 6, 2011, February 27, 2012, June 14, 2012 and September 21,

2012.  Counsel to the Debtors and the Retiree Committee also have spoken regularly over the course of the last year regarding these matters.  During the course of these negotiations, the Parties have exchanged numerous proposals and counter-proposals.  The negotiations took a year and, at times were overseen by the Mediator appointed to facilitate the process.  Finally, on September 21, 2012, the parties reached an agreement in principle to allow the Debtors to terminate the Retiree Benefits.  The Settlement Agreement is the embodiment of these vigorous arm's-length negotiations.  The UCC and the Bondholder Group also participated in the negotiations and support the approval of the Settlement Agreement.

47.     Because this Court previously ordered that the Retiree Committee shall serve as the "authorized representative" of the Debtors' Retirees [D.I. 5568], the Debtors request a finding that each Retiree shall be bound by the Settlement Agreement.  See, e.g., Hourly Emps./Retirees of Debtor v. Erie Forge & Steel Inc. (In re Erie Forge & Steel, Inc.), 418 F.3d 270, 275-76 (3d Cir. 2005) (affirming dismissal of union retirees' objection to section 1114 settlement and holding the retirees were bound by the agreement between the debtors and union); 11 U.S.C. § 1114(e)(1)(B).

48.     Accordingly, the Settlement Agreement satisfies sections 1114(e) and (f) and the Debtors' authority to perform under the Settlement Agreement should be confirmed by this Court.

## C.     **The Bankruptcy Court Has The Power To Approve The Settlement Agreement Under Sections 105(a) And 363 Of The Bankruptcy Code And Bankruptcy Rule 9019**

49.     Given that the Settlement Agreement satisfies the requirements of section 1114, the Court has the authority to approve it under section 105(a) and 363(b) of the Bankruptcy Code, as well as Bankruptcy Rule 9019.  Section 105(a) of the Bankruptcy Code provides that

"[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

50.    Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease the property of the estate outside of the ordinary course of business after notice and a hearing.  11 U.S.C. § 363(b).  Section 363 applies to a settlement when an agreement involves the disposition of the estate's assets in such a way that it ventures beyond an ordinary course transaction.  Myers v. Martin (In re Martin), 91 F.3d 389, 394-95 (3d Cir. 1996).

51.    The use or transfer of estate property under this provision must be supported by a sound business purpose.  Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Decora Indus., Inc., No. 00-4459 JJF, 2002 WL 32332749, at *2 (D. Del. May 20, 2002); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991); Travelers Cas. & Sur. Co. v. Future Claimants Representative, Civil Action No. 07-2785 (FLW), 2008 WL 821088, at *4 (D.N.J. Mar. 25, 2008).  A court determining whether a sound business purpose justifies the transaction "should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike."  In re Montgomery Ward Holding Corp., 242 B.R. at 153-54 & n.1 (quoting In re Lionel Corp., 722 F.2d at 1071).  In addition, a debtor must show that the transaction has been proposed in good faith, that adequate and reasonable notice has been provided and that it is receiving fair and reasonable value in exchange.  See In re Decora Indus., Inc., 2002 WL 32332749, at *2; In re Del. & Hudson Ry. Co., 124 B.R. at 176.  Courts have distinguished the application of section 363 to settlements as opposed to property sales, finding that the settlement of claims requires less

scrutiny than asset sales because settlements must be approved quickly and are often an important first step in formulating a plan.  See Official Unsecured Creditors' Comm. of Pa. Truck Lines, Inc. v. Pa. Truck Lines, Inc. (In re Pa. Truck Lines, Inc.), 150 B.R. 595, 598-99 (E.D. Pa. 1992) (quoting In re Grant Broad. of Phila., Inc., 71 B.R. 390, 398 (Bankr. E.D. Pa. 1987) and In re Neshaminy Office Bldg. Assocs., 62 B.R. 798, 805 (E.D. Pa. 1986)).

52.     Bankruptcy Rule 9019 provides, in pertinent part, that, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  Citing this authority, the Third Circuit has emphasized that "[c]ompromises are favored in bankruptcy."  In re Martin, 91 F.3d at 393 (alteration in original) (citation omitted) (internal quotation marks omitted); see also In re World Health Alts., Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006) (finding settlements "generally favored in bankruptcy").  Additionally, the Third Circuit has recognized that "'[i]n administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts.'"  In re Penn Cent. Transp. Co., 596 F.2d 1102, 1113 (3d Cir. 1979) (alteration in original) (quoting Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968)).  And courts in this District have recognized that the approval of a proposed compromise and settlement is committed to the sound discretion of the bankruptcy court.  See, e.g., In re Coram Healthcare Corp., 315 B.R. 321, 329 (Bankr. D. Del. 2004).

53.     Before approving a settlement under Bankruptcy Rule 9019, a court must determine whether "'the compromise is fair, reasonable, and in the interest of the estate.'"  In re Marvel Entm't Grp., Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997)).  Basic to the process of evaluating proposed settlements is "the

31

need to compare the terms of the compromise with the likely rewards of litigation." Protective

Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25

(1968).  The court need not be convinced that the settlement is the best possible compromise in

order to approve it.  In re Coram Healthcare Corp., 315 B.R. at 330.  Rather, the court's

obligation is to "canvass the issues and see whether the settlement falls below the lowest point in

a range of reasonableness."  Travelers Cas. & Sur. Co., 2008 WL 821088, at *5 (citing Aetna

Cas. & Sur. Co. v. Jasmine, Ltd. (In re Jasmine, Ltd.), 258 B.R. 119 (D.N.J. 2000)); see also In

re Coram Healthcare Corp., 315 B.R. at 330.

 54. The Third Circuit has set out four criteria for a bankruptcy court to consider when

evaluating a settlement proposal:  "(1) the probability of success in litigation; (2) the likely

difficulties in collection; (3) the complexity of the litigation involved, and the expense,

inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."

In re Martin, 91 F.3d at 393 (citing In re Neshaminy Office Bldg. Assocs., 62 B.R. 798, 803

(E.D. Pa. 1986)); see also Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159,

165 (3d Cir. 2002); In re eToys, Inc., 331 B.R. 176, 198 (Bankr. D. Del. 2005).

 55. The Debtors respectfully submit that the Settlement Agreement is fair, reasonable

and in the best interests of the Debtors, their creditors and their estates.  The Debtors believe that

the approval of the Settlement Agreement is an appropriate exercise of the authority granted to

the Court under Bankruptcy Rule 9019(b).  Moreover, as required by section 363, the Settlement

Agreement is proposed in the Debtors' business judgment as a good-faith means to resolve

disputes and potential claims between the Debtors and the Retiree Committee regarding the

modification or termination of the Retiree Welfare Plans.

56.    While the Debtors are prepared litigate the 1114 Termination Motion and believe that they would prevail, such contested motion practice carries with it inherent uncertainties and there is no assurance that the Debtors would achieve a better result than the one set forth in the Settlement Agreement.  The Settlement Agreement fairly balances the Debtors' likelihood of success on the merits against their interest in avoiding the uncertainty of litigating what would undoubtedly be a contentious process and the continued costs of providing Retiree Benefits during the pendency of the litigation.  Furthermore, a loss, even if unlikely, would saddle the Debtors with significant and burdensome costs.

57.    Furthermore, the Settlement Agreement is fair and reasonable.  The Retirees have been represented throughout the negotiation of the Settlement Agreement by experienced and competent counsel.  The Settlement Agreement is the result of a year of arm's-length bargaining involving several proposals and counterproposals from all Parties.  Each Party has vigorously negotiated the best possible deal for its constituencies, making concessions in order to consensually resolve the disputed issues.  As part of the Settlement, the Parties also have agreed to allow individuals currently receiving LTD Benefits who otherwise may be eligible for certain Retiree Benefits to participate in the Settlement, as long as they decide to retire and waive their right to receive further LTD Benefits, as provided for under the Settlement Agreement.  While such individuals currently are not receiving Retiree Benefits and therefore are not participants in the Retiree Welfare Plans, and the Retiree Committee raised certain other potential defenses to their right to benefits, in furtherance of the compromises that are part of the Settlement and at the request for the Debtors, the Retiree Committee agreed to include such provisions as part of the Settlement.

58.     In addition, the interests of the creditors militate in favor of approval of the Settlement Agreement.  In the absence of a settlement between the parties, the Debtors' estates would be burdened with the time and costs of continuing discovery and a trial, which would be disruptive of the estates' efforts to resolve the many matters that are essential to the ultimate resolution of these cases.  The time and expense of fully litigating the 1114 Termination Motion and the benefit to the Debtors' estates in compromising the Retirees' claims, demonstrate that the proposed settlement is fair and equitable.  Counsel to the UCC and the Bondholder Group actively participated in every stage of the negotiations over the consensual termination of the Retiree Welfare Plans, including the mediation sessions, and the UCC supports entry into the Settlement Agreement.  The Debtors believe that the interests of their creditors are therefore served by the prompt and efficient resolution of any disputes regarding the termination of the Retiree Welfare Plans through the Settlement Agreement.  In light of the foregoing, the Debtors respectfully seek approval of the Settlement Agreement.

## Notice

59.     Notice of the Motion has been given via first class mail to (i) the U.S. Trustee; (ii) counsel to the Retiree Committee; (iii) counsel to the LTD Committee; (iv) counsel to the Bondholder Group; (v) counsel to the UCC; (vi) holders of Retiree Claims; and (vii) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

60.     No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed orders attached as Exhibit A and Exhibit C hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  December 31, 2012
            Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

            - and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*