## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | X | |
| *In re* | : | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | : | Case No. 09-10138 (KG) |
| Debtors. | : | Jointly Administered |
| | : | **Related D.I.: 8067** |
| | : | |
| ----------------------------------------------------------------- | X | |
| OFFICIAL COMMITTEE OF LONG TERM | : | Adv. Proc. No. 12-50995 (KG) |
| DISABILITY PLAN PARTICIPANTS, on behalf of | : | **Related D.I.: 1** |
| and as agent for a class of individual participants and | : | |
| beneficiaries under various NORTEL NETWORKS | : | |
| HEALTH AND WELFARE BENEFIT PLANS, | : | **Preliminary Hearing Date: February 14,** |
| Plaintiffs, | : | **2013 at 10:00 am (EST);** |
| | : | |
| v. | : | **Preliminary Hearing Objections Due:** |
| NORTEL NETWORKS INC., *et al.*, | : | **February 4, 2013 at 4:00 pm (EST)** |
| Defendants. | : | |
| ----------------------------------------------------------------- | X | |

**JOINT MOTION PURSUANT TO SECTIONS 363 AND 105 OF THE
BANKRUPTCY CODE, AND BANKRUPTCY RULES 9019 AND 7023
TO (I)(A) PRELIMINARILY APPROVE THE SETTLEMENT AGREEMENT
REGARDING LONG-TERM DISABILITY PLANS AND CLAIMS,
(B) CONDITIONALLY CERTIFY A CLASS FOR SETTLEMENT
PURPOSES ONLY, (C) APPROVE THE NOTICE
PROCEDURES, AND (D) SCHEDULE A FAIRNESS HEARING; AND
(II)(A) FINALLY APPROVE THE SETTLEMENT AGREEMENT,
(B) FINALLY CERTIFY A CLASS, (C) AUTHORIZE THE DEBTORS
TO TERMINATE THE LTD PLANS, AND (D) GRANT RELATED RELIEF**

This motion is filed by: (i) Nortel Networks Inc. ("NNI") and certain of its affiliates that

are debtors and debtors in possession in the above-captioned cases, (collectively, the "Debtors"),

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (b), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

and (ii) the Official Committee of Long Term Disability Participants (the "LTD Committee"),

which Committee was appointed as an official committee under 11 U.S.C. § 1102 and acts on

behalf of all of the Debtors' long-term disabled employees who are participants in the Debtors'

Long Term Disability Plan and certain other plans and programs (such employees are referred to

herein as the "LTD Employees"). The LTD Committee is referred to herein as the "Plaintiff."

The Debtors and the LTD Committee are together referred to herein as the "Movants."

The Movants hereby make this motion (the "Joint Motion") to obtain from the Court,[2] the

entry of preliminary and final orders pursuant to sections 105(a) and 363 of title 11 of the United

States Code (the "Bankruptcy Code"), Rule 9019 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), and Rule 23 of the Federal Rules of Civil Procedures (the "Civil

Rules"), applicable hereto by Bankruptcy Rule 7023.

In the proposed preliminary order, the Movants seek: (i) preliminary approval of the

settlement agreement between the LTD Committee and the LTD Committee Member Parties (as

defined below), on the one hand, and the Debtors, on the other hand, substantially in the form

attached hereto as **Exhibit A** (the "Settlement Agreement"), pursuant to Bankruptcy Rules 7023

and 9019; (ii) conditional (a) certification, solely for settlement purposes, of a class consisting of

all LTD Employees (as defined below) as of the Termination Date (the "Settlement Class"),

(b) appointment of the Class Representatives (as defined below), and (c) approval of Elliott

Greenleaf, counsel to the LTD Committee, as counsel for the Settlement Class ("Class

Counsel"); (iii) approval of the Notice Procedures (as defined below), (iv) scheduling of a

fairness hearing (the "Fairness Hearing") to consider final approval of the Settlement Agreement

---

[2] The positions taken in the class certification section of the Joint Motion are those of Plaintiffs only. The Debtors take no position on the matters set forth in that section other than to support approval of the Settlement Agreement and class certification solely for purposes of settlement only. In the event that the Settlement Agreement does not become effective, the Debtors reserve all rights and defenses with respect to the Adversary Proceeding including the right to contest class certification.

and the establishment of dates prior thereto on which any objections to the proposed Settlement

Agreement may be heard, and (v) the granting of related relief (such order, substantially in the

form attached hereto as **Exhibit B**, is referred to herein as the "Preliminary Settlement Approval

Order").

Through the final order, the Movants seek: (i) approval of the Settlement Agreement

pursuant to Bankruptcy Rules 7023 and 9019 on a final basis, (ii) certification of the Settlement

Class, solely for settlement purposes, and appointment of the Class Representatives (as defined

below) and approval of Class Counsel on a final basis; (iii) authorization of the Debtors to

terminate the LTD Plans (as defined below) with respect to all individuals receiving LTD

Benefits (as defined below) or coverage thereunder, whether or not they are LTD Employees;

and (iv) the granting of related relief (such order, substantially in the form attached hereto as

**Exhibit C**, is referred to herein as the "Final Settlement Approval Order" and together with the

Preliminary Settlement Approval Order, collectively the "Approval Orders").

As detailed below, without admitting or denying liability and solely for the purpose of

settlement, the Debtors consent pursuant to the Settlement Agreement to the issuance of an order

and judgment against them on Count II of the Class Complaint (as defined below), declaring that

they shall not terminate any of the LTD Plans with respect to any of the LTD Employees on or

before May 31, 2013, unless and until NNI allows a general non-priority, unsecured claim in

favor of the LTD Committee in the gross amount of $28 million for benefits under the LTD

Plans based on a hypothetical termination date of March 31, 2013 (and minus the costs of

providing LTD Benefits to the LTD Employees between April 1, 2013 and May 31, 2013).  The

Movants recognize that many LTD Employees would benefit from a transition period prior to

termination of the LTD Plans to allow them time to make alternative arrangements, particularly

to the extent that an LTD Employee suffers from a serious medical condition.  In addition, some

LTD Employees are eligible to retire (as discussed in more detail below) and may benefit from

time to compare their options between the Proposed Retiree Settlement Agreement (as defined

below) and the proposed Settlement Agreement for the LTD Employees.  To accommodate these

concerns, the Parties have agreed to extend the provision of LTD Benefits to the LTD Employees

from April 1, 2013 through May 31, 2013, with the cost of providing such LTD Benefits during

this transition period (for purposes of settlement only, calculated as $680,000 per month) being

deducted to determine the final gross amount of the LTD General Unsecured Claim (as defined

below).  Accordingly, the Settlement Agreement contemplates the allowance of the LTD General

Unsecured Claim in the amount of $26.64 million.  The ultimate cash value of the allowed LTD

General Unsecured Claim will depend, among other things, on the amount of distributions made

by Nortel Networks Inc. on the LTD General Unsecured Claim under a plan of reorganization, or

if the LTD General Unsecured Claim is sold by the LTD Committee, on the amount received by

the LTD Committee for the LTD General Unsecured Claim.  *The Final Settlement Approval*

*Order also will authorize the Debtors to terminate the LTD Plans in their entirety as of May*

*31, 2013, binding all individuals receiving benefits or eligible to receive benefits under any of*

*the LTD Plans, regardless of whether or not they are LTD Employees (including, without*

*limitation, all of the Debtors' active employees (the "Active Employees") and those receiving*

*benefits or eligible to receive benefits under the plans providing medical, dental, vision,*

*hearing and any other continuation coverage pursuant to the Consolidated Omnibus Budget*

*Reconciliation Act ("COBRA" and anyone receiving or eligible to receive such benefits, a*

*"COBRA Participant").*  The Settlement Agreement is explained in detail below.  The Movants

submit that the Settlement Agreement represents a reasonable resolution and settlement of the

Parties'[3] disputes that is fair to the members of the Settlement Class and that is in the best interest of the Debtors, their estates and their creditors.  In support of this Joint Motion, the Parties further represent and state as follows:

**PRELIMINARY STATEMENT**

1.        The Debtors historically have provided their employees with a variety of employee benefits, including: medical coverage; life insurance; dental, vision and hearing insurance; accidental death & dismemberment insurance; business travel accident insurance; short-term disability income continuation insurance; and long-term disability income continuation insurance.  The Debtors continued to offer such benefits to all of their employees, including the LTD Employees and the Active Employees (as well as certain medical, dental, vision and health benefits to the COBRA Participants) throughout their Chapter 11 proceedings but now seek, as part of their restructuring process, to wind down those plans for all participants.  The Court appointed the LTD Committee with the Debtors' support to serve as "the authorized representative of the LTD Plan Participants in connection with negotiations regarding the modification or termination of the LTD Plan, and any claims relating thereto . . . ."[4]

2.        Since the appointment of the LTD Committee in August 2011, the Parties have explored a consensual resolution regarding the termination of the Debtors' LTD Plans.  In November 2012, after the Debtors had filed a motion seeking termination of the LTD Plans, the LTD Committee, which consists of certain LTD Employees, sued the Debtors in a purported class action for injunctive and declaratory relief relating to the Debtors' operation and proposed termination of the LTD Plans.  Finally, after the exchange of thousands of pages of information,

---

[3]        The term "Parties" herein refers to the parties to the Settlement Agreement: the Debtors, the LTD Committee, and the LTD Committee Member Parties (as defined herein).

[4]        See *Order Appointing an Official Committee of Long-Term Disability Participants*, dated June 22, 2011 [D.I. 5790].

multiple in-person and telephonic meetings, the appointment of a neutral third-party Mediator (as defined below), the filing of a motion seeking termination of the benefits in the event an agreement could not be reached, and hours of negotiations, all of which occurred before and after the purported class action was filed, the Parties reached an agreement on the resolution of the Debtors' motion to terminate the LTD Plans and the Adversary Proceeding (as defined below). That agreement is embodied in the Settlement Agreement.

3.      In entering into the Settlement Agreement, the Parties have balanced the importance of the LTD Benefits to the members of the Settlement Class against the infeasibility of the Debtors continuing to provide the LTD Benefits at a time when the Debtors' operations have been reduced to only those most basic functions essential to complete their wind down and bankruptcy process.  For the purpose of this settlement, the Parties do not admit or deny that their respective positions on the LTD Termination Motion and on the claims asserted in the Class Complaint are correct or incorrect.  However, the Parties, in an effort to compromise the claims and avoid further costly litigation, have agreed to the terms of the proposed Settlement Agreement, pursuant to which the Debtors consent to the issuance of an order declaring that they shall not terminate any of the LTD Plans with respect to the members of the Settlement Class on or before May 31, 2013, unless and until NNI allows a general non-priority, unsecured claim in favor of the LTD Committee in the gross amount of $28 million (based on a hypothetical termination date of March 31, 2013)[5] for benefits under the LTD Plans, the proceeds of which, less certain administration expenses of the LTD Committee, if any, are to be allocated by the

---

[5]      The ultimate cash value of the allowed LTD General Unsecured Claim will depend, among other things, on the amount of distributions made by Nortel Networks Inc. on the LTD General Unsecured Claim under a plan of reorganization, or if the LTD General Unsecured Claim is sold by the LTD Committee, on the amount received by the LTD Committee for the LTD General Unsecured Claim.

LTD Committee among the Settlement Class members.[6]  Upon approval by the Court and the

occurrence of the Effective Date (as defined below), the Settlement Agreement provides that the

LTD Plans will be terminated in their entirety and Settlement Class members will fully release

the Debtors and others from all further liability for the LTD Claims (as defined below).

4.    The Movants ask that this Court proceed in accordance with a two step approval

process in order to facilitate notice to Settlement Class members and allow them an opportunity

to appear and object to the Settlement Agreement if they choose to do so.  After preliminary

approval of the Settlement Agreement and the form of notice to be given to the Settlement Class

members, the Movants will provide notice to each Settlement Class member[7] and to other

individuals who may be affected by the termination of the LTD Plans that describes the

Settlement Agreement and informs the Settlement Class members of their right to object to the

Settlement Agreement and the date upon which their objections must be filed with the Court.

For settlement purposes only, the Movants also request conditional certification of the Settlement

Class and the appointment of (i) certain members of the LTD Committee, to represent the

Settlement Class ("Class Representatives")[8] and (ii) Class Counsel, which appointments will be

sought at the initial hearing.  The second step in the approval process involves the setting of the

date upon which the Court determines whether to approve the Settlement Agreement and the

allocation of the Settlement Amount (as defined below) pursuant thereto.  At this hearing, the

---

[6]    The Debtors intend that the LTD General Unsecured Claim be allowed against NNI, but NNI reserves the right to seek recovery from the other Debtors for some portion of the amount distributable on account of the LTD General Unsecured Claim, after consultation with the UCC and the Bondholder Group.

[7]    Consistent with the Court's *Order Granting Debtors' Motion for Entry of an Order Authorizing the Debtors to File Under Seal Certificates of Service Related to LTD Employees* [D.I. 8327], the certificate of service containing the names and addresses of those LTD Employees who receive notice of the Settlement Agreement shall be filed under seal, and a copy of the unsealed certificate of service list shall be delivered to the Court by the Parties and kept under seal by the Clerk of Court.

[8]    The individual Class Representatives are the five members of the LTD Committee who are party to the Settlement Agreement, and are also referred to herein as the "LTD Committee Member Parties".

Court will be asked to authorize the Debtors to terminate the LTD Plans, including the LTD

Benefits provided to all disabled and non-disabled individuals thereunder.  The Movants believe

that the terms of the Settlement Agreement provide the Settlement Class members with a fair and

reasonable settlement that will facilitate a smooth transition for the Settlement Class members

following the termination of the LTD Plans and that it would be beneficial to the Debtors to

terminate the LTD Plans at this stage of their wind down.  Accordingly, the Movants submit this

Joint Motion for the approval of the Settlement Agreement and related relief.  The Movants

reserve the right to supplement this Joint Motion following their review of any objections that

may be filed to the proposed Settlement Agreement.

## JURISDICTION

5.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334, and, to the extent applicable, the Parties consent to the Court hearing, determining and

entering appropriate orders and judgments regarding the relief sought in the Adversary

Proceeding (as defined below) pursuant to 28 U.S.C. § 157(c)(2).  Approval of the Joint Motion

is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).[9]  Venue is proper pursuant to

28 U.S.C. §§ 1408 and 1409.

6.      The statutory bases for the relief requested herein are sections 105(a) and 363(b)

of the Bankruptcy Code, and Bankruptcy Rules 9019 and 7023.

---

[9]      This Joint Motion is made without prejudice to the Parties' positions regarding the jurisdiction of the Court
with respect to the LTD Termination Motion and the Adversary Proceeding in the event that the Settlement
Agreement does not become effective.

## FACTUAL BACKGROUND

A.    **Case Background**

7.    On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel

Networks (CALA) Inc.,[10] filed voluntary petitions for relief under chapter 11 of title 11 of the

Bankruptcy Code (the "Chapter 11 Cases"), which cases are consolidated for procedural

purposes only.  The Debtors continue to operate as debtors in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.

8.    The Office of the United States Trustee for the District of Delaware (the "U.S.

Trustee") has appointed an Official Committee of Unsecured Creditors (the "UCC") in respect of

the Debtors [D.I.s 141, 142].[11]  In addition, an ad hoc group of bondholders has been organized

(the "Bondholder Group").

9.    On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their

Canadian affiliates (collectively, the "Canadian Debtors")[12] commenced a proceeding with the

Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors

Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the

"Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by

the Canadian Court.  Also on the Petition Date, the High Court of England and Wales placed

---

[10]    Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' Chapter 11 Cases for procedural purposes [D.I. 1098].

[11]    Except as specifically noted herein, all docket references shall relate to pleadings filed in the Debtors' Chapter 11 proceedings, currently pending in this Court as Case No. 09-10138 (KG).

[12]    The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[13] into

administration (the "English Proceedings") under the control of individuals from Ernst & Young

LLP (collectively, the "Joint Administrators").  Other Nortel affiliates have commenced and in

the future may commence additional creditor protection, insolvency and dissolution proceedings

around the world.

10.     Since the Petition Date, Nortel has sold its business units and other assets to

various purchasers.  For further information regarding these Chapter 11 Cases, reference may be

made to the Monthly Operating Reports filed by the Debtors and http://dm.epiq11.com/nortel.

**B.     The LTD Plans**

11.     The Debtors historically have provided a number of benefits to their employees

through various benefit plans and other programs, including (as amended or modified from time

to time) the Nortel Networks Inc. Long-Term Disability Plan, Nortel Networks Inc. Short-Term

Disability Plan, the Nortel Networks Inc. Medical Plan, the Nortel Networks Inc. Dental, Vision,

and Hearing Care Plan, the Nortel Networks Inc. Life Insurance Plan, the Nortel Networks Inc.

AD&D Insurance Plan, the Nortel Networks Inc. Health Care Reimbursement Account Plan, the

Nortel Networks Business Travel Accident Insurance Plan, the Nortel Networks Inc. Dependent

Day Care Reimbursement Account Plan, the Nortel Networks Inc. Long-Term Investment Plan,[14]

and any other formal or informal benefit plans, agreements, or programs (including plans,

---

[13]     The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

[14]     The Nortel Networks Inc. Long-Term Investment Plan was terminated effective as of June 30, 2012, for all of the Debtors' employees.  The Nortel Networks Inc. Health Care Reimbursement Account Plan and the Nortel Networks Inc. Dependent Day Care Reimbursement Account Plan were previously terminated for all of the Debtors' employees, effective as of December 31, 2010.

agreements, arrangements or programs that are funded through the purchase of insurance) or

arrangements for disabled employees, their surviving spouses and eligible dependents, including

for medical, surgical, or hospital care benefits, income continuation benefits or any other benefits

in the event of sickness, accident, disability, or death (collectively, and in each case as such plans

have been amended or modified from time to time, the "LTD Plans").[15]   The Debtors offer these

LTD Plans to current employees of the Debtors, including the LTD Employees, who have been

identified by the Debtors as current employees of the Debtors in connection with the

administration of these plans and benefits.[16]   During the course of these Chapter 11 Cases, the

Debtors have continued to provide certain benefits under the LTD Plans (the "LTD Benefits") to

the LTD Employees, as well as to the Active Employees and the COBRA Participants, in the

ordinary course under the plan terms, including as authorized by this Court's January 15, 2009

*Order Authorizing, But Not Directing, The Debtors to Pay Certain Prepetition (I) Wages,*

*Salaries and Other Compensation, (II) Reimbursable Expenses, and (III) Medical, Retirement*

*and Similar Benefits* [D.I. 59].

        12.     There currently are approximately 200 LTD Employees, approximately ten Active

Employees and approximately 129 COBRA Participants who receive various LTD Benefits

under the LTD Plans.  Certain of the LTD Employees are eligible to retire based on their age and

years of service, but have not elected to do so to date.  On December 31, 2012, the Debtors filed

---

[15]     For  retired employees of the Debtors (the "Retirees"), the Debtors maintain other various benefit plans and
other programs including (as amended or modified from time to time) the Nortel Networks Inc. Retiree Medical
Plan, the Nortel Networks Inc. Retiree Life Insurance and Long-Term Care Plan, predecessor plans and other formal
or informal benefit plans, agreements, arrangements or programs (including plans, agreements, arrangements or
programs that are funded through the purchase of insurance) or arrangements for current or future retired employees,
their surviving spouses and eligible dependents, including plans, arrangements, agreements or programs for medical,
surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death (collectively and
in each case as amended or modified from time to time, the "Retiree Welfare Plans").

[16]     The Plaintiffs reserve the right to contest the employment status of the LTD Employees should the
Settlement Agreement not become effective.

the *Debtors' Motion for Entry of Orders Pursuant to 11 U.S.C. §§ 105, 363 and 1114 and Fed.*
*R. Bankr. P. 9019 (A) Approving Settlement Notification Procedures and, Subsequently,*
*(B)Approving a Settlement Agreement with the Official Committee of Retired Employees* [D.I.
9224] (the "Retiree Approval Motion") seeking approval of a settlement agreement with the
Official Committee of Retired Employees (the "Proposed Retiree Settlement Agreement").
Under the Proposed Retiree Settlement Agreement, if approved by the Court, those LTD
Employees who have met the service requirements for retirement would be eligible to receive
benefits thereunder if they elect to retire (and under certain circumstances relinquishing their
right to continued benefits under the LTD Plans) in accordance with the procedures set forth in
that motion.[17]

13.     The Debtors previously sought to terminate the Retiree Welfare Plans and the
LTD Plans by a motion filed in June 2010 (the "2010 Plan Termination Motion").[18]  In
connection with that proposed termination of the Retiree Welfare Plans and the LTD Plans, the
Debtors had negotiated with a health insurance provider to provide the Retirees and LTD
Employees with replacement medical coverage that was not readily available to individuals on
the open market.  Shortly thereafter, the Nortel US Retirement Protection Committee, an ad hoc
steering committee of retired executives of the Debtors (the "Ad Hoc Retiree Committee"), filed
a motion seeking authorization to form a "voluntary employee benefit association," or VEBA, as

---

[17]     The summary of the Proposed Retiree Settlement Agreement is provided for background purposes only and
is subject to the terms of the Proposed Retiree Settlement Agreement which, if approved, would govern.  Individuals
are encouraged to read the Proposed Retiree Settlement Agreement and the motion seeking its approval in their
entirety.

[18]     See *Debtors' Motion for Entry of an Order Authorizing Debtors to Terminate Certain Retiree and Long-*
*Term Disability Plans*, dated June 21, 2010 [D.I. 3204].

an alternative option for providing health insurance (the "VEBA Motion").[19]  Based on

discussions with counsel to the Ad Hoc Retiree Committee, their rejection of the alternative

insurance and the Third Circuit's ruling in IUE-CWA  v. Visteon Corp. (In re Visteon Corp.),

612 F.3d 210 (3d Cir. 2010), the Debtors ultimately withdrew the 2010 Plan Termination Motion

without prejudice in July 2010 [D.I. 3651].  Thereafter, in October 2010, the Nortel US

Retirement Protection Committee withdrew the VEBA Motion without prejudice [D.I. 4104].

As set forth in subsection E *infra*, the Debtors filed, on July 30, 2012 the *Motion for Entry of an

Order Pursuant to 11 U.S.C. §§ 105, 363 and 1108 Authorizing the Debtors to Terminate the

Debtors' Long Term Disability Plans and the Employment of the LTD Employees* [D.I. 8067].

**C.    The Wind Down of the Debtors' Estates**

14.    In the several months following the Debtors' decision to postpone seeking

termination of their LTD Plans, the Debtors worked diligently to wind down their remaining

operations, including completion of the transition services provided to the buyers of their various

businesses.  The Debtors also undertook the sale of their patent portfolio, which closed in July

2011, and have sought to advance the resolution of the other remaining material claims in their

cases through the filing of various motions.  During this time, the Debtors also sought to identify

other possible alternative insurance arrangements for the LTD Employees.

15.    Meanwhile, the Debtors continued to wind down all other aspects of their estates,

to the point where they now have limited residual operations and employees, which remain

solely in order to complete their wind down.  At the time the bankruptcy cases were filed, the

Debtors employed approximately 3,000 individuals.  Nearly all of the Debtors' workforce (other

than the LTD Employees) either took employment with the buyers of the Debtors' businesses or

---

[19]    See *Nortel US Retirement Protection Committee's Motion for an Order Authorizing Formation of a Voluntary Employee Benefit Association to Provide Tax Credit-Eligible Retiree Benefits*, dated July 16, 2010 [D.I. 3671].

elsewhere or were terminated by the Debtors in the various rounds of layoffs conducted over the last four years.  Today, the Debtors employ approximately ten active employees.

16.     As a result of the divestitures and wind down, the maintenance and administration of the LTD Plans (and the Retiree Welfare Plans) now takes a disproportionate amount of time and resources compared to prior years.  Once the Debtors dissolve as corporations, there will be no company even in name to continue the LTD Benefits.  Moreover, while the LTD Plans are administered by third-party vendors, the Debtors generally maintain the LTD Plans as self-insured plans (with the exception of certain life insurance, accidental death & dismemberment insurance, certain HMO medical options and business travel accident insurance benefits)[20] and, as such, the Debtors generally bear the economic risk of the plans and the claims filed thereunder.

17.     Over the last two and a half years since July 2010, when the prior 2010 Plan Termination Motion was withdrawn, the Debtors have continued to provide benefits under the LTD Plans, at an estimated cost of more than $20 million to their estates.  The average cost to the Debtors of providing the LTD Benefits under the LTD Plans was more than $700,000 per month in 2012, and there is no assurance that the administrative cost of these plans will not increase over time.

**D.  Negotiations with the LTD Committee**

18.     On June 3, 2011, several LTD Employees filed the *Motion for Entry of an Order Pursuant to Section 1102(a)(2) of the Bankruptcy Code Appointing an Official Committee of Long-Term Disability Plan Participants* [D.I. 5595] (the "LTD Committee Motion").  The Debtors did not oppose the LTD Committee Motion other than to seek to clarify the scope of the

---

[20]     Since 2011, Nortel's long-term disability coverage for its remaining active employees has been fully insured by Metropolitan Life Insurance Company.  No individual currently receives benefits through the fully insured long-term disability policy and the Debtors ultimately intend to terminate this policy as well.

LTD Committee's appointment so that the Debtors could engage in discussions with the LTD Employees in the hope of reaching a consensual agreement regarding the modification or termination of their LTD Benefits.

19.    Thereafter, the Court issued an order directing the U.S. Trustee to appoint an LTD Committee for the sole purpose of serving as the authorized representative of the LTD Employees in connection with negotiations regarding the modification or termination of the LTD Plans [D.I. 5790].  On August 2, 2011, the U.S. Trustee appointed the members of the LTD Committee [D.I. 6073], as amended on August 4, 2011 [D.I. 6080].

20.    Since the appointment of the LTD Committee, the Parties, as well as the UCC and the Bondholder Group, have devoted significant resources and attention to negotiating in good faith to seek the termination of the LTD Plans and a settlement that would provide a fair and equitable resolution of any potential claims or rights held by the LTD Employees.  The Debtors held an in-person meeting with the LTD Committee on October 6, 2011, in order to provide them information about the LTD Plans and the proposed termination of the LTD Plans and LTD Benefits thereunder.  Additional meetings and on-going telephonic discussions occurred thereafter, including on February 27, 2012, June 27, 2012 and July 19, 2012.  The Debtors provided counsel for the LTD Committee with requested documents and information as part of both formal and informal discovery.

21.    Despite the Debtors and LTD Committee's efforts, a consensual settlement was not reached in the first several months.  In order to further a consensual resolution, on March 28, 2012, the Debtors filed a motion (the "Mediation Motion"), seeking to have a mediator appointed

to facilitate settlement discussions between the Debtors and the LTD Committee.[21]  On April 18,

2012, the Court entered an order granting the Mediation Motion and appointed Richard Levin,

Esq., of Cravath, Swaine & Moore LLP, as mediator (the "Mediator").[22]  In connection with the

appointment of the Mediator, the Debtors agreed to a further 60-day standstill during which they

would not take any action to modify or terminate the LTD Plans.  That standstill expired on June

18, 2012.

**E.**     **Litigation of the LTD Termination Motion**

22.     Given the approaching end of the 2012 plan year, and with the goal of avoiding

further costs related to the LTD Plans, the Debtors filed a motion on July 30, 2012 seeking

authority to terminate the LTD Plans and the employment of the LTD Employees as of

December 31, 2012 (the "LTD Termination Motion").[23]  The Debtors later extended the

requested termination date for the LTD Plans and the LTD Employees' employment to March

31, 2013, consistent with the scheduling of the ultimate hearing on the LTD Termination

Motion.[24]

23.     After the filing of the LTD Termination Motion, the Movants negotiated a

scheduling order to set deadlines for taking discovery and litigating the LTD Termination

Motion.  On August 1, 2012, the Court entered the *Scheduling Order for Hearing on Debtors'*

---

[21]     See *Motion for Entry of an Order (I) Appointing a Neutral Mediator Concerning the Modification or Termination of the Nortel Retiree Welfare Plans and the Nortel Long-Term Disability Plans; (II) Authorizing the Debtors to Pay the Costs of Engagement; and (III) Granting Related Relief* [D.I. 7463].

[22]     See *Order (I) Appointing a Neutral Mediator Concerning the Modification or Termination of the Nortel Retiree Welfare Plans and the Nortel Long-Term Disability Plans; (II) Authorizing the Debtors to Pay the Costs of Engagement; and (III) Granting Related Relief* [D.I. 7560].

[23]     See *Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363 and 1108 Authorizing the Debtors to Terminate the Debtors' Long-Term Disability Plans and the Employment of the LTD Employees* [D.I. 8067].

[24]     See *Debtors' Supplemental Submission in Further Support of Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363 and 1108 Authorizing the Debtors to Terminate the Debtors' Long-Term Disability Plans and the Employment of the LTD Employees* [D.I. 8878].

*Process to Terminate LTD Benefits Pursuant to 11 U.S.C. § 105(a), 363 and 1108* [D.I. 8085] (as

amended from time to time, the "Scheduling Order"), which was subsequently amended by the

*Order Granting Debtors' Motion for Entry of an Order (A) Establishing Discovery Procedures*

*in Connection with Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363*

*and 1108 Authorizing the Debtors to Terminate the Debtors' Long-Term Disability Plans and*

*the Employment of the LTD Employees and (B) Amending the Scheduling Order for Hearing on*

*Debtors' Process to Terminate Benefits*, dated September 20, 2012 [D.I. 8562] (the "Discovery

Procedures Order"), the *Amended Scheduling Order for Discovery Procedures in Connection*

*with Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 363 and 1108*

*Authorizing the Debtors to Terminate the Debtors' Long-Term Disability Plans and the*

*Employment of the LTD Employees*, dated October 17, 2012 [D.I. 8722], the *Order Approving*

*Debtors' Motion for Entry of an Order Further Amending the Scheduling Order for Hearing on*

*Debtors' Process to Terminate Long-Term Disability Benefits*, dated November 6, 2012 [D.I.

8886] and the *Amended Scheduling Order for Hearing on Debtors' Process to Terminate Long-*

*Term Disability Benefits*, dated December 13, 2012 [D.I. 9113].

24.     On October 25, 2012, the LTD Committee filed *The Official Committee of Long*

*Term Disability Participants' Objection to the Debtors' Motion for Entry of an Order Pursuant*

*to 11 U.S.C. §§ 105, 363 and 1108 Authorizing the Debtors to Terminate the Debtors' Long-*

*Term Disability Plans and the Employment of the LTD Employees* [D.I. 8840] (the "LTD

Committee Objection").[25]  The LTD Committee Objection argues, among other things, that the

LTD Plans did not reserve the Debtors' right to terminate LTD Benefits for those who were

already disabled and currently receiving income continuation benefits.

---

[25]     At least 113 LTD Employees also filed one or more objections to the LTD Termination Motion on an
individual basis, raising similar arguments (all such objections, including the LTD Committee Objection, the "LTD
Objections.").

25.     Pursuant to both informal and formal discovery requests made by the LTD Committee, the Debtors have provided the LTD Committee with the information they deemed necessary to evaluate the merits of their claims and the Debtors' settlement proposals.  On September 12, 2011, the LTD Committee sent the Debtors initial broad requests for documents and information (the "Initial Requests").[26]  The Debtors began providing the requested documents and information to the LTD Committee on September 16, 2011.  On August 6, 2012, following the filing of the LTD Termination Motion, the LTD Committee sent the Debtors formal broad requests for documents, interrogatories and requests for admission under the Federal Rules of Civil Procedure (the "Formal Requests" and together with the Initial Requests, the "Requests").  The Debtors regularly have sent additional documents and information, totaling over 27,546 pages of documents, to the LTD Committee over the last year and a half.  These documents were produced on both a voluntary basis and in response to the Formal Requests.  To date, the Debtors have provided the LTD Committee with various LTD Plan documents, LTD Employee communications, claims histories, and other information regarding the Debtors' employees and the Debtors' estates, assets and claims, including by compiling various benefit-related information in response to the Requests.  In addition, the Debtors' professionals and the LTD Committee's advisors have spent numerous hours on both regularly scheduled and individual conference calls since the appointment of the LTD Committee discussing and clarifying the data that the Debtors have produced to the LTD Committee.  Furthermore, the Debtors have provided certain information from LTD Employees' personnel files to each LTD Employee who requested it and copies of various documents produced in discovery to the LTD Committee to LTD Employees who served a discovery request on the Debtors.

---

[26]     Since receiving the Initial Requests, the Debtors have received numerous additional informal requests from the LTD Committee, including requests received on November 9, 2011 and December 7, 2011.  The Debtors also have received and responded to discovery requests from individual LTD Employees.

## F.  The Filing of the Class Action Litigation

26.     On November 19, 2012, the Plaintiff filed a *Verified Complaint for Declaratory and Injunctive Relief* against the Debtors (the "Class Complaint"), thereby commencing this adversary proceeding number 12-50995 (KG) (the "Adversary Proceeding").  The Class Complaint seeks relief under the Employee Retirement Income Security Act, 29 U.S.C. § 1101, *et seq*. ("ERISA"), alleging various claims for declaratory and injunctive relief, including a declaratory judgment that the governing LTD Plan documents do not permit the Debtors to terminate LTD Benefits for those LTD Employees who already are disabled and receiving income continuation benefits.  Among other contentions, the Class Complaint further seeks equitable remedies under ERISA, including for alleged breaches of fiduciary duties under ERISA.

27.     On or about November 26, 2012, the Plaintiff agreed on a telephone call between LTD Committee Counsel and counsel to the Debtors that the time for the Debtors to answer, move or otherwise respond to the Class Complaint was adjourned *sine die* pending the conclusion of discovery regarding the LTD Termination Motion.

## G.  The Proposed Settlement Agreement

28.     During the Fall of 2012, the Debtors and the LTD Committee continued to work towards a consensual settlement that would allow the Debtors to terminate the LTD Plans while addressing the objections raised by the LTD Committee and certain LTD Employees.  In addition to numerous telephone calls and discussions, the Parties' advisors met in person on September 21, 2012.  Finally, the Debtors and the LTD Committee participated in an all-day mediation session with the Mediator on December 4, 2012.  After many hours of negotiation, together with the UCC and Bondholder Group and participation of counsel to the Official

Case 09-10138-MFW    Doc 9304    Filed 01/18/13    Page 20 of 69

Committee of Retired Employees (the "Retiree Committee"), the Parties were able to reach the

primary terms of a settlement in principle. The Settlement Agreement embodies that agreement,

as ultimately memorialized by the Parties.

29.     The following description is a summary only of certain material aspects of the

Settlement Agreement and does not purport to summarize all of the key terms of the Settlement

Agreement. Moreover, because the following description summarizes a comprehensive

agreement, it is by nature neither as detailed nor as precise as the Settlement Agreement itself.

Accordingly, the following description is qualified in its entirety by reference to the Settlement

Agreement, which controls any interpretations of the Settlement Agreement, and to which the

Court and parties in interest are respectfully directed. If the Settlement Agreement is approved,

the LTD Plans would be terminated as of May 31, 2013, subject to the satisfaction of the

conditions to the settlement, including those summarized below:

- Termination of LTD Plans and the Employment of the LTD Employees. If the
  Effective Date has occurred, in accordance with the terms of the Settlement
  Agreement, the Debtors shall terminate all LTD Plans in their entirety, including, for
  the avoidance of doubt, all coverage and benefits provided thereunder, as of May 31,
  2013 at 11:59 p.m. (ET) (the "Termination Date").[27] Effective as of the Termination
  Date, the Debtors shall terminate the employment of the LTD Employees.

- Settlement Consideration.

  o Solely for the purpose of settlement of the Adversary Proceeding, the Parties
    consent to the certification of the Settlement Class pursuant to Federal Rule of
    Civil Procedure 23(b)(2), and Federal Rule of Bankruptcy Procedure
    7023(b)(2).

  o Without admitting or denying liability, and solely for the purpose of
    settlement, the Debtors consent to the entry of an order against them on Count
    II of the Class Complaint declaring that they shall not terminate any of the
    LTD Plans with respect to any of the LTD Employees on or before the
    Termination Date, unless and until NNI allows a general non-priority,
    unsecured claim in favor of the LTD Committee in the gross amount of

---

[27]     In the event the Debtors and the LTD Committee agree in writing to extend the Termination Date to June
30, 2013, the LTD General Unsecured Claim would be reduced in the amount of $680,000.

$28,000,000 based on a hypothetical termination date of March 31, 2013, minus the costs (for purposes of settlement, calculated as $680,000 per month) for the transition period of April 1, 2013 through May 31, 2013, resulting in a general non-priority, unsecured claim in the gross amount of $26,640,000,[28] for the benefits under the LTD Plans (where such general non-priority, unsecured claim in the gross amount of $26,640,000 shall constitute the "LTD General Unsecured Claim"). The LTD General Unsecured Claim shall be allowed as of the date that the Approval Orders have become final and non-appealable orders (the "Effective Date").

o The LTD Committee shall have the right to sell, assign or convey the LTD General Unsecured Claim without further order of the Court, subject to compliance with Federal Rule of Bankruptcy Procedure 3001.

o The Debtors shall make distributions on account of the allowed LTD General Unsecured Claim in accordance with an effective plan confirmed under section 1129 of the Bankruptcy Code (the "Plan").

o The "Settlement Amount" shall constitute (i) the net recovery to the LTD Committee on the allowed LTD General Unsecured Claim, whether through a distribution under the Plan, or the sale, assignment or conveyance of the LTD General Unsecured Claim, less (ii) the Settlement Administration Costs. The term "Settlement Administration Costs" shall refer to the expenses of the LTD Committee and its advisors that are necessary to administer and implement the Settlement Agreement and administer and effectuate distribution of the Settlement Amount, incurred after the Effective Date. **The Settlement Amount will depend, among other things, on the amount of distributions made by Nortel Networks Inc. on the LTD General Unsecured Claim under a plan of reorganization, or if the LTD General Unsecured Claim is sold by the LTD Committee, on the amount received by the LTD Committee for the LTD General Unsecured Claim.**

o The allowance of the LTD General Unsecured Claim shall be granted in full and final settlement of all LTD Claims (as defined below). Upon the Effective Date, all other claims in the Class Complaint shall be deemed dismissed with prejudice.

- LTD Plans Run Off Period.

  o The time period for filing a claim for payment or reimbursement of benefits covered by and approved pursuant to the relevant LTD Plans for claims incurred prior to the Termination Date shall be reduced to a period of six (6) months (or such shorter period as provided under the terms of the relevant LTD Plan), following the Termination Date (the "Run Off Period"). For the avoidance of doubt, a claim for payment or reimbursement of benefits will be

---

[28]    Subject to the terms of section 6(b) of the Settlement Agreement.

deemed filed once filing of the appropriate claim form, if applicable, to the relevant designated claims administrator has occurred (whether by the beneficiary or the provider if the beneficiary so authorizes), in accordance with the terms of the relevant LTD Plan.

o    Claims for benefits under the relevant LTD Plans that accrue prior to the Termination Date and which are not properly filed in accordance with the relevant LTD Plans prior to the earlier of (i) the current run off period under the relevant LTD Plan or (ii) expiration of the Run Off Period, shall be disallowed for all purposes (and the Debtors' claims agent will be authorized to make an appropriate notation on the official claims register maintained in the Debtors' cases as necessary).  These untimely claims are referred to herein as "Untimely Run Off Claims."  No consideration shall be owed or paid by the Debtors or any of their successors, or the LTD Committee with respect to the Untimely Run Off Claims.

o    For the avoidance of doubt, nothing in this section modifies, waives or otherwise overrides the Debtors' or any third party's right to review, approve and object to any timely claim that may be presented during the Run Off Period.  Third party service providers and insurers will be provided notice that Untimely Run Off Claims will not be paid unless timely submitted.

- Apportionment Methodology.

    o    The Settlement Amount shall be allocated among the LTD Employees who are receiving benefits under the LTD Plans as of the Termination Date on the basis of a formula to be provided by the LTD Committee, whereby each LTD Employee shall receive his or her proportional share of the Settlement Amount, subject to applicable withholding tax requirements, calculated based on a fraction, the numerator of which is the actuarial valuation of such LTD Employee's claims under the LTD Plans (as determined by the LTD Committee) and the denominator of which is the aggregate of the actuarial values of all LTD Employees' claims under the LTD Plans (as determined by the LTD Committee), thereafter applied to the Settlement Amount.  The foregoing allocation methodology is referred to herein as the "Apportionment Methodology."  The LTD Committee shall have sole responsibility for calculation of such amounts and distribution of the Settlement Amount pursuant to the Apportionment Methodology.

    o    Within ten (10) business days of the Debtors having served the Settlement Notice (as defined below), the LTD Committee will deliver to the Court, and seek approval of, a schedule that details the calculation of the proportional share of the Settlement Amount to be allocated to each eligible LTD Employee (as determined by the LTD Committee applying the Apportionment Methodology).  Such Court approval, if given, shall be deemed to fully and finally determine the propriety of the application of the Apportionment Methodology to the Settlement Amount and to fully and finally determine the

22

actuarial valuation of each LTD Claim and the calculation of the proportional share of the Settlement Amount to each LTD Employee.[29]

- <u>Effective Date</u>: The Effective Date is the date the Approval Orders become final and non-appealable.

- <u>Satisfaction of LTD Claims.</u>  **AS PART OF THE SETTLEMENT, THE LTD EMPLOYEES WILL HAVE THEIR LTD CLAIMS AGAINST THE DEBTORS AND OTHER THIRD PARTIES RELEASED AND EXPUNGED, SUBJECT ONLY TO THE ENTITLEMENT (IF ANY) TO RECEIVE PAYMENT OF A PORTION OF THE LTD GENERAL UNSECURED CLAIM.  THE TERMINATION OF THE LTD PLANS AND THE ALLOWANCE OF THE LTD GENERAL UNSECURED CLAIM SHALL FULLY SATISFY THE LTD CLAIMS, AND THE LTD EMPLOYEES SHALL BE ESTOPPED FROM ASSERTING ANY FURTHER LTD CLAIMS AGAINST THE DEBTORS OR THE OTHER PARTIES BEING RELEASED.**  As used herein, "<u>LTD Claims</u>" shall include any and all actual and potential claims, demands, causes of action, debts, liabilities or obligations, whether based on any legal or equitable theory (including fiduciary or equitable duties) or otherwise, including, but not limited to suits in contract, tort or equity, whether arising under contract, ERISA, the Consolidated Omnibus Budget Reconciliation Act ("<u>COBRA</u>"), the Tax Code, the Americans with Disabilities Act of 1990, or any other statute, rule, regulation, common law or otherwise, and whether arising under the laws of the United States, any political subdivision thereof or the laws of any other jurisdiction, each as may be amended from time to time, in all cases arising out of or relating to:

  - Any past, current or future benefits or any other obligation, claim or potential obligation arising under or relating to the LTD Plans, including  the LTD Benefits;

  - The administration of the LTD Plans, including, but not limited to, the calculation of LTD Benefits, the application of offsets against LTD Benefits, the denial of LTD Benefits, the determination of eligibility to receive LTD Benefits, the interpretation of the LTD Plans and the drafting of the LTD Plans and all oral and written communications made with respect to such matters;

  - The amendment, modification and/or termination of any of the LTD Plans and/or any benefits or coverage thereunder, whether done previously or as provided for under the provisions of the Settlement Agreement;

  - Claims relating to the employment of the LTD Employees and the termination of their employment;

---

[29]    The LTD Committee reserves the right to file a revised schedule prior to the Fairness Hearing.

- ▪ Claims relating to the Nortel Networks Voluntary Employee Beneficiary Association, the Nortel Networks Health & Welfare Benefits Trust, any other similar trusts that do now exist or may have existed previously (together, the "Trusts"), or any obligation to escrow, segregate or fund amounts relating to the LTD Plans;

- ▪ Any and all claims, defenses, causes of action, damages, costs and expenses that arise from, concern, or are related to, directly or indirectly, the allegations set forth in the Class Complaint or the LTD Objections;

- ▪ Claims for punitive damages, equitable relief, breach of fiduciary duty, detrimental reliance, attorneys' fees or other expenses related to the foregoing.

- o For the avoidance of doubt, LTD Claims shall exclude the following claims, if any, and any and all defenses thereto, which claims shall not be enforceable against or recoverable from the LTD General Unsecured Claim or proceeds thereof, the Settlement Amount, the LTD Committee, or their advisors, in each case in their capacity as such (and which claims collectively shall be referred to as "Excluded Claims"):[30]

  - ▪ Claims arising under or relating to the Retiree Welfare Plans, which are subject to and being settled by the Proposed Retiree Settlement Agreement;

  - ▪ Claims arising under or relating to the Nortel Networks Severance Allowance Plan or the Nortel Networks Enhanced Severance Allowance Plans, including related fringe benefits;

  - ▪ Claims arising under or relating to the Nortel Networks U.S. Deferred Compensation Plan or the Northern Telecom Inc. Senior Management Incentive Award Program;

  - ▪ Claims for qualified pension benefits arising under or relating to the Nortel Networks Retirement Income Plan, Nortel Networks Pension Service Plan, Nortel Networks Cash Balance Plan, Northern Telecom Inc. Retirement Plan for Employees or the Nortel Networks Capital Accumulation and Retirement Program, which are properly asserted only against the Pension Benefit Guaranty Corporation;

  - ▪ Claims for non-qualified pension benefits arising under or relating to the Nortel Networks Retirement Income Plan Restoration Plan, Nortel Networks Cash Balance Restoration Plan, Northern Telecom Inc.

---

[30] Nothing in the Settlement Agreement shall constitute an admission by the Debtors that any such Excluded Claims constitute valid claims against the Debtors.

Excess Pension Plan, Nortel Networks Long-Term Investment Restoration Plan, Nortel Networks Supplementary Executive Retirement Plan, the Nortel Networks Special Pension Benefits Plan and the Nortel Networks Special Pension Credit Plan;

- Claims for benefit payments under any of the LTD Plans that accrue prior to the Termination Date that are properly filed prior to the expiration of the Run Off Period (as amended by the Settlement Agreement) and that are subsequently approved in writing or electronically by the respective designated claims administrator, named ERISA Claims fiduciary or insurer (as defined in the governing plan document) for the LTD Plan under which such claims are asserted;

- Claims for expatriate benefits and relocation expenses;

- Claims for the account balance currently vested in an individual's account pursuant to the terms of the Nortel Networks Long-Term Investment Plan or Northern Telecom Inc. Thrift Savings Plan, subject to investment loss;

- Workers' Compensation benefits approved prior to the Effective Date in accordance with the terms of all applicable workers compensation policies, including insurance policies, to which the Debtors are party, and applicable state workers' compensation laws;

- Payment in respect of accrued but unused vacation, consistent with the Debtors' applicable governing policies;

- Social Security benefits, which are properly asserted only against the United States Social Security Administration; and

- Claims directly arising under a written employment agreement between an individual LTD Employee and the Debtors that are unrelated to life insurance, death benefits, medical insurance, dental insurance, vision insurance, hearing insurance, accidental death and dismemberment insurance, health reimbursement accounts, dependent day care reimbursement accounts, other welfare benefits or any other LTD Claims.

- **Final Settlement.  The Settlement Agreement is being entered into, and the LTD General Unsecured Claim is being granted in full and final satisfaction of the LTD Claims of members of the Settlement Class and, upon the occurrence of the Effective Date, shall supersede any prior obligations of the Debtors relating to the provision of LTD Benefits or payment of LTD Claims under the LTD Plans to members of the Settlement Class, such that the LTD Committee and all members of the Settlement Class shall be forever estopped and barred from**

25

seeking further relief related to the LTD Claims or resolved matters that fall within the scope of the Settlement Agreement.

- **Proofs of Claim.** ANY AND ALL PROOFS OF CLAIM FILED ON ACCOUNT OF, OR WHICH, TO ANY EXTENT, INCLUDE LTD CLAIMS, INCLUDING, BUT NOT LIMITED TO, CLAIMS ARISING FROM OR RELATING TO MODIFICATIONS TO OR THE TERMINATION OF THE LTD PLANS, SHALL BE DISALLOWED AND EXPUNGED FROM THE DEBTORS' CLAIMS REGISTER ON THE EFFECTIVE DATE, SOLELY WITH RESPECT TO THE PORTION OF THE PROOF OF CLAIM RELATING TO THE LTD CLAIMS.

- **Releases.**

  - Upon the Effective Date, for the good and valuable consideration provided by the Debtors in connection with the Settlement Agreement, and except as provided for by the terms of the Settlement Agreement, the LTD Committee, the LTD Committee Member Parties, and each LTD Employee, in his or her individual capacity, and his or her capacity as a member of the Settlement Class, each of its, his or her respective spouses, dependents, heirs, distributees, executors, administrators, members, officers, directors, agents, representatives, successors and assigns; and any purchaser, transferee or assignee of the LTD General Unsecured Claim or any LTD Employee's LTD Claim (collectively, the "**LTD Parties**") will knowingly and voluntarily release and forever discharge the Debtors, their estates, the LTD Plans, the LTD Plan administrators, the members of all Nortel benefit plan committees (including, without limitation, the Employee Benefits Committee, the Joint Leadership Resources Committee, the Compensation and Human Resources Committee and any predecessors thereto), the UCC, the Bondholder Group, and each of their respective past and present parents, subsidiaries, affiliates, general partners, limited partners, shareholders, administrators, liquidators, directors, officers, employees, managers, agents, attorneys, solicitors, trustees, fiduciaries, accountants and advisors, and each of all of their respective predecessors, successors and assigns (collectively, the "**Debtor Releasees**"), from any and all LTD Claims and Untimely Run Off Claims, whether known or unknown, suspected or unsuspected, accrued or unaccrued, matured or unmatured, past or present, fixed or contingent, liquidated or unliquidated, that the LTD Parties now have, had, may have had, or hereafter may have against any of the Debtor Releasees. This Release provides for and effectuates a discharge of the Debtor Releasees to the full extent permitted by applicable law with respect to any and all LTD Claims and shall be contained in the Approval Orders and effectuated through the entry of the Approval Orders.

> o   **Except as otherwise provided in the Settlement Agreement, upon the Effective Date, the Debtors, their estates, successors and assigns (the "Debtor Parties") will knowingly and voluntarily release and forever discharge the LTD Parties and all of their advisors (collectively, the "LTD Releasees") from any and all LTD Claims and Untimely Run Off Claims, whether known or unknown, suspected or unsuspected, accrued or unaccrued, matured or unmatured, past or present, fixed or contingent, liquidated or unliquidated, that the Debtor Parties now have, had, may have had, or hereafter may have against any of the LTD Releasees. This Release provides for and effectuates a discharge of the LTD Releasees to the full extent permitted by applicable law with respect to any and all LTD Claims and shall be contained in the Approval Orders and effectuated through the entry of the Approval Orders.**

- Retirement Eligible Employees.  Pursuant to the terms of the Proposed Retiree Settlement Agreement, which may be amended and is subject to Court approval in all respects, any LTD Employee who is receiving LTD Benefits under the LTD Plans as of the Termination Date (and is therefore a member of the Settlement Class) and has met the service requirements for retirement as of January 31, 2013 (in accordance with the eligibility criteria set forth in the Retiree Approval Motion and the Proposed Retiree Settlement Agreement) can elect to participate in the Proposed Retiree Settlement Agreement provided that such LTD Employee voluntarily terminates his or her employment with the Debtors and irrevocably relinquishes his or her right to receive continued benefits under the LTD Plans, in accordance with the terms of the Proposed Retiree Settlement Agreement.[31]  For the avoidance of doubt and notwithstanding anything to the contrary in the Proposed Retiree Settlement Agreement, if the Termination Date occurs on or before June 30, 2013, any LTD Employee who would have been eligible to receive LTD Benefits under the LTD Plans as of the Termination Date but for the fact that such LTD Employee elected to voluntarily terminate his or her employment with the Debtors solely in order to participate in the Proposed Retiree Settlement Agreement, shall be deemed to be a member of the Settlement Class solely for the purpose of participating in the Settlement Agreement and for no other purpose.

- Continuation of the LTD Committee.  Subsequent to the Effective Date, the LTD Committee shall exist solely for the purpose of enforcing and performing the terms of the Settlement Agreement and the LTD Committee shall be formally disbanded upon payment of the Settlement Amount to the LTD Employees.  The Debtors shall not be liable to pay fees, expenses or costs incurred by the LTD Committee or its professionals, advisors, designees or agents after the Effective Date, exclusive of any fees and expenses related to the preparation of monthly, interim or final fee application, related to work performed or costs incurred for periods prior to the Effective Date, as required under the *Administrative Order Pursuant to 11 U.S.C. §§*

---

[31]    To the extent that the Proposed Retiree Settlement Agreement is amended or approved prior to the Settlement Agreement, the terms of the Proposed Retiree Settlement Agreement shall govern the right of the LTD Employees to participate in the Proposed Retiree Settlement Agreement.

*105(a) and 331, Fed. R. Bankr. P. 2016 and Del. Bankr. L.R. 2016-2 Establishing Procedures for Interim Compensation and Reimbursement of Fees and Expenses for Professionals and Official Committee Member* [D.I. 222], which amounts shall instead be paid out of the Settlement Amount.  Nothing in this provision limits the rights of the LTD Committee, which shall be fully preserved, to continue as an official committee appointed under 11 U.S.C. §1102, as appropriate, in the event that the settlement is not approved.

- <u>Tax Consequences</u>.  Except as expressly provided in section 24 of the Settlement Agreement, the Debtors make no representations or warranties whatsoever regarding any tax benefits, tax obligations and/or other consequences arising from or in connection with the Settlement Agreement, the allowance of the LTD General Unsecured Claim, or any payments made from the Settlement Amount to the members of the Settlement Class, and the recipients and beneficiaries of any such payments shall be solely responsible for any taxes in respect of any payments under the Settlement Agreement or in respect of the LTD General Unsecured Claim.  In the event the LTD General Unsecured Claim is not sold, transferred or assigned by the LTD Committee prior to the time any distributions are made by NNI, NNI reserves the right to withhold all taxes subject to withholding under all applicable provisions of the Tax Code.  To the extent the LTD General Unsecured Claim is sold, transferred or assigned by the LTD Committee prior to the time any distributions are made by NNI in respect of such claim, the Debtors do not intend to withhold taxes on behalf of any person with respect to the LTD General Unsecured Claim or any distributions made with respect to such claim.  The Debtors shall have no liability relating to the withholding of taxes or the issuance of form W-2s.

## H.    <u>The Proposed Notice Procedures</u>

30.    In order to ensure that each member of the Settlement Class receives proper notice of the proposed Settlement Agreement, the date of the hearing scheduled to approve the Settlement Agreement and the deadline to file objections, the Debtors propose to mail a notification substantially in the form attached as <u>Exhibit 1</u> to the Preliminary Settlement Approval Order (the "<u>Settlement Notice</u>") to each such individual and to publish a notice substantially in the form attached as <u>Exhibit 2</u> to the Preliminary Settlement Approval Order in <u>The Wall Street Journal</u> (National Edition), <u>The Globe and Mail</u> (National Edition), <u>USA Today</u> (National Edition), <u>Raleigh News & Observer</u>, <u>Charlotte Observer</u>, <u>Dallas Morning News</u>, <u>Houston Chronicle</u>, <u>Tampa Bay Times</u>, <u>Orlando Sentinel</u>, <u>Miami Herald</u> and the <u>San Jose</u>

<u>Mercury News</u>.  Counsel to the LTD Committee also intends to post the Publication Notice on the LTD Committee website, which is regularly frequented by many Settlement Class members.

31.     Moreover, the LTD Committee intends to send each member of the Settlement Class a personalized attachment listing the recipient's projected allocation of the Settlement Amount, in a form substantially similar to that attached as <u>Exhibit 3</u> to the Preliminary Settlement Approval Order (the "<u>Individualized Settlement Notice</u>" and together with the Settlement Notice and the Publication Notice, the "<u>Settlement Notifications</u>").  In conjunction with the Debtors and the Retiree Committee, where appropriate, counsel to the LTD Committee also will host informational meetings to explain the terms of the Settlement Agreement to the Settlement Class members and answer individuals' questions about the proposed settlement.

32.     Although the Active Employees and COBRA Participants are not members of the Settlement Class and consequently will not receive a personalized Settlement Notice, the Debtors have served them with this Joint Motion and the attached proposed orders, and also intend to serve them with the Preliminary Settlement Approval Order (if entered), by first class mail at their last address known to the Debtors.  Such service, as well as the Publication Notice, will help to ensure that the Active Employees and COBRA Participants are aware of the Debtors' intent to terminate the LTD Plans under which they are eligible to receive certain LTD Benefits, as well as the date of the Fairness Hearing, and the relevant objection deadlines and procedures.

33.     The Parties propose that objections, if any, must be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 on or before the Objection Deadline (as defined below).  Each objection shall state the legal and factual basis of such objection.  The objection must be in writing and signed by counsel or by the objecting party.  The objection must be in conformity

with the Bankruptcy Rules and the Local Rules, and be served on the following parties so as to

be received on or before the Objection Deadline: (i) counsel to the Debtors:  Cleary Gottlieb

Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Fax:  (212) 225-3999

(Attention:  James L. Bromley and Lisa M. Schweitzer) and Morris, Nichols, Arsht & Tunnell

LLP, 1201 North Market Street, Wilmington, Delaware 19801, Fax: (302) 658-3989 (Attention:

Derek C. Abbott), (ii) Class Counsel: Elliott Greenleaf, Attn: Rafael Zahralddin, Esq., 1105

Market Street, Suite 1700, Wilmington, Delaware 19801, (iii) counsel to the UCC: Akin Gump

Strauss Hauer & Feld LLP, Attn: Lisa Beckerman, Esq., One Bryant Park, New York, New York

10036, Facsimile: (212) 872-1002, (iv) counsel to the Bondholder Group: Milbank, Tweed,

Hadley & McCloy LLP, Attn: Thomas J. Matz, Esq., One Chase Manhattan Plaza, New York,

New York 10005, Facsimile: (212) 822-5885 and (v) the Office of the United States Trustee:

Attn: Mark Kenney, Esq., 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware

19801, Facsimile: (302) 573-6497.  Together with the form and manner of Settlement

Notifications described above, these procedures shall be referred to as the "Notice Procedures."

## RELIEF REQUESTED

34.     By this Joint Motion, the Movants seek orders, pursuant to sections 105(a) and

363(b) of the Bankruptcy Code and Rule 9019 and 7023 of the Bankruptcy Rules,

(a)(i) preliminarily approving the Settlement Agreement pursuant to Bankruptcy Rules 7023 and

9019; (ii) conditionally certifying the Settlement Class for settlement purposes only, appointing

the Class Representatives and approving Elliott Greenleaf as Class Counsel; (iii) approving the

Notice Procedures; (iv) scheduling the Fairness Hearing; and (v) granting related relief; and

(b)(i) approving the Settlement Agreement pursuant to Bankruptcy Rules 7023 and 9019 on a

final basis, (ii) certifying the Settlement Class for settlement purposes only, appointing the Class

Representatives and approving Class Counsel on a final basis, (iii) authorizing the Debtors to

terminate the LTD Plans with respect to all individuals receiving or eligible to receive LTD

Benefits thereunder, and (iv) granting related relief.

## BASIS FOR RELIEF

**A.      The Bankruptcy Court Should Preliminarily Approve The Settlement Agreement**

35.      Approval of a class settlement generally is accomplished through two hearings—

one preliminary approval hearing and one final "'fairness'" hearing.  Collier v. Montgomery

Cnty. Housing Auth., 192 F.R.D. 176, 185 (E.D. Pa. 2000); Smith v. Prof'l Billing & Mgmt.

Servs., Inc., Civil No. 06-4453 (JEI), 2007 WL 4191749, at *1 (D.N.J. Nov. 21, 2007).  After a

settlement has been preliminarily approved, notice of the proposed settlement and of the fairness

hearing is provided to class members.  Notice of the conditional class certification and proposed

settlement can be combined in one notice here, because the Movants are requesting that the

Settlement Agreement be preliminary approved pursuant to this Joint Motion.  Collier, 192

F.R.D. at 186.  Settlement Class members may formally object to the proposed settlement at the

subsequent Fairness Hearing.  See id. at 185.

36.      Preliminary approval of a settlement is appropriate when "there are no obvious

deficiencies and the settlement falls within the range of reason."  Smith, 2007 WL 4191749, at

*1.  The preliminary approval determination requires the Court to consider whether "(1) the

parties' negotiations occurred at arms length; (2) there was sufficient discovery; (3) the

proponents of the settlements are experienced in similar litigations; and (4) only a small fraction

of the class objected."  Id. at *1.  When class certification is sought in conjunction with

preliminary approval, then class member objections are not relevant.  See id. at *1 n.3.

37.      The Settlement Agreement satisfies all of the applicable elements and falls well

within the range of reason.  Moreover, each of the above-cited factors further supports

preliminary approval of the Settlement Agreement.

38.     The Settlement Agreement is the result of good faith arm's length negotiations between capable adversaries.  The multiple rounds of vigorous negotiations necessary to finally reach a settlement were conducted over the course of more than one year.  Furthermore, the discussions were mediated by a neutral third party Mediator appointed by this Court.

39.     Moreover, as set forth in more detail above, the Settlement Agreement was signed only after the Parties had first engaged in an extensive discovery process related to the litigation of the LTD Termination Motion.  Indeed, the Parties have completed their production of documents and written fact discovery, and the Debtors provided the LTD Committee with the available information their advisors believed may reasonably be relevant to the consideration of a settlement proposal through informal document exchange and discussions before, during and after the mediation process and through formal discovery under the Federal Rules of Civil Procedure related to the litigation of the LTD Termination Motion.  This process resulted in the exchange of at least 27,546 pages of documents, as well as information provided in response to Interrogatories and Requests for Admission.  Because of the overlap between the membership of the LTD Committee, their counsel and the proposed Class Representatives and Class Counsel, the purported Settlement Class has had the full benefit of such discovery as well.  While the Debtors likely would seek additional discovery if the litigation of the Adversary Proceeding were permitted to proceed, Class Counsel does not believe at this time that any additional written fact discovery would be necessary for the Plaintiff to continue with the adjudication of the Adversary Proceeding.  In addition, the Debtors provided further discovery to individual LTD Employees in

response to their individual requests. Class Counsel is therefore satisfied that there has been sufficient discovery to allow it to enter into the Settlement Agreement in good faith.[32]

40.    As detailed in the Declaration of Rafael X. Zahralddin-Aravena, Class Counsel has the experience and skill to both vigorously litigate class action claims, and previously was approved as counsel to the LTD Committee by this Court. In supporting this Settlement Agreement, Elliott Greenleaf has used its professional experience and judgment to guide the LTD Committee in their determination that settling now on the terms set forth in the Settlement Agreement is reasonable and appropriate. The LTD Committee also has had the professional assistance of financial advisors Alvarez & Marsal and actuaries Towers Watson to assist in the determination that the Settlement Agreement is reasonable and appropriate.

41.    Accordingly, the Court should preliminarily approve the Settlement Agreement.

**B.    The Court Should Conditionally And Finally Certify The Settlement Class And Appoint Class Counsel And Class Representatives Pursuant To Civil Rule 23[33]**

42.    Where, as in this case, the Court has not already certified a class before approving a class settlement pursuant to Civil Rule 23, the Court must determine whether the proposed settlement class satisfies the certification requirements of Civil Rule 23. In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 257 (3d Cir. 2009). Subdivisions (a) and (b) of Civil Rule 23 "are designed to insure that a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives." Id. at 257 (citation omitted) (internal quotation marks omitted).

---

[32]    The LTD Committee reserves all rights to continue the litigation, as necessary, should the Settlement Agreement not be approved and all of the Debtors' objections and defenses to such litigation are fully preserved as well.

[33]    The positions taken in the class certification section of the Joint Motion are those of Plaintiffs only. The Debtors take no position on the matters set forth in that section other than to support approval of the Settlement Agreement and class certification solely for purposes of settlement only. In the event that the Settlement Agreement does not become effective, the Debtors reserve all rights to contest class certification

43.     The Third Circuit has made clear that "'[s]ettlement is relevant to a class certification.'"  In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 341 (3d Cir. 2010) (alteration in original) (citation omitted).  In deciding the issue of class certification, courts have expressed "an overriding public interest in settling class action litigation, and it therefore should be encouraged."  In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 535 (3d Cir. 2004).  See also Sullivan v. DB Invs., Inc., 667 F.3d 273, 317 (3d Cir. 2011) ("[D]istrict courts are afforded wide discretion to give effect to joint compromises that timely advance the interests of the parties without wasteful litigation.").  In light of these considerations, the Settlement Class in this case should be certified on a conditional and final basis for settlement purposes only.

(i)     *THE PROPOSED SETTLEMENT CLASS SATISFIES BANKRUPTCY RULE 7023(A) CRITERIA*

44.     To be certified, a class must satisfy the four requirements of Civil Rule 23(a):  (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Fed. R. Civ. P. 23(a); see Warfarin, 319 F.3d at 527.  The proposed Settlement Class meets each of the foregoing elements.

a.     **The Settlement Class Is Sufficiently Numerous that Joinder is Impracticable**

45.     Numerosity requires a finding that the putative class is "so numerous that joinder of all members is impracticable." Stewart v. Abraham, 275 F.3d 220, 226 (3d Cir. 2001) (citation omitted).  "No single magic number exists satisfying the numerosity requirement." Behrend v. Comcast Corp., 245 F.R.D. 195, 202 (E.D. Pa. 2007) (citation omitted) (internal quotation marks omitted).  However, courts in the Third Circuit have "typically . . . approved classes numbering 40 or more." See Stewart, 275 F.3d at 226-27.

46.     The proposed class of approximately 200 LTD Employees meets the numerosity requirement.  See, e.g., Order Pursuant to Section 105 of the Bankruptcy Code and Bankruptcy

Rules 9019 and 7023 to (I) Approve a Settlement Pursuant to Bankruptcy Rule 9019, (II) Certify a Class Consisting of Two Subclasses of WARN Act Claimants for Settlement Purposes Only, Appoint Class Counsel, Class Representatives, and Preliminarily Approve the Settlement Pursuant to Bankruptcy Rule 7023, (III) Approve the Form and Manner of Notice to Class Members of the Class Certification and Settlement, (IV) Schedule a Fairness Hearing to Consider Final Approval of the Settlement and Class Counsel Fees, (V) Finally Approve the Settlement Pursuant to Bankruptcy Rule 7023 After the Fairness Hearing, and (VI) Grant Related Relief, Diaz v. Mervyn's LLC (In re Mervyn's Holdings, LLC), Case No. 08-11586 (KG), Adv. Proc. No. 08-51810 (KG) (Bankr. D. Del. Dec. 8, 2009), D.I. 4338 (finding in support of class certification that the "[c]lass consisting of two subclasses which consist of 120 and 579 members respectively, is so numerous that joinder of all members is impracticable").  Moreover, joinder of all Settlement Class members is not only impractical given the sheer number of LTD Employees, but because the Settlement Class members live in locations nationwide and suffer from physical disabilities that would make it difficult for them to initiate and prosecute individual law suits against the Debtors relating to the termination of the LTD Plans.  Accordingly, the members of the proposed Settlement Class are too numerous to render joinder practicable, and the numerosity requirement is satisfied.

b.      **Questions of Law and Fact are Common to the Settlement Class**

47.      Under Civil Rule 23(a)(2), there must be at least one question of law and/or fact common to the proposed class.  See Fed. R. Civ. P. 23(a)(2); Warfarin, 319 F.3d at 527-28.  The commonality threshold is low and does not require "an identity of claims or facts among class members." Behrend, 245 F.R.D. at 202-03 (citations omitted).  Further, the existence of individual facts and circumstances will not defeat commonality so long as the class members allege harm under the same legal theory.  See Baby Neal for and by Kanter v. Casey, 43 F.3d 48,

56-57 (3d Cir. 1994); <u>Tracinda Corp. v. DaimlerChrysler AG (In re DaimlerChrysler AG Sec.</u> <u>Litig.</u>), 216 F.R.D. 291, 295-96 (D. Del. 2003) (The commonality requirement is satisfied if the party seeking certification can show that "the questions of law or fact linking the class members are substantially related to the resolution of the litigation, even though the individuals are not identically situated.") (quoting <u>Deutschman v. Beneficial Corp.</u>, 132 F.R.D. 359, 372 (D. Del. 1990)).

48.     In this matter, the fundamental issues of law and fact regarding the declaratory relief sought through the Settlement Agreement are common to all Settlement Class members. The legal questions raised both by the LTD Termination Motion and by the Class Complaint include whether the LTD Plans may be modified and/or terminated by the Debtors and the applicability of the defenses to termination raised by the LTD Committee, both of which are common legal issues necessary to the resolution of the claims of each putative Settlement Class member.  Indeed, the Debtors provide LTD Benefits, including under the Nortel Networks Inc. Long-Term Disability Plan and the Nortel Networks Inc. Medical Plan, to each of the LTD Employees who would make up the Settlement Class pursuant to substantially similar plan documents that are governed by the same administrative practices.  Moreover, the Plaintiff seeks equitable remedies under ERISA including, but not limited to, alleged breaches of fiduciary duty concerning the contents of materials distributed to all of the LTD Employees and the Debtors' reservation of rights to alter or terminate the LTD Plans, which are claims the Plaintiff alleges are common to all of the putative Settlement Class members.  For these reasons, the relief set forth in the Settlement Agreement must be applied on a uniform basis with respect to all participants in the LTD Plans.

36

49.     Furthermore, commonality is not defeated by a showing that some individual facts and circumstances will have to be resolved.  Baby Neal, 43 F.3d at 56-57.  Each Settlement Class member's proportional share of the allowed unsecured claim providing benefits as ancillary relief to the declaratory judgment to which the Parties agreed in the Settlement Agreement, will be calculated applying an identical formula based on the actuarial value of the claims of each LTD Employee under the LTD Plans.  The formula will be applied uniformly.  That the amount yielded by the actuarial valuation of each member's claims to benefits under the LTD Plans necessarily will differ depending on age and benefit elections, and that some LTD Employees will have claims under only some, but not all, of the LTD Plans does not affect the commonality of the legal issue at hand.  This matter turns on the Debtors' uniform interpretation and application of the LTD Plans, particularly relating to the Debtors' termination rights, and their common course of conduct toward members of the proposed Settlement Class and therefore, the proposed Settlement Class members share at least one common issue sufficient to meet the standard under Civil Rule 23(a)(2).

c.     **The Proposed Representatives' Claims are Typical of the Claims of the Settlement Class**

50.     The third element of Civil Rule 23(a) is also satisfied.  Civil Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Courts in the Third Circuit have identified three considerations that are to be weighed in determining whether the typicality requirement is satisfied:  "(1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the

37

interests and incentives of the representatives must be sufficiently aligned with those of the class. Sessions v. Owens-Illinois, Inc., 267 F.R.D. 171, 176-77 (M.D. Pa. 2010) (citation omitted).

51.     Here, the Class Representatives are certain members of the LTD Committee, and all three considerations weigh in favor of finding typicality.  First, the Class Representatives' legal claims are identical to those of the proposed Settlement Class, as the relief sought in the LTD Termination Motion and the class action allegations in the Class Complaint pose the same legal issue – the Debtors' right to modify and/or terminate the LTD Plans.  The fact that the Class Representatives may be entitled to different benefits than members of the Settlement Class based on factors such as their age or benefit elections does not change their legal clams, and all claims asserted by the Class Representatives and the other LTD Employees relate to or arise under the LTD Plans and hinge on whether the Debtors possess the unilateral right to terminate or modify the LTD Plans.  See Baby Neal, 43 F.3d at 58 ("[F]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory.") (alteration in original ) (citation omitted) (internal quotation marks omitted).  Similarly, the Class Representatives are not subject to a unique defense that is inapplicable to members of the Settlement Class and likely to become a major focus of the litigation.

52.     Finally, the Class Representatives, as members of the LTD Committee, were personally selected by the U.S. Trustee's office to serve on the LTD Committee as representatives of similarly-situated individuals [D.I. 6080].  The Class Representatives' interests are aligned with those of the proposed Settlement Class as all Settlement Class members are receiving LTD Benefits from the Debtors pursuant to the LTD Plans, face the same alleged injury -- the loss of all LTD Benefits under the LTD Plans -- in the event the LTD Plans are

terminated, and stand to gain uniformly as a result of the declaratory relief proposed in the

Settlement Agreement.  Accordingly, the Court should find that the typicality requirement is met,

and that the Class Representatives are well-suited to represent the Settlement Class.

>            d.    **The Class Representatives and Class Counsel Will Fairly and
>                  Adequately Protect the Interests of the Settlement Class**

53.     Finally, Civil Rule 23(a)(4) requires that class representatives must "fairly and

adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4); <u>Warfarin</u>, 391 F.3d at 532

(internal quotation marks omitted).  The adequacy inquiry "assures that the named plaintiffs'

claims are not antagonistic to the class and that the attorneys for the class representatives are

experienced and qualified to prosecute the claims on behalf of the entire class." <u>Baby Neal</u>, 43

F.3d at 55.  Thus, the court must inquire as to the "'qualifications of the counsel to represent the

class'" and determine whether there are "'conflicts of interest between named parties and the

class they seek to represent.'" <u>Warfarin,</u> 391 F.3d at 532 (citation omitted).

54.     The Court should find that the Class Representatives and Class Counsel

adequately represent the interests of the Settlement Class members.  The Court directed that the

LTD Committee be appointed to serve as the "authorized representative of the LTD Plan

Participants in connection with negotiations regarding the modification or termination of the

LTD Plan, and any claims relating thereto . . . ."[34]  Furthermore, committees organized under

Section 1102 of the Bankruptcy Code are appointed to "assure adequate representation of

creditors or of equity security holders."[35]  The claims of the Class Representatives in no way

conflict with those of the members of the Settlement Class.  They arise from the same legal

question – whether the Debtors may terminate the LTD Plans under which all Settlement Class

---

[34]     <u>See</u> *Order Appointing an Official Committee of Long-Term Disability Participants*, dated June 22, 2011
[D.I. 5790].

[35]     11 U.S.C. § 1102(a)(2).

members receive LTD Benefits.  Moreover, incidental to the declaratory relief being awarded to

all LTD Employees under the Settlement Agreement, the Class Representatives, like all other

Settlement Class members, will receive benefits that are calculated using a uniform formula

based on actuarial valuations.  As such, there are no interests of the Class Representatives that

are in conflict with or antagonistic to interests of members of the proposed Settlement Class.

55.     Additionally, the Class Representatives are familiar with the underlying facts of

the LTD Termination Motion and the Adversary Proceeding.  By partaking in regularly-held

meetings with Class Counsel to discuss legal strategy and factual analyses and participating in

many of the mediation sessions held amongst the Parties, the Class Representatives have

acquired considerable personal experience with the ongoing litigation.  The Class

Representatives, as members of the LTD Committee, also have had access to certain information

produced by the Debtors on a confidential basis, which was permitted to be shared only with

LTD Committee members, professionals and advisors in accordance with the governing

protective order.  The Class Representatives therefore are able to adequately represent the

interests of the Settlement Class.

56.     Moreover, Class Counsel is well qualified, experienced and sophisticated in

matters of this sort.  Further, Class Counsel has the resources to vigorously prosecute this action

as all of its fees and expenses are being paid by the Debtors pursuant to order of this Court.  As

the Court can see from its review of the fee applications filed to date, this team of qualified and

zealous attorneys have conducted extensive research and thoroughly analyzed the factual and

legal issues in this action.  Plaintiff pursued theories of liability and settlement options affording

the greatest likelihood of success on behalf of the class.  Elliott Greenleaf has been appointed as

class counsel in over fifteen major class actions, including, by way of example, actions in which it

obtained multi-million dollar recoveries for employees and injured parties:  In re One Meridian Plaza Fire Litigation, No. 91-2171 (E.D. Pa.); Ciccarone v. B.J. Marchese, Inc., No. 03-1660 (E.D. Pa.); In re Life USA Holding, Inc., No. 97-7827 (E.D. Pa.) Ciarlantev. Brown & Williamson Tobacco Corp. No. 95-4646 (E.D. Pa.); Loftus v. B.A.T. Industries, plc., No. 97-0182 (E.D. Pa.); Levell v. Monsanto Research Corp., No. 95-0312 (S.D. Ohio); Whitehead v. Vacation Charters Ltd., No. 3764 (Pa. Ct. Com. Pl. Phila. Cty.).  Elliott Greenleaf also has extensive  lead counsel experience in ERISA class actions, including in Boone v. Congoleum Corp., No. 95-5839 (E.D. Pa.) (class counsel), Gorini v. AMP, Inc., No. 99-2215 (M.D. Pa.) and in a number of national multi-district ERISA class action matters for Aetna, Inc.

57.     Furthermore, Elliott Greenleaf has substantial knowledge of the applicable law from its experiences as both plaintiffs' and defense counsel in class action litigations.  Elliott Greenleaf recently defended Luzerne County and Luzerne County government officials in class actions and hundreds of consolidated individual high profile constitutional and civil rights actions filed by several experienced law firms in federal court.  Elliott Greenleaf successfully obtained dismissals of all claims against the government officials, entities and agencies whom they represented, in all of these cases, through the unique procedural mechanism of opposing the plaintiffs' substantial Motions to Amend their Complaints to assert additional constitutional claims.  See Wallace v. Powell, No. 3:09-cv-286, 2009 WL 6850318 (M.D. Pa. Nov. 20, 2009); Belanger v. Ciavarella, No. 3:10-CV-1405, 2011 WL 1601627 (M.D. Pa. Apr. 27, 2011); Wallace v. Powell, No. 3:09-CV-286, 2011 WL 6003916 (M.D. Pa. Nov. 30, 2011).

58.     Elliott Greenleaf also has defended employers and officials in numerous pending and/or recent federal constitutional, employment and/or equal protection cases including:  Ellis v. City of Philadelphia, No. 10-7611 (E.D. Pa.); Alvaro v. Montgomery County Correctional

Facility, No. 10-1256 (E.D. Pa.); Amaro v. Detective Kelly, No. 06-3131 (E.D. Pa.); Beasley v.

Carrillo, No. 10-1180 (E.D. Pa.); Bendy v. Correctional Medical Care Inc., No. 06-1081 (E.D.

Pa.); Boggs v. Doe, No. 09-4400 (E.D. Pa.); Bryant v. Montgomery County Correctional

Facility, No. 10-0009 (E.D. Pa.); D'Agostino v. Montgomery County, No. 11-7728 (E.D. Pa.);

Defreitas v. Montgomery County Correctional Facility, No. 08-5330 (E.D. Pa.); Dreher v. CMC-

Correctional Medical Care, Inc., No. 07-3254 (E.D. Pa.); Frye v. Sellers, No. 06-0025 (E.D. Pa.);

Grange v. County of Montgomery, No. 10-3349 (E.D. Pa.); Holmes v. Seltzer, No. 06-1427

(E.D. Pa.); Livingston v. John Doe Appel, No. 11-2764 (E.D. Pa.); Mayes v. Montgomery

County Correctional Facility, No. 06-0131 (E.D. Pa.); McMonigle v. Correctional Medical Care

Inc., No. 11-0331 (E.D. Pa.); Ramalho v. Montgomery County Correctional Facility, No. 06-

2036 (E.D. Pa.); Seamon v. Algarin, No. 06-4553 (E.D. Pa.); Wagner v. Algarin, No. 10-2513

(E.D. Pa.); Willis v. Montgomery County Correctional Facility, No. 10-1326 (E.D. Pa.); Wilson

v. Algarin, No. 11-5568 (E.D. Pa.); Young v. Slatowski, No. 07-4840 (E.D. Pa.); and Doe v.

Luzerne County, No. 04-1637 (M.D. Pa.).

        59.     Mary E. Kohart, Esq. is the litigator with primary responsibility for this class

action.  In addition to her experience as plaintiff's counsel, Ms. Kohart has defended many

private businesses sued in class actions.  See In re IKON Office Solutions, Inc. Sec. Litig., No.

98-4286 (E.D. Pa.) and, on appeal, No. 01-1553 (3d Cir.) (obtained and defended on appeal

summary judgment ruling on loss causation and scienter grounds in consolidated fraud-on-the-

market class actions under section 10(b) of the Exchange Act and section 11 of the Securities Act

resulting from the audit client's $110 million charge to restated earnings); In re Baby Food

Antitrust Litig., No. 92-5495 (D.N.J.) and, on appeal, No. 97-5609 (3d Cir.) (representation of

Ralston Purina in successful defense of a price fixing class action).  She has also been

instrumental in protecting the interests of absent parties by addressing issues of fairness, the prevalence of common issues and the adequacy of representation in cases where classes had already been certified.

60.     These are only recent and illustrative cases, as the lawyers of Elliott Greenleaf have extensive experience in class action and employment class action cases.

61.     Nor does Elliott Greenleaf have any known conflicts with any members of the proposed Settlement Class.  Accordingly, Class Counsel is fully capable of, and committed to, prosecuting this action vigorously on behalf of the class and effectuating a reasonable, fair and adequate settlement.

(ii)     *THE SETTLEMENT CLASS SATISFIES RULE 23(B)(2) CRITERIA*

62.     In addition to satisfying the requirements of Civil Rule 23(a), the class must satisfy one of the requirements of Civil Rule 23(b).  Fed. R. Civ. P. 23(b).  In this case, the LTD Committee requests certification, for settlement purposes only, under Civil Rule 23(b)(2).

63.     Pursuant to Civil Rule 23(b)(2), a class action is proper where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).  As the Third Circuit has stated, "[w]hat is important is that the relief sought by the named plaintiffs should benefit the entire class." Baby Neal, 43 F.3d at 58-59. See also Sullivan v. DB Invs., Inc., 667 F.3d 273, 319 (3d Cir. 2011) ("[I]njunctive actions, seeking to define the relationship between the defendant and the world at large, will usually satisfy the requirement.") (alteration in original) (citation omitted) (internal quotation marks omitted).

64.     Classes that seek monetary relief may be certified under Civil Rule 23(b)(2) if the monetary relief is "incidental" to the declaratory or injunctive relief sought.  See Wal-Mart

43

Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2557 (2011)).  Incidental damages are those that "'flow

directly from liability to the class *as a whole* on the claims forming the basis for the injunctive or

declaratory relief.'"  Mehling v. New York Life Ins. Co., 246 F.R.D. 467, 476 (E.D. Pa. 2007)

(emphasis added) (quoting Mulder v. PCS Health Sys., 216 F.R.D. 307, 319 (D.N.J. 2003)).

   65.  Through the Settlement Agreement, the proposed Settlement Class seeks an order

declaring that, for settlement purposes, the Debtors cannot terminate the LTD Plans with respect

to any of the LTD Employees unless and until the Debtors agree to provide them with benefits

under the LTD Plans.  Incidental to this relief, NNI has agreed to allow a general non-priority,

unsecured claim in favor of the LTD Committee, for distribution in lieu of benefits to the

Settlement Class members pursuant to the uniform allocation formula set forth in the Settlement

Agreement.   This relief resolves a primary and distinct legal issue regarding contract

interpretation that is universal to all Settlement Class members and provides a meaningful class-

wide remedy.  See Gooch v. Life Investors Ins. Co. of Am., 672 F.3d 402, 427 (6th Cir. 2012)

("Of course, Rule 23(b)(2) certification remains available in other circumstances, including when

the plaintiffs seek a declaration about the meaning of a contract.").  Moreover, the declaratory

relief applies to the Settlement Class as a whole, as all Settlement Class members are participants

in and subject to the terms and conditions of the LTD Plans.  See Gooch, 672 F.3d at 428 ("The

key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted

– the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of

the class members or to none of them.") (citation omitted) (internal quotation marks omitted).

   66.  Further, the monetary relief in the form of an allowed general unsecured claim is

a direct consequence of the requested declaratory judgment, as it flows directly from the

declaration that the LTD Plans cannot be terminated unless and until the benefits under the LTD

Plans are paid in the form of the LTD General Unsecured Claim.  In addition, each Settlement

Class member's proportional share of the Settlement Amount will be determined solely by

reference to a standardized actuarial computation based on a common formula, thereby foregoing

any need for individualized damage determinations.  See e.g., Cronas v. Willis Grp. Holdings,

Ltd., No. 06 Civ. 15295(RMB), 2011 WL 5007976 (S.D.N.Y. Oct. 18, 2011) (approving

settlement under Rule 23(b)(2) where injunctive relief was central to resolution of the dispute

and incidental payment of back pay to the class members was allocated by an agreed-upon

uniform formula); see also In re Budeprion XL Mktg. & Sales Litigation, No. 09-md-2107, 2012

WL 2527021, at *10 (E.D. Pa. July 2, 2012) ("The fact that damages might have been difficult to

ascertain or may have presented an obstacle to certification of a litigation class is no objection to

certification of a settlement class that obviates the need for any individualized damages

calculation.").

67.    Based on the foregoing, the Court should certify the Settlement Class for

settlement purposes, appoint Wendy Boswell Mann, Dianna Irish, Barbara Gallagher, Michael

Stutts and Deborah Jones as the Class Representatives, and appoint Elliott Greenleaf as Class

Counsel.

**C.    The Form And Manner Of Notice Are Reasonable Under The Circumstances**

68.    Bankruptcy Rule 7023(c)(2)(A) provides that for any class certified under

Bankruptcy Rule 7023(b) classes, the court may direct appropriate notice to the class.  In

addition, Bankruptcy Rule 7023(e) requires that all members of the class be notified of the terms

of any proposed settlement.  Fed. R. Bankr. P. 7023(e).  The Bankruptcy Rule 7023(e)

requirement is "designed to summarize the litigation and the settlement and to apprise class

members of the right and opportunity to inspect the complete settlement documents, papers, and

pleadings filed in the litigation."  Krell v. Prudential Ins. Co. of Am. (In re Prudential Ins. Co.

Am. Sales Practice Litig. Agent Actions), 148 F.3d 283, 326-27 (3d Cir. 1998) (citation omitted) (internal quotation marks omitted).

69.     This settlement involves the certification of a Rule 23(b)(2) class.  Thus class notice is authorized but not required.  See Crawford v. Honig, 37 F.3d 485, 487 n.2 (9th Cir. 1995) (stating that Civil Rule 23(b)(2) "does not require notice or permit members to opt out, although a court in its discretion" may provide otherwise).  When given, class notice can be provided in a number of ways, including by publication, direct mail, class notice websites, or other postings.  Settlement notice websites are now also considered as supplements to, as well as substitutes for, publication notice.  Mirfasihi v. Fleet Mortg. Co., 356 F.3d 781, 786 (7th Cir. 2004) ("The World Wide Web is an increasingly important method of communication, and, of particular pertinence here, an increasingly important substitute for newspapers . . . .  [A] firm that was hired to administer the settlement maintained a website with details of the case . . . an acceptable substitute.").

70.     Here, the forms of notice are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Settlement Agreement, the certification of the Settlement Class for settlement purposes only and the Fairness Hearing.  The Settlement Notifications outline the primary terms of the Settlement Agreement, including the releases and declaratory relief and describes how each party in interest may obtain a copy of the Settlement Agreement.  The Settlement Notifications also state the date, time, location and purpose of the Fairness Hearing, and inform each party in interest of his or her right to object to the Settlement Agreement.  Furthermore, the Settlement Notice describes the incidental monetary payments that will be distributed to members of the Settlement Class and will contain a personalized attachment for each Settlement Class member setting forth an estimate of the amount that will be

allocated to him or her pursuant to the methodology set forth in the Settlement Agreement.  As set forth in more detail above, the Active Employees and the COBRA Participants also will receive notice of the Debtors' intention to terminate the LTD Plans in their entirety through their receipt of the Joint Motion.  Therefore, the Debtors respectfully request that the Court approve the Notice Procedures.

**D.      Request To Set A Date For The Fairness Hearing**

71.      The Movants also respectfully request that the Court set a Fairness Hearing to consider granting final approval of the Settlement Agreement.  The Fairness Hearing shall be scheduled by the Court.  The Movants currently propose that the Fairness Hearing take place on April 30 at 10:00 am (prevailing Eastern time), and that the deadline by which interested parties may file an objection be set as April 19, 2013 at 4:00 pm (prevailing Eastern time) (the "Objection Deadline").  The Settlement Agreement will not become effective unless and until the Court has approved the Settlement Agreement on a final basis at the Fairness Hearing.

**E.      The Court Should Approve The Settlement Agreement At The Fairness Hearing on a Final Basis**

72.      The Movants request that the Court give final approval of the Settlement Agreement at the Fairness Hearing, as the Settlement Agreement satisfies all of the necessary legal standards for final approval and is a fair and reasonable exercise of the Debtors' business judgment.

(i)      *THE SETTLEMENT AGREEMENT SATISFIES SECTIONS 105(A) AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019*

73.      The Settlement Agreement, which would fully resolve the Adversary Proceeding and the LTD Termination Motion, and would provide LTD Employees with certain compensation for the termination of the LTD Plans, should be approved as a settlement that is in

47

the best interests of the Debtors, their estates and creditors, the LTD Committee, its members and the LTD Employees generally.

74.     The Third Circuit has emphasized that "[t]o minimize litigation and expedite the administration of a bankruptcy estate, [c]ompromises are favored in bankruptcy." Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996) (second alteration in original) (citation omitted) (internal quotation marks omitted); see also In re Culmtech, Ltd., 118 B.R. 237, 238 (Bankr. M.D. Pa. 1990) ("[C]ompromises are favored in bankruptcy and . . . much of litigation in bankruptcy estates results in settlements.")  Bankruptcy Rule 9019 authorizes a bankruptcy court to approve a compromise or settlement after notice and a hearing, Fed. R. Bankr. P. 9019(a), and section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

75.     In addition, section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease the property of the estate outside of the ordinary course of business after notice and a hearing.  11 U.S.C. § 363(b).  Section 363 applies to a settlement when an agreement involves the disposition of the estate's assets in such a way that it ventures beyond an ordinary course transaction.  In re Martin, 91 F.3d at 394-95 (3d Cir. 1996).

76.     The use or transfer of estate property under Section 363 must be supported by a sound business purpose. Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Decora Indus., Inc., No. 00-4459 JJF, 2002 WL 32332749, at *2 (D. Del. May 20, 2002); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991); Travelers Cas. & Sur. Co. v. Future Claimants Representative, Civil Action No. 07-2785 (FLW), 2008 WL 821088, at *4

48

(D.N.J. Mar. 25, 2008).  A court determining whether a sound business purpose justifies the

transaction "should consider all salient factors pertaining to the proceeding and, accordingly, act

to further the diverse interests of the debtor, creditors and equity holders, alike."  In re

Montgomery Ward Holding Corp., 242 B.R. at 153-54 & n.1 (quoting In re Lionel Corp., 722

F.2d at 1071).  In addition, a debtor must show that the transaction has been proposed in good

faith, that adequate and reasonable notice has been provided and that it is receiving fair and

reasonable value in exchange.  See In re Decora Indus., Inc., 2002 WL 32332749, at *2; In re

Del. & Hudson Ry. Co., 124 B.R. at 176.  Courts have distinguished the application of section

363 to settlements as opposed to property sales, finding that the settlement of claims requires less

scrutiny than asset sales because settlements must be approved quickly and often are an

important first step in formulating a plan.  See Official Unsecured Creditors' Comm. of Pa.

Truck Lines, Inc. v. Pa. Truck Lines, Inc. (In re Pa. Truck Lines, Inc.), 150 B.R. 595, 599 (E.D.

Pa. 1992) (quoting In re Grant Broad. of Phila., Inc., 71 B.R. 390, 398 (Bankr. E.D. Pa. 1987)

and In re Neshaminy Office Bldg. Assocs., 62 B.R. 798, 805 (E.D. Pa. 1986)).

78.     Bankruptcy Rule 9019 provides, in pertinent part, that, "[o]n motion by the trustee

and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R.

Bankr. P. 9019(a).  Courts in this District have recognized that the approval of a proposed

compromise and settlement is committed to the sound discretion of the bankruptcy court.  See,

e.g., In re Coram Healthcare Corp., 315 B.R. 321, 329 (Bankr. D. Del. 2004).

78.     Before approving a settlement under Bankruptcy Rule 9019, a court must

determine whether "'the compromise is fair, reasonable, and in the interest of the estate.'"  In re

Marvel Entm't Grp., Inc., 222 B.R. 243, 249 (D. Del. 1998) (citation omitted).  Basic to the

process of evaluating proposed settlements is "the need to compare the terms of the compromise

with the likely rewards of litigation." Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25 (1968). The court need not be convinced that the settlement is the best possible compromise in order to approve it. In re Coram Healthcare Corp., 315 B.R. at 330. Rather, the court's obligation is to "canvass the issues and see whether the settlement falls below the lowest point in a range of reasonableness." Travelers Cas. & Sur. Co. v. Future Claimants Representative, 2008 WL 821088, at *5 (citing Aetna Cas. & Sur. Co. v. Jasmine, Ltd. (In re Jasmine, Ltd.), 258 B.R. 119 (D.N.J. 2000)); see also In re Coram Healthcare Corp., 315 B.R. at 330.

79.    The Third Circuit has set out four criteria for a bankruptcy court to consider when evaluating a settlement proposal:  "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." In re Martin, 91 F.3d at 393 (citing In re Neshaminy Office Bldg. Assocs., 62 B.R. 798, 803 (E.D. Pa. 1986)); see also Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002); In re eToys, Inc., 331 B.R. 176, 198 (Bankr. D. Del. 2005).

80.    The Movants respectfully submit that the Settlement Agreement is fair, reasonable and in the best interests of the Debtors, their creditors and their estates.[36] The Movants believe that the approval of the Settlement Agreement is an appropriate exercise of the authority granted to the Court under Bankruptcy Rule 9019(b). Moreover, as required by section 363, the Settlement Agreement is proposed in the Debtors' business judgment as a good-faith means to resolve disputes and potential claims between the Parties regarding the LTD Termination Motion and the Adversary Proceeding.

---

[36]    The LTD Committee approved the Settlement Agreement in accordance with its governing bylaws.

81.     The Court is not required to determine that the proposed settlement is the best possible compromise of the claims being settled.  In re Key3Media Grp., 336 B.R. 87, 92-93 (Bankr. D. Del. 2005) (citing In re Coram Healthcare Corp., 315 B.R. at 329).  Rather, the settlement should be approved as long as it does not fall below the lowest point in the range of reasonableness.  Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983), cert. denied, 464 U.S. 822 (1983).  In this respect, it is unnecessary for the Court to consider the information necessary to resolve the factual dispute, nor is it necessary for the Court to "'conclusively determine claims subject to a compromise.'"  In re Key3Media Grp., 336 B.R. at 92 (quoting Martin v. Cox (In re Martin), 212 B.R. 316, 319 (B.A.P. 8th Cir. 1997)).

82.     While the Movants are prepared to litigate the Adversary Proceeding, as well as the LTD Termination Motion, to conclusion, such litigation carries with it inherent uncertainties and there is no assurance that either Movant would achieve a better result through litigation than the one set forth in the Settlement Agreement.  The Settlement Agreement fairly balances each Movant's likelihood of success on the merits against its interest in avoiding the uncertainty of continuing what would undoubtedly be a contentious litigation process.  Avoiding the uncertainty of litigation is particularly important here because such uncertainty precludes both the Debtors and the LTD Employees from making necessary arrangements in anticipation of the termination of the LTD Plans.  In addition, ongoing litigation will saddle the Debtors with significant and burdensome costs.

83.     Furthermore, the Settlement Agreement is fair and reasonable to both sides and was heavily negotiated between experienced and competent counsel for all Parties.  The Settlement Agreement is the result of over one year of arm's length bargaining and numerous settlement and mediation sessions.  Each Party has vigorously negotiated the best possible deal

for its respective constituencies, making concessions where necessary in order to consensually resolve the disputed issues.

84.     In addition, the interests of the creditors militate in favor of approval of the Settlement Agreement.  In the absence of a settlement, the Debtors' estates would be burdened with time-consuming and costly litigation, including costs of continuing to engage in discovery and eventually a trial.  The litigation has been and would continue to detract from the estates' efforts to resolve the many matters that are essential to the ultimate resolution of these cases, which would continue with further discovery, witness testimony and litigation.

85.     The Debtors believe that the interests of their creditors therefore are served by the prompt and efficient resolution of any disputes regarding the termination of the LTD Plans through the Settlement Agreement.  In light of the time and expense of fully litigating the LTD Termination Motion and the Adversary Proceeding that will be saved, the uncertainty of the result of the litigation that will be avoided, and the benefit to each Movant's constituents from compromising the LTD Claims, it is clear that the proposed settlement is fair and equitable.  The UCC and the Bondholder Group, which also participated in the settlement negotiations, support the approval of the Settlement Agreement.  Applying the foregoing <u>Martin</u> factors, the Parties respectfully submit that the Settlement Agreement satisfies sections 105(a) and 363 of the Bankruptcy Code, as well as the requirements of Bankruptcy Rule 9019.

(ii)     *THE SETTLEMENT AGREEMENT SATISFIES CIVIL RULE 23*

86.     Civil Rule 23 provides that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed or compromised only with the court's approval."  Fed. R. Civ. P. 23(e).  Final approval of a settlement pursuant to Civil Rule 23(e) turns on whether the settlement is "fair, reasonable and adequate."  Fed. R. Civ. P. 23(e)(2); <u>see also</u> <u>Erheart v.</u>

Verizon Wireless, 609 F.3d 590, 593 (3d Cir. 2010) (citing In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 258 (3d Cir. 2009)).

87.     The Third Circuit has articulated nine well-established primary factors to be considered in assessing the fairness, reasonableness and adequacy of a proposed settlement including: "'(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of the attendant risks of litigation.'" In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 350 (3d Cir. 2010) (alteration in original) (quoting Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975)).  As described below, these factors strongly support approval of the Settlement Agreement.

### a.     Presumption in Favor of the Settlement Agreement

88.     As a threshold matter, a court may find that a proposed settlement agreement is entitled to an "initial presumption of fairness" where: "'(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'" In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 535 (3d Cir. 2004) (quoting In re Cendant Corp. Litig., 264 F.3d 201, 232 n.18 (3d Cir. 2001)).  Courts have presumed the fairness of a compromise where the settlement resulted from arms-length negotiations between parties that have engaged in extensive litigation and discovery.  See, e.g., Warfarin, 391 F.3d at 535 (affirming attachment of presumption of fairness where settlement negotiations preceded

certification of the class as settlement "resulted from intense arms-length negotiations between experienced counsel" and "came after over three years of active litigation and discovery"); Jones v. Amalgamated Warbasse Houses, Inc., 97 F.R.D. 355, 359 (E.D.N.Y. 1982), aff'd, 721 F.2d 881 (2d Cir. 1983) (recognizing that if the terms of a settlement on their face suggest a *bona fide* compromise, "the settlement is presumed to be regular").  In other words, the very fairness of the settlement terms, in and of itself, is evidence that the settlement was the product of good faith, arms-length negotiations.

89.     Additionally, there is an overriding public interest in settling and concluding litigation, and this is particularly true in class actions.  See Ehrheart 609 F.3d at 593 ("[A] strong public policy exists, which is particularly muscular in class action suits, favoring settlement of disputes, finality of judgments and termination of litigation."); Warfarin, 391 F.3d at 535.  As "[i]t is well established that 'settlement agreements are creatures of private contract law,'" approval of a settlement "simply recognizes the parties' deliberate decision to bind themselves according to mutually agreed-upon terms without engaging in any substantive adjudication of the underlying causes of action."  Sullivan v. DB Invs., Inc., 667 F.3d 273, 312 (3d Cir. 2011) (citation omitted).

90.     In light of the strong policy in favor of settlement of class actions, a court need not try the case when examining the fairness of a proposed settlement agreement.  See Ehrheart, 609 F.3d at 595 (noting the "especially strong" presumption in favor of class action settlements "where substantial judicial resources can be conserved by avoiding formal litigation" and the contemplation of "a circumscribed role for the district courts in settlement review and approval proceedings"); In re Budeprion XL Mktg. & Sales Litig., No. 09-md-2107, 2012 WL 2527021, at *10 (E.D. Pa. July 2, 2012) (recognizing the principle that "the law favors settlement of class

actions" and further noting that "[t]he parties are free to agree to anything in reference to the

subject matter of the litigation") (citing <u>Sullivan</u>, 667 F.3d at 317). Accordingly, a court is

advised to "'be slow to substitute its own judgment for that of experienced counsel who . . . have

arrived at a settlement after extensive litigation and a careful assessment of the risks and

potential rewards involved in a full trial and appeal.'" <u>In re Metro. Life Ins. Co. Sales Practice</u>

<u>Litig.</u>, No. 96-179, 1999 WL 33957871, at *26 (W.D. Pa. Dec. 28, 1999) (alteration in original)

(quoting <u>Walsh v. Great Atl. & Pac. Tea Co.</u>, 96 F.R.D. 632, 642-43 (D.N.J. 1983)), <u>aff'd</u>, 726

F.2d 956 (3d Cir. 1983); <u>see also</u> <u>In re Cendant Corp. Litig.</u>, 264 F.3d 286, 301 (3d Cir. 2001)

("'[i]t cannot be overemphasized that neither the trial court in approving the settlement nor this

Court in reviewing that approval have the right or the duty to reach any ultimate conclusions on

the issues of the fact and law which underlie the merits of the dispute.'") (citation omitted).

91.     For over a year, the Parties have engaged in broad and probing discovery and

motion practice and as a result, have had the opportunity to prudently evaluate the strengths and

weaknesses of their respective legal positions and claims.  Each Party, aided by counsel, has

fully assessed the risks of continuing this action to final hearing and has balanced those risks

against the benefits of the Settlement Agreement.  Critically, there is a key disagreement between

the Parties' experts on the estimated value of the LTD Employees' claims, in the event they are

not worth zero, as the Debtors have maintained.  The Debtors' valuation expert, Ethan Kra,

estimated the LTD Employees' claims under the LTD Plans to be worth between zero and $34.4

million, based on an assumed hypothetical benefit termination date of March 31, 2013,

depending on whether it was determined that they are entitled to any consideration for the

termination of the LTD Plans, and in the event that they are, the applicable discount rate (where

such claims would be valued as of the bankruptcy filing date and constitute unsecured claims).

In contrast, the LTD Committee's actuary, Vincent Bodnar,[37] has estimated the LTD Employees'
claims under the LTD Plans to be worth approximately $60 million based on an assumed
hypothetical benefit termination date of May 31, 2013. Assuming that the Court were to
determine that LTD Employees are entitled to claims for all of their lost benefits, a significant
difference between the estimates of Mr. Bodnar and Dr. Kra results from the discount rates used
and the manner in which the rate is applied to the value of the hypothetical claims.

92.    Accordingly, if litigated to a conclusion, there is a wide range of potential
outcomes for the Parties depending on how the Court ultimately would decide the LTD
Termination Motion and Adversary Proceeding. First, the Court would need to determine
whether the LTD Employees are entitled to any claim against the Debtors related to the
termination of the LTD Plans. Second, even if the Court were to conclude that the LTD
Employees are entitled to assert a claim based on the termination of the LTD Plans, the Court
would need to determine the proper valuation of such claims, which could be based on the
discount rates that were applied by either Mr. Bodnar or Dr. Kra or some other rate determined
by the Court. The outcome of the litigation of such issues necessarily involves substantial
uncertainty for the Parties. Given this and other inherent litigation uncertainties, the Parties
determined that the settlement amount of $28 million (based on a hypothetical termination date
of March 31, 2013)[38] reflects a fair and reasonable compromise over the value of the LTD
Employees' claims. Specifically, under the settlement, Settlement Class members will receive

---

[37]    Effective on November 1, 2012, Towers Watson completed an asset purchase from DaVinci Consulting
Group, and hired all twelve employees of DaVinci Consulting Group's employees, including Mr. Bodnar.

[38]    The ultimate cash value of the allowed LTD General Unsecured Claim will depend, among other things, on
the amount of distributions made by Nortel Networks Inc. on the LTD General Unsecured Claim under a plan of
reorganization, or if the LTD General Unsecured Claim is sold by the LTD Committee, on the amount received by
the LTD Committee for the LTD General Unsecured Claim.

continued benefits from April 1, 2013 through May 31, 2013 and a general unsecured claim that reflects:

- Approximately 81% of the maximum valuation estimated by Dr. Kra; or

- Approximately 47% of the valuation estimated by Mr. Bodnar.

In addition to providing this value, the portion of which that is allocated to each Settlement Class member to be communicated through a personalized Settlement Notice estimating the member's likely individual recovery from the group claim, the Settlement Agreement will provide the further benefit to the LTD Employees of enabling Settlement Class members to plan for their future without the uncertainty of continued litigation.  Furthermore, in exchange for the value given to the Settlement Class members, the proposed settlement also simultaneously promotes the interests of the Debtors and their creditors in winding down the LTD Plans to avoid the time, cost and risk in their continued administration.  For these reasons, and those described in more detail below, the proposed Settlement Agreement provides an appropriate mechanism to fairly, adequately and reasonably resolve all viable claims of the Settlement Class.

### b.    The Complexity, Expense and Likely Duration of the Litigation

93.    This factor requires the Court to look at the complexity of the litigation and the expenditures of both time and money that will be avoided by both of the parties and the judicial system if the settlement is approved.  See In re Budeprion XL Mktg. & Sales Litig., 2012 WL 2527021, at *12 (citing Sullivan, 667 F.3d at 320); Hamilton v. City of Wilmington, No. Civ.A.00-635-GMS, 2002 WL 1998376, at *3 (D. Del. Aug. 26, 2002) (This factor is intended to "'capture the probable costs, in both time and money, of continued litigation'") (citation omitted).  A court should evaluate whether settlement avoids the "risks and burdens of potentially protracted litigation."  Ayers v. Thompson, 358 F.3d 356, 369 (5th Cir. 2004).

94.     As this Court is aware, this case is complex, as demonstrated by the significant fact discovery and motion practice to date, coupled with the almost certain appeal that would accompany a victory by either Party.  The relief set forth in the Settlement Agreement will provide Settlement Class members with an immediate benefit without the significant expense and substantial delay of further litigation.  As the In re Shell Oil Refinery court noted:

> [the] Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation.  In this respect, '[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush.'

In re Shell Oil Refinery, 155 F.R.D. 552, 560 (E.D. La. 1993) (alterations in original) (quoting Oppenlander v. Standard Oil Co., 64 F.R.D. 597, 624 (D. Colo. 1974)).

95.     Settlement will result in a savings of time and money for the Debtors, as well as for the Plaintiff.  The Debtors currently are paying the professional fees and expenses for both Parties to litigate the LTD Termination Motion and the Adversary Proceeding, and settling now will greatly reduce the Debtors' expenditures on professionals.  This will result in cost savings that will allow more funds to be available for distribution to creditors.  Furthermore, the Parties reached a settlement in principle on the eve of taking depositions and the filing of the LTD Committee's expert report.  Should the settlement fail, the Parties would be forced to resume the discovery process and continue to dedicate resources to preparing for a trial on the LTD Termination Motion and further litigation related to the Adversary Proceeding.

c.     **The Stage of the Proceedings**

96.     The Court may consider the stage of the proceedings and the amount of discovery completed, as well as the maturity of the underlying substantive issues in assessing the fairness of the class action settlement.  These factors capture "'the degree of case development that class counsel have accomplished prior to settlement'" to insure that "'counsel had an adequate

appreciation of the merits of the case before negotiating.'" <u>Sullivan</u>, 667 F.3d at 321 (quoting

<u>Warfarin</u>, 391 F.3d at 537). The negotiation of a settlement following discovery is a factor that

weighs in favor of settlement approval. <u>See</u> <u>Bell Atl. Corp. v. Bolger</u>, 2 F.3d 1304, 1314 (3d Cir.

1993) ("[P]ost-discovery settlements are more likely to reflect the true value of the claim and be

fair."); <u>Serrano v. Sterling Testing Sys., Inc.</u>, 711 F. Supp. 2d 402, 415 (E.D. Pa. 2010).

97.     The Settlement Agreement was reached after the essential facts had been

thoroughly investigated by counsel to the LTD Committee, who is also proposed Class Counsel,

in connection with the discovery process conducted with respect to the LTD Termination

Motion. Indeed, the Parties already have reviewed all relevant documents, consulted with

experts, and conducted and responded to interrogatories and requests for admission. Motions

and briefs have been filed in these proceedings, and legal positions explored and challenged

through the course of settlement discussions. The Debtors have shared their expert report with

Class Counsel in its capacity as counsel to the LTD Committee. Hence, there can be no doubt

that the Parties' lawyers are thoroughly aware of the strengths, weaknesses and risks involved in

further litigation of these matters and were in an excellent position to assess their respective

positions. The stage of the litigation weighs strongly in favor of final approval.

> d.    **The Risks of Establishing Liability, Damages and Maintaining the
> Class Action Through Trial**

98.     Courts also should consider the risks of establishing liability, damages and

maintaining the class action through trial. These factors "'examine[] what the potential rewards

(or downside) of litigation might have been had class counsel decided to litigate the claims rather

than settle them'" and attempt "'to measure the expected value of litigating the action rather than

settling it at the current time.'" <u>Sullivan</u>, 667 F.3d at 322 (quoting <u>Cendant</u>, 264 F.3d at 237-39).

A court must similarly measure the likelihood of obtaining and keeping class certification in a

trial after considering the fact that "'the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the class action.'" Id. (quoting Warfarin, 391 F.3d at 537).

99.     Absent the proposed Settlement Agreement, there would be numerous substantive issues before the Court, each of which would be vigorously litigated by the Parties.  Regardless of which Party initially prevailed on these issues, the Parties anticipate lengthy appeals would follow, with all related expenses to be paid from for the Debtors' estates.  There are risks inherent in litigation and establishing liability and damages, including delay that could prevent the Debtors from taking the necessary next step in their wind down process by terminating the LTD Plans completely within the 2013 plan year with respect to all participants.  Settlement Class members would be left in limbo during the litigation regarding the status of their future income and LTD Benefits.  Certification also presents potential challenges, which raises the risk that the Plaintiff could not maintain its Class Complaint through an entire litigation and further weighs in favor of final approval.

> e.     **The Terms of the Settlement Agreement Fall Within the Range of Reasonableness**

100.     When considered in light of the Plaintiff's best possible recovery and the attendant risks of litigating the LTD Termination Motion and the Adversary Proceeding, the Settlement Agreement falls well within the range of reasonableness.  In considering the range of reasonableness of a settlement, courts are to determine whether the settlement provides good value based on the strength of the case as well as in light of the relief sought, based on several factors, including "the value of the settlement" and "the utility of the settlement to the plaintiffs." Hamilton, 2002 WL 1998376, at *7.

101.    Here, the declaratory relief agreed upon provides substantial value and utility to the Settlement Class and the Debtors alike.  By consenting to an order permitting the Debtors to terminate the LTD Plans with respect to the Settlement Class members only if they provide benefits by allowing a general unsecured claim of $26.64 million,[39] the Settlement Class members have ensured that their alleged special rights as disabled employees are amply protected.  The LTD Committee determined, and, as described in more detail above, the Debtors agreed, that the proposed LTD General Unsecured Claim would provide the entirety of the Settlement Class with benefits under the LTD Plans representing a substantial portion of what they could have received if there were no settlement and the LTD Committee prevailed in defeating the LTD Termination Motion, and in their asserted theories of liability.  See Sullivan, 667 F.3d at 323 ("[A] defendants' ability to withstand a much higher judgment does not necessarily 'mean that it is obligated to pay any more than what the [class members] are entitled to under the theories of liability that existed at the time the settlement was reached.'") (second alteration in original) (quoting Warfarin, 391 F.3d at 538).  The certainty of a settlement also will allow the Settlement Class members to begin planning for their futures, while providing funds to ease the transition.

102.    Simultaneously, the settlement allows the Debtors to obtain Court approval of the termination of the LTD Plans, which they sought out of an abundance of caution when they filed the LTD Termination Motion.  The termination of the LTD Plans will save the Debtors' creditors the costs and risks of both the continued provision of benefits and further litigation of these disputes at a time when the Debtors no longer have ongoing businesses to generate revenue to

---

[39]    The ultimate cash value of the allowed LTD General Unsecured Claim will depend, among other things, on the amount of distributions made by Nortel Networks Inc. on the LTD General Unsecured Claim under a plan of reorganization, or if the LTD General Unsecured Claim is sold, on the amount received by the LTD Committee for the LTD General Unsecured Claim

offset the costs, and will eliminate the risk that the Debtors will be forced to pay substantially

increased premiums and other costs in the future in order to secure a third party vendor to

administer the LTD Plans.  Terminating the LTD Plans also will eliminate the Debtors' risk of

bearing increased claims in future periods, which risk is disproportionate when the LTD

Employees predominate the Debtors' remaining workforce.  Finally, the Debtors will be able to

get one step closer to the development and finalization of their chapter 11 plans that are

necessary to close these proceedings.  Based on the foregoing, the Court should approve the

Settlement Agreement under Civil Rule 23 and Bankruptcy Rule 7023 on a final basis.

**F.    The Court Should Approve The Termination Of The LTD Plans Under Which Certain Active Employees and COBRA Participants Receive Benefits[40]**

103.    While for settlement purposes only the Debtors have consented to a declaratory

judgment prohibiting them from terminating the LTD Plans with respect to the Settlement Class

members without providing the LTD Committee an allowed claim, the proceeds of which are to

be distributed to Settlement Class members in lieu of benefits thereunder, such relief would not

extend to non-Settlement Class members, such as the Active Employees and COBRA

Participants, who also are currently receiving or are eligible to receive certain LTD Benefits

under the LTD Plans.  The Active Employees are eligible to receive benefits under some of the

LTD Plans offered by the Debtors.  In addition, the COBRA Participants are eligible for

continuation coverage under the Nortel Networks Inc. Medical Plan and the Nortel Networks

Inc. Dental, Vision and Hearing Care Plan.

---

[40]    The positions taken in this section of the Joint Motion are those of the Debtors only.  Notwithstanding that this is otherwise a joint motion, the LTD Committee makes no representation or argument regarding the COBRA Participants or the Active Employees, and reserves any and all rights to contest the assertions or legal arguments presented by the Debtors in this section with respect to the LTD Employees.

104.    It is the Debtors' position that the governing LTD Plans expressly reserve the

Debtors' right to amend or terminate the LTD Plans.  For example, the 1989 Nortel Networks

Inc. Group Benefits Plan provides:

> While the employer intends to maintain this group benefits plan indefinitely, the employer has no obligation whatsoever to maintain the plan or to provide any benefits pursuant to the plan (including, but not limited to, medical expense benefits for retired employees) for any given length of time, and *reserves the right to amend the plan at any time or from time to time or to terminate the plan*.

1989 Nortel Networks Inc. Group Benefits Plan at 67 (emphasis added), attached to the Ray

Declaration as Exhibit 1.  By further example, the 2004 Nortel Networks Inc. Medical Plan

provides:

> Although the benefits currently available (in the 2004 Plan Year) are described in this summary for the Company's Medical Plan, *the Company reserves the right to change or end the plan described in this summary at any time*. Any plan changes will result from actions taken and approved by the Company. **The Company may adopt such changes or terminate the plan at any time and for any reason**.  The Company's practices, polices [sic], and benefits are outlined here for your information as required by law.  However, this does not constitute an implied or expressed contract or guarantee of employment.

2004 Nortel Networks Inc. Medical Plan Summary Plan Description at 92 (emphasis added),

attached to the Ray Declaration as Exhibit 2.

105.    As set forth in the LTD Termination Motion, the Debtors believe that they have

the right to terminate the LTD Plans and the LTD Benefits provided thereunder without incurring

any liability to plan participants.[41]  Nevertheless, the LTD Committee has taken the position that

---

[41]    The LTD Committee and certain LTD Employees have contested the Debtors' right to terminate the LTD Plans to the extent they provide benefits to the LTD Employees, including through the filing of objections to the LTD Termination Motion and the Class Complaint, on the ground that the LTD Employees are disabled and currently receiving income continuation benefits and cannot be cut off unilaterally, regardless of any reservation of rights language that may be contained in the LTD Plans.  While the Debtors do not concede the validity of such

the LTD Employees are in a distinctly different position than other participants in some of the

LTD Plans -- the Active Employees and the COBRA Participants – none of whom are receiving

income continuation benefits under any of the Long-Term Disability Plans offered by the

Debtors, including the long-term disability plan fully insured by Metropolitan Life Insurance

Company that has provided coverage to the Debtors' active employees since 2011.  Accordingly,

while there is a litigable issue between the Debtors and the LTD Employees regarding those

LTD Employees' rights under the LTD Plans, the Debtors do not believe that any non-LTD

Employee has any colorable argument that his or her LTD Benefits or rights to receive LTD

Benefits is vested.  Thus, the Debtors submit that they can terminate in their business judgment

these other participants' rights to receive LTD Benefits under the LTD Plans without providing

them with any consideration.  The requested order granting the Joint Motion would authorize the

Debtors to terminate the LTD Plans with respect to all individuals receiving or eligible to receive

LTD Benefits or coverage thereunder, whether or not they are LTD Employees.

106.    When a company chooses to provide welfare benefits to its employees, the law

does not create a vested entitlement to the continuation of such benefits.  For example, in In re

Lucent Death Benefits ERISA Litig., 541 F.3d 250, 253 (3d Cir. 2008), plaintiffs, who were

former employees of the defendants, argued that the defendants could not terminate a pensioner

death benefit that had been provided to the plaintiffs.  The Third Circuit held that because the

death benefit was a welfare benefit and not a pension benefit, the benefit had not vested pursuant

to ERISA, explaining that:

> ERISA provides elaborate requirements for the vesting of pension benefits, but it
> does not provide automatic vesting of welfare benefits.  An accrued pension
> benefit is protected by ERISA's anti-cutback provision without any showing that

arguments, their dispute with the LTD Committee and the LTD Employees over the right to terminate is being
resolved by the Settlement Agreement.

it has vested.  In contrast, a welfare benefit is protected from elimination only if the plaintiff proves by a ***preponderance of the evidence*** that the plan provider had intended the welfare benefit to have vested (despite not being obligated to do so by ERISA).

Id. at 253-54 (emphasis added) (citations omitted).

107.     Since benefits provided under welfare benefit plans do not and are not required to vest under ERISA, they are terminable at will unless the plans specifically provide otherwise. As the Third Circuit has explained, "an employer's commitment to vest such benefits is not to be inferred lightly and must be stated in clear and express language . . . [in the documents that provide] the employee welfare benefits." Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Skinner Engine Co., 188 F.3d 130, 139 (3d Cir. 1999) (internal citations omitted).  It is uncontroverted that the LTD Plans are welfare benefit plans and not pension plans, and therefore, the Active Employees and COBRA Participants' right to receive LTD Benefits thereunder did not vest as a matter of law and are terminable at will.

108.     Indeed, neither the terms of the LTD Plans nor the LTD Plan documents even suggest that any LTD Benefits or rights to receive LTD Benefits are vested or were intended to vest.  Instead, each LTD Plan document expressly provides that the Debtors have the unilateral right to modify or terminate the LTD Plans at any time in the Debtors' sole discretion.[42]  Courts specifically have held that when a company reserves the right to change or terminate benefits, even if it otherwise promised those benefits for "life," the benefits are not vested.  In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig., 58 F.3d 896, 904 (3d Cir. 1995) (explaining that a plan containing language both describing welfare benefits as being provided for "life" and a reservation of rights is not ambiguous or inconsistent because, "[a]n employer who promises

---

[42]     See, e.g., 1989 Nortel Networks Inc. Group Benefits Plan at 67; 2004 Nortel Networks Inc. Medical Plan Summary Plan Description at 92.

lifetime medical benefits, while at the same time reserving the right to amend the plan under which those benefits were provided, has informed plan participants of the time period during which they will be eligible to receive benefits *provided* the plan continues to exist."); <u>Vallone v. CNA Fin. Corp.</u>, 375 F.3d 623, 634 (7th Cir. 2004) (holding that a health care allowance benefit provided to encourage early retirement and described as a "lifetime" benefit was not vested because a reservation of rights clause in the plan documents allowed amendment or modification even after retirement).  Here, the LTD Plans do not purport to offer LTD Benefits or a right to receive LTD Benefits to Active Employees or COBRA Participants for life, and the reservation of rights language stands alone.

109.    Nor does COBRA create a vested right for its participants to receive coverage or benefits.  Rather, COBRA simply sets the terms for a qualified participant to continue to receive certain types of health related benefits under a former employer's existing plans.  If the plans are terminated, COBRA coverage ceases.  Accordingly, under Treas. Reg. § 54.4980B-7, Q&A-1(a)(3), an employer may terminate COBRA continuation coverage upon the first date after the employer or employee organization ceases to provide any group health plan (including successor plans) to any of its employees.  If approved by the Court, following the termination of the LTD Plans, the Debtors will no longer maintain medical, dental, vision or hearing benefits for any of its employees, and their obligation to continue providing group medical and other plan continuation coverage rights to the COBRA Participants will therefore cease.

110.    Section 1108 of the Bankruptcy Code authorizes the Debtors to operate their businesses in the ordinary course.  11 U.S.C. § 1108.  Section 363(b)(1) of the Bankruptcy Code further permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing.  11 U.S.C. § 363(b)(1).  Although the Debtors

believe that the exercise of their right to terminate the LTD Plans with respect to the Active

Employees and COBRA Participants is in the ordinary course of their business, to the extent that

such terminations are determined to be outside the ordinary course of business such that Court

approval is required, then the Court should grant the requested relief under Section 363 of the

Bankruptcy Code.  See Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re

Montgomery Ward Holding Corp.), 242 B.R. 147, 155 (D. Del. 1999).

   111. Relief is proper under section 363(b)(1) where the Debtors show a legitimate

business justification for the proposed action.  See Comm. of Equity Sec. Holders v. Lionel

Corp. (In re Lionel Corp.), 722 F.2d 1063 (2d Cir. 1983); In re Del. & Hudson Ry. Co., 124 B.R.

169, 175-76 (D. Del. 1991) (noting that the Third Circuit has adopted the "sound business

purpose" test for section 363(b)(1)).  If a valid business justification exists, the law imposes a

strong presumption "'that in making a business decision the directors of a corporation acted on

an informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company.'"  Official Comm. of Subordinated Bondholders v. Integrated Res.,

Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation omitted).

   112. Here the Debtors have a valid justification to terminate the LTD Plans, not only

because under the LTD Plans they have the right to terminate the LTD Plans and the right to

receive LTD Benefits at will, but in the context of the proposed Settlement Agreement, it would

impose a substantial burden on the Debtors not to terminate the LTD Plans in their entirety.  It is

simply not feasible to maintain the LTD Plans solely for the benefit of the approximately ten

Active Employees remaining and the COBRA Participants, because there is a substantial risk

that the third party vendors who administer the LTD Plans would terminate the agreements, or

substantially increase the premiums and other costs.  Accordingly, the Debtors should be

authorized to terminate the LTD Plans in their entirely upon the approval of the Settlement

Agreement, including with respect LTD Benefits or the right to receive LTD Benefits of the

Active Employees and the COBRA Participants.

## NOTICE

113.     Notice of the Joint Motion has been given via first class mail to (i) the U.S.

Trustee; (ii) counsel to the Bondholder Group; (iii) counsel to the UCC; (iv) the LTD

Employees; (v) the Active Employees; (vi) the COBRA Participants; (vii) counsel to the Retiree

Committee; and (viii) the general service list established in these chapter 11 cases.  The Parties

submit that under the circumstances no other or further notice is necessary.

## NO PRIOR REQUEST

114.     No prior request for the relief sought herein has been made to this or any other

court.

WHEREFORE, the Movants respectfully request that this Court (i) grant this Joint

Motion and the relief requested herein; (ii) enter the proposed orders attached as <u>Exhibit B</u> and

<u>Exhibit C</u> hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  January 18, 2013         CLEARY GOTTLIEB STEEN & HAMILTON LLP
       Wilmington, Delaware

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989
*Counsel for the Debtors and the Debtors in Possession*

-and-
ELLIOTT GREENLEAF

*/s/ Rafael X. Zahralddin-Aravena*
Rafael X. Zahralddin-Aravena (DE No. 4166)
Shelley A. Kinsella (DE No. 4023)
Margaret S. Curran (PA No. 62136)
1105 N. Market Street, Ste 1700
Wilmington, DE 19801
Telephone: (302) 384-9400
Facsimile: (302) 384-9399
Email: rxza@elliottgreenleaf.com
Email: sak@elliottgreenleaf.com
Email msc@elliottgreenleaf.com
*Counsel to the Official Committee of Long Term*
*Disability Participants and Proposed Class Counsel*

69