IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------------- X
                                                                :
In re:                                                          :   Chapter 11
                                                                :
NORTEL NETWORKS INC., *et al.*,[1]                              :   Case No. 09-10138 (KG)
                                                                :
                                         Debtors.               :   (Jointly Administered)
                                                                :
                                                                :   Hearing Date: March 7, 2013 at 10:00 a.m. (ET)
                                                                :
--------------------------------------------------------------- X

### THE JOINT ADMINISTRATORS' SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF THEIR (I) OBJECTION TO JOINT MOTION FOR ENTRY OF AN ORDER ESTABLISHING AN ALLOCATION PROTOCOL PURSUANT TO THE INTERIM FUNDING AND SETTLEMENT AGREEMENT, AND (II) CROSS-MOTION TO COMPEL ARBITRATION

In accordance with the Scheduling Order dated February 14, 2013, the court-appointed administrators and authorized foreign representatives (collectively, the "Joint Administrators")[2] for Nortel Networks UK Limited ("NNUK") and certain of its affiliates (collectively, and including NNUK, the "EMEA Debtors")[3] located in the region known as

---

1. The Debtors in these chapter 11 cases are: Nortel Networks Inc., Nortel Networks Capital Corporation, Alteon WebSystems, Inc., Alteon WebSystems International, Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

2. The Joint Administrators in the UK proceedings for all of the EMEA Debtors, with the exception of Nortel Networks (Ireland) Limited, are: Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, and Stephen John Harris. The Joint Administrators in the UK proceedings for Nortel Networks (Ireland) Limited are: Alan Robert Bloom and David Martin Hughes.

3. The EMEA Debtors are: Nortel Networks UK Limited; Nortel GmbH; Nortel Networks (Austria) GmbH; Nortel Networks (Ireland) Limited; Nortel Networks AB; Nortel Networks B.V.; Nortel Networks Engineering Service Kft; Nortel Networks France S.A.S.; Nortel Networks Hispania, S.A.; Nortel Networks International Finance & Holding B.V; Nortel Networks N.V.; Nortel Networks OY; Nortel Networks Polska Sp. z. o.o.; Nortel Networks Portugal S.A.; Nortel Networks Romania SRL; Nortel Networks S.A.; Nortel Networks S.p.A.; Nortel Networks Slovensko, s.r.o.; Nortel Networks, s.r.o.

01:13401308.1

EMEA (Europe, Middle East, and Africa) in proceedings under the *Insolvency Act 1986*, pending before the High Court of Justice of England and Wales (the "English Court"), hereby submit this Supplemental Memorandum of Law in support of their (i) Objection to the Joint Motion of Nortel Networks, Inc. ("NNI") and its affiliated debtors and debtors-in-possession (collectively, the "U.S. Debtors"), and the Official Committee of Unsecured Creditors (the "Committee" and, together with the U.S. Debtors, the "Movants"), for Entry of an Order Establishing an Allocation Protocol Pursuant to the Interim Funding and Settlement Agreement, and for Related Relief (the "Motion"), and (ii) Cross-Motion to Compel Arbitration.

## INTRODUCTION

When they entered into the Interim Funding and Settlement Agreement (the "IFSA"),[4] the parties knew that the only fair and feasible approach to resolving disputes about allocation of asset sale proceeds would be through a binding, private, transnational dispute resolution procedure, i.e. an arbitration. This was the explicit basis upon which the Nortel debtors entered the IFSA, and upon which the U.S., Canadian, English and French courts approved it. This understanding was confirmed over the course of discussions that took place before the IFSA, and during the year after the IFSA, was approved. The parties exchanged multiple drafts of the proposed dispute resolution protocol, <u>every one of which</u> provided that allocation would be decided by arbitration. The parties agreed that there should be a three member arbitration panel, composed of one person appointed by each of the U.S., Canada and EMEA estates. Although the parties never reached agreement about certain details of the procedure that would be followed, <u>no party ever objected to arbitration or proposed any other</u>

---

4. The IFSA, dated as of June 9, 2009, is attached as Exhibit 1 to the Declaration of Inna Rozenberg, dated April 25, 2011 (Docket No. 5308), submitted with the Motion. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the IFSA.

procedure. Movants' sudden about-face on this point is contrary to the terms of the IFSA, representations made to the courts, the expectations of Nortel stakeholders around the world, fundamental principles of fairness, and common sense. Movants should not be permitted to renege on their agreement.

Arbitration offers the only certain procedure for producing one final, binding decision about allocation. The procedure advocated for by Movants does the exact opposite. Having recognized that their initial proposal to have the U.S. and Canadian Courts deliberate together and issue a single judgment would have been unconstitutional, Movants now advocate that the two courts should conduct simultaneous parallel proceedings leading to separate and independent judgments determining multiple claims of ownership to the same pool of property. It is very unlikely that the Courts will independently reach the same decision on all of the numerous factual and legal issues they will have to decide in order to address the merits of allocation. The procedures to be followed are so unclear that Movants contemplate a future round of briefing to determine how the proceedings should be conducted. Even if the two courts independently reach identical decisions, the two decisions will be subject to separate appeals in the Canadian and U.S. court systems, with different rights, legal grounds, standards of review and tiers of appeal structures in each. Once the appeal processes have taken their course, any differences between the eventual judgments will be addressed in the context of a race to execution, leading to a further phase of litigation about which of the two competing judgments should be enforced, and potentially rendering neither decision enforceable. In short, the process

Movants advocate leads to what Justice Winkler has referred to as a "catastrophic outcome,"[5] i.e. years of further delay without any means of compelling distribution of the funds held in escrow.

The events of the past 21 months have clearly demonstrated the reasons why arbitration is the only feasible approach to determining allocation, and why the alternative proposed by Movants is unworkable. As Justice Winkler observed: "There is no single jurisdiction with the ultimate, final authority in the matter; no final court of appeal or supreme court with the power to issue a decision that conclusively determines the outcome of litigation. . . . Simply put, there does not appear to be any realistic 'litigation option' to resolve this dispute."[6] The Joint Administrators respectfully request that the Court enter their proposed form of protocol so that the parties can select arbitrators and proceed to arbitration without further delay.

The legal grounds for the motion and cross-motion have not changed since the original briefing. We summarize the key points for the Court's convenience:

## I. THE IFSA CONTAINS A BINDING AGREEMENT TO ARBITRATE.

The Federal Arbitration Act ("FAA") requires U.S. courts to enforce a written agreement to arbitrate provided it clearly states the type of disputes to be addressed and shows that the parties intended such disputes to be decided in a manner other than through judicial proceedings. (JA Opening Br. at 16-18 (Docket No. 5531) (citing authorities).) As Movants acknowledge (Movants' Reply Br. at 17 (Docket No. 5571)), the agreement need not use the word "arbitration," provided it is clear that the parties intend the dispute to be resolved through a

---

5. (The Nortel Mediation, Opening Remarks of Chief Justice Warren K. Winkler, Metropolitan Hotel, Toronto April 24, 2012, at 6.)

6. (*Id.* at 5.)

procedure other than a lawsuit. (*Id.* at 17-18; JA Reply Br. at 3-5 (Docket No. 5608).)[7] Nor must the agreement specify the means for selecting the arbitrators or the procedures that will be followed in the arbitration in order to be enforceable. (JA Opening Br. at 25-26.)

Here, there is no dispute that the IFSA is a written agreement that addresses how disputes about allocation of sale proceeds should be decided. Whether the IFSA contains an enforceable arbitration agreement therefore hinges on what the parties intended by agreeing that allocation disputes would be determined by one or more "dispute resolver(s)." (*See* IFSA § 12(b) ("In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in a case where the Selling Debtors fail to reach agreement, determination by the <u>relevant dispute resolver(s)</u> under the terms of the Protocol . . . applicable to the Sale Proceeds . . . .") (emphasis added).)

The most natural reading of the phrase "dispute resolver" is to signify something other than a judge or court. (JA Opening Br. at 18.) This is confirmed by the fact that the IFSA itself contemplates that the parties will negotiate towards a detailed protocol stating the procedures that are to be followed by the "dispute resolver." (IFSA § 12(c).) Parties cannot, by agreement, dictate the procedures to be followed by a court.

Movants, however, argue that because courts also resolve disputes, the parties could have intended the term "dispute resolver" to include possible submission of allocation disputes for resolution by the U.S. and Canadian Courts in a joint hearing. At best, this shows

---

7. *See also Bakoss v. Certain Underwriters at Lloyds of London Issuing Cert. No. 0510135*, No. 10–CV–1455, 2011 WL 4529668, at *6-7 (S.D.N.Y. Sept. 27, 2011), *aff'd*, -- F.3d ---, 2013 WL 238708 (2d Cir. 2013) (upholding district court finding that third-physician provision constituted enforceable agreement to arbitrate); *Cummings v. Consumer Budget Counseling, Inc.*, No. CV-11-3989, 2012 WL 4328637, at *2-3 (E.D.N.Y. Sept. 19, 2012) (finding enforceable agreement to arbitrate where contract referred to binding mediation rather than arbitration); *Alghanim v. Alghanim*, 828 F. Supp. 2d 636, 646-47 (S.D.N.Y. 2011) (provision calling for disputes to be settled by government official constituted enforceable agreement to arbitrate).

only a latent ambiguity in the term "dispute resolver," making it appropriate to examine extrinsic evidence with regard to what the parties intended. (JA Opening Br. at 18-20 (citing authorities).)

Here, all of the extrinsic evidence shows that the parties intended allocation disputes to be decided in a non-judicial proceeding. This starts with an initial proposal, in the negotiations leading up to the IFSA, which provided that the parties would designate "an individual," to be assisted by a designated accounting firm, to serve as the "Dispute Resolver." (Lloyd Decl. ¶ 14 (Docket No. 5532).) This appears to be the genesis of the term "dispute resolver" as subsequently incorporated in the IFSA. (*Id.* ¶¶ 12-22.) The fact that allocation disputes would be resolved in a non-judicial proceeding was confirmed in statements made by the parties and the courts in connection with approval of the IFSA (JA Opening Br. at 21-22) as well as in public statements made by representatives of the U.S. and Canadian debtors (*id.* at 22).

The intention to arbitrate is also abundantly clear from the negotiations the parties conducted after entry of the IFSA towards agreeing on the procedures that would be followed in the dispute resolution process. Over the course of almost a year of periodic discussions, it was accepted at all times, by all parties that the "dispute resolvers" would be one or more private arbitrators appointed for this purpose. This was reflected in every draft of the protocol that was circulated. Before the negotiations were halted, the parties had already broadly agreed that there would be a tripartite panel of dispute resolvers and that each of the three main estates would have the right to appoint an arbitrator to the panel. (*See* Lloyd Decl. ¶¶ 49-52.) Although there was not, initially, agreement about the means by which the arbitrator(s) would be selected, no party ever objected to arbitration or suggested that allocation could or should be determined in a proceeding before a national court.

## II. THE PARTIES DID NOT CONSENT TO HAVE ALLOCATION DETERMINED BY THE U.S. AND CANADIAN COURTS THROUGH JOINT PROCEEDINGS.

In the absence of an agreement among the parties about how the allocation dispute should be decided, no one forum would have jurisdiction to determine how to divide the property of the worldwide Nortel debtors. Movants have argued that the Joint Administrators consented to joint U.S./Canadian jurisdiction over allocation disputes based on (i) the residual jurisdiction clause contained in the IFSA, and (ii) various other agreements between the parties. An examination of the IFSA and the other agreements Movants rely on shows that none of the jurisdiction provisions can be read to apply to disputes over allocation.

Movants argue that Section 16(b) of the IFSA provides for joint jurisdiction of the U.S. and Canadian Courts to determine allocation. This section provides for joint hearings over a "claim, action or proceeding" seeking relief "to the extent relating to matters agreed in this Agreement." (IFSA § 16(b)(ii) (emphasis supplied).) Many things were agreed upon in the IFSA. The fact that each selling debtor is entitled to an allocation of the asset sale proceeds was not one of them. The selling debtors had a preexisting right to the proceeds from the sale of their own property. Determining the allocation of sale proceeds is therefore not within the scope of this jurisdiction clause. Nor is there any inconsistency in having a residual jurisdiction clause of this type in an agreement providing that certain disputes will be decided by arbitration. Such clauses set the forum for ancillary matters such as enforcing the agreement to arbitrate, providing interim relief in support of the arbitration, and enforcing an eventual award. (JA Opening Br. at 24-25.)

Movants also note that the parties have signed numerous other agreements, related to the particular asset sales and other matters, that provided for joint proceedings before the U.S. and Canadian courts to address various matters. In their previous submissions, the Joint

Administrators have shown that none of the relevant jurisdiction provisions can be read to apply to allocation. We refer the Court to those submissions. (JA Reply Br. at 10-14.)

Movants apparently accept that, without a contractual consent to jurisdiction provision in the IFSA or elsewhere, the U.S. and Canadian Courts would not have jurisdiction to determine the rights of the overseas Nortel entities to the proceeds of the sales of global assets. But neither the IFSA nor any of the other relevant agreements gives the Courts jurisdiction to determine how the sale proceeds should be allocated. Thus, if Section 12 of the IFSA is not construed to create an enforceable obligation to arbitrate disputes over allocation, the result is a situation in which no court or tribunal has jurisdiction over such disputes. This cannot be what the parties intended when they signed the IFSA, which was plainly meant to provide a mechanism for resolving allocation disputes. That mechanism is contained in Section 12, which was intended to provide that allocation disputes would be submitted for resolution in a non-judicial forum – i.e. an arbitration.

### III. THE PROCEDURE ADVOCATED BY THE MOVANTS WILL LEAD TO YEARS OF FURTHER DELAY WITH NO ASSURANCE OF EVER BEING ABLE TO COMPEL A RELEASE FROM ESCROW.

Proceeding in the manner sought by the Movants will result in insurmountable practical difficulties:

First, there are major differences in the procedural rules and other legal principles that apply in U.S. and Canadian proceedings, such as: (i) the rules governing pre-trial disclosure; (ii) the rules of privilege, including constitutional principles such as the right against self-incrimination; (iii) the rules of evidence; and (iv) applicable substantive law. Indeed, the protocol proposed by Movants provides for a separate phase of briefing to address the most basic issues about how to even structure the proceedings. (Movants' Reply Br. Ex. A ¶ 4.) It may prove impossible to harmonize all of the applicable rules and legal principles. Nor have Movants

01:13401308.1

9

cited any authority supporting their implicit suggestion that a U.S. court may devise ad hoc procedures for the conduct of substantive proceedings to determine the merits of a legal claim, i.e. that it is at liberty to disregard the Federal Rules of Civil Procedure, the Federal Rules of Evidence and other applicable law including the United States Constitution.

Second, the Movants have now acknowledged that the U.S. and Canadian Courts do not have authority to engage in joint deliberations and issue a joint decision. The Courts will therefore be issuing separate, independent decisions about how proceeds should be allocated. This procedure will only be successful if the two Courts reach <u>identical</u> decisions. The approximately $7.5 billion held in escrow consists of the proceeds of nine major asset sales. Depending on the asset, there are up to 40 individual Nortel entities that have claims to a portion of the proceeds. The claim of each debtor to a portion of the proceeds of each asset sale must be determined individually. In order to reach identical decisions, the two Courts must agree not only on the applicable law and principles that will apply to allocation, but also to the dollar amount that results in each instance – i.e. several hundred individual decisions. It is very unlikely that the two Courts would independently reach identical decisions on each of these minute matters. Yet a deadlock or inconsistency will defeat the purpose of the entire process.

Even if the two Courts do independently issue decisions that coincide, this will not be the end of the matter. In this hotly contested case, it is likely that one or more parties will wish to appeal from the decisions. These appeals will proceed on separate tracks, governed by different law and procedure, through the appellate courts in Canada and the U.S. There will be, once again, a strong likelihood that the courts will reach inconsistent results, and that the matter will eventually be resolved in further proceedings when the parties attempt to execute on two parallel judgments that reach different results about how to divide the same pool of funds.

01:13401308.1

In contrast, an arbitration will lead to a single, binding award that will state clearly how the proceeds should be allocated. Under well-established legal principles, the award will be readily enforceable and subject to limited rights of review in only one court.

## CONCLUSION

For the foregoing reasons, the Courts should deny the Motion and compel the parties to arbitrate in accordance with the attached form of Protocol.

Dated: Wilmington, Delaware
March 4, 2013

**YOUNG CONAWAY STARGATE & TAYLOR, LLP**

/s/ *Maris J. Kandestin*
James L. Patton (No. 2202)
Edwin J. Harron (No. 3396)
John T. Dorsey (No. 2988)
Maris J. Kandestin (No. 5294)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571–6600
Facsimile: (302) 571–1253

- and –

**HUGHES HUBBARD & REED LLP**
Derek J.T. Adler
Gabrielle Glemann
Charles Huberty
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837–6000
Facsimile: (212) 422–4726

- and -

**HERBERT SMITH LLP**
Kevin Lloyd
John Whiteoak
Richard Lawton
Exchange House
Primrose Street
London EC2A 2HS

*Counsel for the Joint Administrators*

01:13401308.1