## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- X
                                          :
*In re*                                   :    Chapter 11
                                          :
Nortel Networks Inc., *et al.,*[1]        :    Case No. 09-10138 (KG)
                                          :
                            Debtors.      :    Jointly Administered
                                          :
                                          :    **Hearing date:  March 7, 2013 at 10:00 a.m.**
                                          :
                                          :    **Re: D.I. 5307, 5308, 5531,  5444, 5532, 5440, 5448, 5529,**
                                          :    **5536, 5571, 5572, 5573, 5575, 5608, 5643, 5752, 9428**
-------------------------------------------------------- X

## SUPPLEMENTAL SUBMISSION OF U.S. DEBTORS
## AND OFFICIAL COMMITTEE OF UNSECURED
## CREDITORS  ON ALLOCATION PROTOCOL ISSUES

---

[1]      The U.S. Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

The U.S. Debtors and the Committee submit this supplemental memorandum pursuant to the Court's Revised Scheduling Order for Allocation Issues, dated February 14, 2013 [D.I. 9428] in further support of their Joint Motion for Entry of an Order Establishing an Allocation Protocol Pursuant to the Interim Funding and Settlement Agreement, and for Related Relief, dated April 25, 2011 [D.I. 5307] (the "Motion"),[2] and in further response to the EMEA Debtors' Objection to the Joint Motion and Cross-Motion to Compel Arbitration (the "Cross-Motion") [D.I. 5531].[3] The Movants also submit this supplemental memorandum to the Canadian Court pursuant to the Canadian Court's correspondence to the Canadian Service List, dated February 13, 2013.  The Movants incorporate herein their prior submissions in support of the Motion and in opposition to the Cross-Motion, and further respectfully submit as follows.

## PRELIMINARY STATEMENT

The time has come for allocation to be decided in an open and transparent setting by the two courts that have the authority and jurisdiction to do so.  This is not a difficult decision.  In fact, the only party to dispute the jurisdiction of these Courts to decide allocation – the EMEA Debtors – repeatedly agreed to the jurisdiction of the U.S. and Canadian Courts to decide the allocation issue in the IFSA and in *eight* separate Escrow Agreements.  Early on in these proceedings, the U.S., Canadian and EMEA Debtors recognized that the best way to maximize value for creditors was to sell Nortel's assets together.  They also recognized that the sale process would not succeed if a selling party could hold up an asset sale pending agreement on allocation of the Sale Proceeds.  The three failed mediations over the past years demonstrate the wisdom of the parties' agreement in the IFSA not to condition the joint sale of Nortel's assets on

---

[2]     Movants also filed a companion motion with the Canadian Court seeking Canadian Court approval of the Allocation Protocol.  *See* Notice of Motion of the Movants in the Canadian Proceedings, dated April 25, 2011 (the "Canadian Motion").

[3]     Capitalized terms used herein but not defined shall have the meaning ascribed to them in the Motion.

a prior agreement regarding allocation.  Those same mediations also demonstrate that it is now time for these Courts to take firm control of allocation.

In the IFSA, the parties agreed to separately negotiate in good faith on an allocation or, failing such agreement, a procedure to resolve any allocation dispute.  Absent agreement on either, the IFSA contains a fallback procedure to reach closure on the allocation issue.  That fallback is Section 16 of the IFSA, which broadly provides that any dispute relating to matters agreed in the IFSA be resolved in a cross-border proceeding before the U.S. and Canadian Courts.  The Escrow Agreements similarly provide that any disputes regarding the release of the sale proceeds from escrow must be resolved in a U.S./Canadian cross-border hearing.  With this carefully conceived structure, the IFSA and Escrow Agreements (each of which are governed by U.S. law) laid the groundwork for a series of enormously successful asset sales, generating over $7 billion in sale proceeds.   Having reaped the benefits of the IFSA and Escrow Agreements, the EMEA Debtors may not now disavow them.

The EMEA Debtors' argument that the parties agreed to arbitration in the IFSA is absurd. The IFSA nowhere says this, in words or substance.  It says quite the opposite:  that the parties will negotiate in good faith to *attempt* to reach agreement on a protocol for resolving any allocation dispute.  The EMEA Debtors' suggestion that an agreement to negotiate divested the Courts of jurisdiction to resolve the allocation dispute fails on its face.  The parties could not have divested the Courts of their jurisdiction in favor of a private arbitration absent the Courts' approval, which was neither sought nor obtained.  Even further, regardless of the IFSA's and Escrow Agreements' provisions retaining jurisdiction jointly in the U.S. and Canadian Courts, absent a clear agreement to arbitrate, arbitration may not be ordered.

Unable to come up with any basis to find an arbitration agreement, the EMEA Debtors raise two red herrings.  First, they claim that the U.S. and Canadian Debtors failed to negotiate in good faith on an allocation protocol.  The parties engaged in over 18 months of intense negotiations, including numerous conference calls, face to face meetings, and exchanges of drafts.  By any measure, this more than met the standard under applicable New York law for good faith negotiations.  Despite these efforts, when negotiations broke down, there remained a wide and insurmountable gulf between the parties on numerous material terms.

The EMEA Debtors' second assertion – that the U.S. and Canadian Courts' resolution of the allocation dispute will lead to "chaos" – is similarly baseless.  These Courts have held numerous cross-border hearings on material issues in these cases with great success.  In addition, these Courts are unquestionably the dispute resolvers most familiar with the underlying facts and relevant legal issues and thus best able to reach an expeditious and final ruling on allocation. The notion that the Courts should now turn this dispute over to yet another private alternative dispute resolution process after three failed mediations is preposterous.  There also is no legal basis to do so absent an agreement by the parties to arbitration, which does not exist.  Movants respectfully submit that it is well within the Courts' power and in the various estates' interest for the Courts to now oversee a prompt and expeditious process for resolving the allocation dispute and enable distributions to creditors around the world.

## ARGUMENT

### I.    The U.S. and Canadian Courts Have Jurisdiction Over the Allocation Issue.

The parties to the IFSA, including the EMEA Debtors, agreed that where, as here, a "claim, action or proceeding . . . *relating to* the matters agreed" in the IFSA "would affect the Canadian Debtors and the US Debtors or the EMEA Debtors" the matter "*must* be commenced"

3

in a "joint hearing of both the Canadian and US Courts conducted under the Cross-Border

Protocol."  IFSA § 16(b)(ii) (emphasis added);  *see* Motion at 12-16; Movants' Reply at 5-11;

*see also* IFSA § 16(b)(i) (consenting to the jurisdiction of the US and Canadian Courts for "all

legal proceedings to the extent relating to the matters agreed in this Agreement").  The words

"relating to" in a consent to jurisdiction and forum selection clause are to be read broadly and

include any matters that bear any conceivable relation or connection to the matters addressed in

the agreement.[4]  Allocation of Sale Proceeds clearly "relates" to matters agreed in the IFSA.[5]

Aside from the funding components, the central tenets of the IFSA were the agreements

regarding the sale transactions and the Sale Proceeds, including the escrowing of the Sale

Proceeds, and indeed, allocation of the Sale Proceeds.

The EMEA Debtors also agreed no fewer than *eight times* over a two-year period to

submit to the exclusive jurisdiction of the U.S. and Canadian Courts for all disputes "arising

under or out of, in respect of, or in connection with" the Escrow Agreements.  Movants' Reply at

---

[4]    *See* Movants' Reply at 8 (citing, *inter alia*, *Schering Corp. v. First Databank, Inc.*, 479 F. Supp. 2d 468, 471 (D.N.J. 2007) (observing that the Third Circuit has found forum selection clauses governing claims "related to" or "concerning" the parties' agreement to be broadly worded); *John Wyeth & Brother Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1075 (3d Cir. 1997) (looking to the court's past interpretation of the scope of 28 U.S.C. § 1334(b) in aid of interpretation of forum selection clause and observing that "the reach of 'related to' jurisdiction is extremely broad, extending to any action the outcome of which '*could conceivably have any effect on the estate being administered in bankruptcy*'") (quoting *Pacor Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) (emphasis in original)).  The phrase "related to" is broader than "arising under."  *See* Movants' Reply at 8 (citing, *inter alia*, *Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128-29 (2d Cir. 2001) (finding that "[t]he term 'related to' is typically defined more broadly [than arising out of] and is not necessarily tied to the concept of a causal connection . . . . Courts have . . . described the term 'relating to' as equivalent to the phrases 'in connection with' and 'associated with' . . . ."); *Huffington v. T.C. Grp.*, 637 F.3d 18, 22 (1st Cir. 2011) (observing that courts describe "with respect to" as synonymous with "relating to" and "in connection with," and observing that the phrase does not require a causal connection but simply means "connected by reason of an established or discoverable relation")).  Recognizing the breadth of the consent to jurisdiction and forum selection clause, the EMEA Debtors obtained a carve-out for claims against the Joint Administrators in their personal capacities which must under Section 17 of the IFSA be brought exclusively in the English Courts "[n]otwithstanding anything in Section 16."  IFSA § 17(c).

[5]    As the IFSA is governed by New York law, Ontario law does not apply.  However, if it did, the result would not be different.  *See* Factum of the Movants in the Canadian Proceedings, dated June 3, 2011 (the "Movants' Factum") at para. 81.

6-7.[6]  The Escrow Agreements expressly govern the release of Sale Proceeds from escrow.

Accordingly, disputes over to whom those proceeds should be released are covered by the plain

language of the broad consent to jurisdiction contained in the Escrow Agreements as well.

Independent of the binding forum selection clauses, the U.S. and Canadian Courts also

have jurisdiction to approve the Allocation Protocol.[7]  *See* Movants' Reply at 9-11; Movants'

Factum at paras. 61-73.  The U.S. Court has subject matter jurisdiction over core proceedings

within the meaning of 28 U.S.C. § 157(b)(2), which includes matters concerning the

administration of the U.S. Debtors' estates and proceedings affecting the liquidation of their

estates.[8]  As the EMEA Debtors have conceded, the allocation issue is such a core proceeding.

*See* Cross-Motion, Ex. A (Proposed Order) at 2.  The Canadian Court similarly has jurisdiction

to resolve matters relating to the allocation issue pursuant to its statutory and inherent

jurisdiction, including, *inter alia*, pursuant to sections 9 and 11 of the CCAA.[9]  Indeed, the U.S.

and Canadian Courts already recognized this inherent power when approving the Cross-Border

---

[6]    *See* Movants' Reply at 6-7 for a complete listing of the clauses in the Escrow Agreements.  The limited exception is the jurisdictional provision in the first Escrow Agreement, executed in March 2009, which provided for exclusive jurisdiction only in this Court.  In addition, a ninth escrow agreement, the Patent Portfolio Execution Escrow Agreement dated June 28, 2011 (after the Motion and Cross-Motion were filed and first argued) contains the same language as the other eight prior Escrow Agreements, but also states that inclusion of this language in that Escrow Agreement would not prejudice the right of any party to make arguments concerning the proper forum for allocation disputes.

[7]    A revised version of the Allocation Protocol attached to Movants' Reply (a negotiated document upon which Movants were able to reach agreement with the Canadian Debtors, the Monitor, and the ad hoc group of major Canadian Creditors (*see* Movants' Reply at 4-5)) is attached hereto as Exhibit A.  It has been slightly revised to reflect the changed circumstances of these cases over the past two years.  A blackline reflecting the changes made is attached hereto as Exhibit B.  In addition, the U.S. Debtors also submit as Exhibit C a revised version of the scheduling proposal submitted on February 8, 2013 solely to account for the fact that some deadlines set forth in that schedule are no longer possible.  The Committee has not adopted or endorsed a schedule for the litigation of the allocation dispute or claims disputes but believes that these matters should be litigated as expeditiously as possible.

[8]    The U.S. Court also has jurisdiction pursuant to sections 105(a) and 363 of the Bankruptcy Code for the reasons set forth in Movants' prior submissions, *see* Motion at 26; Movants' Reply at 9-11, and has jurisdiction over the Canadian Debtors and the EMEA Debtors in their Chapter 15 cases as well as by virtue of their participation in these cases.

[9]    The Canadian Court has "all of the powers that are necessary to do justice between the parties.  Except where provided specifically to the contrary, the Court's jurisdiction is unlimited and unrestricted in substantive law in civil matters."  *See Re InterTAN Canada Ltd.* (2009), 49 C.B.R. (5th) 232 at para. 7 (Ont. S.C.J. [Commercial List]) (citations omitted).

Protocol, expressly referenced in the IFSA, which contemplates that the U.S. and Canadian Courts may be called upon to decide "any motion to allocate sale proceeds which are in the aggregate more than U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement."  Cross Border Protocol ¶ 15(ii); *see also* Movants' Reply at 10.[10]

## II.    The Parties Did Not Agree To Arbitration.

The parties have never agreed to arbitration.   The U.S. Court or Canadian Court did not approve, nor were they ever asked to approve, such an agreement.  The "first principle" of arbitration is that it "is strictly a 'matter of consent' and thus is a way to resolve . . . disputes – but only those disputes – that the parties have agreed to submit to arbitration."  *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2857-58 (2010) (citation and emphasis omitted); *see also* Movants' Reply at 13-20.  The IFSA does not establish the parties' consent to arbitrate disputes over allocation.[11]

A principal purpose of the IFSA was to enable the key Nortel estates jointly to sell Nortel's assets unencumbered by disputes as to the estates' respective entitlement to Sale Proceeds.   The parties to the IFSA thus agreed to leave to another day a potential agreement on (i) the allocation of the Sale Proceeds or (ii) if the parties could not agree on the allocation of the Sale Proceeds, procedures to be followed to resolve that dispute.  If the parties could not agree

---

[10]    As explained in Movants' Reply, while the EMEA Debtors were not an original signatory to the Cross-Border Protocol, in the IFSA and all but the first Escrow Agreement, they agreed to be bound by the terms of the Cross-Border Protocol.  *See, e.g.*, IFSA § 16(b); MEN Escrow Agreement, ¶ 21 (providing that, for claims brought prior to a final bankruptcy decree, each party submits and agrees to the exclusive jurisdiction and rules of the U.S. and Canadian Courts, "including that certain cross-border insolvency protocol approved by the U.S. Bankruptcy Court pursuant to section 105(a) of the Bankruptcy Code in an order dated January 15, 2009 and by the Canadian Court pursuant to an order dated January 14, 2009, as amended or as amended and restated from time to time . . . .").

[11]    In Ontario, as in the U.S., a party cannot be compelled to arbitrate absent its agreement to do so.  *See* Movants' Factum at paras. 82-84.

on either issue, then Section 16's forum selection clause would apply and the allocation dispute would be resolved by the U.S. and Canadian Courts.  It is ludicrous for the EMEA Debtors to suggest instead that the Courts do not have jurisdiction and thus billions of dollars should remain in escrow indefinitely until the parties can agree on distribution or the terms of a protocol.

Consistent with this framework, Section 12(c) provides that the parties shall "negotiate in good faith and *attempt* to reach agreement on a timely basis on a protocol for resolving disputes concerning" allocation.  IFSA § 12(c) (emphasis added).  It is well settled under applicable New York law that an agreement to negotiate in good faith is not an enforceable agreement regarding the ultimate contractual objective.[12]  The EMEA Debtors agree, conceding that "Section 12(c) does not obligate the parties to actually reach agreement on the Protocol."  Cross-Motion at 29. In addition, in stark contrast to their litigation position today, after signing the IFSA, the Joint Administrators publicly admitted, "In the event that it is not possible to agree on an arbitration process with the Canadian and U.S. entities, the process for determining allocation of the sale proceeds is likely to be decided by the courts."   Second Rozenberg Decl. Ex. 2 at 12 [D.I. 5573] (Joint Administrators second progress report to creditors, dated February 12, 2010).[13]

The EMEA Debtors heavily emphasize Section 12(b)'s reference to "relevant dispute resolver(s)."  Far from supporting their argument, however, this reference further demonstrates

---

[12]    *See* Movant's Reply at 27-28 (citing, *inter alia*, *IDT Corp. v. Tyco Grp.*, 13 N.Y.3d 209, 213 n. 2, 918 N.E.2d 913, 915 n.2 (2009) (finding that where an "agreement contemplated the negotiation of later agreements" then "the consummation of those agreements was a precondition to a party's performance")); *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987); *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 126 (S.D.N.Y. 2010)).

[13]    *See also* Movants' Reply at 25 (citing Second Rozenberg Decl. Ex. 1 at 11 (the Joint Administrators' fourth progress report to creditors, dated February 11, 2011 at 11)).  The EMEA Debtors argued in their submissions that the parties' course of conduct after signing the IFSA demonstrates that they believed they had signed an arbitration agreement.  Cross-Motion at 20.  As explained in Movants' Reply, that law only applies if the parties first have an agreement, in which case their conduct might be admissible to interpret an otherwise ambiguous term.  *See* Movants' Reply at 25 n.27.  Even if such evidence were relevant (and it is not) the only course of conduct cited by the EMEA Debtors is the fact that the parties attempted but failed to negotiate an arbitration agreement after the signing of the IFSA, which shows there was no such agreement.  In any event, the strongest indication of the parties' intent post-signing is the Joint Administrators' admission on behalf of the EMEA Debtors that if the parties could not agree on arbitration then the allocation issue would have to be resolved by the courts.

that there was no arbitration agreement.  The term "dispute resolver(s)" is unambiguous, and by its plain meaning, broadly encompasses, among other possibilities, a court, multiple courts, or an arbitrator or multiple arbitrators.  *See* Movants' Reply at 19-21.[14]  The EMEA Debtors can only make the contrary argument by altering the clear language of the IFSA and inserting the word "private" before "dispute resolver(s)," which they then argue cannot include "national courts." *See, e.g.* Lloyd Decl. ¶ 7(a) (referring to "private 'dispute resolvers'"); *see also* EMEA Reply at 1 [D.I. 5608] (referring to a "private dispute resolution process").  However, the word "private" is *not* in the IFSA.  Moreover, the words the parties did use in the IFSA demonstrate without doubt that there was no agreement to arbitrate.  Similarly, the IFSA's reference to the parties attempting to reach agreement on "binding procedures for the allocation of Sales Proceeds" does not establish an arbitration agreement.  Not only is this on its face merely an agreement to negotiate in good faith, there is nothing inconsistent with this language and the parties attempting to agree on procedures for a joint hearing before the U.S. and Canadian Courts on allocation. Indeed, this is precisely what the U.S. and Canadian Debtors previously did in the Cross-Border Protocol.

When the IFSA was presented to the Courts for approval, no party asked the Courts to approve an arbitration agreement.  Had the parties agreed to arbitration, the parties would have made that agreement clear to the U.S. and Canadian Courts, who would have then had to rule on whether they approved the arbitration agreement in their orders approving the IFSA.  *See, e.g.*, Fed. R. Bankr. P. 9019(c) ("On stipulation of the parties to any controversy affecting the estate *the court may authorize* the matter to be submitted to final and binding arbitration") (emphasis added).  However, the parties told the Courts they were *not* being asked to approve a protocol

---

[14]    Under Canadian law, the term "dispute resolver" is also capable of including courts. *See Canada v. Borowksi*, [1981] 2 S.C.R. 575 at 579 (Laskin C.J.C., dissenting on other grounds).

(much less a protocol requiring arbitration) and instead stated that the parties would come back

to the U.S. and Canadian Courts for approval *after* an agreement on a protocol had been reached.

The U.S. IFSA Order, which was subsequently recognized in Canada by the Canadian Court

pursuant to section 18.6 of the CCAA, explicitly noted that no protocol was being approved and

affirmatively required that the parties return for court approval:

> Nothing in this Order or in the [IFSA] shall determine the allocation of proceeds
> from a Sale transaction among the Selling Debtors or shall constitute a Protocol
> for determining the allocation proceeds from a Sale Transaction among the
> Selling Debtors.  In any Sale Transaction for which a US Debtor is a Selling
> Debtor, no protocol for the allocation of proceeds from a Sale Transaction may
> become effective without the prior approval of this Court after notice to parties in
> interest with an opportunity to object, and no proceeds from a Sale Transaction
> may be allocated among the US Debtors and the other Selling Debtors unless such
> allocation is in accordance with a Protocol approved by this Court after notice to
> parties in interest with an opportunity to object or upon further order of this Court
> after notice to parties in interest with an opportunity to object.

U.S. IFSA Order ¶ 8 [D.I. 993].[15]   Indeed, the EMEA Debtors "do not dispute that, pursuant to

the IFSA Approval Order, the U.S. Debtor would be required to present a negotiated allocation

protocol for final approval."  EMEA Reply at 14.

To be sure, after signing the IFSA, the parties sought to negotiate an allocation protocol

that involved arbitration, an action entirely consistent with the fact that no such arbitration

agreement yet existed.  There followed more than one year of extensive good faith negotiations,

far surpassing the New York law requirements.  Unfortunately, despite the parties' efforts, there

remained a wide and insurmountable gulf between them on the terms of an allocation protocol

The list of material open issues was stunning in its breadth, including 29 issues (many with

subparts) on such fundamental matters as:  the scope of the disputes to be addressed; the parties

entitled to participate in the allocation process; the standard by which the allocation issue should

---

[15]      *See also* Movants' Reply at 16-17; *Re Nortel Networks Corp.* (2009), 56 C.B.R. (5th) 224 at para. 29 (Ont.
S.C.J. [Commercial List]) ("The Monitor expects that the Company will return to court . . . to seek approval of the
escrow agreement and a protocol for resolving disputes regarding the allocation of sale proceeds.")

be determined, including governing law; information access; and the scope of examination of witnesses and experts. *See* Movants' Reply at 30 (citing Brod Decl. ¶ 30; Hodara Decl. Ex. A).

Contrary to the EMEA Debtors' assertion, the Courts cannot fill in any terms of the purported arbitration agreement because there is no arbitration agreement. *See* Movants' Reply at 26-27; Movants' Factum at para. 82. The EMEA Debtors cite *Bauhinia Corp. v. China Nat'l Mach. & Equip. Import & Export Corp.*, 819 F.2d 247, 249-50 (9th Cir. 1987) for the proposition that a court has "discretion with respect to what form of arbitration to order." Cross-Motion at 25. However, a court's ability to fashion the form of an arbitration order presupposes that there is a binding arbitration agreement in the first place. In *Bauhinia*, there was no dispute that the contract there "expressly call[ed] for arbitration." *Bauhinia Corp.*, 819 F.2d at 249. Here, by contrast, the two prerequisites for an arbitration agreement to exist – agreement of the parties and court approval of that agreement – are not present.

Because the parties never agreed to arbitrate, the Courts may not compel the parties to arbitrate. *Granite Rock Co.*, 130 S. Ct at 2857-58.[16] Pursuant to the IFSA, the Escrow Agreements and the insolvency laws in both the United States and Canada, the U.S. and Canadian Courts have jurisdiction to order an allocation protocol setting forth procedures for the courts in a joint hearing and to hear and resolve the allocation issue.

## CONCLUSION

WHEREFORE, for the reasons set forth in the Motion, Movants' Reply, and herein, the Movants request that the Court: (i) approve the Revised Allocation Protocol substantially in the form attached as Exhibit A (ii) deny the EMEA Debtors' Cross-Motion to Compel Arbitration, and, (iii)  grant such other and further relief as the Court deems just and proper.

---

[16]    The same principle exists under Ontario law. *See* Movants' Factum at para. 82.

Dated:  March 4, 2013          CLEARY GOTTLIEB STEEN & HAMILTON LLP
        Wilmington, Delaware

                               Howard S. Zelbo (admitted *pro hac vice*)
                               James L. Bromley (admitted *pro hac vice*)
                               Jeffrey A. Rosenthal (admitted *pro hac vice*)
                               Lisa M. Schweitzer (admitted *pro hac vice*)
                               One Liberty Plaza
                               New York, New York 10006
                               Telephone:  (212) 225-2000
                               Facsimile:  (212) 225-3999

                                   - and -

                               MORRIS, NICHOLS, ARSHT & TUNNELL LLP

                               */s/ Ann C. Cordo*
                               Derek C. Abbott (No. 3376)
                               Eric D. Schwartz (No. 3134)
                               Ann C. Cordo (No. 4817)
                               1201 North Market Street
                               P.O. Box 1347
                               Wilmington, Delaware 19801
                               Telephone:  (302) 658-9200
                               Facsimile: (302) 658-3989

                               *Counsel for the Debtors*
                               *and Debtors in Possession*

                                   - and -

                               AKIN GUMP STRAUSS HAUER & FELD LLP

                               Fred Hodara (admitted *pro hac vice*)
                               David Botter (admitted *pro hac vice*)
                               Abid Qureshi (admitted *pro hac vice*)
                               One Bryant Park
                               New York, New York 10036
                               Telephone:  (212) 872-1000
                               Facsimile:  (212) 872-1002

                                   - and -

                               RICHARDS, LAYTON & FINGER, P.A.

                               */s/ Christopher M. Samis*

Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile: (302) 651-7701

*Counsel for the Official Committee
of Unsecured Creditors*