# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re* | ) Chapter 11 |
| | ) |
| Nortel Networks Inc., *et al.*,[1] | ) Case No. 09-10138 (KG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## SUPPLEMENTAL STATEMENT OF NORTEL AD HOC GROUP OF BONDHOLDERS IN FURTHER SUPPORT OF PROPOSED ALLOCATION PROTOCOL

The ad hoc group of Nortel bondholders (the "Bondholder Group")[2] submits this supplemental statement (the "Supplemental Statement") in support of the prompt establishment of the proposed Allocation Protocol (as defined below) and in accordance with the United States Bankruptcy Court for the District of Delaware's order dated February 14, 2013 [Docket No. 9428] and the concurrent and complementary Endorsement of the Ontario Superior Court of Justice, Commercial List.

For almost two years, more than $7 billion in Nortel asset sale proceeds have sat idle. Three mediations have failed. The parties are no closer to resolving the issues of estate entitlement to those proceeds than they were several years ago. This paralysis, however, has not been without significant cost. Since the mediation efforts first began in late 2010, the Nortel estates have been diminished by hundreds of millions of dollars in legal and advisor fees. During that time, failed

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

[2] The Bondholder Group consists of bondholders that hold claims issued or guaranteed by Nortel Networks Corporation ("NNC" and together with its affiliates worldwide, "Nortel"), Nortel Networks Limited ("NNL" and together with NNC and certain of their subsidiaries, the "Canadian Debtors"), Nortel Networks Inc. ("NNI"), and Nortel Networks Capital Corporation ("NNCC" and together with NNI and certain of its subsidiaries, the "U.S. Debtors").

efforts to resolve the Allocation Dispute (as defined below) have taken place behind closed doors, with creditors receiving no information, or worse, misinformation about the nature of the dispute and the positions of certain of the parties. The secrecy with which the process has been cloaked has only served to permit certain parties to remain entrenched in their positions and detached from the creditors they represent.

No longer should these recalcitrant parties be permitted to hide their extreme and indefensible positions from public view and direct scrutiny. The time has come for the U.S. Court and the Canadian Court (together, the "Courts") to bring the dispute over the allocation of proceeds from the sale of Nortel assets (the "Allocation Dispute") out of the confines of conference rooms and into the light of the public courtroom. Transparency and speed are the twin pillars necessary for a rapid and successful court-adjudicated or consensual resolution of the Allocation Dispute. To this end, the Court should adopt the litigation schedules proposed by the Bondholder Group in its February 8, 2013 filing with the U.S. Court  [Docket No. 9393] (the "February 8th Statement") (as appropriately adjusted to account for the passage of time since that filing, but keeping as expeditious a time-frame as possible). A decision to send the Allocation Dispute to arbitration would not only be wrong as a legal matter, since the U.S. and Canadian parties have not consented to such arbitration, but it would also serve merely to perpetuate the status quo of these cases to date. Arbitration would once again allow the parties to hide their arguments and positions behind closed doors and provide fewer opportunities for the Courts to aggressively move these cases toward resolution and ultimately to distributions to creditors.

## Preliminary Statement

1.      Alternative dispute resolution has failed. It has been attempted on three different occasions in these cases. In each instance, no agreement was reached. In fact, no agreement

was reached on any salient or even significant issue in dispute. In each of the past three years, parties

have assembled before a mediator and tried to find areas of consensus. In each of the past three years,

consensus eluded the parties. It is time for the Courts to take control and set an expedited path for

adjudication of the Allocation Dispute.

2.      It is now incumbent upon the Courts to decide the current dispute over the

proposed Allocation Protocol[3] (the "<u>Protocol Dispute</u>") for three reasons:

- *First,* the parties to the IFSA[4] expressly chose the Courts and submitted to only their jurisdiction for the resolution of any Protocol Dispute and any Allocation Dispute.

- *Second,* after years of being denied a timely distribution, all Nortel creditors now turn to the Courts for help. Only the Courts can bring these cases to a successful resolution through a transparent process.

- *Third,* it is now clear that only the Courts can impose a timely resolution of both the Protocol Dispute and the Allocation Dispute through a disciplined and expedient litigation schedule.

3.      Any further efforts to employ alternative dispute resolution methods, including

arbitration, to resolve the Allocation Dispute are not only legally unsupportable and untenable, but

also guarantee nothing more than delay, until they once again are ultimately proven futile. Alternative

dispute resolution has already been well-tested in these cases and found wanting. If the Courts

surrender their judicial powers and cede control over the timing and process of the Allocation Dispute

to an unnegotiated and yet-to-be developed arbitration process, the Bondholder Group firmly believes

---

[3]      In April 2011, the U.S. Debtors and the Official Committee of Unsecured Creditors filed a joint motion in the U.S. cases [Docket No. 5307] and the Canadian Debtors filed a motion in the Canadian proceedings requesting that the U.S. Court and the Canadian Court jointly utilize their respective jurisdiction and exercise their respective authority under the Interim Funding and Settlement Agreement dated as of June 9, 2009 (the "<u>IFSA</u>") to establish a protocol (the "<u>Allocation Protocol</u>") to resolve the Allocation dispute judicially.

[4]      On or about June 9, 2009, after extensive negotiations that included the Bondholder Group and the Unsecured Creditors Committee, the U.S. Debtors, the Canadian Debtors, and Nortel Networks UK Limited and certain of its affiliates located in Europe, the Middle East and Africa (collectively, the "<u>EMEA Debtors</u>"), excluding Nortel Networks S.A. and Nortel Networks, AG, entered into the IFSA. On June 23, 2009, the English High Court provided directions to the Joint Administrators on behalf of the EMEA Debtors, stating that the Joint Administrators were entitled to enter into the IFSA on behalf of the EMEA Debtors. After a joint hearing on June 29, 2009, the U.S. and Canadian Courts approved the IFSA and entered orders authorizing the U.S. Debtors and Canadian Debtors, respectively, to enter into the IFSA [Docket No. 993]

that it would only lead to another "dead-end," beginning with more delay if the Courts attempt to force

an arbitration process upon parties who have never agreed to arbitrate. Thus, the Bondholder Group

reaffirms its position that the best path forward for all Nortel creditors is for the Courts to proceed

directly with litigation of the Allocation Dispute in accordance with the proposed schedule attached to

the February 8th Statement (as appropriately adjusted).

4.      It is also time for the Courts to intervene proactively to resolve the claims

asserted by the EMEA Debtors against the U.S. Debtors and the Canadian Debtors (the "EMEA

Claims") and by the U.K. Pension Parties[5] against the U.S. Debtors and the Canadian Debtors (the

"UK Pension Claims"). The continued assertion of those specious claims, many of which have

already been dismissed in the U.S. and the rest of which the U.S. Court has already expressed

significant skepticism towards,[6] is being used to hijack the Allocation Dispute and also creates a

distorted claims overhang that would inappropriately complicate potential creditor distributions in the

U.S. and Canada. Thus, the Bondholder Group requests that the Courts contemporaneously resolve

the EMEA Claims and the U.K. Pension Claims on parallel tracks in accordance with its proposed

litigation schedule attached to the February 8th Statement (as appropriately adjusted).

### Supplemental Statement

A.      **The Parties to the IFSA Expressly Chose The Courts and Submitted to Only Their Jurisdiction for the Resolution of Any Protocol Dispute and Any Allocation Dispute**

5.      As an initial matter, common to both United States and Canadian law, no party

can be ordered to arbitration absent its express consent.[7] The parties to the IFSA never gave any such

---

[5]    "U.K. Pension Parties" means certain holders of pension claims against Nortel Networks UK Limited.

[6]    See Opinion on Joint Objections to and Motions to Dismiss Claims of Nortel Networks UK Limited, Nortel Networks (Ireland) Limited and Nortel Networks S.A. (March 20, 2012) [Docket No. 7403].

consent. Directly to the contrary, the parties to the IFSA *expressly and repeatedly chose the Courts to be the only "dispute resolvers" of both the Protocol Dispute and the ultimate Allocation Dispute*.

6.      Both the IFSA and the Cross Border Protocol[8] clearly express the parties' choice of the Courts as the "dispute resolvers," a choice that no party has taken issue with to date. All parties now before the Courts actively and vigorously participated in negotiating the terms of the IFSA, including the very terms under which they agreed they would submit to the jurisdiction of the Courts (and no other forums) for purposes of dispute resolution. See IFSA at ¶16(b) ("To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the Cross-Border Protocol adopted by such Courts, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement . . .").[9] Thus, by the *plain language* of the IFSA, resolution of both the Protocol Dispute and the Allocation Dispute fall squarely within the jurisdiction of the Courts.

---

[7]     See Granite Rock Co. v. Int'l Bhd. Of Teamsters, 130 S.Ct. 2847, 2857-58 (2010) ("The first principle [of arbitration] is that . . . [the parties must] have agreed to arbitrate some matters pursuant to an arbitration clause" in order to have submitted the resolution of such matters to arbitration.); see also Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 479 (1989) (finding arbitration is strictly "a matter of consent . . ."), First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995) (arbitration "is a way to resolve those disputes--but only those disputes--that the parties have agreed to submit to arbitration."). The IFSA is governed by the laws of the State of New York, without regard to conflict rules. New York law is therefore applicable. Nonetheless, the Ontario legal framework is substantially similar to that under New York law. The parties must evince an intent to submit themselves to arbitration in writing. The language of the purported arbitration agreement is the starting place, and the court will look to whether the parties have delineated with certainty the necessary key features of arbitration such as scope, the procedure for initiating and conducting the arbitration, and who may be appointed arbitrator and how. See Benner & Associates Ltd. v. Northern Lights Distributing Inc. [1995] O.J. No. 626 (Gen.Div.); Coldmatic Refrigeration of Canada Ltd. v. P.U.M.A.s.p. [1998] O.J. No. 1697 (Gen.Div.).

[8]     "Cross Border Protocol" means those established procedures for coordinating cross-border hearings between the U.S. Court and the Canadian Court, as amended on June 29, 2009 by this Court [Docket No. 990] and the Canadian Court.

[9]     The Allocation Protocol is specifically one of the "matters agreed" under ¶12 of the IFSA. IFSA at ¶ 12(c) ("Without derogating from the obligations provided in Section 12.a., the Debtors shall, as soon as reasonably practicable following the execution of this Agreement, negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions . . . , which Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation.").

7.    In addition, arbitration agreements reached in the context of a U.S. bankruptcy case require court approval under Rule 9019(c) of the Federal Rules of Bankruptcy Procedure.[10] The EMEA Debtors suggest that the parties somehow consented to arbitration because significant time and effort was spent ***attempting***, but failing, to develop an allocation protocol that included a mechanism to provide for arbitration. Mere efforts to negotiate a dispute resolution process – unsuccessful efforts at that – are not and cannot be found to be tantamount to an agreement to submit to arbitration. ***Indeed, failure to reach agreement on a dispute resolution mechanism may well be the best evidence that the parties never consented to arbitration.*** Because agreement on arbitration was never reached, no approval of an arbitration proposal (as would be required under Rule 9019(c) in the case of a U.S. proceeding) was ever sought from the U.S. Court.

**B.    After Years of Being Denied a Timely Distribution, All Nortel Creditors Now Turn To the Courts for Help To Bring These Cases To a Successful Resolution Through a Transparent Process**

8.    Recourse to these Courts for a determination of this dispute is the only viable and efficient path toward a successful resolution of these issues and these cases. In June 2011, the Courts, cognizant of the importance to creditors of an expeditious resolution of the Allocation Dispute, had taken the coordinated step of reserving two weeks in December 2011 for hearings of that dispute. The Bondholder Group supported and applauded this joint effort by the Courts to inject a sense of urgency and finality into the process. Unfortunately, that schedule never came to fruition. Prior to and since that time, certain parties have continually demonstrated their complete inability to use alternative dispute resolution processes to resolve the Allocation Dispute. Accordingly, the Bondholder Group strongly urges the Courts to reassert their control and guidance over this dispute to

---

[10]    Rule 9019(c) states that "[o]n stipulation of the parties to any controversy affecting the estate, the court may authorize the matter to be submitted to final and binding arbitration." Fed. R. Bankr. P. 9019(c)

oversee an orderly and efficient resolution of it, thereby stemming the significant ongoing administrative costs that are depleting creditor recoveries by the day.

9.      Through a "parade of horribles," the EMEA Debtors suggest that the Courts, and by extension the judiciary, would be paralyzed by the complex legal and procedural issues that the Allocation Dispute will encompass and therefore binding arbitration is the appropriate means for resolving the Allocation Dispute. The Bondholder Group disagrees. The EMEA Debtors are clearly overestimating the ability of arbitration to simplify cross-jurisdictional issues while at the same time underestimating the ability of the Canadian and U.S. judicial systems to do so.

10.     First, the Courts and the judiciary are accustomed to grappling with difficult and complex bankruptcy cases. It is both shopworn and indisputable to observe that courts were created for the very purpose of deciding issues that parties cannot resolve themselves and are well-equipped to consider and determine complicated legal and procedural issues, as they do on a daily basis. Here, the Courts have overseen these cases for more than four years and are well-versed in the factual framework, procedural history, and both the obvious and more subtle challenges and legal issues that now confront them. They have no general learning curve as an arbitration panel would. The Courts have already coordinated successfully on other difficult cross-border issues, which notably include approval of the IFSA and the numerous joint sales that have generated the many billions of dollars now at the center of the Allocation Dispute. No court would or could decline to decide the Allocation Dispute simply because it may be difficult and challenging.

11.     Second, an order directing arbitration of the Allocation Dispute will undoubtedly result in further delay given the parties' previous experience with utilizing alternative dispute resolution methods to resolve this issue. The third and final mediation process not only lasted almost 18 months, but it also brought to a halt progress on several other key unresolved issues in these

cases. For example, the Courts themselves were required to table discovery schedules previously set to resolve the EMEA Claims and U.K. Pension Claims until mediation concluded. Should arbitration be ordered, the Courts will no doubt find that the timelines for resolution of these and other similar claims resolution matters across the Nortel estates will create coordination conflicts with an arbitration process that will proceed on a separate timetable controlled by an arbitration panel, which in turn will cause further delay.

12.    Finally, the Bondholder Group is concerned that arbitration of the Allocation Dispute will result in the Courts, the parties, and the actual creditors that the parties represent having little to no visibility or input into both the timing and the decision-making process regarding this keystone issue, resulting in increased uncertainty as to whether and how parties' legal rights are being respected. The Bondholder Group firmly believes that the secretive and confidential nature of the allocation negotiations thus far have greatly contributed to the entrenched, and in certain cases untenable, positions of certain parties that have created the current impasse. Arbitration would similarly take place behind closed doors. It would also create an outcome with very limited appellate oversight.[11] Accordingly, the Bondholder Group requests that the Courts accept the role of guardian of a thorough and transparent litigation process that can and will inject domestic and cross-border accountability and integrity into the resolution of a fundamentally important issue that, despite the best efforts of the parties themselves, has reached an insurmountable impasse.

---

[11]    See, e.g., In re HBLS L.P., 272 B.R. 390, 393 (Bankr. S.D.N.Y.) ("The grounds specified in CPLR § 7511 for vacating or modifying an arbitration award are few in number and are narrowly applied.") (quoting Goldfinger v. Lisker, 68 N.Y.2d 225, 230 (1986)). To vacate or modify an arbitral award, parties must show some kind of wrongdoing or serious failure of the arbitrator or the process; errors of law or fact are insufficient to warrant the vacatur of an award. See In re Sprinzen, 46 N.Y.2d 623, 629 (1979). The Ontario legal position is similar.

**C.    Only the Courts Can Impose a Timely Resolution of Both the Protocol Dispute and Allocation Dispute Through a Disciplined and Expedient Litigation Schedule**

13.    If the Courts rightly determine that both the Protocol Dispute and the Allocation Dispute should be resolved through a coordinated judicial process in accordance with the IFSA and the Cross-Border Protocol – which the Bondholder Group believes they should – the Courts should impose discipline on the process by ordering, and then ensuring that the parties adhere to, a strict pre-trial discovery process, such as the one previously proposed by the Bondholder Group in its February 8th Statement (as appropriately adjusted).  The Nortel Debtors and their stakeholders, all assisted by teams of sophisticated professionals, have had more than sufficient time to identify the key issues in the Allocation Dispute and to refine their positions in respect thereof.  Four years and three intensive rounds of mediation, all with extensive document production and briefing, have provided ample opportunity for the parties to determine their positions and hone their arguments.  Only limited additional information and analysis should be necessary for any party to proceed quickly in this matter.

**Conclusion**

14.    Proactive and aggressive intervention by the U.S. and Canadian Courts, through the imposition of the Allocation Protocol for a joint judicial hearing and the adoption of a 6-month litigation schedule, is crucial to moving certain parties past the irreconcilable positions that have developed and become entrenched over the course of multiple failed efforts to mediate a resolution. The Bondholder Group submits that the time is now for the Courts to take up the reins of deciding the Allocation Dispute in an expeditious manner.

Dated: March 4, 2013

**PACHULSKI STANG ZIEHL & JONES** LLP

By: /s/ Kathleen P. Makowski _____

Laura Davis Jones (Bar No. 2436)
Kathleen P. Makowski (Bar No. 3648)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:  ljones@pszjlaw.com
       kmakowski@pszjlaw.com

-and-

**MILBANK, TWEED, HADLEY & MᶜCLOY** LLP
Dennis F. Dunne
Thomas R. Kreller
Albert A. Pisa
Andrew M. Leblanc
1 Chase Manhattan Plaza
New York, NY 10005
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219