# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------- X

|  |  |
|---|---|
| In re: | : Chapter 11 |
| | : |
| NORTEL NETWORKS INC., *et al.*,[1] | : Case No. 09-10138 (KG) |
| | : |
| Debtors. | : (Jointly Administered) |
| | : |

-------------------------------------------------------------------- X

## NOTICE OF FILING OF SUPPLEMENTARY SUBMISSIONS OF THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK LIMITED AND THE EMEA DEBTORS

**PLEASE TAKE NOTICE** that pursuant to Revised Scheduling Order for Allocation Issues [D.I. 9428] in the above-captioned cases, the court-appointed administrators and authorized representatives (Collectively, the "EMEA Administrators") for Nortel Networks UK Limited, and certain other affiliated entities in proceedings under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, pending before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Proceedings"), by its undersigned counsel, filed, in the above-captioned cases, the Supplementary Submissions of the Joint Administrators of Nortel Networks UK Limited and the EMEA Debtors (the "Submission").

---

[1]. The Debtors in these Chapter 11 cases are: Nortel Networks Inc., Nortel Networks Capital Corporation, Alteon WebSystems, Inc., Alteon WebSystems International, Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

A hearing is scheduled to be held in the above-captioned cases on March 7, 2013. A copy of

the Submission is annexed hereto as Exhibit A.


Dated:  Wilmington, Delaware      YOUNG CONAWAY STARGATT & TAYLOR, LLP
        March 4, 2013

/s/ *Maris J. Kandestin*
James L. Patton (No. 2202)
Edwin J. Harron (No. 3396)
John T. Dorsey (No. 2988)
Maris F. Kandestin (No. 5294)
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 571–6600
Facsimile: (302) 571–1253

- and -

**HUGHES HUBBARD & REED LLP**
Derek J.T. Adler
Gabrielle Glemann
Charles Huberty
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837–6000
Facsimile: (212) 422–4726

- and -

**HERBERT SMITH LLP**
Kevin Lloyd
John Whiteoak
Richard Lawton
Exchange House
Primrose Street
London
EC2A 2HS

Counsel for the Joint Administrators

**EXHIBIT A**

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CRDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS
LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL
NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT
ACT*, R.S.C. 1985, c. C-36, AS AMENDED

**SUPPLEMENTARY SUBMISSIONS OF THE JOINT ADMINISTRATORS OF NORTEL
NETWORKS UK LIMITED AND THE EMEA DEBTORS**

March 4, 2013

**LAX O'SULLIVAN SCOTT LISUS LLP**
Counsel
Suite 2750, 145 King Street West
Toronto, ON  M5H 1J8

**Matthew P. Gottlieb**  LSUC#: 32268B
**James Renihan**  LSUC#: 57553U
Tel:    (416) 598-1744
Fax:    (416) 598-3730

**DAVIES WARD PHILLIPS & VINEBERG LLP**
44th Floor, 1 First Canadian Place
Toronto, ON  M5X 1B1

**Robin B. Schwill**  LSUC#: 38452I
Tel:    416.863.0900
Fax:    416.863.0871

Lawyers for the Joint Administrators of Nortel
Networks UK Limited (In Administration)

2

TO:        **THE SERVICE LIST**

Court File No. 09-CL-7950

### *ONTARIO*
### **SUPERIOR COURT OF JUSTICE**
### **COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CRDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS
LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL
NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT
ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### **SUPPLEMENTARY SUBMISSIONS OF THE JOINT ADMINISTRATORS OF
NORTEL NETWORKS UK LIMITED AND THE EMEA DEBTORS**

### **INTRODUCTION**

1.      Pursuant to the direction of the Court, the Joint Administrators of the EMEA Debtors

provide these submissions in support of their position that the allocation of the Sales Proceeds

must be determined by way of arbitration, as provided in the IFSA. All capitalized terms not

defined herein have the same meaning as the initial factum of the Joint Administrators.

2.      Contrary to the motions brought by the U.S. and Canadian Debtors, it is respectfully

submitted that this Court cannot determine the allocation of the Sales Proceeds by way of a

co-operative procedure with the U.S. Court or otherwise, for several reasons:

(a)     The IFSA requires the parties to it to engage in binding arbitration to determine the

allocation of the Sales Proceeds. The parties' decision to refer to "dispute

resolver(s)" rather than a court, as well as their agreement to determine "binding procedures" for the proceeding makes this clear.

(b)     The extrinsic evidence clearly demonstrates that all parties to the IFSA understood and intended it to require allocation issues to be determined by way of arbitration. They explicitly and without reservation represented this to the courts and spent a year negotiating an arbitration agreement featuring an arbitration panel. At no time were the Courts to be involved in determining allocation. The unchallenged evidence is that the EMEA Debtors only agreed to engage in asset sales because the allocation of the Sales Proceeds would be determined through arbitration and they would have input into the appointment of the arbitrator(s) and the process to be adopted.[1]

(c)     An interpretation that requires this Court to resolve allocation issues in conjunction with the U.S. Court is not feasible. First, this Court does not have the jurisdiction to determine the allocation of proceeds from the sale of foreign assets between foreign parties. Second, there are many different procedural and substantive rules between the jurisdictions that cannot be reconciled, making a joint trial impossible. There is no realistic possibility of each Court independently allocating billions of dollars among approximately 40 entities based on numerous sales in various international jurisdictions in exactly the same manner, leading to inconsistent judgments. Yet this Court is constitutionally bound to retain its jurisdiction and make its own determination on issues submitted to it. Subsequent and separate appeals again

---

[1] Lloyd Declaration, at para. 10(b)

gives rise to the possibility of inconsistent results which would make it impossible to ever compel distribution of the Sales Proceeds.

## STATEMENT OF ISSUES, LAW & AUTHORITIES

**i)      Section 12(b) of the IFSA Unambiguously Requires Arbitration**

3.      The IFSA is governed by New York law. The expert evidence of Tai-Heng Cheng demonstrates:

(a)      A written agreement that evinces an intent to submit to arbitration must be enforced unless there is a clear public policy against arbitrating the dispute in question.[2]

(b)      It is not necessary to use the word "arbitrate" or any similar term in a binding arbitration provision.[3]

(c)      New York law follows a liberal policy of promoting arbitration, particularly in the case of international commercial disputes.[4]

(d)      An arbitration provision that obliges the parties to subsequently agree on a protocol for the proceeding is enforceable.[5] If the parties cannot agree, the Court shall appoint an arbitrator(s) who will then determine the applicable protocol.[6]

4.      Given these principles, s. 12(b) is unambiguously an enforceable arbitration provision:

(a)      Section 12(b) requires the allocation of Sales Proceeds to be determined by "dispute resolver(s)". The parties' decision not to refer to either this Court or the

---

[2] Cheng Expert Report, at para. 17
[3] Cheng Expert Report, at para. 20
[4] Cheng Expert Report, at para. 33
[5] Cheng Expert Report, at para. 45
[6] Cheng Expert Report, at para. 46

4

U.S. Court is notable. Throughout the IFSA, including ss. 1(b), 3, 4, 6(e), 13(a), 13(c), 13(d), 13(e), 15, 16(b), 17(c), 18(a), 18(b) and 19(a), the parties explicitly refer to courts. Both this Court and the U.S. Court are specifically defined. Section 18 specifically directs parties to obtain approval of the IFSA from the "applicable Courts". If the parties had intended for the allocation of Sales Proceeds to be determined by courts, they would have said so. Instead, they chose to use the term "dispute resolver(s)", which evinces a clear intention to have an alternate form of dispute resolution, rather than a court proceeding.

(b)     Section 12(c) obliges the parties to negotiate "binding procedures" of a protocol to be followed by the dispute resolver. This is flatly inconsistent with a court proceeding. Courts already have processes which govern proceedings before them – the parties *cannot* determine their own particular "binding procedures", in Ontario or New York.[7] Only for an *ad hoc* arbitration is such a provision meaningful.

(c)     Under New York law, there is no public policy to justify refusing to enforce s. 12(b). Rather, international commercial arbitrations are to be encouraged.[8]

5.     Consistent with New York law, the Court must give a "practical interpretation to the language employed so that the parties' reasonable expectations are realized."[9] Reading s. 12(b) as an arbitration provision is the only practical interpretation of the provision.

---

[7] Cheng Expert Report, at para. 31
[8] Cheng Expert Report, at para. 33
[9] Cheng Expert Report, at para. 19; citing *In re Same Time Holdings Ltd. & Red Board Ltd.*, No. 101119/06, 2006 WL 2079332, at *3 (N.Y. Sup. Ct. May 20, 2006)

6.     The Courts are not able to deal with this multi-jurisdictional dispute concerning the division of assets among approximately 40 international entities. If "dispute resolver(s)" were to mean this Court and/or the U.S. Court, irresolvable practical problems would arise. Each Court will be asked to allocate billions of dollars raised from various sales of assets located all over the world. At the same time, each Court must ultimately decide the disputes submitted to it independently from the other. It is unlikely in the extreme that both Courts independently will identically allocate the assets, resulting in conflicting decisions and no process for determining how to move forward. Also, the inevitable resulting appeal processes are not governed by a uniform set of procedural or legal rules. Indeed, both Ontario and Delaware have very different appeal processes, including the right to appeal, the issues that can be raised on appeal and the various tiers of appeal courts. The result would be not only years of litigation but potentially also two incompatible judgments, neither of which would be enforceable.

7.     The parties could not have intended a process that is so procedurally flawed that it risks failing altogether. The possibility of inconsistent verdicts must be avoided, but the Courts cannot cede jurisdiction to the other or render, in effect, "joint decisions" in order to avoid this prospect. As noted by Justice Blair in *Menegon*:

> The extension of comity as between Courts in cross-border insolvency situations, and co-operation generally in such matters, are matters of great importance, to be sure, in order to facilitate the successful and orderly implementation of insolvency arrangements in such circumstances. Nothing I have said in these Reasons is intended to counter that ethic. However, comity and international co-operation do not mean that one Court must code [*sic*] its authority and Jurisdiction over its own process or over the application of the substantive laws of its own jurisdiction, whenever any kind of differences between the two jurisdiction may arise.[10]

---

[10] *Menegon v. Philip Services Corp.* (1999), 11 C.B.R. (4th) 262 (Ont. S.C.) (Comm. List), at para. 48 (Tab A)

**ii) Extrinsic Evidence Demonstrates Parties Intended to Arbitrate**

8.      As under Ontario law, New York law permits the Court to consider extrinsic evidence in interpreting s. 12(b) of the IFSA if it is ambiguous.[11] That evidence uniformly demonstrates that the parties to the IFSA intended and understood s. 12(b) to be an arbitration provision:

(a)      The parties engaged Lazard, an investment bank, to provide strategic advice regarding the sale of assets and process for allocating them.[12] In a strategy paper provided to the parties, Lazard proposed referring disputes to a "Dispute Resolver" and noted the parties would need to "[i]dentify an individual" to act as the dispute resolver, as well as "potential replacements" in the event that individual was not available, with the "[c]osts and expenses" of the dispute resolver borne equally among the parties.[13] As parties cannot choose their judge and do not pay his or her costs and expenses, "Dispute Resolver" clearly referred to a private arbitrator.

(b)      When seeking approval of the IFSA from the U.S. Court, American counsel for the U.S. Debtors informed the Court that there would be "a fair and reasonable independent body deciding the allocation", with the role of the courts simply being one of "confirmation that those amounts are appropriate."[14]

(c)      The U.S. Court, in a Memorandum Opinion in relation to an application to stay proceedings brought by the U.K. Pension Authorities, stated that:

>        The purpose of the protocol... is to ensure a fair allocation, to be determined (absent a consensual agreement) in a single cross-jurisdictional forum... The

---

[11] Cheng Expert Report, at para. 48
[12] Lloyd Declaration, at para. 14
[13] Lazard Paper, at p. 70 of Tab "A" to the Lloyd Declaration
[14] Lloyd Declaration, at para. 34

> Nortel debtors in Canada, the U.S. and the U.K. have agreed that these issues must be resolved, on a global basis, in a single cross-jurisdictional forum.[15]

(d)     When the French Court granted approval for NNSA to enter into the IFSA, its order stated that the amount to be allocated to NNSA was to be "determined or which may at least be determinable by a third party neutral arbitrator".[16]

(e)     In accordance with the arbitration process in the IFSA, the parties engaged in extensive negotiations for a protocol for determining allocation, during which they agreed: (i) there would be three dispute resolvers appointed, one each from Canada, the U.S. and the U.K.; (ii) the decision of the dispute resolvers would be final and not subject to appeal, but could be an award under the UN Convention on the Recognition and Enforcement of Foreign Arbitral Awards; and (iii) on detailed procedures to govern the arbitration.[17] At no time did the parties discuss the possibility of the Courts being involved in determining allocation.

9.      The conduct of the parties, both before and after the IFSA was agreed to, demonstrates beyond doubt that any allocation disputes were to be arbitrated. The parties negotiated an arbitration procedure from June 2009 to May 2010.[18] The sudden change of position from the U.S. and Canadian Debtors is not in accordance with the IFSA and cannot be given effect. The unchallenged evidence is that the EMEA Debtors would not have agreed to engage in the asset sales if worldwide allocation was to be determined by two national courts.[19]

---

[15] Lloyd Declaration, at para. 10(b)
[16] Lloyd Declaration, at para. 44
[17] Lloyd Declaration, at para. 47
[18] Lloyd Declaration, at para. 47
[19] Lloyd Declaration, at para. 51

8

### iii)    Section 16(b) Does Not Govern Allocation Disputes

10.    The U.S. and Canadian Debtors argue that s. 16(b) of the IFSA precludes interpreting s. 12(b) as an arbitration provision. This is not correct. Properly interpreted under New York law, s. 16(b) is consistent with the parties' express intention to arbitrate all allocation disputes:

(a)    Under New York law, a general jurisdiction provision does not negate an arbitration provision contained in the same document.[20] Rather, it merely identifies the jurisdiction with power to compel arbitration or enforce an award.[21]

(b)    New York law prioritizes a more specific provision over a more general provision.[22] Even if s. 16(b) can support an interpretation that the parties may commence proceedings *solely* in this Court and/or the U.S. Court, that broad interpretation must be discarded in favour of a more restrictive interpretation that is consistent with the arbitration mandated by s. 12(b).

(c)    New York law requires the IFSA to be read so that all of its terms have meaning.[23] If s. 16(b) precluded arbitration, large components of ss. 12(b) and (c) would be meaningless. By contrast, excluding allocation disputes from the ambit of s. 16(b) still leaves many disputes subject to that provision, such as:

(i)    provision of funding disputes, pursuant to s. 1;

(ii)    use of funding disputes, pursuant to s. 2;

---

[20] Cheng Expert Report, at para. 35
[21] Cheng Expert Report, at para. 35, citing *Isaacs v. Westchester Wood Works, Inc.*, 718 N.Y.S. 2d 338 (N.Y. App. Div. 2000), at 338
[22] Cheng Expert Report, at paras. 34, 37
[23] Cheng Expert Report, at para. 38

(iii)    settlement disputes, pursuant to ss. 3-9;

(iv)    intellectual property license disputes, pursuant to s. 11;

(v)    compelling arbitration and enforcing arbitral awards, pursuant to s. 12; and

(vi)    effectiveness of the IFSA, pursuant to s. 13.

**iv)    No Basis to Refuse to Compel Arbitration**

11.    The arbitration provision found in s. 12(b) must be enforced. As noted above, New York law only permits a Court not to enforce arbitration where a clear public policy prohibits arbitration of the dispute in issue. There is no public policy prohibiting the arbitration of the allocation of the Sales Proceeds.[24]

12.    The fact that the CCC, or any other creditor, is not able to participate in the arbitration is not relevant to this Court's interpretation or enforcement of s. 12(b). The CCC is not a party to the IFSA. It cannot ask this Court to rewrite s. 12(b) or refuse to enforce it. Full opportunity to challenge the terms of the IFSA existed at the time it was put before this Court for approval.

13.    It is notable that, even if there was no arbitration provision in the IFSA, the result would not necessarily be that creditors would have a voice in allocation. Section 12(b) entitles the parties to the IFSA to agree to an allocation of the Sales Proceeds. If such an agreement occurred, there would be no allocation dispute proceedings, and no opportunity for the CCC to argue that the proprietary claims of the various estates should be ignored in favour of a *pro rata* allocation.[25]

---

[24] Cheng Expert Report, at para. 33
[25] While the Canadian Debtors requires the consent of the Monitor and the Bondholders' Committee, such is not the case for the CCC or other creditors.

## ORDER REQUESTED

14.     The EMEA Debtors request an order:

     (a)     dismissing the motions brought by the U.S. and Canadian Debtors; and

     (b)     compelling and directing the parties to the IFSA to engage in arbitration regarding

        all disputes concerning the allocation of Sales Proceeds.

**ALL OF WHICH IS RESPECTFULLY SUBMITTED** this 4th day of March, 2013.

_____
Matthew P. Gottlieb

_____
James Renihan

**LAX O'SULLIVAN SCOTT LISUS LLP**
Counsel
Suite 2750, 145 King Street West
Toronto, ON  M5H 1J8

**Matthew P. Gottlieb**  LSUC#: 32268B
**James Renihan**  LSUC#: 57553U
Tel:     (416) 598-1744
Fax:     (416) 598-3730

**DAVIES WARD PHILLIPS & VINEBERG LLP**
44th Floor, 1 First Canadian Place
Toronto, ON  M5X 1B1

**Robin B. Schwill**  LSUC#: 38452I
Tel:     416.863.0900
Fax:     416.863.0871

Lawyers for the Joint Administrators of Nortel
Networks UK Limited (In Administration)

**SCHEDULE "A"**

**LIST OF AUTHORITIES**

1.      *Menegon v. Philip Services Corp.* (1999), 11 C.B.R. (4th) 262 (Ont. S.C.) (Comm. List)

**SCHEDULE "B"**

**TEXT OF STATUTES, REGULATIONS & BY - LAWS**

1.      None

TAB A

*Indexed as:*
# Menegon v. Philip Services Corp.


**IN THE MATTER OF the Companies' Creditors Arrangement Act,
R.S.C. 1985, c. C-36., as amended
AND IN THE MATTER OF the Courts of Justice Act, R.S.O. 1990 c.
C-43, as amended
AND IN THE MATTER OF a plan of compromise or arrangement of
Philip Services Corp. and the applicants listed on Schedule
"A"
APPLICATION UNDER the Companies' Creditors Arrangement Act,
R.S.C. 1985, c. C-36
Between
Joseph Menegon, plaintiff, and
Philip Services Corp., Salomon Brothers Canada Inc., Merill
Lynch Canada Inc., CIBC Wood Gundy Securities Inc., Midland
Walwyn Capital Inc., First Marathon Securities Limited, Gordon
Capital Corporation, RBC Dominion Securities Inc., TD
Securities Inc., and Deloitte & Touche, defendants**

[1999] O.J. No. 4080

11 C.B.R. (4th) 262

39 C.P.C. (4th) 287

Court File Nos. 99-CL-3442 and 4166CP/98


Ontario Superior Court of Justice
Commercial List

**Blair J.**

August 27, 1999.

(60 paras.)

*Creditors and debtors -- Debtors' relief legislation -- Companies' creditors arrangement legislation
-- Arrangement, judicial approval -- Practice -- Persons who can sue and be sued -- Individuals and
corporations, status or standing -- Class or representative actions -- Conflict of laws -- Bankruptcy.*

Motion by the defendant Philip Services for authorization to enter into a proposed settlement under the Class Proceeding Act. Joint motion by the representative plaintiff Menegon and by Philip for certification of class proceedings as against Philip only. Motion by the defendant Deloitte and Touche and by former officers and directors of Philip to declare an insolvency plan unreasonable. Motion by the creditor Royal Bank for a declaration that its claim against Philip under certain leases be determined under Canadian law. Philip was the parent company of a large network of subsidiaries in Canada and the United States. Publicity regarding inventory discrepancies led to a drop in prices of Philip shares, resulting in various class actions which alleged that Philip's financial disclosure contained material misstatements in violation of United States securities laws. The actions were consolidated and ultimately dismissed, though an appeal was pending. Menegon commenced a class proceeding in Ontario for misrepresentation and rescission relating to purchase of Philip shares. The Royal Bank had a claim against Philip under 57 equipment leases governed by Ontario law with respect to equipment located in Ontario. A memorandum of understanding outlined a proposed settlement between Philip and the class action plaintiffs in both the United States and Canadian proceedings. Philip filed for bankruptcy protection in the United States and for protection in Canada under the Companies' Creditors Arrangement Act. The Canadian plan provided that Canadian claimants were to be governed by and treated in the United States proceedings.

HELD: Class proceedings certified as against Philip for settlement purposes only. Deloitte & Touche, the officers and directors, and the Royal Bank were all entitled to assert claims in the Canadian proceedings. Royal Bank was also entitled to a declaration that its claims under the leases were to be determined in Canadian proceedings. Approval of the settlement was premature. Reasonableness of the plan was an issue to be determined at a sanctioning hearing.

**Statutes, Regulations and Rules Cited:**

Bankruptcy Code.

Class Proceedings Act, 1992, ss. 5(1), 17.

Companies' Creditors Arrangement Act, ss. 5.1(3), 18.6(2), 18.6(5).

Courts of Justice Act, s. 97.

**Counsel:**

David R. Byers, Sean Dunphy and Colleen Stanley, for the Philip Services Corp. et al.
John McDonald, for the Class Proceedings plaintiffs.
J.L. McDougall, Q.C., B.R. Leonard, for the defendants Deloitte & Touche.
B. Zarnell, for the defendants Merill Lynch Canada Inc., Midland Walwyn Capital Inc., First Marathon Securities Limited, Gordon Capital Corporation and Salomon Brothers Canada Inc. ("The Underwriters")
Hilary Clarke, for the Royal Bank of Canada.
Pamela Huff and Susan Grundy, for the Lenders under the Credit Agreement.
Joseph Groia and Subrata Bhattacharjee, for the certain Directors.
E.A. Sellars, for the defendant CIBC as Account Intermediary.
Steven Graff, for the PHH Vehicle Leasing.

**BLAIR J.**:--

I - FACTS

Background

**1**    The issues raised on these Motions touch upon difficult areas in the burgeoning field of cross-border insolvencies.

**2**    Philip Services Corp. is the ultimate parent company of a network of approximately 200 directly and indirectly owned subsidiaries in Canada, the United States and elsewhere. The operations of this international conglomerate of companies are service oriented, with a primary focus on what are referred to as "Metals Services" and "Industrial Services". The former involves the collection, processing and recycling of scrap metal for steel mills and for the foundry and automotive industries. The latter entails providing such things as cleaning and maintenance services, waste collection and transportation, emergency response services and tank cleaning for major industries ("outsourcing services"), and providing "by-products recovery services", with heavy emphasis on chemical and fuel and polyurethane recycling, for the same industries.

**3**    The Philips conglomerate - with consolidated revenues in 1988 of U.S. $2 billion, but a consolidated net loss of U.S. $1.587 billion for the period ending December 31, 1998 - has fallen into insolvent circumstances. On June 25, 1999, Philip Services Corp. and its Canadian subsidiaries sought and obtained the protection of this Court under the provisions of the CCAA to enable them to attempt to restructure their affairs. On the same date, Philip Service Corp. and its primary subsidiary for its U.S. operations, Philip Services (Delaware) Inc., together with other U.S. subsidiaries, filed for Chapter 11 protection under the U.S. Bankruptcy Code in United States Bankruptcy Court (District of Delaware). On July 12, 1999, a "Disclosure Statement and a Plan of Reorganization" was filed in the U.S. Bankruptcy Proceedings ("the U.S. Plan"). On July 15th, a Plan of Compromise and Arrangement was filed in the CCAA Proceedings ("the Canadian Plan").

**4**    As the parties and counsel have done, I shall refer to Philip Services Corp. as "Philip" and to Philip Services (Delaware) Inc. as "PSI". I shall refer to the conglomerate as a whole as "Consolidated Philip."

**5**    Philip is an Ontario corporation with head offices in Hamilton, Ontario. It is a public company with stock trading on the Toronto Stock Exchange, the Montreal Exchange, and the New York Stock Exchange. Although trading is suspended at the present time, the bulk of trading occurred on the New York Stock Exchange. Eighty-two percent of Philip's issued and outstanding shares are owned by U.S. residents. Moreover, it appears, the majority of Philip's operating assets, and of its operations, are located in the United States. Consolidated Philip carries on business at more than 260 locations, and employs more than 40,000 industrial and commercial customers world-wide. In Canada, there are 94 locations, about 2,000 employees, and annual revenues in the neighbourhood of U.S. $333 million.

**6**    Philip expanded very rapidly in the past few years - perhaps too rapidly, as it turns out. Consolidated Philip grew by more than 40 new business acquisitions in 1996 and 1997. Associated with this expansion was the negotiation of a U.S. $1.5 billion Credit Agreement with Philip and PSI as

borrowers and a syndicate of more than 40 lenders (the "Lenders"). Under the Credit Agreement Philip guaranteed the borrowings of PSI, and PSI guaranteed the borrowings of Philip. In addition, certain subsidiaries of Philip and PSI guaranteed all of the liabilities of Philip and PSI to the lenders, and the guarantees from the subsidiaries were secured by general agreements and specific assignments of assets. In short, the Lenders have security over virtually all of the assets of Consolidated Philip. Moreover, subject to certain specific exceptions, it is first security.

**7**      During this same period of expansion, Philip raised about U.S. $362 million through a public offering in the U.S. and Canada. Seventy-five percent of these shares were sold in the U.S. As events transpired, these public offerings have led to a series of class actions against Philip both in the U.S. and in Canada. They arose out of certain discrepancies between copper inventory as shown on the books and records of Philip and actual inventory on hand, which were revealed in audits in early 1998. Publicity surrounding the discrepancies led to a drop in the price of Philip shares, which led to various class actions. Eventually, it was determined that Philip's liabilities had been understated by approximately U.S. 35 million. As a result, it was required to file an Amended Form 10-K with the U.S. Securities and Exchange Commission restating its financial results for 1997 to show an additional loss of $35 million. It was also required to revise the amount of pre-tax special and non-recurring charges for that same year.

**8**      It is said that the unsettling effects of the financial irregularities and the class action proceedings, in conjunction with a general uncertainty in the markets serviced by Consolidated Philip, caused Philip's earnings to drop dramatically. It could not refinance its long-term debt under the Credit Agreement. Its trade credit was curtailed. It lost contracts and, because its bonding capacity was impaired, it was further hampered in its ability to win new contracts. In spite of concerted efforts over a period of nearly a year, Philip was not able to re-finance its debt or to restructure its affairs outside of the court restructuring context. Cash conservation measures in late 1998 led to defaults under the Credit Agreement. Debt restructuring negotiations with the Lenders since that time led ultimately to the parallel insolvency proceedings in Canada and the U.S. to which I have referred above.

        The Class Proceedings

**9**      Developments in the class action proceedings are what have led specifically to the Motions which are presently before this Court.

**10**      In February and March of 1998 various class actions were filed in the United States against Philip, certain of its past and present directors and officers, the underwriters of the Company's November 1997 public offering, and the Company's auditors (Deloitte & Touche).[1] The actions, now consolidated, alleged that Philip's financial disclosure for various time periods between 1995 and 1997 contained material misstatements or omissions in violation of U.S. federal securities laws.

**11**      In May, 1998, a class proceeding was also commenced in Ontario, under the Class Proceedings Act, 1992 ("the CPA Proceeding"). The plaintiff is Joseph Menegon, a retired school teacher living in Hamilton, who had purchased 300 common shares of Philip on the TSE in November, 1998. The CPA Proceedings is an action for misrepresentation, negligent misrepresentation and rescission relating to the purchase of shares of Philip by people in Canada between February 28 and May 7, 1998. The defendants are Philip, the various Underwriters, and Deloitte & Touche.

**12**      At the instance of Philip and Deloitte & Touche, however, a motion was brought for an order dismissing the U.S. Class Action on the grounds that the United States Court was not the proper

Court for the disposition of the claims, but that the Ontario Court was. This motion was successful and on May 4, 1999 the U.S. Class Action was dismissed. A motion to reconsider was also dismissed. Although the U.S. Class Action plaintiffs have appealed, the present status of those proceedings is that they have been dismissed.

**13**    Nonetheless, the U.S. claims persist, and there have been negotiations between counsel for the U.S. and Canadian Class Action plaintiffs and Philip since early 1999 with a view to arriving at a settlement of the class action claims against Philip. Because of the nature of these claims, and the potential quantum of any judgments that might be obtained, a resolution of the Class Action proceedings, according to Philip, is an essential element of any successful restructuring. On June 23, 1999, the parties to the negotiations entered into a Memorandum of Understanding which outlined a proposed settlement between Philip and the U.S. Class Action and CPA Proceedings plaintiffs.

**14**    Philip and the CPA Proceeding plaintiff now seek certification of the CPA Proceeding and approval of the Settlement by the Court. Philip, separately, seeks approval of this Court under the CCAA to enter into the proposed Settlement. These motions have triggered the series of matters that are now to be disposed of. Deloitte & Touche not only opposes the Motions, but seeks separate declaratory relief on its own part touching upon the Settlement itself and as well the overall "fairness" and "reasonableness" of the proposed Canadian Plan. I shall return to the specifics of the competing Motions and the relief sought shortly. First, however, some brief reference to the controversial aspects of the Canadian and U.S. Plans, and to the terms of the Settlement, is required.

The Controversial Aspects of the Plans, and the Settlement

**15**    The principle terms and conditions of the U.S. and Canadian Plans, as they presently stand, were hammered out in a "Lock-Up Agreement" entered into in April, 1999 and later amended on June 21st, between Philip (as Canadian Borrower), PSI, (as U.S. borrower), and a Steering Committee representing the Lenders. There were also negotiations with certain of Philip's major unsecured creditors and with counsel for the U.S. and Canadian class action plaintiffs. The Lock-Up Agreement is variously described as the result of "heavy" negotiations and "very hard bargaining". No doubt that is indeed the case.

**16**    The amended Lock-Up Agreement provides in substance that the Lenders will become the holders of 91% of the equity in the newly restructured Philip, and that they will as well receive U.S. $ 300 million of senior secured debt (now reduced to $250 million through asset sales) and $100 million of secured "payment in kind" notes. Under the U.S. Plan the remaining 9% of the equity in the restructured Philip is to be made available to other stakeholders, on the following basis: 5% (plus U.S. $60 million in junior notes) is to be for the compromised unsecured creditors; 2% for the existing shareholders; 1.5% for the Canadian and U.S. class action plaintiffs; and, 0.5% for the holders of other securities claims. The formula is conditional upon cross-approvals of the U.S. and Canadian Plans.

**17**    From Philip's perspective the Plans filed in both the U.S. and in Canada are interdependent and form a single Plan from a "business point of view". The general concept of the overall plan is that each class of stakeholders in the Consolidated Philip with similar characteristics are to be treated similarly whether they are located in the U.S. or in Canada. With this in mind, and having regard to the need for a coordinated restructuring of claims and interests against Philip, PSI, and the Canadian and U.S. subsidiaries, the Plans provide that,

a)    creditors with claims against Philip's Canadian subsidiaries but not against Philip itself are to file their claims in the CCAA proceedings in Canada, and are to be dealt with in the Canadian Plan; and

b)    creditors with claims against Philip or its U.S. subsidiaries are to have their claims processed in the U.S. proceedings and are to be dealt with in the U.S. Plan.

**18**    The result of this is that the claims of Philip's creditors, whether Canadian or U.S. are to be dealt with under the U.S. Plan and governed by Chapter 11 of the U.S. Bankruptcy Code. This includes the claims of Deloitte & Touche and of the Underwriters, and of certain former officers and directors, for contribution and indemnity in relation to the U.S. and Canadian class proceedings. It also includes the claims of certain creditors, such as Royal Bank of Canada, in relation to personal leases.

**19**    Not surprisingly, those so affected take umbrage at this treatment. They submit that it contravenes the provisions of the CCAA and their substantive rights under Canadian law, and should not be countenanced. It renders the Canadian Plan unfair and unreasonable, in their submission, and should not be sanctioned. Philip argues, on the other hand, that matters relating to whether or not the Plan is fair and reasonable are matters to be dealt with at the sanctioning hearing, when the Plan is brought before the Court for approval after is has received the earlier approval of the Company's creditors.

The Proposed Settlement

**20**    Under the proposed Settlement the Canadian and U.S. class action plaintiffs are to receive 1.5% of the common shares of a restructured Philip, as noted above. The shares are to be distributed pro rata amongst the Canadian and U.S. plaintiffs. There is to be, in addition, an amount of up to U.S. $575,000 for costs of counsel for the U.S. and Canadian class action plaintiffs. The Settlement is embodied in the U.S. Plan as "Allowed Class 8B Claims". It includes the right of persons caught by the class proceedings to opt out; however, any member of the class who elects to opt out of the proposed settlement is also to be dealt with in the U.S. Plan as a Class 8B claimant.

**21**    The proposed Settlement is conditional upon its being approved by the Courts in Canada and in the U.S. and according to Philip, upon the successful implementation of both the Canadian and the U.S. Plan. Philip has made it clear that it and its professional advisors do not believe that a restructuring of Philip can be accomplished without resolution of the class action claims in Canada and the U.S. Philip, counsel in the Canadian class action, and the Lenders all argue that in the event of liquidation, the plaintiffs will get nothing because -- even if they are successful on liability -- they will have no chance of recovering a damage award against the insolvent Philip. The Settlement is also recommended by Ernst & Young, the court appointed Monitor for Philip in the CCAA proceedings.

**22**    What, then, are the specific issues that the Court is asked to determine on the pending Motions?

## II - THE ISSUES RAISED

**23**    The following Motions, as summarized, are before the Court:

1)    A Motion by Philip pursuant to the CCAA for authorization and direction to enter into the proposed Settlement of the proceeding pending against it under the Class Proceeding Act;

2)    A joint Motion by Philip and Mr. Menegon, the representative plaintiff in the CPA Proceedings, for certification of the class proceeding as against the defendant Philip only, and for approval of the Settlement Agreement together with directions regarding notification of members of the proposed class;

3)    A cross-Motion by Deloitte & Touche - one of Philip's co-defendants in the CPA Proceedings, supported by the other co-defendant Underwriters -- for declaratory relief in the nature of an order:

    a)    declaring, pursuant to s. 5.1(3) of the CCAA and s. 97 of the Court of Justice Act that the Canadian Plan is not fair and reasonable in the circumstances, having regard to those provisions in the Canadian Plan which compromise the ability of Deloitte & Touche to claim contribution and indemnity against Philip and certain of its directors, officers and employees;

    b)    precluding the compromise of the Deloitte & Touche claims and amending both the Canadian Plan and the U.S. Plan so the Deloitte & Touche's rights are to be determined under the Canadian Plan alone, and in accordance with Canadian law and without unfairly prejudicing its rights.

4)    A Motion by Royal Bank of Canada for an order,

    a)    declaring that the claim of Royal Bank against Philip under certain leases shall be determined with reference to Canadian law and in the Canadian proceedings;

    b)    declaring that the Canadian Plan is not fair and reasonable because it seeks to compromise the Bank's claims in the U.S. Plan, thus adversely affecting the Bank's rights and circumventing Philip's obligations under Canadian law;

    c)    amending the Canadian Plan so that the Bank's claim is not dealt with in the U.S. Plan; and

    d)    amending sub-paragraph 14(d) of the Initial Order granted in the CCAA proceeding on June 25, 1999 -- which presently permits Philip to terminate any and all arrangements entered into by them by providing that the sub-paragraph does not apply to leases of personal property; and, finally,

5)    A Motion on behalf of certain former officers and directors of Philip seeking to have the Canadian Plan and the U.S. Plan declared not fair and reasonable in the circumstances, having regard to those provisions,

a)  which attempt to compromise or otherwise limit the ability of the
Moving Parties to claim contribution and indemnity from Philip
without compensation whatsoever;

b)  which call for releases to be provided to current directors and offic-
ers of Philip, but not to former directors and officers;

c)  which deprive the Moving Parties of their rights as creditors to vote
on the Canadian Plan.

### III - LAW AND ANALYSIS

The Class Proceedings

**24**    There is little difference is substance between the joint Motion of Philip and the Canadian
class action plaintiff under the Class Proceedings Act, and that of Philip alone, under the CCAA.
Both ultimately seek approval and implementation of the proposed Settlement. However, the CCAA
proceeding provides the context in which this approval is sought and, indeed - as I have already
mentioned - Philip and others are of the view that a successful restructuring of Consolidated Philip
is not possible without the implementation of the proposed Settlement, and that the converse is also
true. Thus, there is a close link between the two, and in my opinion the issue of settlement approval
cannot be viewed in isolation from the CCAA/restructuring environment in the context of which it
was developed.

Certification

**25**    I have little hesitation in certifying - and do certify - the CPA Proceeding as a class pro-
ceeding pursuant to subsection 5(1) of the Class Proceedings Act, as requested. That is, the pro-
ceeding is certified as a class proceeding as against the defendant Philip only and for settlement
purposes only. It is without prejudice to any arguments the other defendants to the CPA Proceed-
ings may wish to make in opposition to any element of the plaintiff's claim, including, but not lim-
ited to, certification of a class as against them.

**26**    For those purposes, however, I am satisfied that the tests set out in subsection 5(1) have
been met. The statement of claim discloses a cause of action based upon faulty disclosure. There is
an identifiable class, as articulated in the materials, and a common issue, as therein very broadly
defined.[2] A class proceeding makes sense, and is the preferable procedure for the resolution of the
common issue in the circumstance, and Mr. Menegon constitutes a representative plaintiff as called
for in the subsection. An Ontario Court has jurisdiction pursuant to the Class Proceedings Act to
certify a Canada-wide opt out class where the action has a "real and substantial" connection to On-
tario, as is the case here; see, Carom v. Bre-X Minerals Ltd., 43 O.R. (3d) 441, February 11, 1999,
(Ont. Gen. Div.); Nantais et al v. Telectronics Proprietary (Canada) Ltd. et al, (1995), 25 O.R. (3d)
331 (Ont. Gen. Div.), leave to appeal refused [1995] O.J. No. 3069, at p. 347 (Div. Ct.).

Approval and Notice

**27**    I have concluded, however, that Notice should be given at this time to the members of the
class as certified, in accordance with the provisions of section 17 of the Class Proceedings Act, but
that the proposed Settlement ought not to be approved at this time and at this stage of the restruc-
turing proceedings.

**28**    This conclusion is based not so much on the issue of whether notification under the Act may
be given jointly for certification and approval, and not so much of the question of the merits of the

proposed Settlement as between the class action plaintiffs and Philip. The former issue has not yet been settled, but need not be determined in this case. The latter is supported by the recommendations of the Monitor and seasoned U.S. representative counsel, and by the "reality check" that is there is no settlement it is unlikely that the class action plaintiffs will ever recover anything from Philip.

**29**     Rather, my conclusion is based upon my sense that it is premature to approve a settlement of the U.S. and Canadian class action proceedings at this stage of the restructuring process. Philip and the Lenders have made it clear that the settlement of those claims forms a central underpinning to the ability of Consolidated Philip to reorganize successfully. But the reverberations of the class actions extend to more than merely the relations between Philip and the class action plaintiffs. They affect the relations between Philip and the co-defendants in the proceedings, and between the class action plaintiffs and the co-defendants as well. The class action plaintiffs and the co-defendants are all unsecured claimants of Philip in the restructuring process - the claim of the co-defendants for contribution and indemnity against Philip and its former officers and directors arise out of the same "nucleus of operative facts"[3] as the claims of the class action plaintiffs against Philip; and one follows from the other. It has frequently been noted that the full name of the CCAA is "An Act to facilitate compromises and arrangements between companies and their creditors". In the bare-knuckled ring of commercial restructuring negotiations, this cannot be accomplished if one group of unsecured claimant is given an unwarranted advantage over another.

**30**     To grant approval to the proposed Settlement of the class action plaintiffs with Philip at this stage would in effect immunize both those plaintiffs and Philip from the need to have regard to the co-defendants in resolving their dispute. It may well be that a plaintiff in an action with multi-party defendants can settle unilaterally with one of those defendants without creating other repercussions in the lawsuit. It may also be, however, that such a settlement cannot be effected without taking into account some aspects of the "other party" issues - things such as the impact of the settlement on the co-defendants' claims for contribution and indemnity, including the quantum of or a cap on recovery and questions of releases, to take only some examples.

**31**     For instance, Philip is contractually bound under the terms of its Underwriting Agreement with the Underwriters to indemnify and hold the Underwriters harmless against all claims based on allegations of untrue statements or alleged untrue statements in a prospectus. More to the point, Philip is not entitled without the consent of the Underwriters, under the terms of the same Agreement, to settle any action in which such claims are made against it and unless the settlement includes an unconditional release in favour of the Underwriters. Approval of the proposed Settlement at this state of the restructuring proceedings would deprive the Underwriters of the contractual right. What is significant at this point is not the attempt to compromise the claim, including the contractual right to the release, but rather the loss of the bargaining chip on the part of the Underwriters in the process as a result of the unilateral settlement as between Philip and the plaintiffs.

**32**     Philip, the Lenders, and counsel for the class action plaintiffs have mounted an adamant chorus that if the proposed Settlement is not approved the U.S. and Canadian class action plaintiffs will get nothing because Philip will be liquidated and, in addition, that there is simply no room for the class action plaintiffs to receive anything more than the 1.5% share distribution in the restructured Philip which is currently on the table. The Lenders point out that they are fully secured and that they need not leave available even that 1.5% interest (not to mention the 9% equity interest which they have agreed to leave available to other stakeholders generally). These pronouncements

may well reflect the final reality of the situation. However, I am somewhat less inclined to accept them at face value than the parties are to make them, particularly at this stage of the proceedings. It would not be the first time in restructuring negotiations where an adamant chorus turned into a more harmonious melody before the end of the day. Only the final moments of the process will tell the tale. In the meantime, as many negotiating options as possible should be kept open as amongst claimants of equal status in the restructuring, in my view.

**33**     I do not say that this proposed Settlement, in its present or some other form, will not ultimately be approved. It is simply premature at this stage in the restructuring process to give it that imprimatur, in my opinion - if the imprimatur is to be given - for the reasons I have articulated. Accordingly, the question of approval of the proposed Settlement is adjourned to a date to be fixed which is more contemporaneous with the sanctioning hearing. In the meantime, Notice of certification and of the pending motion for approval is to be sent to all members of the class.

The Fairness Issues Regarding the Canadian Plan.

**34**     Much of the foregoing reasoning applies to the conclusions I have reached with respect to the issues raised by Deloitte & Touche and others respecting the Canadian Plan and its nexus with the proposed Settlement.

**35**     The claim of the plaintiffs in the CPA Proceedings as against Deloitte & Touche and the Underwriters includes a claim for the difference between the value received by the plaintiffs as a result of the settlement and their actual loss. If the Settlement and the Canadian and U.S. Plans are approved, however, these co-defendants will lose their rights to claim contribution and indemnity form Philip in the class action. This, in itself, is not a reason for impugning the fairness and reasonable of the Plans, because the ability to compromise claims against it is essential to the ability of a debtor corporation to restructure its affairs. Nonetheless, where the proposed structure of the reorganization affects the substantive rights of claimants in a fashion which treats them differently than they would otherwise be treated under Canadian law, and where the effect of that treatment is to place the claimants in a position where their ability to engage in full and complete negotiations with the debtor company are impaired, there is cause for concern on the part of the Court. That, in my view, is the case here.

**36**     The effect of the Canadian Plan, as presently structured, is to deprive Deloitte & Touche, the Underwriters and others such as the former directors and officers of Philip who may have claims of contribution and indemnity as against Philip arising out of the same "nucleus of operative facts" pertaining to the class action claims, for pursuing those contribution claim in the Canadian CCAA proceeding. The same is true, but for different reasons, of the claim of Royal Bank with respect to its equipment leases. This is accomplished by carving out the claims in question from the CCAA proceedings and providing that they are to be dealt with under the U.S. Plan in U.S. Bankruptcy Court in accordance with the provisions of the U.S. Bankruptcy Code. All claims against Philip are to be dealt with in that fashion, notwithstanding that it was Philip which set in motion the CCAA proceeding in the first place and which sought and obtained the stay of proceedings preventing these very same claimants form pursuing their claims in Canada against it. At the same time, the Canadian Plan, but its very terms, is to be binding upon all holders of claims against Philip - including those which are subject to the Canadian Plan; see section 9.15 of the Canadian Plan. This is to be accomplished without even according the right to those claimants to vote on the Plan.

**37**      The binding nature of the Canadian Plan has the effect of requiring the responding claimants to provide releases in favour of Philip while they are at the same time not released by Philip from claims that might be subsequently asserted against them. Furthermore, as the Plan presently stands, Deloitte & Touche and the Underwriters will be against them. Furthermore, as the Plan presently stands, Deloitte & Touche and the Underwriters will be deemed to have released former directors and officers from claims for contribution and indemnity. The Class Action plaintiffs have chosen not to pursue the directors and officers, at the present time, and there is apparently upwards of $100 million in insurance that might be available to satisfy such claims. This is a matter of considerable concern for Deloitte & Touche and for the Underwriters. Philip has advised, during the course of these motions and before, that it does not intend the proposed Settlement or the Plan to preclude the ability of Deloitte & Touche and of the Underwriters to pursue the former officers and directors. For the present, however, the Plan is worded in such a way that they will be so precluded. The real point is that all of this is being visited upon the responding claimants without there being entitled to any say in the Canadian proceedings as to their willingness or lack of willingness to be so treated.

**38**      In my opinion it is the loss of the right to vote in the Canadian Plan which lies at the heart of the present dilemma. The mere fact that a Canadian creditor's rights are to be dealt with and affected by single or parallel insolvency proceedings in the U.S. Bankruptcy Court - or that the reverse may be the case (U.S. creditor/Canadian Court) - is not necessarily sufficient, in itself, to undermine the fairness and reasonable of a proposed Plan; see, for example Roberts v. Picture Butte Municipal Hospital (1998), 64 Alta. L.R. (3d) 218 (Alta. Q.B.); Re Starcom Services Corp., Bank. W.D. Wash., case no M-98-60005, Nov. 20, 1998. In Canadian insolvency proceedings under the CCAA, however, it is the right to vote on the compromise or arrangement which the debtor company proposes to make with them which is the central counterpart, on the part of the creditors, to the debtors right to attempt to make that compromise or arrangement. In my view, having chosen to initiate and take advantage of the CCAA proceedings, Philip cannot now evade the implications and statutory requirements of those proceedings by seeking to carve out certain pesky - and potentially large - contingent claimants, and to require them to be dealt with under a foreign regime (where they will be treated less favourably) while at the same time purporting to bind them to the provisions of the Canadian Plan. All of this without the right to vote on the proposal.

**39**      While the fact that their treatment under U.S. Bankruptcy law will apparently be considerably less favourable then their treatment under Canadian law is not determinative, it is certainly a factor for consideration when taken in conjunction with the loss of voting rights in the Canadian Plan. As counsel have presented it, contribution claimants such as Deloitte & Touche, the Underwriters and the directors and officers will have the status equivalent to equity holders under the U.S. Plan. Their claims will not be considered as unsecured debt claims in terms of priority ranking. Pursuant to the "cram down" provisions of the U.S. Bankruptcy Code, the Bankruptcy Court can approve a plan of reorganization even if a class of creditors votes not to accept the plan provided no junior-ranking class receives a distribution and the plan is otherwise fair and reasonable. Moreover, the U.S. Bankruptcy Court may on motion deem such a class of stakeholders to have voted to reject the plan in order to dispense with the necessity of having such a vote amongst its members. While Philip's deponents and its counsel have not said so expressly, it is the clear inference from the materials filed that that is precisely the route which Philip proposes to follow vis à vis the contribution claimant whose claims have been left to be dealt with under the U.S. Bankruptcy Code.

**40**      For purposes of the CCAA the claim of an unsecured creditor includes a claim in respect of any indebtedness, obligation of liability which would be a claim provable in bankruptcy, and there-

fore includes a contingent claim for unliquidated damages. Thus, Deloitte & Touche, the Underwriters, the officers and directors, and Royal Bank are all entitled to assert claims in the CCAA proceedings. They are Canadian claimants, asserting claims against a Canadian company in a Canadian proceeding. In respect of the claims for contribution and indemnity those claims arise out of a "nucleus of operating facts" which the U.S. Courts - at the urging of Philip, amongst others - have already determined are more conveniently litigated in Canadian class action proceedings.

**41**    In respect of the Royal Bank, the claim relates to some 57 equipment leases entered into between the Bank and Philip under lease agreements governed by the laws of Ontario and with respect to equipment located (with one exception) in Ontario. However, under U.S. Bankruptcy laws, Philip would be entitled to "reject" leases, which it is not entitled to do under Ontario law, although it may of course "break" the leases if it is prepared to suffer the legal consequences. Again the attempt by Philip is to treat the claims under a regime which is more favourable to it and less so to the claimant. That attempt may not in itself be objectionable, but to the extent that it is accomplished by depriving the creditor of its right to vote and to participate in the Canadian proceedings which were initiated for the purposes of shielding Philip against the claim, it is troubling.

**42**    The rights of creditors under the CCAA cannot be compromised unless,

   a)    the creditor has been given a right to vote, in the appropriate class, on the proposed compromise;

   b)    the creditor's vote is in accordance with a value ascribed to the claim by a Court approved procedure;

   c)    the class in which the creditor has been appropriately placed has voted by a majority in number and two-thirds in value in favour of the compromise; and,

   d)    the Court has sanctioned the compromise on the basis that it is fair and reasonable (with considerable deference being given by the Court in this regard to the votes of the creditors).

**43**    See CCAA, section 4, 6 and 12; Re Olympia & York Developments Ltd. (1993), 12 O.R. (3d) 500, at p. 510 (Ont. Gen. Div.).

**44**    Here, for the reasons I have outlines, what Philip proposes is inconsistent with the foregoing.

**45**    Philip and the Lenders argue that the issues raised in this regard by the Respondents go entirely to the fairness and reasonableness of the U.S. and Canadian Plans, and that such considerations should be reserved for determination at the sanctioning hearings. I agree that generally speaking matters relating to fairness and reasonableness are better considered in the overall context of the final sanctioning hearing. Where, as here, however, the debtor company has acted earlier to obtain approval of a step in the restructuring process - in this case, the Class Action Settlement - which gives rise to issues that are inextricably linked to the overall fairness of the proposed Plan, and its compliance with statutory requirements, the consideration of those issues may be called for. This is one of those cases, Settlement - in conjunction with the manner in which the debtor intends to treat other claimants directly affected by the settlement, have the effect of requiring those claimants to participate in the subsequent restructuring negotiations without a full deck of cards.

**46**     Philip and the Lenders also argue that "comity" demands that this Court defer to the U.S. Bankruptcy Court in allowing the claims of Deloitte & Touche, the Underwriters, the former directors and officers, and the Royal Bank to be dealt with in the U.S. Plan. They point out that in its Initial Order in the CCAA proceedings this Court approved an international Protocol which provides for co-operation between the U.S. and Canadian Court, to the extent possible. I do not think that either comity or the question of whether the claims will be dealt with ultimately under the U.S. Plan, are the issues here. In addition, the effect of the Protocol as I read it - given the circumstances outlined above - is to provide some protection to claimants on either side of the border from being swept into the rigours of the other countries regimes where to do so might prevent them from asserting their substantive rights under the applicable laws of their own jurisdiction.

**47**     In this regard, the following provisions of the Protocol are worthy of note:

> (C) Comity and Independence of the Courts
>
> (7)     The approval and implementation of this Protocol shall not divest or diminish U.S. Court's and the Canadian Court's independent jurisdiction over the subject matter of the U.S. Cases and the Canadian Case, respectively. By approving and implementing the Protocol, neither the U.S. Court, the Canadian Court, the Debtors nor any creditors or interested parties shall be deemed to have approved or engaged in any infringement on the sovereignty of the United States or Canada.
>
> 8.     The U.S. Court shall have sole and exclusive jurisdiction and power over the conduct and hearing of the U.S. Cases. The Canadian Court shall have sole and exclusive jurisdiction and power over the conduct and hearing of the Canadian Cases.
>
> 9.     In accordance with the principles of comity and independence established in paragraphs 7 and 8 above, nothing contained herein shall be construed to:
>
> > *     increase, decrease or otherwise modify the independence, sovereignty or jurisdiction of the U.S. Court, the Canadian Court or any other court or tribunal in the United States or Canada ...;
> > *     preclude any creditor or other interested party from asserting such party's substantive rights under the applicable laws of the United States, Canada or any other jurisdiction including, without limitation, the rights of interested parties or affected persons to appeal from the decisions taken by one or both of the Courts.
>
> (emphasis added)
>
> (J) Preservation of Rights
>
> 27.     Neither the terms of this Protocol nor any actions taken under the terms of this Protocol shall prejudice or affects the powers, rights, claims and defenses of the Debtors and their estates, the Committee, the Estate Repre-

sentatives, the U.S. Trustee or any of the Debtors' creditors under applicable law, including the Bankruptcy Code and the CCAA.

(emphasis added)

**48**     The extension of comity as between Courts in cross-border insolvency situations, and co-operation generally in such matters, are matters of great importance, to be sure, in order to facilitate the successful and orderly implementation of insolvency arrangements in such circumstances. Nothing I have said in these Reasons is intended to counter that ethic. However, comity and international co-operation do not mean that one Court must code its authority and Jurisdiction over its own process or over the application of the substantive laws of its own jurisdiction, whenever any kind of differences between the two jurisdiction may arise. Both the Protocol and the provisions of subsection 18.6(2) of the CCAA - which gives this Court authority "to make such orders and grant such relief as it considers appropriate to facilitate, approve or implement arrangements that will result in c co-ordination of proceedings under [the CCAA] with any foreign proceeding" - confirm this, Subsection 18.6(5) of the CCAA provides that "nothing in this section requires the Court to make any order that is not in compliance with the laws of Canada or to enforce any order made by a foreign court" (emphasis added)

**49**     Here, there is yet no order of the U.S. Court, or treatment of the Claimants or Debtor to which comity may be extended, but there is - as I have outlined above - a failure to comply with the requirements of insolvency laws and procedure of Canada, as stipulated in the CCAA. I conclude, therefore, that the Canadian Plan as it presently stands is flawed because it seeks to exclude Canadian claimants from participation in its process by providing that their claims against Philip itself are to be governed by and treated in the U.S. proceedings while at the same time seeking to bind them to the provisions of the Canadian Plan, all without affording those claimants any right to vote.

**50**     There was much debate in argument over whether the issue of treatment of the claims in the Canadian or U.S. proceedings was a function of the "real and substantial connection" of Philip with the U.S. jurisdiction, or a function of the "real and substantial connection" of the responding claimants and their claims to the Canadian proceedings. There is no doubt that Philip has a substantial connection with the United States in terms of the residence of the majority of shareholders and the location of the majority of operating assets. This connection certainly justifies the U.S. Chapter 11 proceedings. However, Philip also has a substantial connection to Canada, with its headquarters in Ontario, its Canadian subsidiaries, and its 94 locations and 2,000 employees throughout the country. This connection, together with its array Canadian creditors, sustains the resort to the CCAA proceedings.

**51**     I do not think that the analysis fall to be made, in these particular circumstances, on purely foreign conveniens grounds. There is more to the situation than that.

Philip initiated the CCAA proceedings and sought and accepted the benefits flowing from that step. The responding claimants seek to assert claims in the Canadian proceeding against the Canadian company which instituted those proceedings, in relation to matters arising out of a Canadian class proceeding or (in the case of Royal Bank) out of Canadian contracts and equipment largely located in Canada. The substantive law of Canada under the CCAA, and the procedures therein laid down, entitle them to assert those claims in the Canadian proceedings and to have a vote on the "Plan" which is set forth by the debtor company to compromise them. They should not be deprived of those substantive and procedural rights without having any say in the matter. Putting it another way,

I am satisfied that the unquestioned "juridical advantage" which Philip seeks to achieve through its proposed treatment of the responding claimants is outweighed by the unquestioned "juridical dis-advantage" on the part of the latter, given that the juridical scales would otherwise be tipped to-wards Philip through the resort to a stratagem which in my view is not sanctioned under the CCAA.

**52**    Philip and the Lenders argue that there is great urgency to effect the restructuring process, and that requiring Philip to adhere to the procedures relating to classification, the valuation of claims, and voting - with the numerous issues that may have to be determined in that context - may well doom the process from the beginning. The Lenders are truculent, as their secured position lead them to be; they say that if the reorganization is not completed quickly they may simply abandon the process and exercise their rights to realize on their security, and the entire restructuring process will fail, with dire consequences for all concerned. Mr. McDougall, on behalf of Deloitte & Touche, characterized this as "the cry of doom".

**53**    I am very aware of the need for timeliness in situations as these - particularly given the sen-sitive nature of Consolidated Philip's service oriented business. However, I do not think that the need for a timely resolution alone is justification for depriving claimants of their substantive rights under Canadian law, and for abrogating their right to vote which lies at the very heart of the Cana-dian restructuring process from the creditor's perspective. It is the tool which gives them ultimate leverage in the bargaining process, and without it their practical rights - as well as their substantive and procedural ones - are greatly diminished.

### III - CONCLUSION

**54**    An order will therefor go in terms of the foregoing.

The Class Proceedings

**55**    As indicated, an Order is granted certifying the CPA Proceedings as a class proceeding, pursuant to subsection 5(1) of the Class Proceedings Act, as against Philip only and for settlement purposes only. The certification is without prejudice to any arguments the other defendants in the CPA Proceeding may wish to make in opposition to any element of the plaintiff's claim including, but not limited to, certification of a class as against them. In addition, notice of the certification and of the pending motion for approval of the proposed Settlement is to given to members of the class as certified, in accordance with the provisions of section 17 of the Act. The question of approval of the Settlement, in its present form or some other form as may be advised, is adjourned to a date to be fixed which is more contemporaneous with the sanctioning hearing.

The Fairness/Substantive Law Issues

**56**    Notwithstanding the observations in these Reasons about the Canadian Plan and the treat-ment of claims in the U.S. proceedings, I am reluctant to grant the sweeping declaratory relief sought by the Respondents. Whether the Plan is ultimately found to be fair and reasonable and in accordance with all necessary requirements remains still a matter for determination in the sanction-ing hearing, after all the negotiations have been concluded and the votes counted. As much as is reasonably possible should be left to that process.

**57**    I am prepared to make an Order, however - and do - declaring that the Canadian Plan as it is presently constituted fails to comply with the procedural and statutory requirements of the CCAA regime in that it seeks to exclude the responding claimants from participation in its process by providing that their claims against Philip itself are to be governed by and treated in the U.S. pro-

ceedings while at the same time seeking to bind them to the provisions of the Canadian Plan, all without affording those claimants any right to vote. Anything further in this respect, it seems to me, should be left to the negotiation arena.

**58**      The position of the Royal Bank is slightly different. It is entitled, in addition, to an order,

    a)      declaring that the claim of Royal Bank against Philip under certain leases shall be determined with reference to Canadian law and in the Canadian proceedings;

    b)      amending the Canadian Plan so that the Bank's claim is not dealt with in the U.S. Plan; and,

    c)      amending sub-paragraph 14(d) of the Initial Order granted in the CCAA proceeding on June 25, 1999 - which presently permits Philip to terminate any and all arrangements entered into by them - by providing that the sub-paragraph does not apply to the Royal Bank leases of personal property.

**59**      There will be not order as to costs.

**60**      Order accordingly.

BLAIR J.

qp/t/qlala/qlalm/qlcvs

1 These various actions were eventually consolidated and transferred to the United States District Court, Southern District of New York, by order dated June 2, 1998.

2 The common issue is very broadly and vaguely defined, and while such a definition has received approval in other cases, I do not mean to be taken as having approved such a definition for any purposes other than those of this particular case.

3 To use the phrase adopted by the parties.

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.
C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, et al.

Court File No. 09-CL-7950

|  |  |
|---|---|
|  | *ONTARIO*<br>**SUPERIOR COURT OF JUSTICE**<br>**COMMERCIAL LIST**<br><br>*IN THE MATTER OF*<br><br>PROCEEDING COMMENCED AT<br>TORONTO |

Supplementary Submissions of the Joint Administrators of
Nortel Networks UK Limited and the EMEA Debtors

**LAX O'SULLIVAN SCOTT LISUS LLP**
Counsel
Suite 2750, 145 King Street West
Toronto, ON  M5H 1J8

**Matthew P. Gottlieb**  LSUC#: 32268B
**James Renihan**  LSUC#: 57553U
Tel:      (416) 598-1744
Fax:      (416) 598-3730

**DAVIES WARD PHILLIPS & VINEBERG LLP**
44th Floor, 1 First Canadian Place
Toronto, ON  M5X 1B1

**Robin B. Schwill**   LSUC#: 38452I
Tel:      416.863.0900
Fax:      416.863.0871

Lawyers for the Joint Administrators of Nortel Networks UK Limited (In
Administration)