**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Nortel Networks, Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |

**SUBMISSION OF THE TRUSTEE OF NORTEL NETWORKS UK PENSION PLAN AND THE BOARD OF THE PENSION PROTECTION FUND**
**<u>IN RESPONSE TO THE COURT'S FEBRUARY 14, 2013 ORDER</u>**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

1. Pursuant to the Court's February 14, 2013 *Revised Scheduling Order For Allocation Issues* [D.I. 9428] (the "Order"), the Trustee (the "Trustee") of Nortel Networks UK Pension Plan (the "Plan") and the Board of the Pension Protection Fund (the "PPF," and, together with the Trustee, the "U.K. Pension Claimants"), by and through their undersigned counsel, hereby respectfully submit the following statement addressing the threshold question of how the dispute concerning the allocation of proceeds from the sale of the Nortel Group's global assets (the "Allocation Dispute") should be determined.

2. As a major creditor in the global Nortel insolvency, and one of the "principal parties" in the Debtors' chapter 11 cases (Order at 1), the U.K. Pension Claimants have a vital interest in ensuring that the remaining issues in these proceedings, including the Allocation Dispute, are resolved as fairly and as efficiently as possible. Whatever process is ultimately determined for resolution of the Allocation Dispute, the U.K. Pension Claimants submit that they should be afforded the status of a participant in those proceedings due to the unique and significant interest they have in the outcome.

**In Accordance with the IFSA, the Parties Should Be Directed to Make a Good Faith Effort to Agree on the Protocol.**

3. Any determination of how the Allocation Dispute should be resolved must take into account the terms of the Interim Funding and Settlement Agreement ("IFSA") agreed to by the U.S., Canadian and EMEA debtors (collectively, the "IFSA Parties").

4. Section 12(b) of the IFSA provides that the sale proceeds deposited into escrow (the "Lockbox") will "[i]n *no* case" be distributed in advance of either:

(a) agreement between all the Selling Debtors (as defined thereunder); or

(b) if the Selling Debtors fail to reach such agreement, a determination by "the relevant dispute resolver(s)" ("Relevant Dispute Resolvers") pursuant to a protocol (the "Protocol") which was to be agreed by the IFSA Parties for the resolution of the Allocation Dispute. IFSA § 12(b) (emphasis added).

5. As a matter of contract, therefore, absent agreement of the IFSA Parties as to distribution, the IFSA does not permit any distribution at all from the Lockbox until the Relevant Dispute Resolvers determine what the allocation distribution shall be.

6. As the Court is aware, the IFSA Parties did not finalize the Protocol (although they have stated that they came close) and, therefore, the issue of who should serve as the Relevant Dispute Resolvers was left unresolved. As a major creditor, the U.K. Pension Claimants are dismayed that the IFSA Parties' failure to finalize those few remaining terms – or to even attempt to finalize the Protocol in any of the prior rounds of mediation – has resulted in the present impasse. In light of the plain language of the IFSA, the most sensible option would be to direct the IFSA Parties to return to the bargaining table and conduct good faith negotiations to finalize any remaining open terms of the Protocol. They should be given thirty (30) days from March 7 to reach agreement, with the understanding that no distributions will be made from the Lockbox unless and until they do so.

7. In the event the IFSA Parties ultimately cannot or will not reach an agreement on any remaining open terms of the Protocol by the deadline, then, as noted below, the Court has the authority to enforce the IFSA Parties' agreement to submit the Allocation Dispute to arbitration and determine the form such arbitration should take. See *The Joint Administrators' Memorandum Of Law In Support Of Their (I) Objection To Joint Motion For Entry Of An Order Establishing An Allocation Protocol Pursuant To The Interim Funding And Settlement Agreement, And (II) Cross-Motion To Compel Arbitration*, dated May 19, 2011 (filed in unredacted form, May 31, 2011) [D.I. 5531] (the "Joint Administrators' Cross-Motion"), at 16-23, 25-28. In that regard, the U.K. Pension Claimants support the Joint Administrators' proposal that the Allocation Dispute be resolved by a three-member panel, with each of the three estates appointing one member, and that all other procedures should be left to the discretion of the panel so appointed. *Id.* at 26, 30-33.

8. In *no* event, however, does the IFSA or any other agreement provide support for the proposition that the Allocation Dispute can be decided jointly by the U.S. and Canadian Courts *exclusively* if the IFSA Parties fail to agree on the Protocol or the Court concludes that no agreement to arbitrate the Allocation Dispute exists. The IFSA Parties agreed – and were empowered by their respective judicial authorities – to submit the Allocation Dispute to *arbitration*, and nothing more. The Debtors' request to substitute an exclusive bilateral judicial process in place of arbitration improperly seeks to extend the Court's authority beyond what the IFSA Parties agreed to and in a manner that would usurp the jurisdiction of the U.K. Court over the property of the EMEA Debtors' estates.

9. In sum, the U.K. Pension Claimants submit that no distributions can be made from the Lockbox unless and until the parties finalize a Protocol for alternative dispute resolution. The parties clearly contemplated an arbitral process, and they should be given thirty (30) days to finalize any remaining open terms of an arbitral Protocol. In the event that the parties are unable to do so, the Court should grant the Joint Administrators' Cross-Motion and compel arbitration on the grounds that the parties in fact agreed to arbitrate the Allocation Dispute even if some terms of the Protocol remain open. The U.K. Pension Claimants submit that the Court should direct the parties to appoint a three-member international arbitration panel, consisting of one arbitrator selected by each of the U.S., Canadian and EMEA estates. The U.K. Pension Claimants submit, however, that in the event the Court elects neither to direct that the parties finalize an arbitral Protocol nor grants Joint Administrators' Cross-Motion, but instead determines that the Allocation Dispute should be resolved by the Courts, any such judicial process must include the U.K. Court in addition to this Court and the Canadian Court.

**Arbitration Is The Preferred Forum.**

10. The U.K. Pension Claimants submit that the record before the Court demonstrates that the IFSA Parties intended to submit the Allocation Dispute to arbitration rather than litigation.[2] Indeed, the U.S. Debtors previously advised the Court that: "The Nortel debtors in Canada, the U.S., and the U.K. have agreed that [the

---

2 Among other reasons, the IFSA's reference to "relevant dispute resolver(s)" (which is a clear reference to "dispute resolution" in contrast to litigation, which the Parties refer to elsewhere in the IFSA by referring to the "courts") – together with the Parties' contemporaneous statements reflecting their intent – belie any intent to submit the Allocation Dispute to anything other than arbitration. See Joint Administrators' Cross-Motion at 16-23.

Allocation Dispute] *must* be resolved, on a global basis, in a *single* cross-jurisdictional forum." *Debtors' Motion For Entry Of An Order Enforcing The Automatic Stay Against Certain Claimants With Respect To The UK Pension Proceedings* (the "Automatic Stay Motion") [D.I. 2441], ¶ 69 (emphasis added); *Declaration Of John Ray In Support Of Debtors' Motion For Entry Of An Order Enforcing The Automatic Stay Against Certain Claimants With Respect To The U.K. Pension Proceedings*, dated February 18, 2010 [D.I. 2444] ("Ray Decl."), ¶ 16.

11. The U.K. Pension Claimants have no doubt that this Court, in coordination with the Canadian and U.K. Courts, is fully capable of adjudicating the Allocation Dispute. They do, however, respectfully submit that arbitration is likely to present a more efficient and cost-effective means of obtaining a final and binding resolution of the Allocation Dispute than would be available through continued, parallel, litigation in three Courts.

12. As has become clear during the three rounds of unsuccessful mediation, the Allocation Dispute involves numerous complicated and overlapping issues that are hotly contested by the various key constituencies in the global Nortel insolvency proceedings. Litigation would not only likely result in further protracted battles before this Court, the Canadian Court and the U.K. Court over those complicated issues, but it would also inject much uncertainty and potential delay given the absence of any coordinated process for appeals from any decisions issued by the three Courts. In contrast, a single binding arbitration procedure before a panel of arbitrators would offer a streamlined process with limited and targeted discovery, a certain end date, and a binding decision with finality.

**Claims Should Not Be Resolved As Part Of The Allocation Dispute.**

13. The U.K. Pension Claimants do not believe, however, that it would be appropriate to determine as part of the Allocation Dispute the amended proofs of claim (the "Amended Claims") they filed on September 5, 2012. Rather, the Allocation Dispute should be resolved prior to the Court's determination of the Amended Claims. Indeed, as the Debtors previously represented to the Court, "[T]he very premise for the U.K. Administrative Proceeding is that NNUK does not have the resources to fund the NNUK Pension Plan, and one of the key elements in determining the 'reasonableness' of imposing a FSD and a CN against a Non-Employer under the U.K. Pensions Act is the financial condition of the Non-Employer…. Until the allocation procedure is completed, however, the financial condition of the Employer, NNUK, and the Non-Employers, including the Debtors, cannot be determined." Automatic Stay Motion, ¶ 70 (citations omitted); Ray Decl., ¶¶ 14, 19. Having made that representation in obtaining the Court's approval of their Automatic Stay Motion, the Debtors are judicially estopped from arguing otherwise now. Edwards v. Wyatt, 330 F. App'x. 342, 351 (3d Cir. May 20, 2009).

14. In addition, the U.K. Pension Claimants understand the Court's Orders of January 31 and February 14, and the hearing on March 7, to have a limited purpose: to determine a process for resolution of the Allocation Dispute. It is *not* their understanding that the Court intends at the March 7 hearing to address procedures and schedules for resolution of other disputes, such as proofs of claim filed in these cases. Accordingly, the U.K. Pension Claimants do not comment here on the schedule proposed by the Debtors in *The U.S. Debtors' Scheduling Proposal For Outstanding Motions And*

*Issues*, dated February 8, 2013 [D.I. 9390], which included deadlines for discovery and other pre-trial matters in connection with the U.K. Pension Claimants' Amended Claims.

15. As previously noted in their *Submission Of The Trustee Of Nortel Networks UK Pension Plan And The Board Of The Pension Protection Fund In Response To The Court's January 31, 2013 Order* [D.I. 9396], neither the Debtors, nor any other party-in-interest, has objected to the Amended Claims. *Id.* ¶ 4. Consequently, no contested matter or adversary proceeding challenging the Amended Claims currently exists that would provide a basis for discovery. It would be entirely premature and inefficient to establish a schedule for discovery and adjudication of the Amended Claims before the Debtors have responded to them.

16. On June 11, 2012, the Debtors filed the *Debtors' Objection To The Proofs Of Claim Filed By The Nortel Networks UK Pension Trust Limited (As Trustee Of The Nortel Networks UK Pension Plan) And The Board Of The Pension Protection Fund, And Motion For An Order Requiring A More Definite Statement Of Claim* [D.I. 7818] (the "Debtors' Motion"). In the Debtors' Motion, they argued that application of Rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Rules") to the U.K. Pension Claimants' proofs of claim "will plainly promote the efficient resolution of their Claims by allowing the Debtors to fully understand the factual basis for the Claimants' assertions …" (Debtors' Motion ¶ 31), and that, as presently drafted, the U.K. Pension Claimants' proofs of claim "are so vague and ambiguous that the Debtors cannot respond to them" (*id.* ¶ 40).

17. The U.K. Pension Claimants filed and served a more definite statement of their proofs of claim, in the form of the Amended Claims, on September 5,

2012. Although Rule 7012(a)(2) of the Rules required the Debtors to respond to the U.K. Pension Claimants' more definite statement within 14 days of its service, the Debtors have yet to file a response and are, therefore, technically in default.

18. The Debtors have had the Amended Claims for almost six months without responding to them. They should be required to do so promptly. The Debtors' response to the detailed allegations set forth in the Amended Claims will identify facts in dispute and narrow the scope of discovery necessary to resolve the Amended Claims in a timely, efficient and cost-effective manner.

19. The U.K. Pension Claimants are just as anxious as the Debtors and other parties-in-interest to have the Amended Claims resolved expeditiously, but they have a right to understand the basis for any objection the Debtors have to the Amended Claims before proceeding with discovery. Prudence and due process requires no less.

20. Accordingly, the U.K. Pension Claimants respectfully reserve their right to address issues concerning the process and schedule for resolution of the Amended Claims at the appropriate time.

Dated: March 4, 2013
Wilmington, Delaware

BAYARD, P.A.

*/s/ Justin R. Alberto*
Charlene D. Davis (No. 2336)
Justin R. Alberto (No. 5126)
222 Delaware Avenue, Suite 900
Wilmington, DE 19899
Tel: (302) 655-5000
Fax: (302) 658-6395
Email: cdavis@bayardlaw.com
jalberto@bayardlaw.com

-and-

WILLKIE FARR & GALLAGHER LLP
Marc Abrams
Brian E. O'Connor
Sameer Advani
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8000
Fax: (212) 728-8111

*Counsel for the Trustee of Nortel Networks UK Pension Plan and the Board of the Pension Protection Fund*

9172927