EXHIBIT "1"

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------- X
*In re*                                                    :          Chapter 11
                                                           :          Case No. 09-10138 (KG)
Nortel Networks Inc., *et al.*,[1]                         :
                                                           :          Jointly Administered
                              Debtors.                     :
                                                           :          **Hearing date: April 2, 2013 at 10:00 a.m. (ET)**
                                                           :          **Objections due: March 12, 2013 at 4:00 p.m. (ET)**
                                                           :
                                                           :          **RE: 9224**
                                                           :
----------------------------------------------------------X

**STATEMENT OF THE OFFICIAL COMMITTEE OF RETIRED
EMPLOYEES OF NORTEL NETWORKS INC., ET AL. IN SUPPORT
OF DEBTORS' MOTION FOR APPROVAL OF THE SETTLEMENT
AGREEMENT AND TERMINATION OF RETIREE BENEFITS**

This Statement of the Official Committee of Retired Employees of Nortel Networks Inc., *et al.* (the "Retiree Committee") is for individuals that have been identified as current or former employees of Nortel Networks Inc., *et al.* ("Nortel" or the "Debtors") who may be entitled to participate in the proposed settlement of the *Debtors' Motion for Entry of an Order Terminating Retiree Benefits and Approving a Settlement Proposal Pursuant to 11 U.S.C. § 1114* (the "Termination Motion"), which the Debtors filed in the Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on July 30, 2012 [Dkt. No. 8066].[2]

As you know, Nortel has sold its various assets and is no longer in business. Because it is no longer actively operating, it has sought Bankruptcy Court approval to terminate the payment of retiree benefits, claiming that it has an absolute right to do so under the relevant employee benefit plans. Nortel contends that it could exercise this right without court approval and Nortel further contends that it can also terminate the retiree benefits in bankruptcy.

As you may be aware, the Termination Motion seeks to terminate all of the retiree benefits provided under Nortel's various benefit plans and other programs, including, but not limited to, the Nortel Networks Inc. Retiree Medical Plan,[3] the Nortel Networks Inc. Retiree Life Insurance and Long-Term Care Plan for Retirees, certain predecessor plans, and other formal or informal benefit plans, agreements, arrangements or programs (including plans, agreements, arrangements

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

[2]    The Debtors have filed and served a Notice of the Settlement Agreement simultaneously herewith.

[3]    The Nortel Networks Inc. Retiree Medical Plan includes the Employee Assistance Program and the Prescription Drug Benefits Program.

or programs that are funded through the purchase of insurance) (collectively, and in each case as amended or modified from time to time, the "Retiree Welfare Plans").  The proposed Settlement Agreement[4] is the result of extensive negotiations between the Retiree Committee and the Debtors, which were conducted with the assistance of a Bankruptcy Court-appointed mediator (the "Mediator").

### The Retiree Committee Supports Approval of the Settlement Agreement

When the Debtors first sought to terminate retiree benefits in 2010, they asked the Bankruptcy Court for authority to do so without making any payment to retirees.

After the Retiree Committee was appointed, it required Nortel to turn over all available plan documents and summaries, communications to retirees, and certain other correspondence and financial information so that the Retiree Committee could analyze and review such materials. The Retiree Committee was authorized by the Bankruptcy Court to hire professionals and it retained and has been assisted by:  (i) Togut, Segal & Segal LLP (the "Togut Firm"), as bankruptcy counsel;  (ii) McCarter & English LLP (the "McCarter Firm"), as employee benefits counsel;  (iii) Alvarez & Marsal ("A&M"), as financial advisor;  and (iv) DaVinci Consulting Group LLC ("DaVinci"), as actuarial advisor[5] under a subcontract with A&M approved by the Bankruptcy Court (collectively, the "Professionals").  The Retiree Committee then spent the next 5 months reviewing such documents and information provided by Nortel and working with its Professionals before engaging the Debtors in settlement discussions and trying to reach a negotiated resolution of the Debtors' stated desire to terminate the Retiree Welfare Plans.  Since the appointment of the Retiree Committee, the members of the Retiree Committee have been especially active and personally involved, meeting in person or by phone with the Professionals on an average of once a week, and sometimes more.

When those negotiations reached an impasse, the Debtors filed the Termination Motion and asked the Bankruptcy Court for authority to terminate the Retiree Welfare Plans and the retiree benefits provided thereunder (a) as of December 31, 2012, and (b) with a payment to retirees of $40 million, minus all costs of providing retiree benefits after July 1, 2012, which would have resulted in a net payment of less than $36 million.

As a result of additional efforts and negotiations, the Retiree Committee has obtained an agreement with the Debtors, subject to Bankruptcy Court approval, such that the Debtors will continue to provide retiree benefits until May 31, 2013, and approximately $66.9 million will be paid for the benefit of Eligible Participants (defined below) as of January 31, 2013.[6]

For the reasons described below, the Retiree Committee supports the Debtors' Motion for Court approval of the Settlement Agreement.

---

[4]    Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Settlement Agreement. In the event of any inconsistency, the terms of the Settlement Agreement govern.

[5]    The employees of DaVinci were acquired by Towers Watson Pennsylvania Inc. ("Towers") and Towers has continued to provide actuarial services to the Retiree Committee.

[6]    This amount will reduce monthly if the Debtors continue to provide retiree benefits after the expected Termination Date (defined below).

## What Is the Retiree Committee?

On January 14, 2009, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. On June 21, 2010, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing Debtors to Terminate Certain Retiree and Long-Term Disability Plans* (the "Original Termination Motion"), which sought Court approval to terminate all of the benefits provided under the Retiree Welfare Plans without any payment to retirees. Although the Debtors withdrew the Original Termination Motion on July 16, 2010, they filed a motion on June 2, 2011 seeking appointment of a retiree committee, in accordance with section 1114 of the Bankruptcy Code, 11 U.S.C. § 101, et seq., to engage in negotiations regarding the modification or termination of the Retiree Welfare Plans. *See Debtors' Motion for an Order Pursuant to Section 1114 of the Bankruptcy Code Appointing an Official Committee of Retired Employees* dated June 2, 2011 [Dkt. No. 5595]. The Bankruptcy Code provides for such committees for this purpose.

After the Court granted Nortel's motion to appoint an Official Committee of Retired Employees, the United States Trustee appointed the Retiree Committee and its members on August 2, 2011. The Retiree Committee consists of five retired Nortel employees who currently receive benefits under the Debtors' Retiree Welfare Plans. The Retiree Committee was appointed to negotiate on behalf of retirees regarding the Debtors' efforts to terminate benefits under the Retiree Welfare Plans. The Retiree Committee does not, however, represent the interests of any individual retiree or the interests of retirees who seek pension benefits or benefits other than benefits provided under the Retiree Welfare Plans.

Since its appointment, the Retiree Committee has worked hard to protect the rights of retirees under the Retiree Welfare Plans while at the same time seeking to negotiate a fair and equitable resolution of the Debtors' requests to terminate all benefits under the Retiree Welfare Plans. The Debtors and Retiree Committee have engaged in formal and informal discovery for approximately one year and have participated in extensive settlement negotiations with and without the assistance of the Mediator. The Retiree Committee also reached out to the Nortel retiree community, which provided the Retiree Committee with thousands of pages of relevant documents as well as statements concerning their individual claims for retiree welfare benefits. In addition, the Retiree Committee has appeared in Court on numerous occasions in connection with, or in opposition to, motions that affected retirees' rights. Additional information regarding the Retiree Committee and the Debtors' cases can be found at the Retiree Committee's official website: www.kccllc.net/nortelretiree.

Eventually, the Debtors and the Retiree Committee were able to enter into the Settlement Agreement, which is summarized and discussed in this Statement.

## What Are the Significant Terms of the Proposed Settlement?[7]

**Payment by the Debtors:** Subject to approval by the Bankruptcy Court, the Debtors and the Retiree Committee have entered into the Settlement Agreement pursuant to which, among other things, the Debtors have agreed to make a settlement payment for the benefit of Eligible Participants (defined below) in the current gross amount of $66,879,000 (the "Settlement

---

[7] This Statement provides a summary of the Settlement Agreement. You should carefully review the Settlement Agreement, a copy of which is attached to the *Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 353 and 1114 and Fed. R. Bankr. P. 9019 Approving a Settlement Agreement with the Official Committee of Retired Employees* [Dkt. No. 9224]. A copy of the Settlement Agreement may also be obtained from the Retiree Committee's website at: www.kccllc.net/nortelretiree. In the event of any inconsistency, the terms of the Settlement Agreement govern.

Amount")[8].  The Settlement Amount payable is reduced at the rate of $707,000 per month if the Debtors continue to provide benefits under the Retiree Welfare Plans after the expected Termination Date (defined below) and until the actual termination of the Retiree Welfare Plans.

**Effective Date of Settlement Agreement**:  The Settlement Agreement will become effective and binding upon all retirees and Eligible Participants on the date that an order of the Bankruptcy Court approving the Settlement Agreement becomes final and non-appealable (the "Effective Date").

**Termination of Retiree Welfare Plans:**  If the Settlement Agreement is approved by the Bankruptcy Court, **the Debtors will terminate all Retiree Welfare Plans and all coverage and benefits provided thereunder shall cease at 11:59 p.m. (ET) on May 31, 2013 (the "Termination Date").**

**Retiree Welfare Plans Run Off Period:**  If the Settlement Agreement is approved by the Bankruptcy Court, the time period for making claims for reimbursement of benefits covered by the Retiree Welfare Plans for claims incurred prior to the Termination Date (the "Run Off Period") will be reduced to six months, commencing on the Termination Date.  Claims for reimbursement of benefits covered by Retiree Welfare Plans for claims incurred prior to the Termination Date which are not properly made or submitted prior to the expiration of the Run Off Period shall be disallowed for all purposes.

**How Will the Settlement Amount Be Apportioned
Among and Distributed to Retirees Eligible To Participate in the Settlement?**

**Eligible Participants:**  Under the Settlement Agreement, "Eligible Participants" are:  (a) retired employees of the Debtors, their spouses and dependents who are eligible as of January 31, 2013 to receive benefits under the Retiree Welfare Plans;  (b) those Nortel employees who are currently receiving employer-paid long-term disability benefits, their eligible spouses and dependents, who may qualify to participate in the settlement under the terms of section 8(a) of the Settlement Agreement;  and (c) former employees currently receiving medical benefits under COBRA, who qualify to participate in the settlement under the terms of section 8(a) of the Settlement Agreement.  Pursuant to section 8(a) of the Settlement Agreement, in order for a current employee of the Debtors, including an LTD Employee, to elect to receive benefits under the Retiree Welfare Plans as of the Effective Date, such employee must, by a written document to be received by the Debtors within thirty (30) days after the Effective Date, voluntarily terminate his or her employment with the Debtors and irrevocably relinquish his or her right to receive benefits under the plans, arrangements, agreements and programs available to current employees, including, without limitation, income continuation benefits pursuant to the Nortel Networks Inc. Long-Term Disability Plan (unless otherwise agreed to by the Debtors in writing in connection with the termination or consensual resolution regarding the termination of such benefits).

**VEBA:**  Under the Settlement Agreement, the Retiree Committee intends to establish a "voluntary employees' beneficiary association" within the meaning of section 501(c)(9) of the Tax Code (a "VEBA") as a way of providing non-taxable benefits to Eligible Participants following the Termination Date.  The VEBA, among other things, will be authorized to purchase a group medical insurance policy (the "VEBA Sponsored Medical Plan") from Aetna Life Insurance Company for the benefit of Eligible Participants, *provided that* (i) a sufficient number of Eligible Participants

---

[8]     A portion of the Settlement Amount will be used to satisfy Settlement Administration Costs that are necessary to administer and implement the Settlement Agreement and the VEBA, determine claims asserted or payable under the Settlement Agreement and resolve any relevant disputes that arise after the Effective Date.

indicate that they prefer the VEBA to use the portion of the Settlement Amount which is allocable to the Medical Claims (defined below) to pay a portion of the Eligible Participants' premium for the VEBA Sponsored Medical Plan rather than to distribute those settlement proceeds to Eligible Participants through a tax-advantaged health reimbursement arrangement (account) ("HRA"), and (ii) a sufficient number of Eligible Participants choose to participate in the VEBA Sponsored Medical Plan to satisfy Aetna Life Insurance Company's underwriting requirements.

**Alternative Insurance Programs:**  The Retiree Committee solicited proposals from numerous insurance providers for group insurance products for the Eligible Participants.  The VEBA Sponsored Medical Plan is the only group medical insurance program that any insurer proposed in response to the Retiree Committee's requests.  No insurance provider that the Retiree Committee consulted was willing to offer group life insurance or long-term care benefits for the Eligible Participants.

**Apportionment Methodology:**  The Settlement Amount will be apportioned among Eligible Participants according to the methodology described in the Settlement Agreement and summarized below.  The description in the Settlement Agreement is more detailed and is controlling.  However, to help you understand the settlement value allocated to you, annexed hereto as Exhibit "1" is a confidential, personalized notice (your "Individual Claim Form") describing your existing benefits, the amount of insurance subsidy you currently receive from Nortel under the Retiree Welfare Plans for medical benefits, and an estimate of the total settlement value allocated to you (your "Settlement Value") from the Settlement Amount on account of the termination of your benefits under the Retiree Welfare Plans.[9]  Attached to your Individual Claim Form you will find a table which sets forth your estimated Settlement Value based on your benefit elections, age and years of service with Nortel and compares your allocation to that of other similarly situated Eligible Participants.  Your Settlement Value is an estimate and the Retiree Committee has the ability to adjust your Settlement Value to correct any errors or to account for changes in the population of retirees.  The final determination of your Settlement Value by the Retiree Committee is binding.

In sum, the Settlement Amount will be allocated by:

(1) Determining the net present value of the benefits each Eligible Participant would be entitled to receive over time under the Nortel Networks Inc. Retiree Medical Plan ("Medical Claims") and the Nortel Networks Inc. Retiree Life Insurance and Long-Term Care Plan for retirees ("Life Insurance and LTC Claims") based on actuarial assumptions and principles, and interest rate assumptions used to calculate the Nortel liability for purposes of the negotiations with the Debtors[10];

(2) Adding all Eligible Participants' Medical Claims, Life Insurance Claims and LTC Claims together to obtain the total benefits claim (the "Total Claim");

(3) Determining what proportion of the Total Claim each Eligible Participant would be entitled to receive for each of Medical Claims, and Life Insurance Claims and LTC Claims to arrive at the Settlement Value;  and

(4) Allocating the Settlement Amount to each Eligible Participant in accordance with their respective Settlement Value for each type of benefits.

---

[9]    Based upon source data provided by the Debtors.

[10]    Actuarial assumptions used to determine the Medical Claims and Life Insurance and LTC Claims are consistent with those utilized by the Retiree Committee and its advisors during their negotiations with the Debtors.

This method attempts to allocate benefits in proportion to each Eligible Participant's respective share of the benefits that Nortel would have paid if it had continued to provide benefits under the Retiree Welfare Plans, but reduces each Eligible Participant's Settlement Value to take into account the fact that after the Termination Date of the Retiree Welfare Plans, the Settlement Amount will be the only source of funds for compensating for or replacing such lost benefits.

This allocation method also is applied separately to Medical Claims, Life Insurance Claims and LTC Claims so that the proportion of the Settlement Amount allocated to pay Medical Claims will mirror the proportion of the Total Claim that would have been paid for Medical Claims if the Nortel retiree welfare plans had been continued.  In other words, the Retiree Committee intends that the amount which the VEBA will allocate for Medical Claims under the Retiree Welfare Medical Plan will be based on the aggregate actuarial liability for the Medical Claims as a percentage of the aggregate actuarial liability for all types of benefits for which the Settlement Amount is intended to compensate.  The Retiree Committee also intends that the VEBA will allocate an amount to pay for Life Insurance and LTC Claims based on the proportionate actuarial valuation of the aggregate Life Insurance and LTC Claims of Eligible Participants as a percentage of the aggregate actuarial liability for all types of benefits for which the Settlement Amount is intended to compensate.

The amounts calculated to be due for Life Insurance and LTC Claims will be allocated to HRAs because, as noted above, no group life or long-term care insurance plan is available for Eligible Participants.  In the event that the VEBA Sponsored Medical Plan is not obtained, the amount allocable to the Medical Claims will also be allocated to HRAs.

In the event that the VEBA Sponsored Medical Plan is obtained, the amount allocated to Medical Claims will be used by the VEBA to pay a portion of the premiums that Eligible Participants will be required to pay under the VEBA Sponsored Medical Plan for medical coverage.

### When Nortel Terminates the Retiree Welfare Plans, Will Replacement Insurance Policies be Available?

**Efforts to Obtain Insurance**:  Throughout the settlement negotiation process, the Retiree Committee explored whether it could provide Eligible Participants with access to group insurance. The Retiree Committee solicited proposals from a number of insurance companies to provide insurance benefits to the Eligible Participants which would, to the extent possible, replicate the benefits provided under the Retiree Welfare Plans.  As stated above, however, the VEBA Sponsored Medical Plan is the only group insurance program that was proposed in response to the Retiree Committee's requests.  A summary of the VEBA Sponsored Medical Plan is enclosed with this Statement as Exhibit "2."  No group life or long-term care insurance was available.

**Use of the Settlement Proceeds**:  Provided that the Election Threshold (described below) is met, the Retiree Committee proposes that the VEBA will attempt to obtain the VEBA Sponsored Medical Plan for the benefit of Eligible Participants.  If it does so, Eligible Participants will receive enrollment packages from Aetna Life Insurance Company.  There can be no guarantee, however, that a sufficient number of Eligible Participants will enroll in the VEBA Sponsored Medical Plan to satisfy Aetna Life Insurance Company's underwriting requirements.  If an insufficient number enroll, the settlement amounts allocable to Medical Claims under the Settlement Agreement – which would have been used to help subsidize Eligible Participants' premiums due for coverage under the VEBA Sponsored Medical Plan – will be used by the VEBA to fund HRAs for the benefit of Eligible Participants in proportion to the amounts of the Eligible Participants' respective Medical Claims under the Settlement Agreement, subject to applicable provisions of law, including statutes, regulations, court decisions, administrative pronouncements and private rulings.  Again, in the

event that the Election Threshold is met, and the VEBA Sponsored Medical Plan is obtained, the amount allocated to Medical Claims will be used by the VEBA to pay a portion of the premium that Eligible Participants will be required to pay under the VEBA Sponsored Medical Plan.

The "Election Threshold" that must be met if the VEBA is to be authorized to obtain the VEBA Sponsored Medical Plan from Aetna Life Insurance Company for the benefit of Eligible Participants has two parts: (i) a sufficient number of Eligible Participants (the "Voting Threshold") must indicate, by completing and returning ballots in the form annexed hereto as Exhibit "3," that they would prefer the VEBA to offer the VEBA Sponsored Medical Plan rather than to distribute settlement proceeds through HRAs, and (ii) a sufficient number of Eligible Participants must choose to participate in the VEBA Sponsored Medical Plan to satisfy the insurer's underwriting requirements. The Voting Threshold that must be met for the VEBA to offer the VEBA Sponsored Medical Plan also has two parts: (a) at least 50% of the number of Eligible Participants who have Medical Claims must vote in favor of the VEBA offering the VEBA Sponsored Medical Plan, and (b) individuals entitled to at least two-thirds of the settlement amount to be paid on account of Medical Claims must vote in favor of the VEBA offering the VEBA Sponsored Medical Plan. The VEBA Sponsored Medical Plan will be offered only if the Election Threshold is satisfied in all respects.

If the Election Threshold is satisfied, Eligible Participants' entitlement to a portion of the Settlement Amount to compensate them for lost medical benefits will be paid by the VEBA as a subsidy toward the premiums that will be due from Eligible Participants under the VEBA Sponsored Medical Plan. The amount that will be paid by the VEBA will satisfy only a portion of the premium that is payable by each Eligible Participant, and each Eligible Participant will be required to pay the balance of the premium that will be due and owing on account of his or her coverage under the VEBA Sponsored Medical Plan.

If the Election Threshold is not satisfied, the portion of the Settlement Amount that is allocated to Eligible Participants' Medical Claims will be used by the VEBA to fund HRAs. An HRA will allow Eligible Participants to seek reimbursement, on a non-taxable basis, of eligible medical expenses from his or her HRA, subject to applicable provisions of law, including statutes, regulations, court decisions, administrative pronouncements and private rulings.

Because group life insurance and long-term care insurance are not available to Eligible Participants, the Retiree Committee intends to have the VEBA allocate the portion of the Settlement Amount allocable to the Life and LTC Claims to HRAs. Each Eligible Participant will then be able to seek reimbursement, on a non-taxable basis, of eligible medical expenses from his or her HRA account.

### What Claims are Being Released as a Result of the Settlement?

**Retiree Welfare Benefits Claims and Related Claims.** Approval of the Settlement Agreement will effectuate a release of a broad range of claims that Eligible Participants may have against the Debtors and related parties, as set forth in full in section 11 of the Settlement Agreement. The claims that will be released include, but are not limited to, claims for retiree life insurance, health insurance and long-term care benefits and claims arising from the termination of the Retiree Welfare Plans. These claims instead will be paid solely from the Settlement Amount in accordance with the terms of the Settlement Agreement. You should carefully review the Settlement Agreement which describes how claims will be treated and released.

**Retiree Proofs of Claim**: Any and all proofs of claim filed by Retirees on account of Retiree Claims shall be disallowed and expunged from the Debtors' claims register on the Effective Date to

the extent that such proofs of claim relate to Retiree Claims. THIS MEANS THAT, AS PART OF THE SETTLEMENT, HOLDERS OF RETIREE CLAIMS WILL HAVE THOSE CLAIMS AGAINST THE DEBTORS AND OTHER THIRD PARTIES RELEASED AND EXPUNGED, SUBJECT ONLY TO THEIR ENTITLEMENT (IF ANY) TO RECEIVE PAYMENT OF A PORTION OF THE SETTLEMENT AMOUNT.

## How Was the Settlement Agreement Reached?

The Retiree Committee and its Professionals engaged in extensive settlement negotiations with the Debtors, both with and without the assistance of the Mediator, while simultaneously preparing to litigate the Debtors' Termination Motion. The Debtors have asserted that they have a unilateral right to terminate the benefits provided under the Retiree Welfare Plans without any liability; the Retiree Committee has disputed that assertion. To evaluate the strengths and weaknesses of the parties' positions, the Retiree Committee, among other things, served and responded to: (i) requests for the production of documents; (ii) requests for admissions; and (iii) interrogatories. The Professionals reviewed and analyzed thousands of pages of documents that were obtained from the Debtors and third parties. Believing that additional information could be provided from the retiree community, the Professionals contacted hundreds of Nortel retirees and obtained and analyzed documentation they possessed regarding the Retiree Welfare Plans. In addition, the Professionals spoke with hundreds of retirees to get a better sense of their understanding of their rights under the Retiree Welfare Plans.

The Retiree Committee and its Professionals were prepared to litigate the Termination Motion, but they were also cognizant of the risks posed by pursuing litigation that would have asked the Bankruptcy Court to make new law, which is always risky. The members of the Retiree Committee concluded that it was more prudent to actively seek a compromise and settlement of the Debtors' and retirees' rights, believing that a settlement, if adequate, would be the best option for retirees. Most important to the Retiree Committee was to preserve, to the extent possible, retirees' ability to receive some compensation. A contested trial might not have achieved that goal.

Settlement negotiations with the Debtors were vigorous. When the parties couldn't make progress alone, the parties agreed to continue negotiations with the assistance of a Bankruptcy Court-Appointed Mediator. Numerous mediation sessions over the course of months produced the Settlement Agreement, which the Retiree Committee believes to be in the best interests of the recipients of retiree welfare benefits from Nortel. One of these sessions lasted an entire day and did not end until 1 am.

## Why Does the Retiree Committee Support the Settlement Agreement?

The Debtors originally sought Court permission to terminate all benefits under the Retiree Welfare Plans as of August 1, 2010 without making any further payment or offering any compensation to retirees. After appointment of the Retiree Committee, and after initial settlement negotiations with the Retiree Committee reached an impasse, the Debtors filed the Termination Motion by which they seek to terminate benefits provided under the Retiree Welfare Plans to retirees on December 31, 2012 in exchange for a payment of $40 million; however, the Debtors intended to subtract from that $40 million payment all of the costs of retiree benefits incurred on and after July 31, 2012, when the motion was filed, which would have resulted in a net payment of less than $36 million.

While the parties maintain their respective legal positions concerning the Debtors' right to terminate the Retiree Welfare Plans and the operation of Bankruptcy Code section 1114, both

parties recognize that, given the novel and complex legal issues presented in this case, pursuing such litigation would be time-consuming and, most importantly, its outcome would be uncertain.

An unfavorable ruling or trial verdict that allows the Debtors to terminate benefits under the Retiree Welfare Plans immediately could be catastrophic for retirees and far less favorable than the result represented by the Settlement Amount. If the Debtors prevail on their Termination Motion, the benefits under the Retiree Welfare Plans would be terminated, and the settlement amount offered to retirees would be less than $36 million. Moreover, there can be no assurance that a court would compel the Debtors to continue providing benefits under the Retiree Welfare Plans while an unfavorable ruling is subject to appeal.

In contrast, under the Settlement Agreement, the Debtors will (a) continue to provide benefits under the Retiree Welfare Plans until May 31, 2013, thereby enabling retirees to receive uninterrupted benefits under the Retiree Welfare Plans (i) for 10 months after the Termination Motion was filed, and (ii) nearly 22 months after the Retiree Committee was appointed, and (b) make a settlement payment of approximately $67 million[11] for the benefit of Eligible Participants. In addition, the Settlement Agreement presents an opportunity for Eligible Participants (a) to gain access to a group medical plan if the Election Threshold is reached, and (b) to realize the benefits of the Settlement Agreement in a tax-efficient manner. All of these attributes of the Settlement Agreement represent a result that is far better than any prior proposal by the Debtors concerning termination of the Retiree Welfare Plans: Eligible Retirees will obtain approximately $30 million more than they would receive if the Debtors' Termination Motion is granted. For all of these reasons, the Retiree Committee supports the Settlement Agreement.

## Miscellaneous

**THE SETTLEMENT AGREEMENT IS THE CONTROLLING DOCUMENT. YOU SHOULD CAREFULLY REVIEW AND CONSIDER THE SETTLEMENT AGREEMENT, INCLUDING THE RELEASE, EXCULPATION AND INJUNCTION PROVISIONS CONTAINED IN THE SETTLEMENT AGREEMENT.**

Any inquiries concerning this Statement and the materials enclosed herewith should be addressed to the attorneys for the Retiree Committee, either by submitting such inquiries through the Retiree Committee website (www.kccllc.net/nortelretiree) or by contacting the undersigned attorneys for the Retiree Committee.

Dated: January 23, 2013

**The Official Committee of Retired Employees, By its attorneys, Togut, Segal & Segal LLP**
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Attn:  Albert Togut, Esq.
         Neil Berger, Esq.
         neilberger@teamtogut.com

---

[11]    The Settlement Amount payable is reduced at the rate of $707,000 per month if the Debtors continue to provide benefits under the Retiree Welfare Plans after the expected Termination Date and until the actual termination of the Retiree Welfare Plans.