EXHIBIT "2"

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x
*In re*                                                    :  Chapter 11
                                                           :
Nortel Networks Inc., *et al.*,[1]                         :  Case No. 09-10138 (KG)
                                                           :
         Debtors.                                :  Jointly Administered
                                                           :
                                                           :  Hearing date: April 2, 2013 at 10:00 a.m. (ET)
                                                           :
                                                           :  RE: 9224
                                                           :
---------------------------------------------------------- x

**STATEMENT OF THE OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF NORTEL NETWORKS INC., *ET AL.*, (A) IN RESPONSE TO OBJECTIONS TO SETTLEMENT MOTION AND (B) IN FURTHER SUPPORT OF DEBTORS' SETTLEMENT AGREEMENT WITH RETIREE COMMITTEE**

TO THE HONORABLE KEVIN GROSS,
CHIEF UNITED STATES BANKRUPTCY JUDGE:

        The Official Committee of Retired Employees (the "Retiree Committee") of Nortel Networks Inc., *et al.* (the "Debtors") respectfully submits this Statement (A) in response to objections to the Debtors' Motion for Entry of Orders Pursuant to 11 U.S.C. §§ 105, 363, and 1114 and Fed. R. Bankr. P. 9019 (A) Approving Settlement Notification Procedures and Subsequently, (b) Approving a Settlement Agreement with the Official

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

Committee of Retired Employees (the "Settlement Motion")[2] [Docket No. 9224] and (B) in further support of the Settlement Agreement,[3] and respectfully states:

## PRELIMINARY STATEMENT

1. Since its appointment during August 2011, the Retiree Committee has engaged in discovery, motion practice and arduous negotiations with the Debtors concerning their attempts to terminate the Retiree Benefits that they have provided to thousands of Retirees across the United States.

2. Throughout that process, the Retiree Committee sought to achieve the best settlement it could on behalf of all eligible Retirees, notwithstanding the Debtors' steadfast assertions that they have the contractual and legal right to terminate all of the Retiree Welfare Plans without any liability whatsoever.

3. The Settlement Agreement represents the culmination of long and intense negotiations that ultimately took place under the supervision of the Court-appointed Mediator. In the Retiree Committee's considered business judgment, the Settlement Agreement is a very favorable recovery that should help Retirees to adjust to the termination of their Retiree Benefits: the Debtors will continue the Retiree Benefits under the Retiree Welfare Plans until May 31, 2013 – nearly three years after their First Termination Motion (defined below) was made; and they will pay approximately $67 million to the Retiree Committee for the benefit of the Retirees.

4. Throughout the negotiations and litigation that the Retiree Committee has engaged in since its appointment, the Retiree Committee sought to obtain a recovery in a fashion that provides benefits to all of the approximately 4,600 Retirees as a whole while recognizing that each of them have their own individual

---

[2] Capitalized terms not defined herein shall have the meanings set forth in the Settlement Motion.
[3] The Debtors have filed and served an Omnibus Reply to the objections.

needs. The Retiree Committee believes that it has achieved that goal: of the 4,600 Retirees who were provided with notice of the Settlement Agreement, only seven individuals filed objections in response to the Settlement Motion. For the reasons set forth below, none of those objections should prevent approval of the Settlement Agreement and the benefits that it will provide.

5. Based upon the foregoing, and what follows, the Retiree Committee requests that the Settlement Agreement be approved by the Court.

I.  **Background**[4]

6. The Debtors initially sought to terminate the Retiree Benefits in June 2010 (the "First Termination Motion"), asserting that they had an absolute right to terminate the Retiree Welfare Plans without negotiating with the Retirees. The Debtors withdrew the First Termination Motion after the Third Circuit's ruling in *IUE-CWA v. Visteon Corp. (In re Visteon Corp.)*, 612 F.3d 210 (3d Cir. 2010). (*See* Settlement Motion ¶ 10.)

7. In June 2011, the Debtors renewed their efforts to terminate retirees' welfare benefits by seeking the appointment of an official committee of retirees to negotiate a termination of Retiree Benefits in accordance with section 1114 of the Bankruptcy Code. (*See* Settlement Motion ¶ 17.) The United States Trustee appointed the Retiree Committee on August 2, 2011 (the "Appointment Date") [Dkt. No. 6074].

8. The Retiree Committee engaged in seventeen months of difficult and contentious negotiations with the Debtors. During that time, while the parties were negotiating with the assistance of the Mediator, the Debtors made a second motion to terminate the Retiree Welfare Plans (the "Second Termination Motion"), and the parties

---

[4] A more complete description of the procedural history of the Debtors' case is set forth in the Settlement Motion.

began preparations for trial. In the Second Termination Motion, the Debtors proposed to terminate all of the Retiree Welfare Plans on December 31, 2012 and pay approximately $36 million to the Retirees.

9. With the assistance of the Mediator, the Retiree Committee was eventually able to reach a settlement with the Debtors, the Official Committee of Unsecured Creditors, and other parties in interest. The proposed settlement is memorialized in the Settlement Agreement and obligates the Debtors to pay approximately $67 million to the Retirees and to continue the Retiree Benefits until May 31, 2013 (the "Termination Date")[5].

10. After the Debtors filed their Settlement Motion on December 31, 2012, the Committee and its advisors began an extensive effort to provide information about the Settlement Agreement to the Retirees. That effort has included:

- *Posting information concerning the Settlement Agreement on the Retiree Committee's web site.* The Retiree Committee posted the Settlement Agreement and the Debtors' Settlement Motion on its web site together with "Settlement Agreement FAQs." The Retiree Committee also provided links to other resources for additional, relevant information. All of that information supplemented the numerous updates that the Retiree Committee posted to its website since its inception.

- *Mailing information concerning the Settlement Agreement and the procedure for objecting to it to approximately 4,600 eligible Retirees.* Consistent with the Court's Order Granting Debtors' Motion For Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363 and 1114 and Fed. R.

---

[5] Purusant to the Settlement Agreement, the Retiree Committee and the Debtors may mutually agree to extend the Termination Date to June 30, 2013.

4

Bankr. P. 9019 Approving Form and Methods of Notice of Hearing to Consider Settlement Agreement with the Official Committee of Retired Employees (the "Notice Procedure Order") [Docket No. 9324], on or before February 1, 2013, the Retiree Committee served copies of its Statement in support of the Settlement Agreement to the approximately 4,600 Retirees identified by the Debtors as potentially entitled to Retiree Welfare Benefits.  The Retiree Committee also sent to each of the Retirees: an "Individual Claim Form" which estimates the Retiree's share of the Settlement Amount;  a Court-approved Ballot asking each eligible retiree to specify his or her preference as to whether settlement proceeds should be used to subsidize benefits provided by a VEBA Medical Plan;  and information concerning the procedure for objecting to the Settlement Agreement.

- *Responding to more than 1,000 Retiree telephone calls and emails after the Settlement Motion was filed*.  The Retiree Committee responded to nearly 1,000 retiree inquiries that it has received on a timely basis.

- *Conducting "town hall" meetings*.  During February and March, 2013, the Retiree Committee and its advisors held "town hall" meetings in cities which have the highest concentration of Nortel Retiree residents:  Raleigh, North Carolina;  Dallas, Texas;  Santa Clara, California;  and Alpharetta, Georgia.  At those meetings, Retiree Committee members and their advisors made presentations about the Settlement Agreement and answered Retirees' questions.  More than 600 people attended the

"town hall" meetings in person and more than 900 more attended by toll-free telephone lines that the Retiree Committee made available. Notice of those "town hall" meetings was posted on the Retiree Committee's web site and was mailed to the Retirees in advance of the meetings [Docket Nos. 9610, 9611, 9612, 9613].

- *Balloting Retirees concerning whether eligible Retirees preferred to spend settlement proceeds on a purchase of group health insurance.* Pursuant to the Notice Procedures Order, the Retiree Committee asked 1,944 Retirees who are eligible to receive benefits under the Nortel Retiree Medical Plan to submit ballots indicating whether they preferred the Retiree Committee to use settlement proceeds allocable to lost medical benefits to subsidize benefits provided by a VEBA Medical Plan or to distribute those settlement proceeds to them through Health Reimbursement Arrangement accounts ("HRAs"). Almost 1,300 Retirees returned ballots expressing their preferences concerning this issue.[6]

11.  In addition to all of the foregoing, the Debtors served notice of the Settlement Agreement on the Retirees and published notice of it in 11 newspapers throughout North America.

12.  The Retiree Committee respectfully submits that in addition to the notice that was provided in accordance with the Notice Procedures Order, it has made every reasonable effort to ensure that Retirees have been fully informed about the terms of the Settlement Agreement and the procedure for objecting to it. Given the breadth of

---

[6] Ballots were provided to 1,944 Retirees who, according to the census provided by the Debtors, were eligible to receive benefits under the Nortel Retiree Medical Plan as of January 31, 2013. The Election Threshhold was not met and the VEBA Sponsored Medical Plan will not be offered. *See* Certification of Karen M. Wagner With Respect To The Tabulation Of Ballots Concerning Potential VEBA Sponsored Medical Insurance Plan [Docket No. 9682].

the Notice provided by the Debtors and the Retiree Committee, and the quantity of relevant information that the Retiree Committee has provided to Retirees, it is highly significant that only seven of the approximately 4,600 eligible Retirees have filed objections to the Settlement Motion (the "Objections"). It is clear that that the Settlement Agreement has Retirees' overwhelming support.

## II. Responses To Specific Objections

13. The Objections raise issues that fall into four basic categories that are discussed below.

14. *Category 1: Objections Based on Hardship*. Mr. Arnold Elias has asserted an Objection to the Settlement Motion on the ground that the settlement will be a hardship for him. *See* Docket No. 9285. Similarly, Thomas Cherry asks, among other things, why "such a small percentage of the funds Nortel put up, [is] being applied toward the employee's settlement?" *See* Docket No. 9429. In addition, Buddy Collins filed an Objection to the Settlement Agreement, asking the Court to "extend the Nortel Retiree Welfare Plan to at least December 31, 2013, and beyond" because, among other things, "it is possible that a Nortel entity will exist for years to come" and Nortel has "ample funds to cover such an extension." *See* Docket No. 9561.

15. The Retiree Committee sympathizes with Messrs. Elias, Cherry and Collins as well as with other Nortel Retirees for whom Nortel's bankruptcy and termination of Retiree Benefits will cause a hardship. For that reason, the Retiree Committee worked very hard to negotiate the best settlement possible with the Debtors despite significant factual and legal challenges.

16. The Retiree Committee supports the Settlement Agreement because it is the best compromise the Retiree Committee was able to obtain after 17 months of

7

negotiations and litigation, the outcome of which was highly uncertain. Indeed, when taking into account the value of the Retiree Benefits that will have been provided to the Retirees from the Appointment Date through the Termination Date, including the $67 million Settlement Amount, the Retiree Committee has enabled Retirees to realize value of nearly $90 million. This outcome is far better than what the Debtors' proposed in their First and Second Termination Motions, and should materially assist Retirees in their transition to other benefits after the Debtors terminate the Retiree Welfare Plans.

17. **_Category 2: Objection to Distribution Through HRAs_**. Thomas Cherry objects to the distribution of settlement proceeds through HRAs rather than through immediate payments of cash. *See* Docket Nos. 9387, 9429, 9659. Mr. Cherry also argues that, by using the HRA structure, the Retiree Committee is impermissibly converting non-health benefits into a health account. *See* Docket No. 9659. In addition, Mr. Cherry expresses concern that the "account owner" could "cancel" retirees' HRAs "at any time and claim the remaining funds." *See* Docket No. 9429. Based upon all of the inquiries from Retirees that the Retiree Committee has received, Mr. Cherry appears to be uniquely situated in that he believes he will have limited use of funds provided through HRAs because he has a military veterans' health insurance plan that pays most of his medical expenses.

18. The Settlement Agreement provides for distribution of settlement proceeds to retirees through HRAs rather than through immediate payments of cash because, as Retiree Committee counsel explained to Mr. Cherry in the email quoted in his objection, HRAs "are generally not taxed."[7] *See* Docket No. 9429. Offering Mr. Cherry or any other retiree an immediate cash payment could endanger the tax benefits

---

[7] The Retiree Committee has requested that the Internal Revenue Service issue a Private Letter Ruling on an expedited basis to confirm, among other things, that distributions from HRAs sponsored by a "stand-alone" VEBA are not taxable.

8

that the Retiree Committee expects all of the 4,600 eligible Retirees to realize from distribution through HRAs. *See* I.R.S. Notice 2002-45, which provides guidance regarding health reimbursement arrangements [HRAs] (stating that "if any person has … a right [to receive cash] under an arrangement currently or for any future year, all distributions to all persons made from the arrangement in the current tax year are included in gross income, even amounts paid to reimburse medical care expenses."). In these circumstances, the Retiree Committee believes that the interests of the approximately 4,600 individuals in the Retiree group as a whole should be controlling.

19.     Mr. Cherry's assertion regarding what he perceives to be the "conversion" of benefits is factually incorrect. Retirees' benefit elections, along with years of service and age, where applicable, are being used as objective criteria to calculate each eligible Retiree's actuarial share of the Settlement Amount because Retiree Benefits are being terminated by the Debtors and cannot be replaced. The HRA structure, which permits reimbursement of eligible medical expenses, is being used to try to achieve the Retiree Committee's goal of maximizing the value of distributions through a tax-efficient vehicle. Consequently, the Retiree Committee is not converting any Retiree Benefit from one form to another.

20.     In addition, Mr. Cherry's concern that the Retiree Committee or a successor could "claim" his remaining funds is also incorrect. The managers of the VEBA trust that will be created pursuant to the Settlement Agreement and of the HRAs will be subject to fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, and will have no general right to claim individuals' HRA funds as their own. In addition, the Retiree Committee has been advised that HRAs can be set up to allow a Retiree's eligible survivors to continue using the HRA after the Retiree's death.

9

21. *Category 3: Ineligibility Because of Employment by Another Company Rather than Retirement from Nortel*. John Yoakum, Sherman Hawkins and Walter Reva object to approval of the Settlement Agreement on the ground that they are ineligible to participate because they accepted employment with another company after the Petition Date instead of retiring directly from Nortel. *See* Docket Nos. 9562, 9645 and 9638. However, as Mr. Reva acknowledges in his Objection, Nortel employees had a right to retiree welfare benefits under Nortel's plans only "if you retire from Nortel…." *See* Reva Objection, Docket No. 9638; *see also* Hawkins objection, Docket No. 9645 (attaching excerpts from a Nortel Retiree Welfare Plan description describing benefits available *upon retirement*).

22. Messrs. Yoakum, Hawkins and Reva did not retire from Nortel, and they are not entitled to Nortel Retiree Welfare Benefits. As a result, the Retiree Committee requests that these Objections be overruled insofar as they assert claims for Retiree Welfare Benefits either against the Debtors or against the Settlement Amount.[8]

23. *Category 4: Ineligibility Due to Voluntary Termination of Participation in Retiree Medical Plan*. Robert Horne objects to the Settlement Agreement on the ground that he is ineligible to participate in the Settlement Agreement because he "elect[ed] to exit the Nortel Retiree healthcare plan in November 2009." *See* Docket No. 9654.

24. Mr. Horne's objection is without merit. The Settlement Agreement was structured to determine eligibility for medical benefits as of January 31, 2013 so that eligibility could be determined as of a fixed date based on the results of the Debtors' annual enrollment for 2013. Mr. Horne has no grounds to object to that date because he

---

[8] The Committee takes no position as to whether Messrs. Yoakum, Hawkins and Reva may have other claims against the Debtors.

10

chose to cease participating in Nortel's Retiree Medical Plan during 2009, more than six months before the Debtors first moved to terminate benefits under that plan.[9]

25.     Further, the Settlement Agreement is intended to provide compensation to Retirees whose Retiree Benefits will be terminated pursuant to section 1114 of the Bankruptcy Code.  Mr. Horne, like many other Retirees, was fortunate enough to obtain alternative health insurance for which he required no subsidy from Nortel.  Mr. Horne, who voluntarily terminated his Retiree medical benefits more than two years ago, should not be permitted to share in the compensation to be provided to Retirees who will be deprived of benefits as a result of the Debtors' termination of the Retiree Welfare Plans.  His objection should be overruled.

*[Concluded on Following Page]*

---

[9] Mr. Horne has also requested to participate in the Settlement Agreement as if he were eligible for retiree life insurance and long-term care insurance benefits.  However, the Debtors have determined that Mr. Horne was ineligible for these benefits and not entitled to elect them under the Retiree Welfare Plans.

**CONCLUSION**

      26.      Based upon the foregoing, the Retiree Committee requests that the Settlement Motion be granted.

DATED:  Wilmington, Delaware
             March 28, 2013

**MCCARTER & ENGLISH, LLP**

      /s/ *William Taylor*
William F. Taylor, Jr. (DE Bar I.D. #2936)
Renaissance Centre 405 N. King Street,
8th Floor
Wilmington, DE 19801
(302) 984-6300
(302) 984-6399 Facsimile
wtaylor@mccarter.com

-and-

Albert Togut, Esq.
Neil Berger, Esq.
Togut, Segal & Segal LLP
One Penn Plaza
New York, New York 10119
(212) 594-5000
(212) 967-4258 Facsimile
altogut@teamtogut.com
neilberger@teamtogut.com

*Counsel to the Official Committee of Retired Employees*