**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-----------------------------------------------------------X
                                                           :
*In re*                                                    :      Chapter 11
                                                           :
Nortel Networks Inc., *et al.*,[1]                         :      Case No. 09-10138 (KG)
                                                           :
                          Debtors.                         :      Jointly Administered
                                                           :
                                                           :
-----------------------------------------------------------X

**DECLARATION OF JOHN J. RAY III IN FURTHER SUPPORT OF DEBTORS'
MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 363
AND 1114 AND FED. R. BANKR. P. 9019 APPROVING A SETTLEMENT
AGREEMENT WITH THE OFFICIAL COMMITTEE OF RETIRED EMPLOYEES**

I, John J. Ray III, declare under penalty of perjury as follows:

1.      On January 6, 2010, upon the motion of Nortel Networks Inc. ("NNI") and the

other above-captioned debtors (together, the "Debtors"), I was appointed by this court as

Debtors' Principal Officer, *nunc pro tunc* to December 7, 2009.  I am also Senior Managing

Director and the sole member of Avidity Partners, LLC.

2.       Except as otherwise indicated, all facts set forth in this declaration are based

upon my personal knowledge, information supplied to me by other members of the Debtors'

management and professionals based on, among other things, a review of the Debtors' files,

books and records, or learned from my review of relevant documents or are based upon my

opinion, which is founded upon my experience and knowledge of the Debtors' operations.  If I

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification
number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc.
(9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation
(0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks
Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826),
Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable
Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the
Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

were called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this declaration.

3.      I submit this declaration in support of the Debtors' motion for an order (i) approving a Settlement Agreement with the Retiree Committee and (ii) granting them such other and further relief as the Court deems just and proper, filed as of December 31, 2012 [D.I. 9224] (the "Retiree Settlement Motion")[2] and the *Debtors' Reply in Further Support of Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363 and 1114 and Fed. R. Bankr. 9019 Approving a Settlement Agreement with the Official Committee of Retired Employees* (the "Reply").  I directly participated in the negotiation of the Settlement Agreement with the Retiree Committee regarding the consensual termination of the Debtors' Retiree Welfare Plans including by attending meetings with the Retiree Committee, providing information and exchanging proposals and counter-proposals.

***The Retiree Welfare Plans and the Wind Down of the Debtors' Estates***

4.      The Debtors historically have provided a number of benefits, including medical coverage, life insurance and long-term care insurance, to their retired employees, as well as to such employees' surviving spouses and eligible dependents, through various benefit plans and other programs.  During the course of these chapter 11 cases, the Debtors have continued to provide benefits under the Retiree Welfare Plans[3] (the "Retiree Benefits") in the ordinary course

---

[2]      Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Retiree Settlement Motion.

[3]      For retired employees of the Debtors, the Debtors maintain various benefit plans and other programs, including the Nortel Networks Inc. Retiree Medical Plan, the Nortel Networks Inc. Retiree Life Insurance and Long-Term Care Plan for Retirees, certain predecessor plans, and other formal or informal benefit plans, agreements, arrangements or programs (including plans, agreements, arrangements or programs that are funded through the purchase of insurance) or arrangements for current or future retired employees, their surviving spouses and eligible dependents, including plans, arrangements, agreements or programs for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death, in each case as such plans, agreements, arrangements or programs have been amended or modified from time to time (collectively, and in each case as amended or modified from time to time, the "Retiree Welfare Plans").

under the plan terms.  As of March 22, 2013, there were over 4,400 individuals receiving or eligible to receive various Retiree Benefits under the Retiree Welfare Plans.

5.      While the Debtors have offered various welfare benefits to their Retirees both prior to and since the Debtors' chapter 11 petitions, the Debtors consistently have asserted that the governing Retiree Welfare Plans specifically reserve the Debtors' right to amend or terminate the Retiree Welfare Plans and the benefits provided thereunder.  The Debtors previously sought to terminate the Retiree Welfare Plans and the LTD Plans in June 2010 by the *Debtors' Motion for Entry of an Order Authorizing Debtors to Terminate Certain Retiree and Long-Term Disability Plans* [D.I. 3204] (the "Plan Termination Motion"), which was later withdrawn without prejudice in July 2010 [D.I. 3651].

6.      Over the last two and a half years since July 2010 through February 2013, the Debtors have continued to provide Retiree Benefits at an approximate cost of $30.6 million to their estates.  Although the Retiree Welfare Plans are administered by third-party vendors, the Debtors generally maintain the Retiree Welfare Plans as self-insured plans (excluding certain life insurance benefits).  The average current cost to the Debtors of providing the Retiree Benefits under the Retiree Welfare Plans is approximately between $707,000 and $1 million per month, and there is no assurance that the administrative cost of these plans will not increase over time.

7.      The Debtors have been working diligently to wind down their remaining operations since the completion of the sale of their patent portfolio, which closed in July 2011.  At this stage of these chapter 11 cases, the Debtors have made substantial progress in their wind down efforts.  The operating business lines have been sold, transition services have been completed and no supplier or customer relationships remain.  Once the Debtors dissolve as corporations, there will be no company even in name to continue the Retiree Benefits.

3

8.      At the time the bankruptcy cases were filed, the Debtors employed approximately 3,000 individuals.  The Debtors currently employ only ten active employees, other than the LTD Employees.  By way of comparison, as of March 22, 2013, there were over 4,400 individuals receiving Retiree Benefits under the Retiree Welfare Plans.  As a result of the divestitures and the wind down, the maintenance and administration of the Retiree Welfare Plans (and benefits provided to active employees and the LTD Employees) now takes a disproportionate amount of time and resources compared to prior years.  Throughout the wind down process, the Debtors have attempted to identify other alternative insurance arrangements for the Retirees.

***Settlement Negotiations with the Retiree Committee and the Exchange of Relevant Information***

9.      Since the appointment of the Retiree Committee over a year and a half ago, the Debtors have devoted significant resources and attention to negotiating in good faith to try and seek the termination of the Retiree Welfare Plans and a settlement that would treat the Retirees fairly and equitably.  On October 6, 2011, the Debtors held an in person meeting with the Retiree Committee to provide them information about the Retiree Welfare Plans and the proposed termination of Retiree Benefits.  Thereafter, the Debtors and their advisors and the Retiree Committee and its professionals participated in numerous and lengthy good faith, arm's-length negotiations regarding the termination of the Retiree Welfare Plans, including the exchange of term sheet proposals and further in person meetings held on February 27, 2012, June 14, 2012, July 19, 2012 and August 20, 2012.  Throughout the process, each party vigorously negotiated the best possible deal for its constituencies, making concessions to consensually resolve disputed issues.

10.      In addition to numerous telephonic discussions between the parties, the Debtors engaged in the regular production of documents and other data, providing the Retiree Committee

access to all potentially relevant information available necessary to evaluate the Debtors' proposals.  Through both informal and formal discovery, the Debtors to date have provided the Retiree Committee with at least 12,000 pages of documents and multiple spreadsheets, including various Retiree Welfare Plan documents, retiree communications, claims histories and other information regarding the Debtors' employees and their estates, assets and claims.  The Debtors have supplemented this information with updated data as it became available.

11.     Notwithstanding the Debtors and Retiree Committee's committed efforts, negotiations reached an impasse and in an effort to reach a consensual resolution, in March 2012, the Debtors sought to have a mediator appointed to facilitate settlement discussions between the Debtors and the Retiree Committee.  Following the appointment of Mr. Richard Levin as Mediator on April 18, 2012 [D.I. 7560], the Debtors and the Retiree Committee continued to work towards a consensual settlement under the supervision of a neutral, third-party mediator.

12.     After almost a year of negotiations, and an all-day mediation session held on September 21, 2012, which involved more than ten hours of negotiation between the Debtors, the Retiree Committee, the UCC, the Bondholder Group and the LTD Committee, the primary terms of a settlement in principle between the Debtors and the Retiree Committee was reached.  That settlement in principle was the result of a proposal from the Debtors to the Retiree Committee, based on the most complete and reliable information available at the time.  The Retiree Committee, as the authorized representative of the Debtors' Retirees, accepted that proposal and agreed to the termination of the Retiree Benefits on those terms.  The Settlement Agreement embodies that agreement, as ultimately memorialized by the parties after continued negotiations and discussions.  The UCC and Bondholder Group also actively participated in the negotiation process.

***The Settlement Agreement is Necessary for the Confirmation of a Chapter 11 Plan***

13.     At the current advanced stage of these chapter 11 cases, the Debtors cannot continue to provide Retiree Benefits to their Retirees for the indefinite future.  The Debtors have reviewed their budgets, financial statements and projected costs in determining the infeasibility of continuing to maintain the Retiree Welfare Plans.  The Debtors considered the most complete and reliable information available to the Debtors in formulating the proposal made to the Retiree Committee.

14.     The termination of the Retiree Welfare Plans pursuant to the terms of the Settlement Agreement is necessary to accommodate the ultimate confirmation of the Debtors' chapter 11 plan.  While the Debtors assert that the Retiree Welfare Plans are terminable at will without liability to the Debtors, the Retiree Committee has claimed, and the Debtors expect they would continue to argue absent settlement, that the Retiree Benefits are vested and that Retirees hold claims against the Debtors for such benefits.  While the Debtors remain confident in their own reading of the Retiree Welfare Plans, the Settlement Agreement avoids the risks and delay of what would be time-consuming and demanding litigation and provides the Debtors with greater certainty regarding the value of claims against the Debtors' estates and potential creditor recoveries under a chapter 11 plan.  The termination of the Retiree Welfare Plans under the Settlement Agreement also relieves the Debtors of the significant financial burden of continuing to provide Retiree Benefits for an indefinite period of time, preserves value for fair and equitable distribution to all of the Debtors' creditors and allows the Debtors to make necessary arrangements to begin the lengthy process of winding down the administration of the Retiree Welfare Plans.  Additionally, it is both desirable and important for the Debtors to terminate the Retiree Welfare Plans now due to the lengthy wind down process associated with the termination

of the Retiree Welfare Plans, which may take several months to complete.  The Settlement

Agreement achieves the finality necessary to allow the Debtors to proceed with the wind down

of their operations and toward the approval and implementation of a plan of reorganization.

***The Settlement Agreement Treats the Retirees Fairly and Equitably***

15.    The Settlement Agreement treats the Retirees fairly and equitably.  In addition to

the continued receipt of benefits through the entire course of the Debtors' chapter 11 cases to

date, which amounts to approximately 54 months of continued Retiree Benefits, the compromise

reached with the Retiree Committee provides the Retirees with a substantial payment despite the

Debtors' position that they would have no post-termination liability under the Retiree Welfare

Plans.  Indeed, previously active employees who were terminated in various rounds of layoffs

and through divestitures of the Debtors' business did not receive any such additional benefits or

payments, and the Debtors' unsecured creditors have not received payments from the Debtors on

account of their claims (whether or not valid) and will not until the confirmation of a plan of

reorganization for the Debtors.  Moreover, the structure of the Settlement Agreement was

designed to assist the Retirees' in transitioning to alternative medical coverage once the Retiree

Welfare Plans are terminated.

16.    The Settlement Agreement also is fair, reasonable and in the best interests of the

Debtors, their creditors and their estates.  Approval of the Settlement Agreement will confer

substantial benefits upon the Debtors and the Debtors' estates by eliminating the need for lengthy

and costly litigation and resolving one of the Debtors' more significant ongoing financial and

administrative burdens.  While the Debtors are prepared to litigate the termination of the Retiree

Welfare Plans and believe they would prevail, such contested motion practice carries with it

inherent uncertainties and there is no assurance that the Debtors would achieve a better result

than the one set forth in the Settlement Agreement.  The Settlement Agreement fairly balances the Debtors' likelihood of success on the merits against their interest in avoiding the uncertainty of continuing this contentious litigation and the burden of the continued costs of providing Retiree Benefits.  Furthermore, prompt resolution of the termination of the Retiree Welfare Plans through the Settlement Agreement is in the interests of the Debtors' creditors generally, as the cost and time devoted to continuing discovery and litigation over this matter will no longer disrupt the estates' efforts to move forward with the ultimate resolution of the Debtors' chapter 11 cases.  Therefore, the Debtors in their business judgment have determined that the Settlement Agreement treats the Retirees fairly and equitably and that consummation of the Settlement Agreement is in the best interests of the Debtors, their creditors and their estates.

***The Notice Procedures***

17.    In accordance with the *Order Granting Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363 and 1114 and Fed. R. Bankr. 9019 Approving Form and Methods of Notice of Hearing to Consider Settlement Agreement with the Official Committee of Retired Employees* dated January 23, 2013 [D.I. 9324], on January 24, 2013, the Settlement Notice was served on approximately 7,000 retired employees of the Debtors and certain individuals who may be eligible for benefits under the Retiree Welfare Plans at their last known address.  The Debtors also caused the Publication Notice to be published in eleven newspapers on January 30, 2013.

***The Debtors' Reply***

18.    Contemporaneously with the submission of this declaration, the Debtors have filed the Reply to address concerns raised by several individuals who have filed responses to the Settlement Motion.

19.     In order to place before the Court a document relevant to the Reply, attached hereto as <u>Exhibit 1</u> is a true and correct copy of an e-mail from Robert Horne to Kim Pulliam, Human Resources, Nortel Networks Inc., dated October 29, 2009.

20.     Additionally, based on a review of the Debtors' books and records maintained in the ordinary course, Robert Horne lacks sufficient years of service to be eligible for life insurance or long-term care benefits.  Attached hereto as <u>Exhibit 2</u> is a true and correct copy of a letter from Ruth A. Hillis to Robert Horne, dated February 16, 2001, relating to Mr. Horne's years of service under the Nortel Networks Inc. Retiree Medical Plan.  Attached hereto as <u>Exhibit 3</u> is a true and correct copy of a letter from Nortel – US Info Center – Pension Services to Robert Horne, dated April 2, 2001, summarizing Mr. Horne's retirement elections and indicating that life insurance was not available to Mr. Horne.


*[Remainder of Page Intentionally Left Blank]*

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:  March 27, 2013

*/s/ John J. Ray III*
John J. Ray III