## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTEL NETWORKS, INC., et al. | ) | Case No. 09-10138 (KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | **Re Dkt No. 5307 and 5531** |

## OPINION

The Court is opining on a matter of great significance in this daunting Chapter 11 case, namely, whether the Court will determine the allocation of proceeds from sales of assets in judicial proceedings, or if the allocation will be decided through an arbitration.[1] See Joint Motion for Entry of an Order Establishing an Allocation Protocol Pursuant to the Interim Funding and Settlement Agreement and for Related Relief (the "Joint Motion") (D.I. 5307); and Joint Administrators' Objection to the Motion and Cross-Motion to Compel Arbitration, dated May 31, 2011 (the "Objection") (D.I. 5531). For the reasons provided in this opinion, the Court finds that parties agreed that the Courts will make the allocation determination rather than an arbitrator or arbitrators. Despite the voluminous submissions of the parties and the lengthy arguments, the Court's decision ultimately turns on a plain and unambiguous agreement between the parties.

---

[1] Canadian entities also commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies Creditors Arrangement Act (Canada) seeking relief from their creditors (the "Canadian Proceedings"). The issue before the Court is similarly before the Canadian Court. The Court will refer to the "Courts" when discussing both this Court and the Canadian Court.

**PARTIES**

It is helpful in understanding the discussion of the issues to describe and define the numerous parties involved in the cases. The Court will refer to the universe of Nortel Entities described below as the "Nortel Parties."

Nortel Networks, Inc. ("NNI") and certain of its affiliates (collectively, the "U.S. Debtors") are debtors in the cases before the Court. They are joined in opposing arbitration by the Official Committee of Unsecured Creditors (the "Committee") and the Ad Hoc Committee of Bondholders (the "Bondholders"). The Bondholders hold claims in excess of $4 billion.

The Canadian Court appointed Ernst & Young to serve as the Monitor (the "Monitor") for the Canadian debtors, Nortel Networks Corporation ("NNC"), NNI's ultimate corporate parent, Nortel Networks Limited ("NNL"), NNI's direct corporate parent, and certain Canadian affiliates (collectively, the "Canadian Debtors").[2] The Canadian Debtors also oppose arbitration.

The third group of major parties, this group favoring and seeking arbitration, consists of entities which the High Court of England and Wales placed into administration (the "EMEA Debtors"). These affiliates, all in administration, are: Nortel Networks UK Limited Nortel Networks (Ireland) Limited; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska Sp z.o.o.; Nortel Networks Hispania, SA; Nortel

---

[2] Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation.

Networks (Austria) GmbH; Nortel Networks GmbH; Nortel Networks s.r.o.; Nortel Networks Engineering Services Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko, s.r.o.; Nortel Networks Romania SRL; Nortel GmbH; Nortel Networks OY; Nortel Networks AB; Nortel Networks International Finance & Holding BV and Nortel Networks France S.A.S.

The Administrators in the insolvency proceedings pending in the United Kingdom for all EMEA Debtors except Nortel Networks (Ireland) Limited are: Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris. The Administrators for Nortel Networks (Ireland) Limited are Alan Robert Bloom and David Martin Hughes (collectively, the "Joint Administrators" or "EMEA Debtors").

**RELEVANT FACTS**

The U.S. Debtors filed for bankruptcy protection on January 14, 2009, and the Canadian Debtors filed for similar relief in Canada. Shortly thereafter, the U.S. Debtors and the Canadian Debtors began a sale of all of its businesses and its intellectual property which eventually generated approximately $9 billion (the "Sales Proceeds").[3]

The prospective sales created a "stickey wicket." In the absence of agreement, what was to happen with the Sales Proceeds? The numerous, multi-national debtors who were competing for the Sales Proceeds addressed the problem by agreement. Thus, on June 9,

---

[3] The beneficial efforts of and stress upon the parties and their professionals cannot be overemphasized. By the Court's count, the U.S. Debtors and the Canadian Debtors conducted nine massive sales, requiring numerous motions, procedures, marketing, negotiations, auctions, hearings and closings. The results were beyond expectations for the most part and certainly were as a group.

3

2009, the U.S. Debtors, the Canadian Debtors and the EMEA Debtors entered into the Interim Funding and Settlement Agreement ("IFSA"), which the U.S. Court (the "U.S. IFSA Order") and the Canadian Court approved by separate orders, dated June 29, 2009. The English High Court already ruled that the Joint Administrators were free to enter into the IFSA on behalf of the EMEA Debtors.

The IFSA provided the necessary mechanism to allow the planned sales of the Nortel Parties' businesses and assets to proceed without dispute among the Nortel Parties. The IFSA, *inter alia*, provided that the parties to the IFSA would not condition the execution of any sale agreement with a third party upon allocation or even a binding procedure for allocation of the sale proceeds (IFSA, ¶ 12(a), but the sale proceeds would instead be placed into an escrow account. IFSA, ¶ 12(b). The sales were each accompanied by an escrow agreement pertaining to that sale (collectively, the "Escrow Agreements"). The Nortel parties also agreed to negotiate for a protocol to resolve allocation disputes. IFSA, ¶ 12(c). The IFSA provides that disputes over the IFSA or anything relating to the IFSA must be decided in a joint hearing of the U.S. Court and the Canadian Court. IFSA, ¶16(b).

The Nortel Parties could not agree upon a protocol which would govern the allocation process. Their failure was not for want of trying. The Nortel Parties engaged in lengthy discussions, including comprehensive settlement discussions, and two rounds of mediation. The most recent mediation with The Honorable Warren K. Winkler, Chief Justice of Ontario, Canada serving as the mediator ended without resolution despite the Chief Justice's expertise

2009, the U.S. Debtors, the Canadian Debtors and the EMEA Debtors entered into the Interim Funding and Settlement Agreement ("IFSA"), which the U.S. Court (the "U.S. IFSA Order") and the Canadian Court approved by separate orders, dated June 29, 2009. The English High Court already ruled that the Joint Administrators were free to enter into the IFSA on behalf of the EMEA Debtors.

The IFSA provided the necessary mechanism to allow the planned sales of the Nortel Parties' businesses and assets to proceed without dispute among the Nortel Parties. The IFSA, *inter alia*, provided that the parties to the IFSA would not condition the execution of any sale agreement with a third party upon allocation or even a binding procedure for allocation of the sale proceeds (IFSA, ¶ 12(a), but the sale proceeds would instead be placed into an escrow account. IFSA, ¶ 12(b). The sales were each accompanied by an escrow agreement pertaining to that sale (collectively, the "Escrow Agreements"). The Nortel parties also agreed to negotiate for a protocol to resolve allocation disputes. IFSA, ¶ 12(c). The IFSA provides that disputes over the IFSA or anything relating to the IFSA must be decided in a joint hearing of the U.S. Court and the Canadian Court. IFSA, ¶16(b).

The Nortel Parties could not agree upon a protocol which would govern the allocation process. Their failure was not for want of trying. The Nortel Parties engaged in lengthy discussions, including comprehensive settlement discussions, and two rounds of mediation. The most recent mediation with The Honorable Warren K. Winkler, Chief Justice of Ontario, Canada serving as the mediator ended without resolution despite the Chief Justice's expertise

and hard work. The termination of the mediation led to the matter coming back before the Courts.[4]

## DISCUSSION

### A. The Joint Administrators' Case for Arbitration

The Joint Administrators argue forcefully in the Objection that the Nortel Parties agreed to arbitration, that the IFSA reflects that agreement and that arbitration is the only practical and efficient procedure. The Joint Administrators maintain that the Nortel Parties understood from the time they negotiated the IFSA that the allocation of proceeds would be decided in a private, transnational arbitration proceeding. The Joint Administrators further argue that: (1) the Joint Motion is improper from a procedural standpoint, because the Court can grant the relief only in an adversary proceeding; (2) the intent to submit the matter to arbitration can be gleaned from its content, or the IFSA is sufficiently ambiguous, particularly the term "dispute resolvers," to require the Court to consider extrinsic evidence; (3) the IFSA created an enforceable promise to negotiate in good faith for an Interim Sales Protocol which the U.S. Debtors and the Canadian Debtors failed to honor; (4) the Nortel Parties reached an understanding calling for arbitration; (5) the Court lacks jurisdiction over the EMEA Debtors; and (6) judicial proceedings are highly impractical, creating the possibility of deadlock between the Court and the Canadian Court and parallel appeal

---

[4] The Nortel Parties and others first argued the Joint Motion and the Objection to the Courts in a joint hearing on June 7, 2011. Without ruling, the Courts referred the dispute to mediation. See Order Directing Mediation, dated June 17, 2011 (D.I. 5752). When the mediation failed, the Courts ordered parties to submit supplemental papers. The Courts heard the second argument on March 7, 2013.

processes.

The Joint Administrators argue that although the IFSA does not contain the words "arbitrator" or "arbitrators," it is sufficient that there is language which clearly manifests the parties' intention to submit to arbitration. *Douglas Fin. Corp. v. Pa. Power & Light Co.*, 858 F.2d 825, 830 (2d Cir. 1988). The Joint Administrators contend that the following language in the IFSA establishes the intention for arbitration:

> [Execution by a selling debtor of sale documents] shall not be conditioned upon such Selling Debtor reaching agreement with the other Selling Debtors regarding (A) allocation of the Sale Proceeds (the "Sale Proceeds") from the relevant Sale Transaction or (B) the binding procedure for the allocation of Sale Proceeds from the relevant Sale Transaction.

IFSA, ¶ 12(a).

Also, in providing for the escrow of Sale Proceeds, the IFSA provides:

> In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all the Selling Debtors or (ii) in a case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol applicable to the Sale Proceeds.

IFSA, ¶ 12(b).

Finally, the IFSA provides:

> [T]he Debtors shall, as soon as reasonably practicable, following the execution of this Agreement, negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Interim Sales Protocol"), which Protocol shall provide binding procedures for the allocation of Sale Proceeds where the Selling Debtors in such transactions have been unable to reach agreement on such allocations.

IFSA, ¶ 12(c).

From these provisions, and particularly the words "dispute resolvers," the Joint Administrators propose the only reasonable interpretation is that no one intended the Court and the Canadian Court to hold a joint trial on allocation.

The IFSA, they argue, is at the very least ambiguous requiring the Courts to consider extrinsic evidence. The Joint Administrators in their supporting papers presented the evidence they claim proves that the Nortel Parties agreed to arbitration. For reasons discussed below, the Court finds that the IFSA is not ambiguous and therefore the Court will not consider extrinsic evidence.[5] At bottom, the IFSA is not reasonably susceptible of more than one interpretation and therefore is not ambiguous. *Foot Locker, Inc. v. Omni Funding Corp. of America*, 911 N.Y.S. 2d 344, 346 (1st Dep't 2010).

---

[5] The question of whether an ambiguity exists is one of law, not fact. *W.W.W. Associates, Inc. v. Giancontieri*, 566 N.E. 2d 639, 642 (N.Y. 1990).

The Joint Administrators also argue that the EMEA Debtors did not submit to the jurisdiction of the Courts, except to enable the Courts to enforce arbitration. They further argue that the Courts do not have jurisdiction to issue a joint opinion on allocation. The Joint Administrators need not have any concern. The Court has independent jurisdiction over the EMEA Debtors and will issue its own opinion on allocation. The Court's jurisdiction rests on the IFSA itself, and Debtors' submission to the Court's jurisdiction by submitting claims against the U.S. Debtors.

The Joint Administrators are correct that the Court will confront practical and logistical difficulties. There is, indeed, the possibility that the Court and the Canadian Court will arrive at different allocations, and the trial at two distant locations may present challenges. However, difficulty is no reason for a court with jurisdiction, detailed knowledge of a case and the means to preside over that case to abandon its authority. *Meredith v. City of Winter Haven*, 320 U.S. 228, 236-37 (1943). It would be easier, but improper, for the Court to abdicate its responsibility by sending the allocation issues to arbitration without any justification. The Court is confident that the Nortel Parties and other interested parties, very ably represented, will assist the Court in minimizing any practical problems. It is entirely in the best interest of all of the Nortel Parties to facilitate the resolution of the allocation of large sums of money sitting in escrow, and equally to assist the Court in reaching the correct decision. Further, based upon the Court's years of presiding over the lawyers in this Chapter 11 case, the Court is certain that they will respect their professional obligations. More

importantly, the Court's enormous respect for the presiding jurist in the Canadian Court, Justice Geoffrey B. Morawetz, further fuels confidence in the Court's ability to render independently a fair and just result in an efficient and decorus manner. The judges overseeing these two cases have thus far worked through numerous difficulties and can no doubt continue to work together seamlessly. The U.S. Debtors and the Canadian Debtors put in place, with the Courts' approval, a Cross-Border Protocol which has facilitated these cases.[6] The EMEA Debtors were not parties to the Cross-Border Protocol, but agreed to its implementation in the Escrow Agreements.

## B.  The Case Against Arbitration

The U.S. Debtors, the Canadian Debtors and their respective constituents are asking the Courts to determine the allocation of the assets, which are largely comprised of the Sales Proceeds. The Court is persuaded by their position.

### *1. Jurisdiction*

The Nortel Parties agreed in the IFSA that they were submitting to the non-exclusive jurisdiction of the Court and the Canadian Court in a joint hearing conducted pursuant to the Cross-Border Protocol for "all legal proceedings to the extent relating to the matters agreed in this Agreement . . ." IFSA, ¶ 16(b)(i).

---

[6] The Court approved the Cross-Border Protocol on January 15, 2009, after the Canadian Court's approval on January 14, 2009.

In furtherance of the Courts' jurisdiction to determine allocation, the Nortel Parties agreed that "any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in . . . a joint hearing of both the Canadian and U.S. Courts conducted under the Cross-Border Protocol . . . IFSA, ¶ 16(b)(ii). The words "any claim, action or proceedings," "any relief whatsoever," "relating to" and "must" in the foregoing provision establish beyond cavil that the Nortel Parties, including the EMEA Debtors, agreed that they were submitting to the Court's jurisdiction. If the quoted provisions are not sufficient to make the point, the Nortel Parties excluded two specific issues, neither allocation, from the Court's jurisdiction. Additionally, as the U.S. Debtors discuss in their papers in support of the Joint Motion, the Escrow Agreements also make it clear that disputes relating to the escrowed funds will be heard by the Court.

The language in the IFSA, "any claim, action or proceeding . . . relating to matters agreed in this [IFSA]," and similar language in the Escrow Agreements[7] are broad forum selection provisions. *Schering Corp. v. First Databank, Inc.*, 479 F. Supp. 2d 468, 471 (D.N.J. 2007); *Pacor v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984). The law is clear: forum selection clauses are interpreted broadly and are enforced. *Foster v. Chesapeake Ins. Co.*, 933 F.2d 1207, 1216-19 (3d Cir. 1991). Clearly, the Nortel Parties agreed in the IFSA and in the Escrow Agreements that the Court with the Canadian Court are the "look to"

---

[7] The Escrow Agreements, to which the EMEA Debtors are a party, also provide that the EMEA Debtors submit to the exclusive jurisdiction of the Courts for all disputes.

10

jurisdictions for resolution of matters covered in such agreements and that includes allocation.

## 2. *The Agreement*

It is very clear that the Nortel Parties did not agree to arbitrate. The Joint Administrators concede the absence of agreement by arguing that the U.S. Debtors and Canadian Debtors had an obligation to negotiate the terms of arbitration.

It is equally clear that without agreement, there is no obligation to arbitrate. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2857-58 (2010). It is true that federal courts follow a policy favoring arbitration, but only if a valid agreement to arbitrate exists. *Id.* at 2859-60. Furthermore, while courts favor enforcing arbitration provisions that exist, courts are not predisposed to find parties agreed to arbitration. *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F. 3d 156, 160 (3d Cir. 2009). Instead, when deciding whether or not there is an agreement to arbitrate, courts will apply standard principles of contract formation. Where the language in the contract is unambiguous, courts will determine intent from the contract language itself without considering extrinsic evidence. *IDT Corp. v. Tyco Group*, 13 N.Y. 3d 209, 214 (2009); *Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 139 (2d Cir. 2000).[8]

---

[8] New York Law governs the IFSA. IFSA, ¶ 16(a).

The EMEA Debtors rely on Paragraph 12 of the IFSA as proof of the Nortel Parties' intent to arbitrate. Paragraph 12 just does not provide such proof. The Nortel Parties are all sophisticated and are represented by highly capable lawyers.[9] They were surely proficient at drafting an arbitration clause, and did not. Instead, Paragraph 12(c) of the IFSA provides that the Nortel Parties will negotiate and attempt to reach agreement on a protocol for resolving allocation. Paragraph 12(a), in turn, provides that the parties will enter into future sales agreements even in the absence of a binding procedure for resolving allocation issues. The Nortel Parties also did not agree to the terms of arbitration, including: who, how many, how selected, where they would sit, right to appeal. The absence of these important terms further evidences that the parties did not even approach any agreement on arbitration. *See also Bor Corp. v. ADT Automotive, Inc.*, Case No. 96 Civ. 1019 (JFK),1996 WL 689364 *10 (S.D.N.Y., Nov. 27, 1996) (holding that the absence of the word "arbitrate" is highly significant to finding the absence of the intent to arbitrate). In *Bor*, the parties had agreed that they would negotiate to hire Ernst & Young or another "dispute resolver." The parties also agreed that the arbitration results would be binding. Even with the apparent arbitration understanding between the parties, the court denied the motion to arbitrate, finding that the parties involved were sophisticated entities who, had they wanted arbitration, would have used the term or a derivative. *Bor* at *10.

---

[9] *See Truck Drivers, Oil Drivers, Filling Station & Platform Workers' Union Local 705, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. (AFL-CIO) v. Schneider Tank Lines, Inc.*, 958 F.2d 171, 175 (7th Cir. 1992), finding that an agreement unambiguously omitted arbitration provisions where it "strained credulity" that parties forgot to include them.

The Court must also consider the U.S. IFSA Order which requires that "no ... protocol for allocation of proceeds from a Sale Transaction may become effective without the prior approval of this Court . . ." Both the IFSA and the U.S. IFSA Order are entirely consistent with the Bankruptcy Rules. The parties must stipulate and the Court must approve arbitration when there is a controversy affecting the estate. Fed. R. Bankr. P. 9019(c), *accord.* Del. Bankr. L.R. 9013-3(b)(i) (requiring consent to arbitration to be "freely and knowingly obtained").

The only language in the IFSA upon which the EMEA Debtors attempt to gain a foothold for their arbitration argument is the term "dispute resolvers." IFSA, ¶ 12(c). The Court is not at all persuaded by this argument. The Courts - and there are two here - are, of course, "dispute resolvers." As the U.S. Debtors show, numerous decisions identify courts as "dispute resolvers." *See*, *e.g.*, *Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 476 F.3d 278, 292 (5th Cir. 2007); *Lewis v. Sullivan*, 279 F.3d 526, 528 (7th Cir. 2002); *Armster v. U.S. Dist. Court for Cent. Dist. of California*, 806 F.2d 1347, 1350, n.2 (9th Cir. 1986); *Farber v. Job*, 467 F. Supp. 163, 170 (D.N. J. 1978). The EMEA Debtors' argument for the significance of "dispute resolvers" is further weakened by their reliance upon *Palumbo v. Select Mgmt. Holdings, Inc.*, No. 82900, 2003 WL 22674397 (Ohio Ct. App. Nov. 13, 2003) and its contrast to the facts here. The EMEA Debtors cite the case to show that "dispute resolver" refers to arbitration. *Palumbo* is inapposite because the parties had defined the term as referring to an accounting firm as arbitrator. *Id.* @ *1. The parties

13

in *Palumbo* had also agreed to detailed procedures for the arbitration (*Id.* @ *2), which the Nortel Parties never did.

The IFSA is unambiguous in providing that it is for the Courts, and not an arbitrator or arbitrators, to determine the allocation issues.[10] Under such circumstances, the Court is obliged to give effect to its plain meaning. *Vintage LLC v. Laws Constr. Corp.*, 13 N.Y.3d 847, 849-50 (2009). In particular, *Pavarini McGovern, LLC v. Tag Court Square, LLC*, 878 N.Y.S. 2d 419-20 (2d Dep't 2009), describes the circumstances present before the Court:

> When interpreting a commercial contract negotiated by and entered into at arm's length between sophisticated business people, represented by an attorney, a court must enforce the agreement according to its terms, and extrinsic and parole evidence is not admissible to create an ambiguity in a written agreement that is complete, clear, and unambiguous on its face.

The Court does not hesitate to find that the IFSA, entered into at arm's length, between sophisticated business people, represented by highly capable lawyers, unambiguously states the agreement that the Courts retain jurisdiction to resolve allocation disputes.

### 3. Proceeding by Motion

The Joint Administrators urge the Court to rule that the U.S. Debtors were required to proceed by filing an adversary complaint. The Court disagrees. The Joint Motion is an effort to enforce an agreement, the IFSA, which the Court approved by the U.S. IFSA Order.

---

[10] The EMEA Debtors do not argue there is any ambiguity in the term "dispute resolvers." Instead, they argue that the term clearly calls for arbitration.

*See*, *e.g.*, *In re Worldcorp. Inc.*, 252 B.R. 890-95 (Bankr. D. Del. 1999) (holding that where a party seeks to enforce a prior order, it is not required to commence an adversary proceeding). The Court also recognizes the irony that the Joint Administrators' proceeded by objection and cross-motion, not by complaint.

## CONCLUSION

The Nortel Parties did not agree to arbitrate and the Court will not - indeed cannot - compel arbitration. The Court has jurisdiction and the IFSA is the call for the submission of an allocation protocol, which will define the procedures for a joint evidentiary hearing to determine allocation. The Court will issue an Order consistent with its decision.

Dated: April 3, 2013

KEVIN GROSS, U.S.B.J.