## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| NORTEL NETWORKS INC., *et al.*,[1] | ) | |
| | ) | Case No. 09-10138 (KG) |
| Debtors. | ) | |
| | ) | Jointly Administered |
| | ) | |
| | ) | **Objection Deadline: April 23, 2013 at 4:00 p.m. (ET)** |
| | ) | **Hearing Date: April 30, 2013 at 10:00 a.m. (ET)** |

## MOTION OF THE OFFICIAL COMMITTEE OF
## LONG TERM DISABILITY PARTICIPANTS FOR
## APPROVAL OF DISTRIBUTION AND RELATED RELIEF

The Official Committee of Long Term Disability Participants (the "LTD Committee") hereby files this motion (the "Motion") for an Order, pursuant to Sections 105(a), 1103(c)(5), and 1109(b) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., (the "Bankruptcy Code") for (i) approval of the structure and method of the proposed distribution of certain settlement funds, (ii) approval of disclosure and notice regarding the proposed distribution including, but not limited to, related tax implications and the potential effect on medical and governement benefits, and (iii) approval of tax withholding and tax noticing procedures for the long term disabled employees (collectively, the "LTD Employees") of the above-captioned debtors (collectively, the "Debtors"). In support of the Motion, the LTD Committee respectfully represents as follows:

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

## I.    PRELIMINARY STATEMENT

1.    The LTD Committee, having reached a settlement (the "Settlement") with the Debtors in the form of an allowed general unsecured claim (the "Claim"), is now seeking approval of the proposed structure and method of distribution of the Settlement proceeds.  The LTD Committee, without admitting or denying the potential liability of the Debtors, and reserving all rights if the Settlement is not approved by the United States Bankruptcy Court for the District of Delaware (the "Court"), fully supports the Settlement.  The LTD Committee approved the Settlement after over a year of negotiation, several months of mediation and, eventually, litigation regarding the Debtors' proposed termination of the LTD Benefits.[2]  As such, the LTD Committee determined that the Settlement is in the best interest of the LTD Employees.  The LTD Committee believes that the Settlement was substantial in light of the risk attendant with litigation.

2.    As part of the Settlement, the LTD Plans will be terminated on June 30, 2013 (the "Termination Date").  The LTD Employees require access to the Settlement funds soon after the Termination Date due to the dire medical exigencies of the constituency, as well as the fact that many have no ability to work and pay for basic living expenses.  Therefore, rather than waiting an undetermined amount of time for a distribution from Nortel Networks Inc. for its Claim, the LTD Committee entered into an agreement with a purchaser (the "Claims Purchaser") to sell its Claim for a set price, providing price stability and an anticipated quicker recovery for the LTD Employees.  The LTD Committee, working with its actuaries and other legal and financial professionals, also sought approval of the allocation of the Settlement proceeds proposed by the

---

[2]  All capitalized terms not defined herein shall have the same meaning as set forth in the Joint Motion (as defined in paragraph 18).

LTD Committee based upon participation in the Debtors' LTD Employee Benefits prior to the Termination Date. As part of this ongoing process, the LTD Committee is now charged with the separate task of determining how the Settlement proceeds should be distributed to each of the eligible LTD Employees in light of the distribution's possible tax consequences and effects on medical and government benefit programs, as further detailed herein.

3.    Had the Debtors not filed for bankruptcy and been in a position to continue the LTD Employees benefits, the majority of these benefits - such as life insurance, AD&D insurance, and medical expense reimbursement benefits - would have remained non-taxable to the recipients; other benefits, such as the income continuation and benefits under the long-term investment plan, still would have been taxable to the recipients. Similarly, if the LTD Committee waited for distribution from the Debtors' estates for its general unsecured claim, such distribution in all likelihood would constitute taxable income for the LTD Employees.

4.    Instead, the value of the benefits for each LTD Employee has been actuarially determined in order to allocate each LTD Employees' proportional share of the Settlement proceeds (the "Settlement Amount"), and the LTD Committee, in an exercise of its fiduciary duties, has examined possible means by which to enhance the value of the Settlement Amount and potentially defer or lessen adverse tax treatment or impact on benefit eligibility.

5.    The LTD Employees, as disabled individuals, are faced with several challenges surrounding their individual life planning in relation to the Settlement. The LTD constituency is permanently unable to work; the income continuation insurance they purchased from the Debtors provided an important, if not primary, source of income for most. Similarly, the medical benefits provided by the Debtors were essential supplements to Medicare, and in some instances, the primary source of medical insurance. Income from the Settlement will be used by the LTD Employees not only to pay for living expenses, but also to cover insurance premiums and

medical costs, which in many instances are substantial and critical to the disabled who have varying levels of health issues.

6.     The method of distribution potentially will impact the LTD Employees' overall taxation of income, as well as their access to government sponsored medical benefits. Mindful of the LTD constituency needs, by this Motion, the LTD Committee sets forth the various issues related to proposed method and structure of distribution of the Settlement Amount and seeks Court approval of proper mechanisms for distribution, taking into account the legal and practical considerations unique to the LTD Employees due to their disabilities.

7.     Accordingly, the LTD Committee proposes a scheme of distribution that it believes is in the best interests of the LTD Employee constituency. As detailed further in this motion, settlement proceeds paid in a lump sum distribution would be taxed under current tax rates at the highest level when compared to other possible methods of distribution. Therefore, the LTD Committee has analyzed the following alternative means of distribution:

(a)     *VEBA/HRA.* Settlement proceeds attributable to medical benefits are not historically taxed; the LTD Committee has been advised that these proceeds can be placed into a Voluntary Employee Benefit Association ("VEBA") trust to preserve their tax free status if the trust allows a Health Reimbursement Account ("HRA") to administer the proceeds as qualified medical expenses.

(b)     *ANNUITY.* The LTD Committee has been advised that the remaining Settlement Amount attributable to income replacement would be taxable as settlement proceeds as it does not fit any exclusion from income available under the Internal Revenue Code ("IRC" or "Code"). However, there has been a private letter ruling ("PLR") allowing the use of an annuity to defer taxes outside the usual exceptions to income under the IRC. The use of an annuity, to be approved by obtaining a PLR from the Internal Revenue Service (the "IRS"), provides a potential solution.

8.     After careful deliberation, the LTD Committee seeks approval from the Court for the authority to pursue a distribution mechanism that deposits eligible Settlement proceeds into a VEBA trust, in which certain of those funds would be administered by an HRA provider. A cap for the HRA at $60,000 is also being requested, which will allow the LTD Employees access to

funds that are unrestricted on use while still preserving the tax free status of eligible Settlement funds at a level appropriate for the constituency. Any remaining Settlement funds, such as funds that are ineligible for tax free status in an HRA or that the LTD Committee and its advisors deem inappropriate for deposit into the HRA because they exceed the proposed $60,000 cap, will be used to purchase an annuity. The intent is for the annuity to provide a schedule of payments over time.

9.      The LTD Committee has communicated the fact that there will be administrative costs related to the Settlement. The LTD Committee's prior analysis projected costs of administration to constitute approximately 4 percent of the total Settlement Amount, which estimates making payments over a four to five year period; however, pending negotiations with the to-be-selected annuity company may vary the projections.

10.      The LTD Committee seeks authority from the Court to allow the LTD Committee or its successors (a LLC or VEBA Committee, as appropriate) to pursue this course of action regarding the distribution of the Settlement Amounts. The LTD Committee (or its successors if appropriate) will seek a PLR from the IRS regarding the use of a VEBA and HRA, as well as the use of an annuity. In the interim, the VEBA and HRA will be established, and an annuity company engaged. The LTD Committee will also adhere to its standard of care in choosing an annuity from a credit worthy institution and will exercise its business judgment to select a conservative vehicle with access to a government guarantee or other suitable means of alleviating risk while utilizing the only tax deferred vehicle that is viable under the circumstances.

11.      The LTD Committee (or its successor) intends to issue an initial distribution to the LTD Employees on or soon after the Termination Date. The LTD Committee contemplates that this initial distribution would be equivalent to an initial payment under the projections

provided to the constituency (and any related updates) prior to the hearing approving the Motion (the "Distribution Hearing"), but reserves its rights to adjust such a payment pending negotiations with the selected annuity company. The VEBA will operate until a response is received from the IRS regarding the PLR; at which time, the VEBA will act appropriately to manage the funds under its care; including, but not limited to a second disbursement of any remaining funds if there is no reasonable advantage to using an HRA and/or annuity.

## II.    BACKGROUND

12.    On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc.,[3] filed in the Court voluntary petitions for relief under chapter 11 the Bankruptcy Code. The Debtors' bankruptcy cases are consolidated for procedural purposes only. The Debtors continue to operate as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

13.    On June 22, 2011, the Court authorized the appointment of the LTD Committee pursuant to Bankruptcy Code Section 1102 (D.I. 5790) to represent the interests of the LTD Employees.

14.    On August 2, 2011, the LTD Committee was formed. The United States Trustee's Office appointed Wendy Boswell Mann, Daniel D. David, Dianna L. Irish, Paul E. Morrison, Barbara Gallagher, Michael Stutts, and Deborah Jones to serve on the LTD Committee. See Amended Notice of Appointment of Unsecured Creditors (D.I. 6080).

15.    There currently are approximately 200 LTD Employees; certain of the LTD Employees are eligible to retire based on their age and years of service, but have not elected to do so to date.

16.     On July 30, 2012, the Debtors filed *Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363 and 1108 Authorizing the Debtors to Terminate the Debtors' Long-Term Disability Plans and the Employment of the LTD Employees* (D.I. 8067), seeking authority to terminate the LTD Plans and the employment of the LTD Employees as of December 31, 2012 (the "LTD Termination Motion").    The Debtors later filed *Debtors' Supplemental Submission in Further Support of Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363 and 1108 Authorizing the Debtors to Terminate the Debtors' Long-Term Disability Plans and the Employment of the LTD Employees* (D.I. 8878), which extended the requested termination date for the LTD Plans and the LTD Employees' employment to March 31, 2013, consistent with the scheduling of the ultimate hearing on the LTD Termination Motion.

17.     On November 19, 2012, the Plaintiff filed a *Verified Complaint for Declaratory and Injunctive Relief* against the Debtors (the "Class Complaint"), thereby commencing adversary proceeding number 12-50995 (KG) (the "Adversary Proceeding"). The Class Complaint seeks relief under the Employee Retirement Income Security Act, 29 U.S.C. § 1101, et seq. ("ERISA"), alleging various claims for declaratory and injunctive relief, including a declaratory judgment that the governing LTD Plan documents do not permit the Debtors to terminate LTD Benefits for those LTD Employees who are already disabled and receiving income continuation benefits. The Class Complaint also seeks, inter alia, equitable remedies under ERISA for alleged breaches of fiduciary duties.

18.     On December 31, 2012, the Debtors filed *Debtors' Motion for Entry of Orders Pursuant to 11 U.S.C. §§ 105, 363 and 1114 and Fed. R. Bankr. P. 9019 (A) Approving*

---

[3]   Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered

*Settlement Notification Procedures and, Subsequently, (B) Approving a Settlement Agreement with the Official Committee of Retired Employees* (D.I.9224) (the "Retiree Approval Motion"), seeking approval of a settlement agreement (the "Retiree Settlement") with the Official Committee of Retired Employees (the "Retiree Committee"). Under the Retiree Settlement, those LTD Employees who have met the service requirements for retirement would be eligible to receive benefits thereunder if they elect to retire (and under certain circumstances relinquishing their right to continued benefits under the LTD Plans) in accordance with the procedures set forth in the Retiree Approval Motion. The Court approved the Retiree Approval Motion on April 2, 2013 (D.I. 9938). On April 5, 2013, the Debtors and the Retiree Committee extended the Termination Date of Retiree benefits from May 31, 2013 to June 30, 2013 (D.I. 9964).

19.    During the fall of 2012, the Debtors and the LTD Committee continued to work towards a consensual settlement that would allow the Debtors to terminate the LTD Plans while addressing the objections raised by the LTD Committee and certain LTD Employees. On December 4, 2012, after many months of negotiation, the Debtors and the LTD Committee, together with the Official Committee of Unsecured Creditors (the "UCC") and the ad hoc group of bondholders (the "Bondholder Group"), and participation of counsel to the Retiree Committee, were able to reach the primary terms of a settlement in principle. The resulting settlement agreement (the "Settlement Agreement") embodies that agreement, as ultimately memorialized by the parties.

20.    On January 18, 2013, the Debtors and the LTD Committee filed the *Joint Motion Pursuant to Sections 363 and 105 of the Bankruptcy Code, and Bankruptcy Rules 9019 and 7023 to (I)(A) Preliminarily Approve The Settlement Agreement Regarding Long-Term Disability Plans and Claims, (B) Conditionally Certify a Class for Settlement Purposes Only, (C) Approve*

---

with the other Debtors' chapter 11 cases for procedural purposes (D.I. 1098).

*the Notice Procedures, and (D) Schedule A Fairness Hearing; and (II)(A) Finally Approve the Settlement Agreement, (B) Finally Certify A Class, (C) Authorize the Debtors to Terminate the LTD Plans, and (D) Grant Related Relief* (the "Joint Motion") (D.I. 9304).  The Joint Motion seeks entry of an order approving certain notice procedures and forms of notice regarding the Settlement that, if approved by the Court, would settle the LTD Termination Motion and the Adversary Proceeding, as well as provide for the termination of the LTD Plans with respect to all plan participants, including the LTD Employees.

21.    On February 14, 2013, this Court entered the *Order (A) Preliminarily Approving the Settlement Agreement Regarding Long Term Disability Plans and Claims, (B) Conditionally Certifying a Class for Settlement Purposes Only, (C) Approving the Notice Procedures, (D) Scheduling a Fairness Hearing and (E) Granting Related Relief* (D.I. 9427) (the "Preliminary Approval Order").   Pursuant to the Preliminary Approval Order, the Court, inter alia, preliminarily approved the Settlement Agreement, Notice Procedures, and authorized the LTD Committee to move forward with final approval of the Settlement Agreement.

22.    The Joint Motion also seeks the conditional certification of a settlement constituency consisting of all LTD Employees as of the Termination Date for settlement purposes only, conditional appointment of Constituency Representatives and Constituency Counsel for settlement purposes only, and requests that a second hearing be scheduled for the Court to consider the final approval of the Settlement Agreement (the "Fairness Hearing"). Pursuant to the Preliminary Approval Order, the Fairness Hearing is scheduled for April 30, 2013 at 10:00 a.m.  The LTD Committee and the Debtors also have agreed to extend the Termination Date to June 30, 2013, pursuant to section 6(b) of the LTD Settlement Agreement so that the termination dates for the Retiree Settlement and the LTD Settlement remain consistent.

23.     The Joint Motion also requests approval of the Settlement Amount and the allocation of the Settlement Amount among the LTD Employees who are receiving benefits under the LTD Plans as of the Termination Date on the basis of a formula provided by the LTD Committee Professionals and approved by the LTD Committee on a final basis at the Fairness Hearing.  Subject to accepted actuarial methods and practices, under the allocation methodology, each LTD Employee shall receive her or his proportional share of the Settlement Amount, subject to tax withholding, calculated based on a fraction, the numerator of which is the actuarial valuation of such LTD Employee's claims under the LTD Plans (as determined by the LTD Committee Professionals and approved by the LTD Committee) and the denominator of which is the aggregate of the actuarial values of all LTD Employees' claims under the LTD Plans (as determined by the LTD Committee Professionals and approved by the LTD Committee), thereafter applied to the Settlement Amount (the "Apportionment Methodology").

24.     The LTD Committee, pursuant to the terms of the Settlement Agreement and Joint Motion, has prepared, served, and filed schedules that detail the calculation of the proportional share of the Settlement Amount to be allocated to each eligible LTD Employee (as determined by the LTD Committee applying the Apportionment Methodology) (See D.I. 10042).  The LTD Committee also served upon each individual LTD Employee an individualized benefit statements ("Individual Statements"), which illustrated the proposed allocation pursuant to actuarial models prepared by the LTD Professionals, on February 25, 2013.

25.     On March 19, 2013, the LTD Committee Professionals further served on the LTD Employees a second Individualized Statement and aggregate chart that demonstrated the use of a structured settlement and an HRA in order to allow the LTD Employees to compare the tax impact of a lump sum settlement to deferred tax payments and a tax free HRA with a cap of

$90,000 per individual.[4]   The same actuarial allocation method was used in both sets of Individual Statements and aggregate charts; only the method of distribution was varied for comparison of the effect on tax liabilities and to provide a benchmark for the potential impact on various medical benefits and government programs. The LTD Committee reserved the right to file a revised schedule prior to the Fairness Hearing in the Settlement Agreement, and, has filed this Motion, in part, to address issues left unresolved by the proposed approval of the Apportionment Methodology after review of the tax and benefit eligibility implications of the Settlement distribution.

26.   The LTD Committee will serve upon each individual LTD Employee soon after the filing of this Motion an additional Individual Statement and aggregate chart showing the effect of a $60,000 cap per individual, as well as an Individual Statements detailing the $60,000 cap, with and without the use of an annuity to defer payments.[5]   A comparison of all four illustrations is included in the attached Exhibit A.

27.   As part of the process approved by the Preliminary Approval Order, the LTD Committee and Debtors have provided notice of the Settlement through various avenues, including by the service of a Settlement Notice, a Publication Notice, and service of two Individualized Settlement Notices, in addition to multiple conference calls with groups of the LTD Employees and calls with individual LTD Employee's counsel, tax advisors and medical benefits counselors. Additionally, several "town hall" meetings were held in conjunction with the Retiree Committee's efforts to provide notice of the Retiree Committee Settlement with the Debtors, at which counsel for the LTD Committee participated in answering questions put forth by LTD Employees regarding the Settlement Agreement, the Retiree Settlement, and the

---

[4] Supplemental Service was made on March 20, 2013.

potential impact of both on LTD Employees. The LTD Committee also responded to multiple inquiries through the LTD Committee's official website and through direct inquiry as to the details of the Settlement as contemplated by the Preliminary Approval Order and prior protective orders entered by this Court to allow the LTD Committee to execute its duties under Bankruptcy Code Section 1102 (b)(3).

28.     A common question that has emerged from these discussions is the effect of distribution of the Settlement Amount on the individual LTD Employees. Two areas of deep concern have been identified: (i) the impact of distribution on federal and state income tax (the "Tax Issues") and (ii) the impact of distribution on eligibility, access or cost, among other things, related to government provided or subsidized medical benefits (the "Benefits Issues").

29.     In order to analyze these issues, the financial advisors to the LTD Committee, Alavarez & Marsal ("A&M"), prepared two technical tax memoranda to identify tax and withholding issues implicated by the Settlement Agreement. The LTD Committee also retained special tax counsel to assist it in advising the LTD Committee with respect to the Tax Issues and filed on March 19, 2013 its *Application of the Official Committee of Long Term Disability Participants for Order under Bankruptcy Code Section 328(A) Approving the Employment and Retention of E. Morgan Maxwell, III, Esq. as Special Tax Counsel to the LTD Committee Nunc Pro Tunc to February 11, 2013* (D.I. 9689), which was approved by Court Order on April 5, 2013 (D.I. 9961).

30.     Additionally, tax counsel Morgan Maxwell ("Maxwell") is preparing, as appropriate, various documents related to the potential distribution mechanisms including the use of a VEBA trust, if approved by the Court, and related trust documents that could provide the

---

[5] These illustrations are based on the assumption that the IRS issues a positive PLR, as defined and described in further detail in Section C of this Motion.

method of disbursement of the Settlement Amount. Maxwell is also providing a legal opinion letter to the LTD Committee to supplement the two technical tax memoranda prepared by A&M. Maxwell is also working with ERISA counsel at Elliott Greenleaf ("EG") to assess the tax implications on the Medical Benefits. Under no circumstances are any of the LTD Committee's Professionals providing individuals with tax or benefit advice.

31.    The Settlement Agreement and negotiations with the Claims Purchaser contemplate that neither the Debtors nor the Claims Purchaser will be responsible for tax withholding or reporting.[6]   Therefore, the LTD Committee will be providing form W-2s and form W-4s to the constituency and requests that the Court approve the process by which it executes the necessary reporting to the IRS and the manner in which this process is presented to the LTD Employees in terms of adequate disclosure.

### III.    JURISDICTION

32.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for this Motion are Sections 105(a), 1103(c)(5), and 1109(b) of the Bankruptcy Code.

### IV.    RELIEF REQUESTED AND ARGUMENT

33.    The LTD Committee, pursuant to Bankruptcy Code Sections 105(a) 1103(c)(5), and 1109(b), seeks through this Motion: (i) approval of the structure and process of the distribution in order to equitably distribute the Settlement proceeds across the constituency; (ii)

---

[6] Section 24 of the Settlement Agreement relieves the Debtors of responsibility regarding the tax consequences of the Settlement Agreement, including withholding taxes and the issuance of form W-2s. It is also contemplated and part of the current negotiations with the purchaser of the Claim that the prospective purchaser will not have responsibility for the tax consequences of the Settlement Agreement.

approval of disclosure and notice regarding the proposed distribution including, but not limited to, related tax implications and the potential effect on medical and government benefits, and (iii) approval of tax withholding and tax noticing procedures. Bankruptcy Code Section 105(a) provides the Court with the authority "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" title 11 of the Bankruptcy Code; the LTD Committee respectfully requests that the Court use its powers pursuant to Section 105(a) to assist in resolving these issues related to distribution of the Settlement Amount.

A.   **LTD Committee's Powers and Fiduciary Duties Related to Distribution**

34.   The LTD Committee has, in the exercise of its fiduciary duties, investigated, examined and analyzed a multitude of complex issues related to the distribution of the Settlement Amounts in order to be able to propose to the Court what the LTD Committee believes is a structure and method of distribution that is in the best interest of the LTD Employee constituency.

35.   The LTD Committee has standing to appear or initiate actions under Section 1109(b), which provides that a committee has the right to appear and be heard on any issue arising in a chapter 11 case. See 11 U.S.C. § 1109(b); Unsecured Creditors' Comm. v. Marepcon Fin. Corp. (In re Bumper Sales, Inc.), 907 F. 2d 1430 (4th. Cir 1990).

36.   The powers of a committee appointed under Bankruptcy Code Section1103 are very broad. See generally 7 Collier on Bankruptcy ¶1103 (16th ed. 2010). Sections 1103 (c)(1),(2), and (5) state, in relevant part, that:

> (c) A committee appointed under section 1102 of this title may -
> (1) consult with the trustee or debtor and possession concerning the administration of the case;
> (2) investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case ....;

> ....
> (5) perform such other services as are in the interest of
> those represented.

11 U.S.C. §1103. The LTD Committee, which was appointed with the duty of acting on behalf

of all of the LTD Employees resolving issues related to the settlement of the constituencies'

disputes with the Debtors, UCC and the Bondholder Group regarding the LTD Termination

Motion, is acting squarely within the powers prescribed by Bankruptcy Code Sections 1109(b)

and 1103(c)(5).

37.    The LTD Committee and the Debtors have agreed that the LTD Committee will

allocate and distribute the Settlement proceeds; issues surrounding such distribution comports

with the LTD Committee's powers under Bankruptcy Code Section 1103(c)(1). Analysis of the

Tax Issues and Benefit Issues concerning distribution is also within the powers to investigate

"any other matter relevant to the case" under Section 1103(c)(3) and to perform services in the

interest of the LTD Employees under Section 1103(c)(5).

38.    Committees in bankruptcy cases, including the LTD Committee here, are tasked

with representing the interests of their constituency in chapter 11 proceedings. Committees will

employ all means necessary to benefit the entire constituency of creditors with the clear purpose

of optimizing the financial outcome for its constituents. Ultimately, a committee will decide

what outcome of the chapter 11 proceedings best suits its constituents. Committees are obligated

to protect the financial interests of their constituents while simultaneously protecting their rights

as a constituency. Great emphasis is placed on the notion that committees must provide a voice

for all constituents of the class.

39.    It is well established that membership on an official committee gives rise to

fiduciary duties to other creditors whose interests the committee represents. In re Refco Inc., 336

B.R. 187, 195 (Bankr. S.D.N.Y. 2006) ("It is well recognized that . . . the members of an official

committee owe a fiduciary duty to their constituents – in the case of an official creditors committee, to all of the debtor's unsecured creditors.")  These fiduciary duties are owed to the *constituency* of creditors that the committee was appointed to represent.  See Westmoreland Human Opportunities, Inc. v. Walsh, 246 F.3d 233, 256 (3d Cir. 2001) (stating members of official creditor's committee owe fiduciary duty "toward their constituent members"); Walsh v. Westmoreland Human Opportunities, Inc. (In re Life Serv. Sys., Inc.), 279 B.R. 504, 513 (Bankr. W.D. Pa. 2002) ("Members of a creditors' committee owe a fiduciary duty to the committee's constituents—i.e., the class of general unsecured creditors in general."); In re Dow Corning Corp., 255 B.R. 445, 485 (E.D. Mich. 2000) (noting "fiduciary duty extends to the class as a whole, not to its individual members." (quoting In re Drexel Burnham Lambert Group, Inc., 138 B.R. 717, 722 (Bankr. S.D.N.Y. 1992)), aff'd sub nom Class Five Nevada Claimants v. Dow Corning Corp., 280 F.3d 648 (6th Cir. 2002), cert. denied, 537 U.S. 816 (2002).

40.    The duty of care applies to committees as it does in agency law generally; put simply, a committee must take care to obtain maximum value for its constituents.  See, e.g., Motorola v. Official Comm. of Unsecured Creditors (In re Iridium Operating, LLC), 478 F.3d 452, 466 (2d Cir. 2007) (remanding to determine whether plan provision met fiduciary duty to maximize recovery of estate's assets); In re Nationwide Sports Distribs., Inc., 227 B.R. 455, 463 (Bankr. E.D. Pa. 1998) ("the purpose of such committees is to represent the interests of unsecured creditors and to strive to maximize the bankruptcy dividend paid to that class of creditors.").  In so doing, a committee's determinations must be arrived at honestly and with care to be accurate.  See In re Gen. Homes Corp., 181 B.R. 870, 882 (Bankr. S.D. Tex. 1994) ("The fiduciary duty that exists between the members of the Unsecured Creditors Committee and the other unsecured creditors includes the duty to act in good faith and to insure to the greatest extent possible its actions are based on 'accurate and correct' information.").

41.     This means, among other things, that a committee must engage professionals when appropriate to ensure competent representation of constituents' interests, and preserve the confidentiality of sensitive information obtained in the course of representation. See In re United Steel Workers v. Lampl Mesta Mach. Co., 67 B.R. 151, 163–64 (Bankr. W.D. Pa. 1986). The committee is required to be reasonably informed and particularly considerate when acting on behalf of its constituents. Before a committee makes a decision, it must be reasonably informed of all material information and remain up-to-date with respect to the chapter 11 proceedings. If a committee is not sufficiently informed, it risks jeopardizing the financial returns to its constituency as a whole.

42.     The LTD Committee has fulfilled its fiduciary duties, including the duty of care. The LTD Committee obtained a fair and reasonable settlement, engaged professionals (EG as its bankruptcy counsel, constituency counsel and ERISA counsel, A&M as its financial advisor, Towers Watson as its actuaries, and Maxwell as its tax counsel) to ensure competent representation of the constituents' interests with care to be accurate, and preserved the confidentiality of sensitive information obtained in the course of representation. On fulfilling its duties, the LTD Committee faced a difficult situation regarding how best and in what manner to distribute the Settlement proceeds to its constituents in the face of the Tax Issues and Benefits Issues.

**B.      Benefit Eligibility Considerations**

43.     The LTD Committee developed the proposed distribution scheme with the understanding that the structure of the Settlement may impact the costs of Medicare premiums, the taxation of Social Security benefits and the eligibility for needs based programs such as Medicaid.

44.     The LTD Employees are currently covered by Medicare Parts A and B because of

their disability. For health care costs not covered by Medicare Parts A and B, including pharmaceutical costs, the LTD Employees currently receive health benefits (medical and dental/vision/hearing) under the Debtor's health plans. When the LTD Plans are terminated on June 30, 2013, the LTD constituents will have to pay for the cost of Medicare Part B premiums,[7] as well as the cost of insurance to cover the costs of health care, including pharmaceutical costs, not covered by Medicare Parts A and B.

45.    The Social Security Administration determines the cost of Medicare Part B and Part D premiums based on an individual's modified adjusted gross income as reported on the federal income tax return. The Social Security Administration uses the federal tax return filed two years earlier to determine modified adjusted gross income. See 20 C.F.R § 418.1135. Accordingly, Settlement Amounts received in 2013 and thereafter, as reported in federal tax returns for 2013 and thereafter, will be used to determine the amount an LTD Employee will pay in Medicare Parts B and D premiums beginning in 2015 and thereafter.

46.    There is a standard premium amount for those with income below a certain threshold (see chart below). Those with a modified adjusted gross income higher than the threshold will pay higher premiums for both Medicare Parts B and D based on an income scale (see below). The additional premium amount for Parts B and D is called the "income-related monthly adjustment amount."[8] See generally 20 C.F.R. § 418, Subpart B (Medicare Part B Income-Related Monthly Adjustment Amount).

---

[7] Under the terms of the LTD Plans, LTD Employees were required to enroll in Medicare Parts A and B after receiving Social Security Disability Income for two years. Nortel credited the LTD Employees with the Part B premium. As of the termination of the LTD Plans, the Part B premium previously paid for by Nortel will be borne by the former LTD Employees. Part A is "free" for those who worked 40 qualifying quarters.

[8] 20 C.F.R. § 418.1101 et seq., 42 U.S.C. §1395r, and 42 CFR Parts 407 and 408.

47.    In 2013, the Medicare Part B premiums are as follows:[9]

| Yearly Income in 2011: | | You Pay in Monthly Part B Premium in 2013 |
|---|---|---|
| File Individual Tax Return | File Joint Tax Return | |
| $85,000 or less | $170,000 or less | $104.90 |
| above $85,000 up to $107,000 | above $170,000 up to $214,000 | $146.90 |
| above $107,000 up to $160,000 | above $214,000 up to $320,000 | $209.80 |
| above $160,000 up to $214,000 | above $320,000 up to $428,000 | $272.70 |
| above $214,000 | above $428,000 | $335.70 |

| Yearly Income in 2011: | You Pay in Monthly Part B Premium in 2013 |
|---|---|
| File married & separate tax return | |
| $85,000 or less | $104.90 |
| Above $85,000 up to $129,000 | $272.70 |
| Above $129,000 | $335.70 |

48.    The chart below shows the estimated Medicare Part D prescription drug plan monthly premium for 2013 based on income.[10] If income is above a certain limit, the income-related monthly adjustment amount in addition to the plan premium is required.[11]

---

[9]  See Federal Register (Medicare Program; Medicare Part B Monthly Actuarial Rates, Premium Rate, and Annual Deductible Beginning January 1, 2013) https://www.federalregister.gov/articles/2012/11/21/2012-28275/medicare-program-medicare-part-b-monthly-actuarial-rates-premium-rate-and-annual-deductible (last visited April 10, 2013) and (Medicare Premiums: Rules for Higher Income Beneficiary), Social Security Administration available at http://www.ssa.gov/pubs/10536.pdf (last visited April 10, 2013).

[10]  See (How Income affects your Medicare Prescription Drug Coverage Premiums) Centers for Medicare and Medicaid services, available at http://www.medicare.gov/Pubs/pdf/11469.pdf (last visited April 10, 2013).

[11]  See generally Medicare prescription drug plan premium for higher-income beneficiary; Social Security plan is listed at http://ssa-custhelp.ssa.gov/app/answers/detail/a_id/ 2134/ ~/medicare-prescription-drug-plan-premium-for-higher-income-beneficiaries (last visited on April 10, 2013).

| Yearly Income in 2011: | | You Pay in Monthly Part D Premium in 2013 |
|---|---|---|
| File Individual Tax Return | File Joint Tax Return | |
| $85,000 or less | $170,000 or less | Your Plan Premium |
| above $85,000 up to $107,000 | above $170,000 up to $214,000 | $11.60 + Your Plan Premium |
| above $107,000 up to $160,000 | above $214,000 up to $320,000 | $29.90 + Your Plan Premium |
| above $160,000 up to $214,000 | above $320,000 up to $428,000 | $48.30 + Your Plan Premium |
| above $214,000 | above $428,000 | $66.60 + Your Plan Premium |

| Yearly Income in 2011: | You Pay in Monthly Part D Premium in 2013 |
|---|---|
| File married & separate tax return | |
| $85,000 or less | Your Plan Premium |
| Above $85,000 up to $129,000 | $48.30 + Your Plan Premium |
| Above $129,000 | $66.60 + Your Plan Premium |

49.     Based on the foregoing, Settlement Amounts received by the LTD Employee in any given year may increase his/her income into income brackets triggering an increase in Medicare Parts B and D premiums.

50.     The amount of Social Security benefits received by the LTD Employees will not change as a result of Settlement Amounts received.[12]  However, Settlement Amounts received by the LTD Employees may cause Social Security benefits to be taxable. Currently, the base amount of total income, as defined by the IRS, for tax on Social Security benefits is as follows:[13]

---

[12]   However, workers' compensation and other public disability benefits may reduce Social Security benefits. See 20 C.F.R. § 404.408.

[13]   See Social Security and Equivalent Railroad Retirement Benefits, U.S. Dept. of Treasury, Internal Revenue Service, available at http://www.irs.gov/pub/irs-pdf/p915.pdf (last visited April 10, 2013) and What You Need to Know When You Get Social Security Disability Benefits Social Security Administration, available at http://www.ssa.gov/pubs/10153.pdf (last visited April 10, 2013).

| $25,000 if you are single, head of household, or qualifying widow(er) |
|---|
| $25,000 if you are married filing separately and lived apart from your spouse for all of 2012 |
| $32,000 if you are married filing jointly |
| $-0- if you are married filing separately and lived with your spouse at any time during 2012 |

Whether, and how much, Social Security benefits are taxable may be affected by the Settlement Amounts received by the LTD Employees.

51.    Finally, Settlement Amounts may preclude eligibility for needs based programs including, but not limited to, Medicaid, Supplemental Security Income ("SSI"),[14] the "Medicare Savings Program," which is administered through Medicaid to provide assistance with Medicare premiums, and the "Extra Help" or "Low Income Subsidy" ("LIS") programs for those with limited resources and income that provide assistance with the payment of premiums, annual deductibles, and prescription co-payments related to the Medicare prescription drug plans.[15]

52.    For example, income limits for the Medicare Savings Program for 2012 are as follows: [16]

| Qualified Medicare Beneficiary (QMB) Program<br>Program helps pay for: Part A premiums, Part B premiums, Deductibles, coinsurance, and copayments, eligible for LIS (prescription drug benefits) | |
|---|---|
| Individual monthly income limit $951 | Married couple monthly income limit $1281 |

---

[14]  The purpose of the SSI program is to assure a minimum level of income for those age 65 and over or who are blind or disabled and do not have sufficient income and resources to maintain a standard of living at the federal poverty level. See 20 C.F.R. § 416.

[15]  This is not meant as an exhaustive list of needs based programs. Eligibility for programs such as Medical Assistance for Workers with Disabilities and the Supplemental Nutrition Assistance Program (SNAP), formerly known as food stamps, as well as needs based programs administered through the States may also be affected by settlement amounts received.

[16]  See Medicare Savings Programs, Medicare.gov http://www.medicare.gov/your-medicare-costs/help-paying-costs/medicare-savings-program/medicare-savings-programs.html (last visited April 10, 2013).

| Specified Low-Income Medicare Beneficiary (SLMB) Program Program helps pay for: Part B premiums only and eligible for LIS | |
|---|---|
| Individual monthly income limit $1137 | Married couple monthly income limit $1533 |
| Qualifying Individual (QI) Program Program helps pay for: Part B premiums only and eligible for LIS | |
| Individual monthly income limit $1277 | Married couple monthly income limit $1723 |
| Qualified Disabled and Working Individuals (QDWI) Program Program helps pay for: Part A premiums only | |
| Individual monthly income limit $3809 | Married couple monthly income limit $5129 |

53.    For the Extra Help or LIS program, which provides assistance for purchasing prescription drugs, resources are limited to $13,300 for an individual or $26,580 for a married couple living together, and income is limited to $17,235 for an individual or $23,265 for a married couple living together.[17]  Resources include bank accounts, stocks and bonds; a home, car, and any life insurance policies are not counted as a resource.  See generally 42 C.F.R. Part 423; see 42 C.F.R. § 423.773 for eligibility for LIS.

54.    Some individuals within the constituency are eligible for the Nortel Networks Retirement Income Plan (hereafter "Pension Benefits").  Nortel's pension plan is currently being administered by the Pension Benefit Guarantee Corporation ("PBGC").

55.    Counsel for the PBGC advised pension-eligible LTD Employees who have made inquiries to the PBGC, and similarly advised counsel for both the LTD Committee and the UCC, that the PBGC may view the receipt of Settlement funds as precluding the commencement of Pension Benefits before age 65, thus precluding the eligibility for "Early Retirement" or

---

[17] See Income and Resource Requirements for the Extra Help with Prescription Drug Costs, Social Security Administration, http://ssacusthelp.ssa.gov/app/answers/detail/a_id/1435/~/ income-and- resource-requirements-for-the-extra-help-with-prescription-drug-costs (last visited April 10, 2013).

"Disability Retirement," if applicable. According to the PBGC, assessments of the effect of the Settlement Agreement on pension-eligible LTD Employees will not be made until the Court enters its final order approving the Settlement (the "Final Order") and, thereafter, on individualized assessments of the Settlement apportionment received by pension-eligible LTD Employees. Accordingly, the LTD Committee continues to advise the LTD Employees to carefully consider the implications of the PBGC's current position, as well as seek independent advice and counsel regarding these benefits.

**C.    Tax Considerations**

56.    The LTD Committee developed the proposed distribution scheme with the understanding that the Settlement could result in adverse tax consequences for the LTD Employees, and has attempted to provide a mechanism that potentially avoids some of the tax impacts to the extent possible.

57.    Prior to the Termination Date, some of the benefits provided to the LTD Employees, such as life insurance, AD & D insurance, and medical expense reimbursement benefits, were non-taxable to the recipients. Other benefits, such as income continuation and benefits under the long term investment plan were taxable. Under the Settlement, the value of these benefits for each LTD Employee has been actuarially determined, and the payments under the Settlement will be factored (sold) for settlement proceeds that will be allocated to the LTD Employee in accordance with their respective actuarially-determined benefits.

58.    Notwithstanding that some of the pre-Termination Date benefits were or would have been non-taxable or taxable over a number of taxable years as received, an LTD Employee's allocated share of the Settlement Amount, if paid to her or him in a lump sum, would be fully taxable in the year it is received in cash. Under the cash method of accounting for tax purposes, which applies to most individual taxpayers, income is reportable in the year in

which it is actually or constructively received by the taxpayer. Therefore, if an LTD Employee receives her or his allocated portion of the Settlement Amount as a lump sum payment, it will be fully taxable in the year received and subject to income tax withholding.[18]

59.    Payments made by an employer under a plan or system that provides sickness or accident disability benefits to employees and their dependents are generally excluded from the definition of wages. IRC § 3121(a). However, unrestricted amounts of cash paid directly to employees in lieu of health coverage are not subject to this exception. Additionally, economic recoveries in the form of back pay arising out of an employment relationship are included as income and are subject to income and FICA tax withholding, even if the amounts recovered are paid in lieu of nontaxable fringe benefits. United States v. McKean, 33 Fed.Cl. 535 (1995). In IRS Revenue Ruling 75-241, 1975-1 C.B. 316, an employee was paid cash in lieu of certain health and welfare benefits in discharge of a requirement under a federal statute that a minimum level of health and welfare fringe benefits be provided. Because the employee had complete control of the disposition of the amounts paid and there was no contractual or legal obligation imposed on the employer to verify that the amounts paid were used by the employee to purchase health and welfare benefits, the amounts paid were held to be wages subject to income and FICA tax withholding.

60.    Unfortunately, each LTD Employee cannot simply be given an option to receive her or his share of the Settlement Amount all in cash; all in a form that would achieve deferral; or any combination of the two. Such a simple, unrestricted choice would result in the LTD Employee being treated as *constructively* receiving the full amount in cash. Accordingly, the LTD Committee has considered possible ways in which an LTD Employee's benefits might be

---

[18] The IRS could also take the position that the lump sum should be treated as "wages" and thus subject to the Federal Insurance Contributions Act ("FICA") tax, and other employment taxes.

paid so as not to become subject to tax in one taxable year. Various methods of potentially achieving this deferral are discussed below.

### 1. Constructive Receipt

61.    Under the constructive receipt rule, an LTD Employee with an unrestricted option to receive all cash will be treated as having received all cash in the year the Final Order is entered, even if he or she actually receives part or all of the Settlement payments on a deferred basis, that is, spread over more than one year. As described briefly above, under the cash method of accounting for federal income tax purposes an item of income becomes subject to tax in the year it is "actually or constructively received by the taxpayer ...." Treasury Regulation ("Treas. Reg.") § 1.451-1(a). An item of income is constructively received by a taxpayer:

> ... in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given." Treas. Reg. § 1.451-2(a). Once the taxpayer has an unqualified vested right to receive immediate payment, the constructive receipt rule will treat him as if he has received payment.

Childs v. Commissioner, 103 T.C. 634, 654 (1994), aff'd, 89 F.3d 856 (11th Cir. 1996).

62.    The LTD Committee is mindful that if the constructive receipt rule applies to an LTD Employee who receives part or all of her allocated share of amount of the Settlement Amount on a deferred basis, this could have significantly detrimental tax effects on the LTD Employee. Income would be taxable under the constructive receipt rule prior to the year the cash (perhaps even cash necessary to pay the tax) is received, and the LTD Employee's entitlement to certain exclusions and benefits that are dependent in part on a taxpayer's annual income, such as the exclusion of Social Security benefits from taxation and the premium costs of and eligibility for certain benefits under Medicare and Medicaid, could be adversely affected.

### 2.    Economic Benefit Doctrine

63.    Even if an LTD Employee receives her or his payments on a deferred basis, and does not have the unrestricted option to receive all cash in a lump sum, the LTD Employee may nonetheless be taxed currently under the "economic benefit doctrine." A taxpayer may be held to have a current economic benefit if a separate fund or trust of assets is unconditionally and irrevocably established exclusively for their benefit.

64.    In Sproull v. Commissioner, 16 T.C. 244 (1951), aff'd per curium, 194 F.2d 541 (6th Cir. 1952), the taxpayer was taxed currently on the present value of an interest in a trust where he was assured of the benefit of payments to be made in the future, even though the payments would not be made or made available to the taxpayer until later taxable years. In Pulsifer v. Commissioner, 64 T.C. 245 (1975), Irish Sweepstakes winnings of a minor who could not legally be paid the funds that were irrevocably held by an Irish court until the winner reached his majority, nonetheless were currently included in the minor's income under the economic benefit doctrine.

65.    Therefore, it is conceivable that if an LTD Employee has an irrevocably determined share of the Settlement Amount, he or she may be currently taxed regardless of the use of a trust and regardless of the schedule of payments over time established by the trust document.

### 3.    Potential Exceptions to the Constructive Receipt Rule and the Economic Benefit Doctrine

66.    The LTD Committee has considered a variety of structures with the intent of achieving deferral without becoming subject to either the constructive receipt rule or the economic benefit doctrine. However, it appears that viable options are quite limited.

67.    Funds paid into and held by a "qualified settlement fund" as described and

governed by IRC § 468B and the Treasury Regulations thereunder, are not currently taxed to the beneficiaries of the fund under either the constructive receipt rule or the economic benefit doctrine. While the general concept of a qualified settlement fund would be very useful in the LTD Employees' circumstances, it is not clear that IRC § 468B would apply by its specific terms. IRC § 468B(d)(2)(D) provides that in order to be subject to these favorable rules, the fund must be, among other requirements, "established for the principal purposed of resolving and satisfying present and future claims against the … [payor into the fund] (or any related person or formerly related person) arising out of personal injury, death or property damage…." C.f. Will v. General Dynamics Corp., No. 06-698-GPM, 2010 BL 318430, 49 EBC 2032 (E.D. Ill. Aug. 9, 2010) (involved the settlement of claims that an IRC § 401(k) plan provider had breached its fiduciary obligations under ERISA by paying excessive fees for the plan's investments; court found that the fund established to resolve the claims would be a "qualified settlement fund" within the meaning of the Treasury Regulations under IRC §468B).[19]

68.    The LTD Committee has considered an alternative structure for potentially achieving deferral and avoiding the application of the constructive receipt and economic benefit rules. In IRS Revenue Ruling 2003-115, 2003-2 C.B. 1052, a taxpayer settling a claim under the September 11 Victim Compensation fund was not subject to current taxation under either the constructive receipt rules or the economic benefit doctrine where (i) the claimant irrevocably elected to receive periodic payments while his control of the receipt of payment was still subject to substantial restrictions; (ii) the fund assigned its obligation to make such periodic payments to

---

[19] Notwithstanding this finding, it is by no means clear that the IRS would consider itself bound when a fund fails to meet the requirements of IRC § 468B, and by no means clear that the beneficiaries of the fund will not be treated as taxable currently when the fund is established, particularly under the economic benefit doctrine. As much as the LTD Committee may desire to achieve the tax result provided by IRC § 468B for the LTD Employees who wish to avoid current taxation, Will v. General Dynamics Corp. seems a slender reed to rely upon.

an assignment company pursuant to a "qualified assignment" described in IRC § 130; and (iii) the assignee funded its obligation to make the periodic payments by purchasing an annuity contract described in IRC § 130(d). In order to avoid current taxation on her or his share of the Settlement Amount under this sort of arrangement, an LTD Employee would be required to relinquish the security of a fixed Settlement Amount in favor of an unsecured contractual obligation of an annuity provider.

69.     The IRS has ruled in a PLR approving an arrangement similar to that described in IRS Revenue Ruling 2003-115, but where the "qualified assignment" rules of IRC § 130 (which specifically apply only when the liability being resolved is for damages or workers' compensation on account of personal injury or sickness and the underlying case involves physical injury or physical sickness) did not apply. In IRS Letter Ruling 200836019 (June 2, 2008), the liability being resolved was for lost overtime wages and non-physical injuries including emotional distress and mental anguish as a result of a pattern of hostile employment practices. Even though the specific provisions of the Internal Revenue Code permitting deferral did not apply, the IRS blessed the arrangement in the PLR because it was essentially economically equivalent to the arrangement in IRS Revenue Ruling 2003-115, which relied upon the Code provisions. It was critical to the favorable conclusion of the PLR that the taxpayer agreed in advance to the arrangement. Before she had a fixed, irrevocable right to a fund in a determined amount, she agreed that she would look solely to the annuity company for her periodic payments. The IRS concluded:

> [t]he ... Assignment [of the payment obligation] will be an irrevocable contract requiring the Assignee [annuity company] to make the specified Periodic Payments to the taxpayer. Under no circumstances can the taxpayer elect to receive the commuted value of the remaining Periodic Payments.... Neither the execution of the ... Assignment nor the purchase of an annuity contract by the Assignee to fund its obligation to the taxpayer shall be viewed

> as conferring a current economic benefit on the taxpayer. After the execution of the ... Assignment, the taxpayer will possess only a mere promise to be paid (though the identity of the promisor will have changed). Moreover, no amount will be set aside from which to make the scheduled payments, nor will a separate fund be irrevocably and unconditionally set aside for the benefit of the taxpayer. Furthermore, taxpayer has no rights against the Assignee other than that of a general creditor.

Id. The Committee is seeking to achieve similar favorable results through the use of an annuity and obtaining an approving PLR from the IRS.

### D.    Proposed Distribution

70.    The LTD Committee and its Professionals have been working diligently to appropriately attempt to reduce the tax liability of the Settlement Amount and maximize the return, pursuant to existing tax laws and regulations, and taking into account: (i) the nature of the Settlement, including the various plans settled through the agreement reached with the Debtors, and (ii) that the constituency represented by the LTD Committee is a disabled population receiving government benefits that require a careful distribution and allocation to maximize resources and minimize impact on government assistance programs.

### 1.    Distribution Considerations

71.    In furtherance of its fiduciary responsibilities and in part because the LTD Employee constituency is a disabled population, the LTD carefully investigated the effect of the distribution mechanism on tax liability and medical/government benefits. Accordingly, the LTD Committee Professionals have explored and analyzed numerous alternatives, including, but not limited to, making Settlement payments over a number of years, the use of a VEBA, an HRA, and an annuity to disburse payments over time.

72.    As previously discussed, on February 25, 2013, the LTD Committee Professionals served to each LTD Employee an Individual Statement that illustrated the proposed allocation

pursuant to the actuarial models deployed by the LTD Committee Professionals taking into account payment after state and federal taxes.[20]  These Individual Statements were provided in order to provide estimates of potential recoveries to assist the individual LTD Employees in consulting with advisors such as benefit counselors, including but not limited to Medicare counseling through the State Health Insurance Assistance Program ("SHIP"), tax consultants and lawyers.

73.    The LTD Committee Professionals also provided the LTD Employees with a second Individualized Statement and aggregate chart on March 19, 2013, which demonstrated the use of a structured settlement with payment of Settlement proceeds over a number of years and the use of an HRA for Settlement proceeds related to medical benefits.  In this model, Settlement proceeds could be allocated with a cap of $90,000 going into an HRA for reimbursement of qualified health expenses and income continuation being distributed, depending on the constituency member's number of years to the original plan "retirement" (defined in the plan as age 65), in a lump sum, over a two-year period or over a four-year period. This model was used, when compared to a lump sum payment, to illustrate to the LTD Employees the significant tax savings that the use of a HRA and structured Settlement resulted in approximately $1 million in estimated costs for a gross tax savings of approximately $ 4 million and a net tax savings of $ 3 million.

74.    While exploring these alternatives, the LTD Committee and its Professionals took into consideration the participation in the various plans offered by the Debtors to the LTD Employees and the Apportionment Methodology that allocated parts of the Settlement Amount to each LTD Employee.  The LTD Committee and their Professionals also took into account the

---

[20]    These Individual Statements and an aggregate chart will be filed under seal prior to the Distribution Hearing, as will the previously served Individual Statements and aggregate charts

diversity of the individual members of the constituency, such as the number of years of eligibility remaining in each plan, the eligibility of LTD Employees to retire, and the impact on both LTD Employees with few years left to retirement and many years left to retirement. The analysis was done with an eye towards maximizing the overall recovery to the LTD constituency as a whole, but several issues have been exposed once individual LTD Employees have examined and compared different scenarios provided to them as part of the Settlement disclosure and education process.

75.    The LTD Committee has incorporated the informal comments, objections and feedback from the constituents and their advisors into their distribution analysis, and continuing reconciliation of data and information used to inform the allocation models; such feedback has also been instrumental in enhancing the ongoing efforts to educate the constituency of the varied issues surrounding the Settlement.    The LTD Committee strongly believes the modeling described in this Motion has assisted the LTD Employees understand the effects of the Debtors' termination of their benefits.

76.    For instance, it was found that those constituency members closer to retirement would not benefit from structured income disbursement, nor would the multiple payments alleviate their impact on the various government programs in which they participate.[21] However, everyone was eligible for, and might benefit from, the use of an HRA. Accordingly, the LTD Committee and its Professionals determined that a combination of these alternatives would provide for the greatest return to the LTD Employees. Therefore, the LTD Committee and its

---

discussed herein.

[21] SHIP counselors and other advisors have also indicated that the tax savings related to an HRA do not fit every LTD Employee as medical benefits might not be as important as income to some and vice versa depending on their other sources of income, access to other insurance and even their individual disability. For example, a healthy blind person might not have high medical

Professionals further investigated capping the amount to be attributed to the HRA, for various reasons, including, but not limited to carefully balancing the administrative costs involved in utilizing these mechanisms and the increase in return to the constituency, and it was determined that capping the HRA amount might maximize the benefit of using an HRA at an amount that could be reasonably used by the constituency members for medical expenses.

### 2.    Proposed Distribution Structure and Method

77.    The LTD Committee has determined that the use of an annuity may potentially prevent the application of the doctrines of constructive receipt and economic benefit to the funds attributable to the Settlement funds not associated with medical benefits such as income continuation. The LTD Committee has further determined that the funds associated with medical benefits that are deposited in the VEBA likely can be accessed on a tax free basis through an HRA. Finally the LTD Committee has investigated the use of a VEBA trust with an HRA and determined that the VEBA can provide a governing structure that will not only possibly preserve earnings of the funds deposited in the VEBA on a tax free basis, but also provides proper security for the funds because of the heightened fiduciary duty standard associated with a VEBA trust.[22]

78.    The LTD Committee has considered that it would be beneficial to many LTD Employees to establish an HRA with a portion of each LTD Employee's share of the Settlement Amount. Funds in an HRA can be used to provide for or reimburse (on a non-taxable basis) the cost of a wide variety of medical and health care expenses (described in IRC § 213(d) and

---

needs, but access to income and maximization of that income could be crucial to a blind LTD Employee who cannot work.

[22]    The LTD Committee will continue to investigate any other conservative mechanisms to bolster the security of the funds in the VEBA, including but not limited to the requirement of a bond for funds held in a VEBA under ERISA, combined with the fiduciary duty obligations of the VEBA trust board.

authorities thereunder) for the LTD Employee, her or his spouse, and dependents. The HRA would be held by a trust to be established by the LTD Committee. Further, the LTD Committee will seek to have the trust qualified as a tax-exempt VEBA described in IRC § 501(c)(9). A VEBA is established to provide "life, sick, accident or other benefits" to its members, their dependents or their designated beneficiaries. In addition to the benefits able to be provided or reimbursed under the HRA, a VEBA could potentially provide a death benefit with any remaining amounts in an LTD Employee's account.[23]

79.    In order for the VEBA to be qualified as a tax-exempt entity under IRC § 501(c)(9), an application for exemption will need to be filed with the and approved by the IRS. The principal benefit to the VEBA of tax-exempt status is that earnings of the VEBA pending distribution to (or for the benefit of) the LTD Employees will not be subject to federal income tax.

80.    To accomplish this structure, the LTD Committee would cause the Settlement Amounts to be transferred from the Claims Purchaser to a limited liability company ("LLC") established by the LTD Committee. The LLC will control the funds for a minimum of five days, and then cause the funds to be transferred to the VEBA. The VEBA will be the sole member of the LLC.[24]

81.    The LTD Committee proposes to utilize a distribution mechanism that deposits eligible Settlement Amounts in the VEBA to be administered by an HRA provider, with a $60,000 cap on the HRA. Remaining Settlement Amounts in the VEBA, such as funds that are

---

[23]  In addition, because some LTD Employees have expressed dismay at the idea of extended payments because they do not believe that they will survive the pay out schedule as they are terminally ill, the LTD Committee is investigating the options for survivability of portions of the settlement and has endorsed the use of an annuity because of the potential for flexibility in regard to survivorship issues.

ineligible for tax free status in an HRA or that the LTD Committee and its advisors deem inappropriate for deposit into the HRA because they are above the $60,000 cap, will be used to purchase an annuity. This proposed distribution scheme provides the potential for structured payments, which has the benefit of addressing another concern of the LTD Committee regarding lump sum cash settlements: early dissipation - the money being spent before the needs of the recipient are met.

82.    A further Individual Statement will be distributed to the constituents concurrently or soon after the filing of this Motion and uses the same assumption as those previously provided to the LTD Employees, but with a cap of $60,000 instead of $90,000 for distribution to an HRA. These Individual Statements will also include, for comparison purposes, a scenario in which there is no annuity utilized and an HRA capped at $60,000. The LTD Committee believes that there is a reasonable trade off in losing approximately $600,000 in tax savings after costs in the scenario using an annuity and VEBA with an HRA capped at a maximum $60,000 per person in order to allow more access to unrestricted funds that could come in the form of annuity payments to the individual LTD Employees. However, as an annuity company still needs to be selected – conditioned upon approval by the Court of this Motion – it is expected that the projected payments from the annuity company will vary the assumptions to a certain degree. The LTD Committee has also created a model in which there are no deferred payments using an annuity, but in which the LTD Committee utilizes a VEBA with an HRA capped at a maximum of $60,000 per person to demonstrate the impact on the constituency if the use of an VEBA/annuity-type vehicle is not approved by the IRS.

83.    The LTD Committee requests that the Court authorize the LTD Committee to further implement the suggested structure of an annuity used in conjunction with a VEBA and an

---

[24]    The Debtors will not be the Plan Sponsor for the VEBA.

HRA capped at $60,000, and the authority to reject the use of an annuity if the annuity does not satisfy a credit worthiness analysis under the business judgment of the LTD Committee or its successors. Using its business judgment and adhering to its fiduciary duties, the LTD Committee will interview multiple annuity companies in consultation with its Professionals in order to make an appropriate selection of an annuity company; the LTD Committee intends to file updated information regarding the annuity selection. If the LTD Committee is not satisfied with the prospectus from the prospective annuity company, it reserves the right to forgo the use of an annuity to defer payments and provide income to cover administrative costs. However, the LTD Committee is hopeful that it can secure a credit worthy alternative for the constituency.

84.    The LTD Committee also requests that the Court further approve the manner of notice to the constituency, and find that notice, education and disclosure to the LTD Employees or the parties legally responsible for their welfare is appropriate under the circumstances. Unlike the typical settlement of a personal injury case with one client, here the client is the LTD Committee who owes fiduciary duties to each LTD Employee. Although the LTD Committee has advised of the risks and benefits of both lump sum and structured settlements, the LTD Committee does not represent the LTD Employees individually and cannot provide advice on the distribution scheme that would best meet the needs of each individual LTD Employee since each participant's situation is unique to that individual. Therefore, the LTD Committee is requesting that the Court approve the disclosure related to the impact of the Settlement on both the Tax Issues and Benefit Issues provided by the LTD Committee in this case as in executing its duty of care to the constituency, regardless of the distribution method selected by the LTD Committee and approved by the Court, is adequate. The LTD Committee has filed this Motion in order to ensure that the effort of both the Debtors and LTD Committee to educate the LTD Employees regarding the Settlement and the impact of the Settlement and distribution of the Settlement are

found to be appropriate under the circumstances.

### E.    Tax Noticing Procedure

85.    As provided herein, the Settlement Agreement contemplates that neither the Debtors nor the Claims Purchaser will be responsible for tax withholding or reporting. Therefore, the LTD Committee will be providing form W-2s and form W-4s to the constituency and requests that the Court approve the process by which it executes this necessary reporting to the IRS and the manner in which this process is presented to the LTD Employees in terms of adequate disclosure. A copy of the proposed correspondence to the individual LTD Employees with a form W-2 and form W-4 is attached as Exhibit B, which the LTD Committee respectfully requests the Court approve.

### V.    NOTICE

86.    Notice of this Motion has been provided to (a) counsel to the Debtors; (b) counsel to the UCC; (c) counsel to the Retiree Committee; (d) counsel to the ad hoc Bondholders Group; (e) the United States Trustee for the District of Delaware; (f) all LTD Employees; and (g) all parties required to receive service under Rule 2002-1(b) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware. The LTD Committee respectfully submits that, given the administrative nature of the relief requested, no other notice of the relief requested herein needs to be given.

*[The remainder of this page is intentionally left blank.]*

## VI.   CONCLUSION

WHEREFORE, the LTD Committee respectfully requests that this Court enter an Order, substantially in the form annexed hereto as Exhibit C, (i) authorizing the structure and approval of the method of distribution of the Settlement Amount, (ii) approval of the disclosure and notice relating to the distribution, (iii) approval of tax withholding and tax noticing procedures, and (iv) for such other and further relief as the Court deems proper and just.

Dated: April 11, 2013
      Wilmington, Delaware

**ELLIOTT GREENLEAF**

Rafael X. Zahralddin-Aravena (DE Bar No. 4166)
Shelley A. Kinsella (DE Bar No. 4023)
Eric M. Sutty (DE Bar No. 4007)
Jonathan M. Stemerman (DE Bar No. 4510)
1105 North Market Street, Suite 1700
Wilmington, Delaware  19801
Telephone:  (302) 384-9400
Facsimile:  (302) 384-9399
Email:  rxza@elliottgreenleaf.com
Email:  sak@elliottgreenleaf.com
Email:  ems@elliottgreenleaf.com
Email:  jms@elliottgreenleaf.com

and

Mary E. Kohart
Margaret S. Curran
ELLIOTT GREENLEAF
925 Harvest Drive, Suite 300
Blue Bell, PA 19422
Telephone:  (215) 977-1000
Facsimile:  (215) 977-1099
Email:  mek@elliottgreenleaf.com
Email:  msc@elliottgreenleaf.com

and

E. Morgan Maxwell, III
P.O. Box 876
Southeastern PA 19399
Telephone: (610) 640-9481
Facsimile: (484) 801-1439
Email: morganmaxlaw@comcast.net

*Counsel to the Official Committee of Long Term
Disability Participants*