EXHIBIT 6

Technical Explanation for the US-India Income Tax Treaty ("Tax Convention with the Republic of India").  Article 23 ("Other Income") would govern both Health Reimbursement Arrangement ("HRA") and "Other Payments" made to me by the LTD Committee.  Article 23 states it is within the rights of India to tax such income.

TREASURY DEPARTMENT
TECHNICAL EXPLANATION OF THE CONVENTION AND PROTOCOL
BETWEEN THE UNITED STATES OF AMERICA
AND THE REPUBLIC OF INDIA
FOR THE AVOIDANCE OF DOUBLE TAXATION AND THE PREVENTION
OF FISCAL EVASION WITH RESPECT TO TAXES ON INCOME
SIGNED AT NEW DELHI ON SEPTEMBER 12, 1989

GENERAL EFFECTIVE DATE UNDER ARTICLE 30: 1 JANUARY 1991

INTRODUCTION

This is a technical explanation of the Convention and Protocol between the United States of America and the Republic of India signed on September 12, 1989 ("the Convention"). Negotiations took as their starting point the U.S. Treasury Department's draft Model Income Tax Convention, published on June 16, 1981 ("the U.S. Model"), the Model Double Taxation Convention published by the United Nations in 1980 ("the U.N. Model") and other treaties of both countries.

The Technical Explanation is an official guide to the Convention. It reflects the policies behind particular Convention provisions, as well as understandings reached with respect to the application and interpretation of the Convention.

The explanations of each article will include explanations of any Protocol provisions relating to that article.

TABLE OF ARTICLES

Article 1--------------------------------General Scope
Article 2--------------------------------Taxes Covered
Article 3--------------------------------General Definitions
Article 4--------------------------------Residence
Article 5--------------------------------Permanent Establishment
Article 6--------------------------------Income from Immovable Property (Real Property)
Article 7--------------------------------Business Profits
Article 8--------------------------------Shipping and Air Transport
Article 9--------------------------------Associated Enterprises
Article 10-------------------------------Dividends
Article 11-------------------------------Interest
Article 12-------------------------------Royalties and Fees for Included Services
Article 13-------------------------------Gains
Article 14-------------------------------Permanent Establishment Tax
Article 15-------------------------------Independent Personal Services
Article 16-------------------------------Dependent Personal Services
Article 17-------------------------------Directors' Fees
Article 18 ------------------------------Income Earned by Entertainers and Athletes

Article 19-------------------------------Remuneration and Pensions in Respect of
                        Government Service
Article 20-------------------------------Private Pensions, Annuities, Alimony and Child Support
Article 21-------------------------------Payments Received by Students and Apprentices
Article 22-------------------------------Payments Received by Professors, Teachers, and
                        Research Scholars
Article 23-------------------------------Other Income
Article 24-------------------------------Limitation on Benefits
Article 25-------------------------------Relief from Double Taxation
Article 26-------------------------------Nondiscrimination
Article 27-------------------------------Mutual Agreement Procedure
Article 28-------------------------------Exchange or Information and Administrative Assistance
Article 29-------------------------------Diplomatic Agents and Consular Officers
Article 30-------------------------------Entry into Force
Article 31-------------------------------Termination
Protocol----------------------------------of 12 September, 1989
Diplomatic Notes-----------------------of 12 September, 1989

ARTICLE 1
General Scope

Article 1 provides that the Convention is applicable to residents of the United States or the Republic of India ("India") except where the terms of the Convention provide otherwise. Under Article 4 (Residence) a person is treated as a resident of a Contracting State if that person is under the laws of that State liable to tax therein by reason of his domicile or other similar criteria, subject to certain limitations, as described in Article 4. If, however, a person is, under those criteria, a resident of both Contracting States, a single State of residence (or no state of residence) is assigned under Article 4. This definition governs for all provisions of the Convention. Certain provisions are applicable to persons who may not be residents of either Contracting State. For example, Article 19 (Remuneration and Pensions in Respect of Government Service) may apply to a citizen of a Contracting State who is resident in neither. Paragraph 1 of Article 26 (Nondiscrimination) applies to nationals of the Contracting States. Under Article 28 (Exchange of Information and Administrative Assistance), information may be exchanged with respect to residents of third states.

Paragraph 2 of Article 1 describes the relationship between the rules of the Convention, on the one hand, and the laws of the Contracting States and other agreements between the Contracting States, on the other. This paragraph makes explicit, on a reciprocal basis, the generally accepted principle that no provision in the Convention may restrict any exclusion, exemption, deduction, credit or other allowance accorded by the tax laws of the Contracting States. Thus, for example, if a deduction would be allowed under the Internal Revenue Code ("the Code") in Computing the taxable income of a resident of India, the deduction will be available to that person in computing income under the treaty. In no event may the treaty increase the tax burden on residents of the Contracting States. Thus, a right to tax given by the treaty cannot be exercised by the United States unless that right also exists under the Code.

A taxpayer may always rely on the more favorable Code treatment. This does not mean, however, that a taxpayer may pick and choose between Code and treaty provisions in an inconsistent manner in order to minimize tax. For example, assume a resident of India has three separate businesses in the United States. One is a profitable permanent establishment and the other two are trades or businesses which would earn taxable income under the Code but which do not meet the permanent establishment threshold tests of the Convention. One is profitable and the other incurs a loss. Under the Convention the income of the permanent establishment is taxable, and both the profit and loss of the other two businesses are ignored. Under the Code, all three would be taxable. The loss would be offset against the profits of the two profitable ventures. The taxpayer may not invoke the Convention to exclude the profits of the profitable trade or business and invoke the Code to claim the loss of the loss trade or business against the profit of the permanent establishment. (See Rev. Rul. 84-17 I.R.B. 1984-1, 10.) If the taxpayer invokes the Code for the taxation of all three ventures, he would not be precluded from invoking the Convention with respect, for example, to any dividend income he may receive from the United States which is not effectively connected with any of his business activities in the United States.

Similarly, nothing in the Convention can be used to deny any benefit granted by any other agreement between the United States and India. For example, if certain benefits or protections, not found in the Convention, are afforded under a Treaty of Commerce, Friendship, and Navigation, or similar agreement, those benefits or protections will be available to residents of the Contracting States regardless of any provisions to the contrary (or silence) in the Convention.

Paragraphs 3 and 4 of Article 1 contain the traditional '"saving clause"' of the U.S. Model. Under paragraph 3, the United States and India reserve their right, except as provided in paragraph 4, to tax their residents and citizens as provided in their internal laws, notwithstanding any Convention provisions to the Contrary. If, for example, an Indian resident performs independent personal services in the United States, he is present in the United States for fever than 90 days in the taxable year and the income from the services is not attributable to a fixed base in the United States, Article 15 (Independent Personal Services) would normally prevent the United States from taxing the income. If, however, the Indian resident is also a citizen of the United States, the saving clause permits the United States to include the remuneration in the worldwide income of the citizen and subject it to tax under the normal rules. Residence, for the purpose of the saving clause, is determined under Article 4 (Residence). Thus, for example, if an individual who is not a U.S. citizen is a resident of the United States under the Code, and is also a resident of India under Indian law, and that individual has a permanent home available to him in India and not in the United States, he would be treated as a resident of India under Article 4 and this determination would apply for purposes of the saving clause. The United States would not be permitted to apply its statutory rules to that person if they are inconsistent with the treaty. Under paragraph 3 the Contracting States also reserve their right to tax former citizens whose loss of citizenship had as one of its principal purposes the avoidance of tax. In the United States, such a former citizen is taxable in accordance with the provisions of section 877 of the Code for 10 years following the loss of citizenship.

Paragraph 4 sets forth certain exceptions to the saving clause in cases where its application would contravene policies reflected in the treaties which are intended to extend a Contracting State's benefits to its citizens and residents. Paragraph 4(a) lists the provisions of the Convention which will be applicable to a Contracting State's citizens and residents despite the general saving clause rule of paragraph 3:

(1) Paragraph 2 of Article 9 (Associated Enterprises) grants the right to a correlative adjustment, and, particularly, permits the override of the statute of limitations for the purpose of refunding tax under such a correlative adjustment.

(2) Paragraphs 2 and 6 of Article 20 (Private Pensions, Annuities, Alimony and Child Support) deal with social security benefits and child support payments. Paragraph 2 of Article 20 provides for the taxation of social security benefits only in the State making the payment. Excepting this rule from the saving clause means that the United States may not apply the Code rules to tax its citizens or residents on Indian social security benefits. Paragraph 6 of Article 20 provides that child support payments by a resident of one Contracting State to a resident of the other may be taxed only by the State of residence of the payer. The inclusion of this paragraph in the exceptions to the saving clause means that a child support payment by an Indian resident to a U.S. resident or citizen will not be taxed by the United States.

(3) Article 25 (Relief from Double Taxation) confers the benefit of a foreign tax credit on the residents of a Contracting State. To apply the saving clause to this Article would render the Article meaningless.

(4) Article 26 (Nondiscrimination) prohibits discriminatory taxation by one Contracting State on the citizens and residents of the other. These prohibitions are intended to apply even if the citizen or resident is also a citizen or resident of the taxing State.

(5) Article 27 (Mutual Agreement Procedure) may confer a country's benefits on its citizens and residents by, for example, waiving the statute of limitations for refunds, or by permitting the competent authorities to use a definition of a term which differs from the internal law definition.
These benefits are intended to be granted by a Contracting State to its citizens and residents.

Paragraph 4(b) provides a different set of exceptions to the saving clause. The benefits referred to are all intended to be granted by a Contracting State to temporary residents, but not to permanent residents or, in the case of the United States, citizens. Viewed from the point of view of the United States as the host country, if beneficiaries of these provisions come to the United States from India and remain in the United States long enough to become residents under the Code, but do not acquire immigrant status (i.e., they do not become green card holders) and are not citizens of the United States, the United States will continue to grant these benefits even if they conflict with the Code rules. The benefits preserved by this paragraph are the following host country exemptions: Government service salaries and pensions under Article 19 (Remuneration and Pensions in Respect of Government Service); certain income of students and apprentices under Article 21 (Payments Received by Students and Apprentices); certain income of visiting professors, etc., under Article 22 (Payments Received by Professors, Teachers and Research Scholars); and the income of diplomatic and consular officers under Article 29 (Members of Diplomatic Missions and Consular Posts).

ARTICLE 2

<u>Taxes Covered</u>

This Article identifies the U.S. and Indian taxes to which the Convention applies. These are referred to in the Convention as '"United States tax" and "Indian tax"' respectively.

In the case of the United States, as indicated in paragraph 1(a), the covered taxes are the Federal income taxes imposed by the Code, together with the excise tax imposed on insurance premiums paid to foreign insurers (Code section 4371). With respect to the tax on insurance premiums, the Convention applies only to the extent that the risks covered by such premiums are not reinsured, directly or indirectly, with a person not entitled, under this or any other Convention, to exemption from the tax. The Article specifies that the Convention does not apply to the accumulated earnings tax (Code section 531), the personal holding company tax (Code section 541) or the social security taxes (Code sections 1401, 3101 and 3111). State and local taxes in the United States are not covered by the Convention.

Providing Convention coverage for the U.S. insurance excise tax effectively exempts Indian companies which insure U.S. risks from the tax. The tax is applicable under the Code only when an Indian company earns premiums which are not effectively connected with a trade or business in the United States. Under Article 7 (Business Profits), the United States cannot subject the business profits of an Indian enterprise to tax (i.e., to a covered tax) if the income of the enterprise is not attributable to a permanent establishment which the enterprise has in the United States or to sales of goods or performance of activities by the Indian company which is of the same kind as the goods sold or the activities carried out through the permanent establishment. If the Indian company sells insurance through a permanent establishment in the United States, and also sells insurance in the United States directly from India, unconnected to the permanent establishment, under the Code, the income from both parts of the business would be subject to net basis taxation, and the excise tax would not apply.

Paragraph 1(b) specifies the existing Indian taxes which are covered by the Convention. They are the income tax, including any surcharge on the income tax, and the surtax. The income tax on the undistributed income of companies, imposed under the Income Tax Act, is not a covered tax.

For purposes of Article 28 (Exchange of Information and Administrative Assistance), the Convention applies to a broader range of taxes than those enumerated in Article 2. For the United States, Article 28 applies to all taxes imposed under Title 26 of the United States Code (i.e., the Internal Revenue Code). For India, Article 28 applies to the income tax, the wealth tax and the gift tax.

Paragraph 1 specifies that the taxes referred to in subparagraphs (a) and (b) do not include fines, penalties and other amounts payable in respect of default or omission in relation to the covered taxes.

Under paragraph 2, the Convention will apply to any taxes which are identical or substantially similar, to those enumerated in paragraph 1, and which are imposed in addition to, or in place of, the existing taxes after September 12, 1989 (the date of signature of the

Convention). The paragraph also provides that the U.S. and Indian competent authorities will notify each other of significant changes in their taxation laws. This refers to changes which are of significance to the operation of the Convention. They will also notify each other of official published material concerning the application of the Convention, such as this technical explanation, Internal Revenue Service rulings and court decisions.

ARTICLE 3
General Definitions

Paragraph 1 defines a number of basic terms used in the Convention. Some terms are not defined in the Convention. These are dealt within paragraph 2. Certain others are defined in other articles of the Convention. For example, the term "resident of a Contracting State" is defined in Article 4 (Residence). The term "'permanent establishment" is defined in Article 5 (Permanent Establishment). The terms "dividends," "interest" and "royalties" are defined in Articles 10, 11 and 12, respectively, which deal with the taxation of those classes of income.

The terms "India" and "United States" are defined in paragraphs 1(a) and (b), respectively. The term "India" means the territory of India, and is further defined to include India's continental shelf. The term "United States'" is defined geographically to mean the territory of the United States, including its continental shelf. Though not specified, the term is understood not to include Puerto Rico, the Virgin Islands, Guam or any other U.S. possession or territory.

The terms "a Contracting State'" and "the State" are defined in paragraph 1(c) to mean India, depending on the context in which the other Contracting the United States or term is used.

The term "tax'" is defined in paragraph 1(d) to mean either Indian tax or United States tax, depending on the context in which the term is used.

Paragraph 1(e) defines the term "'person'" to include an individual, an estate, a trust, a partnership, a company, and any other body of persons or taxable entity. This definition differs from that in the U.S. Model only in the addition of "any other taxable entity", which is implicitly included by the "'any other body of persons" language in the U.S. Model.

The term "company" is defined in paragraph 1(f) as a body corporate or an entity treated as a body corporate for tax purposes. Since the term "body corporate" is not defined in the Convention, in accordance with paragraph 2 of this Article, it has the meaning which it has under the law of the Contracting State whose tax is being applied.

The terms "enterprise of a Contracting State" and "'enterprise of the other Contracting State" are defined in paragraph l(g) as an enterprise carried on by a resident of a Contracting State and an enterprise carried on by a resident of the other Contracting State. The term "enterprise'" is not defined in the Convention.

Paragraphs 1(h) defines the term "competent authority" for both the United States and

India. The Indian competent authority is identified as the Central Government in the Ministry of Finance (Department of Revenue) or their authorized representative. The U.S. competent authority is identified as the Secretary of the Treasury or his delegate. The Secretary of the Treasury has delegated the competent authority function to the Commissioner of Internal Revenue, who has, in turn, redelegated the authority to the Assistant Commissioner (International). With respect to interpretative issues, the Assistant Commissioner acts with the concurrence of the Associate Chief Counsel (International) of the Internal Revenue Service.

The term "national" is defined in paragraph 1(i) as an individual who is a citizen or national of the United States or India. This definition is comparable to that found in the U.S. Model, except that in that Model the definition is in Article 24 (Nondiscrimination). Since the term has application in other articles as well (e.g., Article 19 (Remuneration and Pensions in Respect of Government Service)), in this Convention it has been placed among the General Definitions.

Paragraph 1(j) defines the term "'international traffic'", which is significant principally in relation to Article 8 (Shipping and Air Transport). The term means any transport by a ship or aircraft operated by an enterprise of a Contracting State except when the vessel is operating solely between places within the other Contracting State. The exclusion' from international traffic of transport by, for example, an Indian carrier solely between places within the United States means that a carriage of goods or passengers between New York and Chicago by the Indian carrier, if such carriage were possible under U.S. law, would not be treated as international traffic. The substantive taxing rules in Article 8 of the Convention relating to the taxation of income from transport, therefore, would not apply to income from such carriage, and the United States would not be required to exempt the income under Article 8. The income would, however, be treated as business profits under Article 7 (Business Profits) and would, therefore, be taxable in the United States only if attributable to a U.S. permanent establishment, and then, only on a net basis. The gross basis U.S. tax (Code section 887) would never apply under the circumstances described. If, however, goods are carried by the Indian carrier from Bombay to New York, some of the goods are left in New York and the rest are taken to Chicago, the entire transport would be international traffic.

Several articles of the Convention use the term "'taxable year". Paragraph 1(k) defines the term, in relation to Indian tax, to mean the "previous year'" as that term is defined in the 1961 Indian Tax Act. In relation to U.S. tax, the term is defined in paragraph (a)(23) of section 7701 of the Code.

Paragraph 2 provides that, in the application of the Convention, any term used but not defined in the Convention, unless the context requires otherwise, will have the meaning which it has under the law of the Contracting State whose tax is being applied. If, however, the meaning of a term cannot be readily determined under the law of a Contracting State, or if there is a conflict in meaning under the laws of the two States which creates problems in the application of the Convention, the competent authorities may, pursuant to the provisions of paragraph 3 of Article 27 (Mutual Agreement Procedure), establish a common meaning in order to prevent double taxation or further any other purpose of the Convention. This common meaning need not conform to the meaning of the term under the laws of either Contracting State.

ARTICLE 4
Residence

This Article sets forth rules for determining whether a person is a resident of a Contracting State for purposes of the Convention. Determination of residence is important because, as noted in the explanation to Article 1 (General Scope), as a general matter only residents of the Contracting States may claim the benefits of the Convention. The treaty definition of residence is to be used only for purposes of the Convention.

The determination of residence for treaty purposes looks first to a person's liability to tax as a resident under the respective taxation laws of the Contracting States. A person who, under those laws, is a resident of one Contracting State and not of the other need look no further. That person is a resident for purposes of the Convention of the State in which he is resident under internal law. If, however, a person is resident in both Contracting States under their respective taxation laws, the Article proceeds, where possible, to assign one State of residence to such a person for purposes of the Convention through the use of tie-breaker rules.

Paragraph 1 defines a "resident of a Contracting State". In general, this definition incorporates the definitions of residence in U.S. and Indian law, by referring to a resident as a person who, under the laws of a Contracting State, is subject to tax there by reason of his domicile, residence, citizenship, place of management, place of incorporation or any other similar criterion. Residents of the United States include aliens who are considered U.S. residents under Code section 7701(b). U.S. citizens are treated as resident in the United States for purposes of the Convention. Even though they are not residents of the United States under the Code, it is appropriate for them to be treated as residents under the Convention because they are taxed by the United States in the same manner as residents, i.e., on their worldwide income.

If, under paragraph l(a), a person is liable to tax in a Contracting State only in respect of income from sources within that State, the person will not be treated as a resident of that contracting State for purposes of the Convention. Thus, for example, an Indian consular official in the United States, who may be subject to U.S. tax on U.S. source investment income, but is not taxable in the United States on non-U.S. income, would not be considered a resident of the United States for purposes of the Convention. Similarly, an Indian enterprise with a permanent establishment in the United States is not, by virtue of that permanent establishment, a resident of the United States. The enterprise is subject to U.S. tax only with respect to its income which is attributable to the U.S. permanent establishment, not with respect to its worldwide income, as is a U.S. resident.

Under paragraph l (b), a partnership, estate or trust will be treated as a resident of a Contracting State for purposes of the Convention to the extent that the income derived by such person is subject to tax in that State as the income of a resident, either in the hands of the person deriving the income or in the hands of its partners or beneficiaries. Under U.S. law, a partnership is never, and an estate or trust is often not, taxed as such. Under the Convention income received by a partnership, estate or trust will be treated as income received by a U.S. resident only to the

extent such income is subject to tax in the United States as the Income of a U.S. resident. Thus, for U.S. tax purposes, the question of whether income received by a partnership is received by a resident will be determined by the residence of its partners rather than by the residence of the partnership itself. To the extent the partners (looking through any partnerships which are themselves partners) are subject to U.S. tax as residents of the United States, the income received by the partnership will be treated as income received by a U.S. resident. Similarly, the treatment under the Convention of income received by a trust or estate will be determined by the residence for taxation purposes of the person subject to tax on such income, which may be the grantor, the beneficiaries or the estate or trust itself, depending on the circumstances. This rule regarding the residence of partnerships, estates or trusts is applied to determine the extent to which that person is entitled to treaty benefits with respect to income which it receives from the other Contracting State and the extent to which a resident of the other Contracting State is entitled to treaty benefits with respect to income paid by such person.

If, under the laws of the two Contracting States, and, thus, under paragraph 1, an individual is deemed to be a resident of both Contracting States, a series of tie-breaker rules are provided in paragraph 2 to determine a single State of residence for that individual. The first test is where the individual has a permanent home. If that test is inconclusive because the individual has a permanent home available to him in both States, he will be considered to be a resident of the Contracting State where his personal and economic relations are closest, i.e., the location of his "center of vital interests". If that test is also inconclusive, or if he does not have a permanent home available to him in either State, he will be treated as a resident of the Contracting State where he maintains an habitual abode. If he has an habitual abode in both States or in neither of them, he will be treated as a resident of his Contracting State of citizenship. If he is a citizen of both States or of neither, the matter will be considered by the competent authorities, who will attempt by mutual agreement to assign a single State of residence.

Paragraph 3 seeks to settle dual-residence issues for companies. A company is treated as resident in the United States if it is created or organized under the laws of the United States or a political subdivision. If India used the same rule, dual-corporate residence between the United States and India could never arise. Under its law, however, a corporation is treated as a resident of India if it is managed and controlled there. Dual residence, therefore, can arise if a U.S. corporation is managed in India. Since neither party was prepared to give up its test of corporate residence under a tie-breaker, the paragraph provides that if a company is resident in both the United States and India under paragraph 1, that company shall be considered to be outside the scope of the Convention for most purposes. There are several exceptions. Paragraph 2 of Article 10 (Dividends) applies, such that if a dual resident corporation pays a dividend to a non-dual resident of India, the U.S. paying agent would withhold on that dividend at the appropriate treaty rate, since reduced withholding is a benefit enjoyed by the non-dual resident of India not by the dual resident. Similarly, Articles 26 (Nondiscrimination), 27 (Mutual Agreement procedure), 28 (Exchange of Information and Administrative Assistance), and 30 (Entry into Force) apply to dual resident corporations. Thus, a Contracting State cannot discriminate against a dual resident corporation; such corporations can bring issues to the competent authorities; and information can be exchanged with respect to them.

Paragraph 4 deals with the possibility of dual residents other than individuals or

corporations, such as estates or trusts. In the event of dual residence of such persons, the competent authorities are instructed to settle the matter and determine the mode of application of the Convention to such persons.


ARTICLE 5
Permanent Establishment

This Article defines the term "permanent establishment". This definition is significant for several articles of the Convention. The existence of a permanent establishment in a Contracting State is necessary under Article 7 (Business Profits) for the taxation by that State of the business profits of a resident of the other Contracting State. It can also be a condition for the imposition of the branch tax under Article 14 (Permanent Establishment Tax). Since the term "fixed base" in Article 15 (Independent Personal Services) is understood by reference to the definition of "permanent establishment", this Article is also relevant for purposes of Article 14. Articles 10, 11 and 12 (dealing with dividends, interest, and royalties and fees for included services, respectively) provide for reduced rates of tax by the source State on payments of these items of income to a resident of the other State only when the income is not attributable to a permanent establishment or fixed base which the recipient has in the source State.

This Article differs in several significant respects from the U.S. and OECD Model provisions, principally by requiring a lesser nexus with a country before a permanent establishment is determined to exist there. This Article is similar in many respects to Article 5 of the U.N. Model, and to the permanent establishment definition in U.S. treaties with some other developing countries.

Paragraph 1 provides the basic definition of the term "permanent establishment". As used in the Convention, the term means a fixed place of business through which the business of an enterprise is wholly or partly carried on.

Paragraph 2 contains a list of fixed places of business (or in the case of subparagraph (l), an activity) which will constitute a permanent establishment. The list is illustrative and non-exclusive. According to subparagraphs (a) through f) of paragraph 2, the term permanent establishment includes a place of management, a branch, an office, a factory, a workshop, and a mine, quarry or other place of extraction of natural resources. These are all found in the U.S. Model.

Subparagraphs (g), (h), and (i) provide that an enterprise's warehouse which provides storage facilities to others, a farm or similar agricultural facility, and a store or other sales outlet also constitute permanent establishments. While these are not specifically provided for in the U.S. Model, as "fixed places of business through which the business of an enterprise is carried on" they are fully consistent with the principles of the Model, and are, therefore, implicitly contained within the permanent establishment definition in the Model.

Under subparagraph (j), a drilling rig or other installation or structure used for the exploration or exploitation of natural resources constitutes a permanent establishment only if the

facility is used for an aggregate period exceeding 120 days in a twelve-month period. (See explanation below of Ad Article 5 of the Protocol for a description of the rule applicable when the 120 day time period extends over two taxable years.)

Subparagraph (k) provides rules to determine when a building site or a construction, assembly or installation project constitutes a permanent establishment. Only if the site, project, etc. lasts for more than 120 days in a twelve-month period does it constitute a permanent establishment. The time spent on supervisory activities connected with the project or activity is included in determining whether the 120-day test has been met. A series of construction sites or projects are to be combined for purposes of applying the time threshold test. The 120-day period begins when work physically begins in a Contracting State. (See explanation below of Ad Article 5 of the protocol for a description of the rule applicable when the 120 day time period extends over two taxable years.)

Subparagraph (l) provides the rule for determining the conditions under which the activity of furnishing services, through employees or other personnel, constitutes a permanent establishment. These rules apply only to the provision of services which are not considered to be "included services", as the term is defined in Article 12 (Royalties and Fees for Included Services). Under the subparagraph, the furnishing of services gives rise to a permanent establishment if either the activity continues for an aggregate of more than 90 days in a twelve month period, or the services are performed for a person related to the enterprise providing the services. In the latter case, no time threshold test must be met for a permanent establishment to exist. The determination of whether persons are related for purposes of this test is made in accordance with the rules of Article 9 (Associated Enterprises). Under the U.S. Model such activities would constitute a permanent establishment only if they are exercised through a fixed place of business or by a dependent agent. (See explanation below of Ad Article 5 of the Protocol for a description of the rule applicable when the 90 day time period extends over two taxable years.)

Paragraph I of the Protocol (Ad Article 5) provides a rule which applies with respect to subparagraphs; (j), (k) and (1) of paragraph 3, all of which include time tests for the existence of a permanent establishment. The Protocol rule deals with cases in which the time threshold specified in the particular subparagraph has been met, and that time period extends over two taxable years. The Protocol article states that a permanent establishment will not be considered to exist in any year in which the facility is used or the activity is carried on for a period of less than 30 days in that year. A permanent establishment will exist in the other taxable year and the enterprise will be subject to tax in that year, in accordance with the provisions of Article 7 (Business Profits), but only with respect to income arising in that other year.

For example, subparagraph (l) provides that a U.S. enterprise will have a permanent establishment in India if it provides the services of its employees in India for a period of more than 90 days in a 12-month period. If employees are performing services in India from December 20, 1989 through March 20, 1990, that activity will constitute a permanent establishment because it continues for 91 days in a twelve-month period. Since the 91 days span two calendar years and fewer than 30 days are in one of those years, absent the rule in Ad Article 5 of the protocol, there would be a permanent establishment in both years. Under the Ad Article 5 rule, while the period

from December 20 through December 31, 1989 would be counted to determine that the 90 day threshold test has been net, for purposes of subjecting the enterprise to tax a permanent establishment will be deemed to exist only in 1990. Thus, there will be no Indian tax on the income attributable to services performed in 1989, and if the enterprise performs similar services in India during 1989 independent of the permanent establishment, the U.S. enterprise will not be subject to Indian tax on any income attributable to those services under the limited force of attraction rule of subparagraph (c) of paragraph 1 of Article 7.

Paragraph 3 contains exceptions to the general rule of paragraph 1 that a fixed place of business through which a business is carried on constitutes a permanent establishment. The paragraph lists a number of activities which may be carried on through a fixed place of business, but which, nevertheless, will not give rise to a permanent establishment. The use of facilities solely for storage, display or occasional delivery of merchandise belonging to an enterprise will not constitute a permanent establishment of that enterprise. The maintenance of a stock of goods belonging to an enterprise solely for the purpose of storage, display, or occasional delivery, or solely for the purpose of processing by another enterprise will not give rise to a permanent establishment of the first-mentioned enterprise. The maintenance of a fixed place of business solely for purchasing goods or collecting information for the enterprise, or solely for activities that have a preparatory or auxiliary character for the enterprise such as advertising, the supply of information, or scientific activities, will not constitute a permanent establishment of the enterprise. A combination of these activities will not give rise to a permanent establishment. The use of facilities or the maintenance of a stock of goods solely for regular delivery of goods or merchandise may, however, under the Convention, constitute a permanent establishment since, unlike the U.S. Model, it is not specifically excluded.

Paragraphs 4 and 5 specify when the use of an agent will constitute a permanent establishment. Paragraph 4 specifies three conditions in which a dependent agent will constitute a permanent establishment. Only the first of these is found in the U.S. Model. Under subparagraph 4(a), a dependent agent of an enterprise of a Contracting State will give rise to a permanent establishment of the enterprise in the other Contracting State, if the agent has and habitually exercises in that other State an authority to conclude contracts in the name of that enterprise, and his activities are not limited to those activities specified in paragraph 3 which would not constitute a permanent establishment if carried on by the enterprise through a fixed place of business.

Under subparagraph 4(b), even if the agent has no authority to conclude contracts, he will give rise to a permanent establishment for the enterprise if he habitually maintains a stock of goods or merchandise in the other State on behalf of the enterprise and regularly makes deliveries from that stock, and there have been some additional activities carried on in that other State on behalf of the enterprise which have contributed to the sale. It is not necessary that these sales activities be carried out by the agent. They may be carried out by the enterprise itself or by another agent.

Subparagraph 4(c) contains a rule not found in other U.S. treaties. It provides that an agent who habitually secures orders wholly or almost wholly for an enterprise of a Contracting State will constitute a permanent establishment of the enterprise in the other Contracting State.

Diplomatic notes exchanged at the time of the signing of the Convention explain that in order for an agent to be treated as habitually securing orders wholly or almost wholly for the enterprise all of the following tests must be met:

1. The agent frequently accepts orders for (goods or merchandise on behalf of the enterprise.

2. Substantially all of the agent's sales-related activities in the other Contracting State consist of activities for the enterprise.

3. The agent habitually represents to persons offering to buy goods or merchandise that acceptance of an order by the agent constitutes the agreement of the enterprise to supply goods or merchandise under the terms or conditions specified in the order.

4. The enterprise takes actions that give purchasers the basis for a reasonable belief that such person has authority to bind the enterprise.

Under paragraph 5, as a general rule, an enterprise will not be deemed to have a permanent establishment in a Contacting State merely because it carries on business in that State through an independent agent, including a broker or general commission agent, if the agent is acting in the ordinary course of his business. If, however, the agent's activities are devoted wholly or almost wholly on behalf of the enterprise, and transactions between the agent and the enterprise are on other than an arm's length basis, the agent will not be considered an independent agent.

Paragraph 6 clarifies that a company which is a resident of a Contracting State will not be deemed to have a permanent establishment in the other Contracting State merely because it controls, or is controlled by, a company that is a resident of that other Contracting State, or that carries on business in that other Contracting State. The determination of whether or not a permanent establishment exists will be made solely on the basis of the factors described in paragraphs 1 through 5 of the Article. Whether or not a company is a permanent establishment of a related company, therefore, is based solely on those factors and not on the ownership or control relationship between the companies.

ARTICLE 6
Income from Immovable Property (Real Property)

Paragraph 1 provides that income of a resident of a Contracting State derived from real property situated in the other Contracting State may be taxed in the Contracting State which the property is situated. The paragraph specifies that income from real property includes income from agriculture and forestry. This Article does not grant an exclusive taxing right to the situs State, but merely grants it the primary right to tax. The Article does not impose any limitation in terms of rate or form of tax on the situs State. As clarified in paragraph 3, the income referred to in paragraph 1 means income from any use of real property, including, but not limited to, income from direct use by the owner and rental income from the letting of real property.

Paragraph 2 defines the term "immovable property", which, as is made clear in the title to the Article and in paragraph 1, is to be understood to have the same meaning as the U.S. statutory term "real property". The term is to have the same meaning that it has under the law of

the situs country.

Paragraph 4 specifies that the basic rule of paragraph 1 (as elaborated in paragraph 3) applies to income from real property of an enterprise and to income from real property used for the performance of independent personal services. This clarifies that, notwithstanding the requirements of Articles 7 (Business Profits) and 15 (Independent Personal Services) that income is taxable only if attributable to a permanent establishment or fixed base, respectively, the situs country may tax the real property income of a resident of the other Contracting State even in the absence of a permanent establishment or fixed base in the situs State.

The provision in the U.S. Model for a binding election by the taxpayer to be taxed on real property income on a net basis was not included in the Convention. Both Contracting States provide for net basis taxation of such income under internal law, and, therefore, an election provision is not needed.


ARTICLE 7
Business Profits

This Article provides the rules for the taxation by a Contracting State of the business profits of an enterprise of the other Contracting State. The general rule is found in paragraph 1, that business profits (as defined in paragraph 7) of an enterprise of one Contracting State may not be taxed by the other Contracting State unless the enterprise carries on business in that other Contracting State through a permanent establishment (as defined in Article 5 (Permanent Establishment)) situated there. Where that condition is met, the State in which the permanent establishment exists may tax the income of the enterprise, but only so much of the income as is attributable to
      (a) that permanent establishment;
      (b) sales in that State of goods or merchandise of the same or similar kind as those sold through that permanent establishment; or
      (c) other business activities carried on in that State of the same or similar kind as those effected through that permanent establishment.

This limited force of attraction rule is similar to the rule in Article 7 of the U.N. Model. The rule in Article 7 of the U.S. Model is different, limiting the taxation of business profits to income attributable to that permanent establishment.

Paragraph 2 provides rules for the proper attribution of business profits to a permanent establishment. It provides that the Contracting States will attribute to a permanent establishment the profits which it would have earned had it been an independent entity, engaged in the same or similar activities under the same or similar circumstances and dealing wholly at arm's length with the enterprise of which it is a permanent establishment and other enterprises controlling, controlled by, or subject to the same control as that enterprise. The computation of the business profits attributable to a permanent establishment under this paragraph is subject to the rules of paragraph 3 for the allowance of expenses incurred for the purposes of earning the income. The profits attributable to a permanent establishment may be from sources within or without a

Contracting State. Thus, certain items of foreign source income described in section 864(c)(4)(B) of the Code may be attributed to a U.S. permanent establishment of an Indian enterprise and subject to tax in the United States. The concept of "attributable to" in the Convention is narrower than the concept of "effectively connected" in section 864(c) of the Code. The limited "force of attraction" rule in Code section 864(c)(3), therefore, is not applicable under the Convention.

Paragraph 2 concludes with two sentences not found in the comparable provision of the U.S. Model. These sentences state that the profits attributable to the permanent establishment may be estimated on a reasonable basis if the correct amount is either incapable of determination or exceptionally difficult to determine and if the result is in accordance with the principles contained in the business profits article. The United States expects that this rule would be applied only in unusual cases.

Paragraph III of the Protocol elaborates on paragraphs 1 and 2 of Article 7, paragraph 4 of Article 10 (Dividends), paragraph 5 of Article 11 (Interest), paragraph 6 of Article 12 (Royalties and Fees for Included Services), paragraph 1 of Article 15 (Independent Personal Services), and paragraph 2 of Article 23 (Other Income). This Protocol paragraph incorporates the principle of Code section 864(c)(6) into the Convention. Like the Code section on which it is based, Paragraph III of the protocol provides that any income or gain attributable to a permanent establishment (or, in the context of Articles 10, 11, 12, 15, and 23, a fixed base as well) during its existence is taxable in the Contracting State where the permanent establishment (or fixed base) is situated even if the payments are deferred until after the permanent establishment (or fixed base) no longer exists.

Paragraph 3 provides that in determining the business profits of a permanent establishment, deductions shall be allowed for expenses incurred for the purposes of the permanent establishment. Deductions are to be allowed regardless of where the expenses are incurred. The paragraph specifies that a deduction is to be allowed for a reasonable allocation of expenses for research and development, interest, executive and general administrative expenses and other expenses incurred for the purposes of the enterprise as a whole (or the part thereof which includes the permanent establishment). The language of this paragraph differs from that in the U.S. Model in one significant respect. Under the U.S. Model deductions are not subject to the limitations of local law which may conflict with the general principle of the paragraph. Paragraph 3 in the Convention provides for such deductions in accordance with the provisions of and subject to the limitations of the taxation laws of the State in which the permanent establishment is situated.

Indian law limits certain deductions of a permanent establishment with respect to head office expenditures. The deduction of amounts characterized as executive and general administration expenditures (not interest) is capped at five percent of the adjusted total income of the permanent establishment. This limitation was included in the Convention because of the difficulties India has had in verifying claimed deductions for head office expenses and because of the desire of the Indians to avoid litigation on this issue. In practice, the Indian taxing authority does not inquire extensively into deductions that do not exceed the five percent cap. The amount permitted to be deducted is understood by India to be an approximate average of head office executive and general administrative expense incurred by non-Indian companies for

the purpose of their permanent establishments in India. However, the rule does not provide absolute certainty that U.S. companies with a permanent establishment in India will be able to deduct from their income subject to Indian tax the entire amount of head office expense incurred for the purpose of the permanent establishment.

Ad Article 7 under Paragraph II of the protocol states the understanding of the Contracting States that the deduction of executive and general administrative expenses shall in no case be less than that allowable under the Indian Income Tax Act as on the date of signature of the Convention (September 12, 1989).

Paragraph 3 also states that, with two exceptions, a permanent establishment will not be allowed to deduct amounts it pays to the head office, or any other office, of the enterprise as royalties, fees or other similar payments in return for the use of patents, know-how or other rights, as commissions or other charges for specific services performed or for management, or as interest on moneys lent to the permanent establishment. The rule denying deductions for such payments does not apply to amounts paid as reimbursement of actual expenses or as interest on moneys lent to the permanent establishment of a banking enterprise. Such payments made by the head office or any other office of the enterprise to a permanent establishment are similarly treated in determining the permanent establishment's profits. This provision is similar to the rule in Article 7(3) of the U.N. Model.

Paragraph 4 provides that no business profits will be attributed to a permanent establishment merely because it purchases goods or merchandise for the enterprise of which it is a permanent establishment. This rule refers to a permanent establishment which performs more than one function for the enterprise, including purchasing. For example, the permanent establishment may purchase raw materials for the enterprise's manufacturing operation and sell the manufactured output. While business profits may be attributable to the permanent establishment with respect to its sales activities, no profits are attributable with respect to its purchasing activities. If the sole activity were the purchasing of goods or merchandise for the enterprise the issue of the attribution of income would not arise, because, under subparagraph 3(d) of Article 5 (Permanent Establishment), there would be no permanent establishment.

Paragraph 5 states that the business profits attributed to a permanent establishment are only those derived from its assets or activities. As noted in connection with paragraph 2 of this Article, the Code concept of effective connection, with its limited "force of attraction", is not incorporated into the Convention except to a limited extent as described in connection with paragraph 1 of this Article.

Paragraph 6 explains the relationship between the provisions of Article 7 and other provisions of the Convention. Under paragraph 6, where business profits include items of income that are dealt with separately under other articles of the Convention, the provisions of those articles will take precedence over the provisions of Article 7 except where those articles provide otherwise. Thus, for example, the taxation of interest will be determined by the rules of Article 11 (Interest), and not by Article 7, except where, as provided in paragraph 5 of Article 11, the interest is attributable to a permanent establishment, in which case the provisions of Article 7 apply.

Paragraph 7 defines the term "business profits" as used in the Convention to mean income derived from any trade or business including income from services other than "fees for included services" as defined in Article 12 (Royalties and Fees for Included Services) and including income from the rental of tangible personal property other than income from the rental of property described in paragraph 3(b) of Article 12. Thus, service income (other than fees for included services) is subject to tax in a Contracting State to the extent provided under Article 7, subject to the principle of paragraph 6, described above. Also, rental income from tangible personal property (other than payments received for the use of, or the right to use, any industrial, commercial, or scientific equipment) is subject to tax in a Contracting State to the extent provided under Article 7. The comparable provision in the U.S. Model provides a general definition which says that the term "business profits" means income derived from any trade or business. The definition in the Convention specifically identifies the residual categories of income from services and tangible personal property as business profits in order to clarify the interaction of Articles 7 and 12. The exclusion from the term "business profits" of fees for included services defined in Article 12 and rental of property described in paragraph 3(b) of Article 12 is intended to apply only in cases where paragraph 6 of Article 12 is inapplicable to such income items. In other words, where such income items are attributable to a permanent establishment in a Contracting State, such items shall be considered business profits to which Article 7 applies.

This Article is subject to the saving clause of paragraph 3 of Article 1 of the Convention. Thus, if, for example, a citizen of the United States who is a resident of India derives business profits from the United States which is not attributable to a permanent establishment in the United States, the United States may tax those profits as part of the worldwide income of the citizen, notwithstanding the provisions of this Article under which such income derived by a resident of India is exempt from U.S. tax.

ARTICLE 8
Shipping and Air Transport

This Article provides the rules which govern the taxation of profits from the operation of ships and aircraft in international traffic. The term "international traffic" is defined in paragraph 1(j) of Article 3 (General Definitions) to mean any transport by ship or aircraft operated by an enterprise of a Contracting State, except when the ship or aircraft is operated solely between places within the other Contracting State.

Paragraph 1 provides that profits derived by an enterprise of a Contracting State from the operation in international traffic of ships or aircraft shall be taxable only in that Contracting State. By virtue of paragraph 6 of Article 7 (Business Profits), profits of an enterprise of a Contracting State that are exempt in the other Contracting State under this paragraph remain exempt even if the enterprise has a permanent establishment in that other Contracting State.

Paragraph 2 defines profits from the operation of ships or aircraft in international traffic as profits derived by an enterprise described in paragraph 1 from the transportation by sea or air

respectively of passengers, mail, livestock or goods carried on by the owners or lessees or charterers of ships or aircraft. Such transportation includes the sale of tickets for such transportation on behalf of other enterprises, other activity directly connected with such transportation, and rental of ships or aircraft incidental to any activity directly connected with such transportation. Thus, income of an enterprise from the rental of ships or aircraft constitutes profits from the operation of ships or aircraft in international traffic only if it is incidental to the operation by the enterprise of ships or aircraft in international traffic. For example, under the Convention only bareboat leasing that is incidental to the operation by the enterprise of ships in international traffic is within the scope of Article 8. This provision is narrower than the provision in the U.S. Model, which covers not only rental profits that are incidental to transportation activities of the lessor but also any rental profits derived from the operation of ships or aircraft in international traffic by the lessee.

Paragraph 3 provides that the profits of an enterprise of a Contracting State described in paragraph 1 from the use, maintenance or rental of containers (including equipment for their transport) which are used for the transport of goods in international traffic will be exempt from tax in the other Contracting State. Thus, in order to qualify for the exemption, the recipient of the income must be engaged in the operation of ships or aircraft in international traffic and the container or related equipment must be used for the transport of goods in international traffic. The comparable provision in the U.S. Model (Article 8, paragraph 3) is not limited to situations in which the lessor is engaged in the operation of ships or aircraft in international traffic.

Paragraph 4 clarifies that the provisions of the preceding paragraphs apply equally to profits derived by an enterprise of a Contracting State from participation in a pool, joint business or international operating agency. As with any benefit of the Convention, the enterprise claiming the benefit must be entitled to the benefit under the provisions of Article 24 (Limitation on Benefits).

Paragraph 5 provides that interest on funds connected with the operation of ships or aircraft in international traffic are considered profits derived from the operation of ships or aircraft and that the provisions of Article 11 (Interest) will not apply in relation to such interest. This provision, which is not included in the U.S. Model, provides an exemption from tax in the source State for interest income derived from the working capital of the enterprise needed for the operation of ships or aircraft in international traffic.

Paragraph 6 provides that gains derived by an enterprise of a Contracting State described in paragraph 1 from the alienation of ships, aircraft and containers are taxable only in that State if the ships, aircraft and containers are owned and operated by the enterprise and the income from them is taxable only in that State. This provision is narrower than the comparable provision in the U.S. Model (paragraph 4 of Article 13 (Gains)) because the U.S. Model covers all gains from the alienation of ships, aircraft, or containers operated in international traffic.

This Article is subject to the saving clause of paragraph 3 of Article 1 of the Convention. The United States, therefore, may tax the shipping or air transport profits of a resident of India if that Indian resident is a citizen of the United States.

ARTICLE 9
Associated Enterprises

This Article incorporates into the Convention the general principles of section 482 of the Code. It provides that when related persons engage in transactions that are not at arm's length, the Contracting States may make appropriate adjustments to the taxable income and tax liability of such related persons to reflect what the income or tax of these persons with respect to such transactions would have been had there been an arm's length relationship between the persons.

Paragraph 1 deals with the circumstance where an enterprise of a Contracting State is related to an enterprise of the other Contracting State, and those related persons make arrangements or impose conditions between themselves in their commercial or financial relations which are different from those that would be made between independent persons dealing at arm's length. Paragraph 1 provides that, under those circumstances, the Contracting States may adjust the income (or loss) of the enterprise to reflect the income which would have been taken into account in the absence of such a relationship. The paragraph specifies what the term "related persons" means in this context. An enterprise of one Contracting State is related to an enterprise of the other Contracting State if either participates directly or indirectly in the management, control, or capital of the other. The two enterprises are also related if any third person or persons participate directly or indirectly in the management, control, or capital of both. The term "control" includes any kind of control, whether or not legally enforceable and however exercised or exercisable.

Paragraph 2 provides that, where a Contracting State has made an adjustment that is consistent with the provisions of paragraph 1 and the other Contracting State agrees that the adjustment was appropriate to reflect arm's length conditions, that other Contracting State is obligated to make a corresponding adjustment to the tax liability of the related person in that other Contracting State. The Contracting State making such an adjustment will take the other provisions of the Convention, where relevant, into account. Thus, for example, if the effect of a correlative adjustment is to treat an Indian corporation as having made a distribution of profits to its U.S. parent corporation, the provisions of Article 10 (Dividends) will apply, and India may impose a 15 percent withholding tax on the dividend. The competent authorities are authorized, if necessary, to consult to resolve any differences in the application of these provisions. For example, there may be a disagreement over whether an adjustment made by a Contracting State under paragraph 1 was appropriate.

If a correlative adjustment is made under paragraph 2, it is to be implemented, pursuant to paragraph 2 of Article 27 (Mutual Agreement Procedure), notwithstanding any time limits or other procedural limitations in the law of the Contracting State making the adjustment. The saving clause of paragraph 3 of Article 1 (General Scope) does not apply to paragraph 2 of Article 9 (see the exceptions to the saving clause in subparagraph (a) of paragraph 4 of Article 1). Thus, even if the statute of limitations has run, or there is a closing agreement between the Internal Revenue Service and the taxpayer, a refund of tax can be made in order to implement a correlative adjustment. Statutory or procedural limitations, however, cannot be overridden to impose additional tax, because, under subparagraph (a) of paragraph 2 of Article 1 of the

Convention, the Convention cannot restrict any statutory benefit.

Paragraph 3 of Article 9 of the U.S. Model is not included in the Convention. That paragraph of the U.S. Model preserves the rights of the Contracting States to apply internal law provisions relating to adjustments between related parties when necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such persons. That paragraph is intended merely to clarify that internal law arm's length provisions, such as the rules and procedures under section 482 of the Code, may be applied whether or not explicitly provided for in paragraph 1. The absence of paragraph 3 of the U.S. Model in the Convention, therefore, can not be viewed as casting doubt on the applicability of these statutory provisions.

It is understood that the "commensurate with income" standard for determining appropriate transfer prices for intangibles, added to Code section 482 by the Tax Reform Act of 1986, does not represent a departure in U.S. practice or policy from the arm's length standard. It merely suggests alternative approaches, beyond those spelled out in current regulations, for achieving appropriate transfer prices. It is anticipated, therefore, that the application of this standard by the Internal Revenue Service will be in accordance with the general principles of paragraph 1 of Article 9 of the Convention.


ARTICLE 10
Dividends

Article 10 provides rules for source, and in some cases residence, country taxation of dividends and similar amounts paid by a company resident in one Contracting State to a resident of the other Contracting State. Generally, the article limits the source country's right to tax dividends and amounts treated as dividends.

Paragraph 1 preserves the residence country's general right to tax dividends arising in the source country by permitting a Contracting State to tax its residents on dividends paid by a company that is a resident of the other Contracting State.

Paragraph 2 grants the source country the right to tax dividends paid by a company that is a resident of that country if the beneficial owner of the dividend is a resident of the other Contracting State. The source country tax, however, is limited to 15 percent of the gross amount of the dividend if the beneficial owner is a company that holds at least 10 percent of the voting shares of the company paying the dividend and 25 percent of the gross amount of the dividend in all other cases. The term "beneficial owner" is not defined in the Convention; it is, instead, defined by domestic law of the Contracting States. A nominee or agent which is a resident of a Contracting State may not claim the benefits of this Article if the dividend is received on behalf of a person who is not a resident of that Contracting State. However, dividends received by a nominee for the benefit of a resident would qualify for the benefits of this Article.

The second and third sentences of paragraph 2 relax the limitations on source country taxation for dividends paid by U.S. Regulated Investment Companies and Real Estate Investment Trusts. Dividends paid by Regulated Investment Companies are denied the 15 percent direct

dividend rate and subjected to the 25 percent portfolio dividend rate regardless of the percentage of voting shares held by the recipient of the dividend. Generally, the reduction of the dividend rate to 15 percent is intended to relieve multiple levels of corporate taxation in cases where the recipient of the dividend holds a substantial interest in the payer. Because Regulated Investment Companies and Real Estate Investment Trusts do not themselves generally pay corporate tax with respect to amounts distributed, the rate reduction from 25 to 15 percent cannot be justified by the "relief from multiple levels of corporate taxation" rationale. Further, although amounts received by a Regulated Investment Company may have been subject to U.S. corporate tax (e.g., dividends paid by a publicly traded U.S. company to a Regulated Investment Company), it is unlikely that a 10 percent shareholding in a Regulated Investment Company by an Indian resident will correspond to a 10 percent shareholding in the entity that has paid U.S. corporate tax (e.g., the publicly traded U.S. company). Thus, in the case of dividends received by a Regulated Investment Company and paid out to its shareholders the requirement of a substantial shareholding in the entity paying the corporate tax is generally lacking.

The third sentence of paragraph 2 further limits the availability of the 25 percent portfolio dividend rate in the case of dividends paid by Real Estate Investment Trusts. The 25 percent rate is available only to individual residents of India holding a less than 10 percent interest in the Real Estate Investment Trust. The exclusion of corporate shareholders and 10 percent or greater individual shareholders from the 25 percent portfolio rate is intended to prevent indirect investment in U.S. real property through a Real Estate Investment Trust from being treated more favorably than investment directly in such real property. Dividends paid by a Real Estate Investment Trust (other than amounts subject to tax as effectively connected income under section 897(h) of the Code) that are not entitled to the 25 percent portfolio rate are subject to the U.S. statutory rate of 30 percent.

Paragraph 2 does not affect the taxation of the profits out of which the dividends are paid.

Paragraph 3 defines the term dividends as used in Article 10 to mean the following: income from shares or other rights, not being debt-claims, participating in profits; income from other corporate rights which are subjected to the sane taxation treatment as income from shares by the laws of the Contracting State of which the company making the distribution is a resident; and income from arrangements, including debt obligations, carrying the right to participate in profits, to the extent so characterized under the laws of the source State.

Paragraph 4 provides that the provisions of paragraphs 1 and 2 of Article 10 shall not apply if the beneficial owner of the dividends, a resident of a Contracting State, carries on business in the other Contracting State, of which the company paying the dividends is a resident, through a permanent establishment situated there, or performs in that other State independent personal services from a fixed base situated there, and the dividends are attributable to such permanent establishment or fixed base. Paragraph 4 provides that, in such case, the provisions of Article 7 (Business Profits) or Article 15 (Independent Personal Services), as the case may be, shall apply.

Paragraph 4 excludes dividends paid with respect to holdings that form part of the business property of a permanent establishment or fixed base from the general source country

limitations. Such dividends will be taxed on a net basis using the rates and rules of taxation generally applicable to residents of the State in which the permanent establishment or fixed base is located, as modified by this article and Articles 7 (Business Profits) and 15 (Independent Personal Services).

Paragraph III of the Protocol elaborates on paragraph 4 of Article 10 by incorporating the principle of Code section 864(c)(6) into the Convention. Like the Code section on which it is based, Paragraph III of the Protocol provides that any income or gain attributable to a permanent establishment or fixed base during its existence is taxable in the Contracting State where the permanent establishment (or fixed base) is situated even if the permanent establishment or fixed base no longer exists.

Paragraph 5 bars one Contracting State from imposing any tax on dividends paid by a company resident in the other Contracting State except insofar as such dividends are otherwise subject to net basis taxation in the first-mentioned Contracting State because such dividends are paid to a resident of such first mentioned Contracting State or the holding in respect of which the dividends are paid forms part of the business property of a permanent establishment or fixed base situated in such first-mentioned State.

Notwithstanding the foregoing limitations on source country taxation of dividends, the saving clause of paragraph 3 of Article 1 of the Convention (General Scope) permits the United States to tax dividends received by its residents and citizens as if the Convention had not come into effect.


ARTICLE 11
Interest

Article 11 provides rules for source and residence country taxation of interest.

Paragraph 1 grants to the residence State the right to tax interest derived and beneficially owned by its residents.

Paragraph 2 grants to the source State the right to tax the interest payment. However, if the beneficial owner of the interest is a resident of the other Contracting State, the amount of the tax is limited to:
> (a) 10 percent of the gross amount of the interest that is paid on a loan granted by a bank carrying on a bona fide banking business or by a similar financial institution (including an insurance company); and
> (b) 15 percent of the gross amount of the interest in all other cases.

The term "beneficial owner" is not defined in the Convention; it is, instead, defined by domestic law of the Contracting States. A nominee or agent which is a resident of a Contracting State may not claim the benefits of this Article if the interest is received on behalf of a person who is not a resident of that Contracting State. However, interest received by a nominee for the benefit of a resident would qualify for the benefits of this Article.

Paragraph 2 differs from the comparable provision in the U.S. Model, which provides that only the residence State may tax interest derived and beneficially owned by a resident of a Contracting State, unless the interest is attributable to a permanent establishment or fixed base of the beneficial owner in the other Contracting State.

Paragraph 3 provides exceptions from the rule of paragraph 2 that allows a source country to tax. The exceptions apply to interest that is included in any of three categories. The first category of interest that is exempt from tax in the source State is interest that is derived and beneficially owned by the Government of the other Contracting State, a political subdivision or local authority thereof, the Reserve Bank of India, or the Federal Reserve Banks of the United States, as the case may be, and such other institutions of either Contracting State as the competent authorities may agree pursuant to Article 27 (Mutual Agreement procedure). The second category of interest that is exempt from tax in the source State is interest with respect to loans or credits extended or endorsed by the Export-Import Bank of the United States when the interest arises in India and by the EXIM Bank of India when the interest arises in India.

The third category of interest that is exempt from tax in the source State is interest derived and beneficially owned by a resident of the other Contracting State other than a person referred to in the first or second category if the transaction giving rise to the debt-claim has been approved in this behalf by the Government of the source State. The Indian delegation explained that a lender may apply to the Government of India for approval of the tax exemption. This category of interest is exempt under the Indian tax statute.

Paragraph 4 defines the term "interest" as used in Article 11 to include, *inter alia,* income from debt claims of every kind, whether or not secured by a mortgage, and whether or not carrying a right to participate in the debtor's profits, and in particular, income from government securities, and income from bonds or debentures, including premiums or prizes attaching to such securities, bonds, or debentures.

Penalty charges for late payment are excluded from the definition of interest. Income dealt within Article 10 (Dividends) is also excluded from the definition of interest. Thus, for example, income from a debt obligation carrying the right to participate in profits is not covered by Article 11 to the extent characterized as a dividend under the laws of the Contracting State in which the income arises. The definition of interest in the Convention differs from the definition of interest in the U.S. Model only as to the exclusion of amounts characterized as dividends under Article 10.

Paragraph 5 limits the right of one Contracting State to impose a gross bas 5 tax on interest payments where the beneficial owner of the interest is a person that is a resident of the other Contracting State. A gross basis tax may not be imposed if
(1) the person carries on a business in the Contracting State in which the interest arises through a permanent establishment situated there or performs in the Contracting State in which the interest arises independent personal services from a fixed base situated here and
(2) the interest is attributable to such permanent establishment or fixed base. In such cases the provisions of Article 7 (Business Profits) or Article 15 (Independent Personal Services)

will apply.

Paragraph III of the Protocol elaborates on paragraph 5 by incorporating the principle of Code section 864(c)(6) into the Convention. Like the Code section on which it is based, Paragraph III of the Protocol provides that any annual income or gain attributable to a permanent establishment or fixed base during its existence is taxable in the Contracting State where the permanent establishment or fixed base is situated even if the payments are deferred until after the permanent establishment or fixed base no longer exists.

Paragraph 6 provides a source rule for interest. It provides that interest shall be deemed to arise in a Contracting State when the payer is that State itself or a political subdivision, local authority, or resident of that State. The exception to the general rule that interest is sourced in the State of the payer's residence is the case in which the payer of the interest carries on business through a permanent establishment in the other State or performs independent personal services from a fixed base situated in the other State and the interest is borne by such permanent establishment or fixed base.

Thus, under Article 11 the United States may tax interest that is paid by a U.S. trade or business of a foreign corporation in the United States and attributable to the corporation's permanent establishment in the United States. As U.S. source interest paid, the interest is subject to tax at the rate provided in paragraph 2 when the beneficial owner is a resident of India. The tax allowed under the Convention on the excess interest of a corporation resident in India is not considered interest paid. The tax on excess interest is described in and subject to limitations of Article 14 (Permanent Establishment Tax).

Paragraph 7 provides that, in the case of interest paid by a person with a special relationship to the beneficial owner of the interest, Article 11 applies only to interest payments that would have been made absent such special relationship (i.e., an arm's length interest payment). Any excess amount of interest paid remains taxable according to the laws of the United States and India, respectively, with due regard to the other provisions of the Convention. Thus, for example, if the excess amount would be treated as a distribution of profits, such amount could be taxed as a dividend rather than as interest, but the tax would be subject to the rate limitations of paragraph 2 of Article 10 (Dividends).

Notwithstanding the limitations under Article 11 on source country taxation of interest, the saving clause of paragraph 3 of Article 1 (General Scope) permits the United States to tax its residents and citizens as if the Convention had not come into force.


ARTICLE 12
Royalties and Fees for Included Services

Article 12 provides rules for source and residence country taxation of royalties and fees for included services.

Paragraph 1 grants to the residence State the right to tax royalties and fees for included

services paid to its residents.

Paragraph 2 also grants to the source State the right to tax royalties and fees for included services according to its laws. However, if the beneficial owner of the royalties or fees or included services is a resident of the other Contracting State, the source State shall not impose a tax that exceeds certain limitations. Different limitations apply to payments of royalties and service fees depending the category to which the payments belong.

The first category of royalties and service fees consists of royalties defined in subparagraph (a) of paragraph 3 and fees for included services defined in paragraph 4, other than fees described in subparagraph (b) of paragraph 2. Subparagraph (a) of paragraph 2 limits the source State's right to tax such payments as follows. During the first five taxable years for which the Convention has effect, the source State's tax on the first category of royalties and fees may not exceed 15 percent of the gross amount of such royalties and fees if the payer of the royalties or fees is the Government, or a political subdivision or a public sector company, of a Contracting State. Otherwise the source State's tax is limited to 20 percent of the gross amount of such royalties or fees. During subsequent years, the source State's tax on the first category of royalties and fees may not exceed 15 percent.

The second category of royalties and service fees consists of royalties defined in subparagraph (b) of paragraph 3 (generally relating to payments for the use of, or the right to use, any industrial, commercial, or scientific equipment) and those fees for included services defined in paragraph 4 which are ancillary and subsidiary to the enjoyment of the property described in paragraph 3(b). Subparagraph (b) of paragraph 2 limits the source State's right to tax such payments to 10 percent of the gross amount during all years for which the Convention has effect.

Subparagraph (a) of paragraph 3 defines the term "royalties" as used in Article 12 to mean payments of any kind received as a consideration for the use of, or the right to use, any copyright of a literary, artistic, or scientific work, including cinematographic films or work on film, tape or other means of reproduction for use in connection with radio or television broadcasting, any patent, trademark, design or model, plan, secret formula or process, or for information concerning industrial, commercial, or scientific experience. The term "information concerning industrial, commercial, or scientific experience" alludes to the concept of know-how and means information that is not publicly available and that cannot be known from mere examination of a product and mere knowledge of the progress of technique. As provided in the Commentaries on the Articles of the OECD Model Convention (paragraph 12 of the Art. 12 Comm.): "In the know-how contract, one of the parties agrees to impart to the other, so that he can use them for his own account, his special knowledge and experience which remain unrevealed to the public".

The royalty definition under subparagraph (a) of paragraph 3 also applies to gains from the alienation of a right or property of the type described in that subparagraph only if the proceeds are contingent on the productivity, use, or further alienation thereof. Thus, a noncontingent payment for all rights to property described in subparagraph (a) is not a royalty.

The royalty definition in subparagraph (a) of paragraph 3 of the Convention differs from

the comparable provision in the U.S. Model in two respects. First, the Convention's royalty definition includes payments received in connection with the use or right to use cinematographic films or films or tapes used for radio or television broadcasting. Such payments are excluded from the royalty definition in the U.S. Model. Second, the Convention's royalty definition does not include "other like right or property" at the end of its listing of the types of rights for which a use payment is considered to be a royalty.

Subparagraph (b) of paragraph 3 includes within the definition of royalties payments of any kind received as consideration for the use of, or the right to use, any industrial, commercial, or scientific equipment, other than payments derived by an enterprise described in paragraph 1 of Article 8 (Shipping and Air Transport) from activities described in paragraph 2(c) or 3 of Article 8. The exclusion under Article 8 relates
(1) to income of an enterprise engaged in the operation of ships or aircraft in international traffic to the extent the income is from the operation by that enterprise of ships or aircraft in international traffic or to the extent the income is incidental to such an activity and
(2) to profits of an enterprise engaged in the operation of ships or aircraft in international traffic from the use, maintenance, or rental of containers and container equipment in connection with the operation of ships or aircraft in international traffic.

Paragraph 4 of Article 12 defines fees for included services to mean payments of any kind to any person in consideration for the rendering of any technical or consultancy services (including through the provision of services of technical or other personnel) if such services either
(a) are ancillary and subsidiary to the application or enjoyment of the right, property or information for which a payment described in paragraph 3 is received; or
(b) make available technical knowledge, experience, skill, know-how, or processes, or consist of the development and transfer of a technical plan or technical design.

Paragraph 5 of Article 12 excludes from the definition of included services any amount described in any of the following categories:
(a) for services that are ancillary and subsidiary, as well as inextricably and essentially linked, to the sale of property other than a sale described in paragraph 3(a);
(b) for services that are ancillary and subsidiary to the rental of ships, aircraft, containers or other equipment used in connection with the operation of ships or aircraft in international traffic;
(c) for teaching in or by educational institutions;
(d) for services for the personal use of the individual or individuals making the payment; or
(e) to an employee of the person making the payments or to any individual or firm of individuals (other than a company) for professional services as defined in Article 15 (Independent Personal Services).

Thus, the relationship between Article 12 and Article 15 (Independent Personal Services) is clear. A payment to an individual or firm of individuals, such as a partnership, for professional services is not subject to tax under Article 12.

With respect to service fees that are described in paragraph 4 and not excluded under paragraph 5 ("included services"), Article 12 permits the source State to impose tax in an amount not to exceed the rate of tax on the gross amount under paragraph 2, if the fees are not attributable to a permanent establishment or fixed base in the other State. All services attributable to a permanent establishment or a fixed base (whether or not falling within the defined category of "included services") and all services other than those within the defined category of included services" are considered to be business profits, which are taxable in the source State only to the extent provided in Article 7 (Business Profits). The treatment of service fees provided under Article 12 is a departure from the domestic law of both Contracting States. Under Indian statutory law, a broad range of service fees (fees for technical, managerial or consultancy services performed anywhere) is subject to a 30 percent gross basis tax. Under U.S. statutory law, fees for services performed inside the United States are subject to tax on a net basis if effectively connected with a U.S. trade or business of a nonresident alien or foreign corporation or on a gross basis (30 percent) only if not effectively connected. Paragraph IV of the Protocol (Ad Article 12) clarifies that, where fees for included services may be taxed by the United States under Article 12 but are subject to net basis taxation under internal U.S. law, the level of that net basis taxation (or, where applicable, the sum of that net basis tax and the amount of the tax allowable under paragraph 1 of Article 14 (Permanent Establishment Tax) with respect to those fees) shall not exceed the gross basis tax limitations imposed by paragraph 2 of Article 12. The term "fees for included services" is new under the Convention and is defined in the Convention rather than in the domestic law of either Contracting State.

As explained in the Diplomatic Note Relating to the Memorandum of Understanding on Article 12, a memorandum of understanding was developed by the negotiators indicating how the provisions of the Article relating to the scope of "included services" are to be understood both by the competent authorities and by taxpayers in the Contracting States. As further explained in the Diplomatic Note, this memorandum of understanding represents the views of the Governments of both Contracting States when the Convention was signed. Both Governments anticipated that, as the competent authorities and taxpayers gain more experience with the concept of fees for included services, further guidance would be developed and made public.

The memorandum of understanding describes in some detail the category of services defined in paragraph 4 of Article 12 (Royalties and Fees for Included Services). It also provides examples of services intended to be covered within the definition of included services and those intended to be excluded, either because they do not satisfy the tests of paragraph 4, or because, notwithstanding the fact that they meet the tests of paragraph 4, they are dealt with under paragraph 5. The examples in either case are not intended as an exhaustive list but rather as illustrating a few typical cases. For ease of understanding, the examples in the Memorandum describe U.S. persons providing services to Indian persons, but the rules of Article 12 are reciprocal in application.

The memorandum of understanding first defines the terms "technical services" and "consultancy services", which are the only types of services that are considered "included services" if they are described in subparagraph (a) or (b) of paragraph 4 and are not excluded under paragraph 5. A technical service means a service requiring expertise in a technology. A

consultancy service means an advisory service. These two categories are to some extent overlapping because a consultancy service could also be a technical service. However, the category of consultancy services also includes an advisory service, whether or not expertise in a technology is required to perform it.

The memorandum of understanding next explains the conditions, either of which must exist before a service can be considered described in paragraph 4.

Under paragraph 4, technical and consultancy services are considered included services only to the following extent:

(1) as described in paragraph 4(a), if they are ancillary and subsidiary to the application or enjoyment of a right, property or information for which a royalty payment is made; or

(2) as described in paragraph 4(b), if they make available technical knowledge, experience, skill, know-how, or processes, or consist of the development and transfer of a technical plan or technical design. Thus, under paragraph 4(b), consultancy services which are not of a technical nature cannot be included services.

Paragraph 4(a) of Article 12 refers to technical or consultancy services that are ancillary and subsidiary to the application or enjoyment of any right, property$_1$ or information for which a payment described in paragraph 3(a) or (b) is received. Thus, paragraph 4(a) includes technical and consultancy services that are ancillary and subsidiary to the application or enjoyment of an intangible for which a royalty is received under a license or sale as described in paragraph 3(a), rather than as a royalty payment6 and the tax imposed on the dividend payment would be subject to the rate limitations of paragraph 2 of Article 10 (Dividends).

Notwithstanding the foregoing limitations on source country taxation of royalties, paragraph 3 of Article 1 (General Scope) permits the United States to tax its citizens and residents as if the Convention had not come into effect.

ARTICLE 13
Gains

Article 13 provides that, except as provided in Article 8 (Shipping and Air Transport), each Contracting State may tax capital gains in accordance with the provisions of its domestic law.

The sole exception to the general rule relates to the taxation of gains of an enterprise operated by a resident of a Contracting State where the gains are derived from the alienation of ships, aircraft, or containers owned and operated by the enterprise, the income from which is taxable only in that State (i.e., income from the operation of such ships, aircraft, or containers in international traffic). Such gains shall be taxable only in the Contracting State in which the profits of the enterprise deriving such income are taxable according to Article 8. Article 8 exempts such income from source country taxation.

There is nothing in this article that precludes the imposition of any tax in force under U.S.

domestic law or enacted in the future except the exemption of gains described in Article 8. Thus, for example, the United States preserves its right to impose the tax under section 897 of the Code on gains derived by foreign persons from the disposition of United States real property interests, the tax under section 871(a)(2) on capital gains of aliens present in the United States 183 days or more, the tax under section 872 or 882 on capital gain of a nonresident alien or foreign corporation that is effectively connected 'with the conduct of a U.S. trade or business, the withholding tax on a foreign partner's allocable portion of effectively connected taxable income consisting of gain.

Notwithstanding the foregoing limitations on source country taxation of certain gains, paragraph 3 of Article 1 (General Scope) permits the United States to tax its citizens and residents as if the Convention had not come into effect.

ARTICLE 14
Permanent Establishment Tax

Article 14 provides for the imposition by the Contracting States of a permanent establishment or branch tax. Paragraph 1 of Article 14 confirms the right of the United States to impose a tax on the deemed distribution of certain profits of an Indian resident corporation with a U.S. trade or business and on the excess interest of such a corporation. Paragraphs 2 and 3, as well as those ancillary and subsidiary to the application or enjoyment of industrial, commercial, or scientific equipment for which a royalty is received under a lease as described in paragraph 3(b).

It is understood that, in order for a service fee to be considered "ancillary and subsidiary" to the application or enjoyment of some right, property, or information for which a payment described in paragraph 3(a) or (b) is received, the service must be related to the application or enjoyment of the right, property, or information. In addition, the clearly predominant purpose of the arrangement under which the payment of the service fee and such other payment are made must be the application or enjoyment of the right, property, or information described in paragraph 3. The question of whether the service is related to the application or enjoyment of the right, property, or information described in paragraph 3 and whether the clearly predominant purpose of the arrangement is such application or enjoyment must be determined by reference to the facts and circumstances of each case. Factors which may be relevant to such determination (although not necessarily controlling) include:

1. the extent to which the services in question facilitate the effective application or enjoyment of the right, property, or information described in paragraph 3;

2. the extent to which such services are customarily provided in the ordinary course of business arrangements involving royalties described in paragraph 3;

3. whether the amount paid for the services (or which would be paid by parties operating at arm's length) is an insubstantial portion of the combined payments for the services and the right, property, or information described paragraph 3;

4. whether the payment made for the services and the royalty described in paragraph 3 are made under a single contract (or a set of related contracts); and

5. whether the person performing the services is the same person as, or a related person

to, the person receiving the royalties described in paragraph 3 (for this purpose, persons are considered related if their relationship is described in Article 9 (Associated Enterprises) or if the person providing the service is doing so in connection with an overall arrangement which includes the payer and recipient of the royalties).

To the extent that services are not considered ancillary and subsidiary to the application or enjoyment of some right, property, or information for which a royalty payment under paragraph 3 is made, such services shall be considered "included services" only to the extent that they are described in paragraph 4(b).

The memorandum of understanding presented two examples of the application of paragraph 4(a). The first example illustrates services that are "included services

Example (1)

Facts:        U.S. manufacturer grants rights to an Indian company to use manufacturing processes in which the transferor has exclusive rights by virtue of process patents or the protection otherwise extended by law to the owner of a process. As part of the contractual arrangement, the U.S. manufacturer agrees to provide certain consultancy services to the Indian company in order to improve the effectiveness of the latter's use of the processes. Such services include, for example, the provision of information and advice on sources of supply for materials needed in the manufacturing process, and on the development of sales and service literature for the manufactured product. The payments allocable to such services do not form a substantial part of the total consideration payable under the contractual arrangement. Are the payments for these services fees for "included services"?

Analysis:     The payments are fees for included services. The services described in this example are ancillary and subsidiary to the use of a manufacturing process protected by law as described in paragraph 3(a) of Article 12 because the services are related to the application or enjoyment of the intangible and the granting of the right to use the intangible is the clearly predominant purpose of the arrangement. Because the services are ancillary and subsidiary to the use of the manufacturing process, the fees for these services are considered fees for included services under paragraph 4(a) of Article 12, regardless of whether the services are described in paragraph 4(b).

Example 1 illustrates the application of paragraph 4(a) using services that are not also described in paragraph 4(b). These services are not described in section 4(b) because they do not make available technical knowledge, experience, skill, know-how, or processes, or consist of the development and transfer of a technical plan or technical design. The services described in Example 1 are limited to the provision of procurement and marketing information.

The second example illustrates services which are not "included services".

Example (2)

Facts:          An Indian manufacturing company produces a product that must be manufactured under sterile conditions using machinery that must be kept completely free of bacterial or other harmful deposits. A U.S. company has developed a special cleaning process for removing such deposits from that type of machinery. The U.S. company enters into a contract with the Indian company under which the former will clean the latter's machinery on a regular basis. As part of the arrangement, the U.S. company leases to the Indian company a piece of equipment which allows the Indian company to measure the level of bacterial deposits on its machinery in order for it to know when cleaning is required. Are the payments for the services fees for included services?

Analysis:       In this example, the provision of cleaning services by the U.S. company and the rental of the monitoring equipment are related to each other. However, the clearly predominant purpose of the arrangement is the provision of cleaning services. Thus, although the cleaning services might be considered technical services, they are not "ancillary and subsidiary" to the rental of the monitoring equipment. Accordingly, the cleaning services are not "included services within the meaning of paragraph 4(a).

Example 2 illustrates the treatment of a service that could be considered technical in nature but that is not described in paragraph 4(b) because it does not make available (as described below) to the purchaser technical knowledge or a technical plan, design or process. Because the service described in Example 2 is not "included services" within the meaning of example 4(a) or (b), it is not subject to tax under Article 12. The service is, therefore, taxable in India only to the extent provided under Article 7 (Business Profits) or Article 15 (Independent Personal Services).

Paragraph 4(b) of Article 12 refers to technical or consultancy services that make available to the person acquiring the service technical knowledge, experience, skill, know-how, or processes, or consist of the development and transfer of a technical plan or technical design to such person. The memorandum of understanding explains that, for this purpose, the person acquiring the service shall be deemed to include an agent, nominee, or transferee of such person. The category described in paragraph 4(b) is narrower than the category described in paragraph 4(a) because it excludes any service that does not make technology available to the person acquiring the service.

The memorandum of understanding states that generally technology will be considered "made available" when the person acquiring the service is enabled to apply the technology. The fact that the provision of the service may require technical input by the person providing the service does not *per se* mean that technical knowledge, skills, etc. are made available to the person purchasing the service, within the meaning of paragraph 4(b). Similarly, the use of a product which embodies technology shall not per se be considered to make the technology available.

As described in the memorandum of understanding, typical categories of services that

generally involve either the development and transfer of technical plans or technical designs, or making technology available as described in paragraph 4(b), include:

    1. engineering services (including the subcategories of bioengineering and aeronautical, agricultural, ceramics, chemical, civil, electrical, mechanical, metallurgical, and industrial engineering);

    2. architectural services; and

    3. computer software development.

    As explained in the memorandum of understanding, technical and consultancy services could make technology available in a variety of settings, activities and industries. Such services may, for example, relate to any of the following areas:

    1. bio-technical services;

    2. food processing;

    3. environmental and ecological services;

    4. communication through satellite or otherwise;

    5. energy conservation;

    6. exploration or exploitation of mineral oil or natural gas;

    7. geological surveys;

    8. scientific services; and

    9. technical training.

    The memorandum of understanding provides examples (Examples 3 - 12) in order to indicate the scope of the conditions in paragraph 4(b):

Example (3)

| | |
|---|---|
| Facts: | A U.S. manufacturer has experience in the use of a process for manufacturing wallboard for interior walls of houses which is more durable than the standard products of its type. An Indian builder wishes to produce this product for its own use. It rents a plant and contracts with the U.S. company to send experts to India to show engineers in the Indian company how to produce the extra-strong wallboard. The U.S. contractors work with the technicians in the Indian firm for a few months. Are the payments to the U.S. firm considered to be payments for "included services"? |
| Analysis: | The payments would be fees for included services. The services are of a technical or consultancy nature; in the example they have elements of both types of services. The services make available to the Indian company technical knowledge, skill, and processes. |

Example (4)

| | |
|---|---|
| Facts: | A U.S. manufacturer operates a wallboard fabrication plant outside India. An Indian builder hires the U.S. company to produce wallboard at that plant for a fee. The Indian company provides the raw materials, and the U.S. manufacturer fabricates the wallboard in its plant, using advanced technology. Arc the fees in |

this example payments for included services?

Analysis:     The fees would not be for included services. Although the U.S. company is clearly performing a technical service, no technical knowledge, skills, etc., are made available to the Indian company, nor is there any development and transfer of a technical plan or design. The U.S. company is merely performing a contract manufacturing service.

## Example (5)

Facts:     An Indian firm owns inventory control software for use in its chain of retail outlets throughout India. It expands its sales operation by employing a team of traveling salesmen to travel around the countryside selling the company's wares. The company wants to modify its software to permit the salesmen to access the company's central computers for information on what products are available in inventory and when they can be delivered. The Indian firm hires a U.S. computer-programming firm to modify its software for this purpose. Are the fees which the Indian firm pays treated as fees for included services?

Analysis:     The fees are for included services. The U.S. company clearly performs a technical service for the Indian company, and it transfers to the Indian company the technical plan (i.e., the computer program) which it has developed.

## Example (6)

Facts:     An Indian vegetable oil manufacturing company wants to produce a cholesterol-free oil from a plant which produces oil normally containing cholesterol. An American company has developed a process for refining the cholesterol out of the oil. The Indian company contracts with the U.S. company to modify the formulas which it uses so as to eliminate the cholesterol, and to train the employees of the Indian company in applying the new formulas. Are the fees paid by the Indian company for included services?

Analysis:     The fees are for included services. The services are technical, and the technical knowledge is made available to the Indian company.

## Example (7)

Facts:     The Indian vegetable oil manufacturing firm has mastered the science of producing cholesterol-free oil and wishes to market the product worldwide. It hires an American marketing consulting firm to do a computer simulation of the world market for such oil advise it on marketing strategies. Are the to the U.S. company for included services?

Analysis:     The fees would not be for included services. The American company is providing

a consultancy service which involves the use of substantial technical skill and expertise. It is not, however, making available to the Indian company any technical experience, knowledge or skill, etc., nor is it transferring a technical plan or design. What is transferred to the Indian company through the service contract is commercial information. The fact that technical skills were required by the performer of the service in order to perform the commercial information service does not make the service a technical service within the meaning of 4(b).

Examples 3, 5 and 6 illustrate services that would be described in paragraph 4(b). Example 3 refers to services that could be considered typical of the type of service that is described in that paragraph because the Indian builder is paying to have a technical process made available to it. Examples 5 and 6 illustrate other services, each of which is technical in nature under circumstances in which a technical process is made available to the purchaser.

Examples 4 and 7, however, do not illustrate a service that is described in paragraph 4(b) because, although performing each service requires technical knowledge and skill, no technical knowledge, plan, design or process is made available to the purchaser. In Example 4, the technical knowledge used in making wallboard is retained by the U.S. company acting as a contract manufacturer in the transaction. The Indian purchaser is paying for the manufacture of a product by the U.S. company -- a type of commercial service. Similarly, in Example 7, the technical knowledge required to complete a computer survey of the world market for a product is retained by the marketing consultant. The Indian purchaser is paying for a commercial service.

Under subparagraphs (a) through (e), paragraph 5 of Article 12 describes several categories of services which are not intended to be treated as included services even if they otherwise satisfy the tests of paragraph 4. The memorandum of understanding provides examples of cases where fees would be included under paragraph 4, but are excluded because of the application of one of the conditions of paragraph 5.

Example (8)

Facts:          An Indian company purchases a computer from a U.S. computer manufacturer. As part of the purchase agreement, the manufacturer agrees to assist the Indian company in setting up the computer and installing the operating system, and to ensure that the staff of the Indian company is able to operate the computer. Also as part of the purchase agreement, the seller agrees to provide, for a period of ten years, any updates to the operating system and any training necessary to apply the update. Both of these service elements to the contract would qualify under paragraph 4(b) as an included service. Would either or both be excluded from the category of included services, under paragraph 5(a), because they are ancillary and subsidiary, as well as inextricably and essentially linked, to the sale of the computer?

Analysis:       The installation assistance and initial training are ancillary and subsidiary to the sale of the computer, and they are also inextricably and essentially linked to the sale. The computer would be of little value to the Indian purchaser without these

services, which are most readily and usefully provided by the seller. The fees for installation assistance and initial training, therefore, are not fees for included services, since these services are not the predominant purpose of the arrangement.

The services of updating the operating system and providing associated necessary training may well be ancillary and subsidiary to the sale of the computer but they are not inextricably and essentially linked to the sale Without the upgrades, the computer will continue to operate as it did when purchased, and will continue to accomplish the same functions. Acquiring the updates cannot, therefore, be said to be inextricably and essentially linked to the sale of the computer.

Example (9)

Facts:       An Indian hospital purchases an X-ray machine from a U.S. manufacturer. As part of the purchase agreement, the manufacturer agrees to install the machine, to perform an initial inspection of the machine in India, to train hospital staff in the use of the machine, and to service the machine periodically during the usual warranty period (2 years). Under an optional service contract purchased by the hospital, the manufacturer also agrees to perform certain other services throughout the life of the machine, including periodic inspections and repair services, advising the hospital about developments in X-ray film or techniques which could improve the effectiveness of the machine, and training hospital staff in the application of those new developments. The cost of the initial installation, inspection, training, and warranty service is relatively minor as compared with the cost of the X-ray machine. Is any of the service described here ancillary and subsidiary, as well as inextricably and essentially linked, to the sale of the x-ray machine?

Analysis:    The initial installation, inspection, and training services in India and the periodic service during the warranty period are ancillary and subsidiary, as well as inextricably and essentially linked, to the sale of the X-ray machine because the usefulness of the machine to the hospital depends on this service, the manufacturer has full responsibility during this period, and the cost of the services is a relatively minor component of the contract. Therefore, under paragraph 5(a) these fees are not fees for included services, regardless of whether they otherwise would fall within paragraph 4(b).

Neither the post-warranty period inspection and repair services, nor the advisory and training services relating to new developments are "inextricably and essentially linked" to the initial purchase of the X-ray machine. Accordingly, fees for these services may be treated as fees for included services if they meet the tests of paragraph 4(b).

Example (10)

Facts:       An Indian automobile manufacturer decides to expand into the manufacture of

helicopters. It sends a group of engineers from its design staff to a course of study conducted by MIT for two years to study aeronautical engineering. The Indian firm pays tuition fees to MIT on behalf of the firm's employees. Is the tuition fee a fee for an included service within the meaning of Article 12?

Analysis:  The tuition fee is clearly intended to acquire a technical service for the firm. However, the fee paid is for teaching by an educational institution, and is, therefore, under paragraph 5(c), not an included service. It is irrelevant for this purpose whether MIT conducts the course on its campus or at some other location.

Example (11)

Facts:  As in Example (10), the automobile manufacturer wishes to expand into the manufacture of helicopters. It approaches an Indian university about establishing a course of study in aeronautical engineering. The university contracts with a U.S. helicopter manufacturer to send an engineer to be a visiting professor of aeronautical engineering on its faculty for a year. Are the amounts paid by the university for these teaching services fees for included services?

Analysis:  The fees are for teaching in an educational institution. As such, pursuant to paragraph 5(c), they are not fees for included services.

Example (12)

Facts:  An Indian wishes to install a computerized system in his home to control lighting, heating and air conditioning, a stereo sound system and a burglar and fire alarm system. He hires an American electrical engineering firm to design the necessary wiring system, adapt standard software, and provide instructions for installation. Are the fees paid to the American firm by the Indian individual fees for included services?

Analysis:  The services in respect of which the fees are paid are of the type which would generally be treated as fees for included services under paragraph 4(b). However, because the services are for the personal use of the individual making the payment, under paragraph 5(d) the payments would not be fees for included services.

Paragraph 6 of Article 12 provides an exception from the applicability of paragraphs 1 and 2. This exception applies where the beneficial owner of the royalties carries on business through a permanent establishment in the source State or performs independent personal services from a fixed base situated in the source State and the royalties or fees for included services are attributable to such permanent establishment or fixed base. In such cases the provisions of Article 7 (Business profits) or Article 15 (Independent personal Services) will apply and the source State will generally retain the right to tax such royalties on a net basis rather than a gross basis.

Paragraph III of the Protocol elaborates on paragraph 6 by incorporating into the Convention the principle of Code section 864(c)(6). Like the Code section on which it is based, Paragraph III of the Protocol provides that any income or gain attributable to a permanent establishment or fixed base during its existence is taxable in the Contracting State where the permanent establishment or fixed base is situated even if the payments are deferred until after the permanent establishment or fixed base no longer exists.

Paragraph 7 of Article 12 provides source rules for royalties and fees for included services. Under subparagraph (a), royalties and fees for included services will be deemed to arise in a contracting State when the payer is that State itself, a political subdivision, a local authority, or a resident of that State. Where the payer is a nonresident of a Contracting State that has a permanent establishment or fixed base in the Contracting State in connection with which the liability to pay the royalties and fees for related services, was incurred and the amounts are borne by the permanent establishment or fixed base, then the royalties and fees will be deemed to arise in the Contracting State in which the permanent establishment or fixed base is situated. Thus a royalty payment by a resident of India is sourced in India unless the payer has a permanent establishment or fixed base in the United States and the payment is both in satisfaction of a liability incurred in connection with the permanent establishment or fixed base and borne by the permanent establishment or fixed base.

Under subparagraph (b), a royalty that does not arise in one of the Contracting States under subparagraph (a) and that relates to the use of, or the right to use, a right or property in one of the Contracting States will be deemed to arise in that State. Similarly, a fee for included services that does not arise in one of the Contracting States under subparagraph (a) and that relates to services performed in one of the Contracting States will be deemed to arise in that State. Thus, for example, a royalty that is paid by an individual who is an Indian citizen and German resident will be deemed to arise in India if the payment is for the use of a right in India, even if the German resident has no permanent establishment or fixed base in India. Such a royalty will be deemed to arise in the United States if it is for the use of a right in the United States.

Paragraph 8 provides that, in cases involving special relationships between the payer and beneficial owner of a royalty, Article 12 applies only to the extent of royalty payments that would have been made absent such special relationships (i.e., an arm's length royalty payment). Any excess amount of royalties paid remains taxable according to the laws of the United States and India, respectively, with due regard to the other provisions of the Convention. Thus, for example, if the excess amount is treated as a distribution of profits under national law, such excess amount will be taxed as a dividend respectively, of Article 14 confirm the right of India to subject a U.S. company to tax in India at a rate higher than that applicable to Indian companies and to tax the Interest paid to a banking company's head office by a permanent establishment in India of the U.S. bank.

The base of the U.S. permanent establishment tax described in subparagraph (a)(i) of paragraph 1 is the "dividend equivalent amount". The Convention does not define this term, which is defined under section 884(b) of the Code and the regulations thereunder. Generally the

dividend equivalent amount is the earnings and profits of the foreign corporation that are effectively connected with the conduct of its trade or business in the United States after payment of the corporate income tax, decreased by any increase during the taxable year in the corporation's U.S. assets ("U.S. net equity") or increased by any decrease in its U.S. net equity.

Under the Convention, the dividend equivalent amount is roughly the amount that would be distributed as a dividend if the permanent establishment were operating as a locally incorporated subsidiary, subject to several adjustments. The dividend equivalent amount is determined taking into account not only effectively connected profits (or profits that are deemed to be effectively connected) that are attributable to a permanent establishment in the United States but also profits from the disposition or operation of real estate which are subject to net basis income taxation in the United States under Article 6 (Income from Immovable Property (Real Property)) or Article 13 (Gains), as well as fees for included services if the United States is permitted to tax them under Article 12 (Royalties and Fees for Included Services).

Paragraph V of the Protocol (Ad Article 14) emphasizes that such profits described in Articles 6, 12, 13, are only taken into account in paragraph 1 to the extent to which the profits are subject to U.S. tax based on net income (i.e., by virtue of being effectively connected, or being treated as effectively connected, with the conduct of a trade or business in the United States). Any income which is subject to tax under those Articles based on gross income is not subject to tax under Article 14.

Determining the dividend equivalent amount taking into account fees for included services that are not attributable to a permanent establishment of an Indian company in the United states is appropriate because India imposes a high gross basis tax on such fees paid to a U.S. company to the extent the fees are not attributable to a permanent establishment of the company in India. The total U.S. tax imposed with respect to fees for such included services may not exceed the limitation provided under paragraph 2 of Article 12.

Thus, for example, the United States may impose a permanent establishment tax under subparagraph (a)(i) of paragraph 1 on the business profits of an Indian company attributable to a permanent establishment in the United States. In addition. the United States may impose this tax on income of an Indian corporation that is, in accordance with the Convention, subject to taxation under internal U.S. law on a net basis either because the Indian corporation has elected under Code section 882(d) to treat income from real property not otherwise taxed on a net basis as effectively connected income or because the income is gain which is taxable on a net basis, such as gain that arises from the disposition of a United States Real Property Interest (although not including, under current U.S. law, an interest in a United States corporation). Finally, the United States may impose this tax on income from services that are subject to U.S. tax under Article 12. The United States may not impose its branch tax on the business profits of an Indian corporation that are effectively connected with a U.S. trade or business but that are not included within any of the above-described categories.

The rationale for the net equity adjustment to the permanent establishment tax provided in subparagraph (a)(i) of paragraph 1 is that the corporation decreases the amount of earnings available to the home office to the extent it increases its U.S. net equity (i.e., to the extent it

reinvests its U.S. earnings in its U.S. business). Conversely, the corporation increases the amount of earnings available to the home office to the extent it decreases its U.S. net equity (i.e., to the extent it withdraws from the United States its previously reinvested earnings).

Subparagraph (a)(ii) of paragraph 1 provides for the imposition of the U.S. tax on excess interest. Under section 884(f)(l)(B) of the Code, excess interest is the excess of the total amount allowable as a deduction in computing the U.S. effectively connected income of a foreign corporation over the total interest paid by the foreign corporation's U.S. trade or business. Under the Convention, the tax on excess interest applies only to the excess of interest which is deductible

(1) in computing the U.S. tax on net profits that are attributable to a permanent establishment of an Indian corporation in the United States and

(2) in computing the U.S. tax on net income or gain from real property (although not including, under current U.S. law, gain on shares in a domestic corporation) and fees for included services, over the interest paid by the foreign corporation's U.S. permanent establishment or U.S. trade or business.

It is understood that interest paid is determined without regard to capitalized interest. The excess interest tax can be viewed as a withholding tax on deemed interest payments from the U.S. branch of a foreign corporation to its head office.

Subparagraph (c)(i) of paragraph 1 provides that the rate applicable to the permanent establishment tax described in subparagraph (a)(i) shall not exceed the rate provided in paragraph 2(a) of Article 10 (Dividends). Thus, the rate shall not exceed 15 percent of the dividend equivalent amount.

Subparagraph (c)(ii) of paragraph 1 provides that the rate applicable to the excess interest tax described in subparagraph (a)(ii) shall not exceed the rate specified in paragraph 2(a) or (b) of Article 11 (Interest). Thus, the rate shall not exceed 10 percent if imposed on a bank carrying on a bona fide banking business or a similar financial institution (including an insurance company) ; the rate shall not exceed 15 percent in all other cases.

In the case of India, paragraph 2 provides that a company which is a resident of the United States may be subject to tax in India at a rate higher than that applicable to Indian companies. The maximum difference between the tax rate imposed on a U.S. and an Indian company shall not, however, exceed the difference of 15 percentage points that existed at the time the treaty was signed.

Under paragraph 3, India may impose a tax on interest considered under Indian law to be paid by a permanent establishment in India of a banking company that is a U.S. resident to the head office of such company. However, the rate shall not exceed the rate specified in paragraph 2(a) of Article 11 (Interest). Thus, the rate shall not exceed 10 percent. Such interest is deductible in determining the profits of the banking company's permanent establishment in India under Indian law and paragraph 3 of Article 7 (Business Profits).

ARTICLE 15
Independent Personal Services

The Convention deals in separate articles with different classes of income from personal services. Article 15 deals with the general class of income from independent personal services, and Article 16 (Dependent Personal Services) deals with the general class of dependent personal service income. Exceptions or additions to these general rules are found in Articles 16 through 20 for directors' fees (Article 17); income earned by entertainers and athletes (Article 18); remunerations and pensions in respect of government service (Article 19); private pensions, annuities, alimony, and child support payments (Article 20); payments received by students and apprentices (Article 21); and payments received by professors, teachers, and research scholars (Article 22).

Article 15 provides the rule that an individual or firm of individuals (other than a company) who is a resident of a Contracting State and who derives income from the performance of professional services or other independent activities of a similar character will be exempt from tax in respect of that income by the other Contracting State unless certain conditions are satisfied. The income may be taxed in the other Contracting State if the person has a fixed base regularly available to him in the other Contracting State for the purpose of performing his activities and the income is attributable to that fixed base or if the person stays in the other Contracting State for a period or periods amounting to or exceeding in the aggregate 90 days in the relevant taxable year.

If, however, the individual is an Indian resident who performs independent personal services in the United States, and he is also a U.S. citizen, the United States may, by virtue of the saving clause of paragraph 3 of Article 1 (General Scope) tax his income without regard to the restrictions of this Article.

Amounts described in this Article are not subject to tax under Article 12 (Royalties and Fees for Included Services).

The term "fixed base" is not defined in the Convention, but its meaning is understood to be analogous to that of the term "permanent establishment", as defined in Article S (Permanent Establishment). Similarly, some rules of Article 7 (Business profits) for attributing income and expenses to a permanent establishment are relevant for attributing income to a fixed base. However, the taxing right conferred by this Article with respect to income from independent personal services is somewhat more limited than that provided in Article 7 for the taxation of business profits. Both Articles 7 and 15 provide that a Contracting State may tax certain income of a resident of the other Contracting State which is attributable to a permanent establishment or fixed base in the first State. In Article 15, however the income must be attributable to services performed in the first State, while Article 7 does not require that all of the income-generating activities be performed in the State where the permanent establishment is located.

Paragraph 2 notes that the term "professional services" includes independent scientific, literary, artistic, educational or teaching activities as well as the independent activities of physicians, lawyers, engineers, architects, dentists, and accountants. Other independent activities

of a similar character are also covered by this Article. Article 15 applies to all such services performed by an individual for his own account or by a firm of individuals, where the individual or firm of individuals receives the income and bears the risk of loss arising from the services. The taxation of income of an individual from those types of independent services which are covered by Articles 17 through 22 is governed by the provisions of those Articles.

Paragraph III of the protocol (Ad Articles 7, 10, 11, 12, 15, and 23) refers to Article 15. With regard to this Article, Paragraph III of the protocol states the understanding of the Contracting States that income which is attributable to a fixed base, but is deferred and received after the fixed base no longer exists, may, nevertheless, be taxed by the State in which the fixed base was located. It permits the United States to apply Code 864(c)(6)

ARTICLE 16
Dependent Personal Services

This Article deals with the taxation of remuneration derived by a resident of a Contracting State as an employee.

Under paragraph 1, remuneration derived by an individual who is a resident of a Contracting State as an employee may be taxed by his State of residence. To the extent his remuneration is derived from an employment exercised in the other Contracting State, the remuneration may also be taxed by that other Contracting State, subject to the conditions specified in paragraph 2. Consistent with the general rule of construction that the more specific rule takes precedence over the more general, income dealt within Articles 17 (Directors' Fees), 18 (Income earned by Entertainers and Athletes), 19 (Remuneration and Pensions in Respect of Government Service), 20 (Private Pensions, Annuities, Alimony and Child Support), 21 (Payments received by Students and Apprentices) and 22 (Payments Received by Professors, Teachers and Research Scholars) is governed by the provisions of those Articles rather than this Article.

Under paragraph 2, even where the remuneration of a resident of a Contracting State (described in paragraph 1) is derived from sources within the other Contracting State (i.e., the services are performed there), that other State may not tax the remuneration if three conditions are satisfied:
(1) the individual is present in the other Contracting State for a period or periods not exceeding in the aggregate 183 days in the relevant taxable year;
(2) the remuneration is paid by, or on behalf of, an employer who is not a resident of that other Contracting State; and
(3) the remuneration is not borne by a permanent establishment or fixed base that the employer has in that other State.

If a foreign employer pays the salary of an employee, but a host country corporation or permanent establishment reimburses the foreign employer in a deductible payment which can be identified as a reimbursement, neither condition (2) nor (3), as the case may be, will be considered to have been fulfilled. Conditions (2) and (3) are intended to ensure that a Contracting

State will not be required both to allow a deduction to the payer for the amount paid and to exempt the employee on the amount received. In order for the remuneration to be exempt from tax in the source State, all three conditions must be satisfied.

Paragraph 3 contains a special rule applicable to remuneration for services performed by an individual who is a resident of a Contracting State as an employee aboard a ship or aircraft operated in international traffic. Such remuneration may be taxed only in the Contracting State of residence of the person carrying on the enterprise. This paragraph does not apply to the performance of services by an employee of an enterprise other than the enterprise operating the ship or aircraft in international traffic, such as an insurance salesman who is employed by an insurance company to sell insurance aboard a ship or aircraft.

This paragraph does not grant an exclusive taxing right. In this respect, it differs from the comparable provision in the U.S. Model and is like the comparable provision in the OECD Model. The comparable paragraph in the OECD Model provides a different rule in one respect, however. Under paragraph 3 in the OECD Model such income may be taxed on a non-exclusive basis in the Contracting State in which the place of effective management of the employing enterprise is situated. The United States does not use this rule in its Model, because under U.S. law, a taxing right over an employee of an enterprise managed in the United States (or an employee of a U.S. resident) cannot be exercised with respect to non-U.S. source income unless the employee is also a U.S. citizen or resident.

If a U.S. citizen who is resident in India performs dependent services in the United States and meets the conditions of paragraph 2, and would, therefore, be exempt from U.S. tax were he not a U.S. citizen, he is, nevertheless, subject to U.S. tax on his remuneration by virtue of the saving clause of paragraph 3 of Article 1 (General Scope) of the Convention.

ARTICLE 17
Directors' Fees

This Article provides that a Contracting State may tax the fees paid by a company which is a resident of that State for services performed by an individual resident of the other Contracting State in his capacity as a director of the company. This rule is an exception to the more general rules of Article 15 (Independent Personal Services) and Article 16 (Dependent Personal Services). Thus, for example, in determining whether a non-employee director's fee is subject to tax in the country of residence of the corporation, whether the fee is attributable to a fixed base is not relevant.

The U.S. Model has no comparable provision. The preferred U.S. policy is to treat a corporate director in the same manner as any other individual performing personal services -- outside directors would be subject to the provisions of Article 15 (Independent Personal Services) and inside directors would be subject to the provisions of Article 16 (Dependent Personal Services). The preferred Indian position, on the other hand, is that reflected in the OECD Model, in which a resident of one Contracting State who is a director of a corporation which is resident in the other Contracting State is subject to tax in that other State in respect of

his directors' fees regardless of where the services are performed. The provision in Article 17 of the Convention represents the Indian position.

This Article does not grant an exclusive taxing right, nor does it limit the effect of the saving clause of paragraph 3 of Article 1 (General Scope) of the Convention. Thus, if a U.S. citizen is a director of an Indian corporation, the United States may tax his full remuneration, subject, of course, to any foreign tax credit that may be available under the limits of domestic law.


ARTICLE 18
Income Earned by Entertainers And Athletes

This Article deals with the taxation in a Contracting State of performing artists, entertainers and athletes resident in the other Contracting State from the performance of their services as such. The Article applies both to the income of an entertainer or athlete who performs services on his own behalf and one who performs his services on behalf of another person, either as an employee of that person, or pursuant to any other arrangement. The rules of this Article take precedence over those of Articles 15 (Independent Personal Services) and 16 (Dependent Personal Services). This Article applies, however, only with respect to the income of performing artists, entertainers and athletes. Others involved in a performance or athletic event, such as producers, directors, technicians, managers, coaches, etc., remain subject to the provisions of Articles 15 and 16.

Paragraph 1 describes the circumstances in which a Contracting State may tax the performance income of an entertainer or athlete who is a resident of the other Contracting State. Under the paragraph, income derived by a resident of a Contracting State from his personal activities as an entertainer, such as a theatre motion picture, radio or television artiste, or a musician, or as an athlete exercised in the other Contracting State may be taxed in that other State if the amount of the net income derived by the individual (after deduction of all expense incurred by him in connection with his visit and performance) exceeds $1,500 (or its equivalent in Indian Rupees) for the taxable year. If the net income exceeds $1,500, the full amount, not just the excess, may be taxed in the State of performance.

The OECD Model provides for taxation by the country of performance of the remuneration of entertainers or athletes with no dollar or time threshold. The United States introduces the dollar threshold test in its treaties to distinguish between two groups of entertainers and athletes -- those who are paid very large sums of money for very short periods of service, and who would, therefore, normally be exempt from host country tax under the standard personal services income rules, and those who earn only modest amounts and are, therefore, not clearly distinguishable from those who earn other types of personal service income.

Paragraph 1 applies notwithstanding the provisions of Articles 7 (Business Profits), 15 (Independent Personal Services) or 16 (Dependent Personal Services). Thus, if an individual would otherwise be exempt from tax under those Articles, but is subject to tax under this Article, he may be taxed. An entertainer or athlete who receives less than the $1,500 threshold amount,

and who is, therefore, not affected by this Article, may, nevertheless, be subject to tax in the host country under Articles 15 or 16 if the tests for taxability under those Articles are met. For example, if an entertainer who is an independent contractor earns only $1,400 of income for the calendar year, but the income is attributable to a fixed base regularly available to him in the State of performance, that State may tax his income under Article 15.

Since it is frequently not possible to know until year end whether the income an entertainer or athlete derived from performance in a Contracting State will exceed $1,500, nothing in the Convention precludes that Contracting State from withholding tax during the year and refunding after the close of the year if the taxability threshold has not been met. If, at the end of the year, it is determined that the entertainer or athlete is not subject to tax in that Contracting State under the provisions of paragraph 1 of Article 18, that State is obligated to refund the tax withheld only upon application at the end of the taxable year concerned.

Income derived from a Contracting State by an entertainer or athlete who is a resident of the other Contracting State in connection with his activities as such, but from other than actual performance, such as royalties from record sales and payments for product endorsements, is not covered by this Article, but by other articles of the Convention, as appropriate, such as Article 12 (Royalties and Fees for Included Services) or Article 15 (Independent Personal Services). For example, if an entertainer receives royalty income from the sale of recordings of a concert given in a State, the royalty income would be subject to the provisions of Article 12. Thus, the royalty income would be subject to a gross basis withholding tax by the source State (provided the royalties are not attributable to a fixed base of the entertainer in that State), even if the remuneration from the concert itself may have been covered by Article 18.

Paragraph 2 is intended to deal with the potential for abuse when income from a performance by an entertainer or athlete does not accrue to the performer himself, but to another person. Foreign entertainers commonly perform in the United States as employees of, or under contract with, a company or other person. The relationship may truly be one of employee and employer, with no abuse of the tax system either intended or realized. On the other hand, the "employer" may, for example, be a company established and owned by the performer, which is merely acting as the nominal income recipient in respect of the remuneration for the entertainer's performance. The entertainer may be acting as an "employee", receiving a modest salary, and arranging to receive the remainder of the income from his performance in another form or at a later time. In such case, absent the provisions of paragraph 2, the company providing the entertainers services can escape host country tax because it earns business profits but has no permanent establishment in that country. The entertainer may largely or entirely escape host country tax by receiving only a small salary in the year the services are performed, perhaps small enough to place him below the dollar threshold in paragraph 1. He would arrange to receive further payments in a later year, when he is not subject to host country tax, perhaps as salary payments, dividends or liquidating distributions.

Paragraph 2 seeks to prevent this type of abuse while at the same time protecting the taxpayers' rights to the benefits of the Convention when there is a legitimate employee-employer relationship between the performer and the person providing his services. Under paragraph 2, when the income accrues to a person other than the performer, and the performer (or persons

related to him) participate, directly or indirectly, in the profits of that other person, the income nay be taxed in the Contracting State where the performer's services are exercised, without regard to the provisions of the Convention concerning business profits (Article 7) or independent personal services (Article 15). Thus, even if the "employer" has no permanent establishment or fixed base in the host country, its income may be subject to tax there under the provisions of paragraph:2. Taxation under paragraph 2 is on the person providing the services of the entertainer or athlete. This paragraph does not affect the rules of paragraph 1, which apply to the entertainer or athlete himself. To the extent of salary payments to the performer, which are treated under paragraph 1, the income taxable by virtue of paragraph 2 to the person providing his services is reduced.

For purposes of paragraph 2, income is deemed to accrue to another person (i.e., the person providing the services of the entertainer or athlete), if that other person has control over, or the right to receive, gross income in respect of the services of the entertainer or athlete. Direct or indirect participation in the profits of a person is defined to include, but is not limited to, the accrual or receipt of deferred remuneration, bonuses, fees, dividends, partnership income or other income or distributions.

The paragraph 2 override of the protection of Articles 7 (Business Profits) and 15 (Independent Personal Services) does not apply if it is established that neither the entertainer or athlete, nor any persons related to the entertainer or athlete, participate directly or indirectly in the profits of the person providing the services of the entertainer or athlete. Thus, for example, if a theatrical company owned by a U.S. corporation performs in New Delhi, the Indian promoters of the performance pay the theatrical company, which, in turn, pays salaries to the actors. The theater company has no permanent establishment in India. Since the actors do not participate in the profits of the company, but merely receive their salaries out of the theatrical company's gross receipts, the theatrical company is protected by Article 7 and its income is not subject to Indian tax. Whether the actors are subject to Indian tax depends on whether they exceed the $1,500 threshold in paragraph 1. This exception for non-abusive cases to the paragraph 2 override of the Articles 7 and 15 protection of persons providing the services of entertainers and athletes is not found in the OECD Model. The policy reflected in this exception is, however, consistent with the stated intent of Article 17 of that Model, as indicated in its Commentaries. The Commentaries to Article 17 state that paragraph 2 is intended to counteract certain tax avoidance devices, in which income is diverted from the performer to another person in order to minimize the total tax on the remuneration. It is, therefore, consistent not to apply these rules in non-abusive cases.

Paragraph 3 of the Article is not found in the U.S. or OECD Models. It provides an exception to the rules in paragraphs 1 and 2 in the case of a visit to a Contracting State by an entertainer or athlete who is a resident of the other Contracting State, if the visit is wholly or substantially supported from the public funds of his State of residence or of a political subdivision or local authority of that State. In the circumstances described, only the Contracting State of residence of the entertainer or athlete may tax his income from the performances so supported in the other State.

Paragraph 4 of the Article is also not found in the U.S. or OECD Models. It provides that the competent authorities of the Contracting States may, by mutual agreement, increase the

dollar amounts referred to in paragraph 1 to reflect economic or monetary developments. It is intended that this provision be used to ensure that the threshold for taxation under this Article is not effectively eliminated through inflation.

This article is subject to the provisions of the saving clause of paragraph 3 of Article 1 (General Scope). Thus, if an entertainer or athlete who is resident in India is a citizen of the United States, the United States may tax all of his income from performances in the United States without regard to the provisions of this Article.

ARTICLE 19
Remuneration and Pensions in Respect of Government Service

Subparagraphs (a) and (b) of paragraph 1 deal with the taxation of government compensation (other than a pension). Subparagraph (a) provides that wages, salaries, and similar compensation paid by a Contracting State or by its political subdivisions or local authorities to any individual are exempt from tax by the other Contracting State. Under subparagraph (b), such payments shall, however, be taxable in the other Contracting State, and only in that State, if the services are rendered in that other State and the individual is a resident of that State who is either a national of that State or a person who did not become resident of that State solely for purposes of rendering the services.

Paragraph 2 deals with the taxation of a pension paid by, or out of funds created by, a Contracting State or a political subdivision or a local authority thereof to an individual in respect of services rendered to that state or subdivision or authority. Subparagraph (a) provides that such a pension shall be taxable only in that State. Subparagraph (b) provides an exception under which such a pension shall be taxable only in the other Contracting State if the individual is a resident of, and a national of, that other State. Pensions paid to retired civilian and military employees of a government of either Contracting State are intended to be covered under paragraph 2. Social security and similar benefits paid by a Contracting State in respect of services rendered to that State or a subdivision or authority are also intended to be covered.

Paragraphs 1 and 2 are similar to paragraphs 1 and 2 of Article 19 (Government Service) of the OECD and the U.N. Model Treaties. These paragraphs differ from Article 19 of the U.S. Model under which such remuneration, including a pension, is taxable only in the Contracting State that pays it.

Paragraph 3 provides that the provisions of Articles 16 (Dependent Personal Services), 17 (Directors' Fees), 18 (Income Earned by Entertainers and Athletes) and 20 (Private Pensions, Annuities, Alimony and Child Support) shall apply to remuneration and pensions in respect of services rendered in connection with a business carried on by a Contracting State or a political subdivision or a local authority thereof. This treatment is consistent with the U.S., OECD and U.N. Model Treaties, all of which exclude payments in respect of services rendered in connection with a business carried on by the governmental entity paying the compensation or pension.

Under paragraph 4 (b) of Article 1 (General Scope), the saving clause (paragraph 3 of Article 1) does not apply to the benefits conferred under Article 19 if the recipient of the benefits is neither a U.S. citizen nor has immigrant status in the United States. Thus, for example, an Indian resident who receives a pension paid by India in respect of services rendered to India shall be taxable on this pension only in India unless the individual is a U.S. citizen or acquires immigrant status in the United States.

ARTICLE 20

Private Pensions, Annuities, Alimony and Child Support

This Article deals with the taxation of private (i.e., non-government) pensions, annuities, alimony payments, and child support payments. The rules of this Article do not apply to items of income which are dealt within Article 19 (Remuneration and Pensions in Respect of Government Service), including pensions or social security benefits in respect of government service.

Paragraph 1 provides that private pensions and any annuities derived by a resident of a Contracting State from sources within the other Contracting State are taxable only in the State of residence of the recipient.

Paragraph 2 provides a different rule for social security benefits and other public pensions (other than those which are dealt within Article 19) paid by a Contracting State to a resident of the other Contracting State or a citizen of the United States. Such payments are taxable only in the Contracting State that pays them.

Paragraph 3 defines the term "pension" for purposes of mean a periodic payment made in consideration of or by way of compensation for injuries received in performance of services. Thus, the definition the pension definition a single lump-sum payment.

Paragraph 4 defines the term "annuity" for purposes of Article 20 to mean stated sums payable periodically at stated times during life or during a specified or ascertainable number of years, under an obligation to make the payments in return for adequate and full consideration in money or money's worth (but not for services rendered).

Paragraph 5 deals with alimony payments. It provides that alimony paid to a resident of a Contracting State shall be taxable only in that State. The term "alimony" as used in this paragraph means periodic payments made pursuant to a written separation agreement or a decree of divorce, separate maintenance, or compulsory support, which payments are taxable to the recipient under the laws of the State of which he is a resident. Under U.S. law, alimony is generally deductible to the payer and taxable in the hands of the recipient. Such payments made by Indian residents, therefore, fall within the terms of paragraph 5, and are taxable only in the United States.

Paragraph 6 deals with periodic payments for the support of a minor child made pursuant to a written separation agreement or a decree of divorce, separate maintenance or compulsory support. Paragraph 6 provides that such child support payments paid to a resident of a

Contracting State by a resident of the other Contracting State shall be taxable only in the State of the payer's residence.

This Article 20 is identical to Article 20 of the U.S. Model except that this Article 20 contains a definition of the term "pension"; under this definition, a payment must be, among other things, a periodic payment in order to qualify. Thus, all payments under this Article (pensions, annuities, alimony and child support) must be periodic payments, and a single lump-sum payment does not qualify. A pension under the U.S. Model is considered to include a single lump-sum payment. A single lump-sum payment received under a pension plan would be treated as other income under Article 23. Thus, such a payment would be taxable only in the Contracting 3tate of which the income recipient is a resident unless the income arises in the other Contracting State. Income that arises in the other State may also be taxed by that other State.

Paragraphs 2 (concerning social security benefits and other public pensions) and 6 (concerning child support payments) of Article 20 are not subject to the saving clause of paragraph 3 of Article 1 (General Scope) of the Convention. The benefits of these paragraphs, therefore, are not overridden by any contrary provisions of the Code. Thus, if, for example, a U.S. citizen who is resident in the United States receives a social security benefit payment from the Indian Government or a child support payment from an Indian resident, that payment is exempt from U.S. tax under paragraph 3 of Article 1, notwithstanding the existence of a tax liability under the Code.


ARTICLE 21
Payments Received by Students and Apprentices

Paragraph 1 deals with a student or business apprentice who is or was a resident of one of the Contracting States immediately before visiting the other Contracting State and who is present in that other State principally for the purpose of his education or training. In this case, the student or business apprentice shall be exempt from tax in that other State on payments which arise outside that other State for purposes of his maintenance, education or training.

By "payments which arise outside that other State", we mean payments other than those borne by a permanent establishment in the United States or paid by a U.S. citizen or resident (including, for this purpose, the Government of the United States or any of its political subdivisions or local authorities, or any agency or instrumentality of such Government). Paragraph 1 does not cover a deductible payment by a U.S. company to an Indian business apprentice who is present in the United States principally for the purpose of training.

Paragraph 2 provides that, in regard to grants, scholarships and remuneration from employment not covered by paragraph 1, a student or business apprentice described in paragraph 1 shall also be entitled during such education or training to the sane exemptions, reliefs or reductions in respect of taxes available to residents of the State which he is visiting. Thus, the Indian business apprentice in the example above is entitled to the same exemptions, reliefs or reductions from U.S. tax that are available to U.S. residents with regard to a similar payment. Paragraph 2 is not found in the comparable provision of the U.S. Model Treaty. It conforms to

paragraph 2 of Article 20 (Payments received by students and apprentices) of the U.N. Model.

If a student who is resident in a Contracting State remains in the other State for a period of time exceeding the period during which he is present principally for the purpose of his education or training, the Contracting State which he is visiting may tax the individual under its national law, but only for the period after the purpose of the student's visit has changed.

Paragraph 3 provides that the benefits of this article shall extend only for such period of time as may be reasonable or customarily required to complete the education or training undertaken. This paragraph is not found in either the U.S. or the U.N. model. It was included in the Convention to ensure that the benefits of Article 21 are received only where the educational or training program is not unusually prolonged. In such a case, the principal purpose of the student's or apprentice's presence in a Contracting State would not be his education or training.

Paragraph 4 provides that, for purposes of this Article, an individual shall be deemed to be a resident of a Contracting State if he is resident in that Contracting State in the taxable year in which he visits the other Contracting State or in the immediately preceding taxable year. Thus, a student visiting the United States from India is considered to be a resident of India if he is so resident in the year he arrives in the United States or in the year immediately preceding his arrival in the United States.

By virtue of the exception to the saving clause in paragraph 4)(b) of Article 1 (General Scope) of the Convention, the saving clause does not apply with respect to a person entitled to U.S. benefits under the provisions of this Article if that person is neither a U.S. citizen nor has immigrant status in the United States. Thus, for example, an Indian resident who visits the United States as a student and becomes a U.S. resident according to the Code, other than by virtue of acquiring a green card, would continue to be exempt from U.S. tax in accordance with this Article so long as he is not a U.S. citizen and does not acquire immigrant status in the United States. The saving clause does apply to U.S. citizens and immigrants.


## ARTICLE 22
### Payments Received by Professors, Teachers, and Research Scholars

Paragraph 1 provides an exemption from tax in a Contracting State for an individual who visits that State for a period not exceeding two years for the purpose of teaching or engaging in research at a university, college or other recognized educational institution in that State if the individual is a resident of the other Contracting State immediately before his visit begins. The exemption applies to any remuneration for such teaching or research. The exemption from tax applies for a period not exceeding two years from the date he first visits the Contracting State (the "host State") for the purpose of teaching or engaging in research at a university, college or other recognized educational institution there.

The host State exemption will apply if the teaching or research is carried on at an accredited university, college, school or other recognized educational institution.

Paragraph 2 provides that Article 22 shall apply to income from research only if such research is undertaken by the individual in the public interest and not primarily for the benefit of some other private person or persons.

If a professor or teacher remains in the host State for more than the specified two-year period, he may be subject to tax in that State, under its law, for the entire period of his presence.

There is no provision in the U.S., U.N., or OECD Model dealing with professors or teachers. It is not standard U.S. treaty policy to provide benefits to visiting teachers by treaty. When, however, the treaty partner wishes to include such a provision, the United States will frequently agree, particularly, as in this case, when the treaty partner is a developing country.

By virtue of the exception to the saving clause in paragraph 4)(b) of Article 1 (General Scope) of the Convention, the saving clause does not apply with respect to a person entitled to U.S. benefits under the provisions of this Article if that person is neither a U.S. citizen nor has immigrant status in the United States. Thus, for example, am Indian resident who visits the United States as a professor and becomes a U.S. resident according to the Code, other than by virtue of acquiring a green card, would continue to be exempt from U.S. tax in accordance with this article so long as he is not a U.S. citizen and does not acquire immigrant status in the United States. The saving clause does apply to U.S. citizens and immigrants.

ARTICLE 23
Other Income

This Article provides the rules for the taxation of items of income not dealt within the other Articles of the Convention. An item of income is "dealt with" in an Article when items in the same category are addressed or defined in the Article, whether or not any treaty benefit is granted to that item of income. This Article deals both with types of income which are not dealt with elsewhere, such as, for example, lottery winnings, and also with income of a type dealt with elsewhere in the Convention, but from sources in third States, and, therefore, not covered by the other Articles.

Paragraph 1 contains the general rule that such items of income derived by a resident of a Contracting State will be taxable only in the State of residence. This exclusive right of taxation applies irrespective of whether the residence State exercises its right to tax the income covered by the Article. The rule of this paragraph, granting exclusive taxation rights to the residence State, is modified by paragraphs 2 and 3.

Paragraph 2 contains an exception to the general rule of paragraph 1 for income, other than income from real property, which is attributable to a permanent establishment or fixed base maintained in a Contracting State by a resident of the other Contracting State. The taxation of such income is governed by the provisions of Articles 7 (Business Profits) or 15 (Independent Personal Services). Thus, In general, third-country income which is attributable to a permanent establishment maintained in the United States by a resident of India would be taxable by the United States. There is an exception to this rule for income from real property, as defined in

paragraph 2 of Article 6 (Income from Immovable Property (Real Property)). If an Indian resident derives income from real property located in a third State which is attributable to the resident's permanent establishment or fixed base in the United States, only India and not the United States may tax that income. (See the explanation above, of Article 7 (Business Profits) for a discussion of Paragraph III of the Protocol as it applies to paragraph 2 of this Article.)

Paragraph 3 modifies the exclusive residence State taxation right to tax "other income" granted by paragraph 1, and the rules of paragraph 2 relating to the taxation of "other income" attributable to a permanent establishment or fixed base. Under this paragraph, "other income" which arises in a Contracting State may be taxed by that State even if it is received by a resident of the other Contracting State. This is not an exclusive taxing right; the residence State may continue to tax. Any resulting double taxation is taken care of by the provisions of Article 25 (Relief from Double Taxation). This rule is taken from the U.N. Model, and is consistent with the rules of several other U.S. treaties.

This Article is subject to the saving clause of paragraph 3 of Article 1 (General Scope) of the Convention. Thus, the United States may tax the income of a resident of India not dealt with elsewhere in the Convention, if that Indian resident is a citizen of the United States.

ARTICLE 24
Limitation on Benefits

Article 24 ensures that source basis tax benefits granted by a Contracting State pursuant to the Convention are limited to the intended beneficiaries -- residents of the other Contracting State -- and are not extended indirectly to residents of third States not having a substantial business in, or business nexus with, the other Contracting State. For example, a resident of a third State might establish an entity resident in a Contracting State for the purpose of deriving income from the other Contracting State and claiming source State benefits with respect to that income. Absent Article 24, the entity would generally be entitled to benefits as a resident of a Contracting State, subject, however, to such limitations (e.g., business purpose, substance-over-form, step transaction or conduit principles) as may be applicable to the transaction or arrangement under the domestic law of the source State.

Paragraph 1 provides a two-part test, the so-called ownership and base erosion tests, both of which must be met by a person (other than an individual) if that person is to be entitled to benefits under this paragraph. If a person fails to qualify under this paragraph, benefits may still be granted if the person qualifies under the provisions of paragraphs 2 through 4. Under the tests of paragraph 1, benefits will be granted to a resident of a Contracting State, such as a corporation, partnership or trust, if both

(1) more than 50 percent of the beneficial interest in the person (or in the case of a corporation, more than 50 percent of each class of its shares) is owned, directly or indirectly, by individuals who are subject to tax in one of the Contracting States on worldwide income, or by one of the Contracting States, its political subdivisions or local authorities, and

(2) the person's income is not used in substantial part, directly or indirectly, to meet liabilities (including liabilities for interest or royalties) in the form of deductible payments to

persons, other than persons who are residents of a Contracting State, U.S. citizens, or a Contracting State, political subdivision or local authority.

The first test would be satisfied if a corporation claiming benefits is owned by another corporation which itself is owned (either directly or through additional tiers) by individual residents of a Contracting State, or other qualified owners under subparagraph 1(a). The term "substantial" is not defined. Deductible payments which are less than 50 percent of the relevant income, however, will generally not be considered substantial, although in appropriate circumstances a lower percentage of income will be considered substantial. It is understood that the term "income", as used in subparagraph (b) is to be interpreted as "gross income" under U.S. law, as determined without regard to the residence of the income recipient. Thus, in general, the tern should be understood to mean gross receipts less cost of goods sold.

The rationale for this two-part test is that since treaty benefits can be indirectly enjoyed not only by equity holders of an entity, but also by that entity's various classes of obligees, such as lenders, licensors, service providers, insurers and reinsurers, and others, it is not enough, in order to prevent such benefits from inuring substantially to third-country residents, merely to require substantial ownership of the entity by treaty country residents or their equivalent. It is also necessary to require that the entity's deductible payments be made in substantial part to such treaty country residents or their equivalents. For example, a third-country resident could lend funds to an Indian-owned Indian corporation to be reloaned to the United States. The U.S. source interest income of the Indian corporation would be subject to reduced U.S. withholding tax under Article 11 (Interest) of the Convention. While the Indian corporation would be subject to Indian corporation income tax, its taxable income could be reduced to near zero by the deductible interest paid to the third-country resident. If, under a Convention between India and the third country, that interest is subject to reduced Indian tax, a substantial portion of the U.S. treaty benefit with respect to the U.S. source interest income will have flowed to the third-country resident.

Under paragraph 1, individuals who are residents of a Contracting State are, without further testing, entitled to benefits. It is most unlikely that an individual would be used to derive treaty-benefited income, as the beneficial owner of the income, on behalf of a third-country person. If an individual is receiving income as a nominee on behalf of a third-country resident, benefits will be denied with respect to those items of income under the articles of the Convention which grant the benefit, because of the requirements in those articles that the beneficial owner of the income be a resident of a Contracting State.

Paragraph 2 provides a test for eligibility for benefits which looks not solely at objective characteristics of the person deriving the income, but at the nature of the activity engaged in by that person and the connection between the income and that activity. Under the paragraph, a resident of a Contracting State deriving income from the other Contracting State is entitled to benefits, regardless of the income recipient's ownership, if the recipient is engaged in an active trade or business in its State of residence, and the item of income in question is derived in connection with, or is incidental to, that trade or business. The U.S. tax authorities can be expected to interpret this provision with some flexibility. Thus, for example, if an Indian parent corporation derives income from a U.S. subsidiary, and the income is derived in connection with

activities in India carried on by an Indian subsidiary of the parent, the business connection would be deemed to be present. Income which is derived in connection with, or is incidental to, the business of making or managing investments will not qualify for benefits under this provision, unless the business is a bank or insurance company engaged in banking or insurance activities.

In general, it is expected that if a person qualifies for benefits under paragraphs 1 or 3, no inquiry will be made into whether the person qualifies for benefits under paragraph 2. If any of the other tests of Article 24 are satisfied, all items of income derived by the beneficial owner from the other Contracting State are entitled to treaty benefits. Under paragraph 2, however, the test is applied separately for each item of income.

It is intended that the provisions of paragraph 2 will be self-executing. Unlike the provisions of paragraph 4, discussed below, claiming benefits under this paragraph does not require advance competent authority ruling or approval. The tax authorities may, of course, on review, determine that the taxpayer has improperly interpreted the paragraph and is not entitled to the benefits claimed.

Under paragraph 3, a corporation which is a resident of a Contracting State is entitled to treaty benefits from the other Contracting State if there is substantial and regular trading in the corporation's principal class of shares on-a recognized stock exchange. Benefits are granted to such a corporation whether or not the ownership and base erosion tests of paragraph 1, or the business connection tests of paragraph 2, are met. The term recognized stock exchange" is defined in paragraph 3 of the Article to mean, in the United States, the NASDAQ System and any stock exchange which is registered as a national securities exchange with the Securities and Exchange Commission, and, in India, any stock exchange which is recognized by the Central Government under the Securities Contracts Regulation Act, 1956. The competent authorities may, by mutual agreement, recognize additional exchanges for purposes of paragraph 3.

Paragraph 4 provides that a resident of a Contracting State that derives income from the other Contracting State and is not entitled to the benefits of the Convention under other provisions of the Article may, nevertheless, be granted benefits at the discretion of the competent authority of the Contracting State in which the income arises.

The paragraph itself provides no guidance to competent authorities or taxpayers as to how the discretionary authority is to be exercised. It is understood, however, that in making determinations under paragraph 2, the competent authorities will take into account all relevant facts and circumstances. The factual criteria which the competent authorities are expected to take into account include the existence of a clear business purpose for the structure and location of the income earning entity in question; the conduct of an active trade or business (as opposed to a mere investment activity) by such entity; and a valid business nexus between that entity and the activity giving rise to the income.

It is assumed that, for purposes of implementing paragraph 2, a taxpayer will be permitted to present his case to the source State's competent authority for an advance determination based on the facts, and will not be required to wait until the tax authorities of one of the Contracting States have determined that benefits are denied. In these circumstances, it is

also expected that if the competent authority determines that benefits are to be allowed, they will be allowed retroactively to the time of entry into force of the relevant treaty provision or the establishment of the structure in question, whichever is later, provided that the taxpayer is otherwise entitled to claim such retroactive benefits.


ARTICLE 25
Relief from Double Taxation

This Article describes the manner in which each Contracting States undertakes to relieve double taxation. Both countries use the foreign tax credit method.

In paragraph 1, the United States agrees to allow to its citizens and residents a credit against U.S. tax for Income taxes paid or accrued to India. The credit under the Convention is allowed in accordance with the provisions and subject to the limitations of U.S. law, as that law may be amended over time, so long as the general principle of this Article, i.e., the allowance of a credit, is retained. Thus, although the Convention provides for a foreign tax credit, the terms of the credit are determined by the provisions, at the time a credit is given, of the U.S. statutory credit.

Paragraph 1 also provides for a deemed-paid credit, consistent with section 902 of the Code, to a U.S. corporation in respect of dividends received from an Indian corporation in which the U.S. corporation owns at least 10 percent of the voting shares. This credit is for the tax paid by the Indian corporation on the earnings out of which the dividends are considered paid.

The paragraph makes clear that all of the Indian taxes specified in Article 2 (Taxes Covered) as Indian covered taxes (including those taxes enacted subsequent to signature which become covered under paragraph 2 of Article 2 by virtue of being identical or substantially similar to covered taxes) are to be considered as income taxes for purposes of the U.S. foreign tax credit under the Convention. It is not U.S. policy to allow credit by treaty for taxes which are not creditable under the Code, and it was the understanding of the negotiators that all of these Indian taxes would be creditable taxes under the Code as well.

As indicated, the U.S. credit under the Convention is subject to the limitations of U.S. law, which generally limit the credit against U.S. tax to the amount of U.S. tax due with respect to net foreign source income within the relevant foreign tax credit limitation category (see Code section 904(a)). Nothing in the Convention prevents the limitation of the U.S. credit from being applied on a per-country or overall basis or on some variation thereof.

Paragraph 2 of the Article specifies the rules by which India, in imposing tax on its residents, provides a credit for U.S. taxes. It provides that India will allow a credit against Indian income tax for U.S. income taxes paid, whether by assessment or withholding at source, up to the amount of the Indian tax on the income in respect of which U.S. tax has been paid. It further provides that where the Indian resident claiming the credit is a corporation subject to surtax, the credit is to be claimed first against the income tax and only the excess can be claimed against the surtax.

Paragraph 3 provides rules for determining the source of income for purposes of the treaty foreign tax credit. The general rule is

(1) that income of a resident of a Contracting State is deemed to arise in the other Contracting State, if that other State is given the right to tax that income by the Convention, so long as that taxing right is not solely on the basis of citizenship in accordance with the saving clause of paragraph 3 of Article 1 (General Scope); and

(2) if a resident of a Contracting State derives income which, in accordance with the Convention, may not be taxed in the other State, the income is deemed, for purposes of the credit, to be sourced in the first-mentioned Contracting State.

If, however, the rules in the laws of a Contracting State for the determination of source of income for foreign tax credit purposes differ from the general rule stated above, the statutory rule will apply. This granting of precedence of statutory source rules over the treaty source rule, however, does not apply to determining the source for credit purposes of royalties and fees for included services dealt within Article 12 (Royalties and Fees for Included Services). The source of such income is determined by the general rule stated above, that income of a resident of a Contracting State is sourced in the other Contracting State if it may be taxed in that other State. Thus, such income which may be taxed by India under the provisions of Article 12, is to be treated as from Indian sources for U.S. foreign tax credit purposes even if the activities giving rise to the income take place in the United States or elsewhere outside of India.

The saving clause of paragraph 3 of Article 1 (General Scope) does not apply to this Article. Thus, the United States must grant the benefits of this Article to its citizens and residents, notwithstanding any less beneficial Code provisions to the contrary.

## ARTICLE 26
### Nondiscrimination

This Article ensures that nationals of a Contracting State, in the case of paragraph 1, and residents of a Contracting State, in the case of paragraphs 2 through 4, will not be subject to discriminatory taxation in the other Contracting State. For this purpose, nondiscrimination means providing national treatment.

Paragraph 1 provides that a national of one Contracting State may not be subject to taxation or connected requirements in the other Contracting State which are different from, or more burdensome than, the taxes and connected requirements imposed upon a national of that other State in the same circumstances. A national of a Contracting State is afforded protection under this paragraph even if the national is not a resident of either Contracting State. Thus, a U.S. citizen who is resident in a third country is entitled, under this paragraph to the same treatment in India as an Indian national who is in similar circumstances. The term "national" is defined in subparagraph l (i) of Article 3 (General Definitions) as an individual possessing the nationality or citizenship of a Contracting State.

Paragraph 1 does not obligate the United States to apply the same taxing regime to an

Indian national who is not resident in the United States and a U.S. national who is not resident in the United States. The reason for this is that paragraph 1 of the Article applies only when the nationals of the two Contracting States are in the same circumstances. United States citizens who are not residents of the United States but who are, nevertheless, subject to United States tax on their worldwide income are not in the same circumstances with respect to United States taxation as citizens of India who are not United States residents. Thus, for example, Article 26 would not entitle an Indian national not resident in the United States to the net basis taxation of U.S. source dividends or other investment income which applies to a U.S. citizen not resident in the United States.

Paragraph 2 of the Article provides that a permanent establishment in a Contracting State of an enterprise of the other Contracting State may not be less favorably taxed in the first-mentioned Contracting State than an enterprise of the first-mentioned Contracting State which is carrying on the same activities. This provision, however, does not obligate a Contracting State to grant to a resident of the other Contracting State any tax allowances, reliefs, etc., which it grants to its own residents on account of their civil status or family responsibilities. Thus, if an individual resident in India owns an Indian enterprise which has a permanent establishment in the United States, in assessing income tax on the profits attributable to the permanent establishment, the United States is not obligated to allow to the Indian resident the personal exemptions for himself and his family which would be allowed if the permanent establishment were a sole proprietorship owned and operated by a U.S. resident. Paragraph 2 does not afford protection with respect to the provisions of paragraph 3 of Article 7 (Business Profits). (For a discussion of the meaning of this exception, see the explanation, below, of paragraph 5 of this Article. See the explanation of paragraph 5 also for a discussion of the relationship between paragraph 2 and the imposition of the branch tax.)

Section 1446 of the Code imposes on any partnership with income which is effectively connected with a U.S. trade or business the obligation to withhold tax on amounts allocable to a foreign partner. In the context of the Convention, this obligation applies with respect to an Indian resident partner's share of the partnership income attributable to a U.S. permanent establishment. There is no similar obligation with respect to the distributive shares of U.S. resident partners. It is understood, however, that this distinction is not a form of discrimination within the meaning of paragraph 2 of the Article. No distinction is made between U.S. and Indian partnerships, since the law requires that partnerships of both domiciles withhold tax in respect of the partnership shares of non-U.S. partners. In distinguishing between U.S. and Indian partners, the requirement to withhold on the Indian but not the U.S. partner's share is not discriminatory taxation, but, like other withholding on nonresident aliens, is merely a reasonable method for the collection of tax from persons who are not continually present in the United States, and as to whom it may otherwise be difficult for the United States to enforce its tax jurisdiction. If tax has been overwithheld, the partner can, as in other cases of over-withholding, file for a refund.

Paragraph 3 prohibits discrimination in the allowance of deductions. When an enterprise of a contracting State pays interest, royalties or other disbursements to a resident of the other contracting State, the first-mentioned contracting State must allow a deduction for those payments in computing the 'taxable profits of the enterprise under the same conditions as if the payment had been made to a resident of the first-mentioned Contracting State. An exception to

this rule is provided for cases where the provisions of paragraph 1 of Article 9 (Associated Enterprises), paragraph 7 of Article 11 (Interest) or paragraph 8 of Article 12 (Royalties and Fees for Included Services( apply, because all of these provisions permit the denial of deductions in certain circumstances in respect of transactions between related persons. The term other disbursements is understood to include a reasonable allocation of executive and general administrative expenses, research and development expenses and other expenses incurred for the benefit of a group of related persons which includes the person incurring the expense.

Paragraph 4 requires that a Contracting State not impose other or more burdensome taxation or connected requirements on an enterprise of that State which is wholly or pertly owned or controlled, directly or indirectly, by one or more residents of the other contracting State, than the taxation or connected requirements which it imposes on other similar enterprise of that first-mentioned contracting State.

The 'Tax Reform Act of 1984 ("TRA") introduced section 367(e)(2) of the code which changed the rules for taxing corporations on distributions they make in liquidation. Under prior law, corporations were not taxed on distributions of appreciated property in complete liquidation, although non-liquidating distributions of the same property, with several exceptions, resulted in corporate-level tax. In part to eliminate this disparity, the law now generally taxes corporations on the liquidating distribution of appreciated property. The code provides an exception in the case of distributions by 80 percent or more controlled subsidiaries to their parent corporations, on the theory that the built-in gain in the asset will be recognized when the parent sells or distributes the asset. This exception does not apply to distributions to parent corporations which are tax-exempt organizations or, except to the extent provided in regulations, foreign corporations. It is understood that the inapplicability of the exception to the tax on distributions to foreign parent corporations does not conflict with paragraph 4 of the Article. While a liquidating distribution to a U.S. parent will not be taxed. and, except to the extent provided in regulations, a liquidating distribution to a foreign parent will, paragraph 4 merely prohibits discrimination among corporate taxpayers on the basis of U.S. or foreign stock ownership. Eligibility for the exception to the tax on liquidating distributions for distributions to non-exempt, U.S. corporate parents is not based upon the nationality of the owners of the distributing corporation, but rather is based upon whether such owners would be subject to corporate tax If they subsequently sold or distributed the same property. Thus, the exception does not apply to distributions to persons which would not be so subject -- not only foreign corporations, but also tax-exempt organizations and individuals. The policy of the legislation is to collect one corporate-level tax on the liquidating distribution of appreciated property; if and only if that tax can be collected on a subsequent sale or distribution does the legislation defer the tax.

For the reasons given above in connection with the discussion of paragraph 2 of the Article, it is also understood that the provision in section 1446 of the code for withholding of tax on non-U.S. partners does not violate paragraph 4 of the Article.

It is further understood that the ineligibility of a U.S. corporation with nonresident alien shareholders to make an election to be an "S" corporation does not violate paragraph 4 of the Article. If a corporation elects to be an S corporation (requiring 35 or fewer shareholders), it is generally not subject to income tax and the shareholders take into account their pro rate shares of

the corporation's items of income, loss, deduction or credit. (The purpose of the provision is to allow an individual or small group of individuals to conduct business in corporate form while paying taxes at individual rates as if the business were conducted directly.) A nonresident alien does not pay U.S. tax on a net basis, and, thus, does not generally take into account items of loss, deduction or credit. Thus, the S corporation provisions do not exclude corporations with nonresident alien shareholders because such shareholders are foreign, but only because they are not net basis taxpayers. The provisions also exclude corporations with other types of shareholders where the purpose of the provisions cannot be fulfilled or their mechanics implemented. For example, corporations with corporate shareholders are excluded because the purpose of the provisions to permit individuals to conduct a business in corporate form at individual tax rates would not be furthered by their inclusion.

Paragraph 5 of the Article specifies that no provision of the Article will prevent either contracting State from imposing the tax described in Article 14 (Permanent Establishment Tax) or from applying the limitations described in paragraph 3 of Article 7 (Business Profits). Thus, even if the U.S. branch tax or the Indian extra tax were judged to violate the provisions of paragraphs 2 or 3 of the Article, neither Contracting State would be constrained from imposing the respective tax. Similarly, nothing in Article 26 shall be deemed to prevent India from applying its internal law limitations referred to in paragraph 3 of Article 7 on the amount of head office expenses that can be deducted by the Indian permanent establishment of a U.S. enterprise. As indicated in the explanation of Article 7, the internal law limitation referred to in Article 7 cannot be any less generous than that allowable under the Indian Income Tax Act as of September 12, 1989, the date of signature of the Convention.

Unlike the U.S. Model, the nondiscrimination article of the Convention applies only to the taxes covered as specified in Article 2 (Taxes Covered), and does not extend to all taxes at all levels of government.

The saving clause of paragraph 3 of Article 1 (General Scope) does not apply to this Article, by virtue of the exceptions in subparagraph (a) of paragraph 4. Thus, for example, a U.S. citizen who is resident in India may claim benefits in the United States under this Article.


ARTICLE 27
Mutual Agreement Procedure

This Article provides for cooperation between the competent authorities of the Contracting States to resolve disputes which may arise under the Convention and to resolve cases of double taxation not provided for in the Convention. The competent authorities of the two Contracting States are identified in subparagraph (h) of paragraph 1 of Article 3 (General Definitions).

Paragraph 1 provides that where a resident of a Contracting State considers that the actions of one or both Contracting States will result for him in taxation which is not in accordance with the Convention he may present his case to the competent authority of his State of residence or nationality. It is not necessary for a person first to have exhausted the remedies

provided under the national laws of the Contracting States before presenting a case to the competent authorities. The paragraph provides that a case must be presented to the competent authorities no later than three years from the date of the receipt of notification of the assessment which gives rise to the double taxation or taxation not in accordance with the provisions of the Convention. Thus, for example, if the Internal Revenue Service makes a section 482 adjustment on a taxpayer's 1990 return, and, in 1994, sends the statutory notice of assessment which results in double taxation, the taxpayer has until 1997 to present his case to the competent authority. When the case results from the combined action of the tax authorities in the two Contracting States, the three-year tine period begins to run when the formal notification of the second action is given. Although it is preferred U.S. policy to provide no time limit for the presentation of a case to the competent authorities the limit in paragraph 1 of the Convention should not result in any unreasonable denial of protection or assistance to taxpayers.

Paragraph 2 provides that if the competent authority of the Contracting State to which the case is presented judges the case to have merit, and cannot reach a unilateral solution, it shall seek agreement with the competent authority of the other Contracting State such that taxation not in accordance with the Convention will be avoided. If agreement is reached under this provision, it is to be implemented even if implementation is otherwise barred by the statute of limitations or by some other procedural limitation, such as a closing agreement. Because, as specified in paragraph 2 of Article 1 (General Scope), the Convention cannot operate to increase a taxpayer's liability, time or other procedural limitations can be overridden only for the purpose of making refunds and not to impose additional tax.

Paragraph 3 authorizes the competent authorities to seek to resolve difficulties or doubts that may arise as to the application or interpretation of the Convention. While the paragraph does not include the list of examples of the kinds of matters about which the competent authorities may reach agreement which is found in the U.S. Model, it is understood that the powers of the competent authorities are generally as broad under the Convention as under the U.S. Model. Paragraph 3 also authorizes the competent authorities to consult for the purpose of eliminating double taxation in cases not provided for in the Convention, but with respect to the taxes covered by the Convention. An example of such a case might be double taxation arising from a transfer pricing adjustment between two permanent establishments of a third-country resident, one in the United States and one in India. Since no resident of a Contracting State is involved in the case, the Convention does not, by its terms, apply, but the competent authorities may, nevertheless, use the authority of the Convention to seek to prevent the double taxation.

Paragraph 4 provides that the competent authorities may communicate with each other, including, where appropriate, in face-to-face meetings of representatives of the competent authorities, for the purpose of reaching agreement under this Article. The Article confirms the authority of the competent authorities to develop bilateral and unilateral procedures to implement the Article.

This Article is not subject to the saving clause of paragraph 3 of Article 1 (General Scope). Thus, for example, rules, definitions, procedures, etc., which are agreed upon by the competent authorities under this Article, may be applied by the United States with respect to its citizens and residents even if they differ from the comparable Code provisions. Similarly, as

indicated above, U.S. law may be overridden to provide refunds of tax to a U.S. citizen or resident under this Article.


ARTICLE 28
Exchange or Information and Administrative Assistance

This Article provides for the exchange of information, including documents, between the competent authorities of the Contracting States. The information to be exchanged is that necessary for carrying out the provisions of the Convention or the domestic laws of the United States or Germany concerning the taxes covered by the Convention. Exchange of information with respect to domestic law is authorized insofar as the taxation under those domestic laws is not contrary to the Convention. Thus, for example, information may be exchanged with respect to a covered tax, even if the transaction to which the information relates is a purely domestic transaction in the requesting State and, therefore, the exchange is not made for the purpose of carrying out the Convention.

Paragraph 1 states that information exchange is not restricted by Article 1 (General Scope). This means that information may be requested and provided under this Article with respect to persons who are not residents of either Contracting State. For example, if a third-country resident has a permanent establishment in India which engages in transactions with a U.S. enterprise, the United States could request information with respect to that permanent establishment, even though it is not a resident of either Contracting State. Similarly, if a third-country resident maintains a bank account in India and the Internal Revenue Service has reason to believe that funds in that account should have been reported for U.S. tax purposes but have not been so reported, information can be requested from India with respect to that person's account.

Paragraph 1 also provides assurances that any information exchanged will be treated as secret, subject to the same disclosure constraints as information obtained under the laws of the requesting State. Information received may be disclosed only to persons, including courts and administrative bodies, concerned with the assessment, collection, enforcement or prosecution in respect of the taxes to which the information relates, or to persons concerned with the administration of these taxes. The information must be used by these persons in connection with these designated functions. Persons concerned with the administration of taxes, in the United States, include legislative bodies, such as the tax-writing committees of Congress and the General Accounting Office. Information received by these bodies is for use in the performance of their role in overseeing the administration of U.S. tax laws. Information received may be disclosed in public court proceedings or in judicial decisions. The paragraph confirms the right of the competent authorities to develop procedures for the exchange of information, including, where appropriate, the exchange of information regarding tax avoidance.

Paragraph 2 specifies that the Contracting States will utilize Article 26 to exchange information on a routine basis, on request in relation to a specific case, or on other bases (e.g., spontaneously). The classes of information to be exchanged on a routine basis are to be determined, from time to time, by the competent authorities.

Paragraph 3 explains that the obligations undertaken in paragraph 1 to exchange information do not require a Contracting State to carry out administrative measures which are at variance with the laws or administrative practice of either State. Nor does that paragraph require a Contracting State to supply information not obtainable under the laws or administrative practice of either State, or to disclose trade secrets or other information, the disclosure of which would be contrary to public policy. Either Contracting State may, however, at its discretion, subject to the limitations of the paragraph and its internal law, provide information which it is not obligated to provide under the provisions of this paragraph.

Paragraph 4 provides that when information is requested by a Contracting State in accordance with this Article, the other Contracting State is obligated to obtain the requested information as if the tax in question were the tax of the requested State, even if that State has no direct tax interest in the case to which the request relates. The paragraph further provides that the requesting State may specify the form in which information is to be provided (e.g., depositions of witnesses and authenticated copies of original documents) so that the information can be usable in the judicial proceedings of the requesting State. The requested State should, if possible, provide the information in the form requested to the same extent that it can obtain information in that form under its own laws and administrative practices with respect to its own taxes.

Paragraph 5 specifies the taxes in respect of which information may be exchanged. As in the U.S. Model, the category of taxes covered for exchange of information purposes is broader than the category of taxes covered for other purposes of the Convention, as specified in Article 2 (Taxes Covered). Article 28 applies, in the united States, to all taxes imposed under Title 26 of the U.S. Code (i.e., taxes imposed by the Internal Revenue Code). In India, the Article applies to the income tax, the wealth tax and the gift tax.

ARTICLE 29
Diplomatic Agents and Consular Officers

This Article provides that any fiscal privileges to which diplomatic or consular officials are entitled under general provisions of international law or under special agreements will apply notwithstanding any provisions to the contrary in the Convention.

The saving clause of paragraph 3 of Article 1 (General Scope) does not apply to override any benefits of this Article available to an individual who is neither a citizen of the United States nor has immigrant status there.

ARTICLE 30
Entry into Force

This Article provides the rules for bringing the Convention into force and giving effect to its provisions. Paragraph 1 provides for the notification through diplomatic channels by each Contracting State of the other that the legal procedures to bring the Convention into force have been completed. In the United States, this is the signing of the ratification document by the

President, on the advice and consent of the Senate.

Paragraph 2 provides that the Convention will enter into force on the date of the latter of such notifications. It further provides the rules for the effective dates of the provisions of the Convention. Subparagraph 2(a) contains the effective dates for the United States. In the United States, Convention will have effect with respect to taxes withheld at source for amounts paid or credited on or after January 1 next following the date on which the Convention enters into force. For all other taxes, the Convention will have effect for any taxable period beginning on or after January 1 next following date on which the Convention enters into force.

Subparagraph 2(b) provides that in India the Convention will have effect in respect of income arising in any taxable year which begins on or after April 1 of the year next following the calendar year in which the Convention enters into force.

ARTICLE 31
Termination

The Convention is to remain in effect indefinitely, unless terminated by one of the Contracting States in accordance with the provisions of Article 31. Either Contracting State may give the other Contracting State through diplomatic channels written notice of termination at any time on or before June 30 in any calendar year which begins after the expiration of a period of five years from the date of the Convention's entry into force. Thus, if, for example, the Convention enters into force on May 1, 1990, either State may give notice of termination during the period beginning January 1 and ending June 30 in any calendar year after 1995. If notice is given on or before June 30 of any calendar year beginning after the expiration of the five-year period, the termination will have effect as follows:
(1) In the United States, with respect to taxes withheld at source, the Convention will cease to have effect for amounts paid or credited on or after January 1 of the calendar year following the year in which the notice is given. With respect to other taxes, the Convention will cease to have effect for taxable periods beginning on or after January 1 of the calendar year following the year in which notice is given.
(2) In India, the Convention will cease to have effect for income arising in any taxable year beginning on or after April 1 of the year next following the calendar year in which the notice of termination is given.

Nothing in Article 31, which relates to unilateral termination by a Contracting State of the Convention, should be construed as preventing the Contracting States from entering into a new bilateral agreement that supersedes, amends or terminates provisions of the Convention either prior to the expiration of the five-year period or without the notification period.

PROTOCOL

A Protocol accompanies and forms part of the Convention. The provisions of paragraphs I through V of the Protocol are discussed above in connection with Articles 5, 7, 10, 11, 12, 15,

and 23 of the Convention.

DIPLOMATIC NOTES

In diplomatic notes exchanged at the time the rest of the Convention was signed, the two governments confirmed their understandings with respect to several points. First, with respect to the United States position on tax sparing credits, it was agreed that, if the United States amends its laws to authorize such credits or grants such a credit in a tax treaty with another country, the Convention will be amended to incorporate such a credit The amended Convention would be subject to ratification. Second, as discussed above in connection with paragraph 4(c) of Article 5 (Permanent Establishment), the two governments confirmed their understandings with respect to the circumstances in which a person shall be considered to secure orders in a Contracting State wholly, or almost wholly, for an enterprise. Finally, as discussed above in connection with Article 12 (Royalties and Fees for Included Services), the two governments confirmed their understanding of the purpose of the memorandum of understanding developed and agreed upon by the negotiators, relating to the scope of included services under Article 12.

June 14, 1990