# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------- X
                                                   :
In re                                              :    Chapter 11
                                                   :
Nortel Networks Inc., et al.,¹                     :    Case No. 09-10138 (KG)
                                                   :
                        Debtors.                   :    Jointly Administered
                                                   :
                                                   :    Hearing date:  May 7, 2013 at 10:00 AM (ET) (Proposed)
                                                   :    Objections due:  May 3, 2013 at 4:00 PM (ET) (Proposed)
-------------------------------------------------- X
```

## DEBTORS' MOTION FOR AN ORDER APPROVING NNI'S ENTRY INTO A SUBLEASE TERM SHEET AND SUBLEASE AGREEMENT AT FACILITY IN RALEIGH, NORTH CAROLINA

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (i) approving NNI's entry into a term sheet (the "Term Sheet") dated April 25, 2013 between NNI (the "Sublandlord") and International Business Machines Corporation (the "Subtenant" or "IBM"), attached hereto as Exhibit B, for the sublease of a portion of the leased premises (the "Subleased Premises") at 4001 E. Chapel Hill-Nelson

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

Highway, Raleigh, North Carolina (the "Facility") and a sublease agreement with IBM that is consistent with the terms of the Term Sheet (the "Sublease")[2]; and (ii) granting the Debtors such other and further relief as the Court deems just and proper.  In support of this Motion, the Debtors respectfully represent as follows:

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105 and 363 and of the Bankruptcy Code, Rules 2002 and 6004 of the Bankruptcy Rules, and Rule 6004-1 of the Local Rules.

## Background

3.      On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc.,[3] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, which cases are consolidated for procedural purposes only (the "Chapter 11 Cases").  The Debtors continue to operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors (the "Committee") in

---

[2]      Pursuant to the Term Sheet, NNI and IBM have agreed to use commercially reasonable efforts to finalize and execute the Sublease no later than May 15, 2013.  If the Sublease is finalized prior to a hearing on this Motion, the Debtors intend to file such Sublease with the Court.

[3]      Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

respect of the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized (the "Bondholder Group").

5.        On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[4] commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada), seeking relief from their creditors and a Monitor, Ernst & Young Inc., was appointed by the Canadian Court.  Also on the Petition Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[5] into administration under the control of individuals from Ernst & Young LLP.  Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency and dissolution proceedings around the world.

6.        Since the Petition Date, Nortel has sold its business units and other assets to various purchasers.  For further information regarding these chapter 11 cases, reference may be made to the Monthly Operating Reports filed by the Debtors and http://dm.epiq11.com/nortel.

---

[4]        The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[5]        The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

**Relief Requested**

7.      By this Motion, the Debtors seek the entry of an order: (i) approving NNI's entry

into the Term Sheet and the Sublease; and (ii) granting the Debtors such other and further relief

as the Court deems just and proper.

**Facts Relevant to the Motion**

**A.      Master Lease and Sublease**

8.      NNI currently is the tenant under an existing lease with U.S. Bank National

Association, (as successor trustee to State Street Bank and Trust Company) as owner trustee of

ZSF/Research Gateway Trust (the "Master Landlord"), dated July 27, 2001, for the Facility (the

"Master Lease"), which includes the Subleased Premises.  The Facility consists of office,

electronic laboratory and warehouse space used by NNI in connection with its businesses prior to

its various divestitures.  NNI assumed the Master Lease in late 2009 pursuant to section 365 of

the Bankruptcy Code in connection with the closing of the sale of the CMDA and LTE business

to Telefonaktiebolaget  L. M. Ericsson ("Ericsson").  See Order Authorizing and Approving (A)

the Sale of Certain Assets of the Debtors' CDMA and LTE Business Free and Clear of All Liens,

Claims and Encumbrances, (B) the Assumption and Assignment of Contracts and (C) the

Assumption and Sublease of Certain Leases, dated July 28, 2009 [D.I. 1205].

9.      NNI subsequently subleased approximately 54% of the rentable square footage

available under the Master Lease to third parties, including purchasers of certain former Nortel

businesses, GENBAND US LLC ("GENBAND"), Avaya Inc. and Ericsson (collectively, along

with any other subtenants at the Facility, the "Existing Subtenants").  NNI uses some of the

remaining office space for its residual winddown activities, and the remaining rentable square

footage available under the Master Lease currently remains unused.

10. In an effort to obtain value for the unused rentable square footage at the Facility, NNI has marketed the available space since September 2012 with the assistance of CB Richard Ellis-Raleigh, LLC ("CBRE Raleigh").[6] Among other things, CBRE Raleigh implemented a marketing campaign that included listing the Facility locally and nationally, having the Facility featured in a local business journal and hosting regular tours of the Facility. Based on these efforts, along with the Debtors' and CBRE Raleigh's understanding of local market conditions, the Debtors believe that the Sublease contemplated by the Term Sheet represents the highest or best offer for use of the Subleased Premises and that the execution of the Term Sheet, and ultimately the Sublease, are in the best interests of the Debtors, their estates, creditors and other parties in interest. The Sublease will allow NNI to collect revenue for a majority of the space that is currently unused under the Master Lease.

11. In furtherance of NNI's entry into the Term Sheet and Sublease, NNI intends to negotiate a separate agreement with GENBAND, pursuant to which GENBAND would surrender a portion of the space it currently occupies at the Facility to NNI and would otherwise relocate within the Facility in order to make the Subleased Premises available for sublease to IBM. In connection with this agreement, GENBAND would receive a rent credit over the balance of its sublease term.

**B.     Term Sheet**

12. After arm's-length, good faith negotiations between the Sublandlord and the Subtenant and their respective advisors, the Sublandlord has agreed, subject to this Court's approval, among other things, to lease the Subleased Premises substantially in accordance with

---

[6]     CBRE, Inc. ("CBRE"), a distinct entity from CBRE Raleigh, was retained in these Chapter 11 Cases as the listing and leasing agent for the Debtors for their former U.S. corporate headquarters in Richardson, Texas. See Order Authorizing the Retention and Employment of CB Richard Ellis Inc. as Listing and Leasing Agent for the Debtors *Nunc Pro Tunc* to January 6, 2011, dated March 9, 2011 [D.I. 5086]. In connection with the proposed Sublease, CBRE acted as agent for Subtenant.

the terms and subject to the conditions of the Term Sheet.  The Term Sheet contemplates the

sublease of the Subleased Premises on the following principal terms[7]:

- <u>Subleased Premises</u>:  Subtenant shall sublease the following areas:

  - 2nd floor office space:  Approximately 121,524 RSF

  - MDF room:  Approximately 4,607 RSF

  - Mezzanine office space:  Approximately 25,240 RSF

  - Warehouse space:  Approximately 101,925 RSF

- <u>Base Rent</u>:  During the Sublease Term, Subtenant shall pay the following Full Service Base Rent:

  - Second floor office space: $ 13.00/RSF

  - MDF room: $ 13.00/RSF

  - Mezzanine office space: $ 11.00/RSF

  - Warehouse space: $ 6.00/RSF

The Base Rent will not increase over the Sublease Term.  The aforementioned rents will total approximately $7.8 million over the course of the Sublease.

- <u>Subleased Premises Delivery Date</u>:  Other than that space currently occupied by GENBAND, the Subleased Premises will be delivered to Subtenant on or before May 15, 2013, and the Sublease will become effective as of such date, provided that this Court approves the Term Sheet and entry into the Sublease on or before such date, each of Sublandlord and Subtenant shall have duly executed and delivered the Sublease and Sublandlord shall have delivered a non-disturbance and attornment agreement from the Master Landlord in a commercially reasonable form (the "<u>Master Landlord NDA</u>") and an estoppel from the Master Landlord in a form reasonably acceptable to Subtenant (the "<u>Master Landlord Estoppel</u>"), it being agreed that the form of estoppel employed by Master Landlord in connection with prior requests for an estoppel with respect to the Master Lease shall be reasonably acceptable to Subtenant.  Sublandlord will use commercially reasonable efforts to deliver possession of that portion of the Subleased Premises currently occupied by GENBAND to Subtenant as soon as possible, it being currently anticipated that such delivery date will occur on or about June 1, 2013.

- <u>Construction Period</u>:  Subtenant shall be afforded a construction period during which rent shall abate under the terms of the Sublease, such construction period extending from the

---

[7]    To the extent that there are inconsistencies between any summary description of the Term Sheet contained herein and the terms and conditions of the Term Sheet, the terms and conditions of the Term Sheet shall control.

date on which Subtenant commences possession of the Subleased Premises through June 30, 2013.

- Rent Commencement Date:  July 1, 2013.

- Term:  The sublease term ("Sublease Term") shall expire July 30, 2016, provided that, as required under the Master Lease, the Sublease Term shall terminate upon any termination of the Master Lease (subject to the terms of any non-disturbance agreement between the Master Landlord and Subtenant or between any mortgagee or superior lessor of Master Landlord and Subtenant).   Upon request, Sublandlord shall cooperate, at Subtenant's expense, in facilitating discussions with the Master Landlord regarding a direct lease following expiration of the Sublease.

- Representation/Fees: In connection with the transaction contemplated by the Term Sheet, CBRE represents the Subtenant and CBRE Raleigh represents the Sublandlord.  With regard to CBRE's representation of Subtenant only and subject to authorization by this Court, Sublandlord shall pay CBRE a fee equal to four percent (4%) of the full-service rent received over the initial term of the Sublease pursuant to a separate agreement (the "CBRE Subtenant Broker Fee"), it being understood and agreed that in no event shall Subtenant have any liability for the payment of the CBRE fee or any CBRE Raleigh fee.  With regard to CBRE Raleigh's representation of Sublandlord only and subject to authorization by the Bankruptcy Court, Sublandlord shall pay CBRE Raleigh a fee equal to two (2%) of the full-service rent received over the initial term of the Sublease pursuant to a separate agreement.  Sublandlord and Subtenant shall agree to indemnify and hold harmless each other on customary terms from claims by another person or entity for brokerage fees in connection with the Sublease.

- Expense Reimbursement:  If the Bankruptcy Court approves this Motion but the Sublease is not subsequently entered into on or prior to June 1, 2013 as a result of a default by Subtenant under the Term Sheet or a refusal by Subtenant to enter into a commercially reasonable sublease agreement consistent with the terms of the Term Sheet (except as a result of failure of Sublandlord to satisfy any of the conditions set forth in clauses (i) through (iii) of the preamble of the Term Sheet or to negotiate such a sublease agreement in good faith), Subtenant shall, by wire transfer of funds, promptly reimburse Sublandlord for its actual, documented out-of-pocket expenses (including fees and expenses of counsel to Sublandlord) incurred in connection with the transactions contemplated by the Term Sheet.

13.     The parties' commitment under the Term Sheet to enter into the Sublease is

subject to (i) this Court granting the relief sought in this Motion, (ii) GENBAND's written

agreement to surrender that portion of the Subleased Premises currently occupied by

GENBAND, (iii) the Sublandlord, Master Landlord, trustee, servicer and/or surety under the

Master Lease providing any consents required under the Master Lease to the initial plans and specifications with respect to proposed Subtenant improvements to the Subleased Premises proposed by IBM and (iv) the execution of a definitive sublease agreement consistent with the Term Sheet to be negotiated in good faith by Sublandlord and Subtenant.  Additionally, as further conditions to the effectiveness of the Sublease, Sublandlord has agreed to secure the Master Landlord NDA and the Master Landlord Estoppel.  Sublandord has also agreed to use commercially reasonable efforts to secure a subordination, non-disturbance and attornment agreement from any mortgagee and/or superior lessor reasonably satisfactory in form to Subtenant, with the understanding that such an agreement shall be reasonably satisfactory in form to the Subtenant if it includes terms substantially similar to those included in a Subordination, Non-Disturbance and Attornment Agreement, relating to the Master Lease and dated as of July 27, 2001, between Master Landlord, Sublandlord and LaSalle Bank National Association.

14.    NNI also entered into an exclusive sublease listing agreement dated September 19, 2012 with CBRE Raleigh that contemplates payment to CBRE Raleigh of a fee based on a percentage of total base rent under any sublease in connection with the signing of any sublease and occupancy under such sublease, which fee would be subject to prior Court approval.  The Debtors intend to file a separate motion seeking to retain CBRE Raleigh, and for approval of such fees if the Sublease is executed.

## Basis for Relief

15.    The Debtors seek authority pursuant to sections 105(a) and 363(b) of the Bankruptcy Code to enter into the Term Sheet and the Sublease, and to sublease the Subleased Premises to Subtenant.

8

16.     Section 363(b)(1) of the Bankruptcy Code permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1).  Additionally, this Court may grant the relief requested in this Motion pursuant to section 105(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title."  See 11 U.S.C. § 105(a); see also Gillman v. Continental Airlines (In re Continental Airlines), 203 F.3d 203, 211 (3d Cir. 2000) ("Section 105(a) of the Bankruptcy Code supplements courts' specifically enumerated bankruptcy powers by authorizing orders necessary or appropriate to carry out provisions of the Bankruptcy Code.").

17.     A debtor may enter into contracts and use estate assets, other than in the ordinary course of its business, during the pendency of its bankruptcy proceeding with the court's approval.  To obtain court approval to use property under section 363(b), the Debtors need only demonstrate a sound business purpose for the proposed action.  See Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991) (courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)).

18.     Under the Bankruptcy Code, the Court has "virtually unfettered discretion to authorize the use, sale or lease, other than in the ordinary course of business, of property of the estate."  In re Lionel Corp., 722 F.2d at 1069.

19.    A court reviews the business justifications provided by a debtor by applying the business judgment rule.  That rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).  The rule is based on a presumption that the debtor's decision is reasonable.  See id.

20.    Approval of a debtor's decision to enter into a contract and use estate property under section 363 is in harmony with a bankruptcy court's equitable powers.  Under section 105(a) of the Bankruptcy Code, bankruptcy courts have expansive equitable powers to fashion any order or decree that preserves the value of the debtor's estate and thereby protects the creditors' interests in distribution of a debtor's assets.  See, e.g., Bird v. Crown Convenience (In re NWFX, Inc.), 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy . . . is that equitable principles govern."); In re Cooper Properties Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) ("[T]he Bankruptcy Court is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

21.    The Debtors' decision to enter into the Term Sheet and the Sublease is grounded in sound business judgment.  The Debtors currently are utilizing or subleasing only a portion of the rentable square footage under the Master Lease, and the unused rentable square footage is sufficient to accommodate IBM's proposed occupancy under the Sublease.  Accordingly, the Sublease will enable NNI to obtain revenue from currently unutilized space at the Facility.  The

proposed Sublease is the best use NNI has identified for such unused space based on its marketing efforts.

22.     The Debtors have negotiated the Term Sheet at arms' length to the Subtenant, and will do the same in connection with their negotiation of the Sublease.  The Debtors and their advisors believe the terms and conditions of the Term Sheet and the proposed Sublease to be fair and reasonable.  Accordingly, the business judgment standard has been satisfied and the Court may approve and authorize NNI's entry into the Term Sheet and the Sublease.

### Waiver of Automatic Fourteen-Day Stay Under Bankruptcy Rule 6004(h)

23.     Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the lease of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order.  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.  See Fed. R. Bankr. P. 6004(h) advisory committee's notes.

24.     Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, commentators agree that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure.  See generally 10 Collier on Bankruptcy ¶ 6004.09 (15th ed. 1999).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal.  Id.

25.     Subject to this Court's approval of the Term Sheet and the Sublease and the satisfaction of certain other conditions, the Term Sheet contemplates the execution of a Sublease by May 15, 2013, so that IBM may commence improvements to the Subleased Premises prior to

moving operations to the Subleased Premises.  Accordingly, waiver of any applicable stay is appropriate in this circumstance.

26.    The Debtors have consulted with counsel to the Committee prior to filing this Motion, and understand that the Committee has no objection to the relief sought in this Motion.

## Notice

27.    Notice of the Motion has been given via hand delivery or overnight mail to the (i) U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) counsel to the Subtenant; (v) counsel to the Existing Subtenants; (vi) counsel to the Master Landlord; (vii) counsel to the Indenture Trustee under the Lease; and (viii) the general service list established in these chapter 11 cases pursuant to Bankruptcy Rule 2002.  The Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

28.    No prior request for the relief sought herein has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  April 26, 2013
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley *(admitted pro hac vice)*
Lisa M. Schweitzer *(admitted pro hac vice)*
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Tamara K. Minott*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Tamara K. Minott (No. 5643)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors
and Debtors in Possession*