**EXHIBIT B**

**Term Sheet**

Execution Version

**SUBLEASE TERM SHEET**

This term sheet (the "Term Sheet"), dated as of April 25, 2013, is being executed by the undersigned in order to memorialize their agreements regarding certain significant terms to be included in a sublease relating to premises located in a building (the "Building") located at 4001 E. Chapel-Hill/Nelson Highway in Durham County, North Carolina . This Term Sheet is intended to serve as a commitment to enter into the contemplated sublease subject only to (i) the approval by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), (ii) the written consent of Sublandlord (defined below) and, if required under the Master Lease (defined below), the Master Landlord (defined below), the Trustee (defined below), the Servicer and/or the Surety (each as defined in the Master Lease)) to the Initial Plans (as defined below), (iii) a written agreement of Sublandlord's existing subtenant Genband to surrender the portion of the Premises (defined below) currently occupied by Genband, and (iv) the execution of a definitive sublease agreement consistent with the agreements set forth in this Term Sheet and necessary to effectuate the terms of this Term Sheet, which is currently being negotiated in good faith by the parties (the "Sublease"). The parties agree to use commercially reasonable efforts to finalize and execute the Sublease by no later than May 15, 2013 (the "Targeted Signing Date").

This Term Sheet is only an indicative summary of the material terms and conditions of the Sublease, and is not intended as a complete list of all terms that will be included in the Sublease. The final terms of the Sublease will be set forth in a sublease agreement that is (a) consistent with the terms of this Term Sheet and (b) in all other respects commercially reasonable.

1. Sublandlord:  Nortel Networks Inc.

2. Subtenant:  International Business Machines Corporation

3. Use:  Subtenant may use the Premises (defined below) to operate electronic lab, office, administrative, and warehouse functions and for such other uses which are permitted under current zoning and other applicable laws and under the terms of the Lease Agreement, dated as of July 27, 2001 (as amended, the "Master Lease"), between U.S. Bank National Association (as successor trustee to State Street Bank and Trust Company) (the "Trustee"), as owner trustee of ZSF/Research Gateway Trust, as lessor (the "Master Landlord"), and Sublandlord .

4. Premises:  Subtenant shall sublease the following areas ("Premises"):

- 2nd floor office space:  Approximately 121,524 RSF

- MDF room: Approximately 4,607 RSF

- Mezzanine office space:  Approximately 25,240 RSF

- Warehouse space: Approximately 101,925 RSF

Subtenant reserves the right to adjust the size of the Warehouse portion of the Premises by +/-10% prior to sublease execution. There is a fifteen percent (15.0%) common area factor on the office space. There is no common area factor on the MDF, mezzanine or warehouse spaces.

5.  Non-Disturbance Agreements and Lessor Estoppel: If a Sublease is entered into after the conditions in the preamble to this Agreement are met, then as a further condition to the effectiveness of the Sublease, Sublandlord agrees to secure (i) a non-disturbance and attornment agreement from the Master Landlord in a commercially reasonable form (the "Master Landlord NDA") and (ii) an estoppel from the Master Landlord in a form reasonably acceptable to Subtenant (the "Master Landlord Estoppel"), it being agreed that the form of estoppel employed by Master Landlord in connection with prior requests for an estoppel with respect to the Master Lease shall be reasonably acceptable to Subtenant. Further, with respect to any mortgages, deeds of trust or any superior leases which affect the Building or the land upon which it is situated at the time of Sublease execution or during the Sublease Term (defined below), Sublandlord shall use commercially reasonable efforts to secure and deliver to Subtenant, in recordable form, a subordination, non-disturbance and attornment agreement reasonably satisfactory in form to Subtenant (it being agreed that such an agreement shall be reasonably satisfactory to Subtenant if it includes terms substantially similar to those included in the Subordination, Non-Disturbance and Attornment Agreement, relating to the Master Lease and dated as of July 27, 2001 (the "Agreed Form of SNDA"), between Master Landlord, Sublandlord and LaSalle Bank National Association ). Subtenant will not be required to subordinate its subleasehold interest to the lien of any future encumbrance on the Building or the land upon which it is situated unless and until the holder of such encumbrance executes an agreement in the form of the Agreed Form of SNDA.

6.  Master Lease: The Sublease shall be subject and subordinate to the Master Lease, with the exception of certain provisions of the Master Lease which Sublandlord and Subtenant negotiating in good faith agree to exclude from incorporation of the terms of the Master Lease in the Sublease.

7.  Premises Delivery Date: The Premises must be delivered to Subtenant for construction free of all occupants and tenancies, with all building systems fully operational, in compliance with all laws and other governmental requirements, and otherwise in condition such that Subtenant may immediately commence and pursue its Subtenant improvement work. Other than that space currently occupied by Genband, the Premises will be delivered to Subtenant on or before the Targeted Signing Date and the Sublease will become effective as of such date, provided that (i) the Bankruptcy Court approves this Term Sheet and entry into the Sublease on or before such date, (ii) each of Sublandlord and Subtenant shall have duly executed and delivered the Sublease and (iii) Sublandlord shall have delivered the Master Landlord NDA and Master Landlord Estoppel to Subtenant. Sublandlord will use commercially reasonable efforts to deliver possession of that portion of the Premises currently occupied by Genband to Subtenant as soon as possible, it being currently anticipated that such delivery date will occur on or about June 1, 2013.

8.  Construction Period:  Subtenant shall be afforded a construction period during which rent shall abate under the terms of the Sublease, such construction period extending from the date on which Subtenant commences possession of the Premises through June 30, 2013.

9.  Rent Commencement Date:  July 1, 2013.

10.  Term:  The sublease term ("Sublease Term") shall expire July 30, 2016, provided that, as required under the Master Lease, the Sublease Term shall terminate upon any termination of the Master Lease (subject to the terms of any non-disturbance agreement between the Master Landlord and Subtenant or between any mortgagee or superior lessor of Master Landlord and Subtenant).  Upon request, Sublandlord shall cooperate, at Subtenant's expense, in facilitating discussions with the Master Landlord regarding a direct lease following expiration of the Sublease.

11.  Base Rent:  During the Sublease Term, Subtenant shall pay the following Full Service Base Rent:

- Second floor office space: $ 13.00/RSF

- MDF room: $ 13.00/RSF

- Mezzanine office space: $ 11.00/RSF

- Warehouse space: $ 6.00/RSF

The Base Rent will not increase over the Sublease Term.

12.  Operating Expenses:  The Full Service Base Rent shall include, but not be limited to, the following expenses (if applicable) related to the operation of the Building; (1) subject to Section 13 of this Term Sheet, electricity for a modern office use, (2) HVAC during Normal Business Hours (as defined below), (3) 5-day janitorial services, (4) water, (5) elevator service, (6) 24/7 on-site security service and other services consistent with a full service office sublease, (7) on-site management office and personnel, (8) real property taxes, (9) building property insurance, (10) common area maintenance, and (11) maintenance of the roof and mechanical systems.  There shall be no Operating Expense pass-throughs to Subtenant during the Sublease Term.

13.  Building Hours & Electric:  "Normal Building Hours" means the period from 8:00 AM-6:00 PM Monday through Friday (excluding holidays) and 9:00 AM-1:00 PM on Saturday. In the event Subtenant requires HVAC services after Normal Building Hours, the hourly rate shall be $35 per hour per zone.

The Sublandlord reserves the right to require Subtenant to sub-meter the electricity and pay for the associated costs thereof and associated electrical usage costs to Subtenant of any above-standard office electrical uses.

14. <u>Security Deposit</u>:  Subtenant will not be required to pay a security deposit or first month's rent in advance.

15. <u>Subtenant Improvements</u>:  Subtenant shall deliver to Sublandlord initial plans and specifications with respect to proposed Subtenant improvements to the Premises on or before May 1, 2013 (the "<u>Initial Plans</u>"), which shall be subject to review and approval in accordance with the preamble to this Term Sheet.  Subtenant shall have the right to manage the design, bidding and construction of all Subtenant improvements, subject to approval of any modification or expansion of the Initial Plans by (i) Sublandlord, which approval shall not be unreasonably withheld, conditioned or delayed, and (ii) if required under the terms of the Master Lease, the Servicer and Surety (each as defined in the Master Lease) and the Master Landlord.  There shall be no supervision or construction management fees due to Sublandlord, except for any costs of third party reviews as may be required by the Sublandlord and (to the extent provided in the Master Lease) the Master Landlord, the Trustee, the Surety and the Servicer to review and approve Subtenant's plans and specifications.  Sublandlord shall bear no responsibility for payment of any of the costs associated with such improvements and Subtenant shall be responsible for ensuring that all such costs are paid promptly so that no liens are placed on the Building or on Master Landlord's or Sublandlord's interest therein.  Subtenant's removal obligations upon expiration or earlier termination of the Sublease shall be as provided in the Master Lease; provided that Subtenant shall have no obligation to remove any Subtenant improvements (but shall be required to move any personal property of Subtenant, its employees, agents, guests and invitees) made to the second floor office space upon expiration or earlier termination of the Sublease.

16. <u>Furniture, Fixtures & Equipment</u>:  During the Sublease Term, Subtenant shall have the use of, free of charge, all FF&E in place in the second floor office space and the mezzanine office space as of April 13, 2013.

17. <u>Parking</u>:  During the Sublease Term, Sublandlord shall make available to Subtenant, free of charge, the right to use up to a minimum of 1,000 parking spaces in the Building's parking facilities.

18. <u>Signage</u>:  Subtenant shall have rights to shared monument signage (at the top position) and non-exclusive building signage. There will be no rent, license fees or other charges payable by Subtenant for the signage and naming rights described above except that the cost of such signage and its installation shall be at Subtenant's sole cost and expense.

19. <u>Landlord Responsibilities</u>:  Sublandlord shall be responsible for the repair, maintenance and replacement of all internal and external structural parts of the building, including roof, curtain wall, mechanical, electrical, plumbing, elevators, parking lot/garage and HVAC.

20. <u>Environmental Laws</u>:  Sublandlord shall maintain the Building in compliance with all applicable environmental laws, rules and regulations.  Subtenant

shall conduct its operations at the Premises in compliance with all such laws, rules and regulations.

21. <u>Assignment and Sublease</u>:  Subtenant shall have the right to assign or sublease the Premises to any unrelated entity with Sublandlord's prior written consent, which shall not be unreasonably withheld, conditioned or delayed and without the consent of Master Landlord (but subject to the other, applicable non-consent related requirements of the Master Lease).  Notwithstanding the foregoing, without the consent of Sublandlord or Master Landlord (but subject to the other, applicable non-consent related requirements of the Master Lease), Subtenant may freely assign the Sublease or sub-sublet all or any part of the Premises at any time during the Sublease Term to (i) any affiliate of Subtenant, or (ii) any Person who merges with or into, or is part of a consolidation of, or otherwise acquires ownership or control of, Subtenant or of any Subtenant's affiliates or of any division, function or other business unit (or a portion thereof) of Subtenant or Subtenant's affiliate, whether such merger, consolidation or other acquisition is, without limitation, through the purchase of stock or assets of Subtenant or Subtenant's affiliate, or of the business of Subtenant or Subtenant's affiliate being conducted in any part of the Subleased Premises, whether through a single transaction or a series of transactions.  Any profits resulting from any such assignment or sublease shall belong to Subtenant.  Subtenant shall remain fully liable under the terms of the Sublease following any sub-sublease or assignment of the Sublease.  There will be no recapture rights on the part of Sublandlord.

22. <u>Representation/Fees</u>:  In connection with the transaction contemplated by this Term Sheet, CBRE, Inc. ("<u>CBRE</u>") represents the Subtenant and CB Richard Ellis-Raleigh, LLC ("<u>CBRE Raleigh</u>") represents the Sublandlord.  With regard to CBRE's representation of Subtenant only and subject to authorization by the Bankruptcy Court, Sublandlord shall pay CBRE a fee equal to four percent (4%) of the full-service rent received over the initial term of the Sublease pursuant to a separate agreement, it being understood and agreed that in no event shall Subtenant have any liability for the payment of the CBRE fee or any CBRE Raleigh fee.  With regard to CBRE Raleigh's representation of Sublandlord only and subject to authorization by the Bankruptcy Court, Sublandlord shall pay CBRE Raleigh a fee equal to two (2%) of the full-service rent received over the initial term of the Sublease pursuant to a separate agreement.  Sublandlord and Subtenant shall agree to indemnify and hold harmless each other on customary terms from claims by another person or entity for brokerage fees in connection with the Sublease.

23. <u>Expense Reimbursement</u>.  If the Bankruptcy Court approves a motion of Sublandlord requesting authorization to enter into the Sublease but the Sublease is not subsequently entered into on or prior to June 1, 2013 as a result of a default by Subtenant under this Term Sheet or a refusal by Subtenant to enter into a commercially reasonable sublease agreement consistent with the terms of this Term Sheet (except as a result of failure of Sublandlord to satisfy any of the conditions set forth in clauses (i) through (iii) of the preamble of this Term Sheet or to negotiate such a sublease agreement in good faith), Subtenant shall, by wire transfer of funds, promptly reimburse Sublandlord for its

actual, documented out-of-pocket expenses (including fees and expenses of counsel to Sublandlord) incurred in connection with the transactions contemplated by this Term Sheet.

24. <u>Confidentiality</u>:  This Term Sheet and all discussions related thereto (including Subtenant's identity) shall be held in confidence by the Sublandlord and Subtenant and shall not be discussed with third party consultants except on an "as needed" basis, with the understanding that such third party consultants shall also be required to hold related discussions in confidence; provided that Sublandlord and Subtenant agree that this Term Sheet and the Sublease may be (1) provided to advisors to the Official Committee of Unsecured Creditors that has been appointed in Sublandlord's bankruptcy proceedings, with the understanding that such advisors will be required to hold related discussions in confidence, (2) filed with the Bankruptcy Court in connection with obtaining the approval of such agreements and (3) provided to representatives of the Master Landlord and any other parties from which consent or to which notice may be required in connection with the Sublease or alterations to the Premises contemplated by Subtenant and counsel to each of the same, with the understanding that such parties will be asked to hold related discussions in confidence.

25. <u>Cafeteria</u>:  Full cafeteria service (at no additional cost but not subsidized) shall be available in the Building.  Sublandlord shall use its commercially reasonable efforts to select an operator for the cafeteria and have them operational no later than July 1, 2013.

26. <u>Governing Law</u>.  This Term Sheet shall be governed by the laws of the State of New York.  With respect to any claim, suit, action, or proceedings relating to this Term Sheet ("<u>Proceedings</u>"), each party irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court located in Wilmington, Delaware, and waives any objection which it may have at any time to the laying of venue of any Proceedings brought in such court, waives any claim that such Proceedings have been brought in an inconvenient forum, and further waives the right to object, with respect to such Proceedings, that such court does not have jurisdiction over such party.  Each party hereto hereby waives the right to a trial by jury in any Proceedings.

27. <u>Miscellaneous</u>.  This Term Sheet may not be assigned by Sublandlord or Subtenant (and any purported assignment will be null and void).  This Term Sheet is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto.  This Term Sheet represents the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communications and prior writings.  This Term Sheet may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  Any counterpart delivered by facsimile, pdf or other electronic means shall have the same import and effect as original counterparts and shall be valid, enforceable and binding for the purposes of this Term Sheet.

IN WITNESS WHEREOF, the parties hereto have caused this Term Sheet to be duly executed by their respective authorized officers as the day and year first above written.

SUBLANDLORD:

Nortel Networks Inc.

By: Timothy C. Ross
Its: Chief Financial Officer
    Corporate Secretary

SUBTENANT:

International Business Machines Corporation

_____
By:
Its:

IN WITNESS WHEREOF, the parties hereto have caused this Term Sheet to be duly executed by their respective authorized officers as the day and year first above written.

SUBLANDLORD:

Nortel Networks Inc.

_____

By:

Its:


SUBTENANT:

International Business Machines Corporation

By: *Manley James* /MANLEY JAMES/

Its: SR. PROGRAM MGR