IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Nortel Networks Inc., *et al.*,[1] | ) | Case No. 09-10138 (KG) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) | Hearing date: April 30, 2013 at 10:00 a.m. EST |
|  | ) |  |

## DECLARATION OF BARBARA GALLAGHER

I, Barbara Gallagher, hereby declares as follows:

1.      I am a member of the Official Committee of Long Term Disability Participants ("LTD

Committee") of Nortel Networks Inc., *et al* (the "Debtors") and the Chair of the LTD Committee.  I

respectfully submit this declaration based upon personal knowledge to serve as my direct testimony in

support of the *Joint Motion Pursuant to Sections 363 and 105 of the Bankruptcy Code, and*

*Bankruptcy Rules 9019 and 7023 to (I)(A) Preliminary Approve the Settlement Agreement Regarding*

*Long-Term Disability Plans and Claims, (B) Conditionally Certify a Class for Settlement Purposes*

*Only, (C) Approve the Notice Procedures, and (D) Schedule a Fairness Hearing; and (II) (A) Finally*

*Approve the Settlement Agreement (B) Finally Certify a Class, (C) Authorize the Debtors to Terminate*

*the LTD Plans, and (D) Grant Related Relief* ("Settlement Motion") (D.I. 9304), the *Motion of the*

*Official Committee of Long Term Disability Participants for Approval of Distribution and Related*

*Relief* ("Distribution Motion") (Docket No. 10049) as well as the *Supplement to Motion of the Official*

---

[1]      The Debtors, along with the last four digits of each Debtors' federal tax identification number, are: Nortel
Networks Inc (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems
International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722),
Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545),
Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc
(0358), Northern Telecom International Inc (6286), Nortel Networks Cable Solutions Inc. (0657) and Nortel Networks
(CALA) Inc. (4226).   Addresses for the Debtors can be found in the Debtors' petitions, which are available at
http://chapter11.epiqsystems.com/nortel.

*Committee of Long Term Disability Participants for Approval of Distribution and Related Relief.* (the "Distribution Motion Supplement") (Docket No. 10254). The LTD Committee was as an official statutory committee under 11 U.S.C. 1102 for the sole purpose of serving as the authorized representative of a constituency of participants of certain long term disability benefit plans ("LTD Plans") offered to Nortel employees (the "LTD Plan Participants" or "LTD Employees") in connection with negotiations regarding the modification or termination of the LTD Plans and any claims relating to the LTD Plans.

2.      I began working for the Debtors as a consultant in April 1996 in the system test department for the UCS (Universal Carrier Services) department on a one-year contract. I was hired full-time in the Nortel system test department for Sprint services in April, 1997. In September 1998, I transferred as management to the Change Application Engineering department where I was responsible for all hardware upgrades for every customer segment (wireline and wireless). When I took over the department, there was a significant back-log of upgrades and when the department was re-located to Raleigh, I had reduced the back-log by 90%. I did not relocate to Raleigh and chose to transfer into the CDMA system test organization as a system test planner in late 1999 but, after about two months, I was hand picked to create a new department to support the Debtors newest development effort in wireless: UMTS (Next Generation Wireless). In this position, I was responsible for creating position descriptions, hiring, training, building the test lab (and wireless system), creating the budget to purchase all hardware necessary to build and maintain the lab (approximately $2.0M). I was also responsible for working closely with development managers to identify the new product capabilities and associated documents and methodologies to test all applications and hardware. In November 2000, I was voted Quality Manager of the Year for my hard work and dedication to delivering reliable product to the customers in Europe as well as establishing the ISO guidelines for the entire organization. Because of this work, I was then moved into a senior staff position (selected by my Vice President) to oversee the quality of UMTS products and streamline customer issues and scheduled

2

software upgrades to resolve issues.

3.      In early 2002, I began to notice some health issues and was diagnosed with Grave's disease. Since this disease is not in my family and it is usually either hereditary or stress related, my endocrinologist concluded that because of my work responsibilities and the stress of the job itself, that was the immediate cause for the illness. Grave's is an auto-immune disease which then caused other health issues to surface; namely Narcolepsy which is what ultimately caused my disability in March, 2003. Additional health issues have also made my every day living difficult to manage: migraines, cognitive issues, occular thyroid disease (which has caused over 30 surgeries since 2007) and now Sjogren's Syndrome in which I may ultimately go blind and face the chance of organ failure. However, I try to do the best I can to manage my health in order to support LTD committee activities. In an effort to keep my cognitive issues mild, I do participate in several church activities and have served as the Recording Secretary for the Church Trustees Committee for the past several years.

## The LTD Committee's Negotiation with the Debtors

4.      I have been an active participant in all the LTD Committee's responsibilities and duties in this bankruptcy. The U.S. Trustee appointed me to a seven member LTD Committee in August 2011. The LTD Committee retained counsel, financial advisers, actuaries and later, tax counsel.

5.      The Debtors initially requested authority from the Court to terminate the LTD Employees' health, long-term care and life insurance benefits ("LTD Benefits") in June 2010, way before any LTD Committee had been formed, and offered to continue LTD Benefits until the end of summer 2010 with an alternative option for health insurance ( the "First Termination Motion"). The First Termination Motion was withdrawn by the Debtors.

6.      The LTD Committee's negotiations with the Debtors was difficult and reached numerous impasses, after months of extensive, detailed, and contentious discussions and meetings. The LTD Committee and the Debtors' have very strong and opposing positions on the LTD Benefits and the LTD Plans. The Debtors' legal position in regard to the LTD Benefits and the LTD Plans was

that they have an absolute, unqualified right to terminate LTD Benefits at will under the Employee Retirement Income Security Act ("ERISA"). The Debtors settlement offers were guided and firmly rooted in this position which galvanized the LTD Committee to reject the settlement offers presented to them as the LTD Committee did not agree that the Debtors had any right to terminate any claims in pay status, notably income continuation insurance proceeds, and opposed the Debtors' claims to having an unfettered right to terminate other benefits.

7.      The LTD Committee requested information from the Debtors and began the process of negotiating a resolution to the issues the LTD employees faced regarding the termination of their LTD benefits, which included not only medical benefits, but also disability income replacement proceeds. For many of the LTD employees their income continuation through the disability income replacement provided by the Debtors is the only or the most significant source of income. The LTD employees are permanently disabled, which makes them unable to work. The LTD Committee, Retiree Committee, Debtors, Official Committee of Unsecured Creditors' Committee, and Ad Hoc Committee of Bondholders met in person to hear proposals from the Debtors. Negotiations continued for quite some time after the initial in person meeting.

8.      In March 2012, the Debtors asked the Court to appoint Richard Levin as a mediator. The LTD Committee agreed and did not oppose the request to appoint a mediator. Mr. Levin was selected to facilitate a settlement and to resolve related issues regarding document and information requests. The Debtors, the LTD Committee and other parties in interest spent a great deal of time discussing their positions with the mediator. The LTD Committee provided extensive legal briefing to the Debtors on its position. The LTD Committee engaged in several lengthy negotiating sessions at the mediator's law firm. Even with the mediator's assistance, however, a settlement could not be reached.

9.      Almost a year after the LTD Committee was formed, the Debtors made a second motion asking the Court for authority to terminate the LTD Benefits (the "Second Termination

4

Motion") and offered no settlement payment. Unlike the Retiree Committee, the LTD Committee did not have the protections of 11 U.S.C. 1114 which requires negotiation and a minimum settlement offer.

10.    The LTD Committee opposed the Second Termination Motion, and litigation commenced over the proposed termination of LTD benefits. The LTD Committee formalized the requests for information still outstanding from negotiations and served extensive requests for documents and information through the formal discovery process. The LTD Committee also facilitated the involvement of individual LTD members who wished to participate in the litigation process and established a virtual data room to facilitate individual LTD employee discovery requests. The parties continued to negotiate during the litigation, even engaging in settlement discussions both with and without the mediator, notably even when and if counsel for the parties involved were available in Delaware prior to hearings.

11.    The LTD Committee also sued the Debtors for violation of ERISA Fiduciary duties under a class action filed on November 19, 2012. The complaint alleged that the Debtors had not managed the LTD benefits properly under ERISA and that their fiduciary duties under ERISA were in conflict with the basis and rationale for the authority they were seeking from the Court to terminate the LTD benefits, among other things.

12.    The LTD Committee ultimately reached an agreement with the Debtors on terms of a settlement in principle on December 4, 2012. A formal settlement agreement was then negotiated and signed (the "Settlement Agreement"). The Debtors Settlement Motion asks the Court to approve this settlement agreement, which I support as a member of the LTD Committee, and which was an Exhibit to the Settlement Motion.

13.    All seven members of the LTD Committee approved and authorized the filing of the class action complaint, including two LTD Committee members who later opposed the class action certification for purposes of settlement and the settlement itself. Both LTD Committee members who

have filed oppositions to the settlement and the class action certification have been recused under the

LTD Committee bylaws for a conflict of interest as a result of failing to disclose the intention to object

to the Settlement Agreement and continuing in discussions with the LTD Committee and counsel

during meetings related to the Settlement Motion and Settlement Agreement.  One of the two members

has since resigned from the LTD Committee, and the other has not participated in LTD Committee

business not related to the recusal since being recused despite being included by the LTD Committee.

14.     Pursuant to a Court order approving the noticing of the settlement, various

communications have been sent to the LTD Employees.

## The LTD Committee's Efforts to Inform LTD Participants About the Settlement

15.     The Court approved the procedures for noticing and educating the constituency (Docket

No. 9427) ("Preliminary Approval Order"), the LTD Committee and its advisers began an extensive

effort to provide the LTD Employees with information about the Settlement Agreement.  As part of the

process approved by Court, the LTD Committee and Debtors have provided notice of the settlement

through various avenues, including by the service of a settlement notice, a publication notice placed in

several major newspapers, and service of three individualized settlement notices, in addition to

multiple conference calls with groups of the LTD Employees and calls with individual LTD

Employee's counsel, tax advisers and medical benefits counselors.  Additionally, several "town hall"

meetings were held in conjunction with the Retiree Committee's efforts to provide notice of the

Retiree Committee settlement with the Debtors, at which counsel for the LTD Committee participated

in answering questions put forth by LTD Employees regarding the Settlement Agreement, the Retiree

settlement, and the potential impact of both on LTD Employees.  The LTD Committee also responded

to numerous inquiries through the LTD Committee's official website and through direct inquiry as to

the details of the Settlement Agreement as contemplated by the Preliminary Approval Order and prior

protective orders entered by this Court to allow the LTD Committee to execute its duties under

Bankruptcy Code Section 1102.  The LTD Committee counsel and advisers have been on multiple

calls and responded to 106 formal inquiries through the inquiry form on the official committee website in the period from February 14, 2013 through April 26, 2013. Multiple other inquiries have come from constituents via e-mail and by phone to both counsel for the committee, to Alvarez and Marsal and to myself as Chair and many of our other committee members. In addition, counsel for the LTD Committee has performed a series of educational teleconferences with the LTD employees to address the Settlement Agreement. I also participated in the "town hall" meeting for retirees to which LTD Employees were invited which was held in Dallas, Texas.

16.    In addition to the efforts by the LTD Committee, Debtors and the Retiree Committee to inform the LTD Employees about the options after benefits with the Debtors terminate as well as and the Settlement Agreements reached by both committees, the LTD Employees have been very active in this case. As just one example, approximately 16,000 "hits" were made to the LTD Committee's official website since August, 2012. Since the approval of the noticing for the Settlement Motion on February 14, 2013, there have been 4672 "hits" to the site. In the conference calls held since February 14, 2013, calls average eighty LTD employees per call and have reached a high of over 120 LTD employees.

### Approval of the Settlement Agreement

17.    As a member of the LTD Committee, I have spent long days and hours in negotiation sessions with the Debtors, in meetings with the LTD Committee, in person or on conference calls, in consultation with the LTD Committee's counsel and other professionals, and in evaluating the relevant record in this case and the facts and circumstances surrounding the plight of the LTD employees and the status of their benefits. This process has been taxing, difficult and tough on all the members of the LTD Committee, whose members, despite serious illnesses have engaged in travel and very long conference calls and working sessions, regardless of the toll it takes on all of the members because of their illness, and in negotiation, mediation, education, and question and answer sessions with our constituency, which also often lasted for hours.

18.    I support the Settlement Agreement that the Court has been asked to approve. The LTD Committee negotiated the best compromise available after over a year and a half of negotiations and litigation.    The LTD Committee was unable to obtain replacement benefits because the LTD employees are a very undesirable insurance risk.    However, the LTD Committee has been able to successfully negotiate what I believe is the best settlement, both in terms of the need for uninterrupted access to medical care and income and a settlement that has addressed various forms of other risks that our constituency simply cannot afford to take.

19.    The Settlement Agreement required the Debtors to provide the LTD Committee with an allowed unsecured claim for $28 million[2] for the benefit of the LTD Employees because it afforded the potential for the highest available recovery.    As the Debtors had continued to pay benefits after the bankruptcy was filed and we have been advised by counsel that issues related to disputes which result from pre-bankruptcy circumstances result in unsecured claims, we believe that we likely only had rights to an unsecured claim.    There was a possibility that we also had equitable rights to reform the ERISA plans through the class action, but as the Debtors will not be an operating company and is in chapter 11, we knew there was great risk in the equitable remedies available as well because of the practical consideration that the Debtors would no longer be in existence at the end of the bankruptcy.

20.    The claim was then marketed and sold to a claims purchaser in order to maximize the money that could be used to replace the terminated benefits.    The LTD Committee approved the sale of the claim because it allowed for both a potential higher recovery for the LTD Employees and eliminated the risk of waiting for claims to be paid in the case, a risk that our constituency could not afford to take because of lack of other sources of income and the need for uninterrupted medical care. Also, we have been advised that the price of claims could fluctuate and that a sale would secure a firm price safe from the fluctuations of the market for claims.    The purchase price is confidential but the

---

[2] There has been a $2 million reduction from the total settlement amount due to continuation of benefits.  With this reduction, there is $26,640,000 remaining for distribution to the LTD Employees.

sale has proven successful in both respects. The sale has also allowed the LTD Committee to have funds available to fund a replacement disability plan and an HRA which can be used to pay for qualified medical expenses. No replacement medical insurance was available, but HRA funds can be used to pay for supplemental Medicare insurance. The allowed claim was only also reduced in order to bridge the gap between the original termination date of the plan and the beginning of the retiree medical benefits, also in the form of an HRA so that those LTD employees who opted to participate in the retiree settlement would also have continuous coverage.

21.     I also support the settlement because the Debtors were very firm in their legal position and refused to move off their position throughout the settlement process, both within and outside of mediation. There was no indication that they were going to settle unless the LTD Committee engaged in a strong litigation response. They have always maintained, and still reserve the right to maintain in the Settlement Motion, that they have an absolute right to terminate the LTD benefits without paying a claim to the LTD Employees. When the Debtors made their First Termination Motion, they offered LTD Employees an alternative option for health insurance. In the Second Termination Motion, they offered LTD Employees nothing. The LTD Employees are not like the retirees in respect to having procedures set in place to protect their LTD benefits through a formal negotiation process. With advice from Elliott Greenleaf, the LTD Committee was able to obtain an 1102 ruling to create the official committee, but would have had to litigate in order to get designation as an 1114 committee because the Debtors and other parties did not consent consent/reserve rights to a separate 1114 designation for the LTD Employees when the Retiree Committee and LTD Committee were authorized by the Court. Unlike the retirees, the LTD Employees did not receive a minimum settlement offer after negotiations; this added significant litigation risk on an already contentious litigation. Aside from the already discussed legal disputes between the Debtors and the LTD employees, the added disagreement over the value of the claim and the appropriate discount rate to be applied meant that even if the LTD Committee were to prevail on the merits in every other respect, the

9

claim could be attacked and reduced on this basis as well.

22.     While the LTD Committee was and is confident it is legally correct in its position, we have been advised that there is little settled law that covers our situation. The LTD Committee determined that the risks were too high and the settlement amount reached was the highest possible settlement amount under the circumstances. I support the Settlement Agreement and Distribution Motion because further litigation would present very real risks that our constituency cannot afford. If the Settlement Agreement is not approved and the Debtors reinstate their Second Termination Motion, LTD Employees could receive nothing unless the LTD Employees are able to convince the Court in litigation that they are entitled to a claim or replacement benefits.

23.     Confidentiality agreements prevent me from making a detailed statement about the risks of litigation, LTD Committee advice from counsel and its other professionals, but it is obvious from the public record in this case that the risk of litigating against the Debtors, the Official Committee of Unsecured Creditors, Ad Hoc Committee of Bondholders and other creditors who want to maximize their own recovery in this matter would be significant and very risky.

24.     I also support the Settlement Agreement and the Distribution Motion because it distributes the available settlement funds in a way that is fair and addresses the potential impact on our constituencies' benefits and taxes. I support seeking approval from the Internal Revenue Service of the distribution because there are many LTD employees who simply are too sick and have no resources to pursue the issue on their own, and the LTD Committee seeks authority to distribute the funds in a tax-efficient manner that will give all LTD employees considerable flexibility in determining how to spend their allocated shares while maximizing the tax efficiency of the distribution.

25.     After all of the efforts the LTD Committee has made to inform approximately 200 LTD Employees, though the number has dwindled to 195 LTD Employees as our constituency has aged out or passed away, about the Settlement Agreement and the Distribution Motion, there have been

10

approximately relatively few objections to the Settlement Motion and to the Distribution Motion (some individuals submitting multiple objections). There have also been 41 letters of support (20 from plan years 2001 and prior and 21 from plan years 2002 and after). Significantly, many of the objections (approximately twenty) to the Distribution Motion have been in regard to the use of Health Reimbursement Account ("HRA") or the request to receive a lump sum distribution and are being negotiated to achieve a hopeful resolution of most prior to the hearing on both motions.

26.    In my experience, most or substantially all LTD employees have medical expenses in which they will be able to use the Debtors' settlement money to the fullest extent but the LTD Committee has approved, after intense analysis and counsel from its tax counsel, that funds attributable to medical expenses can be used to fund the HRA or go into the disability plan. All other funds can go into the replacement disability plan and the LTD employees can be given an option to fund either under those conditions. This proposal is in response to the objections that were filed to the Distribution Motion and will be presented as a way to resolve many of the objections filed.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

27.     For these reasons, I believe the Court should approve the Settlement Agreement and the Distribution Motion.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: Apr. 29, 2013

Barbara Gallagher

Jennifer L. Ford
Notary

JENNIFER L. FORD
NOTARY PUBLIC
STATE OF DELAWARE
My commission expires Oct. 20, 2015