# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------X
:
: Chapter 11
:
*In re* :
: Case No. 09-10138 (KG)
Nortel Networks Inc., *et al.*, :
: Jointly Administered
      Debtors. :
: **Hearing Date:**
: May 1, 2013 at 10:00 a.m. ET
:
: **RE: D.I. 9946, 9947, 10246, 10368**
:
:
----------------------------------------------------------X

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
JOINT MOTION FOR AN ORDER RETAINING JURISDICTION
PENDING APPEAL AND IN RESPONSE TO THE JOINT ADMINISTRATORS'
OBJECTION TO JOINT MOTION FOR AN ORDER RETAINING JURISDICTION
PENDING APPEAL AND CROSS-MOTION TO CONFIRM STAY PENDING APPEAL**

    The Movants respectfully submit this reply in further support of the Movants'

*Joint Motion for an Order Retaining Jurisdiction Pending Appeal* [D.I. 10246] (the "Joint

Motion"),[1] and in response to the *Joint Administrators' Objection to Joint Motion for an Order

Retaining Jurisdiction Pending Appeal and Cross-Motion to Confirm Stay Pending Appeal* [D.I.

10368] (the "Objection and Cross-Motion"). In reply to the Objection and Cross-Motion, and in

further support of the Joint Motion, the Movants respectfully represent as follows:

## ARGUMENT

    1.  The Movants agree with the Joint Administrators – up to a point – that the

Joint Motion and the Objection and Cross-Motion do not present the typical dispute over the

existence of an arbitration agreement. This is not a situation where two parties – without any

---

[1]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Joint Motion.

prior Court involvement – entered into commercial negotiations that led to a contract, as to which a later dispute has arisen and the Court is being asked – after the fact – to determine whether the parties agreed to arbitrate that dispute. Unlike in the typical situation and the situation described in all of the cases cited by the Joint Administrators, the Court is no stranger to the agreement in dispute. Rather, because the US Debtors are subject to this Court's oversight, the Court was well aware of the context in which the IFSA was negotiated, and approved the IFSA before it became effective. This Court is thus best positioned to know – to a certainty – whether when it approved the IFSA it intended to and did approve an arbitration agreement, which would have had the effect of divesting this Court of jurisdiction on the most important issue in this bankruptcy proceeding.[2] The Court has ruled definitively that it did not approve an arbitration agreement when it approved the IFSA and it is now frivolous for the Joint Administrators to claim the Court misunderstood its own order. This is in addition to the fact that the IFSA is, on its face, plainly not an arbitration agreement.

2.  As this Court is also aware, very early in these cases, a decision was made to sell all of the businesses and assets of the Nortel group. These sales took place over a period of two years, pursuant to auctions supervised by this Court and the Canadian Court. Before any sale took place, the Joint Administrators agreed, along with the US Debtors and the Canadian Debtors (and indeed any other selling corporate entity in the Nortel group) to not condition agreement to any sale on a particular allocation of sale proceeds. The document containing this cornerstone agreement is the IFSA, the Interim Funding and Settlement Agreement, which was approved by this Court and the Canadian Court on June 29, 2009. In reliance on the IFSA, a series of sales took place and approximately $7.5 billion in sale proceeds was generated. The

---

[2] As noted in the Joint Motion, the Bankruptcy Rules prohibit arbitration without this Court's consent. See Fed. R. Bankr. P. 9019(c).

allocation of these sales proceeds is one of three gating items that is preventing the winding up of the US Debtors (the other two being resolution of the claims of the EMEA Debtors, on which the Joint Administrators' allocation theory is based, and the resolution of the claims of the UK Pension Parties, whose claims are even further attenuated, but premised on the same sort of unsupported allegations against the US Debtors on which the EMEA claims are premised).

        3. The Joint Administrators voluntarily participated in all of the major sales processes. They and their representatives traveled to the United States and Canada repeatedly to participate in the lengthy and contentious negotiations over the sales. Every sale was subject to an auction process, all held in New York. Representatives of the Joint Administrators attended every auction. Every sale was subject to a joint evidentiary hearing before this Court and the Canadian Court. Representatives of the Joint Administrators attended every major sale hearing, both in Toronto and in Wilmington. Every sale was approved by complementary orders entered by both courts, where both courts retained jurisdiction to jointly decide disputes. The proceeds of every sale were deposited in accounts with JP Morgan Chase in New York subject to escrow agreements under which both courts retained jurisdiction to jointly decide disputes, including disputes involving the Joint Administrators. This Court is entitled to take judicial notice of all of the foregoing as all of it took place before this Court and subject to this Court's express approval.

        4. The question presented by the Joint Motion and Objection and Cross-Motion boils down to a simple one – whether the Joint Administrators' appeal of the denial of their May 19, 2011, Cross-Motion to Compel Arbitration (the "Appeal") is frivolous and as such this Court should retain jurisdiction during the pendency of the Appeal. *See Ehleiter v. Grapetree Shores, Inc.*, 482 F.3d 207, 215 n.6 (3d Cir. 2007). In the *Ehleiter* decision, the Third Circuit adopted the Seventh Circuit's decision in *Bradford-Scott Data Corp., Inc. v. Physician*

*Computer Network, Inc.*, 128 F.3d 504, 505 (7th Cir 1997), holding that a trial court can retain jurisdiction over a pending matter, notwithstanding an appeal as of right under Section 16(a) of the Federal Arbitration Act, 9 U.S.C. § 16(a), where the trial court determines that the appeal is "frivolous or forfeited."

       5.      The Joint Administrators' admit that their Appeal is based on their view that the IFSA contained, in section 12(b), an agreement to arbitrate. This view conflicts directly with the decision of this Court, issued on April 3, 2013, [D.I. 9946] and the accompanying order, issued on the same day, [D.I. 9947]. It also conflicts with the endorsement of the Canadian Court issued on April 3, 2013. The Joint Administrators protest that the definition of an appeal requires that the appellant disagree with the decision of the trial court and that, in and of itself, is not enough to satisfy the standard of frivolousness. If mere disagreement were the end of the inquiry, the Joint Administrators might have a point. However, it is not the end of the inquiry.

       6.      The IFSA is not a document created in a vacuum. The IFSA is the central document of these global insolvency proceedings. Without the IFSA, there would have been no sales, no auctions, no $7.5 billion. The Nortel entities would have dissolved each in their own jurisdiction and the assets would have been sold piecemeal for far less consideration. There would be no allocation dispute, but there would be far less money to satisfy creditors. For this reason alone, the IFSA is a very different sort of document.

       7.      The IFSA was also a document that had no legal effect until it was approved by an order of this Court. Thus, the IFSA is a creature of this Court and of this Court's inherent jurisdiction to issue orders relating to the Nortel US Debtors and to interpret those orders. The IFSA was negotiated in May, 2009 and approved by US and Canadian Courts on June 29, 2009. The Joint Administrators were present in the courtrooms in Toronto and

Wilmington when the IFSA was approved.  Never once during that entire approval process were the words arbitrate or arbitration used.  In fact, the US IFSA Order, which was subsequently recognized by the Canadian Court pursuant to section 18.6 of the CCAA, explicitly noted that no protocol was being approved and affirmatively required that the parties return for court approval of any protocol.  U.S. IFSA Order ¶ 8 [D.I. 993].  That requirement of subsequent approval is dispositive.  The IFSA contained no agreement to arbitrate, as the Joint Administrators recognized publicly when they admitted, long after the IFSA had been approved, that "in the event that it is not possible to agree on an arbitration process with the Canadian and U.S. entities, the process for determining the allocation of the sale proceeds is likely to be decided by the courts."  *Supplemental Submission of U.S. Debtors and Official Committee of Unsecured Creditors on Allocation Protocol Issues* dated March 4, 2013, at 7 [D.I. 9570] (quoting Joint Administrators' second progress report to creditors, dated February 12, 2010).

        8.        With the IFSA being a creature of this Court, and after massive briefing and two lengthy joint hearings in June 2011 and March 2013, this Court issued its Opinion finding – without any doubt or hesitation – that the IFSA did not contain an agreement to arbitrate and that it did contain a dispute resolution clause pursuant to which the EMEA Debtors agreed to joint hearings before the US and Canadian Courts.  This Court made it clear that the parties did not even come close to an agreement to arbitrate in the IFSA.  Opinion at 12 ("[T]he parties did not even approach any agreement on arbitration.").  The language of this Court's opinion is clear, definitive and without doubt.  It is also entirely consistent with the language used by the Canadian Court, language which is important as the IFSA was also a creature of the Canadian Court (it having been subject as well to Canadian Court approval).   In the light of such strong language from the Courts that not only oversaw the Cross-Motion to Compel Arbitration,

but also approved the IFSA in 2009, there can no doubt that the Appeal is frivolous and that the "frivolous or forfeited" standard adopted in *Bradford-Scott* and *Ehleiter* to address appeals that have no basis and are calculated to delay and distract has been satisfied.

## **CONCLUSION**

WHEREFORE, the Movants respectfully request that the Court (i) grant the Joint Motion; (ii) deny the Objection and Cross-Motion; and (iii) grant such other and further relief as the Court deems just and proper.

Dated:  April 30, 2013
        Wilmington, Delaware

                          CLEARY GOTTLIEB STEEN & HAMILTON LLP

                          Howard Zelbo (admitted *pro hac vice*)
                          James L. Bromley (admitted *pro hac vice*)
                          Jeffrey A. Rosenthal (admitted *pro hac vice)*
                          Lisa M. Schweitzer (admitted *pro hac vice*)
                          One Liberty Plaza
                          New York, New York 10006
                          Telephone:  (212) 225-2000
                          Facsimile:  (212) 225-3999

                                - and -

                          MORRIS, NICHOLS, ARSHT & TUNNELL LLP

                          */s/ Ann C. Cordo*
                          Derek C. Abbott (No. 3376)
                          Eric D. Schwartz (No. 3134)
                          Ann C. Cordo (No. 4817)
                          1201 North Market Street
                          P.O. Box 1347
                          Wilmington, Delaware 19801
                          Telephone:  (302) 658-9200
                          Facsimile:  (302) 658-3989

                          *Counsel for the Debtors*
                          *and Debtors in Possession*

- and -

AKIN GUMP STRAUSS HAUER & FELD LLP

Fred Hodara (admitted *pro hac vice*)
David Botter (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

- and -

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Christopher M. Samis*
Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Counsel for the Official Committee
of Unsecured Creditors*