# EXHIBIT D

CITATION: Nortel Networks Corporation (Re), 2013 ONSC 1757
COURT FILE NO.: 09-CL-7950
DATE: 20130403

**SUPERIOR COURT OF JUSTICE – ONTARIO**
**(COMMERCIAL LIST)**

RE:        IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

           AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

BEFORE:    MORAWETZ J.

COUNSEL:   D. Tay and J. Stam, for Nortel Networks Corporation

           B. Zarnett, J. Carfagnini and F. Myers, for Ernst & Young Inc., the Monitor

           M. Zigler, K. Rosenberg, A. Jacques, B. Wadsworth and E. Marques, for the Canadian Creditors Committee

           M. P. Gottlieb, J. Renihan and R. B. Schwill, for Nortel Networks UK Limited (in Administration)

           D. Ward, for the UK Pension Trustees/PPF

           A. Hirsh, for the Former Directors and Officers of Nortel Networks Corporation and Nortel Networks Limited

           A. Gray and S. Bomhof, for Nortel Networks Inc. and other U.S. Debtors

           J. Salmas, for Wilmington Trust, National Association

           S. Seigel, for the Bank of New York Mellon

           R. Swan and G. Finlayson, for the Informal Committee of Noteholders

           S. Kukulowicz, R. Jacobs, and M. Wunder, for the Unsecured Creditors' Committee

           E. Lamek, for the Law Debenture Trust Company of New York

HEARD:     March 7, 2013

ENDORSED: March 8, 2013

REASONS:   April 3, 2013

## ENDORSEMENT

Background

[1]    On June 7, 2011, Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") brought a motion requesting approval of a proposed protocol (the "Allocation Protocol") for the allocation of proceeds of the sale of their assets, the assets of Nortel Networks Inc. and certain of its U.S. affiliates including Nortel Networks (CALA) Inc. (collectively, the "U.S. Debtors"), and the assets of Nortel Networks U.K. Limited and certain of its affiliates located in Europe, the Middle East and Africa (collectively, the "EMEA Debtors").

[2]    An endorsement in respect of this motion was released on June 17, 2011 (the "June 17 Endorsement"). It is attached as Schedule "A", and is incorporated by reference into this endorsement.

[3]    A further endorsement was released on June 29, 2011 (the "June 29 Endorsement"). It is attached as Schedule "B", and is incorporated by reference into this endorsement. While the mediation referenced in the June 17 Endorsement and June 29 Endorsement took place, it failed to be worthwhile and was consequently terminated by declaration of the mediator.

[4]    A further endorsement was released on March 8, 2013 (the "March 8 Endorsement"). It is attached as Schedule "C", and is incorporated by reference into this endorsement. The March 8 Endorsement approved the Allocation Protocol, substantially in the form of Schedule "A" to the motion originally returnable June 7, 2011, with reasons to follow. These are the reasons.

[5]    The parties' inability to resolve their differences is unfortunate, as approximately $9 billion, raised from various asset sales and other realizations, awaits distribution to Nortel's global creditors, and the significant time lapse is exacerbating the negative effects of the previously identified public-interest issues (see the June 29 Endorsement). The only positive development for stakeholders since June 2011 was the sale of Nortel's patent portfolio for proceeds exceeding $4 billion (substantially surpassing the $900 million estimated amount).

[6]    The sad reality for all creditors is that four years have passed from when Nortel filed for *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("CCAA") protection.

Interim Funding and Settlement Agreement

[7]    In June 2009, the Canadian Debtors, certain U.S. Debtors, and certain EMEA Debtors (collectively, the "Debtors") entered into an Interim Funding and Settlement Agreement ("IFSA"), which provided for cooperation in the global sale of Nortel's business units.

[8]    Under the IFSA, these parties agreed to "negotiate in good faith and attempt to reach agreement on a timely basis" on a protocol (the "Protocol") for resolving disputes concerning the allocation of sale proceeds ("Sale Proceeds") from sale transactions. Importantly, for the purpose of determining this motion, the parties agreed, to the "fullest extent permitted by applicable law", that any "claim, action or proceeding" seeking "any relief whatsoever to the extent relating to the matters agreed in [IFSA]" must be commenced in the U.S. Court and the Canadian Court, in a

joint hearing of both courts under the cross-border protocol ("Cross-Border Protocol"), if such claim, action or proceeding would affect the Canadian Debtors and the U.S. Debtors or the EMEA Debtors.

[9]    Since the parties entered into the IFSA, they concluded several sales of global Nortel businesses and, in connection with these sales, they entered into escrow agreements ("Escrow Agreements"). These Escrow Agreements provided for the deposit of Sale Proceeds into escrow and the conditional distribution of the proceeds.

[10]    Significantly, under each Escrow Agreement, the parties irrevocably and unconditionally submitted to the exclusive jurisdiction of the U.S. Court and the Canadian Court, and agreed to be bound by any judgment arising "under or out of in respect of or in connection with" the Escrow Agreements.

The Protocol/Allocation Protocol

[11]    Failing to come to an agreement on a Protocol, after one-year of talks, prompted a suspension of negotiation between the parties.  The parties, according to the Canadian Debtors, specifically could not agree on the scope of the dispute to be determined under a Protocol and the dispute resolution process (for example, deciding whether the resolution should take the form of an arbitral award).

[12]    The parties subsequently attempted to reach a consensual resolution on these issues through mediation; however, mediation failed twice.

[13]    The U.S. Debtors and the Official Committee of Unsecured Creditors of the U.S. Debtors (the "Committee") subsequently filed this joint motion in the U.S. Court and the Canadian Court seeking orders approving the Allocation Protocol. The Canadian Debtors concurrently filed a motion seeking approval of the proposed Allocation Protocol, which they developed in conjunction with Ernst & Young Inc. (the "Monitor"), the U.S. Debtors, the Committee and others.

[14]    The Allocation Protocol proposed the following:

    (a) The Canadian Court and the U.S. Court would establish binding procedures, including discovery, for determining the allocation of the Sale Proceeds of the global sales to the Debtors' estates;

    (b) Creditor claims, including but not limited to intercompany claims, shall be determined in accordance with the claims reconciliation process established by the Nortel entity against which any intercompany claim is made;

    (c) The relevant Nortel selling entities (including the Debtors), the Committee, the Bondholder Group, the Monitor, the Joint Administrators (defined below) and the Ad Hoc Committee of Major Creditors Having Claims Only Against the Canadian Debtors would be "core parties" in the Allocation Protocol hearings, with full rights of participation.  Any other party in interest could seek to establish itself as a core party;

(d) The U.S. Debtors intend to file promptly motions with the U.S. Court to dismiss the EMEA Debtors' claims against the U.S. Debtors ("EMEA U.S. Claims"). The Canadian Debtors may file motions with the Canadian Court to dismiss the EMEA Debtors' claims against the Canadian Debtors ("EMEA Canadian Claims"); and

(e) The Canadian and U.S. Courts will hold, simultaneously, (i) a joint hearing regarding allocation of global proceeds and (ii) a hearing into unresolved EMEA Canadian Claims and EMEA U.S. Claims, provided that the Courts, in their discretion, may sit separately to hear evidence or argument that is relevant to only the Canadian or U.S. Debtors, respectively. Each Court would then issue its respective decisions.

<u>Party Submissions</u>

[15]    The parties disagree on the following fundamental issues: whether an agreement to arbitrate was reached (and, correspondingly, whether the Canadian Court and U.S. Court should compel arbitration), whether the Canadian Court and U.S. Court have jurisdiction to approve the Allocation Protocol, and whether the parties negotiated the Protocol in good faith.

*Submissions of the Canadian Debtors and the Monitor*

[16]    The Monitor's submissions essentially corroborate, or expand on, the following submissions of the Canadian Debtors.

[17]    Because the parties were unable to successfully negotiate a Protocol, the Canadian Debtors requests that the Canadian Court exercise its discretionary power to determine allocation issues and accordingly order the parties to direct payments from the escrow funds. Pursuant to section 5 of the IFSA, Sale Proceeds of each significant global transaction may only be distributed if instructed jointly by the depositors and estate fiduciaries (very unlikely at this point) or where the parties have entered into a Protocol (as previously mentioned, the parties could not come to an agreement); however, the distribution agent is able to distribute the proceeds if there is an "any order, judgment or decree" made or entered by any court "affecting the property deposited under th[e] Agreement".

[18]    The Canadian Debtors argue that the court lacks requisite authority to compel the parties to arbitrate their disputes because there has been no agreement to arbitrate. The parties merely agreed, pursuant to section 12(c) of the IFSA, to "negotiate in good faith and <u>attempt</u> to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions". Further, section 12(b) of the IFSA does not constitute an agreement to arbitrate because it has none of the features typically found in an enforceable commercial arbitration agreement, does not provide any methodology for an arbitration and does not reference the word "arbitration". It reads as follows:

> 12(b) In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

[19]    The Canadian Debtors further argue that the parties submitted irrevocably and unconditionally to the exclusive jurisdiction of the Canadian Court and U.S. Court. For example, under their many Escrow Agreements, the parties "irrevocably submit[ed] to and accept[ed] for itself and its properties, generally and unconditionally to the exclusive jurisdiction of … the U.S. Bankruptcy Court for the District of Delaware and the Ontario Superior Court of Justice" and agreed to be bound by any judgment "arising under or out of in respect of or in connection with" the Escrow Agreements. In addition, the parties submitted all legal proceedings seeking "any relief whatsoever" to the extent "relating to" the matters agreed in the IFSA to the exclusive joint jurisdiction of the Canadian Court and U.S. Court, pursuant to section 16(b) of the IFSA, as follows:

> 16(b) To the fullest extent permitted by applicable law, each Party…(ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in … a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors …

[20]    Finally, the Canadian Debtors claim that there is nothing to substantiate allegations that any party acted in bad faith. An agreement to negotiate in good faith, and attempt to reach agreement on a Protocol, does not require any party to ultimately acquiesce to an agreement.

*Submissions of the Joint Administrators of Nortel Networks U.K. Limited*

[21]    The Joint Administrators of Nortel Networks U.K. Limited (the "Joint Administrators"), acting as the court-appointed administrators and authorized foreign representatives for the EMEA Debtors, makes four submissions for dismissing this motion.

[22]    First, section 12(b) of the IFSA (articulated above) constitutes an enforceable arbitration clause to arbitrate the allocation of Sale Proceeds because it is a written agreement evidencing the intention of the parties to submit to binding *ad hoc* arbitration.  In exchange for the arbitration provision, which was designed to provide protection to each of the many worldwide Nortel entities by ensuring that they would have input into the Protocol and the appointment of the dispute resolvers, the parties agreed to give up significant rights in businesses and assets to enable the sale of Nortel's global assets to be completed without delay.

[23]    While the parties' agreement to arbitrate is clear on the face of the IFSA, any possible ambiguity is resolved by reviewing the negotiating history, surrounding circumstances, various courts understanding of how the allocation was to be determined, public statements and positions taken in negotiating a Protocol.

[24]    Second, neither the Canadian Court nor the U.S. Court has the jurisdiction to determine how the proceeds of the sale of the global Nortel assets and businesses should be divided among the estates of the various Nortel Debtors around the world. It is neither proper nor feasible for

courts of two independent nations to reach, in effect, a joint decision for the following three reasons:

- such a process violates the Cross-Border Protocol;

- the Ontario Court does not have jurisdiction to allocate Sale Proceeds that were outside the U.S. and Canada by entities outside the U.S. and Canada; and

- there are practical impediments to the Courts proceeding on the basis of a joint hearing regarding the Sale Proceeds allocation.

[25]   Third, and in the alternative, the Ontario Court has jurisdiction to order the Canadian Debtors to submit to arbitration under a panel of arbitrators. The proper role of the courts in their supervisory function in relation to the U.S. Debtors and Canadian Debtors is to require that the parties appoint an arbitration panel possessing the power to set a procedure for such arbitration.

[26]   Fourth, the parties to the IFSA made an enforceable promise to negotiate a Protocol for the arbitration procedures in good faith; counsel submits that there has been a *bona fide* failure in those negotiations.

[27]   In the Joint Administrators' supplementary submissions, counsel highlights practical problems invariably arising from the U.S. Court and Canadian Court trying to jointly address the division of assets among approximately 40 international entities. Counsel submits that it is unlikely that both courts independently will identically allocate the assets, resulting in conflicting decisions and no process for determining how to move forward.  Counsel also anticipates that the inevitable appeal process is not governed by a uniform set of procedural or legal rules.  The result would not only be years of litigation but potentially also two incompatible judgments, neither of which would be enforceable.

<u>Analysis and Conclusion</u>

[28]   I will assess the merits of the arguments made by all parties on the fundamental issues of divergence, in turn, before rendering my determination.

*Agreement to Arbitrate*

[29]   A common theme permeating the Joint Administrators' arguments is that the parties agreed to arbitrate. As I disagree with this underlying premise, I find many of their arguments to be inherently flawed.

[30]   Simply put, the parties agreed to enter into negotiations to agree on a Protocol; the best position of the Joint Administrators is an agreement to agree, which is unenforceable. I do not find the IFSA, or any of the documents, to be ambiguous in this regard.

[31]   A detailed review of the wording used in the Joint Administrators' argument is telling. The parties struck an <u>agreement</u> embodied in the IFSA; the parties would give up their…ownership rights in the assets to be sold in return for an <u>agreement</u> that, failing an agreement by the parties, the allocation of the sale proceeds would be decided in an arbitral form

that did not prejudice any of the parties by forcing any one of them to submit to the jurisdiction of a foreign court.

[32]   It could very well be that, from their standpoint, the asset sales were predicated on the allocation being decided by way of arbitration. However, in the IFSA, I am unable to find that the parties actually entered into an agreement to arbitrate.

[33]   Contrary to the Joint Administrators view that section 12(b) of the IFSA constitutes an enforceable arbitration clause, a plain and common-sense reading of this section leads to the conclusion that, if the objective of the provision was to create a mechanism for the distribution from the escrow account, the parties failed to achieve such objective. More particularly, section 12(b)(i) has not been met as there has been no agreement of all of the selling debtors; section 12(b)(ii) is irrelevant or inapplicable as the parties have failed to reach agreement on the terms of a Protocol.

*Court's Jurisdiction*

[34]   Conforming to the views espoused by the Canadian Debtors and the Monitor, I am satisfied that this court has discretionary authority under the CCAA to approve the Allocation Protocol. Considering, and potentially approving, the Allocation Protocol is consistent with the CCAA objectives of promoting efficiency and fairness by avoiding a multiplicity of inconsistent proceedings: *Re Muscletech Research and Development Inc.* (2006), 19 C.B.R. (5th) 54 (Ont. S.C.J.). This court's authority extends to the subject matter and the persons at issue here and this court has the authority to make the order sought approving the Allocation Protocol.

[35]   It is my view that all parties have irrevocably and unconditionally submitted to the jurisdiction of the Canadian Court and the U.S. Court. This is established as a result of the jurisdiction clause in each of the Escrow Agreements, the filing of claims by the EMEA Debtors and section 16 of the IFSA. In this respect, I accept the arguments put forth by the Canadian Debtors.

[36]   No compelling argument accompanied the Joint Administrators' assertion that this court has jurisdiction to order the Canadian Debtors to submit to arbitration under a panel of arbitrators. While there may be a presumption in favour of international arbitration, it presupposes that the parties have agreed to arbitrate (which is not the case in the present circumstances).

[37]   The objective of these proceedings must be, at this time, to ensure that the outcome is something that will be final and binding on all parties. This can be accomplished, in my view, by a joint hearing of the matter with the Canadian Court and the U.S. Court.

[38]   I acknowledge the procedural difficulties identified by the Joint Administrators in their supplemental submissions, and I do not underestimate the challenges that lie ahead. However, all parties embraced joint or parallel hearings of the U.S. Court and the Canadian Court to bring forth a number of matters, most notably applications for approval of sales process and for approval of sales. Further, despite the different procedures in the U.S. Court and the Canadian Court, both courts have worked effectively with the result that billions of dollars are now available for distribution to the stakeholders. I maintain confidence that the U.S. Court and the

Canadian Court will ensure that matters going forward are similarly dealt with in a fair and equitable manner.

[39]    Raising potential procedural issues is not sufficient to dismiss the motion of the Canadian Debtors.  Challenges of procedure will be addressed during the proceedings in the same way as procedural issues are addressed in numerous other proceedings that are brought before the court.

*Good Faith*

[40]    With respect to the Protocol negotiations, there is no shortage of conflicting viewpoints. Nevertheless, there is an overall lack of evidence either on the record, or in the parties' oral submissions, demonstrating that any party failed to negotiate the Protocol in good faith. To the contrary, there is evidence that all parties made efforts to come to a mutually beneficial agreement; as pointed out by the Canadian Debtors, failure to come to such an agreement does not necessarily evidence a lack of good faith in negotiations.

*Order*

[41]    Amendments must be made to the Allocation Protocol before it is approved, as mentioned in the March 8 Endorsement. I have specifically rejected the suggestion that there should be specified restrictions on "core parties" in the Allocation Protocol hearing; rather, I determined that certain indenture trustees should also be "core parties", and I invited suggestions as to whether there would be other "potential core parties".

[42]    I note that the U.S. Debtors filed motions with the U.S. Court to dismiss EMEA U.S. Claims, and a decision with respect to this issue has been rendered by Chief Judge Kevin Gross. The U.S. Debtors put forward an amended version of the Allocation Protocol at the March 7, 2013 hearing.  Given that substantial argument was based on the Allocation Protocol as originally presented, it is not appropriate, in my view, to consider amendments that were brought forth at the hearing which was not intended to receive new positions but rather to provide a summary of the positions previously brought forward.  The appropriate version of the Allocation Protocol to consider is the one that was previously brought before the court on June 7, 2011.

[43]    In the result, I grant the Canadian Debtors' motion and approve an amended Allocation Protocol, which incorporates the aforementioned amendments while remaining substantially in the form of Schedule "A" to the motion originally returnable June 7, 2011. The amended Allocation Protocol must be filed with this Court for approval by April 15, 2013.

[44]    By way of directions for scheduling, the trial for this matter is scheduled to commence on January 6, 2014. The trial will begin with the allocation issues and continue thereafter with remaining issues to be addressed in the Allocation Protocol, including EMEA Claims and U.K. Pension matters.

[45]    The cross-motion of the Joint Administrators, requesting an order compelling and directing the parties to the IFSA to engage in arbitration regarding all disputes concerning the allocation of Sale Proceeds, is dismissed.

MORAWETZ J.

**Date:**    April 3, 2013

SCHEDULE "A"

**CITATION:** Nortel Networks Corporation (Re), 2011 ONSC 3805
**COURT FILE NO.:** 09-CL-7950
**DATE:** 20110617

## SUPERIOR COURT OF JUSTICE - ONTARIO

RE:        IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

BEFORE:    MORAWETZ J.

COUNSEL:  Alan Mark, Derrick Tay, Alan Merskey and Jennifer Stam, for Nortel Networks Corporation et al

F. Myers, J. Pasquariello and C. Armstrong, for the Monitor, Ernst & Young Inc.

Mark Zigler, Andrea McKinnon, for the Former & Disabled Employees

G. Finlayson, R. Orzy and R. Swan, for the Noteholder Group

Lily Harmer and Max Starnino, for the Superintendent

S. Seigel, for the Bank of New York Mellon

Alex MacFarlane and Abid Quereshi, for the Official Committee of Unsecured Creditors

R. Paul Steep and Elder C. Marques, for Morneau Shepell

Barry Wadsworth, for CAW-Canada

M. P. Gottlieb, R. Schwill and S. Campbell, for the Joint Administrators

Bill Burden, for the U.K. Pension Trustee

Lyndon Barnes, for the Board of Directors of Nortel

Andrew Gray and Scott Bomhof, for the U.S. Debtors

Arthur O. Jacques, for Nortel NCCE

HEARD:      June 7, 2011


## ENDORSEMENT


[46]    On June 7, 2011, Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") brought a motion requesting approval of an allocation protocol (the "Allocation Protocol").

[47]    A similar motion was also brought at the same time by Nortel Networks Inc. ("NNI") and certain of its U.S. affiliates (the "U.S. Debtors") in the Chapter 11 Proceedings before the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") (the "Chapter 11 Proceedings").

[48]    The hearing was conducted by video conference with the companion motion being heard in the U.S. Court before His Honor Judge Gross.   This joint hearing was conducted in accordance with the provisions of the Cross-Border Protocol which was previously approved by both the U.S. Court and by this Court.

[49]    Both motions had the support of all parties appearing, save for the Joint Administrators of Nortel Networks (U.K.) Limited ("NNUK") and certain of its subsidiaries and affiliates located in the EMEA (collectively, the "EMEA Debtors").

[50]    Decisions in respect of both motions are currently under reserve.

[51]    On June 13, 2011, at the request of both Judge Gross and me, a case conference was conducted by telephone.  It was reported to the participants that our respective decisions relating to the aforementioned motions would be under reserve for a considerable period of time.

[52]    Certain of the issues raised in the motions have been the subject of two mediation sessions.  These mediation sessions were not successful.  It is my understanding that, in addition to the allocation issue, issues of validity of quantification of certain claims and inter-company claims were discussed.

[53]    Allocation issues have arisen out of the Interim Funding and Settlement Agreement ("IFSA"), which was entered into in June 2009, between the Canadian Debtors, certain of the U.S. Debtors and certain of the EMEA Debtors.  The IFSA provides amongst other things, for the parties cooperation in the global sales of Nortel's business units as well as for the parties to attempt to negotiate the terms of an Interim Sales Protocol ("Protocol").

[54]    The parties entered into negotiations for approximately one year with respect to the terms of a Protocol.  After a year of negotiations, the parties were still unable to agree on certain fundamental terms of the Protocol, including, for example, the scope of the issues to be determined under the Protocol.

[55]    As a result, according to the Canadian Debtors, the Protocol negotiations were suspended and the parties agreed to reach a consensual resolution through mediation.  After the mediation was declared unsuccessful, the U.S. Debtors and the Canadian Debtors, developed the proposed Allocation Protocol.

[56]    The Allocation Protocol establishes procedures and an expedited schedule for the cross-border resolution by the U.S. Court and this Court of the allocation of the proceeds from the Sale Transactions pursuant to the IFSA.

[57]    The Allocation Protocol proposes that all hearings in respect of the Allocation Protocol proceed by way of joint hearings between the U.S. Court and this Court pursuant to the cross-border protocol.

[58]    The position of the EMEA Debtors is that issues arising out of the IFSA are to be determined by a dispute resolver, in this case, an arbitrator.

[59]    In my view, pending the release of a decision on the motion, the parties could benefit from the appointment of a mediator so that they can continue to make progress towards the ultimate resolution of Nortel matters.  The parties have exhibited an ability to cooperate and have been extremely successful in realizing significant proceeds from the sale of Nortel assets globally.  However, the creation of an asset pool is not ultimate resolution of Nortel matters.  These proceedings can only be concluded with a distribution of proceeds to the various creditors of Nortel globally.  These proceedings were commenced on January 14, 2009.  Creditors have been waiting nearly two and one-half years for a meaningful distribution.  A mediation will require that the parties continue a dialogue.  It is possible that tangible, positive results will flow from such mediation.

[60]    In order to assist the parties with their deliberations, I am directing that the parties engage in mediation pending my ruling.  I understand that Judge Gross will be issuing a similar direction in the Chapter 11 Proceedings.

[61]    I recognize that the parties may have difficulty in reaching a consensus on a mediator.  In the case conference on June 13, 2011, we asked that the parties consult with each other and provide the name of an acceptable mediator.  No individual has been identified.  It, therefore, falls to both Judge Gross and to me to appoint a mediator.

[62]    The mandate of the mediator is to address issues raised in the motion.  It is recognized that the boundary of this mandate is not clearly defined.  It seems to me that defining a precise boundary, in these circumstances, may be better left to the mediator, as it may not be possible to address the issues affecting allocation without taking into consideration issues relating to the validity and quantification of claims.

[63]    The mediator shall have the right to file periodic reports with the court detailing progress, or lack thereof, recognizing that the sessions are on a without prejudice basis.

[64]    It is my understanding that, at the mediation sessions, there were a large number of parties that participated.  While I do not take issue with the right of any party to participate in the mediation, I did observe that at the hearing of the within motion, the primary submissions were made by the Canadian Debtors, the EMEA Debtors and the Monitor.  It was also my observation that the primary submissions of parties in the Chapter 11 Proceedings were likewise concentrated among a relatively small group of counsel.  The mediation will, in all likelihood, be more effective if the number of participants is significantly reduced from the number that attended the previous sessions.  It is hoped that the parties will be able to work out the details respecting participation of the mediation.

[65]    The identity of the mediator will be provided by way of Supplementary Endorsement early next week.  The mediator shall have the ability to retain advisors and counsel as he or she deems appropriate in the circumstances and to have the expenses of such advisors and counsel paid out of the assets of Nortel.

[66]    In addition, consistent with the conclusion of the U.S. Court, the mediator is to have expanded authority, if the parties agree, to conduct a mediation/arbitration or an arbitration in respect of this matter.

[67]    To the extent that further directions are required in respect of this directed mediation, the parties can contact the Commercial List Office in order to set up a case conference.


"Morawetz J."

_____

MORAWETZ J.

**Date:**   June 17, 2011

SCHEDULE "B"

**CITATION:** Nortel Networks Corporation (Re), 2011 ONSC 4012
**COURT FILE NO.:** 09-CL-7950
**DATE:** 20110629

**SUPERIOR COURT OF JUSTICE - ONTARIO**

**RE:** IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

**BEFORE:** MORAWETZ J.

**COUNSEL:** Alan Mark, Derrick Tay, Alan Merskey and Jennifer Stam, for Nortel Networks Corporation et al

F. Myers, J. Pasquariello and C. Armstrong, for the Monitor, Ernst & Young Inc.

Mark Zigler, Andrea McKinnon, for the Former & Disabled Employees

G. Finlayson, R. Orzy and R. Swan, for the Noteholder Group

Lily Harmer and Max Starnino, for the Superintendent

S. Seigel, for the Bank of New York Mellon

Alex MacFarlane and Abid Quereshi, for the Official Committee of Unsecured Creditors

R. Paul Steep and Elder C. Marques, for Morneau Shepell

Barry Wadsworth, for CAW-Canada

M. P. Gottlieb, R. Schwill and S. Campbell, for the Joint Administrators

Bill Burden, for the U.K. Pension Trustee

Lyndon Barnes, for the Board of Directors of Nortel

- Page 2 -

Andrew Gray and Scott Bomhof, for the U.S. Debtors

Arthur O. Jacques, for Nortel NCCE

## ENDORSEMENT

[1]     This Endorsement relates to my Endorsement of June 17, 2011.  The following directions take precedence over the directions provided on June 17, 2011.

[2]     On June 7, 2011, Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") brought a motion requesting approval of a proposed protocol for the allocation of the proceeds of the sale of their assets, the assets of the U.S. Debtors (defined below) and those of Nortel Networks U.K. Limited (NNUK") and certain of its affiliates located in Europe, the Middle East and Africa (collectively, the "EMEA Debtors") (the "Allocation Protocol").

[3]     A similar motion was also brought at that time by Nortel Networks Inc. ("NNI") and certain of its U.S. affiliates (the "U.S. Debtors") in the Chapter 11 Proceedings before the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") (the "Chapter 11 Proceedings").

[4]     The hearing was conducted by video conference with the companion motion being heard in the U.S. Court before His Honor Judge Gross.  The joint hearing was conducted in accordance with the provisions of the Cross-Border Protocol which was previously approved by both the U.S. Court and by this Court.

[5]     Both motions had the support of all parties appearing, save for the joint administrators of NNUK.

[6]     Allocation issues have arisen out of the Interim Funding and Settlement Agreement ("IFSA"), which was entered into in June 2009, between the Canadian Debtors, certain of the U.S. Debtors and certain of the EMEA Debtors.  The IFSA provides amongst other things, for the parties cooperation in the global sales of Nortel's business units as well as for the parties to attempt to negotiate the terms of an Interim Sales Protocol ("Protocol").

[7]     To date, the parties have been unable to resolve these allocation issues on a consensual basis.  This has resulted in a most unfortunate situation.

[8]     Nortel's insolvency is somewhat unique.  The sale of its business units has created a sizeable asset pool.  With the exception of the IP Transaction, the auction for which commenced on June 27, 2011, the Canadian Debtors, the U.S. Debtors, the EMEA Debtors and their affiliates have now divested substantially all of Nortel's material worldwide assets.  The proceeds of these divestitures – some $3 billion currently with a minimum of a further $900 million expected to be added upon consummation of the patent portfolio and related asset transactions – now sit in escrow awaiting the resolution of allocation.

[9]    This allocation issue, together with the resolution of the EMEA claims and the U.K. pension claims, lies at the heart not only of these CCAA proceedings, but also the Chapter 11 Proceedings and proceedings in the United Kingdom.  As the Monitor noted in its 67th Report: "Simply put, they are matters that must be resolved before any creditor of an applicant (and likely any other Nortel debtor) can expect to receive a meaningful distribution on account of amounts that have now been outstanding in most cases since January 2009.

[10]    The Canadian Debtors have no significant secured creditors.  The Canadian Debtors do, however, have significant unsecured creditors, most of whom are individuals who are employed or were formerly employed by Nortel.  Many of these former employees are pensioners and this group have unsecured claims for both pension and medical benefits.

[11]    There are also significant employee and former employee claims against the U.S. Debtors and the EMEA Debtors.

[12]    For many of these individuals, the delay in receiving a meaningful distribution can be significant.  It is not just a question of calculating the time value of money.  For this group of creditors, time is not on their side.

[13]    This issue is international in scope.  It is also a public-interest issue.  A protracted delay in resolving the impasse surrounding allocation is highly prejudicial to this group.

[14]    In making these comments, I do not mean to suggest that the claims of other creditor groups are not of equal significance.  The reality is, however, that the timing of a receipt of a distribution may be less critical for a financial player as opposed to an individual.

[15]    The difficulty in resolving the allocation issue that is before both the U.S. Court and this Court is, of course, complicated by the fact that it is a multi-jurisdictional issue.  There is no simple solution to the legal predicament that faces all parties.

[16]    Decisions in respect of both motions are currently under reserve.  The nature and length of the arguments presented at the motion will necessitate careful drafting and separate rulings by the U.S. Court and this Court.  Both Courts are concerned that this delay will also delay allocation proceedings and therefore distributions to creditors.  Moreover, the risk of inconsistent decisions and the uncertainty of the appellate process (with further risk of inconsistent decisions) may further delay the progress of the cases.

[17]    A protracted delay in the progress of the cases will only exacerbate an already unfortunate situation for the many individual creditors.  With extended delay comes uncertainty.  For many, uncertainty brings considerable stress and a bad situation becomes even worse. Clearly, the consequences of extended litigation are not desirable.

[18]    Both Courts concluded that the parties could benefit from the appointment of a mediator so that they can continue to make progress towards the ultimate resolution of Nortel matters. Consequently, both the U.S. Court and this Court directed that the parties, who participated in the hearing on June 7, 2011, engage in mediation pending the release of decisions in both motions.  The mediator will have the authority to include such other parties as he deems appropriate, in his discretion.

[19]    The mediator has the authority, in consultation with the parties, to determine the scope of the mediation, as he deems appropriate, including, without limitation, the allocation issue in its entirety and global issues relating to allocation and claims.

[20]    The mediator is authorized to select advisors of his choosing.  The reasonable fees and expenses of the advisors shall be reimbursed by the Canadian Debtors, the U.S. Debtors and the EMEA Debtors.

[21]    The particulars of the mediation are as follows:

>    Mediator:        The Honourable Warren K. Winkler
>                     Chief Justice of Ontario
>                     Court of Appeal for Ontario
>                     Osgoode Hall
>                     130 Queen Street West
>                     Toronto, ON
>                     M5H 2N5
>
>    Timing:          To be arranged by the mediator

[22]    Participation in this mediation is mandatory.  Any agreements reached as a result of mediation will be binding on the parties.

[23]    A settlement of the dispute being mediated shall also be subject to the approval of the U.S. Court and this Court, on notice to parties in interest.

[24]    The parties shall recognize that mediation proceedings are settlement negotiations, and that all offers, promises, conduct and statements, whether written or oral, made in the course of the proceedings, are inadmissible in any arbitration or court proceeding, to the extent allowed by law.  The parties shall not subpoena or otherwise require the mediator or any advisor to the mediator, to testify or produce records, notes or work product in any future proceedings, and no recording will be made of the mediation session.  Evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation session.  In the event that the parties do reach a settlement agreement, the terms of that settlement will be admissible in any court or arbitration proceedings required to enforce it, unless the parties agree otherwise.  Information disclosed to the mediator at a private caucus shall remain confidential unless the party authorizes disclosure.

[25]    The mediator has the right, prior to the commencement of the mediation only, to communicate with Judge Gross and me, for the purposes of obtaining background information.

[26]    The mediation process shall be terminated under any of the following circumstances:

>    (a) by a declaration by the mediator that a settlement has been reached;
>
>    (b) a declaration by the mediator that further efforts at mediation are no longer considered to be worthwhile; or

- Page 5 -

(c) for any other reason as determined by the mediator.


[27]    The Monitor is directed to circulate a copy of this endorsement to all parties who attended on the return of the motion on June 7, 2011.


"Morawetz J."

_____

MORAWETZ J.

**Date:**   June 29, 2011

SCHEDULE "C"


**CITATION:** Nortel Networks Corporation (Re), 2013 ONSC 1470
**COURT FILE NO.:** 09-CL-7950
**DATE:** 20130308

**SUPERIOR COURT OF JUSTICE – ONTARIO**

(COMMERCIAL LIST)


RE:   IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

     AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

     APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

BEFORE:  MORAWETZ J.

COUNSEL: *Derrick Tay and Jennifer Stam*, for Nortel Networks Corporation

     *Benjamin Zarnett, Fred. Myers* and *Jay Carfagnini* for Ernst & Young Inc., Monitor

     *Mark Zigler, Ken Rosenberg, Arthur Jacques, Barry Wadsworth* and *Elder C. Marques* for Canadian Creditors' Committee

     *Matthew P. Gottlieb, Robin B. Schwill* and *James Reinihan* for Nortel Networks UK Limited (in Administration)

     *David Ward* for PPF/Trustee

     *Adam Hirsh* for Former Directors & Officers of Nortel Networks Corporation and Nortel Networks Limited

     *Andrew Gray* and *Scott Bomhof* for Nortel Networks Inc. and other U.S. Debtors

     *John Salmas* for Wilmington Trust, National Association

*Sheryl Seigel* for the Bank of New York Mellon

*Richard Swan* and *Gavin Finlayson* for Informal Committee of Noteholders

*Shayne Kukulowicz*, *Ryan Jacobs* and *Mike Wunder* for Unsecured Creditors' Committee

*Edmond Lamek* for Law Debenture Trust Company of New York

**HEARD:**    March 7, 2013

**DECISION:**    March 8, 2013

## E N D O R S E M E N T

[1]    For reasons to follow, the motion of Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") for an order approving an Allocation Protocol, substantially in the form of Schedule "A" to the motion originally returnable June 7, 2011 is granted, subject to the following modifications:

> (i) the Allocation Protocol is to be based on the protocol presented on the original return date, namely June 7, 2011, and is not to be based on the protocol presented during argument on March 7, 2013;

> (ii) the list of "core parties" referenced in paragraph (o)(iii) of the Motion Record is to be expanded.  Representations were received from numerous indenture trustees on March 7, 2013. These parties are to be included as "core parties"; and

> (iii) the Monitor is directed to provide the court with a revised list of proposed "core parties" for its consideration, balancing interests of natural justice as well as the objective to resolve outstanding issues in the most expeditious and least expensive manner possible.

[2]    The Monitor is also directed to coordinate input from the parties with respect to a litigation schedule.  Directions in respect of the litigation schedule will be addressed in the full reasons for this decision.

[3]    The cross motion of the Joint Administrators of Nortel Networks UK Limited, originally returnable June 7, 2011 requesting an order compelling and directing the parties to the Interim Funding and Settlement Agreement dated June 9, 2009 (the "IFSA") to engage in arbitration

- Page 3 -

regarding all disputes concerning the allocation of Sales Proceeds (as defined in the IFSA), is dismissed.

[4]    The appeal period in respect of this endorsement will commence on the date when full reasons are released, which date will coincide with the release of reasons of Chief Judge Kevin Gross of the United States Bankruptcy Court for the District of Delaware.

"Morawetz J."

_____

Morawetz, J.

**DATE:**        March 8, 2013