## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------------- X
                         :

In re:                             :    Chapter 11
                          :

NORTEL NETWORKS INC., *et al.*,[1]    :    Case No. 09-10138 (KG)
                          :

               Debtors.    :    (Jointly Administered)
                          :
                          :    **RE:  Docket No. 10166**
---------------------------------------------------------------------- X

## <u>NOTICE OF FILING OF ITEMS DESIGNATED FOR RECORD ON APPEAL</u>

        **PLEASE TAKE NOTICE** that in accordance with Rule 8006-1(c) of the

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for

the District of Delaware, the court-appointed administrators and authorized foreign

representatives (collectively, the "<u>Joint Administrators</u>")[2] for Nortel Networks UK Limited

("<u>NNUK</u>") and certain of its affiliates (collectively, and including NNUK, the "<u>EMEA</u>

<u>Debtors</u>"),[3] filed the following items, which will be designated in the record of their appeal

[D.I. 10166] of the Order Approving Allocation Protocol, entered by the United States

---

[1].    The Debtors in these Chapter 11 cases are: Nortel Networks Inc., Nortel Networks Capital Corporation, Alteon WebSystems, Inc., Alteon WebSystems International, Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

[2]    The Joint Administrators in the English proceedings for all of the EMEA Debtors, with the exception of Nortel Networks (Ireland) Limited, are:  Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, and Stephen John Harris.  The Joint Administrators in the English proceedings for Nortel Networks (Ireland) Limited are:  Alan Robert Bloom and David Martin Hughes.

[3]    The EMEA Debtors are located in Europe, the Middle East and Africa and are in proceedings pending before the High Court of Justice of England and Wales.  They are:  Nortel Networks UK Limited; Nortel GmbH; Nortel Networks (Austria) GmbH; Nortel Networks (Ireland) Limited; Nortel Networks AB; Nortel Networks B.V.; Nortel Networks Engineering Service Kft; Nortel Networks France S.A.S.; Nortel Networks Hispania S.A.; Nortel Networks International Finance & Holding B.V; Nortel Networks N.V.; Nortel Networks OY; Nortel Networks Polska Sp. z.o.o.; Nortel Networks Portugal S.A.; Nortel Networks Romania SRL; Nortel Networks S.A.; Nortel Networks S.p.A.; Nortel Networks Slovensko, s.r.o.; Nortel Networks s.r.o.

Bankruptcy Court for the District of Delaware on April 3, 2013 [D.I. 9947] and the

accompanying Opinion [D.I. 9946]:

| Attached Hereto As Exhibit: | Description |
|---|---|
| A | Affidavit of Tai-Heng Cheng |
| B | The Nortel Mediation Opening Remarks of Chief Justice Warren K. Winkler on April 24, 2012 |
| C | Endorsement of Justice Morawetz of the Ontario Superior Court of Justice–Commercial List dated March 8, 2013 |
| D | Endorsement of Justice Morawetz of the Ontario Superior Court of Justice–Commercial List dated April 3, 2013 |
| E | Amended Notice of Motion for Leave to Appeal |
| F | Notice of Motion to Expedite and Consolidate |

Dated: Wilmington, Delaware
       May 1, 2013

                    YOUNG CONAWAY STARGATT & TAYLOR, LLP

                         /s/ Jaime Luton Chapman
                         Edwin J. Harron (No. 3396)
                         John T. Dorsey (No. 2988)
                         Jaime Luton Chapman (No. 4936)

                         Rodney Square
                         1000 North King Street
                         Wilmington, Delaware 19801
                         Telephone:  302-571-6600
                         Fax:  302-571-1253

                              – and –

                         HUGHES HUBBARD & REED LLP

                         Derek J.T. Adler
                         Amera Z. Chowhan
                         Gabrielle Glemann
                         Charles H. Huberty

                         One Battery Park Plaza
                         New York, New York 10004
                         Telephone:  212-837-6000
                         Fax:  212-422-4726

                              – and –

                         HERBERT SMITH FREEHILLS LLP

                         Kevin Lloyd
                         John Whiteoak
                         Richard Lawton

                         Exchange House
                         Primrose Street
                         London EC2A 2HS

                         *Counsel for Joint Administrators*

**EXHIBIT A**

Court File No: 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
COMMERICAL LIST

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORTATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AFFIDAVIT OF TAI-HENG CHENG
(sworn May 31, 2011)

I, Tai-Heng Cheng, of the City of New York, in the State of New York, MAKE OATH AND SAY:

1.    I have been asked to provide my independent expert opinion under New York law, as well as applicable U.S. federal law and international law, on certain issues relating to this case.

## I.    QUALIFICATIONS

2.    I am Senior Legal Advisor at Hoguet Newman Regal & Kenney, LLP.  I am a member of the bars of the State of New York, the U.S. District Courts for the Southern, Eastern and Western Districts of New York, and the U.S. Court of Appeals for the Second Circuit.  I have litigated several cases involving contract law in New York state and U.S. federal courts, and have assisted the U.S. Court of Appeals for the Second Circuit as *amicus curiae* on international law issues.

3.    I have served as an arbitrator, expert and counsel in international arbitrations under ICSID, UNCITRAL, ICDR, ICC, SCC, and JAMS rules, and am a member of the panels of neutrals of the ICDR, CPR, and HKIAC.  I have also advised the Republic of Kosovo on international law matters, including treaties.  In 2010, I chaired an arbitration tribunal that resolved an international contract dispute governed by New York law.  I am presently serving as an expert in international law and arbitration agreements in two international arbitrations.

4.    In addition to being a practicing New York attorney, I am a tenured Professor of Law and Director of the Institute for Global Law, Justice and Policy at New York Law School, where I have taught contract law and international arbitration almost annually since 2006.  I am the author of forty published and forthcoming books, articles and essays in international law, of which a dozen of them address international dispute resolution.  I have given sixty lectures worldwide on international law, including twenty addressing international dispute resolution.  U.S. federal appeals and district court decisions, as well

as U.S. Supreme Court briefs, have cited and relied on my scholarship as authoritative on international law. I have been a visiting professor at Vanderbilt Law School and City University of Hong Kong School of Law, in 2010 and 2008, respectively, and will be a visiting professor at Hebrew University School of Law in 2012. In all my visiting professorships, I teach courses and give public lectures on international law and international dispute resolution.

5.      I am an elected member of the Executive Council of the American Society of International Law ("ASIL"), and was co-chair of its 2011 Annual Meeting. In 2008, I served on its Awards Committee, which selected preeminent works to receive ASIL's Certificate of Merit, its highest award for scholarship. I am also an elected member of the American Law Institute, and serve on its Members Consultative Committees that assist in the preparation of the Restatement (Third) of the U.S. Law of International Commercial Arbitration, and the Principles of World Trade Organization Law. I also serve on the Academic Council of the Institute for Transnational Arbitration, and am Honorary Fellow of the Foreign Policy Association.

6.      I hold Doctor of the Science of Law and Master of Laws degrees from Yale Law School from 2004 and 2000, respectively, where I was a Howard M. Holtzmann Fellow for International Law. I also received a Bachelor of Arts in Law with First Class Honors from Oxford University in 1999, where I was an Oxford University Scholar.

7.      A *curriculum vitae* setting forth a complete list of my professional activities and publications is appended to this affidavit as Exhibit A.

## II.    SUMMARY OF OPINION

8.      The court-appointed administrators and authorized foreign representatives for Nortel Networks UK Limited and the EMEA Debtors (collectively, the "Joint Administrators") have asked me to express my independent expert opinion, under New York law and applicable U.S. federal law: (i) on whether the Joint Administrators and

2

other debtors of the Nortel estate are required to resolve disputes over the allocation of the sale proceeds of Nortel assets (the "Sale Proceeds") through arbitration (as opposed to judicial adjudication); (ii) on whether courts have jurisdiction to resolve the merits of any dispute over the allocation of the Sale Proceeds considering the provisions of the IFSA; and (iii) on what evidence would be admissible to interpret an ambiguous arbitration agreement.

9.      In my opinion, under New York law and the U.S. Federal Arbitration Act (the "FAA"), the Joint Administrators and other debtors of the Nortel estate are required to resolve any disputes over the allocation of the Sale Proceeds through international arbitration, by which I mean an arbitration involving parties of more than one nationality. They must resolve such disputes through international arbitration because they signed the Interim Funding and Settlement Agreement dated as of June 9, 2009 ("IFSA"), which contains a binding arbitration agreement in Section 12(b).  In light of international commercial practices and terminology, and the entire context of Section 12, the words of Section 12(b) plainly and unequivocally require the parties to the IFSA to resolve all disputes concerning the allocation of the Sale Proceeds through an *ad hoc* arbitration.  An *ad hoc* arbitration is an arbitration in which the parties did not select the rules of any arbitral institution in their arbitration agreement.  As with some other *ad hoc* arbitration agreements, the IFSA parties agreed to negotiate in good faith to establish binding procedures for the *ad hoc* arbitration.  As an objective matter, this further shows that the parties did not intend for their disputes to be resolved by a court because they do not have the legal authority to bind a court to the procedures to which they agreed.

10.     Because the IFSA parties have specifically agreed to *ad hoc* arbitration, the general jurisdiction provision in Section 16(b) of the IFSA granting jurisdiction to U.S. and Ontario courts must be interpreted, as a matter of contract law, to confer only limited jurisdiction to courts.  This limited jurisdiction is jurisdiction to determine whether the arbitration agreement is valid and if so, to compel arbitration, and to review the arbitration award after an arbitration tribunal issues it, bearing in mind that the standard of review is much higher than an appellate standard.  This interpretation is consistent

3

with the FAA and the U.N. Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), to which both the United States and Canada are treaty parties and which the United States implemented domestically through the FAA. The court has no jurisdiction to adjudicate the merits of a dispute over the allocation of the Sale Proceeds, which is subject to dispute resolution only through international arbitration.

11.     In New York, if a court were to find that Section 12 is ambiguous, extrinsic evidence of the parties' intent to arbitrate these issues is admissible to resolve the ambiguity. Such evidence includes oral agreements or writings between the parties made prior to or contemporaneous with the execution of the IFSA, as well as evidence of the course of conduct between the parties following the execution of the IFSA. If, after reviewing all evidence submitted, any doubt remained as to the existence of an agreement to arbitrate between the parties, New York law requires courts to support the federal policy favoring arbitration and therefore to resolve any ambiguities in favor of arbitration.

12.     My opinions are explained fully below and are supported by statutes, binding precedents, and persuasive authority.

## III.   QUESTIONS PRESENTED AND ANSWERS

13.     The Joint Administrators have asked me to express an opinion on the following specific questions of New York law:

> (A)   The requirements for there to be an enforceable agreement to arbitrate a dispute;
>
> (B)   Whether Section 12(b) of the IFSA constitutes an agreement to arbitrate relating to the allocation of Sales Proceeds;

4

(C)    Whether Section 16(b) of the IFSA provides the Court with jurisdiction to determine any disputes relating to the allocation of Sales Proceeds;

(D)    Whether Section 12(c) of the IFSA creates a binding obligation on any party to negotiate in good faith towards an agreement on the Interim Sales Protocol referred to in the IFSA;

(E)    Whether extrinsic evidence is admissible in order to consider and determine the proper interpretation of the IFSA with respect to whether the parties agreed to arbitration and regarding what the term "dispute resolver(s)" in the IFSA means; and

(F)    Whether evidence regarding the parties' negotiations is admissible to determine whether such negotiations were conducted in good faith.

14.    For the reasons set forth in more detail below, it is my opinion that:

(A)    Under New York law, an arbitration agreement is valid and enforceable if it is in writing and evinces an intent of the parties to the agreement to submit themselves to binding arbitration. The parties need not agree to the arbitration procedures; rather, New York law only requires an agreement to be bound. Additionally, the terms "arbitration," "arbitrator," or "arbitrate" need not appear in the text of the agreement so long as the agreement evidences the intent of the parties to submit to arbitration. Where the parties' intent is discernible from the plain meaning of the language of the contract, there is no need to look further.

(B)    Section 12(b) of the IFSA is a valid and enforceable arbitration agreement because it is a written agreement evidencing the intent of the parties to submit themselves to binding *ad hoc* arbitration and is consistent with public policy favoring arbitration of international commercial disputes.

5

(C)     Section 16(b) of the IFSA does not provide a court with jurisdiction to determine the merits of any dispute relating to the allocation of the Sales Proceeds because it is displaced by and must be interpreted consistently with the more specific arbitration clause contained in Section 12(b).  Section 16(b) confers on the court limited jurisdiction to determine the validity of the arbitration agreement in Section 12(b) and to enforce it, as well as to review the arbitration award after an arbitration tribunal renders it.  If the parties are unable to reach an agreement on binding procedures for arbitration, the FAA requires the court to appoint an arbitral tribunal, and the tribunal will decide the rules of the arbitration as well as the merits of the arbitral dispute.

(D)     Section 12(c) of the IFSA creates a binding obligation on the parties to negotiate in good faith towards an agreement on the Interim Sales Protocol referred to in the IFSA.  As noted above, where the parties are unable to reach such agreement, the court shall, under the FAA, appoint an arbitration panel, which will then decide the rules to apply and adjudicate the merits of the dispute.  The fact that the parties do not agree on a protocol will not invalidate either the arbitration agreement or the obligation to arbitrate thereunder.

(E)     To the extent that a court determines that Section 12(b) is ambiguous as to the parties' intent to enter into an arbitration agreement, extrinsic evidence of words and actions before and after the conclusion of the IFSA is admissible to determine the parties' intent.

(F)     Evidence regarding the parties' negotiations after the IFSA was concluded is admissible to determine whether such negotiations were conducted in good faith.

IV.    **MATERIALS CONSIDERED**

15.    In preparing this opinion, I have reviewed the following documents:

(A)    Notice of Joint Motion for Entry of an Order Establishing an Allocation Protocol Pursuant to the Interim Funding and Settlement Agreement, and for Related Relief, filed in *In re Nortel Networks Inc.*, No. 09-10138 (KG) (Bankr. Del. Apr. 25, 2011);

(B)    Declaration of Inna Rozenberg in Support of Joint Motion for Entry of an Order Establishing an Allocation Protocol Pursuant to the Interim Funding and Settlement Agreement, and for Related Relief, and its attached exhibits, filed in *In re Nortel Networks Inc.*, No. 09-10138 (KG) (Bankr. Del. Apr. 25, 2011);

(C)    Declaration of Kevin Francis Lloyd ("Lloyd Declaration" or "Lloyd Decl.") in Opposition to Joint Motion for Entry of an Order Establishing an Allocation Protocol Pursuant to the Interim Funding and Settlement Agreement, and in Support of Cross-Motion to Compel Arbitration, and its attached exhibits, filed in *In re Nortel Networks Inc.*, No. 09-10138 (KG) (Bankr. Del. May 19, 2011);

(D)    The Joint Administrators' Motion for an Order Pursuant to § 107(b) of the Bankruptcy Code and Bankruptcy Rule 9018 for Authorization To File Under Seal (i) the Joint Administrators' Memorandum of Law in Opposition to Joint Motion for Entry of an Order Establishing an Allocation Protocol Pursuant to the Interim Funding and Settlement Agreement, and in Support of Cross-Motion to Compel Arbitration, filed in *In re Nortel Networks Inc.*, No. 09-10138 (KG) (Bankr. Del. May 19, 2011);

(E)    The Joint Administrators' (i) Objection To Joint Motion for Entry of an Order Establishing an Allocation Protocol Pursuant to the Interim Funding and Settlement Agreement, and (ii) Cross-Motion

7

to Compel Arbitration, filed in *In re Nortel Networks Inc.*, No. 09-10138 (KG) (Bankr. Del. May 19, 2011);

(F)     The Joint Administrators' Memorandum of Law in Support of Their (i) Objection to Joint Motion for Entry of an Order Establishing an Allocation Protocol Pursuant to the Interim Funding and Settlement Agreement, and (ii) Cross-Motion to Compel Arbitration, in *In re Nortel Networks Inc.*, No. 09-10138 (KG) (Bankr. Del. May 19, 2011);

(G)     Motion Record for *In re Companies' Creditors Arrangement Act, R.S.C.1985, c. C-36, as Amended*, (Ontario Sup. Ct., Commercial List, returnable June 7, 2011).

## V.     APPLICABLE LAW

16.     I have been asked to provide my opinion under New York law, as well as applicable U.S. federal law and international law. Preliminarily, I note that New York law is harmonized with and modified by the FAA on issues relating to international arbitration.[1] The FAA is the implementing legislation in the United States of the New York Convention.

## VI.     THE REQUIREMENTS FOR AN ENFORCEABLE AGREEMENT TO ARBITRATE UNDER NEW YORK LAW

17.     The requirements for an enforceable agreement to arbitrate a dispute under New York law are that there must be a written agreement to arbitrate that evinces an intent of

---

[1] *Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 120 (2d Cir. 2003) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) (noting that where New York law applies to interpreting an arbitration agreement, "under the FAA certain presumptions inform the analysis," including "the federal policy in favor of arbitration [which] requires that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.").

the parties to submit themselves to binding arbitration.[2]  Such an arbitration agreement is valid and must be enforced unless there is a clear public policy against arbitrating the dispute covered by the agreement.[3]

### A.    The Agreement to Arbitrate

18.    When deciding if there is an enforceable arbitration agreement, New York courts first consider whether the parties agreed to arbitrate the dispute at issue.  Whether an arbitration agreement exists raises basic questions of contract formation, such as whether the parties have assented to arbitration, either by agreeing to a freestanding arbitration agreement or by agreeing to an arbitration clause in a contract.[4]  An arbitration agreement must be in writing, and evince an intent by the parties to arbitrate.[5]

19.    The Court will infer the parties' intention from all the provisions of the agreement, interpreting the "document as a whole to determine the parties' purpose and intent, giving a practical interpretation to the language employed so that the parties' reasonable expectations are realized."[6]  Where the parties' intent is discernible from the plain meaning of the language of the contract, there is no need to look further.[7]

20.    It is not necessary to use the terms "arbitrate," "arbitration," or "arbitrator" for an agreement to arbitrate to be enforceable as such.[8]  "[N]o particular wording is required to

---

[2] *Crawford v. Feldman*, 604 N.Y.S.2d 585, 587 (N.Y. App. Div. 1993); *Just In-Material Designs, Ltd. v. I.T.A.D. Assocs., Inc.*, 463 N.Y.S.2d 202, 204-06 (N.Y. App. Div. 1983).

[3] *Broome v. N.Y. State Law Enforcement Officers Union. Dist. Council 82, AFSCME, AFL-CIO*, 915 N.Y.S.2d 708, 710 (N.Y. App. Div. 2011); *In re Arbitration Between City of Kingston and Kingston Prof'l Fire Fighters Assoc.*, 921 N.Y.S.2d 384 (N.Y. App. Div. 2011).

[4] *See, e.g.*, *Merrill Lynch Int'l Fin., Inc. v. Donaldson*, 895 N.Y.S.2d 698, 702 (N.Y. Sup. Ct. 2010) (noting that ordinary principles of contract interpretation determine whether a party is bound by an agreement to arbitrate).

[5] *Crawford*, 604 N.Y.S.2d at 586-86; *Just In-Material Designs*, 463 N.Y.S.2d at 204-06.

[6] *In re Same Time Holdings Ltd. & Red Board Ltd.*, No. 101119/06, 2006 WL 2079332, at *3 (N.Y. Sup. Ct. May 20, 2006).

[7] *Evan v. Famous Music Corp.*, 807 N.E.2d 869, 872 (N.Y. 2004).

[8] Carmody-Wait 2d § 141:14; 5 N.Y. Jur. 2d Arbitration & Award § 89.

constitute a valid, binding arbitration agreement, nor even the inclusion of the words 'arbitrate' or 'arbitrator.'"[9]

21.    In interpreting whether an agreement evinces an intention to arbitrate, New York law is consistent with the federal presumption in favor of arbitration enacted in the FAA. The FAA "creates a body of federal substantive law of arbitrability applicable to any arbitration agreement within the coverage of the Act."[10]    It was implemented to give effect to the "liberal federal policy favoring arbitration agreements."[11]    "[U]nder the FAA, certain presumptions inform the analysis," including "the federal policy in favor of arbitration [which] requires that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."[12]

22.    Like the FAA, New York law follows a liberal policy of promoting arbitration both to give effect to the intention of the parties and to ease congestion of court calendars.[13]    The New York Court of Appeals has instructed that New York "favors and encourages arbitration as a means of conserving time and resources of the courts and the contracting parties."[14]    As such, New York courts "interfere as little as possible with the freedom of consenting parties to submit disputes to arbitration."[15]    Accordingly, New

---

[9] *Railworks Corp. v. Villafane Elec. Corp.*, 788 N.Y.S2d 834, 837 (N.Y. Sup. Ct. 2004) (quoting *Lovisa Constr. Co. v. Ctny. of Suffolk.*, 485 N.Y.S.2d 309, 310 (N.Y. App. Div. 1985)).

[10] 9 U.S.C. §§ 1-16; *PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193, 1198 (2d Cir. 1996) (quoting *Moses*, 460 U.S. at 24-25.).

[11] *Moses*, 460 U.S. at 24; *Singer v. Jeffries & Co. Inc.*, 575 N.E.2d 98, 100-01 (N.Y. 1991).

[12] *Shaw Group*, 322 F.3d at 120 (quoting *Moses*, 460 U.S. at 24-25.).

[13] *Grayson-Robinson Stores, Inc. v. Iris Const. Corp.*, 168 N.E.2d 377, 379 (N.Y. 1960).

[14] *Smith Barney Shearson v. Sacharow*, 689 N.E.2d 884, 890 (N.Y. 1997) (quoting *Matter of Nationwide Gen. Ins. Co. v. Investors Ins. Co.*, 332 N.E.2d 333, 335 (N.Y. 1975).

[15] *Smith Barney*, 689 N.E.2d at 890 (quoting *Matter of 166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*, 575 N.E.2d 104, 107 (N.Y. 1991).

York courts have favored arbitration as a practical means to dispose of differences between parties in commercial settings.[16]

23.      If there is a written agreement evincing an intention to arbitrate, New York courts will examine whether the dispute is arbitrable.  In other words, the court will inquire whether there is any statute, decisional law, or public policy that would prohibit arbitration of the subject matter in dispute.[17]  In light of the overriding New York and federal policy favoring arbitration, New York law invalidates arbitration agreements only very rarely and on narrow public policy grounds, which, in any event, do not apply to this arbitrable dispute.  These limited situations "constitute a very narrow exception to the otherwise broad power of parties to agree to arbitrate all of the disputes arising out of their juridical relationships."[18]

## VII.   WHETHER SECTION 12(B) OF THE IFSA IS AN ENFORCEABLE AGREEMENT TO ARBITRATE

24.      According to New York law, Section 12(b) of the IFSA is a valid and enforceable agreement to submit any disputes among the IFSA parties regarding the allocation of the Sale Proceeds to *ad hoc* arbitration.  It is an enforceable arbitration agreement because it is a written agreement evidencing the intent of the parties to submit themselves to binding *ad hoc* arbitration, and there is no policy against the arbitrability of disputes among debtors to allocate assets from the estate of a bankrupt corporation.

### A.      Section 12(b) Is a Written Agreement that Evinces an Intent to Arbitrate

25.      Section 12(b) of the IFSA is a binding agreement of the IFSA parties to submit disputes on the allocation of Sale Proceeds to *ad hoc* arbitration.  Although Section 12(b)

---

[16] *Maye v. Bluestein*, 351 N.E.2d 717, 720 (N.Y. 1967); *Guadano v. Long Isl. Plastic Surgical Group, P.C.*, 607 F. Supp. 136, 139 (E.D.N.Y. 1982).

[17] *Broome v. N.Y. State Law Enforcement Officers Union. Dist. Council 82, AFSCME, AFL-CIO*, 915 N.Y.S.2d 708, 710 (N.Y. App. Div. 2011); *City of Kingston v. Kingston Prof'l Fire Fighters Assoc.*, 921 N.Y.S.2d 384, 385-86 (N.Y. App. Div. 2011).

[18] *Broome*, 915 N.Y.S.2d at 710; *Kingston*, 921 N.Y.S.2d at 385-86.

does not adopt the wording of model arbitration clauses provided by arbitral institutions because it is an *ad hoc* arbitration agreement, it is nonetheless evident from a straightforward interpretation of the words of Section 12(b), in the context of the other sub-sections of Section 12, that the parties intended to submit disputes about the allocation of Sale Proceeds to arbitration.

26.    Section 12(b) states:

> In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in a case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol applicable to the Sale Proceeds.[19]

27.    There is no dispute that Section 12(b) is a written agreement.

28.    It also unambiguously refers to *ad hoc* arbitration, even though the word "arbitration" is not used.  Contract language is ambiguous when it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."[20]  When viewed objectively by a reasonably intelligent person who has examined the entire context of Section 12 and international commercial usages, Section 12(b) can only mean that disputes would be submitted to *ad hoc* arbitration.  The agreement provides that any disputes over the allocation of the Sale Proceeds would be resolved by "dispute resolver(s)."  There is no need to use the word "arbitrator,"[21] when the phrase "dispute resolver" is commonly used internationally to refer to decision-makers in alternative dispute resolution.  Under the terminology of international commercial practices, the reference to "dispute resolver(s)" evinces a clear intention of

---

[19] IFSA § 12(b).
[20] *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396-97 (2d Cir. 2009) (quoting *Reuson v. Cinque & Cinque P.C.*, 221 F.3d 59, 66 (2d Cir. 2008)); *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 115 (2d Cir. 1994)
[21] Carmody-Wait 2d § 141:14; 5 N.Y. Jur. 2d Arbitration & Award § 89; *Railworks Corp.*, 788 N.Y.S.2d at 837.

the multinational parties to the IFSA to have any dispute arising from the allocation of the Nortel Sale Proceeds adjudicated by an alternative form of dispute resolution rather than through the judicial system.

29.     Section 12(c) further confirms that Section 12(b) is an agreement to submit disputes over the allocation of Sale Proceeds to *ad hoc* arbitration.  Section 12(c) states:

> [T]he Debtors shall, as soon as reasonably practicable, following the execution of this Agreement, negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Interim Sales Protocol"), which Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such transactions have been unable to reach agreement regarding such allocation.[22]

30.     Section 12(c) thus envisages good faith negotiations to agree on a binding procedure for the arbitration.  This is similar to other *ad hoc* arbitration agreements, where the parties agree to binding resolution of their disagreements, but do not set forth the procedure for such arbitration in the arbitration agreement.  Such *ad hoc* arbitration agreements are valid under New York law.  As the New York Appellate Division has instructed, where "[t]he dominant intent was to arbitrate," the machinery of procedures is "subordinate and incidental."[23]

31.     Further, because Section 12(c) explicitly refers to procedures to which the parties would bind themselves and the "dispute resolver(s)," the reference to "dispute resolver(s)" cannot mean courts under New York law.  In New York, procedures for adjudication in court are set by the New York Civil Practice Law and Rules and not by the parties.[24]  It is not open to the parties in a court case to mutually agree to set those rules aside.  Although they could seek the court's permission to vary procedures and

---

[22] IFSA § 12(c).
[23] *Lory Fabrics v. Dress Rehearsal, Inc.*, 434 N.Y.S.2d 359 (N.Y. App. Div. 1980) (quoting *Delma Eng'g Corp. v. K & L Constr. Co.*, 155 N.E.2d 675 (N.Y. 1958)).
[24] N.Y. C.P.L.R § 101 (the CPLR governs "the procedure in civil judicial proceedings in all courts of the state and before all judges"); *see also Ling Ling Yung v. Cnty of Nassau*, 571 N.E.2d 669, 670-71 (N.Y. 1991).

13

stipulate that the parties all agree to make the request, it is ultimately the court's decision whether to grant the motion.  In contrast, Section 12(c) explicitly provides that the parties determine the binding procedures for dispute resolution.  Because the parties cannot exert such authority over a New York court, it is clear that the parties did not intend to submit their disputes to a court when they expressed their agreement to arbitrate in Section 12(b).

32.    Section 12(c) is consistent with the parties' agreement in Section 12(b) to submit disputes relating to allocation of the Sales Proceeds to arbitration because in an *ad hoc* arbitration, the parties can agree to the rules governing arbitration.  Although it will be up to the arbitral tribunal to apply those rules, should the tribunal depart from any of those mutually agreed arbitration rules, it may have committed a reviewable error that could result in annulment of the award.

**B.    New York Public Policy Supports Arbitrating Disputes Over the Proper Allocation of the Sale Proceeds**

33.    Because Section 12(b) is a clear arbitration agreement, it is unenforceable only if arbitrating the disputes it covers violates public policy.[25]  I am not aware of any policy, in the form of statute or otherwise, that would prohibit the arbitrability of disputes over the allocation of the Sale Proceeds.[26]  On the contrary, the consistent public policy of New York and the FAA, as recognized by New York courts, is to favor arbitration of international commercial disputes such as the one here.[27]  International arbitration provides a neutral forum for dispute resolution that avoids giving any one party real or perceived advantages by bringing claims in their own courts rather than the courts of another foreign party.  It also promotes comity among courts around the world by avoiding different courts asserting jurisdiction over the same dispute when an international arbitration tribunal can resolve it.  Enforcing the *ad hoc* arbitration

---

[25] *Broome*, 915 N.Y.S.2d at 710; *Kingston*, 921 N.Y.S.2d at 385-86.
[26] *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) (holding that an international commercial dispute was arbitrable even though it involved U.S. antitrust issues).
[27] *Grayson-Robinson Stores, Inc. v. Iris Const. Corp.*, 168 N.E.2d 377, 379 (N.Y. 1960).

agreement contained in Section 12 would thus promote judicially-recognized public policy.

## VIII. THE JURISDICTION OF THE COURT UNDER SECTION 16(B) OF THE IFSA

34.    Section 16(b) of the IFSA does not provide the U.S. and Ontario courts with jurisdiction to determine disputes relating to the allocation of Nortel Sales Proceeds. As explained at Part VII, *supra*, Section 12(b) is a valid and enforceable arbitration agreement. Because Section 12(b) is a more specific provision providing for arbitration, it precludes interpreting the more general jurisdiction provision in Section 16(b) to grant jurisdiction to the court to resolve disputes that are subject to arbitration under Section 12(b). Instead, under New York principles of contract interpretation, Sections 16(b) must be harmonized with Section 12(b) by interpreting Section 16(b) to confer jurisdiction to the court only to determine the validity of the Section 12 arbitration agreement, and to confirm, enforce or annul the arbitration award after an arbitral tribunal issues the award. Notably, however, the grounds for review of arbitral awards under the FAA and the New York Convention, to which the United States and Canada are both parties, is significantly narrower than the grounds for appeal of court decisions by an appellate court.[28]

35.    Under New York law, when a contract contains an arbitration provision, the existence of a general jurisdiction provision in that contract does not negate the enforceability of the arbitration agreement.  This is true regardless of whether the

---

[28] *Compare* FAA §§ 10-11, 9 U.S.C. §§ 10-11 (limiting review of arbitral awards to instances where (1) the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators; (3) where the arbitrators were guilty of misconduct; (4) where the arbitrators exceeded their powers; or (5) where there was evident miscalculation of figures in the award) *with* Fed. R. App. Proc. 4 & 5 (providing permissive procedures for appeals of lower court decisions, through which a lower court's legal and factual findings may both be reviewed (generally under "de novo" and clearly erroneous standards, respectively)). *See also* U.N. Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York, 10 June 1958), 330 U.N.T.S. 3, 21 U.S.T. 2517, codified at 9 U.S.C. § 201 et. seq. (the "New York Convention"), Art. V(2) (restricting non-recognition of arbitral awards to limited instances, such as if the award is contrary to the public policy of the New York Convention signatory state where enforcement is sought).

arbitration agreement is contained in a specific clause and pertains only to a subset of disputes within the agreement, or whether the arbitration agreement is broader and refers to the disputes embodied in the entire contract.[29] The New York Appellate Division has instructed:

> The express provision in the parties' agreement to arbitrate disputes was not negated by an additional clause in the agreement vesting the courts of this State with exclusive jurisdiction in all actions and proceedings, particularly where there was no express denial of the agreement to arbitrate. The purpose of the exclusive jurisdiction provision was simply to fix "the required venue of applications to compel arbitration or confirm or reject arbitration awards."[30]

36.    These legal principles apply to Section 16(b) of the IFSA. That section provides, in relevant part:

> To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts . . . for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement (but not, for any doubt, any Transfer Pricing Agreement matter generally) . . . .[31]

37.    Here, the broader jurisdictional provision of Section 16(b) does not negate the specific arbitration agreement embodied in Section 12. Moreover, the *ejusdem generis* principle of contract interpretation would give precedence to the specific clause for arbitration rather than the general clause for the exclusive jurisdiction of the courts.[32]

38.    The principle that conflicting contract provisions should be harmonized, if reasonably possible, so as not to leave any provision without force and effect, would also require that the arbitration agreement be given full force such that any dispute arising

---

[29] *Isaacs v. Westchester Wood Works, Inc.*, 718 N.Y.S.2d 338 (N.Y. App. Div. 2000); *Edgewater Growth Capital Partners, LP v. Greenstar N. Am. Holdings, Inc.*, 891 N.Y.S.2d 278 (N.Y. App. Div. 2010).
[30] *Isaacs*, 718 N.Y.S.2d at 338.
[31] IFSA § 16(b).
[32] *Edgewater Growth N. Am.*, 891 N.Y.S.2d at 278-79; *Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956).

from the allocation of the Sales Proceeds would need to be adjudicated by an arbitrator, as required by Section 12 and discussed more fully below.[33]    The court's jurisdiction under Section 16(b) is thus restricted to examining the validity of the arbitration agreement in Section 12(b), and to enforcing it.

39.    If parties cannot agree on a protocol for dispute resolution including the appointment of arbitrators, the court must, pursuant to Section 5 of the FAA, appoint arbitrators, who themselves can determine the rules to apply, as well as to adjudicate the merits of the dispute.[34]

40.    At the end of the arbitration, a court may review the award of arbitration.[35] However, as noted earlier, the standard of review by a court of an arbitral award is very narrow.[36]    The U.S. Court of Appeals for the Second Circuit has instructed that "the courts will not assume the role of overseers to mold the award to conform to their sense of justice.    Thus, an arbitrator's award will not be vacated for errors of law and fact

---

[33] *Edgewater Growth*, 891 N.Y.S.2d at 278-79 ; *Muzak*, 133 N.E.2d at 690.

[34] FAA § 5 ("[I]f for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein[.]"); *CAE Ind., Ltd. v. Aerospace Holdings Co.*, 741 F. Supp. 388, 392 (S.D.N.Y. 1989) ("[I]n the absence of an explicit provision in the Agreement, or if for any other reason there shall be a lapse in the naming of an arbitrator, [Section 5 of the FAA] authorizes the court to appoint an arbitrator which it will do pursuant to an order accompanying this opinion."); *Neptune Maritime, Ltd. v. H&J Isbrandtsen, Ltd.*, 559 F. Supp. 531, 532 (S.D.N.Y. 1983) (district court had authority to appoint arbitrator to decide carrier's claim against merchant where merchant refused to comply with proper demand for arbitration); *Schulze & Burch Biscuit Co. v. Tree Top, Inc.*, 642 F. Supp. 1155 (N.D. Ill. 1986), *aff'd* 831 F.2d 709 (even if parties' prior dealings did not dictate who would arbitrate dispute, court was authorized, under Arbitration Act, to designate and appoint arbitrator upon either parties' application).

[35] FAA § 9.

[36] *See* FAA §§ 10, 11.

committed by the arbitrator[.]"[37]  A decision can be annulled only if, for example, the arbitrators committed fraud or were corrupt.[38]

41.     This interpretation of Section 16(b) is consistent with New York legislation on arbitration.  Section 7501 of New York's Civil Practice Laws and Rules provides:

> A written agreement to submit any controversy thereafter arising or any existing controversy to arbitration is enforceable without regard to the justiciable character of the controversy and confers jurisdiction on the courts of the state to enforce it and to enter judgment on an award. In determining any matter arising under this article, the court shall not consider whether the claim with respect to which arbitration is sought is tenable, or otherwise pass upon the merits of the dispute.

42.     It is also consistent with the FAA.  Section 3 of the FAA provides that when a court is confronted with a lawsuit involving a dispute that is subject to an arbitration agreement, the court shall, on an application of one of the parties, stay the suit.[39]

---

[37] *Sperry Int'l Trade, Inc. v. Gov't of Israel*, 689 F.2d 301, 306 (2d Cir. 1982) (*citing Sprinzen v. Nomberg*, 389 N.E.2d 456, 458 (1979); *accord Hall Street Assoc., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 586 (2008) ("[I]t would stretch basic interpretive principles to expand the stated grounds [Sections 10 and 11] to the point of evidentiary and legal review generally.").

[38] *See* FAA § 10; *see, e.g., Karppinen v. Karl Kiefer Mach. Co.*, 187 F.2d 32, 34 (2d Cir. 1951) (recognizing that although there should be "great hesitation in upsetting an arbitration award," an award may be overturned under the FAA when it is made "abundantly clear" that it has been obtained through "corruption, fraud, or undue means"); *Geyer Roofing Inc. v. Roofers Local 30B, United Union of Roofers, Water Proofers and Allied Workers, AFL-CIO*, 736 F. Supp. 573, 578 (D.N.J. 1990) (in spite of deference owed arbitration awards, courts will not enforce awards procured by fraud or coercion).

[39] FAA § 3 ("If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.")

Likewise, Section 4 of the FAA provides that if a party fails to arbitrate a dispute subject to an arbitration agreement, the court shall compel the parties to arbitrate the dispute.[40]

43.     Similarly, the New York Convention, to which both the United States and Canada are signatories, and which was implemented by the FAA in the United States, requires a court that is faced with a dispute that is subject to an arbitration agreement to refer the dispute to arbitration.[41]  The court may not adjudicate the merits of the dispute, and may only review the award under narrow grounds when it is asked to enforce the award.[42]

## IV.    THE OBLIGATION TO NEGOTIATE A PROTOCOL IN GOOD FAITH UNDER SECTION 12(C)

44.     In my opinion, Section 12(c) of the IFSA creates a binding obligation on each party to negotiate in good faith towards an agreement on the Interim Sales Protocol referred to in the IFSA.  Section 12(c) explicitly states, in relevant part:

> [t]he Debtors shall, as soon as reasonably practicable,
> following the execution of this Agreement, negotiate in
> good faith and attempt to reach agreement on a timely basis
> on a protocol for resolving disputes concerning the
> allocation of Sale Proceeds from Sale Transactions (the
> "Interim Sales Protocol")[.][43]

45.     Neither party has argued that Section 12(c) is invalid, and there is no reason to interpret it any differently than as expressly stated to impose an obligation of negotiating in good faith.  Importantly, however, as stated above in Part VII, the obligation to agree to a protocol setting forth procedures for an *ad hoc* arbitration in Section 12(c) does not nullify the *ad hoc* arbitration agreement contained in Section 12(b) of the IFSA.

46.     Further, as explained in Section VIII, *supra*, to the extent the parties are unable to agree on such a protocol, the courts shall, under Section 5 of the FAA, appoint

---

[40] FAA § 4.
[41] New York Convention, Art. II(3).
[42] New York Convention, Art. V(2).
[43] IFSA § 12(c).

arbitrators.[44]  The arbitrators will then, themselves, determine what arbitral rules to apply, and will render an award on the merits of the dispute.

## X.    RELEVANCE AND ADMISSIBILITY OF EXTRINSIC EVIDENCE TO DETERMINE THE PARTIES' INTENT AND MEANING IN SECTION 12(B)

47.    Even though it is my view that Section 12(b) clearly and unequivocally provides for *ad hoc* arbitration on its face, I have been asked to opine on what evidence would be relevant to resolve any ambiguity in Section 12(b).

48.    If Section 12(b) is found to be ambiguous as to the parties' intent to enter into an arbitration agreement, extrinsic evidence would be relevant and admissible to prove the parties' intent.   In New York, it is well-settled that when an agreement's terms are "ambiguous, indefinite or uncertain" extrinsic or parol evidence is relevant and admissible to determine their meaning.[45]  The purpose of permitting the introduction of parol evidence is to "place the court in the position of the parties when they made the contract," which "enables it to appreciate the force of the words [the parties] used in reducing it to writing."[46] Such evidence is explanatory and admissible unless the contract explicitly prohibits reference to parol and extrinsic evidence to interpret the contract.[47]

49.    Parol evidence may include evidence of preliminary negotiations and all dealings between the parties, which may be considered to "explain the meaning of particular terms

---

[44] 9 U.S.C. § 5; *CAE Ind.*, 741 F. Supp. at 392; *Neptune*, 559 F. Supp. at 532; *Schultze & Burch*, 642 F. Supp. at 1155.

[45] *Korff v. Corbett*, 794 N.Y.S.2d 374, 377 (N.Y. App. Div. 2005) ("To the extent that any of the agreement's terms may be ambiguous, indefinite or uncertain, it is well settled that extrinsic or parol evidence is admissible to determine their meaning."); N.Y. Jur. 2d Evidence & Witnesses § 583 ("Whenever the terms of a contract are susceptible of more than one interpretation, or an ambiguity arises, or the extent and object of the contract cannot be ascertained from the language employed, parol evidence may be introduced to show what was in the minds of the parties at the time of making the contract. . . . The construction of the instrument is aided by the admission of parol evidence explaining ambiguities.").

[46] N.Y. Jur. 2d Evidence & Witnesses § 585.

[47] N.Y. Jur. 2d Evidence & Witnesses § 583.

used."[48]  Additionally, when contract language is ambiguous, the parties can testify as to the intent of the provisions.[49]  It also may include not only the subject matter of the contract, but also the relations of the parties to each other, and the facts and circumstances surrounding the parties when they entered into the contract.[50]  Prior course of conduct is also relevant to proving intent.[51]

50.    Evidence of industry custom or practice may also be considered to determine the parties' intent.[52]  As stated in the American Law Institute's Restatement (Second) of Contracts, "[u]nless otherwise agreed, a usage of trade in the vocation or trade in which the parties are engaged or a usage or trade of which they know or have reason to know gives meaning to or supplements or qualifies their agreement."[53]

51.    Moreover, New York law is clear that consideration of extrinsic evidence is not limited to negotiations or agreements made prior to or contemporaneous with the execution of a contract, but may also include an examination of the parties' conduct after signing of the agreement.  As the U.S. Supreme Court recognized in *Old Colony Trust Co. v. Omaha* in 1913, in a principle that has since been endorsed by numerous New York courts: "the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence."[54]  In fact, the parties' course of performance under

---

[48] *Korff*, 794 N.Y.S.2d at 377; *see also Kenneth D. Laub & Co. v. 101 Park Ave. Assocs.*, 556 N.Y.S.2d 881, 882 (N.Y. App. Div. 1990).

[49] *Carter v. Broadway 48th-49th Street Assocs.*, No. 103378/03, 2008 WL 1745143, at *7 (N.Y. Sup. Ct. Apr. 7, 2008); *Phalen v. Vineyard L.V., Inc.*, 683 N.Y.S.2d 615, 616 (N.Y. App. Div. 1998).

[50] N.Y. Jur. 2d Evidence & Witnesses § 583.

[51] *Railworks Corp.*, 788 N.Y.S.2d at 837 ("[T]he parties' course of conduct prior to their execution of the Stipulation makes clear that [respondent] intended that the dispute be settled by arbitration.").

[52] *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 875 F.2d 1044, 1049 (2d Cir. 1989).

[53] Restatement (Second) of Contracts § 222(3).

[54] *Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 118, (1913).  As the Supreme Court observed, although not strictly treated as such, this rule is sometimes treated as a branch of estoppel.  In effect, by permitting consideration of subsequent conduct, courts prevent parties from asserting a meaning of a contract in litigation that is inconsistent with their

the contract has often been considered by New York courts to be the "best" and "most persuasive evidence of the agreed intention of the parties."[55]    As explained in the Restatement (Second) of Contracts, "[t]he parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning."[56]

52.    In my view, Section 12 is not ambiguous; however, were a court to determine that any party's intent was not clear from the face of the agreement, or that the term "dispute resolver" is ambiguous, the Lloyd Declaration and the exhibits attached to it provide relevant extrinsic evidence to clarify the ambiguity.  Such evidence includes the written or oral communications among the IFSA parties made prior to or contemporaneous with the execution of the IFSA, as well as drafts of the IFSA and communications regarding the drafting thereof.

53.    Admissible extrinsic evidence also extends to words and conduct after the conclusion of the IFSA.  This includes drafts of the Interim Protocol negotiated by the parties and any related communications during that negotiation process as course of conduct evidence that the parties intended for the disputes to be adjudicated by arbitrators.  This same evidence could be admitted to prove the meaning of the term "dispute resolver."  The Joint Administrators could also introduce expert evidence

---

pre-litigation conduct.  *See also Coliseum Towers Assoc. v. Cnty of Nassau*, 769 N.Y.S.2d 293, 296 (N.Y. App. Div. 2003) (finding plaintiff's payment of land taxes without protest for seven years to be probative of the parties' intent that plaintiff was obligated to pay land taxes); *Fed. Ins. Co. v. Americas Ins. Co.*, 691 N.Y.S.2d 508, 512-13 (N.Y. App. Div. 1999) (viewing examination of subsequent conduct as part and parcel of judicial function to give effect to the parties' pre-contractual intentions).

[55] *Fed. Ins. Co.*, 691 N.Y.S.2d at 512-13 (citing *Webster's Red Seal Publ. v. Gilberton World-Wide Publ.*, 415 N.Y.S.2d 229, 230 (N.Y. App. Div. 1979), *aff'd* 421 N.E.2d 118. *See also T.L.C. West, LLC v. Fashion Outlets of Niagara, LLC*, 875 N.Y.S.2d 367, 369 (N.Y. App. Div. 2009) ("[t]he best evidence of the intent of parties to a contract is their conduct after the contract is formed") (citing *Waverly Corp. v. City of New York*, 851 N.Y.S.2d 176, 179 (N.Y. App. Div. 2008)).

[56] Restatement (Second) of Contracts § 202(comment g); *see also* N.Y. Jur. Contracts § 216 (In the determination of the meaning of an indefinite or ambiguous contract, "the practical construction put upon a contract by the parties to it, is sometimes almost conclusive as to its meaning.").

regarding the use of the term "dispute resolver" internationally to encompass arbitrators.[57]

54.      In my opinion, the extrinsic evidence detailed in the Declaration of Kevin Lloyd and the transcripts of hearings to which he refers – including his description of the negotiations predating entry of the IFSA, representations made by various parties to various courts in connection with seeking approval of the IFSA, and the conduct of the parties' post-dating execution of the IFSA, including the various drafts of an Interim Sales Protocol which contained reference to binding arbitration by a three-person panel – confirms that the parties intended to submit any disputes regarding the distribution of the Sales Proceeds to binding arbitration.[58]

### XI.    EVIDENCE REGARDING THE PARTIES' NEGOTIATIONS IS ADMISSIBLE TO DETERMINE WHETHER SUCH NEGOTIATIONS WERE CONDUCTED IN GOOD FAITH

55.      As described in Section IX, above, Section 12(c) of the IFSA imposed on all parties a binding obligation to negotiate in good faith to arrive at a protocol for resolving disputes concerning the allocation of the Sales Proceeds. It appears clear that beginning soon after the IFSA was agreed, the parties did undertake negotiations towards agreement on an Interim Sales Protocol, which extended off and on for close to one year. However, neither the fact that those negotiations occurred, nor that the negotiations spanned a significant time period, is the end of the inquiry. To ascertain whether the parties in fact complied with their contractual obligations, a factfinder must necessarily look to the negotiations to ascertain whether the parties were in fact negotiating in good faith.[59]

---

[57] *See, e.g.*, Restatement (Second) of Contracts § 222(3) (evidence of industry custom admissible to determine meaning of ambiguous contractual provision).
[58] *See, e.g.*, Lloyd Decl. at ¶¶ 12-22, 40, 44, 49-52, 85. *See also* Transcript of June 29, 2009 Hearing, at 34.
[59] *See, e.g.*, *CanWest Global Commc'ns Corp. v. Mirkaei Tikshort Ltd.*, 804 N.Y.S.2d 549, 570 (N.Y. Sup. Ct. 2005) (concluding that party had failed to meet his obligation to negotiate in good faith upon review of course and conduct of such negotiations).

56.    Although the determination of whether a party met an obligation to negotiate in good faith is necessarily a highly-fact based inquiry, the obligation to negotiate in good faith has been generally described as preventing one party from "renouncing the deal, abandoning the negotiations or insisting on conditions that do not conform to the preliminary agreement."[60] A party might also breach its obligation to bargain in good faith by unreasonably insisting on a condition outside of the scope of the parties' preliminary agreement, especially where such insistence is a "thinly disguised pretext for scotching the deal . . . ."[61]

57.    As set forth in the Lloyd Declaration, although the U.S. and Canadian Debtors participated in negotiations towards an Interim Sales Protocol, and now insist their efforts were in good faith, it appears from the Lloyd Declaration that ultimately the agreement broke down when the Canadian Debtors sought to limit the information and arguments that could be put before the dispute resolvers, including by attempting to limit the ability of the EMEA Debtors to make certain arguments respecting the allocation of the Sale Proceeds.[62] Effectively, the Canadian Debtors made their agreement to participate in arbitration contingent on the EMEA Debtors' agreement to not make certain arguments in their dispute.    A negotiating posture through which a party insists on objectively unreasonable conditions as a pretext for reneging on a deal altogether cannot possibly meet a standard of good faith.

## XII.    CONCLUSION

58.    For the foregoing reasons, my opinions may be summarized as follows:

---

[60] *Teachers Ins. & Annuity Assoc. of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987); *see also CanWest*, 804 N.Y.S.2d at 570 (injunctive relief appropriate where defendant breached its duty to negotiate partnership agreement in good faith by "drastically altering the terms" previously agreed by the parties).
[61] *Milex Products, Inc. v. Alra Labs., Inc.*, 603 N.E.2d 1226, 1234 (Ill. App. Ct. 1992).
[62] Lloyd Decl. at ¶ 57.

(A)     Under New York law, an arbitration agreement is valid and enforceable if it is in writing and evinces an intent of the parties to the agreement to submit themselves to binding arbitration. The parties need not agree to the arbitration procedures; rather, New York law only requires an agreement to be bound. Additionally, the terms "arbitration," "arbitrator," or "arbitrate" need not appear in the text of the agreement so long as the agreement evidences the intent of the parties to submit to arbitration. Where the parties' intent is discernible from the plain meaning of the language of the contract, there is no need to look further.

(B)     Section 12(b) of the IFSA is a valid and enforceable arbitration agreement because it is a written agreement evidencing the intent of the parties to submit themselves to binding *ad hoc* arbitration and is consistent with public policy favoring arbitration of international commercial disputes.

(C)     Section 16(b) of the IFSA does not provide a court with jurisdiction to determine the merits of any dispute relating to the allocation of the Sales Proceeds because it is displaced by and must be interpreted consistently with the more specific arbitration clause contained in Section 12(b). Section 16(b) confers on the court limited jurisdiction to determine the validity of the arbitration agreement in Section 12(b) and to enforce it, as well as to review the arbitration award after an arbitration tribunal renders it. If the parties are unable to reach an agreement on binding procedures for arbitration, the FAA requires the court to appoint an arbitral tribunal, and the tribunal will decide the rules of the arbitration as well as the merits of the arbitral dispute.

(D)     Section 12(c) of the IFSA creates a binding obligation on the parties to negotiate in good faith towards an agreement on the Interim Sales Protocol referred to in the IFSA. As noted above, where the parties are unable to reach such agreement, the court

25

shall, under the FAA, appoint an arbitration panel, which will then decide the rules to apply and adjudicate the merits of the dispute.

(E)   To the extent that a court determines that Section 12(b) is ambiguous as to the parties' intent to enter into an arbitration agreement, extrinsic evidence of words and actions before and after the conclusion of the IFSA is admissible to determine the parties' intent.

(F)   Evidence regarding the parties' negotiations after the IFSA was concluded is admissible to determine whether such negotiations were conducted in good faith.

59.   At the Court's request, a case book containing all of the case law and other authority referenced herein will be made available.

_____
Tai-Heng Cheng

STATE OF NEW YORK       }
                        }
COUNTY OF NEW YORK      }

Sworn to before me this
31ˢᵗ day of May, 2011

_____
        Notary Public

**MARC AARON MELZER**
Notary Public, State of New York
No. 02ME6150927
Qualified in New York County
Commission Expires Dec. 20, 2014

26

# EXHIBIT A

PROFESSOR TAI-HENG CHENG
HOGUET NEWMAN REGAL & KENNEY, LLP
10 East 40th Street
New York, NY 10016
tcheng@hnrklaw.com; (646) 239 4054

## EMPLOYMENT

- New York Law School, Professor of Law & Co-Director, Institute for Global Law, Justice & Policy, 2006-present.

  Classes taught: international law, international commercial arbitration, investment treaty arbitration, contracts.

- Hoguet Newman Regal & Kenney, LLP, Senior Legal Advisor, 2007-present.

- Vanderbilt Law School, Visiting Associate Professor, 2010.

- City University of Hong Kong School of Law, Visiting Associate Professor, 2008.

- Sarah Lawrence College, Visiting Professor, 2006-2008.

- Simpson Thacher & Bartlett LLP, New York, Associate, 2003-2006.

- National University of Singapore School of Law, Tutor-in-Law (Adjunct Professor), 2001.

## RECENT ARBITRATION AND LITIGATION MATTERS

- Expert on arbitration agreements in an SCC arbitration.

- Expert on international law in an ICSID bilateral investment treaty arbitration.

- Amicus curiae in a $400 mn. appeal in U.S. federal court concerning Germany's liability for Prussian bonds.

- Chair of an ICDR tribunal in a franchise dispute between European and Latin American corporations (drafted the award).

- Arbitrator on a three-person ICC tribunal in an intellectual property dispute between an American and Japanese corporation.

- Consultant to the Republic of Kosovo Ministry of Foreign Affairs on international law issues.

- Consultant to the UN Transitional Administration in East Timor on their criminal procedure code.

- Consultant to the Singapore Police Force on operations and international matters.

- Lead counsel for an English hedgefund in a JAMS international arbitration against a French financial institution (won $5mn. award and 90% of fees).

- Counsel for a CFO in a white collar trial in U.S. federal court.

- Counsel for a corporate executive in parallel lawsuits in New York, Atlanta, Singapore and the Cayman Islands.

- Counsel for Blackrock, Inc., in securities litigation in U.S. federal court.

- Counsel for Toys "R" Us, Inc., in securities litigation in Delaware chancery court.

- Counsel for GE and Bechtel in a $6.6 bn. international arbitration against the Republic of India.

## ARBITRATION PANELS

- Panel of Neutrals, ICDR, 2009-present.

- Panel of Neutrals, HKIAC, 2009-present.

- Panel of Neutrals, CPR, 2009-present.

## BAR ADMISSIONS

- U.S. District Court for the Western District of New York, 2009.

- U.S. Court for Appeals for the Second Circuit, 2008.

- U.S. District Court for the Eastern District of New York, 2005.

- U.S. District Court for the Southern District of New York, 2005.

- State of New York, 2004.

## EDUCATION

- J.S.D., Yale Law School, 2004.

- M.A., Oxford University, 2004.

- LL.M., Yale Law School, 2000.

- B.A. (Law), First Class Honors, Oxford University, 1999.

## LEARNED SOCIETIES, HONORS, AND AWARDS

- Elected Member, Executive Council, American Society of International Law, 2010-present.

- Co-Chair, American Society of International Law 2011 Annual Meeting.

- Elected Member, American Law Institute, 2009-present.

- Elected Member, Academic Council, Institute for Transnational Arbitration, 2008-present.

- Awards Committee, American Society of International Law, 2008-2009.

- Elected Honorary Fellow, Foreign Policy Association, 2007-present.

- Howard M. Holtzman Fellow for International Law, Yale Law School, 2000-01.

- Oxford University Scholar, Oxford University, 1997-99.

## SCHOLARSHIP

**Book Monographs**
- WHEN INTERNATIONAL LAW WORKS (Oxford University Press, forthcoming 2011).

- STATE SUCCESSION AND COMMERCIAL OBLIGATIONS (BRILL, 2006).

  Cited as authoritative in <u>Mortimer Offshore Servs. Ltd. v. Fed. Rep. Germany</u>, 05 Civ. 10699 (S.D.N.Y. Apr. 9, 2008), slip op. at 2, *aff'd*, 615 F.3d 27 (2010).

  Reviewed in 2007 SING. Y.B. INT'L L., 25 WIS. J. INT'L L. 129 (2007), 30 FORD. J. INT'L L. 1288 (2007), 6 CHI. J. INT'L L. 254 (2007), 23 ARB. INT'L 511 (2007), 51 N.Y.L.S. L. REV. 580 (2007).

**Law Review Articles**
- *Why New States Accept Old Obligations*, 2011 U. ILL. L. REV. 1 (2011).

- *Making International Law Without Agreeing What It Is*, 10 WASH. U. GLOBAL STUDIES L. REV. _ (forthcoming 2011).

- *Shaping an Obama Doctrine of Preemptive Force*, 82 TEMPLE L. REV. 737 (2010) (with E. Valaitis, Statistics Professsor, American University).

  Selected as a "New Voice" at the American Society of International Law 2008 Annual Meeting.

- *Reasons, Reasoning and Reasonableness*, 32 SUFFOLK TRANSNATIONAL L. REV. 409 (2009) (with R. Trisotto, NYLS J.D., 2009).

- *The Universal Declaration of Human Rights at Sixty: Is it Still Right for the United States?*, 41 CORNELL J. INT'L L. 251 (2008).

- *Renegotiating the Odious Debt Doctrine*, 70 L. & CONTEMP. PROBS. 7 (2007).

  Cited as authoritative in <u>Mortimer Offshore Servs., Ltd. v. Fed. Rep. Germany</u>, 08-1783-cv, 615 F.3d 110, n. 12 (2d Cir. 2010); <u>Iraq v. Beaty & Simon</u>, 07-1090, Resp. Br. at 54 (U.S. Supreme Court, Mar. 18, 2009).

- *Precedent and Control in Investment Treaty Arbitration*, 30 FORD. J. INT'L L. 1014 (2007).

  Presented at the British Institute of International & Comparative Law (2007), republished 5:3 TRANSNAT'L DISPUTE MGMT. (May, 2008).

- *Power, Norms and International Intellectual Property Law*, 28 MICH. J. INT'L L. 109 (2006).

- *Power, Authority and International Investment Law*, 20 AM. U. INT'L L. REV. 465 (2005).

- *The Central Case Approach to Human Rights*, 13 PAC. RIM L. & POL'Y 257 (2004).

## Book Chapters, Essays & Other Publications

- 106 AM. SOC'Y INT'L L. PROC. (T. Cheng et al eds., forthcoming 2012).

- *International Arbitration*, in JUDICIAL BENCHBOOK ON INTERNATIONAL LAW (D. Amann ed., ASIL, forthcoming 2011).

- *Developing Narratives in Investment Treaty Arbitration*, 8 SANTA CLARA TRANSNAT'L L. J _ (forthcoming 2010).

- *Positivism, New Haven Jurisprudence and the Fragmentation of International Law*, in ESSAYS IN HONOR OF THOMAS WALDE _ (T Weiler ed., forthcoming 2010).

- *The Structure and Policies of International Mediation*, 5 CONTEMPORARY ISSUES IN INTERNATIONAL ARBITRATION AND MEDIATION _ (R. Rovine ed. forthcoming 2010)

- *Law on Loan: Legal Reconstruction after Armed Conflict*, in CORPORATE SOCIAL RESPONSIBILITY IN ZONES OF CONFLICT _ (forthcoming 2010).

- *The Idea of Law*, 104 PROC. AM. SOC'Y INT'L L. _ (forthcoming 2010).

- *State Succession and Commercial Obligations: Reflections on Kosovo*, in LOOKING TO THE FUTURE: ESSAYS IN HONOR OF W. MICHAEL REISMAN 675 (M. Arsanjani et al. eds.

2010).

- Preface, *in* TRANSNATIONAL DISPUTE MANAGEMENT SPECIAL EDITION: INTERNATIONAL ARBITRATION IN CHINA (T. Cheng & P. Thorp eds, 2010).

- Remarks, *"Consent and the Jurisdiction of Investment Arbitrations, in* INVESTMENT TREATY ARBITRATION AND INTERNATIONAL LAW 85 (I. Laird & T. Weiler eds., 2010).

- Expert Opinion, *Bosh Int'l v. Republic of Ukraine*, ICSID Case No. ARB/008/11 (2010).

- *Reflections on Culture Med-Arb*, 4 CONTEMPORARY ISSUES IN INTERNATIONAL ARBITRATION AND MEDIATION 421 (A Rovine ed. 2010).

- *Is Investment Treaty Arbitration Undertheorized?*, Kluwerarbitrationblog (Apr. 16, 2010).

- *A Renaissance Career in International Law, in* ASIL, *in* CAREERS IN INTERNATIONAL LAW 7 (2009-2010 ed.)

- *New Tools for an Old Quest*, 3 WORLD 3 MED. & ARB. REV. 121 (2009).

- *Some Limits in Applying Chinese Med-Arb Internationally*, 2 NYBSA N.Y. DISPUTE RESOLUTION LAW. 95 (2009) (with A. Kohtio).

- *A Policy and Empirical Appraisal of U.S. Preemptive Self-Defense*, 102 AM. SOC'Y INT'L L. PROC. 430 (2009).

- *What's Reasonable Depends on Who's Asking*, 8 BALTIC Y.B. INT'L L. 382 (2008).

- Brief Amici Curiae, *Mortimer Offshore Servs. Ltd. v. Fed. Rep. Germany*, 08-1783-cv, _ F.3d _ (2d Cir. 2010), 2010 WL 2891069.

- *Commentary on "Who is Sovereign in Sovereign Debt?,"* in Opinio Juris blog (June 10, 2008)

- *The Succession of Kosovo and Minimum Public Order*, in Opinio Juris blog (Feb. 21, 2008).

- *Precedent and Control in Investment Treaty Arbitration, in* INVESTMENT TREATY LAW: CURRENT ISSUES III (A. Bjorklund *et al.* eds., BIICL, 2009*), revising* 30 FORD. J INT'L L. 1014 (2007).

- *Reframing Iran: A View from the Field* (2007) (with P. Huntington and G. Billard)

- *HIV Surveillance: Individual Rights Versus the Common Good*, 1 YALE J. HUM. RTS. 17 (2001).

- LAW MANUAL FOR FRONTLINE POLICING (Singapore Police Force, 2002).

**INVITED PRESENTATIONS**

- Governance Trends in Singapore, Pennsylvania University, 2011.

- Why New States Accept Old Obligations, Michigan State University, 2011.

- Why New States Accept Old Obligations, Florida State University, 2011.

- State Succession After Kosovo, International Civilian Office, Kosovo, 2010.

- Negotiating Bilateral Investment Treaties, Ministry of Foreign Affairs, Kosovo, 2010.

- Arbitration in Asia, ICC San Francisco Meeting, 2010.

- Narratives in Investment Treaty Arbitration, Santa Clara Law School, 2010.

- Making International Law Without Agreeing What It Is, Maryland Law School, 2010.

- Emerging Trends in ADR, Vanderbilt Law School, 2010.

- Why New States Accept Old Obligations, Vanderbilt Law School, 2010.

- Arbitration in Singapore, CPR Annual Meeting, 2010.

- Confidentiality and Privilege in Asia, ABA/NYU Law School, 2010.

- The Fragmentation of International Law, Conference in Honor of Thomas Walde, Scotland, 2009.

- The Future of FTAs and BITS, New York State Bar Association Singapore Meeting, 2009.

- Developments in Med-Arb, Fordham Law School, 2009.

- International Law as Paradigm, Vanderbilt Law School, 2009.

- The Idea of Law, American Society of International Law Annual Meeting, 2009.

- The Global Regulation of Intellectual Property, Hong Kong University School of Law, 2009.

- International Law as Paradigm, Temple Law School, 2009.

- Public Interests and Arbitration's Efficiency, Institute for Transnational Arbitration Academic Council Retreat, 2009.

- The Use of Force by the United States: A Policy & Empirical Appraisal, American Society of International Law Annual Meeting, 2008.

- The Law and Practice of Secession: Kosovo and the International Court of Justice, American Foreign Law Association, 2008.

- State Succession and Recognition, International Civilian Office, Kosovo, 2008.

- Secession, Succession, and Recognition, University of Pristina, Kosovo, 2008.

- Pakistan: A Different Kind of Partner, New York Law School C.V. Starr Presentation, 2008.

- Pakistan: A Different Kind of Partner, U.S. Trust Corporation, 2008.

- Emerging Trends in Investment Treaty Arbitration, Michigan Law School, 2008.

- Would Wider Authorization to Use Force Make Us Safer: Lessons from Iran, Pakistan and 60 Years of U.S. Practice, City University of Hong Kong School of Law, 2008.

- Would Wider Authorization to Use Force Make the United States Safer, Junior International Law Scholars Annual Meeting, 2008.

- New Developments in Med-Arb, Southeast Association of Law Schools Annual Meeting, 2008.

- Med-Arb in China, American Bar Association, ADR Section, 2008.

- Reasons and Reasoning in Investment Treaty Arbitration, Suffolk Law School, 2008.

- The Universal Declaration of Human Rights at Sixty, Sarah Lawrence College, 2008.

- The Reasons Requirement in Investor State Arbitration, Association of the Bar of the City of New York.

- Corruption in Investment Treaty Arbitration, Yale Law School, 2007.

- Precedent and Control in Investment Treaty Arbitration, British Institute of International and Comparative Law, 2007.

- Attracting Foreign Direct Investment in Post-Conflict Zones, Cardozo School of Law, 2007.

- Are There Lawful Exceptions to Investment Treaty Obligations, International Bar Association International Law Weekend, 2007.

- Power, Norms and International Intellectual Property Law, Humbolt University, 2007.

- The Universal Declaration at Sixty, New York Law School, 2007.

- Finding Your Voice as an Emerging Legal Scholar, Yale Law School, 2007.

- Iran: What Next?, United Nations Association of New York, 2007.

- Reframing Iran, U.S. Trust Corporation, New York, 2007.

- Iran: What Next?, New York Law School, 2007.

- The UN's Strategy in Iran and Middle East, UN Department of Political Affairs, 2007.

- Dialogues: Islamic World-U.S.-The West, Singapore Mission to the UN, 2007.

- Renegotiating the Doctrine of Odious Debt, Duke Law School, 2007.

- International Investment Law During and After Armed Conflict, UNCTAD Conference on Corporate Responsibility in Conflict Zones, 2007.

- Pursuing an Advanced Law Degree, Yale Law School, 2006.

- Is the Fair and Equitable Treatment Standard Fair and Equitable?, International Bar Association International Law Weekend, 2006.

- Precedent in Investment Treaty Arbitration, USCIB Young Arbitrators Form, 2006.

- Intellectual Property, International Law and Power, Southeast Association of Law Schools Annual Meeting, 2006.

- State Succession and Iraq, Duke Law School, 2006.

- State Succession and Commercial Obligations, William & Mary School of Law, 2005.

- Current Issues in U.S.-Turkey Relations, U.S. House of Representatives, Committee on International Relations, 2005.

- Seoul Train and North Korean Refugees, Columbia University School of International and Public Affairs, 2005.

- Harmonizing International IP Law: Why Processes Matter, Seton Hall School of Law, 2005.

- Talking Turkey: A Private Perspective on Public Diplomacy, Turkey Consulate, New York, 2005.

- Report on Turkey, United Nations Committee, Association of the Bar of the City of New York, 2005.

- Human Rights in Singapore: Flying Below the Radar, Yale Law School, 2003.

- Enforcing Private Morality: A Cautionary Note, Yale Law School, 2000.

- Introduction to International Law, Lowenstein International Human Rights Clinic, Yale Law School, 1999.

## MEDIA APPERANCES

- *Somali Pirates,* Al-Jeezera English News, February 15, 2011.

- *Palestine Turns to UN in Battle for Statehood,* Al-Jeezera English News, Dec. 10, 2010.

- *Dominican Republic Settles Triple Proceedings*, WORLD MEDIATION AND ARBITRATION REVIEW, Sept. 21, 2009.

- *International Law Forum Addresses Foreign Direct Investment in High-Risk Developing Countries*, 2008:1 CARDOZO LIFE 9.

- *BIICL Forum Draws a Crowd*, GLOBAL ARBITRATION REVIEW, Sept. 14, 2007.

- *Australia-EEUU: Cuestionado Canje de Refugiados*, GLOBAL INFORMATION NETWORK NOTICIAS EN ESPAÑOL, Apr. 23, 2007.

- *Inside the Glass House*, SRI LANKA SUNDAY TIMES, Apr. 22, 2007.

- *U.S.-Aussie Refugee Swap Comes Under Fire*, INTER PRESS NEWS SERVICE AGENCY, Apr. 19, 2007.

- *Next Stop: Iran*, NEW YORK LAW JOURNAL, Sept. 22, 2006.

- *Next Stop: Iran*, NYLAWYER.COM, Sept. 22, 2006.

- *For These Law Students, the Next Stop is Tehran*, THE NATIONAL LAW JOURNAL, Sept. 11, 2006.

- *Diplomacy Newsline*, TURKISH DAILY NEWS, Jan. 20, 2005.

- *Deals and Suits, KKR/Vornado/Toys "R" Us,* 12:7 CORPORATE COUNSEL, July 2005.

- *Big Deals, KKR/Vornado/Toys "R" Us*, 27:6 AMERICAN LAWYER, June 2005.

- *New Deals: Lawyers on Major Transactions*, 231 NEW YORK LAW JOURNAL, Mar. 2005.

- *Criminal Justice in Singapore: Not Just Black and White*, THE STRAITS TIMES, Nov. 25, 2005.

## LANGUAGES

- English and Mandarin.

## CITIZENSHIP

- Singapore citizen; United States permanent resident.

**EXHIBIT B**

# The Nortel Mediation

### Opening Remarks
of
### Chief Justice Warren K. Winkler
Metropolitan Hotel, Toronto
April 24, 2012

Good morning, and thank you for attending this initial Nortel Mediation session.

Following my appointment as mediator by Judge Gross of the U.S. Bankruptcy Court and Justice Morawetz of the Ontario Superior Court of Justice, those courts ordered that this mediation be stood down until Judge Gross released his decision on an important matter related to certain claims being advanced against the U.S. Estate.

Judge Gross released his decision on March 20, 2012.  Shortly afterwards, I scheduled this meeting so that we could begin the mediation process.

The Nortel Insolvency is one of the most complex trans-national legal proceedings in history.  It directly involves companies resident in almost twenty countries, and appears to involve participants from every continent except Antarctica. Amongst those affected are pensioners, employees, disabled former employees, bondholders, trade creditors and governments.

There are existing proceedings before the courts of the United Kingdom, the United States and Canada.  That said, no single

court has ultimate authority over the subject matter of this mediation.

At the heart of the Nortel Insolvency is the distribution of the assets of the Nortel companies.  The sales of Nortel's global business lines and residual intellectual property have produced over $7.0 billion (USD) in cash now held in escrow awaiting distribution.    Funds available for distribution to Nortel's creditors total almost $9 billion (USD).

This is a significant amount of money.  However, the claims made against the Nortel companies substantially exceed this number.  To further complicate matters, there are unresolved

issues as to priorities of claims, validity of claims and the allocation of funds to various jurisdictions.

As you may have gathered from the legal proceedings to date, these circumstances give rise to many difficult legal issues, not the least of which is the determination of which law applies and whose courts have jurisdiction to apply that law.  In legal terms, this is what is known as a "conflict of laws" issue.  However, the complexity of this case would make even a conflict of laws professor cringe!

As if this were not enough to attempt to work through to bring about a timely resolution to the Nortel Insolvency, the fact that there may be more than one avenue of appeal available to the

parties through the courts of numerous countries adds yet another layer of complexity. This, of course, raises the prospect of additional delays and the potential for conflicting decisions. There is a point here worth repeating. There is no single jurisdiction with the ultimate, final authority in the matter; no final court of appeal or supreme court with the power to issue a decision that conclusively determines the outcome of litigation.

This is all by way of saying that I see this as being a situation in which productive and co-operative mediation is essential. Simply put, there does not appear to be any realistic "litigation option" to resolve this dispute. The circumstances cry out for a mediated resolution. Most importantly, mediation has the potential to cut through the myriad of legal complications

underpinning the positions taken by each of the parties and enable them to participate in crafting a solution.

As I said, I do not see a realistic "litigation option" in this case. What I mean is that the alternative to a mediated outcome is a lengthy litigation process canvassing the issues I have already discussed.  Even if judgments are rendered, it would be entirely possible that those judgments would have no legal effect beyond the jurisdiction of the courts rendering them. It will take years to get through this process, with an uncertain outcome, and significant amounts of the assets now available will have been depleted as a result.  This would be a catastrophic outcome for some, and unsatisfactory for most, of those affected by this case.

Justice Morawetz and Judge Gross have ordered that this mediation take place to attempt to avert protracted litigation.  I believe their decisions speak for themselves regarding the desirability of mediation over litigation.   The United States Court of Appeals for the Third Circuit (one of the courts in line to hear an appeal from litigation in this matter in the United States) has also indicated that a mediated solution is the preferred outcome.  As Judge Sloviter wrote late last year,

> We are concerned that the attorneys representing the respective sparring parties may be focusing on some of the technical differences governing bankruptcy in the various jurisdictions without considering that there are real live individuals who will ultimately be affected by the decisions being made in the courtrooms.  It appears that the largest claimants are pension funds in the U.K. and the United States, representing pensioners who are undoubtedly dependent, or who will become dependent, on their pensions.  They are the Pawns in the moves being made by the Knights and the Rooks.

7

Mediation, or continuation of whatever mediation is ongoing, by the parties in good faith is needed to resolve the differences.  No party will benefit if the parties continue to clash over every statement and over every step in the process.

This will result in wasteful depletion of the available assets from which each seeks a portion.  There appears to be one constructive solution – the protocol agreed upon by appointing Justice Winkler to resolve the allocation issues.

I agree with Judge Sloviter that mediation is the only realistic course in which this matter may be advanced.

I am not ignoring the fact that mediation has been attempted without success twice before by a very able mediator and that, despite his best efforts, the parties were not able to come to an agreement.

In my view, there is no point in repeating steps that have not yielded a resolution.  For example, it is obvious from the prior mediation attempts that the complexities of the Nortel proceedings require something different than putting all parties together in the same room, the same hotel or, for that matter, the same city for concentrated and extended mediation sessions. That process has not worked and it is not manageable.  It will not be the path that I will follow.

I intend to take a fresh approach to this mediation.  In the coming weeks, I will be meeting with the parties separately in order to explore possible avenues toward a global resolution. This process may evolve into broader meetings of multiple parties if I begin to see the alignment of interests and the emergence of a foundation for possible agreement.

9

While this mediation is not a public process, it is a matter of real and substantial personal interest for thousands of individuals around the world.  They deserve assurances that genuine efforts to resolve these issues are underway.

Accordingly, updates of a general nature will be posted on the Nortel mediation website.  However, no confidential information will be posted on the website.

In that respect, the usual conditions will apply to this mediation. It will be a confidential, without prejudice process.  Nothing disclosed to me or anyone else in the course of this mediation can be used in any other process.  I will not communicate a

10

party's position to any other party unless I am expressly authorized to do so.

Some parties have expressed concerns regarding the confidentiality and distribution of the mediation briefs which have been provided to me and my counsel. As I have previously indicated, in recognition of these concerns, I will not distribute briefs. Should the parties wish to exchange briefs amongst themselves, they may do so on their own terms.

In any event, there will be no rebuttal or responding briefs. I must emphasize above all that this is not an adversarial process. Mediation is primarily concerned with crafting a solution which addresses the interests of all parties. Positional bargaining and

11

adversarial mindsets do nothing to advance a mediated settlement.

I will spend today by meeting with the parties privately. These meetings will allow me to determine the next steps that need to be taken in this process. Rest assured that there is no significance to the order of the meetings. The schedule has been arranged on the basis of practicality and efficiency, allowing for travel schedules and several requests for joint meetings.

This room will remain available for your use for the remainder of the day, and I will provide an update as to the advancement of this process in the next several days.

12

I look forward to working with you in the hopes of reaching a satisfactory resolution.

Thank you.

**EXHIBIT C**

**CITATION:** Nortel Networks Corporation, 2013 ONSC 1470
**COURT FILE NO.:** 09-CL-7950
**DATE:** 2013/03/08

**SUPERIOR COURT OF JUSTICE – ONTARIO**
(COMMERCIAL LIST)

RE:           IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
              R.S.C. 1985, c. C-36, AS AMENDED

              AND IN THE MATTER OF A PLAN OF COMPROMISE OR
              ARRANGEMENT OF NORTEL NETWORKS COROPORATION, NORTEL
              NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION,
              NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL
              NETWORKS TECHNOLOGY CORPORATION

              APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT
              ACT*, R.S.C. 1985, c. C-36, AS AMENDED

BEFORE:       MORAWETZ J.

COUNSEL:      *Derrick Tay and Jennifer Stam,* for Nortel Neworks Corporation

              *Benjamin Zarnett, Fred. Myers* and *Jay Carfagnini* for Ernst & Young Inc.,
              Monitor

              *Mark Zigler, Ken Rosenberg, Arthur Jacques, Barry Wadsworth* and *Elder C.
              Marques* for Canadian Creditors' Committee

              *Matthew P. Gottlieb, Robin B. Schwill* and *James Reinihan* for Nortel Networks
              UK Limited (in Administration)

              *David Ward* for PPF/Trustee

              *Adam Hirsh* for Former Directors & Officers of Nortel Networks Corporation and
              Nortel Networks Limited

              *Andrew Gray* and *Scott Bomhof* for Nortel Networks Inc. and other U.S. Debtors

              *John Salmas* for Wilmington Trust, National Association

- 2 -

*Sheryl Seigel* for the Bank of New York Mellon

*Richard Swan* and *Gavin Finlayson* for Informal Committee of Noteholders

*Shayne Kukulowicz, Ryan Jacobs* and *Mike Wunder* for Unsecured Creditors' Committee

*Edmond Lamek* for Law Debenture Trust Company of New York

**HEARD:**      March 7, 2013

**DECISION:**      March 8, 2013

## E N D O R S E M E N T

[1]      For reasons to follow, the motion of Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") for an order approving an Allocation Protocol, substantially in the form of Schedule "A" to the motion originally returnable June 7, 2011 is granted, subject to the following modifications:

> (i)  the Allocation Protocol is to be based on the protocol presented on the original return date, namely June 7, 2011, and is not to be based on the protocol presented during argument on March 7, 2013;

> (ii) the list of "core parties" referenced in paragraph (o)(iii) of the Motion Record is to be expanded.  Representations were received from numerous indenture trustees on March 7, 2013. These parties are to be included as "core parties"; and

> (iii) the Monitor is directed to provide the court with a revised list of proposed "core parties" for its consideration, balancing interests of natural justice as well as the objective to resolve outstanding issues in the most expeditious and least expensive manner possible.

[2]      The Monitor is also directed to coordinate input from the parties with respect to a litigation schedule.  Directions in respect of the litigation schedule will be addressed in the full reasons for this decision.

[3]      The cross motion of the Joint Administrators of Nortel Networks UK Limited, originally returnable June 7, 2011 requesting an order compelling and directing the parties to the Interim Funding and Settlement Agreement dated June 9, 2009 (the "IFSA") to engage in arbitration

- 3 -

regarding all disputes concerning the allocation of Sales Proceeds (as defined in the IFSA), is dismissed.

[4]    The appeal period in respect of this endorsement will commence on the date when full reasons are released, which date will coincide with the release of reasons of Chief Judge Kevin Gross of the United States Bankruptcy Court for the District of Delaware.

Morawetz, J.

**DATE:**        March 8, 2013

# EXHIBIT D

CITATION: Nortel Networks Corporation (Re), 2013 ONSC 1757
COURT FILE NO.: 09-CL-7950
DATE: 20130403

**SUPERIOR COURT OF JUSTICE – ONTARIO**
**(COMMERCIAL LIST)**

RE:             IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

BEFORE:      MORAWETZ J.

COUNSEL:    D. Tay and J. Stam, for Nortel Networks Corporation

B. Zarnett, J. Carfagnini and F. Myers, for Ernst & Young Inc., the Monitor

M. Zigler, K. Rosenberg, A. Jacques, B. Wadsworth and E. Marques, for the Canadian Creditors Committee

M. P. Gottlieb, J. Renihan and R. B. Schwill, for Nortel Networks UK Limited (in Administration)

D. Ward, for the UK Pension Trustees/PPF

A. Hirsh, for the Former Directors and Officers of Nortel Networks Corporation and Nortel Networks Limited

A. Gray and S. Bomhof, for Nortel Networks Inc. and other U.S. Debtors

J. Salmas, for Wilmington Trust, National Association

S. Seigel, for the Bank of New York Mellon

R. Swan and G. Finlayson, for the Informal Committee of Noteholders

S. Kukulowicz, R. Jacobs, and M. Wunder, for the Unsecured Creditors' Committee

E. Lamek, for the Law Debenture Trust Company of New York

HEARD:      March 7, 2013

ENDORSED: March 8, 2013

REASONS:   April 3, 2013

# ENDORSEMENT

## Background

[1]    On June 7, 2011, Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") brought a motion requesting approval of a proposed protocol (the "Allocation Protocol") for the allocation of proceeds of the sale of their assets, the assets of Nortel Networks Inc. and certain of its U.S. affiliates including Nortel Networks (CALA) Inc. (collectively, the "U.S. Debtors"), and the assets of Nortel Networks U.K. Limited and certain of its affiliates located in Europe, the Middle East and Africa (collectively, the "EMEA Debtors").

[2]    An endorsement in respect of this motion was released on June 17, 2011 (the "June 17 Endorsement"). It is attached as Schedule "A", and is incorporated by reference into this endorsement.

[3]    A further endorsement was released on June 29, 2011 (the "June 29 Endorsement"). It is attached as Schedule "B", and is incorporated by reference into this endorsement. While the mediation referenced in the June 17 Endorsement and June 29 Endorsement took place, it failed to be worthwhile and was consequently terminated by declaration of the mediator.

[4]    A further endorsement was released on March 8, 2013 (the "March 8 Endorsement"). It is attached as Schedule "C", and is incorporated by reference into this endorsement. The March 8 Endorsement approved the Allocation Protocol, substantially in the form of Schedule "A" to the motion originally returnable June 7, 2011, with reasons to follow. These are the reasons.

[5]    The parties' inability to resolve their differences is unfortunate, as approximately $9 billion, raised from various asset sales and other realizations, awaits distribution to Nortel's global creditors, and the significant time lapse is exacerbating the negative effects of the previously identified public-interest issues (see the June 29 Endorsement). The only positive development for stakeholders since June 2011 was the sale of Nortel's patent portfolio for proceeds exceeding $4 billion (substantially surpassing the $900 million estimated amount).

[6]    The sad reality for all creditors is that four years have passed from when Nortel filed for *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("CCAA") protection.

## Interim Funding and Settlement Agreement

[7]    In June 2009, the Canadian Debtors, certain U.S. Debtors, and certain EMEA Debtors (collectively, the "Debtors") entered into an Interim Funding and Settlement Agreement ("IFSA"), which provided for cooperation in the global sale of Nortel's business units.

[8]    Under the IFSA, these parties agreed to "negotiate in good faith and attempt to reach agreement on a timely basis" on a protocol (the "Protocol") for resolving disputes concerning the allocation of sale proceeds ("Sale Proceeds") from sale transactions. Importantly, for the purpose of determining this motion, the parties agreed, to the "fullest extent permitted by applicable law", that any "claim, action or proceeding" seeking "any relief whatsoever to the extent relating to the matters agreed in [IFSA]" must be commenced in the U.S. Court and the Canadian Court, in a

joint hearing of both courts under the cross-border protocol ("Cross-Border Protocol"), if such claim, action or proceeding would affect the Canadian Debtors and the U.S. Debtors or the EMEA Debtors.

[9]    Since the parties entered into the IFSA, they concluded several sales of global Nortel businesses and, in connection with these sales, they entered into escrow agreements ("Escrow Agreements"). These Escrow Agreements provided for the deposit of Sale Proceeds into escrow and the conditional distribution of the proceeds.

[10]    Significantly, under each Escrow Agreement, the parties irrevocably and unconditionally submitted to the exclusive jurisdiction of the U.S. Court and the Canadian Court, and agreed to be bound by any judgment arising "under or out of in respect of or in connection with" the Escrow Agreements.

The Protocol/Allocation Protocol

[11]    Failing to come to an agreement on a Protocol, after one-year of talks, prompted a suspension of negotiation between the parties.  The parties, according to the Canadian Debtors, specifically could not agree on the scope of the dispute to be determined under a Protocol and the dispute resolution process (for example, deciding whether the resolution should take the form of an arbitral award).

[12]    The parties subsequently attempted to reach a consensual resolution on these issues through mediation; however, mediation failed twice.

[13]    The U.S. Debtors and the Official Committee of Unsecured Creditors of the U.S. Debtors (the "Committee") subsequently filed this joint motion in the U.S. Court and the Canadian Court seeking orders approving the Allocation Protocol. The Canadian Debtors concurrently filed a motion seeking approval of the proposed Allocation Protocol, which they developed in conjunction with Ernst & Young Inc. (the "Monitor"), the U.S. Debtors, the Committee and others.

[14]    The Allocation Protocol proposed the following:

(a) The Canadian Court and the U.S. Court would establish binding procedures, including discovery, for determining the allocation of the Sale Proceeds of the global sales to the Debtors' estates;

(b) Creditor claims, including but not limited to intercompany claims, shall be determined in accordance with the claims reconciliation process established by the Nortel entity against which any intercompany claim is made;

(c) The relevant Nortel selling entities (including the Debtors), the Committee, the Bondholder Group, the Monitor, the Joint Administrators (defined below) and the Ad Hoc Committee of Major Creditors Having Claims Only Against the Canadian Debtors would be "core parties" in the Allocation Protocol hearings, with full rights of participation.  Any other party in interest could seek to establish itself as a core party;

(d) The U.S. Debtors intend to file promptly motions with the U.S. Court to dismiss the EMEA Debtors' claims against the U.S. Debtors ("EMEA U.S. Claims"). The Canadian Debtors may file motions with the Canadian Court to dismiss the EMEA Debtors' claims against the Canadian Debtors ("EMEA Canadian Claims"); and

(e) The Canadian and U.S. Courts will hold, simultaneously, (i) a joint hearing regarding allocation of global proceeds and (ii) a hearing into unresolved EMEA Canadian Claims and EMEA U.S. Claims, provided that the Courts, in their discretion, may sit separately to hear evidence or argument that is relevant to only the Canadian or U.S. Debtors, respectively. Each Court would then issue its respective decisions.

<u>Party Submissions</u>

[15]    The parties disagree on the following fundamental issues: whether an agreement to arbitrate was reached (and, correspondingly, whether the Canadian Court and U.S. Court should compel arbitration), whether the Canadian Court and U.S. Court have jurisdiction to approve the Allocation Protocol, and whether the parties negotiated the Protocol in good faith.

*Submissions of the Canadian Debtors and the Monitor*

[16]    The Monitor's submissions essentially corroborate, or expand on, the following submissions of the Canadian Debtors.

[17]    Because the parties were unable to successfully negotiate a Protocol, the Canadian Debtors requests that the Canadian Court exercise its discretionary power to determine allocation issues and accordingly order the parties to direct payments from the escrow funds. Pursuant to section 5 of the IFSA, Sale Proceeds of each significant global transaction may only be distributed if instructed jointly by the depositors and estate fiduciaries (very unlikely at this point) or where the parties have entered into a Protocol (as previously mentioned, the parties could not come to an agreement); however, the distribution agent is able to distribute the proceeds if there is an "any order, judgment or decree" made or entered by any court "affecting the property deposited under th[e] Agreement".

[18]    The Canadian Debtors argue that the court lacks requisite authority to compel the parties to arbitrate their disputes because there has been no agreement to arbitrate. The parties merely agreed, pursuant to section 12(c) of the IFSA, to "negotiate in good faith and <u>attempt</u> to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions". Further, section 12(b) of the IFSA does not constitute an agreement to arbitrate because it has none of the features typically found in an enforceable commercial arbitration agreement, does not provide any methodology for an arbitration and does not reference the word "arbitration". It reads as follows:

> 12(b) In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

[19]    The Canadian Debtors further argue that the parties submitted irrevocably and unconditionally to the exclusive jurisdiction of the Canadian Court and U.S. Court. For example, under their many Escrow Agreements, the parties "irrevocably submit[ed] to and accept[ed] for itself and its properties, generally and unconditionally to the exclusive jurisdiction of … the U.S. Bankruptcy Court for the District of Delaware and the Ontario Superior Court of Justice" and agreed to be bound by any judgment "arising under or out of in respect of or in connection with" the Escrow Agreements. In addition, the parties submitted all legal proceedings seeking "any relief whatsoever" to the extent "relating to" the matters agreed in the IFSA to the exclusive joint jurisdiction of the Canadian Court and U.S. Court, pursuant to section 16(b) of the IFSA, as follows:

> 16(b) To the fullest extent permitted by applicable law, each Party…(ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in … a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors …

[20]    Finally, the Canadian Debtors claim that there is nothing to substantiate allegations that any party acted in bad faith. An agreement to negotiate in good faith, and attempt to reach agreement on a Protocol, does not require any party to ultimately acquiesce to an agreement.

*Submissions of the Joint Administrators of Nortel Networks U.K. Limited*

[21]    The Joint Administrators of Nortel Networks U.K. Limited (the "Joint Administrators"), acting as the court-appointed administrators and authorized foreign representatives for the EMEA Debtors, makes four submissions for dismissing this motion.

[22]    First, section 12(b) of the IFSA (articulated above) constitutes an enforceable arbitration clause to arbitrate the allocation of Sale Proceeds because it is a written agreement evidencing the intention of the parties to submit to binding *ad hoc* arbitration.  In exchange for the arbitration provision, which was designed to provide protection to each of the many worldwide Nortel entities by ensuring that they would have input into the Protocol and the appointment of the dispute resolvers, the parties agreed to give up significant rights in businesses and assets to enable the sale of Nortel's global assets to be completed without delay.

[23]    While the parties' agreement to arbitrate is clear on the face of the IFSA, any possible ambiguity is resolved by reviewing the negotiating history, surrounding circumstances, various courts understanding of how the allocation was to be determined, public statements and positions taken in negotiating a Protocol.

[24]    Second, neither the Canadian Court nor the U.S. Court has the jurisdiction to determine how the proceeds of the sale of the global Nortel assets and businesses should be divided among the estates of the various Nortel Debtors around the world. It is neither proper nor feasible for

courts of two independent nations to reach, in effect, a joint decision for the following three reasons:

- such a process violates the Cross-Border Protocol;

- the Ontario Court does not have jurisdiction to allocate Sale Proceeds that were outside the U.S. and Canada by entities outside the U.S. and Canada; and

- there are practical impediments to the Courts proceeding on the basis of a joint hearing regarding the Sale Proceeds allocation.

[25]    Third, and in the alternative, the Ontario Court has jurisdiction to order the Canadian Debtors to submit to arbitration under a panel of arbitrators. The proper role of the courts in their supervisory function in relation to the U.S. Debtors and Canadian Debtors is to require that the parties appoint an arbitration panel possessing the power to set a procedure for such arbitration.

[26]    Fourth, the parties to the IFSA made an enforceable promise to negotiate a Protocol for the arbitration procedures in good faith; counsel submits that there has been a *bona fide* failure in those negotiations.

[27]    In the Joint Administrators' supplementary submissions, counsel highlights practical problems invariably arising from the U.S. Court and Canadian Court trying to jointly address the division of assets among approximately 40 international entities. Counsel submits that it is unlikely that both courts independently will identically allocate the assets, resulting in conflicting decisions and no process for determining how to move forward. Counsel also anticipates that the inevitable appeal process is not governed by a uniform set of procedural or legal rules. The result would not only be years of litigation but potentially also two incompatible judgments, neither of which would be enforceable.

Analysis and Conclusion

[28]    I will assess the merits of the arguments made by all parties on the fundamental issues of divergence, in turn, before rendering my determination.

*Agreement to Arbitrate*

[29]    A common theme permeating the Joint Administrators' arguments is that the parties agreed to arbitrate. As I disagree with this underlying premise, I find many of their arguments to be inherently flawed.

[30]    Simply put, the parties agreed to enter into negotiations to agree on a Protocol; the best position of the Joint Administrators is an agreement to agree, which is unenforceable. I do not find the IFSA, or any of the documents, to be ambiguous in this regard.

[31]    A detailed review of the wording used in the Joint Administrators' argument is telling. The parties struck an <u>agreement</u> embodied in the IFSA; the parties would give up their…ownership rights in the assets to be sold in return for an <u>agreement</u> that, failing an agreement by the parties, the allocation of the sale proceeds would be decided in an arbitral form

- Page 7 -

that did not prejudice any of the parties by forcing any one of them to submit to the jurisdiction of a foreign court.

[32]    It could very well be that, from their standpoint, the asset sales were predicated on the allocation being decided by way of arbitration. However, in the IFSA, I am unable to find that the parties actually entered into an agreement to arbitrate.

[33]    Contrary to the Joint Administrators view that section 12(b) of the IFSA constitutes an enforceable arbitration clause, a plain and common-sense reading of this section leads to the conclusion that, if the objective of the provision was to create a mechanism for the distribution from the escrow account, the parties failed to achieve such objective. More particularly, section 12(b)(i) has not been met as there has been no agreement of all of the selling debtors; section 12(b)(ii) is irrelevant or inapplicable as the parties have failed to reach agreement on the terms of a Protocol.

*Court's Jurisdiction*

[34]    Conforming to the views espoused by the Canadian Debtors and the Monitor, I am satisfied that this court has discretionary authority under the CCAA to approve the Allocation Protocol. Considering, and potentially approving, the Allocation Protocol is consistent with the CCAA objectives of promoting efficiency and fairness by avoiding a multiplicity of inconsistent proceedings: *Re Muscletech Research and Development Inc.* (2006), 19 C.B.R. (5th) 54 (Ont. S.C.J.). This court's authority extends to the subject matter and the persons at issue here and this court has the authority to make the order sought approving the Allocation Protocol.

[35]    It is my view that all parties have irrevocably and unconditionally submitted to the jurisdiction of the Canadian Court and the U.S. Court.  This is established as a result of the jurisdiction clause in each of the Escrow Agreements, the filing of claims by the EMEA Debtors and section 16 of the IFSA.  In this respect, I accept the arguments put forth by the Canadian Debtors.

[36]    No compelling argument accompanied the Joint Administrators' assertion that this court has jurisdiction to order the Canadian Debtors to submit to arbitration under a panel of arbitrators. While there may be a presumption in favour of international arbitration, it presupposes that the parties have agreed to arbitrate (which is not the case in the present circumstances).

[37]    The objective of these proceedings must be, at this time, to ensure that the outcome is something that will be final and binding on all parties.  This can be accomplished, in my view, by a joint hearing of the matter with the Canadian Court and the U.S. Court.

[38]    I acknowledge the procedural difficulties identified by the Joint Administrators in their supplemental submissions, and I do not underestimate the challenges that lie ahead. However, all parties embraced joint or parallel hearings of the U.S. Court and the Canadian Court to bring forth a number of matters, most notably applications for approval of sales process and for approval of sales. Further, despite the different procedures in the U.S. Court and the Canadian Court, both courts have worked effectively with the result that billions of dollars are now available for distribution to the stakeholders.  I maintain confidence that the U.S. Court and the

Canadian Court will ensure that matters going forward are similarly dealt with in a fair and equitable manner.

[39]    Raising potential procedural issues is not sufficient to dismiss the motion of the Canadian Debtors. Challenges of procedure will be addressed during the proceedings in the same way as procedural issues are addressed in numerous other proceedings that are brought before the court.

*Good Faith*

[40]    With respect to the Protocol negotiations, there is no shortage of conflicting viewpoints. Nevertheless, there is an overall lack of evidence either on the record, or in the parties' oral submissions, demonstrating that any party failed to negotiate the Protocol in good faith. To the contrary, there is evidence that all parties made efforts to come to a mutually beneficial agreement; as pointed out by the Canadian Debtors, failure to come to such an agreement does not necessarily evidence a lack of good faith in negotiations.

*Order*

[41]    Amendments must be made to the Allocation Protocol before it is approved, as mentioned in the March 8 Endorsement. I have specifically rejected the suggestion that there should be specified restrictions on "core parties" in the Allocation Protocol hearing; rather, I determined that certain indenture trustees should also be "core parties", and I invited suggestions as to whether there would be other "potential core parties".

[42]    I note that the U.S. Debtors filed motions with the U.S. Court to dismiss EMEA U.S. Claims, and a decision with respect to this issue has been rendered by Chief Judge Kevin Gross. The U.S. Debtors put forward an amended version of the Allocation Protocol at the March 7, 2013 hearing. Given that substantial argument was based on the Allocation Protocol as originally presented, it is not appropriate, in my view, to consider amendments that were brought forth at the hearing which was not intended to receive new positions but rather to provide a summary of the positions previously brought forward. The appropriate version of the Allocation Protocol to consider is the one that was previously brought before the court on June 7, 2011.

[43]    In the result, I grant the Canadian Debtors' motion and approve an amended Allocation Protocol, which incorporates the aforementioned amendments while remaining substantially in the form of Schedule "A" to the motion originally returnable June 7, 2011. The amended Allocation Protocol must be filed with this Court for approval by April 15, 2013.

[44]    By way of directions for scheduling, the trial for this matter is scheduled to commence on January 6, 2014. The trial will begin with the allocation issues and continue thereafter with remaining issues to be addressed in the Allocation Protocol, including EMEA Claims and U.K. Pension matters.

- Page 9 -

[45]    The cross-motion of the Joint Administrators, requesting an order compelling and directing the parties to the IFSA to engage in arbitration regarding all disputes concerning the allocation of Sale Proceeds, is dismissed.

**Date:**    April 3, 2013

MORAWETZ J.

SCHEDULE "A"

**CITATION:** Nortel Networks Corporation (Re), 2011 ONSC 3805
**COURT FILE NO.:** 09-CL-7950
**DATE:** 20110617

## SUPERIOR COURT OF JUSTICE - ONTARIO

**RE:**     IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

**BEFORE:**   MORAWETZ J.

**COUNSEL:**   Alan Mark, Derrick Tay, Alan Merskey and Jennifer Stam, for Nortel Networks Corporation et al

F. Myers, J. Pasquariello and C. Armstrong, for the Monitor, Ernst & Young Inc.

Mark Zigler, Andrea McKinnon, for the Former & Disabled Employees

G. Finlayson, R. Orzy and R. Swan, for the Noteholder Group

Lily Harmer and Max Starnino, for the Superintendent

S. Seigel, for the Bank of New York Mellon

Alex MacFarlane and Abid Quereshi, for the Official Committee of Unsecured Creditors

R. Paul Steep and Elder C. Marques, for Morneau Shepell

Barry Wadsworth, for CAW-Canada

M. P. Gottlieb, R. Schwill and S. Campbell, for the Joint Administrators

Bill Burden, for the U.K. Pension Trustee

Lyndon Barnes, for the Board of Directors of Nortel

Andrew Gray and Scott Bomhof, for the U.S. Debtors

Arthur O. Jacques, for Nortel NCCE

HEARD:        June 7, 2011

# ENDORSEMENT

[46]    On June 7, 2011, Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") brought a motion requesting approval of an allocation protocol (the "Allocation Protocol").

[47]    A similar motion was also brought at the same time by Nortel Networks Inc. ("NNI") and certain of its U.S. affiliates (the "U.S. Debtors") in the Chapter 11 Proceedings before the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") (the "Chapter 11 Proceedings").

[48]    The hearing was conducted by video conference with the companion motion being heard in the U.S. Court before His Honor Judge Gross.  This joint hearing was conducted in accordance with the provisions of the Cross-Border Protocol which was previously approved by both the U.S. Court and by this Court.

[49]    Both motions had the support of all parties appearing, save for the Joint Administrators of Nortel Networks (U.K.) Limited ("NNUK") and certain of its subsidiaries and affiliates located in the EMEA (collectively, the "EMEA Debtors").

[50]    Decisions in respect of both motions are currently under reserve.

[51]    On June 13, 2011, at the request of both Judge Gross and me, a case conference was conducted by telephone.  It was reported to the participants that our respective decisions relating to the aforementioned motions would be under reserve for a considerable period of time.

[52]    Certain of the issues raised in the motions have been the subject of two mediation sessions.  These mediation sessions were not successful.  It is my understanding that, in addition to the allocation issue, issues of validity of quantification of certain claims and inter-company claims were discussed.

[53]    Allocation issues have arisen out of the Interim Funding and Settlement Agreement ("IFSA"), which was entered into in June 2009, between the Canadian Debtors, certain of the U.S. Debtors and certain of the EMEA Debtors.  The IFSA provides amongst other things, for the parties cooperation in the global sales of Nortel's business units as well as for the parties to attempt to negotiate the terms of an Interim Sales Protocol ("Protocol").

- Page 3 -

[54]    The parties entered into negotiations for approximately one year with respect to the terms of a Protocol.  After a year of negotiations, the parties were still unable to agree on certain fundamental terms of the Protocol, including, for example, the scope of the issues to be determined under the Protocol.

[55]    As a result, according to the Canadian Debtors, the Protocol negotiations were suspended and the parties agreed to reach a consensual resolution through mediation.  After the mediation was declared unsuccessful, the U.S. Debtors and the Canadian Debtors, developed the proposed Allocation Protocol.

[56]    The Allocation Protocol establishes procedures and an expedited schedule for the cross-border resolution by the U.S. Court and this Court of the allocation of the proceeds from the Sale Transactions pursuant to the IFSA.

[57]    The Allocation Protocol proposes that all hearings in respect of the Allocation Protocol proceed by way of joint hearings between the U.S. Court and this Court pursuant to the cross-border protocol.

[58]    The position of the EMEA Debtors is that issues arising out of the IFSA are to be determined by a dispute resolver, in this case, an arbitrator.

[59]    In my view, pending the release of a decision on the motion, the parties could benefit from the appointment of a mediator so that they can continue to make progress towards the ultimate resolution of Nortel matters.  The parties have exhibited an ability to cooperate and have been extremely successful in realizing significant proceeds from the sale of Nortel assets globally.  However, the creation of an asset pool is not ultimate resolution of Nortel matters.  These proceedings can only be concluded with a distribution of proceeds to the various creditors of Nortel globally.  These proceedings were commenced on January 14, 2009.  Creditors have been waiting nearly two and one-half years for a meaningful distribution.  A mediation will require that the parties continue a dialogue.  It is possible that tangible, positive results will flow from such mediation.

[60]    In order to assist the parties with their deliberations, I am directing that the parties engage in mediation pending my ruling.  I understand that Judge Gross will be issuing a similar direction in the Chapter 11 Proceedings.

[61]    I recognize that the parties may have difficulty in reaching a consensus on a mediator.  In the case conference on June 13, 2011, we asked that the parties consult with each other and provide the name of an acceptable mediator.  No individual has been identified.  It, therefore, falls to both Judge Gross and to me to appoint a mediator.

[62]    The mandate of the mediator is to address issues raised in the motion.  It is recognized that the boundary of this mandate is not clearly defined.  It seems to me that defining a precise boundary, in these circumstances, may be better left to the mediator, as it may not be possible to address the issues affecting allocation without taking into consideration issues relating to the validity and quantification of claims.

[63]    The mediator shall have the right to file periodic reports with the court detailing progress, or lack thereof, recognizing that the sessions are on a without prejudice basis.

[64]    It is my understanding that, at the mediation sessions, there were a large number of parties that participated.  While I do not take issue with the right of any party to participate in the mediation, I did observe that at the hearing of the within motion, the primary submissions were made by the Canadian Debtors, the EMEA Debtors and the Monitor.  It was also my observation that the primary submissions of parties in the Chapter 11 Proceedings were likewise concentrated among a relatively small group of counsel.  The mediation will, in all likelihood, be more effective if the number of participants is significantly reduced from the number that attended the previous sessions.  It is hoped that the parties will be able to work out the details respecting participation of the mediation.

[65]    The identity of the mediator will be provided by way of Supplementary Endorsement early next week.  The mediator shall have the ability to retain advisors and counsel as he or she deems appropriate in the circumstances and to have the expenses of such advisors and counsel paid out of the assets of Nortel.

[66]    In addition, consistent with the conclusion of the U.S. Court, the mediator is to have expanded authority, if the parties agree, to conduct a mediation/arbitration or an arbitration in respect of this matter.

[67]    To the extent that further directions are required in respect of this directed mediation, the parties can contact the Commercial List Office in order to set up a case conference.

"Morawetz J."

_____

MORAWETZ J.

**Date:**  June 17, 2011

## SCHEDULE "B"

**CITATION:** Nortel Networks Corporation (Re), 2011 ONSC 4012
**COURT FILE NO.:** 09-CL-7950
**DATE:** 20110629

## SUPERIOR COURT OF JUSTICE - ONTARIO

**RE:**     IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

**BEFORE:**     MORAWETZ J.

**COUNSEL:**     Alan Mark, Derrick Tay, Alan Merskey and Jennifer Stam, for Nortel Networks Corporation et al

F. Myers, J. Pasquariello and C. Armstrong, for the Monitor, Ernst & Young Inc.

Mark Zigler, Andrea McKinnon, for the Former & Disabled Employees

G. Finlayson, R. Orzy and R. Swan, for the Noteholder Group

Lily Harmer and Max Starnino, for the Superintendent

S. Seigel, for the Bank of New York Mellon

Alex MacFarlane and Abid Quereshi, for the Official Committee of Unsecured Creditors

R. Paul Steep and Elder C. Marques, for Morneau Shepell

Barry Wadsworth, for CAW-Canada

M. P. Gottlieb, R. Schwill and S. Campbell, for the Joint Administrators

Bill Burden, for the U.K. Pension Trustee

Lyndon Barnes, for the Board of Directors of Nortel

- Page 2 -

Andrew Gray and Scott Bomhof, for the U.S. Debtors

Arthur O. Jacques, for Nortel NCCE

## ENDORSEMENT

[1]     This Endorsement relates to my Endorsement of June 17, 2011.  The following directions take precedence over the directions provided on June 17, 2011.

[2]     On June 7, 2011, Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") brought a motion requesting approval of a proposed protocol for the allocation of the proceeds of the sale of their assets, the assets of the U.S. Debtors (defined below) and those of Nortel Networks U.K. Limited (NNUK") and certain of its affiliates located in Europe, the Middle East and Africa (collectively, the "EMEA Debtors") (the "Allocation Protocol").

[3]     A similar motion was also brought at that time by Nortel Networks Inc. ("NNI") and certain of its U.S. affiliates (the "U.S. Debtors") in the Chapter 11 Proceedings before the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") (the "Chapter 11 Proceedings").

[4]     The hearing was conducted by video conference with the companion motion being heard in the U.S. Court before His Honor Judge Gross.  The joint hearing was conducted in accordance with the provisions of the Cross-Border Protocol which was previously approved by both the U.S. Court and by this Court.

[5]     Both motions had the support of all parties appearing, save for the joint administrators of NNUK.

[6]     Allocation issues have arisen out of the Interim Funding and Settlement Agreement ("IFSA"), which was entered into in June 2009, between the Canadian Debtors, certain of the U.S. Debtors and certain of the EMEA Debtors.  The IFSA provides amongst other things, for the parties cooperation in the global sales of Nortel's business units as well as for the parties to attempt to negotiate the terms of an Interim Sales Protocol ("Protocol").

[7]     To date, the parties have been unable to resolve these allocation issues on a consensual basis.  This has resulted in a most unfortunate situation.

[8]     Nortel's insolvency is somewhat unique.  The sale of its business units has created a sizeable asset pool.  With the exception of the IP Transaction, the auction for which commenced on June 27, 2011, the Canadian Debtors, the U.S. Debtors, the EMEA Debtors and their affiliates have now divested substantially all of Nortel's material worldwide assets.  The proceeds of these divestitures – some $3 billion currently with a minimum of a further $900 million expected to be added upon consummation of the patent portfolio and related asset transactions – now sit in escrow awaiting the resolution of allocation.

[9]    This allocation issue, together with the resolution of the EMEA claims and the U.K. pension claims, lies at the heart not only of these CCAA proceedings, but also the Chapter 11 Proceedings and proceedings in the United Kingdom.  As the Monitor noted in its 67th Report: "Simply put, they are matters that must be resolved before any creditor of an applicant (and likely any other Nortel debtor) can expect to receive a meaningful distribution on account of amounts that have now been outstanding in most cases since January 2009.

[10]    The Canadian Debtors have no significant secured creditors.  The Canadian Debtors do, however, have significant unsecured creditors, most of whom are individuals who are employed or were formerly employed by Nortel.  Many of these former employees are pensioners and this group have unsecured claims for both pension and medical benefits.

[11]    There are also significant employee and former employee claims against the U.S. Debtors and the EMEA Debtors.

[12]    For many of these individuals, the delay in receiving a meaningful distribution can be significant.  It is not just a question of calculating the time value of money.  For this group of creditors, time is not on their side.

[13]    This issue is international in scope.  It is also a public-interest issue.  A protracted delay in resolving the impasse surrounding allocation is highly prejudicial to this group.

[14]    In making these comments, I do not mean to suggest that the claims of other creditor groups are not of equal significance.  The reality is, however, that the timing of a receipt of a distribution may be less critical for a financial player as opposed to an individual.

[15]    The difficulty in resolving the allocation issue that is before both the U.S. Court and this Court is, of course, complicated by the fact that it is a multi-jurisdictional issue.  There is no simple solution to the legal predicament that faces all parties.

[16]    Decisions in respect of both motions are currently under reserve.  The nature and length of the arguments presented at the motion will necessitate careful drafting and separate rulings by the U.S. Court and this Court.  Both Courts are concerned that this delay will also delay allocation proceedings and therefore distributions to creditors.  Moreover, the risk of inconsistent decisions and the uncertainty of the appellate process (with further risk of inconsistent decisions) may further delay the progress of the cases.

[17]    A protracted delay in the progress of the cases will only exacerbate an already unfortunate situation for the many individual creditors.  With extended delay comes uncertainty. For many, uncertainty brings considerable stress and a bad situation becomes even worse. Clearly, the consequences of extended litigation are not desirable.

[18]    Both Courts concluded that the parties could benefit from the appointment of a mediator so that they can continue to make progress towards the ultimate resolution of Nortel matters. Consequently, both the U.S. Court and this Court directed that the parties, who participated in the hearing on June 7, 2011, engage in mediation pending the release of decisions in both motions.  The mediator will have the authority to include such other parties as he deems appropriate, in his discretion.

[19]    The mediator has the authority, in consultation with the parties, to determine the scope of the mediation, as he deems appropriate, including, without limitation, the allocation issue in its entirety and global issues relating to allocation and claims.

[20]    The mediator is authorized to select advisors of his choosing.  The reasonable fees and expenses of the advisors shall be reimbursed by the Canadian Debtors, the U.S. Debtors and the EMEA Debtors.

[21]    The particulars of the mediation are as follows:

> Mediator:      The Honourable Warren K. Winkler
>                Chief Justice of Ontario
>                Court of Appeal for Ontario
>                Osgoode Hall
>                130 Queen Street West
>                Toronto, ON
>                M5H 2N5
>
> Timing:        To be arranged by the mediator

[22]    Participation in this mediation is mandatory.  Any agreements reached as a result of mediation will be binding on the parties.

[23]    A settlement of the dispute being mediated shall also be subject to the approval of the U.S. Court and this Court, on notice to parties in interest.

[24]    The parties shall recognize that mediation proceedings are settlement negotiations, and that all offers, promises, conduct and statements, whether written or oral, made in the course of the proceedings, are inadmissible in any arbitration or court proceeding, to the extent allowed by law.  The parties shall not subpoena or otherwise require the mediator or any advisor to the mediator, to testify or produce records, notes or work product in any future proceedings, and no recording will be made of the mediation session.  Evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation session.  In the event that the parties do reach a settlement agreement, the terms of that settlement will be admissible in any court or arbitration proceedings required to enforce it, unless the parties agree otherwise.  Information disclosed to the mediator at a private caucus shall remain confidential unless the party authorizes disclosure.

[25]    The mediator has the right, prior to the commencement of the mediation only, to communicate with Judge Gross and me, for the purposes of obtaining background information.

[26]    The mediation process shall be terminated under any of the following circumstances:

> (a) by a declaration by the mediator that a settlement has been reached;
>
> (b) a declaration by the mediator that further efforts at mediation are no longer considered to be worthwhile; or

- Page 5 -

(c) for any other reason as determined by the mediator.

[27]    The Monitor is directed to circulate a copy of this endorsement to all parties who attended on the return of the motion on June 7, 2011.

"Morawetz J."

_____

MORAWETZ J.

**Date:**   June 29, 2011

SCHEDULE "C"

**CITATION:** Nortel Networks Corporation (Re), 2013 ONSC 1470
**COURT FILE NO.:** 09-CL-7950
**DATE:** 20130308

**SUPERIOR COURT OF JUSTICE – ONTARIO**

(COMMERCIAL LIST)


| | |
|---|---|
| **RE:** | IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED |
| | AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION |
| | APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED |
| **BEFORE:** | MORAWETZ J. |
| **COUNSEL:** | *Derrick Tay and Jennifer Stam*, for Nortel Networks Corporation |
| | *Benjamin Zarnett, Fred. Myers* and *Jay Carfagnini* for Ernst & Young Inc., Monitor |
| | *Mark Zigler, Ken Rosenberg, Arthur Jacques, Barry Wadsworth* and *Elder C. Marques* for Canadian Creditors' Committee |
| | *Matthew P. Gottlieb, Robin B. Schwill* and *James Reinihan* for Nortel Networks UK Limited (in Administration) |
| | *David Ward* for PPF/Trustee |
| | *Adam Hirsh* for Former Directors & Officers of Nortel Networks Corporation and Nortel Networks Limited |
| | *Andrew Gray* and *Scott Bomhof* for Nortel Networks Inc. and other U.S. Debtors |
| | *John Salmas* for Wilmington Trust, National Association |

*Sheryl Seigel* for the Bank of New York Mellon

*Richard Swan* and *Gavin Finlayson* for Informal Committee of Noteholders

*Shayne Kukulowicz*, *Ryan Jacobs* and *Mike Wunder* for Unsecured Creditors' Committee

*Edmond Lamek* for Law Debenture Trust Company of New York

**HEARD:**    March 7, 2013

**DECISION:**    March 8, 2013

## E N D O R S E M E N T

[1]    For reasons to follow, the motion of Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") for an order approving an Allocation Protocol, substantially in the form of Schedule "A" to the motion originally returnable June 7, 2011 is granted, subject to the following modifications:

(i) the Allocation Protocol is to be based on the protocol presented on the original return date, namely June 7, 2011, and is not to be based on the protocol presented during argument on March 7, 2013;

(ii) the list of "core parties" referenced in paragraph (o)(iii) of the Motion Record is to be expanded. Representations were received from numerous indenture trustees on March 7, 2013. These parties are to be included as "core parties"; and

(iii) the Monitor is directed to provide the court with a revised list of proposed "core parties" for its consideration, balancing interests of natural justice as well as the objective to resolve outstanding issues in the most expeditious and least expensive manner possible.

[2]    The Monitor is also directed to coordinate input from the parties with respect to a litigation schedule. Directions in respect of the litigation schedule will be addressed in the full reasons for this decision.

[3]    The cross motion of the Joint Administrators of Nortel Networks UK Limited, originally returnable June 7, 2011 requesting an order compelling and directing the parties to the Interim Funding and Settlement Agreement dated June 9, 2009 (the "IFSA") to engage in arbitration

regarding all disputes concerning the allocation of Sales Proceeds (as defined in the IFSA), is dismissed.

[4]    The appeal period in respect of this endorsement will commence on the date when full reasons are released, which date will coincide with the release of reasons of Chief Judge Kevin Gross of the United States Bankruptcy Court for the District of Delaware.

"Morawetz J."

_____

Morawetz, J.

**DATE:**        March 8, 2013

# EXHIBIT E

Court File No. M42415

# COURT OF APPEAL FOR ONTARIO

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS
LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL
NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT
ACT*, R.S.C. 1985, c. C-36, AS AMENDED

## <u>AMENDED</u> NOTICE OF MOTION FOR LEAVE TO APPEAL

The EMEA Debtors (defined below) will make a Motion to the Court of Appeal for Ontario <u>in writing 36 days after service of the moving party's motion record, factum and transcripts, if any, or on the filing of the moving party's reply factum, if any, whichever is earlier,</u> ~~on a date to be fixed by the Court of Appeal at Osgoode Hall,~~ 130 Queen Street West, Toronto, Ontario, M5H 2N5.

<u>**THE MOVING PARTY** proposes that the motion be heard in writing as an opposed motion under Rule 61.03.1.</u>

~~**PROPOSED METHOD OF HEARING**: The Motion is to be heard~~

~~[ ]      in writing under subrule 61.03.1(1);~~

~~[ ]      in writing as an opposed motion under subrule 37.12.1(4);~~

~~[X]      orally.~~

**THE MOTION IS FOR**

    (a)      an order granting the EMEA Debtors' leave to appeal from the order of Justice Morawetz, released on March 8, 2013 with reasons delivered on April 3, 2013;

    (b)      an order granting the EMEA Debtors leave to serve and file an affidavit for use on this motion and on the appeal if leave is granted, as described below;

    (c)      the costs of this Motion; and,

    (d)      such further and other relief as this Honourable Court may deem just.

**THE GROUNDS FOR THE MOTION ARE**

**i) Background**

    (a)      On January 14, 2009, Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation (collectively, the "Canadian Debtors") commenced these proceedings and received protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "CCAA") (the proceedings are referred to as the "CCAA Proceedings");

    (b)      Also on January 14, 2009, Nortel Networks Inc. ("NNI"), an American subsidiary of NNC, as well as other related American companies (collectively, the "U.S. Debtors"), filed voluntary petitions pursuant to Chapter 11 of the United States Bankruptcy Code;

(c)     In addition, also on January 14, 2009, various direct and indirect subsidiaries of NNL located in Europe, the Middle East and Africa (the "EMEA Debtors") applied for and were granted administration orders under the United Kingdom's *Insolvency Act* 1986;

## ii) The Asset Sales

(d)     In the spring of 2009, the Canadian, U.S. and EMEA Debtors (collectively, the "Nortel Debtors") commenced negotiations to settle various inter-company debts and to attempt to collectively sell off their various lines of business and related assets (the "Asset Sales");

(e)     Because Nortel's business was conducted globally along "business lines", the cooperation of all Nortel entities around the world was required in order to consummate the sale of each business line. However, it became evident that it would not be possible to agree on the allocation of the proceeds of the Asset Sales (the "Proceeds") amongst the various Nortel entities prior to entering into any Asset Sale. In order to maximize the funds available for distribution to creditors and prevent the possibility that disputes over allocation would hinder the Asset Sales, the Nortel Debtors agreed that the Proceeds would be deposited into escrow pending resolution of allocation. This agreement was documented in the Interim Funding and Settlement Agreement (the "IFSA"), effective June 9, 2009;

(f)     In light of the widely differing legal regimes governing each of the Nortel Debtors, the IFSA reflected the Nortel Debtors' intention and agreement that, in the event

that they were unable to agree on an allocation of the Proceeds, allocation would be determined by way of arbitration, rather than by the various national courts;

(g)     The Asset Sales went ahead as planned, and the Nortel Debtors eventually sold substantially all of their collective assets in various sales. In total, Proceeds in the amount of approximately $7.5 billion were realized. However, the Nortel Debtors have to date been unable to agree on how to allocate the Proceeds amongst themselves;

(h)     All of the parties to the IFSA understood and agreed that any dispute regarding allocation would be determined by arbitration. The Nortel Debtors conducted extensive discussions concerning the procedures for that arbitration, including the composition of the arbitral panel that would determine allocation of the Proceeds, compensation for the arbitrators and the binding procedures that the arbitration would follow;

(i)     When seeking approval of the IFSA, American counsel for NNI explained to the United States Bankruptcy Court for the District of Delaware (the "Delaware Court") and the Commercial List of the Ontario Superior Court of Justice (the "Ontario Court") that through the IFSA there would be "a fair and reasonable independent body deciding the allocation" which "would require very little participation or intervention or bother by these two courts";

(j)     The Delaware Court, in a separate opinion, subsequently stated that the allocation was "to be determined (absent a consensual agreement) in a single cross-jurisdictional forum". Similarly, when the Commercial Court of Versailles

(the "French Court") granted approval for Nortel Networks S.A. to enter into the IFSA, the French Court's approval relied on the parties' submission that the allocation would be "determined or which may at least be determinable by a third party neutral arbitrator";

### iii) The Allocation Motions

(k)     In the spring of 2011, shortly before the last Asset Sale, the Canadian and U.S. Debtors abandoned discussions concerning the procedure for the arbitration and suddenly took the position that allocation should instead be determined jointly by the Ontario Court and the Delaware Court;

(l)     On June 7, 2011, in a joint hearing before the Ontario and Delaware Courts, the Canadian and U.S. Debtors moved for an order approving an allocation protocol that would have the Ontario and Delaware Courts jointly hear the allocation dispute, and then each render their own decision as to how the Proceeds should be allocated between more than 20 Nortel Debtors. The proposed protocol did not address how any differences in those two decisions were to be reconciled or purport to co-ordinate any appeals from those decisions;

(m)     In response to those motions, on June 7, 2011, the EMEA Debtors moved for an order directing the Nortel Debtors to arbitrate the allocation dispute, in accordance with the IFSA;

(n)     The Ontario and Delaware Courts heard submissions on June 7, 2011, and both reserved their decisions. The Ontario and Delaware Courts then ordered the parties

to participate in a mediation to attempt to settle all matters relating to the allocation of the Proceeds and the outstanding inter-company claims;

(o)     The mediation was unsuccessful, and the Ontario and Delaware Courts called for the June 7, 2011 motion to be reconvened for supplementary submissions on March 7, 2013, with a decision to follow that day;

**iv) The Decision Below**

(p)     On March 8, 2013, with reasons to follow, the Ontario Court granted the motions of the U.S. and Canadian Debtors and dismissed the EMEA Debtors' motion (the "Motions Decision"). The Motions Judge ordered that the appeal period would not begin to run until reasons for the Motions Decision were released;

(q)     The reasons of the Ontario Court were issued on April 3, 2013 (the "Reasons"). In the Reasons, the Motions Judge ordered that all issues in the CCAA Proceedings as between the EMEA Debtors and the Canadian and U.S. Debtors would be determined at joint trials held by the Ontario and Delaware Courts that would commence on January 6, 2014, beginning with a joint trial to determine allocation of the Proceeds;

(r)     The Motions Judge incorrectly held that, by the terms of the IFSA, the parties did not evince an intention to have the allocation dispute determined by arbitration, despite the clear language of the IFSA and the evidence that the Nortel Debtors all shared a common understanding that allocation would be determined by way of arbitration;

(s)     Rather than direct the parties to arbitrate the allocation issue, the Motions Judge ordered them to participate in joint trials before the Ontario and Delaware Courts, each of which must independently decide how the Proceeds are to be allocated. A joint trial is outside of the Motions Judge's jurisdiction and, in any event, will create insurmountable difficulties and improprieties. Moreover, there is a substantial risk of inconsistent decisions and the two jurisdictions have different procedural and evidentiary rules that cannot be reconciled at a joint trial. There are certain to be separate and independent appeals from the decisions of the Ontario and Delaware Courts. In the event of inconsistent decisions, allocation of the Proceeds will be impossible;

(t)     Further, the IFSA is governed by New York law and the EMEA Debtors, as well as other parties, tendered expert evidence concerning the content of New York law and the proper interpretation and consideration of arbitration agreements. However, the Motions Judge failed to apply New York law when interpreting the IFSA. At no point in the Reasons does the Motions Judge refer to the expert evidence or address the fact that the IFSA is governed by New York law.

(u)     Since the release of the Reasons, the Motions Judge has directed the parties to attempt to reach agreement on a protocol for the hearing of the allocation dispute (the "Protocol") and a timetable to be followed by the parties leading up to the January 6, 2014 trial (the "Timetable"). The Court is expected to approve a Protocol and Timetable in the near future. The Protocol and Timetable are required to be before this Court on this motion and, if granted, the subsequent appeal so that the Court will have a full appreciation of the impact of the Motions Decision.

Therefore, the EMEA Debtors seek leave to introduce both documents by way of affidavit, to be filed after the Protocol and Timetable are approved;

**v) Leave to Appeal Should be Granted**

(v)     The joint trial ordered by the Motions Judge is unprecedented and raises significant questions that are of importance to the practice of insolvency law in general. The ordered joint trial would infringe on the independence and sovereignty of the Ontario Court and establish an unworkable joint trial procedure that will be wrought with inconsistencies and problems;

(w)     The issue on appeal is of significance to the CCAA Proceedings, as it will determine whether or not the allocation dispute is to be determined by both the Ontario Court and the Delaware Court or by a single arbitral panel. The result will have an enormous impact on the trial scheduled for January 6, 2014 and the procedure for resolving the allocation disputes;

(x)     The EMEA Debtors' appeal is *prima facie* meritorious. The Motions Judge misinterpreted the IFSA, ordered the parties to engage in a joint trial that could result in inconsistent and unenforceable decisions and failed to apply the proper law in interpreting the IFSA. The ordered joint trial improperly infringes on the independence and sovereignty of the Ontario Court. As the Motions Judge conceded, his order involves "procedural difficulties" and "challenges" that should not be underestimated;

(y)     The appeal will not unduly hinder the progress of the CCAA Proceedings, as the EMEA Debtors are seeking to have the appeal expedited and are committed to having it heard as quickly as is reasonably possible;

## vi) Leave to File Fresh Evidence Should be Granted

(z)     The EMEA Debtors seek leave to file an affidavit for the purpose of putting the Protocol and Timetable before this Court on the motion for leave and, if granted, subsequent appeal;

(aa)    Neither the Protocol nor the Timetable existed at the time that the Motions were heard, and thus could not possibly have been included in the materials before the Motions Judge;

(bb)    the Protocol and Timetable are relevant to the issue of whether the Motions Judge's order improperly infringes on the jurisdiction of the Ontario Court and, as such, could affect whether the Motions Judge's decision was correct;

(cc)    the Protocol and Timetable are not contentious documents as they will be approved by the Motions Judge;

(dd)    Rules 37, 61.03.1 and 61.16 of the *Rules of Civil Procedure*;

(ee)    sections 13 and 14 of the CCAA; and

(ff)    such further and other grounds as the lawyers may advise.

-10-

**THE FOLLOWING DOCUMENTARY EVIDENCE** will be used at the hearing of the Motion:

(a)     the materials that were before the Motions Judge on the motions;

(b)     an affidavit to be sworn and filed following approval of the Protocol and Timetable; and

(c)     such further and other evidence as the lawyers may advise and this Honourable Court may permit.

April 23̶25, 2013                         **LAX O'SULLIVAN SCOTT LISUS LLP**
                                          Counsel
                                          Suite 2750, 145 King Street West
                                          Toronto, Ontario  M5H 1J8

                                          **Matthew P. Gottlieb**  LSUC#: 32268B
                                          Email:  mgottlieb@counsel-toronto.com
                                          Tel:    (416) 644-5353
                                          **James Renihan**  LSUC#: 57553U
                                          Email: jrenihan@counsel-toronto.com
                                          Tel:    (416) 644-5344
                                          Fax:    (416) 598-3730

                                          and

                                          **DAVIES WARD PHILLIPS & VINEBERG LLP**
                                          155 Wellington Street West
                                          Toronto, ON  M5V 3J7

                                          **Robin B. Schwill**  LSUC#:  38452I
                                          Email:  rschwill@dwpv.com
                                          Tel:    (416) 863-5502
                                          **Sean Campbell**  LSUC#:  49514J
                                          Email:  scampbell@dwpv.com
                                          Tel:    (416) 367-7473
                                          Fax:    (416) 863-0871

                                          Lawyers for the Joint Administrators of Nortel
                                          Networks UK Limited (In Administration)

-11-

TO:          **THE SERVICE LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.
C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, et al.

Court File No. M42415

**COURT OF APPEAL FOR ONTARIO**

PROCEEDING COMMENCED AT
TORONTO

<u>**AMENDED** NOTICE OF MOTION FOR LEAVE TO
APPEAL</u>

**LAX O'SULLIVAN SCOTT LISUS LLP**
Counsel
Suite 2750, 145 King Street West
Toronto, Ontario  M5H 1J8

**Matthew P. Gottlieb** LSUC#: 32268B
Email:  mgottlieb@counsel-toronto.com
Tel:        (416) 644-5353
**James Renihan** LSUC#: 57553U
Email: jrenihan@counsel-toronto.com
Tel:        (416) 644-5344
Fax:       (416) 598-3730

and

**DAVIES WARD PHILLIPS & VINEBERG LLP**

155 Wellington Street West
Toronto, ON  M5V 3J7

**Robin B. Schwill** LSUC#:  38452I
Email:  rschwill@dwpv.com
Tel:        (416) 863-5502
**Sean Campbell** LSUC#: 49514J
Email:  scampbell@dwpv.com
Tel:        (416) 367-7473
Fax:       (416) 863-0871

Lawyers for the Joint Administrators of Nortel Networks UK Limited (In
Administration)

**EXHIBIT F**

Court File No.

### COURT OF APPEAL FOR ONTARIO

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS
LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL
NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT
ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### NOTICE OF MOTION TO EXPEDITE AND CONSOLIDATE

The moving parties, the EMEA Debtors (defined below), will make a Motion to a Judge of

the Court of Appeal for Ontario on a date to be fixed by the Court of Appeal at Osgoode Hall, 130

Queen Street West, Toronto, Ontario, M5H 2N5.

**PROPOSED METHOD OF HEARING**: The Motion is to be heard

[ ]    in writing under subrule 37.12.1(1) because it is;

[ ]    in writing as an opposed motion under subrule 37.12.1(4);

[X]    orally.

**THE MOTION IS FOR**

(a)    an order abridging the time for service and filing of this motion;

(b)      an order expediting the hearing of the EMEA Debtors' motion for leave to appeal from the judgment of Justice Morawetz (the "Motions Judge") released on April 3, 2013 (the "Motions Decision");

(c)      an order directing that the EMEA Debtors' motion for leave to appeal from the Motions Decision be heard orally;

(d)      an order that, if leave to appeal is granted, the appeal be heard at the same time as the motion for leave to appeal;

(e)      an order setting a schedule for the filing of materials;

(f)      an order staying the Motions Decision pending appeal;

(g)      the costs of this Motion; and

(h)      such further and other relief as this Honourable Court may deem just.

## THE GROUNDS FOR THE MOTION ARE

### i) Background

(a)      On January 14, 2009, Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation (collectively, the "Canadian Debtors") commenced these proceedings and received protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "CCAA") (the proceedings referred to as the "CCAA Proceedings");

(b)     Also on January 14, 2009, Nortel Networks Inc. ("NNI"), an American subsidiary of NNC, as well as other related American companies (collectively, the "U.S. Debtors"), filed voluntary petitions pursuant to Chapter 11 of the United States Bankruptcy Code;

(c)     In addition, also on January 14, 2009, various direct and indirect subsidiaries of NNL located in Europe, the Middle East and Africa (the "EMEA Debtors") applied for and were granted administration orders under the United Kingdom's *Insolvency Act* 1986;

## ii) The Asset Sales

(d)     In the spring of 2009, the Canadian, U.S. and EMEA Debtors (collectively, the "Nortel Debtors") commenced negotiations to settle various inter-company debts and to attempt to collectively sell off their various lines of business and related assets (the "Asset Sales");

(e)     Because Nortel's business was conducted globally along "business lines", the cooperation of all Nortel entities around the world was required in order to consummate the sale of each business line. However, it became evident that it would not be possible to agree on the allocation of the proceeds of the Asset Sales (the "Proceeds") amongst the various Nortel entities prior to entering into any Asset Sale. In order to maximize the funds available for distribution to creditors and prevent the possibility that disputes over allocation would hinder the Asset Sales, the Nortel Debtors agreed that the Proceeds would be deposited into escrow

pending resolution of allocation. This agreement was documented in the Interim Funding and Settlement Agreement (the "IFSA"), effective June 9, 2009;

(f)    In light of the widely differing legal regimes governing each of the Nortel Debtors, the IFSA reflected the Nortel Debtors' intention and agreement that, in the event that they were unable to agree on an allocation of the Proceeds, allocation would be determined by way of arbitration, rather than by the various national courts;

(g)    The Asset Sales went ahead as planned, and the Nortel Debtors eventually sold substantially all of their collective assets in various sales. In total, Proceeds in the amount of approximately $7.5 billion were realized. However, the Nortel Debtors were unable to agree on how to allocate the Proceeds amongst themselves;

(h)    All of the parties to the IFSA understood and agreed that any dispute regarding allocation would be determined by arbitration. The Nortel Debtors conducted extensive discussions concerning the procedures for arbitration, including the composition of the arbitral panel that would determine allocation of the Proceeds, compensation for the arbitrators and the binding procedures that the arbitration would follow;

(i)    When seeking approval of the IFSA, American counsel for NNI explained to the United States Bankruptcy Court for the District of Delaware (the "Delaware Court") and the Commercial List of the Ontario Superior Court of Justice (the "Ontario Court") that through the IFSA there would be "a fair and reasonable independent body deciding the allocation" which "would require very little participation or intervention or bother by these two courts";

(j)     The Delaware Court, in a separate opinion, subsequently stated that the allocation was "to be determined (absent a consensual agreement) in a single cross-jurisdictional forum". Similarly, when the Commercial Court of Versailles (the "French Court") granted approval for Nortel Networks S.A. to enter into the IFSA, the French Court's approval relied on the parties' submission that the allocation would be "determined or which may at least be determinable by a third party neutral arbitrator";

### iii) The Decision Below

(k)     In the spring of 2011, shortly before the last Asset Sale, the Canadian and U.S. Debtors abandoned discussions concerning the procedure for the arbitration and suddenly took the position that allocation should instead be determined jointly by the Ontario Court and the Delaware Court;

(l)     On June 7, 2011, in a joint hearing before the Ontario and Delaware Courts, the Canadian and U.S. Debtors moved for an order approving an allocation protocol that would have the Ontario and Delaware Courts jointly hear the allocation dispute, and then each render their own decision as to how the Proceeds should be allocated between over 20 different Nortel Debtors. The proposed protocol did not address how any differences in those two decisions were to be reconciled or purport to co-ordinate any appeals from those decisions;

(m)     In response to those motions, on June 7, 2011, the EMEA Debtors moved for an order directing the Nortel Debtors to arbitrate the allocation dispute, in accordance with the IFSA;

(n)     The Ontario and Delaware Courts heard submissions on June 7, 2011, and both reserved their decisions. The Ontario and Delaware Courts then ordered the parties to participate in a mediation to attempt to settle all matters relating to the allocation of the Proceeds and the outstanding inter-company claims;

(o)     The mediation was unsuccessful, and the Ontario and Delaware Courts called for the June 7, 2011 motion to be reconvened for supplementary submissions on March 7, 2013, with a decision to follow that day;

(p)     On March 8, 2013, with reasons to follow, the Ontario Court granted the motions of the U.S. and Canadian Debtors and dismissed the EMEA Debtors' motion. The Motions Judge ordered that the appeal period would not begin to run until reasons for the Motions Decision were released;

(q)     The reasons of the Ontario Court were issued on April 3, 2013. In those reasons, the Ontario Court ordered that all issues in the CCAA proceedings as between the EMEA Debtors and the Canadian and U.S. Debtors would be determined at joint trials held by the Ontario and Delaware Courts that would commence on January 6, 2014, beginning with a joint trial to determine allocation of the Proceeds;

(r)     The Monitor has proposed an aggressive schedule in which the documentary discovery process would commence in mid-May, 2013;

**iv) Leave to Appeal Must be Expedited**

(s)     The EMEA Debtors are seeking leave to appeal the Motions Decision on the bases that, *inter alia*, the Motions Judge erred in his interpretation of the IFSA, failed to

apply New York law as required by the terms of the IFSA and approved a protocol which improperly infringes the independence and sovereignty of the Ontario Court and results in parallel proceedings with the accompanying risk of inconsistent and thus unenforceable judgments;

(t)     It is important that leave to appeal (and, if granted, the consequent appeal) be heard expeditiously. The CCAA Proceedings cannot reasonably proceed until there has been a final decision as to whether the allocation dispute is to be arbitrated or determined by the Ontario Court and Delaware Court, as it is not known what the scope of pleadings or discovery within the CCAA Proceedings will be;

**v) A Stay Pending Appeal is Warranted**

(u)     There are serious issues regarding the correctness of the Motions Decisions;

(v)     The EMEA Debtors will suffer irreparable harm if the Motions Decision is not stayed pending appeal. The Motions Decision directs the parties to the CCAA Proceedings to adhere to an aggressive schedule to have determined, *inter alia*, the allocation dispute. It is the EMEA Debtors' position that the parties are bound to have allocation determined by arbitration and that the Ontario Court and Delaware Court lack jurisdiction over that dispute.

(w)     It is anticipated that the EMEA Debtors will obtain the benefit of a stay of proceedings from the Delaware Court, as an appeal in the United States from an order refusing to compel arbitration automatically divests the Delaware Court of jurisdiction over the matter pending appeal;

-8-

(x)     Rules 37, 61.03.1 and 61.16 of the *Rules of Civil Procedure*;

(y)     Sections 13 and 14 of the CCAA; and

(z)     Such further and other grounds as the lawyers may advise.

**THE FOLLOWING DOCUMENTARY EVIDENCE** will be used at the hearing of the Motion:

(a)     Such further and other evidence as the lawyers may advise and this Honourable

Court may permit.

**THE MOVING PARTIES ESTIMATE** that 60 minutes are needed to argue this motion.

April 23, 2013

**LAX O'SULLIVAN SCOTT LISUS LLP**
Counsel
Suite 2750, 145 King Street West
Toronto, Ontario  M5H 1J8

**Matthew P. Gottlieb**  LSUC#: 32268B
Email:  mgottlieb@counsel-toronto.com
Tel:    (416) 644-5353
**James Renihan**  LSUC#: 57553U
Email: jrenihan@counsel-toronto.com
Tel:    (416) 644-5344
Fax:    (416) 598-3730

and

**DAVIES WARD PHILLIPS & VINEBERG LLP**
155 Wellington Street West
Toronto, ON  M5V 3J7

**Robin B. Schwill**  LSUC#:  38452I
Email:  rschwill@dwpv.com
Tel:    (416) 863-5502
**Sean Campbell** LSUC#: 49514J
Email: scampbell@dwpv.com
Tel:    (416) 367-7473
Fax:    (416) 863-0871

Lawyers for the Joint Administrators of Nortel
Networks UK Limited (In Administration)

TO:          **THE SERVICE LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, et al.

Court File No.

---

**COURT OF APPEAL FOR ONTARIO**

PROCEEDING COMMENCED AT
TORONTO

---

**NOTICE OF MOTION TO EXPEDITE AND CONSOLIDATE**

---

**LAX O'SULLIVAN SCOTT LISUS LLP**
Counsel
Suite 2750, 145 King Street West
Toronto, Ontario  M5H 1J8

**Matthew P. Gottlieb**  LSUC#: 32268B
Email:  mgottlieb@counsel-toronto.com
Tel:        (416) 644-5353
**James Renihan**  LSUC#: 57553U
Email: jrenihan@counsel-toronto.com
Tel:        (416) 644-5344
Fax:        (416) 598-3730

and

**DAVIES WARD PHILLIPS & VINEBERG LLP**
155 Wellington Street West
Toronto, ON  M5V 3J7

**Robin B. Schwill**  LSUC#:  38452I
Email:  rschwill@dwpv.com
Tel:        (416) 863-5502
**Sean Campbell**  LSUC#:  49514J
Email:  scampbell@dwpv.com
Tel:        (416) 367-7473
Fax:        (416) 863-0871

Lawyers for the Joint Administrators of Nortel Networks UK Limited (In Administration)