**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., *et al.*, | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |
| | **Re: Docket Nos. 9946, 9947** |

**JOINT ADMINISTRATORS' MOTION FOR LEAVE**
**TO APPEAL FROM ORDER APPROVING ALLOCATION PROTOCOL**

01:13535645.2

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ......................................................................................................................5

JURISDICTION AND VENUE ...............................................................................................11

QUESTIONS ON APPEAL .....................................................................................................11

RELIEF REQUESTED.............................................................................................................11

ARGUMENT ...........................................................................................................................12

I.     THE COURT SHOULD GRANT LEAVE TO APPEAL THE
BANKRUPTCY COURT'S DECISION TO ENTER THE
ALLOCATION PROTOCOL PROVIDING FOR JOINT
PROCEEDINGS BEFORE THE U.S. AND CANADIAN COURTS. ...........................12

     A.     The Appeal Raises Controlling Questions of Law As To
Which There Are Substantial Grounds For Difference Of
Opinion. ...........................................................................................................13

     B.     Immediate Appeal Will Materially Advance the Ultimate
Termination of the Litigation...........................................................................15

     C.     Granting Leave to Appeal Will Avoid Potential Wasted
Trial Time and Litigation Expense. .................................................................16

II.    APPEAL FROM THE ORDER APPROVING THE ALLOCATION
PROTOCOL SHOULD BE HEARD TOGETHER WITH THE APPEAL
AS OF RIGHT FROM THE ORDER DENYING THE MOTION TO
COMPEL ARBITRATION BECAUSE THE ISSUES ARE
INTERTWINED. .........................................................................................................16

CONCLUSION.........................................................................................................................18

The court-appointed administrators and authorized foreign representatives (collectively, the "Joint Administrators")[1] for Nortel Networks UK Limited ("NNUK") and certain of its affiliates (collectively, and including NNUK, the "EMEA Debtors")[2] located in the region known as EMEA (Europe, Middle East, and Africa) in proceedings under the Insolvency Act 1986, pending before the High Court of Justice of England and Wales (the "English Court"), respectfully submit this motion (the "Motion"), pursuant to 28 U.S.C. § 158(a) and Rules 8001 8002, and 8003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for leave to appeal from the Order Approving Allocation Protocol, entered by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court" or the "U.S. Court") on April 3, 2013 (the "Allocation Protocol Order," D.I. 9947) and the accompanying Opinion (the "Allocation Opinion," D.I. 9946).

In support of this Motion, the Joint Administrators respectfully state as follows:

## PRELIMINARY STATEMENT

The present motion relates to the dispute that has arisen about how the proceeds from the sales of the former Nortel group's global businesses should be divided between the estates of the various Nortel debtors in Canada, the United States and Europe, the Middle East and Africa ("EMEA"), for eventual distribution to their respective creditors. By Opinion filed on April 3, 2013, the Bankruptcy Court (i) denied the Joint Administrators' motion to compel

---

1. The Joint Administrators in the English proceedings for all of the EMEA Debtors, with the exception of Nortel Networks (Ireland) Limited, are: Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, and Stephen John Harris. The Joint Administrators in the English proceedings for Nortel Networks (Ireland) Limited are: Alan Robert Bloom and David Martin Hughes.

2. The EMEA Debtors are: Nortel Networks UK Limited; Nortel GmbH; Nortel Networks (Austria) GmbH; Nortel Networks (Ireland) Limited; Nortel Networks AB; Nortel Networks B.V.; Nortel Networks Engineering Service Kft; Nortel Networks France S.A.S.; Nortel Networks Hispania, S.A.; Nortel Networks International Finance & Holding B.V; Nortel Networks N.V.; Nortel Networks OY; Nortel Networks Polska Sp. z.o.o.; Nortel Networks Portugal S.A.; Nortel Networks Romania SRL; Nortel Networks S.A.; Nortel Networks S.p.A.; Nortel Networks Slovensko, s.r.o.; Nortel Networks, s.r.o.

arbitration of this dispute in accordance with a post-petition pre-asset sale written agreement

between the various Nortel debtors, and (ii) granted the joint motion of the U.S. Debtors[3] and the

Official Committee of Unsecured Creditors (the "Committee") to instead litigate this dispute

through joint pleadings, discovery, hearings and trials before the U.S. Court and the Ontario

Superior Court of Justice–Commercial List (the "Canadian Court").[4]  In the related Allocation

Protocol Order, also filed on April 3, 2013, the Bankruptcy Court approved the entry of a

protocol (the "Allocation Protocol"), which outlines the process for joint litigation of the

allocation dispute by the U.S. and Canadian Courts.

Pursuant to Section 16(a) of the Federal Arbitration Act (the "FAA"), the

Bankruptcy Court's decision denying the Joint Administrators' motion to compel arbitration is

appealable as of right.[5]  By the present motion, the Joint Administrators seek leave to appeal

from those portions of the Allocation Protocol Order and Allocation Opinion pursuant to which

the Bankruptcy Court ordered that the allocation dispute should be decided through joint

pleadings, discovery, hearings and trial before the U.S. and Canadian Courts.  It is appropriate to

address the appeal from the portion of the Allocation Protocol Order approving the entry of the

Allocation Protocol at the same time as the appeal from the decision denying the motion to

---

3.  The debtors in these chapter 11 cases (the "U.S. Debtors"), along with the last four digits of each tax
identification number, are:  Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel
Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073);
Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc.
(2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel
Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International
Inc. (6286), Nortel Networks Cable Solutions Inc. (0567); Nortel Networks (CALA) Inc. (4226).

4.  The U.S. and Canadian Courts have entered into a Cross-Border Protocol (as defined below) establishing
procedures for the coordination of the insolvency proceedings in their respective jurisdictions.

5.  9 U.S.C. § 16(a) (2006); *Ehleiter v. Grapetree Shores, Inc.*, 482 F.3d 207, 214 (3d Cir. 2007) ("In no uncertain
terms, Section 16 'makes clear that any order favoring litigation over arbitration is immediately appealable and
any order favoring arbitration over litigation is not.'") (citation omitted).

compel arbitration, rather than waiting for the conclusion of the joint cross-border trials, for at least the following reasons:

First, allowing an immediate appeal from the Allocation Protocol Order will serve the interest of judicial efficiency. The filing of the appeal from the Bankruptcy Court's decision denying the Joint Administrators' motion to compel arbitration automatically deprives the Bankruptcy Court of jurisdiction to decide the allocation dispute, thereby staying proceedings on allocation until the appeal has been decided.[6] An immediate appeal of the Allocation Protocol Order will therefore cause no prejudice. Further, although it seems plain that the allocation dispute is required to be arbitrated in accordance with the parties' written agreement, the Joint Administrators' success on this point is not guaranteed. If the decision denying the motion to compel arbitration is affirmed on appeal, the question of the form of judicial proceedings through which the allocation dispute should ultimately be decided will become paramount. In contrast, if the appellate court finds the allocation dispute to be arbitrable without reviewing the portion of the Order approving the Allocation Protocol, the parties will be subject to two conflicting orders: one to arbitrate and one adopting the protocol. If the objections to the propriety of the joint trials ordered by the Bankruptcy Court are addressed now, the Bankruptcy Court and parties will have a road map for how to proceed in the event the appeal is unsuccessful. Delaying appeal until after U.S. and Canadian judgments on the merits could result in the need to repeat the entire trial.

Second, the Allocation Protocol implicates controlling questions of law as to which there are substantial grounds for difference of opinion. The joint trial approach ordered under the Allocation Protocol is unprecedented. Instead of ordering the dispute to be arbitrated,

---

6.  *See Ehleiter*, 482 F.3d at 215 n.6; *see also Guidotti v. Legal Helpers Debt Resolution*, No. 11-1219, 2012 WL 3262461, at *2-3 (D.N.J. Aug. 7, 2012) (granting automatic stay); *V.I. Water & Power Auth. v. Gen. Elec. Int'l*, No. 2006-131, 2009 WL 2413670, at *1 (D.V.I. Aug. 4, 2009) (same).

the U.S. and Canadian Courts have intentionally created a situation in which both courts are seized of a dispute about the same subject matter, *i.e.*, how to divide the $7.5 billion held in escrow among some forty Nortel entities around the world.  The Courts have ordered the parties to engage in a process by which two parallel courts of independent jurisdiction will conduct joint hearings, applying uncertain rules of evidence and procedure, and conduct joint trials, leading to two independent judgments and two separate appeal processes in the U.S. and Canada.  There is at least substantial doubt about the authority of a U.S. Court to formulate *ad hoc* trial procedures in this fashion.  The parties can only hope that the judgments will coincide, as there will literally be no way to reconcile any differences in the ultimate decisions entered by the U.S. and Canadian Courts.

Thus the Joint Administrators seek leave to appeal the novel issue of whether separate courts of two sovereign nations can co-adjudicate a proceeding, each purporting to act under its own substantive and procedural rules, while maintaining each court's sovereignty and independence and observing the due process rights of the parties, in a scenario that is almost certain to lead to a deadlock between two inconsistent judgments.

The issues to be addressed on this appeal could not be more important.  To date, the Nortel bankruptcy proceedings serve as a paradigm for how to promptly sell the business assets of an international corporate group, thereby maximizing the funds available for distribution to creditors, despite the pendency of multiple international insolvency proceedings under widely differing legal regimes.  To complete this paradigm, the Courts must implement a fair and equitable approach for determining how the sale proceeds will be allocated among the various debtors around the world.  Foreign debtors in future cases will not agree to cooperate on sales of global assets if their share of the proceeds must be determined by the local courts of

another nation.  The ideal method for determining allocation of the sales proceeds is the one

contemplated by all parties when they agreed to the asset sales, i.e. by submission to an

international panel of neutral arbitrators.

## BACKGROUND

The Nortel group was a Canada-based global supplier of telecommunications,

computer networks and software serving customers in Canada, the U.S., the Caribbean, Latin

America, Asia and EMEA (Europe, the Middle East and Africa).

On January 14, 2009 (the "Petition Date"), the principal companies in the Nortel

group commenced insolvency proceedings.[7]  The group's ultimate corporate parent Nortel

Networks Corporation ("NNC"), NNUK's direct corporate parent Nortel Networks Limited

("NNL"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors") sought

protection under the Canadian Companies' Creditors Arrangement Act ("CCAA").  The U.S.

Debtors filed voluntary petitions in the U.S. Court pursuant to chapter 11, title 11 of the United

States Code (the "Bankruptcy Code").  The EMEA Debtors were placed into administration in

England under the Insolvency Act 1986 by orders of Mr. Justice Blackburne of the English High

Court.[8]

On the Petition Date, the U.S. Court and the Canadian Court entered Orders

establishing procedures for the coordination of cross-border hearings between the U.S. and

---

7.  Nortel Networks (CALA) Inc. filed for relief on July 14, 2009, which was consolidated and is being jointly
administered with the U.S. Debtors' chapter 11 cases for procedural purposes only.  (Order Directing Joint
Administration of the Debtors' Related Chap. 11 Cases and Granting Related Relief, Jul. 17, 2009, D.I. 1098.)

8.  On May 28, 2009, the Commercial Court of Versailles ordered the commencement of secondary proceedings in
respect of NNSA.

Canadian Courts (as amended, the "Cross-Border Protocol").[9]  The Cross-Border Protocol

allowed the U.S. and Canadian Courts to hold joint hearings "where both the U.S. Court and the

Canadian Court consider such a Joint Hearing to be necessary or advisable, or . . . to, among

other things, facilitate or coordinate proper and efficient conduct of the Insolvency Proceedings

or the resolution of any particular issue in the Insolvency Proceedings."  (Cross-Border

Insolvency Protocol, Ex. 1 ¶ 12(d), Jun. 29, 2009, D.I. 990.)  However, the Cross-Border

Protocol confirmed such proceedings could not infringe on the sovereignty and independence of

the two Courts.  (*Id.* at ¶¶ 7, 8, 12(f).)

> After commencing insolvency proceedings in their respective jurisdictions, the

Nortel group of companies made plans to sell off the Nortel businesses.  Because Nortel's

businesses were conducted globally, along "business lines," the cooperation of all Nortel entities

around the world was necessary in order to consummate the sale of each business line.  This

raised the question of how the purchase price that would be paid for each global business line

should be divided (allocated) among the various Nortel debtors that had an interest in each

business line (the "Selling Debtors").  To prevent this issue from delaying the sales transactions,

the various Nortel debtors agreed that the proceeds of the asset sales would be placed into escrow

pending later determination of how to divide those proceeds either through (i) negotiated

agreement amongst the parties, or (ii) determination by an independent "dispute resolver" in

accordance with procedures to be agreed by the parties.

> On or about June 9, 2009, the Canadian, U.S. and EMEA Debtors entered into the

Interim Funding and Settlement Agreement (the "IFSA"), which provided, *inter alia*, for the

---

9.    Order Approving Cross-Border Court-to-Court Protocol, Jan. 15, 2009, D.I. 54, as amended by the Order
       Approving Stipulation of the Debtors and the Official Comm. Of Unsecured Creditors of Nortel Networks Inc.,
       et al., Amending the Cross-Border Court-to-Court Protocol, Jun. 29, 2009, D.I. 990, annexed hereto as
       Exhibit G.

proceeds of the asset sales to be placed in escrow.  (Apr. 25, 2011, D.I. 5308-1.)  The IFSA

provided that sale proceeds would not be distributed unless either (i) the selling Nortel debtors

agreed on the appropriate allocation, or (ii) in the event that a dispute about allocation could not

be resolved by negotiation, determination by "dispute resolver(s)."  (*Id.* at ¶ 12(b).)

Specifically, Section 12(b) of the IFSA states:

> [T]he entire amount of the Sale Proceeds . . . shall be deposited in
> an escrow account pursuant to an escrow agreement, the terms of
> which shall be negotiated and agreed by all Selling Debtors, in
> each case acting reasonably (the "Escrow Account").  In no case
> shall there be any distribution from the Escrow Account in advance
> of either (i) agreement of all the Selling Debtors or (ii) in the case
> where the Selling Debtors fail to reach agreement, determination
> by the relevant dispute resolver(s) under the terms of the Protocol
> . . . applicable to the Sale Proceeds, and subject in each case to
> payment of the agreed or determined amount of allocation of Sale
> Proceeds to all Selling Debtors.

The IFSA also required the parties to negotiate in good faith towards agreeing on

a protocol to specify the procedures that would be followed by the dispute resolver.  (*Id.* ¶ 12(c).)

The U.S. Court approved the IFSA by order dated June 29, 2009 (Order Approving the Interim

Funding and Settlement Agreement and Granting Related Relief, Jun. 29, 2009, D.I. 993), and

the Canadian Court approved it by order dated June 29, 2009.  By Order dated June 23, 2009, the

English Court ordered that the Joint Administrators "be at liberty" to enter into the IFSA.[10]

Sales of substantially all Nortel assets followed, with proceeds from the sales

escrowed as required by the IFSA and held in bank accounts maintained in the U.S.  The total

currently held in escrow is approximately $7.5 billion, representing the proceeds of nine separate

asset sales.

---

10.  Section 13 of the IFSA provides that no provision of the IFSA shall be effective until each of the U.S. Court and
Canadian Court approved the entirety of the IFSA and the English Court gave a direction that the Joint
Administrators be at liberty to enter into the IFSA, which requirement could be waived by the Joint
Administrators at their discretion.  (IFSA § 13, D.I. 5308-1.)

At all times, both before and after the entry of the IFSA, the parties understood and agreed that the "dispute resolver" that would be appointed to resolve disputes about allocation would be one or more private individuals acting in the capacity of arbitrators.  Shortly after execution and judicial approval of the IFSA, the parties commenced negotiations towards a protocol to specify the procedures that would be followed in this arbitration proceeding.  The parties had reached agreement on the main points of a twenty-nine page protocol, pursuant to which each of the three main debtor groups (Canada, U.S. and EMEA) would appoint one arbitrator to form a three member arbitration panel to resolve disputes over allocation.  Before finalizing this protocol, the parties suspended negotiations in favor of mediation regarding the actual allocation of the IFSA sale proceeds.  Mediation sessions took place in November 2010 and April 2011, without success.

After the failure of the mediation, the U.S. Debtors abruptly reversed course and refused to continue negotiations towards finalizing the IFSA dispute resolution protocol.  They decided that they would no longer honor the understanding upon which the Nortel asset sales had been consummated, *i.e.*, that disputes about allocation of the sale proceeds would be decided in an international arbitration proceeding rather than by any particular national court.  Thus, on April 25, 2011, the U.S. Debtors and the Committee filed the Joint Motion for Entry of an Order Establishing an Allocation Protocol Pursuant to the Interim Funding Settlement Agreement, and for Related Relief (the "<u>Allocation Protocol Motion</u>"), in which they moved the U.S. Court for entry of an order approving an Allocation Protocol establishing procedures and an expedited schedule for joint determination by the U.S. and Canadian Courts of the allocation of the sale proceeds.[11]  (D.I. 5307.)

---

11.  A companion application was filed by the Canadian Debtors before the Canadian Court.

01:13535645.2

62309424_1

The Joint Administrators filed objections to the Allocation Protocol Motion, and made a cross-motion to compel arbitration of the allocation dispute as provided for under the IFSA (the "Cross-Motion").  (Joint Administrators' Objection and Cross-Motion, May 19, 2011, D.I. 5444.)  The Joint Administrators argued that, from the earliest negotiations of the IFSA, the Selling Debtors had agreed that the allocation of the sale proceeds should be decided in a private, transnational arbitration proceeding and not by any national court or courts, and that joint jurisdiction of the Canadian and U.S. Courts was contemplated solely for the purpose of enforcing the arbitration clause or for ancillary relief.  (The Joint Administrators' Mem. of Law, May 31, 2011, D.I. 5531.)  The Joint Administrators further argued that based upon the terms of the IFSA and the history of negotiations regarding the IFSA:

> All evidence confirms that the parties bound themselves to submit allocation disputes to arbitration, regardless of whether they were successful in negotiating a procedural protocol to be followed in such arbitration.  Accordingly under the Federal Arbitration Act (the "FAA"), the Court's jurisdiction over allocation disputes is limited to compelling the parties to submit those disputes to arbitration.

(*Id.* at 3.)

Argument on the Allocation Protocol Motion and Cross-Motion (together with submissions from other parties) was heard in joint hearings before the U.S. Court and Canadian Court on June 7, 2011, after which the U.S. and Canadian Courts reserved decision and ordered the parties to try to mediate the dispute.  This mediation was unsuccessful, and was declared ended in January 2013.

On April 3, 2013, the U.S. Court (Gross, J.) entered the Allocation Protocol Order and Allocation Opinion, denying the Joint Administrators' motion to compel arbitration and

approving the Allocation Protocol that had been submitted by the U.S. Debtors and Committee.[12]

Mr. Justice Morawetz of the Canadian Court, having previously issued an endorsement on

March 8, 2013, issued a further endorsement on April 3, 2013 (the "Allocation Endorsement"),

which reached the same result.[13]  The Courts found that the parties' intention to arbitrate the

allocation dispute was not expressed with sufficient clarity in the terms of Section 12 of the

IFSA.  Instead, the Courts found that they had joint jurisdiction to determine allocation pursuant

to Section 16(b) of the IFSA, which provides that:

> To the fullest extent permitted by applicable law, each Party
> (i) agrees to submit to the non-exclusive jurisdiction of the US and
> Canadian Courts (in a joint hearing conducted under the Cross-
> Border Protocol adopted by such Court, as it may be amended
> from time to time), for purposes of all legal proceedings relating to
> the matters agreed in this Agreement . . .

(IFSA § 16(b), D.I. 5308-1.)

The Allocation Protocol approved by the U.S. and Canadian Courts provides that

the dispute over allocation will be decided through simultaneous proceedings and joint trials

conducted under the Cross-Border Protocol.  (Exhibit G.)  The same hearings will also be used to

adjudicate claims the EMEA Debtors have asserted against the Canadian Debtor and the U.S.

Debtor.  Prior to such hearings, the parties are to participate in joint submission of pleadings,

followed by joint fact discovery, joint expert discovery and joint pre-trial submissions.  The

precise rules of procedure, rules of evidence and constitutional principles that will apply in these

---

12. A copy of the Allocation Protocol Order and the Allocation Opinion are annexed hereto as Exhibits A and B.  A copy of the Form of Allocation Protocol submitted by the U.S. Debtors and Committee and approved in principle by the U.S. and Canadian Courts is annexed as Exhibit C.  Certification of counsel for the U.S. Debtors attaching a final form of the Allocation Protocol incorporating minor updates submitted on April 15, 2013 is annexed as Exhibit D.

13. A copy of the Canadian Court's endorsements are annexed hereto as Exhibits E and F.  The Joint Administrators intend to appeal the Allocation Endorsement concurrently with the appeal of the Allocation Protocol Order and Allocation Opinion.

various phases of the proceedings are not specified in the Allocation Protocol.  Instead the two

courts are to "determine the procedures that will govern the Allocation Protocol Hearings and

related Allocation Protocol Discovery."  (*Id.* ¶ 4.)

The portion of the Allocation Protocol Order in which the U.S. Court denied the

Joint Administrators' Cross-Motion is immediately appealable as of right under Section 16(a) of

the FAA.  9 U.S.C. § 16(a) (2006).  By the present motion, the Joint Administrators seek leave to

appeal that portion of the Allocation Protocol Order in which the U.S. Court approved the

Allocation Protocol and directed that the disputes over allocation of the sale proceeds be

determined through simultaneous proceedings and joint trials before the U.S. and Canadian

Courts.

## JURISDICTION AND VENUE

The Joint Administrators seek leave to appeal from an interlocutory order of the

United States Bankruptcy Court for the District of Delaware.  The United States District Court

for the District of Delaware (the "District Court") has jurisdiction to hear the motion and the

appeal pursuant to 28 U.S.C. § 158(a) (2006).  The relief requested in the Motion is properly

before this Court under Rule 8003 of the Bankruptcy Rules.  Venue in this district is appropriate

under 28 U.S.C. §§ 1408-1409 (2006).

## QUESTIONS ON APPEAL

Whether the U.S. Court erred in approving the Allocation Protocol and directing

that the disputes over allocation of the sale proceeds be decided through joint procedures and the

concurrent jurisdiction of the Canadian Court and U.S. Court.

## RELIEF REQUESTED

By this Motion, the Joint Administrators request that this Court grant the Joint

Administrators leave to appeal the portion of the Allocation Protocol Order in which the U.S.

Court approved an Allocation Protocol establishing procedures for joint and concurrent

resolution by the U.S. and Canadian Courts of the allocation of the sale proceeds.  If leave is

granted, this appeal will proceed together with the Joint Administrators' appeal of the portion of

the Allocation Protocol Order in which the U.S. Court denied the Joint Administrators' Cross-

Motion to compel arbitration of the allocation dispute, which is immediately appealable as of

right under Section 16(a) of the FAA.[14]  A proposed form of order granting the relief requested is

attached hereto.

## ARGUMENT

I. **THE COURT SHOULD GRANT LEAVE TO APPEAL THE BANKRUPTCY COURT'S DECISION TO ENTER THE ALLOCATION PROTOCOL PROVIDING FOR JOINT PROCEEDINGS BEFORE THE U.S. AND CANADIAN COURTS.**

The Court should give the Joint Administrators leave to immediately appeal that

portion of the Allocation Protocol Order in which the U.S. Court approved an Allocation

Protocol establishing procedures for the joint and concurrent resolution by the U.S. and Canadian

Courts of the allocation of the proceeds of the sales of the Nortel businesses.

Interlocutory orders are appealable with leave of court pursuant to 28 U.S.C.

§ 158(a)(3).  The decision whether to grant leave to file an interlocutory appeal from a

bankruptcy court decision is informed by the criteria set forth in 28 U.S.C. § 1292(b) (2006).

*E.g., W.R. Grace & Co. v. Libby Claimants (In re W.R. Grace & Co.)*, No. 08-246, 2008 WL

3522453, at *2 (D. Del. Aug. 12, 2008); *Patrick v. Dell Fin. Servs., Inc.*, 366 B.R. 378, 385

---

14. Because the finality of orders in bankruptcy cases is more liberal than in other civil litigation, combined with a strong federal policy favoring arbitration agreements, a bankruptcy court's order denying arbitration is "final" for the purposes of § 158(a) and a party need not obtain leave of court to appeal such an order.  *Americorp, Inc. v. Hamm*, No. 11-cv-677, 2011 WL 6020187, at *1-2 (M.D. Ala. 2011); *see also Mintze v. Am. Gen. Fin. Servs., Inc. (In re Mintze)*, 434 F.3d 222, 227 (3d Cir. 2006) (noting that "[t]he District Court had appellate jurisdiction under 28 U.S.C. § 158(a)(1) [(providing for an appeal from final judgments, orders, and decrees)] and 9 U.S.C. § 16(a)(1)(B) (providing appeal from an order denying arbitration))."

(M.D. Pa. 2007); *Nat'l Cable Television Coop., Inc. v. Broadstripe, LLC (In re Broadstripe, LLC)*, No. 09-10006, 2009 WL 774401, at *2 (D. Del. Mar. 26, 2009).  Section 1292 provides that leave to appeal an interlocutory order of a bankruptcy court may be granted when:  (a) the order involves controlling questions of law; (b) there is a substantial ground for difference of opinion; and (c) an immediate appeal may materially advance the ultimate termination of the litigation.  28 U.S.C. § 1292(b); *Broadstripe,* 2009 WL 774401, at *2; *Patrick*, 366 B.R. at 385.

"The decision whether to grant an interlocutory appeal from a bankruptcy court order lies with the district court's discretion."  *Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*, No. 01-16034, 2006 WL 2548592, at *3 (S.D.N.Y. Sept. 5, 2006).  Such discretion is appropriately exercised here, where the multi-national disposition of billions of dollars is at stake and where the U.S. Court is embarking on a course that threatens to compromise its independence, sovereignty and the due process rights of the litigants.  The Allocation Protocol contemplated by the U.S. Court represents an unprecedented departure from any established procedure and subjects its participants to potentially concurrent, conflicting orders and judgments of the U.S. Court and the Canadian Court, on both procedural and substantive legal issues.[15]

**A.      The Appeal Raises Controlling Questions of Law As To Which There Are Substantial Grounds For Difference Of Opinion.**

Leave to appeal the Allocation Protocol Order should be granted because the Allocation Protocol Order involves a controlling question of law.  A question is "controlling" if its incorrect disposition would require reversal of the final judgment or is "serious to the conduct of the litigation."  *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 755 (3d Cir. 1974).

---

15.  In order for the decisions of the Courts to be useful and enforceable, they would need to be identical, which would be highly unlikely if each Court independently arrived at its decision.  Engaging in joint deliberations in order to reach consensus, however, would be a violation of the Courts' independence and sovereignty.

The decision appealed from here will plainly control the outcome of the litigation below.  If the appellate court determines that the U.S. Court exceeded its authority by ordering a joint and concurrent resolution by the U.S. and Canadian Courts of the allocation of the sale proceeds, any final judgment entered by the U.S. Court under that protocol would be subject to reversal.  Such judgment will also be reversed if the appellate court determines that the Allocation Protocol proceedings violate principles of independence, sovereignty or deprive parties of due process.

There are substantial grounds for difference of opinion with respect to whether the Bankruptcy Court exceeded its authority by approving the Allocation Protocol, and whether the joint proceedings violate principles of independence, sovereignty and deprive the litigants of due process.  A "substantial ground for difference of opinion" exists where courts differ in their views on the correct legal standard.  *Patrick*, 366 B.R. at 386.  The existence of a matter of first impression may establish a "substantial ground for difference of opinion," especially if the issue is "novel" or requires "highly complex" analysis.  *See Zenith Radio Corp. v. Matsushita Elec. Indus. (In re Japanese Elec. Prods. Antitrust Litig.),* 494 F. Supp. 1190, 1243 (E.D. Pa. 1980).

The questions at issue here are both novel and highly complex.  The Allocation Protocol, which would govern joint but ostensibly separate proceedings, will subject the Protocol's participants to separate and potentially conflicting orders of two separate sovereign courts.  Addressing a dispute of this nature through ad hoc procedures formulated by a U.S. judge and a foreign judge is unprecedented.

Furthermore, the Allocation Protocol will deprive the parties of their due process rights under U.S. procedural law, as the U.S. and Canadian Courts will be forced to reconcile conflicting procedural rules, which may result, for example, in the application of hybrid rules of

evidence and in either limited or compelled disclosure where such limitations or expansions would not otherwise exist absent the attempt to coordinate two separate legal proceedings. Given the novel question as to whether the U.S. Court is empowered to order and enforce a protocol that deviates from established law and procedure, which has a high potential to subject the parties to conflicting orders and judgments issued by the separate sovereign courts, it is appropriate to conclude that there are substantial grounds for difference of opinion.

**B.    Immediate Appeal Will Materially Advance the Ultimate Termination of the Litigation.**

Permitting an immediate appeal from that Bankruptcy Court's decision approving the Allocation Protocol will materially advance the ultimate termination of the litigation. Several factors are pertinent in determining whether an immediate appeal would materially advance the ultimate termination of the litigation, including: (i) whether the need for trial would be eliminated; (ii) whether the trial would be simplified by the elimination of complex issues; and (iii) whether discovery could be conducted more expeditiously and at less expense to the parties. *Patrick*, 366 B.R. at 387.

If the appellate court reverses the determination of the U.S. Court on the Joint Administrators' Cross-Motion to compel arbitration, the allocation dispute would be resolved through arbitration, which would eliminate the issues of potential procedural and substantive conflict. But if the appellate court affirms the denial of the Cross-Motion to compel arbitration, the parties must proceed to litigate allocation through some alternative procedure. If the portion of the Allocation Protocol Order approving the entry of the Allocation Protocol is not appealed, uncertainty will remain about the propriety of the procedures ordered under the Allocation Protocol. Since granting leave to appeal from the decision to approve the Allocation Protocol will cause no delay to the proceedings below, it will speed the ultimate resolution of this matter

if the appellate court addresses the propriety of the Allocation Protocol now rather than waiting until after the U.S. and Canadian Courts have entered their concurrent judgments in the joint proceedings.

> **C.    Granting Leave to Appeal Will Avoid Potential Wasted Trial Time and Litigation Expense.**

Granting leave is also appropriate where doing so promotes "the avoidance of harm to a party *pendente lite* from a possibly erroneous interlocutory order and the avoidance of possible wasted trial time and litigation expense." *Broadstripe, LLC*, 2009 WL 774401, at *2 (citation omitted).  This consideration is present here, where deferral of the appeal of the issue as to whether the Allocation Protocol is sanctioned by the IFSA or can adequately provide the parties due process until the end of litigation could easily result in wasted trial time and litigation expense.

**II.    APPEAL FROM THE ORDER APPROVING THE ALLOCATION PROTOCOL SHOULD BE HEARD TOGETHER WITH THE APPEAL AS OF RIGHT FROM THE ORDER DENYING THE MOTION TO COMPEL ARBITRATION BECAUSE THE ISSUES ARE INTERTWINED.**

Even if the Court determines that the criteria for granting leave to appeal are not present, the appellate court should nevertheless exercise pendant jurisdiction to hear the Joint Administrators' appeal from the interlocutory portion of the Allocation Protocol Order in tandem with the appeal from denial of the motion to compel arbitration.  An appellate court may exercise pendant jurisdiction over issues that are not independently appealable when either:  (i) the non-appealable order is "inextricably intertwined" with the appealable order; or (ii) review of the non-appealable order "is necessary to ensure meaningful review of the appealable order." *CTF Hotel Holdings, Inc. v. Marriott Int'l, Inc.*, 381 F.3d 131, 136 (3d Cir. 2004); *see also Carpenter v. Boeing Co.*, 223 F.R.D. 552, 558 (D. Kan. 2004); *Ace Ins. Co. v. Smith*, No. 06-0325, 2006 U.S. Dist. LEXIS 67761, at *11 (D. Ariz. Sept. 20, 2006).  Issues are inextricably intertwined

"when the appealable issue 'cannot be resolved without reference to the otherwise unappealable issue.'" *Invista S.À.R.L. v. Rhodia, S.A.*, 625 F.3d 75, 88 (3d Cir. 2010) (citation omitted).

The decision approving the Allocation Protocol is inextricably intertwined with the decision denying the Joint Administrators' motion to compel arbitration because: (i) it requires construction of terms of the IFSA and the extent of the Bankruptcy Court's discretion to impose a dispute resolution process thereunder; and (ii) the Allocation Protocol establishes the procedures that the Bankruptcy Court has ordered be followed in lieu of arbitration. If the appellate court finds the allocation dispute to be arbitrable without reviewing the portion of the Order approving the Allocation Protocol, the parties will be subject to two conflicting orders: one to arbitrate and one adopting the protocol. Both orders should therefore be addressed at the same time.

Furthermore, even if the appellate court finds the dispute not to be arbitrable, it would be appropriate for the court to take the next step and determine whether Bankruptcy Court acted appropriately by instituting the unprecedented procedure that has been ordered as the alternative to arbitration. Addressing both issues at once will serve the interest in judicial efficiency by preventing the waste of resources that will occur if the Joint Administrators are successful in challenging the Allocation Protocol process after the joint trial on the merits.

Granting leave to appeal will cause no prejudice to the U.S. Debtor or the Committee. The filing of the appeal from the Bankruptcy Court's order denying the Joint Administrators' motion to compel arbitration deprives the Bankruptcy Court of jurisdiction to

01:13535645.2

62309424_1

address allocation under the Allocation Protocol, thereby staying that aspect of the proceedings below.[16]

## CONCLUSION

For the foregoing reasons, an immediate appeal from the Allocation Protocol Order is essential to timely resolution of the allocation of sale proceeds in a manner that will yield a final, consistent result and afford all parties due process.  The Joint Administrators therefore respectfully request that the Court (i) grant the Joint Administrators leave to appeal the portion of the Allocation Protocol Order that approved the Allocation Protocol, which appeal will proceed in tandem with the appeal as of right from the portion of the Allocation Protocol Order denying the Cross-Motion to compel arbitration, (ii) enter an Order substantially in the form attached hereto, and (iii) grant such other and further relief as the Court deems just and proper.

---

16.  The filing of an appeal from an order denying a motion to compel arbitration automatically deprives the lower court of jurisdiction until the appeal has been fully litigated.  *See Ehleiter*, 482 F.3d at 215 n.6; *see also Guidotti*, 2012 WL 3262461, at *2-3; *V.I. Water & Power Auth.*, 2009 WL 2413670, at *1.

Dated: Wilmington, Delaware
April 17, 2013

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Jaime Luton Chapman*
James L. Patton (No. 2202)
Edwin J. Harron (No. 3396)
John T. Dorsey (No. 2988)
Jaime Luton Chapman (No. 4936)

Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  302-571-6600
Fax:  302-571-1253

– and –

HUGHES HUBBARD & REED LLP

Derek J.T. Adler
Amera Z. Chowhan
Gabrielle Glemann
Charles H. Huberty

One Battery Park Plaza
New York, New York 10004
Telephone:  212-837-6000
Fax:  212-422-4726

– and –

HERBERT SMITH FREEHILLS LLP

Kevin Lloyd
John Whiteoak
Richard Lawton

Exchange House
Primrose Street
London EC2A 2HS

*Counsel for Joint Administrators*

01:13535645.2

62309424_1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., *et al.*, | Bankr. Case No. 09-10138 (KG) |
| Debtors.[1] | (Jointly Administered) |

**[PROPOSED] ORDER GRANTING JOINT ADMINISTRATORS' MOTION FOR
LEAVE TO APPEAL FROM ORDER APPROVING ALLOCATION PROTOCOL**

Upon consideration of the motion (the "Motion") of the court-appointed administrators

and authorized foreign representatives (collectively, the "Joint Administrators") for Nortel

Networks UK Limited and certain of its affiliates,[2] for entry of an order, pursuant to 28 U.S.C.

§ 158(a) and Rules 8001, 8002 and 8003 of the Federal Rules of Bankruptcy Procedure, granting

the Joint Administrators leave to appeal from the portions of the Order and Opinion Approving

Allocation Protocol, which were entered by the United States Bankruptcy Court for the District

---

1. The debtors in these chapter 11 cases, along with the last four digits of each tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567); Nortel Networks (CALA) Inc. (4226).

2. These affiliates, known as the "EMEA Debtors" are:  Nortel GmbH; Nortel Networks (Austria) GmbH; NNIR; Nortel Networks AB; Nortel Networks B.V.; Nortel Networks Engineering Service Kft; Nortel Networks France S.A.S.; Nortel Networks Hispania, S.A.; Nortel Networks International Finance & Holding B.V; Nortel Networks N.V.; Nortel Networks OY; Nortel Networks Polska Sp. z.o.o.; Nortel Networks Portugal S.A.; Nortel Networks Romania SRL; Nortel Networks S.A. ("NNSA"); Nortel Networks S.p.A.; Nortel Networks Slovensko, s.r.o.; Nortel Networks, s.r.o.  The Joint Administrators are court-appointed administrators and authorized foreign representatives in proceedings under the Insolvency Act 1986, pending before the High Court of Justice of England and Wales.  The Joint Administrators in the U.K. proceedings for all of the above listed debtors, with the exception of Nortel Networks (Ireland) Limited ("NNIR"), are:  Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, and Stephen John Harris.  The Joint Administrators in the U.K. proceedings for NNIR are:  Alan Robert Bloom and David Martin Hughes.

of Delaware (the "U.S. Court") on April 3, 2013 (Bankr. D.I. 9947, 9946), approving the entry of

a protocol which outlines the process for joint litigation of the allocation disputes by the U.S.

Court and the Ontario Superior Court of Justice–Commercial List, and due and proper notice of

the Motion having been given, it is hereby:

      ORDERED that the Motion is GRANTED.


Dated:



_____

UNITED STATES DISTRICT JUDGE

**EXHIBIT A**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTEL NETWORKS, INC., *et al.*, | ) | Case No. 09-10138 (KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | **Re Dkt No. 5307 and 5531** |

## ORDER APPROVING ALLOCATION PROTOCOL

Upon the motion dated April 25, 2011 (the "Joint Motion")[1], of Nortel Networks Inc.

and certain of its affiliates, as debtors and debtors in possession in the above-captioned cases

(the "U.S. Debtors"), and the Official Committee of Unsecured Creditors (the "Committee"

and together with the U.S. Debtors, the "Movants"), for entry of an order, as more fully

described in the Motion, approving an Allocation Protocol pursuant to the Interim Funding

and Settlement Agreement, dated as of June 9, 2009 (the "IFSA"); and the Joint

Administrators' Objection to the Joint Motion and Cross-Motion to Compel Arbitration,

dated May 31, 2011 (the "Objection"); and the Court having jurisdiction to consider the Joint

Motion and the Objection and the relief requested therein pursuant to 28 U.S.C. §§ 157 and

1334 and the terms of the IFSA and the U.S. IFSA Order; and the Court having determined

that consideration of the Joint Motion and the Objection is a core proceeding pursuant to 28

U.S.C. § 157(b)(2); and the Court having determined that the legal and factual bases set forth

in the Motion establish just cause for the relief requested in the Joint Motion pursuant to 11

---

[1] Capitalized terms have the same meaning as in the Opinion.

U.S.C. §§ 105 and 363, and that the Objection does not;

IT IS HEREBY ORDERED THAT:

1.      The Joint Motion is GRANTED.

2.      The Objection is DENIED.

3.      The parties shall continue to negotiate the terms of the Allocation Protocol consistent with the Court's Opinion.  The U.S. Debtors shall submit their proposal for the Allocation Protocol to all other parties on or before April 8, 2013, and thereafter the parties shall submit to the Court their versions of the Allocation Protocol on or before April 15, 2013.

4.      The trial to determine the allocation of the Sales Proceeds shall commence on January 6, 2014.  The Court will begin the trial with the allocation issues and continue thereafter with remaining issues to be addressed in the Allocation Protocol, including EMEA claims and U.K. Pension matters.

The Court has scheduled the trial later than initially planned because (1) the Court has coordinated the date with the Canadian Court, (2) the later date will provide the parties and the Court with the time to prepare for a major aspect of these cases, (3) the additional few months will have minimal impact on these cases, (4) because the Court must clear its schedule for a large period of time, the trial date must be realistic and rescheduling will be difficult, and (5) the parties deserve certainty for their planning purposes.

2

5.      The Movants are authorized to take action necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

6.      Notwithstanding any provision in the Federal Rules of Bankruptcy Procedure to the contrary, (i) the terms of this Order shall be immediately effective and enforceable upon its entry, (ii) the Movants are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and (iii) the Movants may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

7.      Nothing in this Order or the Allocation Protocol shall supersede or constitute a waiver of any rights and obligations under the IFSA.

8.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: April 3, 2013

KEVIN GROSS, U.S.B.J.

**EXHIBIT B**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTEL NETWORKS, INC., et al. | ) | Case No. 09-10138 (KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | **Re Dkt No. 5307 and 5531** |

## OPINION

The Court is opining on a matter of great significance in this daunting Chapter 11 case, namely, whether the Court will determine the allocation of proceeds from sales of assets in judicial proceedings, or if the allocation will be decided through an arbitration.[1]  See Joint Motion for Entry of an Order Establishing an Allocation Protocol Pursuant to the Interim Funding and Settlement Agreement and for Related Relief (the "Joint Motion") (D.I. 5307); and Joint Administrators' Objection to the Motion and Cross-Motion to Compel Arbitration, dated May 31, 2011 (the "Objection") (D.I. 5531).  For the reasons provided in this opinion, the Court finds that parties agreed that the Courts will make the allocation determination rather than an arbitrator or arbitrators.  Despite the voluminous submissions of the parties and the lengthy arguments, the Court's decision ultimately turns on a plain and unambiguous agreement between the parties.

---

[1]  Canadian entities also commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies Creditors Arrangement Act (Canada) seeking relief from their creditors (the "Canadian Proceedings").  The issue before the Court is similarly before the Canadian Court.  The Court will refer to the "Courts" when discussing both this Court and the Canadian Court.

## PARTIES

It is helpful in understanding the discussion of the issues to describe and define the numerous parties involved in the cases. The Court will refer to the universe of Nortel Entities described below as the "Nortel Parties."

Nortel Networks, Inc. ("NNI") and certain of its affiliates (collectively, the "U.S. Debtors") are debtors in the cases before the Court. They are joined in opposing arbitration by the Official Committee of Unsecured Creditors (the "Committee") and the Ad Hoc Committee of Bondholders (the "Bondholders"). The Bondholders hold claims in excess of $4 billion.

The Canadian Court appointed Ernst & Young to serve as the Monitor (the "Monitor") for the Canadian debtors, Nortel Networks Corporation ("NNC"), NNI's ultimate corporate parent, Nortel Networks Limited ("NNL"), NNI's direct corporate parent, and certain Canadian affiliates (collectively, the "Canadian Debtors").[2] The Canadian Debtors also oppose arbitration.

The third group of major parties, this group favoring and seeking arbitration, consists of entities which the High Court of England and Wales placed into administration (the "EMEA Debtors"). These affiliates, all in administration, are: Nortel Networks UK Limited Nortel Networks (Ireland) Limited; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska Sp z.o.o.; Nortel Networks Hispania, SA; Nortel

---

[2] Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation.

Networks (Austria) GmbH; Nortel Networks GmbH; Nortel Networks s.r.o.; Nortel Networks Engineering Services Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko, s.r.o.; Nortel Networks Romania SRL; Nortel GmbH; Nortel Networks OY; Nortel Networks AB; Nortel Networks International Finance & Holding BV and Nortel Networks France S.A.S.

The Administrators in the insolvency proceedings pending in the United Kingdom for all EMEA Debtors except Nortel Networks (Ireland) Limited are: Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris. The Administrators for Nortel Networks (Ireland) Limited are Alan Robert Bloom and David Martin Hughes (collectively, the "Joint Administrators" or "EMEA Debtors").

## **RELEVANT FACTS**

The U.S. Debtors filed for bankruptcy protection on January 14, 2009, and the Canadian Debtors filed for similar relief in Canada. Shortly thereafter, the U.S. Debtors and the Canadian Debtors began a sale of all of its businesses and its intellectual property which eventually generated approximately $9 billion (the "Sales Proceeds").[3]

The prospective sales created a "stickey wicket." In the absence of agreement, what was to happen with the Sales Proceeds? The numerous, multi-national debtors who were competing for the Sales Proceeds addressed the problem by agreement. Thus, on June 9,

---

[3]    The beneficial efforts of and stress upon the parties and their professionals cannot be overemphasized. By the Court's count, the U.S. Debtors and the Canadian Debtors conducted nine massive sales, requiring numerous motions, procedures, marketing, negotiations, auctions, hearings and closings. The results were beyond expectations for the most part and certainly were as a group.

2009, the U.S. Debtors, the Canadian Debtors and the EMEA Debtors entered into the Interim Funding and Settlement Agreement ("IFSA"), which the U.S. Court (the "U.S. IFSA Order") and the Canadian Court approved by separate orders, dated June 29, 2009.  The English High Court already ruled that the Joint Administrators were free to enter into the IFSA on behalf of the EMEA Debtors.

The IFSA provided the necessary mechanism to allow the planned sales of the Nortel Parties' businesses and assets to proceed without dispute among the Nortel Parties.  The IFSA, *inter alia*,  provided that the parties to the IFSA would not condition the execution of any sale agreement with a third party upon allocation or even a binding procedure for allocation of the sale proceeds (IFSA, ¶ 12(a), but the sale proceeds would instead be placed into an escrow account.  IFSA, ¶ 12(b).  The sales were each accompanied by an escrow agreement pertaining to that sale (collectively, the "Escrow Agreements").  The Nortel parties also agreed to negotiate for a protocol to resolve allocation disputes.  IFSA, ¶ 12(c).  The IFSA provides that disputes over the IFSA or anything relating to the IFSA must be decided in a joint hearing of the U.S. Court and the Canadian Court.  IFSA, ¶16(b).

The Nortel Parties could not agree upon a protocol which would govern the allocation process.  Their failure was not for want of trying.  The Nortel Parties engaged in lengthy discussions, including comprehensive settlement discussions, and two rounds of mediation. The most recent mediation with The Honorable Warren K. Winkler, Chief Justice of Ontario, Canada serving as the mediator ended without resolution despite the Chief Justice's expertise

and hard work.  The termination of the mediation led to the matter coming back before the

Courts.[4]

## DISCUSSION

### A.  The Joint Administrators' Case for Arbitration

The Joint Administrators argue forcefully in the Objection that the Nortel Parties

agreed to arbitration, that the IFSA reflects that agreement and that arbitration is the only

practical and efficient procedure.  The Joint Administrators maintain that the Nortel Parties

understood from the time they negotiated the IFSA that the allocation of proceeds would be

decided in a private, transnational arbitration proceeding.  The Joint Administrators further

argue that: (1) the Joint Motion is improper from a procedural standpoint, because the Court

can grant the relief only in an adversary proceeding; (2) the intent to submit the matter to

arbitration can be gleaned from its content, or the IFSA is sufficiently ambiguous,

particularly the term "dispute resolvers," to require the Court to consider extrinsic evidence;

(3) the IFSA created an enforceable promise to negotiate in good faith for an Interim Sales

Protocol which the U.S. Debtors and the Canadian Debtors failed to honor; (4) the Nortel

Parties reached an understanding calling for arbitration; (5) the Court lacks jurisdiction over

the  EMEA  Debtors;  and  (6)  judicial  proceedings  are  highly  impractical,  creating  the

possibility of deadlock between the Court and the Canadian Court and parallel appeal

---

[4]  The Nortel Parties and others first argued the Joint Motion and the Objection to the Courts in a joint hearing on June 7, 2011.  Without ruling, the Courts referred the dispute to mediation.  See Order Directing Mediation, dated June 17, 2011 (D.I. 5752).  When the mediation failed, the Courts ordered parties to submit supplemental papers.  The Courts heard the second argument on March 7, 2013.

processes.

The Joint Administrators argue that although the IFSA does not contain the words "arbitrator" or "arbitrators," it is sufficient that there is language which clearly manifests the parties' intention to submit to arbitration. *Douglas Fin. Corp. v. Pa. Power & Light Co.*, 858 F.2d 825, 830 (2d Cir. 1988). The Joint Administrators contend that the following language in the IFSA establishes the intention for arbitration:

> [Execution by a selling debtor of sale documents] shall not be conditioned upon such Selling Debtor reaching agreement with the other Selling Debtors regarding (A) allocation of the Sale Proceeds (the "Sale Proceeds") from the relevant Sale Transaction or (B) the binding procedure for the allocation of Sale Proceeds from the relevant Sale Transaction.

IFSA, ¶ 12(a).

Also, in providing for the escrow of Sale Proceeds, the IFSA provides:

> In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all the Selling Debtors or (ii) in a case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol applicable to the Sale Proceeds.

IFSA, ¶ 12(b).

6

Finally, the IFSA provides:

> [T]he Debtors shall, as soon as reasonably practicable, following the execution of this Agreement, negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Interim Sales Protocol"), which Protocol shall provide binding procedures for the allocation of Sale Proceeds where the Selling Debtors in such transactions have been unable to reach agreement on such allocations.

IFSA, ¶ 12(c).

From these provisions, and particularly the words "dispute resolvers," the Joint Administrators propose the only reasonable interpretation is that no one intended the Court and the Canadian Court to hold a joint trial on allocation.

The IFSA, they argue, is at the very least ambiguous requiring the Courts to consider extrinsic evidence. The Joint Administrators in their supporting papers presented the evidence they claim proves that the Nortel Parties agreed to arbitration. For reasons discussed below, the Court finds that the IFSA is not ambiguous and therefore the Court will not consider extrinsic evidence.[5]  At bottom, the IFSA is not reasonably susceptible of more than one interpretation and therefore is not ambiguous. *Foot Locker, Inc. v. Omni Funding Corp. of America*, 911 N.Y.S. 2d 344, 346 (1st Dep't 2010).

---

[5]  The question of whether an ambiguity exists is one of law, not fact. *W.W.W. Associates, Inc. v. Giancontieri*, 566 N.E. 2d 639, 642 (N.Y. 1990).

The Joint Administrators also argue that the EMEA Debtors did not submit to the jurisdiction of the Courts, except to enable the Courts to enforce arbitration. They further argue that the Courts do not have jurisdiction to issue a joint opinion on allocation. The Joint Administrators need not have any concern. The Court has independent jurisdiction over the EMEA Debtors and will issue its own opinion on allocation. The Court's jurisdiction rests on the IFSA itself, and Debtors' submission to the Court's jurisdiction by submitting claims against the U.S. Debtors.

The Joint Administrators are correct that the Court will confront practical and logistical difficulties. There is, indeed, the possibility that the Court and the Canadian Court will arrive at different allocations, and the trial at two distant locations may present challenges. However, difficulty is no reason for a court with jurisdiction, detailed knowledge of a case and the means to preside over that case to abandon its authority. *Meredith v. City of Winter Haven*, 320 U.S. 228, 236-37 (1943). It would be easier, but improper, for the Court to abdicate its responsibility by sending the allocation issues to arbitration without any justification. The Court is confident that the Nortel Parties and other interested parties, very ably represented, will assist the Court in minimizing any practical problems. It is entirely in the best interest of all of the Nortel Parties to facilitate the resolution of the allocation of large sums of money sitting in escrow, and equally to assist the Court in reaching the correct decision. Further, based upon the Court's years of presiding over the lawyers in this Chapter 11 case, the Court is certain that they will respect their professional obligations. More

8

importantly, the Court's enormous respect for the presiding jurist in the Canadian Court, Justice Geoffrey B. Morawetz, further fuels confidence in the Court's ability to render independently a fair and just result in an efficient and decorus manner. The judges overseeing these two cases have thus far worked through numerous difficulties and can no doubt continue to work together seamlessly. The U.S. Debtors and the Canadian Debtors put in place, with the Courts' approval, a Cross-Border Protocol which has facilitated these cases.[6] The EMEA Debtors were not parties to the Cross-Border Protocol, but agreed to its implementation in the Escrow Agreements.

### B. The Case Against Arbitration

The U.S. Debtors, the Canadian Debtors and their respective constituents are asking the Courts to determine the allocation of the assets, which are largely comprised of the Sales Proceeds. The Court is persuaded by their position.

### 1. Jurisdiction

The Nortel Parties agreed in the IFSA that they were submitting to the non-exclusive jurisdiction of the Court and the Canadian Court in a joint hearing conducted pursuant to the Cross-Border Protocol for "all legal proceedings to the extent relating to the matters agreed in this Agreement . . ." IFSA, ¶ 16(b)(i).

---

[6] The Court approved the Cross-Border Protocol on January 15, 2009, after the Canadian Court's approval on January 14, 2009.

In furtherance of the Courts' jurisdiction to determine allocation, the Nortel Parties agreed that "any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in . . . a joint hearing of both the Canadian and U.S. Courts conducted under the Cross-Border Protocol . . . IFSA, ¶ 16(b)(ii). The words "any claim, action or proceedings," "any relief whatsoever," "relating to" and "must" in the foregoing provision establish beyond cavil that the Nortel Parties, including the EMEA Debtors, agreed that they were submitting to the Court's jurisdiction. If the quoted provisions are not sufficient to make the point, the Nortel Parties excluded two specific issues, neither allocation, from the Court's jurisdiction. Additionally, as the U.S. Debtors discuss in their papers in support of the Joint Motion, the Escrow Agreements also make it clear that disputes relating to the escrowed funds will be heard by the Court.

The language in the IFSA, "any claim, action or proceeding . . . relating to matters agreed in this [IFSA]," and similar language in the Escrow Agreements[7] are broad forum selection provisions. *Schering Corp. v. First Databank, Inc.*, 479 F. Supp. 2d 468, 471 (D.N.J. 2007); *Pacor v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984). The law is clear: forum selection clauses are interpreted broadly and are enforced. *Foster v. Chesapeake Ins. Co.*, 933 F.2d 1207, 1216-19 (3d Cir. 1991). Clearly, the Nortel Parties agreed in the IFSA and in the Escrow Agreements that the Court with the Canadian Court are the "look to"

---

[7] The Escrow Agreements, to which the EMEA Debtors are a party, also provide that the EMEA Debtors submit to the exclusive jurisdiction of the Courts for all disputes.

10

jurisdictions for resolution of matters covered in such agreements and that includes allocation.

## 2. The Agreement

It is very clear that the Nortel Parties did not agree to arbitrate. The Joint Administrators concede the absence of agreement by arguing that the U.S. Debtors and Canadian Debtors had an obligation to negotiate the terms of arbitration.

It is equally clear that without agreement, there is no obligation to arbitrate. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2857-58 (2010). It is true that federal courts follow a policy favoring arbitration, but only if a valid agreement to arbitrate exists. *Id.* at 2859-60. Furthermore, while courts favor enforcing arbitration provisions that exist, courts are not predisposed to find parties agreed to arbitration. *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F. 3d 156, 160 (3d Cir. 2009). Instead, when deciding whether or not there is an agreement to arbitrate, courts will apply standard principles of contract formation. Where the language in the contract is unambiguous, courts will determine intent from the contract language itself without considering extrinsic evidence. *IDT Corp. v. Tyco Group*, 13 N.Y. 3d 209, 214 (2009); *Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 139 (2d Cir. 2000).[8]

---

[8] New York Law governs the IFSA. IFSA, ¶ 16(a).

11

The EMEA Debtors rely on Paragraph 12 of the IFSA as proof of the Nortel Parties' intent to arbitrate. Paragraph 12 just does not provide such proof. The Nortel Parties are all sophisticated and are represented by highly capable lawyers.[9] They were surely proficient at drafting an arbitration clause, and did not. Instead, Paragraph 12(c) of the IFSA provides that the Nortel Parties will negotiate and attempt to reach agreement on a protocol for resolving allocation. Paragraph 12(a), in turn, provides that the parties will enter into future sales agreements even in the absence of a binding procedure for resolving allocation issues. The Nortel Parties also did not agree to the terms of arbitration, including: who, how many, how selected, where they would sit, right to appeal. The absence of these important terms further evidences that the parties did not even approach any agreement on arbitration. *See also Bor Corp. v. ADT Automotive, Inc.*, Case No. 96 Civ. 1019 (JFK),1996 WL 689364 *10 (S.D.N.Y., Nov. 27, 1996) (holding that the absence of the word "arbitrate" is highly significant to finding the absence of the intent to arbitrate). In *Bor*, the parties had agreed that they would negotiate to hire Ernst & Young or another "dispute resolver." The parties also agreed that the arbitration results would be binding. Even with the apparent arbitration understanding between the parties, the court denied the motion to arbitrate, finding that the parties involved were sophisticated entities who, had they wanted arbitration, would have used the term or a derivative. *Bor* at *10.

---

[9]  *See Truck Drivers, Oil Drivers, Filling Station & Platform Workers' Union Local 705, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. (AFL-CIO) v. Schneider Tank Lines, Inc.*, 958 F.2d 171, 175 (7th Cir. 1992), finding that an agreement unambiguously omitted arbitration provisions where it "strained credulity" that parties forgot to include them.

The Court must also consider the U.S. IFSA Order which requires that "no ... protocol for allocation of proceeds from a Sale Transaction may become effective without the prior approval of this Court . . ." Both the IFSA and the U.S. IFSA Order are entirely consistent with the Bankruptcy Rules. The parties must stipulate and the Court must approve arbitration when there is a controversy affecting the estate. Fed. R. Bankr. P. 9019(c), *accord*. Del. Bankr. L.R. 9013-3(b)(i) (requiring consent to arbitration to be "freely and knowingly obtained").

The only language in the IFSA upon which the EMEA Debtors attempt to gain a foothold for their arbitration argument is the term "dispute resolvers." IFSA, ¶ 12(c). The Court is not at all persuaded by this argument. The Courts - and there are two here - are, of course, "dispute resolvers." As the U.S. Debtors show, numerous decisions identify courts as "dispute resolvers." *See*, *e.g.*, *Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 476 F.3d 278, 292 (5th Cir. 2007); *Lewis v. Sullivan*, 279 F.3d 526, 528 (7th Cir. 2002); *Armster v. U.S. Dist. Court for Cent. Dist. of California*, 806 F.2d 1347, 1350, n.2 (9th Cir. 1986); *Farber v. Job*, 467 F. Supp. 163, 170 (D.N. J. 1978). The EMEA Debtors' argument for the significance of "dispute resolvers" is further weakened by their reliance upon *Palumbo v. Select Mgmt. Holdings, Inc.*, No. 82900, 2003 WL 22674397 (Ohio Ct. App. Nov. 13, 2003) and its contrast to the facts here. The EMEA Debtors cite the case to show that "dispute resolver" refers to arbitration. *Palumbo* is inapposite because the parties had defined the term as referring to an accounting firm as arbitrator. *Id.* @ *1. The parties

13

in *Palumbo* had also agreed to detailed procedures for the arbitration (*Id.* @ *2), which the Nortel Parties never did.

The IFSA is unambiguous in providing that it is for the Courts, and not an arbitrator or arbitrators, to determine the allocation issues.[10]   Under such circumstances, the Court is obliged to give effect to its plain meaning.  *Vintage LLC v. Laws Constr. Corp.*, 13 N.Y.3d 847, 849-50 (2009).  In particular, *Pavarini McGovern, LLC v. Tag Court Square, LLC*, 878 N.Y.S. 2d 419-20 (2d Dep't 2009), describes the circumstances present before the Court:

> When interpreting a commercial contract negotiated by and entered into at arm's length between sophisticated business people, represented by an attorney, a court must enforce the agreement according to its terms, and extrinsic and parole evidence is not admissible to create an ambiguity in a written agreement that is complete, clear, and unambiguous on its face.

The Court does not hesitate to find that the IFSA, entered into at arm's length, between sophisticated business people, represented by highly capable lawyers, unambiguously states the agreement that the Courts retain jurisdiction to resolve allocation disputes.

### 3.  Proceeding by Motion

The Joint Administrators urge the Court to rule that the U.S. Debtors were required to proceed by filing an adversary complaint.  The Court disagrees.  The Joint Motion is an effort to enforce an agreement, the IFSA, which the Court approved by the U.S. IFSA Order.

---

[10]  The EMEA Debtors do not argue there is any ambiguity in the term "dispute resolvers."  Instead, they argue that the term clearly calls for arbitration.

*See*, *e.g.*, *In re Worldcorp. Inc.*, 252 B.R. 890-95 (Bankr. D. Del. 1999) (holding that where a party seeks to enforce a prior order, it is not required to commence an adversary proceeding).  The Court also recognizes the irony that the Joint Administrators' proceeded by objection and cross-motion, not by complaint.

## **CONCLUSION**

The Nortel Parties did not agree to arbitrate and the Court will not - indeed cannot - compel arbitration.  The Court has jurisdiction and the IFSA is the call for the submission of an allocation protocol, which will define the procedures for a joint evidentiary hearing to determine allocation.  The Court will issue an Order consistent with its decision.

Dated: April 3, 2013

KEVIN GROSS, U.S.B.J.

**EXHIBIT C**

**Schedule "A"**

**<u>ALLOCATION PROTOCOL</u>**

1. <u>Purpose</u>. The purpose of this Allocation Protocol is for the U.S. and Canadian Courts to set forth binding procedures for determining the allocation of the Sale Proceeds among the Selling Debtors[1] ("<u>Allocation</u>", and any hearing regarding same, an "<u>Allocation Protocol Hearing</u>," and any discovery regarding same, "<u>Allocation Protocol Discovery</u>"). Subject to paragraph 5 hereof, creditor claims, including but not limited to intercompany claims by and between any Nortel entities, their representatives or successors ("<u>Intercompany Claims</u>") are not governed by this Allocation Protocol. All Intercompany Claims between the U.S. Debtors and Canadian Debtors shall be determined in accordance with the Cross-Border Protocol and the Cross-Border Claims Protocol. All other Intercompany Claims shall be determined in accordance with the claims reconciliation process established by the Nortel entity against which any Intercompany Claim is made.

2. <u>Participants</u>. Each of the Selling Debtors, the Committee, the Bondholder Group, the Monitor, the Joint Administrators and the CCC (collectively, the "<u>Core Parties</u>," and each individually, a "<u>Core Party</u>") and their authorized representatives shall have the right to participate fully in (a) any and all Allocation Protocol Hearings before the U.S. and Canadian Courts arising under or relating to this Allocation Protocol, and (b) any and all Allocation Protocol Discovery conducted in connection therewith. The foregoing is without prejudice to (x) the right of any other party in interest to file written submissions in support of or in opposition to any theory of allocation advanced at any Allocation Protocol Hearing before the U.S. and Canadian Courts or request permission to become a Core Party and fully participate in the foregoing, which request shall be made by motion on notice to the Core Parties for cause shown to both the U.S. and Canadian Courts, or (y) the power of the U.S. and Canadian Courts to adopt procedures to manage the Allocation Protocol Hearings and related proceedings.

3. <u>Cross-Border Protocol</u>. Any and all Allocation Protocol Hearings shall proceed in accordance with the Cross-Border Protocol, unless otherwise ordered by the U.S. and Canadian Courts.

4. <u>Procedures</u>. The U.S. and Canadian Courts will determine the procedures that will govern the Allocation Protocol Hearings and related Allocation Protocol Discovery. After hearing the procedural submissions of the Core Parties and taking into account the discovery already conducted to date in connection with the non-binding mediation sessions, the Allocation Protocol Discovery and Allocation Protocol Hearings shall proceed in an expeditious manner.

    a. <u>Pleadings</u>. The Core Parties will exchange pleadings, which they shall be entitled to amend, from time to time, in accordance with the usual practice of

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in ●.

- 5 -

the U.S. and Canadian Courts.  There shall be no restriction on the ability of any Core Party to advance or oppose any theory of allocation.

b.  Fact Discovery.  The U.S. and Canadian Courts will facilitate the Core Parties' exchange of fact discovery by determining the following:

    i.  the deadline for, and acceptable manners of service of, reasonable requests for the production of non-privileged documents on any other Core Party;

    ii.  the deadline for objections to any Core Party's document requests;

    iii.  the deadline for identification of fact witnesses and number of fact witnesses allowed;

    iv.  the process for compelling attendance of fact witnesses at depositions; and

    v.  the deadline for completion of depositions, the number of depositions permitted, and the location of and time allowed for such depositions for each Core Party.

c.  Experts.  The U.S. and Canadian Courts shall facilitate expert discovery by determining the following:

    i.  the deadline for and format of expert reports (including exhibits);

    ii.  the deadline for and format of rebuttal expert reports (including exhibits); and

    iii.  the deadline for completion of expert depositions and the time allowed for such expert deposition.

d.  Joint Conferences.  The U.S. and Canadian Courts shall be available for joint conferences to resolve any discovery disputes among the Core Parties and to receive updates as to the status of the proceedings.  The U.S. and Canadian courts will determine when joint conferences may be set.

e.  Joint Hearings.  The U.S. and Canadian Courts shall have joint hearings on the merits.  The U.S. and Canadian Courts shall determine:

    i.  the date(s) for an opening hearing on the Core Parties' allocation positions (prior to factual discovery) and on the rules governing the joint hearing on the merits;

    ii.  the date(s) for an evidentiary hearing on the merits (after the close of fact and expert discovery and after the completion of written submissions) and the rules governing such hearing, during which opening and closing statements shall be made and cross-examination

- 6 -

and redirect examination of fact and expert witnesses shall take place; and

    iii.   the procedure for requesting or setting joint conferences as necessary to resolve any discovery disputes among the Core Parties or to receive updates to the status of the proceedings.

   f.   <u>Written Submissions</u>.  The U.S. and Canadian Courts will determine:

    i.   the deadline for and format of opening submissions (including exhibits);

    ii.   the deadline for and format of fact affidavits, if any, to accompany the opening submissions, which shall constitute the direct testimony of each fact witness;

    iii.   the deadline for and format of reply submissions (including exhibits); and

    iv.   the deadline for and format of fact affidavits, if any, to accompany the reply submissions.

5.   <u>EMEA Claims</u>.  Certain Intercompany Claims have been made by the EMEA Debtors and/or the Joint Administrators or any other administrator of an EMEA Debtor against (a) the U.S. Debtors (the "<u>EMEA U.S. Claims</u>") and (b) the Canadian Debtors (the "<u>EMEA Canadian Claims</u>" (and together with the EMEA U.S. Claims, the "<u>EMEA Claims</u>")).  The U.S. Debtors intend to file promptly motions with the U.S. Court to dismiss the EMEA U.S. Claims.  The Canadian Debtors may file motions with the Canadian Court to dismiss the EMEA Canadian Claims.

6.   <u>Decisions</u>.  The U.S. and Canadian Courts will (a) hold simultaneously (i) the Allocation Protocol Hearings, (ii) hearings before the U.S. Court on the merits of any remaining EMEA U.S. Claims, and (iii) hearings before the Canadian Court on the merits of any remaining EMEA Canadian Claim, provided, however, that the U.S. and Canadian Courts, in their discretion, may sit separately for portions of such hearings to hear evidence or argument that is relevant to only EMEA US Claims or only EMEA Canadian Claims, and (b) issue their respective decisions on (i), (ii) and (iii).

6.   <u>Appeals</u>.  The Core Parties shall have their usual rights of appeal from all interlocutory and final decisions of the U.S. and Canadian Courts.

**EXHIBIT D**

Case 09-10138-KG Doc 10583 Filed 05/23/13 Page 49 of 130

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X
                                :     Chapter 11

*In re*                         :

                           :     Case No. 09-10138 (KG)

Nortel Networks Inc., *et al.*,[1]    :

                           :     Jointly Administered

              Debtors.      :

                           :     **RE: D.I. 5307 and 9947**

                           :

-------------------------------------------------------X

## CERTIFICATION OF COUNSEL
## REGARDING ALLOCATION PROTOCOL

      I, Ann C. Cordo, counsel for Nortel Networks Inc. and certain of its affiliates, as debtors and debtors in possession in the above-captioned cases (collectively, the "US Debtors"), hereby certify as follows regarding the US Debtors' proposed allocation protocol (the "2013 Allocation Protocol"), attached as **Exhibit A** hereto; the blackline comparison between the 2013 Allocation Protocol and the 2011 Allocation Protocol (as defined below), attached as **Exhibit B** hereto; and the blackline comparison between the 2013 Allocation Protocol and the Monitor's 2013 Allocation Protocol (as defined below), attached as **Exhibit C** hereto.

      1.     As explained fully herein, the US Debtors believe that the way to expedite the litigation is for the Court to enter an order, subject to modification by agreement of the Core

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

Parties[2] and/or order of the Courts, (i) adopting **Exhibit A** as the Allocation Protocol, (ii) ordering April 30, 2013 as the date by which the Core Parties must file opening written submissions on Allocation and May 14, 2013 for any reply submissions, if any, on Allocation, as described fully below in paragraph 15, or alternatively scheduling a joint hearing to establish the deadline for such opening and reply submissions, and (iii) setting a date for a joint hearing with the Canadian Court as soon as practicable to address additional scheduling and discovery planning issues.

2.      On April 25, 2011, the US Debtors and the Committee filed the *Joint Motion for Entry of an Order Establishing an Allocation Protocol Pursuant to the Interim Funding and Settlement Agreement, and for Related Relief* [D.I. 5307] (the "U.S. Allocation Motion") for the approval of an allocation protocol establishing procedures for the cross-border resolution by the U.S. and Canadian Courts of the Allocation dispute.

3.      On June 2, 2011, the US Debtors and the Committee filed the *Reply Memorandum in Further Support of Joint Motion for Entry of an Order Establishing an Allocation Protocol Pursuant to the Interim Funding and Settlement Agreement, and for Related Relief, and in Response to the EMEA Debtors' Cross-Motion to Compel Arbitration* [D.I. 5571], along with an amended allocation protocol, which was attached thereto as Exhibit A (the "2011 Allocation Protocol"). The 2011 Allocation Protocol was agreed to by the Canadian Debtors, the Monitor, and the CCC. The Canadian Debtors subsequently filed a motion for an order approving the 2011 Allocation Protocol in the Canadian Court (the "Canadian Allocation Motion").

---

[2]      Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the 2013 Allocation Protocol, attached as Exhibit A.

2

4.      On March 8, 2013, the U.S. and Canadian Courts granted the U.S. Allocation Motion and the Canadian Allocation Motion respectively, stating that reasons were to follow.  Both the U.S. and Canadian Courts ordered that the version of the allocation protocol to be entered was to follow the 2011 Allocation Protocol with limited exceptions.

5.      On April 3, 2013, the U.S. Court issued its *Opinion* [D.I. 9946] and *Order Approving Allocation Protocol* [D.I. 9947] (the "April 3 Order"), which granted the U.S. Allocation Motion and ordered the parties to negotiate the terms of an Allocation Protocol consistent with the U.S. Court's Opinion.  The U.S. Court further ordered that the US Debtors were to submit their proposal for the Allocation Protocol to all other parties on or before April 8, 2013, and thereafter the parties were to submit to the U.S. Court their versions of the Allocation Protocol on or before April 15, 2013.

6.      Also on April 3, 2013, the Canadian Court issued an Endorsement (the "April 3 Endorsement"), which provided the reasons for the Canadian Court's March 8, 2013 decision granting the Canadian Allocation Motion.  The Canadian Court ordered that certain amendments be made to the 2011 Allocation Protocol, and that the amended Allocation Protocol must be filed with the Canadian Court by April 15, 2013.

7.      Both the U.S. Court's April 3 Order and the Canadian Court's April 3 Endorsement set a trial date commencing on January 6, 2014 for Allocation, EMEA Claims and UK Pension Claims.

8.      Pursuant to the U.S. Court's April 3 Order, the US Debtors circulated a draft of the 2013 Allocation Protocol to the other Core Parties on April 8, 2013.  Thereafter, the US Debtors met and conferred with the other Core Parties regarding the draft and incorporated their comments into the 2013 Allocation Protocol, which is attached hereto as **Exhibit A.**  A

blackline is attached hereto as **Exhibit B**, which compares the 2013 Allocation Protocol and the 2011 Allocation Protocol.

9.     The 2013 Allocation Protocol has been accepted in its current form by the Committee, the Bondholders, each of the Indenture Trustees, and the Directors and Officers. The UK Pension Claimants provided comments, some of which are incorporated in the 2013 Allocation Protocol.  The EMEA Debtors also provided comments, but did so without prejudice to their objection to addressing Allocation in the manner set forth in the Allocation Protocol.

10.     Pursuant to the Canadian Court's April 3 Endorsement, the Monitor is also submitting an Allocation Protocol to the Canadian Court today (the "Monitor's 2013 Allocation Protocol"), to which the CCC provided comments.  A blackline that compares the 2013 Allocation Protocol and the Monitor's 2013 Allocation Protocol is attached hereto as **Exhibit C**. The US Debtors and the Monitor are in near agreement as to the form of the Allocation Protocol. However, the US Debtors' 2013 Allocation Protocol differs in two respects from the Monitor's 2013 Allocation Protocol.

11.     First, the Monitor's 2013 Allocation Protocol adds the phrase "and such other parties as the U.S. Court and the Canadian Court may direct" immediately following the definition of Core Parties in paragraph 2 of the 2013 Allocation Protocol.  While the US Debtors recognize that the Canadian Court's April 3 Endorsement provides that there should not be specified restrictions on Core Parties, the US Debtors submit that every party who has requested Core Party status is granted such status in the 2013 Allocation Protocol submitted by the US Debtors (and the Monitor).  In addition, after the Allocation Order is entered by the U.S. and Canadian Courts, expedited discovery will begin in anticipation of the January 6, 2014 trial date. Therefore, the Core Parties have an interest in finality with respect to who is a Core Party in the

4

Allocation dispute and it is contrary to the interest of justice and efficiency to leave open the possibility that additional Core Parties will be named, especially when no such other party has indicated an interest in Core Party status and it is important that limits be places on the litigation for it to be manageable.  Therefore, given the Canadian Court's comment that the Allocation Protocol should be kept "substantially in the form of [the 2011 Allocation Protocol]," the US Debtors have left the phrase "and such other parties as the U.S. Court and the Canadian Court may direct" in brackets in Paragraph  2 of their 2013 Allocation Protocol and propose that the Courts are able to strike it given the express inclusion of the additional parties within the definition.[2]

12.     Second, the Monitor proposes removing the phrase "the date(s) for an opening hearing on the Core Parties' allocation positions (prior to factual discovery) and on" in paragraph 4(e)(i) in the 2013 Allocation Protocol.  The US Debtors agree that there is a consensus among the Core Parties that an opening hearing on the competing allocation positions is no longer desired or necessary.  However, the US Debtors believe that making this or any other change to the 2013 Allocation Protocol beyond the limited amendments contemplated by the Canadian Court's April 3 Endorsement is inconsistent with the Canadian Court's mandate to keep the 2013 Allocation Protocol "substantially in the form of [the 2011 Allocation Protocol]." The US Debtors, however, have no objection if the Courts strike this phrase.

13.     In an effort to move these proceedings diligently in order to meet the January 6, 2014 trial date, in addition to the Allocation Protocol, the US Debtors circulated on April 8, 2013 to the other Core Parties for Allocation and as parties to the US and Canadian EMEA and UK Pension Claims a proposed schedule (the "<u>Litigation Timetable</u>") and

---

[2]     The US Debtors note that Core Parties are designated as such solely for purpose of the Allocation litigation and  reserve their rights regarding the request of any of the Core Parties to participate in the litigation of  the EMEA Claims and the UK Pension Claims, or any other claims brought against the Debtors.

comprehensive plan for coordinating discovery (the "Discovery Plan") that would apply to discovery in both the Allocation dispute and the EMEA and UK Pension Claims.[3]  The US Debtors indicated their desire to submit these consensually negotiated documents to the Courts with the 2013 Allocation Protocol and requested prompt responses.  Unfortunately, even though it appears that the parties are in agreement on many points regarding scheduling and discovery (as the US Court was advised previously in writing and at the March 26, 2013 status conference), the US Debtors have not received sufficient feedback from a number of Core Parties and are thus not in a position to file the Litigation Timetable or Discovery Plan today.

14.     Notwithstanding the foregoing, no parties have objected that opening written submissions, as defined in paragraph 4(f)(i) of the 2013 Allocation Protocol, should be filed on April 30 and that reply submissions, if any, as defined  in paragraph 4(f)(iii) of the 2013 Allocation Protocol, should be filed on May 14.  The parties further agree that the fact affidavits described in paragraphs 4(f)(ii) and (iv) of the 2013 Allocation Protocol are unnecessary.

15.     As such, while the parties continue to meet and confer regarding the other interim deadlines, the US Debtors respectfully request that the Court so-order the deadlines of April 30 and May 14 for opening written submissions and reply written submissions, if any, respectively, pursuant to paragraphs 4(f)(i) and (iii) of the 2013 Allocation Protocol, or arrange for a joint hearing promptly to set a deadline for opening submissions.  It was discussed among the parties that such opening written submissions filed in this Court would be styled as "Motions for Approval of Allocation Position of [Identifier of Core Party]," and would set out with reasonable particularity the relief sought with respect to Allocation, the material facts relied

---

[3]        Earlier versions were circulated on March 19.

upon, and the legal bases for such position.  The reply written submissions would set out the Core Party's response to the arguments set forth in the opening written submissions.

16.     Given the significant amount of work that must be performed prior to the January 6, 2014 trial date, the US Debtors believe that entry of a Litigation Timetable and Discovery Plan must be done promptly.  Accordingly, the US Debtors respectfully request that the U.S. Court schedule a joint hearing with the Canadian Court to resolve the scheduling and discovery issues and enter orders adopting a Litigation Timetable and Discovery Plan.  The US Debtors are prepared to submit their proposed Litigation Timetable and Discovery Plan— substantially similar to the forms of documents the other Core Parties have had for approximately one month—and seek instruction from the Court with regard to such submissions prior to any joint hearing

17.     The US Debtors will provide a copy of this submission to the Canadian Court by letter requesting identical relief as requested herein.

WHEREFORE, the US Debtors respectfully request that the Court enter an order, subject to modification only by agreement of the parties and/or order of the Courts, (i) adopting **Exhibit A** as the Allocation Protocol (ii) ordering April 30, 2013 as the date by which the Core Parties must file opening written submissions on Allocation and May 14, 2013 for any reply submissions, if any, on Allocation, as described above in paragraph 15, or alternatively scheduling a joint hearing to establish the deadline for such opening and reply submissions, (iii) setting a date for a joint hearing with the Canadian Court as soon as soon as practicable to address the outstanding scheduling and discovery planning issues, and instructing the Core Parties with regard to the submission of proposed Litigation Timetables and Discovery Plans in advance of such hearing, and (iv) grant such other and further relief as is just and proper.

Dated:  April 15, 2013
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Howard S. Zelbo (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Jeffrey A. Rosenthal (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

     - and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors
and Debtors in Possession*

## Exhibit A – 2013 Allocation Protocol

**ALLOCATION PROTOCOL**

1. <u>Purpose</u>. The purpose of this Allocation Protocol is for the U.S. and Canadian Courts to set forth binding procedures for determining the allocation of the Sale Proceeds among the Selling Debtors[1] ("<u>Allocation</u>," and any hearing regarding same, an "<u>Allocation Protocol Hearing</u>," and any discovery regarding same, "<u>Allocation Protocol Discovery</u>"). Subject to paragraphs 5 and 6 hereof, creditor claims, including but not limited to intercompany claims by and between any Nortel entities, their representatives or successors ("<u>Intercompany Claims</u>") are not governed by this Allocation Protocol. All Intercompany Claims between the U.S. Debtors and Canadian Debtors shall be determined in accordance with the Cross-Border Protocol and the Cross-Border Claims Protocol. All other Intercompany Claims shall be determined in accordance with the claims reconciliation process established by the Nortel entity against which any Intercompany Claim is made.

2. <u>Participants</u>. Each of the Selling Debtors, the Committee, the Bondholder Group, the Monitor, the Joint Administrators, the CCC, the Indenture Trustees, the UK Pension Claimants, and the Directors and Officers [and such other parties as the U.S. Court and the Canadian Court may direct] (collectively, the "<u>Core Parties</u>," and each individually, a "<u>Core Party</u>") and their authorized representatives shall have the right to participate fully in (a) any and all Allocation Protocol Hearings before the U.S. and Canadian Courts arising under or relating to this Allocation Protocol, and (b) any and all Allocation Protocol Discovery conducted in connection therewith. The foregoing is without prejudice to (x) the right of any other party in interest to file written submissions in support of or in opposition to any theory of allocation advanced at any Allocation Protocol Hearing before the U.S. and Canadian Courts or request permission to become a Core Party and fully participate in the foregoing, which request shall be made by motion on notice to the Core Parties for cause shown to both the U.S. and Canadian Courts, or (y) the power of the U.S. and Canadian Courts to adopt procedures to manage the Allocation Protocol Hearings and related proceedings.

3. <u>Cross-Border Protocol</u>. Any and all Allocation Protocol Hearings shall proceed in accordance with the Cross-Border Protocol, unless otherwise ordered by the U.S. and Canadian Courts.

4. <u>Procedures</u>. The U.S. and Canadian Courts will determine the procedures that will govern the Allocation Protocol Hearings and related Allocation Protocol Discovery. After hearing the procedural submissions of the Core Parties and taking into account the discovery already conducted to date in connection with the non-binding mediation sessions, the Allocation Protocol Discovery and Allocation Protocol Hearings shall proceed in an expeditious manner.

     a. <u>Pleadings</u>. The Core Parties will exchange pleadings, which they shall be entitled to amend, from time to time, in accordance with the usual practice of

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in Appendix A.

the U.S. and Canadian Courts.  There shall be no restriction on the ability of any Core Party to advance or oppose any theory of allocation.

b.  <u>Fact Discovery</u>.  The U.S. and Canadian Courts will facilitate the Core Parties' exchange of fact discovery by determining the following:

 i. the deadline for, and acceptable manners of service of, reasonable requests for the production of non-privileged documents on any other Core Party;

 ii. the deadline for objections to any Core Party's document requests;

 iii. the deadline for identification of fact witnesses and number of fact witnesses allowed;

 iv. the process for compelling attendance of fact witnesses at depositions; and

 v. the deadline for completion of depositions, the number of depositions permitted, and the location of and time allowed for such depositions for each Core Party.

c.  <u>Experts</u>.  The U.S. and Canadian Courts shall facilitate expert discovery by determining the following:

 i. the deadline for and format of expert reports (including exhibits);

 ii. the deadline for and format of rebuttal expert reports (including exhibits); and

 iii. the deadline for completion of expert depositions and the time allowed for such expert deposition.

d.  <u>Joint Conferences</u>.  The U.S. and Canadian Courts shall be available for joint conferences to resolve any discovery disputes among the Core Parties and to receive updates as to the status of the proceedings.  The U.S. and Canadian courts will determine when joint conferences may be set.

e.  <u>Joint Hearings</u>.  The U.S. and Canadian Courts shall have joint hearings on the merits.  The U.S. and Canadian Courts shall determine:

 i. [the date(s) for an opening hearing on the Core Parties' allocation positions (prior to factual discovery) and on] the rules governing the joint hearing on the merits;

 ii. the date(s) for an evidentiary hearing on the merits (after the close of fact and expert discovery and after the completion of written submissions) and the rules governing such hearing, during which opening and closing statements shall be made and cross-examination

and redirect examination of fact and expert witnesses shall take place; and

   iii.   the procedure for requesting or setting joint conferences as necessary to resolve any discovery disputes among the Core Parties or to receive updates to the status of the proceedings.

  f.  <u>Written Submissions</u>.  The U.S. and Canadian Courts will determine:

   i.   the deadline for and format of opening submissions (including exhibits);

   ii.   the deadline for and format of fact affidavits, if any, to accompany the opening submissions, which shall constitute the direct testimony of each fact witness;

   iii.   the deadline for and format of reply submissions (including exhibits); and

   iv.   the deadline for and format of fact affidavits, if any, to accompany the reply submissions.

5.  <u>EMEA Claims</u>.  Certain Intercompany Claims have been made by the EMEA Debtors and/or the Joint Administrators or any other administrator of an EMEA Debtor and by Nortel Networks AG and Nortel Networks AS against (a) the U.S. Debtors (the "<u>EMEA U.S. Claims</u>"), to which the U.S. Debtors intend to file responsive pleadings, and (b) the Canadian Debtors and the Directors and Officers (the "<u>EMEA Canadian Claims</u>" (and together with the EMEA U.S. Claims, the "<u>EMEA Claims</u>")).  The Canadian Debtors and the Directors and Officers may file motions with the Canadian Court to dismiss the EMEA Canadian Claims.

6.  <u>UK Pension Claims</u>.  Certain claims have been made by the UK Pension Claimants against (a) the U.S. Debtors (the "<u>UK Pension US Claims</u>"), to which the U.S. Debtors intend to file responsive pleadings, and (b) the Canadian Debtors (the "<u>UK Pension Canadian Claims</u>" (and together with the UK Pension US Claims, the "<u>UK Pension Claims</u>")).  The Canadian Debtors may file motions with the Canadian Court to dismiss the UK Pension Canadian Claims.

7.  <u>Decisions</u>.  The U.S. and Canadian Courts will (a) hold simultaneously (i) the Allocation Protocol Hearings, (ii) hearings before the U.S. Court on the merits of any remaining EMEA U.S. Claims and UK Pension US Claims, and (iii) hearings before the Canadian Court on the merits of any remaining EMEA Canadian Claim and UK Pension Canadian Claims, provided, however, that the U.S. and Canadian Courts, in their discretion, may sit separately for portions of such hearings to hear evidence or argument that is relevant to only EMEA US Claims and/or UK Pension US Claims or only EMEA Canadian Claims and/or UK Pension Canadian Claims, and (b) issue their respective decisions on (i), (ii) and (iii).  The trial for this matter is scheduled to commence on January 6, 2014.  The trial will begin with the Allocation issues and continue thereafter with remaining issues to

be addressed in this Allocation Protocol, including EMEA Claims and UK Pension Claims.

8.  <u>Appeals</u>.  The Core Parties shall have their usual rights of appeal from all interlocutory and final decisions of the U.S. and Canadian Courts.

## Appendix A

**Bondholder Group:** The ad hoc group of bondholders that hold claims issued and/or guaranteed by NNC, NNL, NNI, and Nortel Networks Capital Corporation

**Canadian Court:** Ontario Superior Court of Justice (Commercial List)

**Canadian Debtors:** Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), and Nortel Networks Global Corporation., Nortel Networks International Corporation and Nortel Networks Technology Corporation

**CCC:** the ad hoc committee of major creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives (the "Representatives for the Former and Disabled Employees"); the Canadian Auto Workers Union (the "CAW"); Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans ("Morneau"); Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund (the "Ontario Superintendent"); and the court-appointed representatives of the current and transferred employees of the Canadian Debtors ("Nortel Continuing Employee Committee")

**Committee:** The Official Committee of Unsecured Creditors in the chapter 11 cases of the U.S. Debtors

**Cross-Border Protocol:** Schedule A to the "Initial Order and Endorsement," entered by Canadian Court on January 14, 2009, as amended by Schedule A to the "Fifth Amended and Restated Initial Order," entered by the Canadian Court on February 15, 2011; and Exhibit B to the "Order Pursuant to 11 U.S.C. §§ 105(a) Approving Cross-Border Court-To-Court Protocol," entered by U.S. Court on January 15, 2009, as amended by Exhibit 1 to the "Order Approving Stipulation of the Debtors and the Official Committee of Unsecured Creditors of Nortel Networks Inc., et al., Amending the Cross-Border Court-to-Court Protocol," entered by the US Court on June 29, 2009

**Cross-Border Claims Protocol:** Schedule A to the "Order Approving Cross-Border Claims Protocol," entered by Canadian Court on September 16, 2010; and Schedule B to the "Debtors' Motion for Entry of an Order Approving a Cross-Border Protocol on the Resolution of Claims," granted by the U.S. Court on September 16, 2010 pursuant to the "Order Pursuant to 11 U.S.C. §§ 105(a) and 502 Approving a Cross-Border Court-to-Court Claims Protocol"

**Directors and Officers:** Certain individuals as former directors and officers of NNC and/or NNL represented by Osler, Hoskin & Harcourt, LLP

**EMEA Debtors:** Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited; Nortel Networks S.A.; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska Sp z.o.o.; Nortel Networks Hispania, SA; Nortel Networks (Austria) GmbH; Nortel Networks s.r.o.; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko, s.r.o.; Nortel Networks

Romania SRL; Nortel GmbH; Nortel Networks OY; Nortel Networks AB; Nortel Networks International Finance & Holding BV and Nortel Networks France S.A.S.

Indenture Trustees:  (a) Wilmington Trust, National Association as successor indenture trustee pursuant to a trust indenture dated as of November 30, 1988, in respect of the 6.875% notes issued by Nortel Networks Limited; (b) The Bank of New York Mellon (i) as indenture trustee pursuant to a trust indenture dated as of July 5, 2006 among Nortel Networks Limited, as issuer, and Nortel Networks Corp. and Nortel Networks Inc., as guarantors, and (ii) as indenture trustee pursuant to an indenture dated as of March 28, 2007 among Nortel Networks Corp., as issuer, and Nortel Networks Limited and Nortel Networks Inc., as guarantors; and (c) Law Debenture Trust Company of New York as successor indenture trustee pursuant to a trust indenture dated as of February 15, 1996, in respect of the 7.875% notes issued by Nortel Networks Limited and Nortel Networks Capital Corp. and guaranteed by Nortel Networks Limited.

Joint Administrators:  Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the Administrators in the insolvency proceedings pending in the United Kingdom for all EMEA Debtors except Nortel Networks (Ireland) Limited, and Alan Robert Bloom and David Martin Hughes as Administrators for Nortel Networks (Ireland) Limited

Monitor:  Ernst & Young Inc., in its capacity as the court-appointed monitor in the proceedings commenced under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, in respect of the Canadian Debtors

Selling Debtors:  Canadian Debtors, U.S. Debtors, EMEA Debtors and Nortel Networks Optical Components Ltd., Nortel Networks AS, Nortel Networks AG, Nortel Networks South Africa (Pty) Limited, and Nortel Networks (Northern Ireland) Limited

UK Pension Claimants:  The Trustee of the NNUK Pension Plan ("UK Pension Trustee") and the Board of the Pension Protection Fund ("PPF")

U.S. Court or US Court:  United States Bankruptcy Court for the District of Delaware

U.S. Debtors or US Debtors:  Nortel Networks Inc. ("NNI"), Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.

**Exhibit B – Blackline of 2013 Allocation Protocol**

# ~~Schedule "A"~~ALLOCATION PROTOCOL

1. <u>Purpose</u>.  The purpose of this Allocation Protocol is for the U.S. and Canadian Courts to set forth binding procedures for determining the allocation of the Sale Proceeds among the Selling Debtors[1] ("<u>Allocation</u>," and any hearing regarding same, an "<u>Allocation Protocol Hearing</u>," and any discovery regarding same, "<u>Allocation Protocol Discovery</u>").  Subject to ~~paragraph 5~~paragraphs 5 and 6 hereof, creditor claims, including but not limited to intercompany claims by and between any Nortel entities, their representatives or successors ("<u>Intercompany Claims</u>") are not governed by this Allocation Protocol.  All Intercompany Claims between the U.S. Debtors and Canadian Debtors shall be determined in accordance with the Cross-Border Protocol and the Cross-Border Claims Protocol.  All other Intercompany Claims shall be determined in accordance with the claims reconciliation process established by the Nortel entity against which any Intercompany Claim is made.

2. <u>Participants</u>.  Each of the Selling Debtors, the Committee, the Bondholder Group, the Monitor, the Joint Administrators ~~and the CCC~~, the CCC, the Indenture Trustees, the UK Pension Claimants, and the Directors and Officers [and such other parties as the U.S. Court and the Canadian Court may direct] (collectively, the "<u>Core Parties</u>," and each individually, a "<u>Core Party</u>") and their authorized representatives shall have the right to participate fully in (a) any and all Allocation Protocol Hearings before the U.S. and Canadian Courts arising under or relating to this Allocation Protocol, and (b) any and all Allocation Protocol Discovery conducted in connection therewith.  The foregoing is without prejudice to (x) the right of any other party in interest to file written submissions in support of or in opposition to any theory of allocation advanced at any Allocation Protocol Hearing before the U.S. and Canadian Courts or request permission to become a Core Party and fully participate in the foregoing, which request shall be made by motion on notice to the Core Parties for cause shown to both the U.S. and Canadian Courts, or (y) the power of the U.S. and Canadian Courts to adopt procedures to manage the Allocation Protocol Hearings and related proceedings.

3. <u>Cross-Border Protocol</u>.  Any and all Allocation Protocol Hearings shall proceed in accordance with the Cross-Border Protocol, unless otherwise ordered by the U.S. and Canadian Courts.

4. <u>Procedures</u>.  The U.S. and Canadian Courts will determine the procedures that will govern the Allocation Protocol Hearings and related Allocation Protocol Discovery. After hearing the procedural submissions of the Core Parties and taking into account the discovery already conducted to date in connection with the non-binding mediation sessions, the Allocation Protocol Discovery and Allocation Protocol Hearings shall proceed in an expeditious manner.

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in ~~●~~Appendix A.

Case 09-10138-KG   Doc 10533   Filed 04/15/13   Page 66 of 7

-2-

a.  <u>Pleadings</u>.  The Core Parties will exchange pleadings, which they shall be entitled to amend, from time to time, in accordance with the usual practice of the U.S. and Canadian Courts.  There shall be no restriction on the ability of any Core Party to advance or oppose any theory of allocation.

b.  <u>Fact Discovery</u>.  The U.S. and Canadian Courts will facilitate the Core Parties' exchange of fact discovery by determining the following:

    i.  the deadline for, and acceptable manners of service of, reasonable requests for the production of non-privileged documents on any other Core Party;

    ii.  the deadline for objections to any Core Party's document requests;

    iii.  the deadline for identification of fact witnesses and number of fact witnesses allowed;

    iv.  the process for compelling attendance of fact witnesses at depositions; and

    v.  the deadline for completion of depositions, the number of depositions permitted, and the location of and time allowed for such depositions for each Core Party.

c.  <u>Experts</u>.  The U.S. and Canadian Courts shall facilitate expert discovery by determining the following:

    i.  the deadline for and format of expert reports (including exhibits);

    ii.  the deadline for and format of rebuttal expert reports (including exhibits); and

    iii.  the deadline for completion of expert depositions and the time allowed for such expert deposition.

d.  <u>Joint Conferences</u>.  The U.S. and Canadian Courts shall be available for joint conferences to resolve any discovery disputes among the Core Parties and to receive updates as to the status of the proceedings.  The U.S. and Canadian courts will determine when joint conferences may be set.

e.  <u>Joint Hearings</u>.  The U.S. and Canadian Courts shall have joint hearings on the merits.  The U.S. and Canadian Courts shall determine:

    i.  [the date(s) for an opening hearing on the Core Parties' allocation positions (prior to factual discovery) and on] the rules governing the joint hearing on the merits;

    ii.  the date(s) for an evidentiary hearing on the merits (after the close of fact and expert discovery and after the completion of written

submissions) and the rules governing such hearing, during which opening and closing statements shall be made and cross-examination and redirect examination of fact and expert witnesses shall take place; and

iii.   the procedure for requesting or setting joint conferences as necessary to resolve any discovery disputes among the Core Parties or to receive updates to the status of the proceedings.

f.   <u>Written Submissions</u>.  The U.S. and Canadian Courts will determine:

i.   the deadline for and format of opening submissions (including exhibits);

ii.   the deadline for and format of fact affidavits, if any, to accompany the opening submissions, which shall constitute the direct testimony of each fact witness;

iii.   the deadline for and format of reply submissions (including exhibits); and

iv.   the deadline for and format of fact affidavits, if any, to accompany the reply submissions.

5.   <u>EMEA Claims</u>.  Certain Intercompany Claims have been made by the EMEA Debtors and/or the Joint Administrators or any other administrator of an EMEA Debtor and by Nortel Networks AG and Nortel Networks AS against (a) the U.S. Debtors (the "EMEA U.S. Claims"), to which the U.S. Debtors intend to file responsive pleadings, and (b) the Canadian Debtors and the Directors and Officers (the "EMEA Canadian Claims" (and together with the EMEA U.S. Claims, the "EMEA Claims")).  The U.S. Canadian Debtors intend to file promptly and the Directors and Officers may file motions with the U.S. Canadian Court to dismiss the EMEA U.S. Claims.  The Canadian Debtors may file motions with the Canadian Court to dismiss the EMEA Canadian Claims. Canadian Claims.

6.   UK Pension Claims.  Certain claims have been made by the UK Pension Claimants against (a) the U.S. Debtors (the "UK Pension US Claims"), to which the U.S. Debtors intend to file responsive pleadings, and (b) the Canadian Debtors (the "UK Pension Canadian Claims" (and together with the UK Pension US Claims, the "UK Pension Claims")).  The Canadian Debtors may file motions with the Canadian Court to dismiss the UK Pension Canadian Claims.

7.   6. Decisions.  The U.S. and Canadian Courts will (a) hold simultaneously (i) the Allocation Protocol Hearings, (ii) hearings before the U.S. Court on the merits of any remaining EMEA U.S. Claims and UK Pension US Claims, and (iii) hearings before the Canadian Court on the merits of any remaining EMEA Canadian Claim and UK Pension Canadian Claims, provided, however, that the U.S. and Canadian Courts, in their discretion, may sit separately for portions of such hearings to hear evidence or argument

- 4 -

that is relevant to only EMEA US Claims and/or UK Pension US Claims or only EMEA Canadian Claims and/or UK Pension Canadian Claims, and (b) issue their respective decisions on (i), (ii) and (iii).  The trial for this matter is scheduled to commence on January 6, 2014.  The trial will begin with the Allocation issues and continue thereafter with remaining issues to be addressed in this Allocation Protocol, including EMEA Claims and UK Pension Claims.

8.  6.  Appeals.  The Core Parties shall have their usual rights of appeal from all interlocutory and final decisions of the U.S. and Canadian Courts.

–5–

## Appendix A

Bondholder Group:  The ad hoc group of bondholders that hold claims issued and/or guaranteed by NNC, NNL, NNI, and Nortel Networks Capital Corporation

Canadian Court:  Ontario Superior Court of Justice (Commercial List)

Canadian Debtors:  Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), and Nortel Networks Global Corporation., Nortel Networks International Corporation and Nortel Networks Technology Corporation

CCC:  the ad hoc committee of major creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives (the "Representatives for the Former and Disabled Employees"); the Canadian Auto Workers Union (the "CAW"); Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans ("Morneau"); Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund (the "Ontario Superintendent"); and the court-appointed representatives of the current and transferred employees of the Canadian Debtors ("Nortel Continuing Employee Committee")

Committee:  The Official Committee of Unsecured Creditors in the chapter 11 cases of the U.S. Debtors

Cross-Border Protocol:  Schedule A to the "Initial Order and Endorsement," entered by Canadian Court on January 14, 2009, as amended by Schedule A to the "Fifth Amended and Restated Initial Order," entered by the Canadian Court on February 15, 2011; and Exhibit B to the "Order Pursuant to 11 U.S.C. §§ 105(a) Approving Cross-Border Court-To-Court Protocol," entered by U.S. Court on January 15, 2009, as amended by Exhibit 1 to the "Order Approving Stipulation of the Debtors and the Official Committee of Unsecured Creditors of Nortel Networks Inc., et al., Amending the Cross-Border Court-to-Court Protocol," entered by the US Court on June 29, 2009

Cross-Border Claims Protocol:  Schedule A to the "Order Approving Cross-Border Claims Protocol," entered by Canadian Court on September 16, 2010; and Schedule B to the "Debtors' Motion for Entry of an Order Approving a Cross-Border Protocol on the Resolution of Claims," granted by the U.S. Court on September 16, 2010 pursuant to the "Order Pursuant to 11 U.S.C. §§ 105(a) and 502 Approving a Cross-Border Court-to-Court Claims Protocol"

Directors and Officers: Certain individuals as former directors and officers of NNC and/or NNL represented by Osler, Hoskin & Harcourt, LLP

EMEA Debtors:  Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited; Nortel Networks S.A.; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska Sp z.o.o.; Nortel Networks Hispania, SA; Nortel Networks (Austria) GmbH; Nortel Networks s.r.o.; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko, s.r.o.; Nortel Networks

–6–

Romania SRL; Nortel GmbH; Nortel Networks OY; Nortel Networks AB; Nortel Networks International Finance & Holding BV and Nortel Networks France S.A.S.

Indenture Trustees: (a) Wilmington Trust, National Association as successor indenture trustee pursuant to a trust indenture dated as of November 30, 1988, in respect of the 6.875% notes issued by Nortel Networks Limited; (b) The Bank of New York Mellon (i) as indenture trustee pursuant to a trust indenture dated as of July 5, 2006 among Nortel Networks Limited, as issuer, and Nortel Networks Corp. and Nortel Networks Inc., as guarantors, and (ii) as indenture trustee pursuant to an indenture dated as of March 28, 2007 among Nortel Networks Corp., as issuer, and Nortel Networks Limited and Nortel Networks Inc., as guarantors; and (c) Law Debenture Trust Company of New York as successor indenture trustee pursuant to a trust indenture dated as of February 15, 1996, in respect of the 7.875% notes issued by Nortel Networks Limited and Nortel Networks Capital Corp. and guaranteed by Nortel Networks Limited.

Joint Administrators: Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the Administrators in the insolvency proceedings pending in the United Kingdom for all EMEA Debtors except Nortel Networks (Ireland) Limited, and Alan Robert Bloom and David Martin Hughes as Administrators for Nortel Networks (Ireland) Limited

Monitor: Ernst & Young Inc., in its capacity as the court-appointed monitor in the proceedings commenced under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, in respect of the Canadian Debtors

Selling Debtors: Canadian Debtors, U.S. Debtors, EMEA Debtors and Nortel Networks Optical Components Ltd., Nortel Networks AS, Nortel Networks AG, Nortel Networks South Africa (Pty) Limited, and Nortel Networks (Northern Ireland) Limited

UK Pension Claimants: The Trustee of the NNUK Pension Plan ("UK Pension Trustee") and the Board of the Pension Protection Fund ("PPF")

U.S. Court or US Court: United States Bankruptcy Court for the District of Delaware

U.S. Debtors or US Debtors: Nortel Networks Inc. ("NNI"), Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.

<u>**Exhibit C – Blackline of Monitor's 2013 Allocation Protocol**</u>

## ALLOCATION PROTOCOL

1. <u>Purpose</u>.  The purpose of this Allocation Protocol is for the U.S. and Canadian Courts to set forth binding procedures for determining the allocation of the Sale Proceeds among the Selling Debtors[1]  ("<u>Allocation</u>," and any hearing regarding same, an "<u>Allocation Protocol Hearing</u>," and any discovery regarding same, "<u>Allocation Protocol Discovery</u>").  Subject to paragraphs 5 and 6 hereof, creditor claims, including but not limited to intercompany claims by and between any Nortel entities, their representatives or successors ("<u>Intercompany Claims</u>") are not governed by this Allocation Protocol.  All Intercompany Claims between the U.S. Debtors and Canadian Debtors shall be determined in accordance with the Cross-Border Protocol and the Cross-Border Claims Protocol.  All other Intercompany Claims shall be determined in accordance with the claims reconciliation process established by the Nortel entity against which any Intercompany Claim is made.

2. <u>Participants</u>.  Each of the Selling Debtors, the Committee, the Bondholder Group, the Monitor, the Joint Administrators, the CCC, the Indenture Trustees, the UK Pension Claimants, and the Directors and Officers [and such other parties as the U.S. Court and the Canadian Court may direct] (collectively, the "<u>Core Parties</u>," and each individually, a "<u>Core Party</u>") and their authorized representatives shall have the right to participate fully in (a) any and all Allocation Protocol Hearings before the U.S. and Canadian Courts arising under or relating to this Allocation Protocol, and (b) any and all Allocation Protocol Discovery conducted in connection therewith.  The foregoing is without prejudice to (x) the right of any other party in interest to file written submissions in support of or in opposition to any theory of allocation advanced at any Allocation Protocol Hearing before the U.S. and Canadian Courts or request permission to become a Core Party and fully participate in the foregoing, which request shall be made by motion on notice to the Core Parties for cause shown to both the U.S. and Canadian Courts, or (y) the power of the U.S. and Canadian Courts to adopt procedures to manage the Allocation Protocol Hearings and related proceedings.

3. <u>Cross-Border Protocol</u>.  Any and all Allocation Protocol Hearings shall proceed in accordance with the Cross-Border Protocol, unless otherwise ordered by the U.S. and Canadian Courts.

4. <u>Procedures</u>.  The U.S. and Canadian Courts will determine the procedures that will govern the Allocation Protocol Hearings and related Allocation Protocol Discovery. After hearing the procedural submissions of the Core Parties and taking into account the discovery already conducted to date in connection with the non-binding mediation sessions, the Allocation Protocol Discovery and Allocation Protocol Hearings shall proceed in an expeditious manner.

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in Appendix A.

a. <u>Pleadings</u>.  The Core Parties will exchange pleadings, which they shall be entitled to amend, from time to time, in accordance with the usual practice of the U.S. and Canadian Courts.  There shall be no restriction on the ability of any Core Party to advance or oppose any theory of allocation.

b. <u>Fact Discovery</u>.  The U.S. and Canadian Courts will facilitate the Core Parties' exchange of fact discovery by determining the following:

    i. the deadline for, and acceptable manners of service of, reasonable requests for the production of non-privileged documents on any other Core Party;

    ii. the deadline for objections to any Core Party's document requests;

    iii. the deadline for identification of fact witnesses and number of fact witnesses allowed;

    iv. the process for compelling attendance of fact witnesses at depositions; and

    v. the deadline for completion of depositions, the number of depositions permitted, and the location of and time allowed for such depositions for each Core Party.

c. <u>Experts</u>.  The U.S. and Canadian Courts shall facilitate expert discovery by determining the following:

    i. the deadline for and format of expert reports (including exhibits);

    ii. the deadline for and format of rebuttal expert reports (including exhibits); and

    iii. the deadline for completion of expert depositions and the time allowed for such expert deposition.

d. <u>Joint Conferences</u>.  The U.S. and Canadian Courts shall be available for joint conferences to resolve any discovery disputes among the Core Parties and to receive updates as to the status of the proceedings.  The U.S. and Canadian courts will determine when joint conferences may be set.

e. <u>Joint Hearings</u>.  The U.S. and Canadian Courts shall have joint hearings on the merits.  The U.S. and Canadian Courts shall determine:

    i. ~~[the date(s) for an opening hearing on the Core Parties' allocation positions (prior to factual discovery) and on]~~ the rules governing the joint hearing on the merits;

    ii. the date(s) for an evidentiary hearing on the merits (after the close of fact and expert discovery and after the completion of written submissions) and the rules governing such hearing, during which opening and closing statements shall be made and cross-examination and redirect examination of fact and expert witnesses shall take place; and

   iii. the procedure for requesting or setting joint conferences as necessary to resolve any discovery disputes among the Core Parties or to receive updates to the status of the proceedings.

  f. <u>Written Submissions</u>.  The U.S. and Canadian Courts will determine:

   i. the deadline for and format of opening submissions (including exhibits);

   ii. the deadline for and format of fact affidavits, if any, to accompany the opening submissions, which shall constitute the direct testimony of each fact witness;

   iii. the deadline for and format of reply submissions (including exhibits); and

   iv. the deadline for and format of fact affidavits, if any, to accompany the reply submissions.

5. <u>EMEA Claims</u>.  Certain Intercompany Claims have been made by the EMEA Debtors and/or the Joint Administrators or any other administrator of an EMEA Debtor and by Nortel Networks AG and Nortel Networks AS against (a) the U.S. Debtors (the "<u>EMEA U.S. Claims</u>"), to which the U.S. Debtors intend to file responsive pleadings, and (b) the Canadian Debtors and the Directors and Officers (the "<u>EMEA Canadian Claims</u>" (and together with the EMEA U.S. Claims, the "<u>EMEA Claims</u>")).  The Canadian Debtors and the Directors and Officers may file motions with the Canadian Court to dismiss the EMEA Canadian Claims.

6. <u>UK Pension Claims</u>.  Certain claims have been made by the UK Pension Claimants against (a) the U.S. Debtors (the "<u>UK Pension US Claims</u>"), to which the U.S. Debtors intend to file responsive pleadings, and (b) the Canadian Debtors (the "<u>UK Pension Canadian Claims</u>" (and together with the UK Pension US Claims, the "<u>UK Pension Claims</u>")).  The Canadian Debtors may file motions with the Canadian Court to dismiss the UK Pension Canadian Claims.

7. <u>Decisions</u>.  The U.S. and Canadian Courts will (a) hold simultaneously (i) the Allocation Protocol Hearings, (ii) hearings before the U.S. Court on the merits of any remaining EMEA U.S. Claims and UK Pension US Claims, and (iii) hearings before the Canadian Court on the merits of any remaining EMEA Canadian Claim and UK Pension Canadian Claims, provided, however, that the U.S. and Canadian Courts, in their discretion, may sit separately for portions of such hearings to hear evidence or argument that is relevant to only EMEA US Claims and/or UK Pension US Claims or only EMEA Canadian Claims and/or UK Pension Canadian Claims, and (b) issue their respective decisions on (i), (ii) and (iii).  The trial for this matter is scheduled to commence on January 6, 2014.  The trial will begin with the Allocation issues and continue thereafter with remaining issues to be addressed in this Allocation Protocol, including EMEA Claims and UK Pension Claims.

8. <u>Appeals</u>.  The Core Parties shall have their usual rights of appeal from all interlocutory and final decisions of the U.S. and Canadian Courts.

# Appendix A

**Bondholder Group**:  The ad hoc group of bondholders that hold claims issued and/or guaranteed by NNC, NNL, NNI, and Nortel Networks Capital Corporation

**Canadian Court**:  Ontario Superior Court of Justice (Commercial List)

**Canadian Debtors**:  Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), and Nortel Networks Global Corporation., Nortel Networks International Corporation and Nortel Networks Technology Corporation

**CCC**:  the ad hoc committee of major creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives (the "Representatives for the Former and Disabled Employees"); the Canadian Auto Workers Union (the "CAW"); Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans ("Morneau"); Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund (the "Ontario Superintendent"); and the court-appointed representatives of the current and transferred employees of the Canadian Debtors ("Nortel Continuing Employee Committee")

**Committee**:  The Official Committee of Unsecured Creditors in the chapter 11 cases of the U.S. Debtors

**Cross-Border Protocol**:  Schedule A to the "Initial Order and Endorsement," entered by Canadian Court on January 14, 2009, as amended by Schedule A to the "Fifth Amended and Restated Initial Order," entered by the Canadian Court on February 15, 2011; and Exhibit B to the "Order Pursuant to 11 U.S.C. §§ 105(a) Approving Cross-Border Court-To-Court Protocol," entered by U.S. Court on January 15, 2009, as amended by Exhibit 1 to the "Order Approving Stipulation of the Debtors and the Official Committee of Unsecured Creditors of Nortel Networks Inc., et al., Amending the Cross-Border Court-to-Court Protocol," entered by the US Court on June 29, 2009

**Cross-Border Claims Protocol**:  Schedule A to the "Order Approving Cross-Border Claims Protocol," entered by Canadian Court on September 16, 2010; and Schedule B to the "Debtors' Motion for Entry of an Order Approving a Cross-Border Protocol on the Resolution of Claims," granted by the U.S. Court on September 16, 2010 pursuant to the "Order Pursuant to 11 U.S.C. §§ 105(a) and 502 Approving a Cross-Border Court-to-Court Claims Protocol"

**Directors and Officers**: Certain individuals as former directors and officers of NNC and/or NNL represented by Osler, Hoskin & Harcourt, LLP

**EMEA Debtors**:  Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited; Nortel Networks  S.A.; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska Sp z.o.o.; Nortel Networks Hispania, SA; Nortel Networks (Austria) GmbH; Nortel Networks s.r.o.; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko, s.r.o.; Nortel Networks Romania SRL; Nortel GmbH; Nortel Networks OY; Nortel Networks AB; Nortel Networks International Finance & Holding BV and Nortel Networks France S.A.S.

**Indenture Trustees**:  (a) Wilmington Trust, National Association as successor indenture trustee pursuant to a trust indenture dated as of November 30, 1988, in respect of the 6.875% notes issued by Nortel Networks Limited; (b) The Bank of New York Mellon (i) as indenture trustee pursuant to a trust indenture dated as of July 5, 2006 among Nortel Networks Limited, as issuer, and Nortel Networks Corp. and Nortel Networks Inc., as guarantors, and (ii) as indenture trustee pursuant to an indenture dated as of March 28, 2007 among Nortel Networks Corp., as issuer, and Nortel Networks Limited and Nortel Networks Inc., as guarantors; and (c) Law Debenture Trust Company of New York as successor indenture trustee pursuant to a trust indenture dated as of February 15, 1996, in respect of the 7.875% notes issued by Nortel Networks Limited and Nortel Networks Capital Corp. and guaranteed by Nortel Networks Limited.

**Joint Administrators**:  Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the Administrators in the insolvency proceedings pending in the United Kingdom for all EMEA Debtors except Nortel Networks (Ireland) Limited, and Alan Robert Bloom and David Martin Hughes as Administrators for Nortel Networks (Ireland) Limited

**Monitor**:  Ernst & Young Inc., in its capacity as the court-appointed monitor in the proceedings commenced under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, in respect of the Canadian Debtors

**Selling Debtors**:  Canadian Debtors, U.S. Debtors, EMEA Debtors and Nortel Networks Optical Components Ltd., Nortel Networks AS, Nortel Networks AG, Nortel Networks South Africa (Pty) Limited, and Nortel Networks (Northern Ireland) Limited

**UK Pension Claimants**:  The Trustee of the NNUK Pension Plan ("UK Pension Trustee") and the Board of the Pension Protection Fund ("PPF")

**U.S. Court or US Court**:  United States Bankruptcy Court for the District of Delaware

**U.S. Debtors or US Debtors**:  Nortel Networks Inc. ("NNI"), Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.

**EXHIBIT E**

**CITATION:** Nortel Networks Corporation, 2013 ONSC 1470
**COURT FILE NO.:** 09-CL-7950
**DATE:** 2013/03/08

# SUPERIOR COURT OF JUSTICE – ONTARIO
(COMMERCIAL LIST)

**RE:**     IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS COROPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

**BEFORE:**     MORAWETZ J.

**COUNSEL:**     *Derrick Tay and Jennifer Stam*, for Nortel Neworks Corporation

*Benjamin Zarnett, Fred. Myers* and *Jay Carfagnini* for Ernst & Young Inc., Monitor

*Mark Zigler, Ken Rosenberg, Arthur Jacques, Barry Wadsworth* and *Elder C. Marques* for Canadian Creditors' Committee

*Matthew P. Gottlieb, Robin B. Schwill* and *James Reinihan* for Nortel Networks UK Limited (in Administration)

*David Ward* for PPF/Trustee

*Adam Hirsh* for Former Directors & Officers of Nortel Networks Corporation and Nortel Networks Limited

*Andrew Gray* and *Scott Bomhof* for Nortel Networks Inc. and other U.S. Debtors

*John Salmas* for Wilmington Trust, National Association

- 2 -

*Sheryl Seigel* for the Bank of New York Mellon

*Richard Swan* and *Gavin Finlayson* for Informal Committee of Noteholders

*Shayne Kukulowicz*, *Ryan Jacobs* and *Mike Wunder* for Unsecured Creditors' Committee

*Edmond Lamek* for Law Debenture Trust Company of New York

**HEARD:**       March 7, 2013

**DECISION:**    March 8, 2013

## E N D O R S E M E N T

[1]    For reasons to follow, the motion of Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") for an order approving an Allocation Protocol, substantially in the form of Schedule "A" to the motion originally returnable June 7, 2011 is granted, subject to the following modifications:

> (i) the Allocation Protocol is to be based on the protocol presented on the original return date, namely June 7, 2011, and is not to be based on the protocol presented during argument on March 7, 2013;

> (ii) the list of "core parties" referenced in paragraph (o)(iii) of the Motion Record is to be expanded. Representations were received from numerous indenture trustees on March 7, 2013. These parties are to be included as "core parties"; and

> (iii) the Monitor is directed to provide the court with a revised list of proposed "core parties" for its consideration, balancing interests of natural justice as well as the objective to resolve outstanding issues in the most expeditious and least expensive manner possible.

[2]    The Monitor is also directed to coordinate input from the parties with respect to a litigation schedule. Directions in respect of the litigation schedule will be addressed in the full reasons for this decision.

[3]    The cross motion of the Joint Administrators of Nortel Networks UK Limited, originally returnable June 7, 2011 requesting an order compelling and directing the parties to the Interim Funding and Settlement Agreement dated June 9, 2009 (the "IFSA") to engage in arbitration

- 3 -

regarding all disputes concerning the allocation of Sales Proceeds (as defined in the IFSA), is dismissed.

[4]     The appeal period in respect of this endorsement will commence on the date when full reasons are released, which date will coincide with the release of reasons of Chief Judge Kevin Gross of the United States Bankruptcy Court for the District of Delaware.


Morawetz, J.


**DATE:**        March 8, 2013

**EXHIBIT F**

CITATION: Nortel Networks Corporation (Re), 2013 ONSC 1757
COURT FILE NO.: 09-CL-7950
DATE: 20130403

**SUPERIOR COURT OF JUSTICE – ONTARIO**
**(COMMERCIAL LIST)**

RE:  IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

BEFORE:  MORAWETZ J.

COUNSEL:  D. Tay and J. Stam, for Nortel Networks Corporation

B. Zarnett, J. Carfagnini and F. Myers, for Ernst & Young Inc., the Monitor

M. Zigler, K. Rosenberg, A. Jacques, B. Wadsworth and E. Marques, for the Canadian Creditors Committee

M. P. Gottlieb, J. Renihan and R. B. Schwill, for Nortel Networks UK Limited (in Administration)

D. Ward, for the UK Pension Trustees/PPF

A. Hirsh, for the Former Directors and Officers of Nortel Networks Corporation and Nortel Networks Limited

A. Gray and S. Bomhof, for Nortel Networks Inc. and other U.S. Debtors

J. Salmas, for Wilmington Trust, National Association

S. Seigel, for the Bank of New York Mellon

R. Swan and G. Finlayson, for the Informal Committee of Noteholders

S. Kukulowicz, R. Jacobs, and M. Wunder, for the Unsecured Creditors' Committee

E. Lamek, for the Law Debenture Trust Company of New York

HEARD:  March 7, 2013

ENDORSED: March 8, 2013

REASONS:  April 3, 2013

## ENDORSEMENT

<u>Background</u>

[1]    On June 7, 2011, Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") brought a motion requesting approval of a proposed protocol (the "Allocation Protocol") for the allocation of proceeds of the sale of their assets, the assets of Nortel Networks Inc. and certain of its U.S. affiliates including Nortel Networks (CALA) Inc. (collectively, the "U.S. Debtors"), and the assets of Nortel Networks U.K. Limited and certain of its affiliates located in Europe, the Middle East and Africa (collectively, the "EMEA Debtors").

[2]    An endorsement in respect of this motion was released on June 17, 2011 (the "June 17 Endorsement"). It is attached as Schedule "A", and is incorporated by reference into this endorsement.

[3]    A further endorsement was released on June 29, 2011 (the "June 29 Endorsement"). It is attached as Schedule "B", and is incorporated by reference into this endorsement. While the mediation referenced in the June 17 Endorsement and June 29 Endorsement took place, it failed to be worthwhile and was consequently terminated by declaration of the mediator.

[4]    A further endorsement was released on March 8, 2013 (the "March 8 Endorsement"). It is attached as Schedule "C", and is incorporated by reference into this endorsement. The March 8 Endorsement approved the Allocation Protocol, substantially in the form of Schedule "A" to the motion originally returnable June 7, 2011, with reasons to follow. These are the reasons.

[5]    The parties' inability to resolve their differences is unfortunate, as approximately $9 billion, raised from various asset sales and other realizations, awaits distribution to Nortel's global creditors, and the significant time lapse is exacerbating the negative effects of the previously identified public-interest issues (see the June 29 Endorsement). The only positive development for stakeholders since June 2011 was the sale of Nortel's patent portfolio for proceeds exceeding $4 billion (substantially surpassing the $900 million estimated amount).

[6]    The sad reality for all creditors is that four years have passed from when Nortel filed for *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("CCAA") protection.

<u>Interim Funding and Settlement Agreement</u>

[7]    In June 2009, the Canadian Debtors, certain U.S. Debtors, and certain EMEA Debtors (collectively, the "Debtors") entered into an Interim Funding and Settlement Agreement ("IFSA"), which provided for cooperation in the global sale of Nortel's business units.

[8]    Under the IFSA, these parties agreed to "negotiate in good faith and attempt to reach agreement on a timely basis" on a protocol (the "Protocol") for resolving disputes concerning the allocation of sale proceeds ("Sale Proceeds") from sale transactions. Importantly, for the purpose of determining this motion, the parties agreed, to the "fullest extent permitted by applicable law", that any "claim, action or proceeding" seeking "any relief whatsoever to the extent relating to the matters agreed in [IFSA]" must be commenced in the U.S. Court and the Canadian Court, in a

joint hearing of both courts under the cross-border protocol ("Cross-Border Protocol"), if such claim, action or proceeding would affect the Canadian Debtors and the U.S. Debtors or the EMEA Debtors.

[9]     Since the parties entered into the IFSA, they concluded several sales of global Nortel businesses and, in connection with these sales, they entered into escrow agreements ("Escrow Agreements"). These Escrow Agreements provided for the deposit of Sale Proceeds into escrow and the conditional distribution of the proceeds.

[10]    Significantly, under each Escrow Agreement, the parties irrevocably and unconditionally submitted to the exclusive jurisdiction of the U.S. Court and the Canadian Court, and agreed to be bound by any judgment arising "under or out of in respect of or in connection with" the Escrow Agreements.

The Protocol/Allocation Protocol

[11]    Failing to come to an agreement on a Protocol, after one-year of talks, prompted a suspension of negotiation between the parties.  The parties, according to the Canadian Debtors, specifically could not agree on the scope of the dispute to be determined under a Protocol and the dispute resolution process (for example, deciding whether the resolution should take the form of an arbitral award).

[12]    The parties subsequently attempted to reach a consensual resolution on these issues through mediation; however, mediation failed twice.

[13]    The U.S. Debtors and the Official Committee of Unsecured Creditors of the U.S. Debtors (the "Committee") subsequently filed this joint motion in the U.S. Court and the Canadian Court seeking orders approving the Allocation Protocol. The Canadian Debtors concurrently filed a motion seeking approval of the proposed Allocation Protocol, which they developed in conjunction with Ernst & Young Inc. (the "Monitor"), the U.S. Debtors, the Committee and others.

[14]    The Allocation Protocol proposed the following:

(a) The Canadian Court and the U.S. Court would establish binding procedures, including discovery, for determining the allocation of the Sale Proceeds of the global sales to the Debtors' estates;

(b) Creditor claims, including but not limited to intercompany claims, shall be determined in accordance with the claims reconciliation process established by the Nortel entity against which any intercompany claim is made;

(c) The relevant Nortel selling entities (including the Debtors), the Committee, the Bondholder Group, the Monitor, the Joint Administrators (defined below) and the Ad Hoc Committee of Major Creditors Having Claims Only Against the Canadian Debtors would be "core parties" in the Allocation Protocol hearings, with full rights of participation.  Any other party in interest could seek to establish itself as a core party;

(d) The U.S. Debtors intend to file promptly motions with the U.S. Court to dismiss the EMEA Debtors' claims against the U.S. Debtors ("EMEA U.S. Claims").  The Canadian Debtors may file motions with the Canadian Court to dismiss the EMEA Debtors' claims against the Canadian Debtors ("EMEA Canadian Claims"); and

(e) The Canadian and U.S. Courts will hold, simultaneously, (i) a joint hearing regarding allocation of global proceeds and (ii) a hearing into unresolved EMEA Canadian Claims and EMEA U.S. Claims, provided that the Courts, in their discretion, may sit separately to hear evidence or argument that is relevant to only the Canadian or U.S. Debtors, respectively.  Each Court would then issue its respective decisions.

<u>Party Submissions</u>

[15]    The parties disagree on the following fundamental issues: whether an agreement to arbitrate was reached (and, correspondingly, whether the Canadian Court and U.S. Court should compel arbitration), whether the Canadian Court and U.S. Court have jurisdiction to approve the Allocation Protocol, and whether the parties negotiated the Protocol in good faith.

*Submissions of the Canadian Debtors and the Monitor*

[16]    The Monitor's submissions essentially corroborate, or expand on, the following submissions of the Canadian Debtors.

[17]    Because the parties were unable to successfully negotiate a Protocol, the Canadian Debtors requests that the Canadian Court exercise its discretionary power to determine allocation issues and accordingly order the parties to direct payments from the escrow funds. Pursuant to section 5 of the IFSA, Sale Proceeds of each significant global transaction may only be distributed if instructed jointly by the depositors and estate fiduciaries (very unlikely at this point) or where the parties have entered into a Protocol (as previously mentioned, the parties could not come to an agreement); however, the distribution agent is able to distribute the proceeds if there is an "any order, judgment or decree" made or entered by any court "affecting the property deposited under th[e] Agreement".

[18]    The Canadian Debtors argue that the court lacks requisite authority to compel the parties to arbitrate their disputes because there has been no agreement to arbitrate. The parties merely agreed, pursuant to section 12(c) of the IFSA, to "negotiate in good faith and <u>attempt</u> to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions". Further, section 12(b) of the IFSA does not constitute an agreement to arbitrate because it has none of the features typically found in an enforceable commercial arbitration agreement, does not provide any methodology for an arbitration and does not reference the word "arbitration". It reads as follows:

12(b) In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

[19]    The Canadian Debtors further argue that the parties submitted irrevocably and unconditionally to the exclusive jurisdiction of the Canadian Court and U.S. Court. For example, under their many Escrow Agreements, the parties "irrevocably submit[ed] to and accept[ed] for itself and its properties, generally and unconditionally to the exclusive jurisdiction of … the U.S. Bankruptcy Court for the District of Delaware and the Ontario Superior Court of Justice" and agreed to be bound by any judgment "arising under or out of in respect of or in connection with" the Escrow Agreements. In addition, the parties submitted all legal proceedings seeking "any relief whatsoever" to the extent "relating to" the matters agreed in the IFSA to the exclusive joint jurisdiction of the Canadian Court and U.S. Court, pursuant to section 16(b) of the IFSA, as follows:

> 16(b) To the fullest extent permitted by applicable law, each Party…(ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in … a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors …

[20]    Finally, the Canadian Debtors claim that there is nothing to substantiate allegations that any party acted in bad faith. An agreement to negotiate in good faith, and attempt to reach agreement on a Protocol, does not require any party to ultimately acquiesce to an agreement.

*Submissions of the Joint Administrators of Nortel Networks U.K. Limited*

[21]    The Joint Administrators of Nortel Networks U.K. Limited (the "Joint Administrators"), acting as the court-appointed administrators and authorized foreign representatives for the EMEA Debtors, makes four submissions for dismissing this motion.

[22]    First, section 12(b) of the IFSA (articulated above) constitutes an enforceable arbitration clause to arbitrate the allocation of Sale Proceeds because it is a written agreement evidencing the intention of the parties to submit to binding *ad hoc* arbitration.  In exchange for the arbitration provision, which was designed to provide protection to each of the many worldwide Nortel entities by ensuring that they would have input into the Protocol and the appointment of the dispute resolvers, the parties agreed to give up significant rights in businesses and assets to enable the sale of Nortel's global assets to be completed without delay.

[23]    While the parties' agreement to arbitrate is clear on the face of the IFSA, any possible ambiguity is resolved by reviewing the negotiating history, surrounding circumstances, various courts understanding of how the allocation was to be determined, public statements and positions taken in negotiating a Protocol.

[24]    Second, neither the Canadian Court nor the U.S. Court has the jurisdiction to determine how the proceeds of the sale of the global Nortel assets and businesses should be divided among the estates of the various Nortel Debtors around the world. It is neither proper nor feasible for

- Page 6 -

courts of two independent nations to reach, in effect, a joint decision for the following three reasons:

- such a process violates the Cross-Border Protocol;

- the Ontario Court does not have jurisdiction to allocate Sale Proceeds that were outside the U.S. and Canada by entities outside the U.S. and Canada; and

- there are practical impediments to the Courts proceeding on the basis of a joint hearing regarding the Sale Proceeds allocation.

[25]    Third, and in the alternative, the Ontario Court has jurisdiction to order the Canadian Debtors to submit to arbitration under a panel of arbitrators. The proper role of the courts in their supervisory function in relation to the U.S. Debtors and Canadian Debtors is to require that the parties appoint an arbitration panel possessing the power to set a procedure for such arbitration.

[26]    Fourth, the parties to the IFSA made an enforceable promise to negotiate a Protocol for the arbitration procedures in good faith; counsel submits that there has been a *bona fide* failure in those negotiations.

[27]    In the Joint Administrators' supplementary submissions, counsel highlights practical problems invariably arising from the U.S. Court and Canadian Court trying to jointly address the division of assets among approximately 40 international entities. Counsel submits that it is unlikely that both courts independently will identically allocate the assets, resulting in conflicting decisions and no process for determining how to move forward.  Counsel also anticipates that the inevitable appeal process is not governed by a uniform set of procedural or legal rules.  The result would not only be years of litigation but potentially also two incompatible judgments, neither of which would be enforceable.

Analysis and Conclusion

[28]    I will assess the merits of the arguments made by all parties on the fundamental issues of divergence, in turn, before rendering my determination.

*Agreement to Arbitrate*

[29]    A common theme permeating the Joint Administrators' arguments is that the parties agreed to arbitrate. As I disagree with this underlying premise, I find many of their arguments to be inherently flawed.

[30]    Simply put, the parties agreed to enter into negotiations to agree on a Protocol; the best position of the Joint Administrators is an agreement to agree, which is unenforceable. I do not find the IFSA, or any of the documents, to be ambiguous in this regard.

[31]    A detailed review of the wording used in the Joint Administrators' argument is telling. The parties struck an <u>agreement</u> embodied in the IFSA; the parties would give up their…ownership rights in the assets to be sold in return for an <u>agreement</u> that, failing an agreement by the parties, the allocation of the sale proceeds would be decided in an arbitral form

that did not prejudice any of the parties by forcing any one of them to submit to the jurisdiction of a foreign court.

[32]    It could very well be that, from their standpoint, the asset sales were predicated on the allocation being decided by way of arbitration. However, in the IFSA, I am unable to find that the parties actually entered into an agreement to arbitrate.

[33]    Contrary to the Joint Administrators view that section 12(b) of the IFSA constitutes an enforceable arbitration clause, a plain and common-sense reading of this section leads to the conclusion that, if the objective of the provision was to create a mechanism for the distribution from the escrow account, the parties failed to achieve such objective. More particularly, section 12(b)(i) has not been met as there has been no agreement of all of the selling debtors; section 12(b)(ii) is irrelevant or inapplicable as the parties have failed to reach agreement on the terms of a Protocol.

*Court's Jurisdiction*

[34]    Conforming to the views espoused by the Canadian Debtors and the Monitor, I am satisfied that this court has discretionary authority under the CCAA to approve the Allocation Protocol. Considering, and potentially approving, the Allocation Protocol is consistent with the CCAA objectives of promoting efficiency and fairness by avoiding a multiplicity of inconsistent proceedings: *Re Muscletech Research and Development Inc.* (2006), 19 C.B.R. (5th) 54 (Ont. S.C.J.). This court's authority extends to the subject matter and the persons at issue here and this court has the authority to make the order sought approving the Allocation Protocol.

[35]    It is my view that all parties have irrevocably and unconditionally submitted to the jurisdiction of the Canadian Court and the U.S. Court.  This is established as a result of the jurisdiction clause in each of the Escrow Agreements, the filing of claims by the EMEA Debtors and section 16 of the IFSA.  In this respect, I accept the arguments put forth by the Canadian Debtors.

[36]    No compelling argument accompanied the Joint Administrators' assertion that this court has jurisdiction to order the Canadian Debtors to submit to arbitration under a panel of arbitrators. While there may be a presumption in favour of international arbitration, it presupposes that the parties have agreed to arbitrate (which is not the case in the present circumstances).

[37]    The objective of these proceedings must be, at this time, to ensure that the outcome is something that will be final and binding on all parties.  This can be accomplished, in my view, by a joint hearing of the matter with the Canadian Court and the U.S. Court.

[38]    I acknowledge the procedural difficulties identified by the Joint Administrators in their supplemental submissions, and I do not underestimate the challenges that lie ahead. However, all parties embraced joint or parallel hearings of the U.S. Court and the Canadian Court to bring forth a number of matters, most notably applications for approval of sales process and for approval of sales. Further, despite the different procedures in the U.S. Court and the Canadian Court, both courts have worked effectively with the result that billions of dollars are now available for distribution to the stakeholders.  I maintain confidence that the U.S. Court and the

Canadian Court will ensure that matters going forward are similarly dealt with in a fair and equitable manner.

[39]    Raising potential procedural issues is not sufficient to dismiss the motion of the Canadian Debtors. Challenges of procedure will be addressed during the proceedings in the same way as procedural issues are addressed in numerous other proceedings that are brought before the court.

*Good Faith*

[40]    With respect to the Protocol negotiations, there is no shortage of conflicting viewpoints. Nevertheless, there is an overall lack of evidence either on the record, or in the parties' oral submissions, demonstrating that any party failed to negotiate the Protocol in good faith. To the contrary, there is evidence that all parties made efforts to come to a mutually beneficial agreement; as pointed out by the Canadian Debtors, failure to come to such an agreement does not necessarily evidence a lack of good faith in negotiations.

*Order*

[41]    Amendments must be made to the Allocation Protocol before it is approved, as mentioned in the March 8 Endorsement. I have specifically rejected the suggestion that there should be specified restrictions on "core parties" in the Allocation Protocol hearing; rather, I determined that certain indenture trustees should also be "core parties", and I invited suggestions as to whether there would be other "potential core parties".

[42]    I note that the U.S. Debtors filed motions with the U.S. Court to dismiss EMEA U.S. Claims, and a decision with respect to this issue has been rendered by Chief Judge Kevin Gross. The U.S. Debtors put forward an amended version of the Allocation Protocol at the March 7, 2013 hearing.  Given that substantial argument was based on the Allocation Protocol as originally presented, it is not appropriate, in my view, to consider amendments that were brought forth at the hearing which was not intended to receive new positions but rather to provide a summary of the positions previously brought forward.  The appropriate version of the Allocation Protocol to consider is the one that was previously brought before the court on June 7, 2011.

[43]    In the result, I grant the Canadian Debtors' motion and approve an amended Allocation Protocol, which incorporates the aforementioned amendments while remaining substantially in the form of Schedule "A" to the motion originally returnable June 7, 2011. The amended Allocation Protocol must be filed with this Court for approval by April 15, 2013.

[44]    By way of directions for scheduling, the trial for this matter is scheduled to commence on January 6, 2014. The trial will begin with the allocation issues and continue thereafter with remaining issues to be addressed in the Allocation Protocol, including EMEA Claims and U.K. Pension matters.

[45]   The cross-motion of the Joint Administrators, requesting an order compelling and directing the parties to the IFSA to engage in arbitration regarding all disputes concerning the allocation of Sale Proceeds, is dismissed.

**Date:**   April 3, 2013

MORAWETZ J.

## SCHEDULE "A"

**CITATION:** Nortel Networks Corporation (Re), 2011 ONSC 3805
**COURT FILE NO.:** 09-CL-7950
**DATE:** 20110617

## SUPERIOR COURT OF JUSTICE - ONTARIO

**RE:**      IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

            AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

**BEFORE:**    MORAWETZ J.

**COUNSEL:**  Alan Mark, Derrick Tay, Alan Merskey and Jennifer Stam, for Nortel Networks Corporation et al

            F. Myers, J. Pasquariello and C. Armstrong, for the Monitor, Ernst & Young Inc.

            Mark Zigler, Andrea McKinnon, for the Former & Disabled Employees

            G. Finlayson, R. Orzy and R. Swan, for the Noteholder Group

            Lily Harmer and Max Starnino, for the Superintendent

            S. Seigel, for the Bank of New York Mellon

            Alex MacFarlane and Abid Quereshi, for the Official Committee of Unsecured Creditors

            R. Paul Steep and Elder C. Marques, for Morneau Shepell

            Barry Wadsworth, for CAW-Canada

            M. P. Gottlieb, R. Schwill and S. Campbell, for the Joint Administrators

            Bill Burden, for the U.K. Pension Trustee

            Lyndon Barnes, for the Board of Directors of Nortel

- Page 2 -

Andrew Gray and Scott Bomhof, for the U.S. Debtors

Arthur O. Jacques, for Nortel NCCE

HEARD:        June 7, 2011

## ENDORSEMENT

[46]    On June 7, 2011, Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") brought a motion requesting approval of an allocation protocol (the "Allocation Protocol").

[47]    A similar motion was also brought at the same time by Nortel Networks Inc. ("NNI") and certain of its U.S. affiliates (the "U.S. Debtors") in the Chapter 11 Proceedings before the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") (the "Chapter 11 Proceedings").

[48]    The hearing was conducted by video conference with the companion motion being heard in the U.S. Court before His Honor Judge Gross.  This joint hearing was conducted in accordance with the provisions of the Cross-Border Protocol which was previously approved by both the U.S. Court and by this Court.

[49]    Both motions had the support of all parties appearing, save for the Joint Administrators of Nortel Networks (U.K.) Limited ("NNUK") and certain of its subsidiaries and affiliates located in the EMEA (collectively, the "EMEA Debtors").

[50]    Decisions in respect of both motions are currently under reserve.

[51]    On June 13, 2011, at the request of both Judge Gross and me, a case conference was conducted by telephone.  It was reported to the participants that our respective decisions relating to the aforementioned motions would be under reserve for a considerable period of time.

[52]    Certain of the issues raised in the motions have been the subject of two mediation sessions.  These mediation sessions were not successful.  It is my understanding that, in addition to the allocation issue, issues of validity of quantification of certain claims and inter-company claims were discussed.

[53]    Allocation issues have arisen out of the Interim Funding and Settlement Agreement ("IFSA"), which was entered into in June 2009, between the Canadian Debtors, certain of the U.S. Debtors and certain of the EMEA Debtors.  The IFSA provides amongst other things, for the parties cooperation in the global sales of Nortel's business units as well as for the parties to attempt to negotiate the terms of an Interim Sales Protocol ("Protocol").

[54]    The parties entered into negotiations for approximately one year with respect to the terms of a Protocol.  After a year of negotiations, the parties were still unable to agree on certain fundamental terms of the Protocol, including, for example, the scope of the issues to be determined under the Protocol.

[55]    As a result, according to the Canadian Debtors, the Protocol negotiations were suspended and the parties agreed to reach a consensual resolution through mediation.  After the mediation was declared unsuccessful, the U.S. Debtors and the Canadian Debtors, developed the proposed Allocation Protocol.

[56]    The Allocation Protocol establishes procedures and an expedited schedule for the cross-border resolution by the U.S. Court and this Court of the allocation of the proceeds from the Sale Transactions pursuant to the IFSA.

[57]    The Allocation Protocol proposes that all hearings in respect of the Allocation Protocol proceed by way of joint hearings between the U.S. Court and this Court pursuant to the cross-border protocol.

[58]    The position of the EMEA Debtors is that issues arising out of the IFSA are to be determined by a dispute resolver, in this case, an arbitrator.

[59]    In my view, pending the release of a decision on the motion, the parties could benefit from the appointment of a mediator so that they can continue to make progress towards the ultimate resolution of Nortel matters.  The parties have exhibited an ability to cooperate and have been extremely successful in realizing significant proceeds from the sale of Nortel assets globally.  However, the creation of an asset pool is not ultimate resolution of Nortel matters.  These proceedings can only be concluded with a distribution of proceeds to the various creditors of Nortel globally.  These proceedings were commenced on January 14, 2009.  Creditors have been waiting nearly two and one-half years for a meaningful distribution.  A mediation will require that the parties continue a dialogue.  It is possible that tangible, positive results will flow from such mediation.

[60]    In order to assist the parties with their deliberations, I am directing that the parties engage in mediation pending my ruling.  I understand that Judge Gross will be issuing a similar direction in the Chapter 11 Proceedings.

[61]    I recognize that the parties may have difficulty in reaching a consensus on a mediator.  In the case conference on June 13, 2011, we asked that the parties consult with each other and provide the name of an acceptable mediator.  No individual has been identified.  It, therefore, falls to both Judge Gross and to me to appoint a mediator.

[62]    The mandate of the mediator is to address issues raised in the motion.  It is recognized that the boundary of this mandate is not clearly defined.  It seems to me that defining a precise boundary, in these circumstances, may be better left to the mediator, as it may not be possible to address the issues affecting allocation without taking into consideration issues relating to the validity and quantification of claims.

[63]    The mediator shall have the right to file periodic reports with the court detailing progress, or lack thereof, recognizing that the sessions are on a without prejudice basis.

[64]    It is my understanding that, at the mediation sessions, there were a large number of parties that participated.  While I do not take issue with the right of any party to participate in the mediation, I did observe that at the hearing of the within motion, the primary submissions were made by the Canadian Debtors, the EMEA Debtors and the Monitor.  It was also my observation that the primary submissions of parties in the Chapter 11 Proceedings were likewise concentrated among a relatively small group of counsel.  The mediation will, in all likelihood, be more effective if the number of participants is significantly reduced from the number that attended the previous sessions.  It is hoped that the parties will be able to work out the details respecting participation of the mediation.

[65]    The identity of the mediator will be provided by way of Supplementary Endorsement early next week.  The mediator shall have the ability to retain advisors and counsel as he or she deems appropriate in the circumstances and to have the expenses of such advisors and counsel paid out of the assets of Nortel.

[66]    In addition, consistent with the conclusion of the U.S. Court, the mediator is to have expanded authority, if the parties agree, to conduct a mediation/arbitration or an arbitration in respect of this matter.

[67]    To the extent that further directions are required in respect of this directed mediation, the parties can contact the Commercial List Office in order to set up a case conference.

"Morawetz J."

_____

MORAWETZ J.

**Date:**  June 17, 2011

SCHEDULE "B"

**CITATION:** Nortel Networks Corporation (Re), 2011 ONSC 4012
**COURT FILE NO.:** 09-CL-7950
**DATE:** 20110629

**SUPERIOR COURT OF JUSTICE - ONTARIO**

RE:        IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

           AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

BEFORE:    MORAWETZ J.

COUNSEL:   Alan Mark, Derrick Tay, Alan Merskey and Jennifer Stam, for Nortel Networks Corporation et al

           F. Myers, J. Pasquariello and C. Armstrong, for the Monitor, Ernst & Young Inc.

           Mark Zigler, Andrea McKinnon, for the Former & Disabled Employees

           G. Finlayson, R. Orzy and R. Swan, for the Noteholder Group

           Lily Harmer and Max Starnino, for the Superintendent

           S. Seigel, for the Bank of New York Mellon

           Alex MacFarlane and Abid Quereshi, for the Official Committee of Unsecured Creditors

           R. Paul Steep and Elder C. Marques, for Morneau Shepell

           Barry Wadsworth, for CAW-Canada

           M. P. Gottlieb, R. Schwill and S. Campbell, for the Joint Administrators

           Bill Burden, for the U.K. Pension Trustee

           Lyndon Barnes, for the Board of Directors of Nortel

- Page 2 -

Andrew Gray and Scott Bomhof, for the U.S. Debtors

Arthur O. Jacques, for Nortel NCCE

## ENDORSEMENT

[1]     This Endorsement relates to my Endorsement of June 17, 2011.  The following directions take precedence over the directions provided on June 17, 2011.

[2]     On June 7, 2011, Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") brought a motion requesting approval of a proposed protocol for the allocation of the proceeds of the sale of their assets, the assets of the U.S. Debtors (defined below) and those of Nortel Networks U.K. Limited (NNUK") and certain of its affiliates located in Europe, the Middle East and Africa (collectively, the "EMEA Debtors") (the "Allocation Protocol").

[3]     A similar motion was also brought at that time by Nortel Networks Inc. ("NNI") and certain of its U.S. affiliates (the "U.S. Debtors") in the Chapter 11 Proceedings before the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") (the "Chapter 11 Proceedings").

[4]     The hearing was conducted by video conference with the companion motion being heard in the U.S. Court before His Honor Judge Gross.  The joint hearing was conducted in accordance with the provisions of the Cross-Border Protocol which was previously approved by both the U.S. Court and by this Court.

[5]     Both motions had the support of all parties appearing, save for the joint administrators of NNUK.

[6]     Allocation issues have arisen out of the Interim Funding and Settlement Agreement ("IFSA"), which was entered into in June 2009, between the Canadian Debtors, certain of the U.S. Debtors and certain of the EMEA Debtors.  The IFSA provides amongst other things, for the parties cooperation in the global sales of Nortel's business units as well as for the parties to attempt to negotiate the terms of an Interim Sales Protocol ("Protocol").

[7]     To date, the parties have been unable to resolve these allocation issues on a consensual basis.  This has resulted in a most unfortunate situation.

[8]     Nortel's insolvency is somewhat unique.  The sale of its business units has created a sizeable asset pool.  With the exception of the IP Transaction, the auction for which commenced on June 27, 2011, the Canadian Debtors, the U.S. Debtors, the EMEA Debtors and their affiliates have now divested substantially all of Nortel's material worldwide assets.  The proceeds of these divestitures – some $3 billion currently with a minimum of a further $900 million expected to be added upon consummation of the patent portfolio and related asset transactions – now sit in escrow awaiting the resolution of allocation.

- Page 3 -

[9]    This allocation issue, together with the resolution of the EMEA claims and the U.K. pension claims, lies at the heart not only of these CCAA proceedings, but also the Chapter 11 Proceedings and proceedings in the United Kingdom.  As the Monitor noted in its 67th Report: "Simply put, they are matters that must be resolved before any creditor of an applicant (and likely any other Nortel debtor) can expect to receive a meaningful distribution on account of amounts that have now been outstanding in most cases since January 2009.

[10]    The Canadian Debtors have no significant secured creditors.  The Canadian Debtors do, however, have significant unsecured creditors, most of whom are individuals who are employed or were formerly employed by Nortel.  Many of these former employees are pensioners and this group have unsecured claims for both pension and medical benefits.

[11]    There are also significant employee and former employee claims against the U.S. Debtors and the EMEA Debtors.

[12]    For many of these individuals, the delay in receiving a meaningful distribution can be significant.  It is not just a question of calculating the time value of money.  For this group of creditors, time is not on their side.

[13]    This issue is international in scope.  It is also a public-interest issue.  A protracted delay in resolving the impasse surrounding allocation is highly prejudicial to this group.

[14]    In making these comments, I do not mean to suggest that the claims of other creditor groups are not of equal significance.  The reality is, however, that the timing of a receipt of a distribution may be less critical for a financial player as opposed to an individual.

[15]    The difficulty in resolving the allocation issue that is before both the U.S. Court and this Court is, of course, complicated by the fact that it is a multi-jurisdictional issue.  There is no simple solution to the legal predicament that faces all parties.

[16]    Decisions in respect of both motions are currently under reserve.  The nature and length of the arguments presented at the motion will necessitate careful drafting and separate rulings by the U.S. Court and this Court.  Both Courts are concerned that this delay will also delay allocation proceedings and therefore distributions to creditors.  Moreover, the risk of inconsistent decisions and the uncertainty of the appellate process (with further risk of inconsistent decisions) may further delay the progress of the cases.

[17]    A protracted delay in the progress of the cases will only exacerbate an already unfortunate situation for the many individual creditors.  With extended delay comes uncertainty.  For many, uncertainty brings considerable stress and a bad situation becomes even worse.  Clearly, the consequences of extended litigation are not desirable.

[18]    Both Courts concluded that the parties could benefit from the appointment of a mediator so that they can continue to make progress towards the ultimate resolution of Nortel matters.  Consequently, both the U.S. Court and this Court directed that the parties, who participated in the hearing on June 7, 2011, engage in mediation pending the release of decisions in both motions.  The mediator will have the authority to include such other parties as he deems appropriate, in his discretion.

- Page 4 -

[19]    The mediator has the authority, in consultation with the parties, to determine the scope of the mediation, as he deems appropriate, including, without limitation, the allocation issue in its entirety and global issues relating to allocation and claims.

[20]    The mediator is authorized to select advisors of his choosing.  The reasonable fees and expenses of the advisors shall be reimbursed by the Canadian Debtors, the U.S. Debtors and the EMEA Debtors.

[21]    The particulars of the mediation are as follows:

> Mediator:        The Honourable Warren K. Winkler
>                  Chief Justice of Ontario
>                  Court of Appeal for Ontario
>                  Osgoode Hall
>                  130 Queen Street West
>                  Toronto, ON
>                  M5H 2N5
>
> Timing:          To be arranged by the mediator

[22]    Participation in this mediation is mandatory.  Any agreements reached as a result of mediation will be binding on the parties.

[23]    A settlement of the dispute being mediated shall also be subject to the approval of the U.S. Court and this Court, on notice to parties in interest.

[24]    The parties shall recognize that mediation proceedings are settlement negotiations, and that all offers, promises, conduct and statements, whether written or oral, made in the course of the proceedings, are inadmissible in any arbitration or court proceeding, to the extent allowed by law.  The parties shall not subpoena or otherwise require the mediator or any advisor to the mediator, to testify or produce records, notes or work product in any future proceedings, and no recording will be made of the mediation session.  Evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation session.  In the event that the parties do reach a settlement agreement, the terms of that settlement will be admissible in any court or arbitration proceedings required to enforce it, unless the parties agree otherwise.  Information disclosed to the mediator at a private caucus shall remain confidential unless the party authorizes disclosure.

[25]    The mediator has the right, prior to the commencement of the mediation only, to communicate with Judge Gross and me, for the purposes of obtaining background information.

[26]    The mediation process shall be terminated under any of the following circumstances:

> (a) by a declaration by the mediator that a settlement has been reached;
>
> (b) a declaration by the mediator that further efforts at mediation are no longer considered to be worthwhile; or

- Page 5 -

(c) for any other reason as determined by the mediator.

[27]    The Monitor is directed to circulate a copy of this endorsement to all parties who attended on the return of the motion on June 7, 2011.


"Morawetz J."

————————————————————

MORAWETZ J.

**Date:**  June 29, 2011

SCHEDULE "C"

**CITATION:** Nortel Networks Corporation (Re), 2013 ONSC 1470
**COURT FILE NO.:** 09-CL-7950
**DATE:** 20130308

**SUPERIOR COURT OF JUSTICE – ONTARIO**

(COMMERCIAL LIST)

**RE:**    IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

**BEFORE:**    MORAWETZ J.

**COUNSEL:**    *Derrick Tay and Jennifer Stam*, for Nortel Networks Corporation

*Benjamin Zarnett, Fred. Myers* and *Jay Carfagnini* for Ernst & Young Inc., Monitor

*Mark Zigler, Ken Rosenberg, Arthur Jacques, Barry Wadsworth* and *Elder C. Marques* for Canadian Creditors' Committee

*Matthew P. Gottlieb, Robin B. Schwill* and *James Reinihan* for Nortel Networks UK Limited (in Administration)

*David Ward* for PPF/Trustee

*Adam Hirsh* for Former Directors & Officers of Nortel Networks Corporation and Nortel Networks Limited

*Andrew Gray* and *Scott Bomhof* for Nortel Networks Inc. and other U.S. Debtors

*John Salmas* for Wilmington Trust, National Association

*Sheryl Seigel* for the Bank of New York Mellon

*Richard Swan* and *Gavin Finlayson* for Informal Committee of Noteholders

*Shayne Kukulowicz*, *Ryan Jacobs* and *Mike Wunder* for Unsecured Creditors' Committee

*Edmond Lamek* for Law Debenture Trust Company of New York

**HEARD:**    March 7, 2013

**DECISION:**    March 8, 2013

## E N D O R S E M E N T

[1]    For reasons to follow, the motion of Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") for an order approving an Allocation Protocol, substantially in the form of Schedule "A" to the motion originally returnable June 7, 2011 is granted, subject to the following modifications:

> (i) the Allocation Protocol is to be based on the protocol presented on the original return date, namely June 7, 2011, and is not to be based on the protocol presented during argument on March 7, 2013;

> (ii) the list of "core parties" referenced in paragraph (o)(iii) of the Motion Record is to be expanded. Representations were received from numerous indenture trustees on March 7, 2013. These parties are to be included as "core parties"; and

> (iii) the Monitor is directed to provide the court with a revised list of proposed "core parties" for its consideration, balancing interests of natural justice as well as the objective to resolve outstanding issues in the most expeditious and least expensive manner possible.

[2]    The Monitor is also directed to coordinate input from the parties with respect to a litigation schedule. Directions in respect of the litigation schedule will be addressed in the full reasons for this decision.

[3]    The cross motion of the Joint Administrators of Nortel Networks UK Limited, originally returnable June 7, 2011 requesting an order compelling and directing the parties to the Interim Funding and Settlement Agreement dated June 9, 2009 (the "IFSA") to engage in arbitration

regarding all disputes concerning the allocation of Sales Proceeds (as defined in the IFSA), is dismissed.

[4]      The appeal period in respect of this endorsement will commence on the date when full reasons are released, which date will coincide with the release of reasons of Chief Judge Kevin Gross of the United States Bankruptcy Court for the District of Delaware.

"Morawetz J."

_____
Morawetz, J.

**DATE:**        March 8, 2013

**EXHIBIT G**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

--------------------------------------------------------------X

*In re*                    :        Chapter 11

Nortel Networks Inc., *et al.*,[1]      :        Case No. 09-10138 (KG)

           Debtors.      :        Jointly Administered

                   :        **RE: D.I. 18, 54 + 983**

--------------------------------------------------------------X

**ORDER APPROVING STIPULATION OF THE DEBTORS AND THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS OF NORTEL NETWORKS INC., ET
AL., AMENDING THE CROSS-BORDER COURT-TO-COURT PROTOCOL**

Upon consideration of the stipulation dated June 26, 2009 (the "Stipulation")[2] attached

hereto as Exhibit A between Nortel Networks Inc. and its affiliated debtors, as debtors and

debtors in possession in the above-captioned cases (the "Debtors") and the Official Committee of

Unsecured Creditors (the "Committee") to amend the cross-border court-to-court protocol

approved by the Court in the Order Pursuant to 11 U.S.C. § 105(a) Approving Cross-Border

Court-to-Court Protocol [D.I. 54], and good cause appearing for the approval thereof;

IT IS HEREBY ORDERED THAT:

1.    The Stipulation is APPROVED.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Stipulation.

2.      The Amended Protocol, as attached to the Stipulation as Exhibit 1, is approved in all respects, subject to approval of the same by the Canadian Court.

3.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: June 29    , 2009
       Wilmington, Delaware

THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

2

**EXHIBIT A**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-----------------------------------------------------------X
|  |  |
| :--- | :--- |
| *In re* | Chapter 11 |
| Nortel Networks Inc., *et al.,*[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |
|  | **RE: D.I. 18, 54** |
-----------------------------------------------------------X

### STIPULATION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF NORTEL NETWORKS INC., ET AL., AMENDING THE CROSS-BORDER COURT-TO-COURT PROTOCOL

This stipulation (the "Stipulation") is by and between Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors") and the Official Committee of Unsecured Creditors (the "Committee"). The parties hereby stipulate and agree as follows.

### Background

1.      On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

2.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of title 11 of the United States Code (the "Bankruptcy Code").

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

3.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court. Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), has filed petitions in this Court for recognition of the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. In addition, at 8 p.m. (London time) on January 14, 2009, the High Court of Justice in England placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[3] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators"). On May 28, 2009, at the request of the Administrators, the Commercial Court of Versailles, France (Docket No. 2009P00492) ordered

---

[2]      The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[3]      The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

2

the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"),

which consist of liquidation proceedings during which NNSA will continue to operate as a going

concern for an initial period of three months.  In accordance with the European Union's Council

Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings remain

the main proceedings in respect of NNSA.  On June 8, 2009, Nortel Networks UK Limited

("NNUK") filed petitions in this Court for recognition of the English Proceedings as foreign

main proceedings under chapter 15 of the Bankruptcy Code.  On June 26, 2009, the Court

entered an order recognizing the English Proceedings as foreign main proceedings under chapter

15 of the Bankruptcy Code.

4.    On January 15, 2009, this Court entered an order of joint administration pursuant

to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") that

provided for the joint administration of these cases and for consolidation for procedural purposes

only [D.I. 36].

5.    On January 26, 2009, the Office of the United States Trustee for the District of

Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the

"Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  An ad

hoc group of bondholders holding claims against certain of the Debtors and certain of the

Canadian Debtors has also been organized (the "Bondholder Group").  No trustee or examiner

has been appointed in the Debtors' cases.

### The Cross-Border Court-to-Court Protocol

6.    On January 14, 2009, the Debtors filed the Debtors' Motion for Entry of an Order

Pursuant to 11 U.S.C. § 105(a) Approving Cross-Border Court-to-Court Protocol [D.I. 18] (the

"Cross-Border Protocol Motion") for the purpose of establishing a cross-border court-to-court

3

protocol to govern the chapter 11 and Canadian Proceedings (the "First Day Protocol"). On January 15, 2009, the Court entered the Cross-Border Protocol Order [D.I. 54]. Likewise, on January 14, 2009, the Canadian Court issued an order (the "Initial Order") granting the Canadian Debtors various forms of relief, including approval of the First Day Protocol. Initial Order at ¶ 49.

7.      Since the Petition Date, the Court has, on six occasions, approved stipulations among the Debtors and the Committee extending the Committee's time to file a motion for reconsideration of the Cross-Border Protocol Order [D.I.s 318, 466, 549, 676, 799, 900] pursuant to Rule 9013-1(m) Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"). During this time, the Debtors, the Canadian Debtors and the Committee have engaged in constructive, good faith discussions regarding the terms of the First Day Protocol and possible amendments thereto. The changes reflected in the amended cross-border court-to-court protocol (the "Amended Protocol"), attached hereto as Exhibit 1, are the result of those discussions.

8.      In addition to a variety of ministerial changes, the Amended Protocol provides greater clarity on a number of issues including the right to appear and be heard, mutual recognition of the stay of proceedings entered in the U.S. and Canadian Proceedings and the contemplation of a claims protocol. Most importantly, the Amended Protocol clarifies matters for which a joint hearing between the U.S. and Canadian Courts might be necessary and sets forth procedures for obtaining such joint hearings. A blackline reflecting all amendments from the First Day Protocol to the Amended Protocol is attached to the Stipulation as Exhibit 2.

9.      As the Court is aware, the Debtors have entered into the Interim Funding and Settlement Agreement dated as of June 9, 2009 (the "Agreement") with the Canadian Debtors

4

and the EMEA Debtors, excluding Nortel Networks S.A. A joint hearing between this Court and the Canadian Court has been scheduled for June 29, 2009 (to be continued on June 30, 2009 if necessary) regarding the funding of NNL by NNI and other related issues addressed by the Agreement. Obtaining court approval of the amendments to the cross-border protocol constitutes an express condition required for the Agreement to become effective. See Agreement at ¶ 13(a).

### Stipulation

NOW, THEREFORE, the Debtors and the Committee hereby stipulate and agree that the First Day Protocol shall be amended to incorporate the changes reflected in the Amended Protocol attached hereto as Exhibit 1 and that the Court should approve the Amended Protocol in all respects.

Dated: June 26, 2009
        Wilmington, Delaware

By: _____

James L. Bromley (pro hac vice)
Lisa Schweitzer (pro hac vice)
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000


        - and -

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200


*Counsel for the Debtors
and Debtors in Possession*

By: _____

Fred S. Hodara (pro hac vice)
David H. Botter (pro hac vice)
Kenneth A. Davis (pro hac vice)
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000


        - and -

Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700


*Counsel to the Committee*

## EXHIBIT 1

**Amended Cross-Border Court-to-Court Protocol**

## CROSS-BORDER INSOLVENCY PROTOCOL

This cross-border insolvency protocol (the "Protocol") shall govern the conduct of all parties in interest in the Insolvency Proceedings (as such term is defined herein).

The Guidelines Applicable to Court-to-Court Communications in Cross-Border Cases (the "Guidelines") attached as Schedule "A" hereto, shall be incorporated by reference and form part of this Protocol. Where there is any discrepancy between the Protocol and the Guidelines, this Protocol shall prevail.

### A.    Background

1.    Nortel Networks Inc. ("NNI") is the wholly owned U.S. subsidiary of Nortel Networks Limited ("NNL"), the principal Canadian operating subsidiary of Nortel Networks Corporation ("NNC"). NNC is a telecommunications company headquartered in Toronto, Ontario, Canada. NNI is incorporated under Delaware law and is headquartered in Richardson, Texas.

2.    NNI and certain of its affiliates (collectively, the "U.S. Debtors"),[1] have commenced reorganization proceedings (the "U.S. Proceedings") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court"), and such cases have been consolidated (for procedural purposes only) under Case No. 09-10138 (KG). The U.S. Debtors are continuing in possession of their respective properties and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the U.S. Proceedings. On January 22, 2009,

---

[1]    The Debtors in the U.S. Proceedings (as defined herein) are: NNI, Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., XROS, Inc., Sonoma Systems, QTERA Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

the Office of United States Trustee (the "U.S. Trustee") appointed an official committee of

unsecured creditors (the "Creditors Committee") in the U.S. Proceeding. An ad hoc committee

of bondholders (the "Bondholders Committee") has also been organized.

3.    On January 14, 2009, the U.S. Debtors' ultimate corporate parent NNC,

NNI's direct corporate parent NNL (together with NNC and their affiliates, including the U.S.

Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian

Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court")

under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from

their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors have obtained

an initial order of the Canadian Court (as amended and restated, the "Canadian Order"), under

which, inter alia:  (a) the Canadian Debtors have been determined to be entitled to relief under

the CCAA; (b) Ernst & Young Inc. has been appointed as monitor (the "Monitor") of the

Canadian Debtors, with the rights, powers, duties and limitations upon liabilities set forth in the

CCAA and the Canadian Order; and (c) a stay of proceedings in respect of the Canadian Debtors

has been granted.

4.    The Monitor filed petitions and obtained an order in the U.S. Court

granting recognition of the Canadian Proceedings under chapter 15 of the Bankruptcy Code (the

"Chapter 15 Proceedings"). NNI also filed an application and obtained an order in the Canadian

Court pursuant to section 18.6 of the CCAA recognizing the U.S. Proceedings as "foreign

proceedings" in Canada and giving effect to the automatic stay thereunder in Canada. None of

the U.S. Debtors or Canadian Debtors are applicants in both the U.S. Proceedings and Canadian

Proceedings.

---

[2]    The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation,
Nortel Networks Global Corporation and Nortel Networks International Corporation.

5.      For convenience, (a) the U.S. Debtors and the Canadian Debtors shall be referred to herein collectively as the "Debtors," (b) the U.S. Proceedings and the Canadian Proceedings shall be referred to herein collectively as the "Insolvency Proceedings," and (c) the U.S. Court and the Canadian Court shall be referred to herein collectively as the "Courts", and each individually as a "Court."

**B.      Purpose and Goals**

6.      Though full and separate plenary proceedings are pending in the United States for the U.S. Debtors and in Canada for the Canadian Debtors, the implementation of administrative procedures and cross-border guidelines is both necessary and desirable to coordinate certain activities in the Insolvency Proceedings, protect the rights of parties thereto, ensure the maintenance of the Courts' respective independent jurisdiction and give effect to the doctrines of comity. Accordingly, this Protocol has been developed to promote the following mutually desirable goals and objectives in the Insolvency Proceedings:

a.      harmonize and coordinate activities in the Insolvency Proceedings before the Courts;

b.      promote the orderly and efficient administration of the Insolvency Proceedings to, among other things, maximize the efficiency of the Insolvency Proceedings, reduce the costs associated therewith and avoid duplication of effort;

c.      honor the independence and integrity of the Courts and other courts and tribunals of the United States and Canada, respectively;

d.      promote international cooperation and respect for comity among the Courts, the Debtors, the Creditors Committee, the Estate Representatives (which include the Chapter 11 Representatives and the Canadian Representatives as such terms are defined below) and other creditors and interested parties in the Insolvency Proceedings;

e.      facilitate the fair, open and efficient administration of the Insolvency Proceedings for the benefit of all of the Debtors' creditors and other interested parties, wherever located; and

4

f.      implement a framework of general principles to address basic administrative issues arising out of the cross-border nature of the Insolvency Proceedings.

As the Insolvency Proceedings progress, the Courts may also jointly determine that other cross-border matters that may arise in the Insolvency Proceedings should be dealt with under and in accordance with the principles of this Protocol. Subject to the provisions of this Protocol, including, without limitation, those included in paragraph 15 hereof, where an issue is to be addressed only to one Court, in rendering a determination in any cross-border matter, such Court may: (a) to the extent practical or advisable, consult with the other Court; and (b) in its sole discretion and bearing in mind the principles of comity, either (i) render a binding decision after such consultation; (ii) defer to the determination of the other Court by transferring the matter, in whole or in part to the other Court; or (iii) seek a joint hearing of both Courts.

## C.    Comity and Independence of the Courts

7.     The approval and implementation of this Protocol shall not divest nor diminish the U.S. Court's and the Canadian Court's respective independent jurisdiction over the subject matter of the U.S. Proceedings and the Canadian Proceedings, respectively. By approving and implementing this Protocol, neither the U.S. Court, the Canadian Court, the Debtors nor any creditors or interested parties shall be deemed to have approved or engaged in any infringement on the sovereignty of the United States of America or Canada.

8.     The U.S. Court shall have sole and exclusive jurisdiction and power over the conduct of the U.S. Proceedings and the hearing and determination of matters arising in the U.S. Proceedings. The Canadian Court shall have sole and exclusive jurisdiction and power over the conduct of the Canadian Proceedings and the hearing and determination of matters arising in the Canadian Proceedings.

9.      In accordance with the principles of comity and independence recognized herein, nothing contained herein shall be construed to:

a.      increase, decrease or otherwise modify the independence, sovereignty or jurisdiction of the U.S. Court, the Canadian Court or any other court or tribunal in the United States or Canada, including the ability of any such court or tribunal to provide appropriate relief on an ex parte or "limited notice" basis to the extent permitted under applicable law;

b.      require the U.S. Court to take any action that is inconsistent with its obligations under the laws of the United States;

c.      require the Canadian Court to take any action that is inconsistent with its obligations under the laws of Canada;

d.      require the Debtors, the Creditors Committee, the Estate Representatives or the U.S. Trustee to take any action or refrain from taking any action that would result in a breach of any duty imposed on them by any applicable law;

e.      authorize any action that requires the specific approval of one or both of the Courts under the Bankruptcy Code or the CCAA after appropriate notice and a hearing (except to the extent that such action is specifically described in this Protocol); or

f.      preclude the Debtors, the Creditors Committee, the Monitor, the U.S. Trustee, any creditor or other interested party from asserting such party's substantive rights under the applicable laws of the United States, Canada or any other relevant jurisdiction including, without limitation, the rights of parties in interest to appeal from the decisions taken by one or both of the Courts.

10. The Debtors, the Creditors Committee, the Estate Representatives and their respective employees, members, agents and professionals shall respect and comply with the independent, non-delegable duties imposed upon them, if any, by the Bankruptcy Code, the CCAA, the Canadian Order and other applicable laws.

## D.   Cooperation

11.     To assist in the efficient administration of the Insolvency Proceedings and in recognizing that the U.S. Debtors and Canadian Debtors may be creditors of the others'

estates, the Debtors and their respective Estate Representatives shall, where appropriate:  (a)

cooperate with each other in connection with actions taken in both the U.S. Court and the

Canadian Court and (b) take any other appropriate steps to coordinate the administration of the

Insolvency Proceedings for the benefit of the Debtors' respective estates.

    12.  To harmonize and coordinate the administration of the Insolvency

Proceedings, the U.S. Court and the Canadian Court each may coordinate activities and consider

whether it is appropriate to defer to the judgment of the other Court.  In furtherance of the

foregoing:

    a.  The U.S. Court and the Canadian Court may communicate with one another, with or without counsel present, with respect to any procedural matter relating to the Insolvency Proceedings.

    b.  Where the issue of the proper jurisdiction of either Court to determine an issue is raised by an interested party in either of the Insolvency Proceedings with respect to a motion or application filed in either Court, the Court before which such motion or application was initially filed may contact the other Court to determine an appropriate process by which the issue of jurisdiction will be determined; which process shall be subject to submissions by the Debtors, the Creditors Committee, the Monitor, the Bondholders Committee (collectively the "Core Parties"), the U.S. Trustee and any interested party prior to a determination on the issue of jurisdiction being made by either Court.

    c.  The Courts may, but are not obligated to, coordinate activities in the Insolvency Proceedings such that the subject matter of any particular action, suit, request, application, contested matter or other proceeding is determined in a single Court.

    d.  The U.S. Court and the Canadian Court may conduct joint hearings (each a "Joint Hearing") with respect to any cross-border matter or the interpretation or implementation of this Protocol where both the U.S. Court and the Canadian Court consider such a Joint Hearing to be necessary or advisable, or as otherwise provided herein, to, among other things, facilitate or coordinate proper and efficient conduct of the Insolvency Proceedings or the resolution of any particular issue in the Insolvency Proceedings. With respect to any Joint Hearing, unless otherwise ordered, the following procedures will be followed:

(i)    A telephone or video link shall be established so that both the U.S. Court and the Canadian Court shall be able to simultaneously hear and/or view the proceedings in the other Court.

(ii)   Submissions or applications by any party that are or become the subject of a Joint Hearing (collectively, "Pleadings") shall be made or filed initially only to the Court in which such party is appearing and seeking relief. Promptly after the scheduling of any Joint Hearing, the party submitting such Pleadings to one Court shall file courtesy copies with the other Court. In any event, Pleadings seeking relief from both Courts shall be filed in advance of the Joint Hearing with both Courts.

(iii)  Any party intending to rely on any written evidentiary materials in support of a submission to the U.S. Court or the Canadian Court in connection with any Joint Hearing (collectively, "Evidentiary Materials") shall file or otherwise submit such materials to both Courts in advance of the Joint Hearing. To the fullest extent possible, the Evidentiary Materials filed in each Court shall be identical and shall be consistent with the procedural and evidentiary rules and requirements of each Court.

(iv)   If a party has not previously appeared in or attorned or does not wish to attorn to the jurisdiction of a Court, it shall be entitled to file Pleadings or Evidentiary Materials in connection with the Joint Hearing without, by the mere act of such filings, being deemed to have appeared in or attorned to the jurisdiction of such Court in which such material is filed, so long as such party does not request any affirmative relief from such Court.

(v)    The Judge of the U.S. Court and the Justice of the Canadian Court who will preside over the Joint Hearing shall be entitled to communicate with each other in advance of any Joint Hearing, with or without counsel being present, (1) to establish guidelines for the orderly submission of Pleadings, Evidentiary Materials and other papers and for the rendering of decisions by the Courts; and (2) to address any related procedural, administrative or preliminary matters.

(vi)   The Judge of the U.S. Court and the Justice of the Canadian Court, shall be entitled to communicate with each other during or after any joint hearing, with or without counsel present, for the purposes of (1) determining whether consistent rulings can be made by both Courts; (2) coordinating the terms upon of the Courts' respective rulings; and (3) addressing any other procedural or administrative matters.

13.     Notwithstanding the terms of the paragraph 12 above, this Protocol recognizes that the U.S. Court and the Canadian Court are independent courts. Accordingly, although the Courts will seek to cooperate and coordinate with each other in good faith, each of the Courts shall be entitled at all times to exercise its independent jurisdiction and authority with respect to:  (a) the conduct of the parties appearing in matters presented to such Court; and (b) matters presented to such Court, including, without limitation, the right to determine if matters are properly before such Court.

14.     Where one Court has jurisdiction over a matter which requires the application of the law of the jurisdiction of the other Court, such Court may, without limitation, hear expert evidence of such law or, subject to paragraph 15 herein, seek the written advice and direction of the other Court which advice may in the discretion of the receiving Court, be made available to parties in interest.

15.     Notwithstanding anything to the contrary herein contained, to the extent any motion is filed or relief is sought (collectively, "Requested Relief") in either Court relating to:  (i) the proposed sale of assets for gross proceeds in excess of U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor; (ii) any motion to allocate sale proceeds which are in the aggregate more than U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor; (iii) matters relating to the advanced pricing agreement involving both the United States and Canadian taxing authorities; (iv) matters regarding transfer pricing methodology relating to an obligation for the transfer of goods and services between one or more U.S. Debtors and one or more Canadian

9

Debtors; (v) any matter relating to alleged fraudulent conveyance or preference claims in excess of U.S. $30 million and which may have a material impact on both one or more U.S. Debtors and one or more Canadian Debtors; (vi) matters relating to any proposal or approval of a disclosure statement, information circular, plan of reorganization or plan of compromise and arrangements in either the U.S. Proceedings or the Canadian Proceedings; (vii) any motion to appoint a Trustee or Examiner in the U.S. Proceedings, any motion to convert the U.S. Proceedings to a Chapter 7 proceeding, any motion to appoint a Receiver in the Canadian Proceedings, or any motion to convert the Canadian Proceedings to a bankruptcy or proposal proceeding under the Bankruptcy and Insolvency Act (Canada); (viii) any motion to substantively consolidate the Debtors' estates; (ix) matters impacting the material tax attributes of the U.S. Debtors, including the net operating losses of the U.S. Debtors in any prior fiscal year; (x) any motion to amend the terms of any of the Debtors' registered pension plans the effect of which would increase the liability of any Debtor thereunder; (xi) any motion to assume, ratify, reject, repudiate, modify or assign executory contracts having a material impact on the assets, operations, obligations, rights, property or business of both the U.S. and Canadian estates and accounting for annual gross revenue in excess of U.S. $30 million ("Material Contracts"); (xii) any motion seeking relief from the automatic stay in the U.S. Proceedings and/or the stay of proceedings in the Canadian Proceedings (1) involving any Material Contract or (2) to pursue actions having a material impact on the assets, operations, obligations, rights, property or business of at least one U.S. Debtor and one Canadian Debtor and involving damages in excess of U.S. $30 million; (xiii) any motion seeking to create or extend any program, plan, proposal or scheme relating to or authorizing payments to employees where the consideration relates to non-ordinary course incentive performance, retention, severance, termination or such like payments; and (xiv) any

10

motion regarding any program, plan proposal, scheme or similar course of action related to the

wind-down of one or more of the Debtors' businesses;

Then the following procedures shall be followed:

a.   unless otherwise consented to by the Core Parties, any and all documents, other than any Monitor's report related to the Requested Relief, shall be filed (as applicable) and served on the Core Parties on not less than seven days notice prior to the proposed hearing date for such Requested Relief in the Court of the forum country where the party seeking the Requested Relief intends the Requested Relief to be heard; *provided, however,* that to the extent the Requested Relief is necessary to avoid irreparable harm to the Debtors and/or the Debtors' bankruptcy estates, as may be determined by the Court of the forum country where the Requested Relief is being sought or such Court otherwise determines, such documents related to the Requested Relief shall be served on the Core Parties on such reasonable notice as such Court may determine;

b.   upon notice of such Requested Relief being provided to the Core Parties, each of the Core Parties will have not less than two business days from receipt of such notice (or such shorter period as the Court of the forum country where the Requested Relief is being sought shall determine, as set forth in paragraph 15(a) herein) to request, in writing, that the filing party seek a Joint Hearing for the Requested Relief;

c.   if the filing party agrees to seek a Joint Hearing, the Requested Relief shall be heard at a Joint Hearing conducted by the Courts in accordance with the procedures set forth in paragraph 12 herein; and

d.   if the filing party does not agree to seek a Joint Hearing, the party seeking to have the Requested Relief heard at a Joint Hearing may file a notice of Joint Hearing dispute in both the Court of the forum country and the Court of the non-forum country and serve notice thereof on the remaining Core Parties, whereupon the respective Courts of the forum country and the non-forum country may consult with one another in accordance with paragraphs 6 and 12 hereof, in order to determine whether a Joint Hearing is necessary or may otherwise consult with the Core Parties prior to any party proceeding with the underlying Requested Relief in the original proposed forum country.

E.   **Recognition of Stays of Proceedings**

16.   The Canadian Court hereby recognizes the validity of the stay of

proceedings and actions against the U.S. Debtors and their property under section 362 of the

Bankruptcy Code (the "U.S. Stay"). In implementing the terms of this paragraph, the Canadian Court may consult with the U.S. Court regarding: (i) the interpretation, extent, scope and applicability of the U.S. Stay and any orders of the U.S. Court modifying or granting relief from the U.S. Stay; and (ii) the enforcement of the U.S. Stay in Canada.

17.    The U.S. Court hereby recognizes the validity of the stay of proceedings and actions against the Canadian Debtors and their property under the Canadian Order (the "Canadian Stay"). In implementing the terms of this paragraph, the U.S. Court may consult with the Canadian Court regarding: (i) the interpretation, extent, scope and applicability of the Canadian Stay and any orders of the Canadian Court modifying or granting relief from the Canadian Stay; and (ii) the enforcement of the Canadian Stay in the United States.

18.    Nothing contained herein shall affect or limit the Debtors' or other parties' rights to assert the applicability or nonapplicability of the U.S. Stay or the Canadian Stay to any particular proceeding, property, asset, activity or other matter, wherever pending or located. Subject to paragraph 15, herein, motions brought respecting the application of the stay of proceedings with respect to assets or operations of the Canadian Debtors shall be heard and determined by the Canadian Court. Subject to paragraph 15 herein, motions brought respecting the application of the stay of proceedings with respect to assets or operations of the U.S. Debtors shall be heard and determined by the U.S. Court.

## F.    Rights to Appear and Be Heard

19.    The Debtors, the Core Parties, and any other committee that may be appointed by the U.S. Trustee, and the professionals and advisors for each of the foregoing, shall have the right and standing: (i) to appear and to be heard in either the U.S. Court or Canadian Court in the U.S. Proceedings or Canadian Proceedings, respectively, to the same extent as creditors and other interested parties domiciled in the forum country, subject to any local rules or

regulations generally applicable to all parties appearing in the forum; and (ii) to file notices of

appearance or other papers with the clerk of the U.S. Court or the Canadian Court in respect of

the U.S. Proceedings or Canadian Proceedings, respectively; provided, however, that any

appearance or filing may subject a creditor or interested party to the jurisdiction of the Court in

which the appearance or filing occurs; provided further, that an appearance by the Creditors

Committee in the Canadian Proceedings shall not form a basis for personal jurisdiction in

Canada over the members of the Creditors Committee. Notwithstanding the foregoing, and in

accordance with the policies set forth above, including, inter alia, paragraph 12 above; (i) the

Canadian Court shall have jurisdiction over the Chapter 11 Representatives (as defined below)

solely with respect to the particular matters as to which the Chapter 11 Representatives appear

before the Canadian Court; and (ii) the U.S. Court shall have jurisdiction over the Canadian

Representatives (as defined below) solely with respect to the particular matters as to which the

Canadian Representatives appear before the U.S. Court.

20.     In connection with any matter in the Canadian Proceedings in which the

Creditors Committee seeks to become involved and which would otherwise require the Creditors

Committee to execute a confidentiality agreement, the Creditors Committee, its individual

members and professionals shall not be required to execute confidentiality agreements but

instead the Creditors Committee and its members shall be bound by the confidentiality

provisions contained in the Creditors Committee bylaws, and the Creditors Committee's

professionals shall be bound by the terms of the confidentiality agreement with the Debtors dated

February 2, 2009.

**G.     Claims Protocol**

21.     The Debtors anticipate that it will be necessary to implement a specific

claims protocol to address, among other things and without limitation, the timing, process,

13

jurisdiction and applicable governing law to be applied to the resolution of intercompany claims filed by the Debtors' creditors in the Canadian Proceedings and the U.S. Proceedings. In such event, and in recognition of the inherent complexities of the inter-company claims that may be asserted in the Insolvency Proceedings, the Debtors shall use commercially reasonable efforts to negotiate a specific claims protocol, in form and substance satisfactory to the Debtors, the Monitor, and the Creditors Committee, which protocol shall be submitted to the Canadian Court and the U.S. Court for approval. In the event that the Debtors fail to reach agreement among such parties, the Debtors shall file a motion in both the Canadian Court and the U.S. Court seeking approval of such claims protocol as the Debtors shall determine to be in the best interest of the Debtors and their creditors.

**H.      Retention and Compensation of Estate Representative and Professionals**

22.    The Monitor, its officers, directors, employees, counsel and agents, wherever located, (collectively the "Monitor Parties") and any other estate representatives appointed in the Canadian Proceedings (collectively, the "Canadian Representatives") shall (subject to paragraph 19) be subject to the sole and exclusive jurisdiction of the Canadian Court with respect to all matters, including: (a) the Canadian Representatives' tenure in office; (b) the retention and compensation of the Canadian Representatives; (c) the Canadian Representatives' liability, if any, to any person or entity, including the Canadian Debtors and any third parties, in connection with the Insolvency Proceedings; and (d) the hearing and determination of any other matters relating to the Canadian Representatives arising in the Canadian Proceedings under the CCAA or other applicable Canadian law. The Canadian Representatives shall not be required to seek approval of their retention in the U.S. Court for services rendered to the Debtors. Additionally, the Canadian Representatives: (a) shall be compensated for their services to the Canadian Debtors solely in accordance with the CCAA, the Canadian Order and other applicable

14

Canadian law or orders of the Canadian Court; and (b) shall not be required to seek approval of their compensation in the U.S Court.

23.    The Monitor Parties shall be entitled to the same protections and immunities in the United States as those granted to them under the CCAA and the Canadian Order.  In particular, except as otherwise provided in any subsequent order entered in the Canadian Proceedings, the Monitor Parties shall incur no liability or obligations as a result of the Canadian Order, the appointment of the Monitor, the carrying out of its duties or the provisions of the CCAA and the Canadian Order by the Monitor Parties, except any such liability arising from actions of the Monitor Parties constituting gross negligence or willful misconduct.

24.    Any estate representative appointed in the U.S. Proceedings, including without limitation any examiners or trustees appointed in accordance with section 1104 of the Bankruptcy Code (collectively, the "Chapter 11 Representatives") shall (subject to paragraph 19) be subject to the sole and exclusive jurisdiction of the U.S. Court with respect to all matters, including:  (a) the Chapter 11 Representatives' tenure in office; (b) the retention and compensation of the Chapter 11 Representatives; (c) the Chapter 11 Representatives' liability, if any, to any person or entity, including the U.S. Debtors and any third parties, in connection with the Insolvency Proceedings; and (d) the hearing and determination of any other matters relating to the Chapter 11 Representatives arising in the U.S. Proceedings under the Bankruptcy Code or other applicable laws of the United States.  The Chapter 11 Representatives shall not be required to seek approval of their retention in the Canadian Court and (a) shall be compensated for their services to the U.S. Debtors solely in accordance with the Bankruptcy Code and other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek

15

approval of their compensation for services performed for the U.S. Debtors in the Canadian Court.

25. Any professionals (i) retained by and being compensated solely by, or (ii) being compensated solely by, the Canadian Debtors including in each case, without limitation, counsel and financial advisors (collectively, the "Canadian Professionals"), shall be subject to the sole and exclusive jurisdiction of the Canadian Court. Such Canadian Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the Canadian Court under the CCAA, the Canadian Order and any other applicable Canadian law or orders of the Canadian Court with respect to services performed on behalf of the Canadian Debtors; and (b) shall not be required to seek approval of their retention or compensation in the U.S. Court.

26. Any professionals (i) retained by, or (ii) being compensated by, the U.S. Debtors including in each case, without limitation, counsel and financial advisors (collectively, the "U.S. Professionals") shall be subject to the sole and exclusive jurisdiction of the U.S. Court. Such U.S. Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the U.S. Court under the Bankruptcy Code and any other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek approval of their retention or compensation in the Canadian Court.

27. Subject to paragraph 19 herein, any professional retained by the Creditors Committee, including in each case, without limitation, counsel and financial advisors (collectively, the "Committee Professionals") shall be subject to the sole and exclusive jurisdiction of the U.S. Court. Such Committee Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the U.S. Court under the

16

Bankruptcy Code and any other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek approval of their retention or compensation in the Canadian Court or any other court.

**I.    Notice**

           28.    Notice of any motion, application or other Pleading or paper (collectively the "Court Documents") filed in one or both of the Insolvency Proceedings involving or relating to matters addressed by this Protocol and notice of any related hearings or other proceedings shall be given by appropriate means (including, where circumstances warrant, by courier, telecopier or other electronic forms of communication) to the following:  (a) all creditors and interested parties, in accordance with the practice of the jurisdiction where the papers are filed or the proceedings are to occur; and (b) to the extent not otherwise entitled to receive notice under clause (a) of this sentence, counsel to the Debtors; the U.S. Trustee; the Monitor; the Creditors Committee; the Bondholders Committee and any other statutory committees appointed in the Insolvency Proceedings and such other parties as may be designated by either of the Courts from time to time.  Notice in accordance with this paragraph shall be given by the party otherwise responsible for effecting notice in the jurisdiction where the underlying papers are filed or the proceedings are to occur.  In addition to the foregoing, upon request, the U.S. Debtors or the Canadian Debtors shall provide the U.S. Court or the Canadian Court, as the case may be, with copies of any orders, decisions, opinions or similar papers issued by the other Court in the Insolvency Proceedings.

           29.    When any cross-border issues or matters addressed by this Protocol are to be addressed before a Court, notices shall be provided in the manner and to the parties referred to in paragraph 28 above.

17

**J.    Effectiveness; Modification**

30.    This Protocol shall become effective only upon its approval by both the U.S. Court and the Canadian Court.

31.    This Protocol may not be supplemented, modified, terminated, or replaced in any manner except upon the approval of both the U.S. Court and the Canadian Court after notice and a hearing.  Notice of any legal proceeding to supplement, modify, terminate or replace this Protocol shall be given in accordance with the notice provisions set forth above.

**K.    Procedure for Resolving Disputes Under this Protocol**

32.    Disputes relating to the terms, intent or application of this Protocol may be addressed by interested parties to the U.S. Court, the Canadian Court or both Courts upon notice in accordance with the notice provisions outlined in paragraph 28 above.  In rendering a determination in any such dispute, the Court to which the issue is addressed:  (a) shall consult with the other Court; and (b) may, in its sole and exclusive discretion, either:  (i) render a binding decision after such consultation; (ii) defer to the determination of the other Court by transferring the matter, in whole or in part, to such other Court; or (iii) seek a Joint Hearing of both Courts in accordance with paragraph 12 above.  Notwithstanding the foregoing, in making a determination under this paragraph, each Court shall give due consideration to the independence, comity and inherent jurisdiction of the other Court established under existing law.

33.    In implementing the terms of this Protocol, the U.S. Court and the Canadian Court may, in their sole, respective discretion, provide advice or guidance to each other with respect to legal issues in accordance with the following procedures:

    a.    the U.S. Court or the Canadian Court, as applicable, may determine that
          such advice or guidance is appropriate under the circumstances;

    b.    the Court issuing such advice or guidance shall provide it to the non-
          issuing Court in writing;

18

c.    copies of such written advice or guidance shall be served by the applicable Court in accordance with paragraph 28 hereof;

d.    the Courts may jointly decide to invite the Debtors, the Creditors Committee, the Estate Representatives, the U.S. Trustee and any other affected or interested party to make submissions to the appropriate Court in response to or in connection with any written advice or guidance received from the other Court; and

e.    for clarity, the provisions of this paragraph shall not be construed to restrict the ability of either Court to confer as provided in paragraph 12 above whenever it deems it appropriate to do so.

## L.    Preservation of Rights

34.    Except as specifically provided herein, neither the terms of this Protocol nor any actions taken under the terms of this Protocol shall: (a) prejudice or affect the powers, rights, claims and defenses of the Debtors and their estates, the Creditors Committee, the Estate Representatives, the U.S. Trustee or any of the Debtors' creditors under applicable law, including, without limitation, the Bankruptcy Code the CCAA, and the orders of the Courts; or (b) preclude or prejudice the rights of any person to assert or pursue such person's substantive rights against any other person under the applicable laws of Canada or the United States.