# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- X

*In re*

Nortel Networks Inc., *et al.*,[1]

                        Debtors.

-------------------------------------------------------- X

Chapter 11

Case No. 09-10138 (KG)

Jointly Administered

**Hearing date:  TBD**
**Responses due:  TBD**

## DEBTORS' OBJECTION TO PROOFS OF CLAIM
## NOS. 6673 AND 6709 FILED BY QUEENS BALLPARK COMPANY, L.L.C.

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), hereby object (the "Objection"), pursuant to sections 101, 502 and 503 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 3001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to (i) the Proof of Claim filed by Queens Ballpark Company, L.L.C. ("QBC" or the "Claimant") on January 11, 2010 against NNI as an administrative expense claim in the amount of $536,874.96, which is listed on the Debtors' claim register as Claim No. 6673 (the "Expense Claim"); and (ii) the Proof of Claim filed by the Claimant on January 14, 2010 against NNI as a general unsecured claim in the amount of $6,898,294.00, which is listed on the Debtors' claim register as Claim No. 6709 (the "Unsecured Claim" and, together with the Expense Claim, the "Claims").

---

[1]     Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

**Preliminary Statement**

1.       QBC has filed a claim against NNI for advertising, premium ticket, and luxury box revenues allegedly lost as a result of NNI's rejection of an advertising agreement with QBC. This claim for damages is without basis or – at a minimum – overstated because the amount of QBC's alleged lost revenues implausibly suggests that QBC has been unable to mitigate its damages by locating any willing advertisers for the advertising space and time slots at New York Mets major league baseball games for the three full baseball seasons that have been played since NNI rejected the agreement, and that QBC will be unable to find any advertisers for the relevant space and time slots at this major sports venue for three more seasons.  The amount claimed also suggests, improbably, that no one else has purchased any of the premium tickets or box seats or will have any interest in purchasing any of the premium tickets or box seats for the remaining seasons covered by the agreement.  Revenue from other advertisers or ticket purchasers will eliminate or substantially reduce any damages that QBC can now claim as a result of NNI's rejection of the agreement at issue.

2.       Moreover – particularly if such advertising space, tickets and box seats are so valueless that they cannot be sold to others during any of the seven years of the agreement – QBC will be unable to show that  any unpaid-for services provided to the Debtors by QBC prior to the rejection date of the agreement actually provided value to NNI's estate, much less that such goods and services were actually necessary to the preservation of NNI's estate. Accordingly, any claim for administrative expenses, including the Expense Claim, should be denied.

3.      Finally, even if the Claims were otherwise proper, which they are not, they should be disallowed pursuant to Section 502(d) of the Bankruptcy Code in light of the Debtors' pending preference action against QBC.

4.      Accordingly, and for the reasons set forth more fully below, QBC's Claims should be disallowed, reduced, and/or reclassified as general unsecured claims.

### Background

5.      On March 24, 2008, QBC and NNI entered into an advertising agreement (the "Agreement")[2] under which QBC granted NNI the right to advertise the Nortel brand of network systems and services on two LED signs located on the press level façade of the first base side and third base side, respectively, of the ballpark used by the New York Mets ("Citi Field") for one half-inning during each New York Mets regular season baseball game and to sponsor one 60-second feature that was to run on the Citi Field video scoreboard before each regular season baseball game.[3]  QBC also agreed to provide NNI certain additional benefits, including use of premium field-level seats and use of a luxury suite at Citi Field.[4]  A true and correct copy of the Agreement is included as an annex to the Expense Claim, which is attached hereto as Exhibit B.

6.      In exchange, the Agreement provided that NNI would pay QBC an annual payment in the amount of $1,000,000.00 for the 2009 season and an increasing amount in each subsequent season, reaching $1,265,318.90 during the 2015 season.  The annual amounts were to be paid in two equal installments on or before January 1 and July 1 of each year of the term.[5]

---

[2]      The terms of the Agreement are summarized herein for background purposes and are qualified in their entirety by the actual, full terms of the Agreement.

[3]      See Ex. B Annex, at 1-2 (§§ 1.01, 1.02), 21 (Exhibit A to the Agreement), 22 (Exhibit B to the Agreement, § 6).

[4]      See id., at 23 (Exhibit B to the Agreement, §§ 8 and 9).

[5]      See id. at 24 (Exhibit C to the Agreement).

7.        On January 13, 2009, NNI made its first installment payment for the 2009 baseball season under the Agreement in the amount of $500,000.00.  NNI did not make its second installment payment for the 2009 baseball season under the Agreement, and has not made any further payments under the Agreement to QBC.

8.        On January 14, 2009, NNI and its affiliated Debtors, other than Nortel Networks (CALA) Inc.,[6] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, which cases are consolidated for procedural purposes [D.I. 36].

9.        Pursuant to the authority given to the Debtors in the Order Approving Procedures for the Rejection of Executory Contracts and Unexpired Leases and the Abandonment of Certain Assets Related Thereto [D.I. 510], NNI rejected the Agreement effective as of December 17, 2009 [D.I. 2178].

10.        On January 11, 2010, QBC filed the Expense Claim, asserting that NNI is liable for $536,874.96[7] as administrative expenses allegedly relating to the provision of advertising space for NNI and/or the use of premium field-level tickets and the luxury box at Citi Field by the Debtors after the bankruptcy petition was filed.

11.        A few days later, on January 14, 2010, QBC filed the Unsecured Claim asserting that NNI is liable for $6,898,294.00 as contract rejection damages resulting from the rejection of the Agreement by NNI on December 17, 2009.  This claim represents the full amount to which QBC allegedly would have been entitled under the Agreement for the 2010-2015 New York

---

[6]        Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which case is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

[7]        The amount claimed in the Expense Claim represents the installment ($496,000), plus interest ($40,874.96), under the Agreement that came due in July 2009.  See Ex. B at first unnumbered page following cover sheet.

Mets baseball seasons.  A true and correct copy of the Unsecured Claim is attached hereto as Exhibit C.

12.        While the Debtors have had informal discussions with QBC regarding their Claims, to date the Debtors have not received complete information about mitigation efforts that have been or will be taken by QBC to reduce their potential Claims against NNI.

13.        Meanwhile, on December 6, 2010, NNI commenced an adversary proceeding against QBC and Sterling Mets, L.P. (collectively, the "Preference Action Defendants"), captioned Nortel Networks Inc. v. Sterling Mets, L.P. and Queens Ballpark, L.L.C., Adv. Proc. No. 10-55903 (KG) (the "Preference Action"), seeking to avoid and recover pursuant to 11 U.S.C. §§ 547 and 550 certain preferential transfers (the "Subject Transfers") alleged to have been made to the Preference Action Defendants within the ninety (90) days preceding January 14, 2009.  Specifically, the Preference Action seeks to avoid and recover from the Preference Action Defendants (i) the $500,000 transfer to QBC made in January 2009, and (ii) a $19,134.50 transfer to Sterling Mets, L.P. made in December 2008.  The Preference Action remains unresolved as of the filing of this Objection and the Subject Transfers have not been recovered by NNI to date.

### Basis for Objection and Relief Requested

14.        QBC bears the burden of establishing its entitlement to payment on both the Unsecured Claim and the Expense Claim.[8]  Here, the Unsecured Claim seeks the full amount

---

[8]        A claimant must establish a right to payment for claims asserted against a debtor and, upon assertion of an objection, the claimant must prove the validity of his or her claim by a preponderance of the evidence.  See In re Allegheny Int'l, Inc., 954 F.2d 167, 173-74 (3d Cir. 1992).  Moreover, a claimant seeking the reimbursement of expenses under Section 503(b) of the Bankruptcy Code bears the burden of proof from the outset.  In re Phila. Newspapers, Inc., 690 F.3d 161, 173 (3d Cir. 2012); see also 4-503 Collier on Bankruptcy ¶ 503.04 (16th ed.2012) ("[R]equests for payment of administrative expenses are not entitled to the presumption of correctness that is accorded claims prepetition creditors assert through proofs of claim.  An entity seeking allowance of an administrative expense has the burden of proof.")

QBC stood to earn under the Agreement during the years 2010 through 2015, based on NNI's rejection of that Agreement.  However, the Unsecured Claim fails to account for replacement revenue that QBC has received, could have received from its reasonable efforts, or may yet receive from advertising space, premium ticket and luxury box sales in prior or future years, which mitigation surely reduces the amount of damages that QBC may claim.  Furthermore, QBC will be required to prove that the Expense Claim seeks expenses that were actually necessary to the continuation of NNI's business or maintenance of its estate, as is required for administrative priority claims.[9]

15.      Accordingly, the Debtors respectfully request that the Court enter an order pursuant to sections 101, 502 and 503 of the Bankruptcy Code and Bankruptcy Rules 3001 and 9014[10] (i) disallowing, or reducing in an amount to be determined through discovery, the Unsecured Claim and (ii) disallowing, or reducing and reclassifying as a general unsecured claim, the Expense Claim.

16.      Alternatively, to the extent the Claims are not otherwise disallowed, the Debtors respectfully request that both the Unsecured Claim and the Expense Claim be disallowed pursuant to Section 502(d) of the Bankruptcy Code because QBC has not paid amounts owed to the Debtors pursuant to the Preference Action.

**A.      The Debtors Are Not Liable For The Unsecured Claim Because QBC Has Failed To Mitigate Its Potential Damages**

17.      QBC is not entitled to allowance in full of its Unsecured Claim because it has the duty to mitigate any damages purportedly suffered as a result of NNI's rejection of the

---

[9]      Phila. Newspapers,, 690 F.3d at 172.

[10]      Since this is not an omnibus objection, the Debtors do not believe Rule 3007-1(f)(iii) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") is applicable to this Objection.  To the extent, however, that the Court determines otherwise, the Debtors respectfully request permission to submit a supplemental objection as necessary.

Agreement.  Any alternative revenue that was received, or could have been received, as a result

of mitigation would eliminate or, at a minimum, substantially reduce the damages that QBC can

claim.

18.      Under New York law,[11] it is well established that a party may not recover contract

damages unless it has made reasonable efforts to mitigate its losses.  <u>Losei Realty Corp. v. City

of N.Y.</u>, 254 N.Y. 41, 47-48 (1930) ("The law wisely imposes upon a party subjected to injury

from the breach of a contract the active duty to make reasonable efforts to render the injury as

light as possible. . . . [The injured party has] no right, by obstinately persisting in treating the

contract as alive, to make the damages larger than they otherwise would have been."); <u>accord

White v. Farrell</u>, 20 N.Y. 3d 487, 499 (Mar. 21, 2013).

19.      Here, QBC demands the entire amount to which it alleges it would have been

entitled for providing six years' worth of advertising space, seats and other goods and services at

Citi Field,[12] notwithstanding QBC's duty to mitigate and despite the fact that NNI rejected the

Agreement for advertising space and premium tickets at this major sports venue three full

baseball seasons ago.  QBC only would be entitled to assert a claim for full lost revenue if,

incredibly, despite ample time and reasonable efforts, QBC was unable to find a replacement

advertiser for even a single half-inning or pre-game advertising slot for *any* game in the three

years covered by the Agreement since its rejection by NNI, and if QBC can show it will be

unable to find replacement advertisers for the next three baseball seasons, which have not yet

even occurred.   Similarly, QBC would have to show it has been unable to sell *any* of the

premium tickets covered by the Agreement and has been wholly unable to sell the luxury box

---

[11]      The Agreement is governed by New York law.  <u>See</u> Ex. B Annex, at § 8.13 ("This Advertising Agreement shall be governed by, constructed and enforced in accordance with, the laws of the State of New York without regard to principles of conflicts of law.").

[12]      <u>See</u> Ex. C.

seats that otherwise would have been provided to the Debtors, and that even with reasonable efforts over the next several years, no one will want to buy any of the premium tickets or luxury box seats.[13]

20.        Accordingly, the Unsecured Claim should be disallowed or, alternatively, reduced in an amount commensurate with QBC's failure to mitigate.  U.S. W. Fin. Servs., Inc. v. Marine Midland Realty Credit Corp., 810 F. Supp. 1393, 1402 (S.D.N.Y. 1993) ("[A]ny award of damages should be reduced by any unnecessary increase in damages due to the failure of the plaintiff to avoid them." (internal quotation marks and citation omitted)).  Unless the Unsecured Claim is disallowed or, at a minimum, reduced, QBC may receive a disproportionately large distribution in NNI's chapter 11 case in contravention of the provisions and policies of the Bankruptcy Code and to the direct detriment of NNI's estate and other creditors.

21.        At a minimum, before the Claims are finally adjudicated, QBC should have to demonstrate, for example, whether any other persons are or may be interested in using the advertising space, tickets or luxury box, and what efforts QBC has undertaken to mitigate its damages.  Accordingly, in connection with the filing of this Objection, NNI is serving discovery requests upon QBC related to these issues.

---

[13]        Further, any expenses saved by QBC as a result of the Debtors' rejection of the contract also mitigate any damages allegedly suffered by QBC.  See 24 Richard A. Lord, Williston on Contracts § 61:1 (4th ed. 2012) (A plaintiff's direct damages are mitigated by "any expenses saved or losses avoided . . . as a result of [plaintiff] not having to perform his or her return promise" under a rejected contract.); id. § 61:2 (observing that "in order to avoid overcompensating the promisee, any savings realized by the plaintiff as a result of the defendant's breach, such as any costs that are avoided by the plaintiff not having to perform the balance of his or her own obligations under the contract, must be deducted from the recovery").

**B.    The Claimant Is Not Entitled To Administrative Priority Or Interest For The Expense Claim**

22.    The Debtors object to the Expense Claim on the basis that such claim improperly asserts administrative expense status pursuant to the Bankruptcy Code where QBC has not demonstrated such claim relates to benefits provided that were necessary or beneficial to NNI.

23.    The Expense Claim does not establish QBC's right to payment for "the actual, necessary costs and expenses of preserving the estate . . . ."  11 U.S.C. § 503(b)(1)(A).  The determination of whether a claim is entitled to administrative expense status is governed by "a two part-test:  (1) there must be a post-petition transaction between the creditor and the debtor; and (2) the estate must receive a benefit from the transaction." In re Waste Sys. Int'l, Inc., 280 B.R. 824, 826 (Bankr. D. Del. 2002) (citing In re O'Brien Envtl. Energy, Inc., 181 F.3d 527, 532-33 (3d Cir. 1999)).  In describing the benefit that must inure to the estate, this Court has stated that "[t]he benefit must run to the debtor in possession and it is typically *fundamental to the conduction of its business*." In re Cont'l Airlines, Inc., 146 B.R. 520, 526 (Bankr. D. Del. 1992) (emphasis added); see also In re Bernard Techs., Inc., 342 B.R. 174, 177 (Bankr. D. Del. 2006) ("In order to hold administrative expenses to a minimum and to maximize the value of the bankruptcy estate, section 503(b) is narrowly construed.").

24.    As described in O'Brien, a party seeking administrative status for its costs must "carry the heavy burden" of proving actual benefit to the estate. 181 F.3d at 532 (quoting bankruptcy court opinion with approval).  For example, in Bernard Technologies, this Court found that reimbursement of a senior officer's annual physical examination and life insurance premiums was not an administrative expense, in part, because "there [was] no evidence that the estate received any benefit from those payments." 342 B.R. at 181.  Here, QBC cannot meet its

9

"heavy burden" to establish that the premium tickets, luxury box or advertising space at Citi Field provided a benefit that was fundamental or necessary to preserving NNI's estate in the amount claimed.

25.    Notably, it would appear an uphill battle, to say the least, for QBC to establish that the Expense Claim is deserving of administrative priority based on benefits received by NNI in the form of valuable advertising space, box seats, and premium tickets, and, at the same time, establish that QBC was unable to mitigate its claimed damages on the Unsecured Claim because the very same advertising space, box seats, and premium tickets are so poorly valued that QBC has been unable to sell them to anyone else for any of the baseball seasons covered by the Agreement.

26.    Moreover, the Expense Claim also improperly asserts a liability of $40,874.96 in excess of the amount due and owing to QBC, which is composed of "Late Fees accrued and compounded daily based on an annual rate of 16% (through January 5, 2010)."  (See Ex. B.) Section 502(b)(2) of the Bankruptcy Code provides:

> Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if [an] objection to a claim is made, the court, after notice and hearing, shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in lawful currency of the United States in such amount, except to the extent that . . . .
>
> (2) such claim is for unmatured interest.

11 U.S.C. § 502(b)(2).  The text of the statute clearly establishes that "unsecured creditors are not entitled to recover interest that accrues on their claims after the filing of the bankruptcy petition."  In re Loewen Grp. Int'l Inc., 274 B.R. 427, 442-43 (Bankr. D. Del. 2002), overruled in part on other grounds by In re Oakwood Homes Corp., 449 F.3d 588, 592 (3d Cir. 2006); see also In re Kindred Healthcare, Inc., Nos. 99-3199 (MFW), 99-3327 (MFW), 2003 WL 22000598,

at *3 (Bankr. D. Del. Aug. 18, 2003). Accordingly, QBC has no basis in the Expense Claim to claim the $40,874.96 from the Debtors' estates and such amount should be disallowed.[14]

27.     For the reasons stated above, the Expense Claim should be disallowed, or at a minimum, reclassified as a general unsecured claim and allowed only in the reduced amount of $496,000.00, which is the amount of the Expense Claim without interest. Unless the Expense Claim is disallowed or reduced as requested, QBC may receive a disproportionately large distribution in NNI's chapter 11 case in contravention of the provisions and policies of the Bankruptcy Code and to the direct detriment of NNI's estate and other creditors.

**C.     The Claims Must Be Disallowed Pursuant to Section 502(d) Of The Bankruptcy Code**

28.     Section 502(d) of the Bankruptcy Code provides that the court "shall disallow" any claim of any entity from which property is recoverable under section 550 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 547 of the Bankruptcy Code "unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522 (i), 542, 543, 550, or 553 of this title." 11 U.S.C. § 502(d). The Preference Action against the Preference Action Defendants seeks to avoid and recover property under sections 547 and 550 of the Bankruptcy Code. The Preference Action remains pending and the Preference Action Defendants have not paid all or any part of

---

[14]     Even if the invoice portion of the Expense Claim were to be accorded administrative expense status, courts, – including at least one bankruptcy court from within the Third Circuit – have held that, "interest must ordinarily be excluded[ ] as part of an administrative claim of any kind." In re Am. Int'l Airways, Inc., 77 B.R. 490, 495 (Bankr. E.D. Pa. 1987). Courts have endorsed the "basic policy" of "keeping administrative costs to a minimum [which] preserves the debtor's necessarily scarce resources," therefore construing section 503 of the Bankruptcy Code narrowly and approving "only those items clearly allowed by statute." Id., at 494-95 (quoting, in part, In re Grant Broad. of Phila., Inc., 71 B.R. 891, 897 (Bankr. E.D. Pa. 1987)). Section 503(b) of the Bankruptcy Code does not provide for post-petition interest on an administrative expense claim.

the Subject Transfers to the Debtors.  Accordingly, the Claims must be disallowed for this reason alone.

## Reservation of Rights

29.     This Objection is based on the limited information relating to the Claims known by the Debtors as of the date hereof and QBC's failure to provide evidence to NNI of its mitigation efforts regarding the advertising space, premium tickets and luxury box.  The Debtors expressly reserve the right to supplement this Objection, in whole or in part, including, without limitation, based on additional information, facts or circumstances, including, without limitation, information provided by QBC that becomes known to them following the completion of discovery on the Claims.

## No Prior Request

30.     No prior request for the relief sought herein has been made to this or any other court.

## Notice

31.     Notice of this Objection has been given via first class mail to (i) the U.S. Trustee; (ii) counsel to the Official Committee of Unsecured Creditors; (iii) counsel to the ad hoc group of bondholders; (iv) counsel to the Claimant and (v) the general service list established in these chapter 11 cases.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court (i) enter an order substantially in the form attached hereto as Exhibit A disallowing, reducing and/or reclassifying as a general unsecured claim, as applicable, the Unsecured Claim and the Expense Claim, as requested herein, and (ii) grant such other and further relief as is just and proper.

Dated:  May 10, 2013
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-3505
Facsimile:  (212) 225-3999

*Counsel for the Debtors*
*and Debtors in Possession,*


    - and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


  */s/ Tamara K. Minott*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Tamara K. Minott (No. 5643)
1201 North Market Street, 18th Floor
Wilmington, DE  19899-1347
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors-in-Possession*