# **Exhibit B**

## **Expense Claim**

| United States Bankruptcy Court | Administrative |
|---|---|
| For the District of Delaware<br>Nortel Networks Claims Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>FDR Station, P.O.Box 5075<br>New York, NY 10150-5075 | Expense Claim<br>Form |

| Debtor against which claim is asserted : | Case Name and Number |
|---|---|
| **Nortel Networks Inc.** | In Re: Nortel Networks Inc., etal.<br>Case No. 09-10138 (KG) |

**NOTE: This form should not be used to make a claim in connection with a request for payment for goods or services provided to the Debtors prior to the commencement of the case. This Administrative Expense Claim Form is to be used solely in connection with a request for payment of an administrative expense arising after commencement of the case.**

| Name of Creditor<br>*(The person or other entity to whom the debtor owes money or property)* | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. |
|---|---|
| **Queens Ballpark Company, L.L.C.** | ☐ Check box if you have never received any notices from the bankruptcy court in this case. |
| Name and Address Where Notices Should be Sent<br>Citi Field<br>Flushing, NY 11368<br>Attn: General Counsel<br>Telephone No.<br>**(718) 803-4021** | ☐ Check box if the address differs from the address on the envelope sent to you by the court. |

THIS SPACE IS FOR
COURT USE ONLY

| ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR: **NOR001** | Check here if this claim ☐ replaces<br>☐ amends a previously filed claim, dated _____ |
|---|---|

**1. BASIS FOR CLAIM**
- ☒ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☐ Other (Describe briefly)

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (Fill out below)
  Your social security number _____
  Unpaid compensation for services performed
  from _____ to _____
      (date)              (date)

**2. DATE DEBT WAS INCURRED** July 1, 2009

**3. IF COURT JUDGMENT, DATE OBTAINED:**

**4. TOTAL AMOUNT OF ADMINISTRATIVE CLAIM: $ 536,874.96**
☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all additional charges.

**5. Brief Description of Claim (attach any additional information):**

During 2009 pursuant to the parties' written agreement, Queens Ballpark Company, L.L.C. provided Nortel Networks Inc. with certain advertising rights and other goods and services set forth in the attached contract.

| 6. CREDITS AND SETOFFS: The amount of all paym... of making this proof of claim. In filing this claim, clai...<br><br>7. SUPPORTING DOCUMENTS: *Attach copies of sup...* itemized statements of running accounts, contracts, co... DOCUMENTS. If the documents are not available, ex... Any attachment must be 8-1/2" by 11".<br><br>8. DATE-STAMPED COPY: To receive an acknowledg... envelope and copy of this proof of claim. | Filed: USBC - District of Delaware<br>Nortel Networks Inc., Et Al.<br>09-10138 (KG)     0000006673<br><br>[barcode]<br>...INAL. | THIS SPACE IS FOR<br>COURT USE ONLY<br><br>**FILED / RECEIVED**<br>JAN 1 1 2010<br>EPIQ BANKRUPTCY SOLUTIONS, LLC |
|---|---|---|

| Date<br>1-7-10 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any)<br><br>*[signature]* David P. Cohen, E.V.P. |
|---|---|

## Itemized Statement of Charges

Principal Amount of Claim:                    $496,000.00

Late Fees accrued and compounded daily based on
an annual rate of 16% (through January 5, 2010):    $40,874.96

**TOTAL: $536,874.96**

ADVERTISING AGREEMENT

DATED AS OF March 24, 2008

## BY AND BETWEEN

QUEENS BALLPARK COMPANY, L.L.C.

AND

NORTEL NETWORKS INC.

## ADVERTISING AGREEMENT

Advertising Agreement (this "Advertising Agreement") dated as of March 24, 2008 by and between Queens Ballpark Company, L.L.C., a New York limited liability company ("QBC"), and Nortel Networks Inc., a Delaware corporation ("Advertiser"). Certain capitalized terms used in this Advertising Agreement are defined in Schedule 1 annexed hereto.

### W I T N E S S E T H:

**WHEREAS,** the New York City Industrial Development Agency ("NYCIDA"), as landlord, and QBC, as tenant, have entered into a Lease Agreement dated as of August 1, 2006 (as the same may be amended, modified or otherwise supplemented from time to time, the "Stadium Lease") under which QBC subleases the real property upon which a new ballpark (the "Ballpark") is being constructed for use by the Major League Baseball Club commonly known as the New York Mets (the "Mets");

**WHEREAS,** under the Stadium Lease, QBC has the right to display and permit others to display advertising inside and outside the Ballpark and to convey certain ancillary advertising, sponsorship and promotional rights;

**WHEREAS,** QBC desires to grant Advertiser, subject to the terms and conditions of this Advertising Agreement, the right to promote certain of its products or services; and

**WHEREAS,** Advertiser desires to accept the grant of rights upon the terms and conditions hereinafter set forth;

**NOW, THEREFORE,** in consideration of the foregoing premises, the covenants, agreements, representations and warranties, and obligations hereinafter contained, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

### ARTICLE 1
### ADVERTISING RIGHTS,
### RESERVATION OF RIGHTS AND LIMITATIONS

1.01.    Grant of Rights.  Except as otherwise provided or limited in this Advertising Agreement, QBC grants to Advertiser, upon the terms and conditions set forth herein, for all Events during the Term, the right to advertise the Nortel brand of Network Systems and Services on the Advertising Signage described in Exhibit A.  The term "Network Systems and Services" shall mean the following: Converged network infrastructure, unified communications systems, applications and services, including (i) application acceleration, balancing and redirection systems; (ii) Intrusion Protection System (IPS) and Instrusion Detection System (IDS); (iii) network admission/access control services (NAC/NAS) and associated network admission/access hardware; (iv) packet-based communications equipments, including switches, routers, hubs/hub equipment, cache engines, and load balancers; (v) packet-based communications intrusion detection systems (hardware based); (vi) packet-based communications firewall systems

(hardware based); (vii) packet-based communications admission technology; (viii) packet-based communications VPN equipment and related client software and server hardware; (ix) Local Area Network-based (LAN) VoIP/SIP communications servers and terminals; (x) application integration and implementation; (xi) LAN-based wireless (WiFi) infrastructure for administration network; and (xii) Advertiser developed management tools that have been developed specifically for, and form a part of, the products listed in (i)-(xi) above. For the avoidance of doubt, Network Systems and Services shall not include telecommunication services, such as broadband, wireless and wireline services (e.g., Verizon, Sprint and AT&T). During any Non-Mets Event, the Advertising Signage and Advertising Materials may be blocked or obscured by reason of (i) the configuration of the Ballpark for such Non-Mets Event; (ii) the existence of any third-party sponsorship or related agreement involving the promoter or organizer of such Non-Mets Event; or (iii) any conflict between the nature of such Non-Mets Event and the display of the Advertising Materials. QBC shall not, in any such case described in clause (i), (ii) or (iii) above, be required to credit to the Advertiser any amounts paid by the Advertiser under this Advertising Agreement.

Section 1.02    Additional Rights, Goods and Services.    QBC shall also provide Advertiser, during the Term, the additional rights, goods and services as may be set forth in Exhibit B, including usage rights with respect to Mets Marks in promoting Nortel Network Systems and Services as set forth therein.

Section 1.03    Approvals and Limitations.    The rights granted herein are subject to the following approvals and limitations:

(a)    No license, interest or right of any kind is granted to Advertiser in the Mets Marks or any other Intellectual Property otherwise associated with the Mets or any member of the Mets Group, except as may be expressly set forth in Exhibit B. Any such rights shall be conditioned upon and subject to QBC's prior written approval as to the nature and content of each particular use, and shall be strictly limited to the Mets Home Television Territory, as such territory may be amended.

(b)    Advertiser acknowledges the proprietary nature of the Mets Marks and acknowledges that all right, title and interest thereto belong to the Mets Group.  Advertiser recognizes the great value of the publicity and goodwill associated with the Mets Marks, and acknowledges that such goodwill belongs exclusively to the Mets Group, and that the marks have acquired a strong secondary meaning in the minds of the purchasing public.

(c)    Advertiser shall also be solely responsible at its cost and expense for securing and clearing any other consents, licenses, waivers and premiums concerning any advertising content subject to this Advertising Agreement, including without limitation with respect to any third party copyrights, trademarks, service marks, publicity, or privacy rights.

(d)    The design, layout and content of all advertising copy to be displayed hereunder shall comply with all technical details and specifications required by QBC and furnished to Advertiser, and shall be subject in all respects to the prior written approval by QBC, in its sole discretion.

2

(e)   The fabrication of the Advertising Materials shall conform to the materials and other specification requirements of QBC.  QBC may at its election direct Advertiser to use only contractors designated and approved by QBC in connection with such fabrication.  All costs and expenses incurred in connection with the fabrication and installation of the Advertising Materials shall be at the sole cost and expense of Advertiser.  QBC shall be responsible for any maintenance and repair of the Advertising Signage as may be necessary, as determined by QBC in its discretion.

(f)    Except as may be expressly set forth in Exhibit B, nothing herein shall be construed to limit QBC's right to install, display, broadcast or transmit additional advertising anywhere in, upon, around, or outside of the Ballpark or the Premises, nor to entitle Advertiser to any remedy therefor.

## ARTICLE 2
## FEES, PAYMENT AND CREDITS

Section 2.01   Fees.  Advertiser shall make the payments to QBC in the amounts and upon such dates as are set forth on Exhibit C.  All such payments shall be made without notice or demand and without any set off, counterclaim, abatement or reduction whatsoever, in lawful money of the United States by check or money order drawn on a bank which clears through the New York Clearinghouse Association or the Federal Reserve Bank of New York, or by wire transfer of immediately available funds at such times as such payments are required to be made. All amounts set forth in Exhibit C are net amounts and shall not be reduced by any commission, discounts or other adjustments, unless otherwise expressly approved in writing by QBC. No payment or receipt or acceptance of a lesser amount than the correct payment due shall be deemed to be other than a payment on account, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and the recipient may accept such check or payment without prejudice to the recipient's right to recover the balance or pursue any other remedy in this Advertising Agreement or available under applicable law.  All payments to QBC shall be sent to QBC's address set forth in Exhibit D or as otherwise directed by QBC in any invoices sent to Advertiser by QBC.

Section 2.02   Credit for Missed Games; Goods and Services.  On October 31 of each year during the Term, QBC shall issue a credit to Advertiser's account with QBC for any Missed Games, such credit to be that amount determined by multiplying the Payment for Game-Related Rights for the year in question by the fraction whose numerator is the number of Missed Games and whose denominator is 73.  In addition, on December 31 of each year during the Term, if, due to any cause other than the fault of Advertiser, any portion of the Advertising Materials has not been displayed as required hereunder, or if QBC has not provided in full any of the other goods and services required to be provided by QBC in accordance with Exhibit B, QBC shall issue to Advertiser a credit for the value of such advertising rights, goods and services that were not furnished.  Advertiser acknowledges and agrees that the fault of Advertiser shall include, without limitation, the breach by Advertiser of any of its obligations under this Advertising Agreement, including, without limitation, the payment of all amounts due QBC in accordance with the terms hereof.  Advertiser further acknowledges that such additional credit shall not apply to any failure of QBC to provide any Game-Related Rights due to the cancellation of or other failure to play

any Games, the exclusive remedy for which shall be the credit for Missed Games set forth above. Any credit issued hereunder shall be in lieu of, and not in addition to, any right of Advertiser to obtain any refund or credit through the return of any tickets or access passes issued with respect to any Games, and Advertiser hereby waives any right to receive any such refund or credit notwithstanding any "rain check" or similar language as may be set forth thereon. All credits shall be applied against amounts coming due to QBC from Advertiser in respect of the next payment due from Advertiser in accordance with Exhibit C. If the credit is issued during the last year of the Term, the credit amount will be refunded by payment of a check to Advertiser in the amount of the credit.

Section 2.03   Force Majeure.   Notwithstanding anything to the contrary herein, any prevention of, or diminution or delay in, QBC's performance of its obligations hereunder resulting from acts of God or any other cause beyond the reasonable control of QBC, including, without limitation, any: requirement of the MLB Documents; rain or other weather conditions; lock-out, strike, work stoppage, picketing, damage or concerted action by any employee or any labor organization, or other labor dispute, trouble or shortage; war, terrorism, armed conflict, enemy or terrorist action, civil unrest or commotion or order of any civil authority; accidents, fire or other casualty; shortages or unavailability of fuel, steam, water, electricity or materials; threat of any of the foregoing; requirements of law or governmental preemption in connection with any of the foregoing; or any other cause or condition, whether similar or dissimilar to any of the foregoing, shall not constitute a breach or default under this Advertising Agreement, nor shall it constitute a basis for termination by Advertiser.   Advertiser's sole remedy for any such prevention, diminution or delay shall be to request a credit determined in accordance with Section 2.02 of this Advertising Agreement.

Section 2.04   Late Fees.   Any amounts payable under this Advertising Agreement that are not paid when due shall be subject to Late Fees until paid. This is in addition to all other rights and remedies available to QBC.

## ARTICLE 3
## TERM AND TERMINATION

Section 3.01   Term.   The term of this Advertising Agreement shall commence on January 1, 2008, and shall expire on December 31, 2015 (the "Term"), unless this Advertising Agreement is earlier terminated, in which case, the Term shall expire on the date of such termination.

Section 3.02   Termination.   Notwithstanding anything to the contrary in this Advertising Agreement, this Advertising Agreement may be terminated following the occurrence of any of the following events:

(a)   By QBC, if Advertiser shall fail to pay when due a payment due to QBC under this Advertising Agreement and shall not have remedied such payment default within three ten (10) business days following notice thereof.

(b)   By either party, if the other party materially breaches any of its representations and warranties, or fails to fulfill in any material way any of its covenants and

4

agreements hereunder, and shall not have remedied such breach or failure within thirty (30) days following notice thereof.

(c)     By QBC, if Advertiser files a voluntary petition in bankruptcy, or shall be adjudicated bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute or law relating to bankruptcy, insolvency or other relief for debtors, whether federal or state, or shall seek, consent to or acquiesce in the appointment of any trustee, receiver, conservator or liquidator of Advertiser or of all or any substantial part of its properties (the term "acquiesce," as used herein, being deemed to include, but not be limited to, the failure to file a petition or motion to vacate or discharge any order, judgment or decree providing for such appointment within the time specified by law); or a court of competent jurisdiction shall enter an order, judgment or decree approving a petition filed against Advertiser seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute or law relating to bankruptcy, insolvency or other relief for debtors, whether federal or state, and Advertiser shall consent to, or acquiesce in, the entry of such order, judgment or decree, or the same shall remain unvacated and unstayed for an aggregate of sixty (60) days from the date of entry thereof, or any trustee, receiver, conservator or liquidator of Advertiser, or of all or any substantial part of its properties, shall be appointed without the consent or acquiescence of Advertiser and such appointment shall remain unvacated and unstayed for an aggregate of sixty (60) days.

(d)     By Advertiser, if the Mets permanently relocate to a facility other than the Ballpark as its primary home baseball facility.

(e)     By a Lessor or Mortgagee or any other Person, in accordance with any Mortgage or Superior Lease, including in connection with any possession or foreclosure action, the delivery of a new lease or deed, or such Person's succession to any rights of QBC.

Any termination pursuant to this Section 3.02 shall be effective upon provision of written notice of such termination from the terminating party to the other party hereto.

Section 3.03    Effect of Termination.

(a)     If this Advertising Agreement expires or is terminated for any reason whatsoever, then this Advertising Agreement shall be of no further force and effect, except that (i) any right of a party hereunder to receive a payment or obligation of either party hereunder to make a payment, in each case, which has accrued on or prior to the termination or expiration of this Advertising Agreement, shall survive such termination or expiration; (ii) this Section 3.03, Section 3.04, and Articles 4, 5, 7 and 8 shall survive the termination or expiration of this Advertising Agreement; and (iii) no provision contained herein shall relieve either party from liability for any breach of this Advertising Agreement.

(b)     In the event of any termination by Advertiser in accordance with Section 3.02(b) or (d) or any termination in accordance with Section 3.02(e), (i) if such termination occurs during any Baseball Season, Advertiser shall be entitled to a refund with respect to the Payment for Game-Related Rights for the year in question, in accordance with Section 2.02,

treating any Games played during such season following such termination as if they had not been played for the purpose of calculating the number of Missed Games; and (ii) Advertiser shall be entitled to the refund of any amounts Advertiser has paid that relate to (A) advertising rights for any years subsequent to the year in which this Advertising Agreement is terminated; and (B) goods and services (other than Game-Related Rights) that were to have been provided hereunder following the date of such termination. In the event of any termination in accordance with Section 3.02(d) or (e), the payment of the amounts described in the immediately preceding sentence shall be Advertiser's sole and exclusive remedy in respect of such termination.

(c)    In the event of termination by QBC under Section 3.02(a), (b) or (c), then: all amounts due QBC hereunder, including all unpaid charges and fees set forth on Exhibit C, whether in respect of periods prior to, on or following the date of termination (including any such periods that would, but for such termination, have been within the Term), shall become due and payable within ninety (90) days from the date of termination, subject to QBC's obligation to mitigate any actual damages during the remainder of the scheduled Term.

(d)    In the event of any termination by QBC under Section 3.02(d), then: (i) all amounts due (or that would have been due) QBC hereunder in respect of (A) any periods prior to the date of termination; and (B) the remainder of the calendar year in which this Advertising Agreement is terminated shall become immediately due and payable; and (ii) Advertiser shall be entitled to the refund of any amounts Advertiser has paid that relate to advertising rights, goods and services for any years subsequent to the calendar year in which this Advertising Agreement is terminated.

Section 3.04    Cumulative Remedies; Costs and Expenses. QBC's remedies provided for in this Advertising Agreement are in addition to any other remedy allowed by law or equity. Advertiser shall be liable for all reasonable attorney's fees, costs and expenses incurred by QBC arising from any action or proceeding commenced to collect any sums owed and all collection efforts relating thereto.

## ARTICLE 4
## INDEMNITY

Section 4.01    Indemnification. Each of Advertiser and QBC (each, an "Indemnitor") shall defend, indemnify and hold harmless the other party and its affiliates (including, without limitation, each member of the Mets Group, as affiliates of QBC), and if Advertiser is the Indemnitor, each Mortgagee and Lessor, and each of the respective, direct or indirect partners, members, affiliates, principals, managers, directors, officers, stockholders, employees, contractors, licensees, invitees, servants, representatives and agents of any and all of the foregoing (all such Persons, collectively, "Indemnitees") from and against any liability to, and claims and actions by, the Indemnitor and any other Person (including, but not limited to, any employees, agents, invitees, licensees, and contractors of the Indemnitor, and patrons, fans and others in the Ballpark), for or on account of any liabilities, claims, actions, expenses, including, but not limited to, attorney's fees and costs) where such liabilities, claims, actions, or expenses are caused or incurred, in whole or in part, by any alleged or actual (i) liabilities resulting from injury or death of a person or damage or loss of property resulting from the negligence, recklessness or willful misconduct of the Indemnitor, its employees, agents, invitees, licensees,

6

contractors, representatives, or any other persons acting on its behalf; (ii) breach by the Indemnitor of any representation, warranty, or covenant, or (iii) if Advertiser is the Indemnitor, any unauthorized use of the Mets Marks, or any alleged or actual false advertising, fraud, misrepresentation, libel, slander, illegal competition or trade practice, infringement of trademarks, trade names or titles, violations of rights of privacy or infringement of copyrights or other proprietary rights resulting from or arising out of the use or display of the Advertising Materials; provided, however, that in no event shall any such indemnification pursuant to any of clauses (i), (ii) or (iii) above be for any indirect, consequential or special damages, except as provided in the sentence directly following. In the case of damage to the Premises arising out of the negligent acts or omissions of Advertiser, its agents, representatives, or invitees in connection with their use of the Premises, Advertiser's indemnification obligations under this Section 4.01 shall include (but not be limited to) any indirect, consequential, or special damages (including lost profits or lost opportunities) incurred by QBC, NYCIDA, the City or any other Indemnitees. The Indemnitor agrees, except as hereinafter provided, to reimburse each Indemnitee (A) for any legal and other expenses (including the cost of any investigation or preparation) incurred by the Indemnitee in connection with defending any third party actions or claims contemplated by the indemnification provisions set forth above; and (B) for any legal and other expenses (including the cost of any investigation or preparation) incurred by the Indemnitee in enforcing the indemnity under this Section 4.01. Each Indemnitee shall, promptly upon receipt of notice of the commencement of any third party action against such Indemnitee in respect of which indemnification or reimbursement may be sought from the Indemnitor under this Section 4.01, provide notice to the Indemnitor in writing of the commencement thereof, together with a copy of all papers served.. The Indemnitor shall be entitled to participate in and, to the extent that it shall wish, to direct the defense thereof, including the selection of counsel acceptable to the Indemnitee, at its own expense. The Indemnitee shall have the right to employ its own counsel in any such case, but the fees and expenses of such counsel shall be at the expense of the Indemnitee unless the employment of such counsel has been authorized by the Indemnitor in connection with the defense of such action or the Indemnitor shall not have timely employed counsel reasonably acceptable to the Indemnitee to direct or maintain the defense of such action, in which event the same shall be borne by the Indemnitor. In no event shall the provisions of this Section 4.01 be applied for the benefit, or be invoked against a party under any right of subrogation of a third person, including any insurance carrier of either party. No Indemnitor or Indemnitee shall enter into any settlement of a claim subject to this Section 4.01 binding any Indemnitee or Indemnitor, respectively, without its prior written consent (or, in the case of any Indemnitee that is not a party hereto, without such consent of the party in respect of which the Indemnitee derives its rights to indemnification hereunder). For the avoidance of doubt, no approval granted by QBC under any provision of this Advertising Agreement, including without limitation any approval granted pursuant to Section 1.03 of this Advertising Agreement, limits, modifies or otherwise affects any of QBC's rights under this Article 4..

Section 4.02    Survival.  The expiration or termination of this Advertising Agreement shall not affect the continuing obligations of Advertiser as an indemnitor under this Article 4.

Section 4.03    Limitation of Liability.  EXCEPT FOR CLAIMS ARISING FROM (A) EITHER PARTY'S INDEMNIFICATION OBLIGATIONS UNDER THIS AGREEMENT OR (B) LIABILITIES RESULTING FROM A PARTY'S INTENTIONAL ACTS, GROSS

NEGLIGENCE OR WILLFUL MISCONDUCT, NEITHER PARTY WILL BE LIABLE FOR ANY INDIRECT OR CONSEQUENTIAL DAMAGES OR FOR ANY LOSS OF REVENUES, LOSS OF PROFITS OR LOSS OF GOODWILL, EVEN IF THE PARTY OR ITS AUTHORIZED REPRESENTATIVE HAS BEEN ADVISED OF THE POSSIBILITY OF THE TYPE OF DAMAGES AND NOTHWITHSTANDING ANY FAILURE OF THE ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

Section 4.04   Without limiting any warranties implied by law, the liability for which cannot be excluded or limited, and notwithstanding any other provision in this Agreement, either party's total liability to the other party in tort (including negligence) or strict liability arising out of or in connection with this Agreement shall be limited to $1,000,000.

# ARTICLE 5
## SUBORDINATION

Section 5.01   Subordination and Attornment.

(a)   This Advertising Agreement and Advertiser's rights hereunder are subject and subordinate to all Mortgages and Superior Leases, and all such rights are derived from Superior Leases.

(b)   If a Lessor or Mortgagee or any other Person shall succeed to the rights of QBC under this Advertising Agreement, whether through possession or foreclosure action, or the delivery of a new lease or deed, then at the request of the successor to QBC and upon such successor to QBC's written agreement to accept Advertiser's attornment and to recognize Advertiser's interest under this Advertising Agreement, Advertiser shall be deemed to have attorned to and recognized such successor to QBC under this Advertising Agreement.  The provisions of this Article 5 are self-operative and require no further instruments to give effect hereto; provided, however, that Advertiser shall promptly execute and deliver any instrument that such successor to QBC may reasonably request evidencing such attornment.  Subject to the foregoing, upon such attornment, this Advertising Agreement shall continue in full force and effect as a direct agreement between such successor to QBC and Advertiser upon all of the terms, conditions and covenants set forth in this Advertising Agreement.

(c)   Major League Baseball Subservience.

(i)   This Advertising Agreement and the rights, exclusivities and protections granted by QBC to Advertiser hereunder shall, at the request of the Office of the Commissioner of Baseball, be subject to its review and prior written approval, and shall in all respects be subordinate to, and shall not prevent the issuance, entering into, or amendment of, any of the following, each as may be issued, entered into or amended from time to time (collectively, the "MLB Documents"):  (i) any present or future agreements or arrangements regarding the telecast, broadcast, recording (audio or visual), or other transmission or retransmission (including, but not limited to, transmission via the Internet or any other medium of interactive communication, now known or hereafter developed) of Major League Baseball games, and/or the accounts and descriptions thereof, entered into with third parties by any of the Office of the Commissioner of

Baseball, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., Major League Baseball Properties Canada Inc., MLB Advanced Media, L.P., MLB Advanced Media, Inc. ("MLBAM"), MLB Media Holdings, Inc., MLB Media Holdings, L.P., MLB Online Services, Inc., and/or any of their respective present or future affiliates, assigns or successors (collectively, the "MLB Entities"), either on its own behalf or on behalf of the Major League Baseball Clubs and/or other MLB Entities; (ii) any other present or future agreements or arrangements entered into with third parties by, or on behalf of, any of the MLB Entities, including, without limitation, those relating to ticketing, e-commerce, and/or the exploitation of intellectual property rights in any medium, including the Internet or any other medium of interactive communication; (iii) any present or future agreements or arrangements entered into by QBC or SMLP with the other Major League Baseball Clubs and/or one or more of the MLB Entities (including, without limitation, the Major League Constitution, the Basic Agreement between the Major League Baseball Clubs and the Major League Baseball Players Association, the Professional Baseball Agreement, the Major League Rules, the Interactive Media Rights Agreement, and each agency agreement and operating guidelines among the Major League Baseball Clubs and an MLB Entity); and (iv) the applicable rules, regulations, policies, bulletins or directives issued or adopted either by the Commissioner or otherwise pursuant to the Major League Constitution or any such agency agreement.

(ii)    The territory within which Advertiser is granted rights hereunder cannot extend beyond the Home Television Territory of the Mets, as established and amended from time to time pursuant to the MLB Documents. Nothing herein shall be construed as conferring on Advertiser rights in areas outside of the Mets' Home Television Territory.

(iii)    Without limitation as to any other rights of QBC hereunder, QBC shall have the right, at no cost or liability to it or any other Major League Baseball Club or MLB Entity, to terminate this Advertising Agreement at any time Advertiser breaches its obligations under Section 5.01(c)(i) or Section 5.01(c)(ii). The right to terminate shall be exercisable by delivering written notice to Advertiser within thirty (30) days after QBC obtains actual knowledge that such breach or retransmission has occurred and the effective date of such termination shall be no more than thirty (30) days after the date such notice is given, as specified by QBC in such notice.

(iv)    Any right or obligation in this Advertising Agreement involving "Interactive Media," must be approved in writing by MLBAM prior to QBC's execution of this Advertising Agreement. For purposes of this provision, "Interactive Media" shall mean (i) the Internet or any other on-line system or computer network; (ii) any interactive wireless service, including any interactive microwave or cellular service; (iii) any interactive satellite service; (iv) any interactive broadcast television, broadcast radio or cable television service; and (v) any other medium of interactive communication now known or hereafter devised.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES

Section 6.01  Advertiser Representations and Warranties.    Advertiser represents, warrants and covenants to QBC as follows:

(a)    Advertiser is a corporation duly organized and existing and in good standing under the laws of its State of incorporation, set forth above, and has the power to own its properties and to carry on its business as now being conducted and as proposed to be conducted.

(b)    Advertiser has full power, authority and legal right to execute, deliver and perform this Advertising Agreement, and the execution, delivery and performance by Advertiser of this Advertising Agreement have been duly authorized by all necessary action on the part of Advertiser and do not require the approval or consent of any person or other entity (whether governmental or otherwise).

(c)    The execution, delivery and performance by Advertiser of this Advertising Agreement (i) will not violate any provision of the governing instruments of Advertiser and (ii) will not violate any provision of, conflict with, constitute a default under or result in the creation of or imposition of any lien on any of the assets of Advertiser pursuant to the provisions of any currently effective mortgage, indenture, contract, agreement or other undertaking to which Advertiser is a party.

(d)    This Advertising Agreement is the valid and binding obligation of Advertiser, enforceable against it in accordance with the terms and conditions hereof, subject, as to enforcement of remedies, to applicable bankruptcy, insolvency, reorganization, moratorium and other laws affecting the rights of creditors generally and the discretion of courts in granting equitable remedies.

Section 6.02  QBC Representations and Warranties.   QBC represents, warrants and covenants to Advertiser as follows:

(a)    QBC is a limited liability company duly organized and existing and in good standing under the laws of the State of New York, and has the power to own its properties and to carry on its business as now being conducted and as proposed to be conducted.

(b)    QBC has full power, authority and legal right to execute, deliver and perform this Advertising Agreement, and the execution, delivery and performance by QBC of this Advertising Agreement have been duly authorized by all necessary action on the part of QBC and do not require the approval or consent of any person or other entity (whether governmental or otherwise).

(c)    The execution, delivery and performance by QBC of this Advertising Agreement (i) will not violate any provision of the governing instruments of QBC and (ii) will not violate any provision of, conflict with, constitute a default under or result in the creation of or imposition of any lien on any of the assets of QBC pursuant to the provisions of any currently effective mortgage, indenture, contract, agreement or other undertaking to which QBC is a party.

(d)    This Advertising Agreement is the valid and binding obligation of QBC, enforceable against it in accordance with the terms and conditions hereof, subject, as to enforcement of remedies, to applicable bankruptcy, insolvency, reorganization, moratorium and other laws affecting the rights of creditors generally and the discretion of courts in granting equitable remedies.

## ARTICLE 7
## INSURANCE

Section 7.01    Types of Coverages.    At all times during the Term of this Advertising Agreement, each of the parties hereto shall, at its sole cost and expense, maintain the insurance provided for in this Section 7.01 underwritten by insurance companies whose policies are valid in the State of New York and rated A10 or better by the Best's Insurance Reports at the inception of the policy, which insurance shall be of the following types:

(a)    Advertiser shall maintain Statutory Workers' Compensation insurance and New York State Disability Benefits insurance in statutorily required amounts, and Employer's Liability Insurance with a limit of liability of no less than One Million Dollars ($1,000,000) per accident or disease and Five Million Dollars ($5,000,000) aggregate by disease, covering any persons employed by such party in connection with the fabrication of the Advertising Materials or the administration of any in-stadium elements of this Advertising Agreement.

(b)    Advertiser shall maintain Commercial General Liability insurance and property damage insurance with a limit of no less than Five Million Dollars ($5,000,000) per occurrence and Five Million Dollars ($5,000,000) in the aggregate for personal injury, property damage or death, covering incidents that may occur at the Ballpark as a result of Advertiser's advertising or any obligations of Advertiser hereunder including but not limited to blanket contractual liability coverage, including contractual liability covering Advertiser's indemnification obligations under this Advertising Agreement and any use of or access to the Ballpark permitted hereunder by Advertiser or any of its directors, officers, employees, servants, agents, invitees or guests.

(c)    QBC shall maintain Commercial General Liability insurance with a limit of no less than Five Million Dollars ($5,000,000) per occurrence and Five Million Dollars ($5,000,000) in the aggregate for personal injury, property damage or death covering incidents that may occur at the Ballpark as a result of QBC's obligations hereunder, naming Advertiser as an insured party.

(d)    Advertiser shall maintain Advertising Injury and Media Liability insurance with a combined limit of no less than Five Million Dollars ($5,000,000), providing coverage for damages arising out of acts, errors, or omissions of Advertiser, including libel/slander, harm to character, reputation or feelings, product disparagement, any infringement or misappropriation of trademark, copyright, patent, trade secret, image, trade dress, logo, slogan or other proprietary or confidential information or property rights, any invasion or infringement of, or interference with, the right of privacy or publicity, plagiarism, false advertising, unfair competition, and any misstatement or misleading statement, relating to Advertiser's advertising obligations hereunder, or otherwise.

11

Section 7.02 . Additional Requirements.

(a)    All liability policies required to be maintained, and all insurance certificates required to be provided, under this Article 7 in favor of QBC shall name QBC, SMLP, NYCIDA and the City as additional insureds with respect to the operation of Advertiser under this Agreement. All insurance provided by Advertiser shall be primary and any insurance maintained by QBC shall be excess and not contributing with Advertiser's insurance. Advertiser shall arrange with its insurance companies if necessary to endorse its insurance policies accordingly.

(b)    All policies to be maintained for the benefit of either party hereto shall have commercially reasonable deductibles and shall be written so that insurers shall endeavor to notify such party of cancellation at least thirty (30) days prior to the effective date of such cancellation.

(c)    Certificates of insurance evidencing the insurance to be maintained hereunder by Advertiser shall be provided on or before March 1, 2009 The certificates must specifically refer to inclusion of the other party (and others as required by this Article 7) as additional insureds. Upon QBC's request, Advertiser shall deliver to QBC upon renewal of, and with respect to, an insurance policy required hereunder a certificate confirming that all such policies are in effect and in compliance with the provisions hereof. In the event of a request in accordance with the previous sentence, Advertiser shall use reasonable efforts to cause an insurance broker(s) to issue such a certificate(s) and, if such a certificate(s) is not provided by an insurance broker(s), Advertiser shall provide such a certificate from an officer of Advertiser; provided that such officer shall have no liability to QBC or otherwise relating to any such certificate.

(d)    Neither party shall violate, or permit to be violated, any conditions of any of said policies maintained by it, and shall at all times perform and satisfy or cause to be performed and satisfied the conditions, provisions and requirements of the policies.

Section 7.03    Intentionally Omitted.

Section 7.04    Additional Remedy.    Upon Advertiser's failure to provide any insurance as required by this Advertising Agreement, QBC may, in addition to all other remedies available, at its option obtain such insurance and bill the cost thereof directly to Advertiser.


## ARTICLE 8
## MISCELLANEOUS

Section 8.01    Delivery.    This Advertising Agreement shall not be binding upon QBC unless and until QBC shall have executed and delivered a fully executed copy of this Advertising Agreement to Advertiser.

Section 8.02    Expenses.    Each of the parties hereto shall be solely responsible for and shall bear all expenses, other than those as to which such party is entitled to indemnification

hereunder, which it incurs in connection with the negotiation, execution and delivery of this Advertising Agreement.

Section 8.03    Notices. All notices, requests, claims, demands and other communications must be in writing and shall be duly given on the date of delivery, if transmitted by a nationally recognized courier service or by facsimile to the applicable facsimile number set forth below (provided a copy of such facsimile is also sent at the time of such facsimile transmission to the recipient by any other means permitted hereunder), so as to be received during the hours of 8:00 AM to 5:00 PM, Monday through Friday, or on the date of receipt, if mailed to the Person to whom notice is to be given by certified or registered mail, postage prepaid, and properly addressed to the addresses set forth on Exhibit D or such other address as may be set forth in written notice of change of address transmitted in the manner set forth in this Section 8.03.

Section 8.04    Jurisdiction. Each party hereto irrevocably agrees that any legal action, suit or proceeding against them arising out of or in connection with this Advertising Agreement or the transactions contemplated hereby or disputes relating hereto (whether for breach of contract, tortious conduct or otherwise) shall be brought exclusively in the United States District Court for the Southern District of New York, or, if such court does not have subject matter jurisdiction, the state courts of New York located in Queens County and hereby irrevocably accepts and submits to the exclusive jurisdiction and venue of the aforesaid courts in personam, with respect to any such action, suit or proceeding, and waives any claim that such forum is inconvenient or any similar claim.

Section 8.05    Service of Process. Each of the parties hereto hereby acknowledges and confirms that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth in Section 8.03 shall be effective service of process for any action, suit or proceeding in New York with respect to any matters for which it has submitted to jurisdiction pursuant to Section 8.04.

Section 8.06    Intentionally Omitted.

Section 8.07    Relationship of the Parties. It is understood and agreed that QBC and Advertiser are independent contractors, and nothing contained in this Advertising Agreement, nor any act of the parties, shall be deemed or construed to create the relationship of principal and agent, partnership or joint venture between QBC and Advertiser. Neither party hereto shall hold self out to be anything other than an independent contractor, and neither party hereto shall incur or purport to incur liability on behalf of the other.

Section 8.08    Entire Agreement; Written Modification. This Advertising Agreement (together with the Schedules and Exhibits) contains the entire agreement of the parties, and there are no other terms, conditions, promises, understandings, statements or representations, express or implied, concerning this transaction. No party is relying upon any other oral or written statements or representations of the other party that are not expressly set forth in this Advertising Agreement. None of the terms of this Advertising Agreement shall be waived, discharged, altered or modified in any respect, except by an agreement in writing signed by both parties and specifically referring to this Advertising Agreement.

13

Section 8.09   Disclaimer.   In no event shall the Mets Group be liable for, and Advertiser hereby waives any claim for, any indirect, consequential or punitive damages, including loss of profits or business opportunity, arising under or in connection with this Advertising Agreement.

Section 8.10   Confidentiality.   This Advertising Agreement constitutes and contains confidential and proprietary information of QBC (and other members of the Mets Group and their affiliates) and Advertiser. Neither party hereto shall disclose any of the terms or provisions herein contained to any other Person without the prior written consent of the other party; provided that (i) either party may make such disclosure, as and to the extent that such disclosure is required by law (in which case the disclosing party shall give notice to the other party, if permitted by law); (ii) QBC may disclose to a prospective advertiser the pricing terms set forth in Exhibit A; and (iii) neither party shall be prohibited or restricted from making such disclosure (A) in order to protect its rights and enforce its remedies hereunder; (B) to any MLB Entity or as required pursuant to any MLB Document; or (C) to its affiliates (including in the case of QBC, any member of the Mets Group) or, in the case of QBC, any Mets Financing Party, or the respective counsel, accountants, representatives, advisors or consultants of any of the foregoing; provided that, in each case described in this clause (C), the Persons to whom disclosure is made shall be advised of the confidential nature of this Advertising Agreement, and the disclosing party shall be responsible for their compliance with these provisions. QBC and Advertiser shall cooperate jointly on any publicity related to the transaction contemplated by this Advertising Agreement.

Section 8.11   Severability.   If any term or provision of this Advertising Agreement or the application thereof to any Person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Advertising Agreement, or the application of such term or provision to Persons or circumstances other than those held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Advertising Agreement shall be valid and be enforced to the fullest extent permitted by law.

Section 8.12   Assignment.   This Advertising Agreement shall be binding upon the parties hereto and their respective legal representatives, successors and assigns. QBC may freely assign the Advertising Agreement and all or any portion of its entitlements, rights and obligations hereunder at any time and from time to time. Neither this Advertising Agreement nor any of the entitlements, rights and obligations of Advertiser may be assigned, mortgaged, pledged, encumbered or otherwise transferred (in fact, by operation of law or otherwise), in each case, without the prior written consent of QBC, which consent may be withheld by QBC in its sole discretion, except as provided in the sentence immediately following. If an Advertiser Change of Control occurs, QBC shall have the option to terminate this agreement by providing written notice of such election to Advertiser, which termination shall be effective on the date set forth in such notice, unless, prior to the occurrence of such Advertiser Change of Control, Advertiser obtained QBC's consent with respect to such transaction (which consent shall not be unreasonably withheld by QBC). Termination of the Agreement shall be QBC's sole remedy for an Advertiser Change of Control absent the consent of QBC, and such Advertiser Change of Control shall not constitute a breach of this Agreement, nor shall it give rise to the acceleration of any amounts due hereunder.

Section 8.13    Governing Law.    This Advertising Agreement shall be governed by, construed and enforced in accordance with, the laws of the State of New York without regard to principles of conflicts of law.

Section 8.14    No Waiver.    No provision of this Advertising Agreement shall be deemed to have been waived by either party unless such waiver is in writing and is signed by the party against whom such waiver is asserted, and any such waiver shall be effective only for the specific purpose and in the specific instance in which given.    The failure of either party to seek redress for violation of, or to insist upon the strict performance of, any covenant or condition of this Advertising Agreement, shall not be construed as a waiver or relinquishment for the future performance of such obligations of this Advertising Agreement or of the right to exercise such election but the same shall continue and remain in full force and effect with respect to any subsequent breach, act or omission.

Section 8.15    Captions.    The captions in this Advertising Agreement are included for convenience only and shall not be taken into consideration in any construction or interpretation of this Advertising Agreement or any of its provisions.

Section 8.16    Bankruptcy.    In the event that, pursuant to the United States Bankruptcy Code, a trustee of Advertiser (hereinafter referred to as the "Trustee") or Advertiser as debtor-in-possession is permitted to assume this Advertising Agreement and does so and, thereafter, desires to assign this Advertising Agreement to a third party, which assignment satisfies the requirements of the Bankruptcy Code, the Trustee or Advertiser, as the case may be, shall notify QBC of the terms of such proposed assignment in writing.    The giving of such notice shall be deemed to constitute an offer to QBC (notwithstanding any subsequent higher or better offers) to have this Advertising Agreement assigned to it or to its designee for such consideration (or, if such consideration does not consist of money or an obligation to pay money, its equivalent in money), and upon such terms, as are specified in the notice.    The aforesaid offer may be accepted only by written notice given to the Trustee or Advertiser, as the case may be, by such other party within 15 days of the receipt of such notice.    If QBC fails to give its notice within such 15-day period, the Trustee or Advertiser, as the case may be, may complete the assignment referred to in its notice, but only if such assignment is to the entity named in the notice and for the consideration and upon the terms specified therein.    Nothing contained herein shall be deemed to preclude or impair any rights which such other party may have as a creditor in any proceeding.

Section 8.17    Counterparts and Exhibits.    This Advertising Agreement may be executed in counterparts, each of which shall be deemed an original and both of which, when taken together, shall constitute one and the same agreement.

Section 8.18    Certain Rules of Interpretation.    For purposes of this Advertising Agreement, whenever the words "include", "includes", or "including" are used, they shall be deemed to be followed by the words "without limitation", and, whenever the circumstances or the context requires, the singular shall be construed as the plural, the masculine shall be construed as the feminine and/or the neuter and vice versa.    This Advertising Agreement shall be interpreted and enforced without the aid of any canon, custom or rule of law requiring or

suggesting construction against the party drafting or causing the drafting of the provision in question.

[THE NEXT PAGE IS THE SIGNATURE PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Advertising Agreement to be duly executed as of the date and year first above written.

QUEENS BALLPARK COMPANY, L.L.C.

By: _____

Name: Thomas O'Brien Murphy

Title: SVP of Sponsorship

NORTEL NETWORKS INC.

By: _____

Name: Scott Wolfe

Title: SR Contracts Mgr.

## SCHEDULE 1
## DEFINITIONS

"Advertiser Change of Control" means (i) the sale of all or substantially all of Advertiser's assets; (ii) the sale or transfer of a majority of the equity interests of Advertiser; (iii) the merger or consolidation of Advertiser with or into another entity, or other transaction involving Advertiser or any Person which directly or indirectly controls Advertiser, if as a result thereof the direct or indirect holders of a majority in voting power of Advertiser, immediately prior to such transaction, own less than a majority in voting power of Advertiser or the surviving or resulting entity, as the case may be, immediately following such transaction; (iv) the liquidation, dissolution, winding up or termination of Advertiser; or (v) a change in at least a majority of the members of Advertiser's board of directors in connection with a transaction or series of related transactions.

"Advertising Materials" means Advertiser's advertising copy, materials and displays, including any corporate names, logos and identifiers, furnished by or on behalf of Advertiser pursuant to this Advertising Agreement.

"Advertising Signage" means the structures on which the Advertising Materials are displayed as described in Exhibit A.

"Baseball Season" means the period of time each year commencing on the date of the first Regular Season Game and continuing to and including the date of the last Regular Season Game during such year.

"City" means the City of New York, and, its various departments, agencies, bureaus and other subdivisions and the officials thereof.

"Events" means Mets Events and Non-Mets Events.

"Game" means each New York Mets Regular Season Game and each New York Mets Post-Season Game played in the Ballpark during the Term.

"Game-Related Rights" means the rights, goods and services (including, without limitation, tickets and use of luxury suites) that are to be provided either (a) during all Events, (b) during all Mets Events, (c) during all Games, (d) during each New York Mets Regular Season Game played in the Ballpark, or (e) during each New York Mets Regular Season Game played in the Ballpark other than those that are televised by national networks pursuant to a grant of rights by any of the MLB Entities.

"Governmental Authority (Authorities)" means the United States of America, the City, County or State of New York or any political subdivision, agency, department, legislative body, commission, board, bureau or instrumentality of any of the foregoing, or any landmarks preservation agency (or other entity designated or accepted for such purpose by any landmarks preservation commission or art commission), now existing or hereafter created, having jurisdiction over the Ballpark or any portion thereof, or any street, road, avenue, sidewalk or water immediately adjacent to the Ballpark or any vault in or under the Ballpark.

18

"Intellectual Property" means all names, symbols, seals, emblems, logos, insignia, trademarks, trademark applications, trade names, service marks, trade styles, domain names, brands, copyrights, patents and other intellectual property rights (including, without limitation, all derivatives, associated designs, registrations or applications with respect to any of the foregoing).

"Late Fees" means the charge assessed with respect to any payments due after the date specified in this Advertising Agreement. Late Fees shall accrue and compound daily based on an annual rate equal to the lesser of (i) sixteen percent (16%); and (ii) the maximum rate permitted by applicable law.

"Lessor" means a lessor under a Superior Lease, including, but not limited to NYCIDA.

"Major League Baseball Clubs" means professional baseball clubs that are member clubs of Major League Baseball (one of which is the New York Mets).

"Mets Events" means all Games, any exhibition games participated in by the New York Mets, and any practices or workouts of the New York Mets during the Term at the Ballpark, in each case as to which admission is made available to members of the general public.

"Mets Financing Party" means any (i) owner of shares, membership or partnership interests or any other equity interests in SMLP, QBC or any of their controlled affiliates; (ii) lender or other Person that is providing financing to any member of the Mets Group or any Person described in clause (i) above; or (iii) Person that is actually pursuing or is contemplating pursuing a transaction, which, if consummated, would result in such Person's (A) becoming a Person described in clause (i) or (ii) above; or (B) acquiring a substantial portion of the assets of SMLP, QBC or any of their respective controlled affiliates.

"Mets Home Television Territory" means the territory shown on Exhibit E of this Advertising Agreement, as such territory may be amended pursuant to the MLB Documents from time to time.

"Mets Group" means SMLP, QBC and their respective affiliates.

"Mets Marks" means all Intellectual Property of QBC, SMLP, the Mets or any other member of the Mets Group.

"Missed Games" means, during each Baseball Season, the amount, if any, by which 73 exceeds the number of Games.

"Mortgage" means any mortgage, trust indenture or other financing document which exists with respect to the Ballpark and the leasehold interest created thereby.

"Mortgagee" means any mortgagee, trustee or other holder of a Mortgage.

"Non-Mets Events" means all events held during the Term at the Ballpark, other than Mets Events, as to which admission is made available to members of the general public.

For the avoidance of doubt, Non-Mets Events shall not include, among other things, private events, business meetings, conventions and seminars or corporate holiday parties and other corporate outings at the Ballpark.

"Office of the Commissioner of Baseball" means the Office of the Commissioner of Baseball, which office governs an unincorporated association with members consisting of Major League Baseball clubs currently organized into the following two (2) leagues: National League and American League.

"Opening Day" of any Baseball Season means the date of the first (1st) Regular Season Game during such Baseball Season.

"Payment for Game-Related Rights" means the portion of the payment made by Advertiser in accordance with Exhibit C to this Advertising Agreement that is made in consideration for Game-Related Rights.

"Person" means an individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, business trust, tenancy-in common or other entity, or any Governmental Authority.

"Post-Season Games" means the Major League Baseball games played following the conclusion of the last Regular Season game in a playoff format culminating with the World Series of Major League Baseball.

"Premises" means the Ballpark and its contiguous plazas and parking lots.

"Primary Site Ground Lease" means that certain ground lease dated as of August 1, 2006 between the City, as lessor, and NYCIDA, as lessee, for certain tracts or parcels of land located in the Borough and County of Queens and City of New York, which are more particularly bounded and described in the Primary Site Ground Lease.

"Regular Season Games" means the Major League Baseball games (including, if applicable, one or more "tie-breaker" games played for the purpose of determining eligibility for Post-Season Games) participated in to determine the Major League Baseball Clubs that will participate in Post-Season Games.

"SMLP" means Sterling Mets, L.P., a Delaware limited partnership.

"Superior Lease" means any existing ground or underlying lease of the Ballpark or any part thereof including, but not limited to, the Stadium Lease and the Primary Site Ground Lease, as the same may be amended or extended.

## EXHIBIT A

### ADVERTISING SIGNAGE

Advertiser's Advertising Signage in the Ballpark during the Term of this Agreement shall consist of the following:

• Two 4' x 160' LED signs on the press level facade at the Ballpark, one located along the first base side, and the other located along the third base side. Advertiser's advertisements will be displayed on the LED signs for one half-inning during each Mets Regular Season Game. Advertiser will produce its logo animations, at its sole expense.

**EXHIBIT B**

**OTHER RIGHTS, GOODS AND SERVICES**

QBC shall provide Advertiser with the following additional rights, goods and services each year during the Term, as specified below, at no additional cost:

• During the 2008 season only, any and all Network Systems and Services displayed in the Preview Center at Shea Stadium will be Nortel-branded products, provided that all applications and technology shall be subject to the approval of QBC.

• Commencing on January 1, 2009 (unless otherwise indicated) and continuing through December 31, 2015, Advertiser will receive the following rights, goods and services:

1. Commencing on Opening Day of the 2009 Baseball Season, any and all Network Systems and Services displayed in the Business Center at the Ballpark will be Nortel-branded products,, provided that all applications and technology shall be subject to the approval of QBC.

2. If QBC and/or SMLP seek to purchase Network Systems and Services for use at the Ballpark, Advertiser will have the preferential opportunity to provide such Network Systems and Services, subject to satisfaction by QBC and SMLP of quality, service, timeliness, price, and other terms and conditions (all of which shall be set forth in appropriate purchase agreements). QBC and/or SMLP may purchase such Network Systems and Services directly through Advertiser or indirectly through Advertiser's distributor.

3. Subject to the conditions listed in <u>Section 1.03</u> herein, the right for Advertiser to depict the name, logos, mascot image and uniform of the Mets, and to use the designation "Official Converged Network/Unified Communications Systems, Applications and Services Partner of the Mets," in print material and radio and television advertisements, promoting Nortel Network Systems and Services.

4. QBC will not grant to any party other than Advertiser the right to:

(a) use the Mets name or logo in advertising or promoting Network Systems and Services within the Mets Home Television Territory;

(b) advertise, sell or promote Network Systems and Services in the Ballpark.

5. QBC and Advertiser shall cooperate to develop a mutually agreed upon Mets promotion, promoting Nortel Network Systems and Services in conjunction with third party Nortel retailers within the Mets Home Television Territory, subject to QBC's right to approve the third party retailers and all materials relating to the promotion.

6. Sponsorship by Nortel of one 60-second mutually agreed upon feature that will run on the Ballpark video scoreboard once prior to each Mets Regular Season Game. QBC will produce the feature.

**EXHIBIT B**

7. The right to advertise Nortel Network Systems and Services in one full page, four-color, print advertisement in each annual edition of the Mets Yearbook and each regular season edition of the Mets in-stadium program.

8. Use of Empire level luxury suite number 214 at the Ballpark during each Event, including twenty-one tickets or passes to the suite, and four parking spaces in a reserved parking area designated by QBC, for each Mets Regular Season Game. Use of the suite for Events other than Mets Regular Season Games shall be conditioned upon Advertiser purchasing tickets or passes at the applicable face value for each such Event, and for compliance with the terms set forth in Exhibit F and all usage and access rules issued by QBC that are generally applicable to Ballpark suite holders. Food and beverages will be at the expense of Advertiser.

9. Four (4) premium field level tickets to each Mets Regular Season Game at the Ballpark (and the opportunity to purchase the same seats for any Mets Post Season Game at the Ballpark, at the applicable face value). Such rights shall be limited to the Term hereof, and are not subject to renewal.

10. The opportunity to purchase ten (10) tickets, subject to availability, to each Non-Mets Event at the Ballpark, at the face value of such tickets, to the extent QBC or its affiliates control the sale of such tickets.

11. The opportunity each year for four (4) adults, designated by Advertiser, to attend a Mets Spring Training trip, provided that QBC or its affiliates conduct such a trip for its corporate sponsors. QBC will provide hotel accommodations, round-trip airfare, and game tickets.

12. The opportunity for four (4) adults, designated by Advertiser, to attend each Mets hospitality function that is generally open to corporate sponsors of QBC, Citi Field or the Mets (e.g., Welcome Home Dinner and Partner Road Trips).

13. Use of conference facilities at the Ballpark and Tradition Field on one mutually agreed upon non-game date per facility.

14. If any member of the Mets Group pursues any sports-, media- or entertainment-related international development or expansion venture during the Term, and such venture includes sponsorship opportunities in the Network Systems and Services Category that are within the control of the Mets Group, QBC shall (or will cause its applicable affiliate to) offer Advertiser the preferential (relative to any other provider in the category) opportunity to participate in such sponsorship opportunities on mutually agreed upon terms.

Except as expressly provided herein, none of the tickets or suites provided to Advertiser hereunder may be used for any contest or promotion without the prior written approval of QBC.

## EXHIBIT C

### FEES

Advertiser shall pay QBC the following sum(s), according to the following terms:

Each annual payment shall be due and payable in two equal installments on or before January 1 and July 1 of each respective year.

- <u>2009</u>: One Million Dollars ($1,000,000).

- <u>2010</u>: One Million Forty Thousand Dollars ($1,040,000).

- <u>2011</u>: One Million Eighty One Thousand Six Hundred Dollars ($1,081,600).

- <u>2012</u>: One Million One Hundred Twenty Four Thousand Eight Hundred Sixty Four Dollars ($1,124,864).

- <u>2013</u>: One Million One Hundred Sixty Nine Thousand Eight Hundred Fifty Eight Dollars and Fifty Cents ($1,169,858.50).

- <u>2014</u>: One Million Two Hundred Sixteen Thousand Six Hundred Fifty Two Dollars and Eighty Cents ($1,216,652.80).

- <u>2015</u>: One Million Two Hundred Sixty Five Thousand Three Hundred Eighteen Dollars and Ninety Cents ($1,265,318.90).

## EXHIBIT D

## NOTICES

If to QBC:                  Queens Ballpark Company, L.L.C.
                           123-01 Roosevelt Ave.
                           Flushing, New York  11368
                           Attn:  Senior Vice President of Corporate Sales & Services

With copies to:            Queens Ballpark Company, L.L.C.
                           123-01 Roosevelt Ave.
                           Flushing, New York 11368
                           Attn:  General Counsel

If to Advertiser:          Nortel Networks Inc.
                           2380 Performance Dr.
                           Richardson, TX  75083
                           Attn:  General Counsel

With copies to:            Nortel Networks Inc.
                           3500 Carling Ave.
                           m/s 043/52/F12
                           Ottawa, Ontario
                           K2H 8E9, Canada
                           Attn: Senior Counsel, Procurement

## EXHIBIT E

### METS HOME TELEVISION TERRITORY

State of New York

State of Connecticut

State of New Jersey, <u>except</u> for the following counties:

| | |
|---|---|
| Atlantic | Gloucester |
| Burlington | Mercer |
| Camden | Salem |
| Cape May | Cumberland |

The following counties in the State of Pennsylvania:

| | |
|---|---|
| Carbon | Pike |
| Columbia | Schuylkill |
| Lackawanna | Snyder |
| Luzerne | Sullivan |
| Lycoming | Susquehanna |
| Montour | Union |
| Northumberland | Wayne |
| Monroe | Wyoming |

### EXHIBIT F

## TERMS AND CONDITION OF USE OF CITI FIELD
## LUXURY SUITE

### 1. Use of Luxury Suite

(a)  Licensor grants to Licensee during the Term a revocable license to access and use the twenty-one (21)-seat suite designated by Licensor as No. 214 on the Empire level in the Ballpark (the "Suite"), for Licensee's exclusive use for Licensed Events (as defined below) during the Term, except as otherwise expressly provided herein. (The twenty-one (21)-seat suite contains 16 fixed seats and 5 barstools.)  Licensee acknowledges and agrees that this Agreement permits Licensee to access and use the Suite only for Required Events and, as are selected by Licensee in accordance with the terms and conditions of this Agreement, for Optional Events (collectively, "Selected Optional Events").  Required Events and Selected Optional Events are hereinafter collectively referred to as "Licensed Events."  For all Licensed Events, Licensee may access and use the Suite for the duration of each such event, commencing with the opening of the Ballpark gates to members of the public holding tickets for that event, as determined by the Licensor in its discretion, and terminating upon the conclusion of such Licensed Event.  Licensee's right to access and use the Suite for each Licensed Event shall be subject to and conditioned upon presentation by each attendee of a valid ticket/access pass for each such Licensed Event, which tickets/access passes shall be obtained as provided herein.  Licensee acknowledges that its rights of access to and use of the Suite for any Licensed Event derive from the Advertising Agreement to which this Exhibit is appended (and "Advertising Agreement" shall refer to such agreement) and that although the presentation of tickets or access passes for any such Licensed Event is a necessary condition to such right of access and use, such presentation of tickets/access passes shall not entitle the holders thereof to obtain access to and use of the Suite or entry to the Ballpark if Licensee's rights of access and use of the Suite pursuant to the Advertising Agreement shall have been suspended or terminated.

(b)  Licensor shall notify Licensee of upcoming Optional Events and Licensee shall, subject to Section 2 below, have the option (the "Optional Events Option"), to access and use the Suite for such Optional Events, subject to and conditioned upon its purchase of twenty-one tickets/access passes and payment therefor.  Any additional terms, conditions, and provisions applicable to Optional Events will be contained in the notice.  With respect to Mets Post-Season Games that may be played at the Ballpark, Licensee shall have a single Optional Events Option with respect to all such potential games for the Baseball Season in question, and the valid exercise of such option shall be subject to and conditioned upon purchase by the Licensee of twenty-one tickets/access passes for every potential Mets Post-Season Game during the Baseball Season in question and timely payment therefor.  If Licensee does not duly exercise its Optional Events Option with respect to any such Optional Event, Licensor may, in its sole option and without any credit, refund or other payment or compensation to Licensee, permit others to access and use the Suite for each such Optional Event.  Access to and use of the Suite for Selected Optional Events may also be subject to such additional terms and conditions of general applicability as may be established from time to time by any Event Operator for Optional Events.

2. Optional Events  Licensee acknowledges that an Event Operator and not the Licensor may control the terms and conditions pursuant to which the Suite may be accessed and used for certain Optional Events.  Licensee further acknowledges and agrees that Licensor shall not be responsible for any breach or failure on the part of any Event Operator with respect to any such Optional Event and under no circumstance shall any such breach or failure result in any liability on the part of Licensor or entitle Licensee to any credits, refunds or rebates of fees paid pursuant to Exhibit C of the Advertising Agreement or any other benefits.

3. Event Times and Changes.  The time and dates for all Required Events and Optional Events are subject to change and no such change shall result in any credit, refund or other payment to Licensee.  The Mets team roster and opponents are also subject to change without notice.

4. Reservation.  Licensee acknowledges that Licensor is retaining all rights of access to and use of the Suite in respect of all uses and functions that do not constitute Licensed Events and Licensor has the right to use, and permit third parties to access and use, the Suite for all other uses and purposes and any such use or grant of rights to any third parties shall not result in any credit, refund or other right of payment or compensation to Licensee.  Licensee shall comply with Licensor's reasonable requests to accommodate any such third party's use of the Suite.

5. Inconvenience.  No compensation shall be made to or claimed by Licensee by reason of any inconvenience or annoyance arising from the construction of, repairs to, or alterations of the Suite, adjacent private luxury suites, or the Ballpark; however the necessity or occasion therefor may occur.  Licensor reserves the right to make repairs or alterations to the Suite or to any part of the Ballpark when and where it may deem necessary in its sole discretion.

6. Invoicing and Purchases of Tickets/Access Passes.  The price of tickets/access passes for Required Events and Optional Events shall be as established by Licensor or the Event Operator, as the case may be, in their discretion; provided that such prices shall be uniform for all similarly situated private luxury suites at the Ballpark.  In particular, Licensee acknowledges that prices of tickets/access passes for Post-Season Games are established according to guidelines set by the Office of the Commissioner of Major League Baseball.  Tickets/access passes to Required Events and Selected Optional Events shall be obtained by Licensee as follows and in accordance with the procedures specified below:

(a)  Following issuance by the Office of the Commissioner of Baseball of the Regular Season schedule for each Baseball Season during the Term (beginning with the Baseball Season that includes Opening Day), Licensor shall notify Licensee of such schedule and of any other scheduled Required Events (which may include no more than one Mets Exhibition Game).  Licensor shall deliver to Licensee twenty-one (21) tickets/access passes to the Suite for each such scheduled Required Event.

(b)  Following the notification to Licensee of any Optional Events, as provided for in Section 1 above, if Licensee elects to exercise its Optional Events Option, it shall purchase and remit, prior to the deadline set forth in the notification, full payment for twenty-one (21) tickets/access passes to the Suite for each such Selected Optional Event.

(c)   Deadlines for payment set forth in any invoices or notifications respecting the purchase of tickets/access passes as set forth above shall be consistent with those provided to Mets season ticket holders.

(d)   Licensee, at its option, shall have the right to purchase up to ten (10) additional tickets/access passes to the Suite for all Licensed Events, on an event by event basis, at the applicable price determined as set forth in this Section 6, upon such terms as may be set forth in Licensor's notices provided hereunder.   For the avoidance of doubt, the exercise of this option to purchase additional tickets/access passes hereunder requires and is conditioned upon the purchase and payment for all tickets/access passes required to be purchased by Licensee with respect to such Licensed Event.   With respect to additional tickets/access passes to the Suite for potential Post-Season Games to be participated in by the Mets at the Ballpark, Licensor may, in its discretion, during any Baseball Season, require that this option be exercised on a one-time basis with respect to all such potential Post-Season Games.

7.  Obligations of Licensor.  Licensor shall provide the following privileges and services to Licensee with respect to Licensed Events:

(a)   use of the Suite with a refrigerator, ice maker, all weather climate control in the interior area of the Suite, color television, sink with running water, access to restrooms, a closet, spectator seating and lounge furniture.

(b)   cleaning services for the Suite after each such Event.

(c)   utility services for the Suite, including water, heat, air conditioning and electricity, it being understood that no gas utilities will be furnished or be available and that Licensor shall not be liable in any way for any damages suffered by Licensee by reason of any interruption of such services.

8.   Licensee covenants and agrees that it shall:

(a)   use the Suite only as expressly permitted herein, and in accordance with the rules set forth below (as may be amended by Licensor in its discretion from time to time), the receipt of which is acknowledged by Licensee, and all other rules and regulations of general applicability as Licensor may promulgate from time to time in its sole discretion (collectively "Usage Rules").  Copies of Usage Rules shall also be available to Licensee upon request and Licensor may post copies thereof on its website.

(b)   keep and maintain the Suite and its furnishings in good order and repair during the Term, and, at the expiration of the Term, return the Suite to Licensor, clean and without damage, reasonable wear and tear excepted.  Any and all improvements, floor coverings, wall coverings and the like provided by Licensee shall become the property of Licensor at the expiration or termination of this Agreement, without any reimbursement by or cost to Licensor.  Notwithstanding the above, unique network systems installed on Licensee's behalf ("Unique Network Systems") in the Suite shall remain the property of Licensee.

At the expiration or termination of this Agreement, Licensee shall remove such Unique Network Systems at its expense.

(c) bring or consume in the Suite, and cause all of its Invitees to bring or consume in the Suite only food and beverages purchased from Licensor's authorized concessionaires; and pay and be solely responsible for, and promptly pay, all bills for food, beverages and services provided to Licensee or Licensee's Invitees in the Suite by authorized concessionaires.

(d) at all times (i) maintain, and cause all of its Invitees to maintain, proper decorum while using the Suite and being in the Ballpark, (ii) comply with, and cause all of its Invitees to comply with, all laws, ordinances, orders, rules and regulations of all duly constituted governmental authorities, (iii) not cause or permit any use of the Suite in violation thereof; and not interfere with Licensor's business or the enjoyment of Events by other patrons.

(e) not (i) hang, or permit any of its Invitees to hang, banners, corporate identifications or symbols, flags, pennants or emblems of any kind from the Suite; or (ii) place, or permit any of its guests to place, within the Suite, any signs, banners, merchandise, advertising or corporate identifications of any kind that could be visible from outside the Suite, unless Licensee has secured Licensor's prior written approval, which may be withheld in Licensor's sole discretion.

(f) at all times strictly abide by and observe, and cause its guests at all times to strictly abide by and observe, at all times, all applicable laws, rules and regulations, including those pertaining to the use and consumption of alcoholic beverages; and Licensee shall not, and shall cause its guests not to, serve, or permit to be served, in the Suite or elsewhere on the Ballpark premises, alcoholic beverages to persons under twenty-one years of age or persons visibly intoxicated.

(g) not decorate, finish, modify or make changes to the Suite without (i) the prior written consent of Licensor, following due execution of an alteration agreement upon terms and conditions and in the form approved by Licensor, providing for, among other matters, approval of design plans and specifications, permitting, approval of qualified contractors, security for performance and completion, and (ii) other terms and conditions required by Licensor in its sole discretion, all of the foregoing being at the sole cost and expense of Licensee. Notwithstanding the foregoing, no structural changes of any kind will be permitted.

(h) not obstruct, limit or impede Licensor or its employees or agents from its continuing right, which is hereby acknowledged and agreed upon, to enter the Suite at any and all times (i) for the performance of the duties required to be performed by Licensor hereunder and for any and all purposes related thereto, (ii) to investigate any suspected violations of the provisions of this Agreement, the Usage Rules or any applicable governmental laws or provisions, and (iii) generally to inspect the Suite and its condition. In the exercise of these rights, Licensor shall have the right to inspect and be given access to locked boxes, cabinets and like located in the Suite.

vandalism, unless such loss, damage or injury results from the gross negligence or intentional misconduct of Licensor. Without limiting the generality of the foregoing, Licensee, its Invitees and any holder of the tickets/access passes licensed or sold to Licensee, assume all risk and danger incidental to the sport of baseball and all warm-ups, practices and competitions associated with baseball, including specifically (but not exclusively) the danger of being injured by thrown bats, fragments thereof, and thrown or batted balls, and agrees that none of Licensor, MLB Entities, the City, the NYCIDA, and their respective agents, players, officers, employees, affiliates and owners shall be liable for injuries or loss of personal property resulting from such causes.

## 11. Indemnity

(a) Indemnification by Licensee. Licensee shall defend, indemnify and hold harmless Licensor and each member of the Mets Group, each Mortgagee, Lessor and the City and each of their respective, direct or indirect, partners, members, affiliates, principals, directors, officers, stockholders, employees, contractors, licensees, Invitees, servants, representatives and agents (collectively, "Indemnitees") from and against any liability to, and claims and actions by, the Licensee and any of its affiliates and any Person (including, but not limited to, any employees, agents, Invitees, licensees, and contractors of the Licensee and patrons, fans and others in the Ballpark), for or on account of any losses, liabilities, damages, including any indirect, consequential or special damages, including lost profits or lost opportunities, claims, actions, costs and expenses, including, but not limited to, attorney's fees and disbursements (collectively, "Damages") where such Damages are caused or incurred, in whole or in part, by any alleged or actual (i) negligence, recklessness or willful misconduct on the part of the Licensee, its employees, agents, Invitees, licensees, contractors, representatives, and their respective affiliates or any Person acting on its behalf; and (ii) use or occupancy of the Suite or the ways and walks adjacent thereto by Licensee, or any of its employees, agents, Invitees, licensees, contractors, representatives or any Person acting on its behalf. For the avoidance of doubt, no approval granted by Licensor limits, modifies or otherwise affects any of Licensor's rights under this Section 11.

(b) Cost Reimbursements. Licensee shall reimburse each Indemnitee for the following expenses, as incurred: (A) for any legal and other expenses (including the cost of any investigation or preparation) incurred by the Indemnitee in connection with defending any third party actions or claims contemplated by the indemnification provisions set forth above; and (B) for any legal and other expenses (including the cost of any investigation or preparation) incurred by the Indemnitee in enforcing the indemnity under Section 11(a) above.

(c) Limitation of Liability. EXCEPT FOR CLAIMS ARISING FROM (A) EITHER PARTY'S INDEMNIFICATION OBLIGATIONS UNDER THIS AGREEMENT OR (B) LIABILITIES RESULTING FROM A PARTY'S INTENTIONAL ACTS, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, NEITHER PARTY WILL BE LIABLE FOR ANY INDIRECT OR CONSEQUENTIAL DAMAGES OR FOR ANY LOSS OF REVENUES, LOSS OF PROFITS OR LOSS OF GOODWILL, EVEN IF THE PARTY OR ITS AUTHORIZED REPRESENTATIVE HAS BEEN ADVISED OF THE POSSIBILITY OF THE TYPE OF DAMAGES AND NOTHWITHSTANDING ANY FAILURE OF THE ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

(d) Without limiting any warranties implied by law, the liability for which cannot be excluded or limited, and notwithstanding any other provision in this Exhibit F, either party's total liability to the other party in tort (including negligence) or strict liability for all claims arising out of or in connection with this Exhibit F shall be limited to $100,000.

12.  Definitions

Capitalized terms that are not defined in this Exhibit F shall have the same meaning as defined in the Advertising Agreement.

"Event Operator" means an operator of an Optional Event other than the Licensor (and which may include the Office of the Commissioner of Baseball).

"Exhibition Games" means any games participated in by the Mets and by another Major League Baseball team at the Ballpark during the Term, other than Regular Season Games and Post-Season Games.

"Invitee" means, for purposes of this Agreement, all persons who enters the Ballpark or Suite for any business, commercial, social or other purpose, or for the purpose, directly or indirectly, related to the foregoing, at the invitation, permission or approval, expressed or implied, or with the acquiescence of Licensee, or any of its officers, directors, stockholders, members, employees, agents, representatives, contractors, or servants or any of their respective Invitees.

"Lessor" means a lessor under a Superior Lease, including, but not limited to, NYCIDA.

"Licensed Events" means all Required Events and all Selected Optional Events.

"Optional Events" means all events held during the Term at the Ballpark, other than Required Events, as to which admission is made available to members of the general public. For the avoidance of doubt, Optional Events include all Post-Season Games played during the Term at the Ballpark, but shall not include, among other things, private events, business meetings, conventions and seminars or corporate holiday parties and other corporate outings at the Ballpark.

"Optional Events Option" shall have the meaning set forth in Section 1(b) hereof.

"Required Events" means all Regular Season Games participated in by the Mets at the Ballpark during the Term, and the first Exhibition Game participated in by the Mets at the Ballpark each year during the Term.

"Selected Optional Events" shall have the meaning set forth in Section 1(a) hereof.



James B. Denniston
Legal Counsel
jdenniston@nymets.com

January 7, 2010

Nortel Networks Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5075
New York, New York 10150-5075

      Re:    Nortel Networks Inc., Case No. 09-10138 (KG)

Dear Sir/Madam:

      Enclosed for filing in the above jointly administered bankruptcy cases is the Administrative Expense Claim on behalf of Queens Ballpark Company, L.L.C.

      Please cause the Administrative Expense Claim to be filed on the official claim register for debtor Nortel Networks Inc. Also enclosed is a self-addressed stamped envelope along with a copy of the above Administrative Expense Claim. Please file stamp the copy and enclose it in the self-addressed stamped envelope which is enclosed for that use. Thank you for your courtesies.

               Very truly yours,

               James B. Denniston

JBD/sj

Enclosures

**NEW YORK METS**
Citi Field
Flushing, New York 11368

CERTIFIED MAIL

7099 3400 0012 5782 3527

$ 08.02

**RETURN RECEIPT REQUESTED**

Nortel Networks Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5075
New York, NY 10150-5075

RECEIVED

JAN 11 2010