## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
----------------------------------------------------X
                                                    :
                                                    :     Chapter 11
                                                    :
In re                                               :
                                                    :     Case No. 09-10138 (KG)
Nortel Networks Inc., et al.,[1]                    :
                                                    :     Jointly Administered
                                                    :
                          Debtors.                  :
                                                    :     Hearing Date: To commence
                                                    :                  January 6, 2014
                                                    :
----------------------------------------------------X
```

### JOINT OBJECTION TO THE PROOFS OF CLAIM FILED
### BY THE NORTEL NETWORKS UK PENSION TRUST LIMITED
### (AS TRUSTEE OF THE NORTEL NETWORKS UK PENSION PLAN)
### AND THE BOARD OF THE PENSION PROTECTION FUND

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Counsel for the Debtors and Debtors in Possession*

*Counsel for the Official Committee of Unsecured Creditors*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226), (collectively the "Debtors").  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

Preliminary Statement ........................................................................................................1

Jurisdiction..........................................................................................................................3

Background..........................................................................................................................3

A.    Procedural History....................................................................................................3

B.    The U.K. Pensions Act ..............................................................................................5

C.    The History of the U.K. Pension Claims Filed against the Debtors.................................8

D.    The Filing of Amended Proofs of Claim ......................................................................10

Relief Requested ................................................................................................................12

Basis for Relief ..................................................................................................................12

      I.    AS A MATTER OF COMITY, AND UNDER CHOICE OF LAW
            PRINCIPLES, THE COURT SHOULD DISALLOW THE CLAIMS ...............12

      II.    THE CLAIMS SEEK A DOUBLE RECOVERY FOR THE CLAIM
            BROUGHT DIRECTLY BY NNUK ................................................................17

      III.    NNUK WAS NOT "INSUFFICIENTLY RESOURCED" FOR
            PURPOSES OF THE U.K. PENSIONS ACT....................................................19

           A.    The Claims Rely On An Improper "Relevant Time" For Measuring
                Resources That Was Selected Solely For Strategic Purposes..................21

           B.    The Claimants Fail To Demonstrate That NNUK Was
                Insufficiently Resourced ..........................................................................23

      IV.    CLAIMANTS CANNOT PROVE IT WOULD BE REASONABLE TO
            ISSUE FSDS OR CNS AGAINST NNI AND NN CALA ................................24

           A.    The Debtors Did Not Exercise Control Over NNUK..............................25

           B.    NNUK Received Far Greater Benefits From the Debtors Than It
                Provided ..................................................................................................27

           C.    The Debtors Had No Connection Or Involvement With The
                NNUK Pension Plan..................................................................................31

           D.    The Debtors' Financial Circumstances Warrant Disallowance Of
                The Claims ..............................................................................................34

      V.    THE LIABILITY AMOUNTS ALLEGED BY THE CLAIMANTS ARE
            SPECULATIVE, UNREASONABLE AND IRRELEVANT ............................36

      VI.    ADDITIONAL GROUNDS FOR OBJECTION.................................................39

RESERVATION OF RIGHTS ................................................................................................40

NO PRIOR REQUEST ........................................................................................................41

**Page**

CONCLUSION......................................................................................................................41

## TABLE OF AUTHORITIES

**Rules and Statutes**                                                                    **Page(s)**

U.K. Pensions Act 1995 § 75 ................................................................................ 6, 19-20

U.K. Pensions Act 2004 § 43(2) ............................................................................ 6, 19

U.K. Pensions Act 2004 § 43(5) ............................................................................ 6

U.K. Pensions Act 2004 § 43(7) ............................................................................ 7, 27

U.K. Pensions Act 2004 § 43(7)(a) ........................................................................ 25

U.K. Pensions Act 2004 § 43(7)(b) ........................................................................ 27

U.K. Pensions Act 2004 § 43(7)(c) ........................................................................ 32

U.K. Pensions Act 2004 § 43(7)(d) ........................................................................ 34

U.K. Pensions Act 2004 § 44 ................................................................................. 19-20

U.K. Pensions Act 2004 § 44(3) ............................................................................ 6, 20

U.K. Pensions Act 2004 § 47 ................................................................................. 7

U.K. Pensions Act 2004 § 47(4) ............................................................................ 7

U.K. Pensions Act 2004 § 47(4)(b) ........................................................................ 25

U.K. Pensions Act 2004 § 47(4)(c) ........................................................................ 27

U.K. Pensions Act 2004 § 47(4)(e) ........................................................................ 31

U.K. Pensions Act 2004 § 47(4)(f) ......................................................................... 34

U.K. Pensions Act 2004 § 49(3) ............................................................................ 7

U.K. Pensions Act 2004 §§ 132-34 ........................................................................ 8

U.K. Pensions Regulator (Financial Support Directions etc.) Regulations 2005 .............. 19-20

**Cases**                                                                                **Page(s)**

Gerber v. MTC Elec. Techs. Co., Ltd.,
329 F.3d 297 (2d Cir. 2003) .................................................................................. 18

In re Masters Mates & Pilots Pension Plan & IRAP Litig.,
957 F.2d 1020 (2d Cir. 1992) ................................................................................ 18

**Cases**                                                                          **Page(s)**

In re Nortel GMBH & Lehman Bros.,
[2010] EWHC 3010 (Ch.) ................................................................... 34

In re Nortel Networks Corp.,
[2010] ONSC 1304 (Can.).................................................................. 10

In re Nortel Networks, Inc.,
669 F.3d 128 (3d Cir. 2011) ....................................................9-10, 14, 40

J.S. Alberici Constr. Co., Inc. v. Mid-West Conveyor Co., Inc.,
750 A.2d 518 (Del. 2000)................................................................. 14-15

Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.,
162 F.3d 1290 (11th Cir. 1998) ......................................................... 13

Kramer v. W. Pac. Indus., Inc.,
546 A.2d 348 (Del. 1988)................................................................. 19

Laker Airways Ltd. v. Sabena, Belgian World Airlines,
731 F.2d 909 (D.C. Cir. 1984)........................................................... 15

McDermott Inc. v. Lewis,
531 A.2d 206 (Del. 1987)................................................................. 17

Mobil Oil Corp. v. Linear Films, Inc.,
718 F. Supp. 260 (D. Del. 1989)......................................................... 13

Osorio v. Dole Food Co.,
665 F. Supp. 2d 1307 (S.D. Fla. 2009) ................................................ 16

Trustee of Nortel Networks UK Pension Plan v. Nortel Networks, Inc.,
133 S. Ct. 34 (2012)........................................................................ 10

VantagePoint Venture Partners 1996 v. Examen, Inc.,
871 A.2d 1108 (Del. 2005)................................................................ 16-17

Woolfson v. Strathclyde Regional Council,
[1978] UKHL 5, 1978 S.L.T. 159........................................................ 13-14

Yarrington v. Thornburg,
205 A.2d 1 (Del. 1964)..................................................................... 18

**Other Sources**                                                                                                     **Page(s)**

 "Financial Support Directions and Insolvency," Statement from The Pensions Regulator,
www.thepensionsregulator.gov.uk/docs/financial-support-directions-and-insolvency-july-
2012.pdf........................................................................................................................    34

27 Apr. 2004, Parl. Deb., H.C., Standing Comm. B (2008) 791 (U.K.) (statement of Min.
for Pens. Malcolm Wicks)...............................................................................................    21

Reasons of the Determinations Panel in Lehman Brothers Pension Scheme, dated Sept.
29, 2010 ¶ 106, http://www.thepensionsregulator.gov.uk/docs/DN1784039.pdf ..............    27

Reasons of the Determinations Panel in Box Clever Group Pension Scheme, dated Jan.
26, 2012, http://www.thepensionsregulator.gov.uk/docs/DN2084757.pdf.......................    27

Report under § 89 of the Pensions Act of 2004 in relation to the Uniq plc Pension
Scheme, dated Mar. 2012, www.thepensionsregulator.gov.uk/docs/section-89-uniq.pdf..    27

Restatement (Second) of Conflict of Laws § 307 ..........................................................    17

Nortel Networks Inc. ("NNI") and its affiliates, as respective debtors and debtors in possession (individually a "Debtor," collectively, the "Debtors"), together with the Official Committee of Unsecured Creditors (the "Committee" and collectively with the Debtors, the "Objectors") hereby object (the "Objection"), pursuant to sections 105 and 502 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 3001, 3002, 3003, 3007 and 9014 *et seq.* of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the Amended Proofs of Claim (collectively, the "Amended Proofs of Claim," the "U.K. Pension Claims" or the "Claims") filed by the Nortel Networks UK Pension Trust Limited (as Trustee of the Nortel Networks UK Pension Plan) (the "U.K. Pension Trustee") and the Board of the Pension Protection Fund (the "PPF," and together with the U.K. Pension Trustee, the "U.K. Pension Claimants" or the "Claimants") against NNI and Nortel Networks (CALA) Inc. ("NN CALA"), dated September 5, 2012, which are listed on the Debtors' claim register as proof of claim numbers 8357 and 8358. In support of this Objection, the Objectors submit the Declaration of Aatif Iqbal in Support of the Joint Objection to the Proofs of Claim, dated May 14, 2013 (the "Iqbal Decl."), filed contemporaneously herewith and incorporated by reference, and the exhibits thereto. For their Objection, the Objectors hereby respectfully state as follows:

## Preliminary Statement

1.      Nearly five years after various of Nortel's worldwide affiliates commenced creditor protection proceedings, the EMEA Debtors (defined below) and their private creditors continue to pursue nearly identical claims against the Debtors in an unjustifiable attempt to disregard corporate formalities and export into this chapter 11 case the responsibility for their foreign claims in order to improve recoveries of a very specific subgroup of European creditors. In particular, the Nortel Network UK Pension Trust Limited, trustee of the private pension plan

sponsored by Nortel Networks UK (the "NNUK Pension Plan" or the "Plan"), and the Board of the PPF, a privately funded insurer, filed the U.K. Pension Claims to force NNI and NN CALA to fund an alleged shortfall in the NNUK Pension Plan and to increase payments to NNUK's current and former employees.

2.     The Claimants do not allege that either NNI or NN CALA was a party to the NNUK Pension Plan, had employees who participated in the Plan, was directly responsible for or made decisions regarding the funding of the Plan, or had any contractual liability to the Plan. Rather, the Claimants attempt to assert a claim against NNI and NN CALA for alleged NNUK Pension Plan deficits based on their mere affiliation with NNUK, in amounts primarily based on the perceived value of a transaction to which the Debtors were not a party (the Project Swift transaction), purported defects in the general transfer pricing arrangements among various Nortel affiliates, and other "benefits" they allege NNUK provided to the Debtors.  As the evidence will show, the Project Swift transaction had nothing to do with NNI or NN CALA, and the transfer pricing arrangements ultimately harmed the Debtors, who made at least $2 billion in overpayments to NNL while NNUK was a net recipient of transfer pricing payments over the relevant time period.  There simply is no justifiable basis for a claim that the Debtors should be required to pay even more money to either NNUK or its individual creditors in connection with these bankruptcy proceedings.

3.     Moreover, the allowance of any such claim by the Claimants would facially violate public policy and the rights of the Debtors under applicable U.S. law and turn the principle of corporate separateness inherent in our legal system on its head.  Further, such claims are almost entirely duplicative of claims asserted by NNUK itself against the Debtors. Even if such claims could pass muster when asserted by NNUK, which they cannot, they

certainly cannot *also* serve as a basis for NNUK's creditors to pursue additional direct claims against the Debtors. The Claimants have no basis for asserting any claim against the Debtors, and it would be *per se* unreasonable to allow the Claims in light of NNI's and NN CALA's own current financial circumstances. NNUK – the plan sponsor – historically reaped billions of dollars of benefits from the Nortel group, and NNI and NN CALA are not in a position to provide further funds to NNUK or its creditors when the Debtors' own creditors – including thousands of U.S. employees – have been required to compromise their own claims and suffer the curtailment of their pensions and other benefits in connection with the wind down of the Nortel group. For these and the additional reasons set forth herein, as well as any other reasons the Objectors may raise, the Objectors object to the U.K. Pension Claims, and such Claims should be disallowed in full.

## Jurisdiction

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and is a contested matter pursuant to Bankruptcy Rules 9014 *et seq.* Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory bases for the relief requested herein are sections 105 and 502 of the Bankruptcy Code and Bankruptcy Rules 3001, 3002, 3003, 3007 and 9014 *et seq.*

## Background

### A.      Procedural History

6.      On January 14, 2009 (the "Petition Date"), the Debtors, other than NN CALA,[2] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors

---

[2]      NN CALA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009 [D.I. 1098].

continue to operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      The Office of the United States Trustee for the District of Delaware has appointed an Official Committee of Unsecured Creditors in respect of the Debtors [D.I. 141, 142], and an *ad hoc* group of bondholders has been organized.

8.      On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[3] commenced a proceeding in the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors.  A Monitor, Ernst & Young Inc. (the "Monitor" or "Ernst & Young Canada"), was appointed by the Canadian Court.  Also on the Petition Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates (the "EMEA Debtors"),[4] including NNUK, into administration under the control of individuals (the "Joint Administrators") from Ernst & Young LLP ("Ernst & Young UK").  Other Nortel affiliates have commenced, and in the future may commence, additional creditor protection, insolvency, and dissolution proceedings around the world.

9.      Since the Petition Date, the various Nortel affiliates have sold the assets related to their business units and other assets to various purchasers.  For further information regarding

---

[3]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[4]      The EMEA Debtors include the following entities:  Nortel Networks UK Limited ("NNUK"), Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

these chapter 11 cases, reference may be made to the Monthly Operating Reports filed by the

Debtors and to the information contained at http://dm.epiq11.com/nortel.

**B.      The U.K. Pensions Act**

10.      The U.K. Pensions Act 2004 and associated regulations (collectively, the "U.K.

Pensions Act") provide a labyrinth of procedures – largely untested by litigation to date – that

grant the U.K. Pensions Regulator ("TPR") unusual authority, well beyond any available in the

United States, to attempt to protect the benefits of private occupational pension plan members

and to reduce the risk that the PPF, a privately funded insurer of U.K. pension plans, would

have to assume certain obligations in respect of the underfunded pension plan and fund the

compensation to members of such pension plan.  In furtherance of this purpose, the U.K.

Pensions Act purports to authorize TPR to initiate and conduct an administrative process

through which to seek a contribution to the plan's funding, not only against an employer of an

underfunded pension plan (the "Employer"), but also against affiliates of the Employer,

including U.K. and non-U.K. entities, regardless of where they are located and regardless of

whether they had any contractual connection to the Employer's pension plan or its funding, if

they meet specified statutory criteria (the "Target" or "Targets").  The process involves, *inter*

*alia*, the issuance of a "Warning Notice" to the Target(s), followed by an administrative hearing

conducted by TPR's own Determinations Panel (the "Determinations Panel"), after which the

Determinations Panel may determine that a Financial Support Direction ("FSD") will be issued

under Section 43 of the U.K. Pensions Act.  (See Declaration of Richard Hitchcock, dated Feb.

18, 2010 ¶¶ 35-37 [D.I. 2445] (the "Hitchcock Decl.").)

11.      An FSD is a direction to a Target to provide or arrange for the provision of

financial support for the Employer's pension plan.  It may be issued only where the Employer –

here, NNUK – is either (a) a service company (not relevant here) or (b) "insufficiently

resourced" at a "relevant time" selected by TPR.  (U.K. Pensions Act § 43(2); Mem. Op., dated

Mar. 9, 2010, at 5-6, 9 [D.I. 2664] (the "Opinion").)  An Employer is "insufficiently resourced"

under the U.K. Pensions Act if, at the "relevant time," (1) the Employer's resources are less

than 50% of the estimated Section 75 Debt of the pension plan[5] and (2) there exists one or more

"connected and/or associated companies" to the Employer, the value of whose individual or

combined resources is greater than the difference between the value of the Employer's resources

and 50% of the estimated Section 75 Debt.  (U.K. Pensions Act § 44(3); Hitchcock Decl.

¶ 37.5.)

12.     If the Determinations Panel finds that the Employer is not insufficiently

resourced at the relevant time, the threshold criterion for the issuance of an FSD is not met and

no FSD can be issued.  (Hitchcock Decl. ¶ 37.)  Even if the Determinations Panel finds that the

Employer is insufficiently resourced at the relevant time, it can issue a Notice of Determination

that an FSD should be issued against the Target *only* if the Determinations Panel also

determines that it is reasonable to do so.  (Id.; U.K. Pensions Act § 43(5); Opinion at 7.)  In

deciding whether it is reasonable to issue an FSD against a Target, the Determinations Panel

must consider a number of factors, such as, where relevant:  (a) the relationship between the

Target and the Employer, including whether the Target controlled the Employer; (b) the value

of any benefits received directly or indirectly by the Target from the Employer; (c) any

connection or involvement of the Target with the pension plan; and (d) the financial

circumstances of the Target.  (U.K. Pensions Act § 43(7); Opinion at 7.)

13.     The FSD itself does not create an enforceable liability against the Target (here

NNI and NN CALA).  Rather, if an FSD is issued against a Target and the Target does not

---

[5]     This debt (the "Section 75 Debt") as defined in Section 75 of the U.K. Pensions Act 1995 (the "1995 Act"), is calculated by reference to the aggregate cost of buying out all plan benefits through the purchase of annuities from an insurance company for each member.  (See Hitchcock Decl. ¶¶ 24-28.)

comply with it, and if certain statutory criteria are met, pursuant to Section 47 of the U.K.

Pensions Act, TPR may issue a Contribution Notice (a "CN") against the Target.[6]  (U.K.

Pensions Act § 47; Opinion at 7.)  A CN imposes liability on the recipient to pay the sum

specified therein – which may be some or all of the Section 75 Debt – to the trustee of the

pension plan.  The CN claim is treated as a private debt owed by the Target to the trustee of the

pension plan, not a claim held by TPR.  (U.K. Pensions Act § 49(3); Hitchcock Decl. ¶ 46.)

    14.     The PPF – one of the Claimants – is a statutorily-created but privately-funded

insurance entity.  When the sponsor of a U.K. private sector defined benefit occupational

pension plan (a "U.K. Pension Plan") is unable to fully fund its pension obligations, the PPF

provides compensation – up to certain statutory limits (the "PPF Cap") – to plan members.[7]

(Hitchcock Decl. ¶¶ 5.4, 18-22.)  In this case, the Warning Notice alleges that statutory limit is

£670 million as of the "relevant time."  (Warning Notice in the Matter of Nortel Networks UK

Pension Plan, dated Jan. 11, 2010, ¶ 180.2 (the "Warning Notice").)  If the Employer, like

NNUK, is in an administration or insolvency proceeding, the filing of such proceeding triggers

a PPF "assessment period," during which the PPF exercises the trustee's rights and powers and

stands in the shoes of the trustee.  If a pension fund enters the PPF, the PPF benefits from any

payment made on an FSD or CN pursuant to the statute, up to the PPF Cap.  (U.K. Pensions Act

§§ 132-34; Opinion at 8; Hitchcock Decl. ¶¶ 5.5, 46.)

---

[6]    Like an FSD, under the U.K. Pensions Act the Determinations Panel may not issue a CN absent an
affirmative showing that it is reasonable to do so.  In addition to the reasonableness factors required to issue an FSD,
the following factors are considered relevant for a CN to issue:  (a) whether the Target has taken reasonable steps to
secure compliance with the FSD; and (b) the relationship that the Target has or had with the parties to any
arrangements put in place in accordance with the FSD, including whether the Target has or had control of those
parties.  (U.K. Pensions Act § 47(4).)

[7]    Where a U.K. Pension Plan has assets sufficient to pay benefits up to the PPF Cap, but insufficient assets to
pay benefits that exceed the PPF Cap, the PPF's role ceases.  Here, if the NNUK Pension Plan's assets are sufficient
to pay benefits in excess of the level of the PPF Cap, the PPF will have no further claim or interest in this matter,
whether against NNI, NNL or any other entity.

### C.    The History Of The U.K. Pension Claims Filed Against the Debtors

15.    On September 30, 2009 (and January 25, 2010 in the case of NN CALA), the Claimants filed several proofs of claim listed on the Debtors' claim register as proof of claim numbers 5573, 5574, 5575, 5576, 5577, 5578, 5579, 5580, 5581, 5582, 5583, 5584, 5585, 5586, 5587 and 6979 against the Debtors (collectively, the "Original Proofs of Claim").[8]

16.    Notwithstanding the automatic stay, by letters addressed to NNI and NN CALA dated January 13, 2010 – one year after the commencement of these cases, and a few months after the filing of the Original Proofs of Claim – TPR purported to issue a Warning Notice initiating administrative proceedings in the U.K. (the "U.K. Administrative Proceedings") against NNI and NN CALA regarding an alleged shortfall in the funding of the NNUK Pension Plan.  TPR issued similar notices against NNL, NNC, and certain other non-U.S. Nortel entities. The Warning Notice, which is long on words but short on facts, is attached to the Claims as Exhibit 2.

17.    On February 18, 2010, the Debtors filed a motion (the "Stay Motion") pursuant to sections 362(a)(1) and (a)(6) of the Bankruptcy Code to enforce the automatic stay against the Claimants with respect to their participation in the U.K. Administrative Proceedings against NNI and NN CALA [D.I. 2441].  After a hearing on February 26, 2010 (the "Stay Motion Hearing"), the Court granted the Debtors' Stay Motion over the Claimants' objection, issuing an Order enforcing the stay and deeming the U.K. Administrative Proceedings "void and of no force or effect" in this Court with respect to the Debtors.  (Order Enforcing the Automatic Stay Against Certain Claimants With Respect To The U.K. Pension Proceedings, dated Feb. 26, 2010, at 5 [D.I. 2576] (the "Automatic Stay Order").)  In its March 9, 2010 Opinion, the Court

---

[8]    On September 30, 2009, the Claimants similarly filed claims against the Canadian Debtors.  On or about November 29, 2010, the Claimants filed amended proofs of claim against the Canadian Debtors, along with numerous exhibits.

held in relevant part that the claims of a private trustee to recover funds from private companies,

for the benefit of private citizens, did not satisfy either the public policy test or the pecuniary

purpose test that govern the police power exception to the automatic stay. (See Opinion at 11-

17.)

18.    The Court concluded it was both necessary and appropriate to protect the

Debtors from being forced to participate in the U.K. Administrative Proceedings, noting:

"[w]hat we have here are creditors who have filed claims in this Court and who are seeking to

litigate those claims clear of the Court's jurisdiction and the automatic stay." (Opinion at 15;

see also Tr. of Stay Motion Hr'g 182:21-186:4 (Court's Ruling), dated Feb. 26, 2010 [D.I.

2646].) The Automatic Stay Order has since been affirmed by both the District Court (on

March 29, 2011) and the United States Court of Appeals for the Third Circuit (on December 29,

2011). In re Nortel Networks, Inc., 669 F.3d 128 (3d Cir. 2011), aff'g In re Nortel Networks

Inc., No. 09-10138-KG, 2011 WL 1154225 (D. Del. Mar. 29, 2011), cert. denied, 133 S. Ct. 34

(2012).[9]

19.    In affirming the Automatic Stay Order, the Third Circuit agreed that the

Claimants failed to meet either the public policy test or the pecuniary purpose test, and further

held that the Claimants were acting not as government entities even entitled to exercise the

"police power." Id. at 138-39. The Regulator, TPR, did not file a proof of claim and did not

appear in these chapter 11 cases. Furthermore, the Claims were "not predicated upon any

allegation of wrongdoing on the part of Nortel [U.S.]." Id. at 141. The Third Circuit

---

[9]    Notwithstanding the Automatic Stay Order and the absence of NNI, NN CALA and the Canadian Debtors from the U.K. Administrative Proceedings, on June 25, 2010, the Determinations Panel of TPR issued a Determination Notice that FSDs should issue against them and against certain other Nortel affiliates. On April 1, 2011, TPR issued FSDs against NNI, NN CALA, NNC and NNL. The FSDs against NNI and NN CALA are annexed as exhibits to the Claims. As non-participants in the U.K. Administrative Proceedings, the Debtors have not received copies of the participants' submissions to the Determinations Panel other than the Warning Notice and Regulator's Skeleton Argument, which are attached to the Claims.

acknowledged that by filing proofs of claim, the Claimants subjected themselves to the jurisdiction of this Court and to the automatic stay.  It also affirmed the Court's ruling that "with respect to the Debtors [the U.K. Administrative Proceedings] are deemed void and of no force or effect." Id. at 143 (internal citation omitted).  The Third Circuit further advised that to the extent the Claimants attempt to introduce the Determinations Panel's findings against NNI and NN CALA into evidence in these proceedings, this Court should consider that "none of the parties before the Bankruptcy Court participated in the U.K. proceedings with respect to the U.S. parties." Id.  The Claimants filed a Petition for a Writ of Certiorari with the United States Supreme Court, which was denied on June 25, 2012.  Trustee of Nortel Networks UK Pension Plan v. Nortel Networks, Inc., 133 S. Ct. 34 (2012).[10]

**D.    The Filing Of Amended Proofs Of Claim**

20.      On June 11, 2012, the Debtors filed an objection to the Original Proofs of Claim and a motion for an order requiring a more definite statement of claim (the "Objection and Motion for a More Definite Statement") on the grounds that the Original Proofs of Claim (i) improperly relied on the U.K. Administrative Proceedings notwithstanding the Automatic Stay Order and (ii) failed to provide the Court or the Debtors with any facts or law that would explain the purported basis for their Claims [D.I. 7818].[11]  After a hearing on July 11, 2012, the Court granted the Debtors' Objection and Motion for a More Definite Statement and ordered the

---

[10]     In March 2010, the Canadian Court afforded the Monitor similar relief as granted by this Court, holding that the purported exercise of rights by TPR in the U.K. Administrative Proceedings amounted to breaches of the stay imposed by orders entered in the Canadian Debtors' cases, and that "for purposes of the CCAA proceedings, the actions taken by The Pensions Regulator, are null and void in Canada and are to be given no force or effect in these CCAA proceedings."  (See In re Nortel Networks Corp., [2010] ONSC 1304 (Can.) (Mar. 18, 2010) ¶¶ 42-44 (the "Canadian Opinion"), a copy of which is attached as Exhibit 3 to the Iqbal Decl.)  That decision was affirmed by the Canadian Court of Appeal and review was denied by the Canadian Supreme Court.

[11]     The Debtors were unable to share the Warning Notice and its exhibits with the Committee or the Court at that time because Section 82 of the U.K. Pensions Act prohibits disclosure of "restricted information," which includes information obtained by TPR that is not publicly available from other sources, and imposes criminal sanctions for a violation of the statute.  (Hitchcock Decl. ¶ 35.)

Claimants to serve a more definite statement of their proofs of claim, along with supporting

documentation, by September 5, 2012 [D.I. 7984].

21.    On September 5, 2012, the Claimants filed their amended proofs of claim against

NNI and NN CALA.[12]  These proofs of claim purport to assert claims against each of NNI and

NN CALA for an amount no less than $1.335 billion.  Such sums allegedly consist of "amounts

which should have been available to NNUK to satisfy its funding obligations to the Plan but for

the manner in which NNUK was operated for the benefit of the Nortel Group."  (Claims ¶ 325.)

Specifically, the Claimants allege they are owed:

- $376 million for an "inequitable allocation of cash repayments" related to NNL's and NNUK's decision to enter into an interest-free loan during periods in which NNL borrowed money from NNI pursuant to a completely unrelated interest-bearing credit facility, and to NNL's manner of repayment of these various loans (including relating to Project Swift) (Claims ¶¶ 211, 325);

- $92.9 million for amounts NNUK allegedly did not receive from NNL under the Nortel transfer pricing agreements related to NNUK's restructuring costs (Claims ¶¶ 168, 325); and

- Approximately $867 million for alleged inadequate compensation to NNUK under the Nortel transfer pricing agreements for the "true costs" of NNUK's pension liabilities.  (Claims ¶¶ 182, 325.)

The Claims further assert unliquidated claims related to NN CALA's allegedly "unduly

favorable treatment" under its separate transfer pricing arrangements with NNL, and NNUK's

alleged "inadequate[ ] compensat[ion] for the services it provided to the Nortel Group."  (Claims

¶ 325.)

---

[12]    The Claims state that the Claimants are withdrawing the proofs of claim filed against Debtors other than NNI or NN CALA.  (Claims at 1 n. 2.)  In any event, Claimants did not file amended claims against any of the other Debtors, and so the Original Proofs of Claim – proof of claim numbers 5573, 5574, 5575, 5576, 5577, 5578, 5579, 5580, 5581, 5582, 5583, 5584, 5585, 5586, 5587 and 6979 – as well as any and all prepetition claims of the Claimants against those other Debtors, should be disallowed and expunged with prejudice.

**Relief Requested**

22.     By this Objection, the Objectors seek the entry of an order, pursuant to sections 105 and 502(b) of the Bankruptcy Code, Bankruptcy Rules 3001, 3002, 3003, 3007 and 9014 *et seq.*, disallowing in full the U.K. Pension Claims.

**Basis for Relief**

23.     The Claims asserted in the U.K. Pension Claims should be disallowed in full.  As an initial matter, the U.K. Pensions Act should not be applied against the Debtors to allow the Claims as set forth by Claimants, both as a matter of comity and choice of law, because its application under these alleged facts and theories would violate basic principles of U.S., Delaware and Florida law.  Moreover, the Claims seek duplicative recovery on the baseless claims brought directly by NNUK.  Even if these facial obstacles could be overcome, which they cannot, the Claimants could not satisfy the requirements for an FSD because NNUK was not insufficiently resourced as of a relevant time, and it would not be reasonable to impose liability for the Plan's underfunding on the Debtors.[13]

## I.     AS A MATTER OF COMITY, AND UNDER CHOICE OF LAW PRINCIPLES, THE COURT SHOULD DISALLOW THE CLAIMS

24.     In its opinion granting the Automatic Stay Order, this Court stated that "[t]he Claimants who implore this Court to give comity to the U.K. Proceedings are themselves ignoring comity.  They as much as say, 'give the proceedings of our choice the respect we are unwilling to show to other proceedings in which many debtors and creditors are working

---

[13]     The Claimants' further request that the Court treat a judgment on the Claims as "the equivalent of a CN" (Claims ¶ 324) must be rejected by the Court.  A CN is predicated on the issuance of, and non-compliance with, a proper FSD.  For the reasons set forth in this Objection, no basis exists for issuing a valid FSD and accordingly no CN could issue.  Even if this Court were to apply the U.K. Pensions Act and find that the FSD requirements were met, it would have to reject the Claimants' "damages" request.  The amounts sought by the Claimants are entirely speculative, and in any event the benefits claimed by the Claimants pale in comparison to the benefits to NNUK from its participation in the transfer pricing arrangements, in which the Debtors also participated to the Debtors' detriment.

tirelessly to formulate a coherent, equitable plan.'"  (Opinion at 16.)  That statement is equally

apt to the Claimants' assertion of claims in excess of $1.3 billion against two U.S.

corporations[14] on the basis of a U.K. statute that is directly contrary to fundamental principles of

Delaware and Florida corporate law, federal law, and even other U.K. corporate law.

      25.     It is well-established under Delaware and Florida law that the separateness of

corporations is to be respected, such that absent extraordinary circumstances, a corporation is

not responsible for the debts of its affiliates.  Such rare circumstances include where the

corporation and its affiliates wholly disregard corporate formalities, hold themselves out to be

one and the same, or engage in such other extraordinarily inequitable conduct that would make

it unfair to deprive the creditors of the affiliates access to the assets of the corporation.  See,

e.g., Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 266-68 (D. Del. 1989) (applying

Delaware law and refusing to treat parent and subsidiary as one corporation in the absence of a

"lack of attention to corporate formalities, such as where the assets of two entities are

commingled, and their operations intertwined" that results in "fraud or injustice"); Johnson

Enters. of Jacksonville, Inc. v. FPL Grp., Inc., 162 F.3d 1290, 1320-21 (11th Cir. 1998) (Florida

law does not allow piercing the corporate veil unless the subsidiary is a "mere instrumentality"

that the parent used to engage in "improper conduct").[15]  The law in the U.K. is no different.

See, e.g., Woolfson v. Strathclyde Regional Council, [1978] UKHL 5, 1978 S.L.T. 159 (appeal

taken from Scot.) (holding that under English law, "it is appropriate to pierce the corporate veil

---

[14]      NNI is incorporated in Delaware, and NN CALA is incorporated in Florida.

[15]      The right granted to the Pension Benefit Guaranty Corporation ("PBGC") to seek to impose termination liability on the members of a corporation's control group under ERISA does not mandate a contrary result.  Unlike the Claimants, the PBGC is not a privately funded insurer or trustee.  Second, the PBGC has *never* sought to impose such liability on a foreign Nortel affiliate in these cases.  Indeed, the PBGC never filed a claim against NNL or NNC in Canada, or any of the EMEA Debtors, prior to their respective claims bar dates.  It would be the height of unfairness for the Debtors to become insurers of the NNUK Pension Plan when NNUK has not faced a similar claim related to NNI's own pension plan.

only where special circumstances exist indicating that it is a mere façade concealing the true facts").

26.    Ignoring this bedrock principle, and without even contending that such rare circumstances exist here, which they do not, the Claimants – two private actors – seek allowed claims in excess of $1 billion against each of NNI and NN CALA, two U.S. corporations with which they have no privity, no contract and no relevant relationship, to reduce the alleged shortfall in the pension plan sponsored by NNUK, a sister corporation, on the basis of their expansive interpretation of a U.K. statute.[16]  The Claimants ask this Court to allow these extraordinarily large claims, at the expense of the real and direct creditors of NNI and NN CALA, on the basis of this inappropriate extension of the U.K. pension statute.  To apply the U.K. Pensions Act under the vague facts and theories alleged would be to allow the assets of NNI and NN CALA, U.S. corporations that are in chapter 11 proceedings in a U.S. Bankruptcy Court in Delaware, to be diverted away from the Debtors' own creditors for the benefit of private creditors of NNUK.  There is no principle of law, domestic or international, that would abide, much less mandate, such an unfair and inequitable distribution of a debtor's assets.  Accordingly, to the extent the U.K. Pensions Act could be read to permit such an inequitable claim, the Court should apply Delaware and Florida law, not the U.K. Pensions Act, and disallow the Claims in full.

27.    Indeed, considerations of comity and principles of international law compel this result.  It is well established both in Delaware state courts and in the federal courts that courts will not enforce the laws of another state or nation that are repugnant to the public policy of the forum state or the United States.  See, e.g., J.S. Alberici Constr. Co., Inc. v. Mid-West

---

[16]    There is no basis for the Claimants to contend that such circumstances are present here, where, as noted by the Third Circuit, the Claims are "not predicated upon any allegation of wrongdoing on the part of Nortel [U.S.]." In re Nortel Networks, Inc., 669 F.3d at 141.

Conveyor Co., Inc., 750 A.2d 518, 520 (Del. 2000) (citing Travelers Indem. Co. v. Lake, 594 A.2d 38, 45 (Del. 1991)); Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 937 n. 104 (D.C. Cir. 1984) (foreign laws are to be enforced in U.S. courts only to the extent they do not run afoul of U.S. policies). As discussed above, the public policy of both Delaware and the United States is that in the absence of rare circumstances not present here, corporate separateness is to be respected. The manner in which the U.K. Pensions Act is sought to be enforced in these cases is repugnant to this policy, and should not be applied here.

28.     The U.K. Pensions Act, as the Claimants seek to apply it here, is also offensive to the principles of equity that underlie the Bankruptcy Code. Indeed, according to the Claimants, the Act allows TPR to ignore reality and impose liability on affiliates of U.K. companies without any rational basis whatsoever. While the Act purports to require a finding that it is "reasonable" to impose liability on corporate group affiliates, the Claimants (relying heavily on prior TPR positions) seek to impose liability on NNI and NN CALA, even though TPR itself determined that all funding decisions concerning the NNUK Pension Plan were made by NNL and NNC, not any of the Debtors. (Warning Notice ¶ 182-83.) Moreover, as discussed further infra at ¶¶ 38-43, the Claimants (again relying on prior TPR positions) had to strategically manipulate the reference date for making such a claim – the "relevant time" – and undertake other similar financial gymnastics in order to avoid a finding that NNUK's affiliates' own difficult financial circumstances would preclude the bringing of a claim. The reference date selected was June 30, 2008, over six months prior to the Petition Date and approximately three months before the financial crisis that brought down Nortel. There is no valid basis for the selection of this date. To allow the Claims on the basis of Claimants' manipulation of the "relevant time" and their expansive interpretation of the U.K. Pensions Act would not do equity

here and indeed would both violate public policy and create a moral hazard for future companies.

29.    In addition, foreign laws that impose strict liability on a U.S. company where applicable state and/or federal law would require a showing of fault have been held to be unenforceable as violative of due process rights.  See Osorio v. Dole Food Co., 665 F. Supp. 2d 1307, 1335 (S.D. Fla. 2009), aff'd sub nom., Osorio v. Dow Chem. Co., 635 F.3d 1277 (11th Cir. 2011) (refusing to recognize judgment issued by foreign court under statute that presumed liability without any showing of causation).  Claimants seek to apply the U.K. Pensions Act to impose liability on the Debtors as though it were the Debtors', not NNUK's, pension plan at issue, and based on a vague and arbitrary application of the U.K. statute without any showing that the Debtors bear any responsibility for that Plan or for the alleged shortfall in the Plan's funding.  Under these circumstances, to apply the U.K. Pensions Act to NNI and NN CALA would, at minimum, raise serious due process concerns.  To the extent the factual allegations included in the Claims are even worthy of consideration, the Claimants still seek application of the U.K. Pensions Act in such a vague and indiscriminate manner, notwithstanding the statute's requirement of a showing of reasonableness to support a claim, so as to raise substantive and procedural due process concerns.

30.    The result mandated by considerations of comity, due process and principles of international law is no different if the matter is analyzed from a choice of law perspective. Delaware and Florida each has an interest in protecting its own corporations from being held liable for the debts of their corporate affiliates solely on the basis of corporate affiliation. Indeed, Delaware, the forum state whose choice of law rules therefore apply, strongly favors the "internal affairs doctrine," whereby "matters that pertain to the relationships among or between

the corporation and its officers, directors, and shareholders" are governed by the corporate law of the state of incorporation. <u>VantagePoint Venture Partners 1996 v. Examen, Inc.</u>, 871 A.2d 1108, 1113 (Del. 2005) (applying Delaware corporate law to a Delaware corporation); <u>McDermott Inc. v. Lewis</u>, 531 A.2d 206, 218-19 (Del. 1987) (applying Panama corporate law to a Panama corporation); <u>see also</u> Restatement (Second) of Conflict of Laws § 307 (1971) ("The local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability to the corporation for assessments or contributions and to its creditors for corporate debts.").

31.     The principles underlying that doctrine are directly applicable here.  NNI and NN CALA justifiably expected not to be held liable for the funding of the NNUK Pension Plan, under the U.K. Pensions Act or otherwise, because neither was involved in or had responsibility for the funding or decisions concerning the funding of the NNUK Pension Plan, or had guaranteed NNUK's payment of plan contributions.  For these reasons, certainty, predictability and uniformity dictate that Delaware and Florida law apply.  Accordingly, the Court should apply Delaware and Florida law, and under such law the Claims should be disallowed in full.

## II.     THE CLAIMS SEEK A DOUBLE RECOVERY FOR THE CLAIM BROUGHT DIRECTLY BY NNUK

32.     Even if the Claims had any factual or legal validity, which they do not, they must be dismissed as a matter of law as duplicative of the claim brought directly against NNI by NNUK itself.  An essential premise of the U.K. Pension Claims is that they are required to compensate for purported benefits NNUK provided to the Debtors for which it was either never compensated or undercompensated.  NNUK, however, has itself filed a proof of claim against NNI seeking damages based on the same underlying facts and transactions.  (<u>Compare</u> Proof of Claim filed against NNI by NNUK, proof of claim number 7786 (the "<u>NNUK Claim</u>") <u>with</u> the

U.K. Pension Claims.)  As will be proven after discovery and, if necessary, at trial, NNUK's claims are wholly baseless, as are the U.K. Pension Claims.[17]  Even if NNUK's claims were valid, however, the Claims asserted by the U.K. Pension Claimants would have to be disallowed, because any recovery on those claims would be duplicative of any allowed amounts on NNUK's claim.

33.    It is a general rule of law and equity that double recoveries based on the same alleged injury are improper and not permitted.  This principle underlies the "one satisfaction" rule, which "prohibits a plaintiff from recovering more than 'one satisfaction for each injury.'" Gerber v. MTC Elec. Techs. Co., Ltd., 329 F.3d 297, 303 (2d Cir. 2003) (citation omitted); see also In re Masters Mates & Pilots Pension Plan & IRAP Litig., 957 F.2d 1020, 1030 (2d Cir. 1992) ("[W]here a settlement and a judgment compensate a plaintiff for the same injury, a nonsettling defendant is entitled to a judgment reduction at least in the amount of a prior settlement."); Yarrington v. Thornburg, 205 A.2d 1, 2 (Del. 1964) (adopting the collateral source rule, which prohibits double recovery by prevailing claimants from multiple tortfeasors or other sources of compensation not wholly independent of defendant).

34.    The damages amounts sought here make clear that the Claims violate this very principle.[18]  (Claims ¶ 325.)  The Claimants make only a cursory attempt to allege any connection between NNI and the NNUK Pension Plan, and with good reason:  there was none. In light of this fatal flaw in their Claims, the Claimants seek to recover on the basis of general alleged injuries to NNUK.  Id.  In analogous circumstances under U.S. law, such as that of

---

[17]    In making this statement, the Objectors do not undertake any burden of proof, which lies squarely with the U.K. Pension Claimants and NNUK.

[18]    The duplicative nature of the Claims is especially apparent given that, on information and belief, the NNUK Pension Trustee is the largest creditor of NNUK, accounting for approximately 90% of the claims against it. As such, any recovery by NNUK would inure overwhelmingly to the benefit of the NNUK Pension Trustee.

shareholders suing derivatively to remedy harm allegedly caused to the corporation, claimants

in the U.K. Pension Claimants' position would not even have standing to bring such a claim.

See, e.g., Kramer v. W. Pac. Indus., Inc., 546 A.2d 348, 351 (Del. 1988) ("For a plaintiff to

have standing to bring an individual action, he must be injured *directly* or *independently* of the

corporation.") (citation omitted) (emphasis in original).  This is further evidence of the

extraordinary nature of the U.K. Pensions Act, as interpreted by Claimants, and of the

unprecedented type of liability that Claimants purport to create.  The U.K. Pension Claimants

should not be permitted to recover twice, once through the NNUK Claim and once through the

U.K. Pension Claimants' Claims, and therefore the Claims should be disallowed in full.

## III.    NNUK WAS NOT "INSUFFICIENTLY RESOURCED" FOR PURPOSES OF THE U.K. PENSIONS ACT

35.    Although the Court need not reach this issue for the reasons set forth above, the

Claims also lack merit because the U.K. Pension Claimants cannot show that NNUK was

"insufficiently resourced" at a "relevant time," a threshold statutory prerequisite to the assertion

of any claim by the U.K. Pension Claimants.

36.    Under Section 43(2) of the U.K. Pensions Act, the employer under the pension

plan – in this case NNUK – must be "insufficiently resourced" at a "relevant time" that is

"determined by the Regulator."  The U.K. Pensions Act, together with regulations and the 1995

Act, establish the formula for determining whether the Employer satisfies the "insufficiently

resourced" requirement.  (U.K. Pensions Act § 44; 1995 Act § 75 ("Section 75"); U.K. Pensions

Regulator (Financial Support Directions etc.) Regulations 2005 (the "2005 Regulations"),

Regulations 6-12.)  Pursuant to the U.K. Pensions Act, an Employer is "insufficiently

resourced" at a "relevant time" if, at that time, (1) the value of the Employer's resources is less

than 50% of the estimated Section 75 Debt and (2) there is an entity, either connected with the

Employer or an associate thereof, the value of whose resources is not less than the difference

between the value of the Employer's resources and 50% of the estimated Section 75 Debt.  (Id.

at § 44(3); Section 75; 2005 Regulations, Regulation 6.)  In other words, it must be established

that the Employer does not have the resources at a "relevant time" to pay at least half its

statutorily-calculated pension plan debt, and that an affiliate or connected entity exists with

sufficient resources, when added to the Employer's resources, to pay more than half of the

pension plan debt.

37.    Here, the Claimants cannot satisfy this fundamental requirement.  Among other

things, the Claims rely on the strategically chosen date of June 30, 2008 as the "relevant time"

to make this determination, even though that date is not "relevant" to anything, and by TPR's

own admission, had a time that was actually "relevant" been chosen, the threshold

"insufficiently resourced" test could not have been met.  In any event,  even if this "relevant

time" were appropriate, which it is not, the Claimants fail to provide any basis to support a

finding that NNUK was "insufficiently resourced."  On these grounds alone, the Claims should

be disallowed.

**A.     The Claims Rely On An Improper "Relevant Time" For Measuring Resources
        That Was Selected Solely For Strategic Purposes**

38.    Under Section 43 of the U.K. Pensions Act, the threshold requirement that the

Employer be "insufficiently resourced" is to be determined as of a "relevant time," a date TPR

apparently believes it has unfettered discretion to select.  Here, TPR manipulatively selected a

date, June 30, 2008, which was adopted by the Claimants, that is wholly unrelated to the date on

which any alleged underfunding in the Plan actually crystalized.  Simply put, that date bears no

cognizable relationship to NNUK's ability to fund the Plan, to the ability of NNI or NN CALA

(or any other NNUK affiliate or affiliates) to actually pay the funding shortfall, to the date of

NNUK's "insolvency event" (which under Section 121 of the U.K. Pensions Act is January 14, 2009, the date on which NNUK filed for administration), to the date on which the Debtors commenced their chapter 11 cases (January 14, 2009 for the Debtors other than NN CALA),[19] or to any other relevant consideration.

39.     Rather, by its own admission, TPR strategically selected June 30, 2008 because, had it selected any later date, NNUK would not have met the "insufficiently resourced" test and TPR would have been statutorily barred from issuing an FSD.  As TPR stated in a filing in the Canadian Proceeding, "if a later date were substituted it is virtually certain that one element of the 'insufficiently resourced' test would not be met at such later date."  (TPR Factum Filed in CCAA Proceedings, dated Apr. 13, 2010, ¶ 40, a copy of which is attached as Exhibit 1 to the Iqbal Decl.)  TPR made a similar statement in a March 18, 2010 submission to the Determinations Panel, admitting that the "selection by the Regulator of 30th June 2008 is because it is only prior to that date that the test of insufficiently resourced is met and any later date cannot be used."  (This portion of the TPR letter to the Determinations Panel, dated Mar. 18, 2010, is attached as Exhibit 2 to the Iqbal Decl.)

40.     This strategic selection of the "relevant time" in order to manufacture a claim that otherwise would not exist is both an improper basis for asserting claims well in excess of $1.3 billion from the Debtors and also inconsistent with the purpose and intent of the U.K. Pensions Act.

41.     The U.K. Pensions Act's legislative history instructs that the "relevant time" on which the "insufficiently resourced" test is to be measured is intended to be as close as possible

---

[19]     NN CALA filed its chapter 11 petition on July 14, 2009 for reasons unrelated to the Claims.

to the date on which the determination is made to issue the FSD.[20]  That is entirely logical,

because the measurements of the pension deficit, the Employer's resources and the resources of

the selected affiliate, here NNC, should be made on a date as close as possible to the date on

which the decision is made that financial support should be provided.  Here, however, the date

TPR magically selected, and that the Claimants adopted, is nowhere near the date of the

determination to issue an FSD; nor is it a date on which resources could be fairly assessed, such

as the date of the NNUK administration filing (January 14, 2009), or a date close to the date of

administration filings, such as December 31, 2008, the end of the last quarter prior to the filings.

The Claimants do not even attempt to argue that the date they adopted bears any relevance to

the date of the determination to issue an FSD, or to any other date on which a fair measurement

of the funding shortfall in the NNUK Pension Plan or the resources available to close the deficit

could have been made.

42.     Moreover, the fact that TPR selected the date on which the Claimants rely is of

no benefit to them.  This Court is neither bound by TPR's determination nor obligated to give it

any deference, see supra ¶¶ 17-19, and to the extent the selected date is indefensible, the Claims

should fail and be legally and equitably disallowed on that basis.[21]  The Claimants appear to

adopt June 30, 2008 as the "relevant time" solely because it was "selected by the Regulator,"

---

[20]     Indeed, in the Parliamentary debate over the Act, the U.K. Minister for Pensions, Malcolm Wicks, stated that the "relevant time is intended to be as close as possible to the time of the determination to issue a direction."  27 Apr. 2004, Parl. Deb., H.C., Standing Comm. B (2008) 791 (U.K.) (statement of Min. for Pens. Malcolm Wicks). Wicks further explained that the only reason the Regulator is given any flexibility in selecting the relevant time is "to allow sufficient time to carry out the calculations."  Id.  Here, if the relevant time TPR selected were anywhere near the time the Determinations Panel ruled in June 2010 that FSDs were appropriate, it could not satisfy the "insufficiently resourced" test, because by then whatever resources NNC and the other targets had were needed to satisfy their own creditors, not to contribute to the funding of an affiliate's pension plan.

[21]     Having already been allowed to plead their claims twice, the Claimants should not be permitted to further amend the Claims to assert alternative theories of liability based on a different alleged relevant date, and the Claims should be disallowed with prejudice.  However, if the Court were to consider an alternative date, the evidence suggests that as of December 31, 2008, the last day of the last quarter before NNUK filed for administration, January 14, 2009, the Claimants could not satisfy the "insufficiently resourced" test.

(see, e.g., Claims ¶ 288), and TPR's only attempt in the Warning Notice to justify the selection

of this date is its contention that this "is the last quarterly date for which reliable financial

information for the [Nortel] Group is available before its market capitalisation was adversely

impacted by the exceptional conditions in the financial markets in the second half of 2008."

(Warning Notice ¶ 257.)  Such a rationalization is preposterous on its face.  Financial

information was available long after June 30, 2008.  It also is a matter of record that the only

way TPR could even allege its ability to meet the "insufficiently resourced" test was to choose a

date before the capital markets collapse in late 2008 and 2009 and/or the various creditor

protection filings, when the value of the resources of NNUK's affiliates plummeted.  The

evidence already in the public record shows that TPR selected June 30, 2008 solely as a

maneuver to maximize the possibility that U.K. pension claims could be externalized and U.K.

creditors – in particular, the Claimants – could improve their recoveries by requiring U.S.

Nortel affiliates to absorb their losses.

43.     Because the Claims rely on a measurement date, June 30, 2008, that is not a

"relevant time," but instead was selected by TPR purely as a matter of strategy to reach its

desired result – ignoring corporate separateness and burdening the creditors of NNUK's

affiliates with NNUK's debt – the Court should conclude that there is no good faith basis for

that date and that its selection was inconsistent with the statutory purpose.  Accordingly, the

date should be disregarded, and as such, the Claimants cannot meet the threshold requirement of

showing that NNUK was "insufficiently resourced" at a relevant time.[22]

---

[22]     Notably, TPR and apparently the Claimants chose to use the market capitalization of NNC as the reference
for the "insufficiently resourced" test.  (Warning Notice ¶ 299.)  In the period between June 30 and December 31,
2008, the closing price of NNC's stock dropped from over $8 to under $1 per share, with a concomitant loss of
market capitalization from over $4 billion to approximately $100 million.

**B.      The Claimants Fail To Demonstrate That NNUK Was Insufficiently Resourced**

44.      In addition to failing to satisfy the "insufficiently resourced" test by blithely selecting a wholly irrelevant "relevant time" as the basis for the Claims, even if their improperly selected measurement date were used, the Claimants could not demonstrate that NNUK was insufficiently resourced for purposes of the U.K. Pensions Act.  The Claimants' contention that NNUK was "insufficiently resourced" is based solely on the conclusions of TPR, which in turn appear to be based on speculative information, flawed assumptions and an unreliable methodology.

45.      For example, the Claimants have provided no information to suggest that the "expert" upon which TPR relied, the actuary Mr. Mobbs of Watson Wyatt, valued the Section 75 Debt based on objective measures as opposed to his own unfettered discretion.  (See Warning Notice ¶ 308.[23])  Similarly flawed are the "deemed" valuations of the resources of NNUK and NNC, which are based on calculations by another "expert" that appear to be similarly methodologically flawed.

46.      In short, (i) TPR deliberately selected a "relevant time" that was only relevant to one thing – reaching the conclusion it wanted; and (ii) had it selected an appropriate "relevant time," there would have been no "insufficiently resourced" finding and no FSD proceedings at all.  As they are based solely on TPR's results-focused analysis and conclusions, the Claims at issue here suffer from the same facial and irreparable defects, and should be disallowed.[24]

---

[23]      The Watson Wyatt letter cited in the Warning Notice and other documentation describing the valuation of the Section 75 Debt are not available to this Court without the consent of the person to whom it relates due to Section 82 of the U.K. Pensions Act, which prohibits disclosure of information obtained by TPR that is not publicly available from other sources, and imposes criminal sanctions for a violation of the statute.  (Hitchcock Decl. ¶ 35.)

[24]      The Debtors reserve their right to challenge the propriety of the measurement date and the sufficiency of NNUK's resources on any and all further grounds they deem appropriate upon the completion of discovery.

## IV. CLAIMANTS CANNOT PROVE IT WOULD BE REASONABLE TO ISSUE FSDS OR CNS AGAINST NNI AND NN CALA

47.     In addition to failing the "insufficiently resourced" test, which in itself requires that their Claims be disallowed, the Claimants cannot satisfy the "reasonableness" requirement for the issuance of an FSD or a CN under Sections 43(7) and 47 of the U.K. Pensions Act or, in this case, the allowance of a claim against NNI or NN CALA.  The Claimants, U.K. entities acting here in a private capacity, have not shown and cannot demonstrate that it would be reasonable to allow their claims against U.S. Debtors in chapter 11 proceedings where the claims arise entirely out of the alleged deficits under the private pension plan of an indirect U.K. Nortel affiliate.  Every factor identified by the U.K. Pensions Act as relevant to a reasonableness determination weighs in favor of disallowance of the Claims as a matter of law.

### A. The Debtors Did Not Exercise Control Over NNUK

48.     The first factor to be considered in determining whether it would be reasonable to issue an FSD or CN is the relationship between the Debtors and NNUK, and in particular, whether NNI or NN CALA, respectively, has or has had control of NNUK.  (U.K. Pensions Act §§ 43(7)(a), 47(4)(b); Hitchcock Decl. ¶ 37.4.1; <u>see also</u> Opinion at 7.)  It cannot be disputed that NNI and NN CALA were not corporate parents of NNUK, but were and are merely indirect corporate affiliates.  Consistent with the manner in which global corporate groups generally operate, the Nortel entities, if any, that would have been in a position to exercise control over NNUK in the ordinary course were NNUK's parent companies – NNC and NNL – not the

Debtors, who are mere sister companies of NNUK.[25]  The Court already found as much in its

dismissal of various claims asserted by EMEA against the Debtors.[26]

49.    Moreover, the TPR Warning Notice, on which the Claimants place substantial

reliance, alleges as much, stating that the entire Nortel Group operated "essentially under the

leadership and control of one board, being NNL/NNC."  (Warning Notice ¶ 74.)  With respect

to the NNUK Pension Plan, TPR bolstered this contention with the statement that "NNC and

NNL wholly and directly controlled NNUK's activities and stance in relation to the scheme."

(Id. ¶ 182.)  It further stated that the "directors of NNUK included senior North American

Officers of *NNL/NNC*."  (Id. ¶ 74 (emphasis added).)  While NNI and NN CALA do not concede

this statement is accurate, it is made by TPR in the Warning Notice upon which the Claimants

base their Claims.  Notably, TPR made no mention whatsoever of the Debtors being in a control

position of any kind.

50.    The Claimants similarly admit that "NNI, NN CALA, and NNUK were all under

the common control of NNL, and ultimately, NNC."  (Claims ¶ 68.)  Nevertheless, in an effort

to satisfy the control prong of the reasonableness test, the Claimants also allege, without any

support, that NNI "jointly controlled the Group Tax and Group Treasury functions."  (Id. ¶ 78.)

Not only is this allegation conclusory and meritless, it is patently inconsistent with statements

made by representatives of the EMEA Debtors to the High Court of Justice of England and

Wales in connection with the commencement of their administration proceedings, and later

submitted to this Court, in which they affirmed under oath that the EMEA Debtors were

---

[25]    In making this point, the Objectors are not admitting, much less alleging, that any conduct by NNC or NNL alleged in the Claims either occurred or constituted improper control over NNUK that would support the allowance of a claim against any of the Canadian Debtors by the Claimants.

[26]    This Court determined that the Debtors owed no direct fiduciary duties to NNUK or the other EMEA Debtors.  (See Op. on Joint Objections to and Mots. to Dismiss Claims of Nortel Networks UK Limited, Nortel Networks (Ireland) Limited and Nortel Networks S.A., dated Mar. 20, 2012 [D.I. 7403] at 35-36.)

autonomously managed and controlled from England.  (See Decl. of Sharon L. Rolston, dated Jun. 6, 2009, attaching Witness Statement of Sharon Lynette Rolston, dated Jan. 14, 2009 [D.I. 3 in Case No. 09-11972] (the "Rolston Statement"); Witness Statement of Michel Clément, dated Jan. 14, 2009 [D.I. 45 in Case No. 09-11972] (the "Clément Statement").)  Those representations provided detailed descriptions of the key corporate functions located in England – including tax and treasury – that made decisions for the EMEA Debtors.  (See Rolston Statement; Clément Statement; see also Joint Objection and Mot. to Dismiss Claims of Nortel Networks UK Limited, dated Jul. 15, 2011 [D.I. 5970] at 5-7, 21-29; Warning Notice ¶ 142-43; Joint Omnibus Objection to the Remaining Amended Claims Filed by the EMEA Claimants, dated May 14, 2013 at ¶¶ 42-45 (the "EMEA Objection").)

51.    Accordingly, the allegation that NNI and NN CALA somehow exercised control over their indirect affiliate, NNUK, is unsupported by any evidence and has no merit.

**B.    NNUK Received Far Greater Benefits From The Debtors Than It Provided**

52.    The second factor to be considered in determining whether it would be reasonable to issue an FSD or CN is "the value of any benefits received directly or indirectly by [the Debtors] from the employer."  (U.K. Pensions Act §§ 43(7)(b), 47(4)(c); Hitchcock Decl. ¶ 37.4.2; see also Opinion at 7.)  As TPR's Determinations Panel recognized in its Lehman FSD decision, the reasonableness test under U.K. Pensions Act § 43(7) requires a weighing of the relative benefits provided by the Employer to the Target against those the Target provided to the Employer.  (See Reasons of the Determinations Panel in Lehman Brothers Pension Scheme, dated Sept. 29, 2010 ¶ 106, http://www.thepensionsregulator.gov.uk/docs/DN1784039.pdf.) Notwithstanding this authority, the Claims erroneously focus solely on the alleged "benefits"

provided by NNUK to the Debtors and ignore entirely the vastly greater benefits provided by the Debtors to the Nortel group, including NNUK.[27]

53.    As an initial matter, the evidence in this proceeding will demonstrate that the transfer pricing system not only more than compensated NNUK for any benefits it provided to the Debtors, but that system operated to the substantial benefit of NNUK and the substantial detriment of the Debtors.[28]  In fact, NNUK generated negative net cash flow during several years between 2005 and 2009 and was a net *recipient* of transfer pricing payments under the system over that time period.  (See EMEA Objection at ¶ 30.)  NNUK itself acknowledges that NNI made $2 billion in overpayments during the same period under the transfer pricing system. (See, e.g., NNUK Claim ¶ 56.)

54.    In an effort to minimize the significance of these unassailable facts, the Claimants allege that the transfer pricing system failed to adequately compensate them for NNUK's (i) restructuring costs and (ii) actual pension liabilities.  (Claims ¶¶ 168, 182.)  The Claimants are wrong on both counts.  First, the Claimants do not, and cannot, offer any evidence other than their own bald assertions that the transfer pricing system should have included additional restructuring costs.  (Claims ¶ 166.)  In any event, the amount claimed by

---

[27]    Further, it is far from clear under U.K. law that any of the "benefits" that NNUK allegedly provided to the Debtors prior to April 2005, when these relevant provisions of the U.K. Pensions Act came into force, can even be relied upon in making a reasonableness determination.  (See Report under § 89 of the Pensions Act of 2004 in relation to the Uniq plc Pension Scheme, dated Mar. 2012, www.thepensionsregulator.gov.uk/docs/section-89-uniq.pdf ("Having considered the circumstances of the Scheme and the Group, the regulator came to the view that its 'moral hazard' powers (i.e. sections 38-51 of the Pensions Act 2004) were not available.  This view was informed by the fact that the key transactions and corporate events affecting the size of the Group took place before those powers were in place.").)  In the Box Clever Group Pension Scheme, dated Jan. 26, 2012, http://www.thepensionsregulator.gov.uk/docs/DN2084757.pdf, the Determinations Panel took a different view, rejecting the Targets' argument that it would be unreasonable to issue an FSD against them where the key events at issue took place by 2003.  The decision in the Box Clever matter, however, is currently on appeal before the Upper Tribunal (the first independent body to consider this issue).

[28]    To the extent the Claimants allege that any such transfer pricing related "benefits" were received by NN CALA, rather than NNI, NN CALA had a transfer pricing agreement with NNL, not NNUK, and such arrangements cannot serve as a basis for the Claimants to seek redress for NNUK's unrelated pension losses.

the Claimants for these costs, $92.9 million, is miniscule compared to the billions (likely including substantial overpayments) that NNUK received in transfer pricing payments.

55.     With respect to NNUK's additional pension liabilities, such liabilities should not have been, and generally are not, included in the determination of transfer pricing policies. Nevertheless, even if those costs should have be considered, as fairly valued on a balance sheet basis, they were fully covered by the transfer pricing payments NNUK received.[29]

56.     The Claimants' argument that NNUK was not adequately compensated for its research and development ("R&D") and intellectual property investment is equally without merit. The transfer pricing calculations fully accounted for whatever contribution NNUK made with respect to these items. But even if they did not, the evidence will clearly show that NNUK benefited far more from the R&D and IP investment by the Debtors than the Debtors did from NNUK's "investment." Indeed, NNI was by far the largest generator of revenue and total funding for R&D for the Nortel group, dwarfing NNUK's spending.[30] Further, this intellectual property investment by NNI directly benefited NNUK because NNUK received an exclusive, royalty-free license to exploit Nortel's intellectual property in the U.K. regardless of where the R&D for a product was done.[31] These licenses provided substantial value to NNUK. Similarly

---

[29]     According to the Warning Notice, the "fair value of NNUK's pension deficit" as of June 30, 2008 was $453 million, and even the PPF deficit, which was calculated as of January 13, 2009, amounted to £670 million. (Warning Notice ¶¶ 180, 280, 300, 325.) Even if the transfer pricing system should have accounted for additional pension liabilities, which it should not have, the transfer pricing agreements imbued NNUK with benefits well in excess of these amounts. (See EMEA Objection at ¶ 30.)  The Claimants' argument that they were not fully compensated for the claimed Section 75 Debt amount is meritless, because Section 75 Debt is calculated on a "buy-out" basis and does not reflect an ongoing liability.  (See Hitchcock Decl. ¶ 26.)  Moreover, as discussed supra ¶ 45, even the buy-out figure asserted by the Claimants is grossly speculative.

[30]     To the extent the Claimants also contend that NNI and NN CALA benefited from administrative services NNUK performed in the areas of global sales and marketing, global corporate services and global operations, their failure to quantify the value of these services, or to address the benefits NNUK received from the services provided by the Debtors, speaks volumes as to the lack of import of these allegations. (Claims ¶ 315.)

[31]     Under the Master Research and Development Agreement (the "MRDA"), all participants received an exclusive royalty-free license to exploit Nortel's intellectual property in their own respective jurisdictions.

misplaced are the Claimants' allegations that the Debtors received a "benefit" from NNUK because NNUK produced more "patents 'per head'" than the U.S. and Canadian Debtors. (Claims ¶¶ 122, 313.)  The Claimants provide no support for these allegations; in any event, "patents per head" is a meaningless and misleading figure, particularly where NNUK was more than adequately compensated for any R&D contributions it made through the hefty transfer pricing payments it received.[32]

57.    The Claimants' further assertion that NNUK provided a "benefit" to NNI in the so-called "Project Swift" transaction (Claims ¶¶ 210-11) similarly fails on its face.  The Claimants concede, as they must, that NNI was not a party to the transaction, and NNUK provided no consideration to NNI in the transaction.  (Claims ¶¶ 201.)  As alleged in the Claims, Project Swift consisted of a transaction whereby NNL repaid NNUK a portion of an intercompany loan by transferring stock in certain EMEA entities to NNUK, rather than by paying NNUK in cash.  According to the Claimants, NNI benefited from Project Swift because the transaction enabled NNL to hold onto cash that it later used to repay intercompany loans made to it by NNI.  (See, e.g., Claims ¶¶ 210-11.)  Not only were any such repayments to NNI grounded in a valid, preexisting contractual obligation of NNI, but there is no basis in fact to tie any value allegedly received by NNI to NNL's involvement in Project Swift, and such unrelated events cannot form any basis for a determination that it is reasonable to assess U.K. pension losses against NNI.

58.    Moreover, while the Claimants now conveniently argue that Project Swift was forced on NNUK and that NNUK received no benefit from the transaction, the facts are to the contrary.  The transaction was not only approved by NNUK's Board of Directors, but its Board

---

[32]    While the "benefits" provided by NNUK in relation to the product lines described in the Claims are either untrue or exaggerated, such alleged "benefits" are immaterial because NNUK was fully compensated through the various transfer pricing arrangements.

received a detailed 80-page valuation report from Ernst & Young UK – partners of which are now acting as Joint Administrators for NNUK.  In this report, Ernst & Young UK valued the EMEA subsidiaries that NNUK was to receive as part of Project Swift.  Ernst & Young UK's independent valuation of those subsidiaries confirmed that NNUK received fair consideration in exchange for the loan forgiveness it provided to NNL.  In addition, Ernst & Young UK described in detail for the NNUK board the additional tax-related and other benefits from Project Swift.  NNUK's board met numerous times with its key finance personnel to review and discuss the valuations of the EMEA entities as prepared by Ernst & Young UK and to ensure due care and attention was given to the transaction.  Most importantly, there simply is no evidence whatsoever that in these repayment transactions NNI obtained a benefit at NNUK's expense.

59.    Furthermore, the U.K. Pension Trustee was not only fully apprised about Project Swift, but it received independent advice from PricewaterhouseCoopers ("PwC") concerning its interest in the impact Project Swift could have on the ability of NNUK to perform its obligations to the NNUK Pension Plan, and negotiated and obtained a separate contractual guarantee from NNL in connection with that transaction.  (Claims ¶ 224(c).)  Tellingly, neither with respect to Project Swift nor at any other time did the U.K. Pension Trustee seek any undertaking from NNI or NN CALA with respect to the NNUK Pension Plan (nor would one have been appropriate).

60.    In addition to the transfer pricing payments it received, NNUK received a huge benefit from NNI because by 2006, NNI became a guarantor of approximately $4 billion in borrowings by NNC and NNL, while at the same time, NNUK and other EMEA entities were

31

released from their historical guarantees of the Nortel group credit facilities. The Claimants fail to mention this extraordinary benefit to NNUK in their Claims.

61.　　In short, the Claimants' contention that NNUK was not fairly compensated for benefits it allegedly provided to the Debtors is completely belied by the facts, and its conclusory allegations cannot serve as a basis for a reasonableness finding.

**C.　　The Debtors Had No Connection Or Involvement With The NNUK Pension Plan**

62.　　The third factor in determining whether it would be reasonable to issue an FSD or CN against NNI and NN CALA is "any connection or involvement which the [Debtors] ha[ve] or ha[ve] had with the scheme." (U.K. Pensions Act §§ 43(7)(c), 47(4)(e); Hitchcock Decl. ¶ 37.4.3; see also Opinion at 7.) Unlike NNL, which allegedly funded the various Nortel pension plans and guaranteed payments under the NNUK Pension Plan, (Claims ¶¶ 212, 216, 224; Warning Notice ¶¶ 174-176, 178, 182-85, 209), the Debtors had no connection or involvement with the Plan.

63.　　Indeed, the Claimants allege that the Canadian Debtors had "overall control of pension decisions" and made "all decisions regarding the Plan." (Claims ¶¶ 212-13.) Nevertheless, in an effort to tie the Debtors to the Plan where no connection existed, the U.K. Pension Trustee and the PPF allege that the Debtors were "involved in the Group's pension policy and directly with the management and funding of the Plan" because a number of individuals who were NNI and NN CALA directors at various times also served on the U.K. Pension Fund Policy Committee (the "U.K. PFPC"). (Claims ¶ 213-15.) Yet these same individuals were employees of the Canadian Debtors, and nowhere do the Claims allege that these persons attended U.K. PFPC meetings in their roles as NNI or NN CALA directors, as opposed to their roles as employees of the Canadian Debtors or in other capacities. (E.g., compare Claims ¶ 213(d) (listing Katharine Stevenson as a member of the U.K. PFPC and an

32

NNI director from 2005-2006) <u>with</u> Claims ¶ 70(e)(ii) (stating that Katharine Stevenson was

Treasurer of NNC and NNL between 1999 and 2006).)

64.     The Claimants and TPR also both take the position that the U.K. PFPC had no

power regarding the management or funding of the NNUK Pension Plan.  In fact, the Warning

Notice specifically stated that the U.K. PFPC was controlled by "senior officers of Nortel Group

entities *based in Canada*" (Warning Notice ¶ 184 (emphasis added)) and that the "committee

was subject to overall control from NNC/NNL."  (Warning Notice ¶ 209.)

65.     Indeed, in the Warning Notice, TPR summarized its position on control as

follows:

> Both NNC and NNL, as the immediate and ultimate parent companies
> of NNUK were closely involved with the Scheme as is set out in
> paragraphs 182 to 185 above.  Although there was a UK pension fund
> policy committee, it is clear that this committee was subject to overall
> control from NNC/NNL, and NNUK did not act independently in this
> regard.  The failure of NNUK to agree to a long-term schedule of
> regular contributions for over four years from the date the deficiency
> was known in 2002 was a decision taken by NNC/NNL.

(Warning Notice ¶ 209.)  There is no reference to NNI or NN CALA in this paragraph.

66.     To the same effect are ¶¶ 182-185 of the Warning Notice, entitled "The influence

and control of NNC and NNL in relation to the Scheme," wherein TPR detailed what it

described as NNC's and NNL's "whole" and "direct" control of "NNUK's activities and stance

in relation to the Scheme."  (Warning Notice ¶¶ 182-185.)  Nowhere in any of these paragraphs,

or this entire section of the Warning Notice on control of the Plan, are NNI or NN CALA even

mentioned.  To the extent the Claimants have chosen to rest their claim on TPR's prior findings

and statements, they cannot at the same time ignore TPR's statements that undercut and facially

negate any basis for their Claims.

33

67.    In the same vein, not only did the Canadian Debtors alone control funding of the NNUK Pension Plan, but NNL guaranteed a portion of NNUK's obligations under the Plan. (Claims ¶ 224.)  The Debtors did neither.

68.    The Claimants also allege that NNI had involvement in the NNUK Pension Plan because of the so-called "Reciprocal Agreement" among the large Nortel entities.  Pursuant to that Agreement, an employee of one entity who moved to another of the large Nortel entities got pension credit for continuous service at his or her original Nortel entity as though he or she had not switched employers.  Claiming, "on information and belief," that certain ex-NNUK employees moved to NNI, the Claimants make a giant illogical leap in alleging that NNI therefore "contributed to the liabilities of the Plan." (Claims ¶¶ 228-229.)  Assuming *arguendo* that such allegations could be proven by actual facts rather than conclusory assertions, to the extent that NNI took on a number of ex-NNUK employees pursuant to an agreement to which NNUK was a party, that hardly amounts to "contributing to the liabilities of the Plan."

69.    The Claimants simply have not alleged and cannot demonstrate that the Debtors had any involvement in the funding or control of the NNUK Pension Plan.

**D.    The Debtors' Financial Circumstances Warrant Disallowance Of The Claims**

70.    The fourth and final factor the Court should consider in determining whether it would be reasonable to issue an FSD or CN against NNI and NN CALA is "the financial circumstances of the person" against whom liability is sought to be imposed.  (U.K. Pensions Act §§ 43(7)(d), 47(4)(f); Hitchcock Decl. ¶ 37.4.4; <u>see also</u> Opinion at 7.)  The Debtors are in chapter 11 proceedings, and the Warning Notice itself shows NNI (as of September 30, 2009) as having claims or liabilities that exceed its assets by some $4.7 billion.  It also shows NN CALA

as having claims or liabilities in excess of its assets.  (Warning Notice ¶ 253.[33]) Moreover,

NNI's and NN CALA's own employees have faced substantial hardship as a result of the

Debtors' bankruptcy filings.  These current and former U.S. employees have seen their pension

plan terminated and taken over by the PBGC, their deferred compensation plans and other

employee benefits terminated, retiree health and welfare plans terminated and the expected loss

of health and welfare benefits to long-term disabled individuals, in many instances in exchange

for the payment of cash or allowance of claims that, at least in the eyes of these current and

former employees, constituted a significant compromise of their potential claims.  It would be

*per se* unreasonable under these circumstances to dilute potential creditor recoveries in NNI's

and NN CALA's chapter 11 cases in order to increase the recoveries of private creditors of

NNUK.

71.     Any liability imposed against the Debtors based on the underfunding of the

NNUK Pension Plan would be unreasonable as a matter of law as it would reduce the amount

available to pay their own creditors, particularly where the Claims – asserted at over $1.3 billion

– could substantially dilute or swamp the claims of other U.S. creditors, including without

limitation (i) the claims of the Pension Benefit Guaranty Corporation (Claim Number 4735 filed

in the amount of $593 million); (ii) the claims proposed to be awarded to long-term disabled

individuals who worked for the Debtors (as reflected in the proposed settlement which would

grant an allowed claim in the amount of $25.96 million); and (iii) the bondholder guaranty

claims against NNI (Claim Numbers 3971-72, filed in the aggregate amount of

---

[33]     The U.K. High Court of Justice noted in a ruling in the Nortel and Lehman matter related to claims against
EMEA affiliates that the focus of the FSD/CN regime is primarily targets operating in the normal course, not
companies like NNI and NN CALA that are in bankruptcy proceedings.  In re Nortel GMBH & Lehman Bros.,
[2010] EWHC 3010 (Ch) ¶¶ 70, 152, 177-178.  In fact, TPR itself issued a statement last year that the insolvency of
a target and the interests of its creditors must be considered in connection with an FSD.  (See "Financial Support
Directions and Insolvency," Statement from The Pensions Regulator,
www.thepensionsregulator.gov.uk/docs/financial-support-directions-and-insolvency-july-2012.pdf.)

$3,940,750,260.42) which relate to refinanced debt that NNI guaranteed at the same time that NNUK was being released from its historic guarantees.

72.    Even if, as a result of the actions and claim mitigation efforts taken by NNI and NN CALA in their bankruptcy cases, it were ultimately determined that the Debtors were able to satisfy all of their own debts in full, the Claimants potentially could still benefit from any equity value through claims they have asserted against the Canadian Debtors.  A finding of reasonableness simply cannot be made on the facts here.[34]

73.    Accordingly, the Claimants cannot satisfy any prong of the "reasonableness" test and as such their Claims should be disallowed in full.[35]

## V.    THE LIABILITY AMOUNTS ALLEGED BY THE CLAIMANTS ARE SPECULATIVE, UNREASONABLE AND IRRELEVANT

74.    Even if the Claimants actually had a claim against NNI or NN CALA, which they do not, the amounts sought by the Claimants are grossly excessive.  The Claimants seek $376 million for their alleged loss with respect to Project Swift (Claims ¶¶ 211, 325); $92.9 million for the restructuring costs that were not included in the windfall transfer pricing payments received by NNUK (Claims ¶¶ 168, 325); an estimated $867 million for NNI's allocated share of purportedly inadequate transfer payments for NNUK's pension costs (Claims ¶¶ 182, 325); and sums to be determined by this Court in respect of the allegedly "favorable"

---

[34]    The Claimants argue that NNI and NN CALA "are each in a significantly better position to provide financial support to the Plan as compared to NNUK." (Claims ¶¶ 317-18.)  Even if true, this is beside the point.  It is and always has been the obligation of NNUK, not NNI or NN CALA, to fund NNUK's pension plan.  NNUK's relative financial position as compared to indirect affiliates like the Debtors is irrelevant.  Moreover, in light of the substantial benefits that NNUK received through its participation in the transfer pricing arrangements, any obligation its affiliates could conceivably have to contribute to the funding of NNUK's pension plan has been more than satisfied.

[35]    In addition, it would be unreasonable for this Court to impose liability for the alleged underfunding of the NNUK Pension Plan on the Debtors for the reasons discussed supra in Part I, including considerations of comity that counsel against applying the U.K. Pensions Act (as interpreted by Claimants) to the Debtors.  Moreover, even if the Court does not disallow the Claims on the grounds that the threshold statutory prerequisite was not satisfied (i.e. that NNUK was not "insufficiently resourced" at a "relevant time," as discussed supra in Part III), the Claimants' strategic manipulation of these tests means that it would not be "reasonable" to impose liability in any event.

transfer pricing treatment of NN CALA and the alleged R&D and other benefits purportedly provided by NNUK to NNI and NN CALA (Claims ¶ 325).[36]

75.     These amounts are unreasonable for a number of reasons.  First, only one of the items even alleges any relationship to the NNUK Pension Plan or the alleged funding shortfall therein.  That is the $867 million the Claimants seek against NNI and NN CALA for their alleged share of an estimated pension shortfall figure of £1.6 billion. (Claims ¶ 182.)  The remaining items have nothing to do with an FSD, a CN or a pension shortfall.

76.     Moreover, with respect to the $867 million, the Claimants' contention that this represents the Debtors' share of the "true costs of [NNUK's] pension liabilities and the benefit which NNI thereby derived" (Claims ¶ 325) is belied by the facts.  NNI did not derive any benefit from a shortfall in its indirect affiliate's pension plan.  Further, the "true costs" of NNUK's pension liabilities, according to the Warning Notice, was its "fair value" of $453 million as of June 30, 2008.  (Warning Notice ¶ 280.)  These costs were more than covered by NNI's transfer payments (including its overpayments), from which NNUK benefited.  The £1.6 billion deficit figure used by the Claimants (Claims ¶ 181), just like the even higher Section 75 Debt figure they and TPR have used to allege that NNUK was "insufficiently resourced," is based on speculative actuarial calculations that do not represent an actual cost.  They are calculated as the buy-out price for insurance company annuities and would not have been the basis for any pension contribution or any transfer pricing payment.  See supra notes 5, 29.

77.     Further, the $867 million figure does not take account of the relevant facts that demonstrate why NNI and NN CALA should have no liability for the shortfall in the NNUK Pension Plan: (a) it is only alleged that the Canadian Debtors, not the Debtors, controlled

---

[36]     As discussed supra in Part II, NNUK already has asserted its own claims against the Debtors on the same grounds as the Claimants.  The Claims are thus duplicative and secondary.  To the extent there is any recovery, it should be a single recovery, not a double recovery.

NNUK's finances and contributions to the Pension Plan; (b) NNI and NN CALA are mere indirect affiliates of NNUK, not parent companies like the Canadian Debtors; (c) NNI already has paid over $7 billion in transfer pricing payments in recent years; and (d) any liability imposed on NNI or NN CALA would deprive the real U.S. creditors of funds that otherwise would be available to satisfy their claims.

78.    In light of the Canadian Debtors' alleged control of the funding of the NNUK Pension Plan, their alleged decision to impose a "contribution holiday," their corporate relationship with NNUK, and NNL's guaranty of a portion of NNUK's required contributions to the Pension Plan, if any target bears responsibility for the shortfall in the NNUK Pension Plan based on the allegations in the Claims, it would be the Canadian Debtors, not the Debtors.[37] However, even with respect to such allegations, the mere fact that NNUK could have made additional contributions historically is not an proper ground for imposing liability on its affiliates at this time, particularly if it is shown that NNUK made all contribution payments that it was statutorily required to make to the Plan during those periods.

79.    The remaining items of "damages" the Claimants seek do not merit extensive discussion.  First, as to the $376 million they seek for Project Swift, as discussed supra ¶¶ 57-59, neither NNI nor NN CALA was a party to or a beneficiary of that transaction, and the Claimants' contrived arguments regarding the availability of cash to NNL and NNC as a result of that transaction would at most provide a claim against either or both of those entities, not against NNI or NN CALA.

---

[37]    For this reason, while the Objectors are not admitting, much less alleging, that any conduct by NNC or NNL in the Claims either occurred or constituted improper control over NNUK or the Plan, to the extent the Court imposes any liability on the Debtors on the Claims, the Debtors reserve the right to claim over against the Canadian Debtors.

80.     With respect to the $92.9 million the Claimants seek for alleged restructuring costs that were not reimbursed through transfer pricing payments, as discussed <u>supra</u> ¶ 54, it was entirely proper for the transfer pricing regime not to account for these restructuring costs, and in any event, there is no basis for recovering this amount from NNI or NN CALA.  If the Claimants believe such costs were excessive, then their complaint is against the parent companies that they allege controlled the purse strings – NNC and NNL – not indirect affiliates NNI and NN CALA.

81.     The other items of "damages" the Claimants seek are unquantified amounts for "unduly favorable treatment received by NN CALA at NNUK's expense under the transfer pricing system," and "inadequate[] compensat[ion] for the services" NNUK purportedly rendered to the entire Nortel group, including for R&D.  (Claims ¶ 325.)  With respect to the latter, the Claimants provide no facts that even suggest that the transfer pricing payments NNUK received were insufficient to cover any and all of the purported "services" and "benefits" NNUK supposedly provided to NNI and NN CALA.  Moreover, the approximately $4 billion in borrowings by NNC and NNL that NNI guaranteed, at the same time that NNUK and other EMEA entities were released from their historical guarantees of the Nortel group credit facilities, alone far exceeds any amount to which NNUK could possibly be entitled for services and benefits.

82.     The Claimants' remaining item of "damages" seeks an unspecified amount from NN CALA to compensate them because NN CALA allegedly received more "favorable treatment under the Group's transfer pricing system" than NNUK did.  (Claims ¶186.)  They also claim that NNUK provided NN CALA with vaguely described services and other assistance of an unquantified value.  (Claims ¶¶ 183-86.)  These nebulous and conclusory

allegations are meaningless.  In any event, NNI made over $7 billion in transfer pricing

payments, including over $2 billion in overpayments.  As such, the Debtors paid more than their

fair share under the system, and NNUK in turn received more than its fair share under the

system.  Accordingly, the Claimants have alleged no facts that would entitle them to anything

from NN CALA.

83.     The Claimants are not entitled to any recovery from the Debtors, and if liability

is imposed on any party it should be imposed on the Canadian Debtors.

## VI.     ADDITIONAL GROUNDS FOR OBJECTION

84.     The Objectors further object to the Claims to the extent they rely on any findings

or determinations made by TPR or the Determinations Panel, including without limitation the

Warning Notice, the Determination Notices, the Reasons of the Determination Panel, or any

submissions made to the Determinations Panel.  The Court's prior ruling, as affirmed by the

Third Circuit, held that the U.K. Administrative Proceedings are "deemed void and of no force

or effect" as to the Debtors.  (Automatic Stay Order at 5.)  Moreover, as acknowledged by the

Third Circuit, the Objectors did not participate in the Determinations Panel proceedings.  See In

re Nortel Networks, Inc., 669 F.3d at 143 ("One factor to be considered by the Bankruptcy

Court if and when there is an attempt to introduce those findings [from the U.K. Administrative

Proceedings] into evidence at a hearing is that none of the parties before the Bankruptcy Court

participated in the U.K. proceedings with respect to the U.S. parties.").  Without waiving the

foregoing, to the extent such submissions or determinations or the contents thereof are even

admitted into evidence in connection with the Claims, the Objectors reserve all objections and

defenses they may have relating to such documents.

85.     The Objectors also further object to the Claims to the extent they seek to assert

claims or impose liability on NNI or NN CALA on any additional theories or alleged facts not

included in the Claims. Additionally, the Objectors object to any finding of liability based on NN CALA's allegedly "unduly favorable treatment" under its separate transfer pricing arrangements with NNL, or NNUK's alleged "inadequate[ ] compensat[ion] for the services it provided to the Nortel Group" (Claims ¶ 325), as such allegations are not adequately pleaded and do not state a claim upon which relief can be granted under Bankruptcy Rule 7008 or otherwise. The Objectors also object to the Claims to the extent the Claimants assert a claim in excess of their actual damages or seek to obtain recoveries in excess of the allowed amount of any claim, and to the extent the Claimants have failed to mitigate or even attempt to mitigate the amount of their Claims.

## RESERVATION OF RIGHTS

86.    This Objection is based on the limited information relating to the U.K. Pension Claims known by the Objectors as of the date hereof. The Objectors expressly reserve the right to amend or supplement this Objection, in whole or in part, and to file additional objections or proceedings, on any factual or legal basis.

## NO PRIOR REQUEST

87.    No prior request for the relief sought herein has been made to this or any other court.

## CONCLUSION

WHEREFORE, the Objectors respectfully request that the Court (i) sustain this Objection; (ii) disallow and expunge with prejudice the U.K. Pension Claims addressed in this Objection; and (ii) grant such other and further relief as the Court deems just and proper.

Dated:  May 14, 2013          CLEARY GOTTLIEB STEEN & HAMILTON LLP
Wilmington, Delaware

                        Howard S. Zelbo (admitted *pro hac vice*)
                        James L. Bromley (admitted *pro hac vice*)

Jeffrey A. Rosenthal (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
Neil P. Forrest (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*

- and -

AKIN GUMP STRAUSS HAUER & FELD LLP

Fred Hodara (admitted *pro hac vice*)
David Botter (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

- and -

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Christopher M. Samis*
Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
One Rodney Square

42

920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile: (302) 651-7701

*Counsel for the Official Committee
of Unsecured Creditors*