## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X

|  |  |  |
|---|---|---|
|  | : | Chapter 11 |
|  | : |  |
| *In re* | : | Case No. 09-10138 (KG) |
|  | : |  |
| Nortel Networks Inc., *et al.*,[1] | : | Jointly Administered |
|  | : |  |
| Debtors. | : | **Hearing Date:** To commence |
|  | : | January 6, 2014 |
|  | : |  |

-------------------------------------------------------X

## JOINT OMNIBUS OBJECTION TO THE REMAINING
## AMENDED CLAIMS FILED BY THE EMEA CLAIMANTS

---

[1]      The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ............................................................................. 1

Jurisdiction ................................................................................................................ 5

Background ................................................................................................................ 6

A.    Procedural History ........................................................................................ 6

B.    English Proceedings Of The EMEA Claimants ............................................ 7

C.    The EMEA Claims Process ........................................................................... 9

D.    The Remaining Proofs Of Claim ................................................................... 11

      i.    *Transfer Pricing* ............................................................................... 13

      ii.    *Project Swift* .................................................................................... 16

      iii.    *Intercompany Loans and Dividends* ................................................ 17

      iv.    *Unidentified Pre-Petition Asset Sales* ............................................ 18

Relief Requested ....................................................................................................... 18

Basis For Relief ........................................................................................................ 18

      I.    THE PRIMARY LIABILITY CLAIMS LACK MERIT .................................. 19

      II.    THE SECONDARY LIABILITY CLAIMS LACK MERIT ............................. 22

      III.    NNI WAS NOT UNJUSTLY ENRICHED ...................................................... 24

      IV.    THE CONTRACTUAL AND QUASI-CONTRACTUAL CLAIMS LACK MERIT ........................................................................................ 26

      V.    THE CLAIMS PREMISED ON CONTINGENT TAX LIABILITY ARE WITHOUT BASIS .......................................................................... 27

      VI.    THIS COURT'S PRIOR RULING BARS THE FSD CLAIMS ....................... 27

**Page**

VII.  THE CLAIMS ARE SUBJECT TO MULTIPLE
ADDITIONAL DEFENSES ............................................................................27

   A.  The Claims Are Barred, In Whole Or In Part, By The Doctrines Of
Estoppel And Waiver.............................................................................27

   B.  All Claims Premised On An Underlying Breach Of Fiduciary Duty
Fail Because The EMEA Claimants Were Solvent During The
Relevant Period ....................................................................................29

   C.  The Claims Fail Because Claimants' Shareholder Ratified The
Alleged Conduct....................................................................................30

   D.  The Claims Are Barred By The Doctrines Of *In Pari Delicto*, *Ex
Turpi Causa*, Or Other Related Doctrines ................................................31

   E.  The Claims Are Time-Barred, In Whole Or In Part................................31

   F.  Any Recovery By Claimants Would Constitute An Unlawful
Double Recovery Or Unjust Enrichment..................................................34

   G.  Claimants' Breach Of Fiduciary Duty, Unjust Enrichment, And
Other Claims In Tort Are Barred, In Whole Or In Part, To The
Extent That They Arise Under A Contract ...............................................35

   H.  The Claims Are Subject To Equitable Subordination .............................37

VIII.  CLAIMANTS CANNOT ESTABLISH DAMAGES ........................................37

RESERVATION OF RIGHTS ....................................................................................37

NO PRIOR REQUEST ...............................................................................................38

CONCLUSION............................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

10 Del. C. § 8121 ............................................................................................................ 32

10 Del. C. 8106 ............................................................................................................. 32

11 U.S.C. § 108(c) .......................................................................................................... 33

11 U.S.C. § 502(e)(1)(B) ................................................................................................ 27

Fed. R. Civ. P. 15(c)(1)(B) ............................................................................................. 33

**Cases**

Anderson v. Airco, Inc.,
No. Civ. A 02C-12-091HDR, 2004 WL 2827887 (Del. Super. Ct. Nov. 30, 2004) .......... 22

Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.,
181 F.3d 435 (3d Cir. 1999) ........................................................................................... 20

Boyd v. Tempay,
Civil Action No. 07-377-JJF, 2008 WL 5156307 (D. Del. Dec. 4, 2008) ........................ 24

Burlington N. R.R. Co. v. Hyundai Merch. Marine Co.,
63 F.3d 1227 (3d Cir. 1995) ........................................................................................... 28

Capitaliza-T Sociedad de Responsabilidad Limitada de Capital Variable v. Wachovia
Bank of Del. Nat'l Ass'n.,
Civil No. 10-520 (JBS/KMW), 2011 WL 864421 (D. Del. Mar. 9, 2011) ....................... 22-23

Coan v. O & G Indus., Inc. (In re Austin Driveway Servs., Inc.),
179 B.R. 390 (Bankr. D. Conn. 1995) ............................................................................ 33

Coleco Indus., Inc. v. Berman,
423 F. Supp. 275 (E.D. Pa. 1976), aff'd in part, remanded in part on other grounds, 567
F.2d 569 (3d Cir. 1977) ................................................................................................... 34

End of the Road Trust v. Terex Corp. (In re Fruehauf Trailer Corp.),
250 B.R. 168 (D. Del. 2000) ........................................................................................... 32

Fleck v. KDI Sylvan Pools, Inc.,
981 F.2d 107 (3d Cir. 1992), cert. denied sub nom. Doughboy Recreational, Inc.,
Div. of Hoffinger Indus., Inc. v. Fleck, 507 U.S. 1005 (1993) ......................................... 28

**Page(s)**

Fortune Prod. Co. v. Conoco, Inc.,
52 S.W.3d 671 (Tex. 2000) ........................................................................    35

Gelof v. Papineau,
829 F.2d 452 (3d Cir. 1987) .....................................................................    34

Grayson v. Imagination Station, Inc.,
Civil Action No. 5051-CC, 2010 WL 3221951 (Del. Ch. Aug. 16, 2010) ........................    36

Grunstein v. Silva,
C.A. No. 3932-VCN, 2009 WL 4698541 (Del. Ch. Dec. 8 2009) ....................................    36

In re Nortel Networks, Inc.,
469 B.R. 478 (Bankr. D. Del. 2012) ..........................................................    10, 11, 19, 31

Jackson v. W. Telemarketing Corp. Outbound,
245 F.3d 518 (5th Cir. 2001) ...................................................................    33

Kahn v. Seaboard Corp.,
625 A.2d 269 (Del. Ch. 1993) ...................................................................    32

Kuroda v. SPJS Holdings, L.L.C.,
971 A.2d 872 (Del. Ch. 2009) ...................................................................    36

Marvel Entm't Grp., Inc. v. Mafco Holdings, Inc. (In re Marvel Entm't Grp., Inc.),
273 B.R. 58 (D. Del. 2002) .....................................................................    32

McCoy v. Grinnell (In re Radcliffe's Warehouse Sales, Inc.),
31 B.R. 827 (Bankr. W.D. Wash. 1983) .........................................................    33

Mem'l Hermann Healthcare Sys., Inc., v. Eurocopter Deutschland GmbH,
524 F.3d 676 (5th Cir. 2008) ...................................................................    36

Moore Bus. Forms, Inc. v. Cordant Holdings Corp.,
Civ. A. No. 13911, 1995 WL 662685 (Del. Ch. Nov. 2, 1995) ...................................    36

Nebenzahl v. Miller,
No. CIV. A. 13206, 1996 WL 494913 (Del. Ch. Aug. 26, 1996) ..................................    23

New Hampshire v. Maine,
532 U.S. 742 (2001)............................................................................    28

O'Connell v. Arthur Andersen LLP (In re Alphastar Ins. Grp. Ltd.),
383 B.R. 231 (Bankr. S.D.N.Y. 2008) ...........................................................    22

**Page(s)**

Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs
Credit Partners L.P. (In re Fedders N. Am., Inc.),
405 B.R. 527 (Bankr. D. Del. 2009) ................................................................. 22

Palese v. Del. State Lottery Office,
No. Civ. A. 1546-N, 2006 WL 1875915 (Del. Ch. June 29, 2006) .................................. 35

Port Auth. of N.Y. & N.J. v. Arcadian Corp.,
189 F.3d 305 (3d Cir. 1999) ................................................................. 20

RTI Hamilton, Inc. v. Tronox LLC (In re Tronox, Inc.),
No. 09-10156 (ALG), 2010 WL 2010844 (Bankr. S.D.N.Y. May 14, 2010) .................... 26

Ryan Operations G.P. v. Santiam-Midwest Lumber Co.
81 F.3d 355 (3d Cir. 1996) ................................................................. 29

SmithKline Beecham Pharm. Co. v. Merck & Co.,
766 A.2d 442 (Del. 2000) ................................................................. 32

Stewart Title Guar. Co. v. Sterling,
822 S.W.2d 1 (Tex. 1991) ................................................................. 34

Teleglobe USA Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.),
493 F.3d 345 (3d. Cir. 2007) ................................................................. 20

Winstar Holdings LLC v. Blackstone Grp., LP (In re Winstar Commc'ns, Inc.),
435 B.R. 33 (Bankr. D. Del. 2010) ................................................................. 32

Yarrington v. Thornburg,
205 A.2d 1 (Del. 1964) ................................................................. 35

Zenith Radio Corp. v. Hazeltine Research, Inc.,
401 U.S. 321 (1971) ................................................................. 34

Nortel Networks Inc. ("NNI") and its affiliated debtors, as respective debtors and debtors in possession (collectively, the "Debtors"), together with the Official Committee of Unsecured Creditors (the "Committee" and collectively with the Debtors, the "Objectors"), hereby object (the "Objection") pursuant to sections 105, 502 and 510 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 3001, 3002, 3003, 3007 and 9014 *et seq.* of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 3007-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the amended proofs of claim filed by certain Nortel entities located in an operating region known as Europe, the Middle East and Africa ("EMEA") (collectively, the "EMEA Claimants" or "Claimants") against the U.S. Debtors.[2]

In support of this Objection, Objectors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.     Claimants' jumble of claims boil down to a single unsustainable proposition:  that NNI, Claimants' affiliate, should be held liable for billions of dollars in damages for the alleged breaches of fiduciary duty by Claimants' sole shareholder (NNL) and Claimants' own board members.  Claimants' attempt to hold NNI liable because NNL purportedly forced Claimants' board members to abdicate their fiduciary duties is baseless and unprecedented.  The claims should be seen for what they are:  a sham effort to grab NNI's assets – assets that must be made available to NNI's own true creditors – for the benefit of the EMEA entities' creditors.

---

[2]     The amended proofs of claim subject to this Omnibus Objection and abbreviated names used to describe various EMEA Claimants throughout this Objection are listed in Appendix A.  This Omnibus Objection incorporates by reference the arguments made in the previous joint objections and motions to dismiss the claims filed by NNUK, NNIR and NNSA and the French Liquidator (the "Motions to Dismiss") [D.I. 5970, 6022, 6026] and the joint replies filed in further support of the Motions to Dismiss [D.I. 6553, 6574, 6575].

2.      NNI owed no fiduciary duty or duty of care to its EMEA affiliates.  This Court already so held with respect to claims asserted by NNUK, NNIR and NNSA.  The same is true with respect to the substantially identical claims asserted by other Claimants.  This legal axiom disposes of all of the claims seeking to impose liability on NNI as an alleged primary wrongdoer under a breach of fiduciary duty or duty of care theory.  Those claims should be summarily dismissed.

3.      Claimants' attempt to hold NNI secondarily liable for the actions of others – under aiding and abetting, conspiracy or similar theories – likewise fails.  Claimants must first establish the primary liability of NNL or of Claimants' former board members.  They will not be able to do so.

4.      Further, even if some entity or person other than NNI wronged Claimants, Claimants cannot establish that NNI knowingly and substantially assisted any such wrongdoing. The Court already has recognized in its decision on the Motions to Dismiss that Objectors' arguments were "persuasive in showing the weakness and unlikelihood of ultimate success" of the secondary liability claims.  While the Court was required to accept Claimants' factual allegations as true solely for purposes of the Motions to Dismiss, the Court is no longer bound to accept Claimants' unsupportable allegations.  Application of settled legal principles to the actual facts compels the disallowance of these claims.

5.      The claims fail for straightforward reasons.  NNI did not control or dominate Claimants and did not act with the requisite intent or substantially assist in the alleged wrongdoings of others.  NNI had no responsibility or ability to control, manage or influence Claimants.  This was the role of Claimants' boards and officers, their shareholder, NNL, and NNUK, as the supervisor and controller of the treasury and tax functions for the Nortel EMEA

2

regions.  The complained-of transactions were either explicitly or implicitly approved by

Claimants, including by formal approval of their boards, and were approved and ratified by

NNL.  The Joint Administrators, as well as senior officers and directors of NNUK and NNSA,

have stated affirmatively under oath – repeatedly, both in this Court and in the High Court in

London, England – that the treasury, tax and other financial functions of the Nortel entities in the

EMEA region were controlled, coordinated and supervised by NNUK from London and in fact

operated with autonomy from NNL, the EMEA entities' ultimate Canadian parent (and *a fortiori*

with complete autonomy from their affiliate, NNI).

6.       Claimants nonetheless attempt to tag NNI with billions of dollars in liability based

on the thinnest of reeds:   the allegation that a handful of individuals with some relationship to

NNI allegedly participated in Nortel's "Group Tax" and "Group Treasury" functions.  There is,

of course, nothing unusual about a multinational corporation having a group treasury or tax

function.  Further, all or virtually all of the persons identified by Claimants as having

participated in that function held an NNL or EMEA title and were acting in that capacity with

respect to the transactions at issue.  Most important, regardless of any alleged role that an

individual with an NNI relationship might have played in the group treasury or tax function, that

role, even if attributable to NNI, did not substantially assist and was not the "but for" or

proximate cause of any alleged harm to Claimants.  Any harm Claimants suffered as a result of

the transactions in question was caused solely and directly by Claimants' own conduct and that

of NNUK.

7.       A review of the transactions highlighted by Claimants amply proves this point.

The largest category of claims relates to transfer pricing.  Claimants do not dispute that they,

including NNUK, approved the transfer pricing arrangements.  Nor do they dispute that their

shareholder, NNL, ratified them.  Rather than causing or substantially assisting in the transactions, NNI was the victim.  Because it was by far the largest revenue generator in the Nortel group, NNI made billions of dollars of net transfer pricing payments over the years, including at least *$2 billion* in acknowledged *overpayments* from 2000 to 2005 alone.  No other Nortel entity bore a greater burden in respect of transfer pricing payments.  Not even close. Indeed, NNUK, the Claimant bringing the largest transfer pricing claim, was a *net recipient* of huge transfer pricing payments.  In short, NNI was harmed by the transfer pricing regime, as evidenced by the already allowed $2 billion claim against NNL in favor of NNI, and Claimants' attempt to hold NNI liable for any alleged harm to Claimants from that regime is without merit.

8.      The second largest category of claims asserted by Claimants relates to Project Swift, an intercompany transaction in which NNI had no involvement.  Project Swift involved NNL and two principal EMEA entities, NNUK and NNIF.  NNI was not a party to and played no role in Project Swift.  Although not disclosed in its amended claims, NNUK retained Ernst & Young UK – partners of which are now acting as Joint Administrators for the EMEA entities – to conduct an extensive valuation of the consideration transferred in Project Swift.  Ernst & Young UK's valuation demonstrated that Project Swift was fair to NNUK, and NNUK's directors reasonably relied upon this valuation in approving the transaction.  There is thus no basis for NNUK to claim that it was harmed by Project Swift, that its board or its shareholder, NNL, breached fiduciary duties with respect to Project Swift or, most importantly, that NNI played any role in that transaction.

9.      NNUK and NNIR also complain about the terms of loans to which they agreed with NNL.  As in the case of Project Swift, NNI was not a party to those intercompany loans, played no part in them and did not benefit from those loans in any way.  Claimants' muddled

attempt to hold NNI liable for loans between NNL and Claimants merely because NNI separately lent money to NNL is absurd on its face. The claims regarding the allocation of proceeds from pre-petition asset sales – in relation to which Claimants point to only a single sale that occurred in 2006 – fail because, among other reasons, Claimants agreed to that allocation and have no basis now to complain about it after the fact. And the contingent claims related to tax liability are easily rejected because there is no allegation, more than four years into these bankruptcy proceedings, that any such tax claims have been asserted by any taxing authority against the Claimants. Moreover, this Court has already determined the contingent Financial Support Direction claims should be rejected, as the underlying FSDs are deemed null and void.

10.     There are numerous other dispositive defenses to Claimants' claims, many of which are described in more detail below. For example, Claimants cannot establish that they were insolvent during the relevant period and, accordingly, there was nothing improper with the EMEA entities complying with any directives from their shareholder, NNL. Further, there is no dispute that NNL, as the sole shareholder of NNUK and ultimate parent of all the EMEA entities, ratified all of the questioned transactions, which alone bars the claims. The claims also are barred in whole or in part by the applicable statutes of limitations, *in pari delicto* (or the foreign law equivalent such as the English doctrine of *ex turpi causa*) and other dispositive defenses.

11.     As set forth further below, all of the claims can and should be summarily dismissed based on irrefutable facts and accepted legal principles.

## **Jurisdiction**

12.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and is a contested matter pursuant to Bankruptcy Rules 9014 *et seq*. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13.    The statutory bases for the relief requested herein are sections 105, 502 and 510 of the Bankruptcy Code and Bankruptcy Rules 3001, 3002, 3003, 3007 and 9014 *et seq.*

## Background

**A.    Procedural History**

14.    On January 14, 2009 (the "Petition Date"), the Debtors, other than NN CALA,[3] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

15.    The Office of the United States Trustee for the District of Delaware has appointed an Official Committee of Unsecured Creditors in respect of the Debtors [D.I. 141, 142], and an *ad hoc* group of bondholders has been organized.

16.    On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[4] commenced a proceeding in the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors.  A monitor, Ernst & Young Inc. (the "Monitor" or "Ernst & Young Canada"), was appointed by the Canadian Court.

17.    Since the Petition Date, the various Nortel affiliates have sold the assets related to Nortel's business units and other assets to various purchasers.  For further information regarding

---

[3]    NN CALA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009. [D.I. 1098].

[4]    The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

these Chapter 11 cases, reference may be made to the Monthly Operating Reports filed by the

Debtors and to the information contained at http://dm.epiq11.com/nortel.

**B.      English Proceedings Of The EMEA Claimants**

18.      NNUK and eighteen of its affiliates[5] sought orders from the High Court of Justice

of England and Wales (the "English Court") placing NNUK and the other EMEA Claimants into

administration, and appointing individuals from Ernst & Young UK ("Ernst & Young UK") as

administrators (collectively, the "Joint Administrators").  In support of these applications, the

EMEA Claimants submitted and relied upon witness statements from (i) Sharon Lynette Rolston,

then a director of each of the EMEA Companies (the "Rolston Statement"),[6] and (ii) Michel

Clément, president of NNSAS (the "Clément Statement,"[7] and, together with the Rolston

Statement, the "Witness Statements").[8]  These witnesses affirmed under oath that the EMEA

Claimants were autonomously managed and controlled by NNUK from England, and provided

detailed descriptions of the key corporate functions located in England – including tax and

treasury – that made decisions for the EMEA Claimants.  Based on that evidence, the English

Court granted the applications for administration by orders entered January 14, 2009 (the "Initial

Orders").  The Initial Orders found that the EMEA Claimants' administration proceedings (the

"English Proceedings") were "main proceedings," and that England was the center of main

---

[5]      In addition to NNUK, orders of administration were sought with respect to: Nortel GmbH; Nortel Networks (Austria) GmbH; Nortel Networks (Ireland) Limited; Nortel Networks AB; Nortel Networks B.V.; Nortel Networks Engineering Service Kft; Nortel Networks France S.A.S.; Nortel Networks Hispania, S.A.; Nortel Networks International Finance & Holding B.V.; Nortel Networks N.V.; Nortel Networks OY; Nortel Networks Polska Sp. z.o.o.; Nortel Networks Portugal S.A.; Nortel Networks Romania SRL; Nortel Networks S.A.; Nortel Networks S.p.A.; Nortel Networks Slovensko, s.r.o.; and Nortel Networks, s.r.o.

[6]      See Exhibit C to Declaration of Luke A. Barefoot in Support of Joint Objection and Motion to Dismiss Claims of Nortel Networks UK Limited [D.I. 5972] ("Barefoot Decl.").

[7]      See Exhibit D to Barefoot Decl.

[8]      The EMEA Claimants submitted parallel witness statements from Ms. Rolston captioned for each of the EMEA Claimants other than NNSA and NNSAS to both the English Court and this Court.  Each of those statements is substantively identical to the Rolston Statement captioned for NNUK.

interests for NNUK and the other EMEA Claimants.[9]  These findings were critical to permit the

use of a single jurisdiction – England – to serve as the venue for the administration of all of the

EMEA Claimants under the European Union restructuring regulation for coordination of intra-

European insolvency proceedings, Council Regulation (EC) No. 1346/2000.  Without such a

finding, there would have been multiple proceedings in multiple countries, one for each of the

EMEA Claimants.

19.    Upon the EMEA Claimants' petitions, this Court made parallel findings in

granting Chapter 15 recognition to the English Proceedings.[10]  In support of their petitions, the

EMEA Claimants submitted the Witness Statements to this Court along with declarations and

deposition testimony from the Joint Administrators affirming that (i) the Witness Statements

were true and correct, and (ii) the EMEA Claimants' "central management and control is to a

large extent handled from England, where all major decisions are made."[11]  In reliance on this

evidence, this Court entered two orders finding that the EMEA Claimants' center of main

---

[9]    See Order of the High Court of Justice, Chancery Division, Companies Court with Respect to Nortel
Networks UK Limited, dated January 14, 2009, Exhibit E to Barefoot Decl. at 1 ("[T]hese proceedings are main
proceedings . . . ."); Declaration of Michael Todd, Q.C. in Support of Joint Objection and Motion to Dismiss Claims
of Nortel Networks UK Limited, dated July 15, 2011, ¶ 141  [D.I. 5971] ("Todd Decl.").

[10]    NNUK filed a petition for recognition of its English Proceedings as foreign main proceedings pursuant to
Section 1517 of the Bankruptcy Code on June 8, 2009.  See Verified Petition for Recognition of Foreign
Proceedings Pursuant to Chapter 15 of the United States Bankruptcy Code, Barefoot Decl. Ex. G (the "NNUK
Chapter 15 Petition").  The remaining EMEA Claimants filed parallel petitions for recognition on October 20, 2010.
See Verified Chapter 15 Petitions for Recognition of Foreign Proceedings and Related Relief with Respect to the
EMEA Debtors, Barefoot Decl. Ex. H. (the "EMEA Chapter 15 Petitions").

[11]    See Declaration of Stephen John Harris, dated June 5, 2009, Barefoot Decl. Ex. I;  Declaration of Alan
Robert Bloom, dated October 18, 2010, Barefoot Decl. Ex. J.; Response of the Monitor of the Canadian Debtors to
the Verified Chapter 15 Petitions for Recognition of Foreign Proceedings and Related Relief with Respect to the
EMEA Debtors, dated December 30, 2010, Barefoot Decl. Ex. K at Exhibit A, 49:17-50:4, 107:7-17 and 278:25-
279:13; Transcript of Proceedings, In re Nortel Networks Corporation (Jan. 31, 2011), Barefoot Decl. Ex. L at
20:11-14.  Note that while these excerpts of the Joint Administrators' deposition transcript are marked confidential,
counsel for the Joint Administrators have agreed that such excerpts – which have been publicly filed – do not require
confidential treatment.

interests was in England, such that their English Proceedings could be granted Chapter 15 recognition.[12]

C.    **The EMEA Claims Process**

20.    On August 4, 2009, this Court set September 30, 2009 as the general bar date for filing proofs of claim or interest against the U.S. Debtors other than NN CALA.[13]  On September 30, 2009, Claimants filed over three hundred proofs of claim against NNI and the other U.S. Debtors (the "Placeholder Claims").  The Placeholder Claims provided little amplifying information regarding the factual bases for the claims or the types of claims asserted.  For example, the claim filed by NNUK totaled a mere five paragraphs, and only asserted claims "in respect of any heretofore unknown, unliquidated or unmatured claim or claims that the Administrators, NNUK, the Insolvency Practitioner and/or any EMEA Company may have against Nortel Networks Inc."  NNUK Placeholder Claim (Claim No. 5122) ¶ 2.  The only factual context the Placeholder Claim provided was to allege that these "potential claims against the Debtors and their affiliates aris[e] out of transfer pricing, intercompany dealings, trading and other arrangements or agreements between [NNI and NNUK]."  Id.  No such agreements or arrangements were specified, nor was other supporting documentation attached.  The other Placeholder Claims were equally hollow.

21.    Given the lack of any allegations sufficient to provide notice of the bases for the Placeholder Claims, the Debtors objected to the Placeholder Claims on April 1, 2011, seeking an order that required Claimants to amend their proofs of claim to provide a more definite statement

---

[12]    See Order Granting Recognition and Relief in Aid of Foreign Main Proceedings, dated June 26, 2009, Barefoot Decl. Ex. M (the "NNUK Recognition Order"); Order Granting Recognition of Foreign Proceedings and Related Relief with Respect to the EMEA Debtors, dated January 31, 2011, Barefoot Decl. Ex. N (the "EMEA Recognition Order").

[13]    See Order Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof, dated August 4, 2009 [D.I. 1280].

of their alleged claims against the Debtors.[14]  The Canadian Debtors had obtained a parallel order

from the Canadian Court, requiring the EMEA Claimants to file whatever claims they asserted

against the Canadian Debtors by March 18, 2011.[15]  This Court granted the U.S. Debtors'

objection on May 10, 2011, ordering that the EMEA Claimants provide a more definite statement

by June 1, 2011, absent which their claims would be disallowed and expunged with prejudice.[16]

After this Court granted the EMEA Claimants an extension of time,[17] they filed 38 amended

proofs of claim on June 3, 2011 (the "Amended Proofs of Claim").

22.     As confirmed by correspondence between Debtors' counsel and counsel for the

EMEA Claimants, all proofs of claim other than these 38 Amended Proofs of Claim have been

expunged with prejudice.[18]

23.     On July 15 and July 22, 2011, Objectors filed the Motions to Dismiss, relating to

the amended proofs of claim filed by four of the EMEA Claimants – NNUK, NNIR and NNSA

and the French Liquidator.  After briefing and oral argument, by opinion and order dated March

20, 2012, this Court granted in part and denied in part the Motions to Dismiss.[19]  Specifically, the

Court dismissed the above Claimants' amended claims to the extent based on allegations that (i)

NNI acted as a *de facto* director or "shadow director" of NNUK, NNIR, or NNSA; (ii) NNI

---

[14]     See Debtors' Objection to the Proofs of Claim Filed by the EMEA Claimants and Motion for an Order Requiring a More Definite Statement of Claim and Setting a Deadline for the Filing of Any Proofs of Claim by the EMEA Claimants [D.I. 5200] (the "EMEA Claims Objection").

[15]     See EMEA Claims Objection ¶ 3.  Pursuant to the order of the Canadian Court, the EMEA Claimants filed nineteen claims against the Canadian Debtors (collectively, the "Canadian Claims").  See Notice of Submission of Proofs of Claim, dated May 18, 2011 [D.I. 5433].

[16]     See Order Requiring EMEA Claimants to File a More Definite Statement of Claim and Setting a Deadline for the Filing of Any Proofs of Claim By the EMEA Claimants [D.I. 5402].

[17]     See Order Approving Extension of Deadline for EMEA Claimants to File a More Definite Statement of Claim and to File Any Proofs of Claim, dated June 3, 2011 [D.I. 5588].

[18]     Copies of the relevant correspondence are attached as Exhibits A and B to the Declaration of Jacqueline M. Moessner, submitted concurrently herewith.

[19]     In re Nortel Networks, Inc., 469 B.R. 478, 485 (Bankr. D. Del. 2012).

owed a duty of care to NNUK or NNIR; or (iii) NNI was liable as a result of any Financial

Support Direction or Contribution Notice issued in proceedings in the United Kingdom

concerning the NNUK pension scheme.  Because the Court was required to accept Claimants'

factual allegations as true for purposes of the motions to dismiss, the Court declined to dismiss

these Claimants' additional claims, which largely consist of an attempt to hold NNI secondarily

liable for alleged misdeeds of the EMEA Claimants' own directors or their parent company,

NNL.  However, the Court noted that Objectors' arguments were "persuasive in showing the

weakness and unlikelihood of ultimate success" of those remaining claims.[20]

### D.    The Remaining Proofs Of Claim

24.    The remaining EMEA claims (i.e., the claims of NNUK, NNIR and NNSA that

were not dismissed and the claims of the remaining EMEA Claimants that were not subject to the

Motions to Dismiss) can be divided into six categories based on the legal theory advanced by

Claimants as follows:

   i.    *Primary Liability Tort Claims*:  These consist of claims that are
         virtually identical to the claims that were already dismissed by the
         Court with respect to NNUK, NNIR and NNSA, asserting that NNI
         is primarily liable based on an alleged breach of an alleged duty
         owed by NNI to the EMEA Claimants.  The primary liability
         claims brought by other Claimants should likewise be dismissed.

   ii.   *Secondary Liability Tort Claims*:  These are secondary liability tort
         claims under various U.S. state and foreign laws seeking to hold
         NNI liable for allegedly assisting purported breaches of duty and
         other wrongful conduct by the EMEA Claimants' own directors
         and by the entities' shareholder, NNL.  These claims are in the
         nature of, among other things, aiding and abetting breaches of
         fiduciary duty and conspiracy.  The Court already has noted that
         these claims are unlikely to succeed, and in fact Claimants cannot
         establish any element of these claims.

   iii.  *Unjust Enrichment Claims:*   These claims are based on the theory
         that NNI was unjustly enriched or unconscionably received value

---

[20]    Nortel, 469 B.R. at 509.

that belonged to the EMEA Claimants.  In addition to numerous other defects in these claims, Claimants cannot trace to NNI any specific property belonging to Claimants.

iv.    *Other Contractual or Quasi-Contractual Claims*:  These claims allege that NNI had an implied contractual duty to treat each of the Claimants fairly and that it failed to fulfill that duty.  Claimants, however, cannot use a vague implied duty of good faith claim to alter the fundamental terms of the transactions and financial arrangements to which they expressly agreed.

v.    *Contingent Tax Liability Claims*:  These claims are alleged contingent claims against NNI in the event any taxing authority was "to make a claim against [the EMEA Claimants] in relation to a failure to pay the proper level of taxation in any years."[21]  The EMEA Claimants do not assert that any such claim has been made or even threatened by a taxing authority in the four years since the Petition Date.  In any event, NNI would bear no responsibility for any such claims even if asserted by tax authorities.

vi.    *Contingent Claims Relating to UK Pension Proceedings:*  These are claims based on the fact that the U.K. Pensions Regulator has determined that a Financial Support Direction ("FSD") requiring the provision of financial support to the NNUK Pension Plan should be issued against certain of the EMEA Claimants. Claimants contend that NNI should be liable for any support payments required of them by virtue of NNI's supposed involvement in breaches of fiduciary duty and other wrongs, which they contend make NNI responsible for any shortfalls in funding for the NNUK pension plan.  This Court already has ruled on two occasions that as to the Objectors, the pension proceedings in the United Kingdom are "void and of no force or effect thereby precluding liability" on the EMEA Claimants' FSD-based claims. Moreover, the fiduciaries for the pension plan established by NNUK separately are seeking to recover billions from NNI and NN CALA, and to the extent the pension parties are able to establish such claims, any amounts recovered by the EMEA entities on account of such pension claims would constitute an improper double recovery.

With minor variations, these claims also arise out of four alleged fact patterns:  transfer pricing,

Project Swift, intercompany loans and dividends, and pre-petition asset sales.

---

[21]        See, e.g., NNIF Claim ¶¶ 44-45.

i)      *Transfer Pricing*

25.      Claimants allege that they were disadvantaged by the Nortel group's transfer

pricing agreements.[22]  In fact, NNI was the primary victim.

26.      "Transfer pricing" is about taxes.  It refers to the system pursuant to which related

group companies determine the prices charged for transactions, such as the sale of goods or the

provision of services between or among the related companies.  Transfer pricing is extremely

important in a multinational enterprise like Nortel because of the risk of multiple countries taxing

the same income and the opportunities to move income to group members in low tax

jurisdictions.  The basic transfer pricing rule recognized in most jurisdictions is that the pricing

for transactions between or among related parties must be on an arm's length basis (that is, what

unrelated parties in comparable circumstances would charge) so that the various taxing

jurisdictions can be assured that income will not be directed inappropriately from a jurisdiction

in which it is truly earned toward a jurisdiction with a lower tax rate.  For example, if an

intercompany service is provided by entity A in country X, country X will want to make sure that

the service is charged at an arm's length market price so that entity A's income will reflect

appropriate compensation for the service provided.  A below market price charged by entity A

would reduce entity A's income in country X, and entity A would, in turn, pay less tax to country

X.

27.      In Nortel's case, the transfer pricing structure – known as the residual profit split

methodology ("RPSM") – was adopted in 2001 and replaced a prior system known as the cost

---

[22]      See, e.g., NNUK Claim ¶¶ 16-19, 47-56,  NNIR Claim ¶¶ 16-19, 48-50; NNSA Claim ¶¶ 16-22, 54-69; NN Italy Claim ¶¶ 16-20, 47-54; NN Belgium Claim ¶¶ 16-20, 47-54; NN Holland Claim ¶¶ 16-20, 46-53; NN Poland Claim ¶¶ 16-20, 46-53; NN Spain Claim ¶¶ 16-20, 47-54; NN Austria Claim ¶¶ 16-20, 47-54; NN Czech Claim ¶¶ 16-20, 47-54; NN Finland Claim ¶¶ 15-19, 46-53;  NN Germany Claim ¶¶ 16-20, 46-53; NN Hungary Claim ¶¶ 16-20, 45-52; NN Norway Claim ¶¶ 15-19, 46-53; NN Portugal Claim ¶¶ 16-20, 44-51; NN Romania Claim ¶¶ 16-20, 46-53; NN Slovakia Claim ¶¶ 16-20, 46-53; NN Sweden Claim ¶¶ 16-20, 45-52; NN Switzerland Claim ¶¶ 15-19, 46-53; NNSA (French Liquidator) Claim ¶¶ 16-22, 54-69.

sharing method.  The RPSM was contained within the Master Research and Development

Agreement (the "MRDA"), the parties to which are NNL, NNI, NNUK, NNIR and NNSA (the

"MRDA Participants").[23]  These entities generated the vast majority of Nortel's revenue and

conducted substantially all of Nortel's R&D.  While operating, Nortel divided profits or losses

using a schedule to the MRDA, which calculated each MRDA Participant's percentage of the

profits or losses based upon its R&D spend over the preceding five years.  MRDA, Second

Amendment to Schedule A.  Nortel's RPSM, together with volumes of economic analysis, was

submitted for approval to the Internal Revenue Service ("IRS") in the United States and the

Canada Revenue Agency ("CRA") in Canada.[24]  The EMEA Claimants that were MRDA

Participants – NNUK, NNIR and NNSA –  allege that their own directors and their shareholder

and parent, NNL, are culpable for "bringing about" their respective participation in the

agreement.[25]

    28.    In addition to the MRDA, there were distribution agreements (the "Distribution

Agreements") between NNL and specific affiliated Limited Risk Entities (the "LREs"), which

did not engage in material research and development or other risk-taking activities.  NNI was not

a party to the Distribution Agreements, which generally were bilateral agreements between NNL

and specific LREs.  The LREs allege that their own directors and their shareholder or parent

---

[23]     Of course, NNL is also NNI's shareholder and parent.  For the sake of completeness, it should be noted that
Nortel Networks Australia Pty Limited was an original participant under the MRDA, but was terminated from the
agreement in 2007 after ceasing to perform R&D for two years after its R&D facilities were sold in 2005.

[24]     Transfer pricing disputes involving multinational companies are often addressed in advanced pricing
agreements between the IRS and the taxing authorities of other countries pursuant to the "mutual agreement"
provisions of U.S. income tax treaties.  These provisions establish a process under which the "competent authorities"
of the treaty parties (here, the IRS and the CRA) resolve disputes over the interaction of the tax systems of the
parties.  Mutual agreement proceedings are negotiations between the two taxing authorities and the taxpayers have
little direct role in the negotiation process.

[25]     See NNUK Claim ¶ 114; NNIR Claim ¶ 113; NNSA Claim ¶ 120 .

entity, NNL, are culpable for "bringing about" their respective participation in the Distribution Agreements.[26]

29.    Nortel's transfer pricing system led to massive overpayments by NNI.  An IRS audit of NNI's tax returns for 2000 to 2005 led to an agreed-upon upwards adjustment of NNI's income by $2 billion, reflecting that NNI had overpaid NNL under the MRDA during this period by at least that amount.[27]  The adjustment resulted in an increase in NNI's U.S. taxable income, which caused a material reduction in NNI's U.S. tax attributes available to offset income.[28]  This $2 billion adjustment was first determined jointly by the CRA and the IRS, then acknowledged by NNI and NNL in connection with the Final Canadian Funding and Settlement Agreement, dated December 23, 2009 (the "FCFSA") through an agreed allowed claim in that amount against NNL in favor of NNI.  The $2 billion claim was approved and allowed by orders approving the FCFSA entered by this Court and the Canadian Court overseeing NNL's insolvency proceeding after a joint hearing on notice to the Joint Administrators among many others.

30.    By contrast, NNUK – which asserts the largest transfer pricing-related claims of Claimants – was a net recipient of billions of dollars in transfer pricing payments from 2001-2008.  NNI's $7 billion in transfer pricing payments over those years, including at least $2 billion in overpayments from 2000 to 2005 alone, were used to fund research and development conducted in Canada and in the EMEA region, including at English facilities owned by NNUK.  In short, it was NNI that was harmed by the transfer pricing arrangements, not NNUK.

---

[26]    See, e.g., NN Italy Claim ¶ 84; NN Poland Claim ¶ 71; NN Holland Claim ¶ 88; NN Spain Claim ¶ 81; NN Belgium Claim ¶ 93.

[27]    The $2 billion income adjustment represented a compromise amount.  The total claim filed by the IRS against NNI for unpaid taxes for the period 1998 to 2008 was approximately $3 billion, which implied an income adjustment of higher than $2 billion for 2001 to 2005.

[28]    NNI's US net operating loss carryforwards (NOLs) were just under $814 million after such reduction.

ii)      *Project Swift*

31.      The next largest claims are brought by NNUK, NNSA and NNIF with respect to "Project Swift," a corporate transaction completed in December 2007.  Pursuant to this transaction, NNL transferred its shares in NNIF to NNUK in partial repayment of loans owed to NNUK.[29]  As with the transfer pricing arrangements, Project Swift was approved by the boards of NNUK and NNIF after careful analysis and due consideration.

32.      Although not disclosed by the EMEA Claimants in their amended proofs of claim, in connection with Project Swift NNUK's board received a detailed valuation report from Ernst & Young UK – partners of which are now acting as Joint Administrators for NNUK and other EMEA Claimants.  In this report, Ernst & Young UK valued the EMEA subsidiaries that NNUK was to receive as part of Project Swift.  Ernst & Young UK's independent valuation of those subsidiaries confirmed that NNUK received fair consideration in exchange for the loan forgiveness it provided to NNL.  In addition, Ernst & Young UK described in detail for the NNUK board the additional tax-related and other benefits from Project Swift.  NNUK's board met numerous times with its key finance personnel to review and discuss the valuations of the EMEA entities as prepared by Ernst & Young UK and to ensure due care and attention was given to the transaction.  The Joint Administrators' litigation-driven position that Project Swift was unfair to NNUK cannot be squared with the valuation report Ernst & Young UK prepared at the time Project Swift was under consideration and upon which the NNUK board reasonably relied.

---

[29]      NNSA was not ultimately involved in Project Swift.  But because it was originally planned that NNSA's shares would be transferred to NNUK as part of Project Swift, NNSA was purportedly required to repay a loan from NNL.  NNSA does not contest this debt, but alleges that NNSA "was not in a position" to make a repayment when it was asked to do so.  See NNSA Claim ¶¶ 73-79.  NNSA acknowledges, however, that after its controller resisted immediate repayment of the entire loan, it was not required to do so, and subsequently NNSA "apparently . . . *agreed*" to repay the loan in two installments.  Id. at ¶ 75 (emphasis added).

33.    NNUK and NNIF allege that NNI "benefit[ted]" from Project Swift because NNL repaid unrelated loans from NNI.[30]  There is, in fact, no basis to connect these separate transactions.  Moreover, there was nothing improper about NNI's loans to NNL or NNL's subsequent repayment of those loans, which were valid debts and thus properly repaid. Claimants do not allege otherwise.  NNI did not unjustly benefit by being repaid on a valid loan that it extended to NNL, and NNUK and NNIF were not injured by this either.

*iii)    Intercompany Loans and Dividends*

34.    NNUK and NNIR allege that cash was "channeled" to <u>NNL</u> through non-interest bearing loans and purportedly improper dividends.[31]  As with Project Swift, NNI was not a party to these transactions.

35.    NNUK and NNIR make the confused allegation that NNI somehow benefitted from these loans and dividends because NNL repaid other loans from NNI.[32]  Once again, however, there is no contention that NNL's debts to NNI were not valid and enforceable legal obligations.  Nor is it possible to trace to NNI any funds advanced by NNUK or NNIR to NNL in connection with intercompany loans.  To the contrary, it is NNI that provided cash to NNL through its massive transfer pricing payments, including at least $2 billion in overpayments, which was then made available to the entire Nortel group, including NNUK.  Further, it is noteworthy that during the same period of the alleged wrongful acts asserted by Claimants, NNUK, NNSA, and NNIR were released from their historic guarantees of the Nortel group credit facilities.  NNI today is the only Nortel subsidiary that is liable as a guarantor for NNC and NNL's material financial debt obligations.

---

[30]    NNIF Claim ¶ 26; <u>see also</u> NNUK Claim ¶¶ 71, 75.

[31]    <u>See</u> NNUK Claim ¶¶ 57-68; NNIR Claim ¶¶ 51-65.

[32]    <u>See</u> NNUK Claim ¶¶ 63-64; NNIR Claim ¶ 60.

*iv)*      *Unidentified Pre-Petition Asset Sales*

36.      Certain Claimants allege they did not receive a fair allocation from business sales

prior the Petition Date (the "Pre-Petition Asset Sales").  The only business sale alleged by any of

them, however, is a December 4, 2006 sale of Nortel's UMTS business to Alcatel Lucent S.A.

("Alcatel").  Claimants admit that they agreed to the basis on which the proceeds of the sale

would be allocated and do not allege that they objected to that allocation at the time they

received payment as unfair.[33]  Instead, they accepted the agreed-upon allocation.  Claimants

cannot establish that they were harmed by the Pre-Petition asset Sales or if they were that NNI

bears any responsibility for that harm.

## Relief Requested

37.      By this Objection, the Debtors seek the entry of an order, pursuant to sections

105, 502(b) and 510(c) of the Bankruptcy Code, Bankruptcy Rules 3001, 3002, 3003, 3007 and

9014 *et seq.*, and Local Rule 3007-1, disallowing in full the EMEA Claims and, at a minimum,

equitably subordinating any claims allowed.

## Basis For Relief

38.      Although there are dozens of claims set out in hundreds of pages of repetitive and

conclusory allegations, all of the claims can easily be disallowed based on a series of

straightforward and irrefutable propositions:

- ● ***NNI owed Claimants no fiduciary duties or duty of care***.  The same principles that led the Court to dismiss the primary liability claims brought by NNUK, NNIR, and NNSA apply with equal force to the substantially identical claims brought by other Claimants.

- ● ***Claimants' tax and treasury functions were controlled by their boards and NNUK, not NNI.***  Claimants have repeatedly admitted this in sworn

---

[33]      See, e.g., NNIF Claim ¶ 39-40; NN Holland Claim ¶ 54-55; NN Poland Claim ¶ 54-55; NN Italy Claim ¶ 55-56; NN Spain Claim ¶ 55-56; NN Belgium Claim ¶ 55-56.

affidavits submitted in this Court and in the High Court in London, England.

- ***NNI did not act with the requisite knowledge or substantially assist any alleged primary wrongdoer, nor could its actions have caused the transactions at issue.*** No one acting on behalf of NNI had the authority or ability to influence tax and treasury decisions that were knowingly and voluntarily approved by Claimants, including by their own directors, approved and ratified by the Claimants' sole shareholder or parent entity, NNL, and supervised and controlled by NNUK. NNI, moreover, did not know that any of these constituencies were breaching their fiduciary duties, if they were.

- ***NNI did not benefit at Claimants' expense.*** NNI was not a party to Project Swift and received no benefit therefrom and, in any event, Ernst & Young UK determined the transaction was fair to NNUK. NNI was not a party to and did not benefit from the intercompany loans NNL received from either NNUK or NNIR. Nor was NNI unjustly enriched by the Pre-Petition Asset Sales.

- ***Claimants' own conduct and their shareholder's ratification bars the claims against NNI.***

39.    For these reasons, and others including the reasons set forth below, the claims should be disallowed.

## I.    THE PRIMARY LIABILITY CLAIMS LACK MERIT

40.    This Court already has held that under English, Irish and French law, there is no "precedent establishing that a sister company can be considered a *de facto* or shadow director of another sister company," and, accordingly, NNI did not owe fiduciary duties to NNUK, NNIR or NNSA. Nortel, 469 B.R. at 504-05. The Court also rejected similar claims by these Claimants, such as duty of care claims, because they likewise represented an unprecedented and improper attempt to impose fiduciary-like duties upon NNI that do not exist as a matter of law. Id.

41.    The primary liability claims asserted by the other EMEA Claimants likewise must be dismissed, because they too are premised upon legal theories not accepted in the relevant

jurisdictions.[34]  Just as is the case under English, Irish and French law, there is no basis under the

law identified by these other Claimants to impose fiduciary duties or a duty of care on NNI with

respect to its EMEA sister companies.[35]  For this reason alone, all of the EMEA Claimants'

primary liability tort claims should be summarily disallowed.

42.      Even assuming the applicable law was otherwise, Claimants cannot establish that

NNI dominated or controlled them.  As noted above, Claimants and their Joint Administrators

have admitted under oath that the EMEA entities were managed and controlled from England,

independent from any control by Canada, much less control by NNI.   See, e.g., Rolston

Statement ¶ 114 ("The EMEA Senior Management operates with a large degree of autonomy

from Canada, setting all policies, procedures, budgets, targets and operational matters for the

EMEA Region"); Clément Statement ¶ 39 ("[C]entral management and control is directed to a

large extent from England, where all major decisions are made . . . .").  Ms. Rolston, a director of

several EMEA entities, provided detailed descriptions of the key EMEA corporate functions

located in England – including tax and treasury – stating unequivocally that:

---

[34]      Where dismissal is required under the law of both potentially applicable jurisdictions, no choice of law analysis is necessary.  See, e.g., Port Auth. of N.Y. & N.J. v. Arcadian Corp., 189 F.3d 305, 311 (3d Cir. 1999).  To apply foreign law to the claims here, Claimants must establish both a conflict between foreign and Delaware law and that foreign law should govern.  See Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd., 181 F.3d 435, 440-41 (3d Cir. 1999) (noting that the party claiming foreign law differs from that of the forum bears the burden of establishing foreign law, citing the Restatement (Second) Conflict of Laws § 136 cmt. f (1971), and further observing that the court will ordinarily apply forum law if that burden is not met); see also Teleglobe USA Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.), 493 F.3d 345, 358-59 (3d. Cir. 2007) (applying Delaware law where party arguing for Canadian law could not establish a conflict between Canadian and Delaware law and extensively cited Delaware law). Objectors do not concede that foreign law applies to any of the remaining claims, particularly given that NNI's alleged actions or omissions largely, if not exclusively, took place in the United States.  Moreover, Claimants have not shown that foreign law differs from Delaware or other U.S. law with respect to the claims.

[35]      This is also true for claims of mismanagement, domination and control and/or breach of proper business conduct.  Like duty of care claims, these types of claims require a relationship of sufficient proximity, domination or control that have never been found to exist between sister companies in a corporate group.  The Court accordingly should dismiss these primary liability tort claims, no matter their label, as it did with NNSA's mismanagement claim and the various primary claims brought by NNUK and NNIR.

- "[S]enior management of all key primary functions (i.e. sales, finance, treasury, legal and human resources) required for the operation of the EMEA Region are located in England."  Rolston Statement ¶ 15(c);

- "[D]ecisions in relation to settlement of intercompany accounts are made by the EMEA treasury team in England."  Id. ¶ 15(i);

- "[M]anagement, supervision and decision-making in relation to taxation of the EMEA Group is made in England."  Id. ¶ 15(f); and

- Both "finance and control functions" and "treasury and banking functions" for the EMEA Claimants were run from England.  Id. ¶ 15(g), (m).[36]

43.    Those admissions were certainly correct, and the EMEA Claimants also are judicially and collaterally estopped from challenging them.  See infra Section VII.A.

44.    At bottom, Claimants' complaint is that Nortel had group treasury and tax functions – as any multinational business of significant size does.  But, this does not show that any of the EMEA entities were dominated or controlled by anyone, much less by NNI.

45.    Moreover, the allegations as to NNI's participation in group treasury or tax functions centers solely on a handful of individuals who Claimants acknowledge were also working for and held positions at NNL or Claimants themselves at the time of the relevant decisions. Their actions cannot be attributed to NNI.  For example, Claimants allege that Katharine Stevenson was a director of NNI, but also admit that she was the "Group Treasurer," see, e.g., NNUK Claim ¶ 22;  whatever actions she took with respect to transfer pricing, Project Swift or EMEA taxation matters were clearly done in that latter capacity.[37]  Claimants further concede that Ryan Smith, whom they allege performed a central role with respect to these

---

[36]    See also id. ¶ 85 ("Global inter-company facilities and loans are all managed from EMEA Treasury in England"); id. ¶ 186 ("The tax group based in England (the 'EMEA Tax Group') is responsible for managing and supervising tax"); id. ¶ 84 ("EMEA Treasury determines and facilitates how to settle inter-company accounts . . . [and] [t]he ultimate decision regarding payment, or settlement is led by EMEA Treasury"); id. ¶ 205 ("Inter-company loans and inter-company trade settlements are both managed from England . . . .").

[37]    In fact, when Katharine Stevenson signed the intercompany loan agreements that NNUK identifies as having harmed it, see NNUK Claim ¶ 22, she signed on behalf of NNL, not NNI.

matters, including Project Swift and intercompany loans, did so at a time when he was the
"*EMEA Tax Leader* on the ground," having been "*seconded to NNUK*."  See, e.g., NNUK Claim
¶ 19 (emphases added).  It is absurd for the EMEA Claimants to seek to hold NNI responsible for
alleged actions of the EMEA Tax Leader while he was working in London for NNUK.

46.     The primary liability claims should also be disallowed pursuant to the general
defenses set forth in Part VII below.

## II.    THE SECONDARY LIABILITY CLAIMS LACK MERIT

47.     To establish secondary liability, the EMEA Claimants must first establish primary
liability against Claimants' *de jure* directors or NNL as a *de facto* or shadow director.  See, e.g.,
Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit
Partners L.P. (In re Fedders N. Am., Inc.), 405 B.R. 527, 543-44 (Bankr. D. Del. 2009) (primary
breach required for aiding and abetting liability); O'Connell v. Arthur Andersen LLP (In re
Alphastar Ins. Grp. Ltd.), 383 B.R. 231, 274 (Bankr. S.D.N.Y. 2008) (explaining that English
"dishonest assistance" is similar to a state law claim for aiding and abetting breach of fiduciary
duty).  Claimants will not be able to establish primary liability against any person or entity.

48.     Even if Claimants could establish primary liability, to establish aiding and
abetting, or similar liability against NNI, they also would have to establish, at a minimum, that
NNI knowingly and substantially assisted in the primary wrongdoer's actions.  See, e.g.,
Anderson v. Airco, Inc., No. Civ. A 02C-12-091HDR, 2004 WL 2827887, at *4 (Del. Super. Ct.
Nov. 30, 2004) ("Liability for aiding and abetting requires proof of three elements: underlying
tortious conduct, knowledge, and substantial assistance.").  The "kind of scienter required for
aiding and abetting claims is actual knowledge.  The 'universal rule requires actual knowledge of
the tortious conduct by the wrongdoer, not merely that the defendant knew something was wrong
in general.'"  Capitaliza-T Sociedad de Responsabilidad Limitada de Capital Variable v.

<u>Wachovia Bank of Del. Nat'l Ass'n.</u>, Civil No. 10-520 (JBS/KMW), 2011 WL 864421, at *5 (D. Del. Mar. 9, 2011) (internal quotation marks and citation omitted).[38]  Similar requirements exist under foreign law.

49.     Claimants cannot establish substantial assistance by NNI or causation.  As noted, as to each of the complained-of transactions – transfer pricing, Project Swift, intercompany loans and the one pre-petition asset sale – the relevant EMEA entity approved the transaction and its sole shareholder, NNL, approved and ratified it.  NNUK controlled the Claimants' treasury, tax and other financial transactions and, as such, made "all major decisions," Barefoot Decl. Ex. D at ¶ 39, with respect to the challenged transactions.  NNI, a mere affiliate, had no ability to cause, and did not cause, Claimants to enter into these transactions.  Any participation by any of NNI's employees in group treasury or tax operations, even if attributable to NNI, did not rise to the level of substantial assistance, nor would they be the cause of any alleged harm Claimants incurred as a result of the transactions.

50.     Claimants also will be unable to prove that NNI knew that Claimants' directors were breaching their fiduciary duties.  In respect of Project Swift, as just one example, NNUK's own directors received a favorable valuation report from Ernst & Young UK upon which they were entitled to and did rely[39] – none of NNUK's directors could have suspected they were breaching their fiduciary duties by agreeing to the transaction, much less anyone at NNI, which was not even a party.

---

[38]     Moreover, "[t]here must be a clear nexus between the knowledge of the wrong and the substantial assistance in carrying out the wrong."  <u>Capitaliza-T</u>, 2011 WL 864421, at *6 (internal quotation marks and citation omitted).

[39]     <u>See generally</u> <u>Nebenzahl v. Miller</u>, No. CIV. A. 13206, 1996 WL 494913, at *2 (Del. Ch. Aug. 26, 1996) ("The business judgment rule generally protects the actions of directors, affording them the presumption directors act on an informed basis and in the honest belief they acted in the best interest of the corporation.  A plaintiff has the burden of rebutting this presumption."  (citing <u>Aronson v. Lewis</u>, 473 A.2d 805, 812 (Del. 1984)).

51.     Claimants' conspiracy claims likewise fail as the alleged facts do not come close to suggesting, much less proving, a conscious agreement among the affiliates to any unlawful scheme, much less to the detriment of Claimants.  See, e.g., Boyd v. Tempay, Civil Action No. 07-377-JJF, 2008 WL 5156307, at *4 (D. Del. Dec. 4, 2008) (conspiracy requires "conscious commitment to a common scheme"); Todd. Decl. ¶ 108 (unlawful means conspiracy under English law requires intent to cause harm); Declaration of Aidan Redmond SC in Support of the Joint Objection and Motion to Dismiss the Claims of Nortel Networks Ireland (Nortel Ireland), dated July 12, 2011,  ¶ 62 [D.I. 6023] (unlawful means conspiracy under Irish law requires conscious agreement to employ such means); id. ¶ 67 (simple conspiracy under Irish law requires predominant intent to injure the plaintiff).

52.     The secondary liability claims also should be disallowed pursuant to the general defenses set forth in Part VII below.

## III.     NNI WAS NOT UNJUSTLY ENRICHED

53.     NNUK, NNIR, NNIF and NN Holland allege that NNI unconscionably or knowingly received value and/or was unjustly enriched from Project Swift, the Intercompany Loans and the Pre-Petition Asset Sales.  See NNUK Claim ¶¶ 139-51, 176-80, and 196-97; NNIR Claim ¶¶ 138-42, 147-51, and 175; NNIF Claim ¶¶ 61-64, 74-76, and 89-90; NN Holland Claim ¶¶ 108-09.  As Claimants recognize in their claims, whether pleaded under US, English, Irish and/or Dutch law, any such cause of action requires at a minimum an enrichment and/or value received by NNI and a corresponding, *related* impoverishment of the Claimant in circumstances where NNI was at fault or received value with knowledge of its unlawful origin. See NNUK Claim ¶¶ 144, 149; NNIR Claim ¶¶ 138, 155, 175; NNIF Claim ¶¶ 61, 74; NN Holland Claim ¶ 108.

54.     NNI had no reason to believe – much less know – that Project Swift, the intercompany loans and dividends, or the pre-petition asset sale involved breaches of fiduciary duties owed by anyone to any of the Claimants involved in these transactions.  Given that the EMEA entities were solvent, decisions in respect of any of these transactions that considered the welfare of NNL or the Nortel Group as a whole (if that is what occurred, as Claimants allege) were entirely proper.  Still less could anyone have suspected that any value was unfairly transferred as a result of Project Swift, given the Ernst & Young UK valuation report upon which NNUK's own directors reasonably relied.

55.     More importantly, there is no evidence that NNI received *any* value traceable to the complained-of transactions or that any payments that NNI received from Canada with respect to the repayment of valid loans were "unjust."  This alone is fatal to these claims as it is a central element of an unjust enrichment claim for a Claimant to establish that its property can be traced to NNI.  NNI was not a party to and received no payments from Project Swift or the intercompany loans or dividends, and the only allegation of any benefit to NNI is that NNI received cash repayments from NNL on pre-existing loans that were owed to it by NNL.[40]  Not only were any such repayments to NNI grounded in a valid, preexisting contractual obligation of NNL – and therefore anything but unjust – but there is no basis in fact to tie or trace any value allegedly received by NNI to Project Swift.  Nor is there any factual basis for the assertion that NNI received money belonging to Claimants from any pre-petition asset sale, where the claimants identify only one such sale and cannot even say what a just allocation would have been.[41]

---

[40]     NNIF Claim ¶ 26.

[41]     The claims by NNUK and NNIR for transaction at undervalue based upon the Pre-Petition Asset Sales similarly fail.  <u>See</u> NNUK Claim ¶¶ 189-91; NNIR Claim ¶¶ 176-79.

56.     The unjust enrichment claims also should be disallowed pursuant to the general defenses set forth in Part VII below

## IV.    THE CONTRACTUAL AND QUASI-CONTRACTUAL CLAIMS LACK MERIT

57.     Certain Claimants assert claims sounding in implied contract, implied term, or mistake, all in relation to the Pre-Petition Asset Sales.[42]  Claimants cannot use implied duties or similar doctrines to alter the express terms of any contracts to which they agreed, and NNI in any event violated no such duties.  The meritless nature of these claims is exemplified by the claims for mistake, where the EMEA Claimants cannot identify the relevant contract, who made the mistake, or when and where the mistake occurred, and cannot even articulate the basic nature of the purported misunderstanding.  See RTI Hamilton, Inc. v. Tronox LLC  (In re Tronox, Inc.), No. 09-10156 (ALG), 2010 WL 2010844, at *3 (Bankr. S.D.N.Y. May 14, 2010).

58.     The contractual and quasi-contractual claims should also be disallowed pursuant to the general defenses set forth in Part VII below.

## V.    THE CLAIMS PREMISED ON CONTINGENT TAX LIABILITY ARE WITHOUT BASIS

59.     There is no allegation, more than four years into these bankruptcy proceedings, that any tax authority has asserted or threatened to assert any claim or imposed any fine on any of the EMEA entities.  The contingent tax liability claims can be disallowed on this basis alone.

60.     In any event, the contingent tax liability claims are premised upon the same baseless allegations concerning breaches of fiduciary duty that underlie the primary and secondary liability claims, and should be disallowed for this reason as well.

---

[42]     NN Belgium also brings a statutory claim for annulment based upon its allegedly defective consent to the transfer pricing Distribution Agreements, see NN Belgium Claim ¶¶ 75-77, but NNI was not a party to those agreements or otherwise responsible for them.

61.     The contingent tax liability claims should also be disallowed pursuant to the general defenses set forth in Part VII below.

## VI.    THIS COURT'S PRIOR RULING BARS THE FSD CLAIMS

62.     This Court has already ruled that pension proceedings in the United Kingdom are "void and of no force or effect" as to the Objectors, "thereby precluding liability" on any FSD-based claims, and has further held that the FSD claims are also subject to mandatory disallowance under 11 U.S.C. § 502(e)(1)(B).  The FSD claims that have not already been dismissed must be disallowed for both of these reasons.

## VII.    THE CLAIMS ARE SUBJECT TO MULTIPLE ADDITIONAL DEFENSES

63.     Without limiting the Objectors' defenses, and with their full reservation of rights, the Objectors wish to highlight certain of their additional defenses.

### A.    The Claims Are Barred, In Whole Or In Part, By The Doctrines Of Estoppel And Waiver

64.     All of the claims fail because the EMEA Claimants are estopped from arguing that NNI or NNL exercised domination and control over the EMEA entities, or that NNI had sufficient influence over Claimants' financial affairs to have substantially assisted any primary wrongdoers' misdeeds or to have been the but for or proximate cause of any alleged harm to Claimants.  Based on the sworn affidavits described above, the English Court granted the applications for administration by orders entered January 14, 2009, which is "tantamount to a finding that the EMEA Debtors were managed and controlled from England."[43]  Upon the EMEA Claimants' petitions, supported by both the Witness Statements and additional declarations and deposition testimony, this Court made parallel findings to those of the English

---

[43]     Todd Decl. ¶ 141.

Court in granting Chapter 15 recognition to the English Proceedings.[44]  Accordingly, the EMEA

Claimants are estopped from arguing now that NNI controlled them, and the primary liability tort

claims are barred as are secondary liability tort claims premised on the allegation that NNI

substantially assisted NNL in dominating the EMEA Claimants.  See Fleck v. KDI Sylvan Pools,

Inc., 981 F.2d 107, 121 (3d Cir. 1992), cert. denied sub nom. Doughboy Recreational, Inc., Div.

of Hoffinger Indus., Inc. v. Fleck, 507 U.S. 1005 (1993) (under the doctrine of judicial estoppel,

"where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that

position, he may not thereafter, simply because his interests have changed, assume a contrary

position" (internal quotation marks and citations omitted)); Burlington N. R.R. Co. v. Hyundai

Merch. Marine Co., 63 F.3d 1227, 1231-32 (3d Cir. 1995) (collateral estoppel prevents

relitigation of  issues that were actually litigated; finally, actually and necessarily determined;

and whose determination was essential to a prior judgment).[45]

---

[44]     See NNUK Recognition Order; EMEA Recognition Order.

[45]     The EMEA Claimants have previously argued that the reason for the inconsistency between their current position and the Witness Statements is that the Joint Administrators were simply unaware of the facts at the time the statements were first made in early 2009.  See, e.g., The Joint Administrators' Memorandum of Law in Opposition to the Debtors' and Committee's Joint Objection and Motion to Dismiss the Claims of Nortel Networks UK Limited at 48-49 [D.I. 6373].  This is directly contradicted by the sworn declarations and deposition testimony from the Joint Administrators affirming that the Witness Statements were true and correct as late as January 2011, shortly before the Amended Proofs of Claim were filed.  Further, that an earlier position was adopted by mistake is not a defense to judicial estoppel where the offending party had the correct information at its disposal to begin with.  See New Hampshire v. Maine, 532 U.S. 742, 753 (2001).  Here, Rolston served as a director of each of the EMEA Claimants, and Clément served as President of NNSA.  It would be preposterous for the Joint Administrators to claim that accurate information about who controlled Nortel was not available to them when they had access to the very people EMEA now claims were "dominated" by NNL or NNI, not to mention board minutes and other corporate records relevant to the issue of control.

        Moreover, the Joint Administrators' willingness to play "fast and loose" with the courts, see Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 361 (3d Cir. 1996), is manifest here:  despite purportedly discovering that the EMEA Claimants were not, in fact controlled from England, the Joint Administrators have continued to maintain insolvency proceedings in England for all the EMEA Claimants – proceedings to which this Court continues to accord Chapter 15 recognition – which proceedings are only proper if the EMEA Claimants were controlled and directed from England, as the Witness Statements attested.  In short, it is not only the case that the Joint Administrators have adopted an inconsistent position in the past, have prevailed based upon that position, and now seek to reverse that position, but here, they *continue* to maintain and reap the benefits of that past position, which is fundamentally at odds with the claims they now press before this Court.

65.     In addition, by ratifying and approving the decisions and conduct about which they now complain, the Claimants have waived their claims.

**B.    All Claims Premised On An Underlying Breach Of Fiduciary Duty Fail Because The EMEA Claimants Were Solvent During The Relevant Period**

66.     All of the claims premised on underlying breaches of fiduciary duty turn on the notion that it was improper for those who allegedly owed duties to the Claimants – whether NNI, NNL, or the EMEA entities' own *de jure* directors – to consider the interests of NNL or the Nortel Group as a whole in making their tax and treasury-related decisions.  But if an entity is solvent, the directors and any other fiduciaries of the entity are fully entitled to consider and act in the interests of the entity's shareholders, and indeed, should do so.  Here, the EMEA entities' sole ultimate shareholder was NNL, and accordingly there simply were no breaches of fiduciary duty, even if, as Claimants contend, their boards determined to bless transactions that were in the interests of NNL and the Nortel group as a whole, such as transactions seeking to minimize the overall tax burden on the Nortel group of companies.

67.     The EMEA Claimants were solvent at all relevant times.  Some had significant positive cash balances at the time of many of the complained-of transactions and agreements, and, in fact, all were solvent up to the Petition Date.  Moreover, the complained-of transfer pricing arrangements were in place since the early 2000s; Claimants cannot possibly establish or even seriously assert they were insolvent for a period of nearly eight years.  Claimants were subject to regular audits by independent auditors, and, to the Objectors' knowledge, none of the financial statements were qualified by going concern warnings.

68.     Further, once again, Claimants' arguments are flatly inconsistent with their prior representations made under oath.  Claimants' submissions to this Court make clear that they were solvent until the January 2009 bankruptcy filing of the Canadian parent.  See, e.g., Rolston

Statement ¶ 4 ("I am advised by E&Y [the Joint Administrators] that the predicted impairment on the global business of the Nortel Group as a consequence of those [bankruptcy] filings means that it is inevitable that the Company and the EMEA Companies *will become* insolvent." (emphasis added)).  Thus, according to Rolston, a director of many of the EMEA entities at the time, in the absence of the bankruptcy filings and the resulting impairment on Nortel's global operations, Claimants would not otherwise have been insolvent.  Such solvency facially negates the validity of the alleged claims.  Accordingly, all of the claims premised on breaches of fiduciary duty or other, similar duties must be disallowed.

**C.      The Claims Fail Because Claimants' Shareholder Ratified The Alleged Conduct**

69.      Even assuming that any breaches of fiduciary duty occurred, where a company is solvent, its shareholders can ratify any such breaches.  As Claimants' own allegations make clear, NNL approved – indeed, according to Claimants, directed – all of the relevant transactions or arrangements that form the basis of the claims, including the transfer pricing structure, Project Swift, intercompany loans and dividends, and Pre-Petition Asset Sales.  Because the EMEA entities were solvent, NNL's ratification cured any breaches of fiduciary duty, and NNI can be neither primarily nor secondarily liable for them.[46]

**D.      The Claims Are Barred By The Doctrines Of *In Pari Delicto*, *Ex Turpi Causa*, Or Other Related Doctrines**

70.      The doctrine of *in pari delicto*, or as it is known in certain other foreign jurisdictions, *ex turpi causa*, precludes a claimant from recovering against a third party when the claim is based on its own wrongful conduct.  As this Court has held, "[t]o bar a claim on *in pari delicto* grounds, a court must only determine that the parties bore 'substantially equal

---

[46]      See, e.g., Joint Objection and Motion to Dismiss Claims of Nortel Networks UK Limited at 39-40  [D.I. 5970]; Todd Decl. ¶¶ 71-74.

responsibility' for a wrongful scheme."[47]  Here, Claimants affirmatively state that their own directors and sole shareholder – whose actions and decisions are imputed to Claimants – engaged in wrongdoing by breaching their fiduciary duties.  Pursuant to the *in pari delicto* doctrine or the equivalent doctrines of foreign jurisdictions (assuming foreign law applies), Claimants are barred from seeking to hold NNI liable for allegedly directing or assisting their own directors' alleged breaches of fiduciary duty.

**E.    The Claims Are Time-Barred, In Whole Or In Part**

71.    Certain of the EMEA Claims have been expressly brought under U.S. state law, and are governed by at most a four-year statute of limitations, even if it is assumed that Delaware's borrowing statute does not apply.[48]  In their responsive briefing on the Motions to Dismiss where this argument was first raised, the EMEA Claimants did not contest this point, which makes clear that certain claims are time-barred.[49]

72.    For example, the EMEA Claimants that were participants in the MRDA – NNUK, NNIR, and NNSA – entered into that agreement in December 2004, see, e.g., NNIR Claim ¶ 40.  Accordingly, even under a four-year statute of limitations, NNUK, NNIR, and NNSA's state law-based transfer pricing claims premised on the MRDA expired in December 2008, prior to the Petition Date, and must be disallowed.[50]

---

[47]    Nortel, 469 B.R. at 508 (citation omitted).

[48]    See, e.g., Joint Reply in Further Support of Objection and Motion to Dismiss Claims of Nortel Networks UK Limited, dated October 5, 2011 at 59 [D.I. 6553].

[49]    Although certain EMEA Claimants and NNI entered into a tolling agreement approved by this Court, that agreement makes clear that it does not revive causes of action whose limitations period ran prior to its effective date. See Order Approving Stipulation Among the Debtors and the Join Administrators on Behalf of Nortel Networks UK Limited and Nortel Networks (Ireland) Limited Regarding Tolling of Certain Claims, dated December 17, 2010, at Ex. 1 ¶ 9 [D.I. 4623] (confirming that the stipulation "shall not operate to revive any NNUK Claim or NN Ireland Claim . . . that as of [December 17, 2010] was already barred by any Limitations Period.").

[50]    As noted in the Motions to Dismiss, Delaware law is clear that the transfer pricing-based claims arose as of the date of the MRDA, regardless of the EMEA Claimants' efforts to frame their claims as relating to the "operation" or "implementation" of the RPSM under that agreement.  See Marvel Entm't Grp., Inc. v. Mafco

73.    Further, in respect of claims sounding in breaches of fiduciary duty, aiding and abetting such breaches, dishonest assistance, civil conspiracy, breaches of contract, breaches of the duty of care, or unjust enrichment, "the law of the forum generally determines whether an action is barred by the statute of limitations."  Winstar Holdings LLC v. Blackstone Grp., LP (In re Winstar Commc'ns, Inc.), 435 B.R. 33, 44 (Bankr. D. Del. 2010).  Therefore, Claimants cannot claim the benefit of Texas' four-year statute of limitations or any foreign statute that provides for a limit longer than Delaware's three-year period for these claims.  Delaware's borrowing statute establishes, without exception, that where an action arises outside of Delaware, "an action cannot be brought . . . to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose."  See 10 Del. C. § 8121; see also id. § 8106; End of the Road Trust v. Terex Corp. (In re Fruehauf Trailer Corp.), 250 B.R. 168, 184 (D. Del. 2000); SmithKline Beecham Pharm. Co. v. Merck & Co., 766 A.2d 442, 450 (Del. 2000).

74.    Accordingly, most of the claims predicated on transfer pricing arrangements (including the Distribution Agreements between NNL and the LREs), purportedly improper loans or dividends, and Pre-Petition Asset Sales are time-barred under the three-year period and must be dismissed.  For example, as to the Pre-Petition Asset Sales, the EMEA Claimants allege that the purportedly unfair distribution was set out in a "statement dated 24 July 2007."  Even assuming the claims did not accrue on an earlier date (e.g., the date of the sale itself), the claims became time-barred no later than July 2010, nearly a year before the Amended Proofs of Claim were filed in June 2011, and six months before the U.S. Debtors agreed with NNUK and NNIR to toll the limitations periods for any claims that remained timely as of the date of their

---

Holdings, Inc. (In re Marvel Entm't Grp., Inc.), 273 B.R. 58, 72-74 (D. Del. 2002); Kahn v. Seaboard Corp., 625 A.2d 269, 274 (Del. Ch. 1993).

agreement.  Likewise, many of the claims based on intercompany loans or dividends had expired

well before the amended proofs of claim were filed (and, in some cases, before even the

Placeholder Claims were filed).  For example, NNIR bases its claims relating to loans in part

upon an alleged June 2006 loan facility that was repaid in July 2006.[51]  The limitations period on

all of the claims relating to that loan expired at the latest in July 2009.[52]

75.    Claimants cannot rely on "relation back" to the dates that the Placeholder Claims

were filed to save any of the above claims.  See Fed. R. Civ. P. 15(c)(1)(B); Coan v. O & G

Indus., Inc. (In re Austin Driveway Servs., Inc.), 179 B.R. 390, 395 (Bankr. D. Conn. 1995)

("[W]hen the amended pleading does not rely upon the facts and transactions originally pled or

plead them more specifically . . . the proposed amendment will not relate back to the original

pleading.").  Further, Section 108(c) of the Bankruptcy Code does not save these claims.  By its

plain text, that section's tolling provisions are triggered only if "applicable nonbankruptcy law

. . . fixes a period for commencing or continuing a civil action in a court *other than a bankruptcy*

*court* on a claim against the debtor."  11 U.S.C. § 108(c) (emphasis added); see McCoy v.

Grinnell (In re Radcliffe's Warehouse Sales, Inc.), 31 B.R. 827, 831 (Bankr. W.D. Wash. 1983).

## F.    Any Recovery By Claimants Would Constitute An Unlawful Double Recovery Or Unjust Enrichment

76.    Even in the unlikely event that the EMEA Claimants are able to establish some

wrongful conduct and attribute that wrongful conduct to NNI, they are not entitled to recover

damages to the extent they are compensated for by the statutory directors of the EMEA

Claimants and/or NNL.  To allow otherwise would be to permit the EMEA Claimants double

recovery on the same injury.  See, e.g., Stewart Title Guar. Co. v. Sterling, 822 S.W.2d 1, 7

---

[51]    See NNIR Claim ¶¶ 53, 64(f), 65(a), 125(a).

[52]    The only other state whose law the EMEA Claimants suggest could apply to their state law claims is Texas, which applies an even shorter, 2-year limitations period to claims of civil conspiracy, making clear the untimely nature of such claims.  See Jackson v. W. Telemarketing Corp. Outbound, 245 F.3d 518, 523-24 (5th Cir. 2001).

(Tex. 1991) ("The one satisfaction rule applies to prevent a plaintiff from obtaining more than one recovery for the same injury."); <u>Gelof v. Papineau</u>, 829 F.2d 452, 457 (3d Cir. 1987) ("plaintiff is entitled to be made whole, but double payment is a windfall" and "an unwarranted penalty"); <u>Coleco Indus., Inc. v. Berman</u>, 423 F. Supp. 275, 311 (E.D. Pa. 1976) (The "one-satisfaction rule . . . holds simply that if a party's claim has been fully satisfied, he has no further claim."), <u>aff'd in part, remanded in part on other grounds</u>, 567 F.2d 569 (3d Cir. 1977).[53]  This rule clearly applies here, where Claimants have brought multiple causes of action and allege multiple wrongful acts in parallel proceedings for the same alleged injury (against NNL in Canada and against the <i>de jure</i> directors in Europe, in addition to the proceedings before this Court).  <u>See, e.g.</u>, <u>Stewart</u>, 822 S.W.2d at 7; <u>Coleco Indus., Inc.</u>, 423 F. Supp. at 311.  Likewise, the rule bars the double recovery sought by NNUK, on the one hand, and the Nortel Network UK Pension Trust Limited and Board of the UK Pension Protection Fund on the other – both sets of claims are premised on the idea that NNUK was undercompensated for services it provided to the Debtors, and demand compensation as a result of the same transfer pricing arrangements and intercompany loans.  <u>Compare</u> Proofs of Claim filed against NNI and NN CALA by NNUK, proof of claim numbers 7786 and 7769, respectively (together, the "<u>NNUK Claims</u>") <u>with</u> the U.K. Pension Claims, proof of claim numbers 8357 and 8358.

77.     Additionally, should Claimants prevail, NNI is entitled to the benefit of any recovery by the EMEA Claimants from insurance policies or other funds to which the U.S. and Canadian Debtors directly or indirectly contributed.  <u>See, e.g.</u>, <u>Yarrington v. Thornburg</u>, 205 A.2d 1, 2 (Del. 1964).

---

[53]     <u>See also</u> <u>Zenith Radio Corp. v. Hazeltine Research, Inc.</u>, 401 U.S. 321, 348 (1971) ("[A] plaintiff who has recovered any item of damage from one coconspirator may not again recover the same item from another conspirator; the law, that is, does not permit a plaintiff to recover double payment.").

**G.    Claimants' Breach Of Fiduciary Duty, Unjust Enrichment, And Other Claims In Tort Are Barred, In Whole Or In Part, To The Extent That They Arise Under A Contract**

78.    To the extent that the EMEA Claimants contend that NNI was unjustly enriched as a result of Pre-Petition Asset Sales, see, e.g., NNIF Claim ¶¶ 89-90, NN Holland Claim ¶¶ 108-09, they cannot recover on a theory of unjust enrichment because any relevant sale to which they were parties would have been governed by a contract.  See, e.g., Palese v. Del. State Lottery Office, No. Civ. A. 1546-N, 2006 WL 1875915, at *5 (Del. Ch. June 29, 2006) ("A party cannot seek recovery under an unjust enrichment theory if a contract is the measure of the plaintiff's right." (internal quotation marks and citation omitted)); Fortune Prod. Co. v. Conoco, Inc., 52 S.W.3d 671, 684 (Tex. 2000) ("[W]hen a party claims that it is owed more than the payments called for under a contract, there can be no recovery for unjust enrichment.").  As discussed above, insofar as NNI was not a party to the contract, no claim lies against it at all.

79.    Moreover, the EMEA Claimants, in particular the LREs, contend that NNI, on its own or together with NNL, "failed to ensure that [the EMEA Claimants] received reasonable, arm's length compensation for [their] distribution and service activities . . ., including under the [corresponding] [d]istribution [a]greement."  See, e.g., NN Italy Claim ¶ 71; NN Holland Claim ¶ 70; NN Switzerland Claim ¶ 70.[54]  However, claims in tort that merely assert breaches of contractual duty should be rejected because the conduct of the parties is governed by an express contract.  See, e.g., Kuroda v. SPJS Holdings, L.L.C., 971 A.2d 872, 889 (Del. Ch. 2009)

---

[54]    See also NN Italy Claim ¶ 49 ("Pursuant to the Distribution Agreement NN Italy had a contractual right to receive a routine return which reflected an arm's length compensation for its distribution function.  In practice, NN Italy received an adjusted distribution return of only 1% of its third party sales from 2003 onwards (it received returns of 1.76% and 0% in 2001 and 2002 respectively).  This level of return failed to recognize inter-company sales, significant customer intangibles, the service element performed alongside the distribution function or the risks and costs borne outside the routine return (for example, translational foreign exchange risks and hedging gains / losses).  As a result of these factors, NN Italy was not properly rewarded for its functions, which is inconsistent with an arm's length approach."); NN Holland Claim ¶ 50 (similar); NN Switzerland Claim ¶ 48 (similar).

("Where . . . the plaintiff's claim arises solely from a breach of contract, the plaintiff generally

must sue in contract, and not in tort." (internal quotation marks and citation omitted)); Mem'l

Hermann Healthcare Sys., Inc., v. Eurocopter Deutschland GmbH, 524 F.3d 676, 678 (5th Cir.

2008) (affirming that, under Texas law, "[w]hen the injury is only the economic loss to the

subject of a contract itself, the action sounds in contract alone" (alteration in original) (internal

quotation marks and citation omitted)).[55]  To the extent the EMEA Claimants' claims in tort

actually allege losses arising out of purported breaches of the distribution agreements, these

claims sound in contract and accordingly are barred.  In fact,  the EMEA Claimants have brought

breach of contract claims against NNL, which was the counterparty to  the Distribution

Agreements.[56]

## H.    The Claims Are Subject To Equitable Subordination

80.    In the unlikely event that the EMEA Claimants are able to establish both a legal

and factual basis for any claim against NNI, such claim should be equitably subordinated or

equitably disallowed, including pursuant to Bankruptcy Code § 510(c), because of the EMEA

Claimants' own inequitable conduct.  Among other things, by representing to this Court and the

English Court that their tax, treasury and other key financial functions were directed and

---

[55]    See also Grayson v. Imagination Station, Inc., Civil Action No. 5051-CC, 2010 WL 3221951, at *8 (Del.
Ch. Aug. 16, 2010) (rejecting a breach of fiduciary claim because it could not be established without establishing
that a contract was breached); Grunstein v. Silva, C.A. No. 3932-VCN, 2009 WL 4698541, at *6 (Del. Ch. Dec. 8
2009) ("Because of the primacy of contract law over fiduciary law, if the duty sought to be enforced arises from the
parties' contractual relationship, a contractual claim will preclude a fiduciary claim." (internal quotation marks and
citation omitted)); Moore Bus. Forms, Inc. v. Cordant Holdings Corp., Civ. A. No. 13911, 1995 WL 662685, at *6
(Del. Ch. Nov. 2, 1995) (dismissing a claim for aiding and abetting a breach of fiduciary duty because the
underlying breach of fiduciary duty claim had been dismissed as duplicative of a breach of contract claim).

[56]    See, e.g., Proof of Claim by Nortel Networks S.P.A. against Nortel Networks Limited:  Particulars of the
Claim under section 5 of the Proof of Claim, dated March 18, 2011, at D.3.3.A (alleging that "[i]n breach of the
Distribution Agreement, NNL failed to pay a reasonable arm's length rate of return to NN Italy"); Proof of Claim by
Nortel Networks Hispania S.A. against Nortel Networks Limited:  Particulars of the Claim under section 5 of the
Proof of Claim, dated March 18, 2011 at D.3.3.A (asserting similar claim against NNL on behalf of NN Spain);
Proof of Claim by Nortel Networks Romania S.R.L. against Nortel Networks Limited:  Particulars of the Claim
under section 5 of the Proof of Claim, dated March 18, 2011, at C.3.3.A (asserting similar claim on behalf of NN
Romania).

controlled from England, the EMEA Claimants secured important benefits for themselves, including venue in England for all of the EMEA Claimants and Chapter 15 recognition.  Now, having secured those benefits, the EMEA Claimants ask the Court to allow claims premised upon allegations that NNI or NNL controlled the very same tax and treasury functions – allegations that are wholly contradicted by their previous sworn testimony – which claims if allowed would be satisfied at the expense of NNI's own direct and innocent creditors.

## VIII.   CLAIMANTS CANNOT ESTABLISH DAMAGES

81.   Claimants suffered no damages.  Claimants cannot establish that the transfer pricing regime designed to minimize group tax liability harmed them.  None of the Claimants were harmed by Project Swift as demonstrated by the contemporaneous valuation prepared by Ernst & Young UK.  As to intercompany loans, Claimants agreed to those transactions and cannot now after the fact complain about them.  In any event, they were transactions solely with NNL.  NNI was not a party to the loans and received no benefit therefrom.  On the Pre-Petition Asset Sale to Alcatel, Claimants received the exact allocation they agreed to accept at the time of such sale.

## <u>RESERVATION OF RIGHTS</u>

Objectors expressly reserve the right to amend or supplement this Objection, in whole or in part, and to file additional objections, on any factual or legal basis.

Objectors expressly note that this Objection is a summary of the flaws with and defenses to the claims and not a complete recitation of evidence, arguments or defenses. Objectors reserve all rights to raise any additional factual or legal defenses that are developed during the course of these contested proceedings.

## NO PRIOR REQUEST

Except as related to the claims that survived Objectors' Motions to Dismiss, no prior request for the relief sought herein has been made to this or any other court.

## CONCLUSION

WHEREFORE, Objectors respectfully request that the Court (i) sustain this Objection; (ii) disallow and expunge the claims with prejudice; and (iii) grant such other and further relief as the Court deems just and proper.

Dated:  May 14, 2013
      Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Howard S. Zelbo (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Jeffrey A. Rosenthal (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*

- and -

AKIN GUMP STRAUSS HAUER & FELD LLP

Fred Hodara (admitted *pro hac vice*)
David Botter (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

- and -

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Christopher M. Samis*
Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile: (302) 651-7701

*Counsel for the Official Committee
of Unsecured Creditors*