**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re<br>NORTEL NETWORKS INC., *et al.*,<br>Debtors. | Chapter 11<br>Case No. 09-10138 (KG)<br>(Jointly Administered) |

**JOINT ADMINISTRATORS' STATEMENT REGARDING THE ALLOCATION**
**ENTITLEMENT OF THE EMEA DEBTORS TO PROCEEDS OF THE SALES OF**
**THE BUSINESS AND RESIDUAL PATENT ASSETS**

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
 Rodney Square
 1000 North King Street
 Wilmington, Delaware 19801
 Telephone:  302-571-6600
 Fax:  302-571-1253

   -and-

HERBERT SMITH FREEHILLS LLP
 Exchange House
 Primrose Street
 London EC2A 2EG

HUGHES HUBBARD & REED LLP
 One Battery Park Plaza
 New York, New York 10004
Telephone:  212-837-6000
Facsimile:  212- 422-4726


*Counsel for the Joint Administrators*

# TABLE OF CONTENTS

**Page**

I.     SUMMARY OF POSITION.............................................................................1

II.    BASIS OF SUBMISSION AND RESERVATION OF RIGHTS.....................3

III.   BACKGROUND ..........................................................................................5

A.     The Nortel Group Structure ........................................................................5
B.     The Nortel Group's Transfer Pricing System ..............................................7
C.     The Importance of IP to the Nortel Group....................................................9
D.     EMEA in the Nortel Group.........................................................................11
E.     The Asset Sales:  Generating the Sale Proceeds..........................................12

IV.    ALLOCATION METHODOLOGY TO BE APPLIED TO THE
       BUSINESS SALES ........................................................................................17

A.     Attributing the business sale proceeds to the relevant assets...........................17
B.     Ownership of Asset Classes and Entitlement to Allocation of the Sale
       Proceeds Attributable to Each Asset Class in Respect of the Eight Business
       Sales ..........................................................................................................21
C.     Interest in IP Confirmed by Contract - the MRDA.........................................23
D.     Construction of the MRDA Confirming Interests in IP...................................24
E.     Entitlement to IP pursuant to Operation of Law............................................25
F.     Calculating Contribution of the RPEs and Allocating IP ................................27
G.     Exclusive and Non-Exclusive Licenses.........................................................29

V.     ALLOCATION OF RESIDUAL PATENTS ................................................29

VI.    PROPRIETARY CLAIMS ..............................................................................32

VII.   CONCLUSION................................................................................................32

## I.    SUMMARY OF POSITION

1.    Substantially all of the assets of the Nortel group of companies (the "**Nortel Group**") have been sold, giving rise to approximately $7.8 billion[1] currently held in various escrow accounts (the "**Sale Proceeds**"). The Sale Proceeds represent the proceeds of the sales of the eight operating global lines of business of the Nortel Group (the "**Business Sales**") and the separate sale of the residual patent assets that were not integrated with any of these lines of business (the "**Residual Patents Sale**," and collectively with the Business Sales, the "**Asset Sales**").

2.    The court-appointed administrators and authorized foreign representatives (collectively, the "**Joint Administrators**") submit this statement (the "**Allocation Statement**") on behalf of the 23 Nortel entities whose registered offices were in England, other European States, the Middle East and Africa ("**EMEA**"), and which are listed and defined in Schedule 1 hereto (the "**EMEA Debtors**")[2] with regard to how the Sale Proceeds should be divided (the "**Allocation Dispute**")[3] between the estates of the various Nortel debtors in Canada, the United States and EMEA (the "**Selling Debtors**"), for eventual distribution to their respective creditors.

1.  All references to amounts in dollars and the use of the "$" symbol in this Allocation Statement are references to US dollars, unless stated otherwise.

2.  The abbreviations set out in Schedule 1 are used throughout this paper.  Pursuant to English law, on  January 14, 2009 Messrs Alan Bloom, Chris Hill, Stephen Harris and Alan Hudson were appointed as Joint Administrators over each of the EMEA Debtors marked with an asterisk and listed in the table in Schedule 1, other than Nortel Networks (Ireland) Limited, in which Alan Bloom and David Hughes were appointed Joint Administrators.  Since the filing in England, Nortel Networks S.A. has also had a French Administrator and a French Liquidator appointed by the French court, as secondary officeholders in accordance with, and subject to, the EC Regulation on Insolvency Proceedings.  The EMEA Debtors not marked with an asterisk in Schedule 1 are not in administration and their current status is indicated in Schedule 1.

3.  While the gross Sale Proceeds are approximately $7.8 billion, some Selling Debtors have already been paid monies from the Sale Proceeds to extinguish liabilities.  To the extent that any Selling Debtor has already received such a "pre-allocation" from the Sale Proceeds, the EMEA Debtors' position is that this should not be treated as a top slicing reducing the Sale Proceeds available to other Selling Debtors, absent an agreement to the contrary.  In certain other circumstances (for example, settlements with Jabil and Flextronics) the Selling Debtors have already agreed between themselves that such costs should be borne between the Selling Debtors in proportion to their ultimate entitlements to the Sale Proceeds, and the EMEA Debtors' position is that these agreements should be honored and not be affected by the Allocation Dispute.  The EMEA Debtors also submit that each Selling Debtor's costs of completing the Asset Sales should be borne separately by the Selling Debtor incurring the costs, and that this should not form part of the Allocation Dispute.

3.      The EMEA Debtors contend that allocation of the Sale Proceeds should be determined by analyzing the entitlement of each Selling Debtor to the proceeds of the specific assets that were conveyed to the purchaser in each Asset Sale.  To determine the proper allocation of the Sale Proceeds, first the classes of assets sold in a particular Asset Sale must be identified, then the proportion of Sale Proceeds attributable to each class of assets should be determined, and finally it should be determined which Selling Debtor owned (or had an entitlement to or interest in) which assets.  Each EMEA Debtor is entitled to a corresponding portion of the Sale Proceeds attributable to those assets.  This asset based methodology is the only logical, equitable and legally sound approach.

4.      The lines of business sold in each Business Sale straddled the legal and geographic entities in the Nortel Group.  Up to 55 Nortel debtors were required to convey or relinquish their existing rights to various business assets in order to effectuate each Business Sale.  In each Business Sale, the Selling Debtors conveyed to the purchaser a bundle of assets consisting of: (i) fixed assets; (ii) inventory; (iii) Customer Assets (as defined below); and (iv) the intellectual property ("**IP**") used to operate each of the Nortel Group's constituent businesses.  Each business had a different mix of assets, and the entitlement of each Selling Debtor to those assets varied for each Business Sale.

5.      The Residual Patents Sale consisted of the sale of the patents and patent applications (including provisional patent applications and related rights) remaining and not sold as part of the Business Sales (the "**Residual Patents**").  Approximately 7,000 patents and patent applications were sold in the Residual Patents Sale.

6.      A very large proportion of the proceeds of each of the Business Sales was attributable to the IP associated with the particular business line that was sold.  The assets sold

2

in the Residual Patents Sale were all IP assets.  The determination of the ownership of the IP

will therefore be the critical issue in allocating the Sale Proceeds.  With limited exceptions,[4]

each of Nortel Networks Inc. ("**NNI**," the U.S. Debtor), Nortel Networks Limited ("**NNL**," the

Canadian Debtor), Nortel Networks UK Limited ("**NNUK**," an EMEA Debtor), Nortel

Networks S.A. ("**NNSA**," an EMEA Debtor), and Nortel Networks (Ireland) Limited ("**NNIR**,"

an EMEA Debtor) beneficially owned the IP sold through the Business Sales and the Residual

Patents Sale, which had been developed by them on a joint basis.

7.      The allocation of the Sale Proceeds for all IP assets has to properly reflect the

manner in which the IP was developed and owned by the Nortel Group. No arbitrary formula or

measure can be applied.  Rather, each entity with a beneficial ownership in the IP is entitled to

an allocation of the Sale Proceeds from those IP assets in a manner which properly and fairly

reflects its contribution to the value of those assets.  The critical issue, in essence, is

contribution to the value of IP, with respect to both the Business Sales and the Residual Patents

Sale.

8.      For the reasons set out herein, the EMEA Debtors contend that they are entitled to

an allocation of at least $2.7 billion from the Sale Proceeds.

## II.      BASIS OF SUBMISSION AND RESERVATION OF RIGHTS

9.      The allocation entitlements for some of the Selling Debtors have been settled.[5]

Additionally, certain Selling Debtors have assigned their rights with respect to allocation to

---

4.  Two of the EMEA Debtors, Nortel France SAS and Nortel Germany (as defined in Schedule 1), created and owned patents registered in their own respective names separately and are therefore entitled to a small share of the proceeds of the Residual Patents Sale on that basis.

5.  In particular, settlements have been reached in relation to Nortel Group entities in the Asia Pacific region, Israel and the Caribbean and Latin America region.

other Selling Debtors who continue to participate.[6]  Nevertheless, allocation remains to be

determined between approximately 30 entities, of which 22 are EMEA Debtors.

10.    Each EMEA Debtor is entitled to a separate allocation out of the Sale Proceeds.

The EMEA Debtors present their claims together in this joint Allocation Statement solely for

administrative convenience.  At evidentiary hearings and trial, each EMEA Debtor reserves the

right to separately present evidence and submissions in support of a separate allocation out of

the Sale Proceeds.

11.    Submission of this Allocation Statement is subject to, and without waiver of, all

rights of the EMEA Debtors with respect to the Order Approving Allocation Protocol, entered

by the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**") on April

3, 2013 (the "**Allocation Protocol Order**," D.I. 9947) and the accompanying Opinion (the

"**Allocation Opinion**," D.I. 9946), including in connection with their pending appeal therefrom

(Notice of Appeal, D.I. 10166) and the endorsements of Mr. Justice Morawetz of the Ontario

Superior Court of Justice – Commercial List (the "**Canadian Court**"), dated March 8, 2013

and April 3, 2013 (the "**Allocation Endorsements**") including in connection with their pending

appeal therefrom.  Nothing in this paper is to be taken as a submission to, or consent to, the

jurisdiction of either the U.S. Court or the Canadian Court for the determination of the

Allocation Dispute.  This Allocation Statement is being filed pursuant to the May 15, 2013 e-

mail from the Honorable Judge Kevin Gross stating that the Courts will subsequently enter

Orders requiring service by noon today.

---

6.  As to which, see Schedule 1.

### III.    BACKGROUND

### A.    The Nortel Group Structure

12.    The Nortel Group was a global supplier of end-to-end networking products and solutions serving service providers, enterprises, governments and other users.  Nortel Networks Corporation ("**NNC**," a Canadian Debtor) was the publicly traded Canadian parent of the Nortel Group.  NNL was the primary Canadian operating and holding company for most of the Nortel Group.  Collectively, NNC or NNL owned (either directly or indirectly) 100% of the equity of the Nortel subsidiaries in EMEA.

13.    There were two principal types of entities in the Nortel Group:  (1) residual profit entities ("**RPEs**") and (2) non-residual profit entitles ("**non-RPEs**").  A chart is attached as Schedule 2 showing an outline of the structure of the Nortel Group as at the Petition Date (as defined herein).

14.    RPEs were integrated entities that performed various functions, including:  (i) research and development ("**R&D**"); and (ii) marketing and distributing Nortel products in their geographic region on behalf of the Nortel Group.  Each was a fully integrated business with management, sales and marketing, R&D and support functions.  The five RPEs within the group at the date of insolvency were NNI, NNL, NNUK, NNSA, and NNIR.[7]

15.    Prior to the Petition Date (as defined herein), each of the RPEs (with the exception of NNIR) also acted as a Transaction Control Center ("**TCC**").  The TCCs were responsible for placing orders with the Nortel Group's external suppliers on behalf of non-RPEs that distributed products to the Nortel Group's end-customers.

---

7.  A further entity registered in Australia Nortel Networks Australia Pty Limited ("**Nortel Australia**") was previously an RPE. However, that entity ceased to be an RPE prior to January 2009, the date of commencement of insolvency proceedings. Any allocation to which Nortel Australia may have been entitled has been settled and it makes no claim to allocation in these proceedings.

16.    The RPEs were the most significant entities within the Nortel Group.  Crucially, they were the entities that jointly, through their coordinated R&D efforts, created and beneficially owned the IP in the Nortel Group.  Pursuant to the Transfer Pricing System (as defined below) each RPE also held a perpetual, royalty-free exclusive license to exploit Nortel IP within its own designated territory, as well as a perpetual, royalty-free non-exclusive license in parts of the world that were not within another RPE's exclusive territory.

17.    Non-RPEs were entities that were principally engaged in the sale and marketing of products within their geographies, and included limited risk entities ("**LREs**"), cost plus entities ("**CPEs**") and at risk entities ("**AREs**").

18.    The LREs were distribution entities that were primarily engaged in selling and installing Nortel products and providing service and support to Nortel's end-customers. These entities operated under standard form distributor agreements with NNL, which entitled them to an operating margin that was supposed to be equivalent to the margin that they would have been expected to earn as independent economic entities. They held rolling perpetual non-exclusive licenses to exploit the Nortel Group's IP within their territories.

19.    The CPEs were mainly companies that provided marketing, sales or support services to other Nortel entities and to Nortel Group customers.  The CPEs generally received fixed mark-ups on the cost of their services from other Nortel entities.  In some cases they had rolling, perpetual non-exclusive licenses to the Nortel Group's IP.  In other cases, CPEs had non-exclusive rights to use software or IP in particular Nortel Group products.

20.    The AREs were sales and distribution businesses that generated revenues by exploiting the sales exclusivity they had to sell Nortel products in their territories.  The two EMEA AREs had territorial exclusivity to sell certain Nortel Group products in France and

Germany respectively, and enjoyed non-exclusive licenses to exploit the IP within those Nortel Group products and to grant sub-licenses to end consumers.  The two EMEA AREs, Nortel France SAS and Nortel Germany, also created and owned IP – in the form of registered patents – in their own right, separately from the RPEs.  Nortel France SAS and Nortel Germany were parties to the Residual Patents Sale, in which the patents they owned were sold along with all remaining Nortel Group IP.  Nortel France SAS also sold some of its patents as part of the Business Sales, where those patents were used within the relevant business line.[8]

21.     Other companies within the Nortel Group were holding companies that played no part in intragroup trading transactions, but acted as corporate vehicles to hold shares in other companies conducting Nortel's business.

### B.     The Nortel Group's Transfer Pricing System

22.     The Nortel Group operated a complicated transfer pricing arrangement (the "**Transfer Pricing System**"), the stated purpose of which was to compensate each entity on an arm's length basis for its contribution to the Nortel Group.

23.     The Transfer Pricing System was founded upon the principle that the Nortel Group's most significant asset was its IP and its revenues principally arose from the development and commercial exploitation of that IP. The second most important determinant of the Nortel Group's revenue was the machinery used to drive sales, distribution and to support customer relationships.  The Transfer Pricing System was designed to apportion the costs and revenues arising from those two key assets among the various RPEs, LREs, CPEs and AREs comprising the Nortel Group in accordance with their respective functions in the creation and commercial exploitation of IP.

---

8.  In particular, Nortel France SAS sold patents in the Enterprise and GSM/GSM-R Business Sales.

24.     In order to achieve its stated goals, and to satisfy international rules on the taxation of large multinational corporations, the Transfer Pricing System was required to comply with the Arm's Length Principle (as defined below).

25.     The arm's length principle, as set out in Article 9 of the OECD Model Tax Convention[9] (the "**Arm's Length Principle**"), is regarded as the international standard for determining transfer prices. It states that:

> "*[When] conditions are made or imposed between the two [associated] enterprises in their commercial or financial relations which differ from those which would be made between independent enterprises, then any profits which would, but for those conditions, have accrued to one of the enterprises, but, by reason of those conditions, have not so accrued, may be included in the profits of that enterprise and taxed accordingly.*"

26.     This meant that all of the Nortel Group entities participating in the Transfer Pricing System should be no better and no worse off than they would have been if they had been independent economic entities conducting business with each other rather than subsidiaries or affiliates of other controlling entities.  To the extent that the Transfer Pricing System did not produce such a result, the Arm's Length Principle requires that the Transfer Pricing System be adjusted accordingly.  The adjustments necessary to keep the Transfer Pricing System true to the Arm's Length Principle did not happen within the Nortel Group.  In other words, the Transfer Pricing System was not at arm's length.  This is important when

---

9.  The OECD has published transfer pricing guidelines for multinational enterprises and tax administrators (the "**Guidelines**"). The Guidelines provide detailed guidance regarding how to determine whether an intra-group transfer accords with the Arm's Length Principle. Parties are encouraged to enter into prospective agreements that embody these Guidelines so as to comply with the Arm's Length Principle.

addressing the contribution made by each RPE to IP in allocating proceeds generated by the

Business Sales and the Residual Patents Sale.

### C.    The Importance of IP to the Nortel Group

27.    The Nortel Group regarded IP as the key to its continued commercial success.

Between 2001 and 2008, the Nortel Group collectively spent more than $14 billion on R&D to

develop the Nortel Group's IP.

28.    R&D activities encompassed:  (i) new product design and building prototypes of

new products, or modeling improvements to existing products; (ii) the design and development

of manufacturing and testing processes used to ensure mass-produced products would meet

end-customer specifications; (iii) physical and software engineering to produce new products;

(iv) the intellectual work required to understand communications technologies and to determine

how these might be developed in the future; and (v) working with end-customers to develop

customized new products or determine whether existing products met customer demands.

29.    The manner in which the IP was developed in the group through R&D was

achieved by the contribution of all RPEs.  The R&D teams were generally employees of the

RPEs and worked across national boundaries.[10]  The R&D teams were organized into ten

groups supporting the various lines of business in the Nortel Group.  They were led by the

Chief Technology Officer of the Nortel Group, together with the Vice-Presidents responsible

for each business line.

30.    The aim of each of these research groups was to produce new or improved

technology and products that could be exploited commercially, concurrently or in the future, by

---

10.  In certain cases, employees of non-RPEs worked on R&D, but the costs of these employees were borne by recharges made to one or more of the RPEs depending on the research work involved.

the Nortel Group.  Some of the technology researched and designed by employees of the RPEs resulted in patents being sought, where legal requirements of showing a genuine innovation could be met.  Other technology, particularly software, was often kept as a trade secret that was made available through either dedicated licensing programs or through licenses bundled with products sold to customers.

31.    Not all of the research projects within the RPEs led to immediately useful or commercially viable technology.  Significant value also existed as a result of the knowledge and experience the RPEs' scientists and engineers accumulated as part of the trial and error process of researching and developing new products and new technology.

32.    The RPEs created and exploited IP on a joint and collective basis.  The R&D of all of the RPEs was interrelated and coordinated.  The Nortel Group's process of developing new technology often involved building on earlier ideas and innovation, which were sometimes patented or unpatented, and were often developed in countries other than the one in which patents were granted.  The choice of where to seek a patent depended largely on local patent protection laws rather than where the technology being protected by patent was developed.

33.    The decisions about the resources each entity was required to devote to R&D – as distinct from other activities necessary to the operation of the Nortel Group – were driven by wider Nortel Group considerations and were not decisions made by the individual entities themselves. In assessing the contribution of each RPE to the development of IP, R&D expenditure is only one of the many factors to be considered when determining contribution.

### D.    EMEA in the Nortel Group

34.    EMEA's contribution to the Nortel Group was significant and value-enhancing. The European businesses represented a core component of the business lines that were sold as part of the Business Sales.

35.    Not only did the EMEA region cover a wide range of countries in Europe, the Middle East and Africa, it also employed some 4,400 staff prior to entering insolvency proceedings. The EMEA Debtors generated significant customer revenues for the benefit of the wider Nortel Group including from major customer relationships with BT, Cable & Wireless, Telefónica and Vodafone, which it developed and maintained. In terms of financial contribution, EMEA was the Nortel Group's second largest market.  EMEA's revenue was, on average, in excess of 25% of the global Nortel Group revenue and was between 23% and 28% in each year from 2001 to 2008.

36.    The EMEA RPEs contributed significantly to the development of the Nortel Group's IP and customer relationships.  This was primarily through the combined effort of the three EMEA RPEs, each of which had been integrally involved in the creation and development of the Nortel Group's IP since at least the early 1990s.  In addition, the predecessor to NNUK, STC plc, which was incorporated into the Nortel Group in the early 1990s, also came with significant customer and IP assets.

### E.      The Asset Sales:  Generating the Sale Proceeds

37.      On January 14, 2009 (the "**Petition Date**"), the principal companies in the Nortel

Group commenced insolvency proceedings.[11]   NNC, NNL and certain of their Canadian

affiliates (each a "**Canadian Debtor**", and collectively, the "**Canadian Debtors**") sought

protection under the Canadian Companies' Creditors Arrangement Act ("**CCAA**"). NNI and

certain of its affiliates (collectively, the "**U.S. Debtors**") filed voluntary petitions in the U.S.

Court pursuant to chapter 11, title 11 of the United States Code (the "**Bankruptcy Code**").

The EMEA Debtors listed and marked with an asterisk in Schedule 1 were placed into

administration in England under the Insolvency Act 1986 by order of Mr. Justice Blackburne of

the English High Court.[12]

38.      Prior to the Petition Date, Nortel's businesses had been conducted globally along

"business lines."  Following the Petition Date, it was decided that the value of the Nortel Group

as a whole would be maximized if each line of business was sold separately, and if the Residual

Patents that were not exclusively or predominately related to a particular business line were

also sold separately.[13]  The cooperation of all entities in the Nortel Group around the world was

necessary in order to consummate the sale of each business line.  This raised the question of

how the Sale Proceeds received for each global business line should be allocated among the

various Selling Debtors that had an interest in each business line.  To prevent this issue from

delaying the Business Sales, the various entities within the Nortel Group agreed that the Sales

---

11.  Nortel Networks (CALA) Inc. filed for relief on July 14, 2009, which was consolidated and is being jointly administered with the U.S. Debtors' chapter 11 cases for procedural purposes only.  (Order Directing Joint Administration of the Debtors' Related Chap. 11 Cases and Granting Related Relief, Jul. 17, 2009, D.I. 1098.)
12.  On May 28, 2009, the Commercial Court of Versailles ordered the commencement of secondary proceedings in respect of NNSA.
13.  In most of the business sales, the IP relating exclusively to the relevant business was sold to the purchaser.  In the CDMA and the Next-Gen business sales (defined below), IP relating predominantly (but not exclusively) to those businesses was sold.

Proceeds would be placed into escrow pending later determination of how to "allocate" the Sale Proceeds.

39.     Accordingly, on or about June 9, 2009, the Canadian, U.S. and EMEA Debtors entered into the Interim Funding and Settlement Agreement (the "**IFSA**"), which provided, *inter alia*, for the Sale Proceeds of the Asset Sales to be placed in escrow (Apr. 25, 2011, D.I. 5308-1.)  The IFSA was approved by the U.S. Court and by the Canadian Court on June 29, 2009 and later by the English and French courts.

40.     Pursuant to Clause 11 of the IFSA (and subsequently pursuant to escrow agreements that governed once the Sale Proceeds were received), it was agreed that where an entity had an interest in the IP asset class that formed part of a particular Business Sale, but was not a formal party to the sale agreement, that entity would relinquish the IP licenses that it had to the IP being sold and retain the ability to assert that it was a Selling Debtor in relation to the transaction in which it relinquished its IP rights (including, in the case of RPEs, any beneficial ownership in IP).[14]

41.     The eight Business Sales are described in more detail in Schedule 3 to this submission, but in summary consisted of:

a.)     **The Enterprise Sale**: The Enterprise Solutions and Global Services business lines provided large businesses with equipment and know-how related to the design and operation of data communications networks.  The Enterprise Solutions and Global Services business lines were sold pursuant to separate asset sale agreements for the

---

14.  Following the appointment of the French *liquidateur judiciaire* and *administrateur judiciaire* to NNSA by the Versailles Court on May 28, 2009, the Enterprise Sale, MEN and Optical Networks Sale, CVAS Sale, GSM/GSM-R Sale, and the MSS Sale were structured so as to require the approval of the Versailles Court before the sale could be completed.  This meant that NNSA was not a party to the main EMEA sale agreement in these sales, but nevertheless transferred its assets to the buyers once the sale of the NNSA assets was approved by the Versailles Court.  NNSA therefore retains an entitlement to a fair allocation of the Sale Proceeds.

EMEA portion of the business and for North America and the rest of the world,[15] for a

total consideration of $900 million.

b.)    **The MEN and Optical Networks Sale:**  The Metro Ethernet Networks ("**MEN**")

business line provided carrier operators with the equipment and know-how to connect

large corporate users to the internet, or to connect different offices of the same

corporation together.  The optical networking solutions and carrier Ethernet switching

segments of the MEN business line were sold pursuant to separate asset sale agreements

for the EMEA portion of the business and for North America and the rest of the world,

for a total consideration of $774 million.

c.)    **The CVAS Sale:**    The Carrier Voice over Internet Protocol and Applications

Solutions ("**CVAS**") business line (comprised of the carrier VoIP and application

solutions segment of the Carrier Networks business line) provided equipment, software,

and know-how to transmit voice and video communications over data networks using an

internet protocol, including telephones that transmit voice traffic over data networks and

video conferences.  The CVAS business line was sold pursuant to separate asset sale

agreements for the EMEA portion of the business and for North America and the rest of

the world, for a total consideration of $282 million.

d.)    **The GSM/GSM-R Sale:**  The Global System for Mobile communications

("**GSM**") / GSM for Railways ("**GSM-R**") business line was a second generation ("**2G**")

wireless telecommunications system used by carriers to provide digital mobile

telecommunications services.  The GSM/GSM-R business line was sold pursuant to

---

15.  "Rest of the world" in the context of each of the Business Sales means Asia Pacific, the Caribbean and Latin America
("**CALA**"), Oceania and India/Pakistan.

separate asset sale agreements for the EMEA, the North American and the CALA portions of the businesses, for total consideration of $105 million.

e.)    **The MSS Sale:**  The Multi Service Switch ("**MSS**") business line provided products and services to telecom carriers and large data network owners to provide data switching and traffic management necessary to connect and route data traffic to and around the internet.  The MSS business line was sold pursuant to separate asset sale agreements for the EMEA and North American portions of the business, for total consideration of $65 million.

f.)    **The Layer 4-7 Sale:**  The Layer 4-7 assets were the software applications used in the data transport and application data layers (i.e., Layers 4 to 7) of the Open Systems Interconnection Standard.  This software was used by network operators to manage data network traffic and to transmit the data necessary to use internet applications such as e-mail and the World Wide Web.  The Layer 4-7 business line was sold pursuant to separate asset sale agreements for the EMEA and North American portions of the business, for total consideration of $18 million.

g.)    **The CDMA Sale**: Code Division Multiple Access ("**CDMA**") was a 2G wireless technology commonly used in North America to provide digital wireless telephony.  Long Term Evolution Access ("**LTE**") was a fourth generation ("**4G**") wireless telecommunication standard enabling high speed wireless data communications.  The CDMA and LTE Access business lines were sold by way of an asset and share sale agreement, for total consideration of $1.13 billion.  The majority of the EMEA Debtors[16],

---

16.  All 19 of the EMEA Debtors in administration executed appropriate license terminations in this sale.

while not parties to the asset and share sale agreement, executed appropriate license terminations pursuant to Clause 11 of the IFSA. As such, each of the EMEA Debtors was a Selling Debtor for the purposes of Clause 12 of the IFSA.

h.)    **The Next-Gen Sale:**  The Next Generation Packet Core ("**Next-Gen**") assets were the hardware and software used to transport data in third generation ("**3G**") wireless communications.  The Next-Gen business line was sold pursuant to a transaction agreement for total consideration of $10 million.  The majority of the EMEA Debtors[17], while not parties to the transaction agreement, executed appropriate license terminations pursuant to Clause 11 of the IFSA.  As such, each of the EMEA Debtors was a Selling Debtor for the purposes of Clause 12 of the IFSA.

42.    With certain limited exceptions[18] the Business Sales involved third party purchasers acquiring assets, rather than acquiring the legal entities that held those assets.  This involved the transfer of fixed assets, inventory, Customer Assets (as defined below) and the IP necessary to run those businesses.  The IP assets included patents, copyrights, trade secrets and the commercial know-how relating exclusively (or in the case of the CDMA business and the Next Gen business, predominantly) to the business in question.  While each sale had unique aspects that require individual consideration, a consistent methodology should be applied to the allocation of the proceeds of all eight Business Sales.

43.    With respect to the Enterprise Sale, the MEN and Optical Networks Sale, the CVAS Sale, the GSM/GSM-R Sale and the MSS Sale, the EMEA Debtors sold assets in each of the four asset classes (fixed assets, inventory, Customer Assets (as defined below) and IP).

---

17.  All 19 of the EMEA Debtors in administration executed appropriate license terminations in this sale.
18.  Those exceptions being that in the Enterprise Sale the shares in NGS and DiamondWare were also transferred.

In the Layer 4-7 Sale, the EMEA Debtors sold inventory, Customer Assets and IP.  In the

CDMA Sale and the Next-Gen Sale, the EMEA Debtors disposed of their rights in IP assets,

retaining rights to obtain the value of their share of those assets by asserting claims to the Sale

Proceeds pursuant to Clause 12 of the IFSA.

44.     Once the eight Business Sales had been completed, there remained a portfolio of

approximately 7,000 Residual Patents, which did not generate any material revenue and which

did not exclusively or predominately relate to the eight business lines already sold.[19]  The

Residual Patents Sale raised $4.5 billion.

### IV.    ALLOCATION METHODOLOGY TO BE APPLIED TO THE BUSINESS SALES

#### A. Attributing the business sale proceeds to the relevant assets

45.     Given the different asset classes involved in the Business Sales and the differing

bases (as described herein) on which such asset classes were owned by the Selling Debtors, the

Business Sales require an asset based allocation methodology – in which (a) the assets that

comprise the Business Sales are ascertained (being: (i) fixed assets; (ii) inventory; (iii)

Customer Assets (as defined below); and (iv) IP); (b) those assets are valued and reconciled to

the purchase price achieved in each Business Sale; (c) the entities which own (or are otherwise

entitled to) these assets are identified; and (d) sale proceeds in respect of these assets are

allocated to the entities which own (or are otherwise entitled to) the assets.

46.     No other approach other takes proper account of the fact that the various

companies in the Nortel Group owned, or have entitlements to or interests in, the various

---

19.  In relation to each Business Sale, the Nortel RPEs granted to the relevant purchaser a royalty-free non-exclusive perpetual, irrevocable license under any patents that were retained (which were not transferred to the purchaser because they did not relate exclusively or predominantly to the business being sold).  Those licenses were limited to the patents necessary to operate the particular business line in question.  The purchaser of the Residual Patents acquired those patents subject to the licenses that had been granted to the purchasers under the various Business Sales.

different classes of assets sold in the Business Sales and that such entitlements and interests differed as between asset classes and in different proportions within each asset class. Furthermore, all of the Business Sales were structured as asset sale and purchase transactions.

47.     This approach is generally consistent with the approach undertaken by the Nortel Group in relation to allocating the sale proceeds of the disposal of Nortel's Universal Mobile Telecommunications System ("**UMTS**") radio access business when that business was sold before insolvency, completing on December 31, 2006. Although not prescriptive, the UMTS sale is a useful indicator with which to understand the eight Business Sales and the general approach advocated by the EMEA Debtors for the appropriate allocation of the Sale Proceeds from the eight Business Sales.

48.     Each of the Business Sales comprised a different mix of each of the asset classes. Each asset class must be ascertained and valued in order to determine the amount of the purchase price attributable to each of the four asset classes.[20] The appropriate methodology for doing so is as follows:

**(A).     Fixed Assets**

1.   Fixed assets include tangible assets held for business use. They include, but are not limited to, manufacturing equipment, real estate, fixtures and fittings, and office equipment.

2.   Pending further disclosure and expert evidence, the EMEA Debtors contend that fixed assets should be valued on the basis of the estimated market value of those assets.

---

[20]  Such asset classes are consistent with the classes of assets typically identified and reported within the financial statements of companies making acquisitions in the telecoms technology sector.

**(B).**     **Inventory**

1.    Inventory typically includes raw materials, work-in-progress and finished goods. In the context of the Nortel Group, inventory may also represent finished goods or unassembled components (given that manufacturing was undertaken by third party contract manufacturers).

2.    Pending further disclosure and expert evidence, the EMEA Debtors contend that the inventory should be valued on the basis of the estimated market value of those assets.

**(C).**     **Customer Assets**

1.    In each Business Sale, a significant intangible asset sold consisted primarily of the infrastructure that enabled local distribution and sales support and the provision of local support and servicing of the client relationship (together these assets are known as "**Customer Assets**").

2.    Customer Assets produce a future stream of revenue for the purchaser of the businesses.

3.    This asset class is separate from the asset classes of inventory and IP because this asset class enabled the customer contracts to be fulfilled and future revenue to be earned. This asset class relates to the revenue that is able to be generated through the sales and marketing structure in each entity.

4.   The appropriate valuation for this asset class is a fair arm's length return, further particulars of which will be provided following further discovery and expert reports.

**(D).     IP and Goodwill**

1.   IP includes both patented and unpatented technology. In addition, this asset class encompasses: (1) know-how; (2) processes and techniques; and (3) in-process R&D.

2.   In the context of the Nortel Group, IP constituted a very significant portion of the proceeds of each Business Sale.

3.   Pending further disclosure and expert evidence, it is the EMEA Debtors' position that IP is to be valued on a residual basis – that is, the purchase price less other identified assets (being, fixed assets, inventory and Customer Assets).

4.   Given the distressed elements within the sales process it is likely that there is only a limited level of goodwill (if any) across the businesses sold. To the extent there exists goodwill in any Business Sale, it is to be treated as a residual asset and, therefore, falls into this asset class, to be allocated to those entities that owned the IP.

**B.      Ownership of Asset Classes and Entitlement to Allocation of the Sale
Proceeds Attributable to Each Asset Class in Respect of the Eight Business
Sales**

49.       The basis of ownership entitlement of the Selling Debtors to each of the four asset

classes, and their consequential right to the sale proceeds applicable to each such asset class, is

set forth in the following paragraphs:

**(A).      Fixed Assets and Inventory**

1.   The Business Sale proceeds attributable to this asset class should be allocated

to the companies in the Nortel Group that were the legal owners of the fixed

assets and/or inventory sold in each Business Sale.

2.   The various EMEA Debtors sold fixed assets and/or inventory in six of the

eight Business Sales,[21] and are entitled to the estimated market value of those

assets. Pending further discovery and expert reports, the EMEA Debtors are

entitled to not less than $100 million in respect of fixed assets and inventory.

**(B).      Customer Assets**

1.   In relation to the Business Sales, each of the EMEA Debtors (both RPEs and

non-RPEs) contributed significant Customer Assets, including sophisticated

distribution systems and, often, associated customer relationships and future

contracts. Each of the EMEA Debtors is, therefore, entitled to an allocation of

the Sale Proceeds attributable to those assets which they have transferred.

EMEA operated its own Customer Assets and is entitled to an allocation from

the Sale Proceeds equivalent to a fair arm's length return.

---

21.  The EMEA Debtors sold Fixed Assets and Inventory in the Enterprise Sale, the MEN and Optical Networks Sale, the CVAS
Sale, the GSM/GSM-R Sale and the MSS Sale.  The EMEA Debtors also sold inventory in the Layer 4-7 Sale.

2. Pending further discovery and expert reports, it is estimated that the EMEA Debtors are entitled to an allocation of not less than $300 million for Customer Assets.

**(C).    Intellectual Property**

1. IP constituted a very significant portion of the proceeds of each Business Sale. For the reasons set out in further detail below:

(a) IP was beneficially owned by the five RPE entities and, with one exception,[22] the RPEs are entitled to an allocation of the Sale Proceeds attributable to IP in accordance with their respective beneficial ownership shares.

(b) Each RPE's beneficial ownership share is determined by measuring that RPE's contribution (in the broad sense) to the development of IP. Given the nature of the creation and exploitation of the Nortel Group's IP, the IP licenses are not a basis for allocating the Sale Proceeds.

(c) The EMEA Debtors' position is that NNUK, NNIR and NNSA, together with the 2 EMEA AREs (who sold a select number of patents in some of the Business Sales), owned a significant share of the IP assets (or are otherwise entitled to the proceeds from the sale of those assets) that were sold as part of the Business Sales.

---

22. The exception being that the EMEA AREs sold a small number of patents in the Business Sales. Pending further disclosure and expert evidence, the EMEA Debtors' position is that this equates to an allocation entitlement of not less than 0.5% of the IP proportion of the Sale Proceeds of the relevant Business Sales.

### C.      Interest in IP Confirmed by Contract - the MRDA

50.      The Master Research and Development Agreement ("**MRDA**")[23] confirmed

beneficial interests in favor of NNUK, NNIR and NNSA (as well as the other RPEs) in the IP

created as a result of their respective contributions thereto, pursuant to its express terms and by

the implication of necessary terms.

51.      The RPEs entered into the MRDA on or around December 22, 2004.[24]  The

MRDA was effective from January 1, 2001.  The MRDA is part of a suite of transfer pricing

documents that sought to regulate the position between the RPEs for transfer pricing purposes

which, as detailed in paragraphs 22 to 26 above, required individual members in the Nortel

Group to structure their commercial affairs on the basis that they acted in accordance with the

Arm's Length Principle in their dealings with each other.

52.      The MRDA did not in practice conform to the Arm's Length Principle nor was it,

in any event, a document designed to dictate allocation of the sale proceeds on the disposal of

any of the Nortel businesses.  Nevertheless, it is a document that is relevant to the basis upon

which the RPEs operated, in particular in respect of the development of IP. In that context, the

intention of the MRDA, that each RPE is entitled to the exploitation and ownership of IP on the

basis of contribution, is readily apparent.

53.      The Recitals to the MRDA provide that each RPE "*should benefit from its

contribution to research and development activity commensurate with the value of its

contribution.*"  This is the fundamental principle behind the MRDA.  It would be inconsistent

with the Arm's Length Principle (and the OECD Guidelines) for beneficial ownership in the IP

---

23. The MRDA is governed by the laws of Ontario, Canada.
24.  Nortel Australia was also an original party to the MRDA but ceased to be a party prior to the date of insolvency of the Nortel Group.

to be held otherwise than by the RPEs in proportion to their contribution to the IP.  That would defeat the express object of the MRDA and accordingly the MRDA must be construed for the purposes of assessing its impact on the Allocation Dispute consistently with its purpose and not so as to frustrate it.

54.      Further, the Recitals to the Addendum dated December 14, 2007 confirm the above analysis in terms stating that: (i) "*each Participant holds and enjoys equitable and beneficial ownership of NN Technology*"; and (ii) "*this Addendum continues each Participant's rights and obligations in the NN Technology.*"

### D.      Construction of the MRDA Confirming Interests in IP

55.      Pursuant to the express terms of the MRDA, the Participants (i.e., the RPEs) own the IP in the Nortel Group in proportion to their respective contributions to its creation.

56.      In addition, NNUK, NNIR and NNSA are entitled to the proceeds on this basis by the implication of necessary terms into the contract in order to adhere to the Arm's Length Principle, comply with the purpose of the MRDA, and avoid prejudicial results for the RPEs.

57.      The wording of the MRDA, which was not operated in accordance with the Arm's Length Principle, nevertheless illustrates that it was intended that the beneficial interest of each of NNUK, NNIR and NNSA in the IP would be proportionate to the contribution each made. In properly assessing contribution, consistent with the Arm's Length Principle, it is necessary to have regard not only to all financial contributions but also non-direct contributions, particularly by NNUK, NNIR and NNSA, to the Nortel Group that enabled other RPEs to invest in IP.

### E.    Entitlement to IP pursuant to Operation of Law

58.    In the alternative, NNUK, NNIR and NNSA are entitled to their beneficial interest in the IP and, therefore, their portion of the Sale Proceeds related to IP by necessary operation of law.  The MRDA does not preclude – indeed it recognizes and is consistent with – such interest. [25]

### (i)    *Resulting trust*

59.    A resulting trust should be imposed so as to give effect to the parties' presumed intentions.  A resulting trust will presumptively arise where a person conveys property to another, or pays for property purchased in another's name, such that the donee holds the property on resulting trust for the donor.  Likewise, where one party contributes to the acquisition of property, this will presumptively give rise to a resulting trust in favor of the contributor in respect of a share in the property proportionate to his contribution.

60.    The contributions of each of NNUK, NNIR and NNSA gave rise to proprietary entitlements by way of resulting trust.  This is because the parties' dealings were consistent with and supportive of the existence of the proprietary rights of NNUK, NNIR and NNSA and not inconsistent with them. The beneficial interests arose upon the making of the relevant contributions.

### (ii)    *Unjust enrichment*

61.    Unjust enrichment will arise by operation of law where there has been:  (a) an enrichment; (b) a corresponding detriment (for instance by the making of payments or transfer of other property); and (c) there is no juristic reason for the enrichment.

---

25.  Except where otherwise indicated, the matters addressed below are dealt with for present purposes under the law of Ontario, Canada.  For the avoidance of doubt, the EMEA Debtors expressly reserve the right to pursue the same or equivalent arguments under the law of the other jurisdictions, including but not limited to the United States, England, Ireland or France, and in particular the law of the country where each EMEA Debtor did business, and without waiver of any law applicable to individual EMEA Debtor's claims.

62.     It was the agreement and common intention of the parties that NNUK, NNIR and NNSA would each have a beneficial interest in the IP by reason of its respective contribution. This common intention and agreement is reflected by the terms of the MRDA itself.  In addition, the circumstances in which the MRDA was entered into make it clear that the intention behind the agreement was that each of NNUK, NNIR and NNSA would obtain an interest in the IP commensurate with its respective contribution.  This is also consistent with the only legitimate economic rationale of a transfer pricing agreement such as the MRDA: adherence to the Arm's Length Principle.

63.     In reliance on this agreement and the common intention of the parties thereto, each of NNUK, NNIR and NNSA contributed to the creation of the relevant IP, thereby acting to its detriment in the reasonable belief that it was acquiring a beneficial interest.

64.     This interest arose from the moment of the relevant conduct relied on, namely the making of the relevant contributions by NNUK, NNIR and/or NNSA.

65.     The parties intended that the interest of each of NNUK, NNIR and NNSA would be proportionate to its respective contributions as a whole.  To the extent that such contributions were made by NNUK, NNIR and/or NNSA with NNL obtaining full entitlement to the IP thereby created, NNL was enriched to the detriment of NNUK, NNIR and NNSA. There is no juristic reason supporting any such enrichment – indeed, the MRDA reflects the exact opposite.

66.     Even if a resulting trust is not found, a constructive trust should be afforded as the remedy to the unjust enrichment in this case because the unjust enrichment is linked directly to the competing interests in the IP.  Any recourse less than allocation of the Sale Proceeds would be wholly inadequate, given NNL's insolvency.

*(iii)*      ***Proprietary estoppel***

67.      In the further alternative, NNL and NNI acquiesced in the reasonable belief of NNUK, NNIR and NNSA that their respective contributions entitled them to a proprietary interest in the resulting IP and its proceeds.  The respective NNUK, NNIR and NNSA contributions, both direct and indirect, were made pursuant to this shared understanding.

68.      In these circumstances, it would be inequitable for the NNUK, NNIR and NNSA proprietary interests not to be recognized and effect should be given to those interests under the doctrine of proprietary estoppel. NNL and NNI are estopped from denying this interest. On this basis, NNUK, NNSA and NNIR are entitled to an interest proportionate to their contributions as a whole.

### F.      Calculating Contribution of the RPEs and Allocating IP

69.      Contribution is measured by looking at the contributions, in a broad sense, which the RPEs made to the Nortel Group which enabled the development of IP.

70.      As a starting position, it is necessary to look at expenditure directed toward R&D. Over the life of IP development, the IP in the various Business Sales had a varying commercial life, ranging from a few years to over ten years. As best as can currently be determined, pending further discovery and expert reports, the commercial life of IP embedded into the Nortel Group's business is eight years. An eight year commercial life is consistent with a comparison of the IP life figures in the financial statements of Nortel and other comparable companies in connection with the acquisition of IP. As such, eight years of R&D expenditure prior to insolvency will be relevant when assessing R&D expenditure.

71.      It is then necessary to take into account contribution of the RPEs in a broader sense which enabled IP to be developed.  This requires an analysis of the Nortel Group as a

whole and includes other factors, such as the sources of cash and other value used by, for example, the North American RPEs (particularly NNL) to make a *prima facie* larger direct contribution to R&D.

72.     This includes consideration of non-Arm's Length transactions which enabled some RPEs to invest more in R&D or which resulted in other RPEs being less able to so invest. By virtue of various transactions related to, among other things, the improper implementation and operation of the transfer pricing structure contrary to the Arm's Length Principle, the deprivation of cash pursuant to non-commercial intercompany loans and the non-repayment of such loans, significant value was removed from each of NNUK, NNIR and NNSA for the benefit of the North American Debtors (particularly NNL).  These matters arise directly from the misapplication and incorrect implementation of the transfer pricing structure contrary to the Arm's Length Principle generally, and the MRDA contrary to the Arm's Length Principle specifically, amongst the RPEs, being the same structure that creates the beneficial right to IP. As such, in determining the contribution each RPE made to IP, these transfers of value must be taken into account. [26]

73.     In all of the circumstances, and in any event, where each of the RPEs contributed to the development of the IP, equity compels that a fair and proper account is made in respect of each RPE's contribution to R&D (and the resultant IP) and each RPE must be afforded a fair and proper allocation in respect of the IP asset class, with reference to the operation of the Nortel Group in its entirety. Such an allocation to NNUK, NNSA and NNIR should not be less than, in aggregate, 36% of the sale proceeds of the IP assets sold in the Business Sales, with a

---

26.  The facts of these transactions are set out in the Particulars of Claim to the Proofs of Debt filed against the US Debtor on June 3, 2011, and those facts (but not the claims) are incorporated by reference herein, in respect of NNUK at paragraphs 2 to 84, in respect of NNIR at paragraphs 2 to 71, and in respect of NNSA at paragraphs 2 to 84.  The same facts are set out in the Proof of Debt filed against the Canadian Debtor on March, 18 2011, and those facts (but not the claims) are incorporated by reference herein, in respect of NNUK at paragraphs 20 to 32; 61 to 85 and 106 to 161; in respect of NNSA at paragraphs 16 to 70 and in respect of NNIR at paragraphs 21 to 36 and paragraphs 60 to 114.

modest amount due to the 2 EMEA AREs who sold selected IP assets in certain of the Business Sales.

### G.    Exclusive and Non-Exclusive Licenses

74.    As noted above, the Transfer Pricing System also granted various exclusive and non-exclusive licences to the IP or to various rights attaching to IP.  These licenses were terminated as part of the Business Sales.

75.    The EMEA Debtors' primary position is that allocation of the Nortel Group's IP should be determined by reference to beneficial ownership and entitlement to IP. Notwithstanding the EMEA Debtors' primary position, to the extent the approach to the allocation of the Sale Proceeds of either the Business Sales or the Residual Patents Sale set forth herein is not ultimately accepted, allocation to the RPEs can in no event be less than the value of the exclusive and non-exclusive licenses they relinquished as part of the sale process. In such a case, the EMEA non-RPEs will also argue for an allocation in relation to the value of the exclusive and non-exclusive licenses they relinquished.

### V.    ALLOCATION OF RESIDUAL PATENTS

76.    The Residual Patents consisted of the sale of approximately 7,000 individual patents and patent applications (including provisional applications and related rights) and was completed on July 29, 2011.  The Residual Patents Sale raised $4.5 billion, more than the combined total raised from the eight Business Sales.  This sum greatly exceeded the expectations of each of the Nortel debtors and was around five times the amount of the stalking horse bid.

77.     Unlike the Business Sales, the only asset class in the Residual Patents Sale was IP, which consisted of registered patents and patent applications that were not predominantly or exclusively related to any of the business lines and therefore did not transfer with the Business Sales.  These patents were the byproduct of at least two decades of joint endeavor by the RPE entities.  The Sale Proceeds paid were largely paid for strategic reasons and those proceeds are not easily reconcilable to the patents themselves.  It is neither possible nor credible to individually value each patent by reference to its intrinsic value in a manner reconcilable to the purchase price.

78.     The Residual Patents Sale assets consisted of patents registered across the world and were, subject to certain limited exceptions discussed below at paragraph 84, beneficially owned jointly by the RPEs.  The individual patents were registered over a substantial period of time, from as early as the mid-1980s, with the vast majority registered from the mid-1990s to just prior to the insolvency of the Nortel Group.

79.     As is noted in paragraphs 27 to 33 above, the development of the patents was based on the joint work, experience and knowledge of all five RPEs.  For the reasons stated in paragraphs 50 to 68, the patents were beneficially owned by all of the five RPEs in proportion to contribution as a whole.

80.     The EMEA Debtors' position is that the rights to the Sale Proceeds of the Residual Patents Sale should be determined on the same basis as for the IP sold or relinquished as part of the Business Sales.  Therefore, subject to the limited exception noted below at paragraph 84, NNUK, NNIR and NNSA should together receive no less than 36% of the sale proceeds of the Residual Patents Sale.  This represents the contribution in a broad sense to the development of the IP of the Nortel Group, of which the Residual Patents are a necessary part.

81.     In the alternative, the EMEA Debtors reserve the right to assert that because: (a) the Residual Patents Sale was a different type of sale from the Business Sales insofar as it represented the non-revenue producing aspect of the Nortel Group; (b) the Residual Patents were created over a much greater period than the commercial life of the IP sold in the Business Sales (the Residual Patents were, as a whole, created over the effective life of each of the RPEs); and (c) the sale produced a "windfall" for the RPEs insofar as it represented an amount paid by purchasers for largely strategic reasons and which was an amount which greatly exceeded any expectations of the Nortel Debtors, much broader approach to assessing contribution is appropriate when determining the portion of the Residual Patents that each RPE owned.

82.     In making this determination, the following should be considered: (i) the general contribution each entity has generally made to the Nortel Group over the effective life of the IP; (ii) the fact that the RPEs' roles and responsibilities have changed, altered and evolved over time; and (iii) the joint risk and reward undertaken by all five of the RPEs in conducting the business of the Nortel Group over their effective lives.   Allocation should be based on a determination of what would be just and equitable in all the circumstances.

83.     Subject to the limited exception noted below at paragraph 84, and pending further disclosure and expert evidence, any such alternative allocation will entitle NNUK, NNIR and NNSA to a joint allocation of not less than 36% of the sale proceeds of the Residual Patents Sale as a result of their contribution.

84.     In addition to all of the above, the two EMEA AREs (Nortel Germany and Nortel France SAS) are entitled to an allocation of the proceeds of the Residual Patents Sale.  These entities operated autonomously in the Nortel Group and as part of this autonomy they wholly

owned and had registered a limited number of specific patents (approximately 25) that were sold either in certain Business Sales or as part of the Residual Patents Sale.  The AREs should also be remunerated for the property they owned.  Pending further disclosure and expert evidence, the EMEA Debtors' position is that this equates to an allocation entitlement of not less than 0.5% of the Sale Proceeds of the Residual Patents Sale.

## VI.    PROPRIETARY CLAIMS

85.    In the further alternative, and to the extent necessary to effect a fair and equitable distribution, the EMEA Debtors refer to, and rely on, the proprietary claims the EMEA Debtors have asserted to the Canadian Debtor's entitlement to the Sale Proceeds.[27]

## VII.    CONCLUSION

86.    On the basis of the above, and subject to further discovery and expert reports, the EMEA Debtors presently estimate they are entitled an allocation of not less than $2.7 billion from the Sale Proceeds.

*[Remainder of this page left intentionally blank]*

---

27. These proprietary claims are set out in the Particulars of Claim to the Proofs of Debt filed against the Canadian Debtor on March, 18 2011, and are incorporated by reference herein, in respect of NNUK at paragraphs 200 to 217; in respect of NNSA at paragraphs 103 to 120 and in respect of NNIR at paragraphs 162 to 180.

Dated:  Wilmington, Delaware
       May 16, 2013

                              YOUNG CONAWAY STARGATT & TAYLOR, LLP

                              */s/ Jaime Luton Chapman*
                                   James L. Patton (No. 2202)
                                   Edwin J. Harron (No. 3396)
                                   John T. Dorsey (No. 2988)
                                   Jaime Luton Chapman (No. 4936)

                                   Rodney Square
                                   1000 North King Street
                                   Wilmington, Delaware 19801
                                   Telephone:  302-571-6600
                                   Fax:  302-571-1253

                                   – and –

                              HUGHES HUBBARD & REED LLP

                                   Derek J.T. Adler
                                   Amera Z. Chowhan
                                   Gabrielle Glemann
                                   Charles H. Huberty

                                   One Battery Park Plaza
                                   New York, New York 10004
                                   Telephone:  212-837-6000
                                   Fax:  212-422-4726

                                   – and –

                              HERBERT SMITH FREEHILLS LLP

                                   Kevin Lloyd
                                   John Whiteoak
                                   Richard Lawton

                                   Exchange House
                                   Primrose Street
                                   London EC2A 2HS

                              *Counsel for Joint Administrators*

33

**Schedule 1**

**List of the 22 EMEA Debtors and their transfer pricing designations**

| | Residual Profit Share Entities (RPEs) | | |
|---|---|---|---|
| | **Entity Name** | **Country** | **Referred to as** |
| 1. | Nortel Networks UK Limited* | United Kingdom | NNUK |
| 2. | Nortel Networks (Ireland) Limited* | Republic of Ireland | NNIR |
| 3. | Nortel Networks S.A.* | France | NNSA |
| | **Limited Risk Entities (LREs)** | | |
| | **Entity Name** | **Country** | **Abbreviation** |
| 4. | Nortel Networks (Austria) GmbH* | Austria | Nortel Austria |
| 5. | Nortel Networks N.V.* | Belgium | Nortel Belgium |
| 6. | Nortel Networks s.r.o.* | Czech Republic | Nortel Czech Republic |
| 7. | Nortel Networks Engineering Service K.f.t* | Hungary | Nortel Hungary |
| 8. | Nortel Networks S.p.A.* | Italy | Nortel Italy |
| 9. | Nortel Networks B.V.* | The Netherlands | Nortel Netherlands |
| 10. | Nortel Networks Polska Sp. Z.o.o.* | Poland | Nortel Poland |
| 11. | Nortel Networks Portugal S.A.* | Portugal | Nortel Portugal |
| 12. | Nortel Networks Romania SRL* | Romania | Nortel Romania |
| 13. | Nortel Networks Hispania S.A.* | Spain | Nortel Spain |
| 14. | Nortel Networks Slovensko s.r.o.* | Slovakia | Nortel Slovakia |
| 15. | Nortel Networks A. G. | Switzerland | Nortel Switzerland |
| | **Cost Plus Entities (CPEs)** | | |
| | **Entity Name** | **Country** | **Abbreviation** |
| 16. | Nortel Networks Oy* | Finland | Nortel Finland |
| 17. | Nortel Networks Scandinavia AS | Norway | Nortel Norway |
| 18. | o.o.o Nortel Networks (dissolved)** | Russia | Nortel Russia |
| 19. | Nortel Networks South Africa (Proprietary) Limited | South Africa | Nortel South Africa |
| 20. | Nortel Networks AB* | Sweden | Nortel Sweden |
| | **At Risk Entities (AREs)** | | |
| | **Entity Name** | **Country** | **Abbreviation** |
| 21. | Nortel Networks France S.A.S. * | France | Nortel France SAS |
| 22. | Nortel GmbH* | Germany | Nortel Germany |
| | **Holding Companies** | | |
| | **Entity Name** | **Country** | **Abbreviation** |
| 23. | Nortel Networks International Finance & Holding B.V. * and ** | Netherlands | NNIF |

* All of the entities marked with an asterisk are subject to the Administration Order made on January 14, 2009 by the English High Court (Blackburne J) and are under the control of the Joint Administrators.

** The allocation entitlement of Nortel Russia has been assigned to NNIF pursuant to agreements approved by the order of the U.S. Court dated August 8, 2011 (D.I. 6193) and the Canadian Court dated August 23, 2011. Nortel Russia has subsequently been dissolved under Russian law and its allocation entitlement is asserted in this Allocation Statement by NNIF.

Nortel Norway, Nortel South Africa and Nortel Switzerland are solvent subsidiaries of NNIF and remain under the control of their respective directors. The Joint Administrators represent the directors in relation to the allocation entitlements of each of Nortel Norway, Nortel South Africa and Nortel Switzerland.

In addition, the former CPEs Nortel Telecom International Limited (a Nigerian company, **"Nortel Nigeria"**) and Nortel Networks Ukraine Limited (a Ukrainian company, **"Nortel Ukraine"**) have been dissolved pursuant to local insolvency proceedings and have no entitlement to the Sale Proceeds.

**Schedule 2**

**Simplified Nortel Networks Group Structure Chart (as at January 14, 2009)**



## Schedule 3

## DETAILS OF BUSINESS AND RESIDUAL PATENT ASSET SALES

**1.**    **The Enterprise Sale**

1.1.    **Description of sale:**  Enterprise Solutions provided large businesses with the equipment and know-how necessary to design and operate data communications networks.

1.2.    **EMEA Assets sold:**  Fixed Assets, Inventory, Customer Assets and IP. The shares in Nortel Government Solutions, Inc. and DiamondWare were also sold separately in North America.

1.3.    **Date of completion:** December 18, 2009

1.4.    **Purchaser:** Avaya

1.5.    **Sale proceeds:** $900 million

1.6.    **Employees transferred:** 7,668 total, of which 1,099 were EMEA.

1.7.    **EMEA Sellers:** NNUK, NNIR, Nortel Austria, Nortel Belgium, Nortel Czech Republic, Nortel Finland, Nortel France SAS, Nortel Germany, Nortel Hungary, Nortel Italy, Nortel Netherlands, Nortel Norway, Nortel Poland, Nortel Portugal, Nortel Romania, Nortel Russia, Nortel South Africa, Nortel Spain, Nortel Sweden and Nortel Switzerland.  Two other entities: Nortel Networks (Sales and Marketing) Limited and Nortel Communications and Holdings (1997) Limited were also party to the EMEA sale agreement, but do not participate in this Allocation Statement.

1.8.    **Other Sellers:** NNC, NNL, NNI, Nortel Altsystems, Inc. (f/k/a Alteon Websystems, Inc.), Nortel Networks Technology Corporation, Nortel Networks International Inc., Nortel Networks (CALA) Inc., Nortel Networks de Argentina, S.A., Nortel Networks Chile S.A., Nortel Networks de Mexico, S.A. de C.V., Nortel de Mexico, S. de R.L. de C.V., Nortel Networks Peru S.A.C., Nortel Networks Australia Pty Limited, Nortel Networks de Colombia, S.A., Nortel Networks (India) Private Limited, Nortel Technology Excellence Centre Private Limited, PT Nortel Networks Indonesia, Nortel Networks Japan, Nortel Networks Malaysia Sdn. Bhd. Nortel Networks New Zealand Limited, Nortel Networks Singapore Pte. Limited, Nortel Networks (Asia) Limited, Nortel Networks (China) Limited, Nortel Networks (Thailand) Ltd., Nortel Vietnam Limited, Nortel Networks Telecommunications Equipment (Shanghai) Co., Ltd and Nortel Networks Telecomunicacoes do Brazil Ltda.

**2.**    **The MEN and Optical Networks Sale**

2.1.    **Description of sale:**  MEN provided carrier operators with the equipment and know-how to connect large corporate users to the Internet, or to connect different offices of the same corporation together.

2.2.    **EMEA Assets sold:**  Fixed Assets, Inventory, Customer Assets and IP.

2.3.    **Date of completion:**  March 19, 2010

2.4.    **Purchaser:**  CIENA

2.5.    **Sale proceeds:**  $774 million

2.6.    **Employees transferred:**  c. 2,000 total, of which 303 were EMEA.

2.7.    **EMEA Sellers:**  NNUK, NNIR, Nortel Austria, Nortel Belgium, Nortel Czech Republic, Nortel Networks France SAS, Nortel Germany, Nortel Italy, Nortel Netherlands, Nortel Poland, Nortel Portugal, Nortel Russia, Nortel Spain, Nortel Sweden and Nortel Switzerland.  Two other entities: Nortel Networks (Sales and Marketing) Limited and Nortel Networks (Northern Ireland) Limited were also party to the EMEA sale agreement, but do not participate in this Allocation Statement.

2.8.    **Other Sellers:**  NNC, NNL, NNI, Nortel Networks Technology Corporation, Nortel Networks de Colombia S.A.S., Nortel Networks de Mexico S.A. de C.V., Nortel de Mexico S. de R.L. de C.V., Nortel Networks Peru S.A.C., Nortel Networks Australia Pty. Limited, PT Nortel Networks Indonesia, Nortel Networks Malaysia SDN. BHD., Nortel Networks New Zealand Limited, Nortel Networks Singapore PTE. Ltd, Nortel Networks Singapore PTE. Ltd – Philippines Branch, Nortel Networks (Asia) Limited, Nortel Networks (Asia) Limited – Pakistan Branch, Nortel Networks (Asia) Limited – Taiwan Branch, Nortel Networks (China) Limited, Nortel Networks (Thailand) Ltd, Nortel Vietnam Limited, Nortel Networks Telecommunications Equipment (Shanghai) Co. Limited, Nortel Networks de Argentina S.A., Nortel Networks de Ecuador S.A., Shenyang Nortel Telecommunications Co. Ltd, Nortel Networks de Guatemala Ltda., Nortel Networks (CALA) Inc., Nortel Trinidad &Tobago Limited, Nortel Networks Japan, Qtera Corporation, Xros, Inc., Coretek, Inc

3.    **The CVAS Sale**

3.1.    **Description of sale:** CVAS provided equipment, software and know-how to transmit voice and video communications over data networks using the Internet Protocol.  Examples of this include telephones that transmit voice traffic over data networks ("IP telephony") and video conferencing.

3.2.    **EMEA Assets sold:**  Fixed Assets, Inventory, Customer Assets and IP.

3.3.    **Date of completion:**  May 28, 2010

3.4.    **Purchaser:** GENBAND

3.5.    **Sale proceeds:** $282 million

3.6.    **Employees transferred:** 349 in total, of which 290 were EMEA.

3.7.    **EMEA Sellers:** NNUK, NNIR, Nortel Austria, Nortel Belgium, Nortel Czech Republic, Nortel France SAS, Nortel Germany, Nortel Italy, Nortel Netherlands, Nortel Poland, Nortel Portugal, Nortel Romania, Nortel Russia, Nortel Slovakia, Nortel Spain, Nortel Sweden and Nortel Switzerland.  One other entity: Nortel Networks (Sales and Marketing) Limited was also party to the EMEA sale agreement, but does not participate in this Allocation Statement.

3.8.    **Other Sellers:**    NNC, NNL, NNI, Nortel Networks Technology Corporation, Nortel Networks (CALA) Inc., Nortel Networks de Argentina, S.A., Nortel Networks de Mexico, S.A. de C.V., Nortel de Mexico, S. de R.L. de C.V., Nortel Networks Peru S.A.C., Nortel Networks International Inc., Nortel Networks Australia Pty Limited, Nortel Networks (India) Private Limited, Nortel Networks Japan, Nortel Networks Malaysia Sdn. Bhd., Nortel Networks New Zealand Limited, Nortel Networks Singapore Pte. Ltd., Nortel Networks (Thailand) Ltd., Nortel Networks (Asia) Limited (excluding the Pakistan branch), Nortel Networks (China) Limited, PT Nortel Networks Indonesia, Nortel Networks de Guatemala, Ltda., Nortel Vietnam Limited

**4.**    **The GSM/GSM-R Sale**

4.1.    **Description of sale:**  GSM/GSM-R is a second generation (2G) wireless telecommunications system used by carriers to provide digital mobile telecommunications services.

4.2.    **EMEA Assets sold:**  Fixed Assets, Inventory, Customer Assets and IP

4.3.    **Date of completion:** March 31, 2010

4.4.    **Purchasers:**  Ericsson (North American and Caribbean and Latin America assets) and Kapsch CarrierCom (EMEA assets).

4.5.    **Sale proceeds:** $105 million in total paid jointly

4.6.    **Employees transferred:**  c. 670 total, of which 118 were EMEA.

4.7.    **EMEA Sellers:**  NNUK, NNIR, Nortel Austria, Nortel Belgium, Nortel Czech Republic, Nortel France SAS, Nortel Germany, Nortel Italy, Nortel Netherlands, Nortel Poland, Nortel Russia, Nortel Spain, Nortel Slovakia and Nortel Switzerland.  One other entity: Nortel Networks (Northern Ireland) Limited was also party to the EMEA sale agreement but does not participate in this Allocation Statement.

4.8.   **Other Sellers:**   The parties to the North American and CALA Asset Sale Agreements are not known to the EMEA Debtors.

5.   **The MSS Sale**

5.1.   **Description of sale:**   MSS is a collection of routers used by telecoms carriers and large data network owners to provide data switching and traffic management necessary to connect and route data traffic to and around the Internet.

5.2.   **EMEA Assets sold:**   Fixed Assets, Inventory, Customer Assets and IP

5.3.   **Date of completion:**   March 11, 2011

5.4.   **Purchaser:**   Ericsson

5.5.   **Final purchase price:**   $65 million

5.6.   **Employees transferred:**   218 total, of which 66 EMEA

5.7.   **EMEA Sellers:**   NNUK, NNIR, Nortel Austria, Nortel Belgium, Nortel Czech Republic, Nortel France SAS, Nortel Germany, Nortel Italy, Nortel Netherlands, Nortel Poland, Nortel Portugal, Nortel Romania, Nortel Slovakia, Nortel Spain, Nortel Sweden and Nortel Switzerland.  One other entity: Nortel Networks (Sales and Marketing) Limited also participated in the sale, but does not participate in this Allocation Statement.

5.8.   **Other Sellers:**   NNC, NNL, NNI, Nortel Networks Technology Corporation, Nortel Networks (CALA) Inc., Nortel Networks International Inc., Nortel Networks de Mexico, S.A. de C.V., Nortel de Mexico, S. de R.L. de C.V., Nortel Networks Peru SAC, Nortel Networks Australia Pty Limited, PT Nortel Networks Indonesia, Nortel Networks Japan, Nortel Networks Malaysia Sdn. Bhd., Nortel Networks New Zealand Limited, Nortel Networks (Asia) Limited (selling assets from Hong Kong as well as assets of its Taiwan branch), Nortel Networks Singapore Pte. Ltd, Nortel Networks (Thailand) Ltd, Nortel Networks (China) Limited, Nortel Networks Telecommunications Equipment (Shanghai) Co., Ltd.

6.   **The Layer 4-7 Assets Sale**

6.1.   **Description of sale:**   Layer 4-7 assets were the software applications used in the data transport and application data layers (i.e. Layers 4 to 7) of the Open Systems Interconnection standard.  This software was used manage data network traffic and to transmit the data necessary to use Internet applications such as e-mail and the World Wide Web.

6.2.   **EMEA Assets sold:**   Inventory, Customer Assets and IP.

6.3.   **Date of completion:**   March 31, 2009

6.4.    **Purchaser:**  Radware

6.5.    **Final purchase price:**  $18 million

6.6.    **Employees transferred:**  No EMEA employees transferred under this sale.

6.7.    **EMEA Sellers:**  The EMEA Debtors entered into a License Termination Agreement to enable the Other Sellers listed below at paragraph 6.8 to sell the Layer 4-7 Assets on a global basis.

6.8.    **Other Sellers:**  NNC, NNL, NNI as agents for various other Nortel Group entities.  The EMEA Debtors do not currently know who the other Nortel Group entities were.

**7.    The CDMA Sale**

7.1.    **Description of sale:**  CDMA is a 2G wireless technology commonly used in North America to provide digital wireless telephony.  Long Term Evolution, or LTE, is a 4G telecommunications standard enabling high-speed wireless data communications.

7.2.    **EMEA Assets sold:**  The EMEA RPEs terminated their license agreements to enable the sale to proceed on a global basis.

7.3.    **Date of completion:**  November 13, 2009

7.4.    **Purchaser:**  Ericsson

7.5.    **Final purchase price:**  $1.13 billion

7.6.    **Employees transferred:**  No EMEA employees transferred.  More than 2,500 other employees were transferred in this sale.

7.7.    **EMEA Sellers:**  The EMEA Sellers did not sell assets, but NNUK, NNIR, NNSA, NNIF, Nortel Austria, Nortel Belgium, Nortel Czech Republic, Nortel Finland, Nortel France SAS, Nortel Germany, Nortel Hungary, Nortel Italy, Nortel Netherlands, Nortel Norway, Nortel Poland, Nortel Portugal, Nortel Romania, Nortel Russia, Nortel Slovakia, Nortel Spain and Nortel Sweden entered into a License Termination Agreement with the Other Sellers listed at paragraph 7.8 below to permit this sale to proceed on a global basis.  Nortel Nigeria and Nortel Networks (Sales and Marketing) Limited were also party to the License Termination Agreement, but take no part in this Allocation Statement.

7.8.    **Other Sellers:**  NNC, NNL, NNI, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Networks International Inc, Nortel Networks (CALA) Inc, Nortel Networks de Mexico, S.A. de C.V., Nortel de Mexico, S de R.L. de C.V., Nortel

Networks (Asia) Limited, Nortel Networks (China) Limited, and Nortel
Networks Telecommunications Equipment (Shanghai) Co., Ltd.

**8.    Next-Gen Sale**

8.1.    **Description of sale:**  Next Generation Packet core assets are the hardware
and software routers used to provide transport wireless data in third
generation (3G) wireless communications.

8.2.    **EMEA Assets sold:**  EMEA did not own any fixed assets, Inventory or
Customer Assets used in the Next Generation Packet Core business.
Instead, the EMEA RPEs agreed to terminate their IP Licenses to permit a
global sale to proceed.

8.3.    **Date of completion:**  December 8, 2009

8.4.    **Purchaser:**  Hitachi

8.5.    **Final purchase price:**  $10 million

8.6.    **Employees transferred:**  No EMEA employees transferred under this
sale.

8.7.    **EMEA Sellers:**  The EMEA Sellers did not sell assets, but NNUK, NNIR,
NNSA, NNIF, Nortel Austria, Nortel Belgium, Nortel Czech Republic,
Nortel Finland, Nortel France SAS, Nortel Germany, Nortel Hungary,
Nortel Italy, Nortel Netherlands, Nortel Norway, Nortel Poland, Nortel
Portugal, Nortel Romania, Nortel Slovakia, Nortel Spain and Nortel
Sweden entered into a License Termination Agreement with the Other
Sellers listed at paragraph 8.8 below to permit this sale to proceed on a
global basis.

8.8.    **Other Sellers:**  NNC, NNL, NNI, Architel Systems (U.S.) Corporation,
CoreTek, Inc., Nortel Altsystems, Inc. (previously "Alteon WebSystems,
Inc."), Nortel Altsystems International Inc. (previously "Alteon
WebSystems International, Inc."), Nortel Networks Applications
Management Solutions Inc., Nortel Networks Cable Solutions Inc., Nortel
Networks Capital Corporation, Nortel Networks HPOCS Inc., Nortel
Networks International Inc., Nortel Networks Optical Components Inc.,
Northern Telecom International Inc., Qtera Corporation, Sonoma Systems
and Xros, Inc.

**9.    Residual Patents Sale**

9.1.    **Description of sale:**  this was the last sale and consisted of all the Residual
Patents and patent applications not sold as part of the eight sales listed
above.

9.2.    **EMEA Assets sold:**  the EMEA RPEs, in common with all other parties to
the sale, terminated their rights under the MRDA to exclusive use of the

patents to enable the sale to proceed.   No fixed assets, Inventory or Customer Assets were sold as part of this sale.

9.3.    **Date of completion:**  July 29, 2011

9.4.    **Purchaser:**  Rockstar BidCo, L. P. (owned by a consortium consisting of Apple, EMC, Ericsson, Microsoft, Research in Motion and Sony).

9.5.    **Final purchase price:**  $4.5 billion

9.6.    **Employees transferred:**  None were transferred under the terms of the sale, but 16 employees were to be made offers of employment.  None of those 16 employees were from EMEA.

9.7.    **EMEA Sellers:**  NNUK, NNIR, NNSA, Nortel France SAS and Nortel Germany.

9.8.    **Other Sellers:**    NNC, NNL, NNI, NN Applications Management Solutions Inc., Nortel Altsystems, Inc. (previously "Alteon Networks, Inc."), CoreTek, Inc., Qtera Corporation, Xros, Inc.

01:13617193.1