**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
-----------------------------------------------------------X
```
                                                           :
*In re*                                                    :          Chapter 11
                                                           :
Nortel Networks Inc., *et al.*,[1]                         :          Case No. 09-10138 (KG)
                                                           :
                                    Debtors.               :          Jointly Administered
                                                           :
                                                           :          **Hearing date:  To commence January 6, 2014**
                                                           :
                                                           :          **Re: D.I. 9947**
                                                           :
```
----------------------------------------------------------- X
```

**MOTION TO APPROVE ALLOCATION POSITION OF US DEBTORS
AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

---

[1]      The US Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel/.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

FACTS RELEVANT TO THE ALLOCATION DISPUTE........................................ 5

I.      Nortel's Corporate Stucture ......................................................................... 5

II.     Nortel's Transfer Pricing Regime ................................................................ 7

III.    Intellectual Property and the "Enhanced" Exclusive Licenses .............................. 10

IV.     MRDA Provisions Regarding Insolvency, Withdrawal from
        the Agreement and Business Sales ................................................................ 13

V.      NNI Is the Most Valuable Nortel Entity ....................................................... 14

VI.     Nortel Post-Filing Sale Process ................................................................... 16

        A.      The Selling Debtors Agreed to Escrow the Sale Proceeds
                Under the IFSA to Maximize Total Value Available for Creditors............ 16

        B.      The Sale of the Business Lines ........................................................ 17

        C.      The Sale of the Residual Patent Portfolio ....................................... 18

THE US ALLOCATION POSITION............................................................................ 19

I.      ALLOCATION MUST BE BASED ON FAIR MARKET VALUE ..................... 19

II.     ALLOCATION MUST ALSO REFLECT THE RIGHTS OF PARTIES
        UNDER APPLICABLE LAW .......................................................................... 24

NNI'S ENTITLEMENT TO A SUBSTANTIAL MAJORITY
OF THE SALE PROCEEDS .......................................................................................... 26

CONCLUSION.............................................................................................................. 29

## TABLE OF AUTHORITIES

Page(s)

**Rules and Statutes**

11 U.S.C. § 1129(b)(2)(B)(ii) ............................................................... 25

26 U.S.C. § 1001 ............................................................................... 21

26 U.S.C. § 2031 ............................................................................... 22

26 U.S.C. § 2512 ............................................................................... 22

Bankruptcy & Insolvency Act (Canada), R.S.C., 1985, c. B-3, s. 96 ............... 23

Income Tax Act (Canada), R.S.C. 1985, c. 1 (5th Supp.), s. 74.5(a) ............... 22

Insolvency Act, 1986, c. 45, § 107 (U.K.) .............................................. 25

**Cases**

Alberts v. HCA Inc. (In re Greater Se. Cmty. Hosp. Corp. I),
No. 04-10366, 2008 WL 2037592 (Bankr. D.D.C. May 12, 2008) ................... 23, 24

Brace v. United States, Farmers Home Admin. (In re Brace),
163 B.R. 274 (Bankr. W.D.Pa. 1994) ...................................................... 23

Broadcast Music, Inc. v. DMX Inc.,
683 F.3d 32 (2d Cir. 2012) .................................................................. 21

Central Capital Corp., Re (1995), 29 C.B.R. (3d) 33 (Can. Ont. C.J. (Gen. Div. –
Commercial List)) ............................................................................ 25

El Paso Natural Gas Co. v. Fed. Energy Regulatory Comm'n,
96 F.3d 1460 (D.C. Cir. 1996) ............................................................. 21

First Fed. Sav. Bank of Hegewisch v. United States,
52 Fed. Cl. 774 (Fed. Cl. Ct. 2002) ....................................................... 20

Hechinger Litig. Trust v. Bankboston Retail Finance, Inc. (In re Hechinger Inv. Co. of
Delaware),
147 F. App'x 248 (3d Cir. 2005) ........................................................... 20

Henderson v. Minister of Nat'l Revenue,
[1973], C.T.C. 636 (Can. Tax Ct.) ........................................................ 20

Holston Invs., Inc. B.V.I. v. LanLogistics Corp.,
677 F.3d 1068 (11th Cir. 2012) ............................................................ 20

**Page(s)**

In re Heritage Highgate, Inc.,
679 F.3d 132 (3d Cir. 2012)...................................................................................... 23

Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.),
281 B.R. 535 (Bankr. D. Del. 2002) ........................................................................ 23

Lock Realty Corp. IX v. U.S. Health, LP,
707 F.3d 764 (7th Cir. 2013) .................................................................................... 21

Nat'l Coal Ass'n v. Hodel,
675 F. Supp. 1231 (D. Mont. 1987)......................................................................... 21

Nordetek Envtl., Inc. v. RDP Techs., Inc.,
862 F. Supp. 2d 406 (E.D. Pa. 2012) ...................................................................... 24

Official Comm. of Unsecured Creditors of Champion Enters., Inc. v. Credit Suisse
(In re Champion Enters., Inc.), Adv. No. 10-50514 (KG),  2012 WL 3778872
(Bankr. D. Del. Aug. 30, 2012)................................................................................ 22

On Davis v. The Gap, Inc.,
246 F.3d 152 (2d Cir. 2001)...................................................................................... 22

Oracle Am., Inc. v. Google Inc.,
847 F. Supp. 2d 1178 (N.D. Cal. 2012) .................................................................. 22

Pantry Pride Enters., Inc. v. Stop & Shop Cos., Inc.,
806 F.2d 1227 (4th Cir. 1986) .................................................................................. 21

Phillips v. Brewin Dolphin Bell Lawrie Ltd,
[2001] UKHL 2, [2001] 1 W.L.R. 143 (H.L.) (appeal taken from Eng.) .......................... 20, 24

Pleasant Summit Land Corp. v. C.I.R.,
863 F.2d 263 (3d Cir. 1988)...................................................................................... 21

Pocklington Foods Inc. v. Alberta (Provincial Treasurer)
(1998), 218 A.R. 59 (Can. Alta. Q.B.) ..................................................................... passim

R.M. Smith, Inc. v. C.I.R.,
591 F.2d 248 (3d Cir. 1979)...................................................................................... 21

Shubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.),
348 B.R. 234 (Bankr. D. Del. 2005) ........................................................................ 24

Slatky v. Amoco Oil Co.,
830 F.2d 476 (3d Cir. 1987)...................................................................................... 20

|                                                                                                                    | **Page(s)** |
| ------------------------------------------------------------------------------------------------------------------ | ----------- |

Standard Fed. Bank v. United States,
No. 95-CV-478, 2002 WL 31947572 (Fed. Cl. Ct. Dec. 30, 2002)....................................    20

Syracuse Eng'g Co. v. Haight,
110 F.2d 468 (2d Cir. 1940)............................................................................................    23

United States v. 50 Acres of Land,
469 U.S. 24 (1984)...........................................................................................................    21

United States v. Cartwright,
411 U.S. 546 (1973).........................................................................................................    19, 20

**Other Authorities**

Douglas G. Baird & Anthony J. Casey, No Exit? Withdrawal Rights and the Law of
Corporate Reorganizations, 113 Colum. L. Rev. 1 (2013) .................................................    25

Ibbotson SBBI 2010 Valuation Yearbook: Market Results for Stocks, Bonds, Bills, and
Inflation 1926-2009 (James P. Harrington ed., Morningstar 2010)....................................    26

Michael Pellegrino, BVR's Guide to Intellectual Property Valuation (2009 ed.) ..............    26

Roy Goode, Principles of Corporate Insolvency Law (4th ed. 2011)................................    25

Standing Senate Committee on Banking Trade and Commerce, Debtors and Creditors
Sharing the Burden: A Review of the Bankruptcy and Insolvency Act and the
Companies' Creditors Arrangement Act (2003)..................................................................    25

United States Sentencing Commission, United States Sentencing Guidelines
Manual § 2B1.1(b)(1) (effective Nov. 1, 2012).................................................................    22

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "US Debtors"), and the Official Committee of Unsecured Creditors (the "Committee," and together with the US Debtors, the "US Interests") hereby move the US and Canadian Courts for the allocation of sale proceeds and for such other relief as the Courts deem just and proper.

## PRELIMINARY STATEMENT

Each Selling Debtor[2] is entitled to receive the fair market value of the assets and rights it sold or relinquished in connection with the sale of Nortel's businesses and residual patent portfolio (collectively, the "Sales").  The Courts must determine the value of the assets and rights transferred by each of the separate and legally distinct Selling Debtors to allocate over $7 billion in sale proceeds now sitting in escrow.  Using straightforward and universally accepted valuation methodologies, the US Interests will demonstrate at trial that the value of the assets and rights they sold or relinquished constitutes the substantial majority of the sale proceeds.  This is because (1) well-established principles accepted in all relevant jurisdictions mandate that the value generated in the Sales be distributed to the Selling Debtors in accordance with the fair market value of the rights and assets sold by those Selling Debtors, (2) NNI was the most profitable and valuable entity in the Nortel multinational enterprise, and (3) the fundamental legal principles of corporate separateness and absolute priority (equity takes last) must be enforced so that creditors recover first from the value of the corporate entity against which they have claims before any recovery flows to equity holders or to the creditors of such equity holders.

---

[2]      The term "Selling Debtors" refers to any Nortel Debtor that signed or acceded to the Interim Funding and Settlement Agreement (the "IFSA") or that signed one or more of the escrow agreements that were entered into on or before each of the sales set forth below.

The use of the fair market value methodology requires allocation of the substantial majority of the sale proceeds to the US Debtors, as demonstrated by the following objective criteria:[3]

### Revenue

- NNI generated 66% of the MRDA Participants' revenue from 1983 to 2009;

- NNI generated 67% of the MRDA Participants' revenue from 1995 to 2009;

- NNI generated 70% of the MRDA Participants' revenue from 2000 to 2009; and

- NNI generated 66% of the MRDA Participants' revenue from 2005 to 2009.

### Cash Flow

- NNI generated 76% of the MRDA Participants' cash flow from 1983 to 2009;

- NNI generated 81% of the MRDA Participants' cash flow from 1995 to 2009; and

- NNI generated 75% of the MRDA Participants' cash flow from 2005 to 2009.

### Intellectual Property

- The majority of the patents sold in the $4.5 billion sale of the residual patent portfolio were filed *only* in the United States – the territory for which NNI and only NNI held an exclusive, perpetual, royalty-free license.  In other words, those patents could not be exploited or enforced, and thus had no value, in any jurisdiction other than the United States.

- With respect to patents that were filed both in the United States and in other countries, the United States is by far the most profitable country for exploitation of these patents and the country where enforcement actions are the most efficient and lucrative.

---

[3]    These figures divide financial contributions to the Nortel group among the five fully functioning corporate members of the Nortel group that bore the economic risk associated with operating the various Nortel businesses and had stand-alone corporate infrastructure (e.g., human resources, treasury, finance, legal and information technology), business unit leadership, significant sales and marketing leadership and conducted the research and developments expenses.  These units are the participants to the Master Research and Development Agreement (the "MRDA," and the parties to the MRDA, the "MRDA Participants").  Revenue includes third-party revenue.  Cash flow includes adjusted operating income before research and developments expenses and transfer pricing adjustments.

2

**Credit Support**

- NNI alone provided credit support for substantially all of the Nortel group's public debt financing outstanding as of the Petition Date. Without the backing of NNI's balance sheet, the rest of the Nortel group's access to the capital markets would have been impossible or much more expensive.

- At the same time that NNI provided continued credit support for $4 billion in public debt, the EMEA Debtors were released from their prior credit support obligations, materially improving the financial position of the EMEA Debtors and their creditors in liquidation.

- That NNI's cash was the primary source of NNL's working capital is also evidenced by the $1 billion pre-petition revolving credit facility provided by NNI to NNL, without which NNL would have been unable to operate.

**Research and Development**

- NNI conducted research and development ("R&D") in six separate facilities in the United States, located in California, Texas, North Carolina, Massachusetts, Tennessee and New York – paying $7.2 billion for directly funded research and development from 2001 to 2009.

- NNI paid an additional $7.1 billion from 2001 to 2009 in the form of transfer pricing payments, which funded R&D throughout the Nortel group.

- In the five years from 2005 to 2009, NNI funded 69% of Nortel's total investment in R&D – whether the R&D was conducted in the United States, EMEA or Canada.

These and other similar economic facts regarding the Nortel group lead to the inescapable conclusion that a substantial majority of the value of the Nortel multinational enterprise is attributable to the assets and rights sold or relinquished by the US Debtors. Thus, a substantial majority of the sale proceeds must be allocated to the US Debtors.

It is also important to focus on the fact that the group of companies known as "Nortel" belongs to no single jurisdiction. The modern Nortel was not a Canadian company any more than it was a US company or a UK company. Instead, Nortel was a classic multinational enterprise. It consisted of related – but legally separate – corporations operating in over 140 countries. These corporations employed tens of thousands of people. Indeed, the Canadian

3

Court overseeing the criminal case against three former Nortel officers recognized that it was incorrect to think of Nortel as a single entity because Nortel operated dozens of separate entities in geographies all over the world.  Each Nortel company had its own separate corporate existence and its own assets and liabilities.

Similar to other multinational enterprises, the Nortel group was organized, managed and operated according to well-established laws, rules and principles.  Nothing about Nortel or the way that it was organized, managed or operated was unusual or out of sync with international standards.  Nortel was focused on maximizing shareholder value and minimizing taxes and costs on a group level.  By law, pre-insolvency, the leadership of the Nortel group was duty-bound to manage the enterprise in this fashion.

The principles of corporate separateness under which the Nortel group operated are fundamental to the manner in which multinational enterprises – particularly those founded in the common law jurisdictions of Canada, the United Kingdom and the United States – operate in the international economic community.  These corporate law principles drive investment and innovation and, most importantly, create legitimate, and legally cognizable, expectations for all those who come in contact with a multinational enterprise, especially those that lend money, extend credit or take employment.  Because of the recognized reliance placed on such expectations, it is entirely appropriate for stakeholders of these distinct corporate entities to expect that the assets of each such distinct corporate entity will be available to satisfy the respective entity's liabilities.  These principles cannot be ignored or casually overridden. Centuries of common law place an enormous burden on any party seeking to pierce a corporate veil, a burden which no party can sustain here.

Similarly, based on the legal principle of creditor priority in all relevant jurisdictions, known as the "absolute priority rule" in the United States, an equity holder (and the creditors of such equity holder) must wait until the satisfaction of all creditor claims, including principal, interest (whether pre-petition or post-petition) and all other creditor entitlements, before receiving any distributions.

When the Courts place this dispute into the proper context – valuing the assets and rights of separate corporate entities that were transferred as part of larger transactions using the well-established standard of fair market value – the task is not daunting. These valuation issues are exactly the type of issues that US and Canadian courts routinely adjudicate and resolve. Through the use of tried and true fair market valuation methodologies, the US Interests will demonstrate that the fair market value of what the US Debtors sold or relinquished entitles the US Debtors to a substantial majority of the sale proceeds.

**FACTS RELEVANT TO**
**THE ALLOCATION DISPUTE**

I.    <u>Nortel's Corporate Structure</u>

The Nortel corporate organization chart, even in simplified form, shows a classic multinational enterprise:



At the top is a publicly traded corporate holding company, Nortel Networks Corporation ("<u>NNC</u>"), listed and reporting in both the United States and Canada and trading on the New York

Stock Exchange and the Toronto Stock Exchange.  NNC's sole asset is the stock of Nortel

Networks Limited ("NNL"), the Canadian operating company, and an intermediate holding

company.  NNL, in turn, owns, among other things, 100% of the stock of each of Nortel

Networks Inc. ("NNI"), the US operating company and a holding company of other entities;

Nortel Networks UK Limited ("NNUK"), Nortel's UK operating company, as well as a holding

company for a number of Nortel's European entities; Nortel Networks Ireland ("NN Ireland"),

Nortel's Irish operating company; and more than 90% of the stock in Nortel Networks, S.A.

("NNSA"), Nortel's French operating company.[4]

        Embedded within this chart is a simple, yet essential, fact – each of the significant

entities of the Nortel multinational enterprise was and is a separate legal entity, a corporation

properly established and operated under the laws of its jurisdiction and now being liquidated

under the applicable laws governing such proceedings in its jurisdiction.  Each possesses the

critical characteristics of corporate existence – each is a separate legal entity, the assets of each

are and were separate and not commingled (neither vertically between parent and subsidiary, nor

horizontally among sister corporations), their shareholders are and were not liable for the debts

of the corporation and their shareholders hold their investment in the form of equity.

        Nortel's structure was not unique and was clear to those with whom the Nortel

entities did business.  That Nortel was a multinational enterprise comprised of separate legal

entities was *recognized and relied on*, *repeatedly*, by the financial markets and by key

counterparties.  For example, over $4 billion in bond debt exists today and nearly all of it was

---

[4]        At the Petition Date, the remaining shares in NNSA were held by NNIF and three of NNSA's directors.
NNIF is a subsidiary of NNUK.

issued by either NNL or NNC and guaranteed by NNI.[5]  The guarantees were no accident.  With

*nearly 70%* of the revenue of the MRDA Participants generated by NNI in the United States, the

guarantee of Canadian-issued debt by NNI either reduced NNL's overall interest rate or made the

debt issuance possible in the first place (or both).  Without such guarantees, bonds issued only by

NNL or NNC would have been structurally subordinated to claims against NNI.  The financial

markets refused to take that structural subordination risk.  This is understandable, as in the five

years prior to the Petition Date, *no more than 14%* of the revenue of the MRDA Participants was

generated in Canada.

Within the Nortel group, NNI served as the lender under a $1 billion revolving

credit agreement with NNL as the borrower.  Under this revolver, a fully negotiated and

documented credit agreement, year in and year out, NNI provided NNL with billions of dollars

of working capital throughout the course of the calendar year, smoothing out NNL's cash flow

pending payments to NNL under the Nortel transfer pricing regime.  This is in addition to the

billions of dollars in transfer pricing payments NNI made to NNL to fund research and

development throughout the Nortel group of companies, and to share profits therefrom, as

described below.

II.    Nortel's Transfer Pricing Regime

One of the most important questions faced by any multinational enterprise is how

and where income is taxed, particularly given that many different jurisdictions may wish to tax

the same income items.  In other words, multinational enterprises need to manage their affairs to

avoid double taxation and to minimize legitimately their global effective income tax rate.  In a

---

[5]     Additionally, in the past, when NNL or NNC issued debt without a guarantee by either NNI or NNCC (also a US Debtor), one of the Canadian entities issued a separate guarantee for the other.  For instance, in August 2001, NNC issued convertible senior notes guaranteed by NNL.  By (and after) 2006, however, debt issued by NNL or NNC was also guaranteed by NNI in recognition of NNI's superior balance sheet and resources.  (NNCC did not issue debt in this time period.)

group with a single publicly traded corporate parent, the appropriate focus is on maximizing shareholder value. From a tax perspective, this means minimizing effective tax rates on a group basis. These are non-controversial propositions and they formed the basis on which Nortel designed and operated its transfer pricing regime.

"Transfer pricing" is about taxes. It refers to the system pursuant to which related group companies determine the prices charged for transactions, such as the sale of goods or the provision of services between or among the related companies. Transfer pricing is extremely important in a multinational enterprise like Nortel because of the risk of multiple countries taxing the same income and the opportunities to move income to group members in low tax jurisdictions. The basic transfer pricing rule recognized in most jurisdictions is that the pricing for transactions between or among related parties must be on an arm's length basis (that is, what unrelated parties in comparable circumstances would charge) so that the various taxing jurisdictions can be assured that income will not be directed inappropriately from a jurisdiction in which it is truly earned toward a jurisdiction with a lower tax rate. For example, if an intercompany service is provided by entity A in country X, country X will want to make sure that the service is charged at an arm's length market price so that entity A's income will reflect appropriate compensation for the service provided. A below market price charged by entity A would reduce entity A's income in country X, and entity A would, in turn, pay less tax to country X.

While complex to a layperson, developing and maintaining a transfer pricing system is standard operating procedure for multinational enterprises such as Nortel. The Organisation for Economic Co-operation and Development, an international organization of 34 countries founded in 1961 whose purpose is to foster international economic growth and

financial stability, publishes extensive guidelines on the use of transfer pricing for multinational enterprises and has led the charge in the development of a web of bilateral tax treaties among developed countries.  While transfer pricing can take the form of one of several accepted structures, the transfer pricing regime for a multinational enterprise is unique to that enterprise and often (as with the case with Nortel) requires the approval of taxing authorities.  In a multinational enterprise, the taxing authorities scrutinize transfer pricing regimes very carefully.

In Nortel's case, the transfer pricing structure – known as the residual profit split methodology ("RPSM") – was adopted in 2001 and replaced a prior system known as the cost sharing method.  The RPSM was contained within the MRDA, the parties to which are NNL, NNI, NNUK, NN Ireland and NNSA (the "MRDA Participants," and all but NNL, the "Licensed MRDA Participants").[6]  These entities generated the vast majority of Nortel's revenue and conducted substantially all of Nortel's R&D.  While the Nortel multinational enterprise generated billions of dollars annually, as a technology enterprise, Nortel also spent billions on R&D.  Specifically, while operating, Nortel divided profits or losses using a schedule to the MRDA ("Schedule A"), which calculated each MRDA Participant's percentage of the profits or losses based upon its R&D spend over the preceding five years (the "Schedule A percentages").  MRDA, Second Amendment to Schedule A.  Nortel's RPSM, together with volumes of economic analysis, was submitted for approval to the Internal Revenue Service ("IRS") in the United States and the Canada Revenue Agency ("CRA") in Canada.[7]

---

[6]     Nortel Networks Australia Pty Limited was an original party to the MRDA, but was terminated from the agreement in 2007 after ceasing to perform R&D for two years after its R&D facilities were sold in 2005.

[7]     Transfer pricing disputes involving multinational companies are often addressed in advanced pricing agreements between the IRS and the taxing authorities of other countries pursuant to the "mutual agreement" provisions of U.S. income tax treaties.  These provisions establish a process under which the "competent authorities" of the treaty parties (here, the IRS and the CRA) resolve disputes over the interaction of the tax systems of the parties.  Mutual agreement proceedings are negotiations between the two taxing authorities and the taxpayers have little direct role in the negotiation process.

No final approvals had been received by the time of Nortel's January 2009 insolvency filings. A full analysis, however, was well underway. Ultimately, this analysis led to the IRS and CRA concluding that for the period of 2001 to 2005 NNI *overpaid* NNL under the MRDA by at least *$2 billion*.[8] This $2 billion adjustment was first determined jointly by the Canadian and US governments and then was brought by NNI and NNL to the US and Canadian Courts in connection with the Final Canadian Funding and Settlement Agreement ("FCFSA") dated December 23, 2009. This adjustment resulted in an increase in NNI's US taxable income of $2 billion for the period of 2001 to 2005 and caused a material reduction in NNI's US tax attributes available to offset income.[9] This in turn led to the allowance of an agreed $2 billion claim against NNL in favor of NNI, a claim approved by both Courts in orders approving the FCFSA after notice to all relevant creditor constituencies and a hearing on January 21, 2010.

III.    Intellectual Property and the "Enhanced" Exclusive Licenses

In addition to addressing Nortel's transfer pricing regime, the MRDA set forth the agreement among the key Nortel entities concerning the creation, ownership and licensing of Nortel's intellectual property ("IP"). While some perceive Canada to have been the primary location for Nortel's R&D efforts, in fact, substantial R&D also was conducted by Nortel's United States, United Kingdom, France and Ireland affiliates, the same affiliates who are parties to the MRDA. In the United States alone, R&D was conducted in six substantial NNI facilities in Richardson, Texas; Billerica, Massachusetts (along the Route 128 technology corridor outside Boston); Santa Clara, California (Silicon Valley); Raleigh, North Carolina (Research Triangle

---

[8]     The $2 billion income adjustment represented a compromise settlement amount. The total claim filed by the IRS against NNI for unpaid taxes for the period 1998 to 2008 was approximately $3 billion, which implied an income adjustment of higher than $2 billion for 2001 to 2005.

[9]     NNI's US net operating loss carryforwards (NOLs) were just under $814 million after such reduction.

Park); Nashville, Tennessee; and Batavia, New York. This R&D, wherever or by whomever conducted, led to the creation of Nortel's IP – its patents, trade secrets, copyrights and related protected work product.

The MRDA confirms a structure that pre-dates the MRDA:[10] the vast majority of Nortel's IP, wherever or by whomever created, is nominally filed in the name of NNL and is then licensed back to each of the Licensed MRDA Participants – with each holding an *exclusive, perpetual, royalty-free* license (including the right to sublicense) within its home jurisdiction (United States and Puerto Rico for NNI, United Kingdom for NNUK, France for NNSA, and Ireland for NN Ireland). MRDA at Art. 5 & Schedule B. NNL had retained its exclusive rights to Nortel's IP solely in Canada. MRDA at Art. 4.[11] Each Licensed MRDA Participant also was granted a non-exclusive, perpetual, royalty-free license in jurisdictions as to which exclusivity was not otherwise granted. This structure was both intentional and, as described below, directly tied to Nortel's strategy of minimizing taxes on a group-wide basis.

The exclusive, perpetual, royalty-free licenses – what NNI had in the United States with respect to virtually all of Nortel's patents – have all of the hallmarks of and are the economic and tax equivalent of ownership of the intellectual property in the exclusive jurisdiction. As a March 14, 2002 report commissioned by Nortel and then submitted to the IRS and CRA in connection with the review of Nortel's transfer pricing system represented: "From an economic standpoint, each R&D cost sharing participant could be considered to 'own' the [Nortel] technology as it related to its specific region." Similarly, the MRDA specifically states

---

[10]    The MRDA confirmed the structure that was put in place in the 1992 Cost Sharing Agreement: specifically, that each party contributed its IP to the nominal owner, NNL, and then held an exclusive, royalty-free license in perpetuity to exploit Nortel's IP in its geographic territory. See MRDA, at 2, ¶ 2; Amended Research & Development Cost Sharing Agreement (Jan. 1, 1992) at Arts. 4, 5.

[11]    All of Nortel's IP that was produced or conceived as a result of R&D by, or for, any of the MRDA Participants was subject to this arrangement. MRDA at Art. 1(h).

on page 2 that the enhanced exclusive licenses transfer "equitable and beneficial ownership" of

Nortel's IP to the Licensed MRDA Participants with respect to each Licensed MRDA

Participant's exclusive geographical area (for NNI, the United States and Puerto Rico).[12]

   The Licensed MRDA Participants' agreement to have the patents and all other

registered forms of Nortel IP filed in NNL's name and to share the cost of global R&D through

transfer pricing payments was in exchange for the enhanced exclusive licenses that constituted

effective ownership of the IP in their respective jurisdictions.  The choice of this licensing

structure was a conscious and logical economic decision for all concerned and a further effort to

reduce legitimately Nortel's effective global tax rate.  The other alternative was to have NNL

acquire the patents at fair market value from each Licensed MRDA Participant that developed a

patent and then charge market royalties for licenses to each of the Licensed MRDA Participants

in their respective jurisdictions, a structure that would have required substantial upfront

payments by NNL and generated enormous tax liabilities.  Overall, the MRDA and RPSM were

designed to lower the effective tax rate for the Nortel multinational group.

   This structure has very important implications in liquidation.  Most importantly,

because of the exclusive IP rights held by the Licensed MRDA Participants, NNL's interest, if

any, in the IP rights of the Licensed MRDA Participants is indirect and a function of the value of

NNL's equity ownership of the Licensed MRDA Participants.  The necessary result of this

deliberate structure is that, in bankruptcy, the value of the enhanced exclusive licenses flows first

to the Licensed MRDA Participants' creditors.  Only after those creditors are satisfied in full,

including any post-filing interest and any other claims allowed by applicable law, will the

---

[12] Emphasizing that the MRDA Participants owned the Nortel IP in their respective jurisdictions, the MRDA in Section 9(b) further provides that if it is terminated, then each MRDA Participant will continue to hold its "fully paid up" enhanced exclusive and non-exclusive licenses.

residual value of the patents and other IP rights that are subject to the enhanced exclusive licenses flow to NNL as shareholder.

For each of the Licensed MRDA Participants, the value of the enhanced exclusive licenses is critical.  For NNI, the enhanced exclusive license is particularly valuable given that the United States is, and has been for at least 25 years, the largest and most profitable market in the constellation of Nortel entities.

IV.    MRDA Provisions Regarding Insolvency,
       Withdrawal from the Agreement and Business Sales

Consistent with the US Interests' position on allocation, Article 11 of the MRDA provides that in the event of an exit from the MRDA due to a MRDA Participant's insolvency, the MRDA Participant will surrender the enhanced exclusive license but must receive, in exchange, the "*fair market value*" (emphasis added) of the enhanced exclusive license. Specifically, the MRDA provides that upon such exit (referred to in the MRDA as a "Special Default Event"), the MRDA Participant receives the Special Retirement Allocation as full payment for rights in Nortel IP represented by the enhanced exclusive licenses (and the non-exclusive licenses in the rest of the world).  MRDA at Art. 11(d)(iii).  The Special Retirement Allocation, in turn, is defined *not* by reference to the Schedule A percentages that governed while Nortel was an operating company, but as an amount that "represents the fair market value" of the exclusive and non-exclusive licenses.  MRDA at Art. 1(j).  The Schedule A percentages are thus irrelevant in the case of the liquidation of the various affiliates.[13]

---

[13]    Article 11 of the MRDA was not triggered here for two reasons.  First, the automatic stay granted in bankruptcy proceedings prevented application of the termination provision of the MRDA.  See *Order to Enforce the Automatic Stay*, Jan. 16, 2009 [D.I. 68].  Second, on December 31, 2008, a Fourth Addendum was added to the MRDA, providing that "notwithstanding anything to the contrary in the Agreement, in the event of the occurrence of an event described at Section 11(c)(iv)" – i.e., bankruptcy, insolvency, receivership or liquidation – "no Participant affected by such event shall be automatically terminated from participation in the Agreement."  The Fourth Addendum, consistent with the entirety of the MRDA, does not indicate that the parties intended to apply Schedule A to the allocation process or in any manner create such an intention or expectation.

The fair market value requirement is driven by the concern that when a MRDA Participant exits due to insolvency, the transfer of such a valuable right could be avoidable as a fraudulent conveyance (under each of US, UK and Canadian law) unless it can be demonstrated that fair market value is given in exchange for such surrender. Rather than risk the possibility that an insolvent MRDA Participant could exit the Nortel group and take with it an enhanced exclusive license to all of Nortel's IP in a particular region, the MRDA made clear that the enhanced exclusive license would be repurchased from the Licensed MRDA Participant, but that fair market value would have to be paid – adopting the most respected and common standard of value all over the globe – thus reducing if not eliminating the risk of a fraudulent conveyance challenge. In the event the MRDA itself is terminated for any reason, the MRDA further provides that the Licensed MRDA Participants have acquired "fully paid up" enhanced exclusive and non-exclusive licenses such that they hold them free and clear.

The MRDA further expressly provides that the allocation of proceeds from sale of a Nortel business shall *not* be calculated according to the Schedule A percentages. 3d Add. to MRDA at 7. While those percentages may have been relevant when taking into account the ongoing conduct of global R&D by a multinational enterprise averaged over a five-year period, those percentages have no relevance in a business sale context, when the R&D related to the sold business, by definition, will cease upon the closing of the sale. The importance of this distinction is magnified where, as here, all of the businesses were sold within a very short timeframe and R&D was terminated concurrent with the closing of each sale.

V.    NNI Is the Most Valuable Nortel Entity

NNI consistently generated the overwhelming majority of revenue, cash flow, and total funding for R&D among the MRDA Participants. The long-standing dominance of NNI is shown in the chart below.

14

Relative Percentage Contribution by MRDA Participant (Aggregate Amounts)

| | Revenue | | | Cash Flow | | | Total R&D Funding | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2009 | 5 Yr | 15 Yr | 2009 | 5 Yr | 15 Yr | 2009 | 5 Yr | 15 Yr |
| NNL | 12% | 13% | 20% | 1% | 9% | 11% | 24% | 13% | 15% |
| NNI | 69% | 66% | 67% | 88% | 75% | 81% | 65% | 69% | 75% |
| NNUK | 8% | 9% | 9% | 0% | 0% | 0% | 0% | 0% | 0% |
| NN France | 4% | 5% | 2% | 7% | 9% | 4% | 8% | 11% | 7% |
| NN Ireland | 6% | 7% | 3% | 5% | 7% | 3% | 4% | 7% | 3% |

In the above chart, "Total R&D Funding" includes direct R&D funding, R&D cost allocations and transfer pricing payments under the MRDA. Transfer pricing payments under the MRDA were actual R&D funding because these payments were made to other entities for reimbursement of R&D expenses. Indeed, NNI's transfer pricing payments were used primarily to fund the Canadian and EMEA Debtors' R&D. Revenue includes third-party revenue. Cash flow includes adjusted operating income before R&D expenses and transfer pricing adjustments.[14]

In addition to contributing the substantial majority of relative revenue, cash flow and total R&D Funding consistently for the last fifteen years, NNI provided credit support for substantially all of Nortel's debt financing, including approximately $4.2 billion of unsecured public debt as well as providing NNL with a $1 billion revolver.

In addition to being the largest market for each of Nortel's main businesses (CDMA, Enterprise and MEN), the United States is the largest market for exploitation and enforcement of Nortel's IP rights. Substantially all of the patents sold in Nortel's residual patent portfolio (described below) were filed with the US Patent and Trademark Office and the majority of them were not filed in any jurisdiction other than the United States, reflecting the reality that the United States was by far the principal revenue generator among the MRDA Participants and that Nortel saw the patents as having the most value in the United States, with little or often no value in other regions.

---

[14]     MRDA Participants with negative cash flow or negative total R&D funding are represented at 0%.

VI.     Nortel Post-Filing Sale Process

      A.     The Selling Debtors Agreed to Escrow the Sale Proceeds Under the IFSA to Maximize Total Value Available for Creditors

Early on in these proceedings, the US Debtors, Canadian Debtors and EMEA Debtors recognized that the best way to maximize value for their respective creditors was to sell their respective rights, property and other assets together.  The Selling Debtors recognized that the sale process would not succeed if a selling party could hold up a sale pending agreement on the allocation of the sale proceeds.

To address this issue (among others), on June 9, 2009, the US Debtors, the Canadian Debtors and the EMEA Debtors entered into the Interim Funding Settlement Agreement ("IFSA").[15]  The IFSA provided, among other things, that the Selling Debtors would not condition the execution of any sale agreement upon reaching agreement with the other parties on allocation (or a binding procedure for allocation) of the sale proceeds, and that all sale proceeds corresponding to each sale transaction would be held in escrow accounts pending later agreement on allocation by the parties or a litigated resolution of any allocation dispute.  IFSA ¶¶ 12(a); 12(b).  With respect to the enhanced exclusive licenses in particular, the IFSA provided that the parties would enter into a license termination agreement solely for the purpose of facilitating the sale of all Nortel assets (its businesses and IP) and only "in consideration of a right to an allocation" of the sale proceeds.  IFSA ¶ 11(a).[16]  The IFSA further provided that it was not an "amendment, modification or waiver of rights" of any party under any other

---

[15]     NNSA and Nortel Networks AG acceded to the IFSA as EMEA Debtors – each agreeing "to perform and comply with its obligations under the IFSA as if it had been a party from the date of execution thereof" – on or about September 11, 2009.

[16]     See also IFSA ¶ 11(d) ("Where any Debtor enters into any Appropriate License Termination in accordance with the provisions of this Section 11, such Debtor shall be deemed to be a Selling Debtor, and the proceeds of such Asset Sale shall be deemed to be Sale Proceeds, for the purposes of Sections 12.b. and 12.d., and Sections 12.b and 12.d shall apply accordingly.")

agreement, including the MRDA.  IFSA ¶ 20.  Thus, nothing in the IFSA altered in any way the

parties' rights vis-à-vis each other regarding the ownership of any rights, property or other assets

beyond an agreement to sell or relinquish those rights, property or other assets together to or for

the benefit of the buyers.

    After notice to all relevant creditor constituencies and a hearing, the IFSA was

approved by the US and Canadian Courts on June 29, 2009.

    B.  The Sale of the Business Lines

    Between 2009 and 2011, the Nortel group successfully sold all of its major

business lines and related assets.  These include:

- the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. for $17.7 million;

- the sale of substantially all of its CDMA business and LTE Access assets to Telefonaktiebolaget LM Ericsson (publ) for $1.13 billion;

- the sale of substantially all of the assets of the Enterprise Solutions business globally, including the shares of Nortel Government Solutions Incorporated and DiamondWare Ltd. to Avaya Inc. for $900 million;

- the sale of the assets of its Wireless Networks business associated with the development of Next Generation Packet Core network components to Hitachi Ltd. for $10 million;

- the sale of substantially all the assets of its Optical Networking and Carrier Ethernet businesses associated with its Metro Ethernet Networks business unit to Ciena Corporation for $775 million;

- the sale of certain assets of its Carrier Voice Over IP and Application Solutions business to GENBAND US LLC for $282.6 million;

- the sale of substantially all of its Global System for Mobile Communications and the Global System for Mobile Railway Communications business to Ericsson and Kapsch CarrierCom AG for a combined $103 million;

- the sale of certain assets of the Debtors' Multi-Service Switch business to Ericsson for $65 million; and

- certain other sale transactions.[17]

After the bidders were granted access to Nortel's confidential information, each of these business lines were sold in public sales resulting from comprehensive marketing and a rigorous, competitive bidding process, often involving multi-day and/or multi-round auctions.

C.    The Sale of the Residual Patent Portfolio

In parallel to the business lines sales, the various estates and their creditors began to explore how to maximize the value of Nortel's portfolio of patents that were not being transferred in any of the business sales (the "Residual Patent Portfolio").  This portfolio contained over 7,000 patents and patent applications worldwide, consisting of approximately 3,500 unique patent families, which covered a large range of telecommunications, internet search, social networking and other industry technologies.

Working together, the Canadian Debtors, US Debtors and EMEA Debtors jointly retained financial advisor Lazard Freres & Co. LLC and Global IP Group to analyze the potential options for maximizing value of the Residual Patent Portfolio.  The estates and creditors ultimately decided that, to maximize value, the pursuit of the sale of the Residual Patent Portfolio was the best option.  This decision proved incredibly successful.  On April 4, 2011, Nortel announced that certain of its affiliates had entered into a "stalking horse" sale agreement for the sale of Nortel's residual patents and related assets for a purchase price of $900 million.  On May 2, 2011, the US and Canadian Courts entered orders establishing bidding procedures for an auction that allowed other qualified bidders to submit higher or otherwise better offers.[18]

---

[17]    The other sales transactions include a sale of residual Global System for Mobile Communications business, a sale of limited partnership and limited liability company interests and a sale of certain patents and related assets.

[18]    See *Order (A) Authorizing Debtors' Entry Into the Stalking Horse Asset Sale Agreement, (B) Authorizing and Approving the Bidding Procedures and Bid Protections (C) Approving the Notice Procedures and the Assumption and Assignment Procedures, (D) Approving the License Rejection Procedures, (E) Approving a Side*

After the bidders were given access to confidential information about the patent portfolio in order to assess the value of the residual patents, competing bids were submitted by June 13, 2011, and an auction with the qualified bidders commenced on June 27, 2011.  On June 30, 2011, a consortium called "Rockstar Bidco," consisting of Apple, EMC, Ericsson, Microsoft, Research in Motion and Sony, emerged as the winning bidder with a cash purchase price of $4.5 billion.[19]  The sale closed on July 29, 2011.

## THE US ALLOCATION POSITION

### I.    ALLOCATION MUST BE BASED ON FAIR MARKET VALUE

To allocate the sale proceeds in these insolvency proceedings, the Courts must first determine what each legally distinct Selling Debtor held prior to the sales, and second, determine the value of what that Selling Debtor sold or relinquished.

To assess the value of what each Selling Debtor sold or relinquished, the touchstone must be "fair market value."  In other words, the Courts must determine the fair market value of what each Selling Debtor sold or relinquished to determine each Selling Debtor's allocable share.  Fair market value must be used here because it is the foundational metric widely accepted in the law and economics throughout the world.  See United States v. Cartwright, 411 U.S. 546, 550-51 (1973) ("[T]he value of property is to be determined by its fair market value[.]"); Pocklington Foods Inc. v. Alberta (Provincial Treasurer) (1998), 218 A.R. 59, para. 197, 354 (Can. Alta. Q.B.), aff'd (2000), 250 A.R. 188 (Can. Alta. C.A.) (explaining that "the most common value standard is fair market value" and that "Canadian Courts have

---

*Agreement, (F) Authorizing the Filing of Certain Documents Under Seal and (G) Setting a Date for the Sale Hearing*, May 2, 2011 [D.I. 5359].

[19]    See *Order Authorizing And Approving (A) The Sale Of Certain Patent And Related Assets Free And Clear Of All Claims And Interests, (B) The Assumption And Assignment Of Certain Executory Contracts, (C) The Rejection Of Certain Patent Licenses And (D) The License Non-Assignment And Non-Renewal Protections*, July 11, 2011 [D.I. 5935].

generally considered the word 'value' when it is contained in legislation, regulations, contracts and other legal documents to be synonymous with market value or fair market value"); Phillips v. Brewin Dolphin Bell Lawrie Ltd, [2001] UKHL 2, [2001] 1 W.L.R. 143 (H.L.), 154 (appeal taken from Eng.)).[20]

Fair market value is the chosen standard of value in myriad contexts.  Courts often use fair market value to assess the value of a company in the merger and acquisition context.  See, e.g., Hechinger Litig. Trust v. Bankboston Retail Finance, Inc. (In re Hechinger Inv. Co. of Delaware), 147 F. App'x 248, 251 (3d Cir. 2005) (upholding valuation method used by parties – which were performed "under GAAP fair market value standards for purchase accounting" – to value company post-merger); Holston Invs., Inc. B.V.I. v. LanLogistics Corp., 677 F.3d 1068, 1072 (11th Cir. 2012) (holding that the determination of the purchase price of a company in a package deal "requires that the fair market value of the company be considered"); Standard Fed. Bank v. United States, No. 95-CV-478, 2002 WL 31947572, at *1 (Fed. Cl. Ct. Dec. 30, 2002) (stating that, pursuant to GAAP, an entity resulting from a merger or acquisition may use accounting treatment which employs fair market value); First Fed. Sav. Bank of Hegewisch v. United States, 52 Fed. Cl. 774, 776 n.2 (Fed. Cl. Ct. 2002) (same); Pocklington Foods Inc. v. Alberta (Provincial Treasurer) (1998), 218 A.R. 59, paras. 338-340 (Can. Alta.

---

[20]    The fair market value of a business or asset is the highest amount that a reasonably well-informed purchaser would pay in arm's length negotiations in an open and unrestricted market.  Cartwright, 411 U.S. at 551; Henderson v. Minister of Nat'l Revenue, [1973], C.T.C. 636, para. 21 (Can. Tax Ct.); see also Slatky v. Amoco Oil Co., 830 F.2d 476, 484 (3d Cir. 1987) ("[Fair market value], by definition, is the highest price a willing buyer would pay[.]"); Phillips, 1 W.L.R. at 154 ("The value of an asset that is being offered for sale is, prima facie, not less than the amount that a reasonably well informed purchaser is prepared, in arm's length negotiations, to pay for it.").

Q.B.) (explaining that fair market value is the main criteria to be utilized in establishing the fair

value of shares under the various Canadian Business Corporation Acts).[21]

Fair market value is also the standard used to value real and intellectual property.

See, e.g., United States v. 50 Acres of Land, 469 U.S. 24, 25-26 (1984) ("The Fifth Amendment

requires that the United States pay 'just compensation' – *normally measured by fair market value*

– whenever it takes private property for public use." (emphasis added)); id. at 29

("[C]ompensation normally is to be measured by 'the market value of the property' . . . [and]

'[c]onsiderations that may not reasonably be held to affect market value are excluded.'" (internal

citations omitted)); Pleasant Summit Land Corp. v. C.I.R., 863 F.2d 263, 272 (3d Cir. 1988)

(determining fair market value of real estate transaction); Broadcast Music, Inc. v. DMX Inc.,

683 F.3d 32, 45 (2d Cir. 2012) (noting court's determination of reasonable copyright royalty rate

is determined by the "fair market value of the music"); R.M. Smith, Inc. v. C.I.R., 591 F.2d 248,

251 (3d Cir. 1979) (determining fair market value of patents for tax purposes following corporate

liquidation).[22]

In general for federal income tax purposes, whenever property is transferred in

exchange for other property, the amount realized attributable to the property received as

consideration is the fair market value of such property.  Internal Revenue Code, 26 U.S.C.

§ 1001. Similarly, for federal estate and gift tax purposes, the amount taken into account on the

---

[21]     See also Pantry Pride Enters., Inc. v. Stop & Shop Cos., Inc., 806 F.2d 1227, 1231 (4th Cir. 1986) (in right of first refusal case following sale of businesses and mistaken notification of assignment, court remanded the matter for reallocation of the purchase price "according to the fair market value of the lease and equipment").

[22]     See also Lock Realty Corp. IX v. U.S. Health, LP, 707 F.3d 764, 770-71 (7th Cir. 2013) (holding that disputed lease required expert testimony as to the lease's fair market value of net rent); El Paso Natural Gas Co. v. Fed. Energy Regulatory Comm'n, 96 F.3d 1460, 1466 (D.C. Cir. 1996) (approving use of discounted cash flow analysis to ascertain fair market value of oil- and gas-producing properties as part of settlement of take-or-pay contract dispute); Nat'l Coal Ass'n v. Hodel, 675 F. Supp. 1231, 1246 (D. Mont. 1987) (praising fair market value analysis Department of Interior conducted of federal lands).

transfer of an estate or gift is generally the fair market value of the property comprising the estate or gift.  Id. §§ 2031 and 2512; see also Income Tax Act (Canada), R.S.C. 1985, c. 1 (5th Supp.), s. 74.5(a) (deeming transfers of property to be valued at the fair market value of the property); Pocklington Foods Inc. v. Alberta (Provincial Treasurer) (1998), 218 A.R. 59, para. 336 (Can. Alta. Q.B.) (explaining that for estate tax, "value was equivalent to the current price at which the property could be sold").

Courts also regularly use fair market value to determine whether and to what extent a party is entitled to damages in a variety of contexts.  See, e.g., Official Comm. of Unsecured Creditors of Champion Enters., Inc. v. Credit Suisse (In re Champion Enters., Inc.), Adv. No. 10-50514 (KG),  2012 WL 3778872, at *34-35 (Bankr. D. Del. Aug. 30, 2012) (holding the determined fair market value of a bankrupt company showed the plaintiff was unable to establish non-speculative damages for breach of contract of a loan agreement); On Davis v. The Gap, Inc., 246 F.3d 152, 161-63, 166-67 (2d Cir. 2001) (applying fair market value of a license for use of intellectual property as estimate of actual damages); Oracle Am., Inc. v. Google Inc., 847 F. Supp. 2d 1178, 1182 (N.D. Cal. 2012) (explaining that copyright infringement lost license fee damages are based off of the "fair market value of the copyright at the time of infringement" and that reasonable royalty standards for patent damages are "similar, if not the same"); Pocklington Foods Inc. v. Alberta (Provincial Treasurer) (1998), 218 A.R. 59, para. 333 (Can. Alta. Q.B.) (stating that in a "contractual sense," values mean "the price which the subject will bring when it is exposed to the test of competition").  In fact, the fair market value of stolen goods is even a "reasonable estimate of loss" in the criminal context.  See United States Sentencing Commission, United States Sentencing Guidelines Manual § 2B1.1(b)(1) cmt. 3(C)(i) (effective Nov. 1, 2012) (court must take into account "[t]he fair market value of the

property unlawfully taken, copied, or destroyed" when calculating the estimated loss to the victim of, *inter alia*, offenses involving stolen property).

Just as with its prominence throughout business, law and economics, fair market value also is the correct standard for assessing the value of property in insolvency proceedings. See Syracuse Eng'g Co. v. Haight, 110 F.2d 468, 471 (2d Cir. 1940) ("A proper regard for the interests of the bankrupt, as well as for the interests of his creditors, compels the conclusion that fair market price is the most equitable standard."); see also Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.), 281 B.R. 535, 545-46 (Bankr. D. Del. 2002) (in debt valuation to determine solvency, a balance sheet analysis requires that fair market value of the assets be compared to the face value of the liabilities); Alberts v. HCA Inc. (In re Greater Se. Cmty. Hosp. Corp. I), No. 04-10366, 2008 WL 2037592, at *8 (Bankr. D.D.C. May 12, 2008) (assessing fair market value of subsidiary hospital to determine whether transaction was not fraudulent conveyance under bankruptcy law); Brace v. United States, Farmers Home Admin. (In re Brace), 163 B.R. 274, 277, 280 (Bankr. W.D.Pa. 1994) (holding that "the ultimate valuation [of debtors' real estate] should be based on the fair market value considering the use for which the property is designed and intended" and quoting favorably the fair market value determination of a party's expert who used the market approach, income approach and cost approach); Bankruptcy & Insolvency Act (Canada), R.S.C., 1985, c. B-3, s. 96 (requiring a trustee in bankruptcy to provide the court with "the fair market value of the property or services" at issue to enable the court to determine that a transfer at undervalue is void).[23]

---

[23]     See also, e.g., In re Heritage Highgate, Inc., 679 F.3d 132, 142 (3d Cir. 2012) (quoting Assocs. Commercial Corp. v. Rash, 520 U.S. 953, 961 (1997)) (holding that "[t]he proper measure under § 506(a)" – which calls for the division of secured creditors' claims into secured and unsecured portions, with the secured portions of the claims limited to the value of the collateral – "must therefore be the collateral's fair market value because it is most respectful of the property's anticipated use").

There are, moreover, well-established methodologies to determine fair market value that are used every day by investment bankers, economists and valuation experts that are routinely accepted and analyzed by courts in all relevant jurisdictions.  See, e.g., Shubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.), 348 B.R. 234, 274 (Bankr. D. Del. 2005) (noting the market, income, and asset approaches, which are used to determine fair market value, are the "three standard approaches" to valuation); Nordetek Envtl., Inc. v. RDP Techs., Inc., 862 F. Supp. 2d 406, 416 (E.D. Pa. 2012) (noting that measurement of fair market value involves consideration of the market approach, income approach and asset-based approach in context of determining equity interest in corporation); In re Greater Se. Cmty. Hosp. Corp. I, 2008 WL 2037592, at *8 (citing Jay E. Fishman et al., PPC's Guide to Business Valuations ¶ 203.2; Shannon P. Pratt et al., Valuing a Business: The Analysis and Appraisal of Closely Held Companies, at 45 (4th ed. 2000)) (explaining and applying the three basic methodologies to determine fair market value in fraudulent conveyance case); Pocklington Foods Inc. v. Alberta (Provincial Treasurer) (1998), 218 A.R. 59, para. 201 (Can. Alta. Q.B.) (explaining that there are three approaches for valuing a business: asset base, income, and market); Phillips, [2001] UKHL 2, [2001] 1 W.L.R. 143 (H.L.) 154.  At trial, the US Interests will demonstrate, using well-accepted valuation methodologies, the fair market value of the assets and rights the selling US Debtors sold or relinquished.

## II.    ALLOCATION MUST ALSO REFLECT THE RIGHTS OF PARTIES UNDER APPLICABLE LAW

As stated above, the Nortel group of companies was and is comprised of separate and distinct corporate entities subject to the laws of their respective jurisdictions, under which their separate creditors have clear rights and remedies.  It is of fundamental importance across these jurisdictions that, in insolvency, a debtor's assets must be made available to satisfy the

creditors of that debtor before equity may recover.  11 U.S.C. § 1129(b)(2)(B)(ii); Insolvency

Act, 1986, c. 45, § 107 (U.K.); Central Capital Corp., Re (1995), 29 C.B.R. (3d) 33, para. 36

(Can. Ont. C.J. (Gen. Div. – Commercial List)), aff'd (1996), 38 C.B.R. (3d) (Can. Ont. C.A.);

Standing Senate Committee on Banking Trade and Commerce, Debtors and Creditors Sharing

the Burden: A Review of the Bankruptcy and Insolvency Act and the Companies' Creditors

Arrangement Act, at 158-59 (2003) ("[Holders of equity] should be afforded lower ranking than

secured and unsecured creditors, and the law – in the interests of fairness and predictability –

should reflect both this lower priority for holders of equity and the notion that they will not

participate in a restructuring or recover anything until all other creditors have been paid in full.");

Roy Goode, Principles of Corporate Insolvency Law (4th ed. 2011), ¶ 1-04 ("[O]nly when

creditors have been paid in full (which is rarely the case) do shareholders come in to participate

in the surplus remaining.") (citation omitted).  To ensure this absolute priority scheme is

followed, bankruptcy "operates on legal entities, not on firms."  See Douglas G. Baird &

Anthony J. Casey, No Exit?  Withdrawal Rights and the Law of Corporate Reorganizations, 113

Colum. L. Rev. 1, 4-5 (2013).  Quite simply, corporate structure is a "means of providing for

priority among creditors."  See id. at 29.  These principles apply to all aspects of these

insolvency proceedings, including to allocation.  Thus, in allocation, each Selling Debtor is

entitled to the value of the assets and assets it sold or relinquished.  That share of the sale

proceeds will then be available for distribution to that debtor's creditors.

   There is no agreement among the Nortel entities that purported to – or could –

alter the absolute priority rule.  The IFSA expressly provides that the parties thereto reserved all

of their rights under "any other agreement," including in particular the MRDA.  IFSA ¶ 20.  The

IFSA made clear that the Selling Debtors agreed to release their rights with respect to their

enhanced licenses of IP solely to facilitate the global sale of Nortel's assets and "in consideration of" receiving a corresponding right to an allocation of the sale proceeds.  IFSA ¶ 11(a).  Thus, in allocation, each legally distinct Selling Debtor is entitled to the value of what it sold or relinquished in the sales – no less and no more.

This amount, in turn, must be the US Debtors' allocation from the sale proceeds and, under the absolute priority rule, must be made available for distribution to the US Debtors' creditors until they are paid in full, including with post-petition interest.  In particular, the US Interests will establish at trial, using accepted methodologies for determining fair market value, that the US Debtors are entitled to the substantial majority of the sale proceeds.

## NNI'S ENTITLEMENT TO A SUBSTANTIAL MAJORITY OF THE SALE PROCEEDS

That the US Debtors are entitled to the substantial majority of the Sale Proceeds should come as no surprise.  NNI was the principal revenue and cash flow generator among the MRDA Participants, funded most of the group's R&D, owned by far the most valuable enhanced exclusive license and provided credit support for the group's global operations.

The key drivers of the value of a business are revenue and cash flow.  See Ibbotson SBBI 2010 Valuation Yearbook: Market Results for Stocks, Bonds, Bills, and Inflation 1926-2009, 19 (James P. Harrington ed., Morningstar 2010); Michael Pellegrino, BVR's Guide to Intellectual Property Valuation at 4-5 (2009 ed.).  NNI generated approximately $49 billion in revenue from 2001 to 2009, which amounted to 71% of the revenue generated by the MRDA Participants during that same period.  In addition, NNI also paid $7.1 billion in transfer pricing payments from 2001 to 2009 while NNUK and NNL received $2.2 billion and $5.0 billion in transfer pricing receipts, respectively, during that same period.  NNI's transfer pricing payments to its Canadian parent were used by the Canadian and certain of the EMEA Debtor entities to

fund R&D expenses throughout Nortel and to subsidize their operating losses.  Over the same

time period, NNI spent $7.2 billion to fund R&D in the United States and contributed to NNL

title to all of the IP created by NNI in its own R&D facilities (subject to NNI's receipt of an

exclusive license to perpetually exploit Nortel's IP in the United States).  Adding the cost of the

directly funded domestic United States R&D to the transfer pricing payments made pursuant to

the MRDA that funded R&D, NNI funded 69% of Nortel's total IP investment from 2005 to

2009.  NNI also provided a $1 billion revolving credit facility to NNL which NNL used to fund

its working capital requirements.

NNI also provided credit support for substantially all of Nortel's debt financings.

In February 2006, NNI became the only direct borrower on $1.3 billion of debt to refinance debt

maturing under a credit facility at the NNL level.  By 2006, NNC and NNL, as well as the debt

markets, recognized that only through direct NNI credit support in the form of guarantees would

the Nortel group be able to continue to secure sufficient access to the capital markets to satisfy

its liquidity needs.  In a series of NNC/NNL financings directly guaranteed by NNI, the Nortel

group raised approximately $4 billion in debt, which served to refinance maturing debt and the

cash portion of the settlement of major class action litigation facing the Canadian parent, and

otherwise provide critical corporate funding.  By contrast, during this time period, NNUK,

NNSA and NN Ireland were released from their historical guarantees of the Nortel group credit

facilities.  NNI today is the only Nortel subsidiary that is liable as a guarantor for NNC and

NNL's material financial debt obligations.

Moreover, with respect to the sale of the Residual Patent Portfolio, much of which

was created in NNI's six R&D facilities, the substantial majority of the patents sold are filed *only*

in the United States – the territory for which NNI held its exclusive, perpetual, royalty-free

license.  Of the 3,485 unique patent families sold, including 1,335 patent families Nortel

recognized as "high interest" (as reflected in a September 1, 2010 asset list provided to potential

bidders in the residual patent auction), over 70% of all the patent families and "high interest"

patent families were filed *only* in the United States at the time they were sold.  This was a clear

recognition that the US market – as to which NNI alone had the exclusive right in perpetuity to

exploit – was the most valuable market for the Nortel group, so much so that it was the only

market where it was worth seeking patent protection for the inventions the Nortel group created

and, consequently, the only market where those inventions have value (because filing in the

United States but not in any other jurisdictions means that any third party may employ these

inventions outside the United States without fear of patent infringement suits).  Indeed, it was

NNL, not NNI, that was exclusively responsible for determining where patent protection would

be sought.  MRDA at Art. 4(d).  By designating the United States as the sole jurisdiction where

the majority of Nortel's Residual Patent Portfolio was filed, NNL acknowledged that the United

States is the most profitable market for exploiting Nortel's IP and that NNI's exclusive rights in

the Residual Patent Portfolio were by far the most valuable.

        In sum, the basket of rights, property and other assets owned by NNI, including

the enhanced license it owned, were by far the most valuable assets sold or relinquished in the

auctions.  Proceeding, as the Courts must, from the premise that the US Debtors' assets must be

made available for distribution to its creditors and that equity takes last, it is clear that the US

Debtors must be allocated most of the sale proceeds.  This result is mandated by fundamental

principles of law and is the direct consequence of the structure under which the Nortel group of

companies operated before insolvency, a structure that was relied upon by the companies and

their respective creditors and that must be respected in these insolvency proceedings.  Respecting

these corporate structures and following the basic insolvency law principle of absolute priority is not only legally mandated, it is fair, reasonable and just.

## **CONCLUSION**

At trial, the US Interests will demonstrate – using universally accepted valuation methodologies – that the fair market value of what the US Debtors sold or relinquished amounts to the substantial majority of the sale proceeds.

WHEREFORE, for the foregoing reasons, the Movants request that the US and Canadian Courts (i) allocate the asset sale proceeds by applying the principle of fair market value to determine each Selling Debtor's share of assets, rights and property it sold or relinquished in the sales; (ii) award the US Debtors a fair market allocation in an amount to be determined at trial, which is the substantial majority of the total sale proceeds; and (iii) grant such other and further relief as the Courts deem just and proper.

Dated:
May 16, 2013
Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Howard S. Zelbo (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Jeffrey A. Rosenthal (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*


    - and -


AKIN GUMP STRAUSS HAUER & FELD LLP

Fred Hodara (admitted *pro hac vice*)
David Botter (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002


    - and -


RICHARDS, LAYTON & FINGER, P.A.

*/s/ Christopher M. Samis*
Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile: (302) 651-7701

*Counsel for the Official Committee*
*of Unsecured Creditors*