**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

_____

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 09-10138 (KG) |
| NORTEL NETWORKS INC., *et al.,* | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

_____ )

**ALLOCATION POSITION OF
THE CANADIAN CREDITORS COMMITTEE**

The Canadian Creditors Committee ("**CCC**"), by and through its undersigned counsel, respectfully requests hereby that the Court enter an Order adopting the CCC's proposed methodology for the allocation of Nortel Global Assets, as defined herein, and in support thereof states the following:

## JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Allocation Protocol Order [D.I. 9947].  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory basis for the relief requested hereby is section 105(a) of title 11 of the United States Code (the "**Code**").

*[remainder of page intentionally left blank]*

# TABLE OF CONTENTS

PART I – INTRODUCTION AND RELIEF SOUGHT.............................................................3

PART II – OVERVIEW OF ALLOCATION POSITION ..........................................................4

 A. Ownership Allocation Order...................................................................4

 B. Equitable Allocation Order .....................................................................6

PART III – PARTIES............................................................................................................7

 A. Debtors....................................................................................................7

 B. Creditors .................................................................................................8

PART IV – FACTS ............................................................................................................10

 A. Introduction...........................................................................................10

 B. Innovation and Expansion ...................................................................10

 C. Lines of Business .................................................................................11

 D. Role of Nortel Canada..........................................................................12

 E. IP and R&D ...........................................................................................12

 F. Filing and Liquidation...........................................................................13

PART V – ALLOCATION POSITION OF THE CCC...........................................................14

 A. Allocation by Ownership......................................................................14

 B. Allocation Pro Rata by Claims.............................................................18

PART VI – CONCLUSION.................................................................................................25

# PART I – INTRODUCTION AND RELIEF SOUGHT

1.      The Canadian Creditors Committee (the "**CCC**")[1] represents the interests of more than 20,000 Canadian pensioners and other pension interests, long-term disabled and other employees and former employees of Nortel who in the aggregate have asserted approximately $3 billion[2] in Claims against the Canadian Debtors.

2.      This Allocation Proceeding concerns the allocation of approximately $9 billion in Global Assets of the Nortel Debtors for distribution to Nortel's Creditors, who have collectively asserted worldwide Claims far exceeding this amount.

3.      In addition to the CCC, Creditors include the Bondholders and other general unsecured creditors in the U.S, the U.K., and EMEA.  In addition, various Nortel Debtors have asserted Intercompany Claims against one or more of the other Nortel Debtors.

4.      The Global Assets are comprised of approximately $7.3 billion in Sale Proceeds held in trust accounts pursuant to an Interim Funding and Settlement Agreement dated June 9, 2009 between certain of the Nortel Debtors (the "**IFSA**"), and $1.7 billion in cash and other assets in the possession of Nortel Debtors in various jurisdictions ("**Residual Assets**"). The Sale Proceeds are made up of $2.8 billion (the "**Business Sale Proceeds**") from the sale of Nortel's Lines of Business, including the business units (the "**Business Sales**"), and $4.5 billion (the "**Residual IP Proceeds**") resulting from the sale of Nortel's remaining patent portfolio (the "**Residual IP**") owned by Nortel's operating parent, NNL. In

---

[1] Unless defined herein, all Capitalized terms have the meanings ascribed to them in the annexed Glossary of Terms (CCC Pleading).

[2] All amounts stated in this Pleading are approximate and are expressed in USD.

2011, the Residual IP was purchased by a consortium of technology companies ("**Rockstar**"), including Apple, RIM, Sony and Microsoft (the "**Residual IP Sale**").

5.    For the reasons set out below, the CCC seeks the following relief:

    a) an Order (the "**Ownership Allocation Order**") allocating, administering and effecting the distribution of the Sale Proceeds to the Nortel Debtors holding title to the assets sold, according to the value of such assets, as set out below and as will be more particularized in advance of trial;

    b) in the alternative, an Order (the "**Equitable Allocation Order**") allocating, administering and effecting the distribution of the Global Assets of the Nortel Debtors, including the Sale Proceeds, in accordance with equitable principles, so as to effect a *pro rata* distribution among Creditors, rateably by valid Claims; and

    c) such other orders or declarations as may be necessary to give effect to the Ownership Allocation Order or the Equitable Allocation Order, as applicable, including, as may be necessary, orders or directions that the Sale Proceeds and other Global Assets are only distributable in respect of valid Claims, the Global Assets be administered as if Nortel were a single consolidated estate, and all guarantees and Intercompany Claims among the Nortel Debtors be stayed and/or eliminated.

# PART II – OVERVIEW OF ALLOCATION POSITION

## *A.*    *Ownership Allocation Order*

6.    Nortel was a large multi-national technology enterprise headquartered in Canada, with a history dating to the nineteenth century.  Nortel was a world leader in digital telecommunications technology, operating several Lines of Business and developing a catalogue of patents and next-generation applications in wireless 4G/LTE, data networking, optical, voice, internet, and semiconductor technologies.  At its peak Nortel had annual revenue of approximately $30 billion and employed approximately 93,000 people.

7.      On January 14, 2009 (the "**Filing Date**"), Nortel's Canadian Debtors, U.S. Debtors and UK/EMEA Debtors filed for protection from creditors pursuant to the applicable insolvency statutes in their respective jurisdictions (the "**Insolvency Proceedings**")[3]. Thereafter, Nortel ceased operations as a going concern and liquidated its assets through the Business Sales and Residual IP Sale.

8.      This Allocation Proceeding addresses the issue of how the Global Assets should be allocated among the Nortel Debtors, and ultimately, distributed to Creditors.

9.      Where legal title is discernible, it should form the basis of the allocation among the Nortel Debtors. Allocation by legal title is a reasonable and principled approach that respects the legal and contractual rights of the Nortel Entities.

10.      Nortel's IP, including its patents, copyrights, trade secrets, confidential information, trademarks and other intellectual property and associated rights, was its most valuable asset and the primary driver of its profit and value. All of the value in the Residual IP Sale and a significant majority of the value in the Business Sales are attributable to IP.  At all times, title to virtually all of Nortel's IP was held by NNL.

11.      Pursuant to a Master Research and Development Agreement between NNL and certain of its subsidiaries that were Licensed Participants, effective as of January 1, 2001, (as amended, the "**MRDA**"), NNL and the Licensed Participants agreed that:

a)  legal title to Nortel IP is vested in NNL;

b)  each Licensed Participant received a Limited License to make, use, and sell Nortel products using certain NNL-owned IP on an exclusive basis in a prescribed territory, and non-exclusively elsewhere, subject to restrictions;

---

[3] The Canadian Debtors obtained protection under the CCAA.  The U.S. Debtors filed voluntary petitions under Chapter 11 of the Code. NNUK and certain of its affiliates located in EMEA were granted administration orders by the High Court of England and Wales.

c) a Licensed Participant had no right to use NNL's IP licensed to it for any other product or purpose, nor did it possess any legal ownership in such IP; and

d) the MRDA and the Limited Licenses therein were not assignable by the Licensed Participants.

12.    The MRDA is the basis upon which Nortel determined its respective ownership (in the case of NNL) and Limited License rights (in the case of the Licensed Participants) to make use and sell Nortel products using certain NNL-owned IP. NNL relied upon the MRDA, and in particular on its terms concerning ownership of IP, when it agreed to incur liabilities in the Lines of Business.

13.    All Sale Proceeds derived from the sale of IP belong to and must be allocated to the owner of that IP, NNL. In the case of the Residual IP Sale, all of the Residual IP Proceeds belong to NNL. In the case of the Business Sales, the value of IP sold or licensed to the purchasers is primarily attributable to NNL.

14.    The Licensed Participants' limited and non-assignable right to make, use and sell Nortel products embodying the licensed technology had no value, or in the alternative, no material value in the context of the Business Sales. The CCC puts the U.S. Debtors and the UK/EMEA Debtors to the strict proof of the amount of the Sale Proceeds from IP that they may allege is attributable to Licensed Participants, if any.

15.    The remaining assets (other than IP) sold in the Business Sales should be allocated according to legal title, to the extent discernible, and otherwise in accordance with appropriate allocation principles in the context of the Business Sales. Particulars of the allocation methodology of such assets will be provided in advance of trial.

B.    ***Equitable Allocation Order***

16.    If it is concluded that legal title should not form the basis for allocation of the Sale Proceeds, because it is inappropriate, or legal title is not determinable, or for any other reason, then the only fair, reasonable, defensible and equitable alternative in light of Nortel's highly integrated and multi-national operations is to

6

allocate the Global Assets among the Nortel Debtors in accordance with equitable principles so as to effect a *pro rata* distribution among Creditors, rateably by valid Claims.

17.     Prior to the Filing Date ("**Pre-Filing**"), Nortel's business consisted of four interdependent, international Lines of Business that operated without regard to geographic boundaries, and across numerous corporate entities. Nortel's stakeholders, including its Creditors, disregarded individual corporate identities and treated the Nortel Debtors as a single, global concern.

18.     Subsequent to the Filing Date ("**Post-Filing**"), the sale of Nortel's assets reflected the same integrated nature of Nortel's business. With respect to the Business Sales, purchasers bought "Nortel" Lines of Business consisting of assets spread across many corporate entities in multiple jurisdictions.

19.     Failure to give effect to the parties' legal rights regarding the ownership of Nortel assets, including NNL's ownership of the IP, leaves no other justifiable method to unscramble the assets and liabilities of Nortel. Moreover, any attempt to do so would be extremely difficult and prohibitively costly and would prejudice all Creditors. In such circumstances, there would be no reasonable basis to rely upon individual corporate identities, assets and liabilities or to treat the Nortel Debtors as anything other than a single, global estate.

20.     Accordingly, if the Courts conclude they must look beyond the legal title to property and the contractual rights of the relevant Nortel Entities, they should exercise their discretion to allocate the Global Assets to effect a *pro rata* distribution among Creditors, rateably by valid Claims.

# PART III – PARTIES

## *A.*     *Debtors*

21.     The Nortel Debtors consist of the Canadian Debtors, the U.S. Debtors and the UK/EMEA Debtors, each of which is subject to separate Insolvency Proceedings in their respective jurisdictions.

*B.*    **Creditors**

22.    The CCC represents Creditors with claims against the Canadian Debtors and is made up of the following interests:

a) **Former Employees, Pensioners and Disabled Employees of Nortel:**  These are the individual Canadian employees, from salaried staff to senior management, who helped to grow and run Nortel's global businesses. Each of the more than 20,000 former and disabled employees and pensioners (and through them, their survivors and beneficiaries) hold individual contracts of employment with Nortel, and who collectively have an interest in $2 billion in Claims in the form of cash payments owing to Nortel's Canadian pension plans. This group has an additional $1 billion of Claims in contractual health benefits and other employment-related obligations;

b) **The National Automobile, Aerospace, Transportation, and General Workers Union of Canada (CAW – Canada):** The CAW is a trade union representing over 750 members and former members, including actives, retirees, survivors, and disabled employees, under the term of individual retainers or pursuant to obligations imposed by statute;

c) **Nortel Canadian Continuing Employees:** These are approximately 3,600 active and transferred employees of Nortel's Canadian operations;

d) **Morneau Shepell Ltd., in its capacity as administrator of Nortel's two Canadian registered pension plans:** This is the arms-length fiduciary who administers the Nortel Canadian registered pension plans for the benefit of Nortel's Canadian former employees and pensioners; and

e) **The Superintendent of Financial Services for Ontario in his capacity as administrator of the PBGF:**  The PBGF guarantees pension benefits of Ontario members and beneficiaries under covered single-employer defined benefit plans in the event of the insolvency of

the plan sponsor, in accordance with the Ontario *Pension Benefits Act*, R.S.O. 1990, c. P.8 and applicable regulations. The PBGF is administered by the Superintendent of Financial Services and currently covers over 1,500 defined benefit plans with members and beneficiaries in Ontario.

23.    The other Creditors include:

a)   Bondholders, including certain Bondholders which have formed an informal committee comprised of members who purport to represent the interests of holders of bonds issued or guaranteed by NNC, NNL, NNCC and NNI;

b)   The UK Pension Claimants, who have asserted Claims and guarantees in respect of NNUK's pension plan deficit for approximately £2.1 billion (approximately $3 billion); and

c)   Other unsecured creditors in the U.S. and UK/EMEA, including those in the U.S. represented by the official committee of unsecured creditors of the U.S. Debtors, appointed shortly after the Filing Date, whose current members are the U.S. Pension Benefit Guarantee Corporation and two indenture trustees for certain bond issues held by the Bondholders.

24.    In addition to the Claims and guarantees asserted by Creditors against the Nortel Debtors, a number of Intercompany Claims have been asserted among the Nortel Debtors.

25.    The Courts have yet to fully assess Nortel's global Claims among the Core Party Creditors. However, these Claims are essentially being asserted by employees, bondholders and pension interests, in Canada, the U.S. and UK/EMEA.

# PART IV – FACTS

## A.  *Introduction*

26.     Nortel was a Canadian corporate icon, with a rich history dating to the late 1800s.  Over more than a century, Nortel grew to become a world leader in digital telecommunications technology, operating several Lines of Business and developing a catalogue of patents and next-generation applications in wireless 4G/LTE, data networking, optical, voice, internet, and semiconductor technologies.

27.     Due to an inability to raise capital in the face of the collapse of financial markets in the U.S. and elsewhere beginning in 2008, Nortel commenced the Insolvency Proceedings in Canada, the U.S. and the U.K. on the same date, and ultimately ceased operations as a going concern and liquidated its assets. Nortel's value was demonstrated by the Business Sale Proceeds and Residual IP Proceeds, which generated Sale Proceeds of approximately $7.3 billion.

## B.  *Innovation and Expansion*

28.     Nortel became a major innovator of intellectual property starting in the post-Second World War period. In 1961, Nortel opened a new research and development ("**R&D**") lab in Ottawa with 42 engineers, which quickly grew to 800 employees and produced a number of successful products. In 1967, Nortel introduced the SP-1 central office switch at EXPO 67, the 1967 world's fair held in Montreal. Other innovations followed, including the SA-1 community dial office, and the Precision Satellite Tracking Antenna.

29.     In the 1970s, Nortel continued to innovate in partnership with Bell Canada under the name Bell-Northern Research Ltd., with major facilities in Ottawa and smaller R&D centres in some of Nortel's Canadian manufacturing facilities.

30.     In or about 1976, Nortel invented, and later marketed, the "digital switching" technology that supported the establishment of the touch-tone telephone. In the 1990s, Nortel developed its fibre optic cable networking business. Nortel continued to innovate and transitioned from traditional landline phone technology and equipment to wireless and digital technology.

31.    Nortel's expansion continued on a global scale with the establishment of manufacturing and distribution centres in the United States and marketing subsidiaries in Europe, Asia and Latin America. Additional manufacturing, marketing and service operations were established throughout the world.

32.    At its zenith in 2000, Nortel was composed of approximately 140 corporations and joint ventures spread across North America, Europe, the Middle East, Africa, Asia, the Caribbean and Latin America and employed over 90,000 employees serving customers and carrying on business in over 150 countries.

## C.    *Lines of Business*

33.    Nortel operated four main Lines of Business that were globally integrated, interconnected and transcended geographic and corporate boundaries.  As at the Filing Date, Nortel's Lines of Business were as follows:

a) Enterprise Solutions helped customers build communications networks in the areas of data, voice, and multimedia communications;

b) Carrier Networks developed wireless networking technology for mobile smartphones, cell phones and other wireless devices for sale to cable operators and to other service providers who offered mobile voice, data and multimedia communications services to individuals and enterprises;

c) MEN provided high-speed carrier grade Ethernet transport capabilities and optical networking solutions for data-intensive video, including internet video, residential broadcast TV, video-on-demand and new wireless multimedia requiring increasing bandwidth; and

d) Global Services provided management and professional services to help customers design and deploy multi-vendor, multi-technology networks for wireline and wireless carriers, cable operators and mobile virtual network operations.

34.    Nortel's centralized Corporate Support Group served and coordinated all four Lines of Business from Nortel's Canadian headquarters.  The Corporate Support Group included senior management who oversaw and gave direction to

the Lines of Business, and also performed functions such as finance, treasury, legal, accounting, human resources and governance, information technology and manufacturing.

### D. *Role of Nortel Canada*

35.    NNL played the central role in the supervision, conduct, and accounting and reporting for Nortel's Lines of Business, which operated across several Nortel Entities.

36.    NNL and NNC were also responsible for undertaking the necessary financing that Nortel required, particularly starting in the early 2000s. Nortel made various acquisitions in the 1990s that put increasing demands on its treasury. Although substantially all of these were share transactions, the payroll, in-process R&D and other operating expenses associated with the acquired businesses required major cash outlays that ultimately required significant debt financing. NNL and NNC undertook the necessary financing for the benefit of the entire Nortel operation.

37.    While at its peak in 2000 Nortel reported approximately $30 billion of annual consolidated revenues, this was followed swiftly by a period of rapid decline in the wake of the bursting dot-com bubble.

38.    From 2001 onwards, Nortel utilized the capital markets as a source of liquidity to fund its operations globally. NNL and NNC bore substantially all of the cost for these financings.

39.    As part of its restructuring efforts, Nortel downsized its operations including its employment base by two-thirds, such that by 2008 Nortel employed approximately 30,000 (down from approximately 90,000 in 2000).

### E. *IP and R&D*

40.    Nortel's most valuable asset was its IP. Nortel deliberately vested legal title in all or substantially of all its IP in NNL.

41.    At or around the Filing Date, Nortel held approximately 9,000 patents and patent applications and over 2000 trademarks or trademark applications, the

overwhelming majority of which were registered or filed in the name of NNC, NNL or their predecessor corporations.

## F.    *Filing and Liquidation*

42.    The Nortel Debtors commenced the Insolvency Proceedings in Canada, the United States, the United Kingdom and the EMEA region on January 14, 2009. Soon thereafter, Nortel ceased operating as a going concern and the proceedings very quickly focused on a liquidation of Nortel's assets, starting with the Business Sales.

### 1)    The Business Sales

43.    By approximately September 2010, Nortel had divested itself of most of its operating assets through the Business Sales, which included the following:

a)  the Layer 4-7 Business Sale;

b)  the Enterprise Business Sale;

c)  the CDMA Business Sale;

d)  the Packet Core Business Sale;

e)  the MEN Business Sale;

f)  the GSM Business Sale;

g)  the CVAS Business Sale; and,

h)  the MSS Business Sale.

44.    The primary assets sold in the Business Sales consisted of IP, although the sales included other assets such as fixed assets and inventory. Substantially all of the value in the Business Sales was in the IP.

### 2)    The Residual IP Sale

45.    Following the completion of the Business Sales, Nortel retained a significant portfolio of Residual IP. The Residual IP included approximately 6,000 patents and patent applications filed in Canada, the U.S. and other jurisdictions specifically in relation to wireless, wireless 4G, data networking, optical, voice, internet, service provider semiconductors and other applications.

46.     Following an auction featuring nineteen rounds of bidding, the Residual IP was purchased by the Rockstar consortium for approximately $4.5 billion.

47.     The Sale Proceeds resulting from the Business Sales and the Residual IP Sale are currently being held in escrow pending the outcome of this Allocation Proceeding.

# PART V – ALLOCATION POSITION OF THE CCC

## A.     *Allocation by Ownership*

48.     Nortel's IP portfolio included patents, industrial designs, copyrights, trademarks and associated goodwill, trade secrets and confidential information. NNL was the legal owner of all or substantially all of this IP.

49.     Prior to the Sales, Nortel and certain of its subsidiaries entered into agreements addressing the ownership and licensing of IP (excluding trademarks and any associated goodwill) produced or conceived as a result of R&D by or for NNL and such subsidiaries. This IP, together with other IP owned by NNL (including trademarks and any associated goodwill) accounts for a substantial portion of the value of the Sale Proceeds.

50.     These agreements formed the basis of a series of Advanced Pricing Agreements ("**APAs**") wherein tax authorities in various jurisdictions, including Canada, the United States and the United Kingdom, accepted and approved of Nortel's internal transfer pricing practices.

51.     Up to December 31, 2000, each subsidiary receiving a license from NNL (the "**Licensed Subsidiary**") entered into one or more bilateral cost sharing agreements (the "**Cost Sharing Agreements**") with NNL's predecessor, Northern Telecom. The Cost Sharing Agreements specified that NNL owned all IP (excluding trademarks and any associated goodwill, which were in any event predominantly owned by NNL) produced or conceived as a result of R&D by or for NNL and the Licensed Subsidiaries and that the Licensed Subsidiaries received a limited exclusive license, subject to specific field of use limitations. The Cost Sharing Agreements provided that:

a) Legal title including intellectual property rights to the IP (excluding trademarks and any associated goodwill) produced or conceived as a result of R&D by or for NNL and the Licensed Subsidiaries vested in and was owned solely by NNL;

b) Licensed Subsidiaries received licenses (i) to make, have made, use, and sell certain Nortel products in and for a prescribed geographic area and (ii) to use the IP described in paragraph (a) above, as necessary or appropriate in connection therewith;

c) The Nortel products that the Licensed Subsidiaries were licensed to make, use and sell were limited to products, software and services manufactured or marketed, or proposed to be manufactured or marketed, at any time by NNL and its subsidiaries, and all components, parts, sub-assemblies and software associated with or incorporated in such products; and

d) The licenses were, within the above scope of the license, exclusive to the Licensed Subsidiaries, royalty-free, and included a right to sublicense others in conjunction with the Licensed Subsidiaries' making, using and selling Nortel Products.

52.    The Cost Sharing Agreements between NNL and the Licensed Subsidiaries were replaced by the MRDA with effect as of January 1, 2001.

53.    Under the MRDA, the parties continued to agree that NNL would own all IP (excluding trademarks and any associated goodwill) produced or conceived as a result of R&D by or for the parties (including what was developed pursuant to the Cost Sharing Agreements), and that the Licensed Subsidiaries (referred to as "Licensed Participants" in the MRDA) would continue to receive an exclusive license subject to field of use and other limitations.

54.    The MRDA contained the following provisions related to the ownership and licensing of Nortel IP:

- Article 1(f): "NN Technology" shall mean, any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings,

reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill."

- Article 1(g): "Products" means all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, enhancements or other derivatives associated with or incorporated in any of the foregoing."

- Article 4(a): "Except as otherwise specifically agreed, legal title to any and all NN Technology whether now in existence or acquired or developed pursuant to the terms of this Agreement shall be vested in NNL. In consideration therefor, NNL agrees to enter into an Exclusive License and a Non-Exclusive License with each of the Licensed Participants as set forth in Article 5."

- Article 4(d): "With respect to patentable inventions and copyrightable property encompassed by NN Technology whether in existence at the Effective Date or acquired subsequent to the Effective Date by any Participant pursuant to this Agreement, NNL shall have the exclusive right but not the obligation to file and prosecute the applications in its name for patents, copyrights, mask works, industrial designs, and all other registered forms of intellectual property encompassed by such NN Technology in every country of the world."

- Article 4(e): "Licensed Participants have the right to assert actions and recover damages or other remedies in their respective Exclusive Territories for infringement or misappropriation of NN Technology by others."

- Article 5(a)(i): "To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License")."

- Article 5(a)(ii): To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby grants to each Licensed Participant, as of January 1, 2009 (the "Non-Exclusive License

Effective Date"), a non-exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Non-Exclusive Territory, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Non-Exclusive License").

- Article 14(a): This Agreement shall not be assigned by any Participant except with the written consent of the other Participants.

- Article 14(f): This Agreement shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada.

55.    Accordingly, up to and until the completion of the Sales, rights to NN Technology (as defined in the MRDA) were owned by NNL and licensed in the manner described above.

56.    The NN Technology, together with substantially all other IP that was sold or licensed in connection with the Sales, was owned by NNL. The IP applications and registrations in connection therewith were also primarily in the name of NNL.

57.    In relation to the Residual IP Sale, the entirety of the Residual IP Proceeds belongs to NNL. The Residual IP Sale transferred title in patents owned by NNL to Rockstar, after all of Nortel's Lines of Business had been sold. None of the Licensed Participants had any right, title, or legal interest in the Residual IP and, therefore, no consideration was paid by Rockstar for the license rights of the Licensed Participants to make, use, or sell Products (as defined in the MRDA) under the Limited Licenses. The Limited Licenses thus had no value in the context of the Residual IP Sale.

58.    In relation to the Business Sales, the proceeds from the IP attributable to such sales should be allocated primarily to NNL. All or substantially all of the IP transferred in the Business Sales was owned by NNL. The Licensed Participants held Limited Licenses in respect of their own use, but had no right to assign or otherwise transfer their rights under the MRDA or the Limited Licenses granted to them therein. Accordingly, the Limited Licenses had no value, or in the alternative, no material value in the context of the Business Sales. To the extent

that any amount of the Sale Proceeds can be attributed to a Limited License, it would be nominal, and in any event could not exceed, and must be much less than, the amount which a Licensed Participant could claim under the residual profit sharing methodology ("**RPSM**") provided in the MRDA, if it was applicable.

59.    The Business Sale Proceeds attributable to assets other than IP should be allocated to the Nortel Debtors according to legal title to the extent discernible and otherwise in accordance with appropriate valuation principles in the context of the Business Sales. Particulars of the ownership and valuation of the non-IP assets will be provided in advance of trial.

## B.    *Allocation Pro Rata by Claims*

60.    If it is concluded that legal ownership of the assets giving rise to the Sale Proceeds should not form the basis for an Order in the Allocation Proceeding, then the CCC pleads that the only fair, reasonable, defensible and equitable alternative is to allocate the Global Assets among the Nortel Debtors so as to effect a *pro rata* distribution among Creditors, rateably by valid Claims.

61.    If the Court is inclined to look beyond the strict legal and contractual rights of the relevant Nortel Entities, any attempt to distinguish between the Nortel Entities for the purpose of determining an appropriate allocation quickly becomes a prohibitive exercise. This is evident from an examination of Nortel's highly integrated and multinational business.

### 1)    Nortel's Pre-Filing Experience

62.    Pre-Filing, Nortel was a highly integrated, multinational business that operated substantially without regard to corporate or geographic borders. The following features, among others, illustrate Nortel's integrated, global operations:

   a) **Line of Business Organization** – for most purposes, Nortel operated according to Lines of Business. The Lines of Business spanned geographic boundaries and functioned in over a hundred corporate entities incorporated in jurisdictions throughout the world. Nortel's management and employees served dedicated Lines of Business, rather than any particular Nortel Entity. In addition, Nortel's customers,

suppliers and trade creditors transacted with various Nortel Entities along Lines of Business;

b) **Regional Organization** – Nortel organized its trade, supply and customer sales according to regional "hubs", supported by Nortel personnel from various Lines of Business;

c) **Employees Served Global Businesses** – individual employees were given global identification numbers, served the global Nortel business and their work responsibilities extended beyond the Nortel Entities that employed them. Employees were dedicated to Lines of Business or the Corporate Support Group, regardless of where they resided or worked, or the jurisdiction in which their employer was incorporated. Management and employee performance was evaluated along Lines of Business. Employee incentive bonuses were calculated based on Line of Business and overall global performance, rather than the performance of individual Nortel Entities, and employees reported to the heads of the Lines of Business, who in turn reported to the global corporate head-office management (and, ultimately, to the board of directors) in Canada;

d) **Consolidated Financial Reporting** – Nortel prepared consolidated financial statements reporting on:

i. The financial condition of each Line of Business, including global revenue streams;

ii. Significant business developments worldwide, including strategic alliances and acquisitions outside Canada; and

iii. Work-force reductions and restructuring plans implemented across Nortel's global operations.

Nortel's consolidated statements were used to evaluate Nortel's overall global performance and the Lines of Business by management, analysts, lenders, debt purchasers, investors and other stakeholders. Nortel represented that it was one entity, with one vision, one purpose

and goal. The "act as one" concept was reflected in Nortel's financial reporting. While Nortel prepared financial statements at the Nortel Entity level, these statements were prepared primarily for local tax and regulatory requirements;

e) **Centralized Cash Management** – Nortel's central treasury moved funds among the various Nortel Entities in order to fund the operations of the Lines of Business or for tax planning purposes. Some Nortel Debtors were net-users of cash and incurred intercompany debt that was recapitalized from time to time. Nortel utilized the capital markets as a source of liquidity to fund these global operations. However, it was the Canadian Debtors, through NNC and NNL, which bore all or substantially all of the cost of borrowing;

f) **Transfer Pricing** – Nortel adopted a series of complex transfer pricing methodologies in order to allocate profits and losses for tax purposes at arm's length from inter-company receivables and payables. Prior to 2001, Nortel's transfer pricing methodology provided for sharing of intangible property and expenses, including global R&D, pursuant to the Cost Sharing Agreements. Effective 2001, Nortel implemented its RPSM pursuant to the MRDA, for the purpose of allocating Nortel profits based upon each Participant's direct spending on R&D.[4] The cost-sharing and RPSM transfer pricing methodologies included contractual and taxation considerations and were negotiated with various Nortel Entities and revenue authorities in jurisdictions including Canada, the U.S. and the U.K.;

g) **Centralized Management and Control with Line of Business Focus** – Nortel's operations and management were centralized. Decisions were made with a view to Nortel's global operations and across Lines of Business;

---

[4] From 2001 onward, however, Nortel experienced only losses.

h) **Common Boards of Directors** – the same individuals were often members of multiple boards of directors of Nortel Entities. For instance, board members of NNI and NNL also sat on the boards of other Nortel Entities, and boards of directors of NNUK sat on the boards of directors of various Nortel Entities in the EMEA region;

i) **Centralized Corporate Support with Line of Business Focus** – corporate and support functions (e.g. finance, human resources, legal, treasury, accounting, R&D and information technology) were centralized and served various Nortel Entities across regions and Lines of Business. For example, Nortel's treasury group and the treasurer collected and maintained a global cash balance, which was distributed to Nortel Entities according to their need for cash at any particular time; and

j) **Corporate Debt, Financing and Other Costs --** NNL and NNC bore the costs, among other things, of raising corporate debt and paying the interest thereon, for the benefit of the global Nortel enterprise. The remaining Nortel Entitles benefited from this financing and were funded from Nortel's centralized treasury, as noted above at subparagraph (e).

63.    Creditors and other stakeholders perceived Nortel as a single and indivisible entity called "Nortel", effectively without regard to geographic or corporate borders.

64.    For instance, Nortel held itself out to its trade creditors as a single, indivisible entity. Nortel utilized an internal purchasing system for its hardware and software production, and for products and services, using four Transaction Control Centres ("**TCCs**"). The TCCs were organized along Lines of Business and acted as "purchasing hubs" for regional sales among groups of Nortel Entities, as illustrated below:

| Line of Business | TCC Purchasing Entity | Region Purchasing For |
|---|---|---|
| **MEN** | NNL<br>NNUK | Americas<br>EMEA & APAC |
| **Enterprise – Voice** | NNL<br>NNUK | Americas & APAC<br>EMEA |
| **Enterprise – Data** | NNI<br>NNUL | Americas & APAC<br>EMEA |
| **CDMA** | NNL | Global |
| **CVAS** | NNI | Global |
| **GSM** | NNSA | Global |

65.    Nortel's purchasing system worked as follows:

a) a Nortel Entity placed internal purchase orders with its regional sales office;

b) the purchase order was automatically routed through the TCC responsible for making the purchase;

c) the TCC contracted directly with the trade creditor to facilitate delivery of the goods to the Nortel Entity that placed the purchase order;

d) the TCC paid the trade creditor directly;

e) Nortel allocated the purchase to the Nortel Entity that placed the order or regional sales office through its inter-company accounts.

66.    From the perspective of trade creditors, they dealt with a single indivisible entity, "Nortel", operating through the applicable TCC. Trade creditors entered into master agreements with NNL, on behalf of all Nortel Entities.

2)    **Nortel's Post-Filing Experience**

67.    Post-Filing, the sale of Nortel's Lines of Business similarly reflected the integrated and intertwined nature of Nortel's operations.

68.    Over the course of the Insolvency Proceedings, Nortel has liquidated substantially all of its assets.

69.    Despite the best efforts of insolvency professionals to untangle the scrambled, highly-intertwined business and affairs of the Nortel Debtors, at a cost of hundreds of millions of dollars, thus far it has been impossible to do so.

70.    No Business Sale purchaser was willing to pay any material amount for any interest in any particular Nortel Debtor. Purchasers bought "Nortel" Lines of Business including business units, consisting of assets spread across many Nortel Entities in multiple jurisdictions throughout the world.

71.    In its Post-Filing financial statements, Nortel expressly warned of the risk that the U.S. Debtors' estates might be substantively consolidated.  Under the heading "Risk Factors", Nortel stated:

> Some or all of the U.S. Debtors could be substantively consolidated.
>
> There is a risk that an interested party in the Chapter 11 Proceedings, including any of the U.S. Debtors, could request that the assets and liabilities of NNI, or those of other U.S. Debtors, be substantively consolidated with those of one or more other U.S. Debtors. <u>While it has not been requested to date, we cannot assure you that substantive consolidation will not be requested in the future, or that the U.S. Court would not order it.</u> If litigation over substantive consolidation occurs, or if substantive consolidation is ordered, the ability of a U.S. Debtor that has been substantively consolidated with another U.S. Debtor to make payments required with respect to its debt could be adversely affected. For example, the rights of unsecured debt holders of NNI may be diminished or diluted if NNI were consolidated with one or more entities that have a higher amount of unsecured priority claims or other unsecured claims relative to the value of their assets available to pay such claims. [Emphasis added]

72.    Similarly, reports filed by the Monitor and Canadian Debtors during the Insolvency Proceedings have treated the assets of and claims against the Canadian Debtors as one entity within Canada.

73. Such recognition of the potential for consolidation by the U.S. Debtors and the treatment of the Canadian Debtors on a consolidated basis inform the approach that must be applied to Nortel globally, which was even more intertwined, interrelated and impossible to unscramble.

74. There are multiple and overlapping claims by trade creditors across the estates of the Nortel Debtors, which has given rise to the Cross-Border Claims Protocol. For instance, Flextronics Telecom Systems Ltd. ("**Flextronics**"), Nortel's largest supplier, supplied products for multiple Lines of Business, including Enterprise Solutions, Carrier Networks and MEN pursuant to master agreements entered into between Flextronics and NNL. Nortel held itself out to Flextronics, and Flextronics perceived Nortel, as a single indivisible entity. In November 2009, Nortel agreed to pay Flextronics a certain sum in satisfaction of all Flextronics' claims against all Nortel Debtors. While the payment to Flextronics was made by NNI, the Nortel Debtors agreed to allocate the payment according to the weighted average of certain Business Sale Proceeds allocated to each of the Nortel Debtors, rather than in accordance with the debts owned by each Nortel Debtor to Flextronics. In so doing, Flextronics and Nortel Debtors effectively consolidated their claims *inter se*.

75. As described above, employees served the global Nortel business with their work responsibilities extending beyond the individual Nortel Entities that technically employed them. Nortel intended to create a global employment relationship between its employees and the various Nortel Entities. Nortel transferred employees among the various Nortel Entities and across geographic regions without breaks in service and changes in the terms and conditions of employment.

76. The Post-Filing experience of employees was no different. In connection with Nortel's insolvency, employees were told that their employment was being terminated by Nortel *and* its subsidiaries and signed releases in favour of the Nortel Entities.

# PART VI – CONCLUSION

77.    For the reasons set out above, the CCC seeks the Ownership Allocation Order. The most fair, reasonable and juridically justifiable approach to allocation is one based on consideration of legal title to the assets that produced the Sale Proceeds. The legal principles underlying asset ownership are common to all relevant jurisdictions. Nortel's major asset giving rise to the Sale Proceeds was its IP, which was primarily owned by NNL, and the Licensed Participants' Limited License rights had no value in the context of the Sales, or were of *de minimis* value.

78.    Absent adherence to the strict legal and contractual ownership and other rights of the relevant Nortel Entities, there is no supportable basis in law to distinguish between the Nortel Entities in determining an appropriate allocation. Any attempt to restructure the legal ownership of assets and contractual rights agreed to in the MRDA and its predecessor agreements would be prohibitively costly and would prejudice Creditors, particularly the former and disabled employees and pensioners in Canada that helped grow and run Nortel's global business for many years.

79.    For these reasons, the CCC pleads, in the alternative to the Ownership Allocation Order, that the only fair, reasonable and equitable allocation of Nortel's Global Assets is pursuant to the Equitable Allocation Order.

80.    The benefit of a *pro rata* allocation for all Creditors outweighs any potential prejudice. For example, in the case of Bondholders, when they voluntarily undertook to purchase Nortel bonds, it was expressly disclosed that they risked elimination of the cross-border guarantees that formed part of such bonds. These were sophisticated investors who knew or ought to have known the extent of the intermingling of Nortel's assets and intertwined nature of its business across legal, operational and geographical borders. Moreover, the bonds have been actively trading Post-Filing, their acquisition costs have varied, and Bondholders have a variety of mitigation tools at their disposal not available to other Creditors, in particular employee Creditors.

81.     Nortel's employees contributed significant value on the promise that Nortel would provide them with pensions, health, disability and other benefits, on which such employees relied and depended as part of their compensation for their contributed value. Current and former employee pensions and benefits have been severely impacted during the course of the Insolvency Proceedings. Any prejudice asserted by financial creditors pales in contrast to the prejudice actually and already suffered by Nortel's retired, disabled and other former employees.

## NOTICE

82.     Service of this Allocation Position will be made this date via electronic mail to (i) the United States Trustee for the District of Delaware; (ii) counsel to the U.S. Debtors; (iii) counsel to the UCC.; (iv) counsel to the Monitor; (v) counsel to the Canadian Debtors; (vi) counsel to the Joint Administrators of the UK/EMEA Debtors; and (vii) counsel to the Bondholders Group, and by first-class mail to the above and all parties on the Debtors' last available Rule 2002 list.  The CCC submits that under the circumstances no other or further notice is required.

## NO PRIOR REQUEST

84.     No prior request for the relief sought herein has been made to this or any other court other than the CCC's submission of its Allocation Position to the Ontario Superior Court of Justice contemporaneously herewith.

## RESPONSES

84.     It is the CCC's understanding that response to the within Allocation Position may  be made only by the U.S. Debtors, the UCC, the EMEA Debtors, the Joint Administrators, the Canadian Debtors, the Monitor, the Bondholder Group, and any other Core Party (all as defined in the Allocation Protocol approved by this Court) who filed an Allocation Position.

WHEREFORE, the CCC respectfully requests that the Court grant the relief requested herein and grant such other and further relief as it deems just and proper under the circumstances.

Dated: May 16, 2013
Wilmington, Delaware

Respectfully submitted,

DLA PIPER LLP (US)
By: /s/ Selinda A. Melnik
Selinda A. Melnik (Bar No. 4032)
919 North Market Street, Suite 1500
Wilmington, DE 19801
Telephone: +1 (302) 468-5650
E-mail: selinda.melnik@dlapiper.com

*Counsel for the*
*Canadian Creditors Committee*

# GLOSSARY OF TERMS
## (CCC Pleading)[1]

"**Allocation Proceeding**" means the proceedings before the Courts with respect to the allocation of Nortel's Global Assets among the Nortel Debtors and ultimately the Creditors.

"**APAs**" is defined in paragraph 50.

"**Bondholders**" means the bondholders that hold claims issued and/or guaranteed by NNC, NNL, NNI, and NNCC.

"**Business Sales**" is defined in paragraph 4.

"**Business Sale Proceeds**" is defined in paragraph 4.

"**Canadian Debtors**" means Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation.

"**Carrier Networks**" means the Nortel line of business which developed wireless networking technology for mobile smartphones, cell phones and other wireless devices for sale to cable operators and to other service providers who offered mobile voice, data and multimedia communications services to individuals and enterprises.

"**CCAA**" means the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended.

"**CCC**" means the Canadian Creditors Committee, a committee of major creditors having claims against the Canadian Debtors, comprised of: the Former and Disabled Canadian Employees of the Canadian Debtors through their court-appointed representatives and the Canadian Auto Workers Union; Morneau Shepell Ltd., as Administrator of Nortel's Canadian registered pension plans; the Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the Current and Transferred Canadian Employees of the Canadian Debtors.

"**Claims**" means claims against any one or more of the Nortel Debtors as at the Filing Date, without duplication (whether pursuant to a guarantee, joint liability or otherwise), excluding Intercompany Claims and claims for post-filing interest, make-whole payments and call premiums.

---

[1] All singular terms will have the same meaning in plural.

"**Code**" means the United States Bankruptcy Code, Title 11 of the United States Code.

"**Corporate Support Group**" means the centralized services that were largely coordinated from Nortel Canada's headquarters, and was made up of senior management who oversaw and gave direction to Lines of Business and performed functions which included finance, treasury, legal, accounting, human resources and governance, information technology and manufacturing.

"**Cost Sharing Agreements**" is defined in paragraph 51.

"**Courts**" means the Ontario Superior Court of Justice (Commercial List) and the U.S. Court.

"**Creditors**" means all creditors having made Claims.

"**EMEA**" means the regions of Europe, Middle East and Africa where Nortel operated.

"**Enterprise Solutions**" means the Nortel line of business which helped customers build communications networks in the areas of data, voice, and multimedia communications.

"**Equitable Allocation Order**" is defined in paragraph 5(b).

"**Filing Date**" is defined in paragraph 7.

"**Flextronics**" is defined in paragraph 74.

"**Global Assets**" means the Sale Proceeds and the Residual Assets.

"**Global Services**" means the Nortel line of business which provided management and professional services to help customers design and deploy multi-vendor, multi-technology networks for wireline and wireless carriers, cable operators and mobile virtual network operations.

"**GSM**" means the global system for mobile communications infrastructure business operated by Nortel.

"**IFSA**" is defined in paragraph 4.

"**Insolvency Proceedings**" is defined in paragraph 7.

"**Intercompany Claims**" means all claims of any Nortel Debtor against another Nortel Debtor.

"**IP**" means any and all intangible assets, including but not limited to patents, industrial designs, trade secrets, copyrights and applications and registrations thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information, and

trademarks, and any associated customer contracts and goodwill.

"**Licensed Participants**" means the holders of Limited Licenses as at the Filing Date.

"**Limited License**" means the limited, royalty-free licenses that were granted by NNL to the Licensed Participants pursuant to the MRDA to make, use and sell Products and to use NN Technology as necessary or appropriate in connection therewith.

"**Licensed Subsidiaries**" is defined as paragraph 51.

"**Lines of Business**" means the Enterprise Solutions, Carrier Networks, MEN and Global Services businesses operated by Nortel.

"**MEN**" means the Nortel line of business which provided high-speed carrier grade Ethernet transport capabilities and optical networking solutions for data-intensive video, including internet video, residential broadcast TV, video-on-demand and new wireless multimedia requiring increasing bandwidth.

"**Monitor**" means Ernst & Young Inc. in its capacity as the court- appointed monitor in the proceedings commenced under the CCAA in respect of the Canadian Debtors.

"**MRDA**" is defined at paragraph 11.

"**NNC**" means Nortel Networks Corporation, a Canadian Debtor, and ultimate parent of Nortel.

"**NNI**" means Nortel Networks, Inc., a U.S. Debtor.

"**NNL**" means Nortel Networks Limited, a Canadian Debtor, and the operating parent of Nortel.

"**NN Technology**" is defined in the MRDA and in paragraph 54.

"**NNUK**" means Nortel Networks UK Limited, a UK/EMEA Debtor.

"**Nortel**" means NNC and all of its subsidiaries and affiliates, worldwide, including any interests in any joint-ventures, and includes all Nortel Debtors and all Nortel Entities.

"**Nortel Debtors**" means the Canadian Debtors, the U.S. Debtors and the UK/EMEA Debtors, collectively.

"**Nortel Entity**" means any Nortel entity, including subsidiaries and affiliates.

"**Northern Telecom**" means Northern Telecom Limited, a predecessor of NNL.

"**Ownership Allocation Order**" is defined in paragraph 5(a).

"**PBGF**" means the Pension Benefits Guarantee Fund, which guarantees pension benefits of Ontario members and beneficiaries under covered single-employer defined benefit plans in the event the plan sponsor becomes insolvent, as provided by the *Pension Benefits Act,* R.S.O. 1990, c. P.8, as amended, and related regulations.

"**Post-Filing**" is defined in paragraph 18.

"**Pre-Filing**" is defined in paragraph 17.

"**Products"** is defined in the MRDA and in paragraph 54.

"**R&D**" is defined in paragraph 28.

"**Residual Assets**" is defined in paragraph 4.

"**Residual IP**" is defined in paragraph 4.

"**Residual IP Proceeds"** is defined in paragraph 4.

"**Residual IP Sale**" is defined in paragraph 4.

"**Rockstar"** is defined in paragraph 4.

"**RPSM**" is defined in paragraph 58.

"**Sale Proceeds"** means the proceeds of sale generated by the Post-Filing transactions that included the Business Sales and the Residual IP Sale, which generated approximately $7.3 billion.

"**Sales**" means the Business Sales and Residual IP Sale.

"**TCCs**" is defined in paragraph 64.

"**UK/EMEA Debtors**" means Nortel Networks UK Limited ("NNUK") Nortel Networks (Ireland) Limited; Nortel Networks S,A,; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska Sp z.o.o,; Nortel Networks Hispania, SA, Nortel Networks (Austria) GmbH; Nortel Networks s.r.o.; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko, s.r.o,; Nortel Networks Romania SRL; Nortel GmbH; Nortel Networks OY; Nortel Networks AB; Nortel Networks International Finance & Holding BV and Nortel Networks France S.A.S.

"**UK Pension Claimants**" means the Trustee of the NNUK Pension Plan and the Board of the Pension Protection Fund.

"**U.S. Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Debtors**" means Nortel Networks Inc., ("NNI") Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., and Nortel Networks (CALA) Inc.