IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------- x
In re:                                         :   Chapter 11
                                               :
                                               :   Case No. 09-10138 (KG)
Nortel Networks Inc., et al.,¹                 :
                                               :   Jointly Administered
                                Debtors.       :
                                               :   Hearing Date: To commence January 6, 2014
                                               :   Submission Deadline: May 16, 2013 at 12:00 p.m.
                                               :
------------------------------------------------- x
```

## ALLOCATION POSITION OF THE TRUSTEE OF
## NORTEL NETWORKS UK PENSION PLAN AND
## THE BOARD OF THE PENSION PROTECTION FUND

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332) ("NNI"), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226) ("NN CALA").

Pursuant to the litigation timetable approved by the Court on May 15, 2013, the Trustee (the "Trustee") of Nortel Networks UK Pension Plan (the "Plan") and the Board of the Pension Protection Fund (the "PPF," and together with the Trustee, the "U.K. Pension Claimants") hereby respectfully make this submission in support of their allocation position.  In support of this submission, the U.K. Pension Claimants, by and through their undersigned counsel, respectfully state as follows:

## I.    OVERVIEW OF POSITION

1.    This allocation position is submitted by Nortel Networks UK Pension Trust Limited (the "**Trustee**") and the Board of the Pension Protection Fund (the "**PPF**", collectively with the Trustee, the "**UK Pension Claimants**") to the Ontario Superior Court of Justice – Commercial List (the "**Canadian Court**") and the United States Bankruptcy Court for the District of Delaware (the "**US Court**", collectively with the Canadian Court, the "**Courts**"). The allocation relates to the funds in the lockbox located at JP Morgan Chase Bank N.A. pursuant to various escrow agreements resulting from the sales conducted by the Nortel group of companies worldwide ("**Nortel**" or the "**Group**") in the approximate amount of US$7.5 billion (the "**Lockbox Funds**").[2]

2.    The Group is comprised of the following three groups of debtors:

(a)    the debtors who filed for creditor protection pursuant to the *Companies' Creditors Arrangement Act* ("**CCAA**") on January 14, 2009 (collectively, the "**Canadian Debtors**");

---

[2]    The Lockbox Funds do not include the assets/other realizations that exist in certain estates throughout the Group, but such assets/other realizations may be considered by the Courts in making an allocation determination with respect to the Lockbox Funds.

(b)      the debtors who filed for creditor protection pursuant to Chapter 11 of the U.S. Bankruptcy Code on January 14, 2009 (the "**US Debtors**"); and

(c)      the Europe, Middle East and Africa ("**EMEA**") debtors who were placed into administration by the High Court of England and Wales pursuant to the U.K. *Insolvency Act 1986* on January 14, 2009 (the "**EMEA Debtors**").

3.      The UK Pension Claimants support an allocation of the Lockbox Funds in a manner that produces a fair and equitable result, after due consideration of the relevant legal and jurisdictional issues. That position is set out more fully in Part 3 of this submission.  In summary, the UK Pension Claimants' position is that the allocation should enable a broadly common dividend to be paid to the Group's creditors from each relevant debtor's insolvency. In making a determination as to the appropriate allocation of the Lockbox Funds, the UK Pension Claimants assert that the Courts ought to consider the core principles set out below.

(a)      The Group was run as one global business, with its business divided across business groups rather than geographical lines or based on corporate structure.  The Group is a self-described "matrix organization" given its vertical and horizontal integration across various business groups.  As a result, none of the entities in the Group were self-standing businesses.  The Group organized its affairs for tax and treasury purposes such that the resources of Nortel Networks UK Limited ("**NNUK**") were diverted up to the parent Canadian Debtors, and redistributed according to their directions.

(b)      It is not possible to attribute ownership of the jointly sold assets on an entity-by-entity basis as a result of the interconnectivity of the Group, the co-mingling of assets and the intertwining of the Group's affairs, the blurred lines of ownership of certain of the Group's assets and the *en bloc* sale of the residual intellectual property of the Group, all of which affect the very nature of the Lockbox Funds.  Even if it could be done, which the UK Pension Claimants assert that it cannot, an allocation based on such an analysis would ignore the beneficial and equitable interests of other parties in such assets and their proceeds.

(c)      The location of the assets of the Group had an international range.  Consideration as to the international principles of allocation is needed to address the various creditor interests, rather than placing sole reliance on domestic allocation principles.

(d)      The creditors of the Group had legitimate expectations with respect to the assets and the business dealings of the Group as a whole.  Those legitimate expectations can serve to guide the Courts in making allocation decisions where an attempt to identify entity-by-entity ownership shares in the proceeds of the assets is impossible to determine or would produce an inequitable result.

4.      In delivering this Allocation Position, the U.K. Pension Claimants reserve their rights with respect to all jurisdictional issues, including without limitation the U.K. regulatory process and the laws of the United Kingdom.  The U.K. Pension Claimants further reserve the right to rely on any further material facts as may be adduced or determined in the discovery process.

## II.    MATERIAL FACTS

5.    Attached as Appendix A to this submission is a detailed factual background setting forth, among other things, a description of the origins of the Group and the nature of its integrated global operations and management structure prior to insolvency, including the transfer pricing system adopted by the Group.  Set forth below are only certain particularly material facts relevant to the UK Pension Claimants' allocation position herein.

### *Integrated Operational Structure Of The Group*

6.    From the 1990s onwards, the Group increasingly operated along global business lines rather than by geographical division or legal entity.  It was highly integrated and operated essentially as if it were one global enterprise, without regard to separate legal entities.  Although the Group's operational structure continued to evolve through the 1990s and into the early 2000s, the basic concept of organizing the business lines corresponding to families of products or types of customers remained a key feature in the two decades preceding the commencement of these insolvency proceedings.

7.    Under this integrated structure, the interests of national subsidiaries (although legally distinct) were subordinated to the interests of the Group as a whole, and the distinction between legal entities was largely ignored (other than for certain tax and accounting purposes).  In effect, each entity in the Group did not function as a self-standing business, but rather assisted in a single common global business enterprise comprising various operating divisions.

8.    The Group described this structure as a "matrix organization," meaning it was "vertically and horizontally integrated" such that "organizations within Nortel shared

information and perform common tasks across geographic boundaries."[3]  Prior to its insolvency, the Group's matrix structure consisted of four distinct lines of business (sometimes known within Nortel as "business segments") as follows: Enterprise Solutions, Carrier Networks, Metro Ethernet Networks, and Global Services.

9.    Fully integrated entities performing research and development ("**R&D**"), manufacturing support and distribution functions interacted within the Group to fulfil customer demand for products and services in each of the business lines.  This structure was meant to create certain competitive advantages, including collaboration on technology, improved integration of the Group's functions, efficient use of corporate resources, economies of scale within functions, better strategic deployment across the entire Group, avoidance of duplication of functions by product or geographical area, and facilitation of a collaborative environment.  This approach also meant that there was substantial interdependence among the various legal entities in the Group because no single subsidiary owned an entire business segment or was a self-contained business in its own right.

10.    In keeping with this approach, R&D departments were based in various countries, and the work carried out was divided along business lines and shared on a global basis. Likewise, employees from different Nortel entities worked together in the business segments, so that revenues booked by a particular legal entity did not necessarily reflect its own efforts and success.  Similarly, customer contracts would be allocated to entities within the Group to suit Nortel's wider purposes. Some entities were designated as distributors for particular territories, and contracts won by sales personnel elsewhere in the Group would sometimes be allocated to

---

[3]    Joint Request for a US-Canada Bilateral Advance Pricing Agreement / Arrangement dated October 31, 2008 submitted jointly by NNL and NNI to the U.S. Internal Revenue Service and the Canada Revenue Agency, at page 13.

the local distributor entity. In other cases, contracts were allocated within the Group for tax reasons.

### *Integrated Management And Administration Of The Group*

11.     Overall management of the Group remained at all times in the hands of the executive officers of Nortel Networks Corporation ("**NNC**") and Nortel Networks Limited ("**NNL**") headquartered in Toronto, Canada.  As the principal operating entity in the Group's largest market, the United States, Nortel Networks Inc. ("**NNI**") also had a significant influence on the management of the Group together with its Canadian parents.

12.     In addition to organizing its operations on the lines of business segments, the Group also organized its activities through departments that ran across the business divisions (hence the term "matrix").  Thus, business performance, resource allocation, financial reporting, and accounting were managed by reference to business segments.

13.     For example, all entities in the Group were subject to the group-wide Tax and Treasury policies, which were determined and implemented by the Group Tax and Treasury function.  In particular, the Treasury function operated a Group-wide cash management system that transferred cash within the Group and decided what intercompany loans would be made within the Group.  As such, to a very real degree, the economic and financial position of each company within the Group was dictated by central policies and the integrated manner in which the Group operated, rather than by the individual trading performance of that particular entity.

14.     The interdependence among entities extended to their efforts to raise capital for the Group's operations.  NNI guaranteed virtually all of the bonds issued by NNC and NNL.   Accordingly, it was in NNC and NNL's interests to order the Group's affairs to ensure that NNI was financially strong, so that NNI would appear to be a creditworthy guarantor of

NNC and NNL's borrowings. It was also in NNC and NNL's interests to obtain cash from entities in the Group other than NNI, so that NNC/NNL could minimize their third-party borrowing while at the same time maintaining NNI's financial strength and thus its creditworthiness as their guarantor. In this respect, therefore, NNC/NNL and NNI's interests were so closely aligned that they were in effect a single economic unit.

15.     Likewise, as is apparent from NNC and NNL's filings with the United States Securities and Exchange Commission ("**SEC**"), each business segment's performance (as opposed to each legal entity's performance) was accounted for separately, with individual financial breakdowns for each segment appearing in the Group's consolidated financial statements and reports as if the segments were separate businesses.

### *The Group's Transfer Pricing System*

16.     The purpose of the Group's transfer pricing system was to enable the Group entities to operate on an integrated basis across multiple jurisdictions and on a global basis. The transfer pricing arrangements were particularly important as they dictated the ultimate distribution of profits and losses within the Group and the financial performance of each Nortel Group company.

17.     The transfer pricing system was operated by Nortel's Tax function, which was based in Dallas, under the control of NNI (working in conjunction with NNC and NNL). The Group's transfer pricing arrangements were heavily influenced by a desire to satisfy the U.S. tax authorities (as well as the Canadian tax authorities) and arose out of early initiatives by NNI with the United States Internal Revenue Service ("**IRS**").

18.     With effect from January 1, 2001, the Group's transfer pricing arrangements were embodied in a Master Research and Development Agreement ("**MRDA**")

dated December 22, 2004.  The MRDA imposed a "residual profit split model" ("**RPSM**") approach to transfer pricing.

19.     In essence, the RPSM divided the Group entities into residual profit entities ("**RPEs**") (which included NNL, NNI and NNUK) or limited risk entities ("**LREs**"). The distinguishing feature of an RPE was that it performed R&D for the Group, together with other core sales, marketing, administrative, and operating functions whereas LREs functioned primarily as sales operations, acting as intermediaries between the RPEs and customers in jurisdictions not served by the RPEs.  Broadly speaking, the participants' pooled profits were divided into two groups: (1) routine profits based on direct earnings from sales to third parties and certain costs or capital items; and (2) the "residual" profits or losses that were attributed to Nortel's intangible development work such as R&D.  Routine profits were distributed to both RPEs and LREs.  LREs were provided with fixed returns on third-party sales, while RPEs were provided with fixed returns on third-party sales and in respect of certain costs or, depending on the applicable period, certain capital items.  Residual profits/losses were split only among RPEs.

20.     The critical point in relation to the MRDA is that the end-of-year economic position of each Nortel Group company was determined by the operation of the MRDA and ***not*** by the financial performance of that particular company. The Group's profits or losses were allocated to the RPEs by reference to their respective R&D expenditure, irrespective of each RPE's particular financial performance (in terms of revenue, cash-flow, profit or any other financial metric). Likewise, LREs received the amounts determined by operation of the MRDA rather than ending the year with a profit or loss deriving from the LRE's own commercial endeavours.

21.     The clear import of this arrangement was that separate legal entities subordinated their independent status to a common endeavour through the agreement to share in the profits and losses of that common business and to tie their respective annual financial performance to a set of common rules derived from the collective success or failure of that business.  This was reflected in the third recital to the MRDA which provided that each participant bore the full entrepreneurial risks and benefits for the Group's business.

### NNUK's Lack Of Independence

22.     Nortel's integrated global structure meant that NNUK did not operate as an independent freestanding business.  Pursuant to the global operation of the Group as a single entity, companies such as NNUK acted as part of a much larger machine providing resources to allow the Group's business segments (headquartered in NNC/NNL and NNI) to operate as they wished.  Although NNUK was the administrative center of EMEA, NNUK was not free to control the EMEA region itself in furtherance of its own interests.

23.     NNUK's lack of independence is evidenced by the fact that NNUK's board of directors included senior officers of NNC/NNL (and NNI and another US subsidiary, Nortel Networks (CALA) Inc. ("**NN CALA**")) so that control could be exercised over NNUK when required.  In the 2000s, the NNUK board met only seldom, for example to approve its statutory accounts (which accounts reflected mainly intergroup trading) and ratify transactions associated with the Group's reorganizations.

24.     Similarly, the decision to implement the RPSM was made by NNI, NNL and NNC.  NNUK was not consulted with respect to, and had no role in, that decision.  Rather, it was presented as a *fait accompli* to NNUK.  NNUK had no substantive involvement in the negotiations with the IRS about the RPSM transfer pricing arrangements adopted by the Group,

and those arrangements were not even approved by the U.K. revenue authorities. Moreover, by the time the RPSM was adopted, the Group had been consistently generating losses. Thus, the effect of the RPSM was that NNUK bore entrepreneurial risk and had to share in the Group's losses – even though it had not been entitled to share in the Group's profits during the earlier years.

25.    NNUK's lack of independence over its own affairs also impacted its ability to properly fund its pension obligations to its employees. Decisions with respect to the management and funding for the NNUK Pension Plan (the "**Plan**") were made by senior Nortel management at NNC/NNL in Canada. NNUK had virtually no say in that decision-making process. The Group procured the continuation of an employer "contribution holiday" which consumed the 150% surplus in the Plan (as of 1991) and reduced it to a funding deficit of £177 million by 2002 (assessed on an on-going basis). By dictating to NNUK that no employer contributions were to be paid during the "holiday" period, the Group ensured that the equivalent money was available to it for investment in its business for the benefit of the Group as a whole, including NNI and NN CALA. The value (as at January 31, 2012) of the contributions that would have been paid into the Plan but for the contribution holiday is estimated at £950 million.

26.    Nortel's control over NNUK's decision-making in relation to the Plan was exercised through the U.K. Pension Fund Policy Committee (the "**U.K. PFPC**"), which included in its membership senior management individuals within the Group (including officers of NNC, NNL, NNI and NN CALA). The U.K. PFPC was directly involved in discussions with the Trustee concerning various Plan issues, including (from 2004-2005 onwards) the status of funding negotiations with the Trustee and decisions (sometimes in conjunction with the

Canadian PFPC) as to what the Group's position should be in relation to specific points raised in those negotiations.

27.    The main concern of the U.K. PFPC was the funding of the Plan, and it exercised a tight rein in that regard.  Whatever the funding level in the Plan was assessed to be, it was always made clear that the decision as to what (if any) contributions would be paid would be taken by senior Nortel management in Canada.  In fact, for a long time, the Group did not want to pay any contributions to the Plan, preferring to invest in the business.  Even when NNUK was permitted to make contributions, the amounts were significantly less than was needed to eliminate the deficit and restore the Plan to 100% funding level.

28.    As a consequence of these steps and the centralized control over such matters effected by the Group, the level of the Plan's underfunding gradually increased, ultimately reaching a deficit of £2.1 billion (assessed on a buy-out basis) by the time of the Group's insolvency filing on January 14, 2009.  The deficit is now estimated at approximately £2.6 billion (assessed on a buy-out basis).

## III.    RELEVANT LEGAL PRINCIPLES

29.    The UK Pension Claimants are the single largest creditor of the Group and as such have an interest in any allocation of the Lockbox Funds.

30.    As outlined above, it is the position of the UK Pension Claimants that in making a determination on the allocation of the Lockbox Funds, the Courts should consider both the legal and equitable principles arising from the Group's operations and the legitimate expectations of the Group's creditors.

31.    There are various legal bases upon which the Lockbox Funds could be allocated.  Below is the UK Pension Claimants' position on the potential allocation methods that may be considered by the Court.

### *Allocation Based on Legal or Beneficial Ownership*

32.    With the sale of a single entity business, the owner of the assets may be easily ascertainable.  In such circumstances where the owner of the property is not at issue, a court may order the allocation of the proceeds of the sale to the identifiable owner of the property, or its creditors in accordance with their respective priority at law.  However, where the circumstances of a sale involve co-mingled assets, the ownership of which cannot be separately attributed on an entity-by-entity basis, such an approach will not adequately address the allocation of any proceeds.

33.    In addition, where legal ownership does not accurately reflect beneficial and other interests in, and other claims over, the property, allocation based purely on legal title produces an unjust result.

34.    In such a situation, the Courts may allocate those proceeds on some other basis, such as to claimants *pro rata*, or in an equitable manner taking account of the legitimate expectations of stakeholders.

35.    With respect to the assets of the Group, the sale of intellectual property assets has contributed to a substantial part of the Lockbox Funds.  Intellectual property is an asset that, by its nature, encompasses a very complex bundle of interests involving multiple parties.  In the case of the Group, such assets arose as a result of the many years of R&D co-operation across the Group.  As various parties may have an interest in the bundle of rights, it becomes more difficult to ascribe an allocation of value to each portion of the bundle.  It follows

that with intellectual property, it would be inequitable to have the proceeds of any sale allocated to the legal owner and to take no account of beneficial interests in and other claims over such assets.

36.     Moreover, it is not the case that beneficial interests in the intellectual property of the Group were divided on a geographical or regional basis. While Group entities enjoyed licences to use intellectual property in particular jurisdictions on an exclusive or non-exclusive basis, such rights were enjoyed as part of each entity's joint participation in the common global enterprise of the Group and subject to that entity's obligations in that context.

37.     It is the UK Pension Claimants' position that for the following reasons (among others), it would be unjust and inequitable to approach allocation by seeking to attribute ownership on an entity-by-entity basis, to the extent that such an approach is even possible:

(a)     The Group did not operate its business through independent corporate entities.  Rather, the Group operated on a single enterprise basis, with four business segments.  This structure created certain competitive advantages as the entities in the Group could collaborate on technology and the Group had improved integration of core functions and better use of corporate resources than would otherwise have been the case.  However, the business segment model of enterprise ultimately led to a co-mingling of assets and an intertwining of the Group's affairs.  As a result, none of the entities in the Group were self-standing businesses.

(b)     As a demonstration of this position, each of the sales that has generated the Lockbox Funds involved multiple Nortel Group debtors as co-sellers of the relevant assets. It was recognized as part of these sales that the

relevant assets - either businesses, or the residual intellectual property - were owned jointly by more than one debtor as the assets represented the product of their common endeavour in the years prior to the Group's insolvency.  As a result, the ownership of the assets sold cannot be divided and attributed on an entity-by-entity basis.

(c)     For a substantial period prior to the Group's insolvency on January 14, 2009, the legal ownership of the patents of the Group was transferred to certain Canadian Debtors for administrative convenience.  NNUK along with the other RPEs had beneficial interests in, and other claims over, the intellectual property as developers and as participants in the common R&D efforts of the Group over many years. Further, RPEs and LREs were also the holders of exclusive or non-exclusive licence rights to those patents in various jurisdictions.

(d)     With respect to R&D, the intertwined nature of the Group led to the collaboration of employees from different Nortel entities on different projects over many years.   This intertwining makes determining exactly which entity or which entity's employees were responsible for the intellectual property generated by that R&D - for example patents - unascertainable. It would therefore be inappropriate to assess ownership of such assets on the basis of the registered holder of the patent.

(e)     As part of the *en bloc* sale of the residual intellectual property assets (the "**Residual IP**"), approximately 6,000 patents were sold by the Group for approximately US$4.5 billion.  Further, within that transaction, there was no allocation of the purchase price across the approximately 6,000 different

patents.  It would be prohibitively time consuming, expensive and likely impossible to attempt now to allocate the Residual IP purchase price across each individual patent and to investigate the various rights and claims made against each individual patent in order to determine the allocation of that portion of the Lockbox Funds.  Likewise, merely to assess ownership of such assets (and approach allocation) on the basis of the registered holder of the patent would be contrary to the rights of the contributing parties and to legal principles. The assets and their proceeds are simply not divisible on an entity-by-entity basis.

38.     In summary, the Lockbox Funds represent the proceeds of various collective sales transactions entered into since the worldwide collapse of the Group in January, 2009.  These funds represent the fruits of the business of the Group as a whole, which operated as an indivisible endeavour. As a result, an allocation on an entity-by-entity ownership basis is not now possible, and even if it were, it would produce an unjust and inequitable result.

### Allocation pursuant to the MRDA or Other Contractual Basis

39.     Beyond an entity-by-entity approach to allocation, where parties hold both legal and beneficial interests in assets, it is in principle open to the parties to agree on the allocation of the net proceeds upon a sale.

40.     The most common example of such an allocation process would be with respect to trust property held in trust for the benefit of the beneficiaries, that is then sold by a trustee.  Assuming the property was settled into the trust pursuant to an agreement, upon the sale, the parties could look to the trust agreement to determine the allocation of proceeds of sale of the trust property to the beneficiaries.

41.    In this regard, it might be asserted that the provisions of the MRDA should simply be applied to determine the allocation of the Lockbox Funds.

42.    Although it is open for the legal and beneficial owners of assets to agree to an allocation protocol in the event of a sale, it is the UK Pension Claimants' position that, for the reasons that follow (amongst others), application of the MRDA on its own would not adequately address the allocation of the Lockbox Funds:

(a)    The MRDA governed the transfer pricing amongst the Group. The transfer pricing set out in the MRDA was drafted to provide the most advantageous tax results for the Group, but did not represent or recognize the actual legal ownership, beneficial interests or any other equitable allocation of an interest or value in the assets of the Group.

(b)    The methodology of the MRDA – which allocated current profits and losses based on current or recent income and expenditure, and thus bore no necessary relation to the parties' historical contributions to the Group – is inapt to divide the proceeds of sale of assets generated over many years of business activity, many of them before 2004 when the MRDA was signed. Moreover it does not on its face purport to apply to an allocation of the Group's assets when the Group ceases to be a going concern and its assets are liquidated and distributed in insolvency circumstances.

(c)    The methodology of the MRDA takes no account of liabilities that only crystallize or arise upon the termination of the Group's business. It is therefore incapable of properly calculating, upon termination or the Group ceasing to be a going concern, the true cost to a Nortel entity of having

provided services to the Group, for example the costs (including their pension benefits) of the 40,000 employees of NNUK who contributed over many years to the overall business of the Group.  In consequence, the application of the strict MRDA methodology to the division of Nortel's assets upon termination of the business would result in some entities being much less able to pay creditors than others.  Such a result could not reasonably have been intended by the parties to the MRDA when they formulated it as a way of administering the business as a going concern.

(d)      The MRDA was designed by the Canadian and US Nortel entities to suit their own current business needs (including cash-flow and tax requirements) as part of an on-going group, and was prejudicial to the interests of other Nortel entities such as NNUK upon whom the MRDA was imposed.

(e)      The MRDA was imposed on the Group to suit the strategic purposes of the Canadian Debtors and US Debtors.  It received no significant independent consideration or scrutiny in the U.K. (and potentially in respect of other subsidiaries of NNL).  The original version was signed on NNUK's behalf by a single director of NNUK, Gareth Pugh, on the instruction of NNL.

(f)      A straightforward MRDA approach to allocation would attribute equal value to each historic dollar of R&D expenditure in the 5 years preceding the Group's insolvency only, and irrespective of whether that spending actually generated any of the patents sold as part of the Residual IP or any of the particular value in the businesses sold.

(g)    The allocation of the proceeds of business sales post-insolvency may involve Nortel Group entities that were not even parties to the MRDA.  The MRDA could not therefore have been intended to govern such a division.

43.    It is the position of the UK Pension Claimants that an application of the terms of the MRDA is an inadequate means to address the allocation of the Lockbox Funds. Further, an allocation based on a strict interpretation of the MRDA would exacerbate the inequities that were created by the transfer pricing and RPSM calculations contained therein.

### Allocation through the Application of Equitable Principles

44.    It is the position of the UK Pension Claimants that neither an entity-by-entity ownership analysis nor a strict application of the MRDA would provide a proper basis for allocation of the Lockbox Funds across the Group.  As a result, the Courts should consider other principles to arrive at an allocation that would be fair, just and equitable in the circumstances. The Courts ought not adopt an inadequate legal theory resulting in an allocation that would be contrary to the equity and justice of the case.

### (a)    Applying Analogous Principles of Joint Ventures

45.    The MRDA, as drafted, does not contain an appropriate provision to address the allocation of the Lockbox Funds.  However, it is open to the Courts to imply a term into the MRDA or to draw upon closely analogous situations such as in relation to joint ventures for purposes of effecting a fair allocation of the Lockbox Funds.  On its face the MRDA purported not to create a joint venture, and a determination as to whether or not it was, in fact, a joint venture is not required.  The facts provide a basis for considering the analogy of a joint

venture in that, in substance, the parties were acting, on a contractual basis, in concert towards a common business venture.  In this regard, each member of the Group:

        (a)     contributed money, property, effort, knowledge and other assets to a common undertaking;

        (b)     held joint property interests in the subject matter of the Group, including the intellectual property;

        (c)     was subject to the centralized control and management of the Group; and

        (d)     had subordinated its individual economic performance to the collective fortunes of the Group as a whole.

        Further, the third recital of the MRDA provides that each RPE bore the full entrepreneurial risks and benefits for the Group's business, as a whole.

        46.     In this regard, it is the position of the UK Pension Claimants that if a contractual analysis were to be considered on allocation, the Courts can imply a term that the Group was operating in a manner analogous to a joint venture and, as such, on any sale of jointly owned assets of the Group, the sale proceeds should be allocated to enable payment of the Group's creditors (including payment to those creditors rateably from each debtor's estate in the event of any overall shortfall).

        47.     In the case of a joint venture, such as where two or more persons or entities engage in a business activity (often of a finite duration), but do not expressly establish their rights and obligations in a comprehensive partnership or limited liability company

agreement,[4] courts have been compelled to invoke equitable considerations in resolving competing claims to ownership of the joint venture's assets. In such situations, the law will imply an equitable division of the profits and liabilities of the joint venture without regard to any inequality of contribution in the absence of evidence to the contrary; and property purchased with the funds of the joint venture or with profits derived from those funds belongs, unless otherwise agreed and after payment of all of the venture's debts, to all the co-venturers for the purposes of the enterprise so long as it exists.

48.     It is the position of the UK Pension Claimants that it is open to the Courts to consider analogous situations, such as that of a joint venture, in determining an appropriate allocation of the Lockbox Funds.

**(b)     A Resulting Trust or a Constructive Trust**

49.     It is the position of the UK Pension Claimants that the Group had a common intention to share the Group's assets in the event of an *en bloc* sale, regardless of the legal ownership or title to the assets. In equity, a resulting trust reflects a presumption that the non-titled owner has a share in the property based on that person's contribution to acquiring or maintaining the assets. A resulting trust has been found to be appropriate where the parties have a common intention and where they jointly contributed to the assets or property.

50.     With respect to the Group, the common intention can be demonstrated by the integrated and interdependent nature of the global enterprise with its business divided across business groups rather than geographical lines or based on corporate structure. However, the

---

[4]     Here, the MRDA established how the Nortel debtors operated and how they shared profits. In many ways, the MRDA is analogous to a joint venture agreement despite its disclaimer to the contrary. (*See* MRDA, Art. 13.)

business segment model of enterprise led to a co-mingling of assets and an intertwining of the Group's affairs.  As a result, none of the entities in the Group was a self-standing business.

51.     By reference to resulting trust principles, the Group entities jointly contributed to the Lockbox Funds. Further, by virtue of the manner in which the Group was run as a global enterprise, the Group demonstrated a common intention to ensure that on any cessation of business the Group's assets would be applied equitably to settle the Group's various obligations, including rateably by way of a common dividend being payable to creditors by each Group entity if an overall shortfall existed.

52.     Beyond a resulting trust, where one party is enriched as the result of a corresponding deprivation to another party, absent a juristic reason, the Courts may apply an equitable remedy to rectify the unjust enrichment.  In Canada, such rectification can be made through the finding of a constructive trust over the assets of the enriched party for the value of the unjust enrichment.  Ultimately, it is the position of the UK Pension Claimants that a finding of a constructive trust over the assets of the Canadian Debtors and the US Debtors will permit the Courts to effect an allocation of the Lockbox Funds in a manner that is just and equitable in all of the circumstances.

53.     Benefits flowed from NNUK to the Canadian Debtors and the US Debtors. In making an allocation decision, it is the position of the UK Pension Claimants that the Courts have inherent jurisdiction to order an equitable distribution based on the resulting unjust benefits conferred on the Canadian Debtors and the US Debtors.

**(c)     Based on *Pro Rata* Creditor Claims**

54.     As noted above, an entity-by-entity ownership approach to allocation is not viable in this case, nor would an application of the MRDA on its own be appropriate.  In

these circumstances, unless the Courts imply a term or a common intention among the Group to ensure an equitable allocation of the Group's assets upon any cessation of business, it is the UK Pension Claimants' position that it is open to the Courts to exercise their equitable jurisdiction and to make an equitable allocation based on the relative proven creditor claims against the Group as a whole.

55.     Cross-border restructuring proceedings need to address the international aspect and enterprise nature of global entities by offering various mechanisms to promote the cooperation between the courts, a fair and efficient process to all proven creditors, while protecting the interests of all the stakeholders to the global corporate group as a whole.  In this case, there was a reasonable and legitimate expectation on the part of the Group's proven creditors that on any cessation of the Group's business, the Group's assets would not be allocated in such a way as to create an unequal treatment of proven creditors based on the jurisdiction in which they were located.  This is all the more so in considering pension plan creditors, given the Group's adoption of a "common platform" approach to the treatment of Group pension plans in different jurisdictions and the legitimate expectation of an equality of treatment created by that approach.

56.     The Group operated four business enterprises under one global umbrella. It is the UK Pension Claimants' position that a principle of territorialism for each jurisdiction should not apply to allow each geo-political restructuring proceeding to "grab" the assets available in its own jurisdiction to the detriment of the other jurisdictions.  Moreover due to the co-mingled nature of the Group's business and the assets sold to generate the Lockbox Funds, such an entity-by-entity or territorial approach cannot be adopted in any event.

57.     The UK Pension Claimants are the single largest creditor of the Group which operated as one global entity.  The parent Canadian Debtors provided financial assurances in the form of representations to the creditors dealing with NNUK and the EMEA Debtors, including to the Trustee on behalf of the UK Pension Claimants.  Accordingly, it was the UK Pension Claimants' legitimate expectation that if NNUK was unable to meet its financial obligations, the Canadian Debtors would provide the financial assistance required to meet such obligations.

58.     As a result, it is the position of the UK Pension Claimants that a more universal treatment of the proven creditors' claims is the proper approach and would treat the global proven creditor base in a more equitable manner than the territorial manner available under any of the other potential allocation models discussed above.

59.     Equitable distribution based on relative proven creditor claims has been applied in other insolvency proceedings in all three jurisdictions at issue in this case.

Canada

(a)     There has been a trend in Canadian cross-border insolvencies to take an increasingly global view of the enterprise group as a whole.  The principles of comity and cooperation are central features in insolvency law.  With the move towards a more global society, CCAA courts must continue to recognize, respect and give effect to foreign jurisdictions, foreign laws and foreign creditors.

In insolvency proceedings courts often employ equitable principles, including substantive consolidation, where the circumstances call for such a result.

The United States

(b)    In the United States, competing claims to ownership of assets frequently arise in the case of a failed investment fund, for which a receiver has been appointed to take control of the fund and distribute its assets among investors.  Faced with competing demands by investors seeking to maximize their share of a fixed pool of money, case law supports an equitable, *pro-rata* distribution and the formation of a distribution plan that is fair and equitable.  This is particularly true when the *res* consists of fungible property, such as money, that has been co-mingled, inasmuch as there is typically no equitable way to trace the funds at issue.

In the bankruptcy context, United States courts also resort to equitable principles, such as substantive consolidation, to determine creditor recoveries where a group of debtors operated as a single enterprise or where their affairs were so entangled that it is impossible to determine ownership of their assets and liabilities on a legal entity basis without prohibitive expense and delay.

The United Kingdom

(c)    In the United Kingdom, liquidators of bankrupt companies have entered into pooling agreements to distribute a common dividend to the proven creditors of each debtor.  Pooling agreements have been used where it is the most practical and efficient way in which to deal with an allocation among proven creditors of a group of companies.  This is particularly applicable in cases where the affairs of a group were inextricably intermixed.

60.     The factors that have been considered by the Courts as to whether some form of substantive consolidation or partial consolidation is appropriate include:

(a)     difficulty in segregating and ascertaining individual assets and liabilities of each entity;

(b)     presence of consolidated financial statements;

(c)     co-mingling of assets and business functions among the entities in question;

(d)     blurring of ownership interests;

(e)     existence of inter-corporate loan guarantees of affiliates' liabilities;

(f)     transfer of assets or funds between companies without observance of corporate formalities;

(g)     the assumption by the parent company of contractual obligations of its subsidiaries;

(h)     the sharing of overhead, management, accounting, and other related expenses among the different corporate entities;

(i)     the parent and its affiliates having common directors and officers or the parent shifting individuals on and off the subsidiaries' board of directors; and

(j)     the directors of the subsidiary not acting independently in the interest of the subsidiary, but taking direction from the parent or elsewhere in the Group.

61.     Many of these considerations resonate here (as described below) and support application of an allocation metric loosely premised on a substantive consolidation construct that would produce a broadly uniform dividend payable from each debtor estate to proven creditors of the Group.  Further, such a consolidation would alleviate the need to deal with the extensive, complex intercompany claims and could facilitate a swift resolution of the global insolvency of the Group.

62.     It is a fundamental principle in insolvency law that the interests of individual proven creditors may be compromised for the collective interest of the general body of proven creditors.  The Group had enterprise group members in each business segment in each different jurisdiction.  It is open to the Courts to exercise their inherent and equitable jurisdiction to give a fair recovery to all the proven creditors in these enterprise groups.

63.     For the reasons that follow, it is the UK Pension Claimants' position that an equitable distribution based on the relative proven creditor claims is the most appropriate in the circumstances, since:

(a)     the Group did not operate its business through independent corporate entities.  Rather, the Group operated on an enterprise basis, with four business segments.  This structure created certain competitive advantages as the entities in the Group could collaborate on technology and the Group had improved integration of core functions and better use of corporate resources.  However, the business segment model of enterprise ultimately led to a co-mingling of assets and an indissoluble linkage of the Group's affairs.  As a result, none of the entities in the Group were self-standing businesses;

(b)      the interests of the national subsidiaries in the Group were subordinated to the interests of the Group as a whole.  The distinction between the legal entities was ignored and was only relevant for certain tax and mandatory reporting purposes;

(c)      the Group maintained one centralized cash management system, with a transfer pricing system based on advantageous tax results;

(d)      the Group prepared and filed consolidated financial statements;

(e)      with respect to pensions, the Group had a global pension committee that addressed all of the pension contributions in all jurisdictions;

(f)      the existence of cross guarantees made multiple parties essentially jointly and severally liable to the obligations of certain proven creditors; and

(g)      it was the practice of the Group to share information and to perform common tasks across the geographical boundaries.  This included intellectual property development, R&D, manufacturing, support and distribution. This resulted in a co-mingling of developed assets, an intertwining of the Nortel affairs and blurred lines of ownership such that the entity-by-entity ownership cannot be determined in any fair and equitable manner.

64.    It is the position of the UK Pension Claimants that the legitimate expectations of the proven creditors of the Group, taken as a whole, is properly recognized by an allocation that enables an equitable distribution to the proven creditors and avoids the proven creditors of one particular Nortel entity receiving a materially different dividend than the proven

creditors of other Nortel entities.  The Group was a single common endeavor and there is no

proper basis for such an inequality in outcome as among proven creditors of the Group.  Any

other allocation mechanism would serve to permanently impose the institutional inequities on

NNUK and thus the EMEA Debtors[5] (and correspondingly their respective proven creditors).

Only by employing equitable considerations to the issue of allocation can such inequities be

avoided.

65.    If such inequities could be addressed by an appropriate allocation of the

Lockbox Funds to permit a broadly equivalent dividend to be paid to proven creditors across the

Group, an important factual basis underpinning the UK Pension Claimant's Financial Support

Direction (**"FSD"**) and other claims might be removed, and it is possible that the need for an

FSD (and other relief) against the Canadian Debtors and the US Debtors could be avoided.

Likewise it is the position of the UK Pension Claimants that such an appropriate equitable

approach to allocation might in principle obviate the need for the continued pursuit of claims as

between different debtor entities within the Group, thereby potentially facilitating an earlier

resolution of the insolvency proceedings in all stakeholders' interests.

66.    Unlike the US Debtors, the Canadian Debtors and EMEA Debtors, the UK

Pension Claimants do not have a "key to the lockbox".  They were not members of the Group,

were not parties to the MRDA, nor were they parties to any other agreement among the debtors.

Instead, their interest in the Lockbox Funds and their allocation is derivative, arising as a

consequence of the UK Pension Claimants' status as creditors of each of the US Debtors, the

Canadian Debtors and EMEA Debtors.  Accordingly, the UK Pension Claimants fully reserve

---

[5]    For the avoidance of doubt, it is the UK Pension Claimants' position that the manner in which the Group
was run prior to its insolvency prejudiced NNUK.  It follows that the EMEA Debtors were prejudiced in so
far as NNUK was one of their number.

the right to respond to the respective allocation positions of the US Debtors, the Canadian Debtors and EMEA Debtors, particularly if any of those positions request an allocation that does not take into account equitable principles.

67.    Further, the UK Pension Claimants are at an obvious procedural disadvantage to each of the US Debtors, the Canadian Debtors and EMEA Debtors in respect of allocation.   In particular, the UK Pension Claimants have at no time received any material documentary discovery from the US Debtors, the Canadian Debtors or the EMEA Debtors (for example in relation to the particular assets or sales that have generated the Lockbox Funds). Accordingly, the UK Pension Claimants fully reserve the right to supplement and amend their position on allocation in the light of discovery in due course.

68.    It may be that the other Core Parties' allocation positions establish only that no demonstrable formula exists for allocating the Lockbox Funds based on application of traditional *indicia* of legal rights.   With no express agreement among the debtors addressing how to allocate the proceeds of the sale of the Group's businesses in insolvency proceedings in multiple jurisdictions, equitable principles provide the fairest and most practical and efficient methodology for allocation.   The Courts could justifiably conclude that none of the allocation metrics advocated by the respective debtors or Core Parties has any more legitimacy based on traditional *indicia* than any other, and that none is more fair than an allocation which allows a *pro rata* dividend to be paid to the proven creditors of each of the US Debtors, the Canadian Debtors and EMEA Debtors.   Under such circumstances, a *pro rata* division of the Lockbox Funds would comport with the common law default rule in the joint venture context of implying an equitable division of proceeds without regard to each joint venturer's contribution and with

insolvency law applicable to a *res*, like the Lockbox Funds in this case, consisting of fungible, commingled property.

69.     Many considerations exist here that — in the absence of a demonstrably superior legal methodology to allocate the Lockbox Funds — would support the Courts' application of an equitable allocation methodology.  These considerations have been discussed in all the sections above.

70.     For all these reasons, the UK Pension Claimants reserve the right to assert their position on an appropriate allocation more fully, after reviewing the allocation position submitted by the US Debtors, the Canadian Debtors and EMEA Debtors or any other Core Parties.

## IV.    COSTS

71.     It is the position of the U.K. Pension Claimants that allocation of the Lockbox Funds must remain distinct from any consideration as to the costs, professional fees and expenses (together, "**Costs**") incurred by the debtors in each geographic region.  Only those Costs attributable to sales of the global Nortel assets (producing the Lockbox Funds) can arguably be paid from the Lockbox Funds.  In particular, all other Costs incurred or funded pursuant to Orders issued within the Canadian or US insolvency proceedings should be borne by and payable from those portions of the Lockbox Funds that are allocated respectively to the estates of the Canadian and US Debtors, or from other assets or proceeds in those estates that may be available to satisfy such Costs.  Such Costs ought not to diminish (directly or indirectly) the Lockbox Funds otherwise available for proper allocation, particularly in circumstances where the Costs incurred or funded pursuant to Orders issued within the Canadian or US insolvency

proceedings have not been incurred for the benefit of the EMEA Debtors or the creditors of the EMEA estates, including the U.K. Pension Claimants.

72.    The U.K. Pension Claimants reserve the right to articulate their position on Costs more fully, upon obtaining further particulars of same.

## CONCLUSION

WHEREFORE, the U.K. Pension Claimants respectfully request that the Court approve the U.K. Pension Claimants' allocation position.


Dated:  Wilmington, Delaware
       May 16, 2013

                        BAYARD, P.A.


                        */s/ Justin Alberto*
                        Charlene D. Davis (DE No. 2336)
                        Justin Alberto (D.E. No. 5126)
                        222 Delaware Avenue, Suite 900
                        Wilmington, Delaware 19899
                        Tel: (302) 655-5000
                        Fax: (302) 658-6395

                        -and-

                        WILLKIE FARR & GALLAGHER LLP
                        Marc Abrams
                        Brian E. O'Connor
                        Sameer Advani
                        787 Seventh Avenue
                        New York, New York 10019
                        Tel: (212) 728-8000
                        Fax: (212) 728-8111

                        *Counsel for the Trustee of Nortel Networks UK*
                        *Pension Plan and the Board of the Pension*
                        *Protection Fund*

*9542986*