APPENDIX A

**Summary of the Nortel Group's Global Operations**

This document gives a broad description of the operations of the Nortel Networks group of companies (the "**Nortel Group**" or the "**Group**") that are relevant in considering the Allocation Position of the U.K. Pension Claimants.

## PART 1: OVERVIEW OF NORTEL GROUP'S BUSINESS

**A.    Origin and Expansion of the Nortel Group**

1.    The Nortel Group traces its origins back to the Northern Electric and Manufacturing Company Limited, incorporated in Canada in 1895 as an equipment provider for Canada's telephone system.

2.    By the start of the present century it had transformed into a very large multinational group with customers in over 150 countries.  At its height in 2000, the Nortel Group had a market capitalization of over US$250 billion, annual revenue of approximately US$30 billion and nearly 93,000 employees worldwide.  As of the start of 2009, the Nortel Group had approximately 24,000 employees globally and traded in regions throughout the world.

3.    Historically, the Nortel Group focused on providing telecommunications equipment, such as large telephone exchanges, for public networks, but in modern times the Nortel Group has diversified into providing a wide portfolio of products and services.  These include internet technology, wireless communications (i.e. broadly, mobile phone technology), optical networks (i.e. broadly, data transmission via fiber-optic cables), wireline communications (i.e. broadly, landline telephone communications), communications software and a variety of other high technology products in the communications field.  The Nortel Group's customers are primarily businesses, large organizations and public network carriers (i.e. telecommunications network providers, including wireline, wireless and cable operators).

*Global Expansion, Centralization and Integration in the 1990s*

4.    At the start of the 1990s, the Nortel Group (then called Northern Telecom) was a major business in North America.  Although the bulk of the Group's business was confined to North America, the Group had global aspirations.  In 1990, of the Group's consolidated revenues of US$6,768 million, nearly all of it originated in North America with only US$408 million from the rest of the world.  At the time, the Group employed roughly 49,000 individuals, only about 5,000 outside North America.

5.    During the 1990s, the Group engaged in an ever-widening series of global expansions, moving into new territories and technologies.  The following sets forth a comparison of the Group's position in 1992 with its height in 2000:

|  | Northern Telecom Group at 1990 | Nortel Group as at 2000 |
|---|---|---|
| *Employees* | 49,050 | 94,500 |
| *Revenue* | US$6,768 million | US$30,275 million |
| *R&D Expense* | US$1,029 million | US$4,005 million |

6.    During this period of expansion, the Group continued to face barriers to entering new markets as a result of long-standing relationships between potential customers and local network providers and protective regulations.  However, new markets were opening up as a result of the continued deregulation of telecommunications services in various territories and the harmonization of technical standards in different countries, including in Europe, the Middle East and Africa (the "**EMEA**").

7.    During the years of expansion, the Nortel Group's research and development ("**R&D**") activities steadily increased, representing investment across all network businesses around the world for new products, process development and services.

8.    Through a series of transactions including the reorganization of the business, the formation of new companies and the acquisition of or formation of partnerships with existing companies around the world, the Nortel Group expanded in size, revenue and global reach.

These transactions also served to consolidate and centralize certain executive and operational functions, while, at the same time, integrating the business across business segments and departments that spanned across corporate entities and national borders.

9.      These transactions include, for example:

(a)    The Nortel Group's acquisition of STC in 1991 (described below), which was an integral component of the Group's global expansion policy. STC was a predecessor company to NNUK.

(b)    In February 1991, at the time of the acquisition of STC, the Nortel Group announced a significant reorganization of its operations in order to serve customers in global markets better.  Under this structure:

(i)     Marketing, sales and service activities were divided into four geographical areas: Canada, the USA, EMEA and Asia.  The EMEA operation was carried on by STC (renamed Northern Telecom Europe Limited).

(ii)    The Group organized its business along four main "product lines": Central Office Switching, Business Communication Systems, Transmission and Cable.

(iii)   The Group established three further "organizations" with global responsibility for assigned product areas.

(c)    During 1991-92, the Group added a new reportable region (Caribbean and Latin America ("**CALA**").

(d)    The formation, in December 1993, of two operating groups, Nortel North America and Nortel World Trade, that had responsibility for the integrated management of the Group's international marketing and business activities in Europe, Asia and CALA, and its joint ventures outside North America.

(e)    In July 1996, the Nortel Group changed its organizational structure to place more emphasis on its business segments, then described as "*line of business* (*"**LOB**"*) *management*".   The four LOBs at that stage were Switching Networks, Enterprise Networks, Wireless Networks and Broadband Networks,

although the precise designation altered almost annually afterwards. The LOB structure was intended to organize the Nortel Group on a product group basis in EMEA, the USA and Canada. Each LOB was to have responsibility for the marketing and business activities in the USA, Canada and EMEA and was to have global responsibility for all product manufacturing and product development strategy, including R&D. The stated purpose of adopting the LOB structure was to improve customer focus and facilitate the delivery of network solutions to a diverse customer base.

(f)     Also in 1996, the Nortel Group announced the integration of its principal R&D activities into the LOB structure and established Nortel Technology as an organization to link the LOB development groups together. R&D activities became the responsibility of each LOB, with Nortel Technology as a corporate technology advisory group.

(g)     In September 1998, the Group adopted "Nortel Networks" as its brand name to communicate its leadership position in providing high-value, unified network solutions to a diverse and growing base of customers worldwide.

(h)     On January 13, 1999, the Nortel Group announced the phased implementation of a new program to "streamline" business processes: the transition from "vertical integration" (in which the Nortel Group manufactured and assembled the products it sold) to "virtual integration" (in which manufacturing would be largely outsourced and where the Group would act as a "systems house" linking customers, design centers, internal production centers and outsourced manufacturers). This program would involve selling off parts of the Group's business, outsourcing and redeployment of employees. The program involved the creation of seven systems houses in Canada, the USA and Europe. The

systems houses included the NNUK systems house at Monkstown, Northern Ireland.  As part of the program, the Group restructured its entire Global Operations organization and brought all elements of the supply chain under a single executive.

(i)     During this period, the Nortel Group was engaged in a very substantial program of corporate acquisitions which greatly increased the size of the business.  For example, at least 11 substantial acquisitions were effected in the period 1997-2000, and the new businesses were then integrated into the existing Nortel business.

(j)     The Nortel Group structure was reorganized in 2000.  A new parent company, NNC, was created above NNL.  NNL, and under it the rest of the Group, became direct and indirect subsidiaries of NNC.

10.     As a result, the Nortel Group reached its height in 2000.  Revenues reached a high of over US$30 billion, over US$20 billion of corporate acquisitions were made and the Group employed over 90,000 employees.

*The Acquisition of STC in 1991*

11.     STC had developed from Standard Telephones and Cables Limited, a long-established UK telecommunications company with origins in the nineteenth century which was floated on the London Stock Exchange in 1979.

12.     In November 1990 NNL, through its newly incorporated wholly-owned UK subsidiary Northern Telecom Plc, made a Recommended Offer for all of the outstanding shares in STC not already owned by NNL (NNL had previously acquired 27.5% of STC's shares).  It duly acquired the shares between January and March 1991 for an aggregate purchase price of US$2,609 million.  STC (then still called STC Plc) changed its name to Northern Telecom Europe Limited on March 27, 1991.  As of December 31, 1991, the

company's immediate parent was Northern Telecom Plc, itself a wholly-owned subsidiary of NNL.

13.     At the time of the acquisition of STC, the Nortel Group's presence in other parts of the world was limited with small pockets of activity in a few other territories in EMEA and Asia.  The Group had a very small presence in the UK, limited to 300 employees.

14.     NNL's acquisition of a stake in STC was part of its long-term strategy to increase its participation in the worldwide telecommunications equipment markets.  In the Recommended Offer, NNL stated that the acquisition of STC would enhance its market presence in the UK and that STC would play a key role in the development of the worldwide business of the Group.  At the time, NNL's CEO stated that NNL was vigorously expanding its operations outside North America and that STC's "*rich heritage of technological innovation, its commitment to research and development and its strong market position*" would complement NNL's strengths.

15.     At the time of its acquisition in 1991, STC's telecommunications business consisted of R&D, manufacturing, sales and marketing, installation, and servicing of telecommunications systems.  STC had particular strength in cable equipment and submarine fiber-optic cables.   It was Europe's leading supplier of lasers for optical fiber telecommunications, and one of five suppliers in the world of long-haul cable systems.  STC had customers in the UK, Europe and North America.   In particular, STC sold telecommunications equipment to telecom operating companies, principally British Telecommunications Plc ("**BT**"), which was then the largest such company in the UK and accounted for about 99% of the network access services in the UK.  BT was STC's largest customer, and following the acquisition BT became the Group's largest customer in the UK.

16.     At the time of its acquisition, STC had been focusing on its communications systems business, with significant investment in its R&D.   At that stage, the liberalization of the

telecommunications market was progressing in the UK and STC anticipated that liberalization would increasingly progress in Europe.  STC aimed to increase significantly its share of the expanding telecommunications market in Europe and beyond.

17.     As illustrated in the table below, STC was a substantial company in comparison to the rest of the Group and represented a major acquisition, in large part due to its substantial R&D base:

|  | Northern Telecom Group as at 1990 | STC as at 1990 |
| --- | --- | --- |
| *Employees* | 49,050 | 14,200 |
| *Revenue* | US$6,768 million | US$1,600 million |
| *R&D Expense* | US$1,029 million | US$126 million (excluding information systems R&D) |

18.     The Group expected that its revenues from international operations would substantially increase as a result of the STC acquisition, in particular in the field of cable and fiber-optic products.  It also anticipated a significant favorable impact on gross margins as a result of expected efficiencies to be realized upon the combination of the businesses of the Group and STC.  The acquisition of STC had a markedly positive impact on the Group's consolidated profit and loss.  Moreover, the acquisition of STC's intellectual property, facilities and experienced technicians significantly contributed to the Nortel Group's success beyond 1991, enabling the Group to become a market leader in a number of fields.  R&D was carried out in the UK in Harlow and Maidenhead, at STC's former premises.

19.     During the 1990s, the Nortel Group received substantial benefits from the UK, including considerable support from NNUK employees for certain centralized functions; and a considerable customer base in the UK, including some of the Group's major customers.

20.     At the same time, Nortel closed or sold numerous businesses and facilities in the UK, including several "non-strategic" divisions of STC.

*Financial Difficulties and Accounting Irregularities 2000-03*

21.     When the Dot-com bubble burst in 2000-01, the Nortel Group faced financial difficulties.  By the end of 2001, the Group was reporting a dramatic and severe downturn in both the telecommunications industry and the economic environment generally.  The telecommunications industry lost more than US$1 trillion in share value in 12 months and technology markets collapsed with a precipitous drop in demand for high technology products.  The collapse in the technology market resulted in a precipitous drop in demand for the Nortel Group's products in the USA, Europe and other parts of the world.  This resulted in significant excess network capacity, while at the same time service provider customers no longer invested in new networks or equipment and returned to more conservative spending strategies.  In the second quarter of 2001, the Nortel Group wrote down the value of its goodwill by approximately US$12 billion.

22.     The Nortel Group addressed its difficulties by undergoing a major restructuring in 2001 and a series of restructurings thereafter.  In view of the economic difficulties, by 2001 the Nortel Group decided to focus on particular areas in the global networking industry which were regarded as being high-growth areas, in particular optical transmissions, 3G wireless networks and packet networking and related services.

23.     Thereafter, the Nortel Group focused on reducing the size of its business, cutting costs and attempting to increase efficiency.  The Nortel Group focused its activities on its core markets, basing operations in low cost jurisdictions where possible.  The aim was to improve the Group's financial and managerial control and its reporting systems and procedures, thus achieving greater control for central management.

24.     During 2001 and thereafter, the Group engaged in a number of activities designed to "streamline" operations around its core markets, including substantial workforce reductions,

divestitures of parts of its business, outsourcing and reduction of fixed costs.  The principal restructuring programs included:

(a)     The reduction of worldwide employees from more than 90,000 in 2000 to 52,600 in 2001 (over 44% reduction) to about 30,000 as of the start of 2009. Reductions were aimed primarily at the UK and North America.  The Nortel operation in the UK was particularly affected by the workforce reductions.  In 2000, NNUK had 12,440 employees, representing 13.2% of the Nortel Group's global workforce.  By 2003, there were only 2,752, representing 7.8% of the global workforce.

(b)     The continued outsourcing of nearly all manufacturing and production, including part of the manufacturing operation at NNUK's site at Monkstown, Northern Ireland and Cwmcarn, Wales;

(c)     The decrease in the Nortel Group's R&D expense, reflecting the impact of the Group's initiatives to focus spending on key potential growth areas, and the consolidation of R&D in Canada and China;

(d)     The creation and/or expansion of joint ventures in jurisdictions such as South Korea and China; and

(e)     The disposal of non-core businesses and sale of real estate.

25.     During 2003, significant accounting irregularities came to light which led to the Nortel Group restating its accounts and ultimately to regulatory and criminal investigations against former senior Nortel Group management; substantial civil litigation was also brought against the Group by shareholders aggrieved by the accounting irregularities.  The investigations and ramifications of the accounting irregularities were a very important feature of the Nortel Group's affairs for the next three years.  In 2006, the Nortel Group settled the shareholder actions arising from the accounting irregularities for a payment of US$575

million in cash and the issue of approximately 62 million NNC shares (representing approximately 14.5% of the common shares then in issue). During 2007, the Nortel Group reached a settlement with the Ontario Securities Commission and the US SEC of the investigations and proceedings brought by them arising from accounting irregularities.

*Further Restructuring and Business Plans 2004 – 2008*

26.    During 2004 – 2008, the Nortel Group implemented a series of restructuring and business plans that were designed variously to create a streamlined and simplified organizational structure, reduce the workforce, shift positions to lower cost jurisdictions, contain costs, focus on optimized R&D and effect other improvements in business.

27.    These efforts together with other transactions served to further consolidate and centralize certain executive and operational functions, and integrate the business as a single enterprise of interdependent global entities, including:

(a)    The creation of new officer positions (e.g., Chief Strategy Officer, Chief Marketing Officer and Chief Ethics and Compliance Officer);

(b)    The divestiture of substantially all of the Group's remaining manufacturing operations; the use of an outsourced manufacturing model was intended to benefit the Group by enabling it to use leading manufacturing technologies, lower its cost of sales and decrease investment in plant;

(c)    The creation of Solutions Operations Centers in Canada, France and the UK, with overall responsibility for the strategic management and control of the Group's various supply chains, including all customer interfaces, customer service, order management, quality assurance, product cost management, new product information, and network solutions integration, testing and fulfilment;

(d)    During 2007, the Nortel Group accelerated the shift of its R&D expenditure to new and emerging markets and established a Common Engineering function

to centralize key engineering functions that could be used across the entire Group; and

(e)     Sales of non-core businesses and real estate continued during this time.

*Insolvency*

28.     On November 10, 2008, the Nortel Group announced a new operating model, involving the decentralization of corporate functions to the Group's business segments, the creation of vertically-integrated business units and giving greater financial and operational control to the business segments.  It appears likely that this was done to facilitate the sale of separate business segments.

29.     In the years before 2009 the Nortel Group had been facing significant trading pressure and a deterioration of cash and liquidity.  In the light of the Nortel Group's financial difficulties and liquidity problems, the board of directors of NNC/NNL unanimously authorized the initiation of creditor protection proceedings in multiple jurisdictions.

30.     On January 14, 2009, NNC and NNL, the ultimate parent companies of the Nortel Group, and certain of their subsidiaries incorporated in Canada, filed an application in the Ontario Superior Court of Justice under the Companies Creditors' Arrangement Act (Canada) seeking relief from creditors (the "**CCAA filings**").  The Canadian court granted the application and the Canadian court now supervises the Canadian debtor companies in their management of their properties and business.  Ernst & Young Inc was appointed by the Canadian court as the Monitor of the Canadian debtor companies.  References below to the CCAA filings are to documents filed by the Group companies in the Canadian insolvency proceedings.

31.     Also on January 14, 2009, NNI and certain of its subsidiaries incorporated in the USA filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code

(the "**Chapter 11 filings**").  References below to the Chapter 11 filings are to documents filed by the Group companies in the US insolvency proceedings.

32.     Also on January 14, 2009, NNUK and 18 of the Nortel Group's EMEA companies (most of which are NNUK subsidiaries) were placed into Administration by the High Court of Justice of England and Wales pursuant to the Insolvency Act 1986.  The EMEA companies in question include Nortel Networks France SA and Nortel Networks (Ireland) Limited. Individuals from the firm of Ernst & Young LLP were appointed as Administrators.

33.     On May 28, 2009, the Commercial Court of Versailles, France, ordered the commencement of secondary insolvency proceedings in respect of NN France.  However, the English Administration proceedings remain the main proceedings in respect of NN France.

B.     **The Nortel Group's Matrix Structure**

34.     The Nortel Group operated along global business lines rather than by geographical division or legal entity.  It was highly integrated and operated essentially as if it were one large enterprise.  Legal entities were unimportant to the Nortel Group's operation, as the business was operated across the various legal entities and without regard to them.

35.     The Nortel Group described itself as a "matrix organization, which is integrated across borders": the Group's business was organized, on the one hand, around "business lines" or "business segments," which were further integrated with Group-wide departments which ran across the business segments (hence the term "matrix").  It was horizontally and vertically integrated, meaning organizations within group shared information and performed common tasks across geographical boundaries.  Fully integrated entities performing R&D, manufacturing support, and distribution functions interacted within the group to fulfill customer demand for products and services.  This structure was integrated across borders and multinational, and resulted in a high degree of interdependence between the various legal entities in the Group.

36.    As described in the Chapter 11 filings, the Nortel Group employed a global integrated business model in which:

(a)    the main operating subsidiaries (which included NNUK) around the world operated across all of the Nortel Group's business lines or segments;

(b)    a complex internal purchasing system was employed whereby sales orders were routed through one of four purchasing hubs (of which NNUK was one);

(c)    a transfer pricing method was used to allocate costs and revenues around the global business;

(d)    the integrated business model was financed through a complex intercompany cash management system (see further below); and

(e)    responsibility for R&D, sales and operations was shared globally.

*Business Segments: Overview*

37.    All of the Group's business was organized around "business lines" or "business segments" on the basis of product lines (with the exception of certain joint ventures). These business segments operated globally and all of the Group's business, and each business line or segment was capable of operating independently from the other business lines or segments. Most importantly, with certain exceptions, the business segments are not segregated by legal entities but are operated across various legal entities.

38.    The four business segments immediately prior to the Nortel Group's insolvency were:

(a)    *Carrier Networks* which sold wireless products and services to Carrier network providers, and which in recent years represented about 40% of the Group's business;

(b)    *Enterprise Solutions* which sold communications products and services to businesses and large organizations, and which in recent years represented about 24% of the Group's business;

(c)     *Global Services* which provided a broad range of network support services, including installation, maintenance and technical support, and which in recent years represented about 20% of the Group's business; and

(d)     *Metro Ethernet* which provided optical networking products and Ethernet technology, and which in recent years represented about 14% of the Group's business.

39.     Although the structure of the business segments has been regularly reorganized during the recent history of the Nortel Group, for the last two decades, the Group's business has been organized into lines corresponding to families of products or types of customer.

*The role of the business segments in the Nortel Group's business*

40.     The business segments were an integral feature of the Nortel business in two key ways, namely:

(a)     the supply of physical hardware with related software were conducted through the relevant business segments (i.e. as of the end of 2008, the Carrier Networks, Enterprise Solutions and Metro Ethernet business segments); and

(b)     that hardware was deployed and supported through the Global Services business segment (as of the end of 2008).

41.     As set out above, the business segments took on particular importance after 1996 when a "Line of Business" or LOB structure was introduced, whereby each LOB was responsible for marketing and business activities in the United States, Canada and EMEA, and product manufacturing, product development and R&D were conducted on a global basis.

42.     The control, accounting policies and independence of the business segments are summarized below:

(a)     The heads of the business segments were accountable to the Group CEO. Shared costs were allocated to the segments based on headcount.  Each segment had its own accounting policies similar to those of the Group.  Each segment was allocated resources and assets based on customer demand. Working capital for each segment was primarily managed by the Nortel Group at the regional and global level.

(b)     In the Group's SEC filings, each business segment's performance was accounted for separately as if the segments were separate global businesses.

(c)     Each segment provided its own professional services for matters such as strategic planning, network design and engineering, network operations planning, installation and ongoing technical support.

(d)     Both prior to and following insolvency, the Nortel Group sought to sell its business segments as separate business units in their own right.

*Global Nature of Nortel Group's Business*

43.    Historically, as it expanded, the Nortel Group divided the world up into the following geographical regions.  The Group came to have a substantial presence in each of these regions.

(a)     Canada;

(b)     the USA;

(c)     EMEA – Europe, Middle East and Africa;

(d)     Asia Pacific; and

(e)     CALA – the Caribbean and Latin America.

44.    Nevertheless, the Nortel Group operated on a global basis.  Its businesses were highly complex and global in nature, with an integrated structure.  Organization of the Nortel

business along these global business segments or lines ignored individual legal entities within the group.

45.     A report of Ernst & Young Inc in the CCAA proceedings states that: "*As a result of the numerous inter-company transactions related to inventory purchases, provision of services and transfer pricing …, it is evident that there is a significant interdependence among the Nortel entities.*"  Ernst & Young Inc also state that: "*Nortel conducts its business through global business units resulting in a high degree of interdependence among the various legal entities in different countries around the world.*"

46.     Similarly, the Nortel Group's business segments were integrated and interdependent as no one business segment or geographical location alone could provide solutions to customers.   R&D was shared between business segments and across the territories and regions in which the Group operated.   Similarly, the business segments would co-operate with each other, with R&D personnel and with other Nortel organizations to maximize sales opportunities.

47.     The integrated global nature of the business segments was reflected by the diverse geographical location of each segment's senior management.   For example, the organization charts for the Enterprise Solutions, Carrier Networks and Carrier sales segments as of early 2009 show that many managers were scattered around the world, including in the UK and EMEA.

*Organization Along Departments*

48.     The business segment structure was integrated with Group-wide departments which ran across the business segments.   These departments coincided with the extraterritorial services provided by the Residual Profit Entities as described above, namely R&D, operations, sales and marketing and general and administrative services.

49.    All of the Nortel Group employees fell within one or more of the Group's departmental categories:

(a)    R&D;

(b)    Operations;

(c)    Sales and Marketing; and

(d)    Corporate Services.

50.    In its submissions to the transfer pricing tax authorities, the Nortel Group stressed that each of its above functions collaborated with the others, across functions and across borders as best suited the customer, product, project or other defined need.  The Residual Profit Entities operated in a manner reflective of the Nortel Group's matrix organization and were integrated across borders.

51.    The Nortel Group made a conscious decision to adopt its cross-border matrix structure because it believed that it would be beneficial to the Group as a whole, for example, by sharing technological know-how, achieving economies of scale and avoiding duplication of functions.

*Financial Reporting*

52.    The Nortel Group annually filed Form 10-K returns with the US SEC, setting out its activities and financial results for the year.  The Nortel Group also issued detailed Annual Reports which in large part followed the content of the Form 10-Ks.

53.    Consistent with the Group having been run on global lines from North America, with most emphasis being placed on the business segments and very little on separate corporate entities:

(i)    The Form 10-Ks and Annual Reports generally paid no regard to individual companies within the Group or their financial performance or activities.  The emphasis was on reporting by business segment on a

global basis, by geographical region or on a consolidated Group-wide basis.  The main exceptions to this were joint venture companies where there was usually a more detailed description of the year's activities, and the reporting of deferred tax assets for Residual Profit Entities, including NNUK, from 2006.  Otherwise, the Form 10-Ks and Annual Reports were not concerned with the affairs of individual companies.

(ii)    The Nortel Group adopted Group-wide policies, business programs and restructurings.

(iii)   No executive management within the EMEA companies were identified.

54.    Prior to the early 2000s, for financial reporting purposes, revenues were initially attributed to geographical regions both by (i) "point of origin" (i.e. location of a business entity within the Nortel Group) and location of assets and (ii) by destination of customer revenues.  From around the early 2000s, revenues were attributed to geographical regions based on the location of the customer.

**C.    Relevant Companies in the Nortel Group**

*NNC*

55.    The current corporate structure of the Nortel Group arises from a statutory plan of arrangement implemented on May 1, 2000.  Under that structure, NNC, which was incorporated under the Canada Business Corporations Act on March 7, 2000, became the ultimate parent holding company of the Nortel Group, i.e. of NNL and its subsidiaries.  NNL became NNC's principal, direct operating subsidiary in Canada.  NNC was incorporated under the Canada Business Corporations Act on March 7, 2000.

56.     At the start of 2009, NNC had 213 employees, all of whom were employed in Canada.

*NNL*

57.     NNL was incorporated on January 5, 1914 in Canada and was, until the plan of arrangement in 2000 referred to above, the Nortel Group's parent company.  NNL was formerly known as Northern Telecom Limited (until April 29, 1999) and Nortel Networks Corporation (until May 1, 2000).  As a result of the plan of arrangement in 2000, NNC holds all of the common shares in NNL.

58.     At the start of 2009, NNL had about 2,800 employees, almost all of whom were employed in Canada.

59.     NNL is described in the Chapter 11 filings as the historic and actual operational parent of the global Nortel enterprise.  NNL is the direct or indirect parent company of most of the Nortel Group's subsidiaries.

60.     NNL is a Residual Profit Entity (that is, as will be explained further below, one of the five main operating companies within the Nortel Group that performs R&D and has an entitlement to a share in the profits of the Group business).  NNL is also the direct parent company of the other four Residual Profit Entities as at the Group's insolvency, namely:

> (a)     NNI (wholly-owned by NNL);
>
> (b)     NNUK (wholly-owned by NNL);
>
> (c)     NN France (owned 91.17% by NNL and 8.83% by NNIHF, a wholly-owed subsidiary of NNUK);
>
> (d)     NN Ireland (wholly-owned by NNL).

61.     Much of the Group's third party debt is concentrated in NNL (and also NNC), much of it guaranteed by NNI.

*NNI*

62.     NNI was incorporated under the laws of the State of Delaware, USA, on September 16, 1971.  It is a direct, wholly-owned subsidiary of NNI.  It was previously called Northern Telecom Inc.

63.     The Nortel Group's US businesses are primarily conducted through NNI, which is the direct or indirect parent of a majority of the Nortel companies incorporated in the USA.  NNI is a Residual Profit Entity.

*NNUK*

64.     NNUK (f/k/a Nortel Networks Holdings Limited) was incorporated in England on February 25, 2000 under the Companies Act 1985.  NNUK is a wholly owned subsidiary of NNL.

65.     NNUK is and has been the Nortel Group's operating company in the UK since 2000. NNUK is the successor in interest to the previous two main UK operating companies: (i) STC Plc and (ii) the company now known as Nortel Networks Optical Components Limited. The previous two operating companies were both principal employers in relation to the Plan. In brief, the essential facts showing the continuity between the UK operating companies are as follows:

(a)     The Nortel Group acquired STC in 1991, as explained above.

(b)     On January 1, 1992, STC transferred its telecommunications business to its subsidiary Northern Telecom Europe Limited.   On July 1, 1993, Nortel Networks Optical Components Limited (then called Northern Telecom Plc) acquired the telecommunications business from Northern Telecom Europe Limited (then called STC Submarine Systems Limited).

(c)     On March 17, 2000, NNUK acquired the issued share capital in Nortel Networks Optical Components Limited.

66.    The UK operating companies used a variety of names during the above period, including Northern Telecom Europe Limited, Nortel Limited, Nortel Plc and Nortel Networks Plc.

*NN France*

67.    The Nortel Group has long had a presence in France: for example, the Group had an R&D facility in Paris as of 1990.  The company now known as Nortel Networks SA ("**NN France**") was established in 1992.

68.    NN France is a Residual Profit Entity and one of the EMEA entities.  NN France developed wireless network equipment for Nortel Group customers.

69.    NN France is jointly owned by: NNL (91.17%) and NNIHF (8.83%), a wholly-owned subsidiary of NNUK since December 2007.  According to the CCAA filings, NN France was a joint venture until 1999 and, although it is not a subsidiary of NNUK, it is effectively treated as an economic subsidiary of NN UK.

*NN Ireland*

70.    NN Ireland is a Residual Profit Entity and is a wholly owned subsidiary of NNL.  As of 2007, it was jointly owned by: NNL (38.76%) and NNIHF (61.23%), which at that stage was a wholly-owned subsidiary of NNL.

71.    NN Ireland was established in 1973 to manufacture equipment for the export market. Its manufacturing facilities were closed in 2001.

*NN Germany*

72.    NN Germany is now a wholly-owned subsidiary of NNIHF, itself a wholly-owned subsidiary of NNUK since December 2007.

73.    NN Germany was incorporated in 1972 and derived its revenue from telecommunications sales, distribution and leasing of Nortel products.  NN Germany's

business was largely with third party customers within Germany but it also has some third party customers outside Germany.

74.      NN Germany was reliant on the approval and authority of senior EMEA staff based in Maidenhead, UK.

**D.      NNUK's Lack Of Independence**

75.      The Group's global approach to the conduct of its business, in which legal entities were of minimal importance, was reflected in the actual management of NNUK.

*Executive leadership*

76.      The board of NNUK did little except approve the company's statutory accounts, which was the bare minimum to comply with legal requirements.   Since at least the early 1990s, the overall management of the Group has been in the hands of the Executive Officers of NNL/NNC (who shared the same Executive Officers).   The Executive Officers were appointed by the boards of NNL and, where applicable, NNC.

77.      Although the precise allocation of responsibilities and the names of positions have changed over the years, it is clear that the Executive Officers of NNC/NNL have held the key posts in the Group, including:

(a)      President and CEO;

(b)      CFO;

(c)      Controller;

(d)      Treasurer;

(e)      General Counsel;

(f)      Vice-President, Taxation;

(g)      heads of various business segments.

78.      From around the early 2000s, the CEO was designated as the chief operating decision maker in assessing the performance of the Nortel Group's business segments and the

allocation of resources to the segments.  Each segment was managed separately with each segment manager reporting directly to the CEO.

79.     As of the start of 2009, NNC and NNL had 15 executive officers, most of whom had a primary business location in Toronto, Canada.

80.     Each of the boards of NNC and NNL was comprised of the same directors and had the same non-executive chair.  Meetings of the boards of NNC and NNL were generally held together as joint meetings.  NNC and NNL's corporate governance was conducted from Toronto, board meetings were held there, the majority of the directors were resident in Canada, and the companies' headquarters were in Toronto.

81.     As an example of the influence of the Nortel Group's executive leadership on NNUK, it is to be noted that the directors of NNUK included senior North American officers of NNC/NNL such as Douglas Beatty, Michael Gollogly and Peter Currie.

*The Role of NNL and NNI in Overall Management of the Group*

82.     Although the executive leadership of the Nortel Group was in the hands of the officers of NNC/NNL, it appears that in practice much of the overall management of the Group was carried out by NNL and the US operating company NNI.  The Nortel Group was organized so that a significant portion of its global support activities such as executive leadership, operations and corporate services were located within NNL and NNI.  Thus:

> *NNL*
>
> (a)     As already noted above, in the Chapter 11 filings NNL is described as the historic and actual operational parent of the global Nortel enterprise.  NNL is said to provide, from its Toronto headquarters, corporate overhead support to its affiliates throughout the world.  In particular, the Chapter 11 filings state that a substantial portion of Nortel's legal, finance, strategic, insurance,

procurement, human resources and real estate functions are directed on a group-wide basis from NNL's Toronto offices.

(b)     The CEO and CFO were employed by NNL.

(c)     The Common Engineering function for R&D was located primarily in NNL. The Chief Technology Officer resided in Canada.

(d)     A significant portion of the Nortel Group's general and administrative support function was performed centrally by NNL.  Substantial parts of the Group's Finance organization were situated in NNL, including the Group Controller's office and important features of the Treasury function.  The Group's Information Services organization was primarily located in NNL.  The corporate Strategy Team was based in North America, mostly in Canada.

(e)     Significantly, global intercompany funding was co-ordinated and managed in Canada.  This gave NNL control over its substantial indebtedness to NNUK, as described below.

(f)     The executive leadership of the Group's marketing team was based in NNL.

(g)     Many of the Nortel Group's primary contractual external relationships with suppliers/vendors were through NNL.  Similarly, NNL was usually the contracting party with outsourced equipment manufacturers and component suppliers.

*NNI*

(a)     As of 2008, the Global Accounts group (the Group's sales organization for multinational customers) was primarily located in the USA and had its executive leadership in the USA.  The Group's marketing function was primarily located in NNI, with more than 45% of the global marketing team based in NNI.  Much of the leadership of the Global Sales function was

located in the USA.  The Vice President of Global Sales was based in the USA and had a critical role at Nortel, according to the Chairman of the boards of NNC and NNL.

(b)     As of 2008, the Group's Global Operations function was primarily located in NNI.  The Group's Chief Procurement Officer and 43% of the Group's Global Operations function was employed by NNI.

(c)     In the Chapter 11 filings, NNI has described itself as united with NNC and NNL in an integrated, co-dependent business relationship.

NNI's Role in Financing of the Nortel Group

(d)     Although the Nortel Group was under the overall control of NNC and NNL, NNI had a significant influence on the management of the Group together with its Canadian parents.  Through its influence on the affairs of the Group as a whole, NNI influenced the affairs of NNUK.

(e)     The relationship between NNC/NNL and NNI was particularly close because NNI guaranteed most of the bonds issued by NNC/NNL to raise capital for the Group's operations.   For example, NNI guaranteed the following debt securities of NNL, issued under an indenture dated as of July 5, 2006 among NNL, as issuer, NNC and NNI, as guarantors, and The Bank of New York Mellon (formerly known as The Bank of New York), as trustee:

(i)     US$2 billion in aggregate principal amount of senior notes comprised of US$450 million in aggregate principal amount of 10.75% senior notes due 2016, US$550 million in aggregate principal amount of 10.125% senior notes due 2013 and US$1 billion in aggregate principal amount of floating rate senior notes due 2011 with a stated

interest rate per annum, reset quarterly, equal to LIBOR plus 4.250%, each of which were issued on July 5, 2006; and

(ii)    US$675 million in aggregate principal amount of 10.75% senior notes due July 2016, which were issued on May 28, 2008.

(f)    NNI also guaranteed the following debt securities of NNC, issued under an indenture dated as of March 28, 2007 among NNC, as issuer, NNL and NNI, as guarantors, and The Bank of New York Mellon, as trustee:

(i)    US$575 million in aggregate principal amount of 1.75% convertible senior notes due 2012, which were issued on May 28, 2007; and

(ii)    US$575 million in aggregate principal amount of 2.125% convertible senior notes due 2014, which were issued on May 28, 2007.

(g)    Accordingly, it was in NNC/NNL's interests to order the Group's affairs to ensure that NNI was financially strong, so that NNI would appear to be a creditworthy guarantor of NNC/NNL's borrowings. It was also in NNC/NNL's interests to obtain cash from entities in the Group other than NNI, so that NNC/NNL could minimize their third-party borrowing while at the same time maintaining NNI's financial strength and thus its creditworthiness as their guarantor. The organization of the Group in this manner was clearly of benefit to NNI. In this respect, therefore, NNC/NNL and NNI's interests were so closely aligned that they were in effect a single economic unit.

*The Dependant Role of NNUK*

83.    Nortel's integrated global structure meant that NNUK did not operate as an independent freestanding business, but was simply part of the global business controlled by the Group's management, and in particular by NNC/NNL and, in the respects alleged herein,

by NNI.  Pursuant to the global operation of the Group as a single entity, companies such as NNUK acted simply as part of a much larger machine providing resources to allow the Group's business segments (headquartered in NNC/NNL and NNI) to operate as they wished.  Although NNUK was the center of EMEA, NNUK was not free to control the EMEA region itself in furtherance of its own interests.

84.    As a result of the business segment structure, NNUK personnel frequently acted on instructions from individuals employed by other companies in the Nortel Group, including NNI in relation to tax and treasury matters.

85.    In contrast to NNI, NNUK had no real control over the Group's tax and treasury policies.  Although parts of the tax and treasury functions were based in NNUK, it only administered the arrangements determined by NNC/NNL and NNI.

86.    The Group's transfer pricing arrangements were imposed upon NNUK by NNI and its Canadian parent companies.

87.    NNUK did not function as an independent entity within the Group.  It did not have an independent board of directors, as demonstrated by the following:

(a)    the personnel of NNUK's board included senior officers of NNC/NNL and NNI/NN CALA so that control could be exercised over NNUK when required.  Such individuals included:

(b)    Frank Dunn, who was a director of NNOCL between 1997 and 1999, and who was a director of NNC and NNL between 2000 and 2004, serving as Chief Financial Officer from 2000 to 2001 and President and CEO from 2001 to 2004;

(c)    Gary Donahee, who was a director of NNI between 1993 and 1995, before becoming a director of NNOCL from 1998 to 1999, and NNC and NNL's President of the Americas from 2000 to 2003;

(d)     Peter Currie, who was a director of NNOCL between 1994 and 1997 and of NNUK between 2005 and 2007, while also being a director of NNI between 1994 and 1996, as well as being the Executive Vice President and Chief Financial Officer of NNC and NNL between 2005 and 2007;

(e)     Gordon Davies, who was a director of NNUK between 2002 and 2003, and a director of NN CALA between 2007 and 2009, while also being NNL's Assistant General Counsel – Securities, and Corporate Secretary between 2003 and 2004; General Counsel – Corporate, and Corporate Secretary between 2005 and 2007; Deputy General Counsel, and Corporate Secretary in 2008; and Chief Legal Officer and Corporate Secretary in 2009;

(f)     Nicholas DeRoma, who was a director of NNUK between 2000 and 2002, while also being a director of NN CALA between 1999 and 2006, and the Chief Legal Officer of NNC and NNL between 2000 and 2005;

(g)     Douglas Beatty, who was a director of NNUK between 2000 and 2004, while also being the Controller of NNC and NNL between 1999 and 2002 and the Chief Financial Officer of NNC and NNL between 2002 and 2004;

(h)     William LaSalle, who was a director of NNUK between 2001 and 2008, while also being the General Counsel for Operations of NNC and NNL between 2005 and 2007;

(i)     Terry Hungle, who was a director of NNOCL between 1998 and 2001 and of NNUK between 2000 and 2001, while also holding various senior positions with NNC and NNL, including Vice President of Finance in 2001 and Chief Financial Officer between 2001 and 2002; and

(j)     Michael Gollogly, who was a director of NNUK between 2001 and 2002, while also holding various senior finance positions with NNC and NNL, becoming the Controller of NNC and NNL between 2002 and 2004; and

(k)     in later years, the NNUK board met only seldom, for example to approve its statutory accounts (which itself reflected mainly intergroup trading) and ratify transactions associated with the Group's reorganizations.

88.    As a result of this integrated global structure:

(a)     NNUK cannot be said to have conducted businesses for its own benefit in any meaningful sense.  It was working in a common endeavor with the rest of the Group;

(b)     The income of NNUK as a legal entity, and thus its ability to meet its liabilities, depended upon the remuneration allotted to it under the Group's transfer pricing arrangements, which were imposed on NNUK by NNC/NNL and NNI.   These transfer pricing arrangements worked to the benefit of NNC/NNL and NNI and NN CALA and to the financial detriment of NNUK.

(c)     The Group was run to optimize the performance of its business segments and without regard to the needs of the separate corporate entities such as NNUK.

(d)     In particular, NNC/NNL and (in relation to tax and treasury matters) NNI paid no proper regard to the fact that:

(i)     NNUK was the employer of a large pension scheme with a growing deficit, whose members were Nortel employees working for the benefit of the Group as a whole;

(ii)    it was necessary to ensure that NNUK was adequately remunerated by the Group so that it would be in a position to meet its pension liabilities; and

(iii)    under both U.K. and European law pensions are deferred pay, and thus any sustained underfunding in a defined benefit occupational pension scheme amounts to the employer failing to fund the remuneration that employees have earned.

## E.    **Interconnected Cash Management System**

89.    In furtherance of its integrated global business operations, the Nortel Group operated a Group-wide cash management system that transferred cash around the Group as part of the transfer pricing arrangements and to meet the cash needs of the Group generally.

90.    Following the dot.com collapse in the early 2000s and the subsequent downgrading of its credit rating, the Nortel Group was increasingly unable to access capital markets or borrow on competitive terms.  This posed a major difficulty for the continued operation of the Group.  Accordingly, the Group's management took steps to remit cash to NNC/NNL or concentrate it in NNI (thus strengthening NNI's position as NNC/NNL's guarantor and making it easier for them to borrow).  NNI, through the Group Treasury and Group Tax functions which it jointly controlled, played a significant role alongside NNC/NNL in designing and implementing these steps, which were imposed on NNUK.

## PART 2:  OVERVIEW OF THE NORTEL GROUP'S TRANSFER PRICING ARRANGEMENTS

91.    The purpose of the Nortel Group's transfer pricing arrangements was to enable Group entities to operate on an integrated basis across multiple jurisdictions and on a global basis, allocating profits and losses and certain costs across corporate entities.

92.    From 1991, when NNUK became wholly-owned by the Nortel Group, the Group's transfer pricing arrangements consisted of a series of cost-sharing agreements including (among others) in respect of R&D costs, global tangible property (ie physical products) costs, and headquarter costs.

93.    From 1991 to 1995, NNUK was not party to the Group's transfer pricing arrangements, meaning that NNUK was burdened with the costs of its R&D while the rest of the Group reaped the benefits.  Although the work performed by NNUK's R&D team was critical at this time to the Group's expansion within EMEA and North America, and its corresponding increase in profits, none of these R&D costs, which served to benefit the entire Group, were ever repaid to NNUK.

94.    Between January 1, 1995 and January 1, 2001, NNUK was party to a number of cost-sharing agreements, the purpose of which was purportedly to allocate expenses incurred by Nortel entities in: (i) R&D; (ii) manufacturing; (iii) the operation of the Group's head office; and (iv) providing market support groups and product line management for the EMEA region.  However, the cost sharing agreements only provided compensation for the basic costs associated with providing a product or service.  They did not share profits made elsewhere in the Group using NNUK's resources.  Further, the cost-sharing agreements did not fully take into account or properly compensate for various material costs that NNUK incurred, including for example its pension costs.

95.    With effect from January 1, 2001, the Group's transfer pricing agreement used the Residual Profit Split Methodology (the "**RPSM**"):

(a)    NNL and NNI together decided to move from a cost sharing arrangement to the RPSM, and designed the RPSM.

(b)    The terms of the RPSM were set out in the Master Research and Development Agreement dated December 22, 2004, retrospective to January 1, 2001 (the "**MRDA**").  NNI and NNL determined the terms of the MRDA with a view to satisfying the requirements of the U.S. and Canadian revenue authorities.

(c)    NNL and NNI controlled the application for Advance Pricing Agreements with the Canadian, U.S. and U.K. revenue authorities in relation to the MRDA

and instructed Nortel's professional advisers on the application. The application for the Advanced Pricing Agreement in respect of Canada and the UK was made by NNL and NNI jointly.

96.     By the time the RPSM was adopted, the Group had been consistently generating losses. Thus, the effect of the RPSM was that NNUK had to share in the Group's losses, even though it was not entitled to share in the Group's profits during the earlier years.

97.     Essentially, the RPSM divided Nortel entities into RPEs or limited risk entities ("**LREs**"). NNUK, NNL, NNI, NN France SA, NN Ireland and, originally, NN Australia, were designated as RPEs under the RPSM.

98.     The distinguishing feature of an RPE was that it performed R&D for the Group, together with other core sales, marketing, administrative, and operating functions. The LREs functioned primarily as sales operations, acting as intermediaries between the RPEs and customers in jurisdictions not served by the RPEs.

99.     Broadly speaking, the RPSM divided the participants' pooled profits into two groups: (i) routine profits based on direct earnings from sales to third parties and certain costs or capital items; and (ii) the "residual" profits or losses, which were attributed to Nortel's intangible development work such as R&D.

100.     Routine profits were distributed to both RPEs and LREs. LREs were provided with fixed returns on third party sales, while RPEs were provided with fixed returns on third party sales and in respect of certain costs, or, depending on the applicable period, certain capital items. Only RPEs were then eligible for the Group's residual profits/losses identified by the RPSM. These residual profits/losses were distributed among the RPEs in proportion to their R&D costs as a percentage of Group R&D expenditure. The more that an RPE spent on R&D, the greater the share of the identified profit or loss was allocated to it under the transfer pricing arrangements.

101.    Thus, in effect RPEs (such as NNUK) were obliged to bear entrepreneurial risk within the Group and to share in the residual losses (since the Group generated losses during the operation of the RPSM), whereas LREs did not share entrepreneurial risk or losses but were guaranteed fixed returns and profits on the sales activity that the Group allocated to them.

## PART 3: SALES OF NORTEL GROUP'S BUSINESSES

102.    Following the commencement of insolvency proceedings the Nortel Group engaged in a process of selling its assets.  The sales have been effected along business lines rather than along geographic or legal entity lines consistent with the global nature of the way in which the Nortel Group operated.

103.    These sales have generated approximately US$7.5 billion, which has been deposited in accounts in the United States managed by JPMorgan Chase Bank, N.A., as third-party escrow agent.

104.    The critical feature of these sales transactions – whether they were sales of the Group's "business segments" or portfolios of assets – is that there were, in each case, multiple sellers comprising the different Nortel Group estates. Each sale involved multiple sellers because, in each case, the assets subject to the sale were not simply owned by one or a few particular Nortel Group companies, but rather multiple members of the Nortel Group enterprise could lay claim to the proceeds of such sales because they were jointly owned and/or represented the product of their common endeavour in the years prior to the Nortel Group's insolvency.  For these reasons – because the business and assets of the Nortel Group were so co-mingled, the affairs of the Group so intertwined, and the Group so disregarded the separateness of corporate entities – the parties agreed to escrow the proceeds of the sales until their allocation could be determined.