IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
----------------------------------------------------------- x
                                       :
In re                                  :    Chapter 11
                                       :
Nortel Networks Inc., et al.,          :    Case No. 09-10138 (KG)
                                       :
                        Debtors.       :    (Jointly Administered)
                                       :
                                       :
----------------------------------------------------------- x
```

- and the -

### ONTARIO
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, C. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**OPENING ALLOCATION POSITION OF *AD HOC* GROUP OF BONDHOLDERS**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

RELEVANT BACKGROUND .....................................................................................................3

    A.   Sale Transactions .............................................................................................................3

    B.   Ad Hoc Group of Bondholders ......................................................................................5

BONDHOLDER GROUP POSITION ON ALLOCATION............................................................6

CONCLUSION...........................................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Adelphia Commc'ns Corp.*,
  No. 02-41729 (REG), (Bankr. S.D.N.Y. Jan. 3, 2007), ECF No. 12920 ................................8, 9

*In re Beardsley*,
  38 F. Supp. 799 (D. Md. 1941) ...................................................................................9

*In re Hetzel*,
  23 F. Supp. 530 (M.D. Pa. 1938) ...............................................................................10

*In re LTV Steel Co.*,
  285 B.R. 259 (Bankr. N.D. Ohio 2002) ....................................................................6, 9

*In re Mannington Pottery Co.*,
  104 F. Supp. 506 (N.D. W. Va. 1952) .......................................................................10

*In re Port City Construction Co.*,
  387 F. Supp. 237 (E.D. Ark. 1975) ...........................................................................7, 8

*In re Wesley Corp.*,
  18 F. Supp. 347 (D. Ky. 1937) ..................................................................................9

*In re Wilkes*,
  55 F.2d 224 (2d Cir. 1932) .......................................................................................9

*PricewaterhouseCoopers Inc. v. Olympia & York Realty Corp.*
  (2003), 68 O.R. (3d) 544 (C.A.) ...............................................................................7

STATUTES

11 U.S.C. § 506(a) ....................................................................................................9

DOCS_DE:187482.1 61026/001

TO THE HONORABLE KEVIN GROSS, UNITED STATES BANKRUPTCY CHIEF JUDGE
AND THE HONORABLE JUSTICE GEOFFREY B. MORAWETZ OF THE ONTARIO
SUPERIOR COURT OF JUSTICE:

The *ad hoc* group of bondholders (the "Bondholder Group") hereby delivers its

opening allocation submission to the United States Bankruptcy Court for the District of

Delaware (the "U.S. Court") and the Ontario Superior Court of Justice (Commercial List) (the

"Canadian Court" and, together with the U.S. Court, the "Courts"):

## PRELIMINARY STATEMENT

1.       The sole question to be answered by the Courts in this allocation dispute is

remarkably straightforward:  What are the respective legal entitlements of the three main Nortel

estates—the estates of the U.S., Canadian, and EMEA Debtors[1] (collectively, the "Nortel

Estates" of the "Nortel Debtors")—to the aggregate sale proceeds that were generated by the

joint sales of substantially all of the assets of each of those estates?

2.       The answer to that question is similarly clear-cut:  each estate is entitled to

receive the fair market value of the assets it sold and the rights it relinquished in those sales—*i.e.*,

the fair market value of the particular assets and rights that comprised that particular estate's

component of that particular sale transaction.  This approach is logical, principled, and capable

of reasonable and comprehensible application by the Courts, as valuation determinations are

certainly commonplace in both U.S. and Canadian court proceedings.

3.       This straightforward approach flows from basic facts and undeniable logic:  as a

participating seller in each major Nortel asset sale, each of the Nortel Estates sold certain of its

individual assets and/or relinquished certain of its individual rights as a component of a larger

overall transaction in which the individual assets and rights of multiple estates were packaged

---

[1]       Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the 2013
Allocation Protocol [D.I. 1013, Ex. A].

together and sold for a single, aggregate purchase price. The Courts are now being asked to determine how much of the *aggregate* sale proceeds each Nortel Estate is entitled to receive in exchange for the *individual* assets it sold and the *individual* rights it relinquished from their respective estates as components of the various sale transactions. The answer: the fair market value of the assets sold and rights relinquished.

4.    Ironically, the allocation dispute is the direct product of what was a very coordinated and pragmatic decision by the Nortel Estates to cooperate with each other in the sale of the various Nortel business lines and assets. Shortly after Nortel's commencement of global insolvency proceedings in January 2009, representatives of each of the Nortel Estates, cognizant of their fiduciary obligations to their respective estates and their respective creditors, agreed that the best way to maximize the value of each of their *individual* estates was to coordinate with one another to jointly sell *combinations* of those assets, organized by Nortel's then-existing lines of business (and later a collection of "residual" intellectual property) on an *aggregated*, enterprise-wide basis. This decision enabled each of the Nortel Estates to sell its assets without the risk of costly delays and intramural disputes.

5.    The *quid pro quo* for agreeing to participate in such coordinated, joint sales was that each of the Nortel Estates ultimately would receive that portion of the sale proceeds attributable to the assets sold (or, in the case of intellectual property licenses and similar rights, the rights being relinquished) by that particular estate in that particular transaction.

6.    Understanding that this ultimate allocation, *i.e.*, reconciling sale proceeds with specific assets sold/rights relinquished on an estate-by-estate basis, could take time and should not impede the sale transactions themselves, the Nortel Estates agreed—wisely—that this allocation would occur *after* the sale process had been completed.

7.      The sale process is now long completed, and the parties have been unable to agree on allocation.  Consequently, it is time for the Courts to determine, and the Nortel Estates to then actually receive, the amount of sale proceeds attributable to the fair market value of the assets they respectively sold in the sale transactions.  Any methodology other than fair market value would unfairly and impermissibly deprive at least one estate from realizing the full value of its own assets, while at the same time providing an improper windfall of excess value to at least one other estate.  Such a result clearly is not one that can be embraced by either of the Courts.

## RELEVANT BACKGROUND

### A.      Sale Transactions

8.      In early 2009, the Nortel Debtors and their representatives determined that the best way to maximize the value of each Nortel Estate would be to sell Nortel's various lines of business and material assets (the "Sale Transactions") on an enterprise-wide basis.  Subsequently, the Nortel Debtors and their representatives determined to follow the same enterprise-wide approach for the sale of Nortel's residual intellectual property (the "Nortel IP").  One potential roadblock to the multi-estate sales was the inability of the Nortel Debtors to agree to an allocation of the total proceeds received for the combined assets (the "Sale Proceeds") among the Debtors participating in the sale (the "Selling Debtors").  To avoid delaying the sales process, which could have reduced the proceeds ultimately realized, the Nortel Debtors agreed that the marketing and sale of the Nortel assets could and should proceed forthwith, despite the lack of agreement on allocation.  Allocation would be reserved for a later date.

9.      Consequently, on June 9, 2009, the U.S. Debtors, the Canadian Debtors, and the Joint Administrators entered into the Interim Funding and Settlement Agreement (the "IFSA"), *inter alia* permitting the sale of Nortel's assets on an enterprise-wide basis to proceed.  (*See*

3

IFSA [D.I. 874, Ex. B], § 12(a); *see also* Tr. of Hr'g, June 29, 2009, at 59:14-17 (referring to sale

of Nortel's carrier business with material assets in the United States, Canada, and elsewhere).)

Importantly, pursuant to the IFSA, no Nortel Debtor would be required to participate in any Sale

Transaction if that Debtor determined in good faith and in consultation with the other Selling

Debtors that the Sale Transaction would *not* be in the best economic interests of that particular

Debtor's creditors. (*Id.* at 12.e.)

10.     Pending determination of allocation among the Selling Debtors for any particular

Sale Transaction, the Sale Proceeds from that Sale Transaction would be deposited in an escrow

account for the benefit of those Selling Debtors. (*Id.* § 12.b.)[2]

11.     The IFSA, which was the result of protracted negotiations, was approved by the

U.S. Court and the Canadian Court on June 29 and 30, 2009, respectively. The UK

Administrators obtained a direction from the U.K. Court that the U.K. Administrators were at

liberty to enter into the IFSA on June 23, 2009.

12.     Beginning in November 2009, consistent with the terms of the IFSA, the Nortel

Estates, collectively, began a series of campaigns to market and sell the Nortel business lines and

assets. Over the next 20 months, the Nortel Debtors sold substantially all of their respective

businesses and material assets through a series of Sale Transactions. Each of the Sale

Transactions was the result of a vigorous, competitive, and often multi-round, bidding process.

This resulted in a highly successful sale process, generating approximately $7.5 billion in Sale

Proceeds.

13.     The reasonable expectation of the Debtors and their stakeholders, including the

Bondholder Group, in agreeing to work together to maximize the value received in the Sale

---

[2]     The proceeds from the sale of LG-Nortel, a joint venture between Nortel and the South Korean company
LG Electronics, are being held in a restricted account by the Monitor of the Canadian Estates.

4

Transactions was that the Sale Proceeds would be allocated among the various Selling Debtors in a manner that would accurately reflect the fair market value of the assets sold by each of the Nortel Estates in such combined sale, exactly as it would have been had each estate sold its assets and/or relinquished its rights separately.

**B.    Ad Hoc Group of Bondholders**

14.    The members of the Bondholder Group are parties holding bonds (the "Nortel Bonds") issued or guaranteed by certain of the Canadian and U.S. Debtors ("Bond Obligors") between 1988 and 2008.  The funds raised through issuance of the Nortel Bonds were used by Nortel to finance significant business functions, including funding for the businesses and intellectual property sold in the Sale Transactions.  As of January 14, 2009, the aggregate principal amount outstanding under the Nortel Bonds issued or guaranteed by the Bond Obligors was approximately $4.2 billion.  Because the Nortel bonds are obligations of both U.S. and Canadian Debtors, the bondholders are the largest single creditor group of each of the U.S. and Canadian Estates and have functioned as a key stakeholder of each estate throughout the Nortel insolvency proceedings.

15.    The significant economic stake of the Bondholder Group and the integral nature of the Bondholder Group's participation in these proceedings—and in particular in connection with the Sale Transactions and any subsequent allocation issues—was reflected and memorialized by the parties in the IFSA, which provides, *inter alia*, that neither the U.S. Debtors nor the Canadian Debtors may enter into any agreement or make any determination regarding the allocation of the Sale Proceeds without consent of the Bondholder Group.  (*See* IFSA §§ 12(g)(i)-(ii), 13(b).)  Among other things, these express rights resulted in the undisputed designation of the Bondholder Group as a Core Party in the allocation litigation.

16.     The Bondholder Group thus was an active and effective contributing participant in each of the Sale Transactions, continually consulting and conferring with the representatives of the Nortel Estates to ensure that the transactions were being pursued in a manner that would properly expose the assets to all relevant markets, create an open and competitive bidding process, and maximize value.

## BONDHOLDER GROUP POSITION ON ALLOCATION

17.     A lawful allocation of the Sale Proceeds must return to each of the Nortel Estates the value of the assets it sold, or rights it relinquished, in each Sale Transaction.  That is, "the goal is to determine the value of an individual asset as a portion of the whole sale" and then "allocate sale proceeds between individual assets based upon each asset's portion of the total value of all the assets."  *In re LTV Steel Co.*, 285 B.R. 259, 266-267 (Bankr. N.D. Ohio 2002).

18.     This allocation approach is well-reasoned and legally sound.  Each Sale Transaction reflected a decision by *each Selling Debtor* to sell a portion of *its* assets for the highest or otherwise best obtainable price, as a component of a larger overall transaction.  Each sale thus required agreement by representatives of *each* individual estate, in consideration of fiduciary duties to maximize the value of *their individual* estate for the benefit of *its* creditors. (*See generally* IFSA §12.e.)  This comports with a fundamental principle of the legal insolvency regimes in both the US and Canada:  the assets and liabilities of legally distinct entities are considered separately from one another and the value of the assets of each must be preserved for the stakeholders of each.

19.     Thus, the Sale Transactions were, as intended by the IFSA and required by applicable law, a series of active, self-interested decisions by *each* estate to maximize its *own*

6

return on the sale of its *own* assets and relinquishment of rights.[3]  Each estate is entitled to *no more* but *no less* than the fair market value of the total Sale Proceeds attributable to the assets *it* sold and the rights *it* relinquished.  Any contrary allocation would necessarily be improper, as value rightfully attributable to one estate based on the assets it sold through the Sale Transactions would be distributed unjustifiably as a windfall to another estate.

20.     Under Canadian insolvency law, any other approach to allocation would be contrary to the fundamental principle enshrined in the *Bankruptcy and Insolvency Act* (section 96) and the *Companies' Creditors Arrangement Act* (section 36.1) that a transfer of assets for less than fair market value can be declared void.  Canadian courts have confirmed that in reviewing transactions under these provisions, the court "must determine the fair market value of what the bankrupt gave up and the fair market value of what it received in the transactions." *PricewaterhouseCoopers Inc. v. Olympia & York Realty Corp.* (2003), 68 O.R. (3d) 544 (C.A.) at para. 18.  Therefore, proceeds rightfully attributable to one estate based on the fair market value of the assets it sold and/or rights it relinquished through the Sale Transactions must be allocated to that estate.

21.     Courts considering this issue, and issues analogous to it, uniformly agree.  For example, in *In re Port City Construction Co.*, 387 F. Supp. 237 (E.D. Ark. 1975), two estates subject to insolvency proceedings owned separate, but adjacent, parcels of real property, which were each subject to liens held by the appellant bank.  Each estate also had different general, unsecured creditors.  *Id.*  The two parcels were sold as a single, combined unit for $50,000.  *Id.*

---

[3]     Indeed, if the U.S. and Canadian Estates had determined instead that they could maximize value for themselves and their creditors through independent, one-off sales of their assets, the Nortel Estates not only would have carried on accordingly, but they arguably would have been *required* to in accordance with their respective fiduciary duties and the requirements of applicable bankruptcy law.

7

As with the Nortel combined sales, the proper allocation of the purchase price between the estates became an issue for litigation. *Id.*

22.    The bankruptcy court rejected the appellant bank's argument that allocation should have been based on the remaining balance on each estate's respective lien, determining that such an allocation "had no reasonable relation to the value of the respective parcels" and "would ignore the rights of the unsecured creditors of the bankrupts to the equity over the amount of the respective liens." *Id.* Instead, the court ordered that the sale proceeds be allocated between the estates *in proportion to the relative value of the assets purchased through the bulk sale. Id.* The value of the assets was determined by separate appraisals of the constituent parcels—$39,000 and $28,000, or 58.2% and 41.8%, respectively, of the total value sold. The court then applied these percentages to the total sale proceeds to determine the proper allocation of sale proceeds between the two estates. The appellate court affirmed the bankruptcy court's allocation over the appellant bank's objection. *Id.*

23.    Judge Robert E. Gerber of the United States Bankruptcy Court for the Southern District of New York was presented with a similar allocation question in connection with the bankruptcy of former U.S. cable/telecom giant, Adelphia Communications Corp. (*See* Bench Decision On Confirmation, *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), (Bankr. S.D.N.Y. Jan. 3, 2007), ECF No. 12920.) In 2002, the entire Adelphia enterprise, including over 200 of its subsidiary entities, went into bankruptcy. In connection with the Adelphia bankruptcy, Judge Gerber approved a sale under section 363 of the U.S. Bankruptcy Code of substantially all of Adelphia's assets—sold in four aggregate parts to maximize value—that generated approximately $17.6 billion in sale proceeds. (*See generally id.* at 130-134.)

8

24.     As is the case here, the question facing Judge Gerber was how to allocate the sale proceeds among various debtor groups (four debtor groups were established according to their respective ownership interests in the aggregate parts sold).  Five different parties submitted allocation proposals, each supported by expert opinion.  (*Id.*)

25.     Tellingly, *every single proposal* was premised on the return of proceeds to each of the debtor groups according to the value that the assets sold by each debtor group contributed to the total assets sold.  (*Id.*)  The Court ultimately did not have to choose from among the allocation proposals because the allocation dispute was settled before it got to trial.  Nonetheless, Judge Gerber appears to have agreed with the valuation-based approaches advocated by the parties, noting that "I could accept any one of the proffered methodologies."  (*Id.* at 134.)

26.     Several other courts have also directed the allocation of sale proceeds following a combined sale of debtor assets in a similar fashion.[4]  *See In re LTV Steel Co.*, 285 B.R. at 267-68 ("Courts allocate sale proceeds between individual assets based upon each asset's portion of the total value of all the assets." (decided in the § 506(a) context)[5]); *see also In re Wilkes*, 55 F.2d 224, 225 (2d Cir. 1932) (allocating proceeds based upon relative value of individual assets); *In re Wesley Corp.*, 18 F. Supp. 347, 350-51 (D. Ky. 1937) (overruling allocation methodology adopted in bankruptcy proceedings that allowed for payment of secured creditors in full without relation to relative value of those creditors' interests in sale proceeds); *In re Beardsley*, 38 F.

---

[4]     Cases determining allocation of sale proceeds resulting from a consolidated sale of estate assets to secured creditors pursuant to U.S. Bankruptcy Code § 506(a) are instructive.  Courts have used § 506(a) to allocate such sale proceeds to secured creditors based on the value of each creditor's interest (*i.e.*, the collateral securing the creditor's claim) in relation to the total value of all the assets sold.  *See, e.g., In re LTV Steel Co.*, 285 B.R. at 268.  The principles underlying § 506(a) apply equally here.  Indeed, several of the cases basing allocation on § 506(a) cite to decisions not involving § 506(a), but reflect the same predisposition to allocate sale proceeds in accordance with the relative values contributed.  *See, e.g., id.* at 266-68 (collecting and citing cases).

[5]     Although the court in *LTV Steel Co.* directed a value-based allocation pursuant to the specifications of a prior agreement between the parties, the court's discussion of the principles underlying an equitable allocation of proceeds resulting from a bulk sale of assets has broader application.  Indeed, the court cited a litany of analogous cases—none of which involved a similar agreement by the parties—as direct support for its allocation methodology.  *See In re LTV Steel Co.*, 285 B.R. at 266-68.

9

Supp. 799, 802-03 (D. Md. 1941) (allocating sale proceeds "between the realty and the personalty on the basis of the respective appraised values"); *In re Hetzel*, 23 F. Supp. 530 (M.D. Pa. 1938) (allocating sale proceeds based on appraised value of properties sold); *In re Mannington Pottery Co.*, 104 F. Supp. 506, 519-20 (N.D. W. Va. 1952) (allocating value based on "appraisement of the various parcels of real and personal property of the bankrupt.").

## CONCLUSION

27.     Contrary to public reporting during the mediation process, the allocation dispute is a dispute among the Nortel Estates and not individual creditors.  The question before these Courts in the allocation dispute is not what individual creditors of estates are entitled to from their particular debtor(s), nor is it what claims one Nortel Estate may have against another. Similarly, it is not a question of what assets or liabilities an estate may have *outside* of an estate's entitlement to proceeds of the Sales Transactions.  These questions simply have nothing to do with an appropriate determination by the Courts of an allocation of the proceeds of the Sales Transactions among the Nortel Estates.

28.     As stated above, the determination to be made by these Courts in this allocation dispute is what amount of the sale proceeds from each Sale Transaction should go to the individual Nortel Estates.

29.     Simply put, the Courts should allocate the Sale Proceeds in a manner that returns to each estate the fair market value of the assets it sold through the Sale Transactions.  The Bondholder Group submits that this approach presents the most well-reasoned and legally supportable method for allocating the Sale Proceeds and should be adopted by the Courts.

        WHEREFORE, for the foregoing reasons, the Bondholder Group requests that the US and Canadian Courts (i) allocate the asset sale proceeds by determining the fair market value

of each Selling Debtor's share of assets, rights and property it sold or relinquished in the Sale

Transactions; and (ii) grant such other and further relief as the Courts deem just and proper.

Dated: May 16, 2013

PACHULSKI STANG ZIEHL & JONES LLP

_(signature)_

Laura Davis Jones (No. 2436)
Kathleen P. Makowski (No. 3648)
919 N. Market Street, 17th Floor
PO Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

-and-

MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP
Dennis F. Dunne
Albert A. Pisa
Andrew M. Leblanc
Thomas J. Matz
1 Chase Manhattan Plaza
New York, New York 10005-1413
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

-and-

Thomas R. Kreller
601 S. Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone: (213) 892-4463
Facsimile: (213) 629-5063

-and-

BENNETT JONES LLP
Richard B. Swan
Gavin H. Finlayson
3400 One First Canadian Place, P.O. Box 130
Toronto, Ontario, M5X 1A4
Telephone:  (416) 777-5762
Facsimile:  (416) 863-1716

*Attorneys for Ad Hoc Group of Bondholders*

11