UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                               :

In re                                   :    Chapter 11
                                             :

ADELPHIA COMMUNICATIONS CORP.,    :    Case No. 02-41729 (REG)
et al.,                                :    Jointly Administered
                                           :

                         Debtors.         :
------------------------------------------------------------x


BENCH DECISION ON CONFIRMATION[1]


WILLKIE FARR & GALLAGHER LLP
Counsel for Debtors and Debtors in Possession
787 Seventh Avenue
New York, NY 10019-6099
By:    Myron Trepper, Esq.
        Roger D. Netzer, Esq.
        Paul V. Shalhoub, Esq.
        Marc Abrams, Esq.
        Brian E. O'Connor, Esq.
        Terence K. McLaughlin, Esq.
        Rachel Strickland, Esq.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Counsel for the Official Committee of Unsecured Creditors
1633 Broadway
New York, NY  10019
By:    David M. Friedman, Esq.
        Adam L. Shiff, Esq.
        Howard W. Schub, Esq.

---

[1]    I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where the circumstances do not permit more leisurely drafting or more extensive or polished discussion. Because they often start as scripts for decisions to be dictated in open court, they typically have fewer citations and other footnotes, and have a more conversational tone.

Subject to cite checking, technical corrections, and, if circumstances require or permit, supplementation.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
Counsel for the Official Committee of Unsecured Creditors
2121 Avenue of the Stars, 33rd Fl
Los Angeles, CA 90067
By:    Edward T. Attanasio, Esq.

MORGENSTERN JACOBS & BLUE LLC
Counsel for Official Committee of Equity Security Holders
885 Third Avenue
New York, NY  10022
By:    Gregory A. Blue, Esq.
        Eric B. Fisher, Esq.

WEIL, GOTSHAL & MANGES LLP
Counsel for the ACC Bondholder Group
  767 Fifth Avenue
New York, NY  10153
By:    Martin J. Bienenstock, Esq.
        Vernon S. Broderick, Esq.
        Richard W. Slack, Esq.
        Adam P. Strochak, Esq.
        Eleanor Heard Gilbane, Esq.

700 Louisiana, Suite 1600
Houston, Texas 77002
By:    Melanie Gray, Esq.
        Bruce Lucas, Esq.
        James T. Grogan, III, Esq.

STUTMAN, TREISTER & GLATT, P.C.
Co-Counsel for the ACC Bondholder Group
1901 Avenue of the Stars, 12 Floor
Los Angeles, CA 90067
By:    Isaac Pachulski, Esq.

SHEPPARD MULLIN RICHTER & HAMPTON LLP
Counsel for U.S. Bank National Association, as Indenture Trustee in Respect of the
Arahova Notes
333 South Hope Street, 48th Floor
Los Angeles, CA 90071
By:    David J. McCarty,  Esq.

SEWARD & KISSEL LLP
Counsel for Law Debenture Trust Company of New York, as ACC Senior Notes Trustee
One Battery Park Plaza
New York, NY 10004
By:      Arlene R. Alves, Esq.

WHITE & CASE LLP
Counsel for the Ad Hoc Committee of Arahova Noteholders
1155 Avenue of the Americas
New York, NY 10036-2787
By:      J. Christopher Shore, Esq.

FRIED FRANK HARRIS SHRIVER & JACOBSON LLP
Counsel for W.R. Huff Asset Management Co., L.L.C.
One New York Plaza
New York, NY 10004-1980
By:      Gary Kaplan, Esq.

HAYNES AND BOONE, LLP
Counsel for Bank of America, N.A., as Administrative Agent for the Century Cable
Lenders
153 East 53rd Street, Suite 4900
New York, NY  10022
By:      Robin E. Phelan, Esq.
         Judith Elkin, Esq.

BRACEWELL & GIULIANI, LLP
Counsel for the Ad Hoc Committee of Non-Agent TCI and Parnassos Lenders
1177 Avenue of the Americas
New York, NY 10036
By:      Jennifer Feldcher, Esq.

SIMPSON THACHER & BARTLETT LLP
Counsel for Wachovia Bank, N.A., as Administrative Agent for the UCA Lenders
425 Lexington Avenue
New York, NY 10017
By:      Peter Pantaleo, Esq.
         Elisha D. Graff, Esq.

GOODWIN PROCTER LLP
Counsel for Highfields Capital Management and Tudor Investment Corporation
901 New York Avenue
Washington, D.C. 20001
By:    Michael K. Isenman, Esq.

53 State Street, Exchange Place
Boston, MA 02109
By:    Gina Lynn Martin, Esq.

599 Lexington Avenue
New York, NY 10022
By:    Allan S. Brilliant, Esq.

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB P.C. LLP
Counsel for Ad Hoc Bondholders' Committee (a/k/a Committee II)
780 Third Avenue, 36th Floor
New York, NY 10017
By:    Dean Ziehl, Esq.

10100 Santa Monica Boulevard, 11th Floor
Los Angeles, California 90067
By:    Richard Pachulski, Esq.

CLIFFORD CHANCE US LLP
Counsel for Calyon New York Branch
31 West 52nd Street
New York, NY 10019
By:    Andrew Brozman, Esq.
        James Moyle, Esq.

CLIFFORD CHANCE US LLP
Counsel for Bank of NY.
31 West 52nd Street
New York, NY 10019
By:    Angelique Shingler, Esq.

CADWALADER WICKERSHAM & TAFT LLP
Counsel for Perry Capital, LLC
One World Financial Center
New York, NY 10281
By:    Kathryn L. Turner, Esq.

SIDLEY AUSTIN LLP
Counsel for the Fort Myers Noteholders
787 Seventh Avenue
New York, NY 10019
By:    Lee S. Attanasio, Esq.

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
Counsel for the Class Action Plaintiffs
460 Park Avenue, 8th Floor
New York, NY 10022
By:    John H. Drucker, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Counsel for the FrontierVision Ad Hoc Committee
1177 Avenue of the Americas
New York, NY 10036
By:    Kenneth H. Eckstein, Esq.
       Jeffrey S. Trachtman, Esq.

MILBANK, TWEED, HADLEY & MC CLOY LLP
Counsel for JPMorgan Chase Bank
One Chase Manhattan Plaza
New York, NY 10005
By:    James C. Tecce, Esq.

KIRKLAND & ELLIS LLP
Counsel for Ad Hoc Committee of Lenders
777 South Figueroa Street
Los Angeles, CA 90017
By:    Richard L. Wynne, Esq.
       Michael I. Gottfried, Esq.

CLEARY, GOTTLIEB, STEEN & HAMILTON
Counsel for Certain Investment Banks
One Liberty Plaza
New York, NY 10006
By:    Lindsee P. Granfield, Esq.
       Luke A Barefoot, Esq.
       Jane Kim, Esq.

SATTERLEE, STEPHENS, BURKE & BURKE, LLP
Counsel for Prestige Communications
230 Park Avenue
New York, NY 10169
By:    Christopher R. Belmonte, Esq.

SHEARMAN & STERLING, LLP
Counsel for Rembrandt Technologies, L.P.
 599 Lexington Avenue
New York, NY 10022
By:    Marc B. Hankin, Esq.

KLEINBERG, KAPLAN, WOLFF & COHEN, PC
Counsel for Elliot Associates, LP and John Pike
551 Fifth Avenue
New York, NY 10176
By:    David Parker, Esq.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
3 World Financial Center
New York, NY 10281
By:    Patricia Schrage, Esq.

KELLEY, DRYE& WARREN, LLP
Counsel for Wilmington Trust Co.
200 Kimball Drive
Parsippany, NJ 07054
By:    Geoffrey W. Costello, Esq.

DORSEY & WHITNEY, LLP
Counsel for U.S. Bank, N.A., as Indenture Trustee
50 South Sixth Street
Minneapolis, Minnesota 55402
By:    Katherine A. Constantine, Esq.

WILMER, CUTLER, PICKERING, HALE & DORR, LLP
Counsel for  Credit Suisse and Royal Bank of Scotland
300 Park Avenue
New York, NY 10022
By:    Joel Millar, Esq.

LUSKIN, TERN & EISLER, LLP
Counsel for The Bank of Nova Scotia
330 Madison Avenue
New York, NY 10017
By:    Michael Luskin, Esq.

FARRELL FRITZ, P.C.
Counsel for Associated Electric & Gas
1320 Reckson Plaza
Uniondale, NY 11556
By:     Louis A. Scarcella, Esq.

BROWN RUDNICK BERLACK ISRAELS, LLP
Counsel for the Ad Hoc Trade Claims Committee
Seven Times Square
New York, NY 10036
By:     Steven D. Pohl, Esq.

BAKER BOTTS, LLP
Counsel for Verizon Media Ventures
2001 Ross Avenue
Dallas, TX 75201
By:     Eric Soderlund, Esq.

OFFICE OF THE UNITED STATES TRUSTEE
33 Whitehall Street, Sutie 2100
New York, NY 10004
By:     Tracey Hope Davis, Esq.


BEFORE:                    ROBERT E. GERBER
                           UNITED STATES BANKRUPTCY JUDGE

## TABLE OF CONTENTS

Bench Decision on Confirmation…………………………………………………………1

Findings of Fact .......................................................................................... 3

  A.  Background ........................................................................... 3

  B.  New Leadership.................................................................... 6

  C.  Restatement Of Debtor Books And Records........................... 6

  D.  The "Bank of Adelphia Paradigm" ....................................... 9

  E.  The Sale of the Company ................................................... 12

  F.  The May 2005 Schedules................................................... 15

  G.  Origins of the MIA ............................................................ 17

  H.  The November 2005 Plan .................................................. 22

  I.  The Arahova Motions........................................................ 24

  J.  Litigation of the MIA ........................................................ 27

  K.  The Phase I Decision......................................................... 29

  L.  The First Plan Settlement Proposal ..................................... 33

  M.  Appointment of the Monitor............................................... 40

  N.  The 363 Sale And Joint Venture Plan ................................. 42

  O.  The Beginnings of Agreement ............................................ 44

  P.  The Agreement of Tudor And Highfields .............................. 46

  Q.  Closing of the Time Warner/Comcast Sale........................... 53

  R.  Further Agreement ............................................................ 53

  S.  Effort To Terminate Exclusivity......................................... 54

  T.  Still More Agreement ........................................................ 56

  U.  Designation Motions.......................................................... 57

  V.  Valuation of TWC Stock.................................................... 58

  W.  Costs of IPO .................................................................... 61

  X.  The Opponents' Expert ..................................................... 62

  Y.  Canvassing of MIA Issues ................................................. 66

    1.  Phase II Matters (Intercompany Obligations)..................... 67

      a) "CCHC Recap" (Recapitalization of Century Cable Holdings Corp) (Issue 3) 70

        1.  Arahova Noteholders Committee's Contentions ......................... 71

        2.  ACC Bondholder Group's Contentions..................................... 72

        3  My Observations ................................................................. 73

      b) "The Arahova Receivable" (Arahova Communications  $1.44 billion payable

      under the Bank of Adelphia Paradigm) (Issue 13).............................. 75

        1.  ACC Bondholder Group's Arguments ...................................... 75

        2.  Arahova Noteholders Committee's Arguments.......................... 76

        3.  My Observations ................................................................. 77

      c) "The AIH Receivable" ($16.8 billion receivable from ACC Investment

      Holdings, Inc. (Issue 12)............................................................. 79

        1.  Recharacterization.............................................................. 80

        (a) ACC Bondholder Group's Arguments ................................... 80

        (b) Arahova Noteholders Committee's Arguments ....................... 82

        (c)  My Observations ........................................................... 84

        2.  Equitable Subordination...................................................... 85

(a) ACC Bondholder Group's Arguments ....................................................... 85
(b) Arahova Noteholders Committee's Arguments ......................................... 86
(c) My Observations ..................................................................................... 86
d) "CCC Payable" (Century Communications Corp. $717 million payable under
Bank of Adelphia Paradigm) (Issue 14) .......................................................... 87
   1. ACC Bondholder Group's Contentions .................................................... 89
   2. Arahova Noteholders Committee's Contentions ..................................... 89
   3. My Observations ...................................................................................... 90
e) Acquisition Accounting, In General (Intercompany Issues 1, 2) .................... 90
   1. Arahova Noteholders Committee's Contentions ...................................... 92
   2. ACC Bondholder Group's General Contentions ....................................... 94
   3. My Observations ...................................................................................... 96
f) Cleveland Cablevision Acquisition (Intercompany Issue 1) ........................... 96
   1. Arahova Noteholder Committee's Arguments ......................................... 98
   2. ACC Bondholder Group's Arguments ...................................................... 99
   3. My Observations .................................................................................... 101
g) Prestige Acquisition (Intercompany Issue 2) ............................................... 101
   1. ACC Bondholder Group's Arguments .................................................... 103
   2. Arahova Noteholders Committee's Arguments ...................................... 104
   3. My Observations .................................................................................... 106
h) "Historic Entries" (Intercompany Issue 9) .................................................. 106
   1. Arahova Noteholder Committee's Contentions ...................................... 107
   2. ACC Bondholder Group's Contentions .................................................. 107
   3. My Observations .................................................................................... 108
i) Payment of Dividends (Intercompany Issues 4 and 5) ................................... 109
   1. ACC Bondholder Group's Contentions .................................................. 111
   2 Arahova Noteholders Committee's Contentions ...................................... 112
   3. My Observations .................................................................................... 112
j) Reclassification of Co-Borrowing Debt (Intercompany Issue 6) .................... 113
   1. Arahova Noteholders Committee's Contentions ..................................... 115
   2. ACC Bondholder Group's Contentions .................................................. 116
   3. My Observations .................................................................................... 116
k) Interest, Loan Placement, and Management Fees  (Intercompany Issues 7
and 8) .......................................................................................................... 118
   1.    ACC Bondholder Group's Contentions ............................................... 119
   2.    The Arahova Noteholders Committee's Arguments ............................ 120
   3. My Observations .................................................................................... 122
l) "XO Centers" (XO Center or XO Transaction Entries) (Issue 10) ................ 122
m) "Netting" (Netting Intercompany Claims) (Issue 11) .................................. 123
2. Phase III Matters (Fraudulent Conveyances) .................................................. 124
   1. Arahova Noteholders Committee's Contentions ...................................... 124
   2. ACC Bondholder Group's Contentions .................................................. 127
   3. My Observations .................................................................................... 129
3. Phase IV Matters (Allocation Matters) ............................................................ 130
a) Allocation of Sale Proceeds ......................................................................... 130
   1. Arahova Noteholders Committee's Contentions ...................................... 131

2. ACC Bondholder Group's Contentions .................................................... 132
3. FrontierVision Committee's Contentions ................................................ 132
4. Ft. Myers Noteholders' Contentions ....................................................... 133
4. Equity Committee's Contentions ............................................................. 134
5. My Observations ..................................................................................... 134
b) Allocation of Benefits and Burdens of DoJ/SEC Settlement ........................ 134
1. ACC Bondholder Group's Contentions ................................................... 135
2. Plan Proponents'/Arahova Noteholders Committee's Contentions .......... 135
3. My Observations ..................................................................................... 135
4. Phase V Matters (Substantive Consolidation) ............................................. 136
Z. The Waterfall Analyses ..................................................................................... 137
AA. The Negotiation Process. ................................................................................. 143
BB. Ultimate Facts .................................................................................................. 144
Discussion ................................................................................................................... 145
I. Propriety of Settlement ........................................................................................ 148
A. Standards for Approval of Settlement .............................................................. 148
B. Can the Court Use the Knowledge It Acquired? .............................................. 152
C. Assent to Settlement ........................................................................................ 160
D. Merits of Controversy As Affecting    Recoveries & Reasonableness ................ 166
E. Settlement Analysis .......................................................................................... 172
1. Likelihood of Success ............................................................................... 173
2. Complexity, Expense, and Likely Duration of Litigation .......................... 179
3. Arms Length Bargaining .......................................................................... 181
4. Other Settlement Approval Factors .......................................................... 182
a) Benefits of Settlement v. Likely Rewards of Litigation (Factor #1) Prospect Of
Complex And Protracted Litigations If The Settlement Is Not Approved (Factor
#2) ................................................................................................................... 183
b) Proportion of "Class Members" Who Support or Do Not Object ................. 183
c) Competency And Experience Of Counsel Who Support The Settlement .... 185
d) Relative Benefits to be Received by Individuals or Groups Within the Class
........................................................................................................................ 186
e) Nature and Breadth of Releases to be Obtained by Officers and Directors as a
Result of the Settlement ................................................................................. 186
f) Extent to Which the Settlements is Truly the Product of Arms-Length
Bargaining, and Not of Fraud or Collusion ................................................... 187
5. Settlement Analysis Conclusion ............................................................... 187
II. Classification ......................................................................................................... 187
III. Good Faith ............................................................................................................ 190
IV. Unfair Discrimination .......................................................................................... 192
V. Best Interests of Creditors .................................................................................... 196
IPO Costs ............................................................................................................... 199
Administrative costs of chapter 7 trustee and professionals ................................. 201
Familiarity with business ...................................................................................... 202
Delay in receiving distributions ............................................................................ 203
Other Issues ........................................................................................................... 204
VI. Possible Payment More Than In Full ................................................................... 208

VII.  Classes Where No Creditor Voted ........................................................................ 211
VIII.  Exculpation and Releases ................................................................................... 217
IX.  Fees ...................................................................................................................... 228
X.  Forfeited Rigas Sub Debt ...................................................................................... 232
XI.  Equity Committee Objection ................................................................................. 232
XII.  Calyon Issues ....................................................................................................... 240
XIII.  Stay Under FRBP 3020 and 8005 ....................................................................... 250
Conclusion .................................................................................................................... 255

In this contested matter in the jointly administered chapter 11 cases of Adelphia

Communications Corporation and its subsidiaries (the "Debtors"), I have before me, for

confirmation, the First Modified Fifth Amended Joint Chapter 11 Plan (the "Plan")—a

much-revised plan of reorganization for all of the 230-odd Debtors in these cases—now

jointly proposed by the Debtors and the Official Committee of Unsecured Creditors (the

"Creditors Committee"), and bank lender agents Wachovia, the Bank of Montreal, and

the Bank of America (collectively, the "Plan Proponents").  The Plan would distribute the

approximately $15 billion in value remaining after the Debtors' $17.6 billion sale of the

Company this summer to Time Warner and Comcast, and after the distribution of the first

$2.6 billion in value under an earlier confirmed plan for joint venture debtors in the

Adelphia chapter 11 cases.

After 4-1/2 years in chapter 11 in a case that has been among the most

challenging—and contentious—in bankruptcy history (and after seven predecessor plans

that made one creditor constituency or another–and in some cases nearly everybody—

extremely unhappy),[2] the Plan now has overwhelming support.  It has satisfied the

Bankruptcy Code's assent thresholds for all 30 of the 30 impaired classes that were

entitled to, and did, vote on the Plan,[3] holding approximately $10.7 billion of the

Debtors' $12.7 billion total in debt.  But the Plan nevertheless has been faced with

---

[2]     Predecessor plans for all or the bulk of the Debtors in these cases were filed on February 25, 2004, ECF #3910 ("First Plan"); February 24, 2005, ECF #6960 ( "First Amended Plan"); June 25, 2005, ECF #7847 ("Second Amended Plan"); September 28, 2005, ECF #8599 ("Third Amended Plan"); November 21, 2005, ECF #8973 ("Fourth Amended Plan"); April 12, 2006, ECF #10410 ("Modified Fourth Amended Plan"); and August 18, 2006, ECF #11824 ("Fifth Amended Plan.") The Modified Fourth Amended Plan was itself further amended in various respects.

A split-off plan for the Century-TCI and Parnassos Debtors (the "JV Plan") was filed on June 6, 2006, and confirmed on June 29, 2006.

[3]     There were 6 small classes, with aggregate claims entitled to vote of less than $50,000, in which no creditors voted, one way or the other.  Issues arising from that are discussed below.

objections to confirmation—including not just the usual, relatively minor, confirmation objections that normally accompany any chapter 11 plan (and are easily resolved, either by negotiation or judicial determination), but also extremely bitter objections by creditors who were outvoted in the balloting on the plan.

Significantly—as this underlies much of the Plan's support, and the vociferous objection to it—the Plan has as its cornerstone a settlement, described more fully below (the "Settlement"), of intercreditor disputes that have plagued the Adelphia cases for years (and that, if not settled, would continue to do so), and that came very close to torpedoing the Time Warner/Comcast sale.

Principally by reason of the settlement of the interdebtor disputes, the Plan has been vigorously opposed by a group of holders of Senior Notes of ACC (the "ACC Bondholder Group") who vociferously oppose the Settlement. They argue that notwithstanding the overwhelming support for the Plan (including within their own class and the six other classes of ACC creditors and equity holders), the Plan is unconfirmable.

Some minor aspects of the ACC Bondholder Group's objections have merit (or did until they were cured),[4] but the great bulk of them do not. And those that lack merit include, most significantly, the objections to the Settlement, which I have reviewed with considerable care to ensure that it passes muster for reasonableness. Significantly, as relevant to the remaining objections that do have merit (which are minor, in the scheme of things, and which will not require resolicitation of the Plan), the Plan provides for automatic corrections, as the impermissible provisions apply only to the extent permissible under law, or are trumped by an order of the Court directing otherwise. As I

---

[4]     Other objections were filed that are not discussed in this decision, a number of which had merit. But the Plan Proponents made Plan revisions to satisfy or make moot those objectors' concerns.

am now telling the parties how I will address those matters (as discussed below), the Plan will be confirmed.

The following are my Findings of Fact and Conclusions of Law in connection with this determination.

## Findings of Fact

Under my Case Management Order # 3, testimony is taken by affidavit or declaration, and cross-examination and any subsequent testimony is taken live. After a nine-day evidentiary hearing, at which the declarants were cross-examined, I find most, but not all, of the testimony worthy of reliance, and where I have not found testimony credible (or, in the case of expert testimony, persuasive), I will so note. Without getting into all of the detail that characterizes the record on this matter,[5] I summarize my factual findings, and my conclusions based upon them, below.

### A. Background

Adelphia, until the sale of nearly all of its operations to Time Warner and Comcast, was the fifth largest operator of cable systems in the United States. It provided residential customers with analog and digital video services, high-speed Internet access, and other advanced services over its broadband networks. It was founded by John J. Rigas, who later brought his sons and other members of his family into the business. Over the years, Adelphia grew substantially, principally as a result of acquisitions, many of which were financed by borrowings. With the acquisitions, Adelphia became much

---

[5]     The confirmation hearing went on for most of nine days; the transcript of the hearing has 16 volumes. These are in addition to the record of the underlying dispute that is the subject of the Settlement, which went on for 20 days. The principal briefs in opposition to and in support of confirmation exceeded 100 pages each, and the briefs discussing the Settlement issues each exceeded an additional 100 pages each. To the extent practical (and especially with respect to the mind-numbing detail of the inter-debtor dispute issues), this discussion will be shorter. But it nevertheless will be lengthy.

larger, and its operations became much more complex.  The Rigases themselves owned a number of cable companies and other, non-cable assets, through a variety of corporations, partnerships, and LLCs (the "Rigas Family Entities").  The day-to-day affairs of the Rigas Family Entities that were cable companies (the "Managed Entities") were managed by Adelphia.[6]  By 2002, John Rigas and members of his family occupied the top officer positions at Adelphia, and many (but not all) of the seats on the board of directors of ACC (the "Board").[7]

In March 2002, the Debtors disclosed that they were jointly and severally liable for more than $2 billion of borrowings attributed to certain of the Managed Entities under credit facilities (the "Co-Borrowing Facilities") that were not reflected as debt on the Debtors' consolidated financial statements.  It also appeared that a portion of the borrowings for which Adelphia entities were jointly and severally liable had been advanced to various Rigas Family Entities to finance purchases of Adelphia securities.  In the aftermath of this disclosure, the stock of ACC was delisted from the NASDAQ National Market; Deloitte & Touche LLP, the Debtors' independent auditor at that time, suspended its auditing work on Adelphia's consolidated financial statements for the year that ended December 31, 2001, and withdrew its opinion for prior consolidated financial statements; and, ultimately, the Debtors defaulted under all six credit facilities and all of the indentures to which they were a party.

---

[6]      As used here, "Adelphia" refers to enterprise as a whole and "ACC" refers to Adelphia Communications Corporation, the parent company.

[7]      *See In re Adelphia Communications Corp.*, 336 B.R. 610, 621 (Bankr. S.D.N.Y.), *aff'd* 342 B.R. 122 (S.D.N.Y. 2006) (Scheindlin, D.J.) (the "*Arahova Trustee Motion Decision*").  These findings are also supported by the testimony at the confirmation hearing of Adelphia CFO Vanessa Wittman.

In the Spring of 2002, a special committee of the Board, comprised of three members of the Board who were not members of the Rigas Family, commenced a formal investigation into related party transactions between Adelphia entities and members and the Rigas Family Entities.  This investigation led to the public disclosure of previously undisclosed information about the Rigas Family's co-borrowing activities, related party transactions, and involvement in accounting irregularities.  In May 2002, the Rigases resigned their positions as officers and directors of Adelphia.  After the Rigases' resignation, only four directors, unaffiliated with the Rigases (the "Carry-Over Directors") remained on the ACC Board, who managed Adelphia, to the extent anyone could, until new directors and officers came on board.

With no access to traditional sources of liquidity in the capital markets, pending governmental agency investigations, mounting litigation, default notifications under various credit instruments, and the resulting risk of collection and foreclosure actions by creditors, substantially all of the Debtors filed for chapter 11 protection in June 2002.

In July 2002, the United States Trustee for the Southern District of New York (the "UST") appointed the Creditors Committee, as a fiduciary to represent the interests of the unsecured creditors of the Debtors.  The membership of the Creditors Committee changed over the course of time, as creditors sold their claims, and others acquired claims as an investment.  The current members of the Creditors Committee are:  W.R. Huff Asset Management Co., LLC; Appaloosa Management; Law Debenture Trust Debtors of New York, as Indenture Trustee; Sierra Liquidity Fund, LLC; U.S. Bank National Association, as Indenture Trustee; Tudor Investment Corporation; Wilmington Trust, as Indenture Trustee; Highfields Capital Management; and Dune Capital Management LP.

When it looked like there might also be sufficient value in the estate to provide recoveries to equity holders, the UST also appointed an Equity Committee, as a fiduciary to protect equity holder interests.

## B. New Leadership

During the first year of these cases, the Company was led by interim management that lacked significant cable experience. By necessity, interim management focused on stabilizing operations, identifying and hiring an experienced successor management team, commencing the process of creating state-of-the-art corporate governance structures, and conducting a thorough investigation of Rigas Family conduct and transactions.

From August 2002 through July 2003, the Carry-Over Directors began to reconstitute the Board with new independent directors. In addition, the Company appointed a new slate of directors to each subsidiary board. When interim management was replaced in the spring of 2003, the subsidiary management and boards were reconstituted yet again.

In early 2003, the Company (with extensive input from the Creditors Committee) replaced interim management with a slate of senior executives who had substantial cable experience. Thus, it was only in the second year of these cases, once new management was in place and the majority of the Debtors' boards was reconstituted, that the Company and its advisors were able to turn their attention to the Company's restructuring.

## C. Restatement Of Debtor Books And Records

In light of the fiscal mismanagement and fraud on the part of the Rigases that had been discovered up to that point, the Debtors initiated investigations and engaged accountants with forensic accounting skills. After the filing of their chapter 11 cases, the Debtors' accounting personnel initiated an analysis, review, and in certain cases,

6

reconstruction of Adelphia's historical books and records (the "Restatement").  This

process included:

> (a)    an attempt to re-audit and restate financial statements for
> 1999 and 2000;
>
> (b)    the preparation of financial statements for 2001, 2002 and
> 2003; and
>
> (c)    the review of over 7 million lines of intercompany
> transactions (the "Intercompany Transactions").

The Restatement was a massive undertaking that was critical to the reorganization

effort that was about to begin.  By ensuring that the Debtors' financial records and

statements would be presented in accordance with generally accepted accounting

principles ("GAAP"), the Debtors could obtain an audit opinion from

PricewaterhouseCoopers LLP ("PwC"), the Debtors' new independent accountants.

Audited financials were required by Time Warner and Comcast and would have been

required by the SEC if the Debtors were to emerge as stand-alone companies.

Although the Debtors intended initially to prepare separate audited financials for

each subsidiary Debtor that was a reporting Debtor under the '34 Act and similar

securities laws (each, a "Subsidiary Reporting Debtor"), after significant effort, it became

apparent that the Debtors would be unable to complete financial statements for certain of

the Subsidiary Reporting Companies that would be compliant with GAAP.  Early on, the

Debtors' management learned of possible fraudulent conveyances associated with the

prior movement of subsidiaries among various Debtors during the Rigas era.  Thereafter,

in early 2004, the Debtors learned of other issues that could increase or decrease assets or

liabilities of one or another of the individual debtors vis-á-vis each other.  By early Fall of 2004, it was determined that without a resolution of each of these issues, separate financial statements for the Subsidiary Reporting Companies could not be completed.

In order to complete the Restatement, generate consolidated financial statements, and obtain an audit opinion, the Debtors had to reconcile their balance sheet accounts, including general ledger accounts.  These accounted for, among other things, intercompany transactions among consolidated entities, including consolidated joint venture partners.

These Restatement efforts identified accounting errors that generally arose in connection with the misinterpretation or misapplication of GAAP and the failure to maintain adequate internal controls and appropriate books and records.  But as part of the Restatement, intercompany transactions were generally only adjusted when they were not compliant with GAAP or otherwise erroneous.  Other issues, including the validity, treatment and priority of Intercompany Claims, and the eradication of fraud, were not determined and instead reserved for later determination.

This is a critically important fact, which was not understood or sufficiently taken into account by the ACC Bondholder Group's expert.  The focus of the Adelphia effort was to make its financial statements reliable so the *outside world*—investors and counter-parties to transactions—could rely on them.  And this was what Adelphia's auditor, PwC, opined upon.  So far as I can tell (based on evidence I saw in the record of these cases going over 4-1/2 years, including the detailed examination of the Restatement effort that took place in the "MIA" Litigation, discussed below) Adelphia and its outside consultants (including, most notably, Scott MacDonald, Robert DiBella and Carol Savage), and its

8

outside auditor PwC, which opined on consolidated (but not unconsolidated) financials, did a first-rate job.  And Adelphia's financials, *on a consolidated basis*, insofar as they address matters of importance to the outside world, appear indeed to be highly reliable. But the same cannot necessarily be said about Adelphia's *unconsolidated* financials, which underlie interdebtor disputes.  Insofar as Adelphia's financials deal with internal matters, including, most significantly, interdebtor matters that eliminated each other in "eliminating transactions" that were undertaken as part of the process of preparing consolidated financials, they did not have the same level of reliability, because that was not the Restatement Team's focus.[8]  The extent to which the unconsolidated financials had reliability was (and still is) a matter of sharp debate.

As the global notes to the schedules filed by the Company in May 2005 disclosed, the Company "reserve[d] all rights with respect to the intercompany balances, including, without limitation, the appropriate characterization of the intercompany balances in the Plan."  The Debtors have not advocated any particular treatment of the Intercompany Claims or that such schedule entries even constituted claims.[9]

D.  *The "Bank of Adelphia Paradigm"*

In conjunction with the review just described, unless a transaction was evidenced by documentation between two Debtors, intercompany transactions (e.g., cash receipts, disbursements, acquisition accounting and cost allocations) were deemed to have been made by or to a single entity, Adelphia Cablevision, LLC (the "Bank of Adelphia").  This methodology, often referred to as the "Bank of Adelphia Paradigm," aggregated intercompany transaction balances consistent with the actual flow of funds within the

---

[8]      *See* n.95 below

[9]      *See* Wittman Direct, ¶¶ 14-15.

Debtors' cash management system.  In addition to ensuring the consistent application of the Bank of Adelphia Paradigm, the Debtors:

> (a) attempted to correct erroneous and inconsistent intercompany transactions reflected in the income statement;

> (b) sought to apply a consistent allocation methodology for, among other things, corporate and high speed data overhead, high speed data and video call center costs and interest on intercompany balances; and

> (c) otherwise reviewed and adjusted, when they regarded it as necessary, the intercompany transactions.

But this inevitably involved judgment calls, particularly with respect to non-cash transactions.  Since the great bulk of cash transactions involved disbursements from, or deposits to, the Bank of Adelphia, it is understandable (though even then, not indisputable) that Adelphia's accounts "ran them through" the Bank of Adelphia.  But with respect to noncash transactions (especially including recapitalizations, acquisition accounting, and non-cash dividends), the propriety of the use of the Bank of Adelphia Paradigm was and is more debatable.  Use of the Bank of Adelphia would in most material respects (if not all of them) not change results reported to the outside world in consolidated financial reporting, because, as noted, "eliminating transactions" as part of the consolidating process would make use of the Bank of Adelphia Paradigm academic.  But it could have huge significance in its effect on interdebtor transactions.  And its effect would be magnified, arguably astronomically, if the Bank of Adelphia was insolvent (as it now appears to be), and seemingly offsetting transactions—*e.g.*, a reduction in assets on the part of one of the debtors "matched" with a corresponding receivable from the

10

Bank of Adelphia—appeared on the books.  Then the "offsetting" entry would arguably, if not plainly, be offsetting only in theory, and not in practice.  A huge issue in the litigation I will describe below was how one fairly should deal with situations where seemingly "matched" transactions weren't really matched, in practice, because assets (or the accounting equivalent) might be going out in 100% dollars, with offsetting receivables (or the accounting equivalent) in dollars upon which less than 100% distributions would be paid or payable.[10]

Beginning in August 2003, the Debtors convened a series of meetings with key restricted[11] parties (bank lender agents, the Creditors Committee and the Equity Committee) to review and discuss the four primary factors in determining potential recoveries: the "Waterfall" analysis (i.e., the analysis of how distributable value would flow through the corporate structure), the Debtors' long range business plan, the intercompany transactions, and valuation/allocation.  While the underlying facts were not a major subject of controversy, the accounting judgment calls and application of the law to the facts were matters of considerable debate.  The Debtors brought the issues, and the uncertainties concerning their resolution, to the attention of the creditor groups involved, with the hope that they would consensually resolve them.

---

[10]    Participants in bankruptcy cases regularly take into account whether obligations are satisfied in 100% dollars, or amounts materially less.  The dollar significance of the distinction in the Adelphia cases is huge.

[11]    "Restricted" is a word of art in corporate bankruptcy parlance.  It is customary, in chapter 11 cases with publicly traded securities (most significantly, bonds) for debtors to share with creditors' and equity committees, bank lender agents, and other key parties in interest confidential information concerning the debtors' business affairs.  Typically this would be inside information, knowledge of which would give the recipient an unfair leg up if the recipient were to trade on the information. "Restricted" parties agree not to trade in debtor securities.  "Unrestricted" parties, who do not have access to confidential information, are free to trade.  In some instances, entities with individuals with confidential information establish "ethical walls," under which those with confidential information do not disclose it to those on the other side of the wall, and the latter, who do not have access to the confidential information and are unrestricted, remain free to trade.

11

The presentations distributed by the Debtors in the Fall of 2003 and Winter of 2004 informed parties of the potential for significant disputes between creditors, particularly (though not exclusively) Arahova and ACC.[12]  At that time, the precursors to the Arahova Noteholders Committee and the ACC Senior Noteholders Committee were restricted and actively representing their interests.  In an effort to bridge the gap between these creditor groups, in December 2003, the Debtors hosted several meetings and conference calls with affected parties and their respective counsel.  But those efforts proved to be unsuccessful in bridging the gap.

*E. The Sale of the Company*

Adelphia filed a first proposed plan of reorganization (the "First Plan") in February 2004.[13]  The First Plan did not purport to have meaningful creditor support, and instead was intended to provide a basis for the start of negotiations with and (especially) between creditors.  Adelphia's first proposed plan was a "standalone" plan—*i.e.,* one that contemplated that reorganized Adelphia Parent and its subsidiaries would remain ongoing entities continuing in their business operations, to be owned largely (if not wholly) by their creditors, whose claims would be satisfied by the issuance of reorganized Adelphia stock. The First Plan proposed to treat all Intercompany Transactions as either reinstated (all or in part) or discharged (all or in part) and to pay holders of the Arahova notes in full.  The Debtors made no effort to solicit acceptances of the First Plan, and parties in interest were informed that it was designed to focus attention on important issues that

---

[12]     The FrontierVision and Fort Myers Bondholders were also affected, and under some (though less probable) scenarios, the Olympus Bondholders might also be affected.

[13]     *See* n.2 above.

remained unresolved, including the Intercreditor Disputes and claims asserted at the time by the SEC and the DoJ.[14]

However, the enterprise value of reorganized Adelphia under the First Plan—$17.39 billion—was a matter of sharp dispute, particularly with equity holders and creditors with the more junior claims to the Debtors' assets. They had a fear that the standalone enterprise was undervalued, causing them to be unjustifiably "out of the money," depriving them of any recovery from the bankruptcy—which would be particularly unfortunate if the reorganized company were then sold at a higher value, providing a windfall to the more senior classes.[15]

The Debtors were sensitive to these concerns. In April 2004, the Debtors advised me, in a chambers conference, that with the support of both the Creditors Committee and Equity Committee, they would explore parallel alternatives. The Debtors would market the company, to see what it would fetch in a sale. But to keep bidders honest, and to

---

[14]    The SEC had commenced an enforcement action against Adelphia in the District Court, and filed a very substantial proof of claim in this Court, estimated to exceed $5 billion in amount, based on Adelphia's violations of the federal securities laws during the Rigas era. Then, the DoJ threatened to indict Adelphia—the company itself, as contrasted to the individuals (John, Timothy and Michael Rigas, and former Adelphia employees who had assisted them) who were convicted or pleaded guilty to a variety of federal charges relating to their conduct while at Adelphia.

Adelphia ultimately settled those matters (along with the civil action it had brought against the Rigases), and the settlements—which *inter alia* called for the payment, of $715 million in value to the Government, which the Government was likely to use for partial restitution to victims—were approved by Judge Sand of the District Court (who had the Rigas criminal action); Judge Castel of the District Court (who had the SEC action); and by me. *See In re W.R. Huff Asset Mgt. Co., LLC,* 409 F.3d 555 (2d Cir. 2005) (in substance affirming, by denial of mandamus, decision of Judge Sand approving the settlement in the criminal action); *In re Adelphia Communications Corp.,* 327 B.R. 143 (Bankr.S.D.N.Y. 2005) (approving settlement in this Court), *adhered to on reconsideration,* 327 B.R. 175, *aff'd* 337 B.R. 475 (S.D.N.Y. 2006) (Kaplan, D.J.), *appeal dismissed,* No. 06-1417 (2d Cir. Dec. 26, 2006) and *aff'd on cross-appeal,* No. 06-1738 (2d Cir. Dec. 26, 2006) (the "*DoJ/SEC Settlement Decision*").

[15]    In reaction to the First Plan, various parties in interest sought to terminate the Debtors' periods of exclusivity, asserting that a sale of the Debtors' assets would yield a higher valuation than a stand-alone plan. Several substantial creditor groups, representing diverse parts of the capital structure, also objected to the standalone plan and to the Debtors' then pending request for an extension of their periods of exclusivity.

protect against the risk of giving away the company at too low a price, they would reserve the option, as an alternative, to proceed with a standalone plan.

After a search process, the Debtors retained Allen & Company ("Allen") and UBS Securities ("UBSS") as financial advisors, and Sullivan & Cromwell ("S&C"), as legal advisor, in the effort to sell the company.  During the Summer of 2004, the Debtors and their advisors engaged in extensive analysis and effort to achieve a robust sale process.  In January 2005, the Debtors received an impressive number of bids.  After considering the bids, the Board concluded that a bid submitted by Time Warner and Comcast for substantially all of the Debtors' assets was the bid most likely to maximize the value of all estates and each estate.

On April 20, 2005, ACC entered into definitive sale agreements (the "Purchase Agreements") with Time Warner and Comcast (together, the "Buyers") pursuant to which the Buyers agreed to purchase substantially all of the Debtors' U.S. assets, including their equity in the JV Debtors whose reorganization plans were confirmed in June 2006. Under that sale transaction (the "Sale Transaction"), substantially all of Adelphia would be sold for approximately $12.7 billion in cash and an approximately 16% interest in Time Warner Cable, Inc. ("TWC").  That amount reflected a substantial control premium over the standalone valuation of the Debtors at that same April 2005 time—*i.e.,* a substantial premium over the estimated post-emergence trading value of the Debtors.

At that time, the Buyers desired (and the Purchase Agreements required) that the Sale Transaction be implemented pursuant to a chapter 11 plan, and that it be closed on or before July 31, 2006 (the "Outside Date").

14

*F.  The May 2005 Schedules*

In January 2005, the Debtors filed amended Schedules of Liabilities with the Court (the "January 2005 Intercompany Schedules"). They listed each Debtor's net intercompany payable to, or receivable from, the Bank of Adelphia, and contained significant qualifications and reservations of rights. Thereafter, the Debtors' accounting team identified additional accounting issues, prompting the Debtors to file an amended Schedule of Liabilities on May 11, 2005 that listed each Debtor's net intercompany payable to, or receivable from, the Bank of Adelphia (the "May 2005 Schedules").

This was a blockbuster event.  Unlike the Debtors' *consolidated* financials, (addressing their financial condition in a way that would be of significance to the outside world), the May 2005 Schedules, if regarded as the basis for determining intercompany obligations, would have an enormous impact on the distribution of value as between Debtors in the complex Adelphia corporate structure—and, accordingly, on the recoveries of the creditors holding claims against those individual Debtors.

The various constituencies at the time reacted to the publication of the May 2005 Schedules in markedly different ways.  An "Ad Hoc Committee of ACC Senior Noteholders" (the "ACC Senior Noteholders Committee")[16] had appeared in these cases to advocate the interests of Senior Noteholders of ACC.  The ACC Senior Noteholders Committee applauded the figures in the May 2005 Schedules.  An Ad Hoc Committee of

---

[16]    Unfortunately, this name is easy to confuse with the "ACC Bondholder Group," a different entity that is the principal present objector to the Plan.  The ACC Senior Noteholders Committee included (and, since it technically still exists, continues to include) members of the ACC Bondholder Group and also other holders of ACC Senior Notes that over time came to support the Plan.  The ACC Senior Noteholders Committee was a very active participant in these cases for a long time (including, very significantly, as the advocate for the interests of creditors of ACC in the "MIA" interdebtor litigation I will discuss), but ceased to be an advocate in these cases after its members adopted differing views as to the Settlement that is an element of the Plan.

Arahova Bondholders (the "Arahova Bondholders Committee"), which was formed in or before May 2005, strongly objected to them, and moved to strike the schedules. I denied the motion, though I noted the limits as to the extent to which any conclusions in the May 2005 Schedules would be binding on creditors.

The ad hoc committees' respective reactions were such even though the May 2005 Schedules contained significant reservations of rights by the Debtors, including:

- "While the Debtors' management has made every reasonable effort to ensure that the Bankruptcy Schedules are accurate and complete . . . the subsequent receipt of information and/or further review and analysis . . . may result in material changes to financial data and other information contained in the Bankruptcy Schedules."

- "The intercompany balances can be characterized in many ways, including (i) *pari passu* with all third-party debt, including bank debt; (ii) *pari passu* with trade debt but subordinated to bank debt; (iii) subordinated to all third-party debt but senior to common equity; or (iv) equity . . . . The Debtors reserve all of their rights with respect to the intercompany balances, including, but not limited to, the appropriate characterization of the intercompany balances."

- "Any failure to designate a claim as 'contingent', 'unliquidated', or 'disputed' does not constitute an admission by the Debtors that such claim is not 'contingent', 'unliquidated', or 'disputed'."

On May 27, 2005, I approved an application by the Creditors Committee to authorize the retention of Weiser LLP as "Tax and Intercompany Transaction

Consultants" for the Creditors Committee.[17]  But this application turned out to be very controversial, as it brought out into the open, at least for me, the gravity of the interdebtor and intercreditor disputes that would become such a huge aspect of these cases.

During the hearing to consider the Weiser Application, I said that the Creditors Committee's role with respect to the Intercreditor Dispute was not to take sides, but rather to "keep the lid on, in terms of intercreditor disputes and facilitating the settlement of intercreditor issues, if at all possible."[18]

During that hearing and with the agreement (if not also urging) of counsel to the Creditors Committee, I strongly encouraged (though I did not order) that members of the ACC Senior Noteholders Committee be appointed to the Creditors Committee.[19]  As a result, Tudor and Highfields, holders of ACC Senior Notes and members of the ACC Senior Noteholders Committee, joined the Creditors Committee on or about May 20, 2005.

*G.  Origins of the MIA*

In May 2005, Adelphia sought my approval for a major four-way settlement with the United States Department of Justice, the Securities and Exchange Commission, and members of the family of John Rigas.  The settlement addressed, among other things, the DoJ's ability to indict Adelphia itself, the SEC's action and proof of claim against Adelphia, and litigation Adelphia had commenced against the Rigases.  The settlement included, among other things, providing value (partly in cash and partly in other

---

[17]     ECF #7275.

[18]     Tr. of Hrg. of May 4, 2005, at 95.

[19]     *Id.* at 101.  The UST had put ACC bondholder representation on the Creditors Committee at the outset of these cases, but the Creditors Committee membership changed over the years, as a result of resignations from the Creditors Committee and the appearance of hedge funds in these cases.

currency) to the Government of $715 million—though this cost would be offset, in part, by another aspect of the settlement, under which Rigas family assets, many or all of which likely would have been forfeited to the Government, would pass to Adelphia. Adelphia's motion for approval of that settlement engendered a considerable number of objections, principally by unsecured creditors, who expressed the concern, "probably with some justification, that a victims restitution fund that the DoJ and SEC will establish with settlement proceeds will go in major part to equity holder victims of Adelphia fraud, whose recoveries in this Court would be subordinate to creditors under normal bankruptcy priorities."[20]

I approved that motion, "with certain additional measures being included within my approval order to protect rights following the implementation of the settlement."[21] One of those involved interdebtor and intercreditor disputes, which were beginning to boil. I noted:

> Several groups of unsecured creditors—the Ad Hoc Committee of ACC Senior Noteholders, the Ad Hoc Committee of Arahova Noteholders, and the Ad Hoc Trade Claims Committee (who hold claims against entities at different levels in Adelphia's rather complex parent-subsidiary structure)—voice concerns—in many respects, mirror images of each other—as to whether they would inappropriately be prejudiced by any payment on behalf of the estate. In the view of each, the burden of the settlement should be borne, in whole or in material part, by creditors at other levels, or by creditors of different entities. The ACC Senior Noteholders go a step further, and argue that this settlement cannot be approved until the intercreditor disputes, which

---

[20]     *See Adelphia DoJ/SEC Settlement Decision,* n.14, *supra.*

[21]     327 B.R. at 147.

could also involve benefits of the settlement, along with burdens, are resolved.[22]

I disagreed that the pendency of the intercreditor disputes made it impossible to approve

the DoJ/SEC/Rigases settlement, but held:

> While I recognize that the *magnitude* of the burdens, or benefits, from this settlement might appropriately vary from one to another of the 220 debtors, I have no doubt whatever that the settlement is advantageous for all, and I reject the notion that approval of the settlement should be denied or delayed for the resolution of these individual intercreditor disputes—especially given the importance to Adelphia of the prompt resolution of the issues underlying this settlement.

I went on to say:

> However, I agree with those creditors when they say that the allocation of the burdens and benefits of the settlement—*e.g.,* the payment of the $715 million, and the allocation of the excess value deriving from the Managed Entities—should be done in a fashion that does not prejudice their rights in their respective intercreditor disputes. It is reasonable to expect that creditors at the different levels in the corporate chain will have different perceptions as to what is fair when it comes to the allocation of settlement burdens and benefits. Fairness requires that mechanisms be created to permit those issues to be resolved-consensually, if possible, but otherwise with due process.

I continued:

> All would agree, I think, that the rights of various creditor constituencies on these intercreditor disputes should not be prejudiced by the settlement approved today, and paragraph 9 of the proposed order does that quite capably. But the creditor groups have a legitimate need to get a determination on the allocation issues, if they cannot agree, and supplemental mechanisms need to be established to

---

[22]    *Id.* at 171.

accomplish that. I am uncomfortable with the
proposal made by the Debtors, in their reply papers,
that this be left to the plan negotiation process.
While I always welcome consensual agreement, I
think the Debtors' proposal lacks the necessary
mechanism for giving creditors their day in court on
the allocation issues if agreement cannot be
achieved.

I then went on to say:

Accordingly, I believe that such an opportunity for
judicial resolution, if necessary, must be provided.
But it need not be done on a lightning fast basis, and
indeed should not be, as the issues are complex and
they likely will be interwoven with other complex
issues involving intercompany obligations. Also,
none of the Debtors will actually be writing out a
check to the Government any time soon, and I thus
think that concerns creditors articulated as to how
any such payment would be accounted for prior to
resolution of the allocation issues are illusory. …

At this juncture, I will direct that stakeholders who
wish to take a position on allocation issues caucus
amongst themselves, together with professionals for
the Debtors and the Creditors' Committee (who
likely will not be antagonists on these issues, but
who are likely to be helpful in the process) to
establish a game plan for the resolution of the
allocation issues. That game plan should include the
creation of an escape valve litigation mechanism (to
be handled as a contested matter) to resolve any
disputes if necessary. The game plan should provide
sufficient time to get these issues resolved before
confirmation, and, if possible, before the
finalization of any reorganization plan.  I will leave
it to the parties, in the first instance, to decide on the
best way to move the process forward, but I will
make myself available, as usual, for conference
calls, chambers conferences, or more formal
hearings if desired.[23]

---

[23]     *Id.* at 172-173.

When it became increasingly a matter of concern that consensual efforts to resolve the intercreditor issues would be unavailing, the Debtors filed a "Motion in Aid of Confirmation," which came to be referred in shorthand as the "Motion in Aid."  On July 26, 2005, I conducted lengthy hearings on the propriety of granting the Motion in Aid (and, if I were to grant it, what procedures I would establish) as well as several other motions brought by the Arahova Noteholders—one of which was a motion to strike the May 2005 Schedules, and another of which was to give the Arahova Noteholders Committee *STN* authority to bring a fraudulent conveyance action on behalf of Arahova (though not to deal with other aspects of the interdebtor disputes).  I heard extensive argument from various parties in connection with each of the motions.  After the conclusion of the hearing, I issued an oral ruling denying the Arahova Noteholders' motions and approving most of the requested procedures sought in the Motion in Aid, some of which I had modified in order to further the parties' due process rights.

One of the provisions I approved was a reservation of rights on the part of the Debtors to propose a settlement of the MIA issues, subject to parties' rights of Participants in the Motion in Aid litigation to object to the proposed compromise or to the Debtors' authority to compromise disputes.[24]  That authority was never taken away, though the Debtors' ability to take sides on the merits of the controversy, granted in an accompanying paragraph, was thereafter circumscribed by my increasingly specific

---

[24]        *See* Order of Aug. 4, 2005, granting the Motion in Aid, ¶ 12(a).  It provided:

> Nothing contained herein shall preclude the Debtors from seeking to compromise one or more of the Dispute Issues (either by separate motion or in connection with a proposed plan of reorganization) on notice to the appropriate parties, and nothing herein shall prejudice the rights of any Participant [in the MIA] to object to any such compromise and/or to assert that the Debtors have no authority to compromise such disputes.

rulings that the Debtors initially voluntary neutrality on the merits of interdebtor disputes would become mandatory.[25]

I approved the Motion in Aid on August 4, 2005, and thereby established a judicial framework for parties to resolve the interdebtor disputes—which process, since it evolved from the Motion in Aid, came to be referred to in shorthand as the "MIA."

The Arahova Bondholders Committee tried to appeal my orders declining to strike the schedules and teeing up the MIA for determination, but leave to appeal (along with a request for a stay of the MIA litigation) was denied by the district court.[26]

In the fall of 2005, the Debtors established a data room and/or data base, and made Adelphia employees and consultants available for deposition.  Testimony was not similarly available, however, from the Rigases and those of their confederates who had issued instructions resulting in the journal entries that became a focus of the MIA, as Fifth Amendment concerns made obtaining their testimony impractical.

*H.  The November 2005 Plan*

On November 21, 2005, after several previous iterations of a plan of reorganization had been filed with the Bankruptcy Court,[27] the Debtors filed the Fourth Amended Plan (referred to here, for simplicity, as the "November 2005 Plan").  Among other things, it provided for implementing the sale of the Company to Time Warner and Comcast.  Shortly thereafter, I approved a disclosure statement for soliciting acceptances

---

[25]    But here an important distinction must be noted.  Quite intentionally, I did not say that the Debtors couldn't act to help parties reach agreement, or try to facilitate a settlement.  In fact, I repeatedly encouraged them to do so.  The Debtors could even express views as to likely litigation outcomes privately, as an aid to such negotiations, so long as the Debtors didn't take sides when the matters were being litigated.

[26]    *See In re Adelphia Communs. Corp.,* 333 B.R. 649 S.D.N.Y. 2005) (Scheindlin, D.J.)

[27]    *See* n.2 above.

of the November 2005 Plan (the "November 2005 Disclosure Statement").  Solicitation

of votes with respect to the November 2005 Plan commenced on or about December 5,

2005, and the hearing to consider confirmation of the November 2005 Plan was originally

scheduled to begin on February 5, 2006.

The MIA created a mechanism for litigating the complex interdebtor issues, but

could not (and ultimately did not) ensure that a plan of reorganization could be confirmed

prior to the Outside Date so as to preserve the value associated with the Sale Transaction.

Accordingly, the November 2005 Plan provided for, among other things, a holdback of

funds in an amount sufficient to pay affected creditors their full legal entitlements,

regardless of the outcome of the MIA.

Though everyone in the case who spoke to the matter expressed approval of the

sale of the Company to Time Warner and Comcast, the November 2005 Plan was in all

other material respects exceedingly unpopular with creditors.  Over 50 objections to the

confirmation of the November 2005 Plan were filed, including objections by all of the

formal and ad hoc committees in these cases.  And a multitude of stakeholders stated

their intention to oppose vigorously any attempt by the Debtors to seek to confirm the

November 2005 Plan over their rejecting vote.  Further complicating matters, a number

of the objections asserted diametrically opposed positions, demonstrating a lack of

common ground among the Debtors' stakeholders.

As a result, in many cases, the Debtors could not amend the November 2005 Plan

to assuage the concerns of one creditor faction without further alienating another.

Moreover, once the Debtors submitted the November 2005 Plan to their creditors for a

vote, it became clear that the November 2005 Plan was at risk of being rejected by

multiple classes of creditors.  This effectively froze progress on the confirmation of a

reorganization plan, with the deadlock increasingly threatening the Time

Warner/Comcast sale, whose deadline for closing, after confirmation of a reorganization

plan, was just a few months down the road, at the end of the upcoming July.

*I.  The Arahova Motions*

On November 7, 2005, the Arahova Bondholders Group—dissatisfied with the

prospect of litigating the MIA and facing a situation under which the May 2005

Schedules, if respected, could have quite an adverse effect on its members' recoveries—

made a number of motions seeking relief which, if granted, would have been devastating

to creditor recoveries in these cases.  One was for the appointment of a chapter 11 trustee

for the Arahova debtors, which would have been a breach of the Debtors' DIP financing

facility and an event excusing Time Warner and Comcast from closing on their purchase.

Another was to terminate plan exclusivity for the Arahova Debtors, and a third was to

disqualify Willkie Farr (which as of that time had been counsel for the Debtors for 3-1/2

years) from acting in these cases, initially in all respects, and then, after a narrowing of

the motion, only with respect to interdebtor dispute matters.

Then, the Arahova Debtors entered into an agreement to put their motions on hold

pending the outcome of settlement negotiations.  As the ACC Bondholder Group

accurately notes, I sharply criticized the Arahova Bondholders' tactics, and was

"understandably dismayed" by them.  In a lengthy decision in January 2006 denying the

Arahova Debtors' motions insofar as they sought the appointment of a trustee and the

termination of exclusivity, I stated:

> [T]he Court further decides these motions in light of
> the compelling inference that the motions were filed
> as part of a scorched earth litigation strategy that

24

> would provide the Arahova Debtors with little
> benefit that they do not already have (trumped,
> dramatically, by a resulting prejudice to the
> Arahova Debtors themselves, along with all of the
> other Debtors), and which would have the effect
> (and, the Court believes, the purpose) of imperiling
> the pending Time Warner/Comcast transaction and
> the Debtors' DIP financing in an effort to extract a
> greater distribution, sidestepping the Court-
> approved process for determining the Intercreditor
> Dispute issues on their respective merits.[28]

I stated at the conclusion of the *Arahova Trustee Motion Decision*:

> The bringing of motions like these is not unethical,
> or sanctionable, but neither should it be encouraged,
> or rewarded.  Motions that would bring on
> intolerable consequences for an estate should not be
> used as a tactic to augment a particular
> constituency's recovery.[29]

I did not deny, however, a component of the Arahova Bondholder Group's

motions that sought Willkie Farr disqualification as to interdebtor disputes, and dealt with

analogous matters with respect to the Debtors' management.  Each had already expressed

its intention to stay neutral on the merits of the interdebtor disputes, and I granted the

Arahova motion to the extent of making those voluntary commitments mandatory.  In the

portion dealing with management, I stated:

> The Debtors' decision to tee up the Interdebtor
> Disputes for Court determination, and to step to the
> side while affected creditors fought the issues out,
> was sensible, and hardly a breach of fiduciary duty.
> But if the Debtors actually took sides in a way that
> injured one or another of the estates to whom they
> owed their duties of loyalty, that would result in at

---

[28]  *See In re Adelphia Communications Corp.*, 336 B.R. 610, 618-619 (Bankr. S.D.N.Y.), *aff'd* 342 B.R. 122 (S.D.N.Y. 2006) (Scheindlin, D.J.) (the "*Arahova Trustee Motion Decision*").

[29]  336 B.R. at 677-678.

least the appearance of impropriety, and, the Court fears, the reality as well.[30]

Similarly, in the portion dealing with Willkie Farr, I said:

> Though at the outset of these cases, and for most their 3-1/2 year duration to date, no one suggested that interdebtor issues made WF & G conflicted in any way, it now appears that intercreditor issues have expanded to the point that they are now a prominent feature of these chapter 11 cases. Because the parties to the Intercreditor Disputes hold debt of different debtors in the Adelphia overall corporate structure, the Arahova Noteholders can accurately say, even if driven by a tactical agenda, that these cases also present interdebtor disputes. WF & G, which represented all of the Debtors without complaint before the intercreditor issues blew up, must, under the rules applicable to any law firm, now respond to that new circumstance.[31]

I then noted:

> The caselaw above, with its fact-driven approach, makes it clear that no relief beyond requiring neutrality on the Interdebtor Disputes themselves is warranted—especially since the Court has no basis for a conclusion that WF & G has acted wrongfully in any way.  But now that the Interdebtor Disputes are in litigation, WF & G cannot, under a variety of disciplinary pronouncements, act on both sides of the litigated controversy.  It must withdraw from acting against, or for, the Arahova Debtors in those disputes.[32]

In one significant footnote in the *Arahova Trustee Decision,* I stated:

> The Court advised the Debtors and parties in interest in this case, in at least one chambers conference at the end of which it expressed its thoughts, that it saw no problems in the Debtors

---

[30]    *Id.* at 671.

[31]    *Id.* at 672.

[32]    *Id.* at 673.

> (and, by the same logic, the Creditors' Committee) trying to facilitate a settlement between the Arahova Noteholders Committee and the Adelphia Parent Noteholders Committee—and, in that connection, sharing their views as to the likely litigation outcome, if the disputes ultimately came before the Court, based on their analysis of the facts and applicable law. But the Court expressed the view that the Debtors should act as a facilitator and not an advocate, and that if push came to shove, and they did not succeed in bringing the feuding creditor groups together, the Debtors should remain neutral in the controversy, and assist or oppose neither party. The evidence convinces the Court that the Debtors did exactly that, and the Court so finds.[33]

And in another significant footnote, I stated:

> The Court continues to believe, as it has stated previously, that WF & G can continue to act as a facilitator to privately try to assist the creditor groups whose money is at stake to reach a settlement. But now that the controversy has come to this point, WF & G will have to refrain from "going public"; from being an advocate for either side; and from taking any steps that might be regarded by any of the feuding parties as tilting the playing field.[34]

## J.  Litigation of the MIA

Since a sale of the Company depended on confirmation of a reorganization plan, and confirmation of a reorganization plan depended on determining intercreditor entitlements, the resolution of the MIA became increasingly critical. After an intensive discovery period, the MIA was scheduled to, and did begin on January 31, 2006.

The MIA was divided into six phases, initially anticipated to take about one week each:

---

[33]    *Id.* at 627 n.18. With compliant acceptances from the ACC Senior Notes class, among others, having been obtained, I believe that the Debtors have indeed brought the feuding creditor groups together.

[34]    *Id.* at 673 n.173.

(1)        Avoidability of the intercompany claims, admissibility of

May 2005 Schedules and burden of proof with respect to intercompany

claims;

(2)        Validity, priority characterization or allowance of the

intercompany claims;

(3)        Inter-Debtor Fraudulent Conveyance Claims;

(4)        Allocation issues, including allocation of sale proceeds;

(5)        Substantive consolidation; and

(6)        Any remaining issues, possibly including allocation of

post-petition overhead and reorganization expenses amongst the Debtors.

But except as to Phase I (which finished at the time that had been estimated), the

MIA schedule turned out to be exceedingly unrealistic.  Extensive submissions on the

part of the litigants and extensive trial testimony of witnesses caused the MIA to proceed

exceedingly slowly.  It was originally contemplated that hearings with respect to the MIA

would commence on January 31, 2006 and conclude on or about March 7, 2006.  But

after about six weeks, and about 20 trial days (with trial having been held, for the most

part, four days per week), the MIA litigants were still in Phase II.  Fact testimony was

nearing the end, but expert testimony had not yet commenced, and post-trial

supplemental briefing had become necessary on 14 issues I identified, principally with

respect to accounting journal entries with seeming significant effects on intercompany

balances, most of which involved transactions out of the ordinary course, and some of

which at least seemingly resulted from Rigas-era fraud.[35]

---

[35]        In the course of the confirmation hearing trial, I learned that certain issues with material effects on
interdebtor balances would not necessarily also have a material effect on creditor recoveries, by

The MIA also put a tremendous strain on the Debtors' personnel and consultants, who were subjected to day after day of examination by the MIA creditor litigants—drawing them away from their other responsibilities for the Debtors.  Recognizing this strain, and the potential deleterious effect on creditor recoveries, in a February 2006 Chambers conference, I ordered certain of the principal litigants in the MIA—the Arahova Bondholders Committee, the ACC Senior Notes Committee, and the FrontierVision Bondholders Committee—to attend weekly, mandatory, negotiation sessions:  one day per week with lawyers and principals, and an additional one day per week with principals only.[36]  I felt that it was appropriate and necessary for those with economic risk to be in the room negotiating.  Despite a great deal of effort by all sides, no agreement was reached after weeks of negotiation.

### K.  The Phase I Decision

At the conclusion of Phase I, I issued a written decision, establishing the legal framework for going forward.[37]  The *Phase I Decision*, issued after extensive briefing and argument by the litigants to the MIA, was and is, despite its relative brevity, of great importance to any analysis of possible MIA outcomes.

---

reason of mathematical aspects of the "Waterfall" analyses Plan proponents and Plan opponents introduced.  And I then also learned that for the same reason, the determination of a particular MIA issue might have a much more significant detriment to one MIA litigant than the corresponding benefit to the opponent on that same issue.  But at the time the MIA trial was active and ongoing, I had no knowledge or concern as to the effect of any MIA rulings on any particular creditor constituency's recovery, and focused only on determining the proper interdebtor obligations.

That underscores the difference between a settlement, where the parties can fine tune their deal to meet their needs and concerns, and a litigated controversy, where a court must address the dispute before it.

[36]    Their lawyers would be appearing in court before me on that second day, moving the MIA forward four days per week.

[37]    *See In re Adelphia Communications Corp.*, 2006 WL 346418 (Bankr. S.D.N.Y. Feb. 6, 2006) (the "*Phase I Decision*").

The *Phase I Decision* was issued in the context of two earlier decisions I had issued, neither of which had been published, but which instead had been dictated decisions from the bench.  The first was my decision, some months earlier, to deny the Arahova Bondholder Group's motion to strike the May 2005 Schedules, but to recognize that the May 2005 Schedules nevertheless would not be conclusive, especially given their own stated limitations.  The second was my decision, based in substantial part on a decision by Judge Cote of the district court in *WorldCom*,[38] to overrule hearsay objections to the admissibility of restated financial statements prepared by new, honest accounting personnel in the aftermath of a financial fraud.  The May 2005 Schedules were based on the accounting records, but were not financial records themselves.

I will deal with some of this in the legal discussion that follows, but there are several aspects of it that warrant discussion as facts, relevant to any discussion of the extent to which any MIA settlement would be fair.  That is especially so, I think, since all parties to the MIA put on their proof in the MIA to make the showings of fact and as to mixed questions of fact and law that the *Phase I Decision* would require, without challenging any of the legal rulings in the *Phase I Decision* itself.

In the *Phase I Decision*, I held that the Debtors' schedules started "as prima facie evidence of the obligations stated therein,"[39] but that this would be so only if or to the extent that they were not challenged.  But I continued that "just as proofs of claim can be challenged by a party in interest, schedules can be challenged too, and if challenged (as

---

[38]       *See Phase I Decision*, 2006 WL 346418 at *1.

[39]       *See id.*

they have been here), the schedules no longer have a presumption of validity."[40]  And I

went on to say:

> Anyone who wishes to challenge schedule entries
> has the burden of coming forward to do so. But the
> burden of coming forward is not the same as the
> burden of proof.  And once the schedules are
> challenged, the Court must then consider issues
> relating to the existence, amount and priority of the
> underlying intercompany liabilities on the merits.[41]

I then held that the party asserting the existence of a claim had the burden of

establishing, by a preponderance of the evidence, that the claim was valid.  And I went on

to hold, in an aspect of the ruling that is so important to an understanding of the MIA that

I should quote it in full:

> With the schedules having been challenged, the
> schedules themselves are no longer sufficient by
> themselves to establish the existence or amount of
> intercompany claims.  But the financial statements,
> ledgers, journal entries and other accounting
> business records (together, the "Business Records")
> underlying the schedules may be used to establish
> the intercompany receivables or payables that the
> schedules show.  The Business Records, in turn,
> will be evidence of the "right to payment" by which
> "claim" is defined.  *But to say that the Business
> Records may be used for that purpose is not to say
> that the Business Records conclusively establish
> such claims, or that they presumptively do.  To the
> contrary, no presumptions that would alter usual
> burdens of proof would attach to the Business
> Records.*[42]

I continued that the Business Records, once in evidence, could be used like any

other evidence tending to prove or disprove the existence of a fact in question—

---

[40]      *Id.*

[41]      *Id.*

[42]      *Id.* at *1-*2 (emphasis added).

including, as relevant in the MIA, the existence of intercompany obligations, and, hence, intercompany claims. The Business Records, once in evidence, would be "as persuasive in establishing the obligations they reflect as the circumstances warrant."[43]

I continued that under the facts of the MIA, those circumstances would include, "at the least":

> - the extent to which the Business Records are mathematically disputed ["Factor #1'];
>
> - the extent to which the Business Records record or fail to record transactions that seemingly should have been recorded ["Factor #2"];
>
> - the degree of effort, care, thought and integrity that went into the accounting entries in question, when first made and when corrected as part of the restatement process ["Factor #3"];
>
> - express or implied qualifications and caveats in the Business Records ["Factor #4"];
>
> - the extent to which obligations seemingly appearing from the Business Records conform to, or are contradicted by, other relevant evidence ["Factor #5"];
>
> - the extent to which transactions reflected in the Business Records had economic substance ["Factor #6"];
>
> - why do various Debtors (including, inter alia, holding companies) show the liabilities they show ["Factor #7"];
>
> - the extent to which any alternate means of accounting would more accurately track where money actually went, on whose behalf money was paid, or for whose benefit money was spent ["Factor #8"];

---

[43]    *Id.* at *2.

> - the extent to which any aspect of the Business Records is the result of purely historic facts, on the one hand, or judgmental matters, on the other (and, if the latter, the extent to which the judgmental calls should be respected) ["Factor #9"]; and
>
> - the extent to which the Business Records' assumptions or conclusions should be trumped by determinations of law or of mixed questions of fact and law that are up to the courts to decide. ["Factor #10"][44]

Those matters, along with any other relevant matters not listed, would be considered in Phase II or in other proceedings to follow.  And I was careful to note that:

> The matter of the existence of intercompany obligations should not be confused with what I regard as separate issues: whether intercompany obligations should be avoided; whether they should be *pari passu* with other obligations, subordinated to other obligations, or some other possibility; or whether they should be recharacterized to be deemed to be contributions of equity and not debt.[45]

## L.  The First Plan Settlement Proposal

In light of the difficulties occasioned by the litigation of the MIA, the Debtors attempted a different approach to provide the adverse parties with an alternative that would assure a resolution of these cases and a closing prior to the Outside Date to avoid triggering a termination right of each Buyer and other associated negative consequences. In April 2006, the Debtors sought an order from me authorizing the Debtors to propose amendments to the November 2005 Plan to provide certain creditors with a *choice* between:

(a) several potential settlements of the MIA, or

---

[44]     *Id.* at *2.

[45]     *Id.*

(b) a holdback of distributions pending completion of the MIA.

By an order dated April 6, 2006 (the "April 6, 2006 Order"), I granted the request.

Expressly focusing on the issue, I determined that proposing a settlement of interdebtor

disputes—so long as it was not *imposed on creditors*, and creditors could decide whether

or not they liked it—would not be a violation of the Debtor and Willkie Farr neutrality

that had been an important aspect of the *Arahova Trustee Decision*.

In that connection, I provided, in the April 6, 2006 Order, in relevant part:

> The Debtors are authorized, but not required, to
> propose amendments to the Fourth Amended Plan
> of Reorganization (the "Plan") that provide for one
> or more optional proposed settlements of issues in
> these cases, including, but not limited to, issues
> relating to the [MIA], on the following conditions:
>
> > (a) the Amended Plan shall be structured to
> > permit creditors to separately accept or
> > reject
> >
> > > (i) the Plan including the proposed
> > > settlement (the "Settlement Plan")
> > > and
> > >
> > > (ii) the Plan excluding the proposed
> > > settlement, which Plan shall provide
> > > for reserves or escrows of
> > > distributions pending the
> > > determination of the [MIA] to enable
> > > any court determined resolution of
> > > such dispute to be implemented (the
> > > "Reserve Plan");
> >
> > (b) absent further order of the Court
> > following notice and a hearing on motion of
> > a party in interest, *the Debtors are not*
> > *authorized to request confirmation of any*
> > *Settlement Plan under section 1129(b) of the*
> > *Bankruptcy Code if the Settlement Plan is*
> > *rejected by a class of creditors made party*
> > *to a settlement proposed in the Settlement*
> > *Plan*; and

34

> (c) if the Settlement Plan is rejected by a
> class of creditors made party to a settlement
> proposed in the Settlement Plan, the Debtors
> shall be authorized to request confirmation
> of the Reserve Plan, including confirmation
> under section 1129(b) of the Bankruptcy
> Code if appropriate.[46]

The purpose and effect of this provision was to authorize the Debtors to propose a

settlement plan to see if it would fly, and to give the Debtors the comfort that if they did

so, the proposal would not be violative of the principle of neutrality.  This order did not

take away their authority to propose a settlement (in fact, it confirmed it), but it made

such a proposal subject to securing the assent of the affected creditors through the plan

process.

Entry of the April 6, 2006 Order had followed a lengthy hearing on the subject, at

which I had considered a host of somewhat inconsistent needs and concerns—including

most significantly:

> — the need to avoid destroying the sale to Time Warner and
>
> Comcast;
>
> — the unpopularity (and probable rejection) of a holdback plan
>
> from the perspective of many creditor groups;
>
> — the uncertainty as to the estate's ability, given its liquidity
>
> situation, to fund the enormous reserves that would be required for a
>
> holdback plan; and, most obviously,
>
> — the tension between maintaining Debtor neutrality on the
>
> merits, on the one hand, and allowing the Debtors to invoke creditor

---

[46]    April 6, 2006 Order at ¶ 3 (reformatted for clarity; emphasis added).

democracy, on the other, to see if the creditors themselves wanted a

settlement.

If the Debtors reserved the right to invoke cramdown, to get a settlement—

notwithstanding the lack of creditor support for a settlement, most obviously from

creditors of ACC—that would likely (and, quite arguably, properly) be perceived as a

violation of neutrality.  But other creditors were concerned about the risks of creditor

deadlock, and the loss of the Time Warner deal.  Counsel for the Debtors, faced with two

competing positions, proposed that neither the Debtors nor any party would have the right

under the April 6, 2006 Order to seek cramdown, but that anyone would be free to ask for

it in the future.  He used as an example a situation where a settlement might be approved

by 65% in amount, and 60% in number, of a creditor class to be affected by a settlement,

that might fall slightly short of the consent thresholds under the Code.

Later in the hearing, Debtors' counsel continued:

> With respect to the cram-down issue, Your Honor, I
> come back to one basic proposition:  That door
> remains shut, and only Your Honor could have the
> key to unlock it in the future; not the debtor, not
> anyone else.  The Court alone could unlock that
> door.  But it remains firmly shut today, consistent
> with all of my statements in the past, including
> today and last week, in our adherence to the
> neutrality principle.[47]

That, and my response to it, established the ground rules for going forward.  In issuing a

decision on the Debtor motion that led to the April 6, 2006 Order, I said:

> [Debtors' Counsel] said in very nearly these exact
> words:  "The cram-down door remains shut."  That
> is properly so now, and perhaps also forever.  If
> ever that were to change, I would, indeed, have

---

[47]        Tr. of Hrg. of Apr. 6, 2006, at 44-45.

> serious concerns vis-à-vis neutrality, which was a premise under which both I and Judge Scheindlin ruled.  And I'm very sympathetic to the observation that a settlement, by definition, is a two-way street and one can't settle with oneself.
>
> At this juncture, and perhaps more than at this juncture, I must say that it's very hard for me to see how I would ever authorize a cram-down, vis-à-vis the intercreditor issues….
>
> Once more, the point that [Creditors' Committee Counsel] made, while he may only be being careful, is one that I'm sensitive to:  I want to minimize the extent to which I restrict flexibility so I am not quite saying never.  I do have to tell you I'm close to it, and that it would come—it's only if you take really extraordinary examples, like if you have 64 or 65% acceptance in a class, or, you know, some bug because a whole class went fishing on election day and didn't vote against the plan, but you didn't get the necessary assenting votes, then most likely a justification could be made. …
>
> I think I have adequately articulated my concerns and reservations and presumption against approving any kind of cram-down plan.[48]

Two noteworthy messages emerged from the April 6, 2006 hearing.  The first was that so long as cram-down wasn't authorized, the counsel for the ACC Senior Noteholders Committee voiced no objection to seeing if a Debtor-proposed settlement would be accepted by affected creditors in requisite numbers.  He expressed considerable doubt as to whether any such effort would be successful.[49]  But he said once in a brief and then again in court that:

> If the debtors are able to craft a fair, reasonable settlement proposal that has the prospect of acceptance by the various constituencies in this

---

[48]     *Id.* at 53-54.

[49]     *Id.* at 29.

> case, we will be the first to applaud.  We mean it,
> and I wish them luck and hope they can come up
> with something.[50]

The second was a message on my part that necessary assent to a settlement had to be

evidenced by the votes of affected creditors in favor of it, and that I would almost

certainly *not* find necessary assent by cram-down.

The Debtors hoped that this approach would cause creditors to emerge from their

previously entrenched positions, and thereby reach a consensus.  Unfortunately, members

of the ACC Senior Notes Committee, holding the bulk (though not all) of the Senior

Notes represented by that committee, declared the settlement "dead on arrival," and

announced (both publicly and privately) their intent to reject any version of the April Plan

embodying the settlement.

They conveyed these views in a letter dated April 17, 2006 to the Adelphia Board,

and the letter found its way to the Wall Street Journal, substantially simultaneously with

the time (or perhaps before) it was received by at least some of the Board members to

whom the letter to the Board was directed.  On April 19, 2006, the Wall Street Journal

ran an article discussing the intercreditor tensions, quoting portions of that letter.  Later

that day, the Debtors sent me a letter expressing their concern as to the events, noting that

they had taken place pending a hearing on the adequacy of a recently filed supplemental

disclosure statement and re-balloting of the plan.

The Debtors stated in that letter:

> While the ACC Ad Hoc Committee now urges the
> Debtors to abandon their settlement efforts, the
> Debtors note that the Court itself ordered mandatory
> settlement discussions and, when those sessions

---

[50]     *Id.* at 28-29.

> failed to produce a result, authorized the Debtors to
> propose a settlement.  Against that background, the
> inflammatory invective directed at the Debtors'
> good faith efforts to facilitate a settlement as
> authorized by the Court is highly inappropriate, and
> the airing of that invective in the media amounts to
> a deliberate attack on the orderly resolution of this
> matter in the manner contemplated by the
> Bankruptcy Code—through a supervised and
> structured process of balloting and judicial review,
> and based on judicially-approved disclosure
> materials rather than on untested, unilateral
> assertions by interested parties.[51]

But except for the portion quoted above that characterized (correctly) my earlier

orders, this letter was, of course, merely one party's contentions as to this matter.  It

provided no basis for either making judicial findings or taking any judicial action other

than to consider what might be done next.  I held a chambers conference to determine

what, if anything, was appropriate under the circumstances.  After opportunity for parties

to be heard, I authorized discovery under Fed. R. Bankr. P. 2004 to investigate the

circumstances surrounding these events.[52]

I ultimately had no occasion to make judicial findings as to whether anyone acted

improperly with respect to these events, and I do not do so now.  Certainly I do not make

a finding that anyone acted wrongfully.  But it is necessary for me now to make a finding

that investigation of the events surrounding this episode was plainly appropriate, and that

creditors who differed with those who had disseminated the letter had a legitimate right in

seeking such investigation.  It was not improper harassment.  Ironically, evidence shown

to me at the conference and thereafter suggested that to the extent any ACC Senior

---

[51]    Letter of August 19, 2006.

[52]    It is not uncommon, in chapter 11 cases, for creditors to send nasty letters to a Board.  It was the
allegations as to the *dissemination* of the letter, and possibly improper activities with respect to the
plan solicitation process, that required investigation and possibly further consideration.

Bondholders did anything that could be criticized, others (though not necessarily those who sought the discovery) did or at least may have done so too.  And I ruled later that if anyone wanted me to take judicial action beyond investigation of these events, I would permit discovery to let those attacked show that they were doing the same thing others had done.  But ultimately these issues did not have to be addressed.[53]

*M.  Appointment of the Monitor*

During the course of the intercreditor negotiations, those involved in the process made other accusations, apart from those described above.  Creditors asserted, in varying directions, that their negotiating counterparties were not negotiating in good faith.  To address those concerns, I considered alternatives to facilitate the negotiations.

After consultation with the litigants, I considered, and rejected, the appointment of a mediator for the process.  As I told the parties, I had a fear that the issues were so complex, and the litigants would have such a head start on the facts and the law involved in the controversy, that a mediator would have difficulty timely catching up to the litigants' and my understanding of the issues, and the mediator's views as to the merits would not be taken seriously.

Instead, I asked the parties, in March 2006, if they would agree to my appointment of another judge of this Court to act as a "monitor" for the negotiations.  As the term was used, "monitor" had a double meaning.  The monitor would observe the proceedings, and, in addition, would serve as a "hall monitor," in the high school sense, to ensure that litigants were not misbehaving.

---

[53]    I am intentionally not making more detailed findings in this area.  They are unnecessary to this decision.  It is sufficient for purposes of this decision for me to note, once more, that I believe that investigation into the circumstances described here was appropriate, and was not unfair harassment.

The litigants said that they welcomed that.  On April 25, 2006, a lawyer for the

Debtors, who were trying to assist the MIA litigants in reaching an agreement, sent an e-

mail to my Chambers, with copies to the interested parties:

> We have conferred with the participants in the
> settlement conference regarding the Court's
> expressed inclination to appoint a monitor to attend
> settlement conferences and to facilitate discussions
> among the parties.
>
> The settlement participants, which include the ad
> hoc committees for the ACC senior noteholders,
> FrontierVision and Arahova, Huff and the cross-
> holder group (Mr. Pachulski's newly formed
> group), agree that such an appointment may be
> beneficial and will cooperate with the Court's
> designee.  All parties agree that it is important that
> the monitor be authorized to report to the Court on
> the status and progress of his or her efforts.

An additional problem that surfaced at that time was the Debtors' need to focus

on consummating the sale to Time Warner and Comcast, which placed great demands on

the same accounting personnel who were required to be in court testifying for the MIA.

The Debtors thus requested, and I granted, an adjournment of the MIA, in large part to

permit the Debtors to focus on consummating the Sale Transaction.

Since then, for about eight months, there have been no further hearings on the

MIA.  At the time when the hearings were adjourned, the parties were in the middle of

the second of the six sets of hearings and the twice weekly (or more) negotiating sessions,

each of which typically lasted most of a business day, had been ongoing for two months

with no agreement having been reached.  With the sale to Time Warner and Comcast in

increasing jeopardy, and with the deadline for confirming a reorganization plan and

having such a plan go effective coming ever closer (at this point, it was about three weeks

away), I used chambers conferences to address what I feared was an imminent disaster—

a deadlock between creditors that would cause the Debtors to lose the deal with Time

Warner and Comcast, or give them a basis to renegotiate the deal on terms

disadvantageous to the Adelphia estate.  At one such chambers conference, on May 23,

2006, I once more sought to confirm that all were comfortable with the Monitor sharing

her observations with me.  I asked the parties directly, further to the earlier e-mail,

whether any objected to the Monitor communicating directly with me concerning the

settlement negotiations.  No party in attendance (including counsel for the ACC

Noteholders Committee) offered any objection.

From March through May, the Monitor met at length with representatives of the

negotiating parties in Poughkeepsie, New York, and Manhattan on numerous occasions,

and participated in several telephonic meetings with the negotiating parties.  The parties'

meetings with the Monitor continued until July.

*N.  The 363 Sale And Joint Venture Plan*

By the end of May 2006, with twice weekly (or more) negotiations with and

without the assistance of the Monitor ongoing for nearly four months, with no agreement

that could lead to a plan having been reached, the Debtors determined that they had to do

something to save the Time Warner/Comcast deal.  With the agreement of Time Warner

and Comcast, and the support of many of the Debtors' creditor constituencies, the

Debtors sought to get the deal closed with a section 363 sale, instead of a global plan

which would be dependent on resolution of the intercreditor disputes.  Getting Adelphia

sold in this fashion would involve a reorganization plan for the Century-TCI and

Parnassos Debtors and joint ventures in which they were members, but would not raise

the same interdebtor and intercreditor dispute issues, as those debtors were sufficiently

solvent that their creditors could be paid in full without interdebtor concerns.

42

In furtherance of this approach, on May 26, 2006, the Debtors filed a motion (the "363 Motion") seeking authority to, among other things:

> (a) consummate the Sale Transaction for all of the Debtors under a section 363 sale; and

> (b) take the steps necessary to consummate the sale of the Debtors' equity interests in the JV Debtors to Comcast by discharging the liabilities of the joint ventures and their subsidiaries under a simplified version of the April Plan, in accordance with the terms of the Comcast Purchase Agreement.

But as part of that, the Debtors and the Buyers had to, and did, negotiate modifications to the Purchase Agreements, including requirements with respect to the issuance of the TWC stock. Specifically, the Purchase Agreements, as amended, compelled the Debtors to pursue one of two courses of action.

Under the first alternative (the "Plan Requirement"), the Debtors had to confirm a plan of reorganization prior to the IPO Deadline (defined below) and distribute at least 75% of the TWC stock, excluding stock held in escrow, to constituents as long as the stock was then listed on the NYSE or NASDAQ (if such a listing was not obtained, then the threshold would be 90%). (The Plan, if timely confirmed and if TWC is able to obtain the requisite listing, will satisfy the Plan Requirement.)

Alternatively, if the Plan Requirement were not met, the Debtors would be required, within three months of the relevant Time Warner registration statement being declared effective by the SEC (such date, subject to certain extensions, the "IPO Deadline"), to sell at least 33⅓% of TWC stock in an underwritten public offering. In

such an offering, Time Warner would pay all "registration expenses," but the Debtors

would have to bear the applicable brokers' commission and/or underwriting fees.

Time Warner is not obligated to wait to see if the Debtors will comply with the

Plan Requirement.  Indeed, Time Warner's registration process is well underway, with

Time Warner having already filed a registration statement with the SEC.

On June 6, 2006, the Debtors filed a modified plan of reorganization (as

confirmed by the JV Confirmation Order, the "JV Plan") for the Parnassos Debtors and

the Century-TCI Debtors (as defined in the JV Plan, the "JV Debtors").  The JV Plan was

a simplified version of the April Plan, with all debtor groups other than the Century-TCI

Debtor Group and the Parnassos Debtor Group (each as defined in the April Plan)

excluded, and included certain changes to reflect, among other things, the revised Sale

Transaction, a negotiated settlement with the Bank Lenders under the Century-TCI and

Parnassos Prepetition Credit Agreements, and certain clarifications.  In general, the JV

Plan provided that all creditors of the JV Debtors would receive payment, in full and in

cash, of their allowed claims.

Prior to the hearing to consider confirmation of the JV Plan (the "JV

Confirmation Hearing"), I approved a stipulation that preserved the parties' rights in

connection with the MIA while also ensuring the ability of the Debtors to make all

distributions required under the JV Plan.

O.  The Beginnings of Agreement

Meanwhile, one week earlier, as an initial result of the settlement negotiations, on

June 21, 2006, the Monitor filed a report (the "Monitor's Report") in this Court that

included a term sheet (the "Original Term Sheet") that embodied the Monitor's

observations of the state of the settlement negotiations.  In the Monitor's Report, the

Monitor stated that:

> [f]rom my observations and from my perspective,
> this proposed term sheet is beneficial to and in the
> best interests of all parties, and it is a better
> alternative to (i) the plans that have been filed by
> the Debtors with the Court, (ii) the process and
> procedures proposed by the Debtors under section
> 363 of the Bankruptcy Code, and (iii) continuing
> proceedings under the Motion in Aid Process.

The Original Term Sheet was executed by W.R. Huff Asset Management Co.,

L.L.C. ("Huff"), Huff's counsel, certain members of the Ad Hoc Committee of Arahova

Noteholders (the "Arahova Noteholders Committee"), counsel to the Arahova

Noteholders Committee, certain members of the "Ad Hoc Committee of Arahova

Noteholders and ACC Senior Noteholders" ("Committee II"), counsel to Committee II,

certain members of the Ad Hoc Committee of FrontierVision Noteholders (the "FV

Noteholders Committee"), and counsel to the FV Noteholders Committee.  But it was not

executed by any member of or counsel for the *ad hoc* committees of (a) the "ACC Senior

Noteholders Committee"; (b) Olympus Parent noteholders (the "Olympus Noteholders

Committee"); (c) FPL noteholders (the "FPL Noteholders Committee"); or

(d) representatives of holders of trade claims against the Subsidiary Debtors (the

"Subsidiary Trade Committee") or holding company Debtors (the "Parent Trade

Committee").  In addition, none of the Administrative Agents, Bank Lenders, Debtors, or

the Creditors Committee executed the Original Term Sheet.

The Original Term Sheet provided, in part, for the payment of $1.08 billion to

ACC from the distributions as to which unsecured creditors of Subsidiary Debtors

contended that they were otherwise entitled—some of which could be repaid from

distributions from a Contingent Value Vehicle ("CVV"), which would distribute proceeds, if any, derived from litigation by the Adelphia estate against Bank Lenders— and set the value of the TWC stock at $4.7 billion, subject to a "true up" of up to 15% based on a market test post-effective date.

*P.  The Agreement of Tudor And Highfields*

The Original Term Sheet was a step forward, but it should be noted, and perhaps emphasized, that while the Original Term Sheet had the support of Committee II, whose members held both Arahova and ACC senior bonds, it had no support from any bondholders who had claims solely against ACC.  Without that, it could go nowhere.  As noted above,[54] I had stated, at the hearing of April 6, 2006 that a party couldn't settle with itself, and that if there were to be a settlement, it had to have ACC creditor assent.  While I did not quite say "never," I made it quite clear, I think, that I was not likely to cram down an assent on ACC creditors if they did not accept the settlement under a plan.

Thus, further negotiations ensued after the execution of the Original Term Sheet. On July 7, 2006, after additional negotiations amongst several parties, Tudor and Highfields (the "Initial ACC Settling Parties"), restricted members of the ACC Senior Noteholders Committee, came to an agreement with the parties to the Original Term Sheet.  At this point, the Creditors Committee joined the settlement also.

After additional negotiations, effective July 21, 2006, ACC, on behalf of all Debtors,[55] entered into the Plan Agreement with Tudor and Highfields, representatives of

---

[54]    *See* page 37 above.

[55]    Assent by Debtor ACC was subject to a finding on my part that it would be consistent with the neutrality obligation.  As discussed above and below, I regarded the Debtors' neutrality obligation to require them to avoid taking sides on the interdebtor issues, but to permit the Debtors to put up a settlement proposal for creditors to accept or reject as they saw fit.  In the context of approval under a plan, I regarded the Debtors' management to be authorized to assent on behalf of Debtor

Committee II, representatives of the Arahova Noteholders Committee, representatives of the FrontierVision Committee, Huff, representatives of the Subsidiary Trade Committee and representatives of the Creditors Committee.  Tudor and Highfields were the principal "pure"[56] ACC bondholder participants in the settlement discussions, and participated in the settlement discussions with the knowledge of most (if not all) of the other members of the ACC Senior Notes Committee.  But each of Tudor and Highfields executed the Plan Agreement in its individual capacity and not in a fiduciary capacity, and in particular not as an authorized representative of any other ACC senior bondholders—including those on the ACC Senior Noteholders Committee.

Tudor's participation and perspective in the plan negotiations was described in trial testimony before me by Darryl Schall, who is primarily responsible for managing the high yield and distressed debt investments made or managed by Tudor.  Mr. Schall also serves as a member of the Creditors Committee.  The cross-examination of Mr. Schall was neither extensive nor destructive, and I found Mr. Schall's testimony to be fully credible.

---

ACC and other Debtors if, but only if, the settlement under the plan was approved by the votes of classes of claims against the affected Debtors (particularly, as relevant here, ACC), in number and amount, sufficient to satisfy the requirements of the Code for confirmation of a plan.  As they did that, I do not find a violation of the neutrality obligation here.

Though I do not need to deal with the issue here, I note full well that the logic of my analysis suggests that the Debtors' management would be hard pressed to argue that it could bind ACC or other Debtors to a settlement of the interdebtor disputes without the assent of affected creditors under a plan.

[56] By "pure" I mean holders of bonds of ACC alone, and not of any other Debtor.  At all relevant times, neither Tudor nor Highfields has held any bonds or debentures in any estate other than ACC, and they hold predominantly ACC Senior Notes.  I find that in the process of negotiation of the resolution of the MIA they were motivated economically solely by maximizing the value of ACC's Estate and, in particular, maximizing the value available for distribution to ACC Senior Noteholders.

Mr. Schall testified that Tudor holds approximately $192 million (face amount) of ACC Senior Notes.  Tudor also holds some shares of ACC preferred stock, but otherwise has no holdings or other investments in any other of the Debtors.  Tudor has been restricted, and has not traded any of the Debtors' securities since Mr. Schall became a member of the Creditors Committee in May 2005.

In November 2004, Tudor, along with other holders of ACC Senior Notes, joined what became the ACC Senior Notes Committee.  By January 2005, members of the ACC Senior Notes Committee held approximately $1.25 billion in aggregate principal amount of such notes.  The ACC Senior Notes Committee was formed to represent and advocate interests of holders of ACC Senior Notes and to maximize the recoveries of holders of ACC Senior Notes.  Thus it became a principal litigant in the MIA.  From November 2004, Tudor worked closely with the ACC Senior Notes Committee's counsel, Hennigan Bennett & Dorman ("HBD").  As the MIA progressed, it became apparent that one or members of the ACC Senior Notes Committee would need to have access to confidential information that was evidence in the controversy, to properly discuss strategies and other litigation matters with HBD.

After I had directed the litigants in the MIA to attend the mandatory settlement sessions, in the period February through April 2006, Mr. Schall attended nearly all of them, flying to New York from Los Angeles nearly once per week for no less than three months.  He likewise attended almost all of the meetings held with the Monitor; the few meetings that he was unable to attend were attended by Joseph Mazella of Highfields or Bruce Bennett, Esq., of HBD, the lead lawyer trying the MIA from the Parent Bondholders' side.  At the settlement sessions, parties listened to multiple presentations

by the Debtors concerning potential negative consequences to the estates if the MIA couldn't be resolved. They included adverse tax consequences, diminution of value to the estate and bondholder recoveries on account of interest and other costs attendant to delay, and risk to the closing of the sale of the Company to Time Warner.

In March 2006, Perry Capital ("Perry"), and in April 2006, Elliott Associates ("Elliott"), two entities that were other members of the ACC Senior Notes Committee and that are now members of the ACC Bondholder Group, decided to participate more actively in the MIA and settlement negotiations, and each signed a confidentiality agreement allowing it to gain access to the non-public information. They also began to attend some of the settlement meetings being held by the Monitor. At one meeting with the Monitor, Highfields, Tudor, Elliott and Perry (in the presence of counsel) were asked by the Monitor whether she could communicate the status of the negotiations with me. After consulting Mr. Bennett of HBD, each of the four agreed that the Monitor could communicate directly with me.[57]

On or about June 13, 2006, after several days of internal discussions amongst themselves, Tudor, Highfields, Perry and Elliott (the four restricted members of the ACC Senior Noteholders Committee) presented a proposed amended term sheet to the Monitor. That term sheet was rejected by other parties, but negotiations amongst the parties continued. Tudor, Highfields, Perry and Elliott had agreed that Original Term Sheet (which was attached to the Monitor's Report) was not acceptable for several reasons, including an unacceptable valuation of the TWC stock that was to be distributed under the Plan, and an unacceptable governance structure for the Board of Directors that would

---

[57]     This was before my inquiry to the parties on May 23, 2006, discussed at page 42 above.

be responsible for managing the litigation by the CVV.  But negotiations continued on June 29, and on that day Highfields and Tudor agreed in principle to the outline of terms of a revised term sheet and settlement.

It was then agreed, however, that public disclosure of such terms and agreement wouldn't be made until Perry and Elliot had an opportunity to review the proposed terms. That same evening, June 29, Mr. Schall informed John Pike of Elliott of such terms, and of Tudor's intent to sign a final term sheet with the revised terms, and Schall told Pike that he believed that the agreed upon settlement was a fair deal, encouraging Pike to review the settlement as soon as the revised term sheet was circulated.  Tudor and Highfields thereafter signed on to the July 7 modified term sheet and subsequent documents relating to the settlement.

Mr. Schall explained why Tudor agreed to the Settlement, and I found his explanation credible and entirely understandable.  Tudor, after consultation with counsel to the members of the ACC Senior Notes Committee and Highfields, decided to execute the Plan Agreement (in its individual capacity) for various reasons, including:  certainty of more than $1 billion of initial distributions from concessions made by various parties to the Plan Agreement; an ability to select two members of the CVV Board, thereby giving ACC Senior Noteholders greater control over the Bank Litigation Claims; a cessation of monthly interest accruals; avoidance of significant costs (including costs of a required Initial Public Offering) that would be borne if the stock of TWC stock were not distributed by early 2007; protection against the opportunity costs that would result from delayed distributions; a reduction of potential tax exposures that could arise if TWC stock

was distributed in early 2007; and cessation of significant and mounting litigation costs with no certainty as to the timing or favorable outcome of such litigation.

Mr. Schall also believed that there were significant risks in litigating the MIA to its conclusion. The ACC Senior Notes Committee and its counsel began preparing for MIA litigation in November 2004. The trial did not begin until January 31, 2006. Of the estimated five-week trial (comprised of six hearings in total), only the first and part of the second of the hearings were complete, after 20 trial days, over 2-1/2 months. The MIA was a highly complex case that largely relied on interpretation of actions of former management, many of whom were no longer with the Debtors (for good reason), and some of whom had been convicted of crimes as a result of their actions. Moreover, witnesses would have to testify as to journal and other accounting entries that occurred more than five years ago.

In Mr. Schall's view, the MIA proceedings were so complex and subject to so many variables and permutations that he believed that it was impossible to predict the outcome using a financial model or spreadsheet. Given the impossibility of being able to predict with any certainty a settlement range, it came to be Mr. Schall's view that ACC Creditors could receive as little as $600 million or as much as $1.5 billion from the par plus accrued recoveries from structurally senior creditors and other sources at the conclusion of the MIA. Finally, regardless of the ultimate conclusion of the MIA, creditors of ACC would bear the lion's share of the costs of the Debtors' estates and suffer the lion's share of any diminution in value of the Debtors' estates, for the time period in which the MIA was ongoing.

At the time Tudor agreed to settle, it was his view that the bid/ask spread between the June 13 Term Sheet and the terms under which Highfields and Tudor settled was fairly close. Ultimately, he decided that unanimity of the four restricted members of the Ad Hoc Committee was not required for Tudor to agree to a settlement.

Tudor did not receive any special consideration in exchange for entering into the Plan Agreement beyond that being made available to other bondholders, or receive any benefits not available to every other ACC Senior Noteholder. Mr. Schall testified, and I find, that Tudor did not enter the Plan Agreement because of threats, coercion, or other inducements. Tudor entered into the Plan Agreement because, as a holder of ACC Senior Notes, it determined that it was in Tudor's best interest to pursue the course that it believed would result in the maximization of value of ACC Senior Notes.

Mr. Schall further testified, and I find, that certain aspects of the Plan Agreement—such as the cessation of the Rule 2004 discovery earlier that year that I described at page 38 above, and exculpation clauses that would be embodied in the Plan—were designed to be inclusive rather than exclusive. Because Tudor and Highfields joined in the settlement prior to any other members of the Ad Hoc Committee, it believed that, as part of the settlement, these benefits should be available to any holder of ACC Senior Notes that elected to join in the Settlement and not just available to Highfields and Tudor as the first holders of ACC Senior Notes to execute such agreement. In Mr. Schall's experience, release and exculpation provisions were commonly included in bankruptcy reorganization plans and there was nothing unusual or unexpected about including releases and exculpations to settling parties in this Plan.[58]

---

[58]    I took this only as relevant to good faith and the declarant's state of mind.

For the purposes of satisfying myself that Tudor, Highfields and the Plan Proponents acted in good faith, and that there was nothing improper in the settlement process, I find Mr. Schall's testimony and views entirely credible.

Q.  *Closing of the Time Warner/Comcast Sale*

Effective July 31, 2006 (the "Sale Effective Date"), the Debtors consummated the Sale Transaction and JV Plan.  Proceeds from the Sale Transaction consisted of cash in the approximate amount of $12.7 billion and 155,913,430 shares of TWC common stock, representing approximately 16% of the outstanding equity securities of TWC as of the Sale Effective Date.  A portion of that was deposited in an escrow to secure ACC's indemnification obligations and any post-closing purchase price adjustments due to the Buyers from ACC.

R.  *Further Agreement*

Following execution of the Original Term Sheet, members and/or representatives of the Olympus Parent Noteholders, the FPL Noteholders, and the Subsidiary Trade Committees participated in discussions with the Monitor and the creditor parties to the Original Term Sheet in an effort to reach further consensus.  At some point, Bank Lender agents were also brought into the process.  Thereafter, on September 11, 2006, the Debtors, the Creditors Committee, and the Bank Proponents announced the terms of a settlement which, if implemented, will fully and finally resolve numerous issues relating to the treatment afforded Bank Claims under the Plan.  This compromise, which was reached only after extensive and significant negotiations between and among the Debtors, the Creditors Committee and the Banks, including the Agent Banks, resulted in a different treatment of the Bank Claims under the Plan than originally contemplated in the Amended Term Sheet.  On that date, agreements in principle with the FPL Noteholders

Committee and the Olympus Noteholders Committee concerning the terms of consensual plan treatment were also announced.

### S.  Effort To Terminate Exclusivity

On August 17, 2006, the ACC Bondholder Group moved to terminate exclusivity, asking me to allow the ACC Bondholder Group to propose its own plan for all of the Debtors.  In the Exclusivity Motion, the ACC Bondholder Group argued that the filing of a plan incorporating the Plan Agreement was "extremely inappropriate,"[59] and a "blatant abuse of the privilege of exclusivity"[60]—contending that the plan violated neutrality requirements and my earlier orders governing prior plans.[61]  At the hearing on the Exclusivity Motion, counsel to the ACC Bondholder Group continued this argument, stating that "[t]here is no settlement," because it was not "negotiated and agreed to by the parties authorized to control it."[62]

On September 19, 2006, I issued a bench decision in which I denied the relief sought by the Exclusivity Motion.[63]  I ruled, among other things, that:  (a) the Plan containing the Settlement should be put up for a vote;[64] (b) the Plan "was the result of weeks of effort to bring seemingly intractable disagreements to a consensual

---

[59]     Exclusivity Motion, ¶ 4.

[60]     Exclusivity Motion, ¶ 7.

[61]     Exclusivity Motion, ¶¶ 46-48.

[62]     Tr. of Hrg. of Sept. 11, 2006, at 83.

[63]     See In re Adelphia Communications Corp., 352 B.R. 578 (Bankr. S.D.N.Y. 2006) (the "Exclusivity Termination Decision"), clarification granted and reargument denied, 2006 WL 2927222 (Bankr. S.D.N.Y. Oct. 10, 2006) (the "Exclusivity Clarification Decision").

[64]     Id. at 582.

conclusion;"[65] and (c) that I "disagreed with the contentions that the process that led up to

the term sheet that underlies it was in any way unlawful or illegitimate."[66]

A few days earlier, on September 12, when focusing on the disclosure statement, I

addressed the reality that the exclusivity motion, which was then *sub judice*, could have a

bearing on what would be in the disclosure statement.  I then told the parties that

exclusivity was a matter quite different from whether the proponents of the Plan would be

allowed to put the plan forward.[67] And in the latter connection, I said:

> Specifically, I'm going to rule as follows:
>
> That the debtors putting a plan of this character up
> for a creditor vote and soliciting acceptances to a
> plan, which creditors and other stakeholders will be
> free to accept or reject, does not violate the
> undertakings of neutrality or the directions as to
> neutrality that I expressed and that the debtors
> undertook earlier in this case.[68]

On September 22, 2006, when the Plan now up for confirmation was close to

being solicited, the ACC Bondholder Group moved for an order requiring the Debtors to

pay down the bank debt, so as to stop the accrual of interest on that debt.  That was in the

context of a then-pending motion by the Creditors Committee to hold back distributions

of bank claims by reason of receipt of fraudulent conveyance claims that had been

asserted against bank lenders, which would be settled under this Plan.  I tabled that

---

[65]     *Id.* at 585.

[66]     *Id.* at 582.

[67]     Tr. of Hrg. of Sept. 12, 2006, at 19.

[68]     *Id.*  I went on to say that:

> While I understand and respect the sincere substantive
> objections to the compromise embodied in this plan, I do not
> regard it as illegally proposed, and certainly not illegally
> proposed in any way that prohibits it from being solicited.

*Id.* at 19-20.

motion (in accordance with a recommendation of two of the bank agents), in a decision

dictated from the bench, on September 26, 2006.  I said:

> I think what Mr. Pantaleo and Mr. Noble [bank
> agent lawyers] said makes sense, and I'm agreeing
> with their recommendation.  Assuming that the
> proposed motion were granted, it wouldn't move
> this case forward in any material way, because we'd
> still have the issue of the holdback motion.  So it
> wouldn't get the banks paid anyway.  The Debtors,
> Creditors Committee and some of the banks have
> put forward an alternative which would get the
> banks paid and make both the Parent Bondholder
> Group's motion, and the Holdback motion, moot.
> Leaving this issue temporarily aside, pending such a
> possibility, is sensible case management.  In
> addition to obviating the need to have even more
> litigation in this case, over issues that may never
> have to be decided, it avoids interference with a
> solicitation process that I've determined can and
> should go forward, and avoids confusion in the
> solicitation process.
>
> I think the Parent Bondholder Group's motion
> deserves to be heard if and when it makes a
> difference, but this isn't that time.[69]

*T.  Still More Agreement*

Thereafter, and after further negotiations and amendments to improve the

settlement from an ACC creditor perspective, three additional major holders of ACC

Senior Notes— OZ Management, L.L.C. ("Oz"), C.P. Management, LLC ("C.P.") and

Satellite Asset Management, L.P. ("Satellite") (the "Additional ACC Settling Parties")

agreed to support the settlement.  After additional rounds of discussions, on October 11,

2006, an agreement (the "Plan Support Agreement") was reached on the terms of the

Settlement that is now embodied in the Plan.  The Plan Support Agreement was executed

by the Plan Proponents, Committee II, Huff, the Arahova Noteholders Committee,

---

[69]    Tr. of Hrg. of Sept. 26, 2006, at 53.

Appaloosa Management LP, Deutsche Bank Securities, Inc., the Initial ACC Settling Parties and the Additional ACC Settling Parties. Among other terms, the Plan Support Agreement generally provides that at least approximately $1.08 billion in value will be transferred from certain unsecured creditors of various Subsidiary Debtors to certain unsecured senior, trade and other unsecured creditors of ACC and certain other holding company debtors, subject, in some cases, to repayment from contingent sources of value, including the proceeds of the CVV. As the ACC Senior Notes Claims Class has voted to accept the Plan, the $1.08 billion in value has been increased by $50 million in accordance with the Plan to $1.13 billion.

On August 18, 2006, the Debtors and the Creditors Committee filed the Fifth Amended Plan—a first version of the current iteration of the Plan—which reflected the understanding reached in the Amended Term Sheet, and a related disclosure statement supplement (the "Second Disclosure Statement Supplement"). Thereafter, subsequent iterations of these documents, reflecting the additional agreements reached and the added disclosure requirements from the disclosure approval process, were filed. On October 17, 2006, I approved the Second Disclosure Statement Supplement, relating to the Fifth Amended Plan.

*U. Designation Motions*

On November 29, 2006, the Creditors Committee filed a motion, under seal, to designate (disqualify) the votes of certain members of the ACC Bondholder Group, which the Creditors Committee expected to be voted against the Plan, based on circumstances related to those I described on page 38 above. Shortly thereafter, the ACC Bondholders Group moved to designate votes in the ACC class by Huff, members of the Arahova Bondholders Committee and members of the ACC II Committee, expected to be

voted in favor of the Plan, based upon alleged misconduct on the part of Huff and the

Arahova Bondholders Committee, and, in the case of all three of them, by reason of their

ownership of both Arahova and ACC Bonds.  After the Plan Proponents secured the

assenting ACC Senior Notes vote they wanted (even with the targets of the designation

motion presumably voting in opposition to the Plan) the Creditors Committee's

designation motion was withdrawn.  But the ACC Bondholder Group motion remained.

In a written decision,[70] I denied the ACC Bondholder Group's motion, for reasons I set

forth at length there.  One of those reasons was my view as to the importance of creditor

voting.

*V.  Valuation of TWC Stock*

Adelphia offered an expert on the valuation of the TWC stock (the "Adelphia

Valuation Expert"), who testified as to range for that stock from $5.5 billion to

$6.5 billion, with a mid-point of $6.0 billion.  He further testified that in his view, there

was an equal probability that any number in that range would represent the appropriate

valuation.

The ACC Bondholder Group did not have any expert testimony on valuation, and

its only evidence on valuation was a prospectus prepared by TWC, valuing its stock in a

manner that would result in a valuation of the Adelphia portion of the TWC at

$5.5 billion on July 31, 2006.  The ACC Bondholder Group's Expert was not asked to

form an opinion on the value of the TWC stock, and did not do so, although it is highly

likely, if not certain, that he and his colleagues could have done so if requested.  Thus

there was a material imbalance in the weight of the proof, dramatically favoring the Plan

---

[70]    *In re Adelphia Communications Corp.*, --- B.R. ---, 2006 WL 3609959 (Bankr. S.D.N.Y. Dec. 11,
2006) ("the *Vote Designation Decision*").

Proponents, although I took into account points made in cross-examination and from the TWC prospectus in making value adjustments based on the Adelphia Valuation Expert's testimony.

After hearing the evidence, I believe that a number of factors—including, most significantly, the movement in stock valuations since the time the Adelphia Valuation Expert formed his views—make it most probable that there no longer is a realistic likelihood that all values within the Adelphia Valuation Expert's $5.5 billion to $6.5 billion range are equally likely. I think the stock should be valued at the high end of the range, and find as a fact that the stock is now worth $6.5 billion. While there is some evidence in the record—*i.e.*, the TWC prospectus—that could be (and was) argued to support a higher valuation, it is insufficiently probative for me to make a finding as to a higher amount.

On the whole, the Adelphia Valuation Expert testified very competently and credibly. But the very testimony that made him believable showed that by reason of price movements in the stocks of comparable companies in the time between his November 17, 2006 valuation of the TWC stock and the date of his testimony at the confirmation hearing,[71] I should use the high end of the range of values he estimated.

I admitted into evidence a TWC valuation of its stock in its recent prospectus at a level of $5.5 billion on July 31, 2006 ($1 billion below the amount I find), and considered the argument that the valuation the TWC prospectus reflected should be boosted on the basis of comparables to reflect a greater value at this time. That might suggest, if one could do it simply as a matter of arithmetic, a valuation higher than $6.5 billion. But I

---

[71] I find this November 17 date to be sufficiently close to this hearing and any reasonably foreseeable effective date for this Plan so as to reject the ACC Bondholder Group's contention that new expert evidence of valuation had to be obtained.

found believable the Adelphia Valuation Expert's uncontradicted testimony that one would not simply change the valuation by making such a simple arithmetic computation. And the value I find is not that far off from the arithmetic result in any event.

Finally, the Adelphia Valuation Expert's decisions (a) not to include, as a relevant factor, discounted cash flow (even though it had been taken into account as a factor in earlier valuations), by reason of uncertainties as to future cash flow, and (b) to include part, but not all, of the adjustments that might seem to be appropriate by reason of tax attributes, struck me as conclusions that might not be wrong, but could be subject to fair debate. Those factors likewise cause me to conclude that the value of the TWC stock is best valued at the high end of the range the Adelphia Valuation Expert testified to, or $6.5 billion.

The failure of the ACC Bondholder Group to offer its own expert on the valuation of the TWC stock was striking. So was its failure to offer a witness from TWC to explain the methodology and assumptions underlying the TWC valuation at $5.5 billion in July 2006, or to explain how one appropriately could adjust for the July 2006 evaluation to get an evaluation for the present date. While I did take into account points the ACC Bondholder Group made in cross examination, I find there to be a failure of proof as to amounts higher than $6.5 billion, and in any event I find that amount fully supported and persuasive.

A factual finding on my part that the stock is not now worth $5.1 billion or $5.4 billion is not the same as a conclusion of law that it was or would be wrong to enter into a consensual deal under which stock is assumed to be worth $5.1 billion or $5.4 billion. But I am finding that the stock is now worth $6.5 billion.

*W.  Costs of IPO*

If the Plan is confirmed, Adelphia will be able to distribute the TWC stock that creditors will receive under the Plan under a section 1145 exemption. [72]   However, in a liquidation, the stock would not be freely tradable under federal securities laws, and Adelphia would have to register the stock, as part of an initial public offering ("IPO") to permit the lawful sale of the TWC stock.

In this connection, evidence was introduced by Vanessa Wittman, Adelphia's CFO, and Daniel Aaronson, a Managing Director at Lazard, as to what it would cost Adelphia (or a trustee acting in Adelphia's place) to make the stock saleable through an IPO.  Based on that testimony, I find that an initial public offering of the TWC stock in a chapter 7 liquidation would result in significant costs to the estates.  In a hypothetical chapter 7 liquidation, the Debtors would not qualify for a section 1145 exemption, subjecting the Debtors to the costs associated with an IPO in order for the TWC stock to be distributed to creditors.  These costs would entail, among others, primarily two components:  (i) an IPO discount and (ii) underwriting fees.

The term IPO discount describes a market perception that an issuer undertaking an IPO must offer its shares at a discount to their intrinsic value.  Stated in more simple terms, the IPO discount is the amount needed to clear the market from a stated price so that the shares can be sold. [73]  The amount of an IPO discount can range from about 5% to 10% of the value of the stock issued. [74]  I find it reasonable to estimate the IPO discount at

---

[72]      Section 1145(a)(1) reads, in relevant part:  "[S]ection 5 of the Securities Act of 1933 and any State or local law requiring registration . . . do not apply to—the offer or sale under a plan of a security of the debtor."

[73]      Aronson Testimony, Confirm. Hrg Tr. Vol. 2 at 78.

[74]      Aronson Decl. ¶11.

61

7%.  The underwriting fees constitute the gross spread or what the underwriters are paid to conduct the offering as a percentage of the dollar amount of each security sold.[75] Typical IPO underwriting fees range from 3–5%.  I find it reasonable to estimate the underwriting discount at 4%.  I further find it reasonable to assume that the value of the TWC stock to be distributed would be $6.5 billion.  Therefore, I find that the total costs associated with the IPO of TWC stock would amount to about 11% of its value, or $715 million.

## X.  The Opponents' Expert

The ACC Bondholder Group retained an expert (the "Opponents' Expert") to opine on the fairness of the settlement, who was the principal of a well-known and respected financial restructuring firm.  As is typical, the Opponents' Expert relied on fact gathering and analysis by members of his staff, including a principal assistant, who testified.  I sustained *Daubert* objections to the Opponents' Expert's effort to fix a particular dollar amount below which any settlement would not be reasonable.  But I admitted the remainder of his and his assistant's direct testimony and report (including more qualitative analysis of the settlement's fairness), and admitted all of the testimony of each on cross-examination, redirect, and thereafter.

I found the Opponents' Expert to be fully truthful.[76]  However, I have such serious concerns as to the care in reviewing the record of the MIA, and/or in

---

[75]     Wittman Testimony, Confirm. Hrg. Tr. Vol. 2 at 27-28.

[76]     As he put it at trial:

> "[O]ver the course of a long career, I have been subject to great pressure to bend which I have resisted.  I assure you that I'm not about to begin now to yield to pressure, I mean no disrespect, to a bunch of hedge fund managers and their lawyers."

understanding it, that I cannot put any material weight on the Opponents' Expert's conclusions.

At no time prior to preparing his report and coming to his conclusions did the Opponents' Expert read the *Phase I Decision*.[77]  He had not read it as of the time of his deposition.[78]  His testimony and report, in several places, assumed as premises legal matters that were flatly contradictory to holdings in the *Phase I Decision*.  And when questioned on this, the Opponents' Expert asserted that what the *Phase I Decision* actually said would not change his conclusions in any way.  Likewise, and surprisingly, his principal assistant twice expressed the view that it wasn't necessary that a fiduciary or someone advising a fiduciary "should fully familiarize themselves with all of the facts and circumstances and the merits of the litigation before offering any opinion as to the merits."[79]

These matters were not trivial.  The Opponents' Expert repeatedly discussed the company's books and records as if they were entitled to deference, with "presumptive validity" or some kind of burden to show the contrary.[80]  *That is exactly the opposite of*

---

Confirm. Hrg. Tr. Vol. 10 at 25-26.

[77]    Confirm. Hrg. Tr. Vol. 9 at 42.  Also, his principal assistant did not read the *Phase I Decision* before the expert report was issued, or at least did not include it in this list of materials reviewed. Confirm. Hrg. Tr. Vol. 8 at 98.

[78]    Confirm. Hrg. Tr. Vol. 9 at 42.

[79]    *See* Confirm. Hrg. Tr. Vol. 8 at 44-45.

[80]    *See* Testimony at ¶ 42 ("Despite the presumptive validity of the Debtors' books and records…"); Report at 30 ("Both applicable law and accounting standards accord company management wide latitude in accounting for intercompany transactions and relationships; hence, a company's books and records are ordinarily *presumed to be correct*") (emphasis added); *id.* at 70 ("The Debtors' books and records are generally considered acceptable documentation of intercompany claims"). *See also* Confirm. Hrg. Tr. Vol. 9 at 42:

>    "I also understood the Court to be saying that the underlying books and records have probative value.  In my view, they have very significant probative value for the reason that I

*what I had held.*  In the *Phase I Decision* (which the Opponents Expert had not read

before issuing his report or being deposed, but said he had read by the time of trial), I had

held—quite clearly, I think—that:

> But to say that the Business Records may be used
> for that purpose is not to say that the Business
> Records conclusively establish such claims, or that
> they presumptively do.  To the contrary, no
> presumptions that would alter usual burdens of
> proof would attach to the Business Records.

The Opponents' Expert tried to explain the inconsistency between his premise and

the MIA law of the case by saying that he had used "presumption" in a layman's sense,

and not a legal one.  This was wholly unpersuasive to me.  It's far more probable to me,

and I so infer, that his incorrect assumptions resulted not from his failures of memory as

to the law or the difference (if any) between a layman's and lawyer's understanding of a

presumption,[81] but rather from the more fundamental fact that he simply hadn't read the

*Phase I Decision*.

In a related matter, the Opponents' Expert was questioned, during cross-

examination, as to whether or not he, as a fiduciary, would accept accounting entries even

---

> briefly explained a moment ago in answer to your earlier
> question."

See also Confirm. Hrg. Tr. Vol. 9 at 41:

> "Q:  In the bottom-left-hand corner of Page 9, you state:
> 'Arahova must overcome the presumption as to the
> applicability of the debtors' books and records.'
> Do you see that?
> A:  Yes, sir.
> Q:  Do you stand by those words?
> A:  Yes, sir."

[81]   Non-lawyer experts (especially financial advisors) are frequent witnesses in this and other federal
courts.  They not infrequently express views based on the legal context in which their views are
expressed.

if they reflected out of the ordinary, multi-billion dollar transactions, even if they were

back dated 14 months (like the CCHC Recap, discussed below), and even if they would

dramatically affect creditor recoveries.[82]  The Opponents' Expert said he would still

accept them, saying "That's life."[83]  While the issue for consideration, as discussed

below, is not so much what a fiduciary (who is an advocate for the entity for whom he or

she is a fiduciary) would do as what a *court* would do, when deciding the issue, the

premise upon which he expressed that view was flawed in light of the *Phase I Decision*,

which had expressly identified, as matters to be considered:

> — the degree of effort, care, thought and integrity
> that went into the accounting entries in question,
> when first made;
>
> — the extent to which transactions reflected in the
> Business Records had economic substance;
>
> — why do various Debtors (including, inter alia,
> holding companies) show the liabilities they show;
> and
>
> — the extent to which any alternate means of
> accounting would more accurately track where
> money actually went, on whose behalf money was
> paid, or for whose benefit money was spent.

Also, the Opponents' Expert considered it to be sufficiently relevant to his

conclusions that he included in his "Summary of Settlement Dynamics" a statement that

"[b]ecause the Plan provides near par or higher recoveries for creditor groups other than

ACC, the settlement understandably garnered their support."[84]  This was plainly true, as

far as it went, but the Opponents' Expert gave no attention to support for the Plan by

---

[82]     Confirm. Hrg. Tr. Vol. 10 at 28.

[83]     *Id.*

[84]     *See* Report at 5.  *See also* Report at 12 (full page, to same effect).

others who were themselves ACC creditors, such as Tudor, Highfields, Oz, C.P. and

Satellite (all of whom became supporters of the Plan before the vote).  And while he

could not be expected to have predicted the ultimate vote by creditors of ACC, he

declined to amend his views or acknowledge the relevance of approval of the plan by the

ACC Senior Notes class, the ACC Trade Claims class, the ACC Other Unsecured Claims

class, the ACC Sub Debt class, the ACC Preferred Stock class, or the ACC Common

Stock class.[85]

*Y. Canvassing of MIA Issues*

As noted above, trial of the MIA was suspended part of the way through Phase II.

When trial of the MIA was interrupted, it had not resolved:

(a)  Validity, priority, characterization or allowance of the

Intercompany Claims ;

(b)  Inter-Debtor Fraudulent Conveyance Claims;

(c)  Allocation issues, including allocation of sale proceeds;

(d)  Substantive consolidation; and

(e)  Any remaining issues, possibly including allocation of post-

petition overhead and reorganization expenses amongst the Debtors.

The parties appear to be in agreement that the last category, while once an issue, does not

appear to have a significant effect on creditor recoveries.  Thus the principal elements of

the MIA remaining to be litigated would include the character, treatment, and priority of

Intercompany Claims (Phase II); resolution of fraudulent transfer allegations (Phase III);

---

[85]    ACC Senior Notes approval:  71.84%.  ACC Trade Claims approval: 99.88%; ACC Other
Unsecured Claims approval: 99.04%; ACC Sub Debt approval: 76.65 %; ACC preferred stock
approval: 93.52%; ACC common stock approval: 91.17%.

allocation of consideration from the Sale Transaction (Phase IV); and substantive consolidation issues (Phase V).

Though they later will require some interrelated discussion, I think I should describe them separately, in the first instance.

### 1. Phase II Matters (Intercompany Obligations)

During the course of Phase II, there was one issue that was of extraordinary difficulty, and that in many respects dwarfed all others—the extent to which I should follow the Bank of Adelphia Paradigm with respect to noncash transactions. This was a difficult issue because the realities of this case made ordinary accounting assumptions questionable. Many of us were trained in our accounting courses in the principles of "T-Accounts," under which debits and credits would be recorded in journal entries with the items on each side being equal. But what if the offsetting entries, while theoretically equal, were not equal in fact, because the account obligor whose payable was recorded on one side of the T-account was insolvent? Then transactions that theoretically would have offsetting receivables and payables would not have them in reality. If, for example, the Bank of Adelphia were only paying 30 cents on the dollar on its claims (a figure that was used by MIA litigants), assets deemed to leave Arahova, with a corresponding receivable from the Bank of Adelphia back to Arahova, would be "paid for" at the rate of only 30 cents on the dollar.

At the MIA trial, the parties disputed the propriety of applying the "Bank of Adelphia Paradigm" to intercompany balances.. The ACC Senior Noteholders Committee argued that the Bank of Adelphia Paradigm reflected economic reality and should be respected. The Arahova Noteholders argued that the Bank of Adelphia

Paradigm was a fiction and should be disregarded, at least when applied to noncash or non-ordinary course transactions.  The parties vigorously disputed the basis for the Bank of Adelphia Paradigm, how and why it was applied, and the extent to which I should respect it.  I will discuss the Bank of Adelphia Paradigm in greater depth when we come to the first issue where it is relevant, but it should be remembered that this is an issue of huge importance, that affects most, if not all, of the issues in Phase II.

Much of the evidence in Phase II concerned noncash transactions, the accounting for which was of considerable complexity.  As it was not clear to me then (nor is it clear to me now) that I would be willing to reject the application of the Bank of Adelphia Paradigm with respect to all noncash transactions, across the board, I asked the parties to hone in on the propriety of the accounting for specified transactions that then seemed to me to be of particular significance, for individualized attention.  Without having been presented any recovery analyses illustrating the economic "value" of any particular issue, I requested post-trial briefs on 14 issues raised by the parties related to intercompany transactions, on which, as of that time, I had heard testimony:

(1)     Intercompany Claims arising from entries in connection with the acquisition of Cablevision Systems Corp.

(2)     Intercompany Claims arising from entries in connection with the acquisition of Prestige Communications of Georgia and Prestige Communications of North Carolina.

(3)     Intercompany Claims arising in connection with Century Holding companies recapitalization entries posted May 2002, effective March 2001.

68

(4)    Intercompany Claims arising from entries regarding payment of dividends by FrontierVision Partners LP to ACC.

(5)    Intercompany Claims arising from entries regarding payment of dividends by Century Cable Holding Corp. to Arahova Communications Corp.

(6)    Intercompany Claims arising from entries in connection with co-borrowing debt (including funds used for Highland Prestige, ABIZ, and, to the extent applicable, Rigas securities purchases).

(7)    Claims arising from affiliate/intercompany interest entries.

(8)    Intercompany Claims arising from entries in connection with loan placement fees and management fees.

(9)    Intercompany Claims arising from booking of historic entries (including, without limitation, entries related to the "Century step up" and push-down accounting).

(10)    Intercompany Claims in connection with XO center or XO transaction entries.

(11)    Propriety of netting Intercompany Claims.

(12)    $16.8 billion receivable from Bank of Adelphia to ACC Investment Holdings, Inc., to the extent it was not included in other issues.

(13)    Arahova Communications, Inc.'s $1.44 million

receivable[86] (including $865 million in intercompany activity between

Arahova and ACC Ops.), to the extent it is not included in other issues.

(14)    Century Communications Corp.'s $717 million payable,

to the extent it was not included in other issues.

The issues as to some of these were more one-sided than others, and some would be

easier to follow after preliminary matters were addressed.  Thus I shift them around in

order, somewhat.  Arguments that each side could make in this connection follow.

a) *"CCHC Recap" (Recapitalization of Century Cable Holdings Corp) (Issue 3)*

The parties introduced conflicting evidence in Phase II as to whether ledger

balances resulting from accounting journal entries to "recapitalize" Century Cable

Holdings Corp. ("CCHC") should not be regarded as establishing claims.  The issue was

referred to in shorthand as the "CCHC Recap."

The recapitalization entries were made in May 2002 (as one of prepetition

management's last acts, just about one month before these cases were filed), but were

effective as of March 31, 2001.  Putting it plainly, they were backdated by 14 months.

The entries, made by a set of journal entries known as UG-510, related to a transaction in

which CCHC ostensibly borrowed money from the Bank of Adelphia to make a "capital

investment" (whether this was indeed a "capital investment" being a significant element

of dispute), in Century Cable Holdings, LLC ("CCH, LLC").

In their most important respects, the recapitalization entries resulted in:

---

[86]    One debtor's receivable was another debtor's payable, and as a consequence of what now appears to be confusion at the time, back in March I referred to Arahova's receivable as a payable.  In fact all parties agree that it was the *Bank of Adelphia's* payable, and that when referring to it from Arahova's perspective (which is easier to understand), it should be referred to as the "Arahova receivable."

(i) a $3.467 billion payable at CCHC ($2.286 billion of which was to the Bank of Adelphia);and

(ii) a $4.3 billion receivable at CCH, LLC ($3.121 of which was from the Bank of Adelphia).[87]

The Arahova Noteholders Committee argues that the CCHC Recapitalization entries do not reflect actual transactions creating a debt obligation or right of payment, and should not be characterized as debt claims.  On the other hand, the ACC Bondholder Group seeks to have them preserved, and to have the debt treated as valid.

### 1. Arahova Noteholders Committee's Contentions

The Arahova Noteholders Committee argues that the recapitalization entries should be disregarded because they did not involve an actual exchange of cash, or other value; that they resulted in a net intercompany balance at CCHC of almost $3.5 billion that did not actually serve to recapitalize CCH, LLC; and that they did not advance any economic purpose.  The Arahova Noteholders Committee further argues that the purpose of these entries was to hide pre-existing covenant defaults, and to avoid personal liability for issuing false compliance certificates.  Tim Werth, they argue, is the only person who can really explain why these entries were made, and he did not testify and, in any event, pled guilty to various charges.[88]

---

[87]    In this and many other aspects of my discussion of the MIA evidence and issues, I am omitting record citations except where really critical, to avoid making a very long discussion even longer.

[88]    Teri McMullen, who made the entries at Werth's direction, testified that she may never have told any one of Werth's involvement.  *See, e.g.*, McMullen, 2/23/06 AM, 15-16 ("Q.  Okay.  Did you ever tell Ms. [Carol] Savage[a forensic accountant that Adelphia hired to help in the effort to create reliable financials] that Tim Werth told you to upload UG-510 … five weeks before the filing?  A.  No, but on a consolidated basis, it's not visible to her anyways.")

This is a good example of the difference in focus between the Restatement Team's efforts to prepare reliable financials on a consolidated level and the MIA litigants' focus on accounting

The Arahova Noteholders Committee contends that running these balances through the Bank of Adelphia would ignore the economic realities of the recapitalization entries, since (a) CCH, LLC, which was in a net $700 million receivable position with respect to the Bank of Adelphia, would never have assumed a $4 billion credit risk with the Bank of Adelphia, and (b) the Bank of Adelphia would never have assumed a $3.5 billion credit risk with CCHC, which had no ability to repay a loan.

Finally, but significantly, the Arahova Noteholders Committee also contends that the CCHC net payable balance of $3.467 billion and the CCH, LLC net receivable of $4.155 billion are fundamentally unfair because those balances, when run through the Bank of Adelphia, benefit ACC to the detriment of Arahova, since any value residing in CCH, LLC flows directly to the Bank of Adelphia—bypassing the natural flow of the capital structure through Arahova.  As a result, they argue that Century Communications Corp. ("CCC") and Arahova, though effectively parents of CCHC and CCH, LLC, receive no value from their equity ownership of CCHC and CCH, LLC, respectively.

### 2. ACC Bondholder Group's Contentions

The ACC Bondholder Group contends[89] that the recapitalization entries did not require modification in the Restatement process, and do not require modification now.  Moreover, it contends that if I should determine that the recapitalization entries require modification, I should either permit them to stand as a whole or disregard them in their entirety.

---

entries at issue here.  Issues like these that would drop out in consolidation would change intercompany obligations and intercreditor recoveries.

[89]  The ACC Bondholder Group was not a participant in the MIA hearings.  At least as a general matter, it is now arguing points that were made by the ACC Senior Noteholders Committee, or would have been made by the ACC Senior Noteholders Committee or anyone taking its place if the MIA continued.

In other words, the ACC Bondholder Group contends that the Arahova Noteholders Committee should not succeed in obtaining a reversal of only the CCHC payable that resulted from the purported recapitalization, without a simultaneous reversal of corresponding receivables, since there is no principled basis upon which to apply such a selective approach.[90]  In support of its argument, it offered or could offer the following testimony and evidence.

First, the ACC Bondholder Group established that none of the recapitalization entries related to ACC, but only to subsidiaries of Arahova and their balances with the Bank of Adelphia.  Indeed, it elicited testimony from Ms. McMullen in which she acknowledged that the purpose of the recapitalization entries was to reduce the intercompany balances at CCH, LLC, which (in contrast to ACC) was a party to the Century co-borrowing facility.

Moreover, the ACC Bondholder Group asserts that leaving the recapitalization entries intact would be consistent with the Debtors' own Restatement accounting.  It elicited evidence that in determining whether or not to preserve or reverse a particular entry, the Debtors' Restatement Team made no effort to evaluate the original purpose of a particular entry (e.g., whether it was made to manipulate financial results), but simply looked to see whether it had been double-booked.

### 3  My Observations

Factor #3 in the *Phase I Decision* included the degree of "integrity" that went into the accounting entries in question.  Factor #6 in the *Phase I Decision* would require consideration of the extent to which any transaction had economic substance.  The

---

[90]    The Arahova Noteholders Committee disputes that it has adopted a selective approach and contends, instead, that it is advocating for a complete reversal of the CCHC recapitalization entries.

*Phase I Decision* gave the litigants the right to argue that I shouldn't be faithful to accounting entries that were elements of the fraud of the Rigases and their confederates. And I didn't rule that the fact that a transaction was an element of Rigas fraud would *necessarily* be conclusive—as it was possible that a transaction that took place because of Rigas fraud might nevertheless have enough economic substance to require inclusion in the financials.[91]  But it would be exceedingly difficult for ACC to base a claim against other Debtors based on a noncash transaction whose sole apparent purpose was to manipulate covenants, and which had no economic substance.

The evidence showed that members of the Restatement Team did not reverse every transaction that was seemingly or plainly the result of Rigas fraud when doing the work they did.  But there is considerable evidence to support the conclusion, if it is not also beyond doubt, that the Restatement Team's focus was on producing financials that could be audited on a consolidated basis, and that Restatement Team's members had no need or occasion to make determinations as to how to deal with Rigas-era fraud when the fraud eliminated itself in preparing consolidated financials, and affected only transactions within the Adelphia consolidated entity.[92]

Backdated transactions—especially when backdated by 14 months—tend to give rise to concerns on the part of a judge.  Noncash transactions are much more suspect than those where cash actually moved.  Transactions without apparent business purpose are likewise more suspect.  Given the absence of any evidence that the recapitalization entries had a legitimate business purpose, and the testimony from Ms. McMullen (the

---

[91]     For example, a cash transaction amounting to an improper payment to or for the benefit of the Rigases might be a classic breach of fiduciary duty, but it would still at least seemingly require accounting for it.

[92]     *See* n. 95 below.

person who made the entries) and Mr. Donovan (the person responsible for reviewing the entries) suggesting that these entries were illegitimate, I believe, and find, that the chances are remote that I would find an intercompany claim to have been established based upon the CCH Recap. The ACC Parent creditors would have a remote chance of success on this issue.

    b) *"The Arahova Receivable" (Arahova Communications $1.44 billion payable under the Bank of Adelphia Paradigm) (Issue 13)*

The "Arahova Receivable" issue is the first of several that turn on the propriety of establishing claims based on the Bank of Adelphia Paradigm.

    *1. ACC Bondholder Group's Arguments*

The ACC Senior Noteholders Committee introduced evidence in Phase II establishing that the Bank of Adelphia Paradigm was based on the centralized cash management system ("CMS") used by the Debtors, both pre- and postpetition, and that many large corporations use a similar centralized CMS. In fact, what used to be called Century Communications Corp. (which is now called Arahova, and which is different than the present Century Communications Corp.) used a similar centralized CMS before it was acquired by Adelphia. The Bank of Adelphia owned substantially all of the Debtors' bank accounts (other than certain lock box accounts and petty cash accounts), collected all receipts and made all disbursements. And the Arahova Noteholders Committee stated during the completed portion of the MIA that it would not object to the vast majority of intercompany balances.[93]

The ACC Senior Noteholders Committee introduced evidence that after a massive effort by the Debtors and PwC, the books were restated in an attempt to remove the

---

[93]    *See* Arahova Noteholders Opening Statement, 2/7/06 PM, 11-12, 42.

effects of the fraud.  And the ACC Senior Noteholders Committee elicited testimony

from Scott Macdonald and Robert DiBella that the Bank of Adelphia Paradigm now

accurately reflects prepetition transactions.[94]

## 2. *Arahova Noteholders Committee's Arguments*

The Arahova Noteholders Committee countered this evidence with evidence that

the CMS was a significant part of the mechanism used by the Rigases to further their

fraud, and that the CMS was not an ordinary, centralized CMS similar to those used by

other corporations.  There were no controls in place; nor was there a cash management

agreement; and there were no agreements or documents reflecting any Debtor's payment

obligations to the Bank of Adelphia or the Bank of Adelphia's obligation to pay its

balances with affiliates.

As significantly or more so, the Arahova Noteholders Committee elicited

extensive testimony to support its contention that the Restatement did not remove all of

the fraud and did not evaluate all intercompany transactions for economic substance.[95]  If

---

[94]    At the confirmation hearing, I had some colloquy with counsel for the ACC Bondholder Group as
to whether I should rely on generalized testimony from Adelphia CFO Vanessa Wittman as to
Adelphia's use of the Bank of Adelphia Paradigm before the filing of Adelphia's chapter 11 case,
or should rely on my memory of testimony by Robert DiBella, Carol Savage and Scott
MacDonald that had led me to believe that the Bank of Adelphia Paradigm, especially as applied
to noncash transactions, was largely a postpetition development.  My questions were based on
testimony like that of Scott Macdonald to the effect that Rigas-era journal entries were discovered
by the Restatement Team that had erroneously reflected intercompany claims *directly* between
Debtors, rather than between a Debtor and the Bank of Adelphia.  *See* Macdonald, 1/31/06 PM,
144-148; Macdonald, 2/1/06 PM, 146-151).  Apparently no mechanism was in place to prevent an
entry to be made across legal entities and accountants, in many instances, took a shortcut and
recorded a transaction across entities, even though the cash or allocation would otherwise have
flown down from the Bank of Adelphia.  If Mr. MacDonald was right (and I am aware of no
evidence that he wasn't), this would suggest that the Bank of Adelphia Paradigm was not used by
the Rigases, or was not used consistently.

[95]    *See, e.g.,* testimony by Carol Savage, a consultant retained by Adelphia after the filing ("Q.  So,
coming back to your point on transactions of substance, just with respect to the intercompany
transactions, how is it that you determined that the intercompany transactions were transactions of
economic substance or maybe you didn't form a view on it?  A.  I didn't form a view on that in
that I didn't focus specifically on intercompany transactions.  I focused primarily on how a
transaction would have affected the consolidated enterprise.  Q.  And so we're clear then, you're

there was no documentation, in general, the Restatement Team left the transactions as booked.  The prepetition ledgers contained many intercompany transactions directly between Debtors other than the Bank of Adelphia.  The Debtors' books and records show balances between such Debtors.[96]

The Arahova Noteholders Committee offered evidence to establish that the Bank of Adelphia Paradigm did not exist prepetition, and that there was no prepetition record of the Debtors that reflected that all intercompany transactions should run through the Bank of Adelphia.  Such evidence indicated that in April 2002, certain accounting personnel merely "explored the possibility" of rolling all intercompany balances up to cost center 001 (the Bank of Adelphia).  Thus, the Arahova Bondholders could and did argue that just two months before the Commencement Date, the Bank of Adelphia Paradigm was not standard operating procedure for intercompany balances within Adelphia, and it would not have been erroneous for any then existing intercompany balances to be directed between legal entities.

### 3.  My Observations

That arguments could be made on each side of this issue was known to me even before the start of Phase I.  In the *Arahova Trustee Decision*, in January 2006, I had noted:

> The Bank of Adelphia Paradigm is one way to
> ascertain intercompany obligations that arose during
> the Rigas era, but it is not the only way.  Whether it

---

not testifying that intercompany transactions as we defined them were transactions of economic substance, right?  A.  I'm not saying one way or the other that they were or were not.").

[96]    *See* McMullen, 2/21/06 PM, 76-77; Donovan, 3/1/06 PM, 28.

is the appropriate way or not is one of the issues to
be tried as part of the Intercreditor Disputes.[97]

The fact that running transactions through the Bank of Adelphia would subject the

Debtor counterparties to such transactions to a payment risk that was not reflected in the

accounting that presupposed equal offsetting entries was a matter of concern to me when

Phase II was ongoing, and would have to be a matter of concern to me if the MIA were

resumed.

When I issued the *Phase I Decision*, I observed that whether or not I could rely on

book balances would depend on whether they established *claims*, and whether the party

seeking to establish such claims (in this context, ACC) could meet the burden of

establishing their validity.  In that connection at least four of the factors[98] could be argued

to suggest that the Bank of Adelphia Paradigm could not be used where an apparent

premise in its application—that offsetting accounting entries were, in fact, equal—would

not have a basis in reality.

Where there is an interdebtor transaction where no cash changes hands or is

received or spent on behalf of a particular Debtor, quite a decent argument can be made

---

[97]    *Arahova Trustee Motion Decision*, 336 B.R. at 625.

[98]    Specifically:

> Factor #5:  the extent to which obligations seemingly
> appearing from the Business Records conform to, or are
> contradicted by, other relevant evidence;

> Factor #6:  the extent to which transactions reflected in the
> Business Records had economic substance;

> Factor #7:  why do various Debtors (including, *inter alia*,
> holding companies) show the liabilities they show; and

> Factor #9:  the extent to which any aspect of the Business
> Records is the result of purely historic facts, on the one hand,
> or judgmental matters, on the other (and, if the latter, the
> extent to which the judgmental calls should be respected

that it is more appropriate to book the transaction directly between the Debtors involved, instead of using an insolvent entity as an intermediary.

The concern would be magnified if use of the Bank of Adelphia Paradigm resulted in taking value "sidewise" out of Debtors in operating company groups and depriving their corporate parents of the value that otherwise would flow up to them—and at least seemingly channeling it instead to the corporate parents of the Bank of Adelphia, as a consequence of a failure to be returning equal value back to the operating company group Debtors.

This is such a major concern that I think that the Arahova Bondholders would have, at the least, an even money chance of success.

c)  "The AIH Receivable" ($16.8 billion receivable from ACC Investment
    Holdings, Inc. (Issue 12)

As I noted above, the May 2005 Schedules contained significant reservations. One of them said:

> The intercompany balances can be characterized in
> many ways, including (i) *pari passu* with all third-
> party debt, including bank debt; (ii) *pari passu* with
> trade debt but subordinated to bank debt;
> (iii) subordinated to all third-party debt but senior to
> common equity; or (iv) equity . . . . The Debtors
> reserve all of their rights with respect to the
> intercompany balances, including, but not limited
> to, the appropriate characterization of the
> intercompany balances.[99]

During Phase II, the Arahova Noteholders Committee advanced the argument that the $16.8 billion receivable (the "AIH Receivable") owed to ACC Investment Holdings,

---

[99]  The listed alternatives did not include other accounting treatments that might be just or that might more appropriately measure the correct amount of claims, such as a claims allowance mechanism that considered payables resulting from offsetting journal entries to be payable if, but only to the extent that, the entries would really be equal, in the event of the insolvency of any of the parties to the offsetting entries.

Inc. ("AIH"), a wholly-owned subsidiary of ACC, by the Bank of Adelphia should be

recharacterized as equity, equitably subordinated, or disallowed.  The ACC Bondholder

Group argued that there is no basis to recharacterize, subordinate, or disallow the AIH

Receivable.

### 1.  Recharacterization

Recharacterization disputes are not uncommon in bankruptcy cases, and I

conducted a lengthy trial on this issue in a similar interdebtor dispute between PSINet

and PSINet Consulting Solutions (its former subsidiary) in the *PSINet* and *PSINet*

*Consulting Solutions* cases about two years ago, which ultimately resulted in a settlement.

Coincidentally, and perhaps ironically, the trustee of PSINet Consulting Solutions, who

was then arguing in favor of recharacterization, is the Opponents' Expert in these

cases,[100] who takes the opposite position here.[101]

### (a) ACC Bondholder Group's Arguments

The ACC Bondholder Group argues that the intercompany claims arising from the

operation of the cash management system are enforceable as debt and not equity.  It

asserts that the claims reflect liabilities from prepetition transactions of economic

substance among the Adelphia entities where transfers, flowing through the CMS, were

recorded as intercompany payables and receivables through the Bank of Adelphia.

According to the ACC Bondholder Group, this argument is supported by one of the key

---

[100]    *See* Response to *PSINet* Liquidating L.L.C.'s Objection to Claims of *PSINet* Consulting
Solutions…," *In re PSINet*, No. 01-13213 (REG), dated Oct. 17, 2002 (ECF #1278) at ¶ 23 ("First
the Trustee seeks a declaratory judgment that *PSINet*'s contributions to Consulting are equity
investments in Consulting and not loans, as the Reorganized Debtors allege.") (apparent
typographical error corrected).

[101]    *See, e.g.,* Report at 37 ("Parent entities, in [the Opponents' Expert's] experience, routinely provide
value to subsidiaries in the form of intercompany advances….  A fiduciary would assume that the
merits of this issue favor ACC's position.").

cases in the area, *Hillsborough Holdings*.[102]  There, intercompany liabilities pursuant to a

cash management system were held enforceable as debt and not equity.

The ACC Bondholder Group argues that Adelphia's claims were identified as

receivables and payables in Adelphia's books and public financial statements, which was

"sufficient formality for an intercompany loan."  It further argues that in a case that is an

important part of the Second Circuit's bankruptcy jurisprudence, *Augie Restivo*[103] (a case

that also held that substantive consolidation was improper, and which is discussed

below), the Second Circuit established that the enforcement of claims among affiliated

debtors would be the rule, and that intercompany claims often serve as an important

component of creditors' recovery.

The ACC Bondholder Group also contends that recharacterization would be

inappropriate, citing case law for the proposition that the movement of cash and

consideration among affiliated entities pursuant to a consolidated cash management

system results in debt, not capital contributions or dividends.  It asserts that an entry of an

advance on the corporate books is sufficient formality for an intercompany loan since a

cash management system would be unworkable if separate writing for each transaction

were required.  It argues that these transactions do not merit recharacterization because

the AIH Receivable resulted from direct cash proceeds from ACC's securities issuances,

or from the consideration for acquisitions, not equity investments.  This, the ACC

Bondholder Group asserts, is made clear from the interest paid on the AIH Receivable by

the Bank of Adelphia.

---

[102]  *Hillsborough Holdings Corp. v. Celotex Corp. (In re Hillsborough Holdings Corp.)*, 166 B.R. 461, 471 (Bankr. M.D. Fla.), *aff'd* 176 B.R. 223 (M.D. Fla. 1994).

[103]  *Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 519 (2d Cir. 1970)

The ACC Bondholder Group further argues that the intent to treat intercompany transactions as debt is indicated in interest charge entries on the intercompany balances, which were disclosed in the Adelphia prepetition public financial statements.

### (b) Arahova Noteholders Committee's Arguments

The Arahova Noteholders Committee argues that the prepetition ledger entries are insufficient to prove billions of dollars of intercompany debt, and that the ACC Bondholder Group cannot use circumstantial evidence to satisfy ACC's heightened burden of proof as an insider of the Debtor. It argues that evidence of debt—such as loan agreements or promissory notes—is significantly absent. And it argues that when a parent raises money (particularly by issuance of equity), and sends it downward to its subsidiaries, it is entirely reasonable to regard that as an equity investment, especially where, as here, no promissory notes were executed or there was any other contemporaneous documentation to evidence a loan.

The Arahova Noteholders Committee argues that any inter-Debtor balances resulting from contributions of ACC should be characterized as equity because contributions of a parent to its subsidiaries without the creation of a note or other indicia of indebtedness, such as terms of interest or documentation as a "payable," should be treated as equity.[104] The Arahova Noteholders Committee argues that when the Debtors wanted to document a transaction as a debt transaction, the Debtors created

---

[104]  *See* Arahova Noteholders Phase II Responsive Brief ("Arahova P2 Resp. Br.") at 15 (citing *AutoStyle Plastics, Inc.*, 269 F.3d 726, 750 (6th Cir. 2001) ("The absence of notes or other instruments of indebtedness is a strong indication that the advances were capital contributions and not loans.")).

promissory notes, which shows the recognition that a note was the proper way to document a debt transaction.[105]

The Arahova Noteholders Committee asserted in Phase II that prior to the filing of the May 2005 Schedules, creditors of Arahova had no expectation that intercompany claims would cause the holding company and the holders of convertible subordinated debt (which by their terms were subordinated to other creditors) to be senior to operating company creditors.  In fact, it argues that Adelphia's prepetition public filings made clear that all ACC debt was structurally subordinated to the debt of its subsidiaries, such that the assets of an indebted subsidiary would be used to satisfy the applicable subsidiary debt before being applied to the payment of parent debt.

In that connection, the Arahova Noteholders Committee argued that certain of ACC's publicly filed documents said:

> The operations of the Adelphia Parent Company are conducted through its subsidiaries.  Therefore, the Adelphia Parent Company is dependent on the earnings, if any, and cash flow of and distributions from its subsidiaries to meet its debt obligations, including its obligations with respect to the Notes.  Because the assets of its subsidiaries and other investments constitute substantially all of the assets of Adelphia Parent Company, and because those subsidiaries and other investments will not guarantee the payment of the principal of and interest on the Notes, the claims of holders of the Notes effectively will be subordinated to the claims of creditors of those entities.

And it is true that none of the operative debt instruments for Arahova provided that the notes issued thereunder would be subordinate to any intercompany claims, and that

---

[105]    ACC current management testified that when a note existed, management respected the characterization of the transaction and did not run the balances related to the parties to the notes through the Bank of Adelphia.  (*See* Arahova P2 Reply Br. at 15, citing Macdonald Tr. 207:25-208:5.)

Adelphia's prepetition Form 10-K, filed on April 2, 2001 for the period ended December 31, 2000, made clear that "[a]ll significant intercompany accounts and transactions have been eliminated in consolidation," suggesting that there would be no intercompany obligations that could trump Arahova creditor rights to payment.

As a result, the Arahova Noteholders Committee argues that investors would have no way of knowing that intercompany claims among the various Debtor companies would somehow attain priority on par with the claims of investors in the subsidiary notes.

The Arahova Noteholders Committee also disputes ACC's reliance on the accrual of interest on intercompany liabilities as evidence that liabilities arising from a cash management system are debt.  It cites observations on the part of members of Adelphia's Restatement Team and PwC Forensics personnel that regarded interest charges booked by the Rigases as inconsistent and possibly fraudulent.[106]  In essence, the Arahova Noteholders Committee asserts that parties dealing in transactions constituting billions of dollars would be expected to have some formal understanding as to basic issues, such as:  "(1) what is the interest rate? (2) when is payment due? (3) what is the source of the repayment? (4) what security is there for the payment? and (5) does this party have an ability to satisfy the obligations."[107]

*(c)  My Observations*

The ACC Bondholder Group is right when it observes that the fact that money comes down from a parent to its subsidiary does not by itself make it an equity

---

[106]    PwC Forensics identified several instances of apparent affiliate interest manipulation in the records of the Company to alter results of different borrowing group financial statements.  In many instances, the fees have no relationship to capital being provided."  (*See* Arahova P2 Resp. Br. at 13).

[107]    Arahova P2 Resp. Br. at 13.

investment, and that intercompany accounts have been held to be sufficient documentation of debt.  But the Arahova Noteholders Committee also has very respectable arguments in this regard, particularly when one considers the absence of any contemporaneous documentation (not just promissory notes), terms for repayment, means to satisfy the repayment obligation, and the fact that interest accruals were sporadic and at least seemingly fraudulent.  Different results could also apply to the proceeds of debt offerings, on the one hand, and equity offerings, on the other.

There is authority to support and reject recharacterization and disallowance of the AIH Receivable.  I am not in a position to conclude that either side has a material advantage on this issue over the other.  It must be regarded as an issue that could go either way.

### 2. *Equitable Subordination*

Equitable subordination of debt is authorized under both pre- and post-Code caselaw, and section 510(c) of the Bankruptcy Code.  The ACC Bondholder Group and the Arahova Noteholders Committee differ on whether it could appropriately be imposed here.

### (a) *ACC Bondholder Group's Arguments*

The ACC Bondholder Group argues that the AIH Receivable cannot be equitably subordinated because ACC has not engaged in any misconduct that caused harm to Arahova or its creditors.  Contrary to the Arahova Noteholders Committee's assertion, the ACC Bondholder Group argues that the fraud perpetrated by the Rigas family cannot be attributed to ACC, or, alternatively, must be attributed to every Debtor in the Adelphia enterprise.

85

*(b) Arahova Noteholders Committee's Arguments*

The Arahova Noteholders Committee argues that the Rigases' conduct, while serving as officers and directors of ACC (and using their positions as such to control the rest of the Adelphia enterprise) is the epitome of "inequitable conduct" justifying equitable subordination.  And the Arahova Noteholders Committee argues that it is inequitable for ACC creditors to benefit derivatively from the fraud orchestrated by Rigas management to the detriment of the recoveries of Arahova.  For example, $1.776 billion of the AIH Receivable relates to securities of ACC purchased by the Rigases, which purchases were likely, if not plainly, fraudulent.  Debtors other than ACC, including Debtors in the Arahova Group, were liable for co-borrowings that the Rigases used for their own purposes.

*(c) My Observations*

MIA Phase II was never completed.  Thus, factual submissions were not completed, and there has been no expert testimony yet.  That said, it is clear from the existing record that whether part or all of the AIH receivable should be equitably subordinated is a factually intense issue and presents difficult legal issues for adjudication.

I had initially thought that since the Rigases and their confederates were doing improper things throughout Adelphia's capital structure, and were acting, at various times, on behalf of one or another of nearly all of the Debtors, I would be disinclined to penalize creditors of one of the Debtors to benefit the creditors of another, and thus would not regard the Arahova Noteholders Committee's equitable subordination arguments to be as strong as its arguments for recharacterization or (especially) for

declining to follow the Bank of Adelphia Paradigm. But I have since come to respect the

argument that the Rigases used their positions at ACC and control over Debtors other

than ACC in a way that would cause injury to those Debtors to a greater degree than

ACC itself—such as by making them liable for bank debt that at least seemingly was

used for the Rigases' benefit at the ACC level, such as for purchases of ACC securities.

A respectable argument could be made that I would need to take curative action to

address the issue of equitable subordination, if the facts established that those premises

were true.

Accordingly, it is difficult to predict at this juncture which party would prevail if

litigation is not compromised under the Settlement. Very little testimony or evidence was

introduced by the parties during MIA Phase II concerning the AIH Receivable, and the

MIA was stayed before the evidence was closed on this issue. While I see that the

Opponents' Expert predicted victory for ACC on this issue, I cannot share his optimism.

Neither side can assume victory in this regard. I think that equitable subordination is

quite a difficult issue in the case, and one that could easily go either way.

### d) "CCC Payable" (Century Communications Corp. $717 million payable under Bank of Adelphia Paradigm) (Issue 14)

The parties next dispute the propriety of the intercompany payable of Century

Communications Corp. ("CCC") of approximately $717 million to the Bank of Adelphia

because (a) the payable is generated by the Bank of Adelphia Paradigm, and (b) the

payable resulted from the Restatement Team's reversal of certain entries made by

prepetition management (the so-called "Century Step-Up") in connection with the acquisition of Century Communications Corp. (the "Century Acquisition").[108]

When Adelphia acquired Century in October 1999, the price paid by Adelphia was higher than the aggregate book value of the assets owned by Century. The "Century Step-Up" was a series of entries made by the Debtors' prepetition management to step-up the book value of the Century assets to match the market value of the purchase price on the aggregate amount paid for Century stock. Prepetition management originally booked the Century Acquisition using the "equity method," but subsequently changed the accounting to the "hybrid method," whereby the parent recorded the investment with an offset to its equity account, and the purchase price was "pushed down" through intercompany accounts, resulting in intercompany balances to the extent intercompany accounts were used (including an intercompany receivable of approximately $1.777 billion at CCC).

Because the source of the cash for Adelphia's purchase of Century was the Bank of Adelphia, the Restatement Team felt it did not make "sense" for there to be such a large intercompany receivable at Arahova (approximately $1.4 billion), and that it would have been more "appropriate" to: (i) record an intercompany receivable at the Bank of Adelphia, and an intercompany payable at Arahova and (ii) convert Arahova's intercompany receivables into equity. The Restatement Team determined that certain historic entries had generated much of Arahova's intercompany receivable, and determined that a restatement entry should be posted to reverse the associated impact to intercompanies through equity.

---

[108] That payable would become a $354 million receivable upon the elimination of certain historic acquisition balances (the "Historic Entries"), as discussed in connection with Issue 14.

During the Restatement process, the Century Acquisition was adjusted to the equity method, whereby the parent recorded the acquisition as an investment on its books and as equity on the books of the acquired entity, resulting in no intercompany balances. Of the many Restatement entries that together resulted in a decrease to the net intercompany balance between Arahova and the Bank of Adelphia from $1.375 billion down to $351 million, $1.385 billion in adjustments affected transactions in the acquisitions/swaps category. That $1.385 billion in adjustments, in turn, was comprised of two Restatement entries in the amounts of $1.36 billion and $24 million, respectively.

### 1. ACC Bondholder Group's Contentions

To the extent CCC received no value for this transaction, the ACC Bondholder Group contends that the Bank of Adelphia Paradigm is needed to eliminate CCC from these entries. The ACC Bondholder Group's argument is bolstered, it asserts, by the Debtors' acknowledgment that the only reason prepetition accounting personnel recorded transactions with parties other than the Bank of Adelphia was that it was easier to do so.

Finally, the ACC Bondholder Group could argue that the underlying journal entry was driven in part by the requirements of push-down accounting, whereby the value of the purchase price is "pushed down" to the value of the assets and the legal entities.

### 2. Arahova Noteholders Committee's Contentions

The Arahova Noteholders Committee argues that the Debtors' Restatement Team acknowledged that no standards were applied with respect to whether the journal entries would be moved from intercompany to equity, and could not explain why this particular set of step-up entries appeared in the intercompany (as opposed to the equity) accounts, or even why only some of the Century Step-Up entries needed to be made. And the

89

Arahova Noteholders Committee further argues that the Debtors' Restatement Team acknowledged that there was no GAAP provision, and indeed no standard or principle whatsoever, behind its decision to reverse one aspect of the Century Step-Up, other than a feeling that it was inappropriate.

### 3. My Observations.

I haven't yet concluded whether unwinding this transaction would achieve a just result. It appears that there may have been a legitimate basis for the Restatement Team to have made the entries it did. Whether or not those measures were required by GAAP, I find it understandable that the result of a transaction under which the Bank of Adelphia made expenditures for an acquisition would result in a net payable back to the Bank of Adelphia. However, it also appears that the entries may never have been made in the first place if the Restatement Team had a fuller understanding of the original accounting for the Century acquisition.

This issue too could go either way. But on balance, I think the ACC Noteholders Committee has somewhat the better of this argument.

### e) Acquisition Accounting, In General (Intercompany Issues 1, 2)

Another point of contention among the parties is whether the acquisitions of Century Cablevision (the "Cablevision Acquisition") and Prestige Communications North Carolina/Prestige Communications Georgia (the "Prestige Acquisition"), which together constitute two of the three prepetition acquisitions involving Arahova's subsidiaries, should be restated.

The Arahova Noteholders Committee contends that the following intercompany balances arising from Adelphia's accounting for these acquisitions do not represent actual

transfers of value between Debtors creating a right to payment, and that the accounting

for these acquisitions should be restated so as not to rely on intercompany accounts:

> (i)      Adelphia Cable Prestige's net balance of $841 million to
> the Bank of Adelphia;
>
> (ii)     Adelphia Cleveland's net balance of $827 million to the
> Bank of Adelphia; and
>
> (iii)    Adelphia of the Midwest's $898 million payable to the
> Bank of Adelphia.

The ACC Bondholder Group maintains that the use of intercompany payables for these

acquisitions appropriately reflected the debt obligations they were intended to be, was the

preference of Adelphia's prepetition management, and was perfectly appropriate under

GAAP—such that the only reason to restate the accounting for these acquisitions would

be to benefit Arahova.

The Debtors' prepetition management applied three different methodologies in

accounting for acquisitions:  (i) the "intercompany accounts" method, whereby the

purchase price was "pushed down" to the applicable legal entity from the parent,

resulting in an intercompany receivable at the parent level and an intercompany payable

at the subsidiary where the assets are recorded; (ii) the "equity transaction" method,

whereby the parent recorded the acquisition as an investment on the parent's books and

as equity on the acquired legal entity's books, resulting in no intercompany balance; and

(iii) the "hybrid" method, whereby the parent recorded the investment with an offset to its

equity account and the purchase price is "pushed down" through intercompany accounts,

resulting in intercompany balances to the extent intercompany accounts are used.

According to the Arahova Noteholders Committee, each accounting method was applied by prepetition management inconsistently and, according to Arahova, incorrectly. The Debtors originally booked the Cablevision Acquisition using the hybrid method, and the Prestige Acquisition using the intercompany method.[109]

The ACC Bondholder Group and the Arahova Noteholders Committee advance both general arguments in favor of or against the Debtors' acquisition accounting, and arguments that are specific to the challenged acquisitions. The arguments that are applicable to both transactions are addressed first, followed by the arguments that are specific to each of the challenged acquisitions.

### 1. *Arahova Noteholders Committee's Contentions*

As a general matter, the Arahova Noteholders Committee argues that intercompany obligations resulting from the accounting relating to the acquisitions: (i) should have used the equity accounts; (ii) did not result in valid debt with a right to repayment; and (iii) bear no indicia of a validly created debt obligation.

In arguments very much like those previously addressed in connection with AIH Receivable Recharacterization, the Arahova Bondholders Group argues that the purported intercompany obligations of Arahova and its subsidiaries bear none of the hallmarks of debt, as: (i) there are no instruments evidencing indebtedness, maturity dates or schedule

---

[109]    As noted above, a third acquisition, the Century Acquisition, was originally booked using the equity accounting method, but subsequently was changed to the hybrid method when the purchase price was pushed-down to the legal entities, which created an intercompany receivable of approximately $1.777 billion at CCC. During the Restatement process, as discussed above, the accounting of the Century Acquisition was changed once again from the hybrid method to the equity method, which reversed the $1.777 billion intercompany receivable at CCC. According to the Arahova Noteholders Committee, had the Century Acquisition not been adjusted during the Restatement, CCC would have had a $932 million intercompany receivable balance, instead of an $845 million intercompany payable. With the exception of the Restatement of the Century step-up to equity, the Debtors' accounting treatment of the Century Acquisition is not within the scope of the MIA.

of payments, fixed rate of interest, or identified source of repayment; (ii) the capitalization of Arahova and its subsidiaries was inadequate; (iii) Arahova and its subsidiaries and the Bank of Adelphia have a common parent; (iv) the obligations are unsecured; (v) outside financing would not have been available, absent ACC's continued non-disclosure of the Rigas fraud; (vi) the absence of evidence of demands for payment indicates that the obligation was subordinated; (vii) there is no evidence concerning the use of the funds; and (viii) there was no sinking fund to provide repayment.

And the Arahova Noteholders Committee argues that these claims do not rise to a "right to repayment," in particular where, as here:  (i) the purported public disclosures of these obligations are rife with fraud; (ii) interest charges on these obligations were manipulated and bore no relationship to the capital provided; (iii) there is no evidence that cash actually changed hands in these purported borrowings; and (iv) the Debtors recognized the proper way to document a debt transaction, and created promissory notes when they wanted to reflect actual debt.

Significantly, the Arahova Noteholders Committee argues that prepetition management booked the transactions in the way it did not because it was the right thing to do, but simply because it was easier.[110]

And finally, the Arahova Noteholders Committee argues that the Restatement Team's decisions as to what may have been appropriate from an accounting perspective should not dictate how value should be allocated in a bankruptcy case upon proven claims.

---

[110]    *See* Arahova P2 Reply Br. at 13-15.  *See also*  McMullen, 2/17/06 PM, 37-39, 62-63 (acknowledging the absence of criteria or guidelines for the determination of whether an acquisition would be accounted for through equity or intercompany accounts); McMullen, 2/23/06 AM, 81-82 (discussing the relative ease of accounting for acquisitions through intercompany, as opposed to equity, method).

## 2. ACC Bondholder Group's General Contentions

Similarly, the ACC Bondholder Group makes arguments much like those it makes in connection with AIH Receivable Recharacterization.  As a general matter, the ACC Senior Noteholders Committee argued at the MIA hearings that the intercompany obligations running between Arahova Group entities and the Bank of Adelphia would bear the marks of debt, not equity, because:  (i) they do not reflect obligations between a parent to its wholly-owned subsidiary, but rather between Arahova and its subsidiaries and an affiliate (the Bank of Adelphia) with whom they have no direct or indirect ownership interest; (ii) the Debtors knew the difference between equity and debt, as evidenced by the fact that transactions intended to be equity investments, capital contributions, or dividends were recorded as such; (iii) the transactions were not merely rubber-stamped by the Restatement Team, but were reversed when the intent and substance of the transactions reflected equity instead of debt; and (iv) the intercompany claims, arising under the CMS, are similar to the types of liabilities that are incurred daily in the postpetition period and to which the Arahova Debtors have not objected.

The ACC Senior Noteholders Committee next argued that, rather than sweep aside entire categories of intercompany liabilities, the Arahova Noteholders Committee had to establish, on a case by case basis, that the transaction underlying the claim at issue was in substance indicative of an equity contribution rather than cash.

The ACC Senior Noteholders Committee further argued that even where the intercompany obligation was *not* accompanied by certain indicia typical of debt, such as a note or a repayment schedule, such an obligation could properly be treated as debt instead of equity where:  (i) even if no separate writing existed, the obligations at issue were

listed in the Debtors' books and records as payables and receivables, not equity; (ii) the obligations were disclosed in the Debtors' audited financial statements and public filings, affording third-party creditors notice of such obligations and their characterization as debt; (iii) even if no definitive interest rate was contained (an irregularity that was corrected in the Restatement Process), interest on the obligations was charged periodically; (iv) even if no repayment schedule was established, the relevant parties expected the obligations to be repaid; (v) repayment of the obligations was not tied to the profitability of the entities that incurred them, but rather through ongoing and regular settlement of intercompany debt; and (vi) the evidence suggested that the Arahova Debtors were adequately capitalized.

Finally, the ACC Senior Noteholders Committee argued that the debt obligations could not be recharacterized as equity where: (i) there was no identity of interest between the creditor and stockholder (i.e., the obligations did not reflect advances between a parent and its subsidiary or a stockholder and its corporation, but rather between the Arahova Debtors and their affiliate, the Bank of Adelphia); (ii) the recharacterization doctrine is not intended to protect a corporation (i.e., Arahova) from claims asserted against its subsidiaries and other entities in which it has an equity interest because such equity holders would be deemed to know of the existence of the obligations of their affiliates; and (iii) recharacterization of the myriad transactions with the Bank of Adelphia would make it impossible to allocate ownership between creditors whose interest was denominated in dollars and shareholders whose interest was denominated in shares.

### 3. My Observations

I would likely agree with the ACC creditors that transactions would have to be looked at on a case-by-case basis. But I would be mindful of the fact that the burden would go the other way, placing the burden on the entity that was trying to establish a claim.

Once looking at the transactions on a case-by-case basis, I would undoubtedly have to give substantial weight to the McMullen testimony that the debt method was used for accounting for the acquisitions not because it was required by GAAP or preferred, but simply because it was easier. This was not fraudulent, but it was not a satisfactory premise upon which I could find a claim. Though I will talk about the specifics momentarily, this is a matter of substantial concern, and would almost certainly result in an Arahova Noteholders Group win on each of the acquisition accounting issues.

The specific acquisitions that have been challenged, as well as the ACC Senior Noteholders Committee's and the Arahova Noteholders Committee's respective arguments with respect to those acquisitions, are addressed below.

### f) Cleveland Cablevision Acquisition (Intercompany Issue 1)

The "Cablevision Acquisition" is shorthand for two transactions, both of which were finalized in November 2000. In the first transaction, which was a cash transaction, ACC acquired the assets of Cablevision of Cleveland, L.P. and Telerama, Inc. for $990 million pursuant to an Asset Purchase Agreement dated December 8, 1999 (the "Cablevision APA"). ACC subsequently assigned its rights under the Cablevision APA to Adelphia Cleveland, LLC ("Adelphia Cleveland") pursuant to a letter dated November 1, 2000. In the second transaction, a stock transaction, ACC agreed to merge with

Cablevision of the Midwest, Inc. under an agreement pursuant to which ACC issued 10,800,000 shares of its common stock, valued at approximately $503 million, to the shareholders of Cablevision of the Midwest, Inc.  Thus, the total acquisition amount of the Cablevision Acquisition (including both its cash and equity components) was $1.493 billion.

The acquisition was accounted for using the hybrid accounting method.  Journal entries associated with the acquisition were recorded in nine steps.  With respect to the stock portion of the Cablevision Acquisition, Adelphia initially recorded the stock on the equity accounts (i.e., the transfer from ACC to Arahova), but then switched to intercompany accounts (i.e., the transfer from Arahova to CCC) before the equity reached its final resting home (i.e., Adelphia of the Midwest, Inc.).  With respect to the cash portion, only intercompany accounts were used.  Ultimately, an intercompany payable of $503 million was created at Adelphia of the Midwest, Inc. (an entity with no subscribers or employees that was created for the sole purpose of furthering Adelphia's tax strategy) and an intercompany payable of $990 million was created at Adelphia Cleveland, LLC.

Neither the ACC Senior Noteholders Committee's nor the Arahova Noteholders Committee's expert could describe the source of the $990 million for the acquisition with certainty.  The Arahova Noteholders Committee argued that the source was a draw on the Century co-borrowing facility of $1.05 billion on November 1, 2000, while the ACC Senior Noteholders claimed that there was no way to conclude that the source for the cash was the Century co-borrowing facility, in particular since $120 million of the draw was allocated to Adelphia Business Solutions,[111] not CCH, LLC.

---

[111]     Adelphia Business Solutions (often referred to by its former ticker symbol, "ABIZ") was a corporate enterprise (with its own subsidiaries) engaged principally in the telecommunications

### 1. Arahova Noteholder Committee's Arguments

The Arahova Noteholders Committee contends that the accounting for the Cablevision Acquisition was inappropriate for the following reasons:

(i)  The choice of accounting methodologies for the acquisition was a reflection of the relative ease of recording the transactions through the intercompany, as opposed to the equity, methodology.[112]

(ii)  The Restatement Team (to which the ACC Bondholder Group would have this Court defer) itself acknowledged that it would account for the acquisition through the equity, rather than the intercompany, method were the Restatement being performed today and not merely reviewed.

(iii)  There was no legitimate business purpose for the accounting treatment of the Cablevision Acquisition.

(iv)  The acquisition was accounted for through inappropriate intercompany "churning," as is apparent from the number of legal entities through which the Cleveland Cablevision assets (both stock and cash) were transferred.

(v)  The Bank of Adelphia lacked economic interest in the transaction.

---

business, that was spun off from Adelphia shortly before these cases were filed.  In March 2002, ABIZ filed its own chapter 11 case in this Court, before me, and though the two chapter 11 cases were separate, they were closely related, by reason of the interlocking relationships and shared services of the two companies.  While ABIZ had some intercreditor disputes, they were by no means of the same magnitude of those here, and a consensual reorganization plan for ABIZ was confirmed and became effective about three years ago.

[112]    *See* McMullen, 2/17/06 PM, 68-70; McMullen, 2/28/06 PM, 15; ANC-93; ANC-93-A; ACC-284 (UG-660).

(vi)  Recording voluminous intercompany activity had an arbitrary and adverse impact on the recovery of the Arahova noteholders.

(vii)  The intercompany obligations were not accompanied by any of the documentation that is ordinarily expected for a debt transaction.

### 2. ACC Bondholder Group's Arguments

The ACC Bondholder Group defends the accounting of the Cablevision Acquisition on the following grounds:

(i)  It was appropriate to treat the intercompany payables of Adelphia Cleveland and Adelphia Midwest as debt even without additional documents evidencing a debt obligation.  The affiliate liabilities related to the acquisition were evidence enough of an obligation to pay for those assets, in particular given the lack of evidence suggesting that there was no intention to take on an obligation to pay for the assets received, and the absence of standards preventing the assumption of an intercompany obligation.

(ii)  GAAP does not address the character and treatment for business, financial, and accounting purposes for intercompany transactions among wholly-owned subsidiaries.  Instead, the manner in which such transactions are characterized and recorded is within the discretion of management.

(iii)  Adelphia Cleveland and Adelphia of the Midwest actually received the assets associated with these transactions, and these assets were included in Arahova's December 31, 2000, Form 10-K.

99

(iv)  The Restatement Team did not change the intercompany treatment of the Cablevision Acquisition, and there is no evidence that the restated acquisition amounts are inaccurate.

(v)  The guidelines of push-down accounting are not relevant to the Cablevision Acquisition, as push-down accounting does not involve accounting for asset purchases or other acquisition transactions among related entities (i.e., Adelphia affiliates and subsidiaries).  In the Cablevision Acquisition, the intercompany liabilities reflect the accounting for the transactions by the subsidiaries Adelphia Cleveland and Adelphia of the Midwest, Inc., which are, respectively, the purchasers in the asset and stock transactions, not the acquired entities.  Thus, there was no "push-down" of assets or goodwill.

(vi)  Decisions regarding the use of intercompany liabilities for certain acquisitions were motivated in part by "valid" state tax purposes, and thus reflected management's determination to structure the transactions a certain way.  There is no basis for recharacterizing those transactions.

(vii)  There is no evidence suggesting that the Assignment from Cablevision APA to Adelphia Cleveland, LLC should not be honored. Adelphia Cleveland actually received assets purchased under the Cablevision APA and its associated intercompany liabilities, as reflected in the May 2005 Schedules, are appropriate and consistent with Arahova's prepetition financial statements.

100

### 3. My Observations

If it were necessary to account for this transaction in the fashion that Adelphia did so in the prepetition period in order to trace the flow of cash, I would be inclined to respect it. But that is not what the accounting here is all about. It is essentially about the choice to book the intercompany aspects of this acquisition as debt, rather than as equity.

If a thoughtful judgment call had been made during the prepetition period that there were good reasons for employing the debt, or hybrid, methods of accounting, this would be a close issue. But the testimony was repeated, and dramatic, that the debt method was chosen simply because it was easier. Whether or not such a decision makes for sound accounting, it is insufficient support for finding the existence of a claim. For reasons akin to those discussed above, this is an area where the Arahova Noteholders Committee would almost certainly win.

### g) Prestige Acquisition (Intercompany Issue 2)

The Prestige Acquisition involved two transactions, both of which were finalized in July 2000. In the first transaction, Adelphia Prestige Cablevision LLC ("Adelphia Prestige") acquired the assets of Prestige Communication of NC, Inc. (which had franchises in North Carolina, Virginia, and Maryland) pursuant to an asset purchase agreement, entered into in December 1999, for approximately $795 million in cash. Although ACC was the original purchaser for the acquisition, ACC subsequently agreed to assign its rights under the asset purchase agreement to Adelphia Prestige pursuant to an assignment in July 2000.

In the second transaction, ACC acquired the stock of Prestige Communications, Inc. (which had franchises in Georgia) for $300 million in cash pursuant to a stock

purchase agreement, also entered into in December 1999.  ACC subsequently agreed to sell the stock of Prestige Communications, Inc. to a Rigas family entity, Highland Prestige Georgia, Inc. ("Highland Georgia"), for the same price, pursuant to a separate letter agreement in June 2000.  Thus, the total price for the Prestige Acquisition was $1.094 billion, which was paid for by three wire transfers.

On March 8, 2000, the Board of ACC approved the participation of Highland Georgia—the Rigas entity that acquired Highland Prestige—in the Century co-borrowing facility to fund its portion of the acquisition.  On July 31, 2000, approximately $301 million either was advanced (according to Arahova) or allocated (according to ACC) to Highland Georgia, from the CCH Facility to fund Highland Georgia's acquisition of Highland Prestige—even though only $236.4 million was due at the closing.  On the same day the acquisition closed, $900 million was drawn from the Century-TCI credit facility, most likely to fund the $728.6 million in cash required at the closing of the Prestige-North Carolina acquisition.

The Prestige Acquisition was accounted for using the intercompany method. Adelphia Prestige owes the full amount of the Prestige Asset Purchase Agreement and the Prestige Stock Agreement, or $1.094 billion.  In addition, Highland Prestige Georgia has an affiliate payable to Adelphia Prestige of $300 million, the purchase price of Prestige Communications, Inc. (Georgia), while Adelphia Prestige has an affiliate receivable from Highland Prestige Georgia of approximately $300 million in connection with the Prestige Communications, Inc. stock purchase agreement.

### 1. ACC Bondholder Group's Arguments

The ACC Bondholder Group argues that the accounting for the Prestige Acquisition should not be restated for six reasons, most of which are very similar to arguments addressed above:

(i)  It is appropriate to treat the intercompany obligations created in the accounting for the Prestige Acquisition as debt even without additional documents evidencing debt.

(ii)  GAAP does not address the character and treatment for business, financial, and accounting purposes for intercompany transactions among wholly-owned subsidiaries.  Instead, the manner in which such transactions are characterized and recorded is within the discretion of management.  So long as the accounting entries represent real transactions and the amounts recorded are accurate, management's decision is reasonable.  While prepetition management could have recorded the acquisition through a number of alternative accounting methodologies, the accounting methodology it chose was the intercompany method.

(iii)  Adelphia Prestige and Highland Georgia actually received the assets associated with these transactions, and these assets were included in Arahova's September 30, 2000, Form 10-Q.

(iv)  While the Restatement Team recorded numerous entries to adjust the allocation of the total acquisition cost between Adelphia Prestige and Highland Georgia, none of these entries changed the

103

intercompany treatment of the acquisition.  There is no evidence that the restated acquisition amounts are inaccurate.

(v)  It was appropriate to reroute the Prestige Acquisition through the Bank of Adelphia since doing so corrected errors in Adelphia's prepetition ledger (i.e., Adelphia Prestige's gross payable to the Bank of Adelphia and the identification of Adelphia Prestige as a counterparty to Highland Georgia's intercompany payable).[113]

(vi)  The guidelines of push-down accounting are not relevant to the Prestige Acquisition, as push-down accounting does not involve accounting for asset purchases or other acquisition transactions among related entities (i.e., Adelphia affiliates and subsidiaries).  Thus, whereas push-down accounting assigns a new basis of accounting on the financial records of the acquired entity, here, the obligation to pay for the stock of Prestige Communications, Inc. belongs to Highland Prestige Georgia, which is a Rigas-owned entity, not a subsidiary of ACC.

2.  *Arahova Noteholders Committee's Arguments*

The Arahova Noteholders Committee advances its own points (many of which are similar to points that it made in other contexts, as described above), arguing instead that the accounting of the Prestige Acquisition should be restated:

(i)  The Debtors used the incorrect accounting methodology in booking the Prestige Acquisition.  Push-down accounting—the purpose of which is to provide greater visibility in financial statements by reflecting

---

[113]    *See* Mills Rep., 15-16.

the true value, which would otherwise be impossible to discern from consolidated financial statements, of the acquired subsidiary on its books and records—requires the use of equity accounts to record acquisitions. Only under limited circumstances may debt related to an acquisition be pushed-down from the parent to the subsidiary.

(ii)  Even assuming the Debtors appropriately resorted to intercompany, as opposed to equity, accounts to push-down debt from the parent to the subsidiary, the intercompany payable did not rise to the level of debt.  The Prestige Acquisition—though documented with a complete closing set, including an assignment agreement—included no promissory note or other evidence of Adelphia Prestige undertaking any intercompany payment obligation in connection with the transaction.  The companies could have easily created a note as part of the documentation had they intended to create a debt obligation with a right to payment.  The absence of such a note, and other indicia of debt, indicates that the resulting intercompany "payable" arising from the accounting is an equity contribution.

(iii)  The Debtors accounted for the Prestige Acquisition through multiple intercompany transfers involving multiple legal entities, all related to a single economic event.  There was no business justification or requirement under GAAP for transferring the acquired assets through multiple legal entities.  Nor was this accounting treatment driven by the legal documents between the parties involved in these transfers, and to the

105

extent such documents exist, they characterized the transfers as

contributions, not debts.  To insert the Bank of Adelphia as a principal in

the transfer of assets between entities (when it was merely a cash

management vehicle, with no authority to take title to assets of any kind),

by use of the Bank of Adelphia Paradigm, constituted inappropriate

churning that had a significant negative impact on the Arahova Debtors as

a result of the insolvency of the Bank of Adelphia.

### 3.  My Observations

My reactions to this are the same as my reactions to the acquisition accounting

generally, and to the accounting for the Cablevision Acquisition, described above.  I

believe that the Arahova Noteholders Committee would almost certainly win on this

issue.

### h) "Historic Entries" (Intercompany Issue 9)

When Adelphia acquired entities, such as the Century cable systems, the Debtors

carried over the intercompany balances that existed at the acquired entities prior to their

acquisition.  (Of course these were not, at the outset, with the Bank of Adelphia; they

were to and from other entities in the enterprise that was acquired.)  For example, in

1999, when Adelphia purchased Century Communication Corporation and the

FrontierVision system, each business had its own cash management system with payables

and receivables between the acquired entities and their centralized cash management

entity.  Since such payables and receivables netted to zero, the Historic Entries were left

and remain on the books and records of the Debtors.

But now, like all intercompany claims, the Historic Entries run through the Bank of Adelphia.  And this is significant because while the acquired entities were solvent (and running receivables and payables back and forth to their original cash management system entities was of no consequence), here the insolvency of the Bank of Adelphia causes serious consequences.

### 1. Arahova Noteholder Committee's Contentions

The Arahova Noteholders Committee acknowledges that, if the Bank of Adelphia were solvent, the Historic Entries would have "only a negligible impact" on the Arahova Noteholders' recovery.  But the Arahova Noteholders Committee contends that if the Bank of Adelphia is insolvent, the imposition of the Bank of Adelphia artificially and negatively impacts the legal entities involved in the transactions reflected in the Historic Entries.  The Arahova Noteholders Committee argues that, while the transactions reflected in the Historic Entries likely are legitimate (given that they preceded the Rigas fraud), they should be removed nonetheless because (i) these transactions occurred prior to the creation of the Bank of Adelphia, and (ii) the insolvency of the Bank of Adelphia distorts the reality of those transactions.

### 2. ACC Bondholder Group's Contentions

The ACC Senior Noteholders Committee had conceded that the Court should eliminate all Historic Entries, uniformly and across the board.[114]  However, the ACC Bondholder Group objects to what it characterizes as a "pick-and-choose litigation

---

[114]    This was the context in which it made its significant observation that its concession proved that it paid more than "lip service" to neutral principles governing interdebtor obligations.  ACC Senior Noteholders Reply Br. for P2, at 1.

But notwithstanding this concession, the Opponents' Expert said that he would attach a 50% chance to a win on the part of the ACC Bondholder Group with respect to the Historic Entries.  *See* Opponents' Expert Report at 10.

strategy," under which only those Historic Entries that benefit the Arahova Noteholders purportedly should be enforced, whereas those entries that do not should be disregarded.

The ACC Bondholder Group cites, for example, the Historic Entry relating to the Century Step-Up, discussed above. It notes that following the Century Acquisition, the Debtors made repeated and unsuccessful attempts to identify the pre-acquisition central accounting entity in Century's CMS. And the ACC Bondholder Group notes that despite the fact that the Debtors were unable to identify a counterparty in connection with the Historic Entry arising under the Century Acquisition, the Arahova Noteholders Committee seeks to enforce a $2.038 billion receivable from CCC as part of its effort to disaggregate Arahova's net receivable to the Bank of Adelphia into payables and receivables from other companies.

Thus, ACC Bondholder Group argues that to the extent the Arahova Noteholders Committee has selectively adopted the Historic Entries, the Arahova Noteholders Committee should not prevail here, either.

### 3. My Observations

I've previously noted that I believe that the accounting for these individual transactions requires case-by-case analysis. But the ACC Bondholder Group is quite right that the *principles* that govern the case-by-case analysis must be consistently applied across the board.

But that doesn't justify running Historic Transactions through the Bank of Adelphia here. It simply means that on other issues, where the Bank of Adelphia Paradigm would likewise not make sense, it must be rejected there as well.

The ACC Senior Noteholders Committee had acknowledged that the Historic Entries should not be run through the Bank of Adelphia, and for good reason. Mapping, after the fact, transactions that had taken place with different, solvent, cash management system entities to the Bank of Adelphia (and an insolvent Bank of Adelphia, to boot), would be illogical and unfairly prejudicial. The Opponents' Expert's view that ACC creditors would have a 50% chance of prevailing on this issue—one that the ACC Senior Noteholders Committee had, candidly and properly, conceded—is unjustifiable, and must be rejected. The issue of Historic Entries is one that the Arahova Bondholders Group almost certainly would win.

### i) Payment of Dividends (Intercompany Issues 4 and 5)

Some of the "Dividends" issues that were once a part of the MIA are no longer relevant, by reason of changes in the Plan made since that time.[115] But an underlying theme of all of the "Dividends" issues is the evidence submitted in the MIA suggesting (if not also conclusively establishing) the Rigases' apparent use of dividends to manipulate financial results, and their failure to comply with the requisite corporate formalities when they did so.[116]

While dividends affecting FrontierVision no longer adversely affect it (resulting in higher FrontierVision recoveries under the Plan), other Dividends issues remain. The parties also dispute the treatment of a $275 million loan that was recharacterized by the

---

[115]    For that reason, I won't burden this discussion with the $145 million intercompany payable balance of FrontierVision Partners, LP ("FVP") incurred in connection with its purported payment of $145 million of dividends

[116]    The FrontierVision Committee adduced evidence in Phase 2 confirming that dividends adversely affecting it were devoid of economic substance, and, moreover, were not properly authorized— and consequently, that the resulting payable balances of FVP (which under an earlier plan proposal was part of the FrontierVision Group) should be treated as equity or equitably subordinated if I were ever to reach this issue.

Debtors' prepetition accountants in April 2002 as a dividend from CCH to Arahova.  In February 2002, CCH, LLC borrowed $275 million under the Century co-borrowing facility to repay certain Arahova 9 1/4 % notes and obtain operational cash.  These funds were contributed to the Bank of Adelphia.  On February 15, 2002, the Bank of Adelphia repaid $200 million of principal and $9.75 million of accrued interest due on the Arahova notes.  In April 2002, the $275 million borrowing was recharacterized as a dividend payment from CCHC (an affiliate of CCH, LLC) to Arahova through a series of intercompany journal entries.  The Restatement Team reversed that dividend payment, because it was neither documented nor authorized by the CCHC Board of Directors and because it lacked a business purpose other than to enable compliance with debt covenants.

Similarly, the Arahova Noteholders Committee has challenged three sets of prepetition journal entries related to the payment of dividends:  (i) a $185 million payable from CCHC to CCC; (ii) a $93.6 million payable from CCH, LLC to CCHC; and (iii) a $93.6 million payable from CCHC to Century Mendocino Cable Television, Inc.

With respect to the first, by a series of journal entries an intercompany payable was recorded on CCHC, and net intercompany receivables/debits to equity were recorded on two cost centers that rolled into CCC, in the amount of $185 million.  There was no corporate documentation (i.e., a declaration of dividends), and no cash was actually moved.  Instead, the transaction simply involved changes to the net intercompany balance between CCHC and CCC.

With respect to the second, by another series of journal entries an increase was recorded on CCH, LLC, with an offsetting intercompany payable, in the amount of $93.6

million.  A debit to equity was recorded on CCHC, with an offsetting intercompany receivable in the same amount.  Once more there was no corporate documentation (i.e., a declaration of dividends), and no cash was actually moved.  Instead, the transaction simply involved changes to the net intercompany balance between CCH, LLC and CCHC.

With respect to the third, by another series of journal entries an increase was recorded in CCHC, with an offsetting intercompany payable, in the amount of $93.6 million.  A credit to equity was recorded in Century Mendocino, with an offsetting intercompany payable, in the same amount.

### 1. ACC Bondholder Group's Contentions

The ACC Bondholder Group contends that the Restatement's reversal of the entry recording the $275 million as a dividend should be upheld, and that the recharacterization of the $275 million as the loan as it was originally to be should stand.  It further contends that the prepetition characterization of the $275 million as a dividend was without economic substance to the extent it allowed Arahova (which borrowed money through CCH, LLC to pay off $209 million in bond debt with no effect on CCH, LLC's books) to (i) use CCH, LLC for its own benefit and (ii) improve its balance sheet, as well as CCH, LLC's.  In support of its argument, the ACC Bondholder Group cites the testimony of Carol Savage, who concluded that, because there was no basis to record a dividend, the recharacterization of the loan as a dividend was unjustified.

The ACC Bondholder Group contends that the other dividends-related entries had a legitimate business purpose and were accompanied by transferred assets with real

value, but assumes a reversal of the dividends-related entries in certain of its recovery scenarios.

### 2 *Arahova Noteholders Committee's Contentions*

The Arahova Noteholders Committee argues that the Restatement Team's recharacterization of the $275 million entry as a loan is unfair to the extent it creates *both* an obligation on the part of the Arahova to pay $275 million to the Century lenders and a payable at Arahova of $275 million to the Bank of Adelphia, offset by a receivable that will be repaid at only 35 cents on the dollar.  Moreover, the Arahova Noteholders Committee argues that the recharacterization of only *certain* entries by the Restatement Team was unfairly selective—as the Restatement Team discovered other entries that lacked economic substance (i.e., the CCHC Recapitalization entries, discussed above) but left them untouched when they did not impact Arahova's consolidated financials.

The Arahova Noteholders Committee contends that each of the challenged journal entries was:  (i) unaccompanied by an actual transfer of cash; (ii) not based on a legitimate business purpose; (iii) unaccompanied by documentation, verbal directives, or corporate policy; and (iv) backdated, having been uploaded to the General Ledger on September 18, 2001, with an effective date of January 1, 2001.

### 3. *My Observations*

Though the first of the Dividends transactions is more complex than the others, they share a common characteristic—dividends unaccompanied by documentation or actual transfers of cash or other assets, and without any apparent legitimate business purpose.  I announced my intention to consider as a relevant factor whether accounting entries have "integrity" issues—where the intercompany claim rests on a transaction that

112

at least seemingly was an element of the Rigases' fraud.  Even if they hadn't been
fraudulent, the dividends still lacked the requisite corporate formalities.

 Either by ruling that the accounting entries implementing the dividends should be
reversed, or by finding that the accounting entries simply don't support claims, I would
almost certainly be unwilling to find claims based on these dividends.

>   *j) Reclassification of Co-Borrowing Debt (Intercompany Issue 6)*

CCH, LLC and Ft. Myers Cablevision, LLC (both Adelphia entities) and
Highland Prestige of Georgia, Inc. (a Rigas entity) entered into the "Century" co-
borrowing facility, one of Adelphia's infamous co-borrowing facilities, in April 2000—
this one for $2.25 billion in co-borrowings.  In September 2000, the Debtors involved
with the Century co-borrowing facility closed on an additional $500 million term loan
under the Century co-borrowing facility under which ABIZ was provided up to $500
million of borrowing availability.  ABIZ had borrowed up to its $500 million availability
by December 31, 2001.  To account for the borrowings, an affiliate receivable was
recorded at CCH, LLC due from ABIZ.

The Century co-borrowing facility was used by both Adelphia and the Rigases to
fund acquisitions and operations, and by the Rigases to fund their purchases of Adelphia
securities.  Under the Century co-borrowing facility, each co-borrower was jointly and
severally liable for repayment of all amounts borrowed.

From April 2000 through April 2002, the Debtors "reclassified" $1.161 billion of
the Century co-borrowing facility from Adelphia Debtors to the Rigas co-borrowing
entities through the manipulation of the intercompany accounts.  Both the Arahova
Noteholders Committee and the ACC Bondholder Group agree that the "reclassification"

of the co-borrowing indebtedness had no valid, discernable business purpose.  And as all of the borrowers were jointly liable on the co-borrowing debt, the "reclassification" of the co-borrowing debt did not relieve CCH, LLC of its obligation to reply the debt.

Further, no formal agreement to transfer the indebtedness was entered into by the creditor.  Therefore, the "reclassification" of the co-borrowing debt and the removal of the co-borrowing debt from the books and records of CCH, LLC should never have occurred.  This is undisputed.  It was one of the most egregious, and commented upon, aspects of the prepetition fraud.

During the Restatement, the Company and its auditors concluded that the "reclassification" of the debt related to the Century co-borrowing facility to the Rigases had to be corrected, and that the co-borrowing debt had to be returned to the books and records of CCH, LLC.  The corrective entries made by the Restatement Team returned the debt to CCH, LLC and also recorded an affiliate receivable at CCH, LLC equal to the amount of the co-borrowing debt originally "reclassified" to the Rigases.  The affiliate receivable owed by the Rigases was then determined to be uncollectible and written-off. The affiliate receivable at CCH, LLC due from ABIZ was also written-off.

However, when the prepetition accounting entry "reclassified" the debt from CCH, LLC to the Rigases, an intercompany payable obligation to the Bank of Adelphia was created.  The corrective entry did not remove this intercompany payable obligation. Therefore, while the original reclassification entry was routed through the Bank of Adelphia, the corrective entry was not.  Rather, the Restatement Team elected to record CCH, LLC's full liability of the co-borrowing debt, and then to record a corresponding increase in the affiliate receivable balance due directly from the Rigas entity Highland

Prestige.  Then, the Restatement Team "reclassified" that affiliate receivable to a CCH, LLC contra-equity account (a reduction to equity), in effect writing it off as uncollectible. As result, a $1.161 billion intercompany payable, not including any adjustment for interest, remains on the books and records of CCH, LLC that should have never been recorded.

Most or all of those measures were necessary to correct the Rigases' original fraudulent accounting, and to present accurate consolidated financials for Adelphia to the outside world.  The issue here is a different one:  whether, as a by-product, the pre- or post-petition accounting entries distorted intercompany balances that eliminated in consolidation, and should or should not be regarded as a basis for finding intercompany claims.

### 1. Arahova Noteholders Committee's Contentions

According to the Arahova Noteholders Committee, the effort of the Restatement Team to correct the fraudulent accounting associated with the co-borrowing debt "reclassification" was incomplete.  The Arahova Noteholders Committee further argues that, rather than simply reverse the original fraudulent journal entry, the Company's "corrective" entry preserved the impact of the fraud on CCH, LLC.  The Arahova Noteholders Committee argues that CCH, LLC's receivable with the Bank of Adelphia should be increased by $1.16 billion.

The Arahova Noteholders Committee makes a similar argument concerning the $500 million ABIZ component.  It argues that because the cash was deposited into the Company's cash management system and should have been accounted for in accordance with the Debtors' cash management policy (which routed all cash transactions through

the Bank of Adelphia), CCH, LLC should have had an intercompany receivable balance

from the *Bank of Adelphia* rather than an affiliate receivable due from ABIZ.  Therefore,

the Arahova Noteholders Committee argues, the affiliate receivable from ABIZ that was

written-off should have been due to the *Bank of Adelphia,* and the Bank of Adelphia,

rather than CCH, LLC, should have taken the write-off hit.

Thus the Arahova Noteholders Committee argues that CCH, LLC's intercompany

receivable balance is understated in the May 2005 Schedules by $500 million.  All

together, the Arahova Noteholders Committee argues the CCH, LLC Receivable should

be increased by $1.6 billion.

### 2. *ACC Bondholder Group's Contentions*

The ACC Bondholder Group argues that the fraudulent reclassification entries

should not simply have been reversed because the Bank of Adelphia was not a party to

the CCH Co-Borrowing credit facility, and Restatement entries should not impact the

Bank of Adelphia.

The ACC Bondholder Group also contends that the affiliate receivable from

Highland Prestige Georgia was properly treated as a contra-equity account because it was

not written off as uncollectible as of the petition date.

### 3. *My Observations*

The principal focus of this dispute is whether it would have been more

appropriate for the Restatement Team to reverse the reclassification entries or whether it

made sense to reverse partially the reclassification entries and to create a contra-equity

account with Highland Prestige.  Some aspects of this are totally or fairly clear, and

others are quite debatable.

116

One that seems totally clear is that the Restatement Team had to do *something* to show the liability of CCH, LLC (or at least some Debtor entity) for the entirety of the co-borrowing debt. But this could be done in a variety of ways, especially since the financials would be presented on a consolidated basis. The issue, it seems to me, is whether or not this particular method of accounting for the co-borrowing debt were adopted, what intercompany claims I should find as a consequence of this.

One that seems fairly clear is that if cash went into and came out of the Bank of Adelphia, it would be unfair to make CCH, LLC (an Arahova Group entity) suffer the consequences of the ABIZ write-off, rather than the Bank of Adelphia itself. (This conclusion would favor the Arahova Noteholders Group.)

One that is quite a bit more debatable, but which I would certainly consider, would be whether claims should be held to be established (or not established) based on simply reversing the Rigases' fraudulent reclassification entries. But I would need to hear more about the implications of such an approach, and, in particular, whether this too could be argued to be unduly selective.

When I issued the *Phase I Decision*, I very intentionally included Factor #9: the extent to which any aspect of the Business Records was the result of purely historic facts, on the one hand, or judgmental matters, on the other—and if the latter, the extent to which the judgmental calls should be respected. Here we have a judgment call that plainly was made by the Restatement Team in good faith. But it was still a judgment call, and for the purpose of determining whether intercompany claims were established, it would need to be reviewed *ab initio*.

117

I think it is reasonable to conclude that the Arahova Noteholders Group would likely prevail on the ABIZ component of this, and, though less clearly, it would have a reasonable chance of prevailing as to the remainder.  But except for the ABIZ component, I think the issue could go either way.

### k) Interest, Loan Placement, and Management Fees  (Intercompany Issues 7 and 8)

During the prepetition period, the interest charged on intercompany obligations—to the extent it was charged at all—was charged inconsistently and with no true attribution to intercompany balances.  The Restatement Team, in an effort to correct the irregularities and inconsistencies of the interest manipulations and their negative impact on intercompany balances, reversed all prepetition interest charges for the years 1999 through 2002, except for the few instances where an agreement governed.  Though they are equally willing to acknowledge the erratic and fraudulent nature of the prepetition interest charges, the parties to the MIA dispute the way those charges should be treated after the Restatement process.

With respect to claims arising from entries in connection with loan placement and management fees, the Restatement Team also determined that such fees were inconsistent and manipulated to achieve fraudulent ends.  Where there was a management agreement with a third party in place, the Restatement Team charged a management fee in those instances in accordance with the agreement, and where there was no agreement, the Debtors allocated the ACC overhead amongst the various cost centers, based on subscribers, as an approximation for the fair value of services provided.

### 1. ACC Bondholder Group's Contentions

The ACC Bondholder Group argues that the approach taken by the Restatement Team was effective and appropriate.  Under that approach, affiliates received a restated interest charge or credit based on their average net affiliate receivable balance during that time period.  An entity that had a positive intercompany balance would be considered to be an entity that was a net provider of funds to the enterprise, while an entity with a negative intercompany balance was a net borrower of funds. The interest rate was based on ACC's average borrowing rate.

The ACC Bondholder Group further argues that "the method used during the Restatement process was a reasonable, consistent, and fair way to reconcile the Debtors' previously inconsistent interest charging practices."[117]  Interest was re-charged to affiliates using the Bank of Adelphia Paradigm.  Ms. Savage testified that the methodology used for restating intercompany interest was GAAP compliant.

The ACC Bondholder Group asserts that it is entirely appropriate that interest would be charged on intercompany balances, as just because the methods of charging interest were inconsistent, that wouldn't mean that the charges themselves were not legitimate.  The ACC Bondholder Group asserts that the Bank of Adelphia was entitled to charge interest on capital provided to other affiliate entities.

Further, the ACC Bondholder Group argues that the restated interest charges were consistent with the Debtor's past practice of charging interest on intercompany accounts.  Mr. DiBella determined that there was a past practice of charging interest on prepetition intercompany accounts.  Specifically, he testified that the prepetition financial statements

---

[117]    *See* ACC Bondholder Group Addendum at 86.

119

of Arahova and Olympus disclosed interest charges, which were used to determine what intercompany interest was charged in the prepetition period.

Then, the ACC Bondholder Group argues that, "in light of the painstaking detail required to reverse and recalculate the interest, should the Arahova Noteholders Committee be successful in any of its challenges relating to the Intercompany Issues, or the intercompany claims as restated, interest would have to be recalculated again on a per-entity basis."[118]

Finally, the ACC Bondholder Group argues that the Restatement approach to the fraudulent prepetition loan placement and management fees practices should be upheld as a consistent and fair treatment of this issue.

### 2. The Arahova Noteholders Committee's Arguments

The Arahova Noteholders Committee disputes the validity of claims arising from affiliate/intercompany interest and claims arising from entries in connection with management fees for several reasons.

First, it contends that prepetition charges for interest and management fees were arbitrary, inconsistent, bore no relationship to the capital or services being provided, and appeared to have been purposefully manipulated to alter results of different borrowing group financial statements.  In other words, the Arahova Noteholders Committee asserts that there was no real prepetition practice to charge interest or management fees.  It further argues that there was a practice, and an intent, to commit fraud by applying charges under these labels, and that it would be inappropriate to infer intent to pay

---

[118]      *See* ACC Bondholder Group Addendum at 88.

interest or management fees based on the fraudulent intent of certain members of pre-petition management.

Second, the Arahova Noteholders Committee contends that, while the Restatement Team made a decision to reverse all of the inconsistent charges and apply charges in a consistent manner, the Restatement Team was simply making judgment calls, and there is no evidence whatsoever that prepetition management intended to charge interest or management fees in that manner or at all. Nor is it equitable to impose hundreds of millions, if not billions, of interest charges, which affect creditor recoveries, without any objective manifestation of prepetition management's intent to charge interest on intercompany balances. Indeed, the Arahova Noteholders Committee charges its opponent with having admitted that the Debtors did not locate or identify any agreements addressing affiliate interest except in a few limited instances.

Third, the Arahova Noteholders Committee argues that the existence of agreements for particular transactions proves that the Debtors knew how to document an obligation to pay interest or management fees when they wanted to do so.

Fourth, it contends that the Restatement Team was inconsistent in its approach. When it came to interest, the Restatement Team charged interest to all Debtors in the absence of a definitive agreement, but did not charge interest to the Rigas Managed Entities ("RMEs") unless there was a definitive agreement. Yet, when it came to management fees, the Restatement charged Debtors and RMEs for services even in the absence of a management agreement.

### 3. My Observations

It is reasonable to conclude that either party could prevail on these issues. The Restatement Team elected to apply charges, did so in a reasonable way, and the entries were consistent with GAAP. However, the Restatement Team clearly made a judgment call, and it might be inequitable to adhere to that decision where the interest and management fees that existed prepetition had no economic substance and the Restatement Team's entries would affect creditor recoveries.

### l) "XO Centers" (XO Center or XO Transaction Entries) (Issue 10)

The parties to the MIA apparently disagree as to both the definition and the treatment of the so-called "XO" transactions.

The Arahova Noteholders Committee contends that the XO transactions are a series of debt transfers, related to the movement of $1.5 billion in debt from Arahova to CCH, LLC through CCC, an intermediary,[119] that harm the Arahova Noteholders when run through the Bank of Adelphia Paradigm.

The ACC Bondholder Group contends that the Arahova Noteholders Committee's interpretation of those alleged XO transactions is incorrect. Instead, the ACC Bondholder Group alleges that the XO Centers are a different set of entries that were recorded to comply with APB 20 (a pronouncement of the Accounting Principles Board), that relates to how certain changes (e.g., in accounting principles being applied, reporting entities) are to be presented in financial statements. In this case, ABP-20 governed to the extent it mandated the recasting of balances upon a significant external acquisition Moreover, the ACC Bondholder Group argues that even assuming that the Arahova

---

[119]    *See* page 87 above.

Noteholders Committee correctly identifies the XO transactions, those transactions are harmless in that routing $1.5 billion in debt reassignment transfers through the Bank of Adelphia Paradigm was acceptable.

Accordingly, to the extent that the XO Transaction Entries were considered an issue at all, they would be resolved as part of the Court's analysis of CCC's $717 million payable.

### m) "Netting" (Netting Intercompany Claims) (Issue 11)

The ACC Bondholder Group challenges the Arahova Noteholders Committee's use of net intercompany balances by silo, arguing that this is improper under section 553 of the Bankruptcy Code.[120]  Instead, according to the ACC Bondholder Group, the intercompany balances should be net numbers for each Debtor separately.  So far as I can determine, the Arahova Noteholders Committee has not addressed these contentions in comparable depth.  Until and unless the Arahova Noteholders Committee did so, I would likely rule in the ACC creditors' favor in this regard.

But while this presumably would have to be considered if the MIA resumed, it appears that this issue is not that material to ACC creditor recoveries.  Mr. Aronson testified that Lazard's debtor-by-debtor model demonstrated that there was no material difference between the recoveries using the silo by silo netting under the 18 Debtor group waterfall model then in use and using debtor-by-debtor netting.[121]  Thus it appears that a victory in this regard would not result in a materially better recovery for ACC creditors.

---

[120]      *See* ACC Bondholder Group Addendum at 92-99.

[121]      *See* Aronson Decl. ¶ 21.

## 2. *Phase III Matters (Fraudulent Conveyances)*

Arahova Holdings, a direct subsidiary of CCHC, at one time held approximately 469,000 basic cable subscribers. In a transaction on September 28, 2001 (the "September 2001 Transaction"), Adelphia, under Rigas management, moved Arahova Holdings to become a direct subsidiary of Olympus, an indirect subsidiary of ACC.

The restructuring was achieved by distributing the equity in Arahova Holdings (the "Subscriber Dividend") up the organization ladder in a series of steps—from CCHC, to CCC, to Arahova, to ACC Operations, Inc. ("ACC Ops"), and then down to Olympus. The Subscriber Dividend was to be used as collateral for the Olympus co-borrowing facility, another of the co-borrowing facilities that have been an issue in this case.

The Arahova Noteholders Committee asserts that the Subscriber Dividend was an avoidable intentional and constructive fraudulent conveyance entitling Arahova to a judgment against ACC Ops and/or Olympus. The ACC Bondholder Group disagrees, for numerous reasons, based on the Arahova Noteholders Committee's asserted failure to include, as part of its analysis, other transactions that the ACC Bondholder Group asserts should be regarded as related, and also deficiencies that would assertedly exist if the Subscriber Divided fraudulent conveyance claims were considered alone.

Although Phase III did not begin, the pre-hearing briefing with respect to Phase III was completed.

## 1. *Arahova Noteholders Committee's Contentions*

The Arahova Noteholders Committee charges both intentional and constructive fraudulent conveyance claims. As a general matter, according to the Arahova

Noteholders Committee, the Subscriber Dividend hindered and/or delayed payment to Arahova in at least four ways:

> (i) had the truth been disclosed, the Arahova indenture trustee could have accelerated the notes and taken steps to block the transfer because the transfer was a breach of Arahova Indentures;

> (ii) the transfer reduced Arahova's subscriber base by as much as 26 percent if the joint ventures were included and 17 percent if they were not (i.e., from approximately 2,721,000 to 2,251,000 basic cable subscribers);

> (iii) under the Olympus co-borrowing facility, an Arahova subsidiary (Adelphia of Western Connecticut) was made jointly and severally liable for the Olympus co-borrowing facility, which hindered its ability to service the preexisting debt; and

> (iv) while it is true that a significant portion of the proceeds of the Olympus co-borrowing facility was used to pay down certain existing debt obligations, no Arahova bond debt was repaid and the facility increased Adelphia's overall leverage.[122]

The Arahova Noteholders Committee bases its intentional fraudulent conveyance claims on assertions that the Subscriber Dividend was part of the overall Rigas fraud, which had several components, including the fraudulent use of the co-borrowing facilities, misleading accounting entries, and other sham transactions designed to conceal covenant non-compliance.  And it argues that even though the Olympus co-borrowing

---

[122]    Arahova P3 Br. at 24.

facility was publicly filed and "formally documented," the Rigases were nonetheless convicted of bank fraud and Colin Higgin, the Deputy General Counsel of Adelphia, who signed all of the documents in the September 2001 Transaction, invoked his Fifth Amendment right against self-incrimination on questions concerning the covenant compliance fraud and the connection between the Subscriber Dividend and the co-borrowing fraud.

The Arahova Noteholders Committee bases its constructive fraudulent conveyance claims on assertions that Arahova was insolvent as of the time of the Subscriber Dividend, and that Arahova didn't get reasonably equivalent value when it gave away those subscribers.  The Arahova Noteholders Committee would likely submit evidence that there was no consideration at all received by Arahova in exchange for the transferred assets, with the transferred subsidiaries merely transferred up to ACC with no consideration provided in exchange.  And it will argue that based on the price paid per subscriber in the Sale Transaction, ($3,810 per subscriber), 469,000 subscribers would be worth nearly $1.75 billion.  Thus it will argue that it did not receive reasonably equivalent value for the Subscriber Dividend.

In response to an argument by ACC creditors that separate transactions should be collapsed, the Arahova Noteholders Committee could argue that there is no evidence to support the notion that other transactions in April 2000 and January 2001 (discussed below), and the September 2001 Transaction, were components of a single, integrated transaction.  The Arahova Noteholders Committee could proffer evidence that the transfers made as part of the April 2000 and January 2001 Transactions were absolute and unconditional.  The Arahova Noteholders Committee contends that it also would

126

proffer evidence that none of the entities transferred in April 2000 and January 2001 were substantially the same.[123]

### 2. ACC Bondholder Group's Contentions

On the intentional fraudulent conveyance claim, the ACC Bondholder Group would argue that the Subscriber Dividend was executed with the advice of outside counsel, formally documented, publicly disclosed, and made for a valid business purpose, i.e., to facilitate financing and paying off the Arahova Bridge Loan. In other words, the ACC Bondholder Group could contend that the transfer was consistent with an intention to pay creditors. And the ACC Bondholder Group would be able to note that no witness testified that the Subscriber Dividend was intended to hinder, delay, and defraud creditors, and, significantly, that the burden of proof would fall on the Arahova Noteholders Committee.

On constructive fraudulent conveyance, the ACC Bondholder Group might or might not dispute solvency, but most assuredly would dispute the value of the transfer, and, more fundamentally, suggestions that the Arahova Group didn't benefit from the transfer. And the ACC Bondholder Group would also argue (at least for constructive fraudulent conveyance and perhaps for intentional fraudulent conveyance as well), that it's improper to consider just the September 2001 Transaction, and that it would be essential to collapse the September 2001 Transaction with other transfers going in the other direction.

---

[123]     The Arahova Noteholders Committee has argued that none of the entities transferred in April 2000 were transferred in September 2001. Of the 26 subsidiaries transferred in September 2001, 25 were indigenous (i.e., not subject to earlier transfer). Finally, even if there were a relationship between the subsidiaries transferred in and the subsidiaries transferred out, the purpose of the transfer in was to allow CCH, LLC to borrow additional funds under the Century co-borrowing facility. The Arahova Noteholders Committee would argue that it makes no sense, and it would be inequitable, to allow the transfer out while leaving the debt resulting from the transfer in.

The ACC Bondholder Group would likely make two additional arguments in an attempt to defeat the Subscriber Dividend fraudulent conveyance claims. First, it would argue that the Subscriber Dividend was the seventh step of a ten step transaction that took place in September 2001, which cannot be isolated from those other transactions under the step transaction or collapsing doctrine. And the ACC Bondholder Group could submit evidence that the subsidiaries holding the cable systems that comprise the Subscriber Dividend started out at CCHC, not at Arahova, and did not stop at ACC Ops, but were transferred to Olympus. The ACC Bondholder would argue that the ten steps of the September 2001 Transaction must be collapsed such that any fraudulent conveyance claims must be deemed to reside at CCHC, not at Arahova.

Second, the ACC Bondholder Group could argue that the Subscriber Dividend and the rest of the September 2001 Transaction, which moved cable systems up from CCHC to ACC Ops, must be viewed together and collapsed with prior transactions (an April 2000 Transaction[124] and a January 2001 Transaction[125]), which moved those cable systems down from ACC Ops to CCHC[126] and CCH, LLC.[127] The ACC Bondholder Group could argue that the Subscriber Dividend should not be isolated from the April 2000 and January 2001 Transactions because the assets simply were moving within the

---

[124]    In April 2000, ACC Ops contributed approximately 460,000 subscribers through Arahova and subsequently down the chain to CCHC and its subsidiary, CCH, LLC. CCH, LLC used the assets as collateral to enter into the $2.25 billion Century Bank Facility pursuant to the Century Credit Agreement (the "Century Facility"). ACC Bondholder Group Addendum at 103.

[125]    In January 2001, ACC Ops contributed approximately 140,000 subscribers to CCHC and its wholly owned subsidiary, Arahova Holdings (through Arahova). Simultaneously, CCH, LLC transferred assets back to CCHC, which contributed them to Arahova Holdings. Using the assets as collateral, Arahova Holdings entered into a $1.3 billion Arahova Bridge Facility. ACC Bondholder Group Addendum at 103.

[126]    CCHC has a large payable to the Bank of Adelphia under the May 2005 Schedules. That payable would be effected by reversal of other journal entries such as those reflecting the CCHC recapitalization and the Century Step-Up, as described below.

[127]    ACC Bondholder Group Addendum at 107-108.

Adelphia enterprise for purposes of raising money through various credit facilities with different collateral requirements and pursuant to documented capital contributions and declared dividends.

### 3. My Observations.

To prevail on a claim for *intentional* fraudulent conveyance, the Arahova Noteholders Committee would need to prove that the challenged transfer was made within one year before the bankruptcy petition filing (which it plainly was), and with actual intent to hinder, delay, or defraud any entity to which the debtor was or became indebted,[128] which would be much more debatable.

The issue on intentional fraudulent conveyance, in my mind, is whether the Rigases' fraud, which was manifest, was also of the type that it evidenced an intent to defraud *creditors*, and in a manner that is actionable under fraudulent conveyance law. It might have been, but that's a debatable proposition.

To prevail on a claim for constructive fraudulent conveyance, the Arahova Noteholders Committee would need to prove that: (a) the debtor transferred the property within one year of the filing of the bankruptcy petition; and (b) the debtor received less than reasonably equivalent value in exchange for the transfer, and (i) was insolvent as of the date of the transfer or was rendered insolvent thereby, (ii) was engaged in a business or transaction, for which any property remaining with the debtor was an unreasonably small capital, or (iii) intended to incur debts that would be beyond the debtor's ability to pay.[129]

---

[128]    *See* Bankruptcy Code section 548(a)(1)(A)

[129]    *Id.* section 548(a)(1)(B).

Only the first of these would be free from doubt.  But I think that the real battle will most likely turn on the valuation of the subscribers, the extent to which other transactions at the same time should be included or excluded as part of the analysis, and the extent to which other, earlier, transfers, in the opposite direction, should be taken into account as part of a broader collapsing analysis.  All of these issues are hotly debatable, and at this juncture I don't think that either side could be said to have a material likelihood of success.

The Arahova Noteholders' fraudulent conveyance claims raise complex factual and legal issues.  Assuming (as I do) that each side could deliver on the proof to which its pretrial briefing referred, both sides could offer factual and legal support for their positions at trial, and it is difficult to predict with a reasonable degree of certainty which side would ultimately prevail.  Either the Arahova Noteholders Committee or ACC creditors could prevail on this issue.

   3.  *Phase IV Matters (Allocation Matters)*

   a) *Allocation of Sale Proceeds*

Allocation of value of the Time Warner/Comcast sale proceeds was scheduled to be litigated in Phase IV of the MIA.  Once more, although that hearing did not begin, the parties submitted briefs setting forth their respective positions regarding the allocation of the value from the sale transaction to the various Debtor Groups, principally based on the opinions of their expert witnesses.[130]

---

[130]    Many more constituencies weighed in on this issue.

### 1. Arahova Noteholders Committee's Contentions

The Arahova Noteholders Committee argues that the sale proceeds should be allocated based on the relative value to the buyers of the assets being sold. It argues that the most reasonable method of determining for doing that allocation is to calculate future cash flows based on standard valuation techniques. The Arahova Noteholders Committee rejects the prices paid in the initial step of the Sale Transaction (before accounting for critical asset swaps between Time Warner and Comcast) as a legitimate starting point for the valuation of the Adelphia properties, and instead uses Adelphia's own five-year projections to perform a discounted cash flow ("DCF") analysis to estimate the present value of the future cash flows expected from Adelphia's properties. Additionally, its expert extended Adelphia's projections to ten years, in order to, "analyze the assets at a more mature stage and to allow the Debtors' financial results to normalize following the reorganization and any additional adjustments by new management."[131] It then proposes to take into account value-added synergies, cost center and subscriber data, and Time Warner's projections concerning the cash flow contributions of each Debtor.

The Arahova Noteholders Committee attempts to refute the criticisms of the DCF method by arguing that it would be inappropriate to set a cap on the recoveries of certain creditors. Rather, it argues that the allocation of value should be based upon fairness and the relative value (to the buyer) of the assets sold.

Additionally, the Arahova Noteholders Committee argues that I determined that allocation of value should not be based upon the Asset Purchase Agreements ("APA"), but rather should be left to my discretion. In fact, the Arahova Noteholders Committee

---

[131]    Arahova Reply Br. for P4, at 3-4.

argues that the APAs are silent on how the proceeds of the sale will be allocated among creditors; how the purchasers value each individual asset being sold; and how the split of the overall bid of $17.6 billion was determined as between Time Warner and Comcast.

### 2. ACC Bondholder Group's Contentions

The ACC Bondholder Group argues that the "actual" purchase price attributable to each of the four groups of assets, each of which has a specific identifiable purchase price, is the most appropriate way to begin the value allocation process.[132]

Further, the ACC Bondholder Group contends that the best allocation of value is the application of a Last Twelve Months Operating Cash Flow ("LTM OCF") multiple to the purchase price for each Debtor Asset Group, asserting that LTM OCF is the most reasonable indicator of an asset's fair market value, where it is the value obtained through a well-run sale process between well-informed parties.

The ACC Bondholder Group differs from the other constituency groups (with the exception of the Arahova Noteholders Committees) only in its choice of the multiple that should be applied to derive the value of entities within a particular group.

### 3. FrontierVision Committee's Contentions

The FrontierVision ("FV") Committee concludes that the appropriate valuation methodology would be to take the actual purchase price for each Debtor group and determine a multiple by applying a combination of Subscriber Count, LTM OCF, and Projected OCF date in order to properly allocate value.

---

[132] The TWC transaction is viewed by the parties as four separate transactions: (a) $2.351 billion (excluding the buyer discharge amount) paid by Comcast for Adelphia's interests in the Comcast JVs; (b) $592 million paid by Comcast for the Comcast MCEs; (c) $375 million paid by Time Warner for the Time Warner MCEs; and (c) $13.724 billion paid by Time Warner for the remainder of Adelphia's assets. *See* ACC P4 Br. at 9-10.

It criticizes the ACC Bondholder Group for using solely LTM OCF, because it assumes OCF data that was not available to the Debtor at the time of the Sale Transaction.  The FV Committee claims that reliance on LTM OCF is inappropriate, because *projections* are more reliable than historical financial performance, because they take into account expectations regarding the future income-generating capacity of the assets in question.

Further, the FV Committee claims that sole reliance on OCF ignores Subscriber Count, which it argues is a widely recognized metric in the cable television industry that the contracting parties themselves used instead of OCF as the principal operating metric for adjusting the purchase price at closing.

### 4. Ft. Myers Noteholders' Contentions

The Ft. Myers Noteholders agree with the ACC Bondholder Group, asserting that the starting point for any allocation of sale value should be the actual purchase price paid by Time Warner and Comcast for each of the four portions of the Debtors' business. They argue further that the value attributable to each of these four groups should then be allocated among the legal entities in such groups based upon the LTM OCF of each entity.

The Ft. Myers Noteholders discount the Arahova valuation methodology, which they argue ignores the fact that the market value of the Debtors' assets has already been established through an extensive and open sale process.  They assert that DCF is unreliable and based upon various valuation assumptions (like discount rates, projections bias, and growth rates), which if changed would greatly vary the outcome of the valuation methodology.

### 4. *Equity Committee's Contentions*

The Equity Committee argues that the correct methodology to allocate the sales proceeds from the Sale Transaction is a methodology it refers to as Asset Purchase Agreement Operating Cash Flow ("APA OCF") multiples methodology.  The Equity Committee argues that the most appropriate allocation method is an allocation based on each subscriber's relative contribution of the operating cash flow of a respective group.  It advocates using the latest projection period available to Time Warner and Comcast when negotiating the purchase prices for the four asset groups, or in other words, the one year Projected OCF.  The Equity Committee would determine the allocation of sales proceeds by dividing the purchase price for each of the four Debtor groups by the Projected OCF of each of the four components.

### 5. *My Observations*

None of the methodologies described above strikes me as unreasonable, and the caselaw doesn't appear to require the use of one approach.  I could accept any one of the proffered methodologies or, alternatively, could derive a blended valuation based on each approach.  I think I would need to listen to cross examination of the experts advocating these various approaches   At this point, I'm not in a position to predict which of those four different views will prevail.

### b) *Allocation of Benefits and Burdens of DoJ/SEC Settlement*

The parties to the MIA also disagree as to how the allocate the benefits and burdens of the DoJ/SEC settlement.  The settlement requires the Debtors to transfer to the Government $715 million in cash, TWC stock, and CVV Interests, and the Government to transfer to the Debtors title to entities that had been owned and/or controlled by the

Rigases (e.g., the RMEs) and forfeited to the DoJ.  The RMEs generally are thought to be worth approximately $900 million.

### 1.  ACC Bondholder Group's Contentions

The ACC Bondholder Group argues that the Plan and  Settlement "allocates the entire $900 million benefit" of the Government/Rigas Settlements to the creditors of Subsidiary Debtors, with the entire $600 million fixed costs allocated to creditors of ACC.

### 2.  Plan Proponents'/Arahova Noteholders Committee's Contentions

The Plan Proponents and the Arahova Noteholders Committee disagree, contending that the Plan (and the  Settlement) do not make any reference to allocating the benefits and burdens of the Government/Rigas settlements.  They do not specifically address the question of which estate(s) should be allocated the $715 million payment to be made to the Government, nor which estate(s) should receive an allocation of proceeds from the Sale Transaction for the value of the RMEs.

### 3.  My Observations

Of course this is an issue that is resolved as part of the Settlement under the Plan.  But if it weren't resolved under the Plan, it would have to be resolved as part of the MIA.

Although the parties to the MIA undoubtedly would make different arguments, and assert different theories, as to the allocation of the benefits and burdens of the DoJ/SEC settlement, I don't yet have a basis for forming views as to how this would be decided, as these issues would have been resolved in the latter part of Phase IV, or thereafter.  Without the benefit even of briefing, much less evidence, I can't say any more than that I recognize legitimate differences of opinion as to this issue.

135

*4.  Phase V Matters (Substantive Consolidation)*

If the MIA had continued, we would have considered potential substantive

consolidation of the entire Adelphia enterprise in Phase V.  When the proceedings

suspended, we had not yet even begun to consider these issues.

Neither side has given me much to work with in this area, but of course we all

have the benefit of the Second Circuit's decision in *Augie Restivo*.[133]  There the Second

Circuit made clear that entanglement of related debtors' affairs was by itself insufficient

to warrant substantive consolidation, and that substantive consolidation should be granted

only when it was determined that all creditors would benefit, because untangling is either

impossible or so costly as to consume the assets, or where no accurate identification and

allocation of assets is possible.[134]

While I would of course keep an open mind as to this issue, I would need litigants

to address in proceedings before me the very high standards the Second Circuit imposes

to justify substantive consolidation.  As the ACC Bondholders recognized in their

supplemental solicitation material, substantive consolidation would be "a highly unlikely

result," given that the Debtors have issued restated financial statements and filed the May

2005 Schedules, "thus evidencing an ability to generally determine the assets and

liabilities of each Debtor."[135]  Here, the Rigas-era accounting was frequently fraudulent,

---

[133]    *See* n.103 above.

[134]    *See* 860 F2d. at 519.  As the Second Circuit there stated:

> Commingling, therefore, can justify substantive consolidation
> only where "the time and expense necessary even to attempt to
> unscramble them [is] so substantial as to threaten the
> realization of any net assets for all the creditors," or where no
> accurate identification and allocation of assets is possible.

*Id.* (citation omitted).

[135]    Disclosure Statement at GG-16 n.18 (citation omitted).

but it was for the most part competent, and corporate identities were maintained, and records reflected exactly when and how money was spent, and for which entity's benefit.

Under those circumstances, I think the ACC Bondholder Group was plainly right in theorizing that substantive consolidation would be a highly unlikely result.

*Z.  The Waterfall Analyses*

Because when the MIA was ongoing I didn't know how any possible results might cut in terms of creditor recoveries, I asked the parties, in their preparation for the confirmation hearing, to provide me with that information.  Both sides did.  Each side referred to its work as a "waterfall analysis" or "waterfall model"—predicting how value would flow from one Debtor to another in the context of various outcomes as to interdebtor obligations, and then predicting how the resulting value would affect creditor recoveries.

Various analyses of that character were prepared by personnel at the Debtors' Financial Advisor, Lazard.  As Lazard Managing Director Daniel Aronson explained in his testimony (which I found fully credible), Lazard's waterfall model was developed with the assistance and input of the Debtors and their legal advisors.  As a general matter, the model and that Debtor Group structure was designed to follow the Debtors' corporate structure and to respect the structural priorities of creditors' claims and the flow of residual equity after satisfaction of claims.  Thus, under the Lazard waterfall model, distributable value of a Debtor Group was used to pay creditors of such Debtor Group and then residual value, if any, would flow to the parent of such Debtor Group.

In preparation for the confirmation hearing, I needed a means to ascertain whether the distributions to creditors under the Plan (and in particular the Settlement embodied in the Plan) would fall within the range of reasonableness for potential MIA outcomes.

137

Lazard was retained to act as "number crunchers" with respect to assumptions and positions proposed by participants in the MIA. As such, Lazard didn't independently verify the assumptions or positions provided by the various contentious parties (the ACC Bondholder Group, the Arahova Bondholders Committee and FrontierVision Noteholders Committee). It simply predicted what the effect on recoveries would be in light of various outcome scenarios for the MIA. My review of the assumptions provided leads me to find that the various parties chose outcome scenarios that covered most of the key outcome possibilities.

On September 13, 2006, counsel for the ACC Bondholder Group sent a letter to counsel for the Debtors that set forth the recovery scenarios that the ACC Bondholder Group wanted to include in its position statement. On that same date, the Debtors' counsel passed it on to Lazard. Thereafter, Lazard had numerous conversations with John Pike of Elliott Associates, a member of the ACC Bondholder Group, to discuss the Waterfall Model inputs requested, to clarify certain assumptions, and to suggest that Lazard would have difficulty showing the number of scenarios the ACC Bondholder Group had requested in a meaningful presentation. Pike thereafter provided further instructions, and Lazard completed the requested scenarios. They were included in the Disclosure Statement as part of the ACC Bondholder Group's materials soliciting rejection of the Plan.

On a valuation for the TWC stock of $6.48 Billion (the figure closest to the $6.5 Billion that I have found, as discussed at page 60 above) Lazard computed the

highest[136] possible ACC Senior Noteholder recovery (on the ACC Senior Noteholders'

"Base Case," with the ACC Bondholder Group's desired outcome on nearly all issues in

a non-substantive consolidation scenario) to be 112.9%.[137]  The outcome in the event of

substantive consolidation, at a $6.48 billion valuation, was 110.8%.

Similarly, at about the same time, the Arahova Noteholders Committee asked Mr.

Aronson to compute recoveries under different MIA outcome assumptions.  On the

Arahova Noteholders Committee's assumptions, the range of recoveries for ACC Senior

Noteholders ran from 50.3% on the low end to 86.3% on the high end.[138]  The high end

ACC Senior Noteholder recovery was based on the Arahova "worst case scenario,"

which was based upon an allowance of all intercompany balances listed in the May 2005

Schedules with three changes that the Arahova Noteholders believed that the ACC Senior

Noteholders Committee did not materially dispute.[139]

Thereafter, the Creditors Committee requested that Lazard run several additional

recovery scenarios through the Lazard Waterfall Model.  Those recovery scenarios used

---

[136]     The assumptions then provided by the ACC Bondholders Group did not provide a reasonable basis
for computing the low end of the range of ACC Senior Noteholders' recovery.  Other creditors'
assumptions did, and they are discussed below.

[137]     If the ACC Senior Noteholders got their 112.9%, Arahova Noteholders would get only 33.0%.
But as I discuss below, the relevant inquiry, from the perspective of ACC creditors who are
dissatisfied with their treatment, is what *ACC creditors* get, and what their possible range of
recoveries is.  The only legitimate area of concern for an ACC creditor would be *its* recovery, and
not the pain others suffer.  That is especially so since any creditor group should be indifferent to
the constituency that contributes to make its recovery greater, so long as its recovery is, in fact,
increased.

[138]     These figures were all lower than the recovery levels now projected, because they were premised
on lower valuations for the TWC stock that ACC Senior Noteholders would receive under the
Plan.

[139]     The first was the CCHC Recap, which, it will be recalled, involved backdating entries by 14
months, for the apparent purpose of hiding covenant violations.  The second was alleged
dividends; and the third was "historic entries," which appear to have been booked as debt because
booking them as equity would have been more trouble.

In each case, I've predicted success for the Arahova Bondholders on those issues.  But they are
relatively modest drivers of recovery, which I would estimate, from other sources, to represent
approximately 5% less for ACC Senior Noteholders.

some of the same assumptions used in the ACC Recovery Scenarios and the Arahova

Recovery Scenarios, but in different combinations, and generally tracked specific

litigation outcomes, rather than a home run for the ACC Senior Noteholders.  On a

$6.48 billion TWC stock valuation,[140] ACC Senior Noteholders would have a range of

recoveries of from 54.2% to 88.2%, depending upon the assumptions used.

Although many of the 14 issues for which I requested post-trial briefs involved

significant dollar amounts (and some of the 14 could have an impact on the materiality of

the resolution of other of the 14 issues on creditor recoveries), in general, Mr. Aronson

agreed that (1) the AIH $16.8 billion receivable and (2) application of the Bank of

Adelphia Paradigm had the most material impact on recoveries on ACC Senior Notes

Claims.[141]  However, there were certain issues other than those that also could materially

impact the recoveries of the holders of Arahova Notes Claims and the ACC Senior Notes

Claims.

Similarly, staff working for the Opponents' Expert did waterfall models as well.

They predicted outcomes depending on certain combinations of particularly outcome

determinative issues.  In that connection, I note and accept the observations in the

Opponents' Expert report that there are nearly 40 million distinct permutations of the

disputes that could affect interdebtor recoveries; that calculation of the incremental

impact of the disputes takes approximately one minute per permutation; and that it would

---

[140]    This was the highest they provided for.  On a higher TWC stock valuation of $6.5 billion, ACC
bondholders would have a somewhat higher range of recoveries.

[141]    Though I don't think it's anywhere near as material, they also would have the greatest impact on
recoveries for the holders of Arahova Notes Claims.

take nearly 76 years to calculate the impact of the various disputes under each permutation.[142]

When using a $6.48 billion TWC stock valuation, the Opponents' Expert team came up with a high of a 112.9% recovery for the ACC Senior Notes.  His figure was identical to that computed by Mr. Aronson when using the same TWC stock valuation—a fact that I regard as rather significant.  And the Opponents' Expert also produced what amounted to an impact analysis for Senior Note recoveries.  It started with the 112.9% that ACC would get based on full reliance on the Debtors' books and records, and then showed the reductions from that recovery that would result from determinations adverse to ACC Senior Noteholders with respect to various issues.  Based on a $6.48 billion valuation for the TWC stock,[143] they included:

---

[142]    Opponents' Expert Report at 42.

[143]    These figures apparently could vary somewhat depending on the value of the TWC stock.  Impact analyses for a TWC stock valuation of $5.4 billion (which I think is too low) and for a TWC stock valuation of $7.0 billion (which I think is too high) appear at page 78 of the Opponents' Expert's Report.

| Issue | Impact |
|---|---|
| AIH Receivable | -13.7% |
| Arahova Receivable | -3.0% |
| Silo Netting | -2.2% |
| Value Allocation (ACC) | +1.3% |
| Value Allocation (Arahova) | -4.0% |
| Fraudulent Conveyance (at $900 million recovery, Arahova Treatment | -6.4% |
| Century Recap | -2.2% |
| Acquisition Accounting | -2.4% |
| Century Step-Up | -4.4% |
| Co-Borrowing | -0.6% |
| Other Disputes | +0.1% |

These figures, taken from an exhibit[144] that is based, in turn, on other, less organized, evidence in the record, are very helpful in understanding the way by which issue determinations have an impact on resulting recoveries.  If the above-listed various subtractions and additions from the "Books and Records" 112.9% recovery are all taken into account, they show net subtractions of 37.7%, suggesting a low recovery of 75.2% for holders of ACC Senior Notes.  They do not account, however, for other elements of litigation risk to the ACC Senior Noteholders, which other constituencies assert (and the Lazard waterfall model establishes) push the ACC Senior Noteholders Recoveries down to about 53.7%.  The evidence in the record that there would be a low recovery of 53.7%

---

[144]        ACC Bondholders Group. Exh. 206.

for the ACC Bondholder Group, based on certain litigation outcome assumptions, was unchallenged, and I find it to be true.

The Settlement was valued by the Opponents' Expert at an 88.7% recovery for ACC Senior Bondholders, at a $6.48 billion valuation for the TWC stock.[145]  That is in the context of the 112.9% to 75.20% range found by the Opponents' Expert, and the 112.9% to 53.7% range found by Lazard.  *It is this 88.7% recovery that the ACC Bondholder Group contends is below the range of reasonableness.*

*AA.  The Negotiation Process.*

Based on all of the evidence summarized in the chronology described above, I now find once again that the process that led to the Settlement was entirely proper and fair.  I ruled to that effect once in the *Exclusivity Termination Decision*,[146] but said in the *Exclusivity Reargument/Clarification Decision* that I was willing to reexamine that in light of any further evidence that was brought to my attention.

After hearing such evidence, and particularly the testimony of Mr. Schall, I believe even more strongly, and find that the negotiation process was fair and the result of arms length bargaining.

I have gone back to the events around April 19, when I authorized Rule 2004 discovery as to the events concerning the publication of the letter with respect to the Fourth Amended Plan.  After reviewing the matter one more time, I now regard investigation of the circumstances surrounding the events of that time to be no less appropriate than I did then, and find that such investigation did not constitute unfair

---

[145]    Opponents Expert's Report at 12; *accord id.* at 14, 19.  He valued the recovery at 84.8%, if there had been no ACC accepting class, but the ACC Senior Noteholders Class did accept the Plan, and thus the dissenting ACC Bondholder Group members could secure the benefits of the 88.7% recovery that resulted from the accepting members' votes for the class as a whole.

[146]    352 B.R. at 582-585.

harassment.  Likewise, the parties consented *three* times to communications between the Monitor and me.  I see no evidence that the Monitor did anything other than to assist the parties in making their own deal.

There is no evidence from which I could conclude that Tudor and Highfields (and later, Oz, C.P. and Satellite) decided to settle for any reason other than the fact that they came to the view that the Settlement (as gradually improved on), was in their interests and the interests of other ACC Bondholders whose sole or primary interest was maximizing recoveries on ACC Senior Notes.  And I see no evidence of undue consideration or inducements to them, or pressure on them.  Nor do I see any special treatment for Tudor and Highfields that they did not try to make available for any other holders of ACC Senior Notes who wished to secure the same benefits.  I find that there was nothing improper in any of the respects just noted.

## BB.  Ultimate Facts

Based on the foregoing, I make the following findings of ultimate facts.[147]

The parties to the Settlement process—all or substantially all professional investors in distressed debt—were sophisticated and well counseled.  They were not bullied or improperly influenced in any way by each other, or by the Monitor.  The Settlement Parties engaged in the effort leading up to the Settlement, and to the Plan, in good faith.

The Monitor did not communicate with me in any manner that had not been expressly authorized by the parties, on three separate times.

---

[147]     To the extent any is a mixed question of fact and law, it should be regarded as such.

At all relevant times, Tudor and Highfields (and, at the applicable times, Oz, C.P. and Satellite) all negotiated, and thereafter settled, in good faith and without any improper inducements or motives.  They were motivated, and properly so, by legitimate interests in maximizing the recoveries of holders of ACC Senior Notes, and had no countervailing interests or concerns.

The Plan Proponents proceeded in good faith.  The Debtors and the Creditors Committee, and the counsel to each, all fiduciaries or counsel to such, acted only in what they reasonably believed was the best interests of the Debtors' estates, their creditors, and other stakeholders.

The Settlement appropriately reflects the range of potential outcomes of the MIA litigation, and insofar as its merits are concerned, falls well within the range of reasonableness.

The Settlement is even more plainly appropriate, if not also essential, in light of the costs and delays that would be associated with the continued litigation of the MIA.

The Settlement is fair and equitable, and is in the best interests of the estate.

The value of the TWC stock is $6.5 billion.

No dissenting creditor is receiving less than it would receive in the event of a liquidation of the Debtor against whom that creditor has a claim.

Discussion

It's unnecessary for me here to make this decision even longer by discussing all of the extensive law relating to confirmation of a reorganization plan, but I think I should take a moment to discuss the more important aspects of the key provisions of chapter 11 that bear on this controversy.  Section 1123 of the Code addresses what a reorganization plan must, and may, contain; section 1123(a) discusses what a plan *must* contain, and

145

section 1123(b) discusses what it *may* contain.  Section 1126 discusses, among other things, the requisite acceptances that must be obtained to confirm a plan.  And section 1129 of the Code sets forth the substantive requirements for confirmation of a reorganization plan—cross-referencing in several instances, either explicitly or under the caselaw, other sections of the Code, principally other sections in chapter 11.

Listed among the things that a plan must contain, under section 1123(a), are classes for various kinds of claims, which, if impaired, will then be entitled to vote, individually, for or against acceptance of the plan.  Section 1126 then discusses what levels of support are required for classes of claims and interests to accept, setting forth the familiar requirement for approval by a class of creditors, that it be supported by creditors (other than those disqualified from voting) holding a majority in number, and at least 2/3 in amount, of the allowed claims of such class held by creditors that have either accepted or rejected the plan.  The combination of those two requirements, and especially the supermajority requirement embodied in the "2/3 in amount," has the result that a class of claims will not have voted in favor of a plan in the absence of a great deal of consensus.

But classes of claims, like individual holders, can have different perspectives, and in the typical large chapter 11 case, there will be many classes of impaired claims and interests.  It is sometimes the case, but not common, that every single class accepts, and the Bankruptcy Code deals with both acceptance scenarios by a combination of two sections of the Code, 1129(a) and 1129(b).

Subject to an exception that's often applicable, and is discussed below, section 1129(a) provides, in substance, that a court may confirm a reorganization plan only if all

of its requirements are met.  Those requirements include, as relevant to the Adelphia

cases (which are subject to the pre-BAPCPA law), 13 subsections of section 1129(a).

Satisfaction of some of those 1129(a) requirements is disputed here, and I'll discuss those

in due course.[148]

Section 1129(a) has two requirements for ensuring that the plan has the requisite

support.  Flipping them in numerical order, because I think they're easier to understand

that way, section 1129(a)(10) provides that if any class of claims is impaired under the

plan, *at least one* class of claims has accepted it, without including any acceptance by an

insider.  And section 1129(a)(8) requires that *all* of the classes of impaired claims and

interests have accepted the Plan.  But the Code goes on to say, in section 1129(b), that if

the only deficiency in the plan is the inability to satisfy 1129(a)(8)—*i.e.*, to secure the

acceptances of *every single class* of claims and interests—the plan can nevertheless be

confirmed, if the additional requirements of section 1129(b) are satisfied.  Those

requirements include, most significantly, those that the plan "does not discriminate

unfairly," and that it be "fair and equitable"—requirements that have been fleshed out in

the caselaw.  This scenario is colloquially referred to as "cramdown."

As noted above, getting the affirmative vote of every single impaired class of

claims and interests isn't common in large chapter 11 cases, if indeed it's common in

any.  But it has happened here.  The Plan was approved by 30 of the 30 impaired classes

that voted on the Plan.  And because I will rule in accordance with the Tenth Circuit's

decision in *Ruti-Sweetwater*, discussed in Point VII below (and not let a few small classes

in which no vote was cast at all undermine the votes of thousands of other creditors, with

---

[148]    I'm not going to burden this decision with discussion of the 1129(a) requirements that are
undisputed.

billions in debt), the 30 of 30 accepting classes satisfy section 1129(a)(8).  *We do not have a cramdown situation here.*  Thus the additional requirements of section 1129(b) are inapplicable.

As noted above, section 1123(b)(3), which describes what a plan may contain, expressly includes settlements, and the Settlement that this Plan contains is one of its most important, and controversial features.  All parties agree, as do I, that while a Plan may contain a settlement, any such settlement (like the Fed. R. Bankr. P. 9019 settlements that are more common in chapter 11 cases) must pass muster for fairness, under standards articulated by the Supreme Court, the Second Circuit and lower courts.

The fairness of the Settlement, in my view, is the most important issue here.  I'll discuss that first, and then the remaining objections to confirmation.

## I.

### Propriety of Settlement

*A.  Standards for Approval of Settlement*

The legal standards for determining the propriety of a bankruptcy settlement are well established.  I've previously discussed them at length earlier in this case, most notably in the *Adelphia DoJ/SEC Settlement Decision,*[149] where my analysis of the settlement factors was affirmed by the district court.  As noted there and in many cases elsewhere, the legal standard for determining the propriety of a bankruptcy settlement is whether the settlement is in the "best interests of the estate."[150]  To determine that a settlement is in the best interests of the estate, the Supreme Court held in *Protective*

---

[149]    *See* n.14, *supra.*

[150]    *In re Purofied Down Prods. Corp.,* 150 B.R. 519, 523 (S.D.N.Y. 1993) (Leisure, J.) (" *Purofied Down Products*").

*Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,*[151] that the

settlement must be "fair and equitable."[152]  Such a finding is to be based on "the

probabilities of ultimate success should the claim be litigated," and:

> [A]n educated estimate of the complexity, expense,
> and likely duration of such litigation, the possible
> difficulties of collecting on any judgment which
> might be obtained, and all other factors relevant to a
> full and fair assessment of the wisdom of the
> proposed compromise.  Basic to this process in
> every instance, of course, is the need to compare the
> terms of the compromise with the likely rewards of
> litigation.[153]

The settlement need not be the best that the debtor could have obtained.[154]

"[T]here is a range of reasonableness with respect to a settlement—a range which

recognizes the uncertainties of law and fact in any particular case and the concomitant

risks and costs necessarily inherent in taking any litigation to completion—and  the judge

will not be reversed if the appellate court concludes that the settlement lies within that

range."[155]

---

[151]    390 U.S. 414 (1968) ("*TMT*").

[152]    *Id.* at 424.

[153]    Id. at 424-25. See also *Purofied Down Products, 150 B.R. at 523; Official Comm. of Unsecured Creditors of Int'l Distrib. Ctrs., Inc. v. James Talcott, Inc. (In re Int'l Distrib. Ctrs., Inc.),* 103 B.R. 420, 422 (S.D.N.Y. 1989) (Conboy, J.) (" International Distribution Centers") (determination as to whether proposed compromise is fair and equitable requires exercise of informed, independent judgment by court).

[154]    *See In re Penn Cent. Transp. Co.,* 596 F.2d 1102, 1114 (3d Cir. 1979) (" *Penn Central*"); *accord International Distribution Centers,* 103 B.R. at 423 ("Indeed, a court may approve a settlement even if it believes that the Trustee ultimately would be successful.") (citations omitted). Rather, the settlement must fall "within the reasonable range of litigation possibilities." *Penn Central,* 596 F.2d at 1114.

[155]    *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.) (Friendly, J.), *cert. denied,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972) (construing *TMT* in context of settlement of derivative suit).

A bankruptcy court need not conduct an independent investigation into the reasonableness of the settlement but must only "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness."[156]

It is not necessary for the court to conduct a "mini-trial" of the facts or the merits underlying the dispute.[157]  Rather, the court only need be apprised of those facts that are necessary to enable it to evaluate the settlement and to make a considered and independent judgment about the settlement.[158]  In doing so, the court is permitted to rely upon "opinions of the trustee, the parties, and their attorneys."[159]

As a general matter, settlements or compromises are favored in bankruptcy and, in fact, encouraged.[160]  As the Supreme Court noted in *TMT*:

> Compromises are a normal part of the process of reorganization.  In administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts.[161]

---

[156]    *In re W.T. Grant Co.,* 699 F.2d 599, 608 (2d Cir. 1983) (internal quotation marks omitted)

[157]    *Purified Down Products,* 150 B.R. at 522; *International Distribution Centers,* 103 B.R. at 423.

[158]    *See Purified Down Products,* 150 B.R. at 522; *In re Energy Coop., Inc.,* 886 F.2d 921, 924-25 (7th Cir. 1989).

[159]    *International Distribution Centers,* 103 B.R. at 423.

[160]    *See In re New York, N. H. & H. R.R. v. Smith,* 632 F.2d 955, 959 (2d Cir. 1980) (courts generally favor compromises, as compromises are "a normal part of the process or reorganization," citing *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106 (1939)); *Purified Down Products* 150 B.R. at 522-523 (S.D.N.Y. 1993) (settlement approved, noting that approval should not be overturned absent a clear abuse of discretion, which is evidenced by lenient standards which encourage settlement); *In re World Health Alternatives, Inc.,* 344 B.R. 291, 296 (Bankr. D. Del 2006 (settlement approved, noting that settlements are favored, minimize litigation and expedite administration of the estate).

[161]    *TMT*, 390 U.S. at 424.

The decision whether to accept or reject a compromise lies within the sound discretion of the court.[162]

In *In re Texaco Inc.,*[163] Judge Schwartzberg of this Court listed a number of factors to consider in approving a settlement.  Drawing in part from class action litigation, he suggested that the Court consider:

(1) The balance between the likelihood of plaintiff's or defendants' success should the case go to trial vis a vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures;

(2) The prospect of complex and protracted litigation if the settlement is not approved;

(3) The proportion of the class members who do not object or who affirmatively support the proposed settlement;

(4) The competency and experience of counsel who support the settlement;

(5) The relative benefits to be received by individuals or groups within the class;

(6) The nature and breadth of releases to be obtained by the directors and officers as a result of the settlement; and

(7) The extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.[164]

---

[162]     *See Purofied Down Products,* 150 B.R. at 522 ("A Bankruptcy Court's decision to approve a settlement should not be overturned unless its decision is manifestly erroneous and a 'clear abuse of discretion.' ").

[163]     84 B.R. 893, 901 (Bankr. S.D.N.Y. 1988),

*B.  Can the Court Use the Knowledge It Acquired?*

As an additional threshold matter, the parties debate the extent to which a court that actually has the controversy to be settled before it, and that may have heard briefing, argument and/or evidence before the case was settled, must disregard the additional familiarity with the controversy that it acquired as part of that process.

The Plan Proponents argue that months of exposure to the MIA, and the events that preceded it, dramatically increased my ability to understand the issues and to form informed views as to the MIA's outcome possibilities and settlement fairness.  The ACC Bondholder Group argues that for a court to consider views it may have formed while it heard the controversy but did not yet announce (or, possibly, views the court did not yet form, but are now informed by knowledge it then acquired) would be a denial of due process.  It argues the truism that under Fed. R. Evid. 605, "[t]he judge presiding at the trial may not testify that trial as a witness."  Nor, of course, can he or she be deposed. Based on that, it contends that the ability of the judge to apply the judge's knowledge of the case and its range of probable outcomes is circumscribed.  It argues that I must examine the controversy as if I were a "visiting judge" (or perhaps an appellate judge) who had come in to the case as an outsider, and had read only the record.[165]

I don't agree.  I think the contention runs flatly inconsistent with the long-time practice in judicial consideration of settlements (both in the bankruptcy court and the

---

[164]    *See Texaco,* 84 B.R. at 902.

[165]    In this connection, the ACC Bondholder Group accuses the Plan Proponents of pretending that the ACC Bondholder Group contended that the Bankruptcy Court cannot determine a contested matter concerning the reasonableness of a settlement, and says that the issue it "did raise was that a judge cannot be a witness to supply certain facts the judge will then use for a ruling."  It goes on to say that "[t]he relevant issue, therefore, … is whether a judge presiding over the contested approval of a settlement of a litigation can take into account anything other than the properly admitted evidence at the settlement hearing."  (Ltr. of Dec. 14, 2006 at 1-2).

district court), and if ever accepted, would represent a sea change in the manner in which settlements are evaluated—requiring the individual with more knowledge than anyone of the propriety of the settlement to abandon the benefits of his or her expertise with respect to the matter to be decided. More importantly, I think it runs counter to Second Circuit authority.

Settlements approved by bankruptcy courts can and do come up in two rather distinct contexts. One involves litigation pending or threatened in another forum—as it might, for example, if the debtor were prosecuting or defending an antitrust case in another district, an SEC enforcement action were pending in the district court, or a criminal prosecution against the debtor were pending or threatened. The second is where the controversy is pending before the bankruptcy court itself—as preference and fraudulent conveyance actions normally are, or where there is a dispute pending as to the allowance of a claim, or as this controversy typifies.[166] As a practical matter, by reason of the many *in rem* controversies that typify bankruptcy litigation, and the expanded jurisdiction of the bankruptcy court in non-*in rem* controversies to hear matters with an effect on the estate that came into being with the passage of the Modern Bankruptcy Code in 1978,[167] applications for settlement of matters pending before the bankruptcy court are at least as common as those for settlement of litigation pending elsewhere. And applications for approvals of settlements pending before the same also take place in the

---

[166] Sometimes it involves both, as did my earlier decision, affirmed by the district court, to approve the Debtors' settlements with the DoJ (with respect to threatened criminal prosecution) and the SEC (with respect to an enforcement action), both of which would have been considered elsewhere, and with respect to the SEC's monetary claim against the estate, which would have been heard before me.

[167] Under the old Bankruptcy Act, much of the estate's litigation had to be commenced in a "plenary action" in another forum. This was a major change from prior law.

153

district court—which, for example, is not infrequently called upon to pass on the fairness of a settlement in a class action before it.

As noted above in my discussion of the applicable law, the approval of settlements is a matter within the discretion of the bankruptcy court. The exercise of discretion, at least in the context of settlements, typically involves consideration of the applicable law (with respect to the underlying issues to be litigated), the facts that are put forward and/or alleged with respect to the underlying controversy, and the consideration of judicially prescribed factors to be taken into account in exercising one's discretion for considering approval of the settlement. But in the bankruptcy context, it also includes judicial experience, knowledge of the past proceedings in the case and the alternatives for its future, and consideration of what is best for the future of the parties and the estate. The latter considerations, in particular, require the judge to bring as much to the table as possible.

In approving a settlement, a judge who has seen the controversy first hand (the "Firing Line Judge")[168] has a leg up in numerous respects. Without suggesting that these in any way cover the waterfront, they include:

> *Background.* The judge knows what the parties have been litigating; what they will thereafter be litigating, and perhaps most importantly, in each case, why.

> *Context*. The judge knows what expressions mean in the relevant documents, and what shorthand references in testimony signify.[169] The

---

[168] So named because that is an expression the Second Circuit has used. *See infra* at 159 & n.180.

[169] For example, in this case, if a witness says I did something because "Mike" or "Tim" told me to, the judge who had heard the case would know that "Mike" refers to the indicted (though acquitted) Mike Mulcahey, and that "Tim" refers to Tim Werth, who pled guilty to criminal charges.

judge knows how the testimony fits together, and can often sense what its

implications are.

     *Knowledge of the record.*  The judge knows generally what is in

the record, and where to look to find the specifics.  The judge's memory of

the record doesn't trump what is actually in the record, of course, but it

sensitizes the judge to assertions that may be inconsistent with the record,

and that may warrant a search of the record to see what was actually said.

     *Understanding of Factual Technical Matters.*  Some matters, such

as financial accounting, can get very technical, and take time to

understand.  Seemingly similar words (*e.g.,* "consolidated" and

"consolidating," in accounting context) can have very different meanings.

Technical jargon is frequently used by fact witnesses, and especially

experts.  Briefs arguing such matters can be very difficult to understand

without getting up to speed on the learning curve.

     *Credibility.*  Most of the time, issues as to the credibility of

witnesses will be obvious to anyone who was in the courtroom at the time,

and to the extent they are, a judge who saw the testimony would have an

advantage.[170]

     *Views as to Possible Outcomes.*  Though a judge will not

ultimately decide the case until all of the evidence is in and the final briefs

---

[170]    Unannounced views that I might have formed as to witness credibility seem to be one of the ACC Bondholder Group's biggest concerns.  *See* Ltr. at 2.  As a "best practices" measure, or perhaps as a legal matter, some might argue that a judge should refrain from reliance on unexpressed views as to credibility, at least if it meant finding the opposite of evidence in the record.  But in this case, I don't need to decide whether such would be desirable as a "best practices" measure (which it might be), or legally required (which is more debatable).  In the *Adelphia* cases, this is not an issue, since, as I told the parties, I found all of the MIA witnesses to be credible.

are considered, the judge will be continually thinking about the case. With the luxury of having heard the actual evidence and argument, he or she will in many cases be able to make informed (and, perhaps, the best informed) judgments as to ranges of outcomes, or likelihood of success. This is, after all, quite similar to the decisions federal trial judges make on preliminary injunction applications or stay requests, where likelihood of success is an important factor. That is especially so when an expert comes in from the outside and professes to be able to express a better opinion as to probable outcome than the judge hearing the case could.

These are all in addition, of course, to a judge knowing that he or she has issued rulings with a potential (or certain) outcome on the controversy that those arguing the fairness of the settlement may have ignored.[171]

The caselaw also supports the view that bankruptcy judges can appropriately invoke their knowledge and expertise with respect to the proceedings that went on before them. In *Nellis v. Shagrue*,[172] Judge Sotomayor, then a district judge, considered the propriety of a settlement in the *Eastern Airlines* chapter 11 case. Judge Lifland of this Court had approved a settlement, relying in material part on his expertise with the matter before him. Judge Sotomayor observed that "[t]he experience and knowledge of the bankruptcy court judge is of significance in assessing the propriety of the settlement."[173]

She went on later to observe:

---

[171]    For example, the Opponents' Expert here used as a premise for his report and direct testimony an assumption that for the purpose of this controversy, the Debtors' books and records were presumed to be accurate. I remembered, from having written the opinion on this exact issue, that the assertion was inconsistent with what my opinion actually had said.

[172]    165 B.R. 115 (S.D.N.Y. 1994)

[173]    *Id.* at 123.

> Chief Judge Lifland's four year history with the parties and the Eastern bankruptcy is legend. There is no question that Judge Lifland was well informed and knowledgeable about the extensive litigation between the parties. Judge Lifland has presided over the Eastern Chapter 11 petition since its inception and has overseen the rise and fall of prior settlements. He has, in addition, approved other settlements which have been upheld by this court on appeal…. Thus, Judge Lifland is thoroughly familiar with the parties and their financial standing. His particular expertise in this matter and his understanding of the intricacies of the settlement and its impact on all of the parties provides ample support for the settlement's approval….[174]

Similarly, other judges have routinely utilized the knowledge they gained in seeing the cases before them when evaluating settlements, and even related cases of which they had knowledge.  In *In re MCorp Financial, Inc.*,[175] District Judge Lynn Hughes, apparently sitting as a bankruptcy court, confirmed a reorganization plan that included, as ours does, an important settlement.  He discussed the propriety of approving that settlement (there one with the FDIC, with respect to its distribution under the plan) at length.[176]  In connection with that discussion, he observed:

> In addition to the confirmation hearing itself, this court has accumulated a large store of background information about the debtors and other parties. This court signed the order closing the debtors' banks in the Houston region on the application of the government; heard the debtors' action against the Federal Reserve Board's capital allocation directive; presided over most of the debtors' defensive litigation' and by necessity, acquired a familiarity with the Dallas litigation.

---

[174]     *Id.* at 125.

[175]     160 B.R. 941 (S.D. Tex. 1993).

[176]     *See id.* at 948.

157

And *In re Spielfogel*,[177] Judge Eisenberg of the Eastern District of New York

considered a proposed settlement extensively before disapproving it.  As one of the

factors that informed her discretion in this regard, she observed:

> For the past two years, this Court has presided over
> this bankruptcy case and, since 1989, the
> bankruptcy case filed by Interstate Cigar
> Conclusions of Law, Inc.  Consequently, this Court
> has come to know these related bankruptcy cases
> very well.

Similarly, the Second Circuit has approved settlements where district judges, in

approving class action settlements, took advantage of their personal exposure to the case

being settled, and/or their personal experience and expertise.  In *In re The Drexel*

*Lambert Burnham Group*, for example, the Second Circuit affirmed a determination by

Judge Pollack certifying a class and subclasses for settlement purposes, and approving a

settlement agreement.  It observed:

> We will defer to the district court's management of
> the case, particularly because the district judge has
> had substantial experience in supervising complex
> securities cases. He has presided over both the SEC
> action against Drexel, and other cases involving
> Drexel and its former officers and directors. He
> knows the difficulties the class has had in proving
> its claims, and is aware of Drexel's financial
> straits.[178]

If judges, in the exercise of their discretion in reviewing settlements, have

regularly considered matter even outside the record of the litigation actually before them,

I find it hard to conceive that a judge could not consider matter *in* the record, or as to

---

[177]     211 B.R. 133, 144 (E.D.N.Y. 1997).

[178]     *Id.* at 293.

which the judge could take judicial notice, that he or she actually saw, heard, and thought about.[179]

But we don't need to rely on practices or inferences, as the Second Circuit has spoken directly on the matter. In *Detroit v. Grinnell Corp.,*[180] a case involving the approval of class action settlements of nationwide antitrust class actions, the Second Circuit, quoting a Third Circuit decision that had held likewise, noted that "[a]s we evaluate the settlement approved in this case, this Court must remain mindful that":

> Great weight is accorded [the trial judge's] views because *he is exposed to the litigants, and their strategies, positions and proofs.* He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly.[181]

---

[179]   In the motion that led to the *Exclusivity Clarification Decision*, see n.63, *supra*, I was asked to confirm that the communications between the Monitor and the Court would not be considered as evidence at the confirmation or settlement hearing. *See* 2006 WL 2927222, *2. I said "[o]f course not; this is self-evident. Such communications, while expressly authorized by the parties, were not evidence, and will not be evidence." *Id.* I added, in that connection, "[T]o [the] extent that the ACC Bondholder Group needs clarification that the Court 'will not consider anything at the confirmation or settlement hearing other than that which is properly admitted into evidence,' … it may have it." *Id.*

Consistent with that, I have not relied on anything the Monitor said in connection with this decision in any way. (Though the ACC Bondholder Group may be trying to make more of the last sentence, the committee's concern as to communications with the Monitor was the context of, and the only thing I meant by, the final sentence.) That did not, of course, foreclose me from reliance on information and expertise I developed by other appropriate means, including, most significantly, from the prior proceedings in this case and from the MIA litigation, both of which were appropriate subjects of observation and judicial notice.

[180]   495 F.2d 448 (2d Cir. 1974), abrogated as to other matters (relating to fee award, after settlement), *Goldberger v. Integrated Resources, Inc,* .209 F.3d 43 (2d Cir. 2000)

[181]   *Id.* at 454 (emphasis added).

The argument that the letter or spirit of Fed. R. Evid. 605 bars the judge from considering his or her knowledge has no merit. The judge is not, of course, testifying. The judge is exercising judicial discretion based on information the judge knows about. The bases for the exercise of that discretion are expressed in a decision, oral or in writing. The facts that inform the exercise of that discretion will have a basis in the record, in matters of which the judge took judicial notice, and/or other matters as described in the decision—and if they are not articulated in the record or appropriately relied on, in any material respect, the litigant will be free to argue that the decision was an abuse of discretion.

Likewise, in *In re "Agent Orange" Prod. Liab. Litig.*,[182] the Second Circuit affirmed the certification of a class action and approval of a settlement for Agent Orange victims.  Citing *Grinnell,* the Second Circuit held:

> Our role in scrutinizing the approval of the settlement is limited in light of the district court's extensive knowledge of the parties and their respective cases.[183]

Thus there is nothing in the law that requires a court approving a settlement to approach the case with blinders, and to disregard its knowledge of the case, and the litigants' "strategies, positions and proofs."  I must categorically reject the notion that a judge weighing a settlement is foreclosed from forming views as to likelihood of success that were formed but not publicly announced, or that weren't previously formed, but now can be.

## C.  Assent to Settlement

In the MIA Order, the Debtors reserved the right to seek to compromise one or more of the Dispute Issues (either by separate motion or in connection with a proposed plan of reorganization) on notice to the appropriate parties.[184]  Others had the right to object to any such compromise[185] (which the ACC Bondholder Group has done), and/or to assert that the Debtors have no authority to compromise such disputes.[186]  The ACC Bondholder Group has also done that.

---

[182]    818 F.2d 145 (2d Cir. 1987).

[183]    *Id.* at 170-171.

[184]    *See* Aug 4, 2005 Order at ¶ 12(a), quoted at n.24, *supra*.

[185]    *Id.*

[186]    *Id.*

The ACC Bondholder Group's objections to the merits of the compromise—*i.e.*, as to the reasonableness of the settlement—have been addressed above[187] and below.[188] Here I reject the ACC Bondholder Group's contentions that only the now-dormant ACC Senior Notes Committee was empowered to propose this settlement, that only an "independent fiduciary" could propose the Settlement and/or that *nobody* could propose the settlement—and that the Debtors, with the assent of the affected classes, did not have the power to do so.

In these cases, the Debtors have always had the rights of debtors and debtors in possession, which include the right to propose settlements in a reorganization plan, under Code section 1123(b)(3), or under Fed. R. Bankr. P. 9019.  There are no statutory impediments to debtors settling claims against each other, but as discussed in the *Arahova Trustee Decision,* the Debtors and their counsel had conflicts in doing so.  It was for that reason that I approved the Debtors' proposal to establish the MIA process, with ad hoc committees carrying the sword for the creditors of the Debtor groups that had conflicts with each other, with the Debtors and their counsel maintaining neutrality as to the merits of the controversy.

With this litigation having been commenced, was the litigation then condemned to proceed on until conclusion, without any way to stop it?  Of course not.  With proper assent and court approval, the MIA could always be settled.  It could be settled as part of a Rule 9019 process based on the agreement of the affected ad hoc committees, or it could be settled under a reorganization plan, as section 1123(b)(3) of the Code expressly

---

[187]     *See* Facts Section Y.

[188]     *See* Discussion Section I(D).

authorizes.  If the latter, of course, it would require confirmation of the Plan, and securing the requisite stakeholder assent.[189]

Tudor and Highfields originally were designated by the ACC Senior Noteholders Committee to be its representatives in the MIA negotiations, and were the earliest members of the ACC Senior Noteholders Committee to negotiate a settlement of MIA issues.  They had participated in the settlement discussions with the knowledge of most (if not all) of the other members of the ACC Senior Noteholders Committee.  But each of Tudor and Highfields executed the Plan Agreement in its individual capacity and not in a fiduciary capacity, and in particular not as an authorized representative of any other ACC senior bondholders—including, most particularly, those on the ACC Senior Noteholders Committee.

It appears that the ACC Senior Noteholder Committee did not have bylaws, and did not have a means to decide whether to take official action when its members differed in their approaches.  But with the ACC Senior Noteholders Committee having split and become disabled, and with at least some members now believing that the Settlement would be a good thing, it is ludicrous to believe that dissenters on that committee could prevent ACC Senior Noteholders from considering the Settlement proposal.  As counsel for Tudor and Highfields properly observed at closing arguments,[190] the objectors to the Settlement are not an official committee, and "do not have … standing to hold the majority of the ACC noteholders hostage to their own desires…."  The Debtors had

---

[189]    That assent, under familiar principles, requires approval by 2/3 in amount and more than 1/2 in number of the allowed claims of such class held by creditors (other than any entity whose vote has been disqualified) that voted on the plan.  *See* Code section 1126(c).

[190]    Confirm. Hrg. Tr. Vol. 15 at 78.

reserved the right to propose a settlement to see if creditors would favor it, and these circumstances made that entirely appropriate.[191]

I gave the Debtors their reservation of rights to continue to propose a settlement of interdebtor issues in August 2005.  About six weeks later, the Second Circuit issued a decision that confirms the wisdom of my having done so, and, indeed, suggests that I may have even gone farther than I needed to in requiring Debtor neutrality—or, at the least, would be acting entirely properly in authorizing the Debtors to propose the Settlement, as part of the Plan, here.  In *In re Smart World Technologies, LLC*,[192] creditors sought and obtained an order of the bankruptcy court approving a Fed. R. Bankr. P. 9019 settlement of estate claims without the consent of the debtor in possession.  The Second Circuit, speaking through a panel of Chief Judges Walker, Jacobs and Newman, found this to have been improper, and reversed.

The *Smart World* court noted that Rule 9019 vests authority to settle solely in the debtor-in-possession, and found this "hardly surprising" in light of the "numerous provisions in the Bankruptcy Code establishing the debtor's authority to manage the

---

[191]    In those arguments, I asked counsel for Tudor and Highfields the rather technical question as to whether the settling party was the "class of ACC noteholders as a whole," or whether it was "the debtors who have been authorized by the plan and the assent of the ACC noteholders to allow the debtors to agree to it on behalf of ACC."  He answered that "it's all of those," and continued that it was "the debtors who have filed the plan on behalf of all of the estates and the noteholders who have voted by the requisite majority set up by Congress to approve the plan; and also, to some extent, … it's the settlement parties … who agreed to … sign the settlement term sheet which was embodied in the plan."

As a practical matter he was right in all respects, and as a technical matter, he was right in at least the first two respects.  If the settlement were accomplished solely by a 9019 motion, it would be the Debtors, and the Debtors alone, who would have the authority to settle Debtor claims, subject, of course, to Court approval.  (*See* the discussion of *Smart World*, below.)  But under a section 1123 settlement (settling controversies as part of a plan), the Debtors and other Plan Proponents were in the most technical sense making a proposal for the settlement of the claims between the various Debtor estates, which settlement was agreed to and approved (subject to Court approval of the settlement's reasonableness) by the acceptance of the 30 classes that voted in favor of the Plan—most significantly the seven classes of affected ACC creditors and equity security holders.

[192]    423 F.3d 166 (2d Cir. 2005).

estate and its legal claims."[193]  It noted that under section 323 of the Code, the debtor has

the power to sue and be sued on the estate's behalf, "which presumably includes the

derivative power to settle suits."  It went on to say:

> In other words, § 323 implies what Rule 9019
> expressly states—that *it is the debtor-in-possession,*
> *as legal representative of the estate, who is vested*
> *with the power to settle the estate's claims.*[194]

After noting that the Code not only authorizes the chapter 11 debtor to manage the

estate's legal claims but in fact imposes duties on the debtor in doing so, the Circuit

continued that "[i]n making the debtor-in-possession accountable for the estate's legal

claims, Congress vested the debtor with the responsibility to determine how best to

handle those claims."  It thus concluded:

> In short, Rule 9019, which by its terms permits only
> the debtor-in-possession to move for settlement, is
> in complete harmony with the provisions of the
> Bankruptcy Code delineating the chapter 11
> debtor's role.  *It is the debtor-in-possession who*
> *controls the estate's property, including its legal*
> *claims,* and it is the debtor-in-possession who has
> the legal obligation to pursue claims or to settle
> them, based upon the best interests of the estate.[195]

The *Smart World* court acknowledged that in some circumstances continuing the power

of a debtor in possession to so act might be a bad idea, justifying the appointment of a

trustee or granting *STN* authority.[196]  But there no *STN* order had been entered, and I did

not enter an *STN* order as to MIA issues here.  Plainly, I looked to creditor bodies to carry

the sword for their respective estates and for the Debtors to step to the side with respect

---

[193]  *Id.* at 174.

[194]  *Id.* at 175 (emphasis added).

[195]  *Id.* (emphasis added).

[196]  *Id.* at 176.

to the *merits*, but the very considerable language in *Smart World* directing the bench and

bar to remember the Debtors' retention of settlement authority underscores how the

dysfunction of one ad hoc committee could not deprive the Debtors of authority to

propose a settlement.  That is particularly so where the settlement would take place under

a Plan, giving creditors the right to vote their approval or disapproval of it.

The Debtors could propose the Settlement, and we would see if creditors and

other stakeholders favored it, particularly creditors of ACC.  They did—including not just

the class of ACC Senior Noteholders (72% approval), but the classes of ACC Sub Debt

(77% approval); ACC Trade Claims (100% approval); ACC Other Claims (99%

approval); ACC Preferred Stock (94% approval); and ACC Common Stock (91%

approval).

The ACC Noteholders Group's argument that if the now-paralyzed ACC Senior

Noteholders Committee didn't support the settlement, only an independent ACC

fiduciary could, misses the mark in several respects.  First, I had expressly ruled, when

denying the Arahova Bondholders' motion for a trustee in the *Arahova Trustee Decision*

(later affirmed on appeal), that it was unnecessary to appoint trustees or nonstatutory

fiduciaries to deal with the conflicts resulting from the MIA.  Secondly, the ACC Senior

Noteholders Committee, before it split, had taken exactly the opposite position.  In its

understandable opposition to the Arahova Trustee Motion, the ACC Senior Noteholders

Committee stated "[t]here is no principle of law of corporations that requires affiliated

corporate entities to have separate and 'independent' management."[197]  The Debtors were

and are themselves fiduciaries, and like any other Debtors in Possession, they could

---

[197]    Combined Objection of the ACC Senior Noteholders to the Arahova Trustee Motion, p. 6.

propose a plan that included a settlement.  Pursuant to their April 5, 2005 Order reservation of rights (and unless I had ruled otherwise), they could still propose Settlement, if as part of a plan.   The Plan and its related settlement would still have to get the necessary assent under section 1126 and my approval of the Settlement's reasonableness under the applicable caselaw, but it cannot be said that the dysfunction of the ACC Senior Noteholder Committee could foreclose the Settlement's consideration.

I was quite clear, I think, in expressing the unlikelihood that I would impose a settlement by cramdown,[198] for lack of the requisite assent, but here the ACC creditors made their assent unmistakably clear to the Debtors.  The Debtors had the right to propose the Settlement as part of the Plan, and it was then up to the plan process, and the Court, to determine whether the Settlement would be approved.

### D.  Merits of Controversy As Affecting Recoveries & Reasonableness

In my discussion as to the relevant facts, I canvassed the issues in the MIA, with expressions of views as to outcome where warranted—though recognizing that some of the issues are very close, and not as capable of prediction as others.  However, as I've already noted, I took the evidence in the MIA without knowing (or caring) about the extent to which resolution of any particular issue would affect any creditor group's recovery.

Of course the *creditors* cared, and they reached a settlement in terms of what they'd get.  That requires going back to see whether the outcome the parties reached is fair and equitable and within the range of reasonableness in light of potential outcomes in the MIA, and is in the best interests of the estate.  As a practical matter, that here means

---

[198]       *See* page 37, *supra.*

the *ACC* estate, as this is the only estate where an assertion has been made that the Settlement isn't attractive enough.

The evidence at the confirmation hearing showed that there was not a material difference in views as to the extent to which MIA issues would drive creditor recoveries. The Opponents' Expert expressed the view that two issues in particular—the AIH Receivable and the Arahova Receivable[199]—would have the most significant effect on creditor recoveries, and Lazard's Mr. Aronson did not disagree.  I would say, however, that other issues, particularly when considered with a cumulative effect, and/or where they would be one-sided in probable outcome, should still be considered.  For instance, the Plan Proponents are right when they say that the CCHC Recap, the Historic Entries and the Alleged Dividends were all areas where the ACC Senior Noteholders would have little chance of recovery.[200]  Conversely, the ACC Bondholders are right when they say that there's little likelihood that I would ultimately disregard Bank of Adelphia balances resulting from ordinary course transactions where cash actually moved.

Using Lazard's analysis, the one-sided issues that will almost certainly cut against the ACC Senior Noteholders[201] (which have nearly, but not quite, been conceded) would reduce the ACC Senior Notes maximum likely recovery down to a maximum of about 90.4% (at a $5.4 billion TWC stock valuation), and an unstated (but plainly higher)

---

[199]    This was a payable from the Bank of Adelphia.

[200]    Counsel for the ACC Bondholder Group, while acknowledging weaknesses as to these issues, valued the likelihood of Arahova victory on each as only 80%, and computed, as a matter of probability analysis, that the likelihood of Arahova winning all three was the mathematical product of multiplying 80% x 80% x 80%—*i.e.*, 51.2%.  I disagree.  The likelihood of Arahova winning on each of these issues would for all practical purposes be very close to 100%, and the likelihood of ACC prevailing on even one of them would be negligible.  It is the *other* issues— Bank of Adelphia Paradigm, AIH Receivable, Arahova Receivable, Fraudulent Conveyance, and Netting where ACC has strong points to make, and where the odds on each would be about even money.

[201]    CCHC Recap, Historic Entries, Alleged Dividends.

percentage at a $6.48 billion TWC stock valuation.  Using the Opponents' Expert's analysis, the one-sided issues would reduce the ACC Senior Noteholders' maximum recovery by something more than 5%, down to a level below 107.9% on a $6.48 billion valuation.[202]

Likewise, the one-sided issues that will almost certainly cut against the Arahova Bondholders (which appear now to have been conceded) raised the low of the ACC Senior Noteholders' recovery up to 53.7% from what likely would otherwise have been a much lower number.

The more difficult analysis then continues with the narrower likely ACC Senior Notes recovery spread—a maximum (that for lack of a Lazard computation for a $6.48 billion valuation) I will assume to be 107.9%, on the high end, and 53.7% (or 55.7%, if silo netting is considered) on the low end—and the highly debatable MIA issues that drive creditor recoveries substantially.  On each of these—the AIH $16.8 billion Receivable (which breaks down into sub-issues, most notably those relating to the separate issues of recharacterization and equitable subordination); the Arahova $1.4 billion receivable (and its related issues, the propriety of use of the Bank of Adelphia Paradigm); and the September 2001 Fraudulent Conveyance—the issues are too close for me to predict victory, or material likelihood of success, for either side.  I must reject suggestions by the Opponents' Expert that he could make a better prediction as to outcome on these issues than I could—especially when his report conspicuously omits attention by the Opponents Expert or his staff to the *Phase I Decision*, and is inconsistent with it.

---

[202]    A win for Arahova on Silo Netting was estimated to result in a loss of another 2.2% to ACC Senior Noteholders, but I have concluded that on this record ACC Bondholders would likely win on that issue.

Since there is no meaningful basis for either side to conclude that it has a material likelihood of success on any of the major issues, I think we need to evaluate what the recoveries would be in the event that one or the other side won one, two, or three of the key issues, respectively. I think there are dangers in trying to fix probabilities with too much precision, as if the litigation recoveries are subject to a mathematical model. We are much more likely to be talking about win or lose scenarios with huge swings in outcome, as contrasted to spectrums of recoveries.[203]

As I've observed, recharacterization is an issue that could go either way—as it's easier to find recharacterization to be appropriate where, as here, the receivable runs from a subsidiary to its parent for value the parent itself downstreamed, which often has characteristics of an investment. And so, I think, is equitable subordination—especially since it appears that $1.776 billion of the debt represents "proceeds" of securities "purchased" by the Rigases with co-borrowings at others' expense. I think, with all due respect, that the Opponents' Expert's conclusion that "[a] fiduciary would assume that the merits of this issue favor ACC's position" is inexplicable. I would not assume that. And I believe my ability to analyze these issues, particularly since I know what my

---

[203]    There is also another factor, which may be relevant to creditor profitability analyses, but which in my view should have little, if any, relevance to my settlement analysis. The mathematical dynamics of the waterfall model in the *Adelphia* cases are such that small increases in ACC Senior Noteholder recoveries result in much larger corresponding decreases in Arahova Noteholder recoveries. The consequence of this is that small incremental gains for ACC Senior Noteholders cause far greater pain to those on the other side.

Much of the debate at the Confirmation Hearing focused on the recovery for the Arahova Noteholders, even though the real (or at least only legitimate) concern of the ACC Senior Noteholders was with respect to maximizing *ACC* recoveries. Focusing on another constituency's pain (and the other constituency's success in relieving its pain) may be perfectly acceptable as an investment technique, but the success of such a strategy is not a judicial concern. Bankruptcy judges focus on the *maximization* of recoveries for the creditors in the cases under their watch. Entities choosing to invest in bankruptcy cases should understand that bankruptcy judges will be focusing on the requirements of law and what is best for the maximization of creditor recoveries, and not on individual investment strategy agendas.

opinions said, and I've conducted a recharacterization trial before, is at least as good as the Opponents' Expert's.

The Lazard waterfall models also show that if Arahova were to prevail on *only one* of the key issues—the subscriber fraudulent conveyance claim; deeming the Bank of Adelphia solvent for the purpose of applying the Bank of Adelphia Paradigm; subordinating or recharacterizing the AIH debt—ACC would do about the same or worse than under the present Settlement. Putting it another way, ACC would have to win on *all* of the major issues to do materially better than it will now—remembering that at the TWC stock valuation I have found, ACC Senior Noteholders will now get 88.7% recoveries, with a top, if they win all realistically winnable issues, of about 107%.

Many of the issues that matter most are capable of going either way, and, depending on their outcome, can materially change recoveries. Contrary to the suggestion of the ACC Bondholder Group, the Settlement does not assume a complete victory any party on every issue. A realistic assessment of the issues, the evidence, and the law shows that both sides could lose some of the most important issues if the MIA were to continue.

Predicting outcome is assisted in part, but only in part, by the fact that a subset of the totality of the MIA issues has the most material effect. The parties seem to agree that (1) the propriety of the use of the Bank of Adelphia Paradigm on non-cash transactions; (2) the extent to which I should regard offsetting journal entries as equal when because of insolvency, seemingly equal and offsetting entries are not; (3) the applicability of recharacterization and equitable subordination to the AIH $16.8 billion receivable; and (4) the fraudulent conveyance claims underlying the September 2001 Subscriber

Dividend are the most important value drivers. Assuming that I were to use the "Corrected Base Case" (which presumes—appropriately I think—victory for the Arahova Bondholders on issues where the ACC Senior Bondholders would have a remote likelihood of success, *i.e.*, CCHC Recap, Historic Transactions and Dividends), a decision in favor of the Arahova Noteholders Committee on only one (and, of course, one or more) of those four issues would result in recoveries for ACC near or less than those in the Plan.

I do note that the Substantive Consolidation scenario gives the ACC Senior Noteholders a recovery of 110% at the $6.48 billion TWC stock valuation level. But that is, as the ACC Senior Noteholders recognized in their supplemental solicitation material, "a highly unlikely result," given that the Debtors have issued restated financial statements and filed the May 2005 Schedules, "thus evidencing an ability to generally determine the assets and liabilities of each Debtor."[204]

Finally, I note one other thing. The parties on both sides frequently talk of "give-ups," from one Debtor group to another, or from one group of creditors to another, as part of their discussion of settlement fairness. I don't doubt for half a second that this is how they regarded things, but it is not one upon which I place substantial weight. Whether

---

[204]     Disclosure Statement at GG-16. That point, which I believe to be well taken, would seemingly make it highly unlikely that the Second Circuit's requirements for substantive consolidation, as described in *Augie Restivo*, could be satisfied. As the ACC Bondholder Group properly observed:

> In fact, the Court has recognized the existence of books and records for each estate. ("In particular, there are many bills of particulars that make loose allegations in the character of alter ego, veil piercing, when the record that I've seen for six weeks in the MIA process indicates that whatever else we have here, we don't have an inability to have accurate—have books and records that show where money was spent and which obligations, subject to my MIA decision, should be honored or dishonored.")

*Id.* at GG-16 n.18 (citation omitted).

something is a "give-up" or not is in the eyes of the beholder—depending, most

significantly, on whether one was entitled to it in the first place.  And in this case,

entitlements were and still are highly debatable, because they presuppose the outcome of

matters that would be the meat of some of the most complex financial litigation this or

any other Court has ever seen.  Thus I have gone in my analysis straight to the

combination of the legal and factual issues, the waterfall analyses, and the range of

potential recoveries—in which the recoveries for the ACC Senior Notes are somewhere

in the middle.  I look at the Settlement result in light of the litigation risks and other

relevant factors (such as delay in getting distributions), and, except for key procedural

matters (such as arms length negotiation and good faith), not so much as to how the

parties got there.

*E.  Settlement Analysis*

As noted above, *TMT* requires "an educated estimate of the complexity, expense,

and likely duration of such litigation, the possible difficulties of collecting on any

judgment which might be obtained, and all other factors relevant to a full and fair

assessment of the wisdom of the proposed compromise."[205]  As part of that, it requires a

comparison of the terms of the compromise with the likely rewards of litigation.  I'll start

with the analysis in *TMT* terms, and then focus on particular additional factors that have

been identified by lower courts as helpful in making settlement approval determinations.

---

[205]      *TMT*, 390 U.S. at 424.

*1. Likelihood of Success*

Though *TMT* does not expressly mention it as a factor, the first and most

fundamental of the factors relevant to an assessment of the wisdom of a compromise is

each side's likelihood of success.  During the course of the MIA, I stated:

> I also have to say that the notion that either of you
> would hit a home run and convince me that I should
> blindly follow accounting entries, even when they
> are not reflecting cash transactions, on the one hand,
> or that I should disregard the result of months and
> months of effort on the part of the company's
> management to look at these transactions and to
> look at transaction that, the great bulk of which
> plainly were the grist of traditional—what people
> would regard as normal economic relations doesn't
> come as a surprise….[206]

I also stated:

> But I have seen a lot of evidence that leads me to
> believe that there is at least a possibility of
> intercompany debt, if not a certainty of
> intercompany debt, and I don't know the extent to
> which intercompany debt, in addition to the debt to
> your guys and so forth, is being fully satisfied or
> not.[207]

It was obvious to me then, and is no less obvious to me now, that neither side

would hit a home run on all of the MIA issues.  But what I did not then know was that

some of the factors I was then taking into account would either not have a material effect

on actual creditor recoveries, or would be conceded by the other side.  By way of

example, I thought the chances were remote that Arahova could win on ordinary course

cash transactions.  If they were disregarded, the ACC recoveries would be, I suspect,

very, very low.  But after rulings and comments on my part in Phase I of the MIA, the

---

[206]    MIA Hrg. Tr. Vol. 23, (3/1/06), at 19-20 (transcription error corrected).

[207]    Tr. of Hrg. of Jun. 7, 2006, at 70.

173

Arahova Bondholders came to concede on that issue, raising the recovery to ACC Senior

Noteholders up to the 50% range, which became the new floor.  By the same token, the

*Phase I Decision* would have made clear to anyone who read it that the Debtors' books

and records would not have presumptive validity, and that I would be making individual

decisions as to whether individual book entries gave rise to the requisite "right to

payment" that is the underpinning of any claim, and as to whether those asserting the

existence of a claim had met their burden to establish it.

Thus, to make an intelligent estimate as to possible outcomes in the MIA, one

must consider the *Phase I Decision*, and the legal principles that it addressed.  The MIA

was a proxy for a claims resolution process, in which the claims to be allowed or

disallowed were claims by one Debtor against another—in contrast to the more typical

claims allowance/disallowance scenario, in which an outsider to the estate (say, "Joe

Creditor") tries to prove his claim against the estate and the estate objects.

The Arahova Bondholders Committee had initially tried to make the ACC Senior

Noteholders prove up to thousands of individual transactions just to get to the point

where creditors of ACC could show that other Debtors owed ACC anything—as, for

example, other Debtors might owe ACC, directly or indirectly (and subject to

considerations of insolvency, recharacterization, equitable subordination and, possibly,

other matters) for any proceeds of ACC debt or equity offerings proceeds that had been

spent on behalf of other Debtors.  I declined to endorse the requirement the Arahova

Bondholders Group sought to impose, for reasons apart from its unfairness, because it

was unreasonable and inappropriate as a matter of evidence.  The underlying ledger

balances could be used as evidence—not as a presumption, but as evidence—tending to

174

show the existence of debt.  And if debt was shown, it could be argued to support an allowable claim, which is often, but not always, the same thing.

But that was only the beginning of the analysis, not the end of it.  Everybody who participated in the MIA quickly learned, if he or she did not already know, that when Adelphia's team of outside accountants and senior accounting employees worked on restating the Company's financials, their focus was on coming up with financials that could be relied on by the *outside world*.  They were *consolidated* financials, with an emphasis on the last "ed," upon which Adelphia's new auditor, PwC, could express an opinion.  That effort was plenty hard in itself (especially as a consequence of the Rigases' accounting treatment of co-borrowings), but the Restatement Team had the luxury, if we can call it such, of knowing that most of the interdebtor obligations that were the subject of the MIA *would cancel each other out as part of the consolidation process.*  Thus the Restatement Team had much lesser reason to review and change interdebtor ledger entries, and did not make changes in many instances.  And the Restatement Team couldn't have made informed decisions as to how to address many of the interdebtor obligations in any event, as the proper accounting treatment would turn on legal conclusions that only I (or a higher court) could provide.

That is why it was and is so important to read carefully, and understand, the *Phase I Decision*.  The May 2005 Schedules had dropped out of the picture.  The ledgers (and, in yielding the results in the ledgers, the journal entries) remained, but the ledgers were only prima facie proof of the balances they reflected.  To the extent (and the extent was huge) that they were products of Rigas fraud, errors, judgmental matters, capital contributions, dividends, or other matters that could not, under any principled basis, be

regarded as supporting "claims," and as a matter of law, those seeking to establish claims had the burden of proof.

When one examines the *Phase I Decision*, one can see that it had two components. One was a bundle of statements as to the applicable law—few if any of which were new or unfamiliar to the bankruptcy community, but which had never been applied in this context before. The second was a guidebook for how to prove that one had an allowable claim (especially on key matters in dispute), or on how to disprove it. The particular factors I invited the litigants to address were expressly made not exclusive, but they all had their origins in the parties' briefs, oral argument, or issues that had arisen in the prior 3-1/2 years of the Adelphia cases. A few of those factors dropped out of the picture—such as my need to confirm that they were not subject to mathematical errors (Factor #1), and my concern that there might be unrecorded transactions (Factor #2)—but when the evidence emerged over the next six weeks, it became increasingly clear that most, if not all, of the other factors would be highly relevant to a determination of the issues I was tasked to decide, if not also creditor recoveries.

I've discussed the particular issues and drivers of potential recoveries in excruciating length in several places above. When pruned to their essentials, the key elements of those discussions establish a range of recoveries for ACC Senior Bondholders of from 53.7% to 112.9%, and (after near-certain losing issues from ACC's perspective are taken into account), a realistic range of recoveries from 53.7% to something less than 107.9%. Based on my $6.5 billion valuation of the TWC stock, ACC Senior Noteholders will get a recovery of a little more than 88.7%.[208]

---

[208]    The 88.7% is based on a valuation of the TWC stock at the level of $6.48 billion. Computations based on that valuation are in the record. I valued the stock at a slightly higher $6.50 billion,

Is a settlement at this level reasonable, fair and equitable and in the best interests of the ACC estate?  It plainly is.  I've concluded that the Arahova Noteholders will almost certainly win on the three relatively small issues, described above, that would reduce ACC Senior Noteholders' recoveries by somewhat more than 5% below the ACC Senior Noteholders starting 112.9%.  If the Arahova Noteholders then win just on fraudulent transfer,[209] the ACC Senior Noteholders get 87.8%—an amount very close to (though even then, slightly less than) what ACC Senior Noteholders get under the Settlement.  If the Arahova Noteholders win on fraudulent transfer[210] and AIH subordination (or, I infer, recharacterization), ACC Senior Noteholders get 76.7%.  If the Arahova Noteholders win on fully adjusted intercompany obligations and fraudulent transfer,[211] ACC Senior Noteholders recoveries go down to 62.2%.  And if the Arahova Noteholders win on fully adjusted intercompany obligations and AIH subordination or recharacterization, ACC Senior Noteholder recoveries go down to 53.7%.

I can't agree with analysis offered by counsel for the ACC Bondholder Group under which he multiplies probabilities together to derive a probability of success for the Arahova Noteholders that goes down to about 13%.[212]  It suffers from two problems. The first is that individual likelihoods for Arahova victories, on the one-sided issues, are materially understated, by calling them only 80% each, and materially understated even more when one computes a resulting likelihood of only 51% for winning all three—when

---

which would increase ACC Noteholders recoveries to a somewhat higher level.  Since I don't know exactly how much, I refer to the ACC Senior Noteholders recovery under the Settlement as 88.7+%.

[209]    at $1.095 billion.

[210]    at same level.

[211]    at same level.

[212]    *See* Confirm. Hrg. Tr. Vol. 13 at 85.

in fact the likelihood of Arahova's winning on all three of those issues, while perhaps not 100%, is very close to that.

The second is that the statistical mathematical technique that the ACC Bondholder Group's counsel utilized is only appropriate, if at all, to measure the probability of wins on *all* of the issues at the same time. As the Arahova Noteholders' counsel pointed out at summation, while the probability of coming up "heads" on three coin tosses in a row might be 1 in 8, the probability of coming up "heads" on any given coin toss is 1 in 2—and the likelihood of coming up with at least one "head," after 3 tosses, is quite high.

On the most litigable issues, the likelihood of the Arahova Noteholders winning all of them (and thus bringing the ACC Senior Noteholders' recoveries down all the way to their low of 53.7%) is very small. But the likelihood of the Arahova Noteholders winning any *one* of the major issues, and thereby approximating the Settlement itself, is still about 50%. And the likelihood of the ACC Senior Noteholders going up from 88.7% to about 108% is only about 50%. Based on this analysis, I don't know if a statistician would say that the Settlement is exactly in the *middle* of the risk-reward range, but (especially when other factors are considered, discussed below), it plainly is fair and equitable and hardly falls outside the range of reasonableness. In essence, the Settlement sacrifices an even-money upside potential for certainty, greater downside protection, and receipt of greater distributions now, rather than years from now, if at all.[213] That may not

---

[213]   It could be reasonably argued that the dissenters want to bet the farm for a rather modest incremental recovery. Under the Settlement, the ACC Bondholders sacrifice a potential upside of about 18%, with an even-money likelihood of getting it, for downward protection of about twice that much, though with increasing unlikelihood as the recovery gets worse. ACC creditors also get distributions now that, if they get them at all, they may have to wait years for.

be the only rational decision that a settling party might make, but it is certainly a reasonable one, even before other factors, discussed below are taken into account.

## 2. *Complexity, Expense, and Likely Duration of Litigation*

This is a factor that heavily weighs in favor of approval of the Settlement here. The MIA was and would continue to be extremely complex and expensive to litigate. At the time it was suspended, it had already been tried for six weeks, and the litigants were still only in Phase II. The effort remaining to be done was (and still is) staggering. In reviewing a compromise, a bankruptcy court need not be aware of or decide the particulars of each individual claim resolved by the settlement agreement, or "assess the minutia of each and every claim"; rather, the court "need only canvass the issues and see whether the settlement falls 'below the lowest point in the range of reasonableness.'"[214] In arguing the merits of the Settlement here, the parties focused on only the most outcome determinative issues, but the feuding creditor groups did not so limit the MIA when it was being litigated during the winter and spring of this year, and they have given me no indication that they would do so in the future. Even if they did, the parties would still have to litigate the details of numerous extraordinarily complex claims.

The expense and delay occasioned by the continued litigation of the MIA would prejudice many parties, but the ACC creditors would be victimized by this most of all. As the MIA continued, administrative expenses would continue to accrue and/or have to be paid in cash. Interest on secured bank debt would have to continue to be paid, and while the interest charges could be ended by paying the banks off (as the ACC Bondholder Group proposed), that would require Adelphia's unsecured creditors

---

[214] *Cosoff v. Rodman (In re W.T. Grant Co.),* 699 F.2d 599, 608 (2d Cir. 1983); *Shugrue,* 165 B.R. at 123.

community (which includes, of course, ACC Senior Noteholders) to give up what it perceived to be a material aspect of its strength in litigation against the banks.  At least as a general matter, creditors like to receive their distributions sooner, rather than later, and if the MIA continued, ACC Senior Noteholders, along with many others, might have to wait years for their distributions, or at least the portion of their distributions that could be affected by the outcome of the MIA.  And any "holdback" plan that tried to pay off claims sooner might be subject to feasibility concerns, by reason of the need to create massive reserves to fund the distribution to the ultimate MIA litigation winner.

The MIA was also extremely painful for the Debtors and their personnel, who were understandably focused on maximizing value for the estates, and who were extremely burdened by the tasks of preparing and appearing for testimony to meet the desires of the various creditor groups.  And the MIA had a tendency to show more and more Rigas misconduct, disclosure of which would require retention of counsel for the innocent Adelphia employees who had followed Rigas-era instructions, and expose the Debtors and their assets to adverse tax consequences if transactions were structured in the form that they had to be unwound.

Finally, this case has been so litigious, with so much money at stake, that it is reasonable (if not essential) to anticipate that every determination in the MIA, if it continues to be litigated, will be appealed.  Many orders that I've issued in these cases have been appealed, and I can only assume that many more have not yet been appealed only by reason of lack of finality.  If the MIA must be decided, appellate litigation, which I regard as nearly certain, will be very time-consuming and expensive.  Getting one's arms around the issues in the MIA (not to mention ruling on them) will be a daunting job

for any appellate judge, and it is unfair and inappropriate, in my view, to expect that any appellate judge could decide the MIA issues on the merits in anything less than a considerable time.

### 3. Arms Length Bargaining

A "fundamental indicator of a settlement's fairness is the requirement that the settlement was properly negotiated at arm's length by the parties."[215]  I think it's plain that the Settlement was the result of an arm's length bargaining process.  After substantial negotiation, the Settlement initially secured the support of Tudor and Highfields, who were and are holders of unsecured claims against ACC (and no other Debtor), and who were the two members of the ACC Senior Noteholders Committee that agreed to become restricted and join the Creditors Committee to ensure adequate representation of holders of ACC Senior Notes.  As restricted members of the ACC Senior Noteholders Committee and members of the Creditors Committee since the end of 2005, Tudor and Highfields:

(a) were the members of the ACC Senior Noteholders Committee originally designated to be its representatives in negotiations in connection with the Resolution Process;

(b) were the only members of the ACC Senior Noteholders Committee to attend all or nearly all of the negotiation sessions; and

(c) had access to all confidential information that was relevant to the MIA and all of the advice of counsel to the ACC Senior Noteholders Committee.

---

[215]    *In re Hibbard*, 217 B.R. 41, 48 (Bankr. S.D.N.Y. 1998).

Counsel for the ACC Senior Noteholders Committee had fought the MIA with incredible tenacity and skill, and had a knowledge of the MIA record, and the strengths and weaknesses of every party's position, second to none.

In the Exclusivity Termination Decision, I observed that the Plan "was the result of weeks of effort to bring seemingly intractable disagreements to a consensual conclusion."[216] Given the months of twice-weekly mandatory negotiations, the months of negotiations with the Monitor acting as a mediator, and the acrimonious nature of the disputes, the Settlement was clearly the product of arm's length negotiations.

### 4. Other Settlement Approval Factors

*TMT* also calls upon the court to consider "all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise."  In *In re Texaco Inc.,*[217] Judge Schwartzberg of this Court listed a number of factors to consider in approving a settlement—some of which have already been discussed, but some of which qualify as other relevant factors here.

Drawing in part from class action litigation, Judge Schwartzberg suggested that the Court consider:

> (1) The balance between the likelihood of plaintiff's or defendants'
> success should the case go to trial vis a vis the concrete present and future
> benefits held forth by the settlement without the expense and delay of a
> trial and subsequent appellate procedures;

---

[216]    352 B.R. at 585.  *See also In re Dow Corning Corp.,* 192 B.R. 415, 424 (Bankr. E.D. Mich. 1996 (considering difficulty and contentiousness of negotiations in finding settlements were products of arm's-length bargaining).

[217]    84 B.R. 893, 901 (Bankr. S.D.N.Y. 1988),

(2) The prospect of complex and protracted litigation if the settlement is not approved;

(3) The proportion of the class members who do not object or who affirmatively support the proposed settlement;

(4) The competency and experience of counsel who support the settlement;

(5) The relative benefits to be received by individuals or groups within the class;

(6) The nature and breadth of releases to be obtained by the directors and officers as a result of the settlement; and

(7) The extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.[218]

a) *Benefits of Settlement v. Likely Rewards of Litigation (Factor #1)*
   *Prospect Of Complex And Protracted Litigations If The Settlement Is Not*
   *Approved (Factor #2)*

The first two *Texaco* factors (which refer to likelihood of success in the absence of settlement, expense and delay of a trial and subsequent appellate procedures, and complex and protracted litigation if the settlement is not approved) have already been discussed at length.  In my view, they individually and especially collectively strongly support approval of the proposed settlement.

b) *Proportion of "Class Members" Who Support or Do Not Object*

The third *Texaco* factor—the proportion of the class members who do not object or who affirmatively support the proposed settlement—is particularly relevant here.

---

[218]    *See Texaco,* 84 B.R. at 902.  *See also* the *DoJ/SEC Settlement Decision.,* 327 B.R. at 160 (listing and applying the *Texaco* factors).

183

Here, the ACC Bondholder Group made vigorous efforts to persuade holders of ACC Senior Notes to disapprove the settlement, laying out, in extensive supplemental solicitation material,[219] numerous reasons why, in the ACC Bondholder Group's view, the Settlement was inadequate, and laying out the hope that with refusal to support the Settlement, ACC Senior Noteholders could negotiate a better deal.  But ACC Senior Noteholders felt otherwise, and the Settlement secured the approval of 71% in amount, and 72% in number, of the holders of ACC Senior Notes who voted on the Plan.[220]  And by a statistic that I think is otherwise largely irrelevant, it is interesting that *97.5%* of the voting members of the ACC Senior Noteholders class that were not members of the ACC Bondholder Group favored the Plan even after hearing the ACC Bondholder Group's arguments—and that, putting it another way, only *2.5%* of the voting holders of ACC Senior Notes who weren't ACC Bondholder Group members agreed with the ACC Bondholder Group's opposition to the Plan.

In the *DoJ/SEC Settlement Decision*, in a Rule 9019 context, I expressed the view that "the approval of a settlement cannot be regarded as a counting exercise," and that, rather, "it must be considered in light of the *reasons* for any opposition, and the more fundamental factors—such as benefits of settlement, likely rewards of litigation, costs of litigation and downside risk—described above."[221]  I still feel that way, in the Rule 9019 context and now also in the context of a section 1123(b)(3) settlement proposed under a

---

[219]    *See In re Adelphia Communications Corp.*, 352 B.R. 592 (Bankr. S.D.N.Y. 2006) (the "*Supplemental Solicitation Material Decision*").

[220]    Equally telling, holders of ACC Trade Claims and Other Unsecured Claims (who did not benefit from subordination and would receive less under the Settlement than holders of ACC Senior Notes would) approved the Settlement by 100% in Amount and 99% in Amount, respectively.  And holders of ACC Sub Debt (who would lose their distributions to holders of ACC Senior Notes, until ACC Senior Notes were paid in full) approved the Plan by 77% in Amount.

[221]    327 B.R. at 165.

reorganization plan.  But where, as here, the settlement is in the context of a Plan, I think

*Texaco* Factor #3 requires some material consideration of the votes that were obtained on

the Plan, even though this factor should not, in my view, be regarded as conclusive or

giving rise to a presumption.  Here the Plan and its included Settlement has the approval

of 7 of the 7 ACC classes—all of which would have an understandable desire to

maximize the recoveries of ACC.  If the approval percentages are so high, and so many

feel that the Plan and its Settlement are worthy of approval, one must at least pause to

consider why a judge should feel otherwise.

### c)  Competency And Experience Of Counsel Who Support The Settlement

This inquiry, in my view, requires a focus on the counsel who are on the side of

the entity assertedly not getting the best deal it could.  Therefore I take into account the

competency and experience of counsel for *ACC creditors*, and not the competency and

experience of counsel for Arahova, Huff, FrontierVision, and Fort Myers, who are

accused of getting the better end of the Settlement deal.  The counsel for the Senior

Noteholders who support the settlement (Tudor, Highfields, Oz, C.P. and Satellite) are all

highly competent.  Counsel for the ACC Bondholder Group is also highly competent.

The counsel that has the most knowledge and ability to evaluate the merits of the

controversy—counsel for the now-paralyzed ACC Senior Noteholders Committee—has

been disabled by committee deadlock from any role other than sharing his knowledge

with his clients, and is not in a position to share his views with me.  If he were to do so,

one or another of the members of his client group might accuse him of disloyalty, or of

acting adversely to its interests.  This factor is a wash.

*d) Relative Benefits to be Received by Individuals or Groups Within the Class*

On a settlement of this character, with all holders of ACC Senior Notes receiving the same Plan treatment and the same 88.7% recovery, all get the same distributions that Tudor and Highfields first secured.  Tudor and Highfields likewise obtained an equal opportunity for others approving the Settlement to get exculpations and releases— though, for reasons noted below, I must invalidate them for reasons unrelated to the settlement.  Those opposing the settlement (such as those in the ACC Bondholder Group) did not get the same treatment, but it was equally available to them.  This factor goes principally to deals in which a favored party gets special consideration not generally available for class members, and here Tudor and Highfields went out of their way to ensure that what they obtained was generally available.

This is a factor that should be irrelevant or of minimal significance unless a settling party tries to grant or receive favored treatment not available generally.  It is irrelevant here.

*e) Nature and Breadth of Releases to be
    Obtained by Officers and Directors as
    a Result of the Settlement*

As is apparent, this is a factor that is relevant principally in class action settlements.  It is difficult to adapt to the circumstances here, but to the extent it is, it queries whether the ACC Senior Noteholders who agreed to the Settlement got any special releases not available to others in their class.  As noted, they took steps to make the benefits they secured available to all.  To the extent any chose not to qualify for such benefits, that was a matter of their own choosing.

*f) Extent to Which the Settlements is Truly*
  *the Product of Arms-Length Bargaining,*
  *and Not of Fraud or Collusion*

As in the *Adelphia DoJ/SEC Settlement Decision,*[222] I give this factor moderate weight on the motion now before me, though I would give it much greater weight if I ever thought it had not been satisfied.  I discussed the arms length bargaining at length above, because I thought it important to have the comfort that the proposed Settlement was the result of a vigorously negotiated process.  It plainly was.  This factor supports approval of the Settlement

*5. Settlement Analysis Conclusion*

In my view, the Settlement, looking initially solely at its economic terms, is plainly reasonable (and even more plainly, well within the range of reasonableness), fair and equitable, and in the best interests of the ACC estate, and I so find, as a mixed question of fact and law.  When one adds to the equation the additional *TMT* and *Texaco* factors—most significantly, the complexity of the underlying litigation, and the huge expense and delay that would be occasioned by prosecuting it—this decision as to the Settlement's reasonableness becomes quite an easy one.  The Settlement is eminently reasonable, fair and equitable, and in the best interests of the ACC estate (and, to the extent relevant, the other Debtor estates), and I so find.

## II.

### Classification

The ACC Bondholders object to classification of ACC Trade Claims and Allowed Other Unsecured Claims in two separate classes, arguing that creditors that comprise

---

[222]    *See* 327 B.R. at 165.

either class are general unsecured creditors of equal rank and priority.  The ACC

Bondholder Group further argues that the placement of the above-mentioned claims in

two separate classes is arbitrary, and suggests that the only reasonable conclusion for

segregating these substantially similar claims into two classes is the Plan Proponents'

desire to gerrymander an accepting impaired class of ACC claims.

The Plan Proponents urge the Court to reject allegations of gerrymandering,

arguing that Claims and Equity Interests were not classified separately by the Proponents

"solely to create an impaired assenting class"; rather, they argue, the Plan's classification

structure was created with a view towards recognizing and respecting legal rights and

obligations, and maximizing and protecting value for all creditors of each of the Debtors.

Pursuant to section 1122(a), a plan may place a claim or an interest in a particular

class only if such claim or interest is substantially similar to the other claims or interests

of such class.  Normally this applies to ensure that different types of claims aren't

bunched together in the same class.  But caselaw has also considered the converse

situation.  Although section 1122(a), by its terms, doesn't require that all similarly-

situated claims be classified together, caselaw has made clear that separate classification

of substantially similar unsecured claims is permissible only when there is a reasonable

basis for doing so or when the decision to separately classify "does not offend one's

sensibility of due process and fair play."[223]  When considering assertions of

gerrymandering, courts in the Second Circuit have inquired whether a plan proponent has

---

[223]     *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 703 (Bankr. S.D.N.Y. 1993).

classified substantially similar claims in separate classes for the sole purpose of obtaining at least one impaired assenting class.[224]

The classification structure in the Plan is based on the requirement that the Debtors recognize the similar legal character of the claims and equity interests grouped together, and the different legal character of those Claims and Equity Interests that are classified separately.  The Trade Claims are generally liquidated Claims, as opposed to the Other Unsecured Claims, which are primarily unliquidated litigation and rejection damage Claims.[225]  While Classes containing both types of claims require reserves, the reserves for the Other Unsecured Claims may be subject to significant fluctuation based on the outcome of certain litigation.[226]  Classifying Trade Claims apart from Other Unsecured Claims insulates the former against the risk that the reserves for the latter are not capable of precise estimation.  Such motivation is more than sufficient reason for the classification structure embodied in the Plan, and I find, as a fact or mixed question of fact and law, that the classification structure was not established to gerrymander an impaired assenting class.  Accordingly, the Plan complies with section 1122 of the Bankruptcy Code and relevant Second Circuit caselaw.[227]

---

[224]    *See Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd. P'ship),* 21 F.3d 477, 483 (2d Cir. 1994) ("separate classification of unsecured claims solely to create an impaired assenting class will not be permitted").

[225]    *See* Wittman Decl. ¶ 41.

[226]    *See id.*

[227]    Though all classes of bank claims have now accepted the Plan, and it may not be necessary to reach this issue, I note that the classification of the Bank Claims is also appropriate.  First, the Plan separately classifies the Administrative Agents, Non-Administrative Agents and Syndicate Lenders in order to provide them with LIF allocations that are appropriate to their respective roles in these cases.  Second, the Banks have different rights vis-à-vis each other with respect to the Prepetition Credit Agreements, the Debtors and the Bank Litigation.  Third, the Administrative Agents', Non-Administrative Agents' and Syndicate Lenders' Claims are distinct from each other on the basis of the degree to which their claims are infected by the allegations of prepetition misconduct by the Creditors Committee in its adversary proceeding against Bank Lenders and others.

III.

Good Faith

Section 1129(a)(3) of the Code requires that the Plan have been proposed in good faith and not by any means forbidden by law. I find this requirement plainly to have been satisfied here.

The Plan has been proposed by the Debtors, the Creditors Committee, and agents for bank lenders. The first two are fiduciaries, and I have seen, first hand, how they have balanced—wholly successfully, I find—their responsibilities as fiduciaries to maximize value and bring these cases to a successful end, with the demands that have been placed upon them by feuding individual creditor groups with parochial desires to maximize the return on their individual investments in these cases. Likewise, the bank agents acted vigorously, but always properly, in addressing the concerns in their domain.

I noted, in the *Exclusivity Termination Decision*, that here the Debtors proposed, jointly with the Creditors Committee, a reorganization plan that, among other things, proposed a compromise of intercreditor disputes (and of the interdebtor disputes, which in huge respects drive the intercreditor disputes) that had plagued this case for years.[228] On April 6, 2006, I expressly authorized the Debtors to put out a proposal for an interdebtor dispute compromise for a vote. As I noted above in my Findings of Fact,[229] the purpose and effect of this provision was to authorize the Debtors to propose a settlement plan to see if it would fly, and to give the Debtors the comfort that if they did so, the proposal would not be violative of the principle of neutrality. That order did not

---

[228]    352 B.R. at 582.

[229]    *See* page 34 above.

190

take away their authority to propose a settlement (in fact, it confirmed it), but it made

such a proposal on securing the assent of the affected creditors through the plan process.

Similarly, as also noted above in my Findings of Fact, I held on September 12:

> That the debtors putting a plan of this character up
> for a creditor vote and soliciting acceptances to a
> plan, which creditors and other stakeholders will be
> free to accept or reject, does not violate the
> undertakings of neutrality or the directions as to
> neutrality that I expressed and that the debtors
> undertook earlier in this case.[230]

And having considered the conduct of Plan Proponents, the Debtors and the

Creditors Committee, and also the Settling Parties whose earlier agreements ultimately

led to the Plan, I went on to say that:

> While I understand and respect the sincere
> substantive objections to the compromise embodied
> in this plan, I do not regard it as illegally proposed,
> and certainly not illegally proposed in any way that
> prohibits it from being solicited.[231]

Finally, in the Exclusivity Termination Decision I noted that:

> I disagree with the contentions that the process that
> led up to the term sheet that underlies it was in any
> way unlawful or illegitimate.[232]

In a later decision, the *Exclusivity Clarification Decision*,[233] I addressed a concern

expressed by the ACC Bondholder Group that I had made that determination without

knowing all relevant facts.  I stated, in ruling on that motion:

> The ACC Bondholder Group seeks a somewhat
> similar ruling with respect to my determination that
> there was nothing unlawful or illegitimate in the

---

[230]    Tr. of Hg. of Sept. 12, 2006, at 19.

[231]    *Id.* at 19-20.

[232]    352 B.R. at 582.

[233]    *See n.*63, *supra.*

> process that led to the proposed settlement.  But
> here I can agree with it only in part.  It is true, as the
> ACC Bondholder Group noted, that I did not
> conduct an evidentiary hearing before reaching that
> determination.  But it is also true that I based my
> determinations on a very considerable body of
> information then known to me, which did not raise
> material disputed issues of fact, including, most
> obviously, two undisputed confirmations of my
> ability to receive reports from the settlement
> monitor.[234]

But I went on to say that:

> [t]o the extent the ACC Bondholder Group can
> bring facts heretofore unknown to me to my
> attention, or which might cause me to believe that
> the heretofore undisputed facts upon which I ruled
> were in fact inaccurate, it can indeed present them,
> and they will be duly considered.[235]

However, after hearing evidence at the Confirmation Hearing, I have heard

nothing to cause me to change any of my earlier findings—except that it showed that

there were *three,* and not just two, express consents to the Monitor speaking to me.  In

particular, the testimony of Darryl Schall, discussed in my Findings of Fact above, causes

me even more strongly to believe that the settlement process took place in good faith.  I

so find.

## IV.

### Unfair Discrimination

The ACC Noteholders argue that the solicitation process has been irreparably

tainted by offers of special consideration to some, but not all members of the Senior

Notes class.  In substance, the ACC Noteholders argue that members of a *de facto*

---

[234]    2006 WL 2927222 at *1.

[235]    *Id.*

subclass of "ACC Settling Parties" within the ACC Class receive consideration, not available to class members generally, as the "price" for their accepting votes, including broad releases and exculpation;[236] payment of fees and expenses through the Effective Date without any burden to show a substantial contribution to the estate;[237] and the unilateral ability to approve reduced distributions to the entire ACC Senior Notes Claims class.[238] The ACC Bondholders argue that because these benefits are not available to all the members of the Senior Notes, the Plan treats members of the same class differently in violation of section 1123(a)(4) of the Code.

The Plan Proponents argue that all the claims in the Senior Notes receive identical treatment and receive their pro rata share from the pool of available assets. And they further argue that because the distributions to the Senior Notes are not in any way tied to releases and exculpations, all claims of the Senior Notes are treated exactly the same, as required by section 1123(a)(4).

Section 1123(a)(4) of the Code states that a plan shall

> provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.

Neither the Code nor its legislative history precisely defines the standards of "equal treatment."[239] However, courts have held that the statute does not require identical treatment for all class members in all respects under a plan,[240] and that the

---

[236]    *See* Plan §§ 16.3, 16.15.

[237]    *See* Plan § 6.2(d)(i).

[238]    *See* Plan § 12.3.

[239]    *See* Collier, 1123.01[4].

[240]    *See In re AOV Industries Inc.*, 792 F.2d 1140, 1154 (D.D.C. 1986) ("We do not hold that all class members must be treated precisely the same in all respects").

requirements of section 1123(a)(4) apply only to a plan's treatment *on account of particular claims* or interests in a specific class—not the treatment that members of the class may separately receive under a plan on account of the class members' other rights or contributions.

Judge Martin Teel's extensive decision in *Heron, Murchetter,*[241] a case involving a law firm bankruptcy, is instructive in this regard.[242]  In *Heron*, *Murchetter,* the plan placed the debtor's former partners in the same class and provided them with the same distributions on account of their claims under the plan, regardless of whether they elected to make contributions to fund the plan and regardless of whether they released their claims against the plan funders.  However, the plan also provided that the former partners who made capital contributions would receive certain releases and injunctive protection.  Some of the partners objected to this portion of the plan, arguing that the different value of releases (the amount of which depended on when the partner left the debtor) provided unequal treatment of their claims in violation of section 1123(a)(4).  Judge Teel overruled this objection, because he found that the plan provided recovery to all class members without regard to whether the partners released their claims against the plan funders (participating partners).  He observed:

> The objectors fail to distinguish between a partner's treatment under the plan on account of a claim or interest and treatment for other reasons.  Only the former is governed by § 1123(a)(4). . . . The plan's provisions dealing with partner contributions,

---

[241]    *See In Re Heron, Murchetter, Ruckert & Rothwell*, 148 B.R. 660 (Bankr. D.C. 1992).

[242]    The ACC Bondholder Group's reliance on *AOV* is misplaced.  In *AOV*, where all creditors in a class received pro rata distributions in exchange for release of their derivative claims, the objecting creditor was required to release a more valuable direct claim against the guarantors.  *Id* at 1151.  The *AOV* Court held that section 1123(a)(4) was violated in that case because the plan required "unequal consideration" to be tendered for "equal payment".  *Id.*  The release in that case was directly tied to the amount the objecting creditor was going to recover on account of his claim.

releases, and the permanent injunction have no connection to a partner's status as a claim or interest holder within a particular class. These provisions constitute a separate feature of the plan, designed to allow adequate funding of the plan. Every partner who wants to receive the protection of the permanent injunction must agree to contribute to the plan and to release any claims against the other partners and creditors. This policy is applied to every partner without regard to his status as a claim or interest holder. As such, it does not constitute treatment of a claim of a particular class for purposes of § 1123(a)(4).[243]

The Plan, like the plan in *Heron*, *Murchetter,* provides exactly the same treatment to all claims in the Senior Notes. All holders of Senior Notes recover on *pro rata* basis from a single pool of funds, and the recovery on these claims is not conditioned on or in any way tied to the releases. The exculpation and release provisions of Section 16.3 are separate and independent provisions negotiated and agreed to as part of the Settlement— available to any and all who also support the Settlement. Notably, *all* holders of ACC Senior Notes — including members of the ACC Bondholder Group — were entitled to avail themselves of the protection afforded by the release and exculpation provisions of Section 16.3 of the Plan.[244] The extent to which the releases otherwise pass muster under

---

[243] *Id*. at 672. Similarly in *In re Acequia, Inc.,* one of two feuding shareholder claimed that he was receiving unequal treatment under the plan because he was denied the right to participate in the management of the reorganized debtor, while the other shareholder was not subject to such a bar. *In re Acequia, Inc.,* 787 F.2d 1352, 1362 (9th Cir. 1986). The court held that the plan satisfied the requirements of section 1123(a)(4) by providing the same voting rights and restrictions to each shareholder on account of his or her interests. The plan's separate provisions permitting only one of the shareholders to participate in post-confirmation management did not violate section 1123(a)(4) because such rights were not being given on account of that shareholder's interests.

[244] Section 16.3(c)(iv) of the Plan includes in the definition of Released Parties "(iv) to the fullest extent permitted under applicable law, each of the Settlement Parties, the FPL Committee and the Olympus Parties (and in the case of parties in this subsection (iv) that are *ad hoc* committees, each of their members, solely in their capacity as such) which vote in favor of the Plan, or in the case of parties in this subsection (iv) that are *ad hoc* committees which support the Plan." Plan, § 16.3(c)(iv).

applicable caselaw raises a separate issue,[245] discussed below, but the releases do not raise an unfair discrimination issue.

The exculpation and release provisions have no bearing on the Plan's treatment of claims.  Equal treatment of claims is all that is required by section 1123(a)(4) of the Bankruptcy Code.  I hold that the treatment of each ACC Senior Note claim under the Plan is the same whether the holder of such claim voted to accept or to reject the Plan, and that the requirements of section 1123(a)(4) are satisfied.

## V.

## Best Interests of Creditors

The "Best Interests" test embodied in section 1129(a)(7) of the Bankruptcy Code requires that, with respect to an impaired class of claims or interests, each holder that rejects a plan receive or retain under such plan property of a value, as of the effective date, that is no less than such holder would receive in a hypothetical chapter 7 liquidation of the debtor on such date.[246]

---

"Settlement Parties" is defined in the Plan to mean "the ACC Settling Parties, Committee II, the Arahova Noteholders Committee, the FrontierVision Committee, Huff, the ACC Trade Committee, the Subsidiary Trade Committee and the Creditors Committee."

"ACC Settling Parties" is defined in the Plan to mean "Tudor, Highfields, OZ Management, L.L.C., C.P. Management LLC, and Satellite Asset Management, L.P. (and their respective affiliates and separate accounts thereof holding Claims against the Debtors) *and any other holder of ACC Senior Notes that executes the Plan Support Agreement agreeing to vote to accept the Plan and otherwise agreeing to be bound by the terms of the Global Settlement*." (emphasis added).

[245]    As noted below, recent Second Circuit authority requires me to invalidate them for Settling Parties.  Thus this issue appears to be moot.

[246]    Section 1129(a)(7)(A) of the Bankruptcy Code requires, in relevant part, that:

With respect to each impaired class of claims or interests

(A)  each holder of a claim or interest of such class

(i)  has accepted the plan; or

(ii)  will receive or retain under the plan on account of such claim or interest property of a      value, as of the effective date of the

196

The ACC Bondholder Group contends that the Plan does not meet the best interests test under section 1129(a)(7)—principally because, it argues, an independent chapter 7 trustee exercising its fiduciary duties on behalf of ACC would not conclude that the Settlement is in ACC's best interest, and because a chapter 7 trustee would be able to achieve greater recoveries for the ACC Bondholder Group than those provided in the Plan. The ACC Bondholder Group also argues that the Plan Proponents have overstated the liquidation costs that would have to be satisfied in a chapter 7 case, and the interest that would have to be paid to other creditors. I disagree with the ACC Bondholder Group's contentions in this regard, to the extent they need to be addressed, and find that the Plan easily meets the requirements of the Best Interests test.

The plan proponent has the burden of proof to establish by a preponderance of the evidence that its plan meets the Best Interests test.[247] In determining whether the best interests standard is met, the court must measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in the event of liquidation under chapter 7. In doing so, the court must take into consideration the applicable rules of distribution of the estate under chapter 7, as well as the probable costs incident to such liquidation.

Under chapter 7, a debtor's estate is liquidated by a trustee appointed by the bankruptcy court. Here, substantially all of the Debtors' businesses have been sold to Time Warner and Comcast, and the estates consist primarily of cash, TWC stock (which

---

plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

[247]    *In re Affiliated Foods, Inc.*, 249 B.R. 770, 787 (Bankr. W.D. Mo. 2000); see also *In re Featherworks Corp.*, 25 B.R. 634, 642 (Bankr. E.D.N.Y. 1982) ("As the proponent of the plan, the debtor had the burden of establishing that it met the requirements of the Code.").

is not now freely marketable), and the value to be realized from the Contingent Value Vehicle. Accordingly, the determination of whether the Plan satisfies the Best Interests test here necessarily focuses on the incremental costs that may accrue in a chapter 7 that the estates need not absorb under the Plan, and, to the extent applicable, any incremental cost savings they might enjoy.

Comparing the estimated recovery for each impaired creditor under the Plan with its estimated recovery in a hypothetical chapter 7 case requires examining, among others, five significant factors: (i) the costs and discounts associated with an initial public offering of the TWC stock; (ii) the additional administrative expense costs of having one or more chapter 7 trustees appointed to liquidate the estates; (iii) the loss of value associated with losing the expertise of the Debtors' employees and professionals; (iv) increased claims against the Debtors and resulting delays in distribution; and (v) the Settlement embodied in the Plan. Also, in the event the Plan is not confirmed, the Debtors will be required to continue to pay postpetition interest to holders of Bank Claims, which approximates $42 million a month (offset by approximately $22 million earned in interest on the bank debt).[248]

The first two alone are determinative, but I will discuss them all. I conclude, after doing the liquidation analysis, that nonaccepting creditors of impaired classes (including, in particular, those of ACC) would receive more in chapter 11 than in a hypothetical chapter 7 liquidation on the effective date.

---

[248] See Confirm. Hrg. Tr. Vol. 2 at 42.

*IPO Costs*

First, a huge cost of a chapter 7 liquidation of the Estates would be the cost of liquidating $6.5 billion in TWC stock.  In chapter 11, the Debtors could distribute that stock without going through an underwriting and registering it with the SEC, by reason of the Code's exemption, under section 1145, for securities distributed under a plan.  But section 1145 is inapplicable to liquidations under chapter 7, and one or more chapter 7 trustees would have the expensive task of distributing that huge block of stock in an underwriting, by means of an initial public offering of the TWC stock.

Costs associated with an IPO would include, among others, an IPO discount, which I have found above, as a fact, reasonably should be estimated to be 7%.[249]  Such costs would also include underwriting fees, which I have found, as a fact, reasonably should be estimated to be 4%.  Together, the costs associated with the IPO of all of the TWC stock (or, in the case of a partial IPO, additional costs associated with subsequent public sales) would amount to about 11% of its value.  As I've valued the TWC stock at $6.5 billion, the IPO costs can reasonably be estimated to be $715 million.[250]

The ACC Bondholder Group disagrees with the Plan Proponents' estimate of the IPO costs.  It argues that because cable is a well-performing sector, and in light of the high quality of TWC's assets and investor familiarity with Time Warner, the TWC stock would not need to be priced at a discount to attract investors.  Furthermore, the ACC Bondholder Group asserts that the Debtors control the amount of TWC stock that would

---

[249]     *See* Aronson Declaration, ¶ 11.  *See also* Confirm. Hrg. Tr. Vol. 2 at 26 ( Ms. Wittman, Adelphia's current CFO, testified that the IPO discount is in the five to ten percent range, and, given the size of this offering, could be more like five to seven percent.)

[250]     Similar calculations using the lowest value of Ms. Wittman's IPO discount range would yield IPO cost in excess of $480 million.  With the deemed value of TWC stock at $6.5 billion, the total IPO costs will be in excess of $900 million for IPO discount of 10% and in excess of $580 million for IPO discount of 5% (keeping the underwriting discount at 4% in each case).

be offered to the public above a threshold of 33 1/3% of the Debtors' holdings.  It

contends that if only the minimum required amount is offered to the public, a 4%

underwriters fee would result in IPO costs of approximately $85 million.

I can't accept the ACC Bondholder Group's argument.  First, even assuming that

cable stocks are in demand, there has been no testimony or evidence that today's cable

market will vitiate the need to price shares at a discount; the argument is only

speculation.  Furthermore, there has been no testimony that the scarcity of TWC shares

on the market will drive up the price per share with the effect of obliterating the need for

or the desired effect of the IPO discount.[251]

Second, I agree with the Plan Proponents that in the event of a liquidation, *all* of the

TWC stock would need to be sold to the public in order for a chapter 7 trustee to liquidate

the estate.[252]  In one way or another, the stock will have to be liquidated, and it will have

to be liquidated in accordance with law.  It is therefore reasonable to use the numbers

which represent the cost of the IPO for all of the TWC shares held by Adelphia for the

purposes of Best Interests test, because secondary offerings would incur comparable costs

and expenses to the IPO.  Thus, it is reasonable to assume that all of the TWC stock held

by the Debtors would be sold during the IPO.

---

[251]    In fact, the Debtors' valuation expert (the only expert to testify on valuation of TWC stock) did
not believe that there would be an "addition scarcity premium" with a $5-6 billion dollar float.
Confirm. Hrg. Tr. Vol. 3 at 51-52 ("Five to $6 billion is enough stock to make a very active in the
stock, including for large investors that have to put substantial amounts of money to work.  So I
don't think that at the levels you're talking about there would be this -- you seem to be getting at a
supply-and-demand issue, but I don't believe that $5 billion would limit the supply of the stock…
there's enough stock trading in the marketplace that institutions can go into the market and acquire
it without bidding the stock away from where they believe the value is.")

[252]    Mr. Aronson of Lazard testified that he understood that in a chapter 7 liquidation the Debtor may
have to IPO all of the shares (a third would be issued in the first offering, and then there would be
either one more or a series of offerings).  Confirm. Hrg. Tr. Vol. 3 at 12-13.

*Administrative costs of chapter 7 trustee and professionals*

Second, the estimated aggregate amount of cash available for distributions would be lower in a hypothetical chapter 7 because of increased administrative costs. Under section 326(a) of the Code, a chapter 7 trustee is entitled to a statutory fee of up to 3% on all distributions made by the trustee in excess of $1 million. In addition, the chapter 7 trustee's advisors would be entitled to reasonable compensation for services rendered and related expenses incurred, which would be entitled to treatment as administrative expense claims.[253] Given the amount of time such professionals would be required to devote to become familiar with the Debtors and the issues related to these cases, such fees and costs would reduce overall recoveries. Furthermore, if the MIA weren't settled, one would have to factor in the very substantial cost of litigating it. If multiple trustees were appointed, for each of the affected Debtor groups, each would have to have its own counsel, with the associated costs. Alternatively, if a single trustee were to be put in place, once again deputizing creditor groups to do the litigation (as they did before), it is reasonable to exact that each would look to the estate for compensation for that counsel, under "substantial contribution" requests.

While section 326(c) of the Code doesn't permit the aggregate compensation of all trustees in the case to exceed the maximum compensation prescribed for a single trustee by section 326(a), the professionals of each chapter 7 trustee would be entitled to professional fees and costs. Under such circumstances, a hypothetical chapter 7 liquidation would add at least several million dollars of costs, further reducing creditor recoveries. While I assume that in an estate of this size, a chapter 7 trustee would not get

---

[253]       See Code sections 327, 328 and 503.

the maximum fee authorized under law, or close to it, even if a single chapter 7 trustee were appointed and received a 0.5% fee on all distributions, assuming approximately $15 billion in distributions, the trustee's fee would exceed $70 million.

Furthermore, if a plan is not confirmed, additional fees and expenses of professionals (already approaching $1 billion) will continue to accrue, and, in the event the MIA process is resumed, will be significant.

*Familiarity with business*

Third, a chapter 7 liquidation would likely involve the appointment of chapter 7 trustees unfamiliar with the Debtors' business, assets and/or liabilities. In contrast, the Plan contemplates the appointment of a Plan Administrator, Quest, that has been serving as an advisor to the Creditors Committee since August 2006 and has been working with the Debtors, the Creditors Committee and their professionals to familiarize itself with the Debtors' cases and steps needed to implement the Plan. Quest is in the best position to determine which of the Debtors' employees should be retained to consummate and administer the Plan. These employees have significant experience and background knowledge relating to (a) the Causes of Action included in the CVV, (b) the Sale Transaction, for purposes of negotiating the release of reserves or protecting the Estates against indemnity claims under the Purchase Agreements, (c) assumed or rejected executory contracts and related cure and rejection damage Claims, (d) general Claims reconciliation, and (e) tax strategies. The need to replace an organization like Quest could result in reduced recovery in certain litigation for the Estates and the diminished ability of the Estates to defend against Claims and requested closing adjustments in connection with the Time Warner/Comcast sale.

*Delay in receiving distributions*

Fourth, in a hypothetical chapter 7, the Debtors' creditors would likely be forced to wait a significant period of time before receiving distributions, either due to the IPO (and any resulting lock up period)[254] or the delayed and perhaps disrupted prosecution of the CVV litigation, for example. There is a risk that distribution of the proceeds of a hypothetical chapter 7 liquidation might not occur for one or more years after the completion of such liquidation in order to resolve Claims and prepare for distribution, and the "time value" of distributions must be factored into the "best interests" analysis. Delayed distributions would be less valuable than the near-term distributions.

*Adoption of Settlement*

The Plan proposes distributions to creditors based on a settlement of disputed issues, including the MIA and a settlement with Bank Lenders. The Plan Proponents believe it is reasonable to assume that a chapter 7 trustee would adopt settlements similar to the Settlement and the settlement with the Bank Lenders embodied within the Plan in order to avoid the risks, length, cost and uncertainties of litigation. I agree with the Plan Proponents. I think that there's no realistic basis to conclude that a chapter 7 trustee for ACC would come to a different view as to the desirability of the Settlement than Tudor, Highfields, Oz, C.P., Satellite, and all of the accepting ACC classes of claims and interests did. Even if there were individual trustees for individual estates, and an ACC trustee took positions, as an advocate, allied with the interests of ACC creditors, there is no reasonable basis for a conclusion that he or she could argue anything other than the

---

[254]    The Registration Rights Agreement requires that the remaining shares of TWC Class A Stock be "locked up" for up to six months following an IPO if requested by the underwriters (which request the Plan Proponents view as highly likely). As a result, the creditors would be subject to an unhedged market risk for two-thirds of the value of the TWC Class A Stock for a six-month period. See Wittman Declaration, ¶ 86.

same merits that have been discussed at length above, or that the trustees for other estates would agree as to the merits of a chapter 7 trustee's positions. It is much more likely that taking into account the complexity and expense of litigating the MIA and the risk of protracted litigation, the chapter 7 trustee for the ACC estate will adopt the Settlement, concluding, as I do, that it is in the best interests of the ACC estate and its creditors.

*Other Issues*

The ACC Bondholder Group also asserts that an independent chapter 7 trustee would incorporate at least three of the following changes to the Plan. In the view of the ACC Bondholder Group, an ACC chapter 7 trustee would: (1) enhance recoveries from TWC stock by increasing the deemed value of the stock to "market-based" levels, (2) limit interest payments on postpetition interest to the federal judgment rate, and (3) relieve ACC creditors from bearing $87 million for the fees and expenses of Settling Parties and the proposed $27 million insider reimbursement and indemnification obligations that the Plan seeks to charge to ACC creditors.[255]

I think it is mistaken in each regard.

*(1) TWC stock value*

The ACC Bondholder Group argues that the Plan intentionally and artificially undervalues TWC Stock in order to dilute recoveries of the ACC Bondholder Group. It further asserts that the deemed value ascribed to TWC stock under the Plan is based upon an arbitrary valuation inconsistent with both the earnings capacity of TWC and the market prices of comparable enterprises. The ACC Bondholder Group contends that in a chapter 7 liquidation, it would receive the benefit of "market based" distributions.

---

[255]    ACC Bondholders Group's Confirmation Brief at 74-83.

Without providing any expert testimony on valuation of TWC stock, the ACC Bondholder Group submits that the Debtors' TWC Stock currently has a market value of $6.3 billion to $7.3 billion.  The Opponents' Expert, who did not purport to do a valuation, assumed the value of the TWC stock to be in the range of $6 billion to $7 billion.[256]  From the valuation data on record and the analysis offered by the only valuation expert in this case, I've determined that the TWC stock is now worth $6.5 billion.  This value, while at the high end of the range proposed by the Proponents' Expert, is also within the range posited by both the ACC Bondholder Group and the Opponents' Expert.  I see no reason to conclude that an independent chapter 7 trustee would secure or adopt a different valuation.

 (2)  *"Legal rate" of interest*

   The parties dispute whether the modified contract rate, as provided for in the Plan, or the lower federal judgment rate should be applied in payment of postpetition interest.  Pursuant to section 726(a)(5) of the Bankruptcy Code, in a chapter 7 liquidation of a solvent debtor, a creditor must receive pendency interest on its claim "at the legal rate from the date of the filing of the petition."  Because section 1129(a)(7) of the Bankruptcy Code requires that a chapter 11 plan of reorganization provide non-consenting impaired creditors, as of the effective date of the such plan, with at least as much as they would receive in a hypothetical chapter 7 liquidation on such date, the requirements of section 726(a) are imported into a chapter 11 case.[257]

---

[256] Opponents' Expert Report at 21 (admitted as a belief based on reliance on valuations of others, but not admitted as independent valuation testimony).

[257] See section 1129(a)(7) of the Code; *see also In re Schoenberg*, 156 B.R. 963, 969 (Bankr. W.D. Tex. 1993) (reference to the "legal rate" in section 726(a)(5) of the Bankruptcy Code is made applicable to chapter 11 through section 1129(a)(7) of the Bankruptcy Code).

The ACC Bondholder Group asserts that it would receive a greater recovery in a chapter 7 liquidation than under the Plan, because the Plan as part of the Settlement proposes to pay postpetition interest on Subsidiary Trade Claims and Other Unsecured Claims at 8% Interest,[258] and various other unsecured Claims (such as Notes) at the applicable contract rate, rather than at the federal judgment rate.  The ACC Bondholder Group claims that recoveries that would otherwise go to its class are being diverted to provide an improperly high interest rate to certain unsecured creditors.

I previously indicated my views on the meaning of "legal rate" in an April 27, 2006 oral decision.  I then said that "[i]t is by far the better view, in my opinion, that "legal rate" is the federal judgment rate and not the same as that authorized under section 506(b), which is a contract rate."[259]  The settling parties negotiated to provide for contract rates, and modified contract rates, as part of the Settlement.  At the Confirmation Hearing, counsel for the ACC Bondholder Group argued that if a trustee applied the federal judgment rate, as opposed to contract rates or the Trade Claims rate to the postpetition interest, the difference in postpetition interest would be $300 million.[260]

Assuming, without deciding, that the argued number was correct, the Plan and the Settlement nevertheless satisfy the Best Interests test.  Mathematically, even the lowest IPO costs of $585 million (assuming 4% underwriting discount, 5% IPO discount and $6.5 billion deemed value) (and without counting trustee expenses and professional fees) would exceed, by $285 million, the $300 million that the estates might save (and the

---

[258]    Sections 5.1(d)(i) and 5.1(e)(i) of the Plan provide that Allowed Subsidiary Debtor Trade Claims and Allowed Subsidiary Debtor Other Unsecured Claims will accrue Case 8% Interest (i.e., simple interest on a Claim or Claims at 8% per annum from the Commencement Date up to but not including the Effective Date).  Plan, §§ 5.1(d)(i) and 5.1(e)(i).

[259]    Tr. of Hrg. of Apr. 27, 2006, at 7.

[260]    Confirm. Hrg. Tr. Vol. 8 at 132-133.

ACC Bondholder Group's class might recover) under chapter 7 liquidation with postpetition interest paid out at the federal judgment rate.  Because I find that the best interests test would be satisfied even if $300 million in interest savings were taken into account as an addition to the ACC Bondholder Group recovery in a hypothetical chapter 7 case, I don't need to decide the interest entitlement issue.[261]  Section 1129(a)(7) requires me only to ensure that the rejecting creditors in the impaired classes receive no less in a hypothetical chapter 7 liquidation than they would under a plan.

### (3) Fees and Expenses of Settling Parties and Reimbursement and Indemnification Obligations

The ACC Bondholder Group contends that a chapter 7 trustee for ACC would not impose on the ACC Senior Notes class an estimated $87 million in fees and expenses of the Settling Parties and $27 million reimbursement and indemnification obligations that, they asset, the Plan charges to ACC creditors.

As discussed below, I will be "ordering otherwise" with respect to fee awards, so they will more closely track the amounts to which creditors and their professionals would be entitled under any circumstances.  But in any event, the sums that are the subject of this objection are not enough to be material.  Even if $114 million in costs were added to the $300 million that the ACC Bondholder Group's class might recover under chapter 7 liquidation with postpetition interest paid out at the federal judgment rate, the costs of the IPO (again without considering the additional cost of one or more trustees and trustee professionals) would still be greater.

---

[261]    Thus I don't need to consider another point Plan Proponents might make—that many individual Debtors other than ACC might still be solvent even after considering intercompany obligations (thus entitling their creditors to interest at the contract rate or the Trade Claims 8% rate), and resulting in a lesser waterfall to ACC in the event of a chapter 7 liquidation.

Finally, I don't find there to be a best interest problem based on the contention that some creditors, such as FrontierVision bondholders or holders of OpCo Trade claims, might be paid more than in full. I don't think the premise would ever be meaningful, (because at $6.5 billion valuation, their increased recoveries won't exceed their give-ups from payment in full), but in any event, recoveries for ACC dissenting bondholders under the Plan are so much better than under any conceivable liquidation scenario that the issue is moot.

Thus, the Plan satisfies the best interests test as to each impaired class.

## VI.

### Possible Payment More Than In Full

The bulk of the consideration that was paid for the Time Warner/Comcast acquisition was in cash, but a major portion of it was in TWC stock—whose value is in some respects subjective, and which is subject to fluctuations in value. Because all creditors could not be paid in cash, most unsecured creditors will be paid at least in part in TWC stock. As the value of the TWC stock has increased since the deal was struck, benefiting all creditors (including those of ACC), we have the irony of the argued possibility that some creditors might be getting paid more than par plus accrued. This, the ACC Bondholder Group argues, would be contrary to law, and makes the Plan unconfirmable. I disagree.

Objections to confirmation based on "overpayment" aren't' common, as it is the rare case where there's so much value to be distributed to unsecured creditors that such is a possibility. Where it might happen, the Code places limits on that, but only to a point.

The first is the "fair and equitable" requirement of section 1129(b) of the Code, which would prohibit payment of more than par plus accrued in any instance where

section 1129(b) applies—*i.e.*, any situation where cramdown is proposed.  But here we

do not have a cramdown situation, as each of the 30 voting impaired classes (and,

notably, each of the ACC classes) voted in favor of the Plan.  As co-counsel for the ACC

Bondholder Group plainly recognized:

> One of the arguments in our confirmation objection
> … is that because of the value of the Time Warner
> stock, it is possible that subsidiary creditors will
> receive more than par plus interest at the rate that
> Your Honor authorized.
>
> Well, if we lose the benefit of the fair and equitable
> test, we can't make that argument.  On the other
> hand, if we have the benefit of the fair and equitable
> test, the Court cannot approve a plan that allows
> valuation schemes that would allow those
> subsidiary creditors to receive more than par plus
> accrued interest.[262]

With all 30 of the voting classes having voted in favor of the plan, the provisions

of section 1129(b) are inapplicable.  The ACC Bondholder Group loses the benefit of the

fair and equitable test, and it can't make that argument.

The second is the "Best Interests" test of section 1129(a)(7), which protects

dissenting creditors, even where their classes vote in favor of a plan.  In a liquidation, a

creditor could not be paid more than in full, and to the extent there were value in any of

the debtors after paying creditors in full, value would flow up to corporate parents and

might eventually flow up all the way to ACC.  But the Best Interests test is not a

prohibition, as such, against paying creditors in full.  Rather, as discussed in Section V

above, it measures recoveries under the Plan and compares them to the recoveries that

would be received in a liquidation.

---

[262]     Tr. of Hg. of Nov. 27, 2006, at 31; *see also* Confirm. Hrg Tr. Vol. 12 at 33-34.

As the Best Interests discussion above makes clear, at the $6.5 billion valuation for TWC stock that I have found, dissenting creditors do much, much, better under the Plan than they would under a liquidation.  So there is no valid Best Interests objection on a $6.5 billion valuation.

Is there a possibility that the value of TWC stock could go higher, and be at that higher level at the time the Plan goes effective?  Of course there is, just as there's a possibility that the value could drop lower.  But I don't think any such alternative value could reasonably be found to affect a Best Interests analysis.  If, as I think one must, one combines the give-ups by the highest recovering creditors (FrontierVision OpCo creditors and OpCo Trade Creditors) and the present spread between liquidation recoveries and recoveries under the Plan, there is no realistic scenario under which increases in the value of TWC stock at any foreseeable time at which the Plan would go effective would exceed the critical "delta."[263]

The Code places limits on recoveries by reason of plan distributions to the extent I just noted, but not more.  Of course, the risk of overpayment can be brought to creditors'

---

[263]    In summations, though not in its papers, the ACC Bondholder Group made one additional argument.  Without citation of authority, other than a reference to section 502(b)(1), counsel for the ACC Bondholder Group argued in substance that an overpaid creditor would not have an allowed claim to the extent of the any distribution greater than payment in full (assertedly because it would be "unenforceable under state law"), and, at least impliedly, that any plan that permitted such a result would be unconfirmable for this reason, apart from "Fair and Equitable" and "Best Interests" considerations.  I cannot agree, as I think the argument improperly merges two separate concepts.

Creditors receiving distributions in this case already have allowed claims, whose allowed amount was determined by the terms of their contracts or by settlements I approved.  Creditors then get distributions on their allowed claims, in accordance with the provisions of the Plan.  As relevant here, the claims of bondholders and holders of trade claims were fixed previously, and were then allowed.  I am aware of no caselaw or other authority, and certainly the ACC Bondholder Group didn't bring any to my attention, suggesting that we should have a second claims allowance process to fix allowed claims in different amounts, because *distributions* on creditors' allowed claims might be too high.  The "Fair and Equitable" and "Best Interests" tests cover that concern, to the extent they are applicable.

attention during the solicitation process, and if creditors don't want to permit that risk (which of course would be their right), they can vote to reject the Plan. But here they voted to accept the Plan, though issues as to an uncertain value of the TWC stock (and, in particular, the likelihood that it would be worth more than the deemed value that was an important element of the Plan)[264] were a prominent feature of the vote solicitation process. By their votes, creditors said in substance that they weren't troubled by the risk that troubles the ACC Bondholders. With their votes approving the Plan, and with the Plan provisions passing muster under the Best Interests test, the ACC Bondholder Group's stated concerns in this regard have no merit.

## VII.

### Classes Where No Creditor Voted

While 30 of the 30 classes that voted on the Plan, representing in excess of $12 billion in debt, accepted the Plan, there were classes for 6 Debtors wherein no creditor voted. The claims that might have been voted, but which were not voted, totaled less than $50,000—an amount that is less than 5/1000 of 1% (*i.e.*, .0005%) of the claims that did.[265] The ACC Bondholder Group argues that because these classes did not vote one way or another, they cannot be said to have accepted the Plan, and that the Plan Proponents thus had to proceed by cramdown. I cannot agree.

Section 7.3 of the Plan adopts a presumption that "[i]f no holders of Claims or Equity Interests eligible to vote in a particular Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the holders of such Claims or Equity Interests in such

---

[264]    I should note, in this connection, that so long as they didn't run afoul of the requirements of section 1129, or other provisions of the Code, creditors were free to establish any deemed value they wanted for the TWC stock, and to base their shares of the pie on that amount.

[265]    I do not regard the ACC Bondholder Group's post-hearing contentions that these should really be regarded as much more material as persuasive.

Class."[266]  This presumption was explicit and well advertised, appearing in both the Plan

and the Second Disclosure Statement Supplement.[267]  The ACC Bondholder Group

objects to this presumption, arguing that it violates sections 1126(c) and (d) of the

Bankruptcy Code, and Bankruptcy Rule 3018(c), because "it improperly deems an

impaired class to have accepted the Plan even if no creditors in that class cast a ballot to

accept the Plan."[268]  But I overrule the ACC Bondholder Group's objection, and uphold

the Plan presumption with respect to the non-voting creditors in these classes.

First, caselaw at the Circuit Court of Appeals level—the only law at that high a

level—supports the presumption.  In the well-known *Ruti-Sweetwater* case,[269] the Tenth

Circuit affirmed a bankruptcy court's decision that "a non-voting, non-objecting creditor

who is the only member of a class . . . is deemed to have accepted the Plan for purposes

of § 1129(b)."[270]  There, appellants Heins, creditors in a class where there had been no

---

[266]     Disclosure Statement Supplement, at DSS2-100 reads:

> if no holder of a Claim or Equity Interest eligible to vote in a
> particular Class timely votes to accept or reject the Plan, the
> Plan will be deemed accepted by the holders of such Claims or
> Equity Interests in such Class.

[267]     The Disclosure Statement Supplement discloses this presumption at two different locations.  *See*
Disclosure Statement Supplement at DSS2-4 and DSS2-100.  In addition, each ballot included the
following notation in bold text:

> The Proponents have requested that the Bankruptcy Court
> adopt a presumption that if no holder of a Claim or Equity
> Interest in a Class of Claims or Equity Interests eligible to vote
> in a particular Class timely submits a ballot to accept or reject
> the Plan, then the applicable Class will be deemed to have
> accepted the Plan. Accordingly, if you do not wish such a
> presumption with respect to any Class for which you hold
> Claims or Equity Interests to become effective, you should
> timely submit a ballot accepting or rejecting the Plan for any
> such Class.

[268]     ACC Bondholder Group Br. at 110.

[269]     *Heins v. Ruti-Sweetwater, Inc. (In re Ruti-Sweetwater, Inc.)*, 836 F.2d 1263 (10th Cir. 1988).

[270]     *Id.* at 1266.  *See also In re Campbell*, 89 B.R. 187, 188 (Bankr. N.D. Fla. 1988) ("[T]hose
impaired classes which failed to vote and did not object to confirmation of the plan are deemed to

vote, one way or the other, later decided that they didn't want to be bound by the plan upon which they hadn't voted, and argued that the requirements of section 1129 hadn't been satisfied.  The Tenth Circuit rejected that argument, endorsing the rulings, in the bankruptcy court and the district court, that "the Heins' inaction constituted an acceptance of debtors' Plan of reorganization."[271]  The Tenth Circuit noted that the former Bankruptcy Act had provided that a failure to vote was considered a rejection of the plan, but that the present Code did not indicate whether a failure to vote, such as there (and here), should be deemed to be an acceptance or rejection of the plan,[272] and further observed that "creditors are obligated to take an active role in protecting their claims."[273]

 *Ruti-Sweetwater* carries even greater weight when applied to a case like this one, because the situation faced by the debtor-in-possession there was similar to that of the Debtors.  Like this case, *Ruti-Sweetwater* involved a complicated plan of reorganization for a large multi-entity conglomerate with a sophisticated capital structure and various levels of indebtedness.[274]  Subjecting the plan to the higher requirements for cramdown, simply by reason of a class's failure to vote, made no sense.

---

have accepted the plan for purposes of meeting the requirements of § 1129(a)(8) of the Bankruptcy Code.").

[271] *Id.* at 1267.

[272] *Id.*

[273] *Id.* at 1266–67 ("To hold otherwise would be to endorse the proposition that a creditor may sit idly by, not participate in any manner in the formulation and adoption of a plan in reorganization and thereafter, subsequent to the adoption of the plan, raise a challenge to the plan for the first time."); *see also Campbell*, 89 B.R. at 188 ("A single creditor or class of creditors should not, by their total inaction, be able to force a debtor to have to resort to the cram down process to obtain confirmation of a plan when all of the other confirmation requirements, including the affirmative acceptance of the plan by at least one impaired class, have been met.")

[274] *Ruti-Sweetwater*, 836 F.2d at 1263–1264 ("At the time of their filings, the debtors faced demands from secured and unsecured creditors holding claims of millions of dollars in addition to the obligations owed to thousands of timeshare owners.  Following their filings, the debtors prepared a complicated (120 pages) Plan of Reorganization which included treatment of eighty-three separate classes of secured creditors and forty separate classes of timeshare owners").

I recognize that some cases and commentators have criticized and distinguished *Ruti-Sweetwater*,[275] including one decision in this Court,[276] although under dramatically different facts.  But *Ruti-Sweetwater* is the only authority at the Circuit Court of Appeals level.  And more importantly, I think *Ruti-Sweetwater* is rightly decided, especially in a situation like that one (and here), where dozens of classes vote, where the effect of not voting is announced in advance, and everyone else's will would be burdened by those who simply don't vote at all.  Regarding non-voters as rejecters runs contrary to the Code's fundamental principle, and the language of section 1126(c), that only those actually voting be counted in determining whether a class has met the requirements, in number and amount, for acceptance or rejection of a plan,[277] and subjects those who care about the case to burdens (or worse) based on the inaction and disinterest of others.  A holding to the contrary would mean that a failure to vote isn't relevant in a case where *anyone* else in that class votes, but is enough to force cramdown if the lack of interest in that class is so extreme that nobody at all chooses to vote, one way or the other.  As Mr. Mabey, debtors' counsel in *Rudi-Sweetwater*, successfully argued in *Ruti-Sweetwater*,[278] that cannot be the law.  Section 1126(c) recognizes the unlikelihood of everyone caring enough about the plan to vote—basing acceptances not on the total claims in the class,

---

[275]    *See In re Friese*, 103 B.R. 90 (Bankr. S.D.N.Y. 1989) (Brozman, J.); *Bell Rd. Inv. Co. v. M. Long Arabians (In re M. Long Arabians)*, 103 B.R. 211, 215 (9th Cir. BAP 1989); *In re Higgins Slack Company*, 178 B.R. 853. 856 (Bankr. N.D. Ala. 1995); 7 Collier 1129.03[8] n. 152.

[276]    *See Friese*, *supra.*

[277]    *See* Code section 1126 ("A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, *that have accepted or rejected such plan*").

[278]    *See* 836 F2d. at 1264, 1265.

but only those voting.[279]  And that is a principle upon which the bankruptcy community often relies, as creditor democracy could otherwise be frozen as a consequence of the disinterest of others.  On a matter where the Code is essentially silent, making an exception to the principle of section 1126(c)—that only votes actually cast count—makes no sense.[280]

It is true, as I've noted, that lower courts have held to the contrary.  But the highest of them, the BAP in *M. Long Arabians*, expressed its views in a case where a dissenting creditor had actually tried to vote, but was not allowed to, and the *M. Long Arabians* court's principal attention to *Ruti-Sweetwater* (which had not been cited by either side, nor, obviously, substantively addressed by either side), was to distinguish it on that basis.[281]  The *M. Long Arabians* court went on to say, as *dictum*, in a matter where, as noted, neither side had even cited the case, that it declined to follow *Ruti-Sweetwater* to the extent it held that a nonvoting creditor was deemed to have accepted

---

[279]    *See* n.277, *supra*.

[280]    I assume that a literalistic textual argument could be made that the sentence structure of section 1126(c) requires one accepting vote before the other principle, that only actual voters' acceptances or rejections count, kicks in.  But any such textual analysis suffers from two flaws—first from its disregard of the plainly stated principle that only votes actually cast matter (a principle of huge importance in all but the smallest chapter 11 cases), and the fact that as the Tenth Circuit noted, the former Bankruptcy Act made failures to vote rejections, a provision that is conspicuously absent here.

[281]    *See M. Long Arabians*, 103 B.R. at 215:

> Although not cited by either side, *In re Ruti-Sweetwater, Inc.,* 836 F.2d 1263 (10th Cir. 1988), deserves some comment.  In that case, the Tenth Circuit held that the nonvoting, nonobjecting judgment lien creditor, who was the only member in its class, was "deemed" to have accepted the plan.  It is clear that the crucial factor in *Ruti-Sweetwater* was that the creditor failed to object to the plan, thereby "waiving" its right to challenge the plan.  Since Bell Road attempted to reject the Plan and, in fact, objected to the Plan, *Ruti-Sweetwater* is clearly distinguishable.

the plan,[282] but did so without stating the reasons for that conclusion, and did not address how such a conclusion could be reconciled with section 1126(c)'s provisions that only those votes actually cast count.

Similarly, in *Friese*, Judge Brozman of this Court believed that *Ruti-Sweetwater's* analysis was faulty, but it does not appear that there was any consideration of the other text in section 1126(c) providing that only votes actually cast count in determining number and amount.[283]  That is understandable, as *Friese* involved a case in which *no votes at all* had been voted in favor of the plan.[284]  And the prototypical case that has held contrary to the *Ruti-Sweetwater* conclusion has been a very small case in which there is insufficient basis to find creditor assent.  For example, the early case of *Townco Realty,*[285] decided before *Ruti-Sweetwater* but often cited by those coming to the opposite view, involved a plan with only six creditors, one of which was owed 99.9% of the total debt.[286]

I don't need to decide, and don't now decide, whether a like analysis would apply in a smaller case, where billions of dollars of claims hadn't been voted for and against acceptance of a plan and the nonvoting claims were only a tiny proportion of that amount. In the Adelphia cases, and under these facts, I believe that *Ruti-Sweetwater* should be followed.

---

[282]     *Id.* at 215.

[283]     *See Friese*, 103 B.R. at 92.

[284]     *See id.* at 91.

[285]     *In re Townco Realty, Inc.,* 81 B.R. 707, 708 (Bankr. S.D. Fla. 1987).

[286]     *Id.*

VIII.

Exculpation and Releases

The Plan, in its Sections 16.3 and 16.15, has a variety of provisions relating to exculpation and releases (and injunctions enforcing them), which are attacked, and defended, in broad brush by the ACC Bondholders on the one hand, and the Plan Proponents, on the other.  The ACC Bondholders argue that the third-party releases and exculpation provisions in Section 16.3 of the Plan (and the injunction provisions of Section 16.15) violate section 524(e) of the Code and applicable caselaw because of their character and breadth.[287]  The Plan Proponents respond that the exculpation, release, and injunction provisions under the Plan are limited in nature and should be allowed under the unique circumstances of this case.[288]

I can't agree with either side in full, as each side's position, to varying degrees, lumps together provisions of different types, with different degrees of justification, and, most importantly, different levels of propriety under applicable caselaw.  The objections are sustained in part, and overruled in part, as more fully set forth below.

As relevant to the objections here,[289] the Plan has two key subsections relating to exculpation and releases:

> — Section 16.3(a), captioned "Exculpation," which provides that
>
> 8 identified categories of people or entities ("Exculpated Parties") shall
>
> not be liable, "to the extent permitted by applicable law," for various

---

[287]    *See* ACC Bondholder Grp. Br. at 97-102.

[288]    *See* Plan Proponents Br. at 94-103.

[289]    The Debtors have considerable leeway in issuing releases of any claims the Debtors themselves own, and while there is also a Section 16(b), under which the Debtors issue releases on their own part, it is thus uncontroversial and not objected to.

"Covered Matters," which are all postpetition acts or omissions, and which

generally involve the conduct of the chapter 11 case and the Plan.  (A

separate Section 16.3(b)(ii) places limits on the exculpation, generally

carving out certain kinds of egregious conduct.)  Section 16.3(a) goes on

to provide that the confirmation order will contain an injunction, once

more "to the extent permitted by applicable law," enjoining "all parties in

interest" from asserting or prosecuting claims arising from actions or

omissions in connection with, the Covered Matters against any of the

Exculpated Parties. [290]

---

[290]    Section 16.3(a) provides, in full (but as reformatted for readability, and with certain key aspects emphasized):

As part of the Global Settlement,

(i) the Debtors (including their management and board of directors, both current and former (but in the case of former, first appointed after the Commencement Date)),

(ii) the Buyers,

(iii) the Indenture Trustees that do not file objections to the Plan,

(iv) the Statutory Committees,

(v) to the fullest extent permitted under applicable law, each of the Settlement Parties, the FPL Committee and the Olympus Parties (and in the case of parties in this subsection (v) that are ad hoc committees, each of their members, solely in their capacity as such) which vote in favor of the Plan, or in the case of parties in this subsection (v) that are ad hoc committees, support the Plan,

(vi) the Plan Administrator,

(vii) Administrative Agents, Non-Administrative Agents and Bank Lenders, in each case in Accepting Bank Classes, provided however, that this Section 16.3(a) does not limit or prejudice the prosecution or defense of the Bank Actions, and

(viii) the CVV Trustee

— Section 16.3(d), captioned "Releases by Holders of Claims and Equity Interests," which provides for releases by creditors and equity holders (including those not voting for the Plan) of 10 identified categories of persons or entities (called the "Third-Party Releasees") for postpetition acts, in any way relating to the Debtors or the Covered Matters.[291]

---

(and in each case their respective Affiliates, officers, partners, directors, employees, agents, members, shareholders, advisors (including any attorneys, financial advisors, investment bankers and other professionals retained by such Persons in their capacities as such), and professionals of the foregoing

(collectively, the "Exculpated Parties")), and in all cases, each in their capacity as such,

shall not be liable, *to the extent permitted by applicable law*, for any Cause of Action arising from and after the applicable Commencement Date from actions or omissions in connection with, relating to, or arising out of

these Chapter 11 Cases, this Plan, the Disclosure Statement, the Sale Transaction Documents and the Sale Transactions, including the solicitation of votes for and in pursuit of confirmation of this Plan or the JV Plan, or the implementation of this Plan or the JV Plan, the Sale Transaction Documents and the Sale Transactions, including all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all activities leading to the promulgation, confirmation and consummation of this Plan (the "Covered Matters").

*To the extent permitted by applicable law*, the Confirmation Order shall enjoin all parties in interest from asserting or prosecuting any Claim or Cause of Action, arising solely from actions or omissions in connection with, the Covered Matters against any of the Exculpated Parties.

[291]   Section 16.3(d) provides, in full (but once more reformatted for readability, and with key aspects emphasized):

Releases by Holders of Claims and Equity Interests.

Except as otherwise expressly provided in this Plan or the Confirmation Order, on the Effective Date,

*to the fullest extent permissible under applicable law*, as such law may be extended or interpreted subsequent to the Effective Date,

*all holders of Claims and Equity Interests* (other than the Debtors),

in consideration for the obligations of the Debtors and the reorganized Debtors under this Plan, the Plan Documents, the Sale Transaction, and other contracts, instruments, releases, agreements or documents

219

executed and delivered in connection with this Plan, the Plan Documents and the Sale Transaction,

and each entity (other than the Debtors) that has held, holds or may hold a Claim or Equity Interest, as applicable,

will be deemed to forever release, waive and discharge all claims, demands, debts, rights, causes of action or liabilities (other than the right to enforce the obligations of any party under this Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with this Plan), including as a result of this Plan being consummated, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise

that are based in whole or in part on any act or omission, transaction, event or other occurrence

taking place on or after the Commencement Date through and including the Effective Date

in any way relating to the Debtors and/or the Covered Matters

against the following Persons in their respective capacities as such (the "Third Party Releasees"):

> (i) the Debtors, their estates, the reorganized Debtors and the current directors, officers and employees of the Debtors;

> (ii) any former directors and officers of the Debtors who were first appointed after the Commencement Date;

> (iii) the Debtors' Professional Persons, (excluding Boies, Schiller and Flexner LLP);

> (iv) the DIP Agent and the DIP Lenders;

> (v) each of the Settlement Parties, the FPL Committee and the Olympus Parties (and in the case of parties in this subsection (v) that are ad hoc committees, each of their members, solely in their capacity as such) which vote in favor of the Plan, or in the case of parties in this subsection (v) that are ad hoc committees which support the Plan;

> (vi) the Statutory Committees and their members and, only if and to the extent such members acted in such capacity by or through such Persons; and

> (vii) except with respect to Items 1–8 of Schedule Y defining Designated Litigation, the Indenture Trustees that do not file objections to the Plan,

and in each of (i) through (vii) their respective Affiliates, officers, partners, directors, employees, agents, members, shareholders, advisors (including any attorneys, financial advisors, investment bankers and other professionals retained by such Persons, and Professional Persons of the foregoing);

> (viii) Administrative Agents, Non-Administrative Agents and Bank Lenders, their Affiliates and any holders of

220

Bank Claims and professionals of the foregoing from claims of any current and former holders of equity securities of the Debtors (in their capacity as such) with respect to which the Bank Lenders, their respective Affiliates or such holders of Bank Claims would have the right to indemnification for any Claim (except as provided for in this Plan or by order of an applicable court) from one or more Debtors under the terms of the Prepetition Credit Agreement (to the extent not inconsistent with applicable law),

provided that the release of the Administrative Agents, Non-Administrative Agents, the Bank Lenders, their respective Affiliates and any holders of Bank Claims as set forth in this clause (viii) shall extend to any act or omission, transaction, event or other occurrence taking place *from the beginning of time through the Effective Date;*

provided, however, that the failure of the Bankruptcy Court to approve the release pursuant to this clause (d)(viii) shall not invalidate any acceptance by the Administrative Agents, Non-Administrative Agents or Bank Lenders of the Plan or provide holders of Bank Claims (including in the Administrative Agent and Non-Administrative Agent Classes) with the right to withdraw their acceptances of the Plan; and

(ix) the Transferred Joint Venture Entities, provided that the release of the Transferred Joint Venture Entities

(a) shall extend to any act or omission, transaction, event, or other occurrence taking place at any time on or prior to the Effective Date, and

(b) shall not extend to any Assumed Sale Liabilities or defenses or offsets, if any, to Retained Claims.

Notwithstanding the foregoing, in no event shall

(v) anything in this Section be construed as a release by the holders of Bank Claims or any Investment Bank of any Defensive Claims, if any (or of any rights to distributions in accordance with the terms of this Plan),

(w) anything in this Section be construed as a release of any Person from claims of the insurer under the Debtors' directors and officers insurance policy for a return of advanced costs or from claims that such insurance policies have been rescinded,

(x) any Excluded Individuals be Third Party Releasees,

(y) except as set forth in clause (viii) above, any release granted in this Section (or any related injunction granted pursuant to this Plan) release or be deemed to release those prior or existing defendants in the Securities Class Action, who are identified on Schedule D as may be supplemented in accordance with this Plan from claims asserted against such defendants in the Securities Class Action or

(z) anything in this Section be construed as a release of any Person's (other than a Debtor's) fraud or willful

Since the third-party releases and exculpation in Sections 16(a) and 16(d) apply only "to the extent permitted by applicable law," the Plan is confirmable without change, and without resolicitation of votes. But I think I need to say now what I regard as permitted, and not permitted, "under applicable law."[292]

Section 524(e) of the Code provides that

> discharge of a debt of the debtor does not affect the
> liability of any other entity on, or the property of
> any other entity for, such debt.

While the ACC Bondholder Group argues that section 524(e) "expressly prohibits" third-party releases and injunctions,[293] I think that statement is inaccurate. Section 524(e) provides that the *discharge itself* does not grant such a release or injunction, and is silent on whether a bankruptcy court can expressly discharge or otherwise affect the liability of a non-debtor. That silence does not mean that third-party releases are always forbidden.[294] Their propriety, in individual cases, is the subject of extensive caselaw in this Circuit and elsewhere, including several decisions of the Second Circuit itself.

---

misconduct and except as set forth in (viii) above shall not
impact the litigation in connection with the Bank Lender
Avoidance Complaint.

[292]  As the Plan is confirmable without change, I am indifferent to whether the rulings in this section are implemented in the confirmation order or by separate order. They should be implemented in one place or the other. The Plan Proponents can decide which they prefer.

[293]  ACC Bondholder Br. at 97.

[294]  *See In re Specialty Equipment Companies, Inc.,* 3 F.3d 1043, 1047 (7th Cir. 1993):

> Appellants seem to be arguing for a much broader reading of
> section 524(e), one that would effectively preclude a
> reorganization plan from granting releases to any party other
> than the debtor. But section 524(e) provides only that a
> discharge does not affect the liability of third parties. This
> language does not purport to limit or restrain the power of the
> bankruptcy court to otherwise grant a release to a third party.
> While a third-party release, like the one in *Union Carbide*
> releasing a co-debtor from liability, may be unwarranted in
> some circumstances, a per se rule disfavoring all releases in a

222

In the Second Circuit, it has long been the law that third party releases are permissible under at least some circumstances.[295]  But the Second Circuit has imposed increasingly stringent standards for the bankruptcy court's exercise of its power to approve them.  In its important 1992 decision in *Drexel Burnham*,[296] the Second Circuit held that  "[i]n bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction *plays an important part in the debtor's reorganization plan*."[297] But in its recent decision in *Metromedia*,[298] while acknowledging (and not overruling) the earlier law in this area, the Second Circuit put its earlier holdings in a context that now limits the use of third-party releases to situations that can be regarded as unique.[299]

After citing its earlier holding in *Drexel Burnham* that third-party litigation injunctions and releases are appropriate when they play "an important part in the debtor's reorganization plan," the *Metromedia* court went on to say that "while none of our cases explains when a nondebtor release is "important" to a debtor's plan, it is clear that such a release is proper *only in rare cases*."[300]  It cited decisions from the Sixth Circuit that

---

reorganization plan would be similarly unwarranted, if not a misreading of the statute.

[295]    *See MacArthur. Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 837 F2d. 89, 93 (2d Cir. 1988), *cert. denied,* 488 U.S. 868 (1988).

[296]    *SEC v. Drexel Burnham Lambert Group, Inc.*  (*In re Drexel Burnham Lambert Group, Inc.*), 960 F.2d 285, 293 (2d Cir. 1992).

[297]    *Id.* at 293 (emphasis added).

[298]    *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.),* 416 F.3d 136 (2d Cir. 2005).

[299]    *See id.* at 142.

[300]    *Id.* (emphasis added).

"such an injunction is a dramatic measure to be used cautiously,"[301] and from the Third

Circuit that "nondebtor releases have been approved only in 'extraordinary cases.'"[302]

The *Metromedia* court went on to note that courts have approved nondebtor

releases when the estate received substantial consideration; the enjoined claims were

"channeled" to a settlement fund rather than extinguished; the enjoined claims would

indirectly impact the debtor's reorganization by way of indemnity or contribution; and the

plan otherwise provided for the full payment of the enjoined claims.  And it went on to

say that nondebtor releases may also be tolerated if the affected creditors consent.  But it

continued that:

> [T]his  is not a matter of factors and prongs. No
> case has tolerated nondebtor releases absent the
> finding of circumstances that may be characterized
> as unique.

The tenor of the *Metromedia* decision, as much as its plain language, cannot be

ignored.  It requires the bankruptcy community in this Circuit to be much more

circumspect in providing for third-party releases than it used to be.

Thus, in the Second Circuit, third-party releases or injunctions to prevent a

creditor from suing a third party now are permissible under some circumstances, but not

as a routine matter.  They are permissible if, but only if, there are unusual circumstances

to justify enjoining a creditor from suing a non-debtor party.

Here I think some, but much less than all, of the release provisions now pass

muster under the *Metromedia* standard.  And I think it's plain that they have to be

---

[301]   *Class Five Nev. Claimants v. Down Corning Corp. (In re Dow Corning Corp.,)* 280 F.3d 648,
657-58) (6th Cir. 2002).

[302]   *Gillman v. Continental Airlines (In re Continental Airlines),* 203 F.3d 203, 212-13 (3d Cir. 2000).

analyzed individually, as the relevant factors apply to different situations in different ways.  Preliminarily, however, I think I need to make some observations.

First, though without question it has long been the custom in the bankruptcy community to make distinctions between releases involving pre- and post- petition conduct, I think that after *Metromedia*, limitation to postpetition events, by itself, is insufficient to justify a third-party release.[303]  Plainly there is less potential for abuse if only postpetition events are covered.  But every chapter 11 case, large or small, has a postpetition period.  That is hardly unique.  And many large chapter 11 cases, though thankfully not all of them, have intercreditor bickering and threats, aimed at each other and at debtor board members and management, that give the targets of those threats a legitimate fear that they will be sued.  But unfortunately, that can't be said to be unique, either.

Likewise, many players in the bankruptcy process provide benefits to the case. DIP lenders are certainly in this category, and so are professionals to the estate or its fiduciaries.  But they get interest and fees for their services.  Their delivery of services is not unique.[304]

Turning to the specific categories of persons, entities and claims that are the subject of releases or exculpation, I rule that three categories of third-party releases (and, if necessary, exculpation) are acceptable:

> 1.  *Indemnified Persons.*  Some people and entities (*e.g.*, by
>
> employment contracts, corporate bylaws, or retention or loan agreements)

---

[303]    It's an entirely appropriate consideration for a *debtor's*  release, and for a debtor to grant exculpation.  But here we are talking only about *third-party* releases and exculpation.

[304]    But this general principle would not disqualify them from third-party releases if they are subject to indemnification.  *See* below.

must be indemnified by the estate with respect to their services.[305]   To the extent that the third party releases are congruent with the indemnification obligations, and the Debtors would be liable for any liability imposed on such persons, third-party releases are acceptable.  That is so even if they involve professionals for, or lenders to, the estate.

2. *Unique Transactions*.  The Buyers put in $17.5 billion into this estate, and agreed to rework their agreements to take the Debtors' assets in a section 363 sale, when creditor feuding made it impossible to confirm the reorganization plan that the Buyers originally bargained for.  That qualifies as having contributed substantial consideration to the reorganization.

3. *Consent*.  The Seventh Circuit held in *Specialty Equipment* that consensual releases are permissible,[306] and the *Metromedia* court did not quarrel with that view.[307]  *Specialty Equipment* teaches that if, as here, the proposed release is appropriately disclosed, that consent can be established by a vote in support of a plan.[308]  Here, as in *Specialty Equipment*,[309] I think that those voting in favor of the Plan were on full notice that they

---

[305]    *See* Wittman Decl. ¶ 81 .

[306]    *See Specialty Equipment, supra*, 3 F.3d at 1047.

[307]    *See* 416 F.3d at 142 ("Nondebtor releases may also be tolerated if the affected creditors consent").

[308]    *See Specialty Equipment*, 3 F.3d at 1047 ("Unlike the injunction created by the discharge of a debt, a consensual release does not inevitably bind individual creditors. It binds only those creditors voting in favor of the plan of reorganization").

[309]    *See id.* at 1045 ("In addition, the Plan provides that all creditors voting in favor of the Plan are deemed to give Releases to a number of third parties (including the Senior Lenders, Debtors' management and underwriters involved in the 1988 leveraged buyout involving the Debtors) from any liability arising out of a relationship with the Debtors.  Creditors who abstained or voted against the Plan are deemed not to have granted the Releases.").

would be granting the releases, if and to the extent they were permissible

under applicable law.  I will uphold the releases and exculpation with

respect to anyone who voted in favor of the Plan.

But beyond that, I cannot approve the third-party releases or exculpation here.

Other than the Buyers, nobody in this case made a substantial contributions of assets, or

otherwise provided consideration to the estate.  The "give-ups" that parties made were of

rights to recover that were subject to fair debate.  In the case of creditors, even those that

are Settling Parties, they were merely striking the kinds of deals with respect to their

shares of the pie that chapter 11 contemplates.  I don't doubt that in this case the Settling

Parties engaged, as the Plan Proponents argue, in "tireless efforts" to come together to

work out a global compromise aimed at resolving these cases.  But that's not unique.  It's

something creditors have to do in every chapter 11 case, at the risk of destroying

themselves (or their recoveries in the case) with their own quests for incremental

recoveries.

Nor can I accept the notion that the releases pass muster under *Metromedia*

because the Settling Parties elected to make them an element of their deal.  First, of

course, they provided that their releases and exculpation would remain only to the extent

permissible under applicable law—fully recognizing, it appears, that their enforceability

was at least debatable.  But even if they had not, I could not approve them.  It would set

the law on its head if parties could get around it by making a third party release a *sine

qua non* of their deal, to establish a foundation for an argument that the injunction is

essential to the reorganization, or even "an important part" of the reorganization.[310]

---

[310]    In this connection, however, I should make an important point.  While I find the release and
exculpation provisions unenforceable, in part, I don't regard them as having been coercive or to

With that said, I fully understand the legitimate needs and concerns of parties to seek some protection from the continuing threats that creditors have launched against each other (and against the Debtors' Board and management) over the 4-1/2 years of these cases. To a considerable extent, they will now have peace from that, because the great bulk of any claims would at least seemingly belong to the *Debtors*, and not individual creditors, and the *Debtors* undisputedly could, and will, release any such claims. And targets of litigation will also have the benefit of *res judicata*. But I cannot, consistent with *Metromedia*, give the prospective targets of further intercreditor disputes releases in advance from such threats. What I will do, if desired, is provide for exclusive jurisdiction in this Court to consider any claims concerning the Covered Matters—all or substantially all of which involve the administration of the estates and my earlier rulings and orders in these cases. I will be able to tell the difference between legitimate claims, on the one hand, and harassment, or retaliation, or frivolous litigation, on the other. Any claims hereafter brought will not be released in advance, but they will be subject to Rule 11.

## IX.

### Fees

The Plan provides, in § 6.2(d),[311] for fees to be paid as an administrative expense by the estate to the Settlement Parties for their counsel and, in some cases, at least

---

have improperly affected the vote. Creditors and equity holders voting on the Plan knew that they'd be enforceable only to the extent of applicable law. And the release provisions were, as the Plan Proponents argued (Plan Proponents Br. at 35 n.32) "a variant of the tried and true 'carrot and stick' approach utilized to provide classes of creditors with an inducement to vote on a plan of reorganization." Only part of the carrot could be delivered, but this was a risk upon which creditors were on notice.

[311]    It provides, in full (but as reformatted for readability, and with emphasis added):

seemingly, other professionals, in this case.  It further provides, in substance (perhaps

anticipating the issues that might arise with respect to the propriety of such a provision

and the extent to which the plan would then be confirmable under section 1129(a)(1)[312])

---

Reimbursement and Allocation of Settlement Party Fees and Expenses.

Reimbursement.  Each of

> (v) the Olympus Parties, with respect to the reasonable fees and expenses of one counsel acting on their behalf incurred up to and including the Effective Date (the "Olympus Fee Claims"),

> (w) the FPL Committee, with respect to their reasonable fees and expenses incurred up to and including the Effective Date, provided, however, the fees and expenses of the FPL Committee shall not exceed $4 million (the "FPL Fee Claims"),

> (x) the Settlement Parties (other than the ACC Settling Parties), with respect to their reasonable fees and expenses incurred up to and including the Effective Date,

> (y) the ACC Committee, with respect to its reasonable fees and expenses incurred prior to June 28, 2006, and

> (z) the ACC Settling Parties with respect to their reasonable fees and expenses incurred (including the fees and expenses incurred by other professional persons in connection with the Chapter 11 Cases for which the ACC Settling Parties request reimbursement) on and after June 28, 2006 up to and including the Effective Date,

shall receive reimbursement of their reasonable fees and expenses incurred in connection with the Chapter 11 Cases as Administrative Claims (other than the fees and expenses of the Creditors Committee, the Olympus Fee Claims and the FPL Fee Claims, the "Settlement Party Fee Claims").

*The Settlement Parties, the FPL Committee and the Olympus Parties shall comply with any procedures required by the Bankruptcy Court in connection with seeking reimbursement of Settlement Party Fee Claims, FPL Fee Claims or Olympus Fee Claims.*

[312]   That section provides that a court can confirm a plan only if, among other things, "[t]he plan complies with the applicable provisions of this title."

that the Settlement Parties "shall comply with any procedures required by the Bankruptcy Court in connection with seeking reimbursement" of such fee claims.[313]

I will impose additional procedures, requiring applications for reimbursement. And any such fee applications will have to satisfy applicable requirements of law. Though the safety valve makes the Plan confirmable notwithstanding this provision, there is no basis in the Bankruptcy Code of which I'm now aware that authorizes fees of this character to be paid to creditors or their professionals without satisfying the requirements of the Code for fee awards —which include application to the Court and at least seemingly satisfying the requirements of section 503(b), and particularly sections 503(b)(3) and (4).

By agreement with the UST, to resolve a UST objection, the Settlement Parties agreed to file "something in the nature of a fee statement or a narrative that describes in very general terms who the party is, their role in the case, and then attaches time records for review."[314]  But their agreement did not, as I understood it, encompass an agreement on the part of the Settling Parties to limit fee requests to those that would be permissible under section 503(b).  In fact, they agreed that:

> the fees will be reviewed on a reasonableness standard, simply whether the fees are reasonable for the work performed rather than a 503(b) standard and that there would be no necessity to file the fee statements or have a court hearing in the absence of objection, and then only to the extent of the objection.[315]

---

[313]     *See* n.311, *supra.*

[314]     Confirm. Hrg. Tr. Vol. 12 at 56.

[315]     *Id.* at 57.

As that agreement did not, by its terms, limit the Court's powers in exercising its responsibilities, or purport to describe the standards under which any Court consideration would take place, I have no problem with the agreement, but it was sufficient only to address the UST's objection.

At this juncture, I'm unaware of any basis for awarding the requested fees except to the extent that applications are filed for them and they pass muster under sections 503(b)(3) and (b)(4), but I'm willing to keep an open mind.  If the Plan goes effective, the Settlement Parties can file fee applications,[316] and Settlement Parties can make such arguments as they wish to support contentions that they should be reviewed under standards other than those under sections 503(b)(3) and (b)(4).

If the Settlement Parties hereafter file applications for fees, they should be prepared to address their entitlement to them, separately, under "substantial contribution" doctrine and otherwise.  To the extent fees are requested under the former, applicants for fees should be prepared to address whether the fees were incurred as part of the MIA litigation process (for which a strong argument could be made that they're appropriate); the MIA settlement process (for which some argument could be made that they're appropriate), and for other things.  Applicants for fees also should address whether the fees are sought for lawyers, accountants, other professionals, or for the creditors themselves, and should address the law that is applicable to requests in each category.

For now, the confirmation order should simply provide that fees will be sought only after application to the Court, and that nothing in the confirmation order will be

---

[316]    For the avoidance of doubt, they shall file them in the manner that fee applications are customarily submitted, and not just "something in the nature of a fee statement or a narrative that describes in very general terms who the party is, their role in the case, and then attaches time records for review."

determinative of the entitlement of any party to the fees after such application, as to which all of the rights of the applicants, the UST, and the Court will be reserved.

## X.

### Forfeited Rigas Sub Debt

In connection with the confirmation of the Plan, I have been asked to decide an issue as to the Debtors' cancellation of the ACC Sub Debt that the Rigases forfeited to the Government as part of the DoJ/SEC Settlement, and that, pursuant to the same settlement, then was passed on to the Debtors. In a separate opinion, I've determined that the Rigas Sub Debt was never validly issued, and was not (nor could it be) the subject of an allowed claim, and was not subject to subordination provisions that would make it subject to turnover to more senior debt. Hence the Rigas Sub Debt was properly cancelled under the Plan, and was not subject to turnover to holders of ACC Senior Notes.

The Plan Proponents proffered two alternative paragraphs for inclusion in a proposed confirmation order to address the two possible outcomes as to this issue. They should include the one that is consistent with this ruling.

## XI.

### Equity Committee Objection

As previously noted, a feature of the Plan is its CVV, which will prosecute claims against bank lenders and others, taking over the Bank Lenders Litigation. I had previously permitted the Equity Committee to intervene in that litigation, which had initially been brought by the Creditors' Committee, with Debtor ACC as co-plaintiff, under *Housecraft* authority, to assert claims that the Creditors Committee and Debtors

had not themselves brought.  I gave the Equity Committee *STN* authority to assert those additional claims.

The cash and TWC stock now in the estate will be insufficient to pay ACC Senior Notes in full (it will be recalled that holders of ACC Senior Notes will get 88.7% on their claims), and holders of ACC Trade Claims and Other Unsecured claims will receive even less.  And stakeholders below them in the capital structure (ACC Sub Debt, ACC preferred stock and ACC common stock) will not receive any distributions from the assets now on hand.  But the CVV offers hope for those classes to receive supplemental distributions, and if ACC Senior Notes Claims, ACC Trade Claims, ACC Other Unsecured Claims and ACC Sub Debt could hereafter be paid in full, there then might be value to go further down to ACC preferred stock and to ACC common stock.

For value to pour down all the way to equity, the CVV would have to recover at least $6.5 billion—an ambitious goal, which seemingly is so ambitious that it could fairly be said that equity is hopelessly out of the money.

Nevertheless, the Equity Committee has also raised a number of objections to confirmation, principally with respect to the CVV.  I find its objections to be without merit, and they will be overruled.

First the Equity Committee argues that the Court "lacks jurisdiction" to remove the Equity Committee as a plaintiff in the Bank Litigation, to transfer the Equity Committee claims to the CVV, or to substitute the CVV Trustees as plaintiffs, because the reference has been withdrawn.  This can be quickly disposed of.  The withdrawal of the reference gave the district court the responsibility for *adjudicating* the remainder of

the Bank Litigation (except for pending motions to dismiss, which I will decide), but it did not address the estate's *ownership* of its existing claims.

The Equity Committee next argues that the Debtors can't transfer the Equity Committee claims to the CVV. Once more I disagree. The Equity Committee does not, as it asserts, have "ownership" of the Additional Bank Claims, nor must the Plan Proponents obtain the Equity Committee's consent to transfer those claims to the CVV. Citing my previous grant of standing under the *STN Trilogy*,[317] the Equity Committee has claimed "vested ownership and control over those claims," and that "neither the Debtors nor other parties in interest have the right to control that litigation."[318] But the additional claims it brought are estate actions that were brought on behalf of the Estates. The *STN Trilogy* speaks to when a party other than a trustee or debtor may bring an estate cause of action. At least as a general matter,[319] it does not strip a debtor of standing.

---

[317]    The so-called "trilogy" of committee standing cases in this Circuit consists of *Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.)*, 779 F.2d 901 (2d Cir. 1985); *Commodore Int'l, Ltd. v. Gould (In re Commodore Int'l, Ltd.)*, 262 F.3d 96 (2d Cir. 2001); and *In re Housecraft Indus. USA, Inc.*, 310 F.3d 64 (2d Cir. 2002).

[318]    *See* Equity Committee's Objection to the Plan, at ¶ 57.

[319]    *STN* authority can be granted for a variety of reasons. In *STN*, the Second Circuit declared that granting approval for a committee to sue on the estate's behalf would be appropriate where the committee "presented a colorable claim or claims for relief that on appropriate proof would support a recovery, and where the trustee or debtor in possession unjustifiably failed to bring suit or abused its discretion in not suing." 779 F.2d at 905. But as I noted in my decision in this case when I gave the Equity Committee *STN* authority, *In re Adelphia Communications Corp*, 330 B.R. 364 (Bankr. S.D.N.Y. 2005) (the "*Housecraft Decision*"), the "unjustifiable" failure of a debtor to bring the suit itself does not require an improper motive for the failure. Rather, a debtor's failure to bring a claim is deemed to be unjustifiable when the committee has presented a colorable claim that on appropriate proof would support recovery, and the action is likely to benefit the reorganization estate. *Id.* at 374 n.19. It is plain from the *Housecraft Decision* that I did not decide it as I did based on a perception that the Debtors or their counsel had failed to bring the additional claims for any reason that might have been deemed to be inappropriate.

I don't need to decide, and don't now decide, whether a debtor might lose the power to discontinue or settle litigation brought on its behalf under *STN* authority where *STN* authority was granted because the Debtor had improper motive or couldn't be relied upon to act responsibly, or where a court, when issuing *STN* authority, chose to take the debtor's control away. Here we have neither of those scenarios.

*Smart World*,[320] upon which the Equity Committee relies, neither holds, or suggests, to the contrary.  In Smart World, the Second Circuit declined to permit an intervening party to "take ownership of the debtor's legal claims."[321]  But its holding that a committee could not take such ownership in a non-*STN* situation does not tell us what the Circuit would think about taking away debtor control in a situation where *STN* authority was granted—especially if for reasons other than debtor misconduct.  The entire tenor of *Smart World*, not to mention its plain language, emphasizes the rights of a debtor to control litigation on behalf of its estate.

But more fundamentally, the record in this case negates the Equity Committee's assertion that it has exclusive standing.  By stipulation dated July 24, 2003,[322] several parties in interest, including the Equity Committee, agreed, among other things, that:

> Notwithstanding anything set forth herein, to the
> extent the Committee's Standing Motion is granted:
> (a) the Debtors shall retain the right to compromise
> and to settle the Lender Claims, whether pursuant to
> a plan of reorganization or otherwise; and
> (b) parties-in-interest shall retain the right to oppose
> such settlement(s), in each case as if this Stipulation
> and Order never existed and the Debtors had
> retained *exclusive* control over the Lender
> Claims.[323]

---

[320]  *Smart World Techs, LLC v. Juno Online Servs., Inc. (In re Smart World Techs., LLC)*, 423 F.3d 166 (2d Cir. 2005).

[321]  *Id.* at 182.

[322]  *See* "Stipulation and Order Regarding (1) the Creditors' Committee's Motion for Leave to Prosecute Claims and Causes of Action Against the Pre-petition Agents and Prepetition Secured lenders, (2) the Equity Committee's Motion to Intervene in the Adversary Proceeding and (3) the Pre-petition Agents' Responses in Opposition to the Motions of the Creditors' Committee and the Equity Committee and Alternative Motions to Dismiss the Creditors' Committee's Complaint," dated July 29, 2003 (Docket No. 1925).

[323]  Committee Standing Stipulation, at ¶ 10 (emphasis added).

This stipulation, which I "so ordered," expressly preserved the Debtors' right to settle the Lender Claims. It's plain to me that any right to control the litigation granted to the Equity Committee was neither exclusive nor absolute.

Bankruptcy Code section 1123(b)(3)(A) also lends support for the Plan Proponents' inherent right to establish a mechanism under which Bank Lender Action claims might be settled. Section 1123(b)(3)(A) provides that a plan may provide for the settlement or adjustment of any claim or interest belonging to the debtor *or the estate*. The estate could have a variety of entities acting as its advocate, but section 1123(b)(3)(a) doesn't distinguish between them.

The Equity Committee's argument also disregards the collaborative basis on which the Equity Committee was granted derivative standing in the first place. In the *Housecraft Decision*, I acknowledged some uncertainty about the prospect for success for the additional claims the Equity Committee wanted to pursue, and while noting that some of those claims "pushed the envelope," I nevertheless granted derivative standing, in part, because of the collaborative nature of the endeavor with the Creditors' Committee.[324] In

---

[324]    *See Housecraft Decision,* 330 B.R. at 385:

> Thus, while some of the Equity Committee's claims will likely not survive 12(b)(6) motions, and while others—especially the RICO claims—will be at some substantial risk at the time of motions for summary judgment, some of the Equity Committee's claims have potential promise. Those in the latter two categories are at least colorable.

> But while the ultimate prognosis may not be particularly optimistic for all but a few of the Equity Committee's claims, the "ultimate prognosis" is not the test, as the discussion above makes clear. And the Court necessarily must consider the fact that the Equity Committee does not propose asserting its supplemental claims in isolation, but rather as an adjunct to the claims the Creditors' Committee will assert. As the Equity Committee fairly observes, its motion does not present the Court with the more common cost-benefit analysis where the cost of an independent full-blown litigation must be analyzed. Here the Court must consider the incremental cost of

fact, when the Equity Committee first sought the right to bring the Additional Bank

Claims, it premised its request upon the likelihood that the Creditors' Committee's would

be granted.[325]   At the time, the Equity Committee assured me that the joint nature of the

process would render its claims only incrementally more costly to prosecute.  The Equity

Committee's earlier assertions and assurances are inconsistent with its present claim of

"exclusive standing" over the additional claims it wishes to pursue.

The Equity Committee next argues that the Plan's proposed distribution of

proceeds from the CVV violates the Absolute Priority Rule.  It argues that a number of

the claims that would be transferred under the Plan to the CVV belong only to ACC,[326]

and that if successful litigation results in the recovery of damages for harm suffered by

ACC, those recoveries must be distributed only to satisfy ACC's creditors and then

ACC's equity holders.[327].  Again I disagree.

Initially, I disagree with the premise.  It's at least possible, if it's not already

wholly clear, that to the extent claims in the Bank Lenders Action have merit, the

beneficiaries of any successful litigation would include many of the various Debtors.  If it

were not for the Settlement, the benefits of successful litigation of the Bank Lenders

---

permitting the Equity Committee to pursue the additional
claims it wishes to assert.  And here the incremental cost of
prosecuting the Equity Committee's claims will be quite small
— at least in the context of the claims already to be asserted
by the Creditors' Committee, and the potential rewards of
success on even one of the Equity Committee's claims.

Id. at 385-86.

[325]   I characterized my decision to award derivative standing to the Creditors' Committee as follows:
"Upon the foregoing analysis, it is obvious to the Court — and not just true on balance — that the
prosecution of the litigation by the Creditors' Committee here would be in the best interests of the
estate.  That determination is, to be blunt about it, an easy one."  Id. at 384.

[326]   Equity Committee's Objection to the Plan, at ¶¶ 75-80.

[327]   Equity Committee's Objection to the Plan, at ¶¶ 81-86.

Action would have to be allocated amongst the various estates, just like the benefits of the Time Warner/Comcast sale and the DoJ/SEC settlement.

Secondly, assuming, *arguendo*, that rights in the Bank Lenders Action would belong solely to ACC and not other Debtors as well, ACC creditors had the ability to give up any such rights, if they so chose, under a reorganization plan. Any "gift" from ACC to other Debtors was authorized because all classes accepted the Plan.[328]

Similarly, I see no valid Absolute Priority Rule objection to the so called "deathtrap provision," requiring equity holders to vote in favor of the Plan or forfeit their distributions under it. Because the CVV Interests at issue will have only speculative value on the Effective Date, and because a "carrot and stick" provision such as the one set forth in the Plan is wholly permissible, the Equity Committee's argument fails.

Unless there's a grand slam home run in the litigation pursued by the CVV, it is beyond rational dispute that the holders of Equity Interests are out of the money. As set forth on page 121 of the Second Disclosure Statement Supplement, it is extremely remote and unlikely that there will be sufficient litigation recoveries, if any.[329] ACC equity holders shouldn't expect to receive any recovery on account of such interests unless there are net proceeds of at least $6.5 billion from the litigation prosecuted by the CVV.[330]

In light of the projected insolvency of ACC as of the anticipated Effective Date of the Plan, the Bankruptcy Code doesn't require that *any* distribution be made to the

---

[328]    I don't need here to address cramdown scenarios, which might or might not be subject to the same principle.

[329]    *See* Second Disclosure Statement Supplement, at DSS2-121.

[330]    *Id.*

holders of Equity Interests in ACC.[331]   The Plan gives equity holders *more* than their

legal entitlement.

Though remote in the extreme, the mere possibility that the CVV could realize

much better than expected recoveries doesn't alter the above analysis.   Courts have held

that speculative recoveries from a litigation trust don't factor into the various calculations

that must be made at the point in time at which a debtor seeks to confirm a plan.   For

example, in *In re Kentucky Lumber Co*, the Sixth Circuit refused to award postpetition

interest to unsecured creditors upon a large post-confirmation recovery by the debtor,

even though, after all unsecured claims were paid in full, it was "at least possible that

some money [would] remain in excess of the unsecured creditors' claims and hence be

available to the debtor or its shareholders." [332]

But though there was a reasonable basis for giving equity holders nothing, Plan

Proponents provided them with something, albeit of uncertain value, as an inducement to

vote in favor of the Plan.   It gave them junior CVV interests.   This "carrot and stick"

provision, by which a creditor is offered an inducement to vote on a plan of

reorganization, is not inconsistent with any provision of the Code[333]—though I'd prefer

---

[331]   *See In re Guilford Telecasters, Inc.*, 128 B.R. 622, 627 (Bankr. M.D. N.C. 1991) ("The going concern value of the Debtor is far less than aggregate allowed unsecured claims against the Debtor which exceed $9.6 million, and the Debtor, under a reorganization value, is clearly insolvent.  The value of the shareholders' interests is zero and, therefore, the plan need not provide for this class. In view of the Debtors' insolvency and the fact that no class of interests junior to shareholders is receiving property of the estate, the plan does not discriminate unfairly and the treatment of shareholders is fair and equitable.") (citations omitted).

[332]   *Thompson v. Ky. Lumber Co. (In re Kentucky Lumber Co.)*, 860 F.2d 674, 675 (6th Cir. 1988).

[333]   *See In re Drexel Burnham Lambert Group*, 138 B.R. 714, 717 (Bankr. S.D.N.Y. 1992) ("Indeed, § 1129(a)(3) provides that the Court shall confirm a plan only if … the plan is proposed in good faith and not by any means forbidden by law.  We do not view the carrot and the stick, factually presented in this case, as forbidden by the Code or any law we know of").  *See also In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999) ("There is no prohibition in the Code against a Plan proponent offering different treatment to a class depending on whether it votes to accept or reject the Plan.").

to qualify that general statement to make it applicable if (but only if) the inducement is to give a stakeholder more than it would be entitled to, rather than to threaten to take an existing right away.  Just as in *Drexel*, the Plan offers a share in a newly-formed entity (here the CVV, as opposed to the reorganized debtors) as an inducement to holders of Equity Interests to vote on the Plan where they would otherwise be receiving no distribution.[334]

Finally, the Equity Committee objects to the provision of the Plan providing that the Equity Committee will terminate on the Plan's effective date, except for the narrow purpose of final applications for fees.  I think such a provision is entirely appropriate.  I leaned over backward in this case to give the Equity Committee a fair shot at maximizing value in these cases, and to ensure that value wasn't unfairly taken away from it by senior classes, but the time for that has come and gone.  The Equity Committee served responsibly and well.  But now its job is done.

## XII.

## Calyon Issues

Under the Bank Lenders' loan agreements, the bank lenders, which are secured (and, indeed, oversecured), are entitled to the repayment of their principal, interest, and attorneys fees.  They also have a contractual right under their loan agreements to indemnification for losses they may suffer in connection with their loans, unless they are judicially determined to have acted in a way that would disqualify them from that entitlement.

---

[334]    While the gift contemplated by the Plan may very well be a valueless one, the risk was fully disclosed.  In the words of the *Drexel* court, the Equity Committee is most likely receiving "exactly what their interest is worth:  nothing."  138 B.R. at 717.

Although the Creditors Committee and Equity Committee, on behalf of the estate, are plaintiffs in a major plenary litigation pending against bank lenders and others (the "Bank Lenders Action") arising out of the co-borrowing facilities that have been a prominent feature of these cases, bank lenders have received, over the course of these cases, adequate protection payments in an amount equal to their postpetition interest. And the Plan Proponents, bank lender agents, and ad hoc committees of holders in bank debt claims have entered into a number of settlements under which bank debt will be paid in full under the Plan, subject to a reservation of rights on the part of the estate, and a potential clawback of amounts paid. Bank lenders will thus be paid, on the effective date of the Plan, principal, interest (to the extent not previously paid), and all of their attorneys fees and other expenses through the effective date.

As part of their respective settlements, the Plan Proponents and bank lenders have also agreed on the establishment, for various groups of bank lenders, of a "litigation indemnification fund" ("LIF") for each, to fund *future* expenses. Since, after the effective date, bank lenders will be paid off and have no further expenses incurred in connection with getting repaid, the only such expenses that will thereafter be incurred will be those associated with the defense of the Bank Lenders Action.

The Plan offers the bank lenders that are a party to the Bank Lenders Action an additional $80 million[335] (coupled with the JV Plan, a total of $90 million)[336] to pay their

---

[335]    The Plan provides for the establishment of three $20 million LIFs, one each for the administrative agent banks under the co-borrowing credit agreements. In addition, the Plan provides for the establishment of a separate LIF of $12 million for the accepting non-administrative agent bank classes, and a $3 million LIF for the syndicate banks. The Plan also provides for the establishment of a $4 million LIF to pay the post-effective date indemnification claims of the lenders under the FrontierVision credit agreement, which includes a "most favored nations" provision that likely will cause the FrontierVision LIF to be increased to over $5 million.

[336]    The JV Plan provides for the establishment of a $10 million LIF to pay the post-effective date indemnification claims of the banks under the Century-TCI and Parnassos (non co-borrowing)

post-effective date indemnification claims.  This amount is in addition to upwards of $170 million that has been paid to the banks for their expenses through the effective date.[337]

This amount is satisfactory to all but one of the approximately 400 bank lenders.[338]  Calyon[339] asserts that the amount it would get is insufficient to fund its desired expenditures in its litigation defense.  And it has voted against the Plan and raised objections to confirmation, notwithstanding the acceptance of the Plan by each of the classes in which it is a member.  It asserts that it must be provided the funds it wishes to spend on the defense of the Bank Lenders Action, which its expert asserts would range from $4 million to $39 million.

Of course these amounts have not been spent yet, if they ever will be, and I'm thus required to determine how to deal with Calyon's prepetition claim for losses it has not yet incurred, and which now are both contingent and unliquidated.

The Code provides for a mechanism for dealing with claims of this nature, in the context of the need to avoid holding up distributions to everyone else as a consequence of

---

credit facilities applied to JV Plan debtors.  By Order dated June 29, 2006, I confirmed the JV Plan and established the $10 million LIF for the benefit of the JV banks, several of which overlap with the bank lenders under the Fifth Amended Plan.

[337]  The Debtors state that they already have paid the administrative agent banks more than $110 million, and that non-administrative agent banks and syndicate banks have submitted invoices that their expenses through the effective date will be almost $50 million and $10 million, respectively, making a total of approximately $170 million only for the pre-effective date indemnification claims.  Amended and Renewed Motion for Order Estimating the Indemnification Claims of Certain Bank Lenders (Docket #12503) ("Estimation Motion"), at 11–12.

[338]  Each of the classes of bank lenders has accepted the Plan.

[339]  Calyon New York Branch is a commercial bank that was a syndicate member in each of the Debtors' secured lending facilities, three of which were co-borrowing facilities, and has been described as a non-administrative agent bank.  One of Calyon's affiliates was an investment bank that underwrote portions of Adelphia's public offerings, and two other Calyon affiliates were purchasers of bank claims in the secondary market.  All parties refer to them collectively as "Calyon."

claims that, while legally cognizable, are for amounts that have not yet matured.  The

Plan Proponents filed a motion asking me to estimate, under section 502(c) of the Code,

the claims of bank lenders dissatisfied with the LIFs that were offered to them.  Because

all of the other bank lenders are now satisfied with the LIFs that were offered, the

estimation motion now concerns only Calyon.  If the Plan Proponents establish a reserve

sufficient to pay the amount that I estimate,[340] that will resolve any confirmation

objection Calyon might have.[341]

> Bankruptcy Code section 502 provides:
>
> (c) There shall be estimated for purpose of
> allowance under this section-
>
>> (1) any contingent or unliquidated claim, the
>> fixing or liquidation of which, as the case
>> may be, would unduly delay the
>> administration of the case….

As I've previously observed, in an earlier decision likewise using estimation in

connection with confirmation issues,[342] estimation provides a means for a bankruptcy

---

[340]    The settlements with the bank lenders provided for the LIFs to be actually funded and disbursed out of the estate, and to be held for the benefit of bank lenders.  *See* Confirm. Hrg. Tr. Vol. 12 at 48.  Notwithstanding its vote in opposition to the Plan, Calyon, as a member of classes that did accept, is entitled to equal treatment, and will thus share in the LIF to which it is entitled under the settlements.  But to the extent it wants more, its entitlement is only to the creation of a reserve, sufficient to fund any additional amounts that I estimate to be appropriate.

[341]    Calyon raised a confirmation objection under the Best Interests test, but I find it to be unpersuasive.  As the beneficiary of the settlements struck by other bank lenders (as to which Calyon, notwithstanding its vote against the plan, can ride piggy-back), Calyon will get the benefit of the LIFs its fellow bank lenders bargained for, even before any additional amounts I might award.  They got that as part of a settlement under the Plan, which would self destruct in the event the Plan were not confirmed.  In a chapter 7 liquidation, it is highly likely, if not certain, that a chapter 7 trustee, with a view toward the needs and concerns of unsecured creditors, would object to bank claims and seek a holdback of the amounts otherwise due to them, just as the Creditors Committee did earlier in this case, resulting in the disallowance of bank claims until and unless the objection to allowance and/or payment were resolved in a bank lender's favor.  In chapter 7, Calyon would forfeit the benefits of the settlement deal its fellow bank lenders struck, which made the holdback motion moot.  In any event, posting a reserve in the amount I would fix on the estimation motion would satisfy any and all Best Interests concerns.

[342]    *See In re Adelphia Business Solutions, Inc.,* 341 B.R. 415 (Bankr. S.D.N.Y. 2003).

court to achieve reorganization, and/or distributions on claims, without awaiting the

results of legal proceedings that could take a very long time to determine.[343]  In that

connection, it has been repeatedly held, including in cases at the Circuit Court of Appeals

level, that when estimating claims, bankruptcy courts may use whatever method is best

suited to the contingencies of the case, so long as the procedure is consistent with the

fundamental policy of Chapter 11 that a reorganization "must be accomplished quickly

and efficiently."[344]  Bankruptcy courts have employed a wide variety of methods to

estimate claims, including summary trial, a full-blown evidentiary hearing, and a review

of pleadings and briefs followed by oral argument of counsel.  In so doing, courts

specifically have recognized that it is often "inappropriate to hold time-consuming

proceedings which would defeat the very purpose of 11 U.S.C. § 502(c)(1) to avoid

undue delay."[345]  Consistent with past practice in this Court and elsewhere, I am

estimating Calyon's future expenses for the purposes of establishing a fair reserve, and

not for the purposes of ultimate allowance.[346]

---

[343]   *Id.* at 422 (citing *See In re Continental Airlines, Inc.,* 981 F.2d 1450, 1461 (5th Cir. 1993)) (Bankruptcy Courts may estimate claims under § 502(c)(1) in order to (i) "avoid the need to await the resolution of outside lawsuits to determine issues of liability or amount owed by means of anticipating and estimating the likely outcome of these actions," and (ii) "promote a fair distribution to creditors through a realistic assessment of uncertain claims").

[344]   *Bittner v. Borne Chemical Co.,* 691 F.2d at 135-37; *see also, e.g., In re Brints Cotton Mktg., Inc.,* 737 F.2d 1338, 1341 (5th Cir. 1984) (citing 3 *Collier on Bankruptcy* ¶ 502.03, at 502-77 (15th ed. 1983)).

[345]   *In re Windsor Plumbing Supply Co.,* 170 B.R. 503, 520 (Bankr. E.D.N.Y. 1994); *accord* ABIZ, 422 B.R. at 423 (*quoting Windsor Plumbing*).

[346]   This approach is consistent with the decision in this district in *Ralph Lauren Womenswear,* 197 B.R. 771 (Bankr. S.D.N.Y. 1996), where the court estimated a claim for voting purposes, and said, "This being but an estimation hearing, my findings of fact will not have any preclusive effect upon the ultimate disposition of Kreisler's claim. This is due to the fundamental difference between the adjudication of a claim and its temporary allowance for plan purposes." *Id.* at 775. *See also In re MacDonald,* 128 B.R. 161 (Bankr. W.D. Tex. 1991) (using estimation of administrative expenses claim to determine feasibility, but not ultimate allowance).

With respect to estimation and the means to do it, I take my guidance from the earlier decision in this Court in *Ralph Lauren Womenswear*, which I followed in *ABIZ*. As noted in each of those cases, neither the Code nor the Rules prescribes any method for estimating a claim, and it is therefore committed to the reasonable discretion of the court, which should employ whatever method is best suited to the circumstances of the case.[347]

As the *Ralph Lauren Womenswear* described the estimation process most commonly used:

> A trier of fact first determines which version [of the facts] is most probable and proceeds from there to determine an award in a fixed amount. An estimator of claims must take into account the likelihood that each party's version might or might not be accepted by a trier of fact. The estimated value of a claim is then the amount of the claim diminished by [the] probability that it may be sustainable only in part or not at all.[348]

Here we are not talking about a past tort, where the issue of liability is uncertain and the damages are uncertain as well. Here we are talking about a prediction as to the future, where the fact that *some* future fees will have to be paid is certain (or nearly so), but the amount is highly uncertain.

There is also uncertainty as to whether the future fees, to the extent incurred, will be reasonable. Section 506(b) of the Bankruptcy Code limits oversecured lenders' claims for fees and costs to an amount sufficient to pay "reasonable" expenses[349]—not just any

---

[347] *See ABIZ*, 341 B.R. at 424; *Ralph Lauren Womenswear*, 197 B.R. at 775.

[348] *Ralph Lauren Womenswear*, 197 B.R. at 775.

[349] Section 506(b) provides: "To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose."

amount that the banks happen to incur and submit for repayment.  The issue of whether

fees are "reasonable" is an objective standard, rather than a subjective one.  In the

absence of an objective standard, parties could run up legal fees and waste estate funds

that would otherwise be distributed.[350]  Exercising my discretion, I now analyze the

record to determine a reasonable amount to reserve to award Calyon for its LIF.

---

[350]     *See In re Continental Vending Machine Corp.*, 543 F.2d 986, 994 (2d Cir. 1976) ("In applying this
standard, a rule of reason must be observed, in order to avoid such clauses becoming a tool for
wasteful diversion of an estate at the hands of secured creditors who, knowing that the estate must
foot the bills, fail to exercise restraint in enforcement expenses."); *see also In re Wonder Corp. of
America*, 72 B.R. 580, 591 (Bankr. D. Conn. 1987) ("Where services are not reasonably necessary
or where action is taken because of an attorney's excessive caution or overzealous advocacy,
courts have the right and the duty, in the exercise of their discretion, to disallow fees and costs
under § 506(b)."); *In re Dalessio*, 74 B.R. 721, 723 (9th Cir. 1987) ("A court should not reward a
creditor whose overly aggressive attorney harasses and opposes the debtor at every stage of the
bankruptcy proceeding, nor should an oversecured creditor be given a blank check to incur fees
and costs which will automatically be reimbursed out of its collateral."); *In re Mills*, 77 B.R. 413,
420 (Bankr. S.D.N.Y. 1987) ("'It is inherently unreasonable . . . to ask a debtor to reimburse
attorneys' fees incurred by a creditor that are not cost-justified either by the economics of the
situation or necessary to preservation of the creditor's interest in light of the legal issues
involved.'") (quoting *Matter of Nicfur-Cruz Realty Corp.*, 50 B.R. 162, 169 (Bankr. S.D.N.Y.
1985)).

The amended estimation motion seeks an order estimating Calyon's post-effective date indemnification claims against the Debtors in an amount not to exceed approximately $632,000. That amount represents Calyon's pro rata share of the $12 million LIF that was consensually established under the Plan for Calyon and the other non-administrative agent banks.  The Plan Proponents contend that because the overwhelming majority of the claims and issues related to the non-administrative agent banks are the same as the claims and issues relevant to the administrative agent banks, and that the administrative agent banks are taking the lead on those issues on behalf of all bank defendants, the proposed funding of an additional $12 million is "more than sufficient."[351]  But Calyon objects to its $632,000 pro rata share of that $12 million fund.

I conclude, in the exercise of my discretion, that it is reasonable to estimate Calyon's reserve entitlement at a somewhat higher amount, but not anywhere near the amounts Calyon claims.  I considered the testimony of Calyon's expert, who asserted that in its defense of the Bank Lenders Action, Calyon would spend in the range of $4 million to $39 million after the effective date, and would require an "absolute minimum" of $4 million.  While I found him to be fully truthful and to be competent, as a general matter, in preparing budgets for future litigation, I find such fundamental flaws in his assumptions and in the reasonableness of Calyon's litigation expenditures that I cannot credit his testimony in material respects.

Accordingly, I believe Calyon's claim for the amounts that it wants to spend in the future should be estimated in an amount materially less than the $4 million "absolute

---

[351]     Estimation Motion at 4–5.

minimum."[352]  While I will not hold Calyon to the exact $632,000 amount that was

apparently perfectly satisfactory for everyone else, I will require that the Plan Proponents

reserve only an additional $700,000 for Calyon, bringing its LIF to a total of

approximately $1.33 million.  The following factors inform the exercise of my discretion

in this regard.

First, I believe that the Calyon expert assumed litigation efforts that would go far

beyond anything reasonably predictable, or, for that matter, reasonable.  For example, his

estimation model included costs through a writ of certiorari to the United States Supreme

Court!  And he failed sufficiently to assess the likelihood of settlement of the Bank

Lenders Action (a factor that is especially reasonable to take into account given the fact

that bank lenders have already settled other plaintiffs' claims in Adelphia related

litigation), and the fact that a mediator has been appointed to serve.  The Calyon expert

also had deficient knowledge as to this case.  He didn't know that the banks had been

treated as oversecured, and had been paid their contractual rate of interest since the outset

of this case.[353]  And he also took into account costs in connection with the MIA

litigation,[354] in which the banks were not participants.  And while he acknowledged that

the motions to dismiss had been briefed, argued, and were pending (and for which Calyon

will be compensated, to the extent its costs were reasonable, under the Plan), he argued

the need for more of the same, which I think is just exaggeration.[355]

---

[352]    Strictly speaking, the reserve, which will be maintained by the Plan Proponents or their designee, will be for the amount in *excess* of the $12 million (with approximately $632,000 being Calyon's share) that they will already actually pay out for Calyon's bank lender group.

[353]    *See* Confirm. Hrg. Tr. Vol. 10 at 82.

[354]    *See id.* at 83.

[355]    Confirm. Hrg. Tr. Vol. 10 at 70–71.

Second, the Calyon expert placed insufficient weight on the legal work that Calyon and the other bank lenders already have done in connection with the bank litigation.[356]  As stated above, the bank lenders already have spent (and the Plan proposes to award) an aggregate of approximately $170 million in pre-effective date legal fees. The syndicate lenders and the nominal agent banks already have billed the Adelphia estate in excess of $62 million in legal fees through the effective date.[357]  Calyon itself has submitted an invoice to the Debtors for $6 million of pre-effective date legal fees.

While some of counsels' and consultants' work undoubtedly involved the pending chapter 11 cases, it must be remembered that the bank lenders were oversecured, they were getting paid their current interest, and there was very little risk that they would not get their principal and fees paid in full.  The inference is inescapable that the overwhelming bulk of the amounts the bank lenders expended was for defense of the Bank Lenders Action.

Going forward, it is hardly the case that they will be starting from scratch. Indeed, one very major matter—the filing of motions to dismiss, and the arguments on such motions—has already been completed.  Similarly, Calyon has already submitted invoices totaling more than $6 million, and reasonably can be expected to be submitting invoices for several hundred thousand dollars more through the effective date.  It has researched the legal and factual issues relating to the claims against it, filed and argued its own motion to dismiss, and responded to document discovery requests.

---

[356]    Apart from his discussions with Clifford Chance and Kirkland & Ellis, attorneys for the Calyon parties and the syndicate banks, respectively, the Calyon expert had no discussions with any other attorneys representing defendants in the bank litigation.  *Id.* at 69–70.

[357]    Confirm. Hrg. Tr. Vol. 10 at 81.

249

Calyon's past expenditures of $6 million to date (not counting additional sums it will bill the estate for with respect to services prior to the effective date) represent an extraordinary amount of money.  To the extent they are reasonable at all, they must have been for the defense of the Bank Lenders Action.  If any material portion of that related to getting repaid (and I regard that as very unlikely), any such portion would be unreasonable, and would have to be regarded as an offset against greater amounts that Calyon might demand.

Third, it appears, from the proceedings in this case, that Calyon has chosen to write and speak at much greater length, and to litigate on many more issues, than every other bank lender similarly situated in this case.  That was its privilege, of course, but it raises material issues as to the reasonableness of its fees.  Calyon can, if it elects, litigate over anything and everything, but whether its charges for doing so are reasonable—and whether the estate should be required to pay them—is a very different issue.

Fourth, I find it odd that an amount that is satisfactory for every other similarly situated lender is materially inadequate for Calyon.

Calyon can and should coordinate with the other bank lenders similarly situated. The bank lenders have acted in a coordinated fashion before, and I am confident that they will continue to do so going forward.

## XIII.

### Stay Under FRBP 3020 and 8005

For the foregoing reasons, I'll be confirming the Plan, and will be entering a confirmation order.  We then have to turn to the issue of the extent, if any, to which I should stay its effectiveness pending appeal.

I've considered that matter at length, in the context of the two Bankruptcy Rules that govern stays.  FRBP 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."  It was added in 1999 to provide sufficient time for a party to seek a stay pending appeal before the plan is implemented and appeal becomes moot.[358]  Fed. R. Bankr. P. 8005, which governs stays (of any kind of order or judgment) pending appeal, provides that motions for stays pending appeal must ordinarily be presented to the bankruptcy judge in the first instance.[359]

I conclude, in the exercise of my discretion, that fairness to the ACC Bondholder Group—and to the district court, which will have a lengthy decision to plow through, and which may not deal with bankruptcy issues on a daily basis—requires that I not take an affirmative step that would foreclose all opportunities for judicial review, and that I should not "order[] otherwise" to take away the normal period for asking for a further stay.  But I further conclude, based on a very extensive knowledge of this case, and the merits of the objections, that I would grant no further stay, and that if a further stay is to come, it must come only from the district court or a higher court.

In *Hilton v. Braunskill*, the Supreme Court laid out standards for determining whether a court should issue a stay of an order pending appeal.  It identified four relevant criteria: (1) the likelihood of success on the merits of the appeal, (2) irreparable injury to the movant if a stay is denied, (3) substantial injury to the party opposing a stay if one is

---

[358]    *See* Advisory Committee Note 1999 Amendment.

[359]    Rule 8005 provides, as relevant to the proceedings before me:

> A motion for a stay of the judgment, order, or decree of a bankruptcy judge, for approval of a supersedes bond, or for other relief pending appeal must ordinarily be presented to the bankruptcy judge in the first instance.

issued, and (4) where the public interest lies.[360]  The Second Circuit and the courts in the

Southern District for New York have adopted the same four factors when deciding the

issue.[361]

Here I do not believe that an appeal would have a likelihood of success.

Sometimes I decide matters of first impression or where the issue is close, but this is not

one of them.  The ACC Bondholder Group's principal complaint is its objection to the

settlement, but an issue of that character is reviewed on an abuse of discretion basis, and

the appellant must show that the settlement falls below the lowest range of

reasonableness.  As hopefully is apparent, I've canvassed the Settlement at great length

and with great care, and I think it's not remotely close to the level where any appellate

court would find that it falls below the lowest level of reasonableness.  In fact, 72% of the

members of the ACC Senior Notes Class voted in favor of the Plan, with its Settlement

(with other classes of ACC creditors supporting the Plan, in comparable or even higher

numbers)—and the ACC Bondholder Group, even with its extensive solicitation

materials, was unsuccessful in convincing more than 2.5% of the other ACC Bondholders

that the Settlement was a bad idea.  Those creditors were free to disapprove the

Settlement based on a standard *much less demanding* than that the appellate courts would

---

[360]     *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (citing 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2904 (1973)).

[361]     *See, e.g., Hirschfeld v. Board of Elections*, 984 F.2d 35, 39 (2d Cir.1993) (citing *Hilton* and second circuit cases that had applied the four factors test); *In re The Singer Company N.V.*, 2000 WL 257138, at *5 (S.D.N.Y. 2000) ("The standard for granting a stay pending appeal has been set forth by the Second Circuit. To obtain such relief, the Court must consider: (1) whether the movant has demonstrated a substantial possibility, although less than a likelihood, of success on appeal; (2) whether the movant will suffer irreparable injury without a stay; (3) whether any party will suffer substantial injury if a stay is issued; and (4) whether public interests may be implicated."); *In re Metiom, Inc.*, 318 B.R. 263 (S.D.N.Y. 2004) (discussing the standard for stay pending appeal).  Judge Batts applied the four criteria above when considering a request for a stay of appeal on a case before me.  *See In re Ames Dept. Stores, Inc.*, 2003 WL 749172, at *1 (S.D.N.Y. 2003).

have to apply—*e.g.*, if any simply wanted to hold out for a little more—but the support

for the Plan and its Settlement was overwhelming.

Ultimately the dissatisfaction with the Plan and the Settlement is the desire on the

part of ACC Bondholder Group members to obtain relatively modest incremental

recoveries for the ACC Senior Notes, and/or to advance other investment strategies

unrelated to the recoveries for creditors of ACC.  Either may be an understandable reason

for voting against a plan, or for trying to convince other creditors to do so, but these do

not constitute legally cognizable bases for declaring a settlement to be below the range of

reasonableness.

I have likewise found other arguments by the ACC Bondholder Group to be

unpersuasive, and see no material likelihood that an appellate court would regard them as

any more persuasive than I did.

Turning to the second factor, irreparable injury to the movant, I assume it to be

true that if a stay isn't granted, the Plan will go effective, and that if that happens, there is

a very high probability that any appellate court would then find an appeal to be moot.

And I assume, without deciding, that the irreparable injury requirement could thus be

deemed to be satisfied.

But the last two factors, prejudice to those who prevailed and the public interest,

strongly dictate against any further extension of the stay.

While working through the issues in this case necessarily took me some time, I

have nevertheless fully understood the prejudice to the estate of delay.  As Ms. Wittman

testified at the confirmation hearing, the Debtors pay continuing postpetition interest on

$5.2 billion in bank debt, which interest approximates $42 million per month, and accrue

approximately $68 million per month on other debt.  Although the Debtors earn

approximately $38 million per month on the $9.8 billion in cash proceeds of the Time

Warner/Comcast sale, the net interest expense still amounts to approximately $72 million

per month.  Such interest results in costs to general unsecured creditors of approximately

$2.4 million every single day.  Though the ACC Bondholder Group has seized on this

loss of value to advocate in favor of paying down the bank debt, such payment was an

integral part of the Plan Proponents' settlement of all pending disputes under the Plan,

and can't be severed from the Plan.  I agree with the Plan Proponents' point that there is

no method (sound or otherwise) to triage the loss of value owing to non-bank debt short

of consummating the Plan.

Similarly, the public interest, in my view, strongly dictates against extension of

the stay.  In this case, 30 of 30 classes that voted on the plan supported it, holding debt in

excess of $10 billion of the more than **$**12 billion outstanding.  It would be grossly

unconscionable, in my view, to thwart the will of such an overwhelming majority to

accommodate the desires of such a small minority, who are simply dissatisfied with the

Settlement under the Plan.  Aside from the interests of the estate as a whole, I must think

of the 72% of the ACC Senior Notes that accepted the Plan (and even higher percentages

of ACC Sub Debt, Trade Claims, Other Unsecured Claims, Preferred Stock and Common

Stock holders) whose will would be frustrated, and whose recoveries will suffer more

than any as a consequence of delay.  The public interest requires bankruptcy courts to

consider the good of the case as a whole, and not individual creditors' investment

concerns.  Particularly where, as here, the incremental recoveries to ACC Senior

Noteholders, if their contentions were accepted, would be modest, and the desire to block

consummation of this Plan seemingly must be driven by other factors, the public interest cannot tolerate any scenario under which private agendas can thwart the maximization of value for all.

Thus, under the facts of this case, where every single class has accepted the Plan, where the holders of more than **$10** billion in claims would be prejudiced by the objection to confirmation of a vocal few, and where there will huge costs to the estate resulting from delay in the Plan's going effective, I will not grant a longer stay. The requirements of Fed. R. Bankr. P. 8005 for action in this Court shall be deemed satisfied, and further application to me is waived. Any further application for a stay shall be made to the district court.

Conclusion

The Plan has secured the assent of over $10 billion in claims, representing approximately 84 % of the claims in this case, and, as more relevant to section 1126 and 1129 requirements, the assent, in both number and amount, of 30 of the 30 classes who voted on the Plan. But I fully recognize that confirmation of a plan is not just a popularity contest, but also requires consideration of whether the substantive requirements of the Bankruptcy Code have been satisfied.

After having reviewed, with care, all of the requirements of section 1129 of the Code (and, additionally, the reasonableness of the Settlement), I've determined that the Plan fully conforms to the requirements of the Code. I will enter an order confirming the Plan**.** Matters that I require by this decision that do not require Plan revisions, but which nevertheless require implementation, can be effected through either the Confirmation Order or one or more supplemental orders. With a proposed confirmation order having

255

been circulated in advance, the Plan proponents are to settle such an order on one day's

notice by fax, e-mail or hand.

Dated: New York, New York               ___*s/Robert E. Gerber*_____
       January 3, 2007                    United States Bankruptcy Judge