**<u>EXHIBIT A</u>**

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**ALLOCATION POSITION OF THE MONITOR**
**AND CANADIAN DEBTORS**

**PART I – INTRODUCTION AND PRELIMINARY STATEMENT**

***This Pleading***

1.      This is the allocation pleading of Ernst and Young Inc., the Monitor appointed by the

Court in these proceedings (the "**Monitor**"), and of Nortel Networks Corporation, Nortel

Networks Limited, Nortel Networks Technology Corporation, Nortel Networks International

Corporation and Nortel Networks Global Corporation (the "**Canadian Debtors**").

*Preliminary Statement*

2.      Approximately U.S. $7.3 billion has been realized as proceeds from two groups of asset sales effected by members of the Nortel Group.[1]  The first group of sales (referred to below as Business Sales) involved tangible and intangible assets of, for the most part, operating Nortel businesses.  The remaining sale, the Rockstar Transaction, involved only intangible assets and was effected after all Nortel businesses had been sold.

3.      The sales were effected as contemplated by the IFSA[2] referred to below – which left for further agreement or determination how the sale proceeds were to be allocated among the sellers.  The relevant parties have failed to subsequently agree on allocation.  The Court must now determine the proper allocations, so that the Estates[3] and their creditors can benefit from the successful sales.

*The Question*

4.      Allocating the proceeds from the sales, and accrued and accruing interest thereon, requires the identification of the proper allocation question.   The Monitor and Canadian Debtors submit that the proper question is:

> **What portion of the proceeds realized in each transaction was due to the transfer of, or surrender by, the Canadian Debtors, EMEA Debtors[4] or**

---

[1]    The terms Nortel Group and Nortel used in this pleading are described in paragraph 9 and footnote 10 below.

[2]    The Interim Funding and Settlement Agreement referred to in paragraph 18 and footnote 15 below.

[3]    The term Estates is defined in paragraph 17 and footnote 14 below.

[4]    As described in paragraph 16.

- 3 -

**U.S. Debtors[5], as the case may be, of property interests in the assets which were the subject matter of that transaction?**

*Tangible Asset Allocation – Business Sales*

5.     The relevant property interest in the tangible assets sold in the Business Sales was ownership.  The tangible assets were effectively sold for their net book values.  The appropriate allocation of the portion of the proceeds of each Business Sale attributable to the tangible assets is therefore to allocate to each owner of a tangible asset sold its net book value.[6]

*Intangible Asset Allocation – Business Sales*

6.     The primary component and driver of the value of the intangible assets sold in the Business Sales was intellectual property.  There were two relevant property interests in the intellectual property conveyed in the Business Sales – first, ownership, which was held by Nortel Networks Limited ("**NNL**"), and second certain licence rights held by certain U.S. Debtors and EMEA Debtors pursuant to the MRDA[7] referred to below which licence rights were surrendered as part of the Business Sales.  The MRDA defined and limited those licence rights and set the maximum benefits that could be derived from their permitted use. The allocation of intangible assets thus involves the allocation to U.S. Debtors and EMEA

---

[5]     As described in paragraphs 15.

[6]     As described in paragraphs 27 to 29 below.

[7]     See paragraphs 30 and 37 below.

Debtors of the value of their surrendered MRDA licence rights, and the allocation to NNL as owner of the balance of the proceeds attributable to the intangible assets.[8]

*Rockstar Transaction Allocation*

7.    The intangible assets in the Rockstar Transaction were in all material respects, intellectual property.  The owner of the intellectual property sold was NNL.  The Rockstar Transaction took place after all Nortel businesses had been sold.  As the MRDA licences of any U.S. Debtors or EMEA Debtors were, at the time of the Rockstar Transaction, inapplicable to and without value in respect to the intellectual property sold, the only relevant property interest was that of NNL, to whom those proceeds are to be allocated.[9]

*Allocation of Accrued and Accruing Interest*

8.    Accrued and accruing interest on the sale proceeds should be allocated in proportion to the allocations of proceeds for tangible and intangible assets referred to above.

**PART II - BACKGROUND**

**The Nortel Group**

9.    Nortel Networks Corporation ("**NNC**") is a Canadian company and one of the Applicants/Canadian Debtors in this proceeding.  At the time of the commencement of these

---

[8]    See paragraphs 30 to 32 below.

[9]    See paragraph 33 below.

proceedings NNC owned, directly or indirectly, 143 companies.  NNC together with its direct and indirect subsidiaries are sometimes referred to herein as Nortel or the Nortel Group. [10]

10.    NNC was a holding company. The major Canadian operating company in the Nortel Group was NNL, which is also a Canadian Debtor.

11.    The Nortel Group traces its origins back to Northern Electric and Manufacturing Company Limited, incorporated in the 1890s as an equipment provider for Canada's then-nascent telephone system. In more recent times, the Nortel Group was focussed on the development and provision of software and hardware technology solutions for telecommunications environments. These included wireless communications, data transmission networks, wired communications, internet technology, communications software and other high-technology products and services in the communications field.

12.    At its height in 2000, NNC had a market capitalization of approximately U.S. $250 billion.  Members of the Nortel Group had customers across the globe and in the aggregate they employed a total of nearly 93,000 employees worldwide.

***Insolvency Proceedings***

13.    The burst of the high-tech 'bubble' in 2001 was followed by expanding competitive pressures in the communications technology industry.  These factors, as well as legal and regulatory proceedings arising from accounting issues, detrimentally affected the profitability

---

[10]    Although the terms Nortel Group or Nortel are used herein to refer to the collectivity of the many different Nortel operating and holding entities, they do not describe a legal entity but a number of affiliated legal entities commonly described in business terms as a corporate group or enterprise.

- 6 -

of the business of the Nortel Group. Attempts to solve these challenges were made. These efforts were ultimately unsuccessful.

14.    On January 14, 2009, the Canadian Debtors filed for and obtained protection from this Court in this proceeding under the *Companies' Creditors Arrangement Act*.

15.    On January 14, 2009 Nortel Networks Inc. ("**NNI**") a U.S. Corporation and several of its U.S. affiliates[11] (collectively, the "**U.S. Debtors**") which were all members of the Nortel Group filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**") for protection under Chapter 11 of Title 11 of the U.S. *Code*.

16.    Nortel Networks UK Limited ("**NNUK**"), and certain of its European subsidiaries and affiliates including Nortel Networks France S.A. ("**NN France**") and Nortel Networks (Ireland) Limited ("**NN Ireland**")[12] (these European Nortel entities, along with Nortel Networks AG and Nortel Networks AS[13], being collectively referred to as the "**EMEA Debtors**"), which were all also members of the Nortel Group, were granted administration orders in the U.K. on January 15, 2009, under the *Insolvency Act 1986*.

---

[11]    Including Nortel Networks (CALA) Inc. ("**NN CALA**"), which filed a voluntary petition on July 14, 2009.

[12]    NNUK, NN France and NN Ireland were the EMEA participants under the residual profit split method (referred to as the "**RPSM**") provided for under the MRDA.

[13]    Nortel Networks AG and Nortel Networks AS are both European entities that were sellers or deemed sellers in certain of the Business Sales but did not file for administration orders. They are represented by the same counsel as those EMEA Debtors that did file for administration orders and should be included in that group for the purposes of this allocation proceeding.

17.    As a result, there are three main estates (the "**Estates**") under insolvency proceedings: (i) the Canadian Debtors, (ii) the U.S. Debtors, and (iii) the EMEA Debtors.[14]

*The Business Sales, The Rockstar Transaction, and The Escrowed Proceeds*

18.    On June 9, 2009, most of the Canadian Debtors, U.S. Debtors (other than NN CALA) and EMEA Debtors entered into an Interim Funding and Settlement Agreement (the "**IFSA**")[15] in contemplation, in part, of asset sales being made.  The IFSA provides that the proceeds of these sales would be deposited into escrow pending agreement as to their allocation or agreement as to a protocol for a process to determine how they should be allocated. The IFSA was entered into and so provided in order that a sales process aimed at the timely monetization of the assets at maximum achievable values would not be hindered by allocation disputes among the three Estates and the numerous corporate debtors within them.

19.    In 2009 and 2010, certain sales of assets relating to Nortel businesses ("**Business Sales**") took place.  As a result of those sales, the value of those businesses and all assets in connection with them was maximized and monetized.  Thereafter, no member of the Nortel Group carried on an operating business.  The Business Sales were pursuant to the following transactions:

---

[14]    Certain other Nortel subsidiaries also filed for creditor protection in their local jurisdictions.  For example, on May 28, 2009 NN France commenced secondary proceedings pursuant to which an administrator and liquidator have been appointed by the Versailles Commercial Court.

[15]    This was supplemented by a Final Canadian Funding and Settlement Agreement dated December 23, 2009 ("**CFSA**").  The IFSA and CFSA also addressed certain other rights and obligations between the Estates, for example arising under the MRDA.

(a)     A sale in respect of the Layer 4-7 business to Radware Ltd.;

(b)     A sale of the CDMA/LTE Access business to Telefonaktiebolaget L M Ericsson (publ.) ("**Ericsson**");

(c)     A sale of the Enterprise business to Avaya Inc.;

(d)     A sale of the Next Generation Packet Core assets to Hitachi, Ltd.;

(e)     A sale of the Metro Ethernet Networks business to Ciena Corporation;

(f)     A sale of the GSM/GSM-R business to Ericsson and Kapsch Carriercom AG;

(g)     A sale of the CVAS business to GENBAND Inc.;

(h)     A sale in respect of GSM infrastructure and solutions business in the Caribbean and Latin America to Ericsson; and

(i)     A sale of the Multi-Service Switch/Passport business to Ericsson.

20.     Following the Business Sales, a portfolio of intellectual property ("**IP**") comprised of patents and patent-related assets (such as patent applications) remained.  This IP had not been assigned to purchasers in the Business Sales and was not being used by any members of the Nortel Group (other than non-material use in a wind down or transition services capacity). These patents and patent-related assets were owned by NNL.  In 2011 these patents and patent-related assets were sold to Rockstar Bidco, LP (the "**Rockstar Transaction**").

21.     As contemplated by the IFSA, for the purposes of participation in the resolution of any allocation dispute, in each Business Sale and in the Rockstar Transaction NNL, NNI and

NNUK were named as sellers (or deemed to be sellers), and various other members of the Nortel Group, including other Canadian Debtors, U.S. Debtors and EMEA Debtors, were also sellers or deemed sellers in all but one of these transactions.[16]

22.    Also as contemplated by the IFSA, the sellers in each transaction collectively conveyed whatever interest, if any, they may have had in the assets being conveyed, generally without particularization as to which seller was selling a particular asset or a particular interest in an asset, and without any acknowledgement that any particular seller actually had an interest, or interest of value, in any particular asset.  In the agreements for the Business Sales, the parties agreed to allocate the purchase price first to tangible assets in accordance with their net book values, with the balance of the purchase price being allocated to intangible assets—but there was generally no agreement in connection with a Business Sale as to which portion of the purchase price was to be associated with any particular intangible asset or seller.  In the case of the Rockstar Transaction there was no need to differentiate between asset types as it was in all material respects comprised of intangible assets, namely the patents and patent-related assets.  The absence of agreements about allocation related matters in connection with the sales referred to above was contemplated by the IFSA.

23.    Proceeding in the manner contemplated by the IFSA permitted highly advantageous asset sales to be effected.  However, although the parties attempted to reach agreement after the sales on allocations or on a dispute resolution process, no agreement concerning

---

[16]   Even though the EMEA Debtors were not technically sellers in respect of the entire transaction described at paragraph 19 (h) above, they have been treated as sellers for the purpose of allocation.

allocation or concerning a dispute resolution process was reached under the IFSA, delaying the Estates and creditors from benefitting from the sale proceeds. By orders made on March 8, 2013 with reasons given on April 3, 2013, this Court and the U.S. Court (collectively, the "**Courts**") ruled that allocation would be determined by them, and they approved a process – the Allocation Protocol – for that determination.

### The Amounts To be Allocated

24.     Net proceeds of approximately U.S. $2.8 billion from the Business Sale transactions, together with accrued and accruing interest, are being held under the escrow arrangements contemplated by the IFSA.   An additional amount of approximately U.S. $4.5 billion was realized from the Rockstar Transaction and, together with accrued and accruing interest, is also being held under those escrow arrangements.

## PART III – THE ISSUE FOR DETERMINATION AND SUMMARY OF POSITION

### The Issue for Determination

25.     The Courts are being asked to allocate, among the three Estates, the U.S. $7.3 billion proceeds of sale currently held in escrow[17] and all of the accrued and accruing interest thereon.[18]

---

[17]    Subject to any post-filing agreed upon cost sharing arrangements pursuant to the various side agreements that have been entered into by the Estates. Any adjustments resulting from these various side agreements have not been applied to the proposed allocation figures set out herein.  Such adjustments, which require only mechanical accounting, can be made by the relevant parties once the Court determines the allocations in this proceeding.

26.     The Monitor and the Canadian Debtors submit that the issue for determination in connection with the Estates' respective allocations is:

> **What portion of the proceeds realized in each transaction was due to the transfer of, or surrender by, the Canadian Debtors, EMEA Debtors or U.S. Debtors, as the case may be, of property interests in the assets which were the subject matter of that transaction?**

Those respective portions are the allocations due to the respective Estates.

### Summary of the Monitor and Canadian Debtors' Position

*Business Sales Allocations*

27.     The Business Sales were, for the most part, sales of bundles of assets of operating businesses. The Business Sales involved tangible and intangible assets.

---

[18]   The Monitor and the Canadian Debtors note as follows with respect to certain specific allocation matters: (i) pursuant to the Allocation Settlement Agreement (APAC/CALA) dated June 19, 2012, and approved by this Court and the US Court, the allocation entitlements of all sellers except the Canadian Debtors, the US Debtors, the EMEA Debtors, Nortel Networks o.o.o ("**Nortel Russia**"), Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications and Holdings (1997) Limited (collectively, "**Nortel Israel**") were agreed and approximately U.S. $44.9 million was paid from the escrow accounts to satisfy such allocation entitlements; (ii) the entitlements, if any, of Nortel Russia and Nortel Israel to the sale proceeds were assigned to, in the case of Nortel Russia, Nortel Networks International Finance and Holding BV (an EMEA Debtor) and, in the case of Nortel Israel, NNI and NNUK such that those entities are entitled to any sale proceeds due to Nortel Russia and Nortel Israel, respectively; (iii) the Estates have entered into various post-filing cost sharing agreements pursuant to which they have agreed to bear a portion of specified costs in proportion to their allocation entitlement from all or certain of the sales, and for any amounts due from one Estate to another under such agreements to be paid from the sale proceeds. As such, once the Estates' allocation entitlements are determined, a "true-up" to account for such agreements will be required prior to allocation entitlements being distributed to the Estates; and (iv) there are various "non-IFSA" transactions where only one Estate was a vendor (in the case of the Canadian Debtors, for instance, the sale of the LG-Nortel joint venture, the sale of the Carling Facility, the sale of the Relay assets and the sale of the IP addresses). These transactions are not subject to the Allocation Protocol and are therefore not addressed in this pleading.

28.    The proceeds of sale attributable to tangible assets should be allocated to each owner

of a tangible asset conveyed, in accordance with the net book value of that tangible asset.

Ownership of the tangible assets is the relevant property interest, and the proceeds received

in respect of those property interests are properly allocable on the basis of the net book

values of those tangible assets since that was the portion of the purchase price the parties in

the agreements for the Business Sales agreed to allocate to them.

29.    The Monitor and the Canadian Debtors therefore ask that the Courts allocate the sale

proceeds from the sale of those tangible assets based on the net book value of that portion of

the total tangible assets sold (or deemed to be sold) by entities within the following groups,

aggregated as follows:

| | |
|---|---|
| Canadian Debtors: | U.S. $101,900,000 |
| U.S. Debtors: | U.S. $374,400,000[19] |
| EMEA Debtors: | U.S. $91,900,000 |

30.    The Business Sales also involved the sale of intangible assets, the key component of

which was IP.  The IP involved in the Business Sales was owned by NNL.  Ownership is the

appropriate property interest for allocation purposes; the only other property interest in the IP

involved in the Business Sales were licence rights which were held pursuant to the terms of

the Master R&D Agreement (the "**MRDA**").

---

[19]    The calculation of total tangible assets sold by the US Debtors includes net book value of tangible assets
sold directly by the US Debtors and the equity value of the shares of Nortel Government Solutions ("NGS")
and Diamondware Limited ("Diamondware") sold by the US Debtors.  NGS and Diamondware were
wholly-owned subsidiaries of NNI and their shares were sold as part of the Enterprise Business Sale to
Avaya.

31.    The Monitor and the Canadian Debtors ask the Courts to allocate the proceeds attributable to the intangible assets conveyed in such Business Sales to NNL, less the value of any licences to use the IP that were at the time of each Business Sale held and being used in the operation of the businesses by certain U.S. Debtors and EMEA Debtors pursuant to the terms of the MRDA[20].  Amounts equal to the portion of sales proceeds due to the relative value of those license rights should be allocated to those U.S. Debtors and EMEA Debtors respectively.

32.    The onus of proving the value of any licence rights is on the U.S. Debtors and EMEA Debtors respectively.  However, given that the maximum amount that the U.S. Debtors and the EMEA Debtors could claim as an allocation of the proceeds of sale of intangible assets in the Business Sales is that calculated by reference to the RPSM split or share provided for under the MRDA (as explained below)[21], the maximum allocations to the relevant U.S. Debtors and EMEA Debtors would be:

---

[20]    Although Business Sales may have included other intangible assets such as customer relationships, employee relationships, etc., for various reasons, those type of intangible assets did not have a value separate and apart from the IP at the relevant time.  To the extent that any U.S. Debtors or EMEA Debtors assert that they had that type of intangible asset, it is not relevant to their allocation entitlement for this reason and because the U.S. Debtors' and EMEA Debtors' entitlement to share in any future benefits that might have been derived from businesses sold if they had continued to operate them were set by the MRDA; allocating value to different intangible assets that had been deployed in those businesses does not yield any different result for the U.S. Debtors and EMEA Debtors.

[21]    Certain of the EMEA Debtors, as well as NN AG, and NN CALA, had been granted non-exclusive licences and entered into distribution agreements pursuant to which such local entities were generally provided the right to distribute Products in their territory (on a non-exclusive basis).  Under those agreements, they were guaranteed reasonable arm's length rate of return based on operating margin, set at 1%.  These entities were commonly referred to as "limited risk entities" or "LREs".  The Monitor and the Canadian Debtors submit that these non-exclusive licences and agreements were not the subject matter of or property interests in the intangible assets conveyed in the Business Sales and the LREs are not entitled to any allocation of the proceeds on account of intangible assets.

| U.S. Debtors | 38.53% | U.S. $870,000,000 |
| EMEA Debtors, Nortel Networks AG and Nortel Networks AS | 11.63% | U.S. $262,500,000 |

with the balance (49.84%, i.e. U.S. $1,125,300,000) allocated to NNL. However, as explained in paragraphs 57 to 61 below, since those are the maximum allocations of the U.S. Debtors and EMEA Debtors, to the extent they fail to prove those allocations and their actual allocations are lower, that of NNL increases by a corresponding amount.

*Rockstar Transaction Allocation*

33.    The Rockstar Transaction was comprised in all material respects of intangible assets which were IP; in particular, patents and patent-related assets. The only property interest in the IP conveyed in the Rockstar Transaction was that of NNL, as owner.[22] The Monitor and the Canadian Debtors ask the Courts to allocate the U.S. $4.5 billion realized from the Rockstar Transaction, together with accrued and accruing interest thereon, to the Canadian Debtors.

---

[22] There was a limited and immaterial subset of patents conveyed that were registered in the names of Nortel Group entities other than NNL; however, pursuant to the MRDA referred to and defined below, NNL was the owner of all patents.

**PART IV - ANALYSIS**

*Nortel IP, Role of R&D, MRDA and RPSM*

*Intellectual Property*

34.     Through the Nortel Group's operating lifespan, an enormous amount of IP was developed arising from, among other things, technological discoveries and inventions.  That IP was comprised of thousands of patents and patent applications as well as industrial designs, copyrights and applications, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documents and information. Certain of the IP was applied to the design, development and deployment of innovative communications products, systems and solutions which were made or used by members of the Nortel Group in their businesses.

*Research and Development*

35.     The IP was the result of significant research and development ("**R&D**") activities carried on by Canadian Debtors and others. Members of the Nortel Group, in the aggregate, invested billions of dollars in R&D over the years.  The most critical factor in creating value of any aspect of the Nortel Group was valuable, commercializable IP to provide customers with innovative products, systems and solutions, generated from the R&D.

36.     R&D within the Nortel Group was undertaken by a combination of in-house developers and external alliances, partnerships and joint ventures.    Functionally headquartered in Ottawa, the global R&D team carried out internal R&D in ten key centres in

Canada, the U.S., the U.K., Ireland and France, as well as in other locales and through joint ventures in China and Turkey.

*Master R&D Agreement and the Residual Profit Split Methodology*

37.     The key contractual document which described, confirmed and defined, among other things, the ownership and nature of the interests in the IP and the manner and extent to which U.S. Debtors and EMEA Debtors could benefit from the carrying on of their or any businesses of the Nortel Group (and thus from the exploitation of IP and any other intangible assets in these businesses) was the MRDA.   The MRDA was entered into by the relevant members of the Nortel Group, including NNL, NNI, NNUK, NN France and NN Ireland (each a "Participant" within the meaning of the MRDA) and was effective from January 1, 2001.[23]

38.     The MRDA was a sophisticated contractual regime, entered into expecting that it would be adhered to by the parties thereto and that it would govern their affairs including for taxation purposes.   Accordingly, care was taken by each party in defining and confirming the ownership of, and nature and extent of any other interests (licence rights), in the IP, and the allocation and sharing of the benefits of the ongoing exploitation of IP and other intangible assets used in the operation of Nortel businesses.   The sharing method, mandated by the MRDA was the RPSM.

---

[23]   Nortel Networks Australia Pty Limited ("**NN Australia**") also entered into the MRDA when it was originally executed.  NN Australia no longer operates under the MRDA.

39.    The MRDA specifically recognized that IP was the key profit driver of Nortel's businesses.

40.    To reflect the recognition within the Nortel Group that the quantum of R&D spending was the appropriate measure to ascertain the respective shares of benefits to be derived from the use of IP in the operations of the business of members of the Nortel Group, the preamble of the MRDA stated:

> ...each Participant believes that it is appropriate that each Participant should benefit from its contribution to R&D activity commensurate with the value of its contribution to that R&D activity in the context of the manner in which the Nortel Networks business is conducted and that the residual profit split methodology (RPSM) is the best arm's length measure, in the circumstances of NNL and the Participants, of such contributions with reference to such benefits...

41.    Consistent with this recognition, the MRDA mandated the RPSM, which had been developed by specialized, independent experts who had been tasked with analyzing the Nortel Group's business and recommending the best methodology to allocate income or loss among the members of the Nortel Group.  The RPSM took into account the functional and operational realities of the members of the Nortel Group, and thus recognized that 'routine' functions, such as sales, administration, distribution and similar routine functions should be identified and compensated with routine returns.  The RPSM also recognized that residual profits and losses of the businesses were attributable to the use of IP which had been developed through the overall R&D activity; thus it allocated those residual profits and losses to the relevant parties to the MRDA according to their relative contributions to such R&D. In other words, the RPSM was designed so that the total economic profit or loss earned by

each Participant (as defined in the MRDA) equalled the sum of (i) its 'routine' return for distribution, manufacturing and/or other routine functions, and (ii) its share of the 'residual' profit or loss based on its R&D contribution.

42.     Although R&D was carried out by those members of the Nortel Group who were party to the MRDA, all resulting IP, including all patents, was owned by NNL. This was a fundamental element of the binding arrangements within and among members of the Nortel Group and was expressly, authoritatively and definitively confirmed and reflected in the MRDA, and the amendments thereto, as it had been in the cost-sharing arrangements which preceded the MRDA.

43.     In a recital to the MRDA, it was provided that, to the extent other members of the Nortel Group performed R&D Activity which led to the creation of IP, they (referred to in the MRDA as "**Licenced Participants**") had "held and enjoyed equitable and beneficial ownership of certain exclusive rights" in the IP pursuant to a 1992 Cost Sharing Agreement. Those rights were in the nature of licence rights.  The recital in the MRDA went on to provide that those Licenced Participants were intended to continue to hold and enjoy such rights.  The MRDA went on to express such rights as licence rights, granted by NNL, to use product-related IP in the operation of their businesses and by such use contribute to the overall profit in which they would share as their residual profit split[24] under the MRDA.  The MRDA provided it was the parties' entire agreement, thus superseding all prior agreements. The conditions, obligations, and terms of their rights in the IP, and share of the benefits to be

---

[24] Consistent with the LRE's limited role as distributors (with no role in R&D and non-exclusive, terminable licences) they received only a flat percentage of operating margins with no guarantee of future revenues.

obtained from the business operations including the exploitation of licence rights in their business operations (as well as the exploitation of any other intangible assets used in the businesses) were thus prescribed by the MRDA.  The value of those rights (as well as any other intangible assets), whether in the form of licences or otherwise, were thus defined and circumscribed by the conditions, obligations, terms and benefits of the MRDA.[25]

44.    The MRDA and the RPSM that it mandated thus constitute the parties' governing agreement for ownership of and licence rights in the IP, and the methodology for sharing and allocating the benefits of the exploitation of IP generated by R&D activity through business operations which were the only uses the MRDA licences permitted U.S. Debtors and EMEA Debtors, as licensees, to undertake in connection with the IP.

*The Specific Terms of the MRDA*

45.    The MRDA expressly provides, among other things:

(i)     IP, referred to in the MRDA as "NN Technology" was defined as follows:

"NN Technology" shall mean, any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information

---

[25]   The description of the rights of Licensed Participants under the MRDA as "equitable and beneficial ownership of certain exclusive rights under NT Technology" were intended to continue (as expressed in a recital to the MRDA) and the licence rights specifically granted by the MRDA were the same bundle of rights – the continuation of the rights was by the granting of the licence rights – and they were subject to the same terms, conditions, obligations and benefits. For the purpose of allocating a value to those rights, any difference in nomenclature is not relevant.  It was at all times clear that the rights in IP which any U.S. Debtors or EMEA Debtors had were those provided for in the MRDA and subject to its terms, obligations and conditions, and all other rights in the IP were those of NNL, the legal owner of the IP and the grantor of the licence rights.

produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill.

(ii)    In respect of ownership of IP:

Except as otherwise specifically agreed, <u>legal title to any and all NN Technology whether now in existence or hereafter acquired or developed pursuant to the terms of this Agreement, shall be vested in NNL</u>. In consideration therefor, NNL agrees to enter into an Exclusive License and a Non-Exclusive License with each of the Licensed Participants as set forth in Article 5. [emphasis added]

(iii)    In respect of the license rights granted to specified subsidiaries that engaged in R&D (therein referred to as Licensed Participants), to use IP in connection with the operation of their businesses:

To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby:

(i)    continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights <u>to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant</u>, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License"); and

(ii)    grants to each Licensed Participant, as of January 1, 2009 (the "Non-Exclusive License Effective Date"), a non-exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, <u>rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Non-Exclusive Territory</u>, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or

appropriate in connection therewith ("Non-Exclusive License").

...

"Products" shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time <u>by, or for, any of the Participants,</u> and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing. ..." [emphasis added]

(iv)    In respect of the non-assignability of any license:

This Agreement shall not be assigned by any Participant except with the written consent of each of the other Participants.

(v)    In respect of the parties' agreement and understanding:

In respect to the subject matter hereof, this Agreement sets forth the entire agreement and understanding between the Participants.

(vi)    In respect of governing law:

This agreement shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada.

(vii)    In respect of the sharing of benefits from the carrying on of operating business, including the exploitation of licenses for IP and the use of any other intangible assets:

(a)    For and as a consequence of the performance of R&D Activity, each Participant [NNL and its subsidiaries that engaged in R&D] shall be entitled to receive a payment in an amount equal to the allocation determined under the RPSM

(the "R&D Allocation") as the measure of the benefit to which it is entitled commensurate with its performance of, and contribution to, R&D Activity.

(b)      Each Participant hereby accepts and agrees to make the payment determined under the RPSM in Amended Schedule A as representing such Participant's share of the R&D Allocation.

Schedule "A" of the MRDA is the RPSM which set out the steps for calculating each participant's share of operating earnings.

*The MRDA Has Been In Force At All Material Times*

46.    The parties to the MRDA implemented the RPSM effective January 1, 2001, and from that date onward, until the Business Sales, they shared ongoing benefits from the exploitation of IP and other intangible assets through their business under the terms of MRDA and the RPSM method it mandated.

47.    The MRDA was amended by specific documents over the years.  The parties' bargain concerning NNL's ownership of the IP and the limits on the use and benefits the U.S. Debtors and EMEA Debtors could derive from their licence rights never changed.  Indeed the parties to the MRDA expressly confirmed that those terms of the bargain remained in full force and effect. Specifically, the MRDA was amended by:

(i)      an Addendum executed by counterparts between October 18, 2005 and June 21, 2006;

(ii)     Agreement with Respect to Certain Technology effective as of December 30, 2006 (specific to the closing of a particular transaction between NNL and Alcatel-Lucent the following day);

(iii)    a second Addendum executed by counterparts in December, 2007;

(iv)    a third Addendum executed by counterparts between December 19, 2008 and January 13, 2009; and

(v)     a fourth Addendum executed by counterparts between January 8, 2009 and January 13, 2009.

48.    The parties have continued to rely upon the MRDA during the current insolvency proceedings, including as the basis for NNL's acceptance of a claim against it by NNI for U.S. $2 billion arising out of a compensating adjustment negotiated by the U.S. and Canadian tax authorities in relation to the MRDA, all as presented to and approved by this Court.[26]

***Allocations***

*The Defining Characteristics For Allocation Purposes of the Property Interests*

49.    As noted herein, tangible assets should not present major issues for allocation purposes.  Ownership is the relevant property interest, and net book value the appropriate allocation metric.

---

[26]  This, in turn, will require corresponding adjustments to any allocation to the EMEA Debtors.

- 24 -

50.    As for intangible assets, based on the parties' agreement to the MRDA, all IP that was transferred in the Business Sales and the Rockstar Transactions was owned by NNL.  That ownership is the relevant property interest, and provides the proper basis for allocation subject only to the value, if any, of licence rights in the IP held by the U.S. Debtors or the EMEA Debtors under the MRDA, as all other rights or interests in the IP were those of NNL.

51.    Under the MRDA, the U.S. Debtors and EMEA Debtors had a licence to use the IP to develop and make, or have made for them, Products (as defined in the MRDA) for their business operations.

52.    The bargain that was struck thus limited the licence rights to specified uses for and by specific members of the Nortel Group and they were non-assignable and personal to those Nortel Group participants that were party to the MRDA.  The MRDA set a limit on the interest of the U.S. Debtors and EMEA Debtors in the IP and a limit on the benefits they could derive from their licences, alone or in combination with the deployment of any intangible assets in the operation of their businesses.  It therefore also determines the maximum value that could be ascribed to their licences in the Business Sales, and renders their licences irrelevant, inapplicable and of no value in connection with the Rockstar Transaction.

53.    In other words, the MRDA, as the parties' agreement to allocate the benefits of the businesses on the basis of the RPSM, determines the maximum value for U.S. Debtors or EMEA Debtors of their licence rights and other intangible assets to the extent a licence was applicable and relevant in connection with a specific Business Sale, since (i) what was realized by the sale to a third party  simply represented the capitalized value of what might

have been realized by way of operating revenues from ongoing use of that IP and other intangible assets; and (ii) the MRDA's sharing formula determined the upper limit of what U.S. Debtors and EMEA Debtors could realize through the use of the licence and other intangible assets, and therefore limits the value of what they, as holders of licence rights could be considered to have surrendered[27]. The MRDA, and the terms of the licence it prescribes, renders any licence rights inapplicable and without value in connection with the Rockstar Transaction.

*The Rockstar Transaction*

54.    As discussed above, NNL owned the IP sold in the Rockstar Transaction. The sale of that ownership interest generated U.S. $4.5 billion of sale proceeds. As owner of the IP, NNL is entitled to those proceeds, and all interest accrued and accruing thereon, in their entirety.

55.    At the time of the Rockstar Transaction, none of the Nortel entities, and in particular the U.S. Debtors and EMEA Debtors, were carrying on business operations in their exclusive or any territory, and they had no prospect of doing so. The businesses in which they were engaged had all been sold to third parties and the full value of all assets employed in them (including, without limitation, the IP licences) maximized and realized. Accordingly, after the Business Sales the U.S. Debtors and the EMEA Debtors were not "…making, having made, using, licensing, offering to sell or selling any Products" (as defined in the MRDA), let alone Products using or embodying IP that was the subject of the Rockstar Transaction or otherwise. At the time of the Rockstar Transaction, any of the licences that the U.S. Debtors

---

[27]    In the case of the LREs, see footnote 21 above.

or EMEA Debtors had bargained for under the MRDA (which were non-assignable and limited in scope) were inapplicable, irrelevant and without value.  Although certain U.S. Debtors and EMEA Debtors joined in the Rockstar Transaction as sellers or deemed sellers, as provided in the IFSA, this is not to be taken as any acknowledgement that they had transferred or surrendered any interest of value in the Rockstar Transaction.

56.    In sum, the IP sold in the Rockstar Transaction was not subject to any licence or other intangible rights of value of the U.S. Debtors on EMEA Debtors.  Hence, only NNL had a valuable property interest in the IP sold; only NNL contributed IP of value to the sale. NNL is solely entitled to the proceeds of the Rockstar Transaction, and all interest accrued and accruing on those proceeds.

*The Business Sales*

57.    With respect to the value realized in the Business Sales for tangible assets, the respective entities that owned and contributed those assets to the sales are entitled to the net book value of those assets.

58.    In the Business Sales most of the value related to the intangible assets.  IP was the primary intangible asset[28]; more importantly, it was the driver and key component of the value realized for intangible assets in the Business Sales.

---

[28]    The others being employees and customer relationships did not have any value separate and apart from the IP as set out in footnote 20.

59.     NNL owned the IP that was sold in the Business Sales.  The EMEA Debtors and U.S. Debtors (as well as Canadian Debtors) that were parties to the MRDA and had engaged in R&D, were operating their businesses until the time of the Business Sales.  Any licences they had under the MRDA that they were using in the businesses that were part of the Business Sales were surrendered as part of the Business Sales.  Unlike the ownership interests of NNL, which were assignable and saleable, these license rights were not assignable or saleable. The U.S. Debtors and EMEA Debtors, who surrendered licence rights in the Business Sales, are entitled to a share of the proceeds of the Business Sales in excess of the net book value of the tangible assets to the extent that those non-assignable licence rights had value at the time of the Business Sales.

60.     The onus of showing their non-assignable licences had value at the time of the Business Sales rests on the U.S. Debtors and EMEA Debtors.  However, the determination of that value must take into account the terms of the MRDA, which created the licences and expressly determines the maximum benefit the licence holders could derive from the operation of the businesses and the deployment and use of intangible assets therein including IP or licences for IP.

61.     To the extent that there were other intangible assets beyond IP, the interests of the U.S. Debtors and the EMEA Debtors in those intangible assets were not valuable; in any event, the maximum benefit the U.S. Debtors and the EMEA Debtors could derive from all intangible assets would be from operating their business and was thus subject to the MRDA. Accordingly, taking into account other intangible assets does not change the allocation entitlement of the U.S. Debtors and the EMEA Debtors.

62.    Therefore, the proceeds of the Business Sales are to be allocated as set forth in paragraphs 29 and 32 above.

**PART V – CONCLUSION**

63.    The Monitor and Canadian Debtors request that the Courts give effect to the Allocation Position set forth herein.  The Monitor and the Canadian Debtors reserve the right to respond to any Allocation Positions of other Core Parties.


May 16, 2013

**Goodmans LLP**                                   **Gowling Lafleur Henderson LLP**
333 Bay Street, Suite 3400                  Suite 1600, First Canadian Place
Toronto, Ontario M5H 2S7                  100 King Street West
                                                             Toronto, Ontario M5X 1G5
Benjamin Zarnett LSUC#17247M
Jay A. Carfagnini  LSUC#22293T        Derrick Tay LSUC#21152A
Jessica Kimmel LSUC#32312W            Jennifer Stam LSUC#46735J
Peter Ruby LSUC#38439P
Joseph Pasquariello LSUC#38390C       Tel: 416.862.5697
                                                             Fax: 416.862.7661
Tel: 416.979.2211
Fax: 416.979.1234                               Lawyers for the Canadian Debtors

Lawyers for the Monitor, Ernst &
Young Inc.



**TO**:              Core Parties Service List

Court File No: 09-CL-7950

IN THE MATTER OF THE COMPANIES' *CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

| |
|---|
| ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)** |
| Proceeding commenced at Toronto |
| **ALLOCATION POSITION OF THE**<br>**MONITOR AND THE CANADIAN DEBTORS** |
| **Goodmans LLP**<br>333 Bay Street, Suite 3400<br>Toronto, Ontario M5H 2S7<br><br>Benjamin Zarnett LSUC#17247M<br>Jay A. Carfagnini  LSUC#22293T<br>Jessica Kimmel LSUC#32312W<br>Peter Ruby LSUC#38439P<br>Joseph Pasquariello LSUC#38390C<br>Tel: 416.979.2211<br>Fax: 416.979.1234<br><br>Lawyers for the Monitor, Ernst & Young Inc.<br><br>**Gowling Lafleur Henderson LLP**<br>Suite 1600, First Canadian Place<br>100 King Street West<br>Toronto, Ontario M5X 1G5<br><br>Derrick Tay LSUC#21152A<br>Jennifer Stam LSUC#46735J<br>Tel: 416.862.5697<br>Fax: 416.862.7661<br><br>Lawyers for the Canadian Debtors |

\6182351