# <u>EXHIBIT B</u>

| UNITED STATES BANKRUPTCY COURT    FOR THE    DISTRICT OF DELAWARE | PROOF OF CLAIM |
|---|---|

| Name of Debtor: Nortel Networks Inc. | Case Number: 09-10138 (KG) |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br><br>Nortel Networks UK Pension Trust Limited (as trustee of the Nortel Networks UK Pension Plan) and The Board of the Pension Protection Fund | ☒ Check this box to indicate that this claim amends a previously filed claim. |
|---|---|

| Name and address where notices should be sent:<br>Nortel Networks UK Pension Trust Limited<br>(as trustee of the Nortel Networks UK Pension Plan)<br>Westacott Way<br>Maidenhead, Berkshire<br>SL6 3QH<br>Attn: David Davies, Chairman<br>Telephone number: 44 78 0829 6794<br><br>and<br><br>The Board of the Pension Protection Fund<br>Knollys House<br>17 Addiscombe Road<br>Croydon<br>Surrey<br>CR0 6SR<br>Attn: Richard Favier, Senior Insolvency Advisor<br>Telephone number: 44 208 633 4940 | With notice to:<br>Brian E. O'Connor, Esq.<br>Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, NY 10019<br>Telephone number: (212) 728-8000 | Court Claim Number: __5573__<br>  *(If known)*<br><br>Filed on: ____9/30/2009____<br><br><br>FILED / RECEIVED<br><br>SEP 05 2012<br><br>EPIQ BANKRUPTCY SOLUTIONS, LLC |
|---|---|---|

| Name and address where payment should be sent (if different from above):<br><br><br><br>Telephone number: | ❑ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>❑ Check this box if you are the debtor or trustee in this case. |
|---|---|

| **1. Amount of Claim as of Date Case Filed: <u>See attached Rider</u>** _____<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>☒   Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.<br><br>**2. Basis for Claim: <u>See attached Rider</u>** _____<br>    (See instruction #2 on reverse side.)<br><br>**3. Last four digits of any number by which creditor identifies debtor:** _____<br><br>    **3a. Debtor may have schedules account as:** _____<br>    (See instruction #3a on reverse side.)<br><br>**4. Secured Claim** (See instruction #4 on reverse side.) **<u>See attached Rider</u>**<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>Nature of property or right of setoff:   ❑ Real Estate   ❑ Motor Vehicle   ☒ Other<br>Describe: _____<br><br>Value of Property: $_____ Annual Interest Rate___%<br><br>Amount of arrearage and other charges as of time case filed included in secured claim,<br><br>if any: $_____   Basis for perfection: _____<br><br>Amount of Secured Claim: _____   Amount Unsecured: $_____ | **5.   Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**<br><br>Specify the priority of the claim.<br><br>❑   Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).<br><br>❑   Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).<br><br>❑   Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).<br><br>❑   Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).<br><br>❑   Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).<br><br>(continued on next page) |
|---|---|

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this claim.
See attached Rider

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See instruction 7 and definition of "redacted" on reverse side.)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain: **See attached Rider**

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**See attached Rider**

**Amount entitled to priority:**

$_____

*\*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with after respect to cases commenced on or a the date of adjustment.*

| | FOR COURT USE ONLY |
|---|---|
| **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. | |

Brian E. O'Connor
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8000
Fax: (212) 728-8111
*Counsel for Nortel Networks UK Pension Trust Limited
(as trustee of the Nortel Networks UK Pension Plan) and
The Board of the Pension Protection Fund*

Date:  9/5/12

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
---------------------------------------------- x
In re:                                         :
                                               :  Chapter 11
                                               :
Nortel Networks Inc., et al.,¹                 :  Case No. 09-10138 (KG)
                                               :
                      Debtors.                 :  Jointly Administered
                                               :
                                               :
---------------------------------------------- x
```

## RIDER TO AMENDED PROOF OF CLAIM OF THE TRUSTEE OF NORTEL NETWORKS UK PENSION PLAN AND THE BOARD OF THE PENSION PROTECTION FUND

Nortel Networks UK Pension Trust Limited, trustee (the "Trustee") of Nortel Networks UK Pension Plan (the "Plan"), and the Board of the Pension Protection Fund (the "PPF" and, together with the Trustee, the "U.K. Pension Claimants"), by and through their undersigned counsel, hereby state and allege as follows:[2]

### INTRODUCTION

1.    The U.K. Pension Claimants assert these claims pursuant to the U.K. Pensions Act 2004, as amended by the U.K. Pensions Acts 2008 and 2011 (together the "Act"), a statute of the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), QteraCorporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

[2]    This Claim and Rider amends Claim No. 5573, filed against Nortel Networks Inc., and Claim No. 6979, filed against Nortel Networks (CALA) Inc. The U.K. Pension Claimants are withdrawing their proofs of claim filed against the remaining Debtors. The U.K. Pension Claimants file this pleading as a more definite statement of their claims against NNI and NN CALA, in compliance with the Order of this Court dated July 11, 2012 [D.I. No. 7984]. The U.K. Pension Claimants have attached supporting documentation for their claims, as required by the Court's Order. They will, however, also serve NNI and NN CALA with discovery requests, as they will with NNUK, inasmuch as the documentary evidence supporting the U.K. Pensions Claimants' claims is in the possession and control of the Nortel Group, not the U.K. Pension Claimants. The U.K. Pension Claimants reserve the right to amend and/or supplement the allegations contained herein based on information obtained through discovery.

8315059

United Kingdom.  They seek a judgment against each of Nortel Networks Inc. ("NNI") and

Nortel Networks (CALA) Inc. ("NN CALA") in an amount to be determined by this Court at

trial, but in no event less than US$1.335 billion, which is the equivalent of the financial support

that, but for the Automatic Stay Order (defined below), NNI and NN CALA would have been

directed to secure for the Plan in response to Financial Support Directions ("FSDs") issued under

the Act by the U.K. Pensions Regulator (the "Regulator"), and which, upon issuance of a

Contribution Notice ("CN") under the Act by the Regulator, would have constituted a debt due

and owing to the Trustee and/or the PPF under U.K. law.

## PARTIES

2.    The Trustee is the Trustee of the Plan, which is a defined benefit occupational

pension scheme governed by U.K. law,[3] for which Nortel Networks UK Limited ("NNUK"), an

English company, is the principal employer.  NNUK, which was the operating company in the

U.K. of the Nortel Networks group of companies (the "Nortel Group", the "Group" or "Nortel"),

was incorporated on February 25, 2000.  It is the successor in interest to Nortel's previous two

main U.K. operating companies, STC plc (company number 106921) ("STC") and Nortel

Networks Optical Components Limited ("NNOCL") (company number 2515751) (both of which

had different names at different times).  Each of these entities was, at different times, the

sponsoring employer of the Plan before NNUK and, like NNUK, was a direct or indirect wholly-

owned subsidiary of Canada-based Nortel Networks Limited ("NNL").  References below to

"NNUK" include references to its predecessor companies, unless the context otherwise requires.

---

[3]    References herein to "U.K. law" are references to legislation which applies in the United Kingdom or the
relevant parts of it and, so far as concerns the law governing the trusts of the Plan, to the law of England and Wales.

8315059

3.      The Plan has approximately 38,000 members[4] and was closed to new members in

2000. Under the Rules of the Plan, NNUK is obliged to meet the balance of the cost of providing

retirement benefits to the members of the Plan after taking into account the members' own

contributions.

4.      The PPF is a statutory fund created by the Act as part of the regulatory framework

introduced by the U.K. government to protect occupational pensions in the U.K.  The PPF

provides compensation to members of eligible pension schemes where the employer has suffered

a qualifying insolvency event and where the scheme's assets are insufficient to cover a specified

level of compensation.  Funding for this "safety net" is derived principally from a mandatory levy

assessed on all eligible U.K. occupational pension schemes.

5.      NNI is a debtor in the above-captioned Chapter 11 cases.  NNI is a Delaware

corporation with its principal place of business in Richardson, Texas.  NNI is a wholly-owned

subsidiary of NNL, which is itself a wholly-owned subsidiary of Canada-based corporate parent

Nortel Networks Corporation ("NNC").

6.      NN CALA is a debtor in the above-captioned Chapter 11 cases. NN CALA is a

Delaware corporation with its principal place of business in Sunrise, Florida.  NN CALA is a

wholly-owned subsidiary of NNI.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

This is a core proceeding as to which this Court may enter a final judgment under 28 U.S.C. §

157.

---

[4]       This is the approximate number of members of the Plan as at April 2012. The total number of members in
the Plan has decreased (from approximately 42,000) since January 2009.

8315059

8.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409, as this proceeding arises in a case under the Bankruptcy Code pending in this District.

9.      The statutory predicates for the relief requested in this proceeding are sections 501 and 105 of the Bankruptcy Code, as complemented by Rule 3001 of the Federal Rules of Bankruptcy Procedure, the Act, as complemented by the provisions of the Pensions Regulator (Financial Support Directions) Regulations 2005 (SI 2005/2188) (the "FSD Regulations"), and the U.K. Pensions Act 1995 and the U.K. Insolvency Act 1986.

### OVERVIEW OF THE CLAIMS

10.      The U.K. Pension Claimants' claims are based on the application of the Act, specifically sections 43 to 50.  These provisions govern the recovery of pension scheme deficits in circumstances where, *inter alia*, the sponsoring employer of a pension scheme is unable to fund it properly.

11.      Those provisions of the Act are compatible with European Council Directives dated October 20, 1980 and June 3, 2003 relating to the protection of employees in the event of the insolvency of their employer (80/987/EEC and 2003/41/EC), which, *inter alia*, require the U.K. Government to protect occupational pensions in the event of the insolvency of the sponsoring employer. The provisions of the Act permit, subject to certain conditions, the issuance by the Regulator of FSDs and CNs against targets ("Targets") who are "associated" or "connected," within the meaning of the Act, with the sponsoring employer where it is "reasonable" to require the Targets to provide financial support for the underfunded pension scheme.

12.      This statutory regime is designed to make multiple companies in the same corporate group liable to contribute to underfunded pension scheme liabilities of an affiliate.  In substance, the result obtained by the issuance of FSDs is analogous (at least in insolvency

- 4 -

8315059

situations) to that obtained under U.S. law by the Pension Benefit Guaranty Corporation under the Employee Retirement Income Security Act of 1974, pursuant to which joint and several liability for any underfunded pension scheme liabilities of an entity is imposed by statute on members of that entity's "controlled group."

13.     At the onset of the Nortel Group's insolvency on January 14, 2009, the Plan had assets of approximately £1.4 billion and estimated liabilities (arising from obligations to provide pensions to or in respect of members) of £3.5 billion.  Thus, the Plan's funding deficit as at January 14, 2009 was approximately £2.1 billion, a funding level of approximately 40% on a buy-out basis (which reflects the Plan's funding deficit as against the estimated amount required to secure members' benefits through the purchase of annuities from an authorized insurance company).  As at today's date, the deficit (assessed on a buy-out basis) is estimated at approximately £2.6 billion.

14.     NNUK entered administration (an insolvency process under the U.K. Insolvency Act 1986) on January 14, 2009, by virtue of an order of the High Court of Justice of England and Wales.

15.     As sponsor of the Plan, NNUK is liable for its funding deficiency pursuant to section 75 of the U.K. Pensions Act 1995.  Section 75 imposes a statutory debt (the "Section 75 Debt") on the sponsoring employer of a U.K. pension scheme if (among other matters) the sponsor suffers an insolvency event.  The amount of the debt is equal to the funding deficit, calculated on a buy-out basis.

16.     As a result of its insolvency, NNUK is able to meet only a small part of the Plan's funding deficit, meaning that the Plan will (unless recoveries are made from other Nortel Group companies) suffer a serious funding shortfall.

8315059

17.     As a matter of U.K. law, the funding deficit represents remuneration earned by Nortel employees in return for their services.  Those services were provided for the benefit of the Group, for which the Group has so far failed to pay, with the result that thousands of present and former Nortel employees in the U.K. will not receive the full pension entitlements that they have earned.  Even if the Plan enters the PPF, that will not result in Plan members receiving the full amount of the pensions they earned, and were entitled to, under the Rules of the Plan.

18.     The case for the imposition of an FSD or CN by the Regulator under the Act is necessarily fact-specific.  In relation to the Nortel Group, it depends in particular on (a) the way in which the Nortel Group operated its business from 1991 onwards, (b) the role which NNUK performed within the Group and (c) NNUK's relationship with other Group companies, in particular NNI and NN CALA.  As alleged below, by reason of the relationship existing between NNUK, on the one hand, and NNI and NN CALA, on the other, and the benefits which NNI and NN CALA derived from NNUK's membership in the Nortel Group, both directly and indirectly (as members of the Nortel Group), the provisions of the Act warrant the issuance by the Regulator of FSDs and CNs against NNI and NN CALA.

19.     In fact, FSDs were issued by the Regulator against NNI and NN CALA.  Pursuant to the Automatic Stay Order (defined below), however, those FSDs have been declared null and void. This Court will decide whether grounds exist under the Act that would permit the Regulator to issue FSDs and CNs against NNI and NN CALA and, if so, the amount of any debt owed to the Trustee under U.K. law.

8315059

# FACTUAL BACKGROUND

## A.    The History Of The Nortel Group

### i.    Expansion

20.    The Nortel Group is a global group that was, for many years, an industry leader in the telecommunications, network, and software industry. Prior to its insolvency, the Group consisted of a parent company, NNC, and approximately 142 subsidiaries operating worldwide.

21.    The Nortel Group began as a Canadian telecommunications company in 1895, eventually expanding to the United States in 1971 after the U.S. market was largely deregulated. By the early 1990s, Nortel had become one of the leading telecommunications companies in North America.

22.    Initially, Nortel had only a minor presence in the U.K., in the form of a research and development ("R&D") facility in Maidenhead.

23.    During the late 1980s and 1990s, the Group sought to expand into new markets outside North America. The U.K. market was also undergoing a similar period of deregulation to that of the U.S., which made the market very attractive to Nortel. Accordingly, Nortel decided to take advantage of the deregulation in the U.K. and to pursue expansion in that market.

24.    In 1987, it acquired a 27% stake in NNUK's predecessor company, STC. STC was a long-established, publicly-traded, U.K. telecommunications company with established customers, expertise and intellectual property.

25.    In 1991, Nortel acquired the remaining 73% of STC. STC was a major acquisition for Nortel and was part of its long-term strategy to increase its participation in worldwide telecommunications equipment markets.

8315059

ii.     **The Benefits Flowing From The Acquisition Of NNUK And Its Subsequent Activities**

26.     After the acquisition, STC was known as "Northern Telecom Europe Limited." It was 100% owned by NNOCL (then known as Northern Telecom plc), which was in turn owned by NNL (then known as Northern Telecom Limited). There were certain changes to the corporate structure between 1991 and 2000, when the company now known as NNUK (company number 3937799) was inserted into the group, holding 100% of NNOCL (among various other companies) and being itself owned by NNL.

27.     The STC acquisition represented the Nortel Group's first major step into the U.K. market and gave the Nortel Group ownership of a number of additional significant R&D facilities throughout the U.K. as well as the ownership of STC's existing and future patents and other technology. The acquisition also provided the Nortel Group with access to large European carrier companies.

28.     The acquisition of STC also brought with it the Plan, of which STC was the then sponsoring employer. At the time of acquisition, the Plan was in surplus, being 150% funded on an on-going basis, which enabled the Nortel Group to benefit from a "contribution holiday" – a period during which no contributions were made into the Plan by the employer, although Plan members continued to make contributions totaling approximately £166 million (including the impact of transfers into the Plan) – that began in 1989 and was continued by Nortel until 2002, by which time the Plan's funding surplus had become a deficit.

29.     Subsequent to the acquisition of STC, NNUK and its personnel were major contributors to the Nortel Group in terms of, among other things, R&D, operations, sales and marketing, and corporate services. The U.K. formed part of what became Nortel's Europe, Middle East and Africa ("EMEA") region, and NNUK was by far the largest business of the

8315059

Nortel Group's EMEA entities, being the headquarters for the EMEA region. NNUK became

one of the two principal non-Canadian operating subsidiaries of the Nortel Group (the other being

NNI).

30.     As part of their remuneration for providing such services to the Group, NNUK's

personnel earned pension benefits under the Plan.

31.     From the mid-1980s to 2000, the Nortel Group expanded rapidly, moving from

development and manufacturing of traditional landline phone technology and equipment into the

wireless and digital age. It expanded aggressively into Europe, Asia, Africa, and Latin America,

and NNUK's R&D facilities were of key importance during this period of expansion, enabling

the Group to compete in what was increasingly a fiercely competitive market.

32.     At its height in 2000, the Nortel Group had a market capitalization of over

US$250 billion, annual revenue of approximately US$30 billion and nearly 93,000 employees

worldwide.

33.     The bursting of the dot.com bubble in 2000-2001 caused a major decline in the

Group's fortunes, with its market capitalization collapsing to US$2 billion by 2002. Faced with

increasing competition, the Nortel Group suffered a series of serious setbacks, in particular the

discovery of accounting irregularities which led to successive restatements of its financial

statements, the downgrading of its credit ratings, and, in consequence, inability to access capital

markets and resulting illiquidity.

34.     At the same time, the Nortel Group and its competitors tried to adjust to the new

landscape, but demand for Nortel's products dropped dramatically and competition increased.

**iii.**        **The Restructuring**

35.     In response to the financial difficulties it faced, the Nortel Group adopted a major

restructuring plan in 2001. The plan reduced the Group's workforce by 44%, from

8315059

approximately 94,500 to 52,600 by the end of 2001. NNUK suffered a reduction of

approximately 78% of its workforce. Several more workforce restructurings followed in 2002,

2004, 2006, 2007, and 2008.

36.     By 2008, the Nortel Group had outsourced nearly all of its manufacturing and

production work to a number of suppliers, consolidated its R&D in fewer locations, sold off non-

core businesses, and expanded the number of joint ventures and alliances with other large

organizations, all in an attempt to transition from a traditional supplier of telecommunications

equipment to a provider of networking hardware and software solutions.

37.     Despite the restructuring efforts, the Nortel Group's operating costs continued to

exceed its revenues. This fact, coupled with its limited access to credit markets after its credit

rating was downgraded, led to the decision in early 2009 to begin insolvency proceedings in

several jurisdictions.

    iv.     **The Insolvencies**

38.     On January 14, 2009, NNC and NNL, the ultimate parent companies of the Nortel

Group, and a number of their subsidiaries in Canada, filed an application in the Ontario Superior

Court of Justice under the Companies Creditors' Arrangement Act seeking relief from creditors.

39.     Similarly, on January 14, 2009, NNI and several of its subsidiaries incorporated in

the United States filed voluntary petitions for relief under Chapter 11 of the United States

Bankruptcy Code.

40.     Also on January 14, 2009, when NNUK was placed into administration by the

High Court of Justice of England and Wales pursuant to the U.K. Insolvency Act 1986, 18 of the

Nortel Group's EMEA subsidiaries were placed in administration with it.

41.     On July 14, 2009, NN CALA filed a petition seeking relief under Chapter 11 of

the Bankruptcy Code.

8315059

v.    **The Position Of NNUK And The Plan On Insolvency**

42.    By January 14, 2009, the Plan was funded only to approximately 40% (assessed on a buy-out basis).

43.    NNUK's participation in the Nortel Group has left it in a particularly weak financial state compared to other companies in the Group.  It is currently estimated that NNUK's ordinary unsecured creditors will receive only a small fraction of their claims against NNUK. The Plan is one such creditor, by virtue of its claim against NNUK for the funding deficit pursuant to the Section 75 Debt, which claim represents the overwhelming majority in value of NNUK's external creditors (*i.e.*, excluding intercompany claims).  Accordingly the Plan's funding deficit currently appears to be largely irrecoverable from NNUK.

44.    In contrast to NNUK, NNI and NN CALA have fared much better from their participation in the Group, and stand in a much better position in insolvency than NNUK.  NNI's and NN CALA's creditors will enjoy a much more favorable rate of return than NNUK's creditors, and in particular a much better rate of return than that expected to be achieved by the Plan.  On information and belief, based on available public data on NNI's and NNUK's current assets and liabilities and without taking into account any allocation of the US$7.5 billion of asset sale proceeds, the anticipated return for NNI's creditors is between approximately 23% and 80% – as compared to a return of approximately 11% for NNUK creditors.

vi.    **Post-Petition Sales Of The Nortel Group's Businesses**

45.    Since entering insolvency, the Nortel Group has been engaged in the process of selling its assets.  The sales have been effected along business lines rather than along geographic or legal entity lines consistent with the global nature of the way in which the Nortel Group operated, as described below.  The largest sales to date have included: (i) certain portions of the Layer 4-7 data portfolio, sold to Radware Ltd.; (ii) the CDMA business and LTE Access assets,

8315059

sold to Telefonaktiebolaget LM Ericsson; (iii) the Enterprise Solutions global business, including

the shares of Nortel Government Solutions Inc. and DiamondWare Ltd., sold to Avaya, Inc.; (iv)

the Wireless Networks business associated with the development of Next Generation Packet Core

network components, sold to Hitachi, Ltd.; (v) the Optical Networking and Carrier Ethernet

businesses, sold to Ciena Corporation; (vi) the GSM/GSM-R business, sold to Ericsson and

Kapsch CarrierCom AG; (vii) certain assets from the Carrier Voice Over IP and Application

Solutions business, sold to GENBAND US LLC; (viii) certain assets from the Multi-Service

Switch (formerly known as "Passport") business, sold to Ericcson; and (ix) the sale of Nortel's

patent portfolio, sold to a consortium comprising Apple Inc., Microsoft Corporation and certain

other parties.

46.    Those sales have generated approximately US$7.5 billion (before transaction

costs, adjustments, and escrow balances), which has been deposited in accounts in the United

States managed by JPMorgan Chase Bank, N.A., as third-party escrow agent.  The allocation of

those funds remains the subject of an on-going dispute among the various Nortel estates, which

have been unable to agree on an appropriate metric or metrics for allocating the sale proceeds

among the Group.

## B.    Overview Of The Operation And Management Of The Nortel Group

### i.    Introduction

47.    From the 1990s onwards, the Nortel Group increasingly operated along global

business lines rather than by geographical division or legal entity.  It was highly integrated and

operated essentially as if it were one large corporation, without regard to separate legal entities.

The interest of national subsidiaries (although legally distinct) was subordinated to the interests

of the Group as a whole, and the distinction between legal entities was ignored in the operational

side of business; the distinction was relevant only for tax and accounting purposes.  So far as the

8315059

Nortel Group's global management was concerned, everybody in the Group was simply assisting in a single global business comprising various operating divisions.

48.    The Nortel Group described itself as a "matrix organization," meaning it was "vertically and horizontally integrated" such that "organizations within Nortel share information and perform common tasks across geographic boundaries." (Joint Request for a US-Canada Bilateral Advance Pricing Agreement / Arrangement dated October 31, 2008 submitted jointly by NNL and NNI to the U.S. Internal Revenue Service and the Canada Revenue Agency, at page 13). Fully integrated entities performing R&D, manufacturing support, and distribution functions interacted within the group to fulfill customer demand for products and services. Annexed hereto as Exhibit 1 is a an organizational chart of the Nortel Group as of February 11, 2009.

49.    In addition to organizing its business on the lines of business segments, the Nortel Group also organized its activities through departments that ran across the business divisions (hence the term "matrix").

**ii.    The Nortel Group's Business Lines And Operation As A Single Global Enterprise**

50.    Prior to its insolvency, the Nortel Group's matrix structure consisted of four distinct lines of business (sometimes known within Nortel as "business segments"):

(a)    Enterprise Solutions,

(b)    Carrier Networks,

(c)    Metro Ethernet Networks, and

(d)    Global Services.

51.    This structure was meant to create certain competitive advantages, including collaboration on technology, improved integration of the Nortel Group's functions, efficient use of corporate resources, economies of scale within functions, better strategic deployment across

8315059

the entire group, avoidance of duplication of functions by product or geographical area, and facilitation of a collaborative environment.

52.     The Enterprise Solutions segment sold communications products and services to businesses and large organizations.  This included telephone systems as well as a range of sophisticated communications and networking solutions.  In the last two years before the Nortel Group's insolvency, Enterprise Solutions accounted for approximately 24% of the Group's revenue.

53.     The Carrier Networks segment sold wireless communications products and services to carrier networks, such as mobile phone service providers and cable operators.  The carriers then used this technology to provide their customers with mobile voice, data, and multimedia communications services.  In the last two years before the Nortel Group's insolvency, Carrier Networks accounted for approximately 40% of the Group's revenue.

54.     The Metro Ethernet segment provided optical networking products and ethernet technology.  Ethernet is a family of networking technologies that was originally used to provide computer networks for localized areas such as office buildings, but is now used for a wide range of purposes.  Customers of this segment included carrier networks and large businesses.  In the last two years before the Nortel Group's insolvency, Metro Ethernet accounted for approximately 14% of the Group's revenue.

55.     The Global Services segment provided a broad range of network support services, including technical support, network installation and planning services, network maintenance, and operations support to users of multi-technology networks.  In the last two years before the Nortel Group's insolvency, Global Services accounted for approximately 20% of the Group's revenue.

8315059

56.     The four business lines identified above took various forms over the years and were frequently reorganized and renamed during the 1990s and 2000s, but the business segment structure remained a feature of Nortel's operations throughout this period.

57.     The business segments operated globally and were a vital part of the way the Group was organized and operated.  The fact that the Nortel Group conducted its business through global business segments created substantial interdependence among the various legal entities in the Nortel Group.  No single subsidiary owned a whole business segment or was a completely self-contained business.

58.     R&D departments were based in various countries, and the work carried out was divided along business lines and shared on a global basis.

59.     Employees from different Nortel entities worked together in the business segments, so that revenues booked by a particular legal entity did not necessarily reflect its own efforts and success.

60.     Similarly, customer contracts would be allocated to entities within the Group to suit Nortel's wider purposes:

> (a)     Some entities were designated as distributors for particular territories and contracts won by sales personnel elsewhere in the Group would sometimes be allocated to the local distributor entity;
>
> (b)     in some cases, contracts were allocated for tax reasons.

61.     Nortel's internal purchasing system operated so that sales orders were placed by customers at a local level and internal purchasing orders were then routed through one of Nortel's "purchasing hubs" (one of which was in the UK).  These purchasing hubs then placed orders with suppliers around the world.

8315059

62.      The allocation of costs and profits through the global enterprise was determined by the Group's transfer pricing model adopted by NNC/NNL with the assistance of NNI (as alleged in paragraphs 142 to 186).

63.      The finance function also operated on a global basis to enable the Nortel Group to use its cash wherever it needed it within the Group, which was increasingly in NNC/NNL and NNI (as alleged in paragraphs 187 to 211).

64.      As a result of this structure, the financial performance and solvency of each entity in the Nortel Group was controlled and determined by the Group's policies (in particular in relation to transfer pricing and treasury/cash management) rather than by the efforts and success of the entity and its employees.

### iii.    Financial Reporting

65.      The Nortel Group's financial reporting also reflected its integrated global operations.  NNC and NNL each filed annual Form 10-Ks with the United States Securities and Exchange Commission ("SEC").  The Form 10-Ks make little mention of individual companies with the exception of certain of the Nortel Group's joint venture companies.  Initiatives and policies were announced on a group-wide basis, and the only executive management identified in the Form 10-Ks were the executive officers and board of directors of NNC and NNL.

66.      As is apparent from NNC and NNL's filings with the SEC, each business segment's performance was accounted for separately, with individual financial breakdowns for each segment appearing in the Nortel Group's consolidated financial statements and reports as if the segments were separate businesses.

### iv.    NNC And NNL's Control Of The Nortel Group

67.      Until the insolvency proceedings were commenced on January 14, 2009, overall control of the Group was vested in the management of NNL, and later NNC and NNL, as the

8315059

parents of the Group.  NNL was the ultimate parent of the Group until May 1, 2000, on which

date NNC became the new parent of the Group above NNL.

68.    NNI, NN CALA, and NNUK were all under the common control of NNL, and,

ultimately, NNC.  For many years, the Nortel entities, including NNI, NN CALA, and NNUK,

operated in an interdependent manner, and the Group's profits and losses were apportioned on a

global basis.  Because of this operational structure, NNUK had the closest possible connection

with other companies in the Nortel Group and, in particular, with the companies from which it

was primarily managed, NNL, NNC and (in the respects alleged below, paragraphs 69 to 79)

NNI.

**v.    NNI's Role In The Management Of The Nortel Group**

69.    Although the Nortel Group was under the overall control of NNC and NNL, NNI

had a significant influence on the management of the Group together with its Canadian parents.

Through its influence on the affairs of the Group as a whole, NNI influenced the affairs of

NNUK.

70.    NNI's influence on the management of the Group (and on NNUK as one of the

participants in the Group) appears from the following:

(a)    NNI was influential in the Group because it was the entity that operated in

the Group's largest single market;

(b)    In the present Chapter 11 proceedings, NNI has described itself as having

an "integrated co-dependent business relationship" with NNC and NNL;

(c)    As part of this relationship, NNI undertook certain management functions

for the Nortel Group and/or jointly controlled such functions with NNC/NNL.

These functions included Group Tax (which incorporated transfer pricing

functions) and Group Treasury (as alleged in paragraphs 74 to 79).  Other

- 17 -

8315059

headquarters functions (such as parts of the Group's global accounts, global sales and global operations organization) were located in NNI;

(d)    Heads of the Group's business segments were often based in the U.S.  For example, the Group's wireless and switching global sales functions teams were based in Dallas, and the opticals business unit was based in Atlanta; and

(e)    There was an overlap of senior directors/officers between NNC/NNL, on the one hand, and NNI, on the other.  For example:

(i)    John Doolittle was Vice President of NNI, while also being Treasurer of NNC and NNL (positions he held since June 2008), having previously been Assistant Treasurer (between 1999 and 2002) and Vice President, Tax (between 2002 and 2006) for NNC and NNL;

(ii)    Katharine Stevenson was a director of NNI between 2005 and 2006, while also being Treasurer of NNC and NNL between 1999 and 2006;

(iii)    Paul Karr was a director of NNI between 2007 and 2008, while also being the Controller of NNC and NNL between 2005 and 2009;

(iv)    Dennis Carey was a director of NNI in 2008, while also being the Executive Vice President, Corporate for NNC and NNL between 2006 and 2009; and

(v)    Donald Schuenke was a director of NNI between 1994 and 1998, while also being a director and the Chairman of NNL (then Northern Telecom Limited) between 1994 and 1998.

71.    The relationship between NNC/NNL and NNI was particularly close because NNI guaranteed most of the bonds issued by NNC/NNL to raise capital for the Group's operations.

8315059

For example, NNI guaranteed the following debt securities of NNL, issued under an indenture dated as of July 5, 2006 among NNL, as issuer, NNC and NNI, as guarantors, and The Bank of New York Mellon (formerly known as The Bank of New York), as trustee:

       (a)    US$2 billion in aggregate principal amount of senior notes comprised of US$450 million in aggregate principal amount of 10.75% senior notes due 2016, US$550 million in aggregate principal amount of 10.125% senior notes due 2013 and US$1 billion in aggregate principal amount of floating rate senior notes due 2011 with a stated interest rate per annum, reset quarterly, equal to LIBOR plus 4.250%, each of which were issued on July 5, 2006; and

       (b)    US$675 million in aggregate principal amount of 10.75% senior notes due July 2016, which were issued on May 28, 2008.

72.    NNI also guaranteed the following debt securities of NNC, issued under an indenture dated as of March 28, 2007 among NNC, as issuer, NNL and NNI, as guarantors, and The Bank of New York Mellon, as trustee:

       (a)    US$575 million in aggregate principal amount of 1.75% convertible senior notes due 2012, which were issued on May 28, 2007; and

       (b)    US$575 million in aggregate principal amount of 2.125% convertible senior notes due 2014, which were issued on May 28, 2007.

73.    Accordingly, it was in NNC/NNL's interests to order the Group's affairs to ensure that NNI was financially strong, so that NNI would appear to be a creditworthy guarantor of NNC/NNL's borrowings.  It was also in NNC/NNL's interests to obtain cash from entities in the Group other than NNI, so that NNC/NNL could minimize their third-party borrowing while at the same time maintaining NNI's financial strength and thus its creditworthiness as their guarantor. The organization of the Group in this manner was clearly of benefit to NNI. In this respect,

8315059

therefore, NNC/NNL and NNI's interests were so closely aligned that they were in effect a single economic unit.

### vi.    The Group Tax and Group Treasury functions

74.    All entities in the Group were subject to the Group-wide Tax and Treasury policies, which were determined and implemented by the Group Tax and Group Treasury functions.

75.    Among other matters, the Tax function influenced the allocation of contracts within the Group and determined the Group's transfer pricing arrangements.  The transfer pricing arrangements were particularly important as they dictated the ultimate distribution of profits and losses within the Group and the financial performance of each Nortel company.

76.    Among other matters, the Treasury function operated a Group-wide cash management system that transferred cash within the Group and decided what intercompany loans would be made within the Group.

77.    NNI's importance in the management of the Nortel Group was reflected by its joint control of the Group's Tax and Treasury functions.  Since NNUK was subject to the policies imposed by the Group's Tax and Treasury functions, NNI was able significantly to influence NNUK's affairs via its joint control of these functions.

78.    On information and belief, NNI, along with NNC/NNL, jointly controlled the Group Tax and Group Treasury functions:

    (a)    The transfer pricing system was operated by Nortel's tax function based in Dallas;

    (b)    The Group's transfer pricing arrangements were heavily influenced by a desire to satisfy the U.S. tax authorities (as well as the Canadian tax authorities) and arose out of early initiatives by NNI with the United States Internal Revenue

- 20 -

8315059

Service ("IRS") to secure Advance Pricing Agreements in the first half of the 1990s. The adoption of the residual profit split method ("RPSM") for transfer pricing in the 2000s, in place of the previous cost sharing arrangement, was made at the suggestion of the IRS;

(c)    The key individuals who managed the Group's transfer pricing arrangements were John Doolittle, Mark Weisz, Mike Orlando, Laurie Krebs and John Payne, all of whom held positions within NNI (as well as in some cases NNC/NNL);

(d)    Together with NNL, NNI decided to move from a cost sharing arrangement to the RPSM and designed the RPSM model;

(e)    The terms of the RPSM were set out in the a Master Research and Development Agreement ("MRDA") dated December 22, 2004, retrospective to January 1, 2001. NNI and NNL determined the terms of the MRDA with a view to satisfying the requirements of the U.S. and Canadian revenue authorities;

(f)    The Group's transfer pricing arrangements were imposed upon NNUK by NNI and its Canadian parent companies. A director of NNUK was required to sign the MRDA in December 2004 without any discussion or negotiation with the board of directors of NNUK. NNUK was merely informed by the U.S. tax team what its results under transfer pricing would be. NNUK had no substantive involvement in the negotiations with the U.K. revenue authorities about the RPSM transfer pricing arrangements adopted by the Group, and those arrangements were not approved by the U.K. revenue authorities. Ultimately, those arrangements were not beneficial to NNUK from a commercial point of view;

8315059

(g)    NNI and NNL controlled the application for an Advance Pricing Agreement with the Canadian, U.S. and U.K. revenue authorities in relation to the MRDA and instructed Nortel's professional advisers on the application.  The relevant representatives of NNI included John Doolittle, Mark Weisz, Mike Orlando and John Payne. The application for the Advanced Pricing Agreement dated October 31, 2008 was made by NNL and NNI jointly; and

(h)    NNI also jointly controlled the Nortel Group Tax Department with NNC/NNL.  Key individuals within the Tax Department were NNI personnel such as Mark Weisz, Mike Orlando, John Payne, Claire Barbieri and Ryan Smith.

79.    Similarly, the key individuals with Nortel's Group Treasury were from NNI. They included Katharine Stevenson (the Group Treasurer, and a director of NNI), John Doolittle and Paul Karr.

**vii.    NNUK's Operation As Part Of The Global Group**

80.    Nortel's integrated global structure meant that NNUK did not operate as an independent freestanding business, but was simply part of the global business controlled by the Group's management, and in particular by NNC/NNL and, in the respects alleged herein, by NNI.  Pursuant to the global operation of the Group as a single entity, companies such as NNUK acted simply as part of a much larger machine providing resources to allow the Group's business segments (headquartered in NNC/NNL and NNI) to operate as they wished.  Although NNUK was the center of EMEA, NNUK was not free to control the EMEA region itself in furtherance of its own interests.

81.    As a result of the business segment structure, NNUK personnel frequently acted on instructions from individuals employed by other companies in the Nortel Group, including NNI in relation to tax and treasury matters.

- 22 -

8315059

82.     In contrast to NNI, NNUK had no real control over the Group's tax and treasury policies.  Although parts of the tax and treasury functions were based in NNUK, it only administered the arrangements determined by NNC/NNL and NNI.

83.     The Group's transfer pricing arrangements were imposed upon NNUK by NNI and its Canadian parent companies.

84.     NNUK did not function as an independent entity within the Group.  It did not have an independent board of directors, as demonstrated by the following:

(a)     the personnel of NNUK's board included senior officers of NNC/NNL and NNI/NN CALA so that control could be exercised over NNUK when required. Such individuals included:

(i)     Frank Dunn, who was a director of NNOCL between 1997 and 1999, and who was a director of NNC and NNL between 2000 and 2004, serving as Chief Financial Officer from 2000 to 2001 and President and CEO from 2001 to 2004;

(ii)     Gary Donahee, who was a director of NNI between 1993 and 1995, before becoming a director of NNOCL from 1998 to 1999, and NNC and NNL's President of the Americas from 2000 to 2003;

(iii)     Peter Currie, who was a director of NNOCL between 1994 and 1997 and of NNUK between 2005 and 2007, while also being a director of NNI between 1994 and 1996, as well as being the Executive Vice President and Chief Financial Officer of NNC and NNL between 2005 and 2007;

(iv)     Gordon Davies, who was a director of NNUK between 2002 and 2003, and a director of NN CALA between 2007 and 2009, while also

8315059

being NNL's Assistant General Counsel – Securities, and Corporate Secretary between 2003 and 2004; General Counsel – Corporate, and Corporate Secretary between 2005 and 2007; Deputy General Counsel, and Corporate Secretary in 2008; and Chief Legal Officer and Corporate Secretary in 2009;

(v)     Nicholas DeRoma, who was a director of NNUK between 2000 and 2002, while also being a director of NN CALA between 1999 and 2006, and the Chief Legal Officer of NNC and NNL between 2000 and 2005;

(vi)    Douglas Beatty, who was a director of NNUK between 2000 and 2004, while also being the Controller of NNC and NNL between 1999 and 2002 and the Chief Financial Officer of NNC and NNL between 2002 and 2004;

(vii)   William LaSalle, who was a director of NNUK between 2001 and 2008, while also being the General Counsel for Operations of NNC and NNL between 2005 and 2007;

(viii)  Terry Hungle, who was a director of NNOCL between 1998 and 2001 and of NNUK between 2000 and 2001, while also holding various senior positions with NNC and NNL, including Vice President of Finance in 2001 and Chief Financial Officer between 2001 and 2002; and

(ix)    Michael Gollogly, who was a director of NNUK between 2001 and 2002, while also holding various senior finance positions with NNC and NNL, becoming the Controller of NNC and NNL between 2002 and 2004;

8315059

(b)      NNUK's board generally played no substantive role in the running of even the U.K. business, notwithstanding the substantial reorganization of the U.K. business during the 2000s;

(c)      in later years, the NNUK board met just once a year to approve its statutory accounts (which itself reflected mainly intergroup trading) and ratify transactions associated with the Group's reorganizations; and

(d)      NNUK's board generally did not consist of senior individuals who ran the business of the Group in the U.K. or EMEA.

85.    As a result of this integrated global structure:

(a)      NNUK cannot be said to have conducted businesses for its own benefit in any meaningful sense.  It was working in a common endeavor with the rest of the Group;

(b)      The income of NNUK as a legal entity, and thus its ability to meet its liabilities, depended upon the remuneration allotted to it under the Group's transfer pricing arrangements, which were imposed on NNUK by NNC/NNL and NNI.  These transfer pricing arrangements worked to the benefit of NNI and NN CALA and to the financial detriment of NNUK, as alleged in paragraphs 142 to 186.

(c)      The Group was run to optimize the performance of its business segments and without regard to the needs of the separate corporate entities such as NNUK.

(d)      In particular, NNC/NNL and (in relation to tax and treasury matters) NNI paid no proper regard to the fact that:

8315059

(i)      NNUK was the employer of a large pension scheme with a growing deficit, whose members were Nortel employees working for the benefit of the Group as a whole;

(ii)     it was necessary to ensure that NNUK was adequately remunerated by the Group so that it would be in a position to meet its pension liabilities; and

(iii)    under both U.K. and European law pensions are deferred pay, and thus any sustained underfunding in a defined benefit occupational pension scheme amounts to the employer failing to fund the remuneration that employees have earned.

C.    **NNUK And The Importance Of Its Role And Contribution Within The Nortel Group**

   i.      **Introduction**

86.      During its participation in the Nortel Group from 1991 to 2009, NNUK and its employees provided substantial benefits to the Group as a whole, including to NNI and NN CALA.  The Nortel Group regarded NNUK as one of its key integrated entities, and it was designated as one of Nortel's residual profit entities ("RPEs"); the Group considered that such RPEs were the source of "extraterritorial support" for other members of the Group.  In relative terms, NNUK provided the highest level of extraterritorial support of all of the Group's RPEs. The degree of extraterritorial support provided by NNUK was reflected by its disproportionately high level of costs compared to other similar entities in the Group.

87.      Under the Group's globalised integrated operating model, NNUK and its employees were required to provide this extraterritorial support to the Group, including to NNI

- 26 -

8315059

and NN CALA, and to incur the costs of doing so, regardless of whether this was in the interests of NNUK.

88.     The general benefits conferred by NNUK on the Group were of particular advantage to NNI as one of the largest entities in the Group.  Since Nortel was operated as a single global business, any contributions made by NNUK and its employees to the business anywhere in the world ultimately flowed around the Group and were of benefit to all of the entities that participated in the Nortel business.  Because NNI was one of the largest participants in this global business, it enjoyed a large share of these benefits.  Similarly, the costs borne by NNUK to sustain the global business and which it did not recover through the transfer pricing system, as alleged in paragraphs 142 to 186, reduced the burden of cost that would otherwise have fallen on other Group entities, including NNI.

ii.     **The Benefits That The Acquisition Of NNUK (STC) Brought To The Nortel Group**

89.     The acquisition in 1991 of the business that ultimately became NNUK benefitted the Group in at least the following ways:

(a)     The acquisition of STC brought with it customer connections with large European carrier companies such as BT, Cable & Wireless, and Telefonica;

(b)     The acquisition enabled Nortel to break into the U.K. telecom market which opened up access to and led to success in the EMEA region, which in turn allowed Nortel to develop relationships and products that contributed to the growth of its operations in the North American and CALA regions;

(c)     The acquisition also brought with it ownership of high quality R&D and products that met European technological standards (referred to as "ETSI

8315059

standards") rather those applicable to North America (referred to as "ANSI standards");

(d)     The acquisition also gave the Nortel Group major R&D units in the U.K. as well as a manufacturing site in Monkstown, Northern Ireland;

(e)     The acquisition of STC gave the Nortel Group ownership of significant R&D expertise.  The Nortel Group acquired STC's ownership of a significant amount of optical cabling technology, which represented a substantial improvement over the previous copper cable technology.  This technology was then introduced by the Nortel Group into North America, allowing the company to cover large distances by cable on land, which gave it a considerable competitive advantage.  The technology also allowed the Nortel Group to transform itself from a North American telecommunications company to a global group during the late 1990s and early 2000s;

(f)     STC represented a major acquisition for the Group.  The Nortel Group derived the benefit of the STC acquisition immediately: its European revenues for 1991 increased to US$1.35 billion, a rise of 514% from the previous year.  These revenues made up 17% of the Nortel Group's total revenue for 1991; and

(g)     The fact that on the date of STC's acquisition, the Plan had a 150% surplus enabled the Group to continue an employer "contribution holiday" and thus not fund any pension accrual from acquisition until 2002, by which time the Plan had fallen into deficit.  This was of benefit to the Group, in terms of funds that were freed for the benefit of other entities in the Group, but correspondingly disadvantaged the Plan.

- 28 -