8315059

90.    Following the acquisition in 1991, NNUK went on to become the largest business of the Nortel Group's EMEA entities and was the headquarters for the EMEA region.  Its senior management team in Maidenhead operated as the senior management team for EMEA.  EMEA was one of Nortel's main geographical operating regions and represented an important market for the Group.  NNUK's designated role in relation to the EMEA companies included the provision of management, goods (tangible and intangible) and services, including financial support. NNUK maintained overall responsibility for EMEA sales, finance, human resources, legal matters, and customer support, albeit at the direction of the Group.  All the operations of the EMEA entities, including Nortel Networks SA ("NNSA") and Nortel Networks (Ireland) Limited,  were managed on a day-to-day basis from Maidenhead.  After 1991, NNUK generated the most business in the EMEA region.

### iii.    NNUK's Contribution To Research And Development

91.    R&D was essential to the Nortel Group's business. The acquisition of STC gave Nortel R&D staff in the U.K. as well as laboratories and engineering teams with 30 years' experience in the field of telecommunications and technology and engineering of the highest quality, in particular in the field of fiber-optic transmission.  On the basis of the work carried out by STC and its successor Nortel companies in the U.K. in the area of optical transmission products, Nortel was able to expand its existing markets and enter new markets around the world in the optical networking business.

92.    NNUK's engineers contributed to international bodies setting industry standards such as the International Telecommunications Union ("ITU"), ANSI, and ETSI.  As a result, NNUK was well placed to know which technologies were gaining favor within the standards setting community, for example, in products such as ATM transmission and Synchronous Digital Hierarchy transmission. This resulted in "first mover" advantage, *i.e.*, where competitor

8315059

companies have to comply with that industry standard and adopt Nortel's technologies and norms in order to do so. This meant that the Nortel Group was able to move more swiftly into the market, since its products were already compatible with the industry standards.

93.    Nortel made NNUK's Maidenhead R&D site in the U.K. one of the Group's ten "Centers of Excellence." Along with NNL, NNUK was one of the two Nortel Group entities that contributed, proportionate to the size of its business, the most to R&D activity. NNUK's R&D contributed in at least the following seven key areas: (1) optical transmission; (2) adaptation of products from North American to other technical standards; (3) next generation networks; (4) media gateways; (5) wireless; (6) Centrex IP; and (7) provider backbone transport.

a.    *Optical Transmission*

94.    Beginning in the late 1980s, STC was one of the world's leading suppliers of fiber-optic cables. After the acquisition of the remaining part of STC in 1991, Nortel gained STC's expertise and used it to produce technologies and products that allowed the Nortel Group to expand in its existing markets and enter new markets around the world.

95.    NNUK employees worked on optical transmissions systems and products beginning in 1991, and the technologies they produced allowed the Nortel Group's global optical business to enjoy significant success in the 1990s. The revenue from the Group's optical business increased from approximately US$500 million per year in the early 1990s to approximately US$10 billion per year by the end of the 1990s. By 2003, with the assistance of NNUK, the Nortel Group was a leading provider of optical networking products to service providers and enterprises in the global market, and a significant portion of the Group's optical revenues were earned in the U.S. market.

8315059

### b.    *Adaptation of DMS*

96.    Nortel's Digital Multiplex System ("DMS") portfolio is a family of switches that control the routing of telephone calls, delivering local and long distance voice services for telecommunications operators.  The business was originally developed in North America.  To sell DMS products worldwide, however, DMS needed to be converted to other international standards, such as the European ETSI standards.

97.    NNUK played a crucial role in converting DMS products from ANSI to ETSI standards.  NNUK also developed new software that enabled Nortel to reduce dramatically the cost of introducing the switches to individual countries.

98.    Converting DMS to the ETSI standard both opened new markets to the Nortel Group, particularly in Europe, and also allowed the Nortel Group to retain existing customers in the United States and Canada who were expanding their businesses outside of North America.

99.    The expansion into European markets was of particular benefit to NN CALA, because the CALA region used European ETSI standards.  STC's technology and customer-base helped develop Nortel's presence in the CALA market and win customers for NN CALA such as Cable & Wireless.  Products supplied by NN CALA originated in EMEA (predominantly from NNUK) or had been adapted there.  NNUK's supply hub at Monkstown supplied products to customers in CALA.  Further, NNUK provided switching adaptations that were used by NN CALA in the CALA region: for example, Nortel won a major wireless contract in 1997-98 with Bell South in the CALA region.  This involved the full build of a Bell South network, resulting in revenue of approximately US$300-400 million.  A string of signaling adaptations was required for the project, all based upon ETSI adaptations carried out in Maidenhead.

100.    Additionally, NNUK's conversion of Nortel's DMS portfolio of switches from North American ANSI standards to European ETSI standards during the 1990s enabled the

8315059

Group to retain important U.S. customers who wanted to expand beyond the North American market, such as WorldCom, Nynex, Qwest, Global Crossing, Level 3 Communications, Bell Cablemedia, Carrier One, Sprint and GTE. For example, in 1998, WorldCom, a customer in the United States, wanted to expand its business into the European market. NNUK supported this expansion by adapting the Nortel Group's DMS switch to ETSI standards for WorldCom. In order to be able to win the contract to supply WorldCom in Europe, the NNUK R&D department performed substantial work at a loss, as part of Nortel's internal "friends and family" policy. Because no profit margin existed on switches, NNUK was unable to recover the adaption costs from any future sales. The estimated cost to NNUK and European Nortel entities was US$17 million.

### c.    *Next Generation Networks*

101.    Next Generation Networks ("NGN") refers to a technology, known as "packet" technology, which replaced the previous generation of "circuit" based technology. Using circuit based technology, a fixed amount of resources is secured between two communicating points for the duration of a telephone call. Circuits were originally designed only for voice communication. They restrict the transmission of other media and are a severe waste of resources for tasks such as web browsing.

102.    "Packet" technology puts the information in packets that can be routed individually through a system, removing the need to keep circuits open in order to communicate.

103.    NGN refers to various products and technologies, including: the CS2000 softswitch that NNUK developed as the successor to the DMS, which allowed the routing of transmissions through a network; the concept of phantom trunking, patented by engineers at NNUK's laboratories in Harlow and Maidenhead around 1997; the concept of call servers using switched network signaling, jointly patented by NNUK's engineers in Maidenhead and Harlow;

8315059

and the application-specific integrated circuits ("ASIC") silicon devices invented and patented by NNUK engineer Simon Brueckheimer and his team in Harlow.

104.    These technologies played a significant role in both generating revenue for the Nortel Group and assisting in customer retention. The ASIC silicon devices formed essential parts of the Nortel Group's Media Gateways, which allowed products that had been sold for circuit based systems to be converted to packet based transmission without expensive changes of hardware. This product supported Nortel's U.S. market, served by NNI.

105.    CS2000 began as a development by NNUK engineers and used various concepts devised by NNUK employees. CS2000 generated vast revenue for the Nortel Group and was particularly successful in the U.S. The CS2000 was a major product sold by Nortel's "CVAS" business (58% of whose revenue was generated in North America in 2008). CS2000 was widely used by Verizon in the U.S.; other U.S. customers of CS2000 included AT&T, Cable One US and Adelphia Communications Corporation. During the 2000s, Nortel was consistently ranked as the number one global softswitch provider, and as of 2009, it was the dominant softswitch supplier in North America, with 61% revenue market share. By 2002, Nortel was Verizon's largest softswitch vendor, and CS2000 was the backbone of Verizon's U.S. nationwide packet network. The CS2000 softswitch was supported by a further class of products known as Media Gateways, also developed by NNUK.

### d.    *Media Gateways*

106.    Routing of transmissions through a network required, in addition to softswitches like the CS2000, Media Gateways, which provide the "switching fabric" for the switch to operate. This fabric refers to the connection that a Media Gateway provides between old circuit based networks and new packet based networks.

8315059

107.    The early Media Gateways relied on silicon chip designs invented by engineers in the Harlow labs in the mid-1990s. These gateways were known as MG4000 and Passport Voice Gateway. The gateways allowed the Nortel Group to offer customers the ability to retain existing hardware and networks, but benefit from the improved use of resources that packet based networks provided. Over the next decade, NNUK's R&D remained critical to the development of the Passport product line.

108.    NNUK developed the ETSI interfaces and ATM interfaces that formed part of every Passport product sold by the Nortel Group, including NNI and NN CALA. For example, in March 1999, the Nortel Group released version 1.0 of the Passport 8780 in North America. NNUK developed the ETSI interfaces that were released in version 1.2 of the Passport 8780 in the fall of 1999.

109.    Further, NNUK's ASIC silicon device, forming part of Nortel's Media Gateways, were critical to NNI's engagement with AT&T in 1997 and several other major U.S. carriers, including WorldCom, Southwestern Bell Corporation, Sprint, and Verizon.

110.    In addition, the NNUK laboratory at Harlow contributed significant research to a patented method for delineating cell boundaries when packets of data are transmitted over ATM networks, which are packet-based networks. This patented method is used by every ATM interface. ATM interfaces developed at Harlow likely formed part of every Passport 7000 product sold by the Nortel Group.

### e.    *Wireless*

111.    NNUK's R&D department offered a number of significant contributions to the Nortel Group's wireless products. First, beginning in 1997, the Nortel Group offered a variety of products for the Global System for Mobile communication ("GSM") networks, which was a second-generation technological standard for mobile phone systems. GSM became the world's

8315059

most popular standard for such systems. NNUK was entirely responsible for the part of the GSM network called a Home Location Register ("HLR"). An HLR identifies the location of users when they access the network and ensures appropriate call routing across the network. A team of approximately 60 employees at NNUK's facility in Maidenhead worked on the technology. It was impossible to build a GSM network without an HLR.

112. Nortel expanded into the GSM market in the United States, largely because of NNUK's R&D and assistance from NNUK personnel in developing customer relationships. In particular, Simon Brueckheimer, head of NNUK's R&D department, was selected to take the lead on bids to AT&T in or around 1997. AT&T was an NNI customer which, at the time, had no market presence outside of the United States.

113. This expansion enabled NNI to become one of the main suppliers of GSM in North America, selling to major U.S. customers such as AT&T as well as Bell South, Omnipoint, T-Mobile, Cingular and Nextel. By the late 1990s, Nortel had won 34% of the GSM market in the U.S. Together with its successor technology UMTS, GSM was earning Nortel annual revenues in the U.S. of between US$1 billion and US$2 billion by the early 2000s. By 2009, GSM and UMTS had gained approximately 50% of the market in the United States.

114. NNUK's R&D teams also worked on disaster recovery solutions for HLR products. These products allowed a second HLR to take over if a network's primary HLR failed, avoiding the loss of operational ability in the network. Following the September 11, 2001 terrorist attacks, this became a very popular product and was a technology only offered by the Nortel Group and Ericsson.

115. A second wireless technology that NNUK played a key role in developing was a product known as Agile Communications Environment ("ACE"). It was developed in the NNUK

8315059

laboratories between 2004 and 2008 and is a type of "middleware" that bridges the gap between telephony and desktop IT domains.

116.    NNUK's engineers at Harlow, led by Andy Jeffries, developed smart antenna technology for both the GSM and the North American standard, IS-136.  The smart antenna technology included the adaptive antenna beam selection ("AABS") smart antenna, which formed part of the Nortel Group's Code Division Multiple Access ("CDMA") portfolio, which was primarily sold in North America.  In 2006, the Nortel Group did work for Sprint, a U.S. customer, that doubled the capacity of Sprint's base stations.  Jeffries was also instrumental in developing NNI's relationship with its major customer, Verizon, regarding smart antenna technology, as he was in developing NNI's relationship with other U.S. customers, including AT&T, Clearwire, TMO USA, and Sprint/Nextel.

117.    NNUK's facilities in Maidenhead also worked on switching adaptations that were used to grow the Nortel Group's wireless business globally, including in the CALA region, served by NN CALA.

### f.    Centrex IP

118.    Centrex IP is an internet-based system that performs the function of a private telephone or telecommunications exchange for large business customers.  It connects to an existing DMS100 or CS2000 softswitch using an IP address so that a user can be anywhere in the world and still connect to their own telephone line and into the private exchange.

119.    Centrex IP was developed exclusively in Maidenhead between 1996 and 1997.  It reached market in 1999/2000 and has been sold in the United States and around the world.  Key customers in the United States include Bank of America, First Data, Bell South, Tellus, and the United States federal government, including the Secret Service and at least one U.S. Air Force base.

8315059

### g.    *Provider Backbone Transport*

120.    Provider Backbone Transport ("PBT") allows ethernet networks to reserve end-to-end connections between two points in the network, enabling voice and other quality-sensitive content to be conveyed over an ethernet.  PBT was invented in 2006 by three NNUK employees and one Nortel employee in Canada.   Nortel successfully bid on a number of PBT Metro Ethernet contracts with large U.S. customers, including Frontier (one of the U.S.'s largest rural communications providers) and Verizon.

### iv.    NNUK Produced A High Volume Of Patents For The Nortel Group

121.    In an R&D driven industry like telecommunications, patents are critical in protecting and generating revenues.  Patents are the primary mechanism for protecting intellectual capital.  By obtaining key patents on a product or technology, a company can prevent others from moving into that market space quickly, thereby preserving its revenue stream.  It can also generate revenue by licensing the patented technology to other companies.

122.    NNUK employees filed a disproportionately high number of patents compared to other RPEs such as NNL or NNI.  In terms of the volume of patents generated, both the Harlow and Maidenhead Laboratories in the U.K. were significant contributors to Nortel's patent portfolio from the early 1990s, with substantially more patents "per head" than the Canadian and U.S. laboratories.

123.    While patents serve many useful purposes, the process of obtaining patents is a long and expensive one that typically takes 5-6 years from submission to filing.

124.    The Nortel Group encouraged its employees and R&D teams to obtain patents. STC's laboratories in Harlow had an excellent history of obtaining patents, and this continued after the acquisition of STC by the Nortel Group.  Both the Harlow and Maidenhead laboratories were significant contributors to Nortel's patent portfolio from the early 1990s.

8315059

125.    Many of the patents obtained by NNUK were U.S. patents that directly benefitted NNI and NN CALA because of their relevance to the markets served by those entities.  Between 2003 and 2008, 341 of the 747 patents obtained by NNUK were United States patents.

**v.    NNUK's Contribution To Global Sales And Marketing**

126.    NNUK had a substantial sales and marketing function which worked for the benefit of the Group.

127.    A number of global customer accounts were managed by NNUK employees from the U.K.  For these customers, NNUK staff managed the customer relationship not only for dealings and sales in the U.K. or EMEA, but worldwide.  Examples of these global customers are BT, Cable & Wireless and Vodafone.

128.    In particular, NNUK provided important management services to NN CALA, including assistance in managing accounts and relationships with major customers in the CALA region who were headquartered in Europe (*e.g.*, Cable & Wireless and Telefonica).

129.    NNUK was also a major contributor to training of customers (as well as of Nortel staff) which helped develop the market for Nortel products.

130.    Certain NNUK employees held senior operational positions and played an important role in the global sales and marketing function of the Group, including Malcolm Collins, an employee of NNUK who was based in Raleigh, North Carolina and served as President of the Enterprise Networks business segment from late 2002 to 2005.

131.    NNUK's sales and marketing efforts were not for its own benefit but were for the Group generally.  That is because customer contracts were not allocated to the legal entity that won the business and, in any event, the transfer pricing regime reallocated the profits and losses from any business won.

8315059

### vi.    NNUK's Contribution To Global Corporate Services

132.    NNUK provided extensive corporate services for the benefit of the Group.

133.    NNUK personnel were used by the Group to perform global corporate services at a Group-wide level, including management functions (particularly in relation to EMEA), accounting functions, legal functions and business functions (such as acting as head of a business segment or product line).  Part of the Group's Global Treasury function was operated by NNUK personnel (although Global Treasury and the policies it adopted were ultimately under the joint control of NNC/NNL and NNI; thus NNUK had no real say in the decisions which affected it).

134.    From 1991, NNUK was required to lead and manage the Nortel Group's EMEA region (albeit in accordance with the Group's policies and subject to the control of NNC/NNL and, in relation to tax and treasury matters, of NNI).

### vii.    NNUK's Contribution To Global Operations

135.    The Operations function of the Nortel Group involved manufacturing, delivery of customer orders, supply chain management, procurement, logistics, installation and product support.

136.    NNUK provided a substantial operations function for the benefit of the Group. Part of Nortel's Global Operations function was based in NNUK and NNUK's site at Maidenhead was a combined Technical Support and Global Product support center.

137.    Notably, NNUK operated and ran one of only four Nortel purchasing hubs worldwide (at Monkstown in Northern Ireland) which was used by all EMEA entities as well as other Nortel corporate entities and businesses, such as NN CALA.

138.    NNUK employees were regularly seconded to work elsewhere in the Group, including in the U.S., and NNUK employees held a number of senior global roles.  Certain

8315059

NNUK employees held positions in the global operations of the Nortel Group that provided benefits to all entities with the Nortel Group, including specifically NNI and NN CALA.

> **viii.    Group Funding From The Surplus In The Plan**

139.    As stated above, the Plan enjoyed a 150% funding surplus (assessed on an on-going basis, *i.e.*, assuming future employer contributions and future positive investment returns from return-seeking assets) in 1991 when the Nortel Group acquired NNUK, enabling the Group to continue an employer "contribution holiday." The "contribution holiday" continued until 2002, when it became apparent that the Plan had moved into a significant funding deficit (then calculated at approximately £177 million on an on-going basis).

140.    By allowing the surplus to be depleted in this way, the Group contributed to the deficit existing today. The estimated value of the "contribution holiday" (i.e. the value of the contributions had they been made and remained in the Plan) as at September 30, 2002 was £500 million and, as at January 31, 2012, was £950 million. By contrast, during the period of the "contribution holiday," the members of the Plan paid in approximately £166 million (including the impact of transfers into the Plan) to secure their pensions.

141.    By dictating to NNUK that no employer contributions were paid during the holiday period (and thus depriving the Plan of £950 million worth of contributions), the Nortel Group ensured that the equivalent money was available to it for investment in its business for the benefit of the Group as a whole (and thus for NNI and NN CALA as participants in the Group).

**D.    Transfer Pricing And Residual Profit Entities**

142.    NNUK was not adequately compensated for substantial costs which it incurred in providing its contribution to the Nortel Group as a whole. As a result, what in effect was a material underpayment to NNUK benefitted the Group as a whole, and NNI and NN CALA specifically.

8315059

143.    As a result of the extensive corporate activity undertaken by NNUK since 1991

for the benefit of the Group, as outlined above, NNUK incurred high levels of costs.  But due to

the "line of business" structure and the transfer pricing arrangements imposed on it by the Group,

NNUK was unable to control either its own costs or its own earnings and profitability. It was, in

effect, entirely dependent on the Group to provide it with sufficient remuneration to enable it to

meet the costs (including pension costs) which it was incurring for the benefit of the Group.

144.    The transfer pricing arrangements determined the ultimate profitability and

financial position of all wholly-owned Group companies, including NNUK, NNI and NN CALA.

The arrangements controlled how much the various Nortel entities paid and were paid for goods

and services supplied among Nortel Group members.  Under the RPSM, the arrangements also

allocated certain profits and losses among the Nortel RPEs.  Critically, the funds available to

NNUK for uses such as funding the Plan (and avoiding the build-up of a deficit) were determined

primarily by the transfer pricing arrangements, rather than representing either the surplus

available to it from its own operations, or bearing any connection to NNUK's individual

profitability as a company.

145.    The transfer pricing systems adopted by the Group were inequitable – in design

and implementation – in certain important respects, with the result that NNUK was under-

remunerated for the high level of costs it was incurring.  In particular, certain significant costs

were understated or left wholly outside of the transfer pricing arrangements, as described below.

Thus, NNUK was not properly compensated for its contribution to the Group.  The flaws in the

system worked to the financial detriment of NNUK, but were disproportionately advantageous to

NNI, resulting in the present disparity of outcome in insolvency where NNUK's anticipated

creditor returns are much lower than those of NNI.  NN CALA was also unduly favorably treated

under the transfer pricing system.

8315059

146.    Moreover, the Group's cash settlement policies aggravated NNUK's position. The sums due to NNUK under the transfer pricing arrangements were not actually paid in cash but were converted into the interest-free Intercompany Loan, which was then largely discharged in non-cash assets via Project Swift in 2007, thus depriving NNUK of proper payment in cash.

147.    Through its joint control of the Group Tax function, NNI played a significant role in the imposition of the transfer pricing policies. It was also heavily involved in the operation of the Group's cash settlement policy.  NNI has thus substantially contributed to NNUK's current very weak financial position (and by extension to the Plan's inability to make good its funding deficit from NNUK's resources), while securing for itself a disproportionately large share of the Group's resources.

i.    **Brief History Of The Nortel Group's Transfer Pricing Arrangements**

148.    From 1991, when NNUK became wholly-owned by the Group, the Group's transfer pricing arrangements consisted of a series of cost-sharing agreements including (among others) in respect of R&D costs, global tangible inventory property costs, and headquarter costs.

149.    From 1991 to 1995, NNUK was not party to the Group's transfer pricing arrangements at all, meaning that NNUK was burdened with the costs of its R&D while the rest of the Nortel Group reaped the benefits.  On information and belief, although the work performed by NNUK's R&D team was critical at this time to the Nortel Group's expansion within EMEA and North America, and its corresponding increase in profits, none of these R&D costs, which served to benefit the entire Nortel Group, was ever repaid to NNUK.

150.    On information and belief, between January 1, 1995 and January 1, 2001, NNUK was party to a number of cost-sharing agreements, the purpose of which was purportedly to allocate expenses incurred by Nortel entities in (1) R&D; (2) manufacturing; (3) the operation of the Nortel Group's head office; and (4) providing market support groups and product line

8315059

management for the EMEA region.  However, the cost sharing agreements only provided

compensation for the basic costs associated with providing a product or service.  They did not

share profits made elsewhere in the Group, using NNUK's resources.  Furthermore, the cost-

sharing agreements did not fully take into account – or properly compensate for – various

material costs which NNUK incurred, including for example its pension costs.

151.    With effect from January 1, 2001, the Nortel Group's transfer pricing agreement

used the RPSM.  NNI, NNL and NNC made the decision to implement the RPSM and NNUK

was not consulted with respect to, and had no role in, this decision.  To the contrary, it was

presented simply as a *fait accompli* to NNUK.  By the time the RPSM was adopted, the Nortel

Group had been consistently generating losses.  Thus, the effect of the RPSM was that NNUK

had to share in the Group's losses – even though it was not entitled to share in the Group's profits

during the earlier years.

152.    The RPSM was given effect in the MRDA dated December 22, 2004, but that

agreement was made effective from January 1, 2001.  Essentially, the RPSM divided Nortel

entities into RPEs or limited risk entities ("LREs").  NNUK, NNL, NNI, NN France SA, NN

Ireland and, originally, NN Australia were designated as RPEs under the RPSM.  The

distinguishing feature of an RPE was that it performed R&D for the Nortel Group, together with

other core sales, marketing, administrative, and operating functions.  Other entities in the Nortel

Group – the LREs – functioned primarily as sales operations, acting as intermediaries between

the RPEs and customers in jurisdictions not served by the RPEs.  NN CALA was designated as

an LRE.

153.    Broadly speaking, the RPSM divided the participants' pooled profits into two

groups: (1) routine profits based on direct earnings from sales to third parties and certain costs or

capital items; and (2) the "residual" profits or losses, which were attributed to Nortel's intangible

- 43 -

8315059

development work such as R&D. Routine profits were distributed to both RPEs and LREs: LREs were provided with fixed returns on third-party sales, while RPEs were provided with fixed returns on third-party sales and in respect of certain costs or, depending on the applicable period, certain capital items. Only RPEs – such as NNUK and NNI – were then eligible for the Group's residual profits/losses identified by the RPSM. These residual profits/losses were distributed among the RPEs in proportion to their R&D costs as a percentage of Group R&D expenditure. The more that an RPE spent on R&D, the greater the share of the identified profit (or loss) was allocated to it under the transfer pricing arrangements. Thus, in effect RPEs (such as NNUK) were obliged to bear entrepreneurial risk within the Group and to share in the residual losses (since the Group generated losses during the operation of the RPSM), whereas LREs (such as NN CALA) did not share entrepreneurial risk or losses, but were guaranteed fixed returns and profits on the sales activity which the Group allocated to them.

### ii.    Inequities In The Transfer Pricing System

154.    A corporate group's transfer pricing arrangements, in a typical scenario, are meant to reflect the price that would be paid for goods and services if the transactions were arm's-length transactions between independent companies.

155.    None of Nortel's various transfer pricing arrangements adequately compensated NNUK because the costs borne by NNUK, in connection with the services it provided to the Group, were not adequately reflected in those arrangements. They were non-open market transactions, and they failed to replicate arm's-length terms upon which NNUK might reasonably have been expected to provide its goods and services. Had NNUK been an independent company operating its affairs in furtherance of its own financial interests, it would not have agreed to the terms of the Group's transfer pricing arrangements. By way of one obvious example, the MRDA contained express provisions requiring the participants to agree to amend the RPSM to the extent

8315059

necessary to reflect negotiations with the revenue authorities. This purportedly required NNUK to agree to changes which would directly affect its profitability in the light of negotiations between, for example, NNI and the IRS – negotiations over which NNUK had no control.

156.    Following the Group's collapse, the IRS itself challenged aspects of the Group's transfer pricing arrangements, leading to a settlement in which NNL has agreed to a US$2 billion claim by NNI as an adjustment for overpayments relative to NNL made by NNI by way of transfer pricing payments.

157.    There were a number of specific aspects of the transfer pricing arrangements, which operated to NNUK's detriment and to the corresponding benefit of NNI and NN CALA, the most significant of which relate to (a) restructuring costs; and (b) pension costs.

a.    *Restructuring Costs*

158.    In and after 2001, following the dot.com collapse, the Nortel Group commenced a series of restructurings as part of Group-wide efforts to cut costs and improve efficiency. These included major workforce reductions.

159.    A disproportionately large number of job cuts fell on NNUK: for example, in 2000 NNUK had 12,440 employees, representing 13.2% of the Group's global workforce, but by 2007, NNUK only had 2,054 employees representing 8% of the global workforce. Similarly, R&D in the U.K. was cut back severely compared to other parts of the Group.

160.    As a major service provider for the Group, NNUK had a high cost base, which included high overheads and significant employment costs, including pension costs. For that reason, NNUK experienced a particularly high level of restructuring costs during the period 2001-08 relative to its size, namely US$1.065 billion of the US$5.335 billion total restructuring costs borne by the RPEs over this period (*i.e.*, 19.97% of the RPE total). NNUK's restructuring costs included real cash costs to it, such as severance payments to employees and costs for

- 45 -

8315059

redundant premises.  NNUK was required to bear these costs for the benefit of Group's operations as a whole.[5]

161.    The imposition of these costs on NNUK was disproportionate to its size relative to the rest of the Group: for example, based on NNUK's MRDA percentage shares over the 2001 - 2008 period, NNUK should have borne only 7.33% of the total restructuring costs incurred by the RPE's over this period, *i.e.*, less than half of the share of the RPEs' restructuring costs that were actually imposed on NNUK.

162.    In contrast, NNI bore a lower level of costs relative to its share of the business risks of the Group, as measured by the MRDA, namely US$2.644 billion of the RPEs' total US$5.335 billion in restructuring costs (*i.e.*, 49.55% of the RPE total).  Based on NNI's MRDA percentage shares over the 2001-2008 period, NNI should have borne 51.38% (US$2.741billion) of the total restructuring costs over this period instead.

163.    The net effect was that NNUK bore a disproportionate share of the cost of the Group-wide restructurings of the global business during 2001-08, and lessened the cost burden that would otherwise have fallen on NNI.

164.    This disparity was not corrected by the Group's transfer pricing system as restructuring costs were left out of account when calculating the "adjusted" profits or losses for the purposes of Nortel's RPSM transfer pricing arrangements.  The burden of meeting these costs was left with NNUK, and the cash costs had to be paid from its own resources.  This was despite the fact that the MRDA (at least prior to 2006 when it was amended to reflect the practice of the Group Tax function), did not provide for restructuring costs to be excluded from the calculation of residual profits or losses; instead, prior to the 2006 amendment, it appeared that the Group

---

[5]     The figures in this paragraph, and in those that follow in relation to restructuring costs, assume that 100% of relevant restructuring costs for each RPE were cash costs rather than non-cash costs (for example write-downs of intangible assets).

8315059

simply decided to leave these costs out of account as a matter of practice when operating the RPSM.

165.    The failure of the transfer pricing system to correct the disproportionate burden of restructuring costs was the responsibility of the Group Tax function which, as set out above, was jointly controlled by NNI and managed by NNI personnel.  Thus, NNI played a significant role in imposing this disproportionate burden on NNUK.

166.    Had the Group operated fairly, both NNUK and NNI would have borne restructuring costs in proportion to their relative share of the risks and rewards of the Group's business as measured by the MRDA, such that NNUK would have borne lower restructuring costs and NNI higher restructuring costs.

167.    By way of illustration, had NNUK and NNI borne shares of the RPEs' restructuring costs in proportion to their weighted average shares of residual profits/losses under the MRDA in 2001-2008, NNUK would have borne US$391.0 million (7.33%) of the RPEs' restructuring costs (that is, US$674.3 million less than NNUK actually bore) and NNI would have borne US$2.741 billion (51.38%) of such costs (that is, US$97.9 million more than NNI actually bore).

168.    Accordingly, as a result of the disproportionate allocation of the burden of restructuring costs, NNI enjoyed a gain of US$97.9 million at the expense of other RPEs in the Group that bore a greater proportion of restructuring costs than their MRDA share (such as NNUK and NN Australia).  On information and belief, NNUK suffered a loss in respect of the restructuring costs, and NNI realized a corresponding gain at NNUK's expense, of approximately

8315059

US$92.9 million.[6] This represents the amount of the restructuring costs borne by NNUK that should be re-allocated to NNI.

### b.    *Pension Costs*

169.    Pension costs in particular represent a further example of how the transfer pricing system failed in respect of NNUK. NNUK was in effect obliged to incur its pension liabilities and run substantial investment risks within its pension scheme for the benefit of the Group, given that the Plan formed part of the cost of providing benefits for past and present employees who worked for the global Nortel business. Yet the Group failed to ensure that NNUK was allocated sufficient funds under its transfer pricing system to meet the cost of these liabilities and risks.

170.    The transfer pricing arrangements took account of such pension costs as were recorded in NNUK's income and expenditure management accounts, which were prepared under U.S. Generally Accepted Accounting Principles ("U.S. GAAP"). However, under U.S. GAAP, not all pension costs are recorded in a company's income and expenditure account.

171.    U.S. GAAP accounts for pension costs in two ways, first, through a charge to the income and expenditure account and, second, by an adjustment to the company's reserves.

172.    As regards the income and expenditure pension charge, material items include the current on-going service cost, interest cost and management's expected return on assets. Only limited charges appear in the income and expenditure account in respect of increases in the costs of funding the past service liabilities.

173.    As regards the reserve adjustment, this represents the substantial balance of the deficit, from accumulated year-on-year changes to the actual as against expected pension

---

[6]    In addition, NN Australia suffered a loss in respect of the restructuring costs, and NNI realized a corresponding gain at NN Australia's expense, of approximately US$4.9 million.

8315059

liabilities (resulting from, for example, inflation, interest rates, longevity) and assets (resulting from, for example, the difference between actual and expected returns).

174.    Under this system, any increase in the deficit (compared to the assumptions previously made) up to a certain limit (based on the size of the scheme) is accounted for *only in a company's reserves*, and never appears in the income and expenditure account. Furthermore, increases in the deficit in excess of this limit would only gradually be recognized in the income and expenditure account over a period of many years.

175.    These features of U.S. GAAP mean that, for a pension scheme such as the Plan, which had very significant liabilities in respect of past service, the bulk of any increase in the cost of funding the deficit would not be recognized in the transfer pricing model in the short term, but was instead deferred until such time (if at all) as it was required to be recognized in the income and expenditure account. This situation prevailed all of the time after the Plan moved into deficit on the U.S. GAAP basis in 2001/2002.   Nortel's bankruptcy in 2009 meant that such costs never in fact came to be recognized in the income and expenditure account.

176.    The pension costs not recognized at all, together with those to be recognized only over a period of many years, as described above, stood, at the date of the Nortel insolvency, at £782 million, even using the actuarial assumptions applied at that time by Nortel as a Group.

177.    The pension costs incurred by all sponsoring employers of all pension schemes in the Group were accounted for under U.S. GAAP.  Nevertheless, the particular way in which Nortel's transfer pricing system took account of U.S. GAAP pension costs (namely the fact that it only recognized pension costs recorded in the income and expenditure account) operated to NNUK's detriment, given that such a large proportion of the Plan's liabilities related to past service and the pension scheme was large compared with the size of NNUK's on-going business.

8315059

178.    The impact of the exclusion or delayed recognition of increases in the costs of

providing past service benefits under the transfer pricing model was exacerbated because the

assumptions on which NNUK's pension costs were assessed under transfer pricing from 2001

were significantly less prudent than an estimate of NNUK's pension liabilities as assessed on an

"economic cost" basis.  The economic cost basis does not take credit for any asset performance

above that provided by investment in government bonds.   In effect, therefore, it does not rely on

assumed future investment returns to subsidize the cost to an employer of providing pension

benefits.  It also makes realistic assumptions about life expectancy.

179.    The effect of the transfer pricing model only factoring in pension costs recognized

in the income and expenditure account under U.S. GAAP was that, even if the assumptions used

post-2001 became more prudent (or realistic, as investment returns remained depressed), the

increase in past service liabilities resulting from that more prudent estimation would still not have

been fully factored into the transfer pricing model for the reasons set out above.  Furthermore, to

the extent that the assumptions used post-2001 continued to take credit for investment returns that

were not in fact being achieved, the disparity between NNUK's actual pension liabilities and the

amount it was being allocated under transfer pricing to meet those pension liabilities, continued

to widen.

180.    The fact that the transfer pricing model did not take account of the true cost of

NNUK's pension liabilities operated substantially to NNUK's disadvantage because: (a) NNUK

had large pension liabilities relative to the size of its business, so that shortfalls in the estimation

of its pension costs were potentially very significant (compared to other Nortel companies); (b)

NNUK's business was wound down under successive restructurings from 2001 onwards, which

meant that it was not able to bear its actual pension funding costs in the event that those costs

were not covered by the Group's transfer pricing arrangements; and (c) the depletion of the prior

- 50 -

8315059

funding surplus in the Plan, which inured to the benefit of the rest of the Group, meant that by 2001 there was no "safety margin" within the Plan in the event that investment returns from the Plan's assets failed to subsidize the cost of providing benefits.

181.    The combination of this disparity between the significant pension liabilities NNUK was required to fund and the extremely limited degree to which it could share such costs with other Group companies under the transfer pricing system, meant that, at the date of insolvency, the Plan's deficit, assessed on an economic cost basis, was approximately £1.6 billion.  Had the features described above not been present, NNUK would have been able to fund the Plan to a much higher level than it was in fact able to and/or it would now have more assets available to it to satisfy its creditors, including its major creditor, the Plan.

182.    The fact that NNUK was never adequately compensated for its pension liabilities meant that, under the transfer pricing model, sums were allocated and paid to other members of the Nortel Group, including NNI, when they should not have been.  Had the transfer pricing model permitted NNUK to recover its pension costs on a more realistic basis, NNUK would have been substantially better off.  For example, applying average MRDA allocations as per the transfer pricing model, on information and belief, the U.K. Pension Claimants estimate that NNI's share of NNUK's pension costs, calculated on an economic basis, would have been approximately US$867 million greater than it was.  Accordingly, as a result of the operation of the transfer pricing system (which NNI had a hand in designing and implementing), NNI has received a very substantial benefit at NNUK's expense.

c.    *Unduly Favorable Treatment of NN CALA*

183.    NN CALA was largely reliant on NNUK for products, R&D, sales assistance and customer development.  NNUK staff contributed to the success of Nortel in the CALA region and

8315059

helped develop the Group's business there.  This contributed to sales in the CALA region which

were channeled by Nortel through NN CALA.

184.    Under the RPSM, NN CALA, as an LRE, was allocated fixed returns and profits

on costs it incurred.  NN CALA was thus insulated from entrepreneurial risk and enjoyed a

guaranteed profit margin in relation to its sales activity in the CALA region.

185.    In contrast, NNUK had to incur the cost of providing the services that benefited

NN CALA and, rather than profiting under the transfer pricing system, was prejudiced by it in the

ways described above.  Further, the provision of fixed returns to NN CALA increased the

residual losses of the Group, in which NNUK was obliged to share under the RPSM.

186.    Thus, NN CALA has benefited from the efforts of NNUK employees and received

favorable treatment under the Group's transfer pricing system.  Accordingly, the U.K. Pension

Claimants seek a reasonable amount of financial support for the Plan in respect of NN CALA's

receipt of this benefit, in an amount to be determined by the Court.

**E.    Specific Transactions That Operated To The Detriment Of NNUK And To The Benefit of NNI and NN CALA.**

187.     In addition to the benefits that NNUK and its employees provided to the Group

(including NNI and NN CALA) through its efforts, NNUK was also required by the Group to

assist it to manage its cash-flow needs.  In particular, following the dot.com collapse in the early

2000s and the subsequent downgrading of its credit rating, the Nortel Group was increasingly

unable to access capital markets or borrow on competitive terms.  This posed a major difficulty

for the continued operation of the Group.

188.     Accordingly, the Group's management took steps to remit cash to NNC/NNL or

concentrate it in NNI (thus strengthening NNI's position as NNC/NNL's guarantor and making it

easier for them to borrow).  NNI, through the Group Treasury and Group Tax functions which it

8315059

jointly controlled, played a significant role alongside NNC/NNL in designing and implementing these steps, which were imposed on NNUK.

189.    This resulted in NNUK being subjected to certain transactions which were to its financial detriment, in order to meet the cash-flow needs of other parts of the Group.  The transactions were designed (and/or their effect was) to divert or withhold cash from NNUK, and NNI participated in and/or benefited from these transactions, all of which were disadvantageous to NNUK (and the Plan as its major creditor).

190.    The transactions, which had the effect of withholding from NNUK cash to which it was entitled, included (a) NNUK's interest-free loan to NNL, (b) Project Swift, and (c) certain elements of the transfer pricing system adopted by Nortel.  By virtue of these transactions, NNC/NNL succeeded in obtaining funds from entities in the Group other than NNI (such as NNUK).  This was of benefit to NNI because (a) NNI did not have to provide the funds to NNC/NNL itself and (b) it reduced NNC/NNL's third-party borrowing requirements and thus also reduced NNI's exposure as their guarantor.

**i.        NNUK Provided An Interest Free Loan To NNL**

191.    In or around 2003, NNL, assisted by NNI, caused NNUK to make a large, interest-free, loan to NNL.  The loan was necessary because NNL had not paid the inter-company balance that it owed to NNUK as a result of transfer pricing arrangements and intra-Nortel Group transactions.  The amount owing to NNUK under the loan facility continued to increase rapidly, and by late 2007, the principal balance was approximately US$959.0 million (the "Intercompany Loan").  NNL and NNI decided to impose the Intercompany Loan on NNUK in order to withhold cash from NNUK and make it available to NNL, thus satisfying the wider cash-flow needs of the Group but to NNUK's detriment.

- 53 -

8315059

192.    On information and belief, NNI personnel were heavily involved in the decision to impose the Intercompany Loan on NNUK and in fixing its terms. Representatives of NNI in the Group Tax and Group Treasury functions were responsible for formulating and implementing the transaction. On information and belief, the NNI personnel involved included Katharine Stevenson, Ryan Smith and Mark Weisz.

193.    The Intercompany Loan was first documented by a loan agreement in 2003 (signed by Ms Stevenson of NNI) and subsequently restated in various facility agreements. No repayments were made for nearly 4 years and the amount outstanding from NNL to NNUK rose to approximately US$959.0 million by October 2007.

194.    The Intercompany Loan was made on an interest-free basis, even though the MRDA provided that late payment of amounts due under transfer pricing would accrue interest, and even though the U.K. revenue authorities imputed interest charges for tax purposes.

195.    The amount of interest that would have been paid by NNL to NNUK during the terms of the loans, had they not been made on an interest-free basis, would have been, on information and belief, approximately £120.5 million.

196.    On information and belief, during the same period, NNI was also making loans to NNL, but the NNI loans were on an interest-bearing basis and regular cash repayments were made by NNL to NNI.

197.    The Intercompany Loan from NNUK to NNL was plainly disadvantageous to NNUK (and the Plan as its major creditor):

(a)    NNUK's non-trading tax losses were eroded by the imputed interest charges imposed by the U.K. revenue authorities;

(b)    there was no realistic prospect of NNL being able to repay NNUK in cash in the foreseeable future;

- 54 -

8315059

(c)    the financial fortunes of the Nortel Group were worsening, meaning that NNUK was exposed to the risk of being unable to recover payment in full should NNL become insolvent; and

(d)    the consequence of withholding the cash from NNUK was that NNUK would be unable to make larger contributions to the Plan.

198.    Although the loan from NNUK was primarily designed to benefit NNL, it was also of material benefit to NNI.  Had NNUK not lent funds to NNL on advantageous terms, NNI would either:

(a)    have had to lend further amounts to NNL itself; or

(b)    have had to guarantee further borrowing by NNL from third-party lenders at commercial rates.

Either way, given NNL's subsequent insolvency, NNI would now be in a much worse financial position.

199.    Had interest been payable by NNL on its loan from NNUK, NNL would have had less money available to pay interest on its loan from NNI, and NNI would have received reduced (or no) interest.

**ii.    Project Swift**

200.    In late 2007, NNL, assisted by NNI, decided that, for tax reasons, part of the Intercompany Loan should be repaid to NNUK.  In a transaction named "Project Swift," NNL repaid part of the loan by transferring to NNUK all of the outstanding shares of NNL's Dutch subsidiary Nortel Networks International Finance & Holding BV ("NNIFH").  NNIFH, a holding company, owned all of the outstanding shares in each of the EMEA companies except NN France SA and NN Ireland, which were wholly or largely owned by NNL.

8315059

201.    Project Swift was entered into between NNL and NNUK on or about December 21, 2007.  Pursuant to its terms:

(a)    NNUK acquired the share capital of NNIFH from NNL; and

(b)    in return for the acquisition, NNUK discharged £327.6 million (approximately US$628.9 million at the then applicable exchange rate) of NNL's indebtedness under the US$959.0 million Intercompany Loan.

202.    The transaction was approved at a meeting of the NNUK Board on December 20, 2007.

203.    On information and belief, although the transaction was "approved" at a meeting of the NNUK Board, Project Swift was imposed on NNUK by NNC/NNL, assisted by NNI, as a way of continuing to withhold cash from NNUK.  As with the interest-free loan, representatives of NNI in the Group Tax and Group Treasury functions were responsible for designing and implementing Project Swift and were closely involved in the valuation of the EMEA subsidiaries. On information and belief, the NNI personnel involved included Paul Karr, William LaSalle, Ryan Smith and Mark Weisz.

204.    NNUK had no realistic option but to enter into Project Swift.  As a result of the imputed interest charges imposed by the U.K. revenue authorities, on information and belief, the annual tax expense to NNUK was approximately US$20 million, which eroded NNUK's non-trading tax losses resulting in a cash cost to NNUK.  NNL was unwilling and/or unable to repay the interest-free loan or to pay a proper rate of interest on it, but leaving the loan outstanding was no longer feasible as it would cost NNUK cash due to the annual tax charge.  Moreover, as a Group entity, NNUK was in practice obliged to comply with the requirements of Group Tax and Group Treasury (which were jointly controlled by NNI), which supported Project Swift.  In the

8315059

circumstances, there was little else that NNUK could do but enter into Project Swift to reduce the amount of NNL's indebtedness.

205.    Project Swift was plainly disadvantageous to NNUK (and the Plan as its major creditor):

(a)      the EMEA subsidiaries it acquired by reason of the transaction were illiquid assets;

(b)      as the EMEA subsidiaries were an integral part of the Group, NNUK could not sell them to raise cash (indeed, selling them would have broken up Nortel's European distribution network), so it could not actually raise funds from them or realize any value they might actually have had;

(c)      accordingly, the Project Swift transaction did not make NNUK any better able to pay contributions to the Plan to meet the then increasing funding deficit;

(d)      although the true value of the Project Swift subsidiaries is at present unclear, on any view their value in an insolvency situation was significantly less than US$628.9 million;

(e)      at the time of Project Swift, the Nortel Group was in serious financial difficulty;

(f)      NNUK (and by extension the Plan as its major creditor) would have been better off if NNL had repaid its interest-free loan in cash in 2007 as it should  have done; and

(g)      even if the Project Swift subsidiaries had been worth US$628.9 million (which is denied), £113.0 million of NNL's indebtedness under the interest-free loan remained outstanding upon NNL's entry into insolvency proceedings in January 2009.